# EXHIBIT 17

---

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In Re:                          Chapter 11
W.R. Grace & CO., et al,        Case No. 01-01139 (JFK)
                Debtors.

VIDEOTAPED DEPOSITION OF ALAN C. WHITEHOUSE, M.D.

Deposition upon oral examination of ALAN C. WHITEHOUSE, M.D., taken at the request of the Debtors, before Osmund D. Miller, a Notary Public, RPR, CCR No. 2280, at the offices of Storey and Miller Court Reporters, 717 West Sprague Avenue, Suite 1520, Spokane, Washington, commencing at or about 9:00 a.m., on October 18, 2007 pursuant to the Federal Rules of Civil Procedure.

---

Page 2

```
 1                  APPEARANCES
 2
 3   FOR THE CLAIMANTS:
                   MCGARVEY, HEBERLING, SULLIVAN &
 4                 MCGARVEY, P.C.
                   By:  Jon L. Heberling
 5                 Attorney at Law
                   745 South Main
 6                 Kalispell, Montana
 7   FOR W.R. Grace:
                   KIRKLAND & ELLIS LLP
 8                 By:  Barbara Harding
                   Attorney at Law
 9                 655 Fifteenth Street, N.W.
                   Washington, D.C. 20005
10                      And
                   Scott A. McMillin
11                 Attorney at Law
                   200 East Randolph Drive
12                 Chicago, Illinois 60601
                        And
13                 DORIS MCCHINSKI
14   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS:
                   Arlene Krieger
15
     FOR THE PROPERTY DAMAGE COMMITTEE:
16                 Matt Kramer
17   FOR THE FUTURE CLAIMANTS REPRESENTATIVE:
                   Emily Somers
18
     FOR THE U.S. ATTORNEY STATE OF MONTANA:
19                 Kris McLean
20   FOR THE EPA'S CRIMINAL DIVISION:
                   Robert Marsden
21
22
23
24
25
```

---

Page 3

```
 1            THIS IS A CONFIDENTIAL DEPOSITION
 2
 3        (Ex. Nos. 1 through 4, marked.)
 4        VIDEOGRAPHER:  My name is Bonnie Hamada, NCRA Certified
 5   Legal Videographer of LVS Productions.  I am the videographer
 6   in the pending matter.  It is Thursday, October 18, 2007.
 7   The time is now 9:11 a.m.  We are at the office of Storey &
 8   Miller, 717 West Sprague Avenue, 15th Floor, Spokane,
 9   Washington.
10        We are here to take the deposition both stenographically
11   and by videotape of Dr. Alan Whitehouse, M.D., filed in the
12   U.S. Bankruptcy Court, District of Delaware, Case Number
13   01-01139 JFK, entitled, W.R. Grace & Co., et al.
14        Notice of this videotaped deposition was given by Barbara
15   Harding.
16        Would Counsel please now voice identify yourself and whom
17   you represent.
18        MR. HEBERLING:  John Heberling for the Libby Claimants.
19        MS. HARDING:  Barbara Harding on behalf of W.R. Grace.
20        MR. MCMILLIN:  Scott McMillin also on behalf of W.R.
21   Grace.
22        MS. MCCHINSKI:  Doris McChinski on behalf of W.R. Grace.
23        MS. KRIEGER:  Arlene Krieger on behalf of the Official
24   Committee of Unsecured Creditors.
25        MR. KRAMER:  Matt Kramer on behalf of the Property Damage
```

