# EXHIBIT A

        IN THE UNITED STATES BANKRUPTCY COURT
           FOR THE DISTRICT OF DELAWARE
                    -   -   -

In Re:                     : Chapter 11
                           :
                           : Case No.
W.R. GRACE & CO., et al,   : 01-01139 JKF
                           :
                           : (Jointly
           Debtors         : Administered)


                    -   -   -

           Friday, May 1, 2009

                    -   -   -

           Oral deposition of PETER VAN

N. LOCKWOOD, ESQUIRE, taken pursuant to

notice, was held at the offices of CAPLIN

& DRYSDALE, One Thomas Circle N.W., Suite

1100, Washington, DC  20005, commencing

at 9:43 a.m., on the above date, before

Lori A. Zabielski, a Registered

Professional Reporter and Notary Public

in and for the Commonwealth of

Pennsylvania.


              -   -   -

        MAGNA LEGAL SERVICES
         Seven Penn Center
         1635 Market Street
             8th Floor
   Philadelphia, Pennsylvania 19103

Page 2

```
1   APPEARANCES:
2
3   DRINKER BIDDLE & REATH, LLP
    BY:  MICHAEL F. BROWN, ESQUIRE
4        JEFFREY M. BOERGER, ESQUIRE
    One Logan Square
5   18th & Cherry Streets
    Philadelphia, Pennsylvania 19103-6996
6   215.988.2988
    (brownmf@dbr.com)
7   (jeffrey.boerger@dbr.com)
    Representing OneBeacon America Insurance
8   Company, Seaton Insurance Company,
    Government Employees Insurance Company,
9   Columbia Insurance Company f/k/a Republic
    Insurance Company
10
11
    CAPLIN & DRYSDALE, CHARTERED
12  BY:  NATHAN D. FINCH, ESQUIRE
         JEFFREY A. LIESEMER, ESQUIRE*
13       (*VIA TELECONFERENCE)
    One Thomas Circle N.W.
14  Suite 1100
    Washington, DC  20005
15  202.862.7801
    (ndf@capdale.com)
16  (jal@capdale.com)
    Representing Grace, Official Committee of
17  Asbestos Personal Injury Claimants
    ("ACC"), and Witness
18
19
    W.R. GRACE & CO.
20  BY:  RICHARD C. FINKE, ESQUIRE*
         ASSISTANT GENERAL COUNSEL
21       (*VIA TELECONFERENCE)
    5400 Broken Sound Boulevard, NW
22  Suite 300
    Boca Raton, Florida  33487
23  561.362.1533
    Representing W.R. Grace & Co.
24
```

Page 3

```
1   APPEARANCES (continued)
2
3   KIRKLAND & ELLIS, LLP
    BY:  BARBARA M. HARDING, ESQUIRE
4        THEODORE L. FREEDMAN, ESQUIRE
    655 Fifteenth Street, N.W.
5   Washington, DC  20005-5793
    202.879.5081
6   (barbara.harding@kirkland.com)
    (tfreeedman@kirkland.com)
7   Representing the Debtors
8
9   SIMPSON THACHER & BARTLETT, LLP
    BY:  ELISA ALCABES, ESQUIRE
10  425 Lexington Avenue
    New York, New York  10017-3954
11  212.455.3133
    (ealcabes@stblaw.com)
12  Representing Travelers Casualty and
    Surety Company
13
14
    VORYS, SATER, SEYMOUR AND PEASE, LLP
15  BY:  TIFFANY STRELOW COBB, ESQUIRE*
         ROBERT J. SIDMAN, ESQUIRE*
16       (*VIA TELECONFERENCE)
    52 East Gay Street
17  Columbus, Ohio  43215
    614.464.8322
18  (tscobb@vorys.com)
    Representing The Scotts Company, LLC
19
20
    COHN WHITESELL & GOLDBERG, LLP
21  BY:  DANIEL C. COHN, ESQUIRE
    101 Arch Street
22  Boston, Massachusetts 02110
    617.951.2505
23  (cohn@cwg11.com)
    Representing the Libby Claimants
24
```

Page 4

```
1   APPEARANCES (continued)
2
3   SPEIGHTS & RUNYAN
    BY:  DANIEL H. SPEIGHTS, ESQUIRE*
4        (* VIA TELECONFERENCE)
    200 Jackson Avenue East
5   P.O. Box 685
    Hampton, South Carolina  29924
6   803.943.4444
    (dspeights@speightsrunyan.com)
7   Representing Anderson Memorial Hospital
8
9   TUCKER ARENSBERG
    BY:  MICHAEL A. SHINER, ESQUIRE
10  1500 One PPG Place
    Pittsburgh, Pennsylvania  15222
11  412.594.5586
    (mshiner@tuckerlaw.com)
12  Representing Certain London Market
    Insurers and AXA Belgium
13
14
15  MENDES & MOUNT, LLP
    BY:  CAROLINA ACEVEDO, ESQUIRE*
16       (*VIA TELECONFERENCE)
    750 Seventh Avenue
17  New York, New York  10019
    212.261.8262
18  (carolina.acevedo@mendes.com)
    Representing AXA Belgium as Successor to
19  Royale Belge SSA
20
    MENDES & MOUNT, LLP
21  BY:  ALEXANDER MUELLER, ESQUIRE*
         (*VIA TELECONFERENCE)
22  750 Seventh Avenue
    New York, New York  10019-6829
23  212.261.8296
    (alexander.mueller@mendes.com)
24  Representing London Market Companies
```

Page 5

```
1   APPEARANCE (continued)
2
3   FORD MARRIN ESPOSITO & WITMEYER & GLESER
    BY:  ELIZABETH M. DeCRISTOFARO, ESQUIRE
4   Wall Street Plaza
    New York, New York  10005-1875
5   212.269.4900
    Representing Continental Casualty Company
6   and Continental Insurance Company
7
8   BILZIN SUMBERG BAENA PRICE & AXELROD, LLP
    BY:  MATTHEW I, KRAMER, ESQUIRE
9   200 South Biscayne Boulevard
    Suite 2500
10  Miami, Florida  33131-5340
    305.450.7246
11  (mkramer@bilzin.com)
    Representing Property Damage Committee
12
13
    STROOCK & STROOCK & LAVAN, LLP
14  BY:  ARLENE G. KRIEGER, ESQUIRE
    180 Maiden Lane
15  New York, New York  10038-4982
    212.806.5400
16  (akrieger@stroock.com)
    Representing Official Committee of
17  Unsecured Creditors
18
19  CROWELL & MORING, LLP
    BY:  MARK PLEVIN, ESQUIRE
20       NOAH S. BLOOMBERG, ESQUIRE
    1001 Pennsylvania Avenue NW
21  Washington, DC  20004-2595
    202.624.2913
22  (mplevin@crowell.com)
    (nbloomberg@crowell.com)
23  Representing Fireman's Fund Insurance
    (Surety Bond)
24
```

Page 6

```
 1   APPEARANCES (continued)
 2
     STEVENS & LEE, P.C.
 3   BY: JOHN D. DEMMY, ESQUIRE
     1105 North Market Street, 7th Floor
 4   Wilmington, Delaware 19801
     302.654.5180
 5   (jdd@stevenslee.com)
     Representing Fireman's Fund Insurance
 6
 7
     ALAN B. RICH LAW OFFICES
 8   BY: ALAN B. RICH, ESQUIRE
     Elm Place, Suite 4620
 9   1401 Elm Street
     Dallas, Texas 75202
10   214.744.5100
     (arich@alanrichlaw.com)
11   Representing Property Damage FCR
12
13   CONNOLLY BOVE LODGE & HUTZ, LLP
     BY: JEFFREY C. WISLER, ESQUIRE
14   The Nemours Building
     1007 North Orange Street
15   P.O. Box 2207
     Wilmington, Delaware 19899
16   302.88.6528
     (jwisler@cblh.com)
17   Representing Maryland Casualty
18
19   ECKERT SEAMANS CHERIN & MELLOTT, LLC
     BY: EDWARD J. LONGOSZ, II, ESQUIRE
20   1747 Pennsylvania Avenue, NW
     12th Floor
21   Washington, DC 20006
     202.659.6619
22   (elongosz@eckertseamans.com)
     Representing Maryland Casualty and Zurich
23
24
```

Page 7

```
 1   APPEARANCES (continued)
 2
     WILEY REIN, LLP
 3   BY: KARALEE C. MORELL, ESQUIRE
     1776 K Street NW
 4   Washington, DC 20006
     202.719.7520
 5   (kmorell@wileyrein.com)
     Representing Maryland Casualty and Zurich
 6
 7
     COZEN O'CONNOR
 8   BY: JACOB C. COHN, ESQUIRE
     1900 Market Street
 9   Philadelphia, Pennsylvania 19103-3508
     215.665.2147
10   (jcohn@cozen.com)
     Representing Federal Insurance Company
11
12
     ORRICK HERRINGTON & SUTCLIFFE, LLP
13   BY: JONATHAN P. GUY, ESQUIRE
       JOSHUA M. CUTLER, ESQUIRE
14   Columbia Center
     1152 15th Street, N.W.
15   Washington, DC 20005-1706
     202.339.8516
16   (jguy@orrick.com)
     Representing Future Claimants
17   Representative
18
19   CUYLER BURK, P.C.
     BY: ANDREW CRAIG, ESQUIRE
20   4 Century Drive
     Parsippany, New Jersey 07054
21   973.734.3200
     (acraig@cuyler.com)
22   Representing Allstate Insurance Company
23
24
```

Page 8

```
 1   APPEARANCES (continued)
 2
     WILSON ELSER MOSKOWITZ EDELMAN & DICKER,
 3   LLP
     BY: CARL PERNICONE, ESQUIRE*
 4     (*VIA TELECONFERENCE)
     150 East 42nd Street
 5   New York, New York 10017-5639
     212.915.5656
 6   (carl.pernicone@wilsonelser.com)
     Representing Arrowood Indemnity Company
 7
 8
     WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
 9   BY: KEVIN J. MANGAN, ESQUIRE*
       (*VIA TELECONFERENCE)
10   222 Delaware Avenue
     Suite 1501
11   Wilmington, Delaware 19801
     302.252.4361
12   (kmangan@wcsr.com)
     Representing State of Montana
13
14
15   PEPPER HAMILTON, LLP
     BY: LINDA J. CASEY, ESQUIRE*
16     (*VIA TELECONFERENCE)
     3000 Two Logan Square
17   Philadelphia, Pennsylvania 19103
     215.981.4000
18   (caseyl@pepperlaw.com)
     Representing BNSF Railway Company
19
20         - - -
21
22
23
24
```

Page 9

```
 1           - - -
 2        I N D E X
 3           - - -
 4
 5   Testimony of:
 6     PETER VAN N. LOCKWOOD, ESQUIRE
 7
 8   By Mr. Brown        Page 12
 9   By Ms. Alcabes      Page 267
10   By Ms. Cobb         Page 339
11   By Mr. Cohn         Page 368
12
13
14           - - -
15        E X H I B I T S
16           - - -
17   NO.   DESCRIPTION              PAGE
18   1   Amended Notice of Deposition
         of Asbestos PI Committee...    12
19
20   2   Objections to the Official
         Committee...        12
21   3   Form 8-K and Term Sheet      15
22   4   Exhibit-6 to Exhibit Book    26
23   5   First Amended Joint Plan of
         Reorganization...        27
24
```

Page 10

1  EXHIBITS (continued)
2
3  NO.  DESCRIPTION          PAGE
4  6    Exhibit-19 to Exhibit Book   83
5  7    Settlement Agreement
       * CONFIDENTIAL *        144
6
     8    Complaint for Declaration of
7       the Relief...              175
8  9    Diagram                  175
9  10   Exhibit-2 to Exhibit Book   196
10 11   Exhibit-4 to Exhibit Book   224
11 12   Exhibit-10 to Exhibit Book  260
12 13   Travelers Casualty and Surety
       Company's Notice of Deposition
13      to the Official Committee of
       Asbestos Personal Injury
14      Claimants...              267
15 14   Debtors' Disclosure...      280
16 15   Documents bearing Bates stamps
       TRAVAS0000019 through 141
17      * CONFIDENTIAL *        289
18 16   Notice of Service of Discovery  324
19
           - - -
20
21
22
23
24

Page 11

1            - - -
2     DEPOSITION SUPPORT INDEX
3            - - -
4
5  Direction to Witness Not to Answer:
6  Page  Line       Page   Line
7  NONE
8
9
10 Request for Production of Documents:
11 Page  Line       Page   Line
12 NONE
13
14
15 Stipulations:
16 Page  Line       Page   Line
17 12   02
18
19
20 Area(s) Marked Confidential:
21 Page  Line       Page   Line
22 152   01  through  168   03
   292   01  through  311   14
23
24

Page 12

1            - - -
2        (It is hereby stipulated and
3   agreed by and among counsel for
4   the respective parties that the
5   filing, sealing and certification
6   of the deposition are waived; and
7   that all objections, except as to
8   the form of the question, will be
9   reserved until the time of trial.)
10           - - -
11       PETER VAN N. LOCKWOOD,
12  ESQUIRE, after having been first
13  duly sworn, was examined and
14  testified as follows:
15           - - -
16       EXAMINATION
17           - - -
18       (ACC 30(b)(6)-1 and 2
19  premarked for identification.)
20           - - -
21  BY MR. BROWN:
22     Q.   Good morning, Mr. Lockwood.
23     A.   Good morning, Mr. Brown.
24     Q.   You are appearing here today

Page 13

1  as the Rule 30(b)(6) designee for the
2  ACC, correct?
3     A.   Correct.
4     Q.   And that is with respect to
5  a number of 30(b)(6) notices, correct?
6     A.   A very large number, yes.
7     Q.   Can you look at the one
8  that's been put before you and marked ACC
9  Rule 30(b)(6)-1, which I will call ACC-1
10 here after.
11    A.   I have it.
12    Q.   Can you identify it?
13    A.   It is an Amended Notice of
14 Deposition of Asbestos PI Committee
15 Pursuant to Rule 30(b)(6) served by four
16 insurance companies, One Beacon, Seaton,
17 Geico, and Columbia.  And it contains an
18 attachment with definitions and topics
19 which are the subject matter of
20 testimony.
21    Q.   Okay.  And can you look at
22 the document that I put before you that's
23 marked ACC-2.
24    A.   I have it.

Page 14

```
 1        Q.   And identify that document,
 2   please.
 3        A.   That document is the
 4   Objections of the Official Committee of
 5   Asbestos Personal Injury Claimants to
 6   Rule 30(b)(6) Notices of Deposition
 7   served by Certain Plan Objectors.
 8        Q.   Okay.  And is it correct
 9   that you are here today prepared to
10   testify about the topics that are listed
11   in ACC-1 subject to the objections that
12   appear in ACC-2?
13        A.   The answer to that question
14   is yes, subject to the following caveats:
15   To the extent that the topics in this
16   notice or any of the other notices are
17   subjects that the ACC has a person with
18   knowledge on, I am here to testify about
19   it.  To the extent that the ACC doesn't
20   have a person with knowledge on certain
21   topics, then I am here to testify that
22   the ACC doesn't have knowledge on those
23   topics.
24        Q.   Okay.  And --
```

Page 15

```
 1        A.   And to the extent that
 2   occurs, we will see how it occurs in the
 3   course of the questions.
 4        Q.   Okay.  And then you
 5   mentioned ACC and a person with the ACC.
 6        How are you using the term
 7   "ACC"?
 8        A.   I am using it as the entity
 9   that was appointed in the bankruptcy case
10   by the U.S. Trustee.
11        MR. BROWN:  ACC-3.
12        (ACC 30(b)(6)-3 marked for
13   identification at this time.)
14   BY MR. BROWN:
15        Q.   Okay.  Mr. Lockwood, you now
16   have before you a document that should
17   have two exhibit labels on it.  One is an
18   Exhibit-12 from the deposition of
19   Mr. Finke, and the other is ACC-3.
20        Could you identify the
21   document that has been marked as ACC-3?
22        A.   It appears to be a Form 8-K
23   file by W.R. Grace & Company dated April
24   6, 2008.
```

Page 16

```
 1        Q.   Have you ever seen this
 2   document before?
 3        A.   Frankly, I am not sure.
 4        Q.   Okay.
 5        A.   I may have.  I may not have.
 6        Q.   All right.  Why don't you go
 7   to the back of the document, starting
 8   with page 9.
 9        A.   Page 9 or page 8?
10        Q.   I am sorry.  Page 8.
11        A.   I am there.
12        Q.   Can you identify that
13   document?
14        A.   It appears to be a copy of a
15   Term Sheet for the Resolution of Asbestos
16   Personal Injury Claims entered into by a
17   variety of parties, including the ACC.
18        Q.   Okay.  Have you seen the
19   Term Sheet, either this Term Sheet or
20   some iteration of it previously?
21        A.   I have seen the original of
22   it.
23        Q.   Okay.  Can you take a look
24   at what you have before you and tell me
```

Page 17

```
 1   whether it differs in any way from the
 2   original?
 3        MR. FINCH:  Objection.
 4        THE WITNESS:  On the face of
 5   it, it does not appear to
 6   different.  I mean, obviously, a
 7   comparison of the original and
 8   this copy would be the definitive
 9   way of determining whether there
10   is a difference, but this looks to
11   be the same, as best I can recall.
12   BY MR. BROWN:
13        Q.   Okay.  And this document was
14   negotiated by the parties that executed
15   it, is that correct, or their counsel?
16        A.   Broadly speaking, yes.  I
17   mean, negotiated implies human beings in
18   a room or in some communication, and
19   these are all entities.  So various
20   representatives of the entities that are
21   listed here in negotiated this document
22   on behalf of their respective principals.
23        Q.   Is there anything in the
24   Term Sheet that you can see that's
```

Page 18

1  inaccurate?
2       MR. FINCH:  Object to form.
3       THE WITNESS:  To answer that
4  question, I would have to read
5  every word in the Term Sheet and
6  determine whether or not there are
7  statements in here which are
8  contained facts which might be
9  erroneously stated.  I am not sure
10 that there are any such things.
11 BY MR. BROWN:
12      Q.   Take a moment to review it,
13 if you would.  It's not that long.
14      A.   Well, I have read it.  As
15 far as I can tell, it is accurate in the
16 sense that it states the terms of an
17 agreement, and those are the terms of the
18 agreement.  It doesn't purport to recite
19 facts.
20      Q.   Okay.  Look at the first
21 sentence.  There is a reference there to
22 certain of the principal terms and
23 conditions.
24      Do you see that?

Page 19

1       A.   I do.
2       Q.   Were there other principal
3  terms and conditions that were left off
4  the Term Sheet?
5       A.   I don't believe there were
6  that had been negotiated, agreed on.
7       It is common that a Term
8  Sheet is subject to a definitive
9  agreement.  And in a complicated
10 bankruptcy case, involving a complicated
11 settlement, it would be my understanding
12 and I believe the understanding of
13 everybody else that was involved in this
14 that this Term Sheet would only purport
15 to set out certain of the most -- what
16 the parties consider to be the most
17 important terms, and other terms would
18 remain to be negotiated as part of the
19 drafting of either the definitive Plan or
20 a more definitive settlement agreement or
21 whatever document would be required to
22 flesh out the details.
23      Q.   Okay.  Can you turn to page
24 9, and you will see under the Romanette

Page 20

1  5, there is a sentence that begins,
2  "Provided however..."?
3       A.   Yes.
4       Q.   Do you know to what that
5  refers?
6       MR. FINCH:  Objection.  I
7  caution the witness not to reveal
8  any privileged communications.  If
9  you can answer the question
10 without divulging privileged
11 information, you can do so.
12      MS. HARDING:  And I am going
13 to object also as to privilege as
14 to the relevancy of negotiations,
15 and I believe that -- well --
16 okay.
17      THE WITNESS:  I am trying to
18 remember what this phrase referred
19 to at the time this Term Sheet was
20 entered into.  As best I can
21 recall, at the time of the Term
22 Sheet, the concept that was
23 reflected by this language was
24 that what was going to be

Page 21

1  transferred to the Trust was
2  coverage for asbestos personal
3  injury claims, and to the extent
4  that there was coverage that
5  didn't -- that somehow or another
6  didn't cover asbestos personal
7  injury claims, like, for example,
8  workers' compensation insurance,
9  that wouldn't be transferred to
10 the Trust.
11      But since this Term Sheet
12 was superseded by the Plan
13 ultimately, I am not sure exactly
14 what the significance of this
15 particular term at this time is.
16 BY MR. BROWN:
17      Q.   Okay.  Well, putting aside
18 workers' compensation coverage, is there
19 any other coverage that you are aware of
20 that Grace has under the policies that
21 are being transferred to the Asbestos PI
22 Trust?
23      MR. FINCH:  Objection to the
24 form.

Page 22

1          THE WITNESS:  The answer to
2     that is certainly, yes.
3          I mean, for example, Grace
4     has insurance beginning in -- I
5     don't know -- 1986 or so that
6     contains asbestos exclusions,
7     running up through today, and none
8     of that insurance is being
9     transferred to the Trust because
10    it doesn't provide any coverage
11    for asbestos personal injury
12    claims.
13  BY MR. BROWN:
14    **Q.   What if we limited it to**
15  **asbestos insurance rights?  In other**
16  **words, the policies -- the asbestos**
17  **insurance rights are being transferred to**
18  **the Trust by Grace, correct?**
19    A.   Well, you are using a term
20    that is a term that is defined in the
21    Plan, and as defined in the Plan, the
22    asbestos insurance rights under the terms
23    of the Plan and the Insurance Transfer
24    Agreement are being transferred to the

Page 23

1     Trust.
2          **Q.   Okay.  And does that include**
3     **all the coverages under the policies that**
4     **are covered by that term?**
5          A.   I have no idea, because
6     asbestos insurance rights are not
7     asbestos insurance policies, and I have
8     not undertaken to examine each and every
9     policy that does or might provide
10    coverage for asbestos personal injury
11    claims to determine whether or not there
12    is some coverage under that policy that
13    doesn't and that might not be
14    transferred.
15          As a general proposition, my
16    recollection is that the Plan is pretty
17    specific about what's being transferred
18    and what's not.
19          There is an Exhibit-5, for
20    example, that lists various categories of
21    policies and settlement agreements and
22    things of that nature.  There is the
23    Insurance Transfer Agreement; there are
24    schedules of insurance rights.

Page 24

1          Trying to answer a question
2     from memory that's as broad and all
3     encompassing as that, I think frankly is
4     virtually impossible, and I don't think I
5     can do it any better than I just did.
6          MR. BROWN:  Okay.  And just
7     so everyone knows how we are going
8     to be handling the question
9     regarding Plan documents, we are
10    going to mark certain Plan
11    exhibits as separate exhibits in
12    the deposition.
13          Mr. Lockwood has a
14    separately tabbed collection of
15    all the Plan documents.  He wants
16    to work off of that.  I have no
17    problem with that.  But, for
18    purposes of the record, it will be
19    the individual Plan documents that
20    we are referring to.
21          THE WITNESS:  For purposes
22    of the record, what I have in
23    front of me is the printed book
24    called Exhibit Book to First

Page 25

1     Amended Joint Plan of
2     Reorganization and Disclosure
3     Statement as of February 27, 2009,
4     which is the document that was
5     distributed to people to vote on
6     the Plan.  And the only -- there
7     are no markings or anything in it.
8          What I have had done is, so
9     that I could have ready access to
10    the multiple -- well, there are 33
11    exhibits in this book, and I have
12    simply had numerical tabs placed
13    on the first page of each separate
14    exhibit, so that if somebody wants
15    me to find an exhibit, I can look
16    to the tab rather than pawing
17    through hundreds of pages of
18    documents to see where the
19    exhibit, in fact, can be found.
20  BY MR. BROWN:
21    **Q.   All right.  Mr. Lockwood,**
22  **can you take a look at Exhibit 6?**
23          MR. BROWN:  And we will have
24    that marked as ACC-4.

Page 26

1           (ACC 30(b)(6)-4 marked for
2      identification at this time.)
3           THE WITNESS:  I have it.
4    BY MR. BROWN:
5      Q.    Okay.  And why don't you
6    identify that document?
7      A.    That is Exhibit 6 to Exhibit
8    Book captioned Asbestos Insurance
9    Transfer Agreement.
10     Q.    Okay.  And it has certain
11   attachments to it, correct?
12     A.    It does.
13     Q.    Okay.  Can you look at
14   Schedule 1?
15     A.    I am looking at it.
16     Q.    Okay.  Am I correct that all
17   of the policies that are listed on
18   Schedule 1 fit within the definition of
19   asbestos insurance policies under the
20   Plan?
21     A.    I will need to look at this
22   a little bit here.
23          As I understand it, and I am
24   going to read from this document, "All

Page 27

1    insurance policies that the Insurance
2    Contributors have reason to believe
3    potentially or actually provide insurance
4    coverage for Asbestos Pi Claims are
5    listed and described accurately on the
6    attached Schedule 1."  That, to my
7    knowledge, is what Schedule 1 is.
8      Q.    All right.  Now, what I
9    would like you to do is to look at
10   Exhibit 1, which is the Joint Plan
11   itself, and specifically page 5,
12   definition 13.
13          MR. BROWN:  And we will mark
14      that as ACC-5.
15          (ACC 30(b)(6)-5 marked for
16      identification at this time.)
17          MR. FINCH:  What page do you
18      want him to go to?
19          MR. BROWN:  Page 5,
20      definition 13.
21          THE WITNESS:  Looking at it.
22   BY MR. BROWN:
23     Q.    Asbestos Insurance Rights?
24     A.    That is correct.

Page 28

1      Q.    My question is, well, you
2    will see the asbestos insurance rights
3    starts off, "shall mean any and all
4    rights, titles, privileges," and so
5    forth.
6           Do you see that language?
7      A.    I do.
8      Q.    And that's with respect to
9    asbestos insurance policies?
10     A.    Well, among other things,
11   yes.
12     Q.    And those are all being
13   transferred to the Asbestos PI Trust,
14   correct?
15          MR. FINCH:  Object to form.
16          THE WITNESS:  The reason I
17   am hesitating is I am not sure I
18   can recall whether or not the
19   general -- to answer the question,
20   I have to look to see what the
21   Plan says about the transfer and
22   whether or not the Plan statement
23   about what's being transferred.
24   This is simply the definition.

Page 29

1           There are other provisions
2    that describe what is transferred
3    to the Trust.  I would have to
4    look to the Plan to see what the
5    definition of the assets being
6    transferred is and then look at
7    the Insurance Transfer Agreement,
8    which was Exhibit-4, ACC
9    Exhibit-4, and see whether those
10   two are coextensive.  I think they
11   are, but that's what I would have
12   to do to make sure.
13   BY MR. BROWN:
14     Q.    Well, if you look at page 2
15   of the Transfer Agreement, the very first
16   sentence is, "Effective upon the
17   Effective Date, the Insurance
18   Contributors hereby irrevocably transfer,
19   convey, and grant to the Asbestos PI
20   Trust all of their Asbestos Insurance
21   Rights."
22     A.    Okay.
23     Q.    Now, bearing in mind that
24   language and turning back to the

Page 30

1   definition of asbestos insurance rights,
2   which does have some restrictions at the
3   end of it, after the provided that
4   language on page 6 --
5        A.   Yes, I see it.
6        Q.   Other than what's excluded
7   from asbestos insurance rights in that
8   language in the definition, are all of
9   the Debtors' interests in the policies
10  that are on Schedule 1 of the asbestos
11  Insurance Transfer Agreement being
12  transferred to the Asbestos PI Trust, or
13  are some others being retained by the
14  Debtors?
15       A.   All I can say is that what
16  is being transferred is all of the
17  asbestos insurance rights as defined in
18  the Plan.  And if there are, in fact,
19  some other rights that are not asbestos
20  insurance rights, then the Plan does not
21  appear to transfer those.
22       Q.   Okay.  And the workers'
23  compensation coverage is one of those
24  items?

Page 31

1        A.   That's my recollection, that
2   is workers' comp rights are not
3   transferred.
4        Q.   Okay.  Are you aware of
5   anything else that is not transferred?
6        A.   Not as I sit here right now.
7   I do not recall having any knowledge of
8   anything that specifically carved out of
9   the policies, but, again, I mean, the
10  definitions say what they say.
11       Q.   Okay.  Can you go back to
12  the --
13       A.   I mean, if you have some
14  specific item in mind that you want to
15  ask me about whether it is or it isn't
16  transferred, I will try and answer that.
17  But asked globally the way you are doing
18  it, I don't have any recollection of
19  anything.
20       Q.   Okay.  Can you turn back to
21  ACC-3, please.
22       MR. FINCH:  What's that, the
23  Term Sheet?
24       MR. BROWN:  Yes.

Page 32

1        THE WITNESS:  That's the 8-K
2   with the Term Sheet in it, I
3   believe.
4        MR. BROWN:  Yes.
5        THE WITNESS:  I have it.
6   BY MR. BROWN:
7        Q.   On page 10, Roman 4, if you
8   will just take a look at that for a
9   moment?
10       A.   The provision captioned
11  Binding Effect?
12       Q.   Correct.
13       A.   I have read it.
14       Q.   Okay.  Does the ACC
15  understand the Term Sheet to be binding
16  on the parties to it?
17       MS. HARDING:  Object under
18  408 and instruct the witness not
19  to answer if it reveals settlement
20  negotiations.
21       THE WITNESS:  The ACC --
22       MR. BROWN:  Wait.
23       MR. JACOB COHN:  Does that
24  create an evidentiary privilege in

Page 33

1   discovery as opposed to
2   admissibility in trial?
3        MS. HARDING:  I have made my
4   objection for the record.
5        MR. JACOB COHN:  Jacob Cohn,
6   Federal Insurance Company.
7   BY MR. BROWN:
8        Q.   I don't know that the Debtor
9   should be instructing a Rule 30 --
10       A.   The Debtor hasn't instructed
11  the witness not to do anything as far as
12  I am aware.
13       MR. JACOB COHN:  I heard her
14  try.
15       MS. HARDING:  Suggest.
16       THE WITNESS:  Would you read
17  back the question, please?
18       (The reporter read from the
19  record as requested.)
20       THE WITNESS:  The ACC
21  understands that the Plan, when
22  the Plan is confirmed, will be
23  binding on it and everybody else
24  that is bound by a confirmed Plan.

Page 34

1    The ACC does not consider the Term
2    Sheet to have any binding effect
3    at this particular time in the
4    bankruptcy process.
5    BY MR. BROWN:
6        **Q.    Did the Term Sheet have a**
7    **binding effect prior to the filing of a**
8    **Plan?**
9            MR. FINCH:  Objection to the
10    extent that it calls for either a
11    legal conclusion or privileged
12    information.
13        You can answer, if you can.
14        THE WITNESS:  Well, it calls
15    for the former, and I am not going
16    to refuse to answer.
17        If you want my opinion, it's
18    a question of contract law.  I
19    personally doubt very much that as
20    a matter of contract law or
21    bankruptcy law, the Term Sheet was
22    binding, because, number one, as
23    under contract law, it wouldn't,
24    as I said earlier, have contained

Page 35

1    all the material terms and
2    conditions.  And so it would be
3    very difficult under doctrines
4    having to do with completeness of
5    contracts to be enforceable for it
6    to have been binding.
7        And, secondly, it wasn't a
8    Plan, and it wasn't a settlement
9    agreement that was separate from
10    the Plan.  It recites by its terms
11    that "The parties shall use their
12    best efforts to incorporate the
13    terms in this Term Sheet into a
14    mutually agreeable Plan of
15    Reorganization to be filed with
16    the Bankruptcy Court as soon as
17    possible."
18        And, therefore, almost by
19    definition, it recognizes that as
20    a stand-alone document in a
21    bankruptcy context, it's not
22    binding on anybody, in my opinion.
23    But that's just my opinion.
24    BY MR. BROWN:

Page 36

1        **Q.    Okay.  Put that aside.**
2    **Just note the date.  It's**
3    **April 6, 2008.  So the next series of**
4    **questions I have pertains to the period**
5    **prior to that.**
6        A.  Okay.
7        **Q.    Were any asbestos insurance**
8    **entities involved in the negotiation of**
9    **the Term Sheet?**
10        MS. HARDING:  Object --
11        THE WITNESS:  Not that I
12    recall.
13        MS. HARDING:  Object under
14    408.
15    BY MR. BROWN:
16        **Q.    Were any asbestos insurance**
17    **entities invited to participate in the**
18    **negotiations of the Term Sheet?**
19        MS. HARDING:  Same
20    objection.
21        THE WITNESS:  Well, to the
22    extent that the Term Sheet
23    negotiations involve people
24    sitting down together and/or being

Page 37

1    on telephone calls together to
2    discuss it and agree on it, to my
3    knowledge, I don't recall any.
4        Whether or not the Debtors,
5    for example, had communications
6    unknown to the ACC with their
7    insurers on the subject matter
8    that ultimately was reflected in
9    the Term Sheet, I don't know.
10    BY MR. BROWN:
11        **Q.    Okay.  Well, for purposes of**
12    **this question, I am asking for the ACC's**
13    **knowledge.**
14        A.  I understand.  But I want to
15    make it clear what the limitations of the
16    ACC's knowledge is.
17        **Q.    I understand.**
18    **To the ACC's knowledge, were**
19    **any asbestos insurance entities consulted**
20    **regarding any provision in the Term**
21    **Sheet?**
22        MS. HARDING:  Same
23    objection.
24        THE WITNESS:  To the ACC's

Page 38

1    knowledge, they are unaware of any
2    such consultations.
3    BY MR. BROWN:
4        Q.   Did any asbestos insurance
5    entity consent to the assignment of the
6    policy or proceeds thereof prior to the
7    execution of the Term Sheet?
8        A.   Not to the knowledge of the
9    ACC as an entity or me, in particular.
10   My make statements about the ACC's
11   knowledge, I am speaking obviously of
12   both its and my knowledge at the same
13   time.
14       Q.   Did any asbestos insurance
15   entity agree to any term in this Term
16   Sheet before the parties in the Term
17   Sheet executed it?
18       A.   I have no idea.
19       Q.   Do you have any knowledge of
20   any such --
21       A.   I have no knowledge that
22   they did and I have no knowledge that
23   they didn't.
24       Q.   Okay.  The initial Joint

Page 39

1    Plan was filed on September 19th, 2008,
2    correct?
3        A.   I don't, as I sit here,
4    right now, unrefreshed by looking at the
5    document, recall that that's the specific
6    date, but A, it sounds about right, and
7    B, I will take your word for it, if you
8    are representing that that's the date.
9        Q.   Okay.  And along with the
10   filing of the initial Plan, there was
11   also a filing of the Asbestos PI Trust
12   Agreement and the Asbestos PI TDP,
13   correct?
14       A.   I don't recall actually
15   whether those documents were filed at
16   exactly the same time the Plan was filed
17   or whether they were filed on some later
18   day.
19       They were certainly filed at
20   some approximation of the same time, but
21   it could have been a month later or
22   something like that.  Again, what was
23   filed with the court is a matter of
24   record, so...

