# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
- - -

In Re:                    : Chapter 11
                          :
                          : Case No.
W.R. GRACE & CO., et al,  : 01-01139 JKF
                          :
                          : (Jointly
          Debtors         : Administered)


- - -


Friday, May 15, 2009

- - -


          Oral deposition of DAVID T.

AUSTERN, ESQUIRE, taken pursuant to

notice, was held at the offices of ORRICK

HERRINGTON & SUTCLIFFE, LLP, Columbia

Center, 1152 15th Street, N.W.,

Washington, DC  20005-1706, commencing at

10:07 a.m., on the above date, before

Lori A. Zabielski, a Registered

Professional Reporter and Notary Public

in and for the Commonwealth of

Pennsylvania.

                - - -
          MAGNA LEGAL SERVICES
           Seven Penn Center
           1635 Market Street
                8th Floor
     Philadelphia, Pennsylvania 19103

Page 2

1  APPEARANCES:
2
3  DRINKER BIDDLE & REATH, LLP
   BY:  MICHAEL F. BROWN, ESQUIRE
4  One Logan Square
   18th & Cherry Streets
5  Philadelphia, Pennsylvania 19103-6996
   215.988.2988
6  (brownmf@dbr.com)
   (jeffrey.boerger@dbr.com)
7  Representing OneBeacon America Insurance
   Company, Seaton Insurance Company,
8  Government Employees Insurance Company,
   Columbia Insurance Company f/k/a Republic
9  Insurance Company
10
11 ORRICK HERRINGTON & SUTCLIFFE, LLP
   BY:  JONATHAN P. GUY, ESQUIRE
12    ROGER FRANKEL, ESQUIRE
      JOSHUA M. CUTLER, ESQUIRE
13 Columbia Center
   1152 15th Street, N.W.
14 Washington, DC  20005-1706
   202.339.8427
15 (jguy@orrick.com)
   Representing Future Claimants
16 Representative
17
18 CAPLIN & DRYSDALE, CHARTERED
   BY:  JEFFREY A. LIESEMER, ESQUIRE
19 One Thomas Circle, NW
   Suite 1100
20 Washington, DC  20005
   202.862.5000
21 (jal@capdale.com)
   Representing Grace, Official Committee of
22 Asbestos Personal Injury Claimants
   ("ACC")
23
24

Page 3

1  APPEARANCES (continued)
2
3  KIRKLAND & ELLIS, LLP
   BY:  THEODORE L. FREEDMAN, ESQUIRE*
4    (*VIA TELECONFERENCE)
   Citigroup Center
5  153 East 53rd Street
   New York, New York  10022-4611
6  212.446.4800
   (theodore.freedman@kirkland.com)
7  Representing the Debtors
8
9  THE LAW OFFICES OF JANET S. BAER, P.C.
   BY:  JANET S. BAER, ESQUIRE
10 70 West Madison Street
   Suite 2100
11 Chicago, Illinois  606002
   312.641.2162
12 Representing the Debtors
13
14 SIMPSON THACHER & BARTLETT, LLP
   BY:  ELISA ALCABES, ESQUIRE
15    KAREN E. ABRAVANEL, ESQUIRE*
      (*VIA TELECONFERENCE)
16 425 Lexington Avenue
   New York, New York  10017-3954
17 212.455.3133
   (ealcabes@stblaw.com)
18 (kabravenel@stblaw.com)
   Representing Travelers Casualty and
19 Surety Company
20
21
22
23
24

Page 4

1  APPEARANCES (continued)
2
3  VORYS, SATER, SEYMOUR AND PEASE, LLP
   BY:  WILLIAM J. POHLMAN, ESQUIRE*
4    TIFFANY STRELOW COBB, ESQUIRE*
      (*VIA TELECONFERENCE)
5  52 East Gay Street
   Columbus, Ohio  43215
6  614.464.8322
   (wjpohlman@vorys.com)
7  (tscobb@vorys.com)
   Representing The Scotts Company, LLC
8
9
   COHN WHITESELL & GOLDBERG, LLP
10 BY:  CHRISTOPHER M. CANDON, ESQUIRE
   101 Arch Street
11 Boston, Massachusetts 02110
   617.951.2505
12 (candon@cwg11.com)
   Representing the Libby Claimants
13
14
   SPEIGHTS & RUNYAN
15 BY:  DANIEL H. SPEIGHTS, ESQUIRE*
      (* VIA TELECONFERENCE)
16 200 Jackson Avenue East
   P.O. Box 685
17 Hampton, South Carolina  29924
   803.943.4444
18 (dspeights@speightsrunyan.com)
   Representing Anderson Memorial Hospital
19
20
   TUCKER ARENSBERG, P.C.
21 BY:  MICHAEL A. SHINER, ESQUIRE*
      (*VIA TELECONFERENCE)
22 1500 One PPG Place
   Pittsburgh, Pennsylvania  15222
23 412.594.5586
   (mshiner@tuckerlaw.com)
24 Representing Certain London Market

Page 5

1  APPEARANCES (continued)
2
3  BILZIN SUMBERG BAENA PRICE & AXELROD, LLP
   BY:  MATTHEW I. KRAMER, ESQUIRE*
4    (*VIA TELECONFERENCE)
   200 South Biscayne Boulevard
5  Suite 2500
   Miami, Florida  33131-5340
6  305.450.7246
   (mkramer@bilzin.com)
7  Representing Property Damage Committee
8
9  STROOCK & STROOCK & LAVAN, LLP
   BY:  DANIEL J. HARRIS, ESQUIRE*
10    (*VIA TELECONFERENCE)
   180 Maiden Lane
11 New York, New York  10038-4982
   212.806.5400
12 (djharris@stroock.com)
   Representing Official Committee of
13 Unsecured Creditors
14
15 CROWELL & MORING, LLP
   BY:  MARK PLEVIN, ESQUIRE
16    NOAH S. BLOOMBERG, ESQUIRE
   1001 Pennsylvania Avenue NW
17 Washington, DC  20004-2595
   202.624.2913
18 (mplevin@crowell.com)
   (nbloomberg@crowell.com)
19 Representing Fireman's Fund Insurance
   (Surety Bond)
20
21
22 STEVENS & LEE, P.C.
   BY:  JOHN D. DEMMY, ESQUIRE
   1818 Market Street, 29th Floor
23 Philadelphia, Pennsylvania  19103-1702
   215.751.2885
24 (jdd@stevenslee.com)

Page 6

1  APPEARANCES (continued)
2
3  ALAN B. RICH LAW OFFICES
   BY:  ALAN B. RICH, ESQUIRE
4  Elm Place, Suite 4620
   1401 Elm Street
5  Dallas, Texas  75202
   214.744.5100
6  (arich@alanrichlaw.com)
   Representing Property Damage FCR
7
8
   CONNOLLY BOVE LODGE & HUTZ, LLP
9  BY:  JEFFREY C. WISLER, ESQUIRE
   The Nemours Building
10 1007 North Orange Street
   P.O. Box 2207
11 Wilmington, Delaware  19899
   302.88.6528
12 (jwisler@cblh.com)
   Representing Maryland Casualty
13
14
   ECKERT SEAMANS CHERIN & MELLOTT, LLC
15 BY:  EDWARD J. LONGOSZ, II, ESQUIRE
   1747 Pennsylvania Avenue, NW
16 12th Floor
   Washington, DC  20006
17 202.659.6619
   (elongosz@eckertseamans.com)
18 Representing Maryland Casualty and Zurich
19
20 COZEN O'CONNOR
   BY:  JACOB C. COHN, ESQUIRE
21 1900 Market Street
   Philadelphia, Pennsylvania  19103-3508
22 215.665.2147
   (jcohn@cozen.com)
23 Representing Federal Insurance Company
24

Page 7

1  APPEARANCES (continued)
2
3  CUYLER BURK, P.C.
   BY:  STEFANO V. CALOGERO, ESQUIRE
4  Parsippany Corporate Center
   Four Century Drive
5  Parsippany, New Jersey  07054
   973.734.3200
6  (scalogero@cuyler.com)
   Representing Allstate Insurance Company
7
8
   GOODWIN PROCTER, LLP
9  BY:  BRIAN H. MUKHERJEE, ESQUIRE*
   (*VIA TELECONFERENCE)
10 901 New York Avenue, N.W.
   Washington, DC  20001
11 202.346.4124
   (bmukherjee@goodwinprocter.com)
12 Representing CNA Insurance
13
14 WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
   BY:  KEVIN J. MANGAN, ESQUIRE*
15 (*VIA TELECONFERENCE)
   222 Delaware Avenue
16 Suite 1501
   Wilmington, Delaware  19801
17 302.252.4361
   (kmangan@wcsr.com)
18 Representing State of Montana
19
20 PEPPER HAMILTON, LLP
   BY:  LINDA J. CASEY, ESQUIRE*
21 (*VIA TELECONFERENCE)
   3000 Two Logan Square
22 Philadelphia, Pennsylvania  19103
   215.981.4000
23 (caseyl@pepperlaw.com)
   Representing BNSF Railway Company
24

Page 8

1                - - -
2            I N D E X
3                - - -
4
5  Testimony of:
6      DAVID T. AUSTERN, ESQUIRE
7

8  By Mr. Brown          Page  12, 242
9  By Ms. Alcabes        Page  95
10 By Mr. Candon         Page  123, 251
11 By Mr. Demmy          Page  164
12 By Mr. Cohn           Page  173
13 By Mr. Plevin         Page  192
14 By Ms. Cobb           Page  207
15 By Ms. Casey          Page  219
16 By Mr. Mangan         Page  221
17 By Mr. Speights       Page  222
18
19
20
21
22
23
24

Page 9

1                - - -
2            E X H I B I T S
3                - - -
4  NO.      DESCRIPTION          PAGE
5  Austern-1
6     Amended Notice of Deposition
      Of David T. Austern    31
7  Austern-2
8     Exhibit 2 to Exhibit Book
      Asbestos PI Trust Agreement   32
9  Austern-3
10    First Amended Joint Plan of
      Reorganization...    43
11 Austern-4
12    Exhibit 6 to Exhibit Book
      Asbestos Insurance Transfer
13    Agreement          80
14 Austern-5
      Exhibit 4 to Exhibit Book
15    Trust Distribution Procedures  90
16 Austern-6
      Exhibit 10 to Exhibit Book
17    Cooperation Agreement    92
18 Austern-7
      Notice of Deposition of
19    David Austern     95
20 Austern-8
      Debtors' Disclosure Statement
21    for the First Amended Joint
      Plan of Reorganization...    118
22 Austern-9
      Notice of Deposition of
23    David T. Austern     124
24

Page 10

1    EXHIBITS (continued)
2
     NO.    DESCRIPTION              PAGE
3
     Austern-10
4        Form 8-K              124
5    Austern-11
         Exhibit 8 to Exhibit Book
6        Best Interests Analysis    156
7
            - - -
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 11

1            - - -
2       DEPOSITION SUPPORT INDEX
3            - - -
4
5    Direction to Witness Not to Answer:
6    Page  Line      Page   Line
7    181   13        225    16
     229   04        239    03
8
9
10   Request for Production of Documents:
11   Page  Line      Page   Line
12   NONE
13
14
15   Stipulations:
16   Page  Line      Page   Line
17   NONE
18
19
20   Area(s) Marked Confidential:
21   Page  Line      Page   Line
22   NONE
23
24

Page 12

1                 - - -
2            PROCEEDINGS
3                 - - -
4        MR. GUY:  We will follow the
5    federal rules.
6                 - - -
7        DAVID T. AUSTERN, ESQUIRE,
8    after having been first duly
9    sworn, was examined and testified
10   as follows:
11                - - -
12           EXAMINATION
13                - - -
14   BY MR. BROWN:
15       Q.   Good morning, Mr. Austern.
16   My name is Michael Brown.  I represent
17   OneBeacon American Insurance Company,
18   Seaton Insurance Company, GEICO, and
19   Republic Insurance Company.
20           Could you state your full
21   name for the record, please?
22       A.   David Thomas Austern.
23       Q.   Have you ever been deposed
24   before?

Page 13

1        A.   Yes.
2        Q.   How many times?
3        A.   Somewhere between 25 and 30
4    times.
5        Q.   So it's fair to say that you
6    are familiar with the protocol for a
7    deposition then?
8        A.   I am.
9        Q.   Okay.  Can you give me a
10   summary of your professional background?
11       A.   I was an assistant district
12   attorney in the New York County District
13   Attorney's Office for four years; I was
14   an assistant United States attorney in
15   the United States Attorney's Office in
16   Washington, D.C. for four years; I was a
17   law professor for two years; I was in the
18   private practice of law for something
19   like 12 years; and I've been general
20   counsel of the Manville Personal Injury
21   Settlement Trust, and I have had some
22   other asbestos matters for the last 21
23   and a half years.  That doesn't add up to
24   45, and it should, but...

