# EXHIBIT A



## WILCOX & FETZER LTD.

In The Matter Of:

# W.R. Grace & Co., et al.

## Case No. 01-01139 JKF

_____

### Richard Charles Finke

### March 30, 2009

_____

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE


IN RE:                  ) Chapter 11
                        )
W. R. GRACE & CO.,      ) Case No. 01-01139 JKF
et al                   )
                        )
     Debtors            )


          Deposition of RICHARD CHARLES FINKE
taken pursuant to notice at the law offices of
Drinker, Biddle & Reath, LLP, 1100 North Market
Street, Suite 1000, Wilmington, Delaware,
beginning at 9:35 a.m., on Monday, March 30,
2009, before Allen S. Blank, Registered Merit
Reporter and Notary Public.


APPEARANCES:

        LISA G. ESAYIAN, ESQUIRE
        KIRKLAND & ELLIS, LLP
        200 East Randolph Drive
        Chicago, IL 60601

            For - Debtors

        DANIEL A. SPEIGHTS, ESQUIRE
        SPEIGHTS & RUNYAN
        200 Jackson Avenue, East
        Hampton, SC 29924

            For - Anderson Memorial Hospital

     -------------------------------------------
                  WILCOX & FETZER
     1330 King Street -  Wilmington, Delaware 19801
                  (302) 655-0477
                  www.wilfet.com

## Page 2

1  APPEARANCES:  CONTINUED
2      JOHN W. KOZYAK, ESQUIRE
       KOZYAK TROPIN THROCKMORTON
3      2525 Ponce de Leon, 9th Floor
       Miami, FL 33134
4
5          For - Anderson Memorial Hospital

6      MATTHEW I. KRAMER, ESQUIRE
       BILZIN, SUMBERG, BAENA, PRICE
       & AXELROD, LLP
7      200 S. Biscayne Boulevard, Suite 2500
       Miami, FL 33131-5340
8
           For - PD Committee
9
10     ARLENE G. KRIEGER, ESQUIRE
       STROOCK & STROOCK & LAVAN, LLP
       180 Maiden Lane
11     New York, NY 10038-4982
12         For - Official Committee of
             Unsecured Creditors
13
       ALAN B. RICH, ESQUIRE
14     Elm Place
       1401 Elm Street, Suite 4620
15     Dallas, TX 75202
16         For - PD FCR
17     ELISA ALCABES, ESQUIRE
       SIMPSON, THACHER & BARTLETT, LLP
18     425 Lexington Avenue
       New York, NY 10017-3954
19
           For - Travelers Casualty & Surety
20             Company
21     KATHLEEN A. ORR, ESQUIRE
       ORRICK, HERRINGTON & SUTLIFFE, LLP
22     1152 15th Street, N.W.
       Washington, D.C. 20005
23
           For - David Anstern, Asbestos PI
24

## Page 3

1  APPEARANCES:  CONTINUED
2      MICHAEL F. BROWN, ESQUIRE
       DRINKER, BIDDLE & REATH, LLP
3      One Logan Square
       18th and Cherry Streets
4      Philadelphia, PA 19103-6996
5          For - Government Employees Insurance
             Company, Columbia Insurance,
6            One Beacon America Insurance
             Company and Seaton Insurance
7            Company
8      SHANNON L. GRIFFIN, ESQUIRE
       O'MELVENY & MYERS, LLP
9      Times Square Tower
       7 Times Square
10     New York, NY 10036
11         For - Arrowood Indemnity Company,
             f/k/a Royal Indemnity Co.
12
       MARNIE E. SIMON, ESQUIRE
13     STEVENS & LEE
       1818 Market Street, 29th Floor
14     Philadelphia, PA 19103-1702
           - and -
15     JOHN D. DEMMY, ESQUIRE (VIA TELEPHONE)
       STEVENS & LEE
16     1105 North Market Street, 7th Floor
       Wilmington, DE 19801
17
           For - Fireman's Fund Insurance
18             Company
19     SHAYNE W. SPENCER, ESQUIRE
       ELIZABETH DeCRISTOFARO, ESQUIRE (VIA
20     TELEPHONE)
       FORD, MARRIN, ESPOSITO, WITMEYER
21     & GLESER, LLP
       Wall Street Plaza
22     New York, NY 10005-1875
23         For - CNA Insurance Company
24

## Page 4

1  APPEARANCES:  CONTINUED
2      ANDREW F. CRAIG, ESQUIRE (VIA TELEPHONE)
       CUYLER BURK, LLP
3      Parsippany Corporate Center
       Four Century Drive
4      Parsippany, NJ 07054
5          For - Allstate Insurance Company
6      LAURA M. STOVER, ESQUIRE (VIA TELEPHONE)
       NEARHOOD LAW OFFICES
7      7537 E. McDonald Drive
       Scottsdale, AZ 85250
8          - and -
       GABRIELLA V. CELLAROSI, ESQUIRE
9      (VIA TELEPHONE)
       ECKERT SEAMANS
10     1747 Pennsylvania Avenue, N.W.
       Suite 200
11     Washington, D.C. 20006-4604
12         For - Maryland Casualty Insurance
             Company and Zurich
13           Insurance Company
14             * * * * * *
15         RICHARD CHARLES FINKE,
16     the deponent herein, having first been
17     duly sworn on oath, was examined and
18     testified as follows:
19             EXAMINATION
20  BY MR. SPEIGHTS:
21     Q.  Would you state your full name, please,
22  sir?
23     A.  Yes.  Richard Charles Finke, F-i-n-k-e.
24     Q.  Mr. Finke, who are you employed by?

## Page 5

1      A.  W. R. Grace & Co.
2      Q.  How long have you been employed by Grace?
3      A.  Twenty years.
4      Q.  Can you tell me the approximate date you
5  started?
6      A.  No.  I can tell you the exact date I
7  started.  February 27, 1989.
8      Q.  Who do you presently report to?
9      A.  Mark Shelnitz, general counsel of W. R.
10  Grace.
11     Q.  How long have you reported to
12  Mr. Shelnitz?
13     A.  Since he became general counsel, which
14  was three or four years ago.  I forget how long.
15     Q.  Does April 2005 seem about right?
16     A.  It seems about right, yes.
17     Q.  Would you give me the positions you have
18  held at Grace and the approximate dates you held
19  each position?
20     A.  When I was hired, I held the position of
21  senior litigation counsel and I became assistant
22  general counsel for litigation in -- it was
23  around March of 2006.
24     Q.  Is that your present position?

W.R. Grace & Co., et al.
RICHARD CHARLES FINKE

Page 6

1    A. Yes.
2    Q. When you initially went to work at Grace,
3  who did you report to?
4    A. I reported to Robert Beber, B-e-b-e-r.
5    Q. And how long did you report to Mr. Beber?
6    A. Until he retired. He was general counsel
7  of W. R. Grace. When he retired, I frankly don't
8  recall the year or the date.
9    Q. Who did you report to between the
10  retirement of Mr. Beber and Mr. Shelnitz taking
11  over as general counsel?
12    A. I reported to David Siegel, S-i-e-g-e-l,
13  who became general counsel after Mr. Beber.
14    Q. Were you reporting to Mr. Siegel when
15  Grace filed its petition for reorganization?
16    A. Yes.
17        MS. GRIFFIN: May I interrupt? I
18  apologize. I'm Shannon Griffin with O'Melveny &
19  Myers. I represent Arrowood Indemnity. And I
20  thought we were going to do introductions. So I
21  apologize for the interruption.
22        But I would like to enter an exhibit
23  before we take off on Arrowood's objections,
24  which were filed last night. Everyone should

Page 7

1  have received a copy. And I have copies for
2  everybody here. But I would like to mark this as
3  Exhibit 1 so I don't have to keep objecting
4  throughout.
5        MR. SPEIGHTS: I have not seen it so
6  I would like to see it before you mark it.
7        MS. GRIFFIN: Sure.
8        (Finke Deposition Exhibit No. 1 was
9  marked for identification.)
10        MR. SPEIGHTS: Although it's normal
11  for a party to mark its exhibits during its own
12  examination, I certainly don't object to counsel
13  marking it now to avoid having to state these
14  same objections orally or restate them
15  innumerable times.
16        MS. GRIFFIN: Thank you.
17        MR. BROWN: While we are doing that,
18  so that we can avoid it. My clients, Government
19  Employees Insurance Company, Columbia Insurance
20  Company and Seaton Insurance Company and One
21  Beacon America Insurance Company, join in those
22  objections.
23        MS. ALCABES: My clients as well,
24  Travelers Casualty & Surety Company, also joins

Page 8

1  in the objection.
2        And to the extent that the debtor
3  implied on Friday that this was the one and only
4  time that this witness would be provided, we
5  object to any implication of that sort and
6  reserve our rights to take another deposition as
7  required.
8        MS. SIMON: And my clients, Firemen's
9  Fund Insurance Company, also joins in the
10  objections and reserves its rights to depose the
11  deponent at that time, if necessary.
12        MR. SPENCER: Continental Casualty
13  also joins in the objection and reserves its
14  rights as stated by all other counsel previously.
15        MS. ESAYIAN: From the debtor's
16  perspective, everyone's reservations of rights
17  are noted and I believe our position was clearly
18  stated on Friday. And I won't take more time
19  here.
20  BY MR. SPEIGHTS:
21    Q. Mr. Finke, were your general duties and
22  responsibilities the same from 1989 until the
23  bankruptcy?
24    A. Yes.

