# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
_____X
In Re:                          Chapter 11


                                Case No.

                                01-01139 JKF

W.R. Grace & Co., et al.,

                                (Jointly
            Debtors.            Administered)
_____X


          * * * CONFIDENTIAL * * *


               —    —    —

               May 13, 2009

               —    —    —

      DEPOSITION of RICHARD FINKE, held

at the offices of Kirkland & Ellis, 655

Fifteenth Street, N.W., Washington, DC,

commencing at 9:32 A.M., on the above

date, before Lisa Lynch, a Registered

Merit Reporter, New Jersey Certified Court

Reporter, License No. XI00825, and

Certified Realtime Reporter


          —    —    —

      MAGNA LEGAL SERVICES, LLP

      7 Penn Center, 8th Floor
         1635 Market Street
         Philadelphia, PA  19103

| Page 2 | Page 4 |
|---|---|

**Page 2**

1 A P P E A R A N C E S:
2
3 DRINKER BIDDLE & REATH, LLP
   BY: MICHAEL F. BROWN, ESQUIRE
   One Logan Square
4  18th and Cherry Streets
   Philadelphia, Pennsylvania 19103-6996
5  (brownmf@dbr.com)
   Representing OneBeacon America Insurance
6  Company, Seaton Insurance Company,
   Government Employees Insurance Company,
7  Columbia Insurance Company f/k/a Republic
   Insurance Company
8
9  CAPLIN & DRYSDALE, CHARTERED
   BY: JEFFREY A. LIESEMER, ESQUIRE
10 One Thomas Circle NW
   Suite 1100
11 Washington, DD 20005
   202.862.7801
12 (jal@capdale.com)
   Representing Grace, Official Committee of
13 Asbestos Personal Injury Claimants ("ACC")
14
   KIRKLAND & ELLIS, LP
15 BY: BARBARA M. HARDING, ESQUIRE
        THEODORE L. FREEDMAN, ESQUIRE
16 655 Fifteenth Street, N.W.
   Washington, DC  20005-5793
17 202.879.5081
   (barbara.harding@kirkland.com)
18 (tfreedman@kirkland.com)
   Representing the Debtors
19
20 THE LAW OFFICES OF JANET S. BAER, P.C.
   BY: JANET S. BAER, ESQUIRE
21 70 West Madison Street
   Suite 2100
22 Chicago, Illinois 60602
   jbaer@jsbpc.com
23 Representing W.R. Grace
24

**Page 4**

1 A P P E A R A N C E S:(continued)
2 MENDES & MOUNT, LLP
   BY: ALEXANDER MUELLER, ESQUIRE
3 750 Seventh Avenue
   New York, New York 10019
4 212.261.8296
   (alexander.mueller@mendes.com)
5 Representing London Market Companies
6
   FORD MARRIN ESPOSITO & WITNEYER & GLESER
7 BY: ELIZABETH M. DeCRISTOFARO, ESQUIRE*
   (*VIA TELECONFERENCE)
8 Wall Street Plaza
   New York, New York 10005-1875
9 212.269.4900
   Representing Continental Casualty Company
10 and Continental Insurance Company
11
   BILZIN SUMBERG BAENA PRICE & AXELROD, LLP
12 BY: MATTHEW I. KRAMER, ESQUIRE*
   (*VIA TELECONFERENCE)
13 200 South Biscayne Boulevard
   Suite 2500
14 Miami, Florida 33131-5340
   305.450.7246
15 (mkramer@bilzin.com)
   Representing Property Damage Committee
16
17 STROOCK & STROOCK & LAVAN, LLP
   BY: ARLENE G. KRIEGER, ESQUIRE*
18      LEWIS KRUGER, ESQUIRE*
   (*VIA TELECONFERENCE)
19 180 Maiden Lane
   New York, New York 10038-4982
20 212.806.5400
   (akrieger@stroock.com)
21 Representing Official Committee of
   Unsecured Creditors
22
23
24

| Page 3 | Page 5 |
|---|---|

**Page 3**

1 A P P E A R A N C E S: (continued)
2 SIMPSON THACHER & BARTLETT, LLP
   BY: ELISA ALCABES, ESQUIRE
3 425 Lexington Avenue
   New York, New York 10017-3954
4 212.455.2846
   (ealcabes@stblaw.com)
5 Representing Travelers Casualty and Surety
   Company
6
7 VORYS, SATER, SEYMOUR AND PEASE, LLP
   BY: WILLIAM J. POHLMAN, ESQUIRE*
8      PHILIP DOWNEY, ESQUIRE*
   (*VIA TELECONFERENCE)
9 52 East Gay Street
   Columbus, Ohio 43215
10 614.464.8349
   (wjpohlman@vorys.com)
11 Representing The Scotts Company, LLC
12
   LEWIS, SLOVAK & KOVACICH, PC
13 BY: TOM L. LEWIS, ESQUIRE
   P.O. Box 2325
14 723 Third Avenue
   Great Falls, Montana 59403
15 406.761.5595
   tom@lsklaw.net
16 Representing the Libby Claimants
17
   SPEIGHTS & RUNYAN
18 BY: DANIEL H. SPEIGHTS, ESQUIRE*
   (*VIA TELECONFERENCE)
19 200 Jackson Avenue East
   P.O. Box 685
20 Hampton, South Carolina 29924
   803.943.4444
21 (dspeights@speightsrunyan.com)
   Representing Anderson Memorial Hospital
22
23
24

**Page 5**

1 A P P E A R A N C E S: (continued)
2
   CROWELL & MORING, LLP
3 BY: MARK D. PLEVIN, ESQUIRE
        NOAH S. BLOOMBERG, ESQUIRE
4 1001 Pennsylvania Avenue, N.W.
   Washington, DC 20004-2595
5 202.624.2913
   (mplevin@crowell.com)
6 (nbloomberg@crowell.com)
   Representing Fireman's Fund Insurance
7 (Surety Bond)
8
   STEVENS & LEE, P.C.
9 BY: MARNIE E. SIMON, ESQUIRE
   1818 Market Street, 29th Floor
10 Philadelphia, Pennsylvania 19103-1702
   215.751.2885
11 (mes@stevenslee.com)
   Representing Fireman's Fund Insurance
12
   LAW OFFICES OF ALAN B. RICH
13 BY: ALAN B. RICH, ESQUIRE
   Elm Place, Suite 4620
14 1401 Elm Street
   Dallas, Texas 75202
15 214.744.5100
   (arich@alanrichlaw.com)
16 Representing Property Damage PCR
17
   CONNOLLY BOVE LODGE & HUTZ, LLP
18 BY: JEFFREY C. WISLER, ESQUIRE
   The Nemours Building
19 1007 North Orange Street
   P.O. Box 2207
20 Wilmington, Delaware 19899
   302.888.6528
21 (jwisler@cblh.com)
   Representing Maryland Casualty
22
23
24

Page 6

```
 1   A P P E A R A N C E S: (continued)
 2   ECKERT SEAMANS CHERIN & MELLOTT, LLC
       BY:  EDWARD J. LONGOSZ, II, ESQUIRE
 3   1747 Pennsylvania Avenue, N.W.
       12th Floor
 4   Washington, DC 20006
       202.659.6619
 5   (elongosz@eckertseamans.com)
       Representing Maryland Casualty and Zurich
 6
 7   WILEY REIN, LLP
       BY:  RICHARD A. IFFT, ESQUIRE
 8   1776 K Street NW
       Washington, DC 20006
 9   202.719.7170
       (rifft@wileyrein.com)
10   Representing Maryland Casualty and Zurich
11
12   COZEN O'CONNOR
       BY:  JACOB C. COHN, ESQUIRE
13   1900 Market Street
       Philadelphia, Pennsylvania 19103-3508
       215.665.2147
14   (jcohn@cozen.com)
       Representing Federal Insurance Company
15
16   ORRICK HERRINGTON & SUTCLIFFE, LLP
       BY:  PERI N. MAHALEY, ESQUIRE
17   Columbia Center
       1152 15th Street, N.W.
18   Washington, DC 20005-1706
       202.339.8516
19   (pmahaley@orrick.com)
       Representing PI Future Claimants'
20   Representative
21
22   CUYLER BURK, P.C.
       BY:  ANDREW CRAIG, ESQUIRE
       4 Century Drive
23   Parsippany, New Jersey 07054
       973.734.3200
24   (acraig@cuyler.com)
```

Page 7

```
 1   A P P E A R A N C E S: (continued)
 2   O'MELVENY & MEYERS LLP
       BY:  TANCRED SCHIAVONI, ESQUIRE*
 3   (*VIA TELEPHONE)
       7 Times Square
 4   New York, New York 10036
       212.326.2267
 5   (tschiavoni@omm.com)
       Representing Arrowood Indemnity Company
 6
 7   WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
       BY:  KEVIN J. MANGAN, ESQUIRE*
 8   (*VIA TELECONFERENCE)
       222 Delaware Avenue
 9   Suite 1501
       Wilmington, Delaware 19801
10   302.252.4361
       (kmangan@wcsr.com)
11   Representing State of Montana
12
13   PEPPER HAMILTON, LLP
       BY:  LINDA J. CASEY, ESQUIRE*
       (*VIA TELECONFERENCE)
14   3000 Two Logan Square
       Philadelphia, Pennsylvania 19103
15   215.981.4000
       (caseyl@pepperlaw.com)
16   Representing BNSF Railway Company
17   KRAMER LEVIN NAFTALIS & FRANKEL, LLP
       BY:  SARAH SCHINDLER-WILIAMMS, ESQUIRE*
18   (*VIA TELECONFERENCE)
       1177 Avenue of the Americas
19   New York, New York 10036
       212.715.9515
20   (SSchindlerWilliams@kramerlevin.com)
       Representing the Equity Committee
21
22
23
24
```

Page 8

```
 1              INDEX
             EXAMINATION
 2
     Witness Name              Page
 3   RICHARD FINKE
 4     BY MR. BROWN           12,333
 5     BY MS. ALCABES          129
 6     BY MR. LEWIS            187
 7     BY MR. PLEVIN           265
 8     BY MR. WISLER           285
 9     BY MR. COHN             289
10     BY MR. MANGAN           296
11     BY MR. DOWNEY          305, 371
12     BY MR. SCHIAVONI        343
13     BY MR. SPEIGHTS         347
14
15            EXHIBITS
     EXHIBIT   DESCRIPTION        ID
16
17   Exhibit 1  Notice of Deposition of   16
           Debtors Pursuant to Rule
           30(b)(6)
18
     Exhibit 2  Document entitled W.R.     16
19         Grace/Confirmation Hearing
           30(b)(6) Deposition Notice
20
21   Exhibit 3  SEC Form 8-K         25
22   Exhibit 4  Exhibit 6 to Exhibit Book, 41
           Asbestos Insurance
23         Transfer Agreement
24   Exhibit 5  Exhibit 19 to Exhibit    53
           Book, Retained Causes of
```

Page 9

```
 1           EXHIBITS
     EXHIBIT   DESCRIPTION        ID
 2
 3   Exhibit 6  Exhibit 2 to Exhibit Book,  55
           Asbestos PI Trust Agreement
 4
     Exhibit 7  Exhibit 4 to Exhibit Book, 55
 5         Trust Distribution
           Procedures
 6
 7   Exhibit 8  First Amended Joint Plan  70
           of Reorganization
 8   Exhibit 9  Exhibit 5 to Exhibit Book, 92
           Schedule of Settled
 9         Asbestos Insurers Entitled
           to 524(g) Protection
10
11   Exhibit   Settlement Agreement     98
10         Bates stamped OB 1 through
           33
12
     Exhibit   Travelers/Allstate      135
13  11     30(b)(6) deposition notice
14   Exhibit   Travelers 30(b)(6)      136
12         supplemental deposition
15         notice
16   Exhibit   Grace/Aetna Asbestos     149
13         Settlement Agreement dated
17         May 22, 1996
18   Exhibit   Exhibit 25 to Exhibit    178
14         Book, CMO for Class 7A
19         Asbestos PD Claims
20
21
22
23
24
```

Page 10

DEPOSITION SUPPORT INDEX

Direction to Witness Not To Answer
Page  Line    Page  Line
 30    2       37    12
 37    17      39    8
 39    15      369   1

Request For Production of Documents
Page  Line    Page  Line
(None)

Stipulations
Page  Line    Page  Line
(None)

Questions Marked
Page  Line    Page  Line
(None)

– – –

Page 11

1   R I C H A R D   F I N K E,
2       having been sworn by the Notary
3       Public of the States of New York
4       and New Jersey, was examined and
5       testified as follows:
6                    – – –
7   EXAMINATION BY
8   MR. BROWN:
9       Q.   Good morning, Mr. Finke.
10  My name is Michael Brown.  I represent One
11  Beacon, Seaton, Geico and Republic for the
12  objecting insurance companies in the Grace
13  bankruptcy.  You've been deposed several
14  times before, correct?
15      A.   Yes, I have.
16      Q.   Okay.  So we can dispense
17  with the formalities of what a
18  deposition's all about?
19      A.   Yes, we can.
20      Q.   Okay.
21          MS. HARDING:  Michael,
22  would you mind if I made a quick
23  statement on the record?
24          MR. BROWN:  Sure.

Page 12

1       MS. HARDING:  I just wanted
2   to make a statement on the record
3   that the debtors have designated
4   Mr. Finke to answer certain
5   appropriate questions related to
6   certain 30(b)(6) topics.
7           As we've indicated, Mr.
8   Finke will be available for seven
9   hours today.  We've also designated
10  Mr. Hughes and Mr. LaForce to
11  answer other 30(b)(6) topic
12  questions.  We are hoping and
13  expecting that the parties seeking
14  to ask questions have coordinated
15  so that we can end in seven hours
16  and we think it's a reasonable
17  expectation.
18          The debtors have reviewed
19  the deposition of Mr. Lockwood and
20  agree, in essence, with Mr.
21  Lockwood's answers with respect to
22  how the Plan operates and so we
23  think and are very hopeful that
24  there will not be a need to go

Page 13

1   further than seven hours to get to
2   the appropriate inquiry as to how
3   the Plan operates.  So I just
4   wanted to get that on the record.
5           MR. BROWN:  Okay.
6   Actually, that's helpful.  Maybe I
7   could follow up with a question for
8   Mr. Finke.
9       Q.   Mr. Finke, have you
10  reviewed Mr. Lockwood's Rule 30(b)(6)
11  deposition transcript?
12      A.   Yes, I have.
13      Q.   Okay.  Is there anything
14  that you read in that transcript that you
15  disagreed with?
16      A.   No, nothing of substance.
17      Q.   Okay.  How about anything
18  not of substance?
19      A.   There are a few occasions,
20  I think, where I either would have worded
21  something differently or where I think Mr.
22  Lockwood may have been either in error --
23  might have been in error depending on
24  whether he was -- depending on the

Page 14

1   context.  Let me give you one example of
2   that.
3        Q.   Sure.
4        A.   He, I think, made a
5   statement at one point where he equated
6   asbestos in place coverage or insurance
7   coverage with the asbestos insurance
8   reimbursement agreements.  I believe he
9   said he thought they were the same thing,
10  and perhaps in substance or in concept
11  they are.  I'm not an insurance lawyer,
12  but I know that under the Plan
13  definitionally the definition of asbestos
14  (sic) in place insurance coverage
15  specifically excludes asbestos
16  reimbursement agreements from the
17  definition.
18       Q.   Okay.
19       A.   Which would suggest they
20  are not the same.
21       Q.   All right.  I'm going to
22  suggest that Miss Alcabes, or one of the
23  people whose issue that is, may want to
24  follow up with you on that point.

Page 15

1        A.   Sure.
2        Q.   But let's pass on that.
3        Other than what you've just
4   described, is there anything else in Mr.
5   Lockwood's deposition transcript that the
6   debtors disagreed with?
7        A.   Nothing that comes to
8   mind.
9             MR. BROWN:  Okay.  Let me
10       have the first exhibit marked, and
11       can we go off the record for a
12       second.
13            (Off the record.)
14            (Notice of Deposition of
15       Debtors Pursuant to Rule
16       30(b)(6) marked for identification
17       as Exhibit Finke-1.)
18            (Document entitled W.R.
19       Grace/Confirmation Hearing 30(b)(6)
20       Deposition Notice marked for
21       identification as Exhibit
22       Finke-2.)
23  BY MR. BROWN:
24       Q.   Mr. Finke, I'm going to put

Page 16

1   before you two exhibits marked -- we're
2   using the term Finke 30(b)(6) 1 and Finke
3   30(b)(6) 2.  For shorthand during the
4   deposition I'll just refer to them as
5   Finke-1 and Finke-2.  Could you identify
6   Finke-1 for me, please?
7        A.   It is a Notice of
8   Deposition of Debtors Pursuant to Rule
9   30(b)(6) served by One Beacon, Seaton,
10  Geico and Columbia.
11       Q.   Going forward, it would be
12  more accurate to refer to Columbia as
13  Republic.  I know it says Columbia there.
14  The date on here is April 28th, 2009 and
15  the site is Drinker Biddle & Reath's
16  offices but we obviously changed those by
17  agreement after this was scheduled.
18       Is it your understanding that
19  you're appearing here today in response to
20  this Rule 30(b)(6) notice?
21       A.   Yes.
22       Q.   And there were several
23  others served on you as well?
24       A.   Correct.

Page 17

1        Q.   Correct, all right.
2        If you look at what's been marked
3   as Finke-2, can you identify that for
4   me?
5        A.   It is a chart 18 pages long
6   entitled W.R. Grace/Confirmation Hearing
7   30(b)(6) Deposition Notice Witness
8   Designations.
9        Q.   Okay.  And is it your
10  understanding that this document was
11  prepared by your counsel?
12       A.   Yes, that's my
13  understanding.
14       Q.   And have you seen it before
15  today?
16       A.   Yes.
17       Q.   Okay.  And am I correct
18  that it basically lists all the various
19  topics from all the 30(b)(6) notices that
20  were served on Grace and then designates
21  one of, I believe, three individuals to
22  testify about the various topics?
23       A.   I would agree that it
24  includes all 30(b)(6) notices that have

Page 18

1    been served as of the time that the chart
2    was created.
3         MS. HARDING:  And I just
4    want to just object to the extent
5    that Exhibit 2 does not include the
6    cover letter that accompanied
7    Attachment A which also set out our
8    objections with respect to the
9    30(b)(6) notices.
10        I have no objection to him
11   answering questions about it; I
12   just wanted to make clear on the
13   record that there was a cover
14   letter that accompanied that.
15        MR. COHN:  Which I actually
16   have but I didn't --
17        MR. BROWN:  Can we just go
18   off the record a second?
19        (Off the record.)
20   BY MR. BROWN:
21   Q.   Mr. Finke, when we were
22   just off the record, we were discussing
23   another document, a copy of which I do not
24   have and apparently no one else does,

Page 19

1    which was described as being objections to
2    the various 30(b)(6) notices that were
3    served on the debtors.  Are you familiar
4    with the document that I'm describing?
5    A.   No, I don't think I am.
6    Q.   Okay.  In any event, you're
7    appearing here today pursuant to the Rule
8    30(b)(6) notices for the topics for which
9    you've been designated on Finke-2 and
10   subject to whatever objections were
11   asserted by the debtors, correct?
12   A.   Correct.
13        MR. BROWN:  Okay.  We don't
14   have a document, but my
15   recollection of the objections was
16   that there was an objection to this
17   witness testifying about any Plan
18   negotiations or draft Plan
19   documents.  Is that right, Barbara?
20        MS. HARDING:  That's
21   correct.
22        MR. BROWN:  Okay.  At Mr.
23   Lockwood's deposition we reached an
24   agreement that we wouldn't go down

Page 20

1    the road of having all the people
2    in this room ask questions about
3    negotiations and draft documents
4    only to draw objections and
5    instructions not to answer.
6         Can we have that same
7    arrangement for this deposition
8    with the understanding that if
9    there subsequently is a ruling by a
10   court that entitles us to discovery
11   on those subjects that the witness
12   would be recalled for that purpose?
13        MS. HARDING:  Subject to
14   Judge Fitzgerald ordering the
15   debtors to submit and answer
16   questions to those, then we can
17   have that agreement, yes.
18        MR. COHN:  Just for my
19   clarity, in all of these
20   depositions we're talking about the
21   relevance objection instruction
22   that was asserted at Lockwood's
23   deposition that I clarified on the
24   record?

