# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
     FOR THE DISTRICT OF DELAWARE
_____X
In Re:                        Chapter 11
                               Case No.

                          01-01139 JKF

W.R. Grace & Co., et al.,

                          (Jointly
          Debtors.   Administered)
_____X


          —   —   —

          June 12, 2009

          —   —   —

     DEPOSITION of ELIHU INSELBUCH,

held at the offices of Caplin &

Drysdale, Chartered, 375 Park Avenue,

New York, New York, commencing at

approximately 9:37 A.M., on the above

date, before Lisa Lynch, a Registered

Merit Reporter, New Jersey Certified

Court Reporter, License No. XI00825,

and Certified Realtime Reporter


          —   —   —

     MAGNA LEGAL SERVICES, LLP

     7 Penn Center, 8th Floor
      1635 Market Street
      Philadelphia, PA  19103
          1.866.MAGNA.21

| Page 2 | Page 4 |
|---|---|

**Page 2**

1  A P P E A R A N C E S :
2
3  DRINKER BIDDLE & REATH, LLP
   BY:  MICHAEL F. BROWN, ESQUIRE*
   (*VIA TELECONFERENCE)
4  One Logan Square
   18th and Cherry Streets
5  Philadelphia, Pennsylvania 19103-6996
   (brownmf@dbr.com)
6  Representing OneBeacon America
   Insurance Company, Seaton Insurance
7  Company, Government Employees
   Insurance Company, Columbia Insurance
8  Company, Republic Insurance Company
   n/k/a Starr Indemnity & Liability
9  Company.
10
11  CAPLIN & DRYSDALE, CHARTERED
    BY:  NATHAN D. FINCH, ESQUIRE
    JEFFREY A. LIESEMER, ESQUIRE*
12    (*VIA TELECONFERENCE)
    One Thomas Circle NW
13  Suite 1100
    Washington, DD 20005
14  202.862.7801
    (ndf@capdale.com)
15  (jal@capdale.com)
    Representing Grace, Official
16  Committee of
    Asbestos Personal Injury Claimants
17  ("ACC")
18
19  ANDERSON KILL & OLICK, PC
    BY:  ROBERT M. HORKOVICH, ESQUIRE*
    (*VIA TELECONFERENCE)
20  1251 Avenue of the Americas
    New York, New York 10020
21  212.278.1322
    (rhorkovich@andersonkill.com)
22  Representing Grace, Official
    Committee of Asbestos Personal Injury
23  Claimants ("ACC")
24

**Page 4**

1  A P P E A R A N C E S : (continued)
2
3  COHN WHITESELL & GOLDBERG, LLP
   BY:  DANIEL C. COHN, ESQUIRE
4  101 Arch Street
   Boston, Massachusetts 02110
5  617.951.2505
   (cohn@cwgll.com)
6  Representing the Libby Claimants
7
   SPEIGHTS & RUNYAN
8  BY:  DANIEL A. SPEIGHTS, ESQUIRE
   200 Jackson Avenue East
9  P.O. Box 685
   Hampton, South Carolina 29924
10  803.943.4444
   (dspeights@speightsrunyan.com)
11  Representing Anderson Memorial
   Hospital
12
13  MENDES & MOUNT, LLP
    BY:  EILEEN T. McCABE, ESQUIRE*
14    (*VIA TELECONFERENCE)
    750 Seventh Avenue
15  New York, New York 10019
    212.261.8283
16  (eileent.mccabe@mendes.com)
    Representing AXA Belgium as Successor
17  to Royale Belge SSA
18
19  MENDES & MOUNT, LLP
    BY:  ALEXANDER MUELLER, ESQUIRE
    750 Seventh Avenue
20  New York, New York 10019
    212.261.8296
21  (alexander.mueller@mendes.com)
    Representing London Market Companies
22
23
24

| Page 3 | Page 5 |
|---|---|

**Page 3**

1  A P P E A R A N C E S : (continued)
2
3  KIRKLAND & ELLIS, LP
   BY:  THEODORE L. FREEDMAN, ESQUIRE
   Kirkland & Ellis LLP
4  601 Lexington Avenue
   New York, NY 10022
5  212.446.4934
   (theodore.freeman@kirkland.com)
6  Representing the Debtors
7
   THE LAW OFFICES OF
8  JANET S. BAER, P.C.
   BY:  JANET S. BAER, ESQUIRE
9  70 West Madison Street
   Suite 2100
10  Chicago, Illinois 60602
   jbaer@jsbpc.com
11  Representing W.R. Grace
12
   SIMPSON THACHER & BARTLETT, LLP
13  BY:  KAREN E. ABRAVANEL, ESQUIRE
   425 Lexington Avenue
14  New York, New York 10017-3954
   212.455.7985
15  (kabravanel@stblaw.com)
   Representing Travelers Casualty and
16  Surety Company
17
   VORYS, SATER, SEYMOUR AND PEASE, LLP
18  BY:  PHILIP F. DOWNEY, ESQUIRE*
   (*VIA TELECONFERENCE)
19  First National Tower
   106 South Main Street
20  Suite 1100
   Akron, Ohio  44308
21  330.208.1152
   (pfdowney@vorys.com)
22  Representing The Scotts Company, LLC
23
24

**Page 5**

1  A P P E A R A N C E S : (continued)
2
3  FORD MARRIN ESPOSITO
   WITMEYER & GLESER, LLP
4  BY:  ELIZABETH M. DeCRISTOFARO,
   ESQUIRE
5  Wall Street Plaza
   New York, New York 10005-1875
6  212.269.4900
   (emdecristofaro@fmew.com
7  Representing Continental Casualty
   Company and Continental Insurance
8  Company
9
   BILZIN SUMBERG BAENA
10  PRICE & AXELROD, LLP
   BY:  MATTHEW I. KRAMER, ESQUIRE*
11    (*VIA TELECONFERENCE)
   200 South Biscayne Boulevard
12  Suite 2500
   Miami, Florida 33131-5340
13  305.450.7246
   (mkramer@bilzin.com)
14  Representing Property Damage
   Committee
15
16  STROOCK & STROOCK & LAVAN, LLP
   BY:  KENNETH PASQUALE, ESQUIRE*
17    (*VIA TELECONFERENCE)
   180 Maiden Lane
18  New York, New York 10038-4982
   212.806.5400
19  (kpasquale@stroock.com)
   Representing Official Committee of
20  Unsecured Creditors
21
   STEVENS & LEE, P.C.
22  BY:  JOHN D. DEMMY, ESQUIRE
   1105 North Market Street, 7th Floor
23  Wilmington, Delaware 19801
   302.654.5180
24  (jdd@stevenslee.com)

| | Page 6 |
|---|---|

1  A P P E A R A N C E S: (continued)
2
LAW OFFICES OF ALAN B. RICH
3    BY:  ALAN B. RICH, ESQUIRE*
         (*VIA TELECONFERENCE)
4    Elm Place, Suite 4620
     1401 Elm Street
5    Dallas, Texas 75202
     214.744.5100
6    (arich@alanrichlaw.com)
     Representing Property Damage PCR
7
8    ECKERT SEAMANS CHERIN & MELLOTT, LLC
     BY:  EDWARD J. LONGOSZ, II, ESQUIRE
9    1747 Pennsylvania Avenue, N.W.
     12th Floor
10   Washington, DC 20006
     202.659.6619
11   (elongosz@eckertseamans.com)
     Representing Maryland Casualty and
12   Zurich
13
     COZEN O'CONNOR
14   BY:  JACOB C. COHN, ESQUIRE
     1900 Market Street
15   Philadelphia, Pennsylvania 19103-3508
     215.665.2147
16   (jcohn@cozen.com)
     Representing Federal Insurance
17   Company
18
     ORRICK HERRINGTON & SUTCLIFFE, LLP
19   BY:  JONATHAN P. GUY, ESQUIRE
          ROGER FRANKEL, ESQUIRE
20   Columbia Center
     1152 15th Street, N.W.
21   Washington, DC 20005-1706
     202.339.8516
22   (jguy@orrick.com)
     (rfrankel@orrick.com)
23   Representing PI Future Claimants'
     Representative
24

| | Page 8 |
|---|---|

1  A P P E A R A N C E S: (continued)
2
GOODWIN PROCTER
3    BY:  DANIEL M. GLOSBAND, ESQUIRE*
          (*VIA TELECONFERENCE)
4    Exchange Place
     53 State Street
5    Boston, MA 02109
     617.570.1930
6    (dglosband@goodwinprocter.com)
     Representing CNA
7
8    A L S O   P R E S E N T:
9    DAVID AUSTERN
10
11                    – – –
12
13
14
15
16
17
18
19
20
21
22
23
24

| | Page 7 |
|---|---|

1  A P P E A R A N C E S: (continued)
2
CUYLER BURK, P.C.
3    BY:  STEFANO V. CALOGERO, ESQUIRE
4    4 Century Drive
     Parsippany, New Jersey 07054
     973.734.3200
5    (scalogero@cuyler.com)
     Representing Allstate Insurance
6    Company
7
     WILSON ELSER MOSKOWITZ
8    EDELMAN & DICKER, LLP
     BY:  CARL J. PERNICONE, ESQUIRE*
9         (*VIA TELECONFERENCE)
     150 East 42nd Street
10   New York, New York 10017-5639
     212.915.5656
11   (carl.pernicone@wilsonelser.com)
     Representing Arrowood Indemnity
12   Company
13
     WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
14   BY:  KEVIN J. MANGAN, ESQUIRE*
          (*VIA TELECONFERENCE)
15   222 Delaware Avenue
     Suite 1501
16   Wilmington, Delaware 19801
     302.252.4361
17   (kmangan@wcsr.com)
     Representing State of Montana
18
19   PEPPER HAMILTON, LLP
     BY:  LINDA J. CASEY, ESQUIRE*
20        (*VIA TELECONFERENCE)
     3000 Two Logan Square
21   Philadelphia, Pennsylvania 19103
     215.981.4000
22   (caseyl@pepperlaw.com)
     Representing BNSF Railway Company
23
24

| | Page 9 |
|---|---|

1              INDEX
             EXAMINATION
2
     Witness Name              Page
3    ELIHU INSELBUCH
4      BY MR. COHN          11
       BY MR. SPEIGHTS      169
5      BY MR. BROWN         190
       BY MR. J. COHN       224
6      BY MS. ABRAVANEL     241
       BY MR. DEMMY         248
7      BY MR. DOWNEY        250
       BY MR. MANGAN        255
8
9            EXHIBITS
10   EXHIBIT           ID
11   Exhibit 1         11
       Notice of Deposition
12
     Exhibit 2         23
13     Term sheet, 11 pages
14   Exhibit 2A        24
       Term sheet, seven pages
15
     Exhibit 3         25
16     Preliminary Expert Report on
       W.R. Grace Trust by Mark
17     Peterson dated March 2009
18   Exhibit 4         25
       Exhibit 4 to Exhibit Book,
19     Trust Distribution Procedures
20   Exhibit 5         204
       Biography page of Elihu
21     Inselbuch
22   Exhibit 6         208
       Biography page of Elihu
23     Inselbuch
24

Page 10

1      DEPOSITION SUPPORT INDEX
2
3   Direction to Witness Not To Answer
      Page  Line     Page  Line
4   (None)
5   Request For Production of Documents
      Page  Line     Page  Line
6   (None)
7   Stipulations
      Page  Line     Page  Line
8   (None)
9   Questions Marked
      Page  Line     Page  Line
10  (None)
11

          _   _   _

12
13
14
15
16
17
18
19
20
21
22
23
24

Page 11

1    E L I H U   I N S E L B U C H,
2        having been sworn by the Notary
3        Public of the States of New
4        York and New Jersey, was
5        examined and testified as
6        follows:
7                    _   _   _
8          MR. COHN:  All right.
9        Let's start off marking this as
10       Exhibit 1.
11          (Notice of Deposition
12       marked for identification as
13       Inselbuch Exhibit 1.)
14                  _   _   _
15   EXAMINATION BY
16   MR. COHN:
17       Q.   Good morning.
18       A.   Good morning.
19       Q.   As you know, I'm Dan
20   Cohn, counsel for the Libby
21   claimants.
22       I've placed in front of you a
23   document marked Exhibit 1.  Do you
24   recognize it?

