# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - -

In Re:                    : Chapter 11
                          :
                          : Case No.
W.R. GRACE & CO., et al,  : 01-01139 JKF
                          :
                          : (Jointly
          Debtors         : Administered)


- - -

Thursday, June 11, 2009

- - -


Oral deposition of JAY W.
HUGHES, JR., ESQUIRE, taken pursuant to
notice, was held at the offices of
KIRKLAND & ELLIS, 665 Fifteenth Street,
NW, Washington, DC  20005, commencing at
9:07 a.m., on the above date, before Lori
A. Zabielski, a Registered Professional
Reporter and Notary Public in and for the
Commonwealth of Pennsylvania.


- - -

MAGNA LEGAL SERVICES
Seven Penn Center
1635 Market Street
8th Floor
Philadelphia, Pennsylvania 19103

Page 2

```
1   APPEARANCES:
2
3   LEWIS SLOVAK KOVACICH, P.C.
    BY:  TOM L. LEWIS, ESQUIRE
4   725 Third Avenue North
    Great Falls, Montana  59401
5   406.761.5595
    (tom@lsklaw.net)
6   Representing the Libby Claimants
7
8   COHN WHITESELL & GOLDBERG, LLP
    BY:  DANIEL C. COHN, ESQUIRE
9   101 Arch Street
    Boston, Massachusetts 02110
10  617.951.2505
    (cohn@cwg11.com)
11  Representing the Libby Claimants
12
13  KIRKLAND & ELLIS, LLP
    BY:  BARBARA M. HARDING, ESQUIRE
14  655 Fifteenth Street, N.W.
    Washington, DC  20005-5793
15  202.879.5081
    (barbara.harding@kirkland.com)
16  Representing the Debtors and Witness
17
18  KIRKLAND & ELLIS, LLP
    BY:  THEODORE L. FREEDMAN, ESQUIRE*
19     (*VIA TELECONFERENCE)
    601 Lexington Avenue
20  New York, New York  10022
    212.446.4800
21  (theodore.freedman@kirkland.com)
    Representing the Debtors
22
23
24
```

Page 3

```
1   APPEARANCES (continued)
2
3   THE LAW OFFICES OF JANET S. BAER, P.C.
    BY:  JANET S. BAER, ESQUIRE
4   70 West Madison Street
    Suite 2100
5   Chicago, Illinois  606002
    312.641.2162
6   Representing the Debtors
7
8   SPEIGHTS & RUNYAN
    BY:  DANIEL H. SPEIGHTS, ESQUIRE*
9     (*VIA TELECONFERENCE)
    200 Jackson Avenue East
10  P.O. Box 685
    Hampton, South Carolina  29924
11  803.943.4444
    (dspeights@speightsrunyan.com)
12  Representing Anderson Memorial Hospital
13
14
    DRINKER BIDDLE & REATH, LLP
15  BY:  MICHAEL F. BROWN, ESQUIRE
    One Logan Square
16  18th & Cherry Streets
    Philadelphia, Pennsylvania  19103-6996
17  215.988.2988
    (brownmf@dbr.com)
18  Representing OneBeacon America Insurance
    Company, Seaton Insurance Company,
19  Government Employees Insurance Company,
    Republic Insurance Company n/k/a Starr
20  Indemnity & Liability Company
21
22
23
24
```

Page 4

```
1   APPEARANCES (continued)
2
3   CAPLIN & DRYSDALE, CHARTERED
    BY:  JEFFREY A. LIESEMER, ESQUIRE
4   One Thomas Circle N.W.
    Suite 1100
5   Washington, DC  20005
    202.862.7801
6   (jal@capdale.com)
    Representing Grace, Official Committee of
7   Asbestos Personal Injury Claimants
    ("ACC")
8
9
    ANDERSON KILL & OLICK, P.C.
10  BY:  ROBERT M. HORKOVICH, ESQUIRE*
       (*VIA TELECONFERENCE)
11  1251 Avenue of the Americas
    New York, New York 10020
12  212.278.1322
    (rhorkorvitz@andersonkill.com)
13  Representing the ACC
14
15  SIMPSON THACHER & BARTLETT, LLP
    BY:  ELISA ALCABES, ESQUIRE*
16     (*VIA TELECONFERENCE)
    425 Lexington Avenue
17  New York, New York  10017-3954
    212.455.3133
18  (ealcabes@stblaw.com)
    Representing Travelers Casualty and
19  Surety Company
20
21  VORYS, SATER, SEYMOUR AND PEASE, LLP
    BY:  PHILIP F. DOWNEY, ESQUIRE*
22     (*VIA TELECONFERENCE)
    52 East Gay Street
23  Columbus, Ohio  43215
    330.208.1152
24  (pdowney@vorys.com)
```

Page 5

```
1   APPEARANCES (continued)
2
3   MENDES & MOUNT, LLP
    BY:  EILEEN T. McCABE, ESQUIRE
4   750 Seventh Avenue
    New York, New York 10019
5   212.261.8262
    (eileen.mccabe@mendes.com)
6   Representing AXA Belgium as Successor to
    Royale Belge SSA
7
8
    MENDES & MOUNT, LLP
9   BY:  ALEXANDER MUELLER, ESQUIRE
    750 Seventh Avenue
10  New York, New York  10019-6829
    212.261.8296
11  (alexander.mueller@mendes.com)
    Representing London Market Companies
12
13
    FORD MARRIN ESPOSITO & WITMEYER & GLESER
14  BY:  ELIZABETH M. DeCRISTOFARO, ESQUIRE
    Wall Street Plaza
15  New York, New York  10005-1875
    212.269.4900
16  Representing Continental Casualty Company
    and Continental Insurance Company
17
18
    STROOCK & STROOCK & LAVAN, LLP
19  BY:  KENNETH PASQUALE, ESQUIRE*
       (*VIA TELECONFERENCE)
20  180 Maiden Lane
    New York, New York  10038-4982
21  212.806.5400
    (kpasquale@stroock.com)
22  Representing Official Committee of
    Unsecured Creditors
23
24
```

Page 6

```
 1   APPEARANCES (continued)
 2
 3   CROWELL & MORING, LLP
     BY:  NOAH S. BLOOMBERG, ESQUIRE*
 4      (*VIA TELECONFERENCE)
     1001 Pennsylvania Avenue NW
 5   Washington, DC  20004-2595
     202.624.2913
 6   (nbloomberg@crowell.com)
     Representing Fireman's Fund Insurance
 7   (Surety Bond)
 8
 9   STEVENS & LEE, P.C.
     BY:  MARNIE E. SIMON, ESQUIRE
10   1818 Market Street, 29th Floor
     Philadelphia, Pennsylvania  19103-1702
11   215.751.2885
     (mes@stevenslee.com)
12   Representing Fireman's Fund Insurance
13
14   ECKERT SEAMANS CHERIN & MELLOTT, LLC
     BY:  EDWARD J. LONGOSZ, II, ESQUIRE
15   1747 Pennsylvania Avenue, NW
     12th Floor
16   Washington, DC  20006
     202.659.6619
17   (elongosz@eckertseamans.com)
     Representing Maryland Casualty and Zurich
18
19
     WILEY REIN, LLP
20   BY:  RICHARD A. IFFT, ESQUIRE
     1776 K Street NW
21   Washington, DC  20006
     202.719.7520
22   (rifft@wileyrein.com)
     Representing Maryland Casualty and Zurich
23
24
```

Page 8

```
 1   APPEARANCES (continued)
 2
 3   O'MELVENY & MYERS, LLP
     BY:  TANCRED SCHIAVONI, ESQUIRE
 4   Times Square Tower
     7 Times Square
 5   New York, New York 10036
     212.326.2267
 6   (tschiavoni@omm.com)
     Representing Arrowood Indemnity Company
 7
 8
     WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
 9   BY:  KEVIN J. MANGAN, ESQUIRE
     222 Delaware Avenue
10   Suite 1501
     Wilmington, Delaware  19801
11   302.252.4361
     (kmangan@wcsr.com)
12   Representing State of Montana
13
14   PEPPER HAMILTON, LLP
     BY:  LINDA J. CASEY, ESQUIRE
15   3000 Two Logan Square
     Philadelphia, Pennsylvania  19103
16   215.981.4000
     (caseyl@pepperlaw.com)
17   Representing BNSF Railway Company
18
                    - - -
19
20
21
22
23
24
```

Page 7

```
 1   APPEARANCES (continued)
 2
 3   COZEN O'CONNOR
     BY:  JACOB C. COHN, ESQUIRE
 4   1900 Market Street
     Philadelphia, Pennsylvania  19103-3508
 5   215.665.2147
     (jcohn@cozen.com)
 6   Representing Federal Insurance Company
 7
 8   ORRICK HERRINGTON & SUTCLIFFE, LLP
     BY:  PERI N. MAHALEY, ESQUIRE
 9   Columbia Center
     1152 15th Street, N.W.
10   Washington, DC  20005-1706
     202.339.8516
11   (pmahaley@orrick.com)
     Representing Future Claimants
12   Representative
13
14   CUYLER BURK, P.C.
     BY:  STEFANO V. CALOGERO, ESQUIRE
15   Parsippany Corporate Center
     4 Century Drive
16   Parsippany, New Jersey  07054
     973.734.3200
17   (scalogero@cuyler.com)
     Representing Allstate Insurance Company
18
19
     WILSON ELSER MOSKOWITZ EDELMAN & DICKER,
20   LLP
     BY:  CARL PERNICONE, ESQUIRE
21   150 East 42nd Street
     New York, New York  10017-5639
22   212.915.5656
     (carl.pernicone@wilsonelser.com)
23   Representing Arrowood Indemnity Company
24
```

Page 9

```
 1                    - - -
 2               I N D E X
 3                    - - -
 4
 5   Testimony of:
 6     JAY W. HUGHES, JR., ESQUIRE
 7
 8   By Mr. Lewis          Page  13, 424
 9   By Mr. Mangan         Page  211
10   By Ms. Casey          Page  240
11   By Mr. Brown          Page  296, 479
12   By Mr. Jacob Cohn      Page  344
13   By Ms. Simon          Page  358
14   By Ms. McCabe          Page  360
15   By Mr. Schiavoni      Page  361, 483
16   By Mr. Ifft        Page  380
17   By Ms. DeCristofaro     Page  386
18   By Ms. Alcabes        Page  388
19   By Mr. Speights       Page  397
20   By Mr. Downey          Page  418
21
22
23
24
```

Page 10

```
 1                - - -
 2           E X H I B I T S
 3                - - -
 4   NO.  DESCRIPTION          PAGE
 5   Hughes-1
         Monthly Asbestos Litigation
 6       Summary - March      86
 7   Hughes-2
         Letter dated 3/27/01 to
 8       Allan McGarvey from Terry
         MacDonald          168
 9
     Hughes-3
10       Exhibit 4 to Exhibit Book
         Trust Distribution Procedures 211
11
     Hughes-4
12       Documents bearing Bates stamps
         GCO 000023 through 000026   242
13
     Hughes-5
14       Documents bearing Bates stamps
         GCO 000081 through 000091   254
15
     Hughes-6
16       Document bearing Bates stamp
         GCO 000174       257
17
     Hughes-7
18       Documents bearing Bates stamps
         GCO 000111 through 000112   275
19
     Hughes-8
20       Document bearing Bates stamp
         GCO 000173       280
21
     Hughes-9
22       Document bearing Bates stamp
         GCO 000140       281
23
24
```

Page 11

```
 1   EXHIBITS (continued)
 2
     NO.  DESCRIPTION          PAGE
 3
     Hughes-10
 4       Documents bearing Bates stamps
         GCO 000207 through 000215   282
 5
     Hughes-11
 6       Letter dated 4/25/09 to Counsel
         from Barbara Harding with
 7       attachment        296
 8   Hughes-12
         Exhibit 6 to Exhibit Book
 9       Asbestos Insurance Transfer
         Agreement        299
10
     Hughes-13
11       Document bearing Bates stamp
         GCO 000219       362
12
     Hughbes-14
13       Documents bearing Bates stamps
         GCO 000199 through 000200   367
14
     Hughes-15
15       Exhibit 5 to Exhibit Book
         Schedule of Settled Asbestos
16       Insurers Entitled to 524(g)
         Protection        479
17
18                - - -
19
20
21
22
23
24
```

Page 12

```
 1                - - -
 2      DEPOSITION SUPPORT INDEX
 3                - - -
 4
 5   Direction to Witness Not to Answer:
 6   Page   Line      Page    Line
 7   408   22
 8
 9
10   Request for Production of Documents:
11   Page   Line      Page    Line
12   NONE
13
14
15   Stipulations:
16   Page  Line      Page    Line
17   NONE
18
19
20   Area(s) Marked Confidential:
21   Page  Line      Page    Line
22
23      (Mr. Speights dropped of
         teleconference from:)
24   285   01    to   299   24
```

Page 13

```
 1                - - -
 2           PROCEEDINGS
 3                - - -
 4      MR. LEWIS:  Federal rules.
 5                - - -
 6      JAY W. HUGHES, JR., ESQUIRE,
 7   after having been first duly
 8   sworn, was examined and testified
 9   as follows:
10                - - -
11           EXAMINATION
12                - - -
13   BY MR. LEWIS:
14      Q.   Good morning, Mr. Hughes.
15   My name is Tom Lewis.  We met sometime
16   ago when we were negotiating on some
17   settlements out of Libby, Montana.
18      Do you recall that?
19   A.   Yes, I do.
20   Q.   What's your full name?
21   A.   Jay, J-A-Y, W. Hughes, Jr.
22   Q.   Who is your employer?
23   A.   W.R. Grace & Company.
24   Q.   And what is your position
```

Page 14

1  with W.R. Grace?
2      A.  I am a senior litigation
3  counsel in the legal department.
4      Q.  How long have you held that
5  position?
6      A.  I have had that title
7  probably since 1991.
8      Q.  When asbestos claims began
9  accumulating against Grace in the '80s
10  and '90s right up until the time of the
11  bankruptcy, what was your role with
12  respect to those claims?
13      A.  I was responsible for the
14  day-to-day management and resolution of
15  the asbestos personal injury claims filed
16  against the company.
17      Q.  Who was your -- or who were
18  your supervisors at that time, your
19  direct reports?
20      A.  Since 1991, my supervisor
21  was the general counsel, Bob Beber.  Bob
22  retired in 1998.  In 1998, David Siegel
23  became general counsel.  I reported to
24  Dave.  Dave retired in -- well, it was

Page 15

1  after bankruptcy -- in 2005.  Mark
2  Shelnitz became general counsel.  And at
3  some point after Shelnitz became the
4  general counsel, Richard Finke became
5  assistant general counsel for litigation,
6  and I reported to Richard since then.
7      Q.  We have taken the deposition
8  of Mr. Finke.  What documents have you
9  reviewed to prepare to testify in this
10  30(b)(6) deposition?
11      A.  I've reviewed the deposition
12  transcripts of Mr. Finke, of Mr. Posner,
13  and I have taken a look at the Trust
14  Distribution Procedures, the Trust
15  Agreement, and some other insurance
16  agreements, just to kind of refresh my
17  recollection about the issues that I am
18  testifying about.
19      Q.  Have you reviewed any
20  written communications between insurers
21  and Grace relating to resolution of
22  disputes with insurance carriers in
23  preparation for this deposition?
24      A.  No.

Page 16

1      Q.  Were you involved with
2  resolution disputes with insurers during
3  your time as senior litigation counsel
4  assigned to the asbestos claims?
5      A.  Yes.
6      Q.  How would you describe your
7  role in those insurance dispute
8  resolutions, by settlement, I assume,
9  primarily, right?  That's a compound
10  question.
11          MS. HARDING:  Object to
12  form.
13          MR. LEWIS:  I will rephrase
14  the question.
15  BY MR. LEWIS:
16      Q.  How were you involved in
17  resolving the disputes with the insurance
18  companies?
19      A.  Well, my primary role
20  involved what I would refer to as
21  post-settlement or post-resolution
22  disputes with insurance carriers.  I
23  wasn't directly involved, although I was
24  obviously consulted because of my

Page 17

1  involvement in the underlying asbestos
2  personal injury cases.  I wasn't
3  generally involved in the coverage
4  litigation between Grace and coverage
5  disputes and the insurance carriers.
6          I have had a much greater
7  involvement in certain disputes that
8  arose based on what I would call the kind
9  of execution and implementation of the
10  insurance and agreements and settlement
11  agreements and coverage in place
12  agreements and reimbursement agreements.
13          MS. HARDING:  Wait one
14  second.  To everybody that's on
15  the phone, could everybody please
16  mute their lines while the
17  questioning is going on here in
18  the room.  We hear a lot of
19  rustling and talking and things.
20  So please put your phones on mute.
21  Thank you.
22          MS. ALCABES:  Barbara, if
23  the witness could speak up a
24  little bit, it would be helpful,

Page 18

1   too.  Thanks.
2        MS. HARDING:  The witness is
3   talking pretty loudly, so there is
4   not a whole lot we can do about
5   that.  Sorry.
6        MR. LEWIS:  Can you hear me?
7        MS. ALCABES:  Yes.
8        MR. LONGOSZ:  Yes.
9        MS. HARDING:  All right.
10  Thank you.
11  BY MR. LEWIS:
12       Q.   Did you review your prior
13  depositions or testimony relating to the
14  Grace bankruptcy to prepare for this
15  deposition?
16       A.   Yes, I did.
17       Q.   How many times have you been
18  deposed with respect to the bankruptcy,
19  once?
20       A.   Twice before today.
21       Q.   Okay.  I have one
22  deposition.  Where were you deposed the
23  first time?
24       A.   The first time I was deposed

Page 19

1   in the fraudulent conveyance lawsuit,
2   which was an adversary proceeding, I
3   believe, in the bankruptcy, and that took
4   place in 2002.  And then I was deposed in
5   2007 in connection with the personal
6   injury estimation trial.
7        Q.   Did you testify on behalf of
8   Grace in the estimation trial?
9        A.   No, I didn't.
10       Q.   Well, I don't want to cover
11  that.  I have been through that
12  deposition.
13       And I think what you are
14  referring to when you talk about
15  post-settlement disputes, just generally,
16  you were talking about arranging for
17  audits, reporting to settled insurers,
18  and this sort of thing; is that generally
19  correct?
20       A.   Yes, documenting settlements
21  and issues that arose in terms of Grace's
22  documentation of payment, in terms of
23  reimbursements under the agreement.
24       Q.   One of the interesting

Page 20

1   things to the Libby counsel that it
2   involved when we became involved in this
3   case was the way insurance was --
4        MR. SCHIAVONI:  Objection to
5   form.
6        MS. HARDING:  He didn't ask
7   a question.
8        MR. LEWIS:  Let me finish
9   the question.
10       MR. SCHIAVONI:  I wanted to
11  give you a chance to start over.
12       MR. LEWIS:  What did you
13  say, sir?
14       MR. SCHIAVONI:  I was giving
15  you an opportunity to start over.
16       MR. LEWIS:  Just let me
17  complete my question.  My question
18  is going to be pretty benign.  I
19  just want to get this witness to
20  another subject.  And you can make
21  your objection, and we will
22  proceed.
23  BY MR. LEWIS:
24       Q.   When we got in the case, we

Page 21

1   made interrogatory requests early on in
2   all of our cases, inquiring as to whether
3   there was liability insurance available
4   to Grace to resolve these claims, and the
5   answer we got was generally, don't worry
6   about it, we have got enough money, you
7   don't need to know about insurance.  And
8   no insurance information was provided.
9        MR. SCHIAVONI:  Objection.
10       MR. LEWIS:  I am not done.
11  Okay.
12       MR. SCHIAVONI:  You are
13  giving a speech.  You are not
14  asking a question.
15  BY MR. LEWIS:
16       Q.   Do you recall that sort of
17  response early on?
18       MS. HARDING:  Object to
19  form.  I would have to --
20       MR. SCHIAVONI:  Object to
21  form.
22       THE WITNESS:  I would have
23  to see a response.  I am familiar
24  with our discovery responses

Page 26

1    MS. HARDING:  I am not
2  telling him not to answer.  I am
3  just stating my objection.
4    MR. LEWIS:  Thank you.  Are
5  you done?
6    MS. HARDING:  Yes.
7    MR. SCHIAVONI:  Counsel, you
8  are asking for a legal conclusion,
9  point-blank.  It's obvious.  You
10  can certainly say otherwise, but
11  that's what you are asking for.
12  We object.  And stop making
13  speeches.  Just answer [sic]
14  questions.
15    MR. LEWIS:  I think you
16  should keep your composure and not
17  get so upset, Counsel.  I am going
18  to conduct this deposition.  You
19  can object, and we will proceed.
20  Okay?
21    All right.  Read back the
22  last question, please.
23    (The reporter read from the
24  record as requested.)

