# EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
-   -   -

In Re:                    : Chapter 11
                          :
                          : Case No.
W.R. GRACE & CO., et al,  : 01-01139 JKF
                          :
                          : (Jointly
          Debtors         : Administered)


-   -   -

Monday, May 4, 2009

-   -   -

Continuation of oral

deposition of PETER VAN N. LOCKWOOD,

ESQUIRE, taken pursuant to notice, was

held at the offices of CAPLIN & DRYSDALE,

One Thomas Circle N.W., Suite 1100,

Washington, DC  20005, commencing at

12:05 p.m., on the above date, before

Lori A. Zabielski, a Registered

Professional Reporter and Notary Public

in and for the Commonwealth of

Pennsylvania.

MAGNA LEGAL SERVICES
Seven Penn Center
1635 Market Street
8th Floor
Philadelphia, Pennsylvania 19103

369846cf-8848-4f90-bdd3-5892ddf78042

## Page 450

```
1   APPEARANCES:
2
3   DRINKER BIDDLE & REATH, LLP
    BY: MICHAEL F. BROWN, ESQUIRE.
4   One Logan Square
    18th & Cherry Streets
5   Philadelphia, Pennsylvania 19103-6996
    215.988.2988
6   (brownmf@dbr.com)
    (jeffrey.boerger@dbr.com)
7   Representing OneBeacon America Insurance
    Company, Seaton Insurance Company,
8   Government Employees Insurance Company,
    Columbia Insurance Company f/k/a Republic
9   Insurance Company
10
11  CAPLIN & DRYSDALE, CHARTERED
    BY: NATHAN D. FINCH, ESQUIRE
12      JEFFREY A. LIESEMER, ESQUIRE*
        (*VIA TELECONFERENCE)
13  One Thomas Circle N.W.
    Suite 1100
14  Washington, DC 20005
    202.862.7801
15  (ndf@capdale.com)
    (jal@capdale.com)
16  Representing Grace, Official Committee of
    Asbestos Personal Injury Claimants
17  ("ACC"), and Witness
18
    ANDERSON KILL & OLICK, P.C.
19  BY: ROBERT M. HORKOVICH, ESQUIRE
    1251 Avenue of the Americas
20  New York, New York 10020
    212.278.1322
21  (rhorkovitz@andersonkill.com)
    Representing the ACC
22
23
24
```

## Page 451

```
1   APPEARANCES (continued)
2
3   KIRKLAND & ELLIS, LLP
    BY: THEODORE L. FREEDMAN, ESQUIRE
4   655 Fifteenth Street, N.W.
    Washington, DC 20005-5793
5   202.879.5081
    (tfreedman@kirkland.com)
6   Representing the Debtors
7
8   THE LAW OFFICES OF JANET S. BAER, P.C.
    BY: JANET S. BAER, ESQUIRE
9   70 West Madison Street
    Suite 2100
10  Chicago, Illinois 606002
    312.641.2162
11  Representing the Debtors
12
13  SIMPSON THACHER & BARTLETT, LLP
    BY: SAMUEL J. RUBIN, ESQUIRE*
14      (*VIA TELECONFERENCE)
    425 Lexington Avenue
15  New York, New York 10017-3954
    212.455.3122
16  (srubin@stblaw.com)
    Representing Travelers Casualty and
17  Surety Company
18
19  VORYS, SATER, SEYMOUR AND PEASE, LLP
    BY: TIFFANY STRELOW COBB, ESQUIRE*
20      (*VIA TELECONFERENCE)
    52 East Gay Street
21  Columbus, Ohio 43215
    614.464.8322
22  (tscobb@vorys.com)
    Representing The Scotts Company, LLC
23
24
```

## Page 452

```
1   APPEARANCES (continued)
2
3   COHN WHITESELL & GOLDBERG, LLP
    BY: DANIEL C. COHN, ESQUIRE
4   101 Arch Street
    Boston, Massachusetts 02110
5   617.951.2505
    (cohn@cwg11.com)
6   Representing the Libby Claimants
7
8   SPEIGHTS & RUNYAN
    BY: DANIEL H. SPEIGHTS, ESQUIRE*
9       (*VIA TELECONFERENCE)
    200 Jackson Avenue East
10  P.O. Box 685
    Hampton, South Carolina 29924
11  803.943.4444
    (dspeights@speightsrunyan.com)
12  Representing Anderson Memorial Hospital
13
14  TUCKER ARENSBERG
    BY: MICHAEL A. SHINER, ESQUIRE*
15      (*VIA TELECONFERENCE)
    1500 One PPG Place
16  Pittsburgh, Pennsylvania 15222
    412.594.5586
17  (mshiner@tuckerlaw.com)
    Representing Certain London Market
18  Insurers and AXA Belgium
19
20  FORD MARRIN ESPOSITO & WITMEYER & GLESER
    BY: ELIZABETH M. DeCRISTOFARO, ESQUIRE
21  Wall Street Plaza
    New York, New York 10005-1875
22  212.269.4900
    Representing Continental Casualty Company
23  and Continental Insurance Company
24
```

## Page 453

```
1   APPEARANCES (continued)
2
3   BILZIN SUMBERG BAENA PRICE & AXELROD, LLP
    BY: MATTHEW I. KRAMER, ESQUIRE*
4       (*VIA TELECONFERENCE)
    200 South Biscayne Boulevard
5   Suite 2500
    Miami, Florida 33131-5340
6   305.450.7246
    (mkramer@bilzin.com)
7   Representing Property Damage Committee
8
9   STROOCK & STROOCK & LAVAN, LLP
    BY: ARLENE G. KRIEGER, ESQUIRE*
10      (*VIA TELECONFERENCE)
    180 Maiden Lane
11  New York, New York 10038-4982
    212.806.5400
12  (akrieger@stroock.com)
    Representing Official Committee of
13  Unsecured Creditors
14
15  CROWELL & MORING, LLP
    BY: MARK PLEVIN, ESQUIRE
16      NOAH S. BLOOMBERG, ESQUIRE
    1001 Pennsylvania Avenue NW
17  Washington, DC 20004-2595
    202.624.2913
18  (mplevin@crowell.com)
    (nbloomberg@crowell.com)
19  Representing Fireman's Fund Insurance
    (Surety Bond)
20
21
22
23
24
```

## Page 454

```
 1   APPEARANCES (continued)
 2
 3   STEVENS & LEE, P.C.
     BY: JOHN D. DEMMY, ESQUIRE*
 4      (* VIA TELECONFERENCE)
     1105 North Market Street, 7th Floor
 5   Wilmington, Delaware 19801
     302.654.5180
 6   (jdd@stevenslee.com)
     Representing Fireman's Fund Insurance
 7
 8
     ALAN B. RICH LAW OFFICES
 9   BY: ALAN B. RICH, ESQUIRE*
        (*VIA TELECONFERENCE)
10   Elm Place, Suite 4620
     1401 Elm Street
11   Dallas, Texas 75202
     214.744.5100
12   (arich@alanrichlaw.com)
     Representing Property Damage PCR
13
14
     CONNOLLY BOVE LODGE & HUTZ, LLP
15   BY: JEFFREY C. WISLER, ESQUIRE
     The Nemours Building
16   1007 North Orange Street
     P.O. Box 2207
17   Wilmington, Delaware 19899
     302.88.6528
18   (jwisler@cblh.com)
     Representing Maryland Casualty
19
20
     ECKERT SEAMANS CHERIN & MELLOTT, LLC
21   BY: EDWARD J. LONGOSZ, II, ESQUIRE
     1747 Pennsylvania Avenue, NW
22   12th Floor
     Washington, DC 20006
23   202.659.6619
     (elongosz@eckertseamans.com)
24   Representing Maryland Casualty and Zurich
```

## Page 455

```
 1   APPEARANCES (continued)
 2
 3   WILEY REIN, LLP
     BY: KARALEE C. MORELL, ESQUIRE
 4   1776 K Street NW
     Washington, DC 20006
 5   202.719.7520
     (kmorell@wileyrein.com)
 6   Representing Maryland Casualty and Zurich
 7
 8   COZEN O'CONNOR
     BY: ILAN ROSENBERG, ESQUIRE*
 9      (*VIA TELECONFERENCE)
     1900 Market Street
10   Philadelphia, Pennsylvania 19103-3508
     215.665.4621
11   (irosenberg@cozen.com)
     Representing Federal Insurance Company
12
13
     ORRICK HERRINGTON & SUTCLIFFE, LLP
14   BY: JONATHAN P. GUY, ESQUIRE
        JOSHUA M. CUTLER, ESQUIRE
15   Columbia Center
     1152 15th Street, N.W.
16   Washington, DC 20005-1706
     202.339.8516
17   (jguy@orrick.com)
     Representing Future Claimants
18   Representative
19
20   CUYLER BURK, P.C.
     BY: TANYA M. MASCARICH, ESQUIRE*
21      (*VIA TELECONFERENCE)
     4 Century Drive
22   Parsippany, New Jersey 07054
     973.734.3200
23   (tmascarich@cuyler.com)
     Representing Allstate Insurance Company
24
```

