# EXHIBIT A

```
 1      IN THE UNITED STATES BANKRUPTCY COURT
           FOR THE DISTRICT OF DELAWARE
 2                    - - -
 3
        In Re:                    : Chapter 11
 4                                :
                                  : Case No.
 5      W.R. GRACE & CO., et al,  : 01-01139 JKF
                                  :
 6                                : (Jointly
              Debtors             : Administered)
 7
 8                    - - -
 9            Friday, May 1, 2009
10                    - - -
11            Oral deposition of PETER VAN
12   N. LOCKWOOD, ESQUIRE, taken pursuant to
13   notice, was held at the offices of CAPLIN
14   & DRYSDALE, One Thomas Circle N.W., Suite
15   1100, Washington, DC  20005, commencing
16   at 9:43 a.m., on the above date, before
17   Lori A. Zabielski, a Registered
18   Professional Reporter and Notary Public
19   in and for the Commonwealth of
20   Pennsylvania.
21
                      - - -
22           MAGNA LEGAL SERVICES
                Seven Penn Center
23              1635 Market Street
                    8th Floor
24       Philadelphia, Pennsylvania 19103
```

```
                                                  Page 10
 1   EXHIBITS (continued)
 2
 3   NO.    DESCRIPTION                    PAGE
 4    6     Exhibit-19 to Exhibit Book       83
 5    7     Settlement Agreement
            * CONFIDENTIAL *                144
 6
      8     Complaint for Declaration of
 7          the Relief...                   175
 8    9     Diagram                         175
 9   10     Exhibit-2 to Exhibit Book       196
10   11     Exhibit-4 to Exhibit Book       224
11   12     Exhibit-10 to Exhibit Book      260
12   13     Travelers Casualty and Surety
            Company's Notice of Deposition
13          to the Official Committee of
            Asbestos Personal Injury
14          Claimants...                    267
15   14     Debtors' Disclosure...          280
16   15     Documents bearing Bates stamps
            TRAVAS0000019 through 141
17          * CONFIDENTIAL *                289
18   16     Notice of Service of Discovery 324
19
                   - - -
20
21
22
23
24
```

```
                                                  Page 11
 1                 - - -
 2          DEPOSITION SUPPORT INDEX
 3                 - - -
 4
 5   Direction to Witness Not to Answer:
 6   Page    Line        Page    Line
 7   NONE
 8
 9
10   Request for Production of Documents:
11   Page    Line        Page    Line
12   NONE
13
14
15   Stipulations:
16   Page    Line        Page    Line
17    12     02
18
19
20   Area(s) Marked Confidential:
21   Page    Line        Page    Line
22    152    01 through  168     03
      292    01 through  311     14
23
24
```

```
                                                  Page 12
 1                  - - -
 2          (It is hereby stipulated and
 3   agreed by and among counsel for
 4   the respective parties that the
 5   filing, sealing and certification
 6   of the deposition are waived; and
 7   that all objections, except as to
 8   the form of the question, will be
 9   reserved until the time of trial.)
10                  - - -
11          PETER VAN N. LOCKWOOD,
12   ESQUIRE, after having been first
13   duly sworn, was examined and
14   testified as follows:
15                  - - -
16              EXAMINATION
17                  - - -
18          (ACC 30(b)(6)-1 and 2
19   premarked for identification.)
20                  - - -
21   BY MR. BROWN:
22       Q.    Good morning, Mr. Lockwood.
23       A.    Good morning, Mr. Brown.
24       Q.    You are appearing here today
```

```
                                                  Page 13
 1   as the Rule 30(b)(6) designee for the
 2   ACC, correct?
 3       A.    Correct.
 4       Q.    And that is with respect to
 5   a number of 30(b)(6) notices, correct?
 6       A.    A very large number, yes.
 7       Q.    Can you look at the one
 8   that's been put before you and marked ACC
 9   Rule 30(b)(6)-1, which I will call ACC-1
10   here after.
11       A.    I have it.
12       Q.    Can you identify it?
13       A.    It is an Amended Notice of
14   Deposition of Asbestos PI Committee
15   Pursuant to Rule 30(b)(6) served by four
16   insurance companies, One Beacon, Seaton,
17   Geico, and Columbia.  And it contains an
18   attachment with definitions and topics
19   which are the subject matter of
20   testimony.
21       Q.    Okay.  And can you look at
22   the document that I put before you that's
23   marked ACC-2.
24       A.    I have it.
```

