# EXHIBIT B

```
   IN THE UNITED STATES BANKRUPTCY COURT
      FOR THE DISTRICT OF DELAWARE
                  - - -


In Re:                     : Chapter 11
                           :
                           : Case No.
W.R. GRACE & CO., et al,   : 01-01139 JKF
                           :
                           : (Jointly
          Debtors          : Administered)


                  - - -

          Monday, May 4, 2009

                  - - -
```

Continuation of oral deposition of PETER VAN N. LOCKWOOD, ESQUIRE, taken pursuant to notice, was held at the offices of CAPLIN & DRYSDALE, One Thomas Circle N.W., Suite 1100, Washington, DC  20005, commencing at 12:05 p.m., on the above date, before Lori A. Zabielski, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Pennsylvania.

```
                  - - -
         MAGNA LEGAL SERVICES
           Seven Penn Center
           1635 Market Street
               8th Floor
     Philadelphia, Pennsylvania 19103
```

Page 506

1  having to do with how the Asbestos
2  Permanent Channelling Injunction
3  works.
4      The provisions in the
5  Asbestos Permanent Channelling
6  Injunction are very complex. As a
7  general proposition, however, I
8  would say that the claims that are
9  being channelled to the Asbestos
10 Personal Injury Trust are claims
11 that are against the Debtors or
12 against various other entities
13 defined as asbestos-protected
14 parties that arise in the manner
15 that satisfies the requirements of
16 Section 524(g), which has very
17 specific language about what can
18 and cannot be channelled to an
19 Asbestos Personal Injury Trust
20 under that section.
21     What you are, in effect,
22 trying to ask is does the phrase
23 you have used fit within or
24 without the terminology of Section

Page 507

1  524(g) where the term as such is
2  not used. So I can't really
3  answer the question yes or no as
4  stated.
5      All I can tell you is that
6  the Asbestos Permanent Channelling
7  Injunction, in my understanding,
8  is not intended to channel to the
9  Trust claims that Section 524(g)
10 does not authorize to be
11 channelled to the Trust.
12 BY MR. COHN:
13     Q.  All right. We have gone a
14 little afield from the question, so if I
15 can go back and ask what I meant to, and
16 let's try it again.
17     MR. SCHIAVONI: Again,
18 Mr. Cohn, we would ask you to
19 identify in the notice where it is
20 you identify this as a topic,
21 because to the extent Mr. Lockwood
22 is not designated by the committee
23 on it, it's not really a proper
24 question to pose to him by another

Page 508

1  committee member.
2      MR. COHN: It's covered by
3  several of the topics, and I would
4  really like to just go on.
5  BY MR. COHN:
6      Q.  So the question is, will
7  claims of individual asbestos PI
8  claimants against insurers for their own
9  misconduct be an asset of the Asbestos PI
10 Trust?
11     MS. BAIER: Objection.
12     MR. FINCH: Objection to
13 form.
14     MR. SCHIAVONI: I would
15 object, asked and answered.
16     And I would remind
17 Mr. Lockwood he has addressed this
18 issue in other cases like
19 Pittsburgh Corning and to the
20 extent you need to go any further
21 here, I think it raises a whole
22 host of issues about waiver.
23     MS. DeCRISTOFARO: Note my
24 objection, too.

Page 509

1      THE WITNESS: Would you read
2  back the question, please?
3      (The reporter read from the
4  record as requested.)
5      MS. DeCRISTOFARO:
6  Objection.
7      MR. FINCH: Objection.
8      THE WITNESS: As phrased,
9  the answer to that question is
10 unequivocally no.
11     MR. COHN: Thank you.
12 BY MR. COHN:
13     Q.  Now, directing your
14 attention to the Asbestos Insurance
15 Entity Injunction, if an asbestos PI
16 claimant has a claim against an insurer
17 based on the insurer's own alleged
18 misconduct, does the Asbestos Insurance
19 Entity Injunction bar him from asserting
20 that claim?
21     MR. FINCH: Objection.
22     MR. SCHIAVONI: Objection,
23 calls for a legal conclusion and
24 objection to form and the other

