# EXHIBIT C

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

_____X
In Re:                              Chapter 11

                                    Case No.
                                    01-01139 JKF
W.R. Grace & Co., et al.,

                                    (Jointly
            Debtors.                Administered)
_____X

            —  —  —

        May 6, 2009

            —  —  —

    DEPOSITION of JEFFREY POSNER, held at the offices of Kirkland & Ellis, 655 Fifteenth Street, N.W., Washington, DC, commencing at 9:08 A.M., on the above date, before Lisa Lynch, a Registered Merit Reporter, New Jersey Certified Court Reporter, License No. XI00825, and Certified Realtime Reporter

            —  —  —

    MAGNA LEGAL SERVICES, LLP

    7 Penn Center, 8th Floor

        1635 Market Street

        Philadelphia, PA  19103

            1.866.MAGNA.21

Page 14

1      (Notice of Deposition of
2   Jeffery Posner received and marked
3   for identification as Posner
4   Exhibit 1.)
5      (Curriculum vitae of
6   Jeffery M. Posner received and
7   marked for identification as Posner
8   Exhibit 2.)
9      (Affidavit Under 11 USC
10  327(e) received and marked for
11  identification as Posner Exhibit
12  3.)
13
14  J E F F R E Y   P O S N E R,
15     having been sworn by the Notary
16     Public of the States of New York
17     and New Jersey, was examined and
18     testified as follows:
19              _ _ _
20  EXAMINATION BY
21  MS. FORSHAW:
22     Q.  Good morning.  Mr. Posner.
23     A.  Good morning.
24     Q.  Good to see you again.  I

Page 15

1   know you've been through this drill many
2   times.  If I talk too fast, just stop me.
3   If you have any questions about my
4   questions, let me know.  If you need to
5   take a break, let me know.
6      A.  Definitely.
7      Q.  Okay.  I'm just --
8         MR. KRAMER:  I'm sorry.
9   Who's asking the questions, please?
10        MS. FORSHAW:  Sure.  It's
11  Mary Beth Forshaw from Simpson
12  Thacher representing Travelers
13  Casualty.  If you guys have a hard
14  team hearing us, will you let us
15  know?
16        MS. KRIEGER:  Yes, we will.
17  Thank you.
18     Q.  Mr. Posner, I'm going to
19  put before you a Notice of Deposition of
20  Jeffery Posner.  Do you understand you're
21  here to testify in response to that notice
22  today?
23     A.  Yes, I do.
24        MS. FORSHAW:  I have eight

Page 16

1   or nine copies of exhibits which
2   I'll pass out through the
3   deposition.  You can put that
4   aside.  For the record, I've marked
5   the Notice of Deposition of Jeffery
6   Posner as Exhibit 1.
7   BY MS. FORSHAW:
8      Q.  Mr. Posner, let me put
9   before you what I've marked as Exhibit 2,
10  which is a resume of Jeffery Posner.  Do
11  you recognize this document as your
12  resume?
13     A.  Yes, but it appears to me
14  to be an outdated copy of it.
15     Q.  Okay.  And for the record,
16  can you tell us in what way is this resume
17  outdated?
18     A.  My business address, it's
19  an old business address which leads me to
20  believe that's a version that I kept
21  several years ago.
22     Q.  Is the professional
23  experience described in your resume true
24  and accurate?

Page 17

1      A.  Yes, I'm sure it is.
2      Q.  And this resume indicates
3   that you were employed at W.R.
4   Grace & Company from 1982 to 1999.  Is
5   that correct?
6      A.  Yes, it is.
7      Q.  And for the record, can you
8   give us an overview of your employment
9   experience at W.R. Grace listing your
10  positions and the approximate years you
11  held each position?
12     A.  I started with Grace in
13  1982 as an assistant claims manager.  In
14  1986 I assumed the duties of a risk
15  analyst.  Thereafter I became the
16  assistant director of risk management
17  sometime, I think, in 1987 and then in
18  1988 I was promoted to the director of
19  risk management and I became an assistant
20  vice president of the company.
21     Q.  And during your tenure at
22  W.R. Grace, were you responsible for
23  overseeing asbestos-related coverage
24  litigations?

