# EXHIBIT D

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - -

| | |
|---|---|
| In Re: | : Chapter 11 |
| | : |
| | : Case No. |
| W.R. GRACE & CO., et al, | : 01-01139 JKF |
| | : |
| | : (Jointly |
| Debtors | : Administered) |

- - -

Thursday, June 11, 2009

- - -

Oral deposition of JAY W. HUGHES, JR., ESQUIRE, taken pursuant to notice, was held at the offices of KIRKLAND & ELLIS, 665 Fifteenth Street, NW, Washington, DC 20005, commencing at 9:07 a.m., on the above date, before Lori A. Zabielski, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Pennsylvania.

- - -

MAGNA LEGAL SERVICES
Seven Penn Center
1635 Market Street
8th Floor
Philadelphia, Pennsylvania 19103

```
 1                     - - -

 2              AFTERNOON SESSION

 3                     - - -

 4   BY MR. LEWIS:

 5         Q.    I want to go to page 13 of

 6   the document entitled Topic of Deposition

 7   that Grace produced here.  I want to go

 8   to the Rights of BNSF, BNSF being

 9   Burlington Northern Santa Fe Railway

10   Company.

11              A.    Yes.

12              Q.    What do you know about those

13   claims in the bankruptcy?

14                   MS. HARDING:  Object to

15              broadness and form.

16              But go ahead.

17                   THE WITNESS:  What I know is

18              that Burlington Northern

19              Railroad -- well, let me start

20              again.

21                   Grace's mine and milling

22              facility outside of Libby, Montana

23              had a process where from the mill,

24              it ran down the mountain to a
```

1    loading station on railroad tracks
2    that were on the banks of the
3    Kootenai River that they operated
4    this loading station on railroad
5    property and rail line owned by
6    the Burlington Northern Railroad;
7    that in connection with the
8    agreement to which Grace operated
9    the loading facility, for lack of
10   a better term, they agreed to
11   indemnify the Burlington Northern
12   Railroad for injuries and personal
13   injuries resulting from the
14   loading activities on the property
15   down at the railroad; and that
16   there is a question in my mind,
17   and although I have seen some
18   documents, and there is also that
19   there was some insurance provided
20   to them in connection with the
21   indemnification, either through a
22   specific policy that Grace
23   acquired that Burlington Northern
24   was the insured or there were also

1    some allegations -- again, I don't
2    know which one -- I am not sure
3    this latter part was ever proven,
4    at least to my satisfaction.
5              There were also some
6    allegations that there may have
7    been some Grace policies in
8    existence during some period of
9    time during Grace's operation that
10   Burlington Northern was added as
11   an additional insured on the Grace
12   policies.
13 BY MR. LEWIS:
14        Q.   You have never seen those
15 policies?
16        A.   I have seen some of the
17 indemnification agreements, and I may
18 have seen the policies, some of the
19 policies over the course of time.
20        Q.   Do you recall that the
21 policies --
22             MS. HARDING:   Were you
23   finished?  I didn't know if you
24   were finished.

```
 1                    THE WITNESS:   Yes.
 2                    MS. HARDING:   Sorry.  Okay.
 3   BY MR. LEWIS:
 4          Q.    By the way, any time if I
 5   interrupt you, sometimes I get going and
 6   I interrupt -- I am in a good way today,
 7   but sometimes I interrupt -- you stop me,
 8   and I will let you finish your answer.  I
 9   may not like it, but I will let you
10   answer.
11                    Did you see any of the
12   policies that named Burlington Northern
13   Santa Fe as an additional named insured?
14          A.    I don't recall specifically
15   seeing those, no.
16          Q.    Are you referring to siding
17   agreements?  Is that what you are
18   referring to?
19          A.    Yes.
20          Q.    So it's your understanding
21   that the siding agreements themselves
22   provided that Grace would indemnify the
23   BNSF?
24                    MS. HARDING:   I just don't
```

```
 1        think --
 2                MR. LEWIS:    I thought that's
 3        what you said.
 4   BY MR. LEWIS:
 5        Q.      Did you say that?
 6        A.      There is an indemnification
 7   around.
 8        Q.      Whether it's a siding
 9   agreement, there is an indemnification?
10        A.      Right.   And I have seen
11   those.   I just don't recall the specific
12   details.
13        Q.      And there were Grace
14   employees that worked on that siding
15   loading vermiculite concentrate -- do you
16   know what vermiculite concentrate is?
17        A.      Yes, I do.
18        Q.      Okay. It's partially
19   processed.   It's ore processed before
20   it's expanded, correct?
21        A.      Yes.   It's beneficiated up
22   at the mine and mill that's processed,
23   and it's shipped in railcars out to
24   expanding plants.   And it generally then
```

```
 1   Northern Santa Fe.
 2              Is that acceptable?
 3        A.    Sure, that's great.
 4        Q.    And when I refer to Grace, I
 5   will be referring to W.R. Grace Company
 6   and its predecessors that operated at the
 7   mine, including Zonolite Corporation.
 8              Is that okay?
 9        A.    That's fine.
10        Q.    Are you aware of the
11   historical business relationship between
12   Grace and BNSF?
13        A.    Yes.
14        Q.    Would it be a fair and
15   accurate summary of that relationship to
16   say that from at least as early as 1942
17   Grace operated, through various leases
18   and agreements between BNSF and Grace, a
19   loading dock and suspension bridge over
20   the railway's right-of-way and also
21   transported vermiculite to be mined over
22   the railway tracks?
23        A.    Yes.
24        Q.    And do you have an
```

