# EXHIBIT 2

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Re: Docket Nos.: 21020 and 21167** |
| | ) | **Objection Deadline: _____, 2009** |
| | | **Hearing Date: Proposed June 18, 2009 at 1:00  p.m.** |

## PLAN PROPONENTS' JOINT MOTION IN LIMINE TO STRIKE THE EXPERT REPORTS AND TESTIMONY OF GEORGE L. PRIEST AND JAMES B. SHEIN

Debtors W.R. Grace & Co., *et al.*, The Official Committee of Asbestos Personal Injury

Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of

Equity Security Holders (collectively, the "Plan Proponents") respectfully request that the Court

exclude the testimony of George L. Priest and James B. Shein and strike their expert reports.

These expert reports, which have been submitted by certain Objecting Insurers[2] in

opposition to confirmation of the First Amended Joint Plan of Reorganization, offer inadmissible

---

[1]  The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

[2]  These Insurers include: Government Employees Insurance Company, Columbia Insurance Company f/k/a Republic Insurance Company, and Seaton Insurance Company; Arrowood Indemnity Company f/k/a Royal Indemnity Company; Continental Casualty Company and Continental Insurance Company and affiliated companies; Federal Insurance Company; Fireman's Fund Insurance Company and Allianz S.p.A. f/k/a Riunione Adriatica Di Sicurta; and Maryland Casualty Company, Zurich Insurance Company, and Zurich International (Bermuda) Ltd.

legal opinions that seek to usurp the role of the Court in interpreting applicable law and in addition, are fundamentally flawed and unreliable.

George L. Priest is a law professor who seeks to testify that "the Plan severely affect[s] the rights of Grace's insurers." Declaration of George Priest ("Priest Report"), attached hereto as Exhibit A, at ¶ 18. James B. Shein is a lawyer and professor of management and strategy who seeks to testify that representatives of the Asbestos PI Trust Advisory Committee ("TAC") established under the Plan "have conflicting fiduciary duties to a subset of the claimants making claims against the Trust." Expert Report of James B. Shein ("Shein Report"), attached hereto as Exhibit B, at ¶¶ 5, 14-17. Priest's and Shein's opinions are inadmissible because they present impermissible legal conclusions and lack reliability. Additionally, Professor Shein is not qualified to offer expert testimony with respect to the topics set forth in his report. Both experts' opinions should be excluded.

## I.   LEGAL STANDARDS

Under Rule 702 and *Daubert v. Merrell Dow Pharms., Inc.*, federal trial courts must serve as "gatekeepers" to ensure that "any and all scientific testimony or evidence admitted is not only relevant, ***but reliable***." 509 U.S. 579, 589 (1993) (emphasis added); *see also Dodge v. Cotter Corp.*, 328 F.3d 1212, 1223 (10th Cir. 2003) ("[We]e have recognized that (the district court) has no discretion to avoid performing the gatekeeper function.") (internal citations omitted). The proponent of the expert testimony bears the burden of showing that the proferred expert testimony is both relevant and reliable. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145-46 (3d Cir. 2000).

2

A.    **An Expert Must Be Qualified With Specialized Knowledge Before Offering
An Expert Opinion.**

Before even assessing the substance of purported expert testimony and determining that it

is reliable and assists the trier of fact, a court must ensure that an individual is qualified to testify

as an expert.  Rule 702 requires that an expert be qualified with ***specialized knowledge*** before

offering an expert opinion.  *U.S. v. Faines*, 216 Fed. Appx. 227, 229 (3d Cir. 2007); *Schneider v.*

*Fried*, 320 F.3d 396, 404 (3d Cir. 2003) ("Qualification refers to the requirement that the witness

possess ***specialized expertise.***")  (emphasis added).  An expert may be generally qualified but

may lack qualifications to testify outside his area of expertise.  *Calhoun v, Yamaha Motor Corp.,*

*U.S.A.*, 350 F.3d 316, 322 (3rd Cir. 2003) (holding that general knowledge of expert in the fields

of psychology and human factors engineering may allow him to opine on proper warning labels

on products but that proffering admissible testimony that the proper age for jet ski use is sixteen

or above requires "more specific knowledge," that he did not have).

