# EXHIBIT 3

1              THE COURT:  All right.  The --

2              MR. BROWN:  Your Honor, I just want to -- I mean the

3 motion that is up right now is the motion on Shein and Priest.

4 I --

5              THE COURT:  Yes.

6              MR. BROWN:  Sometimes these arguments tend to have a

7 tendency to stray off into subjects like that one.  I do think

8 that issue should be dealt with at the end, and there's going

9 to be a lot of talk I think on that particular issue.

10              THE COURT:  All right.  I'm still going to take a

11 five-minute recess, just so we can -- I'm sorry, Mr. Lockwood,

12 but, you know, like you, I have hit the age where occasionally

13 I need a recess.

14                          (Laughter)

15              MR. LOCKWOOD:  Touche.

16                          (Recess)

17              THE COURT:  Can you just get the other people, so we

18 can let Mr. Lockwood get started?

19                          (Pause)

20              THE COURT:  When you're ready, Mr. Lockwood.

21                          (Pause)

22              MR. LOCKWOOD:  Your Honor --

23              THE COURT:  Yes, sir?

24              MR. LOCKWOOD:  -- I'm here to address the motion in

25 limine filed by the plan proponents to strike the expert

1  reports and testimony of Professors George L. Priest and James

2  B. Shein.  I think in order to make this a little bit better

3  tied to some of the other things that are going on here, I

4  should start out by observing that as the record presently

5  stands, these professors have both -- have been designated

6  experts for both Phase I and Phase II.  So I'm going to try and

7  address separately their appropriateness in Phase I and then

8  discuss Phase -- their appropriateness as a Phase II witness

9  after I go through the Phase I.

10         I think this is fairly straightforward.  There's not

11  vast quantities of briefing and documentation that the Court

12  needs to deal with.  And, moreover, I don't want to waste the

13  Court's time.  Has the Court had the time to read the --

14         THE COURT:  I have.

15         MR. LOCKWOOD:  Okay, so I won't repeat stuff.  The --

16  dealing with Phase I first, and I'd like to start with

17  Professor Shein.  Professor Shein has been tendered as an

18  expert in -- it's not exactly clear to me what his professed

19  expertise that he's being offered to the Court is.  He --

20  because he -- and the briefing in opposition to our motion to

21  strike asserts that he's not -- even though he's a lawyer, he's

22  not offering legal opinion, so he's not a expert about law.

23  And even though he cites the Delaware Code of Ethics, he's not

24  being proffered as an expert in legal ethics.

25         Instead, his testimony I think can fairly be boiled

**J&J COURT TRANSCRIBERS, INC.**

1 down to the proposition that as a professed expert in some sort

2 of organizational structures and the avoidance of, I don't

3 know, conflicts of interest within organizational structures,

4 he's being tendered to say that he doesn't like the way the

5 trust agreement and the TDPs work insofar as the Trust Advisory

6 Committee has a role created by the trust agreement and in the

7 administration of the trust.  He thinks there's a potential or

8 actual conflict of interest in their role as what we'll call

9 TAC members where they have a fiduciary duty to the general

10 constituency of present claimants and their -- the fact that

11 they will also be tendering claims to the trust on behalf of

12 clients at their individual law firms.

13          I'm not going to address the substantive merits of

14 his views on that subject, but with respect to Phase I at

15 least, they have absolutely no relevance to the question of

16 whether the plan is insurance neutral.  I mean essentially he's

17 being tendered by some insurers who, if the plan is insurance

18 neutral, will have their rights to object to claims that are

19 presented to those insurers by the trust on the ground that

20 those claims are in some way or another tainted by conflicts of

21 interest that arose in the resolution of those claims by the

22 trust because of this role.

23          Again, whatever you might say about that position, it

24 doesn't tell the Court anything about whether or not Section

25 7.15 of the plan, which contains the insurance neutrality

1  provisions that Phase I will be all about, does or doesn't do

2  what it says.  And indeed, as we will hear probably some length

3  in the next portion of the discussion on the pretrial, it at

4  least is the plan proponent's view -- and I'm not sure really

5  that the insurers in their heart of hearts disagree with this

6  -- that the question of whether the plan is insurance neutral

7  or phrased differently impairs adversely if -- impacts the

8  rights of insurers is a legal issue.

