# EXHIBIT 24

Case 01-01139-AMC   Doc 22814-24   Filed 08/14/09   Page 2 of 13

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
- - -

| | | |
|---|---|---|
| In Re: | : | Chapter 11 |
| | : | |
| | : | Case No. |
| W.R. GRACE & CO., et al, | : | 01-01139 JKF |
| | : | |
| | : | (Jointly |
| Debtors | : | Administered) |

- - -

Friday, May 1, 2009

- - -

Oral deposition of PETER VAN N. LOCKWOOD, ESQUIRE, taken pursuant to notice, was held at the offices of CAPLIN & DRYSDALE, One Thomas Circle N.W., Suite 1100, Washington, DC 20005, commencing at 9:43 a.m., on the above date, before Lori A. Zabielski, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Pennsylvania.

- - -

MAGNA LEGAL SERVICES
Seven Penn Center
1635 Market Street
8th Floor
Philadelphia, Pennsylvania 19103

Page 10

1   EXHIBITS (continued)
2
3   NO.   DESCRIPTION                         PAGE
4   6    Exhibit-19 to Exhibit Book           83
5   7    Settlement Agreement
         * CONFIDENTIAL *                     144
6
    8    Complaint for Declaration of
7        the Relief...                        175
8   9    Diagram                              175
9   10   Exhibit-2 to Exhibit Book            196
10  11   Exhibit-4 to Exhibit Book            224
11  12   Exhibit-10 to Exhibit Book           260
12  13   Travelers Casualty and Surety
         Company's Notice of Deposition
13       to the Official Committee of
         Asbestos Personal Injury
14       Claimants...                         267
15  14   Debtors' Disclosure...                280
16  15   Documents bearing Bates stamps
         TRAVAS0000019 through 141
17       * CONFIDENTIAL *                     289
18  16   Notice of Service of Discovery       324

Page 11

DEPOSITION SUPPORT INDEX

Direction to Witness Not to Answer:
Page   Line        Page   Line
NONE

Request for Production of Documents:
Page   Line        Page   Line
NONE

Stipulations:
Page   Line        Page   Line
12     02

Area(s) Marked Confidential:
Page   Line        Page   Line
152    01   through 168    03
292    01   through 311    14

Page 12

(It is hereby stipulated and agreed by and among counsel for the respective parties that the filing, sealing and certification of the deposition are waived; and that all objections, except as to the form of the question, will be reserved until the time of trial.)

---

PETER VAN N. LOCKWOOD, ESQUIRE, after having been first duly sworn, was examined and testified as follows:

---

EXAMINATION

---

(ACC 30(b)(6)-1 and 2 premarked for identification.)

---

BY MR. BROWN:
Q. Good morning, Mr. Lockwood.
A. Good morning, Mr. Brown.
Q. You are appearing here today

Page 13

as the Rule 30(b)(6) designee for the ACC, correct?
A. Correct.
Q. And that is with respect to a number of 30(b)(6) notices, correct?
A. A very large number, yes.
Q. Can you look at the one that's been put before you and marked ACC Rule 30(b)(6)-1, which I will call ACC-1 here after.
A. I have it.
Q. Can you identify it?
A. It is an Amended Notice of Deposition of Asbestos PI Committee Pursuant to Rule 30(b)(6) served by four insurance companies, One Beacon, Seaton, Geico, and Columbia. And it contains an attachment with definitions and topics which are the subject matter of testimony.
Q. Okay. And can you look at the document that I put before you that's marked ACC-2.
A. I have it.

Page 14

1  Q. And identify that document,
2  please.
3  A. That document is the
4  Objections of the Official Committee of
5  Asbestos Personal Injury Claimants to
6  Rule 30(b)(6) Notices of Deposition
7  served by Certain Plan Objectors.
8  Q. Okay. And is it correct
9  that you are here today prepared to
10 testify about the topics that are listed
11 in ACC-1 subject to the objections that
12 appear in ACC-2?
13 A. The answer to that question
14 is yes, subject to the following caveats:
15 To the extent that the topics in this
16 notice or any of the other notices are
17 subjects that the ACC has a person with
18 knowledge on, I am here to testify about
19 it. To the extent that the ACC doesn't
20 have a person with knowledge on certain
21 topics, then I am here to testify that
22 the ACC doesn't have knowledge on those
23 topics.
24 Q. Okay. And --

