Page 370

1  whenever possible, I will try to use
2  terms that are defined in the Plan for
3  the sake of clarity. And when I use a
4  term that is defined in the Plan, I am
5  using it with the meaning so defined.
6      A. Okay.
7      Q. And may I ask that when you
8  give answers, that you use terms that are
9  defined in the Plan, and that unless you
10 otherwise explain it to me, I will assume
11 that you are using that term with the
12 definition defined in the Plan?
13     A. If I use the term in an
14 answer, I will try and make sure that I
15 am using it as defined in the Plan.
16     Q. All right. Referring to
17 Exhibit-3, which is -- and I am sorry.
18 Not Plan Exhibit-3.
19     A. Okay.
20     Q. ACC Exhibit-3.
21         MS. HARDING: Can you remind
22 me what that is, please?
23         MR. DANIEL COHN: That's the
24 Form 8-K with the Term Sheet

Page 371

1  attached.
2         THE WITNESS: I have it.
3  BY MR. DANIEL COHN:
4      Q. Who negotiated the deal
5  that's embodied in that Term Sheet on
6  behalf of the Asbestos PI Committee?
7         MR. FINCH: Objection.
8         MS. HARDING: Objection.
9         MR. FINCH: To the extent it
10 enters into Plan negotiations, I
11 am not sure how it relevant to the
12 confirmation here.
13         MS. HARDING: Same
14 objection.
15         THE WITNESS: Are you
16 instructing me to answer it?
17         MR. FINCH: I will let you
18 answer that question, and we will
19 see how far it goes.
20         THE WITNESS: I am not
21 entirely sure I remember
22 accurately who the parties were,
23 and it also depends on what you
24 mean by involved in negotiating.

Page 372

1  There were direct negotiations
2  between sort of principals, if you
3  will, and then there were other
4  people, like myself, that were
5  involved in commenting on drafts
6  of the Term Sheet to other people
7  on their side.
8      But taking the term and
9  meaning of who was face-to-face,
10 my recollection is that on behalf
11 of the ACC, it was a combination
12 of what was designated or called a
13 negotiating subcommittee of the
14 ACC, and my partner,
15 Mr. Inselbuch.
16     The people on the
17 negotiating subcommittee, I
18 believe, included Joe Rice,
19 Russell Budd, and I think Perry
20 Weitz and John Cooney, but I am
21 not positive about that. But I
22 believe it was those four. It
23 could have been three, but I think
24 it was those four.

Page 373

1  BY MR. DANIEL COHEN:
2      Q. And was the Libby claimant
3  representative on the committee a member
4  of the negotiating subcommittee?
5      A. Not to the best of my
6  recollection.
7      Q. Was the Term Sheet submitted
8  to a vote by the committee?
9         MS. HARDING: Objection.
10        THE WITNESS: Well, I don't
11 know whether the Term Sheet in
12 precisely the form that it exists
13 in Exhibit-3 was submitted for a
14 vote, but certainly a document
15 embodying the terms of the Term
16 Sheet was submitted to a vote of
17 the committee.
18 BY MR. DANIEL COHEN:
19     Q. And did that vote result in
20 approval of the deal?
21     A. Yes.
22     Q. How did the Libby claimants
23 vote?
24     A. I don't recall, but I am

Page 374

1  sure you do.
2  Q. Would it refresh your memory
3  if I told you that the Libby claimants
4  voted against the deal?
5  A. I have a vague recollection
6  that that's what happened, but I wasn't
7  sure enough about it to testify under
8  oath.
9  Q. In addition to the Term
10 Sheet that constitutes ACC Exhibit-3 --
11 A. Yes, sir.
12 Q. -- were there any other
13 documents embodying the deal as struck at
14 that time?
15 A. Not that I recall.
16 Q. Were there any oral --
17 A. Well, let me -- actually,
18 let me -- I mean, the answer is not -- I
19 am pretty sure there were not, other than
20 drafts that might have led up to it. But
21 that document was negotiated -- as we
22 read earlier, it refers to "the Term
23 Sheet will be incorporated in the
24 mutually agreeable Plan of reorganization

Page 375

1  to be filed with the bankruptcy court as
2  soon as possible."
3  My recollection is at the
4  time the Term Sheet was agreed to, the
5  Debtors had filed a Plan, which had never
6  been voted on or approved, and the ACC
7  and the FCR had filed a proposed Plan,
8  which similarly had never been voted on
9  or approved.
10 And, therefore, the Term
11 Sheet was negotiated with all parties
12 having some knowledge of the types of
13 additional terms and conditions that each
14 one had proposed in their separate plans.
15 And some of those terms and conditions,
16 if you actually go back and look at those
17 two plans and look at this Plan, you will
18 see they are the same.
19 So I guess in that sense,
20 there were other documents embodying
21 terms of the Plan, and those were they.
22 But they also embodied a whole bunch of
23 terms that were different from the Term
24 Sheet.

