Page 422

1  exposure to an asbestos-containing
2  product or to conduct for which Grace has
3  legal responsibility, and the second
4  criteria is that there is little
5  likelihood of a substantial recovery
6  elsewhere?
7      A.   I don't believe that the
8  second criteria applies. I think the 95
9  percent requirement is a proxy for the
10 proposition that you don't have a
11 substantial likelihood of recovery
12 elsewhere.
13      If you look at the 75
14 percent criteria, you will see that there
15 is little chance of a recovery elsewhere.
16 But I don't see that as applicable to the
17 95 percent criteria.
18      Q.   All right. So it is the
19 position of the Asbestos PI Committee
20 that to qualify for the eight times
21 multiplier, you need only meet one
22 criterion, namely, that the claimant's
23 exposure to asbestos was 95 percent of
24 the exposure to an asbestos-containing

Page 423

1  product or from conduct which Grace has
2  legal responsibility?
3      MR. FINCH:  And otherwise
4  satisfy the medical criteria, yes,
5  the beginning of 5.4(a) says,
6  correct?
7      Object to form.
8      THE WITNESS:  Well, we are
9  talking about the definition of an
10 extraordinary claim, and the
11 definition of an extraordinary
12 claim includes the medical
13 criteria by definition.
14      So whether he was including
15 it or not, the provision -- I
16 mean, these questions -- it is the
17 position of the ACC that the TDP
18 means what it says. That's what
19 it says. The committee --
20 BY MR. DANIEL COHN:
21      Q.   The purpose of the
22 deposition isn't to argue, but I wouldn't
23 be asking these questions if I thought
24 the answer was self-evident. So you are

Page 424

1  actually being very helpful.
2      A.   Glad to hear it.
3      Q.   So if I can just try to get
4  it again in a way that I think will be
5  helpful. All right.
6      The last question was meant
7  to presuppose that there was a claim
8  because you can't have a multiplier
9  unless there is a claim that you are
10 multiplying.
11      So if you make the
12 assumption that there is a claim, then is
13 it the case that the sole criterion for
14 the eight times multiplier is that the
15 claimant's exposure to asbestos was 95
16 percent the result of exposure to an
17 asbestos-containing product or to conduct
18 for which Grace has legal responsibility?
19      A.   The committee has no
20 position other than what's stated in the
21 TDP. First, it has to be an
22 extraordinary claim, which is defined to
23 begin with, and -- is your problem --
24 maybe I have been misunderstanding.

Page 425

1      Is your problem about the
2  second criteria in either case there is
3  little likelihood of a substantial
4  recovery elsewhere, the fact that that
5  could be read as included within the
6  definition of extraordinary claim to
7  begin with? Is that the problem?
8      Q.   And could be interpreted as
9  applying to the 95 percent as well as to
10 the 75 percent?
11      A.   Okay. I didn't understand
12 why you were asking that question.
13      Q.   Would you like me to then
14 try to ask it in a way that would make
15 you comfortable answering yes or no?
16      A.   I actually think, if that's
17 the question, that you ought to ask
18 Mr. Indiana that.
19      Q.   Okay.
20      A.   Because there is an arguably
21 ambiguity about that, which I did not
22 understand initially. And, as I sit here
23 right now, I can't tell you what the
24 committee's position is on that. So I

Page 426

1 would have to, I guess, retract some of
2 my previous testimony on that subject.
3        (There was a discussion held
4    off the record at this time.)
5        MR. DANIEL COHN: Let's go
6    back on the record.
7 BY MR. DANIEL COHN:
8    Q.   Would it be fair to say that
9 most of the holders of asbestos PI
10 claims — strike that.
11       Would it be fair to say that
12 most asbestos PI claims are based upon
13 exposure to Grace's asbestos-containing
14 products as opposed to exposure to
15 asbestos generated through Grace's
16 operations?
17       MS. HARDING: Object to
18    form.
19       THE WITNESS: When you say
20    most of the claims, I take it you
21    are referring to most of the
22    claims for which POCs have been
23    filed in the bankruptcy or most of
24    the -- are you referring to most

Page 427

1    of the claims which could be
2    brought to the Trust? What
3    specific claims are we talking
4    about?
5 BY MR. DANIEL COHN:
6    Q.   Well, if you can answer,
7 most of the claims that are expected to
8 be brought to the Asbestos PI Trust.
9       MS. HARDING: Object to
10    form.
11       THE WITNESS: I don't think
12    that the committee has ever
13    attempted to analyze or project
14    claims against Grace on the basis
15    of whether or not they are
16    products claims or non-products
17    claims. That's just not something
18    that the committee -- committees
19    of this sort or the Grace
20    committee normally does, and I
21    don't believe we have done it.
22       On a sort of impressionistic
23    level, I guess I would probably
24    assume that most of the claims

Page 428

1    would be, quote, product claims
2    based on my understanding of how
3    that claim is used in insurance
4    law terminology.
5 BY MR. DANIEL COHN:
6    Q.   And is it the case that the
7 typical holder of a products claim will
8 have been exposed not only to Grace's
9 asbestos-containing products but to
10 asbestos-containing products of other
11 manufacturers?
12       MS. HARDING: Object to
13    form.
14       MR. FINCH: Object to form.
15       THE WITNESS: Again, that
16    presupposes an analysis of the
17    Grace claims that, to my
18    knowledge, nobody has ever done
19    before and expectations which
20    nobody has ever had any reason to
21    have expectations on before.
22       I think it is sort of
23    commonly accepted in sort of the
24    asbestos arena that companies who

Page 429

1    manufacture and distribute
2    asbestos-containing products and
3    who don't have a contracting
4    function, subsidiary, affiliate,
5    division, are likely to have
6    substantially more products claims
7    than they have non-products
8    claims.
9       But, again, I am not an
10    expert on that subject. And
11    nobody has ever done any analysis
12    of the Grace claims history for
13    the purpose of trying to figure
14    out in the past how the claims
15    broke down, and so there is really
16    not much specific information
17    available on that subject.
18 BY MR. DANIEL COHN:
19    Q.   So despite your having been
20 involved in — let me strike that.
21       On how many asbestos cases
22 have you been involved in approximately?
23       MS. HARDING: Object to
24    relevancy.

