1   A     It was -- It was -- The purpose of the surgery was to

2   remove pleural plaque, yes, sir.

3   Q     Now, you continued in your employment up until 1983 as

4   a full-time regular employee; is that correct?

5   A     Yes, sir.

6   Q     Did you hold any other positions besides assistant to

7   the general manager after the new man was brought in in, I

8   think you said 1971?

9   A     Well, no, I didn't.   In the period the position

10  essentially remained the same, but the title changed, I

11  think, to when I retired it was manager of administration.

12  But the duties and responsibilities really didn't change.

13  Q     Would you tell the jury what the business of Zonolite

14  and W. R. Grace was in Libby, Montana during your tenure of

15  employment there in general terms.   What were you folks

16  doing?

17  A     Well, the purpose of the operation at Libby was to

18  mine vermiculite from Vermiculite Mountain.   It was mined

19  by power shovels or frontend loaders, loaded onto trucks

20  and haled to a transfer point where it was conveyed to the

21  mill.   And over the years there were -- there were

22  different mills.

23        And the milling operation, the purpose of this was to

24  concentrate the vermiculite from the total mill feed.   And

25  by "concentrate," I mean to get the vermiculite in as pure

1    a form as possible and remove as many of the contaminants

2    and other materials from the ore which were not of a value

3    in the final product which was used primarily in the

4    building industry.

5    Q    Thank you, sir.  Then if I understand -- Well, let me

6    ask you one other question:  Did you have an expansion

7    facility for the vermiculite in the Libby area?

8    A    Yes, sir.

9    Q    Do you still have one there?

10   A    No, sir.

11   Q    When did that cease?

12   A    In 1969, I believe.

13   Q    So up until 1969, you had a facility where you

14   expanded the raw vermiculite into its usable form; is that

15   true?

16   A    Well, that's true.  But I must say that it was only a

17   very small part of the production that was expanded in the

18   Libby expanding plant.

19   Q    I think I understand.  That means your two principal

20   functions there were, first, mining the ore; right?  Is

21   that one of them?

22   A    Yes, sir.

23   Q    And then what you called concentrating the vermiculite

24   in the mill; is that true?

25   A    Yes, sir.

1    Q    Did the mining operations continue in that same

2    general pattern throughout your direct employment with

3    Zonolite and W. R. Grace up until 1983?

4    A    The same general manner, yes, sir.

5    Q    Now, I know that there were changes in the way you

6    milled the ore, and I'm not implying otherwise, and I'll

7    get into that in a minute; but the same functions were

8    there.  You mined it and you milled it, right?

9    A    Yes, sir.

10    Q    Is this an open pit mine?

11    A    Yes, sir.

12    Q    Would you tell the jury what that means.

13    A    Well, it means that all of the mining is above

14    ground.  The mine was literally located on the top of a

15    mountain, and the ore was removed in layers, if you will,

16    and -- which we referred to as levels from the top going

17    down.  These levels varied in height over the period I was

18    there, depending on the type of the equipment that we

19    used.

20        The equipment generally got larger in size, but the

21    levels ranged from about 18 feet to about 24 feet in

22    height, and the ore would be taken from the face on these

23    levels and loaded into trucks, and as one level would be

24    fully mined, then they would drop down and mine on the

25    level blow it.

1    Q    So there weren't tunnels involved in the mining

2    operations generally?

3    A    No, sir.

4    Q    What kind of a mill did you have when you came on

5    board in 1984 -- excuse me -- 1948 to concentrate raw

6    vermiculite?

7    A    A dry mill.

8    Q    Okay.  What does that mean in general terms?

9    A    It means that the ores that came from the mine was put

10   through a dryer to take off the surface moisture, and all

11   of the work which was done to that ore in the mill in the

12   concentration process was done by a dry process.  There was

13   no water or any other moisture added to it.

14   Q    Was that the only mill in 1948?

15   A    Yes, sir.

16   Q    And was that in one building?

17   A    Yes, sir.

18   Q    Was the building in multiple levels?

19   A    Yes, sir.

20   Q    How many floors?

21   A    Well, to the best of my recollection, there were about

22   six floors.

23   Q    And was this known as the old dry mill?

24   A    Yes.

25   Q    Okay.  When you started in 1948, is it true that the

1   concentrate which was produced in the mill from the ore fed

2   into the mill was in the neighborhood of 500 tons per day?

3   A    Yes, sir.

4   Q    So the end product, concentrated vermiculite, was 500

5   tons a day?  That was the production?

6   A    That was the approximate production, yes, sir.

7   Q    Did that production increase as time went by?

8   A    Yes, sir.

9   Q    To what level did that increase?

10  A    Well, when I retired -- When I retired in 1983, they

11  were producing approximately a thousand tons a day.

12  Q    1983?

13  A    Yes.

14  Q    And that would be a thousand tons per day of

15  concentrated vermiculite?

16  A    Yes, sir.

17  Q    Did the production ever exceed that between 1948 and

18  1983?

19  A    Well, it would exceed it -- It would exceed it in this

20  respect:  When I say a thousand tons a day, that was an

21  approximate average.  They could produce maybe twelve

22  hundred tons one day or eleven hundred tons, but

23  essentially, the production never exceeded that -- in that

24  area of tonnage.

25  Q    Over the years, they changed from a dry mill process

1    to a wet mill process; is that correct?

2    A    Yes, sir.

3    Q    When did they put in the first wet mill?

4    A    The first wet mill was put on stream in 1954.

5    Q    And did the -- Did that mean that was the end of the

6    dry mill, or was that in addition to the dry mill?

7    A    That was in addition to the dry mill.

8    Q    So in 1954 when the first wet mill came on, you

9    continued to use the dry mill full bore; is that correct?

10    A    Yes, sir.

11    Q    And that expanded your production substantially; is

12    that correct?

13    A    No, sir, it did not.  It increased the production

14    somewhat, but it didn't increase it substantially.

15    Q    What was the increase?

16    A    Well, I don't believe -- possibly a hundred tons a

17    day.

18    Q    Okay.  Now, when was the new wet mill put in place?

19    A    Well, it was built in the early '70s.  It went on

20    stream full-time in early 1974.

21    Q    So early 1974, the wet mill went on stream?

22    A    Yes.

23    Q    The new one?

24    A    Yes, sir.

25    Q    And I heard Mr. Graham say in his opening statement --

1    Excuse me.

2        I want to know if you agree with this:  You folks

3    admit that at least by 1967 you knew then you had a serious

4    asbestos-related disease problem in that mill?  Do you

5    agree with that?

6    A    No.  I don't believe I agree with that -- those

7    terms.

8    Q    Do you agree that at least by 1967, there was

9    significant evidence that asbestosis or asbestos-related

10   disease was a serious health hazard to your employees?

11   A    I think it's true that by 1967, we recognized that

12   there was -- that there was a problem with asbestosis with

13   some of our employees, yes.

14   Q    Isn't it a fact that you knew for many years before

15   that that you had a problem with asbestos-related disease

16   among your employees.