---

Page 4

```
 1   Committee.
 2        MS. SOMERS:  Emily Somers on behalf of Future Claimants
 3   Representative.
 4        MR. MCLEAN:  Kris McLean.  I am an Assistant United
 5   States Attorney for Montana.
 6        MR. MARSDEN:  Robert Marsden, I am a special agent with
 7   EPA's criminal division.
 8        VIDEOGRAPHER:  Present to make the official record of the
 9   proceeding is a Certified Court Reporter, Osmund D. Miller of
10   Storey and Miller, who will now swear the witness.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

1           ALAN WHITEHOUSE, M.D.
        called as a witness at the request of
2         the W.R. Grace, having been first duly
        sworn according to law, did testify as
3         follows herein:

4     MS. HARDING:  Mr. Heberling, I believe you have some new

5 materials you want to produce, and we will put those on the

6 record.

7     MR. HEBERLING:  Okay.  As discussed, the first thing we

8 brought is a large plastic box with charts used in the study

9 of 123 patients.  The box is in somewhat disarray.  The

10 charts are no longer in number order.  So we can't assure

11 that 123 are there.  Dr. Haber was the last person to work

12 with the charts at Libby Clinic -- excuse me, the CARD Clinic

13 in Libby.  So it's my understanding we will take that box to

14 a copy shop today, and the one copy will be made for

15 W.R. Grace, and Dr. Whitehouse will retain the originals.

16     MS. HARDING:  Okay.

17     MR. HEBERLING:  Then Exhibit 2 is a CD marked Original

18 Spreadsheet.  A couple weeks ago, we sent you, Barbara

19 Harding, an e-mail attaching the original numbers used in the

20 study of 123 patients.  This CD contains those same original

21 numbers, plus three or four spreadsheets where the individual

22 pulmonary function tests are analyzed, and there is a

23 statistical table.  So, for completeness, we have submitted

24 this Exhibit 2.

25     Exhibit 3 is a listing of body mass index values for, I

---

Page 6

1 believe, 123 patients.  This was found in a computer record

2 at the CARD Clinic.  For what it's worth, we are bringing it

3 in and it's marked as Exhibit 3.

4     And Exhibit 4 is another computer listing, probably also

5 from this computer record at the CARD Clinic.  This has been

6 recently found, and it is basically notes of the readings of

7 the 123 x-rays by Dr. Teel and Dr. Whitehouse for the

8 Whitehouse 2004 paper.

9     MS. HARDING:  Okay.  And per our previous agreement, as I

10 understand it, these are additional reliance materials for

11 Dr. Whitehouse in this case.  And you have agreed to

12 possibly, if necessary, allow Dr. Whitehouse to sit for

13 further deposition in connection with these materials, as

14 well as the documents, to the extent that's necessary?

15     MR. HEBERLING:  That's correct.  And limited to those

16 materials.

17             EXAMINATION

18 BY MS. HARDING:

19 Q.  Dr. Whitehouse, in front of you -- excuse me.  Good

20 morning.  I am Barbara Harding with W.R. Grace.

21     In front of you is the expert report that you submitted

22 in this case, dated July 23, 2007.  Do you recognize that?

23 A.  Yes, I do.

24 Q.  Would this report contain -- with the exception of the

25 rebuttal reports that you have also submitted, does this

---

Page 7

1 contain your most current up-to-date summary of the opinions

2 that you intend to express in this case?

3 A.  I believe so, yes.

4 Q.  The reason I ask is because you have two prior reports,

5 one in October and one in June.  But as I read this report,

6 it appears to embody all of the previous opinions that you

7 had, with additional information and some modifications.  Is

8 that right?

9 A.  That's correct.

10 Q.  So that it's fair, in terms of understanding and asking

11 you questions about your opinions in this case, that I should

12 refer to the July 23rd, 2007 report.  Is that right?

13 A.  That's correct.

14 Q.  The other thing I think I ought to state on the record,

15 I will be asking you some questions today about some medical

16 records that were produced pursuant to various court orders

17 in this case, as well as the case -- the Montana criminal

18 case, and there is one order, at least some of the records

19 are to be maintained confidentially.  So we will mark this

20 deposition confidential so we make sure we are all in

21 compliance with the order.  I would like to make sure the

22 record is clear on that.

23     I would like to ask you about Exhibit 3, first, in your

24 report.  If you could turn to Exhibit 3.  It's toward the

25 end.

---

Page 8

1 A.  Where would I find that in here?

2 Q.  I think it's about two thirds of the way through.  It's

3 not a page number because it's not attached at the end.

4 A.  It's not marked as an exhibit on here, as far as anything

5 that I can see.

6 Q.  At the bottom right corner, most of the exhibits start

7 with an exhibit number.

8 A.  Here we are.  I found it.  I think I found it.

9 Q.  And how was the group of people that's identified in this

10 exhibit -- how were they identified?

11 A.  Hang on.  I don't have three yet.  I am still working to

12 find it.  This must be it because that's four.  Okay, now I

13 have it.  Go ahead.  Repeat the question.

14 Q.  Sure.  How was the group of people identified, the group

15 of people that are set out in this exhibit, which is 12 pages

16 long, how were they identified?

17 A.  Okay.  Now, this is people that I had in that database

18 that you have.  Is that where this list came from?

19 Q.  That's what I am asking you.  I am asking you -- I don't

20 know.  My question to you is, how was this list compiled?

21 A.  Well, I mean, I recognize all the names, and I think

22 that's where it came from, but, unfortunately, this was not

23 my compilation.

24 Q.  So Exhibit 3 is not a list that you compiled?

25 A.  It may very well be the list, but it's not the way that I

WR GRACE BANKRUPTCY    ALAN C WHITEHOUSE M.D.    October 18, 2007

Page 9

1  had put it together in my computer.  So it's hard for me to
2  recognize exactly, you know, whether it's the same list or
3  not.  I think it probably is, because I recognize most of the
4  names here.
5  Q.   Well, if you didn't compile the list, who did?
6  A.   I am not certain whether you -- because you had a disk, a
7  computer disk that was given to you -- or was given to
8  Mr. McLean, I know, and I think Mr. Heberling had it also --
9  that had a database of about 500-some odd patients on it, and
10  I think that that's what this represents.  Although, I don't
11  know for sure because I don't recognize it when I compare
12  that with what I know of my database looked like.
13       So this is obviously something that was printed -- it may
14  have been printed off of this.
15  Q.   Well, this is a list that is attached as an exhibit to
16  your expert report as material upon which you rely in
17  formulating your opinions, correct?
18  A.   Okay.
19  Q.   My question --
20  A.   At the time I wrote this I didn't --
21  Q.   I want to finish my question.
22  A.   I am sorry.
23  Q.   That's okay.  I am trying to understand if it's an
24  exhibit that you are relying on for your opinions in this
25  case.  I am trying to understand, who prepared it?

---

WR GRACE BANKRUPTCY    ALAN C WHITEHOUSE M.D.    October 18, 2007

Page 10

1  A.   I think that this is probably a printed off copy.  It may
2  have been Mr. Heberling that did this, made the copy of this.
3  When I have reviewed my report, I did not see this attached
4  to it, this particular one.  It looks to me like the list of
5  the 500 or so patients that I had seen in my office in
6  Spokane that I had been keeping a database on.
7  Q.   Okay.
8  A.   So I think that's probably what it is.  Although, the way
9  it's printed is different than the way I had printed out
10  previously when I used it for my own computer, if you
11  understand what I mean.
12       MR. HEBERLING:  Counsel, you might refer to the place in
13  his report where the exhibit is referenced.
14       MS. HARDING:  I will ask my question, John.  I object to
15  the -- if you have an objection, that's fine.
16  Q.   (BY MS. HARDING)  Are the people on this list in
17  Exhibit 3, are they all patients of yours?
18  A.   Yes, they are.  They are all patients that I have seen,
19  and that, for the most part, I think are patients at the
20  CARD Clinic in Libby.
21  Q.   And are they all -- the categories at the top says, last
22  name, first name, birth, diagnosis date and "ex cat."  I
23  believe that means, exposure category.  Is that right?
24  A.   Right.
25  Q.   Are these categories that you have set up in an Excel

---

WR GRACE BANKRUPTCY    ALAN C WHITEHOUSE M.D.    October 18, 2007

Page 11

1  spreadsheet in your office?  Is that right?
2  A.   I set it up in my own -- basically, in my home computer
3  that I utilize both in Libby and at home that identifies
4  whether there are environmental exposures, they're family of
5  Grace workers, or whether they were people that were working
6  for W.R. Grace.
7       And in this particular one, if you go through this, you
8  see it has community and family member, and community,
9  basically, is equivalent to the environmental category I have
10  in my computer records.
11       And then the last is listed as worker, which is people
12  that had worked for W.R. Grace, mostly miners.
13  Q.   So the determination of whether somebody on the list was
14  placed into a category of community, family member or worker,
15  was something that you made on the -- in the records in your
16  Excel spreadsheet; is that right?
17  A.   Yes.
18  Q.   The top of the -- the title of it is, Client Sort By
19  Exposure.  Do you see that?
20  A.   Yes.
21  Q.   When it says "client," are those -- does that mean
22  clients of yours, or are those clients of Mr. Heberling?
23  A.   Those are clients of Mr. Heberling's.  In my own database
24  has people in it that were not his clients at all.  So I have
25  got -- it's a mix of his clients and other patients that I

---

WR GRACE BANKRUPTCY    ALAN C WHITEHOUSE M.D.    October 18, 2007

Page 12

1  have seen over the years, and that database, in particular,
2  was started very early on.
3       And there are people in this -- I think, in this client
4  sort here, that are not people that I have ever scene.  There
5  is a few of them I have never seen, looking through here a
6  little bit, and I think -- and this list, I suspect, is --
7  was put together in order to list all of the clients.  There
8  is so much crossover there, I have to look to find out,
9  sometimes, whether it's a patient of mine that has never --
10  that's not a client of Mr. Heberling's or Mr. Lewis or
11  anybody else.  Do you understand?
12  Q.   Yes.  So, actually, I think you previously said that the
13  people on the list were all your patients, but you are saying
14  they are not all your patients?
15  A.   They may not all be.  In fact, I looked through here and
16  there is at least one name I don't recognize.  And the way
17  it's been put together makes me think it's their total client
18  list.
19  Q.   It's the Heberling --
20  A.   I would have to look back in the report as to how that
21  reads, because I haven't looked at that particular part of it
22  very carefully recently.
23  Q.   On what basis are you relying upon this exhibit for your
24  opinions in this case?
25  A.   Oh, this -- I am relying on this because the vast

Page 13

1    majority of these people are people that I have personally
2    seen and have taken care of in my office, here or at the CARD
3    Clinic.
4    Q.   But there are people on the list that you have not seen?
5    A.   I think there are.  And I -- let me go back to the
6    original point on here where it's referenced in the original
7    report.  Let me look at that for just a moment.
8    Q.   Sure.
9    A.   Can you tell me what page that is?
10   Q.   I don't have that written here, I don't think.
11        MR. HEBERLING:  Page 13, Paragraph 31.
12        THE WITNESS:  These are the Libby claimants from his
13   office, from Mr. Heberling's office, and the majority of
14   those are people that I have seen, and there are a -- a few
15   in here that I have not, but very few.
16   Q.   Do you know how many patients on the list that are not
17   patients of yours?
18   A.   The exact number?  I don't believe so, unless I reference
19   them, or we reference them, in this thing.  And I don't think
20   we did.  No.  I don't know the exact number.
21   Q.   So, was this list derived from a computer program in
22   Mr. Heberling's office or a computer program in your office?
23   A.   No.  This was this from a computer program in his office.
24   I got confused when you first brought this up because I
25   thought this was a re-copy of my database that you have a

Page 14

1    copy of, of the 500 or so patients that I have seen, and
2    there are some of those that are not on this list, and there
3    are some on this list that are not in my database.
4    Q.   As I understand it, in this litigation, you produced
5    paper copies of the records of the patients in your database,
6    but W.R. Grace has not been provided a copy of the database,
7    correct?
8    A.   No.  I believe they do have a copy of the database.  I
9    know they have a copy of it because it was given both to
10   Mr. Heberling and to Mr. McLean.
11   Q.   The Excel spreadsheet?
12   A.   The Excel.
13   Q.   The spreadsheet, the actual computer program itself?
14   A.   No.  It was a spreadsheet on a computer disk.  It's the
15   same thing, basically.
16   Q.   What criteria were used to either include people on the
17   list or exclude them?  Was it just whether or not they were a
18   client of Mr. Heberling?
19   A.   No.  When I was assembling that database, it was every
20   patient I had seen in the office, or in Libby, that I had
21   data on, that I knew personally.
22   Q.   No.  I am sorry.  I am asking you about the list, Exhibit
23   No. 3 to your report.  The criteria used to produce this
24   list.
25   A.   This list was produced by Mr. Heberling's office of all

Page 15

1    their clients.  Okay.
2    Q.   And, so, it's all of their clients from your database; is
3    that right?
4    A.   Well, there are some in here that are not in my database,
5    I don't believe.  There may be a few of them but not very
6    many.  But I recognize one name in here that's not in my
7    database.
8    Q.   So the designation of community household or worker
9    would, then, come from a computer program in Mr. Heberling's
10   office, not from your office?
11   A.   Well, it came from a number of places.  Exposure
12   histories were obtained on all of them.  I obtained them in
13   my office.  His office obtained exposure histories.  CARD
14   Clinic obtained exposure histories.  EPA and ATSDR have --
15   it's a compilation of all exposure histories that go into
16   this community versus family member versus worker.
17   Q.   My question to you is, who, ultimately, made the
18   decision, with respect to Exhibit 3, of how to designate an
19   individual; you or Mr. Heberling?
20   A.   I am not sure I can answer your question.  I think it's a
21   combination of things, because I had designated a lot of them
22   and have exposure histories in these people.  They have very
23   complete exposure histories that obtained.  I think it's
24   probably a combination of both.
25   Q.   Have you reviewed the exposure histories that

Page 16

1    Mr. Heberling's firm has compiled for the individuals on the
2    list?
3    A.   Yes.
4    Q.   And are you relying upon those exposure histories as
5    well?
6    A.   Yes.  You know, in places where they may disagree with
7    something that I have, which I really haven't come up with,
8    then I would say so.
9    Q.   Do you know whether or not though the exposure histories
10   that were compiled by Mr. Heberling's law firm have been
11   produced in this case?
12   A.   They are in the charts in Libby, so they are produced.
13   His exposure histories were given to us, and I reviewed them
14   and put them in the charts.
15   Q.   So the exposure histories that are in your patient charts
16   come from the information gathered by Mr. Heberling's law
17   firm?
18   A.   No.  They come from several places, as I indicated.  In
19   those charts are exposure histories that I did, Dr. Black
20   did, the nurses did, in taking histories when the patients
21   came in.  Exposure histories that were obtained by ATSDR
22   during the screening.  Mr. Heberling's exposure histories.
23   There is a large -- there is multiple sources concerning
24   those exposure histories.
25   Q.   The exposure histories compiled by Mr. Heberling's firm,

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 17

1 are they in a particular format that you recognize them?

2 A.   Yes.

3 Q.   What do they look like?

4 A.   Basically, it's a boxed-in exposure history that has

5 dates on one side and where they worked during that period of

6 time and what they were doing.  A lot of it relates to things

7 like that, installation, playing in piles of vermiculite.

8 They are quite complete.

9 Q.   With respect to Exhibit 3 and the exposure categories,

10 again, I want to make sure I understand.  The final -- this

11 list, as I understand it, was generated by Mr. Heberling from

12 his computer program?

13 A.   Yes.  I think this is entirely his client list, and that

14 is one of the reasons why there is a few in here I don't

15 recognize.  But there is very few that are not included in

16 this, because of all these people go to the CARD Clinic and,

17 so, I have seen them, and at one time or another, they were

18 in my database.

19 Q.   Have you reviewed and verified the classification of the

20 exposure categories that appear from Mr. Heberling's computer

21 on Exhibit 3?

22 A.   Well, yes, in fact, I have.  Because in the process of

23 looking at each of those exposure histories, when I have one

24 that -- when I have the chart there and I am looking at the

25 exposure history, I go back and look at what I have in there

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

---

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 18

1 as well, and we are always looking in various exposure

2 histories, to see if there is anything different, and when I

3 see it, I initial it.

4 Q.   You have independently identified the exposure categories

5 that are in Mr. Heberling's database?

6 A.   Oh, yes.  Certainly.

7 Q.   There is a designation of AD on the list, and as I

8 understand it, that means alive or dead.  Is that right?

9 A.   That's right.

10 Q.   As I look through the list, it looks like approximately

11 83 percent of the current clients, or the clients that are on

12 this list, are alive, and 17 percent have died.  Is that

13 right?  Have you done any calculations on that?

14      MR. HEBERLING:  Objection.  Foundation.

15      THE WITNESS:  I think there is -- I will have to look up

16 the exact number, but I think it's 82 that have died that are

17 on this list of their clients.  I think it's 82.  Maybe 83.

18 So, that would be -- I would have to count it again, but I

19 think that's about what it is.

20 Q.   (BY MS. HARDING)  You can use the designation you have

21 for A over D, and calculate that percentage, correct?

22 A.   Sure.  I can calculate that pretty easily.

23 Q.   With respect to the patients that aren't yours on the

24 list, you have confirmed their exposure categorization as

25 well?

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

---

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 19

1 A.   I may not have.  If they are not one that I have not seen

2 at all, ever, I would not have confirmed it myself, no.

3 Q.   Do all of the patients -- do all of the clients listed on

4 this Exhibit 3 have asbestos-related disease?

5 A.   To the best of my knowledge they do.  Yes.

6 Q.   But you can't confirm that for the people that aren't

7 your own patients, right?

8 A.   That's correct.

9 Q.   But the people who are your patients on this list all

10 have an asbestos-related disease that was diagnosed by you?

11 A.   They may have originally been diagnosed in the CARD

12 Clinic, but, for the most part, I have seen them myself at

13 one time or another.  So if they showed up on my database,

14 which I stopped doing a number of years ago, then they will

15 be in here.  There are some probably some of his clients that

16 are new on this that I don't know about.

17 Q.   So, did you suggest that you stopped doing a database?

18 A.   Well, I didn't need to anymore.  I had a number of

19 reasons for stopping doing the database.  First off, I

20 retired from my practice in Spokane in 2004, and I was just

21 working part-time up at the CARD Clinic, and we were

22 preparing a database up there that is going to be much more

23 extensive.  And it was sort of superfluous doing it.

24 Q.   So the CARD Clinic now has a database?

25 A.   We don't have it totally completed, but we have a lot of

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

---

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 20

1 data and variety of things.  We are about to put them into a

2 large database.

3 Q.   What's the status of that compilation of that database?

4 How many patients are in it now?

5 A.   Well, it's not in the form in the clinic as a database.

6 It's basically a compilation of typed and various things that

7 have lists of various patients in and various problems that

8 they have, so that we can refer to that if we need to find

9 anything.  And when it goes into a database, then it will be

10 on computer.

11      At this point in time, it's not on computer.

12 Q.   What percent of the clients that are on Exhibit 3 have

13 interstitial fibrosis caused by asbestos; do you know?

14 A.   I don't have -- let me look.  I think we have got that in

15 here somewhere, but I don't think I know for sure, right off

16 the top of my head, what number they are.  The majority of

17 these are people with pleural disease.

18 Q.   So the majority of people with pleural disease and not

19 asbestosis, have you -- what's the purpose of this list as an

20 exhibit and reliance materials for your report?

21 A.   Basically, to indicate the -- sort of the breakdown of

22 the patients, as to whether they are environmental

23 exposures -- which they have listed as community -- or

24 whether they are family members, where they had exposure to

25 workers that were bringing home a fair amount of asbestos

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 21

1   contamination, versus the workers.

2       And as time has gone by, more and more of the patients

3   that are appearing now are environmental exposures.

4       The other thing is that I haven't actually counted the

5   number of interstitial in any of these, but I understand it

6   fairly well reflects the Piepins article about one percent

7   interstitial disease.

8   Q.   Are all the people on this patient list from the Libby

9   area or Lincoln County?

10  A.   I think there are some that are outside.  Yes, there are.

11  There are people that have moved away.  There is people that

12  were here for recreation or hunting -- they spent a fair

13  amount of time in Libby -- that are not residents, never were

14  residents, but also -- but came away with asbestos disease of

15  one sort or another.

16  Q.   So, included in the list are people who live in Libby and

17  Lincoln County.  Any other surrounding counties in Montana?

18  A.   I would guess other, you know, a fair number of these

19  probably live in Sanders County, which is nearby.  You know,

20  we have a scattering of people from Missoula, Troy.  We have

21  some people from Bonners Ferry, Idaho.  People from Spokane

22  that used to live -- the majority of these lived at one time

23  or another in Libby, and met the criteria for Grace's health

24  plan of having lived there for six months or a year, whatever

25  the case may be, and -- but there are some that do not, that

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 22

1   have not, lived there for -- as a permanent resident.

2   Q.   Have you done any analysis on the distribution of age at

3   diagnosis of the people that are on Mr. Heberling's list?

4   A.   Yeah, we have, and I think -- I am not sure whether we

5   put the numbers in here or not.  I am trying to remember.  I

6   have seen those numbers.  I can give you a rough idea of what

7   they are.  Let's see if it's in here.  It's not in there.  I

8   probably don't have exact figures.  We have patients as low

9   as their 30's, at this point in time, and as high as original

10  diagnosis in their 80's.

11  Q.   So, people --

12  A.   Excuse me.  Go ahead.

13  Q.   Go ahead.  I didn't mean to interrupt you.

14  A.   As time has gone by, we are seeing more and more younger

15  people currently, and we are seeing a fair number of people

16  that are in their late 40's, early 50's, who were presenting

17  with disease, somewhat severe disease; and probably seeing

18  less people that are older, because we probably already have

19  seen the majority of those because of the latency periods

20  until they develop disease.

21      MR. KRAMER:  Could I just request that the witness please

22  speak up when answering questions?

23      THE WITNESS:  You turned up my mic?

24      VIDEOGRAPHER:  It doesn't make any difference for that,

25  for the telephone.

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 23

1   Q.   (BY MS. HARDING)  Dr. Whitehouse, you would agree there

2   is a large spike in diagnoses in the years 2000 and 2001,

3   correct?

4   A.   That's certainly true.

5   Q.   In fact, it looks like over 90 percent of all the

6   diagnoses were made in 1997 or later.  Does that sound right?

7   A.   That's probably correct, yes.

8   Q.   You would agree that increase in diagnoses in 2000 and

9   2001 was substantial, correct?

10  A.   It was, and it correlated with the screening that was

11  done.

12  Q.   This represented a marked change from the number of

13  diagnoses you made previously on an annual basis, correct?

14  A.   Well, yes.  Although, I had seen -- I had a large influx

15  of patients in 1999, and both '98 and 99, well before that.

16  Q.   You previously testified that the increase in diagnoses

17  in 2000, 2001, were as a result of the ATSDR screening,

18  correct?

19  A.   The diagnoses were made because of the screening, yes.  I

20  mean, they were recognized at that point in time.

21  Q.   Well, the screening screened for abnormalities, and then

22  the diagnoses were made by you and your colleagues at the

23  CARD Clinic, correct?

24  A.   That's correct.

25  Q.   You would agree that there is no epidemiological reason

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 24

1   why there would be a large increase of this size in people

2   becoming sick in 2001, right?

3   A.   No.  But I think it's multifactorial.  If you look at the

4   incidents of environmental cases that have occurred, they

5   began to start to occur about 1996-'97, but really

6   significantly in 1998.  So I think we are looking also at

7   latency period making a lot more people that had

8   identifiable disease.  It's a combination of things.  You are

9   right.  A lot of those cases were from the ATSDR screening,

10  the majority.

11  Q.   You previously testified, I believe, that you have been

12  seeing patients in Libby since the 1970's.  Is that right?

13  A.   Yes.  Although, I think there is a few scattered ones;

14  although, I was not able, really, to localize any records on

15  those, but I do have records on probably everybody I have

16  seen since 1980.

17  Q.   Since 1999, it looks like, as far as I can tell, that

18  almost 90 percent of the people that were diagnosed are still

19  alive.  Does that sound right to you?

20  A.   I would guess that's -- I don't know for sure, actually,

21  when you -- probably, because later on, in the more cases we

22  have seen since then, we are seeing cases that are not as

23  sick as the ones we had seen previously.  That would make

24  sense.

25  Q.   You can calculate that from the record here, because you

Page 25

1  have a diagnosis date and you have an indication about

2  whether they are still alive or not, correct?

3     A.   That's true.  We could calculate it from the CARD data

4  too.

5     Q.   With respect to the category community that's listed on

6  Exhibit 3 --

7     A.   Uh-huh.

8     Q.   -- what's the criteria for being included in the

9  community category?

10    A.   Well, to begin with, that means that there were no

11 identifiable family members that they lived with or had close

12 association with, that were cases.  They weren't workers at

13 the plant.  There are a few here that worked as contractors

14 for Grace that were included as workers.

15    Q.   Can I interrupt you really quickly, I want to ask, if

16 somebody was a contractor for Grace, they were included as a

17 Grace worker, not in community?

18    A.   I believe so.  Yes.  At least, that's how I would have

19 included it.

20         The community ones are people that lived in Libby that

21 worked elsewhere, other than at the mine, or for Grace, and

22 had the myriad of exposure histories that we obtained to

23 vermiculite.  Playing in piles.  Running on the track.

24 Playing Little League ball.  Living in certain areas where we

25 knew that there were high concentrations of airborne fibers.

---

Page 26

1  We suspected that there were along the railroad tracks,

2  things like that.  Those were all part of what we considered

3  community exposures.

4     Q.   If a worker -- if a client of Mr. Heberling's on this

5  chart had other exposure, other occupational exposure to

6  commercial asbestos, were they included in the category

7  community?

8     A.   What do you mean?  Are you referring -- why don't you

9  clarify that for me?  I am not sure I understand exactly what

10 your question is.

11    Q.   Sure.  If an individual client of Mr. Heberling had

12 exposure to commercial asbestos in his occupation, for

13 instance, in shipyards or in the Navy or in construction,

14 things like that, were they -- but did not work for

15 W.R. Grace and was not a household member of somebody who did

16 work for W.R. Grace, were those individuals included in the

17 exposure category community?

18    A.   Yes.  They might have been.  And, in fact, we have -- a

19 number of those people, we tried to apportion the severity of

20 their exposures when that happens.

21    Q.   When you say apportion the severity of their exposures,

22 explain that, please.

23    A.   Most of the people have had exams at the V.A., and the

24 V.A. asked us to apportion what their -- they know about the

25 exposure histories.  And, so, we try to make some

---

Page 27

1  apportionment, depending on what the Navy exposure was.  Most

2  of the time it winds up being 50/50.

3     Q.   So you have -- you have a separate analysis for the

4  people that are in the community category in Exhibit 3 that

5  identifies the people that, in addition to community

6  exposures at Libby, also have other occupational -- or

7  non-Grace occupational asbestos exposures?

8     A.   We don't do it as a separate category.  We know about it,

9  and we take it into account.  And Grace knows about it,

10 Health Network America knows about it, because they have the

11 records, and some of our judgment calls are made on the

12 severities of exposures that they had elsewhere.  And you are

13 right, there are some people that have had fairly significant

14 exposures elsewhere, and there is some that is very minimal

15 and transient.

16    Q.   In this litigation in the bankruptcy, are you aware of

17 anyplace in connection with your reports where that analysis

18 and that information has been produced?

19    A.   No.  It hasn't been produced and it hasn't been collated

20 or put together as a database or anything else.  It's on

21 individual charts.  And, so, you have those charts and you

22 have those exposure histories already.  So, I don't know

23 whether you put it together or not, but we have not.

24    Q.   So we have individual patient charts which some have --

25 that have various levels of information about exposures?

---

Page 28

1     A.   Yes.

2     Q.   Okay.  With respect to your analysis of how the exposures

3  are apportioned, or how they should be apportioned, has that

4  been produced, do you know?

5     A.   No.

6     Q.   No, you don't know?  Or, no, it hasn't been produced?

7     A.   Well, it's been produced because it's in the charts.  I

8  mean, it's not -- if there is an analysis that's been done,

9  it will be in the progress notes, in the charts of the

10 individual patient, because -- at least, that's what I do,

11 always.  I make a notation, or I make a note in the chart,

12 originally, also about their various exposure histories and

13 whether I thought it was significant or not.  Or at some

14 point, there may be, later on, the same sort of a note.  But

15 you should see something or other, if I thought it was a

16 significant exposure.

17         You know, to give you an example, if somebody is on a

18 Naval vessel and is above decks all the time, and it's a

19 fairly modern vessel, more modern vessel, then there may not

20 be much of an exposure.

21         If they worked in the Bremerton Shipyards, refitting

22 Naval vessels, you know, it's a significant exposure.  There

23 is all gradations in between.

24    Q.   It sounded like you said earlier that you actually have

25 analysis where you have provided to the V.A. or to the Libby

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 29

1  medical plan something where you have apportioned exposures.
2  Is that what you were saying earlier?
3  A.   No.  We are asked by the V.A. -- not a lot; I mean I have
4  probably done, maybe, three or four of these altogether -- to
5  apportion their exposures.  And we do it the best we can with
6  that.  It's hard to do because we don't have really
7  significant exposure at that time in either case.  But we
8  know about the latency when they were exposed, and we know
9  what they have now and what's developed as we watched them.
10  So we make -- I don't want to use an educated guess, because
11  it's more than that.  But we basically look at it and try to
12  make an apportionment that's fair to Grace, fair to the V.A.
13  and fair to the patient.
14  Q.   With respect to any of these exhibits that you have --
15  that you or Mr. Heberling has compiled in connection with any
16  of your reports in this case, where you analyze your patient
17  data and you synthesize the information and you provide your
18  opinions about the totality of the circumstances concerning
19  your patients, is there anything that you produced in this
20  case that reflects the exposures and the relative
21  contribution of exposures from commercial asbestos in
22  non-Grace occupational settings?
23       MR. HEBERLING:  Objection.  Compound, overbroad.
24       THE WITNESS:  Specifically related to producing any kind
25  of a database or anything like that, we have not.  And I have

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 30

1  not done so.
2  Q.   (BY MS. HARDING)  Indeed, in Exhibit 3, for instance,
3  there is no indication whatsoever in the community category
4  of anybody who had other asbestos occupational exposures,
5  correct?
6  A.   No.  Not in this particular database, no.  Nor in my own
7  database is there anything.
8  Q.   Is there anything in your reports in this case -- or in
9  the criminal case, for that matter -- that indicates the
10  degree to which some of your patients have had
11  occupational -- non-Grace occupational asbestos exposure?
12  A.   No.  Not in these reports.
13  Q.   If you -- you also have another exhibit, Exhibit No. 5,
14  that's attached to this report, correct?
15  A.   Uh-huh.
16  Q.   It's part of our Exhibit 1 in this case?  Your report?
17  A.   Right.
18  Q.   But it's Exhibit 5 to your report.  And as I understand
19  it, that is a summary of deceased clients' charts, and then a
20  spreadsheet of deceased clients.  Is that correct?
21  A.   Yes, it is.
22  Q.   Again, are these clients of Mr. Heberling?
23  A.   These are clients of Mr. Heberling's, yes.
24  Q.   So these, again, include people, individuals who are not
25  your patients, correct?

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 31

1  A.   Inevitably, yes.  I think.  But let me take a look at it
2  again and see how many.  It would be only a few that I have
3  not seen.
4  Q.   And I take it, also --
5  A.   Some of these dates are way back.  Like, I obviously
6  haven't seen somebody that died in 1960.  That was before I
7  even went to medical school.
8  Q.   So, include -- this Exhibit 5 includes people who are not
9  your patients, and, I take it, it does not include all of the
10  individuals that you have seen with asbestos disease in Libby
11  that are your patients, correct?
12  A.   That is correct.
13  Q.   Because it's Mr. Heberling's list?
14  A.   Yes.
15  Q.   Have you -- if you cross reference Exhibit 3 with
16  Exhibit 5, have you looked at the age of distribution at
17  death for the people that are the same?
18  A.   No.
19  Q.   That's something that could be done, correct?
20  A.   I assume so.
21  Q.   So if you cross reference Exhibit 3 with Exhibit 5, you
22  could get a list of the people that, according to Exhibit 5,
23  have died that were Mr. Heberling's clients, correct?
24  A.   I would believe so.
25  Q.   And because you have the age at death for the 34 people,

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 32

1  you could understand the distribution of their age at death,
2  correct?
3       MR. HEBERLING:  Objection.  Unclear as to 34 people.
4       THE WITNESS:  Where did three come from?
5  Q.   (BY MS. HARDING)  The 34 were the -- I cross referenced
6  Exhibit 5 and Exhibit 3, and I come up with four, so you can
7  just take my word for it.  That's the number of people that
8  match from Exhibit 3 to Exhibit 5.
9       MR. HEBERLING:  Objection.  Foundation.
10       THE WITNESS:  I am not sure how to answer your question,
11  because how are you getting -- what are you using to -- for
12  the 34?  You are talking about this sheet here.
13  Q.   (BY MS. HARDING)  I am talking about Exhibit 5, which, as
14  I understand it, is a list of clients of Mr. Heberling's that
15  have died, which is a subcategory of people that are listed
16  in Exhibit 3, which are all of his clients.  Correct?
17  A.   This deceased client list, though, my understanding is,
18  80-some odd.  There may be the whole 113 in this list.  I
19  would have to look through it.  I see we have got -- this is,
20  I believe, the 84 that are listed as asbestos deaths in the
21  second part of that, or 82.
22  Q.   You know what I will do --
23  A.   I can count them, but I don't know where the 34 number
24  comes from.
25  Q.   I have a bunch of questions about Exhibit 5, and maybe I

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 33

1  will just ask you the question about the comparison after we
2  establish the foundation for Exhibit 5.
3  A.    Okay.
4  Q.    Okay.  How is that?  That will make it a little easier.
5        But before we get there, I would like to turn to
6  Exhibit 4, please.
7  A.    Okay.  Well -- there we go.  Okay.
8  Q.    Okay.  So you see Exhibit No. 4, correct?
9  A.    I do.  I have it right in front of me.
10 Q.    And this Exhibit 4 to your July 2007 report is titled,
11 Rapid Progression and Pleural Deaths.  Correct?
12 A.    That's correct.
13 Q.    How was this group of people identified?  Is this a
14 list -- that's two questions.  Is this a list that you
15 generated or Mr. Heberling generated?
16 A.    No.  I generated this.
17 Q.    What criteria were used to include or exclude individuals
18 on the list?
19 A.    Well, there is two groups of people in here.  One are
20 groups of people that have had very rapid progression of
21 their disease.  I have actually removed a couple from there
22 in the process of writing these up and getting it all
23 together.  But I don't have anything that I can really show
24 anybody at this point, except the names and the x-rays.
25       The criteria for rapid progression was rapid loss of

---

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 34

1  pulmonary function and rapid x-ray changes -- mostly
2  radiographic issue -- over a period of five years or less,
3  which has not been described in the literature previously.
4        There are now -- there is some more on there that could
5  be on this list now, that have been added since, and a couple
6  removed; mostly because of the fact that I had trouble being
7  able to demonstrate good x-rays on them.  And one in
8  particular, which I couldn't get an x-ray repeated.  It was a
9  lousy copy, so I removed it from the list.
10 Q.    So it's rapid progression shown in x-ray changes over
11 five years?
12 A.    Or less.
13 Q.    Or less?
14 A.    Some of them only in a couple years.
15 Q.    As well as rapid progression of lung function decline
16 over five years as well?
17 A.    Yes.  Or less.
18 Q.    Or less?
19 A.    That was the criteria that originally set out -- that put
20 them in here was a five-year benchmark period.
21 Q.    And this was -- did you review your database to come up
22 with that list, your computer database, or did you review
23 your patient files to come up with the list?
24 A.    Actually, that's a list that I have been accumulating
25 for, probably, the last seven or eight months in patients I

---

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 35

1  have seen, or Dr. Black has seen, and then I had seen them
2  subsequently to confirm what's going on.
3  Q.    So, are the -- there is 22 people on the list, correct?
4  A.    Right now there is 21 people on the list that I am going
5  to use.  And I don't have a -- current names for you in the
6  others, so I think that most of them are on here.  I think
7  there is -- is a couple that are missing.
8  Q.    This list says -- the list we have in Exhibit 4, which is
9  the most current, your reliance materials that you provided
10 in this case in connection with your July report, has a list
11 of 22 individuals.  Do you see that?
12 A.    That's what I had at the time.  But if you look at the
13 whole list, you will find that the last four had died a
14 fairly long period -- had died long enough ago, and they are
15 not listed under the rapid progression.  There is eight --
16 there is actually 18 listed under rapid progression, and then
17 I have taken two out, and I guess I added four or five more
18 to it since that time that you don't have on that list.
19 Q.    Okay.  So, do you have a copy of the current list?
20 A.    I do not have it with me.
21 Q.    Are you relying on the current list in connection with
22 your testimony in this case?
23 A.    No.
24 Q.    The one that I don't have, or the one that's in that
25 report?

---

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 36

1  A.    No.  I am going to rely on the ones in the report here.
2  It's obviously not fair to give you things you don't have --
3  use things you don't have.  I only accumulated those since
4  July, so those are more recent.  So I am not going to rely on
5  those on -- in -- particularly, although I could -- we could
6  produce it as further evidence if it's need be.
7  Q.    Is there anybody on this list, Exhibit 4, that you have
8  since taken off the list, you are no longer relying on for
9  this proposition?
10 A.    Yes.  13 and 14.  Well, actually, I have taken them off
11 the list because I am in the process of reviewing all these
12 for a paper, and I wasn't satisfied with the quality of the
13 radiograph stuff that I have got in order to do it.  So I
14 just took them off the list.  And that relates to a paper.
15 And that's where some of this originally came from to begin
16 with, because I have been accumulating that list now for
17 probably over a year, I guess, overall.
18 Q.    In the fall of 2006, you had, as I count, five
19 individuals that were on this list that are no longer on the
20 list.  Correct?  I have Carol Girard, Tom Harvey, Lerah
21 Parker, FM and Ruben Fellenberg were on your list that you
22 produced in October, but are no longer on the list in the
23 July exhibit, correct?
24 A.    Well, the list also had some other -- that original list
25 also had the names of some people that are on a PowerPoint

Page 37

1  presentation, and that really were not either rapid
2  progression, except Ruben Fellenberg is one of the ones on my
3  current list.
4      What are those names again?  Run them by me.
5  Q.  So, Mr. Fellenberg is now back on the list?
6  A.  Yes.  He is currently on the list.
7  Q.  Carol Gerard?
8  A.  No.  She was a mesothelioma patient that died, and I had
9  that on the list for the purposes of demonstrating just the
10  case itself.
11      And Tom Harvey, I don't have enough information yet to
12  consider him rapid progression.  Originally, I thought that
13  because, from the history, he had a -- some fairly sudden
14  events, but we weren't able to get the old fears.
15  Q.  Lerah Parker?
16  A.  No.
17  Q.  She is not on the list now?
18  A.  She is not on the list of rapid progression, no.
19  Q.  Why was she taken off?
20  A.  I am not so sure why.  The list was sort of a compilation
21  of things that I was doing at one time, x-rays that I wanted
22  to save, things that might be useful if I give a lecture,
23  something like that.  It probably shouldn't have been on the
24  list in the first place.
25  Q.  Who is identified as initials FM?  Do you know why that

Page 38

1  individual is no longer on the list?
2  A.  I am not sure why I took him off.  He actually did fairly
3  rapidly progress.  Partly, it was because of the fact it was
4  almost all hard copy films, and I couldn't deal with the hard
5  copy films very well, as far as, I would have to get them
6  photographed and all if I was going to use them for a paper.
7  Whereas, everything else is on the digital films at the
8  clinic.
9  Q.  Any reason why the individual FM was listed with initials
10  as opposed to a name?
11  A.  He was not a client, as far as I know.
12  Q.  Not a client --
13  A.  Anybody that's on this list that's initials is not a
14  client of Mr. Heberling's or Mr. Lewis's.
15  Q.  Okay.  But he is a patient of yours?
16  A.  He is dead.
17  Q.  Who has since died?
18  A.  Yes.
19  Q.  And then, Ruben Fellenberg we already talked about?
20  A.  Yes.  And there is a couple more that will probably wind
21  up getting provided to you at some point.
22  Q.  Do you have their names?  Are they clients of
23  Mr. Heberling's you can reveal their names, or not?
24  A.  I don't know.  I am sorry.  I can't even -- I don't have
25  the complete -- the list of what I added to that

Page 39

1  subsequently.  I don't necessarily need to rely on that.
2  Okay?  But I have added a couple other people that, more
3  recently, I have seen this same sort of abnormalities occur
4  in, since, and they have come up since July, which is why you
5  don't have them on this list.
6  Q.  Now, is Francis Cole the same person as Bud Cole?
7  A.  Yes.
8      MS. HARDING:  They are running out of tape, so we will
9  take a couple-minute break.
10      VIDEOGRAPHER:  This will conclude Tape No. 1.  The time
11  is now 10:07 a.m.
12      (Recess taken from time 10:07 to time 10:14.)
13      VIDEOGRAPHER:  This is the continued videotaped
14  deposition of Dr. Alan C. Whitehouse, Volume 1, Tape 2.  The
15  time is now 10:14 a.m.  The date remains to be October 18,
16  2007.
17  Q.  (BY MS. HARDING)  Dr. Whitehouse, we were talking about
18  Exhibit 4 to your July 2007 report.  In your fall 2006
19  report, the column that is now labeled, Rapid Progression,
20  previously had been labeled, Progressive, not rapid
21  progression.  I just want to take -- did the inclusion
22  criteria for that category change, or did you just change the
23  category name?
24  A.  Well, no.  I removed some that were not rapid
25  progression, but they were progressive.  So, let's put it

Page 40

1  that way.  I think that's probably the best way to handle it.
2  So I removed them for a variety of reasons, but they were
3  there for the use for PowerPoint presentations, if I gave a
4  lecture.
5      And they were progressing, I thought, but I wasn't really
6  able to document it as well as I would like, and it wasn't
7  rapid, concerning the criteria that I put on this list,
8  except for Ruben Fellenberg.
9  Q.  Who -- although he is not on the Exhibit 4 in your
10  July 2007 report, he is back on your current list now, which
11  we don't have yet, right?
12  A.  Yes.  If you would like to have that list, I can get it
13  to you.  Although, that may not be complete, either, because
14  I will add to it as time goes by.
15  Q.  Okay.  We would like to get a copy of the current list
16  when -- maybe after the deposition, okay?
17      In your July report, you state the following, with
18  respect to Exhibit 4, in your report, and I quote -- it's
19  from Paragraph 35.  Would you like me to wait so you can read
20  along?
21  A.  Yes.  I would appreciate that.  Okay.
22  Q.  It says, "Rapid progression in the Libby cohort can also
23  be seen radiographically.  Exhibit 4 is a Chart and CD
24  titled, 'Rapid Progression and Pleural Deaths,' which