Page 40

1        Q.   Okay.  Between April 6, 2008
2    and September of 2008, is it fair to say
3    that the Plan documents were being
4    drafted?
5        MS. HARDING:  Object under
6    408.
7        THE WITNESS:  Of course.
8    BY MR. BROWN:
9        Q.   And who were the parties
10   that were involved in the negotiation of
11   Plan documents?
12       MS. HARDING:  Object under
13   408.
14       MR. FINCH:  Are you talking
15   about entities or people?
16       THE WITNESS:  A lot.
17       MR. BROWN:  Let's start with
18   entities.
19       MR. FINCH:  That, you can
20   answer.
21       THE WITNESS:  Entities,
22   representatives of the Debtors,
23   the Equity Committee, the Future
24   Claimants' Representative and the

Page 41

1    ACC, and I can't remember whether
2    there was any involvement by
3    representatives of the Unsecured
4    Creditors' Committee or not.  I
5    just don't remember at this point.
6    BY MR. BROWN:
7        Q.   How about any of the Sealed
8    Air indemnified parties?
9        MS. HARDING:  Object under
10   408.
11       THE WITNESS:  At some point,
12   representative of the Sealed Air
13   indemnified parties were involved
14   in reviewing drafts and commenting
15   on drafts, et cetera.  I think
16   they were involved before we filed
17   the first Plan, but I am not -- I
18   mean, I know they were -- right
19   now, we are looking at the Amended
20   Plan filed in February 27, 2009.
21   I am quite confident that they
22   were involved in discussing --
23   reviewing and discussing this
24   Plan.

Page 42

1     I just don't remember for
2   sure whether they were involved in
3   the first Plan or whether they got
4   involved between the first Plan
5   and this Plan. I think they were
6   involved in the first Plan.
7   BY MR. BROWN:
8     Q.  Okay. Would your answer be
9   the same for the Fresenius indemnified
10  parties?
11    MS. HARDING: Object under
12  408. I think we should take a
13  break. I would like to consult
14  with counsel.
15    MR. BROWN: Okay.
16    THE WITNESS: Does that
17  include me or do you want to just
18  talk to him?
19    MS. HARDING: I will talk to
20  Nate.
21    (There was a break from
22  10:15 a.m. to 10:17 a.m.)
23    MR. FINCH: Can we read back
24  the pending question?

Page 43

1     (The reporter read from the
2   record as requested.)
3     MR. FINCH: You can answer
4   that question.
5     THE WITNESS: In general,
6   yes, although their involvement
7   was less.
8   BY MR. BROWN:
9     Q.  Okay. What was the
10  involvement of Sealed Air and Fresenius
11  in the drafting of the Plan documents?
12    MR. FINCH: Objection,
13  instruct the witness not to
14  answer.
15    MS. HARDING: Objection.
16    MR. JACOB COHN: Basis,
17  please.
18    MR. FINCH: Basis is Judge
19  Fitzgerald's ruling that Plan
20  negotiations and the draft Plan
21  Agreement are not relevant to the
22  confirmability of the Plan.
23    MS. HARDING: Same
24  objection.

Page 44

1   BY MR. BROWN:
2     Q.  Let me, Mr. Lockwood, refer
3   you back to ACC-2, which was the
4   objection, and direct your attention
5   specifically to paragraph 3.
6     A.  I see it.
7     MR. BROWN: Okay. This is
8   more directed to Nate than anyone
9   else. There are, as you might
10  guess, a whole host of questions
11  that lots of people in this room,
12  including myself, would want to
13  ask concerning the negotiations of
14  the Plan and the Plan documents as
15  well as questions about prior
16  drafts that weren't filed.
17    Is it safe to say that you
18  will object to those questions and
19  instruct the witness not to
20  answer?
21    MR. FINCH: That is correct.
22    MR. BROWN: Okay. Then with
23  the caveat that we won't ask them
24  simply because we are not here to

Page 45

1   waste everyone's time, I am going
2   to move forward and not ask
3   questions about the negotiations.
4     Can we have an agreement on
5   that ground?
6     MR. FINCH: Sure. We can
7   have an agreement on that point.
8     MR. BROWN: And in the event
9   that that is ever reversed or your
10  position is not upheld by the
11  court, we would have an
12  opportunity to come back and ask
13  questions about the drafting as
14  well as the negotiations.
15    MR. FINCH: If Judge
16  Fitzgerald reverses herself on
17  what she has ruled in various
18  other cases, you would have that
19  opportunity.
20    MR. BROWN: Or some higher
21  court.
22    MR. FINCH: Or some higher
23  court.
24    MR. BROWN: Fair enough.

Page 46

1     MR. JACOB COHN:  I want to
2 be perfectly clear here that you
3 are not relying upon not a ruling
4 that you don't need to answer
5 questions at these depositions on
6 this subject, but your position is
7 that this is a relevance objection
8 and you are instructing not to
9 answer on the basis of relevance.
10     MR. FINCH:  That's right.
11     MR. JACOB COHN:  And you are
12 aware of the local Delaware rules
13 on this subject?
14     MR. FINCH:  Yes, I am.
15     MR. JACOB COHN:  I am.
16     MR. BROWN:  Thanks, Jacob.
17     MR. SPEIGHTS:  Excuse me.
18 This is Dan Speights, representing
19 Anderson Memorial Hospital.
20     Mr. Finch, would you advise
21 us of what rulings you are
22 referring to?
23     MR. FINCH:  Sure.  If you
24 look at the ACC's objections to

Page 47

1 the 30(b)(6) notice, Dan --
2     MR. SPEIGHTS:  If it's
3 contained in there, just refer to.
4 I want to make sure if we want to
5 file a motion, we have the basis
6 of your objection.
7     MR. FINCH:  Yes.  The basis
8 of the objection is set forth on
9 page 2, paragraph number 3, and
10 ACC deposition Exhibit-2 to this
11 deposition.
12     MR. SPEIGHTS:  Thank you,
13 Mr. Finch.
14 BY MR. BROWN:
15     Q.   Okay.  Mr. Lockwood, in the
16 period between the Term Sheet and the
17 filing of the initial Plan in September,
18 was any asbestos insurance entity invited
19 to participate in the negotiation of the
20 Plan documents or the drafting of the
21 Plan documents?
22     MS. HARDING:  Same
23 objection.
24     THE WITNESS:  I have no

Page 48

1 knowledge whether they were or
2 were not.
3 BY MR. BROWN:
4     Q.   To your knowledge, did any
5 asbestos insurance entity actually
6 participate?
7     MS. HARDING:  Same
8 objection.
9     THE WITNESS:  I have no
10 knowledge that they did.
11 BY MR. BROWN:
12     Q.   Was any asbestos insurance
13 entity consulted concerning any term or
14 provision in the Joint Plan or any Plan
15 documents?
16     MS. HARDING:  Same
17 objection.
18     THE WITNESS:  In the same
19 period?
20     MR. BROWN:  Correct.
21 BY MR. BROWN:
22     Q.   From April 2008 to
23 September, when the initial Plan was
24 filed in September of 2008.

Page 49

1     A.   I have no knowledge that
2 anyone was.
3     Q.   Were any asbestos insurance
4 entities consulted regarding the
5 assignment or transfer of their policies
6 or proceeds under their policies to the
7 Asbestos PI Trust in that time period?
8     MS. HARDING:  Same
9 objection.
10     THE WITNESS:  I have no
11 knowledge that they were or were
12 not.
13 BY MR. BROWN:
14     Q.   Did any consent?
15     A.   I have no knowledge --
16     MS. HARDING:  Same
17 objection.
18     THE WITNESS:  -- that anyone
19 did, in fact, consent.
20 BY MR. BROWN:
21     Q.   Okay.  Now, I want to focus
22 your attention now on the period after
23 the initial Plan was filed.
24     In that period, after the

Page 50

1   initial Plan and Plan documents were
2   filed, did GEICO consent to the Joint
3   Plan or any Plan document or any
4   provision in the Plan or Plan documents?
5       A.   Not to my knowledge.
6       Q.   Okay.  Would your answer be
7   the same for Republic Insurance Company?
8       A.   Yes.
9       Q.   And OneBeacon American
10  Insurance Company?
11      A.   Yes.
12      Q.   And Seaton Insurance
13  Company?
14      A.   Yes.
15      Q.   How about any other asbestos
16  insurance entity?  Would your answer be
17  the same?
18      A.   No, I don't think it would,
19  actually.  I believe -- and I would have
20  to sort of try and reconstruct and
21  recollect the timing, but I believe there
22  was a settlement agreement entered into
23  with Equitas during some time period.  It
24  actually might have predated.  It might

Page 51

1   have predated the Plan.
2          But, in any event, the
3   settlement agreement with Equitas to my
4   recollection involved its agreeing to
5   either this Plan or a 524(g) Plan that
6   this Plan would qualify as.
7          And I believe that there was
8   also a settlement agreement with the
9   KWELM Companies that either by its terms
10  or implicitly represented the KWELM
11  Companies' consent to this Plan, to the
12  first Plan.  Those are the only two that
13  come to mind.
14      Q.   Why don't we turn to the
15  first Amended Joint Plan, which is
16  Exhibit-1 in your book.
17      A.   Okay.  I have it.
18          MR. FINCH:  Exhibit-5 to the
19  deposition.
20          THE WITNESS:  It's ACC
21  Exhibit-5.
22  BY MR. BROWN:
23      Q.   All right.  Could you turn
24  to the first page?

Page 52

1       A.   The cover page?
2       Q.   No, no.  The first --
3       A.   Numbered page.
4       Q.   -- well, it's actually not
5   numbered, but it's 1.  It should be 1.
6       A.   Okay.  I have it.
7       Q.   All right.  Midway down the
8   page, it says, "This Plan constitutes a
9   settlement of all Claims in the Demands
10  against the Debtors on, and subject to,
11  the terms described herein and the other
12  Plan Documents."
13          Are the Debtors settling the
14  asbestos PI claims against them through
15  this Plan?
16      A.   I think --
17          MS. HARDING:  Object to
18  form.
19          THE WITNESS:  I think it
20  would be a fair characterization
21  that the Plan embodies a
22  compromise between the class of
23  claimants consisting of the
24  asbestos PI claimants and others.

Page 53

1   And if the Plan were confirmed
2   that that compromise could be
3   called a settlement between the
4   Debtors and those entities, under
5   which there would be a Trust
6   created and the claims would be
7   brought to the Trust, not against
8   the Debtors, I think that would be
9   a fair characterization, yes.
10  BY MR. BROWN:
11      Q.   Is it a settlement of the
12  demands that have not yet even been
13  asserted against the Debtors?
14          MS. HARDING:  Object to
15  form.
16          MR. FINCH:  Object to form.
17          THE WITNESS:  That calls for
18  a legal conclusion at an almost
19  metaphysical level, frankly.
20          I guess you could conceive
21  of it as that or you could just
22  say that the Plan itself is what
23  it is.  I mean, it has the effect
24  under 524(g) of the bankruptcy

Page 54

1   code on the holders of future
2   demands that the bankruptcy code
3   prescribes.
4        It's hard to come to an
5   answer because settlement sort of
6   implies -- I mean, to the extent
7   that the Future Claimants
8   Representative is regarded as the
9   equivalent of a guardian ad litem
10  for the Future Claimants, which is
11  one way of looking at it, you
12  could characterize it as a
13  settlement.
14       But, again, the Future
15  Claimants Representative exists,
16  only in a legal capacity of
17  somebody appointed by the
18  bankruptcy court for that purpose,
19  has no independent ability to
20  settle things.  So, as I said
21  before, I mean, I am not sure the
22  question, A, could be answered
23  and, B, is meaningful.
24  BY MR. BROWN:

Page 55

1        Q.   To the extent it is a
2   settlement, is it binding on the asbestos
3   insurance entities in the view of the
4   ACC?
5            MS. HARDING:  Object to the
6   form.  Calls for a legal
7   conclusion.
8            THE WITNESS:  That question
9   is unanswerable as phrased
10  because, I mean, binding for what
11  purpose?
12  BY MR. BROWN:
13       Q.   For purposes of insurance
14  coverage.
15           MS. HARDING:  Same
16  objection.
17           THE WITNESS:  The extent of
18  which, A, it's a settlement within
19  the meaning of, for example,
20  insurance comprehensive general
21  liability insurance policies that
22  talk about settlements, B, it
23  could be made without the consent
24  of insurance companies, under the

Page 56

1   Plan that's an issue that will
2   only get resolved by some other
3   court in the event there is a
4   dispute between the Trust and any
5   asbestos insurance company over
6   whether it is a, quote, settlement
7   that's binding on them.
8        That is not something that
9   the Plan or the Confirmation Order
10  under the insurance neutrality
11  provisions of this Plan purports
12  to resolve.
13  BY MR. BROWN:
14       Q.   Is it intended to be
15  binding?
16           MS. HARDING:  Object to
17  form.
18           THE WITNESS:  Intended by
19  whom?
20  BY MR. BROWN:
21       Q.   By the ACC?
22           MR. FINCH:  Object to the
23  question to the extent it calls
24  for privileged or work product

Page 57

1   analysis.  To the extent the ACC
2   has a position on that, that it's
3   not privileged and work product,
4   you can answer.
5            THE WITNESS:  I guess the
6   best answer I could give you on
7   that from the ACC's perspective is
8   that -- well, let me back up a
9   little bit.  When you say "is it
10  intended," you are describing the
11  settlement.  The settlement is a
12  125-page Plan with multiple
13  exhibits.
14       In light of the insurance
15  neutrality provisions, there are
16  clearly aspects that are not
17  binding on the insurers, but the
18  question of whether -- I guess the
19  best way I could put it is the ACC
20  would hope that in the event that
21  post-consummation, the Trust
22  sought coverage from any
23  particular set of insurers, whose
24  asbestos insurance rights were

Page 58

1 assigned to the Trust, that the
2 Trust would be able to obtain such
3 coverage, either by agreement with
4 the asbestos insurance companies
5 or through coverage litigation in
6 some coverage court, which
7 coverage litigation might entail a
8 decision by a judge that in some
9 manner or another what the Trust
10 was doing pursuant to the Plan in
11 terms of resolving individual
12 asbestos claims was, in fact,
13 binding on the insurers. That's
14 about the best I can do.
15 BY MR. BROWN:
16     Q.   Okay.  To the extent it
17 constitutes a settlement of asbestos PI
18 claims, is it superseded by Section 7.15
19 entitled Insurance Neutrality?
20     A.   That question is almost
21 incomprehensible to me, because Section
22 7.15 is sort of a form selection
23 provision.  Essentially, in my view of
24 it, what it does is it says to the extent

Page 59

1 that there are disagreements about the
2 Trust's rights under transferred
3 insurance assets, those disputes are
4 going to get resolved by the parties, the
5 insurers, and the Trust at a later date
6 in front of a later court.
7         And so some later court
8 would determine whether it was a
9 settlement or not.  The 7.15 itself
10 doesn't purport to say whether it is or
11 isn't a settlement.  It says essentially
12 that some other court, if necessary, will
13 have to decide that issue because the
14 insurers don't want to have coverage
15 litigation in this bankruptcy case.
16     Q.   All right.  But the sentence
17 that we are referring to on page 1 says,
18 "The Plan constitutes a settlement of all
19 Claims and Demands against the Debtors
20 on, and subject to, the terms described
21 herein and the other the Plan Documents."
22     A.   That is --
23     Q.   My question is, is that
24 language superseded by the insurance

Page 60

1 neutrality language that appears in 7.15?
2         MS. HARDING:  Objection.
3         MR. FINCH:  Objection, asked
4 and answered.
5         THE WITNESS:  I cannot give
6 you any better answer to that than
7 the one I gave you already.
8         You are asking me whether a
9 descriptive sentence in a Plan
10 supersedes a form selection clause
11 in some other part of the Plan,
12 and, to me, that's just -- I don't
13 even understand how one could
14 supersede the other in the first
15 place.  I mean, if you can explain
16 to me why you think it supersedes
17 it, maybe I could have a more
18 specific answer.
19 BY MR. BROWN:
20     Q.   Well, why don't you look at
21 7.15 A on page 87 of the Plan.
22     A.   Okay.
23     Q.   As I read that sentence,
24 other than what appears in the other

Page 61

1 portions of 7.15, nothing in the Plan,
2 the Plan documents, the Confirmation
3 Order, is to operate or shall operate --
4 "shall in any way operate to, or have the
5 effect of, impairing any Asbestos
6 Insurance Entity's legal, equitable or
7 contractual rights, if any, in any
8 respect."
9     A.   Yeah?
10         MS. HARDING:  Object to
11 form.  Is there a question?
12         MR. BROWN:  I am reading the
13 language first.  Can I finish?
14         MS. HARDING:  I am sorry.  I
15 thought you were asking a
16 question.  I didn't hear it.
17 BY MR. BROWN:
18     Q.   To the extent that the Plan
19 or the Confirmation Order constitutes a
20 settlement of asbestos PI claims against
21 the Debtors, is that going to then be
22 binding upon the insurers in coverage
23 litigation?
24         MS. HARDING:  Object to

Page 62

1  form.  It calls for a legal
2  conclusion.
3      THE WITNESS:  If a coverage
4  court decides that it's a
5  settlement and that it's a
6  settlement that's reasonable and
7  that it doesn't have to be
8  consented to by insurers, then the
9  coverage court will have decided
10 that the settlement isn't
11 impairing the insurers' rights
12 under their policies.
13      That's what I mean by it's
14 up to the coverage court.  Your
15 question assumes that for it to be
16 a settlement, it would have to
17 impair the insurers' rights.  My
18 limited understanding of insurance
19 law is that that may be true or it
20 may not be true.  But what this
21 says is that the Plan and the
22 Confirmation Order aren't
23 purporting to resolve that issue.
24      Your rights are what they

Page 63

1  are; you will be able to present
2  them to a coverage court.  And the
3  coverage court, if it agrees with
4  you, will say, first, the Plan
5  doesn't control the outcome of
6  this decision because that's what
7  7.15(a) says, and, secondly, you
8  are correct in asserting that this
9  is an unconsented-to settlement or
10 it's not a settlement or whatever
11 defense you have applies.  And it
12 will say you win, you don't have
13 any coverage obligations for this
14 claim or these claims or whatever.
15 That's my understanding of how
16 this is supposed to work.
17 BY MR. BROWN:
18     Q.   Okay.  I am going to go
19 through the Plan and various items.  We
20 are going to jump around a little bit.
21 So why don't we first turn to page 5.
22     A.   I have it.
23     Q.   And the definition -- we
24 looked at this earlier -- 13,

Page 64

1  specifically (a) under 13.
2      A.   I see it.
3      Q.   Is that language intended to
4  include any property damage-related
5  causes of action?
6      A.   It depends on what you mean
7  by included.  What it basically means is
8  that, as I understand it, that the Trust
9  gets the rights; nobody else gets the
10 rights.  The Trust can then seek coverage
11 from the insurers.
12      Since the Trust has no
13 asbestos property damage claims to assert
14 against the insurers, it will not be
15 asserting asbestos property claims
16 against the insurers.  But the effect of
17 the transfer would mean that, for
18 example, Grace or a property damage
19 claimant could not assert property damage
20 claims under that insurance coverage
21 because those rights have been assigned
22 to the Trust and they are, therefore, no
23 longer available to be invoked or
24 utilized by anybody else.

Page 65

1      Q.   Okay.  Let's turn to page 6,
2  Asbestos Insurance Coverage Defenses, 6
3  and 7.
4      A.   Definition 16.
5      Q.   Correct.
6      A.   I see it.
7      Q.   Did you have a chance to
8  read it?
9      A.   Yes.
10     Q.   And there are two exceptions
11 that are listed there to asbestos
12 insurance coverage defenses?
13     A.   Correct.
14     Q.   And the first one says,
15 "...the Plan or any of the Plan documents
16 do not comply with the Bankruptcy
17 Code..."
18      So, as I understand that, if
19 in a subsequent coverage action, an
20 insurer sought to argue that the Plan or
21 Plan documents don't comply with the
22 bankruptcy code, they would be precluded
23 from doing so by virtue of the
24 confirmation of the Plan; is that

Page 66

1    correct?
2        A.    Correct.
3        Q.    And the second one has to
4    deal with the assignment of policy
5    rights, correct?
6        A.    Correct.
7        Q.    And asbestos insurance
8    entities would be prohibited from
9    litigating that issue?
10       A.    If the bankruptcy court
11   decided that those consent rights were
12   effectively preempted by the bankruptcy
13   code. If it decided the other way, then
14   they wouldn't be precluded from doing so.
15       Q.    Okay. If you go before the
16   two exceptions, it describes "Asbestos
17   Insurer Coverage Defenses include any
18   defense based on the terms of the Plan or
19   the Plan documents or the manner in which
20   the Plan or Plan documents were
21   negotiated..."
22            What if an asbestos
23   insurance entity wanted to argue in
24   subsequent coverage litigation that the

Page 67

1    resolution of asbestos PI claims was the
2    product of some sort of collusion between
3    the Plan proponents? Could that be
4    argued by the asbestos insurance
5    companies in the subsequent coverage
6    litigation?
7            MS. HARDING:  Object to
8    form.
9            MR. FINCH:  Objection to
10   form.
11           THE WITNESS:  First, it's
12   hypothetical. Second, it's a
13   question sort of to some extent of
14   insurance law.
15           But subject to that, and the
16   fact that I don't profess to be an
17   expert on this subject, it is my
18   understanding that an asbestos
19   insurer could argue any state law
20   coverage defense that it had,
21   including collusion.
22           It is also my understanding
23   that the Trust in this
24   hypothetical scenario in which

Page 68

1    this dispute is arising could
2    argue that it's not collusion
3    because of the insolvency clauses
4    in the CGL policies and that,
5    therefore, almost by definition, a
6    bankruptcy case doesn't involve
7    collusion.
8            They couldn't argue that the
9    bankruptcy court had decided that
10   it wasn't collusion, because the
11   insurance neutrality provision
12   would preclude that argument. But
13   it could certainly argue to the
14   coverage court that the type of
15   agreement that is entered into
16   here, as a result, as I said, of
17   state law -- of the facts and the
18   state law didn't amount to
19   collusion. But as such, the
20   collusion defense is not, in my
21   opinion, precluded by this
22   language.
23   BY MR. BROWN:
24       Q.    Okay.

Page 69

1        A.    Again, that's my legal
2    opinion. You got it, for whatever it's
3    worth.
4        Q.    Let's back up then. Is it
5    intended to prevent such an argument --
6    let's back up.
7        A.    Intended by who?
8        Q.    For purposes of these
9    questions -- and I will try to fix my
10   questions -- the ACC, because that's you
11   are here to speak for.
12           MR. FINCH:  Object to form.
13   It assumes there is an intent.
14   Object to form.
15           MS. HARDING:  Object to
16   form, too.
17           THE WITNESS:  The intent of
18   the ACC in this language, frankly,
19   is to satisfy what we perceive to
20   be the requirements of the Third
21   Circuit decision in combustion
22   engineering for rendering a Plan
23   sufficiently, quote, neutral,
24   close quote, as to its impact on

Page 82

1  up some kind of derivative successor
2  liability, veil piercing, alterego,
3  whatever kind of claims, and the notion
4  was that Grace's economic enterprise,
5  which included the Non-Debtor affiliates,
6  were going to be freed of asbestos
7  liability.
8        So if there aren't any
9  claims asserted against them, then
10  nothing ever gets enjoined.  The
11  injunction only kicks in the event
12  that a claim actually attempts to assert
13  derivative liability of Grace against one
14  of these entities.
15     Q.   Do you know if any of them
16  have asbestos liabilities for their own
17  products or actions?
18     A.   I am not aware of any such
19  allegations or claims by anybody.  I have
20  never seen them or heard of them.
21     Q.   Okay.  Can you turn to page
22  33 of the Joint Plan, definition 178.
23     A.   I see it.
24     Q.   Definition 178 makes

Page 83

1  reference to Exhibit-19 to the Plan.
2        Do you see that?
3     A.   Yes.
4     Q.   And that's entitled Retained
5  Causes of Action Schedule.  And actually
6  I think we will get that marked.
7        MR. FINCH:  Are you going to
8  mark Exhibit-19 to the Plan?
9        MR. BROWN:  Yes.
10        THE WITNESS:  This was
11  supposed to be Exhibit-19.  This
12  is Exhibit-5 to the Plan.
13        MR. BOERGER:  Sorry.  Here
14  you go.
15         (ACC 30(b)(6)-6 marked for
16  identification at this time.)
17  BY MR. BROWN:
18     Q.   If you thumb through there,
19  Mr. Lockwood, you would get to page 10
20  where it says Retained Causes of Action
21  (Insurance Claims)?
22     A.   Uh-huh.
23     Q.   And then it goes on for
24  several pages, listing multiple insurance

Page 84

1  companies?
2     A.   Yes.
3     Q.   Among the insurance
4  companies that are listed on this
5  document is American Employers, which for
6  now is OneBeacon; Employers Commercial
7  Union, which is also OneBeacon; GEICO;
8  Republic; and Unigard Security, which is
9  now Seaton.
10        Do you have any
11  understanding of what causes of action
12  the Debtor is retaining with respect to
13  those four insurance companies?
14     A.   No.  My only understanding
15  is that they don't include causes of
16  action relating to asbestos insurance
17  rights, which are referred to in the
18  exclusion at the end of 178.
19     Q.   Do you have an understanding
20  as to whether the Debtors will continue
21  to be insurers under any of the policies
22  issued by those companies or whether the
23  Asbestos PI Trust will become the
24  punitive insurer?

Page 85

1        MS. HARDING:  Object to
2  form.
3        MR. FINCH:  Object to form.
4        THE WITNESS:  When you say
5  those insurance policies, which
6  insurance policies are you talking
7  about?
8  BY MR. BROWN:
9     Q.   Whatever ones are included
10  within the Retained Causes of Action.
11        MR. FINCH:  Object to form.
12        THE WITNESS:  I believe that
13  if it's a retained cause of
14  action, by definition, the Trust
15  is not going to be the punitive
16  insured under whatever cause of
17  action.  Indeed, I am not sure
18  that the Trust -- there is sort of
19  a sematic issue when you talk
20  about the Trust becoming an
21  insured.
22        The Trust has whatever
23  rights under the insurance
24  transfer it gets.  Whether that

Page 86

1  would make it a, quote, insured,
2  close quote, for purposes of
3  insurance law, I have absolutely
4  no idea.  That's a terminological
5  issue.
6       But my understanding of this
7  is that whatever rights Grace is
8  retaining against the four
9  companies that you identified are
10 mutually exclusive of any rights
11 that the Asbestos PI Trust is
12 getting.
13      And so since I don't know
14 what policies Grace is retaining
15 rights to or what coverages, all I
16 can say is that whatever they are,
17 they are not rights that were
18 transferred to the Trust.  Grace
19 and the Trust aren't going to be
20 trying to make claims on the same
21 set of rights.
22 BY MR. BROWN:
23    Q.    But they may make claims on
24 the same set of policies?

Page 87

1    A.   I don't think so, because I
2  believe that the assignment of the
3  asbestos insurance rights relates to
4  policies that, as a general proposition,
5  Grace is not retaining any rights in.
6       So I would speculate that
7  you must be talking about other policies,
8  but since I have no idea what retained
9  rights Exhibit-19 or Retained Causes of
10 Action refer to, I really can't answer
11 the question.
12    Q.    Do you know whether anyone
13 has any idea what retained rights are --
14    A.   I would assume that the
15 Debtor knows what it thought it was
16 retaining, because that particular
17 exhibit was something that was prepared
18 by the Debtor.
19    Q.    Okay.  Is there any plan to
20 your knowledge to update this exhibit so
21 that it's a little more clear in terms of
22 what is being retained other than simply
23 putting the name of the entity and an
24 address?

Page 88

1       MS. HARDING:  Objection to
2  form.
3       MR. FINCH:  Objection.
4       THE WITNESS:  Prior to this
5  deposition, I am not aware of any
6  undertaking by anybody to do an
7  update of this.  Whether or not
8  the result of this deposition or
9  some other deposition, somebody
10 might possibly make such a
11 decision in the future, would be
12 rank speculation at this point.
13 BY MR. BROWN:
14    Q.    Would it be fair to say that
15 absent that, we are not really going to
16 know what's retained?
17      MR. FINCH:  Object the form.
18      MS. HARDING:  Object to
19 form.
20      THE WITNESS:  I told you
21 earlier, I would assume that
22 somebody at Grace knows what is
23 sought to be retained by this.  I
24 don't know who that person is, but

Page 89

1  somebody probably does.
2  BY MR. BROWN:
3    Q.    Okay.  If you turn to page
4  37 of the Joint Plan, definition 200.
5    A.   Ah, yes.  I see it.
6    Q.    Okay.  I have a few
7  questions on this one.
8       It says, "'Settled Asbestos
9  Insurance Company' shall mean any
10 Asbestos Insurance Entity that has
11 entered into an Asbestos Insurance
12 Settlement Agreement prior to the
13 conclusion of the Confirmation
14 Hearing..."
15      What's the basis for
16 limiting it to prior to the confirmation
17 hearing?
18      MR. FINCH:  Object.  To the
19 extent that calls for privileged
20 information or work product, you
21 are not allowed to answer.  To the
22 extent you can answer that without
23 divulging privileged
24 communications, you can do so.

Page 102

1  BY MR. BROWN:
2      Q.    So that if prior to the
3  issuance of the warrant, there is
4  additional stock issued, you are going to
5  adjust the strike price as well as the
6  number of warrants; is that right?
7      A.    You are going to make the
8  adjustments described in this section.  I
9  am not sure I want to summarize them the
10  way you just did, but this section spells
11  out in somewhat gory detail exactly the
12  type of antidilution provision that's
13  being offered for these warrants.
14      Q.    What if there is dilution
15  after the issuance of the warrant?  Is
16  there any mechanism to deal with that
17  situation?
18      MS. HARDING:  Object to
19  form.
20      THE WITNESS:  There is a
21  warrant agreement around here
22  somewhere -- I believe it's
23  probably an exhibit to this
24  Plan -- that specifies all of the

Page 103

1  rights of the warrant holder.
2      I cannot, sitting here, tell
3  you at the moment that I can
4  recall whether there is a -- it's
5  a one-year warrant, and I just
6  don't remember whether during the
7  one-year exercise period that
8  there is or there is not
9  anti-dilution provisions.
10  BY MR. BROWN:
11      Q.    Okay.
12      A.    But if there are, they will
13  be in the warrant agreement as well as
14  they might be referenced in this section
15  of the Plan.
16      Q.    Let's go to the heading 7.2
17  The Asbestos PI Trust.
18      A.    I see it.
19      Q.    Do you see the second full
20  paragraph beings "The purpose of the
21  Asbestos PI Trust"?
22      A.    I see it.
23      Q.    And it lists a few items
24  there.

Page 104

1      A.    Yes.
2      Q.    Does the asbestos PI Trust
3  assume the duties and obligations of the
4  Debtors under asbestos insurance
5  policies?
6      MR. FINCH:  Object to form,
7  overly broad.
8      MS. HARDING:  Object to
9  form.
10      THE WITNESS:  As I
11  understand it, the duties and the
12  obligations of the Debtors under
13  insurance policies are triggered
14  only by the submission of claims
15  by the Debtor or some other
16  insured under the policies.
17      Absent an effort by the
18  insured or successor to get
19  coverage for claims, there are no
20  independent remaining duties and
21  obligations.
22  BY MR. BROWN:
23      Q.    If I can stop you, by
24  successor in that sentence, you mean

Page 105

1  Asbestos PI Trust?
2      A.    PI Trust.
3      Q.    Fair enough.
4      A.    When the Trust is assigned
5  rights under the policies and the Debtors
6  are given the right to assert any and all
7  coverage defenses --
8      MR. FINCH:  You mean
9  insurers?
10      THE WITNESS:  I am sorry.
11  Let me start over again.
12      When the Trust is assigned
13  rights under the policies and the
14  insurers are retaining all of
15  their coverage defenses with the
16  two exceptions we discussed
17  earlier, if the Trust proposes to
18  demand in some way or another
19  coverage from one or more insurers
20  under those policies, then
21  whatever the insurer asserts as a
22  pre-condition to coverage, what
23  you would call an obligation or a
24  right, would have to be fulfilled

Page 106

1    to the extent that a coverage
2    court determines that there is a
3    pre-condition to coverage.
4          And since the Trust is the
5    one seeking the coverage, by
6    hypothesis, it's the only one that
7    has any incentive to make sure
8    that the rights or -- excuse me --
9    that the obligations, the
10   pre-conditions are satisfied as
11   required by a coverage court.
12         And so to that extent, yes,
13   the Trust, one way or another, to
14   the extent determined by a
15   coverage court or by negotiations
16   with insurers, will have to
17   perform what you have described as
18   the obligations and rights under
19   the assigned insurance coverage.
20   That's my understanding.
21   BY MR. BROWN:
22        Q.   Do the Debtors, the
23   Reorganized Debtors, retain any duties or
24   obligations under the asbestos insurance

Page 107

1    policies if this Plan is confirmed?
2         A.   There are provisions
3    involving cooperation in the Plan
4    documents which would allow the Trust to
5    require, to the extent those cooperation
6    provisions say so, the Debtors to help
7    satisfy or wholly satisfy whatever the
8    particular requirement might be that only
9    the Debtor could do.
10        So there is, I guess, the
11   answer is there is an indirect obligation
12   on the Debtor's part.  But the Debtor,
13   qua-Debtor, vis-a-vie, the insurer, since
14   the Debtor under the asbestos insurance
15   rights will not on its own be seeking
16   coverage, the Debtor sort of independent
17   of the Trust would not have any rights,
18   any obligations to the insureds except to
19   the extent, as I say, that the
20   cooperation with the Trust efforts to
21   access that insurance trigger such
22   cooperation obligations.
23        Q.   And the cooperation
24   obligations that you described in the

Page 108

1    beginning of your answer are set forth in
2    the cooperation agreement; is that what
3    you were referring to?
4         A.   They are set forth there.
5    There may be -- I don't remember whether
6    they are also set forth in other
7    documents, such as the Insurance Transfer
8    Agreement and/or the Plan itself.  But
9    they are set forth -- I think there may
10   be some set forth in the Insurance
11   Transfer Agreement.  I am not sure.  I
12   would have to look at them.
13        Q.   Okay.
14        A.   But I do remember that there
15   are cooperation arrangements.
16        Q.   If I understand your answer,
17   the cooperation obligation of the
18   Reorganized Debtors post-confirmation is
19   not the asbestos insurance companies but
20   rather to the Trust under the cooperation
21   agreement?
22        A.   That's correct.
23             MS. HARDING:  Object to
24   form.