Page 14

1    Q.    Those are estimates, I take
2  it?
3    A.    Those are estimates, yes.
4    Q.    What did you do in
5  preparation for today's deposition?
6    A.    I reviewed some documents,
7  and I spoke to counsel.
8    Q.    What documents did you
9  review?
10    A.    I also reviewed some
11  transcripts.
12         I reviewed the Personal
13  Injury Trust Agreement; the Trust
14  Distribution Process -- the Personal
15  Injury Trust Distribution Process; the
16  Transfer Agreement; the Cooperation
17  Agreement; I reviewed Ms. Biggs' latest
18  estimation report; Dr. Peterson's latest
19  report; Dr. Florence's latest report;
20  Dr. Whitehouse's -- one of
21  Dr. Whitehouse's reports -- I am sorry --
22  two of Dr. Whitehouse's reports; the
23  rebuttal to those reports from Dr. Welsh
24  and Dr. Freedman; the objections filed by

Page 15

1  the Libby claimants and by one or more
2  insurance companies, and I am not sure I
3  know which ones; my prior deposition in
4  this case; my prior deposition in the
5  Combustion Engineering case; my testimony
6  in the Combustion Engineering case.  I
7  may have left something out, but I think
8  those are most of the documents I
9  reviewed.
10    Q.    Okay.  And you also
11  mentioned that you had reviewed some
12  transcripts?
13    A.    Those were the depositions
14  and trial testimony -- oh, excuse me.
15  Yes.  I reviewed Mr. Lockwood's
16  deposition.
17    Q.    Did you actually review the
18  Amended Plan of Reorganization?
19    A.    Yes -- and excuse me -- and
20  the Disclosure Statement.
21    Q.    And over what period of time
22  did you review all these materials in
23  preparation for your deposition?
24    A.    Two weeks.  I did one other

Page 16

1  thing in preparation of the deposition.
2  I listened to parts of, albeit not all,
3  of the Lockwood deposition.
4    Q.    Did you meet with counsel in
5  preparation for the deposition?
6    A.    Yes.
7    Q.    When?
8    A.    Last Friday and yesterday.
9    Q.    And for how long last
10  Friday?  What period of time did you meet
11  with counsel?
12    A.    I confess I don't remember,
13  but it was several hours.
14    Q.    And the more recent meeting?
15    A.    I would say three hours.
16    Q.    Was it just counsel for the
17  Future Claimants' Representative or were
18  other Plan proponent counsel present?
19    A.    No.  There were no other
20  Plan proponent counsel.
21    Q.    In reviewing Mr. Lockwood's
22  deposition testimony, was there anything
23  in his transcript with which you
24  disagreed?

Page 17

1    A.    I don't remember -- nothing
2  occurs to me, although if you showed me a
3  question and answer, I might say I
4  disagreed.  But I don't recall anything.
5    Q.    Okay.  When you listened in
6  on a portion of the deposition, was there
7  anything that you heard by way of an
8  answer by Mr. Lockwood that struck you as
9  inaccurate?
10    A.    Not that I recall.
11    Q.    Okay.  Now, you mentioned
12  that you had reviewed the Disclosure
13  Statement, the Plan, the PI Trust
14  Agreement I assume you were referring to,
15  the PI Trust Distribution Procedures, the
16  Transfer Agreement, and the Cooperation
17  Agreement?
18    A.    Yes.
19    Q.    Do you understand all of
20  those documents?
21    A.    No.
22    Q.    Are there particular
23  documents that you understand better than
24  others?

Page 18

1    A.   Yes.
2    Q.   Which ones?
3    A.   The Trust Distribution
4  Process.
5    Q.   By that, you mean the
6  Asbestos PI Trust Distribution
7  Procedures?
8    A.   Yes, yes.
9    Q.   Okay.
10   A.   I will refer to it as the
11 TDP, most likely.
12   Q.   We will finish the
13 deposition a lot sooner if you do that.
14   A.   And there were some sections
15 in some of the other documents I thought
16 I understood and some sections I thought
17 I did not.
18   Q.   Okay.  How about the Trust
19 Agreement?
20   A.   I believe I understood most
21 of that.
22   Q.   Okay.  You were appointed by
23 the bankruptcy court as the, quote, legal
24 representative, close quote, under

Page 19

1  Section 524(g) of the bankruptcy code,
2  correct?
3    A.   Correct.
4    Q.   When did that occur?
5    A.   Just about this time of year
6  five years ago.
7    Q.   Okay.  So in 2004?
8    A.   Yes.
9    Q.   And, as I understand it,
10 under the Plan your title is the asbestos
11 PI FCR, correct?
12   A.   Yes.
13   Q.   And the FCR is for Future
14 Claimants' Representative?
15   A.   Yes.
16   Q.   You will understand if I
17 refer to you as the FCR in the
18 deposition?
19   A.   I will understand what the
20 reference is.
21   Q.   Okay.  You are a
22 co-proponent of the Plan, correct?
23   A.   Yes.
24   Q.   How did you come to be the

Page 20

1  FCR?  I understand that you were approved
2  by the bankruptcy court, but how were you
3  presented, if you will, for that role?
4    A.   Understanding I was not in
5  the case at the time, I can only tell you
6  what documents I have looked at appear to
7  say.
8    Q.   Okay.
9    A.   The Debtor presented to the
10 court a motion of seeking an appointment
11 of an FCR, provided the court with three
12 names and an untitled fourth name -- I
13 will explain that in a moment.  The three
14 names proposed were me and two other
15 people, and then a statement that the
16 Property Damage Representatives didn't
17 want any of the three names mentioned by
18 the Debtor and wanted some unnamed fourth
19 person.  So there were four, if you will,
20 potential choices presented to the
21 bankruptcy court.
22   Q.   Who were the other two named
23 individuals?
24   A.   Professor Eric Green and

Page 21

1  Dean Trafelet.
2    Q.   I gather from your answer
3  that at the time this occurred, it was
4  contemplated that there would be a single
5  asbestos trust that would handle both
6  personal injury claims and property
7  damage claims?
8    A.   I don't know.
9    Q.   Do you have any idea how the
10 Debtors came up with the three names that
11 they did?
12   A.   I know what they said in
13 their pleading.  They said they had
14 discussed this matter with, well,
15 obviously, the Property Damage Trust
16 Representatives that I mentioned, and
17 they had discussed it with one or more
18 Creditors Committees and the Asbestos
19 Claimants Committee.
20   Q.   And then did the bankruptcy
21 court select you from the list of
22 contenders for the position?
23   A.   Well, I have left out a
24 pleading.

Page 22

1    Q.   Okay.
2    A.   The Asbestos Claimants
3  Committee filed a motion, I guess, in
4  response to the Debtors motion in which
5  they -- I should back up a step.
6       The Debtors motion had a
7  chart on it, as I recall, which showed
8  who opposed various of the names
9  mentioned and who was in favor of various
10  of the names mentioned, looking at the
11  committees.  And one of the things that
12  was said was that the ACC opposed me and
13  wanted Dean Trafelet.  The ACC responded
14  to that, I believe, saying they did not
15  oppose me, but they wanted Dean Trafelet
16  rather than me.
17    Q.   Okay.  And did judge
18  Fitzgerald then make a decision based
19  upon the pleadings you just described?
20    A.   I don't know what drove her
21  decision, but she made a decision and she
22  selected me.
23    Q.   Okay.  Now, did you have the
24  title FCR with respect to other asbestos

Page 23

1  trusts?
2    A.   Yes.
3    Q.   Which ones?  Actually, just
4  for purposes of that question, I want to
5  focus on trusts that are obviously up and
6  running as opposed to ones that may be in
7  the works.
8    A.   One other trust, the
9  Combustion Engineering Trust.
10    Q.   And then you mentioned
11  earlier that you are the general counsel
12  for the Manville Trust?
13    A.   Yes.
14    Q.   Is your role as the general
15  counsel for the Manville Trust akin to
16  your role as the FCR for the Combustion
17  Engineering Trust?
18    A.   No.
19    Q.   Okay.  Can you describe the
20  differences in your roles?
21    A.   Well, first of all, the
22  Manville Trust has a Futures Claims
23  Representative.
24    Q.   Okay.

Page 24

1    A.   So I certainly don't have
2  that role.  I advise the trustees -- I am
3  the legal advisor to the trustees and
4  sometimes trust staff.
5    Q.   And what is your role as the
6  FCR for the Combustion Engineering Trust?
7    A.   I represent future
8  claimants.
9    Q.   Are you familiar with a term
10  "Trust Advisory Committee"?
11    A.   Yes.
12    Q.   Is there a Trust Advisory
13  Committee for the Combustion Engineering
14  Trust?
15    A.   Yes.
16    Q.   And who are its current
17  members?
18    A.   Mr. Cooney, Mr. Weitz,
19  Mr. Kazan, and there is somebody else.
20  And I am not sure who it is.
21    Q.   With respect to the
22  Combustion Engineering Trust, did you
23  have the role of future claimants -- let
24  me back up.  Strike that.

Page 25

1       Did you have the role of
2  legal representative, as that term is
3  used in Section 524(g) of the bankruptcy
4  code?
5    A.   I believe that was what I
6  was, yes.
7    Q.   Okay.  And were you a
8  co-proponent of the CE Trust --
9    A.   Yes.
10    Q.   The CE Plan?
11    A.   Yes.
12    Q.   Putting aside confirmed
13  plans and trusts that are up and running,
14  are you the designated Future Claimants'
15  Representative in connection with any
16  pending asbestos bankruptcy cases other
17  than the Grace case?
18    A.   No.
19    Q.   Are you familiar with the
20  statutory requirements for a Section
21  524(g) trust?
22    A.   I am generally familiar.  I
23  am not sure I can recall each and every
24  one right at the moment.

Page 26

1    Q.   You have read Section
2 524(g)?
3    A.   I have.
4    Q.   How many times?
5    A.   Countless times.
6    Q.   Okay.  That's what I thought
7 you would say.
8       Did you play any role in the
9 drafting or enactment of Section 524(g)?
10    A.   I met with some legislators
11 and the staff of some legislators at the
12 time it was being proposed.
13    Q.   And who were they?
14    A.   Senator Heflin, one of
15 Senator Heflin's legislative assistants,
16 counsel to Senator Kennedy.  There were
17 some other staff members of some other
18 senators that I met with.  I am not sure
19 I can recall them.
20    Q.   Besides meeting with them,
21 did you have any input in the provisions
22 that appear in Section 524(g)?
23    A.   I am not sure I know what
24 you mean by input.  I attended --

Page 27

1    Q.   Let me back up.
2       Did you comment on any
3 drafts?  Did you provide suggestions as
4 to what the legislation should involve in
5 terms of requirements for 524(g) trust?
6    A.   No.
7    Q.   Okay.  What was the nature
8 of your input then?
9    A.   I was asked to come answer
10 questions that they had about the
11 necessity for 524(g).
12    Q.   Okay.  And what, if you
13 recall, did they specifically ask you?
14    A.   Well, the Manville Trust, of
15 course, did not have the benefits of a
16 524(g) injunction, and it frustrated
17 somewhat dramatically our ability to sell
18 our Manville stock, which was a very
19 large percentage of the assets of the
20 Trust.  And they wanted to know why --
21 because there was another injunction
22 under Section 105.  They wanted to know
23 why I thought it would be easier to sell
24 the Manville stock if we had 524(g)

Page 28

1 protection in addition to whatever
2 Section 105 gave us.
3    Q.   And what was your rationale
4 or your response?
5    A.   First of all, we couldn't
6 sell the stock because people,
7 prospective purchasers were worried about
8 Section 105 protection, and that came out
9 again and again in attempts to sell the
10 stock.  I can't think of any other way of
11 putting it.
12    Q.   Okay.  Other than what you
13 have just described, did you have any
14 other input with respect to Section
15 524(g)'s enactment?
16    A.   No.
17    Q.   All right.  In this case,
18 there are actually two Future Claimants'
19 Representatives, correct?
20    A.   Yes.
21    Q.   There is the PI FCR and
22 there is the PD FCR?
23    A.   Yes.
24    Q.   I want to focus on your role

Page 29

1 as the PI FCR, obviously, and what I
2 would like you to do first is to identify
3 for me the members of the Asbestos PI
4 Trust Advisory Committee in this case.
5    A.   Well, the members --
6    Q.   The proposed members, I
7 should say.
8    A.   The members are actually, as
9 I understand it, individual claimants,
10 but they are represented by certain
11 lawyers, who I guess you would say appear
12 on their behalf.  And they are Mr. Budd,
13 Mr. Cooney, Mr. Weitz, and Mr. Rice.
14       MR. BROWN:  Okay.  Could you
15    read my last question?
16       (The reporter read from the
17    record as requested.)
18       MR. BROWN:  Let me back up.
19    You might have misunderstood my
20    question, Mr. Austern.
21 BY MR. BROWN:
22    Q.   I was asking about the Trust
23 Advisory Committee as opposed to the
24 asbestos PI Committee.  But let's start

Page 30

1  with what you went through.
2          Why don't you tell me who
3  the members of the Asbestos PI Committee
4  are?
5          A.    Again, they are claimants,
6  but the PI Committee, I believe, is a
7  much larger group of people than the ones
8  I have just mentioned.
9          Q.    Right.
10         A.    And I don't know all the
11 people who are on it.
12         Q.    Okay.  Does Mr. Weitz's firm
13 have a client that is on the PI
14 Committee?
15         A.    As far as I know, he does.
16         Q.    And Mr. Cooney's firm?
17         A.    Yes.
18         Q.    And Mr. Rice's firm?
19         A.    Yes.
20         Q.    And Mr. Budd's firm?
21         A.    Yes.
22         Q.    And then there are others?
23         A.    Yes.
24         Q.    But you are not sure how

Page 31

1  many others?
2          A.    And I don't know who they
3  are.
4          Q.    Now, let's get to the
5  asbestos PI TAC.  The members of the
6  asbestos PI TAC in this case are who?
7          A.    Well, I could look at the
8  signature page on the Trust Agreement and
9  tell you, but some of the people I have
10 mentioned.
11         Q.    Actually, before we do that,
12 I neglected to mark your notice.  So why
13 don't we go back to that.
14         MR. BROWN:  We will mark
15 this as Austern-1.
16         (Austern-1 marked for
17 identification at this time.)
18 BY MR. BROWN:
19         Q.    Mr. Austern, you have before
20 you what's been marked as Austern-1.  I
21 neglected to do this at the outset of the
22 deposition.
23         Why don't you review that
24 and let me know if you can tell me what

Page 32

1  it is.
2          A.    It's the amended notice of
3  my deposition.
4          Q.    Okay.  And that's the notice
5  pursuant to which you are appearing here
6  today?
7          A.    Yes.
8          Q.    And you received a number of
9  other Notices of Deposition from other
10 parties?
11         A.    Yes.
12         Q.    You can put that aside.
13         MR. BROWN:  This will be
14 Austern-2.
15         (Austern-2 marked for
16 identification at this time.)
17 BY MR. 1234:
18         Q.    Mr. Austern, you now have
19 before you a document that has been
20 marked Austern-2.  It is Exhibit 2 to the
21 Exhibit Book.  You will see that there is
22 prior exhibit label on it.  This document
23 was used in Mr. Lockwood's deposition.
24         But why don't you tell me

Page 33

1  what this document is?
2          A.    It is the Asbestos PI Trust
3  Agreement.
4          Q.    Okay.  And this is the
5  document to which you wanted to refer to
6  find the members of the TAC, correct?
7          A.    That's correct.
8          Q.    Okay.  Who are the members
9  of the TAC?
10         A.    I believe I already
11 mentioned them:  Mr. Budd, Mr. Cooney,
12 Mr. Rice, and Mr. Weitz.
13         Q.    Okay.  I am correct, am I
14 not, that the members of the TAC were
15 selected by the Asbestos PI Committee?
16         A.    I assume that is true.  I
17 was not present when they were selected.
18         Q.    Does the law firm of Baron
19 and Budd have clients that have submitted
20 claims to the Combustion Engineering
21 Trust?
22         A.    As far as I know.
23         Q.    Okay.  And would your answer
24 be the same for Mr. Cooney's firm?