Page 9

1    Q. Can you generally describe what your
2  duties and responsibilities were during that
3  period?
4    A. Primarily, I was responsible for
5  oversight and management of asbestos property
6  damage cases, including reporting to Grace
7  management on the status or developments in those
8  cases.
9        I also was responsible for oversight
10  of expert witnesses that Grace retained or
11  Grace's counsel retained to testify in the
12  asbestos property damage litigation.
13    Q. Were you part of a, for lack of a better
14  term, a team of lawyers working under Mr. Beber?
15    A. Yes.
16    Q. And what did you call the team?
17    A. Just the asbestos litigation group
18  informally.
19    Q. When a case was filed against Grace, how
20  was it decided which member of the group would be
21  responsible for that case?
22    A. Early in the process or shortly after the
23  team was formed, the caseload was divided
24  geographically so that each person of the team

3  (Pages 6 to 9)

W.R. Grace & Co., et al.
RICHARD CHARLES FINKE

Page 30

1  did.
2  Q. Was it searchable?
3  A. To a limited extent, yes.
4  Q. Who in your office was the person that
5  you would go to if you needed something searched?
6  A. I would have gone to my paralegal.
7  Initially, it was Gail, whose last name I can't
8  recall. And after Gail, to my paralegal that's
9  still with us, Adie Hammond. A-d-i-e.
10  Q. H-a-m-m-o-n-d?
11  A. Yes.
12  Q. Have you seen pages of the index?
13  A. Yes.
14  Q. Have you seen the entire index printed
15  out?
16  A. No.
17  Q. Do you know how long the index would be,
18  how many pages if you printed it out or how many
19  gigabytes or whatever these computer people call
20  the amount of it in the computer?
21  A. No, I don't know. I think it would be
22  extremely voluminous if it were printed out in
23  hard copy. But I don't know by how much.
24  Q. Does the index actually show the document

Page 31

1  like in a PDF format or is it just a list of the
2  documents with certain information?
3  A. It's a list of the documents with certain
4  fields.
5  Q. What fields?
6  A. Product type, job sites, product names,
7  dates, names of addressees, names of the sender
8  or author. And number, a number had been
9  assigned to each document. So the document
10  number would appear. I don't recall what else.
11  Q. Would that be a Bates stamp number?
12  A. Yes.
13  Q. And, as I understand it, someone with
14  computer skills could search it by any of these
15  fields?
16  A. That's correct.
17  Q. Did you have any involvement with the
18  personal injury litigation before the bankruptcy?
19  A. Very little.
20  Q. What little did you have?
21  A. On occasion, there may be an issue in a
22  personal injury case that came to my attention or
23  an expert involved in the property damage
24  litigation would be appearing in a personal

Page 32

1  injury case. And then I would talk to Jay Hughes
2  about that issue or the expert to determine
3  either if he needed assistance relating to that
4  issue or expert or if -- or just for my own
5  edification to see if anything going on in this
6  personal injury case might impact the property
7  damage.
8  Q. Who is Jay Hughes?
9  A. Jay Hughes is an attorney with W. R.
10  Grace. He has been with Grace longer than I
11  have. He is still with Grace. And Jay's primary
12  responsibility at Grace was to oversee the
13  personal injury litigation.
14  Q. Did he report to Mr. Beber before
15  Mr. Beber's retirement?
16  A. Yes.
17  Q. And did he then report to Mr. Siegel
18  while he was general counsel?
19  A. Yes.
20  Q. And does he presently report to
21  Mr. Shelnitz?
22  A. He presently reports to me.
23  Q. I'd like to talk about Anderson before
24  the bankruptcy a few minutes. First of all, see

Page 33

1  if we can try to pin down when you had
2  responsibility for Anderson. Did you have
3  responsibility for Anderson when the venue motion
4  was decided and the judge said it could be
5  maintained in Hampton County?
6  A. No.
7  Q. Did you have responsibility for Anderson
8  at the time of the evidentiary hearing on
9  certification?
10  A. Yes.
11  Q. Did you have responsibility for Anderson
12  when the motion to certify was filed and briefed?
13  A. I believe so. I do recall reading the
14  briefs. I don't recall specifically if that --
15  if I did that because they had already been filed
16  when I took over the case or if I had already
17  assumed responsibility for the case and then they
18  were filed. I just don't recall.
19  Q. Do you recall whether you were involved
20  in the decision to challenge the adequacy of
21  Speights & Runyan?
22  A. Yes.
23  Q. And, yes, you recall you were involved?
24  A. Yes.

9  (Pages 30 to 33)

Case 01-01139-AMC    Doc 22793-1    Filed 08/14/09    Page 7 of 29

W.R. Grace & Co., et al.
RICHARD CHARLES FINKE

Page 162

1    A. My understanding is that the homeowner
2  would have a claim against the personal injury
3  trust.
4    Q. Where is that set forth?
5    A. I believe that's in the plan under the
6  definition of indirect PI trust claim. I may not
7  have the exact terminology there.
8    Q. Does the indemnification cover defense as
9  well as payment of the claim?
10   A. That would be set forth in the PI TDP.
11  And I would refer to that document before trying
12  to answer your question. Because I'm not sure of
13  the answer.
14   Q. If somebody had sued Grace in 1979 for
15  exposure to Monokote in the Jordan Hospital in
16  Plymouth, Massachusetts, would someone at Grace
17  have gone to see whether it had any records of
18  Monokote being in the Jordan Hospital?
19   A. This is a hypothetical lawsuit before
20  1979?
21   Q. No. In 1999. I said before the
22  bankruptcy. I meant to say that. I may have
23  misspoken.
24   A. Maybe I misheard it. Okay. I'm sorry.

Page 163

1    Q. 1999. Somebody serves a complaint
2  alleging mesothelioma exposure in the Jordan
3  Hospital in Plymouth, Mass, would the Grace
4  person handling the PI claims check to see if
5  there were any records showing Monokote had been
6  installed in the Jordan Hospital?
7    A. I don't know.
8    Q. Who would be the best person to ask that
9  question to?
10   A. Jay Hughes.
11   Q. Is Mr. Hughes in Columbia or Boca?
12   A. He is based in Cambridge, Massachusetts.
13       MR. SPEIGHTS: That's all I have at
14  this time, Mr. Finke. I reserve my position to
15  be able to pursue those questions which counsel
16  has instructed you not to answer and other
17  questions that flow from that, if I am permitted
18  to proceed along those lines.
19       Would somebody who wants to question
20  the witness like to have this chair or can we do
21  it from wherever you are?
22       MR. BROWN: Does anyone else on the
23  PD side have any questions?
24       Okay. Why don't we take a five

Page 164

1  minute break.
2       (The deposition was recessed from
3  3:46 p.m. to 3:53 p.m.)
4              EXAMINATION
5  BY MR. BROWN:
6    Q. Mr. Finke, my name is Michael Brown and I
7  represent the cast of foreign insurance companies
8  that I identified earlier.
9       I want to go back and fill in some of
10  the blanks in terms of your employment history
11  with Grace. And I want to start by asking the
12  role that you had pre-petition and then go to
13  post-petition.
14       As I understand it, you were senior
15  litigation counsel at the time the petition was
16  filed?
17   A. Yes.
18   Q. And prior to that, your primary
19  responsibility was with PD claims, is that
20  correct?
21   A. Yes.
22   Q. And I think you identified some minimal
23  involvement on the PI side?
24   A. Right. Very sporadic.