Page 21

1         MR. BROWN:  That is
2    correct, and I believe the document
3    that we don't have, the objections
4    to the 30(b)(6)'s, if I recall
5    correctly, had a paragraph setting
6    forth that objection and a number
7    of different decisions by Judge
8    Fitzgerald in other cases.
9         MS. HARDING:  That's
10   correct, and it relates -- our
11   objection relates to the -- to the
12   relevance to the extent that the
13   questions seek information relating
14   to settlement negotiations,
15   drafting --
16        MR. COHN:  The
17   clarification that I thought that I
18   made earlier that I'll make clear
19   is still the clarification that
20   this is a relevance objection, or
21   are you asserting a privilege?
22        MS. HARDING:  Well, I
23   disagree with that
24   characterization.  The objection is

Page 22

1  set out in our official objection
2  to the 30(b)(6) notices which is
3  filed on record.  It includes
4  attorney-client privilege, it
5  includes work product, it includes
6  joint interest privilege.  I don't
7  have it in front of me so I can't
8  recite them, but it includes much
9  more than relevance so --
10      MR. COHN:  Just to be
11  clear, because --
12      MS. HARDING:  With respect
13  to negotiations, you can -- there
14  will be other objections other than
15  just relevance, so --
16      MR. COHN:  Well, but my
17  understanding was there was a
18  blanket instruction not to answer
19  without any attempt to parse
20  through potential privilege
21  objections on the basis of a
22  blanket relevance objection.  Am I
23  missing something?
24      MS. HARDING:  I don't

Page 23

1  disagree with that, but I think
2  that in light of the blanket
3  relevance objection with respect to
4  negotiations that there was that
5  agreement reached.  That doesn't
6  mean that with respect to
7  everything that might fall under
8  negotiations that there wouldn't be
9  other objections as well.
10      MR. COHN:  I'm not
11  suggesting that --
12      MS. HARDING:  Okay.
13      MR. COHN:  -- if there's a
14  valid privilege objection here that
15  you've somehow waived your right to
16  assert that by asserting a blanket
17  objection, but my understanding is
18  we didn't start down that path
19  because there was a relevance
20  objection.
21      I'm sorry, Michael.
22      MR. BROWN:  That's all
23  right.  Suffice it to say that if
24  we ask questions concerning the

Page 24

1  negotiations of the Plan or the
2  draft Plan documents that that will
3  draw an instruction not to
4  answer.
5      MS. HARDING:  That's
6  correct.
7      MR. BROWN:  Okay, thank
8  you.
9      (SEC Form 8-K marked for
10  identification as Exhibit
11  Finke-3.)
12  BY MR. BROWN:
13      Q.   Mr. Finke, you have before
14  you now another document that has been
15  marked for this deposition as Finke-3.
16  You'll note that there is a prior
17  deposition exhibit number on there, Number
18  12, and that was from your deposition as a
19  fact witness.  Do you see that?
20      A.   Yes, I do.
21      Q.   We obviously had some
22  questioning about this at your prior
23  deposition but that was not in your
24  capacity as a designee for Grace and I

Page 25

1  have some additional questions.  So the
2  first one is:  Can you identify the
3  document?
4      A.   Yes.  This is a Form 8-K
5  report that was filed by W.R. Grace with
6  the Securities and Exchange Commission on
7  April 6, 2008.
8      Q.   And the document has a
9  couple of attachments, correct?
10      A.   Yes.
11      Q.   What are they?
12      A.   Let's see.  The first
13  attachment is, in essence, a press release
14  in which Grace announced the -- its
15  settlement of asbestos personal injury
16  claims in the context of the Chapter 11
17  cases and the second attachment is a term
18  sheet for resolution of asbestos personal
19  injury claims.
20      Q.   And was the press release
21  actually issued?
22      A.   I do not know.
23      Q.   Okay.  If it was issued,
24  was it issued on or about the time that

Page 26

1   this document was filed, to your
2   knowledge?
3       A.   Yes.
4       Q.   Let's focus on the term
5   sheet.  Who are the parties to the term
6   sheet?
7       A.   The debtors, the Official
8   Equity Security Committee, the Official
9   Committee of Personal Injury Claimants and
10  the Future Claimants' Representative.
11      Q.   And what is the date of the
12  term sheet?
13      A.   April 6, 2008.
14      Q.   I want you to focus now on
15  the period -- for purposes of my next
16  series of questions -- the period prior to
17  April 6, 2008.  And am I correct that
18  prior to April 6, 2008 that Grace did not
19  consult with any of its insurers
20  concerning the terms that appear in this
21  term sheet?
22          MS. HARDING:  I'm going to
23      object to the extent that it seems
24      to me that this is going right into

Page 27

1       the issue of negotiations and
2       settlement negotiations with
3       respect to the Plan.  I thought we
4       weren't going to go there.
5           MR. COHN:  I think there
6       was no -- if there was no contact,
7       how are we going into that?
8           MR. BROWN:  Yeah, we ought
9       to see what his answer is.  I'm not
10      asking him about negotiations with
11      the parties that signed the term
12      sheet.  I'm asking about whether
13      Grace consulted with any of its
14      insurers concerning the terms of
15      the term sheet prior to executing
16      it.
17          MS. HARDING:  First of all,
18      I'm going to object.  I think that
19      the -- this is not a topic of the
20      30(b)(6) notice and we're prepared
21      to answer questions about how the
22      Plan operates.  I think that that's
23      what Judge Fitzgerald would
24      instruct the debtors to do and

Page 28

1       we're here to do that.
2           We're not here to talk
3       about and have the witness testify
4       about how it was negotiated, how it
5       came about, the prior drafts, who
6       was consulted, who wasn't
7       consulted, and all that.  I don't
8       think that's the proper scope of
9       this deposition.
10          MR. BROWN:  I'm not asking
11      who was consulted.  I'm asking him
12      whether the insurers -- I'm asking
13      him to affirm that the insurers
14      were not consulted.
15          MS. HARDING:  Right.  But
16      the problem with that is if we
17      answer that question, then we have
18      opened the door to answering that
19      question with respect to any party
20      and I think that that's not the
21      proper subject of this
22      deposition.
23          MR. BROWN:  I can assure
24      you the only one I'm going to ask

Page 29

1       about is the insurers.
2           MS. HARDING:  Well, I
3       understand that you are, but I
4       don't want to spend any of the time
5       of the seven hours talking about
6       any of the negotiations or what led
7       up to the drafting of the document.
8       We didn't agree to that.  It wasn't
9       asked for in the 30(b)(6) topics
10      with respect to how the term sheet
11      came about and so I think that
12      we've got an agreement.
13          If you all want to seek an
14      order compelling us to answer those
15      kinds of questions, then I think
16      you should do that.  Otherwise,
17      we're here to talk about how the
18      Plan operates.  So --
19          MR. BROWN:  I thought you
20      just --
21          MS. HARDING:  That's what
22      he's here to answer questions
23      about.
24          MR. BROWN:  Are you

Page 34

1  question.
2      MS. HARDING:  Well, by
3  asking him -- I think it does.  I
4  think we disagree about that.  I
5  think why don't we move forward.
6  At a break I'm happy to talk about
7  it further but right now I'm
8  instructing him not to answer the
9  questions.
10     MR. BROWN:  Well, I'll ask
11 a series --
12     MR. LEWIS:  Hold on just a
13 second.  My name is Tom Lewis.  I
14 represent the Libby claimants, and
15 I've never seen a deposition like
16 this.  I'm in practice 30 some
17 years.
18     I thought the examiner
19 makes a question and if there's an
20 objection, the objection is stated
21 clearly as to that particular
22 question and we don't sit here and
23 debate for 15 or 20 minutes whether
24 the question should be answered.

Page 35

1      I think we should proceed
2  in a proper question and answer
3  proceeding here or we're never
4  going to get done and we're going
5  to have an impossible record.
6      So I object to the form of
7  the examination and the failure of
8  counsel for this witness to make a
9  proper objection on the record of
10 this deposition and I join in the
11 objection that this gentleman to my
12 right --
13     MR. COHN:  Mr. Cohn.
14     MR. LEWIS:  Thank you.
15     MS. HARDING:  I think I've
16 stated the objection very clearly
17 and I instruct the witness not to
18 answer.
19     MR. LEWIS:  I disagree with
20 that.  I have not heard an
21 objection on the record of this
22 deposition.
23     MS. HARDING:  The objection
24 is relevance.  It's not relevant

Page 36

1  under 408.  The objection
2  relates -- the rules of the
3  bankruptcy law do not require the
4  debtors to answer questions
5  relating to Plan negotiations and
6  settlement with respect to their
7  Plan and attorney-client privilege,
8  work product and joint interest
9  privilege.
10     MR. BROWN:  Okay.
11     MR. COHN:  Wait, I'm sorry.
12 I don't mean to -- I would like to
13 know with whom you assert a common
14 interest exists.
15     MS. HARDING:  You know
16 what?  My objection's on the record
17 and I'm not stating any more.  I've
18 instructed the witness not to
19 answer and I think we should move
20 forward.
21     MR. BROWN:  I think we
22 should, too, and I'm going to say
23 for purposes of stating your
24 objections to this series of

Page 37

1  questions let's just use the
2  shorthand, you know, same as before
3  so that we don't have to repeat
4  it.
5  BY MR. BROWN:
6      Q.   Mr. Finke, I'm correct, am
7  I not, that prior to signing this term
8  sheet that we've been discussing that
9  Grace did not obtain the consent of any of
10 its insurers with respect to any of the
11 terms in the term sheet?
12     MS. HARDING:  Same
13 objection.  Instruct the witness
14 not to answer.
15     Q.   Why did Grace exclude its
16 insurers?
17     MS. HARDING:  Same
18 objection.  Instruct the witness
19 not to answer.
20     Q.   The initial Joint Plan, Mr.
21 Finke, was filed on September 19th, 2008,
22 correct?
23     A.   I believe that's correct.
24     Q.   Okay.  And it included, did

Page 38

1  it not, the initial version of the
2  **Asbestos PI Trust agreement and the**
3  **Asbestos PI TDP?**
4          MS. HARDING:  I'm sorry,
5  Mike, can you repeat the question?
6  I'm sorry.
7          (The reporter reads the
8  pending question.)
9          MS. HARDING:  And "it" was
10  the --
11          MR. BROWN:  The Plan.
12          MS. HARDING:  Thank you,
13  okay.
14      A.   I don't recall which
15  documents were -- or exhibits were filed
16  with the Plan.
17      Q.   Okay.  Do you know whether
18  **a press release was issued by Grace in**
19  **conjunction with the filing of the initial**
20  **Plan in September of 2008?**
21      A.   I don't recall.
22      Q.   **Am I correct that in the**
23  **period between April 6, 2008 and September**
24  **19th, 2008 that the Plan proponents were**

Page 39

1  **engaged in negotiating the terms of the**
2  **plan and drafting Plan documents?**
3      A.   Yes.
4      Q.   **In that time frame,**
5  **did Grace consult with any of its insurers**
6  **concerning the terms of the Joint Plan or**
7  **any of the Plan documents?**
8          MS. HARDING:  Same
9      objection.  Instruct the witness
10      not to answer.
11      Q.   **In that time frame, did**
12  **Grace obtain the consent of any of its**
13  **insurers with respect to any of the terms**
14  **in the Plan or the Plan documents?**
15          MS. HARDING:  Same
16      objection.  Instruct the witness
17      not to answer.
18          MR. BROWN:  Okay.  Let's
19  mark another exhibit.  The next
20  document we're going to mark is
21  Exhibit 6 to the Exhibit Book which
22  is the asbestos insurance transfer
23  agreement, and by convention I
24  brought one copy to be marked and

Page 40

1  one for counsel.
2          MS. HARDING:  Thank you.
3          (Exhibit 6 to Exhibit Book,
4      Asbestos Insurance Transfer
5      Agreement, marked for
6      identification as Exhibit
7      Finke-4.)
8  BY MR. BROWN:
9      Q.   **Mr. Finke, you have before**
10  **you the document marked as Finke-4.  Can**
11  **you identify the document for me,**
12  **please?**
13      A.   This is the proposed
14  asbestos transfer agreement also referred
15  to as Exhibit 6 to the Exhibit Book.
16      Q.   **And what is your**
17  **understanding as to what this document**
18  **accomplishes?**
19      A.   It is --
20          MS. HARDING:  Object to
21      form but --
22      A.   It is intended once it is
23  signed to transfer the asbestos insurance
24  rights to the Asbestos PI Trust.

Page 41

1      Q.   **Okay.  It has a -- it has a**
2  **few schedules.  Look at Schedule 1, if you**
3  **will, and can you just identify what**
4  **Schedule 1 is?**
5      A.   Schedule 1 is a, I think,
6  20-page list of primary and excess
7  insurance policies that were or are
8  applicable to asbestos-related claims.
9      Q.   **And who is the insured**
10  **under those policies?**
11      A.   My understanding is that
12  the insured under the policies would be
13  one or more of the debtors in these
14  Chapter 11 cases.  I don't recall if a
15  non-debtor affiliate would have been an
16  insured under any of these.  I'd have to
17  check on that.
18      Q.   **By non-debtor affiliate,**
19  **who were you -- what entities or**
20  **individual are you thinking of?**
21      A.   Any Grace-affiliated entity
22  that is not a debtor.
23      Q.   **Okay.  Who owns the**
24  **policies at this point?**

Page 42

1        A.    The debtors, or the -- I
2   should say the insurance contributors.
3        Q.    And that includes the
4   debtors?
5        A.    Debtors, and I believe the
6   non- -- I believe that the non-debtor
7   affiliates as well.
8        Q.    And I think they are
9   described somewhere.  I think Mr. Lockwood
10   told us they were.
11        A.    Who are you referring to
12   when you say "they"?
13        Q.    The non-debtor affiliates.
14        A.    They are listed on an
15   exhibit.
16        Q.    You're right, there was
17   another exhibit that had that.
18        A.    The number of which I don't
19   recall offhand.
20        MS. ALCABES:  Exhibit 16.
21        MR. BROWN:  Oh, yes,
22   Exhibit 16.
23        Q.    Exhibit 16 to the Exhibit
24   Book?

Page 43

1        A.    Correct.
2        MR. BROWN:  Okay.  I'm not
3   going to bother marking that.
4        Q.    If the Joint Plan is
5   confirmed and if the asbestos insurance
6   transfer agreement is executed as
7   contemplated by the Joint Plan, who are or
8   will be the insureds under the policies on
9   Schedule 1?
10        MS. HARDING:  Object to
11   form.
12        MR. LIESEMER:  Join.
13        MS. HARDING:  And also
14   object to the extent it calls for
15   speculation and a legal conclusion
16   as well.
17        A.    My understanding is that
18   the named insureds would remain the same
19   as they currently are but that the rights
20   and interests in the policies themselves
21   are transferred to the PI Trust.
22        Q.    Who will be the owner of
23   the policies?
24        MS. HARDING:  Same

Page 44

1   objections.
2        MR. LIESEMER:  Object to
3   the form.
4        A.    Again, I'm not an insurance
5   attorney but I believe -- since the
6   policies themselves are not being
7   assigned, I believe the ownership of the
8   policies does not change.
9        Q.    Are you familiar with the
10   basic responsibilities of an insured under
11   a general liability insurance policy?
12        MR. LIESEMER:  Object to
13   the form.
14        MS. HARDING:  Object to the
15   form in terms of basic.
16        MR. BROWN:  Well, let me
17   rephrase it.
18        Q.    Are you familiar with any
19   of the responsibilities of an insured
20   under a standard general liability
21   policy?
22        MS. HARDING:  Object to
23   form as to foundation but...
24        A.    Yes.

Page 45

1        Q.    Why don't you tell me which
2   ones you're familiar with?
3        A.    There's an obligation to
4   provide notice to the insurer of a claim
5   or an event that gives rise to a claim, an
6   obligation to provide relevant
7   documentation in support of a claim under
8   a policy.  Offhand, I can't think of any
9   other specific obligations.
10        Q.    Have you heard of the duty
11   to cooperate under the policy?
12        MS. HARDING:  Object to
13   form.  It assumes facts not in
14   evidence.  With respect to what
15   policy?  There are hundreds of
16   different insurance policies.
17        MR. BROWN:  Yes, there are,
18   and I'm asking him just about
19   general provisions in a general
20   liability policy.
21        Q.    Are you familiar with the
22   concept of the duty to cooperate on the
23   part of an insured under a general
24   liability insurance policy?

Page 46

1        MS. HARDING:  Again object
2   to form.
3        MR. LIESEMER:  Join in that
4   objection.
5        MS. HARDING:  And
6   foundation.
7        A.   Yes.
8        Q.   Okay.  Are you familiar
9   with the right to defend or to associate
10  in the defense of claims under a general
11  liability policy?
12       MS. HARDING:  Same
13  objection.
14       MR. LIESEMER:  Object to
15  the form.
16       A.   No, I'm not.
17       Q.   Let me ask you a
18  different -- to your knowledge, does Grace
19  have any duties to the insurers listed on
20  Schedule 1 of the transfer agreement?
21       MS. HARDING:  Object to the
22  form.
23       MR. LIESEMER:  Object to
24  the form.

Page 47

1        A.   Does Grace currently have
2   any duties?  Is that the question?
3        Q.   Well, let's break it up.
4   Let's say:  Did Grace pre-petition have
5   any duties to the insurers listed on
6   Schedule 1?
7        MS. HARDING:  Same
8   objection.
9        A.   Whatever -- whatever duties
10  and obligations are spelled out in the
11  policy, yes.
12       Q.   Okay.  If the Plan is
13  confirmed, what happens to those duties
14  and obligations?
15       MR. LIESEMER:  Object to
16  the form.
17       MS. HARDING:  Same
18  objection.  And I am going to
19  object, I think, to -- are you --
20  what particular -- are you talking
21  about any particular policy or with
22  respect to all of the policies
23  listed in the exhibit or -- object
24  to the form.

Page 48

1        MR. BROWN:  Okay.
2        MS. HARDING:  I don't see
3   how he could answer that question
4   with respect to all policies.
5        A.   The duties and obligations
6   are still owed to the insurance companies
7   since the Plan is intended to be
8   insurance-neutral.  I don't have an answer
9   as to specific duties in terms of whether
10  the PI Trust has a given duty and
11  obligation or whether that given duty or
12  obligation remains with a Grace entity.  I
13  think it would depend on the nature of the
14  duty or obligation.
15       Q.   Okay.  How about the duty
16  to cooperate in the defense of a claim?
17       MS. HARDING:  Same
18  objection as before.
19       MR. LIESEMER:  Join.
20       Q.   Is that a duty that would
21  remain with the reorganized debtors or is
22  that a duty that would be assumed by the
23  Trust or both or something different?
24       A.   I don't -- I don't know the

Page 49

1   answer to that because I'm not aware of
2   any attempt or effort by either Grace or
3   the ACC or the FCR to try to parse out
4   specific duties, obligations, et cetera
5   under the policies since it is the intent
6   of the joint co-proponents that the Plan
7   and the transfer of insurance rights be
8   insurance-neutral aside from, you know,
9   the fact of the assignment that it has
10  not -- that no one -- none of the
11  co-proponents have felt it necessary to
12  engage in that effort.
13       Q.   Under the Joint Plan, is
14  the Asbestos PI Trust the successor to the
15  debtors with respect to asbestos-related
16  liabilities?
17       MR. LIESEMER:  Object to
18  form.
19       MS. HARDING:  Object to
20  form.
21       MR. BROWN:  Let me rephrase
22  that.
23       Q.   With respect to -- well,
24  back up.

Page 54

1      A.   No, no, I'm not aware of
2  any general claims.  I'm not aware of any
3  claims that I could identify with respect
4  to any given insurer.
5          MR. BROWN:  Let's mark the
6  next exhibit, which will be the
7  Asbestos PI Trust agreement.
8          (Exhibit 2 to Exhibit Book,
9  Asbestos PI Trust Agreement  marked
10 for identification as Exhibit
11 Finke-6.)
12         (Exhibit 4 to Exhibit Book,
13 Trust Distribution Procedures,
14 marked for identification as
15 Exhibit Finke-7.)
16 BY MR. BROWN:
17     Q.   Okay.  Mr. Finke, you have
18 before you Exhibits 6 and 7.  Exhibit 6 --
19 well, why don't you tell me if you can
20 identify both of those documents?
21     A.   Exhibit 6 is the Asbestos
22 PI Trust agreement.  I should say the
23 proposed Asbestos PI Trust agreement that
24 is also known as Exhibit 2 to the Exhibit

Page 55

1  Book.  Finke Exhibit 7 is the Trust
2  Distribution Procedures relevant to the
3  Asbestos PI Trust and also known as
4  Exhibit 4 to the Exhibit Book.
5      Q.   Okay.  What role, if any,
6  do either of those two documents
7  contemplate for Grace's insurers in the
8  handling, resolution, settlement, defense
9  of asbestos claims asserted against or
10 submitted to the Trust?
11         MS. HARDING:  Object to the
12 form.
13         MR. LIESEMER:  Object to
14 the form.
15         MS. HARDING:  Could you
16 read back the question, please?
17         (The reporter reads the
18 pending question.)
19         MS. HARDING:  Okay, and I
20 object to it asbeing overly broad
21 with respect to Grace's insurers
22 without reference to any particular
23 insurer or policy.  And, Michael,
24 do you have -- are you asking him

Page 56

1  to look at a specific provision of
2  the policy or...
3          MR. BROWN:  I'm just asking
4  the question I asked.
5      A.   I don't know the answer to
6  your question.  I'm not that familiar with
7  the two agreements to know whether these
8  two documents set forth the role of the
9  asbestos insurers with respect to the
10 handling, settlement, resolution, payment,
11 et cetera of asbestos PI claims.
12     In general, the Plan includes the
13 asbestos insurance coverage that is
14 transferred to the Trust to be available
15 to either pay asbestos PI claims or
16 reimburse the PI Trust for its payment of
17 claims.  Sitting here today, I just -- I
18 do not recall to what extent, if any,
19 these two documents contain provisions
20 that relate to that role.
21     Q.   Let me broaden the scope of
22 the question to not just these two
23 documents but the Plan or any of the Plan
24 documents.  Would that change your

Page 57

1  answer?
2          MS. HARDING:  Object to
3  form.
4          MR. LIESEMER:  Join.
5      A.   I thought I just answered
6  that question so maybe I don't understand
7  the question.
8      Q.   Well, my initial question
9  to you focused on the two documents, the
10 Trust agreement and the asbestos PI TDP.
11 I'm asking the question more broadly now.
12     If you look at the Plan -- at all
13 the Plan documents, do any of them
14 contemplate any role for Grace's insurers
15 in the handling, defense, resolution, of
16 any asbestos PI claim submitted to the
17 asbestos PI Trust for resolution?
18         MS. HARDING:  Object to
19 form.  I think it's overly broad.
20 And by Plan, do you mean all of the
21 exhibits, including all of the
22 documents and policies listed in
23 exhibits?
24         MR. BROWN:  I'm using the

Page 58

1  term "Plan" and "Plan documents" as
2  defined in the Plan.
3          MR. LIESEMER:  Object to
4  the form of the question.
5      A.   The Plan certainly contains
6  provisions that posit a role for the
7  asbestos insurers to act as a source of
8  funds for payment of asbestos PI claims
9  and reimbursement of asbestos PI claims
10 paid by the Trust.  In terms of the
11 insurers' role in handling or defense, et
12 cetera, of -- in connection with asbestos
13 PI claims, it is my understanding that the
14 insurers' role is whatever it is under the
15 policies and that that role is -- remains
16 the same notwithstanding the transfer of
17 the asbestos insurance rights to the
18 Trust.
19      Q.   Would you look at pages 43
20 and 44 of the Trust agreement, which I
21 think is 6.
22      A.   Yes.
23          MS. HARDING:  43, did you
24 say?  What page?