Page 12

1       A.   Not really.
2       Q.   Are you able to describe
3   it for me?
4       A.   It appears to be a
5   notice of my deposition.
6       Q.   All right.  And do you
7   understand that you are here today
8   pursuant to this Notice of
9   Deposition?
10      A.   Yes.
11      Q.   And that that's in
12  connection with the contested matter
13  that is at issue by the proposed
14  confirmation of the Chapter 11 plan
15  in the Grace case?
16      A.   If you say so.
17      Q.   Thank you.  This
18  deposition will go very quickly if
19  you take that position to all of my
20  questions.
21      Now, today I am going to be
22  referring to the Libby claimants.  Do
23  you understand that those are people
24  who are clients of the firms of

Page 13

1   McGarvey Heberling or Lewis Slovack
2   in Montana?
3       A.   I understand that some
4   of them may be clients of those
5   firms.
6       Q.   Well, you understand the
7   ones that are being represented here
8   today at the deposition?
9          MR. FINCH:  Objection.
10      You can answer.
11      Q.   And you understand these
12  are people who are represented in the
13  bankruptcy case also by my firm, Cohn
14  Whitesell & Goldberg?
15      A.   I understand that you
16  represent some people and that the
17  other two firms represent some
18  people.  My understanding of the
19  concept of the Libby claimants are
20  claimants that may have claims now or
21  may in the future have claims against
22  Grace who reside in the Libby area.
23      Q.   And who claim to have
24  been exposed -- excuse me -- to have

Page 18

1        MR. FINCH:  Object to
2    form.
3        A.   I don't know what you
4    mean.  I have served as, and do serve
5    as, counsel to some of the trust
6    advisory committees.
7        Q.   And would you explain
8    for the record what a trust advisory
9    committee is?
10       MR. FINCH:  Object to
11   form.
12       A.   Under the terms of these
13   plans and under the terms of the TDPs
14   that are part of the plan documents,
15   an entity is created called a trust
16   advisory committee which consists of
17   one or more attorneys who have
18   responsibilities that are defined
19   within the TDP documents and within
20   the trust agreement documents.
21       MR. J. COHN:  Dan, let's
22   just note the arrival of two
23   more counsel.  Would you
24   identify yourselves?

Page 19

1        MR. MUELLER:  Alex
2    Mueller from Mendes & Mount for
3    certain London market insurance
4    companies.
5        MS. DeCHRISTOFARO:
6    Elizabeth DeChristofaro from
7    Ford Marrin for Continental
8    Casualty Company and
9    Continental Insurance
10   Company.
11       THE WITNESS:  Those
12   appearances are not part of the
13   roles of the TACs, and I don't
14   remember where I was in the
15   middle of my answer.
16       MR. COHN:  Well, let's
17   help you by reading back as far
18   as you got in this answer.
19       (Off the record.)
20       (The Reporter reads the
21   last answer.)
22   BY MR. COHN:
23       Q.   Do you have anything to
24   add?

Page 20

1        A.   That's enough.
2        Q.   And in that capacity,
3    have you been actually called upon to
4    render advice to those trust advisory
5    committees?
6        A.   From time to time.
7        Q.   Now, what is your role
8    in the W.R. Grace Chapter 11 case?
9        A.   My firm is counsel to
10   the asbestos creditors committee.
11       Q.   And what is your
12   personal role in connection with that
13   representation?
14       A.   I suspect that I am the
15   lead counsel.
16       Q.   You suspect or is that
17   what you are?
18       A.   What I am is in the eye
19   of the beholder.
20       Q.   Did you participate in
21   negotiations concerning the plan --
22   strike that.
23       Did you participate in
24   negotiations that led to the filing

Page 21

1    of the Chapter 11 plan that is now
2    coming before the Bankruptcy Court?
3        A.   I did.
4        Q.   Would you describe your
5    role in those negotiations?
6        A.   I was counsel to the
7    asbestos creditors committee.
8        Q.   Would it be fair to say
9    that you were the lead negotiator for
10   the asbestos creditors committee?
11       MR. FINCH:  Object to
12   form.
13       A.   I wouldn't say so.
14       Q.   Who else participated in
15   the negotiations on behalf of the
16   ACC?
17       A.   Well, if we're talking
18   about the part of the negotiations
19   that involve the crafting and
20   agreement to the term sheet or the
21   economic arrangements with the
22   debtor, the committee -- when I say
23   "the committee", I mean the asbestos
24   creditors committee -- the committee

Page 22

1 appointed a negotiating subcommittee
2 that attended those negotiations and
3 I attended with them.
4      That negotiating subcommittee,
5 as I remember, consisted of Mr. Rice;
6 Mr. Weitz, W-e-i-t-z; Mr. Cooney, and
7 one or both of Mr. Budd and/or Mr.
8 Baron.
9      If we're talking about the
10 negotiations thereafter that involved
11 work with the futures rep and other
12 plan proponent constituencies in
13 developing what became the documents
14 that reflect the plan, I played a
15 minor role in that other than --
16 well, I should say I played a minor
17 role in that other than in connection
18 with the development of the trust
19 agreement and the TDP.
20      The other documents and the
21 negotiation of those documents were
22 assigned by the committee to my
23 partner, Mr. Lockwood, and others who
24 worked under his leadership.

Page 23

1      **Q.   So is it fair to say on**
2 **behalf of the ACC you were the person**
3 **primarily responsible for the trust**
4 **agreement and the TDP?**
5      A.   I was the counsel
6 primarily involved in that work.
7      MR. COHN:  Let's mark
8 this as Exhibit 2, please.
9      (Term sheet, 11 pages,
10 marked for identification as
11 Inselbuch Exhibit 2.)
12 BY MR. COHN:
13      **Q.   Do you have Exhibit 2 in**
14 **front of you?**
15      A.   I do.
16      **Q.   Do you recognize it?**
17      A.   No.
18      **Q.   If you would turn to the**
19 **last four pages of that document, let**
20 **me ask you whether you recognize**
21 **those four pages.**
22      A.   I do not.  It purports
23 to be the term sheet.  I've never
24 seen it in this form so I guess I

Page 24

1 could compare it with my copy of the
2 term sheet that I signed and figure
3 out whether it's the same document,
4 but I have no way of knowing.  If you
5 represent to me that it is, I'll
6 accept your representation.
7      **Q.   Well, yes, let me**
8 **represent to you that's the same**
9 **document that I have always seen and**
10 **has always been represented to me to**
11 **be the correct term sheet.**
12      A.   Well, I have a book in
13 front of me with three documents that
14 I've been working with.  One is the
15 TDP as it exists in the plan, one is
16 the trust agreement as it exists in
17 the plan and the other is the term
18 sheet that I signed.
19      MR. COHN:  Let's go off
20 the record.
21      (Off the record.)
22      (Term sheet, seven
23 pages, marked for
24 identification as Inselbuch

Page 25

1 Exhibit 2A.)
2      (Preliminary Expert
3 Report on W.R. Grace Trust by
4 Mark Peterson dated March
5 2009 marked for identification
6 as Inselbuch Exhibit 3.)
7      (Exhibit 4 to Exhibit
8 Book, Trust Distribution
9 Procedures, marked for
10 identification as Inselbuch
11 Exhibit 4.)
12      MR. COHN:  All right,
13 back on the record.
14      **Q.   Do you now have in front**
15 **of you a document that has been**
16 **marked as Exhibit 2A?**
17      A.   Yes, sir.
18      **Q.   Do you recognize that**
19 **one?**
20      A.   I do.
21      **Q.   Tell us what it is.**
22      A.   It's the term sheet that
23 was signed among the debtor, the
24 futures rep, the committee and I

Page 26

1  believe the equity.  Yes, the equity
2  committee I guess they're called.
3       Q.    Okay.  And when you said
4  "the committee" in your answer, you
5  meant the Asbestos Claimants
6  Committee?
7       A.    Yes.  I will mean that
8  always.
9       Q.    Terrific.  And that's
10  also what we mean when we say ACC?
11       A.    Yes.
12       Q.    Now, does this document,
13  Exhibit 2A, reflect the entire deal
14  amongst those parties concerning the
15  subject matter thereafter at the time
16  that it was entered into?
17            MR. FINCH:  Object to
18       form.
19       A.    Like all term sheets, it
20  reflects all the points that the
21  people who signed it thought needed
22  to be put on paper at the time.
23       Q.    And what points were
24  agreed to but not put on paper?

Page 27

1       A.    None that I recall.  But
2  for sure when you -- when you
3  negotiate a term sheet, you
4  understand that what will evolve in
5  what are much more complicated
6  documents are issues subsidiary to
7  the issues that are agreed in the
8  term sheet that will need to be
9  resolved over time within the context
10  of the term sheet agreement.
11       Q.    Were there any
12  understandings reached in connection
13  with this term sheet that would not
14  rise to the level of an agreement?
15       A.    Not --
16            MR. FINCH:  Object to
17       form.
18       A.    -- that I recall.
19       Q.    And specifically
20  concerning treatment of Libby claims,
21  were there any agreements or
22  understandings?
23       A.    Not that I recall, other
24  than what's provided in the

Page 28

1  document.
2       Q.    Have you reviewed a
3  transcript of the recent deposition
4  of Peter Lockwood?
5       A.    I read it briefly,
6  quickly.
7       Q.    In that brief reading,
8  did you come across any statements
9  made by Mr. Lockwood with which you
10  disagreed?
11            MR. FINCH:  Object to
12       form, vague, overbroad.
13       A.    Yeah, there was one
14  place where he was talking about or
15  answering questions that had to do
16  with a provision in the term sheet --
17  in the TDP -- let's see -- in the
18  extraordinary claims section as to
19  whether or not that portion of the
20  extraordinary claims criteria which
21  requires that there not be the
22  potential for substantial recovery
23  elsewhere would apply to the
24  extraordinary claim that would

Page 29

1  satisfy the criteria otherwise for an
2  eight times treatment.  He was
3  unclear about that, at best, and
4  perhaps wrong.  My understanding of
5  that provision is that that
6  requirement is included in either
7  category of the extraordinary claims
8  treatment.
9       Q.    All right.  To qualify
10  for the eight times multiplier under
11  extraordinary claims treatment, you
12  must, in addition to meeting the
13  exposure criteria set forth in the
14  TDP, also show little likelihood of
15  substantial recovery elsewhere?
16       A.    Whatever that language
17  is, yes, for sure.
18       Q.    Any other statements
19  come to mind that you saw with which
20  you did not agree?
21            MR. FINCH:  Object to
22       form.
23       A.    Not that I recall off
24  the top of my head.