Page 27

1  BY MR. LEWIS:
2    Q.   With that preface --
3    MR. SCHIAVONI:  I object.
4  If you are going to incorporate
5  your statements about the law in
6  questions, it's just
7  objectionable.  And you are a very
8  experienced trial lawyer.  You
9  know that.  You know better.
10  Objection to form.
11    MR. LEWIS:  Are you finished
12  with your objection?
13    Okay.
14  BY MR. LEWIS:
15    Q.   With that preface and
16  acknowledging your objection, was it
17  important to you in your role in settling
18  these cases that you have a passing
19  knowledge of the laws of the various
20  states in which the cases were brought?
21    MS. HARDING:  Object to
22  form.
23    MR. SCHIAVONI:  Objection to
24  form.

Page 28

1    THE WITNESS:  Yes.
2  BY MR. LEWIS:
3    Q.   For example, you settle
4  cases in a multitude of states, correct?
5    A.   Yes.
6    MS. HARDING:  Just object to
7  form in terms of you.
8    But go ahead.
9  BY MR. LEWIS:
10    Q.   When I say "you," I am
11  referring to you on behalf of Grace.
12    If you want me to use Grace,
13  I will use Grace.  Would that be better?
14  I will use Grace if that bothers you so
15  much.
16    Were you mindful of what
17  jurisdiction or even venue you were in
18  when you evaluated cases for settlement?
19    A.   Yes.
20    Q.   And why is that?
21    A.   Well, I think there
22  obviously can be legal distinctions in
23  terms of the law with respect to personal
24  injury cases that would be relevant to

Page 29

1  the value of the case.  And also there
2  are differences in historical verdicts,
3  the amount of the verdicts in a case, so
4  the jurisdiction would be relevant there
5  as well.
6    Q.   For example, whether there
7  is joint and several liability in a state
8  or not might impact your valuation of the
9  settlement; is that true?
10    A.   Yes.
11    Q.   What factors did you
12  consider in evaluating a case for
13  settlement?
14    A.   Well, I think I have
15  testified in both of my prior depositions
16  in this case in a fairly detailed manner
17  on that question.
18    But I think the same types
19  of factors that any individual involved
20  in resolving asbestos cases, specifically
21  in personal injury cases, generally the
22  quality of the evidence in terms of the
23  exposure of the particular plaintiff to
24  Grace's products, the particular

Page 30

1 individual in terms of his age, the
2 seriousness of the disease. In the
3 asbestos arena, there is a distinction
4 between, say, lung cancer and
5 mesothelioma. Primarily it is due to the
6 fact that lung cancer, there are
7 established alternative causes to it.
8 And those are -- that's kind of an
9 overview.
10    Q.   Would the nature and extent
11 of the exposure in most cases be of
12 paramount importance to you in evaluating
13 a case for settlement?
14    MS. HARDING: Object to
15 form.
16    THE WITNESS: I don't know
17 if it would be paramount
18 importance, but I think that
19 certainly the evidence of exposure
20 to Grace products was something
21 that was one of the primary issues
22 in terms of evaluating the case
23 against Grace and what it might be
24 worth.

Page 31

1 BY MR. LEWIS:
2    Q.   What percentage of the
3 cases, if you know, that are claims that
4 were brought against Grace were primarily
5 Monokote exposure cases?
6    MS. HARDING: Object to
7 form, foundation, and overly
8 broad.
9    But if you can answer, go
10 ahead.
11    THE WITNESS: I couldn't
12 give a specific percentage, but a
13 substantial portion of the cases
14 historically involved exposures to
15 Monokote 3 and other products to
16 which a commercially chrysotile
17 asbestos had been added
18 commercially.
19 BY MR. LEWIS:
20    Q.   Do you consider the Monokote
21 cases as primarily chrysotile cases?
22    MS. HARDING: Object to
23 form.
24    THE WITNESS: I think that

Page 32

1 in terms of the percentage of
2 asbestos in the products, they
3 were overwhelmingly chrysotile.
4 The only other asbestos that would
5 have been involved would have been
6 that which is incidental to the
7 vermiculite, if it originated from
8 Libby.
9 BY MR. LEWIS:
10    Q.   Was there any other source
11 amphibole asbestos besides the asbestos
12 that contaminated the vermiculite in
13 Libby and products manufactured by Grace?
14    MR. SCHIAVONI: Objection,
15 no foundation, speculation.
16    THE WITNESS: It's fairly
17 well-known that chrysotile
18 deposits in Quebec, I believe, and
19 other parts of the world may have
20 some tremolite contamination as
21 well. Besides that, I would say
22 only the vermiculite and the
23 potential for -- Libby vermiculite
24 and the potential for Libby

Page 33

1 amphibole.
2 BY MR. LEWIS:
3    Q.   So if I suggested that most
4 amphibole asbestos used in Grace products
5 came from Libby, would you agree or not
6 agree with that?
7    MS. HARDING: Just object to
8 form.
9    You can answer.
10    THE WITNESS: I don't have a
11 basis for agreeing because I don't
12 have --
13    MR. SCHIAVONI: Objection,
14 calls for speculation, no
15 foundation.
16    MR. LEWIS: I think he was
17 saying that, Counsel. But don't
18 interrupt the witness again. You
19 can make your objections, but
20 don't interrupt the witness. I
21 don't interrupt the witness.
22 Let's have some decorum here.
23    Would you like to finish
24 your answer, sir?

Page 34

1    MR. SCHIAVONI:  I think he
2  just acknowledged that the
3  question called for speculation.
4    MR. LEWIS:  I think he did,
5  but allow him to answer.  That was
6  a foundational question.
7    THE WITNESS:  I said I don't
8  know enough about the issue of
9  contamination -- amphibole
10  contamination in chrysotile to
11  answer that question.
12  BY MR. LEWIS:
13    **Q.    Fair enough.**
14      **Do you have enough**
15  **understanding of the asbestos that was**
16  **generated from Grace's and Zonolite's**
17  **operations in Libby was amphibole?**
18    MS. HARDING:  Object to
19  form, generated.
20    But go ahead.
21    THE WITNESS:  Yes.
22  BY MR. LEWIS:
23    **Q.    Was it all amphibole as far**
24  **as you know?**

Page 35

1    MS. HARDING:  Object to
2  form.
3    MR. SCHIAVONI:  No
4  foundation, calls for speculation.
5  We have a lawyer testifying here,
6  not a fact witness from Libby or a
7  scientist or anything else.
8    MR. LEWIS:  Go ahead and
9  answer.
10    THE WITNESS:  Well, I was
11  going to start by saying what
12  counsel down the table just said.
13    But my understanding is
14  amphibole, but I am not a
15  mineralogist and I don't have that
16  kind of expertise.
17  BY MR. LEWIS:
18    **Q.    Yes, but one of the things**
19  **that you said was important and a factor**
20  **in evaluating a claim was the nature of**
21  **the exposure, correct?**
22    MS. HARDING:  Object to
23  form.
24    Go ahead.

Page 36

1    THE WITNESS:  But that's not
2  what I meant by nature of the
3  exposure.  By nature of the
4  exposure I meant the extent, the
5  duration of the exposure and the
6  extent to which the activity that
7  was involved in terms of was the
8  individual applying our product,
9  was he working in a work space
10  where someone else was applying
11  it, did they mix our product.
12  That's what I am talking about,
13  the kind of factors that an
14  industrial hygienist would use in
15  assessing the nature of the
16  exposure and the risk to the
17  worker, who was the plaintiff.
18  BY MR. LEWIS:
19    **Q.    Another factor you talked**
20  **about was the quality of the evidence.**
21      **What did you mean by that?**
22    A.    What I meant is that if
23  there were -- in a typical asbestos
24  personal injury case, you might have

Page 37

1  coworkers who said a Monokote product
2  and/or Zonolite product was present at
3  this work site.  And if the individual
4  again, if the plaintiff himself recalled
5  it and accurately described it in
6  deposition testimony, that, in my
7  opinion, would be better evidence and
8  would be more persuasive to a jury than
9  if a coworker who had no personal
10  relationship with or didn't work
11  alongside the plaintiff gave the same
12  kind of testimony and it was an indirect
13  connection between that.
14      And also there was
15  documentary evidence.  If we had evidence
16  in our files that our product was used at
17  a particular building at a particular
18  time period, then I would consider that
19  higher quality evidence than if we had no
20  documents, which was often the case, no
21  documents actually which showed shipments
22  or sale of our product for installation
23  in a particular building and an
24  individual coworker or person at the

Page 38

1  site, sometimes somebody who wasn't even
2  involved in the application of the
3  product, testified about it.
4    Q.   Have you ever been to Libby?
5    A.   Yes, I have.
6    Q.   How many times did you go
7  there?
8    A.   I have been there twice.
9    Q.   Did you go up to the mine?
10   A.   No, I haven't been to the
11  mine.  It was closed.
12   Q.   Have you ever reviewed
13  documents concerning the kinds of
14  exposures at Libby?
15   A.   Yes, I have.
16   Q.   Libby claims did not involve
17  products claims; is that correct?
18       MS. HARDING:  Object to
19  form.
20       MR. SCHIAVONI:  Objection,
21  calls for a legal conclusion,
22  overly broad.
23       MS. HARDING:  And it's
24  overly broad.

Page 39

1        MR. LIESEMER:  I join in the
2  objection.
3        MR. SCHIAVONI:  Lacks
4  foundation, overly ambiguous.
5        MR. LEWIS:  Do you want the
6  question read back or do you
7  remember?
8        THE WITNESS:  You should
9  probably read it back.
10       MR. LEWIS:  I will just
11  restate it.
12  BY MR. LEWIS:
13   Q.   Did Libby claims involve
14  products claims?
15       MS. HARDING:  I am just
16  going to object to form in terms
17  of Libby claims.  There is a wide
18  variety of Libby claims and a wide
19  variety of people.  I don't
20  know --
21       MR. LEWIS:  Do you want me
22  to define Libby claims?  That's
23  fine.
24       MS. HARDING:  I will object

Page 40

1  to form and let the witness
2  answer.
3        MR. LEWIS:  The witness
4  knows exactly what I am asking
5  about here.
6        MS. HARDING:  I don't know
7  that the witness knows what you
8  are talking about.
9        MR. SCHIAVONI:  Are you
10  contending that all the policies
11  have same definitions for products
12  in asking this question?  Because
13  when you say the witness
14  understands, I mean, you seem to
15  be coaching the witness.  Is that
16  your contention, that every policy
17  has the same definition for
18  products?
19       MR. LEWIS:  I am not even
20  referring to policies here, sir.
21  I am referring to common law, tort
22  law.  Okay.  Those kinds -- the
23  distinction is between products
24  claims --

Page 41

1        MR. SCHIAVONI:  And what?
2        MR. LEWIS:  -- injuries that
3  result from exposures to products
4  as opposed to injury in Libby that
5  related to exposure to the mining
6  and manufacturing of products or
7  sub-products.  So I am not talking
8  about insurance policies right
9  here right now.  I will later.
10       MR. JACOB COHN:  If there is
11  a question, I object to the form.
12       MS. HARDING:  I just object
13  to the form, and I think you can
14  answer.  Did we get the question
15  back yet?
16       MR. LEWIS:  I might take
17  eight hours here today if we keep
18  doing this.
19       MS. HARDING:  Well, I don't
20  want to take eight hours, but I do
21  want to make sure the witness
22  understands the question.
23       MS. DeCRISTOFARO:  And I
24  join.

Page 54

1      A.   The McDonald study, Amanda
2  study, 1986.
3      **Q.   Do you believe that the**
4  **exposures at the dry mill were**
5  **substantially similar to the exposures to**
6  **Monokote 3 on construction sites?**
7      MS. HARDING:  Object to form
8  and foundation.  This witness is
9  not an expert, and I think it's an
10  improper question to ask this
11  witness.
12      But you can answer.
13      MR. LIESEMER:  Object to the
14  form of the question.
15      MR. SCHIAVONI:  On a more
16  fundamental basis, this witness is
17  a 30(b)(6) witness.  He is not an
18  expert; he is not a fact witness.
19  And this is not a topic that is
20  designated.
21      MR. LEWIS:  Yes, it is.
22      MR. SCHIAVONI:  Really?
23  Which one?
24      MR. LEWIS:  Just look a

Page 55

1  them, Counsel.  I am not going to
2  answer your questions.  I don't
3  have to answer to you.  You make
4  your objections on the record, and
5  we will proceed.  Or otherwise we
6  will be here forever.
7      MR. SCHIAVONI:  If you can't
8  identify it --
9      MS. HARDING:  Let's just
10  answer.  I don't think he can
11  answer, but go ahead.
12      MR. LEWIS:  Do you want to
13  the question read back?  Let's
14  read the question back so he can
15  get a complete record.
16      (The reporter read from the
17  record as requested.)
18      MR. SCHIAVONI:  I object to
19  form, and I object to Grace
20  offering this testimony.  It's not
21  designated as corporate testimony.
22  If that's what Grace is going to
23  do, then you have my objection on
24  the record.

Page 56

1      MS. HARDING:  Grace has
2  already made its objections, and
3  the witness can answer to the
4  extent that --
5      THE WITNESS:  Again, I am
6  not an industrial hygienist, and I
7  really -- having my opinion on
8  whether they are quote/unquote
9  substantially similar, I don't
10  think I can do that.
11      They both involve asbestos
12  exposures.  I have described in my
13  earlier testimony the conditions
14  were different, that one involved
15  the spray application of a
16  finished product at the
17  construction site, the Libby
18  exposures involved working at a
19  mine and mill operation.  And the
20  data that does exist is available,
21  and I would rather rely on the
22  data that's available.  And I
23  don't have that in front of me.
24  BY MR. LEWIS:

Page 57

1      **Q.   Do you recall when we**
2  **started this deposition that I asked you**
3  **to testify in the role of senior**
4  **litigation counsel, settling asbestos**
5  **claims?**
6      A.   Yes.
7      **Q.   We talked about that.**
8      **Do you agree that to perform**
9  **that role well for your employer, you had**
10  **to know something about asbestos**
11  **exposure?**
12      A.   Absolutely.
13      MS. HARDING:  Object to
14  form.
15      Go ahead.
16  BY MR. LEWIS:
17      **Q.   And you differentiated --**
18  **let me withdraw that question.**
19      **In every case that you**
20  **looked at as an individual case, would**
21  **the nature and extent of the exposure be**
22  **fundamental to your evaluation of the**
23  **case?**
24      MS. HARDING:  Objection to

Page 58

```
 1      form.
 2          THE WITNESS:  Yes.
 3   BY MR. LEWIS:
 4      Q.   The Libby cases were largely
 5   settled on a case-by-case basis, correct?
 6          MS. HARDING:  Object to
 7   Libby cases.  It's overly broad.
 8          But go ahead.
 9          THE WITNESS:  Yes.
10   BY MR. LEWIS:
11      Q.   Again, I am talking about
12   Libby cases, as you earlier defined them,
13   correct?
14      A.   Yes.
15          MS. HARDING:  Who defined
16   them?
17          MR. LEWIS:  He agreed that
18      we were talking about Libby cases,
19      we were talking about cases that
20      arose in Lincoln County, and he's
21      testified that they were not --
22      that they were manufactured --
23      they were exposure cases different
24      from Monokote exposures in the
```

Page 59

```
 1      sense -- and that's what I am
 2      asking about.
 3          MS. HARDING:  Okay.  I
 4   object to the form.  I think the
 5   terminology of "Libby cases" is
 6   overly broad.
 7          But go ahead.
 8          MR. SCHIAVONI:  Can you just
 9      add to that those are a
10      pre-petition cases, right?
11          MR. LEWIS:  Please answer
12      the question.
13          MR. SCHIAVONI:  Objection to
14      form, overly broad.
15          MS. DeCRISTOFARO:  I join.
16          THE WITNESS:  Prior to
17      bankruptcy, the cases in Libby
18      involving Libby employees and
19      family members that were settled
20      generally were settled
21      individually, although in the
22      period of time just prior to the
23      bankruptcy, there were cases that
24      were settled in small groups of
```

Page 60

```
 1      five to ten cases.
 2   BY MR. LEWIS:
 3      Q.   Was that with the Heberling
 4   firm?
 5      A.   Yes.
 6      Q.   There were other settlements
 7   where you settled cases, 10,000 claims at
 8   a time, correct?
 9      A.   Yes.  Not Libby cases.
10   Cases in other parts of the country
11   involving exposures to finished products.
12      Q.   Right.
13          In those cases where you
14   settled them 10,000 at a time or several
15   thousand at a time, did you evaluate the
16   quality of evidence for each individual
17   claim in those cases?
18          MS. HARDING:  Object to
19   form.
20          THE WITNESS:  Generally, the
21      agreement set forth specific
22      requirements for a case,
23      qualifying materials, and we
24      reviewed, individually reviewed
```

Page 61

```
 1      the qualifying materials that were
 2      submitted for each case before the
 3      case was settled.
 4          I have testified about this
 5      and how those settlement
 6      agreements or inventory
 7      settlements worked in both of my
 8      prior depositions in this case.
 9   BY MR. LEWIS:
10      Q.   Did you evaluate the
11   exposure for each individual claim?
12      A.   Exposure --
13          MS. HARDING:  Object to
14      form, and I am just going to
15      not -- I am not going to instruct
16      the witness not to answer, but he
17      has had prior deposition testimony
18      on how these cases were settled.
19      And counsel has indicated that you
20      have reviewed those transcripts,
21      so I just would request that we
22      try not to repeat the same
23      questions that were asked
24      previously since the witness has
```

Page 62

1  already testified so we can try to
2  get through this today.  I am not
3  going to -- with that, I am just
4  making a request.
5         MR. LEWIS:  Could you read
6  back the question, please?
7         (The reporter read from the
8  record as requested.)
9         THE WITNESS:  Well, the
10  qualifying materials that were
11  required under the settlement
12  agreements generally included
13  evidence of exposure, and that
14  would have been evaluated before
15  the settlement was made.
16  BY MR. LEWIS:
17     Q.   As I recall your testimony,
18  you were highly critical of the nature of
19  evidence of exposure in most products
20  cases; is that true?
21         MS. HARDING:  Object to
22  form.
23         THE WITNESS:  I was critical
24  as to the credibility of the

Page 63

1  exposure evidence in many cases
2  historically that were being filed
3  in the period from -- well,
4  throughout the period of the
5  asbestos litigation, but
6  specifically in the late '90s and
7  early 2000.
8  BY MR. LEWIS:
9     Q.   Did you feel that
10  plaintiffs' counsel were inventing
11  evidence for their clients?
12         MS. HARDING:  Object to
13  form.
14         MR. LIESEMER:  Object to
15  form.
16         THE WITNESS:  Inventing
17  evidence implies something that --
18  I questioned the validity of the
19  process through which the evidence
20  was created.  Whether it's
21  invented, I don't know.  But there
22  are people's memories, and the way
23  memory works, in my experience as
24  a human being and also from people

Page 64

1  who are experts in the area, a lot
2  this evidence seemed inconsistent
3  with it.
4  BY MR. LEWIS:
5     Q.   It was inconsistent with
6  your own documents relating to where your
7  asbestos was located or Grace's asbestos
8  was located, correct?
9         MS. HARDING:  Object to
10  form.
11         THE WITNESS:  I don't know
12  if it was inconsistent because we
13  unfortunately didn't have a
14  complete set of documents which
15  would have told us where our
16  products were located.
17         It was often inconsistent
18  with what we knew about our
19  products and how they were used
20  and, you know, the product
21  formulas and the type of material
22  and the conditions that were being
23  used, they were being applied
24  under.