## Page 456

```
 1   APPEARANCES (continued)
 2
 3   WILSON ELSER MOSKOWITZ EDELMAN & DICKER,
     LLP
 4   BY: CARL PERNICONE, ESQUIRE
     150 East 42nd Street
 5   New York, New York 10017-5639
     212.915.5656
 6   (carl.pernicone@wilsonelser.com)
     Representing Arrowood Indemnity Company
 7
 8   O'MELVENY & MYERS, LLP
 9   BY: TANCRED SCHIAVONI, ESQUIRE*
        (*VIA TELECONFERENCE)
     Times Square Tower
10   7 Times Square
     New York, New York 10036
11   212.326.2267
     (tschiavoni@omm.com)
12   Representing Arrowood Indemnity Company
13
14   WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
15   BY: KEVIN J. MANGAN, ESQUIRE*
        (*VIA TELECONFERENCE)
     222 Delaware Avenue
16   Suite 1501
     Wilmington, Delaware 19801
17   302.252.4361
     (kmangan@wcsr.com)
18   Representing State of Montana
19
20   PEPPER HAMILTON, LLP
21   BY: LINDA J. CASEY, ESQUIRE*
        (*VIA TELECONFERENCE)
     3000 Two Logan Square
22   Philadelphia, Pennsylvania 19103
     215.981.4000
23   (caseyl@pepperlaw.com)
     Representing BNSF Railway Company
24
```

## Page 457

```
 1   APPEARANCES (continued)
 2
 3   GOODWIN PROCTER, LLP
     BY: DANIEL M. GLOSBAND, ESQUIRE*
 4      (*VIA TELECONFERENCE)
     Exchange Place
 5   53 State Street
 6   Boston, Massachusetts 02109
     617.570.1930
 7   (dglosband@goodwinprocter.com)
     Representing CNA Insurance
 8
 9   KRAMER LEVIN NAFTALIS & FRANKEL, LLP
10   BY: GREGORY A. HOROWITZ, ESQUIRE
     1177 Avenue of the Americas
11   New York, New York 10036
     212.715.9571
12   (ghorowitz@kramerlevin.com)
     Representing Official Committee of Equity
13   Holders
14
15
16
17
18
19
20
21
22
23
24
```

Page 606

1  provisions occur, but this is the one I
2  was thinking of.
3      MR. SPEIGHTS:  Thank you,
4  Mr. Lockwood.
5      That's all I have subject to
6  reserving my position, as others
7  have done, that Anderson should be
8  permitted to fully explore the
9  negotiations of the Plan of
10 Reorganization.  And I understand
11 from Friday's session, that
12 counsel will not permit
13 Mr. Lockwood to answer those
14 questions, and that will be a
15 continuing objection on our part.
16     MR. FINCH:  Thank you,
17 Mr. Speights.  I think Mr. Plevin
18 has requested that he go next.
19         - - -
20     EXAMINATION
21         - - -
22 BY MR. PLEVIN:
23     Q.   Good afternoon,
24 Mr. Lockwood.

Page 607

1      A.   Good afternoon.
2      Q.   As you know, I am
3  representing Fireman's Fund in this case
4  for the limited purpose of addressing
5  issues relating to the surety bond that
6  Fireman's Fund issued to Grace with
7  respect to the Edwards appeal in Texas.
8          Are you familiar generally
9  with the Edwards appeal in Texas?
10     A.   Generally, yes.
11     Q.   And you understand that
12 that's a case that in which the
13 plaintiffs obtained a judgment against
14 W.R. Grace at the trial court?
15     A.   Correct.
16     Q.   Grace then took an appeal,
17 correct?
18     A.   Correct.
19     Q.   The appeal -- withdrawn.
20         With respect to the appeal,
21 Fireman's Fund issued a supersedeas bond?
22     A.   That's my understanding.
23     Q.   And are you also familiar
24 with the fact that in connection with the

Page 608

1  issuance of the supersedeas bond, W.R.
2  Grace signed an indemnity agreement with
3  Fireman's Fund with respect to the bond?
4      A.   I am generally aware that
5  Grace has an indemnity on that bond,
6  that's correct.
7      Q.   Okay.  And are you aware
8  that Fireman's Fund has filed a proof of
9  claim on a contingent basis with respect
10 to any amounts it is required to pay with
11 respect to the supersedeas bond?
12     A.   Yes.
13     Q.   Does the Plan classify the
14 Fireman's Fund claim in any way?
15     A.   The answer is yes.  I am
16 hesitating only because I can't remember
17 whether the Plan actually singles the
18 Fireman's Fund out by name for
19 classification or whether it only
20 classifies it because of the way of the
21 definitions in the Plan work.  But one or
22 the other of those ways, the Plan
23 classifies Fireman's Fund surety bond
24 claim.

Page 609

1      Q.   And what is your
2  understanding or recollection of the
3  classification of the Fireman's Fund
4  claim?
5      A.   That it is a Class 6 claim
6  that is channelled to the Trust.
7      Q.   And as a Class 6 claim, how
8  is the claim to be paid or treated?
9      A.   Well, after satisfying
10 itself that there is, in fact, a valid
11 Grace indemnity of the surety bond and
12 assuming, of course, hypothetically that
13 the surety bond has been drawn down on
14 because the plaintiffs prevailed on an
15 appeal, the trustees would treat it, I
16 believe, as a pre-petition liquidated
17 claim with respect to its value and would
18 pay the applicable payment percentage on
19 it.
20     Q.   Okay.  And if the Edwards
21 plaintiffs were to prevail on their
22 appeal, what kind of claim would they
23 have against the estate, what class?
24     A.   If the Edwards claimants

Page 610

1  were to prevail on their claim?
2      Q.   Yes.
3      A.   Well, under the provisions
4  of the TDP, which require marshalling,
5  the Edwards claim, I believe, would have
6  to be pursued initially against the bond.
7  To the extent that it fully satisfied the
8  bond, they wouldn't have any claim
9  anymore.
10      Q.   If I could ask you to look
11  at Exhibit-11, ACC Exhibit-11, and the
12  TDPs.
13      A.   I have them.
14      Q.   Page 20 contains Section
15  5.2(b).  Do you see that?
16      A.   I do.
17      Q.   Is that the marshalling
18  provision you had in mind when you just
19  gave that previous answer?
20      A.   That is correct.
21      Q.   And that marshalling
22  provision applies to holders of
23  pre-petition liquidated claims that are
24  secured by letters of credit, appeal

Page 611

1  bonds, or other security, correct?
2      A.   Correct.
3      Q.   If I could ask you to turn
4  back two pages to page 18, do you see
5  that there is a definition in bold type
6  partway through the first paragraph of
7  Section 5.2(a) defining pre-petition
8  liquidating claims?
9      A.   I do.
10      Q.   I want to go through with
11  you the four subparts here and try to
12  figure out where the Edwards claim would
13  qualify as a pre-petition liquidated
14  claim.
15      A.   It wouldn't.
16      Q.   Okay.  So explain to me --
17      A.   In Romanette (ii), the
18  Edwards claim as opposed to Fireman's
19  Fund's claim is excluded because,
20  although it is a non-final judgment in
21  the tort system obtained prior to the
22  petition date, there is a supersedeas
23  bond associated with it, which means that
24  it is not within the definition of

Page 612

1  pre-petition liquidated claims for that
2  purpose.
3      So the Edwards claimants
4  have two choices, I suppose.  And maybe
5  my first answer was a little bit too
6  fast.  The Edwards claimants could either
7  finish their appeal, at which point they
8  would have a pre-petition liquidated
9  claim, that would be a final judgment.
10  Romanette (ii) only excludes non-final
11  judgments.  So they couldn't avoid the
12  appeal by saying to the Trust and
13  Fireman's Fund, oh, we have a
14  pre-petition liquidated claim, you have
15  got to pay it.
16      So they have got a choice.
17  They have either got to pursue -- let me
18  rephrase this.
19      Q.   They have got to defend the
20  appeal.
21      A.   Let me phrase.  They either
22  got to defend the appeal, or they would
23  have to somehow or another withdraw it,
24  dismiss it, whatever, and then seek to

Page 613

1  pursue what would then be an unliquidated
2  claim, I guess, against the Trust.
3      But at that point, Fireman's
4  Fund would, as I understand it, no longer
5  have any liability on the surety bond
6  because Fireman's Fund liability is
7  dependent on the entry of a final
8  judgment on the matter that was bonded
9  which was the specific appeal, not some
10  generic bonding of the claim as a whole.
11      That's my understanding.  I
12  don't profess to be an expert on this.
13  But that's my understanding of it.
14      Q.   And your understanding is
15  that if Grace prevailed on the appeal and
16  that ruling became final, either because
17  it was affirmed by the Texas Supreme
18  Court or was not further appealed, that
19  the Edwards claimants would have a claim
20  against the Trust pursuant to the TDPs,
21  just like every other claimant who did
22  not have a pre-petition liquidated claim?
23      MR. GUY:  Objection,
24  compound.