Page 14

1 Q. And identify that document,
2 please.
3 A. That document is the
4 Objections of the Official Committee of
5 Asbestos Personal Injury Claimants to
6 Rule 30(b)(6) Notices of Deposition
7 served by Certain Plan Objectors.
8 Q. Okay. And is it correct
9 that you are here today prepared to
10 testify about the topics that are listed
11 in ACC-1 subject to the objections that
12 appear in ACC-2?
13 A. The answer to that question
14 is yes, subject to the following caveats:
15 To the extent that the topics in this
16 notice or any of the other notices are
17 subjects that the ACC has a person with
18 knowledge on, I am here to testify about
19 it. To the extent that the ACC doesn't
20 have a person with knowledge on certain
21 topics, then I am here to testify that
22 the ACC doesn't have knowledge on those
23 topics.
24 Q. Okay. And --

Page 15

1 A. And to the extent that
2 occurs, we will see how it occurs in the
3 course of the questions.
4 Q. Okay. And then you
5 mentioned ACC and a person with the ACC.
6 How are you using the term
7 "ACC"?
8 A. I am using it as the entity
9 that was appointed in the bankruptcy case
10 by the U.S. Trustee.
11 MR. BROWN: ACC-3.
12 (ACC 30(b)(6)-3 marked for
13 identification at this time.)
14 BY MR. BROWN:
15 Q. Okay. Mr. Lockwood, you now
16 have before you a document that should
17 have two exhibit labels on it. One is an
18 Exhibit-12 from the deposition of
19 Mr. Finke, and the other is ACC-3.
20 Could you identify the
21 document that has been marked as ACC-3?
22 A. It appears to be a Form 8-K
23 file by W.R. Grace & Company dated April
24 6, 2008.

Page 16

1 Q. Have you ever seen this
2 document before?
3 A. Frankly, I am not sure.
4 Q. Okay.
5 A. I may have. I may not have.
6 Q. All right. Why don't you go
7 to the back of the document, starting
8 with page 9.
9 A. Page 9 or page 8?
10 Q. I am sorry. Page 8.
11 A. I am there.
12 Q. Can you identify that
13 document?
14 A. It appears to be a copy of a
15 Term Sheet for the Resolution of Asbestos
16 Personal Injury Claims entered into by a
17 variety of parties, including the ACC.
18 Q. Okay. Have you seen the
19 Term Sheet, either this Term Sheet or
20 some iteration of it previously?
21 A. I have seen the original of
22 it.
23 Q. Okay. Can you take a look
24 at what you have before you and tell me

Page 17

1 whether it differs in any way from the
2 original?
3 MR. FINCH: Objection.
4 THE WITNESS: On the face of
5 it, it does not appear to
6 different. I mean, obviously, a
7 comparison of the original and
8 this copy would be the definitive
9 way of determining whether there
10 is a difference, but this looks to
11 be the same, as best I can recall.
12 BY MR. BROWN:
13 Q. Okay. And this document was
14 negotiated by the parties that executed
15 it, is that correct, or their counsel?
16 A. Broadly speaking, yes. I
17 mean, negotiated implies human beings in
18 a room or in some communication, and
19 these are all entities. So various
20 representatives of the entities that are
21 listed here in negotiated this document
22 on behalf of their respective principals.
23 Q. Is there anything in the
24 Term Sheet that you can see that's