Page 602

1  nature of the general objection?
2      MR. FREEDMAN:  The nature of
3  the general objection is that they
4  are presenting hypotheticals,
5  which the witness can't answer
6  and, as a result, require him to
7  set forth opinions about things
8  that are beyond what he should be
9  testifying to in the 30(b)(6)
10 deposition.
11     MR. SCHIAVONI:  That's been
12 90 percent of the testimony,
13 hypotheticals.
14     MR. FREEDMAN:  Well, I am
15 stating this objection to this
16 line of questions.  You have done
17 well on everything else.
18 BY MR. SPEIGHTS:
19   Q.  Mr. Lockwood, I am going to
20 try to wind up in less than ten minutes.
21     MR. FINCH:  Mr. Speights,
22 before you wind up, can we take a
23 two-minute break?
24     MR. SPEIGHTS:  That will be

Page 603

1  fine, if it's two minutes.
2      MR. FINCH:  It's two
3  minutes.  Off the record.
4      (There was a break from 3:17
5  p.m. to 3:20.)
6  BY MR. SPEIGHTS:
7    Q.  Mr. Lockwood, has trustees
8  been selected for the PI Trust?
9    A.  Yes.
10   Q.  Have they been revealed?
11   A.  Their names are set forth at
12 the end of the PI Trust Agreement.  The
13 second-to-last page is a signature page
14 which names three individuals, Harry
15 Huge, Lewis Sifford, and Dean Trafelet,
16 as the three prospective trustees.
17   Q.  Did the ACC choose these
18 three people?
19   A.  The ACC and the FCR
20 consulted each other on these three
21 prospective individuals and then proposed
22 them to the co-proponents and the
23 co-proponents accepted them.
24   Q.  Had the ACC or the FCR

Page 604

1  proposed any other person to the
2  co-proponent which they did not accept?
3    A.  Not that I recall.
4    Q.  Has the ACC chosen an entity
5  to administer the Trust?
6    A.  Not to my knowledge.
7  Indeed, I don't believe the ACC is
8  capable of making that choice.  I believe
9  under the Trust Agreement, the trustees
10 are the only parties with the authority
11 to make that decision.
12   Q.  Is statute of limitations a
13 legal defense in the Trust Distribution
14 Procedures?
15   A.  To the extent --
16   Q.  To any claim?
17   A.  Yes, to the extent so
18 provided in the TDPs.  What I mean by
19 that is there are one or more provisions
20 that address that subject in which the
21 statute of limitations is made
22 applicable.
23   Q.  And if I sit down tonight
24 and very carefully review again this

Page 605

1  Trust Distribution Procedure for the
2  Grace PI Trust, I will find statute of
3  limitations somewhere?
4    A.  Somewhere in there, it is my
5  best recollection that there is a
6  provision, one or more provisions, that
7  address statute of limitations.
8      I might be able to find it,
9  if you really wanted me to root around in
10 it for a while here.  I can't from memory
11 remember exactly where it shows up, but I
12 am --
13   Q.  Well, I actually don't want
14 you to do that.
15   A.  Okay.
16   Q.  But I would request you or
17 your attorney --
18   A.  Okay.  It's Section
19 5.1(a)(2) of the TDP is at least one
20 place.  It's captioned Effect of Statutes
21 of Limitation and Repose.  It starts at
22 page 16 of the TDP and extends over to
23 page 17.  There may be possibly other
24 places where statute of limitations

Page 634

1  the same position and give the
2  same instruction.
3      If you ask about questions
4  that Libby claimants have taken in
5  papers filed in the court, for
6  example, in a Disclosure Statement
7  objections and the bullet point
8  Plan objections and the
9  committee's responses made to that
10 in open court, I will permit
11 Mr. Lockwood certainly to answer
12 those questions.
13     But anything that gets into
14 communications with between the
15 Libby claimants with the rest of
16 the ACC or counsel for the ACC
17 about their respective views of
18 insurance coverage, I am going to
19 take the position as privileged.
20     And so I think you have to
21 do it on a question-by-question
22 basis, but that's my general
23 position.
24 BY MR. SCHIAVONI:

Page 635

1      Q.  Okay. Mr. Lockwood, I just
2  have one other brief topic. And here is
3  the first question on that: Does the
4  Plan purport to release claims that may
5  exist between insurers and Non-Debtors?
6      MR. FINCH:  Objection, form,
7  broad, vague.
8      THE WITNESS:  Phrased as
9  broadly as you have, I think the
10 answer is yes.
11     MR. SCHIAVONI:  Okay. Thank
12 you. I have no further questions.
13     MR. FINCH:  Is there anyone
14 else in the room who has
15 questions?
16     MR. BROWN:  I have some
17 follow-ups.
18     MR. FINCH:  Is there anyone
19 else on the telephone who has not
20 asked questions yet who has
21 questions?
22     (No response.)
23     MR. FINCH:  Hearing no
24 affirmative response, I will let

Page 636

1  you have follow-up until we run
2  out of time.
3      (There was a discussion held
4  off the record at this time.)
5      (There was a break from 3:55
6  p.m. to 4:03 p.m.)
7          - - -
8       EXAMINATION
9          - - -
10 BY MR. BROWN:
11     Q.  Mr. Lockwood, just a couple
12 of follow-ups. The court reporter is
13 actually going to read back a question
14 and answer. I think it's probably easier
15 to do that, and then I will ask my
16 follow-up question. It was end of
17 Mr. Wisler's questioning of you.
18     A.  Okay.
19     (The reporter read from the
20 record as requested.)
21 BY MR. BROWN:
22     Q.  And after that,
23 Mr. Lockwood, Mr. Wisler asked you a
24 follow-up as to what type of claim it

Page 637

1  would be.
2      And is it correct that the
3  ACC does not have a position on what type
4  of claim it would be if it's not a Class
5  6 claim?
6      A.  Well, the ACC doesn't, as
7  such, have positions on hypothetical
8  questions. So, yes, the ACC doesn't have
9  a position on that issue. The ACC --
10 well, I will leave it at that.
11     Q.  On Friday, Mr. Cohn asked
12 you a question, who drafted the TDP.
13 That was the question, and you gave an
14 answer which I am happy to show you the
15 full answer. But I WANT to repeat a
16 portion of your answer. You said: "The
17 participants that did it were basically
18 counsel for the ACC, counsel for the FCR,
19 and members of the ACC itself in terms of
20 reviewing and commenting on things, and
21 the FCR himself."
22     When you said the ACC
23 itself, what did you mean?
24     A.  I meant --

Page 638

1  Q. I am sorry. When you said
2 members of the ACC itself, what members
3 are you talking about?
4  A. Well, I was referring to the
5 personal injury counsel who were the
6 delegated representatives of the
7 individual ACC members, if that's what
8 you are driving at.
9  Q. That's what I am driving at.
10 And who specifically were
11 they?
12  A. As far as I know -- well,
13 the way in which the process works, in
14 general, is sometimes the ACC has
15 in-person meetings, sometimes it has
16 telephonic meetings, sometimes documents
17 get sent to it by email as PDF
18 attachments or whatever, and the ACC has
19 asked do you want to have a meeting or is
20 this good enough for you. So there is a
21 variety of ways in which the ACC views an
22 input as obtained.
23 And my answer was simply
24 that at the conclusion of a process, the

Page 639

1 members of the ACC had weighed in in one
2 or more of the ways in which I had
3 described some of them had; they all had
4 the opportunity to express their views;
5 and, therefore, the final product was the
6 product of their input. And there was a
7 final vote to go forward with the
8 document.
9  Q. Okay. And when you say the
10 members, you are talking about their
11 actual personal injury counsel?
12  A. As far as I know. But,
13 again, I couldn't tell you whether an
14 individual personal injury lawyer might
15 have consulted with his client, the
16 member, on one or more aspects of the TDP
17 or, for that matter, even sent the client
18 a copy of the entire TDP and had a
19 discussion with him about it. I
20 certainly couldn't exclude that.
21  Q. Can you tell me the list of
22 counsel that you are talking about, the
23 actual names?
24  A. They would be -- as a