Page 18

```
 1       A.   Yes, I was.
 2       Q.   And when did those duties
 3  commence?
 4       A.   Well, Grace's coverage
 5  litigation began in 1983 and I became
 6  involved at that time and ultimately
 7  assumed additional responsibilities as the
 8  litigation had progressed through the
 9  years.
10       Q.   And I note that your resume
11  says at the top that you in the past have
12  negotiated one billion of insurance
13  settlements relating to asbestos and
14  environmental litigation.  Do you see
15  that?  It's under Summary of
16  Qualifications.
17       A.   Yes, I do.
18       Q.   Were those negotiations,
19  negotiations on W.R. Grace's behalf?
20       A.   Yes.  I mean, there may
21  have been some other negotiations but
22  principally it's W.R. Grace.
23       Q.   Okay.  And at W.R. Grace,
24  did you negotiate settlements with my
```

Page 19

```
 1  client, Aetna Casualty & Surety Company,
 2  which I'm going to call Travelers Casualty
 3  interchangeably because it's changed its
 4  name?
 5       A.   Yes, I did.
 6       Q.   And do you recall generally
 7  when those settlements with Travelers
 8  Casualty were signed up?
 9       A.   The first one involving
10  some old policies from one of the
11  predecessor companies, I'm speculating a
12  little, but it was probably sometime in
13  the early '90's and then there was a
14  settlement involving the excess policies,
15  and that probably was later on in
16  the '90's, I suspect.  I can't remember
17  the precise dates.
18       Q.   And were you the person at
19  Grace who was principally responsible for
20  negotiating with Travelers Casualty?
21       A.   Yes, I was.
22       Q.   With respect to both
23  settlements?
24       A.   Yes.
```

Page 20

```
 1       Q.   And after the settlements
 2  were signed, were you responsible for
 3  administering the settlements?
 4            MS. ESAYIAN:  Objection to
 5       form.  You can answer if you can.
 6       A.   I was involved.  There were
 7  people that were actually doing the detail
 8  work.  You know, it involved keeping track
 9  of payments of claims and things of that
10  nature and sending out bills.  I didn't do
11  that but I was involved and had some
12  oversight responsibility for that.
13       Q.   Let me restate the
14  question.  Were you involved in ensuring
15  that Grace performed its obligations under
16  the settlements Grace had executed with
17  Travelers Casualty?
18            MR. HORKOVICH:  Objection,
19       compound.
20            THE WITNESS:  Can I have
21       that read back, please?
22            (The reporter reads the
23       pending question.)
24       A.   I certainly had a role in
```

Page 21

```
 1  that.
 2       Q.   Who else was involved in
 3  making sure that Grace performed its
 4  obligations under the settlements Grace
 5  executed with Travelers Casualty?
 6       A.   Well, the settlements
 7  required Grace to obtain certain
 8  information so we had to put procedures in
 9  place to ensure that that information was
10  obtained, that we kept track of that
11  information, and that we allocated --
12  allocated claim payments in accordance
13  with the procedures set forth in the
14  agreement.  So there were a number of
15  people.  Obviously, outside counsel was
16  involved in providing information to us,
17  we had people in-house, we had computer
18  programmers that were programming the
19  computers and writing programs for the
20  process.  So there were a number of people
21  in the process but certainly I was, you
22  know, involved in ensuring that those
23  procedures were in place and that the
24  proper information was obtained and, you
```

Page 30

1    (Mr. Speights hangs up the
2    telephone.)
3        MR. HORKOVICH:  We're just
4    very sensitive to protecting the
5    rights of the insurance companies
6    since there are confidentiality
7    agreements -- provisions in the
8    agreements and want to make sure
9    that any questioning done by any
10   insurance company regarding the
11   agreements that have
12   confidentiality provisions in it
13   are -- that there's not an
14   attribution to Grace or the Plan
15   proponents that some
16   confidentiality provision has been
17   violated because the insurance
18   companies have questioned the
19   witness about it.
20       MS. FORSHAW:  Thank you.
21       MR. PERNICONE:  Yes, I
22   think that runs both ways too, from
23   Grace and the Plan proponents to --
24       MS. KRIEGER:  We can't hear