1    understanding as to whether Grace
2    provided indemnification to BNSF for any
3    personal injury or death that resulted
4    from Grace's operations of the suspension
5    bridge and loading dock?
6                MS. HARDING:  Object to the
7         form.
8                MR. LIESEMER:  Object to the
9         form of the question.
10               THE WITNESS:  Yes.
11               (Hughes-4 marked for
12          identification at this time.)
13   BY MS. CASEY:
14        Q.    Take a look at exhibit
15   Hughes-4 for me, please.
16        A.    Sure.
17        Q.    Do you recognize this
18   document?
19        A.    I think I have seen it
20   before.
21        Q.    Do you know what this
22   document is?
23        A.    Based on my review this
24   afternoon, it is an agreement between

```
 1   purchase or obtain insurance in its own
 2   name to insure its indemnification
 3   obligation to BNSF?
 4              MS. HARDING:  Object to
 5        form.
 6              THE WITNESS:  I don't know.
 7   BY MS. CASEY:
 8        Q.    And then moving on to
 9   paragraph 9, are you aware of any
10   policies that were purchased for BNSF in
11   accordance with paragraph 9 of this
12   agreement?
13        A.    As I said, I am not sure I
14   have seen any policies.  I do recall that
15   there is correspondence in the file that
16   would indicate that there may have been
17   policies purchased.
18        Q.    Have you seen any
19   certificates of insurance indicating that
20   policies have been purchased?
21        A.    Not that I specifically
22   recall.
23              MS. CASEY:  Okay.  On the
24        record real quick, I am going to
```

```
1    a break so I have time to read all
2    the documents that have been
3    marked and just take a ten-minute
4    break?
5            MS. CASEY:  Yes.
6            MS. HARDING:  I want to make
7    sure that I am making my proper
8    objections.  Thanks.
9            (There was a break from 2:43
10   p.m. to 2:57 p.m.)
11           THE WITNESS:  Before we go
12   further, in reviewing the
13   documents here, I think I
14   misspoke.  I had it reversed in
15   looking at the correspondence in a
16   couple of things you said.
17           The certificates of
18   insurance and the correspondence
19   from 1961, my understanding is
20   that there is evidence that Grace
21   purchased insurance for the
22   benefit of the Burlington Northern
23   related to the operation of the
24   loading facility out in Libby,
```

```
 1        Montana.
 2             I haven't seen -- I am not
 3        familiar with the fact that
 4        Burlington Northern was
 5        specifically added as an insured
 6        to Grace's own general liability
 7        policies, and I think I had that
 8        reversed when we were speaking a
 9        moment ago.
10   BY MS. CASEY:
11        Q.    Is it your understanding
12   that to the extent any policy was
13   purchased naming BNSF as the insured,
14   that it is the subject of a settlement
15   agreement with the insurers and Grace?
16             MS. HARDING:  Object to
17        foundation to the extent that you
18        know.
19             MR. SCHIAVONI:  Vague and
20        ambiguous.
21             THE WITNESS:  I would have
22        to look at the insurance
23        agreements themselves.
24   BY MS. CASEY:
```

```
 1             MR. LEWIS:  He testified
 2        after a break that Grace purchased
 3        independent policies that provided
 4        coverage to BNSF.
 5   BY MR. LEWIS:
 6           Q.    That was your testimony,
 7   correct?
 8           A.    I don't think that's what I
 9   testified to.  I think that prior to the
10   break, I had testified that there were
11   two -- it is my understanding there were
12   two allegations by BNSF of possible
13   insurance coverage related to the loading
14   facility at Libby, Montana in the
15   railroads, the right-of-way, and that I
16   had testified beforehand that I had heard
17   and was aware of documents and letters
18   concerning the existence of support for
19   the allegation that they had been named
20   as an additional insured under the Grace
21   comprehensive general liability policies.
22                And I think I corrected that
23   and said that the letters and the
24   information I was talking about indicated
```