B.    **Expert Testimony Must Be Based Upon Identifiable And Replicable
Methods.**

To be reliable, an expert's opinion must be based on the "methods and procedures of

science" rather than on "subjective belief or unsupported speculation," and the expert must have

"good grounds" for his or her belief.  *Daubert*, 509 U.S. at 590; *see also In re TMI Litig.*, 193

F.3d 613, 670 (3d Cir. 1999) ("We note that in order for expert testimony to be reliable, and

therefore admissible, it must be based on the methods and procedures of science rather than

***subjective belief*** or speculation.") (emphasis added); *Calhoun*, 350 F.3d at 323 ("As for his

proffered testimony on the specific substance of such warnings, particularly the age requirement,

Bruton offered no support for his beliefs.  His proffered opinions on these matters were

unreliable, and the District Court properly restricted such testimony."); *see also Ammons v.*

3

*Aramark Uniform Servs., Inc.*, 368 F.3d 809, 816 (7th Cir. 2004) (upholding exclusion of expert

opinion that "was nothing more than speculation.").

In addition, the expert's opinion must be based on "methods and procedures" that are

reliable. *Calhoun*, 350 F.3d at 321. To be reliable, an expert's opinion must be based on an

actual, identifiable methodology. *See Oddi*, 234 F.3d at 156 (upholding the exclusion of

proposed expert John Noettl where "Oddi could not establish the existence of Noettl's

methodology and research let alone the adequacy of it.").

The test for reliability under Rule 702 is an "exacting" one. *Weisgram v. Marley Co.*,

528 U.S. 440, 442 (2000) (since Daubert, "parties relying on expert evidence have had notice of

the exacting standards of reliability such evidence must meet."). As the Third Circuit has

recognized, the lack of an identifiable methodology renders an expert's opinions inadmissible:

> Since Noettl conducted no tests and failed to attempt to calculate any of the forces
> on Oddi or the truck during this accident, he used little, if any, methodology
> beyond his own intuition. There is nothing here to submit to peer review, and it is
> impossible to ascertain any rate of error for Noettl's assumptions about the forces
> that caused Oddi's horrific injuries. Similarly, no standards control his analysis,
> and no 'gatekeeper' can assess the relationship of Noettl's method to other
> methods known to be reliable and the non-judicial uses to which it has been put.
> Clearly, the district court did not abuse its discretion in excluding Noettl's
> proffered expert opinion testimony.

*Oddi*, 234 F.3d at 158; *see also McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651, 658 (7th Cir.

1998) ("We have said before, and reiterate, that 'an expert who supplies nothing but a bottom

line supplies nothing of value to the judicial process.'") (internal citations omitted).

In particular, an expert's "untestable say-so" is insufficient under Rule 702. *Durkin v.

Equifax Check Servs., Inc.*, 406 F.3d 410, 421 (7th Cir. 2005); *see also General Elec. Co. v.

Joiner*, 522 U.S. 136, 146 (1997) ("nothing in either Daubert or the Federal Rules of Evidence

requires a district court to admit opinion evidence that is connected to existing data only by the

*ipse dixit* [unsupported say-so] of the expert"); *Oddi*, 234 F.3d at 158 ("Noettl's *ipse dixit* does

4

not withstand Daubert's scrutiny."); *see also Brown v. Primerica Life Ins. Co.*, No. 02 C 8175, 2006 WL 1155878, at *4 (N.D. Ill. Apr. 29, 2006) (holding that an expert report that only offers an ultimate conclusion and "'does nothing to substantiate this opinion is worthless, and therefore inadmissible.'") (internal citations omitted). Even "[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant." *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999).