9        I mean the -- as Mr. Bernick pointed out, the concept

10  originated with the Court in the context of a legal dispute

11  about the confirmation of a bankruptcy plan.  It's hard to

12  imagine anything more quintessentially legal than that.  But

13  Professor Shein, if you read his expert report, basically says

14  I don't think this is a good provision, and I -- we submit that

15  whatever else that might or might not have to say about

16  something, it doesn't address whether the plan is insurance

17  neutral, and, therefore, it has no possible relevance to Phase

18  I.

19        Now, the insurers in response to that have sort of

20  taken the position of, well, gee, it's not a jury trial, and so

21  motions to eliminate witnesses when it's a bench trial, you

22  know, let it all in, and the Court can decide whether to give

23  it weight or not.  But with all due respect, as you can tell

24  from their citation by Professor Shein of his own self-help

25  expert qualification, which is when he was tendered as a

1  witness in the <u>Thorpe Insulation</u> case, the Court in the process

2  of refusing to permit him to testify made some offhand comment

3  to the effect that oh, yeah, he's an expert in corporate

4  governance.  And, you know, they -- so once you let him in --

5  into Phase I, or for that matter, in Phase II, but we're

6  talking about Phase I at the moment, you have now qualified him

7  as an expert to testify, which they will -- can then cite in

8  other cases or to you -- either to you or other people.

9       Secondly, if they put him on, we're going to have to

10  spend time cross examining him, since we don't know what the

11  Court's ruling is going to be when he's tendered live as to

12  what, if any, relevance the Court thinks his testimony has, and

13  particularly if it's in Phase I, but the record in Phase I can

14  spill over into Phase II, because we don't want to necessarily

15  repeat the same evidence in two different phases.  It's going

16  to require us to cross examine him and redirect and all.  It

17  could use up a lot of time, and there's really no point to it

18  if we're right and his testimony simply has no relevance to

19  whether the plan is insurance neutral or not.

20       Professor Priest, again a Phase I witness, is a

21  little bit different, because although Professor Priest is also

22  a lawyer and indeed a law professor and indeed has no degrees

23  in economics, he professes, as quoted by the insurers in their

24  papers, to be testifying only about economics.  And insofar as

25  whether or not the plan is insurance neutral, he has -- which

1  is the Phase I issue, he has precisely four paragraphs of his

2  expert report that address that topic, Paragraphs 52 through

3  55.  And what do those paragraphs say?

4         Paragraph 52 says in part, "The plan claims to

5  incorporate a policy of insurance neutrality," in quotes, and

6  then he quotes Section -- portions of Section 7.15 of the plan.

7  That's Paragraph 52.  The Court doesn't need an expert to quote

8  portions of the plan to it.

9         Paragraph 53, "In terms of the economic structure of

10  rights and responsibilities established by Grace's policies,

11  there are multiple problems with the claim that this provision

12  establishes, quote, insurance neutrality, close quote, for the

13  plan."  And then he proceeds to -- he says, "First, the

14  provision is needlessly circular and, therefore, confusing."  I

15  don't believe that's an opinion of economics.  And I don't

16  believe -- and, Your Honor, if you've read the Phase I trial

17  briefs of the insurers, you may recognize that argument.  And

18  if you've read our briefs, you may see that we've responded to

19  it.

20         And he then proceeds to quote various sections of --

21  subsections of 7.15, and he ends up with a question.  "Since

22  the other insurer provisions of Section 7.15 declare the

23  primacy of the plan, e.g. Section 7.15B, are the insurers

24  contractual rights and coverage defenses preserved or excepted

25  from preservation?"  That's not an economic opinion.  That's

1 just argument, and it's just -- you don't need an expert.  It's

2 not appropriate to try and put lawyer brief arguments in the

3 mouth of a witness.  And that's it for Paragraph 53.

4          Paragraph 54 addresses whether or not the carve out

5 for the assignment of the insurance rights to the trust is

6 insurance neutral.  We agree it's not insurance neutral.

7 That's why it's a carve out.  Our argument as lawyers in the

8 appropriate time in Phase II, when it comes to addressing the

9 assignment issue, which is we all said all along is a Phase II

10 issue, is that even in Combustion Engineering in the Third

11 Circuit, where the issue of insurance neutrality was addressed

12 and the Court said that it was insurance neutral, they

13 simultaneously ruled that the transfer of insurance rights was

14 okay and preempted by the Bankruptcy Code.