Page 15

1  A. And to the extent that
2  occurs, we will see how it occurs in the
3  course of the questions.
4  Q. Okay. And then you
5  mentioned ACC and a person with the ACC.
6  How are you using the term
7  "ACC"?
8  A. I am using it as the entity
9  that was appointed in the bankruptcy case
10 by the U.S. Trustee.
11 MR. BROWN: ACC-3.
12     (ACC 30(b)(6)-3 marked for
13 identification at this time.)
14 BY MR. BROWN:
15 Q. Okay. Mr. Lockwood, you now
16 have before you a document that should
17 have two exhibit labels on it. One is an
18 Exhibit-12 from the deposition of
19 Mr. Finke, and the other is ACC-3.
20 Could you identify the
21 document that has been marked as ACC-3?
22 A. It appears to be a Form 8-K
23 file by W.R. Grace & Company dated April
24 6, 2008.

Page 16

1  Q. Have you ever seen this
2  document before?
3  A. Frankly, I am not sure.
4  Q. Okay.
5  A. I may have, I may not have.
6  Q. All right. Why don't you go
7  to the back of the document, starting
8  with page 9.
9  A. Page 9 or page 8?
10 Q. I am sorry. Page 8.
11 A. I am there.
12 Q. Can you identify that
13 document?
14 A. It appears to be a copy of a
15 Term Sheet for the Resolution of Asbestos
16 Personal Injury Claims entered into by a
17 variety of parties, including the ACC.
18 Q. Okay. Have you seen the
19 Term Sheet, either this Term Sheet or
20 some iteration of it previously?
21 A. I have seen the original of
22 it.
23 Q. Okay. Can you take a look
24 at what you have before you and tell me

Page 17

1  whether it differs in any way from the
2  original?
3  MR. FINCH: Objection.
4  THE WITNESS: On the face of
5  it, it does not appear to
6  different. I mean, obviously, a
7  comparison of the original and
8  this copy would be the definitive
9  way of determining whether there
10 is a difference, but this looks to
11 be the same, as best I can recall.
12 BY MR. BROWN:
13 Q. Okay. And this document was
14 negotiated by the parties that executed
15 it, is that correct, or their counsel?
16 A. Broadly speaking, yes. I
17 mean, negotiated implies human beings in
18 a room or in some communication, and
19 these are all entities. So various
20 representatives of the entities that are
21 listed here in negotiated this document
22 on behalf of their respective principals.
23 Q. Is there anything in the
24 Term Sheet that you can see that's

Page 18

1  inaccurate?
2      MR. FINCH: Object to form.
3      THE WITNESS: To answer that
4  question, I would have to read
5  every word in the Term Sheet and
6  determine whether or not there are
7  statements in here which are
8  contained facts which might be
9  erroneously stated. I am not sure
10 that there are any such things.
11 BY MR. BROWN:
12     Q. Take a moment to review it,
13 if you would. It's not that long.
14     A. Well, I have read it. As
15 far as I can tell, it is accurate in the
16 sense that it states the terms of an
17 agreement, and those are the terms of the
18 agreement. It doesn't purport to recite
19 facts.
20     Q. Okay. Look at the first
21 sentence. There is a reference there to
22 certain of the principal terms and
23 conditions.
24     Do you see that?

Page 19

1     A. I do.
2     Q. Were there other principal
3  terms and conditions that were left off
4  the Term Sheet?
5     A. I don't believe there were
6  that had been negotiated, agreed on.
7  It is common that a Term
8  Sheet is subject to a definitive
9  agreement. And in a complicated
10 bankruptcy case, involving a complicated
11 settlement, it would be my understanding
12 and I believe the understanding of
13 everybody else that was involved in this
14 that this Term Sheet would only purport
15 to set out certain of the most -- what
16 the parties consider to be the most
17 important terms, and other terms would
18 remain to be negotiated as part of the
19 drafting of either the definitive Plan or
20 a more definitive settlement agreement or
21 whatever document would be required to
22 flesh out the details.
23     Q. Okay. Can you turn to page
24 9, and you will see under the Romanette

Page 20

1  5, there is a sentence that begins,
2  "Provided however..."?
3      A. Yes.
4      Q. Do you know to what that
5  refers?
6      MR. FINCH: Objection. I
7  caution the witness not to reveal
8  any privileged communications. If
9  you can answer the question
10 without divulging privileged
11 information, you can do so.
12     MS. HARDING: And I am going
13 to object also as to privilege as
14 to the relevancy of negotiations,
15 and I believe that -- well --
16 okay.
17     THE WITNESS: I am trying to
18 remember what this phrase referred
19 to at the time this Term Sheet was
20 entered into. As best I can
21 recall, at the time of the Term
22 Sheet, the concept that was
23 reflected by this language was
24 that what was going to be