Page 376

1  Q. I meant the question
2  ordinarily, which is were there in
3  addition --
4  A. Okay. As far as I am aware,
5  there were no other documents other than
6  drafts of the Term Sheet that embodied
7  the deal reflected in the Term Sheet.
8  Q. Were there any oral aside
9  agreements accompanying the Term Sheet?
10 MS. HARDING: Objection to
11 the extent it seeks discovery
12 related to negotiations of the
13 Plan of reorganization.
14 BY MR. DANIEL COHN:
15 Q. Just for clarity, I am not
16 asking for negotiations. I am asking for
17 whether there was any further agreement;
18 in other words, any terms not embodied in
19 this Term Sheet that were agreed to among
20 the parties at the time of this
21 agreement?
22 A. Well, that's why I made the
23 comment about the two preexisting plans.
24 I don't remember anything of this sort.

Page 377

1  I am confident that there was no side
2  agreement of material economic terms of
3  the Plan that wasn't put into the Term
4  Sheet, but there may well have been some
5  mutual understanding that many of the
6  terms from the prior plans and our Plan
7  had embodied terms from the pre-filed
8  Grace Plan dealing with various things.
9  And there may well have been
10 some understanding that we would use
11 those two preexisting documents as a
12 starting point to the drafting of a Plan
13 that would embody the Term Sheet. Other
14 than that, I am not aware of anything
15 that by could anybody's imagination be
16 called a side agreement.
17 Q. And there any oral
18 agreements that were made in conjunction
19 with this Term Sheet, ACC Exhibit-3?
20 A. None, other than -- the type
21 of understanding that I just testified
22 about would have had to have been oral.
23 There was no written document saying we
24 are going to incorporate the following X

Page 378

1  terms from the previous plans that I am
2  aware of.
3       Q.  As the ACC's designee to
4  take this 30(b)(6) deposition, would you
5  be aware if there were such an agreement?
6       A.  I believe I would be, yeah.
7       Q.  What agreements, if any,
8  were struck at the time of ACC Exhibit-3
9  concerning how Libby claimants' claims
10 would be treated?
11      A.  Other than that they would
12 be part of the asbestos claimants whose
13 claims would be channelled to the Trust
14 and whose consideration would be paid out
15 of the assets that were to be contributed
16 to the asbestos Trust under the Term
17 Sheet, there were no agreements that I am
18 aware of.
19      Q.  Were there any agreements
20 concerning who would bear responsibility
21 for restitution claims, if any, in
22 connection with the criminal trial now
23 going on in Montana?
24           MS. HARDING: Object to

Page 379

1  form.
2            THE WITNESS: I don't
3  believe there were at that time,
4  no.
5  BY MR. DANIEL COHN:
6       Q.  Have there been any
7  agreement on that subject since then?
8       A.  Well, there is provisions in
9  the Plan that speak to that, so yes.
10      Q.  Apart from provisions of the
11 Plan, are there any agreements between
12 the Asbestos PI Committee and any of the
13 other Plan proponents on the subject
14 matter of the Plan?
15      A.  The Plan embodies the
16 agreements.  There are no side
17 agreements, oral or written, that vary
18 from the Plan that I am aware of.  And,
19 indeed, I would be very surprised if I
20 was not aware -- if there were any that I
21 was not aware of.
22      Q.  All right.  And one last
23 question on this subject.  It has been
24 known from time to time for the

Page 380

1  co-proponents of a Plan to enter into a
2  co-proponent agreement governing that
3  relationship.  Is there any such
4  agreement, written or orally?
5       A.  No.  Well, you say written
6  or oral.  There is certainly no written
7  agreement of that.  I mean, the Plan
8  itself -- other than the Plan itself.  I
9  mean, when you sign on to a Plan, is the
10 Plan proponent with somebody else is a
11 Plan proponent.  That's in a written
12 document, and we have sort of agreed.
13      But if you are talking about
14 some oral agreement that says this binds
15 us outside the Plan or -- I am not sure
16 really what kind of agreement you have in
17 mind.  But, as far as I am aware, there
18 isn't any such other than what's
19 reflected in the Plan itself.
20           MR. FINCH: The parties to
21 the Plan also, to the extent there
22 are issues in common, there may
23 well be a common interest
24 privilege for purposes of