Page 430

```
1        MR. FINCH:  Yes.  Object to
2   relevancy.
3        THE WITNESS:  20 plus or
4   minus, assuming by as asbestos
5   case, you mean asbestos bankruptcy
6   cases.
7   BY MR. DANIEL COHN:
8        Q.   That's what I meant, yes.
9             And --
10       MR. FINCH:  Class action.
11  BY MR. DANIEL COHN:
12       Q.   And in the course of that,
13  you have not reached the point of being
14  able to be comfortable about the nature
15  of the typical products claim?
16       MS. HARDING:  Object to
17  form.
18       MR. FINCH:  Object to form.
19       THE WITNESS:  The typical
20  products claim, I am not sure
21  there is such a thing.  I mean, in
22  the Armstrong World Industry case,
23  they had a contracting subsidiary,
24  and there were a whole lot of
```

Page 431

```
1   non-products claims at issue in
2   that case.  AC&S, there was a
3   dispute with Travelers as to
4   whether or not the products claims
5   were a hundred percent, 45
6   percent, or zero percent.
7        So you could say I suppose
8   the typical non-products claim is
9   being around -- either installing
10  or being around somebody who was
11  installing asbestos.
12  BY MR. DANIEL COHN:
13       Q.   Right.  I was really
14  asking --
15       A.   Premises claims for
16  manufacturers and distributors, which is
17  another kind of non-products claim, as I,
18  in my non-expert capacity, understand it,
19  are, I think, generally thought to be
20  significantly less prevalent,
21  particularly because of workers'
22  compensation law and the statutory bar
23  associated with that.
24       Q.   Let me for the moment stay
```

Page 432

```
1   with products claims for the moment.
2        (If a person was exposed to
3   Grace's products, would it be the usual
4   case that the same person was also
5   exposed to asbestos-containing products
6   of other manufacturers?)
7        MS. HARDING:  Object to
8   form.
9        MR. FINCH:  Object to form.
10       THE WITNESS:  I am not an
11  expert on this subject.  Do you
12  want my personal inexpert
13  understanding?  My impression is
14  that most people in the building
15  construction trades, which is
16  where a lot of Grace product was
17  used, are exposed to products of
18  more than one manufacturer of
19  asbestos-containing building
20  products.  That's about all I can
21  give you.
22  BY MR. DANIEL COHN:
23       Q.   And that person in the tort
24  system would have the right to sue all
```

Page 433

```
1   the manufacturers to whose products he
2   had been exposed?
3        MR. FINCH:  Object to form.
4   Where in your 30(b)(6) deposition
5   notice is the topic that would be
6   relevant to these questions?
7        MR. DANIEL COHN:  The nature
8   of the claims against Grace is one
9   of the topics.
10       MR. FINCH:  This is pretty
11  far afield.  You are asking him
12  what he knows about asbestos
13  claims generally from undefined,
14  undescribed manufacturers at some
15  unspecified time.
16       MR. DANIEL COHN:  I am
17  asking about asbestos PI claimants
18  against Grace, but I am asking
19  about what other claims they would
20  have, yes.
21       THE WITNESS:  I want to make
22  it perfectly clear that I am doing
23  my best to answer your questions,
24  but I do not regard myself as
```

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - -

In Re:                    : Chapter 11
                          :
                          : Case No.
W.R. GRACE & CO., et al,  : 01-01139 JKF
                          :
                          : (Jointly
          Debtors         : Administered)


- - -

Monday, May 4, 2009

- - -

Continuation of oral

deposition of PETER VAN N. LOCKWOOD,

ESQUIRE, taken pursuant to notice, was

held at the offices of CAPLIN & DRYSDALE,

One Thomas Circle N.W., Suite 1100,

Washington, DC  20005, commencing at

12:05 p.m., on the above date, before

Lori A. Zabielski, a Registered

Professional Reporter and Notary Public

in and for the Commonwealth of

Pennsylvania.

- - -

MAGNA LEGAL SERVICES
Seven Penn Center
1635 Market Street
8th Floor
Philadelphia, Pennsylvania 19103

Page 482

1      MR. FINCH: Let's go off the
2   record.
3      (There was a discussion held
4   off the record at this time.)
5      MR. FINCH: Back on the
6   record.
7      THE WITNESS: Mr. Finch
8   reminded me that, as I testified
9   on Friday, there are certain
10  provisions of the TDP that are
11  unique to this TDP and, therefore,
12  have not been the subject of prior
13  experience with other trusts and,
14  in particular, Sections 5.12 and
15  5.13, which I testified about at
16  some length.
17     I have probably had at least
18  as great, if not a greater, role
19  in the creation of those sections
20  that Mr. Inselbuch did. So I
21  don't know -- to suggest that
22  there are no questions that you
23  can ask about the TDP, that I
24  might not have as much or more

Page 483

1   knowledge than Mr. Inselbuch.
2   But, by and large, the provisions,
3   such as Section 5.10, that we were
4   just discussing that are fairly
5   what I would call standard TDP
6   provisions, my answer stands, that
7   he would be more knowledgeable on
8   those than I would.
9   BY MR. COHN:
10     Q.   Thank you.
11        In that case, let's turn to
12  insurance. Have you had occasion to
13  familiarize yourself with Grace's
14  insurance coverage for asbestos PI
15  claims?
16     A.   Only at a pretty general
17  level as was demonstrated on Friday.
18     Q.   Are you generally familiar
19  with comprehensive general liability
20  insurance?
21     A.   In the course of my work in
22  these bankruptcy cases over the last 15
23  or 20 years, I have had occasion to learn
24  in a non-expert capacity a fair amount of

Page 484

1   what I would regard as insurance law,
2   including a fair amount about
3   comprehensive or CGL policies.
4      Q.   And do you understand, at
5   least in general terms, the distinction
6   between products/completed operations
7   claims, on the one hand, and
8   non-products/non-completed operations
9   claims, on the other?
10        MR. FINCH: Object to form.
11        MS. DeCRISTOFARO:  Object to
12  form.
13        MR. FINCH:  Why don't you
14  define it so he knows exactly what
15  you are talking about.
16        You can answer. Object to
17  form.
18        THE WITNESS:  If you are
19  using those terms as they are used
20  in comprehensive general liability
21  policies, I think I have a general
22  understanding of that, but I
23  certainly would not profess to be
24  an expert on the subject.

Page 485

1   BY MR. COHN:
2      Q.   And would you mind if when I
3   refer to products/completed operations
4   claims under a standard CGL policy, if I
5   just use the term "products claims"?
6      A.   That's fine.
7      Q.   And would you mind if when I
8   refer to non-products/non-completed
9   operations claims under a standard CGL
10  policy, if I just call them "non-products
11  claims"?
12     A.   That's fine.
13        MR. SCHIAVONI:  We will
14  object, though, Dan.
15  BY MR. COHN:
16     Q.   Is it your understanding --
17  strike that.
18        Is it the understanding of
19  the Asbestos PI Committee that the Libby
20  claims hold non-products claims?
21     A.   I don't think the Asbestos
22  Claimants Committee has an understanding
23  on that subject. We understand that the
24  Libby claimants contend that they have

Page 486

1    non-products claims?
2        Q.   Is it the committee's
3    understanding that other asbestos PI
4    claimants besides the Libby claimants
5    hold non-products claims?
6            MR. SCHIAVONI:  I object to
7    form; again, vague and ambiguous
8    with regard to the committee.
9            Mr. Cohn, are you asking
10   whether your own clients
11   understand this or by majority
12   vote or before -- how?
13           MR. COHN:  Thank you,
14   Mr. Schiavoni.
15           You may answer the question.
16           THE WITNESS:  It is the
17   committee's understanding that
18   there are an unknown number of
19   present and future claimants
20   whose --
21           MR. SCHIAVONI:  We also
22   object, that the question calls
23   for waiver of the attorney-client
24   privilege and any common interest