17   A    No, sir.  I don't think that I agree with that

18   statement.

19   Q    Okay.  Well, we'll get into that more later then.

20       But in any event, you knew in 1967 you had a problem.

21   And the wet mill didn't come on line until 1974; is that

22   correct?

23   A    Yes, sir.

24   Q    When you got the new wet mill on, did that increase

25   your production --

1    A    Yes, sir.

2    Q    -- to about a thousand tons per day?

3    A    Yes, sir.

4    Q    Okay.  Mr. Lovick, for every ton of vermiculite, that

5    is, vermiculite concentrate that you produced at that mill,

6    you had to go through a lot of ore; is that correct?

7    A    Yes, sir.

8    Q    Would you agree with me that for every ton of

9    vermiculite concentrate, it took about 22 tons of ore?

10   A    That is a -- Over the period, that -- That figure

11   varied, but that is roughly an accurate figure, and I say

12   "roughly an accurate figure," because you'd have to take a

13   particular period of time to put on it.  But an average, I

14   would say over the years, an estimated 5 percent of the

15   material that was moved in the mine became a salable

16   product.  So that would be -- that one ton from every 20

17   tons.

18           MR. LEWIS:  Well, could I have Exhibit G-42,

19   please.

20       I have another book up there.  May I approach the

21   witness with this exhibit, Your Honor?

22           THE COURT:  Yes.

23   Q    (BY MR. LEWIS)  I have a copy of this exhibit, sir,

24   and I'll direct your attention to the portion of that

25   exhibit that I want to question you about.

1          Now, is G-42, a document -- Well, the first page of

2     G-42 is a confidential letter or note to C. N. Graff from

3     R. M. Vining dated July 24, 1969; is that correct?

4     A    Yes, sir.

5     Q    And who was Mr. Vining.

6     A    Mr. Vining was president of construction products

7     division of which Zonolite operation at Libby was a part

8     of.

9     Q    So to explain that to the jury, after W. R. Grace

10    acquired Zonolite Company, Zonolite became a division

11    within the Grace family of companies or divisions; is that

12    true?

13    A    Zonolite became a part of a division within the

14    Zonolite family.

15    Q    So Zonolite was a subdivision of this division you

16    just named which Mr. Vining was the head of; is that

17    correct?

18    A    Yes.

19    Q    And what was that division?

20    A    Construction products division.

21    Q    And where was their headquarters?

22    A    In Cambridge, Massachusetts.

23    Q    Okay.  Turn to the second page of this document.  This

24    says, "Zonolite vermiculite ore review," dated July 24,

25    1969, by Harry Brown and Floyd Stuart.  Is that correct?

1    A    Yes, sir.

2    Q    On page Roman numeral four dash one of that report, it

3    talks about "bottlenecks are eliminating factors at

4    Zonolite operations in Libby."

5         Do you see that?

6    A    Yes.

7    Q    And under three here it says, "Higher mine waste ore

8    ratio exists at Libby.  At Libby the mine moves

9    approximately 22 tons of ore for each ton of concentrate

10   produced"; is that correct?

11   A    Yes, sir.

12   Q    Would you agree with that generally?

13   A    Yes, sir, I would.

14   Q    Okay.  What percentage of that ore was tremolite

15   asbestos?

16   A    I don't know.

17   Q    Of that 22 tons, what percentage would be asbestos?

18   A    I don't know.

19   Q    Would 3 percent sound about accurate?

20   A    I don't know, sir.

21   Q    Plaintiff's Exhibit 40.1.  What is that document?

22   A    It's a letter or report from R. A. Schneider to R. M.

23   Vining.

24   Q    And who was Mr. Schneider?

25   A    Mr. Schneider was chief engineer of construction

1    products division.

2    Q    In Cambridge, Massachusetts?

3    A    Yes, sir.

4    Q    And this letter is personal and confidential, March 3,

5    1969 letter entitled, "Insight to Environmental Dust

6    Control for Vermiculite Mining Expanding Operations for" --

7    to you among others; is that correct?

8    A    Yes, sir.

9    Q    And did you actually receive this personal and

10   confidential document?

11   A    Yes, sir.

12   Q    Okay.  I'll get back to that first page later, but I

13   want to direct your attention to the fourth page where it

14   says "introduction problem."  Do you see that?

15   A    Yes.

16   Q    It says, "The vermiculite mine at Libby contains about

17   3 percent tremolite, a type of asbestos," do you see that?

18   A    Yes.

19   Q    Okay.  So the ore was about 3 percent asbestos; is

20   that correct?

21   A    This is what it states here, yes.

22   Q    Do you have any reason to question that?

23   A    No, sir.

24   Q    So if the production was 1,000 tons of concentrated

25   vermiculite a day after the wet mill was put in, that means

1    that there would have been 21,000 tons of waste material

2    that had to go through that mill and be disposed of; is

3    that true?

4    A    Yes, sir.

5    Q    And what's 3 percent of 21,000 tons?  Would you agree

6    with me that's about -- about 660 tons of asbestos a day

7    that had to be discarded through that plant?

8    A    About 630.

9    Q    I won't argue with that.

10    A    Yeah.

11    Q    A lot of asbestos; right?

12    A    Yes.

13    Q    Where did that asbestos go?  Where was it discarded?

14    A    Well, it was discarded in one of two -- one of two

15    places.  It would have been -- one of three places,

16    actually.  It would have been discarded in the mine dump in

17    lower grade material which would never have gone to the

18    mill.

19        And the second place it would have been discarded

20    would have been in the mill tailings of which there were --

21    there were two mill tailing circuits, a coarse circuit and

22    a fine circuit.  And they were discarded -- The coarse

23    tailings were discarded -- well, at that time, they were

24    all discarded on the side of the mountain.

25        And the third place they would have gone is that some

1    of the tremolite would have been retained in the

2    concentrate.

3    Q    Well, that's not quite true, is it?  Isn't it a fact

4    that some of the fine tailings went into a stream that ran

5    right into the Kootenai River for a long time?

6    A    It was discarded on the side of that mountain, as I

7    stated, and some of that material, yes, did end up in the

8    Kootenai River.

9    Q    Did not you testify in your deposition that some of it

10   was discarded into a creek that went by the mill?

11   A    It ran down the mountain into a creek, yes.

12   Q    What was the creek?

13   A    Rainy Creek.

14   Q    Did that run right into the Kootenai?

15   A    Yes, sir.

16   Q    About 12 miles above the town of Libby?

17   A    Well, about -- roughly a little over five miles above

18   the --

19   Q    Closer than that than, five miles from Libby?

20   A    Yes, sir.

21   Q    But in any event, there were tons and tons of asbestos

22   waste material, just the asbestos portion, were put over

23   the side of that mountain everyday of that mill's

24   operations; is that correct?