25  presents a collection of 18 cases of rapid progression

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 41

1  secondary to pleural disease.  See also chart, Exhibit 4.  To
2  my knowledge, progression of pleural disease of this nature
3  has not been reported elsewhere."
4      Paragraph 36:  "Pleural disease from exposure to Libby
5  asbestos appears to be far more severe than asbestos pleural
6  disease reported elsewhere.  Exhibit 4 is a CD in which
7  presents seven cases of pleural disease progression leading
8  to death.  None of the seven deceased patients had
9  significant interstitial disease."
10     Q.   Did I read that correctly?
11     A.   You did.
12     Q.   And we have already discussed its rapid progression of
13 lung function and x-ray changes, correct?
14     A.   Yes.
15     Q.   How much progression did you require to be included in
16 this list, for somebody to be included in this list?
17     A.   It's a qualitative basis.  It had to be very observable.
18 It was presented to a number of people who had looked at it
19 and said, my goodness, I have never seen anything like that.
20 That was -- basically, one of the real indexes was that
21 people had not seen that kind of change that quickly
22 previously.  And they had to have significant pulmonary
23 function loss.
24     As it turns out, the pulmonary function losses were
25 large, like, 20, 30, 40 percent, over fairly short periods of

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 42

1  time.  And there were a variety of cases.  Since then, I have
2  got a couple of interstitial ones in there also that have
3  also rapidly progressed.  Most -- but they are mixed as well.
4      I mean, so they have both pleural disease and
5  interstitial disease, but the interstitial disease appears to
6  is have rapidly changed as well.
7      We said 22.  Actually, I have 21 now, because of the ones
8  we removed.  I had forgotten that.
9      I had been working with 22 for a long time, and then I
10 took one out, so I have 21 now.  The list you will get will
11 have 21 in it.  If you add Ruben Fellenberg and take out two
12 of the other ones, you have --
13     Q.   21?
14     A.   I think you will wind up with three or four new ones that
15 you don't have now.  Okay?
16     Q.   Okay.  I will come back to that.  -
17     A.   I am not trying to confuse.
18     Q.   That's okay.
19     A.   This is all ongoing, and I get spurts where I work on
20 some of this stuff and look at it, and then it sits for a
21 while.
22     Q.   I want to ask you a couple questions about what you just
23 said, because I am a little bit confused.  In the report, in
24 your July 27 report, which, you said, summarizes the opinions
25 that you are going to provide in this litigation, you said

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 43

1  none of the seven deceased patients had significant
2  interstitial disease.  And those are the seven patients that
3  are --
4      A.   That's correct.
5      Q.   Let me finish the question.  Those are the seven patients
6  that are marked under the pleural death box in Exhibit 4,
7  correct?
8      A.   Yes.  That was my opinion, based upon reading the x-rays.
9      Q.   Okay.
10     A.   And knowing the patients.
11     Q.   That the seven patients listed in the pleural death
12 category did not have asbestosis, correct?
13     A.   I did not think so.  They were confusing x-rays, and I
14 would be the first one to admit that.  They had so much
15 pleural disease that it overlay much of the lung fields.
16     And, so, under those circumstances, you always worry a
17 little bit whether there is any interstitial disease
18 underlying that, that you can't see.  But to the best of my
19 knowledge and from watching the progression, until their
20 death, I was looking at pleural disease.
21     Q.   You mentioned people that looked at the charts with you.
22 What other individuals have you consulted with, with respect
23 to the creation of Exhibit 4?
24     A.   Well, I haven't consulted with them at all.  It wasn't
25 the charts.  It was x-rays that I have shown to a number of

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 44

1  people that have looked at it, and they have been seen by
2  Steve Levin in Mount Sinai, Dr. Frank, who I know you know at
3  this point, and by Jack Ruckdeschel at Karmanos, who is the
4  CEO of Karmanos in Detroit.
5      Q.   What was last name?
6      A.   Jack Ruckdeschel.
7      Q.   Where is he from?
8      A.   He is the CEO of Barbara Karmanos Cancer Institute in
9  Detroit.  And we have been involved with Karmanos at the
10 clinic.
11     Who else?  Anyway, all of them had the same impressions,
12 all three of those, about they had not seen anything like
13 that previously, and encouraged me to go ahead and get it
14 written up, ultimately, which I will do.
15     Q.   In connection with the x-ray changes of the -- of all of
16 the people listed on Exhibit 4?
17     A.   Not all of them.  I think that I showed them probably
18 about 12 or 14 or something like that at the time.  See, most
19 of that happened about a year ago, and I have been working on
20 a compilation of that, writing up case histories and things
21 like this.  And they did see the pulmonary functions that
22 went along with them.  They saw a summary of it.  They didn't
23 see all of them.
24     Q.   Do you have a list of the actual individuals that you
25 showed these people?

Page 45

1  A.   No.

2  Q.   Can you -- looking at the list, can you tell me which

3  ones you showed them?

4  A.   Probably.  No. 4, 5, 6, 7, 8, 9, 11, 12.  Probably 15 and

5  16 and 18.  I may not have shown all of them to everybody.

6  So you have to -- you have to take that list as not

7  necessarily being absolutely accurate.

8  Q.   Okay.  I would like to ask you a question about the

9  individuals in the pleural death column.  Mr. Wright, who is

10  listed as No. 4 on Exhibit 4?

11  A.   Yes.

12  Q.   I understand from the Exhibit 3 to your report,

13  Mr. Heberling's client list, that he was a worker for

14  W.R. Grace.  Is that correct?

15  A.   Yes, he was.

16  Q.   And he worked at the W.R. Grace from 1957 to 1963.  Do

17  you know that?

18  A.   I don't have that data with me right here.  I probably do

19  actually have it here in the deceased -- and the death list.

20  And the death list is by year, and he died a long time ago.

21  Q.   I have written down he was 78 years old at the date of --

22  A.   Date of death, yes.  I am not finding that.  Do you see

23  it on the deceased client list?

24  Q.   He is on there.  He is on --

25       MR. HEBERLING:  5-13-01.

Page 46

1  A.   What date?

2       MR. HEBERLING:  5-13-01.

3  Q.   (BY MS. HARDING)  If you look at No. 30 -- oops.

4  A.   I had forgotten.  I thought he died a little bit longer

5  ago than that.  That's correct, I am sure.

6  Q.   (BY MS. HARDING)  He also is listed, as I understand it,

7  on his death certificate as having asbestosis, correct?

8  A.   In effect, we might as well get that clarified right now,

9  while we are at it.  I basically use the terminology Selikoff

10  uses, and a lot of people are currently using, referring to

11  pleural disease as pleural asbestosis.  And I think the

12  knowledge base of the amount of subpleural fibrosis these

13  people were having with pleural disease, I don't make the

14  differentiation.  It's all the same disease.

15       If they die of it, they can die of pleural disease and

16  die of interstitial disease, and they are all part of a

17  continuum, in my opinion.

18  Q.   Did you sign Mr. Wright's death certificate?

19  A.   I probably did.  I am not sure.

20  Q.   I don't believe I have it.

21  A.   Do you have a copy of it there?  I might not have.  I am

22  not sure.

23  Q.   Although his death certificate says asbestosis, he did

24  not have asbestosis, or he did?

25  A.   It depends on how you define it, like I just said.

Page 47

1  Q.   Well --

2  A.   I use the terms interchangeably, and you are probably not

3  going to shake me from that because I have dealt with so many

4  of these people, and I looked at so many CT's of people that

5  have pleural disease, that have interstitial disease

6  underlying, low DLCO's, and they technically have asbestosis,

7  and the two, almost invariably, coexist in our patient

8  population.  Not always.  We have pure pleural disease.

9       If you look at it as a continuum, over time, you see

10  interstitial disease you can't see on the plane chest x-ray.

11  We have the advantage of having one of the largest series of

12  HRCT's -- that's high resolution CAT scans -- of anyplace in

13  the world.

14  Q.   Since you are being frank, I will be frank as well.  I --

15  it would not be unusual, medically or scientifically, to see

16  a patient with asbestosis, with interstitial fibrosis caused

17  by asbestos, to rapidly decline and to die from asbestosis,

18  correct?

19  A.   It would not be unusual.

20  Q.   It has been documented in the literature for asbestos

21  cohorts, people that are highly exposed to asbestos, that

22  people that develop interstitial fibrosis from asbestos and

23  have it seriously, can have rapid progression and die from

24  it?  Correct --

25  A.   There are definitions of rapid progression.  If you look

Page 48

1  at the interstitial stuff I have in here, we are looking

2  about a year or two.  And I don't think that's reported.  I

3  defined the pleural disease as about five years.

4       But in reality, the ones in here that look like there is

5  a significant loss of interstitial -- or significant change

6  in interstitial disease is a lot quicker than that.

7  Q.   But in your Exhibit No. 4, you have classified the

8  individuals that have died under pleural disease?

9  A.   Yes.

10  Q.   You noted in your report, none of the seven deceased

11  patients had significant interstitial disease.  As I

12  understand your testimony and your reports, it is the loss

13  and rapid progression associated with pleural disease that is

14  significant and different in this population, correct?

15  A.   That's correct.  And these were -- these did not have any

16  evidence of significant interstitial disease.  But in that

17  other list of rapid progression, there is a couple people

18  with interstitial disease who rapidly progressed over a very

19  short period of time.  A couple years.

20  Q.   Given the importance that you place on what you are

21  seeing with respect to pleural disease change, I would think

22  that you would think it would be important to attempt to

23  determine whether or not your patients have interstitial

24  fibrosis or pleural disease, and to make that distinction in

25  your records.  But you don't, correct?

Page 49

1  A.   Unfortunately, except for two of them that I know of off
2  the top of my head, the rest of them did not have HRCT's.  So
3  I have two of them in there that did, that had absolutely no
4  evidence of interstitial disease.
5       But I also have a number of other ones that were older
6  deaths, for one thing.  They died before 2000.  They did not
7  have HRCT's, to my knowledge.
8  Q.   Dr. Whitehouse, with respect to six of the seven
9  individuals that are listed in the pleural death column, on
10 their death certificates, they are all listed as having
11 asbestosis, correct?
12 A.   That's correct.  And I would have listed them that way --
13 and I would have put that diagnosis down on their death
14 certificate, even with pleural disease, for the reasons that
15 I already told you.  It's because the patients -- you know, I
16 much prefer to use Selikoff's terminology of pleural
17 asbestosis, that the differentiation of interstitial disease
18 from pleural disease is a false one.  I don't want to get
19 into how that came about.  It's slowly being eliminated, or,
20 at least, doctors currently are thinking about these things
21 in much different terms.  And I have thought about them in
22 different terms for many years, and I think that's a false
23 separation.  As a matter of fact, I know it's a false
24 separation.
25 Q.   So, then, it would also be a false separation to list, on

Page 50

1  Exhibit 4, pleural deaths for these individuals, then.
2  Correct?
3  A.   Not necessarily.  I am referring to the fact that they
4  had pleural disease with no evidence of interstitial disease
5  that I could find at the time.  Okay?  That's not mutually
6  exclusive.
7  Q.   Do you believe, then, today, that these individuals died
8  from a combination of pleural disease and interstitial
9  fibrosis, or just pleural disease?
10 A.   As far as I could tell, they died of just pleural
11 disease, or if they had any interstitial disease, it was very
12 minimal, and they died of pleural disease and restrictive
13 lung disease from that.
14 Q.   So, then, the listing on their death certificates would
15 be inaccurate as to asbestosis, then.  Correct?
16 A.   Not in my opinion.
17 Q.   Well, in the opinion of the American Thoracic Society,
18 would you agree they would disagree with categorization of
19 somebody as having asbestosis on their death certificate if
20 they indeed did not have interstitial fibroses?
21 A.   I am not sure they would.  If you read the 2004 ones,
22 there is a lot of hedging about -- I can't give you the exact
23 quotes on that, but there is now, I think, significant debate
24 about that, and I think the debate about trying to separate
25 two things out, when they are both due to the same process,

Page 51

1  and they are in a continuum from one end to the other is a
2  very false assumption.
3       And it doesn't -- it doesn't go along with Halstead's
4  principles of disease, which dates back years, about
5  causative factors and end results.  It's a false way of
6  looking at a disease process that starts with the inhalation
7  of an asbestos fiber, usually starts with pleural changes,
8  then develops interstitial disease.
9       And, so, you call it asbestosis.  I prefer to call it
10 interstitial disease, pleural disease, or combinations of the
11 two, but I call them all asbestosis, and I have for a long
12 time.
13 Q.   So, for the individuals listed on Exhibit 4 under the
14 pleural death column, all of -- of the individuals in your
15 records would be listed as having asbestosis, correct?
16 A.   They might be, yes.
17 Q.   With respect to the individuals listed under pleural
18 death, none -- as I can tell from cross-referencing to
19 Exhibit No. 3 -- none of those individuals are classified as
20 community exposure, correct?
21 A.   No. 21, Greg Shockley, worked for the railroad.  He
22 worked in Libby.  So he would be classified as community,
23 probably.  I don't believe he ever -- by my recollection, I
24 don't believe he ever worked for Grace.
25      Clarice Hack, were family members of Grace workers.  Don

Page 52

1  Riley was an employee of Grace.  Dean Adkins, Jack DeShazer
2  and Andy Wright were all employees of Grace.
3       So there may be one that was community, and that's Frank
4  Shockley.
5  Q.   Is he not a client of Mr. Heberling?
6  A.   He is a client of Mr. Lewis's.  I don't know whether he
7  would be on that list or not.
8  Q.   That's why he isn't on Exhibit 3, correct?
9  A.   That might be the reason.
10      MS. KRIEGER:  Excuse me.  I hate to interrupt.  Could we
11 ask for Dr. Whitehouse to speak up?
12      MS. HARDING:  We will move the phone down a little
13 closer, because we can all hear him fine in here.
14      MS. KRIEGER:  Fine.
15      MS. HARDING:  No problem.
16 Q.   (BY MS. HARDING)  I would like to ask you a couple of
17 questions about the individuals on Exhibit No. 4 that I
18 understand have been classified under the community exposure
19 category in Exhibit 3.  Okay?
20 A.   Okay.
21 Q.   The first person is Ron Masters.
22 A.   Yes.
23 Q.   Is he somebody that's still on your current list?
24 A.   Yes.
25 Q.   And if you go back and look at Exhibit 3, under

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 53

1  community, on Page 4, about a third -- a quarter of the way
2  down, you will see Ron Masters and he is listed as a
3  community exposure, correct?
4     A.   Yes.
5     Q.   Now, do you know if Mr. Masters worked in the lumber
6  yard?  Do you recall?
7     A.   You know what?  I am not going to trust my memory to
8  recalling about the individual exposures of those and the
9  environmental exposures.  I would be happy to go and look
10 through a chart, if you have their chart.  I know you do have
11 those.
12    Q.   I think I do have those.  I don't have extra copies,
13 though, because they were medical records, and we were -- I
14 think -- unclear to me which ones we are supposed to have
15 only one copy, so we only kept one copy.
16    A.   I will give it right back to you.  I can use that to
17 recollect things, and that will take care of it.
18    Q.   I think, if you see a Page No. 5 of that group of
19 documents.
20    A.   Yes, he did work in the lumber yard.
21    Q.   He worked at the plywood plant; is that right?
22    A.   That's correct.
23    Q.   He also worked at other mines?
24    A.   Played in the piles, vermiculite at home, garden.
25 Lived -- home insulated.  Lived three miles downstream from

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 54

1  the conveyor and the loading.
2     Q.   Those are the reasons you would have included him in the
3  community exposure; is that right?
4     A.   Yes.  And the lumber -- and people that worked in the
5  lumber yard are included in the community exposures.
6     Q.   And you also have a note in your records that you
7  question whether some of his pulmonary function decline is
8  due to asthma.  Is that fair?
9     A.   Show me where that is.
10    Q.   I believe it's at Page 89, toward the end.  I don't think
11 it's marked, though.
12       You treated him with steroids that helped?
13    A.   Oh, I questioned whether it was due to it, although he
14 was wheezing at that time.  Was having some broncho spasm,
15 and I gave him some steroids, yes.
16    Q.   And the steroids actually helped him a great deal?
17    A.   It has helped him.  Although, it didn't -- I think, on
18 that particular occasion, it didn't help him very much.  Let
19 me see the date -- is there another note in there?
20    Q.   There may be.  I don't know.
21    A.   Yeah.  There is one from 7-12-06.  I always see people
22 back.  It did not help him and he was still wheezing, and we
23 agreed that we were just going to continue with what he was
24 on.
25    Q.   Thank you.  The next thing I want to ask you about is

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 55

1  Clinton Hagen.
2     A.   Yes.
3     Q.   Looking back at Exhibit 3, Mr. Hagen is also classified
4  as a community exposure, correct?
5     A.   He is.  That's correct.
6        THE WITNESS:  Can you hear me now?
7        MS. KRIEGER:  Yes, I can.  Thank you very much.
8     Q.   (BY MS. HARDING)  I will show you the records we have for
9  Mr. Hagen that were provided by you.
10    A.   I know him well.
11    Q.   And looking at Page 61 --
12    A.   I have it.
13    Q.   -- Mr. Hagen, in addition to the vermiculite exposures
14 that you list at Page 61 of that -- of his medical records,
15 he also worked at the lumber yard.  Correct?
16    A.   Yes, he did.
17    Q.   And he worked at the plywood plant.  Correct?
18    A.   That's sort of one in the same.
19    Q.   He has done mechanical repair work on insulated pipes.
20 Correct?
21    A.   I need to look back in here, whether that was at the
22 lumber yard or not.  It might have been.
23    Q.   And he was a welder?
24    A.   He was a welder.
25    Q.   Those are all the questions that I have with respect to

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 56

1  Mr. Hagen.
2     A.   Uh-huh.
3     Q.   With respect to Mr. Martin.  Is he somebody that is still
4  on the list or not on the list?
5     A.   He is not on the list anymore, and I -- actually, the
6  reason was -- so you understand why -- I had two films on
7  him, and the second film, I thought, probably had shown
8  worsening.  I took him off the list because the film, I
9  thought, was of really poor quality, and I asked the hospital
10 to re-take the film, and they refused to do so.
11    Q.   So, as of right now, you don't have the current film?
12    A.   No.  I don't have another film on him.  So I just -- you
13 know, this list -- I want this list to be accurate.  Okay?
14 And demonstrative of what I am seeing.  So I took him off the
15 list.
16    Q.   Depending on what you see on the next film, he may or may
17 not be back on the list, correct?
18    A.   Probably not, because I will have written things up by
19 then.
20    Q.   Okay.  With respect to Larry Hill --
21    A.   Yes.
22    Q.   -- he is another individual that is on your list, and he
23 is also, as I understand it, listed as a community exposure
24 on Mr. Heberling's list in Exhibit 3.  Is that right?
25    A.   Yes.

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 57

1  Q.   Do you recall the other occupational asbestos exposure of
2  Mr. Hill, or would you allow me to show you the medical
3  records?
4  A.   Show me the medical records.  He is a very sad case
5  because he has had fulminant disease in the last three or
6  four years associated with severe chest pain.
7  Q.   In addition to information regarding his exposure in
8  Libby to vermiculite -- which I understand to be, played in
9  piles and worked around the conveyer belt area, the screening
10  plant, lived in a home insulated with vermiculite --
11  A.   Where is that listing in here?
12  Q.   Actually, it looks like it's on Page 1 --
13  A.   On Page 1?
14  Q.   -- with respect to the Zonolite exposures.  Then on
15  Page 2, it indicates that he worked as a contractor,
16  subcontractor, to W.R. Grace?
17  A.   I see an X mark there, and I don't know what that part
18  is.  I did not take that history myself.
19  Q.   Who took the history?
20  A.   I think Dr. Black saw him, originally.  In fact, he is
21  actually Dr. Black's patient.
22  Q.   This is Dr. Black's patient.  Mr. Hill also worked in a
23  Naval ship yard, correct?  On Page 2, does it indicate that?
24  A.   Yes.
25  Q.   And he also worked in a foundry and as a plumber,

---

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 58

1  correct?
2  A.   Yes.
3  Q.   Based on my understanding of the classifications in
4  Exhibit 3, I originally -- my original question was going to
5  be, this individual will be miss-classified as a community
6  exposure.  But as I understand your testimony, he is not
7  miss-classified as community, because you have not, in your
8  community designation, removed people who had other asbestos
9  occupational non-Grace exposure, correct?
10  A.   That's correct.  He had very high exposures levels in
11  Libby, too, basically, by taking the history from him, and I
12  have done that myself subsequent to that time.  I don't know
13  where it is in the chart.  And it may not be in the chart.
14  But I have talked to him at length at least one time about
15  it.
16  Q.   As I understand your previous testimony, when you say he
17  had very high levels of exposure to -- at Libby, you are not
18  indicating that you have any knowledge whatsoever about the
19  actual level of exposure of Mr. Hill, but that he had a
20  number of potential pathways for exposure at Libby, correct?
21  A.   That's partly that.  But it's also information that I
22  have developed by talking to a lot of people as to what their
23  exposure histories are.  As the areas that have come to the
24  fore when you work -- when you see over a thousand people in
25  the clinic and you know what they were exposed to and where

---

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 59

1  they were exposed to it, then you begin to draw some
2  conclusions about the severity of some of the exposures.
3      But the other problem is that it's not possible -- we
4  don't know what the levels were, as you know, and there is a
5  very marked difference in susceptibility to disease from
6  individual to individual, and whether that's genetic,
7  familial, we don't know what it is for sure.
8      At any rate, the things he was exposed to were things I
9  associate with high levels, and particularly around the
10  conveyor belt across the river.
11  Q.   I want to make sure I understand.  When you say high
12  levels, you are not corresponding that to any particular
13  quantitative number.  It's just that you see it as being
14  exposure that has been more serious than, potentially,
15  others, correct?
16  A.   Correct.
17  Q.   You also just mentioned the issue of the individual
18  susceptibility, which I have seen you discuss in the cost
19  recovery deposition.  And I want to make sure I understand
20  it.
21      As I understand it, it's a relatively new theory -- I
22  guess is the way to say it -- that you and -- I don't know --
23  perhaps, others, have developed with respect to the potential
24  for asbestos exposure to be more important in some
25  individuals as opposed to other individuals, correct?

---

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 60

1  A.   I think that's true.  Dr. Black and I have talked about
2  that extensively, because we see whole families.  Now, maybe
3  they just had high exposure more than other people, but a lot
4  is not explainable.
5      For example, two people that live -- I had this
6  experience.  Two people that worked side by side in the dry
7  mill, at the same time, almost exactly the same dates, and
8  were friends, and one is dead, and the other one has no
9  evidence of disease, period.  I don't know how to explain
10  that, except genetics.  They both were nonsmokers.  I will
11  give you Larry Hill's backup.
12  Q.   Thank you.
13  A.   If we could take a break for a minute, I would appreciate
14  it.  I need to stand up and straighten my knee out for a
15  break.
16  Q.   Ten-minute break or longer?
17  A.   I don't need too much time.  I will head to the bathroom.
18  Q.   Let's shoot for five or ten minutes.
19      VIDEOGRAPHER:  We are going off the record at 10:49 a.m.
20      (Recess taken from 10:49 to 10:56.)
21      VIDEOGRAPHER:  We are back on the record at 10:56 a.m.
22  Q.   (BY MS. HARDING)  Dr. Whitehouse, it's fair to say that
23  you have opined in this litigation, as well as in the
24  criminal case --
25      MR. MCLEAN:  Excuse me.  We can't have any questions

Page 61

1  relating to the criminal case in the deposition.  There will
2  be none that is related to this criminal case, and I will
3  instruct Dr. Whitehouse not to answer questions that have any
4  relation to the criminal case.
5      MS. HARDING:  On what basis?
6      MR. MCLEAN:  Because it's not allowed under the Federal
7  Rules of Criminal Procedure, the judge's protective order.
8      MS. HARDING:  You are saying Dr. Whitehouse's opinions he
9  reached in the criminal case and their relevance and what
10  they say don't bear on his credibility and our ability to
11  understand what he is saying in this bankruptcy case?
12     MR. MCLEAN:  I am telling you, I will not let him answer
13  any questions that relate to the criminal case.
14     MS. HARDING:  Mr. Heberling?
15     MR. HEBERLING:  I don't take a position on that.
16     MS. HARDING:  Despite the fact the witness has offered an
17  expert report as an expert in the criminal case and has also
18  offered an expert report in this case, and the fact that
19  there may or may not be differences with respect to what the
20  witness has said in the criminal case and what the witness
21  said in this case, and any of the other myriad of issues that
22  may be in play, you are instructing the witness not to answer
23  questions?
24     MR. MCLEAN:  If questions relate to information supplied
25  in the criminal case or to his criminal case expert report,

Page 62

1  then that is what I am going to do.  Correct.
2      MS. HARDING:  When you say information supplied in the
3  criminal case, what do you mean?  What information did you
4  supply to the witness in the criminal case that is not --
5  what information did you provide to the witness in the
6  criminal case.
7      MR. MCLEAN:  What I am talking about, really, is the
8  criminal discovery process and Judge Mulloy's protective
9  order saying that the information supplied by the United
10  States to the defendants in their criminal case could not be
11  used for any other purpose, including bankruptcy or civil
12  cases.  And, so, that's what I am referencing.
13     As well as, this witness should not be cross-examined
14  about information contained in his criminal expert witness
15  report, because that, in a criminal case, is only done at
16  trial, and there is no such thing as a deposition in a
17  criminal case unless there is a court order allowing that
18  under Federal Rule of Criminal Procedure 15.  We don't have
19  that in place here.
20     MS. HARDING:  Well, as I understand it, the information
21  that -- the discovery that's been provided in the criminal
22  case is some of the very same discovery that's been provided
23  in the bankruptcy case.  Indeed, it provides essentially the
24  foundation of Dr. Whitehouse's opinion in the bankruptcy
25  case.

Page 63

1      Are you telling me he can't testify about the medical
2  records and documents that were supplied by the U.S.
3  government in the criminal case in this bankruptcy case?
4      MR. MCLEAN:  I think we just need to be clear that the
5  government has no idea what was supplied by claimants in the
6  bankruptcy case, and that was the point of the protective
7  order was to separate the government, disclosure in the
8  criminal case, from whatever might occur in the bankruptcy
9  case.
10     That's the distinction I am making is that you can ask
11  him whatever questions you want about the bankruptcy
12  discovery, bankruptcy expert witness reports.  It's only when
13  you get into asking questions about the criminal expert
14  report and whatever -- and there is overlap, I am guessing.
15     MS. HARDING:  There is significant overlap.
16     MR. MCLEAN:  I don't want you to ask questions that ask
17  about criminal discovery.  Just stick to the bankruptcy
18  discovery and we will be fine.
19     MS. HARDING:  Well, the criminal discovery included the
20  production of his medical records.  That's basis.  That's the
21  predominant issue that we are intending to ask him about
22  today.  So, are you instructing him not to answer questions
23  about the medical records that were provided in the criminal
24  case?
25     MR. MCLEAN:  That's what Judge Mulloy's protective order

Page 64

1  says.  You are not allowed to ask about or use those criminal
2  records -- medical records -- in any proceedings other than
3  the criminal case.
4      MS. HARDING:  So Dr. Whitehouse is not permitted to talk
5  about the 123 records that were produced in connection with
6  his progression study, then.  That would be an area he is not
7  allowed to talk about here?
8      MR. MCLEAN:  If he provided it in the bankruptcy case,
9  you can ask him whatever questions you want.
10     MS. HARDING:  He provided it in both, in the criminal
11  case and in this case.
12     MR. MCLEAN:  Okay.  I am not aware what he provided in
13  the bankruptcy case.
14     MS. HARDING:  I think let's go off the record for one
15  second, please.
16     VIDEOGRAPHER:  We are going off the record at 11:01 a.m.
17     (Discussion off the record.)
18     VIDEOGRAPHER:  We are back on the record at 11:09 a.m.
19     MS. HARDING:  The proposal on the table is to essentially
20  defer further discussion of the issue about the criminal case
21  until after lunch, if that's amenable to all the parties?
22     MR. MCLEAN:  It is.
23     MS. HARDING:  The only question I have of counsel is, do
24  you have identification of documents that were produced in
25  the criminal case by the government that you think that we

Page 65

1  should not be asking questions of Dr. Whitehouse about?

2      MR. MCLEAN:  I don't have them with me today, but they

3  are a matter of record in the criminal case and the

4  protective order issued by Judge Mulloy.

5      MS. HARDING:  And it's your position that any records

6  that were produced by the government in connection with the

7  protective orders issued out of the criminal case, that you

8  are instructing Dr. Whitehouse not to answer questions about

9  those documents.  Is that right?

10     MR. MCLEAN:  To the extent -- I guess the basic answer

11 is, yes.  And what I am trying to indicate is that, if those

12 same records were disclosed in the bankruptcy process, I have

13 no problem with asking and answering questions about those.

14 It's just a matter of the source.  And if there is

15 duplications -- there has got to be duplications in this

16 case.  To the extent there is duplications, my only objection

17 is to referencing discovery in a criminal case.

18     So if you have documents that were provided in the

19 bankruptcy proceedings, bankruptcy disclosures, and they just

20 happened to have been provided in the criminal case, I have

21 got no problem with that.

22     MR. MCLEAN:  Well, the only documents that I am aware of

23 that were not produced -- that were not part of the discovery

24 process in the bankruptcy case -- and I say that that way

25 because some of the orders with respect to discovery in the

Page 66

1  bankruptcy case actually ended up being issued by Judge

2  Mulloy.  So, that's where I am concerned.

3      The only medical records that I am aware of that were a

4  part of the criminal production, that were not part of the

5  kind of request for documents in the civil litigation, are

6  the documents in connection with the victim witness -- victim

7  witnesses in the criminal case.

8      And, you know, I don't want to be asking questions about

9  medical records and have you come back later and tell me I

10 have somehow done something wrong or committed misconduct or

11 something like that.  So I want a clear statement, with the

12 exception of those records, that we are permitted to ask him

13 questions about all of the other patient records and

14 documents that he has provided.  Is that fair?  Is that a

15 fair assessment of your understanding as well?

16     MR. MCLEAN:  Yes.

17     MS. HARDING:  And I am not agreeing to this issue.

18 That's how we will proceed at this point.

19     MR. MCLEAN:  Yes.

20     MS. HARDING:  All right.

21     MR. HEBERLING:  I should add one thing about the

22 documents in the big plastic box.  Not all of the 123 are our

23 clients, so as to those who were not clients, we can't cause

24 those to be copied without redacting.

25     MS. HARDING:  Okay.  I think we can deal with that off

Page 67

1  the record.

2      MR. HEBERLING:  We can supply a list of people who are

3  clients, and the others can be excluded and not copied.

4      MS. HARDING:  Okay.  For my position, it depends on the

5  reliance that Dr. Whitehouse places on the records, and if he

6  is relying on the records to form his opinions, then they

7  should be produced in some form.  And, so, we can discuss the

8  form that they are produced after, off the record.

9      MR. HEBERLING:  You have all the records and all the data

10 anyway.  It's not a major issue I can see.

11     MS. HARDING:  We have computer data that pick up some of

12 the information on the records, correct?

13     MR. HEBERLING:  Yes.

14     MS. HARDING:  But we don't have copies of the records

15 right now, correct?

16     MR. HEBERLING:  Well, we think you probably do.

17     MS. HARDING:  Why don't we talk about it off the record,

18 then.

19     THE WITNESS:  May I say something off the record now?

20     MS. HARDING:  Sure.

21     VIDEOGRAPHER:  Did you want to go off the record?

22     MR. HEBERLING:  It's agreeable to our side.

23     MS. HARDING:  It's agreeable.

24     VIDEOGRAPHER:  We are going off the record at 11:13 a.m.

25     (Discussion off the record.)

Page 68

1      VIDEOGRAPHER:  This is the continued videotaped

2  deposition of Dr. Alan C. Whitehouse and Volume 1, Tape 3.

3  The date remains to be October 18, 2007.  The time is now

4  11:16 a.m.

5  Q.  (BY MS. HARDING)  Dr. Whitehouse, I would like to ask you

6  about Exhibit 5 to your July 23rd -- July 2007 report in the

7  bankruptcy case.

8  A.  Yes.  I have it.

9  Q.  At Paragraph 37, you discuss and -- start to discuss the

10 Exhibit 5, and you say, "It is observed that 82 out of 108,

11 76 percent, deceased clients of McGarvey, Heberling, Sullivan

12 & McGarvey have died of asbestos disease, excluding those of

13 yet undetermined cause."  And you reference Exhibit 5.

14 A.  Yes.

15 Q.  Do you see that?

16 A.  I do.

17 Q.  And then you state, "When asbestos-related disease does

18 not appear on the death certificate, determination is made by

19 best evidence review of medical records."

20     Do you see that?

21 A.  Yes.

22 Q.  As I understand it, that means, that if the death

23 certificate itself did not list an asbestos-related cause of

24 death, you reviewed the information on the patient and, at

25 times, changed the cause of death for the individual.  Is

Page 69

1  that right?

2  A.   Correct.

3  Q.   And it would be -- your assessment would then be

4  sometimes different than the assessment of the doctor who

5  signed the death certificate, correct?

6  A.   Yes.  By way of explanation --

7  Q.   Actually, because we are running out of time, I think

8  you -- we will get to that later.  I want to kind of get to

9  some questions about the exhibit.  I just want to understand

10  what you --

11       MR. HEBERLING:  He is entitled to explain his answer if

12  he chooses to.

13       MS. HARDING:  That's fine, if you want to explain your

14  answer, go ahead.

15       THE WITNESS:  To -- I am aware from long-standing that

16  the physicians in Libby, in coding death certificates, coded

17  almost any respiratory death as COPD.  Sometimes it's

18  pulmonary fibrosis.  And when you reviewed the records, you

19  got obvious other information.  That's basically the

20  explanation for doing it the way we did it.

21  Q.   (BY MS. HARDING)  Okay.  So it's your opinion that

22  physicians in Libby, with the exception of you and Dr. Black,

23  perhaps?

24  A.   And currently, they are not doing that.  They are doing

25  it more correctly.  This was for older deaths.

Page 70

1  Q.   At what time did you feel like all the other physicians

2  in Libby started to get the death certificates right, from

3  your perspective?

4  A.   I don't know.  I mean, it's not -- it's fairly reasonably

5  recent, and even that's not uniform.

6  Q.   So, in the last five years?

7  A.   Probably since the -- since the turn of the century.

8  Since 2000.

9  Q.   You also state, "While these numbers are representative

10  of Libby claimants only" -- by that you mean Mr. Heberling's

11  clients, right?

12  A.   Yes.

13  Q.   You state that they are indicative of the probability of

14  death due to asbestos disease?

15  A.   That's true.

16  Q.   So the -- as I understand it, you have got -- the

17  probability that you are referring to is 76 percent?

18  A.   Of dying of asbestos disease?  76 percent you are talking

19  about is the total percent of the deaths in this group.

20  Q.   I am asking you what probability you are talking about.

21  You say that, while these numbers are representative of the

22  Libby claimants only, they are indicative of the probability

23  of death due to asbestos disease.

24  A.   Yeah.  That's basically, if you established asbestos

25  diagnosis, that the probability of death due to some --

Page 71

1  either asbestosis or to one of the cancers that's commonly

2  associated with asbestos disease, that that number, then,

3  is -- that's where that number comes from.

4  Q.   The 76 percent?

5  A.   Yes.

6  Q.   So, if you are diagnosed with any kind of disease related

7  to asbestos, then you have a 76 percent chance of dying from

8  that disease.  That's your opinion?

9  A.   I am talking about lung disease now.  But, yes.  At least

10  in the Libby population, based upon the deaths that we have

11  looked at carefully and the death certificate reviews.

12  Q.   And the percentage -- the way that you get the percentage

13  is, the enumerator is the number of people who have died, and

14  the denominator is the number of people that are

15  Mr. Heberling's clients, correct?

16  A.   That have asbestos disease, correct.

17  Q.   And you make that determination even though you have no

18  indication whatsoever in your calculation what the exposed

19  population is of the people that actually ended up with

20  asbestos disease in Mr. Heberling's client list, correct?

21  A.   I am not sure I understand your question.

22  Q.   Well, first of all, let me ask you this.  You don't know

23  how many other people have asbestos-related disease that

24  aren't Mr. Heberling's clients, correct?

25  A.   No.  There is probably -- I know how many we have in the

Page 72

1  clinic, but I don't know how many other cases there are out

2  there in Libby that we haven't seen yet.

3  Q.   Right.  And, actually, based on other information in your

4  reports and other things that you have done, you suggested

5  there are many, many more cases of asbestos-related disease

6  in the Libby area, correct?

7  A.   In the Libby area and around the country, too, I suspect,

8  because we take care of a fair number of people that are out

9  of state that come back to Libby.

10  Q.   Right.  So the denominator, with respect to the

11  percentage of people that die from asbestos-related disease,

12  should include all of the people that have asbestos-related

13  disease, right?

14       MR. HEBERLING:  Objection.  Unclear as to which

15  denominator.

16       THE WITNESS:  The denominator we are using is the number

17  of deaths, the percentage that are asbestos related, not

18  necessarily the entire population of asbestos disease.

19  Because, obviously, if you have a pleural plaque at age 40,

20  you know, you wouldn't be included as a death -- if you are

21  living and working and everything else.  You wouldn't be

22  included as a death until you actually died and then we

23  reviewed the death certificate and we know that you have had

24  asbestos disease and we can document that in some form or

25  another, or be highly suspicious that's what it was when we

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 73

1  looked at the death certificates.

2       And I use the same criteria Selikoff did for death

3  review.

4   Q.   (BY MS. HARDING)  The ratio you get, the way you get your

5  percentage, is, you have a number of people with disease and

6  a number of people who die, correct?

7   A.   No.  The ratio we are talking about, 76 percent --

8   Q.   Yes.

9   A.   -- is the number that died and the ones that had asbestos

10  disease at the time of the death.

11  Q.   In Mr. Heberling's client list?

12  A.   In his client list, right.

13  Q.   Do you have any information whatsoever to let you believe

14  or lead you to believe or provide a foundation that

15  Mr. Heberling's client list includes all of the people in the

16  Libby area that have some form of asbestos-related disease?

17  A.   No.  Obviously, not.  There is 667 total clients.  There

18  has been over -- well over 15 or 1800 identified.  I don't

19  know the exact number now.  We are still seeing two or three

20  new ones a week.

21  Q.   So, if the actual number -- let's just speculate.  If the

22  actual number of people in Libby with asbestos-related

23  disease were 1,000, and the number of deaths associated with

24  asbestos were the number that you have here, which is 82 --

25  correct?

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 74

1   A.   Correct.

2   Q.   -- then the probability from death that you would

3  calculate from those two numbers would be significantly

4  different than 76 percent, correct?

5   A.   Yes.  But they haven't died yet.

6       MR. HEBERLING:  Objection.  Misstates the record.  Go

7  ahead.

8       THE WITNESS:  You are talking about when you die, whether

9  your death was due to asbestosis or lung cancer or some

10  asbestos-related disease, as opposed to, say, you stepped in

11  front of a bus.

12  Q.   (BY MS. HARDING)  I understand that.  And you are saying

13  82 of 108 of Mr. Heberling's clients have actually died from

14  something that you consider to be asbestos-related disease,

15  right?

16  A.   Correct.

17  Q.   And the point that I am making is that the percentage

18  that you get is based solely on the denominator that you use,

19  which is 108, which is the clients?

20  A.   Yes.  The ones that died.

21  Q.   Of his clients?

22  A.   Of his clients, yes.

23  Q.   And you don't --

24  A.   This isn't related to anybody except his clients, this

25  particular chart.

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 75

1   Q.   Except that you say that that is indicative of the

2  probability of death due to asbestos disease, correct?

3   A.   I think that his client list is pretty representative of

4  what we see in the CARD Clinic.  I think it's quite

5  representative.

6       And, in addition, we send cards to families of everybody

7  that dies, and I see all those because I sign all those,

8  along with the rest people in the clinic.  I am up there

9  twice a month, and I sign, probably, two every time I am up

10  there.

11      And I know who those people are, and I know what they die

12  of, and I think the percentage -- I don't have any statistics

13  on this, but I think it's going to be a reasonable percentage

14  in Libby that, if you die, that your asbestos disease, if you

15  had it, was going to be a significant contributing cause to

16  your death, if not the sole cause.

17  Q.   I think you just said that the CARD Clinic has a number

18  of other individuals currently diagnosed with

19  asbestos-related disease, correct?

20  A.   Oh, yeah.  We have two, two and a half, maybe three times

21  what his client list is.

22  Q.   Okay.  I think, as I understand what you are saying, you

23  are saying that the -- you believe that the ratio that's

24  observed in Mr. Heberling's client list is the same as the

25  ratio that would be observed if, for instance, you took all

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 76

1  of the people, individuals in Libby, who currently have

2  asbestos-related disease, and the deaths that have occurred

3  in that group?

4   A.   I think it's going to be -- I don't have the statistics.

5  I will be the first one to admit I don't have the statistics,

6  but I would very much suspect that it's very close.

7   Q.   But you don't have any -- you don't have any data to

8  support that, correct?

9   A.   No, I don't, at this point.  ATSDR has a fair amount of

10  data, but I don't have any data concerning all of our current

11  patients or anything.  We are dealing here with his client

12  list, predominantly.

13  Q.   So, for the opinion that 76 percent of people that will

14  die from asbestos-related disease, you are relying on the

15  ratio you derived from Mr. Heberling's client list, correct?

16  A.   Basically, yes.

17  Q.   You also state that -- in the same area, I believe --

18  that a patient diagnosed with asbestos disease from

19  predominantly chrysotile exposure has a much lower likelihood

20  of death.  Correct?

21  A.   That's correct.

22  Q.   As I understand it, you have indicated previously that

23  you have examined many patients in the past that are just

24  exposed to chrysotile asbestos.  Is that right?

25  A.   Those were patients that were in my office in Spokane.

Page 77

1  They are not part of the CARD Clinic population at all.
2  Q.   And what -- as I understand it, in previous testimony,
3  you have indicated that the kinds of work histories of those
4  individuals that are exposed just to chrysotile are people
5  that were in the shipyards, that were insulators, pipe
6  fitters, the traditional occupational asbestos exposures.
7  Correct?
8  A.   Yes.  Some that you are not aware of, but we are in the
9  State of Washington because they were almost all from the
10 State of Washington.
11 Q.   So, almost all of the individuals that you had previously
12 seen that have only chrysotile exposure were almost all from
13 the State of Washington?
14 A.   Most of them were.  There were maybe a few other ones
15 outside, but not very many.
16 Q.   And it's your opinion that the occupational exposures
17 that individuals -- that you were talking, these other 500
18 group of people you have seen that were only exposed to
19 chrysotile?
20 A.   Yes.  And that 500 is an estimate, because I did not keep
21 an accurate database on them.  It's probably more than that,
22 actually.
23 Q.   But the occupational exposures that we just discussed,
24 the types of occupations that they did and the asbestos
25 exposures they received, it's your opinion those were solely

Page 78

1  chrysotile asbestos exposures?
2  A.   They were solely chrysotile.  They may have had some
3  amosite exposures also, because it was mixed in frequently
4  with chrysotile.  And I can tell you all the areas that were
5  predominant in the State of Washington, if you are interested
6  in that information.
7  Q.   I am interested in what you just said.  You said that
8  they did have amosite exposure as well.  So they weren't