Page 109

1         THE WITNESS:  But the
2    asbestos insurance companies,
3    through the retention of asbestos
4    coverage defenses, are the
5    indirect beneficiaries of that
6    provision.
7    BY MR. BROWN:
8         Q.   How so?
9         A.   Because if they don't -- if
10   the Trust can't get Grace to perform the
11   cooperation that the policies require,
12   the insurance companies won't have to
13   provide the coverage if the coverage
14   court says such cooperation is mandatory.
15        There is nothing in the Plan
16   that says that an insurance company -- if
17   policy obligations are not performed as
18   required by the policy by somebody,
19   nevertheless they have to pay on the
20   insurance.  The only entity or person
21   that could make such a determination
22   would be a coverage court judge and only
23   in the context of deciding that for
24   whatever reason the particular obligation

Page 110

1  sought to be enforced by the insurer was
2  not applicable or required.
3      Q.   Okay.  I want to ask you the
4  same series of questions with respect to
5  two other types of documents, and we can
6  try to short-circuit this or you can give
7  me the long answer.  I don't care.
8          Would your answers to the
9  questions concerning the assumption of
10 duties under the asbestos insurance
11 policies or the retention of those
12 duties, as you have just articulated, be
13 the same if my questions dealt with the
14 Asbestos Insurance Settlement Agreements?
15     A.   Well, sort of, except that
16 the Asbestos Insurance Settlement
17 Agreements, as far as I am aware, don't
18 have any obligations.  They fully
19 performed.  Well, strike that.  There are
20 two categories of asbestos insurance.
21     Q.   I want to get to the third
22 one as well.
23     A.   There is a pre-petition
24 where it's been fully performed, and

Page 111

1  there is post-petition one where we make
2  a settlement as the case is going on,
3  such as the Equitas agreement that I
4  mentioned before, and any others that
5  might get entered into.
6          With respect to the former,
7  the pre-petition settlement agreements,
8  it's my understanding, rightly or
9  wrongly, that both parties have
10 essentially fully performed those
11 agreements, both the Debtors and the
12 insurers, at least to the extent
13 described in Exhibit-5, which is where
14 those are identified and described.
15         The only remaining
16 obligation, quote/unquote, that I am
17 aware of under those agreements is a
18 potential indemnity obligation on the
19 part of Grace in the event that somebody
20 successfully or attempts to sue a settled
21 insurer.
22         The Plan channels to the
23 Trust any claims against those settled
24 insurers, and, therefore, there should

Page 112

1  never be any indemnity claim because the
2  claim gets cutoff from the insurer before
3  it reaches the point where the insurer
4  has paid money, which would trigger an
5  indemnity right.  That's quite a bit
6  different from the non-settled coverage
7  that I was discussing earlier.
8      Q.   But that obligation, to the
9  extent it exists, is being assumed by the
10 Asbestos PI Trust?
11     A.   That obligation -- if one
12 could hypothesize, on the one hand, a
13 524(g) order that created the Trust in
14 the first place and protected the insurer
15 at the same time, which is what this Plan
16 does, and simultaneously somebody being
17 able to violate the 524(g) injunction by
18 successfully suing a protected party
19 without blowing up the entire Plan and
20 blowing up the Trust in the process, then
21 in that almost unimaginable hypothetical
22 situation, the protected insurer would
23 have an indemnity claim against Grace,
24 which would be channelled to the Trust

Page 113

1  and either -- I forget whether it's
2  Section 5.12 or 5.13 of the TDP says that
3  the Trust has to honor that claim to the
4  extent that it's valid.
5      Q.   Okay.  I know some others in
6  the room have probably a question about
7  another type of agreement.
8          Asbestos Insurance
9  Reimbursement Agreements, are the
10 obligations of the Debtors under those
11 documents being assumed by the Trust?
12     A.   That cannot be answered yes
13 or no, because the Trust and its handling
14 of claims is obviously going to be in
15 some sense different from Grace in its
16 handling of the claims because Grace
17 didn't have a TDP.
18         The Plan proponents are
19 seeking in the Plan and in the
20 confirmation process a ruling from the
21 court under applicable bankruptcy
22 principles that the Debtors can transfer
23 those agreements to the Trust and the
24 Trust's performance under those

Page 114

1  agreements, under the TDP, will satisfy
2  the obligations of the Debtors to those
3  insurers, such that they will have to
4  perform under those agreements.
5          The asbestos -- the insurers
6  holding such agreements have indicated
7  that they disagree with that legal
8  principle, or proposition.  There will be
9  in Phase 2 of the confirmation
10  proceedings evidence taken as to the
11  extent to which the substitution for the
12  Trust and the TDP process for Grace is
13  sufficiently materially different and
14  adverse to, what I will call, the
15  reimbursement insurers that it is not
16  legally permissible for the court to say
17  that under bankruptcy preemption
18  principles, those insurers have to
19  perform under those agreements.
20          That's clearly going to be a
21  confirmation issue, and we have conceded
22  under other circumstances that that is
23  something that we don't contend the
24  Insured's neutrality provision applies

Page 115

1  to.
2          Q.   Can I turn you now to
3  Section 7.22, subsection (d), Romanette
4  (ii).
5          A.   I see it.
6          Q.   The last sentence of that
7  section says, "Asbestos Insurance Rights
8  shall be so vested free and clear of all
9  Encumbrances, liens, security interests,
10  and other Claims or causes of action,
11  except that all Asbestos Insurance
12  Coverage Defenses is preserved."
13          What does that mean?
14          MS. HARDING:  Object to
15  form.
16          THE WITNESS:  Well, it
17  basically means that if somebody
18  thinks that they have got a lien
19  on asbestos insurance rights that
20  are purporting to be transferred
21  to the Trust, they better show up
22  and complain about it because the
23  purpose of the Plan is to provide
24  a transfer that is free of such

Page 116

1  liens or encumbrances or whatever.
2          The exception is put in
3  frankly because in other cases, I
4  think Federal-Mogul, some insurers
5  -- or maybe it was Kaiser -- I
6  don't know -- some insurers took
7  the position that this kind of a
8  clause might be read to override
9  the asbestos insurance coverage
10  defense carve-out.  And so for
11  avoidance of doubt, we threw in
12  the exception.
13  BY MR. BROWN:
14          Q.   Okay.  You are familiar, are
15  you not, with various claims that have
16  been asserted or threatened by Scotts,
17  Kaneb, BNSF, and Libby with respect to
18  asbestos insurance policies, aren't you?
19          A.   Yes.
20          Q.   Are whatever claims they
21  have, if any, through any of the
22  insurance asbestos policies, are they
23  being extinguished by virtue of this
24  sentence?

Page 117

1          MS. HARDING:  Object to
2  form.
3          THE WITNESS:  My
4  understanding of the Plan, and I
5  have to confess that I have that I
6  am not sure I thought about that
7  question before, is that those
8  types of claims are being
9  channelled to the Trust to the
10  extent that there are Grace
11  indemnities of insurers with
12  respect to such claims.
13          I think there is a TDP
14  provision -- again, it's 5.12 or
15  5.13 -- that is, in essence, an
16  acknowledgment that those types of
17  claims are treated as indirect PI
18  Trust claims.
19          And so I would have to say
20  that I don't believe that this
21  provision is intended by some sort
22  of self-operative effect to
23  extinguish -- this provision, to
24  me, is more like a C363B type of

Page 118

1    provision, essentially that we are
2    going to transfer the assets to
3    the Trust and if you got a claim
4    or an interest in the assets, then
5    you can litigate that claim
6    against the Trust.
7          But we are going, I guess,
8    have potential confirmation
9    objections about whether there are
10   any such claims.  I mean, the mere
11   assertion of a claim doesn't mean
12   that it's valid.
13   BY MR. BROWN:
14       Q.   Okay.  If I can direct your
15   attention down to 7.2.4, which is
16   entitled Assignment and Enforcement of
17   Asbestos PI Trust Causes of Action.
18       A.   Yes.
19       Q.   I must confess, I am a bit
20   baffled by this one, so I need some help
21   with it.
22          How do Asbestos PI Trust
23   causes of action differ from asbestos
24   insurance rights?

Page 119

1        A.   Well, I have to go back and
2    look at the definitions to answer that
3    question.
4           Well, I think asbestos PI
5    Trust causes of action does include
6    asbestos insurance rights.
7        Q.   What else does it include?
8        A.   Well, if you look at the
9    definition, it includes defenses such
10   that, for example, if a claimant says, I
11   have a valid claim against Grace that's
12   channelled to the Trust and the Trust
13   disagrees with it, the Trust retains all
14   the defenses to that claim that Grace
15   would have had.  That's clause A under
16   definition 47.
17       Q.   Okay.
18       A.   Clause B is, for example,
19   contribution rights, et cetera.  So, for
20   example, if the Trust has -- if Grace has
21   contribution rights that it has not
22   asserted and that which are still valid
23   against a codefendant in a tort system
24   and the codefendant brings in indirect

Page 120

1    Asbestos PI Trust claim against the
2    Trust, the Trust could assert Grace's
3    contribution rights as a counterclaim to
4    that.  That's two categories of things
5    that this is intended to include.
6        Q.   Okay.  Let's go to page 64,
7    7.2.6, Creation and Termination of the
8    Asbestos PI TAC.
9        A.   Correct.
10       Q.   It says, "On or before the
11   Confirmation Date, the initial members of
12   the Asbestos PI TAC shall be selected by
13   the Asbestos PI Committee."
14          That has already occurred,
15   correct?
16       A.   Correct.  They are
17   identified in the Asbestos PI Trust
18   Agreement.
19       Q.   Okay.  How many actual
20   committee members are there on the
21   Asbestos PI Committee?
22       A.   I don't remember.  But we
23   have the Disclosure Statement here.  I
24   could pretty quickly find out by just

Page 121

1    looking at it where they are identified.
2        Q.   Okay.
3        A.   It's certainly more than the
4    four that are going to be on the TAC.
5        Q.   Okay.  Is it fair to say
6    that the actual committee members who are
7    asbestos claimants act through their tort
8    counsel in connection with their
9    obligations as committee members?
10       A.   As a general proposition,
11   that's true.  In any given committee on
12   any given issue, an individual member
13   might choose to show up and act on their
14   own behalf, and there have been some
15   examples in the past where that has
16   occurred.
17          But, as a general
18   proposition, the committee members are
19   blue-collar folks of limited legal
20   knowledge, and they delegate to their
21   personal injury lawyers their sort of
22   activities acting for them as an agent on
23   these committees.
24       Q.   Okay.  You are counsel to

Page 122

1  the Asbestos PI Committee.  You don't
2  have occasion, do you, to deal directly
3  with the actual claimants?
4          MR. FINCH:  Object to the
5  form.
6          THE WITNESS:  That's not
7  entirely true.  I get calls
8  periodically that I just got this
9  incomprehensible Disclosure
10  Statement from Grace and could you
11  please tell me what it means or
12  something.  But as a general
13  proposition --
14          MR. FINCH:  Transfer to it
15  to Finch.
16          THE WITNESS:  Or where do I
17  file my proof of claim.
18          But, as a general
19  proposition, I don't nor do other
20  folks at Caplin & Drysdale deal
21  directly with original committee
22  members.
23  BY MR. BROWN:
24      Q.    You deal with personal

Page 123

1  injury attorneys, correct?
2      A.    As a general proposition, we
3  deal with the PI lawyers who have been
4  appointed by their client committee
5  member to act on their behest in the
6  committee.
7      Q.    Now, the TAC members are
8  John Cooney, Perry Weitz, Joe Rice,
9  and -- who was the fourth one?
10      A.    Well, I can tell you by
11  looking at the PI Trust Agreement, which
12  is Exhibit-2 to the Plan and looking at
13  the signature page, we should have, which
14  is --
15      Q.    Russell Budd.
16      A.    Russell Budd, John Cooney,
17  Joseph Rice, and Perry Weitz.
18      Q.    And each of them works for a
19  law firm, correct?
20      A.    Each of them is a partner a
21  law firm, yes.
22      Q.    Sorry.  I didn't mean to...
23          Now, does each of those law
24  firms have a client that sits on the

Page 124

1  committee?
2      A.    Yes.
3      Q.    And do those committee
4  members for those firms act through those
5  four gentlemen?
6      A.    On the committee?
7      Q.    Yes.
8      A.    Generally, yes.
9      Q.    Okay.  So is it fair to say
10  that Mr. Rice, Mr. Weitz, Mr. Cooney, and
11  Mr. Budd selected themselves to be
12  members of the TAC?
13      A.    No, because there are many
14  other members of the committee, and the
15  committee as a whole, which, in this
16  particular case, I believe has a majority
17  of members that are not these four
18  gentlemen, decided which of their members
19  they thought would be appropriate persons
20  to put on the TAC.
21      Q.    And how was that decided?
22      A.    As far as I know, they had
23  informal discussions, and they had a
24  committee meeting.  I don't remember

Page 125

1  whether there were votes or anything like
2  that.  But at the end of the day, through
3  some sort of nomination or informal
4  self-nomination or self-nomination,
5  speeches, lobbying, discussions, what
6  have you, there came a time at which the
7  committee voted to select these four
8  people.
9      Q.    Okay.
10      A.    And I might add that the
11  Future Claimants Representative had a
12  sort of a generalized oversight in the
13  sense that while the Plan contemplates
14  that the committee would nominate the
15  TAC.  If the FCR thought, for some reason
16  or another, that somebody had been put on
17  the TAC that was a real bad idea, the
18  committee would probably have had to
19  listen to the Future Representative's
20  views on that even though the Futures Rep
21  did not have sort of a formal veto or
22  role in that process.
23      Q.    Okay.  I want to now turn to
24  page -- well, it's 69 on my version,

Page 126

1  Section 7.7, Conditions to Occurrence of
2  the Confirmation Date, and I want to
3  focus your attention first on (g).
4      A.  I see it.
5      Q.  What are the securities that
6  are funding the Asbestos PI Trust?
7      A.  The warrant and the Deferred
8  Payment Agreement, which is a debt
9  obligation, which also includes, I
10  believe, a promissory note or promissory
11  notes.
12      Q.  Can you describe for me the
13  circumstances under which the asbestos PI
14  claim -- excuse me -- the Asbestos PI
15  Trust will be funded with dividends?
16      A.  In the event that it
17  exercises the warrant and acquires stock
18  pursuant to that exercise and the stock
19  pays dividends, it will get dividends.
20      Q.  And if the warrant is not
21  exercised?
22      A.  Then it won't get dividends.
23      Q.  What about if there is a
24  default under the deferred payment note?

Page 127

1      A.  My recollection is that the
2  Trust has the right to get 50.1 percent
3  of the stock of the Debtor under those
4  circumstances.
5          But, again, the terms of --
6  that's a very complicated set of
7  documents, and the precise terms of that
8  are whatever the document states.  I can
9  only give you a sort of a very
10  generalized description.
11      Q.  Okay.  Let me draw your
12  attention now down to (l), condition (l).
13      A.  Yes, I see it.
14      Q.  What does that mean?
15      MS. HARDING:  Object to
16  form.
17      THE WITNESS:  Well, what it
18  means is that if you didn't have a
19  TDP, which includes things like a
20  payment percentage and mechanisms
21  for trying to trying to limit the
22  ways in which the Trust expends
23  monies on claims, and you just had
24  sort of a come in, sue the Trust

Page 128

1  and the tort system, et cetera,
2  you would have a
3  first-come-first-serve operation
4  where there was the distinct
5  possibility that, as it happened
6  in the Manville Trust at the very
7  beginning, all the money would run
8  out the door at the front end, and
9  there wouldn't be anything left
10  for future claimants, which would
11  violate 524(g).
12  BY MR. BROWN:
13      Q.  Okay.  Well, the way that
14  this provision is written suggests that
15  any procedures other than those that are
16  set forth in this Plan would defeat the
17  purposes of Section 524(g).
18          Is that what is intended
19  here?
20      MR. FINCH:  Object to form.
21      MS. HARDING:  Object to
22  form.
23  BY MR. BROWN:
24      Q.  Are there other options, is

Page 129

1  the question?
2      A.  If the question is could one
3  hypothesize a somewhat different set of
4  TDPs that had somewhat different
5  procedures, the answer is depending on
6  what that different TDP set of procedures
7  was, you might be able to say the same
8  thing about it.
9          The purpose of this thing is
10  to say that this structure, according to
11  the court, satisfies the requirements of
12  524(g) that say that you have to
13  establish this requirement.
14          I mean, this is a finding of
15  fact that is intended to have the court
16  rule that the Plan does, in fact, meet
17  the requirements of a subsection of
18  524(g).
19      Q.  You could, in fact, have a
20  Plan that met the qualifications for
21  524(g) that actually had a role for
22  asbestos insurance entities, correct?
23      MR. FINCH:  Object to form.
24      MS. HARDING:  Object to

Page 130

1    form.
2         THE WITNESS:
3    Hypothetically, probably yes.  It
4    would be more difficult, but,
5    hypothetically, yes.  You could
6    have -- we have had some plans
7    that had coverage in place
8    agreements with insurers, for
9    example, that we felt satisfied
10   524(g).  But you have to get the
11   insurers' agreement to have a
12   coverage in place agreement.
13   BY MR. BROWN:
14        Q.   Okay.  Let's go now to
15   condition (r) -- I am sorry.  Condition
16   (s).
17        A.   Yes.
18        Q.   Now, for purposes of my
19   question, I want you to assume that when
20   I use the term "settled asbestos
21   insurance companies," I want you to
22   assume that those that are pre-petition.
23        A.   Okay.
24        Q.   And my question is a very

Page 131

1    general one, because I have heard
2    different views, and that is, what
3    benefits are being provided by or on
4    behalf of settled asbestos insurance
5    companies listed on Exhibit-5?
6         A.   It is the position of the
7    ACC that Grace is paying close to
8    $3 billion of value to the Trust on
9    behalf of not only itself but a variety
10   of other protected parties, including
11   Non-Debtor affiliates and, in this
12   particular case, settled asbestos
13   insurers.
14        And it is doing so on behalf
15   of settled asbestos insurers because
16   those insurers have indemnity claims
17   against Grace, which are being, if they
18   hypothetically could ever occur, are
19   being channelled to the Trust as a means
20   of protecting Grace against such -- well,
21   let me back up.
22        The purpose of putting
23   settled asbestos insurers in here is not
24   to provide a gratuitous asbestos insurers

Page 132

1    because we think they are nice folks.
2         Q.   I didn't think so.
3         A.   Settled asbestos insurers,
4    by definition, are insurers that have
5    indemnity rights against Grace.
6         Q.   They have also paid a lot of
7    money?
8         A.   And they paid a lot of money
9    in the past.  But the past money -- money
10   is fungible.  The past money went into
11   Grace's coffers, went out or didn't go
12   out, et cetera.  But they are not being
13   asked for any new money.
14        But Grace has an economic
15   interest in not having asbestos PI claims
16   brought against those insurers that could
17   then trigger an indemnity obligation of
18   Grace to the insurer against which that
19   asbestos PI claim is asserted.  They
20   have an economic interest in preventing
21   that.
22        So the deal is channel any
23   such claim that might give rise to the
24   asbestos indemnity claim to the Trust,

Page 133

1    and in exchange for that, part of what
2    Grace is paying you is to get rid of
3    asbestos PI claims which include indirect
4    asbestos PI claims for indemnity or
5    direct asbestos PI claims for indemnity.
6         Q.   Okay.
7         A.   And that's the basis.
8         Q.   I think you said at the very
9    beginning of either the last question or
10   the one before that Grace was
11   contributing 3 million?
12        A.   Billion.
13        Q.   That's what I thought.
14   Okay.  I just wanted to make sure I had
15   the number correct.
16        A.   I mean, that's our view of
17   the approximate amount of what they were
18   contributing at the time we made the
19   deal, I guess would be a better way to
20   put it.  There are other people that
21   might value it differently.
22        Some of things that were
23   worth more at the time the deal was made
24   are worth less today but hopefully will

Page 134

1  be worth more in the future. So it's a
2  moving target. But 3 billion is
3  notionally the deal we thought we made.
4       Q.  I want to now turn your
5  attention to Section 7.8, which is
6  entitled Conditions to Occurrence of the
7  Effective Date, and specifically
8  condition (s), the last condition.
9       A.  I see it.
10      Q.  I just want to make sure I
11  understand this. If the court were to
12  enter an order, saying that contractual
13  indemnity claims of settled insurers are
14  not properly classified as indirectly PI
15  Trust claims, then the Plan can't go
16  effective even if it's confirmed?
17      A.  Unless somebody waives this
18  provision, that is correct.
19      Q.  Okay. And among the parties
20  that need to waive it are Sealed Air and
21  Fresenius?
22      A.  Among the parties are, yes.
23      Q.  That holds true, I gather,
24  in the event that Scotts' claim or BNSF's

Page 135

1  claim or Montana's claim was determined
2  not to be an indirect PI Trust claim?
3       A.  Well, yes and no. I mean,
4  to be precise about it, if something is
5  included -- if one of those claims is
6  included within the definition of an
7  indirect PI Trust claim and instead is
8  held to be a general unsecured claim,
9  that's triggered. This provision is
10 triggered.
11          There could be a dispute
12 about whether a particular claim was, in
13 fact, defined as an indirect PI Trust
14 claim and, therefore, whether this
15 provision was triggered or not.
16      Q.  Okay. Can you now look at
17 Section 7.13, specifically the language
18 that is underscored.
19      A.  I see it.
20      Q.  To the extent that my
21 clients, OneBeacon or Seaton, have claims
22 against Fresenius or Sealed Air, are they
23 released under this provision?
24      MS. HARDING:  Object to

Page 136

1  form.
2       MR. FINCH:  Object to form.
3       THE WITNESS:  Well, it would
4  depend upon whether you had
5  something called an
6  asbestos-related claim. I mean,
7  the --
8  BY MR. BROWN:
9       Q.  Or an asbestos claim?
10      A.  Or an asbestos claim or an
11 SA claim.
12          This isn't a blanket release
13 of all claims. It purports to be a
14 release of certain specified claims as
15 set out in the definitions that are
16 incorporated in this language.
17      Q.  Let me --
18      A.  But to that extent, the
19 answer is yes.
20      Q.  So if OneBeacon or Seaton
21 had a claim that fits within the
22 definition of Asbestos Claim, initial cap
23 A, initial cap C, against Fresenius or
24 Sealed Air, that claim is released

Page 137

1  pursuant to this provision; is that
2  correct?
3       A.  As those claims are defined,
4  yes.
5       Q.  Does this provision release
6  claims that constitute asbestos claims
7  that Scotts may have against settled
8  asbestos insure companies?
9       MS. HARDING:  Object to
10 form. Also, I think it calls for
11 legal conclusion.
12          THE WITNESS:  I have to say
13 that that does. The problem is
14 that the claims are being
15 channelled, and so the question
16 that you are raising of release is
17 whether, for example, the claims
18 simply are released and vanish or
19 whether they are released in the
20 sense of you can't assert them
21 against the particular entity
22 because they are going somewhere
23 else, i.e. to the Trust -- this is
24 in general -- let me make two

Page 138

1    observations.
2         One, in general, this is my
3    idea of this is it's tied to the
4    channelling injunction, not
5    independent of it. And, secondly,
6    this is a provision that I believe
7    was in the Sealed Air settlement
8    and Fresenius settlement
9    agreements that the court approved
10   back in 2003.
11        And my recollection is that
12   this was another provision that we
13   did not have discretion about
14   whether we would put in the Plan
15   in the form that it appears.
16   BY MR. BROWN:
17        Q.   Right. And what I am trying
18   to do with my questions is to ascertain
19   the scope of the release.
20        A.   And I can't really tell you
21   anything more than I think I just said on
22   that subject. And you are asking me for
23   a legal opinion. That's clearly correct.
24        Q.   Well, I am asking you about

Page 139

1    what the scope of the injunction is
2    that's in your client's Plan.
3         A.   I described, I thought, in
4    some detail what I thought the scope of
5    the injunction is. But if you want to
6    turn to the injunction provisions and ask
7    me specific questions about their scope,
8    I am sure you will do that.
9         Q.   We will get to the
10   injunction.
11        A.   I am sure you will do that.
12        Q.   Does this language that we
13   are referring to here under 7.13 the
14   underscored language release claims that
15   BNSF or the Libby claimants might have or
16   might choose to assert against settled
17   asbestos insurance companies?
18        MR. FINCH: Objection to
19   form, calls for legal conclusion.
20        MS. HARDING: Same
21   objection.
22        THE WITNESS: I think those
23   are the same. Those claims are
24   channelled to the Trust, and I

Page 140

1    don't believe the intendment of
2    this paragraph is to sort of mean
3    that the claims vanish, if that's
4    what you mean by release.
5         What I believe the
6    intendment of this claim is is
7    that this provision is that it's
8    sort of a belt-and-suspenders
9    piece of channelling injunction.
10   BY MR. BROWN:
11        Q.   So the claims are both
12   enjoined, channelled, and then released?
13        A.   Against the
14   asbestos-protected parties but not
15   against the Trust, for example.
16        What I can't tell from your
17   question is whether you are sort of
18   insinuating that somehow or another the
19   release has the effect of freeing the
20   Trust from liability for these claims,
21   which I don't believe it does.
22        Q.   What's the consideration for
23   the release insofar as it pertains to the
24   Sealed Air indemnified parties and the

Page 141

1    Fresenius indemnified parties?
2         MS. HARDING: Object to
3    form.
4         THE WITNESS: In the case of
5    Sealed Air, it was about a
6    billion, 200 million dollars of
7    stock and cash. And in the case
8    of Fresenius, it was about $115
9    million of cash.
10   BY MR. BROWN:
11        Q.   And to whom did that go?
12   Did that go to any of the settled
13   asbestos insurers or someone else?
14        A.   Settled asbestos insurers?
15   Why would the settled asbestos insurers
16   get anything? It wasn't their claims
17   that were -- they got an injunction
18   against those claims. That's what they
19   got.
20        Q.   But I asked at the outset
21   whether this release releases claims that
22   OneBeacon or Seaton would have against
23   Fresenius and Sealed Air, and you said it
24   would. And so --

Page 142

1    A.   If there were any such
2  claims, I can't personally imagine what
3  those claims would be because what part
4  of the -- the deal is a package.  The
5  settled asbestos insurers are getting
6  their own channelling injunction against
7  the types of claims that this release
8  deals with, namely, as defined asbestos
9  claims which are claims against Grace, or
10  successor liability type claims for
11  Fresenius and Sealed Air who were
12  potentially derivatively liable for
13  claims against Grace.  That's what the
14  fraudulent transfer litigation was all
15  about, was attempting to impose
16  fraudulent transfers/successor liability
17  for Grace debts on non-Grace entities as
18  a result of their relationship with
19  Grace.
20        And so they pay us a lot of
21  money.  We agreed we would make them
22  protected parties.  And this, to the
23  extent we are talking about this,
24  protects them, this releases in addition

Page 143

1  to adjoining claims that are being
2  channelled to the Trust.
3        So, as I said earlier, if
4  the settled asbestos insurers have
5  claims, which I can't imagine that they
6  would, that are the nature of this, they
7  get channelled to the Trust.
8        MR. BROWN:  It's 12:25.  I
9  would like to take a five-minute
10  break.  I am happy to keep going.
11  I don't know if anyone wants
12  lunch.
13        MR. FINCH:  We have lunch
14  coming in.  Off the record.
15        (There was a discussion held
16  off the record at this time.)
17        - - -
18        (There was a luncheon recess
19  from 12:27 p.m. to 1:07 p.m.)
20        - - -
21        AFTERNOON SESSION
22        - - -
23  BY MR. BROWN:
24    Q.   Mr. Lockwood, were you

Page 144

1  involved in the fraudulent transfer
2  litigation involving Sealed Air and
3  Fresenius?
4    A.   Yes.
5    Q.   What was your role?
6    A.   Co-counsel with a number of
7  members of my firm and the counsel for
8  the Property Damage Committee, and then
9  there was a third set of counsel from the
10  Milberg Weiss firm that was sort of
11  jointly representing the PD and the PI
12  committees.
13    Q.   Are you generally familiar
14  with the corporate transactions that took
15  place that gave rise to that litigation?
16    A.   I was.  Whether or not I can
17  remember them now, I am not sure.
18    Q.   Okay.
19        MR. BROWN:  Let's mark this.
20        (ACC 30(b)(6)-7 marked for
21  identification and marked
22  Confidential at this time.)
23        MR. BROWN:  Just for
24  purposes of this portion of the

Page 145

1  deposition, the document that's
2  just been marked ACC-7 is a
3  Settlement Agreement involving one
4  of the insurers.
5        MR. FINCH:  It's also
6  confidential.
7        MS. HARDING:  It's
8  confidential.
9        MR. BROWN:  I think the
10  protocol is is that absent a
11  waiver from my client on this
12  subject, that this portion of the
13  transcript would remain
14  confidential.
15        MS. HARDING:  Well, is
16  everybody in the room and
17  everybody on the phone subject to
18  the confidentiality order?
19        MR. BROWN:  Well, that's a
20  good question.  I am.
21        THE WITNESS:  I am.
22        MR. BOERGER:  If they are
23  not, we can ask for them to be
24  excused, as I recall, under the

Page 146

1    order.
2        MS. HARDING: I was going to
3    ask affirmatively if everyone in
4    the room and on the phone is
5    subject to confidentiality order
6    that relates to the production of
7    the Exhibit ACC-7, which is the
8    settlement agreement.
9        MR. COHN: Is that a
10   freestanding confidentiality order
11   or is that within the confines of
12   the big one we signed?
13       MR. BROWN: No. It's in
14   connection with the one I think
15   that's just been filed; is that
16   correct? I don't know whether the
17   court has actually signed it.
18       MS. HARDING: It says 2009
19   protection order, which has not
20   been signed yet.
21       MR. BROWN: Right. And it's
22   not a March one anymore. It's
23   probably going to be a May one.
24       MR. FINCH: Right. It's

Page 147

1    before the court. I don't think
2    she signed it yet.
3        MR. BROWN: All right. In
4    any event, this is being used
5    subject to that order when it gets
6    signed.
7        Has everyone signed off on
8    that order that's in the room on
9    the telephone?
10       MS. HARDING: Everybody but
11   Mr. Cohn, I believe.
12       THE WITNESS: I think
13   Mr. Cohn signed off on that order.
14   There is a separate order relating
15   to --
16       MS. HARDING: Okay.
17       THE WITNESS: -- that hasn't
18   been signed.
19       MS. HARDING: I apologize
20   then.
21       MR. BROWN: Then we will go
22   forward.
23   BY MR. BROWN:
24       Q.   Mr. Lockwood, have you ever

Page 148

1    seen the document before that is labeled
2    ACC-7?
3        MR. SPEIGHTS: Mr. Finch?
4        MR. FINCH: Yes.
5        MR. SPEIGHTS: This is Dan
6    Speights, representing Anderson
7    Memorial Hospital. I have not
8    signed off on a confidentiality
9    order. I want to make that clear
10   for the record.
11       But would you identify what
12   Exhibit-7 is?
13       MR. BROWN: Exhibit-7 is a
14   settlement agreement between
15   certain entities named Grace and
16   my client, which is OneBeacon,
17   although the parties signing the
18   agreement, I believe, is
19   Commercial Union, a predecessor in
20   interest.
21       MR. FINCH: Mr. Brown, could
22   you identify where in the 30(b)(6)
23   notice this document or this line
24   of questioning about this document

Page 149

1    would fall?
2        MR. BROWN: I will be happy
3    to, although I don't know the
4    particular number, but I am sure
5    it's covered, the scope of the
6    injunctions.
7        MR. FINCH: Okay.
8        THE WITNESS: Anyway, the
9    question was --
10       MS. HARDING: Just a second.
11   Mr. Speights, if you are not party
12   to the confidentiality order, then
13   I think we probably have to ask
14   you to drop off the call at this
15   point, and then we can send you an
16   email when the questioning is
17   over.
18       MR. SPEIGHTS: That might be
19   appropriate, but let me
20   understand. Is this an agreement
21   regarding insurance that you want
22   to keep confidential?
23       MR. BROWN: The agreement
24   that is the exhibit, ACC-7, has

Page 150

1    confidentiality provisions in it,
2    and, therefore, it has been made
3    subject to a protective order that
4    has been submitted to the court
5    and signed off on by everyone, it
6    sounds like, except Anderson
7    Memorial.
8        MR. SPEIGHTS:  And all I am
9    asking is is that an
10   insurance-related document, and
11   Mr. Finch probably can respond to
12   that, if you are uncomfortable.
13   Is this an insurance-related
14   document, Mr. Finch?
15       MR. FINCH:  Yes.
16       MR. SPEIGHTS:  I will be
17   glad to sign off then.  The cable
18   in my area has been cut, and I
19   have no email access.  So I will
20   give you a telephone number to
21   call, if you would, when you
22   finish with this document.
23       MS. HARDING:  Okay.
24       MR. FINCH:  Okay.  Tell us.

Page 151

1        MR. SPEIGHTS:  843.987.3805.
2        MR. FINCH:  Okay.
3        MR. SPEIGHTS:  Thank you.
4        MS. HARDING:  And I think I
5    am just going to object to this
6    line of questioning because I
7    don't think it was properly
8    designated as a topic, and the
9    Debtor certainty hasn't prepared
10   to address any issues that you
11   might raise here that might relate
12   to confidentiality or any of the
13   issues that might surround this
14   agreement.
15       That said, we will listen to
16   the questions and go from there.
17       MR. FINCH:  This portion of
18   the confidential is document and
19   that exhibit.
20           * * * * *
21   THE FOLLOWING PORTION OF THE TRANSCRIPT
22   HAS BEEN DEEMED CONFIDENTIAL BY COUNSEL
23           * * * * *
24

Page 152

1            * * * * *
2    CONFIDENTIAL PORTION OF TRANSCRIPT BEGINS
3            * * * * *
4    BY MR. BROWN:
5        Q.   I believe the question
6    pending, but I am not sure at this point,
7    was whether you ever seen this document
8    before, ACC-7.
9        A.   And the answer is I don't
10   think so.  I certainly don't remember
11   having seen it before.
12       Q.   Okay.  Well, I will
13   represent to you that it is one of the
14   settlement agreements that was entered
15   into between Commercial Union Insurance
16   Company, American Employers Insurance
17   Company, and a company called W.R. Grace
18   & Company, and another company called
19   W.R. Grace & Company-Conn.
20       A.   Well, it certainly, on the
21   signature pages, appears to be that.
22       MS. HARDING:  Mr. Brown,
23   just so I am clear, is it a
24   document that was produced to you

Page 153

1    in discovery in the last several
2    months in response to discovery
3    requests that you all made in the
4    confirmation proceeding?
5        MR. BROWN:  I believe that
6    the document Bates labels that you
7    have on here are a result of the
8    production of this document to
9    Kaneb by us.
10       MS. HARDING:  In the
11   confirmation proceeding?
12       MR. BOERGER:  They are --
13       MS. HARDING:  I don't have
14   the list with me so I can't tell.
15       MR. BOERGER:  The broader
16   production of this and other
17   documents is subject to the
18   protective order being entered.
19       MS. HARDING:  And it was
20   produced to all parties?
21       MR. BROWN:  No.  The Debtors
22   have it because, I believe, that's
23   where it originally came from, and
24   Kaneb has it because it was

Page 154

1    produced to Kaneb in connection
2    with the lift stay motions which
3    are in connection with the court.
4         It has not been produced to
5    other parties, although it has
6    been promised, subject to the
7    entry of the protective order that
8    we just discussed.
9         MS. HARDING:  I am not part
10    of the other negotiations with the
11    other parties.  You just handed
12    out copies to the other parties;
13    is that right?
14         MR. BROWN:  Sorry?  I am
15    not --
16         MS. HARDING:  You guys just
17    handed out copies to the other
18    parties.  I don't know if there
19    wasn't a reason that it wasn't
20    produced to the other parties that
21    I am aware of.
22         MR. BROWN:  Because the
23    protective order has not yet been
24    signed.