Page 38

1        MR. BROWN:  I couched it as
2  does he have an understanding.
3        THE WITNESS:  I don't know.
4  BY MR. BROWN:
5     Q.   Do you have an understanding
6  as to whether Section 524(g) of the
7  bankruptcy code requires someone with the
8  title Future Claimants' Representative
9  after a Plan of Reorganization has been
10  confirmed and gone effective?
11        MR. GUY:  Same objection.
12        THE WITNESS:  I believe it
13  does.
14  BY MR. BROWN:
15     Q.   And what is the basis for
16  your belief?
17     A.   Well, my belief is based on
18  Fibreboard and the decision in Fibreboard
19  by the Supreme Court.  And I don't
20  remember if I am confusing that with
21  actually what got into the language of
22  524(g).  But the Supreme Court found
23  something of a conflict between present
24  claimants and future claimants, or at

Page 39

1  least potential conflicts, and there was
2  a Future Claims Representative or
3  essentially a requirement in that case.
4  And I think it was transferred into
5  524(g).
6     Q.   If I showed you the language
7  of 524(g), would you be able to tell me
8  where that is set forth?
9     A.   If it's not there, I
10  wouldn't.
11     Q.   You are not sure whether
12  it's there?
13     A.   That's right.
14     Q.   Okay.  The Joint Plan in
15  this case has two trusts, correct?
16     A.   Yes.
17     Q.   It has an Asbestos PI Trust,
18  and it has an Asbestos PD Trust.  Why?
19     A.   Well, that's the way the
20  Plan proponents have done it.  My view of
21  this is that property damage claimants
22  are different than personal injury
23  claimants.
24     Q.   Are you aware of any other

Page 40

1  asbestos trust that is up and running
2  that has a two-trust structure, one trust
3  involving PI claims and the other
4  involving PD claims?
5     A.   The answer to the first part
6  of your question would be yes, but not
7  because of that division.
8     Q.   Okay.  What's the division?
9     A.   Well, I believe that -- I
10  believe what I refer to as the
11  Halliburton Trust has a number of
12  sub-trusts for dispute claims but not the
13  differentiation as between property
14  damage and otherwise.
15     Q.   When you say sub-trust, do
16  you mean by that sub-funds within a
17  single trust?
18     A.   Yes.
19     Q.   Okay.  As opposed to two
20  distinct trusts?
21     A.   Yes.
22        MR. COHN:  Michael, I think
23  he's referring to silica trust.
24  BY MR. BROWN:

Page 41

1     Q.   You mentioned the PD claims
2  and PI claims are different.  They are
3  actually treated differently under this
4  Joint Plan; are they not?
5     A.   Yes.
6     Q.   Can you describe the
7  difference between asbestos PI claims and
8  asbestos PD claims under the Joint Plan?
9     A.   I can describe the treatment
10  of personal injury claims; I cannot
11  describe the treatment of property damage
12  claims.
13     Q.   Can you describe the
14  differences?
15     A.   No, because I can't...
16     Q.   Do you know whether Section
17  524(g) addresses the propriety of a
18  two-trust structure of bankruptcy?
19     A.   I do not.
20     Q.   Are you familiar with the
21  distinction between the term "demand" as
22  it's used in 524(g) and "claim" as it's
23  used in the bankruptcy code?
24     A.   No.

Page 42

```
 1      Q.   Do you have any
 2  understanding at all of what a demand is?
 3      A.   In bankruptcy law, no.
 4      Q.   Who do you understand to be
 5  your constituency?
 6      A.   Future claimants.
 7      Q.   Do you have an understanding
 8  that future claimants are the holders of
 9  future demands?
10      A.   I don't know.
11      Q.   Do you have an understanding
12  as to whether the Debtors face the
13  prospect of any future asbestos PD
14  demands or asbestos PD claims?
15      A.   I believe there are
16  scenarios in which they do.
17      Q.   Could you describe them?
18      A.   No, but I believe that there
19  are property damage claims that -- that
20  the Debtor is responsible
21  post-confirmation for certain property
22  damage claims.
23      Q.   And that those property
24  damage claims would fit within what you
```

Page 43

```
 1  understand to be a future property damage
 2  claim as opposed to a current property
 3  damage claim?
 4      A.   I am not sure.
 5      Q.   All right.
 6      MR. BROWN:  We will mark
 7  this Austern-3.
 8      (Austern-3 marked for
 9  identification at this time.)
10  BY MR. BROWN:
11      Q.   Mr. Austern, you have before
12  you a document that we have marked
13  Austern-3.
14      My first question is, can
15  you identify it?
16      A.   It's the first Amended Joint
17  Plan of Reorganization.
18      Q.   And this is one of the
19  documents you indicated previously that
20  you reviewed in preparation for this
21  deposition, correct?
22      A.   Yes.
23      Q.   Are there particular
24  provisions in the Plan, as you sit here
```

Page 44

```
 1  today, for which you -- strike that.
 2      Are there particular
 3  provisions in the Plan that you don't
 4  understand?
 5      A.   Yes.
 6      Q.   Are there any that stick out
 7  in your mind in that regard?
 8      A.   Can I look at the Plan for a
 9  moment?
10      Q.   Sure.
11      A.   By way of example, 7.15 of
12  the document.
13      Q.   That's one that you do not
14  understand?
15      A.   Well, it's one I have
16  trouble trying to understand.
17      Q.   You are in good company.
18      A.   There are other sections of
19  the Plan and other documents I reviewed
20  that address insurance issues, which I
21  have trouble understanding and rely on
22  counsel to explain to me.
23      Q.   Well, as would have it, 7.15
24  is an area that I wanted to question you
```

Page 45

```
 1  about.  So why don't we turn to that
 2  section.
 3      A.   (Witness complies with
 4  request.)
 5      Q.   And why don't you take a
 6  moment to review it.  It's not terribly
 7  long.
 8      MR. GUY:  Is there any
 9  particular section, Michael?
10      MR. BROWN:  Well, I have
11  questions about a few sections, so
12  it might be easiest if he reads
13  the whole thing.
14      THE WITNESS:  Okay.  I have
15  reviewed it.
16  BY MR. BROWN:
17      Q.   Okay.  Recognizing that you
18  don't understand it fully, do you have an
19  idea of what its intended purpose is?
20      A.   Its intended purpose, as I
21  understand it, is to create insurance
22  neutrality.
23      Q.   And what do you understand
24  insurance neutrality to be?
```

Page 46

1    A.   That the Plan does not
2  interfere with the rights of the
3  insurance companies.
4    Q.   Okay.  Are there any
5  exceptions to that broad statement, as
6  you understand Section 7.15?
7        MR. COHN:  You might want to
8  rephrase that because you just
9  changed from his understanding of
10  insurance neutrality in the broad
11  concept to a provision that very
12  clearly is not what it was
13  announced to be.
14        MR. BROWN:  Can you read the
15  last question?
16        (The reporter read from the
17  record as requested.)
18  BY MR. BROWN:
19    Q.   You understand Section 7.15
20  to be intended to preserve the insurers'
21  rights; is that a fair statement?
22    A.   Yes.
23    Q.   Okay.  Is it your belief
24  that that's what it accomplishes?

Page 47

1    A.   I don't know.
2        (There was a discussion held
3        off the record at this time.)
4  BY MR. BROWN:
5    Q.   Mr. Austern, are you
6  familiar with the UNR decision in the
7  Seventh Circuit, the citation to which is
8  942 F.2d 1101?
9    A.   I am familiar with the UNR
10  Trust.  I am not familiar with the
11  decision.
12    Q.   Are you familiar with what
13  happened in the trial court in the
14  Fuller-Austin coverage case?
15        MR. GUY:  Objection, vague.
16        THE WITNESS:  No.
17  BY MR. BROWN:
18    Q.   You said you just read
19  Section 7.15.  Let's focus on (a).
20        Is your understanding that
21  (a) is a preemptory provision with
22  respect to the Plan, Plan documents, and
23  Confirmation Order except as specifically
24  set forth in Section 7.15?

Page 48

1        MR. GUY:  Objection.
2        MR. LIESEMER:  Object to the
3        form of the question.
4        MR. GUY:  It calls for a
5        legal conclusion.  The witness is
6        a fact witness.
7        MS. BAER:  Same objection.
8        THE WITNESS:  I am not
9  positive I know what you mean by
10  preemptory.  You sort of focused
11  on my problem with 7.15.  I don't
12  know how you read the successive
13  paragraphs as impacting on each
14  other.
15  BY MR. BROWN:
16    Q.   Do you believe Section 7.15
17  to be unclear?
18    A.   To me.
19        MR. GUY:  Objection.
20  BY MR. BROWN:
21    Q.   Okay.  Well, let's explore
22  that a little bit.
23        Let's look at Section
24  7.15(b), and you will see that there is a

Page 49

1  reference in subsection (b) to, quote,
2  the beneficiaries of the Asbestos PI
3  Trust?
4        Do you see that?
5    A.   Yes.
6    Q.   Do you have any
7  understanding as to what that means?
8    A.   It means what it states, the
9  beneficiaries of the Personal Injury
10  Trust.
11    Q.   And who are they?
12    A.   Well, there are personal
13  injury claimants obviously, and there
14  are, under certain circumstances,
15  indirect personal injury claimants.
16    Q.   Okay.  And who do you
17  understand to be within the definition of
18  indirect PI Trust claimants?
19    A.   Entities that can bring
20  claims as indirect claimants on the
21  grounds that they have paid dollars that
22  the Personal Injury Trust should
23  reimburse them for.
24    Q.   Okay.  Are you familiar at

Page 50

1  all with any of the Debtors' pre-petition
2  settlements with insurance companies?
3       A.   I have seen a list, and
4  that's the extent of my knowledge.
5       Q.   Are you aware that at least
6  certain of those insurers have
7  contractual indemnity provisions against
8  the Debtors in those settlement
9  agreements?
10       A.   Can you explain to me what
11  you mean by contractual?
12       Q.   Sure.  I will represent to
13  you that there are settlement agreements
14  that are pre-petition settlement
15  agreements in which the insurer paid a
16  sum of money to the Debtors, and in
17  exchange for paying that money, the
18  Debtors agreed to indemnify the insurer
19  in the event that claims were asserted
20  against the policy after the settlement
21  by other parties.
22       A.   Third party claimants?
23       Q.   Third parties.
24            Do you understand the term

Page 51

1  "indirect PI Trust claims" to include the
2  insurers insofar as they have the type of
3  contractual indemnity claim that I just
4  described?
5            MR. LIESEMER:  Object to the
6  form of the question.
7            MR. GUY:  Same objection.
8            THE WITNESS:  Mr. Brown, I
9  understand that all asbestos
10  personal injury insurance has been
11  channelled to the Asbestos
12  Personal Injury Trust.  And there
13  are settled insurance companies
14  that -- how would I describe it --
15  their obligations have been
16  settled with the Debtor; there are
17  unsettled ones; and then there are
18  those that have coverage in place
19  agreements or reimbursement
20  agreements.
21            I don't know where your
22  question fits into my
23  understanding of those buckets of
24  insurance entities.

Page 52

1  BY MR. BROWN:
2       Q.   Okay.  Let me parse that
3  out.  Do you understand certain of the
4  Debtors' insurance companies to have
5  indirect asbestos PI claims?
6       A.   They could.  They could have
7  the right to file them, yes.
8       Q.   Okay.  And do you understand
9  those insurers to fit within the phrase
10  in (b), the beneficiaries of the Asbestos
11  PI Trust?  In other words, are the
12  insurers that have the contractual
13  indemnity claims against the Debtors,
14  quote, beneficiaries of the Asbestos PI
15  Trust, as that term is used in 7.15(b)?
16            MR. LIESEMER:  Object to the
17  form of the question.
18            MR. GUY:  Objection, asked
19  and answered, compound.
20            MS. BAER:  Same objection.
21            MR. GUY:  You may answer.
22            THE WITNESS:  As far as I
23  know, they could be under certain
24  circumstances.

Page 53

1  BY MR. BROWN:
2       Q.   All right.  Then I would now
3  like you to compare the language in (a)
4  and the language in (b) based on the
5  assumption that they are.
6            MR. GUY:  Now I am confused.
7            MR. BROWN:  Anyone who reads
8  this provision is confused.
9            MR. GUY:  I am confused.
10  It's talking --
11            THE WITNESS:  You are asking
12  me to compare (a) to (b) or (b) to
13  (a)?
14            MR. GUY:  For what purpose?
15  BY MR. BROWN:
16       Q.   If the insurer that I just
17  described is a beneficiary of the
18  Asbestos PI Trust, then, according to
19  (b), it is bound by the Plan, the Plan
20  documents, and the Confirmation Order,
21  correct?
22       A.   That's what (b) says, yes.
23       Q.   So does (b) then supersede
24  subsection (a)?