Page 165

1    Q. And that was primarily when there was a
2  PD expert, as I understood it, that may have some
3  application to PI claims?
4    A. More or less, yes. Or was involved in
5  some way in a property -- I'm sorry, personal
6  injury case, which might have ramifications for
7  property damage litigation.
8    Q. Okay. And then other than what you
9  described earlier, you had no involvement on the
10  PI side?
11   A. That's right.
12   Q. Okay. Who did have the involvement on
13  the PI side?
14   A. Jay Hughes.
15   Q. And what was Mr. Hughes' title
16  pre-petition?
17   A. I believe it was also senior litigation
18  counsel.
19   Q. Okay. So you were senior litigation
20  counsel on PD, he was senior litigation counsel
21  on PI?
22   A. Correct.
23   Q. And who did you report to at that time?
24   A. When I first started, it was in 1989, it

W.R. Grace & Co., et al.
RICHARD CHARLES FINKE

---

### Page 166

1  was Robert Beber.
2  Q. How do you say that?
3  A. Beber. B-e-b-e-r.
4  Q. Okay. Beber?
5  A. Right.
6      I don't recall his title at the time.
7  He was not general counsel. He became general
8  counsel a year to two after that.
9  Q. Okay. And at the time of the petition,
10 that's who you were reporting to?
11     A. At the time of the Chapter 11 petition, I
12 was reporting to David Siegel, general counsel.
13 Q. Okay. Mr. Siegel had replaced Mr. Beber
14 by that point?
15     A. Yes.
16 Q. Okay. And how about Mr. Hughes at the
17 time of the petition? Who did he report to
18 directly?
19     A. Also to Mr. Siegel.
20 Q. And Mr. Siegel was the GC at that time?
21     A. Yes.
22 Q. Did Grace have national coordinating
23 counsel for PI claims pre-petition?
24     A. I don't know if they were actually deemed

---

### Page 167

1  or considered national coordinating counsel. But
2  the Casner & Edwards law firm in Boston --
3  Q. I'm sorry. What was the name of that?
4  A. Casner & Edwards, C-a-s-n-e-r, & Edwards
5  law firm in Boston performed some of the
6  functions of national coordinating counsel.
7  Q. Okay. Were they also local counsel for
8  the Boston area?
9  A. I believe they were, yes. Yes, in fact,
10 I think they were.
11 Q. Okay. And what were the national
12 coordinating counsel functions that they
13 undertook?
14     A. Supported local counsel throughout the
15 country in terms of providing documents and
16 transcripts, coordinating the use of experts. I
17 think they were also involved in responding to
18 standard discovery requests.
19 Q. And how many sets of counsel around the
20 country did Grace have with respect to the
21 defense of PI claims?
22     A. Probably -- I'm going to say 25. That's
23 just a little bit more than a guess. As I said,
24 I wasn't involved with the litigation of the

---

### Page 168

1  personal injury cases.
2  Q. Okay. Mr. Hughes was the individual who
3  dealt primarily with the outside counsel handling
4  PI claims?
5  A. Yes.
6  Q. Who else at Grace was involved in the
7  handling of PI claims?
8  A. Really, no one else. He had a staff of
9  legal assistants that helped to maintain the
10 files. But Jay was really the only in-house
11 attorney involved with the personal injury cases.
12 Q. What about Mr. Beber?
13     A. He would have been involved as well to
14 the extent of being Jay's superior.
15 Q. And then Mr. Siegel after Mr. Beber?
16     A. After Mr. Beber, right.
17 Q. All right. You I believe testified
18 earlier this morning that you became assistant GC
19 for litigation in March of 2006, is that correct?
20     A. I think so.
21 Q. Was that a new position?
22     A. Yes.
23 Q. Okay. And if I understood your testimony
24 earlier today, that from that point forward,

---

### Page 169

1  Mr. Hughes reported to you rather than reporting
2  to the general counsel?
3  A. Yes.
4  Q. Okay. So from March of 2006 on, is it
5  fair to say you have played some role on the PI
6  side?
7  A. Yes. But I would describe it still as a
8  minor role.
9  Q. Can you describe for me what the role has
10 been?
11     A. More coordination with the other parts of
12 our reorganization effort to make sure that
13 others working on the reorganization such as
14 finance, such as those who prepare our SEC
15 disclosure documents, were kept informed of
16 developments, facts, relating to the personal
17 injury claims in the Chapter 11.
18 Q. I think you used the term you were
19 coordinating the parts. Can you tell me what you
20 mean by the parts?
21     A. Well, yes. When I -- part of the role of
22 assistant general counsel in the Chapter 11 was
23 to coordinate and oversee all of the individuals
24 involved, both at Grace as well as outside

---

43  (Pages 166 to 169)

W.R. Grace & Co., et al.
RICHARD CHARLES FINKE

---

Page 174

1      **A. Pre-petition or post-petition?**
2      Q. Post-petition we are talking about.  As
3   you were describing his role in the negotiations.
4      **A. I don't know.**
5      Q. And was your role in dealing with PI
6   issues and the resolution of PI issues indirect
7   in the sense that Mr. Hughes reported to you or
8   did you have any direct involvement?
9      **A. It was really indirect.**
10      Q. And besides Mr. Hughes, who else was
11   involved in that effort on the Grace side?
12      **A. Mark Shelnitz, the general counsel.**
13   **Robert Tarola.**
14      Q. I'm sorry?
15      **A. Robert Tarola, T-a-r-o-l-a, the former**
16   **CFO.  The CEO, Fred Festa, had some involvement.**
17   **And outside counsel, David Bernick.  And I**
18   **believe -- I don't know if Ted Freedman was**
19   **involved with the negotiations or came in after a**
20   **deal had been reached.**
21      Q. Other than the individuals you have just
22   run through on the Grace side, was there anyone
23   else that you can recall that was on the Grace
24   negotiating team for the resolution of the PI

---

Page 175

1   claims?
2      **A. Pam Zilly was involved in some of the**
3   **discussions as well.  She is with Blackstone.**
4   **She is our financial advisor.**
5      Q. What was her role?
6      **A. Beyond being financial adviser, I don't**
7   **know.  I wasn't directly involved.**
8      Q. What was Mr. Festa's role?
9      **A. I think primarily to ensure that the**
10   **other parties understood that the Grace**
11   **representatives there spoke with the full**
12   **authority of the company, but, again, I was not**
13   **present at the meetings and discussions that he**
14   **attended with the personal injury**
15   **representatives.**
16      Q. Were you at any of the meetings with the
17   personal injury representatives?
18      **A. No.**
19      Q. I gather Mr. Hughes was?
20      **A. I believe he was, yes.**
21      Q. And Mr. Shelnitz?
22      **A. Yes.**
23      Q. Okay.  I want to shift gears for a second
24   and turn to insurance.  And, again, looking at

---

Page 176

1   the issue pre-petition.  Have you had any role or
2   did you have any role in connection with Grace's
3   liability insurance program before the petition
4   date?
5      **A. No.**
6      Q. Who was responsible for this at Grace?
7      **A. Bob Beber handled it from the litigation**
8   **standpoint.  And Jeff Posner was in charge of our**
9   **risk management function, including insurance.**
10      Q. When did Mr. Posner leave Grace?
11      **A. I honestly don't know.  I don't recall.**
12      Q. Was it after the petition date?
13      **A. I believe it was before.**
14      Q. And his title immediately before he left
15   was risk manager?
16      **A. I don't know.**
17      Q. But that's the function that he had, was
18   risk manager for Grace?
19      **A. Yes.**
20      Q. Post-petition, have you had any role in
21   connection with Grace's liability insurance
22   program?
23      **A. A limited one.  Limited to the extent of**
24   **motions that have been made or objections**

---

Page 177

1   **asserted by insurance.  To the extent an issue is**
2   **being litigated, I have been involved in**
3   **reviewing motion papers and related documents,**
4   **participating in conference calls on strategy.**
5      Q. For dealing with the insurance?
6      **A. For dealing with the insurance.  Some of**
7   **the insurance issues.  Certainly not all of them.**
8      Q. Can you tell me which issues you're
9   talking about?
10      **A. Issues related to the claims by Keneb**
11   **pipeline that they believe they are entitled to**
12   **insurance coverage.  In connection with**
13   **remediation costs or potential responsibility for**
14   **remediation costs in connection with the Otis**
15   **pipeline.**
16      **There were a few others.  I'm just**
17   **drawing a blank right now.**
18      Q. Have you had any role in the Scotts
19   adversary proceeding?
20      **A. Yes.  Thank you.  Yes, I have reviewed**
21   **the papers, not that there have been much --**
22   **there has been much recently.  But I did review**
23   **the adversary proceeding papers when Scotts first**
24   **commenced its adversary proceeding.  And, again,**

---

45  (Pages 174 to 177)

W. R. Grace & Co., et al.
RICHARD CHARLES FINKE

Page 178

1  participated in conference calls relating to
2  their claim that they are entitled to coverage.
3      Q.  And with whom were these conference calls
4  that you participated?
5      A.  Outside counsel from Kirkland & Ellis.
6  And Mr. Posner is often on those calls.  I think
7  that's -- and it's usually the same group.
8      Q.  Did you play any role in the manner in
9  which insurance is handled under the plan?
10     A.  No.
11     Q.  Who did?
12     A.  Other than Kirkland & Ellis, I don't know
13  who else was involved.
14     Q.  Other than what you have just described,
15  have you had any role in the manner in which
16  insurance, unsettled insurance, is handled under
17  the plan?
18     A.  No.
19     Q.  How about any role in connection with the
20  manner in which settled insurance is handled
21  under the plan?
22     A.  No.
23     Q.  Did anyone replace Mr. Posner as the risk
24  manager?