Page 59

1          MR. BROWN:  Yes.  Bear with
2  me one second here.
3          THE WITNESS:  43 and 44.
4          MR. BROWN:  43 and 44, yes.
5      Q.   Do you see on pages 43 and
6  44 there are some gentlemen listed as
7  members of the TAC?
8      A.   Yes.
9      Q.   Do you know any of those
10 gentlemen?
11     A.   I have met Mr. Cooney, Mr.
12 Rice and Mr. Weitz.  I have not had much
13 contact with them, though.
14     Q.   What do you understand to
15 be their professional background, the
16 three you met?
17     A.   They are attorneys.  They
18 have represented asbestos personal injury
19 plaintiffs in litigation against Grace and
20 other defendants.
21     Q.   Do you have any idea as to
22 how many claims each of these gentlemen's
23 firms has asserted on behalf of claimants
24 against Grace?

Page 60

1          MR. LIESEMER:  Object to
2  the form of the question.
3      A.   No.
4          MS. HARDING:  You're asking
5  him personally?  Is that what you
6  mean, personally?  I mean, W.R. --
7  well, you ask him.
8      Q.   Do you know whether --
9  let's try it a different way.
10 Mr. Cooney.  Mr. Cooney is with the
11 firm of Cooney & Conway, correct?
12     A.   That's my understanding,
13 yes.
14     Q.   How many clients does
15 Cooney & Conway have with asbestos claims
16 against Grace, to your knowledge?
17          MR. LIESEMER:  Object to
18 the form.
19          MS. HARDING:  Objection
20 just because of the relevance, but
21 go on.
22     A.   I don't know.
23     Q.   Would your answer be the
24 same for the other gentlemen?

Page 61

1      A.   Yes.
2      Q.   The TAC members, there's
3  four individuals listed there.  They were
4  selected by the ACC, correct?
5      A.   That is my understanding,
6  yes.
7      Q.   And the ACC is made up of a
8  collection of asbestos personal injury
9  claimants, the actual committee,
10 correct?
11          MS. HARDING:  Object to the
12 form.
13     A.   That is my understanding.
14     Q.   Is it your understanding
15 that those individual asbestos claimants
16 delegate their responsibilities as ACC
17 members to their personal injury
18 counsel?
19     A.   It's my understanding that
20 their counsel often act on the claimants'
21 behalf in connection with the business of
22 the ACC.
23     Q.   Okay.
24     A.   Whether there's any

Page 62

1   delegation, I wouldn't know.
2       Q.   Okay.  Does each of the
3   firms that's listed on pages 43 and 44 --
4   just for the record, Baron & Budd, PC;
5   Cooney & Conway; Motley Rice, LLC and
6   Weitz & Luxenberg -- do each of those
7   firms have a client who's a member of the
8   ACC?
9       A.   I don't recall.
10      Q.   What do you understand to
11  be the role of the asbestos PI T-A-C, or
12  TAC, in connection with the Asbestos PI
13  Trust?
14           MS. HARDING:  Object to the
15  form of the question.
16      A.   To provide advice to the
17  Trust with respect to the matters set
18  forth in the Trust agreement and the
19  TDP.
20      Q.   Do they owe any fiduciary
21  duties to -- in their role as members of
22  the TAC?
23           MS. HARDING:  Objection to
24  form.

Page 63

1            MR. LIESEMER:  Object to
2   form.
3            MS. HARDING:  Calls for a
4   legal conclusion.
5       A.   I don't know.  Offhand, I
6   could look it up in the documents to see
7   if the documents ascribe such a duty to
8   them.
9       Q.   Why don't you look at
10  Section 5.2.
11      A.   Of which?
12      Q.   The Trust agreement.
13           MS. HARDING:  So Exhibit 2
14  of the Plan but Exhibit 6?
15           MR. BROWN:  Correct.
16           THE WITNESS:  Finke Exhibit
17  6.
18      Q.   Does Section 5.2 refresh
19  your recollection as to whether the
20  members of the TAC have any fiduciary
21  duties in connection with their role as
22  TAC members?
23      A.   Yes.
24      Q.   Okay.  And they do,

Page 64

1   correct?
2       A.   Yeah, well, specifically
3   Section 5.2 states that "the members of
4   the TAC shall serve in a fiduciary
5   capacity representing all holders of
6   present PI Trust claims."
7       Q.   Okay.  Do you have any
8   further understanding as to what the
9   nature of the fiduciary duties is that
10  they owe to all holders of present PI
11  Trust claims?
12           MS. HARDING:  Object to
13  form.
14      A.   I'm afraid I do not
15  understand your question.
16      Q.   I'll try to rephrase it
17  then.
18           What are the fiduciary duties that
19  the TAC members owe to holders of PI Trust
20  claims?
21           MR. LIESEMER:  Object to
22  form.
23           MS. HARDING:  Same
24  objection.

Page 65

1            MR. LEWIS:  I object as to
2   foundation.
3       A.   I am not able to identify
4   specific duties.  As a fiduciary they're
5   obligated to act in the best interests of
6   the holders of present PI Trust claims.
7       Q.   And when you say holders,
8   you mean all holders of present --
9       A.   Yes.
10      Q.   -- PI Trust claims?
11      A.   Yes.
12      Q.   And all holders includes
13  holders of PI Trust claims that are not
14  clients of TAC members' respective law
15  firms, correct?
16      A.   It includes them, yes.
17      Q.   Now, in the role of
18  personal injury counsel for their
19  individual clients, they have a separate
20  set of fiduciary duties, correct?
21           MS. HARDING:  Object to
22  form and also calls for a legal
23  conclusion and outside the scope of
24  the designation of this 30(b)(6)

Page 66

1    witness, I believe, but...
2        MR. LIESEMER:  Join in the
3    objections.
4        THE WITNESS:  I'm sorry.
5    Can you read the question again?
6        (The reporter reads the
7    pending question.)
8        A.    They have fiduciary
9    obligations to their clients, yes.
10       Q.    Okay.  And to your
11   knowledge, do those fiduciary duties
12   differ from -- that is, the duties that
13   they owe to their respective clients --
14   differ from the fiduciary duties that each
15   of these TAC members has in their role as
16   a TAC member?
17       MR. LIESEMER:  Objection to
18   form.
19       MS. HARDING:  Same
20   objection as I had to the previous
21   question.
22       A.    In general, they owe the
23   same obligation to fulfill the role of a
24   fiduciary, which is to act in the best

Page 67

1    interests of their clients.  Whether there
2    are specific duties in their role as TAC
3    members that are different from specific
4    duties in their role as counsel
5    representing their clients, I don't
6    know.
7        Q.    Do you have an
8    understanding as to how the TAC members
9    will deal with the situation where the
10   best interests of their individual clients
11   differs from the best interest of all
12   holders of present PI Trust claims?
13       MS. HARDING:  Object to
14   form.
15       MR. LIESEMER:  Objection to
16   form.
17       MS. HARDING:  Calls for
18   speculation.
19       A.    I don't know.
20       Q.    Is there any mechanism in
21   any of the Plan documents, to your
22   knowledge, that addresses that issue?
23       MS. HARDING:  Object to
24   form.

Page 68

1        A.    I am not aware of any.
2        Q.    Okay.  Now, you're familiar
3    with the term "PI Trust claims" as it's
4    used in the Trust agreement, correct?
5        MR. LIESEMER:  Objection to
6    form.
7        A.    Yes, I am.
8        Q.    And if you look at Footnote
9    1 to the Trust agreement, if you would,
10   Footnote 1 says that what is defined as
11   asbestos PI claims in the plan will be
12   referred to as PI Trust claims in the
13   Trust agreement, correct?
14       A.    Yes.
15       Q.    And are you familiar with
16   the scope of the defined term "asbestos PI
17   claims" as it appears in the Plan?
18       A.    Yes.
19       Q.    I'm correct, am I not, that
20   it includes the term "indirect PI Trust
21   claim"?
22       A.    Yes.
23       Q.    So based on that
24   definitional connection, is it fair to say

Page 69

1    that Mr. Weitz, Mr. Cooney, Mr. Budd
2    and -- I missed someone -- Mr. Budd, Mr.
3    Cooney, Mr. Rice and Mr. Weitz are
4    fiduciaries to the holders of indirect PI
5    Trust claims?
6        MS. HARDING:  Object to
7    form.
8        MR. LIESEMER:  Join in the
9    objection.
10       A.    I believe that to be
11   correct.
12       Q.    Are you generally familiar
13   with my client, OneBeacon's, contractual
14   indemnity claims?
15       A.    No.
16       Q.    Okay, we'll get to that
17   later then.
18       MR. BROWN:  Let's mark this
19   next.
20       (First Amended Joint Plan
21   of Reorganization marked for
22   identification as Exhibit
23   Finke-8.)
24       Q.    Mr. Finke, you have before

Page 70

1  you now what has been marked as Exhibit 8
2  to this deposition and what is Exhibit 1
3  to the Exhibit Book.  First question is:
4  Would you identify the document, please?
5      A.   Yes.  I think Exhibit 8 is
6  the First Amended Joint Plan of
7  Reorganization that was filed by Grace and
8  its co-proponents.
9      Q.   Okay.
10     A.    And the date is February --
11 date on the document is February 27,
12 2009.
13     Q.   Okay.  Have you reviewed
14 this document in its entirety?
15     A.   Yes.
16     Q.   How many times?
17         MS. HARDING:  You mean in
18 its entirety how many times?
19         MR. BROWN:  Well, let's
20 start-up with that question.
21     A.    Interpreting review as
22 meaning a detailed word-for-word reading
23 of the entire document, I would say
24 once.

Page 71

1      Q.   Okay.  And how many times
2  have you partially reviewed the
3  document?
4      A.   Many times.
5      Q.   Okay.  Do you understand
6  it?
7      A.   I have an understanding of
8  it.  I would not profess to have a
9  complete understanding of it.
10     Q.   Okay.  Are there particular
11 provisions in the Plan that you're quite
12 certain you don't understand?
13         MS. HARDING:  Object to
14 form and relevance and concern that
15 we're not going to the seven
16 hours -- I mean, if you have a
17 specific question about a specific
18 provision that you don't understand
19 as an insured, then I think you
20 should ask him questions about
21 that.  I think...
22         MR. BROWN:  Is that an
23 instruction not to answer the
24 question?

Page 72

1         MS. HARDING:  No, it's
2  not.
3         MR. BROWN:  Okay.  It's
4  just --
5         MS. HARDING:  It's just an
6  objection that...
7      A.   I'm sure that I do not
8  understand the annex or annexes that I
9  believe relate to tax issues.
10         MS. HARDING:  I guess --
11 are you asking him in his personal
12 capacity?
13         MR. BROWN:  I don't think
14 he's here in his personal capacity.
15 I think he's here in his capacity
16 as a designee for W.R. Grace or for
17 the debtors.
18         MS. HARDING:  Okay.  Are
19 you asking him if there's anybody
20 at W.R. Grace that has an
21 understanding of different
22 provisions of the Plan as lawyers
23 and --
24         MR. BROWN:  I think he's

Page 73

1  here to testify about the operation
2  of the Plan.  I think that was --
3  isn't he?  So my question is
4  what --
5         MS. HARDING:  He's here to
6  answer questions to help you
7  understand the Plan.
8         MR. BROWN:  Barbara, can
9  we --
10         MS. HARDING:  So I think if
11 there are questions that you don't
12 understand, I think you should ask
13 him those.
14         MR. BROWN:  I would like to
15 know whether there are particular
16 provisions in the Plan that the
17 witness can identify that he is not
18 familiar with or that he doesn't
19 understand.
20         MS. HARDING:  Well, I think
21 he's asked and answered, so...
22     A.   Yes, for myself there are
23 provisions that I do not understand, such
24 as the tax annexes.  This --

Page 74

1        MS. HARDING:  Which also
2  were not designated 30(b)(6) topics
3  by any person who --
4        MR. BROWN:  Can I ask that
5  we just let the witness answer the
6  question?
7        MS. HARDING:  Well, I think
8  if you want to ask him questions
9  about topics that were designated
10  that you asked him to become
11  familiar with, then --
12        MR. BROWN:  I didn't ask
13  him a question about the tax annex.
14  It was in his answer.
15        MS. HARDING:  Well, that's
16  because you asked him about any
17  provision of the Plan.  You
18  asked -- we tried to prepare the
19  witness to answer questions about
20  topics that everybody asked about.
21        MR. BROWN:  All right.
22  I'll ask my question again.  If you
23  have an objection and you want to
24  instruct him not to answer, then do

Page 75

1        it and we'll move on.
2  BY MR. BROWN:
3        Q.   Mr. Finke, as you sit here
4  today looking at the Joint Plan, can you
5  identify particular provisions that you do
6  not understand?
7        MS. HARDING:  Object, asked
8  and answered, but answer one more
9  time if you'd like.
10        A.   In addition to what I've
11  already identified, the provision on the
12  warrants is not entirely clear to me.  And
13  if I spent the time to go through the
14  document page by page, there may be a few
15  other sections that I don't feel very
16  comfortable with in terms of the level of
17  my understanding.
18        Speaking on behalf of W.R. Grace as
19  a whole, there are individuals who
20  understand those sections and, taken as a
21  whole, I think W.R. Grace does have a good
22  understanding of the Plan.
23        Q.   Okay.  Well, let me take
24  your counsel up on her offer and direct

Page 76

1  your attention to page 87 of the Plan,
2  Section 7.15, and what I would like you to
3  do, because I have a series of questions
4  about it, is why don't you take a few
5  moments to review Section 7.15.  In fact,
6  if you want to take a break at this
7  point --
8        MR. BROWN:  Does that make
9  sense?  Okay.
10        MS. HARDING:  Well, I mean,
11  how long is it, again?
12        THE WITNESS:  Seven
13  pages.
14        MS. HARDING:  Five-minute
15  break?
16        MR. BROWN:  That's fine,
17  yes.
18        (Recess taken.)
19  BY MR. BROWN:
20        Q.   Mr. Finke, we had a short
21  break and before that I directed your
22  attention to Section 7.15 of the Plan
23  entitled Insurance Neutrality.  Did you
24  have an opportunity to review that section

Page 77

1  during the break?
2        A.   Yes.
3        Q.   This was not one of the
4  sections that you mentioned in your prior
5  testimony that you were -- that you did
6  not understand.  Is it safe to say that
7  this is a provision that you do
8  understand?  And I'm asking that question,
9  really, in your capacity as an individual
10  and as the designee on this subject for
11  the debtors.
12        MS. HARDING:  Object to
13  form.
14        A.   Yes, I believe I understand
15  it.
16        Q.   Okay.  Can you turn to
17  Section 11.9 of the Plan, and that's
18  entitled Exculpation, and if you'd take a
19  moment to review that section.
20        (The witness reviews the document.)
21        A.   Okay.
22        Q.   Given the language in
23  Section 7.15, am I correct that asbestos
24  insurance entities are not bound by the

1  exculpation provision in Section 11.9 of
2  the Plan?
3        MR. LIESEMER:  Object to
4  the form.
5        MS. HARDING:  Object to the
6  form.
7        A.   I believe they -- the
8  asbestos insurance companies are bound by
9  Section 11.9.
10       Q.   They are bound?
11       A.   Yes.
12       Q.   If you go back to 7.15,
13  where is that set forth?
14       MS. HARDING:  Object to
15  form.
16       MR. LIESEMER:  Same
17  objection.
18       A.   Well, of course, there's no
19  provision in Section 7.15 that
20  specifically states that the insurers are
21  bound by Section 11.9.  I assume that's
22  not what you're asking, but -- well,
23  literally, I think that is what you asked,
24  so --

1        Q.   Yes, that is what I asked.
2        A.   -- that's my answer then.
3        Q.   So there's nothing in 7.15
4  that says that they're bound by 11.9 but
5  your testimony is that they are in fact
6  bound by 11.9?
7        A.   Yes.
8        Q.   Are there any other
9  provisions in the Plan that are not
10  specifically spelled out in Section 7.15
11  for which the insurers are bound
12  notwithstanding Section 7.15?
13       MS. HARDING:  Objection to
14  form, and I think it misstates his
15  testimony.
16       THE WITNESS:  I'm sorry.
17  Could you read back the question?
18       (The reporter reads the
19  pending question.)
20       MS. HARDING:  Object to
21  form.  I think it's confusing,
22  speculative.  I don't see how you
23  can possibly answer that question.
24  But if you can answer it, go ahead.

1        It also calls for a legal
2  conclusion.
3        (The witness reviews the document.)
4        A.   Okay.  I would direct you
5  to Section 7.15(h) which states that "the
6  asbestos insurance entities shall be
7  subject to the releases and injunctions to
8  the extent described in this Plan" so my
9  answer to your question is that I believe
10  any provisions in the Plan that would
11  constitute a release or an injunction, and
12  I would include 11.9 in that language, are
13  binding on the asbestos insurance
14  entities.
15       Q.   So your testimony is that
16  7.15(h) includes through its language
17  Section 11.9?
18       A.   Yes, that is how I read
19  it.
20       Q.   What consideration, if any,
21  are Grace's insureds getting under the
22  Plan in exchange for the exculpation
23  provision in 11.9?
24       MR. LIESEMER:  Objection to

1  form.
2        MS. HARDING:  Objection to
3  form.
4        A.   All right.  First, your
5  question assumes that the insurance
6  entities would be entitled to some
7  consideration in exchange for being bound
8  by Section 11.9.  I don't know that to be
9  the case.  I don't know that they're not
10  entitled to it either.
11       But as far as consideration, if one
12  had to justify being bound by Section 11.9
13  on the basis of consideration, I think the
14  answer with respect to asbestos insurance
15  entities would also apply to all parties
16  involved in the Chapter 11, which is that
17  the entities and individuals covered by
18  the exculpation have been active in the
19  business of these Chapter 11 cases, they
20  have had to take positions, make
21  arguments, make decisions, et cetera, that
22  affect one or more parties involved in the
23  Chapter 11 cases and have thereby exposed
24  themselves to potential liability, I

Page 82

1  suppose, for their acts or omissions.  And
2  the Chapter 11 itself could not proceed to
3  the point of resolution without the
4  efforts of these entities and these
5  individuals.  So to the extent -- so there
6  is a -- in order to encourage and
7  facilitate the activities of the parties
8  listed in Section 11.9, it is my
9  understanding that it is common in these
10 types of bankruptcies to provide
11 exculpation of those entities and
12 individuals for their activities, and I'm
13 quoting here from 11.9, "In connection
14 with or arising out of the Chapter 11
15 cases."  It is their participation and the
16 fruits of their participation that would
17 constitute consideration.
18      Q.   I want to circle back to a
19 question that I asked a few questions ago
20 concerning 7.15 and I asked you a question
21 to the effect of other than what's
22 specifically set forth in Section 7.15 are
23 there any other provisions in the Plan or
24 Plan documents that are binding upon

Page 83

1  Grace's insurers, and in answer to that
2  question you referred me to subsection (h)
3  and how 11.9 in the debtor's view was
4  encompassed within the language of (h).
5      So I want to go back to that
6  question and ask:  Other than 11.9, is
7  there anything else?
8      A.   I'm --
9          MS. HARDING:  Object to
10 form.  I think it's confusing
11 and I'll leave it at that.  If you
12 can answer, go ahead.
13     A.   I believe there is a more
14 general provision relating to the binding
15 nature of court orders, findings, et
16 cetera.  That is what I was looking for
17 initially in response to your answer and
18 then I remembered the provision in 7.15(h)
19 and so I've directed you to that
20 provision.  If you want me to spend the
21 time -- I do not know where in that Plan
22 that more general provision is that I have
23 in mind.
24     Q.   Well --

Page 84

1      A.   I could spend the time to
2  look for it if you'd like.
3      Q.   No, let's try this a little
4  differently.  Look at 7.15(a).
5      A.   Okay.
6      Q.   It says "Except to the
7  extent provided in this Section 7.15,
8  notwithstanding anything to the contrary
9  in the Confirmation Order, the Plan or any
10 of the Plan documents -- nothing in the
11 Confirmation Order, the Plan or the Plan
12 documents, including any other provision
13 that purports to be preemptory or
14 supervening, shall in any way operate to
15 or have the effect of impairing any
16 asbestos insurance entity's legal,
17 equitable or contractual rights, if any,
18 in any respect."  Have I read that
19 correctly?
20     A.   I believe so.
21     Q.   Okay.  And what I'm asking
22 is:  Given that broad statement, are there
23 any other provisions in the plan that are
24 not set forth in 7.15 that override the

Page 85

1  language in 7.15(a)?
2          MS. HARDING:  Object to
3  form.
4      A.   Based on the language of
5  7.15(a), and if I'm understanding it as it
6  was intended, it states by its terms that
7  nothing else in the Plan or any of the
8  Plan documents would operate, you know, to
9  impair the -- an asbestos insurance
10 entity's rights.
11     Q.   So is your answer no?
12         MS. HARDING:  Object, asked
13 and answered, but...
14     A.   Based on the language in
15 7.15(a), my answer would be no, subject
16 to -- subject to wanting to review the
17 remainder of the Plan because, as I
18 mentioned, I do have in mind that there is
19 one or more general provisions concerning
20 the applicability or binding nature of
21 court orders, court findings and the like.
22     And while I understand 7.15(a)
23 appears to act in such a way that would
24 make my proviso in my answer irrelevant, I

Page 86

1  would still feel more comfortable having
2  found and reviewed those other provisions
3  before giving an unequivocal "no".
4      Q.    Let's do this because we
5  don't want to waste time.  Why don't we --
6  I'm going to continue on.  We'll obviously
7  have breaks.  And during one of those
8  breaks, why don't you look for whatever
9  provision it is that you -- or provisions
10  that you think you're talking about and
11  then when we return from our break, even
12  if I'm not the questioner, would you bring
13  those one or two sections up to me?  That
14  will save us some time.
15     A.    That's fine.
16     Q.    All right.  I want to focus
17  your attention now on 7.15(b).
18         (The witness reviews the document.)
19     A.    Okay.
20     Q.    You see on the second line
21  there rolling over to the third line the
22  phrase "The beneficiaries of the Asbestos
23  PI Trust"?  Do you see that?
24     A.    Yes.