Page 30

1    Q.   Have you reviewed a
2  transcript of the recent deposition
3  of Mark Peterson?
4    A.   No.
5    Q.   All right.  Let me now
6  hand you a document that has been
7  marked as Exhibit 3.  This is Dr.
8  Peterson's report.
9        MR. COHN:  What I'm
10  handing around the room are
11  just the pages on which I
12  intend to ask questions because
13  otherwise the copying would
14  have been voluminous.
15    Q.   I'm sorry.  Did I --
16    A.   You didn't ask me
17  anything.
18    Q.   Thank you.  Do you
19  recognize the document that has been
20  marked Exhibit 3?
21    A.   I recognize it says what
22  it says it is.
23    Q.   Which is what?
24    A.   It says it's the

Page 31

1  Preliminary Expert Report on W.R.
2  Grace Trust by Mark Peterson of Legal
3  Analysis Systems dated March 2009.
4    Q.   And do you know Dr.
5  Peterson?
6    A.   I do.
7    Q.   What is his capacity in
8  this case?
9    A.   He is engaged as an
10  expert to assist the asbestos -- to
11  assist the committee.
12    Q.   Thank you.
13  Let me now hand you a document
14  that's been marked as Exhibit 4.  I
15  will represent to everyone concerned
16  this is a copy of the trust
17  distribution procedures, or TDP, that
18  has been attached to the plan.
19        MR. COHN:  In accordance
20  with our custom at these
21  depositions, the parties will
22  use their own copies to refer
23  to but we understand it is the
24  same document.

Page 32

1    Q.   Do you recognize Exhibit
2  4, Mr. Inselbuch?
3    A.   I accept your
4  representation that it is what it
5  says it is.
6    Q.   Okay, thank you.
7        Now, let me ask you to look at
8  Exhibit 3, which is Dr. Peterson's
9  report, and take a look at page five.
10    A.   I'm at page five.
11    Q.   All right.
12    A.   I should warn you I'm
13  reading this for the first time.
14    Q.   Okay.  Let me point you
15  then to exactly the statement I want
16  you to read.  Would you read the
17  first sentence of the second
18  paragraph on page five?
19    A.   Yes.
20    Q.   Would you like to read
21  it out loud, please, for the
22  record?
23    A.   "The trust's TDP follows
24  the standard form used for almost

Page 33

1  every asbestos trust created since
2  2002."
3    Q.   Do you agree with that
4  statement?
5    A.   Yes.
6    Q.   So when I talk about the
7  standard form or a term such as that,
8  you'll understand that I'm referring
9  to what Dr. Peterson is referring to
10  here, which is the standard form of
11  TDP that has been used for almost
12  every asbestos trust created since
13  2002?
14        MR. FINCH:  Object to
15  form.
16    A.   Is that a question?
17    Q.   Will you understand that
18  that's what I mean by that term?
19    A.   Okay.
20    Q.   Now, in this case there
21  were some departures from the
22  standard form; is that correct?
23    A.   In each case there is
24  some departures from the standard

Page 34

1   form and there were some here too.
2       Q.   Who drafted the TDP in
3   this case?
4       A.   The TDP that evolved
5   into the one in this case?
6       Q.   Yes.
7       A.   That's now on file?
8       Q.   Exhibit 4.
9       A.   The first draft, my
10  office, probably Anne McMillan.
11      Q.   And how did the document
12  evolve from that first draft into
13  Exhibit 4?
14      A.   Okay.  You will recall
15  that at some point the Court relieved
16  the debtor's exclusivity.  At that
17  point the committee and the futures
18  rep determined to file their own
19  plan, proposed plan of
20  reorganization.
21      In that connection, it was
22  understood that there would be the
23  need for a trust agreement and a TDP
24  and it was at that point, which I

Page 35

1   believe was somewhere in the fall of
2   2007, that we began the preparation
3   of the TDP.
4       A draft was crafted by our
5   office for consideration by the
6   committee.  After the committee
7   considered the draft and considered
8   input from Dr. Peterson, the draft
9   was put in a form that was then
10  submitted to the futures rep's
11  counsel for their consideration.  And
12  after we received their comments and
13  suggestions, the draft was further
14  edited and reconsidered by the
15  committee and sometime by the
16  beginning/early part of 2008 there
17  was a TDP that was agreeable to the
18  committee and to the futures rep.
19      Prior to that time we had
20  actually filed a plan, I believe,
21  that was proposed by the committee
22  and the futures rep but I believe --
23  my best memory is that plan was filed
24  before there was agreement between

Page 36

1   the committee and the futures rep on
2   the terms of the TDP.
3       Events then overtook that plan.
4   In fact, the events that you make
5   reference to with this term sheet
6   which was signed -- I'm referring to
7   Exhibit 2A -- in early April of 2008
8   and now there was a TDP that needed
9   to be considered by the other plan
10  proponents because it would now not
11  be associated with a separate plan
12  that had been filed by the committee
13  and the futures rep but, rather,
14  would evolve into a plan that would
15  be filed by the plan proponents as
16  part of that plan.
17      In the spring of 2008 the
18  committee and the futures rep were
19  already aware of criticisms that
20  counsel for some of the Libby
21  claimants had with the terms of the
22  TDP and we entered into a dialogue at
23  the instructions of the committee
24  with you and with Mr. Heberling to

Page 37

1   see whether points that you were
2   making were of sufficient validity to
3   cause us to consider changes in the
4   TDP.  Some of those points were so
5   considered and resulted in changes in
6   the TDP that evolved in the spring
7   and summer of 2008 and are reflected
8   in the plan as filed.
9       There were also comments to the
10  TDP that were received from other
11  parties who had an interest and a
12  right to consider the documents.  I'm
13  mindful of the representatives that
14  counsel for Sealed Air participated
15  in some parts of the TDP and trust
16  agreement and there may have been
17  comments as well from the debtor.
18  I'm not -- I don't recall.  But the
19  effect of all of that was it was --
20  the result of all of that was the TDP
21  that is now your Exhibit 4.  That's
22  the general history of its evolution.
23      Q.   Let's turn to Section
24  5.3(b)(3) of the TDP at pages 31 and

Page 102

1  into two parts.  The first part is
2  the greater of the trust's last offer
3  to the claimant or the award that the
4  claimant declined in non-binding
5  arbitration.  That's what it says the
6  first part is.  However, that amount
7  should not exceed the amount that the
8  jury decides.
9       Now, the balance, it says, gets
10  divided into five equal installments
11  in years 6 through 10 following the
12  year of the initial payment, all of
13  that again subject to the applicable
14  payment percentage, the maximum
15  available payment and the claims
16  payment ratio provisions.  So that's
17  how it gets paid out.  And it doesn't
18  get any sequencing adjustments.
19       Q.   And is it subject to
20  maximum value or is it --
21       A.   Yes, and it's subject to
22  the maximum values.
23       Q.   So that the amount of
24  the trust's last offer or the

Page 103

1  non-binding arbitration award --
2       A.   Yes.
3       Q.   -- assuming that they --
4  that the jury verdict is not less
5  than those amounts --
6       A.   Yes.
7       Q.   -- will get paid on the
8  same basis as though the claim had
9  been allowed -- excuse me --
10  liquidated upon expedited review?
11       A.   That's what it seems to
12  say.
13       Q.   The next traunch, if you
14  will, of the jury verdict is the
15  amount between that initial payment
16  and the maximum value for the claim.
17  Is that correct?
18       MR. FINCH:  Object to
19  form.  Maximum value or maximum
20  extraordinary value as the case
21  may be.
22       THE WITNESS:  Could I
23  have the question back?
24       (The reporter reads the

Page 104

1  pending question.)
2       MR. FINCH:  Object to
3  form.
4       A.   No.  It's the amount
5  between whatever the award was and
6  what was paid, limited by the maximum
7  value.
8       Q.   Right.  So --
9       A.   Could be less.
10       Q.   That's a very fair
11  point.  So let's assume that the jury
12  verdict is in excess of the --
13       A.   Then it would be the
14  difference between the maximum --
15       Q.   -- maximum value.
16       A.   -- value and what was
17  already paid.
18       Q.   And when we say "maximum
19  value", to Mr. Finch's point --
20       A.   Yeah.
21       Q.   -- we are including --
22  that is the greater of the maximum
23  value set forth in the matrix or the
24  scheduled value multiplied by the

Page 105

1  extraordinary claims multiplier if
2  the claim is an extraordinary
3  claim?
4       A.   Well, maximum value is a
5  defined term.  It's a defined term
6  with respect to extraordinary claims
7  too.
8       Q.   And then to the extent
9  that there is remaining value to the
10  jury verdict over and above those two
11  traunches that we spoke about, how
12  does that get paid?
13       A.   It doesn't.
14       Q.   I just want to make sure
15  I understand your testimony a few
16  minutes ago.  Did I hear you
17  correctly that, to your knowledge, no
18  claimant has ever exercised the right
19  to pursue its claim in the tort
20  system under one of these standard
21  form TDPs?
22       A.   That's my best
23  recollection.
24       Q.   And you would most

Page 106

1  likely have been aware if such an
2  event had taken place?
3      A.  I think so, but I can't
4  be sure of that.
5      Q.  All right.  Let's talk
6  about the extraordinary claims
7  multiplier under Section 5.4(a).
8      A.  Yes.
9      MR. J. COHN:  I'm sorry,
10  Dan.  Where are you?
11      MR. COHN:  Section
12  5.4(a) in the TDP.
13      MR. FINCH:  Page 32.
14      Q.  Now, is it fair to say
15  that to obtain liquidation of a claim
16  as an extraordinary claim a claimant
17  must meet two criteria, one having to
18  do with exposure and one having to do
19  with little likelihood of a
20  substantial recovery elsewhere?
21      A.  I don't know whether
22  it's fair to say that.  I think
23  that's correct.
24      Q.  Now, focusing first on

Page 107

1  the exposure criteria, how do these
2  vary from standard form TDPs that
3  we've been referring to?
4      A.  The variance is the
5  additional provision toward the
6  bottom of the runover paragraph on
7  page 33 that provides for an
8  additional category where the
9  exposure was 95 percent the result of
10  exposure to Grace products.
11      Q.  So under the standard
12  form of TDP, there is an
13  extraordinary claim treatment for
14  exposures that are 75 percent the
15  result of the debtor's asbestos?
16      A.  Correct.
17      Q.  And those provide a five
18  times multiplier for such claims?
19      A.  That's correct.
20      Q.  And here the change is
21  that there's an eight times
22  multiplier for exposures of 95
23  percent?
24      A.  That's correct.