Page 65

1  BY MR. LEWIS:
2     Q.   Okay.  In the Finch
3  deposition that I read, I could not
4  understand how you went through the
5  information submitted for each claimant
6  in this inventory or mass settlements, I
7  would call them.
8         Did you do that
9  post-settlement or pre-settlement?
10     A.   Post-settlement --
11         MS. HARDING:  Object to
12  form.
13         THE WITNESS:  -- generally.
14  BY MR. LEWIS:
15     Q.   So if you settled 10,000
16  cases for $50 million, as you did in one
17  case, does that mean that you paid the
18  $50 million regardless of whether there
19  was proof, actual proof, in each
20  individual case?
21         MR. JACOB COHN:  Object to
22  form.
23         MS. HARDING:  Object to
24  form.

Page 66

1    THE WITNESS:  We paid them
2  50 million -- it varied from
3  settlement to settlement, quite
4  frankly.  In certain situations,
5  we paid the money, but the
6  authority for the attorneys
7  representing the claimants to
8  release the money and pay the
9  money was subject to receiving
10  communications from us that the
11  qualifying materials met the
12  requirements of the agreement.
13  BY MR. LEWIS:
14    Q.   In any one of those
15  settlements, did Grace ever reject the
16  proof offer to support the individual
17  claims post settlement?
18    A.   Yes.
19    Q.   How many times did that
20  happen?
21    MS. HARDING:  Object to
22  form.
23    THE WITNESS:  It happened
24  more times than I could -- it

Page 67

1  happened on a fairly regular
2  basis, although it wasn't a
3  substantial percentage of the
4  cases.
5  BY MR. LEWIS:
6    Q.   So if you settle a case for
7  50 -- 10,000 claims for $50 million, and
8  100 of those claims, for example -- I am
9  asking you to assume a hypothetical
10  here -- didn't show substantial proof of
11  exposure or disease, the proof was
12  defective in some manner, would the
13  amount allocated for those 100 claimants
14  be deducted from the settlement?
15    A.   Yes.
16    Q.   In every case?
17    A.   Not in every case, but, I
18  mean, there were other -- it's difficult
19  to say.  I mean, in the administration of
20  cases like that, you could assume a
21  certain percentage of cases weren't going
22  to meet the requirements in valuing the
23  cases.  There are all kinds of ways you
24  could do it, but there was definitely a

Page 68

1  process in place.
2    And, again, I am -- and I
3  think as I have testified in the past,
4  there was a process was in place, and I
5  was confident that in the process that we
6  had in place was reviewing the qualifying
7  materials and we were paying places only
8  where they had submitted qualifying
9  materials consistent with the agreement.
10    I think my opinion as to the
11  relative credibility of some of the
12  qualifying materials, both medical and
13  exposure, I have testified before and
14  that is --
15    Q.   You have so testified.  I am
16  not going to get into that.
17    A.   Okay.
18    Q.   Do you recall the case, the
19  specific case where you settled 10,000
20  claims for $50 million, the firm you
21  settled with?
22    A.   I believe it was Baron &
23  Budd.
24    Q.   Were those 10,000 claims

Page 69

1  just asbestosis claims or were there
2  cancer and mesos in those claims?
3    A.   There were cancers and
4  mesos.
5    Q.   Did the settlement provide
6  that the mesos would get a different
7  amount than the asbestosis claims?
8    A.   As I recall, yes.
9    Q.   Who made the decision as to
10  who got what, how much each claimant was
11  individually paid?  Did Grace have any
12  input in that?
13    MS. HARDING:  Just object to
14  the extent it calls for
15  attorney-client work product
16  information.  And to the extent --
17  I instruct the witness not to
18  answer to the extent that it calls
19  for that.  To the extent that it
20  doesn't, you can answer.
21    MR. LEWIS:  I think the
22  that's a fair objection because
23  the question is not very precise.
24  I will rephrase the question.

Page 126

1      MR. LEWIS:  How what?  I am
2  sorry.  I couldn't hear that.  I
3  am hard of hearing.
4      MR. SCHIAVONI:  How
5  claims --
6      MS. BAER:  He's criticizing
7  my city and its ethical
8  reputation.
9      MR. LEWIS:  That was a joke.
10  I get it now.
11  BY MR. LEWIS:
12      Q.   Did you study the TDP that's
13  part of the Reorganization Plan in
14  preparation for your deposition today?
15      MS. HARDING:  Object to the
16  word "study," but go ahead.
17      THE WITNESS:  Yes, I did.
18  BY MR. LEWIS:
19      Q.   You reviewed it?
20      A.   I reviewed it.
21      Q.   Were you part of the team
22  that helped formulate the TDP?
23      A.   I reviewed --
24      MS. HARDING:  Object to

Page 127

1  form.
2      THE WITNESS:  -- it on
3  behalf of Grace at the request of
4  the general counsel when it was
5  being distributed among the Plan
6  proponents, but I wouldn't say
7  that I was involved in drafting
8  it.  That was something that was
9  done by, as I recall, the Asbestos
10  Creditors Committee and the Future
11  Claimants' Representative.
12  BY MR. LEWIS:
13      Q.   I will get back to that more
14  later.
15      So it was drafted by the
16  ACC, correct?
17      MR. LIESEMER:  Object to
18  form.
19      MR. SCHIAVONI:  Object.
20      MS. HARDING:  Object to form
21  in terms of foundation.
22      THE WITNESS:  That's my
23  understanding, but, again, my
24  involvement was that while after

Page 128

1  the process and the original
2  draft, was that either the general
3  counsel or Richard Finke asked me
4  to take a look at it for Grace.
5  BY MR. LEWIS:
6      Q.   Did Grace have any
7  significant input on the TDP?
8      MR. LIESEMER:  Object to the
9  form.
10      MS. HARDING:  Object to the
11  form.
12      THE WITNESS:  I don't recall
13  whether we had any significant
14  input in terms of the draft that
15  was circulated, but we certainly
16  were given an opportunity to
17  provide comments.
18  BY MR. LEWIS:
19      Q.   What, if any, comments did
20  you provide concerning the TDP?
21      A.   I don't recall.
22      Q.   Who else would have reviewed
23  the TDP on behalf of Grace?
24      MS. HARDING:  Object to

Page 129

1  foundation.
2      MR. LEWIS:  If you know.
3      THE WITNESS:  Counsel for
4  Grace in the bankruptcy.
5  BY MR. LEWIS:
6      Q.   Do you know if counsel in
7  the bankruptcy offered any comments to
8  the ACC's proposed TDP?
9      A.   I don't recall.
10      Q.   You are identified,
11  according to the document provided by
12  your counsel, as the 30(b)(6)
13  representative on development of the TDP,
14  including negotiations, other discussions
15  between or within the Plan proponents and
16  preparation of documents, including
17  drafts.
18      Do you have knowledge of
19  what's identified there?
20      MS. HARDING:  I am just
21  going to object, Counsel, to the
22  line of questioning in that
23  category, and the objections are
24  set out in full in the objection

Page 130

1  we filed with the court.  And I am
2  not going to list them all here,
3  but they are listed in that
4  category.
5      And as we have said in other
6  depositions we listed somebody for
7  every category, noting in our
8  objections and in our
9  communications with counsel, that
10  we didn't believe that all
11  categories were proper categories
12  for inquiry in the 30(b)(6)
13  deposition, as we believe this
14  category is not.
15      MR. LEWIS:  Do you direct
16  the witness not to answer any
17  questions in this category,
18  development of the --
19      MS. HARDING:  I have allowed
20  the witness to answer, and he's
21  answered he didn't know.  I just
22  wanted to note that for the record
23  to the extent that you are
24  complaining that he is not --

Page 131

1      MR. LEWIS:  I am not
2  complaining about anything.  I am
3  just asking questions.
4      I wanted to ask more
5  questions in this area, and I was
6  asking you if you are going to
7  direct -- you are claiming
8  privilege?
9      MS. HARDING:  I am not going
10  to have a blanket objection, but I
11  wanted to remind counsel of that
12  objection.  And then you can ask
13  questions, and we can go from
14  there.
15  BY MR. LEWIS:
16      Q.   So your involvement in the
17  development of the TDP was, as you
18  described earlier?  You just reviewed it,
19  correct?
20      A.   Yes, a draft.
21      Q.   Were there any negotiations
22  between you and the ACC concerning the
23  language of the TDP?
24      MR. LIESEMER:  Object to the

Page 132

1  question.
2      MS. HARDING:  Object to the
3  form, and I think the witness has
4  already asked and answered.
5      THE WITNESS:  I think I may
6  have participated in a phone call
7  where drafts were discussed in
8  discussions with ACC and FCR
9  representatives and Grace and
10  Grace's counsel, but I don't have
11  a specific recollection.
12  BY MR. LEWIS:
13      Q.   Do you have any knowledge of
14  the preparation of the documents,
15  including the drafts of the TDP?
16      A.   Again, I described my
17  involvement and the knowledge I have.  I
18  was provided with copies of the drafts
19  early on in the process and reviewed them
20  and advised Grace and Grace's counsel and
21  my comments based on my experience in
22  asbestos litigation.  But the primary
23  drafting role was with the ACC and FCR,
24  as it probably should be.

Page 133

1      Q.   Why do you say it probably
2  should be?
3      MS. HARDING:  Object to
4  form.
5      THE WITNESS:  Because their
6  constituency will ultimately be
7  the beneficiaries of the Trust.
8  BY MR. LEWIS:
9      Q.   Because, to Grace, Grace
10  will pay the same amount under the
11  settlement regardless of how the TDP is
12  drawn, correct?
13      MR. LIESEMER:  Object to the
14  form.
15      MS. HARDING:  Object to the
16  form.
17      THE WITNESS:  I guess that's
18  probably part of it but, again,
19  the terms of their constituency,
20  the ultimate beneficiaries of the
21  Trust and the way the Trust
22  operates and the distribution
23  procedure is something that they
24  probably -- the asbestos claimants

Page 294

CONFIDENTIAL

Page 295

CONFIDENTIAL

Page 296

CONFIDENTIAL

          - - -
        EXAMINATION
          - - -
BY MR. BROWN:
    Q.   Good afternoon, Mr. Hughes.
My name is Michael Brown.  I represent
GEICO, Republic Insurance Company, Seaton
Insurance Company, and OneBeacon America

Page 297

Insurance Company.
        We have just had marked as
Hughes-11 a document that I would like
you to take a look at and tell me if you
can identify it.
    A.   It's a letter indicted April
25th, 2009 from Barbara Harding to
counsel, and attached is the witness
designations and topics of deposition and
a listing of the designated witness based
on deposition notices that have been
filed in this case and the confirmation
hearing.
    Q.   Okay.  And have you seen
this document before today?
    A.   I have.
    Q.   And just so it's clear, this
is a compilation of all the various
topics and particular Grace witness that
is prepared to testify about the subjects
where his name appears, correct?
    A.   Right.
    Q.   Okay.  You can put that
aside.

Page 298

1      Are you generally familiar
2  with Grace's liability insurance program?
3      A.   Yes.
4      Q.   Okay.  Do you understand
5  that Grace has various layers of
6  insurance?
7      A.   Yes.
8      Q.   Okay.  Could you describe
9  for me your understanding of that?
10      A.   Well, under the period of
11  time from, say, pre-1985 when there was
12  asbestos insurance available, Grace would
13  each year or -- and it would have a
14  primary policy with CNA from 1973 through
15  '85, Maryland Casualty before that, and
16  that there would be additional policies,
17  excess policies, which would provide
18  coverage for losses or claims in the
19  event that the aggregate limits of the
20  primary policies were exhausted.
21      And so a company like Grace
22  would go up and buy, you know, coverage,
23  insurance coverage for a particular year,
24  a particular policy period, and they

Page 299

1  would have a primary policy.  And then
2  they would have policies above that, say,
3  you know, at $5 million level, $10
4  million level, depending on how they
5  assess their risk.
6      Q.   Okay.  And you have a
7  general familiarity with the concept of a
8  coverage chart, correct?
9      A.   Yes.
10      Q.   Okay.  And you understand
11  that there is various layers of coverage
12  from the primary to the umbrella and the
13  excess above that?
14      A.   Yes.
15      Q.   And Grace, as you just
16  testified, purchased policies in each
17  policy year at each of those levels?
18      A.   Yes.
19      MR. BROWN:  Let me mark a
20  second document, and this will be
21  Hughes-12.
22      (Hughes-12 marked for
23  identification at this time.)
24      (Mr. Speights re-joined the

Page 300

1  deposition via teleconference at
2  this time.)
3  BY MR. BROWN:
4      Q.   Mr. Hughes, you have before
5  you a document we marked as Hughes-12.
6  Can you take a few moments to familiarize
7  yourself with it?
8      A.   Sure.
9      MS. HARDING:  I am going to
10  note for the record that we
11  did designate Mr. Finke with
12  respect to the Transfer Agreement.
13  But if you want to ask prosecute
14  Hughes a question --
15      MR. BROWN:  I am not going
16  to ask him a lot about the
17  agreement.  I am going to ask
18  about the attachment to the
19  agreement.
20      MS. HARDING:  I don't think
21  it changes the notation for the
22  record.  But go ahead and ask him
23  questions, and to the extent he
24  can answer without speculating...

Page 301

1  BY MR. BROWN:
2      Q.   Let me start by asking you
3  whether you have seen the document marked
4  Hughes-12 before?
5      A.   I have seen the agreement
6  before.
7      Q.   Okay.  Can you look at the
8  back of it, and you will note that the
9  agreement has some schedules?
10      A.   Yes.
11      Q.   I believe there are three of
12  them.
13      Have you seen those
14  schedules before today?
15      A.   I can't say that I have seen
16  these schedules.  I have seen similar
17  documents.
18      Q.   Okay.  Have you seen ones
19  similar to what's been marked or what is
20  identified as Schedule 1?
21      A.   Yes.
22      Q.   Okay.  In what connection
23  did you see the document that is attached
24  as Schedule 1 to Hughes-12?

Page 302

1    A.    Just in connection with the
2  case, in connection with you, know, my
3  involvement in asbestos litigation and
4  the coverage issues associated with it to
5  Jeff Posner and others within Grace.  I
6  think I have seen this policy list
7  before.
8    Q.    Okay.  Is this a document
9  that Mr. Posner prepared; do you know?
10    A.    Not specifically, no.
11    Q.    Okay.  Is it a document that
12  someone at Grace prepared?
13    A.    I don't know this specific
14  version of the document, but Mr. Posner
15  certainly would be the person that if I
16  were to have undertaken the task of
17  creating this document, I would have
18  consulted with Mr. Posner.
19    Q.    Okay.  Can you take a look
20  at the first page?  It's a -- the
21  Schedule is a 20-page document.  And you
22  will see that there are -- well, first of
23  all, what do you understand the schedule
24  generally to be?

Page 303

1    A.    The list of policies that
2  were available to Grace to pay
3  asbestos-related claims.
4    Q.    Okay.  Would these be
5  policies that would have been in the part
6  of the general liability program that you
7  indicated you were generally familiar
8  with?
9    A.    Yes.
10    Q.    Okay.  Can you describe for
11  me what each of the headings along the
12  top of the first page, what you
13  understand those to mean?
14    A.    Well, the policy year is the
15  year that the insurance policy covered in
16  terms of losses that occurred in the year
17  or at least triggered the insurance
18  coverage for that period of time.
19  Insurer is obviously the insurer.  And
20  then insurance company that's providing
21  the coverage is obligated to provide
22  insurance for losses that triggered the
23  policy.
24    The policy number identifies

Page 304

1  the specific insurance policies.
2  Generally, you have a policy number
3  identifying which policy.  And then the
4  layers, when we were talking about before
5  about the program and how you have to
6  umbrella policies and excess policies,
7  and they are layered based on the amount
8  of the coverage available for a
9  particular policy period.  That
10  identifies which policy -- excuse me --
11  which layer the particular policy is in
12  the Grace coverage block.
13    Q.    If it says primary, that's
14  the very bottom level of insurance; is
15  that correct?
16    A.    Yes.
17    Q.    And then if it has a one
18  next to it, is that the first layer
19  excess?
20    A.    First layer excess would be
21  the way I understand it.
22    Q.    And it goes up to -- the
23  highest number I thought I saw was 8 and
24  would be the highest level for any policy

Page 305

1  year?  That is the highest level of
2  excess insurance?
3    A.    That's the highest I saw.
4    Q.    Okay.  Now, I think you
5  testified earlier that you were the
6  person that was primarily responsible for
7  handling the day-to-day defense of Grace
8  PI claims at least internally at Grace;
9  is that right?
10    A.    Yes.
11    Q.    Okay.  And in that capacity,
12  did you have occasion to deal with
13  insurance issues?
14    A.    Yes.  Again, as I have
15  described, primarily in the context of
16  Grace's obligations under insurance
17  arrangements with reimbursement or
18  coverage in place arranged.  Grace had
19  obligations to insurers in making sure we
20  met those obligations and getting
21  reimbursed under the agreements.
22    Q.    Okay.
23    A.    And the policies as well, I
24  suppose.