369846cf-8848-4f90-bdd3-5892ddf78042

Page 614

1   THE WITNESS: Actually, the
2   answer to that depends on
3   precisely what the Texas appeal at
4   courts decided. If they decided
5   that they were going to remand for
6   a new trial, then your question is
7   correct, they would have an
8   unliquidated claim.
9        If somehow or another -- I
10  don't think this is possible based
11  on the nature of the appeal, but
12  if, for some reason or another,
13  they would decide that the claim
14  was invalid, then I don't think
15  the Edwards claimants would have a
16  claim against the Trust, either,
17  because I think res adjudicata
18  would apply to the Trust as much
19  as it would apply to Grace or
20  Fireman's Fund, for that matter.
21  BY MR. PLEVIN:
22       Q.  Okay. If you could look at
23  Section 5.6 on page 35.
24       Does this section have any

Page 615

1   impact on the classification of the
2   Fireman's Fund claim or the treatment of
3   the Fireman's Fund claim?
4        MR. FINCH: Objection,
5   compound.
6        THE WITNESS: Well, I don't
7   think it has any impact on the
8   classification of the claim,
9   because, as footnote 8 points out,
10  the classification occurs in the
11  Plan, and this simply incorporates
12  the Plan definition.
13       On the treatment, this, in
14  effect, is what the Plan provides
15  for the treatment of claims
16  falling within this definition.
17  So assuming that Fireman's Fund's
18  surety bond claim is an indirect
19  PI Trust claim, this would be the
20  section that would provide for its
21  treatment.
22       Although, I want to make
23  clear, treatment is a technical
24  term in the bankruptcy law. And I

Page 616

1   am using treatment in a more
2   generic sense because the Plan
3   provides for the treatment, which
4   is to channel it to the Trust, and
5   this is the detail of how the
6   Trust is going to deal with it
7   once it gets there.
8   BY MR. PLEVIN:
9        Q.  If you look at the footnote
10  8 that you referenced on page 35, an
11  allowed claim by Fireman's Fund would be
12  classified as an indirect PI Trust claim
13  pursuant to subclause (y); is that your
14  understanding?
15       A.  Well, actually, you got to
16  strike the word "allow" because there
17  won't be any allowance.
18       Q.  I understand. You have
19  explained that before.
20       A.  A quick look at this
21  suggests to me that (y) is the correct
22  place for it.
23       Q.  Can you think of any other
24  TDPs or plans in asbestos bankruptcies

Page 617

1   that provided that claims by entities
2   that had issued supersedeas bonds or
3   letters of credit would be treated as
4   indirect asbestos claims subject to the
5   payment percentage?
6        A.  Not off the top of my head.
7   I could go back and look at a bunch of
8   TDPs to see whether there are any such,
9   but I don't remember off the top -- I
10  have to say, my recollection is that the
11  Edwards claim is somewhat unique in my
12  experience in terms of its size and
13  components and status in the bankruptcy
14  case.
15       So it wouldn't necessarily
16  surprise me if the magnitude of that
17  claim was such that it caused us to focus
18  on this question for the first time
19  explicitly in this Plan. But, again, I
20  would really have to go back and look at
21  the TDPs to testify confidently about
22  that.
23       Q.  Do you recall that subclause
24  (y), as shown on footnote 8, was inserted

**Page 618**

1    into the Plan specifically for the
2    purpose of addressing a contingent claim
3    by Fireman's Fund under the indemnity
4    agreement?
5        A.   I can't say that that was
6    the sole reason that it was put in there,
7    but I can't say that it wasn't.  I really
8    don't remember at this point the drafting
9    history of the TDP sufficiently to be
10   able to say yeah or nay on that.
11       Fireman's Fund was certainly
12   contemplated -- I mean, the
13   Edwards/Fireman's Fund situation was
14   certainly contemplated as being within
15   that provision.  But whether it was the
16   only thing or whether we said to
17   ourselves, gee, there might be other
18   things or this is the way we need to
19   spell this out, I just don't remember at
20   this point in time.
21       Q.   Can you recall any of the
22   back and forth between your committee and
23   anybody that your committee negotiated
24   with about --

**Page 619**

1       MS. BAIER:  Objection.  I
2    will stop you right there because
3    now you are getting into the
4    territory of the negotiations
5    among the co-proponents of the
6    Plan or negotiations that are work
7    product and privileged and the
8    like.  And we have made it very
9    clear in this deposition that
10   those are not going to be
11   responded to.
12       MR. PLEVIN:  Just so I
13   understand, because I wasn't here
14   for the deposition on Friday,
15   that's a position in an objection
16   you are asserting as opposed to
17   something that's already been
18   ruled on?
19       MR. FINCH:  Yes.
20       MS. BAIER:  Yes.
21       THE WITNESS:  But unlike
22   many of the other objections, it's
23   one that I am being instructed not
24   to answer the question subject to

**Page 620**

1    the objection.
2       MR. PLEVIN:  Okay.
3       THE WITNESS:  A lot of other
4    things, as Mr. Schiavoni is fond
5    of pointing out, I have answered
6    notwithstanding the interposition
7    of an objection.
8       MR. PLEVIN:  Just so I am
9    clear, is the witness being
10   instructed not to answer?
11       MR. FINCH:  Yes, the witness
12   is being instructed not to answer
13   questions that get into the
14   details of Plan negotiations of a
15   particular Plan provisions, which
16   is a position we took in our
17   objections to 30(b)(6) notice
18   generally, and that objection will
19   stand.  I will instruct him not to
20   answer on, on reliance on prior
21   orders of Judge Fitzgerald in
22   other cases where exactly that
23   topic was presented.
24       MR. PLEVIN:  Just so I am

**Page 621**

1    clear, the question I just asked --
2    or, I would say, mostly asked --
3       MR. FINCH:  The question you
4    asked --
5       THE WITNESS:  You tried to
6    ask.
7       MR. FINCH:  -- went far
8    enough down the line that it had
9    the objection.
10      MR. PLEVIN:  And you are
11   instructing him on that question?
12      MR. FINCH:  Yes.
13   BY MR. PLEVIN:
14      Q.   Mr. Lockwood, has the
15   committee taken the position with respect
16   to the question of whether in the event
17   that -- let me back up a minute and ask a
18   foundational question.
19      Are you aware that Fireman's
20   Fund issued insurance liability coverage
21   to W.R. Grace?
22      A.   Yes.
23      Q.   And are you aware of the
24   fact that W.R. Grace and/or other

369846cf-8848-4f90-bdd3-5892ddf78042

## Page 622

1  constituencies in the case are making a
2  claim on Fireman's Fund for payment
3  pursuant to those policies?
4      MR. FINCH: Object to form.
5      THE WITNESS: Well, my
6      awareness of that is that the
7      rights under those policies are
8      being assigned to the Trust under
9      the Plan. And my expectation is,
10     therefore, that any such demands
11     that you just described would be
12     made on behalf of the Trust, not
13     on behalf of Grace.
14         But subject to that caveat
15     or correction, if you will, I am
16     aware that there have been
17     discussions of a possible
18     resolution of that insurance.
19 BY MR. PLEVIN:
20     Q. Does the committee have a
21 position as to the right of Fireman's
22 Fund to set-off against any amounts it is
23 obligated to pay as coverage under the
24 policies for asbestos liabilities any