Page 70

```
 1      the rights of insurers such that
 2      the insurers will not have legal
 3      standing to object to confirmation
 4      of the Plan.  That's the intent.
 5           You are now drilling down
 6      several layers under that
 7      generalized intent to ask about
 8      specific hypothetical applications
 9      of fact and law in a subsequent
10      coverage litigation which this
11      insurance neutrality provision
12      creates.  And I don't think the
13      ACC has an intent on that subject,
14      because the ACC has not, in fact,
15      attempted to drill down that level
16      of this thing, of this language.
17           All I can tell you is that
18      looking at the language as
19      somebody who was involved in
20      creating it, it's my understanding
21      and belief that this language
22      preserves your state law collusion
23      defense, and it's up to some
24      coverage court to determine on the
```

Page 71

```
 1      facts and the context whether the
 2      behavior of the Plan and the Plan
 3      participants in some way or
 4      another in the context of
 5      a bankruptcy and under all the
 6      relevant policy provisions which
 7      include insolvency clauses does or
 8      doesn't include the kind of
 9      collusion that would allow under
10      applicable insurance law the
11      insurer to disclaim coverage.
12           That's the best I can do on that.
13 BY MR. BROWN:
14      Q.   All right.  Let's go to page
15 11, and specifically I am looking at
16 definition 29 which begins on page 10,
17 Asbestos PD Trust Causes of Action,
18 appearing on page 10 and going to page
19 11.
20      A.   I see it.
21      Q.   Okay.  And do you see the
22 sentence that begins, "notwithstanding
23 the foregoing" in the center of that
24 definition?
```

Page 72

```
 1      A.   Yes.
 2      Q.   We discussed this, I think,
 3 a little bit earlier, if I am correct.
 4           The assets that are
 5 described in that sentence, are they
 6 going into the Asbestos PI Trust?
 7      A.   No.
 8      Q.   Where are they going, if
 9 anywhere?
10      A.   I think they are being
11 retained by the Debtors, keeping in mind
12 that we are talking here about a very
13 generic set of rights.
14      Q.   Right.  All right.  Let's go
15 to page 23, please, definition 96.
16      A.   I see it.
17      Q.   There is a parenthetical
18 that excepts out from the definition of
19 Disallowed, and it contains asbestos PI
20 claim and U.S. ZAI PD claim.  What is the
21 reason for that exception?
22      A.   Basically, the reason is
23 that with respect to, first, asbestos PI
24 claims, they are being sent to a Trust
```

Page 73

```
 1 for resolution and they will never be
 2 allowed or disallowed in this bankruptcy
 3 case.  And the way the term "disallowed"
 4 is used is to describe things that happen
 5 in the bankruptcy case under Section 502
 6 of the bankruptcy code.
 7           I believe, although I am not
 8 really all that familiar with the
 9 negotiations of the U.S. ZAI PD, that
10 essentially the same outcome or process
11 is contemplated by that, namely, the U.S.
12 ZAI PD claims are being channelled to PD
13 Trust for resolution, and they are not
14 going to get resolved, i.e. allowed or
15 disallowed in the bankruptcy case.  So
16 this is simply to note that fact, if you
17 will.
18      Q.   Okay.  Just so I understand
19 you, asbestos PI claims then are not
20 subject to 502(e) disallowance under the
21 Plan; is that correct?
22           MR. FINCH:  Object to form.
23           THE WITNESS:  That is
24      correct.
```