Page 640

1 general proposition, I believe they are
2 in the Disclosure Statement. If they
3 are, it's a hell of a lot better
4 description of them than my memory. I
5 just --
6 MR. FINCH: There is also an
7 order entered by the U.S. Trustee
8 that identifies the 11 individual
9 members of the ACC and their
10 counsel, care of their firms.
11 BY MR. BROWN:
12  Q. That's what I am driving at.
13 I would like to know who the individuals
14 were at their firms that were involved.
15  A. Well, let me just see. I am
16 somewhat surprised. The Disclosure
17 Statement does not appear to contain the
18 members of the ACC. It just lists the
19 counsel representing the committee as a
20 whole. I had misremembered. I had
21 thought that it did.
22 I can't really remember. I
23 mean, I know the four -- I identified
24 four earlier as being involved in the

Page 641

1 discussions with Grace. They are
2 included. I think there is at least nine
3 members of the ACC. I do not recall, as
4 I sit here, who the other five members of
5 the ACC are. I mean, they are of
6 record -- strike that. I do not recall
7 who the other five lawyers for the
8 members of the ACC are. They are of
9 record.
10  Q. But the four to which you
11 are referring is Mr. Budd, Mr. Rice,
12 Mr. Cooney, and Mr. Weitz?
13  A. Correct.
14  Q. You were talking about the
15 Trust Distribution Procedures and who
16 drafted them.
17 Would your answer be the
18 same with respect to the Trust Agreement?
19  A. On the Trust Agreement, I
20 think there was more input from Grace,
21 and, indeed, I think there may have been
22 some from counsel from Sealed Air, as I
23 think about it. And, indeed, now that I
24 think about it, I think there may have

Page 642

1  even been a little input from the Sealed
2  Air counsel on the TDP.  But, again, the
3  primary draftspersons were counsel for
4  the ACC and the FCR.
5      Q.  Okay.  Can I direct your
6  attention to the Plan, which I guess is
7  ACC-5, and specifically it's page 70 on
8  my copy.  It's under Section 7.7
9  Conditions to Occurrence of the
10 Confirmation Date, specifically condition
11 (j).
12     A.  I see it.
13     Q.  Can you just take a moment
14 to read that?  I have one question on
15 that.
16     A.  I have read it.
17     Q.  In the portion of that
18 condition dealing with asbestos PD
19 claims, second-to-the last line, you will
20 see the words "if any" appear there, but
21 the same language doesn't appear for
22 asbestos PI claims.
23     Why?
24     MR. FINCH:  Objection,

Page 643

1  foundation.
2      THE WITNESS:  I need to talk
3  to my counsel about this one.
4      (There was a discussion held
5  off the record between the witness
6  and counsel at this time.)
7      MR. FINCH:  The discussion
8  was with respect to whether I need
9  to instruct him not to answer the
10 question.  He is allowed to answer
11 the question as long as doing so
12 doesn't reveal privileged
13 communication.
14     I think you can answer.
15     THE WITNESS:  Barely.
16     The "if any" is in there, as
17 best I can recall, because the
18 Plan proponents -- in contrast of
19 PI, "if any" is under PD.  Because
20 the Plan proponents are quite
21 confident that there is going to
22 be lots of future PI demands and
23 are less confident that there is
24 going to be lots of future PD

Page 644

1  demands, or if there are, they
2  will be valid.
3      MR. BROWN:  Okay.  That's
4  all I have.
5      MR. FINCH:  Could you go
6  back to the question I asked you
7  to find and read that question and
8  read the answer, and I will see if
9  I have got any redirect.
10     Does anybody else have any
11 questions?
12     (No response.)
13     MR. FINCH:  Hearing none,
14 let me just hear that back.
15     (The reporter read from the
16 record as requested.)
17     MR. FINCH:  No questions.
18     I think that is the end of
19 the deposition.
20     (The deposition concluded at
21 4:19 p.m.)

Page 645

CERTIFICATE


    I HEREBY CERTIFY that the witness
was duly sworn by me and that the
deposition is a true record of the
testimony given by the witness.




_____
Lori A. Zabielski
Registered Professional Reporter
Dated:  May 5, 2009




    (The foregoing certification
of this transcript does not apply to any
reproduction of the same by any means,
unless under the direct control and/or
supervision of the certifying reporter.)