Page 31

1    whoever is speaking.
2        MR. PERNICONE:  It was
3    irrelevant so don't worry.
4        MS. KRIEGER:  Okay.
5        MR. PERNICONE:  You can
6    read it in the record.
7        MS. FORSHAW:  Can I ask you
8    to read the last question back?
9            _ _ _
10       (The reporter reads the
11   record as follows:
12       "QUESTION:  Who at Grace
13   was responsible for allocating
14   claims in accordance with the
15   settlements executed with Travelers
16   Casualty?")
17           _ _ _
18       A.  Well, I had the ultimate
19   responsibility but I'm not a computer
20   programmer.  I had someone actually write
21   the program for it but the ultimate
22   responsibility I think it's fair to say
23   probably would have been mine.
24       Q.  Okay.  And earlier in your

Page 32

1    testimony you indicated that Grace was
2    required to obtain certain information as
3    a result of the Travelers Casualty
4    settlements.  Who at Grace was in charge
5    of collecting that information?
6        A.  I mean, again, I think, you
7    know, I probably had the ultimate
8    responsibility but, again, you know, the
9    information that was required by the
10   settlement agreement really had to do with
11   information pertaining to the underlying
12   cases.  So, again, you know, as I recall,
13   you know, the information was obtained
14   from local counsel and then we had, I
15   guess, clerks putting some of that
16   information into the computer and then we,
17   you know, ran the allocations and kept
18   track of the information in the computer
19   and kept paper files.
20       Q.  We'll get back to some of
21   the specifics of the obligations later.  I
22   just want to finish going through your
23   background a bit.
24       Mr. Posner, it's my understanding

Page 33

1    that you left Grace in 1999; is that
2    correct?
3        A.  Yes, it is.
4        Q.  And since your 1999
5    departure, however, you've continued to do
6    work for W.R. Grace, correct?
7        A.  Yes.
8        Q.  And can you outline the
9    nature of the work that you've done for
10   W.R. Grace since 1999?
11       A.  Well, basically, Grace has
12   me on retainer and I function as their
13   outsourced risk manager.  I perform many
14   of the same functions that I performed
15   when I was an employee of the company.  I
16   buy their insurance, I have oversight for
17   insurance claims and I'm still involved in
18   issues relating to asbestos coverage.
19       Q.  Since 1999, have you had
20   any oversight responsibility with respect
21   to insurance settlements?
22       MS. ESAYIAN:  Objection to
23   form.  You can answer if you can.
24       A.  Yes, I have.

Page 34

1    Q.   And what oversight
2  responsibility have you had in that
3  respect?
4    A.   Well, I think my duties
5  have really not changed.  I mean, I think
6  Grace looks to me to ensure that we're
7  complying with whatever requirements are
8  in those settlement agreements and there
9  are people at Grace, again, that perform
10 various functions but I think it's fair to
11 say that Grace relies on me to ensure that
12 we're complying with whatever is
13 necessary.
14    Q.   And since 1999, has Grace
15 employed anyone in-house who has had
16 insurance-related functions?
17    A.   No, I'm really the only
18 person.  And there are other people there
19 who were there before I left who assisted,
20 for example, in the allocation issue,
21 computer programmers, people of that sort.
22 But, no, Grace does not have an in-house
23 insurance person.  I'm really the only
24 insurance person.

Page 35

1    Q.   Now, it's my understanding
2  that you have worked for Grace during the
3  period when Grace has been in Chapter 11.
4  Is that correct?
5    A.   Yes.
6    Q.   And I'm going to put before
7  you what I've marked as Posner Exhibit 3,
8  which is entitled Affidavit Under 11 USC
9  327(e).  Do you recognize that document?
10   (The witness reviews the document.)
11    A.   I actually don't.  I mean,
12 it appears that I signed it.  I don't
13 remember it.
14    Q.   Does your handwriting
15 appear on page one of the document, Mr.
16 Posner?
17    A.   Yes, it does.
18    Q.   Okay.  And if you could --
19 I actually couldn't read Paragraph 2.  Can
20 you read the handwriting that appears in
21 Paragraph 2?
22    A.   It says, "The debtors have
23 requested that the firm provide insurance
24 and risk management" -- I think that says