1  that there were policies that Grace had
2  purchased and that -- for BNSF rather
3  than being named as additional insured
4  under the Grace policies.
5       Q.    That's my understanding of
6  your testimony, sir.  So Grace purchased
7  policies that covered BNSF, correct?
8            MR. SCHIAVONI:  Objection.
9       That's not what he testified to.
10           THE WITNESS:  I haven't seen
11      the policies.  I said I was shown
12      correspondence, and the
13      correspondence I was referring to
14      that I had seen before indicated
15      that there were policies of that
16      kind.  But I hadn't seen the
17      policies.  I hadn't seen the
18      policies.
19 BY MR. LEWIS:
20      Q.    You had been identified as
21 Grace's 30(b)(6) designated witness on
22 the subject of these insurance policies.
23           Is it your testimony now --
24      A.    Well, I testified --

```
 1         Q.    Well, I am asking -- no, I
 2   am asking you what you know about that.
 3              From your own knowledge, did
 4   Zonolite or Grace, or and Grace, agree to
 5   indemnify the railroad contractually for
 6   liability relating to that siding in
 7   Libby?
 8              MS. HARDING:  I will object
 9         on foundation to the extent you
10         know.
11              MR. LEWIS:  If he doesn't
12         know, he can say he doesn't know.
13              THE WITNESS:  I don't know.
14         I would have to see a document,
15         this document and certainly
16         correspondence which would imply
17         that.  But I don't see anything
18         directly evidencing that kind of
19         agreement between Grace, Zonolite,
20         and the railroad.
21   BY MR. LEWIS:
22         Q.    Did Zonolite agree to
23   purchase insurance at any time to
24   provide -- to provide coverage for BNSF,
```

```
 1    if you know?
 2              MR. SCHIAVONI:  Objection to
 3         form, no foundation.
 4              THE WITNESS:  Again, there
 5         are documents that would indicate
 6         that that was the case, but I
 7         haven't seen any of the policies.
 8    BY MR. LEWIS:
 9         Q.    Does Grace have copies of
10    the insurance policies?
11              MS. HARDING:  I will object
12         to the form.
13              THE WITNESS:  Grace has
14         copies of insurance policies.
15    BY MR. LEWIS:
16         Q.    We have requested those, and
17    Grace has not provided those to us.
18    Where are those policies kept?
19              MS. HARDING:  Objection to
20         form.  I think you asked him does
21         Grace have copies of insurance
22         policies, and he said yes, we have
23         copies of insurance policies.
24              Secondly, we have no
```