### C.   Expert Testimony Must Not Consist Of Legal Advocacy And May Not Present Legal Conclusions.

In addition to being the product of a reliable scientific methodology, Rule 702 requires that expert testimony concern topics that assist the trier of fact. Legal opinions do not do this. Purported expert advice to the court on the legal issues has repeatedly and unequivocally been held to be beyond the scope of Rule 702. *See e.g. United States v. Leo*, 941 F.2d 181, 196 (3d Cir. 1991) ("it is not permissible for a witness to testify as to the governing law."); *United States v. Articles of Banned Hazardous Substances*, 34 F.3d 91, 96 (2d Cir. 1994) ("It is a well-established rule in this Circuit that experts are not permitted to present testimony in the form of legal conclusions."); *Peschko v. City of Camden*, No. 02-5771, 2006 WL 1798001, at *4 (D.N.J. June 28, 2006) ("expert testimony that expresses a legal conclusion must be excluded."); *Haberern v. Kaupp Vascular Surgeons Ltd. Defined Ben. Plan & Trust Agreement*, 812 F.Supp. 1376, 1378 (E.D. Pa. 1992) ("An expert may not opine legal conclusions drawn by applying the law to the facts.").

Indeed, courts consistently hold that Rule 702 cannot be used as a tool for circumventing the adversarial process by packaging lawyer advocacy under the guise of "expert opinion." *Fisher v. Ciba Specialty Chems. Corp.*, 238 F.R.D. 273, 281 (S.D. Ala. 2006) (excluding expert

5

where "the Court does not perceive McFaddin's report as an 'expert report' at all, but rather as written advocacy by a lawyer, akin to a supplemental brief on the facts presented by another attorney representing plaintiffs.").

## II.    ARGUMENT

### A.    Professor Priest's Testimony Should Be Excluded Because He Offers Impermissible Legal Conclusions That Are Fundamentally Flawed And Unreliable.

Professor Priest's opinions are inadmissible on at least two grounds.  First, his opinions are fundamentally flawed and unreliable, failing to meet the standards for expert testimony set forth in Federal Rule of Evidence 702 and *Daubert*.  Second, while he suggests that his opinions are based on an "economic analysis," at bottom Professor Priest seeks to offer impermissible legal conclusions and thus usurp the proper role of the Court.

#### 1.    Professor Priest's Report Fails To Meet The Evidentiary Standards Of Reliability Under The Federal Rules Of Evidence And Daubert.

Professor Priest's opinions are based solely on unsupported speculation and subjective belief, and he employed no methodology to reach them. *See TMI*, 193 F.3d at 670;  *Oddi*, 234 F.3d at 158.  Professor Priest's essential argument is that the Plan "severely affect[s] the rights of Grace's insurers."  Exhibit A, Priest Report at ¶ 18.  But he offers *no* support for his conclusions regarding the generalities of the insurer/insured relationship and employs *no* methodology to reach them.  Moreover, even if his unsupported assertions had merit, his deposition testimony reveals that he has no basis to conclude that *Grace's* insurers have been placed at a disadvantage. Accordingly, his opinions are not reliable and should be excluded.

Professor Priest has not looked at any evidence in this case. *See* Exhibit C, Priest Dep. at 179.  When asked if he has any knowledge as to how Grace and its insurers were handling claims against Grace in the tort system prior to bankruptcy, he admits that he has "no personal

6

knowledge of that at all." *Id.* at 34-36. He has made no effort to determine whether the handling

of the claims under the Trust documents will produce economic outcomes that are less favorable

to insurers than would have occurred if Grace had not gone bankrupt. *Id.* He admits that he has

no factual basis for comparing the provisions of the TDP to the values and criteria utilized by

Grace and its insurers to settle claims prior to the bankruptcy. *Id.* at 143. Nonetheless, without

explaining his methodology or means of determination, he *asserts* that inclusion of the insurers

will "*invariably* produce a different result from a settlement from which those insurers are

excluded." *Id.* at 177 (emphasis added).