15          So the Third Circuit didn't seem to find any

16 necessary conflict between insurance neutrality and a ruling on

17 the assignment issue.  But, in any event, number one, the

18 assignment issue is a Phase II issue, so it's -- so citing it

19 in the economist's brief as an example of an exception to

20 insurance neutrality is not offering any assistance to the

21 trier of fact either.

22          So we get to Paragraph 55.  "Even if plan Section

23 7.15 were interpreted to preserve all contractual rights and

24 coverage defenses of Grace's insurers, the assertion of a

25 contractual right or a coverage defense does not place an

1  insurer in the position for which it bargained to possess

2  control over the settlement of asbestos personal injury claims

3  brought against Grace," and it goes on.

4       What Paragraph 54 fairly read amounts to is a

5  statement as a matter of economics that there is no such thing

6  as insurance neutrality.  Even if you preserve all of the

7  rights, it still adversely affects them, and, therefore,

8  inferentially, the plan cannot be determined to be insurance

9  neutral, I guess.  Again, that has -- that's in -- to the

10  extent that that's relevant to anything, it's argument.  It's

11  not economics, and it certainly isn't something that the Court

12  needs to hear a live witness tell the Court the same thing

13  that's in a bunch of lawyer's briefs and will be an oral in

14  Phase II of the case as well as presumably, I believe, also in

15  Phase I.  I think we're going to hear -- when we get to the

16  Phase I argument, I think you will hear insurers basically

17  saying insurance neutrality either doesn't exist, or if there's

18  any exceptions to it, it doesn't exist, and we're prepared to

19  deal with all of that.  But Professor Priest offers up nothing

20  that is appropriate expert testimony on that subject.

21       Okay.  Now, let's turn to Phase II where we do get

22  into some of these issues.  Going back to Professor Shein,

23  Professor Shein, as we have pointed out earlier, testifies that

24  he doesn't think it's good policy, his words, to have a TAC

25  that has, as he describes it, these conflicting roles.  There's

1  a whole lot of problems with the analysis that he's gone

2  through, including the fact that he's not saying it violates

3  any law.  If we have to deal with his actual testimony, he

4  doesn't really have any explanation of how, why it's okay for

5  an Asbestos Claimants Committee to have lawyers on it that have

6  claims against the debtor as well as a fiduciary duty to all

7  the present claimants for the Committee.

8         If anything, he sort of suggests that, well, that's

9  the way it works as a matter of law.  Well, if it works that

10 way as a matter of law there, why doesn't it work that way for

11 an asbestos trust?  But again, that's sort of arguing on the

12 merits.  But the question is he's -- he's a professor of

13 business organization, and he's -- his testimony boils down to

14 asking this Court to tell the plan proponents that they should

15 rewrite the trust documents.  Trust documents, by the way,

16 which are identical to those of a number of other plans that

17 this Court has already confirmed.  Should rewrite those,

18 because the Court has been persuaded by Professor Shein that

19 they could be done better.

20        Mind you, these documents were not only sent -- they

21 were sent out for a vote by a class whose interests, unlike

22 with the insurers, were directly affected by these, and they've

23 said we can live with it.  We think it's okay.  And as Your

24 Honor has said from time to time, as we discussed confirmation

25 issues over the year, you don't get a line item veto here.  So

1  while -- even if Your Honor decided that you agree with

2  Professor Shein that the trust would be better off if the TAC

3  members didn't represent any individual clients, even though

4  they would -- there would be utility for representing the group

5  of present claimants, it would be markedly diminished, because

6  if they don't have any clients, then what are they going to

7  know about how client's claims and client's interests should be

8  protected.

9          But the -- putting that aside, that's really not

10 something that Your Honor at the end of the day has the power

11 to do, unless you decide that there's something illegal about

12 it.  It's a violation of law or ethics rules or something.  But

13 Professor Shein, as the insurers who sponsor him admit in their

14 papers, is not testifying that there's violations of law, nor

15 could he, or violations of ethical rules, which he's not an

16 expert on.  He's just in here sort of saying, Judge, I think it

17 would be a better way if we did it this way.  And with all due

18 respect to Professor Shein, that's not expert testimony that's

19 admissible in a controverted case where what you're talking

20 about is the legality of a plan that somebody has put up for a

21 vote and is seeking confirmation of.