Page 21

1  transferred to the Trust was
2  coverage for asbestos personal
3  injury claims, and to the extent
4  that there was coverage that
5  didn't -- that somehow or another
6  didn't cover asbestos personal
7  injury claims, like, for example,
8  workers' compensation insurance,
9  that wouldn't be transferred to
10 the Trust.
11     But since this Term Sheet
12 was superseded by the Plan
13 ultimately, I am not sure exactly
14 what the significance of this
15 particular term at this time is.
16 BY MR. BROWN:
17     Q. Okay. Well, putting aside
18 workers' compensation coverage, is there
19 any other coverage that you are aware of
20 that Grace has under the policies that
21 are being transferred to the Asbestos PI
22 Trust?
23     MR. FINCH: Objection to the
24 form.

Page 22

1 THE WITNESS: The answer to
2 that is certainly, yes.
3 I mean, for example, Grace
4 has insurance beginning in -- I
5 don't know -- 1986 or so that
6 contains asbestos exclusions,
7 running up through today, and none
8 of that insurance is being
9 transferred to the Trust because
10 it doesn't provide any coverage
11 for asbestos personal injury
12 claims.
13 BY MR. BROWN:
14 Q. What if we limited it to
15 asbestos insurance rights? In other
16 words, the policies -- the asbestos
17 insurance rights are being transferred to
18 the Trust by Grace, correct?
19 A. Well, you are using a term
20 that is a term that is defined in the
21 Plan, and as defined in the Plan, the
22 asbestos insurance rights under the terms
23 of the Plan and the Insurance Transfer
24 Agreement are being transferred to the

Page 23

1 Trust.
2 Q. Okay. And does that include
3 all the coverages under the policies that
4 are covered by that term?
5 A. I have no idea, because
6 asbestos insurance rights are not
7 asbestos insurance policies, and I have
8 not undertaken to examine each and every
9 policy that does or might provide
10 coverage for asbestos personal injury
11 claims to determine whether or not there
12 is some coverage under that policy that
13 doesn't and that might not be
14 transferred.
15 As a general proposition, my
16 recollection is that the Plan is pretty
17 specific about what's being transferred
18 and what's not.
19 There is an Exhibit-5, for
20 example, that lists various categories of
21 policies and settlement agreements and
22 things of that nature. There is the
23 Insurance Transfer Agreement; there are
24 schedules of insurance rights.

Page 24

1 Trying to answer a question
2 from memory that's as broad and all
3 encompassing as that, I think frankly is
4 virtually impossible, and I don't think I
5 can do it any better than I just did.
6 MR. BROWN: Okay. And just
7 so everyone knows how we are going
8 to be handling the question
9 regarding Plan documents, we are
10 going to mark certain Plan
11 exhibits as separate exhibits in
12 the deposition.
13 Mr. Lockwood has a
14 separately tabbed collection of
15 all the Plan documents. He wants
16 to work off of that. I have no
17 problem with that. But, for
18 purposes of the record, it will be
19 the individual Plan documents that
20 we are referring to.
21 THE WITNESS: For purposes
22 of the record, what I have in
23 front of me is the printed book
24 called Exhibit Book to First

Page 25

1 Amended Joint Plan of
2 Reorganization and Disclosure
3 Statement as of February 27, 2009,
4 which is the document that was
5 distributed to people to vote on
6 the Plan. And the only -- there
7 are no markings or anything in it.
8 What I have had done is, so
9 that I could have ready access to
10 the multiple -- well, there are 33
11 exhibits in this book, and I have
12 simply had numerical tabs placed
13 on the first page of each separate
14 exhibit, so that if somebody wants
15 me to find an exhibit, I can look
16 to the tab rather than pawing
17 through hundreds of pages of
18 documents to see where the
19 exhibit, in fact, can be found.
20 BY MR. BROWN:
21 Q. All right. Mr. Lockwood,
22 can you take a look at Exhibit 6?
23 MR. BROWN: And we will have
24 that marked as ACC-4.