Page 381

1  discovery and litigation of
2  confirmation objections.  But
3  those are not -- I would not
4  regard those as any types of
5  agreements you are questioning
6  about.
7  BY MR. DANIEL COHN:
8       Q.  All right.  Directing your
9  attention now to ACC Exhibit-11, which is
10 the TDP?
11      A.  I have it.
12      Q.  All right.  Who drafted the
13 TDP?
14           MR. FINCH: Objection.  This
15 gets into Plan negotiations and
16 drafting.  I will let you answer
17 that question, but we will see how
18 it goes from there.
19           THE WITNESS: To some
20 extent Mr. Inselbuch may know
21 more about this than I do.  But I
22 have a pretty good knowledge of
23 it.
24      As I have previously

Page 382

1 mentioned in this deposition, this
2 TDP in its inception was a sort of
3 mark-up job on one of the previous
4 TDPs from one of the previous
5 bankruptcies that that had been
6 confirmed. I don't recall, as I
7 sit here today, which one it was,
8 but it would have been one of the
9 more recent ones.
10    It then, of course, had to
11 be modified to reflect the
12 particularities of Grace and the
13 claims against Grace and what have
14 you. And you have heard some
15 testimony about things like
16 Sections 5.12 and 5.13. The
17 participants that did it were
18 basically counsel for the ACC,
19 counsel for the FCR, and members
20 of the ACC itself in terms of
21 reviewing and commenting on
22 things, and the FCR himself.
23    The actual, physical
24 drafting as opposed to the

Page 383

1 commenting and what have you was,
2 I believe, done by Caplin &
3 Drysdale.
4 BY MR. DANIEL COHN:
5    Q. What input, if any, did
6 Grace have concerning the TDP?
7    MS. HARDING: Objection with
8 respect to negotiations.
9    THE WITNESS: Well, it was a
10 general proposition. Grace was
11 furnished copies of drafts and
12 afforded the opportunity to
13 comment on them.
14 BY MR. DANIEL COHN:
15    Q. And were any changes made to
16 what sounds like an ACC FCR draft at the
17 behest of Grace?
18    MS. HARDING: Same
19 objection.
20    THE WITNESS: I don't really
21 recall.
22 BY MR. DANIEL COHN:
23    Q. Directing your attention to
24 Section 2.1 of the TDP.

Page 384

1    A. I have it.
2    Q. In the second sentence,
3 there is reference to, and I quote,
4 "...the intention of paying all claimants
5 over time as equivalent a share as
6 possible of the value of their claims
7 based on historical values for
8 substantially similar claims in the tort
9 system."
10    A. Yes.
11    Q. Now, is that, in fact, the
12 intention of the Asbestos PI Committee in
13 respect to how the TDP should operate?
14    A. The intention of the ACC on
15 how the TDP should operate is expressed
16 in all of the terms of the TDP. That
17 particular aspirational sentence that you
18 have plucked from the beginning of the
19 TDP is not is not somehow or another a
20 super-preemptory provision that controls
21 all the other provisions in the Trust
22 that somebody might think either were or
23 were not in agreement with it.
24    Q. In that phrase that I just

Page 385

1 read, what does the term "historical
2 values" mean?
3    A. Again, Mr. Inselbuch
4 probably would have a more definitive
5 knowledge of this, but my understanding
6 is that it refers to the historical
7 claims data primarily in this particular
8 case from Grace with respect to
9 settlements and judgments in the tort
10 system as the starting point.
11    Q. If that's the starting
12 point, what else is meant by historical
13 value?
14    A. Well, again, this is boiler
15 plate language from TDPs. In some cases,
16 depending upon the facts of the case, the
17 claims history of comparable defendants
18 in the tort system is looked at.
19    The TDPs are generally
20 drafted in consultation with the
21 committees asbestos claims advisor which
22 is usually, if not invariably, Mark
23 Peterson, and depending on the amount of
24 claims data available to Mr. Peterson

Page 386

from the Debtor, the length of time that the Debtor has been in bankruptcy and, therefore, the possible staleness of the pre-petition data and the judgment of Mr. Peterson and the members of the committee and the FCR, sometimes claims data from other defendants is taken into account.

Q. And the purpose of that is to most accurately discern the amount that claimants would obtain if they were permitted to resort to the tort system?

MR. FINCH: Object to the form.

THE WITNESS: The purpose for that is to provide the values that are used in the various portions of the TDP where values are assigned. They are used in determining the expedited review criteria, which is basically an average value open settlement offer to claimants that don't want to get into a whole lot of

Page 387

back-and-forth about their claims. It doesn't apply individual review as such, although you also have the so-called average and maximum values, which are also tied to the analysis of the historical claims values, which are intended to provide sort of targets, if you will, for what, on average, the individual review process is supposed to come up with.