Page 487

1    privilege.
2            MR. FINCH:  We disagree with
3    that assertion.  He didn't ask
4    about communications with the
5    committee or its counsel.
6            Read back the question.
7            (The reporter read from the
8    record as requested.)
9            MR. FINCH:  To the extent
10   you can answer that without
11   revealing privileged
12   communications, you may do so.  I
13   don't think it calls for
14   privileged communications on its
15   face.
16           MR. SCHIAVONI:  Again, we
17   take the position that this
18   constitutes the comprehensive
19   waiver, to the extent you are
20   testifying about the understanding
21   of the committee.
22           MR. FINCH:  No.  He's
23   testifying about the position of
24   the committee and what the

Page 488

1    committee knows from public
2    sources.  He is not testifying
3    about the committee's work product
4    or what communications may be
5    privileged between the committee
6    members, on the one hand, and
7    counsel, on the other.
8            MR. SCHIAVONI:  He's
9    testifying about -- he's a lawyer.
10   He's testifying about what a
11   lawyer thinks and what a group of
12   lawyers think --
13           MR. FINCH:  No, he is not.
14           MR. SCHIAVONI:  -- about a
15   legal issue.
16           MR. FINCH:  No, he is not.
17           MR. SCHIAVONI:  All right.
18   We can brief it later.
19           THE WITNESS:  The
20   committee's position, to my
21   knowledge, on this subject has
22   been expressed in briefs filed in
23   the court, and I will reiterate
24   that position as expressed in

Page 489

1    briefs filed in the court, which
2    is that at some theoretical level,
3    since the committee has not
4    undertaken to any sort of specific
5    factual investigation on this
6    subject, that there are or could
7    be claims that under CGL
8    non-products limits would be for
9    insurance purposes covered by the
10   same CGL coverage that Libby
11   claimants' claims are, i.e. under
12   non-products coverage if the Libby
13   claimants' claims are covered by
14   non-products coverage.
15           The point being that the
16   committee's position is that
17   whatever the Libby claimants
18   assert to be the unique or
19   identifying characteristics of
20   their claims that would bring them
21   under the, quote, non-products,
22   close quote, coverage of certain
23   Grace CGL policies, that there are
24   other claimants who either have or

Page 498

1    Q.    I hand you a document that
2    has been marked as ACC 30(b)(6)-18, and
3    for the information of those in the room
4    and on the telephone, this is Exhibit-8
5    from the Plan Exhibit Book, namely the
6    Best Interest Analysis.
7        A.    I have it.
8        Q.    Now, in that document, Grace
9    places a value of $500 million on Grace's
10   unsettled insurance rights.
11       Does the asbestos personal
12   injury – strike that.
13       Does the Asbestos PI
14   Committee agree with that figure?
15       MR. FINCH:  Object to form.
16       MS. BAIER:  Objection.
17       MR. FINCH:  And object on
18   privilege grounds and instruct
19   witness not to answer to the
20   extent that that would divulge the
21   disclosure of privileged
22   communications for or work product
23   communications.
24       If you have an understanding

Page 499

1    independent of that based on
2    things that you have learned or
3    the committee has learned from
4    sources not protected by the
5    privilege, you can answer.
6        MS. BAIER:  I will object to
7    form.  It assumes things not in
8    the record.
9        THE WITNESS:  All the
10   committee knows about this is set
11   forth in Note D to this exhibit,
12   which specifies that the insurance
13   recovery is based on the current
14   book value of the insurance asset
15   ($500 million).  The Note goes on
16   to say that the ultimate amount of
17   the insurance received will depend
18   on a number of factors, and then
19   lists the factors.
20       This is a document that was
21   prepared by Grace, and the
22   committee has accepted it from
23   Grace as being what it purports to
24   be, Grace's analysis of the

Page 500

1    application of a Bankruptcy
2    Chapter 7 liquidation test.
3    BY MR. COHN:
4        Q.    Would the Asbestos PI
5    Committee agree that that figure, namely
6    the $500 million value, represents the
7    best available figure for purposes of
8    Plan confirmation?
9        MR. FINCH:  Object to form,
10   mischaracterizes prior testimony.
11       THE WITNESS:  I don't even
12   know what you mean for purposes of
13   Plan confirmation.
14       It's proffered, as I
15   understand it, for a very limited
16   purpose, determining what would
17   happen in the event of a
18   hypothetical Chapter 7 liquidation
19   as compared with what is projected
20   to happen in this proposed Chapter
21   11 reorganization.
22       As proposed as a projection
23   for that purpose and given that
24   the committee is a Plan proponent,

Page 501

1    I take it, it is fair to say that
2    the committee has accepted that
3    number as described for that
4    purpose.
5    BY MR. COHN:
6        Q.    Who drafted the Asbestos
7    Insurance Entity Injunction?
8        A.    That was the product of a
9    group effort along with the rest of the
10   Plan.  I don't recall who crafted the
11   first draft of what is ultimately in the
12   Plan.
13       Q.    What is the purpose of the
14   Asbestos Insurance Entity Injunction?
15       A.    My understanding of the
16   purpose is that its principal rationale
17   is that there is a variety of types of
18   insurance rights that are being
19   transferred to the Trust for the benefit
20   of all Trust beneficiaries as part of
21   what I will call the deal reflected in
22   this Plan.
23       In order to prevent
24   individual Trust beneficiaries from

Page 502

1   seeking disproportionate shares of
2   insurance through direct actions or
3   otherwise, the injunction was crafted in.
4   I might add, many earlier cases than this
5   one, perhaps not in precisely the same
6   language, but the concept has been around
7   for a while, to protect the Trust and its
8   beneficiaries from having people do what
9   I would call jumping the queue in getting
10  disproportionate or attempting to get
11  disproportionate shares of insurance that
12  should be shared by all.
13          MR. COHN:  Let's go off the
14      record for a second.
15          (There was a discussion held
16      off the record at this time.)
17  BY MR. COHN:
18      Q.   Directing your attention to
19  what has been marked ACC 30(b)(6)
20  Exhibit-4.
21      A.   Yes.
22      Q.   Namely, the Asbestos
23  Insurance Transfer Agreement?
24      A.   Yes.