25            MR. GRAHAM:  Your Honor, I don't know whether now

1   would be an appropriate time to make an objection as to

2   Mr. Lewis' and Mr. Lovick's calculations, but so we don't

3   mislead the jury further, I think if you take twenty-one

4   hundred tons of material and multiply it times point zero

5   three, you come out with substantially less than 630 tons.

6            MR. LEWIS:   Twenty-one thousand tons.

7            MR. GRAHAM:   Okay.   I'm sorry.

8   Q    (BY MR. LEWIS)   The witness has testified 630 tons of

9   asbestos a day; right?

10  A    Yes, sir.

11           MR. LEWIS:   Okay?

12           MR. GRAHAM:   I'm sorry.   I misunderstood.

13  Q    (BY MR. LEWIS)   This might be informative to the

14  jury.   I've got some photos that were given to me by your

15  counsel here.   I'd like to have them marked.

16           MR. LEWIS:   G-101 through --

17           CLERK OF COURT:   G-1 --

18           MR. LEWIS:   One-oh-one.

19           CLERK OF COURT:   One-oh-one.   Okay.

20           MR. LEWIS:   One-oh-tow.   One-oh-three.

21  One-oh-four.   One-oh-five, and 106.   And there's the

22  order.

23       While she's marking, I think I can proceed, Your

24  Honor, if that's all right.

25       May I approach the witness?

1                THE COURT:  Go ahead.  Yes.

2    Q    (BY MR. LEWIS)  Mr. Lovick, I'm handing you what is a

3    photo which has been marked for purposes of identification

4    Plaintiff's Exhibit G-101.  Do you recognize that photo?

5    A    Yes, sir.

6    Q    Did you take that photo?

7    A    No, sir.

8    Q    Do you know who took it?

9    A    No, sir.

10   Q    Do you know what it represents?

11   A    Yes, sir.  It shows a sample of No. 1 concentrate

12   vermiculite in its concentrated form and it's in its

13   expanded form.

14   Q    And there's a ruler there; is that correct?

15   A    Yes.

16   Q    On the right side of the ruler is the concentrated

17   form of vermiculite; is that correct?

18   A    Yes.

19   Q    And on the left side is the expanded form?

20   A    Yes.

21   Q    And that's a coarser grade of vermiculite; is that

22   true?

23   A    That's the largest commercial grade that they market

24   at this time.

25   Q    Does that accurately portray concentrated and expanded

1    vermiculite of that coarse grade?

2    A    I would say that it did, yes.

3              MR. LEWIS:  Move admission of Plaintiff's Exhibit

4    G-101.

5              MR. GRAHAM:  No objection, Your Honor.

6              THE COURT:  Be received.

7        Any objection to receiving these other photos that

8    have been marked?

9              MR. GRAHAM:  No, Your Honor.  In fact, we had

10   submitted them as Defendant's Proposed Exhibits included in

11   our packet.

12             THE COURT:  All right.  What are the numbers on

13   them again?

14             MR. LEWIS:  Okay.  I now hand you --

15             THE COURT:  Just give me the span of the numbers.

16             MR. LEWIS:  G-102 through G-107.

17             THE COURT:  They're all admitted.

18             MR. LEWIS:  Thank you, Your Honor.

19             THE COURT:  All right.

20   Q    (BY MR. LEWIS)  I'm handing you G-102 through G-107.

21   Now is it true that G-102 through G-106 all show different

22   forms of or grades of vermiculite?

23   A    Yes, sir.  They're different grades or different

24   sizes.  One-oh-six is not the particular grade.  It's just

25   a piece of vermiculite.

1    Q    It's quite a large piece of vermiculite?

2    A    Yes.

3    Q    And it's expanded so the jury can see that?

4    A    Yes, sir.

5    Q    Okay.  Now, G-107 is not vermiculite at all; is it?

6    A    No, sir.

7    Q    What is that?

8    A    That is tremolite.

9    Q    Tremolite asbestos?

10   A    Yes, sir.

11   Q    And it's sort of a white color; is it not?

12   A    Yes, sir.

13          MR. LEWIS:  May I give these to the jury to look

14   at?

15          THE COURT:  Yes.  Just hand them to the jury, and

16   they'll pass them among themselves.

17          MR. LEWIS:  Thank you, Your Honor.

18   Q    (BY MR. LEWIS)  Now, that white tremolite or whitish

19   substance, tremolite asbestos, is that what would makes up

20   the white dust that would coat the mills where the men

21   worked?

22   A    Well, generally, the tremolite which is found up there

23   is the white material that forms the dust in the area, yes,

24   sir.

25   Q    Now, in the old dry mill, that was a terribly dusty

1    place; was it not?

2    A    Yes, sir.

3    Q    And it had that tremolite asbestos in very fine dust

4    from top to bottom in all those six levels you testified

5    about; is that true?

6    A    Yes, sir.

7    Q    And you knew that and saw that when you first went to

8    work there in 1948; is that true?

9    A    Yes, sir.

10   Q    And in fact on the top levels it would accumulate on

11   the rafters four or five inches deep from time to time; is

12   that true?

13   A    Well, in regard to this entire line of questions and

14   my answers, the tremolite would be one of the ingredients

15   of the dust which would accumulate.

16   Q    The dust would be white, right?

17   A    Not -- Not necessarily.  The dust would be generally

18   more of a golden color than a white or a gray color.

19   Q    Okay.  What about when you got to the wet mill

20   process?  Was there tremolite asbestos in the wet mills?

21   A    Yes.  Because all of the ore came into the wet mill.

22   It was -- It was fed into the wet mill before any of it

23   went to the dry mill, and the tremolite was one of the

24   ingredients in the mill feed.

25   Q    And would there be -- In the wet mill, would there be

1    a very fine mud that would develop and cover some of the

2    machines?

3    A    In some areas, yes.

4    Q    Well, like for, say, a millwright, would a millwright

5    have to get down in that mud from time to time and get it

6    on his clothes to do his work, or do you know?

7    A    Well, in some of the work that a millwright would be

8    required to do, he would certainly come in contact with

9    some of the mud, yes, sir.

10    Q    And it would be the whitish mud that we're talking

11    about, right?

12    A    Possibly.

13    Q    Just so that we can get a perspective, you said, I

14    think, that the coarse waste would be discarded up at the

15    mine level; is that correct?

16    A    Well, no, sir.  The mill was actually, elevation-wise,

17    was located below the mine.  And the tailings from the mill

18    would be discarded at the mill level, which were somewhat

19    lower than the mine.

20    Q    Okay.  I understand that.  Maybe I misspoke or you

21    misunderstand me.  I apologize for lack of clarity in the

22    question.  But there was a waste disposal area at the mine

23    itself above the mill; is that correct?

24    A    Yes.  For mine waste there was.

25    Q    All right.  And that would be discarded in one

1   direction off the mountain; right?

2   A    Well, one --

3   Q    Would it be discarded over the side of the mountain?

4   A    It would be discarded over the side of the mountain,

5   yes, sir.

6   Q    Right now how many miles down that mountain does that

7   waste area go?

8   A    Well, I'm not sure.  Possibly the better part of a

9   mile.