9  solely chrysotile exposure, then?
10 A.   I think it's well known, in some instances, there was
11 some amosite mixed in with chrysotile.  Not necessarily a
12 lot.  There is hardly anything as pure chrysotile.  There is
13 also some mixtures of various things.  For the most part, it
14 was chrysotile they were exposed to.  And sometimes you don't
15 know what all was there.
16 Q.   You based a number of your opinions in previous reports,
17 as well as in this report, on the distinctions that you see
18 in the group of workers that you diagnosed with what you have
19 termed chrysotile only exposures, as opposed to the group of
20 individuals that you have -- that you have seen that have
21 exposure to asbestos from Libby, correct?
22 A.   That's correct.
23     MR. HEBERLING:  Objection.  Misstates the report.
24 Q.   (BY MS. HARDING)  And you have indicated on numerous
25 occasions that the -- that the distinction that you are

Page 79

1  drawing is between groups of workers that have only
2  chrysotile exposure and groups of workers that have exposure
3  at Libby, correct?
4     MR. HEBERLING:  Objection.  Misstates the report.
5     THE WITNESS:  Probably you need to read to me what I
6  wrote about that, at this point in time.
7  Q.   (BY MS. HARDING)  The one place that I see is in -- I
8  don't have a paragraph right here, but you have, a patient
9  diagnosed with asbestos disease from predominantly chrysotile
10 exposure has a much lower likelihood of death?
11 A.   That's correct.
12 Q.   And as I understand your testimony today, though, you are
13 saying that that group of workers that you have seen in the
14 past, they didn't just have chrysotile exposure, they also
15 had other exposures.  Correct?
16 A.   I didn't say that.  What I said was that many of the
17 chrysotile -- that was used had some small amounts of amosite
18 in it.  That's a known fact.  That's not anything that I know
19 specifically.  And I don't even know for sure, particularly,
20 where that -- which of the exposures that these people had,
21 had any other kind of asbestos associated with it.
22     But I know they were not predominantly amphiboles at all,
23 like we have in Libby, which is a very different type of
24 asbestos.
25 Q.   In your July 2007 report, on Page 1 you say, "Since 1980

Page 80

1  I have evaluated or treated over 700 patients for asbestos
2  disease from Libby asbestos.  Since about 2000, patient data
3  has been tracked on a database.  Since 1980, I also evaluated
4  or treated over 500 patients with asbestos disease from
5  predominantly chrysotile exposures."
6  A.   That's correct.
7  Q.   As I understand the testimony you gave in the cost
8  recovery action, you stated that, with respect to these 500
9  patients that were predominantly exposed to chrysotile, that
10 workers from -- these were workers from furnaces, pipe
11 fitters, Navy workers; those were the types of workers that
12 you are talking about, correct?
13 A.   Nuclear power plants, paper mills, beet factories, all
14 kinds of things.
15 Q.   Insulators?
16 A.   Insulators.  Not many insulators, actually, except at
17 Hanford.  I used the word predominantly, if you notice there.
18 Q.   What's your foundation for your opinion that the diseases
19 that resulted from these exposures in this other group of 500
20 people were as a result of chrysotile exposure, and not
21 exposure to other amphiboles that were present?
22 A.   My history was that of, you know, getting an exposure
23 history that was very extensive, and every one is where they
24 were exposed.  And most of them were related to industrial
25 claims in the State of Washington.  And not only did I get

Page 81

1  that history, but they came frequently with a very long
2  detailed list of every place they ever worked.
3      So, I don't know.  I mean, as far as I know -- not as far
4  as I know.  They never worked in the Libby asbestos expansion
5  plant or Grace expansion plant.  They -- most of them had
6  been shipyard workers, workers in -- at Hanford that were
7  insulating the nuclear power plants and the paper plant down
8  in Wallula.  That's where the majority of them came from.
9  Q.   What was the range of exposure dates for all those
10  various patients?
11  A.   Everything from World War II up until the present.
12  Q.   Until today's present?
13  A.   Yes.  I think that they were -- their exposures were,
14  really, very less, or negligible, after about 1985, because
15  they were mandated to have protection.
16  Q.   Okay.  But up until 1985, at least some of the
17  individuals in groups of people in your -- that group of 500,
18  had exposures to chrysotile and amosite, and possibly
19  crocidolite as well, correct?
20  A.   Maybe in something else in there.  I don't know for sure.
21  I don't know what all they were individually exposed to.  I
22  mean, we don't -- you don't get that information.  I don't
23  know what all they used at Hanford in various areas.  There
24  was tremendous asbestos exposures in Hanford.
25      What I am saying is, I can only know of three deaths in

Page 82

1  any of those people that I saw, and some of them were pretty
2  old at that time, and most of the stuff that I was seeing
3  from chrysotile was relatively minimal disease.
4  Q.   What is it that makes -- or what foundation do you have,
5  that you were seeing -- let me ask you this.
6      What percentage of the diseased population in that area
7  do you believe that you were seeing during that time?
8  A.   I have no idea.
9  Q.   And your testimony is that those workers were being
10  exposed at their jobs to, predominantly, chrysotile, but
11  probably also amosite as well, correct?
12  A.   From what I understand about the commercial uses of
13  chrysotile over the years, there probably was some
14  amosite in it, but not a high percentage.  But that was true
15  in New York and in the shipyards as well.
16  Q.   So if they were working on pipes that were insulated with
17  both chrysotile and amosite in 1985, they would be exposed to
18  both, correct?
19  A.   Yeah.  And I usually ask people about the color of the
20  asbestos that they were exposed to.  You don't get any
21  histories really very much of brown asbestos or blue
22  asbestos.  It's all white asbestos, for the most part.
23  Q.   Would you have -- what do you think that the -- well, I
24  will come back to that later.
25      Have you ever investigated or researched the literature

Page 83

1  to determine the percentage of asbestos -- various types of
2  asbestos in different types of occupational asbestos
3  exposures?
4  A.   No.  I mean, I have seen them in various literature, but
5  I never investigated it per se.
6  Q.   Have you ever reviewed the paper by Balzer and Cooper
7  from 1968, discussing the composition of insulation material?
8  A.   I have actually seen that, and I am trying to -- I don't
9  remember details about it, though.  In fact, I know I read it
10  at one point.  Do you have a copy?
11  Q.   I have a copy of it.  Yes.  If you look at -- I am
12  showing you a copy of an article, Balzer and Cooper, 1968, on
13  Page 223, insulating materials used.
14      Do you see that?
15  A.   I do.
16  Q.   And under -- for amosite blankets, it suggests that
17  100 percent of those are made of amosite.  Is that right?
18  A.   They are referring to them as amosite blankets, so I
19  think that, obviously, they were amosite then.  It doesn't
20  relate to the mixture in the blankets.
21  Q.   Is the mixture maybe defined?  What do you think that
22  means, then?
23  A.   Well, I assume they are 100 percent amosite if they
24  indicated that.  But I don't know how frequently amosite
25  blankets were used.  I have no knowledge of that.

Page 84

1  Q.   Do you see -- have you reviewed this article in the past?
2      MR. HEBERLING:  Objection.  Asked and answered.
3      THE WITNESS:  I vaguely recall it.  I don't recall
4  specifically reading it.
5  Q.   (BY MS. HARDING)  One other article I would like to ask
6  you if you have seen before or read before.  It's an article
7  by Dr. Nicholson and Dr. Landrigan, a status report out
8  of Mt. Sinai, published in 1996.
9      Have you seen this article before?
10  A.   I don't think I have.
11  Q.   If you could turn to Table 2.  Do you see Table 2?
12  A.   I have it.
13  Q.   Do you see the heading, "Risks of lung cancer and
14  mesothelioma in workers exposed to various asbestos
15  minerals."  And then there is a listing of asbestos exposure
16  and location, and then type of asbestos.
17      Do you see that?
18  A.   Yes.
19  Q.   And do you see -- for instance, under insulation
20  application under United States, do you see that?
21  A.   I do see that.
22  Q.   It's got 60 percent chrysotile and 40 percent amosite.
23  Right?
24  A.   I do.
25  Q.   Under asbestos products, United States; do you see that?

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 85

1  A.   Yes.

2  Q.   80 percent chrysotile, 15 percent amosite, and five

3  percent crocidolite.  Correct?

4  A.   I do.  I see that.

5  Q.   So the question that I have for you is twofold.  The

6  first question is that you don't know the extent of the

7  amphibole exposures of your group of 500 workers that you

8  said were predominantly exposed to chrysotile, correct?

9  A.   That's correct.

10  Q.   Additionally, in connection with any of your reports or

11  exhibits in this case, particularly Exhibit No. 3, you

12  haven't indicated anywhere in your reports or in your

13  exhibits that the workers that are -- not the workers -- the

14  individuals that are listed under community exposure, the

15  potential exposures that they had to other asbestos,

16  including chrysotile or other amphiboles, right?

17       MR. HEBERLING:  Objection.  Confusing.

18       MS. HARDING:  Fair enough.  I will ask the question

19  again.

20       THE WITNESS:  It is.

21  Q.   (BY MS. HARDING)  With respect, specifically, to Exhibit

22  No. 3 to your July 2007 report --

23  A.   Okay.

24  Q.   -- there is nothing on that exhibit, or anywhere in your

25  report, that would give the reader of the report or the

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 86

1  exhibits the information that people listed in the community

2  exposure category also potentially had exposures to

3  chrysotile and other amphibole in other occupations, correct?

4  A.   No, there is nothing on there about that.

5       MR. HEBERLING:  Could we keep a copy of the Nicholson?

6       MS. HARDING:  Sure.

7       MR. HEBERLING:  Thank you.

8  Q.   (BY MS. HARDING)  On Paragraph 42 of your report --

9  A.   Okay.

10  Q.   -- you indicate that deaths in the Libby cohort are

11  summarized on the attached chart, Libby cohort deaths per

12  source.  Correct?  Do you see that?

13  A.   Which exhibit are you talking about, five?  We are

14  talking about that.

15  Q.   Yes, Exhibit 5.

16  A.   I see that.

17  Q.   And you say, at the very beginning of Paragraph 42, among

18  the clients of McGarvey, Heberling, Sullivan & McGarvey, an

19  additional 26 miners have died from asbestos-related disease

20  since 2001, and a total of 35 non-mineworker Libby residents

21  have died of asbestos-related disease to date.  Correct?

22  A.   Correct.

23  Q.   And then you state, the above conservatively totals 215

24  deaths in the Libby cohort due to asbestos-related disease?

25  A.   That's correct.

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 87

1  Q.   And the Libby cohort you are referring to is the -- is

2  Mr. Heberling's clients?

3  A.   We are talking about all Libby deaths here.

4  Q.   So Exhibit 5 is not just a list of individuals who are

5  from Mr. Heberling's client list, they are all individuals in

6  Libby who have died have asbestos-related disease, is that

7  right?

8       MR. HEBERLING:  Objection, misstates the record.

9       THE WITNESS:  No.

10       MS. HARDING:  That's not right?

11       THE WITNESS:  This list is all clients.  There is --

12  Q.   (BY MS. HARDING)  This list meaning which one?

13  A.   Exhibit 5.

14  Q.   Exhibit 5 is just clients --

15  A.   That number came from a total of Sullivan's article on

16  deaths, plus what he -- what we enumerated here in 42.

17  Q.   I see.

18  A.   And we think it's a very conservative number.

19  Q.   Okay.  But the cohort that you are referring to then is

20  all people in Libby?

21  A.   All the people that have asbestos disease in Libby.

22  A.   And all the people that have ever been exposed.  The

23  cohort itself --

24  A.   You guess you could look at it that way, yes.

25  Q.   That's your opinion?

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 88

1  A.   We are looking at the number of people that have died in

2  Libby due to asbestos disease that we know about that died

3  from it.

4  Q.   By cohort you are just talking about the number of people

5  that you identified?

6  A.   We are just talking about the number of people in Libby

7  due to asbestos.

8  Q.   Okay.

9       With respect to the statement that an additional 26

10  miners have died from asbestos-related disease since 2001,

11  and a total of 35 non-mineworker Libby residents have died of

12  asbestos-related disease to date.  How are non-mineworker

13  Libby residents defined?

14  A.   Non-mineworker refers to family and environmental.

15  Q.   Family and environmental.

16       Dr. Whitehouse, I would like to ask you about your

17  calculation that you make starting at paragraph 43.

18  A.   Okay.

19  Q.   You state that, based on a review of available medical

20  records, asbestos-related disease is determined to be a

21  significant factor in death.

22  Q.   Where are you reading from, 43?  Paragraph 43 starts with

23  ATSDR 2002.

24  Q.   I think it's down a little further.

25  A.   Okay.

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 89

1   Q.   Well, just --
2   A.   Go ahead and repeat what you were saying.
3   Q.   Let's go right to -- look on page 20?
4   A.   I have 20.
5   Q.   And it's got you are referring to ATSDR table ten,
6   correct?
7   A.   Okay.
8   Q.   Excuse me one second.  I am sorry.  You state that,
9   starting at the top of page 20 under ATSDR, you are
10  explaining that table ten shows 12 deaths in Category 501,
11  asbestosis.
12  A.   Right.
13  Q.   And then going down, then you start talking about your
14  review, based on a review of available medical records?
15  A.   Yes.
16  Q.   When you start talking about that, you are talking about
17  a separate independent review that you have done, correct?
18  A.   Right.
19  Q.   Not something ASDTR did?
20  A.   No.
21  Q.   You are saying that those deaths that you identified by
22  your re-review of their death certificates, correct?
23  A.   That's correct.
24  Q.   That they would be placed in Category 501 asbestosis in a
25  best evidence study even if they weren't classified as such

STOREY & MILLER  717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 90

1   on the death certificate, correct?
2   A.   Yes.  I would agree with that, yes.
3   Q.   And you have also said there is no ICD9 category for
4   asbestos related disease or asbestos pleural disease?
5   A.   I am wrong about that.  That's a recent category.  I
6   don't know when it started being used.  Pleural thickening is
7   now a category.  It's sort of a garbage bag of things under
8   511 that are other asbestos diagnoses, plaques, pleural
9   thickening, blunting of the angle.  A number of things.
10  Q.   That is actually --
11  A.   That was a misstatement.
12  Q.   That -- I wanted to ask you about that because I wanted
13  to find out, do you know when that classification started?
14  A.   No, I don't.  Because I know in my office, I closed my
15  office in December of '04, I think it had just become
16  available sometime shortly before that that my builder told
17  me about that.  I don't know when it became available.
18  Q.   What were the ranges of the death certificate dates that
19  you reviewed, do you know?
20  A.   That was in 2001 on.  I think we are talking about that
21  one, aren't we?
22  Q.   They were all of the death certificates were from 2001
23  on?
24  A.   No, I reviewed them from way back as well, but I think
25  that 26 deaths that he is referring to there.

STOREY & MILLER  717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 91

1   Q.   Right?
2   A.   Summary of deceased clients charts.  Those were the ones
3   we were referring to back here under Paragraph 42, additional
4   26 miners.  That's 2001.
5   Q.   You would agree with me that there is, at the time that
6   you were writing then -- so you don't know when it was
7   actually started.  I think I have it here somewhere.  I
8   believe it was 1997 or 1998?
9   A.   Was it that early?  I was not aware of it.  So --
10  Q.   So it's fair to say that to understand the relationship
11  of that number of deaths to a general population, you would
12  need to use the correct ICD9 code, right?
13  A.   Well, I am not quite sure.  To begin with, a lot of those
14  were things I did not code.  Obviously I didn't code most of
15  those charts at all.  So I can't even answer that question
16  for you.  I think they probably were all asbestosis judging
17  by how things are coded in Libby by the physicians, but I
18  can't guarantee that to you.  Some of those could have been
19  pleural deaths.  See, I may not have seen every one of those
20  patients or seen them individually at the time of their
21  death.
22  Q.   But you have gone back and reviewed the death certificate
23  and made what you call a best evidence determination,
24  correct?
25  A.   I have.  And that's based upon charts and what was

STOREY & MILLER  717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 92

1   available to me.  So -- yes, I have made a best evidence
2   determination, but, on the other hand, some of those could
3   have been pleural deaths as well.  They are coded as
4   asbestosis.  But you actually haven't seen the patient
5   yourself necessarily, although most of them I had seen, then
6   the death certificates came to me later, then I think it's
7   correct.  You have to realize that asbestos related pleural
8   disease, it could have been a cause of death in some of
9   those.  It's not possible for me to know that for sure.  All
10  I can tell you is I know they were asbestos death.
11  Q.   Let me try to short circuit this.  Would you agree with
12  me that in doing the kind of what's fair to call back of the
13  envelope calculation you have done in your report?
14  A.   Uh-huh.
15  Q.   On page 20 and 21, that your observed number, enumerator,
16  has to have the same criteria for inclusion as your
17  denominator, correct?
18  A.   Run that by me again.
19  Q.   If you are going to compare -- let's say you are going to
20  compare -- let's pick something other than asbestos.  Let's
21  say you want to understand the rate of death from lung cancer
22  in Libby compared to the rate of death of lung cancer in the
23  general population.  Okay?
24  A.   Uh-huh.
25  Q.   Whatever you use to count lung cancer cases in Libby, you

STOREY & MILLER  717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

Page 93

1  should use the same thing to count lung cancer cases in the
2  general population, right, the same definition?
3  A.    But the definition includes people with asbestos disease.
4  Okay.
5  Q.    I am trying to ask you a complete unrelated asbestos
6  question.  I am trying to ask you a question about math, and
7  calculate it in a proposed SMR?
8  A.    I see what you mean.
9  Q.    If you are going to use, whatever the disease is, and
10  let's say the disease is classified as ICD9 code 10, and
11  that's what you use in your enumerator.  In your denominator
12  when you looking at a general population, you should use only
13  ICD9 code 10?  Correct?
14  A.    That's correct.
15  Q.    You shouldn't use ICD9, 10, plus 10 and 14, if you don't
16  use -- if you didn't use that enumerator, right?
17  A.    I understand that.  Except in this particular situation
18  you have to realize that the codings are problematic
19  sometimes.
20  Q.    But you would also have to in your denominator to make
21  your a calculation at all kind of, at least in terms of math,
22  correct, then you have to also review all the death
23  certificates in the denominator to see if he they met your
24  same criteria, correct, because you could reclassify a bunch
25  of people in the denominator as well, correct?

Page 94

1  A.    The denominator is the number of people that have
2  asbestos disease.  Unfortunately, we don't know how many
3  people have asbestos in Libby.  We do not.  We don't know how
4  many will develop asbestos disease.  We know there is a lot
5  more occurring since the late 1990's.  More and more cases
6  are showing up.  And they are not as sick.  So they are not
7  dying at this point in time.  We look at all the evidence
8  concerning progression of pleural plaques to severe disease,
9  that's where they are headed.  So, in a sense, in a sense
10  it's apples and oranges.  We are talking about just the
11  specific number of deaths that have occurred in that period
12  of time since 2001.
13  Q.    Dr. Whitehouse, I am really trying to get at the
14  methodology that you used to arrive at your calculation on 20
15  and 21, and you have attempted to compare the number of
16  deaths related to asbestos in Libby to the number of deaths
17  in the general population.  Correct?
18  A.    Yes.  And ATSDR has already done that in their report
19  which you see at the top of the page.
20  Q.    Correct?
21  A.    Forty to eighty times higher than expected.
22  Q.    Right.  As you are well aware, that table that reports
23  that is the table that includes all of the W.R. Grace
24  workers, correct?
25  A.    Yes.

Page 95

1  Q.    And, indeed, when the ATSDR did the calculation where
2  they didn't include the W.R. Grace workers, there was no
3  significant elevation of risk for that category, correct?
4  A.    For asbestosis?
5  Q.    Yes.
6  A.    I don't believe that's the case.  You better show that to
7  me then because I don't think that's correct.
8  Q.    Dr. Whitehouse, I am showing you what is the health
9  consultant ATSDR study that you cited in your report that you
10  are referring to at the top of page 20.  Correct?
11  A.    Uh-huh.
12  Q.    Let me ask you a question.  Do you recognize that study?
13  A.    Yes, I do.
14  Q.    And is that the study that you are referring to on page
15  20 of your report?
16  A.    Although you are getting into the -- some complexities of
17  this that, frankly, if you understand it, you are a better
18  person than I am because it's difficult to understand.
19  Q.    I really just have a question --
20  A.    What all did you want to talk about because I wanted to
21  look at all the pages in this thing because as to where you
22  are looking at it, which one you are looking at, because what
23  you said was, if I understood it correctly, that there wasn't
24  any increased rate.  Is that right?
25  Q.    My question to you is, that when the ATSDR removed the

Page 96

1  W.R. Grace workers from their calculations, that they did not
2  find any statistically significant increase in any of the
3  categories that they were studying.
4  A.    All right.
5  Q.    It's table eight.  And it's -- the heading is combined
6  respiratory mortality excluding former workers in central
7  Lincoln County using the Montana and U.S. population
8  references.
9  A.    I do see that.  I do know one thing for a fact is that
10  their information concerning mesotheliomas is very wrong and
11  does not include -- it does not include all of the
12  mesotheliomas by a long shot.
13      MR. HEBERLING:  Objection, misstates the report, the
14  question relates to table eight.
15  Q.    (BY MS. HARDING)  Dr. Whitehouse?
16      MR. HEBERLING:  It says 3.3 three for SMR.  That's
17  elevated.
18      MS. HARDING:  I object to counsel testifying.
19      MR. HEBERLING:  I object to the misstatement of this
20  report.  You mischaracterized it.
21      MS. HARDING:  I will ask the witness a question to see if
22  I mischaracterized it.
23  Q.    (BY MS. HARDING)  Doctor, with respect to table eight, do
24  you see it?
25  A.    Yes, I see table work.

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 97

1  Q.   With respect to each of the categories that were examined

2  in table eight, there is lung cancer, mesothelioma, COPD,

3  asbestos, cancer, other respiratory and combined causes.  Do

4  you see that?

5  A.   Yes.

6  Q.   And you see there are confidence intervals reported for

7  each of the statistical SMR's that are reported, correct?

8  A.   Right.

9  Q.   And for any of the categories in table eight, is there a

10 statistically significant relationship reported?

11 A.   Absolutely.  SMR for asbestosis has been well known that

12 one case is too many.  If you see part way down there.

13 Q.   What's the confidence interval for asbestosis reported on

14 table eight of the ATSDR study?

15 A.   The confidence interval they have is .04 to 18.55.  And I

16 am not sure I know exactly what that means, but I will take

17 the SMR number.

18 Q.   The question I asked you though was not what the SMR

19 number was, the question I asked you was, in table eight is

20 there any statistically significant relationship reported by

21 the ATSDR?

22 A.   Frankly, I would have to look at a P value for that.  I

23 don't see it.

24 Q.   Does the ATSDR report any confidence interval that does

25 not include one, on table eight?

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 98

1  A.   That does not include one?  What do you mean, like 1.0?

2  Q.   Dr. Whitehouse, do you understand confidence -- I believe

3  that you understand confidence intervals, correct?

4  A.   I do, but I don't use confidence intervals, I use P

5  values for all of my statistical stuff, so you need to

6  interpret that part of it.

7  Q.   You can't interpret table eight?

8  A.   I can interpret confidence interval, which is very wide,

9  which means it's not very probable.  But I don't know what

10 that means as P value.  I don't know how to convert it just

11 looking at it.  If you have a confidence interval of .04 to

12 18.55, that's extremely wide.  I understand that.  But I

13 don't know what the P value is in that.  And I think that's

14 important.  That's not the probability of it occurring by

15 chance, which is far more important to a physician when you

16 are looking at those kind of numbers.

17 Q.   So you disagree, you believe that there is a

18 statistically significant relationship reported in table

19 eight.  That's your testimony?

20 A.   Well, what I believe is that probably the data is wrong

21 to begin with because I know very well that there are nine

22 environmental mesotheliomas since 1996 in Libby.  Okay.  And

23 there is one reported here, and excludes former workers in

24 central Lincoln County.  And, basically, I think it's sort of

25 a garbage in garbage in to tell you the truth.  I think there

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 99

1  is a whole lot more asbestosis than this, than reported in

2  this study, which I think is probably incomplete.  And that's

3  an opinion based upon looking at this and knowing what was

4  done at the time and knowing what subsequently has been done.

5  And, so, we are taking one point in time that probably has

6  inadequate reporting.  And they report reference 1979 to 1998

7  and you are asking me about mortality, excluding former

8  workers in a period of time that goes back, and I am talking

9  about current, because I have been working up there since '04

10 on a regular basis, and, currently, I know there is a whole

11 heck of a lot more deaths associated with this.  And, so,

12 it's difficult -- we commented about this study in here but

13 when you really come right down to it, the more important

14 data is what is coming out right now.

15 Q.   I guess I will ask you one final time.  My question was,

16 is there a statistically significant relationship in any

17 category reported in table eight?

18 A.   Probably not.

19 Q.   Dr. Whitehouse, were we able to reach agreement with

20 respect to when you are calculating an SMR and you are using

21 an ICD9 code to do it, that whatever ICD9 codes you include

22 in your enumerator you should include in your denominator.

23 Can we agree on that?

24 A.   Basiically you should, yes.

25 Q.   With respect to the table that's the first page of

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 100

1  Exhibit No. 5.

2  A.   Uh-huh.

3  Q.   Who compiled or who drafted that table?

4  A.   Mr. Heberling took the numbers that we talked about and

5  put them into the table, or his people did.

6  Q.   When you say the numbers that we talked about, what

7  numbers did he use to -- if you know --

8  A.   He took a combination of numbers.  The numbers that were

9  appropriate death certificates and the ones that I had

10 reviewed.  And, you know, there are death certificates that

11 clearly stated asbestosis, and there is other ones in

12 reviewing them it didn't seem like think were most probable

13 cause.  And people that I knew that the death certificate was

14 wrong.  It's a combination of everything.

15 Q.   Was there any -- with respect to the yes/no category in

16 the first part of the table, was there some protocol or

17 methodology that you used to classify somebody under yes or

18 no?

19 A.   Well, basically I looked -- if I didn't know the patient,

20 then I would look for things like pulmonary fibrosis, which

21 was one of the common things that the physicians had used in

22 Libby to diagnose asbestosis.  And when you went back you

23 realized it was asbestosis.  That was one of the big ones.

24      There were ones that were coded as COPD, and then you had

25 to go look at all the records to see whether or not that was

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 101

1  really the case in pulmonary functions and thing likes that
2  and you found out they weren't COPD.
3  Q.   Is there a written protocol --
4  A.   No.
5  Q.   -- where you describe what you did?
6  A.   No.
7  Q.   And the description you just gave -- strike that.
8       On the chart that's behind the first page of Exhibit
9  No. 5 that begins, Deceased Client Death Date Order.
10  A.   Uh-huh.
11  Q.   Date of doctor letter, what does that describe?
12  A.   What is that?
13  Q.   The 7th column over to the right, date -- it says, Date
14  of Doctor Letter.
15  A.   That was a letter that oh he-sometimes that was a letter
16  from me, sometimes it might have been a letter from somebody
17  else having reviewed it.
18  Q.   But what letters in the context of litigation where
19  somebody is giving an opinion about the cause of teeth, is
20  that what that is?
21  A.   They were opinions about cause of death, yes.
22  Q.   And are they from -- are they from litigation, are they
23  derived because of litigation?
24  A.   I guess so, since they are all clients that have
25  lawsuits, I assume so.

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

---

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 102

1  Q.   I would like to ask you about a couple of the individuals
2  on the chart.
3  A.   Uh-huh.
4  Q.   Are all of the people on this chart your patient?
5  A.   Of the deceased clients chart?
6  Q.   Yes?
7  A.   Obviously not.  They were people that died long before I
8  was even in practice.
9  Q.   Have you determined how many people on this chart were
10  your clients?
11  A.   No, I have not for sure.  I could easily enough.  Most of
12  them are.
13  Q.   And are these -- just remind me, I think I may have asked
14  this, I just don't know the answer.  Are all of the people on
15  this list clients of Mr. Heberling?
16  A.   Yes.
17  Q.   On Page 1, Kenneth Fredricks, do you see him?
18  A.   Kenneth what?
19  Q.   Fredricks.  About halfway down.
20  A.   Yes, I do.  That's somebody I don't know.
21  Q.   Okay.  And his cause of per the death certificate said,
22  carcinoma right lung.  Acute renal failure, and emphysema,
23  right?
24  A.   Right.
25  Q.   What protocol or methodology did you use to determine or

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

---

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 103

1  make an attribution of that lung cancer to asbestos, because
2  you have a yes checked there, correct?
3  A.   Let me see the doctor letter.  Do you have that?
4  Q.   I do not have that.
5  A.   Do you have them?
6  Q.   I don't have those, no.  It says Exhibit 225.  Is that --
7  A.   A, my memory isn't that good.  I don't remember.
8  Q.   Did you require that there be a certain quantitative
9  level of asbestos exposure before you attributed the lung
10  cancer to asbestos?
11  A.   No.  I had the opportunity in any of these to look
12  through the chart as far as radiographic changes, and there
13  may have been radiographic changes that were asbestos
14  related, there may have been pulmonary function studies.  It
15  was a combination of a whole bunch of things that would lead
16  you to think that it was asbestos, an asbestos death, as
17  opposed to, like for this example, an emphysema death.
18  Q.   Even though emphysema is listed as cause of death by Dr.
19  Brus, B-R-U-S, correct?
20  A.   Correct.
21  MS. HARDING:  We have to take a break.
22  MR. HEBERLING:  Do you want to break for lunch?
23  MS. HARDING:  What time is it.
24  THE WITNESS:  Quarter after 12:00.
25  MS. HARDING:  Okay.

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

---

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 104

1  VIDEOGRAPHER:  This will conclude tape number three.  The
2  time is now 12:15 p.m.
3  (Lunch recess.)
4  VIDEOGRAPHER:  This is the continued videotaped
5  deposition of Dr. Alan C. Whitehouse and Tape No. 4.  The
6  date remains to be October 18, 2007.  The time is now 1:21
7  p.m.
8  MS. HARDING:  Actually, I want to make one statement for
9  the record in response, Jon, to your comment at the very
10  beginning of the deposition regarding the records in the bin
11  over here, the records regarding the 123 patients.
12  Mr. McMillin contacted Dr. Haber.  Dr. Haber indicates
13  that when at Libby, he has never reviewed paper copies of
14  records.  He has only reviewed x-rays, and then,
15  subsequently, he reviewed electronic copies of records.  He
16  has never touched or seen any of the paper patient charts at
17  Libby.
18  So, in connection with whether we need to copy them, I
19  think we should talk off the record and figure out what to
20  do, whether we need to copy them at all.
21  MR. HEBERLING:  That's fine.  We understand his position.
22  Q.   (BY MS. HARDING)  Dr. Whitehouse, I wanted to clarify a
23  couple of things.
24  In connection with your July 2007 report, who drafted
25  your report?

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

WR GRACE BANKRUPTCY          ALAN C WHITEHOUSE M.D.          October 18, 2007

Page 105

1  A.  It was a combination of myself and Arthur Frank and
2  Mr. Heberling, and many, many phone calls. And basically,
3  though, information here all came from me. And it's all been
4  reviewed by me. Some of it was his information that I
5  reviewed, but it's my report.
6  Q.  So some of it was Mr. Heberling's information you
7  reviewed?
8  A.  He had some information concerning, like, deaths of these
9  older people I didn't have, so we put it in there, and I
10  reviewed them. And I reviewed their death certificates when
11  he sent them to me.
12  Q.  In terms of who wrote your report, did you write your
13  report?
14  A.  It was a combination of people. I dictated stuff to him,
15  and then his typist put it up and it got sent to me, and we
16  hashed it out. I didn't type it myself. I don't have a
17  typist.
18  Q.  With respect to the exhibits that we have already talked
19  about, Exhibits 1 -- actually, 3, 4 and 5. With respect to
20  Exhibit 5, I just want to -- actually, we talked about
21  Exhibit 5. So Exhibit 6 is Libby claimants on oxygen.
22  A.  Uh-huh.
23  Q.  Who compiled that exhibit?
24  A.  He compiled the names of it, because he has a list of
25  everybody that's on oxygen. The list is accurate.

WR GRACE BANKRUPTCY          ALAN C WHITEHOUSE M.D.          October 18, 2007

Page 106

1  Q.  He -- Mr. Heberling?
2  A.  Yes. He compiled the list because they contacted the
3  clients themselves to ask them about it. But it's an
4  accurate list, because we take care of these people and we
5  prescribe the oxygen.
6  Q.  So all of the people on Exhibit 6 are your patients?
7  A.  I think they are all clinic patients. There may be one
8  or two that are not. There is one name that I don't
9  recognize. But, everybody else -- in fact, almost all of
10  them are my patients.
11  Q.  How many aren't your patients? Do you know?
12  A.  Well, there may be one, two, three. I think that's all.
13  Q.  With respect to individual --
14  A.  At least, I don't recognize their names, or I haven't
15  seen them for a long time.
16  Q.  With respect to Exhibit 7, how did you verify that
17  individuals on this list that aren't your patients, that the
18  information on this list is correct?
19  A.  Now, which ones on Exhibit 7?
20  Q.  On Exhibit 6.
21  A.  On Exhibit 6. How did I verify that the oxygen was?
22  Q.  No. You indicated there was some people on the list that
23  aren't your patients, and I wanted to know how you verified
24  that the information on the list is correct if they are not
25  your patients?

WR GRACE BANKRUPTCY          ALAN C WHITEHOUSE M.D.          October 18, 2007

Page 107

1  A.  I have no reason to doubt it, basically. I have seen
2  many of these. I have seen death certificates. On, like,
3  the ones on oxygen, most of those have not died yet. I have
4  no reason to doubt it.
5  Q.  But you didn't do any independent review of their records
6  or Mr. Heberling's records?
7  A.  Most of them I did, because they are all my patients, or
8  patients that I have seen, and we prescribe the oxygen in the
9  clinic.
10  Q.  Right. With respect to the patients that aren't yours on
11  Exhibit No. 6, you did not independently look at the
12  patients' records, or Mr. Heberling's records, to verify that
13  the exhibit is accurate, correct?
14  A.  No. Except that Dr. Black may very well have, because
15  they may be Dr. Black's patients. We have three docs in the
16  clinic, so I don't necessarily see everybody, if you follow
17  me.
18  Q.  I do. But the point is that you did not. Correct?
19  A.  I did not, on a couple of these.
20  Q.  In connection with Exhibit 6, I understand your testimony
21  to be that many of the patients are yours and many of the
22  patients are Dr. Black's. Is that right?
23  A.  Yes.
24  Q.  And you have patient charts that you created. Is that
25  correct?

WR GRACE BANKRUPTCY          ALAN C WHITEHOUSE M.D.          October 18, 2007

Page 108

1  A.  Yes.
2  Q.  And then, from the patient charts, Mr. Heberling has
3  access to those as well?
4  A.  He has access -- he gets copies of the ones that are his
5  clients. That's all. He doesn't have access to all the
6  other charts. He has access to what we copy for him.
7  Q.  And those are all that are in Exhibit 6?
8  A.  Yes.
9  Q.  Only Mr. Heberling's clients, correct?
10  A.  Yes.
11  Q.  But Mr. Heberling is the one that took your medical
12  records and then compiled this list of Libby claimants on
13  oxygen, correct?
14  A.  Oh, yeah. Basically.
15  Q.  And then, did you go back and then verify that the list
16  was created accurately from your records?
17  A.  No. But I have no reason to doubt it at all because I
18  recognize all the names, and I know they are on here, most of
19  the names, and I know they are on oxygen, and I prescribed it
20  myself. Or Brad did. We basically see each other's
21  patients. It's pretty much a lot of crossover between the
22  two of us. So we have seen -- almost every patient has been
23  seen by each of us at one time or another.
24  Q.  So in the Libby CARD Clinic, you have seen every patient
25  that the Libby CARD Clinic has?

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 109

1   A.   Probably not every one, but pretty close to it.

2   Q.   How many patients does Libby CARD Clinic have now?

3   A.   Let's see.  We have about -- we are over 1,500.  I don't

4   know the exact number now.  We are well over 1,500 now, and I

5   am only up there now three days, twice a month, so there is

6   not -- no likelihood I am going to see every one of them,

7   particularly the ones that are more recent.  I probably will

8   not seen those at all.  The ones through screening in the

9   last year or so, I may never see those.

10  Q.   When did you start going to Libby three days a month?

11  A.   Oh, that was about six months ago.  I was four days a

12  month until then.  Since 2004.

13  Q.   From 2004 until about --

14  A.   The end of 2004.

15  Q.   End of 2004 until about how long ago?  Six months?

16  A.   Maybe six months ago we changed the schedule around

17  because I was spending a lot of time working at home on

18  papers.

19  Q.   So, from the end of 2004 until about six months ago, you

20  were going to Libby four days a week, four days a month?

21  A.   No.  Four days, twice a month.  Eight days a month.

22  Q.   Eight days a month.

23  A.   Eight days a month.

24  Q.   And then in more recent times, six months, you were going

25  three days a week -- three days a month?

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 110

1   A.   Three days, twice a month.  Six days a month.

2   Q.   All right.  That's where I got confused.

3   A.   Just reduced by one day of visits.

4   Q.   It went from eight a month to six a month?

5   A.   Uh-huh.

6   Q.   Prior to when you were visiting eight days a month, what

7   was your practice in terms of visiting the Libby CARD Clinic?

8   A.   It was rather variable.  A lot of the consults were being

9   sent to Spokane to see me, by Brad, and then I was up there

10  one or two days a month.

11  Q.   And how long do you think you were visiting one to two

12  days a month?

13  A.   That had been going on since 2000, or even before that,

14  actually.  I have been going to Libby even before 2000.

15  Q.   So when did you start going to Libby regularly?

16  A.   I don't know.

17  Q.   Was it -- do you recall if it's in the late nineties

18  or --

19  A.   I am sure it was in the late nineties, but I don't know

20  otherwise.

21  Q.   Did you start going there -- did you have a financial

22  arrangement with the Libby CARD Clinic when you first

23  started?

24  A.   I just sort of got paid on a daily basis when I was up

25  there.

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 111

1   Q.   You get paid daily by the Libby CARD Clinic?

2   A.   Yes.

3   Q.   And that same arrangement has been in place since around

4   1998?

5   A.   Yeah.

6   Q.   Exhibit 7 is mesothelioma cases due to exposure to Libby

7   asbestos.

8   A.   Are we done with these other, 1 through 6?

9   Q.   Well, not completely.  I am just asking these quick

10  questions for a minute.  I just want to understand how they

11  were prepared.

12       Exhibit 7 --

13  A.   Yes.

14  Q.   -- Mesothelioma Cases Due to Exposure to Libby Asbestos.

15  A.   Uh-huh.

16  Q.   Who drafted that chart?

17  A.   It was a combination, actually.  We provided all the

18  names, the ones that we have, and Jon Heberling had a few

19  names who we did not have, that we looked up records on.  And

20  there was a couple of them from out of town they learned of

21  that we then tracked down, talked to their families, got

22  exposure history, things like that.

23  Q.   When you said they, you meant Mr. Heberling and his firm?

24  A.   The patients.  I said, when we tracked them down, we

25  talked to the family members and things like that to get

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 112

1   exposure histories.  There is a few of them, though, that

2   Mr. Heberling had, that had filed lawsuits when they found

3   they had a mesothelioma.  We were informed of that so we

4   could track down the information.

5        And then, sometimes, we just get a call from a family

6   member.  Like, we had one in Colorado that they just called

7   and let us know.  We got a call from a doctor that wanted to

8   get more information, and we learned about mesothelioma that

9   way.

10  Q.   And then, who put the list together?

11  A.   I think Brad did, originally.  I am not quite sure who

12  originally started it.  I have seen this risk -- this list

13  without a lot of the data on it, so I think the ultimate form

14  you see right here was put together by Mr. Heberling, but the

15  data came from us.

16  Q.   And did you -- did you personally review or -- the data

17  upon which the chart was based?

18  A.   Not everybody's, but for the majority of them.  I have

19  seen the majority of these people, and, in fact, I have seen

20  now 11 recently.  Actually, even more than 11 recently.  Plus

21  a lot of the older ones that go back into the eighties or

22  early nineties that I have seen as well.

23       And then there is some that I have not seen that go way

24  back, particularly the ones that were quite a ways back.

25  Q.   Who -- what individual -- was it Mr. Heberling or you or

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

WR GRACE BANKRUPTCY    ALAN C WHITEHOUSE M.D.    October 18, 2007

Page 113

1  Mr. Black -- or Dr. Black -- that indicated the -- under
2  dates of work at Grace?
3  A.   That came from Grace's alpha list, I understand, and I
4  think Mr. Heberling put those names -- those dates in on
5  there.
6  Q.   And then Mr. Heberling would have filled in if they
7  weren't Grace workers.  There is other information.  Some of
8  them say environmental?
9  A.   That came from us.
10 Q.   That came from who?
11 A.   It came from us.  A lot of it came from me, because I had
12 just completed and sent in a paper relative to the 11 new
13 cases that we got, that have not ever been reported.
14 Q.   Okay.  You have sent in a paper to a journal?
15 A.   Yes.
16 Q.   Are you at liberty to discuss the journal or the paper?
17 A.   I can tell you the details, some of the details about the
18 cases, but I am not at liberty to provide you with the paper
19 or anything else, really, at this point.  I am under sort of
20 a copyright deallybob, whatever you call it.
21 Q.   I will come back and ask you a few questions about the
22 list.
23      So, Exhibit 10, Studies on Progression of Asbestos
24 Disease?
25 A.   Let me find 10 in here.  Here we go.

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA    (509)455.6931

---

WR GRACE BANKRUPTCY    ALAN C WHITEHOUSE M.D.    October 18, 2007

Page 114

1  Q.   You attached this in other litigation, correct?
2  A.   Yes.  This is something that we compiled a long time ago,
3  when I was looking through the literature concerning
4  progression, and something that's been important for me
5  relative to what I am doing now, too.
6  Q.   Right.  And I think you previously testified that the
7  original -- the draft of this was drafted by Mr. Heberling.
8  Right?
9  A.   Yeah.  Putting it into this format, yes.  I read all
10 these articles and have discussed them with him.
11 Q.   Who first read the articles and came up with idea?
12 A.   And came up with the idea?
13 Q.   Who first read the articles and compiled the data like
14 this, you or Mr. Heberling?
15 A.   I don't remember.  I think it was a joint project.
16 Q.   You discussed that previously in testimony, right?
17 A.   I think so, a long time ago.  I don't remember how long
18 it was that I last talked about it.  Actually, it needs to be
19 updated a little bit, maybe.
20 Q.   Exhibit 11, who drafted that exhibit?
21 A.   Well, I did all the work on that and gave him a list of
22 all these numbers related to death certificates, and they put
23 it into this format.
24 Q.   And Exhibit 12, did you draft that, or did Mr. Heberling
25 and his law firm draft that?

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA    (509)455.6931

---

WR GRACE BANKRUPTCY    ALAN C WHITEHOUSE M.D.    October 18, 2007

Page 115

1  A.   The same deal.  I did all the HNA denials, downgrades to
2  severity, all the audit of that, gave him the data on those
3  70 charts, and then they typed it up.  I don't have a typist,
4  so, that's part of the problem.
5  Q.   So you wrote it up.  Did you write it up by hand and give
6  it to him to type, or just talked to him --
7  A.   I gave him the numbers, basically.  We keep -- I keep
8  fairly -- I don't keep them.  The clinic sort of keeps fairly
9  extensive listings of what happens with HNA.
10 Q.   Going back to Exhibit 5, which is a death certificate,
11 the deceased client death date order exhibit.  The second
12 page of Exhibit 5.
13 A.   Yup.  I have it.
14 Q.   You indicated that you had reviewed a lot of these death
15 certificates, correct?
16 A.   Yes.
17 Q.   And as I understand it, it's in connection with these
18 individuals who are clients of Mr. Heberling, they have
19 lawsuits, correct?
20 A.   Yes.
21 Q.   And they need some kind of a -- Mr. Heberling needs to
22 know whether or not he can make a claim to attribute the
23 death to asbestos exposure, correct?
24 A.   That's correct.
25 Q.   And, so, you endeavored to review the death certificate

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA    (509)455.6931

---