Page 155

1         MS. HARDING:  I understand
2    your representation.  I just don't
3    know if that's the case as to why
4    it hasn't been provided to other
5    parties if it's already been
6    provided to you.
7         MS. DeCRISTOFARO:  This is
8    his client's settlement agreement.
9         MS. HARDING:  I understand.
10    I am not concerned about him.  I
11    am concerned about the fact that
12    the agreement got sent down the
13    list and was distributed to the
14    room, and I don't know the reason
15    why it hasn't been produced to the
16    other parties yet.
17         MR. BROWN:  Two reasons:
18    One, many of them didn't request
19    it; and the second reason is
20    because we withheld production of
21    it pending the execution of the
22    protective order, which is pending
23    before the court.
24         MR. FINCH:  And you are

Page 156

1    operating as if that order will be
2    entered.
3         MR. BROWN:  Precisely.
4    Otherwise, we will have to put off
5    confirmation.
6         MS. HARDING:  Got it.  I
7    wasn't part of that negotiation so
8    it wasn't clear.
9         MR. BROWN:  All right.
10    BY MR. BROWN:
11         Q.   Now that we are clear...
12         A.   Having established that I
13    don't remember it or haven't seen it,
14    what do you want to ask me about it?
15         Q.   I would like to look at the
16    signature line and the first entity there
17    that signed it.  You will note that this
18    is dated from May of 1993.
19         A.   Yes.
20         Q.   And one of the parties to
21    this agreement is W.R. Grace & Co.?
22         A.   Yes.
23         Q.   I am correct, am I not, that
24    that is not the W.R. Grace & Co. that is

Page 157

1    the lead Debtor in this case?
2         MR. FINCH:  Objection, lack
3    of foundation.
4         MS. HARDING:  Object to
5    form.
6         MR. FINCH:  And I also
7    object to the extent that calls
8    for a legal conclusion as to the
9    effect of the transactions that
10    occurred in 1994 and 1996.
11         THE WITNESS:  I don't
12    remember.
13    BY MR. BROWN:
14         Q.   Do you remember how many
15    companies there have been with the name
16    W.R. Grace & Co.?
17         A.   Not specifically.  I know
18    there has been more than one.
19         Q.   Does four sound right?
20         A.   I just don't -- I don't
21    recall at this point.  I have not -- I
22    knew back when we were litigating the
23    fraudulent conveyance cases against
24    Fresenius and Sealed Air, but I just

Page 158

1    don't remember now.
2         And, frankly, I hadn't
3    realized that this topic was going to
4    come up, so I didn't try and refresh my
5    memory on that subject.
6         MR. FINCH:  And it's my
7    position, just for the record,
8    that I don't believe questioning
9    him about this document nor does
10    transactions falls within the
11    scope of the subject matter of
12    testimony.  So the witness was
13    not --
14         MR. BROWN:  I am sorry.  Go
15    ahead.
16         MR. FINCH:  So the witness
17    was certainly not prepared to
18    answer questions about this
19    document or the corporate
20    transactions that gave rise to the
21    fraudulent transfer case.
22    BY MR. BROWN:
23         Q.   Mr. Lockwood, there is a
24    company called Fresenius Medical Care

Page 159

1    Holdings, Inc. today, correct?
2         A.   As best I can recall, yes.
3         Q.   And that was once called
4    Fresenius National Medical Care Holdings,
5    Inc., correct?
6         A.   I will take your word for
7    it.  I don't remember it.
8         Q.   Okay.
9         A.   I mean, I know that there
10    were -- I remember that there were name
11    changes in the Fresenius group over time,
12    but I can't tell you that specific name
13    was one of them.  It sounds like it could
14    have been.
15         Q.   Was Fresenius Medical Care
16    Holdings, Inc. at one time known as W.R.
17    Grace & Company?
18         MR. FINCH:  Objection, lack
19    of foundation.
20         THE WITNESS:  I just don't
21    remember.  I just don't remember.
22    BY MR. BROWN:
23         Q.   All right.  Well, then I am
24    going to ask you to make an assumption.

Page 160

1         A.   Okay.
2         Q.   Assume for the moment that
3    the company on this Exhibit-5 -- excuse
4    me -- Exhibit-7, ACC-7, that is called
5    W.R. Grace & Co. is now known as
6    Fresenius Medical Care Holdings, Inc.
7         A.   Okay.
8         Q.   If that's the case, are
9    contractual indemnity claims that
10    OneBeacon has under this agreement
11    enjoined?
12         MS. HARDING:  Object to
13    form.
14         MR. FINCH:  Object to form.
15         THE WITNESS:  If the
16    contractual indemnity claims are
17    based on asbestos personal injury
18    claims against the historic group
19    of Grace companies, which includes
20    Grace, Sealed Air, and Fresenius,
21    then I believe they are enjoined.
22         But I also believe, as I
23    said earlier, just as the claims,
24    contractual indemnity claims that

Page 161

1    OneBeacon and Seaton have against
2    Grace itself is that there are no
3    such claims because the claims
4    that might give rise to
5    contractual indemnity claims from
6    Sealed Air to OneBeacon are
7    themselves enjoined from being
8    asserted against both Sealed Air
9    and OneBeacon.
10    BY MR. BROWN:
11         Q.   And that's under the
12    asbestos PI channelling injunction?
13         A.   Correct.
14         Q.   Again, this is line of
15    questioning is based upon my assumption,
16    which you are subject to dispute.
17         A.   I have accepted your
18    assumption for purposes of my answer.
19         Q.   Why don't you take a look at
20    definition 115 in the Plan.
21         A.   I see it.
22         Q.   Does that refresh your
23    recollection about my assumption?
24         A.   It doesn't refresh my

Page 162

1    recollection, but it certainly causes me
2    to be willing to accept your assumption.
3         Q.    Okay.  Now, if my assumption
4    is correct, then the entity that signed
5    this document called W.R. Grace & Company
6    at the time, May of 1993, claims by
7    OneBeacon against that company are
8    enjoined, and, as you indicated, they are
9    channelled to the Trust.
10        Are they also released?
11        A.    Could I ask you to bear with
12   me for a moment?
13        Q.    Sure.
14        A.    This agreement was signed in
15   1993, correct?
16        Q.    Yes.
17        A.    The Plan in definition 124
18   describes the Fresenius transactions as
19   having taken place in 1996.  The Sealed
20   Air transaction -- I don't know whether
21   that's described in here.  But my
22   recollection --
23        MR. FINCH:  Cryovac
24   transaction.

Page 163

1         THE WITNESS:  That took
2    place after 1993 but before the
3    Fresenius transaction.
4    BY MR. BROWN:
5         Q.    That's 92.
6         MR. FINCH:  Definition 92.
7         THE WITNESS:  Okay.  So that
8    was '98.  Okay.  My memory is
9    incorrect.  Okay.  I will accept
10   your representation on the
11   Fresenius definition.
12   BY MR. BROWN:
13        Q.    All right.  Just to circle
14   back, any contractual indemnity claim, as
15   you indicated, that arises out of an
16   asbestos personal injury claim that
17   OneBeacon might have against FMCH,
18   Fresenius Medical Care Holdings, Inc., is
19   enjoined by the asbestos PI channelling
20   injunction and channelled to the Trust?
21        MS. HARDING:  Object to
22   form, calls for legal conclusion.
23        THE WITNESS:  My
24   understanding of the way the Plan

Page 164

1    works is that any claim that would
2    give rise to that claim is
3    channelled to the Trust, and,
4    therefore, that claim, absent a
5    failure of the Plan as a whole to
6    be confirmed, will never come into
7    existence on the part of OneBeacon
8    or Seaton.  But if it did, it
9    would be channelled to the Trust.
10   BY MR. BROWN:
11        Q.    Okay.  And it's released
12   under the Plan, correct?
13        MS. HARDING:  Object to
14   form.
15        THE WITNESS:  Under the
16   provision that we were talking
17   about earlier, my answer would be
18   the same as the answer I gave
19   earlier about the effect of the
20   release, which is that the release
21   is basically a belt-and-suspenders
22   mechanism for making sure it's
23   channelled to the Trust.  It's
24   released against the particular

Page 165

1    corporation, but it's not released
2    against the Trust.
3    BY MR. BROWN:
4         Q.    Okay.  And beyond the
5    injunction and the release, the
6    Reorganized Debtors have agreed to
7    indemnify Fresenius against such a claim,
8    correct?
9         MS. HARDING:  Object to
10   form; calls for a legal
11   conclusion, I think.
12        THE WITNESS:  I don't
13   remember that.  There is a
14   settlement agreement with
15   Fresenius under which it is
16   certainly possible that that
17   exists.
18        I think that may be true,
19   but without looking at the
20   Fresenius agreement, which I think
21   itself is an exhibit here, to make
22   sure that my vague recollection on
23   that subject is accurate, I would
24   have to defer to the terms of that

Page 166

1    agreement itself as being the
2    definitive answer to your
3    question.
4    BY MR. BROWN:
5        Q.   And to the extent that it's
6    contained in the Fresenius agreement --
7        A.   Correct.
8        Q.   -- that indemnity obligation
9    only arises in the event that the Plan is
10   confirmed, correct?
11       A.   I believe that's correct,
12   because I believe that the Fresenius
13   agreement itself is contingent on
14   confirmation to the Plan.  And,
15   therefore, if the Plan isn't confirmed,
16   then I think the Fresenius agreement
17   becomes ineffective or invalidated or
18   terminates, or whatever word you want to
19   use.
20       Q.   Okay.  Now, what about to
21   the extent that OneBeacon or Seaton or,
22   for that matter, any other settled
23   insurer had a claim that was not arising
24   out of an asbestos personal injury

Page 167

1    claim --
2        MR. KRAMER:  I am going to
3    object for the record because
4    these questions really don't
5    relate to this document, so we
6    either should unseal the record
7    and call Mr. Speights now or if
8    you can simply ask your questions
9    related to this document and then
10   you can unseal the record.
11       Matt Kramer for the Property
12   Damage Committee.
13       MR. BROWN:  I am happy to do
14   that.  That's fine.
15       THE WITNESS:  It seems to me
16   that there is nothing confidential
17   that we are talking about.  I
18   mean, if we are not talking about
19   the terms of the settlement --
20       MR. BROWN:  That's fine.
21   That's fair enough.
22       MR. KRAMER:  Since I made
23   the objection, I will be happy to
24   call Mr. Speights.

Page 168

1        * * * * *
2    CONFIDENTIAL PORTION OF TRANSCRIPT ENDS
3        * * * * *

Page 169

1        (Mr. Speights re-joined.)
2    BY MR. BROWN:
3        Q.   All right.  There was a
4    question pending, but let me see if I can
5    rephrase it.
6        To the extent that a settled
7    asbestos insurance company has a
8    contractual indemnity claim under a
9    settlement agreement against Fresenius or
10   Sealed Air that is not related to an
11   underlying asbestos personal injury
12   claim, is that type of claim enjoined
13   under the Plan?
14       A.   Well, it's not enjoined by
15   the asbestos permanent channelling
16   injunction.
17       Q.   Asbestos PI channelling
18   injunction?
19       A.   PI channelling injunction.
20   Whether it's enjoined by some other
21   injunction, I can't think of offhand.
22       Q.   What about the successor
23   claims injunction?
24       A.   I am going to have to look

Page 170

1    at that injunction.
2        I can't recall ever having
3    spent a lot of time thinking about that
4    issue before, but it seems possible that
5    that hypothetical claim could be enjoined
6    by the successor claims injunction in
7    Section 8.5 of the Plan as against
8    Fresenius and Sealed Air.
9        Q.   I want to turn your
10   attention now to Section 7.15.  We have
11   talked about it a little bit already,
12   Insurance Neutrality.
13       A.   I have it.
14       Q.   Okay.  Other than the
15   conditions set forth in (g) under 7.15,
16   are asbestos insurance entities bound by
17   any other findings or conclusions
18   contained in the Plan?
19       A.   Yes, potentially under
20   Section 7.15(j).
21       Q.   Okay.  Anything else?
22       A.   Well, yes, two other
23   categories of things.  One would be
24   rulings on compliance with the bankruptcy

Page 171

1    code provisions, which are not under the
2    definition of asbestos coverage defenses
3    preserved, as we had discussed earlier.
4        Q.   Okay.
5        A.   And, secondly, there is a
6    race judicata provision in Section
7    7.15(e) that, in effect, says that if an
8    asbestos insurer actually litigates some
9    claim in the bankruptcy case, it could
10   be -- assuming that otherwise
11   non-bankruptcy principles of race
12   judicata or collateral estoppel would
13   apply, it could be bound by the outcome
14   of any such litigation that it initiated.
15       Q.   Okay.
16       A.   Other than that, I believe
17   the answer to your question, those are
18   the only conditions that I am aware of.
19       Q.   Okay.  Would it be correct
20   to say that this provision overrides the
21   exculpation provision in the Plan which
22   appears at Section 11.9?
23       MR. FINCH:  Object to form.
24       MS. HARDING:  Object to

Page 172

1    form.
2        THE WITNESS:  Let me turn to
3    Section 11.9.  I don't think so,
4    because I think the exculpation
5    provision comes under the heading
6    bankruptcy issues.
7        The exculpation provision is
8    pretty limited.  What it applies
9    to are acts or omissions in
10   connection with or arising out of
11   the Chapter 11 cases.  And my
12   understanding of what is intended
13   to be covered by that is some
14   claim that one of the parties
15   covered by it engaged in some sort
16   of misconduct during the course of
17   the bankruptcy case -- I don't
18   know -- a claim, to put it
19   personally, the Asbestos Claimants
20   Committee somehow or another
21   breached a fiduciary duty to its
22   constituency by proposing a Plan
23   that this exculpation provision
24   would apply to that sort of a

Page 173

1    claim or a similar claim against
2    the Debtors.
3        But those types of claims
4    are not insurance coverage claims
5    or defenses.  They would just be
6    some sort of -- and, indeed, it's
7    almost inconceivable to me how an
8    insurance company could ever have
9    the sort of claim that would be
10   exculpated by Section 11.9,
11   frankly.
12   BY MR. BROWN:
13       Q.   Well, if they did --
14       MR. FINCH:  Object to the
15   form.
16   BY MR. BROWN:
17       Q.   -- would the exculpation
18   provision take precedence over Section
19   7.15?
20       MR. FINCH:  Object to form.
21       MS. HARDING:  Object to
22   form.
23       THE WITNESS:  That question
24   is almost impossible to answer,

Page 174

1    because without knowing what the
2    claim is -- I mean, 7.15 addresses
3    specific types of situations
4    having to do with insurance.
5        11.9 addresses claims that,
6    on their face, have no apparent
7    relationship to insurance, and,
8    therefore, to know whether there
9    is any overlap between the two to
10   determine which one would prevail
11   in the event that there was an
12   overlap, you would have to have
13   some idea what kind of claim you
14   are talking about. And, frankly,
15   I have no idea what kind of claim
16   you want me to hypothesize for
17   purposes of that question.
18 BY MR. BROWN:
19       Q.   All right. There are some
20   releases that are mentioned in Section
21   7.15, and I want you to put those aside
22   for a moment.
23           Other than the releases that
24   are cited in 7.15, are any other releases

Page 175

1    that appear in the Plan or Plan documents
2    binding on asbestos insurance entities?
3           MS. HARDING:  Object to
4    form.
5           THE WITNESS:  I would have
6    to give you a very similar answer
7    to the one I just gave you on
8    exculpation because I would have
9    to know what kind of claims you
10   are talking about.
11       7.15 is intended to deal
12   with insurance policy/settlement,
13   insurance settlement, insurance
14   reimbursement situations, and
15   preservation of insurer rights
16   with respect to those types of
17   agreements. Releases in the Plan
18   may or may not cover those
19   situations.
20       As a general proposition, I
21   don't think the Plan purports to
22   release claims by asbestos
23   insurers sort of generically
24   against a whole lot of different

Page 176

1    people. There are some specific
2    releases that we have talked about
3    already.
4        Without knowing what sort of
5    a claim you believe the Plan
6    releases and being able to figure
7    out whether that claim ties into
8    the sort of relationships that
9    7.15 -- policy type relationships
10   that 7.15 is intended to address,
11   I really can't answer. I am not
12   trying to evade the question. I
13   just can't answer it for the
14   reasons I stated.
15          MR. BROWN:  Okay.
16          (ACC 30(b)(6)-8 and 9 marked
17   for identification at this time.)
18 BY MR. BROWN:
19       Q.   All right. Mr. Lockwood,
20   you have before you two documents, ACC-8
21   and ACC-9. Let's start with 8.
22       A.   I have it.
23       Q.   Have you ever seen that
24   document before?

Page 177

1        A.   Yes.
2        Q.   What is it?
3        A.   It is a complaint by The
4    Scotts Company attempting to initiate an
5    adversary proceeding in the Grace
6    bankruptcy case against various insurers
7    and Grace.
8        Q.   Okay. And is the relief
9    that is sought by Scotts in this
10   adversary complaint as against the
11   insurers that are defendants, who are
12   also settled asbestos insurance
13   companies, enjoined in its totality?
14       A.   As of right now or under the
15   Plan?
16       Q.   Under the Plan.
17       A.   I want to say yes to that,
18   but I would have to say this: I believe
19   that Scotts is asserting claims in this
20   action as asserted additional insured
21   under vendor coverage in W.R. Grace
22   insurance policies, point one.
23           I believe the basis is suits
24   against Scotts for Scotts' liability for

Page 178

1  products that contain vermiculite that it
2  obtained from Grace.
3         To the extent, therefore,
4  that the claims sought to be asserted
5  against the insurers for coverage for
6  those claims that I just described are
7  the ones that are the subject matter,
8  they are enjoined under the Plan because
9  they are asbestos personal injury claims
10 -- and you can walk through them --
11 Asbestos PI claims, channel
12 asbestos Trust.  You can walk through the
13 definitions, and they are ultimately
14 claims that are channelled to the Trust.
15        If there is some other kind
16 of claim for which they are seeking
17 insurance coverage -- and I can't quite
18 imagine what it is, because I am not
19 aware that they are alleged vendor of any
20 products of Grace don't contain
21 vermiculite and create an
22 asbestos-related injury alleged from
23 vermiculite, then they wouldn't be
24 enjoined.  But I don't think there are

Page 179

1  any such claims.  I never heard of them.
2  So that's the caveat.
3         Q.   If the underlying claim or
4  an underlying claim against Scotts
5  alleges that Scotts itself was negligent
6  and Scotts is held liable in that case
7  for its own negligence and perhaps for
8  the negligence of Grace and then seeks
9  coverage against the settled asbestos
10 insurers under the vendor endorsements,
11 are all of those claims enjoined by the
12 asbestos PI channelling injunction?
13        MS. HARDING:  Object to the
14 form.
15        THE WITNESS:  The only
16 claims that are enjoined by the
17 asbestos PI channelling injunction
18 are claims against settled
19 insurers that meet two
20 qualifications:  One, they are
21 indemnified by Grace, the claim
22 against the insurer; and, two,
23 they are based on exposure to an
24 asbestos-containing product

Page 180

1  manufactured, distributed, et
2  cetera, by Grace.  Those are the
3  two requirements, and as far as I
4  can recall, the only two
5  requirements.
6  BY MR. BROWN:
7         Q.   Can you look at what's been
8  marked as ACC-9?
9         A.   I am looking at it.
10        Q.   You have seen this document
11 before?
12        A.   Yes, I saw it in a courtroom
13 in the not-too-distant past.
14        Q.   And you would recall when
15 you saw it in the courtroom, that
16 Mr. Bernick drew a line on this diagram.
17        Do you recall where he drew
18 a line?
19        A.   No.
20        Q.   I will refresh your
21 recollection.  It was from the block that
22 says "Scotts" directly into the block
23 that says "Asbestos PI Trust."
24        A.   Okay.  I can imagine why he

Page 181

1  would have drawn that line.
2         Q.   And he was indicating by
3  that line, as I understood it, that claim
4  4 on this diagram, claim 5, and claim 6
5  are nonexistent.
6         Is that your understanding?
7         A.   Of what he was doing or what
8  the facts are?
9         Q.   Yes.  Of what he was doing?
10        A.   To the extent stated in the
11        MR. FINCH:  Object to form.
12        MS. HARDING:  Objection to
13 form.
14        THE WITNESS:  If you drew a
15 line from the box called "Scotts"
16 to the Trust, that would be what
17 one was doing.
18 BY MR. BROWN:
19        Q.   Okay.  And do you agree with
20 that?
21        A.   To the extent stated in the
22 answers to the previous questions, i.e.
23 that if -- the box at the top that gives
24 rise to the claims against Scotts says
25 "asbestos claimants."  If those asbestos

Page 182

1  claimants have a claim against the Grace
2  Trust as shown by number 1 and also have
3  a claim against Scotts and the claim
4  against Scotts is based on as how he put
5  it, G plus S, which I would infer to mean
6  Scotts selling a product -- let's back
7  up.
8         What is a vendor
9  endorsement?  You are only entitled
10  coverage under somebody else's policy.
11  These are not Scotts policies.  They are
12  Grace policies.  Scotts says, I have got
13  a vendor endorsement.  That means I am a
14  seller of a product, as I understand it,
15  that you, the person whose policy I am
16  claiming vendor coverage under, sold to
17  me.
18         So I don't personally see
19  how Scotts could be a vendor of a
20  non-asbestos Grace product that would
21  give rise to an asbestos-related personal
22  injury claim.  And, therefore, I think
23  that it should be -- unless there is some
24  kind of weird kind of claim that I

Page 183

1  haven't heard emanating from Scotts, the
2  line actually should go from Scotts to
3  the Asbestos PI Trust, and numbers 4, 5,
4  and 6 are an all set.
5         Q.   And that's true even if the
6  basis of the underlying asbestos claim
7  brought by the claimants against Scotts
8  is at least, in part, as a result of
9  Scotts' own negligence in selling Grace's
10  product?
11         A.   Well, the question -- when
12  you add that hypothetical, then you get
13  to the question of does the vendor
14  endorsement apply at that time.
15         Q.   That's a coverage issue.
16         A.   And I don't know the answer
17  to that.
18         Q.   That's a coverage issue.
19         A.   I understand that.  But you
20  are asking me to assume the answer to a
21  coverage issue.  You are asking me to
22  assume that the claim could be based on
23  Scotts' own negligence but nevertheless
24  still covered by the vendor endorsement.

Page 184

1         If that's true -- but it
2  still has to arise -- Scotts has to have
3  been negligent in, if you will,
4  re-selling a Grace product, and so the
5  underlying exposure would be to the Grace
6  product.
7         As the Plan is drafted, if
8  you look at the definition of asbestos
9  personal injury claim and sort of trace
10  that through to what winds up going into
11  the Trust, it would not cut off the fact
12  that somebody who was selling a Grace
13  product had some sort of additional basis
14  for the liability of that product.  They
15  were being sued as a result.
16         So the answer is that,
17  unless the court says that claim cannot
18  be channelled to the Trust, it is
19  channelled to the Trust.
20         Q.   Okay.  Let's go to Section
21  8.25, Asbestos PI Channelling Injunction.
22         A.   I have it.
23         Q.   I am sorry.  I am just
24  looking at my notes here.

Page 185

1         I am correct, am I not, that
2  the asbestos PI channelling injunction,
3  among other claims, enjoins any claims
4  that BNSF has against settled asbestos
5  insurance companies that arise from
6  asbestos PI claims?
7         A.   Generally stated, I believe
8  that to be correct.
9         Q.   Are there any exceptions
10  about when you are aware?
11         A.   Again, I would have to parse
12  the definitions to see whether there
13  might be some hypothetical possibility of
14  a claim that wouldn't be covered.  But to
15  the extent that BNSF is asserting against
16  settled insurers claims that are based on
17  asbestos-related injuries arising from
18  Grace vermiculite that somehow or another
19  BNSF was involved with and held liable
20  for, those claims are channelled to the
21  Trust.
22         Q.   Okay.  And are the claims
23  that the Libby claimants have asserted or
24  could assert against the settled asbestos

Page 186

1  insurance companies relating to asbestos
2  PI claims, are they, too, enjoined and
3  channelled pursuant to the asbestos PI
4  channelling injunction?
5      A.   Yes.  The Libby claimants
6  are no different from any other asbestos
7  personal injury claimant as far as this
8  injunction is drafted.
9      Q.   Okay.  And the claims that
10  the settled asbestos insurance companies
11  have, contractual or otherwise, that
12  arise from asbestos PI claims against the
13  Debtors, Non-Debtor affiliates, Sealed
14  Air, the Sealed Air indemnified parties,
15  and the Fresenius indemnified parties are
16  all enjoined under this asbestos PI
17  channelling injunction as well, correct?
18      A.   I refuse to accept the
19  proposition that there can be any such
20  claims, because the claims against you
21  that would give rise to those indemnity
22  claims are all enjoined, and so you
23  are -- it's a catch-22.  If the claims
24  could be asserted against you, it would

Page 187

1  be because there is no 524(g) injunction.
2          If there is no 524(g)
3  injunction, there is no Trust.  There is
4  no -- so the Trust hasn't -- there is
5  nothing -- there is no place to channel
6  them.  If there is no 524(g) channelling
7  injunction, this Plan doesn't exist.  You
8  are back to square one.  You got
9  indemnity claims against Grace.
10      Q.   But, Mr. Lockwood, just a
11  few moments ago, you put some
12  qualifications on the scope of the
13  channelling injunction as applied to the
14  Scotts action.
15      A.   Yeah, because those claims
16  were claims to be an additional insured,
17  and the asbestos personal injury -- you
18  can be an additional insured with respect
19  to asbestos claims and with respect to
20  non-asbestos claims.
21          The channelling injunction
22  deals with asbestos claims.  The claims
23  you have recited for BNSF and Libby are
24  asbestos claims.  There is no dispute to

Page 188

1  my knowledge as to whether they are
2  asbestos claims or not.  So they are more
3  straightforward.
4          The Scotts claims, if one
5  could hypothesize having a vendor claim
6  out of non-asbestos activities, which I
7  don't think you can, but I am trying to
8  be accurate as to what the injunction
9  doesn't do -- I don't think Scotts is in
10  any different position from BNSF because
11  I don't think Scotts has any non-asbestos
12  vendor claims under your policies.
13          But if it did, since they
14  weren't asbestos claims, they wouldn't be
15  covered by the asbestos permanent
16  channelling injunction.
17      Q.   Is it safe to say you can't
18  answer my question?
19      A.   I thought I answered your
20  question.
21      Q.   Well, I thought your
22  explanation was why you couldn't answer
23  it.
24          MR. FINCH:  Object to form.

Page 189

1          MS. HARDING:  Object to form
2  as well.
3          THE WITNESS:  Re-ask your
4  question so I can figure out why I
5  didn't answer it, if you think I
6  didn't answer it.
7          MR. BROWN:  Can you go back
8  to that question?
9          (The reporter read from the
10  record as requested.)
11          THE WITNESS:  And I said to
12  you --
13          MR. BROWN:  Let's hear what
14  you said to me.
15          (The reporter read from the
16  record as requested.)
17          THE WITNESS:  All I can say
18  is I did a hell of a job trying to
19  answer your question.
20  BY MR. BROWN:
21      Q.   You weren't willing to
22  accept the proposition was the problem
23  from the outset.
24      A.   Well, I think -- there is

Page 190

1    still a fundamental disconnect in the
2    sense that the asbestos permanent
3    channelling injunction either applies or
4    it doesn't apply.
5            If it applies, it cuts off
6    the claims before they reach you.  If it
7    doesn't apply, it doesn't channel your
8    indemnity claims to the Trust.
9            The only exception to that,
10   which might be covered under some other
11   provision of the Plan, is if Scotts has a
12   non-asbestos claim, which is determined
13   to be eligible for vendor coverage under
14   your policies and they are not exhausted
15   and blah, blah, blah and it ultimately
16   gets determined that there is actual
17   liability on your part and that liability
18   was indemnified by Grace, then the
19   asbestos permanent channelling injunction
20   doesn't apply.
21           Whether there is some other
22   provision in the Plan that would preclude
23   that claim from being asserted, I don't
24   remember.

Page 191

1            Q.    I think we are talking past
2    each other.  Let's just move on.
3            Let's go to Section 8.4,
4    which is the Asbestos Insurance Entity
5    Injunction.
6            A.    I have it.
7            Q.    What is the purpose of this
8    injunction?
9            A.    The purpose of this
10   injunction --
11           MS. HARDING:  Object to
12   form.
13           THE WITNESS:  Excuse me?
14           MS. HARDING:  I just object
15   to form.
16           THE WITNESS:  From the ACC's
17   perspective, the purpose of this
18   injunction is to protect the
19   insurance assets being transferred
20   to the Trust from being
21   intercepted, if you will, or --
22           MR. FINCH:  Looted.
23           THE WITNESS:  -- looted or
24   pillaged, or whatever, by claims

Page 192

1    from claimants, direct action type
2    claims.
3            This is intended to be a
4    communal asset for the benefit of
5    the present of future claimants in
6    the Trust, and allowing individual
7    claimants to go around the back
8    door, if you will, and bring
9    claims against the insurers whose
10   coverage was being assigned for
11   the communal benefit of the Trust
12   would be inequitable, in our view,
13   and that's the purpose of this
14   injunction.
15   BY MR. BROWN:
16           Q.    Okay.  You are aware that
17   Scotts and BNSF have asserted certain
18   rights under certain asbestos insurance
19   policies, correct?
20           A.    Correct.
21           Q.    Does this injunction enjoin
22   those two entities from pursuing coverage
23   for asbestos-related claims under the
24   settled asbestos insurance policies or

Page 193

1    frankly under any asbestos insurance
2    policies?
3            MR. FINCH:  Object to form,
4    compound.
5            THE WITNESS:  Not if what we
6    are suing for is not based upon or
7    arising out of an asbestos PI
8    claim against the Debtors or any
9    asbestos insurance rights.
10           If they are asserting -- you
11   have to look at the definition of
12   asbestos PI claim; you have to
13   look at the definition of asbestos
14   insurance rights.
15           The asbestos insurance
16   rights are the rights of the
17   Debtor.  They are not the rights
18   of Scotts or BNSF.  So you have --
19   and asbestos PI claims are
20   personal injury claims arising out
21   of exposure to Grace products.
22           So it would depend upon,
23   again, the type of claim that was
24   being asserted by Scotts or BNSF.

Page 194

1    BNSF, for example, purports to
2    have, at least in one instance, I
3    think it's Royal, claims issued
4    directly to it by Royal that were
5    somehow procured by Grace but
6    which don't cover Grace.  I don't
7    believe that this injunction would
8    preclude suits by BNSF on that
9    sort of insurance claim.
10 BY MR. BROWN:
11    **Q.    Would the prior injunction**
12 **enjoin that type of claim?**
13    A.    The asbestos personal
14 injury?
15    **Q.    Yes.**
16    A.    No, because those policies
17 are not within the definition -- they are
18 not covered in Exhibit-5, and so Royal
19 wouldn't be an asbestos-protected party
20 with respect to those policies.
21    We are now talking about
22 non-settled coverage here, aren't we?
23 Wasn't that what your question was?
24    **Q.    I don't know.  This was your**

Page 195

1 **hypothetical.**
2    A.    You asked me were the claims
3 as additional insureds of BNSF and Scotts
4 covered by this injunction, and I am
5 trying to tell you it depends on what
6 kind of claims against whom.
7    I mean, it's got -- first,
8 unlike the 524(g) injunction, which
9 applies only to protected parties, this
10 applies to people with settled coverage,
11 unsettled coverage, reimbursement
12 coverage, as long as it's coverage that's
13 being transferred to the Trust.  If it's
14 coverage that's not being transferred to
15 the Trust, then there is no effort to
16 protect it.
17    **Q.    Okay.**
18    A.    The complexity of your
19 question arises out of the fact that you
20 could have coverage that's being
21 transferred to the Trust, which somebody
22 nevertheless claims to be an additional
23 insured on, such as Scotts under a vendor
24 endorsement.  And there, I think this

Page 196

1 injunction probably does preclude Scotts
2 from seeking that coverage, although I
3 really have to think about that.
4    I don't know.  I have to
5 confess that I haven't really -- I would
6 really have to parse this to make sure
7 whether -- if you are talking about
8 unsettled coverage, not settled coverage,
9 but unsettled coverage.  And I am not
10 sure Scotts -- so if it's unsettled,
11 then, by definition, it hasn't been
12 indemnified by Grace.  So the claims
13 don't go to the Trust on that basis.
14    I guess I have to just say I
15 think it may very well be enjoined by
16 this, but, really, to be more confident
17 about that, I would really have to spend
18 more time parsing this and thinking about
19 it.
20    **Q.    Okay.**
21    A.    I think it would be
22 channelled -- not channelled but
23 enjoined.
24    **Q.    I am going to move at this**

Page 197

1 **point from the Plan to another document,**
2 **so why don't we take a quick break.**
3    A.    Okay.
4    (There was a break from 2:10
5    p.m. to 2:22 p.m.)
6 BY MR. BROWN:
7    **Q.    Mr. Lockwood, can you take a**
8 **look at Exhibit-2.  That's Exhibit-2 to**
9 **the Plan, which we are going to mark as**
10 **ACC1-10.**
11    (ACC 30(b)(6)-10 marked for
12    identification at this time.)
13 BY MR. BROWN:
14    **Q.    Can you identify it?**
15    A.    ACC Exhibit-10 is the
16 Asbestos PI Trust Agreement, which is
17 attached as Exhibit-2, to the February
18 27, 2009 Plan reorganization of W.R.
19 Grace.
20    **Q.    Can I direct your attention**
21 **to Section 2.2 entitled General**
22 **Administration and specifically**
23 **subsection (e).**
24    A.    Yes.

Page 198

Q.    There is a reference in subsection (e) to the TAC, T-A-C, which is the Trust Advisory Committee, correct?

A.    Correct.

Q.    And the Futures Representative, which is the Asbestos PI Futures Representative, correct?

A.    Correct.

Q.    And earlier today, we went through a list of the individuals who are on the TAC, and you mentioned Russell Budd, John Cooney, Joe Rice, and Perry Weitz.

A.    Correct.

Q.    Am I correct that each of those gentlemen or their respective firms represent asbestos claimants with claims against Grace?

A.    Correct.

Q.    Can you give me some idea of how many claims Mr. Budd's firm has against Grace?

MR. FINCH:  Objection, lack of foundation.

Page 199

THE WITNESS:  No, except that it's -- I think we established when we were doing request for admission or something to somebody that all four of those, each one of those firms represents at least 1,000 claimants against Grace.

BY MR. BROWN:

Q.    We did.

A.    What I don't know is how many more than a thousand any of them may represent.

Q.    Okay.

A.    The proofs of claim are on file. Somebody could go and ascertain that, if it mattered.

Q.    Okay.  Do you know how many -- the firms that those four TAC members are members of collectively how many they have?  In other words, if you took the four firms, do you have an idea or estimate as to the number of claims that they have against Grace?

Page 200

MR. FINCH:  Objection, foundation.

THE WITNESS:  Only in the sort of vaguest and most general terms.  Well, I am sure it's more than 10,000.  Again, it could be 20,000; it could be 30,000.  I just don't know.

Those firms -- with the exception of Mr. Cooney's firm, those firms represent a lot of people.  And in the case of Mr. Rice, he has co-counsel relationships, his firm does, with a lot of other firms.  So it gets into the question of, quote, what do you mean by representation, sole representation, joint representation.  But, suffice it to say, they represent a lot of claimants.

BY MR. BROWN:

Q.    Okay.  And in their capacity as counsel for those claimants, they have

Page 201

fiduciary duties to their clients, correct?

A.    However those are established by the local bars, et cetera, before which they practice, yes, generally.

Q.    And they get paid to represent those clients, correct?

A.    Generally speaking, I assume that's correct.

Q.    And is it your understanding that, generally speaking, that's through a contingency arrangement?

A.    Again, generally speaking, correct.

Q.    And is it your understanding that the contingent fee that is typically charged by those firms is somewhere between 33 and a third and 40 percent of the recovery?

MR. FINCH:  Objection, lack of foundation, calls for speculation.