Page 54

1      A.  I don't know.
2      Q.  Let's go to a defined term
3  in the Plan which appears on page 6,
4  number 16, quote, asbestos insurer
5  coverage defenses.  Take a moment to
6  review that provision.
7          MR. GUY:  So that I don't
8      have to repeat it throughout, I am
9      going to enter a standing
10     objection.  The witness is here
11     not as a 30(b)(6) witness on
12     insurer issues, and the Plan says
13     what it says.
14         MR. BROWN:  I understand.
15         MR. COHN:  Can you keep your
16     voice up, Tom?
17         MR. GUY:  We will go off the
18     record.
19         (There was a discussion held
20     off the record at this time.)
21  BY MR. BROWN:
22     Q.  Have you had a chance to
23  review the definition of asbestos insurer
24  coverage defenses?

Page 55

1      A.  Yes.
2      Q.  Do you understand it?
3      A.  No.
4      Q.  Fair enough.  You are not
5  alone.
6          Let's get back to 7.15.
7      A.  Can you give me the page
8  again?
9      Q.  I am sorry.  It's page 87.
10  Actually, what I would like to do is I
11  want to do a comparison.  Can you also
12  look at Section 11.9?  You might want to
13  take a moment to read 11.9.
14     A.  Can you give me a page
15  number?
16     Q.  Yes.  Page 115, Section 11.9
17  entitled Exculpation.
18     A.  Okay.
19     Q.  If you keep that page handy
20  and go back and look at Section 7.15, I
21  will represent to you, feel free to look
22  yourself, that there is no specific
23  reference in 7.15 to Section 11.9.
24     A.  I believe that's correct.

Page 56

1      Q.  Okay.  My question is, do
2  you have an understanding as to whether
3  the language in 7.15(a) supersedes the
4  language in 11.9?
5      A.  I don't know.
6      Q.  Do you know whether it's
7  intended to?
8      A.  No.
9      Q.  Reading both of those
10  provisions, do you understand whether it
11  does?
12         MR. GUY:  Objection, calls
13     for a legal conclusion.
14         MR. BROWN:  It just calls
15     for his understanding.
16         THE WITNESS:  Mr. Brown, I
17     must confess to you when I read
18     11.9 both the first time and the
19     second time, what I concentrated
20     on was on the fact that I had
21     exculpation, and I didn't
22     concentrate very much more.
23  BY MR. BROWN:
24     Q.  So you have been exculpated

Page 57

1  if the Plan is confirmed?
2      A.  Yes.
3      Q.  Let's just use that as an
4  example, not to pick on you, but since
5  you understand at least that much in
6  11.9.
7          Insofar as an insurer had a
8  claim against you, would you still be
9  exculpated in light of Section 7.15 as
10  you understand it?
11         MR. LIESEMER:  Object to the
12     form of the question.
13         MR. GUY:  Objection, calls
14     for a legal conclusion.
15         THE WITNESS:  The first part
16     of the answer is that in the Trust
17     Agreement, I also have what is not
18     labeled as exculpation but
19     indemnification rights, not
20     including gross negligence.
21         The answer is I don't know
22     the answer to that question.
23  BY MR. BROWN:
24     Q.  Does that concern you?

Page 58

1      A.   Does a possible conflict of
2   7.15 to 11.9 concern me?
3      Q.   Well, yes.
4      A.   No.
5      Q.   Okay.  Would you go back to
6   Section 7.7 of the Plan?
7      A.   Did you say 7.7?
8      Q.   Yes.  7.7 entitled
9   Conditions to Occurrence of the
10   Confirmation Date.
11      MR. GUY:  What page is that?
12      MR. BROWN:  I am sorry.  It
13   starts on page 69, and there are a
14   lot of conditions.  So it runs to
15   page 81.
16      THE WITNESS:  Okay.
17   BY MR. BROWN:
18      Q.   You are free to look at
19   that, if you want, but I understand you
20   have already reviewed the Plan.
21      A.   Yes.
22      Q.   My question is, do you have
23   an understanding as to whether Section
24   7.15 entitled Insurance Neutrality

Page 59

1   preempts Section 7.7 insofar as the
2   Debtors's insurers are concerned?
3      MR. GUY:  Objection, calls
4   for a legal conclusion.
5      THE WITNESS:  I don't know.
6   BY MR. BROWN:
7      Q.   Okay.  If you look at
8   Section 7.8, which begins on page 81,
9   that one is entitled Conditions to
10   Occurrence of the Effective Date.
11      If I asked you the same
12   question, would your answer be the same
13   with respect to Section 7.8?
14      A.   Can I look at 7.8 for a
15   moment?
16      Q.   Sure.
17      A.   I am sorry.  Could you
18   repeat the question?
19      Q.   Let me see if I can rephrase
20   it.  My question is whether the
21   preemptory language that appears in
22   Section 7.15(a) preempts the conditions
23   set forth in Section 7.8, as understand
24   it?

Page 60

1      MR. GUY:  Objection.
2      MR. LIESEMER:  I join in
3   that objection.
4      MR. GUY:  It calls for a
5   legal conclusion.
6      THE WITNESS:  I don't know.
7   BY MR. BROWN:
8      Q.   Okay.  Can you now look at
9   7.15(h)?
10      A.   Did you say (e)?
11      Q.   (H).  It appears on page 88.
12      A.   Yes.
13      Q.   Do you understand 7.15(h) to
14   bind all of the Debtors' insurers to all
15   of the releases and injunctions set forth
16   in the Plan?
17      MR. GUY:  Objection, calls
18   for a legal conclusion.
19      THE WITNESS:  I don't know.
20   BY MR. BROWN:
21      Q.   Let's go to page 97 of the
22   Plan, Section 8.5 entitled Successor
23   Claims Injunction.
24      MR. GUY:  When you get to a

Page 61

1   point for a break, can we take
2   one?
3      MR. BROWN:  Why don't we do
4   that right now.
5      (There was a break from
6   11:03 a.m. to 11:13 a.m.)
7      (The reporter read from the
8   record as requested.)
9   BY MR. BROWN:
10      Q.   Mr. Austern, I don't know if
11   you have had a chance to review that
12   section during the break, but if not, can
13   you take a look at it?
14      A.   Yes, I have reviewed this.
15      Q.   Do you have an understanding
16   as to the purpose of the successor claims
17   injunction?
18      MR. LIESEMER:  Object to the
19   form of the question.
20      THE WITNESS:  Well, as its
21   name implies, it is intended to
22   enjoin certain conduct.  Beyond
23   that, I, of course, was not part
24   of this case when either the

Page 62

1    Sealed Air or the Fresenius
2    actions were commenced and
3    concluded and settled.
4    BY MR. BROWN:
5        Q.    Do you understand the
6    Fresenius indemnified parties and the
7    Sealed Air indemnified parties to be the
8    beneficiaries of the successor claims
9    injunction?
10       A.    I believe they are.
11       Q.    Okay.  The successor claims
12   injunction is a 105 injunction, correct?
13       A.    Correct.  It's not a 524(g)
14   injunction.
15       Q.    I gather from your answer
16   that you understand the difference
17   between a Section 105 injunction and a
18   Section 524(g) injunction?
19       A.    To the extent that Manville
20   had only a Section 105 injunction, yes.
21       Q.    Okay.  Do you have an
22   understanding as to whether the successor
23   claims injunction enjoins any claims that
24   are asbestos-related claims?

Page 63

1        MR. GUY:  Objection, calls
2    for a legal conclusion.
3        THE WITNESS:  Do you mean
4    asbestos personal injury, or no?
5    BY MR. BROWN:
6        Q.    Could be, or any other type
7    of asbestos-related claim.
8        A.    I am not sure.
9        Q.    Do you understand there to
10   be a problem with using a Section 105
11   injunction to enjoin asbestos-related
12   claims?
13       MR. GUY:  Objection, vague
14   as to problem.
15       MR. LIESEMER:  I join in the
16   objection.
17       THE WITNESS:  There are
18   certain 105 injunctions that can
19   be lifted.  I assume you cannot do
20   that with a 524(g) injunction as
21   it is inexorably intertwined with
22   the Plan itself.  I don't know of
23   any other distinctions.
24   BY MR. BROWN:

Page 64

1        Q.    The successor claims
2    injunction by its terms cannot be lifted?
3        A.    It cannot, as I understand
4    it.
5        Q.    If a claim fits within the
6    definition of the successor claim, as
7    that term is defined in the Plan, do you
8    understand the successor claims
9    injunction to enjoin that claim?
10       MR. LIESEMER:  Object to the
11   form of the question.
12       MR. GUY:  Same objection.
13       MS. BAER:  Same objection.
14       THE WITNESS:  I don't know.
15   BY MR. BROWN:
16       Q.    Let's turn back for a moment
17   to asbestos PI channelling injunction,
18   page 90, Section 8.2.
19       A.    Okay.
20       Q.    Do you understand the
21   asbestos PI channelling injunction to be
22   purely a 524(g) injunction?
23       MR. GUY:  Objection.
24       THE WITNESS:  I don't know.

Page 65

1    I don't know if it is or not.
2    BY MR. BROWN:
3        Q.    All right.  Mr. Austern, I
4    want to shift gears here and turn back to
5    the Asbestos PI Trust Agreement, which we
6    marked as Austern-2.  And I would like to
7    direct your attention to Section 6.1.
8    And you are going to want a page.
9        A.    It's 34.
10       Q.    In 6.1, the second sentence
11   says, "He shall serve in a fiduciary
12   capacity, representing the interests of
13   the holders of future PI Trust Claims for
14   the purpose of protecting the rights of
15   such persons."
16       Do you see that?
17       A.    Yes.
18       Q.    And the "he" there is you,
19   correct?
20       A.    Yes.
21       Q.    What do you understand your
22   obligations to be to the holders of
23   future PI Trust claims?
24       A.    I represent them, and, as to

Page 66

1   them, I am a fiduciary.
2       Q.   Okay.  And what is the
3   nature of your fiduciary duties?
4       A.   To make sure the Trust has
5   sufficient funds and the funds to pay
6   them.
7       Q.   Anything else?
8       A.   It's more than to just pay
9   them.  It's to pay them in the same
10  manner that people who preceded them were
11  paid.
12      Q.   Is that all future
13  claimants?
14      A.   It's all future personal
15  injury claimants.
16      Q.   Does it matter whether they
17  have meritorious claims or not?
18      A.   Oh, I don't know.  I
19  haven't -- if it's not a meritorious
20  claim -- let me back up a second.  These
21  claimants are people I have never met,
22  and I dare say the day I meet them, they
23  are no longer my clients.
24      Q.   It's a convenient

Page 67

1   arrangement.
2       A.   I am principally responsible
3   for making sure there are funds available
4   to pay them in the same manner in which
5   claimants in the FIFO Queue of the Trust
6   were paid.  In that respect, I have a
7   fiduciary obligation to them.
8       Q.   Okay.  Can you turn to
9   Section 5.2 of the Trust Agreement, and
10  that appears on page 28.
11      A.   Yes.
12      Q.   Now, the first sentence of
13  Section 5.2 says, "The members of the TAC
14  shall serve in a fiduciary capacity
15  representing all holders of present PI
16  Trust Claims."  And we have already gone
17  through earlier the members of the TAC:
18  Mr. Weitz, Mr. Cooney, Mr. Rice, and
19  Mr. Budd.
20          Do you have an understanding
21  as to what their fiduciary duties are to
22  all holders of present PI Trust claims?
23      A.   All holders of present PI
24  Trust claims?

Page 68

1       Q.   Yes.  I am just reading from
2   Section 5.2.
3       A.   They are, as I am to some
4   extent, an advisor to the trustees who
5   are there to protect the rights of
6   present claimants.
7       Q.   Okay.  And when you say
8   present claimants, all present claimants,
9   right?
10      A.   Yes.
11      Q.   If you compare the language
12  in the second sentence of 6.1 with the
13  first sentence in 5.2, the wording is a
14  little different.
15          Do you see that?
16      A.   Yes.
17      Q.   What's the reason for the
18  different wording, if you know?
19          MR. LIESEMER:  Object to the
20  form of the question.
21          MR. GUY:  Objection as to
22  what difference you are referring
23  to.
24  BY MR. BROWN:

Page 69

1       Q.   Okay.  In 6.1, it says that
2   "he," meaning you, "shall serve in a
3   fiduciary capacity," and then it goes on
4   to say, "representing the interest of
5   holders of future PI Trust Claims..."
6           Do you see that?
7       A.   Yes.
8       Q.   And then there is another
9   phrase, and it says, "for the purpose of
10  protecting the rights of such persons."
11          Do you see that?
12      A.   Yes.
13      Q.   Now, if you go to 5.2, that
14  latter phrase, "for the purpose of
15  protecting the rights of such persons,"
16  is not there.
17          Is there a reason?
18      A.   I don't know.
19      Q.   Do you understand the TAC
20  members to have the same fiduciary
21  obligations to all holders of present PI
22  Trust claims that you have to all holders
23  of future PI Trust claims?
24          MR. LIESEMER:  Object to the

Page 70

1  form of the question.
2      THE WITNESS:  Well, I don't
3  think 6.1 says "all," but I will
4  accept the way you phrased it.
5  BY MR. BROWN:
6      Q.   Okay.
7      A.   I can't think of any
8  difference, as I sit here now, in terms
9  of -- it's a different population, but
10  other than that, I can't I can't think of
11  any difference.
12      Q.   You rightly noted that the
13  word "all" does not appear in 6.1.
14          Is there any particular
15  reason for that?
16      A.   Not that I know of.
17      Q.   Let me ask you a more
18  general question.  What is the purpose of
19  the TAC?
20      MR. LIESEMER:  Object to the
21  form of the question.
22      THE WITNESS:  To advise the
23  trustees with respect to present
24  claimants and the operation of the

Page 71

1  Trust.
2  BY MR. BROWN:
3      Q.   And what do you mean by
4  advise?
5      A.   Well, present their views to
6  the trustees and under some
7  circumstances, in the Trust Agreement,
8  either give or do not give their consent
9  to certain trustee action.
10      Q.   Is there a reason why the
11  TAC members are personal injury asbestos
12  lawyers?
13      A.   I can give you my personal
14  view.
15      Q.   Okay.
16      A.   They represent the
17  beneficiaries of the Trust, and I don't
18  know who else you would appoint.
19      Q.   You are familiar, are you
20  not, with the consultation provisions
21  that appear in Section 2.2(e) of the
22  Trust Agreement, correct?
23      MR. GUY:  What page?
24      MR. BROWN:  Page 10.