Page 179

1      A.  No.  He basically still serves the same
2  function but as an outside consultant.
3      Q.  Okay.  Thank you.
4          (Finke Deposition Exhibit No. 12
5  was marked for identification.)
6  BY MR. BROWN:
7      Q.  Mr. Finke, you have what's been marked
8  Exhibit 12.  If you would take a few moments to
9  look at it.  My first question is going to be
10  whether you have ever seen it before?
11     A.  Yes, I have seen it before.
12     Q.  Can you identify it for me?
13     A.  It's Form 8K that Grace filed with the
14  SEC announcing its agreement in principle with
15  the personal injury committee and others to
16  resolve present and future asbestos related PI
17  claims.
18     Q.  When did you first see it?
19     A.  I believe it was shortly after it was
20  filed.  A day or two after it was filed.
21     Q.  Had you seen drafts of it before it was
22  filed?
23     A.  I don't believe I did.  But I -- I cannot
24  be a hundred percent sure I didn't see a draft.

Page 180

1  But I don't think that I did.
2      Q.  Do you know, if it wasn't you, do you
3  know who was involved at Grace in the preparation
4  of this document?
5          And just for clarification, it's an
6  8-K.  It has attachments to it.  You probably
7  noted.
8      A.  Right.
9      Q.  One is a pre release and the other is a
10  terms sheet.  So we can probably take -- why
11  don't we take them one by one.
12     A.  Typically, the 8-K's are prepared by an
13  in-house attorney, Michael Conron, who obtains
14  input and facts from persons who are involved
15  firsthand with the events being reported.  In
16  this case, I believe he would have obtained the
17  details from Mark Shelnitz since Mr. Shelnitz was
18  personally involved in the negotiations.
19     Q.  Did he receive any information from you?
20     A.  No.
21     Q.  Okay.  How about the press release that's
22  attached to it?  There is a couple of names at
23  the top from media relations and investor
24  relations.  But do you know who prepared the

Page 181

1  press release?
2      A.  Where are you at?  I'm not finding it.
3      Q.  I think it's probably page five it starts
4  at.
5      A.  Okay.  Okay.  There we go.  William
6  Corcoran is -- I forget if he is executive
7  vice-president or senior vice-president.  And he
8  is in charge of media relations, among other
9  things.  Typically, Mr. Corcoran prepares press
10  releases.  In the same manner as I described, I
11  described Mr. Conron preparing 8-K's.  He would
12  have obtained the information from whoever was
13  personally involved.
14     Q.  And would that have been Mr. Shelnitz or
15  someone else?
16     A.  I'm pretty confident it would have been
17  Mr. Shelnitz.
18     Q.  But it was not you?
19     A.  Correct.
20     Q.  Let's go to the terms sheet, which
21  appears to begin on page eight.
22     A.  Um-hmm.
23     Q.  Had you seen this terms sheet prior to
24  the filing of the 8-K?

46  (Pages 178 to 181)

W.R. Grace & Co., et al.
RICHARD CHARLES FINKE

| Page 182 |
|---|
| 1   **A. I believe I did.** |
| 2   Q. When? |
| 3   **A. I think I saw it in a prior draft.** |
| 4   **Within a few days of the final, the final** |
| 5   **version.** |
| 6   Q. Were you involved in preparing any of the |
| 7   drafts? |
| 8   **A. No, I was not.** |
| 9   Q. Do you know who was? |
| 10  **A. No, I don't. I believe Mr. Shelnitz was** |
| 11  **involved along with outside counsel.** |
| 12  Q. How about Mr. Hughes? |
| 13  **A. I don't know.** |
| 14  Q. Do you know who was involved for the |
| 15  other constituencies that are a party to the |
| 16  terms sheet? |
| 17  **A. No, I do not.** |
| 18  Q. In the first line of the text, it says, |
| 19  this term sheet sets forth certain of the |
| 20  principal terms and conditions. |
| 21          Are there other principal terms and |
| 22  conditions that are not reflected or were not |
| 23  reflected in the terms sheet? |
| 24  **A. I don't know. I wasn't involved in the** |

| Page 183 |
|---|
| 1   **discussions. I don't know if there were other** |
| 2   **principal terms and conditions that have been** |
| 3   **agreed upon at that time and not included.** |
| 4   Q. Were any of Grace's insurers involved in |
| 5   the discussions that led up to the execution of |
| 6   the terms sheet? |
| 7   **A. Not to my knowledge. But, again, I** |
| 8   **wasn't personally involved in the discussions.** |
| 9   Q. Do you know whether Grace's insurers were |
| 10  purposely left out of any discussions leading up |
| 11  to the terms sheet? |
| 12  **A. Not that I know of.** |
| 13  Q. Who would be the individual at Grace, to |
| 14  your knowledge, that would know the answer to |
| 15  those questions? |
| 16  **A. Mr. Shelnitz.** |
| 17  Q. If you look on the first page down at |
| 18  I.A.1.b, titled, Insurance? |
| 19  **A. Yes.** |
| 20  Q. There is a reference there to the |
| 21  assignment of insurance policies and all |
| 22  insurance proceeds. Do you see that? |
| 23  **A. Yes.** |
| 24  Q. Did Grace, to your knowledge, seek the |

| Page 184 |
|---|
| 1   consent of any of its insurers prior to agreeing |
| 2   to that term with the other constituencies to the |
| 3   terms sheet? |
| 4   **A. I don't know.** |
| 5   Q. Who would know? |
| 6   **A. Mr. Shelnitz.** |
| 7   Q. If you turn to the next page on page nine |
| 8   under v. I want to direct your attention to the |
| 9   second paragraph that begins with the word, |
| 10  provided. |
| 11  **A. Okay.** |
| 12  Q. Do you understand what's being referred |
| 13  to in that section? |
| 14  **A. No, I'm not sure what's being referred to** |
| 15  **by the foregoing.** |
| 16          **(Finke Deposition Exhibit Nos. 13 and** |
| 17  **14 were marked for identification.)** |
| 18  BY MR. BROWN: |
| 19  Q. Mr. Finke, you have two documents that |
| 20  have been marked Exhibit 13 and one is Exhibit 14 |
| 21  in front of you. Can you just identify them both |
| 22  for me? |
| 23  **A. Exhibit 13 is debtor's preliminary list** |
| 24  **of witnesses that they intend to call during the** |

| Page 185 |
|---|
| 1   **confirmation hearing and is dated March 13, 2009.** |
| 2   **Exhibit 14 is the second amended case** |
| 3   **management order related to the first amended** |
| 4   **joint plan of reorganization and was ordered on** |
| 5   **January 29, 2009.** |
| 6   Q. Would I be correct if I said that you |
| 7   have seen both of these documents before? |
| 8   **A. Yes, you would.** |
| 9   Q. If you look at the witness list, you'll |
| 10  note that your name appears first? |
| 11  **A. Yes.** |
| 12  Q. As someone who, at least on a preliminary |
| 13  basis, is going to testify in Phases I and II of |
| 14  the confirmation hearing? |
| 15  **A. Um-hmm.** |
| 16  Q. About company information. |
| 17          What is the company information that |
| 18  you possess relevant to plan confirmation? |
| 19          MS. ESAYIAN: Objection to the form |
| 20  of the question. You can answer, if you can. |
| 21          THE WITNESS: I was asked by outside |
| 22  counsel to be available to testify at one or both |
| 23  of the confirmation hearings to the extent they |
| 24  needed someone to present their basic company |

Wilcox and Fetzer, Ltd.    Registered Professional Reporters    302-655-0477

W.R. Grace & Co., et al.
RICHARD CHARLES FINKE

---

Page 186

1  information, such as anything from the nature of
2  our businesses to number of employees and more
3  specifically with respect to our asbestos
4  litigation and claims, both historical, meaning
5  pre-petition litigation history relating to
6  asbestos claims, as well as the asbestos related
7  claims filed in the Chapter 11.
8        The only thing I wanted to add was,
9  in a subsequent discussion, it was decided that
10 Jay Hughes would most likely handle any issues
11 relating or testimony relating to personal
12 injury -- asbestos personal injury claims and
13 issues.
14 BY MR. BROWN:
15    Q.  That was going to be my question.  You
16 used the generic term asbestos litigation.  Did
17 you mean PD asbestos litigation?
18    **A.  Well, initially the discussion was**
19 **generic.  But, as I say, subsequently it was**
20 **narrowed to property damage and attic insulation**
21 **within my purview.**
22    Q.  To your knowledge, you're not going to be
23 proffering any testimony on PI issues?
24    **A.  That is my understanding, yes.**