Page 87

1      Q.    What do you understand that
2  term to mean?
3         MR. LIESEMER:  Object to
4  the form.
5      Q.    What does that term mean?
6      A.    I understand it to mean
7  holders of asbestos PI claims.
8      Q.    Okay.  And does that
9  include holders of indirect Asbestos PI
10  Trust claims?
11         MR. LIESEMER:  Object to
12  form.
13     A.    Yes.
14     Q.    And does it include
15  indemnified insurer -- does it -- excuse
16  me.
17         Does that term include the holders
18  of indemnified insurer TDP claims?
19         MR. LIESEMER:  Object to
20  the form.
21     A.    Is that a defined term?
22     Q.    Good question.  It is a
23  term that appears in Section 5.13 of the
24  Trust Distribution Procedures.  I don't

Page 88

1  know that it is, per se, defined.
2         MS. HARDING:  Where is it
3  in the TDP?
4         MR. BROWN:  It's in Section
5  5.13.
6         MR. COHN:  Is that on page
7  49 of the TDP?
8         MR. BROWN:  I don't know
9  the page number.
10        THE WITNESS:  Page 49,
11  yes.
12     A.    Based on Section 5.13 of
13  the TDP and on the basis that a holder of
14  an indemnified insured TDP claim
15  potentially may have that claim paid by
16  the PI Trust in accordance with Section
17  5.13, I would interpret such a holder to
18  be a beneficiary of the PI Trust.
19     Q.    Okay.  So let's just take
20  one of my clients, for example.  Let's
21  take Seaton Insurance Company.  If Seaton
22  Insurance Company has an indemnified
23  insured TDP claim, then Seaton Insurance
24  Company, as I understand 7.15(b), is bound

Page 89

1  by the Plan, the Plan documents and the
2  confirmation order?
3         MR. LIESEMER:  Object to
4  the form.
5         MS. HARDING:  Object to the
6  form.
7      Q.    Do I have that correct?
8      A.    I believe so, yes.
9      Q.    Okay.  And is it bound by
10  the Plan, Plan documents and confirmation
11  order insofar as it may also be listed as
12  being a partially settled insurer?
13        MS. HARDING:  Object to the
14  form.  And are you referring to
15  7.15(b)?
16        MR. BROWN:  Yes.
17        MS. HARDING:  Back to
18  7.15(b) when you asked that
19  question?
20        MR. BROWN:  Yes.
21     A.    I'm not sure I see the
22  connection between Section 5.13 of the TDP
23  and your question, if there is any.
24  The -- I believe the answer is they are

Page 90

1   bound to the same extent any asbestos
2   insurance entity is bound under the
3   Plan.
4        Q.    Mr. Finke, you understand,
5   don't you, that -- well, let's not do it
6   that way.  Let's go to -- I think it's the
7   asbestos insurance transfer agreement.
8            MS. HARDING:  Is that one
9   of our exhibits?
10           MR. BROWN:  No, I'm sorry,
11  it's not that.  It's Exhibit 5.
12       Q.    Do you have Exhibit 5?
13       A.    Retained causes of action?
14       Q.    No.  This is Exhibit 5 to
15  the Exhibit Book.
16       A.    To the Exhibit Book.
17           MS. HARDING:  I have a
18  copy.  It's not his but you can
19  look at it if you'd like.
20           MR. COHN:  What is the
21  document?
22           MS. BAER:  It's Exhibit 5
23  to the Exhibit Book, Schedule of
24  Settled Asbestos Insurers.

Page 91

1            (Exhibit 5 to Exhibit Book,
2        Schedule of Settled Asbestos
3        Insurers Entitled to 524(g)
4        Protection marked for
5        identification as Exhibit
6        Finke-9.)
7        Q.    What I'd like you, Mr.
8   Finke -- first of all, why don't you
9   identify what we've just marked as Exhibit
10  9?
11       A.    Okay.  Finke Exhibit 9 is
12  Exhibit 5 to the Exhibit Book.  It is
13  entitled Schedule of Settled Asbestos
14  Insurers Entitled to 524(g) Protection.
15       Q.    Now, you understand, don't
16  you, that at least some of the insurance
17  companies that are listed on this schedule
18  have indemnity claims against the
19  debtors?
20           MR. LIESEMER:  Object to
21  the form of the question.
22       A.    Yes, I believe that's
23  correct.
24       Q.    And to the extent that

Page 92

1   there are indemnity claims against the
2   debtor and to the extent that those are
3   asbestos-related, those fit within the
4   defined term "indemnified insured TDP
5   claims", correct?
6            MS. HARDING:  Object to
7   form.
8            MR. LIESEMER:  Join.
9            MS. HARDING:  Are you
10  looking for 7.15?
11           MS. ALCABES:  5.13.
12           MS. HARDING:  There you go.
13       A.    No, I don't agree.
14           MR. BROWN:  Could you read
15  back the last question?
16           (The reporter reads the
17  requested portion.)
18       A.    No, I don't agree.  My
19  understanding of Section 5.13 is this
20  provision would take effect only upon
21  confirmation of the Plan since the
22  definition indicates, or requires, that
23  the indemnified insuror TDP claim is
24  channeled to the PI Trust, which it can't

Page 93

1   be at this point.
2        Q.    All these questions are in
3   the context of the Plan being confirmed.
4        A.    Well, then I don't --
5        Q.    Let me back up.  I think
6   the record's kind of muddled at this
7   point.
8        A.    Okay.
9        Q.    Why don't you -- if you
10  look at the schedule of settled asbestos
11  insurance companies, I believe you'd
12  testified -- that's Exhibit 9 -- I believe
13  you'd testified that some of the companies
14  that are listed on there have contractual
15  indemnity claims against the debtors.
16       A.    That was under the
17  assumption we were talking about current
18  claims.  I didn't realize you had -- that
19  your questions were all in the context of
20  the assumption of a confirmed plan.
21       Q.    All right.  If you look at
22  the schedule, you understand that the
23  insureds that are listed on here have
24  settlement agreements with the debtors,

Page 94

1    correct?
2        A.    Yes.
3        Q.    And you also understand
4    that certain of those settlement
5    agreements have contractual indemnity
6    provisions in them, correct?
7        A.    Yes.
8        Q.    And I believe you testified
9    that those contractual indemnity
10   provisions are under the Plan to be
11   treated as indemnified insured TDP claims
12   under Section 5.13 of the TDP.  Is that
13   correct?
14       A.    No, no, that certainly
15   wasn't my intent.
16       Q.    Okay.  How are they being
17   treated under the Plan?
18       A.    As indirect PI Trust
19   claims.
20       Q.    Okay.  Do you understand
21   indemnified insured TDP claims to be a
22   class of indirect PI Trust claims?
23       A.    It appears to me to be
24   that, that they are the same.  Or at least

Page 95

1    I don't see a distinction.  Whether they
2    are intended to be or not, I don't know.
3    Since we really were not involved in the
4    drafting of the TDP, my --
5        Q.    The "we" you're referring
6    to is Grace?
7        A.    Grace, yes.  My bigger
8    problem is that once the plan is confirmed
9    I don't understand -- have not understood
10   and don't today how there can be such a
11   claim under 5.13 since my understanding of
12   the mechanics of the asbestos PI
13   channeling injunction is that any claim
14   against a settled insurer which is an
15   asbestos protected party would be barred
16   and that claim would be channeled to the
17   PI Trust and that that holder of that PI
18   claim, the sole resolution -- not
19   resolution -- the sole source for any
20   recovery for the holder of that claim is
21   the PI Trust.
22       So I have not understood, and still
23   don't, how any indemnified insurer TDP
24   claim could arise.

Page 96

1        Q.    Let's get back to the
2    insurance neutrality provision then, which
3    is 7.15.
4        A.    Okay.
5        Q.    Getting back to 7.15(b),
6    this line of questioning talked with or
7    started with the reference to the term,
8    the phrase, "the beneficiaries of the
9    Asbestos PI Trust".
10       A.    Uh-huh.
11       Q.    I'm a little confused by
12   your testimony at this point.  If you are
13   the holder of an indemnified insurer TDP
14   claim post-confirmation, are you a
15   beneficiary of the Asbestos PI Trust?
16       MR. LIESEMER:  Object to
17   the form of the question.
18       MS. HARDING:  Object to
19   form.
20       A.    Assuming for the sake of
21   argument such a claim could arise, my
22   understanding would be yes.
23       MR. BROWN:  All right.  I'm
24   going to shift gears.  We'll mark

Page 97

1    another document.  The document I'm
2    about to mark is one of our
3    settlement agreements so we can
4    mark this portion of the deposition
5    subject to the protective order but
6    what I would like to do with this
7    one, like we did with Mr. Posner,
8    to the extent that no one objects
9    to the extent that we, my clients,
10   would like to use this portion of
11   the testimony without having it
12   under seal, we would be able to do
13   so without asking all parties to
14   agree.  Is that fair?
15       MS. HARDING:  That's up to
16   you.
17       MR. BROWN:  All right.
18       MR. LEWIS:  Did you say
19   Mr. Posner?
20       MR. BROWN:  Yes.
21       MR. LEWIS:  Okay.
22       (Settlement Agreement
23   Bates stamped OB 1 through 33
24   marked for identification as

Page 98

1    Exhibit Finke-10.)
2         MS. HARDING:  And as I
3    understand it, all parties are -- I
4    think all parties in this room have
5    agreed to the protective order.
6         MR. BROWN:  I don't know.
7    Is Mr. Speights on the line?
8         Mr. Speights?
9         MS. BAER:  We can put on
10   the record that Mr. Speights never
11   objected to the provisions of the
12   protective order.
13        MR. BROWN:  Okay.
14        Q.   Mr. Finke, you have before
15   you a document which has been marked
16   Finke-10 and I'd like you to take a few
17   moments to review it and then tell me
18   whether you have ever seen the document
19   before.
20        A.   No, I have not.
21        Q.   Okay.  Can you turn to
22   pages 30 and 31?
23        MR. LIESEMER:  Are you
24   referring to the Bates numbering?

Page 99

1         MR. BROWN:  Actually, it's
2    the same on these, on this
3    particular document, but OB 30 and
4    31.
5         Q.   Do you recognize any of the
6    signatures that appear on either of those
7    pages?
8         MS. HARDING:  You mean the
9    names of the people that have
10   signed or the actual signatures?
11        MR. BROWN:  The latter.
12        A.   The signature of Robert H.
13   Beber appears to be his signature, not --
14   I can't say that conclusively, but --
15        Q.   Do you recognize --
16        A.   -- it looks familiar.
17        Q.   Do you recognize the
18   signature of Mr. Posner?
19        A.   I don't.
20        Q.   Who are the parties to the
21   agreement?
22        MS. HARDING:  Object to
23   form and object to the extent that
24   he's testified that he's never seen

Page 100

1    the document before.
2         A.   Based on the --
3         MS. HARDING:  To the extent
4    that you know.
5         THE WITNESS:  Sorry.
6         A.   Based on the signature
7    page, the parties are W.R. Grace & Co.,
8    W.R. Grace & Co.-Conn., Commercial Union
9    Insurance Company as successor in interest
10   to Employers Commercial Union Insurance
11   Company of America and Employers
12   Commercial Union Insurance Company and
13   American Employers Insurance Company.
14        Q.   Okay.  And would you agree
15   with me that the parties that executed
16   this document appear, at least from what
17   is on the document, to have signed it in
18   or around May of 1993?
19        A.   Yes.
20        Q.   Okay.  If you look at the
21   signature block for Mr. Beber, he's
22   indicated as having signed this document
23   on behalf of W.R. Grace & Co.  Do you see
24   that?

Page 101

1         MS. HARDING:  Which?
2         A.   Yes.
3         MS. HARDING:  Wait a
4    minute.  What page?  30 or 31?
5         MR. BROWN:  OB 30.
6         MS. HARDING:  Right, I just
7    wanted to make it clear that he
8    appears to be in two different
9    places.
10        MR. BROWN:  I'm focused on
11   the first signature on OB 30.
12        MS. HARDING:  Page 30, all
13   right.
14        Q.   The company that was called
15   W.R. Grace & Company in May of 1993 has a
16   different name today, doesn't it?
17        A.   I believe that's correct.
18        Q.   Okay.  And the name is
19   Fresenius Medical Care Holdings, Inc., is
20   it not?
21        A.   I don't know the answer off
22   the top of my head.
23        Q.   Okay.  Let me direct you to
24   a few things in the Plan.  I'd like you to

Page 102

1    look at the definitions that appear in the
2    plan, the defined term "FMCH" which is
3    number 115, the defined term "Fresenius
4    transaction" which appears at definition
5    124 and the defined term "Grace New York"
6    which appears as the defined term 130.  So
7    it's 115, 124 and 130.
8         A.    Okay.
9         Q.    Reviewing those defined
10   terms, does that help you to answer my
11   last question?
12        A.    As I say, on the basis of
13   the defined terms, it would appear that
14   W.R. Grace & Co. prior to September of
15   1996 is now known as Fresenius Medical
16   Care Holdings.
17        Q.    And Fresenius Medical Care
18   Holdings, Inc., is a non-debtor,
19   correct?
20        A.    Correct.
21        Q.    Take a look back at
22   Finke-10, if you would.
23             MS. HARDING:  The
24        settlement agreement --

Page 103

1             THE WITNESS:  Right.
2         Q.    Specifically page two.  See
3    the defined term in this agreement 1.2,
4    "indemnitor"?
5         A.    Yes.
6         Q.    And that includes or it
7    says it means W.R. Grace & Co. and W.R.
8    Grace & Co.-Conn. and their respective
9    successors in interest.  Did I read that
10   correctly?
11        A.    Yes.
12        Q.    So based on your prior
13   testimony, am I correct that Fresenius
14   Medical Care Holdings is the W.R.
15   Grace & Co. that is referred to in this
16   defined term "indemnitor"?
17        A.    It appears to be.
18        Q.    Okay.  And if you turn to
19   OB 15 to OB 20 in the same document,
20   you'll agree with me, would you not, that
21   there is an indemnification provision that
22   appears there?
23        A.    Yes.
24        Q.    And the indemnity runs

Page 104

1    from the indemnitors under this section to
2    the insurers, correct?
3             MS. HARDING:  Objection to
4        form, it calls for a legal
5        conclusion, and this witness has
6        testified he's never seen the
7        document.  But to the extent that
8        you can answer...
9         A.    That's what the language
10   appears to provide.
11        Q.    Okay.  Would it be fair to
12   say, based on that testimony, that to the
13   extent that the insurers have contractual
14   indemnity claims under this settlement
15   agreement, they have them both against
16   W.R. Grace & Co.-Conn. as well as
17   Fresenius Medical Care Holdings, Inc.?
18             MS. HARDING:  Same
19        objection.
20        A.    I wouldn't know.
21        Q.    You don't know?
22        A.    No, I don't know.
23        Q.    All right.  Well, I'm going
24   to ask you to assume for the purposes of

Page 105

1    my next series of questions that such
2    claims do exist.
3             MS. HARDING:  I'm sorry,
4        Michael.  What's the assumption
5        just so I can -- assume that?
6             MR. BROWN:  That there is a
7        contractual indemnity claim that
8        these insurers have running both
9        against W.R. Grace & Co.-Conn. as
10       well as Fresenius Medical Care
11       Holdings, Inc.
12            MS. HARDING:  Okay.
13            MR. BROWN:  Okay.
14        Q.    Now, we talked a little bit
15   earlier, Mr. Finke, about contractual
16   indemnity claims against the debtors,
17   correct?
18        A.    Yes.
19        Q.    And I believe you testified
20   that those are indirect PI Trust claims
21   and that, based upon your reading, you
22   also understood them to be indemnified
23   insurer TDP claims as described in Section
24   5.13 of the TDP.

Page 114

1    they're also Class 6 claims, correct?
2        A.    Correct.
3        Q.    And indemnified insurer TDP
4    claims are also Class 6 claims, correct?
5        A.    I believe so but I'm going
6    to go back and reread the definition
7    again.
8        Q.    Okay.
9        (The witness reviews the document.)
10       A.    Yes.
11       Q.    Can you describe for me the
12   factual basis for putting all of those
13   claims in the same class?
14           MS. HARDING:  Object to
15       form.  Calls for -- to the extent
16       that it calls for a legal
17       conclusion and --
18       A.    I would refer to the --
19           THE WITNESS:  I'm sorry.
20           MS. HARDING:  -- and
21       attorney-client work product
22       privileges to the extent that they
23       apply.  But if you can still
24       answer, go ahead.

Page 115

1        A.    My answer would be to refer
2    to the terms of the Plan and the
3    definitions.  The definitions of asbestos
4    PI claims would incorporate the factual
5    basis of those claims.
6        Q.    All right.  I'm asking a
7    broader question, I think, Mr. Finke, and
8    I'm not asking for a legal conclusion.
9           MS. HARDING:  Okay.
10          And --
11       Q.    I'm asking for what is it
12   that's factually similar about these
13   claims that warrants in the debtor's view
14   placing them all into Class 6.
15          MS. HARDING:  Object to
16      form.
17          MR. LIESEMER:  Object to
18      form.
19          MS. HARDING:  Foundation
20      and it...
21       A.    I may be misunderstanding
22   your broad question, but I have to again
23   respond by referring to the factual
24   circumstances laid out in the definition

Page 116

1    of asbestos PI claims.  It is those --
2    those set of circumstances that result in
3    all of these claims being classified as
4    Class 6 claims.
5        Q.    What are the similarities
6    between the claims; that is, between the
7    personal injury claims and the contractual
8    indemnity claims, if any?
9           MS. HARDING:  Object to
10      form.
11          MR. LIESEMER:  Object to
12      form.
13       A.    Assuming you're referring
14   to contractual indemnity claims arising
15   out of, directly or indirectly, an
16   asbestos PI claim, the similarity is that
17   the underlying claim is by a person who
18   alleges -- and I'm just paraphrasing
19   because I don't want to read this entire
20   definition -- but alleges that he has
21   contracted an asbestos-related disease due
22   to exposure to asbestos from a Grace
23   product or operation.
24       Q.    Anything else?

Page 117

1           MS. HARDING:  Object to
2       form.
3        A.    I don't understand your
4    question.
5        Q.    My question is:  Is there
6    any other basis for classifying the
7    contractual indemnity claims that we've
8    just been discussing with the personal
9    injury claims, the asbestos personal
10   injury claims?
11          MS. HARDING:  Object to
12      form.
13       A.    The basis I've laid out for
14   the definition of asbestos PI claims.
15       Q.    Okay.  Mr. Finke, why are
16   contractual indemnity claims arising from
17   the asbestos claims that you just
18   described placed into Class 6 while other
19   contractual indemnity claims against Grace
20   are placed into Class 9?
21          MS. HARDING:  Object to
22      form and to the -- and object to
23      the extent it calls for a legal
24      conclusion.  If you can answer, go

Page 118

1    ahead.
2        A.    Because the contractual
3    indemnity claims that arise based out of
4    an asbestos PI claim all seek to impose
5    liability upon the debtors as a result of
6    the debtors' asbestos-related products or
7    operations.
8        Q.    Okay.  Is Fresenius a
9    separate entity from any of the debtors
10    today?
11        MS. HARDING:  Object to
12    form.
13        Q.    Separate legal entity.
14        A.    Yes.
15        Q.    How about Sealed Air
16    Corporation?  Is that a separate legal
17    entity?
18        A.    Yes.
19        Q.    And they're both
20    non-debtors, correct?
21        A.    Correct.
22        Q.    Are they -- do they have
23    separate -- does Fresenius and the debtors
24    have separate management?

Page 119

1        A.    Yes.
2        Q.    And would your answer be
3    the same with respect to Sealed Air and
4    the debtors?
5        A.    Yes.
6        Q.    Does Fresenius and the
7    debtors or do Fresenius and the debtors
8    have any shared operations?
9        A.    Not that I'm aware of.
10        Q.    Do Sealed Air and the
11    debtors have any shared operations?
12        A.    Not that I'm aware of.
13        Q.    Do any of the debtors have
14    any ownership interest in Fresenius?
15        MS. HARDING:  Object to
16    form.
17        A.    I don't know but I'm not
18    aware of any.
19        Q.    Do any of the debtors have
20    any ownership interest in Sealed Air?
21        MS. HARDING:  Same
22    objection.
23        A.    Again, I don't know but I'm
24    not aware of any.

Page 120

1        Q.    Do any of the debtors
2    control Fresenius?
3        A.    No.
4        Q.    Do any of the debtors
5    control Sealed Air?
6        A.    No.
7        MR. BROWN:  How did we mark
8    the transfer agreement?
9        MS. BAER:  The insurance
10    transfer agreement is Exhibit 4.
11        (Off the record.)
12    BY MR. BROWN:
13        Q.    We talked about this
14    earlier.  Can you take a look at Schedule
15    1 to Exhibit 4?
16        A.    Yes.
17        Q.    My question is:  Does
18    Fresenius have any rights under the
19    policies listed on Schedule 1?
20        MS. HARDING:  Object to
21    form.
22        A.    I don't believe so.
23        Q.    How about Sealed Air?
24        A.    I don't believe so.

Page 121

1        MR. BROWN:  Why don't we
2    take a five-minute break.  I may be
3    finished.
4        MS. HARDING:  Okay.
5        (Recess taken.)
6    BY MR. BROWN:
7        Q.    Mr. Finke, I have a few
8    more questions for you and then I'll pass
9    you along to the next questioner.
10        Can you take a look at Section 11.9
11    of the Plan again?  That's the exculpation
12    provision.
13        A.    Yes.
14        Q.    Do you understand the scope
15    of the exculpation provision in terms of
16    the entities and individuals that are
17    actually exculpated under this
18    provision?
19        MS. HARDING:  Object to
20    form.
21        A.    Yes, I believe I do.
22        Q.    Okay.  Well, let me give
23    you a couple of examples.  It's includes
24    the Asbestos PI Committee, correct?