Page 108

1      Q.  How did this change come
2  about?
3      A.  Based upon discussions
4  that I and members of the committee
5  had with you and Mr. Heberling, the
6  idea was that, as distinguished from
7  the usual situation where asbestos
8  claimants were generally exposed to
9  more than one defendant's product, it
10  would be the case in Libby or for
11  people exposed in Libby that there
12  would be only exposure to Grace's
13  product and, thus, that was a little
14  different from what was normally
15  provided.
16      To put in context what the
17  extraordinary claims provision is
18  trying to accomplish, as you know,
19  the scheduled values or even the
20  individual review values are meant to
21  reflect the respective defendants'
22  share of the responsibility for the
23  claim as kind of evidenced
24  historically by what the defendant

Page 109

1  had paid to settle claims.
2      In most jurisdiction, the
3  defendant, which would be Grace here
4  but it could be any of the others,
5  would be jointly and severally liable
6  with others for the tort
7  responsibility and, thus, if the case
8  went to verdict, they would be a
9  single recovery, a single amount, and
10  any one of the jointly and severally
11  responsible tort feasors would have
12  to pay that if called upon to pay
13  that.  And that would develop into,
14  under the state law, rules that would
15  involve contribution or things like
16  that among joint tort feasors.
17      The TDP is designed to provide
18  for an award in the normal case where
19  there are multiplicity of available
20  defendants of that defendant's
21  respective share.  When we first
22  worked with this concept, which I
23  believe goes back to the original
24  Manville, maybe even the Manville

Page 190

1  defendant would have specific
2  liability to the particular claimant
3  because of the exposure to the
4  particular product which was caused
5  in part by this defendant even if
6  they didn't manufacture it.
7       MR. SPEIGHTS:  Thank
8  you, sir.
9       THE WITNESS:  Next?
10      MR. FINCH:  Lunch break?
11      (Off the record.)
12  — — — — —
13  EXAMINATION BY
14  MR. BROWN:
15      Q.   Good afternoon, Mr.
16  Inselbuch.  Michael Brown.  I
17  represent Geico, Republic Insurance
18  Company, Seaton Insurance Company
19  and OneBeacon America Insurance
20  Company.
21      A.   How fortunate for you.
22      Q.   I want to follow up on
23  some of Mr. Cohn's questioning of you
24  earlier this morning and I think --

Page 191

1  I'm not sure I followed all of the
2  exhibits but I believe Exhibit 2A is
3  the term sheet, at least your copy of
4  the term sheet, the one you were
5  familiar with.  Is that correct?
6       A.   Yes, sir.  It's the one
7  I signed.
8       Q.   Okay.  Do you have that
9  in front of you?
10      A.   I do.
11      Q.   Okay.  I'm correct, am I
12  not, that it's dated April 6, 2008?
13      A.   That's correct.
14      Q.   And you executed it on
15  behalf of the official committee of
16  asbestos personal injury claimants,
17  otherwise known as the committee, or
18  the ACC, correct?
19      A.   That's correct.
20      Q.   Okay.  You indicated
21  earlier in response to one of Mr.
22  Cohn's questions that the ACC had a
23  negotiating subcommittee and I
24  understood you to be saying that that

Page 192

1  was a subcommittee in connection with
2  the negotiations leading to the term
3  sheet.  Is that correct?
4       A.   That's correct.
5       Q.   Okay.  And those
6  individuals were Joe Rice, Perry
7  Weitz, John Cooney and Fred Baron
8  and/or Russell Budd.  Am I correct?
9       A.   No, not Fred, no.  Steve
10  Baron --
11      Q.   Steve Baron.  I'm sorry.
12      A.   -- and/or Russell
13  Budd.
14      Q.   All right.  Am I correct
15  that counsel for the ACC was also
16  involved in those negotiations?
17      A.   Correct.
18      Q.   And would that be you
19  and Mr. Lockwood?
20      A.   It would certainly be
21  me.  I don't recall whether Lockwood
22  was there for some or all of that.
23      Q.   Okay.  Did the other
24  parties that ultimately became the

Page 193

1  plan proponents -- did they also have
2  negotiating teams?
3       A.   The debtor certainly
4  did, the futures claimants certainly
5  did, the equity security holder
6  certainly did, yes.
7       Q.   Okay.  Can you identify
8  the debtor's negotiating team?
9       A.   Their chairman was
10  there, their general counsel was
11  there, their chief financial officer
12  was there, Mr. Bernick was there, the
13  chief legal officer was there.  There
14  may have been others but those are
15  the people I remember.
16      Q.   Okay.  The chairman was
17  Mr. Festa?
18      A.   Yes, sir.
19      Q.   And the general counsel
20  was Mr. Shelnitz?
21      A.   Yes, sir.
22      Q.   And the CFO was Mr.
23  LaForce?
24      A.   I don't recall his

Page 194

1   name.
2       Q.   Okay.  Who was the chief
3   legal officer?
4       A.   That would have been Mr.
5   Shelnitz.
6       Q.   Okay.  And who was the
7   negotiating team for the FCR?
8       A.   Mr. Frankel, at some
9   points David Austern I believe was
10  there.  There may have been others.
11      Q.   You don't recall them?
12      A.   I don't recall now.
13      Q.   Okay.  And how about the
14  equity committee?
15      A.   Mr. Weschler.
16      Q.   Is that it?
17      A.   As far as I recall.
18      Q.   Now, other than the four
19  parties that ultimately signed the
20  term sheet, were there any other
21  parties or entities or individuals
22  that were involved in the
23  negotiations leading up to the April
24  6, 2008 term sheet?

Page 195

1       MR. FINCH:  Object to
2   form.
3       A.   Not that I recall.
4       Q.   Were any of the debtor's
5   insurers involved in the negotiations
6   that resulted in the term sheet?
7       A.   None that I attended.
8       Q.   To your knowledge, were
9   any of them asked or invited to
10  participate in the negotiations that
11  led up to the term sheet?
12      MR. FINCH:  Objection,
13  lack of foundation.
14      A.   I don't know.
15      Q.   Were you ever advised by
16  any other party to the negotiations
17  that they did not want the insurers
18  to participate in the negotiations?
19      MS. BAER:  Objection.
20      A.   No.
21      Q.   Did any other party to
22  the negotiations suggest that they
23  did want the insurers involved in the
24  negotiations?

Page 196

1       A.   Not that I recall.
2       Q.   All right.  I think you
3   testified earlier this morning that
4   after the term sheet -- Well, let me
5   back up.
6       You indicated in your earlier
7   testimony, I believe, that Anne
8   McMillan from your office prepared
9   the initial draft of the TDP.  Is
10  that correct?
11      A.   I said it may have been
12  Anne McMillan.
13      Q.   Okay.  Do you know
14  whether whoever created it -- well,
15  let me back up.
16      Was it someone from Caplin &
17  Drysdale that created the initial
18  draft?
19      A.   Correct.
20      Q.   Do you know whether that
21  draft still exists today?
22      A.   No.
23      Q.   Do you know what
24  model -- I think I heard the term

Page 197

1   earlier in your testimony that there
2   was a model that was used.
3       Do you know what model was used
4   to create the first draft of the
5   TDP?
6       A.   My ex -- I don't know
7   the answer.  My expectation would be
8   that she or someone else in the firm
9   would have started with the
10  then-most-recent rendition of the TDP
11  sometime in 2007 that had been
12  approved either by a committee in
13  some other bankruptcy or in court and
14  used that as the beginning place to
15  start.  I don't recall what that
16  might have been.
17      Q.   Okay.  Now, you
18  indicated that that initial draft was
19  created by your office in the fall of
20  two thousand --
21      A.   Two thousand --
22      Q.   Sorry -- in the fall of
23  2007 for consideration by the
24  committee.

Page 198

1    A.   I think that's
2  correct.
3    Q.   Is that right?
4    A.   I believe that's
5  correct.
6    Q.   And that was after your
7  office had received input from Mark
8  Peterson on the draft, as I
9  understood your earlier testimony?
10    A.   No, before.
11    Q.   Okay.
12    A.   The draft would have had
13  blanks for all of the numbers and for
14  the payment percentage.
15    Q.   Okay.  Did it go to Mark
16  Peterson first or did it go to your
17  client first?
18    A.   I don't recall.  It
19  certainly would not have gone to
20  Peterson first.  It might have gone
21  to him simultaneously.
22    Q.   And Mr. Peterson, I
23  gather, provided you with his
24  comments?

Page 199

1    A.   Provided the committee
2  with his thoughts, yes.
3    Q.   Okay.  And what were the
4  nature of his thoughts or comments on
5  the draft that was provided to him?
6    A.   He doesn't comment on
7  the draft.  He provides
8  information --
9    Q.   What does he comment
10  on?
11    A.   He doesn't comment.  He
12  provides information that will
13  facilitate the committee's decisions
14  as to what figures to place in the
15  matrix and also to deal with the --
16  just a second.  I've got to get the
17  right word for you -- the claims
18  payment ratio.
19    Q.   Does he actually provide
20  the committee with figures for the
21  matrix?
22    A.   He does.  He provides
23  his recommendations, he provides them
24  with considered -- sometimes with

Page 200

1  alternate recommendations based upon
2  different concepts.  He sometimes
3  provides them with ranges of
4  recommendations for them to
5  consider.
6    Q.   Okay.  You indicated
7  earlier that in or around early 2008
8  that the committee shared its then
9  working draft of the TDP with the
10  FCR.  Do I have that correct?
11    A.   I think that timing is
12  correct but I'm not sure.  It could
13  have been a little earlier than
14  that.
15    Q.   And had there been a
16  plan filed, a joint plan, proposed
17  plan, by the ACC and FCR at that
18  point?
19    A.   That's my
20  recollection.
21    Q.   All right.  You then
22  indicated that the -- the plan I
23  suppose you were talking about was
24  superseded by events was, I think,

Page 201

1  the term that you've used and that's
2  what ultimately led up to the term
3  sheet.  What events were you alluding
4  to?
5    A.   Well, soon thereafter we
6  began the estimation hearings and in
7  the course of the estimation hearings
8  what the -- the negotiations that led
9  to the term sheet began.  And once
10  there was agreement on the term sheet
11  with the debtor, there was no need to
12  pursue the separate plan that the
13  committee and the futures rep had
14  filed because we would be pursuing a
15  plan with the debtor and the equity
16  committee.
17    Q.   When did the estimation
18  hearing begin?
19    A.   I don't recall offhand,
20  but my best guess would be sometime
21  in March of 2008.
22        THE WITNESS:  Earlier
23  than that?
24    A.   Well, I've got that

Page 202

1  wrong.  I'm told I got that wrong.
2  It was earlier in 2008.
3       Q.   You indicated also that
4  at some point -- it wasn't clear to
5  me when in this process -- the draft
6  TDP was shared with Sealed Air.  Can
7  you tell me when that was?
8       A.   It would have been later
9  on, after there was pretty much a
10  draft of plan documents because they
11  didn't just see the TDP; they saw a
12  whole bunch of plan documents to
13  provide their comments.  I can't give
14  you a date, but it would have been in
15  2008 at some point.
16       Q.   Would it have been after
17  the term sheet was signed but before
18  the initial plan documents were filed
19  in September of 2008?
20       A.   I don't recall.
21       Q.   Do you have an
22  understanding as to why Sealed Air
23  had an interest in the TDPs?
24       A.   There was a settlement

Page 203

1  agreement with Sealed Air and
2  Fresenius under which they would pay
3  considerable sums that would be
4  available to compensate some of the
5  claimants here.  And under the terms
6  of that settlement agreements, there
7  were requirements that had to be
8  accomplished in order to trigger
9  their obligation to pay the monies.
10  Some of those obligations involved
11  protections and language in plans --
12  in a plan of reorganization for their
13  benefit.
14       Q.   At the time that the
15  TDPs were shared with Sealed Air for
16  their review, were they also shared
17  with the debtor's insurers for the
18  debtor's insurers' review?
19       A.   I have no idea.
20       Q.   Let me shift gears for a
21  moment because I gather Mr. Cohn is
22  not back with the copies.
23       MR. J. COHN:  I am.
24       MR. BROWN:  Oh, you

Page 204

1  are.
2       MR. J. COHN:  Yes.
3       MR. BROWN:  Do you want
4  to, I guess, give the witness
5  the one-page bio first?
6       MR. J. COHN:  Sure.
7       (Biography page of Elihu
8  Inselbuch marked for
9  identification as Inselbuch
10  Exhibit 5.)
11       Q.   Mr. Inselbuch, you
12  should have before you a one-page
13  document that I'm going to bet that
14  you don't have any trouble
15  identifying but I'll ask the question
16  anyway.  Can you identify it?
17       A.   It's a biography of me
18  that is, I believe, put together by
19  my firm and is either on the website
20  or in other material where the firm
21  collects a rogues gallery of its
22  lawyers.
23       Q.   I will represent to you
24  that I pulled it off your website.