Page 310

1    to. I think it's unquestionably
2    clear that we have gone over and
3    beyond our requirements under
4    30(b)(6) in this whole process.
5         MR. BROWN: Okay. Can I ask
6    my next question?
7         MS. HARDING: Yes, you may.
8    BY MR. BROWN:
9         Q. Mr. Hughes, let's go to
10   other schedules for the moment. Let's
11   take a look at the second schedule.
12        MS. HARDING: Again,
13   Mr. Hughes wasn't even designated
14   with respect to this schedule or
15   this exhibit, but go ahead. I am
16   happy to let him answer the
17   question.
18        MR. BROWN: We was
19   designated as a person that would
20   be produced on insurance issues.
21   There are nine topics on that
22   chart that had his name next to
23   it. We don't need to quarrel
24   about it. If he doesn't know the

Page 311

1    answer, fine.
2    BY MR. BROWN:
3         Q. Mr. Hughes, my question with
4    respect to Schedule 2 of Hughes-12 is, do
5    you understand what the schedule
6    reflects?
7         A. Yes.
8         Q. What is that?
9         A. It's a list of the insurance
10   settlement agreements -- settlement
11   agreements which resolved coverage
12   disputes with liability insurers that
13   provided Grace with insurance coverage
14   for asbestos-related personal injury and
15   property damage claims and the dates of
16   those agreements.
17        Q. If you could take a look at
18   Schedule 3, which is a couple pages
19   along, do you have an understanding of
20   what is reflected on Schedule 3?
21        A. It's a similar list of
22   insurers where we have what's
23   characterized here as a asbestos
24   reimbursement agreements.

Page 312

1         Q. All right. Let's go back to
2    Schedule 1 and specifically page 7 of
3    Schedule 1.
4         A. Okay.
5         Q. And you heard me when I
6    introduced myself that one of my clients
7    is GEICO. You will see in the middle of
8    the page that there are three policies
9    for GEICO listed on page 7.
10        Do you see those?
11        A. Yes.
12        Q. Okay. Did Grace to your
13   knowledge have any settlement with GEICO?
14        A. Not to my knowledge.
15        Q. Okay. Let's go a little bit
16   further on to page 16. Another one of
17   the companies that I indicated I
18   represent is Republic, and you will see
19   toward the top of that page there are two
20   policies listed for Republic.
21        To your knowledge, did Grace
22   have any settlements with Republic
23   Insurance Company?
24        A. Again, I am familiar with

Page 313

1    and maintain a list in my office because
2    of my involvement in terms of what -- I
3    don't know and don't recall specifically
4    an agreement with Republic.
5         But the other issue, of
6    course, when you come with insurance
7    companies is kind of the changing
8    landscape of who they are. But I don't
9    specifically recall Republic Insurance.
10   I think there are over 60 or 70
11   agreements, settlement agreements with
12   different kinds.
13        Q. Would you agree with me that
14   Republic Insurance Company does not
15   appear on either Schedule 3 -- excuse me
16   -- either 2 or 3?
17        A. No.
18        Q. Does that help refresh your
19   recollection as to whether Grace had --
20        MR. LEWIS: That sounds like
21   a double negative. I don't know
22   that the record is clear on that.
23        MR. SCHIAVONI:
24        No, he doesn't agree or not?

Page 314

1    MR. LEWIS:  Can you read it
2  back?  I might have muddled it.
3    (The reporter read from the
4  record as requested.)
5    THE WITNESS:  I agree that
6  it's correct.
7  BY MR. BROWN:
8    Q.   We were talking about
9  Republic.  Why don't we try to fix that.
10   I am correct, am I night
11  knot that Republic Insurance Company does
12  not appear on Schedule 2 or 3?
13    A.   Yes, you are correct.  It
14  does not appear on Schedule 2 or 3.
15    Q.   Does that refresh your
16  recollection as to whether Grace had a
17  settlement agreement with Republic?
18    A.   I have no recollection that
19  it does, and since it doesn't appear on 2
20  and 3 and my understanding is 2 and 3 are
21  accurate, then I would say my
22  understanding would be no, that there is
23  no settlement agreement with Republic.
24    Q.   Okay.  You indicated at the

Page 315

1  outset that you were generally familiar
2  with Grace's insurance program.
3    Are you generally familiar
4  with the rights and duties of the
5  insured, on the one hand, and the
6  insurer, on the other, under an excess
7  policy?
8    MS. HARDING:  Object to
9  form.
10    Go ahead.
11    THE WITNESS:  Yes, I am
12  generally familiar.
13  BY MR. BROWN:
14    Q.   Okay.  Can you describe your
15  familiarity in terms of -- what do you
16  understand to be the insurer's, the
17  excess insurer's rights under an excess
18  policy?
19    MS. HARDING:  I am just
20  going to object to form and to the
21  extent it's overly broad and
22  doesn't refer to a specific
23  policy.
24    But if you can answer the

Page 316

1  question, go ahead.
2    THE WITNESS:  Well, to
3  provide insurance coverage and to
4  provide indemnity payments when
5  the underlying policies under the
6  terms of the insurance contract.
7  If a loss covered within the scope
8  of the coverage provided to the
9  insured and that the underlying
10  policies have been exhausted, that
11  it would trigger an obligation on
12  the part of the excess insurer to
13  pay the claim, again, in a manner
14  consistent with the insurance
15  policy.
16  BY MR. BROWN:
17    Q.   Okay.  And just following up
18  on that latter phrase at the end of your
19  answer, do you understand generally --
20  and I understand that it may be different
21  from policy to policy.  But do you
22  understand generally that the insurer has
23  a duty to cooperate with the excess
24  insurer?

Page 317

1    MS. HARDING:  Object to
2  form.  Again, same objection.
3    THE WITNESS:  I know
4  generally that in terms of
5  insurance policies, an insured has
6  a duty to cooperate.
7  BY MR. BROWN:
8    Q.   And the insured has a duty
9  to give notice of claims; you are
10  familiar with that as well?
11    A.   Yes.
12    Q.   And are you generally
13  familiar at that the excess layer, the
14  insure has a right to associate in the
15  defense of claims?
16    MS. HARDING:  Object to
17  form.
18    THE WITNESS:  To associate
19  in defense of claims?
20  BY MR. BROWN:
21    Q.   Yes.
22    A.   Yes, although I think that,
23  again, that's something that you alluded
24  to earlier that I would think varied from

Page 318

1 policy to policy in specific relation.
2     Q.   Okay.  To your knowledge,
3 does Grace have any agreement with GEICO
4 pursuant to which GEICO gave up any of
5 its rights or ceded any of its rights
6 under the policies that appear page 7 of
7 Schedule 1 of Hughes-12?
8        MS. HARDING:  Object to
9 form.
10       THE WITNESS:  Not to my
11 knowledge.
12 BY MR. BROWN:
13     Q.   And would your answer be the
14 same with respect to Republic?
15     A.   Yes.
16     Q.   To your knowledge, has GEICO
17 or Republic given up any of its claims
18 handling rights pursuant to any agreement
19 with Grace?
20       MS. HARDING:  Just objection
21 to form.  That assumes facts not
22 in evidence.
23       But go ahead.
24       THE WITNESS:  Not to my

Page 319

1 knowledge.
2 BY MR. BROWN:
3     Q.   Okay.  You indicated earlier
4 that your title is senior litigation
5 counsel; is that correct?
6     A.   Yes.
7     Q.   And I guess at the time of
8 the petition you reported to Mr. Siegel;
9 is that correct?
10     A.   Yes.
11     Q.   And he was the general
12 counsel at the time?
13     A.   Yes.
14     Q.   How would you describe your
15 responsibilities with respect to asbestos
16 personal injury claims pre-petition?
17       MS. HARDING:  I am just
18 going to object to the form to the
19 extent it's overly broad, requires
20 an overly broad interpretation.
21       But to the extent you can
22 answer it --
23       MR. LEWIS:  I am not.
24       MR. BROWN:  I am not asking

Page 320

1 for an exhaustive list.
2        MS. HARDING:  Right.
3        THE WITNESS:  As I said
4 earlier, I was responsible for the
5 day-to-day management and
6 resolution of the claims
7 internally.  And as such, I worked
8 with the outside law firms in
9 litigating the cases and settling
10 cases, and internally I worked
11 with different groups within the
12 company to appropriately record
13 and manage the provision of
14 services from outside counsel
15 firms, payment of the firms,
16 payment of the settlements.
17 BY MR. BROWN:
18     Q.   Okay.  What was the period
19 of time over which you had that role?
20     A.   I would say from 1989
21 through 19 -- excuse me -- through 2001,
22 April of 2001.
23     Q.   Okay.  And that was the
24 petition date?

Page 321

1     A.   Yes.
2     Q.   Is it fair to say that you
3 are the person at Grace most
4 knowledgeable with respect to the manner
5 in which asbestos personal injury claims
6 were handled pre-petition?
7     A.   Yes.
8     Q.   Did Grace have national
9 coordinating counsel with respect to
10 asbestos bodily injury claims?
11     A.   It depends on how you define
12 national coordinating counsel.  We had a
13 national -- Casner & Edwards in Boston
14 handled all our documents, and Bob
15 Murphy, a partner there, would
16 participate in trials and work with
17 outside counsel.  And there were some
18 other lawyers around the country who I
19 would call upon to do that as well.
20     Q.   Okay.  I gather from your
21 answer that he didn't have the official
22 title national coordinating counsel?
23     A.   Well, also, I think after
24 1989, the outside counsel didn't report

Page 322

1    to him. I view national coordinating
2    counsel kind of strictly as I understand
3    it is when the outside counsel in a
4    particular jurisdiction report on a
5    day-to-day basis to the firm, and then
6    the national counsel, in turn, reports to
7    the client and the corporation.
8          And we had it set up a
9    little differently, that after 1989 --
10   again, before that, I viewed Bob Murphy
11   as serving what I would call traditional
12   national coordinating counsel and that
13   the outside firms reported to him. But
14   we kind of reversed that.
15       **Q.   Okay. If I understood your**
16   **answer then, is it fair to say from 1989**
17   **to 2001, that effectively you acted as**
18   **the national coordinating counsel?**
19       A.   Yeah, with the assistance of
20   Casner & Edwards and Bob Murphy and
21   others.
22       **Q.   Mr. Finke, I believe,**
23   **testified that in addition to Casner &**
24   **Edwards Grace had approximately 25 other**

Page 323

1    **firms around the country that were**
2    **defending Grace in various jurisdictions**
3    **against asbestos PI claims.**
4          **Does that sound about right**
5    **to you?**
6        A.   It sounds a little low,
7    actually, since there are 50 different
8    states and then I think we had cases in
9    virtually every state and in some
10   jurisdictions, California, Texas, would
11   have more than one counsel.
12       **Q.   So what would be your**
13   **estimate or number?**
14       A.   My estimate would be 50.
15       **Q.   Now, what was your**
16   **interaction with each of those 50 or so**
17   **law firms in terms of defending against**
18   **asbestos claims?**
19       A.   They would report on a
20   regular basis in terms of developments,
21   they would -- again, obviously when you
22   talk about 50 firms, a lot of the level
23   of activity of some of the firms was lot
24   less than others.

Page 324

1          But, again, there were
2    communications on the status of cases on
3    what was going on, on working with Grace
4    witnesses, expert, fact, was done through
5    me. And I made the arrangements. The
6    only exception to that was, again, with
7    Casner & Edwards that the process worked
8    that discovery responses, Grace's
9    discovery responses in the underlying
10   cases, those would be -- I would be
11   copied on them. But they would be
12   directly sent to Casner & Edwards and Bob
13   Murphy or the associates at that firm
14   that were actually prepared and would
15   work directly with the local counsel in
16   preparing responses.
17       **Q.   Okay. Is it fair to say**
18   **that you and the local firms, the 50 or**
19   **so firms that you testified that defended**
20   **Grace, and the Casner & Edwards firm**
21   **acted as a group in the defense of**
22   **asbestos claims asserted against Grace?**
23       A.   Yes.
24       MS. HARDING:  Object to

Page 325

1    form.
2          Go ahead.
3    BY MR. BROWN:
4        **Q.   Can you describe for me the**
5    **types of things that that group did in**
6    **defending Grace against asbestos claims?**
7        A.   Virtually everything an
8    attorney would do representing the
9    company in asbestos or any kind of toxic
10   tort case. You know, they responded to
11   complaints, they responded to discovery,
12   they appeared on Grace's behalf at
13   depositions, they tried cases, they
14   negotiated settlements, they participated
15   in defense groups.
16       **Q.   Let me just give you an**
17   **example. A complaint comes in the door.**
18   **Was it the responsibility of whatever**
19   **counsel was handling that particular case**
20   **to look at the complaint, to see if the**
21   **complaint had procedural defects or the**
22   **statute of limitations had expired, to do**
23   **those sort of things?**
24       A.   Yeah. The complaints came

Page 326

1  and generally were served through us. I
2  know some people had systems where local
3  counsel accepted service. We did not do
4  that.
5        We had a system where when
6  the complaint was entered into the case
7  management system, it automatically sent
8  the complaint to the firm that had been
9  designated as local counsel in that
10  jurisdiction, and that local counsel,
11  once they received the complaint, review
12  the complaint and file an appropriate
13  response and then handle the case.
14     Q.   And an appropriate response
15  might be a motion to dismiss? It could
16  be an Answer?
17     A.   It could be an Answer; it
18  could be a motion to dismiss. You have
19  to keep in mind we don't have to get --
20  we have to keep in mind the asbestos
21  personal injuries cases in a lot of
22  jurisdictions, a lot of this was kind of
23  institutionalized through case management
24  orders that in some cases, all you had to

Page 327

1  do was enter an appearance. There
2  wasn't -- some of the analysis because of
3  the repetitious nature of it, that
4  typically if I was involved in a lawsuit
5  today as an in-house lawyer and sent it
6  to somebody, we might sit down and talk
7  about what the Answer is and what the
8  allegations are.
9        In an asbestos case, again,
10  because there were thousands of them --
11  in some cases there were actually what I
12  would call form Answers and form
13  Complaints and so on. So it was highly
14  managed by a case management order and
15  the court.
16     Q.   Let me give you an example
17  from my own experience and ask you
18  whether Grace did these sort of things.
19        I used to do some of the
20  that work when I was a junior associate,
21  and one of the things I was charged with
22  was reviewing complaints and finding out
23  if there were procedural defects with
24  complaints. And sometimes the complaints

Page 328

1  would come in in a box load and you would
2  look through them and see if they made
3  the statute of limitations, whether they
4  had other procedural defects that might
5  have been peculiar to the given
6  jurisdiction, and, if appropriate, file
7  motions, file preliminary objections.
8  It's called different things in different
9  jurisdictions.
10        Were your local counsel
11  doing that sort of thing pre-petition?
12     A.   Yes.
13        MS. HARDING: Object to
14  form. Are you asking him
15  generally did that happen or did
16  it happen with all cases?
17        MR. BROWN: I am trying to
18  get a sense of how the cases were
19  handled pre-petition, whether
20  motions were filed if it was
21  appropriate.
22        MS. HARDING: Right. But
23  they have hundreds of thousands of
24  cases. Are you just saying did

Page 329

1  that ever happen or are you asking
2  if that happened in every case?
3        MR. BROWN: No.
4        MS. HARDING: I am asking
5  you because it's not clear.
6        MR. BROWN: I am asking him
7  whether in the course of
8  evaluating a case that came in the
9  door, whether it was the
10  responsibility of counsel to look
11  at it for procedural defects and,
12  if appropriate, file a motion and
13  if appropriate, file an answer.
14        THE WITNESS: Yes.
15  BY MR. BROWN:
16     Q.   You also mentioned
17  discovery, and I think you said the
18  Casner & Edwards firm, if I understood
19  you correctly, handled Grace's responses
20  to discovery; is that correct?
21     A.   Asbestos personal injury
22  cases, yes.
23     Q.   Okay. How was the discovery
24  that Grace took of claimants handled by

Page 330

1  you, by Casner & Edwards, and the other
2  local firms that were defending cases?
3       MS. HARDING:  And I am just
4   going to -- I think you have
5   already taken this into
6   consideration.  I will object.  To
7   the extent it calls for
8   attorney-client privilege or work
9   product, do not answer.  But I
10  don't think you are asking him for
11  that.  So I just want to make it
12  clear.
13      THE WITNESS:  With a couple
14  of exceptions, which were
15  important but were relatively
16  infrequent, it would be handled by
17  the local counsel.  The exceptions
18  are that if we received the
19  deposition notice of a Grace or
20  fact witness of a Grace former
21  employee or an expert, kind of a
22  national asbestos personal injury
23  expert, and we had specific
24  expertise and the fact witness

Page 331

1   case would generally be Bob
2   Murphy.
3       But we might have somebody
4   from an outside firm that wasn't
5   specifically assigned a
6   jurisdiction to handle that.  But
7   in terms of coworker depositions,
8   plaintiff depositions, developing
9   discovery with respect to a
10  particular job site, that would be
11  handled by the local counsel.
12  BY MR. BROWN:
13      Q.   Okay.  Do I gather from your
14  answer that local counsel, for example,
15  in written discovery depositions would
16  inquire into exposure to Grace products?
17      A.   Yes.
18      Q.   Okay.  And product ID
19  sometimes called?
20      A.   Yes.
21      Q.   And how about medical
22  issues?
23      A.   Well, as you may know, if
24  you had some prior involvement with it,

Page 332

1   the answer to the question is yes,
2   although in many jurisdictions and
3   certainly in the major jurisdictions,
4   there tended to be a joint medical
5   defense group.  And one firm or one
6   particular -- lawyers would often handle
7   some of the medical records issues and
8   the medical testimony issues in the case
9   on behalf of all of the defendants.
10      Q.   Okay.  And did your local
11  counsel look for other causes to a
12  particular claimant's injury?  For
13  example, if they were a long-term smoker,
14  would that be an issue that Grace pursued
15  in discovery?
16      A.   Sure.
17      Q.   What other sort of defenses
18  in that regard would Grace inquire into?
19      A.   Smoking, alternative
20  exposures, history, you know, whether the
21  person -- where the person worked and
22  exposure to other people's products,
23  questionable diagnoses in a meso case.
24  We would have it sent out to somebody

Page 333

1   else to review the pathology.  All the
2   kinds of things that a defense lawyer in
3   an asbestos case and just more broadly in
4   a personal injury case would do.
5       They were given relatively
6   broad, they being the local counsel,
7   authority to act on Grace's behalf in
8   defending the cases.
9       Q.   Were they told to zealously
10  defend Grace?
11      MS. HARDING:  Well, object
12  to the extent it calls for
13  attorney-client communications.
14      THE WITNESS:  I certainly
15  hope I wouldn't have to tell
16  people to do that since they are
17  members of the bar and they have
18  that ethical obligation.
19      But, yeah, they were
20  certainly told -- there was a
21  management process, and there were
22  guidelines provided to them to
23  some degree of what they wanted to
24  do and what they shouldn't do.