## Page 623

1  amounts owing from Grace to Fireman's
2  Fund under the indemnity agreement in the
3  event that Fireman's Fund pays under the
4  bond for the Edwards claim?
5      MS. BAIER: Objection to the
6      extent you are asking for a legal
7      opinion or conclusion from a fact
8      witness.
9      MR. FINCH: I join in that.
10     THE WITNESS: As of now, the
11     answer to that question is not
12     yet.
13 BY MR. PLEVIN:
14     Q. Okay. Do you know when --
15 do you have an expectation, rather, as to
16 when the committee will have a position
17 on that?
18     A. Well, all I can say is that
19 that question is being analyzed, to my
20 understanding, in connection with
21 discussions that insurance counsel for
22 the committee and others are having with
23 representatives of Fireman's Fund.
24     MR. PLEVIN: All right. I

## Page 624

1  have no further questions. Thank
2  you.
3         - - -
4      EXAMINATION
5         - - -
6  BY MR. SCHIAVONI:
7      Q. Mr. Lockwood, I have a
8  couple of softballs for you.
9         Did you review the
10 description of the status of the coverage
11 that Grace claims that Royal issued to
12 Zonolite in the Disclosure Statement?
13     A. Do you mean did I review the
14 portions of the Disclosure Statement
15 purporting to describe that?
16     Q. Yes.
17     A. I think I did, yes.
18     Q. Okay. Did you review the
19 description of the January 5, 1995
20 settlement agreement between Grace and
21 Royal in the Disclosure Statement?
22     A. If you could refer me to the
23 particular provision in the Disclosure
24 Statement to which you are referring, it

## Page 625

1  would probably expedite this.
2         I think I probably did, if
3  it's in the Disclosure Statement, but it
4  would be easier to answer the question
5  definitively if I could look at the
6  Disclosure Statement, which I have
7  available.
8      MR. SCHIAVONI: Carl, if you
9      could hand a copy of the
10     Disclosure Statement to
11     Mr. Lockwood.
12     MR. PERNICONE: I just did.
13     THE WITNESS: Could you give
14     the page or section number?
15 BY MR. SCHIAVONI:
16     Q. The provision I have on mine
17 is on page 41. I believe it's 2.10.2.2.
18     A. I see that provision.
19     Q. All right. Let me just ask
20 you the question clean again that I just
21 asked you.
22     A. Okay.
23     Q. Did you review the
24 description of the January 5, 1995

369846cf8848-4f90-bdd3-5892ddf78042



# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                                    )        Chapter 11
                                          )
W. R. GRACE & CO., *et al.*[1]            )        Case No. 01-01139 (JKF)
                                          )        Jointly Administered
Debtors.                                  )
                                          )
                                          )
                                          )
                                          )

## EXHIBIT 4 TO EXHIBIT BOOK
## TRUST DISTRIBUTION PROCEDURES

**EXHIBIT 4**

Attached.

---

[1]   The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.),
W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon,
Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc.,
Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC
(f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a
Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC
Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities
Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary
Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe,
Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc.
(f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace
Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W.
R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe
Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai
Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH,
Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings
Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA
Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental
Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin &
Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country
Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

**DRAFT: 2/27/09**

# WRG ASBESTOS PI TRUST
# DISTRIBUTION PROCEDURES

DOC# 288785 v20 - 02/27/2009

# WRG ASBESTOS PI TRUST DISTRIBUTION PROCEDURES

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| SECTION I — Introduction | | 1 |
| 1.1 | Purpose | 1 |
| 1.2 | Interpretation | 2 |
| SECTION II — Overview | | 2 |
| 2.1 | PI Trust Goals | 2 |
| 2.2 | Claims Liquidation Procedures | 3 |
| 2.3 | Application of the Payment Percentage | 4 |
| 2.4 | PI Trust's Determination of the Maximum Annual Payment and Maximum Available Payment | 6 |
| 2.5 | Claims Payment Ratio | 7 |
| 2.6 | Indirect PI Trust Claims | 10 |
| SECTION III — TDP Administration | | 10 |
| 3.1 | Trust Advisory Committee and Futures Representative | 10 |
| 3.2 | Consent and Consultation Procedures | 10 |
| SECTION IV — Payment Percentage; Periodic Estimates | | 11 |
| 4.1 | Uncertainty of Grace's Personal Injury Asbestos Liabilities | 11 |
| 4.2 | Computation of Payment Percentage | 11 |
| 4.3 | Applicability of the Payment Percentage | 13 |

DOC# 288785 v20 - 02/27/2009

SECTION V — Resolution of PI Trust Claims ........................................ 15

5.1    Ordering, Processing and Payment of Claims ............................ 15
       (a)    Ordering of Claims ........................................ 15
              (1)    Establishment of the FIFO Processing Queue .............. 15
              (2)    Effect of Statutes of Limitations and Repose ............ 16
       (b)    Processing of Claims.......................................... 17
       (c)    Payment of Claims............................................ 17
5.2    Resolution of Pre-Petition Liquidated PI Trust Claims .............. 18
       (a)    Processing and Payment ...................................... 18
       (b)    Marshalling of Security...................................... 20
5.3    Resolution of Unliquidated PI Trust Claims ........................ 20
       (a)    Expedited Review Process .................................... 21
              (1)    In General .............................................. 21
              (2)    Claims Processing Under Expedited Review ............... 22
              (3)    Disease Levels, Scheduled Values
                     and Medical/Exposure Criteria ......................... 23
       (b)    Individual Review Process ................................... 27
              (1)    In General .............................................. 27
                     (A)    Review of Medical/Exposure Criteria ............ 29
                     (B)    Review of Liquidated Value ..................... 29
              (2)    Valuation Factors to Be Considered in
                     Individual Review ..................................... 30
              (3)    Scheduled, Average and Maximum Values ................. 31
5.4    Categorizing Claims as Extraordinary and/or Exigent Hardship....... 32
       (a)    Extraordinary Claims ........................................ 32
       (b)    Exigent Hardship Claims ..................................... 33
5.5    Secondary Exposure Claims ......................................... 34
5.6    Indirect PI Trust Claims .......................................... 35
5.7    Evidentiary Requirements .......................................... 37
       (a)    Medical Evidence ............................................ 37
              (1)    In General .............................................. 37
                     (A)    Disease Levels I–IV ............................ 38
                     (B)    Disease Levels V–VIII .......................... 39
                     (C)    Exception to the Exception for Certain
                            Pre-Petition Claims............................. 39
              (2)    Credibility of Medical Evidence ....................... 40
       (b)    Exposure Evidence............................................ 41
              (1)    In General .............................................. 41
              (2)    Significant Occupational Exposure...................... 42
              (3)    Grace Exposure......................................... 42
5.8    Claims Audit Program............................................... 43
5.9    Second Disease Claims ............................................. 44

5.10    Arbitration.................................................................. 45
    (a)    Establishment of ADR Procedures ........................ 45
    (b)    Claims Eligible for Arbitration ............................ 46
    (c)    Limitations on and Payment of Arbitration Awards........ 46
5.11    Litigation ............................................................ 47
5.12    Insurance – Related TDP Claims ................................... 47
5.13    Indemnified Insurer TDP Claims.................................... 49

SECTION VI — Claims Materials ........................................... 51

6.1    Claims Materials ..................................................... 51
6.2    Content of Claims Materials ........................................ 52
6.3    Withdrawal or Deferral of Claims ................................... 52
6.4    Filing Requirements and Fees ....................................... 53
6.5    Confidentiality of Claimants' Submissions ......................... 53

SECTION VII — General Guidelines for Liquidating and Paying Claims .......... 54

7.1    Showing Required ................................................... 54
7.2    Costs Considered .................................................. 55
7.3    Discretion to Vary the Order and Amounts of Payments in
    Event of Limited Liquidity ....................................... 55
7.4    Punitive Damages .................................................. 56
7.5    Sequencing Adjustment ............................................. 57
    (a)    In General......................................... 57
    (b)    Unliquidated PI Trust Claims ..................... 57
    (c)    Liquidated Pre-Petition Claims .................... 58
7.6    Suits in the Tort System........................................... 58
7.7    Payment of Judgments for Money Damages ............................ 59
7.8    Releases .......................................................... 60
7.9    Third-Party Services .............................................. 60
7.10    PI Trust Disclosure of Information................................ 61

SECTION VIII — Miscellaneous ............................................. 61

8.1    Amendments ........................................................ 61
8.2    Severability ...................................................... 61
8.3    Governing Law ..................................................... 62

## WRG ASBESTOS PI TRUST DISTRIBUTION PROCEDURES

The WRG Asbestos PI Trust Distribution Procedures (the "**TDP**") contained herein provide for resolving all "Asbestos PI Claims" as defined in the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W.R. Grace & Co., *et al.*, the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders, dated as of February 27, 2009 (as it may be amended or modified, the "**Plan**"),[1] including, without limitation, all asbestos-related personal injury and death claims caused by conduct of, and/or exposure to products for which, W.R. Grace & Co. and/or the other Debtors (collectively referred to as "**Grace**"), and their predecessors, successors, and assigns, have legal responsibility as provided in and required by the Plan and the WRG Asbestos PI Trust Agreement (the "**PI Trust Agreement**"). The Plan and PI Trust Agreement establish the WRG Asbestos PI Trust (the "**PI Trust**"). The Trustees of the PI Trust (the "**Trustees**") shall implement and administer this TDP in accordance with the PI Trust Agreement.