|  | Page 102 |  | Page 104 |
|---|---|---|---|
| 1 | BY MR. BROWN: | 1 | A. Yes. |
| 2 | Q. So that if prior to the | 2 | Q. Does the asbestos PI Trust |
| 3 | issuance of the warrant, there is | 3 | assume the duties and obligations of the |
| 4 | additional stock issued, you are going to | 4 | Debtors under asbestos insurance |
| 5 | adjust the strike price as well as the | 5 | policies? |
| 6 | number of warrants; is that right? | 6 | MR. FINCH: Object to form, |
| 7 | A. You are going to make the | 7 | overly broad. |
| 8 | adjustments described in this section. I | 8 | MS. HARDING: Object to |
| 9 | am not sure I want to summarize them the | 9 | form. |
| 10 | way you just did, but this section spells | 10 | THE WITNESS: As I |
| 11 | out in somewhat gory detail exactly the | 11 | understand it, the duties and the |
| 12 | type of antidilution provision that's | 12 | obligations of the Debtors under |
| 13 | being offered for these warrants. | 13 | insurance policies are triggered |
| 14 | Q. What if there is dilution | 14 | only by the submission of claims |
| 15 | after the issuance of the warrant? Is | 15 | by the Debtor or some other |
| 16 | there any mechanism to deal with that | 16 | insured under the policies. |
| 17 | situation? | 17 | Absent an effort by the |
| 18 | MS. HARDING: Object to | 18 | insured or successor to get |
| 19 | form. | 19 | coverage for claims, there are no |
| 20 | THE WITNESS: There is a | 20 | independent remaining duties and |
| 21 | warrant agreement around here | 21 | obligations. |
| 22 | somewhere -- I believe it's | 22 | BY MR. BROWN: |
| 23 | probably an exhibit to this | 23 | Q. If I can stop you, by |
| 24 | Plan -- that specifies all of the | 24 | successor in that sentence, you mean |

|  | Page 103 |  | Page 105 |
|---|---|---|---|
| 1 | rights of the warrant holder. | 1 | Asbestos PI Trust? |
| 2 | I cannot, sitting here, tell | 2 | A. PI Trust. |
| 3 | you at the moment that I can | 3 | Q. Fair enough. |
| 4 | recall whether there is a -- it's | 4 | A. When the Trust is assigned |
| 5 | a one-year warrant, and I just | 5 | rights under the policies and the Debtors |
| 6 | don't remember whether during the | 6 | are given the right to assert any and all |
| 7 | one-year exercise period that | 7 | coverage defenses -- |
| 8 | there is or there is not | 8 | MR. FINCH: You mean |
| 9 | anti-dilution provisions. | 9 | insurers? |
| 10 | BY MR. BROWN: | 10 | THE WITNESS: I am sorry. |
| 11 | Q. Okay. | 11 | Let me start over again. |
| 12 | A. But if there are, they will | 12 | When the Trust is assigned |
| 13 | be in the warrant agreement as well as | 13 | rights under the policies and the |
| 14 | they might be referenced in this section | 14 | insurers are retaining all of |
| 15 | of the Plan. | 15 | their coverage defenses with the |
| 16 | Q. Let's go to the heading 7.2 | 16 | two exceptions we discussed |
| 17 | The Asbestos PI Trust. | 17 | earlier, if the Trust proposes to |
| 18 | A. I see it. | 18 | demand in some way or another |
| 19 | Q. Do you see the second full | 19 | coverage from one or more insurers |
| 20 | paragraph beings "The purpose of the | 20 | under those policies, then |
| 21 | Asbestos PI Trust"? | 21 | whatever the insurer asserts as a |
| 22 | A. I see it. | 22 | pre-condition to coverage, what |
| 23 | Q. And it lists a few items | 23 | you would call an obligation or a |
| 24 | there. | 24 | right, would have to be fulfilled |

Page 106

1    to the extent that a coverage
2    court determines that there is a
3    pre-condition to coverage.
4         And since the Trust is the
5    one seeking the coverage, by
6    hypothesis, it's the only one that
7    has any incentive to make sure
8    that the rights or -- excuse me --
9    that the obligations, the
10   pre-conditions are satisfied as
11   required by a coverage court.
12        And so to that extent, yes,
13   the Trust, one way or another, to
14   the extent determined by a
15   coverage court or by negotiations
16   with insurers, will have to
17   perform what you have described as
18   the obligations and rights under
19   the assigned insurance coverage.
20        That's my understanding.
21   BY MR. BROWN:
22        Q.   Do the Debtors, the
23   Reorganized Debtors, retain any duties or
24   obligations under the asbestos insurance