Page 36

1  "consulting services to the debtors and
2  the firm has consented to provide such
3  services."
4    Q.   And have you in fact
5  provided such services to the debtor
6  during the pendency of its bankruptcy?
7    A.   Yes, I have.
8    Q.   And can you outline for us
9  generally the nature of the services you
10 provided to Grace during its bankruptcy?
11    A.   Again, I think it's many of
12 the services that I provided while I was
13 an employee.  I continue to purchase their
14 insurance and I'm responsible for the
15 administration of all of their worldwide
16 insurance policies and I continue to be
17 involved in asbestos insurance coverage
18 issues and environmental insurance
19 coverage issues as they arise.  I've
20 negotiated some settlements, you know,
21 since I left the firm with insurance
22 carriers, I think principally ones in
23 bankruptcy.  As I recall, there may have
24 been some others.  So again I'm performing

Page 37

1  many of the same functions that I
2  performed while an employee and I've been
3  involved in issues related to bankruptcy
4  as they pertain to insurance coverage.
5    Q.   And what are your
6  compensation arrangements with Grace?
7    A.   I think my retainer is
8  either 130 or $135,000 a year.  I can't
9  remember the precise number.
10    Q.   And is that a flat fee that
11 you're paid for providing
12 insurance-related services to Grace?
13    A.   Yes.  I mean, it gets
14 negotiated every year but basically they
15 deposit money in my bank.  I don't get any
16 hourly rate.  I don't get additional
17 compensation beyond that nor do I get less
18 compensation.
19    Q.   I am sorry, I didn't --
20    A.   Nor do I get less
21 compensation.  I get what the agreed-upon
22 amount is.
23    Q.   It's a flat fee?
24    A.   It's a flat fee, yes.

Page 294

1  a sub of one of the entities.
2       MR. BROWN:  Okay, all
3  right.  Subject to --
4       A.   That's an assumption.
5       MR. BROWN:  Subject to
6  other -- follow-up after others
7  have questioned, I am complete.
8  Thank you, Mr. Posner.
9       THE WITNESS:  Thank you.
10      MS. DeCRISTOFARO:  Could we
11 take a five-minute break?
12      MS. ESAYIAN:  Sure.
13      (Recess taken.)
14      (LexisNexis printout in re:
15 Maryland Casualty v. Grace, et al.
16 received and marked for
17 identification as Posner Exhibit
18 22.)
19 EXAMINATION BY
20 MS. DeCRISTOFARO:
21      Q.   Good afternoon, Mr. Posner.
22      A.   Good afternoon.
23      Q.   I'm Elizabeth DeCristofaro.
24 I represent Continental Casualty.  I have

Page 295

1  a few follow-up questions to issues that
2  you addressed earlier.
3       I just asked the reporter to mark a
4  copy of a legal case in one of the series
5  of cases known as Maryland Casualty v.
6  W.R. Grace.  It's a decision of the Second
7  Circuit.  It is generally referred to as
8  the installation trigger case, and I do
9  not have any questions related to the law
10 or the holding.  I'm only marking this as
11 a matter of convenience with respect to
12 some of the factual recitation.
13      And I direct you to what is
14 considered page four of the exhibit and in
15 the right-hand column, the first full
16 paragraph, the next to the last sentence
17 says: "According to Grace, as of early
18 1992, it had spent 184.6 million dollars
19 to settle claims or satisfy judgments in
20 property damage asbestos lawsuits and 194
21 million to defend itself."
22      Now, is that statement generally
23 consistent with your recollection of Grace
24 spending large amounts of money to defend