For example, Professor Priest fails to offer any support for his assertion that, instead of

protecting insurance rights through insurance neutrality provisions such as Plan § 7.15, "[t]he

more realistic resolution of these issues is to include Grace's insurers in the working out of the

distribution of remaining Grace assets--including its insurance assets--toward the most equitable

settlement of the asbestos claims against Grace." Exhibit A, Priest Report at ¶ 55. While he

insists that settlement is the more realistic solution in the case of Grace, Exhibit C, Priest Dep. at

162, he concedes that *sometimes* "litigation is the appropriate way to resolve cases." *Id.*

Moreover, he has no personal knowledge or ability to describe what settlement would look like

in *this* case or the likelihood that the parties could agree. *Id.* at 163.

Professor Priest's assertion that "Grace's insurers also cannot rely on an ex-post

evaluation by a court as to the 'reasonableness' of settlements that the Trust might enter" is

likewise unsupported. Exhibit A, Priest Report at ¶ 49. He admits that "as a factual matter," he

cannot say whether excluding the insurers from the TDP will result in more or less money being

paid by the insurers. Exhibit C, Priest Dep. at 176. Moreover, while he claims that the Plan

works to the "severe economic prejudice of its insurers," Exhibit A, Priest Report at ¶ 56, he

makes no attempt to quantify this "severe economic prejudice," positing that it is simply an "analytical statement." Exhibit C, Priest Dep. at 212-13.

In short, Professor Priest offers absolutely no foundational basis for his opinions, and accordingly under Rule 702 and *Daubert* they should be excluded. *See, e.g., Dearson v. Bostrom Seating, Inc.*, 241 F.Supp.2d 494, 496-497 (E.D. Pa. 2003) (in granting motion *in limine*, court stated that proponent of expert testimony "must demonstrate by a preponderance of the evidence that [the expert opinions] are reliable" in that "the particular opinion is based on valid reasoning and reliable methodology"); *see also Cuffari v. S-B Power Tool Co.*, No. 02-3763, 2003 WL 22520411, at *1 (3d Cir. Nov. 7, 2003) (trial court should determine whether an expert's opinion is based on valid reasoning and reliable methodology).

### 2.    Professor Priest Offers Impermissible Legal Opinions.

While Professor Priest attempts to repackage his opinions as "economic" in nature, at bottom they consist entirely of impermissible legal opinions.[3] *See e.g. Leo*, 941 F.2d at 196; *Haberern*, 812 F.Supp. at 1378. Professor Priest opines that the Plan, particularly § 7.15, is not insurance neutral. His chief concern is that § 7.15(g) allows insurers' policies to be assigned to the Trust without insurer consent. Exhibit A, Priest Report at ¶ 54 ("Far from 'insurance neutrality', this provision erases contractual rights and coverage defenses otherwise available to insurers."). This assertion is groundless because this Court has consistently held that transfer of rights to insurance policies is permissible under bankruptcy law.[4] Aside from lacking merit, Professor Priest is presenting a legal opinion. He concedes that insurance neutrality is "not a

---

[3] Nor does Professor Priest have any special training, qualifications, or expertise in economics.

[4] *See, e.g. In re Federal-Mogul Global Inc.*, 385 B.R. 560, 566 (Bankr. D. Del. 2008), *aff'd*, 402 B.R. 625 (D. Del. 2009); Memorandum Opinion, Dkt. No. 6375, *In re Global Industrial Technologies Inc.*, No. 02-21626-JKF, at *3-4 n.3 (Bankr. W.D. Pa. Sept. 21, 2007); *In re Kaiser Aluminum Corp.*, No. 02-10429 (JKF), 2006 WL 616243 at *24 (Bankr. D. Del. Feb. 6, 2006), *aff'd*, 343 B.R. 88 (D. Del. 2006); Memorandum Opinion, Dkt. No. 5194, *In re Pittsburgh Corning*, No. 00-22876 (JFK) at *52-53 (W.D. Pa. Dec. 21, 2006), *aff'd*, 260 Fed. Appx. 463 (3d Cir. 2008).