22          Professor Priest is basically somewhat similar in the

23 sense that excluding the paragraphs that we've talked about on

24 the subject of insurance neutrality already.  Most of his

25 expert report talks -- contains generalities about the

1  economics of the interrelationship between insurers and

2  insureds, which while making interesting reading, doesn't

3  directly bear on any issue before the Court.  The Court is not

4  being asked to determine, make rulings on the economics of the

5  relationship between insurers and insureds.  And indeed the

6  testimony of those economics would largely be relevant, if to

7  anything, to coverage disputes as to whether or not certain

8  behavior by an insured was inconsistent not only with the

9  letter of an insurance policy but with the underlying economic

10 underpinnings of an insurance policy.

11         But this Judge -- excuse me -- this Court and the

12 insurers themselves coming to this Court are not seeking

13 coverage rulings from the Court.  They're not seeking -- we

14 haven't tendered to the Court the question -- a bunch of legal

15 questions, which when asked of Professor Priest, he eschewed

16 any intention to testify about, as to what exactly are the

17 circumstances under which, for example, the insurer's right to

18 consent to the settlement of claims is waived or can be

19 overridden by reasonable settlements or what have you.

20         There's a lot of case law out there, depending on the

21 facts and circumstances, and nobody has -- is asking this Court

22 to hypothesize an action by the trust against the insurers for

23 coverage and seeking a determination based on the hypothetical

24 facts and circumstances relating to that tender of claims by

25 the trust to the carriers as to whether or not the trust's

1 handling of those claims, hypothetically, does or does not

2 under applicable non-bankruptcy insurance law comport with the

3 provisions of their policies.  And Professor Priest, for sure,

4 professes not to be talking about that.

5          So what is he talking about?  Well, he's got a

6 section of his report called -- Roman V, Problematic Features

7 of the Grace Plan from the Standpoint of Economics, and it

8 basically runs from Paragraph 39 to Paragraph 50.  And I'm not

9 going to take the Court through all of those paragraphs, but if

10 you read them, it's clear that essentially if -- if the plan is

11 insurance neutral, then all of the so-called defects in the

12 plan that Professor Priest is talking about again as an

13 economist are preserved to be the subject of defenses to

14 coverage raised by insurers down the road.  And Professor

15 Priest, other than the economic patina that he professes to add

16 to these -- to the points he's making in these paragraphs is

17 making the exact same arguments about why the plan is adversely

18 impacting insurer's rights that the insurers lawyers in their

19 briefs are making.  So again, he's not contributing anything to

20 the trier of fact that the lawyers aren't contributing, and,

21 therefore, we would submit that his testimony on that subject

22 is improper expert testimony.

23          And at the end he even delivers an opinion on the

24 subject of -- in Paragraphs 50 and 51 about why the transfer of

25 insurance rights is a violation of the economic expectations of

1 insurers where we litigated that in front of Your Honor on a

2 number of occasions now, and as far as I'm aware, Your Honor

3 has never indicated a need to hear an economist tell you that

4 some -- that that economist is of the opinion that even if

5 there's bankruptcy preemption, that nevertheless you shouldn't

6 do it, because it has an economic effect on the insurer's

7 expectations or something like that.

8          So bottom line is we don't think that Professor Shein

9 and Professor Priest have either relevant or, for want of a

10 better word, competent expert testimony to contribute to this

11 case at either Phase I or Phase II stages, and we would request

12 -- respectfully request Your Honor to grant the motion in

13 limine to exclude their testimony.  Thank you.

14          THE COURT:  Good afternoon.

15          MR. PRATT:  Good afternoon, Your Honor.  Warren Pratt

16 representing GEICO Republic Insurance Company and Seaton

17 Insurance Company.  We respectfully submit that the motion in

18 limine should be denied for three reasons, and I'll cover these

19 quickly.

20          First, these proffered experts are imminently

21 qualified.  Second, their opinions are reliable as required by

22 Rule 702 of the Federal Rules of Evidence.  And third, we

23 believe their opinions will be helpful to the Court.  I'm just

24 going to start very briefly with qualifications.

25          Professor Priest is a professor of law and economics

1  the debtor under the plan, and the appointment to or

2  continuance in office of individuals is consistent with the

3  interest of creditors and equity security holders and with

4  public policy."