Page 42

```
 1         I just don't remember for
 2    sure whether they were involved in
 3    the first Plan or whether they got
 4    involved between the first Plan
 5    and this Plan. I think they were
 6    involved in the first Plan.
 7  BY MR. BROWN:
 8      Q.  Okay. Would your answer be
 9  the same for the Fresenius indemnified
10  parties?
11         MS. HARDING: Object under
12    408. I think we should take a
13    break. I would like to consult
14    with counsel.
15         MR. BROWN: Okay.
16         THE WITNESS: Does that
17    include me or do you want to just
18    talk to him?
19         MS. HARDING: I will talk to
20    Nate.
21         (There was a break from
22    10:15 a.m. to 10:17 a.m.)
23         MR. FINCH: Can we read back
24    the pending question?
```

Page 43

```
 1         (The reporter read from the
 2    record as requested.)
 3         MR. FINCH: You can answer
 4    that question.
 5         THE WITNESS: In general,
 6    yes, although their involvement
 7    was less.
 8  BY MR. BROWN:
 9      Q.  Okay. What was the
10  involvement of Sealed Air and Fresenius
11  in the drafting of the Plan documents?
12         MR. FINCH: Objection,
13    instruct the witness not to
14    answer.
15         MS. HARDING: Objection.
16         MR. JACOB COHN: Basis,
17    please.
18         MR. FINCH: Basis is Judge
19    Fitzgerald's ruling that Plan
20    negotiations and the draft Plan
21    Agreement are not relevant to the
22    confirmability of the Plan.
23         MS. HARDING: Same
24    objection.
```

Page 44

```
 1  BY MR. BROWN:
 2      Q.  Let me, Mr. Lockwood, refer
 3  you back to ACC-2, which was the
 4  objection, and direct your attention
 5  specifically to paragraph 3.
 6      A.  I see it.
 7         MR. BROWN: Okay. This is
 8    more directed to Nate than anyone
 9    else. There are, as you might
10    guess, a whole host of questions
11    that lots of people in this room,
12    including myself, would want to
13    ask concerning the negotiations of
14    the Plan and the Plan documents as
15    well as questions about prior
16    drafts that weren't filed.
17         Is it safe to say that you
18    will object to those questions and
19    instruct the witness not to
20    answer?
21         MR. FINCH: That is correct.
22         MR. BROWN: Okay. Then with
23    the caveat that we won't ask them
24    simply because we are not here to
```

Page 45

```
 1    waste everyone's time, I am going
 2    to move forward and not ask
 3    questions about the negotiations.
 4         Can we have an agreement on
 5    that ground?
 6         MR. FINCH: Sure. We can
 7    have an agreement on that point.
 8         MR. BROWN: And in the event
 9    that that is ever reversed or your
10    position is not upheld by the
11    court, we would have an
12    opportunity to come back and ask
13    questions about the drafting as
14    well as the negotiations.
15         MR. FINCH: If Judge
16    Fitzgerald reverses herself on
17    what she has ruled in various
18    other cases, you would have that
19    opportunity.
20         MR. BROWN: Or some higher
21    court.
22         MR. FINCH: Or some higher
23    court.
24         MR. BROWN: Fair enough.
```

Page 46

1  MR. JACOB COHN: I want to
2  be perfectly clear here that you
3  are not relying upon not a ruling
4  that you don't need to answer
5  questions at these depositions on
6  this subject, but your position is
7  that this is a relevance objection
8  and you are instructing not to
9  answer on the basis of relevance.
10  MR. FINCH: That's right.
11  MR. JACOB COHN: And you are
12  aware of the local Delaware rules
13  on this subject?
14  MR. FINCH: Yes, I am.
15  MR. JACOB COHN: I am.
16  MR. BROWN: Thanks, Jacob.
17  MR. SPEIGHTS: Excuse me.
18  This is Dan Speights, representing
19  Anderson Memorial Hospital.
20  Mr. Finch, would you advise
21  us of what rulings you are
22  referring to?
23  MR. FINCH: Sure. If you
24  look at the ACC's objections to

Page 47

1  the 30(b)(6) notice, Dan --
2  MR. SPEIGHTS: If it's
3  contained in there, just refer to.
4  I want to make sure if we want to
5  file a motion, we have the basis
6  of your objection.
7  MR. FINCH: Yes. The basis
8  of the objection is set forth on
9  page 2, paragraph number 3, and
10  ACC deposition Exhibit-2 to this
11  deposition.
12  MR. SPEIGHTS: Thank you,
13  Mr. Finch.
14  BY MR. BROWN:
15  Q. Okay. Mr. Lockwood, in the
16  period between the Term Sheet and the
17  filing of the initial Plan in September,
18  was any asbestos insurance entity invited
19  to participate in the negotiation of the
20  Plan documents or the drafting of the
21  Plan documents?
22  MS. HARDING: Same
23  objection.
24  THE WITNESS: I have no