The maximum values are supposed to provide limits on what the individual review process is supposed to come up with. And all of these are done in the context of a Trust that is attempting to pay similar claims in a similar value, and they are all averages, by definition. They are not balkanized numbers reflecting the results of different -- you don't have different sets of numbers for

Page 388

different jurisdictions where the history settlement values might be higher or lower, whatever.

The expedited review, which is where the numbers are used for the most part, is a result of an averaging process. And, as I say, Mr. Inselbuch and Mark Peterson, who are both going to be witnesses in this case can tell you a lot more about the detail about it than I can.

BY MR. DANIEL COHN:
Q. Is it the position of the Asbestos PI Committee that a TDP would be legally sufficient if it did not try to treat claims as equivalently as possible in accordance with their historical value in the court system?

MS. HARDING: Object to form.

MR. FINCH: Object to form.

THE WITNESS: That's such a hypothetical question. I have no

Page 389

idea what the committee's position would be on that. And, moreover, I have no idea what kind of a TDP you are talking about.

It's the committee's position that this TDP satisfies the requirements of Section 524(g) of the bankruptcy code and is a reasonable means of doing so.

BY MR. DANIEL COHN:
Q. Now, you have previously testified earlier today that the Plan envisions that asbestos PI claims will not be allowed or disallowed pursuant to Section 502 of the bankruptcy code; is that correct?

A. That is the general contemplation of the Plan.

Q. If an asbestos PI claim were to be allowed or disallowed under Section 502, what would the standard for doing so be?

MR. FINCH: Objection, hypothetical, calls for a legal

Page 390

1  conclusion, irrelevant to the Plan
2  at issue.
3       MS. HARDING: Same
4  objection.
5       THE WITNESS: Presumably, it
6  would be the result of the
7  bankruptcy court's determination
8  on the basis of a full contested
9  matter proceeding as to what the
10 state law validity and appropriate
11 amount would be.
12      I am not exactly sure how
13 the bankruptcy court would
14 determine the appropriate amount,
15 but I am pretty sure that they
16 wouldn't determine it by reference
17 to the historic values of claims
18 settled by Grace in the tort
19 system or the historic values of
20 Grace verdicts in the tort system.
21 They would determine it like any
22 court would determine it.
23      Moreover, it wouldn't be
24 done by the bankruptcy court. It

Page 391

1  would have to be done by the
2  district court, because under the
3  Section 157 of 28 U.S.C., the
4  bankruptcy court doesn't have
5  jurisdiction to determine the
6  amount and validity of personal
7  injury claims. And you would
8  probably have a right to a jury
9  trial under Section, I think it's
10 1408.
11      And so you would wind up
12 with some jury being empanelled by
13 the District Court, I guess, of
14 Delaware, and that jury would tell
15 you whatever that jury thought
16 that claim was worth.
17 BY MR. DANIEL COHN:
18      Q. And the standard under
19 Section 502 -- and this is a yes-or-no
20 question. The standard under Section 502
21 would be the claimant is entitled to
22 whatever he is entitled to under
23 applicable non-bankruptcy law except to
24 the extent that it is overridden by a

Page 392

1  specific provision of the bankruptcy
2  code?
3       MR. FINCH: Object to the
4  form.
5       MS. HARDING: Objection to
6  the form.
7       THE WITNESS: I am certainly
8  getting opportunities to do my
9  opinions about legal matters here
10 today. This is really refreshing.
11      Generally speaking, I guess
12 the answer to that is yes.
13 BY MR. DANIEL COHN:
14      Q. May I direct your attention
15 to Section 5.3 of the TDP.
16      A. I have it.
17      Q. And specifically to Section
18 5.3(a)(3). Can you explain to me how the
19 schedule values listed there were
20 derived?
21      MR. FINCH: Objection, asked
22 and answered; certainly answered.
23      MS. HARDING: And calls for
24 negotiations to the extent it

Page 393

1  does, I am objecting.
2       MR. DANIEL COHN: Can we
3  stop for a second and go off the
4  record.
5       (There was a discussion held
6  off the record at this time.)
7       THE WITNESS: Let's go back
8  on the record. Mr. Inselbuch and
9  Mr. Peterson are better equipped
10 to answer the question that you
11 just asked because, while I
12 reviewed these TDPs and commented
13 on them and am generally familiar
14 with how they were created, et
15 cetera, the way in which our firm
16 and our committee operated was
17 that Mr. Inselbuch had a greater
18 role in working with the committee
19 and other lawyers in my firm on
20 the nitty-gritty of a lot of these
21 provisions.
22      And this particular
23 provision, they would be more
24 equipped to answer than I am. I