Page 503

1       Q.   Which is Exhibit-6 to the
2   Plan Exhibit Book.
3       A.   Yes.
4       Q.   Does that agreement assign
5   to the Asbestos PI Trust the claims of
6   individual asbestos PI claimants against
7   insurers for their own misconduct?
8           MR. FINCH:  Object to form.
9           MR. SCHIAVONI:  Objection to
10      form.
11          THE WITNESS:  I don't
12      believe this agreement assigns
13      claims to the Trust at all.  This
14      agreement assigns insurance
15      rights, according to my
16      understanding of the agreement.
17      How claims wind up in the Trust is
18      by the Asbestos Permanent
19      Channelling Injunction.
20  BY MR. COHN:
21      Q.   So —
22      A.   And the Asbestos Insurance
23  Injunction indirectly, perhaps.  But
24  primarily Asbestos Permanent Channelling

Page 504

1   Injunction.
2       Q.   So the Asbestos PI Trust
3   will not end up holding — strike that.
4           Would the committee agree
5   that the Asbestos PI Trust will not end
6   up holding claims of individual asbestos
7   PI claimants against insurers for their
8   own misconduct?
9           MS. BAIER:  Objection to
10      form.
11          MR. SCHIAVONI:  Objection to
12      form, and, in addition, I would
13      say that the question calls for
14      the waiver of privilege.  And I
15      would also ask Mr. Cohn that you
16      identify the topic of on your
17      30(b)(6) notice that this is
18      responsive to.
19          MS. BAIER:  I would also
20      object to form, especially to the
21      word "holding."
22          I think it mischaracterizes
23      what the testimony has been and
24      confuses the issue by asking what

Page 505

1   the Trust holds.  I don't think
2   the Trust holds things.
3           MR. FINCH:  I object to
4   form.  I disagree that it calls
5   for privileged information.
6           MR. COHN:  With that, would
7   the witness do his best.
8           THE WITNESS:  The Trust
9   certainly isn't going to hold any
10  claims.  It's going to have claims
11  asserted against it.  The people
12  that hold the claims are the
13  claimants.
14          With respect to this, the
15  question about whether claims
16  involving the quote, I think you
17  phrased it, independent tort
18  liability of insurers, close
19  quote, the problem I have
20  answering that question is that it
21  attempts to summarize in a single
22  phrase, which does not necessarily
23  have a precise legal meaning, a
24  complicated set of questions

Page 506

1    having to do with how the Asbestos
2    Permanent Channelling Injunction
3    works.
4        The provisions in the
5    Asbestos Permanent Channelling
6    Injunction are very complex. As a
7    general proposition, however, I
8    would say that the claims that are
9    being channelled to the Asbestos
10    Personal Injury Trust are claims
11    that are against the Debtors or
12    against various other entities
13    defined as asbestos-protected
14    parties that arise in the manner
15    that satisfies the requirements of
16    Section 524(g), which has very
17    specific language about what can
18    and cannot be channelled to an
19    Asbestos Personal Injury Trust
20    under that section.
21        What you are, in effect,
22    trying to ask is does the phrase
23    you have used fit within or
24    without the terminology of Section

Page 507

1    524(g) where the term as such is
2    not used. So I can't really
3    answer the question yes or no as
4    stated.
5        All I can tell you is that
6    the Asbestos Permanent Channelling
7    Injunction, in my understanding,
8    is not intended to channel to the
9    Trust claims that Section 524(g)
10    does not authorize to be
11    channelled to the Trust.
12    BY MR. COHN:
13        Q.    All right.  We have gone a
14    little afield from the question, so if I
15    can go back and ask what I meant to, and
16    let's try it again.
17        MR. SCHIAVONI:  Again,
18        Mr. Cohn, we would ask you to
19        identify in the notice where it is
20        you identify this as a topic,
21        because to the extent Mr. Lockwood
22        is not designated by the committee
23        on it, it's not really a proper
24        question to pose to him by another

Page 508

1    committee member.
2        MR. COHN:  It's covered by
3    several of the topics, and I would
4    really like to just go on.
5    BY MR. COHN:
6        Q.    So the question is, will
7    claims of individual asbestos PI
8    claimants against insurers for their own
9    misconduct be an asset of the Asbestos PI
10    Trust?
11        MS. BAIER:  Objection.
12        MR. FINCH:  Objection to
13    form.
14        MR. SCHIAVONI:  I would
15    object, asked and answered.
16        And I would remind
17    Mr. Lockwood he has addressed this
18    issue in other cases like
19    Pittsburgh Corning and to the
20    extent you need to go any further
21    here, I think it raises a whole
22    host of issues about waiver.
23        MS. DeCRISTOFARO:  Note my
24    objection, too.

Page 509

1        THE WITNESS:  Would you read
2    back the question, please?
3        (The reporter read from the
4    record as requested.)
5        MS. DeCRISTOFARO:
6    Objection.
7        MR. FINCH:  Objection.
8        THE WITNESS:  As phrased,
9    the answer to that question is
10    unequivocally no.
11        MR. COHN:  Thank you.
12    BY MR. COHN:
13        Q.    Now, directing your
14    attention to the Asbestos Insurance
15    Entity Injunction, if an asbestos PI
16    claimant has a claim against an insurer
17    based on the insurer's own alleged
18    misconduct, does the Asbestos Insurance
19    Entity Injunction bar him from asserting
20    that claim?
21        MR. FINCH:  Objection.
22        MR. SCHIAVONI:  Objection,
23    calls for a legal conclusion and
24    objection to form and the other

Page 518

1  litigation concerning the applicability
2  of and injunction similar to the Asbestos
3  Insurance Entity Injunction in any other
4  case?
5        MR. WISLER: Can you repeat
6    that? I didn't hear you, Dan.
7  BY MR. COHN:
8        Q.   Are you aware of any
9  litigation concerning the scope of the
10  asbestos or an injunction similar to the
11  Asbestos Insurance Entity Injunction in
12  any other case?
13        A.   The only litigation that I
14  am aware of that's remotely similar --
15  and I don't profess to know all the
16  litigation that might be floating around
17  out there -- is actually litigation over
18  an entity that is closer to the Asbestos
19  Permanent Channelling Injunction. And
20  it's the Travelers injunction that's
21  presently before the United States
22  Supreme Court. To be more specific, it's
23  the Manville injunction that Travelers is
24  litigating about.

Page 519

1        Q.   Has Maryland Casualty
2  Company paid or agreed to pay any money
3  or other consideration in order to be
4  covered by the Asbestos PI Channelling
5  Injunction?
6        A.   Well, that depends on how
7  you use the term "pay."
8        The basis, which I take it
9  which is what you are asking for, for
10  Maryland Casualty being a protected party
11  to this Plan is that in the past
12  Maryland Casualty Company has paid a lot
13  of money to Grace and entered into a
14  settlement agreement with Grace which
15  releases that coverage and which Grace
16  indemnifies it against claims.
17        As I testified, I believe,
18  on Friday, Grace, as part of this deal,
19  Grace has had two positions that it has
20  taken that we have -- we being the
21  committee and its representative --
22  accepted. Number one is a claim for
23  indemnity from a settled insurer based on
24  claims against that insurer that are

Page 520

1  asbestos personal injury claims against
2  or arising out of Grace is something that
3  has to be channelled to the Trust because
4  it fits within the definition of an
5  asbestos personal injury claim under
6  524(g), and that in order that Grace be
7  protected from such indemnity claims, the
8  roughly $3 billion that Grace and various
9  related parties are paying to this Plan
10  is, in part, on behalf of those settled
11  insurers.
12        So if the question means, is
13  Maryland Casualty Company paying
14  something over and above what Grace is
15  paying, the answer is not to my
16  knowledge.
17        Q.   Is there a benefit to the
18  Grace Bankruptcy Estate or to the
19  Asbestos PI Trust from having the
20  Asbestos PI Channelling Injunction
21  protect Maryland Casualty Company?
22        MR. FINCH: Object to that
23  question to the extent that it
24  calls for speculation.