10   Q    And how about the waste area or the tailings that come

11   out of the mill?  How far down the mountain does that go?

12   A    Probably in the neighborhood of a mile.

13   Q    And that's that white gash that you see when you look

14   up from Libby; is that right?

15   A    Yes, sir.

16   Q    And those fine tailings continued to be discarded into

17   the Kootenai River at least until 1970 or 1971; is that

18   true?

19   A    Yes, sir.

20   Q    And then in '70 and '71, you folks built a impoundment

21   dam; is that true?

22   A    Yes.

23   Q    And that's where the fine tailings were discharged?

24   A    Yes.

25   Q    But the tailings were never buried; were they?

1    A    No, sir.

2    Q    All tailings were always open to exposure from the

3    air; right?

4    A    Yes, sir.

5    Q    And these tailings would include tremolite asbestos.

6    Do you agree with that?

7    A    Yes.

8    Q    Were you ever able to get all of the asbestos out of

9    the final concentrated tremolite?

10   A    No, sir.

11   Q    So in those photos that the jury's just seen, those

12   first six photos that have concentrated vermiculite and

13   expanded vermiculite, they still contain some asbestos; is

14   that true?

15   A    It's possible that they contain some asbestos.

16   Q    Do you know a percentage of that tremolite -- or

17   excuse me, that vermiculite is asbestos?

18   A    No, sir.

19   Q    Mr. Lovick, you know as you sit right now that the

20   asbestos mined at Libby is dangerous to your employees'

21   health.  Is that true?

22   A    Yes, sir.

23   Q    Would you agree with me that it is in fact, you know

24   now, at least, that it is in fact a hazardous material.  Is

25   that true?

1    A    Yes, sir.

2    Q    And the dispute, if I understand the opening statement

3    and the position taken by the company, is you folks claim

4    that you didn't know it was dangerous until about 1967.  Is

5    that correct?

6    A    That's roughly correct, yes.

7    Q    Is it your testimony that Zonolite or W. R. Grace

8    never became concerned with removing the tremolite asbestos

9    from the final vermiculite material because it could cause

10   disease?

11   A    No, sir.  That's not true.

12   Q    Maybe I misunderstood your --

13        MR. LEWIS:  Do you have Mr. Lovick's deposition?

14   The original?  That's not the original.  Oh, there it is.

15   I'm sorry, Deb.  Thank you very much.  I should have known

16   better than to question.

17        September 6th, 1989.

18        May I approach the witness, Your Honor?

19        THE COURT:  Very well.

20   Q    (BY MR. LEWIS)  Sir, I'm handing you what appears to

21   be your original deposition in this case and others.  Was

22   that deposition taken on September 6th, 1989?

23   A    Yes, sir.

24   Q    Would you turn to page 26 of that deposition.  And

25   look at line 20.  And was this question asked and this

1    answer given:

2        "Are you aware of any concern of W. R. Grace or the

3    Zonolite Company to remove the tremolite from the material

4    because the tremolite could cause disease?"

5        And your answer is:  "Well, my answer is I don't

6    know."

7        Do you see that?

8    A    Yes, sir.

9    Q    So you don't know of any concern or you did not know

10   as of 1989 of any concern by W. R. Grace or Zonolite to

11   remove the tremolite because it would cause disease?

12   A    This statement, because it could cause disease and I

13   say, "I don't know," but this does not mean -- My answer

14   did not mean that we were not concerned about removing

15   tremolite from the concentrate.

16   Q    I know that.  You were removing tremolite from the

17   concentrate because it was a waste material and not useful

18   for the final end product, concentrated or expanded

19   tremolite; is that true?

20   A    That's partially true.  We were also concerned about

21   removing tremolite like we were concerned about removing

22   all contaminants because of the fact that they -- tremolite

23   was one of the ingredients of the dust which was found in

24   the area which we always knew was not a healthful

25   situation.

1   Q    Okay.  So your testimony is part of the reason you

2   removed the tremolite from the concentrate was because it

3   created a health hazard to the users of the concentrated

4   vermiculite?  Is that your testimony?

5   A    That's -- That's a part of the reason that we did.

6   Q    Okay.  And what's the other part?  Because you had to

7   get it out so you could sell it?

8   A    No.  Because it -- We wanted to remove all of the

9   foreign material we could from the concentrate.

10  Q    But were you motivated by health concerns for the end

11  product user?  That's what the question goes to.

12  A    Well, I -- I'm not sure -- I'm not sure that I can

13  answer that question.

14  Q    Are you aware that vermiculite insulation from the

15  W. R. Grace plant was used in the home of Don and Millie

16  Johnson?

17  A    No, sir, I did not know that.

18  Q    Now, you said earlier that when this -- this ore comes

19  into the mill, you testified that a substantial tonnage is

20  tremolite asbestos.  And you said that it goes into the

21  tailings, different types of tailings; right?

22  A    Some of it, yes.

23  Q    But some of the it goes in the air, right?

24  A    Yes, sir.

25  Q    Some of it goes in the rafters and covers the

1    equipment; right?

2    A    Yes, sir.

3    Q    And some of it goes all the way into the air above the

4    plant; right?

5    A    Yes, sir.

6    Q    And when that plant's running, it's a dusty mess;

7    right?

8    A    It's dusty, yes, sir.

9    Q    And the dust goes right up into the sky and spreads

10    all over Libby; isn't that true?

11    A    No, sir.

12    Q    It doesn't?

13    A    No, sir.

14    Q    All right.  This morning when I came to trial, I gave

15    you this book which has been marked for the record, Your

16    Honor, G -- Plaintiff's Exhibit G-57.

17        Did you have an opportunity to look through this book?

18    A    Yes, sir I did.

19        MR. LEWIS:  May I approach the witness, Your

20    Honor?

21        THE COURT:  Sure.

22    Q    (BY MR. LEWIS)  Do you recall your -- Excuse me, I

23    don't mean to turn my back on you.  I'm sorry.

24        Do you recall your deposition being taken in the

25    Gidley case?

1    A    Yes, sir.

2    Q    Do you recall identifying a file that you maintained

3    concerning asbestos matters at the -- at the plant or the

4    mill in Libby?

5    A    Well, I'm not really sure what file you will refer to

6    but --

7    Q    In any event, are the documents contained in G-57

8    those documents you compiled in the ordinary and usual

9    course of your business with W. R. Grace or Zonolite?

10    A    Yes, sir.  These would all come from our files.

11    Q    And they are true and correct copies of what's

12    contained in your file?

13    A    I believe so, yes, sir.

14    Q    And they were accumulated in the ordinary course of

15    your business?

16    A    Yes, sir.

17           MR. LEWIS:  I'd move the admission of G-57.

18           MR. GRAHAM:  We would object to the introduction

19    of G-57, Your Honor, on the basis of relevancy and

20    materiality.  Most of these documents, as the witness will

21    testify, were accumulated subsequent to all of the matters

22    realted to this lawsuit and were accumulated in connection

23    with a study and not with the ordinary course of business.