WR GRACE BANKRUPTCY    ALAN C WHITEHOUSE M.D.    October 18, 2007

Page 116

1  to determine whether you can provide a letter indicating that
2  the death was due to asbestos exposure, correct?
3  A.   Yes.  And I also indicate whether I think it's not.  And,
4  of course, if I indicated that they probably -- I don't think
5  they are on this list.
6  Q.   A couple of questions about the people on the list.  We
7  started to talk about that before the break.  On Page 2,
8  Mr. Hendrickson.  Do you see Mr. Hendrickson?
9  A.   You are going to have to give me the charts if you expect
10 me to tell you the details of it.  Because I don't remember
11 all these.
12 Q.   I am actually going to ask you about what's on the list
13 here.
14 A.   Okay.
15 Q.   On Page 2, you have got Edmond Hendrickson?
16 A.   Right.
17 Q.   And the chart indicates that it's pneumonia.  He died
18 from pneumonia and severe rheumatoid arthritis.  Correct?
19 A.   That was on the death certificate, yes.
20 Q.   And you don't dispute that Mr. Hendrickson died as a
21 result of pneumonia and severe rheumatoid arthritis, correct?
22 A.   No.  I -- that wasn't my job.  My job was to find out if
23 they had not only asbestos disease, but was it a significant
24 factor as far as their death was concerned.
25 Q.   Right.

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA    (509)455.6931

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 117

1   A.   And, so, I didn't make judgment calls concerning some of
2   the other diagnoses, necessarily.
3   Q.   But you made a judgment that the death by pneumonia and
4   severe rheumatoid arthritis was related or attributable to
5   asbestos exposure, correct?
6   A.   No.  I didn't necessarily ever say that either one of
7   those was necessarily attributable to asbestosis.  What I
8   would say was that the asbestosis was a significant factor in
9   their death.
10       And just for an example -- and I don't know it applies to
11  this or not -- but somebody that has bad asbestos disease and
12  gets pneumonia, that's a modus exodus for an awful lot of
13  people that have severe lung disease.  That's what they die
14  of.  They die of pneumonia.  But the under cause of death is
15  their asbestos disease.
16  Q.   Severe rheumatoid arthritis.  Is it your position that
17  severe rheumatoid arthritis is causally associated with
18  asbestos exposure?
19  A.   We are very suspicious that rheumatoid arthritis is part
20  of the picture of asbestos disease.  Our own observations are
21  that we have too much rheumatoid arthritis in Libby.  And,
22  secondly, the studies done at the University of Montana
23  concerning positive anti-nuclear factors indicate a very high
24  incidence of positive RA factors and positive anti-nuclear
25  factors in the Libby group.

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA    (509)455.6931

---

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 118

1   Q.   So, as I understand, you are suspicious that asbestos
2   exposure is associated with severe rheumatoid arthritis, but
3   you have not come to a final conclusion about that?
4   A.   It hasn't been proven yet.
5   Q.   There was another individual, Mr. Hugill, H-U-G-I-L-L?
6   A.   Where is it?
7   Q.   On the same page, a little further down.
8   A.   I do not know him.
9   Q.   You do not know him?
10  A.   No.  And I don't think that I read that letter.  No.
11  That was a letter that was -- that was Sam Hammer,
12  apparently, who was involved in that.
13  Q.   And that's -- the cause of death was systemic
14  cardiomyopathy and coronary artery disease?
15  A.   I really -- I can't remember that one, if I actually
16  looked at it.  I might have looked at it.  And the yes may
17  have been from me, but I don't remember it.
18  Q.   Okay.
19  A.   But, obviously, if Sam Hammer had done significant --
20  they did a study on his lungs.  That's a pretty definitive
21  pathologist.
22  Q.   So the cause of death on the death certificate is
23  ischemic cardiomyopathy and coronary artery disease.
24  Correct?
25  A.   As far as I know, yeah.  He obviously died in Spokane.

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA    (509)455.6931

---

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 119

1   Q.   And you are relying on the -- this exhibit in your report
2   in this case, and the determination by Dr. Hammer that it was
3   associated or related to asbestos.  Is that right?
4   A.   Well, you are putting words in my mouth.  I don't recall
5   whether I looked at that death certificate or whether John
6   Peterson was called by -- or wrote a letter, or whether it
7   was a letter from Sam Hammer who had all the data, or whether
8   I was even involved in it at all.  So you are putting a few
9   words in my mouth, because I don't remember that one at all.
10  Q.   Okay.
11  A.   I might have looked at it.  But if you can provide me
12  with the chart, I might be able to tell you.
13  Q.   Do you have an opinion about whether or not ischemic
14  cardiomyopathy and coronary artery disease are conditions
15  that are caused by asbestos?
16  A.   They are not caused by asbestos.
17  Q.   Miles "Rusty" Rightmire is a little further below there.
18  A.   I know Miles Rightmire quite well.  He is my patient.
19  Q.   The death certificate for Mr. Miles indicates he died
20  from metastatic carcinoma, cancer of the pancreas?
21  A.   Yes.
22  Q.   Other significant conditions, COPD.
23       Do you see that?
24  A.   This is a real good example of somebody who doesn't know
25  what asbestos looked like.  This guy had severe asbestos

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA    (509)455.6931

---

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 120

1   disease, both interstitial and pleural.  It's signed out as
2   COPD.  That's a real good example that you picked out of how
3   death certificates are not very accurate sometimes.
4   Q.   Do you dispute that the patient -- I suspect you
5   don't because he is your patient -- that he had cancer of the
6   pancreas?
7   A.   I didn't take care of him for that.  I didn't -- don't
8   dispute that.  I heard he died of that.
9   Q.   Do you hold the opinion that cancer of the pancreas is
10  caused by exposure to asbestos?
11  A.   It probably is.  It's not quite as definitive as some
12  other cancers, but it probably is.  As you undoubtedly know,
13  kidney and colon are well thought to be related to that.
14  Pancreas, probably.  But, you know, some of those studies
15  have actually been done.
16  Q.   Actually, I will come back and ask you questions about
17  kidney and colon cancer.
18       So you do hold the opinion it's been demonstrated
19  scientifically that cancer of the pancreas is caused by
20  asbestos exposure?
21  A.   You are putting words in my mouth because that's not what
22  I said.  What I said was, it's thought it may very well be
23  related to that, but it's not been proven.
24  Q.   I did not hear you say that, so if you did, I apologize.
25  A.   All right.

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA    (509)455.6931

Page 121

1  Q.   Mr. Davidson, at the top of Page 3.  It indicates that

2  the cause in the death certificate was -- I will get there --

3  astrocytoma of cervical spinal cord.  Is that right?

4  A.   Yes.

5  Q.   It indicates that you have -- that you found that this

6  death was due to asbestos exposure.  Is that right?

7  A.   The words "due to asbestos exposure" is not something

8  that I necessarily say.  I say, I am willing to say it's a

9  significant factor in the person's death, and that may mean

10  that they may die of something else, but they are severely

11  debilitated or something else associated with their asbestos

12  disease at the time that they die.

13      So that associated death that's associated with severe

14  asbestos disease is a significant contributing factor, and

15  that's probably the terminology that's best used for it,

16  rather than, actually, "due to" it.  Because it probably was

17  not totally due to asbestosis.  It was a contributing factor.

18  Q.   Because your chart -- the column is titled, "due to

19  asbestos disease."  Correct?

20  A.   It says, cause per death certificate.  What does it say?

21  Due to asbestos disease.  Probably that's a miss-label, as

22  far as saying it's actually due to, as much as it is -- the

23  asbestos disease is either a cause or a significant

24  contributing cause.  Because there are people that have

25  asbestos disease, sometimes pretty severe, which has no

Page 122

1  bearing whatsoever on their death.

2  Q.   And what information do you have to indicate -- or what

3  did you have to indicate that asbestos disease contributed to

4  his death from astrocytoma of cervical spinal cord?

5  A.   You will have to give me the chart and let me see it,

6  because I don't have it.

7  Q.   I don't have it either.  You don't recall from your

8  review?

9  A.   No way I would.  This guy died in 2000.

10  Q.   Is he your patient?

11  A.   He was not my patient.

12  Q.   Well, what's the possible -- what's the possible way that

13  asbestos disease could cause or contribute to death by

14  astrocytoma of cervical spinal cord?

15  A.   Hypothetically -- and I don't know exactly in this

16  situation -- if you had bad asbestos disease and were in

17  respiratory failure, your tolerance and your longevity after

18  some kind of a brain tumor or a cord tumor may be very low.

19  That may be how I arrived at that.  I don't remember this one

20  at all.

21  Q.   Is there any literature to support that?  Any scientific

22  literature or medical literature that discusses the

23  asbestos --

24  A.   I have been practicing medicine since 1960.  Those are

25  judgment calls made by physicians with experience.  And I

Page 123

1  qualify there.

2  Q.   Mr. DeShazer.  Is that the right way to say that?  I am

3  sorry.

4  A.   Yeah.

5  Q.   On Page 3?

6  A.   Yup.  That's another COPD that was asbestosis.

7  Q.   As I understood, the death certificate indicates that

8  Mr. DeShazer died from chronic renal failure.  Is that right?

9  A.   This was another situation where the asbestos was a very

10  significant factor in his death.  Actually, I looked at that

11  one not so long ago, and I do have a little recollection

12  about that one.

13  Q.   I went to the NIH website, Dr. Whitehouse.  I was just

14  trying to see whether there was any indication that asbestos

15  exposure, asbestos disease, is somehow associated or part of

16  the disease process for chronic renal failure.  This is what

17  I printed out.

18      MS. HARDING:  Can you mark that one, please.

19      (Ex. No. 5, marked.)

20  Q.   (BY MS. HARDING)  Is there any indication, at least from

21  the information from the NIH --

22      MR. HEBERLING:  Let him read it first.

23      MS. HARDING:  I will ask him a question, and then he can.

24      MR. HEBERLING:  He can't do both.

25  Q.   (BY MS. HARDING)  I will ask a question, and you can take

Page 124

1  whatever time you need to answer.  Is there any indication in

2  that document, or in any other published paper or literature

3  that you can point to, suggesting that chronic renal failure

4  is caused by or associated with asbestos exposure or asbestos

5  disease?

6  A.   Well, yes, there is.  In fact, if you notice the possible

7  complications, it says, congestive heart failure.  It works

8  both ways.  People with asbestosis have chronic -- what's

9  called cor pulmonale, which is a form of congestive failure,

10  which, when it gets really severe, it causes renal failure.

11  And the two exist coexistent ly.

12      It's like so many things in medicine.  There is nothing

13  that happens in absentia -- or very few things that happen in

14  absentia -- of something else that's going along at the same

15  time, particularly in people that are older.  And I don't

16  know whether that was -- what my conclusions were in this or

17  not.  I don't remember.

18      This is the same way, that -- you know, if you can

19  provide me with the charts, I will be happy to review it and

20  give you my reasoning behind it.

21  Q.   I don't have the -- I just don't have the charts with me.

22  I would be happy to provide them if I did.

23      The bottom line is that whatever you found from the

24  charts would be indicated in your -- in the records you

25  provided us?

Page 125

1  A.   In the what?

2  Q.   In the records that you attached in connection with this

3  exhibit, your --

4  A.   Not necessarily.  Don was not my patient at the time he

5  died, so I don't know.  You won't have any records of mine.

6  I had them at one point, but I don't have them now.  I mean,

7  I may have got a copy of them when I was requested to review

8  it.

9  Q.   Have you provided any records to indicate the analysis

10  that you applied to arrive at the conclusion that the chronic

11  renal failure was caused by or contributed to by his asbestos

12  exposure or asbestos disease?

13  A.   No.  Basically, what I get is a cover letter with a chart

14  asking whether it was a significant factor or not.  And then

15  I review the records and I make a judgment call on that.  And

16  I hand-write it on the letter, and I fax the letter back and

17  sign it.  And I send back as many as, "no," as I do, "yes, I

18  am sure."  Maybe more.  I don't know what the statistics are.

19      But I get asked to review a lot of charts like that, and

20  I look at them carefully and make a judgment call.  Sometimes

21  I know the patient.  It's very easy.  Sometimes it takes a

22  lot of work.

23  Q.   But you can't remember why you made the determination

24  here, correct?

25  A.   No.

Page 126

1  Q.   And the only way you would be able to determine that

2  would be to look at the records that you originally reviewed.

3  Is that what you are saying?

4  A.   Basically, that would be it, yeah, and what was sent to

5  me.

6  Q.   And William Carr on Page 3 died of leukemia?

7  A.   He was my patient.  He had severe asbestosis.

8  Q.   He had asbestosis.  Did he have interstitial fibrosis, or

9  did he have pleural fibrosis, or pleural disease?

10  A.   I think he just had pleural disease.  He was very

11  restricted.  He had very restricted pulmonary function and

12  very little tolerance for his leukemia, is basically what it

13  amounted to.  And he died -- sort of a situation you wouldn't

14  expect him to.

15      Usually, people with chronic lymphocytic leukemia live a

16  long time, a lot more than seven years.  And he just sort of

17  went downhill.  I think it was a combination of both.  He

18  died, actually, of respiratory failure, but Bob Albin signed

19  his death certificate.  He had him in the hospital at the

20  time.

21  Q.   Once again, is there -- are you aware of any published

22  literature that indicates that leukemia is caused by asbestos

23  exposure or disease related asbestos?

24  A.   No, it's not caused by it.  In this particular situation,

25  it was a major factor.  I had taken care of this guy for his

Page 127

1  asbestosis for a long time, and he was pretty much on death's

2  doorstep when he got his leukemia.  He survived longer than I

3  would have expected him to.  I took care of him for a long

4  time.

5  Q.   As we are going through this, as I understand what you

6  are saying, that if somebody has any type of disease related

7  to asbestos, but they die from something else, that because

8  they have a disease related to asbestos at the time, that you

9  attribute their death, in part, to their asbestos disease?

10  Is that right?

11  A.   No.  You misspoke what I said.  What I said was that I

12  make a judgment call about how bad their asbestos is and how

13  much it affects -- if it's an attributing cause to a death

14  where they also have another illness that is maybe, in part,

15  responsible to it as to how much the asbestos disease

16  contributes to it, and if it's a significant factor as far as

17  their death, then I would say -- that's what I would say.

18      But I wouldn't -- just because somebody has got, maybe, a

19  few pleural plaques or something like that, I wouldn't say

20  anything about that at all, unless it was, perhaps, a lung

21  cancer.

22  Q.   You would agree that the leukemia is what caused this

23  individual's death, right?

24      MR. HEBERLING:  Objection.  Unclear as to cause.

25      THE WITNESS:  You know, I wasn't there when he died so I

Page 128

1  don't know.  It doesn't surprise me that he died, because I

2  knew him well and I knew how bad his lung disease was.  But

3  on the other hand, he was hospitalized by the oncologist at

4  the time, and I wasn't involved with it.

5  Q.   (BY MS. HARDING)  Edith Moles died of multiple cerebral

6  vascular accidents, Page 3?

7  A.   Yes.

8  Q.   You also classified her death as due to asbestos disease,

9  correct?

10  A.   I didn't say it was entirely due to it.  I said it was a

11  major contributing factor.  Sally Aiken is the coroner.

12  Okay.  She found -- I guess she found a stroke at the time.

13  She signed the death certificate.

14  Q.   I notice that --

15  A.   These are all very sick people at the time they died.

16  They all had bad problems with their lungs, and then

17  something else was the final capping blow, basically, is what

18  it amounts to, when you see something like that.  It doesn't

19  take much to push them into a corner and die.

20  Q.   Have you done any research or have you looked to see

21  whether there is any support for your theories that these

22  various conditions that are serious in and of themselves --

23  you would agree that leukemia, aside from asbestos exposure,

24  is a pretty significant disease, correct?

25      MR. HEBERLING:  Objection.  Compound.

Page 129

1    THE WITNESS:  I already answered that question,
2  basically.  I told you before that some of these are serious
3  diseases, but the judgment calls are made on the basis of the
4  fact that the patient was quite sick with their lung disease,
5  and it didn't take much to knock them off.
6    Then, on top of that, chronic lymphocytic leukemia is
7  generally a reasonably benign disease.  Not always, but it's
8  a disease that people live with sometimes 20 years without
9  therapy.  And I don't remember all the details of the final
10 terminal event, except I know that he was basically near
11 terminal from his asbestosis, much less his chronic
12 lymphocytic leukemia.  I don't know whether he developed a
13 pneumonia and died.  I just don't remember that one.  I knew
14 the guy, so I didn't need to review his chart.
15 Q.   There also were two individuals that also died on the
16 list that died from colon cancer?
17 A.   Yup.
18 Q.   And you previously testified that colon cancer is not
19 caused by asbestos exposure or disease, correct?
20 A.   Did I say that?
21 Q.   Previously, in past years?
22 A.   I don't believe that I did, because I have known for a
23 long time that colon cancer is thought to be a cancer
24 associated with asbestos disease.  I might have said that
25 very early on, like, in the nineties, but I certainly

Page 130

1  wouldn't say that now.
2  Q.   But your opinion now is that colon cancer is causally
3  associated with asbestos exposure?
4  A.   It's not my opinion.  It's an opinion that is well held
5  in the literature.
6  Q.   In which literature is that opinion held?
7  A.   I can't give you a quote on that.
8  Q.   Are you relying on any particular studies to arrive at
9  that conclusion?
10 A.   You know, there is a lot of studies that relate to colon
11 cancers.  I don't know exactly what they are right now.  I
12 know I have read it.  The literature previously -- and it's
13 become basically common knowledge in the asbestos world.
14 Q.   In this list, as well as the other list, there are
15 individuals -- individuals that are identified on Exhibit 3
16 as being people who are community exposures, correct?
17 A.   Yes.
18 Q.   So on Exhibit 5 here, if you cross reference it to
19 Exhibit 3, you can find the individuals that Mr. Heberling
20 has listed as community exposures, correct?
21 A.   I assume so.
22 Q.   I want to ask you about those individuals.  The first one
23 I would like to ask you about is Mr. DeShazer.
24 A.   Which one?  Is there more than one DeShazer on that list?
25 Q.   I believe it's Gerald DeShazer.

Page 131

1  A.   What page is it on?
2  Q.   I will have to look at that.
3  A.   There is a Margaret and a Donald and a Jack.  The
4  DeShazer's have not had a good time with the asbestos,
5  unfortunately.  I have Gerald here.
6  Q.   It's on Page 7.
7  A.   Right.  Got it.
8  Q.   And Mr. DeShazer, as I understand it from the exposure
9  history that you provided with his records, in addition to
10 the information listed on your exposure history, or that of
11 Mr. Heberling -- I don't know whose -- maybe you can actually
12 identify that, please.  These are the records that were
13 produced in connection with this exhibit for Mr. Gerald
14 DeShazer.
15 A.   Okay.
16 Q.   Is the exposure summary there at the end, is that
17 something that was created by you, or was that created by
18 Mr. Heberling?
19 A.   These were created by Mr. Heberling.
20 Q.   And that indicates that Mr. DeShazer also worked in the
21 Navy, correct?
22 A.   Yes.  Well, he chipped and repainted ships, it says, and
23 he was on board a ship for four years.
24 Q.   Does it say what years that was?
25 A.   It says '59.  I presume he couldn't remember the years or

Page 132

1  something.
2  Q.   Have you reviewed the literature involving the asbestos
3  exposures for individuals that were aboard ships in the Navy?
4  A.   I actually have, yes.  I have read a fair amount of stuff
5  about it.
6  Q.   And you are aware that the -- you are aware of the high
7  levels of asbestos exposure that have been reported for
8  individuals in the Navy, correct?
9  A.   That's true.  And a lot of it depends on what kind of a
10 ship and where on the ship they were stationed.  In
11 particular, boiler rooms were very bad.  But there was a lot
12 of asbestos on the ship, no question about it.
13 Q.   So, while Mr. DeShazer is listed as a community exposure,
14 his occupational history suggests he may have had exposure in
15 other places as well, correct?
16 A.   Well, he had very heavy exposure in Libby, and, plus, he
17 was -- a lot of family -- is he listed as a community
18 exposure on that list or not?
19 Q.   Do you recall whether he is or not?
20 A.   I would have listed him as family exposure, probably.  I
21 mean, he -- the whole DeShazer family virtually has asbestos
22 disease.  I mean, really -- I mean, literally, telling you
23 that.  I don't know whether it's genetic or not.  They lived
24 -- you have it on here, too.  You don't know where Rainy
25 Creek is, but Rainy Creek is the creek that runs by the road

Page 133

1 that goes up to the Grace mine, and that was a very heavily
2 contaminated area. The trucks came by there. A lot of
3 vermiculite blew off the trucks.
4     There was also not too far from there, the screening
5 plant, ultimately, and the conveyor belt. Although, that
6 probably wasn't there when he lived there. But he had a high
7 exposure. Very high.
8 Q.   A question about that. So Mr. Gerald DeShazer, he is
9 listed as a community exposure, as is Daniel, Sandra --
10 Q.   As well as who?
11 Q.   Daniel, Sandra and Gerald are all listed as community
12 exposures. Are you suggesting they should be in the
13 household category, and not in the community category?
14 A.   Well, him. You need to show me the other ones in order
15 to say anything about that. But he was around a fair number
16 of people that worked for Grace.
17 Q.   Another question. Have you -- because you have not --
18 because you haven't -- you have indicated that you don't have
19 any information or knowledge to allow you to quantify the
20 type of community asbestos exposure that you believe
21 Mr. DeShazer had, based on his history here, correct?
22 A.   Well, not entirely. I have the 1975 Grace report on
23 levels that were done around the hospital, near the lumber
24 mill in an area, and those ranged up to one and a half fibers
25 per cc.

Page 134

1 Q.   And do you know whether -- do you recall whether or not
2 those were eight-hour time weighted average exposures or not?
3 Do you know?
4 A.   No, I don't. Those were the lowest of the exposures.
5 Actually, there were very high exposures in other areas, but
6 those were downtown Libby exposures.
7 Q.   The -- what's your foundation for saying that those were
8 higher exposures than the ones you just discussed?
9 A.   Grace's own data. They ranged up to 60, 70 fibers per
10 cc, up closer you got to the mine, or in various parts of the
11 mine. And they also had an expansion plant right downtown
12 that spewed dust out of the stack all the time, that had a
13 fair amount of exposure.
14     I mean, you have got to be, you know, not even looking at
15 things to know that there were some really high exposures
16 down there around the ball fields and down near the railroad
17 tracks and all. I mean, this is just common sense.
18 Q.   I am trying to get an understanding of your -- your
19 opinion about levels. You just said something --
20 A.   You just got it. You just got it right there. They were
21 high, and they were never measured.
22 Q.   You believe that there were 60 to 70 fibers --
23 A.   I don't know what they were. I know they were enough to
24 give disease. Let's put it that way. And bad disease in a
25 lot of these people.

Page 135

1 Q.   I understand. You just said that there were 60 to 70
2 fibers per cc, and it sounded like you were talking in the
3 air--
4 A.   I was talking --
5 Q.   Let me finish my question, please. It sounded like you
6 were saying that that was in the air. That's not correct,
7 right?
8 A.   No. I said -- maybe you didn't hear me -- up as you got
9 to the mine.
10 Q.   So you mean the mine levels?
11 A.   Those were mine levels.
12 Q.   Okay.
13 A.   But there is no question that there were higher levels in
14 downtown Libby for a whole number of reasons, which I can
15 enumerate, but related to their plants, to the facilities
16 there, related to the railroad tracks, related to all the
17 things known to have stirred up asbestos in the air.
18 Q.   When you say higher, you don't mean higher than the mine;
19 you just mean --
20 A.   No, no, no. I just mean higher than those one and a
21 halves. I am pretty sure they were higher than that. And
22 they were also 24-hour exposures, all day long. People that
23 lived there were exposed to that all the time, rather than
24 just for an eight-hour work shift.
25 Q.   And I read some of your previous testimony on this issue

Page 136

1 where you talked about these environmental exposures that you
2 thought were higher prior to the 1975 measurements that were
3 taken in downtown Libby.
4     What I was trying to get at earlier was, have you -- in
5 any of the work that you have done for these veterans claims,
6 or anything like that, have you attempted to compare what you
7 believe to be the exposures that may have been available --
8 that may have been in the community, to exposures that have
9 been -- the average exposures of people on ships that have
10 been reported in the literature?
11 MR. HEBERLING: Objection. Compound and unclear as to
12 what "or anything like that" might mean.
13 THE WITNESS: Well, I haven't tried to compare it to the
14 levels that are in the literature. But on the other hand, I
15 have taken very careful histories from these people of their
16 exposures and what they were doing, and, obviously, there was
17 some very significant shipboard exposures. There were some
18 other ones that were probably relatively minimal, and it
19 depended on a lot of the factors I talked about earlier.
20 Q.   Mr. Wesley, Reynolds James Wesley?
21 A.   Uh-huh.
22 Q.   I believe that he is also listed as somebody that's
23 community exposure in Exhibit No. 3. He is also on Exhibit
24 No. 5.
25 A.   What page is that? Mr. Reynolds was my patient.

Page 137

1  Mr. Reynolds died of an abdominal sarcoma, which, I think,
2  was a mesothelioma misdiagnosed, but I can't prove it.
3  Q.   And Mr. Wesley also was exposed -- according to the
4  exposure records prepared by Mr. Heberling, I have he joined
5  the Navy at age 16.  Do you recall that, from his exposure
6  history?
7  A.   I don't recall that for sure, but do you have it here?
8  Q.   I do.  The question I just had is whether or not -- I
9  mean you would agree that he would have exposure, in addition
10  to exposure that he had at Libby, in the Navy?
11  A.   How long was he in the Navy and where was he stationed?
12  Q.   I would -- I would show you this but I only have my notes
13  on it.  It says 41 to question mark, and then the next date
14  on it is 1955.  So I don't know whether that indicates he was
15  in the Navy that long or not.
16  A.   That's not very helpful.  He might have been stationed at
17  a lifeguard station.
18  Q.   Well, this is the exposure history that was provided by
19  Mr. Heberling.  Actually, you can look at it.  Here.
20  A.   It wasn't that I was particularly concerned about what
21  was on here as the fact, I knew the patient and took care of
22  him.  He had significant asbestos disease, and I told you he
23  had a sarcoma that I think probably was a sarcoma, peritoneal
24  mesothelioma, but there is no way to prove it.  And the
25  pathologists -- I wasn't smart enough to send it off to

Page 138

1  Hammer, and our pathologist in Spokane, you know, didn't
2  think it was.  Although, I am not so sure they are right on
3  that.
4      MS. HARDING:  Dr. Whitehouse, I am going to object to the
5  answer being nonresponsive, only because I have a lot of
6  information to get through and I was just asking about his
7  exposure.  So, I would like to try as much as we can to limit
8  your answers at least to the general question that I have
9  asked, if we could.
10      THE WITNESS:  I don't really have any comment on this.
11  Q.   (BY MS. HARDING)  It doesn't describe his --
12  A.   It doesn't help.
13  Q.   It doesn't help you understand what his Naval shipyard
14  exposures were, right?
15  A.   That's correct.
16  Q.   There is another -- I have a couple of other examples I
17  wanted to show you, but the point I want to ask you, have you
18  done any kind of systematic review of the people listed as
19  community exposures, to determine the percent or number of
20  individuals listed as community exposures that actually have
21  other exposure to asbestos -- commercial asbestos -- from
22  non-Grace occupations?
23  A.   No.  Ask me in February.
24  Q.   Ask in February?
25  A.   Ask me in February.  I will probably have it.  Or we will

Page 139

1  probably be able to get it, if the timetable for our database
2  comes true.
3  Q.   So you have a database right now that has some of that
4  information in it?
5  A.   No, we don't.  It's being constructed right now.
6  Q.   How long has it been under construction?
7  A.   Not for very long, but there is finally a fire lit under
8  getting it done.
9  Q.   And that database will include the information on
10  individuals that relates to their non-Grace occupational
11  asbestos exposures?
12  A.   Every asbestos exposure they have had will be in there.
13  Q.   But you don't have that now, right?
14  A.   No.  And there is no way we can retrieve it
15  systematically at this point.
16  Q.   You have the information in your patient records,
17  correct?
18  A.   Yes.  You know, we are too busy taking care of sick
19  people and dealing with other problems to go scouting through
20  records at this point in time.
21      MR. HEBERLING:  Do you want to take a break?
22      THE WITNESS:  Whatever.  If you want to take a break,
23  it's all right with me.
24      MR. HEBERLING:  In five minutes.  There is five more
25  minutes on the tape.

Page 140

1      THE WITNESS:  Okay.
2      MS. HARDING:  Go ahead.
3      VIDEOGRAPHER:  This will conclude Tape No. 4.  The time
4  is now 2:17 p.m.
5      (Recess taken from 2:19 to 2:24.)
6      VIDEOGRAPHER:  This is the continued videotaped
7  deposition of Dr. Alan C. Whitehead -- Whitehouse and Tape
8  No. 5.  The date remains to be October 18, 2007.  The time is
9  now 2:24 p.m.
10  Q.   (BY MS. HARDING)  Dr. Whitehouse, I would like to ask you
11  about Exhibit No. 7, the mesothelioma cases due to exposure
12  to Libby asbestos.
13  A.   Okay.
14  Q.   As I understand it, these are now a list that you have
15  turned into an article of some sort, that you submitted to
16  some -- to some kind of journal?
17  A.   Yes.
18  Q.   Is that correct?
19  A.   That's correct.
20  Q.   And it's listing a certain number of cases; is that
21  right?
22  A.   Yes.  It actually just brings up to the date the number
23  of mesothelioma cases as of this spring, this last spring.
24  Q.   Which cases are at issue in that article?
25  A.   Let me check them off.  No. 7, Marvin Flatt, Carol

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 141

1 Gerard, Jack Harrison, Loreta Orem, Arnold Pederson, Toni
2 Riley, Ernest Roberts.  You know, I didn't use Ernest Roberts
3 because the verification wasn't proper.
4 James Roberts.  I am getting my Roberts confused.
5 Everett Sanderson.
6 Q.  No. 26, Sanderson.  Okay.
7 A.  Victoria Skidmore, still alive.  Elizabeth Trimble and
8 Ford Wilson.
9 Let me see if that adds up right.  How did I get ten?
10 Q.  I got 11.
11 A.  One of those may have been reported before.
12 MR. HEBERLING:  It's 11.
13 MS. HARDING:  I got 11.
14 THE WITNESS:  Did you?
15 Q.  (BY MS. HARDING)  I counted 11.  11 is the right number?
16 A.  Except that there were two that were family members.  Oh,
17 I know what this was about was, we had an argument over this,
18 John and I did, because he included a couple family ones here
19 as environmental, and I said they were family in my paper.
20 So there is two family.  Two of them had family exposures.
21 Q.  Which two are listed here that Mr. Heberling listed as
22 environmental that you think should be family?
23 A.  I knew that you were going to ask me that.  Darlene
24 Riley, I know, was, and Loreta Orem.  Those are the two.
25 Loreta Orem, who lived in Kalispell, did her father's

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 142

1 clothing every Saturday when he came home, and Darlene Riley
2 was related to the other Riley that died of asbestosis.  He
3 was her stepfather or father or something.  Stepfather,
4 maybe.
5 Q.  I want to ask you about the cases that are listed as
6 environmental.  So, actually, I won't ask you about those
7 two, Darlene Riley and Loreta Orem -- maybe -- but they
8 should be changed and classified as family?
9 A.  Well, I have classified them as family, basically,
10 because -- and I classified them as family for the paper.
11 Q.  But this is your -- the exhibit that you attached as the
12 underlying material for your report, and this was compiled by
13 Mr. Heberling and not you?
14 A.  No.  You know, I am very instrumental in doing this, but
15 in the process of doing that, somebody put them down as
16 environmental.  I took issue with it, ut it was already --
17 but we were already done with it so nothing could be -- you
18 now have clarification of it.  I wasn't an attempt to deceive
19 anybody or anything.
20 Q.  I wasn't suggesting it was.  I was just trying to
21 understand how the classifications of the -- whether somebody
22 was environmental or not were made, and, more importantly,
23 who made them, you or Mr. Heberling?
24 A.  No.  I made the judgments on that, whether they were
25 environmental or family.  Those were all my judgments because

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 143

1 those are judgments that had to be looked at very carefully
2 for this paper.
3 Q.  I am talking about the exhibit that was attached to your
4 report, Doctor.  With respect to the exhibit attached to your
5 report, the mesothelioma list, it sounds like what you are
6 telling me for this document, Mr. Heberling made the
7 judgments, but for the paper you are submitting, you made the
8 judgments?
9 A.  No.  I made the judgments on this, too, except somebody
10 in his office put them down as environmental rather than
11 family, and it was too late to change it.  I am telling you
12 right now, they were family, those two.  So you understand
13 that.
14 The paper, when it comes out, will demonstrate nine
15 environmental cases and two family cases.  And there is a lot
16 of people that do that, that sort of lump things together.  I
17 don't do that.
18 Q.  How did you go about investigating the exposure histories
19 of the nine environmental and two family cases?
20 A.  I went through all the exposure histories in the chart.
21 Dr. Black, my partner, made some phone calls to some of the
22 people that were now living out of town, and talked to the
23 family members.  We talked to the doctors that took care of
24 them.  We talked to a doctor in Colorado.  And, let's see,
25 what was the other one I talked to?  It may have been Elko,

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 144

1 Nevada, but I am not sure.
2 I talked to so many doctors I sometimes forget who I
3 talked to at one time about a patient.
4 Some of them were my patients.  In fact, a lot of these
5 were my patients and I can tell you those if you want know
6 who they are.
7 Q.  I will just go through the list.  Marvin Flatt, was he
8 your patient?
9 A.  No, he is not my patient.  He is still alive.
10 Q.  Where does he reside?
11 A.  I think he lives in -- I am trying to remember whether he
12 lives in Kalispell or Spokane.  I don't recall.  He does not
13 live in Libby now, I don't think.  I know he doesn't.  I have
14 not seen him.
15 Q.  And he is classified as an environmental case?
16 A.  Right.
17 Q.  Carol Gerard?
18 A.  Carol Gerard was my patient.  She lived in Salt Lake
19 City.  I had seen her in Spokane, and she clearly was
20 environmental.  She worked at a chiropractor's office and did
21 not have any relatives or anything that were associated with
22 the asbestos.
23 Q.  So the exposure information you have on Carol Gerard was
24 derived in your own clinical setting?
25 A.  Yes.

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 145

1  Q.   Exposure information for Marvin Flatt, that was derived
2  from?
3  A.   That was information I was given.  I was given the path
4  reports and the exposure history.
5  Q.   But the exposure history came from who?
6  A.   I think that probably came from Mr. Heberling's office.
7  Q.   Do you know how Mr. Heberling came across the exposure
8  history of Marvin Flatt?
9  A.   I don't recall.  Actually, I think I probably do know,
10 when I think about it.  It probably was related to a lawsuit,
11 and then he requested the entire chart.
12 Q.   Is Marvin Flatt Mr. Heberling's client?
13 A.   Yes.  No. 7 there.
14 Q.   Jack Harrison; is that your patient?
15 A.   Yes.  Jack Harrison was a gentleman who lived in Libby
16 for about five years.  He worked for the Forest Service, as I
17 recall.  And I have gone over all the details on that one
18 myself in his chart, and I spoke with Dr. Clifford personally
19 in Colorado.  It was a suburb, I think it was Wheat Ridge,
20 Colorado, where I talked to him.  That sounds familiar.
21 Q.   But he is your patient?
22 A.   No, he was not my patient.
23 Q.   I misunderstood you.
24 A.   He died in Denver, or he died in Wheat Field, or wherever
25 it was he lived in.  A suburb of Denver.

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 146

1  Q.   You got his exposure information from who?
2  A.   Wheat Ridge, I guess it is, isn't it?  Yeah.  Wheat
3  Ridge.
4  Q.   But who provided --
5  A.   Is that right?  Wheat Ridge.
6  Q.   Who provided the exposure information?
7  A.   His wife and the doctor.
8  Q.   And then Loreta Orem; is that a patient of yours?
9  A.   No, that's not a patient of mine.
10 Q.   Is that a client --
11 A.   That was obtained through medical records, and that's the
12 one that did her father's clothes, and I would consider
13 family.
14 Q.   And you got the exposure information from Mr. Heberling
15 for that one, then?
16 A.   Yes.
17 Q.   It's a client of Mr. Heberling's?
18 A.   Right.
19 Q.   Darlene Riley, you said you classified as family?
20 A.   You missed Arnold Pederson.
21 Q.   Arnold Pederson.  How did you arrive -- is that your
22 patient?
23 A.   No.  It was -- Dr. Black obtained all that information
24 the same way that I did.  He called the family and talked to
25 them and talked to the doctor and got all the exposure

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 147

1  history that way.  We had the death certificate and the path
2  report.
3  Q.   How did you become aware of Mr. Pederson's mesothelioma?
4  A.   Through Dr. Black.  He and I were talking about all
5  these.  As I was writing the paper, we were collecting the
6  information together.
7  Q.   Is he a patient of Dr. Black's?
8  A.   No.  He is dead.
9  Q.   Was he a patient of Dr. Black's?
10 A.   I don't think he was.  I think Dr. Black may have known
11 him in the past, and I think he is one that lived -- I am
12 trying to remember where he lived.  Somewhere in Nevada.  I
13 think he lived in Nevada.
14 Q.   So, that exposure information came from --
15 A.   Came from the family.
16 Q.   From the family?
17 A.   Uh-huh.
18 Q.   Mr. Roberts?
19 A.   Yeah.  Not the first Mr. Roberts.
20 Q.   James Roberts.
21 A.   James Roberts.
22 Q.   Is that a patient of yours?
23 A.   No, it was not a patient of mine.  And the exposure
24 history, I think, came from Mr. Heberling.  I got the path
25 report and the death certificate on him, as I recall.  Yes.

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 148

1  I do have that.
2  Q.   The history you have on his exposure came from
3  Mr. Heberling, correct?
4  A.   Yes.
5  Q.   Everett Sanderson; is that a patient of yours?
6  A.   No, that was a patient that Brad knew a fair amount about
7  and obtained the exposure history and all, as I recall.
8  Q.   Do you know where he obtained the exposure history?
9  A.   No, I do not for sure.  I can tell you if I had the
10 records here, but I don't have them here right now.
11 Q.   Victoria Skidmore?
12 A.   She is still alive, and I have seen her so I know about
13 her exposure history.
14 Q.   You have seen her as a patient?
15 A.   Yes.  I still do.  She's been alive for ten years with a
16 mesothelioma.  She has been biopsied twice and confirmed by
17 Sam Hammer.
18 Q.   And her exposure history was taken by you or somebody
19 else?
20 A.   Well, originally, by somebody else, but I have taken it
21 subsequently.
22 Q.   And that information is reflected in the exposure history
23 you provided in connection with this list?
24 A.   I am sorry?
25 Q.   Is that exposure information provided in connection with

WR GRACE BANKRUPTCY       ALAN C WHITEHOUSE M.D.       October 18, 2007

Page 149

1  the information you provided in connection with this list?
2  A.    Oh, absolutely.
3  Q.    Elizabeth Trimble; is that a patient of yours or
4  Dr. Black's or something else?
5  A.    I am not sure I recall that one, off the top of my head,
6  whether Brad was involved in that or not.
7  Q.    It says --
8  A.    Brad had done an awful lot of work in tracking down
9  these, and had called a lot of family members.  Wait a
10  minute.  I remember.  I am sorry.  She was a patient of
11  Brad's.  She was the school nurse in Libby.
12  Q.    Okay.
13  A.    I had forgotten that.
14  Q.    And this is a client of Mr. Heberling's?
15  A.    Yes, it is.  But all that exposure history was obtained
16  through the CARD Clinic.
17  Q.    And Wilson -- Ford Wilson?
18  A.    That, I believe, was obtained from Dr. Obermiller in --
19  including the exposure history -- who is in Kalispell.
20  Q.    Exposure history; you believe you got that from
21  Dr. Obermiller?
22  A.    Yeah.  I think there is one more not on this list too,
23  but I can't recall who it is.
24  Q.    And as I understand what you put together here and
25  what -- you have, apparently, written an article or something

WR GRACE BANKRUPTCY       ALAN C WHITEHOUSE M.D.       October 18, 2007

Page 150

1  on these -- let me ask you about the article first.  Is it a
2  description of the cases?
3  A.    It's a short case history, a chart that shows their
4  exposures and the path, what type of mesothelioma it was.
5  They were all epithelial.  And except for one, we couldn't
6  get the -- we got a path report, but it wasn't adequate to
7  tell us what kind it was.  And then, as case history, has a
8  short dissertation on the exposure histories for people with
9  mesothelioma.  It was a very short communication.
10  Basically, it's designed to bring up-to-date the total
11  number of mesotheliomas in Libby.  You add these 11.  Because
12  Tricia Sullivan only reported on miners, and we had all these
13  other ones, and saw the article when it came out.  It sort of
14  provoked us.  I say me and Brad Black, to put these all
15  together.
16  Q.    These mesotheliomas, according to the title here that you
17  say, are mesothelioma cases that are due to exposure to Libby
18  asbestos, correct?
19  A.    Yes.  All of them were exposed in Libby.
20  Q.    Okay.
21  A.    Most of them had some type of asbestos abnormality in
22  their chest x-ray aside from their mesothelioma.
23  Q.    And you and Dr. Black have reached the opinion in your
24  report that these mesothelioma cases on this list, you
25  believe, were due to or caused by exposure from Libby,

WR GRACE BANKRUPTCY       ALAN C WHITEHOUSE M.D.       October 18, 2007

Page 151

1  correct?
2  A.    Yes.  Absolutely no question about.
3  Q.    Environmental exposure from Libby?
4  A.    Yes.
5  Q.    Now, we did receive -- in connection with the exhibit,
6  some of the information -- the only information you provided
7  on their exposures, and can I ask you some questions about
8  some of that?
9  MR. HEBERLING:  I didn't hear that question.
10  MS. HARDING:  I was just explaining, we received data
11  from you relating to the --
12  MR. HEBERLING:  There is a CD attached.
13  MS. HARDING:  Right, there is a CD attached.  I had some
14  questions about some of the individuals that are listed as
15  environmental exposures.  Mr. Flatt.
16  THE WITNESS:  There you are.  We need both of them.
17  Go ahead.  I am sorry.  We interrupted your train of
18  thought I am sure.
19  Q.    (BY MS. HARDING)  I first wanted to ask about Mr. Flatt
20  because he is a client of Mr. Heberling's, correct?
21  A.    Yes.
22  Q.    And as I understand it, the exposure summaries that we
23  have are -- were compiled by Mr. Heberling.  Is that right?
24  In connection --
25  A.    Well, probably, perhaps, that, but it probably came from

WR GRACE BANKRUPTCY       ALAN C WHITEHOUSE M.D.       October 18, 2007

Page 152

1  either the wife, if he is sick, or it came from -- now that I
2  think about it, I think it was a V.A. patient from Spokane.
3  You know, there are so many of these, it's hard for me to
4  remember each individual one.
5  Q.    Give me a second, I am just trying to find the actual
6  records of this particular individual.
7  MR. HEBERLING:  There should be an exposure history by us
8  and one by the doctors in Boston.
9  Q.    (BY MS. HARDING)  Let me ask you about Mr. Harrison while
10  we are looking for the other document.  Sorry.
11  Mr. Harrison.  Your exposure history indicates that he
12  was in the Navy in World War II on a destroyer, but you still
13  listed him as environmental, correct?
14  A.    Yes.  I think there is also something else to be said
15  about that.
16  Q.    Before you explain, could you answer the question?  You
17  listed him as an environmental Libby --
18  MR. HEBERLING:  He said yes.
19  THE WITNESS:  I said yes.
20  Q.    (BY MS. HARDING)  Okay.  If you said yes, then, go ahead.
21  A.    There is a book of literature now that seems to indicate
22  that chrysotile may have a very minimal role to play in the
23  development of mesothelioma, and it priorly is entirely an
24  amphibole disease.  I think the school is still a little bit
25  out on that, although the statistics are looking that way.

Page 153

1  And, so, you -- and you have to, under those circumstances,
2  somewhat minimize, possibly, the Navy exposure.
3       Although, I guess you have to still worry about some
4  other types of amphiboles that may be around. Far and away,
5  the biggest exposure for him was his environmental exposure
6  in Libby.
7  Q.  How long did Mr. Flatt work in the Navy?
8  A.  Mr. Flatt or Mr. Harrison?
9  Q.  Mr. Harrison.
10 A.  I don't know that answer right now, off the top of my
11 head.
12 Q.  He worked in the Navy on a destroyer in World War II,
13 correct?
14 A.  I just plain don't recall. If you can give me the
15 data -- I mean, it's in my reports and all, but I don't have
16 it right here.
17 Q.  And is it your opinion, is that the only kind of asbestos
18 exposure that Mr. Harrison could have received in the Navy or
19 World War II on a destroyer is the chrysotile asbestos?
20 A.  No, I didn't say that. What I said, there may have been
21 some exposure to amphiboles I don't know about. By far and
22 away, the most significant exposure he had was the Libby
23 asbestos.
24 Q.  I take it you don't -- first of all, here is the exposure
25 history that was attached to the report.

Page 154

1  A.  And I had these when I wrote up this, by the way.
2  Q.  And that exposure indicates he worked in the Navy, but it
3  doesn't give you a time, correct?
4  A.  It does not.