THE WITNESS:  I really don't

Page 202

1    have firsthand knowledge of that.
2    BY MR. BROWN:
3        Q.   Okay.  Well, if it's a
4    contingent fee arrangement and there is
5    no recovery, there is no payment to the
6    firm, generally speaking, correct?
7        A.   Except for reimbursed
8    expenses in those states that permit you
9    to advance expenses and require that you
10   seek recovery from your client under
11   their ethical rules, but yes.
12       Q.   So is it fair to say that
13   Mr. Budd, Mr. Cooney, Mr. Weitz, and
14   Mr. Rice are motivated by their fiduciary
15   obligations and their own personal gain
16   to obtain a recovery on behalf of their
17   clients against the Asbestos PI Trust?
18       A.   When they are acting as
19   counsel for their individual clients,
20   yes.
21       Q.   Okay.  How about when they
22   are acting as TAC members?
23       A.   When they are acting as TAC
24   members, they have a fiduciary

Page 203

1    obligation, as they do as ACC members, to
2    look out for the interests of the
3    constituency they represent as a whole.
4        Q.   Okay.  And the fiduciary
5    duties that they owe to their clients, on
6    the one hand, and to all beneficiaries of
7    the Asbestos PI Trust, on the other hand,
8    are they the same?
9        A.   I don't know how to answer
10   that question.
11       Q.   Let me --
12       A.   Because they are acting in
13   different capacities.  So when you say
14   are they the same, do you mean do they
15   come from the same source?  I can't
16   answer that.
17       Q.   Are the fiduciary duties
18   that they have to their clients, on the
19   one hand, and to all claimants against
20   the Asbestos PI Trust in conflict with
21   one another at any level?
22       A.   As a general proposition, I
23   don't think so, because when they process
24   individual claims against the Trust, they

Page 204

1    are not acting as TAC members.  And when
2    they are acting as TAC members, they are
3    not involved in processing individual
4    claims or evaluating individual claims or
5    having anything to do with individual
6    claims any more than they are as ACC
7    members with respect to individual claims
8    and their clients in the bankruptcy case.
9        Q.   Well, if you look at (e),
10   the section that I referred you to at the
11   outset, it says that the TAC members
12   should consult with the trustees on
13   matters of general implementation and
14   administration of the PI Trust.
15           MR. FINCH:  Object to form.
16       The document doesn't say that.
17   BY MR. BROWN:
18       Q.   All right.  Mr. Lockwood,
19   just take a look at Section 8, if you
20   would.
21       A.   It says, "The Trustees shall
22   consult with the TAC and the Futures
23   Representative on the general
24   implementation and administration of the

Page 205

1    PI Trust."
2        Q.   Okay.  What's covered by
3    Romanette (i), would that involve how the
4    Trust should deal with meritless claims?
5        A.   That question is hard to
6    answer in the sense that I am not sure
7    what you mean by meritless claims.  I
8    mean, the TDPs identify what claims are
9    eligible for compensation and what
10   aren't.
11           If you are of the personal
12   opinion that certain categories of claims
13   under the TDP, under the criteria are,
14   quote, meritless, close quote, well, the
15   TAC and the Futures Rep take the TDP as
16   it finds it.
17           So they don't have a
18   fiduciary obligation to render personal
19   opinions about the TDP criteria as it
20   applies to individual clients or
21   individual claims.
22           That said, at some level, I
23   suppose they have a generalized -- if the
24   trustees raise with them the question, on

Page 206

1  some generalized basis, whether there is
2  some large category of claims that are,
3  quote, meritless that are not otherwise
4  prescribed by the Trust, I could
5  hypothesize the situation where they
6  might be consulted on that subject.
7      Q.   Okay.  And that would be
8  true even if their firm was the firm that
9  submitted those claims, correct?
10     A.   Well, if their firm was the
11 firm that submitted their claims, I would
12 assume that they would recuse themselves,
13 just like any organization, if there was
14 a specific conflict of interest on a
15 subject like that, the party involved
16 would recuse themselves.
17     Q.   Is there anything in the
18 Trust Agreement or the TDP that requires
19 them to recuse themselves?
20     A.   No, but there is nothing in
21 the TDP that requires them to act in any
22 way different from any set of fiduciaries
23 that are they are confronted in a
24 particular factual context, some conflict

Page 207

1  of interest between their personal
2  interests and their interest of the
3  entity that they are involved with.
4      Q.   Well, to the extent that
5  their fiduciary duties to their clients
6  in any particular case are in conflict
7  with their fiduciary duties to all
8  beneficiaries of the Asbestos PI Trust,
9  are they required to step aside from the
10 decision-making?
11     MR. FINCH:  Objection, form.
12     THE WITNESS:  Yeah, I
13 mean -- if you take the position
14 that prosecuting an individual
15 claim is a conflict with the
16 interest of the Trust as a whole
17 because if the claim is
18 successful, it will reduce the
19 amount in the Trust that would be
20 available to other people; if the
21 claim were unsuccessful, then no,
22 they don't have an obligation not
23 to prosecute individual claims.
24     It's well understood that

Page 208

1  the whole function of the TAC is
2  to represent the interest of
3  people with individual claims,
4  albeit on a collective basis.
5      If you are saying the
6  hypothetical you gave earlier that
7  if there was some -- the trustees
8  were proposing a change that
9  somehow or another focused on the
10 individual claims of a particular
11 firm as opposed to categories of
12 claims that virtually all lawyers,
13 asbestos lawyers represented, then
14 you might have a recusal issue.
15     And/or the trustees might be
16 motivated to discount the advice
17 they were getting.  Because this
18 is a consultation provision.  It
19 doesn't say the trustees having
20 consulted with the TAC; all of a
21 sudden have to agree with whatever
22 the TAC tells them.  It just says
23 they have to consult with them.
24 BY MR. BROWN:

Page 209

1      Q.   What about the next
2  subsection, which is (f), which sets
3  forth a whole series of items on which
4  the trustees must obtain the consent of
5  the TAC and the Futures Representative?
6      A.   Subject to certain other
7  provisions that apply if the TAC and the
8  FCR don't give their consent, yes.  What
9  do you mean what about it?  There are --
10 it exists in the TDP, in the Trust
11 Agreement.  And there are specified
12 things that they have to obtain consent
13 from the TAC on and the FCR, and if they
14 don't get the consent, they can get them
15 overruled by the judge.
16     Q.   Let me ask you a more
17 general question.  What is the need to
18 have the TAC?
19     A.   The TAC goes back -- the
20 concept goes back at least to the
21 Manville TDP.  And the notion was that
22 this was -- this Trust was created --
23 well, let me start out by saying that my
24 partner, Mr. Inselbuch, who you are going

Page 210

1  to take the deposition of on June 12th --
2      Q.   Somebody is.
3      A.   -- is a lot better to
4  equipped to give you the historical
5  overview of these kind of TDP provisions
6  than I am, and anything I say on this
7  subject frankly is subject probably to be
8  corrected by him.
9          But, in general, as I
10  understand the history of the concept,
11  the idea was that this is a settlement
12  between a whole lot of people who are
13  agreeing to have their claims taken away
14  from the Debtor and put in a Trust, and
15  the Trust is going to deal with the
16  claims.
17          And the notion was that --
18  first, it was always a criteria you would
19  not put a asbestos personal injury lawyer
20  or anybody would submit claims in as a
21  trustee. So the trustee, by definition,
22  therefore, in order to avoid that sort of
23  conflict, were not going to have any real
24  knowledge about asbestos personal injury

Page 211

1  litigation and asbestos personal injury
2  claims.
3          And, as I understand, the
4  notion was that it would be a good idea
5  to do two things: First, have
6  experienced personal injury lawyers
7  around who could, to the extent needed,
8  educate trustees who come to the job with
9  no real knowledge of how the system works
10  to give them input. That's the
11  consultation notion.
12          And the same for the FCR,
13  who would be a counterbalance, to some
14  extent, because to the extent that the
15  TAC represents present claimants, it
16  would have, even as a collective group
17  representing present claimants, some kind
18  of incentive to try and get more money
19  out sooner than might be in the
20  beneficial interests of the future
21  claimant. So you have the Future
22  Claimants' Representative who has got
23  coequal status in the TAC in advising the
24  trustees.

Page 212

1          With respect to the consent
2  process, the notion was we made a deal in
3  the bankruptcy case. That deal was
4  embodied in the Trust Agreement and the
5  TDP. If people are going to start
6  changing that deal after the fact, then
7  representatives who knew and were
8  involved with making the original deal
9  ought to at least presumptively have some
10  voice in whether or not it's okay to
11  change it.
12          However, there is the safety
13  valve on that, which is if the TAC, for
14  example, decides that they want to
15  resist -- let's assume you needed to
16  change the payment -- lower the payment
17  percentage because you thought there was
18  going to be more future claims coming in
19  than had been predicted.
20          Well, the TAC might have an
21  institutional interest in keeping the
22  payment percentage high, and the Futures
23  Rep might want to see it lowered and the
24  trustees might want to see it lowered.

Page 213

1  So how do you deal with that?
2          Well, the TAC is supposed to
3  be representing the present claimants.
4  That's where their fiduciary is. So if
5  they don't consent, you go to the judge,
6  and you say, judge, "The TAC is being
7  unreasonable here." And that's how you
8  resolve it. So, in an overview sense,
9  that's the concept behind it.
10      Q.   Okay. The statute 524(g)
11  does not require a TAC in connection with
12  an asbestos Trust, does it?
13      A.   It doesn't require a TAC,
14  and it doesn't require a Futures Rep.
15  But the legislative history says it was a
16  modeled on Manville and Manville has had
17  an SEB on the Futures Representative,
18  vis-a-vie the Trust, at least since the
19  Trust was reorganized in the mid-1990s or
20  early 1990s. Again, Inselbuch can tell
21  you more about that because he was there.
22      Q.   The TAC, if I understand the
23  Trust Agreement, has fiduciary duties to
24  indirect PI Trust claimants as well,

Page 214

1  correct?
2       A.   As a general proposition,
3  that's true.
4       Q.   Now --
5       A.   But I will say -- it's a
6  little tricky because it's clear that the
7  vast bulk of the claimants whose claims
8  were being channelled to the Trust are
9  direct claimants.  And, moreover, the
10  individual -- the indirect claimants
11  generally tend to be entities that have
12  the financial and legal wherewithal to
13  look at their own interests.
14       So my own personal
15  perspective on it, while you can make a
16  general statement on the fiduciary
17  obligation, the major focus of the TAC
18  and the FCR is direct claimants, not
19  indirect claimants.
20       Q.   To the extent that the TAC
21  acts in a manner that the indirect
22  asbestos PI claimants feel is in their
23  interest, is the TAC insulated from any
24  liability to indirect asbestos PI

Page 215

1  claimants?
2       A.   Could you reread that
3  question, please?
4            (The reporter read from the
5       record as requested.)
6            THE WITNESS:  Aren't you
7       missing a "not" in that question?
8  BY MR. BROWN:
9       Q.   Against their interest is
10  what I meant.
11       A.   There is, I think, in here
12  some kind of a -- I don't know what you
13  call it -- exculpation provision or
14  something.  But it doesn't cover bad
15  faith.
16            So the answer is we would
17  have to look at the document to determine
18  exactly what potential liability TAC
19  has.
20            And, moreover, given the
21  TAC's role, which is it doesn't have the
22  unilateral power to make any decisions.
23  The trustees make the decision, and the
24  TAC consults or consents.  It's a little

Page 216

1  hard to hypothesize the claim that you
2  talk about.
3            But, in any event, I am
4  looking for the -- I am pretty sure there
5  is a Trust Agreement provision here
6  somewhere that addresses -- Section 4.6.
7  Essentially, it provides for indemnity
8  and exculpation to the extent that that's
9  permitted by a statutory trust law, Trust
10  organized under the laws of Delaware.  So
11  whatever the laws of Delaware permit you
12  to indemnify fiduciaries for is what's
13  provided.
14            And that's obviously both
15  fact-specific and depends.  And I don't
16  know what Delaware law does or doesn't
17  provide on hypothetical fact
18  circumstances.
19       Q.   Let's go to page 13 on my
20  draft.
21       A.   Of the Trust Agreement?
22       Q.   Yes.
23       A.   I am there.  What Section is
24  this, just to make sure we have the same

Page 217

1  pagination?
2       Q.   It's under the Consent
3  provision.  It's (f), Romanette (xiv).
4       A.   I see it.
5       Q.   I am not sure I understand
6  this, the latter part of this, and I want
7  to ask you what it means.
8            Do you see where it says,
9  "...or to comply with an applicable
10  obligation under an insurance policy or
11  settlement agreement pursuant to Section
12  [6.5] of the TDP"?
13       A.   Yes.
14       Q.   Does this mean that the
15  trustees need the consent of the TAC in
16  order to comply with obligations under
17  insurance agreements, insurance policies?
18       A.   Well, first, since it
19  incorporates Section 6.5 of the TDP, you
20  have to look to see what that is, because
21  it certainly -- if there is any
22  limitations on their ability to comply
23  with obligations under transfer insurance
24  rights, it's got to be spelled out in

Page 218

1    6.5.  There is no other limitation
2    expressed in that paragraph.
3           6.5 deals with the
4    confidentiality of claimants'
5    submissions.  In general, it takes the
6    position that claimants' submissions to
7    the Trust are made in the course of
8    settlement negotiations and, therefore,
9    would be treated as confidential.  To the
10   extent state law provides a privilege,
11   the privilege is not going to be
12   eliminated.
13           There is then a provision --
14   there is a provision about subpoenas
15   getting information.  And then there is
16   the sentence, "Notwithstanding anything
17   in the foregoing to the contrary, with
18   the consent of the TAC and the Futures
19   Representative, the PI Trust may, in
20   specified limited circumstances, disclose
21   information, documents or other materials
22   reasonably necessary in the PI Trust's
23   judgment to preserve, litigate, resolve
24   or settle coverage, or to comply with any

Page 219

1    applicable obligation under an insurance
2    policy or settlement agreement within the
3    Asbestos Insurance Policies or the
4    Asbestos Insurance Settlement Agreements;
5    provided...," and then it takes steps
6    reasonably feasible in its judgment to
7    preserve the further confidentiality of
8    such documents, et cetera.
9           That's the scope of this.
10   It basically has to do with the
11   confidentiality of medical information
12   and personal information that's submitted
13   in claims files.
14      Q.   So if an insurance company
15   wants to see that information because the
16   Trust is seeking recovery under an
17   insurance policy for that claim, the
18   trustees need the consent of the TAC to
19   provide that information to the insurer;
20   is that correct?
21      A.   Voluntarily.  And, again, if
22   the TAC were to refuse to consent to it,
23   there is dispute resolution provisions.
24   The Trust could go to the bankruptcy

Page 220

1    court, and indeed there have been some
2    instances in which there has been
3    litigation, existing trusts by the Trust,
4    trying to get the court to determine that
5    certain claims information has to be
6    turned over to certain insurers in
7    connection with settlement agreements,
8    for example.
9           And in some instances, the
10   Trust has issued orders saying that
11   effect.  So this is not an absolute veto
12   power on the part of the TAC.
13           But, as I say, the
14   plaintiffs bar and their clients have a
15   general feeling that their personal
16   medical information shouldn't be
17   indiscriminately disseminated to anybody
18   who says they have a desire to do so --
19   excuse me -- to use it for whatever
20   purposes they may wish to use it.
21      Q.   I want to turn your
22   attention now to Section 5.5.
23      A.   Of the Trust Agreement?
24      Q.   Yes.

Page 221

1       A.   Okay.
2       Q.   Now, there is a provision,
3    as I understand it, under the TDP
4    pursuant to which an asbestos PI claim
5    can resort to the tort system after going
6    through a bunch of hoops; is that
7    correct?
8       A.   Correct.
9       Q.   If the asbestos PI claimant
10   elects to do that, then I presume that
11   the Trust will have defense counsel to
12   defend that claim; is that correct?
13      A.   One would assume that would
14   be the case.  It's happened to
15   infrequently in practice that it's hard
16   to know, but I can't imagine that they
17   would defend themselves in court without
18   a lawyer.
19      Q.   Okay.  And would that lawyer
20   be a Trust professional as that term is
21   used in Section 5.5(a)?
22           MR. FINCH:  5.5(a) talks
23   about TAC employment of
24   professionals.

Page 222

1    THE WITNESS: But it also
2 talks about Trust professionals.
3    You would have to go back
4 and look at the definition of
5 Trust professional.
6    That's an interesting
7 question. I don't know whether
8 they would be considered to be a
9 Trust professional or not,
10 actually.
11 BY MR. BROWN:
12    Q.  I don't think I can find a
13 definition of Trust professional.
14    A.  It's in Section 4.8(a), the
15 fourth line. As a general proposition,
16 the Trust professionals are clearly
17 people who represent the Trust in a sort
18 of generalized sense, but it does include
19 counsel. Whether or not it would include
20 counsel in a particular case -- suffice
21 it to say that if the question is would
22 the TAC and members of the TAC have
23 access to the files of a counsel for the
24 Trust that was the defending case --

Page 223

1    Q.  That's the question.
2    A.  -- brought by the TAC's law
3 firm, the answer is no.
4    Q.  Where does it say that?
5    A.  It doesn't have to say that
6 because the TAC's role is a generic role.
7 It talks about the general administration
8 of the Trust, et cetera.
9    Asking for information about
10 an individual claim that that guy is
11 pursuing in a tort system against the
12 Trust has nothing to do with the general
13 administration of the Trust and would be
14 a blatant exercise in abuse of kind of
15 fiduciary power, and no trustee would
16 accept it. And I don't believe it would
17 ever cross the mind of any TAC member
18 that they could even try it, much less
19 skied succeed it at it.
20    Q.  But this provision does give
21 them complete access, correct, as
22 written? It says, "...complete access to
23 all information generated by them or
24 otherwise available to the PI Trust..."

Page 224

1    A.  It says provided -- it says
2 "...complete access to all information
3 generated by them...," and it talks about
4 the TAC as a group.
5    An individual tort claim
6 would not be litigated by the TAC as a
7 group. At best, it would be litigated by
8 one of the TAC members. And the TAC
9 members -- I can't imagine the TAC
10 members saying, that as a group, we want
11 to find out how you are defending a
12 particular claim against did Trust so we
13 can give that information to the
14 plaintiff's lawyer that's part of our
15 group so we can help win the case.
16    I mean, it's just a
17 preposterous suggestion, quite frankly.
18 I mean, yeah, you are right, the document
19 doesn't prohibit that particular abuse of
20 fiduciary authority. But, you know,
21 documents generally don't hypothesize
22 every possible breach of fiduciary duty.
23 You could create a laundry list, 50 pages
24 long, of all of those possible abuses and

Page 225

1 say thou shall not commit each one of
2 them.
3    Q.  Mr. Lockwood, I am correct,
4 am I not, that there was no asbestos
5 insurance entity that was involved in the
6 drafting of the Asbestos PI Agreement?
7    A.  To the best of my knowledge,
8 that's correct.
9    Q.  Let's turn to Plan
10 Exhibit-4.
11    A.  I have it.
12    (Exhibit-11 marked for
13 identification at this time.)
14    THE WITNESS: Do you want me
15 to identify it?
16    MR. BROWN: Yes.
17    THE WITNESS: It's the Grace
18 Trust Distribution Procedures.
19 BY MR. BROWN:
20    Q.  Okay. Now, no asbestos
21 insurance entity was invited to
22 participate in the drafting of the TDP,
23 correct?
24    A.  To the best of my knowledge,

Page 226

1 that's correct.
2     **Q.  And no asbestos insurance**
3 **entity was consulted about the terms of**
4 **it, correct?**
5     MS. HARDING: Object to
6 form.
7     MR. FINCH: Object to form.
8     THE WITNESS: At one level,
9 that's certainly true. I mean, I
10 will say that, in fact, I believe
11 that there were -- because of the
12 process that we went through of
13 filing successive draft versions
14 of this, in effect, the insurer
15 saw earlier versions of the TDP,
16 indeed, I think have objected to
17 various provisions in them. And
18 those objections could be reviewed
19 as commenting on them. And then
20 there were filed amended versions
21 of them.
22     So to that extent, I guess,
23 they did have an opportunity to,
24 quote, comment on them, close

Page 227

1 quote. But other than through the
2 process that I have just
3 described, no.
4 BY MR. BROWN:
5     **Q.  Okay. The question was**
6 **whether they were consulted concerning**
7 **them.**
8     A.  Well, I understand that, and
9 sending you a -- serving a copy on you
10 and having you make an objection or file
11 some comment or argument in court could
12 be viewed at some level as consulting.
13     But, as I said, we didn't do
14 it other than in the manner that I just
15 described. If you don't think that's
16 consulting, that's fine.
17     **Q.  And no asbestos insurance**
18 **entity consented in writing or orally to**
19 **the terms of the TDP, correct?**
20     MS. HARDING: Object to
21 form.
22     MR. FINCH: Object to form.
23     THE WITNESS: Except for
24 Equitas and KWELM in the manner

Page 228

1 that I described earlier in my
2 deposition. That's as far as I
3 know, correct.
4 BY MR. BROWN:
5     **Q.  Okay. Did any asbestos**
6 **insurance entity play any role in the**
7 **establishment of a medical criteria in**
8 **the TDP?**
9     MS. HARDING: Object to the
10 form.
11     THE WITNESS: Not to my
12 knowledge.
13 BY MR. BROWN:
14     **Q.  How about the exposure**
15 **criteria?**
16     A.  Same answer.
17     **Q.  How about the claims**
18 **resolution process?**
19     A.  Same answer.
20     **Q.  How about any other term in**
21 **the TDP?**
22     MR. FINCH: Object to form,
23 overly broad.
24     THE WITNESS: Again, the

Page 229

1 only role that was played was --
2 well, let me back up a second.
3 This TDP is in most particulars
4 similar, if not identical, to TDPs
5 that have been adopted in prior
6 asbestos bankruptcy cases.
7     In many of those cases, the
8 same insurers have objected to the
9 same provisions of the TDPs that
10 they object to now. And in some
11 cases, over time the TDPs have
12 actually been modified and,
13 indeed, in some cases, some of the
14 provisions that we talked about,
15 like the one relating to providing
16 access for insurance coverage, I
17 believe was put into a TDP along
18 the way, not this one for the
19 first time, but some earlier TDP,
20 because it became apparent that
21 that was going to be needed to
22 deal with insurance problems.
23     And to that extent, the
24 insurers, as a result of this

Page 230

1  cumulative iteration process, have
2  had that sort of a role.
3  Obviously, that's not the kind of
4  role you have in mind.  The kind
5  of role you have in mind is coming
6  to you and saying we want to
7  negotiate about it, we want to get
8  your agreement to it, we want to
9  get your approval of it.  And that
10 sort of a role, to my knowledge,
11 you didn't have on this TDP.
12 BY MR. BROWN:
13      Q.   All right.  Under this TDP,
14 is there any role for any asbestos
15 insurance entity --
16      A.   In --
17      Q.   Well, I hadn't finished.
18      A.   Sorry.
19      Q.   -- in connection with any of
20 the claims resolution processes?
21      A.   Well, you yourself
22 identified one a few questions back,
23 which is if the claimant doesn't settle
24 its claim with the Trust, brings the

Page 231

1  claim against the Trust in the tort
2  system, and the Trust has to defend it.
3  It is certainly within the contemplation
4  of these documents that the Trust could
5  tender that defense in that claim to an
6  insurer.
7      Q.   Okay.
8      A.   And that would be where the
9  Trust -- while it doesn't spell that out
10 in here, that would certainly be a place
11 where an insurer might have an
12 involvement.
13      Beyond that, there is
14 nothing in the Trust that expressly
15 addresses any participation by insurers
16 in the claims resolution process.
17      That said, if some coverage
18 court decides that the insurers have the
19 right to participate in the claims
20 resolution process, the TDP has amendment
21 procedures in it, and the trustees might
22 very well conclude that if the only way
23 they could get access in the future to a
24 lot of valuable assigned insurance rights

Page 232

1  was to allow insurers to handle the
2  claims, they would have to right under
3  this document and the Trust Agreement
4  with the consent of the TAC and the FCR
5  to amend it to give the insurers a right.
6  But, in its present form, there is no
7  express provision involving the insurers
8  in the claims resolution process.
9      Q.   And that's true for the
10 expedited review, individual review, and
11 arbitration, correct?
12      A.   It's certainly true of the
13 expedited review and individual review.
14 It's an interesting question whether or
15 not the Trust could tender a claim for
16 arbitration to an insurer.  I don't know
17 whether there is anything that would
18 prohibit them from doing that.
19      Arbitration is, to some
20 extent, like litigation, and they could
21 certainly tender a claim for an insurer,
22 a litigation claim to an insurer.  They
23 might be able to.  I don't know of
24 anything that would preclude them, I

Page 233

1  guess, from tendering it to an insurer
2  for arbitration.  I don't know.
3      Q.   But the TDP doesn't spell
4  out any role?
5      A.   The TDP doesn't spell it
6  out, no.
7      Q.   Let's go to Section 2.6.
8      A.   Of which document?
9      Q.   Trust Distribution
10 Procedures, ACC-11.
11      A.   Okay.
12      Q.   Now, the first question I
13 have, that refers to indirect PI Trust
14 claims?
15      A.   Correct.
16      Q.   There is in Section 5.12 and
17 5.13 a couple of other terms that are
18 used.  In 5.12, the term "insurer-related
19 TDP claims" is used.
20      A.   Correct.
21      Q.   In 5.13, the term
22 "indemnified insurer TDP claims" is used.
23      And my first question is
24 whether those two terms are included

Page 234

1  within the term "indirect PI Trust
2  claim"?
3       A.   Well, that's, again, almost
4  a metaphysical debate, because --
5  actually, if you really parse the
6  definitions in the Plan, I remember
7  concluding that there was probably a
8  better argument that the claims that are
9  identified in 5.12 and 5.13 were direct
10 PI Trust claims and not indirect PI Trust
11 claims.
12       But we decided, rather than
13 to have to get into parsing things --
14 this is a classic example, these two
15 provisions of how you change TDP
16 provisions when insurers raise objections
17 that you think are meritorious in some
18 way or another.  We decided to just have
19 these specific provisions deal with
20 claims that are being channelled to the
21 Trust, whether they are direct claims or
22 indirect claims, being sort of not a
23 matter of great moment.  They are one or
24 the other or both.  And so they are dealt

Page 235

1  with in these two specific provisions --
2       MR. FINCH:  Which two are
3  you referring to?
4       THE WITNESS:  5.12 and 5.13.
5       -- to make sure that
6  everybody knew exactly how they
7  were going to be dealt with.
8  BY MR. BROWN:
9       Q.   So is your answer that the
10 terms "insurer-related TDP claims" and
11 "indemnified insurer TDP claims" might be
12 direct Trust claims or, on the other
13 hand, might be indirect Trust claims?
14      A.   My own personal opinion is
15 that they are direct PI Trust claims, if
16 you go back to the Plan and look at the
17 definitions.
18      Q.   Is that the ACC's position
19 or your personal position or both?
20      A.   Well, I mean, I am the ACC
21 representative, and I was the one who was
22 most involved in drafting the Plan, so I
23 guess it's the ACC's perspective.
24      I personally don't see

Page 236

1  frankly at the end of the day that it
2  matters whether they are direct or
3  indirect claims, and that's why we didn't
4  attempt to change the definition.
5  Remember, these two provisions are new.
6       Q.   I know.
7       A.   They were drafted long after
8  the definitions of direct and indirect PI
9  Trust claims were put in both the Plan
10 and in this TDP.
11      And so the question is, was
12 there any utility having agreed to put
13 these provisions in to deal with these
14 particular kinds of claims to going back
15 and trying to sort of re-write the
16 definitions of direct claims and indirect
17 claims to put them in one basket or the
18 other, and we couldn't see that it
19 mattered.
20      But if you, through your
21 probing cross-examination, convince me
22 that it does matter, then maybe we will
23 have to go and fix it.
24      Q.   Well, we are using the term

Page 237

1  "direct PI Trust claim," and I am not
2  sure there is such a term.
3       A.   Well, there may not be.  I
4  don't think there is an indirect PI Trust
5  claim, and I don't remember what -- there
6  is some term that we used for the claims
7  that are going in here somewhere, I would
8  assume.
9       Q.   Well, you have asbestos PI
10 claims.
11      A.   Well, maybe that's the term.
12 Yeah, it's asbestos PI claims.
13      Q.   So the ACC --
14      A.   It's on page 1, unnumbered
15 page 1, second line.  It says,
16 "...provide for resolving all 'Asbestos
17 PI Claims' as defined in the First
18 Amended Joint Plan of Reorganization," et
19 cetera.
20      Q.   I am sorry.  What document
21 are you in?
22      A.   TDP, page 1, second line on
23 the page.  There is the reference to
24 asbestos PI claims in quotes as defined

Page 238

1  in the First Amended Plan.  That's the
2  generic term.  And indirect PI Trust
3  claim is simply a subset of that.  And I
4  don't think it's an indirect PI Trust
5  claim.  I think it's an asbestos PI claim
6  which, of course, happens to include in
7  its definition indirect PI Trust claims.
8          (There was an interruption
9      at this time.)
10 BY MR. BROWN:
11     Q.    Just to circle out this line
12 of questioning, there is a Section in
13 5.6.
14     A.    Of the TDP?
15     Q.    Of the TDP.
16     A.    That's the section that
17 deals with PI claims.
18     Q.    So based on your answers
19 that you just gave, I presume that the
20 ACC's position is that 5.6 has no
21 application to insurer-related TDP claims
22 or indemnify insurer TDP claims?
23     A.    Correct.
24         MS. HARDING:  I think I

Page 239

1  wanted to object to form before
2  you answered, but that's all
3  right.
4  BY MR. BROWN:
5      Q.    Okay.  Let's go to page --
6          MS. HARDING:  Could you
7  repeat the question, please?
8          (The reporter read from the
9      record as requested.)
10         MS. HARDING:  Object to
11 form.  I think it's very
12 confusing.
13         THE WITNESS:  To make it
14 clear, the way in which the term
15 of the so-called insurance related
16 TDP claims are treated under the
17 TDP is set forth in Section 5.12
18 of the TDP and not in Section 5.6
19 of the TDP.
20         Similarly, the way in which
21 indemnified insurer TDP claims is
22 defined in the TDP, are treated
23 under the TDP is contained in
24 Section 5.13 of the TDP and not in

Page 240

1          Section 5.6 of the TDP.
2  BY MR. BROWN:
3      Q.    If I can direct your
4  attention now to Section 4.3 of the TDP.
5      A.    I have it.
6      Q.    Let's see.  The third full
7  paragraph begins "There is uncertainty."
8  I direct your attention to the second
9  sentence there.
10     A.    Yes.
11     Q.    If federal or state law were
12 to impose greater restrictions or limits
13 on the asbestos PI claimants to recover
14 in the tort system, is there a mechanism
15 under the Trust Agreement or the Trust
16 Distribution Procedures to incorporate
17 such restrictions or limits into the TDP?
18     A.    Yes, you could amend them.
19     Q.    Okay.  And does that
20 amendment require the consent of the
21 Trust Advisory Committee?
22     A.    Subject to the ability to go
23 to court if the trustees disagree with
24 the TAC's refusal to give such consent,

Page 241

1  yes.
2      Q.    Okay.
3      A.    I would also observe,
4  however, that to some extent, changes in
5  federal or state law could show up
6  without amendments to the TDP.  Because
7  in individual review, arbitration and
8  claims that go through to the tort
9  system, the trustees can apply applicable
10 state or federal law principles that
11 govern those claims.
12         The only claims for which
13 there are specified criteria, which might
14 or might not -- strike -- which might
15 become superseded at some level by some
16 hypothetical state or federal law would
17 be the expedited review provisions.  They
18 are the ones that are written down.
19         Everything else is you have
20 a claim, to the extent that you have a
21 valid claim under state law for
22 individual review, arbitration, and the
23 tort system.
24         So to the extent that you

Page 242

1  had such changes, they began to show up
2  in the results of individual review,
3  arbitration, or litigation in the tort
4  system, that could affect the totality of
5  the PI Trust claims to be paid over time,
6  which is what this sentence is talking
7  about.
8      Q.   All right.  If you look at
9  Section 5.3(a)(3), specifically the
10  sentence that begins "thereafter."
11         MR. FINCH:  What page are
12  you on, Mike?
13         MR. BROWN:  Mine is page 23.
14         THE WITNESS:  23.  I see it.
15  BY MR. BROWN:
16      Q.   Okay.  Now, there are some
17  limitations imposed by Section 524(g) and
18  by the Trust Agreement on the types of
19  changes that can be made under the TDP.
20         Is that a fair statement?
21         MR. FINCH:  Object to form.
22         THE WITNESS:  I am not sure,
23  actually.  What sort of
24  limitations do you have in mind?