Page 72

1      MS. ALCABES:  Page 10.
2      THE WITNESS:  Yes.
3  BY MR. BROWN:
4      Q.   Why don't you tell me what
5  the general purpose of the consultation
6  provisions is for?  Well, it's actually
7  for the TAC and for the Futures'
8  Representative.
9      A.   There are a lot of decisions
10  trustees have to make.  This is
11  consultation, not carving out consent for
12  a moment, in terms of investments, in
13  terms of selecting vendors, in terms of
14  things that are not in the Trust
15  Distribution Process, and that
16  consultation is described in (e).
17      Q.   Okay.  You mentioned in your
18  answer the consent provisions.
19      A.   There are consent
20  provisions.
21      Q.   And those appear in (f),
22  correct, on page 11?
23      A.   Yes.
24      Q.   What is the rationale for

Page 73

1  the consent provisions that appear in the
2  Trust Agreement?
3      A.   As distinguished from
4  consultation?
5      Q.   Or as distinguished from not
6  having them at all?
7      A.   As I understand it, there
8  are certain decisions that trustees make
9  that are so important, they can only be
10  made with the consent of both the TAC and
11  the Future Claims Representative.
12      Q.   And that was a negotiated
13  term of the overall Plan, correct?
14      A.   Well, it's been negotiated a
15  lot before, and I am not sure if any
16  specific provision was negotiated in this
17  Plan.
18      Q.   Why can't the trustees make
19  these decisions on their own?
20      MR. GUY:  Objection as to
21  "these decisions."
22      MR. BROWN:  Well, let's back
23  up.
24  BY MR. BROWN:

Page 74

1    Q.    You will agree with me that
2  Section 2.2(f) sets forth a number of
3  different items for which the trustees
4  need the consent of the TAC and the
5  Future Claimants' Representative,
6  correct?
7    A.    Yes.
8    Q.    It goes on from Romanette 1
9  to Romanette 15, correct?
10   A.    Yes.
11   Q.    Why is there a need to have
12  the consent of the Future Claimants'
13  Representative and the TAC on these
14  particular items rather than simply
15  consultation?
16   A.    My answer is the same, and I
17  will speak forgetting the TAC, as the
18  Future Claimants' Representative, I want
19  the right to under certain circumstances
20  not agree to a decision by the trustees
21  and have that be the end of the decision.
22   Q.    Well, it's not actually the
23  end of the decision, is it?
24   A.    No.  There are ways of

Page 75

1  resolving that difference.
2    Q.    And what are those?
3    A.    Well, I may confuse this
4  with the Manville Trust, but you can
5  seek, shall we say, guidance from the
6  bankruptcy court.
7    Q.    By that, you mean a ruling?
8    A.    Yes, yes.
9    Q.    If your consent has been
10  unreasonably withheld in the views of the
11  trustees?
12   A.    That's correct.
13   Q.    Is there anything in Section
14  524(g) to your knowledge that requires a
15  Trust, an asbestos Trust, to have a
16  consultation and consent provisions that
17  are set forth in this Trust Agreement?
18   A.    I do not know of anything in
19  524(g) like that.
20   Q.    Do you know who the
21  designated trustees are for the Asbestos
22  PI Trust?
23   A.    Yes.
24   Q.    Okay.  Who are they?  Or

Page 76

1  list of them.
2    A.    Dean Trafelet, Lewis
3  Sifford, and Harry Huge.
4    Q.    And do you know each of
5  those gentlemen?
6    A.    Well, in the case of
7  Mr. Huge and Mr. Trafelet, I do know
8  them.  In the case of Mr. Sifford, I have
9  met him on a number of occasions.
10   Q.    Okay.  What is the
11  professional background of Mr. Huge?
12   A.    Let's see.  I first met him
13  about 40 years ago at the Justice
14  Department.  I am sorry.  He is a lawyer.
15  He has been with the government.  He has
16  been in private practice.  Do you want
17  more?
18   Q.    Does he have experience with
19  asbestos trusts?
20   A.    Yes, he does.
21   Q.    What is that experience?
22   A.    He is a trustee of Armstrong
23  and I believe a trustee of OCF.
24   Q.    How long has he had the role

Page 77

1  of trustee in Armstrong?
2    A.    I met with him shortly after
3  he was appointed, and I should be able to
4  remember that.  I think four or five
5  years.
6    Q.    And how about as a trustee
7  in OCF?
8    A.    I don't know.
9    Q.    Okay.  Why don't you tell me
10  what the professional background of
11  Mr. Sifford is?
12   A.    I know him less well.
13  Mr. Sifford is a practicing lawyer in a
14  law firm, and he is an Armstrong trustee,
15  I believe.  And that's, I believe, the
16  first time I met him, and thus I looked
17  him up.  And according to
18  Martindale-Hubbell, he does both personal
19  injury plaintiff's work and personal
20  injury defense work.  I am getting close
21  to exhausting my knowledge of him.
22   Q.    Okay.  Is the personal
23  injury work that he does, both defense
24  and plaintiff's work, asbestos-related?

Page 78

1     A.    It is not as far as I know.
2     Q.    Do you know what it does
3  relate to?
4     A.    No.
5     Q.    Okay.  Do you know how long
6  he has been a trustee of the Armstrong
7  Trust?
8     A.    The same period of time
9  Mr. Huge has been, but I don't remember
10  when that started.
11     Q.    I thought you said that one
12  was four to five years ago?
13     A.    Four to five years ago.  I
14  don't remember exactly.
15     Q.    All right.  And what is the
16  professional background of Mr. Trafelet?
17     A.    Before I get to that, let me
18  explain.  Armstrong was confirmed, and
19  for a long time, there was no activity
20  for reasons that allude me.  So I can't
21  remember exactly when I got involved in
22  talking to those people.
23     Q.    Okay.
24     A.    Mr. Trafelet is a lawyer who

Page 79

1  was a judge of, I believe, the Circuit
2  Court in Cook County, Illinois for a
3  period of time, and he is an asbestos
4  trustee of -- it seems to me, he is the
5  sole trustee of the Loomis Trust and also
6  a Futures Rep, I believe, at Armstrong.
7     Q.    Okay.  And he was one of the
8  gentlemen that you mentioned that, if I
9  remember correctly, the Asbestos PI
10  Committee, otherwise known as the ACC,
11  wanted to have the role that you have?
12     A.    Yes.
13     Q.    Do you know how long he has
14  been a trustee of the Loomis Trust?
15     A.    Since it was confirmed.  And
16  this I really should know, but I think it
17  was confirmed about three years ago.
18     Q.    Okay.  And do you know
19  whether he was the FCR in Armstrong
20  before a plan was confirmed?
21     A.    I do not know.
22     Q.    Okay.  But he is the FCR for
23  the Trust?
24     A.    Yes, I believe he is.

Page 80

1     Q.    And would I be correct that
2  he's based that for four or five years?
3     A.    Yes.
4     Q.    Let's go to Section 4.9 of
5  the Trust Agreement.  Take a moment to
6  read that, if you would.
7     A.    Okay.
8     Q.    The second-to-the-last
9  sentence in Section 4.9 says, "No Trustee
10  shall act as an attorney for any person
11  who holds an asbestos claim."
12        Do you see that?
13     A.    Yes.
14     Q.    What's the reason for that?
15     A.    To avoid conflicts.
16     Q.    What type of conflicts?
17     A.    Well, you are a trustee of a
18  Plan paying somebody; you shouldn't be
19  paying your client.
20     Q.    Is there any other reason?
21     A.    Not that I know of.
22        MR. BROWN:  Mark this as
23  Austern-4.
24        (Austern-4 marked for

Page 81

1  identification at this time.)
2  BY MR. BROWN:
3     Q.    Exhibit-4, Mr. Austern, is
4  Exhibit 6 to the Exhibit Book.  My first
5  question for you is, can you identify it?
6     A.    It's the Asbestos Insurance
7  Transfer Agreement, which is part of the
8  Plan, as you point out.
9     Q.    And I believe you said this
10  is one of the documents that you had
11  reviewed; am I correct?
12     A.    Yes.
13     Q.    Do you understand this
14  agreement?
15     A.    Not in its entirety.
16     Q.    Okay.  Are there particular
17  provisions of this agreement that you do
18  not understand that you could direct my
19  attention to?
20     A.    Well, I would have to look
21  at it for a moment.  I am not sure I
22  understand all of the representations and
23  warranties and some of the terms in them.
24  There are two schedules, if I remember

Page 82

1    correctly, here.
2        Q.    I think there is three.
3        A.    All right.  I was never
4    quite sure I understood the constant or
5    individual differences between the
6    Schedules 2 and 3.
7        Q.    Okay.  Other than what you
8    what you just described, do you generally
9    have a good handle on the Asbestos
10   Insurance Transfer Agreement?
11       A.    I wouldn't describe it as a
12   good handle, but I recognize some of the
13   paragraphs.
14       Q.    All right.  Let me direct
15   your attention -- let's look at Section 1
16   on page 2, and you should probably look
17   at subsection (a).  And then (d) is the
18   one I have the question on.
19       A.    Yes.
20       Q.    In (d), it says, "The
21   Transfer is not an assignment of any
22   insurance policy."
23           Do you see that?
24       A.    Yes.

Page 83

1        Q.    What is it?
2        A.    It's an assignment of a --
3    do you mean what is the Transfer
4    Agreement?
5        Q.    Yes.  What is the transfer,
6    which is a defined term?
7        A.    Being transferred?
8        Q.    Yes.
9        A.    The proceeds.
10       Q.    Anything else?
11       A.    Well, I confess as the
12   Futures Claims Rep, I never got past the
13   proceeds because the money was what
14   interested me.
15       Q.    Okay.  Have you reviewed any
16   of the Debtors' insurance policies?
17       A.    No.
18       Q.    Have you ever reviewed a
19   general liability insurance policy?
20       A.    Yes.
21       Q.    Do you have a general
22   understanding as to the duties and
23   obligations of an insured under general
24   liability insurance policy?

Page 84

1        A.    In general.
2        Q.    Could you describe for me
3    what some of those duties are?
4        A.    Well, you have to report
5    claims.
6        Q.    Okay.
7        A.    And you have to, under
8    certain policies, confer with the
9    insurance company about what you are
10   settling and why and for how much.  And,
11   forgetting individual policies for a
12   minute, under corporate policies, there
13   are certain audit rights that sometimes
14   exist as a condition of payment to the
15   insured.
16       Q.    Are you familiar with the
17   requirement in some policies that the
18   insurer have a right to defend the
19   insured?
20           MR. LIESEMER:  Object to
21   form.
22           THE WITNESS:  As well as an
23   obligation.
24   BY MR. BROWN:

Page 85

1        Q.    Okay.  And are you aware
2    that in some policies there is a right on
3    the part of the insurer to associate in
4    the defense of the insured?
5            MR. LIESEMER:  Object to
6    form.
7            THE WITNESS:  I am not sure
8    I am familiar with that.
9    BY MR. BROWN:
10       Q.    Okay.  Well, you indicated
11   that the one thing you knew that was
12   being transferred was proceeds.
13           Are you aware of anything
14   else that's being transferred pursuant to
15   the Asbestos Insurance Transfer
16   Agreement?
17       A.    I am not sure what you mean
18   by anything else, other than the money.
19       Q.    That's it?
20       A.    Well, other things may be
21   being transferred, but I can't think of
22   anything right now.
23       Q.    Okay.  Do you have an
24   understanding as to whether the Asbestos

Page 86

1  PI Trust will become the insured under
2  the policies that are listed on Schedule
3  1 to this agreement?
4        MR. GUY:  Objection, calls
5  for a legal conclusion.
6        THE WITNESS:  Mr. Brown, I
7  don't know.  I certainly hope so.
8  BY MR. BROWN:
9        Q.    Do you have an understanding
10 as to what, if anything, happens to the
11 obligations of the insured under the
12 policies on Schedule 1 if the Plan is
13 confirmed?
14       MR. GUY:  Objection to form.
15       MR. LIESEMER:  I join in
16 that objection.
17       THE WITNESS:  Let me make
18 sure I understand the question.
19 What happens to the obligations of
20 -- if the policy was still in the
21 hands of the Debtor, what would
22 happen to the obligations of the
23 Debtor and the rights of the
24 insurance company?