---

Page 187

1    Q.  Would your answer be the same with
2  respect to insurance related issues?
3    **A.  Yes.**
4    Q.  How about with the manner in which
5  indirect asbestos PI trust claims are handled
6  under the plan?
7    **A.  I would expect that Jay Hughes would**
8  **handle that.**
9    Q.  Okay.  If you can look at what's been
10 marked as Exhibit 14, the second amended case
11 management order.  I want to direct your
12 attention specifically to paragraph two.
13       The second sentence in paragraph two
14 talks about the first phase of the confirmation
15 hearing.  Do you see that?
16    **A.  Yes.**
17    Q.  And there are three Romanettes in that
18 sentence.
19       Do I understand you correctly that
20 you are not, to your knowledge, being proffered
21 to offer any testimony relevant to i or ii?
22    **A.  That's correct.**
23    Q.  And if you go to the next sentence, which
24 talks about the topics to be addressed in the

---

Page 188

1  second phase of the confirmation hearing, are
2  you, to your knowledge, being proffered to offer
3  any testimony with respect to i or iii?
4    **A.  I think that's unknown at this point.**
5    Q.  Is that true for both i and iii?
6    **A.  Yes.**
7    Q.  Okay.  I want to go back to the
8  preliminary witness list.  And I think most of
9  these individuals on here we have already
10 identified in terms of what their acknowledge is.
11 Pam Zilly, she is with the Blackstone Group, she
12 is the financial person?
13    **A.  Correct.**
14    Q.  I believe you said Denise Martin is a PD
15 expert?
16    **A.  Yes, she is an expert.  She'll offer**
17 **expert testimony concerning the likelihood that**
18 **future property damage and ZAI claims will be**
19 **brought.**
20    Q.  Okay.  I believe I heard earlier the name
21 Hudson LaForce.  Who is that?
22    **A.  He is our current chief financial**
23 **officer.**
24    Q.  And Derrick Tay?

---

Page 189

1    **A.  He is a Canadian restructuring attorney**
2  **who represents Grace in Canada concerning the**
3  **Canadian ZAI claimants.**
4    Q.  And Mr. Dunbar, he is an outside
5  modelling consultant?
6    **A.  Yes, I believe that's right.**
7    Q.  Mr. Hughes we have talked about.
8        What about all the doctors?
9    **A.  Can you be more specific what you're**
10 **asking?**
11    Q.  What's the area?  Have each of the other
12 witnesses listed here starting with I guess
13 Dr. Florence, are they all experts?
14    **A.  Other than Jay Hughes, yes.**
15    Q.  And they have all submitted reports at
16 this point?
17    **A.  I presume so.**
18    **(Finke Deposition Exhibit No. 15 was**
19 **marked for identification.)**
20 BY MR. BROWN:
21    Q.  All right.  Mr. Finke, you have before
22 you a document marked Exhibit 15.  The first
23 question is, can you identify it?
24    **A.  Exhibit 15 is debtors' response to**

---

48  (Pages 186 to 189)

W.R. Grace & Co., et al.
RICHARD CHARLES FINKE

Page 190

1    Government Employees Insurance Company and
2    Columbia Insurance Company's requests for
3    admission, interrogatories and requests for
4    production of documents.
5        Q. And I gather you have seen this document
6    before?
7        A. Yes, I have.
8        Q. Okay. If you would turn to the last
9    page.
10       A. Um-hmm.
11       Q. Is that your signature on the
12   verification?
13       A. Yes, it is.
14       Q. The verification is worded a little
15   oddly. At least in my experience.
16           The first question I have for you is
17   that, do you actually have any personal knowledge
18   of the information that's contained in the
19   responses to the interrogatories that you
20   verified?
21       A. Well, I'm just going to note for the
22   record that it's a rather long document. So if
23   you want him to read the whole thing, that's
24   going to take a while.

Page 191

1        Q. I don't want him to read the whole thing.
2    If you turn to page 50.
3        A. I was just going to read the -- review
4    the answers to interrogatories.
5            In general, no, I would not have
6    firsthand knowledge of most of the facts or the
7    facts asserted in the responses to the
8    interrogatories.
9        Q. In your verification, you note, sort of
10   the middle or halfway down, that the responses
11   are true and correct to the best of my personal
12   knowledge or based on information supplied to me
13   by others.
14       A. Right.
15       Q. Who are the others?
16       A. Primarily counsel at Kirkland & Ellis.
17       Q. Anyone else?
18       A. No, I don't believe so.
19       Q. Okay. Can I direct your attention to the
20   first interrogatory?
21       A. Um-hmm.
22       Q. Just let me know when you're finished
23   reading it.
24       A. Okay. I'm ready.

Page 192

1        Q. It says that, prior to September 19,
2    2008, which is when the initial joint plan was
3    filed, correct?
4        A. Yes.
5        Q. Okay. It says, prior to that time,
6    debtors did not communicate or consult with GEICO
7    or Columbia regarding the proposed terms of the
8    plan, asbestos PI trust agreement, asbestos
9    insurance transfer agreement with TDP.
10           Why not?
11       A. I was not involved in whatever decision
12   was made concerning communicating or consulting
13   with the insurers.
14       Q. And would that have been Mr. Shelnitz
15   again that was involved in that?
16       A. I don't know that. But that is who I
17   would -- who I would ask.
18       Q. I want to direct your attention to the
19   fourth interrogatory.
20       A. Okay.
21       Q. In Grace's response to interrogatory
22   four, the latter portion of it, it says, but also
23   does not prohibit participation. Do you see
24   that?

Page 193

1        A. Yes.
2        Q. Could you describe for me your
3    understanding of the manner in which Grace's
4    insurance companies could participate in the
5    investigation and evaluation defense in allowance
6    or settlement of the asbestos PI claims in the
7    event the plan is confirmed?
8        A. My understanding of that provision is the
9    insurers could negotiate with the PI trust for
10   whatever role the insurers would seek to have
11   with respect to the claim submitted to the PI
12   trust.
13       Q. And with whom would they be negotiating
14   specifically, the individuals?
15       A. Well, the trustees. Whoever that is.
16       Q. Would the TAC be involved in that
17   process?
18       A. I would not know that. I do not know
19   that.
20       Q. So it's your understanding that the only
21   way in which the insurers would be involved was
22   through some sort of negotiation with the trust?
23           MS. ESAYIAN: Objection to
24   foundation. But you can answer, if you can.

49 (Pages 190 to 193)

W.R. Grace & Co., et al.
RICHARD CHARLES FINKE

Page 194

1    THE WITNESS:  I wouldn't say it's the
2  only way because I haven't -- I'm not
3  knowledgeable enough about the manner in which
4  the trust would operate to know whether that's
5  the only avenue.
6  BY MR. BROWN:
7    Q.  It's the only one you're aware of?
8    A.  It is the only one I am aware of, yes.
9    Q.  Is there someone that has some knowledge
10  about other mechanisms by which Grace's insurers
11  could be involved in the topics that are
12  identified in interrogatory number four?
13    A.  I doubt very much that anyone at Grace
14  would have such knowledge since I don't believe
15  anybody at Grace has been involved in
16  bankruptcies before or asbestos 524 G trusts.
17    Q.  If not at Grace, where or who?
18    A.  You would have to consult with
19  experienced bankruptcy counsel.
20    Q.  Kirkland & Ellis?
21    A.  They are taken.
22    Q.  Okay.
23    MR. BROWN:  Why don't we take a five
24  minute break.

Page 195

1    THE WITNESS:  Okay.
2    (Deposition recessed from 4:52 p.m.
3  to 5:03 p.m.)
4  BY MR. BROWN:
5    Q.  Mr. Finke, I understand you had a
6  clarification on one of your responses?
7    A.  Yes.  With respect to Exhibit 15, I had
8  identified counsel as Kirkland & Ellis as having
9  supplied information upon which I relied in
10  connection with the debtor's interrogatory
11  responses.  An additional person that I forgot
12  about was, but who did review the interrogatory
13  responses, was Jeff Posner.  I also relied on his
14  review and comments concerning the answers.
15    Q.  Did Mr. Posner review all of the answers
16  or were there certain ones that he passed on?
17    A.  My understanding is he reviewed all of
18  them.
19    Q.  The question will probably come up.  But
20  there is a lot of other insurers here that served
21  interrogatories on you, on Grace.  Is the answer
22  the same for all of them as well?
23    A.  Yes.  As far as I know, he reviewed all
24  of the interrogatory answers or answers to

Page 196

1  interrogatories that have been propounded by
2  insurers.
3    Q.  Is it fair to say that you didn't have
4  any independent knowledge of any of the responses
5  that were given to the insurance companies?
6    A.  The answer is if I had -- if I had any,
7  it would be very little.  I hate to make the
8  sweeping statement that there is not a single
9  answer.
10    Q.  I'm just trying to save you the question
11  from seven other lawyers.
12    A.  I understand.  I just don't want to be
13  caught with a generalization where somebody finds
14  an exception.
15    Q.  Okay.  Fair enough.
16    Have you either pre-petition or
17  post-petition had occasion to review the terms of
18  any of Grace's insurance policies?
19    A.  Certain specific provisions I have
20  reviewed.  I have not read any of the policies in
21  their entirety.  But, for example, in connection
22  with the Scotts adversary proceeding, I did
23  review the I guess relevant provisions of the
24  policy that Scotts is relying on.