Page 122

1      A.   Yes.
2      Q.   And we talked a little
3  about the Asbestos PI Committee being
4  individual asbestos claimants, correct?
5      A.   Yes.
6      Q.   And you testified that, by
7  and large, they perform their duties as
8  committee members through their asbestos
9  personal injury counsel, correct?
10      A.   Correct.
11      Q.   Okay.  And that would
12  include, among other individuals, Mr. Rice
13  and his law firm, correct?
14      A.   Yes, I believe that's
15  right.
16      Q.   And Mr. Cooney and his law
17  firm?
18      A.   Well, I guess what I don't
19  know is which of the -- which of the
20  asbestos plaintiffs' attorneys we've
21  identified are -- or have clients that are
22  members of the committee.  I just don't
23  recall.
24      Q.   Okay, fair enough.

Page 123

1      There are also -- the TAC is within
2  the scope of this exculpation provision,
3  correct?
4      A.   Yes.
5      Q.   So it would include the TAC
6  members, Mr. Weitz, Mr. Cooney, Mr. Budd
7  and Mr. Rice, correct?
8      A.   Correct.
9      Q.   And to the extent that the
10  firms -- to extent that any members of the
11  Asbestos PI Committee are represented by
12  the firms of Mr. Cooney, Mr. Rice, Mr.
13  Weitz and Mr. Budd, they too would be
14  covered by it, correct?
15      A.   Correct.
16          MS. HARDING:  Object to
17  form.
18      Q.   All right.  Now, about
19  halfway down the provision it has a phrase
20  that says "or any of their respective
21  Representatives".  Do you see that?
22      A.   Yes.
23      Q.   And Representatives is in
24  initial cap R, correct?

Page 124

1      A.   Yes.
2      Q.   Why don't you go to the
3  defined term Representatives which appears
4  at 33 of the Joint Plan.  It's definition
5  number 177.
6          MS. HARDING:  I think I
7  lost the line of -- did you
8  previously ask if the TAC was
9  covered --
10          MR. BROWN:  Yes.
11          MS. HARDING:  -- by the
12  exculpation in 11.9?
13          MR. BROWN:  Yes.
14          MS. HARDING:  I'm just
15  looking and I don't see that so I
16  just wanted to make sure that the
17  record wasn't unclear.
18          MS. BAER:  Barbara.
19          MR. BROWN:  Asbestos PI
20  Trust Advisory Committee.
21          MS. HARDING:  All right.
22          MR. BROWN:  We're happy to
23  have it taken out.
24          MS. HARDING:  No, no.  I

Page 125

1  was talking because I was going too
2  fast and I just didn't see it and I
3  wanted to make sure.
4      A.   Okay.
5      Q.   Sitting here today and
6  looking at the defined term
7  Representatives and seeing its use in
8  Section 11.9 of the Plan, do you have any
9  idea of the scope of this exculpation
10  provision in terms of who's covered by
11  it?
12          MS. HARDING:  Object to
13  form.
14      A.   Well, certainly the
15  definition of Representatives gives me an
16  idea as to the scope of the exculpation
17  provision.
18      Q.   Okay.  But I mean the
19  actual identities of the individuals, you
20  couldn't -- you couldn't give me a list
21  today, could you?
22      A.   No.
23      Q.   Okay.
24      A.   I could not.

Page 126

1    Q.   Do you have any idea who
2  the advisors or consultants are of Mr.
3  Cooney's firm or Mr. Weitz's firm or Mr.
4  Rice's firm or --
5      A.   No.
6        MS. HARDING:  Object to
7  form.
8      A.   No, I do not.
9      Q.   Okay.  How does the court
10 know if it confirms this Plan who all's
11 covered by the exculpation provision,
12 given the breadth of the definition of
13 Representatives?
14       MS. HARDING:  Object to
15 form --
16       MR. LIESEMER:  Object to
17 form.
18       MS. HARDING:  -- to the
19 extent it calls for a legal
20 conclusion.
21     A.   I would be speculating that
22 perhaps they'll be -- those individuals
23 would be identified to the court at some
24 point, but I don't know.

Page 127

1    Q.   Do you know how far back
2  the exculpation provision goes in terms of
3  time?
4      A.   No, because it's -- it's
5  not set up to be framed in terms of a
6  beginning date and an end date.  It's --
7  the scope of the provision relates to
8  conduct in connection with or arising out
9  of the Chapter 11 cases so that, to my
10 understanding, that could encompass
11 conduct before the Chapter 11 cases were
12 commenced, conduct afterwards.
13     Q.   How long before it was
14 commenced?
15       MS. HARDING:  Object to
16 form.
17     A.   The provision does not
18 say.
19       MR. BROWN:  Okay.  All
20 right.  I think with that I'm going
21 to pass you along to Miss Alcabes,
22 and I may -- I'll reserve the right
23 for any follow-up questions after
24 the others have finished.  Thank

Page 128

1  you.
2        THE WITNESS:  You're
3  welcome.
4  EXAMINATION BY
5  MS. ALCABES:
6      Q.   Good afternoon, Mr. Finke.
7  My name is Elisa Alcabes.  I'm counsel for
8  Travelers Casualty & Surety Company.
9  We've met before.
10     A.   Yes.
11     Q.   Can you just tell me what
12 you did to prepare for your deposition
13 today?
14     A.   I reviewed the Plan; a
15 number of the exhibits to the Plan, some
16 more than once; met with counsel, Grace's
17 bankruptcy counsel, to discuss various
18 provisions of the Plan and related
19 documents.  I'm trying to think if there
20 is anything else.  Read the deposition
21 transcript of Peter Lockwood and listened
22 to the -- listened in on the deposition of
23 Jeff Posner which I viewed as preparation
24 for this deposition.  That's all I can

Page 129

1  recall at this point.
2      Q.   About how much time did you
3  spend with Grace's bankruptcy counsel
4  preparing?
5      A.   About 15 hours.
6      Q.   And you said you listened
7  in on the Posner deposition.  Do you agree
8  with the testimony that Mr. Posner
9  provided?
10       MS. HARDING:  Object to
11 form.
12     A.   Yes, I do.  I can't think
13 of anything that I disagreed with so I
14 would say, in general, yes.
15     Q.   And you said previously
16 that you generally agreed with the
17 deposition testimony of Mr. Lockwood as
18 well, correct?
19     A.   Correct.
20     Q.   You mentioned that there
21 was one point in his deposition where he
22 seemed to have equated coverage in place
23 with the reimbursement agreements.  Is
24 that right.

Page 130

1   A.   Yes.
2      Q.   Do you recall whether there
3   was a substantive issue that you had with
4   it or whether he just seemed to have
5   inadvertently referred to reimbursement
6   agreements as coverage in place?
7      A.   I would -- I don't know if
8   there was -- I don't recall having a
9   substantive disagreement.  At the time I
10  was -- I had focused on the defined terms
11  and if he was using those terms as defined
12  terms in the Plan, then it occurred to me
13  that he was making an incorrect statement
14  since, of course, he's speaking and didn't
15  identify them as whether or not he was
16  referring to them as defined in the Plan.
17  He may or may not be incorrect in equating
18  the two; I don't know.
19     Q.   I'm going to represent that
20  we've looked through the Lockwood
21  transcript and I'm not sure which
22  reference you're talking about and we
23  would like to understand what it is that
24  you were disagreeing with to the extent it

Page 131

1   may be substantive so we would ask during
2   a break or subsequent to the deposition if
3   you would please let us know which portion
4   of the transcript you're referring to.
5      Right now, can you turn to what's
6   been marked as Finke Exhibit 4, which is
7   the transfer agreement, and turn to
8   Schedule 2.  That's the schedule of
9   asbestos insurance settlement agreements,
10  correct?
11     A.   Correct.
12     Q.   And in preparation for your
13  deposition, did you review any of these
14  agreements?
15     A.   No, I did not.
16     Q.   Are you generally familiar
17  with any of the agreements?
18     A.   No, I am not.
19     Q.   Do you have a general
20  understanding of what the agreements
21  provide?
22     A.   Very general.
23     Q.   What's your general
24  understanding?

Page 132

1      A.   That the insurance company
2   agreed to pay a definite amount of money
3   in exchange for an indemnification
4   agreement from Grace to indemnify the
5   insurer in the event that claims were made
6   against -- in the event that asbestos
7   claims were made against the policy.
8      Q.   And can you turn to
9   Schedule 3 which is the schedule of
10  asbestos insurance reimbursement
11  agreements?
12     A.   Yes.
13     Q.   Did you review any of those
14  agreements prior to your deposition?
15     A.   No.
16     Q.   Have you ever seen any of
17  the agreements?
18     A.   No, I have not.
19     Q.   Are you generally familiar
20  with what the agreements say?
21     A.   Again, on a very general
22  level.
23     Q.   What's your general
24  understanding?

Page 133

1      A.   That the parties to the
2   agreement worked out procedures or
3   protocols pursuant to which the insurers
4   would reimburse the insured party in whole
5   or in part for asbestos claims paid by the
6   insured.
7      Q.   To your understanding, who
8   was the insured party that you're
9   referring to?
10     A.   Grace or one of the Grace
11  debtors.
12     Q.   Do you have an
13  understanding of the obligations that
14  Grace undertook in executing those
15  agreements?
16     A.   No.
17     Q.   Do you have a general
18  understanding?
19     A.   No, I don't.
20     Q.   Do you have an
21  understanding that Grace undertook to
22  perform a certain allocation with respect
23  to claims that were going to be -- with
24  respect to claims that they were going to

Page 198

1    to our rights.
2         MR. LIESEMER:  Well, wait a
3    minute.  There was a dialogue
4    between the Libby claimants'
5    representatives and the ACC with
6    respect to the TDP.  They weren't
7    completely shut out of the --
8         MR. LEWIS:  That's the only
9    thing that was discussed with us,
10   that is correct, counsel.
11        Q.   In any event, I'll get on
12   to the next area because counsel's
13   directed you not to answer any questions
14   concerning the first matters relating to
15   the Plan.  The second one is the funding
16   of the asbestos PI Trust including value
17   at time of negotiation of assets to be
18   used to fund the Asbestos PI Trust.  Oh,
19   I'm sorry, I've got the wrong man there.
20   That's LaForce.
21        Go to asbestos -- go to injunctions
22   on page 10.  The first area is the
23   asbestos PI channeling injunction.  You're
24   designated to testify about that?

Page 199

1        A.   Yes.
2        Q.   And you're familiar with
3    the asbestos PI channeling injunction and
4    the effect it has on those of interest to
5    this litigation?
6         MS. HARDING:  Object to
7    form.
8        A.   Yes.
9        Q.   First of all, what is a
10   channeling injunction?
11        A.   It's --
12        MS. HARDING:  Just object.
13   Are you asking him under the -- the
14   definition of channeling injunction
15   under this Plan or just generally?
16        MR. LEWIS:  I'm just asking
17   him what a channeling injunction
18   is, what is his understanding of a
19   channeling injunction.
20        A.   An injunction that requires
21   holders of certain types of claims to
22   pursue those claims only against, as in
23   this case, the Asbestos PI Trust.  It
24   makes the Trust the sole recourse for

Page 200

1    holders of those claims.
2        Q.   And that's covered in
3    Section 8.2 --
4        A.   Correct.
5        Q.   -- of the amended Plan of
6    Reorganization, correct?
7        A.   Correct.
8        Q.   By the way, you indicated
9    in earlier testimony that there are -- or
10   suggested that there might be more
11   discussion or more changes or changes
12   coming to this Plan.
13        A.   I don't recall discussing
14   that, but --
15        Q.   I thought you said that
16   there were issues that hadn't been
17   resolved related to this Plan.  Maybe I
18   misunderstood you.
19        A.   There are details -- what I
20   recall talking about are details with
21   respect to some of the Plan documents that
22   need -- still need to be worked out.  I
23   don't recall addressing whether there
24   would be changes to the Plan, although I

Page 201

1    believe there -- well, the Plan itself
2    provides for the ability to modify it.
3        Q.   Now, this is the first
4    Amended Joint Plan.  Is there a second
5    Amended Joint Plan in the offing or does
6    this look like it, for the most part?
7        A.   I expect there will be some
8    changes to this Plan before -- before
9    final confirmation.
10        Q.   Let's go to Section 8.1
11   relating to channeling injunctions -- the
12   channeling injunction -- excuse me -- and
13   8.2.  I apologize.
14        A.   Uh-huh.
15        Q.   Does that treat the Libby
16   claimants, PI claimants, just like all
17   other PI claimants?
18        A.   Yes.
19        (Mr. Plevin enters the
20   deposition room)
21        Q.   Okay.  Now, the second area
22   of inquiry was development of asbestos PI
23   channeling injunction among Plan
24   proponents, including negotiations, other

Page 286

1  gave relating to the 17 Maryland Casualty
2  topics to which you as the Grace
3  designated representative disagree?
4      A.   No.
5      Q.   I wanted to ask you some
6  questions about the so-called independent
7  claims against Maryland Casualty that Mr.
8  Lewis asked you about.  During his
9  deposition, Mr. Lockwood gave an example
10 of what he deemed to be an independent
11 claim, and I'll quote from page 517 of his
12 deposition transcript.
13     Mr. Lockwood said:  "I mean, if
14 somebody in Libby, Montana is run over by
15 an insurer's truck on the way to work, of
16 course the injunction doesn't bar the
17 claimant from suing that insurer."
18     My question for you, Mr. Finke:  Is
19 do you agree with that example as an
20 example of an independent claim --
21     A.   Yes.
22     Q.   -- if it existed?
23     A.   Yes.
24     Q.   Now, as to the Plan's

Page 287

1  treatment of any other so-called
2  independent claims by the Libby claimants,
3  I'm going to ask you to please read from
4  page 525, line 1 through 527, line 24 of
5  the transcript of Mr. Lockwood's
6  deposition and then I'm going to ask you a
7  question.
8      A.   Okay.
9      Q.   I'm going to ask you a
10 couple of questions.
11     A.   Okay.
12     Q.   Take your time, please.
13     MS. HARDING:  525, line one
14 through 527, line 24?
15     MR. WISLER:  Correct.
16     (The witness reviews the document.)
17     A.   Okay.
18     Q.   As the designated Grace
19 representative, do you agree with the
20 testimony of Mr. Lockwood that you just
21 read?
22     A.   I do, yes.
23     Q.   And does that testimony
24 clarify your earlier testimony about the

Page 288

1  Plan treatment of so-called independent
2  claims against Maryland Casualty?
3      A.   Yes, because I hadn't -- I
4  hadn't considered my earlier answer
5  viewing it from the perspective of the
6  terms or scope of the indemnification
7  obligation by Grace, which is what this
8  testimony relates to.
9      Q.   Mr. Lockwood's testimony?
10     A.   Yes.  Sorry.
11     Q.   And, Mr. Finke, would you
12 agree with me that there's no provision of
13 the Plan that expressly carves out Libby's
14 so-called independent claims against
15 Maryland Casualty from the asbestos PI
16 channeling injunction?
17     A.   I would agree with that.
18     MR. WISLER:  That's all I
19 have.  Thank you.
20     EXAMINATION BY
21 MR. COHN:
22     Q.   Mr. Finke, Jay Cohn for
23 Federal Insurance Company.
24     Earlier you weren't able to testify

Page 289

1  about the TDPs.  Is that because Grace had
2  nothing to do with the formulation of the
3  TDPs?
4      A.   No.
5      MS. HARDING:  Object to
6  form but go ahead.
7      THE WITNESS:  Sorry.
8      A.   No.  The primary reason is
9  that Grace -- while Grace was not a
10 principal drafter of the TDPs, when we
11 were provided with a draft, I asked Jay
12 Hughes to review it and provide any
13 comments that he had on it, and of course
14 we all -- our outside counsel also
15 reviewed it.  But, in essence, I delegated
16 responsibility to Jay since he is much
17 more familiar with the personal injury
18 litigation, claims history, disease
19 levels, et cetera.  So I personally am not
20 the most knowledgeable at Grace about the
21 TDPs.
22     Q.   Does W.R. Grace have an
23 understanding of what the concept of
24 insurance neutrality means?

Page 290

1      A.   Yes.
2      Q.   Could you explain to me
3  what W.R. Grace's concept -- understanding
4  of that concept is?
5           MS. HARDING:  Just object
6      to form it calls for
7      a legal analysis or legal
8      conclusions.  To the extent that
9      you can answer...
10     A.   I think our understanding
11 of insurance neutrality is well worded in
12 Section 7.15(a), which is that none of the
13 Plan provisions, other than a few specific
14 exceptions, will operate to impair any of
15 the asbestos company's contractual rights
16 under their policies or settlement
17 agreements or reimbursement agreements.
18     Q.   Okay.  So if you were to
19 carve out the first independent clause of
20 7.15(a) which reads:  "Except to the
21 extent provided in this Section 7.15," the
22 balance of that paragraph sets forth W.R.
23 Grace's understanding of the concept of
24 insurance neutrality; is that right?

Page 291

1           MS. HARDING:  Object to
2      form.
3      A.   I don't entirely agree with
4  your statement or your question because I
5  think the definitions of certain terms,
6  and in particular the asbestos insurance
7  coverage defenses, also relates to our
8  understanding of insurance neutrality.
9  Specifically, that that -- that definition
10 identifies a couple of defenses that the
11 insurance companies would not be able to
12 assert after confirmation.
13     Q.   Those would be exceptions
14 to a true insurance neutrality, right?
15          MS. HARDING:  Object to
16     form and to the extent that it
17     calls for a legal conclusion.
18     A.   Yes.
19     Q.   Thank you.
20     Are you familiar with the UNR
21 decision from the Seventh Circuit?
22     A.   I've heard of it.  I've not
23 read it.  I have a very general
24 understanding of --

Page 292

1      Q.   Could you tell me --
2      A.   -- what the holding --
3      Q.   Could you tell me your
4  understanding of what happened in UNR?
5           MS. HARDING:  Object to
6      form, object to the extent that it
7      calls for Mr. Finke's legal
8      analysis of the decision and I
9      think it's overly broad and
10     impossible to answer.  But to the
11     extent that you can answer...
12          MR. FREEDMAN:  Do you have
13     a copy of the case or citation,
14     just to make sure we're talking
15     about --
16          MR. COHN:  992 Fed 2nd.
17     1101.
18          MS. HARDING:  And I also
19     object to the extent that
20     questioning is seeking to have a
21     discussion with the witness about
22     the legal conclusions that the
23     Court might or might not reach as
24     to the Plan and the application of

Page 293

1  certain precedent in law.  I think
2  it's improper.
3      Q.   Do you need to hear the
4  question again?
5      A.   Yes, I do.
6           (The reporter reads the
7      record as follows:
8           "QUESTION:  Could you tell
9      me your understanding of what
10     happened in UNR?")
11          MS. HARDING:  Object.  Are
12     you asking about the decision or
13     what happened in the case?
14          MR. COHN:  What the result
15     was to the insurer in that case.
16     A.   My understanding is that
17 the court --
18          MS. HARDING:  Same
19     objections but go ahead.
20     A.   -- held that the
21 confirmation of a Plan of Reorganization
22 triggered insurers' obligations to pay.
23     Q.   Okay.  I will represent to
24 you that UNR as part of its settlement was

Page 294

1   to pay 150 million dollars of its stock
2   into the Trust and that the holding was
3   that the confirmation of that Plan
4   required the insurer to immediately pay
5   UNR the value of that stock.  And my
6   question to you is:  Is it the intention
7   of the insurer neutrality Plan provision
8   in this Plan to protect the insurers from
9   such a result in this case?
10         A.   I believe that it is
11  Grace's intent, yes.
12         MR. COHN:  Okay, I have no
13  other questions.
14         MR. BROWN:  I have a couple
15  of follow-ups.
16         MS. HARDING:  Anybody on
17  the phone that has questions?
18         MR. KRAMER:  I know Dan
19  Speights will have questions.
20         MR. DOWNEY:  I have
21  questions.  This is Phil Downey for
22  Scotts but I'm happy to wait my
23  turn.
24         MR. COHN:  If I may suggest

Page 295

1   that PD be held to the end?
2          MS. HARDING:  Yeah, so
3   we'll wait for PD folks to the end.
4   Are there insurers on the phone
5   that have any questions?  Any
6   insurers on the phone?  No?
7          MR. MANGAN:  I may have
8   questions.  This is Kevin Mangan on
9   behalf of the State of Montana.
10         MS. HARDING:  Okay, great.
11  EXAMINATION BY
12  MR. MANGAN:
13         Q.   Good afternoon, Mr. Finke.
14  Can you hear me all right on the phone?
15         A.   Yes.
16         Q.   Okay, great.
17         Are you aware the State of
18  Montana's filed a claim for contribution
19  and indemnification against Grace?
20         A.   Yes.
21         Q.   And in this bankruptcy,
22  obviously?
23         A.   Yes.
24         Q.   And a proof of claim.

Page 296

1          How is the State classified under
2   the Plan?
3          MS. HARDING:  Object to
4   form.  Go ahead, to the extent you
5   know.
6          A.   As a Class 6 indirect PI
7   Trust claim.
8          Q.   What is the basis for that
9   classification?
10         A.   Well --
11         MS. HARDING:  I'm just
12  going to object to the extent that
13  it calls for attorney-client
14  privilege or work product
15  communications.  To the extent you
16  can answer without divulging that,
17  then go forward.  And to the extent
18  that -- I do agree that it's broad
19  and I'm not sure I understand what
20  he's asking about, but if you do,
21  Richard, go ahead.
22         A.   My answer is going to be
23  the definition of indirect PI Trust claim
24  in the Plan.