Page 205

1       In the second paragraph there
2  are a number of cases that are
3  referenced --
4       A.   Yes.
5       Q.   -- some of which you
6  have mentioned earlier in your
7  testimony today, and what I want to
8  ask you about each of those cases is
9  whether Mark Peterson was involved in
10  those cases.  So can you run down the
11  list that is in the bio and tell me,
12  one, whether Mark Peterson was
13  involved and, two, as to each what
14  his role was?
15       A.   Okay.
16       MR. FINCH:  Object to
17  form.  You can answer.
18       THE WITNESS:  I can
19  answer this?
20       MR. FINCH:  Yes.
21       A.   The best I can do, let's
22  see.  Johns-Manville, he was not
23  involved in the original bankruptcy
24  proceeding.  In the restructuring

Page 222

1  throughout the country, how
2  information might be made available
3  to the trust, how the process can be
4  made less cumbersome, things like
5  that.
6      Q.    Are the members of the
7  plaintiffs' asbestos bar the only
8  ones that have that knowledge?
9      A.    In that detail, yes.
10     Q.    There's no defense
11 attorneys in asbestos litigation that
12 would have that knowledge?
13     A.    No, not all of it.  Very
14 little of it.  The defense attorneys
15 will be familiar with what's in their
16 files and what they do.
17     Q.    And how does that
18 differ --
19        MR. FINCH:  Object to
20 form.
21     Q.    -- from what the
22 plaintiffs' asbestos attorneys do?
23     A.    It's like day and
24 night.

Page 223

1      Q.    In your experience with
2  other asbestos trusts, does the trust
3  agreements provide that the trustees
4  will be required to consult with the
5  TAC members on various issues?
6      A.    The documents say what
7  they say.  They often call for
8  consultation on specific issues.
9      Q.    And do they often also
10 call for the trustees to obtain the
11 consent of the TAC and the future
12 claimants' representative before
13 certain actions can be taken?
14     A.    Yes.  And failing that
15 consent, there are provisions for
16 overriding the refusal of consent.
17     Q.    What is the necessity of
18 having these consent provisions in
19 the trust agreement?
20        MR. FINCH:  Object to
21 form.
22     A.    So that as -- as the
23 trust is administered, it will be
24 administered in a way that is

Page 224

1  consistent with the expectations of
2  the constituencies that care about
3  it.
4      Q.    And the only
5  constituencies that care about it, I
6  gather, are the asbestos claimants?
7      A.    And the futures
8  representative.
9      Q.    Do the insurers have any
10 interest in it?
11     A.    The insurers have an
12 interest in what they're required to
13 pay.  What they're required to pay is
14 defined by their contracts.
15        MR. BROWN:  All right.
16 I think, Mr. Inselbuch, that
17 may be all I have.  I'll pass
18 to the next questioner.
19        MR. J. COHN:  I'll
20 follow up.  I think it makes
21 sense.
22            _  _  _
23 EXAMINATION BY
24 MR. J. COHN:

Page 225

1      Q.    Mr. Inselbuch, Jacob
2  Cohn for Federal Insurance Company.
3      If we could go to the TDPs for
4  a moment, Exhibit --
5      A.    I'd ask you to speak a
6  little louder --
7      Q.    Sure.  You know what?
8  Why don't I come down there?
9      A.    -- because you're
10 talking in my bad ear.
11     Q.    All right.  You have
12 the --
13     A.    I have the TDP.
14     Q.    -- TDPs.  If you take a
15 look at page 31, the end of
16 5.3(b)(1)(B) --
17     A.    Yeah.
18     Q.    -- it's the paragraph
19 above the scheduled value
20 paragraph --
21     A.    Yes.
22     Q.    -- beginning provision.
23     A.    Yes.
24     Q.    It has a reference to

Page 226

1  choice of law.
2      A.   Yes.
3      Q.   And it says -- there's a
4  reference to the Alabama wrongful
5  death statute and there's a reference
6  to "shall only govern the rights
7  between the PI trust and the
8  claimant, and, to the extent the PI
9  trust seeks recovery from any entity
10 that provided insurance coverage to
11 Grace, the Alabama wrongful death
12 statute shall govern."
13     A.   Uh-huh.
14     Q.   Are you familiar with
15 that provision?
16     A.   I see it.
17     Q.   What is the purpose of
18 that provision?
19     A.   Which part of it?
20     Q.   The part that applies --
21 at least purports to apply a rule to
22 insurer disputes.
23         MR. FINCH:  Object to
24 form.

Page 227

1          (The witness reviews the
2  document.)
3      A.   The point of this whole
4  provision was to ameliorate a problem
5  that existed under the law of
6  Alabama.  As you know, under the
7  terms of the TDP, no punitive damages
8  are included in the recovery.  As
9  this was all explained to me at the
10 time, in Alabama the recovery for
11 wrongful death is couched in terms of
12 punitive damages.  So that, read
13 literally, there could be no recovery
14 under this document for a wrongful
15 death that would have as its
16 operative jurisdiction the State of
17 Alabama.
18         This provision was inserted to
19 cure that problem, to make it
20 possible for what we would all --
21 what we all regarded as
22 run-of-the-mill ordinary death claims
23 that happened to occur in Alabama to
24 recover under the terms of the trust.

Page 228

1          Whether or not this provision,
2  as it states, also will govern the
3  relationship with insurers is
4  something that I guess the insurers
5  can debate at some point in court.
6      Q.   Is this, therefore,
7  intended to be a carve-out from the
8  insurer neutrality provision of the
9  plan?
10         MR. FINCH:  Object to
11 form, lack of foundation.
12         (The witness reviews the
13 document.)
14     A.   I don't know the answer
15 to that.
16     Q.   You are familiar with
17 the insurance neutrality provision of
18 the plan?
19     A.   Only very generally.
20     Q.   Would reviewing that
21 give you any help in answering this
22 question?
23     A.   No.  That's something
24 you ought to ask Mr. Lockwood.

Page 229

1      Q.   You've represented
2  numerous what have come to be known
3  as asbestos creditors committees, or
4  ACCs, correct?
5      A.   Yes.
6      Q.   And as counsel you are
7  representing the members of that
8  committee, correct?
9          MR. FINCH:  Object to
10 form.
11     A.   Yes.
12     Q.   And those members have
13 fiduciary duties; is that correct?
14     A.   Yes.
15     Q.   To whom do those
16 fiduciary duties run?
17     A.   The entire
18 constituency.
19     Q.   Who is the
20 constituency?
21     A.   All asbestos claimants
22 against the particular debtor.
23     Q.   Irrespective of the
24 validity of their claims; is that

Page 230

1 correct?
2        MR. FINCH:  Object to
3    form.
4        A.    Well, when I say "a
5    claimant", I presuppose that they
6    have a claim.
7        Q.    So you operate on the
8    assumption, is it correct, that
9    somebody that is represented by a
10   lawyer that is asserting a claim has
11   a valid claim against that particular
12   debtor?
13       A.    No.  You asked me to
14   whom did the fiduciary duty extend.
15   It extends to those folks who have
16   claims.
17       Q.    Is there a fiduciary
18   duty of the committee to attempt to
19   ferret out those people who have come
20   before the Bankruptcy Court but do
21   not have meritorious claims?
22       A.    No.  The committee's
23   duty is to participate in the
24   preparation of a TDP and a plan that

Page 231

1    will, as best possible, pay claims
2    that are valid and in as an efficient
3    manner as possible.
4        Q.    And as representatives
5    of existing claimants, the ACC wants
6    to get as much money as possible for
7    the existing claimants, correct?
8        A.    First of all, the ACC
9    are the victims who are appointed to
10   the committee.  You seem to be
11   fudging over talking about their
12   lawyers.
13       Q.    I don't think that I am,
14   but please --
15       A.    Okay.  I'm talking about
16   the claimants.  Surely, their job is
17   to see in the debates among the
18   various creditor constituencies how
19   much of the pie that's available to
20   all creditors can be allocated to
21   asbestos claimants.
22       Q.    Okay.  And the FCR has a
23   different constituency.  Those
24   are --

Page 232

1        A.    Yet-to-come claimants.
2        Q.    -- yet-to-come
3    claimants?
4        A.    But he also is
5    interested in seeing to it that as
6    much money as possible goes in the
7    pot.
8        Q.    They have a common
9    interest in maximizing the size of
10   the pot, correct?
11       A.    I believe so.
12       Q.    And it is therefore in
13   the interest of the asbestos
14   creditors committee and the FCR to
15   see as much insurance money paid into
16   that pot as quickly as possible,
17   correct?
18       A.    Sure.
19       Q.    And when the trust is
20   established, the trust owes a
21   fiduciary duty to its beneficiaries,
22   correct?
23       A.    Correct.
24       Q.    And --

Page 233

1        A.    The trustees do.
2        Q.    The trustees.
3        And the beneficiaries of the
4    trust --
5        A.    Yes.
6        Q.    -- are existing and
7    future claimants against that debtor
8    who's established a trust, correct?
9        A.    Correct.
10       Q.    And the trust has a
11   fiduciary duty to maximize the
12   compensation to its beneficiaries,
13   correct?
14       MR. FINCH:  Object to
15   form.  Mischaracterizes the
16   document.
17       A.    Sure.
18       Q.    And the main issue
19   between the current claimants and the
20   future claimants is ensuring that
21   enough money is available going out
22   in time to assure as much as possible
23   the non-preferential treatment of
24   each claim.  Is that correct?

Page 234

1    A.   You could -- that's
2  fair.  That's a fair way to put it.
3    Q.   And the trust,
4  similarly, shares an interest in
5  getting as much money into the trust
6  from whatever source as quickly as
7  possible.  Is that correct?
8         MR. FINCH:  Object to
9    form.
10   A.   Yes.  The trustees also
11 have a fiduciary responsibility in
12 addition to the futures rep to see to
13 it that all claimants that come
14 before the trust are treated more or
15 less equitably.
16   Q.   Do the trustees have any
17 duty at all to the insurers?
18   A.   As insurers?
19   Q.   Yes.
20   A.   Not that I can think
21 of.
22   Q.   In fact, with respect to
23 the insurance relationship, typically
24 insurers are in an adversarial

Page 235

1  position with the trust, correct?
2    A.   Yes.
3    Q.   You've been involved, as
4  you said, as counsel for what we
5  could colloquially call the Manville
6  TAC, correct?
7    A.   Correct, yes.  Still
8  am.
9    Q.   Are you familiar with
10 the Manville trust's having issued
11 pronouncements that it will no longer
12 honor claims that are submitted based
13 upon the diagnosis of certain doctors
14 whose reliability has been called
15 into question?
16   A.   I am.
17   Q.   Would you take a look at
18 page 40 of the TDPs, please,
19 5.7(a)(2), regarding the credibility
20 of medical evidence?
21   A.   Yes.
22   Q.   There's no reference to
23 the doctors who have been
24 discredited -- strike that.

Page 236

1       There's no reference in these
2  TDPs to the doctors who the Manville
3  trust will no longer consider paying
4  claims based upon their diagnosis, is
5  there?
6    A.   That's correct.
7    Q.   Do you know why those
8  doctors are not identified here?
9    A.   Because it's for the
10 trustees to decide whether or not
11 they will list one or another
12 facility as being a facility whose
13 evidence they will not credit.
14   Q.   And the trustees are
15 supposed to consult with TAC members
16 about that; is that correct?
17        MR. FINCH:  Object to
18   form.
19   A.   Not necessarily.
20   Q.   In Manville, is there a
21 cap on the contingent fee that
22 plaintiffs' attorneys can recover?
23   A.   There is.
24   Q.   And that is how much?