Page 334

1    And there were things that I did
2    in terms of resolving cases that
3    would have taken them out.
4         But, yeah, I think they
5    understood that they were to
6    zealously defend it, and we had
7    some very good lawyers
8    representing us.
9  BY MR. BROWN:
10       Q.   And was it your
11  responsibility internally to make certain
12  that that happened?
13       A.   Yes.
14       Q.   Now, did you work with any
15  asbestos plaintiffs lawyers?  When I say
16  work with them, did you have interaction
17  with any of the big guns in the asbestos
18  bar?
19       A.   Personally?
20       Q.   Yes.
21       A.   Yes.
22       Q.   Who?
23       A.   And I was alluding to this
24  earlier.  Most of them, certainly in

Page 335

1  terms of the inventory settlement
2  agreements and when we got into the
3  process of settling larger groups, local
4  defense counsel on the asbestos personal
5  injury cases, when it's comes to
6  resolving larger groups, have kind of
7  conflicting motivations.
8         On one hand, they want to do
9  their client a good service, and they
10  want to get rid of cases as cheaply as
11  possible, but on the other hand,
12  inventory settlements where we might buy
13  up or settle the docket for six months,
14  eight months, even two, three months,
15  settlements like that cause the defense
16  lawyers to lose billable hours in terms
17  of their own businesses, lawyers.
18         So when we started getting
19  into those negotiations in the larger
20  groups, I would handle them personally.
21  And it was generally in that capacity
22  that I dealt directly with plaintiffs'
23  lawyers.
24       Q.   Okay.

Page 336

1       A.   And I dealt with most of
2    them, at least at that time.  It's been
3    eight years.  I am sure it's a new group.
4    But at that point, many of them.
5       Q.   I am not so sure.
6            Give me some examples.
7       A.   You can go down
8    geographically.  I know Perry Weitz, and
9    I have met with Perry Weitz.  I know Joe
10   Rice.  I know Greitzer & Locks.  I have
11   dealt with Dino Vovet (phonetic), Peter
12   Angelos' firm many times.  I used to know
13   Mike Kelly who has passed away.  I know
14   Jim Ferraro.  I know Irving Gonzalez, who
15   is in jail.  I know -- who else?  I have
16   dealt with -- I know Russell Budd and
17   Fred Baron.  I have dealt with Peter
18   Krauss.
19       Q.   You mentioned Mr. Cooney
20   earlier, I think.
21       A.   Cooney, I know John Cooney.
22   I have met with him.
23       Q.   Any others that you can
24   think of?

Page 337

1       A.   There is probably others I
2    have met with, and I have missed some.
3    But there are some that I haven't met,
4    either because we didn't get into those
5    kinds of discussions or I was comfortable
6    with the ability of our local counsel to
7    negotiate cases and just the need for me
8    to meet with them didn't arise.
9    Particularly in California, the
10   traditional California firms, I don't
11   recall meeting working with Steve Casner,
12   and there are others out there.
13       Q.   All right.  Again, we are
14   still focused on the pre-petition time
15   frame.
16         Was Grace required to obtain
17  the consents of any of the members of the
18  plaintiffs bar with respect to the manner
19  in which Grace defended itself against
20  asbestos claims, any of the gentlemen you
21  just mentioned?
22         MS. HARDING:  Object to
23   form.
24         THE WITNESS:  You will have

Page 338

1  to repeat that.
2       MR. LEWIS:  We will have it
3  read back.
4       (The reporter read from the
5  record as requested.)
6       MS. HARDING:  I am sorry.
7       MR. LEWIS:  I am sorry.  I
8  don't understand the question.
9       MR. BROWN:  You are not
10 answering it.
11      MR. LEWIS:  I just object to
12 the question as unintelligible as
13 stated.
14      MR. BROWN:  Do you
15 understand the question?
16      THE WITNESS:  I think so.
17 I think the answer is no,
18 although they would occasionally
19 volunteer information to tell
20 Grace how to defend cases.
21 BY MR. BROWN:
22      Q.    And you didn't seek their
23 consent?
24      A.    No.

Page 339

1       Q.    Did the plaintiffs bar
2  participate in the internal
3  decision-making regarding the manner in
4  which Grace defended asbestos claims
5  pre-petition?
6       A.    No.
7       Q.    Did Grace leave it up to the
8  plaintiffs' attorneys to decide how much
9  Grace would pay for a claim?
10      A.    No.
11      Q.    Did Grace consult with the
12 plaintiffs bar with respect to the manner
13 in which Grace and its outside counsel
14 defended claims?
15      A.    No.
16      Q.    Did the plaintiffs'
17 attorneys decide what medical criteria
18 were satisfactory for a settlement with
19 Grace?
20      A.    It was a product of
21 negotiation if there were inventory
22 settlements that had specific objective
23 medical criteria.  They didn't dictate to
24 Grace what the medical criteria was.

Page 340

1       Q.    How about the exposure
2  criteria?  Did that dictate that to
3  Grace?
4       A.    No, they didn't.
5       Q.    Did they dictate to Grace
6  the types of proofs that Grace would
7  accept for a settlement?
8       A.    Again, it was a negotiation.
9  But, no, they didn't dictate it.
10      Q.    Did they decide what type of
11 release Grace would accept in exchange
12 for a settlement?
13      A.    No.  It's a negotiation.
14      Q.    All right.  Again,
15 pre-petition, your title was senior
16 litigation counsel?
17      A.    Yes.
18      Q.    Okay.  Did the plaintiff's
19 attorney have the power to remove you if
20 they didn't like the way you were
21 handling the defense of Grace claims?
22      MS. HARDING:  Objection.
23 It's relevance at this point.
24      Go ahead.

Page 341

1       THE WITNESS:  No, they
2  didn't.
3  BY MR. BROWN:
4       Q.    Did they control how much
5  you were paid for your job at Grace?
6       A.    No.
7       MR. BROWN:  I might be
8  finished.  Let me have a couple of
9  minutes.
10      (There was a break from 4:11
11 p.m. to 4:16 p.m.)
12 BY MR. BROWN:
13      Q.    Mr. Hughes, can I ask you to
14 take a look at what was previously marked
15 Hughes-3?
16      A.    (Witness complies with
17 request.)
18      MS. HARDING:  Exhibit 4 to
19 the Exhibit Book.
20      MR. LEWIS:  Exhibit 4 to the
21 Exhibit Book, which is Exhibit-3
22 to the deposition.
23 BY MR. BROWN:
24      Q.    Mr. Hughes, Exhibit-3, there

Page 342

1  was a question earlier today.  It's the
2  Trust Distribution Procedures, correct?
3      A.   Yes.
4      Q.   And I think you indicated
5  that you did not draft this document; do
6  I have that correct?
7      A.   Yes.
8      Q.   I believe you said the ACC,
9  asbestos claimants committee, drafted the
10  document; is that correct?
11        MR. LIESEMER:  Object to the
12  form of the question.
13        THE WITNESS:  That was my
14  understanding, yes.
15  BY MR. BROWN:
16      Q.   Okay.  And you indicated
17  that you had reviewed the document?
18      A.   Yes, I have.
19      Q.   And if I remember your
20  testimony correctly, you indicated that
21  you were given an opportunity to comment
22  on the document?
23      A.   Yes.
24      Q.   I believe you also stated

Page 343

1  that you didn't recall any comment that
2  you had on the document; is that correct?
3      A.   I didn't recall any specific
4  comment.  I recall that there were some
5  comments I had made.
6      Q.   Okay.  Do you recall what
7  those comments were?
8      A.   Not as I sit here today, no.
9      Q.   Okay.  I think you were also
10  asked who else at Grace reviewed the
11  document, and I believe your answer was
12  your outside counsel did, reviewed it; do
13  I have that right?
14      A.   Yes.
15      Q.   Other than you and your
16  outside counsel, are you aware of anyone
17  else that reviewed and drafted the TDP on
18  the Grace side?
19      A.   I don't know if Richard
20  Finke or Mark Shelnitz, our general
21  counsel, had taken a look at it at that
22  time.  Perhaps Richard was asked about
23  that question when he was deposed.  But
24  they would be the other logical

Page 344

1  candidates who may have taken a look at
2  it.
3      Q.   Okay.  And the Trust
4  Distribution Procedures are the
5  procedures pursuant to which asbestos
6  personal injury claims are to be handled
7  if the Plan is confirmed, correct?
8      A.   Right, by the Trust.
9        MR. BROWN:  Okay.  All
10  right.  I am going to pass you to
11  Mr. Cohn.  Thank you.
12        -  -  -
13        EXAMINATION
14        -  -  -
15  BY MR. JACOB COHN:
16      Q.   Good afternoon, Mr. Hughes.
17  Jacob Cohn for Federal Insurance Company.
18  How are you?
19        MS. HARDING:  Did you all
20  join in somebody's 30(b)(6)?
21        MR. JACOB COHN:  No.  I am
22  participating as a party in
23  interest here.
24        MS. HARDING:  So just to be

Page 345

1  clear, you didn't notice the dep
2  and you didn't join anybody else's
3  notice?
4        MR. JACOB COHN:  No.  I am
5  just a party to the case, and I
6  came to the deposition.  And I am
7  entitled to cross-examine, so I
8  am.
9  BY MR. JACOB COHN:
10      Q.   Now, Mr. Hughes --
11        MS. HARDING:  There are a
12  lot of people who want to ask
13  questions today.  Do you have a
14  sense of how long it will take?
15        MR. JACOB COHN:  I would
16  think no more than 15 to 20
17  minutes, hopefully less.
18        MS. HARDING:  All right.  I
19  think in the interest of not
20  having to come back, I will go
21  forward, but I --
22        MR. JACOB COHN:  You are
23  burning --
24        MS. HARDING:  I will State

Page 346

1    an objection on the record that
2    you didn't notice the deposition.
3        MR. JACOB COHN:  I don't
4    understand that to be a bona fide
5    deposition objection.
6        MS. DeCRISTOFARO:  At one
7    point, there was an email that
8    said in the interest of not having
9    a notice, that not everyone needed
10   to serve separate notices.
11       MR. JACOB COHN:  Everything
12   is on the record.
13   BY MR. JACOB COHN:
14       Q.  From 1989 to 2001, you were
15   principally in charge of handling
16   asbestos claims against Grace, correct?
17       A.  Asbestos personal injury
18   claims, yes.
19       Q.  And from 1989 to 2001 Grace
20   was a for-profit business corporation,
21   correct?
22       A.  Yes.
23       Q.  So your goal was to minimize
24   the amount of money that Grace had to pay

Page 347

1    in the defense and settlement and
2    resolution of asbestos PI claims,
3    correct?
4        A.  Yes.
5        Q.  Now, just looking for a
6    moment at what was marked Hughes-12,
7    which is Exhibit 6 to the Exhibit Book
8    from the Plan, if you would just take a
9    quick look at the Schedule 2.
10       Now, Schedule 2, am I
11   correct, these are insurance companies
12   that had settlement agreements where they
13   paid a lump sum of money to Grace and
14   received a release for policy obligation;
15   would that be correct?
16       A.  That's my understanding.
17       Q.  Okay.  And, for example,
18   Federal Insurance Company, my client, has
19   a settlement for one of its policies, and
20   I will represent to you that they paid
21   $300,000 in 1997 to settle a $500,000
22   sub-limit.
23       Now, that $300,000 was put
24   into Grace's treasury; is that right?

Page 348

1        MS. HARDING:  Object to form
2    and foundation.
3        MR. JACOB COHN:  Whatever.
4    You can answer.
5        THE WITNESS:  I assume so,
6    yes.
7    BY MR. JACOB COHN:
8        Q.  So that became part of the
9    money that would be available to you,
10   whatever settlement would come in to pay
11   for the resolution of asbestos PI claims,
12   correct?
13       MS. HARDING:  Object to
14   form.
15       THE WITNESS:  Well, again, I
16   don't -- yeah.  I mean, perhaps
17   indirectly.  But there was
18   $300,000 that was settled and
19   $300,000 was entered -- became
20   Grace's property, and Grace
21   settled cases as part of its
22   business operations.
23   BY MR. JACOB COHN:
24       Q.  And Grace would typically

Page 349

1    have to promise the insurer to use those
2    funds to pay for the resolution of
3    asbestos claims; is that accurate?
4        MS. HARDING:  Object to
5    form, in terms of typically.
6        THE WITNESS:  Yeah, I guess
7    it's an accounting matter they
8    would apply it to asbestos
9    liabilities.
10   BY MR. JACOB COHN:
11       Q.  All right.  Now, Schedule 3
12   is listed as schedule Asbestos Insurance
13   Reimbursement Agreements, right?
14       A.  Right.
15       Q.  Now, those are what would be
16   typically called a coverage in place
17   agreement; would you agree with that
18   terminology?
19       A.  Yes.
20       Q.  Okay.  So as I understand
21   from Grace's Securities and Exchange
22   Commission filings, most of these
23   agreements require the insurer to pay a
24   portion of every claim that Grace settles

Page 350

1  that triggers their policy; would that be
2  right?
3       MS. HARDING:  Object to form
4  and object to asking him questions
5  about generally insurance
6  settlement agreements.
7       MR. JACOB COHN:  Okay.
8       MS. HARDING:  Every
9  agreement is different.
10       MR. JACOB COHN:  That's
11  fine.
12  BY MR. JACOB COHN:
13       Q.   Can I rely upon Grace's SEC
14  filings?
15       A.   Yes.
16       Q.   Okay.  So can you describe
17  to me the policies that are identified in
18  those filings as policies that pay on a
19  pro rata basis, how the money would be
20  spent and recouped from those insurers?
21       MS. HARDING:  Object to
22  form.
23       THE WITNESS:  We certainly
24  had arrangements with insurance

Page 351

1  companies that provided that they
2  would pay us a percentage or a pro
3  rata portion of the money we spent
4  that triggered their policy that
5  we spent on asbestos claims.
6  BY MR. JACOB COHN:
7       Q.   And Grace itself paid a
8  portion of every dollar that was spent to
9  resolve an asbestos claim, correct?
10       A.   I think we generally paid it
11  in the first instance and was reimbursed
12  under these kinds of agreements, but yes.
13       Q.   And typically how much of
14  every dollar that you paid out would you
15  be reimbursed from one of these
16  agreements?
17       MS. HARDING:  Object to
18  form, foundation.
19       Go ahead.
20       THE WITNESS:  Again, it
21  would vary, but based on valuation
22  we do on the 1.7 billion and the
23  500 million I referred to earlier,
24  I think 25 cents on the dollar, 30

Page 352

1  cents on the dollar.
2  BY MR. JACOB COHN:
3       Q.   Would come back in?
4       A.   Again, it would vary
5  depending on where we were in terms of
6  the coverage, yes, we would be
7  reimbursed.  And it varied when, you
8  know, during the time period.  There is a
9  lot of factors that go into that.  And I
10  don't think you can answer it
11  definitively, but it certainly would be
12  in the range I mentioned for some period
13  of the time.
14       Q.   And Grace believed it could
15  do a better job of handling the claims by
16  itself without having the insurers be
17  involved; is that accurate?
18       MS. HARDING:  Object to
19  form.
20       THE WITNESS:  Whether or not
21  we thought we could do a better
22  job or the insurance carriers
23  would prefer that we did it, the
24  evolution of it was that Grace

Page 353

1  handled it itself?
2  BY MR. JACOB COHN:
3       Q.   Okay.  And at all times,
4  while you were there, Grace endeavored to
5  minimize the amount of money it had paid
6  to resolve asbestos claims; is that fair
7  to say?
8       A.   Yes.
9       Q.   Now, in 2005, there was a
10  conference call between Grace and its
11  insurers.  Were you a participant in that
12  call?
13       A.   I don't specifically recall,
14  but I may have been.
15       Q.   Do you remember any
16  discussion between Grace and its insurers
17  to the effect that Grace was not ready to
18  deal with its high level excess insurers?
19       A.   In what sense not ready?
20       Q.   In the sense of , in the
21  course of the bankruptcy proceedings,
22  W.R. Grace communicating that sentiment
23  to its non-settled high level insurers?
24       A.   I don't recall that

Page 354

1    conversation.
2        Q.   You said you were given a
3    chance to review the TDPs in 2008 -- I am
4    sorry.  Was it 2008?
5        A.   Yeah, it would have been
6    2008.
7        Q.   Okay.  Now, at that point in
8    time, Grace's obligations pursuant to the
9    settlement it reached in April 2008 were
10   established, correct?
11           MS. HARDING:  Object to
12   form.
13           THE WITNESS:  Yes.  There
14       had been a Term Sheet and an
15       agreement reached.
16   BY MR. JACOB COHN:
17       Q.   There was a defined amount
18   of money and other things that Grace was
19   going to give to the Trust to settle its
20   asbestos liabilities; is that right?
21       A.   Yes.
22           MS. HARDING:  Well, just
23       object to form.
24           THE WITNESS:  Asbestos

Page 355

1       personal injury liabilities.
2    BY MR. JACOB COHN:
3        Q.   And is it fair to say that
4    thereafter, the most significant interest
5    that Grace had in the TDPs was insuring
6    that it obtained the 75 percent or
7    greater vote from the asbestos PI
8    claimants?
9            MS. HARDING:  Object to
10       form.
11           THE WITNESS:  It was
12       important to Grace that we emerge
13       from bankruptcy and that the Trust
14       and so on and the Plan proceed so
15       that the reorganized company could
16       emerge from bankruptcy and be free
17       from its asbestos liabilities.
18       That was the purpose of the
19       Chapter 11, and that was obviously
20       Grace's interest.
21   BY MR. JACOB COHN:
22       Q.   So is the answer to my prior
23   question yes, getting 75 percent super
24   majority approval by the asbestos

Page 356

1    constituencies was the most important
2    consideration to Grace in reviewing the
3    TDPs?
4            MR. LIESEMER:  Object to the
5        form.
6            MS. HARDING:  Object to the
7        form.
8            THE WITNESS:  I think that
9        the most important consideration
10       to Grace in the TDP was that they
11       were, from a legal standpoint,
12       sufficiently consistent with, to
13       the extent they had to be,
14       consistent with the prior practice
15       and that they were a reasonable
16       means of processing and paying
17       claims so that the Plan would be
18       confirmed.
19   BY MR. JACOB COHN:
20       Q.   So it was important at this
21   point -- strike that.
22           At this point, Grace had no
23   additional financial interest in how
24   asbestos claims were handled; is that