### SECTION I

### Introduction

    **1.1**    **Purpose.** This TDP has been adopted pursuant to the PI Trust Agreement. It is designed to provide fair, equitable and substantially similar treatment for all PI Trust Claims that may presently exist or may arise in the future.

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Plan and the PI Trust Agreement; *provided, however,* that "Asbestos PI Claims" as defined in the Plan shall be referred to herein as "**PI Trust Claims.**"

**1.2    Interpretation.** Except as may otherwise be provided below, nothing in this TDP shall be deemed to create a substantive right for any claimant. The rights and benefits provided herein to holders of PI Trust Claims shall vest in such holders as of the Effective Date.

**SECTION II**

**Overview**

**2.1    PI Trust Goals.** The goal of the PI Trust is to treat all claimants equitably. This TDP furthers that goal by setting forth procedures for processing and paying Grace's several share of the unpaid portion of the value of asbestos personal injury claims generally on an impartial, first-in-first-out ("FIFO") basis, with the intention of paying all claimants over time as equivalent a share as possible of the value of their claims based on historical values for substantially similar claims in the tort system.[2] To this end, the TDP establishes a schedule of eight asbestos-related diseases ("Disease Levels"), seven of which have presumptive medical and exposure requirements ("Medical/Exposure Criteria") and specific liquidated values ("Scheduled Values"), and seven of which have anticipated average values ("Average Values") and caps on their liquidated values ("Maximum Values"). The Disease Levels, Medical/Exposure Criteria, Scheduled Values, Average Values and Maximum Values, which are set forth in Sections 5.3 and 5.4 below, have all been selected and derived with the intention of achieving a fair allocation of the PI Trust funds as among claimants suffering from different disease processes in light of the best available information considering the settlement histories of Grace and the rights claimants would have in the tort system absent the bankruptcy.

---

[2]    As used in this TDP, the phrase "in the tort system" shall not include claims asserted against a trust established for the benefit of asbestos personal injury claimants pursuant to section 524(g) and/or section 105 of the Bankruptcy Code or any other applicable law.

- 2 -

**2.2    Claims Liquidation Procedures.**  PI Trust Claims shall be processed based on their place in the FIFO Processing Queue to be established pursuant to Section 5.1(a) below. The PI Trust shall take all reasonable steps to resolve PI Trust Claims as efficiently and expeditiously as possible at each stage of claims processing and arbitration, which steps may include, in the PI Trust's sole discretion, conducting settlement discussions with claimants' representatives with respect to more than one claim at a time, provided that the claimants' respective positions in the FIFO Processing Queue are maintained and each claim is individually evaluated pursuant to the valuation factors set forth in Section 5.3(b)(2) below.  The PI Trust shall also make every effort to resolve each year at least that number of PI Trust Claims required to exhaust the Maximum Annual Payment and the Maximum Available Payment for Category A and Category B claims, as those terms are defined below.

The PI Trust shall liquidate all PI Trust Claims except Foreign Claims (as defined below) that meet the presumptive Medical/Exposure Criteria of Disease Levels I–V, VII and VIII under the Expedited Review Process described in Section 5.3(a) below.  Claims involving Disease Levels I–V, VII and VIII that do not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level may undergo the PI Trust's Individual Review Process described in Section 5.3(b) below.  In such a case, notwithstanding that the claim does not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level, the PI Trust can offer the claimant an amount up to the Scheduled Value of that Disease Level if the PI Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the tort system.

Claimants holding claims involving Disease Levels II-VIII may alternatively seek to establish a liquidated value for the claim that is greater than its Scheduled Value by electing the PI Trust's Individual Review Process.  However, the liquidated value of a claim that undergoes

the Individual Review Process for valuation purposes may be determined to be less than the Scheduled Value for the applicable Disease Level, and in any event shall not exceed the Maximum Value for the relevant Disease Level set forth in Section 5.3(b)(3) below, unless the claim qualifies as an Extraordinary Claim as defined in Section 5.4(a) below, in which case its liquidated value cannot exceed the maximum extraordinary value specified in Section 5.4(a) for such claims. Level VI (Lung Cancer 2) claims and all Foreign Claims may be liquidated only pursuant to the PI Trust's Individual Review Process.

Based upon Grace's claims settlement histories in light of applicable tort law, and current projections of present and future unliquidated claims, the Scheduled Values and Maximum Values set forth in Section 5.3(b)(3) have been established for each of the Disease Levels that are eligible for Individual Review of their liquidated values, with the expectation that the combination of settlements at the Scheduled Values and those resulting from the Individual Review Process should result in the Average Values also set forth in that provision.

All unresolved disputes over a claimant's medical condition, exposure history and/or the liquidated value of the claim shall be subject to binding or non-binding arbitration as set forth in Section 5.10 below, at the election of the claimant, under the ADR Procedures that are provided in Attachment A hereto. PI Trust Claims that are the subject of a dispute with the PI Trust that cannot be resolved by non-binding arbitration may enter the tort system as provided in Sections 5.11 and 7.6 below. However, if and when a claimant obtains a judgment in the tort system, the judgment shall be payable (subject to the Payment Percentage, Maximum Available Payment, and Claims Payment Ratio provisions set forth below) as provided in Section 7.7 below.

2.3    **Application of the Payment Percentage.** After the liquidated value of a PI Trust Claim other than a claim involving Other Asbestos Disease (Disease Level I – Cash Discount

Payment), as defined in Section 5.3(a)(3) below, is determined pursuant to the procedures set forth herein for Expedited Review, Individual Review, arbitration, or litigation in the tort system, the claimant shall ultimately receive a pro-rata share of that value based on a Payment Percentage described in Section 4.2 below. The Payment Percentage shall also apply to all Pre-Petition Liquidated Claims as provided in Section 5.2 below and to all sequencing adjustments paid pursuant to Section 7.5 below.

An Initial Payment Percentage shall be set pursuant to Section 4.2 below promptly after the PI Trust is established by the Trustees after consultation with the PI Trust Advisory Committee (the "**TAC**") and the Legal Representative for Future Claimants (the "**Futures Representative**") (who are described in Section 3.1 below). The Initial Payment Percentage shall apply to all PI Trust Voting Claims accepted as valid by the PI Trust, unless adjusted by the PI Trust with the consent of the TAC and the Futures Representative pursuant to Section 4.2 below, and except as provided in Section 4.3 below with respect to supplemental payments in the event the Initial Payment Percentage is changed. The term "**PI Trust Voting Claims**" includes (i) Pre-Petition Liquidated Claims as defined in Section 5.2(a) below; (ii) claims filed against Grace in the tort system or actually submitted to Grace pursuant to an administrative settlement agreement prior to the Petition Date of April 2, 2001; and (iii) all asbestos claims filed against another defendant in the tort system prior to February 27, 2009, the date the Plan was filed with the Bankruptcy Court (the "**Plan Filing Date**"); provided, however, that (1) the holder of a claim described in subsection (i), (ii) or (iii) above, or his or her authorized agent, actually voted to accept or reject the Plan pursuant to the voting procedures established by the Bankruptcy Court, unless such holder certifies to the satisfaction of the Trustees that he or she was prevented from voting in this proceeding as a result of circumstances resulting in a state of emergency affecting,

as the case may be, the holder's residence, principal place of business or legal representative's place of business at which the holder or his or her legal representative receives notice and/or maintains material records relating to his or her PI Trust Voting Claim; and provided further that (2) the claim was subsequently filed with the PI Trust pursuant to Section 6.1 below by the Initial Claims Filing Date defined in Section 5.1(a) below. The Initial Payment Percentage shall be calculated on the assumption that the Average Values set forth in Section 5.3(b)(3) below shall be achieved with respect to existing present claims and projected future claims involving Disease Levels II–VIII.