Page 107

1    policies if this Plan is confirmed?
2         A.   There are provisions
3    involving cooperation in the Plan
4    documents which would allow the Trust to
5    require, to the extent those cooperation
6    provisions say so, the Debtors to help
7    satisfy or wholly satisfy whatever the
8    particular requirement might be that only
9    the Debtor could do.
10        So there is, I guess, the
11   answer is there is an indirect obligation
12   on the Debtor's part.  But the Debtor,
13   qua-Debtor, vis-a-vie, the insurer, since
14   the Debtor under the asbestos insurance
15   rights will not on its own be seeking
16   coverage, the Debtor sort of independent
17   of the Trust would not have any rights,
18   any obligations to the insureds except to
19   the extent, as I say, that the
20   cooperation with the Trust efforts to
21   access that insurance trigger such
22   cooperation obligations.
23        Q.   And the cooperation
24   obligations that you described in the

Page 108

1    beginning of your answer are set forth in
2    the cooperation agreement; is that what
3    you were referring to?
4         A.   They are set forth there.
5    There may be -- I don't remember whether
6    they are also set forth in other
7    documents, such as the Insurance Transfer
8    Agreement and/or the Plan itself.  But
9    they are set forth -- I think there may
10   be some set forth in the Insurance
11   Transfer Agreement.  I am not sure.  I
12   would have to look at them.
13        Q.   Okay.
14        A.   But I do remember that there
15   are cooperation arrangements.
16        Q.   If I understand your answer,
17   the cooperation obligation of the
18   Reorganized Debtors post-confirmation is
19   not the asbestos insurance companies but
20   rather to the Trust under the cooperation
21   agreement?
22        A.   That's correct.
23        MS. HARDING:  Object to
24   form.

Page 109

1         THE WITNESS:  But the
2    asbestos insurance companies,
3    through the retention of asbestos
4    coverage defenses, are the
5    indirect beneficiaries of that
6    provision.
7    BY MR. BROWN:
8         Q.   How so?
9         A.   Because if they don't -- if
10   the Trust can't get Grace to perform the
11   cooperation that the policies require,
12   the insurance companies won't have to
13   provide the coverage if the coverage
14   court says such cooperation is mandatory.
15        There is nothing in the Plan
16   that says that an insurance company -- if
17   policy obligations are not performed as
18   required by the policy by somebody,
19   nevertheless they have to pay on the
20   insurance.  The only entity or person
21   that could make such a determination
22   would be a coverage court judge and only
23   in the context of deciding that for
24   whatever reason the particular obligation

Page 198

1  Q. There is a reference in
2 subsection (e) to the TAC, T-A-C, which
3 is the Trust Advisory Committee, correct?
4  A. Correct.
5  Q. And the Futures
6 Representative, which is the Asbestos PI
7 Futures Representative, correct?
8  A. Correct.
9  Q. And earlier today, we went
10 through a list of the individuals who are
11 on the TAC, and you mentioned Russell
12 Budd, John Cooney, Joe Rice, and Perry
13 Weitz.
14  A. Correct.
15  Q. Am I correct that each of
16 those gentlemen or their respective firms
17 represent asbestos claimants with claims
18 against Grace?
19  A. Correct.
20  Q. Can you give me some idea of
21 how many claims Mr. Budd's firm has
22 against Grace?
23  MR. FINCH: Objection, lack
24  of foundation.

Page 199

1  THE WITNESS: No, except
2  that it's -- I think we
3  established when we were doing
4  request for admission or something
5  to somebody that all four of
6  those, each one of those firms
7  represents at least 1,000
8  claimants against Grace.
9 BY MR. BROWN:
10  Q. We did.
11  A. What I don't know is how
12 many more than a thousand any of them may
13 represent.
14  Q. Okay.
15  A. The proofs of claim are on
16 file. Somebody could go and ascertain
17 that, if it mattered.
18  Q. Okay. Do you know how many
19 -- the firms that those four TAC members
20 are members of collectively how many they
21 have? In other words, if you took the
22 four firms, do you have an idea or
23 estimate as to the number of claims that
24 they have against Grace?