Page 296

1  itself in asbestos litigation?
2       A.   Yes.  As I indicated
3  before, you know, Grace had spent
4  significant amounts of money.  And,
5  obviously, if they put this in here, then
6  we must have submitted information or
7  stated that we had spent that amount of
8  money so it would be consistent with what
9  I knew at the time, I think.
10      Q.   And during the course of
11 this afternoon you indicated that you were
12 involved in the negotiations of the
13 settlement agreements both with the
14 primary and the excess insurers --
15      A.   Correct.
16      Q.   -- of Grace; is that
17 correct?
18      And you generally included where it
19 was proper a provision that those
20 agreements would provide reimbursement to
21 Grace for defense costs.  Is that
22 correct?
23      A.   Correct.  Some of the
24 agreements are what I'm going to call

Page 297

1  coverage in place agreements that had
2  ongoing obligations for the insurance
3  carriers to reimburse Grace for defense
4  costs.  Some of the agreements were I'm
5  going to call buy-outs of the policies in
6  which there was no ongoing obligation.
7       Q.   And when negotiating those
8  agreements, it was the understanding of
9  both parties that Grace was going to
10 vigorously defend itself and probably
11 expend money in defense costs; is that
12 correct?
13      MR. HORKOVICH:  Objection
14 to form.
15      A.   Well, yeah.  I mean, I
16 think it was the understanding that, you
17 know, Grace would use its best efforts to
18 defend itself as best it could, you know,
19 considering all factors.
20      Q.   And the next sentence of
21 that paragraph, the last sentence says,
22 "Continental has exhausted the limits of
23 its insurance coverage by paying 117
24 million dollars in defense costs and 70

Page 298

1  million dollars indemnity in Grace." Is
2  that generally consistent with your
3  recollection?
4       MS. ESAYIAN:  Just so the
5    record is clear, it says "and 70
6    million in indemnity to Grace".
7       MS. DeCRISTOFARO:  I'm
8    sorry.  Did I misread it?
9       MS. ESAYIAN:  A little
10   bit.
11      MS. DeCRISTOFARO:  Sorry.
12   A.   You know, it's a little
13 strange to me because the indemnity -- I
14 believe this opinion relates to the
15 primary policies that CNA had issued to
16 Grace.  My recollection of those policies
17 is that there was a two million dollar per
18 year annual aggregate.  So I'm trying to
19 sort out in my mind, you know, how CNA
20 paid 70 million in indemnity.  I'm just
21 trying to think how they got to that
22 figure, sitting here today.  I need to
23 think about that.
24   Q.   Well, does the figure for

Page 299

1  defense costs seem reasonable to you?
2    A.   I --
3    Q.   Or does it refresh your
4  recollection?  Let me make it a simpler
5  question.  If it doesn't, it doesn't
6  but --
7    A.   Well, again, we're talking
8  about what numbers were in 1992.  I do
9  have a recollection, for example, that
10 when we entered into the CNA settlement
11 agreement in 1990, you know, that CNA had
12 paid significant amounts of money in
13 defense costs and probably over 100
14 million dollars.  It's just the 70 million
15 in indemnity that I'm trying to figure out
16 how they got to that number because
17 sitting here today it doesn't make sense
18 to me, not to say it's not right.  I would
19 need to think about it a little more.
20   Q.   Okay.  But when you
21 mentioned a little bit earlier in addition
22 to the amounts set out in the settlement
23 agreement there are amounts -- other
24 amounts paid to Continental, this is some

Page 300

1  of what you were referring to; is that
2  correct?
3    A.   Yeah.  I mean, Continental
4  had been defending Grace for many years
5  and had expended --
6    Q.   Large amounts of money?
7    A.   -- large amounts of money.
8  Some of that money was billed back to
9  Grace and some Continental Casualty
10 ultimately had to bear and the amounts
11 were significant and were in addition to
12 the 21 million dollars referenced in the
13 settlement agreement, correct.
14   Q.   Correct.  And through its
15 relationship with Grace and its payment of
16 these defense costs, Continental Casualty
17 had an understanding that Grace was
18 vigorously defending itself?
19      MS. ESAYIAN:  Objection to
20   form.
21      MR. HORKOVICH:  Objection
22   to form.
23   A.   Well, I mean, you're asking
24 what Continental Casualty understood.