term used commonly in economics." Exhibit C, Priest Dep. at 32. "[I]t's not a term of art in economics. It's not defined specifically." *Id.*

Indeed, insurance neutrality is a judicial construct, and Professor Priest is seeking to instruct the Court in the interpretation of the Plan. An 'insurance neutrality' provision was first added to a plan of reorganization in proceedings before this Court in *In re Combustion Engineering*. It was added so that the pre-petition rights and obligations of both the Debtor and the insurers would remain unaffected by the plan, thus removing any standing of the Insurers to object to the plan. The provision accomplished this by preserving for "'any Entity . . . any and all claims, defenses, rights or causes of action' under subject insurance policies and settlement agreements." *In re Combustion Engineering, Inc.*, 391 F.3d 190, 218 (3d Cir. 2004). The Third Circuit upheld the effect of this provision on the insurers in that case, determining that with its addition, the plan did not impair the rights or increase the burdens of the objecting insurers. *Id.* Accordingly, those insurers had no standing to challenge assignments by the bankruptcy estate to the asbestos personal injury trust. *Id.*

This Court's opinion in *Pittsburgh Corning* also highlights the fact that insurance neutrality is a judicial construct. This Court explains that insurers only have standing to raise issues with respect to the Plan to the limited extent it affects their rights and obligations. "Beyond that, however, they lack standing. We have referred to this concept as 'insurance neutrality.'" Memorandum Opinion, Dkt. No. 5192, *In re Pittsburgh Corning*, No. 00-22876 (JFK), at 49-50 (Bankr. W.D. Pa. Dec. 21, 2006), *aff'd*, 260 Fed. Appx. 463 (3d Cir. 2008). Analysis by the American Bankruptcy Institute Journal further highlights the fact that insurance neutrality is a legal issue. *See* Leonard P. Goldberger, *Last Man Standing: Insurers' Participation in Plan Confirmation Process*, 27-NOV AM. BANKR. INST. J. 30, 30 (2008) (recognizing that the determination of whether a Plan is "insurance neutral" is a critical threshold

9

issue a court must resolve in order to determine whether the insurers have ***standing*** to object to a plan of reorganization.).

At bottom, Professor Priest is simply instructing the Court on how to rule on a legal issue, akin to submitting a legal brief on the insurance neutrality of the Plan and its impact on the Objecting Insurers' rights. *See Fisher,* 238 F.R.D. at 281. It is the task of the Court to determine whether the Plan is insurance neutral and whether the Insurers accordingly have standing to object to its Confirmation. The Court must decide if it affects Insurers' rights under the provisions of the Bankruptcy Code and other applicable law. Professor Priest provides no information that will assist this Court with this task.

**B.**    **Professor Shein's Report Should Be Excluded Because It Presents Impermissible Legal Conclusions And Is Unreliable, And He Is Not Qualified To Testify As An Expert.**

Professor Shein's opinions are inadmissible for similar reasons.[5] His report asserts that the structure of the Trust and TAC create an insurmountable conflict of interest (Exhibit B, Shein Report at ¶¶ 14-17) and that the exculpation provisions of the Plan and Trust Agreement insulate attorneys on the TAC from all malpractice claims. *Id.* at ¶¶ 29-32. At heart, these are legal conclusions that the Court must make. They are not the proper subject of expert testimony. Moreover, Professor Shein concedes he is not qualified to make such determinations.

**1.**    **Professor Shein's Expert Report Consists Entirely of Impermissible Legal Opinions.**

Just like Professor Priest, Professor Shein offers impermissible legal conclusions. Far from explaining or elucidating the evidence in this case in a way that would be otherwise

---

[5] Indeed, it is important to note at the outset that Professor Shein's opinions only relate to the TDP and its operations, which have nothing to do with whether the Plan is insurance neutral as a result of its express insurance neutrality provisions. As such, his testimony, if admissible at all, would only be admissible in Phase II of the Confirmation Hearing.