5       What it deals with there is that the people who are

6  going to run successors to the debtor, and I would suggest that

7  this trust is a successor to the debtor with respect to

8  asbestos claims, that the interest there, the Court's interest

9  there is to determine whether or not those -- the continued

10  role of those TAC advisors and the trustee is consistent with

11  the interest of creditors and with public policy.  It has

12  nothing to do with the vote, and the Court can make an

13  independent determination of that.  And if the Court believes

14  that the TDP structure is not a good structure even if it's not

15  illegal in the sense -- in the sense I think the Court was

16  using that word you can reject the plan.  And that was the

17  entirety of my remarks.  You have that authority.

18       THE COURT:  All right.  Thank you.  Somebody who

19  thinks the Court has discretion.  Gee.

20       MR. BERNICK:  We'll see if they stand by that

21  position when Your Honor rules.

22       MR. LOCKWOOD:  Well, I'd really like to see whether

23  they'd stand by Mr. Demmy's last argument, because if the trust

24  is a successor to the debtor then we don't really have much

25  trouble with, for example, things like assigning the insurance.

1 Because the trust -- it's not an assignment.  The trust is a

2 successor, it just -- the insurance just goes over.  And I

3 won't be here arguing with the reimbursement insurers over

4 whether or not the trust stands in the shoes of Grace when it

5 comes to resolving claims, et cetera.  The fact of the matter

6 is the only decided cases under 1129(a)(5) have specifically

7 held that it doesn't apply to trustees of -- trusts of this

8 order or liquidating trust or anything else.  And that's kind

9 of spur of the moment stab, but it really -- I'm going to carry

10 the day.

11          Let's go back to a couple points, Your Honor.  First,

12 Mr. Pratt was arguing about, you know, voting and nuances and

13 stuff like that.  What Mr. Pratt ignores which he would know if

14 he actually looked at the votes in this, is that the vast

15 majority of the master ballots were cast by law firms that are

16 not members of the TAC.  And those lawyers were operating on

17 their view of their fiduciary duties to their clients, and they

18 voted in master ballots to have these people be on the TAC.  So

19 they made a decision that it was okay.

20          They were willing to trust the TAC members to fulfill

21 as they did when they were ACC members.  I mean, somebody, Mr.

22 Pratt or Mr. Giannotto made the comment about the fact that the

23 TAC members were generally, if not invariably, chosen from

24 members of the ACC which was, of course, appointed by the U.S.

25 Trustee.  And so the idea that there's some sort of voting

1  issue here or that the people that are voting don't know that

2  the TAC members have their own clients that will be presenting

3  claims to the trust is, with all due respect, absurd.  It's

4  just not true.

5           Now, another question was raised, well, is it fair to

6  future claimants?  And indeed that ties to the notion about the

7  Court has to make sure that similar -- 524(g) says that similar

8  claims have to be treated similarly.  Actually if you look at

9  that particular provision it says that the presents and the

10 futures have to be treated similarly.  Not that the presents

11 among themselves all have to be treated similarly.  And that

12 points up the fact that the futures representative, who is in

13 fact the effective guardian ad litem for the future claimants,

14 has signed off on the TAC.  And I would suggest that with all

15 due respect David Austern, who was chief claims handling

16 executive for the Manville Trust for the last 20 years,

17 probably has a whole lot better idea about what's in the

18 interest of asbestos claimants than Professor Shein who

19 concededly has never had anything to do with an asbestos trust.

20 And as for Mr. Giannotto's assertion that he's going to testify

21 in his role involved in some pension trust he's had -- he's

22 seen similar situations that have given rise to similar

23 problems, there's not one word in his expert report that says

24 that.  And if the idea is that having had his deposition taken

25 and his nose rubbed in the fact that he doesn't know anything

1  about any of the way these trusts operate and has no experience

2  with them and is sauntering in here and making opinions about

3  conflicts that he's now going to show up at trial live and

4  start talking about stuff that he didn't talk about in his

5  report and he didn't say anything about in his deposition is

6  totally unacceptable as a basis for trying to defend against a

7  motion in limine to exclude his testimony.

8      Don't take my word for it, read his opinion, and see

9  if you -- when you get right down to it Professor Shein has one

10 thing to contribute to the Court as the trier of fact, one

11 thing, which is the observation that the TAC members are going

12 to have fiduciary duties to the present claimants as a whole,

13 and are going to be submitting claims to the trust on behalf of

14 their individual clients, and that there's theoretically the

15 possibility for conflicts there.  That's not in dispute.  We

16 don't need Professor Shein to make that observation.  But

17 that's the only fact that he's testified about in his expert

18 report.  Everything else is hypothetical speculation about

19 conflicts of interest.