Page 48

1  knowledge whether they were or
2  were not.
3  BY MR. BROWN:
4  Q. To your knowledge, did any
5  asbestos insurance entity actually
6  participate?
7  MS. HARDING: Same
8  objection.
9  THE WITNESS: I have no
10  knowledge that they did.
11  BY MR. BROWN:
12  Q. Was any asbestos insurance
13  entity consulted concerning any term or
14  provision in the Joint Plan or any Plan
15  documents?
16  MS. HARDING: Same
17  objection.
18  THE WITNESS: In the same
19  period?
20  MR. BROWN: Correct.
21  BY MR. BROWN:
22  Q. From April 2008 to
23  September, when the initial Plan was
24  filed in September of 2008.

Page 49

1  A. I have no knowledge that
2  anyone was.
3  Q. Were any asbestos insurance
4  entities consulted regarding the
5  assignment or transfer of their policies
6  or proceeds under their policies to the
7  Asbestos PI Trust in that time period?
8  MS. HARDING: Same
9  objection.
10  THE WITNESS: I have no
11  knowledge that they were or were
12  not.
13  BY MR. BROWN:
14  Q. Did any consent?
15  A. I have no knowledge --
16  MS. HARDING: Same
17  objection.
18  THE WITNESS: -- that anyone
19  did, in fact, consent.
20  BY MR. BROWN:
21  Q. Okay. Now, I want to focus
22  your attention now on the period after
23  the initial Plan was filed.
24  In that period, after the

Page 94

1  addition or on an ad hoc basis, it was
2  done. But in either event, I don't
3  recall that process ever having been
4  contested by anybody and, therefore, been
5  the subject of a judicial opinion that it
6  was or wasn't okay.
7      Q.   Let's look back at the
8  definition, and I want to focus your
9  attention on the language that appears
10 after the italicized phrase, "provided
11 however."
12         MR. FINCH: This is
13 definition 200?
14         MR. BROWN: Yes.
15         THE WITNESS: After the
16 italicized, "provided however,"
17 yes.
18 BY MR. BROWN:
19     Q.   That language.
20     A.   Yes.
21     Q.   There is a reference there
22 to "the Asbestos Insurance Settlement
23 Agreement is approved by the Court..."
24         Do you see that?

Page 95

1      A.   Yes.
2      Q.   When is it anticipated that
3  such approval will be sought?
4      A.   Well, it sort of depends on
5  which Asbestos Insurance Settlement
6  Agreement you are talking about.
7      Q.   Pre-petition.
8      A.   My anticipation is that the
9  confirmation process itself, since those
10 agreements are already listed on
11 Exhibit-5, would constitute the approval
12 process. I don't know that we
13 contemplate at the moment a separate
14 procedure for submitting those agreements
15 for approval.
16         And if nobody -- I mean, if
17 somebody objected, I guess you might wind
18 up with some kind of separate proceeding.
19 But at the moment, at least, my view, it
20 would be rolled into the confirmation
21 process.
22     Q.   Okay. Let me focus your
23 attention now on the "further provided ,"
24 the language that appears after "further

Page 96

1  provided."
2      A.   Yes.
3      Q.   My question with respect to
4  this language is, how does a settled
5  asbestos insurance company on Exhibit-5
6  ascertain the scope of the protection
7  that is being afforded it by the asbestos
8  PI channelling injunction?
9          MS. HARDING: Objection to
10 form.
11         MR. FINCH: Same objection.
12         THE WITNESS: The same way
13 anybody else in the universe would
14 try and figure that out.
15         To say that 524(g) is not
16 the world's most precisely worded
17 statute is something of an
18 understatement. Combustion
19 engineering has made it pretty
20 clear that you can get the
21 protection provided by the
22 statute, but you can't protect
23 anything that's not covered by the
24 statute.

Page 97

1          So if you've got a type of
2  claim that nobody is fighting you
3  about in a confirmation process
4  over whether it is or isn't
5  covered, then you have to make
6  your own judgment as to whether or
7  not some claim that might be
8  brought against any
9  asbestos-protected party might be
10 covered.
11         You don't put in a Plan or a
12 Disclosure Statement a multipage
13 litany of hypothetical causes of
14 action that you think might or
15 might not be brought by somebody
16 at some time, somewhere, and then
17 say, in my opinion, these fall on
18 the good side of the line and
19 these fall on the bad side of the
20 line.
21 BY MR. BROWN:
22     Q.   Okay. There are a number of
23 different asbestos-protected parties
24 under this Plan.