Page 398

1  some extent, subject to referring
2  you to Mr. Inselbuch about more
3  specifics, the expedited review
4  values are an average of a certain
5  level nationally of claims of that
6  category.
7       But an election to take
8  expedited review is simply an
9  election by the claimant or the
10 claimant's lawyer that they will
11 accept that amount for their
12 claim. The historical value of
13 that claim -- it could be higher
14 or lower. I mean, the claim
15 itself has no historical value, so
16 you would be talking about the
17 historical value of some other
18 similar claim. And depending on
19 what level of similarity you were
20 opting for, the historical value
21 of the claim might be higher or
22 lower. So, I mean, the answer is
23 no.
24 BY MR. DANIEL COHN:

Page 399

1       Q.  All right. Let's add the
2  assumption that both claims elect
3  individual review and that the Trust upon
4  examination of the claims concludes that
5  each claim has an historical value of
6  $100,000.
7       Should those claims be each
8  liquidated for $100,000?
9       MR. FINCH: Object to form.
10      MS. HARDING: Object to
11 form.
12      THE WITNESS: The individual
13 review process has a number of
14 factors that are taken into
15 account that are spelled out in
16 the TDP, and some of those
17 factors, as best I can recall --
18 and, again, this is something you
19 probably want to explore with
20 Mr. Inselbuch.
21      But, in general, some of
22 those factors are related to
23 history, and a lot of the factors
24 are related to who the claimant is

Page 400

1  and what the nature of his disease
2  is. They are very individual
3  specific.
4       And in individual review,
5  the claims handlers, under my
6  understanding, don't go back to
7  the files and try and find some
8  claim that's identical to this
9  claim that they can could use to
10 say it has a historical value of X
11 and, therefore, we are going to
12 apply it. They look at think
13 claim, and they apply the
14 criteria. And that's the value
15 they come up with.
16 BY MR. DANIEL COHEN:
17      Q.  So if they do not do exactly
18 what you said they don't do, which is to
19 look for the closest historical analog to
20 the claim, what standard do they apply?
21      MS. HARDING: Object to
22 form.
23      MR. FINCH: Objection to
24 form.

Page 401

1       THE WITNESS: They apply the
2  standards set by the Trust when
3  they go for individual review
4  which are set forth in Section
5  5.3(b)(2) of the TDP. In
6  Romanette -- well, it says, "The
7  PI Trust shall thus take into
8  consideration all of the factors
9  that affect the severity of
10 damages and values within the tort
11 system," which would include the
12 tort system as existed today,
13 "including, but not limited to,
14 credible evidence of..." Romanette
15 (i) through (vi), some of which
16 involve as in Romanette (vi) and
17 Romanette (v), history.
18 BY MR. DANIEL COHN:
19      Q.  All right. Let me ask the
20 question but not in terms of historical
21 value but in terms of value in the tort
22 system today.
23      Is the purpose of the
24 5.3(b)(2) criteria that you just referred

Page 402

1  to to best approximate the value of the
2  claim in the tort system today?
3       MS. HARDING: Object to
4  form.
5       MR. FINCH: Objection to
6  form.
7       THE WITNESS: The purpose of
8  the criteria -- again,
9  Mr. Inselbuch may be better to
10 this than I am.
11      But the purpose of the
12 criteria is to negotiate about the
13 claimant and his lawyer a deal
14 that is acceptable to both of
15 them. Because if you don't
16 negotiate an acceptable deal in
17 individual review, then you go to
18 mediation, binding or nonbinding
19 arbitration, and the tort system.
20      So at the end of the day,
21 this is referred to as an
22 alternative dispute resolution
23 system for a reason, because
24 that's what it is. You start out

Page 403

1  with standing settlement offers in
2  an effort to get rid of most of
3  the claims without a lot of
4  processing costs on the basis of
5  values that are perceived to be
6  likely to be acceptable because
7  they are plus or minus some
8  reasonable amount from various
9  plaintiffs law firms' historical
10 values. You move to individual
11 review for people that want more
12 than that and who think they can
13 show they are entitled to it. And
14 if you don't persuade them in the
15 negotiation of individual review,
16 you can wind up in the tort system
17 with a judge and a jury deciding
18 what the claim is worth, applying
19 applicable non-bankruptcy law,
20 which will not include, to my
21 knowledge, anything about the
22 historical settlements or the
23 historical judgments experienced
24 by the Debtor for whose