Page 521

1        Mr. Wisler: Could you read
2  the question back, please?
3        MR. SCHIAVONI: Objection to
4  form; objection, calls for waiver;
5  objection, calls for legal
6  conclusion.
7        MR. FINCH: I disagree that
8  it calls for waiver.
9        But you can answer.
10        THE WITNESS: Could you
11  reread the question?
12        MR. COHN: Let's go off the
13  record for a second.
14        (There was a discussion held
15  off the record at this time.)
16        (The reporter read from the
17  record as requested.)
18        Mr. Wisler: I object to
19  form.
20        THE WITNESS: Yes.
21  BY MR. COHN:
22        Q.   What is that benefit?
23        MR. FINCH: You can answer
24  the question to the extent that it

Page 522

1 doesn't reveal privileged or work
2 product information.
3 THE WITNESS: The benefit to
4 the Grace Estate is that it
5 eliminates potential claims by
6 Maryland Casualty Company against
7 the Debtor and its Estate. That's
8 the benefit.
9 BY MR. COHN:
10 Q.  Is there any agreement
11 between Grace and Maryland Casualty
12 Company which requires Grace to indemnify
13 Maryland Casualty Company for its own
14 misconduct?
15 MR. FINCH: Objection to the
16 extent that calls for a legal
17 opinion. And object to the extent
18 that there is information
19 responsive to this question that's
20 privileged, I instruct you not to
21 answer if it would reveal
22 privileged communications.
23 If you can answer the
24 question without revealing

Page 523

1 privileged communications, you can
2 do so --
3 MR. SCHIAVONI:
4 Mr. Lockwood, I think --
5 MR. FINCH: Tank, let me
6 finish.
7 MR. SCHIAVONI: Oh, I am
8 sorry.
9 MR. FINCH: But I still
10 object to the extent that it calls
11 for a legal opinion.
12 MS. BAIER: I also object.
13 You have asked Mr. Lockwood
14 whether he knows about -- you
15 haven't asked him about whether he
16 knows. You asked him is there an
17 agreement between Grace and
18 Maryland Casualty Company. I
19 object to the form. You are now
20 asking Mr. Lockwood to get into
21 the head of W.R. Grace.
22 MR. SCHIAVONI: I am sorry,
23 Mr. Finch. I didn't mean to
24 interrupt you before.

Page 524

1 Mr. Schiavoni for Arrowood.
2 We join your objection, and we
3 would also say this is outside the
4 scope of the designation and that
5 Mr. Lockwood doesn't have to
6 answer every single question no
7 matter what it is. This is not in
8 the designation.
9 MR. FINCH: Can we hear back
10 the question?
11 (The reporter read from the
12 record as requested.)
13 THE WITNESS: In my
14 understanding, there is an
15 agreement between Grace and
16 Maryland casualty company which
17 contains indemnification
18 provisions. I am not in a
19 position to express an opinion on
20 what the scope of that
21 indemnification is, much less
22 whether or not Grace and Maryland
23 Casualty agree on what the scope
24 of that indemnification is.

Page 525

1 BY MR. COHN:
2 Q.  Is it the position of the
3 Asbestos PI Committee that if the
4 indemnification provisions are construed
5 to protect Maryland Casualty from its own
6 misconduct, that such provisions would be
7 enforceable?
8 MR. FINCH: Object to form,
9 calls for a legal conclusion.
10 THE WITNESS: It actually
11 calls for speculation.
12 MR. FINCH: That, too.
13 THE WITNESS: In addition.
14 The committee's
15 understanding of the way this Plan
16 works, which is what expresses the
17 committee's position, is that it's
18 a legal question which, assuming
19 that a dispute on this subject
20 arises at some point in the
21 future, will be determined by
22 litigation over, A, what exactly
23 is the basis for the claim against
24 Maryland Casualty, legal and

24 (Pages 538 to 541)

Page 538

1    understand how -- Grace's
2    consideration is a lump sum of
3    stuff, notes, cash, warrants,
4    insurance, what have you.
5        And, as I analyzed it
6    earlier, it's the committee's
7    stated position that the statute
8    allows Grace under those
9    circumstances to designate
10   insurers that it settled with and
11   have indemnity claims for
12   protection against asbestos
13   personal injury claims in the
14   future.
15       I don't know any basis on
16   which a court could say that,
17   these 12 asbestos settled insurers
18   are just okeydoke to get
19   protection under that approach,
20   but Insurer Y, for some reason or
21   another, isn't. So I can't even
22   speculate what your hypothetical
23   would entail, much less what its
24   consequences would be.

Page 539

1    BY MR. WISLER:
2        Q.   So in the ACC's view, all
3    the settled asbestos insurance companies
4    sort of ride together in terms of whether
5    they are entitled to 524(g) protection?
6        MR. FINCH: Objection,
7    mischaracterizes prior testimony;
8    object to the form.
9        MR. WISLER: If I
10   mischaracterize it, please
11   clarify.
12       THE WITNESS: The only
13   caveat I would say to that is the
14   one that we spent some time
15   dancing around with Mr. Cohn
16   earlier, that if there was some
17   sort of ruling that some certain
18   claims couldn't properly be
19   channeled against a particular
20   insurer while other claims could
21   be , i.e. his notional independent
22   tort claims versus claims that are
23   clearly asbestos PI claim that
24   says the coverage isn't exhaustive

Page 540

1    or wasn't properly settled or
2    whatever, at that point, I
3    don't -- the Plan does not purport
4    to provide blanket protection.
5        It provides protection for
6    claims that fit within the
7    definitions of the Plan, and if
8    somehow or another the court
9    determines that some particular
10   claim doesn't fit within the
11   definitions of the claims that
12   either are or legally can be under
13   524(g) channeled to the Trust,
14   then, in my opinion, that would
15   not result in the Plan failing a
16   condition of the sort I talked
17   about earlier. Whether or not
18   there could be other consequences
19   of such a ruling is a different
20   matter.
21   BY MR. WISLER:
22       Q.   Let's talk about that
23   because you just described the
24   possibility that the court could rule