24    So we would so object.

25           THE COURT:  Any response?

1          MR. LEWIS:  The witness has testified they were

2    accumulated in the ordinary and necessary course of

3    business of the company.  They certainly come within an

4    exception to the hearsay rule.

5          THE COURT:  Very well.  The objection is

6    overruled.

7    Q    (BY MR. LEWIS)  Now, these were referred in your

8    deposition as your documents.  Do you recall that?

9    A    No.  I can't say that I -- You mean just now?

10   Q    No.  In the Gidley deposition?

11   A    Well, I certainly don't remember everything that was

12   asked of me in the Gidley deposition but --

13   Q    Would you tell the jury what these documents are

14   generally, in general terms.

15   A    These documents cover a wide range -- a wide range of

16   material.  They cover -- They include letters and data that

17   I collected for a study.  There is included in here reports

18   from state agencies, reports that were compiled by myself

19   and others, there are engineering reports in here on the

20   results of dust sampling, there are many letters in here

21   that were written by others in and outside of the company

22   which refer to -- to dust matters and inspections that were

23   made by agencies and by air sampling.  There is a

24   considerable number of reports which pertain to a study

25   which I participated in gathering the raw data for -- after

1    I retired on former employees.  And included in these is a

2    large number of death certificates on people who had

3    previously worked for us.

4    Q    You went around and obtained those death certificates

5    for the McGill study.  That is correct?

6    A    Yes, sir.

7    Q    And those death certificates that you obtained are --

8    they're included in this Exhibit G-57; is that correct?

9    A    Copies of them, yes, sir.

10    Q    I stand corrected.  Copies of them.  That's correct.

11    And what was the purpose of securing these death

12    certificates?

13    A    This was data for the McGill study by a team of

14    epidemiologists who wished to evaluate the effects of

15    tremolite exposure by former employees and reasons for --

16    reasons for the deaths of the -- these employees who were

17    in the cohort list.

18    Q    What do you mean cohort list?

19    A    Well, we compiled a list of all employees who had ever

20    worked for us.  And for the study, in order for it to be

21    meaningful, there had to be some criteria.  And they used a

22    criteria of people who had been employed 20 or more years

23    previous to the study, which was done in 1983, which meant

24    that anybody who had been hired in 1963 or prior to that

25    and had worked for us one or more years were to be included

1    in this cohort list.

2    Q    And W. R. Grace acquired this company in 1963; is that

3    correct?

4    A    Yes, sir.

5    Q    So the study went back only as far as as 1963 and did

6    not include people that were employed before 1963; is that

7    correct?

8    A    Included all people that were employed before 1963.

9    Q    It included them?

10    A    Before 1963 not after 1963.

11    Q    Okay.  I misunderstood.  So this included only

12    employees that were --

13    A    Had been employed one or more years and had been hired

14    in 1963 or prior.

15    Q    All right.  Now we're tracking.  Thank you.

16        So if somebody got employed in 1964, they would not be

17    included in this study?

18    A    That is correct.

19    Q    All right.  Now, you said that these were a group of

20    epidemiologists that wanted to study this.  Actually, Grace

21    paid for this study; is that true?

22    A    It was not -- It was not the epidemiologists that

23    wanted this.  Grace made a grant to McGill University to

24    conduct this study.

25    Q    Grace paid for the study; right?

1    A    Yes, sir.

2    Q    Okay.  And where is McGill university?

3    A    In Montreal, Quebec.

4    Q    Isn't it a fact that long before the McGill study in

5    '83, you already knew that this tremolite asbestos was very

6    dangerous to your employees?

7    A    I don't understand the term "very dangerous," so I

8    can't agree.

9    Q    How about just dangerous?  Dangerous to your

10   employees?

11   A    We knew that tremolite was a toxic material, but we

12   did not know the degree of the danger it was.

13   Q    You didn't know in 1983, you didn't know -- You knew

14   only that tremolite was a dangerous -- or a toxic material,

15   but you didn't know how dangerous it was?  Is that your

16   testimony?

17   A    Yes, sir.

18   Q    Oh.  You've got the exhibits.  Thank you.

19        Did the State of Montana routinely do -- That's a bad

20   word.  Did the State of Montana from time to time do

21   studies or -- or inspect the plant that Zonolite or W. R.

22   Grace was operating in Libby?

23   A    Yes, sir.

24   Q    And did you always receive copies of those reports?

25   A    I believe so, yes, sir.

1  Q    Did you receive copies of those reports before W. R.

2  Grace acquired the company?

3  A    Yes, sir.

4  Q    I direct your attention to Plaintiff's Exhibit G-9.

5  I'll help you find it, sir.

6  A    G what?

7  Q    G-9.  These are tabulated on the side.  I hope you can

8  find it.

9  A    Yes, sir.

10  Q    Right here would be G-9.

11       Is G-9 a report from the Montana State Board of Health

12  Division of Disease Control concerning an industrial

13  hygiene study at Zonolite of Libby, Montana on August 8 and

14  9, 1956?

15  A    Yes, sir.

16  Q    Did you receive a copy of this report?

17  A    Yes, sir.

18  Q    Turn to page three of that report.  And do you see an

19  area that says "toxicity"?

20  A    Yes, sir.

21  Q    You just said you knew that asbestos was toxic, you

22  just don't know how dangerous it was; right?

23  A    Yes, sir.

24  Q    Okay.

25       MR. LEWIS:  First of all, I'd move the admission

1    of Plaintiff's Exhibit G-9.

2              MR. GRAHAM:  No objection, Your Honor.

3              THE COURT:  Be received.

4              MR. LEWIS:  Thank you, Your Honor.

5    Q    (BY MR. LEWIS)  Under "toxicity," would you read those

6    paragraphs to the jury.

7    A    It's titled "Toxicity."  It states:  "A review of the

8    literature indicates that vermiculite or the dust from this

9    material is not especially toxic, and it's generally

10   included only as a nuisance dust.  However, the asbestos

11   dust in the dust in the air is of considerable toxicity and

12   is a factor in the consideration of reducing dustiness in

13   this plant."

14             Next paragraph:  "According to Drinker and Hatch, the

15   pathological changes produced by asbestos are not like

16   those of silicosis.  The asbestos fiber group about the

17   neck of the small air sacks in the lungs and stimulate the

18   formation of a diffuse fibrosis.  There is no definite

19   migration or transportation of the dust particles to lymph

20   nodes and no formation of fibrous nodules.  As the fibrosis

21   increases, the reduction in lung area causes a serious

22   decrease in lung capacity, more difficulty in breathing.

23   Hence it is suggested that enlarged hearts noted frequently

24   in the cases of secondary asbestosis may be the result of

25   the increased work with the heart resulting from this

1    condition.  It takes more work to pump the blood through

2    the asbestotic than through the normal lung."

3    Q    Now, you said you received this report.  Did that not

4    put -- Do you not understand that the asbestos in your mind

5    created a significant health hazard to your employees after

6    reading that?