5  Q.  Do you know, do any of your records indicate how long he
6  worked in the Navy?
7  A.  I am not sure if we have anything else further on him or
8  not. It doesn't say otherwise.
9  Q.  So, that's --
10 A.  The same thing you have there.
11 Q.  That's all of the information that you have --
12 A.  That's all. That probably is. It may not be. I would
13 have to look at Brad's notes as well, because he made -- that
14 probably is all.
15 Q.  And it doesn't indicate how long he was exposed in the
16 Navy, correct?
17 A.  No, it does not.
18 Q.  So you have no way to quantify the amount of asbestos he
19 might possibly have been exposed to in the Navy, correct?
20 A.  That's correct.
21 Q.  You don't know whether or not he was exposed to
22 chrysotile or amosite or crocidolite on Naval ships, correct?
23 A.  I don't know that.
24 Q.  You are aware of the extensive literature documenting the
25 extraordinarily high exposures that workers were often

Page 155

1  exposed to in the Navy, correct?
2  A.  I am aware of that.
3  Q.  Then the only information that's provided in the exposure
4  history here is that Mr. Harrison lived in Libby, in the
5  summers only, from 1980 to 1985. Correct?
6  A.  That's correct.
7  Q.  You don't know what levels of exposure he was exposed to
8  while in Libby. Correct?
9  A.  No. Except I know where he lived, he was getting
10 significant exposures. But I don't know otherwise.
11 Q.  Where was he living?
12 A.  Oh, let me see that again here, because it's on there. I
13 have forgotten it. If it's not here, it's something that I
14 have got. Living in the Wheat Grass Motel for those times
15 that he was there.
16 Q.  And what is it about living in the Wheat Grass Motel that
17 makes you think he had exposures that must have been much
18 higher than exposures he had during the Navy?
19 A.  I don't know that for certain. I talked to Brad about
20 that, and Brad thought he had significant exposures. That's
21 Brad Black, Dr. Black. Beyond that, I can't give you any
22 other further information.
23 Q.  I am just trying to understand the foundation for your
24 opinion, that it was clearly his exposure in Libby that
25 caused his mesothelioma, when this gentleman worked in the

Page 156

1  Navy for an undetermined amount of time and was potentially
2  exposed to high levels of chrysotile, amosite or crocidolite?
3  A.  Well, for whatever reason -- and I have to find the
4  original notes we have on that, because I have a fair number
5  of notes on that, that were provided to me by Dr. Black, and
6  I just don't recall what all was in there, except that it was
7  felt by both him and myself that the likely source of this
8  was his Navy -- not his Navy exposure, but was his Libby
9  exposure. And particularly because the large number of
10 mesothelioma cases we were starting to see that are dating
11 back mostly to the seventies and early eighties.
12      It's sort of like the environmental stuff is all of a
13 sudden marching forward and has reached the end of latency
14 period. That's the reason for it.
15 Q.  I understand that, Doctor. First of all, his asbestos
16 exposures he would have received in the Navy, would have
17 occurred early on in his life, correct?
18 A.  Fairly early on, yes.
19 Q.  His first exposures would have been in the Navy, right?
20 A.  Yes.
21 Q.  And additionally --
22 A.  You know, I am not trying to draw --
23 Q.  Let me just ask my question.
24      You really don't have any information on exposure to
25 allow you to draw the conclusion that his mesothelioma was

Page 157

1  caused by exposure in Libby.  Isn't that fair to say?
2  A.  I can't say that for certain.  But what I can say is that
3  the paper is written around the number of mesotheliomas that
4  are appearing in Libby, Montana in people that were exposed
5  to Libby asbestos.  Okay?  It doesn't necessarily mean that
6  there was not another exposure that we don't know about of
7  significance.
8  Q.  Dr. Whitehouse, the table -- let me ask you a question.
9  The table is labeled, mesotheliomas due to exposure to Libby
10  asbestos.  And how many mesotheliomas have been attributed to
11  exposure to people that worked in the Navy over the last
12  50 years?
13  A.  There has been a fair number of them.
14  Q.  Hundreds?
15  A.  Probably so.
16  Q.  Thousands?
17      MR. HEBERLING:  Objection.  You are not letting him
18  finish.  You are interrupting him.
19  Q.  (BY MS. HARDING)  I apologize.  I don't mean to interrupt
20  you.
21  A.  I have been in practice in Spokane from 1969.  I did not
22  see a single mesothelioma, to my recollection, prior to 1980.
23  I maybe saw one in the eighties.
24      I have now seen -- including all these, plus some other
25  ones here that are on this list -- probably 15 since 1985

Page 158

1  that are associated with Libby asbestos in some form or
2  another.
3      Now, that's not coincidental.  That's an observation as a
4  physician that I legitimately can make, relative to the
5  number of mesotheliomas that are occurring in Libby.  And you
6  may argue that one or two of those may have had some other
7  significant exposure.  It doesn't change the issue.
8  Q.  Doctor, I am trying to understand the foundation for your
9  opinions.  And you would agree with me that thousands of
10  mesotheliomas have been attributed in the literature to
11  exposures in the Navy, correct?
12  A.  I am sure there are.  I don't know there are thousands,
13  but I am sure there a large number, yes.  No question about
14  it.
15  Q.  Indeed, in Washington State there have been numerous,
16  hundreds of mesotheliomas that have developed in individuals
17  that were exposed in the shipyards in the Washington State
18  area, correct?
19  A.  Yeah.  And to my knowledge, almost all of those were in
20  Western Washington, and, of course, we are in very Eastern
21  Washington.  We really don't see them over here to any
22  significant amount.  So if, indeed -- you know, if you look
23  at the comparison, the numbers that are being seen in Spokane
24  versus the numbers that are all of a sudden being seen in
25  Libby associated with Libby asbestos, you can't help but draw

Page 159

1  the conclusion that there is a significant factor in their
2  production, related to Libby asbestos and the environment.
3  And that's what I am saying.
4  Q.  Dr. Whitehouse, I didn't ask you any questions in that
5  regard.  I was asking --
6      MR. HEBERLING:  Objection.  Argumentative.
7  Q.  (BY MS. HARDING)  I've asked you questions relating to
8  the individual case of Mr. Harrison, and asked you how you
9  attributed his asbestos to his mesothelioma to asbestos out
10  of Libby, and I am trying to understand that.
11      Now --
12      MR. HEBERLING:  Again, objection.  Argumentative.  And
13  the question is asked and answered.
14  Q.  (BY MS. HARDING)  With respect to Loreta Orem, was Loreta
15  Orem's exposures that she got indirectly from her father's
16  clothing -- which, as I understand, is the pathway of
17  exposure you believe exists?
18  A.  That's what I understand.
19  Q.  Were the asbestos exposures that her father experienced
20  solely from asbestos from Libby?
21  A.  To my knowledge.
22  Q.  To your knowledge they were?
23  A.  Yes.
24  Q.  I am showing you -- we can mark this.
25      (Ex. No. 6, marked.)

Page 160

1  Q.  (BY MS. HARDING)  This is the information that was
2  provided with respect to Loreta Orem from you in connection
3  with this mesothelioma list.
4  A.  Uh-huh.
5  Q.  And the exposure history, as you see on the last page,
6  indicates -- discusses work for construction companies,
7  Zonolite from approximately '63 to '65.  Do you see that?
8  A.  What page are you on?
9  Q.  The very last page of the document I handed you.
10  A.  Oh, here.  Okay.
11  Q.  And it says that Mr. Orem only came home on weekends.  Do
12  you see that?
13  A.  Yes.  That's what I said earlier.  Saturdays.
14  Q.  If you will turn the page previously, to the previous
15  pages, where it says, job site list of Loreta Orem's father,
16  Samuel Orem.
17  A.  Uh-huh.
18  Q.  Do you see those?
19  A.  Yup.
20  Q.  Do you know whether or not Mr. Orem would have brought
21  home asbestos on his clothes from any of the jobs listed
22  there?
23  A.  When you look at these job sites -- you have the dates
24  and when she was born?
25  Q.  Pardon me, sir?

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 161

1   A.   Well, it was a peculiar situation in that he worked in
2   Libby and drove home to Kalispell on the weekends, and then
3   she did his clothes Saturday morning.  Is that same situation
4   present in these other places?  And what were the dates that
5   he worked for them, and what relationship were they to when
6   she was born?
7   Q.   Well, Doctor, I think those are all very good questions,
8   but I beg your pardon, but I am not the one that listed this
9   person as somebody whose mesothelioma was due to asbestos in
10  Libby.  I ask you those questions.
11       Do you know what the date ranges were for her father for
12  these jobs?
13  A.   I do not.  But what I have been told is that that was her
14  exposure, her only exposure, was that when her father brought
15  home his dirty clothes from Libby.
16  Q.   And who --
17  A.   I don't even know that any of these other jobs, he
18  wasn't -- she wasn't living with her father, or was somewhere
19  else.  I don't know what the relationship is in those.
20  Q.   And who supplied the information to you about her
21  exposures?
22  A.   This was supplied by Mr. Heberling, these records were.
23  Q.   Did Mr. --
24  A.   I think she was 49.  In 1963, she would have been 12 to
25  15 years of age at the time she was exposed to that Libby

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 162

1   asbestos.  He died in '93.  And you would have to isolate the
2   jobs that she -- that he did afterwards as to whether he ever
3   brought any dirty clothes home or not, or whether he was even
4   exposed to asbestos or not.
5   Q.   But you haven't done that now, right?
6   A.   No, I haven't done that.
7   Q.   You are aware of all the other potential pathways this
8   individual had, but you have not attempted to answer the
9   questions that you posed here, correct?
10  A.   What I told you previously was that I was reporting cases
11  that I know were associated with Libby asbestos.  That does
12  not necessarily mean there may not have been something else
13  that we don't know about.
14  Q.   Did Mr. Heberling provide you with information indicating
15  that Mrs. Odem, or somebody on behalf of Ms. Odem, had filed
16  a lawsuit against a number of other asbestos defendants?
17  A.   Not that I am not aware of.
18       MS. HARDING:  Would you mark that, please?
19       (Ex. No. 7, marked.)
20       MS. HARDING:  Orem.  I keep saying "Odem," and I think
21  it's Orem.
22       THE WITNESS:  It's Orem.
23       I think that the physician who did her agent P noted the
24  asbestos dust on her father's work clothing, carrying it into
25  the household.

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 163

1        MS. HARDING:  Could we mark this, please?
2        (Ex. No. 7 marked.)
3   Q.   (BY MS. HARDING)  Exhibit 7, that's the questionnaire
4   that was filed on behalf of Mrs. Orem in this case, in the
5   Grace case.  Do you understand --
6   A.   Is this the one that's marked?
7   Q.   If you turn to Part 5, I think it is, which is about
8   three quarters of way back -- actually, if you turn to
9   Page 11, the questionnaire.  Do you see Page 11?
10  A.   It's blank.
11  Q.   Does it look like this?
12  A.   Yup.
13  Q.   Do you see where the title is, Part 5, exposure to
14  non-Grace asbestos containing products?
15  A.   Yes.
16  Q.   And it says, see attached -- it says party against which
17  lawsuit or claim was filed.  Do you see that, in the left
18  corner?  Right here?
19  A.   Okay.  I see that.
20  Q.   It says, see attached chart.  Do you see that?
21  A.   Yes.
22  Q.   And then if you turn further back -- actually, about
23  three pages back, you will find a chart that says, Part 5,
24  exposure to non-Grace asbestos containing products.
25       Do you see that?

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 164

1   A.   I see that.
2   Q.   And there are six pages of charts indicating the
3   number -- the names of all of the defendants that were sued
4   on behalf of Mrs. Loreta Orem.  Correct?  Do you see those?
5   A.   I do see those.
6   Q.   There is over at least 25, maybe 50 different companies
7   that were sued.  Is that correct?
8   A.   I see it.
9   Q.   And you see all the different information about her
10  father's work history and the alleged exposures he had,
11  correct?  For instance, Armstrong World --
12  A.   Wait a minute.  There is another plaintiff in here.  It
13  says, plaintiff, Leonard Toebe.  Who is Leonard Toebe that's
14  in this thing?
15  Q.   I have no idea.
16  A.   Well, a bunch of these pages are Leonard Toebe's.
17  Q.   Well, the first three are Loreta Orem, correct?
18  A.   Yeah.
19  Q.   And Loreta -- under Loreta Orem's exposure to non-Grace
20  asbestos containing products, it lists Armstrong World
21  Industries.  Do you see that?
22  A.   I am just looking at the whole thing here to see if this
23  is a duplicate of the other one with a different name on it.
24  Q.   I think, if you just look at the Armstrong categories,
25  you will see that it's not a duplicate.

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 165

1   A.   Under Leonard Toebe it says, Armstrong World Industries.
2   Plaintiff Leonard Toebe, T-O-E-B-E.  And I am having a little
3   trouble finding Armstrong Industries here under Loreta Orem.
4   Maybe it's there and I missed it, but it looks to me like
5   it's Leonard Toebe.
6   Q.   Doctor, could you turn your attention the first three
7   pages, please?
8   A.   I am, but you just mentioned Armstrong Industries.
9   Q.   I am trying to direct your attention to the listing of
10  Armstrong Industries under plaintiff Loreta Orem.
11  A.   There you are.
12  Q.   Do you see it?
13  A.   Yup.  I see it.
14  Q.   It indicates, pipe covering, arm attempt cement, and
15  then, Anaconda Aluminum Plant, Columbia Falls, Montana,
16  ironworker eight hours a day, five days a week, from 1953 to
17  1970 intermittently.  Correct?
18  A.   I see that.  Uh-huh.
19  Q.   Then there are a number of other defendants listed, some
20  of which have actual approximations of the amount of other
21  exposures and the days they were exposed, and some are just
22  listed as defendants, right?  Without any other information,
23  correct?
24  A.   I see those.
25  Q.   It's fair to say you did not have this information prior

STOREY & MILLER  717 W. SPRAGUE AVE, STE 1520, SPOKANE WA     (509)455.6931

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 166

1   to classifying Mrs. Orem's mesothelioma as a mesothelioma
2   that was exposure due to Libby exposure, correct?
3   A.   No, I did not have this information.
4   Q.   Would this information change your opinion that
5   Ms. Orem's mesothelioma was due solely to exposure from Libby
6   asbestos?
7        MR. HEBERLING:  Objection.  Mischaracterizes the record.
8   He did not say solely.
9        THE WITNESS:  I didn't say solely.  I said that what was
10  written about that was people that were associated at some
11  time or another with Libby asbestos.  So -- and that's what I
12  said.  I didn't say anything about this one, because I did
13  know about some of the exposures, and some of them -- and the
14  other exposures are in the case reports.  This one I was not
15  aware of.
16  Q.   (BY MS. HARDING)  So it's fair to say that the title of
17  your chart then should be changed, and it shouldn't read,
18  mesothelioma cases due to exposure to Libby asbestos, but
19  rather, should say, mesothelioma cases associated --
20       MR. HEBERLING:  Objection.  Unclear what "due to" may
21  mean.
22  Q.   (BY MS. HARDING) -- mesothelioma cases where Libby
23  asbestos is somehow associated with the individual?
24  A.   You -- I guess you could say mesothelioma cases
25  associated with exposure to Libby asbestos.  You could say

STOREY & MILLER  717 W. SPRAGUE AVE, STE 1520, SPOKANE WA     (509)455.6931

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 167

1   that.
2   Q.   Is that a more appropriate heading for the chart?
3   A.   I don't know.  What is "due to" is a legal term.
4   Q.   Well --
5   A.   I am not being facetious.  Actually, I would like your
6   opinion on that.
7   Q.   Doctor, this is a chart that you produced as your -- your
8   relying on materials in this case.
9   A.   I didn't put the title on there.  I produced most of the
10  chart here, yes.  Most of it.  In fact, almost all of it.
11  Q.   Did you review the title of the chart?
12  A.   Probably not.
13  Q.   Did you use the words "due to" in the body of your
14  report?
15  A.   I don't think I did, no.  I used the words "associated
16  with it."  Would you like these back?
17  Q.   Thank you.
18  A.   There you go.
19  Q.   A few other questions about the chart.  Mr. Pederson?
20  A.   Yes.
21  Q.   How did you -- again, I think you explained that
22  Mr. Black was --
23  A.   Dr. Black.
24  Q.   Dr. Black.  I am sorry.  Dr. Black was an acquaintance of
25  Mr. Pederson, possibly?

STOREY & MILLER  717 W. SPRAGUE AVE, STE 1520, SPOKANE WA     (509)455.6931

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 168

1   A.   Was what?
2   Q.   Mr. Pederson, No. 22 on the list?
3   A.   He was what?  I didn't hear you.
4   Q.   I can't recall.  I think -- thought you said he was an
5   acquaintance?
6   A.   I don't know he was an acquaintance, but I think he knew
7   about him from some way or another.  I know he called his
8   family and his doctor and talked over the history and all
9   with them.  That, I do know.
10  Q.   That Dr. Black got his history from his family doctor and
11  his family.  Is that fair?
12  A.   I think so.  And got the death certificate and the path
13  reports and all.
14  Q.   This is the -- you can mark that as the next exhibit.
15       (Ex. No. 8, marked.)
16  Q.   (BY MS. HARDING)  This is the death certificate for
17  Arnold Pederson from the State of Washington, correct?
18  A.   Correct.
19  Q.   And the last page of that is the exposure history
20  provided by you in this case relating to Mr. Pederson's
21  asbestos exposures, correct?
22  A.   Right.  And I have seen this before.
23  Q.   It indicates that his exposure to Libby was vacationing
24  in Libby several weeks per year, beginning in the sixties.
25  Is that right?

STOREY & MILLER  717 W. SPRAGUE AVE, STE 1520, SPOKANE WA     (509)455.6931

Page 169

1  A.   That's right.  Actually, I am not sure Brad actually knew

2  him, looking at that date.  That could be in error.  I know

3  he talked to his family.

4  Q.   They spent time fishing on the Kootenai River and

5  frequently around the vermiculite screening plant, which was

6  a very popular fishing location, correct?

7  A.   That's correct.

8  Q.   That's the basis for the attribution of the mesothelioma

9  to Libby, correct?

10  A.   Well, there is a little more than that.  His wife has

11  pleural disease and is still a patient in the clinic.  And

12  although he was in the merchant marine, his wife was not.

13  So, obviously, he had a very significant exposure in Libby to

14  Libby asbestos, if his wife has disease and they fished

15  together and they vacationed together up in Libby, because

16  she didn't have any other exposure.

17  Q.   Well, it's possible that he could have had other asbestos

18  exposures, correct?

19  A.   Possibly, I said, but more likely than not, it's related

20  to this exposure.  There is no evidence there was any other

21  exposures.

22  MS. HARDING:  Can we mark -- are you aware that

23  Mr. Pederson has also filed a lawsuit against other

24  defendants who are non-Grace defendants?

25  THE WITNESS:  No.  I am not aware of that.

Page 170

1  (Ex. No. 9, marked.)

2  Q.   (BY MS. HARDING)  If you look on exhibit -- what's the

3  title is Andrine Mary Jane Pederson.  Actually, I should have

4  said it's been filed on behalf of Pederson individually and a

5  personal representative of the estate of Arnold N. Pederson.

6  Do you see that?

7  A.   I do.

8  Q.   It versus a number of defendants there.  Do you see

9  those?

10  A.   Yes.  Lots.

11  Q.   Saberhagen Holdings, Tacoma Asbestos Company, the Brower

12  Company, Bartells Asbestos Settlement Trust, General

13  Refractories Company, Georgia Pacific Corporation, Viacom,

14  Inc., and it goes on.

15  Do you see all those?

16  A.   I do.

17  Q.   And if you turn to page -- it doesn't have a page number.

18  If you go to the fourth page in, you will see specific

19  disease, mesothelioma.

20  A.   Uh-huh.

21  Q.   Do you see the military service from 1943 to 1946?

22  A.   Yes.

23  Q.   And it says that he was a carpenter, correct?

24  A.   Right.

25  Q.   And it indicates places of exposure:  Seattle,

Page 171

1  Washington; Los Angeles, California; and Libby, Montana.

2  Do you see that?

3  A.   I do.

4  Q.   And the dates of exposure are 1943 through 1979, correct?

5  A.   That's correct.

6  Q.   So you would agree that it appears that Mr. Pederson had

7  other non-Grace occupational asbestos exposure, correct?

8  A.   It would appear that way.

9  Q.   You indicated that Dr. Black talked to the family members

10  of Mr. Pederson.  Is that how he got the exposure information

11  that is put on the chart that Mr. Heberling provided?

12  A.   Yes.  Mr. Heberling's assistants may have obtained it

13  independently, but that's similar to what we have on the

14  chart for his wife.

15  Q.   If you look at the back of the hard --

16  Would you mark this as Exhibit 10.

17  (Ex. No. 10, marked.)

18  Q.   (BY MS. HARDING)  Exhibit 10, it's interrogatory answers

19  in the cases Arnold M. Pederson versus Saberhagen Holdings

20  Inc., et al.

21  Do you see that?

22  A.   Right.

23  Q.   And these are the plaintiffs that would be the --

24  Mr. Pederson -- Mrs. Pederson on behalf of Mr. Pederson's

25  responses to the interrogatories.  Correct?  You were not

Page 172

1  provided a copy of this information before -- or were you

2  provided a copy of this information before designating

3  mesothelioma as the mesothelioma due to exposure to Libby

4  asbestos?

5  A.   I have not seen it.

6  Q.   Do you know if Mr. Black has seen it -- Dr. Black has

7  seen it?

8  A.   I don't think he has seen it either.

9  Q.   Do you know if Mr. Heberling has seen it?

10  A.   I have no idea.

11  Q.   If you look at Exhibit Appendix A?

12  A.   What page is that?

13  Q.   Toward the very end.  It's maybe the fifth page from the

14  end.

15  A.   Okay.  I was looking through here real quickly to see

16  what was in it.  Okay.  Appendix A.

17  Q.   Do you see the Asbestos Exposure History?  That's the

18  title of Appendix A, Arnold Pederson Asbestos Exposure

19  History?

20  A.   I see it.

21  Q.   You see under manufacturers, contractor suppliers,

22  correct?  The fourth column over?

23  A.   Yes, I do.

24  Q.   And some of the companies that are listed there are Napa,

25  Bestwall, Nat Gyp, Kaiser Gypsum, Georgia Pacific, USG,

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 173

1  Bondex, Hamilton, Paco, CertainTeed.
2     You see all those, right?
3  A.  Yes, I see those.  I was not aware of these, and I don't
4  think we were made aware of these at all.
5  Q.  It's fair to say that Mr. Pederson had substantial, by
6  his own allegations, substantial exposure to non-Grace
7  asbestos, correct?
8     MR. HEBERLING:  Objection.  Lack of foundation.
9     THE WITNESS:  It's not really possible for me to
10 quantitate any of these, particularly, so I don't know.  I
11 just don't know.  There is no way to know.
12 Q.  (BY MS. HARDING)  Would you still hold the opinion that
13 Mr. Pederson's fishing trips to Libby would be -- well, you
14 say on the chart, due to exposure of Libby asbestos.  I take
15 it you don't hold this opinion, correct?
16 A.  Well, I think, in his particular case, I suspect it is
17 for another reason.  First off is, it would appear that Libby
18 asbestos is far more mesothelioma-genic -- I just made that
19 word up, by the way -- than chrysotile.
20    Plus, his wife has asbestos pleural disease, and fairly
21 significant disease, was exposed -- was in Libby at the same
22 time but did not have any of his other exposures.  And, so, I
23 didn't know about these other exposures, but even now, that I
24 doubt it's going to make any difference as far as my opinion.
25    Certainly, it was a very significant for -- in his

---

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 174

1  mesothelioma.  Whether it was a sole cause or not, there is
2  no way for me to know.  All I can do is report they are
3  associated with it.
4  Q.  It's your opinion Mrs. Pederson could not have received
5  asbestos exposure from take-home dust brought home by
6  Mr. Pederson in all of his other jobs over the decades that
7  he was exposed to other asbestos?
8  A.  No way that I can prove that, obviously, one way or the
9  other.  All I can say is, the likelihood is, judging by that
10 she has pleural disease, that's fairly typical for asbestos,
11 for Libby, that in all likelihood, the majority of the
12 exposure that she had was asbestos-related, and it was
13 identical to this.
14    So, that's all I can say about it.  What I am writing up
15 is about cases that are associated with Libby asbestos.
16 Q.  And it's your opinion that the asbestos -- the exposures
17 that are listed at Appendix A of the Exhibit 10 are all the
18 other non-Grace exposures that are listed there, would only
19 be exposures to chrysotile asbestos?  That's your opinion?
20 A.  No.  I have no idea.  No way for me to know that.
21 Q.  I just want to make sure I understand.  So, you have got
22 numerous cases throughout your reports and on your exhibits
23 where you attribute asbestos disease to exposures from
24 take-home, or take-home dust exposures, correct?
25 A.  Yes.

---

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 175

1  Q.  From the Libby mine, correct?
2  A.  Yes, correct.
3  Q.  And it's your opinion that Mrs. Pederson could not have
4  been exposed from take-home dust from Mr. Pederson's other
5  asbestos-related jobs over his decades of work?
6     MR. HEBERLING:  Objection.  Asked and answered.
7     THE WITNESS:  I said it was quite less likely.
8  Particularly since the changes that she has got in her x-ray
9  are very typical for Libby asbestos.  We already talked about
10 the pleural disease that people have.
11 Q.  (BY MS. HARDING)  And the typical Libby asbestos disease,
12 is it your opinion that that disease is different than
13 asbestos -- than a disease caused by chrysotile, or is it
14 your opinion that it's different than disease caused by any
15 other asbestos exposure?
16 A.  Well, it's clearly different than what's caused by
17 chrysotile.  It's different than what else has been reported
18 in this country associated with whatever amphibole exposures
19 there have been.  It's different from that.
20    Whether it's overall different than what's been reported
21 in South Africa and Australia is a little bit unclear.  There
22 is some stuff that suggests it is, based upon talking with
23 the people in Australia, we have talked to one on one, and
24 what's in the literature, but that remains a little bit to be
25 seen.  I don't know for certain about that.

---

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 176

1  Q.  So it's your opinion it's different than pleural-related
2  changes that might be caused by exposure to amosite in the
3  United States?
4  A.  As far as I can tell from the literature, yes.  And
5  particularly in the nature of its rapidly progressive
6  changes.
7  Q.  And it's different than exposure -- than disease that
8  would be caused by exposure to crocidolite in the United
9  States?
10 A.  Probably.  There isn't any significant number of reports
11 or any reports that I come upon that show that there is a
12 rapidity of changes, and the extent of disease with low
13 exposure with crocidolite that we, apparently, are seeing
14 here in Libby.  So it probably is different.
15    You know, it's hard to say absolutely on things like
16 that, because there may be cases that have never been
17 reported, or things that have not been written up, or are
18 being written up, but as far as we can tell from the
19 literature, it's a far more aggressive type of asbestos as it
20 relates to pleural disease.
21 Q.  What particular cohorts in the United States have you
22 compared to the disease that you have seen in patients in
23 Libby?
24 A.  Well, there is a lot written about -- and I read most of
25 it -- about amosite in insulation workers on the east coast,

WR GRACE BANKRUPTCY        ALAN C WHITEHOUSE M.D.        October 18, 2007

Page 177

1   and some of it has been things that Selikoff and Levin have

2   written of.  Actually, things Arthur Frank have written of.

3   And this appears to be -- have a more rapidly progressive and

4   much more pleural disease associated with it.

5       And that was their opinions also, by the way, when they

6   looked at it, and they have been out to Libby and looked at a

7   lot of our stuff, and they have come to the same opinion.

8   They are the ones that have written the paper.

9       So, that's where a lot of that opinion comes from.

10  Q.   When you say, they are the ones who have written the

11  papers, who do you mean?

12  A.   Levin and Frank.

13  Q.   And what particular studies are you talking about when

14  you say you have compared them to the workers that -- for

15  instance, the shipyard or insulation workers for the

16  Dr. Selikoff study?

17  A.   Levin has been involved with this, with Selikoff, in

18  doing all the insulation workers, and they have a huge study

19  on insulation workers, mostly in the New York area, New

20  Jersey.  And it was Steve's opinion that this was -- the kind

21  of stuff that we were seeing here was different than he has

22  ever seen with amosite.

23       And that, basically, is from the basis of the work that

24  he has done.  He trained Selikoff.

25       MS. HARDING:  All right.  We will take a break.

WR GRACE BANKRUPTCY        ALAN C WHITEHOUSE M.D.        October 18, 2007

Page 178

1       VIDEOGRAPHER:  This will conclude Tape No. 5.  The time

2   is now 3:23 p.m.

3       (Recess taken from 3:25 to 3:33.)

4       VIDEOGRAPHER:  This is the continued videotaped

5   deposition of Dr. Alan C. Whitehouse and Tape No. 6.  The

6   date remains to be October 18, 2007.  The time is now 3:33

7   p.m.

8   Q.   (BY MS. HARDING)  Dr. Whitehouse, your opinion about

9   Mr. Pederson's mesothelioma, as I understand it, is, in part,

10  based upon your opinion about the disease that Mrs. Pederson

11  has, correct?

12  A.   In part, it is, because it looks like typical Libby

13  asbestos pleural disease.

14  Q.   Is Mrs. Pederson a patient at the CARD Clinic?

15  A.   Yes.

16  Q.   Is she -- are her records -- have her records been

17  produced in this case?

18  A.   I don't know.  I have no idea.

19  Q.   Is she a client of Mr. Heberling's?

20  A.   I doubt it.  Although, I don't know, maybe she is.

21  Q.   You have indicated --

22  A.   You should ask him.

23  Q.   You indicated that she has been accepted into the Libby

24  medical plan, correct?

25  A.   I understand that's the case.

WR GRACE BANKRUPTCY        ALAN C WHITEHOUSE M.D.        October 18, 2007

Page 179

1   Q.   And are you currently treating her?

2   A.   No.  Dr. Black is.

3   Q.   Dr. Black is.  And what, specifically -- what specific

4   disease does she have?

5   A.   She has asbestos pleural disease.

6   Q.   Does she have pleural plaque, does she have diffuse

7   pleural thickening?

8   A.   I think she has diffuse pleural thickening.  It's been a

9   long time since I have seen her x-rays.  Brad showed it to me

10  when I started to work this up last spring.  It was clear

11  what it was, and I don't remember.  It was more than just

12  plaques, though.

13  Q.   How long -- does she have declining pulmonary function?

14  A.   I can't answer that.  I don't know.

15  Q.   How long has she been a patient of the CARD Clinic?

16      MR. HEBERLING:  Objection.  This line of questions

17  relates to somebody who probably is not a Libby claimant, so

18  I don't think he is at liberty to discuss her case.  She is

19  not a client in our office.

20      MS. HARDING:  Well, Dr. Whitehouse has identified her and

21  her disease as being something that he is relying upon, in

22  part, for reaching his opinion about her husband's disease.

23  He is the one that said it.  I didn't know she was a patient.

24  I didn't know she was anything else.  So --

25      MR. HEBERLING:  I will try to get her permission that her

WR GRACE BANKRUPTCY        ALAN C WHITEHOUSE M.D.        October 18, 2007

Page 180

1   medical records be used.

2       THE WITNESS:  In short, I can't answer your questions

3   because I am not that familiar with it.

4       MR. HEBERLING:  She might be a client of Tom Lewis, but I

5   don't think she is a client of our office.

6   Q.   (BY MS. HARDING)  Do you know when the Pederson's moved

7   to Libby?

8   A.   When they moved to Libby?  They lived in Libby in the

9   sixties.  They live in Spokane now.  I don't recall when they

10  left there, though.  I don't know that.  I know they moved to

11  Spokane.

12  Q.   They don't live in Libby now?

13  A.   No.

14  Q.   If you could turn to -- Dr. Whitehouse, I am going to

15  have this marked as the next exhibit.  I think it might be

16  11, but I am not sure.

17      (Ex. No. 11, marked.)

18  Q.   (BY MS. HARDING)  You have cited this abstract from Dr.

19  Bruce Case as reliance materials in your report, correct?

20  A.   Uh-huh.

21  Q.   And this is entitled -- you cited CL Case 2006,

22  Mesothelioma Update For Libby, Montana Occupational and

23  Non-Occupational -- do you see that -- lung cancer, Volume

24  54:S 110.

25      Do you see that?

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 181

1  A.  What was the latter part of that?  I have the abstract
2  here, No. 38, and you said something about *colon No. 10 or
3  something?
4  Q.  I might have misread it.  What's the title?
5  A.  Mesothelioma Update For Libby, Montana Occupational and
6  Non-Occupational.
7  Q.  Okay.  And this is an abstract from the presentation that
8  Dr. Case provided somewhere.  Is that right?
9  A.  Yes.
10  Q.  Were you present at the presentation?
11  A.  No, I was not.  Not at that one.
12  Q.  Was Dr. Black present at the presentation?
13  A.  I am not sure whether he was or not.  We were both there
14  at the -- this was the American College of Chest Physicians
15  in Seattle, in October of '06.  Is that what it is?  Or was
16  this a session associated with Marv?
17  Q.  I don't know.  It was cited in your report.  I don't
18  know.
19  A.  Okay.  Let me double-check it, then.  What page is it
20  cited?
21  Q.  It would be reflected in your report, correct, wherever
22  it's from?
23  A.  It doesn't matter where it's from.
24  Q.  I want to ask you a quick question about it.  In
25  Paragraph 2 it says, the methods.  You see Paragraph 2 says,

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 182

1  methods?
2  A.  Uh-huh.
3  Q.  Then it says, case data for mesotheliomas in Libby was
4  obtained from three sources?
5  A.  Yes.
6  Q.  A, published McDonald, McGill follow-up studies,
7  W.R. Grace.  Do you see that?
8  A.  Yes.
9  Q.  The information from attorneys representing mesothelioma
10  victims.  Do you see that?
11  A.  Yes, right.
12  Q.  Third is C, Dr. Brad Black on case numbers occupational,
13  non-occupational origin, and basis of diagnosis at CARD
14  Clinic in Libby.
15  Do you see that?
16  A.  Right.
17  Q.  Do you know whether any of the information that was
18  provided by Dr. Case in connection with this presentation --
19  or do you know what information provided by Dr. Case in this
20  presentation was provided by Dr. Black?
21  MR. HEBERLING:  Objection.  Lack of foundation.
22  THE WITNESS:  No, I do not know how much he provided.
23  And I know that there was concerns about some significant
24  errors in this.  And --
25  Q.  (BY MS. HARDING)  I am sorry, there were concerns about

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 183

1  significant errors --
2  A.  Significant errors in what he presented.  I don't know
3  all the details, how he got all this information.  We were
4  not happy about it.
5  Q.  We, meaning you and Dr. Black?
6  A.  Well, this sort of -- you know, he -- I never talked to
7  him about this at all.  I guess Dr. Black did.  But there is
8  significant errors in it, and that I do know.  And neither of
9  us were happy of this presentation when we knew we were going
10  to have to write up our stuff.  We were going to do -- do a
11  fair amount of work in the process of doing that.
12  So he sort of is not really associated with Libby at all.
13  And I am not sure how he got all of this stuff, and I know
14  there are significant errors in it.
15  Q.  Did you know that Dr. Case was originally named as an
16  expert in this case on behalf of the Libby claimants, but was
17  subsequently withdrawn?
18  A.  Yes, I am aware of that.
19  Q.  Do you know why he was withdrawn?
20  A.  Not really for sure.  I really don't.  I think that I
21  personally was not happy with his being involved, and
22  particularly concerning many of his stands concerning
23  asbestos.  Particularly as far as chrysotile.
24  Well, no.  We might as well get right down to the
25  nitty-gritty now, as I think about it.

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 184

1  Canada remains one of the largest exporters of chrysotile
2  in the world, and he has been a proponent of that not causing
3  any disease at all, and we just didn't want to be associated
4  with that.  That's basically what it amounts to.
5  Q.  And that's why he was no longer --
6  A.  Yeah.
7  Q.  -- he was withdrawn as a testifying expert on behalf of
8  the Libby claimants?
9  MR. HEBERLING:  Objection.  Asked and answered.
10  THE WITNESS:  I don't know exactly why he was withdrawn.
11  Okay.  I do know that was my opinion of him.  Okay?  And I
12  did not want to particularly be associated with him because
13  of that stand that he has taken for the Canadian government.
14  Okay?
15  So, whether I influence other people with that or not, I
16  don't know.
17  Q.  Do you know whether Dr. Black provided Dr. Case
18  information on Mr. Pederson?
19  A.  I do not know.
20  Q.  And do you know whether --
21  A.  I have no idea what Dr. Black told Dr. Case.
22  Q.  So, then, you wouldn't know whether or not he provided
23  information on Ms. Orem either, correct?
24  A.  No.  I have no idea.
25  Q.  A quick question about -- I think it's Exhibit 9, which

Page 185

1  were the interrogatory answers that were apparently submitted
2  by Mrs. Pederson.
3  A.  Uh-huh.
4  Q.  If you will look at the second page of that document?
5  A.  Do I have it here?
6  Q.  Yes.  Exhibit 9.
7  A.  I am sorry.  I didn't realize I still had it.  Go ahead.
8  Q.  You will see on the second page, under marital status and
9  children, question D asked the present general state of
10 health of decedent's spouse and each child?
11     MR. HEBERLING:  Objection.  He has the wrong exhibit, or
12 you two aren't communicating for some reason.
13     MS. HARDING:  It's the interrogatories.  Do you have the
14 interrogatory answers?
15     THE WITNESS:  No, I don't.  This is the complaint, I
16 think.  I think I gave it back to you.
17     MS. HARDING:  I think we marked them, didn't we?
18     MR. HEBERLING:  Yes, you did.
19     THE WITNESS:  That is not it, is it?
20     MS. HARDING:  No.  I don't think so.
21 Q.  (BY MS. HARDING)  Looking at Page 2, under marital status
22 and children, 2D, the question is, present general state of
23 health of the decedent spouse and each child listed above,
24 or, if deceased, the date and cause of death.
25     Do you see that?

Page 186

1  A.  Yes.
2  Q.  The answer A is Andrine Mary Jane Pederson.  Do you see
3  that?
4  A.  Yes.
5  Q.  And then the answer to question D is, Mrs. Pederson is
6  currently on blood pressure medication.  Her lower back goes
7  out and she has been going to a chiropractor.  She also
8  suffers from lung problems and is on Advair.
9      Do you see that?
10 A.  I do.
11 Q.  And Advair is a medication for asthma, correct?
12 A.  Well, not necessarily just for asthma.  Advair is also
13 approved usages for any kind of broncho spasm associated with
14 COPD, and we have had some patients that have responded to
15 Advair that have improved their breathing on it.  So, that's
16 why we use it.  And it's off label usage.
17 Q.  Off label usage for treatment of COPD?
18 A.  No, just off label usage for treatment of their asbestos
19 problems.  If their dyspnea, their shortness of breath
20 responds to it.  Which is perfectly acceptable, medically, to
21 do that.
22 Q.  So you used Advair to treat patients with
23 asbestos-related disease?
24 A.  We do when we demonstrated that it improves their
25 breathing.

Page 187

1  Q.  Okay.  I have some questions I would like to ask you
2  about your progression study.
3  A.  Okay.
4  Q.  While we are looking for the study, Dr. Whitehouse, you
5  authored an article, Asbestos-Related Pleural Disease Due to
6  Tremolite Associated With Progressive Loss of Lung Function,
7  Serial Observation in 133 Miners and Family Members and
8  Residents in Libby, Montana?
9  A.  That's correct.
10 Q.  American Journal of Industrial Medicine, 2004?
11 A.  That's right.
12 Q.  And this article, as its title indicates, relates to loss
13 of lung function in individuals who have pleural disease,
14 correct?
15 A.  That's correct.
16 Q.  And not interstitial fibrosis caused by asbestos,
17 correct?
18 A.  Predominantly, pleural disease.  Some of those people had
19 small amounts of interstitial disease.  Generally, zero one,
20 though.  There was small amounts of interstitial disease in a
21 number of people in there, and that's reported in the paper.
22 Q.  It's reported in the paper that there were individuals
23 with some interstitial disease, but it's not reported in the
24 paper what the extent of it was, correct?
25 A.  No.  I think it is.  Somewhere, you will find it in there

Page 188

1  that it was --
2  Q.  Page 221 says, the remaining patients, 56.
3     So 56 of the 123 --
4  A.  Right.
5  Q.  -- had minimal radiographic evidence of irregular
6  interstitial changes involving the bases at profusion
7  category zero/one or one/zero.
8  A.  That's right.
9  Q.  But the ratio of that, of whether they were zero/one or
10 one/zero, or how many had zero/one, or how many had one/zero
11 is not reported, correct?
12 A.  It wasn't listed there, no.  It wasn't important for the
13 paper.
14 Q.  It wasn't important for the paper for you to make it
15 transparent how many of your patients had a reading of
16 one/zero on a chest radiograph?
17 A.  I don't think so.  I think what we -- you know, it was
18 relatively minimal disease.  Okay?  And it was at extreme
19 bases, and it was not felt to be a significant factor as far
20 as their asbestos disease at that point in time.  And a lot
21 of it probably wasn't even asbestos-related.
22 Q.  I am sorry.  A lot of what wasn't asbestos-related?
23 A.  Some of those interstitial changes.  One of the problems
24 with interstitial disease, when you read it, if you see
25 people that have been heavy smokers in the past or people

Page 189

1  that have had maybe a lot of respiratory infections as a
2  child, you may see some scarring in the base.  It's clearly
3  there.  And you can't call -- you have to call that as far
4  as, possibly an asbestos abnormality, but many of those may
5  not be.
6      And he didn't have the typical pictures of rales and
7  things like that, that you have with interstitial disease.
8  So I think that was an appropriate call.
9  Q.   Previously in the day, you testified that the individuals
10 that you treat with disease in Libby, you believe, have a mix
11 of pleural and interstitial changes, and it's difficult to
12 determine which is which.
13 A.   No.  You very much mischaracterized what I said.  Okay?
14     What I said is, Libby is predominantly a pleural disease,
15 but we have discovered, particularly in the last few years,
16 that many of these people have subpleural fibrosis, and that
17 it may be a continuum that goes from pleural disease to
18 subpleural fibrosis, interstitial disease.  That's what I
19 said.
20 Q.   Okay.  And as I understand what you are saying here is
21 that you had 56 people that had zero/one or one/zero, which
22 indicate -- the one/zeroes at least would indicate that they
23 have radiographic changes consistent with asbestosis,
24 correct?
25 A.   They have radiographic changes that might be related to

Page 190

1  asbestosis.  The diagnosis of asbestosis is made on multiple
2  factors.
3  Q.   But that for those people in your progression study, you
4  believe that many of them that have one/zero, their
5  interstitial fibrosis wasn't caused by asbestos; it was
6  caused by something else?
7  A.   Either caused by something else or it was minimal enough
8  in total extent that it was not significant.
9      MS. HARDING:  Could we mark that, please?  That's a copy
10 of the article.
11     (Ex. No. 12, marked.)
12 Q.   (BY MS. HARDING)  A few questions.  Did you submit the
13 article to any attorneys for review or comment before it was
14 published?
15 A.   To attorneys before it was published?
16 Q.   Yes.
17 A.   Mr. Heberling had looked at a draft of it.  A number of
18 other people had reviewed it also.
19 Q.   Okay.  Other than Mr. Heberling, who else previewed it?
20 A.   Attorneys?  No other attorneys.
21 Q.   Other individuals that weren't with Mr. Heberling?
22 A.   I think probably Dr. Miller looked at it, at one point in
23 time, and Jim Lucky was available to me for a lot of
24 consultative advice on dealing with that.
25 Q.   There are no -- you don't report any standardized

Page 191

1  mortality ratios in this study, correct?
2  A.   None at all.
3  Q.   And you don't have any -- you don't report any relative
4  risks, correct?
5  A.   Any what?
6  Q.   Relative risk?
7  A.   No.  I am reporting in there observations on patients
8  that I saw who came to me, who had return appointments, and
9  everybody that had an asbestos disease had a return
10 appointment.  And, so, they were seen within several years.
11 Some, longer than that, when they had a second pulmonary
12 function, or sometimes there were more.  The last one was
13 taken along with the first one, on a random basis, for
14 incorporation in the study.
15     And those charts that you have in that green file reflect
16 the ones that were used.  Okay?  And you will also note that
17 there was a study done on Embril (phonetic), which was
18 probably -- which was not disclosed in that there because of
19 confidentiality from Imunex when I did that.
20     If they went on Embril, that was the last pulmonary
21 function before they started on Embril was the end of the
22 study.  I didn't take any of the Embril study.  I didn't know
23 what was going to happen with Embril on these people, so I
24 didn't want to skew the study having another variable to it.
25 Q.   I want to ask you to try to direct your answer to my

Page 192

1  questions.
2  A.   I knew you were going to get there eventually, so I might
3  as well help you get there quicker.
4  Q.   I do want to ask you a few things.  In your paper, you
5  identified an annual decline in DLCO amongst the patient
6  coworkers of three percent?
7  A.   Yes.
8  Q.   You believe the DLCO measurement is a particularly
9  important indicator of restrictive disease in the Libby
10 tremolite disease patients, correct?
11 A.   That's correct.
12 Q.   And you believe that this level of decline constituted
13 rapid progressive loss of lung function, correct?
14 A.   More than you would expect, and more than previously
15 reported.  There has been a subsequent report by Alfonso
16 showing -- pretty much mirroring that.  I think his was 2.2
17 percent per year.
18     And what we see in the Libby cohort since then very much
19 mirrors that.  It's continuing to go on, at least that
20 same -- maybe even a little bit faster than that, but that
21 same -- roughly, same rate.  We haven't done the statistics
22 on that.  It continues to go up in Libby with the whole
23 group.
24 Q.   When you say the cohort, you mean the 123 people that you
25 studied in this group?

Page 193

1  A.   No.  I am talking about the whole 1,500 of them would.
2  We have a significant portion of those that are losing their
3  DLCO at very similar rates.
4  Q.   You have a new analysis on the --
5  A.   No.  We haven't done an analysis.
6  Q.   Let me finish my question.
7  A.   I am sorry.  My apologies.
8  Q.   Do you have a new analysis on a different set of
9  patients?
10  A.   No.  I haven't done the analysis.  I observe what's going
11  on.  I record on the pulmonary functions what the losses have
12  been from time to time, and sometimes from the very beginning
13  until that time, and that's an observation both Dr. Black and
14  I have made, and something we will get written up again as a
15  follow-up to that paper.
16  Q.   And what you are indicating is that you observe in your
17  patients, in all of your patients, this decline in lung