Page 243

1  BY MR. BROWN:
2      Q.   Looking at the sentence that
3  I just directed you to, are there any
4  restrictions placed on the trustee in
5  terms of how they can change any of these
6  items, the disease levels, the scheduled
7  values, the medical or exposure criteria,
8  et cetera?
9      A.    Well, first, they have
10  fiduciary obligations to the
11  beneficiaries of the Trust which would
12  preclude them from making arbitrary
13  decisions that work to the detriment of
14  claimants.  So they have that sort of
15  restriction, but that's sort of general.
16         They have a restriction of
17  sorts in the need to go through the
18  consent process.  But at the end of the
19  day, they could do it, as I said earlier,
20  if a judge thought that either the FCR or
21  the TAC or both were being unreasonable.
22         I suppose, to go back to
23  your earlier question, that one could
24  hypothesize -- at some level, the

Page 244

1  trustees are obligated to make sure that
2  the Trust continues to comply with
3  524(g).  There is no question about that.
4  It's just hard to know what sort of
5  changes you could imagine that would be
6  consistent with their fiduciary duties to
7  the claimants that would jeopardize that.
8  So, yeah, it's a restriction, I guess,
9  but how it would actually ever come into
10  play, I don't know.
11      Q.   There is a reference on page
12  28 to foreign claims.
13      A.   Yes.
14      Q.   Which does not include
15  claims in U.S. jurisdictions or Canada.
16      A.   Correct.
17      Q.   Are there other claims
18  pending out there in other jurisdictions
19  right now?
20      A.   Against Grace?
21      Q.   Yes.
22      A.   I am not personally aware of
23  any such claims, but there have been
24  claims brought against other trusts by

Page 245

1  non-residents of the United States and
2  Canada.  So, therefore, since it's
3  possible, you put in a provision that
4  deals with the possibility that it might
5  occur in this case.
6         I mean, this is sort of a
7  standard provision nowadays in these
8  trusts.  I don't think it's responsive to
9  anything particular in the Grace case.
10  But, as I say, I just don't remember any
11  such claims.
12      Q.   All right.  Can you turn to
13  page 31?
14      A.   I am there.
15      Q.   The paragraph that begins,
16  "with respect"?
17      A.   Yes.
18      Q.   About halfway down the
19  sentence that begins "The choice of law
20  provision..."?
21      A.   Yes.
22      Q.   What is the purpose of this
23  provision?
24      A.   Let me refresh my memory on

Page 246

1  this.  Well, the first sentence has to be
2  taken into context with the second.
3      **Q.   Okay.**
4      A.   The first sentence was put
5  in because there is a prohibition on the
6  payment of punitive damages.  At some
7  point along the way, through an objection
8  to one of the prior plans, it was brought
9  to the attention of the ACCs that in
10 Alabama, the only way you could assert a
11 wrongful death claim is to call it a
12 punitive damage claim, even though you
13 were getting compensatory damages under
14 the wrongful death statute.  And that was
15 felt to be basically unfair to Alabama
16 wrongful death claimants.
17        But, on the other hand, you
18 didn't simply want to eliminate the
19 prohibition on real punitive damages in
20 Alabama.  So what you did was you said we
21 will apply a different jurisdiction; we
22 will apply Pennsylvania, which is where
23 the court was sitting in that Plan in
24 which this Plan was copied, which makes a

Page 247

1  distinction between wrongful death claims
2  and punitive damage claims.
3        So if an Alabama claim comes
4  in, you look to Pennsylvania law to see
5  whether it would be treated as a punitive
6  damages claim or a wrongful death
7  compensatory damages claim.
8        The second sentence has to
9  do with let's assume an Alabama claimant
10 brings a claim in Texas and the Texas
11 court was going to apply Alabama law, you
12 would want to have the same provision
13 apply to that choice of law claim as
14 applied if the claim had been brought in
15 Alabama in the first place.  And I think
16 that kicks you back up to -- and there
17 was also the notion that with respect
18 to -- this was put in with respect to
19 insurers who were taking the position
20 that it was arbitrary to sort to
21 reclassify Alabama punitive damages
22 claims as something else.
23        So it basically says this
24 reclassification only applies to the

Page 248

1  Trust, and if the Trust presents some
2  Alabama claim, decided under Pennsylvania
3  law to be not a punitive damages claim to
4  an insurer for reimbursement and the
5  insurer says this is a punitive damage
6  claim, I am not going to pay it because
7  my policy doesn't cover punitive damage
8  claims, then what this does is preserve
9  that argument in a form of insurance
10 neutrality, if you will, to that
11 insurance company because it says that
12 this provision is binding only on the
13 Trust and the claimants.  It's not
14 binding on the insurance company.
15      Q.   Okay.  That was a fair
16 explanation.
17        I am going to skip over 5.6
18 because we have been there.
19        Okay.  Let me direct your
20 attention to Section 5.7(b)(3),
21 specifically the last full paragraph and
22 the last sentence of that paragraph.
23      A.   Yes.
24      Q.   What's the purpose of that

Page 249

1  provision?
2      A.   As I understand it, that
3  provision is intended to deal with the
4  following situation:  A plaintiff in the
5  court system isn't suing the Trust
6  because the Trust has a channelling
7  injunction to go through a proof of claim
8  process.  Similarly, a claimant making a
9  proof of claim against another bankruptcy
10 trust under the TDPs for those trusts is
11 only generally required to produce
12 evidence of exposure to the product of
13 the Debtor, whose liability is that
14 bankruptcy trust has assumed.
15        As a result, plaintiffs
16 would not normally identify Grace
17 products as among the asbestos-containing
18 products to which they were exposed and a
19 suit against other defendants or in a
20 claim against another bankruptcy trust.
21        And what this says is the
22 Trust can't say, well, gee, you sued
23 Owens Illinois and you said you were
24 exposed to Owens Illinois products, but

Page 250

1 nothing in your complaint says you were
2 exposed to Grace products, so I am going
3 to treat the absence of an allegation of
4 exposure to Grace products in the Owens
5 Illinois suit as an omission that you
6 weren't exposed to Grace products.
7 Having said that, you still have to prove
8 that you were exposed to Grace products
9 to get money out of this Trust.
10      Q.   And how do you do that?
11 Let's assume for the moment that the
12 theoretical plaintiff we are talking
13 about in the tort case was asked in a
14 deposition, tell me all the products that
15 you were exposed to that contained
16 asbestos and he went through a list of
17 all the products of all the defendants in
18 that case but didn't mention any products
19 from Grace.
20      He still gets to come in and
21 make a claim against the Grace Trust,
22 correct?
23      A.   Let me put it to you this
24 way:  Anybody can commit fraud.  If a

Page 251

1 plaintiff files under oath statements
2 that this is 100 percent guaranteed the
3 only products, asbestos-containing
4 products, that I was ever exposed to and
5 then turns around without any new or
6 additional discovered evidence or
7 anything else and basically lies in the
8 declaration of -- the various evidentiary
9 materials that he produces in support of
10 his proof of claim, then that plaintiff
11 could probably get away with defrauding
12 this Trust, just like plaintiffs can get
13 away with lying whether they got exposed
14 to Owens Illinois products in the suit
15 against Owens Illinois.
16      So, yes, there is nothing
17 much you can do to write in a document
18 that says thou shall not commit fraud and
19 get away with it.
20      Q.   All right.  Let's go to
21 Section 5.8, Claims Audit Program.
22      A.   Yes.
23      Q.   I want to direct your
24 attention to the first paragraph, last

Page 252

1 sentence, "In the event that PI Trust
2 reasonably determines that any individual
3 or entity has engaged in a pattern or
4 practice providing unreliable medical
5 evidence to the PI Trust, it may decline
6 to accept additional evidence from such
7 provider in the future."
8      It's not required to; it
9 may, correct?
10      A.   Yes.
11      Q.   Okay.  What role, if any,
12 does the TAC play in deciding whether the
13 PI Trust will accept additional evidence
14 from that provider in the future?
15      A.   I don't know that there is
16 anything specific in the TDP that tells
17 you the answer to that.
18      I believe in practice, the
19 trustees would probably consult the TAC
20 to get the TAC's views on the subject,
21 which they might or might not accept,
22 depending on what the views were.
23 Certainly, a number of trusts have
24 refused to take B reads from some or all

Page 253

1 of the so-called Judge Jack doctors.
2      Q.   I was going to call this the
3 Judge Jack provision.
4      Does an individual TAC
5 member have a role in that decision even
6 if the medical provider was for one of
7 that TAC member's clients?
8      MR. FINCH:  Object to form.
9      THE WITNESS:  Well, again,
10 the TAC doesn't have any role in
11 the decision other than
12 consultation.  I suppose
13 theoretically a TAC member could
14 express his views on whether or
15 not a particular medical provider
16 that had done work for him or his
17 clients was a sufficiently bad
18 actor to be disqualified.  The
19 trustees, however, are the ones
20 that are going to make that
21 decision, not the TAC member.
22      MR. BROWN:  I am going to
23 suggest a short break because I
24 think I am getting close to the

Page 254

1    end.
2        THE WITNESS:  I am sure the
3    other folks in the room will be
4    deliriously happy to hear that.
5    Whether I am not or not depends on
6    how many of them I am going to get
7    to hear from and for how long.
8        (There was a break from 3:30
9    p.m. to 3:45 p.m.)
10   BY MR. BROWN:
11       Q.   Mr. Lockwood, can I direct
12   your attention to Section 5.13 of the PI
13   TDP?
14       A.   I have it.
15       Q.   Okay.  Does the TAC play any
16   role in the manner in which indemnified
17   insurer TDP claims are processed under
18   the TDP?
19       A.   Not that I am aware of, no.
20       Q.   Okay.  To the extent that a
21   settled asbestos insurer has contractual
22   indemnity rights that include legal fees
23   associated with claims asserted against
24   them for coverage, can the settled

Page 255

1    asbestos insurer collect those legal fees
2    under the TDP?
3        MS. HARDING:  Object to
4    form.
5        THE WITNESS:  Could you read
6    back that question, please?
7        (The reporter read from the
8    record as requested.)
9        THE WITNESS:  I know of no
10   reason why it couldn't.
11   BY MR. BROWN:
12       Q.   Would the legal fees be
13   subject to the payment percentage?
14       A.   Yes.
15       Q.   Okay.  Section 6.4, if I
16   could direct your attention to that, it's
17   entitled Filing Requirements and Fees.
18       A.   Before we leave that last
19   question what sort of hypothetical legal
20   fees would the indemnified insurer have
21   in light of the channelling injunction?
22        It seems to me that this is
23   the same issue we had earlier, unless you
24   are talking about legal fees for

Page 256

1    defending the channelling injunction.  In
2    other words, you are positing a claim
3    being brought against you in violation of
4    the channelling injunction, expending
5    fees in defense of that claim injunction,
6    not being able to recover the fees from
7    the claimant who violated the injunction,
8    and having your indemnity agreement with
9    Grace interpreted in a manner such that
10   those fees were indemnifiable?  That's
11   the hypothetical?
12       Q.   That's one of the
13   hypotheticals.
14       A.   Well, I reiterate the
15   comment that I made earlier, which is I
16   can't imagine that that hypothetical can
17   ever occur, but my answer is what I gave
18   it to be.  If it did occur, then that's
19   how it would be handled.
20       Q.   Let's take the other example
21   you gave.  Suppose a settled asbestos
22   insurer expended funds defending the
23   injunction.  Can the costs associated
24   with defending the injunction, are they

Page 257

1    channelled to the Trust -- are they paid
2    by the Trust?
3        MS. HARDING:  Object to
4    form.
5        MR. FINCH:  Object to form.
6        THE WITNESS:  First, if they
7    are successful, I think in most
8    instances, you could probably
9    recover them from the claimant
10   because the claimant would have
11   filed a lawsuit in violation of a
12   federal court injunction which was
13   pretty clear on its face that the
14   claim being asserted was
15   channelled.
16        But putting that aside, the
17   indemnities, as I understand them,
18   with Grace have to do with being
19   required to spend monies with
20   respect to insurance that has been
21   settled.
22        You are hypothesizing that
23   if somebody sues unsuccessfully
24   you for additional coverage, that

Page 258

1    the indemnity covers that claim,
2    which, if it does and you can't
3    get it back from the plaintiff,
4    then it would be channelled to the
5    Trust, I guess.
6   BY MR. BROWN:
7    Q.   And subject to the payment
8   percentage?
9    A.   And subject to the payment
10   percentage.
11    Q.   Okay.  Let me direct your
12   attention again to 6.4, which is entitled
13   Filing Requirements and Fees.
14    A.   Yes.
15    Q.   It says, "The trustees shall
16   have the discretion to determine, with
17   the consent of the TAC and Futures
18   Representative, (a) whether a claimant
19   must have previously filed an
20   asbestos-related personal injury claim in
21   the tort system to be eligible to file
22   the claim with the PI Trust..."
23        What exactly does that mean?
24    A.   That is a provision that it

Page 259

1   was put in as a precautionary mechanism
2   to deal with the possibility that the
3   trustees could conclude that a large
4   number of plaintiffs lawyers were only
5   filing claims against bankruptcy trusts,
6   that were not filing the claims against
7   solvent defendants in the tort system.
8        And the concept would be
9   that if that practice arose and became
10   widespread, it would create a possible
11   indicia of claims that were really not
12   legitimate, that people were violating --
13   it would mostly come up -- the concern
14   was where it would come up with is in the
15   Category 1 claims, which you would get a
16   minimal amount of money on minimal amount
17   of proof.  It was sort of what in
18   bankruptcy cases would be regarded as a
19   convenience class.
20        And the idea would be if you
21   were filing a bunch of claims with a
22   bunch of trusts and not in the tort
23   system and were getting a hundred bucks
24   from this Trust and 200 bucks from that

Page 260

1   Trust and whatever, that if a Trust put
2   in either a requirement that you had to
3   file the claim against somebody in the
4   tort system or alternatively you imposed
5   a filing fee in the Trust of 50 or a
6   hundred bucks, it would render the
7   practice unprofitable enough that it
8   would go away.
9        To my knowledge, I don't
10   think any -- this is a fairly standard
11   provision in these Trust TDPs.  I don't
12   think it's ever been invoked by any trust
13   so far, because I don't think the
14   perception has arisen that the problem of
15   the sort I described has become
16   widespread, but that's my understanding
17   of the rationale behind it.
18    Q.   Okay.  Now, I would like to
19   direct you to --
20    A.   Again, Mr. Inselbuch would
21   have more definitive knowledge on that
22   subject than I would.  So if he says
23   something different, I would stand to be
24   corrected by him.

Page 261

1    Q.   Okay.  His answers will
2   supersede yours then?
3    A.   Almost assuredly.
4        MR. SHINER:  Are you
5   volunteering him for deposition?
6        THE WITNESS:  He's already
7   been identified.  His deposition
8   is set for June 12th.
9   BY MR. BROWN:
10    Q.   Let's put the TDPs aside,
11   Mr. Lockwood.  Did we mark earlier the
12   Cooperation Agreement?
13    A.   Not that I recall.
14    Q.   I know we talked about it.
15        (ACC 30(b)(6)-12 marked for
16   identification at this time.)
17        THE WITNESS:  Okay.
18   BY MR. BROWN:
19    Q.   Mr. Lockwood, we talked
20   about this document, titled the
21   Cooperation Agreement, marked ACC-12, a
22   bit earlier in your deposition.
23        And as I understand this,
24   this document is designed, in part, to

Page 262

1    enable the Asbestos PI Trust to comply
2    with whatever obligations it might have
3    under asbestos insurance policies in the
4    event that it elects to seek insurance
5    coverage for claims.  And it requires the
6    Reorganized Debtors to maintain a whole
7    host of documents in various databases
8    and so forth that are described.
9              Is that a fair
10   generalization of the document?
11       A.   Yeah, I think so.
12       Q.   Okay.  Now, is there any
13   requirement vis-a-vie the Reorganized
14   Debtors and the asbestos insurance
15   entities that this information is
16   preserved for purposes of coverage
17   litigation or frankly underlying
18   litigation?
19       A.   Do you mean is there
20   somewhere in the Plan documents a direct
21   undertaking writing for the Reorganized
22   Debtors to the insurers as opposed to the
23   Reorganized Debtors to the Trust?
24       Q.   Right.

Page 263

1        A.   I don't believe so.
2        Q.   Does the Trust contemplate
3    maintaining these documents imperpituity
4    or requiring the Reorganized Debtors to
5    do so?
6        A.   The Trust doesn't exist, so
7    the Trust doesn't contemplate anything.
8        Q.   All right.  Does the ACC
9    contemplate that the Trust will, for the
10   life of the Trust, have these documents
11   preserved?
12       A.   The ACC contemplates that
13   the trustees will, based on the facts and
14   circumstances in the future as to what
15   their relationships are with respect to
16   insurers, do what their fiduciary
17   obligations to maximize insurance
18   coverage for the benefit of their
19   beneficiaries will require.
20       Q.   All right.  You can put that
21   aside.
22            The TDPs have a payment
23   percentage that we talked about?
24       A.   Correct.

Page 264

1        Q.   And to the extent that a
2    claim gets paid, it's subject to the
3    payment percentage; is that your
4    understanding?
5        A.   Correct.
6        Q.   Now, if the Asbestos PI
7    Trust pays as PI claim and it only pays
8    the schedule value times the payment
9    percentage to the claimant, is the
10   Asbestos PI Trust able to recoup the
11   entire schedule value from the insurers?
12       A.   That depends on, A, whatever
13   agreements might exist that relate to
14   that subject that bind the Trust and, B,
15   what some coverage court might decide are
16   the insurers' coverage obligations if
17   there is some dispute over that issue.
18       Q.   Is there a difference
19   between insurers that have Insurance Pi
20   Reimbursement Agreements, I believe they
21   are called, as opposed to insurers that
22   are unsettled?
23       A.   I would say potentially,
24   yes.

Page 265

1        Q.   What's the nature of the
2    difference?
3        A.   As a general proposition,
4    the reimbursement agreements --
5            (There was an interruption
6    at this time.)
7            THE WITNESS:  My
8    recollection is that as a general
9    proposition, the reimbursement
10   agreements provide for a specific
11   amount of reimbursement expressed
12   as a percentage or for some other
13   basis of amounts that Grace paid
14   in claims prior to the bankruptcy.
15            There is obviously a much
16   stronger argument that if the
17   Trust succeeds to those
18   agreements, as we advocate that it
19   should, that the Trust rights
20   would be the same as Grace's were.
21            There might be arguments to
22   a different effect, but certainly,
23   there is a pretty strong argument
24   that based on the pre-petition

Page 306

1        MR. FINCH:  Objection, form,
2    foundation, calls for speculation.
3        MS. HARDING:  Objection,
4    form.
5        THE WITNESS:  What was the
6    question again?
7    BY MS. ALCABES:
8        Q.   Will the Trust be able to
9    perform that provision in the agreement,
10   the indemnification provision?
11       MR. FINCH:  Same objection.
12       THE WITNESS:  I have not
13   considered this question before
14   today, so you are asking me, as I
15   sit here, to give you a legal
16   opinion about this.
17   BY MS. ALCABES:
18       Q.   Let me try to speed this up.
19       Can you turn to ACC
20   Exhibit-11, the Trust Distribution
21   Procedures, and specifically to Section
22   5.13.
23       The first paragraph of 5.13
24   indicates that it applies to any claim of

Page 307

1    a Settled Asbestos Insurance Company
2    seeking indemnification from Grace, but
3    it doesn't reference any claim of an
4    insurer who is a party to a reimbursement
5    agreement who has an indemnification
6    claim.
7        And the question is, is
8    there some reason why reimbursement
9    agreements were left out of Section 5.13
10   or is there somewhere else in the TDPs
11   that deals with indemnification claims by
12   insurers under reimbursement agreements?
13       A.   I don't think there is, and
14   I think the reason for it is that the --
15   first, it was not clear that there would
16   be any indemnification or obligations by
17   anybody unless the reimbursement
18   agreements were, in fact, held to be
19   transferable to the Trust and performed
20   by Travelers.
21       I mean, if Travelers doesn't
22   have to perform under the agreement,
23   then, for sure, neither Grace or the
24   Trust has to perform indemnification

Page 308

1    obligations.  So it's in a different
2    category from the settled insurers that
3    have fully performed agreement.  And
4    while Mr. Brown and I may have a
5    disagreement about how hypothetical the
6    indemnification scenario might be, at
7    least one can say that the performance of
8    the agreement by the settled insurer has
9    occurred and, therefore, the
10   indemnification agreement is, if you
11   will, ripe.
12       Here, the indemnification
13   agreement assumes that there is some kind
14   of performance by somebody under that
15   agreement.  And, again, I haven't
16   considered this, but, for all I know,
17   Aetna could, in effect, set off
18   indemnification claims against
19   obligations that it would otherwise
20   required to pay under the reimbursement
21   agreement.
22       Q.   Does the Plan say that?
23       MR. FINCH:  Object to the
24   form.

Page 309

1        THE WITNESS:  That's what I
2    meant earlier by it's a question
3    of performance after the fact in
4    the future by the parties to the
5    agreement.
6        It's entirely possible to me
7    that the Trust will be bound by
8    the indemnification provision, and
9    the only issue is whether or not
10   it would be handled by set-off, if
11   it ever came to pass, or -- I
12   mean, part of the problem is one
13   of the reasons is if Travelers
14   agreed that this indemnification
15   agreement would be honored by it
16   with whatever negotiations we had,
17   then Travelers would be a settled
18   insurers and this indemnification
19   wouldn't be a problem for Traveler
20   because nobody could make claims
21   against it.
22       Right now, nobody can make
23   claims against Travelers, I don't
24   think, because of the asbestos

Page 318

1    I hear you; I understand
2    that you are hypothesizing something.
3    But I can't see how it can ever come to
4    pass.  And so I have no idea.  If a PD
5    claim -- I mean, I have never
6    considered -- I don't know the answer to
7    that hypothetical question.  I just know
8    I don't think it can happen.
9        Q.   Okay.  Under Travelers'
10   other agreement, which was a fully
11   settled agreement -- and I am not going
12   to put it in front of you right now; I
13   don't think it's necessary -- but to the
14   extent there is indemnification for
15   non-asbestos claims, how does that
16   indemnification claim get addressed in
17   the Plan?
18       A.   I think --
19           MS. HARDING:  Objection to
20   form.
21           MR. FINCH:  Objection, asked
22   and answered, I think.
23           MS. ALCABES:  I don't think
24   it's been answered.

Page 319

1            THE WITNESS:  I think the
2    answer was I am not aware of any
3    non-asbestos claims that could be
4    brought against that coverage.
5    But if it's not an asbestos PI
6    claim, then it isn't channelled to
7    the Trust and it's a claim against
8    Grace.  And it would be handled
9    however claims against Grace get
10   handled under the Plan.
11   BY MS. ALCABES:
12       Q.   Potentially as a Class 9
13   claim?
14       A.   To the extent, however the
15   Class 9 claims get treated, presents,
16   futures, contingent, whatever.
17       Q.   So, for example, if an
18   environmental claim came up that had
19   nothing to do with asbestos and there is
20   a claim against Travelers that would
21   trigger the indemnity in its fully
22   settled agreement, that's a claim that
23   would be addressed separate and apart
24   from how claims were addressed in Class 6

Page 320

1    and Class 7, right?
2            MR. FINCH:  Objection.
3            MS. HARDING:  Objection to
4    form.
5            THE WITNESS:  That's my
6    understanding of the way the Plan
7    works.
8    BY MS. ALCABES:
9        Q.   Just getting back to one
10   follow-up question along the lines that
11   Michael was asking you about the
12   retention of any rights under policies
13   that are being transferred under the
14   Transfer Agreement.
15           Can you just turn to the
16   TDPs -- I am sorry.  Let me strike that.
17   I will get back to that.
18           You agree that the
19   reimbursement agreements are not subject
20   to the insurance neutrality provisions,
21   correct?
22       A.   Correct.
23           MS. ALCABES:  Can you give
24   me five minutes, and I will take a

Page 321

1    break for five minutes and
2    re-group and see if we can wrap it
3    up.
4            (There was a break from 5:02
5    p.m. to 5:19 p.m.)
6    BY MS. ALCABES:
7        Q.   Can you turn to Lockwood
8    Exhibit-4, which is Exhibit-6 to the
9    Plan.  It is the Transfer Agreement.
10       A.   Yes.
11       Q.   And turn to page 3.  It's
12   Section 2(c).  And this is going back to
13   some other questions that Michael asked
14   you about, the rights that Grace may be
15   retaining under the policies that are
16   being transferred.
17           The last sentence of that
18   paragraph starts, "Upon the Effective
19   Date, the Insurance Contributors shall
20   cede to the Asbestos PI Trust all control
21   of the pursuit of any and all claims with
22   respect to any Asbestos Insurance
23   Policy..."
24           Do you see that?

Page 322

1    A.   Yes.
2    Q.   Actually let me finish it.
3         "...under any Asbestos
4  Insurance Policy, Asbestos Insurance
5  Settlement Agreement, Asbestos In-Place
6  Insurance Coverage, or Asbestos Insurance
7  Reimbursement Agreement, and the Asbestos
8  PI Trust shall have the right to control
9  and direct the choice of counsel and
10 conduct of all such proceedings."
11        So that seems to suggest
12 that, in fact, Grace is retaining no
13 control over the policies that are the
14 subject of the Transfer Agreement; would
15 you agree?
16        MS. HARDING:  Object to the
17 form.
18        THE WITNESS:  Well, I don't
19 know whether there is a
20 distinction between control of the
21 policies.  I mean, what this talks
22 about is control, the pursuit of
23 any and all claims with respect to
24 the policies.

Page 323

1         And it is my understanding
2  that as to the asbestos insurers
3  policies that are illuminated in
4  the various schedules and
5  definition and the other
6  agreements, that Grace is
7  transferring the rights under
8  those policies and the Trust has
9  control over them.
10        For example, if it wants to
11 settle with an insurer, it can
12 settle the entire policy buyback,
13 if you will, and that there is no
14 retained insurance rights that
15 Grace has under those policies,
16 yes.
17 BY MS. ALCABES:
18    Q.   So if Grace wanted to tender
19 a claim a non-asbestos claim under the
20 policies, it would have to go to the
21 Trust?
22    A.   I don't think --
23        MS. HARDING:  Object to the
24 form.

Page 324

1         THE WITNESS:  I don't think
2  it has any right to tender any
3  claims, period.  The Trust hasn't
4  agreed to act as some sort of
5  front person for Grace to tender
6  non-asbestos claims.  This is an
7  economic deal.
8         These policies that don't
9  have asbestos exclusions, et
10 cetera, et cetera, that are
11 defined in this thing are the
12 rights under those policies for
13 coverage are being assigned to
14 this Trust as part of the deal.
15 And Grace isn't retaining some
16 economic interest in those
17 policies, according to my
18 understanding of this Plan.
19        MS. ALCABES:  Okay.  Let's
20 mark one last exhibit.
21        (ACC 30(b)(6)-16 marked for
22 identification at this time.)
23        THE WITNESS:  I have it.
24 BY MS. ALCABES:

Page 325

1    Q.   Okay.  These are
2  Travelers -- sorry -- the Debtors'
3  Responses to RFA served by Travelers.
4         Do you see that?
5    A.   Yes.
6    Q.   Did you see these RFA
7  responses before they were served on
8  Travelers?
9    A.   Yes.
10   Q.   And do you concur with all
11 the responses were provided by the
12 Debtors?
13   A.   Best I can recall, we did.
14   Q.   So can you turn to Request
15 to Admit Nos. 15 and 16.  They sort of go
16 hand in hand.  It's on the last page,
17 page 13 of the RFA responses.
18   A.   Yes, I see them.
19   Q.   And the request is to admit
20 that the 1996 agreement is an executory
21 contract, and that request is denied.
22   A.   I thought it was 1992
23 agreement.
24   Q.   I am reading from page 13.

Page 366

1    A.    Well, the answer to that is,
2  first, normally the punitive or potential
3  indirect claimant, as a defendant in the
4  state court action, would have the right
5  to get discovery from the plaintiff.  And
6  that discovery in many jurisdictions, if
7  not most, would include discovery of the
8  plaintiff as to whether that plaintiff
9  had filed claims with any Trust,
10 including the prospective Grace Trust.
11       If the state court, for some
12 reason or another, said that that
13 discovery against the plaintiff would not
14 be permitted, it seems unlikely that
15 discovery of the same information from a
16 Trust would be permitted because the
17 hypothesis -- by hypothesis, the state
18 law doesn't regard it as relevant.  So
19 under normal circumstances, it's hard to
20 imagine why an indirect claimant would
21 ever need discovery from a Trust.
22       That stated, there are
23 provisions in Section 6.5 that allow
24 indirect claimants or anybody else to try

Page 367

1  and get a subpoena from a court, either
2  the Bankruptcy Court or the Delaware
3  Court or the United States Court for the
4  District of Delaware, for such records.
5  And whichever court that subpoena is
6  sought to be issued from will decide
7  whether or not the prospective indirect
8  claimant, because you won't be an
9  indirect claimant until you lose the suit
10 with the plaintiff -- whether that
11 prospective indirect claimant will or
12 will not be given access to that
13 information by the Trust.  But the first
14 line of attack is getting it from the
15 plaintiff.
16       And I might add, other than
17 the recitation that the submission and
18 the proof of claim is part of settlement
19 discussions, which is simply a view like
20 any defendant and a plaintiff might say
21 we agree that our settlement discussions
22 and our settlement agreement is
23 confidential, whether or not that makes
24 it non discoverable to a third party that

Page 368

1  isn't bound by the settlement agreement
2  is a matter, again, of federal or state
3  applicable non-bankruptcy law.
4    Q.    But as you interpret the TDP
5  then, there is not an outright
6  prohibition from a Payne in discovery
7  against the Trust?
8    A.    No.
9    Q.    Okay.
10       MS. COBB:  Well, those are
11 my questions, and I reserve the
12 right to ask follow-up questions,
13 depending upon the progression of
14 the questioning by the insurers.
15 But I will pass the witness to
16 Mr. Cohn.
17       MR. DANIEL COHN:  Thank you.
18       MS. COBB:  And thank you for
19 your courtesy, Dan.
20       MR. DANIEL COHN:  You are
21 very welcome.
22       - - -
23       EXAMINATION
24       - - -

Page 369

1  BY MR. DANIEL COHN:
2    Q.    All right.  Mr. Lockwood,
3  you are the representative of the
4  Asbestos PI Committee who is most
5  knowledgeable on the topics as to which
6  the Libby claimants have designated a
7  Rule 30(b)(6) deposition?
8    A.    Most knowledgeable about the
9  full range of the topics.  There might be
10 individual topics that I might defer, as
11 I have in a few questions earlier, for
12 example, to my partner, Mr. Inselbuch,
13 whose deposition is scheduled, but yes.
14   Q.    And if I may, I want to
15 start off with a couple of matters of
16 terminology.  When I use the term "Libby
17 claimants," I am referring to the clients
18 of my firm who are people who allege that
19 they have suffered personal injury from
20 exposure to asbestos of Grace in Lincoln
21 County, Montana.
22   A.    Okay.
23   Q.    And the other terminological
24 matter I want to get straight is that,

Page 370

1 whenever possible, I will try to use
2 terms that are defined in the Plan for
3 the sake of clarity.  And when I use a
4 term that is defined in the Plan, I am
5 using it with the meaning so defined.
6      A.   Okay.
7      Q.   And may I ask that when you
8 give answers, that you use terms that are
9 defined in the Plan, and that unless you
10 otherwise explain it to me, I will assume
11 that you are using that term with the
12 definition defined in the Plan?
13      A.   If I use the term in an
14 answer, I will try and make sure that I
15 am using it as defined in the Plan.
16      Q.   All right.  Referring to
17 Exhibit-3, which is -- and I am sorry.
18 Not Plan Exhibit-3.
19      A.   Okay.
20      Q.   ACC Exhibit-3.
21      MS. HARDING:  Can you remind
22 me what that is, please?
23      MR. DANIEL COHN:  That's the
24 Form 8-K with the Term Sheet

Page 371

1 attached.
2      THE WITNESS:  I have it.
3 BY MR. DANIEL COHN:
4      Q.   Who negotiated the deal
5 that's embodied in that Term Sheet on
6 behalf of the Asbestos PI Committee?
7      MR. FINCH:  Objection.
8      MS. HARDING:  Objection.
9      MR. FINCH:  To the extent it
10 enters into Plan negotiations, I
11 am not sure how it relevant to the
12 confirmation here.
13      MS. HARDING:  Same
14 objection.
15      THE WITNESS:  Are you
16 instructing me to answer it?
17      MR. FINCH:  I will let you
18 answer that question, and you will
19 see how far it goes.
20      THE WITNESS:  I am not
21 entirely sure I remember
22 accurately who the parties were,
23 and it also depends on what you
24 mean by involved in negotiating.

Page 372

1 There were direct negotiations
2 between sort of principals, if you
3 will, and then there were other
4 people, like, myself, that were
5 involved in commenting on drafts
6 of the Term Sheet to other people
7 on their side.
8      But taking the term and
9 meaning of who was face-to-face,
10 my recollection is that on behalf
11 of the ACC, it was a combination
12 of what was designated or called a
13 negotiating subcommittee of the
14 ACC, and my partner,
15 Mr. Inselbuch.
16      The people on the
17 negotiating subcommittee, I
18 believe, included Joe Rice,
19 Russell Budd, and I think Perry
20 Weitz and John Cooney, but I am
21 not positive about that.  But I
22 believe it was those four.  It
23 could have been three, but I think
24 it was those four.

Page 373

1 BY MR. DANIEL COHEN:
2      Q.   And was the Libby claimant
3 representative on the committee a member
4 of the negotiating subcommittee?
5      A.   Not to the best of my
6 recollection.
7      Q.   Was the Term Sheet submitted
8 to a vote by the committee?
9      MS. HARDING:  Objection.
10      THE WITNESS:  Well, I don't
11 know whether the Term Sheet in
12 precisely the form that it exists
13 in Exhibit-3 was submitted for a
14 vote, but certainly a document
15 embodying the terms of the Term
16 Sheet was submitted to a vote of
17 the committee.
18 BY MR. DANIEL COHEN:
19      Q.   And did that vote result in
20 approval of the deal?
21      A.   Yes.
22      Q.   How did the Libby claimants
23 vote?
24      A.   I don't recall, but I am

Page 378

1  terms from the previous plans that I am
2  aware of.
3      **Q.   As the ACC's designee to**
4  **take this 30(b)(6) deposition, would you**
5  **be aware if there were such an agreement?**
6      A.   I believe I would be, yeah.
7      **Q.   What agreements, if any,**
8  **were struck at the time of ACC Exhibit-3**
9  **concerning how Libby claimants' claims**
10  **would be treated?**
11      A.   Other than that they would
12  be part of the asbestos claimants whose
13  claims would be channelled to the Trust
14  and whose consideration would be paid out
15  of the assets that were to be contributed
16  to the asbestos Trust under the Term
17  Sheet, there were no agreements that I am
18  aware of.
19      **Q.   Were there any agreements**
20  **concerning who would bear responsibility**
21  **for restitution claims, if any, in**
22  **connection with the criminal trial now**
23  **going on in Montana?**
24      MS. HARDING:  Object to

Page 379

1      form.
2      THE WITNESS:  I don't
3      believe there were at that time,
4      no.
5  BY MR. DANIEL COHN:
6      **Q.   Have there been any**
7  **agreement on that subject since then?**
8      A.   Well, there is provisions in
9  the Plan that speak to that, so yes.
10      **Q.   Apart from provisions of the**
11  **Plan, are there any agreements between**
12  **the Asbestos PI Committee and any of the**
13  **other Plan proponents on the subject**
14  **matter of the Plan?**
15      A.   The Plan embodies the
16  agreements.  There are no side
17  agreements, oral or written, that vary
18  from the Plan that I am aware of.  And,
19  indeed, I would be very surprised if I
20  was not aware -- if there were any that I
21  was not aware of.
22      **Q.   All right.  And one last**
23  **question on this subject.  It has been**
24  **known from time to time for the**

Page 380

1  **co-proponents of a Plan to enter into a**
2  **co-proponent agreement governing that**
3  **relationship.  Is there any such**
4  **agreement, written or orally?**
5      A.   No.  Well, you say written
6  or oral.  There is certainly no written
7  agreement of that.  I mean, the Plan
8  itself -- other than the Plan itself.  I
9  mean, when you sign on to a Plan, is the
10  Plan proponent with somebody else is a
11  Plan proponent.  That's in a written
12  document, and we have sort of agreed.
13      But if you are talking about
14  some oral agreement that says this binds
15  us outside the Plan or -- I am not sure
16  really what kind of agreement you have in
17  mind.  But, as far as I am aware, there
18  isn't any such other than what's
19  reflected in the Plan itself.
20      MR. FINCH:  The parties to
21      the Plan also, to the extent there
22      are issues in common, there may
23      well be a common interest
24      privilege for purposes of

Page 381

1      discovery and litigation of
2      confirmation objections.  But
3      those are not -- I would not
4      regard those as any types of
5      agreements you are questioning
6      about.
7  BY MR. DANIEL COHN:
8      **Q.   All right.  Directing your**
9  **attention now to ACC Exhibit-11, which is**
10  **the TDP.**
11      A.   I have it.
12      **Q.   All right.  Who drafted the**
13  **TDP?**
14      MR. FINCH:  Objection.  This
15      gets into Plan negotiations and
16      drafting.  I will let you answer
17      that question, but we will see how
18      it goes from there.
19      THE WITNESS:  To some
20      extent, Mr. Inselbuch may know
21      more about this than I do.  But I
22      have a pretty good knowledge of
23      it.
24      As I have previously

Page 382

1   mentioned in this deposition, this
2   TDP in its inception was a sort of
3   mark-up job on one of the previous
4   TDPs from one of the previous
5   bankruptcies that that had been
6   confirmed.  I don't recall, as I
7   sit here today, which one it was,
8   but it would have been one of the
9   more recent ones.
10      It then, of course, had to
11  be modified to reflect the
12  particularities of Grace and the
13  claims against Grace and what have
14  you.  And you have heard some
15  testimony about things like
16  Sections 5.12 and 5.13.  The
17  participants that did it were
18  basically counsel for the ACC,
19  counsel for the FCR, and members
20  of the ACC itself in terms of
21  reviewing and commenting on
22  things, and the FCR himself.
23      The actual, physical
24  drafting as opposed to the

Page 383

1   commenting and what have you was,
2   I believe, done by Caplin &
3   Drysdale.
4   BY MR. DANIEL COHN:
5       Q.   What input, if any, did
6   Grace have concerning the TDP?
7           MS. HARDING:  Objection with
8   respect to negotiations.
9           THE WITNESS:  Well, it was a
10  general proposition.  Grace was
11  furnished copies of drafts and
12  afforded the opportunity to
13  comment on them.
14  BY MR. DANIEL COHN:
15      Q.   And were any changes made to
16  what sounds like an ACC FCR draft at the
17  behest of Grace?
18          MS. HARDING:  Same
19  objection.
20          THE WITNESS:  I don't really
21  recall.
22  BY MR. DANIEL COHN:
23      Q.   Directing your attention to
24  Section 2.1 of the TDP.