Page 87

1  BY MR. BROWN:
2        Q.    I am not sure I understood
3  the qualification.  Let me try it a
4  little differently.
5             To the extent that the
6  Debtor has duties and obligations under
7  one or more of its insurance policies, if
8  this Plan is confirmed, what happens to
9  those duties and obligations, as you
10 understand it?
11       MR. LIESEMER:  Object to the
12 form.
13       MS. BAER:  I join in the
14 objection.
15       THE WITNESS:  The Plan is
16 going to be administered pursuant
17 to the Trust Distribution Process
18 as it affects personal injury
19 asbestos claims.
20       To that extent, the personal
21 injury Trust, as far as I know, is
22 not going to call up each and
23 every insurance company and say
24 "Can I settle this claim?"  I hope

Page 88

1  that's responsive to your
2  question.
3  BY MR. BROWN:
4        Q.    What is it going to do?
5  What is the Trust going to do?
6        MS. BAER:  Objection to
7  form.
8        MR. LIESEMER:  I join.
9        THE WITNESS:  It's going to
10 settle claims pursuant to the
11 Trust Distribution Process.
12 BY MR. BROWN:
13       Q.    Okay.  Will the Debtors'
14 insurers have any role in the handling
15 defense or settlement of any claim
16 submitted to the Asbestos PI Trust?
17       MR. GUY:  Objection.
18       MR. LIESEMER:  Objection to
19 form.
20       MR. GUY:  Objection, calls
21 for speculation.
22       MS. BAER:  Objection, same.
23       THE WITNESS:  Let me address
24 audit rights.  In my copious free

Page 89

1  time, Mr. Brown, I am the claims
2  administrator of the Dow Corning
3  Trust -- that is not an asbestos
4  Trust -- and this issue has arisen
5  in that context.  And I dare say
6  it may arise in the context of the
7  W.R. Grace Trust.
8        If insurance companies
9  object to paying because they do
10 not have audit rights or because
11 of any other input into the Trust,
12 I dare say they are going to bring
13 that to the attention of the
14 trustees.  And either that will be
15 worked out between the trustees
16 and the insurance company or
17 some -- I don't like this phrase
18 because I am not sure I know what
19 it means -- but some coverage
20 court will have to determine the
21 rights of the insurance company as
22 a function of the trustees'
23 duties.
24       MR. BROWN:  Could you read

Page 90

1     back the question?
2          (The reporter read from the
3     record as requested.)
4     BY MR. BROWN:
5          Q.   Other than what you just
6     described, will the Debtors' insurers
7     have any role in the handling defense or
8     settlement of asbestos PI claims into the
9     Trust?
10          MR. GUY:  Same objection as
11     to speculation.
12          MR. LIESEMER:  Same
13     objection.
14          MS. BAER:  Same.
15          THE WITNESS:  I don't know
16     what the trustees are going to do
17     about that, so I don't know.
18          MR. BROWN:  Why don't we
19     take five minutes.
20          (There was a break from
21     11:46 a.m. to 11:57 a.m.)
22          MR. BROWN:  Let's go ahead
23     and mark this document.
24          (Austern-5 marked for

Page 91

1     identification at this time.)
2     BY MR. BROWN:
3          Q.   Mr. Austern, you have been
4     handed what's been marked Austern-5.
5     It's Exhibit 4 to the Exhibit Book.
6          Can you identify it?
7          A.   This is the TDP for the
8     Plan.
9          Q.   I am correct, am I not, that
10     this is one of the documents that you
11     reviewed in preparation for today's
12     deposition?
13          A.   Yes.
14          Q.   Are you aware of any
15     provision in the TDP or the Trust
16     Agreement that we spoke about earlier
17     that provides for any role for the
18     Debtors' insurers in the handling,
19     defense, or settlement of any asbestos
20     claims submitted to the Trust?
21          A.   No.
22          Q.   Are you aware of any other
23     Plan document that provides for such a
24     role?

Page 92

1          A.   No.
2          Q.   Is there a reason for that?
3          A.   I don't know.
4          MR. BROWN:  All right.
5     Let's mark this.
6          (Austern-6 marked for
7     identification at this time.)
8     BY MR. BROWN:
9          Q.   Mr. Austern, you have
10     another document in front of you now
11     marked Austern-6.  It's Exhibit 10 to the
12     Exhibit Book.
13          Can you identify this
14     development?
15          A.   It is the Cooperation
16     Agreement between the Debtor and others.
17          Q.   And, again, this is one of
18     the documents that you reviewed in
19     preparation for today's deposition,
20     correct?
21          A.   I don't remember if I
22     specifically did it for that purpose, but
23     I have certainly reviewed it in the past.
24          Q.   Okay.  What is the purpose

Page 93

1     of this document?
2          A.   I am not sure I know the
3     legal purpose.  It creates certain rights
4     and obligations between and among some of
5     the parties.
6          Q.   Okay.  And who are those
7     parties?
8          A.   Well, the Debtor, the
9     Reorganized Debtor, and the Trust.  I
10     mean the personal injury Trust.
11          Q.   The Debtors' insurers are
12     not a party to this agreement, correct?
13          A.   No.
14          Q.   We talked a little bit
15     earlier about general liability insurance
16     policies.
17          Are you generally familiar
18     with what's called duty to cooperate in a
19     general liability policy on the part of
20     the insured?
21          A.   Generally.
22          MR. LIESEMER:  Objection to
23     form.
24     BY MR. BROWN:

Page 94

1      Q.   If the Joint Plan is
2 confirmed and if there is a duty to
3 cooperate under a given policy, what
4 happens to that duty?
5           MR. GUY:  Objection, calls
6 for speculation.
7           THE WITNESS:  Well, the
8 proceeds of the policy have been
9 transferred to the Personal Injury
10 Trust.  I don't know what happens
11 to the duty of the Trust standing
12 in the shoes of the Debtor.
13 BY MR. BROWN:
14      Q.   So you don't know whether
15 the Trust steps into the shoes of the
16 Debtor with respect to the Debtors'
17 obligations under the policy; is that
18 what your telling me?
19      A.   I don't know.
20           MR. BROWN:  I think I am
21 going to pass you to the next
22 questioner, Mr. Austern.  Thank
23 you.  Subject to maybe a few
24 follow-ups, I am finished.

Page 95

1                - - -
2             EXAMINATION
3                - - -
4 BY MS. ALCABES:
5      Q.   Hello, Mr. Austern.  My name
6 is Elisa Alcabes from Simpson Thacher &
7 Bartlett.  I am counsel for Travelers
8 Casualty and Surety Company.
9           Travelers served a Notice of
10 Deposition on you.  I am just going to
11 have that marked.
12           (Austern-7 marked for
13 identification at this time.)
14 BY MS. ALCABES:
15      Q.   Do you recall seeing this
16 notice?
17      A.   I saw many notices.  I don't
18 know if I saw this one.
19      Q.   Okay.  And are you familiar
20 at all with any of the agreements between
21 Travelers and W.R. Grace that were
22 entered into pre-petition?
23      A.   No.
24      Q.   Can you turn to Austern

Page 96

1 Exhibit-4, which is the Transfer
2 Agreement, and look at Schedules 2 and 3?
3      A.   (Witness complies with
4 request.)
5      Q.   Correct me if I'm wrong, I
6 believe you said you weren't sure what
7 the difference was between Schedules 2
8 and 3?
9      A.   In the sense that I don't
10 know why there are two schedules.  I
11 mean, clearly different people are listed
12 under certain schedules.
13      Q.   Do you have an understanding
14 that the types of settlement agreements
15 are different on Schedule 2 and Schedule
16 3?
17      A.   I assume that's why there
18 are two schedules.
19      Q.   You previously also
20 mentioned that you understood that there
21 were three types of insurance agreements;
22 there were settlements -- there were
23 settled insurers, there were unsettled
24 insurers, and there were insurers are

Page 97

1 coverage in place agreements or
2 reimbursement agreements?  I am not sure
3 I said that exactly right.
4           I believe you said you
5 understood there were three types of
6 settled insurers -- three types of
7 insurers.  I have got it right now.
8 Three types of insurers.
9           There are unsettled
10 insurers, fully settled insurers, and
11 insurers with coverage in place or
12 reimbursement agreements; is that right?
13      A.   That is my understanding.
14      Q.   And that's how you
15 understand this Plan to operate; is that
16 correct?
17      A.   Yes.
18      Q.   Okay.  So do you understand
19 that Schedule 2 lists the fully settled
20 insurers, the insurers that have fully
21 settled agreements?
22      A.   What do you mean by fully?
23      Q.   Fully paid settlement
24 agreements.

Page 114

1   unfortunately, because of the Manville
2   Trust, aware of the fact that indemnity
3   litigation in most states requires a
4   perfectly innocent joint tortfeasor or a
5   perfectly innocent party.  Beyond that, I
6   would have to look at the terms of an
7   agreement.
8       Q.   Do you have an understanding
9   of how the Plan treats indemnity claims
10  by insurers under reimbursement
11  agreements?
12      A.   I would have to rely on the
13  advice of insurance counsel on that.
14      Q.   What about claims for
15  indemnity under what I will call the
16  fully settled agreements, which are in
17  Schedule 2 to the Transfer Agreement?
18      A.   I would have the same
19  answer.
20      Q.   So you just don't know?
21      A.   I just don't know.
22      Q.   Can you turn to the TDPs,
23  which are Austern-5?
24      A.   Yes.

Page 115

1       Q.   And Section 5.6 which starts
2   on page 35.
3       A.   Yes.
4       Q.   Do you have a general
5   understanding of what indirect PI Trust
6   claims are?
7       A.   A general understanding.
8       Q.   What's your understanding
9   general understanding?
10          MR. GUY:  Objection, asked
11      and answered.
12          MS. ALCABES:  I am sorry if
13      you went into it before.  Did you
14      go into in detail?
15          MR. BROWN:  Yes.
16  BY MS. ALCABES:
17      Q.   Do you have any
18  understanding of whether or not indemnity
19  claims under reimbursement agreements
20  would be subject to 5.6?
21      A.   I believe they would be.
22      Q.   And if you turn to Section
23  5.13 on page 49, Indemnified Insurer TDP
24  Claims?

Page 116

1       A.   Yes.
2       Q.   Do you understand that
3   provision?
4       A.   I have a general
5   understanding of it.
6       Q.   And is it your understanding
7   that indemnification claims arising under
8   fully settled settlement agreements would
9   be subject to that provision?
10      A.   Yes.
11      Q.   Are you aware of the
12  distinction between executory and
13  non-executory contracts in the bankruptcy
14  context?
15      A.   I thought executory
16  contracts were signed contracts, but, no,
17  I am not.
18      Q.   Are you aware of whether the
19  Plan modifies any reimbursement
20  agreements?
21          MR. GUY:  Objection, calls
22      for a legal conclusion.
23          THE WITNESS:  I don't know.
24  BY MS. ALCABES:

Page 117

1       Q.   Are you aware of whether the
2   Plan modifies the terms or provisions of
3   any fully settled settlement agreements?
4           MR. GUY:  Same objection.
5           THE WITNESS:  I don't know.
6   BY MS. ALCABES:
7       Q.   And, again, is it your
8   position that if a dispute arose as to
9   whether the Plan modifies obligations
10  under either one of those settlement
11  agreements, that your role would not
12  arise until post-confirmation?
13      A.   That's correct.
14      Q.   And your role would be to
15  participate in whatever way the trustee
16  asks you to participate in the resolution
17  of those claims?
18      A.   Subject to my inserting
19  myself into it, yes.
20      Q.   Do you have any intention of
21  reviewing any reimbursement agreements
22  prior to the confirmation hearing?
23      A.   Not unless insurance counsel
24  suggests I do so.

Page 150

1    award.
2         Q.    For my own edification, does
3    that occur at the same time?  Can you be
4    in individual review and extraordinary
5    claims?
6         A.    No.
7         Q.    It's a multiple-step
8    process?
9         A.    Yes.
10        Q.    And for purposes of time,
11   can you estimate a time frame for
12   claiming individual review and getting an
13   offer from the Trust?
14             MS. BAER:  Objection,
15        speculation.  It also doesn't
16        exist.
17             THE WITNESS:  No.  But I
18        will tell you it will be faster in
19        the second year than it is in the
20        start-up year.
21   BY MR. CANDON:
22        Q.    Given that this case has
23   gone on for eight years, does that have
24   any other impact on the Trust, the first

Page 151

1    one to two years?
2             MR. GUY:  Objection, vague.
3             MS. BAER:  Same objection.
4             THE WITNESS:  The answer is
5        I don't know, but I assure you it
6        will be addressed because it has
7        gone on so long.
8    BY MR. CANDON:
9         Q.    It's a significant back load
10   of claims?  Backlog, I should say.
11        A.    Well, that is almost always
12   true, but beyond that, it has gone on a
13   long time.
14        Q.    If a claimant is not
15   satisfied with the individual review
16   offer, what's the next step?
17        A.    Arbitration.
18        Q.    And I think the TDP offers
19   two, either binding or nonbinding
20   arbitration?
21        A.    That's correct.
22        Q.    Who actually represents the
23   Trust in the arbitration proceeding?
24        A.    Ordinarily -- let me stop

Page 152

1    for a second.  In most trusts,
2    arbitration is on the papers.  It's not
3    an appearance, if you will, process,
4    although.  And the arbitration procedures
5    for this Plan have not been written.  But
6    traditionally, the only opportunity, if
7    the arbitrator agrees, is by telephone
8    conference call.  So representation with
9    a small R.  It's not a formal appearance
10   or hearing.
11             In which case, it depends on
12   the trust.  In the case of Manville
13   Trust, someone at the general counsel's
14   office; the Eagle-Picher Trust has a
15   lawyer who does it in-house.  And I am
16   not sure what the other trusts are doing.
17        Q.    And, again, the claimant
18   cannot exceed the maximum value or cannot
19   be offered more than the maximum value of
20   the TDP?
21        A.    That's correct.
22        Q.    So the maximum value still
23   is the ruling number on whether or not
24   the outcome of arbitration?