Page 197

1    Q.  By that, do you mean the vendor
2  endorsement?
3    A.  Yes.
4    Q.  Anything else?
5    A.  There might have been a few, very few
6  other portions of policies that I reviewed.  But
7  nothing specific comes to mind.
8    Q.  How about in connection with Keneb's
9  claims?  Have you reviewed any policies in
10  connection with that?
11    A.  I have not.
12    Q.  You're aware, are you not, that Grace had
13  a number of pre-petition settlement agreements
14  with various insurers?
15    A.  Yes.
16    Q.  Have you reviewed any of those
17  agreements?
18    A.  I have not.
19    Q.  You mentioned I guess that you had
20  reviewed the complaint, I think, in the Scotts
21  adversary?
22    A.  Yes.
23    Q.  When is the last time you reviewed that
24  complaint?

W.R. Grace & Co., et al.
RICHARD CHARLES FINKE

| | Page 198 | | Page 200 |
|---|---|---|---|
| 1 | **A.  I don't think I have reviewed it since** | 1 | have been available has been exhausted. |
| 2 | **shortly after they filed it.** | 2 | Q.  To the extent that the claims by Keneb do |
| 3 | Q.  Back in the fall of 2004? | 3 | give rise to claims by the insurers, how are they |
| 4 | **A.  That sounds right, yeah.** | 4 | treated under the plan, to your knowledge? |
| 5 | Q.  Is that when you reviewed the vendor | 5 | **A.  That I do not know.** |
| 6 | endorsement that you just referred to? | 6 | (Finke Deposition Exhibit No. 16 was |
| 7 | **A.  Yes.  All at the same time.** | 7 | marked for identification.) |
| 8 | Q.  Do you have an understanding as to how | 8 | BY MR. BROWN: |
| 9 | the claims that Scotts has against the various | 9 | Q.  All right, Mr. Finke, you have before you |
| 10 | insurers that are named in the adversary | 10 | Exhibit 16.  Can you identify this document? |
| 11 | proceeding, how those claims are treated under | 11 | **A.  Yes.  This is the debtors' response to** |
| 12 | the plan? | 12 | **One Beacon America Insurance Company and Seaton** |
| 13 | **A.  I believe they are treated as indirect PI** | 13 | **Insurance Company's requests for admission,** |
| 14 | **trust claims under the plan.** | 14 | **interrogatories and requests for production of** |
| 15 | Q.  And what does that mean in real terms? | 15 | **documents.** |
| 16 | **A.  That the insurers' claims would be** | 16 | Q.  Okay.  And you'll note that on page 21, |
| 17 | **presented to the or submitted to the PI trust.** | 17 | the interrogatory responses begin? |
| 18 | MS. ESAYIAN:  Are you asking about | 18 | **A.  Yes.** |
| 19 | the insurers claims or Scotts' claims? | 19 | Q.  And your verification, I believe, is |
| 20 | MR. BROWN:  I was asking about the | 20 | essentially identically worded to the one we just |
| 21 | Scotts claims against the insurers. | 21 | looked at for GEICO and Columbia, is that |
| 22 | THE WITNESS:  I apologize.  I thought | 22 | correct? |
| 23 | you were referring to any insurers' claims | 23 | **A.  Correct.** |
| 24 | resulting from coverage of Scotts' claims. | 24 | Q.  And am I correct that the direct source |

| | Page 199 | | Page 201 |
|---|---|---|---|
| 1 | Scotts' claims, I believe those are | 1 | of any knowledge with respect to the responses |
| 2 | also indirect PI trust claims. | 2 | comes either from Kirkland & Ellis or from |
| 3 | BY MR. BROWN: | 3 | Mr. Posner? |
| 4 | Q.  And is it your understanding that they | 4 | **A.  That's correct.** |
| 5 | are enjoined in their entirety as against the | 5 | Q.  You don't have any personal knowledge of |
| 6 | insurers? | 6 | the responses? |
| 7 | MS. ESAYIAN:  Objection to form.  But | 7 | **A.  No, I do not.** |
| 8 | you can answer, if you can. | 8 | Q.  Let me direct your attention to |
| 9 | THE WITNESS:  I don't know. | 9 | interrogatory number three and the response to |
| 10 | BY MR. BROWN: | 10 | it. |
| 11 | Q.  Do you have an understanding as to | 11 | **A.  Okay.** |
| 12 | whether the claims that Keneb is asserting give | 12 | Q.  Were you involved in the events leading |
| 13 | rise to any claims by certain insurers against | 13 | up to the January 13, 2005 amended joint plan |
| 14 | Grace? | 14 | that Grace filed? |
| 15 | **A.  I think, in theory, my understanding is** | 15 | **A.  I was involved in certain aspects or** |
| 16 | **that, in theory, it could, they could, Keneb's** | 16 | **certain sections of the plan.** |
| 17 | **claims could give rise.  But that the likelihood** | 17 | Q.  Did you play a role with that plan |
| 18 | **that there is any coverage available is very** | 18 | similar to the one you played with the joint |
| 19 | **small.** | 19 | plan? |
| 20 | Q.  Coverage available to -- | 20 | **A.  In general, yes.** |
| 21 | **A.  Keneb.** | 21 | Q.  Are you familiar with the term resolved |
| 22 | Q.  Do you understand what the reason for | 22 | that was used to describe the insurance policies |
| 23 | that is or the basis is for that statement? | 23 | under that prior plan? |
| 24 | **A.  Only that what coverage might otherwise** | 24 | **A.  I remember the prior plan included that** |

51  (Pages 198 to 201)

UNITED STATES

SECURITIES AND EXCHANGE COMMISSION

WASHINGTON, DC 20549

FORM 8-K

CURRENT REPORT PURSUANT

TO SECTION 13 OR 15(D) OF THE

SECURITIES EXCHANGE ACT OF 1934

Date of report (Date of earliest event reported) April 6, 2008

W. R. GRACE & CO.

(Exact Name of Registrant as Specified in Its Charter)

Delaware

(State or Other Jurisdiction of Incorporation)

| | | |
|---|---|---|
| 1-13953 | | 65-0773649 |
| (Commission File Number) | | (IRS Employer Identification No.) |

7500 Grace Drive

21044

Columbia, Maryland
(Address of Principal Executive Offices) (Zip Code)

(410) 531-4000



(Registrant's Telephone Number, Including Area Code)

(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

o    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

o    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

o    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

o    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

-------------------------------------------------------------------------------

W. R. GRACE & CO.

FORM 8-K

CURRENT REPORT


Item 7.01.                    Regulation FD Disclosure.


On April 6, 2008, W. R. Grace & Co., on behalf of itself and its subsidiaries
and affiliates that are debtors in the Chapter 11 cases, (the "Company")
entered into an agreement in principle (the "Agreement") with the Official
Committee of Asbestos Personal Injury Claimants, the Future Claimants
Representative and the Official Committee of Equity Security Holders, all
parties-in-interest in the Company's Chapter 11 case, that would settle all
present and future asbestos-related personal injury claims against the Company
on the terms and conditions set forth therein.  Certain terms and conditions of
the Agreement are described in the press release attached hereto as Exhibit
99.1.  The description of the terms and conditions of the Agreement is
qualified in its entirety by reference to the provisions of the Agreement
attached hereto as Exhibit 99.2.


The information furnished pursuant to this Item 7.01, including Exhibit 99.1
and Exhibit 99.2, shall not be deemed to be "filed" for purposes of Section 18
of the Securities Exchange Act of 1934, as amended, (the "Exchange Act"), or
otherwise subject to the liabilities of such section, nor shall such
information be deemed incorporated by reference in any filing under the
Securities Act of 1933, as amended, or the Exchange Act, except as shall be
expressly set forth by specific reference in such a filing.


Item 9.01.                    Financial Statements and Exhibits.