Page 297

1          Q.   Is it your position that
2   contribution and indemnification claims
3   fit within the indirect PI definition?
4          A.   Yes.
5          Q.   Mr. Lewis had asked you a
6   series of questions with regard to the
7   treatment of Libby claimants' claims under
8   the Plan and their claims specifically as
9   to Maryland Casualty, the State of Montana
10  and Burlington Northern.  Do you recall
11  that questioning?
12         A.   Yes.
13         Q.   I believe you testified --
14  and obviously correct me if I'm wrong --
15  that the Libby claimants' claims against
16  the State that give rise to the State's
17  claims against the debtors for
18  indemnification or contribution go into
19  the Trust.
20         MS. HARDING:  Object to
21  form.
22         Q.   Is that your testimony?
23         A.   That the Montana -- that
24  the State of Montana's claims for

Page 334

1  settlement agreement in front of you
2  involving Commercial Union?
3      A.  Yes.
4      Q.  And there was a contractual
5  indemnity provision in there?  Do you
6  recall that?
7      A.  Yes.
8      Q.  And we had a discussion as
9  to what type of claim that was and you
10  indicated that that was an insurer
11  indemnified TDP claim?
12      MR. LIESEMER:  Object to
13  the form.
14      Q.  Do you recall that?
15      MS. HARDING:  Object to
16  form and to the question to the
17  extent that it's maybe mixing
18  apples and oranges; I'm not sure.
19  I'm just confused.
20      A.  I believe -- I don't think
21  I identified it as such.  I think I might
22  have agreed that it fit the definition
23  that's in the TDP.
24      Q.  Yes.  I thought you said

Page 335

1  that's what it was, but maybe I'm wrong.
2      A.  Okay, maybe I'm wrong.  At
3  this hour, it could go either way.
4      Q.  Well, I'm not sure what to
5  make of that.  Maybe I should go fishing
6  here.
7      What I'm driving at, is to the
8  extent that settled asbestos insurance
9  entities have contractual indemnity claims
10  against Grace under their respective
11  settlement agreements, those are
12  classified as Class 6 claims, are they
13  not?
14      A.  Yes.
15      MR. LIESEMER:  Object to
16  form.
17      Q.  That's why my client, One
18  Beacon, got a Class 6 ballot, I presume?
19      A.  Yes.
20      Q.  And that's why my other
21  client, Seaton, got a Class 6 ballot,
22  correct?
23      A.  Yes.
24      MS. HARDING:  Object to

Page 336

1      form.  To the extent you know,
2      but...
3      Q.  So would those be examples
4  of other contractual indemnity claims in
5  response to Mr. Plevin's question to you
6  of earlier today that are classified as
7  Class 6 claims?
8      A.  Yes, I believe they would
9  be.
10      Q.  Okay.  And I think you
11  mentioned -- you reiterated here just a
12  moment ago that the classification of the
13  Fireman's Fund Insurance Company
14  contractual indemnity claim was something
15  that was under discussion, I think was the
16  term you used.
17      A.  Yes, sir.
18      Q.  Is that also true of the
19  contractual indemnity claims held by
20  settled asbestos insurance companies?
21      MS. HARDING:  Object to
22  form.
23      A.  Not to my knowledge.
24      Q.  With respect to the

Page 337

1  Fireman's Fund Insurance Company claim,
2  when you say it's under discussion, do you
3  mean to suggest that it may be classified
4  differently than Class 6?
5      MS. HARDING:  Object to the
6  extent that it calls for
7  attorney-client, work product or
8  joint interest communications.  If
9  you can answer without divulging
10  those, go for it.
11      A.  Yeah, I think that follows
12  from that, that it's some aspect that's
13  under discussion.
14      Q.  Is one of the other
15  classifications being considered Class
16  9?
17      A.  I don't feel I can answer
18  that.
19      Q.  Different subject.
20      Earlier today I was asking you a
21  series of questions regarding Section 7.15
22  in the Plan.  That's the insurance
23  neutrality provision.  We had a lengthy
24  discussion about 7.15 and its interaction

Page 338

1   with 11.9, you'll recall?
2       A.   Yes.
3       Q.   That's the exculpation
4   provision.
5       A.   Yes.
6       Q.   You indicated that you had
7   some doubt, you thought there was some
8   other provision that you were thinking
9   about but couldn't recall that might --
10  I'm paraphrasing -- take precedence over
11  the insurance neutrality provision in
12  7.15.  Do you recall that testimony?
13      A.   I recall that, yes.
14      Q.   Okay.  Since or during one
15  of the many breaks we've had today, have
16  you been able to figure out what provision
17  it was that you were thinking of?
18      A.   Yes, I believe so, and it
19  would not have the effect of overriding
20  the 7.15(a).  The provision I was thinking
21  of related to the court retaining
22  exclusive jurisdiction over a number of
23  issues, but even with -- first of all,
24  that would not -- I don't think that would

Page 339

1   apply here.  But especially with respect
2   to insurance issues, as you probably know,
3   the jurisdiction is not exclusive.
4       Q.   That was the only other
5   provision?
6       A.   Yeah, that was -- that is
7   the only one that I had in mind.
8           MS. HARDING:  And object to
9   the form of your question with the
10  use of the term "other" because I
11  don't think that he testified that
12  there was --
13          MR. BROWN:  I think he
14  mentioned that there was at least
15  one other provision, there might
16  have been two, and I'm just trying
17  to clarify whether the one he just
18  referred to involving the retention
19  of jurisdiction is the only other
20  provision.
21          MS. HARDING:  That he was
22  thinking about.
23          MR. BROWN:  That he was
24  thinking of --

Page 340

1           THE WITNESS:  Yes.
2           MR. BROWN:  -- when he was
3   suggesting that there was an
4   additional section to Section 7.15
5   in the Plan.
6       A.   Yes.  Yes, that's the only
7   one.
8           MR. BROWN:  All right.
9           MS. HARDING:  I think --
10  object to -- I'm just going to
11  object to the form of the question,
12  Mike, because I think your -- maybe
13  I'm wrong, but I think that your
14  questions are suggesting that he
15  testified that there was a
16  provision in the Plan that
17  overrode -- overrides Section
18  7.15(a) and I don't think that was
19  his testimony.  He said he was
20  going to look for one and he said
21  he didn't find one.
22          MR. BROWN:  The one he had
23  in mind was the one he just
24  testified to.

Page 341

1           MS. HARDING:  Yes, yes.
2           THE WITNESS:  Correct.
3           MS. HARDING:  Okay, sorry.
4   I just wanted to make sure we're
5   clear.
6           MR. BROWN:  Thank you, Mr.
7   Finke.
8           MS. HARDING:  Mr. Speights,
9   are you on?
10          MR. SCHIAVONI:  Barbara, I
11  just had 10 minutes of questioning.
12  I can do it after Mr. Speights or
13  before, whenever you want.  This is
14  Tanc Schiavoni.
15          MS. HARDING:  Oh, Tanc, Mr.
16  Schiavoni.
17          MR. SCHIAVONI:  I'll be
18  quick.  I had to get off the line
19  to book a flight to Pittsburgh.
20          MS. HARDING:  Is Mr.
21  Speights on the line?
22          MR. SPEIGHTS:  I'm on, and
23  I don't mind if the gentleman wants
24  to go first.



## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                              :      Chapter 11
                                    :      Case No. 01-01139 JKF
W.R. GRACE & CO., *et al.,*          :      (Jointly Administered)
                                    :
        Debtors.                    :

### <u>NOTICE OF DEPOSITION OF DEBTORS PURSUANT TO RULE 30(B)(6)</u>

PLEASE TAKE NOTICE that, pursuant to Rule 30 of the Federal Rules of Civil

Procedure and Rules 7030 and 9014 of the Federal Rules of Bankruptcy Procedure, OneBeacon

America Insurance Company ("OneBeacon"), Seaton Insurance Company ("Seaton"),

Government Employees Insurance Company ("GEICO"), and Columbia Insurance Company

f/k/a Republic Insurance Company ("Columbia"), through their undersigned counsel, will take

the deposition of **W.R. Grace & Co., et al.** ("Debtors"), c/o David M. Bernick, Esq., Kirkland &

Ellis LLP, 200 East Randolph Drive, Chicago, IL 60601. The deposition will commence on

**April 28, 2009,** beginning at **9:30 a.m.,** at Drinker Biddle & Reath LLP, 1100 N. Market Street,

Wilmington, DE 19801-1254, and will continue from day to day thereafter until complete. The

deposition will proceed before an officer authorized by law to administer oaths and will be

recorded by stenographic means. You are hereby invited to attend and examine the witness.

Pursuant to Rule 30(b)(6), the Debtors shall designate one or more officers, directors,

managing agents, or other persons who consent to testify on their behalf as to all facts and other

information known or reasonably available to Debtors relating to the matters set forth in

Attachment A. For each person designated to testify as to any matter set forth in Attachment A,

the Debtors are requested to produce at the deposition all documents which the person has

reviewed in preparing to testify with respect to the matters as to which the person is designated

to testify, and, unless already made available in discovery, all other documents relating to the

matters set forth in Attachment A.

Dated: April 9, 2009

/s/ David P. Primack
Warren T. Pratt (DE Bar I.D. #4334)
David P. Primack (DE Bar I.D. #4449)
DRINKER BIDDLE & REATH LLP
1100 N. Market Street, Suite 1000
Wilmington, DE 19801-1243
Telephone: (302) 467-4200
Facsimile: (302) 467-4201

- and -

Michael F. Brown (*pro hac vice*)
Jeffrey M. Boerger (*pro hac vice*)
DRINKER BIDDLE & REATH LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6996
Telephone: (215) 988-2700
Facsimile: (215) 988-2757

Counsel for OneBeacon America Insurance
Company, Seaton Insurance Company,
Government Employees Insurance
Company, and Columbia Insurance
Company f/k/a Republic Insurance
Company

ATTACHMENT A

DEFINITIONS

1.      "Plan" means the Debtors' First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W. R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants Representative, and the Official Committee of Equity Security Holders Dated February 27, 2009.

2.      The following terms have the meanings ascribed to them in the Plan:

   a.  "Asbestos Insurance Entity"

   b.  "Asbestos Insurance Entity Injunction"

   c.  "Asbestos Insurance Rights"

   d.  "Asbestos Insurance Transfer Agreement"

   e.  "Asbestos PI Channeling Injunction"

   f.  "Asbestos PI Claim"

   g.  "Asbestos PI FCR"

   h.  "Asbestos PI TAC"

   i.  "Asbestos PI Trust"

   j.  "Asbestos PI Trustee"

   k.  "Asbestos PI Trust Agreement"

   l.  "Asbestos PI Trust Distribution Procedures"

   m. "Bankruptcy Code"

   n.  "Class"

   o.  "Debtors"

   p.  "Exhibit Book"

- 1 -

  q. "General Unsecured Claim"

  r. "Indirect PI Trust Claim"

  s. "Plan Documents

  t. "Settled Asbestos Insurance Company"

3. "BNSF" means BNSF Railway Company, or any predecessor of BNSF Railway Company, including without limitation, the Great Northern Railway Company, the Burlington Northern Railroad Company, and The Burlington Northern & Santa Fe Railway Company.

4. "Document" or "documents" shall have the meaning set forth in Rule 34 of the Federal Rules of Civil Procedure, and shall include, without limitation, the original and non-identical copy of any written, electronic, recorded, or graphic matter, however produced or reproduced, including, without limitation, any correspondence, memoranda, notes, meeting minutes, telegrams, reports, transcripts, e-mails, or telephone conversations or any other writings or documentary material of any nature whatsoever, together with any attachments thereto and enclosures therewith, and any other retrievable matter (whether encarded, taped or encoded, electrostatically or otherwise), in the possession, custody, or control, of you, your agents, employees, counsel, or other representatives. Non-identical copies, drafts, and identical copies with handwriting are separate "documents" within the meaning of that term.

5. "Kaneb" means Kaneb Pipe Line Operation Partnership, L.P. and/or Support Terminal Services, Inc.

6. "Libby Claimants" means the claimants who allege personal injuries due to exposure to asbestos from the Debtors' operations in Lincoln County, Montana.

7. "Non-Settled Asbestos Insurance Company" means any Asbestos Insurance Entity other than a Settled Asbestos Insurance Company.

8.      "Scotts" means The Scotts Company, LLC.

SUBJECT MATTER OF TESTIMONY

A.      Classification and treatment of Indirect PI Trust Claims, including "Indemnified Insurer TDP Claims" and "Insurance-Related TDP Claims" as those terms are used in Sections 5.13 and 5.12 respectively of the Asbestos PI Trust Distribution Procedures.

B.      Bases for the classification of certain contractual indemnity claims held by Settled Asbestos Insurance Companies as Class 6 Asbestos PI Claims.

C.      Bases for the classification and treatment of non-asbestos-related contractual indemnity claims held by Settled Asbestos Insurance Companies as Class 9 General Unsecured Claims.

D.      Scope and operation of the Asbestos PI Channeling Injunction.

E.      Scope and operation of the Asbestos Insurance Entity Injunction and Successor Claim Injunction.

F.      Scope and operation of Section 7.15 of the Plan entitled, "Insurance Neutrality," and any other purported insurance neutrality provisions in the Plan or Plan Documents.

G.      Operation of the Asbestos PI Trust Agreement and Asbestos PI Trust Distribution Procedures.

H.      Bases for Settled Asbestos Insurance Company designations appearing in Exhibit 5 to the Exhibit Book.

I.      Scope and bases for releases and exculpation provisions in the Plan.

- 4 -

J.      The scope, operation, and necessity of the findings of fact, conclusions of law, orders, and decrees set forth in Section 7.7 of the Plan.

K.      The impact of the Plan and Plan Documents on the claims asserted, threatened, or that may later be asserted by Scotts, BNSF, the Libby Claimants, and/or Kaneb against the Debtors and/or any Asbestos Insurance Entity.

L.      The criteria used to select the Asbestos PI Trustees and the Asbestos PI TAC.

M.      The business background, experience, and qualifications of the individuals selected to be the Asbestos PI Trustees and the members of the Asbestos PI TAC.

N.      The respective powers and authority conferred upon the Asbestos PI Trustees, Asbestos PI TAC, and the Asbestos PI FCR under the Plan and Plan Documents including, but not limited to, the Asbestos PI Trust Agreement, Asbestos PI Trust Distribution Procedures, and the Asbestos Insurance Transfer Agreement.

O.      The respective roles of the Asbestos PI Trustees, Asbestos PI TAC, and the Asbestos PI FCR in the evaluation, handling, defense and settlement/resolution of Asbestos PI Claims under the Plan and Plan Documents.

P.      The role, if any, of the Asbestos Insurance Entities in the evaluation, handling, defense and settlement/resolution of Asbestos PI Claims under the Plan and Plan Documents.

Q.      The scope of the Asbestos Insurance Rights that are to be transferred or assigned to the Asbestos PI Trust pursuant to the Asbestos Insurance Transfer Agreement, and any other Plan Documents.

R.     The impact of the Plan and Plan Documents on the respective rights and duties of the Debtors and Asbestos Insurance Entities under the Asbestos Insurance Policies.

S.     The impact of the Plan and Plan Documents on subsequent coverage litigation between the Asbestos PI Trust (or the Debtors) and Asbestos Insurance Entities including, but not limited to, Non-Settled Asbestos Insurance Companies.

T.     The nature and value of the Asbestos PI Trust Assets to be used to fund the Asbestos PI Trust.

U.     The Plan's compliance with Section 524(g) of the Bankruptcy Code, as well as other applicable provisions of the Bankruptcy Code.

V.     Any other topic identified in a Rule 30(b)(6) Deposition Notice served by any Asbestos Insurance Entity on the Debtors.

14509752_1

WR Grace / Confirmation Hearing 30(b)(6) Deposition Notice

Witness Designations

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| Anderson Memorial Hospital | The interpretation of the sales information attached to Anderson Memorial Hospital's ZAI Proof of Claim Form, including billing registers, and all information contained therein | Richard Finke |
| Travelers and Allstate | 1. The treatment of the Travelers 1992 Agreement under the Revised Joint Plan | Richard Finke |
| | 2. The treatment of the Travelers 1996 Agreement under the Revised Joint Plan | Richard Finke |
| | 3. The treatment of the Allstate 1994 Agreement under the Revised Joint Plan | Richard Finke |
| | 4. The treatment of the Allstate 1996 Agreement under the Revised Joint Plan | Richard Finke |
| | 5. The provisions of the Revised Joint Plan that relate to Asbestos Insurance Settlement Agreements, including, without limitation, Sections 1.1(14), 1.1(16), 1.1(200), 7.7, 7.13, 7.15, 8.4.1, 9.1 and Exhibit 6 (Asbestos Insurance Transfer Agreement) | Richard Finke |
| | 6. The provisions of the Revised Joint Plan that relate to Asbestos Insurance Reimbursement Agreements, including, without limitation, Sections 1.1(9), 1.1(16), 7.2.2(d)(iv), 7.7, 7.13, 7.15, 9.1 and Exhibit 6 (Asbestos Insurance Transfer Agreement) | Richard Finke |
| | 7. The provision of the Revised Joint Plan that relate to Indirect PI Trust Claims, including, without limitation, Section 1.1(138) and Exhibit 4 (Trust Distribution Procedures) | Richard Finke |
| | **SUPPLEMENTAL NOTICE** | |
| | 1. The provisions of the Revised Joint Plan that relate to Asbestos PD Claims and Indirect PD Trust Claims, including, without limitation, Sections 1.1(18), 1.1(137), 3.1.7, Exhibit 3 (Asbestos PD Trust Agreement), and Exhibit 25 (Class 7A CMO) Trust Distribution Procedures | Richard Finke |
| | 2. The classification of Travelers as a Class 7A creditor and solicitation of Class 7A claims | Richard Finke |

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | 3. The treatment and/or payment, pursuant to the Revised Joint Plan, of claims for indemnification arising under the Travelers 1992 Agreement arising from Asbestos PD Claims | Richard Finke |
| | 4. The treatment and/or payment, pursuant to the Revised Joint Plan, of claims for indemnification arising under the Travelers 1996 Agreement arising from Asbestos PD Claims | Richard Finke |
| OneBeacon, Seaton, GEICO, Columbia | A. Classification and treatment of Indirect PI Trust Claims, including "Indemnified Insurer TDP Claims" and "Insurance-Related TDP Claims" as those terms are used in Sections 5.13 and 5.12 respectively of the Asbestos PI Trust Distribution Procedures | Richard Finke |
| | B. Bases for the classification of certain contractual indemnity claims held by Settled Asbestos Insurance Companies as Class 6 Asbestos PI Claims | Richard Finke |
| | C. Bases for the classification and treatment of non-asbestos-related contractual indemnity claims held by Settled Asbestos Insurance Companies as Class 9 General Unsecured Claims | Richard Finke |
| | D. Scope and operation of the Asbestos PI Channeling Injunction | Richard Finke |
| | E. Scope and Operation of the Asbestos Insurance Entity Injunction and Successor Claim Injunction | Richard Finke |
| | F. Scope and operation of Section 7.15 of the Plan entitled, "Insurance Neutrality", and any other purported insurance neutrality provisions in the Plan or Plan Documents | Richard Finke |
| | G. Operation of the Asbestos PI Trust Agreement and Asbestos PI Trust Distribution Procedures | Jay Hughes |
| | H. Bases for Settled Asbestos Insurance Company designations appearing in Exhibit 5 to the Exhibit Book | Richard Finke |
| | I. Scope and bases for releases and exculpation provisions in the Plan | Richard Finke |
| | J. The scope, operation, and necessity of the findings of fact, conclusions of law, orders, and decrees | Richard Finke |

2

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
| --- | --- | --- |
| | set forth in Section 7.7 of the Plan | Richard Finke |
| | K. The impact of the Plan and Plan Documents on the claims asserted, threatened, or that may later be asserted by Scotts, BNSF, the Libby Claimants, and/or Kaneb against the Debtors and/or any Asbestos Insurance Entity | Richard Finke |
| | L. The criteria used to select the Asbestos PI Trustees and the Asbestos PI TAC | Richard Finke |
| | M. The business background, experience, and qualifications of the individuals selected to be the Asbestos PI Trustees and the members of the Asbestos PI TAC | Richard Finke |
| | N. The respective powers and authority conferred upon the Asbestos PI Trustees, Asbestos PI TAC, and the Asbestos PI FCR under the Plan and Plan Documents including, but not limited to , the Asbestos PI Trust Agreement, Asbestos PI Trust Distribution Procedures, and the Asbestos Insurance Transfer Agreement | Richard Finke |
| | O. The respective roles of the Asbestos PI Trustees, Asbestos PI TAC, and the Asbestos PI FCR in the evaluation, handling, defense and settlement/resolution of Asbestos PI Claims under the Plan and Plan Documents | Richard Finke |
| | P. the role, if any, of the Asbestos Insurance Entities in the evaluation, handling, defense and settlement/resolution of Asbestos PI Claims under the Plan and Plan Documents | Richard Finke |
| | Q. The scope of the Asbestos Insurance Rights that are to be transferred or assigned to the Asbestos PI Trust pursuant to the Asbestos Insurance Transfer Agreement, and any other Plan Documents | Richard Finke |
| | R. The impact of the Plan and Plan Documents on the respective rights and duties of the Debtors and Asbestos Insurance Entities under the Asbestos Insurance Policies | Richard Finke |
| | S. The impact of the Plan and Plan Documents on subsequent coverage litigation between the Asbestos PI Trust (or the Debtors) and Asbestos Insurance Entities including, but not limited to, Non- | Richard Finke |

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| Fireman's Fund Insurance Co. (re Surety Bond Issues) | Settled Asbestos Insurance Companies | |
| | T. The nature and value of the Asbestos PI Trust Assets to be used to fund the Asbestos PI Trust | Hudson La Force |
| | U. The Plan's compliance with Section 524(g) of the Bankruptcy Code, as well as other applicable provisions of the Bankruptcy Code | Richard Finke |
| | 1. The classification and treatment of the Proofs of Claim under the Plan (including, to the extent applicable, the TDPs) | Richard Finke |
| | 2. The classification and treatment of the Supersedeas Bond Claim under the Plan (including, to the extent applicable, the TDPs) | Richard Finke |
| | 3. The extent to which the claims asserted in the Proofs of Claim are "Pre-Petition Liquidated Claims" subject to treatment under § 5.2 of the TDPs | Richard Finke |
| | 4. The extent to which the Supersedeas Bond Claim is "Pre-Petition Liquidated Claim" | Richard Finke |
| | 5. The actual, expected, and/or intended effect of excluding Indirect PI Trust Claims from § 5.6 of the TDPs | Richard Finke |
| | 6. The meaning and operation of § 5.2 of the TDPs in respect of Pre-Petition Liquidated Claims | Richard Finke |
| | 7. The meaning of the phrase "provided there is no supersedeas bond associated with such verdict or judgment…" in § 5.2(a)(ii) of the TDPs, as well as how this phrase works in relation to § 5.2(b) of the TDPs | Richard Finke |
| | 8. The extent to which the Supersedeas Bond Claim is an Indirect PI Trust Claim, a Class 6 Claim, or a Class 9 Claim | Richard Finke |
| | 9. Debtors' contentions, if any, regarding whether FFIC may setoff any obligations it may owe to Grace under liability insurance policies issued or allegedly issued by FFIC to W.R. Grace & Co., et | Richard Finke |