Page 237

1    A.   25 percent.
2    Q.   Is the rationale for
3  that because it's a lot easier to
4  recover from a trust than it is to
5  recover from a defendant in the tort
6  system?
7    A.   No.
8         MR. FINCH:  Objection.
9    Q.   Is there a rationale for
10 that?
11   A.   Jack Weinstein insisted
12 on it.
13   Q.   To your knowledge, has
14 any trust, other than the one that
15 the judge insisted upon imposing a
16 fee cap, ever imposed a contingent
17 fee cap on the recovery of
18 plaintiffs' attorneys?
19   A.   No.  And remember that
20 Weinstein was sitting over the
21 question of the fairness of a class
22 action settlement.  He was not
23 sitting as a bankruptcy judge.
24   Q.   Is that fair to say that

Page 238

1  you were the most responsible --
2  sorry -- the ACC is the most
3  responsible for preparing the TDPs;
4  is that right?
5          MR. FINCH:  Object to
6  form.
7      A.   As among what group?
8      Q.   Well --
9      A.   We were more responsible
10 than the New York City Police
11 Department.
12     Q.   Well, in the course of
13 negotiating TDPs and plans generally
14 when you are representing --
15     A.   Yes.
16     Q.   -- ACCs, is it typical
17 for the ACC's counsel to draft the
18 first draft?
19     A.   Of the TDP?
20     Q.   Yes.
21     A.   Yes.
22     Q.   And then it's typical
23 that the FCR would do further comment
24 on it?

Page 239

1      A.   Have to, yes.
2      Q.   Is it fair to say that
3  the FCR and the ACC are the
4  constituencies that are most
5  concerned with the contents of a
6  TDP?
7          MR. FINCH:  Object to
8  form.
9      A.   Yes.
10     Q.   Is it fair to say that
11 once a debtor has cut an economic
12 deal with the asbestos constituencies
13 that its interest in the TDPs are
14 primarily to ensure that they will
15 garner the necessary supermajority
16 vote and comply with 524g so that a
17 plan could be confirmed?
18         MR. FINCH:  Objection to
19 form.
20         MS. BAER:  Objection.
21 Objection to form, lack of
22 foundation.
23     A.   You'd have to ask
24 them.

Page 240

1      Q.   Is that your experience,
2  however?
3          MS. BAER:  Objection.
4          MR. FINCH:  Object to
5  form, foundation.
6      A.   I don't read their
7  minds.
8      Q.   Typically, is the
9  involvement of debtors in such
10 situations in the negotiation of TDPs
11 limited to the issues that I've just
12 mentioned?
13         MS. BAER:  Objection.
14         MR. FINCH:  Object to
15 form.
16         MS. BAER:  Form,
17 foundation.
18     A.   No, no.  The debtors
19 have an interest in dealing with
20 objectors that might have objections
21 to the TDP and they'll address those
22 issues with us and with the futures
23 rep, and it would depend on the
24 particular case.

Page 241

1          MR. J. COHN:  I pass the
2  witness.  Thank you.
3          THE WITNESS:  Anybody
4  else?
5          MR. FINCH:  Anybody
6  else?
7                _ _ _
8  EXAMINATION BY
9  MS. ABRAVANEL:
10     Q.   Mr. Inselbuch, my name
11 is Karen Abravanel.  I'm from Simpson
12 Thacher and I represent Travelers
13 Casualty & Surety.
14     You said that you haven't
15 reviewed any of the insurance
16 policies at issue in these
17 procedures.  Is that right?
18     A.   That's my best
19 recollection.
20     Q.   Have you reviewed any of
21 the settlement agreements entered
22 into between Grace and its insurers
23 pre-petition?
24     A.   I do not believe so.

Page 246

1    claim?
2         MR. FINCH:  Objection.
3    Form, foundation, calls for
4    speculation, hypothetical.
5         A.    As a general
6    proposition, an indirect claimant
7    steps into the shoes of the claimant
8    because the basis for the indirect
9    claim is that he have absolved the
10   trust from the direct claimant's
11   claim.  So they could step into the
12   shoes of the claimant, they could
13   proceed as an expedited claim, they
14   could proceed as an individual review
15   claim.  If there were an entitlement
16   to extraordinary treatment, that
17   would apply.
18        Q.    Okay.
19        A.    Whatever -- whatever the
20   rules that would apply to the direct
21   claimant would apply to the indirect
22   claimant.
23        Q.    Okay.  And let me just
24   be a little bit more specific.  Would

Page 247

1    the PI -- will the PI trust apply the
2    payment percentage of a payment --
3         A.    Yes.
4         Q.    -- on an indirect PI
5    trust claim?
6         A.    Yes.
7         Q.    Okay.  Can you tell me,
8    on the flip side, if the plan is
9    confirmed how will the asbestos PI
10   trust calculate an insurer's payment
11   obligation under an asbestos
12   reinsurance agreement?
13        A.    I have no idea.
14        MR. FINCH:  Objection.
15        Q.    Sorry, sorry.  Asbestos
16   reimbursement agreement.
17        MR. FINCH:  Objection to
18   form and foundation.
19        A.    I have no idea.
20        MS. ABRAVANEL:  Okay, I
21   have no further questions.
22   Thank you.
23        THE WITNESS:  Anybody
24   else?

Page 248

1         MR. DEMMY:  I'll do them
2    from down here.  If you can't
3    hear me, just let me know.
4         THE WITNESS:  I can hear
5    you.
6         MR. FINCH:  Who are you
7    and who do you represent?  I
8    know who you are.  Who do you
9    represent?
10        MR. DEMMY:  I will do
11   that.
12
13   EXAMINATION BY
14   MR. DEMMY:
15        Q.    My name is John Demmy
16   and I represent Firemen's Fund
17   Insurance Company and some other
18   related insurers.
19        In the Grace case, does the
20   committee conduct its business
21   through periodic meetings?
22        A.    Yes.
23        Q.    Do you participate in
24   those meetings?

Page 249

1         A.    I do.
2         Q.    Who typically
3    participates in those meetings?
4         A.    Counsel for each of the
5    individual committee members, counsel
6    for the committee, and whoever else
7    in a particular situation might be
8    asked to participate.
9         Q.    Do the appointed
10   committee members, the holders of
11   claims, ever participate in the
12   committee meetings?
13        A.    Not usually.
14        Q.    Do they ever?
15        A.    There have been an
16   occasion where they did but it's --
17   it would be most unusual.
18        MR. DEMMY:  Okay, that's
19   all the questions I have.
20   Thank you.
21        THE WITNESS:  Anybody
22   else?
23        MR. FINCH:  Next?
24        MR. DOWNEY:  Phil

W R GRACE & CO NEW

*Filing Date: 04/06/08*

UNITED STATES

SECURITIES AND EXCHANGE COMMISSION

WASHINGTON, DC 20549



FORM 8-K

CURRENT REPORT PURSUANT

TO SECTION 13 OR 15(D) OF THE

SECURITIES EXCHANGE ACT OF 1934

Date of report (Date of earliest event reported) April 6, 2008

W. R. GRACE & CO.

(Exact Name of Registrant as Specified in Its Charter)

Delaware

(State or Other Jurisdiction of Incorporation)

(Commission File Number)        1-13953                        65-0773649
7500 Grace Drive                         (IRS Employer Identification No.)
                                                                      21044
Columbia, Maryland
(Address of Principal Executive Offices) (Zip Code)

(410) 531-4000

1

(Registrant's Telephone Number, Including Area Code)


(Former Name or Former Address, if Changed Since Last Report)


Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):


o    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)


o    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)


o    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))


o    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))


-----------------------------------------------------------------------------

W. R. GRACE & CO.


FORM 8-K

*W R GRACE & CO NEW*

*Filing Date: 04/06/08*

CURRENT REPORT


Item 7.01.            Regulation FD Disclosure.


On April 6, 2008, W. R. Grace & Co., on behalf of itself and its subsidiaries and affiliates that are debtors in the Chapter 11 cases, (the "Company") entered into an agreement in principle (the "Agreement") with the Official Committee of Asbestos Personal Injury Claimants, the Future Claimants Representative and the Official Committee of Equity Security Holders, all parties-in-interest in the Company's Chapter 11 case, that would settle all present and future asbestos-related personal injury claims against the Company on the terms and conditions set forth therein. Certain terms and conditions of the Agreement are described in the press release attached hereto as Exhibit 99.1. The description of the terms and conditions of the Agreement is qualified in its entirety by reference to the provisions of the Agreement attached hereto as Exhibit 99.2.


The information furnished pursuant to this Item 7.01, including Exhibit 99.1 and Exhibit 99.2, shall not be deemed to be "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, (the "Exchange Act"), or otherwise subject to the liabilities of such section, nor shall such information be deemed incorporated by reference in any filing under the Securities Act of 1933, as amended, or the Exchange Act, except as shall be expressly set forth by specific reference in such a filing.


Item 9.01.            Financial Statements and Exhibits.


(d)  Exhibits


99.1                      Press Release


99.2                      Term Sheet for Resolution of Asbestos Personal Injury Claims dated as of April 6, 2008

---

*W R GRACE & CO NEW*

*Filing Date: 04/06/08*

SIGNATURES


Pursuant to the requirements of the Securities Exchange Act of 1934, the
Registrant has duly caused this report to be signed by the undersigned,
thereunto duly authorized.


W. R. GRACE & CO.
(Registrant)
By /s/ Mark A. Shelnitz
Mark A. Shelnitz
Secretary


Dated:  April 7, 2008


3
----------------------------------------------------------------------

4

Exhibit 99.1

Grace News #2919

Media Relations:                    Investor Relations:
William Corcoran                     Bridget Sarikas
T +1 410.531.4203                    T +1 410.531.4194
Ewilliam.corcoran@grace.com         Ebridget.sarikas@grace.com

### GRACE ANNOUNCES SETTLEMENT OF ASBESTOS PERSONAL INJURY CLAIMS

COLUMBIA, Maryland, April 7, 2008 -- W. R. Grace & Co. (NYSE: GRA) today announced an agreement in principle that would settle all present and future asbestos-related personal injury claims. The agreement, reached with the Official Committee of Asbestos Personal Injury Claimants, the Future Claimants Representative and the Official Committee of Equity Security Holders, requires the following assets to be paid into a trust to be established under Section 524(g) of the United States Bankruptcy Code:

Cash in the amount of $250 million;

Warrants to acquire 10 million shares of Grace common stock at an exercise price of $17.00 per share, expiring one year from the effective date of a plan of reorganization;

Rights to proceeds under Grace's asbestos-related insurance coverage;

The value of cash and stock under the litigation settlement agreements with Sealed Air Corporation and Fresenius Medical Care Holdings, Inc.; and

Deferred payments at $110 million per year for five years beginning in 2019, and $100 million per year for ten years beginning in 2024; the deferred payments would be obligations of Grace backed by 50.1% of Grace's common stock to meet the requirements of Section 524(g).

The agreement in principle contemplates the filing of a plan of reorganization and related documents with the Bankruptcy Court. The plan will be subject to approval of its co-proponents, exit financing, and Bankruptcy Court and District Court approvals.

"This agreement in principle is a very important step in emerging from Chapter 11," said Fred Festa, Grace's Chairman, President and Chief Executive Officer. "In this challenging global marketplace, we need to be able to focus all of our efforts on increasing shareowner value and continued improvement in our core businesses. The agreement and the Plan of Reorganization that will be based on it will be good for our shareholders, customers, creditors, and our employees. A lot of work remains to be done before we can confirm a Plan of Reorganization, but I am optimistic we will be successful in reaching that goal by the end of this year or early in 2009."

1

------------------------------------------------------------------------

"Also, I want to point out that the Plan of Reorganization will preserve all employee benefits. During the seven years we have been in Chapter 11, our people have nearly doubled Grace's sales and dramatically improved the core businesses. We look forward to final approval of our Plan of Reorganization when we can once again operate without the constraints of Chapter 11," said Festa.