Page 357

1    correct?
2            MS. HARDING:  Object to the
3        form.
4            THE WITNESS:  Well, that's
5        not necessarily correct.  But we
6        certainly had -- since our
7        obligation to fund the Trust,
8        personal injury Trust, was fixed,
9        both in terms of the payments that
10       were to be made at the time of
11       emergence and the payments off in
12       the future, then I guess to that
13       extent, yeah, we had already
14       established what our liability
15       was.  And our concern was that the
16       Trust Distribution Procedures were
17       met whatever legal criteria that
18       were necessary and that the Plan
19       be confirmed.
20   BY MR. JACOB COHN:
21       Q.   So as of the time that the
22   settlement was reached, your concern with
23   the TDPs was that they enable a Plan to
24   be confirmed in a way that would enable

Page 358

1  **Grace to have finality with respect to**
2  **its asbestos obligations and emerge as a**
3  **for-profit corporation again?**
4  　　　　MS. HARDING: Object to
5  　　form. I think it mischaracterizes
6  　　and doesn't completely accurately
7  　　summarize what he just said
8  　　regarding legal criteria.
9  BY MR. JACOB COHN:
10 　　Q.  Would you agree with what I
11 just said?
12 　　A.  No.  We operated in
13 bankruptcy as a for-profit company. I
14 think our goal would be to operate as a
15 corporation unencumbered by asbestos
16 liabilities.
17 　　　　MR. JACOB COHN:  No further
18 　　questions.  Thanks.
19 　　　　- - -
20 　　　　EXAMINATION
21 　　　　- - -
22 BY MS. SIMON:
23 　　Q.  Good afternoon.  My name is
24 Marnie Simon.  I represent Fireman's Fund

Page 359

1  Insurance Company and the Allianz related
2  entities.
3  　　A.  Sure.
4  　　Q.  I believe you testified when
5  speaking with Michael Brown that
6  reviewing the GEICO policies under, I
7  think it was, Exhibit-12 here and Exhibit
8  6 to the Plan Asbestos Insurance Transfer
9  Agreement, I believe you testified there
10 that to your knowledge, GEICO had not --
11 there were no agreements between Grace
12 and GEICO in terms of GEICO ceding or
13 waiving its rights under those excess
14 policies; is that correct?
15 　　A.  Yes.
16 　　Q.  And would you answer --
17 　　A.  That I was aware of.
18 　　Q.  That you were aware of.
19 　　　　And would your answer be the
20 same for the Fireman's Fund and Allianz
21 companies?
22 　　A.  You are talking with respect
23 to the excess insurance policies?
24 　　Q.  The excess policies of

Page 360

1  Allianz on page 1 of Schedule 1, the
2  Fireman's Fund policies on page 7 of
3  Schedule 1, and then the Reunion -
4  Adriatica policy on page 16.
5  　　　　MS. MAHALEY:  I object to
6  　　the form of the question.
7  BY MS. SIMON:
8  　　Q.  Are you aware of any
9  agreements with those insurance companies
10 to waive their rights under their excess
11 policies that was in place with Grace
12 pre-petition?
13 　　A.  No, I am not.
14 　　　　MS. HARDING:  Object to
15 　　form.
16 　　　　MS. SIMON:  That's all.
17 　　　　- - -
18 　　　　EXAMINATION
19 　　　　- - -
20 BY MS. McCABE:
21 　　Q.  Good afternoon, Mr. Hughes.
22 My name is Eileen McCabe, and I here
23 today --
24 　　A.  I remember you Eileen.

Page 361

1  　　Q.  I am here today on behalf of
2  AXA Belgium as a successor to Royale
3  Belge.
4  　　　　And just to make this go
5  quickly, if I could follow up with the
6  same questions that were just asked to
7  you with regard to the Royale Belge
8  policies that appear on page 16 of what's
9  been designated Hughes Exhibit-12.  There
10 are three policies that are identified
11 there for excess policies.
12 　　　　Are you aware of any
13 agreement that Royale Belge had
14 pre-petition pursuant to Royale Belge
15 ceded or waived any of its excess
16 policies as listed on that policy?
17 　　　　MS. HARDING:  Object to
18 　　form.
19 　　　　THE WITNESS:  No, I am not.
20 　　　　MS. McCABE:  That's it.
21 　　　　- - -
22 　　　　EXAMINATION
23 　　　　- - -
24 BY MR. SCHIAVONI:

Page 378

1    was correct, that you didn't -- it
2    was one of those backwards things.
3         THE WITNESS:  Sorry.
4    BY MR. SCHIAVONI:
5         Q.    Some of your data may be in
6    Exhibit-1, but you didn't prepare
7    Exhibit-1 and you didn't supervise the
8    preparation of Exhibit-1; is that right?
9         A.   I did not prepare Exhibit-1,
10   nor did I supervise the preparation of
11   Exhibit-1.
12        Q.    The 1995 Grace/Royal
13   settlement covered policies issued to the
14   Zonolite Company; is that generally
15   right?
16        A.   Yes.
17        Q.    Okay.  Are you aware whether
18   Royal's also alleged to have issued,
19   entirely separate from that, a high level
20   excess policy in the 1980s to Grace?
21        A.   I learned that in connection
22   with the bankruptcy.  I am not sure I
23   knew that beforehand.
24        Q.    Okay.  But sitting here

Page 379

1    today, you are familiar with the fact
2    that there is a separate high level
3    excess policy that Royal has issued in
4    '80s to Grace; is that right?
5         A.   I believe so, yes.
6         Q.    And Mr. Brown asked you some
7    questions about whether or not rights to
8    associate in the defense and to
9    cooperated had been ceded by his clients
10   to Grace.
11            Do you remember those
12   questions generally?
13        MS. HARDING:  Object to
14   form.
15            But go ahead.
16        MR. SCHIAVONI:  All right.
17        THE WITNESS:  There are
18   questions about it.  I think the
19   question was whether we had waived
20   or all agreed, and the answer was
21   no, I wasn't aware of any such
22   agreement.
23   BY MR. SCHIAVONI:
24        Q.    Has either Royal or

Page 380

1    Arrowwood ceded or in any way waived or
2    given up any of its rights to associate
3    in the defense or cooperate or any other
4    rights under its high level excess
5    policy?
6         A.   Not that I am aware of.
7         MS. HARDING:  Object the
8    form with respect to rights.
9    BY MR. SCHIAVONI:
10        Q.    And am I correct that prior
11   to the bankruptcy filing, Grace hadn't
12   tendered any claims to Royal under that
13   high level excess policy?
14        A.   I don't know the extent to
15   which we were tendered claims
16   pre-petition to high level excess
17   policies.  Generally, the notice of the
18   claims was done by our insurance broker.
19        Q.    Okay.  So you don't know one
20   way or the other?
21        A.   I don't.
22        MR. SCHIAVONI:  That's all I
23   have.  Thank you, Mr. Hughes.
24            - - -

Page 381

1            EXAMINATION
2              - - -
3    BY MR. IFFT:
4         Q.    Good afternoon, Mr. Hughes.
5         A.   Good afternoon.
6         Q.    My name is Richard Ifft.  I
7    represent Maryland Casualty Company and
8    two Zurich entities, Zurich Insurance
9    Company and Zurich Insurance Bermuda
10   Company.
11        A.   Okay.
12        Q.    I am not, I think, going to
13   ask many questions about Maryland
14   Casualty today.
15            With respect to Zurich, I
16   will represent to you that the two Zurich
17   entities issued a number of high level
18   excess policies, and I will direct your
19   attention to what we have marked as
20   Exhibit-12, the Exhibit 6 to the Exhibit
21   Book for the Plan.
22            Directing your attention to
23   Schedule 1, page 20, you will see there
24   is about 11 or so participations on that

Page 382

1  last page.
2      A.   Yes.
3      Q.   If I were to ask you the
4  same questions that other carriers have
5  asked you, if you are aware of any
6  waivers by any of the Zurich entities or
7  their rights under the policy, are you
8  aware of that with respect to those
9  policies?
10     A.   No, I am not.
11         MS. HARDING:  Object to
12     form --
13         MR. LIESEMER:  Object to
14     form.
15         MS. HARDING:  -- as to
16     rights.
17  BY MR. IFFT:
18     Q.   You are aware, Mr. Hughes,
19  that the excess insurers under their
20  policies typically have certain rights
21  with respect to their ability to be
22  involved with respect to the handling of
23  the claims against Grace?
24     A.   Yes.

Page 383

1         MR. LIESEMER:  Object to the
2     form.
3  BY MR. IFFT:
4      Q.   And is it your testimony
5  that you are not aware of any waiver of
6  any such rights by the Zurich companies
7  with respect to their policies?
8         MS. HARDING:  Object to form
9     again.
10        But go ahead.
11        MR. IFFT:  You can answer.
12        THE WITNESS:  I am not aware
13     of any.
14  BY MR. IFFT:
15     Q.   Let me direct your attention
16  to Schedule 3.  I will represent to
17  you that this is the Schedule of Asbestos
18  Insurance Reimbursement Agreements, and
19  you will see at the bottom there is one
20  agreement with Zurich International with
21  respect to, I will represent to you, one
22  of those 11 policies.
23        Do you happen to be familiar
24  with that agreement, sitting here today?

Page 384

1      A.   No, I am not.
2      Q.   I think you testified that
3  you had some familiarity with Asbestos
4  Insurance Reimbursement Agreements
5  generally, correct?
6      A.   Yes.
7      Q.   And what's your
8  understanding as to how those typically
9  work?
10     A.   They typically would work
11  that as the costs were incurred under --
12  we would agree in terms of how it was
13  allocated, but Grace had a model in terms
14  of how the terms were allocated on
15  different policies.  And to the extent
16  the policy was triggered that the party,
17  in this case Zurich International, would
18  pay Grace or reimburse Grace for some
19  portion of the costs that were incurred
20  for those claims.
21     Q.   Pursuant to a defined
22  percentage in the agreement?
23     A.   Defined percentage,
24  generally, yes.

Page 385

1      Q.   Do those agreements also
2  typically have any provisions that on
3  their face alter the rights that
4  otherwise might exist under the policy
5  with respect to the insurer's involvement
6  in the claims?
7         MS. HARDING:  Object to
8     form.
9         MR. LIESEMER:  Join.
10        THE WITNESS:  I think that
11     would vary.  My understanding
12     would be generally no, but I think
13     that it certainly -- I would have
14     to look at the individual
15     agreement to comfortably say that.
16  BY MR. IFFT:
17     Q.   Okay.  You are not sure,
18  sitting here today?
19     A.   I am not sure, but you are
20  also ask asking me specifically about
21  agreements.  And your other questions
22  were generally in the absence, but here
23  there were agreements.  And I have to
24  look at the individual agreements before

Page 386

1  making a blanket statement about what
2  they provide and what they don't provide.
3      Q.   Fair enough.  They may or
4  may not have, and you would have to look
5  at the agreement?
6      A.   Right.
7          MR. IFFT:  I don't have
8  anything further.
9          - - -
10         EXAMINATION
11         - - -
12 BY MS. DeCRISTOFARO:
13     Q.   Good afternoon, Mr. Hughes,
14 my name is Elizabeth DeCristofaro.  I
15 represent a group of insurance companies,
16 Continental Insurance Company,
17 Continental Casualty, generally referred
18 to as the CNA Insurance Companies.
19         And you are familiar that
20 the CNA Insurance Companies issued
21 insurance policies to Grace?
22     A.   Yes.
23     Q.   I am trying to do this
24 without having to take you through a

Page 387

1  number of names and policies.
2          You are aware that some of
3  the policies issued by the CNA Companies
4  to Grace were high level excess policies;
5  is that correct?
6      A.   Yes.
7      Q.   And there has been no
8  settlement or other agreements affecting
9  those high level high level excess
10 policies; is that correct?
11         MS. HARDING:  Object to
12 form.
13         Go ahead.
14         THE WITNESS:  That's my
15 understanding, yes.
16 BY MS. DeCRISTOFARO:
17     Q.   So to follow up on the
18 questions you were asked previously, you
19 are not aware of any agreement in which
20 the companies that issued those high
21 level excess policies waived or
22 surrendered any rights under those
23 policies?
24         MR. LIESEMER:  Object to

Page 388

1  form.
2          MS. HARDING:  Object the
3  form.
4          THE WITNESS:  No, I am not
5  aware of any agreement.
6          MS. DeCRISTOFARO:  Then I
7  have no further questions.
8          MS. HARDING:  We are done in
9  the room.  Elisa, do you want to
10 go?
11         - - -
12         EXAMINATION
13         - - -
14 BY MS. ALCABES:
15     Q.   Hi.  This is Elisa Alcabes
16 from Simpson, Thacher & Bartlett, Mr.
17 Hughes.  I am counsel for Travelers
18 Casualty and Surety Company previously
19 known AETNA.
20     A.   Yes.
21     Q.   You mentioned before that
22 you had involvement in the reimbursement
23 agreement pre-petition; is that correct?
24     A.   Yes.

Page 389

1      Q.   And I believe you said that
2  you were in part responsible for insuring
3  that Grace undertook its obligations
4  under the reimbursement agreement?
5      A.   Yes.  And I was involved in
6  disputes that arose concerning those
7  obligation.
8      Q.   With respect to allocation,
9  I believe you just mentioned that there
10 was a model that Grace used; is that
11 correct?
12         MS. HARDING:  Object to
13 form.  It misstates the testimony
14 but go ahead.
15         THE WITNESS:  Yes.
16 BY MS. ALCABES:
17     Q.   Can you just explain a
18 little bit more how Grace allocated or
19 performed allocation that was necessary
20 under the reimbursement agreement?
21     A.   I can tell you who did it, I
22 can tell you that it was done, but I
23 can't give you specifics and the details
24 of how that was done.

Page 478

1    I think that's a question
2  that's overly broad, and I think
3  it really -- it's specific to an
4  insurance company and to law firms
5  and to jurisdictions.
6    But, again, we worked with
7  insurance companies in settling
8  and resolving these claims and
9  resolving their coverage over the
10  course of the 15, 20 years I was
11  involved in it.
12  BY MR. LEWIS:
13    Q.   Did any insurer that had
14  coverage for Grace, any insurer, object
15  to the manner in which you were
16  conducting the defense of the claims for
17  asbestos-related disease against Grace?
18    MR. SCHIAVONI:  Object to
19  form.
20    THE WITNESS:  None that I
21  recall.
22    MR. LEWIS:  That's all I
23  have.
24    MR. BROWN:  Let's mark

Page 479

1  Hughes-15.
2    (Hughes-15 marked for
3  identification at this time.)
4    MS. HARDING:  Just to save
5  time, again, Exhibit 5 to the Plan
6  was topic upon which Mr. Finke was
7  designated to testify and I think
8  did.  But to the extent that the
9  witness can answer the questions
10  related to it, go ahead.
11    MR. BROWN:  It's an
12  insurance-related question.
13    MS. HARDING:  I understand.
14    - - -
15    EXAMINATION
16    - - -
17  BY MR. BROWN:
18    Q.   Mr. Hughes, can you look at
19  what's been marked Exhibit-6, Schedule 1,
20  we talked about that earlier?  I think
21  that's 5 there in front of you.
22    A.   Yes.
23    Q.   If you look at Exhibit 6.
24    MS. HARDING:  Which is

Page 480

1  Hughes Exhibit-12.
2  BY MR. BROWN:
3    Q.   Can you go to Schedule 1 of
4  that document?
5    A.   Yes.
6    Q.   And specifically, page 18, I
7  direct your attention down toward the
8  bottom of the document, you will see
9  Unigard Security.
10    Do you see that?
11    A.   Yes.
12    Q.   And do you see in the policy
13  number column that there are two policies
14  listed?
15    A.   Yes.
16    Q.   Okay.  There is one 1-0589
17  and 1-2517.  Do you see those?
18    A.   Yes.
19    Q.   Now, could you go to what's
20  been marked as Exhibit-15, which is
21  Exhibit 5 to the Exhibit Book, and turn
22  to page 9.
23    If you see at the bottom of
24  that there is a reference there to two

Page 481

1  settlement agreements for Unigard
2  Security Insurance Company?  Do you see
3  those?
4    A.   Yes.
5    Q.   And it says "now known as
6  Seaton"?
7    A.   Yes.
8    Q.   Okay.  Do you understand
9  those two settlement agreements to
10  pertain to the two policies that are on
11  the first exhibit that I had you look at?
12    MS. HARDING:  Object on
13  foundation, to the extent that you
14  know.  And --
15  BY MR. BROWN:
16    Q.   You can look at the policy
17  numbers.
18    A.   Yeah, they have the same
19  policy numbers.
20    Q.   Okay.  Now, would you look
21  at Schedule 2 to Exhibit 6?  Do you see
22  that there are two settlement agreements
23  listed there for Unigard Security
24  Insurance Company?

Page 482

1     A.   Yes.
2     Q.   Do you understand those two
3  settlement agreements to relate to the
4  references of the prior document?
5          MS. HARDING:  Object on
6  foundation.  Mr. Finke testified
7  that he prepared these schedules.
8          But to the extent that you
9  know, go ahead.
10         THE WITNESS:  I mean, they
11 have the same policy numbers --
12 excuse me.  They don't have policy
13 numbers on Schedule 2, but they
14 have the same dates in the
15 agreement.
16 BY MR. BROWN:
17     Q.   It's your understanding it's
18 the same agreement, correct?
19         MS. HARDING:  Object on
20 foundation.
21         THE WITNESS:  Yes.
22 BY MR. BROWN:
23     Q.   Okay.  Are you aware of any
24 other agreements between Grace and

Page 483

1  Unigard, or its successor, Seaton,
2  regarding Unigard policy number 1-0589 or
3  1-2517 relating to asbestos-related
4  coverage other than the two that are
5  listed there?
6     A.   Settlements, did you say?
7     Q.   Yes.
8     A.   No, I am not.
9     Q.   Are you aware of any other
10 agreements between Grace and Unigard, or
11 Seaton, regarding claims handling under
12 any coverage that is alleged to exist
13 under policy number 1-0589 or 1-2517?
14     A.   No, I am not.
15         MR. BROWN:  Thank you.
16         MR. SCHIAVONI:  Just four or
17 five things, sir.
18             - - -
19          EXAMINATION
20             - - -
21 BY MR. SCHIAVONI:
22     Q.   Is it fair to say that you
23 have no personal knowledge concerning the
24 circumstances under which Exhibits 6

Page 484

1  through 9 were prepared?
2     A.   No.
3          MS. HARDING:  Is it fair to
4  say?
5          THE WITNESS:  I am sorry.
6  BY MR. SCHIAVONI:
7     Q.   Let me ask again.  That was
8  a mistake right that you just said?
9     A.   Yes, it was.
10     Q.   Is it fair to say that you
11 have no personal knowledge concerning the
12 circumstances under which Exhibits 6
13 through 9 were prepared?
14     A.   I have no personal knowledge
15 of the circumstances through which
16 Exhibits 6 through 9 were prepared.
17     Q.   All right.  Those are
18 exhibits at this deposition, 6 through 9,
19 right?
20     A.   Yes.
21     Q.   And I am sorry to ask you
22 this, I apologize, but how old were you
23 in 1963?
24         MR. LEWIS:  I object.