The Payment Percentage may thereafter be adjusted upwards or downwards from time to time by the PI Trust with the consent of the TAC and the Futures Representative to reflect then-current estimates of the PI Trust's assets and its liabilities, as well as then-estimated value of then-pending and future claims. Any adjustment to the Initial Payment Percentage shall be made only pursuant to Section 4.2 below. If the Payment Percentage is increased over time, claimants whose claims were liquidated and paid in prior periods under the TDP shall receive additional payments only as provided in Section 4.2 below. Because there is uncertainty in the prediction of both the number and severity of future PI Trust Claims, and the amount of the PI Trust's assets, no guarantee can be made of any Payment Percentage of a PI Trust Claim's liquidated value.

**2.4    PI Trust's Determination of the Maximum Annual Payment and Maximum Available Payment.** The PI Trust shall estimate or model the amount of cash flow anticipated to be necessary over its entire life to ensure that funds shall be available to treat all present and future holders of PI Trust Claims as similarly as possible. In each year, the PI Trust shall be empowered to pay out all of the income earned during the year (net of taxes payable with respect

thereto), together with a portion of its principal, calculated so that the application of PI Trust funds over its life shall correspond with the needs created by the estimated initial backlog of claims and the estimated anticipated future flow of claims (the "**Maximum Annual Payment**"), taking into account the Payment Percentage provisions set forth in Section 2.3 above and Sections 4.2 and 4.3 below. The PI Trust's distributions to all claimants for that year shall not exceed the Maximum Annual Payment determined for that year.

In distributing the Maximum Annual Payment, the PI Trust shall first allocate the amount in question to (a) outstanding Pre-Petition Liquidated Claims; (b) PI Trust Claims involving Disease Level I (Cash Discount Payment) which have been liquidated by the PI Trust; (c) any PI Trust Claims based on a diagnosis dated prior to the Effective Date ("Existing Claims"); and (d) Exigent Hardship Claims (as defined in Section 5.4(b) below). Should the Maximum Annual Payment be insufficient to pay all such claims in full, they shall be paid in proportion to the aggregate value of each group of claims and the available funds allocated to each group of claims shall be paid to the maximum extent to claimants in the particular group based on their place in their respective FIFO Payment Queue. Claims in any group for which there are insufficient funds shall be carried over to the next year, and placed at the head of their FIFO Payment Queue. The remaining portion of the Maximum Annual Payment (the "**Maximum Available Payment**"), if any, shall then be allocated and used to satisfy all other liquidated PI Trust Claims, subject to the Claims Payment Ratio set forth in Section 2.5 below. Claims in the groups described in (a), (b), (c) and (d) above shall not be subject to the Claims Payment Ratio.

2.5    **Claims Payment Ratio.** Based upon Grace's claims settlement histories and analysis of present and future claims, a Claims Payment Ratio has been determined which, as of the Effective Date, has been set at 88% for Category A claims, which consist of PI Trust Claims

involving severe asbestosis, severe disabling pleural disease and malignancies (Disease Levels IV–VIII) and at 12% for Category B claims, which are PI Trust Claims involving non-malignant Asbestosis or Pleural Disease (Disease Levels II and III).

In each year, after the determination of the Maximum Available Payment described in Section 2.4 above, 88% of that amount shall be available to pay Category A claims and 12% shall be available to pay Category B claims that have been liquidated since the Petition Date, except for claims which, pursuant to Section 2.4 above, are not subject to the Claims Payment Ratio; provided, however, that the amount available to pay each Category of claims in each year shall be proportionately reduced by the amounts required to pay any Insurance-Related TDP Claims (as defined in Section 5.12 below) and any Indemnified Insurer TDP Claims (as defined in Section 5.13 below). In the event there are insufficient funds in any year to pay the liquidated claims within either or both of the Categories, the available funds allocated to the particular Category shall be paid to the maximum extent to claimants in that Category based on their place in the FIFO Payment Queue described in Section 5.1(c) below, which shall be based upon the date of claim liquidation. Claims for which there are insufficient funds allocated to the relevant Category shall be carried over to the next year where they shall be placed at the head of the FIFO Payment Queue. If there are excess funds in either or both Categories, because there is an insufficient amount of liquidated claims to exhaust the respective Maximum Available Payment amount for that Category, then the excess funds for either or both Categories shall be rolled over and remain dedicated to the respective Category to which they were originally allocated.

The 88%/12% Claims Payment Ratio and its rollover provision shall apply to all PI Trust Voting Claims as defined in Section 2.3 above (except Pre-Petition Liquidated Claims, Other Asbestos Disease claims (Disease Level I – Cash Discount Payment), Existing Claims and

Exigent Hardship Claims), and shall not be amended until the third anniversary of the date the PI Trust first accepts for processing proof of claim forms and other materials required to file a claim with the PI Trust. Thereafter, both the Claims Payment Ratio and its rollover provision shall be continued absent circumstances, such as a significant change in law or medicine, necessitating amendment to avoid a manifest injustice. However, the accumulation, rollover and subsequent delay of claims resulting from the application of the Claims Payment Ratio shall not, in and of itself, constitute such circumstances. In addition, an increase in the numbers of Category B claims beyond those predicted or expected shall not be considered as a factor in deciding whether to reduce the percentage allocated to Category A claims.

In considering whether to make any amendments to the Claims Payment Ratio and/or its rollover provisions, the Trustees shall consider the reasons for which the Claims Payment Ratio and its rollover provisions were adopted, the settlement histories that gave rise to its calculation, and the foreseeability or lack of foreseeability of the reasons why there would be any need to make an amendment. In that regard, the Trustees should keep in mind the interplay between the Payment Percentage and the Claims Payment Ratio as it affects the net cash actually paid to claimants.

In any event, no amendment to the Claims Payment Ratio to reduce the percentage allocated to Category A claims may be made without the unanimous consent of the TAC members and the consent of the Futures Representative, and the percentage allocated to Category A claims may not be increased without the consent of the TAC and the Futures Representative. The consent process set forth in Sections 5.7(b) and 6.6(b) of the PI Trust Agreement shall apply in the event of any amendments to the Claims Payment Ratio. The Trustees, with the consent of the TAC and the Futures Representative, may offer the option of a reduced Payment Percentage

to holders of claims in either Category A or Category B in return for prompter payment (the "**Reduced Payment Option**").

2.6    **Indirect PI Trust Claims.**  As set forth in Section 5.6 below, Indirect PI Trust Claims, if any, shall be subject to the same categorization, evaluation, and payment provisions of this TDP as all other PI Trust Claims.

## SECTION III

## TDP Administration

3.1    **Trust Advisory Committee and Futures Representative.**  Pursuant to the Plan and the PI Trust Agreement, the PI Trust and this TDP shall be administered by the Trustees in consultation with the TAC, which represents the interests of holders of present PI Trust Claims, and the Futures Representative, who represents the interests of holders of PI Trust Claims that shall be asserted in the future.  The Trustees shall obtain the consent of the TAC and the Futures Representative on any amendments to this TDP pursuant to Section 8.1 below, and on such other matters as are otherwise required below and in Section 2.2(f) of the PI Trust Agreement.  The Trustees shall also consult with the TAC and the Futures Representative on such matters as are provided below and in Section 2.2(e) of the PI Trust Agreement.  The initial Trustees, the initial members of the TAC and the initial Futures Representative are identified in the PI Trust Agreement.

3.2    **Consent and Consultation Procedures.**  In those circumstances in which consultation or consent is required, the Trustees shall provide written notice to the TAC and the Futures Representative of the specific amendment or other action that is proposed.  The Trustees shall not implement such amendment nor take such action unless and until the parties have

- 10 -

engaged in the Consultation Process described in Sections 5.7(a) and 6.6(a), or the Consent

Process described in Sections 5.7(b) and 6.6(b), of the PI Trust Agreement, respectively.

## SECTION IV

### Payment Percentage; Periodic Estimates

**4.1    Uncertainty of Grace's Personal Injury Asbestos Liabilities.** As discussed

above, there is inherent uncertainty regarding Grace's total asbestos-related tort liabilities, as

well as the total value of the assets available to the PI Trust to pay PI Trust Claims.

Consequently, there is inherent uncertainty regarding the amounts that holders of PI Trust Claims

shall receive. To seek to ensure substantially equivalent treatment of all present and future PI

Trust Claims, the Trustees must determine from time to time the percentage of full liquidated

value that holders of present and future PI Trust Claims shall be likely to receive, *i.e.*, the

"Payment Percentage" described in Section 2.3 above and Section 4.2 below.

**4.2    Computation of Payment Percentage.** As provided in Section 2.3 above, the

Initial Payment Percentage shall be set by the Trustees after consultation with the TAC and the

Futures Representative promptly after the date the PI Trust is established. The Initial Payment

Percentage shall be between 25% and 35% and shall apply to all PI Trust Voting Claims as

defined in Section 2.3 above, unless the Trustees, with the consent of the TAC and the Futures

Representative, determine that the Initial Payment Percentage should be changed to assure that

the PI Trust shall be in a financial position to pay holders of unliquidated and/or unpaid PI Trust

Voting Claims and present and future PI Trust Claims in substantially the same manner.