Page 200

1  MR. FINCH: Objection,
2  foundation.
3  THE WITNESS: Only in the
4  sort of vaguest and most general
5  terms. Well, I am sure it's more
6  than 10,000. Again, it could be
7  20,000; it could be 30,000. I
8  just don't know.
9  Those firms -- with the
10  exception of Mr. Cooney's firm,
11  those firms represent a lot of
12  people. And in the case of
13  Mr. Rice, he has co-counsel
14  relationships, his firm does, with
15  a lot of other firms. So it gets
16  into the question of, quote, what
17  do you mean by representation,
18  sole representation, joint
19  representation. But, suffice it
20  to say, they represent a lot of
21  claimants.
22 BY MR. BROWN:
23  Q. Okay. And in their capacity
24 as counsel for those claimants, they have

Page 201

1 fiduciary duties to their clients,
2 correct?
3  A. However those are
4 established by the local bars, et cetera,
5 before which they practice, yes,
6 generally.
7  Q. And they get paid to
8 represent those clients, correct?
9  A. Generally speaking, I assume
10 that's correct.
11  Q. And is it your understanding
12 that, generally speaking, that's through
13 a contingency arrangement?
14  A. Again, generally speaking,
15 correct.
16  Q. And is it your understanding
17 that the contingent fee that is typically
18 charged by those firms is somewhere
19 between 33 and a third and 40 percent of
20 the recovery?
21  MR. FINCH: Objection, lack
22  of foundation, calls for
23  speculation.
24  THE WITNESS: I really don't

Page 378

1  terms from the previous plans that I am
2  aware of.
3      Q.   As the ACC's designee to
4  take this 30(b)(6) deposition, would you
5  be aware if there were such an agreement?
6      A.   I believe I would be, yeah.
7      Q.   What agreements, if any,
8  were struck at the time of ACC Exhibit-3
9  concerning how Libby claimants' claims
10 would be treated?
11     A.   Other than that they would
12 be part of the asbestos claimants whose
13 claims would be channelled to the Trust
14 and whose consideration would be paid out
15 of the assets that were to be contributed
16 to the asbestos Trust under the Term
17 Sheet, there were no agreements that I am
18 aware of.
19     Q.   Were there any agreements
20 concerning who would bear responsibility
21 for restitution claims, if any, in
22 connection with the criminal trial now
23 going on in Montana?
24         MS. HARDING:  Object to

Page 379

1      form.
2          THE WITNESS:  I don't
3      believe there were at that time,
4      no.
5  BY MR. DANIEL COHN:
6      Q.   Have there been any
7  agreement on that subject since then?
8      A.   Well, there is provisions in
9  the Plan that speak to that, so yes.
10     Q.   Apart from provisions of the
11 Plan, are there any agreements between
12 the Asbestos PI Committee and any of the
13 other Plan proponents on the subject
14 matter of the Plan?
15     A.   The Plan embodies the
16 agreements.  There are no side
17 agreements, oral or written, that vary
18 from the Plan that I am aware of.  And,
19 indeed, I would be very surprised if I
20 was not aware -- if there were any that I
21 was not aware of.
22     Q.   All right.  And one last
23 question on this subject.  It has been
24 known from time to time for the

Page 380

1  co-proponents of a Plan to enter into a
2  co-proponent agreement governing that
3  relationship.  Is there any such
4  agreement, written or orally?
5      A.   No.  Well, you say written
6  or oral.  There is certainly no written
7  agreement of that.  I mean, the Plan
8  itself -- other than the Plan itself.  I
9  mean, when you sign on to a Plan, is the
10 Plan proponent with somebody else is a
11 Plan proponent.  That's in a written
12 document, and we have sort of agreed.
13         But if you are talking about
14 some oral agreement that says this binds
15 us outside the Plan or -- I am not sure
16 really what kind of agreement you have in
17 mind.  But, as far as I am aware, there
18 isn't any such other than what's
19 reflected in the Plan itself.
20         MR. FINCH:  The parties to
21     the Plan also, to the extent there
22     are issues in common, there may
23     well be a common interest
24     privilege for purposes of