Page 301

1  It's difficult for me to answer.  I mean,
2  I could tell you that Grace had always
3  attempted to defend itself and of course
4  it wanted to pay out as little money as
5  possible and didn't want to take on
6  additional risk by trying cases where it
7  was inappropriate.  What Continental
8  understood, I'm not quite sure.
9    Q.   Okay.  When the primary
10 policies were exhausted, is it correct to
11 say that Grace turned to seek coverage
12 from its excess insurers?
13   A.   Well, I think -- you know,
14 I think some of the time periods overlap
15 in the sense that Grace was seeking
16 coverage from its primary carriers, CNA,
17 Royal and Maryland, and then there came a
18 point in time when the excess coverage
19 litigation got instituted so the time
20 frames may have overlapped in the sense
21 that Grace was -- might have been
22 simultaneously seeking money from the
23 primary and the excess.  But certainly
24 after it settled with CNA it was certainly

Page 302

1  seeking money from the excess as well.
2      Q.  And the excess insurers --
3  the recovery it was seeking from the
4  excess insurers included payment of these
5  ongoing defense costs which were
6  substantial?
7      A.  Yes.
8          MR. HORKOVICH:  Objection
9  to form.
10     A.  Grace was seeking ongoing
11 defense costs that were unreimbursed and
12 that we believed were properly
13 attributable to the excess carriers.
14     Q.  So the excess carriers
15 also -- excuse me before I go there.
16         There was another litigation called
17 Maryland Casualty v. Grace generally
18 referred to as the asbestos excess
19 litigation.
20     A.  Yes.
21     Q.  And that included at the
22 outset all of Grace's excess insurers.  Is
23 that correct?
24     A.  It certainly included a lot

Page 303

1  of them.  I think it included all but I'm
2  not quite sure.  It probably did but I
3  don't remember specifically.
4      Q.  And in that lawsuit Grace
5  was seeking a declaration that those
6  excess carriers owed them defense and
7  indemnity.  Is that correct?
8      A.  Correct, yes.
9      Q.  Okay.  And that litigation
10 was ultimately resolved in large part by
11 settlement agreements.  Is that correct?
12     A.  Yes.  I mean, ultimately
13 what had happened was I think we had
14 settled with all excess carriers up to the
15 50 million dollar layer and I think the
16 court ruled that excess carriers above the
17 50 million dollar layer were not ripe, so
18 to speak, at the time because Grace -- I
19 think Grace's liabilities, you know, at
20 least at that time wasn't anticipated that
21 we were going to get to that level.
22         So we settled with the carriers up
23 to the 50 million dollar level and as a
24 practical matter I think we preserved our

Page 304

1  right to institute later proceedings
2  against the carriers above that level.
3      Q.  But the carriers who
4  entered into settlement agreements with
5  Grace understood through these litigations
6  that Grace was incurring substantial
7  defense costs; is that correct?
8          MR. HORKOVICH:  Objection
9  to form.
10     A.  I think that's a fair
11 statement.
12     Q.  And they understood on that
13 basis that Grace was vigorously defending
14 itself for asbestos defense cases?
15         MR. HORKOVICH:  Objection
16 to form.
17     A.  Well, again, I mean, you're
18 asking me to put what they understood.  I
19 mean, I don't know.  I mean, Grace, I
20 think, was -- it's fair to say was
21 vigorously defending itself and I think
22 they would have to know that.  Now, what
23 they understood or didn't understand,
24 you'd have to ask them.

Page 305

1      Q.  Okay.  Now, there were also
2  a series of questions in which the term
3  "products" was used during the course of
4  the afternoon.  Is that correct?
5      A.  Yes.
6      Q.  But in none of those
7  questions the term "products" was defined
8  or the definition in the policies was
9  referred to.  Is that correct?
10     A.  I think one of the
11 gentlemen asked me to distinguish a
12 products claim from a premises claim and
13 then I did that without looking at a
14 policy.  I gave him, you know, my general
15 understanding of the distinction between
16 two kinds of claims under an insurance
17 policy.
18     Q.  And do you have any present
19 understanding as to whether the term
20 "products" includes any operations
21 coverage?  Let me make --
22         MR. HORKOVICH:  Objection.
23     Q.  -- that specific.
24         MR. HORKOVICH:  Objection