10

inaccessible to the trier of fact, Professor Shein's expert report merely offers legal analysis and conclusions, impermissibly usurping this Court's essential function.

Professor Shein sets out the fundamental problem with the Plan as he sees it in paragraphs 14-17 of his expert report. In his view, there is a fundamental conflict of interest because attorneys on the TAC represent individual Claimants seeking payments from the Trust. He claims that that these attorneys have a fiduciary duty to their individual clients to pursue unmeritorious claims on their behalf, thus creating an intractable conflict of interest because they have a fiduciary duty as TAC members to ensure that unmeritorious claims are not paid. Exhibit B, Shein Report at ¶¶ 14-17; *see also* Exhibit D, Shein Dep. at 41-42. According to Professor Shein, "[b]ecause members of the TAC also serve as attorneys for some (but not all) beneficiaries of the Trust, there is an inherent potential for a breach of the duty of loyalty to all Trust Beneficiaries." Exhibit B, Shein Report at ¶ 16.

Professor Shein also opines that "[t]he indemnification and exculpation clauses in the Plan and Trust Agreement significantly immunize members of the TAC from any liability resulting from negligent breach of fiduciary duties to the Trust or to their individual clients." *Id.* at ¶ 29. According to Professor Shein, the trust documents "allow[] for broad release for future improper behavior, and no recourse for malpractice against members of the TAC and for breaches of fiduciary duty." *Id.* at ¶ 37.

Professor Shein's report is legal advocacy at its core. It is filled with citations to law review articles, the Delaware Lawyers' Rules of Professional Conduct, and provisions of the Plan and Asbestos PI Trust Agreement. *See* Exhibit B, Shein Report at Shein Exhibit B ¶¶ 7-12, 22, 25, 30-31, 33. As Professor Shein acknowledges, "in order to render [his] opinions in this case," he "had to interpret various legal documents that are at issue in [this] case" and ultimately the Plan documents will be "interpreted by the Court." Exhibit D, Shein Dep. at 148-49.

11

Thus, for example, Professor Shein asserts that the Trust Agreement creates situations that will violate conflict-of-interest rules across the country, citing the Delaware Rules of Professional Conduct. Exhibit B, Shein Report at ¶¶ 21-22. However, he acknowledges that the Court can "probably" read these rules with the same level of attention that he reads them. Exhibit D, Shein Dep. at 108-09.

Similarly, Professor Shein opines on the operative *legal* effect of the Plan and Trust Agreement when he claims that their exculpation provisions insulate TAC members for malpractice claims in *any* capacity. Exhibit B, Shein Report at ¶¶ 29-32; Exhibit D, Shein Dep. at 123-24, 129. Again, however, he concedes that the obligations created by such documents are legal questions that the Court can decide. *Id.* at 127.

Professor Shein has not provided the Court with relevant information to guide its decisions. Instead he seeks to usurp the Court's function. The Court has the duty and responsibility to determine the operative legal effect of the Plan and corresponding documents. An expert "may not testify as to whether [a] legal standard has been satisfied." *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1212-13 (D.C. Cir. 1997). But this is exactly what Professor Shein tries to do. Indeed, he is not aware of "any instance" in which "an expert has been allowed in court to give testimony such as [his] regarding the propriety of an asbestos trust." Exhibit D, Shein Dep. at 159. For this reason alone, his opinions should be excluded.

### 2.    Professor Shein Has No Specialized Knowledge On The Issues He Addresses And Is Not Qualified To Testify As An Expert Witness.

Professor Shein's report is also inadmissible because he has no specialized knowledge on the issues he discusses and is not qualified to opine on these issues as an expert witness. *See, e.g. Faines*, 216 Fed. Appx. at  229; *Schneider*, 320 F.3d at 405.