20     And you heard Mr. Giannotto up here testifying quite

21 vigorously about all the hypothetical conflicts that he

22 personally sees.  He can make those arguments as good as

23 Professor Shein.  Indeed, he appears to be able to make them

24 better, because he certainly made a lot more of them than

25 Professor Shein made.  So, I mean --

1          MR. GIANNOTTO:  Can I testify then?

2          MR. LOCKWOOD:  The point being that if you don't have

3    expertise in the way trusts are run, and you don't have

4    expertise in the way in which a complex mechanism where you

5    have, as the Court pointed out, the trustees with overall

6    fiduciary duty, a futures rep who doesn't represent claimants,

7    and a TAC who have co-equal rights as advisors, that if you

8    don't know how that works, it is not helpful to the trier of

9    fact to have you come in and speculate about how it might work

10   because of the undisputed fact that you act in both capacities.

11   The Court can speculate to that extent just as well as

12   Professor Shein can, and maybe as well as Mr. Gianotto can, I

13   don't know.  But we're not here to test the speculative

14   capacity of either the professor, Mr. Giannotto or the Court.

15         The question again comes back to the notion of under

16   Rule 702, what facts is Professor Shein going to be presenting

17   to the Court that the Court can't figure out for itself, that

18   will help the Court in resolving issues that are before the

19   Court?

20         And my final point is that nobody ever satisfactorily

21   answered the question about what legal provision is being

22   violated by the trust structure that this Court would have the

23   power to deny confirmation over.  If they want to make that

24   argument, and if they have standing to make that argument, they

25   can do it in Phase II.  We're not here today to resolve plan

1  confirmation objections.  We're only here today to determine

2  whether Professor Shein and Professor Priest have helpful

3  testimony that this Court needs the assistance of in deciding

4  the legal issues that Mr. Giannotto has told the Court will be

5  presented allegedly in the capacity of insurers as creditors in

6  Phase II.  We will get to in Phase II the question of whether

7  they are creditors.  Again, that's not here in connection with

8  this motion in limine.

9         The final point I would make is be careful what you

10 wish for.  The citation to Combustion Engineering about the

11 claims -- the insurers not having any right to handle claims

12 prior to the petition, that's what the reimbursement agreement

13 trial was all about in Phase II.  Because they didn't -- the

14 ones that were paying, unlike the ones that are here today

15 arguing about this, didn't have any right to handle claims

16 either.  Grace was the one that was handling the claims.  And

17 we're going to litigate that issue.

18        Now, if the nonsettling insurers, not the

19 reimbursement insurers, but the nonsettling insurers would like

20 to participate in that noninsurance neutral litigation so that

21 the Court could rule that the plan -- that the TDPs don't

22 violate their rights because no insurers prior to the petition

23 had the right to handle claims and the nonsettling insurers if

24 and when their coverage was reached would be in no different

25 position because they're excess insurers than the reimbursement

1 insurers were well, there's a provision in the plan in the

2 neutrality provision that allows them to do that.  They can go

3 in and litigate that, and if they lose it then they're going to

4 be bound by res judicata or collateral estoppel.

5      But I don't really think they want to litigate that

6 issue, Your Honor.  I think that again was just kind of a make

7 weight argument to make it sound like Professors Priest and

8 Shein had admissible testimony here that would help the Court

9 in determining whether or not somebody, you know, had a claim

10 or something like that.  But the bottom line is nobody has

11 identified to you, I believe, a single fact that the purported

12 expertise of these two professors is presenting to you that's

13 going to help you decide any issue that you're facing in this

14 case.  And certainly not in Phase I.

15      THE COURT:  I am a little, I guess, confused as to

16 how these experts have anything to offer with respect to the

17 neutrality issue that's coming up for Phase I.  I can have a

18 different view, perhaps about Phase II.  But I'm really not

19 seeing it so much for the Phase I issues.  So perhaps somebody

20 can tell me what you think is relevant to the neutrality

21 provisions that we're going to be talking about.

22      MR. PRATT:  In terms of Professor Shein, he's not

23 relevant to the neutrality provisions.  The issue we had is is

24 he still encompassed in Phase I, because we weren't -- it's not

25 clear -- it wasn't clear to us from the wording of the order