Page 114

1   agreements, under the TDP, will satisfy
2   the obligations of the Debtors to those
3   insurers, such that they will have to
4   perform under those agreements.
5        The asbestos -- the insurers
6   holding such agreements have indicated
7   that they disagree with that legal
8   principle, or proposition. There will be
9   in Phase 2 of the confirmation
10  proceedings evidence taken as to the
11  extent to which the substitution for the
12  Trust and the TDP process for Grace is
13  sufficiently materially different and
14  adverse to, what I will call, the
15  reimbursement insurers that it is not
16  legally permissible for the court to say
17  that under bankruptcy preemption
18  principles, those insurers have to
19  perform under those agreements.
20       That's clearly going to be a
21  confirmation issue, and we have conceded
22  under other circumstances that that is
23  something that we don't contend the
24  Insured's neutrality provision applies

Page 115

1   to.
2        Q. Can I turn you now to
3   Section 7.22, subsection (d), Romanette
4   (ii).
5        A. I see it.
6        Q. The last sentence of that
7   section says, "Asbestos Insurance Rights
8   shall be so vested free and clear of all
9   Encumbrances, liens, security interests,
10  and other Claims or causes of action,
11  except that all Asbestos Insurance
12  Coverage Defenses is preserved."
13       What does that mean?
14       MS. HARDING: Object to
15  form.
16       THE WITNESS: Well, it
17  basically means that if somebody
18  thinks that they have got a lien
19  on asbestos insurance rights that
20  are purporting to be transferred
21  to the Trust, they better show up
22  and complain about it because the
23  purpose of the Plan is to provide
24  a transfer that is free of such

Page 116

1   liens or encumbrances or whatever.
2        The exception is put in
3   frankly because in other cases, I
4   think Federal-Mogul, some insurers
5   -- or maybe it was Kaiser -- I
6   don't know -- some insurers took
7   the position that this kind of a
8   clause might be read to override
9   the asbestos insurance coverage
10  defense carve-out. And so for
11  avoidance of doubt, we threw in
12  the exception.
13  BY MR. BROWN:
14       Q. Okay. You are familiar, are
15  you not, with various claims that have
16  been asserted or threatened by Scotts,
17  Kaneb, BNSF, and Libby with respect to
18  asbestos insurance policies, aren't you?
19       A. Yes.
20       Q. Are whatever claims they
21  have, if any, through any of the
22  insurance asbestos policies, are they
23  being extinguished by virtue of this
24  sentence?

Page 117

1        MS. HARDING: Object to
2   form.
3        THE WITNESS: My
4   understanding of the Plan, and I
5   have to confess that I have that I
6   am not sure I thought about that
7   question before, is that those
8   types of claims are being
9   channelled to the Trust to the
10  extent that there are Grace
11  indemnities of insurers with
12  respect to such claims.
13       I think there is a TDP
14  provision -- again, it's 5.12 or
15  5.13 -- that is, in essence, an
16  acknowledgment that those types of
17  claims are treated as indirect PI
18  Trust claims.
19       And so I would have to say
20  that I don't believe that this
21  provision is intended by some sort
22  of self-operative effect to
23  extinguish -- this provision, to
24  me, is more like a C363B type of

Page 118

1  provision, essentially that we are
2  going to transfer the assets to
3  the Trust and if you got a claim
4  or an interest in the assets, then
5  you can litigate that claim
6  against the Trust.
7       But we are going, I guess,
8  have potential confirmation
9  objections about whether there are
10 any such claims. I mean, the mere
11 assertion of a claim doesn't mean
12 that it's valid.
13 BY MR. BROWN:
14     Q.  Okay. If I can direct your
15 attention down to 7.2.4, which is
16 entitled Assignment and Enforcement of
17 Asbestos PI Trust Causes of Action.
18     A.  Yes.
19     Q.  I must confess, I am a bit
20 baffled by this one, so I need some help
21 with it.
22         How do Asbestos PI Trust
23 causes of action differ from asbestos
24 insurance rights?