Page 404

1  liabilities the Trust has assumed.
2  BY MR. DANIEL COHN:
3       Q. Right. So the ultimate end
4  point, if the alternative dispute
5  resolution process does not succeed, is
6  to go to the tort system and have a jury
7  or judge, if that that gets elected,
8  actually demonstrate the value of the
9  claim in the tort system?
10      A. That's correct. And these
11 plans are drafted in the hope that you
12 will eliminate that from happening in
13 very many cases because: A, it produces
14 widely disparate results and, B, it
15 increases claims processing expenses by a
16 very large margin.
17      And the experience of most
18 of these trusts in other cases is that
19 there are vanishingly few cases that ever
20 wind up going into the tort system.
21      Q. Well, let's talk for a
22 minute about experience in other cases.
23      In other cases, if you can
24 generalize, approximately what percentage

Page 405

1  of claims are settled upon expedited
2  review?
3       MR. FINCH: Objection, lack
4  of foundation.
5       MS. HARDING: Objection to
6  form.
7       THE WITNESS: I have no
8  knowledge of that. You can ask
9  Mr. Inselbuch that. My bet is
10 that he doesn't have any knowledge
11 of that, either, but he might.
12 BY MR. DANIEL COHN:
13      Q. You did say a moment ago,
14 though, that vanishingly few claims in
15 other cases end up in the tort system?
16      A. That much, I have been told
17 by people that work with the other
18 trusts, but that's a narrative
19 description.
20      I couldn't actually tell you
21 whether it's one case a year or five
22 cases or none. It's just not very many.
23      But when you start moving
24 backward from that, how many cases go to

Page 406

1  arbitration, how many cases go to
2  individual review, what percentage goes
3  to expedited review, each Trust does have
4  records from which they can derive that
5  information. And it may be that
6  Mr. Inselbuch might have knowledge of
7  some of that. I don't.
8       MR. FINCH: Grace ACC
9  certainly doesn't.
10 BY MR. DANIEL COHN:
11      Q. You have earlier testified
12 that the starting point for the TDP was
13 the TDP in some recent case; is that
14 correct?
15      A. That's my recollection.
16      Q. And revisions were then made
17 to address the specific needs of the
18 Grace case; is that correct?
19      A. Revisions over time were
20 made. There had been multiple drafts of
21 the TDP over the last -- I don't know --
22 eight months. And some of the earlier
23 drafts got filed as in the September
24 filing, and --

Page 407

1       (There was an interruption
2  at this time.)
3  BY MR. DANIEL COHN:
4       Q. All right. Were any of
5  those revisions made with the specific
6  intention of addressing issues that had
7  been raised by the Libby claimants?
8       A. Yes.
9       Q. Which ones? Or why don't
10 you start off with one, and then we will
11 go through it.
12      A. I don't know that I will get
13 a hundred percent of them, but for
14 example, in expedited review categories
15 in Section 5.3(a)(3), the category of
16 severe disabling pleural disease, Level
17 IV-B with its value and all of its
18 criteria, to my knowledge, has never
19 existed in any other TDP, in any other
20 case before and was entirely a function
21 of attempting to address concerns and
22 demands raised by the Libby claimants.
23 That's one that I know.
24      In addition to that, under

Page 408

1  the Section 5.4(a) of the TDP, the
2  creation of a eight times multiple for
3  claimants whose exposure was 95 percent a
4  result of exposure to an
5  asbestos-containing product of Grace was
6  new, and the standard one is the five
7  times provision, which is also in here
8  for 75 percent exposure.
9       There was another one that I
10 was thinking about. Those are the two
11 that jump out. I know there is at least
12 another one that I was just thinking
13 about and I have forgotten about.
14      MR. DANIEL COHN: Why don't
15 we take a five-minute break, and
16 perhaps you will remember in that
17 period.
18      THE WITNESS: Well, I would
19 just assume not take a five-minute
20 break because I would like to get
21 as much of this done as I can, and
22 if every time I can't remember
23 something we take a five-minute
24 break, we will be here for a very

Page 409

1  long time.
2       MR. DANIEL COHN: No, no. I
3  was not meaning to set a
4  precedent. But if you would like
5  --
6       THE WITNESS: If it comes to
7  me, I will volunteer it.
8  BY MR. DANIEL COHN:
9       Q. All right. Then let's turn
10 our attention to disease Level IV-B.
11      Is that the level that's
12 labeled severe disabling pleural disease?
13      A. Correct.
14      Q. Would you please explain to
15 me how that provision was designed to
16 address Libby claims?
17      MS. HARDING: Object to form
18 to the extent that it's designed
19 to address just Libby claims.
20      MR. FINCH: I join in that.
21      THE WITNESS: It was --
22      MS. HARDING: I think that's
23 what you said, right?
24      MR. DANIEL COHN: Well --