Page 541

1    that some certain claims, in your words,
2    were not properly channeled.
3        Is it the ACC's position
4    that indemnity claims of a settled
5    asbestos insurance company would result
6    from those some certain claims would then
7    no longer be classified as Class 6 and
8    channeled to the Trust?
9        MR. FINCH: Objection, form.
10       MS. BAIER: Can you read
11   that over, please?
12       (The reporter read from the
13   record as requested.)
14       MS. BAIER: Objection as to
15   form.
16       THE WITNESS: If I
17   understand the question and
18   speaking at a somewhat high level
19   of generality, if a claim against
20   a settled insurer was ruled not
21   to be channeled to the Trust in
22   the first instance, because it
23   didn't fit within -- because of
24   one of two reasons: Either it

Page 542

1  didn't fit within the definition
2  or, alternatively, even though it
3  might be read to fit within the
4  definition, it could not be under
5  Section 524(g) so channelled, you
6  just weren't legally permitted to
7  do so, and the claim went forward,
8  and an indemnity claim were to
9  arise out of that claim, then it
10  is the position of the ACC that
11  that indemnity claim would not be
12  a Class 6 claim, because, by
13  definition, it didn't arise out of
14  an asbestos personal injury claim.
15  It arose out of something that the
16  court had decided since it wasn't
17  channelled was, by definition, not
18  an asbestos personal injury claim.
19  BY MR. WISLER:
20  Q.  Is the ACC in agreement with
21  Exhibit-5 of the exhibit book?  Are you
22  familiar with that exhibit?
23  A.  I am generally familiar with
24  it.  The ACC, as a Plan proponent, is --

Page 543

1  if what you mean by is in agreement with
2  it, we are sponsoring a Plan of which
3  it's an exhibit.  So I guess you could
4  say we are in agreement with it.
5  MR. WISLER:  That's all I
6  have.  Thank you, Mr. Lockwood.
7  MR. MANGAN:  Hello.  This is
8  Kevin Mangan on the phone.
9  MR. WISLER:  One second,
10  please.
11  MR. MANGAN:  Sure, Jeff.
12  MR. WISLER:  I am sorry.
13  Just one follow-up.  I apologize.
14  BY MR. WISLER:
15  Q.  Mr. Lockwood, in response to
16  my next-to-the-last question, you
17  testified that the claim we were
18  discussing -- and I am not going to try
19  to repeat all the words -- would not be a
20  Class 6 claim.
21  Is it the ACC's position
22  that it would then under this Plan be a
23  Class 9 claim?
24  MR. FINCH:  Object to form.

Page 544

1  You can answer.
2  THE WITNESS:  I don't know
3  that the ACC has a position on
4  what kind of claim it would be at
5  that point.
6  MR. WISLER:  Okay.  Thank
7  you.
8  - - -
9  EXAMINATION
10  - - -
11  BY MR. MANGAN:
12  Q.  Mr. Lockwood, Kevin Mangan
13  on behalf of the State of Montana.  I
14  have a few follow-up questions from
15  Mr. Cohn.
16  Specifically, I am going to
17  refer you to ACC Document 11, which is
18  Exhibit-4.  It's the TDP.
19  A.  Yes, sir.
20  Q.  If you could flip to Section
21  5.7?
22  A.  Section 5.7 of the TDP.
23  Q.  Correct.
24  A.  Evidentiary Requirements?

Page 545

1  Q.  Right.  Specifically,
2  5.7(a)(1).
3  A.  Correct.
4  Q.  If you could take a second
5  and take a look at that.
6  A.  Including the subsections
7  (a), (b) and (c) or just the lead in
8  (a)(1)?
9  Q.  Just (a)(1).
10  A.  Okay.
11  Q.  You see the (a)(1) requires
12  a ten-year latency period.
13  A.  Correct.
14  Q.  The period between the first
15  exposure and diagnosis.
16  Why a ten-year latency
17  period?
18  A.  It's my understanding that
19  that is generally considered by the
20  medical profession to be the minimum
21  latency period for asbestos-related
22  diseases to manifest themselves.
23  Q.  And is that how that number
24  came up with, to the best of your

Page 558

1    And that scenario to me appears to
2    be extraordinarily unrealistic, if
3    not impossible.
4    BY MS. CASEY:
5        Q.   I would like you to turn to
6    Exhibit ACC Exhibit-11.
7            MR. FINCH:  The TDP?
8            MS. CASEY:  Yes, the TDP.
9            THE WITNESS:  Okay.  I have
10   it.
11   BY MS. CASEY:
12       Q.   And specifically 5.12.
13       A.   I have it.
14       Q.   Okay.  5.12 by its terms
15   applies to claims that BNSF and others
16   would have against settled asbestos
17   insurance companies.  Let me ask an
18   initial question.
19           It is the ACC's position
20   that the Asbestos Insurance Entity
21   Injunction also enjoins asbestos claims
22   as defined by the Plan from being
23   asserted against unsettled asbestos
24   insurance companies, correct?

Page 559

1        A.   In general, that's true.
2    The language is very specific as to what
3    kind of claims that it enjoins against
4    non-settled insurers, but subject to the
5    caveat that you have to look at the
6    definition to know exactly which kind of
7    claims you are talking about, yes.
8        Q.   Does the TDP have a
9    provision by which BNSF Railway can
10   assert its enjoined claims against the
11   unsettled asbestos insurance companies?
12           MR. SCHIAVONI:  Objection to
13   form.
14           THE WITNESS:  At the moment,
15   I can't think of anything.
16   BY MS. CASEY:
17       Q.   Okay.  My final questions
18   concern the contribution that Grace is
19   allegedly providing to the Plan on behalf
20   of the insurance companies for the
21   benefit of the 524(g) injunction.
22           I understand the cash
23   portion -- at least I understand the
24   argument that the ACC is present

Page 560

1    regarding cash portion.  I am not sure I
2    understand the basis for saying that the
3    channelling of the indemnification claims
4    constitutes a substantial contribution to
5    the Plan or a benefit to the Plan, to the
6    asbestos claimants.
7            Can you explain how that
8    constitutes a benefit?
9            MR. FINCH:  Objection,
10   mischaracterizes prior testimony.
11           THE WITNESS:  I don't
12   believe I testified that that was
13   a benefit to the Trust.
14           The channelling of the
15   claims, the indemnity claims,
16   against Grace, I testified was a
17   benefit to the Grace Estate.
18           The statute, in general,
19   says that a protected party has to
20   have something conducted on its
21   behalf to the Trust in exchange
22   for the injunction.  That's a very
23   broad paraphrase to the statute.
24           So the protection for the

Page 561

1    settled insurance company is the
2    injunction.  The benefit to the
3    Trust, which if it, in effect,
4    purchases that protection, is the
5    Grace contribution, which Grace is
6    making on behalf of itself and
7    multiple other entities.
8    BY MS. CASEY:
9        Q.   The cash contribution?
10       A.   Well, the entirety of the
11   contribution.  There is cash; there is
12   notes; there is warrant; there is
13   insurance; and there is the Grace
14   Estate's claim against Fresenius and
15   Sealed Air.
16           You will recall that
17   Fresenius and -- the committee -- the two
18   committees, the PI and the PD committees,
19   brought claims against Sealed Air and
20   Fresenius on behalf of the Grace Estate.
21   So when those claims were settled, they
22   were not only settled by the entities
23   against which they were brought, namely,
24   Sealed Air and Fresenius but, to the