7    A    Yes, sir.

8    Q    You did understand or did not?

9    A    Yes, sir.

10   Q    You knew that?

11   A    Yes.

12   Q    Did you give a copy of that report to any of your

13   employees?

14   A    No, sir.  Not to my knowledge.

15   Q    Now going to page four of that report, 1956 report, do

16   you see those conclusions?

17              THE COURT:  What year was this?

18              MR. LEWIS:  Excuse me, Your Honor.  It's 1956.

19              THE COURT:  Fifty-six.

20              MR. LEWIS:  August 8 and 9, 1956.

21   Q    (BY MR. LEWIS)  Do you see the conclusions and

22   recommendations there?

23   A    Yes, sir.

24   Q    I'm going to read some of those to speed this up and

25   see if you agree with me.  Number one -- Well, I'll skip

1    part of it.  Says, "The following are several reasons why

2    the dustiness in the dry mill and heavy -- and why the

3    exhaust mechanism in design does not function:  One.  Dust

4    vibrates almost continuously off the rafters which have

5    become loaded and are continually loaded with dust

6    generating from many sources."

7         Is that there?

8    A    Yes.

9    Q    "Rubber connectors between vibrating screens in the

10   feed spouts are not tight nor are they replaced when they

11   vibrate off or they are worn out."

12        Is that there?

13   A    Yes, sir.

14   Q    I could go on and read, but in any event, there's

15   about 14 different findings.  In fact, the summary says in

16   14, "In summary, the foregoing points are illustrative of

17   what would be poor policy in matters of maintenance and

18   operation of this plant.  The following recommendations are

19   based on the observations presented and on the basis of

20   dust counts, silica content, and asbestos content of the

21   dust.  It will be recognized that the following

22   recommendations are particularly broad and non-specific.

23   Until such time as the general overall maintenance and

24   repair of existing deduct work both in the exhaust system

25   and ore feed pipes have been sufficiently repaired, no

1    specific recommendations appear to be justified."

2         So it was -- the place was in such bad shape, they

3    couldn't make specific recommendations.  Is that true?

4    A    No.  I don't think that's true.  I think they could

5    have made specific recommendations.

6    Q    Well -- Okay.  Now turn to Exhibit G-10.  The first

7    page of that is a January 12, 1959 letter from Benjamin

8    Wick, industrial hygiene engineer for the Division of

9    Disease Control to Mr. R. A. Blake, manager of Zonolite

10   Company.  Is that correct?

11   A    Yes.

12   Q    And he's enclosing two copies of the industrial

13   hygiene study done on December 16 and 17 1958.  Is that

14   correct?

15   A    Yes, sir.

16   Q    And also included in this Exhibit G-10 is that

17   industrial hygiene study which is dated, I guess the date

18   of the study is January 12, 1959.  Is that correct?

19   A    Yes.

20        MR. LEWIS:  Move the admission of Plaintiff's

21   Exhibit G-10.

22        MR. GRAHAM:  No objection, Your Honor.

23        THE COURT:  Very well.  Be received.

24   Q    (BY MR. LEWIS) Would you go to page one of that

25   report.  Under "concentrations," is there a paragraph or

1    subsection that says "concentrations" there?

2    A    Yes.

3    Q    Is there any mention of asbestos in that?

4    A    Yes, sir.

5    Q    Would you read that to the jury, please.

6    A    "A review of table one indicates that the

7    concentrations in the dust were somewhat lower than they

8    were during the previous study in August, 1956.  But the

9    concentrations were still significant in view of the

10    concentration of asbestos particles found in each of the

11    samples.  The concentration of asbestos was estimated by

12    counting the asbestos particles contained in each of the 13

13    samples collected.  The percentage of airborne asbestos was

14    determined to be in a concentration of from 12 to 31

15    percent with an average being approximately 27 percent.

16    The values found in the asbestos particles column is based

17    generally on the average concentration of 27 percent.  It

18    should be noted that this concentration may be less than

19    that actually present in the air, since the particles which

20    had characteristics of asbestos were the only ones counted

21    and those particles that are so small that the rod-like

22    appearance could not be observed were not counted asbestos

23    -- as asbestos but were evaluated as overall dust level."

24    Q    So they found concentrations of from 12 to 31 percent

25    of asbestos in the airborne dust, but they said that those

1    counts, if anything, would be low.  Is that true?

2    A    Yes, sir, it said they could be low.

3    Q    And that the actual amount of asbestos in the air

4    could have been higher?

5    A    Yes, sir.

6    Q    Did you receive this report?

7    A    Yes, sir.

8    Q    And would you agree with me that on pages three --

9    actually two through six of this report, there are a

10   multitude of specific recommendations that needed to be

11   accomplished to clean up the dust problem at the mill?

12   A    Yes, sir.

13   Q    And those were the same kinds of problems pointed out

14   with more specificity in this report, the same kinds of

15   problems that were in the 1956 report.  Is that true?

16   A    Yes, sir.

17   Q    It was in that time that you folks heard about a

18   gentleman by the name of Glen Taylor having developed some

19   lung problems.  Is that true?

20   A    Yes, sir.

21   Q    Would you look at Plaintiff's Exhibit G-10.1.

22   A    Yes.

23   Q    And that indicates that there was a question of

24   asbestosis in that man's medical findings on that date.  Is

25   that correct?

1   A    Yes.

2   Q    And he's also had pulmonary tuberculosis; is that

3   correct?

4   A    Yes.

5   Q    But you were put on notice at least by February 11,

6   1959 that there was a questionable diagnosis of asbestosis

7   for one of your employees; is that true?

8   A    Yes, sir.

9   Q    And you knew about that?

10  A    Yes.

11  Q    Is that true?

12  A    Yes.

13  Q    The direct your attention to Plaintiff's Exhibit

14  G-10.2.

15  Q    Do you recognize that document?

16  A    Yes, sir.

17  Q    What is the date of that document?

18  A    July 20th, 1959.

19  Q    And who was it addressed to?

20  A    It was addressed to Raymond A. Blake.

21  Q    Who was the author of the document?

22  A    Dr. J. M. Carins.

23  Q    And who was Dr. Carins?

24  A    He was a general practitioner and surgeon in Libby

25  Montana.

1    Q    Did you receive a copy of this report?

2    A    Mr. Blake received a copy and I saw a copy, yes, sir.

3    Q    Did you see a copy very soon after Mr. Blake received

4    it?

5    A    I don't remember exactly when, but it would have been

6    relatively soon.

7    Q    What does this report tell Mr. Blake?

8    A    It's an analysis of the -- a breakdown of the results

9    of the interpretations of an x-ray study that were done of

10   all of our employees in 1959.

11   Q    Who commissioned that x-ray study?

12   A    The company did.

13   Q    So this was an x-ray study done at the request of the

14   company?