18  function?
19  A.   Not all.  We have, basically, three patient populations.
20  We have a group of patients that have relatively minimal
21  disease, that are staying the same.  We have a group of
22  patients that have had rapid declines and then have leveled
23  off.  And another group that gets significant declines that's
24  not quite so rapid, but it continues on.  And then we have
25  had a few that have rapidly declined and gone on to death.

Page 194

1       So we are seeing a mix of all different types.
2  Q.   The people that rapidly progress and progress to death,
3  we discussed in Exhibit No. 4, correct?
4  A.   We have, correct.
5  Q.   The people that are not progressing, that have minimal
6  disease, as you have described it, how many, approximately,
7  of the approximately 1,500 patients at the CARD Clinic,
8  approximately how many of them have this minimal disease
9  that's not progressing?
10  A.   I knew you were going to ask me that.  I am not sure I
11  can answer it because I don't really know the answer.  It's
12  probably around 400 or 500 that are stable, at this point in
13  time.  There appears to be correlation with length of time
14  from their exposures.  Some of those are more recent
15  exposures, and you wouldn't have expected them to be
16  progressing at this point.
17       I think you are going to have to wait until the database
18  is done, and we will be able to answer all those questions.
19  We can't really answer them -- or I can't -- accurately at
20  this point.
21  Q.   Okay.
22  A.   I mean, I can give you my impressions of what I think is
23  happening, but I can't give you any statistics on it.
24  Q.   Okay.  In Johnson v. Grace, a while ago you testified
25  that an individual's diffusing capacity was normal.  And I am

Page 195

1  going to read your testimony, if you -- tell me if you still
2  agree with it.
3       It is within the limits of variation in our laboratory
4  diffusion, the two years is within, are both normal and they
5  are within the limits of variation that we might see in the
6  laboratory.  She was 94 percent last year, 86 percent this
7  year, both of which are in the normal range, both within two
8  standard deviations of the norm.
9       Now, that's not -- that's inconsistent with the
10  statements you made about progression in this particular
11  paper, correct?
12  A.   True.  Except that when you are dealing with a large
13  number like that, you have created your own bell-shaped
14  curve.  And, so, if you look at a large number and compare
15  the columns side by side, even if there is that variation
16  within diffusion capacity that occurs, you have eliminated it
17  because of the large number.
18       I am not sure I can explain that to you statistically,
19  except I know that's the case.  And, so, large numbers
20  eliminate the variation, test to test, and the pattern of
21  looking at the patients was always the first one I had and
22  the last one that I had.
23  Q.   With respect to --
24  A.   The last one I had prior to when I ended the study, or
25  something else happened.

Page 196

1  Q.   With respect to the individuals in the study, though,
2  your testimony that you gave earlier with respect to what's
3  within the norm is still valid, correct?
4  A.   Yeah.  I think it is.  I think we usually consider
5  diffusion about plus or minus two or three.
6  Q.   And the American Thoracic Society has articulated that
7  annual loss of lung function that is less than 15 percent is
8  not clinically significant.  Correct?
9  A.   Less than 50 percent?
10  Q.   15.
11  A.   15 percent.  I very much would disagree with that,
12  because, you know, just with clinical experience.  You start
13  losing lung function at ten percent per year, you are dead in
14  three years, four years.  And that happens to people,
15  generally, that have fairly significant disease.  So I
16  wouldn't agree with that statement at all.
17  Q.   Okay.  In your report, though, you have indicated that
18  you ascribe -- you make your diagnosis of asbestos-related
19  disease in accordance with the standards set out by the
20  American Thoracic Society, correct?
21  A.   That's correct.
22  Q.   On the FEV1, the FEV1 measurement correlates with loss of
23  lung function better than any other measurement, correct?
24  A.   No.
25  Q.   No?

Page 197

1   A.   No.

2   Q.   You haven't previously testified to that?

3   A.   I don't think so.

4   Q.   Okay.

5   A.   If it was, it was some sort of a misspeak, but I don't

6   think I have ever testified to that.

7        I look at everything.  We look at individual patients and

8   not correlation in large groups, except in a paper like that.

9   Q.   Okay.  You did not report the FEV1 data in your study,

10  correct?

11  A.   No.  The reason I didn't was twofold.

12  Q.   I just asked if you did or you didn't.  Right?

13  A.   Fine.  That's fine.

14  Q.   But I think you discussed some of the reasons you

15  haven't.  I really want to try to get through some of this.

16       You didn't report it, and the reason I ask is because you

17  cited a number of papers in support of your methodology in

18  your report, in your paper, but in each of the articles that

19  you cited, those authors all reported the FEV1 measurement.

20  Correct?  Have you gone back and looked?

21       MR. HEBERLING:  Objection.  Misstates the article and the

22  testimony.

23       THE WITNESS:  For your information, the FEV1 exactly

24  paralleled the FEC, and there was no point confusing the

25  issue by reporting too much.  And that's in the paper

Page 198

1   somewhere.

2   Q.   (BY MS. HARDING)  There were 123 individuals in your

3   published longitudinal study, correct?

4   A.   Right.

5   Q.   You didn't compare -- you didn't use a control group,

6   correct?

7   A.   No.  They were their own controls.

8   Q.   You didn't compare the rate of loss of lung function in

9   the 123 patient study group with the loss of lung function

10  experienced by a similarly situated cohort without tremolite

11  exposure, correct?

12  A.   That is done by using percent of predicted, which are

13  well established norms for rate of lung function loss.  So if

14  you lose pulmonary function at a rate greater than, say, the

15  percentage that you began with, that is an overall loss as

16  compared with what would have been predicted as you aged.

17  It's all downhill after age 18.  So you have to use

18  percentage of the predicted in order to determine whether or

19  not they are losing over and beyond what would be expected

20  with aging.

21  Q.   Dr. Whitehouse, Dr. Becklake is an author and scientist

22  that you quoted previously in your reports, correct?

23  A.   Yes.

24  Q.   And you are aware of Dr. Becklake's statement in his

25  previous work that, "Although in a longitude -- in longitude

Page 199

1   study, each subject is supposed to serve as his or her own

2   control, there was a general agreement that a well designed

3   longitudinal pulmonary function study of the effects of a

4   repetitive hazard must include and explicit carefully

5   selected control group."

6        You are aware that that's what Dr. Becklake has said?

7        MR. HEBERLING:  Objection.  That's awfully fast, and it's

8   in context.  I think it would be fair to show the witness the

9   article and the statement.

10  Q.   (BY MS. HARDING)  Are you aware of that statement?

11  A.   I am not aware of that exact statement, the way it's

12  written, but I have seen that kind of a statement before.

13  This study was a well-designed study on a specific group of

14  people, measuring what happened to them compared with

15  predicted numbers over a period of, what, 35 or 36 months

16  average.  There is nothing wrong with that plan.

17       It may not be what Becklake writes about, but that wasn't

18  what I was quoting Becklake for.

19  Q.   So you agree, you did not follow that particular study

20  design, correct?

21  A.   No.  I am sure there is many study designs I didn't

22  follow.

23  Q.   Now, you -- in connection with your supplemental reports,

24  you have actually indicated that there are certain statements

25  in this paper that should be changed, because they were --

Page 200

1   they were stated incorrectly in your published paper.

2   Correct?

3   A.   I think there is two of them.  They are relatively

4   minimal and not very important.  Whatever.

5   Q.   The statement that the subjects are representative of the

6   Libby area population and the practice group of 491 patients

7   was changed in your report --

8   A.   In a sense.

9   Q.   Can I finish the question, please?

10  A.   Sure.  Go ahead.

11  Q.   -- was changed to read that these subjects are

12  representative of the Libby area (asbestos disease)

13  population and the practice group of 491 patients.

14       That's a correction that you made in your -- in one of

15  your supplemental reports, correct?

16  A.   Supplemental report to you?

17  Q.   Yes.

18  A.   That's true.

19  Q.   So, what you originally stated in your paper was not

20  correct?

21  A.   No.  It was probably understated, basically.  Yes.

22  Q.   Also, in Whitehouse -- you have also indicated that in

23  your paper -- actually, on Page 220, you state in your

24  published paper that the same technician was used throughout

25  the entire period?

WR GRACE BANKRUPTCY    ALAN C WHITEHOUSE M.D.    October 18, 2007

Page 201

1  A.   That was in error.

2  Q.   I understand it was in error.  But why did you report

3  that in your paper?

4  A.   Well --

5  Q.   What I mean is, what's the importance of having the same

6  technician throughout the entire process?

7  A.   Well, basically, it should have read that the same

8  technician supervised the entire laboratory, with the

9  exception of a couple studies that were done up in Libby.  It

10  would have been a more accurate statement in there.

11      I have had one technician that's worked for me for

12  24 years, until I retired, who basically looked after the

13  entire lab and was there every day, and anything that was

14  done by anybody else, she supervised.

15      So, yeah, you are right.  That's a misstatement.  I am

16  not quite sure how I arrived at that in the process of doing

17  it.

18      On the other hand, I was trying to take care of lots and

19  lots of patients at the same time I am writing a paper like,

20  and that's difficult to do.

21  Q.   Were you reviewing the PFT tests at the time you were

22  writing the paper?

23  A.   Was I doing what?

24  Q.   You had the PFT tests of your patients at the time you

25  were doing the paper, correct?

WR GRACE BANKRUPTCY    ALAN C WHITEHOUSE M.D.    October 18, 2007

Page 202

1  A.   Yes.

2  Q.   And the individuals who take the test are written on

3  the --

4  A.   Yes.

5  Q.   -- on the papers, correct?

6  A.   I probably didn't even pay much attention to that as I

7  was doing it.

8  Q.   So your testimony is, at the time you were writing the

9  paper, you did not know about all the different technicians

10  that actually administered your PFT tests.  Is that right?

11  A.   I wasn't paying any attention to it, obviously.  I mean,

12  I was well aware that we were getting reliable results.  I

13  have run pulmonary function laboratories since 1965, and, so,

14  I am quite well aware of them.  We have good studies and bad

15  studies.

16  Q.   Are there any other corrections that you need to make to

17  the paper at this point, Dr. Whitehouse?

18  A.   None that you don't already know about, people have

19  written about.  I haven't made any other corrections, no.

20  Q.   There are other misstatements in the paper, correct?

21  A.   Any other misstatements in the paper?

22  Q.   Yes.

23  A.   I don't think there is any misstatements, no.

24  Q.   Well, you indicate that you removed patients that had the

25  presence of a significant non-asbestos-related condition such

WR GRACE BANKRUPTCY    ALAN C WHITEHOUSE M.D.    October 18, 2007

Page 203

1  as sarcoidosis or congestive heart failure.  Correct?

2  A.   That's not really a misstatement.  There is all forms of

3  sarcoid.  In fact, many of the people that we have with

4  sarcoid up there are absolute quiescent.  It doesn't affect

5  their lung function at all.  If congestive heart failure is

6  totally under control, there is no reason why I would remove

7  it, as long as it didn't particularly change during the

8  course of the thing.  There is no reason to say that's a

9  misstatement.

10  Q.   Even though you didn't remove some patients that had

11  those conditions, correct?

12  A.   But I did remove any of the active sarcoids in people

13  that -- people that had bypasses between first and second

14  study, they were removed.  Unfortunately, I cannot provide

15  you with the 130 that were removed, because they were removed

16  from that box of charts there, and I don't even know who they

17  are now, at this point, because of that.  And they were

18  removed in Libby.

19  Q.   There is also an indication that, on Page 220, that

20  patients were either referred by internists and family

21  practitioners or were self-referred?

22  A.   That's correct.

23  Q.   So, none of your patients in the study were referred by

24  Mr. Heberling?

25  A.   I don't think they were.  Not in that study.  Those

WR GRACE BANKRUPTCY    ALAN C WHITEHOUSE M.D.    October 18, 2007

Page 204

1  patients were patients that most of whom I had been seeing

2  for quite a while.  It's conceivable they did, but they,

3  basically, came on their own volition.  They may have talked

4  to a lawyer beforehand.  I don't recall that.  But they were

5  -- these were people that -- most of the people there were

6  people that I had been seeing for quite a while.

7  Q.   You reported in your paper that they were all

8  self-referred.  Correct?

9  A.   Pretty much they were.  Yeah.

10  Q.   The patients were either referred by internists and

11  family practitioners or were self-referred.  Correct?

12  A.   That's true.  And if there were people that the lawyers

13  had told us to see, they still came on their own volition.

14  So I still consider that a self-referral.  I didn't get

15  referral letters from lawyers sending patients to me at all.

16  Q.   This is a document that we originally received from the

17  CARD Clinic in connection with one of the first productions.

18  We can mark that as Exhibit -- wherever we are.

19      (Ex. No. 13, marked.)

20  Q.   (BY MS. HARDING)  This was in connection with the first

21  production that -- I think the CARD Clinic actually made the

22  redactions on the paper of the medical information.

23      Do you recall the process?

24  A.   I recall that they had a scanner up there, and they were

25  redacting charts like mad.  And now you are telling me that

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 205

1  you did not have the charts that are in that box there.  How
2  come there is a number 86 on there?
3      Q.   No.  I think I have actually said the opposite.  I think
4  I told Mr. Heberling, I think we do have the charts, that we
5  subsequently have received them.  We have electronic versions
6  of the charts.
7      MR. HEBERLING:  You told us before the deposition that
8  you wanted to make arrangements for an extra hour or so,
9  continuing the deposition, because you didn't have those.
10     MS. HARDING:  That's not what I said.  I said I wanted to
11 review them so we could determine whether or not we had them.
12 We have electronic copies.  So without seeing the hard
13 copies, we couldn't tell for sure whether we had them or not.
14 That's why I suggested we discuss it off the record.  We
15 reviewed them and determine whether we have them or not.
16     MR. HEBERLING:  Now you are saying that you have them?
17     MS. HARDING:  I don't know what's in that box.  Right?
18     THE WITNESS:  What's in that box are 123 records labeled
19 with a number like that in them.  Exactly like that.
20     Q.   (BY MS. HARDING)  And, Dr. Whitehouse, I have no idea
21 what's in that box because I have never seen it before.  What
22 we have are electronic copies of your patient records, which
23 we have.
24     MR. HEBERLING:  So you determined at lunch you have seen
25 them.  Is that right?

STOREY & MILLER  717 W. SPRAGUE AVE, STE 1520, SPOKANE WA    (509)455.6931

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 206

1      MS. HARDING:  No.  I haven't looked at them yet.  Can we
2  have the discussion later?
3      MR. HEBERLING:  Either you have seen them or you haven't.
4      MS. HARDING:  I want to stop this discussion now, and I
5  would like to continue the questioning.  And if there is an
6  issue about documents, we will discuss it later.  I have -- I
7  would like to continue the questioning, please, unless we
8  want to take the time out.
9      THE WITNESS:  I will give you a few more minutes at the
10 end of this, then, to continue so I can say something about
11 this.  Okay?  Those things weigh probably what do you think
12 they weigh?  I think this weighs 50 or 60 pounds we drug down
13 there.  There are 30 of them that are missing out of that
14 box.  Okay?  I took them up to Libby in order, left them
15 there for Dr. Haber to get copies of.  Okay?
16     You obviously copied them because you have this here.  I
17 haven't looked at them since.  I drug them back home about
18 three or four months ago and stuck them in my workshop.
19 Okay?  They are all out of order.
20     We brought them in.  We had to look through some of the
21 things when we were working over some stuff this week, and
22 then I find out that you got the copies all along.
23     Now, I am not very happy about that, and I am going to
24 voice my unhappiness about it right now so I am done saying
25 it.

STOREY & MILLER  717 W. SPRAGUE AVE, STE 1520, SPOKANE WA    (509)455.6931

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 207

1      You don't need those copies anymore.  You already have
2  them.  We will take them home with us.
3      MS. HARDING:  Mr. Heberling and I will discuss the issue
4  of the document production after the deposition.
5      THE WITNESS:  That will be fine.
6      MS. HARDING:  These documents were printed from
7  electronic copies and that is what I am showing you.  The
8  first one is an electronic copy that was produced by CARD,
9  and I understand it.  That's my understanding.  I didn't do
10 the production.  I didn't do the copies.  That's my
11 understanding.  All right?
12     THE WITNESS:  Okay.
13     Q.   (BY MS. HARDING)  With respect to that document, you will
14 notice at the top right-hand corner, the third line down, can
15 you read what it says?
16     A.   I can't.
17     Q.   Showing you a second version of that document that's
18 not -- do you agree it's the same document?
19     A.   I assume it is.  I don't know.  I don't have much
20 information.  It probably is.  There is a couple lines that
21 are the same.  It says it's referred by Heberling.
22     Q.   Was this a patient that was in the 123 patients that were
23 in your study?
24     A.   Yes.  It probably was.  It was in that.  Okay.
25     Q.   I am sorry, it was or was not?

STOREY & MILLER  717 W. SPRAGUE AVE, STE 1520, SPOKANE WA    (509)455.6931

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 208

1      A.   It was.
2      Q.   It was in the --
3      A.   Anything that has that number on it up to 123 was in the
4  study.
5      Q.   Do you know how many patients that were in your
6  progression study were referred to you by Mr. Heberling or
7  any other lawyer?
8      A.   I have no idea.
9      Q.   Dr. Whitehouse, on Page 221, there is a statement at the
10 top of the page that is the second line in.  These subjects
11 are representative of the Libby area population and the
12 practice group of 491 patients.
13     Sorry.  That's the one that you changed, correct?
14     A.   That's one we already talked about.
15     Q.   But you haven't changed the part that says -- you still
16 contend that the subjects are representative of the practice
17 group of 491 patients, correct?
18     A.   Yeah, because they were randomly selected.  I mean, they
19 weren't selected.  They -- there was actually 153, and I just
20 took all the charts on everybody that had two sets of
21 pulmonary functions, or more.  A lot of them had only one
22 and, so, obviously, wouldn't fit the criteria for getting in
23 the study.
24     And then I went through all those 153 and took out the
25 ones that I knew should not be in there; people that may have

STOREY & MILLER  717 W. SPRAGUE AVE, STE 1520, SPOKANE WA    (509)455.6931

Page 209

1  had surgery recently or a bypass or went -- I went through
2  carefully, and those were numbered 124 through 153, and were
3  just sort of set aside and not used.
4  Q.  The issue I want to get at is with respect to the 123.
5  There were 70 patients of the 123 were W.R. Grace workers,
6  correct?
7  A.  Yeah, whatever you say.  I am sure you have the right
8  number.  I would have to look it up.  Whatever.
9  Q.  So, by saying that the subjects are representative of the
10  practice group of 491 patients, you are not suggesting that
11  that same ratio of worker to non-worker exist in your
12  remaining patients, correct?
13  A.  No, not really.  I had a large number of people that
14  actually had been seen before I even started this paper, that
15  were workers that had never came back, never returned, and
16  then they finally returned several years later.
17  Q.  Right.  But you have 70 of the 123 were workers in the
18  study?
19  A.  They are mostly workers, yes.
20  Q.  About what percentage of that of --
21  A.  I think I actually gave you the percentage here, didn't
22  I?
23  Q.  It's in there somewhere.
24  A.  70 percent were former employees of Grace.  22 percent
25  were family members, and eight percent were characterized as

Page 210

1  Libby environmental exposures.  And when I wrote that, I was
2  not aware of how many environmental exposures we were going
3  to get later on.
4  Q.  Later in your paper, on 224, you say, "Progressive loss
5  of lung function -- this is under conclusions -- is
6  continuing 40 years after last exposure, and 76 of this group
7  who are representative of the population of Libby, Montana."
8      Now, is that another statement that, actually, based on
9  your previous change, should probably be edited?
10  A.  Where is it?
11  Q.  Under conclusions.
12  A.  I don't think I did a breakout of how many were family,
13  miners, et cetera.  They are not representative of the total
14  population.  They are representative probably of my patient
15  population.
16  Q.  Well, even of your patient population, you don't have
17  that percentage of workers in your remaining patient
18  population of 491, correct?
19      MR. HEBERLING:  Objection.  Unclear as to the word
20  "representative."
21      THE WITNESS:  I don't know what percentage I do have in
22  the whole group of patients.  You have the database.  You
23  could calculate that, probably, if you wanted to.
24  Q.  (BY MS. HARDING)  And if, actually, that percentage was
25  significantly different, then it wouldn't be representative,

Page 211

1  correct?
2      MR. HEBERLING:  Objection.  Unclear as to the meaning of
3  "representative."
4      THE WITNESS:  I don't think it is significantly
5  different, because I probably saw virtually every person that
6  was a miner in Libby, at one time or another.  So I don't
7  know the answer to that.
8  Q.  (BY MS. HARDING)  And with respect to the entire Libby
9  population, do you think that the percentage of workers in
10  your study is the -- is representative of the percent of
11  workers in the Libby, Montana population?
12  A.  Considering the turnover, it probably is not exactly, no.
13  It's probably a higher percentage in that group than it is in
14  the overall population of Libby.
15  Q.  You say in your last paragraph, "It is apparent from
16  these data that the majority of the 1,500 persons who have
17  radiologic changes of asbestos exposure are at increased risk
18  for progressive loss of lung function from pleural changes
19  alone, or from potential future development of interstitial
20  fibrosis."
21  A.  Yes.  I very much believe that.
22  Q.  You haven't reported the radiographic changes that
23  occurred in this group, correct?
24  A.  No, but others are going to be reporting long-term
25  radiographic changes, and that will be coming out before very

Page 212

1  long, as well as another paper that I will have concerning
2  rapid progression of radiographic changes.
3      So, you will be seeing a paper that will demonstrate
4  plaques going on to develop diffuse pleural thickening
5  developing blunted angles, interstitial disease in a fairly
6  significant number of people.
7  Q.  So those papers that are forthcoming would, in your
8  opinion, support that statement here in the last paragraph
9  that the paper that you have written here doesn't support
10  that, correct?
11  A.  I think my observations supported that quite nicely.
12  Q.  But you haven't provided the radiographic changes in this
13  paper, correct?
14  A.  But I didn't talk about radiographic changes in that
15  paper there, did I?
16  Q.  That's the point, isn't it?
17  A.  Let me read that last sentence again, then.  It says,
18  "The majority who have radiologic changes at this time are at
19  increased risk for progressive loss of lung function."
20      And I totally agree with that.
21  Q.  But you haven't reported the radiological changes in this
22  paper, correct?
23  A.  I said those are the ones who have radiologic changes
24  now.  I didn't report radiologic changes, I reported
25  pulmonary function loss.  That's a perfectly straight

Page 213

1  statement.  That's a true statement.

2  Q.   I understand.  The point I am trying to make, the title

3  of your paper is, asbestos-related pleural disease due to

4  tremolite associated with progressive loss of lung function.

5  Correct?

6  A.   Right.  It doesn't say anything about radiologic changes.

7  Q.   It discusses asbestos-related pleural disease, correct?

8  A.   Right.

9  Q.   You haven't reported in the paper what the diseases of

10  the individuals are, correct?

11  A.   Yes.  I reported that they range from plaque of diffuse

12  pleural thickening in there.  Gordon Teel has read all those

13  films, looked at all of them as well.  They all have either

14  plaques or diffuse pleural thickening.  That was reported in

15  the paper.

16  Q.   But you haven't reported it in the paper how the pleural

17  disease of the individuals in the study correlates with their

18  lung function.  Correct?

19  A.   No.  I didn't intend to.  There is no reason to.  That's

20  not what the paper was about.

21  Q.   You would say there is no reason to report the actual

22  disease of the patients that you are alleging have pulmonary

23  function loss?

24  A.   No.

25  MR. HEBERLING:  Objection.  Asked and answered.  Contrary

Page 214

1  to the paper, the testimony.

2  MS. HARDING:  Could you read back the last answer,

3  please?

4  (Answer read.)

5  Q.   (BY MS. HARDING)  You just stated there is no reason to

6  report the radiographic changes of the asbestos-related

7  disease, and I am asking you --

8  A.   I reported that they all had radiographic pleural

9  changes.  They had to have that to be even entered into the

10  study.  That was confirmed by somebody else.  Okay?

11  MR. HEBERLING:  I think you don't understand the word

12  changes.

13  THE WITNESS:  And I was reporting the changes in their

14  lung function, not the radiologic changes.  Okay?  I followed

15  exactly what I said I was going to do in there.

16  Q.   (BY MS. HARDING)  Doctor, did you include all patients

17  who had two or more PFT's in your study that were in your

18  patient group of 491?

19  A.   Yes.  Uh-huh.  I actually -- plus, including another 30

20  that I eliminated from it.

21  Now, what you didn't do, and your statistical experts

22  missed, was the fact that in April, roughly April or May, was

23  when I started collecting the people, and I collected them

24  until November or so.  If I collected them in April and

25  copied everything, I didn't look at anything further.  That

Page 215

1  was the second one.

2  There was occasionally a patient that would have

3  something later on in November or December, and they

4  criticized me for not including those.  It wasn't part of the

5  study design.

6  The study design started sometime after -- after

7  Christmas, and as I saw patients and had the second study I

8  put them in, or if I saw them and saw they had enough studies

9  to be put in, I would go ahead and do it.

10  Q.   So your testimony is that, under the criteria that you

11  just set out, you did include all patients that had two or

12  more lung function tests?

13  A.   Yes.  It was basically between April and October or

14  November, somewhere in there.

15  Q.   It's fair to say that there were patients that were

16  included in your 123 that had COPD, correct?

17  A.   I had about, I think, three or four people that had

18  evidence of severe airway obstructions with low residual

19  volumes.  And that met the criteria of obstructive disease

20  due to asbestos.  And that's a pretty well defined by a

21  number of authors, and I -- that met those criteria.

22  Q.   My question to you is, in the 123, you did not exclude

23  all patients that had COPD, correct?

24  A.   For the reasons I just gave you.

25  Q.   The answer is yes?

Page 216

1  A.   It's in my paper.  Yes.  But it's related in the paper,

2  too.

3  Q.   With respect to heart disease, in the 123 included in the

4  paper, you did not exclude all patients that had heart

5  disease, correct?

6  A.   No.  In fact, there are large numbers that had heart

7  disease that had bypasses.  That wasn't one of the criteria

8  for exclusion.  Not just heart disease.

9  Q.   Okay.  And you did not exclude individuals from your 123

10  who had prior thoracic surgery, correct?

11  A.   Only if they had it in the interim between the two

12  studies.

13  Q.   Right.  If they had it prior to the first study, you

14  still allowed them in your study, correct?

15  A.   Yes.

16  Q.   And you also did not exclude all patients from the 123

17  that also had asthma, correct?

18  A.   Well, when you look carefully at the numbers, you will

19  find that -- I think there is probably only one or two

20  pulmonary functions at all that met the 12 percent rise in

21  FEV1 with bronchodilator, and that was on one and sometimes

22  three or four studies.  So, clinical asthma was not present

23  in those people, and it wasn't present by definition of

24  pulmonary functions, nor was it by their longitudinal

25  follow-up.

Page 217

1  Q.   So your testimony is that you did exclude all patients
2  that had clinical asthma --
3  A.   Yes.
4  Q.   -- from your 123?
5  A.   Yes.
6       MS. HARDING:  We will take a quick break so they can
7  change.
8       VIDEOGRAPHER:  This will conclude Tape No. 6.  The time
9  is now 4:32 p.m.
10      (Recess taken from 4:23 to 4:39.)
11  Q.  (BY MS. HARDING)  Dr. Whitehouse, a couple --
12      VIDEOGRAPHER:  Excuse me.
13      This is the continued videotaped deposition of Dr. Alan
14  C. Whitehouse and Tape No. 7.  The date remains to be
15  Thursday, October 18, 2007.  The time is now 4:39 p.m.
16  Q.  (BY MS. HARDING)  Dr. Whitehouse, just a couple more
17  questions about your progression study.
18  A.   Uh-huh.
19  Q.   As I understand it, you reported that the smoking
20  histories of your patients, their past smoking, did not have
21  an impact on their lung function.  Is that right?
22  A.   That's correct and I did the statistics on that at the
23  time.
24  Q.   At the time you did?
25  A.   Yes.

Page 218

1  Q.   And is the analysis you did on smoking, is that part of
2  the additional material that you turned over this morning?
3       MR. HEBERLING:  No.
4       THE WITNESS:  The reason being, it's a long story
5  concerning computers but I lost it in a computer crash and I
6  got most of it back, but that's one thing I lost and that was
7  the statistical analysis.  You know when you do one of these
8  things, you have multiple books and sheets open and I lost
9  one.
10      I had a crash just about a week ago, plus I had one about
11  year ago.  I haven't been very lucky with it but I have all
12  the original data.  But at any rate, I did the statistics on
13  it, there was no change in the -- between the smokers,
14  ex-smokers and current smokers.  In fact the current smokers
15  were little bit better that than the rest.  I mean, that's
16  just sort of an aside.  But there was no statistical
17  significance.
18  Q.   Did that strike you as odd?
19  A.   No, not particularly.  Most of the people were
20  ex-smokers, and when you are talking about statistical
21  significance, there was only a small number of smokers left
22  because everybody had stopped smoking 20-30 years ago and,
23  so, we are dealing in a point in time when none of them were
24  smoking and hadn't smoked for a long time.  It was almost for
25  almost all intense and purposes they were almost all

Page 219

1  nonsmokers because they quit so long ago.
2  Q.   An d you wouldn't have expected any decline in lung
3  function from a cohort of people that had had substantial
4  prior smoking?
5  A.   Well, as it turns out, it was not a significant
6  difference.  I think the diffusions were a little bit lower
7  and mirrored Alfonso's study.  Of course your people could do
8  the statistics on that because they have the smoking history
9  whether they were ex-smokers or current smokers or not.
10  Q.   The problem with that, your PFT technician does not
11  record the individual smoking history, correct?
12  A.   No.  It's on the data sheet.
13  Q.   When you said the data sheet, it's not on the PFT test,
14  correct?
15  A.   You, but it's on the master sheet that has all the
16  pulmonary functions on the study, whether they were
17  ex-smokers or current smokers.  And you have that.
18  Q.   And that sheet, the sheet was a sheet filled out by you,
19  correct?
20  A.   Yes.  That was a sheet filled out by me looking at the
21  charts.
22  Q.   And, so, that sheet is -- reflects your determination
23  about whether an individual had been a prior smoker or
24  current smoker, correct?
25  A.   Yes.  We do not put all this data down on our pulmonary

Page 220

1  functions.  If you noticed they are all blank.  All that
2  business about smoking and other things is all on the chart
3  but not in the pulmonary functions.
4  Q.   You recognize that's contrary to established practice,
5  correct?
6  A.   I don't think it is contrary to required practice.  These
7  techs are busy and they need to get the data for doing the
8  predicted numbers, but that doesn't have anything to do with
9  the predicted, the smoking history.
10  Q.   You aren't aware of guidelines that require that the
11  technician always record the smoking information of an
12  individual before they take a PFT test?
13  A.   Those guidelines are quite applicable to a laboratory
14  that does outside pulmonary functions studies.  All our
15  pulmonary functions studies are done on our own patients and
16  they are all recorded on the charts.  So there are.
17  They are all there somewhere in the chart, and I know where
18  to find them.
19  Q.   With respect to obesity, you report in your paper that,
20  on page 224, there was no evidence of significant weight
21  changes in this group.
22  A.   That's right.  I did the statistics on that, too.
23  Q.   And have you provided those statistics?
24  A.   I provided you with a list of the weights or the heights
25  and all.  That was one of the sheets that was in the computer

Page 221

1   that was at least partially lost, because it is upgrading the
2   reference numbers and you can't achieve those.  But the MBI's
3   are in there, and I have no idea how that occurred and I was
4   not aware of that until I started to pull the stuff out in
5   the last few days.
6   Q.   That's the -- you mean the data you turned over this
7   morning?
8   A.   Yes.  Did you see that one sheet that has ref, ref, ref
9   all along.  I have no idea how it got that way.  You need to
10  be aware of the fact that last Friday night when I tried to
11  put a bunch of stuff into my Ipod into it, I overloaded my
12  computer, got it right up to the limit.  And I have been
13  having some trouble with it and I started taking stuff off of
14  it and then the whole thing crashed, started to make a lot of
15  noise, the hard drive.  So I got the important data off of
16  it, that is all the original numbers and all.  But -- and I
17  got the calculations, which you will see there, when I did
18  the statistics myself.  Although they were done by an outside
19  statistician as well.  So you have all -- you will have all
20  the important data.  You have all the important data.  It's
21  just a little bit disjointed because of what happened in my
22  computer.  You have the original data.
23  Q.   The data you provided today on obesity, as I understand
24  what you are saying, we are getting some of the data because
25  some of it you couldn't print out last night because of

Page 222

1   computer crash?
2   A.   You are getting a list of height and ages you can match
3   up by number with the patients if you need to.
4   Q.   You said there is a statistician that also did a
5   calculation with respect to the BMI?
6   A.   No, I did that myself, but he did the calculus, he did
7   the -- all the calculations originally for statistical
8   significance of the FEC, the TLC, and the diffusion capacity.
9   Q.   Okay.  Did the statistician do the smoking analysis that
10  you discussed?
11  A.   No, I did that also.
12  Q.   You did that on your own?
13  A.   Yes.
14  Q.   Can you describe how you did the smoking analysis?
15  A.   Oh, I used the XL program, the data program concerning --
16  and you will see it in there when you look at it --
17  concerning two columns, as far as whether there was a
18  significant difference when they looked at all the columns
19  together.  And it's a fairly complicated program that I
20  really don't understand, which is why I sent it to a
21  statistician to do because it's -- and he put in time and a
22  number of other things.  He did a whole bunch of
23  manipulations that I don't quite understand and basically
24  said, you know, it's all highly significant statistically
25  greater than point zero zero zero one.

Page 223

1   Q.   I am sorry.  You were -- I think you now were describing
2   the results you reported in your paper?
3   A.   The probabilities.  That's the PFT's I was talking to you
4   about earlier.
5   Q.   I am actually asking you about the analysis you didn't
6   report in your paper, the smoking analysis and the BMI.  The
7   BMI, I understand you said you did that yourself, the
8   statistician did not do this?
9   A.   No.  And I did the smoking thing too.
10  Q.   You did the smoking and statistician did not do the
11  smoking?
12  A.   Right.
13  Q.   My question to you, with respect to smoking analysis, can
14  you describe the methodology you used?
15  A.   I used that XL program for statistic.  I don't remember
16  exactly what it's called.  You know, I had to look the whole
17  thing up and then talk to some people about how you make it
18  work, and then entered it into those columns.  And when you
19  pull this out you will see them if you look at them how the
20  statistical analysis was done.  I got basically the same
21  results the statistician did on the major numbers, the FEC
22  and TLC and DLCO, but I have lost that one, too.  I lost all
23  the smoking stuff in there.
24  Q.   Right.  So, we can't see the smoking one because you
25  apparently lost it?

Page 224

1   A.   I won't be able to find that one.  You have the notation
2   of who is a smoker and who is not a smoker, but there is so
3   few smokers in there that you wouldn't have much in the way
4   of statistical significance even if they were different.
5   Q.   One question I have -- the last question on the
6   progression paper.  You did not appear to, at least in the
7   paper, take into account any effects of wood smoke in Libby,
8   correct?
9   A.   No.  That's a given for all of them.
10  Q.   Pardon me?
11  A.   That's basically a given for all the people who would
12  smoke in the air.
13  Q.   It's a given that they are exposed to the wood smoke in
14  the air?
15  A.   They are all exposed to it, yeah.
16  Q.   You would agree that wood smoke can have an impact on
17  lung function?  Correct?
18  A.   Yeah, there has been papers about that, and papers about
19  asthma associated with wood smoke, yes.
20  Q.   But you did not take into account the potential loss of
21  lung function for Libby area residents due to wood smoke in
22  your paper, correct?
23  A.   There is no way I could.
24  Q.   It's possible that then wood smoke could be an important
25  and founding factor in the results you reported in your

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 225

1  paper, correct?
2  A.   I guess so.  Most of the reports about wood smoke, at
3  least the ones in Spokane, and there has been extensive ones
4  done here, relate to asthma and not to just loss of lung
5  function overall, particularly restrictive disease.
6       MS. HARDING:  Could you mark that paper there.
7       (Exhibit 14 marked.)
8  Q.   (BY MS. HARDING)  Exhibit 14 is a paper titled Health
9  Effects of Wood Smoke.  Do you see that?
10 A.   Uh-huh.
11 Q.   You have seen that before, correct?
12 A.   I may not have seen all this, but I have sure seen a lot
13 of it, and have been very active in this community concerning
14 smoke.
15 Q.   You have been?
16 A.   Yes.
17 Q.   How have you been active with respect to this issue?
18 A.   I was sort of the driver in getting the field burning
19 stopped in the State of Washington.
20 Q.   Okay.  On Page 8 of this document it says, under general
21 effects of wood smoke, do you see that?
22 A.   Yes.
23 Q.   Under general effects of wood smoke, it says, "Wood smoke
24 exposure causes a decrease in lung function and an increase
25 in the severity of existing lung disease with increases in

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 226

1  smoke concentration or exposure time."  Right?
2  A.   Where are you reading there 1234.
3  Q.   The very first line --
4  A.   Wait I have the wrong page.  I have six.
5  Q.   Actually I have --
6  A.   I am not sure I have eight.  There is eight.
7  Q.   Eight and nine.  Actually I see it's eight and nine?
8  A.   You know what I have got, I have eight, ten and 12, and
9  the back sides are empty.
10 Q.   Here, why don't I give you this copy then.  We will mark
11 this instead, please.  There it is you have it right there.
12 A.   I got that.
13 Q.   You don't disagree with that statement, correct?
14     MR. HEBERLING:  Objection.  Unclear as to what statement
15 you are referring to.
16     MS. HARDING:  I am referring to the statement, wood smoke
17 exposure causes a decrease in lung function and an increase
18 in the severity of existing lung disease with increases in
19 smoke concentrations or exposure time.
20     And I am asking Dr. Whitehouse -- my understanding is
21 that you agree with that statement, correct?
22     THE WITNESS:  Well, I would certainly qualify it.  The
23 reason being, if you look under three with the literature
24 cite, which is number -- is it number three or number two?
25 That's a two.  Similarly, you have health effects associated

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 227

1  with residential wood smoke combustion, internal report US
2  EPA environmental criteria and assessment office, researched
3  at Menlo Park 1986.
4       I don't see a peer reviewed literature article on that.
5  That quote is not an article in the medical literature, it's
6  a -- I don't know if you call it an opinion or it's a
7  statement from the EPA.
8  Q.   But --
9  A.   And it may be correct.  But it would be nice to see the
10 original article.  I know of the articles relative to asthma
11 in children, and to my knowledge those are the -- that's
12 always been the major thing that's been written about.  Some
13 of those were done in Spokane.
14 Q.   So it's your view that the only effects of wood smoke
15 that had been demonstrated are the effects on children?
16 A.   No, I didn't say that.  I know that smoke aggravates
17 preexisting lung disease.  Whether it changes lung function
18 or not is a different story.  And what degree it might change
19 lung function is another issue.  And I don't see any articles
20 quoted in that relative to that statement.  So I have to take
21 it with a grain of salt.
22 Q.   You have agreed it could be a confounding effect with
23 respect to your lung function paper.  The degree of the wood
24 smoke issue in Libby has been serious in the past, correct?
25 A.   It has.  It has been all over most states in the west.

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 228

1  Most cities in the west it's been a major problem.  Libby has
2  problems with inversions, there is no question they have
3  crummy air part of the year.
4  Q.   I would like to ask you some questions about the ATSDR
5  pilot study environmental cases.
6  A.   Uh-huh.  Those were my patients.  Are you aware of that?
7  Q.   Yes.
8       (Exhibit 15 marked.)
9  Q.   (BY MS. HARDING)  Exhibit 15 is review of
10 asbestos-related abnormalities among a group of patients from
11 Libby, Montana, a pilot study of environmental cases.
12 A.   Correct.
13 Q.   And the investigator is listed as Dan Middleton.
14 A.   Yes.
15 Q.   And as a principal investigator, co-investigators Aubrey
16 Miller, and collaborator is listed as you, Dr. Alan
17 Whitehouse.
18 A.   Correct.
19 Q.   Around 2000, the ATSDR began working on the protocol for
20 assessing environmental exposure in a case series, correct?
21 A.   Uh-huh.
22 Q.   Originally, as I understand it, the intention was to
23 conduct the research in two phases, a pilot phase followed by
24 a larger case series, correct?
25 A.   Correct.

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 229

1  Q.   For both of the phases of research, how were the patients
2  to be identified?
3  A.   Well, in the pilot study?
4  Q.   In the pilot study, right.  Well, actually --
5  A.   They basically asked me, Aubrey Miller did, how many
6  cases I had that I thought were environmental cases.  This
7  was very early on, probably even before I knew about all the
8  exposure pathways and things like that.  So I came up with
9  27 cases for them.
10  Q.   This is in 2000, correct?
11  A.   In 2000.  Right after this whole thing broke.  And I sat
12  down with him, and we got releases from all these people, and
13  then we sat down in a very large conference and want over the
14  x-rays with him, and they took -- made copies or we gave them
15  copies of the x-rays which they took so some of the NIOSH B
16  readers.  And what they did when they went through the whole
17  thing was that they found a few other exposures like some
18  family stuff and things like that that I wasn't aware of, and
19  basically it may have been my naiveté, but there were eight
20  of them that were clearly purely environmental.
21  Q.   Right.  So, at the beginning of the study, you provided
22  them with 27 cases that were environmental, that you believed
23  to be environmentally exposed individuals that had developed
24  disease in Libby, correct?
25  A.   Correct.

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 230

1  Q.   At the end of the process the ATSDR determined out of the
2  27 only eight were environmentally exposed cases with disease
3  in Libby, correct?
4  A.   That's correct.  They had found another pathway that I
5  didn't know about which was related to work or whatever,
6  family, or something else.
7  Q.   They had found within the exposure histories of the
8  individuals that you had provided, that they had other
9  asbestos exposures, correct?
10  A.   Yes.  Actually what they did, they interviewed all these
11  people very extensively to find out if there were other
12  exposure pathways.  And there was that I didn't know at the
13  time.
14  Q.   I understood previously this morning you talked about
15  first seeing environmental, what you believe to be
16  environmentally exposed people with disease in 1995 or '96, I
17  think you said.  That was when you first saw it.  And, so, as
18  I understand it, between then and --
19  A.   Well, I can't really remember when I first, you know,
20  when my brain said, you know, these are not miners or family
21  members.  It was probably somewhere around there.  It may
22  have been as late as 1998.
23  Q.   And then between either '96 or '98 when you first
24  believed that you saw that, and around 2000, is when you
25  believed you had discovered about 27 cases.  Correct?

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 231

1  A.   That's right.
2  Q.   And you don't disagree with the ATSDR's reclassification
3  of the from 27 to eight of the environmental exposures,
4  correct?
5  A.   I have to go back over them again.  But I wasn't arguing
6  with them about them particularly at all, no.  I just
7  accepted what they said at the time.
8  Q.   And you were listed as a collaborator and were involved
9  in the creation of the posters that were created by the
10  ATSDR?
11  A.   Yes.