Page 384

1       A.   I have it.
2       Q.   In the second sentence,
3   there is reference to, and I quote,
4   "...the intention of paying all claimants
5   over time as equivalent a share as
6   possible of the value of their claims
7   based on historical values for
8   substantially similar claims in the tort
9   system."
10      A.   Yes.
11      Q.   Now, is that, in fact, the
12  intention of the Asbestos PI Committee in
13  respect to how the TDP should operate?
14      A.   The intention of the ACC on
15  how the TDP should operate is expressed
16  in all of the terms of the TDP.  That
17  particular aspirational sentence that you
18  have plucked from the beginning of the
19  TDP is not is not somehow or another a
20  super-preemptory provision that controls
21  all the other provisions in the Trust
22  that somebody might think either were or
23  were not in agreement with it.
24      Q.   In that phrase that I just

Page 385

1   read, what does the term "historical
2   values" mean?
3       A.   Again, Mr. Inselbuch
4   probably would have a more definitive
5   knowledge of this, but my understanding
6   is that it refers to the historical
7   claims data primarily in this particular
8   case from Grace with respect to
9   settlements and judgments in the tort
10  system as the starting point.
11      Q.   If that's the starting
12  point, what else is meant by historical
13  value?
14      A.   Well, again, this is boiler
15  plate language from TDPs.  In some cases,
16  depending upon the facts of the case, the
17  claims history of comparable defendants
18  in the tort system is looked at.
19          The TDPs are generally
20  drafted in consultation with the
21  committees asbestos claims advisor which
22  is usually, if not invariably, Mark
23  Peterson, and depending on the amount of
24  claims data available to Mr. Peterson

Page 402

1 to to best approximate the value of the
2 claim in the tort system today?
3         MS. HARDING:  Object to
4 form.
5         MR. FINCH:  Objection to
6 form.
7         THE WITNESS:  The purpose of
8 the criteria -- again,
9 Mr. Inselbuch may be better to
10 this than I am.
11         But the purpose of the
12 criteria is to negotiate about the
13 claimant and his lawyer a deal
14 that is acceptable to both of
15 them.  Because if you don't
16 negotiate an acceptable deal in
17 individual review, then you go to
18 mediation, binding or nonbinding
19 arbitration, and the tort system.
20         So at the end of the day,
21 this is referred to as an
22 alternative dispute resolution
23 system for a reason, because
24 that's what it is.  You start out

Page 403

1 with standing settlement offers in
2 an effort to get rid of most of
3 the claims without a lot of
4 processing costs on the basis of
5 values that are perceived to be
6 likely to be acceptable because
7 they are plus or minus some
8 reasonable amount from various
9 plaintiffs law firms' historical
10 values.  You move to individual
11 review for people that want more
12 than that and who think they can
13 show they are entitled to it.  And
14 if you don't persuade them in the
15 negotiation of individual review,
16 you can wind up in the tort system
17 with a judge and a jury deciding
18 what the claim is worth, applying
19 applicable non-bankruptcy law,
20 which will not include, to my
21 knowledge, anything about the
22 historical settlements or the
23 historical judgments experienced
24 by the Debtor for whose

Page 404

1 liabilities the Trust has assumed.
2 BY MR. DANIEL COHN:
3         Q.    Right.  So the ultimate end
4 point, if the alternative dispute
5 resolution process does not succeed, is
6 to go to the tort system and have a jury
7 or judge, if that that gets elected,
8 actually demonstrate the value of the
9 claim in the tort system?
10         A.    That's correct.  And these
11 plans are drafted in the hope that you
12 will eliminate that from happening in
13 very many cases because, A, it produces
14 widely disparate results and, B, it
15 increases claims processing expenses by a
16 very large margin.
17         And the experience of most
18 of these trusts in other cases is that
19 there are vanishingly few cases that ever
20 wind up going into the tort system.
21         Q.    Well, let's talk for a
22 minute about experience in other cases.
23         In other cases, if you can
24 generalize, approximately what percentage

Page 405

1 of claims are settled upon expedited
2 review?
3         MR. FINCH:  Objection, lack
4 of foundation.
5         MS. HARDING:  Objection to
6 form.
7         THE WITNESS:  I have no
8 knowledge of that.  You can ask
9 Mr. Inselbuch that.  My bet is
10 that he doesn't have any knowledge
11 of that, either, but he might.
12 BY MR. DANIEL COHN:
13         Q.    You did say a moment ago,
14 though, that vanishingly few claims in
15 other cases end up in the tort system?
16         A.    That much, I have been told
17 by people that work with the other
18 trusts, but that's a narrative
19 description.
20         I couldn't actually tell you
21 whether it's one case a year or five
22 cases or none.  It's just not very many.
23         But when you start moving
24 backward from that, how many cases go to

Page 406

arbitration, how many cases go to
individual review, what percentage goes
to expedited review, each Trust does have
records from which they can derive that
information.  And it may be that
Mr. Inselbuch might have knowledge of
some of that.  I don't.
        MR. FINCH:  Grace ACC
        certainly doesn't.
BY MR. DANIEL COHN:
        Q.    You have earlier testified
that the starting point for the TDP was
the TDP in some recent case; is that
correct?
        A.    That's my recollection.
        Q.    And revisions were then made
to address the specific needs of the
Grace case; is that correct?
        A.    Revisions over time were
made.  There had been multiple drafts of
the TDP over the last -- I don't know --
eight months.  And some of the earlier
drafts got filed as in the September
filing, and --

Page 407

        (There was an interruption
        at this time.)
BY MR. DANIEL COHN:
        Q.    All right.  Were any of
those revisions made with the specific
intention of addressing issues that had
been raised by the Libby claimants?
        A.    Yes.
        Q.    Which ones?  Or why don't
you start off with one, and then we will
go through it.
        A.    I don't know that I will get
a hundred percent of them, but for
example, in expedited review categories
in Section 5.3(a)(3), the category of
severe disabling pleural disease, Level
IV-B with its value and all of its
criteria, to my knowledge, has never
existed in any other TDP, in any other
case before and was entirely a function
of attempting to address concerns and
demands raised by the Libby claimants.
That's one that I know.
        In addition to that, under

Page 408

the Section 5.4(a) of the TDP, the
creation of a eight times multiple for
claimants whose exposure was 95 percent a
result of exposure to an
asbestos-containing product of Grace was
new, and the standard one is the five
times provision, which is also in here
for 75 percent exposure.
        There was another one that I
was thinking about.  Those are the two
that jump out.  I know there is at least
another one that I was just thinking
about and I have forgotten about.
        MR. DANIEL COHN:  Why don't
we take a five-minute break, and
perhaps you will remember in that
period.
        THE WITNESS:  Well, I would
just assume not take a five-minute
break because I would like to get
as much of this done as I can, and
if every time I can't remember
something we take a five-minute
break, we will be here for a very

Page 409

long time.
        MR. DANIEL COHN:  No, no.  I
was not meaning to set a
precedent.  But if you would like
--
        THE WITNESS:  If it comes to
me, I will volunteer it.
BY MR. DANIEL COHN:
        Q.    All right.  Then let's turn
our attention to disease Level IV-B.
        Is that the level that's
labeled severe disabling pleural disease?
        A.    Correct.
        Q.    Would you please explain to
me how that provision was designed to
address Libby claims?
        MS. HARDING:  Object to form
to the extent that it's designed
to address just Libby claims.
        MR. FINCH:  I join in that.
        THE WITNESS:  It was --
        MS. HARDING:  I think that's
what you said, right?
        MR. DANIEL COHN:  Well --

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
-  -  -

In Re:                      : Chapter 11
                            :
                            : Case No.
W.R. GRACE & CO., et al,    : 01-01139 JKF
                            :
                            : (Jointly
            Debtors         : Administered)


-  -  -

Monday, May 4, 2009

-  -  -

Continuation of oral

deposition of PETER VAN N. LOCKWOOD,

ESQUIRE, taken pursuant to notice, was

held at the offices of CAPLIN & DRYSDALE,

One Thomas Circle N.W., Suite 1100,

Washington, DC  20005, commencing at

12:05 p.m., on the above date, before

Lori A. Zabielski, a Registered

Professional Reporter and Notary Public

in and for the Commonwealth of

Pennsylvania.
                -  -  -
            MAGNA LEGAL SERVICES
             Seven Penn Center
             1635 Market Street
                 8th Floor
        Philadelphia, Pennsylvania 19103

Page 450

```
1   APPEARANCES:
2
3   DRINKER BIDDLE & REATH, LLP
    BY:  MICHAEL F. BROWN, ESQUIRE
4   One Logan Square
    18th & Cherry Streets
5   Philadelphia, Pennsylvania 19103-6996
    215.988.2988
6   (brownmf@dbr.com)
    (jeffrey.boerger@dbr.com)
7   Representing OneBeacon America Insurance
    Company, Seaton Insurance Company,
8   Government Employees Insurance Company,
    Columbia Insurance Company f/k/a Republic
9   Insurance Company
10
11  CAPLIN & DRYSDALE, CHARTERED
    BY:  NATHAN D. FINCH, ESQUIRE
12      JEFFREY A. LIESEMER, ESQUIRE*
        (*VIA TELECONFERENCE)
13  One Thomas Circle N.W.
    Suite 1100
14  Washington, DC 20005
    202.862.7801
15  (ndf@capdale.com)
    (jal@capdale.com)
16  Representing Grace, Official Committee of
    Asbestos Personal Injury Claimants
17  ("ACC"), and Witness
18
19  ANDERSON KILL & OLICK, P.C.
    BY:  ROBERT M. HORKOVICH, ESQUIRE
    1251 Avenue of the Americas
20  New York, New York 10020
    212.278.1322
21  (rhorkorvitz@andersonkill.com)
    Representing the ACC
22
23
24
```

Page 452

```
1   APPEARANCES (continued)
2
3   COHN WHITESELL & GOLDBERG, LLP
    BY:  DANIEL C. COHN, ESQUIRE
4   101 Arch Street
    Boston, Massachusetts 02110
5   617.951.2505
    (cohn@cwg11.com)
6   Representing the Libby Claimants
7
8   SPEIGHTS & RUNYAN
    BY:  DANIEL H. SPEIGHTS, ESQUIRE*
9       (*VIA TELECONFERENCE)
    200 Jackson Avenue East
10  P.O. Box 685
    Hampton, South Carolina 29924
11  803.943.4444
    (dspeights@speightsrunyan.com)
12  Representing Anderson Memorial Hospital
13
14  TUCKER ARENSBERG
    BY:  MICHAEL A. SHINER, ESQUIRE*
15      (*VIA TELECONFERENCE)
    1500 One PPG Place
16  Pittsburgh, Pennsylvania 15222
    412.594.5586
17  (mshiner@tuckerlaw.com)
    Representing Certain London Market
18  Insurers and AXA Belgium
19
20  FORD MARRIN ESPOSITO & WITMEYER & GLESER
    BY:  ELIZABETH M. DeCRISTOFARO, ESQUIRE
21  Wall Street Plaza
    New York, New York 10005-1875
22  212.269.4900
    Representing Continental Casualty Company
23  and Continental Insurance Company
24
```

Page 451

```
1   APPEARANCES (continued)
2
3   KIRKLAND & ELLIS, LLP
    BY:  THEODORE L. FREEDMAN, ESQUIRE
4   655 Fifteenth Street, N.W.
    Washington, DC 20005-5793
5   202.879.5081
    (tfreedman@kirkland.com)
6   Representing the Debtors
7
8   THE LAW OFFICES OF JANET S. BAER, P.C.
    BY:  JANET S. BAER, ESQUIRE
9   70 West Madison Street
    Suite 2100
10  Chicago, Illinois 606002
    312.641.2162
11  Representing the Debtors
12
13  SIMPSON THACHER & BARTLETT, LLP
    BY:  SAMUEL J. RUBIN, ESQUIRE*
14      (*VIA TELECONFERENCE)
    425 Lexington Avenue
15  New York, New York 10017-3954
    212.455.3122
16  (srubin@stblaw.com)
    Representing Travelers Casualty and
17  Surety Company
18
19  VORYS, SATER, SEYMOUR AND PEASE, LLP
    BY:  TIFFANY STRELOW COBB, ESQUIRE*
20      (*VIA TELECONFERENCE)
    52 East Gay Street
21  Columbus, Ohio 43215
    614.464.8322
22  (tscobb@vorys.com)
    Representing The Scotts Company, LLC
23
24
```

Page 453

```
1   APPEARANCES (continued)
2
3   BILZIN SUMBERG BAENA PRICE & AXELROD, LLP
    BY:  MATTHEW I. KRAMER, ESQUIRE*
4       (*VIA TELECONFERENCE)
    200 South Biscayne Boulevard
5   Suite 2500
    Miami, Florida 33131-5340
6   305.450.7246
    (mkramer@bilzin.com)
7   Representing Property Damage Committee
8
9   STROOCK & STROOCK & LAVAN, LLP
    BY:  ARLENE G. KRIEGER, ESQUIRE*
10      (*VIA TELECONFERENCE)
    180 Maiden Lane
11  New York, New York 10038-4982
    212.806.5400
12  (akrieger@stroock.com)
    Representing Official Committee of
13  Unsecured Creditors
14
15  CROWELL & MORING, LLP
    BY:  MARK PLEVIN, ESQUIRE
16      NOAH S. BLOOMBERG, ESQUIRE
    1001 Pennsylvania Avenue NW
17  Washington, DC 20004-2595
    202.624.2913
18  (mplevin@crowell.com)
    (nbloomberg@crowell.com)
19  Representing Fireman's Fund Insurance
    (Surety Bond)
20
21
22
23
24
```

Page 454

1  APPEARANCES (continued)
2
3  STEVENS & LEE, P.C.
   BY: JOHN D. DEMMY, ESQUIRE*
4  (* VIA TELECONFERENCE)
   1105 North Market Street, 7th Floor
5  Wilmington, Delaware 19801
   302.654.5180
6  (jdd@stevenslee.com)
   Representing Fireman's Fund Insurance
7
8
   ALAN B. RICH LAW OFFICES
9  BY: ALAN B. RICH, ESQUIRE*
   (*VIA TELECONFERENCE)
10 Elm Place, Suite 4620
   1401 Elm Street
11 Dallas, Texas 75202
   214.744.5100
12 (arich@alanrichlaw.com)
   Representing Property Damage FCR
13
14
   CONNOLLY BOVE LODGE & HUTZ, LLP
15 BY: JEFFREY C. WISLER, ESQUIRE
   The Nemours Building
16 1007 North Orange Street
   P.O. Box 2207
17 Wilmington, Delaware 19899
   302.88.6528
18 (jwisler@cblh.com)
   Representing Maryland Casualty
19
20
   ECKERT SEAMANS CHERIN & MELLOTT, LLC
21 BY: EDWARD J. LONGOSZ, II, ESQUIRE
   1747 Pennsylvania Avenue, NW
22 12th Floor
   Washington, DC 20006
23 202.659.6619
   (elongosz@eckertseamans.com)
24 Representing Maryland Casualty and Zurich

Page 455

1  APPEARANCES (continued)
2
3  WILEY REIN, LLP
   BY: KARALEE C. MORELL, ESQUIRE
4  1776 K Street NW
   Washington, DC 20006
5  202.719.7520
   (kmorell@wileyrein.com)
6  Representing Maryland Casualty and Zurich
7
8  COZEN O'CONNOR
   BY: ILAN ROSENBERG, ESQUIRE*
9  (*VIA TELECONFERENCE)
   1900 Market Street
10 Philadelphia, Pennsylvania 19103-3508
   215.665.4621
11 (irosenberg@cozen.com)
   Representing Federal Insurance Company
12
13
   ORRICK HERRINGTON & SUTCLIFFE, LLP
14 BY: JONATHAN P. GUY, ESQUIRE
   JOSHUA M. CUTLER, ESQUIRE
15 Columbia Center
   1152 15th Street, N.W.
16 Washington, DC 20005-1706
   202.339.8516
17 (jguy@orrick.com)
   Representing Future Claimants
18 Representative
19
20 CUYLER BURK, P.C.
   BY: TANYA M. MASCARICH, ESQUIRE*
21 (*VIA TELECONFERENCE)
   4 Century Drive
22 Parsippany, New Jersey 07054
   973.734.3200
23 (tmascarich@cuyler.com)
   Representing Allstate Insurance Company
24

Page 456

1  APPEARANCES (continued)
2
3  WILSON ELSER MOSKOWITZ EDELMAN & DICKER,
   LLP
4  BY: CARL PERNICONE, ESQUIRE
   150 East 42nd Street
5  New York, New York 10017-5639
   212.915.5656
6  (carl.pernicone@wilsonelser.com)
   Representing Arrowood Indemnity Company
7
8  O'MELVENY & MYERS, LLP
   BY: TANCRED SCHIAVONI, ESQUIRE*
9  (*VIA TELECONFERENCE)
   Times Square Tower
10 7 Times Square
   New York, New York 10036
11 212.326.2267
   (tschiavoni@omm.com)
12 Representing Arrowood Indemnity Company
13
14 WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
   BY: KEVIN J. MANGAN, ESQUIRE*
15 (*VIA TELECONFERENCE)
   222 Delaware Avenue
16 Suite 1501
   Wilmington, Delaware 19801
17 302.252.4361
   (kmangan@wcsr.com)
18 Representing State of Montana
19
20 PEPPER HAMILTON, LLP
   BY: LINDA J. CASEY, ESQUIRE*
21 (*VIA TELECONFERENCE)
   3000 Two Logan Square
22 Philadelphia, Pennsylvania 19103
   215.981.4000
23 (caseyl@pepperlaw.com)
   Representing BNSF Railway Company
24

Page 457

1
   APPEARANCES (continued)
2
3
   GOODWIN PROCTER, LLP
4  BY: DANIEL M. GLOSBAND, ESQUIRE*
   (*VIA TELECONFERENCE)
5  Exchange Place
   53 State Street
6  Boston, Massachusetts 02109
   617.570.1930
7  (dglosband@goodwinprocter.com)
   Representing CNA Insurance
8
9
   KRAMER LEVIN NAFTALIS & FRANKEL, LLP
10 BY: GREGORY A. HOROWITZ, ESQUIRE
   1177 Avenue of the Americas
11 New York, New York 10036
   212.715.9571
12 (ghorowitz@kramerlevin.com)
   Representing Official Committee of Equity
13 Holders
14
              - - -
15
16
17
18
19
20
21
22
23
24

Page 458

1               - - -
2            I N D E X
3               - - -
4
5  Testimony of:
6       PETER VAN N. LOCKWOOD, ESQUIRE
7
8  By Mr. Cohn          Page 462
9  By Mr. Wisler        Page 531
10 By Mr. Mangan        Page 544
11 By Ms. Casey         Page 549
12 By Mr. Speights      Page 563
13 By Mr. Plevin        Page 606
14 By Mr. Schiavoni     Page 624
15 By Mr. Brown         Page 636
16
17              - - -
18          E X H I B I T S
19              - - -
20 NO.   DESCRIPTION            PAGE
21 17    Notice of Deposition of
       Asbestos PI Committee Pursuant
22     to Rule 30(b)(6)        460
23 18    Exhibit 8 to Exhibit Book   460
24              - - -

Page 459

1               - - -
2      DEPOSITION SUPPORT INDEX
3               - - -
4
5  Direction to Witness Not to Answer:
6  Page  Line      Page  Line
7  620   11        632   14
8
9
10 Request for Production of Documents:
11 Page  Line      Page  Line
12 NONE
13
14
15 Stipulations:
16 Page  Line      Page  Line
17 12    02
   (Previously)
18
19
20 Area(s) Marked Confidential:
21 Page  Line      Page  Line
22 NONE
23
24

Page 460

1               - - -
2       PETER VAN N. LOCKWOOD,
3  ESQUIRE, after having been first
4  duly sworn, was examined and
5  testified as follows:
6               - - -
7          PROCEEDINGS
8               - - -
9       (ACC 30(b)(6)-17 and 18
10 premarked for identification at
11 this time.)
12              - - -
13      MR. COHN:  Go ahead,
14 Mr. Schiavoni.
15      MR. SCHIAVONI:  I just
16 wanted to object.  We have written
17 the Libby claimants separately
18 about this, but we object to them
19 doing any questioning of
20 Mr. Lockwood on the grounds that
21 the Libby claimants are members of
22 the committee; they have not
23 objected to Mr. Lockwood's
24 designation to testify on behalf

Page 461

1  of the committee; nor have they
2  offered in response to requests
3  any alternative witness to testify
4  on any topics on which they
5  disagree with Mr. Lockwood.
6      We see Mr. Lockwood's
7  testimony and the failure of the
8  Libby claimants to object to the
9  designation of Mr. Lockwood as an
10 adoptive omission by the Libby
11 claimants, and we object to any
12 questioning by them as essentially
13 questioning seeking to impeach
14 their own witness.  Thank you.
15      MR. COHN:  You are welcome.
16 We will respond to your
17 correspondence, but, for the
18 moment, let's simply say that we
19 reject the basis for your
20 objection.
21      MR. SCHIAVONI:  If there are
22 any topics that the Libby
23 claimants object to Mr. Lockwood's
24 designation on, we need to know

Page 478

1     THE WITNESS:  That's
2  unanswerable, because assuming
3  that you are asking about the
4  Grace Trust, which is what we are
5  here to talk about, the Grace
6  Trust, A, doesn't exist; B,
7  doesn't have any operating
8  history; C, hasn't established
9  what the procedures and personnel
10  to handle claims are; and, D,
11  depending upon the complexities of
12  individual claims subject to
13  individual review and the back and
14  forth between the Trust claims
15  handling personnel and the
16  plaintiff and plaintiff's lawyer,
17  there is no set period of time
18  that any individual claim would
19  require for individual review that
20  I am aware of.
21  BY MR. COHN:
22     **Q.   So is it your testimony that**
23  **the Asbestos PI Committee drafted this**
24  **TDP and proposed it as part of a Plan**

Page 479

1  **with no expectation whatsoever as to the**
2  **time frames that it would take to process**
3  **claims upon individual review?**
4     MR. SCHIAVONI:  Objection to
5  form with regard to the term
6  "committee" and whether that's
7  intended to include Mr. Cohn's
8  clients or not.
9     MR. FINCH:  Object to form.
10     THE WITNESS:  I am not aware
11  of any expectations of the
12  committee on that subject that
13  aren't contained in the TDP, and I
14  don't recall seeing any in the
15  TDP.  You might want to ask
16  Mr. Inselbuch that question.  But
17  I am not aware of any, and I don't
18  think there are any.
19     I do believe the committee
20  had a general expectation that the
21  trustees, as part of their
22  fiduciary obligations to claimants
23  under this Trust, are expected to
24  create a claims handling structure

Page 480

1  that is as efficient in processing
2  claims through individual review
3  or otherwise as is reasonably
4  possible and could be done at a
5  reasonable cost per claim.  Beyond
6  that, I really don't know anything
7  more to say.
8  BY MR. COHN:
9     **Q.   If a claimant receives an**
10  **offer upon individual review and chooses**
11  **not to accept the offer, what is his next**
12  **step?**
13     MR. FINCH:  Object to form.
14     THE WITNESS:  It's some form
15  of mediation and
16  binding/nonbinding arbitration as
17  the steps set forth in the TDP.  I
18  am riffling through the pages at
19  the moment to find it.
20     Section 5.10 of the TDP
21  addresses ADR procedures that the
22  Trust is to implement, and, to my
23  knowledge, I think that's the next
24  step after there is a failure to

Page 481

1  agree in individual review between
2  the claimant and the Trust.
3     Again, Mr. Inselbuch
4  probably has more familiarity with
5  Trust practices than I do.
6  BY MR. COHN:
7     **Q.   All right.  I think what I**
8  **will do is there are a whole line of such**
9  **questions, but I will wait for**
10  **Mr. Inselbuch, if your testimony is that**
11  **he would be best equipped to answer those**
12  **questions.**
13     A.   I think it is a fair
14  statement that Mr. Inselbuch has had a
15  more detailed involvement in the drafting
16  of the TDP and more personal experience
17  in the operation of other trusts that, to
18  some extent, this Trust is modeled after.
19  So, to that extent, I think you are
20  probably correct.
21     MR. FINCH:  Can I confer
22  with my client for just a second,
23  Mr. Cohn?
24     MR. COHN:  Sure.

Page 482

1          MR. FINCH:  Let's go off the
2     record.
3          (There was a discussion held
4     off the record at this time.)
5          MR. FINCH:  Back on the
6     record.
7          THE WITNESS:  Mr. Finch
8     reminded me that, as I testified
9     on Friday, there are certain
10    provisions of the TDP that are
11    unique to this TDP and, therefore,
12    have not been the subject of prior
13    experience with other trusts and,
14    in particular, Sections 5.12 and
15    5.13, which I testified about at
16    some length.
17         I have probably had at least
18    as great, if not a greater, role
19    in the creation of those sections
20    that Mr. Inselbuch did.  So I
21    don't know -- to suggest that
22    there are no questions that you
23    can ask about the TDP, that I
24    might not have as much or more

Page 483

1     knowledge than Mr. Inselbuch.
2     But, by and large, the provisions,
3     such as Section 5.10, that we were
4     just discussing that are fairly
5     what I would call standard TDP
6     provisions, my answer stands, that
7     he would be more knowledgeable on
8     those than I would.
9     BY MR. COHN:
10         Q.   Thank you.
11         In that case, let's turn to
12    insurance.  Have you had occasion to
13    familiarize yourself with Grace's
14    insurance coverage for asbestos PI
15    claims?
16         A.   Only at a pretty general
17    level as was demonstrated on Friday.
18         Q.   Are you generally familiar
19    with comprehensive general liability
20    insurance?
21         A.   In the course of my work in
22    these bankruptcy cases over the last 15
23    or 20 years, I have had occasion to learn
24    in a non-expert capacity a fair amount of

Page 484

1     what I would regard as insurance law,
2     including a fair amount about
3     comprehensive or CGL policies.
4          Q.   And do you understand, at
5     least in general terms, the distinction
6     between products/completed operations
7     claims, on the one hand, and
8     non-products/non-completed operations
9     claims, on the other?
10         MR. FINCH:  Object to form.
11         MS. DeCRISTOFARO:  Object to
12    form.
13         MR. FINCH:  Why don't you
14    define it so he knows exactly what
15    you are talking about.
16         You can answer.  Object to
17    form.
18         THE WITNESS:  If you are
19    using those terms as they are used
20    in comprehensive general liability
21    policies, I think I have a general
22    understanding of that, but I
23    certainly would not profess to be
24    an expert on the subject.

Page 485

1     BY MR. COHN:
2          Q.   And would you mind if when I
3     refer to products/completed operations
4     claims under a standard CGL policy, if I
5     just use the term "products claims"?
6          A.   That's fine.
7          Q.   And would you mind if when I
8     refer to non-products/non-completed
9     operations claims under a standard CGL
10    policy, if I just call them "non-products
11    claims"?
12         A.   That's fine.
13         MR. SCHIAVONI:  We will
14    object, though, Dan.
15    BY MR. COHN:
16         Q.   Is it your understanding --
17    strike that.
18         Is it the understanding of
19    the Asbestos PI Committee that the Libby
20    claims hold non-products claims?
21         A.   I don't think the Asbestos
22    Claimants Committee has an understanding
23    on that subject.  We understand that the
24    Libby claimants contend that they have

Page 530

1    can't, he will say he can't answer
2    the question.
3        MR. SCHIAVONI:  If the
4    answer is please refer to docket
5    number blankety-blank, then I
6    agree with you.  If the answer is,
7    as the answers have been to the
8    other questions, then he's
9    obviously waived it, because there
10   is no file.
11       MR. WISLER:  Objection.
12       MR. COHN:  Would you like
13   the question read again?
14       THE WITNESS:  No.  I can
15   remember the question.  Are you
16   still pressing?
17       MR. COHN:  Sure.
18       THE WITNESS:  The committee
19   has not filed either a joinder in
20   the objection or a response in
21   opposition to the objection, and I
22   have no idea whether the committee
23   is ever going to take a position
24   on the objection.

Page 531

1        MR. COHN:  Thank you,
2    Mr. Lockwood.  No further
3    questions.  I will pass the
4    witness to whoever is next.
5        Mr. Wisler:  I think
6    Maryland Casualty will be next.
7    Can we have a 15-minute break,
8    please?
9        MR. FINCH:  I prefer you not
10   have a 15-minute break.  I will
11   give you five minutes.  I would
12   like you to come down here so we
13   can hear you better.
14       MR. WISLER:  Off the record.
15       (There was a discussion held
16   off the record at this time.)
17       (There was a break from 1:37
18   p.m. to 1:56 p.m.)
19           - - -
20          EXAMINATION
21           - - -
22   BY MR. WISLER:
23       Q.  Mr. Lockwood, my name is
24   Jeffrey Wisler.  I represent Maryland

Page 532

1    Casualty Company and Zurich in this
2    bankruptcy case.
3        Mr. Lockwood, what is the
4    ACC's position as to the viability of
5    this Plan if the bankruptcy court finds
6    that one or more of the settled asbestos
7    insurance companies are not entitled to
8    524(g) protection?
9        MR. FINCH:  Objection, calls
10   for speculation.
11       I instruct the witness not
12   to answer the question to the
13   extent it would reveal privileged
14   or work product-protected
15   communications or information.  To
16   the extent you can answer the
17   question without so doing, you can
18   do so.
19       THE WITNESS:  Well, it's a
20   hypothetical question, and it
21   really is unanswerable because it
22   would depend upon what the reason
23   that the court gave for denying
24   the protection.  A lot of reasons

Page 533

1    that the court might conceivably
2    give, if it gave such, might have
3    the effect of blowing up the Plan,
4    effectively.  I mean, there would
5    be conditions to confirmation that
6    could not be satisfied nor waived.
7        On the other hand -- I don't
8    know.  I haven't thought enough
9    about the permutations and
10   combinations to know whether there
11   could be some ground on which the
12   court could deny a particular
13   settled insurer the right to be a
14   protected party for some reason
15   that wouldn't apply sort of
16   generally to the Plan but which
17   could, somehow or another, either
18   the parties could waive that
19   that -- I really don't know.
20       The committee certainly
21   doesn't have a position on it,
22   because the committee, as my
23   answer has demonstrated so far,
24   hasn't thought through the

Page 534

1    hypothetical circumstances that
2    might produce the result that you
3    posit.
4    BY MR. WISLER:
5        Q.   Well, in your answer, you
6    said that there are certainly scenarios
7    where such a ruling could, I think you
8    used the word, blowup the Plan.
9            What would be some examples
10   of that?
11           MR. FINCH:  Objection, form.
12           MS. BAIER:  Objection, calls
13   for speculation.
14           THE WITNESS:  The Plan
15   provides that a list in Exhibit-5
16   of settled insurers are entitled
17   to be protected parties under the
18   Plan.  The rationale for that, as
19   I said earlier, was that they had
20   potential indemnity claims against
21   W.R. Grace.
22       If, hypothetically, the
23   court interpreted the statute to
24   say that the on-behalf-of, that

Page 535

1    Grace somehow or another couldn't
2    make a contribution on behalf of
3    those settled insurers because
4    they weren't putting in fresh
5    money into the Plan so that Grace
6    was left with no protection
7    against indemnity claims because
8    no claims against those insurers
9    were being brought, that would go
10   pretty far way to blowing up the
11   Plan.  At a minimum, it would
12   require a whole renegotiation of
13   the Plan, in my opinion, as to
14   that hypothetical.
15   BY MR. WISLER:
16       Q.   Because if an insurer -- let
17   me make sure I understand what you are
18   saying.
19           You said that would go a
20   long way towards destroying the Plan.  Is
21   that because, for instance, if a settled
22   asbestos insurer with indemnity rights
23   were not protected, then their indemnity
24   claims would no longer be properly listed

Page 536

1    as Class 6 claims or no longer properly
2    channelled?
3            MR. FINCH:  Object to form.
4            THE WITNESS:  Let me back
5    up.  Under bankruptcy law, a
6    bankruptcy court doesn't have a
7    line item veto under which they
8    can exercise particular provisions
9    in the Plan that they don't like
10   but go ahead and confirm the rest
11   of it.  The Plan is an integrated
12   whole.  Judge Fitzgerald will
13   either confirm the Plan or she
14   will deny confirmation of the
15   Plan.
16       The scenario you posit, she
17   would deny confirmation of the
18   Plan because it purported to grant
19   protected party status to entities
20   that she said couldn't be
21   protected, for whatever reason.
22   At that point, everybody involved
23   in this bankruptcy would have to
24   sit down and figure out how to

Page 537

1    deal with the problem that was
2    created by that.  And I have no
3    idea how we would deal with the
4    problem that would be created by
5    that outcome.
6        We certainly haven't -- we
7    don't -- if the question is have
8    we got a backstop Plan in the
9    hopper that we can lay on the
10   table, the answer is no.
11   BY MR. WISLER:
12       Q.   What if the ruling was not
13   so global per the example you gave, but
14   individual, to say that one settled
15   asbestos insurance company, for whatever
16   reason, had not given or provided or
17   there was not adequate consideration
18   provided on behalf of that settled
19   asbestos settled insurer?
20           MR. FINCH:  Objection to
21   form, speculation.
22           MS. BAIER:  Objection.  He's
23   just answered that one.
24           THE WITNESS:  Yeah, I don't

Page 538

```
 1   understand how -- Grace's
 2   consideration is a lump sum of
 3   stuff, notes, cash, warrants,
 4   insurance, what have you.
 5        And, as I analyzed it
 6   earlier, it's the committee's
 7   stated position that the statute
 8   allows Grace under those
 9   circumstances to designate
10   insurers that it settled with and
11   have indemnity claims for
12   protection against asbestos
13   personal injury claims in the
14   future.
15        I don't know any basis on
16   which a court could say that,
17   these 12 asbestos settled insurers
18   are just okeydoke to get
19   protection under that approach,
20   but Insurer Y, for some reason or
21   another, isn't.  So I can't even
22   speculate what your hypothetical
23   would entail, much less what its
24   consequences would be.
```

Page 539

```
 1   BY MR. WISLER:
 2        Q.   So in the ACC's view, all
 3   the settled asbestos insurance companies
 4   sort of ride together in terms of whether
 5   they are entitled to 524(g) protection?
 6        MR. FINCH:  Objection,
 7   mischaracterizes prior testimony;
 8   object to the form.
 9        MR. WISLER:  If I
10   mischaracterize it, please
11   clarify.
12        THE WITNESS:  The only
13   caveat I would say to that is the
14   one that we spent some time
15   dancing around with Mr. Cohn
16   earlier, that if there was some
17   sort of ruling that some certain
18   claims couldn't properly be
19   channelled against a particular
20   insurer while other claims could
21   be , i.e. his notional independent
22   tort claims versus claims that are
23   clearly asbestos PI claim that
24   says the coverage isn't exhaustive
```

Page 540

```
 1   or wasn't properly settled or
 2   whatever, at that point, I
 3   don't -- the Plan does not purport
 4   to provide blanket protection.
 5        It provides protection for
 6   claims that fit within the
 7   definitions of the Plan, and if
 8   somehow or another the court
 9   determines that some particular
10   claim doesn't fit within the
11   definitions of the claims that
12   either are or legally can be under
13   524(g) channelled to the Trust,
14   then, in my opinion, that would
15   not result in the Plan failing a
16   condition of the sort I talked
17   about earlier.  Whether or not
18   there could be other consequences
19   of such a ruling is a different
20   matter.
21   BY MR. WISLER:
22        Q.   Let's talk about that
23   because you just described the
24   possibility that the court could rule
```

Page 541

```
 1   that some certain claims, in your words,
 2   were not properly channelled.
 3        Is it the ACC's position
 4   that indemnity claims of a settled
 5   asbestos insurance company would result
 6   from those some certain claims would then
 7   no longer be classified as Class 6 and
 8   channelled to the Trust?
 9        MR. FINCH:  Objection, form.
10        MS. BAIER:  Can you read
11   that over, please?
12        (The reporter read from the
13   record as requested.)
14        MS. BAIER:  Objection as to
15   form.
16        THE WITNESS:  If I
17   understand the question and
18   speaking at a somewhat high level
19   of generality, if a claim against
20   a settled insurer were ruled not
21   to be channelled to the Trust in
22   the first instance, because it
23   didn't fit within -- because of
24   one of two reasons:  Either it
```

Page 542

1  didn't fit within the definition
2  or, alternatively, even though it
3  might be read to fit within the
4  definition, it could not be under
5  Section 524(g) so channelled, you
6  just weren't legally permitted to
7  do so, and the claim went forward,
8  and an indemnity claim were to
9  arise out of that claim, then it
10 is the position of the ACC that
11 that indemnity claim would not be
12 a Class 6 claim, because, by
13 definition, it didn't arise out of
14 an asbestos personal injury claim.
15 It arose out of something that the
16 court had decided since it wasn't
17 channelled was, by definition, not
18 an asbestos personal injury claim.
19 BY MR. WISLER:
20     Q.   Is the ACC in agreement with
21 Exhibit-5 of the exhibit book?  Are you
22 familiar with that exhibit?
23     A.   I am generally familiar with
24 it.  The ACC, as a Plan proponent, is --

Page 543

1  if what you mean by is in agreement with
2  it, we are sponsoring a Plan of which
3  it's an exhibit.  So I guess you could
4  say we are in agreement with it.
5      MR. WISLER:  That's all I
6  have.  Thank you, Mr. Lockwood.
7      MR. MANGAN:  Hello.  This is
8  Kevin Mangan on the phone.
9      MR. WISLER:  One second,
10 please.
11     MR. MANGAN:  Sure, Jeff.
12     MR. WISLER:  I am sorry.
13 Just one follow-up.  I apologize.
14 BY MR. WISLER:
15     Q.   Mr. Lockwood, in response to
16 my next-to-the-last question, you
17 testified that the claim we were
18 discussing -- and I am not going to try
19 to repeat all the words -- would not be a
20 Class 6 claim.
21         Is it the ACC's position
22 that it would then under this Plan be a
23 Class 9 claim?
24     MR. FINCH:  Object to form.