Page 153

1         A.    Yes, but there are
2    arbitrators who have written opinions
3    suggesting that is an extraordinary
4    claim.
5         Q.    So if we go through the
6    arbitration process and the claimant
7    agrees to the figure, do they have the
8    ability to then take that claim to
9    extraordinary --
10        A.    If they choose binding
11   arbitration, it's binding arbitration.
12        Q.    Suppose they go through
13   nonbinding arbitration and still no
14   agreement is reached.  What's the next
15   step?
16        A.    Exit to the tort system.
17        Q.    In your experience, how
18   frequently does that happen?
19        A.    Well, the Manville Trust has
20   a little over 800,000 claims, and it's
21   happened once.
22        Q.    So infrequently?
23        A.    I would say infrequently.
24        Q.    Now, if the claimant is

Page 170

1    Q.   Right.  You are not aware of
2  the numbers?
3    A.   No.
4    Q.   Is there any reason why a
5  recusal mechanism with respect to TAC
6  members in connection with the individual
7  review of claims could not be written
8  into the Grace TDPs?
9    A.   I suppose it could be.  I
10  think it would be redundant.
11    Q.   Redundant how?
12    A.   Well, the Model Rules of
13  Professional Conduct require that lawyers
14  recuse themselves where they have
15  conflicts.
16    Q.   Is it your view that the
17  Grace Trust Agreement and/or TDPs would
18  incorporate those model rules in
19  connection with any potential conflicts?
20    A.   I am not sure I know what
21  you mean by incorporate.  But those rules
22  exist for all practicing lawyers who are
23  licensed to practice law.
24    Q.   It's your view that the TAC

Page 171

1  members will be bound by those rules in
2  connection with their activities with
3  regard to the Grace Trust?
4    A.   That is a much better answer
5  than I gave and that's my answer.
6    Q.   In the event -- let me start
7  over.
8    After the Grace Trust is
9  implemented, if it is, or is established,
10  I should say, if there is occasion in
11  which an individual claim becomes the
12  subject of a review and the TAC members
13  are involved in that, would you request
14  their recusal if the claim was one in
15  which a TAC member was the claimant's
16  counsel?
17    MR. GUY:  Objection.
18    MR. LIESEMER:  Objection to
19  form.
20    MR. GUY:  Hypothetical,
21  speculation.
22    You may answer.
23    THE WITNESS:  If that TAC
24  member did not recuse themselves

Page 172

1  and I knew that this claim was
2  theirs, yes.
3  BY MR. DEMMY:
4    Q.   Changing subjects a bit, you
5  understand that one of the provisions of
6  the Plan is -- and I think you have
7  looked at the Transfer Agreement
8  previously in the deposition.
9    One of the provisions of the
10  Plan is a proposed assignment of
11  insurance rights by Grace to the Trust,
12  correct?
13    A.   Yes.
14    Q.   Are you aware of any
15  requirement in the bankruptcy code or
16  otherwise that requires Grace to assign
17  insurance rights to the Trust in
18  connection with a Plan that incorporates
19  a Section 524(g) channelling injunction?
20    A.   I am not a bankruptcy
21  lawyer, but I don't know of any
22  requirement.
23    Q.   So that's a discretionary
24  activity by Grace or a discretionary

Page 173

1  proposal by Grace as part of this Plan?
2    A.   I am not sure I know what
3  you mean by discretionary, but I would
4  agree they have done that.
5    Q.   Okay.  Grace doesn't have to
6  propose a transfer of insurance rights to
7  the Trust as part of this Plan, correct?
8    MS. BAER:  Objection to the
9  form.
10    THE WITNESS:  To the extent
11  I understand the bankruptcy code,
12  that's true.
13    MR. DEMMY:  I don't have any
14  other questions.
15    - - -
16    EXAMINATION
17    - - -
18  BY MR. COHN:
19    Q.   Mr. Austern, you said that
20  in preparation for these depositions, you
21  reviewed the updated reports of Jenny
22  Biggs and Mr. Florence and Mr. Peterson;
23  is that right?
24    A.   Yes.

Page 182

1        MR. COHN:  And the Lockwood
2    deposition, that as soon as I
3    start getting into substantive
4    issues about what happened in the
5    negotiation of the Plan of the
6    TDPs, I am going to face an
7    instruction not to answer on the
8    bases that Ms. Harding has set
9    forth previously?
10       MR. GUY:  I didn't attend
11   Finke.  I did attend Peter's.  I
12   know that objection was raised,
13   but I also know that he got into a
14   lot of those issues.  So we will
15   take it question by question.
16       MS. BAER:  The Debtor will
17   object to any of those questions
18   being asked and answered.
19       MR. LIESEMER:  So will the
20   ACC.
21   BY MR. COHN:
22       Q.   Who besides the FCR and the
23   ACC was involved in the negotiation of
24   the TDPs, if anyone?

Page 183

1        A.   I don't remember anybody
2    else.
3        Q.   So, as far as you know, the
4    TDPs were drafted in consultation between
5    the FCR and the ACC alone; is that
6    correct?
7        MR. GUY:  Objection.
8        THE WITNESS:  Well,
9    recognizing that the ACC included
10   a Libby claimant, the answer is
11   yes.
12   BY MR. COHN:
13       Q.   Okay.  Is it fair to say
14   that -- strike that.
15       In constructing TDPs, what
16   are the major concerns of you, as the
17   FCR?
18       A.   The payment percentage; the
19   maximum available payment; the maximum
20   payment meaning the year; whether there
21   is sequencing, which in plain English is
22   if you are not paid -- if you are awarded
23   a payment but not paid because of maximum
24   available payment percentages, you get

Page 184

1    interest called sequencing; inflation
2    issues; and the scheduled values.
3        Q.   You want to maximize the
4    recovery for your constituency, correct?
5        A.   Yes.
6        Q.   You want to maximize the
7    likelihood that money is going to be
8    available to pay your constituency,
9    correct?
10       A.   That's correct.
11       Q.   You want to at the same time
12   maximize the payment to all beneficiaries
13   within the confines of making sure there
14   is enough money around; is that right?
15       MR. GUY:  Objection as to
16   beneficiaries.
17       THE WITNESS:  Well --
18       MR. COHN:  Let me take that
19   back.
20   BY MR. COHN:
21       Q.   Do you understand
22   beneficiaries to be those people who are
23   entitled to receive money from the Trust?
24       A.   Yes.

Page 185

1        MR. GUY:  Presents or
2    futures?
3        MR. COHN:  Aren't the
4    futures and the presents all
5    beneficiaries of the contemplated
6    Trust?
7        MR. GUY:  But your questions
8    have been asking about futures,
9    and the witness has been answering
10   as to futures.  And now you are
11   bringing it back as to --
12       MR. COHN:  I thought I was
13   talking holistically.
14   BY MR. COHN:
15       Q.   Does your answer change for
16   the last couple of questions?
17       A.   No.  But I was going to say
18   the Plan -- the TDP and I believe the
19   Plan itself requires that all
20   beneficiaries be treated similarly.  So
21   to the extent that I have to live with
22   that, the answer is yes.
23       Q.   What is the FCR's view with
24   respect to the propriety of inflation,

Page 190

1    Q.   How many meetings did you
2  personally attend in the course of
3  negotiating the TDPs?
4         MR. GUY:  Meetings with who?
5         MS. BAER:  Objection.
6  BY MR. COHN:
7    Q.   I guess with the ACC would
8  be the other involved party that wasn't
9  your counsel.
10        A.   I am sorry.  Are you
11  eliminating this to negotiating the TDP?
12    Q.   Yes.
13        A.   I would have to guess.
14  Somewhere between eight and 12.
15    Q.   Was there discussion of
16  whether or not to permit the insurers to
17  be involved in the processing of claims?
18        MR. LIESEMER:  Objection.
19        MR. GUY:  Objection.
20        You can answer -- well, you
21  know what?  I will defer to these
22  guys.
23        MS. BAER:  Can you read back
24  the question?

Page 191

1        (The reporter read from the
2  record as requested.)
3        MS. BAER:  Objection.
4        MR. LIESEMER:  Objection.
5        MR. GUY:  But do you want
6  the witness to answer?
7        MS. BAER:  To the extent the
8  witness would have to reveal
9  discussions about negotiations of
10  the various Plan documents, I
11  would object.
12        If you can answer without
13  revealing that kind of
14  information, then I won't object.
15        THE WITNESS:  I don't think
16  I can.
17        MR. COHN:  So you are
18  instructing?
19        MR. GUY:  Yes.
20        MR. DEMMY:  Can I ask a
21  clarifying question?  Who is
22  instructing the witness not to
23  answer?
24        MR. GUY:  I am instructing,

Page 192

1  as counsel for the FCR,
2  Mr. Austern not to answer the
3  question because the other Plan
4  proponents are raising
5  confidentiality issues with regard
6  to settlement discussions, and I
7  am adhering to that request.
8        And as the Court has stated
9  many times, negotiations are not
10  relevant and, therefore, would not
11  be admissible at the Plan
12  confirmation hearing.
13        MR. COHN:  We disagree.
14        MR. GUY:  Understood.
15        MR. COHN:  I think I tested
16  your tolerance to where I am going
17  to get instructions not to answer.
18  I think I will stand down now and
19  let Mr. Plevin question.
20               - - -
21            EXAMINATION
22               - - -
23  BY MR. PLEVIN:
24    Q.   Good afternoon, Mr. Austern.

Page 193

1        A.   Good afternoon.
2    Q.   Just so we are straight, I
3  represent Fireman's Fund Insurance
4  Company in this case only with respect to
5  issues concerning Fireman's Fund's proof
6  of claim and the indemnity agreement
7  between Fireman's Fund and Grace and the
8  supersedeas bond that Fireman's Fund
9  posted with respect to a case in Texas
10  that I want to ask you some questions
11  about.
12        Let me start, first of all,
13  by asking if you are generally familiar
14  with the Edwards case in Texas?
15        A.   Yes.
16    Q.   Can you tell me what you
17  know about that case in general?
18        A.   Mr. Reaud, R-E-A-U-D, I
19  think --
20    Q.   Correct spelling.  I don't
21  know if the pronunciation is right.
22        A.   -- has a judgment on appeal
23  in an asbestos personal injury claim
24  against Grace in a number of millions of

Page 202

1  Mr. Austern, the concept of set-off in
2  bankruptcy?
3      A.   I understand set-off
4  generally as a proposition.  I am not
5  sure I would apply it -- I don't know
6  that I know enough bankruptcy law to
7  apply it to bankruptcy.
8      Q.   Okay.  What is your
9  understanding of the concept of set-off?
10     A.   Well, if I owe you $10,000
11 and I have to pay Mr. Guy because you owe
12 him some money, I can set-off from what I
13 paid Mr. Guy what I owe you.
14         MR. PLEVIN:  Can you read
15     that answer back?
16         (The reporter read from the
17     record as requested.)
18 BY MR. PLEVIN:
19     Q.   Are you aware, Mr. Austern,
20 that Grace has made claims for insurance
21 coverage against Fireman's Fund under
22 liability insurance policies issued by
23 Fireman's Fund?
24     A.   Yes.

Page 203

1      Q.   And that the insurance
2  coverage claims Grace has made at least
3  include, if not -- they are not limited
4  to claims for coverage of asbestos
5  personal injury claims?
6      A.   I am sorry.  Can you say
7  that again?
8      Q.   I got a little tied up
9  there.
10         Grace is seeking coverage
11 from Fireman's Fund under the Fireman's
12 Fund insurance coverage policies for
13 asbestos personal injury claims asserted
14 against Grace, correct?
15     A.   Yes.
16     Q.   Do you have a view as to
17 whether in the event that Fireman's Fund
18 is obligated to pay insurance coverage to
19 Grace, Fireman's Fund would be able to
20 reduce that obligation by any amount that
21 Grace is obligated to pay under the
22 indemnity agreement?
23         MR. GUY:  Objection.  I
24     don't see how he can answer that

Page 204

1  question without getting into a
2  legal analysis.  He is here as a
3  fact witness.
4          But, again, let me talk to
5  my client, and I think we can
6  resolve it with the answer.
7          MS. BAER:  We join in the
8  objection.
9          (There was a discussion held
10 off the record at this time.)
11         THE WITNESS:  I have no
12 view.
13 BY MR. PLEVIN:
14     Q.   Do you have a concern that
15 if the Edwards appeal were to be --
16 withdrawn.
17         Do you have a concern that
18 if the Edwards judgment were to be
19 affirmed on appeal and Fireman's Fund
20 paid money to Edwards and then made a
21 claim against Grace for the amount paid,
22 that that would in some way reduce the
23 amount of money coming into the Trust
24 from the Fireman's Fund insurance policy?

Page 205

1          MR. LIESEMER:  Objection to
2  the form.
3          MS. BAER:  Objection.
4          MR. GUY:  Objection to form.
5          THE WITNESS:  Mr. Plevin, I
6  have any concern that the activity
7  might reduce the amount of
8  insurance coming into the Grace
9  Trust.  And I understand this is
10 approximately $6 million.  And if
11 Fireman's Fund were to reduce its
12 payment or be entitled to reduce
13 its payment under the Fireman's
14 Fund policy for asbestos personal
15 injury to the Trust and it would
16 reduce it by $6 million, yes, I
17 have a concern.
18 BY MR. PLEVIN:
19     Q.   And I am sure this has been
20 established on the record long before I
21 came here, but let me just ask this
22 question for foundational purposes.
23         You are an attorney,
24 Mr. Austern?