(d)  Exhibits


99.1                          Press Release


99.2                   .      Term Sheet for Resolution of Asbestos Personal
Injury Claims dated as of April 6, 2008


2
------------------------------------------------------------------------------

SIGNATURES


Pursuant to the requirements of the Securities Exchange Act of 1934, the
Registrant has duly caused this report to be signed by the undersigned,
thereunto duly authorized.


W. R. GRACE & CO.
(Registrant)
By /s/ Mark A. Shelnitz
Mark A. Shelnitz
Secretary


Dated:  April 7, 2008


3

------------------------------------------------------------------------

Exhibit 99.1

Grace News #2919

Media Relations:              Investor Relations:
William Corcoran              Bridget Sarikas
T +1 410.531.4203            T +1 410.531.4194
Ewilliam.corcoran@grace.com Ebridget.sarikas@grace.com

### GRACE ANNOUNCES SETTLEMENT OF ASBESTOS PERSONAL INJURY CLAIMS

COLUMBIA, Maryland, April 7, 2008 -- W. R. Grace & Co. (NYSE: GRA) today
announced an agreement in principle that would settle all present and future
asbestos-related personal injury claims. The agreement, reached with the
Official Committee of Asbestos Personal Injury Claimants, the Future Claimants
Representative and the Official Committee of Equity Security Holders, requires
the following assets to be paid into a trust to be established under Section
524(g) of the United States Bankruptcy Code:

Cash in the amount of $250 million;

Warrants to acquire 10 million shares of Grace common stock at an
exercise price of $17.00 per share, expiring one year from the effective date
of a plan of reorganization;

Rights to proceeds under Grace's asbestos-related insurance
coverage;

The value of cash and stock under the litigation settlement
agreements with Sealed Air Corporation and Fresenius Medical Care Holdings,
Inc.; and

Deferred payments at $110 million per year for five years beginning in 2019, and $100 million per year for ten years beginning in 2024; the deferred payments would be obligations of Grace backed by 50.1% of Grace's common stock to meet the requirements of Section 524(g).

The agreement in principle contemplates the filing of a plan of reorganization and related documents with the Bankruptcy Court.  The plan will be subject to approval of its co-proponents, exit financing, and Bankruptcy Court and District Court approvals.

"This agreement in principle is a very important step in emerging from Chapter 11," said Fred Festa, Grace's Chairman, President and Chief Executive Officer. "In this challenging global marketplace, we need to be able to focus all of our efforts on increasing shareowner value and continued improvement in our core businesses. The agreement and the Plan of Reorganization that will be based on it will be good for our shareholders, customers, creditors, and our employees. A lot of work remains to be done before we can confirm a Plan of Reorganization, but I am optimistic we will be successful in reaching that goal by the end of this year or early in 2009."

1

---

"Also, I want to point out that the Plan of Reorganization will preserve all employee benefits. During the seven years we have been in Chapter 11, our people have nearly doubled Grace's sales and dramatically improved the core businesses. We look forward to final approval of our Plan of Reorganization when we can once again operate without the constraints of Chapter 11," said Festa.

*        *        *        *        *

Grace is a leading global supplier of catalysts and other products to petroleum refiners; catalysts for the manufacture of plastics; silica-based engineered and specialty materials for a wide-range of industrial applications; sealants and coatings for food and beverage packaging, and specialty chemicals, additives and building materials for commercial and residential construction. With annual sales of more than $3.1 billion, Grace has about 6,500 employees and operations in over 40 countries.  For more information, visit Grace's web site at www.grace.com.

\*   \*   \*   \*   \*

This announcement contains forward-looking statements, that is, information
related to future, not past, events.  Such information generally includes the
words "believes," "plans," "intends," "targets," "will," "expects,"
"anticipates," "continues" or similar expressions.  For these statements, Grace
claims the protection of the safe harbor for forward-looking statements
contained in the Private Securities Litigation Reform Act of 1995.  Grace is
subject to risks and uncertainties that could cause actual results to differ
materially from those projected in the forward-looking statements or that could
cause other forward-looking information to prove incorrect.  Factors that could
cause actual results to materially differ from those contained in the
forward-looking statements include: Grace's bankruptcy, plans of reorganization
proposed by Grace and others, Grace's legal proceedings (especially the Montana
criminal proceeding and environmental proceedings), the cost and availability
of raw materials and energy, Grace's unfunded pension liabilities, costs of
environmental compliance, risks related to foreign operations, especially,
security, regulation and currency risks and those factors set forth in Grace's
most recent Annual Report on Form 10-K, quarterly report on Form 10-Q and
current reports on Form 8-K, which have been filed with the Securities and
Exchange Commission and are readily available on the Internet at www.sec.gov.
Reported results should not be considered as an indication of future
performance.  Readers are cautioned not to place undue reliance on
forward-looking statements, which speak only as of the date thereof. Grace
undertakes no obligation to publicly release any revisions to the
forward-looking statements contained in this announcement, or to update them to
reflect events or circumstances occurring after the date of this announcement.

\#\#\#

Corporate Communications

W. R. Grace & Co.-Conn.

7500 Grace Drive

Columbia, MD 21044

2

Exhibit 99.2


W. R. GRACE & CO., et al.
CASE NO. 01-1139 (JFK)


TERM SHEET FOR RESOLUTION OF
ASBESTOS PERSONAL INJURY CLAIMS



This Term Sheet sets forth certain of the principal terms and conditions under which the Debtors, the Official Equity Security Committee, the Official Committee of Personal Injury Claimants ("ACC") and the Future Claimants Representative ("FCR") in the above-captioned Chapter 11 cases are prepared to file a plan of reorganization ("Plan") as co-proponents providing for the resolution of all asbestos personal injury claims and liabilities, including without limitation all asbestos personal injury claims pending at the filing date of the Chapter 11 cases and those arising subsequent thereto (collectively, "Asbestos PI Claims"). This Term Sheet also sets forth the proposed treatment of other key classes of claims asserted in the Chapter 11 cases. This Term Sheet has been produced for settlement purposes only and is subject to the provisions of Rule 408 of the Federal Rules of Evidence.


I.              Treatment of Claims

A.              Asbestos PI Trust

All Asbestos PI Claims will be channeled to a trust (the "Asbestos PI Trust") that is established in accordance with Section 524(g) of the United States Bankruptcy Code. The Asbestos PI Trust will pay claims from trust assets in accordance with a trust agreement and trust distribution procedures established by the ACC and FCR in connection with the Plan.

1.              Funding of Asbestos PI Trust at Emergence. On the Effective Date of the Plan, the Asbestos PI Trust shall receive the following, each of which shall be a condition to the Plan becoming effective:

a.              Cash Payment: $250 million, plus, if the Effective Date occurs after December 31, 2008, interest from January 1, 2009 to the Effective Date accrued at the same rate applicable to Grace's senior debt.

b.              Insurance: the assignment by W. R. Grace & Co.-Conn. ("Grace") and all of its affiliates to the Asbestos PI Trust, of all insurance policies and all insurance proceeds available for payment of Asbestos PI Claims, effective as of the Effective Date, including without limitation:

i.              Any such proceeds from the date hereof of all settlements with insurance companies, and all interest accrued thereon;

--------------------------------------------------------------------------
ii.              Any proceeds of the settlement with Equitas held in escrow with all interest accrued thereon;

ii.              Any proceeds of all settlements with all insurance companies

under coverage in place agreements or installment payment arrangements where payment has not yet occurred;

iv.           Assignment of and the right to recover on all outstanding insurance policies potentially applicable to personal injury claimants; and

v.            The right to recover from all insolvent insurance estates as to which Grace or its affiliates has made a claim and the proceeds of all payments received by Grace or its affiliates from those insolvent estates after the date hereof, and all interest accrued thereon.

Provided however that Grace is in the process of examining its policies and the foregoing will not affect Grace's separate coverages, if any, for losses not arising from asbestos personal injury claims.

The ACC and FCR (or, after the Effective Date, the Asbestos PI Trust) shall control (and Grace shall cooperate in connection with) any negotiations or legal proceedings related to the underlying policies or settlement agreements applicable to Asbestos PI Claims.

c.            Warrant: a warrant for 10 million shares of W. R. Grace & Co. ("Parent") common stock, exercisable at $17 per share, and expiring one year after the Effective Date.

d.            Cryovac, Inc. Payment: The consideration contemplated by the Sealed Air Settlement Agreement.

e.            Fresenius Medical Care Payment:  The proceeds of the payment contemplated by the Fresenius Settlement Agreement.