4

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | a1., against Grace's obligations to FFIC under the Special Surety Indemnification Agreement, and the bases for any such contentions | |
| | 10. Debtors' pre-petition payment or funding for the payment of Asbestos Claims, such as judgments, settlements, and litigation costs, from sources other than liability insurance | Jay Hughes |
| | 11. The actual, expected, and/or intended impact, if any, of Plan Confirmation on the Special Surety Indemnification Agreement, the Supersedeas Bond, and the Supersedeas Bond Claim, including whether or not Reorganized Debtors will retain the Debtors' obligations under the Special Surety Indemnification Agreement and who, if not Reorganized Debtors, will succeed to or assume such obligations | Richard Finke |
| | 12. The actual, expected, and/or intended impact, if any, of Plan Confirmation on W.R. Grace & Co. v. Aaron Clifton Edwards, et al., No. 06-00-00112-CV (Tex. App., 6th Appellate Dist.), and the claims asserted in the Proofs of Claim | Jay Hughes |
| Fireman's Fund Insurance Co. and Allianz | 1. The drafting, negotiation, scope and operation of the Plan, the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures, including efforts to (i) involve Asbestos Insurance Entities in the negotiation and/or drafting of the Plan, the Asbestos PI Trust Distribution Procedures, or the Asbestos PI Trust Agreement, or (ii) obtain the consent of the Asbestos Insurance Entities to the Plan, the Asbestos PI Trust Distribution Procedures, and the Asbestos PI Trust Agreement | Richard Finke |
| | 2. The scope and operation of the Asbestos Insurance Entity Injunction and Successor Claims Injunction | Richard Finke |
| | 3. The scope and operation of the Asbestos PI Channeling Injunction, including but not limited to, the effect of the Asbestos PI Channeling Injunction on claims against Settled Asbestos Insurance Companies | Richard Finke |
| | 4. The bases for designating an Asbestos Insurance Entity as a Settled Asbestos Insurance Company | Richard Finke |
| | 5. The selection, qualification, and experience of the proposed Asbestos PI Trustees and the proposed | Richard Finke |

| Dep. Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | Asbestos PI Trust Advisory Committee members | |
| | 6. Compensation or other financial arrangements between or among any of the proposed Asbestos PI Trustees, Asbestos PI Trust Advisory Committee members or members of the Asbestos PI Committee in respect of the negotiation, drafting or contemplated operation of the Asbestos PI Trust | Richard Finke |
| | 7. The value of the Warrants | Hudson La Force |
| | 8. The meaning and operation of Section 7.15 of the Plan, including the interaction of Section 7.15 with Sections 8.1.1, 7.13, 7.7(uu), and 7.7(tt) and the Asbestos Insurance Transfer Agreement | Richard Finke |
| | 9. The meaning of the phrase "any defense that the Plan or any of the Plan Documents do not comply with the Bankruptcy Code" in Section 1.1(16) (definition of "Asbestos Insurer Coverage Defenses") | Richard Finke |
| | 10. The impact, if any, of Plan Confirmation on Non-Settled Asbestos Insurance Companies, including: <br> a) Whether and to what extent the Reorganized Debtors retain the Debtors' obligations under Asbestos Insurance Policies; <br> b) Whether the Asbestos PI Trust assumes the obligations of the Debtors under the Asbestos Insurance Policies; <br> c) The application of the exculpation provision of Section 11.9 of the Plan; <br> d) Whether the Plan will act as a settlement or judgment that will immediately trigger a payment obligation under the Asbestos Insurance Policies issued by the Non-Settled Asbestos Insurance Companies; <br> e) Whether the Non-Settled Asbestos Insurance Companies' indemnity obligations will be triggered due to the establishment of title Asbestos PI Trust and transfer of assets to the Trust; <br> f) Whether the Non-Settled Asbestos Insurance Companies' indemnity obligations for any Asbestos PI Claim will accrue or be triggered prior to the payment of an Asbestos PI Claim by Asbestos PI Trust; <br> g) Whether and how the Plan and Plan Documents can be used in subsequent Asbestos Insurance Actions or other proceedings by the Asbestos PI Trust or the Debtors against Non-Settled Asbestos | Richard Finke |

6

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | Insurance Companies;<br><br>b) The role, if any, the Non-Settled Asbestos Insurance Companies will have in the evaluation, defense, allowance, or settlement of Asbestos PI Claims channeled to or submitted to the Asbestos PI Trust;<br><br>i) Whether, and to what extent, the Non-Settled Asbestos Insurance Companies will be responsible for paying all or part of any Asbestos PI Claim resolved by the Asbestos PI Trust pursuant to the Asbestos PI Trust Distribution Procedures or for indemnifying the Asbestos PI Trust for any payment it makes on account of Asbestos PI Claims | Richard Finke |
| | 11. The Debtors' duties and obligations with respect to any Asbestos Insurance Policies upon the transfer of the Asbestos Insurance Rights to the Asbestos PI Trust | Richard Finke |
| | 12. The meaning and scope of the definition of Indirect PI Trust Claims, including whether, and to what extent, claims by Asbestos Insurance Entities for indemnification and/or contribution from Debtors for claims asserted against them, such as, by illustration, the Libby Claimants, or The Scotts Company, LLC, or BNSF Railway Company (or its predecessors) | Richard Finke |
| | 13. The treatment of Indirect PI Trust Claims by the Plan and the Plan Documents | Richard Finke |
| | 14. The basis for classification and treatment of an Asbestos Insurance Entity's Asbestos Claims against the Debtors for indemnification arising from contract or otherwise as Class 6 Asbestos PI Claims | Richard Finke |
| Maryland Casualty Co., Zurich Insurance Co., and Zurich International | 1. The scope of protection provided to Settled Asbestos Insurance Companies by the Asbestos PI Channeling Injunction and the scope of Debtors' indemnity obligations under the respective Asbestos Insurance Settlement Agreements | Richard Finke |
| | 2. The viability of the Plan if the Court upholds any objections to the application of the Asbestos PI Channeling Injunction to one or more of the Settled Asbestos Insurance Companies | Richard Finke |
| | 3. The Plan's treatment of any Settled Asbestos Insurance Companies who are found by the Court to have discrete, unsettled coverage under an otherwise settled policy | Richard Finke |

7

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | 4. The intended scope of Debtors' indemnity obligations under the MCC Settlement Agreements | Richard Finke |
| | 5. The Plan Proponents' position that Settled Asbestos Insurance Companies are not creditors | Richard Finke |
| | 6. The impact of the Plan and Plan Documents on the claims asserted, threatened, or that may later be asserted by Scotts, BNSF, and/or the Libby Claimants, against the Debtors and/or any Asbestos Insurance Entity | Richard Finke |
| | 7. The bases for the classification of certain indemnity claims arising from contract or otherwise, against the Debtors held by Settled Asbestos Insurance Companies as Class 6 Asbestos PI Claims | Richard Finke |
| | 8. The classification and treatment under the Plan of Asbestos Insurance Entities' claims against the Debtors for indemnification arising from contract or otherwise which are not Indirect PI Trust Claims | Richard Finke |
| | 9. The scope and operation of the Asbestos PI Channeling Injunction, including but not limited to, the effect of the Asbestos PI Channeling Injunction on claims against Settled Asbestos Insurance Companies | Richard Finke |
| | 10. The Plan's compliance with section 524(g) of the Bankruptcy Code | Richard Finke |
| | 11. The meaning and scope of the indirect PI Trust Claims, including whether, and to what extent, claims by Asbestos Insurance Entities for indemnification and contribution deriving from claims against them, such as those by the Libby Claimants, Scotts, BNSF are Indirect PI Trust Claims | Richard Finke |
| | 12. The treatment of Indirect PI Trust Claims under the Plan, the Asbestos PI Trust Distribution Procedures, and the other Plan Documents, including but not limited to, the treatment of an Asbestos Insurance Entity's claims against the Debtors for indemnification arising from a pre-bankruptcy petition settlement agreement | Richard Finke |
| | 13. The scope of Section 524(g) of the Bankruptcy Code on claims against Settled Asbestos Insurance | Richard Finke |

8

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | Companies | |
| | 14. The scope and operation of the Asbestos Insurance Entity Injunction and Successor Claims Injunction | Richard Finke |
| | 15. The meaning of the phrase "any defense that the Plan or any of the Plan Documents do not comply with the Bankruptcy Code" in Section 1.1(16)(definition of "Asbestos Insurer Coverage Defenses") | Richard Finke |
| | 16. The meaning and operation of the insurer neutrality provision of Section 7.15 of the Plan, including the interaction of Section 7.15 of the Plan with Sections 8.1.1, 7.13, 7.7(uu), and 7.7(tt) of the Plan and the Asbestos Insurance Transfer Agreement | Richard Finke |
| | 17. The Plan's treatment of Asbestos Insurance Reimbursement Agreements | Richard Finke |
| Libby Claimants | **Plan** | |
| | 1. Development of Plan among plan proponents, including negotiations, other discussions between or within the plan proponents, and preparation of documents, including drafts. | Richard Finke |
| | 2. Funding of the Asbestos PI Trust, including value at time of negotiation of assets to be used to fund the Asbestos PI Trust. | Hudson La Force |
| | 3. Current value of assets to be used to fund the Asbestos PI Trust. | Hudson La Force |
| | 4. Projected value at scheduled Confirmation Hearing of assets to be used to fund the Asbestos PI Trust. | Hudson La Force |
| | **Asbestos PI Trust** | |
| | 1. Development of the TDP, including negotiations, other discussions between or within the plan proponents, and preparation of documents, including drafts. | Jay Hughes |

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | 2. TDP's in other cases used as models, points of reference or in any other way utilized in the development of the TDP ("Other TDPs"). | Jay Hughes |
| | 3. Liquidation of claims under Other TDPs. | Jay Hughes |
| | 4. Process by which the Asbestos PI Trust will liquidate claims. | Jay Hughes |
| | 5. Disease categories under the TDP. | Jay Hughes |
| | 6. The "Severe Pleural" disease category under the TDP. | Jay Hughes |
| | 7. Provisions of the TDP concerning "Extraordinary Claims." | Jay Hughes |
| | Injunctions | |
| | 1. The Asbestos PI Channeling Injunction. | Richard Finke |
| | 2. Development of Asbestos PI channeling Injunction among plan proponents, including negotiations, other discussions between or within the plan proponents, and preparation of documents, including drafts. | Richard Finke |
| | 3. Injunctions in other cases similar to the Asbestos PI Channeling Injunction used as models, points of reference or in any other way utilized in the development of the Asbestos PI Channeling Injunction ("Other Channeling Injunctions"). | Richard Finke |
| | 4. Litigation concerning scope of Other Channeling Injunctions. | Richard Finke |
| | 5. Scope and operation of the Asbestos PI Channeling Injunction, including the effect, if any, on actions by Libby Claimants against parties other than the Debtors, including but not limited to BNSF, the State of Montana and Maryland Casualty Company, for their own allegedly tortious conduct ("Libby Claimants' Independent Actions"). | Richard Finke |
| | 6. Necessity of, or benefit to plan proponents or Asbestos PI Trust from, the Asbestos PI Channeling | Richard Finke |

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | Injunction (including consideration supplied to any of the plan proponents by those protected by the Asbestos PI Channeling Injunction). | Richard Finke |
| | 7. The Asbestos Insurance Entity Injunction. | Richard Finke |
| | 8. Development of Asbestos Insurance Entity Injunction among plan proponents, including negotiations, other discussions between or within the plan proponents, and preparation of documents, including drafts. | Richard Finke |
| | 9. Injunctions in other cases similar to the Asbestos Insurance Entity Injunction used as models, points of reference or in any other way utilized in the development of the Asbestos Insurance Entity Injunction ("Other Insurance Entity Injunctions"). | Richard Finke |
| | 10.  Litigation concerning scope of Other Insurance Entity Injunctions. | Richard Finke |
| | 11.  Scope and operation of the Asbestos Insurance Entity Injunction, including the effect, if any, on Libby Claimants' Independent Actions. | Richard Finke |
| | 12.  Necessity of, or benefit to plan proponents or Asbestos PI Trust from, the Asbestos Insurance Entity Injunction (including consideration supplied to any of the plan proponents by those protected by the Asbestos Insurance Entity Injunction). | Richard Finke |
| | 13.  The Successor Claims Injunction. | Richard Finke |
| | 14.  Development of Successor Claims Injunction among plan proponents, including negotiations, other discussions between or within the plan proponents, and preparation of documents, including drafts. | Richard Finke |
| | 15.  Injunctions in other cases similar to the Successor Claims Injunction used as models, points of reference or in any other way utilized in the development of the Successor Claim Injunction ("Other Successor Claims Injunctions"). | Richard Finke |

11

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | 16.  Litigation concerning scope of Other Successor Claims Injunctions. | Richard Finke |
| | 17.  Scope and operation of the Successor Claims Injunction, including the effect, if any, on Libby Claimants' Independent Actions. | Richard Finke |
| | 18.  Necessity of, or benefit to plan proponents or Asbestos PI Trust from, the Successor Claims Injunction (including consideration supplied to any of the plan proponents by those protected by the Successor Claims Injunction). | Richard Finke |
| | 19.  Release and exculpation provisions of the Plan (the "Releases and Exculpations"). | Richard Finke |
| | 20.  Development of The Releases and Exculpations among plan proponents, including negotiations, other discussions between or within the plan proponents, and preparation of documents, including drafts. | Richard Finke |
| | 21.  Injunctions in other cases similar to the Releases and Exculpations used as models, points of reference or in any other way utilized in the development of the Releases and Exculpations ("Other Releases and Exculpations"). | Richard Finke |
| | 22.  Litigation concerning scope of Other Releases and Exculpations. | Richard Finke |
| | 23.  Scope and operation of the Releases and Exculpations, including the effect, if any, on Libby Claimants' Independent Actions. | Richard Finke |
| | 24.  Necessity of, or benefit to plan proponents or Asbestos PI Trust from, the Releases and Exculpations (including consideration supplied to any of the plan proponents by those protected by the Releases and Exculpations). | Richard Finke |
| | 25.  The plan's compliance with Section 524(g) of the Bankruptcy Code.

Liquidation Analysis | Richard Finke |

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | 1.  Liquidation analysis contained in Exhibit Book as Exhibit 8 (the "Liquidation Analysis") | Hudson La Force |
| | 2.  Development of Liquidation Analysis among plan proponents, including negotiations, other discussions between or within the plan proponents, and preparation of documents. | Hudson La Force |
| | 3.  Projections, assumptions, calculations and sources of information utilized in preparing Liquidation Analysis. | Hudson La Force |
| | 4.  Any changes in, or changes in the validity of, any such projections, assumptions, calculations and sources of information, through the present date. | Hudson La Force |
| | Claims History | |
| | 1.  Grace claims history concerning Asbestos PI Claims. | Jay Hughes |
| | 2.  Grace's settlement practices and verdict history for Asbestos PI Claims. | Jay Hughes |
| | 3.  Grace's settlement practices and verdict history for punitive damage claims. | Jay Hughes |
| | 4.  Grace's settlement practices and verdict history for wrongful death claims. | Jay Hughes |
| | 5.  Grace's settlement practices and verdict history for claims resulting from exposure to Grace's asbestos in Lincoln County, Montana. | Jay Hughes |
| | 6.  Grace's settlement practices and verdict history for claims resulting from exposure outside of Lincoln County, Montana, to Grace's asbestos originating in Lincoln County, Montana. | Jay Hughes |
| | Rights of BNSF | |
| | 1.  Claims of Burlington Northern Santa Fe Railroad and affiliates ("BNSF") against the Debtors. | Jay Hughes |
| | 2.  Proofs of claim filed by BNSF. | Jay Hughes |

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | 3. Any rights of indemnification by BNSF against the Debtors, and any agreements pertaining thereto. | Jay Hughes |
| | 4. Any rights of contribution by BNSF against the Debtors. | Jay Hughes |
| | 5. Any insurance covering BNSF for Libby Claimants' Independent Actions against BNSF. | Jay Hughes |
| | **Rights of the State of Montana** | |
| | 1. Claims of the State of Montana against the Debtors. | Jay Hughes |
| | 2. Proofs of claim filed by the State of Montana. | Jay Hughes |
| | 3. Any rights of indemnification by the State of Montana against the Debtors, and any agreements pertaining thereto. | Jay Hughes |
| | 4. Any rights of contribution by the State of Montana against the Debtors. | Jay Hughes |
| | 5. Any insurance covering the State of Montana for Libby Claimants' Independent Actions against the State of Montana. | Jay Hughes |
| | **Rights of Maryland Casualty Company** | |
| | 1. Claims of the Maryland Casualty Company, including affiliates ("MCC") against the Debtors. | Jay Hughes |
| | 2. Proofs of claim filed by MCC. | Jay Hughes |
| | 3. Any rights of indemnification by MCC against the Debtors, and any agreements pertaining thereto. | Jay Hughes |
| | 4. Any rights of contribution by MCC against the Debtors. | Jay Hughes |
| | 5. Any insurance covering MCC for Libby Claimants' Independent Actions against MCC. | Jay Hughes |

14

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | **Insurance** | |
| | 1. Grace's insurance policies (whether owned by Grace or purchased for another entity), coverage issues and settlements with insurers. | Jay Hughes |
| | 2. Grace's insurance coverage for products/completed operations, including terms thereof, aggregate caps, and defenses to and limitations on such coverage. | Jay Hughes |
| | 3. Projected value of the Asbestos Insurance Rights constituting products/completed operations coverage. | Jay Hughes |
| | 4. Projected aggregate liquidated amount of the Asbestos PI Claims (including future claims) covered by products/completed operations insurance. | Jay Hughes |
| | 5. Grace's insurance coverage for premises/non-completed operations, including terms thereof, aggregate caps, and defenses to and limitations on such coverage. | Jay Hughes |
| | 6. Projected value of the Asbestos Insurance Rights constituting premises/non-completed operations coverage. | Jay Hughes |
| | 7. Projected aggregate liquidated amount of the Asbestos PI Claims (including future claims) covered by premises/non-completed operations insurance. | Jay Hughes |
| | 8. Settlements with Grace insurers. | Jay Hughes |
| | 9. Bases for designation under the Plan of certain Asbestos Insurance Entities as Settled Asbestos Insurance Companies. | Jay Hughes |
| CNA | 1. The meaning and operation of the insurer neutrality provision of Section 7.15 of the Plan, including the interaction of Section 7.15 of the Plan with Sections 8.1.1, 7.13, 7.7(uu), and 7.7(t) of the Plan and the Asbestos Insurance Transfer Agreement. | Richard Finke |
| | 2. The treatment of Indirect PI Trust Claims under the Plan, the Asbestos PI Trust Distribution Procedures, and the other Plan Documents, including but not limited to, the treatment of an Asbestos | Richard Finke |

| Dep. Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | Insurance Entity's claims against the Debtors for indemnification arising from a pre-bankruptcy petition settlement agreement. | |
| | 3. The meaning and scope of Indirect PI Trust Claims, including whether, and to what extent, claims by Asbestos Insurance Entities for indemnification and contribution deriving from claims against them, such as those by the Libby Claimants, Scotts, and BNSF, are Indirect PI Trust Claims. | Richard Finke |
| | 4. The basis for classification and treatment of an Asbestos Insurance Entity's Asbestos Claims against the Debtors for indemnification arising from contract or otherwise as Class 6 Asbestos PI Claims. | Richard Finke |
| | 5. The classification and treatment under the Plan of Asbestos Insurance Entities' claims against the Debtors for indemnification arising from contract or otherwise which are not Indirect PI Trust Claims. | Richard Finke |
| | 6. The scope and operation of the Asbestos PI Channeling Injunction, including but not limited to, the effect of the Asbestos PI Channeling Injunction on claims against Settled Asbestos Insurance Companies. | Richard Finke |
| | 7. The scope and operation of the Asbestos Insurance Entity Injunction and Successor Claims Injunction. | Richard Finke |
| | 8. The meaning of the phrase "any defense that the Plan or any of the Plan Documents do not comply with the Bankruptcy Code" in Section 1.1(16) (definition of "Asbestos Insurer Coverage Defenses") | Richard Finke |
| | 9. The drafting, negotiation, scope and operation of the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures, including efforts to obtain the consent of the Asbestos Insurance Entities to the Plan, the Asbestos PI Trust Distribution Procedures, and the Asbestos PI Trust Agreement, or to involve them in drafting the Asbestos PI Trust Agreement. | Richard Finke |
| | 10. The selection, qualification, and experience of the Asbestos PI Trustees and Asbestos PI Trust Advisory Committee members. | Richard Finke |

16

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | 11. Any compensation or other financial arrangements between each Asbestos PI Trustee and any Asbestos PI Trust Advisory Committee member or member of the Asbestos Claimants Committee on the one hand, and the Asbestos PI Trust. | Richard Finke |
| | 12. The bases for designating an Asbestos Insurance Entity as a Settled Asbestos Insurance Company. | Richard Finke |
| | 13. The Plan's treatment of Asbestos Insurance Reimbursement Agreements. | Richard Finke |
| | 14. The valuation of the Warrants, including, but not limited to, the use of any valuation model or similar valuation tool. | Hudson La Force |
| | 15. The impact, if any, of Plan Confirmation on Non-Settled Asbestos Insurance Companies, including:<br><br>a. Whether and to what extent the Reorganized Debtors retain the Debtors' obligations under Asbestos Insurance Policies;<br><br>b. Whether the Asbestos PI Trust assumes the obligations of the Debtors under the Asbestos Insurance Policies;<br><br>c. The application of the exculpation provision of Section 11.9 of the Plan;<br><br>d. Whether the Plan will act as a settlement or judgment that will immediately trigger a payment obligation under the Asbestos Insurance Policies issued by the Non-Settled Asbestos Insurance Companies;<br><br>e. Whether the Non-Settled Asbestos Insurance Companies' indemnity obligations will be triggered due to the establishment of the Asbestos PI Trust and transfer of assets to the Trust;<br><br>f. Whether the Non-Settled Asbestos Insurance Companies' indemnity obligations for any Asbestos PI Claim will accrue or be triggered prior to the payment of an Asbestos PI Claim by Asbestos PI Trust;<br><br>g. Whether and how the Plan and Plan Documents can be used in subsequent Asbestos Insurance Actions or other proceedings by the Asbestos PI Trust or the Debtors against Non-Settled Asbestos Insurance Companies;<br><br>h. The role, if any, the Non-Settled Asbestos Insurance Companies will have in the evaluation, defense, allowance, or settlement of Asbestos PI Claims channeled to or submitted to the Asbestos PI | Richard Finke |