*       *       *       *       *

Grace is a leading global supplier of catalysts and other products to petroleum refiners; catalysts for the manufacture of plastics; silica-based engineered and specialty materials for a wide-range of industrial applications; sealants and coatings for food and beverage packaging, and specialty chemicals, additives and building materials for commercial and residential construction. With annual sales of more than $3.1 billion, Grace has about 6,500 employees and operations in over 40 countries. For more information, visit Grace's web site at www.grace.com.

\* \* \* \* \*

This announcement contains forward-looking statements, that is, information related to future, not past, events. Such information generally includes the words "believes," "plans," "intends," "targets," "will," "expects," "anticipates," "continues" or similar expressions. For these statements, Grace claims the protection of the safe harbor for forward-looking statements contained in the Private Securities Litigation Reform Act of 1995. Grace is subject to risks and uncertainties that could cause actual results to differ materially from those projected in the forward-looking statements or that could cause other forward-looking information to prove incorrect. Factors that could cause actual results to materially differ from those contained in the forward-looking statements include: Grace's bankruptcy, plans of reorganization proposed by Grace and others, Grace's legal proceedings (especially the Montana criminal proceeding and environmental proceedings), the cost and availability of raw materials and energy, Grace's unfunded pension liabilities, costs of environmental compliance, risks related to foreign operations, especially, security, regulation and currency risks and those factors set forth in Grace's most recent Annual Report on Form 10-K, quarterly report on Form 10-Q and current reports on Form 8-K, which have been filed with the Securities and Exchange Commission and are readily available on the Internet at www.sec.gov. Reported results should not be considered as an indication of future performance. Readers are cautioned not to place undue reliance on forward-looking statements, which speak only as of the date thereof. Grace undertakes no obligation to publicly release any revisions to the forward-looking statements contained in this announcement, or to update them to reflect events or circumstances occurring after the date of this announcement.

### 

Corporate Communications

W. R. Grace & Co.-Conn.

7500 Grace Drive

Columbia, MD 21044

2

*W R GRACE & CO NEW*

*Filing Date: 04/06/08*

Exhibit 99.2

W. R. GRACE & CO., et al.
CASE NO. 01-1139 (JFK)

TERM SHEET FOR RESOLUTION OF
ASBESTOS PERSONAL INJURY CLAIMS

This Term Sheet sets forth certain of the principal terms and conditions under which the Debtors, the Official Equity Security Committee, the Official Committee of Personal Injury Claimants ("ACC") and the Future Claimants Representative ("FCR") in the above-captioned Chapter 11 cases are prepared to file a plan of reorganization ("Plan") as co-proponents providing for the resolution of all asbestos personal injury claims and liabilities, including without limitation all asbestos personal injury claims pending at the filing date of the Chapter 11 cases and those arising subsequent thereto (collectively, "Asbestos PI Claims"). This Term Sheet also sets forth the proposed treatment of other key classes of claims asserted in the Chapter 11 cases. This Term Sheet has been produced for settlement purposes only and is subject to the provisions of Rule 408 of the Federal Rules of Evidence.

I.              Treatment of Claims

A.              Asbestos PI Trust

All Asbestos PI Claims will be channeled to a trust (the "Asbestos PI Trust") that is established in accordance with Section 524(g) of the United States Bankruptcy Code. The Asbestos PI Trust will pay claims from trust assets in accordance with a trust agreement and trust distribution procedures established by the ACC and FCR in connection with the Plan.

1.              Funding of Asbestos PI Trust at Emergence. On the Effective Date of the Plan, the Asbestos PI Trust shall receive the following, each of which shall be a condition to the Plan becoming effective:

a.              Cash Payment: $250 million, plus, if the Effective Date occurs after December 31, 2008, interest from January 1, 2009 to the Effective Date accrued at the same rate applicable to Grace's senior debt.

b.              Insurance: the assignment by W. R. Grace & Co.-Conn. ("Grace") and all of its affiliates to the Asbestos PI Trust, of all insurance policies and all insurance proceeds available for payment of Asbestos PI Claims, effective as of the Effective Date, including without limitation:

i.              Any such proceeds from the date hereof of all settlements with insurance companies, and all interest accrued thereon;

----------------------------------------------------------------------

ii.              Any proceeds of the settlement with Equitas held in escrow with all interest accrued thereon;

iii.              Any proceeds of all settlements with all insurance companies

under coverage in place agreements or installment payment arrangements where payment has not yet occurred;

iv.        Assignment of and the right to recover on all outstanding insurance policies potentially applicable to personal injury claimants; and

v.        The right to recover from all insolvent insurance estates as to which Grace or its affiliates has made a claim and the proceeds of all payments received by Grace or its affiliates from those insolvent estates after the date hereof, and all interest accrued thereon.

Provided however that Grace is in the process of examining its policies and the foregoing will not affect Grace's separate coverages, if any, for losses not arising from asbestos personal injury claims.

The ACC and FCR (or, after the Effective Date, the Asbestos PI Trust) shall control (and Grace shall cooperate in connection with) any negotiations or legal proceedings related to the underlying policies or settlement agreements applicable to Asbestos PI Claims.

c.        Warrant:  a warrant for 10 million shares of W. R. Grace & Co. ("Parent") common stock, exercisable at $17 per share, and expiring one year after the Effective Date.

d.        Cryovac, Inc. Payment: The consideration contemplated by the Sealed Air Settlement Agreement.

e.        Fresenius Medical Care Payment:  The proceeds of the payment contemplated by the Fresenius Settlement Agreement.

2.        Deferred Payment Obligations: Grace shall make additional payments to the Asbestos PI Trust over a 15 year period as follows:  five annual payments of $110 million commencing on January 2, 2019; and 10 annual payments of $100 million commencing on January 2, 2024.  Such payment obligations shall be subordinate to any bank debt or bonds outstanding and shall be guaranteed by Parent or any successor ultimate parent entity of Grace. Such guaranty shall be secured by an obligation of Parent to issue to the Asbestos PI Trust, in the event an additional payment is not made, the number of shares of Parent common stock which, when

2

-------------------------------------------------------------------------

added to the number of shares of common stock issued and outstanding as of the Effective Date, shall constitute 50.1% of the voting shares of Parent as of the Effective Date (such number of shares shall be equitably adjusted for stock splits, stock dividends, recapitalizations, corporate reorganizations or changes in control of Parent after the Effective Date).

B.        Other Classes

1.        Administrative Claims: 100% of allowed amount in cash.

2.        Priority Tax Claims: 100% of allowed amount in cash.

3.        Priority Non-Tax Claims: 100% of allowed amount in cash.

4.        Secured Claims: 100% of allowed amount either in cash or by reinstatement.

5.        Unsecured Employee Claims (post-retirement health and special pension): 100% of allowed amount by reinstatement.

6.        Workers Compensation Claims: 100% by reinstatement.

7.        Allowed General Unsecured Claims: 100% of allowed amount plus

post-petition interest as follows: (i) for holders of pre-petition bank credit facilities, post-petition interest at the rate of 6.09% from the filing date through December 31, 2005 and thereafter at floating prime, in each case compounded quarterly; and (ii) for all other unsecured claims, interest at 4.19%, compounded annually, or if pursuant to an existing contract, interest at the non-default contract rate.

8.          Allowed Environmental Claims: 100% of allowed amount in cash.

9.          Traditional Asbestos Property Damage Claims: 100% of allowed amount in cash for settled claims.  The Plan shall set forth procedures for the allowance of all Asbestos PD Claims that are disputed as of the Effective Date.

10.          ZAI Claims: Unless the Plan Proponents agree otherwise as to the treatment of ZAI Claims, the court shall estimate, for purposes of allowance and distribution, any liability on account of ZAI Claims prior to or in connection with the confirmation of the Plan.  ZAI Claims shall be paid 100% of their allowed amount up to the amount of the court's estimate.

II.                              Channeling Injunctions.  The Plan shall contain injunctions under Sections 524(g) and Section 105(a) of the Bankruptcy Code to protect the Debtors, Cryovac, Sealed Air, Fresenius, their affiliates, officers, directors and employees, and other parties in interest and certain insurers.  The Plan shall also contain such provisions, injunctions and releases

3

---------------------------------------------------------------------

(i) as are necessary to comply with the terms of the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement; and (ii) to the full extent permitted by law, to indemnify, and release all of Grace's officers, directors, employees and professionals, and the members of all official committees, the FCR and their professionals, from any liability on account of claims against Grace, or arising in or in connection with these Chapter 11 cases.  The foregoing injunctions, indemnifications and releases shall be at least as extensive as, and consistent with, the injunctions, indemnifications and releases provided for under Grace's Amended Plan currently filed in the Chapter 11 Cases to the extent such latter injunctions, indemnifications and releases are not inconsistent with this Term Sheet.

III.          Resolution of Outstanding Issues.   The parties agree to cooperate in seeking a resolution of outstanding issues material to or not otherwise resolved in connection with the confirmation of a plan of reorganization.

IV.          Binding Effect.  This Term Sheet has been approved by all necessary corporate or organizational action of the Board of Directors of

Parent and Grace, the ACC, the FCR and the Equity Committee, and shall be binding upon the parties and each of their respective successors and assigns to the fullest extent permitted by applicable law. The parties shall use their best efforts to incorporate the terms of this Term Sheet into a mutually agreeable plan of reorganization to be filed with the Bankruptcy Court as soon as possible.

V.          Confidentiality.

The parties shall treat all negotiations regarding this Term Sheet as confidential. Neither the contents nor the existence of this Term Sheet shall be disclosed by any party, either orally or in writing, except to its directors, officers, employees, legal counsel, financial advisors, accountants and clients on a confidential basis until the Debtors have issued a press release announcing the terms and conditions contained herein. Notwithstanding the foregoing, the parties agree that this Term Sheet or the terms of this Term Sheet may be disclosed to the Official Committee of Unsecured Creditors and the Official Committee of Asbestos Property Damage Claimants. Grace will provide counsel to the ACC and counsel to the FCR an opportunity to review and comment on any press release relating to this Term Sheet prior to its issuance.

4.

---------------------------------------------------------------

AGREED TO AND ACCEPTED BY:
Dated: April 6, 2008
THE DEBTORS:
W. R. GRACE & CO., on behalf of itself and its subsidiaries and affiliates that are Debtors in the Chapter 11 cases
By:
Name:                                    /s/ Fred Festa
Title:                                   Fred Festa
                                         Chairman, President and Chief Executive Officer
THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS
By:
Name:                                    /s/ R. Ted Weschler
Title:                                   R. Ted Weschler
                                         Chair of the Committee
THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS:
CAPLIN & DRYSDALE, CHARTERED, on behalf of and in its capacity as counsel to the ACC
By:                                      /s/ Elihu Inselbuch
Name:
THE FUTURE CLAIMANTS REPRESENTATIVE:                      Elihu Inselbuch
ORRICK, HERRINGTON & SUTCLIFFE LLP, on behalf of and in its capacity as counsel to the FCR
By:                                      /s/ Roger Frankel
Name:
                                                          Roger Frankel

5

---------------------------------------------------------------



Confidential
For Settlement Discussions Only

## W. R. GRACE & CO., et al.
## CASE NO. 01-1139 (JFK)

## TERM SHEET FOR RESOLUTION OF
## ASBESTOS PERSONAL INJURY CLAIMS

This Term Sheet sets forth certain of the principal terms and conditions under which the Debtors, the Official Equity Security Committee, the Official Committee of Personal Injury Claimants ("ACC") and the Future Claimants Representative ("FCR") in the above-captioned Chapter 11 cases are prepared to file a plan of reorganization ("Plan") as co-proponents providing for the resolution of all asbestos personal injury claims and liabilities, including without limitation all asbestos personal injury claims pending at the filing date of the Chapter 11 cases and those arising subsequent thereto (collectively, "Asbestos PI Claims"). This Term Sheet also sets forth the proposed treatment of other key classes of claims asserted in the Chapter 11 cases. This Term Sheet has been produced for settlement purposes only and is subject to the provisions of Rule 408 of the Federal Rules of Evidence.