Page 485

1  That's an impertinent question.
2          THE WITNESS:  I was 6 years
3  old.
4          MR. SCHIAVONI:  It
5  demonstrates how silly your
6  questions were, sir.
7  BY MR. SCHIAVONI:
8     Q.   How old were you in 1963?
9     A.   I was 6.
10     Q.   Is it fair to say you didn't
11 work at Grace in the '50s and '60s,
12 right?
13     A.   No, I didn't.
14     Q.   And you never worked at the
15 Zonolite Company; is that right?
16     A.   No, I didn't.
17     Q.   Is it fair to say that you,
18 Mr. Hughes, have no personal knowledge as
19 to whether or not any policies were
20 actually issued to BNSF in the '50s or
21 '60s, do you, because you weren't around
22 then?
23     A.   No, I don't.
24         MR. SCHIAVONI:  Thank you,

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO.,** *et al.*[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |
| | ) | |
| | ) | |

**EXHIBIT**
Hughes-3
6/1/09   CC

## EXHIBIT 4 TO EXHIBIT BOOK
## TRUST DISTRIBUTION PROCEDURES

**EXHIBIT 4**

Attached.

---

[1]    The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

REMAINDER OF EXHIBIT OMITTED
SEE EXHIBIT 4 TO EXHIBIT BOOK
(D.I. 20874)

# KIRKLAND & ELLIS LLP
### AND AFFILIATED PARTNERSHIPS

EXHIBIT
Hughes-11
6-11-09 bt
PENGAD 800-631-6989

655 Fifteenth Street, N.W.
Washington, D.C. 20005

To Call Writer Directly:
(202) 879-5081
bharding@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

April 25, 2009

Subject:    Designation of Witnesses in response to OneBeacon America
Insurance Company ("OneBeacon"), Seaton Insurance Company
("Seaton"), Government Employees Insurance Company ("GEICO"),
Columbia Insurance Company f/k/a Republic Insurance Company
("Columbia"), Fireman's Fund Insurance Company, Allianz S.p.A.,
f/k/a Riunione Adriatica di Scurta (collectively, "FFIC"), Travelers
Casualty and Surety Company, f/k/a The Aetna Casualty and Surety
Company ("Travelers"), Allstate Insurance Company ("Allstate"),
CNA, Libby Claimants, and London Market Companies Deposition
Notices of W.R. Grace et Co., et al. (*In re W.R. Grace & Co., et al.*,
Bankruptcy Case No. 01-01139 (JKF)).

Dear Counsel:

Pursuant to Rule 30 of the Federal Rules of Civil Procedure (F.R.C.P.), made applicable
in these proceedings by Rules 7030 and 9014 of the Federal Rules of Bankruptcy Procedure,
Debtors W.R. Grace & Co. et al. (hereinafter "Grace") have objected to the notices of deposition
served by the above captioned parties seeking Rule 30(b)(6) testimony from Grace. Debtors'
Objection to Notices of Deposition of W.R. Grace & Co. et al. Pursuant to Rule 30(b)(6).
(Docket No. 21312). Grace has objected to the deposition notices on the grounds that they
purport to seek legal conclusions, information prepared in anticipation of litigation, information
obtained by or on behalf of counsel for Grace in preparation for trial, information protected by
the work product privilege, information protected by the attorney/client privilege, information
protected by the common interest privilege, information protected by Federal Rule of Evidence
408, and/or information otherwise beyond the permissible scope of discovery as set forth in the
Federal Rules of Civil Procedure, the Federal Rules of Evidence, the Federal Rules of
Bankruptcy Procedure or this Court's rules.

Pursuant to Rule 30 of the Federal Rules of Civil Procedure and subject to and without
waiving any of its objections and all other claims of privilege, Grace has designated Richard
Finke, Jay Hughes, and Hudson La Force to serve as witnesses in response to the above
captioned Rule 30(b)(6) notices. *See* Attachment A. With such designations, Grace hereby
retracts Mark Shelnitz and Jeff Posner as designated witnesses for these Rule 30(b)(6)

# KIRKLAND & ELLIS LLP

April 25, 2009
Page 2

depositions.  In accordance with F.R.C.P. 30(d)(1), Grace shall make each witness available for one (1) day of seven (7) hours.  The designated witnesses will respond to questions relating to Rule 30(b)(6) subject matters and other factual inquiries relevant to Phase I and II of these proceedings.  *See* Attachment A.

Sincerely,

Barbara M. Harding

BHH/kfl

**WR Grace / Confirmation Hearing 30(b)(6) Deposition Notice**

**Witness Designations**

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| Anderson Memorial Hospital | The interpretation of the sales information attached to Anderson Memorial Hospital's ZAI Proof of Claim Form, including billing registers, and all information contained therein. | Richard Finke |
| Travelers and Allstate | 1. The treatment of the Travelers 1992 Agreement under the Revised Joint Plan | Richard Finke |
| | 2. The treatment of the Travelers 1996 Agreement under the Revised Joint Plan | Richard Finke |
| | 3. The treatment of the Allstate 1994 Agreement under the Revised Joint Plan | Richard Finke |
| | 4. The treatment of the Allstate 1996 Agreement under the Revised Joint Plan | Richard Finke |
| | 5. The provisions of the Revised Joint Plan that relate to Asbestos Insurance Settlement Agreements, including, without limitation, Sections 1.1(14), 1.1(16), 1.1(200), 7.7, 7.13, 7.15, 8.4.1, 9.1 and Exhibit 6 (Asbestos Insurance Transfer Agreement) | Richard Finke |
| | 6. The provisions of the Revised Joint Plan that relate to Asbestos Insurance Reimbursement Agreements, including, without limitation, Sections 1.1(9), 1.1(16), 7.2.2(d)(iv), 7.7, 7.13, 7.15, 9.1 and Exhibit 6 (Asbestos Insurance Transfer Agreement) | Richard Finke |
| | 7. The provision of the Revised Joint Plan that relate to Indirect PI Trust Claims, including, without limitation, Section 1.1(138) and Exhibit 4 (Trust Distribution Procedures) | Richard Finke |
| | **SUPPLEMENTAL NOTICE** | |
| | 1. The provisions of the Revised Joint Plan that relate to Asbestos PD Claims and Indirect PD Trust Claims, including, without limitation, Sections 1.1(18), 1.1(137), 3.1.7, Exhibit 3 (Asbestos PD Trust Agreement), and Exhibit 25 (Class 7A CMO) Trust Distribution Procedures | Richard Finke |
| | 2. The classification of Travelers as a Class 7A creditor and solicitation of Class 7A claims | Richard Finke |

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | 3. The treatment and/or payment, pursuant to the Revised Joint Plan, of claims for indemnification arising under the Travelers 1992 Agreement arising from Asbestos PD Claims | Richard Finke |
| | 4. The treatment and/or payment, pursuant to the Revised Joint Plan, of claims for indemnification arising under the Travelers 1996 Agreement arising from Asbestos PD Claims | Richard Finke |
| OneBeacon, Seaton, GEICO, Columbia | A. Classification and treatment of Indirect PI Trust Claims, including "Indemnified Insurer TDP Claims" and "Insurance-Related TDP Claims" as those terms are used in Sections 5.13 and 5.12 respectively of the Asbestos PI Trust Distribution Procedures | Richard Finke |
| | B. Bases for the classification of certain contractual indemnity claims held by Settled Asbestos Insurance Companies as Class 6 Asbestos PI Claims | Richard Finke |
| | C. Bases for the classification and treatment of non-asbestos-related contractual indemnity claims held by Settled Asbestos Insurance Companies as Class 9 General Unsecured Claims | Richard Finke |
| | D. Scope and operation of the Asbestos PI Channeling Injunction | Richard Finke |
| | E. Scope and Operation of the Asbestos Insurance Entity Injunction and Successor Claim Injunction | Richard Finke |
| | F. Scope and operation of Section 7.15 of the Plan entitled, "Insurance Neutrality", and any other purported insurance neutrality provisions in the Plan or Plan Documents | Richard Finke |
| | G. Operation of the Asbestos PI Trust Agreement and Asbestos PI Trust Distribution Procedures | Jay Hughes |
| | H. Bases for Settled Asbestos Insurance Company designations appearing in Exhibit 5 to the Exhibit Book | Richard Finke |
| | I. Scope and bases for releases and exculpation provisions in the Plan | Richard Finke |
| | J. The scope, operation, and necessity of the findings of fact, conclusions of law, orders, and decrees | Richard Finke |

2

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | set forth in Section 7.7 of the Plan | Richard Finke |
| | K. The impact of the Plan and Plan Documents on the claims asserted, threatened, or that may later be asserted by Scotts, BNSF, the Libby Claimants, and/or Kaneb against the Debtors and/or any Asbestos Insurance Entity | Richard Finke |
| | L. The criteria used to select the Asbestos PI Trustees and the Asbestos PI TAC | Richard Finke |
| | M. The business background, experience, and qualifications of the individuals selected to be the Asbestos PI Trustees and the members of the Asbestos PI TAC | Richard Finke |
| | N. The respective powers and authority conferred upon the Asbestos PI Trustees, Asbestos PI TAC, and the Asbestos PI FCR under the Plan and Plan Documents including, but not limited to , the Asbestos PI Trust Agreement, Asbestos PI Trust Distribution Procedures, and the Asbestos Insurance Transfer Agreement | Richard Finke |
| | O. The respective roles of the Asbestos PI Trustees, Asbestos PI TAC, and the Asbestos PI FCR in the evaluation, handling, defense and settlement/resolution of Asbestos PI Claims under the Plan and Plan Documents | Richard Finke |
| | P. the role, if any, of the Asbestos Insurance Entities in the evaluation, handling, defense and settlement/resolution of Asbestos PI Claims under the Plan and Plan Documents | Richard Finke |
| | Q. The scope of the Asbestos Insurance Rights that are to be transferred or assigned to the Asbestos PI Trust pursuant to the Asbestos Insurance Transfer Agreement, and any other Plan Documents | Richard Finke |
| | R. The impact of the Plan and Plan Documents on the respective rights and duties of the Debtors and Asbestos Insurance Entities under the Asbestos Insurance Policies | Richard Finke |
| | S. The impact of the Plan and Plan Documents on subsequent coverage litigation between the Asbestos PI Trust (or the Debtors) and Asbestos Insurance Entities including, but not limited to, Non- | Richard Finke |

3

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | Settled Asbestos Insurance Companies | |
| | T. The nature and value of the Asbestos PI Trust Assets to be used to fund the Asbestos PI Trust | Hudson La Force |
| | U. The Plan's compliance with Section 524(g) of the Bankruptcy Code, as well as other applicable provisions of the Bankruptcy Code | Richard Finke |
| Fireman's Fund Insurance Co. *(re Surety Bond Issues)* | 1. The classification and treatment of the Proofs of Claim under the Plan (including, to the extent applicable, the TDPs) | Richard Finke |
| | 2. The classification and treatment of the Supersedeas Bond Claim under the Plan (including, to the extent applicable, the TDPs) | Richard Finke |
| | 3. The extent to which the claims asserted in the Proofs of Claim are "Pre-Petition Liquidated Claims" subject to treatment under § 5.2 of the TDPs | Richard Finke |
| | 4. The extent to which the Supersedeas Bond Claim is "Pre-Petition Liquidated Claim" | Richard Finke |
| | 5. The actual, expected, and/or intended effect of excluding Indirect PI Trust Claims that are Pre-Petition Liquidated Claims from § 5.6 of the TDPs | Richard Finke |
| | 6. The meaning and operation of § 5.2 of the TDPs in respect of Pre-Petition Liquidated Claims | Richard Finke |
| | 7. The meaning of the phrase "provided there is no supersedeas bond associated with such verdict or judgment..." in § 5.2(a)(ii) of the TDPs, as well as how this phrase works in relation to § 5.2(b) of the TDPs | Richard Finke |
| | 8. The extent to which the Supersedeas Bond Claim is an Indirect PI Trust Claim, a Class 6 Claim, or a Class 9 Claim | Richard Finke |
| | 9. Debtors' contentions, if any, regarding whether FFIC may setoff any obligations it may owe to Grace under liability insurance policies issued or allegedly issued by FFIC to W.R. Grace & Co., et | Richard Finke |

4

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | a1., against Grace's obligations to FFIC under the Special Surety Indemnification Agreement, and the bases for any such contentions | |
| | 10. Debtors' pre-petition payment or funding for the payment of Asbestos Claims, such as judgments, settlements, and litigation costs, from sources other than liability insurance | Jay Hughes |
| | 11. The actual, expected, and/or intended impact, if any, of Plan Confirmation on the Special Surety Indemnification Agreement, the Supersedeas Bond, and the Supersedeas Bond Claim, including whether or not Reorganized Debtors will retain the Debtors' obligations under the Special Surety Indemnification Agreement and who, if not Reorganized Debtors, will succeed to or assume such obligations | Richard Finke |
| | 12. The actual, expected, and/or intended impact, if any, of Plan Confirmation on W.R. Grace & Co. v. Aaron Clifton Edwards, et al. No. 06-00-00112-CV (Tex. App., 6th Appellate Dist.), and the claims asserted in the Proofs of Claim | Jay Hughes |
| Fireman's Fund Insurance Co. and Allianz | 1. The drafting, negotiation, scope and operation of the Plan, the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures, including efforts to (i) involve Asbestos Insurance Entities in the negotiation and/or drafting of the Plan, the Asbestos PI Trust Distribution Procedures, or the Asbestos PI Trust Agreement, or (ii) obtain the consent of the Asbestos Insurance Entities to the Plan, the Asbestos PI Trust Distribution Procedures, and the Asbestos PI Trust Agreement | Richard Finke |
| | 2. The scope and operation of the Asbestos Insurance Entity Injunction and Successor Claims Injunction | Richard Finke |
| | 3. The scope and operation of the Asbestos PI Channeling Injunction, including but not limited to, the effect of the Asbestos PI Channeling Injunction on claims against Settled Asbestos Insurance Companies | Richard Finke |
| | 4. The bases for designating an Asbestos Insurance Entity as a Settled Asbestos Insurance Company | Richard Finke |
| | 5. The selection, qualification, and experience of the proposed Asbestos PI Trustees and the proposed | Richard Finke |

5

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | Asbestos PI Trust Advisory Committee members | |
| | 6. Compensation or other financial arrangements between or among any of the proposed Asbestos PI Trustees, Asbestos PI Trust Advisory Committee members or members of the Asbestos PI Committee in respect of the negotiation, drafting or contemplated operation of the Asbestos PI Trust | Richard Finke |
| | 7. The value of the Warrants | Hudson La Force |
| | 8. The meaning and operation of Section 7.15 of the Plan, including the interaction of Section 7.15 with Sections 8.1.1, 7.13, 7.7(uu), and 7.7(tt) and the Asbestos Insurance Transfer Agreement | Richard Finke |
| | 9. The meaning of the phrase "any defense that the Plan or any of the Plan Documents do not comply with the Bankruptcy Code" in Section 1.1(16) (definition of "Asbestos Insurer Coverage Defenses") | Richard Finke |
| | 10. The impact, if any, of Plan Confirmation on Non-Settled Asbestos Insurance Companies, including:<br>   a) Whether and to what extent the Reorganized Debtors retain the Debtors' obligations under Asbestos Insurance Policies;<br>   b) Whether the Asbestos PI Trust assumes the obligations of the Debtors under the Asbestos Insurance Policies;<br>   c) The application of the exculpation provision of Section 11.9 of the Plan;<br>   d) Whether the Plan will act as a settlement or judgment that will immediately trigger a payment obligation under the Asbestos Insurance Policies issued by the Non-Settled Asbestos Insurance Companies;<br>   e) Whether the Non-Settled Asbestos Insurance Companies' indemnity obligations will be triggered due to the establishment of tile Asbestos PI Trust and transfer of assets to the Trust;<br>   f) Whether the Non-Settled Asbestos Insurance Companies' indemnity obligations for any Asbestos PI Claim will accrue or be triggered prior to the payment of an Asbestos PI Claim by Asbestos PI Trust;<br>   g) Whether and how the Plan and Plan Documents can be used in subsequent Asbestos Insurance Actions or other proceedings by the Asbestos PI Trust or the Debtors against Non-Settled Asbestos | Richard Finke |

6

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | Insurance Companies;<br><br>h) The role, if any, the Non-Settled Asbestos Insurance Companies will have in the evaluation, defense, allowance, or settlement of Asbestos PI Claims channeled to or submitted to the Asbestos PI Trust;<br><br>i) Whether, and to what extent, the Non-Settled Asbestos Insurance Companies will be responsible for paying all or part of any Asbestos PI Claim resolved by the Asbestos PI Trust pursuant to the Asbestos PI Trust Distribution Procedures or for indemnifying the Asbestos PI Trust for any payment it makes on account of Asbestos PI Claims | |
| | 11. The Debtors' duties and obligations with respect to any Asbestos Insurance Policies upon the transfer of the Asbestos Insurance Rights to the Asbestos PI Trust | Richard Finke |
| | 12. The meaning and scope of the definition of Indirect PI Trust Claims, including whether, and to what extent, claims by Asbestos Insurance Entities for indemnification and/or contribution from Debtors for claims asserted against them, such as, by Illustration, the Libby Claimants, or The Scotts Company, LLC, or BNSF Railway Company (or its predecessors) | Richard Finke |
| | 13. The treatment of Indirect PI Trust Claims by the Plan and the Plan Documents | Richard Finke |
| | 14. The basis for classification and treatment of an Asbestos Insurance Entity's Asbestos Claims against the Debtors for indemnification arising from contract or otherwise as Class 6 Asbestos PI Claims | Richard Finke |
| Maryland Casualty Co, Zurich Insurance Co., and Zurich International | 1. The scope of protection provided to Settled Asbestos Insurance Companies by the Asbestos PI Channeling Injunction and the scope of Debtors' indemnity obligations under the respective Asbestos Insurance Settlement Agreements | Richard Finke |
| | 2. The viability of the Plan if the Court upholds any objections to the application of the Asbestos PI Channeling Injunction to one or more of the Settled Asbestos Insurance Companies | Richard Finke |
| | 3. The Plan's treatment of any Settled Asbestos Insurance Companies who are found by the Court to have discrete, unsettled coverage under an otherwise settled policy | Richard Finke |