In making any such adjustment, the Trustees, the TAC and the Futures Representative

shall take into account the fact that the holders of PI Trust Voting Claims voted on the Plan

relying on the findings of experts that the Initial Payment Percentage range represented a

reasonably reliable estimate of the PI Trust's total assets and liabilities over its life based on the best information available at the time, and shall thus give due consideration to the expectations of PI Trust Voting Claimants that the Initial Payment Percentage would be applied to their PI Trust Claims.

Except with respect to PI Trust Voting Claims to which the Initial Payment Percentage applies, the Payment Percentage shall be subject to change pursuant to the terms of this TDP and the PI Trust Agreement if the Trustees with the consent of the TAC and Futures Representative determine that an adjustment is required.  No less frequently than once every three (3) years, commencing with the first day of January occurring after the Effective Date, the Trustees shall reconsider the then applicable Payment Percentage to assure that it is based on accurate, current information and may, after such reconsideration, change the Payment Percentage if necessary with the consent of the TAC and the Futures Representative.  The Trustees shall also reconsider the then applicable Payment Percentage at shorter intervals if they deem such reconsideration to be appropriate or if requested to do so by the TAC or the Futures Representative.

The Trustees must base their determination of the Payment Percentage on current estimates of the number, types, and values of present and future PI Trust Claims, the value of the assets then available to the PI Trust for their payment, all anticipated administrative and legal expenses, and any other material matters that are reasonably likely to affect the sufficiency of funds to pay a comparable percentage of full value to all holders of PI Trust Claims.  When making these determinations, the Trustees shall exercise common sense and flexibly evaluate all relevant factors.  The Payment Percentage applicable to Category A or Category B claims may not be reduced to alleviate delays in payments of claims in the other Category; both Categories

of claims shall receive the same Payment Percentage, but the payment may be deferred as needed, and a Reduced Payment Option may be instituted as described in Section 2.5 above.

4.3    **Applicability of the Payment Percentage.** Except as set forth below in this Section 4.3 with respect to supplemental payments, no holder of a PI Trust Voting Claim, other than a PI Trust Voting Claim for Other Asbestos Disease (Disease Level I – Cash Discount Payment) as defined in Section 5.3(a)(3) below, shall receive a payment that exceeds the Initial Payment Percentage times the liquidated value of the claim. Except as otherwise provided in Section 5.1(c) below for PI Trust Claims involving deceased or incompetent claimants for which approval of the PI Trust's offer by a court or through a probate process is required, no holder of any other PI Trust Claim, other than a PI Trust Claim for Other Asbestos Disease (Disease Level I – Cash Discount Payment), shall receive a payment that exceeds the liquidated value of the claim times the Payment Percentage in effect at the time of payment. PI Trust Claims involving Other Asbestos Disease (Disease Level I – Cash Discount Payment) shall not be subject to the Payment Percentage, but shall instead be paid the full amount of their Scheduled Value as set forth in Section 5.3(a)(3) below.

If a redetermination of the Payment Percentage has been proposed in writing by the Trustees to the TAC and the Futures Representative but has not yet been adopted, the claimant shall receive the lower of the current Payment Percentage or the proposed Payment Percentage. However, if the proposed Payment Percentage was the lower amount but was not subsequently adopted, the claimant shall thereafter receive the difference between the lower proposed amount and the higher current amount. Conversely, if the proposed Payment Percentage was the higher amount and was subsequently adopted, the claimant shall thereafter receive the difference between the lower current amount and the higher adopted amount.

- 13 -

There is uncertainty surrounding the amount of the PI Trust's future assets. There is also uncertainty surrounding the totality of the PI Trust Claims to be paid over time, as well as the extent to which changes in existing federal and state law could affect the PI Trust's liabilities under this TDP. If the value of the PI Trust's future assets increases significantly and/or if the value or volume of PI Trust Claims actually filed with the PI Trust is significantly lower than originally estimated, the PI Trust shall use those proceeds and/or claims savings, as the case may be, first to maintain the Payment Percentage then in effect.

If the Trustees, with the consent of the TAC and the Futures Representative, make a determination to increase the Payment Percentage due to a material change in the estimates of the PI Trust's future assets and/or liabilities, the Trustees shall also make supplemental payments to all claimants who previously liquidated their claims against the PI Trust and received payments based on a lower Payment Percentage. The amount of any such supplemental payment shall be the liquidated value of the claim in question times the newly adjusted Payment Percentage, less all amounts previously paid to the claimant with respect to the claim (excluding the portion of such previously paid amounts that was attributable to any sequencing adjustment paid pursuant to Section 7.5 below).

The Trustees' obligation to make a supplemental payment to a claimant shall be suspended in the event the payment in question would be less than $100.00, and the amount of the suspended payment shall be added to the amount of any prior supplemental payment/payments that was/were also suspended because it/they would have been less than $100.00. However, the Trustees' obligation shall resume and the Trustees shall pay any such aggregate supplemental payments due the claimant at such time that the total exceeds $100.00.

- 14 -

## SECTION V

## Resolution of PI Trust Claims.

5.1    Ordering, Processing and Payment of Claims.

5.1(a)  Ordering of Claims.

5.1(a)(1)  Establishment of the FIFO Processing Queue.  The PI Trust shall order claims that are sufficiently complete to be reviewed for processing purposes on a FIFO basis except as otherwise provided herein (the "FIFO Processing Queue").  For all claims filed on or before the date six (6) months after the date that the PI Trust first makes available the proof of claim forms and other claims materials required to file a claim with the PI Trust (such six month anniversary being referred to herein as the "Initial Claims Filing Date"), a claimant's position in the FIFO Processing Queue shall be determined as of the earliest of (i) the date prior to April 2, 2001 (the "Petition Date") that the specific claim was either filed against Grace in the tort system or was actually submitted to Grace pursuant to an administrative settlement agreement; (ii) the date before the Petition Date that the asbestos claim was filed against another defendant in the tort system if at the time the claim was subject to a tolling agreement with Grace; provided, however, that if a claimant was barred from pursuing other defendants in the tort system by the terms of a preliminary injunction or other stay entered by the Court in the Grace bankruptcy proceedings and such claimant files an asbestos claim against another defendant in the tort system within one year after such preliminary injunction or other stay is lifted, the claimant shall be deemed to have filed the asbestos claim against the other defendant on the date the preliminary injunction or other stay was first entered; (iii) the date after the Petition Date but before the date that the PI Trust first makes available the proof of claim forms and other claims materials required to file a claim with the PI Trust that the asbestos claim was

- 15 -

filed against another defendant in the tort system; (iv) the date after the Petition Date but before the Effective Date that a proof of claim was filed by the claimant against Grace in the Chapter 11 Cases; or (v) the date a ballot was submitted on behalf of the claimant for purposes of voting to accept or reject the Plan pursuant to the voting procedures approved by the Bankruptcy Court.

Following the Initial Claims Filing Date, the claimant's position in the FIFO Processing Queue shall be determined by the date the claim is filed with the PI Trust. If any claims are filed on the same date, the claimant's position in the FIFO Processing Queue shall be determined by the date of the diagnosis of the asbestos-related disease. If any claims are filed and diagnosed on the same date, the claimant's position in the FIFO Processing Queue shall be determined by the claimant's date of birth, with older claimants given priority over younger claimants.

5.1(a)(2)  **Effect of Statutes of Limitation and Repose.**  All unliquidated PI Trust Claims must meet either (i) for claims first filed in the tort system against Grace prior to the Petition Date, the applicable federal, state and foreign statute of limitation and repose that was in effect at the time of the filing of the claim in the tort system, or (ii) for claims not filed against Grace in the tort system prior to the Petition Date, the applicable federal, state or foreign statute of limitation that was in effect at the time of the filing with the PI Trust. However, the running of the relevant statute of limitation shall be tolled as of the earliest of (A) the actual filing of the claim against Grace prior to the Petition Date, whether in the tort system or by submission of the claim to Grace pursuant to an administrative settlement agreement; (B) the tolling of the claim against Grace prior to the Petition Date by an agreement or otherwise, provided such tolling is still in effect on the Petition Date; or (C) the Petition Date.