Page 381

1      discovery and litigation of
2      confirmation objections.  But
3      those are not -- I would not
4      regard those as any types of
5      agreements you are questioning
6      about.
7  BY MR. DANIEL COHN:
8      Q.   All right.  Directing your
9  attention now to ACC Exhibit-11, which is
10 the TDP.
11     A.   I have it.
12     Q.   All right.  Who drafted the
13 TDP?
14         MR. FINCH:  Objection.  This
15     gets into Plan negotiations and
16     drafting.  I will let you answer
17     that question, but we will see how
18     it goes from there.
19         THE WITNESS:  To some
20     extent, Mr. Inselbuch may know
21     more about this than I do.  But I
22     have a pretty good knowledge of
23     it.
24         As I have previously

Page 382

1   mentioned in this deposition, this
2   TDP in its inception was a sort of
3   mark-up job on one of the previous
4   TDPs from one of the previous
5   bankruptcies that that had been
6   confirmed.  I don't recall, as I
7   sit here today, which one it was,
8   but it would have been one of the
9   more recent ones.
10       It then, of course, had to
11  be modified to reflect the
12  particularities of Grace and the
13  claims against Grace and what have
14  you.  And you have heard some
15  testimony about things like
16  Sections 5.12 and 5.13.  The
17  participants that did it were
18  basically counsel for the ACC,
19  counsel for the FCR, and members
20  of the ACC itself in terms of
21  reviewing and commenting on
22  things, and the FCR himself.
23       The actual, physical
24  drafting as opposed to the

Page 383

1   commenting and what have you was,
2   I believe, done by Caplin &
3   Drysdale.
4   BY MR. DANIEL COHN:
5       Q.    What input, if any, did
6   Grace have concerning the TDP?
7           MS. HARDING:  Objection with
8       respect to negotiations.
9           THE WITNESS:  Well, it was a
10      general proposition.  Grace was
11      furnished copies of drafts and
12      afforded the opportunity to
13      comment on them.
14  BY MR. DANIEL COHN:
15      Q.    And were any changes made to
16  what sounds like an ACC FCR draft at the
17  behest of Grace?
18          MS. HARDING:  Same
19      objection.
20          THE WITNESS:  I don't really
21      recall.
22  BY MR. DANIEL COHN:
23      Q.    Directing your attention to
24  Section 2.1 of the TDP.

Page 384

1       A.    I have it.
2       Q.    In the second sentence,
3   there is reference to, and I quote,
4   "...the intention of paying all claimants
5   over time as equivalent a share as
6   possible of the value of their claims
7   based on historical values for
8   substantially similar claims in the tort
9   system."
10      A.    Yes.
11      Q.    Now, is that, in fact, the
12  intention of the Asbestos PI Committee in
13  respect to how the TDP should operate?
14      A.    The intention of the ACC on
15  how the TDP should operate is expressed
16  in all of the terms of the TDP.  That
17  particular aspirational sentence that you
18  have plucked from the beginning of the
19  TDP is not is not somehow or another a
20  super-preemptory provision that controls
21  all the other provisions in the Trust
22  that somebody might think either were or
23  were not in agreement with it.
24      Q.    In that phrase that I just

Page 385

1   read, what does the term "historical
2   values" mean?
3       A.    Again, Mr. Inselbuch
4   probably would have a more definitive
5   knowledge of this, but my understanding
6   is that it refers to the historical
7   claims data primarily in this particular
8   case from Grace with respect to
9   settlements and judgments in the tort
10  system as the starting point.
11      Q.    If that's the starting
12  point, what else is meant by historical
13  value?
14      A.    Well, again, this is boiler
15  plate language from TDPs.  In some cases,
16  depending upon the facts of the case, the
17  claims history of comparable defendants
18  in the tort system is looked at.
19          The TDPs are generally
20  drafted in consultation with the
21  committees asbestos claims advisor which
22  is usually, if not invariably, Mark
23  Peterson, and depending on the amount of
24  claims data available to Mr. Peterson