12

Here, Professor Shein acknowledges that he has never been asked to participate in the design of an asbestos trust or been sought out as an expert on asbestos trust design. Exhibit D, Shein Dep. at 164. Nor has he previously held himself out as an expert in litigation on trust governance or trust procedures. *Id.* at 157. In particular, he admits that he is not an expert on the conflict-of-interest rules applicable to lawyers. *Id.* at 90. Nor does he purport to be "an expert on the interpretation of legal documents." *Id.* at 156.

Moreover, while he attempts to argue that his experience in "human behavior" qualifies him as an expert, such alleged expertise would not allow him to offer the opinions regarding the Trust representatives' fiduciary duties, alleged conflicts of interest, and interpretation of Plan documents that he seeks to present in this case. Even if such expertise were relevant to his opinions, Professor Shein lacks the requisite qualifications. Professor Shein is not a psychologist. Exhibit D, Shein Dep. at 156. He did not receive a Ph.D in psychology and has not published any research on human behavior in a peer review publication. *Id.* at 156-57. Accordingly, Professor Shein is not qualified to give the opinions he has submitted in this case, much less testify as an expert in "human behavior."

### 3.    Professor Shein's Expert Report Fails To Meet The Evidentiary Standard of Reliability.

Finally, Professor Shein's opinions are also fundamentally flawed and unreliable. Professor Shein is not aware of any instance in which Trust procedures similar to those he criticizes here have been found to be improper in any way. *Id.* at 164. Nor could he identify *any* experts who share his opinions regarding the structure of the Grace trust or any similarly structured trust. *Id.* at 160. Indeed, he is not aware of *any* instance in which the sort of Trust procedures he criticizes have actually resulted in the sorts of problems he hypothesizes might arise in his report. *Id.* at 164-65. There is simply no basis for the opinions he offers.

13

## III.    **CONCLUSION**

For the foregoing reasons, the Plan Proponents respectfully request that the Court strike

the reports submitted by George Priest and James Shein and preclude them from testifying at the

Confirmation Hearing.

Dated:  May 28, 2009

Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick
Lisa G. Esayian
Douglas Smith
300 N. LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

and

Theodore Freedman
Justin S. Brooks
Citigroup Center
153 East 53rd Street
New York, New York  10022-4611
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

and

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Kathleen P. Makowski (Bar No. 3648)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

*Co-Counsel for the Debtors and Debtors in Possession*

14

CAMPBELL & LEVINE, LLC

/s/ Mark T. Hurford
Mark T. Hurford (No. 3299)
800 N. King Street, Suite 300
Wilmington, DE 19801
Telephone: (302) 426-1900
Facsimile: (302) 426-9947
mth@camlev.com

and

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
375 Park Avenue, 35th Floor
New York, NY 10152-3500
Telephone: (212) 319-7125
Facsimile: (212) 644-6755

Peter Van N. Lockwood
Nathan D. Finch
Jeffrey A. Liesemer
One Thomas Circle, N.W.
Washington, D.C. 20005
Telephone: (202) 862-5000
Facsimile: (202) 429-3301

*Counsel for the Official Committee of Asbestos
Personal Injury Claimants*

PHILIPS, GOLDMAN & SPENCE, P .A.

/s/ John C. Philips
John C. Philips (Bar No.110)
1200 North Broom Street
Wilmington, DE 19806
Telephone: (302) 655-4200
Facsimile: (302) 655-4210
jcp@pgslaw.com

and

DOCS_DE:148777.1

ORRICK, HERRINGTON & SUTCLIFFE LLP
Roger Frankel
Richard H. Wyron
Jonathan P. Guy
1152 15th Street, NW
Washington, DC 20005
Telephone: (202) 339-8400
Facsimile: (202) 339-8500

*Counsel for David T Austern, Asbestos PI Future Claimants' Representative*

SAUL EWING LLP

/s/ Teresa K.D. Currier
Teresa K.D. Currier (Bar No. 3080)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6800
Facsimile: (302) 421-6813

and

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Philip Bentley
Gregory Horowitz
Douglas Mannal
David Blabey
1177 Avenue of the Americas
New York, NY 10022
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Official Committee of Equity Security Holders*

16