Page 119

1     A.  Well, I have to go back and
2  look at the definitions to answer that
3  question.
4         Well, I think asbestos PI
5  Trust causes of action does include
6  asbestos insurance rights.
7     Q.  What else does it include?
8     A.  Well, if you look at the
9  definition, it includes defenses such
10 that, for example, if a claimant says, I
11 have a valid claim against Grace that's
12 channelled to the Trust and the Trust
13 disagrees with it, the Trust retains all
14 the defenses to that claim that Grace
15 would have had. That's clause A under
16 definition 47.
17    Q.  Okay.
18    A.  Clause B is, for example,
19 contribution rights, et cetera. So, for
20 example, if the Trust has -- if Grace has
21 contribution rights that it has not
22 asserted and that which are still valid
23 against a codefendant in a tort system
24 and the codefendant brings in indirect

Page 120

1  Asbestos PI Trust claim against the
2  Trust, the Trust could assert Grace's
3  contribution rights as a counterclaim to
4  that. That's two categories of things
5  that this is intended to include.
6     Q.  Okay. Let's go to page 64,
7  7.2.6, Creation and Termination of the
8  Asbestos PI TAC.
9     A.  Correct.
10    Q.  It says, "On or before the
11 Confirmation Date, the initial members of
12 the Asbestos PI TAC shall be selected by
13 the Asbestos PI Committee."
14        That has already occurred,
15 correct?
16    A.  Correct. They are
17 identified in the Asbestos PI Trust
18 Agreement.
19    Q.  Okay. How many actual
20 committee members are there on the
21 Asbestos PI Committee?
22    A.  I don't remember. But we
23 have the Disclosure Statement here. I
24 could pretty quickly find out by just

Page 121

1  looking at it where they are identified.
2     Q.  Okay.
3     A.  It's certainly more than the
4  four that are going to be on the TAC.
5     Q.  Okay. Is it fair to say
6  that the actual committee members who are
7  asbestos claimants act through their tort
8  counsel in connection with their
9  obligations as committee members?
10    A.  As a general proposition,
11 that's true. In any given committee on
12 any given issue, an individual member
13 might choose to show up and act on their
14 own behalf, and there have been some
15 examples in the past where that has
16 occurred.
17        But, as a general
18 proposition, the committee members are
19 blue-collar folks of limited legal
20 knowledge, and they delegate to their
21 personal injury lawyers their sort of
22 activities acting for them as an agent on
23 these committees.
24    Q.  Okay. You are counsel to

Page 130

1  form.
2      THE WITNESS:
3  Hypothetically, probably yes. It
4  would be more difficult, but,
5  hypothetically, yes. You could
6  have -- we have had some plans
7  that had coverage in place
8  agreements with insurers, for
9  example, that we felt satisfied
10 524(g). But you have to get the
11 insurers' agreement to have a
12 coverage in place agreement.
13 BY MR. BROWN:
14   Q. Okay. Let's go now to
15 condition (r) -- I am sorry. Condition
16 (s).
17   A. Yes.
18   Q. Now, for purposes of my
19 question, I want you to assume that when
20 I use the term "settled asbestos
21 insurance companies," I want you to
22 assume that those that are pre-petition.
23   A. Okay.
24   Q. And my question is a very

Page 131

1  general one, because I have heard
2  different views, and that is, what
3  benefits are being provided by or on
4  behalf of settled asbestos insurance
5  companies listed on Exhibit-5?
6    A. It is the position of the
7  ACC that Grace is paying close to
8  $3 billion of value to the Trust on
9  behalf of not only itself but a variety
10 of other protected parties, including
11 Non-Debtor affiliates and, in this
12 particular case, settled asbestos
13 insurers.
14        And it is doing so on behalf
15 of settled asbestos insurers because
16 those insurers have indemnity claims
17 against Grace, which are being, if they
18 hypothetically could ever occur, are
19 being channelled to the Trust as a means
20 of protecting Grace against such -- well,
21 let me back up.
22        The purpose of putting
23 settled asbestos insurers in here is not
24 to provide a gratuitous asbestos insurers

Page 132

1  because we think they are nice folks.
2    Q. I didn't think so.
3    A. Settled asbestos insurers,
4  by definition, are insurers that have
5  indemnity rights against Grace.
6    Q. They have also paid a lot of
7  money?
8    A. And they paid a lot of money
9  in the past. But the past money -- money
10 is fungible. The past money went into
11 Grace's coffers, went out or didn't go
12 out, et cetera. But they are not being
13 asked for any new money.
14        But Grace has an economic
15 interest in not having asbestos PI claims
16 brought against those insurers that could
17 then trigger an indemnity obligation of
18 Grace to the insurer against which that
19 asbestos PI claim was asserted. They
20 have an economic interest in preventing
21 that.
22        So the deal is channel any
23 such claim that might give rise to the
24 asbestos indemnity claim to the Trust