Page 410

1  THE WITNESS: The origin of
2  the impetus for developing this
3  criteria was from the Libby
4  claimants's counsel. It clearly
5  is not limited, however, to Libby
6  claims. It applies to anybody who
7  meets the criteria.
8      And all I can tell you is
9  that a combination of committee's
10 counsel, Mark Peterson, the
11 committee's expert Laura Welch
12 considered the contentions of the
13 Libby claimants both through their
14 lawyers and Dr. Whitehouse, to the
15 extent they considered them to
16 have a plausible basis, that you
17 could have diffuse pleural
18 thickening of the sort that's set
19 forth in this criteria with the
20 severity indications that are set
21 forth in the criteria, that
22 somebody being able to show that,
23 had a compensable disease that was
24 certainly more serious than Level

Page 411

1  III asbestosis pleural disease --
2  and should be entitled to more
3  money for it.
4  BY MR. DANIEL COHN:
5      Q. Is it the intention of the
6  Asbestos PI Committee that anyone who has
7  a legitimate diagnosis of severe pleural
8  disease should qualify for Level IV-B?
9      MR. FINCH: Object to form.
10     MS. HARDING: Objection to
11 form.
12     MR. FINCH: You can answer
13 to the position of the ACC. I am
14 not sure that the ACC has an
15 intent. Do you mean by severe
16 pleural disease, severe disabling
17 pleural disease as defined in
18 Level IV-B?
19     MR. DANIEL COHN: I will
20 tell you what -- thank you -- I
21 will ask the question again.
22 BY MR. DANIEL COHN:
23     Q. Is the position of the
24 Asbestos PI Committee that anyone who has

Page 412

1  a legitimate diagnosis of severe
2  disabling pleural disease should qualify
3  for a claim at Level IV-B under the TDP?
4      MR. FINCH: Excuse me -- let
5  me finish. Do you mean by severe
6  disabling pleural disease as
7  defined in the TDP or by severe
8  disabling pleural disease, do you
9  mean something else?
10     MR. DANIEL COHN: I mean
11 what would be generally accepted
12 among medical professionals as a
13 legitimate diagnosis of severe
14 disabling pleural disease without
15 regard to the specific criteria
16 that are in the TDP.
17     MR. FINCH: Objection to
18 form.
19     THE WITNESS: It is the
20 position of the committee that
21 anybody who meets the criteria set
22 forth under the heading severe
23 disabling pleural disease should
24 have a liquidated value for their

Page 413

1  claim of $50,000.
2  BY MR. DANIEL COHN:
3      Q. Let me ask you --
4      A. The ACC has no position
5  other than the one expressed in these
6  criteria on this subject.
7      Q. Is it the position of the
8  Asbestos PI Committee that if two people
9  are equally sick, as would be determined
10 in accordance with generally accepted
11 medical criteria, and one of them
12 qualifies under the medical criteria set
13 forth in the TDP, that both should have
14 claims under the TDP of a Level IV-B?
15     MR. FINCH: Object to form.
16     MS. HARDING: Object to
17 form.
18     THE WITNESS: I am not even
19 sure I understand that question.
20 I mean, you are saying, is it the
21 position that somebody who doesn't
22 meet the criteria for Level IV-B
23 that some doctor views as equally
24 sick as somebody who does meet the

Page 414

1  criteria should be treated as
2  though the first person had met
3  the criteria? Because if that's
4  the question, the answer is no.
5  BY MR. DANIEL COHN:
6      Q. If you change some doctor
7  to, in accordance with generally accepted
8  medical standards, then that's exactly
9  what I am asking. Whether two people
10 with the same diagnosis under generally
11 accepted medical standards should receive
12 the same treatment under the TDP?
13     MR. FINCH: Objection to
14 form.
15     MS. HARDING: Objection,
16 form.
17     THE WITNESS: For openers,
18 the Level IV criteria have
19 nonmedical criteria. They have
20 exposure criteria. Secondly,
21 medical standards don't exist in a
22 vacuum. They are standards that
23 doctors believe exist and apply,
24 and they have any given -- any

Page 415

1  given doctor can have their own
2  views on what medical standards do
3  or don't require.
4      And the reason for having
5  the criteria for the expedited
6  review part of this as opposed to,
7  for example, individual review or
8  what you could get if you went to
9  the tort system, is to limit the
10 amount of argumentation you are
11 going to get in individual review
12 on whether somebody does or
13 doesn't qualify. So you create
14 these criteria which if a
15 doctor -- if two doctors have two
16 patients and each one of them
17 concludes that each patient
18 satisfies the criteria for Level
19 IV, it's the position of the
20 committee that they should both be
21 treated as qualifying for Level
22 IV.
23     If one doctor says he
24 doesn't meet the criteria, but I

Page 416

1  think he's got diffuse pleural
2  thickening and he's entitled to
3  $50,000, that doesn't entitled
4  him, in the committee's view, to
5  get treated under expedited review
6  for Level IV. He may be able to
7  establish to the Trust's
8  satisfaction or individual review
9  that, despite the fact that he
10 doesn't meet these criteria, that
11 somehow or another he has a claim
12 that's worth that or indeed more
13 than that.
14     But the purpose of the
15 expedited criteria is to make it
16 easy for Trust claims handling
17 people to determine whether
18 somebody is entitled on an
19 expedited review to just take the
20 offer. It's standing there, and
21 if you meet the criteria, you get
22 it. That's the purpose, as I
23 understand it, of this approach in
24 the TDP.