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| W.R. GRACE & CO., *et al.*, | Case No. 01-1139 (JKF) |
| Debtors-in-possession. | Jointly Administered |

## OBJECTIONS OF THE OFFICIAL COMMITTEE
## OF ASBESTOS PERSONAL INJURY CLAIMANTS TO RULE 30(B)(6)
## NOTICES OF DEPOSITION SERVED BY CERTAIN PLAN OBJECTORS

Pursuant to Federal Rules of Civil Procedure 26 and 30, and Federal Rules of Bankruptcy Procedure 3020(b)(1), 7026, 7030, and 9014, the Official Committee of Asbestos Personal Injury Claimants ("ACC"), by and through its undersigned counsel, hereby objects as follows to the Rule 30(b)(6) notices of deposition (collectively, "Notices") served on the ACC by OneBeacon America Insurance Company, Seaton Insurance Company, Government Employees Insurance Company, Columbia Insurance Company f/k/a Republic Insurance Company, Fireman's Fund Insurance Company, Allianz S.p.A., f/k/a Riunione Adriatica di Scurta, the Libby Claimants, Maryland Casualty Company, Zurich Insurance Company, and Zurich International (Bermuda) Ltd.:

1.      The ACC objects to the Notices to the extent they seek Rule 30(b)(6) testimony regarding legal conclusions, information prepared in anticipation of litigation, information obtained by or on behalf of counsel for the ACC in preparation for trial, information protected by the attorney-client privilege, information protected by the common-interest privilege, information protected by Federal Rule of Evidence 408, and/or information otherwise beyond the permissible scope of discovery as set forth in the Federal Rules of Civil Procedure, the Federal Rules of Evidence, the Federal Rules of Bankruptcy Procedure, or the rules of this Court.

{D0150983.1}

2.    The ACC further objects to the Notices to the extent they seek testimony and information protected by the work product doctrine. *See* Hickman v. Taylor, 329 U.S. 495, 511 (1947) (finding that the work product doctrine excludes from disclosure attorney statements, memos, correspondence, briefs, and mental impressions obtained or prepared by an attorney in anticipation of litigation); In re Grand Jury (Impounded), 138 F.3d 978, 981 (3d Cir. 1998); Tobacco & Allied Stocks, Inc. v. Transamerica Corp., 16 F.R.D. 537, 541-43 (D. Del. 1954) (stating that "pre-trial discovery does not call for the elicitation of contentions, opinions or legal conclusions of an attorney").

3.    The ACC also objects to the Notices to the extent they seek testimony that would disclose communications in connection with negotiations of a plan of reorganization or draft plan documents.  Courts in numerous asbestos-related bankruptcies have prohibited discovery into, and the disclosure of, such information. *See* In re Federal-Mogul Global, Inc., Case No. 01-10578 (JKF) (Bankr. D. Del. Feb. 26, 2007) (Hr'g Tr. at 31) (finding that draft plan documents are not properly discoverable); In re Pittsburgh Corning Corp., Case No. 00-22876 (JKF) (Bankr. W.D. Pa. Feb. 19, 2004) (Hr'g Tr. at 64-66) (finding that drafts of plan documents are not discoverable); In re ACandS, Inc., No. 02-12687 (RJN) (Bankr. D. Del. Sept. 30, 2003) (Hr'g Tr. at 42-45) (denying discovery into plan negotiations on the grounds that such discovery is irrelevant to the issue of good faith in proposing the plan); In re Babcock & Wilcox Co., No. 00-10992 (JAB) (Bankr. E.D. La. Aug. 20, 2003) (Hr'g Tr. 84) (denying insurers' motion to compel discovery on draft plan of reorganization documents and confidential plan of reorganization negotiations); In re Combustion Eng'g, Case No. 03-10495 (JKF) (Bankr. D. Del. May 2, 2003) (Hr'g Tr. at 301) (observing that "drafts generally are not relevant to anything"); In re Eagle-

<u>Picher Indus.</u>, 169 B.R. 130, 134 (Bankr. S.D. Ohio 1994) (finding that creditors were not entitled to drafts of proposed plans of reorganization).

4.      The ACC expressly reserves all other claims of privilege.

5.      Subject to and without waiving any of its objections, the ACC designates the following witness pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure: Peter Lockwood. The ACC will make Mr. Lockwood available for deposition on all topics designated by any plan objector for no longer than a total of eight (8) hours, on either May 1, 2009, or May 4, 2009.

[Signature of counsel on following page]

{D0150983.1} 3

CAMPBELL & LEVINE, LLC

*/s/ Marla R. Eskin*
Marla R. Eskin (No. 2989)
Mark T. Hurford (No. 3299)
800 N. King Street, Suite 300
Wilmington, DE 19801
Telephone: (302) 426-1900
Telefax: (302) 426-9947
meskin@camlev.com
mhurford@camlev.com


CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
375 Park Avenue, 35th Floor
New York, NY 10152-3500
Telephone: (212) 319-7125
Telefax: (212) 644-6755

Peter Van N. Lockwood
Nathan D. Finch
Jeffrey A. Liesemer
One Thomas Circle, N.W.
Washington, D.C. 20005
Telephone: (202) 862-5000
Telefax: (202) 429-3301

*Counsel for the Official Committee*
*of Asbestos Personal Injury Claimants*


Date: April 17, 2009

W R GRACE & CO NEW                                    Filing Date: 04/06/08

UNITED STATES

SECURITIES AND EXCHANGE COMMISSION

WASHINGTON, DC 20549

FORM 8-K

CURRENT REPORT PURSUANT

TO SECTION 13 OR 15(D) OF THE

SECURITIES EXCHANGE ACT OF 1934

Date of report (Date of earliest event reported) April 6, 2008

W. R. GRACE & CO.

(Exact Name of Registrant as Specified in Its Charter)

Delaware

(State or Other Jurisdiction of Incorporation)



EXHIBIT
Acc 30(6)(5)3
5-1-09          12

|                              | 1-13953           | 65-0773649                        |
|------------------------------|-------------------|-----------------------------------|
| (Commission File Number)     |                   | (IRS Employer Identification No.) |

7500 Grace Drive                                     21044
Columbia, Maryland
(Address of Principal Executive Offices) (Zip Code)

DEPOSITION
EXHIBIT
# 12
3/20/09 ns B

(410) 531-4000

(Registrant's Telephone Number, Including Area Code)

(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to
simultaneously satisfy the filing obligation of the registrant under any of the
following provisions (see General Instruction A.2. below):

o    Written communications pursuant to Rule 425 under the Securities Act (17
CFR 230.425)

o    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR
240.14a-12)

o    Pre-commencement communications pursuant to Rule 14d-2(b) under the
Exchange Act (17 CFR 240.14d-2(b))

o    Pre-commencement communications pursuant to Rule 13e-4(c) under the
Exchange Act (17 CFR 240.13e-4(c))

--------------------------------------------------------------------------------

W. R. GRACE & CO.

FORM 8-K

2

WR GRACE & CO NEW

Filing Date: 04/08/08

CURRENT REPORT

Item 7.01.                    Regulation FD Disclosure.