15   A    Yes, sir.

16   Q    And how many employees were examined?

17   A    A hundred and thirty.

18   Q    How many of them had abnormal chest x-rays?

19   A    Forty-eight.

20   Q    And was there evidence of pleural thickening --

21   A    Yes, sir.

22   Q    -- in some of those?

23   A    Yes, sir.

24   Q    And interstitial fibrosis?

25   A    Yes, sir.

1    Q    Do you understand interstitial fibrosis to be a form

2    of asbestosis?

3    A    No, sir.

4    Q    You don't understand that to be asbestosis?

5    A    No, sir.

6    Q    In any event, an interstitial fibrosis -- there were

7    26 cases of that in those x-rays; is that correct?

8    A    Yes.

9    Q    And there was at least one malignant lesion.  Is that

10   true?

11   A    Yes, sir.

12   Q    Now, were you informed by this doctor that that was an

13   inordinately high incident of lung disease for that group

14   of employees?

15   A    I don't -- I don't really recall.

16   Q    You don't recall?

17   A    No.

18   Q    You don't recall one way or the other?

19   A    No.  I think that -- I think the answer is yes.

20   Q    The answer is yes; isn't it?

21   A    Yes.

22   Q    You know that that's an exceptionally high level of

23   lung problems for a group of a hundred and thirty people;

24   is that true?

25   A    Yes.

1    Q    And those findings, pleural thickening and

2    interstitial fibrosis, are consistent with asbestos-related

3    disease, if nothing else; is that true?

4    A    I don't know.

5    Q    But in any event, in 1959, would you agree with me

6    this identified a potential serious health hazard to the

7    lungs of your workers?

8    A    Yes, sir.

9    Q    I want to ask you to go to --

10          MR. LEWIS:  Well, I better move the admission of

11    that, Your Honor.  I'm sorry.  Move the admission of

12    Plaintiff's Exhibit G-10.2.

13          THE COURT:  Objection?

14          MR. GRAHAM:  No objection.

15          THE COURT:  Received.

16          MR. GRAHAM:  That's the report of July 20th,

17    1959?

18          MR. LEWIS:  I apologize, counselor.  Yes, it is.

19    July --

20          THE COURT:  We'll go for about another ten

21    minutes then take a coffee break.

22          MR. LEWIS:  Thank you, Your Honor.

23    Q    (BY MR. LEWIS) Would you turn to Plaintiff's Exhibit

24    G-11.  Did that come from the W. R. Grace file?

25    A    Yes, sir.

1    Q    It's got "file" marked in the upper left-hand corner.

2    Is that your writing?

3    A    I believe not.

4    Q    But in any event, you received a copy of this April

5    19, 1962 report; is that correct?

6    A    Well, I'm not sure that I received a copy.  It would

7    have been received in the company.  I would have seen it

8    sometime after that.

9    Q    And that's another report from the Montana Department

10    of Health people; is that correct?

11    A    Yes, sir.

12    Q    Now, that's -- I apologize for the copy there.  That's

13    the best we can do.  Can you struggle with me to read this?

14    A    Yes, sir.

15    Q    Okay.

16    A    I'll certainly try.

17    Q    Okay.  I want to get a look at the very first

18    paragraph -- in fact the very first sentence of this

19    report.  Would you read that to the jury.

20    A    "On March 6th, 7th, and 8th, 1962, an industrial

21    hygiene study was made of the Zonolite mill at Libby,

22    Montana to determine if any of the" -- I can't read that

23    word.

24    Q    Does it look like components or -- It is difficult to

25    read.

1    A    ". . . if any of the components . . ."  That fits, but

2    -- ". . . if any of the components of the operations

3    continued to be a threat to the health of the employees.

4    The last" --

5    Q    That --

6    A    Excuse me.

7    Q    Go ahead.  Go ahead and read on if you want.

8    A    "The last study of December, 1958 indicated

9    substantial quantities of dust in various areas of the

10    plant for which recommendations were made concerning a

11    substantial reduction.  The study of March 6th through 8th,

12    1962 was made after a conference with Mr. R. A. Blake,

13    manager of the company, and Mr. R. J. Kujawa, chief

14    engineer of the plant.  Mr. Robert Vinion acted as guide

15    during the study and supplied information needed for the

16    performance of the investigation."

17    Q    Now Mr. Blake you've already said was the manager of

18    the company.  Mr. Kujawa -- that's K-U-J-A-W-A -- he was

19    the chief engineer.  Was he stationed in Libby?

20    A    Yes, sir.

21    Q    Is he still alive?

22    A    No, sir.

23    Q    Do you know what he died of?

24    A    Colonic cancer.

25         THE COURT:  What?

1  Q    (BY MR. LEWIS)  Do you know if he had any lung-related

2  problems?

3  A    Not to my knowledge.

4  Q    How about Mr. Vinion?  Is he still alive?

5  A    No, sir.

6  Q    What did he die of?

7  A    He died of lung cancer to my understanding from what

8  -- what I was told in both cases.

9  Q    Well, in any event, you checked into these employees

10  as part of your McGill study?

11  A    No, sir.  These two people were not included.

12  Q    They weren't?

13  A    They've died since that study was made.

14  Q    I see.  You only looked at people who died, you didn't

15  look for people who were still living and afflicted by this

16  disease; is that right?

17  A    Well, that and --

18  Q    In the McGill study?

19  A    That's not entirely true.  When you say "looked at,"

20  I'm not sure what that means, sir.

21  Q    Well, that's fair criticism.  When you did the McGill

22  study, was that a mortality study?

23  A    Basically, yes.

24  Q    And you obtained in 1983 death certificates; right?

25  A    Yes.

1    Q    That was the major thrust of the study; right?

2    A    Well, included in that, we -- If I may expand on this.

3    Q    Well, I'll ask you, did you look for people that were

4    still alive?  Did you look for people that were still alive

5    who suffered from lung disease?  Did you do that?

6    A    May I explain?

7    Q    Sure.  Go ahead.

8    A    Because that -- that statement is partially true, and

9    I'll explain why it's true.  These people, and there were

10   over 400 people included in the cohort list.  As I've

11   previously stated, I believe a hundred and sixty-five

12   people of these were dead, which meant that there were 240

13   or so alive.  And these people were scattered all over the

14   United States.  It was not practical to examine all of

15   those.

16       What we did is get addresses of these people as to

17   where they were located.  People that were located within

18   200 miles of Libby, we contacted them by writing letters

19   and asked them if they would be willing to participate in

20   this study and asked them if they would come into Libby for

21   a questionnaire and a chest x-ray and a pulmonary function

22   test.  And if they did, well, we would pay their expenses.

23       Some of these people, of course, lived in Libby and in

24   the area, and others within 200 miles.  There were

25   something over 200 people on this list, just over 200, and

1    I think we got compliance of about 80 or 90 of these

2    people.

3        So we did, to use your words, we did look at some of

4    them.

5    Q    Okay.

6    A    But not all of them.

7    Q    And they were -- And McGill conducted that study,

8    McGill University?

9    A    Yes, sir.

10    Q    Okay.  Now, to go on, in this report, does it not say

11    under "Description of Operations" the second paragraph,

12    that the dry mill was observed most closely during this

13    study, and it was found as during all previous

14    investigations to be extremely dusty and in the need of

15    repair and modification to reduce dustiness to acceptable

16    limits?