12  Q.   Do you recall those?
13  A.   I still have that.  The only problem, it covered half
14  this wall.  Here you go.
15  Q.   I have a couple questions that I would like to ask you
16  relating to autopsies.  Typically, why are autopsies
17  performed in medical cases or when people die?
18  A.   That's a really good question, because most physicians in
19  the general practice of internal medicine or chest disease,
20  we don't even ask for autopsies because we know what they
21  died of.  We know more than the pathologist can tell us for
22  the most part.  And I really sincerely mean that.  We've
23  looked at them and have all the physiologic things, and also
24  autopsies aren't needed.  So autopsies generally don't help
25  us very much with a cause of death.

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 232

1     We have -- I don't know, you may have some specific
2  questions concerning asbestos and go ahead and shoot on
3  those.
4  Q.   I have a -- they can help you identify what kind of
5  disease somebody really had, correct?
6  A.   They can.  In the case of asbestos diseases, the ability
7  to spot asbestos bodies is very patchy, and particularly in
8  pleural disease you normally don't see them.  And in many of
9  the cases that have severe interstitial disease you don't
10  even see asbestos bodies.  And there are a lot of factors
11  related to things that are being digested and coughed out,
12  and particularly with chrysotile.  So, it is spotty and it's
13  not a reliable evidence of -- that the disease was for or not
14  -- well, it is for disease probably, but not against -- not
15  saying that they didn't have it.  And not only that, but you
16  can get asbestos bodies in normal people.
17  Q.   Well, as I understand your answer, you are talking about
18  kind of attribution of disease that is seen to asbestos.
19  That was your answer?
20  A.   I figured that's where you were headed.
21  Q.   Actually, the question that I was trying to get at is
22  just in determining what disease an individual actually has,
23  autopsies can be very useful, correct?
24     MR. HEBERLING:  Objection, answered.
25     THE WITNESS:  There are times when it's very useful and

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 233

1 there is times when it's not useful at all.  And there is
2 times when it's misleading.
3 Q.   (BY MS. HARDING)  Previously you were asked -- there is a
4 series of questions in the cost recovery deposition that you
5 provided.  I don't know if you recall them.
6 A.   When did we do that one?
7 Q.   That was in September of 2002 I believe, September 6,
8 2002.
9 A.   I don't remember that one very well.  Go ahead.
10 Q.   The person that was -- in any event, you were asked a
11 question about -- the question was, first question, well, are
12 pulmonary functions always indicative of whether or not it's
13 pleural asbestos disease?  In other words, can there be other
14 reasons?  And you answered, I will happy to show you this to
15 you afterwards if you like.  No.  But if you have somebody
16 that has pleural thickening and there is a question whether
17 it's fat tense density, and they have, you know, they are not
18 massively obese or anything like that, reasonably normal
19 weight, and they have fairly severe restrictive lung disease,
20 I think with the asbestos exposure and all, I think that your
21 assumption is that probably is not fat, that is probably
22 pleural thickening, although it's been very difficult to deal
23 with, you want see very many people that this issue hasn't
24 been resolved.  And then the question is, well, resolved by
25 someone's opinion?  And your answer is, or in some other way.

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 234

1 I mean, some of these people have been fluoroscoped and the
2 plaques have been photographed.  Then the question is; that's
3 what I was wondering.  Either that or autopsy would tell you
4 whether or not they had plaques I suppose?  And your answer
5 is, yes.  And then the question is, or thickening?  And your
6 answer is, yes.
7 A.   Yes, that would be easily picked up with autopsy.
8 Q.   So, in view of the fact that you have suggested in your
9 writings in the literature, as well as in your reports that
10 you issued in this case, that you are seeing a unique disease
11 process in Libby, which you said on numerous times here
12 today, correct?
13      MR. HEBERLING:  Objection.  Contrary to the record and
14 contrary to the testimony today as well.  He hasn't said the
15 word unique.
16      MS. HARDING:  I am sorry.  Different.
17      THE WITNESS:  Yeah, I think it is a different -- I think
18 it's a different -- I don't know if it's different process,
19 but it's manifestations appear to me to be different.
20 Q.   (BY MS. HARDING)  Today I think you said that you believe
21 they are different from other asbestos exposures in people
22 exposed to chrysotile in United States, to people exposed to
23 amosite in the United States, and people exposed to
24 crocidolite in the United States, correct?
25 A.   As best I can tell, yes.

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 235

1 Q.   And you have also testified today that, in several
2 different places, that you think it's important to be
3 transparent and important to make sure that people can
4 understand what you have done, and you want them to
5 understand what you have done, correct?
6 A.   Uh-huh.
7 Q.   So I am wondering why you have not suggested to your
8 patients or to their family members that, for people and
9 particularly that have progressed to death, or people that
10 have rapid progression and later die or severe disease, why
11 they didn't get autopsies?
12 A.   We have.
13 Q.   You have?
14 A.   In fact, we have a program now set up -- we have two
15 programs set up.  First off, it takes an IRB, investigational
16 review board has to approve that.  The HIPAA laws really
17 restrict what we can do.  So we now have an IRB approved by
18 the Spokane IRB for obtaining tissue samples and banking
19 them.  And, so, everybody that I send over there for a
20 thoracotomy, or whatever the case may be, is getting tissue
21 samples which we are saving.  We aren't doing anything with
22 them yet but we will be.  Secondly, we have trained a guy
23 that runs the -- that owns the mortuary, and this is with
24 patients permission obviously, we get permission for this, to
25 harvest lung sections which will then also be preserved and

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 236

1 stored until we need them for some specific study.  And we
2 have a specific protocol for that as well.
3      And that's fairly recent.  So in a sense that's an
4 autopsy.  We are not interested any place else except the
5 lungs, for the most part.
6 Q.   Have you actually gotten any tissue into the -- has
7 actually occurred yet?
8 A.   Yeah, we have some tissue.  In fact, we probably got some
9 today from a patient that I sent for a thoracotomy for a
10 nodule.  So that will -- there will be tissue that's looked
11 at by the pathologists in Spokane, and then they will ship
12 off a chunk to us, we will stick in storage thing and it
13 will sit there, and it will be anonymous and numbered and
14 will be available for whenever we decide to do, whatever
15 study we decide to.
16 Q.   Who is the pathologist that they will be sent to, do you
17 know?
18 A.   That will look at them in Spokane?
19 Q.   Yes.
20 A.   There is three of them.  Frank -- the only two I know
21 right now are Frank Martin and Irby Cosette, guys I have
22 known for years.  There is a new one there at Deaconess
23 Hospital also.  We have been doing all this stuff at
24 Deaconess, although we haven't specified it be done at
25 Deaconess.  So there may be some at Sacred Heart as well.

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

WR GRACE BANKRUPTCY       ALAN C WHITEHOUSE M.D.       October 18, 2007

Page 237

1  Q.  Have there been any autopsies performed on any of your
2  patients to your knowledge?
3  A.  I don't know whether any have been done or not recently.
4  We have had a lot of deaths, and whether or not that's
5  actually been done, I know it's just been recently a provide
6  by the IRB.  Brad Black is sort of in charge of that aspect
7  of it.  We have an awful lot of people that have given
8  permission for autopsies when they die, already, and will
9  prior to when they might die.
10 Q.  Have you or anyone at the CARD Clinic ever instructed
11 your patients not to get autopsies?
12 A.  No, I haven't done that.  But we have been very resistant
13 to dealing with Kalispell for a number of reasons.  We are
14 very resistant to information being misused by Dr. Flynn.
15 Q.  When you say Kalispell, what do you mean?
16 A.  The hospital.
17 Q.  And, so, I guess I am not understanding your answer to
18 the question.  You have not instructed your patients or have
19 you -- I think you said you have not instructed your patients
20 not to get autopsies?
21 A.  No, no.  But I instructed them to get them in Spokane,
22 whatever we are going to do to get them in Spokane or locally
23 so we can get things in our tissue database.  And we don't
24 want the stuff misused.  This is all done with be a IRB in
25 mind, investigational research, so we don't want it misused

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

WR GRACE BANKRUPTCY       ALAN C WHITEHOUSE M.D.       October 18, 2007

Page 238

1  either in the process.  We will have the path reports from
2  our pathologists in Spokane.
3  Q.  And as I understand, the Libby medical plan actually pays
4  for autopsies, correct?
5  A.  Yup.
6  Q.  Are you aware whether or not --
7  A.  If we do an autopsy for Grace, then we wind up having to
8  give them the tissue.  And we really do not have a high level
9  of trust in what HNA will do with those autopsy specimens
10 and so, as a result we have not been doing that.
11 Q.  Do the Libby medical plan, do they specify the
12 pathologists that has to do the autopsy?
13 A.  Yeah, uh-huh.  And they insist on getting the specimen.
14 Q.  Who is that?
15 A.  The one the Kalispell.  And they insist on getting the
16 specimens themselves from what I understand.  That was the
17 way it was being done.  We haven't sent anything to Kalispell
18 for any tissue there for a long time.
19 Q.  Are you aware whether or not Mr. Heberling or any of the
20 other lawyers that represent the patients in the CARD Clinic
21 have instructed their clients not to get autopsies?
22 A.  Not that I am aware of.  I am not aware of that.
23 Q.  Have you ever, or anyone at CARD Clinic to your
24 knowledge, ever instructed any of your patients not to get
25 autopsies in Kalispell?

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

WR GRACE BANKRUPTCY       ALAN C WHITEHOUSE M.D.       October 18, 2007

Page 239

1  A.  Yes, I have.  I don't want my patients getting autopsies
2  in Kalispell.
3  Q.  Okay.  So you have instructed them not to get autopsies?
4  A.  Yes.  I have a -- we have an ongoing problem with HNA and
5  Dr. Flynn and refusing payments and things like that, so if
6  we are going to get autopsies, we will either get lung
7  specimens in in Libby or we will get them in Spokane.  And I
8  think Brad has ordered a couple of those in Spokane.
9  Q.  This is a death certificate for Gynell Kujawa.  This is a
10 patient that's on one of your lists, correct?
11 A.  Yeah, I think so.  She died what, last year, didn't she?
12 Q.  It's difficult to read.  I will show you the records in a
13 second.
14 A.  Died in 2001.  Does that sound right?  You are talking
15 about Loren or Gynell?
16 Q.  Gynell.
17 A.  She died last year.
18 Q.  And is Gynell on your deceased client list?  She is on
19 the community list or one of the lists?
20 MR. HEBERLING:  She is on Page 6.  Exhibit 5, Page 6.
21 MS. HARDING:  Thank you.
22 THE WITNESS:  Got it.
23 Q.  (BY MS. HARDING)  And this is somebody who, according to
24 death certificate, dies of anoxia.  Is that right, and
25 stroke?

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

WR GRACE BANKRUPTCY       ALAN C WHITEHOUSE M.D.       October 18, 2007

Page 240

1  A.  Yeah.  I believe it was a long time before that.
2  Q.  And then, as I understand it, you were asked by
3  Mr. Heberling to opine as to whether the death was -- was the
4  asbestos disease a substantial factor in the death.
5  A.  Yes.
6  Q.  You were asked that question, correct?
7  A.  That's correct.
8  Q.  And then could we mark that please.
9  (Exhibit 16 marked.)
10 Q.  (BY MS. HARDING)  And you write an answer back on that
11 letter, correct.  And on Exhibit 16 could you read what your
12 message back is because I can't completely decipher the
13 writing.
14 A.  Yes.  Autopsy pending also.
15 Q.  So the answer was yes.  And then autopsy pending,
16 correct?
17 A.  Yes.
18 Q.  And then this is Exhibit 17.
19 (Exhibit 17 marked.)
20 A.  By the way, I never saw the autopsy results.  This is the
21 first time I have seen them.
22 MS. HARDING:  All right.
23 Q.  (BY MS. HARDING)  You will notice on the second page,
24 final anatomic diagnosis on the second page, under opinion,
25 do you see that?

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA   (509)455.6931

Page 241

1  A.   I see that.

2  Q.   It says, this adult female was examined, by autopsy, to

3  determine if asbestosis or related disease state was present.

4  At autopsy, both lungs showed prominent emphysematous change.

5  While adhesions were present bilaterally, only minimal

6  pleural plaque was present.  No mesothelioma was present.

7  Examination of the pulmonary tissues did not show conspicuous

8  interstitial fibrosis.  Iron stains, but also H&E sections

9  and recuts, did not show any substantial numbers of

10  ferruginous bodies.  In summary, at least with regard to

11  asbestos, the histologic findings would not support that

12  diagnosis.

13       Studies of the lung did, however, show fairly prominent

14  acute pneumonitis.  Is that right?

15  A.   Pneumonitis.

16  Q.   Focal areas of confluent pneumonia.  This is the most

17  significant finding of the autopsy with direct regard to the

18  cause of death.

19       From the above studies, I believe the cause of death

20  should be certified as pneumonia occurring in a background of

21  significant pulmonary compromise due to emphysema.

22  Asbestosis is not present.  The manner of death is natural.

23       And it's signed by George R. Lindholm, M.D., forensic

24  pathologist.  He is at Incyte Pathology Diagnostic?

25  A.   Yes.

Page 242

1  Q.   Is that in Kalispell?

2  A.   No, that's in Spokane.

3  Q.   I have one other question.  I had a question about a

4  letter that Mr. Heberling sent to you.

5       Could you mark that, please.  And I will just read it

6  first and he can mark it.

7       "Dear Dr. Whitehouse:  Enclosed is a copy of your

8  response to our letter of 1/9/06 and a copy of the Death

9  Certificate.  Enclosed further is a copy of the autopsy.  Was

10  the asbestos disease a substantial factor in the death?

11  Please handwrite your answer and return."  Will you mark

12  that, please.

13       (Exhibit 18 marked.)

14  Q.   (BY MS. HARDING)  Could you read the response that you

15  write to Mr. Heberling, please?

16  A.   I wrote, "Yes -- markedly under estimated by the

17  pathologist.  Did not have emphysema."

18       And do you want me to discuss that?

19  Q.   I would like to ask you a couple of questions first.  Did

20  you do the autopsy?

21  A.   No.  But this needs clarification relative to emphysema

22  as a pathologic diagnosis or a physiologic diagnosis.  What

23  the pulmonary functions studies were, what the chest x-ray

24  looked like.  Okay.  And, so, it requires a fair amount of

25  discussion because I looked at all those relative to this.

Page 243

1  Q.   You just indicated before that you hadn't seen the

2  autopsy.  Was that incorrect?

3  A.   I hadn't seen the autopsy no.  Actually, I must have.  I

4  didn't realize it.  I had forgotten it then.  I didn't think

5  I had seen it.  So, okay, I retract that, I am sorry.

6       To begin with, asbestos bodies are very frequently not

7  seen in the lung and in people that have asbestosis.

8  Secondly, this lady had significant fairly severe pleural

9  disease.

10       There is a lot of -- how do you -- how would I say it?

11  There is lot of pulmonary function change that is many times

12  reflected in the x-rays and sometimes is not reflected in the

13  x-ray, that causes fairly significant restrictive lung

14  disease that is a factor in somebody's death, particularly if

15  somebody is bedridden, that is not identified well, except by

16  x-ray or by pulmonary function testing.

17       And, so, he identified pleural plaques.  We have no idea

18  whether that was bilateral or not.  He said adhesions, but

19  only minimal pleural plaque was present.

20       I think that, at the time, I probably looked at the x-ray

21  and the chart in order to making those judgments, and I need

22  to do it again, and point out to you what I saw at that point

23  in time which I think was pertinent to the patients problems.

24  Okay?  Because if she had -- which I think she did --

25  significant restrictive disease, some obstructive airways

Page 244

1  disease, maybe a manifestation of asbestos pleural disease.

2  And that's a rather complicated subject to discuss.  I talked

3  about it earlier with low residual volumes and with some

4  degree of airway obstruction associated with it, which has

5  been reported in the literature.  So it's a little bit more

6  complicated than just sitting here looking at these numbers,

7  you have to look at the whole picture, and that means the

8  x-rays and the pulmonary functions and the chart.  And if you

9  have the chart I will be happy to do it right now.

10  Q.   So it's your position that you are in a better position

11  determine whether or not somebody had COPD -- sorry, not

12  COPD -- emphysema, by X-ray and lung function tests than a

13  pathologist doing an autopsy?

14  A.   Emphysema and COPD are two entirely different factors.

15  Q.   That's why I corrected myself.  Emphysema.  I am asking

16  about emphysema?

17  A.   People may have emphysema as an aging phenomenon, that

18  physiologically has very little import because they don't

19  have airway obstruction.  It's airway obstruction that kills

20  people with lung disease.  And that's why I am saying the

21  pulmonary functions are more key to that than anything else.

22  That's one of the reasons why getting autopsies frequently

23  doesn't give you information.  It gives you less information

24  than what you already know from the patient from your

25  physiologic studies.

Page 245

1  Q.  So your opinion is that the pathologist, Mr. Lindholm,
2  got it wrong, correct?
3  A.  I don't know whether he did or not, I am not sure.  I had
4  other -- with the information you have given me here.  If you
5  want to give me the x-rays and the chart that has the
6  pulmonary function on it, then I can give you the reasons why
7  I came to that conclusion.
8  Q.  Dr. Whitehouse, I am asking you about your response to
9  Mr. Heberling when he asked you, enclosed is a copy of your
10  response to our letter of 1/9/06 and a copy of the Death
11  Certificate.  Enclosed further is a copy of the autopsy.  Was
12  asbestos disease a substantial factor in the death?  Please
13  handwrite your answer and return.
14      Your answer is, "Yes -- markedly underestimated by the
15  pathologist.
16  A.  That may be the answer right there.
17  Q.  Then you say, did not have emphysema.  Isn't that what it
18  says?
19  A.  Yes.
20  Q.  So your position is that, as a pulmonologist, you are in
21  a better position to determine whether somebody had emphysema
22  at their death based on the x-rays and your lung function
23  tests than the pathologist who did an autopsy?
24  A.  Absolutely.  I probably should have used the word COPD.
25  But, yes, I'm in much better position to make a diagnosis

Page 246

1  than the pathologist ever is.  Their actually are studies
2  that have demonstrated that.  There is radiographic studies
3  as well.
4  Q.  What about asbestosis.  He is say there is --
5  A.  Obviously, I made comment about it being underestimated.
6  I am talking about the x-ray there and maybe about the
7  pulmonary function.  But you haven't given me all the data.
8  Q.  Doctor, this is an individual you have listed in your
9  report and you are relying on and he is on your list, and I
10  have all of the data you have given me.  If there is other
11  data --
12      MR. HEBERLING:  Objection, misstatement of factual
13  situation.  You have all the charts.  You are not giving him
14  the chart or the x-ray.  You have all of them.
15      MS. HARDING:  Oh, you mean the patient records of this
16  individual.
17      MR. HEBERLING:  Yes.
18      MS. HARDING:  I don't know if I have them or not.
19      THE WITNESS:  I assume you do.  Assuming you do, there is
20  an x-ray that may demonstrate large amounts of pleural
21  disease and maybe even interstitial disease.  And, secondly,
22  there is a -- you know, there may be pulmonary functions that
23  show severe restrictive disease.  And I just can't remember.
24  I don't keep that data in my head.  But, obviously, I looked
25  at it or I wouldn't have written that note the way I did.

Page 247

1  You have to give me all the data before I can really answer
2  that.  I think that's incomplete the way it is.
3  Q.  Is this a patient of yours?  Was she a patient of yours?
4  A.  No, she was not a patient of mine.  She was a patient in
5  the clinic and I add all the information there.
6  Q.  Is she a Libby claimant?
7  A.  I don't -- she must be.
8  Q.  Is she a prepetition Libby claimant or s post petition
9  Libby claimant?
10      MR. HEBERLING:  Post.
11      MS. HARDING:  You are representing somebody you have
12  given her records to us?
13      MR. HEBERLING:  Yes.
14      MS. HARDING:  Okay.
15  Q.  (BY MS. HARDING)  And perhaps I just don't understand.
16  How is it that you can diagnose emphysema from a chest x-ray
17  better than a pathologist who opens the chest and looks
18  inside?
19      MR. HEBERLING:  Objection, the question misstates the
20  testimony horribly.
21      THE WITNESS:  What kills people is not necessarily
22  emphysema.  It's chronic obstructive pulmonary disease.
23  Which may be associated with a normal chest x-ray or may be
24  associates with blebs in the chest that you can see that
25  somebody might read as emphysema.

Page 248

1      There was a study done a long time ago in Colorado in
2  which they gave the radiologist a number of -- a lot of
3  x-rays -- and asked him whether they emphysema, COPD, or
4  whether they were normal.  And we had the pulmonary function
5  studies and we knew what they had, and it was a random
6  pattern.  You can't tell for sure.  So, you may not be able
7  to read -- they may have emphysema, but absolutely normal
8  pulmonary function and has no physiologic consequence.  They
9  may have severe restrictive disease due to pleural disease,
10  and the emphysema is just sort of a co-exist thing that is
11  related to the fact they are old.
12  Q.  Dr. Whitehouse, if you look at the pathology report, the
13  pathologist says, from the above studies I believe the cause
14  of death should be certified at pneumonia.  Correct?
15  A.  It might very well have been the immediate cause.
16  Q.  He didn't say that the cause of death was emphysema,
17  correct?
18  A.  No, he didn't.
19  Q.  He said, occurring in a background of significant
20  pulmonary compromise due to emphysema.  Correct?
21  A.  That's the problem.  He has no way of knowing about the
22  pulmonary compromise.  He has absolutely no way of knowing
23  whether that compromised pulmonary function or not.
24      The pathologist is not somebody that's in a position to
25  know that.  That's one of the reasons why autopsies

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 249

1  frequently are misleading.

2      You show me the pulmonary function and show me the chest

3  x-ray and I will give you a better statement as to why I made

4  those statements about the fact that she had significant

5  disease, asbestos disease, that was contributory to her

6  death.

7  Q.   I guess the pathologist is also not in a position to

8  determine whether or not asbestosis is present then too?

9  A.   May or may not be.  I have seen all kinds of things on

10  that.  But, I don't know.  He didn't describe it.  I would

11  like to --

12  Q.   He didn't describe it?

13  A.   He didn't describe asbestosis.  He didn't describe

14  interstitial fibrosis.  You are right.  On the other hand,

15  pleural disease can kill you, and that's frequently

16  underestimated by the pathologist.

17      So, you should give me all the data if you want me to

18  make a determination like that.

19  Q.   Dr. Whitehouse, are familiar with the Libby asbestos

20  exposure scientific council?

21  A.   Not very.  I am not even sure which council that is.

22  There are so many councils around Libby now.

23  Q.   So you don't recall attending their meetings?

24  A.   Which meeting are you talking about?  You need to be a

25  little more -- I am not sure.  That term doesn't ring a bell.

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 250

1  Q.   I am asking you, I just have a note that I have seen

2  something somewhere, so I don't know.  But I have a note that

3  February 23, 2000 Libby asbestos exposure scientific council

4  meeting minutes.  Do you recall attending a meeting on

5  February 23, 2000?

6  A.   You give me more credit than is due me.

7  Q.   So you don't recall those contacts?

8  A.   Absolutely not.

9  Q.   With that council?

10  A.   No.  Where was it, in Libby.

11  Q.   It sounds like it was in Libby.

12      With respect to your various contacts with the ATSDR?

13  A.   Yes.

14  Q.   When was the first time that you communicated with the

15  ATSDR about the issues in Libby?

16  A.   Well, they basically communicated with me as I recall.

17  My first contact with powers at be was Aubrey Miller and Mike

18  Spence in my office sometime in either late 1999 or early

19  2000.

20  Q.   How did that meeting come about?

21  A.   Well, Aubrey Miller thought I was some sort of kook and

22  he wanted to find out.  That's what he said.  I mean, he has

23  written that.  And I showed him a bunch of x-rays and talked

24  to him about it and he decided that I wasn't crazy.

25  Q.   I am sorry --

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 251

1  A.   He may have been wrong.

2  Q.   Dr. Spence was at that meeting as well?

3  A.   Dr. Spence was, yes.

4  Q.   What did you discuss at that time?

5  A.   We discussed what I had been seeing.  I had a fair number

6  of patients at that point in time that I had seen, and they

7  had been reported by Andy Snyder in the PI article in 1991,

8  and they were following up on that.  And how they came to

9  learn about me I am not absolutely certain.  But Aubrey was

10  skeptical, and he admits he was skeptical, and came to see

11  what we had.  I showed him a number of cases.  I don't

12  remember what Mike Spence said.  I don't think Mike Spence

13  did much talking.

14  Q.   The article by Mr. Snyder appeared around what time?

15  A.   November -- I think it was November of 1999.

16  Q.   So this was subsequent to that article?

17  A.   Yes, this was subsequent to that article, but not very

18  long afterwards.

19  Q.   I can't recall, were you quoted in that article?

20  A.   No, I wasn't.  I don't think I was quoted.  My name may

21  have come up, but I don't think I was quoted.

22  Q.   Did you talk to Mr. Snyder about his article or his

23  research?

24  A.   No, I did not.  In fact, I avoided Mr. Snyder because

25  there was all kinds of litigation going on.  I didn't want to

---

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 252

1  get involved with the press.

2  Q.   Litigation involving Mr. Snyder or some other litigation

3  involving the press?

4  A.   No, it was litigation, asbestos litigation of one sort or

5  another that was ongoing, and I didn't want to get involved

6  with a member of the press discussing things that he might

7  want to ask me, so I just avoided him and I went to a senate

8  hearing and I guess I offended him when I just ignored him

9  one time in a senate hearing later that year.  I have since

10  learned to like the guy and get along with him fine.

11  Q.   Subsequent to your initial meeting with Mr. Miller and

12  Mr. Spence, what was your next contact with ATSDR or anybody

13  else -- was your contact at that time all with the ATSDR or

14  with other governmental groups?

15  A.   I was invited to a meeting in Cincinnati.  Jim Lucky was

16  there and Aubrey and Henry Anderson, and what's his name?

17  Wise?  What's his first name?

18  Q.   Chris Wise?

19  A.   Chris Wise.  And a discussion of how they were going to

20  do a screening.

21  Q.   So that was the meeting to discuss the protocol for the

22  screening study?

23  A.   We decided on the protocol there we were going to use.

24  And then I was in a meeting in Atlanta probably later that

25  year, maybe earlier the next year, relative to this.  I was

Page 253

1  involved in some of the decision-making and sort of -- a lot
2  of it just went on without me.  Then I was spending more time
3  at Libby thereafter.
4  Q.    Let's see, the meeting in Cincinnati where you
5  established the protocol, and then there was another meeting
6  after that.  Were you involved in some decision making about
7  the actual protocol or something else?
8  A.    No, I think there was a meeting, as I recall, in Atlanta,
9  where there was just a discussion about a variety of things.
10  There was also a meeting I went to at the NIH.  And I don't
11  remember those dates, they are probably in my curriculum
12  vitae, where I discussed these cases.  And I had -- each time
13  I would have more cases to deal and discuss were the ones
14  that were clear examples of what I was talking about.
15  Q.    In the meeting in Atlanta, was that meeting with the
16  ATSDR or other government groups?
17  A.    I think it was a bunch of different government groups.  I
18  think NIOSH and EPA were there.  I don't remember all the
19  details of all those meetings.  This was a whole flock of
20  them, and I was trying to run a busy practice at that time
21  and my partner was griping because I was out of town.  The
22  usual.
23  Q.    With respect to the meeting in Atlanta, can you recall
24  some of individuals who were present?
25  A.    Ms. Kizinski was there, I know that.  She probably even

Page 254

1  has a list of who was there.  I think all the same principals
2  that are involved now, the same sort of people.
3  Q.    From --
4  A.    From all the various agencies.
5  Q.    So there were people from ATSDR there?
6  A.    Probably.  I don't remember exactly who was there at that
7  time.
8  Q.    Do you remember who you talked to while you were there,
9  who your contacts were with there?
10  A.    No, I don't.  Brad Black and I were both there at the
11  time.  We talked to a whole flock of different people.  But
12  the same people that are the principals right now involved
13  with this at ATSDR.  Libarger (phonetic) was there, I know
14  that.  And Dan Middleton was there.  Sharon Campalucci was
15  there, Mike Aubrey was there.  And I can't remember all the
16  physicians, although I think Jim Lucky was probably there.  I
17  am not certain about that.
18  Q.    With respect to the EPA, do you recall who was present
19  from the EPA?
20  A.    No.  I think Aubrey was there, but I can't recall anybody
21  else.
22  Q.    When was your first contact -- was this your first
23  contact with the EPA or had you had prior contacts?
24  A.    No, prior contact with Aubrey in my office.  That was I
25  guess officially EPA contact.

Page 255

1  Q.    Anybody else from the EPA that you had contacts with
2  during this time?
3  A.    Well, Chris Wise obviously, and I met Paul Paranar
4  somewhere along that line and I don't remember when.
5  Q.    When was the first time you described your views about
6  what was happening in Libby to Mr. Paranar?
7  A.    I don't know.
8  Q.    You don't recall?
9  A.    I am not sure I ever discussed it directly with him.  I
10  did with Aubrey for sure.  Aubrey and I talked many times
11  about this.
12  Q.    What about with Mr. Wise, do you remember talking about
13  your views with Mr. Wise?
14  A.    A bit when I was in Cincinnati.  We talked about --
15  mostly it wasn't views, it was more a matter of presenting
16  representative cases, patient cases.
17  Q.    So you would give a presentation?
18  A.    I gave an actual presentation at all of those meetings.
19  Q.    And at the meeting in Atlanta, the EPA was present as
20  well?
21  A.    I think so.
22  Q.    How --
23  A.    I don't know in an official capacity or not.  I didn't
24  pay a lot of attention to that.
25        MS HARDING:  Our tape ran out.

Page 256

1        VIDEOGRAPHER:  This will conclude tape No. 7, the time is
2  now 5:39 p.m.)
3        (Off the record from 5:39 to 5:40.)
4        VIDEOGRAPHER:  This is the continued videotaped
5  deposition of Dr. Alan C. Whitehouse and tape number eight.
6  The date remains to be October 18, 2007.  The time is now
7  5:40 p.m.
8  Q.    (BY MS. HARDING)  Dr. Whitehouse, were you consulted at
9  all with respect to the -- when Mr. Paranar was preparing his
10  action memos regarding Libby?
11  A.    No.
12  Q.    Were you consulted when Mr. Wise was preparing his risk
13  memos on Libby; were you consulted about those?
14  A.    No.
15  Q.    Did you provide any information to the EPA for use in
16  either of those projects?
17  A.    Not that I am aware of.  I dealt strictly with patients.
18  Q.    Other than Aubrey Miller, were there other officials from
19  the EPA that you talked with since 1999?
20  A.    Well, probably, but I don't know.  I don't remember who.
21  I talked at one time or another casually with the
22  administrators of Denver Region 8 who have been in Libby.  My
23  conversations with any of these people have not been on
24  policy or clean up, or anything like that.  I stick pretty
25  much to taking care of patients, that's for the most part,

Page 257

1  and writing some of this stuff up, and being a pulmonary
2  consultant to the clinic.  So there wouldn't be much in the
3  way of talking to EPA about cleanup or things like that.  I
4  might go to something and listen, but I don't think I would
5  be involved with decision-making or anything.
6  Q.   You mentioned earlier, very early on this morning that
7  the -- you are seeing patients who are younger than you have
8  seen previously whose disease is less severe.
9  A.   Yes.
10 Q.   And I believe -- well the question is, is it your opinion
11 in this case that those individuals are going to progress in
12 the same way that you have seen in individuals with exposure,
13 for instance, from the work environment at Libby?
14 A.   Yes.  And I have seen people that were not workers that
15 have also progressed in the same way.  And the literature,
16 basically, also backs that up, that this is a progressive
17 disease, may be a slowly progressive disease, but that it
18 will be a progressive disease once it's established.  And we
19 are seeing, you know, pleural plaques within the less heavily
20 exposed people probably within ten years of their exposure
21 and the heavy exposure has been a few years.
22 Q.   What's your foundation for saying that you are seeing
23 plaques in individuals with less than ten years of exposure?
24 A.   Some of it is basically Grace's own data that was in the
25 miners, heavier exposures.  You probably seen those graphs

Page 258

1  that they -- provided to you.
2  Q.   Absolutely.  And those are, as I understand it, those are
3  workers from W.R. Grace in the Sixties and -- Sixties I think
4  who had --
5  A.   Into the Seventies as well.
6  Q.   Or into the Seventies, but who had heavy exposures and
7  you had -- there were radiographic changes on their x-rays,
8  correct?
9  A.   That's what I am saying though, that the heavier exposed
10 people develop pleural disease probably within a few years,
11 or maybe five years at least.  But there are studies in '69
12 that was 17 percent that had been there less than five years.
13 Now, the ones that have lesser exposures, that have
14 plaques, it may be that there is going to be a slower
15 progression.  There may not be.  They may not even be related
16 to the extent of exposure.  I don't know the answer to that,
17 that still remains to be determined.
18 Q.   So you don't know yet whether the level of exposure is
19 related to the progression of disease?
20 A.   Well, logically, logic would tell you that it is.  And
21 the literature would tell you that it is.
22 Q.   I was just going to say, the literature is fairly
23 established?
24 A.   The literature would tell you that.  But on the other
25 hand, we are also now we are seeing people that we wouldn't

Page 259

1  have thought was necessarily a heavy exposure.  Maybe it was
2  a heavy exposure and we didn't know it.  But that are
3  progressing within ten years or so of their last exposure, or
4  what we can identify as their last significant exposure.
5  See, we don't even know some of these people aren't still
6  being exposed.
7  Q.   What group of patients in this group of exhibits that you
8  have here, are the group of patients that you are relying on
9  for your opinion that the people that I defined, that you
10 defined earlier, people who are you are seeing that are
11 younger and whose disease is less severe.
12 A.   Yes.
13 Q.   What specific patients are you relying upon for your view
14 that those individuals are going to progress in the same
15 fashion as the individuals from the worker cohort who worked
16 at the mine?
17 A.   I didn't say they would necessarily progress in the same
18 fashion.  I don't know the answer to that.  I do know that we
19 have people that have had just pleural plaques, or some
20 degree of diffuse pleural thickening, that have progressed
21 that were environmental exposures.
22 Q.   Which patients in these lists, can you identify a patient
23 for me that just has pleural plaques, just environmental
24 exposure, and has progression?
25 A.   Sure.  What was the number of that -- it was four that

Page 260

1  was the list that I gave you of progressive disease?
2  Q.   Yes, rapid progression and pleural deaths?
3  A.   Yes.
4  Q.   Yes.
5  A.   If I can find it.  Ron Masters.
6  Q.   Ron Masters?
7  A.   Clinton Hagen.  Those two both have had just pleural
8  plaques that are progressing.  Probably Ken Moss.  Larry Hill
9  had nothing but some diffuse pleural plaques about five or six years
10 ago and is really rapidly progressing.  If you look at those,
11 I think that will tell you a lot.
12 Q.   So those are the community exposed individuals?
13 A.   Those are community exposed people, yes.
14 Q.   That you are relying upon --
15 A.   That's not all that I am relying on, I am relying on a
16 whole host of people I have seen, but these are the ones that
17 progressed rather remarkably quickly.
18 Q.   And just had plaque?
19 A.   Well, at the beginning they just had plaques or they
20 some diffuse pleural thickening, but it wasn't very marked
21 and then all of a sudden it just exploded.  Then they got
22 blunting of their angles and loss of lung volume and a lot of
23 fibrosis in a very short period of time.  It started out with
24 what would have been defined as plaques, although I think on
25 CT you would have seen there was some more diffuse stuff than

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 261

1  that.  Some of these people had nothing but just isolated
2  plaques along the chest walls.
3  Q.   You say said fibrosis in the pleural, fibrosis of the
4  pleura or fibrosis in the interstitia?
5  A.   No, I am talking about fibrosis in the pleura.
6       I would like to take a one minute break to make a phone
7  call.  I need to tell my wife I am not going to home for
8  dinner.  I live almost an hour away.
9       MR. HEBERLING:  Off the record, please.
10      VIDEOGRAPHER:  We are going off the record at 5:50 p.m.
11      (Off the record from 5:50 to 5:53.)
12      VIDEOGRAPHER:  We are back on the record at 5:53 p.m.
13 Q.   (BY MS. HARDING)  I just want to make sure I have a
14 couple things right, Dr. Whitehouse.
15      In your 2007, July 2007 report in this case, you stated
16 that you base your diagnosis of asbestos disease on the
17 guidelines established by the American Thoracic Society,
18 correct?
19 A.   That's correct.
20 Q.   With respect to differential diagnosis, Doctor.  If you
21 have a patient that has a history of important medical events
22 that could potentially bear on the diagnosis of the
23 individual as having an asbestos-related disease, or
24 something else, do you request the medical records of the
25 individual so you can make the differential diagnosis?

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 262

1  A.   Well, some of it, yes, sometimes I do, but sometimes if
2  it's very remote I might not.  And it also depends on what
3  the patient is telling me as well.  But I certainly take that
4  into consideration every tomorrow.
5  Q.   For instance what are some examples of the kinds of
6  events or important historical medical information that if a
7  patient had those previous medical conditions would be
8  important to you to review their records before you made a
9  differential diagnosis of asbestos disease?
10 A.   I will tell you one where it's probably not.  I have had
11 a number of people that come you to and say they have lupus.
12 And then when you talk to them about it, they have a positive
13 LE or they have a positive anti-nuclear factor but no signs
14 or symptoms of lupus, have never really even had significant
15 disease.  So what happens is that -- this is unfortunately
16 common in Spokane, somebody comes in with a lot of minor
17 symptoms like fibromyalgia or something and the Doc does an
18 anti-nuclear factor that's positive.  Voila, you can tell the
19 patient you have lupus and the patient is satisfied.  I have
20 had that happen a number of times.
21 Q.   What about, for instance, pneumonia, what if an
22 individual has several previous occasions or instances of
23 pneumonia in their history?
24 A.   Well, it depends on whether they have anything on their
25 x-ray that's left over that may be related to it.  Most

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 263

1  pneumonia leaves nothing in the x-rays and leaves no loss of
2  pulmonary function.  There are really bad pneumonias that
3  will leave scars, bad looking scars, and cause a lot of
4  pulmonary function.  That's generally evident between a
5  combination of the x-ray and what the patient tells you about
6  it.  For example, in Libby, and this is true about a lot of
7  hospitals that are community hospitals, somebody gets a cold
8  and is coughing and has some bronchitis and they stick the
9  patient in the hospital and they have, quotes, walking
10 pneumonia.  Or they have pneumonia.  You look at the x-rays
11 there is no evidence of anything on them.  I have couple of
12 those when I looked -- I actually looked at the films in the
13 hospital and they were identical to the films that I had,
14 that were just showing the asbestos changes.  So a lot of
15 times you don't need to get records or anything like that,
16 you just need to get the x-rays, talk to the patient about
17 it.  And then there is times that you really do need the
18 records, and you probably occasional see that in my files.
19 Q.   What kinds of occasions would you need to get the
20 records?
21 A.   Basically, somebody that's had cancer and has had
22 surgery.  Somebody that tells you they had a mass in their
23 lungs and had a biopsy but it wasn't cancer.  I had that
24 happen a lots of times.  And it's atelectasis.  I have gotten
25 the reports and old x-rays and I think of one person I didn't

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 264

1  see very long ago actually did have a mass and a surgeon
2  resected it and looked at his chest x-ray did not show a mass
3  now, but it was clearly there and it was an area of rounded
4  atelectasis.  Those are the sort of examples where you might
5  want to get the x-rays sand see what had gone on.
6  Q.   Did you have an understanding of the average age of death
7  in the Libby or Lincoln County area?
8  A.   The average age of death?
9  Q.   Uh-huh.
10 A.   I do not know that?
11 Q.   Do you have any information on the average age of death
12 of your patients?
13 A.   No.  I have had a fair number of them die.  In that 123 I
14 have had about 25 or 26, 27 die.  In that whole 490 database
15 I added it up and I had about 60 some odd that had died.  I
16 am not really sure that's excessive deaths or just related to
17 their age or what it is.  I don't have the data on that.
18 Q.   You haven't looked at the kind of average age of deaths
19 of your patients at the CARD Clinic?
20 A.   There is two factors in there, one is when they die, but
21 the other is how sick they are for how long before they die.
22 That's probably worse than dying.
23 Q.   Have you analyzed any of the data that you have provided
24 in your expert reports to attempt to get an average age of
25 death?

WR GRACE BANKRUPTCY    ALAN C WHITEHOUSE M.D.    October 18, 2007

Page 265

1  A.   No.

2  Q.   That's actually something that you could do with a couple

3  of your exhibits, correct?

4  A.   Probably.  I am not sure what I would do with it though.

5  Q.   But from the data that you have reported in your

6  exhibits, you could get an average age of death, correct?

7  A.   Probably.

8      MS. HARDING:  All right.

9      THE WITNESS:  Are we done?

10     MS. HARDING:  We are done.

11     MR. HEBERLING:  I will reserve my questions until the

12  time of trial.

13     VIDEOGRAPHER:  This will conclude tape number eight of

14  eight and it's now 6:00 p.m.)

15

16

17

18

19

20

21

22

23

24

25

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA    (509)455.6931

---

WR GRACE BANKRUPTCY    ALAN C WHITEHOUSE M.D.    October 18, 2007

Page 266

1              CORRECTION SHEET

2   PAGE              LINE              CORRECTION

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA    (509)455.6931

---

WR GRACE BANKRUPTCY    ALAN C WHITEHOUSE M.D.    October 18, 2007

Page 267

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19     I have read the foregoing 264 pages of my testimony and
   I declare (or certify) under penalty of perjury under the
20  laws of the State of Washington that the foregoing is true
   and correct, except for the corrections noted above.

21

22     Dated at_____,_____this

23  _____day of_____, 2007.

24                    _____
                      ALAN C. WHITEHOUSE, M.D.

25

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA    (509)455.6931

---

WR GRACE BANKRUPTCY    ALAN C WHITEHOUSE M.D.    October 18, 2007

Page 268

1  STATE OF WASHINGTON
                 ss:  Reporter's Certificate
2  COUNTY OF SPOKANE

3      I, Osmund D. Miller, a Certified Shorthand Reporter and

4  Notary Public in and for the State of Washington,

5      DO HEREBY CERTIFY:

6      That the foregoing is a true and correct transcription

7  of my shorthand notes as taken upon the deposition of ALAN C.

8  WHITEHOUSE, M.D. on the date and at the time and place as

9  shown on Page 1 hereto,

10     That the witness was sworn upon his oath to tell the

11  truth, the whole truth and nothing but the truth, and did

12  thereafter make answers as appear herein,

13     That I am not related to any of the parties to this

14  litigation and have no interest in the outcome of said

15  litigation,

16     Witness my hand and seal this 23rd day of October, 2007.

17

18              RPR, CCR No. 2280
   OSMUND D. MILLER
19  Certified Shorthand Reporter and Notary
   Public in and for the State of Washington,
20  residing in Spokane.  My commission expires
   December 15, 2008.

21

22

23

24

25

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA    (509)455.6931

WR GRACE BANKRUPTCY      ALAN C WHITEHOUSE M.D.       October 18, 2007

Page 269

```
 1                     EXAMINATIONS                  Page

 2       EXAMINATION BY MS. HARDING:                   6

 3                       EXHIBITS

 4       Description                                  Page

 5
         (Ex. Nos. 1 through 4, marked.)                3
 6
         (Ex. No. 5, marked.)                         123
 7
         (Ex. No. 6, marked.)                         159
 8
         (Ex. No. 7, marked.)                         162
 9
         (Ex. No. 7 marked.)                          163
10
         (Ex. No. 8, marked.)                         168
11
         (Ex. No. 9, marked.                          170
12
         (Ex. No. 10, marked.)                        171
13
         (Ex. No. 11, marked.)                        180
14
         (Ex. No. 12, marked.)                        190
15
         (Ex. No. 13, marked.)                        204
16
         (Exhibit 14 marked.)                         225
17
18       (Exhibit 15 marked.)                         228

19       (Exhibit 16 marked.)                         240
20
21       (Exhibit 17 marked.)                         240

22       (Exhibit 18 marked.)                         242

23

24

25
```

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA      (509)455.6931