Page 544

1      You can answer.
2      THE WITNESS:  I don't know
3  that the ACC has a position on
4  what kind of claim it would be at
5  that point.
6      MR. WISLER:  Okay.  Thank
7  you.
8      - - -
9      EXAMINATION
10     - - -
11 BY MR. MANGAN:
12     Q.   Mr. Lockwood, Kevin Mangan
13 on behalf of the State of Montana.  I
14 have a few follow-up questions from
15 Mr. Cohn.
16         Specifically, I am going to
17 refer you to ACC Document 11, which is
18 Exhibit-4.  It's the TDP.
19     A.   Yes, sir.
20     Q.   If you could flip to Section
21 5.7?
22     A.   Section 5.7 of the TDP.
23     Q.   Correct.
24     A.   Evidentiary Requirements?

Page 545

1      Q.   Right.  Specifically,
2  5.7(a)(1).
3      A.   Correct.
4      Q.   If you could take a second
5  and take a look at that.
6      A.   Including the subsections
7  (a), (b) and (c) or just the lead in
8  (a)(1)?
9      Q.   Just (a)(1).
10     A.   Okay.
11     Q.   You see the (a)(1) requires
12 a ten-year latency period.
13     A.   Correct.
14     Q.   The period between the first
15 exposure and diagnosis.
16         Why a ten-year latency
17 period?
18     A.   It's my understanding that
19 that is generally considered by the
20 medical profession to be the minimum
21 latency period for asbestos-related
22 diseases to manifest themselves.
23     Q.   And is that how that number
24 came up with, to the best of your

Page 562

1  extent that the proceeds of those
2  settlements wind up in the Grace Trust as
3  opposed to the Grace Estate for
4  distribution to other people, they are a
5  settlement part of Grace's contribution
6  to the Trust.
7      Q.   Has the ACC attempted to
8  apportion or value those portions of the
9  contributions made by Grace that are upon
10  Grace's behalf versus upon the insurer's
11  behalf?
12          MR. FINCH:  You can answer
13      that yes or no.
14          THE WITNESS:  Well, I will
15      answer it no and add I am not sure
16      how anybody could go about doing
17      that.  It's what is known as a
18      lump sum deal.
19          MS. CASEY:  I have no
20      further questions.
21          MR. SCHIAVONI:  Actually,
22      could we let Mr. Speights from
23      South Carolina go first.
24          MR. FINCH:  You are up, Dan.

Page 563

1              - - -
2            EXAMINATION
3              - - -
4  BY MR. SPEIGHTS:
5      Q.   Mr. Lockwood, were you
6  involved in the negotiation of the 524 --
7  strike that.
8          Were you involved in the --
9          MS. BAIER:  Dan, can you
10      speak up or come closer to the
11      phone or something?
12          THE WITNESS:  Nobody can
13      hear you.
14          MR. SPEIGHTS:  I picked up
15      the phone.  I am not on speaker.
16          MR. FINCH:  Now we can hear
17      you.
18          THE WITNESS:  That's better.
19          MR. FINCH:  That's better.
20  BY MR. SPEIGHTS:
21      Q.   Let me start over again.
22  Mr. Lockwood, were you involved in the
23  negotiation of the 524(g) statute?
24      A.   Me personally?

Page 564

1          MR. FINCH:  Objection,
2      foundation.
3  BY MR. SPEIGHTS:
4      Q.   Yes, you personally.
5      A.   No.
6      Q.   Was your law firm?
7          MR. FINCH:  Objection, form,
8      foundation, relevance.
9          THE WITNESS:  It depends on
10      how you define negotiations when
11      it comes to dealing with a
12      congressional enactment.  My
13      partner, Mr. Inselbuch, to my
14      knowledge, had at least one
15      meeting with Senator Heflin on the
16      subject of the statute.
17          What other discussions,
18      either in committee or outside
19      committee or whatever,
20      Mr. Inselbuch might have been
21      involved with, I really don't
22      know.  But he's being deposed on
23      June 12th, and I guess you could
24      ask him.

Page 565

1  BY MR. SPEIGHTS:
2      Q.   Would you agree with me that
3  the 524(g) statute always refers to the
4  word "Trust" in singular rather than
5  plural?
6      A.   I would have to go back and
7  look at the statute to be sure of that.
8  If you tell me it does, I am not going to
9  argue with you about it.
10      Q.   Well, I am actually not
11  going to tell you anything.  But if you
12  don't recall without looking at the
13  statute, I certainly would accept that
14  answer.
15      A.   I do not specifically recall
16  without looking at the statute.
17      Q.   Do you recall any bankruptcy
18  that was contested and provides for two
19  asbestos trusts, two or more asbestos
20  trusts?
21      A.   Do you mean a bankruptcy
22  where the Plan proposed to create two
23  trusts, and somebody said there could
24  only be one and that was the contest and

Page 566

1  the court ruled on that?
2      Q.   I will accept that.
3      A.   I don't think I do recall
4  any such bankruptcy.
5      Q.   How many bankruptcies do you
6  recall where there had been separate
7  trusts of property damage and personal
8  injury?
9      A.   As I sit here right now, I
10 can't think of one.  I believe there have
11 been some, but I am hard-pressed to
12 identify one from memory.  This was not a
13 topic I was prepared to deal with:
14     My recollection, however, is
15 there were a number of bankruptcies in
16 which there was no property damage trust
17 at all, whether separate or as part of a
18 single trust to which PI trusts were also
19 channelled.
20     Q.   Mr. Lockwood, what was the
21 status of the PI estimation proceedings
22 when the ACC agreed, at least in
23 principle, with the Debtors to resolve
24 this bankruptcy?

Page 567

1      A.   There are others that are
2  probably better equipped to be precise
3  about that than I, but my general
4  recollection was that I believe that
5  Grace had basically completed putting on
6  its case.  And it was before the PI and
7  FCR were putting on their case.
8      But I really was not --
9  unlike Mr. Finch, who is sitting here
10 next to me, who actually was involved in
11 trying that case, I wasn't.  So I could
12 be wrong about that.
13     Q.   Well, maybe you could
14 represent Mr. Finch, and I could question
15 him.
16     Regardless -- and by the
17 way --
18     A.   Suffice it to say, there had
19 been a lot of witnesses put on by Grace
20 at the time the case was over -- excuse
21 me -- was postponed.
22     Q.   What was your understanding
23 of Grace's position of the total amount
24 that should be paid to asbestos PI

Page 568

1  claimants, both present and future,
2  whenever it ended its presentation of the
3  estimation?
4      MS. BAIER:  Objection as to
5  form.
6      MR. FINCH:  Object to form.
7      THE WITNESS:  My
8  recollection is that Grace had
9  various numbers on the table from
10 various witnesses, but they were
11 all way too low.
12 BY MR. SPEIGHTS:
13     Q.   Well, what is your
14 recollection of the last number they were
15 using before you settled?
16     MS. BAIER:  Objection as to
17 form.
18     MR. FINCH:  Object form and
19 lack of -- well, maybe not lack of
20 foundation but lack of recall.
21     THE WITNESS:  When you say
22 "they were using," using in what
23 context?
24 BY MR. SPEIGHTS:

Page 569

1      Q.   Well, what is your
2  understanding of Grace's last position of
3  the total amount that should be paid to
4  asbestos present and future PI claimants
5  before the deal was negotiated with the
6  ACC?
7      MS. BAIER:  Objection to
8  form.
9      MR. FINCH:  Mr. Speights,
10 are you asking for his
11 recollection of what is the
12 estimate of the total present and
13 future liability for asbestos PI
14 claims put forward through the
15 testimony of Tom Florence in his
16 expert report and testimony that
17 occurred on March 31st, 2008, two
18 days before the company rested its
19 case?
20     MR. SPEIGHTS:  Well, that
21 wasn't my question, but I will ask
22 that.  If Mr. Lockwood knows the
23 answer to that, maybe that will
24 suffice.

Page 570

1        THE WITNESS:  I have no
2    idea.
3    BY MR. SPEIGHTS:
4        Q.    As I anticipated, so I want
5    to go back to the question.
6        A.    I don't have any better
7    answer because my recollection was that
8    Grace had put up experts with different
9    numbers at different times based on
10   different assumptions.  The record is
11   publicly available.  It contains whatever
12   it contains.  I just don't remember
13   what -- I don't remember whether -- I
14   don't remember whether Grace had a single
15   number that was proposed by it to be the
16   definitive number or a range of numbers
17   that the judge could have selected,
18   depending upon which set of assumptions
19   the Grace experts were operating on, that
20   she thought were more plausible than what
21   other assumptions.
22            Your question presupposes,
23   as did Mr. Finch's question to you, that
24   there was some landing point in which

Page 571

1    Grace came up with the number.  I don't
2    even know if there was such a number,
3    much less what it was.
4        Q.    Mr. Lockwood, I have had a
5    little difficulty understanding what the
6    number or the range was in reading
7    Mr. Bernick's various presentations at
8    the estimation hearing.
9        Do you have a recollection
10   of some bookend, some general range where
11   Grace was trying to place the PI
12   liability?
13           MR. FINCH:  Objection to the
14           extent that this calls for
15           examination of the 30(b)(6)
16           witness on topics that I don't
17           recall anybody designating.  He
18           certainly wasn't prepared to
19           respond to questions this specific
20           about those topics.
21           I will let him answer that
22           question, but I suggest that his
23           recollection of that is not likely
24           to be any better of that than what

Page 572

1    he testified to a minute ago.
2        THE WITNESS:  Well, I seem
3    to remember numbers as low as
4    maybe in the 400 million plus
5    range and numbers as high as a
6    billion dollars plus or minus.
7            But whatever the numbers
8    were, as I said earlier, they were
9    always a whole lot lower than what
10   thought bore any resemblance to
11   reality.
12   BY MR. SPEIGHTS:
13       Q.    Thank you, Mr. Lockwood.
14   Let me turn to another subject.
15           What is the document -- and
16   you may have already testified about it,
17   but what is the document that first
18   memorialized a settlement?  Was it a term
19   sheet, a memorandum of understanding or
20   something else?
21       A.    My recollection is it was
22   labeled a term sheet, but I am not
23   positive about that.
24       Q.    And I am just going to use

Page 573

1    that term with the understanding that it
2    may actually be called something else.
3            Who was involved in the
4    negotiation of the term sheet on behalf
5    of the ACC?
6        A.    I think I asked and answered
7    this question the other day.  I think it
8    was -- from the ACC's perspective, A, it
9    didn't include me; and, B, it involved
10   Mr. Inselbuch and some or all of four
11   members of the ACC, including Mr. Rice,
12   Mr. Budd, Mr. Weitz, and Mr. Cooney.
13           I do not know who was
14   involved on the Grace side other than I
15   recall generally that it included outside
16   counsel, inside counsel for Grace, and
17   some representative of the Equity
18   Committee or representatives, plural.
19       Q.    And you did testify about
20   that.  I didn't recall Mr. Inselbuch
21   being there, because it's your
22   recollection that Mr. Inselbuch was
23   involved in those negotiations?
24       A.    He was.  But, again, there

Page 590

1  many judgments did PI plaintiffs obtain
2  against Grace?
3       MR. FINCH:  Objection, lack
4  of foundation.
5       THE WITNESS:  I don't really
6  recall.  I recall that there was
7  an exhibit somewhere that we put
8  in in the estimation case that, I
9  believe, reflected judgments and
10  verdicts of PI cases against
11  Grace.  I think it was all of
12  them, but it might have been for
13  some period shorter than all time.
14       It was, I want to say, in
15  the 20s, but my memory is
16  really -- I wouldn't vouch for my
17  memory on something like that.
18  BY MR. SPEIGHTS:
19       Q.   I understand.  We will await
20  Mr. Finch's deposition.
21       Sometime in the 12 or 16
22  hours that I have been listening to you
23  by telephone, Mr. Lockwood, you said
24  something about some PI claimants

Page 591

1  receiving a payment of $300, although
2  technically they, if you followed some
3  formula, might receive only about $100.
4       Does that ring any bells
5  with you?
6       A.   Yes.  I know what you are
7  talking about.
8       Q.   What do we call that group
9  of claimants?
10       A.   I believe they are called
11  Category I, Other Asbestos Disease, Level
12  I, cash discount payment.  They are
13  identified in Section 5.3(a)(3) of the
14  TDP.
15       Q.   And how many such claimants
16  does the ACC anticipate there being?
17       A.   I don't believe the ACC has
18  a real expectation on this.  It is
19  entirely possible Mark Peterson, the
20  committee's asbestos claims expert, might
21  have made a projection of what percentage
22  of the claims would be expected to fall
23  within that category.
24       My general recollection

Page 592

1  is -- this type of category, the Level I
2  cash discount payment, which I believe I
3  characterized earlier in my testimony, is
4  akin to a convenience class in sort of
5  standard bankruptcy, has been used in
6  virtually every case in the last ten
7  years.  And my recollection is that it's
8  a relatively small percentage of claims
9  and a vastly smaller percentage of
10  dollars that wind up getting spent that
11  way.
12       But I really can't be more
13  specific than that.  Peterson might have
14  an estimate, and Inselbuch might know
15  more about other Trust experience with
16  this category of claims I do.
17       MR. FINCH:  Mr. Speights,
18  Dr. Peterson put in an expert
19  report in March of this year that
20  may shed some light on that
21  question.
22       MR. SPEIGHTS:  Thank you,
23  Mr. Finch.
24  BY MR. SPEIGHTS:

Page 593

1       Q.   I will move to what may well
2  be my last category, Trust Distribution
3  Procedures.
4       Was the Debtor involved in
5  the drafting of the Trust Distribution
6  Procedures?
7       MR. FINCH:  Objection, asked
8  and answered.
9       THE WITNESS:  As I testified
10  the other day, the principal
11  draftspersons for that document
12  were the ACC and the FCR, that
13  Grace saw drafts of it, made
14  comments on it.  But I would not
15  consider it to be accurate to
16  describe them as one of the
17  principal drafters of it.
18  BY MR. SPEIGHTS:
19       Q.   Do you have, I think it's,
20  Exhibit-11, the Trust Distribution
21  Procedures in front of you?
22       A.   I do.
23       Q.   If you would turn to page
24  42, Section 5.7(b)(3), Grace exposure.

Page 602

1    nature of the general objection?
2        MR. FREEDMAN:  The nature of
3    the general objection is that they
4    are presenting hypotheticals,
5    which the witness can't answer
6    and, as a result, require him to
7    set forth opinions about things
8    that are beyond what he should be
9    testifying to in the 30(b)(6)
10   deposition.
11       MR. SCHIAVONI:  That's been
12   90 percent of the testimony,
13   hypotheticals.
14       MR. FREEDMAN:  Well, I am
15   stating this objection to this
16   line of questions.  You have done
17   well on everything else.
18   BY MR. SPEIGHTS:
19       Q.    Mr. Lockwood, I am going to
20   try to wind up in less than ten minutes.
21       MR. FINCH:  Mr. Speights,
22   before you wind up, can we take a
23   two-minute break?
24       MR. SPEIGHTS:  That will be

Page 603

1    fine, if it's two minutes.
2        MR. FINCH:  It's two
3    minutes.  Off the record.
4        (There was a break from 3:17
5    p.m. to 3:20.)
6    BY MR. SPEIGHTS:
7        Q.    Mr. Lockwood, has trustees
8    been selected for the PI Trust?
9        A.    Yes.
10       Q.    Have they been revealed?
11       A.    Their names are set forth at
12   the end of the PI Trust Agreement.  The
13   second-to-last page is a signature page
14   which names three individuals, Harry
15   Huge, Lewis Sifford, and Dean Trafelet,
16   as the three prospective trustees.
17       Q.    Did the ACC choose these
18   three people?
19       A.    The ACC and the FCR
20   consulted each other on these three
21   prospective individuals and then proposed
22   them to the co-proponents and the
23   co-proponents accepted them.
24       Q.    Had the ACC or the FCR

Page 604

1    proposed any other person to the
2    co-proponent which they did not accept?
3        A.    Not that I recall.
4        Q.    Has the ACC chosen an entity
5    to administer the Trust?
6        A.    Not to my knowledge.
7    Indeed, I don't believe the ACC is
8    capable of making that choice.  I believe
9    under the Trust Agreement, the trustees
10   are the only parties with the authority
11   to make that decision.
12       Q.    Is statute of limitations a
13   legal defense in the Trust Distribution
14   Procedures?
15       A.    To the extent --
16       Q.    To any claim?
17       A.    Yes, to the extent so
18   provided in the TDPs.  What I mean by
19   that is there are one or more provisions
20   that address that subject in which the
21   statute of limitations is made
22   applicable.
23       Q.    And if I sit down tonight
24   and very carefully review again this

Page 605

1    Trust Distribution Procedure for the
2    Grace PI Trust, I will find statute of
3    limitations somewhere?
4        A.    Somewhere in there, it is my
5    best recollection that there is a
6    provision, one or more provisions, that
7    address statute of limitations.
8        I might be able to find it,
9    if you really wanted me to root around in
10   it for a while here.  I can't from memory
11   remember exactly where it shows up, but I
12   am --
13       Q.    Well, I actually don't want
14   you to do that.
15       A.    Okay.
16       Q.    But I would request you or
17   your attorney --
18       A.    Okay.  It's Section
19   5.1(a)(2) of the TDP is at least one
20   place.  It's captioned Effect of Statutes
21   of Limitation and Repose.  It starts at
22   page 16 of the TDP and extends over to
23   page 17.  There may be possibly other
24   places where statute of limitations

Page 634

1    the same position and give the
2    same instruction.
3         If you ask about questions
4    that Libby claimants have taken in
5    papers filed in the court, for
6    example, in a Disclosure Statement
7    objections and the bullet point
8    Plan objections and the
9    committee's responses made to that
10   in open court, I will permit
11   Mr. Lockwood certainly to answer
12   those questions.
13        But anything that gets into
14   communications with between the
15   Libby claimants with the rest of
16   the ACC or counsel for the ACC
17   about their respective views of
18   insurance coverage, I am going to
19   take the position as privileged.
20        And so I think you have to
21   do it on a question-by-question
22   basis, but that's my general
23   position.
24   BY MR. SCHIAVONI:

Page 635

1         Q.   Okay.  Mr. Lockwood, I just
2    have one other brief topic.  And here is
3    the first question on that:  Does the
4    Plan purport to release claims that may
5    exist between insurers and Non-Debtors?
6         MR. FINCH:  Objection, form,
7    broad, vague.
8         THE WITNESS:  Phrased as
9    broadly as you have, I think the
10   answer is yes.
11        MR. SCHIAVONI:  Okay.  Thank
12   you.  I have no further questions.
13        MR. FINCH:  Is there anyone
14   else in the room who has
15   questions?
16        MR. BROWN:  I have some
17   follow-ups.
18        MR. FINCH:  Is there anyone
19   else on the telephone who has not
20   asked questions yet who has
21   questions?
22        (No response.)
23        MR. FINCH:  Hearing no
24   affirmative response, I will let

Page 636

1    you have follow-up until we run
2    out of time.
3         (There was a discussion held
4    off the record at this time.)
5         (There was a break from 3:55
6    p.m. to 4:03 p.m.)
7         - - -
8         EXAMINATION
9         - - -
10   BY MR. BROWN:
11        Q.   Mr. Lockwood, just a couple
12   of follow-ups.  The court reporter is
13   actually going to read back a question
14   and answer.  I think it's probably easier
15   to do that, and then I will ask my
16   follow-up question.  It was end of
17   Mr. Wisler's questioning of you.
18        A.   Okay.
19        (The reporter read from the
20   record as requested.)
21   BY MR. BROWN:
22        Q.   And after that,
23   Mr. Lockwood, Mr. Wisler asked you a
24   follow-up as to what type of claim it

Page 637

1    would be.
2         And is it correct that the
3    ACC does not have a position on what type
4    of claim it would be if it's not a Class
5    6 claim?
6         A.   Well, the ACC doesn't, as
7    such, have positions on hypothetical
8    questions.  So, yes, the ACC doesn't have
9    a position on that issue.  The ACC --
10   well, I will leave it at that.
11        Q.   On Friday, Mr. Cohn asked
12   you a question, who drafted the TDP.
13   That was the question, and you gave an
14   answer which I am happy to show you the
15   full answer.  But I WANT to repeat a
16   portion of your answer.  You said:  "The
17   participants that did it were basically
18   counsel for the ACC, counsel for the FCR,
19   and members of the ACC itself in terms of
20   reviewing and commenting on things, and
21   the FCR himself."
22        When you said the ACC
23   itself, what did you mean?
24        A.   I meant --

Page 638

1      Q.   I am sorry.  When you said
2  members of the ACC itself, what members
3  are you talking about?
4      A.   Well, I was referring to the
5  personal injury counsel who were the
6  delegated representatives of the
7  individual ACC members, if that's what
8  you are driving at.
9      Q.   That's what I am driving at.
10         And who specifically were
11  they?
12      A.   As far as I know -- well,
13  the way in which the process works, in
14  general, is sometimes the ACC has
15  in-person meetings, sometimes it has
16  telephonic meetings, sometimes documents
17  get sent to it by email as PDF
18  attachments or whatever, and the ACC has
19  asked do you want to have a meeting or is
20  this good enough for you.  So there is a
21  variety of ways in which the ACC views an
22  input as obtained.
23         And my answer was simply
24  that at the conclusion of a process, the

Page 639

1  members of the ACC had weighed in in one
2  or more of the ways in which I had
3  described some of them had; they all had
4  the opportunity to express their views;
5  and, therefore, the final product was the
6  product of their input.  And there was a
7  final vote to go forward with the
8  document.
9      Q.   Okay.  And when you say the
10  members, you are talking about their
11  actual personal injury counsel?
12      A.   As far as I know.  But,
13  again, I couldn't tell you whether an
14  individual personal injury lawyer might
15  have consulted with his client, the
16  member, on one or more aspects of the TDP
17  or, for that matter, even sent the client
18  a copy of the entire TDP and had a
19  discussion with him about it.  I
20  certainly couldn't exclude that.
21      Q.   Can you tell me the list of
22  counsel that you are talking about, the
23  actual names?
24      A.   They would be -- as a

Page 640

1  general proposition, I believe they are
2  in the Disclosure Statement.  If they
3  are, it's a hell of a lot better
4  description of them than my memory.  I
5  just --
6         MR. FINCH:  There is also an
7      order entered by the U.S. Trustee
8      that identifies the 11 individual
9      members of the ACC and their
10      counsel, care of their firms.
11  BY MR. BROWN:
12      Q.   That's what I am driving at.
13  I would like to know who the individuals
14  were at their firms that were involved.
15      A.   Well, let me just see.  I am
16  somewhat surprised.  The Disclosure
17  Statement does not appear to contain the
18  members of the ACC.  It just lists the
19  counsel representing the committee as a
20  whole.  I had misremembered.  I had
21  thought that it did.
22         I can't really remember.  I
23  mean, I know the four -- I identified
24  four earlier as being involved in the

Page 641

1  discussions with Grace.  They are
2  included.  I think there is at least nine
3  members of the ACC.  I do not recall, as
4  I sit here, who the other five members of
5  the ACC are.  I mean, they are of
6  record -- strike that.  I do not recall
7  who the other five lawyers for the
8  members of the ACC are.  They are of
9  record.
10      Q.   But the four to which you
11  are referring is Mr. Budd, Mr. Rice,
12  Mr. Cooney, and Mr. Weitz?
13      A.   Correct.
14      Q.   You were talking about the
15  Trust Distribution Procedures and who
16  drafted them.
17         Would your answer be the
18  same with respect to the Trust Agreement?
19      A.   On the Trust Agreement, I
20  think there was more input from Grace,
21  and, indeed, I think there may have been
22  some input from counsel from Sealed Air, as I
23  think about it.  And, indeed, now that I
24  think about it, I think there may have

Page 642

1  even been a little input from the Sealed
2  Air counsel on the TDP. But, again, the
3  primary draftspersons were counsel for
4  the ACC and the FCR.
5      Q.   Okay. Can I direct your
6  attention to the Plan, which I guess is
7  ACC-5, and specifically it's page 70 on
8  my copy. It's under Section 7.7
9  Conditions to Occurrence of the
10 Confirmation Date, specifically condition
11 (j).
12     A.   I see it.
13     Q.   Can you just take a moment
14 to read that? I have one question on
15 that.
16     A.   I have read it.
17     Q.   In the portion of that
18 condition dealing with asbestos PD
19 claims, second-to-the last line, you will
20 see the words "if any" appear there, but
21 the same language doesn't appear for
22 asbestos PI claims.
23     Why?
24     MR. FINCH: Objection,

Page 643

1  foundation.
2      THE WITNESS: I need to talk
3  to my counsel about this one.
4      (There was a discussion held
5  off the record between the witness
6  and counsel at this time.)
7      MR. FINCH: The discussion
8  was with respect to whether I need
9  to instruct him not to answer the
10 question. He is allowed to answer
11 the question as long as doing so
12 doesn't reveal privileged
13 communication.
14     I think you can answer.
15     THE WITNESS: Barely.
16     The "if any" is in there, as
17 best I can recall, because the
18 Plan proponents -- in contrast of
19 PI, "if any" is under PD. Because
20 the Plan proponents are quite
21 confident that there is going to
22 be lots of future PI demands and
23 are less confident that there is
24 going to be lots of future PD

Page 644

1  demands, or if there are, they
2  will be valid.
3      MR. BROWN: Okay. That's
4  all I have.
5      MR. FINCH: Could you go
6  back to the question I asked you
7  to find and read that question and
8  read the answer, and I will see if
9  I have got any redirect.
10     Does anybody else have any
11 questions?
12     (No response.)
13     MR. FINCH: Hearing none,
14 let me just hear that back.
15     (The reporter read from the
16 record as requested.)
17     MR. FINCH: No questions.
18     I think that is the end of
19 the deposition.
20     (The deposition concluded at
21 4:19 p.m.)
22
23
24

Page 645

1          CERTIFICATE
2
3
4      I HEREBY CERTIFY that the witness
5  was duly sworn by me and that the
6  deposition is a true record of the
7  testimony given by the witness.
8
9
10
11
12 _____
13 Lori A. Zabielski
14 Registered Professional Reporter
15 Dated: May 5, 2009
16
17
18
19
20     (The foregoing certification
21 of this transcript does not apply to any
22 reproduction of the same by any means,
23 unless under the direct control and/or
24 supervision of the certifying reporter.)

1       ACKNOWLEDGEMENT OF DEPONENT

2          I, _Peter Van N. Lockwood_____, do

3   hereby certify that I have read the

4   foregoing pages,   1-    PGS, and that

5   the same is a correct transcription of

6   the answers given by me to the questions

7   therein propounded, except for the

8   correction or changes in form or

9   substance, if any, noted in the attached

10  Errata Sheet.

11  _Peter Van N. Lockwood_____ _6/1/09_____

12
    WITNESS NAME                    DATE

13

14

15

16

17  Subscribed and sown

18  to before me this

19  __1st__ day of _June_____, 20_09__.

20  My commission expires:

21          **Jeanne G. Katz**
            **Notary Public, District of Columbia**
            **My Commission Expires 12/14/2012**

22

23  _____

    Notary Public

24

```
 1                  -     -    -    -    -

 2                       E R R A T A

 3                  -     -    -    -    -

 4     PAGE    LINE    CHANGE

 5      17      5     "to" to "to be"

 6      17      21    "here in" to "herein"

 7      21      21    "are" to "are not"

 8      37      16    "is" to "are"

 9      38      10    "My" to "When I"

10      41      12    "representative" to "representatives"

11      69    21-22   "combuston engineering" to "Combustion Engineering"

12      80      13    "pre-petitioned" to "pre-petition"

13      80      22    "consultancy and cleaning" to "Consultancy and Cleaning"

14      82      2     "alterego" to "alter ego"

15      84      18    "178" to "Definition 178"

16      84      21    "insurers" to "insureds"

17      85      15    "punitive" to "putative"

18      90      7     "the" to "an"

19      96      19    "engineering" to "Engineering"

20      98      1     "is" to "are"

21      98    19-20   "and insurance protection" to "any insurance injunction"

22     100      14    "is" to "in"

23     104      18    "or" to "or its"

24     107      13    "-vie" to "-vis"
```

| | | |
|---|---|---|
| 1 | | — — — — |
| 2 | | E R R A T A |
| 3 | | — — — — |
| 4 | PAGE | LINE   CHANGE |
| 5 | 111 | 20   delete "or" |
| 6 | 112 | 2   "cutoff" to "cut off" |
| 7 | 115 | 12   "is" to "are" |
| 8 | 117 | 24   "C363B" to "section 363(b)" |
| 9 | 118 | 3   "you" to "you've" |
| 10 | 118 | 8   "have" to "to have" |
| 11 | 119 | 24   "in" to "an" |
| 12 | 131 | 24   "gratuitous" to "gratuitous benefit to" |
| 13 | 134 | 14   "indirectly" to "indirect" |
| 14 | 142 | 16   "transfers" to "transfer" |
| 15 | 143 | 1   "adjoining" to "enjoining" |
| 16 | 158 | 9   "does" to "the" |
| 17 | 171 | 6 & 11   "race" to "res" |
| 18 | 178 | 11   "channel" to "channeled" |
| 19 | 178 | 12   "Trust" to "Trust claims" |
| 20 | 183 | 4   "an all set" to "a null set" |
| 21 | 192 | 5   "of" to "or" |
| 22 | 193 | 5   "we" to "they" |
| 23 | 194 | 3   "claims" to "policies" |
| 24 | 205 | 16   "it finds" to "they find" |

```
1                  —  —  —  —  —

2                  E R R A T A

3                  —  —  —  —  —

4    PAGE     LINE     CHANGE

5    220      3        "trusts by the Trust" to "trusts, by the trust"

6    220      10       "Trust" to "court"

7    823      19       delete "skied"

8    224      12       "did" to "the"

9    226      14       "insurer" to "insurers"

10   226      18       "reviewed" to "viewed"

11   232      2        "to" to "the"

12   238      17       "PI" to "indirect PI"

13   249      13       delete "is"

14   249      13       "liability is" to "liabilities"

15   250      5        "omission" to "admission"

16   258      24       delete "it"

17   266      12       delete "a"

18   266      22       insert "The" after "worded."

19   267      12       "-vie" to "-vis"

20   269      19       "Pi" to "PI"

21   270      11       "evaluate" to "evaluates"

22   272      7        "the fact of law" to "fact and law"

23   272      14       delete "of"

24   272      21       insert "were" before "in force"
```

```
 1                              -  -  -  -

 2                         E R R A T A

 3                              -  -  -  -

 4    PAGE      LINE      CHANGE

 5    279       5         "sure that" to "sure"

 6    279       6         "subject," to "subject,"

 7    288       8         "Grace's had" to "Grace's, had"

 8    289       8         insert "Grace" before "has"

 9    294       24        delete "position"

10    297       1         "IN" to "In"

11    297       6         "rights" to "right"

12    297       16        "gray" to "Grace"

13    308       3         "agreement" to "agreements"

14    310       8         "injunction. If" to "injunction if"

15    310       11        "then" to "than"

16    324       13        insert "that" before "are"

17    338       1         "COBB" to "FINCH"

18    346       18        insert "it" before "depends"

19    361       20        "[rable" to "liability"

20    366       2         "punitive" to "putative"

21    368       6         "a Payne" to "obtaining"

22    377       7         "pre-filed" to "previously filed"

23    379       8         "is" to "are"

24    385       21        "committees" to "committee's"
```

| | PAGE | LINE | CHANGE |
|---|---|---|---|
| 1 | | | - - - - - |
| 2 | | | E R R A T A |
| 3 | | | - - - - - |
| 4 | PAGE | LINE | CHANGE |
| 5 | 388 | 2' | "history" to "historical" |
| 6 | 402 | 12 | "about" to "with" |
| 7 | 403 | 24 | delete "for" |
| 8 | 416 | 3 | "entitled" to "entitle" |
| 9 | 416 | 8 | "or" to "on" |
| 10 | 419 | 3 | "to" to "at" |
| 11 | 419 | 23-24 | "in all" to "a null" |
| 12 | 425 | 18 | "Indiana" to "Inselbuch" |
| 13 | 425 | 20 | "arguably" to "arguable" |
| 14 | 435 | 9 | "met" to "me" |
| 15 | 468 | 13 | "is" to "has" |
| 16 | 469 | 24 | "errors" to "criteria" |
| 17 | 471 | 8 | "pressed" to "met" |
| 18 | 472 | 13 | "to" to "of" |
| 19 | 491 | 16 | "respected" to "respective" |
| 20 | 491 | 17 | "conference" to "categories" |
| 21 | 492 | 8 | "obtain" to "obtained" |
| 22 | 493 | 19 | ~~test~~ "by" to "from" |
| 23 | 526 | 22 | "combustion engineering" to "Combustion Engineering" |
| 24 | 535 | 9 | insert "a" after "go" |

```
1                    –   –   –   –

2               E R R A T A

3                    –   –   –   –

4    PAGE     LINE    CHANGE

5    536       8      "exercise" to "excise"

6    539       23     "claim that" to "claims, that"

7    539       24     "exhaustion" to "exhausted"

8    546       17     delete "as" after "by"

9    550       6      "at that name insurer" to "named insured"

10   551       1-2    delete "be in" before "BNSF"

11   554       11     "turn, Have" to "turn have"

12   557       16     insert "by" before "hypothesis"

13   559       24     "present" to "presenting"

14   572       9      insert "we" after "what"

15   581       15     insert "of" after "Plan"

16   588       6      "have" to "as"

17   594       8      insert "to" before "deal"

18   614       17     "adjudicata" to "judicata"

19   626       11     "an" to "a"

20   633       10     insert "of" before "my"

21   633       21     "THE WITNESS" to "MR. FINCH"

22   634       3      "questions" to "positions"

23   638       18     insert "been" after "has"

24   644       1      "are;" to "are, that"
```