Page 206

1    A.   Yes.
2    Q.   And you have practiced law
3 for how many years?
4    A.   45.
5        MR. PLEVIN:  Thank you.  I
6 have no further questions.
7        MR. CALOGERO:  I have no
8 questions.
9        MR. WISLER:  Maryland
10 Casualty has no questions.
11       MR. GUY:  Are there any
12 insurers on the phone who have
13 questions?
14       Scotts?  BNSF?  Do you have
15 any questions?
16       MS. COBB:  Yes.  This is
17 Tiffany Cobb on behalf of The
18 Scotts Company, LLC, with Vorys,
19 Sater, Seymour and Pease.  Can you
20 hear me?
21       MR. GUY:  Yes.  Hi, Tiffany.
22          - - -
23       EXAMINATION
24          - - -

Page 207

1 BY MS. COBB:
2    Q.   Mr. Austern, in your
3 capacity as the Asbestos PI Future
4 Claimants' Representative, what fiduciary
5 duties do you owe?
6        MR. GUY:  Tiffany, we
7 covered that earlier in the
8 deposition.  Were you listening
9 in?
10       MS. COBB:  I was.
11       MR. GUY:  I just don't want
12 to have a lot of duplicity in the
13 questioning.  I will allow this
14 one.
15       THE WITNESS:  I have a
16 fiduciary duty to future
17 claimants.
18 BY MS. COBB:
19    Q.   But what are the duties?
20    A.   Essentially to make sure
21 there is sufficient funds, that when they
22 file claims they will be treated the same
23 or similarly to present claimants.
24    Q.   In your capacity as the FCR,

Page 208

1 who specifically do you view as your
2 punitive clients?
3    A.   Future claimants.
4    Q.   Okay.  And in your capacity
5 as the FCR then, do you owe a fiduciary
6 duty to asbestos PI claimants as defined
7 in the Plan who hold future demands
8 against any entity that is addressed in
9 the definition of an asbestos PI
10 claimant?
11    A.   Can you repeat the last part
12 of that.  Against whom?
13    Q.   Sure.  Against any entity
14 that is addressed in the definition of
15 asbestos PI claimant?
16    A.   Yes.
17    Q.   In your capacity as the FCR,
18 do you owe a fiduciary duty to indirect
19 PI Trust claimants who hold future
20 demands against the Debtors?
21    A.   Yes.
22    Q.   In your capacity as the FCR,
23 do you owe a fiduciary duty to
24 insurance-related claimants who hold

Page 209

1 future demands against any settled
2 insurance company?
3    A.   I think I would have to go
4 back and look at the definition of those
5 people.
6    Q.   Okay.  Then let's do that.
7 If you would, please, look at Exhibit-5
8 which is the TDP, and if you would please
9 look at Section 5.12.
10    A.   I am looking at it, but give
11 me a moment.
12    Q.   Sure.
13    A.   Okay.  What was the
14 question?
15    Q.   In your capacity as the FCR,
16 do you owe a fiduciary duty to
17 insurance-related claimants who hold
18 future demands against any settled
19 insurance companies?
20    A.   I don't know.  I would have
21 to think about that.  I realize they
22 could be indirect claimants, at least I
23 think they could be indirect claimants.
24 So I would have to think about that.  I

Page 242

1    Mr. Austern, but I would like to
2    read a statement into the record,
3    if that's okay.
4        As counsel for the
5    Creditors' Committee that Plan
6    proponents have previously
7    discussed and agreed the
8    Creditors' Committee may seek a
9    subsequent deposition of
10   Mr. Austern or any other person or
11   persons solely in connection with
12   Plan feasibility issues.  Thank
13   you.
14       MR. GUY:  Mr. Brown.
15       - - -
16       EXAMINATION
17       - - -
18   BY MR. BROWN:
19       Q.  Mr. Austern, I have a few
20   follow-up questions mainly to what
21   Mr. Cohn questioned you about.
22       I think one of the documents
23   that the Libby claimants' counsel handed
24   you was an 8-K.  I don't recall the name

Page 243

1    of it.  Do you have it there?
2        A.  I have it here.  I have it.
3        Q.  Okay.  And attached to that
4    8-K there is a Term Sheet, correct?
5        A.  Yes.
6        Q.  And I believe your testimony
7    was earlier that you have seen this Term
8    Sheet but some other iteration of it; is
9    that correct?
10       A.  Yes.
11       Q.  Not in the form of an
12   attachment to an 8-K?
13       A.  Oh, no.  I meant I have seen
14   a printed version of this.
15       Q.  Okay.  But, in substance,
16   it's the same document as what is
17   attached to the 8-K?
18       A.  Yes.
19       Q.  Okay.  You will agree with
20   me, will you not, that the Term Sheet is
21   dated April 6, 2008?
22       A.  If you will tell me -- yes,
23   it is.
24       Q.  Okay.  To your knowledge,

Page 244

1    were any of the Debtors' insurers
2    consulted about any term of this Term
3    Sheet prior to April 6, 2008?
4        A.  Well, I didn't consult with
5    them, so I don't know.  I did not consult
6    with them.
7        Q.  Are you aware of anyone else
8    consulting with them?
9        A.  No.
10       Q.  To your knowledge, did any
11   of the Debtors' insurers consent to any
12   term in the Term Sheet prior to April 6,
13   2008?
14       A.  Not that I know of.
15       Q.  Now, the initial Joint Plan
16   was filed in September of 2008, correct?
17       A.  Yes.
18       Q.  Would I be correct in
19   assuming that between April 6, 2008 and
20   September 2008 that the Plan proponents
21   were working on the terms of the Plan and
22   Plan documents?
23       A.  I was, and I know others
24   were.

Page 245

1        Q.  Okay.  And would I also be
2    correct that in that time period the Plan
3    proponents and their counsel were
4    drafting Plan documents?
5        A.  I know my counsel was.
6        Q.  In that time frame, April 6,
7    2008 to September 2008, to your
8    knowledge, were any of the Debtors
9    insurers' consulted about any of the
10   terms in the Plan or Plan documents?
11       A.  I do not know of any
12   consultations that took place.
13       Q.  Okay.  To your knowledge,
14   were any of the Debtors insurers'
15   consented about any term in the Plan or
16   Plan documents in that time frame?
17       A.  Well, having not been
18   consulted, I would be surprised if they
19   consented, but I don't know if they
20   consented.
21       Q.  All right.  Now, in your
22   prior testimony, in answer to one of
23   Mr. Cohn's questions, you indicated that
24   you were aware of circumstances in which

Page 246

1  plaintiff's personal injury attorneys had
2  waived their fees?
3      A.   Yes.
4      Q.   Putting those circumstances
5  aside, do you have an understanding as to
6  what the customary contingency fee
7  arrangement is for plaintiffs' asbestos
8  personal injury lawyers?
9          MR. LIESEMER:  Objection to
10     the form.  No foundation.
11         THE WITNESS:  I know what it
12     is in the Manville Trust because
13     the Manville Trust dictates what
14     it will be.
15 BY MR. BROWN:
16     Q.   Okay.
17     A.   Putting that aside, I think
18 it depends on the case.  I am familiar
19 with the fact, for instance, that medical
20 malpractice attorneys charge a somewhat
21 higher contingency fee than others do.  I
22 am not sure I know what the standard fee
23 is for asbestos personal injury.
24     Q.   Do you have any idea what

Page 247

1  Mr. Cooney's firm charges by way of
2  contingency fee?
3      A.   No.
4      Q.   Mr. Weitz?
5      A.   No.
6      Q.   Mr. Rice?
7      A.   No.
8      Q.   Mr. Budd?
9      A.   No.
10     Q.   Anyone?
11     A.   No.
12     Q.   You mentioned that there is
13 a cap -- I am not sure you used the term
14 "cap" -- there is a fee in the Manville
15 Trust Agreement?
16     A.   Yes.
17     Q.   Is it a cap?
18     A.   No -- it is a cap.  It says
19 the fee cannot exceed 5 percent.
20     Q.   Okay.  How did that term
21 come about in the Manville Trust?
22     A.   In words of one syllable,
23 Judge Weinstein insisted on it.
24     Q.   Is there a cap under this

Page 248

1  Plan?
2      A.   Not that I know of.
3      Q.   Why?
4      A.   I don't know.
5      Q.   Are you aware of other
6  asbestos trusts where there is a cap with
7  respect to contingency fees that can be
8  paid to plaintiffs lawyers?
9      A.   You did say asbestos trusts?
10     Q.   Yes.
11     A.   I do not know of any other
12 asbestos trust that has a cap.
13     Q.   Focusing for a moment on the
14 CE Trust, are the TAC members paid for
15 their services as TAC members?
16     A.   You know, I don't remember.
17 I know there is a provision to pay their
18 expenses.  I can't remember if they are
19 paid.  I just know I am paid.
20     Q.   Well, that's important.
21         How about with respect to
22 this Trust in the Grace bankruptcy?  Do
23 you know whether the TAC members will be
24 paid in any fashion for their services

Page 249

1  TAC members?
2      A.   Do you mean other than
3  expenses?
4      Q.   Yes.
5      A.   And I don't recall any
6  specific provision.
7      Q.   Okay.  I found it.
8      A.   Which page?
9      Q.   Page 32.
10     A.   Are we in the Plan?
11     Q.   No.  We are in the Trust
12 Agreement, page 32 of the Trust
13 Agreement.
14     A.   I am sorry.  Just a minute.
15 What page?
16     Q.   32, Section 5.6.
17     A.   I seem to have an agreement
18 that's out of pagination.  Just a moment.
19         Yes.  5.6, yes, they are
20 paid -- I stand corrected -- an hourly
21 rate.
22     Q.   All right.  Do you have any
23 understanding today as to what the hourly
24 rate will be for the members of the TAC

Page 250

1   if the Plan is confirmed?
2       A.    No, I don't.
3       Q.    Do you have any view as to
4   what the hourly rate would be if the Plan
5   is confirmed?
6       A.    I confess, Mr. Brown, having
7   forgotten that they are entitled to an
8   hourly rate, I would have to think about
9   that.  But I, at this point, have no
10  view.
11      Q.    Okay.  Do you have a view as
12  to whether they should be paid that
13  hourly rate above and beyond whatever
14  fees they get from their individual
15  clients who recover from the Trust?
16      A.    If Section 5.6 gives them
17  the right to get the hourly rate, I think
18  they should get the hourly rate.
19              MR. BROWN:  I think that's
20  all.  Thank you, Mr. Austern.
21              MR. CANDON:  I have one
22  follow-up question.
23              MR. GUY:  Sure.  Go ahead.
24                  - - -

Page 251

1              EXAMINATION
2                  - - -
3   BY MR. CANDON:
4       Q.    Mr. Austern, you had
5   mentioned that you reviewed Mr. Biggs'
6   estimation report, and the figure was
7   somewhere exactly between, you said, 3
8   and 5 billion?
9       A.    Let me explain.  There was a
10  follow-up letter to the report.  The
11  report I believe said 3.8, and it was
12  reduced to 3.6 because of the
13  mathematical error.
14      Q.    Did she provide a separate
15  estimate for Libby claims?
16      A.    No, she did not.
17              MR. CANDON:  Okay.  That's
18  all I have.  Thank you.
19              MR. GUY:  Okay.  We are
20  done.
21              (The deposition concluded at
22  3:27 p.m.)
23
24

Page 252

1              CERTIFICATE
2
3
4       I HEREBY CERTIFY that the witness
5   was duly sworn by me and that the
6   deposition is a true record of the
7   testimony given by the witness.
8
9
10
11
12  _____
13      Lori A. Zabielski
14      Registered Professional Reporter
15      Dated:  MAY 17, 2009
16
17
18
19
20      (The foregoing certification
21  of this transcript does not apply to any
22  reproduction of the same by any means,
23  unless under the direct control and/or
24  supervision of the certifying reporter.)

Page 253

1          INSTRUCTIONS TO WITNESS
2
3       Please read your deposition over
4   carefully and make any necessary
5   corrections.  You should state the reason
6   in the appropriate space on the errata
7   sheet for any corrections that are made.
8       After doing so, please sign the
9   errata sheet and date it.
10  You are signing same subject to the
11  changes you have noted on the errata
12  sheet, which will be attached to your
13  deposition.
14      It is imperative that you return
15  the original errata sheet to the deposing
16  attorney within thirty (30) days of
17  receipt of the deposition transcript by
18  you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24





# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                                  )       Chapter 11
                                        )
**W. R. GRACE & CO.**, *et al.*[1]       )       Case No. 01-01139 (JKF)
                                        )       Jointly Administered
            **Debtors.**                 )
                                        )
                                        )
                                        )
                                        )

## EXHIBIT 2 TO EXHIBIT BOOK
## ASBESTOS PI TRUST AGREEMENT

**EXHIBIT 2**

Attached.

---

[1]  The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.),
W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon,
Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc.,
Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC
(f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a
Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC
Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities
Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary
Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe,
Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc.
(f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace
Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W.
R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe
Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai
Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH,
Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings
Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA
Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental
Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin &
Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country
Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

REMAINDER OF EXHIBIT OMITTED
SEE EXHIBIT 2 TO EXHIBIT BOOK
(D.I. 20874)



IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO.,** *et al.* | ) | Case No. 01-1139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |

**FIRST AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE OF W. R. GRACE & CO., ET AL., THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS, THE ASBESTOS PI FUTURE CLAIMANTS' REPRESENTATIVE, AND THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS DATED FEBRUARY 27, 2009**

REMAINDER OF EXHIBIT OMITTED
SEE FIRST AMENDED JOINT PLAN
(D.I. 20872)





# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| **W. R. GRACE & CO.**, *et al.*[1] | ) | Case No. 01-01139 (JKF) |
|  | ) | Jointly Administered |
| Debtors. | ) |  |
|  | ) |  |
|  | ) |  |
|  | ) |  |

### EXHIBIT 6 TO EXHIBIT BOOK
### <u>ASBESTOS INSURANCE TRANSFER AGREEMENT</u>

EXHIBIT 6

Attached.

---

[1]  The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

REMAINDER OF EXHIBIT OMITTED
SEE EXHIBIT 6 TO EXHIBIT BOOK
(D.I. 20874)

EXHIBIT

PENGAD 800-631-6989

Acc3ol(bX6)-11
5-1-09   Lk

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO., et al.**[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

EXHIBIT

PENGAD 800-631-6989

Austern S
5-15-09   Lk

### EXHIBIT 4 TO EXHIBIT BOOK
### TRUST DISTRIBUTION PROCEDURES

**EXHIBIT 4**

Attached.

---

[1]  The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

REMAINDER OF EXHIBIT OMITTED
SEE EXHIBIT 4 TO EXHIBIT BOOK
(D.I. 20874)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                              )        Chapter 11
                                    )
**W. R. GRACE & CO.**, *et al.*[1]  )        Case No. 01-01139 (JKF)
                                    )        Jointly Administered
                    **Debtors.**    )
                                    )
                                    )
                                    )





### EXHIBIT 10 TO EXHIBIT BOOK
### COOPERATION AGREEMENT

**EXHIBIT 10**

Attached.

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

REMAINDER OF EXHIBIT OMITTED
SEE EXHIBIT 10 TO EXHIBIT BOOK
(D.I. 20874)