2.            Deferred Payment Obligations:  Grace shall make additional payments to the Asbestos PI Trust over a 15 year period as follows:  five annual payments of $110 million commencing on January 2, 2019; and 10 annual payments of $100 million commencing on January 2, 2024.  Such payment obligations shall be subordinate to any bank debt or bonds outstanding and shall be guaranteed by Parent or any successor ultimate parent entity of Grace. Such guaranty shall be secured by an obligation of Parent to issue to the Asbestos PI Trust, in the event an additional payment is not made, the number of shares of Parent common stock which, when

2

--------------------------------------------------------------------------------

added to the number of shares of common stock issued and outstanding as of the Effective Date, shall constitute 50.1% of the voting shares of Parent as of the Effective Date (such number of shares shall be equitably adjusted for stock splits, stock dividends, recapitalizations, corporate reorganizations or changes in control of Parent after the Effective Date).

B.            Other Classes

1.            Administrative Claims: 100% of allowed amount in cash.

2.            Priority Tax Claims: 100% of allowed amount in cash.

3.            Priority Non-Tax Claims: 100% of allowed amount in cash.

4.            Secured Claims: 100% of allowed amount either in cash or by reinstatement.

5.            Unsecured Employee Claims (post-retirement health and special pension): 100% of allowed amount by reinstatement.

6.            Workers Compensation Claims: 100% by reinstatement.

7.            Allowed General Unsecured Claims: 100% of allowed amount plus

post-petition interest as follows: (i) for holders of pre-petition bank credit facilities, post-petition interest at the rate of 6.09% from the filing date through December 31, 2005 and thereafter at floating prime, in each case compounded quarterly; and (ii) for all other unsecured claims, interest at 4.19%, compounded annually, or if pursuant to an existing contract, interest at the non-default contract rate.

8.          Allowed Environmental Claims: 100% of allowed amount in cash.

9.          Traditional Asbestos Property Damage Claims:  100% of allowed amount in cash for settled claims.  The Plan shall set forth procedures for the allowance of all Asbestos PD Claims that are disputed as of the Effective Date.

10.          ZAI Claims: Unless the Plan Proponents agree otherwise as to the treatment of ZAI Claims, the court shall estimate, for purposes of allowance and distribution, any liability on account of ZAI Claims prior to or in connection with the confirmation of the Plan.  ZAI Claims shall be paid 100% of their allowed amount up to the amount of the court's estimate.

II.                                    Channeling Injunctions.  The Plan shall contain injunctions under Sections 524(g) and Section 105(a) of the Bankruptcy Code to protect the Debtors, Cryovac, Sealed Air, Fresenius, their affiliates, officers, directors and employees, and other parties in interest and certain insurers.  The Plan shall also contain such provisions, injunctions and releases

3

--------------------------------------------------------------------------------

(i) as are necessary to comply with the terms of the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement; and (ii) to the full extent permitted by law, to indemnify, and release all of Grace's officers, directors, employees and professionals, and the members of all official committees, the FCR and their professionals, from any liability on account of claims against Grace, or arising in or in connection with these Chapter 11 cases.  The foregoing injunctions, indemnifications and releases shall be at least as extensive as, and consistent with, the injunctions, indemnifications and releases provided for under Grace's Amended Plan currently filed in the Chapter 11 Cases to the extent such latter injunctions, indemnifications and releases are not inconsistent with this Term Sheet.

III.          Resolution of Outstanding Issues.   The parties agree to cooperate in seeking a resolution of outstanding issues material to or not otherwise resolved in connection with the confirmation of a plan of reorganization.

IV.          Binding Effect.  This Term Sheet has been approved by all necessary corporate or organizational action of the Board of Directors of

Parent and Grace, the ACC, the FCR and the Equity Committee, and shall be binding upon the parties and each of their respective successors and assigns to the fullest extent permitted by applicable law. The parties shall use their best efforts to incorporate the terms of this Term Sheet into a mutually agreeable plan of reorganization to be filed with the Bankruptcy Court as soon as possible.


V.                  Confidentiality.



The parties shall treat all negotiations regarding this Term Sheet as confidential. Neither the contents nor the existence of this Term Sheet shall be disclosed by any party, either orally or in writing, except to its directors, officers, employees, legal counsel, financial advisors, accountants and clients on a confidential basis until the Debtors have issued a press release announcing the terms and conditions contained herein. Notwithstanding the foregoing, the parties agree that this Term Sheet or the terms of this Term Sheet may be disclosed to the Official Committee of Unsecured Creditors and the Official Committee of Asbestos Property Damage Claimants. Grace will provide counsel to the ACC and counsel to the FCR an opportunity to review and comment on any press release relating to this Term Sheet prior to its issuance.

4

---------------------------------------------------------------------------


AGREED TO AND ACCEPTED BY:
Dated: April 6, 2008
THE DEBTORS:
W. R. GRACE & CO., on behalf of itself and its subsidiaries and affiliates that are Debtors in the Chapter 11 cases
By:                           /s/ Fred Festa
Name:                         Fred Festa
Title:                        Chairman, President and Chief Executive
                              Officer
THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS
By:                           /s/ R. Ted Weschler
Name:                         R. Ted Weschler
Title:                        Chair of the Committee
THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS:
CAPLIN & DRYSDALE, CHARTERED, on behalf of and in its capacity as counsel to the ACC
By:                           /s/ Elihu Inselbuch
Name:                                                 Elihu Inselbuch
THE FUTURE CLAIMANTS REPRESENTATIVE:
ORRICK, HERRINGTON & SUTCLIFFE LLP, on behalf of and in its capacity as counsel to the FCR
By:                           /s/ Roger Frankel
Name:                                                 Roger Frankel


5

---------------------------------------------------------------------------

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., *et. al.*, | ) | Case No. 01-01139 (JJF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

## DEBTORS' PRELIMINARY LIST OF WITNESSES THAT
## THEY INTEND TO CALL DURING THE CONFIRMATION HEARING

Pursuant to the Court's Second Amended Case Management Order Related to the First

Amended Joint Plan of Reorganization, dated January 29, 2009 (Docket No. 20622), the

Debtors' hereby identify, prior to the close of discovery, the following individuals likely to be

called by the Debtors' during the Confirmation Hearings established pursuant to such Order.

The Debtors also indicate in which Phase of the Confirmation Hearing, as set forth in the Order,

they anticipate calling each witness and the broad general issues for which each witness is

presently expected to testify.

As discovery has not yet been completed, the Debtors reserve their rights to

supplement/alter this list as necessary and to designate additional/alternative individuals to

testify in their case-in-chief at the Confirmation Hearings. Moreover, the identification of any

individual on this list does not necessarily mean that the Debtors intend to depose or offer

testimony from a particular witness. However, this list is intended to be a good faith effort to

identify those persons who the Debtors will likely call as a witness at trial, either live or by

deposition.


DEPOSITION
EXHIBIT
#13
3/30/09 ASD

| Witness | Phase | Issues |
|---|---|---|
| Richard Finke | I and II | Company Information |
| Jeff Posner | I and II | Insurance Issues |
| Pam Zilly | I and II | Financial Issues |
| David Austern | II | PI Trust Issues |
| Honorable Alexander M. Sanders, Jr. | II | PD Trust Issues |
| Denise Martin | II | PD/ZAI Issues |
| Hudson LaForce | II | Financial Issues |
| Derrick Tay | II | Canadian Issues |
| Fred Dunbar | II | PI Issues |
| Dr. Thomas Florence | II | PI Issues |
| Dr. Steven Haber | II | PI Issues |
| Dr. Daniel Henry | II | PI Issues |
| Jay Hughes | II | PI Issues |
| Dr. Suresh Moolgavkar | II | PI Issues |
| Dr. Howard Ory | II | PI Issues |
| Dr. John Parker | II | PI Issues |
| Dr. David Weill | II | PI Issues |

This list may include some, but not necessarily all, fact or expert witnesses called solely for rebuttal or impeachment purposes. The Debtors may identify and produce expert witness reports from one or more experts who would be called solely for purposes of rebuttal. The Debtors also reserve the right to call as a witness any person identified on any other party's Preliminary Witness List or any subsequently filed witness list.

Dated:  March 13, 2009                     Respectfully submitted,

                              KIRKLAND & ELLIS LLP
                              David M. Bernick, P.C.
                              Lisa G. Esayian
                              Andrew Running
                              200 East Randolph Drive
                              Chicago, Illinois 60601
                              Telephone:  (312) 861-2000
                              Facsimile:  (312) 861-2200

Theodore L. Freedman
Deanna Boll
Citigroup Center
153 East 53rd Street
New York, New York  10022-4611
Telephone:  (212) 446 - 4800
Facsimile:  (212) 446 – 4900

<u>and</u>

PACHULSKI STANG ZIEHL & JONES LLP

<u>/s/James E. O'Neill</u>
Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Kathleen P. Makowski (Bar No. 3648)
Timothy Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400

Co-Counsel for the Debtors and Debtors in Possession