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | Trust; | |
| | i. Whether, and to what extent, the Non-Settled Asbestos Insurance Companies will be responsible for paying all or part of any Asbestos PI Claim resolved by the Asbestos PI Trust pursuant to the Asbestos PI Trust Distribution Procedures or for indemnifying the Asbestos PI Trust for any payment it makes on account of Asbestos PI Claims. | |
| | 16. The Debtors' duties and obligations with respect to any Asbestos Insurance Policies upon the transfer of the Asbestos Insurance Rights to the Asbestos PI Trust. | Richard Finke |
| | 17. The treatment of workers compensation obligations as unimpaired, general unsecured claims that are to be liquidated and paid in full. | Richard Finke |
| London Market Companies | 1. The treatment of the London Market Companies 1995 Agreement under the Revised Joint Plan. | Richard Finke |
| | 2. The treatment of the London Market Companies 1996 Agreement under the Revised Joint Plan. | Richard Finke |
| | 3. The provisions of the Revised Joint Plan that relate to Asbestos Insurance Reimbursement Agreements, including, without limitation, Sections 1.1(9), 1.1(16), 7.2.2(d)(iv), 7.7, 7.13, 7.15, 9.1 and Exhibit 6 (Asbestos Insurance Transfer Agreement). | Richard Finke |
| | 4. The provisions of the Revised Joint Plan that relate to Indirect PI Trust Claims, including, without limitation, Sections 1.1(138) and Exhibit 4 (Trust Distribution Procedures). | Richard Finke |

18

*W R GRACE & CO NEW*                                                    *Filing Date: 04/06/08*

UNITED STATES

SECURITIES AND EXCHANGE COMMISSION

WASHINGTON, DC 20549

FORM 8-K

CURRENT REPORT PURSUANT

TO SECTION 13 OR 15(D) OF THE

SECURITIES EXCHANGE ACT OF 1934

Date of report (Date of earliest event reported) April 6, 2008

W. R. GRACE & CO.

(Exact Name of Registrant as Specified in Its Charter)

Delaware

(State or Other Jurisdiction of Incorporation)



|  |  |
|---|---|
| 1-13953 | 65-0773649 |
| (Commission File Number) | (IRS Employer Identification No.) |
| 7500 Grace Drive | 21044 |

Columbia, Maryland
(Address of Principal Executive Offices) (Zip Code)

(410) 531-4000

---

1

(Registrant's Telephone Number, Including Area Code)


(Former Name or Former Address, if Changed Since Last Report)


Check the appropriate box below if the Form 8-K filing is intended to
simultaneously satisfy the filing obligation of the registrant under any of the
following provisions (see General Instruction A.2. below):


o    Written communications pursuant to Rule 425 under the Securities Act (17
CFR 230.425)


o    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR
240.14a-12)


o    Pre-commencement communications pursuant to Rule 14d-2(b) under the
Exchange Act (17 CFR 240.14d-2(b))


o    Pre-commencement communications pursuant to Rule 13e-4(c) under the
Exchange Act (17 CFR 240.13e-4(c))


--------------------------------------------------------------------------------

W. R. GRACE & CO.


FORM 8-K

CURRENT REPORT

Item 7.01.                    Regulation FD Disclosure.

On April 6, 2008, W. R. Grace & Co., on behalf of itself and its subsidiaries
and affiliates that are debtors in the Chapter 11 cases, (the "Company")
entered into an agreement in principle (the "Agreement") with the Official
Committee of Asbestos Personal Injury Claimants, the Future Claimants
Representative and the Official Committee of Equity Security Holders, all
parties-in-interest in the Company's Chapter 11 case, that would settle all
present and future asbestos-related personal injury claims against the Company
on the terms and conditions set forth therein.  Certain terms and conditions of
the Agreement are described in the press release attached hereto as Exhibit
99.1.  The description of the terms and conditions of the Agreement is
qualified in its entirety by reference to the provisions of the Agreement
attached hereto as Exhibit 99.2.

The information furnished pursuant to this Item 7.01, including Exhibit 99.1
and Exhibit 99.2, shall not be deemed to be "filed" for purposes of Section 18
of the Securities Exchange Act of 1934, as amended, (the "Exchange Act"), or
otherwise subject to the liabilities of such section, nor shall such
information be deemed incorporated by reference in any filing under the
Securities Act of 1933, as amended, or the Exchange Act, except as shall be
expressly set forth by specific reference in such a filing.

Item 9.01.                    Financial Statements and Exhibits.

(d)  Exhibits

99.1                          Press Release

99.2                          Term Sheet for Resolution of Asbestos Personal
Injury Claims dated as of April 6, 2008

2

---------------------------------------------------------------------------

SIGNATURES


Pursuant to the requirements of the Securities Exchange Act of 1934, the
Registrant has duly caused this report to be signed by the undersigned,
thereunto duly authorized.


W. R. GRACE & CO.
(Registrant)
By /s/ Mark A. Shelnitz
Mark A. Shelnitz
Secretary


Dated:  April 7, 2008



3
----------------------------------------------------------------------------

Exhibit 99.1

Grace News #2919

Media Relations:              Investor Relations:
William Corcoran              Bridget Sarikas
T +1 410.531.4203            T +1 410.531.4194
Ewilliam.corcoran@grace.com Ebridget.sarikas@grace.com

## GRACE ANNOUNCES SETTLEMENT OF ASBESTOS PERSONAL INJURY CLAIMS

COLUMBIA, Maryland, April 7, 2008 -- W. R. Grace & Co. (NYSE: GRA) today announced an agreement in principle that would settle all present and future asbestos-related personal injury claims. The agreement, reached with the Official Committee of Asbestos Personal Injury Claimants, the Future Claimants Representative and the Official Committee of Equity Security Holders, requires the following assets to be paid into a trust to be established under Section 524(g) of the United States Bankruptcy Code:

.          Cash in the amount of $250 million;

.          Warrants to acquire 10 million shares of Grace common stock at an exercise price of $17.00 per share, expiring one year from the effective date of a plan of reorganization;

.          Rights to proceeds under Grace's asbestos-related insurance coverage;

.          The value of cash and stock under the litigation settlement agreements with Sealed Air Corporation and Fresenius Medical Care Holdings, Inc.; and

Deferred payments at $110 million per year for five years beginning in 2019, and $100 million per year for ten years beginning in 2024; the deferred payments would be obligations of Grace backed by 50.1% of Grace's common stock to meet the requirements of Section 524(g).

The agreement in principle contemplates the filing of a plan of reorganization and related documents with the Bankruptcy Court.  The plan will be subject to approval of its co-proponents, exit financing, and Bankruptcy Court and District Court approvals.

"This agreement in principle is a very important step in emerging from Chapter 11," said Fred Festa, Grace's Chairman, President and Chief Executive Officer. "In this challenging global marketplace, we need to be able to focus all of our efforts on increasing shareowner value and continued improvement in our core businesses. The agreement and the Plan of Reorganization that will be based on it will be good for our shareholders, customers, creditors, and our employees. A lot of work remains to be done before we can confirm a Plan of Reorganization, but I am optimistic we will be successful in reaching that goal by the end of this year or early in 2009."

1
--------------------------------------------------------------------------------

"Also, I want to point out that the Plan of Reorganization will preserve all employee benefits. During the seven years we have been in Chapter 11, our people have nearly doubled Grace's sales and dramatically improved the core businesses. We look forward to final approval of our Plan of Reorganization when we can once again operate without the constraints of Chapter 11," said Festa.

*   *   *   *   *

Grace is a leading global supplier of catalysts and other products to petroleum refiners; catalysts for the manufacture of plastics; silica-based engineered and specialty materials for a wide-range of industrial applications; sealants and coatings for food and beverage packaging, and specialty chemicals, additives and building materials for commercial and residential construction. With annual sales of more than $3.1 billion, Grace has about 6,500 employees and operations in over 40 countries.  For more information, visit Grace's web site at www.grace.com.

*    *    *    *    *

This announcement contains forward-looking statements, that is, information related to future, not past, events.  Such information generally includes the words "believes," "plans," "intends," "targets," "will," "expects," "anticipates," "continues" or similar expressions.  For these statements, Grace claims the protection of the safe harbor for forward-looking statements contained in the Private Securities Litigation Reform Act of 1995.  Grace is subject to risks and uncertainties that could cause actual results to differ materially from those projected in the forward-looking statements or that could cause other forward-looking information to prove incorrect.  Factors that could cause actual results to materially differ from those contained in the forward-looking statements include: Grace's bankruptcy, plans of reorganization proposed by Grace and others, Grace's legal proceedings (especially the Montana criminal proceeding and environmental proceedings), the cost and availability of raw materials and energy, Grace's unfunded pension liabilities, costs of environmental compliance, risks related to foreign operations, especially, security, regulation and currency risks and those factors set forth in Grace's most recent Annual Report on Form 10-K, quarterly report on Form 10-Q and current reports on Form 8-K, which have been filed with the Securities and Exchange Commission and are readily available on the Internet at www.sec.gov. Reported results should not be considered as an indication of future performance.  Readers are cautioned not to place undue reliance on forward-looking statements, which speak only as of the date thereof. Grace undertakes no obligation to publicly release any revisions to the forward-looking statements contained in this announcement, or to update them to reflect events or circumstances occurring after the date of this announcement.

### ###

Corporate Communications

W. R. Grace & Co.-Conn.

7500 Grace Drive

Columbia, MD 21044

2
--------------------------------------------------------------------------------

Exhibit 99.2

W. R. GRACE & CO., et al.
CASE NO. 01-1139 (JFK)


TERM SHEET FOR RESOLUTION OF
ASBESTOS PERSONAL INJURY CLAIMS


This Term Sheet sets forth certain of the principal terms and conditions under which the Debtors, the Official Equity Security Committee, the Official Committee of Personal Injury Claimants ("ACC") and the Future Claimants Representative ("FCR") in the above-captioned Chapter 11 cases are prepared to file a plan of reorganization ("Plan") as co-proponents providing for the resolution of all asbestos personal injury claims and liabilities, including without limitation all asbestos personal injury claims pending at the filing date of the Chapter 11 cases and those arising subsequent thereto (collectively, "Asbestos PI Claims"). This Term Sheet also sets forth the proposed treatment of other key classes of claims asserted in the Chapter 11 cases. This Term Sheet has been produced for settlement purposes only and is subject to the provisions of Rule 408 of the Federal Rules of Evidence.


I.              Treatment of Claims

A.              Asbestos PI Trust

All Asbestos PI Claims will be channeled to a trust (the "Asbestos PI Trust") that is established in accordance with Section 524(g) of the United States Bankruptcy Code. The Asbestos PI Trust will pay claims from trust assets in accordance with a trust agreement and trust distribution procedures established by the ACC and FCR in connection with the Plan.

1.              Funding of Asbestos PI Trust at Emergence. On the Effective Date of the Plan, the Asbestos PI Trust shall receive the following, each of which shall be a condition to the Plan becoming effective:

a.              Cash Payment: $250 million, plus, if the Effective Date occurs after December 31, 2008, interest from January 1, 2009 to the Effective Date accrued at the same rate applicable to Grace's senior debt.

b.              Insurance: the assignment by W. R. Grace & Co.-Conn. ("Grace") and all of its affiliates to the Asbestos PI Trust, of all insurance policies and all insurance proceeds available for payment of Asbestos PI Claims, effective as of the Effective Date, including without limitation:

i.              Any such proceeds from the date hereof of all settlements with insurance companies, and all interest accrued thereon;

--------------------------------------------------------------------------------
ii.              Any proceeds of the settlement with Equitas held in escrow with all interest accrued thereon;

ii.              Any proceeds of all settlements with all insurance companies


8

under coverage in place agreements or installment payment arrangements where payment has not yet occurred;

iv.              Assignment of and the right to recover on all outstanding insurance policies potentially applicable to personal injury claimants; and

v.               The right to recover from all insolvent insurance estates as to which Grace or its affiliates has made a claim and the proceeds of all payments received by Grace or its affiliates from those insolvent estates after the date hereof, and all interest accrued thereon.

Provided however that Grace is in the process of examining its policies and the foregoing will not affect Grace's separate coverages, if any, for losses not arising from asbestos personal injury claims.

The ACC and FCR (or, after the Effective Date, the Asbestos PI Trust) shall control (and Grace shall cooperate in connection with) any negotiations or legal proceedings related to the underlying policies or settlement agreements applicable to Asbestos PI Claims.

c.               Warrant: a warrant for 10 million shares of W. R. Grace & Co. ("Parent") common stock, exercisable at $17 per share, and expiring one year after the Effective Date.

d.               Cryovac, Inc. Payment: The consideration contemplated by the Sealed Air Settlement Agreement.

e.               Fresenius Medical Care Payment:  The proceeds of the payment contemplated by the Fresenius Settlement Agreement.

2.               Deferred Payment Obligations:  Grace shall make additional payments to the Asbestos PI Trust over a 15 year period as follows:  five annual payments of $110 million commencing on January 2, 2019; and 10 annual payments of $100 million commencing on January 2, 2024.  Such payment obligations shall be subordinate to any bank debt or bonds outstanding and shall be guaranteed by Parent or any successor ultimate parent entity of Grace. Such guaranty shall be secured by an obligation of Parent to issue to the Asbestos PI Trust, in the event an additional payment is not made, the number of shares of Parent common stock which, when

2

--------------------------------------------------------------------------------

added to the number of shares of common stock issued and outstanding as of the Effective Date, shall constitute 50.1% of the voting shares of Parent as of the Effective Date (such number of shares shall be equitably adjusted for stock splits, stock dividends, recapitalizations, corporate reorganizations or changes in control of Parent after the Effective Date).

B.               Other Classes

1.               Administrative Claims: 100% of allowed amount in cash.

2.               Priority Tax Claims: 100% of allowed amount in cash.

3.               Priority Non-Tax Claims: 100% of allowed amount in cash.

4.               Secured Claims: 100% of allowed amount either in cash or by reinstatement.

5.               Unsecured Employee Claims (post-retirement health and special pension): 100% of allowed amount by reinstatement.

6.               Workers Compensation Claims: 100% by reinstatement.

7.               Allowed General Unsecured Claims: 100% of allowed amount plus

post-petition interest as follows: (i) for holders of pre-petition bank credit facilities, post-petition interest at the rate of 6.09% from the filing date through December 31, 2005 and thereafter at floating prime, in each case compounded quarterly; and (ii) for all other unsecured claims, interest at 4.19%, compounded annually, or if pursuant to an existing contract, interest at the non-default contract rate.

8.          Allowed Environmental Claims: 100% of allowed amount in cash.

9.          Traditional Asbestos Property Damage Claims:  100% of allowed amount in cash for settled claims.  The Plan shall set forth procedures for the allowance of all Asbestos PD Claims that are disputed as of the Effective Date.

10.          ZAI Claims: Unless the Plan Proponents agree otherwise as to the treatment of ZAI Claims, the court shall estimate, for purposes of allowance and distribution, any liability on account of ZAI Claims prior to or in connection with the confirmation of the Plan.  ZAI Claims shall be paid 100% of their allowed amount up to the amount of the court's estimate.

II.                              Channeling Injunctions.  The Plan shall contain injunctions under Sections 524(g) and Section 105(a) of the Bankruptcy Code to protect the Debtors, Cryovac, Sealed Air, Fresenius, their affiliates, officers, directors and employees, and other parties in interest and certain insurers.  The Plan shall also contain such provisions, injunctions and releases

3

--------------------------------------------------------------------------------

(i) as are necessary to comply with the terms of the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement; and (ii) to the full extent permitted by law, to indemnify, and release all of Grace's officers, directors, employees and professionals, and the members of all official committees, the FCR and their professionals, from any liability on account of claims against Grace, or arising in or in connection with these Chapter 11 cases.  The foregoing injunctions, indemnifications and releases shall be at least as extensive as, and consistent with, the injunctions, indemnifications and releases provided for under Grace's Amended Plan currently filed in the Chapter 11 Cases to the extent such latter injunctions, indemnifications and releases are not inconsistent with this Term Sheet.

III.          Resolution of Outstanding Issues.   The parties agree to cooperate in seeking a resolution of outstanding issues material to or not otherwise resolved in connection with the confirmation of a plan of reorganization.

IV.          Binding Effect.  This Term Sheet has been approved by all necessary corporate or organizational action of the Board of Directors of

Parent and Grace, the ACC, the FCR and the Equity Committee, and shall be binding upon the parties and each of their respective successors and assigns to the fullest extent permitted by applicable law.  The parties shall use their best efforts to incorporate the terms of this Term Sheet into a mutually agreeable plan of reorganization to be filed with the Bankruptcy Court as soon as possible.


V.              Confidentiality.



The parties shall treat all negotiations regarding this Term Sheet as confidential.  Neither the contents nor the existence of this Term Sheet shall be disclosed by any party, either orally or in writing, except to its directors, officers, employees, legal counsel, financial advisors, accountants and clients on a confidential basis until the Debtors have issued a press release announcing the terms and conditions contained herein.  Notwithstanding the foregoing, the parties agree that this Term Sheet or the terms of this Term Sheet may be disclosed to the Official Committee of Unsecured Creditors and the Official Committee of Asbestos Property Damage Claimants.  Grace will provide counsel to the ACC and counsel to the FCR an opportunity to review and comment on any press release relating to this Term Sheet prior to its issuance.

4

--------------------------------------------------------------------------------


AGREED TO AND ACCEPTED BY:
Dated: April 6, 2008
THE DEBTORS:
W. R. GRACE & CO., on behalf of itself and its subsidiaries and affiliates that are Debtors in the Chapter 11 cases
By:                           /s/ Fred Festa
Name:                         Fred Festa
Title:                        Chairman, President and Chief Executive
                              Officer
THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS
By:                           /s/ R. Ted Weschler
Name:                         R. Ted Weschler
Title:                        Chair of the Committee
THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS:
CAPLIN & DRYSDALE, CHARTERED, on behalf of and in its capacity as counsel to the ACC
By:                           /s/ Elihu Inselbuch
Name:                                           Elihu Inselbuch
THE FUTURE CLAIMANTS REPRESENTATIVE:
ORRICK, HERRINGTON & SUTCLIFFE LLP, on behalf of and in its capacity as counsel to the FCR
By:                           /s/ Roger Frankel
Name:                                           Roger Frankel


5

--------------------------------------------------------------------------------

EXHIBIT

PENGAD 800-631-6989

ACC 3060 -4

5-1-09          IX

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                                    )        Chapter 11
                                          )
W. R. GRACE & CO., *et al.*[1]            )        Case No. 01-01139 (JKF)
                                          )        Jointly Administered
              Debtors.                    )
                                          )
                                          )
                                          )
                                          )

Δ π EXHIBIT          4

Deponent   Fink

30 (b) (6)

Date 5-13-09 Rptr. LL

WWW.DEPOBOOK.COM

EXHIBIT 6 TO EXHIBIT BOOK
ASBESTOS INSURANCE TRANSFER AGREEMENT

EXHIBIT 6

    Attached.

---

[1]   The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.),
W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon,
Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc.,
Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC
(f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a
Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC
Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities
Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary
Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe,
Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc.
(f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace
Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W.
R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe
Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai
Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH,
Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings
Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA
Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental
Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin &
Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country
Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

REMAINDER OF EXHIBIT OMITTED
SEE EXHIBIT 6 TO EXHIBIT BOOK
(D.I. 20874)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE





In re:                 )     Chapter 11

                           )

W. R. GRACE & CO., *et al.*[1]     )     Case No. 01-01139 (JKF)

                           )     Jointly Administered

           Debtors.      )

                           )

                           )

                           )

                           )

### EXHIBIT 2 TO EXHIBIT BOOK
### <u>ASBESTOS PI TRUST AGREEMENT</u>

**EXHIBIT 2**

Attached.

---

[1]   The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

# REMAINDER OF EXHIBIT OMITTED
# SEE EXHIBIT 2 TO EXHIBIT BOOK
# (D.I. 20874)

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., *et al.*[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |
| | ) | |
| | ) | |

**EXHIBIT 4 TO EXHIBIT BOOK
TRUST DISTRIBUTION PROCEDURES**

**EXHIBIT 4**

Attached.

---

[1]  The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

REMAINDER OF EXHIBIT OMITTED
SEE EXHIBIT 4 TO EXHIBIT BOOK
(D.I. 20874)





## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO.,** *et al.* | ) | Case No. 01-1139 (JKF) |
| | ) | Jointly Administered |
| **Debtors.** | ) | |
| | ) | |

**FIRST AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE OF W. R. GRACE & CO., ET AL., THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS, THE ASBESTOS PI FUTURE CLAIMANTS' REPRESENTATIVE, AND THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS DATED FEBRUARY 27, 2009**

# REMAINDER OF EXHIBIT OMITTED SEE FIRST AMENDED JOINT PLAN (D.I. 20872)

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE



| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO.**, *et al.*[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| **Debtors.** | ) | |
| | ) | |
| | ) | |
| | ) | |

### EXHIBIT 5 TO EXHIBIT BOOK
### SCHEDULE OF SETTLED ASBESTOS INSURERS
### ENTITLED TO 524 (g) PROTECTION

**EXHIBIT 5**

Attached.

---

[1]   The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.),
W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon,
Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc.,
Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC
(f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a
Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC
Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities
Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary
Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe,
Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc.
(f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace
Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W.
R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe
Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai
Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH,
Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings
Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA
Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental
Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin &
Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country
Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

REMAINDER OF EXHIBIT OMITTED
SEE EXHIBIT 5 TO EXHIBIT BOOK
(D.I. 20874)