I.    **Treatment of Claims**

    A.    **Asbestos PI Trust**

        All Asbestos PI Claims will be channeled to a trust (the "Asbestos PI Trust") that is established in accordance with Section 524(g) of the United States Bankruptcy Code. The Asbestos PI Trust will pay claims from trust assets in accordance with a trust agreement and trust distribution procedures established by the ACC and FCR in connection with the Plan.

        1.    **Funding of Asbestos PI Trust at Emergence.** On the Effective Date of the Plan, the Asbestos PI Trust shall receive the following, each of which shall be a condition to the Plan becoming effective:

            a.    <u>Cash Payment:</u> $250 million, plus, if the Effective Date occurs after December 31, 2008, interest from January 1, 2009 to the Effective Date accrued at the same rate applicable to Grace's senior debt.

            b.    <u>Insurance:</u> the assignment by W. R. Grace & Co.-Conn. ("Grace") and all of its affiliates to the Asbestos PI Trust, of all insurance policies and all insurance proceeds available for payment of Asbestos PI Claims, effective as of the Effective Date, including without limitation:

OHS East:160410748.4
17367-8 RLF/RLF

Confidential
For Settlement Discussions Only

    i.    Any such proceeds from the date hereof of all settlements with insurance companies, and all interest accrued thereon;

    ii.    Any proceeds of the settlement with Equitas held in escrow with all interest accrued thereon;

    iii.    Any proceeds of all settlements with all insurance companies under coverage in place agreements or installment payment arrangements where payment has not yet occurred;

    iv.    Assignment of and the right to recover on all outstanding insurance policies potentially applicable to personal injury claimants; and

    v.    The right to recover from all insolvent insurance estates as to which Grace or its affiliates has made a claim and the proceeds of all payments received by Grace or its affiliates from those insolvent estates after the date hereof, and all interest accrued thereon.

Provided however that Grace is in the process of examining its policies and the foregoing will not affect Grace's separate coverages, if any, for losses not arising from asbestos personal injury claims.

The ACC and FCR (or, after the Effective Date, the Asbestos PI Trust) shall control (and Grace shall cooperate in connection with) any negotiations or legal proceedings related to the underlying policies or settlement agreements applicable to Asbestos PI Claims.

  c.    <u>Warrant</u>: a warrant for 10 million shares of W. R. Grace & Co. ("Parent") common stock, exercisable at $17 per share, and expiring one year after the Effective Date.

  d.    <u>Cryovac, Inc. Payment</u>: The consideration contemplated by the Sealed Air Settlement Agreement.

  e.    <u>Fresenius Medical Care Payment</u>: The proceeds of the payment contemplated by the Fresenius Settlement Agreement.

2.    **Deferred Payment Obligations:** Grace shall make additional payments to the Asbestos PI Trust over a 15 year period as follows: five annual payments of $110 million commencing on January 2, 2019; and 10 annual payments of $100 million commencing on January 2, 2024. Such payment obligations shall be subordinate to any bank debt or bonds

Confidential
For Settlement Discussions Only

outstanding and shall be guaranteed by Parent or any successor ultimate parent entity of Grace. Such guaranty shall be secured by an obligation of Parent to issue to the Asbestos PI Trust, in the event an additional payment is not made, the number of shares of Parent common stock which, when added to the number of shares of common stock issued and outstanding as of the Effective Date, shall constitute 50.1% of the voting shares of Parent as of the Effective Date (such number of shares shall be equitably adjusted for stock splits, stock dividends, recapitalizations, corporate reorganizations or changes in control of Parent after the Effective Date).

**B.    Other Classes**

1.    **Administrative Claims**: 100% of allowed amount in cash.

2.    **Priority Tax Claims**: 100% of allowed amount in cash.

3.    **Priority Non-Tax Claims**: 100% of allowed amount in cash.

4.    **Secured Claims**: 100% of allowed amount either in cash or by reinstatement.

5.    **Unsecured Employee Claims (post-retirement health and special pension)**: 100% of allowed amount by reinstatement.

6.    **Workers Compensation Claims**: 100% by reinstatement.

7.    **Allowed General Unsecured Claims**: 100% of allowed amount plus post-petition interest as follows: (i) for holders of pre-petition bank credit facilities, post-petition interest at the rate of 6.09% from the filing date through December 31, 2005 and thereafter at floating prime, in each case compounded quarterly; and (ii) for all other unsecured claims, interest at 4.19%, compounded annually, or if pursuant to an existing contract, interest at the non-default contract rate.

8.    **Allowed Environmental Claims**: 100% of allowed amount in cash.

9.    **Traditional Asbestos Property Damage Claims**: 100% of allowed amount in cash for settled claims. The Plan shall set forth procedures for the allowance of all Asbestos PD Claims that are disputed as of the Effective Date.

10.    **ZAI Claims**: Unless the Plan Proponents agree otherwise as to the treatment of ZAI Claims, the court shall estimate, for purposes of allowance and distribution, any liability on account of ZAI Claims prior to or in connection with the confirmation of the Plan. ZAI Claims shall be paid 100% of their allowed amount up to the amount of the court's estimate.

Confidential
For Settlement Discussions Only

II.     **Channeling Injunctions.**  The Plan shall contain injunctions under Sections 524(g) and Section 105(a) of the Bankruptcy Code to protect the Debtors, Cryovac, Sealed Air, Fresenius, their affiliates, officers, directors and employees, and other parties in interest and certain insurers.  The Plan shall also contain such provisions, injunctions and releases (i) as are necessary to comply with the terms of the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement; and (ii) to the full extent permitted by law, to indemnify, and release all of Grace's officers, directors, employees and professionals, and the members of all official committees, the FCR and their professionals, from any liability on account of claims against Grace, or arising in or in connection with these Chapter 11 cases.  The foregoing injunctions, indemnifications and releases shall be at least as extensive as, and consistent with, the injunctions, indemnifications and releases provided for under Grace's Amended Plan currently filed in the Chapter 11 Cases to the extent such latter injunctions, indemnifications and releases are not inconsistent with this Term Sheet.

III.    **Resolution of Outstanding Issues.**   The parties agree to cooperate in seeking a resolution of outstanding issues material to or not otherwise resolved in connection with the confirmation of a plan of reorganization.

IV.     **Binding Effect.**  This Term Sheet has been approved by all necessary corporate or organizational action of the Board of Directors of Parent and Grace, the ACC, the FCR and the Equity Committee, and shall be binding upon the parties and each of their respective successors and assigns to the fullest extent permitted by applicable law.  The parties shall use their best efforts to incorporate the terms of this Term Sheet into a mutually agreeable plan of reorganization to be filed with the Bankruptcy Court as soon as possible.

V.      **Confidentiality.**

The parties shall treat all negotiations regarding this Term Sheet as confidential.  Neither the contents nor the existence of this Term Sheet shall be disclosed by any party, either orally or in writing, except to its directors, officers, employees, legal counsel, financial advisors, accountants and clients on a confidential basis until the Debtors have issued a press release announcing the terms and conditions contained herein.  Notwithstanding the foregoing, the parties agree that this Term Sheet or the terms of this Term Sheet may be disclosed to the Official Committee of Unsecured Creditors and the Official Committee of Asbestos Property Damage Claimants.  Grace will provide counsel to the ACC and counsel to the FCR an opportunity to review and comment on any press release relating to this Term Sheet prior to its issuance.

Confidential
For Settlement Discussions Only

AGREED TO AND ACCEPTED BY:

Dated: April 6, 2008

**THE DEBTORS:**

W. R. GRACE & CO., on behalf of itself and its subsidiaries and affiliates that
are Debtors in the Chapter 11 cases

By: _____

Name: Fred Festa

Title:  Chairman, President and Chief Executive Officer

**THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS**

By: _____

Name: R. Ted Weschler

Title:  Chair of the Committee

**THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY
CLAIMANTS:**

CAPLIN & DRYSDALE, CHARTERED, on behalf of and in its capacity as
counsel to the ACC

By: _____

Name:  Elihu Inselbuch

**THE FUTURE CLAIMANTS REPRESENTATIVE:**

ORRICK, HERRINGTON & SUTCLIFFE LLP, on behalf of and in its capacity
as counsel to the FCR

By: _____

Name:  Roger Frankel

Confidential
For Settlement Discussions Only

AGREED TO AND ACCEPTED BY:
Dated: April 6, 2008

**THE DEBTORS:**
W. R. GRACE & CO., on behalf of itself and its subsidiaries and affiliates that
are Debtors in the Chapter 11 cases

By: _____
Name: Fred Festa
Title: Chairman, President and Chief Executive Officer


**THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS**

By: _____
Name: R. Ted Weschler
Title: Chair of the Committee

**THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY
CLAIMANTS:**
CAPLIN & DRYSDALE, CHARTERED, on behalf of and in its capacity as
counsel to the ACC


By: _____
Name: Elihu Inselbuch


**THE FUTURE CLAIMANTS REPRESENTATIVE:**
ORRICK, HERRINGTON & SUTCLIFFE LLP, on behalf of and in its capacity
as counsel to the FCR


By: _____
Name: Roger Frankel

Confidential
For Settlement Discussion Only

**AGREED TO AND ACCEPTED BY:**
Dated: April 6, 2008

**THE DEBTORS:**
W. R. GRACE & CO., on behalf of itself and its subsidiaries and affiliates that
are Debtors in the Chapter 11 cases

By. _____
Name: Fred Festa
Title: Chairman, President and Chief Executive Officer


**THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS**


By: _____
Name: R. Ted Weschler
Title: Chair of the Committee

**THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY
CLAIMANTS:**
CAPLIN & DRYSDALE, CHARTERED, on behalf of and in its capacity as
counsel to the ACC


By: _____
Name: Elihu Inselbuch


**THE FUTURE CLAIMANTS REPRESENTATIVE.**
ORRICK, HERRINGTON & SUTCLIFFE LLP, on behalf of and in its capacity
as counsel to the FCR


By _____
Name: Roger Frankel

OHS East 160410748.4
17167.8 REDYRLS

5



Δ π EXHIBIT 3
Deponent ENSELBUCH
Date 6-12-09 Rptr. LL
WWW.DEPOBOOK.COM

# Preliminary Expert Report on W. R. Grace Trust

## Mark A. Peterson

## Legal Analysis Systems

## March 2009

REMAINDER OF EXHIBIT OMITTED
SEE NOTICE OF SERVICE OF
EXPERT WITNESS REPORT
(D.I. 21029)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                                )      Chapter 11
                                       )
**W. R. GRACE & CO.**, *et al.*[1]     )      Case No. 01-01139 (JKF)
                                       )      Jointly Administered
                    **Debtors.**       )
                                       )
                                       )
                                       )
                                       )

### EXHIBIT 4 TO EXHIBIT BOOK
### TRUST DISTRIBUTION PROCEDURES

**EXHIBIT 4**

Attached.

---

[1]    The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

REMAINDER OF EXHIBIT OMITTED
SEE EXHIBIT 4 TO EXHIBIT BOOK
(D.I. 20874)