7

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | 4. The intended scope of Debtors' indemnity obligations under the MCC Settlement Agreements | Richard Finke |
| | 5. The Plan Proponents' position that Settled Asbestos Insurance Companies are not creditors | Richard Finke |
| | 6. The impact of the Plan and Plan Documents on the claims asserted, threatened, or that may later be asserted by Scotts, BNSF, and/or the Libby Claimants, against the Debtors and/or any Asbestos Insurance Entity | Richard Finke |
| | 7. The bases for the classification of certain indemnity claims arising from contract or otherwise, against the Debtors held by Settled Asbestos Insurance Companies as Class 6 Asbestos PI Claims | Richard Finke |
| | 8. The classification and treatment under the Plan of Asbestos Insurance Entities' claims against the Debtors for indemnification arising from contract or otherwise which are not Indirect PI Trust Claims | Richard Finke |
| | 9. The scope and operation of the Asbestos PI Channeling Injunction, including but not limited to, the effect of the Asbestos PI Channeling Injunction on claims against Settled Asbestos Insurance Companies | Richard Finke |
| | 10. The Plan's compliance with section 524(g) of the Bankruptcy Code | Richard Finke |
| | 11. The meaning and scope of the indirect PI Trust Claims, including whether, and to what extent, claims by Asbestos Insurance Entities for indemnification and contribution deriving from claims against them, such as those by the Libby Claimants, Scotts, BNSF are Indirect PI Trust Claims | Richard Finke |
| | 12. The treatment of Indirect PI Trust Claims under the Plan, the Asbestos PI Trust Distribution Procedures, and the other Plan Documents, including but not limited to, the treatment of an Asbestos Insurance Entity's claims against the Debtors for indemnification arising from a pre-bankruptcy petition settlement agreement | Richard Finke |
| | 13. The scope of Section 524(g) of the Bankruptcy Code on claims against Settled Asbestos Insurance | Richard Finke |

8

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | Companies | |
| | 14. The scope and operation of the Asbestos Insurance Entity Injunction and Successor Claims Injunction | Richard Finke |
| | 15. The meaning of the phrase "any defense that the Plan or any of the Plan Documents do not comply with the Bankruptcy Code" in Section 1.1(16)(definition of "Asbestos Insurer Coverage Defenses") | Richard Finke |
| | 16. The meaning and operation of the insurer neutrality provision of Section 7.15 of the Plan, including the interaction of Section 7.15 of the Plan with Sections 8.1.1, 7.13, 7.7(uu), and 7.7(tt) of the Plan and the Asbestos Insurance Transfer Agreement | Richard Finke |
| | 17. The Plan's treatment of Asbestos Insurance Reimbursement Agreements | Richard Finke |
| Libby Claimants | Plan | |
| | 1. Development of Plan among plan proponents, including negotiations, other discussions between or within the plan proponents, and preparation of documents, including drafts. | Richard Finke |
| | 2. Funding of the Asbestos PI Trust, including value at time of negotiation of assets to be used to fund the Asbestos PI Trust. | Hudson La Force |
| | 3. Current value of assets to be used to fund the Asbestos PI Trust. | Hudson La Force |
| | 4. Projected value at scheduled Confirmation Hearing of assets to be used to fund the Asbestos PI Trust. | Hudson La Force |
| | Asbestos PI Trust | |
| | 1. Development of the TDP, including negotiations, other discussions between or within the plan proponents, and preparation of documents, including drafts. | Jay Hughes |

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | 2. TDP's in other cases used as models, points of reference or in any other way utilized in the development of the TDP ("Other TDPs"). | Jay Hughes |
| | 3. Liquidation of claims under Other TDPs. | Jay Hughes |
| | 4. Process by which the Asbestos PI Trust will liquidate claims. | Jay Hughes |
| | 5. Disease categories under the TDP. | Jay Hughes |
| | 6. The "Severe Pleural" disease category under the TDP. | Jay Hughes |
| | 7. Provisions of the TDP concerning "Extraordinary Claims." | Jay Hughes |
| | Injunctions | |
| | 1. The Asbestos PI Channeling Injunction. | Richard Finke |
| | 2. Development of Asbestos PI channeling Injunction among plan proponents, including negotiations, other discussions between or within the plan proponents, and preparation of documents, including drafts. | Richard Finke |
| | 3. Injunctions in other cases similar to the Asbestos PI Channeling Injunction used as models, points of reference or in any other way utilized in the development of the Asbestos PI Channeling Injunction ("Other Channeling Injunctions"). | Richard Finke |
| | 4. Litigation concerning scope of Other Channeling Injunctions. | Richard Finke |
| | 5. Scope and operation of the Asbestos PI Channeling Injunction, including the effect, if any, on actions by Libby Claimants against parties other than the Debtors, including but not limited to BNSF, the State of Montana and Maryland Casualty Company, for their own allegedly tortious conduct ("Libby Claimants' Independent Actions"). | Richard Finke |
| | 6. Necessity of, or benefit to plan proponents or Asbestos PI Trust from, the Asbestos PI Channeling | Richard Finke |

10

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | Injunction (including consideration supplied to any of the plan proponents by those protected by the Asbestos PI Channeling Injunction). | |
| | 7. The Asbestos Insurance Entity Injunction. | Richard Finke |
| | 8. Development of Asbestos Insurance Entity Injunction among plan proponents, including negotiations, other discussions between or within the plan proponents, and preparation of documents, including drafts. | Richard Finke |
| | 9. Injunctions in other cases similar to the Asbestos Insurance Entity Injunction used as models, points of reference or in any other way utilized in the development of the Asbestos Insurance Entity Injunction ("Other Insurance Entity Injunctions"). | Richard Finke |
| | 10. Litigation concerning scope of Other Insurance Entity Injunctions. | Richard Finke |
| | 11. Scope and operation of the Asbestos Insurance Entity Injunction, including the effect, if any, on Libby Claimants' Independent Actions. | Richard Finke |
| | 12. Necessity of, or benefit to plan proponents or Asbestos PI Trust from, the Asbestos Insurance Entity Injunction (including consideration supplied to any of the plan proponents by those protected by the Asbestos Insurance Entity Injunction). | Richard Finke |
| | 13. The Successor Claims Injunction. | Richard Finke |
| | 14. Development of Successor Claims Injunction among plan proponents, including negotiations, other discussions between or within the plan proponents, and preparation of documents, including drafts. | Richard Finke |
| | 15. Injunctions in other cases similar to the Successor Claims Injunction used as models, points of reference or in any other way utilized in the development of the Successor Claim Injunction ("Other Successor Claims Injunctions"). | Richard Finke |

11

| Dep. Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | 16. Litigation concerning scope of Other Successor Claims Injunctions. | Richard Finke |
| | 17. Scope and operation of the Successor Claims Injunction, including the effect, if any, on Libby Claimants' Independent Actions. | Richard Finke |
| | 18. Necessity of, or benefit to plan proponents or Asbestos PI Trust from, the Successor Claims Injunction (including consideration supplied to any of the plan proponents by those protected by the Successor Claims Injunction). | Richard Finke |
| | 19. Release and exculpation provisions of the Plan (the "Releases and Exculpations"). | Richard Finke |
| | 20. Development of The Releases and Exculpations among plan proponents, including negotiations, other discussions between or within the plan proponents, and preparation of documents, including drafts. | Richard Finke |
| | 21. Injunctions in other cases similar to the Releases and Exculpations used as models, points of reference or in any other way utilized in the development of the Releases and Exculpations ("Other Releases and Exculpations"). | Richard Finke |
| | 22. Litigation concerning scope of Other Releases and Exculpations. | Richard Finke |
| | 23. Scope and operation of the Releases and Exculpations, including the effect, if any, on Libby Claimants' Independent Actions. | Richard Finke |
| | 24. Necessity of, or benefit to plan proponents or Asbestos PI Trust from, the Releases and Exculpations (including consideration supplied to any of the plan proponents by those protected by the Releases and Exculpations). | Richard Finke |
| | 25. The plan's compliance with Section 524(g) of the Bankruptcy Code. | Richard Finke |
| | Liquidation Analysis | |

12

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | 1. Liquidation analysis contained in Exhibit Book as Exhibit 8 (the "Liquidation Analysis") | Hudson La Force |
| | 2. Development of Liquidation Analysis among plan proponents, including negotiations, other discussions between or within the plan proponents, and preparation of documents. | Hudson La Force |
| | 3. Projections, assumptions, calculations and sources of information utilized in preparing Liquidation Analysis. | Hudson La Force |
| | 4. Any changes in, or changes in the validity of, any such projections, assumptions, calculations and sources of information, through the present date. | Hudson La Force |
| | Claims History | |
| | 1. Grace claims history concerning Asbestos PI Claims. | Jay Hughes |
| | 2. Grace's settlement practices and verdict history for Asbestos PI Claims. | Jay Hughes |
| | 3. Grace's settlement practices and verdict history for punitive damage claims. | Jay Hughes |
| | 4. Grace's settlement practices and verdict history for wrongful death claims. | Jay Hughes |
| | 5. Grace's settlement practices and verdict history for claims resulting from exposure to Grace's asbestos in Lincoln County, Montana. | Jay Hughes |
| | 6. Grace's settlement practices and verdict history for claims resulting from exposure outside of Lincoln County, Montana, to Grace's asbestos originating in Lincoln County, Montana. | Jay Hughes |
| | Rights of BNSF | |
| | 1. Claims of Burlington Northern Santa Fe Railroad and affiliates ("BNSF") against the Debtors. | Jay Hughes |
| | 2. Proofs of claim filed by BNSF. | Jay Hughes |

| Dep. Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | 3. Any rights of indemnification by BNSF against the Debtors, and any agreements pertaining thereto. | Jay Hughes |
| | 4. Any rights of contribution by BNSF against the Debtors. | Jay Hughes |
| | 5. Any insurance covering BNSF for Libby Claimants' Independent Actions against BNSF. | Jay Hughes |
| | Rights of the State of Montana | |
| | 1. Claims of the State of Montana against the Debtors. | Jay Hughes |
| | 2. Proofs of claim filed by the State of Montana. | Jay Hughes |
| | 3. Any rights of indemnification by the State of Montana against the Debtors, and any agreements pertaining thereto. | Jay Hughes |
| | 4. Any rights of contribution by the State of Montana against the Debtors. | Jay Hughes |
| | 5. Any insurance covering the State of Montana for Libby Claimants' Independent Actions against the State of Montana. | Jay Hughes |
| | Rights of Maryland Casualty Company | |
| | 1. Claims of the Maryland Casualty Company, including affiliates ("MCC") against the Debtors. | Jay Hughes |
| | 2. Proofs of claim filed by MCC. | Jay Hughes |
| | 3. Any rights of indemnification by MCC against the Debtors, and any agreements pertaining thereto. | Jay Hughes |
| | 4. Any rights of contribution by MCC against the Debtors. | Jay Hughes |
| | 5. Any insurance covering MCC for Libby Claimants' Independent Actions against MCC. | Jay Hughes |

14

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | Insurance | |
| | 1. Grace's insurance policies (whether owned by Grace or purchased for another entity), coverage issues and settlements with insurers. | Jay Hughes |
| | 2. Grace's insurance coverage for products/completed operations, including terms thereof, aggregate caps, and defenses to and limitations on such coverage. | Jay Hughes |
| | 3. Projected value of the Asbestos Insurance Rights constituting products/completed operations coverage. | Jay Hughes |
| | 4. Projected aggregate liquidated amount of the Asbestos PI Claims (including future claims) covered by products/completed operations insurance. | Jay Hughes |
| | 5. Grace's insurance coverage for premises/non-completed operations, including terms thereof, aggregate caps, and defenses to and limitations on such coverage. | Jay Hughes |
| | 6. Projected value of the Asbestos Insurance Rights constituting premises/non-completed operations coverage. | Jay Hughes |
| | 7. Projected aggregate liquidated amount of the Asbestos PI Claims (including future claims) covered by premises/non-completed operations insurance. | Jay Hughes |
| | 8. Settlements with Grace insurers. | Jay Hughes |
| | 9. Bases for designation under the Plan of certain Asbestos Insurance Entities as Settled Asbestos Insurance Companies. | Richard Finke |
| CNA | 1. The meaning and operation of the insurer neutrality provision of Section 7.15 of the Plan, including the interaction of Section 7.15 of the Plan with Sections 8.1.1, 7.13, 7.7(uu), and 7.7(tt) of the Plan and the Asbestos Insurance Transfer Agreement. | Richard Finke |
| | 2. The treatment of Indirect PI Trust Claims under the Plan, the Asbestos PI Trust Distribution Procedures, and the other Plan Documents, including but not limited to, the treatment of an Asbestos | Richard Finke |

15

| Dep Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | Insurance Entity's claims against the Debtors for indemnification arising from a pre-bankruptcy petition settlement agreement. | |
| | 3. The meaning and scope of Indirect PI Trust Claims, including whether, and to what extent, claims by Asbestos Insurance Entities for indemnification and contribution deriving from claims against them, such as those by the Libby Claimants, Scotts, and BNSF, are Indirect PI Trust Claims. | Richard Finke |
| | 4. The basis for classification and treatment of an Asbestos Insurance Entity's Asbestos Claims against the Debtors for indemnification arising from contract or otherwise as Class 6 Asbestos PI Claims. | Richard Finke |
| | 5. The classification and treatment under the Plan of Asbestos Insurance Entities' claims against the Debtors for indemnification arising from contract or otherwise which are not Indirect PI Trust Claims. | Richard Finke |
| | 6. The scope and operation of the Asbestos PI Channeling Injunction, including but not limited to, the effect of the Asbestos PI Channeling Injunction on claims against Settled Asbestos Insurance Companies. | Richard Finke |
| | 7. The scope and operation of the Asbestos Insurance Entity Injunction and Successor Claims Injunction. | Richard Finke |
| | 8. The meaning of the phrase "any defense that the Plan or any of the Plan Documents do not comply with the Bankruptcy Code" in Section 1.1(16) (definition of "Asbestos Insurer Coverage Defenses") | Richard Finke |
| | 9. The drafting, negotiation, scope and operation of the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures, including efforts to obtain the consent of the Asbestos Insurance Entities to the Plan, the Asbestos PI Trust Distribution Procedures, and the Asbestos PI Trust Agreement, or to involve them in drafting the Asbestos PI Trust Agreement. | Richard Finke |
| | 10. The selection, qualification, and experience of the Asbestos PI Trustees and Asbestos PI Trust Advisory Committee members. | Richard Finke |

16

| Dep. Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | 11. Any compensation or other financial arrangements between each Asbestos PI Trustee and any Asbestos PI Trust Advisory Committee member or member of the Asbestos Claimants Committee on the one hand, and the Asbestos PI Trust. | Richard Finke |
| | 12. The bases for designating an Asbestos Insurance Entity as a Settled Asbestos Insurance Company. | Richard Finke |
| | 13. The Plan's treatment of Asbestos Insurance Reimbursement Agreements. | Richard Finke |
| | 14. The valuation of the Warrants, including, but not limited to, the use of any valuation model or similar valuation tool. | Hudson La Force |
| | 15. The impact, if any, of Plan Confirmation on Non-Settled Asbestos Insurance Companies, including:<br><br>a. Whether and to what extent the Reorganized Debtors retain the Debtors' obligations under Asbestos Insurance Policies;<br><br>b. Whether the Asbestos PI Trust assumes the obligations of the Debtors under the Asbestos Insurance Policies;<br><br>c. The application of the exculpation provision of Section 11.9 of the Plan;<br><br>d. Whether the Plan will act as a settlement or judgment that will immediately trigger a payment obligation under the Asbestos Insurance Policies issued by the Non-Settled Asbestos Insurance Companies;<br><br>e. Whether the Non-Settled Asbestos Insurance Companies' indemnity obligations will be triggered due to the establishment of the Asbestos PI Trust and transfer of assets to the Trust;<br><br>f. Whether the Non-Settled Asbestos Insurance Companies' indemnity obligations for any Asbestos PI Claim will accrue or be triggered prior to the payment of an Asbestos PI Claim by Asbestos PI Trust;<br><br>g. Whether and how the Plan and Plan Documents can be used in subsequent Asbestos Insurance Actions or other proceedings by the Asbestos PI Trust or the Debtors against Non-Settled Asbestos Insurance Companies;<br><br>h. The role, if any, the Non-Settled Asbestos Insurance Companies will have in the evaluation, defense, allowance, or settlement of Asbestos PI Claims channeled to or submitted to the Asbestos PI | Richard Finke |

17

| Dep. Notice Filed by | Topic of Deposition | Designated Witness |
|---|---|---|
| | Trust; | |
| | i. Whether, and to what extent, the Non-Settled Asbestos Insurance Companies will be responsible for paying all or part of any Asbestos PI Claim resolved by the Asbestos PI Trust pursuant to the Asbestos PI Trust Distribution Procedures or for indemnifying the Asbestos PI Trust for any payment it makes on account of Asbestos PI Claims. | |
| | 16. The Debtors' duties and obligations with respect to any Asbestos Insurance Policies upon the transfer of the Asbestos Insurance Rights to the Asbestos PI Trust. | Richard Finke |
| | 17. The treatment of workers compensation obligations as unimpaired, general unsecured claims that are to be liquidated and paid in full. | Richard Finke |
| London Market Companies | 1. The treatment of the London Market Companies 1995 Agreement under the Revised Joint Plan. | Richard Finke |
| | 2. The treatment of the London Market Companies 1996 Agreement under the Revised Joint Plan. | Richard Finke |
| | 3. The provisions of the Revised Joint Plan that relate to Asbestos Insurance Reimbursement Agreements, including, without limitation, Sections 1.1(9), 1.1(16), 7.2.2(d)(iv), 7.7, 7.13, 7.15, 9.1 and Exhibit 6 (Asbestos Insurance Transfer Agreement). | Richard Finke |
| | 4. The provisions of the Revised Joint Plan that relate to Indirect PI Trust Claims, including, without limitation, Sections 1.1(138) and Exhibit 4 (Trust Distribution Procedures). | Richard Finke |

18

EXHIBIT

Hughes 12
6-11-09 bc

PENGAD 800-631-6989

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                                              )       Chapter 11
                                                    )
W. R. GRACE & CO., *et al.*[1]                     )       Case No. 01-01139 (JKF)
                                                    )       Jointly Administered
                         Debtors.                   )
                                                    )
                                                    )
                                                    )
                                                    )

## EXHIBIT 6 TO EXHIBIT BOOK
## ASBESTOS INSURANCE TRANSFER AGREEMENT

EXHIBIT 6

Attached.

---

[1]    The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.),
W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon,
Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc.,
Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC
(f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a
Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC
Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities
Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary
Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe,
Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc.
(f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace
Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W.
R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe
Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai
Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH,
Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings
Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA
Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental
Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin &
Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country
Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

REMAINDER OF EXHIBIT OMITTED
SEE EXHIBIT 6 TO EXHIBIT BOOK
(D.I. 20874)

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO.**, *et al.*[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |
| | ) | |
| | ) | |

### EXHIBIT 5 TO EXHIBIT BOOK
### SCHEDULE OF SETTLED ASBESTOS INSURERS
### ENTITLED TO 524 (g) PROTECTION

**EXHIBIT 5**

Attached.

---

[1]  The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc.,  CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.



REMAINDER OF EXHIBIT OMITTED
SEE EXHIBIT 5 TO EXHIBIT BOOK
(D.I. 20874)