If a PI Trust Claim meets any of the tolling provisions described in the preceding sentence and the claim was not barred by the applicable federal, state or foreign statute of

limitation at the time of the tolling event, it shall be treated as timely filed if it is actually filed with the PI Trust within three (3) years after the Initial Claims Filing Date. In addition, any claims that were first diagnosed after the Petition Date, irrespective of the application of any relevant federal, state or foreign statute of limitation or repose, may be filed with the PI Trust within three (3) years after the date of diagnosis or within three (3) years after the Initial Claims Filing Date, whichever occurs later. However, the processing of any PI Trust Claim by the PI Trust may be deferred at the election of the claimant pursuant to Section 6.3 below.

     **5.1(b)  Processing of Claims.**  As a general practice, the PI Trust shall review its claims files on a regular basis and notify all claimants whose claims are likely to come up in the FIFO Processing Queue in the near future.

     **5.1(c)  Payment of Claims.**  PI Trust Claims that have been liquidated by the Expedited Review Process as provided in Section 5.3(a) below, by the Individual Review Process as provided in Section 5.3(b) below, by arbitration as provided in Section 5.10 below, or by litigation in the tort system provided in Section 5.11 below, shall be paid in FIFO order based on the date their liquidation became final (the "**FIFO Payment Queue**"), all such payments being subject to the applicable Payment Percentage, the Maximum Available Payment, the Claims Payment Ratio, and the sequencing adjustment provided for in Section 7.5 below, except as otherwise provided herein. Pre-Petition Liquidated Claims, as defined in Section 5.2 below, shall be subject to the Maximum Annual Payment and Payment Percentage limitations, but not to the Maximum Available Payment and Claims Payment Ratio provisions set forth above.

     Where the claimant is deceased or incompetent, and the settlement and payment of his or her claim must be approved by a court of competent jurisdiction or through a probate process prior to acceptance of the claim by the claimant's representative, an offer made by the PI Trust

on the claim shall remain open so long as proceedings before that court or in that probate process remain pending, provided that the PI Trust has been furnished with evidence that the settlement offer has been submitted to such court or in the probate process for approval. If the offer is ultimately approved by the court or through the probate process and accepted by the claimant's representative, the PI Trust shall pay the claim in the amount so offered, multiplied by the Payment Percentage in effect at the time the offer was first made.

If any claims are liquidated on the same date, the claimant's position in the FIFO Payment Queue shall be determined by the date of the diagnosis of the claimant's asbestos-related disease. If any claims are liquidated on the same date and the respective holders' asbestos-related diseases were diagnosed on the same date, the position of those claims in the FIFO Payment Queue shall be determined by the PI Trust based on the dates of the claimants' birth, with older claimants given priority over younger claimants.

    **5.2**       **Resolution of Pre-Petition Liquidated PI Trust Claims.**

        **5.2(a)  Processing and Payment.**  As soon as practicable after the Effective Date, the PI Trust shall pay, upon submission by the claimant of the appropriate documentation, all PI Trust Claims that were liquidated (i) by a binding settlement agreement for the particular claim entered into prior to the Petition Date that is judicially enforceable by the claimant, (ii) by a jury verdict or non-final judgment in the tort system obtained prior to the Petition Date, provided there is no supersedeas bond associated with such verdict or judgment, (iii) by a judgment that became final and non-appealable prior to the Petition Date, or (iv) as a result of being allowed by the Bankruptcy Court (collectively **"Pre-Petition Liquidated Claims"**). In order to receive payment from the PI Trust, the holder of a Pre-Petition Liquidated Claim must submit all documentation necessary to demonstrate to the PI Trust that the claim was liquidated in the

manner described in the preceding sentence, which documentation shall include (A) a court authenticated copy of the jury verdict (if applicable), a non-final judgment (if applicable), a final judgment (if applicable), or the Bankruptcy Court's order allowing the claim (if applicable) and (B) except in the case of a Pre-Petition Liquidated Claim arising from the Bankruptcy Court's order allowing the claim, the name, social security number and date of birth of the claimant and the name and address of the claimant's lawyer.  Indirect PI Trust Claims that are Pre-Petition Liquidated Claims are not subject to the provisions of Section 5.6 of this TDP.

The liquidated value of a Pre-Petition Liquidated Claim shall be the unpaid portion of the amount agreed to in the binding settlement agreement, the unpaid portion of the amount awarded by the jury verdict or non-final judgment, the unpaid portion of the amount of the final judgment, or the unpaid portion of the amount allowed by the Bankruptcy Court, as the case may be, plus interest, if any, that has accrued on that amount in accordance with the terms of the agreement, if any, or under applicable state law for settlements or judgments as of the Petition Date; however, except as otherwise provided in Section 7.4 below, the liquidated value of a Pre-Petition Liquidated Claim shall not include any punitive or exemplary damages.  In addition, the amounts payable with respect to such claims shall not be subject to or taken into account in consideration of the Claims Payment Ratio and the Maximum Available Payment limitations, but shall be subject to the Maximum Annual Payment and Payment Percentage provisions.  In the absence of a Final Order of the Bankruptcy Court determining whether a settlement agreement is binding and judicially enforceable, a dispute between the claimant and the PI Trust over this issue shall be resolved pursuant to the same procedures in this TDP that are provided for resolving the validity and/or liquidated value of a PI Trust Claim (*i.e.*, arbitration and litigation in the tort system as set forth in Sections 5.10 and 5.11 below).

Pre-Petition Liquidated Claims shall be processed and paid in accordance with their order in a separate FIFO queue to be established by the PI Trust based on the date the PI Trust received all required documentation for the particular claim. If any Pre-Petition Liquidated Claims were filed on the same date, the claimants' position in the FIFO queue for such claims shall be determined by the date on which the claim was liquidated. If any Pre-Petition Liquidated Claims were both filed and liquidated on the same dates, the position of the claimants in the FIFO queue shall be determined by the dates of the claimants' birth, with older claimants given priority over younger claimants.

      **5.2(b)  Marshalling of Security.**  Holders of Pre-Petition Liquidated Claims that are secured by letters of credit, appeal bonds, or other security or sureties shall first exhaust their rights against any applicable security or surety before making a claim against the PI Trust. Only in the event that such security or surety is insufficient to pay the Pre-Petition Liquidated Claim in full shall the deficiency be processed and paid as a Pre-Petition Liquidated Claim.

      **5.3     Resolution of Unliquidated PI Trust Claims.**  Within six (6) months after the establishment of the PI Trust, the Trustees, with the consent of the TAC and the Futures Representative, shall adopt procedures for reviewing and liquidating all unliquidated PI Trust Claims, which shall include deadlines for processing such claims. Such procedures shall also require that claimants seeking resolution of unliquidated PI Trust Claims must first file a proof of claim form, together with the required supporting documentation, in accordance with the provisions of Sections 6.1 and 6.2 below. It is anticipated that the PI Trust shall provide an initial response to the claimant within six (6) months of receiving the proof of claim form.

      The proof of claim form shall require the claimant to assert his or her claim for the highest Disease Level for which the claim qualifies at the time of filing. Irrespective of the

Disease Level alleged on the proof of claim form, all claims shall be deemed to be a claim for the highest Disease Level for which the claim qualifies at the time of filing, and all lower Disease Levels for which the claim may also qualify at the time of filing or in the future shall be treated as subsumed into the higher Disease Level for both processing and payment purposes. A claimant who has received payment for a Disease Level IV-A claim or a Disease Level IV-B claim may not assert or receive payment for another Disease Level IV claim.

Upon filing of a valid proof of claim form with the required supporting documentation, the claimant shall be placed in the FIFO Processing Queue in accordance with the ordering criteria described in Section 5.1(a) above. The PI Trust shall provide the claimant with six (6) months notice of the date by which it expects to reach the claim in the FIFO Processing Queue, following which the claimant shall promptly (i) advise the PI Trust whether the claim should be liquidated under the PI Trust's Expedited Review Process described in Section 5.3(a) below or, in certain circumstances, under the PI Trust's Individual Review Process described in Section 5.3(b) below; (ii) provide the PI Trust with any additional medical and/or exposure evidence that was not provided with the original claim submission; and (iii) advise the PI Trust of any change in the claimant's Disease Level. If a claimant fails to respond to the PI Trust's notice prior to the reaching of the claim in the FIFO Processing Queue, the PI Trust shall process and liquidate the claim under the Expedited Review Process based upon the medical/exposure evidence previously submitted by the claimant, although the claimant shall retain the right to request Individual Review as described in Section 5.3(b) below.

5.3(a)  **Expedited Review Process.**

5.3(a)(1)  **In General.**  The PI Trust's Expedited Review Process is designed primarily to provide an expeditious, efficient and inexpensive method for liquidating all