Page 133

1  and in exchange for that, part of what
2  Grace is paying you is to get rid of
3  asbestos PI claims which include indirect
4  asbestos PI claims for indemnity or
5  direct asbestos PI claims for indemnity.
6    Q. Okay.
7    A. And that's the basis.
8    Q. I think you said at the very
9  beginning of either the last question or
10 the one before that Grace was
11 contributing 3 million?
12   A. Billion.
13   Q. That's what I thought.
14 Okay. I just wanted to make sure I had
15 the number correct.
16   A. I mean, that's our view of
17 the approximate amount of what they were
18 contributing at the time we made the
19 deal, I guess would be a better way to
20 put it. There are other people that
21 might value it differently.
22        Some of things that were
23 worth more at the time the deal was made
24 are worth less today but hopefully will

Page 366

1  A. Well, the answer to that is,
2  first, normally the punitive or potential
3  indirect claimant, as a defendant in the
4  state court action, would have the right
5  to get discovery from the plaintiff. And
6  that discovery in many jurisdictions, if
7  not most, would include discovery of the
8  plaintiff as to whether that plaintiff
9  had filed claims with any Trust,
10  including the prospective Grace Trust.
11  If the state court, for some
12  reason or another, said that that
13  discovery against the plaintiff would not
14  be permitted, it seems unlikely that
15  discovery of the same information from a
16  Trust would be permitted because the
17  hypothesis -- by hypothesis, the state
18  law doesn't regard it as relevant. So
19  under normal circumstances, it's hard to
20  imagine why an indirect claimant would
21  ever need discovery from a Trust.
22  That stated, there are
23  provisions in Section 6.5 that allow
24  indirect claimants or anybody else to try

Page 367

1  and get a subpoena from a court, either
2  the Bankruptcy Court or the Delaware
3  Court or the United States Court for the
4  District of Delaware, for such records.
5  And whichever court that subpoena is
6  sought to be issued from will decide
7  whether or not the prospective indirect
8  claimant, because you won't be an
9  indirect claimant until you lose the suit
10  with the plaintiff -- whether that
11  prospective indirect claimant will or
12  will not be given access to that
13  information by the Trust. But the first
14  line of attack is getting it from the
15  plaintiff.
16  And I might add, other than
17  the recitation that the submission and
18  the proof of claim is part of settlement
19  discussions, which is simply a view like
20  any defendant and a plaintiff might say
21  we agree that our settlement discussions
22  and our settlement agreement is
23  confidential, whether or not that makes
24  it non discoverable to a third party that

Page 368

1  isn't bound by the settlement agreement
2  is a matter, again, of federal or state
3  applicable non-bankruptcy law.
4  Q. But as you interpret the TDP
5  then, there is not an outright
6  prohibition from a Payne in discovery
7  against the Trust?
8  A. No.
9  Q. Okay.
10  MS. COBB: Well, those are
11  my questions, and I reserve the
12  right to ask follow-up questions,
13  depending upon the progression of
14  the questioning by the insurers.
15  But I will pass the witness to
16  Mr. Cohn.
17  MR. DANIEL COHN: Thank you.
18  MS. COBB: And thank you for
19  your courtesy, Dan.
20  MR. DANIEL COHN: You are
21  very welcome.
22  - - -
23  EXAMINATION
24  - - -

Page 369

1  BY MR. DANIEL COHN:
2  Q. All right. Mr. Lockwood,
3  you are the representative of the
4  Asbestos PI Committee who is most
5  knowledgeable on the topics as to which
6  the Libby claimants have designated a
7  Rule 30(b)(6) deposition?
8  A. Most knowledgeable about the
9  full range of the topics. There might be
10  individual topics that I might defer, as
11  I have in a few questions earlier, for
12  example, to my partner, Mr. Inselbuch,
13  whose deposition is scheduled, but yes.
14  Q. And if I may, I want to
15  start off with a couple of matters of
16  terminology. When I use the term "Libby
17  claimants," I am referring to the clients
18  of my firm who are people who allege that
19  they have suffered personal injury from
20  exposure to asbestos of Grace in Lincoln
21  County, Montana.
22  A. Okay.
23  Q. And the other terminological
24  matter I want to get straight is that,