Page 417

1  BY MR. DANIEL COHN:
2      Q. Let me shift your attention
3  away from Level IV-B and just use another
4  level as an example. So let's take Level
5  VIII, mesothelioma.
6      A. Yes.
7      Q. Is it the position of the
8  Asbestos PI Committee that the criteria
9  for expedited review should be such that
10 most, if not all, legitimate mesothelioma
11 claims should qualify under the expedited
12 review criteria for payment of the
13 scheduled values set forth in Section
14 5.3(a)(3)?
15     MR. FINCH: Objection to
16 form.
17     THE WITNESS: You are
18 ignoring the Grace exposure
19 requirement, it seems to me, in
20 your question. I mean, all the
21 criteria requires the diagnosis of
22 mesothelioma.
23 BY MR. DANIEL COHN:
24     Q. I apologize, so let me add

Page 418

1  the assumption that exposure criteria are
2  met and let me also in response to
3  Mr. Finch's objection say that what I
4  mean by legitimate is shorthand for a
5  claim that would be accepted in
6  accordance with medical standards as a
7  genuine mesothelioma claim.
8       MS. HARDING: Object to
9  form.
10      MR. FINCH: Object to form.
11      THE WITNESS: The
12 mesothelioma category has only two
13 requirements. One is that you
14 have Grace exposure, which is
15 defined in Section 5.7(b)(3) of
16 the TDP; and the other is that you
17 have a diagnosis of mesothelioma.
18 And the requirements for a
19 diagnosis of any asbestos-related
20 disease are set forth in Section
21 5.7.
22      It is the intention of the
23 ACC, as I understand it, that 100
24 percent of the people that meet

Page 419

1  those criteria are entitled to the
2  scheduled value, have their claims
3  liquidated to scheduled value.
4  BY MR. DANIEL COHN:
5     Q.  If you have Grace exposure
6  and you have mesothelioma, is it the
7  position of the Asbestos PI Committee
8  that if you did not qualify under the
9  standards set forth in the TDP, that the
10 standards under the TDP would be in
11 error?
12      MS. HARDING: Object to
13 form.
14      MR. FINCH: Object to form.
15      THE WITNESS: Could you read
16 that question back?
17      (The reporter read from the
18 record as requested.)
19      MR. FINCH: Object to form.
20      THE WITNESS: Frankly, I
21 can't imagine how you wouldn't
22 qualify. And, therefore, the
23 question seems to contemplate in
24 all set.

Page 420

1  The only way in which you
2  couldn't qualify is if somehow or
3  another you either didn't satisfy
4  the Grace exposure criteria or
5  your diagnosis was performed in
6  some manner that didn't qualify,
7  either, or was performed by some
8  doctor that the Trust had put on
9  as a result of its audit
10 provisions, a list of doctors that
11 they won't take diagnoses from.
12 The question seems, to me, to be
13 frankly meaningless.
14 BY MR. DANIEL COHN:
15     Q.  Actually, it's quite
16 meaningful.
17     A.  Well, I don't understand it
18 then.
19     Q.  You just answered it just
20 fine.
21     A.  Okay. Glad I got something
22 right.
23     Q.  So now let me shift
24 attention now back to Level IV-B and

Page 421

1  severe disabling pleural disease.
2       Again, if you need to defer
3  to Mr. Inselbuch or Mr. Peterson, that's
4  fine. But can you tell me where the
5  scheduled value, average value, and
6  maximum value came from?
7     A.  I think you would have to
8  talk to Mr. Peterson and Mr. Inselbuch
9  about that. I mean, I just don't have
10 enough specific knowledge.
11    Q.  Then let me turn my
12 attention to the next provision that you
13 mentioned a few minutes ago, the
14 extraordinary claims multiplier under
15 Section 5.4(a).
16    A.  Yes.
17    Q.  Would it be fair to say that
18 to meet the criteria for the eight times
19 multiplier -- strike that.
20      Would it be fair to say you
21 need to meet two criteria in order to
22 qualify for the eight times multiplier:
23 One is the claimant's exposure to
24 asbestos must be 95 percent the result of