On April 6, 2008, W. R. Grace & Co., on behalf of itself and its subsidiaries and affiliates that are debtors in the Chapter 11 cases, (the "Company") entered into an agreement in principle (the "Agreement") with the Official Committee of Asbestos Personal Injury Claimants, the Future Claimants Representative and the Official Committee of Equity Security Holders, all parties-in-interest in the Company's Chapter 11 case, that would settle all present and future asbestos-related personal injury claims against the Company on the terms and conditions set forth therein.  Certain terms and conditions of the Agreement are described in the press release attached hereto as Exhibit 99.1.  The description of the terms and conditions of the Agreement is qualified in its entirety by reference to the provisions of the Agreement attached hereto as Exhibit 99.2.


The information furnished pursuant to this Item 7.01, including Exhibit 99.1 and Exhibit 99.2, shall not be deemed to be "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, (the "Exchange Act"), or otherwise subject to the liabilities of such section, nor shall such information be deemed incorporated by reference in any filing under the Securities Act of 1933, as amended, or the Exchange Act, except as shall be expressly set forth by specific reference in such a filing.


Item 9.01.                    Financial Statements and Exhibits.



(d)  Exhibits



99.1                         Press Release



99.2                         Term Sheet for Resolution of Asbestos Personal Injury Claims dated as of April 6, 2008


2
-------------------------------------------------------------------------

3

**SIGNATURES**


Pursuant to the requirements of the Securities Exchange Act of 1934, the
Registrant has duly caused this report to be signed by the undersigned,
thereunto duly authorized.


W. R. GRACE & CO.
(Registrant)
By /s/ Mark A. Shelnitz
Mark A. Shelnitz
Secretary


Dated:  April 7, 2008


3
----------------------------------------------------------------------------

4

*W R GRACE & CO NEW*                                          *Filing Date: 04/06/08*

Exhibit 99.1

Grace News #2919

Media Relations:              Investor Relations:
William Corcoran              Bridget Sarikas
T +1 410.531.4203            T +1 410.531.4194
Ewilliam.corcoran@grace.com  Ebridget.sarikas@grace.com

### GRACE ANNOUNCES SETTLEMENT OF ASBESTOS PERSONAL INJURY CLAIMS

COLUMBIA, Maryland, April 7, 2008 -- W. R. Grace & Co. (NYSE: GRA) today
announced an agreement in principle that would settle all present and future
asbestos-related personal injury claims. The agreement, reached with the
Official Committee of Asbestos Personal Injury Claimants, the Future Claimants
Representative and the Official Committee of Equity Security Holders, requires
the following assets to be paid into a trust to be established under Section
524(g) of the United States Bankruptcy Code:

.          Cash in the amount of $250 million;

.          Warrants to acquire 10 million shares of Grace common stock at an
exercise price of $17.00 per share, expiring one year from the effective date
of a plan of reorganization;

.          Rights to proceeds under Grace's asbestos-related insurance
coverage;

.          The value of cash and stock under the litigation settlement
agreements with Sealed Air Corporation and Fresenius Medical Care Holdings,
Inc.; and

5

                Deferred payments at $110 million per year for five years
beginning in 2019, and $100 million per year for ten years beginning in 2024;
the deferred payments would be obligations of Grace backed by 50.1% of Grace's
common stock to meet the requirements of Section 524(g).


The agreement in principle contemplates the filing of a plan of reorganization
and related documents with the Bankruptcy Court.  The plan will be subject to
approval of its co-proponents, exit financing, and Bankruptcy Court and
District Court approvals.


"This agreement in principle is a very important step in emerging from Chapter
11," said Fred Festa, Grace's Chairman, President and Chief Executive Officer.
"In this challenging global marketplace, we need to be able to focus all of our
efforts on increasing shareowner value and continued improvement in our core
businesses. The agreement and the Plan of Reorganization that will be based on
it will be good for our shareholders, customers, creditors, and our employees.
A lot of work remains to be done before we can confirm a Plan of
Reorganization, but I am optimistic we will be successful in reaching that goal
by the end of this year or early in 2009."


                                    1
------------------------------------------------------------------------------


"Also, I want to point out that the Plan of Reorganization will preserve all
employee benefits. During the seven years we have been in Chapter 11, our
people have nearly doubled Grace's sales and dramatically improved the core
businesses. We look forward to final approval of our Plan of Reorganization
when we can once again operate without the constraints of Chapter 11," said
Festa.


                        *   *   *   *   *


Grace is a leading global supplier of catalysts and other products to petroleum
refiners; catalysts for the manufacture of plastics; silica-based engineered
and specialty materials for a wide-range of industrial applications; sealants
and coatings for food and beverage packaging, and specialty chemicals,
additives and building materials for commercial and residential construction.
With annual sales of more than $3.1 billion, Grace has about 6,500 employees
and operations in over 40 countries.  For more information, visit Grace's web
site at www.grace.com.

W R GRACE & CO NEW

Filing Date: 04/06/08

\*    \*    \*    \*    \*

This announcement contains forward-looking statements, that is, information related to future, not past, events. Such information generally includes the words "believes," "plans," "intends," "targets," "will," "expects," "anticipates," "continues" or similar expressions. For these statements, Grace claims the protection of the safe harbor for forward-looking statements contained in the Private Securities Litigation Reform Act of 1995. Grace is subject to risks and uncertainties that could cause actual results to differ materially from those projected in the forward-looking statements or that could cause other forward-looking information to prove incorrect. Factors that could cause actual results to materially differ from those contained in the forward-looking statements include: Grace's bankruptcy, plans of reorganization proposed by Grace and others, Grace's legal proceedings (especially the Montana criminal proceeding and environmental proceedings), the cost and availability of raw materials and energy, Grace's unfunded pension liabilities, costs of environmental compliance, risks related to foreign operations, especially, security, regulation and currency risks and those factors set forth in Grace's most recent Annual Report on Form 10-K, quarterly report on Form 10-Q and current reports on Form 8-K, which have been filed with the Securities and Exchange Commission and are readily available on the Internet at www.sec.gov. Reported results should not be considered as an indication of future performance. Readers are cautioned not to place undue reliance on forward-looking statements, which speak only as of the date thereof. Grace undertakes no obligation to publicly release any revisions to the forward-looking statements contained in this announcement, or to update them to reflect events or circumstances occurring after the date of this announcement.

### 

Corporate Communications

W. R. Grace & Co.-Conn.

7500 Grace Drive

Columbia, MD 21044

2