17    A    Yes, sir.

18    Q    You see that?

19    A    Yes, sir.

20    Q    And participating in arriving at that conclusion was

21    the manager, Mr. Blake, the chief engineer, Mr. Kujawa, and

22    I guess Mr. Vinion as guide.  They were consulted before

23    that finding was made; is that correct?

24    A    Yes, sir.

25    Q    And the report indicates in the next paragraph that

1    the sampling that they did was conducted on what appeared

2    to be average days of operations; is that true?

3    A    Yes.

4    Q    So that would appear to make it, would you agree, an

5    adequate or reasonable sampling?

6    A    Yes, sir, I would agree.

7    Q    So you continued to have a serious dust problem in the

8    dry mill in 1962.  Do you agree with that?

9    A    Yes, sir.

10   Q    Now, look at Plaintiff's Exhibit G-11.1.  It's

11   entitled "Acquisition of Zonolite Company R-C-A No. 225."

12   Have you ever seen that document before?

13   A    Yes, sir.

14   Q    And is that part of the records of W. R. Grace?

15   A    I would assume that it is, yes, sir.

16   Q    Well, in fact, it was generated by W. R. Grace

17   employees; is that true?

18   A    When I say I've seen this, I have -- I've only seen it

19   in connection with preparation of a deposition very

20   recently.  So I am not familiar with it.  I have not read

21   this.

22   Q    All right.  I won't ask you any questions about it.

23   That's fair.  I appreciate that.

24        But you do recognize this as an official Grace

25   document; is that right?

1    A    Yes, sir.

2    Q    And it was produced by Grace employees?

3    A    Yes, sir.  I would assume so.

4         MR. LEWIS:  Move the admission of Plaintiff's

5    Exhibit G-11.1.

6         MR. GRAHAM:  No objection, Your Honor.

7         THE COURT:  Be received.

8    Q    (BY MR. LEWIS)  Now, I'll direct your attention to

9    Plaintiff's Exhibit G-12.  This is an agreement and plan of

10   reorganization between W. R. Grace and Company and Zonolite

11   Company.  Do you see that?

12   A    Yes, sir.

13   Q    Have you had an opportunity to review this document?

14   A    Yes, sir.  I've seen it.  Again, I have not read it.

15   Q    It was generated by W. R. Grace and Zonolite, but it's

16   not within your area of expertise.  Is that fair?

17   A    That's correct.

18   Q    But you do recognize it as a Grace document?

19   A    Yes, sir.

20        MR. LEWIS:  For the record, we move for the

21   admission of Plaintiff's Exhibit G-12, Your Honor, because

22   it includes our representation concerning assumption of

23   liabilities and completes the record.

24        MR. GRAHAM:  We have no objection to the

25   admission of that, Your Honor.

95

1          THE COURT:  Be received.

2          MR. LEWIS:  Thank you, Your Honor.

3     Q    (BY MR. LEWIS)  Okay.  The next document is

4     Plaintiff's G-13.  Is that another Montana State Board of

5     Health report of industrial hygiene study at Zonolite?

6     A    Yes, sir.

7     Q    For April 11, 1963?

8     A    Yes, sir.

9     Q    Would you read the first paragraph under "Description

10    of Operations" on page two.

11    A    "The operation of the plant is essentially that as

12    described in previous reports and will not be repeated here

13    except to evaluate the overall dustiness on each floor and

14    concern-- comments concerning dust producers at the

15    locations noted.  In general, there appeared to be little

16    if any improvement at any point in the plant except perhaps

17    at the row grinder where a significant reduction in dust

18    contributed to this area has been accomplished.

19    Specifically, the major dust producing areas were as

20    follows . . ."

21    Q    Fifth floor the screens were very dusty.  Is that

22    true?

23    A    Yes.

24    Q    "Fourth floor:  Much dustiness continues to be

25    apparent in this area."  True?

1    A    Yes.

2    Q    "Third floor:  The main dust producers in this area

3    were at No. 3 concentrator bin"?

4    A    Yes.

5    Q    And there's other dust leaks on the third floor.  Is

6    that true?

7    A    Yes.

8    Q    And it goes on all the way down, at all levels there

9    was too much dust.  Do you agree with that?

10    A    Yes.

11    Q    Who was the general manager of Zonolite on April 11,

12    1963?

13    A    Mr. Blake.

14    Q    And you reported to him; is that correct?

15    A    Yes, sir.

16         THE COURT:  Well, perhaps this would be a good

17    time to -- we'll take a coffee break, members of the jury.

18    Get back here in about 15 minutes.  I think the coffee

19    ought to be ready for the jurors.  We'll recess.

20         (The proceedings in this matter were recessed at

21    2:40 p.m. and reconvened at 3:26 p.m.)

22         (The following proceedings were had in open court

23    with the jury present, beginning at 3:23 p.m.)

24         THE COURT:  Back on the matter of Mildred Johnson

25    versus W. R. Grace and Company.

1    Members of the jury, during the 15 minute coffee break

2    which stretched into 45 minutes, the case has been settled

3    to the complete satisfaction of both parties.  So it's

4    over.

5    Sometimes it doesn't happen until the jury is sitting

6    in the box and heard some evidence.  So you provided an

7    important public function just being here and moving this

8    matter along.  And we have two other matters that are very

9    similar to this; one has been settled, the other is very

10    close to being settled.  So I want to thank you for your

11    time and your service in this case.  And that's it.  You're

12    free to go.

13    Thank you very much.  You're discharged.

14    (The proceedings in this matter were adjourned

15    and the jury was released at 3:28 p.m.)

16

17

18

19

20

21

22

23

24

25

98

1

2                          C E R T I F I C A T E

3    STATE OF MONTANA          )
                               :  SS
4    County of Lewis and Clark )

5        I, TINA C. BRILZ, RPR, Official Court Reporter and

6    Notary Public of the State of Montana residing at Helena,

7    Montana, do hereby certify as follows:

8        That the foregoing trial was reported by me on August

9    23, 1990, in the courtroom in the United States Courthouse

10   in Missoula, Montana.

11       That the foregoing ninety-seven (97) pages of

12   typewritten material constitute a true and accurate

13   transcription of my stenographic notes which were reduced

14   to writing by means of computer-aided transcription.

15       I further certify that I am not an attorney nor counsel

16   of any of the parties nor a relative or employee of any

17   attorney or counsel connected with this action or otherwise

18   interested in the event thereof.

19       IN WITNESS WHEREOF, I have hereunto set my hand and

20   affixed my Official Seal on this 25th day of August, 1990.

21

22                    _____
                      REGISTERED PROFESSIONAL REPORTER
23
                      NOTARY PUBLIC for the State of
24                    Montana residing at Helena,
                      Montana.  My commission expires
25                    November 26, 1992.