Page 97

that other?

MR. HEBERLING: Do you?

MR. GRAHAM: I don't know, and I don't know whether it was actually attached, but it refers to it, and I was just curious as to whether you had it.

Thank you. Sorry for the interruption.

BY MR. HEBERLING:

Q Would you please refer to Exhibit 22? Did you receive this discharge summary for Glenn Taylor, admission date, February 11, 1959 -- And the admission summary is written by Dr. G.W. Setser. Did you receive that in 1959?

A We received this discharge summary. I really don't recall exactly when, whether it was right after his discharge or not, but, yes, we did receive it.

Q And did you receive it sometime -- Is it likely that you received it sometime during the year of 1959?

A Yes, it is.

Q Okay. It says here that Mr. Taylor worked at Zonolite for eighteen years. Did you know him?

A Yes, sir.

Q As of 1959, did you observe any shortness

Page 98

of breath in Mr. Taylor?

A Yes, sir.

Q In your estimation was it severe?

MR. GRAHAM: I would object on the basis of foundation and speculation.

Go ahead and answer, if you can.

THE WITNESS: Well, I don't recall exactly, but as I recall, yes, I would think it would have to be classified as severe.

BY MR. HEBERLING:

Q What did you see?

A Just his general actions and his general movements. It was obvious that he had breathing difficulties.

Q Then, on the second page, right in the middle, it says "Final Diagnosis on Discharge". Do you see, "1. Histoplasmosis" and, "2. Asbestosis"?

A Yes, sir.

Q Do you know what became of Glenn Taylor?

A Yes, sir. He died.

Q Do you know how long after this 1959 report he died?

A No, sir, I don't know. I don't recall.

Q Let's go to Exhibit No. 23. Does this appear to be a letter of Dr. Knight at the Montana

Page 99

State Tuberculosis Sanitarium to you dated March 10, 1959?

A This letter was not to me. This letter was from me.

Q Are you looking at Exhibit 23?

A I'm sorry. I was looking at Exhibit 24. Excuse me.

Q Okay.

A Yes, sir. This is a letter to me from Dr. Knight. I'm sorry.

Q Did you receive that at or about its date in 1959?

A Yes, sir.

Q Did you discuss this case with Dr. Knight over the phone?

A I don't recall.

Q Do you know why he was inquiring about asbestos?

MR. MURPHY: You mean beyond what's stated in his letter?

MR. HEBERLING: Right. Generally.

MR. MURPHY: The letter states what he's doing.

BY MR. HEBERLING:

Q Generally, did you know why he was

Page 100

inquiring about asbestos?

A No, sir. I couldn't speculate on why he was inquiring, other than what it states in this letter.

Q So you don't have any information beyond what's in the letter --

A No, sir.

Q -- at this time? Let's go to -- Now, I believe attached to the first page of Exhibit 23 is a letter under your signature, April 1, 1959. Do you see that?

A Yes, sir.

Q Were you the author of that letter?

A Yes, sir.

Q And also attached are two handwritten pages. Do you see those?

A Yes, sir.

Q And whose handwriting is that?

A Butch Bleich's, Mr. R.A. Bleich.

Q And he was your supervisor? He was the plant manager?

A Yes, sir.

MR. GRAHAM: Excuse me. I'm confused. Were you referring to 23 or 24?

THE WITNESS: 24.

Page 101

MR. HEBERLING: I have 23.
MR. GRAHAM: See. I think there's confusion, because the letter from Lovick is, in our set, marked as 24.
MR. HEBERLING: Okay. You probably also have it attached as 23. There were two different copies. Do you have it attached to 23?
MR. MURPHY: No.
MR. GRAHAM: No.
MR. MURPHY: 23 stands alone as Knight to Lovick and is so marked one page, both with your tab and with the Plaintiff's exhibit stamp in the lower left corner. 24 is Lovick to Knight of April 1, 1959, so marked with your tab and Plaintiff's exhibit number in the lower left corner, plus the two handwritten pages that you've just begun to ask him about.
MR. GRAHAM: Plus another --
MR. MURPHY: Plus, in our book, two more letters, so that Exhibit 24 in this book has a total of five pages.
BY MR. HEBERLING:
Q And is that true with regard to your book as well? Is Exhibit 24 the April 1, 1959 letter?
A Yes.

Page 102

Q And it has the two handwritten pages attached?
A Yes. Yes.
MR. GRAHAM: And his also has, again, the duplication of, then, 23 and then another copy of his letter of 24. Should we just pull those two off?
MR. MURPHY: I was going to say, you may want to just pull them off or go off the record to clear this up, but the last two pages could just be removed because they're duplicates.
MR. HEBERLING: Yes. Let's do that.
THE VIDEOGRAPHER: Do you want to go off the record?
MR. GRAHAM: No.
MR. HEBERLING: We can edit it later.
THE WITNESS: Here are the two copies which I've removed, if you'd like to --
MR. HEBERLING: Okay. I'm sure we're making a lot of paper noises here.
BY MR. HEBERLING:
Q So Exhibit 24, does that appear to be a letter dated April 1, 1959 which you wrote?
A Yes, sir.

Page 103

Q And then are there two handwritten pages attached to it?
A Yes, sir.
Q And is that the handwriting of Butch Bleich?
A Yes, sir.
Q And in the handwritten part, on page one of that, toward the bottom, do you see where Mr. Bleich quotes the 1956 State report which says, "However, the asbestos dust in the dust in the air is of considerable toxicity"? Do you see that?
A Yes, sir.
Q And, then, with regard to the studies being done by Dr. Knight, if any, did you ever ask for the results of the studies?
A Not that I recall, no, sir.
Q Do you have any further contact with Dr. Knight after this letter of April 1?
A Not that I recall, no, sir.
Q Then let's go to Exhibit 25. Does that appear to be a memo, Lovick to Kelley, dated April 17?
A Yes, sir.
Q Were you the author of that memo?
A Yes, sir.

Page 104

Q Then Exhibit 26, does that appear to be a letter of Dr. Cairns, C-A-I-R-N-S, dated July 20, 1959 to Mr. Bleich, manager of Zonolite?
A Yes, sir.
Q Did you receive this in Libby in 1959?
A Yes, sir.
Q Was that on or about its date that you received it?
A Yes, sir.
Q Was Dr. Cairns Glenn Taylor's doctor?
A I don't know.
Q There's a study of x-rays done on employees in 1959 which Dr. Cairns reports here. Do you see that?
A Yes, sir.
Q Was Dr. Cairns hired by the company to do this report?
A No, sir.
Q How was it that he did the report? Did he volunteer to do it?
A He just did it, is all I can tell you. He was chief of staff of the medical staff of the hospital, and he was not asked to do this by the company. I think he just did it on his own.
MR. GRAHAM: Excuse me, Counsel.

Page 105

11:41:20 With regard to Exhibit 26, is that a -- I don't know what the source for this report was, but is that a complete report to your knowledge?

11:41:32 MR. HEBERLING: That was going to be one of my questions, as to whether there should be a signature page or something like that, it being a letter.

11:41:38 MR. GRAHAM: Or whether the second page has any relation to the first page.

11:41:42 MR. HEBERLING: That I think we can establish. It's the same numbers. There's 130 people examined and 82 normal and 48 abnormal. That appears on the first and second pages.

11:41:56 MR. MURPHY: Actually, there is one number different in the two. I mean, they obviously appear to be based on the same information, but if you look at the pneumoconiosis numbers, one is eight, and one is seven.

11:42:04 MR. GRAHAM: The only point that I was trying to make is that these two pages are included as one -- part of the exhibit, and I don't know whether they're connected, but, anyway, maybe you can establish that.

11:42:16 MR. HEBERLING: That's one of my questions to the witness, and I'll ask if counsel

Page 106

has a third page. I've never seen one.

11:42:26 MR. GRAHAM: I think that you're making a wrongful assumption in that the first page in here is marked page one and the second one is page two of the same document, and I don't believe that's the case, but I don't know.

11:42:44 BY MR. HEBERLING:

11:42:46 Q Okay. In the middle of the first page, it says "Number of Persons Examined - 130". Was that all of the workers at Zonolite in 1959?

11:42:52 A Yes, sir.

11:42:56 Q And what was the purpose of having chest x-rays for all 130 workers?

11:43:04 A In 1959 the Montana legislature passed an industrial disease law, which became a part of the Workmen's Compensation law, and that industrial disease law took into account the responsibility of employers for various specified industrial diseases, which would become compensable, and one of the diseases which was specified in the law was silicosis, which we felt was the only industrial disease which would have any possibility of Zonolite, our operation, being responsible for.

11:43:54 And the law specified that compensation would be based upon progression of the disease after

Page 107

the passage of this act, and we x-rayed all of our employees to establish a base, which could then be followed, so if there was any progression of the disease in our people -- And the only disease we could be responsible for was for silicosis, but the results of the interpretations of the x-rays showed that we had -- none of our employees had silicosis, but, nevertheless, we had a base established for their chest -- lung conditions at that time.

11:44:42 Q Was it your understanding that under this '59 law for occupational disease the company was not responsible for conditions which preexisted the effective date of the law?

11:44:54 A It was our understanding we were not responsible for conditions which existed at that time, which had been contracted previously to the passage of the law.

11:45:06 Q Was this effort in part to protect the company against liability for preexisting conditions?

11:45:14 MR. GRAHAM: Object to the form, and it requires speculation as well.

11:45:18 THE WITNESS: Well, it would establish what their conditions were at that time, and in that sense, yes, it would be for the

Page 108

company's protection that they couldn't be responsible.

11:45:30 BY MR. HEBERLING:

11:45:32 Q Okay. In the middle of the first page, do you see 48 abnormal out of a total 130?

11:45:38 A Yes, sir.

11:45:38 Q So that would be a little over a third abnormals?

11:45:44 A Yes, sir.

11:45:48 Q Would the 130 include workers who had been there, say, less than a year?

11:45:54 A Yes, sir. It included everyone who was on the payroll at that time.

11:46:00 Q And do you see under the lettering, "a" to "l", "Pleural Thickenings - 8"? Do you see that?

11:46:06 A Yes, sir.

11:46:10 Q And are you aware that that could be the result of asbestos exposure?

11:46:14 A Yes, sir, it could be.

11:46:18 Q And do you see, also, "Defects of the Diaphragm" -- that's "b" -- three of those?

11:46:24 A Yes, sir.

11:46:26 Q You're aware that that could be a result of asbestos exposure as well?

11:46:32 MR. GRAHAM: Objection. Vague and

ambiguous as to time.
THE WITNESS: This just says "Defects". It could be for any reason.
BY MR. HEBERLING:
Q Okay. And do you see "c. Interstitial Fibrosis"?
A Yes.
Q 26?
A Yes.
Q Are you aware that that could be the result of asbestos exposure?
MR. GRAHAM: Same objection.
THE WITNESS: It could be, yes, but not necessarily.
BY MR. HEBERLING:
Q What's your understanding of interstitial fibrosis is?
A It's a scarring of the lung tissues, to my understanding.
Q Now, to your knowledge was there an additional page or two of this report with the doctor's signature on it?
A I don't know.
Q When you first saw this report, were you alarmed?

MR. MURPHY: Objection to the form of the question.
THE WITNESS: Well, that was forty years ago almost, and I don't remember what my reaction might have been.
BY MR. HEBERLING:
Q Did this appear to be an extraordinary number of abnormal chests?
MR. MURPHY: Objection to the form of the question.
THE WITNESS: There again, I don't know what one could expect, but I would say, yes, it would appear to be a large number of abnormal chests.
BY MR. HEBERLING:
Q Did you make any inquiries as to how many abnormal chests one could expect in a normal population?
A Not specifically, no, sir. I don't know that we did.
Q Did you determine which people were the 48 abnormal chests?
A We knew which ones they were because we had copies of the interpretations of the x-rays.
Q And did you obtain those from the

hospital?
A Yes, sir.
Q And as of 1959, did you feel that serious health problems had been identified?
MR. MURPHY: Objection to the form of the question. Vague and ambiguous.
THE WITNESS: I don't recall what we would have thought about that.
BY MR. HEBERLING:
Q Have you testified in the past that when you received this report you did feel that serious health problems had been identified?
A I don't recall.
Q I'm now showing you your deposition dated May 27, 1992, and do you see on page 52 a discuss of the July 20, 1959 report from Dr. Cairns?
A Yes.
Q And then do you see the question, And did these appear to be serious health problems that had been identified?
And then did you give the answer, As a layman?
Repeat of the question. As a layman, do you feel that these were serious health problems identified?

Answer: Included in that abnormal list, yes, there would have been some that were serious health problems.
Do you see that?
A Yes, sir.
Q And is that the testimony you gave at the time?
A Yes, sir.
Q So would you agree that Dr. Cairns essentially confirmed what the company already k based on the '56 report, but he brought it home to particular employees?
MR. GRAHAM: I would object on the basis that it assumes that the health employees that the witness has been talking about or -- the health problems are those related to asbestos.
Go ahead and answer the question, if you can.
THE WITNESS: Can I hear the question again, please?
(The reporter then read back the preceding question.)
MR. MURPHY: And I would also object on the grounds that it's vague and ambiguous.
THE WITNESS: I don't think that I

could say that he did confirm that. I don't really know what he confirmed, because this statistical review included all abnormal chests from whatever reason. For example, there's one in here that -- Metallic object in the chest, that certainly is not something we would have been responsible for. Just like some of these other things. There's no way that they could have been caused by their employment with us.

BY MR. HEBERLING:

Q I am now showing you again your May 27, 1992 deposition, and at page 242 do you see the question, So, really, would you agree with me that Dr. Cairns essentially confirmed what you already knew based upon the 1956 report but brought it home to your particular employees?

Answer: I think that would be a true statement. Yes.

Do you see that?

A Yes.

Q Did you give that testimony at that time?

A Yes, I did.

MR. GRAHAM: We should note for the record that the question at that time was objected to, and Counsel omitted to read the objections that

were made, and we would make the same objections now.

BY MR. HEBERLING:

Q Did the company personally notify the 48 workers with abnormal chests?

A The company did not directly notify them, but the employees with abnormal chests were notified.

Q And how were they notified?

A By their physicians.

Q Are you sure that every one of them was notified by his physician?

A No. I can't say that I'm sure of that, but that was the procedure, and the physicians had all agreed that they would contact the employees on their conditions.

Q And so, as far as copies of these x-ray reports went, was there one kept at the hospital, one at Zonolite and one to the family doctors?

A Yes, sir.

Q Is that how it went?

A Yes, sir. That is the way it was handled.

Q And later on did you find out that there were problems with this procedure of leaving it to the family doctor to notify the employee?

A Well, later on we changed the procedure so that everyone with an abnormal chest was notified by a company representative.

Q And when did you do that?

A I don't recall the date.

Q Was that late '70s, about?

A It would have been in the '70s, yes, sir.

Q And did you change the procedure because of problems that some employees were not being notified?

MR. MURPHY: Objection. Asked and answered.

THE WITNESS: I would not say that that was true. We changed the procedure so that that could not happen or would not happen.

BY MR. HEBERLING:

Q Okay. I'm now showing you a memo from yourself to -- And this is Exhibit 192. We'll get to it. From yourself to Mr. Eschenbach dated November 18, 1980. Was that a memo that you authored?

A I don't know what it says, but I probably did.

MR. MURPHY: Please look at before you assume that you did or you didn't, if you

haven't seen it.

THE WITNESS: Yes, sir, I --

BY MR. HEBERLING:

Q Do you believe you were the author of that memo?

A Yes, sir.

Q I'll read you a portion from the last page. It says, "In all cases the employees' physician is given a copy of the radiologist's review and is to review it with his patient. We found this was not always being done, so beginning in 1975, we began notifying employees ourselves." Do you see that?

A Yes, sir.

Q And was that a correct statement of what happened?

A I'm sure it was.

MR. MURPHY: Let me object if the purpose of that was to suggest there was something inconsistent in Mr. Lovick's prior answer with respect to problems. Otherwise, it seems improper Cross-Examination to simply read him something and say, Is that what it says? The document speaks for itself. So I object to that last question belatedly on the grounds that it's improper impeachment.

Page 117

MR. HEBERLING: Okay. Counsel, the purpose is not to impeach. It's to get the full and complete testimony into the record and get it correct. So that's why I'm doing that, but I understand the objection.
BY MR. HEBERLING:
Q If the worker had an appointment to see the doctor, would he have to pay for the appointment?
A No, sir.
Q Was that arranged with the local physicians?
A Yes, sir, it was.
Q And so they were donating their time in that regard?
A Yes, sir.
Q Was the company's next set of x-rays on the employees 1964?
A Yes, sir.
Q And did the company continue to do annual chest x-rays all the way up to 1983 when you left?
A Yes, sir.
MR. HEBERLING: It's a little after twelve. We can stop there.
THE VIDEOGRAPHER: We're going off the record. It's approximately 11:58.

Page 118

(Lunch recess.)
THE VIDEOGRAPHER: We're back on the record. It's approximately 1:04.
BY MR. HEBERLING:
Q Before lunch we were discussing the procedure for the annual chest x-rays, and we discussed whether the workers were directly notified or not, and so in the '60s and the '70s, up to 1975, is it correct that if a worker had an abnormal x-ray the company would not directly notify the worker even though the company knew it?
A Yes. It was the responsibility of the doctor to tell the employee if there was a problem, but if there was an x-ray that appeared to be quite damaging to the employee, we would notify the employee to be sure to see his doctor about it.
Q Quite damaging?
A Well, if it looked to be serious and he might need some further follow-up or something.
Q When did you start doing that?
A I think we always did that, but the procedure was for the doctor to see them, and we would always post notices that the employees should -- all employees should check with their doctors to get their results.

Pag

Q I'm now showing you your deposition taken December 20, 1983, page 209. Do you see the question, When, as I understand it, in the mid-'60s, if a person had significant x-ray changes, that person was not informed directly, but his regular physician was informed; is that correct?
Answer: That's correct.
And if the employee did not talk to his regular physician or his regular physician did not inform him, no one would have discouraged him fr continued employment? Is that a fair statement?
The answer, That would be correct, yes.
Is that the answer you gave at the time?
A That's the answer I gave at the time.
MR. GRAHAM: Objection. Improper attempt at impeachment.
BY MR. HEBERLING:
Q Now back to Exhibit 26. Is that in front of you?
A Yes.
Q Do you see in the second sentence in the letter it states, "It is not accurate nor complete without a personal, physical differential diagnosis, which should be done on all cases showing any abnormal defects of the chest"? Do you see that?

Pag

A Yes, sir.
Q And in 1959 did the company do anything t ensure that workers with an abnormal chest had a full exam?
A No, sir. I don't know that they would have done anything directly.
Q To your knowledge did the company do anything to notify the 82 workers with normal ches that there was a pattern there indicating danger in the workplace?
MR. MURPHY: Objection to the form of the question.
THE WITNESS: No. I don't know that we did anything directly.
BY MR. HEBERLING:
Q What about the eight workers with possible asbestosis? Did the company do anything to move them to work in areas of less exposure?
A No, sir, but it must be understood that we did not have the authority to do that. We were bound by union rules as to what we could do to m employees around.
Q Did you raise the issue with the union?
A Yes, we did, on occasions.

Q In '59 did you?
A I don't know that we did in '59, no.
Q Did you or anyone receive a medical study of the Libby -- Excuse me. Recommend a medical study of the Libby employees to find out what the risks were in 1959?
A No, sir. Not that I recall.
Q Did you disclose this report of Dr. Cairns, Exhibit 26, to Ben Wake of the Board of Health?
A I don't recall.
Q Do you recall receiving any directive from company headquarters in Chicago to do anything as a result of this report?
A No, sir, I don't recall that we did.
Q In your mind back in '59, did this underscore the need to take better care of the dust problem?
MR. GRAHAM: Object to the form. Go ahead and answer. It's vague and ambiguous.
THE WITNESS: I don't really know what the question means, but it would certainly reinforce what we have always felt, that we should do what we can to alleviate the dust problem that we

had.
BY MR. HEBERLING:
Q Let's go to Exhibit 27. Does this appear to be a letter by you to Mr. Foot of Detroit Insurance Agency in Michigan dated September 2, 1959?
A Yes, it is. However, it's not Foot. It's Toot. It's T-O-O-T.
Q Okay. Are you the author of this letter?
A Yes, sir.
Q It states in the second paragraph, "Dr. Little ... reviewed the x-rays of all our employees. He sorted out those which showed any evidence or where there was ... suspicion of ... condition which possibly could be classified as an industrial disease." Do you see that?
A Yes, sir.
Q And then the third paragraph, "We also filed with the board our election to come under the Occupational Disease Act with Royal Indemnity Company as our insurance carrier." Do you see that?
A Yes, sir.
MR. GRAHAM: Object. Improper examination.
/////

BY MR. HEBERLING:
Q So was this for insurance against occupational disease claims?
A Yes, sir.
Q And was it your understanding that a occupational disease claim would only appear if there was liability if it was caused for a condition at work -- caused by a condition at work?
A Well, that's what the Occupational Disease Act was is to cover employees whose condition resulted from their employment.
Q And what was the purpose of purchasing insurance?
MR. GRAHAM: I would object to the question on the basis that it assumes that this witness knows what the purpose was. Go ahead and answer it, if you can.
THE WITNESS: For the same reason that we had industrial accident insurance, so the insurance company was involved in the compensation and protection of those employees.
BY MR. HEBERLING:
Q And did you purchase insurance to protect the company?
MR. GRAHAM: Same objection.

THE WITNESS: Well, I don't know what you mean by "Protect the company". I don't know what you mean. For the same reason that you have insurance for anything, you're buying it, in a sense, for protection.
BY MR. HEBERLING:
Q And did the company seek coverage for all occupational diseases, more than just silicosis?
A We sought coverage under the Occupational Disease Act, which would cover any occupational diseases which were defined in that act.
Q So anything the company was held liable for the insurance would cover it? Is that fair?
A Yes, sir.
Q And in doing this were you doing all you could to protect the company?
MR. MURPHY: Objection to the form of the question.
THE WITNESS: Well, I don't know what that question means, so I can't answer it.
BY MR. HEBERLING:
Q Well, was there anything that you could have done to protect the company that you didn't do?
A Not that I know of, no, sir.
Q In the last paragraph it says, "In regard

to the list of diseases not covered by the act, which we would like to consider insuring as compensable, you will hear from Walter on this." Who was Walter at that time?

A Walter Bein, who was vice-president of Zonolite Company.

Q And was he in Chicago?

A Yes, sir.

Q Let's refer to Exhibit 28. Does this appear to be a memo from you to Mr. Bein dated September 2, 1959?

A Yes, sir.

Q And are you the author of this memo?

A Yes, sir.

Q Okay. In paragraph two it states, "No people are hired until they have received a physical examination, including (a) chest x-ray." Do you see that?

A Yes, sir.

Q Was that a new policy as of '59?

A To the best of my recollection, that would have been instituted in 1959. Yes, sir.

Q And why would the company not want people with chest problems?

A Well, for the same reason that you don't

want people with any other diseases which could be aggravated by their employment.

Q So was that also to protect the company, that policy?

A Yes.

Q Let's refer to Exhibit 29. Does that appear to be a memo from you to Mr. Bein also dated September 2, 1959?

A Yes, sir.

Q Are you the author of this one as well?

A Yes, sir.

Q In the middle paragraph you're discussing a conversation with Dr. Little. Do you see that?

A Yes, sir.

Q It says, "In our conversation we discussed moral obligation to employees, the practical aspects, i.e., cost of such insurance, et cetera. It was his feeling that at this time he would not recommend our asking to be insured for asbestosis or other occupational disease. He stated that, actually, (we had not yet) proved that any of our people are so afflicted." Do you see that?

A Yes, sir.

Q Did you feel a moral obligation to the employees --

A Yes.

Q -- generally?

A Yes, sir.

Q Did you feel a moral obligation to notify the workers that asbestos dust is toxic?

A Well, we certainly felt that we had a moral obligation to make as safe a working environment as it was possible.

Q Did you feel a moral obligation to notify the workers that there was a serious health hazard at the workplace?

MR. MURPHY: Objection as to the form.

MR. HEBERLING: I'm going to object to having two attorneys making objections. Normally, we have one.

BY MR. HEBERLING:

Q Go ahead.

A Well, I would say that, yes, we would have an obligation.

Q Then Dr. Little apparently stated that it was not proved what the situation was. What was your understanding as to what kind of proof might required to prove the situation?

MR. MURPHY: Objection as to the

form. Vague and ambiguous.

THE WITNESS: I don't know. This would be a judgment thing on the part of a physici that they would be convinced that that is what caused the particular condition.

BY MR. HEBERLING:

Q In 1959 was there any pulmonologist in Libby?

A No, sir.

Q Is it your understanding that a pulmonologist is a lung specialist?

A Yes, sir.

Q To your knowledge did the company consul with a lung specialist in 1959 on how to proceed?

A Not that I recall, no, sir.

Q To your knowledge did the company ever d so?

A I don't know. Not to my knowledge. I really don't know.

Q Were you aware that Dr. Little was a radiologist?

A Yes, sir.

Q And that he was not a lung specialist?

A Yes, sir.

Q Here, in the fourth paragraph down, with

regard to Glenn Taylor, you write, "Their final diagnosis was questionable asbestosis in his case." Do you see that?
A Yes, sir.
Q Do you recall we reviewed the report from the doctor?
A Yes, sir.
Q And it was not questionable asbestosis but just plain asbestosis?
A No, sir.
MR. GRAHAM: I'd object to that as a misstatement of the discharge certificate, and if you want to refer back to it and refer to the recommendations, it says, "Patient should return for a lung biopsy, which he did not prefer to have done at this time, to determine definitely the diagnosis of asbestosis."
THE WITNESS: And --
BY MR. HEBERLING:
Q So here in Exhibit 29 you quoted "Questionable asbestosis," did you not?
A I quoted whatever that report says. What number is it?
Q It's Exhibit 22. Do you see on the first page in the middle "Admission Diagnosis:

Questionable asbestosis"?
A Yes, sir.
Q And then do you see on the second page in the middle "Final Diagnosis on Discharge: Asbestosis"?
A It states that -- It does state that, but the first page says, Questionable diagnosis (sic), and then the second page, on the last sentence, it says, "(The) patient shall return for a lung biopsy, which he did not prefer to have done at this time, to determine definitely the diagnosis of asbestosis."
Q So is it your position that in quoting "Questionable asbestosis" that wasn't an error?
MR. MURPHY: Objection. Argumentative.
BY MR. HEBERLING:
Q Go ahead.
A No, I don't think that was an error, because it's quoted right from the report.
Q And then in the fifth paragraph down, do you see where it says, Dr. Little "also stated, though, that we have a greater moral obligation to remove the hazard if one exists. This, I believe, we all agree with." Do you see that?

A Yes, sir.
Q And was that true even if it meant spending more money to alleviate the situation?
MR. MURPHY: Objection to the form. Vague and ambiguous.
THE WITNESS: There's no conditions stated in this statement.
BY MR. HEBERLING:
Q So if it meant spending more money on maintenance crews, the company would do that?
A Yes, sir.
Q Then in the last paragraph, there's a discussion of when follow-up exams should take place. The last sentence, do you see it says, "He was not too definite in a suggestion for a follow-up. Perhaps a blanket in two years"? Do you see that?
A Yes, sir.
Q Did you seek other advice on how soon the follow-up exam should be?
A We pretty much relied on Dr. Little's suggestion, because he was a pulmonologist with -- a radiologist with experience in industrial diseases, and we may have gotten some opinions from other doctors locally, but, primarily, we were relying on

Dr. Little.
Q Dr. Little is talking about a follow-up in one or two years. Did the company do that?
A He says, Perhaps in two years. No, we did not do it.
Q In fact, the company did not do that for five years; correct?
A That's correct.
Q Let's refer to Exhibit 30. Does that appear to be a letter signed by you to fellow employees dated September 9, 1959?
A Yes, sir.
Q And does it attach a list of doctors and various employees who, apparently, had those doctors?
A Yes, sir.
Q Okay. Are you the author of this Exhibit 30?
A Yes, sir.
Q And let's refer to Exhibit 32. Does that appear to be a memo from Mr. Bleich to Mr. Kelley dated April 13, 1961?
A Yes, sir.
Q Did you see this memo in Libby in 1961?
A I don't recall.

Page 133

Q Is it likely that this is a Zonolite document?

A Yes, sir.

Q Then let's refer to Exhibit 33, and does this appear to be a letter by you --

MR. MURPHY: Did you skip 31 on purpose, or did you just miss it?

MR. HEBERLING: I skipped over it.

MR. MURPHY: Okay.

BY MR. HEBERLING:

Q Does Exhibit 33 appear to be a letter by you to Mr. C.A. Pratt dated June 14, 1961?

A Yes, sir.

Q Are you the author of this letter?

A Yes, sir.

Q Who was Mr. Pratt?

A He was the vice-president of Western Mineral Products Company in Minneapolis, who were one of our customers.

Q And did they purchase vermiculite from your company?

A Yes, sir.

Q Did Zonolite own part of Western Mineral?

A They had a financial interest. Yes, they owned a part of it.

Page 134

Q And then did Grace later acquire Western Mineral?

A Yes, sir.

Q Had Mr. Pratt been making an inquiry with concern for his own workers' health?

A I don't recall.

Q You're saying "In reply to your letter of June 12".

A Excuse me. Yes. He would have made an inquiry, which is why I would have written this letter.

Q Have you seen the letter of June 12 any time in the last ten years?

A Not that I recall.

Q Then in the first paragraph, you say, "I am happy to outline our past experience (with) regard to the effect of dust in our mill upon our employees' health. This is a very complex and confusing thing and one from which it is difficult to draw any conclusions." Do you see that?

A Yes, sir.

Q What further information did you need at the time to draw any conclusions?

MR. MURPHY: Objection to the form. Lack of foundation.

Pa

THE WITNESS: I don't know.

BY MR. HEBERLING:

Q Did you recognize at the time that you needed further information to draw conclusions?

A We couldn't draw any conclusions at that time, so, obviously, we would have needed more information.

Q What efforts were underway to gather more information to draw conclusions from?

A Well, among other things, we talked with the doctors collectively that were in Libby about the situation of our employees and asked their advice on what could be done or what information could gather, and we went along with what we lear from them, and their conclusion was -- is that the could not say that we had a serious problem with ( employees and employees' health.

Q Is that your understanding of what information you got from the doctors?

A Yes, sir.

Q Do you have any document from the docto that so states?

A Not that I recall, because this information was given in meetings with them, an think that there are documents which I have seen

P

that outline what was stated by the doctors a of these meetings.

Q How recently have you seen these documents?

A I don't know. In the last few years. That's as close an estimate in time as I can g you.

Q Do you know who the author of such a document might be?

A Me.

Q So is this some document where you summarized what was said at a meeting?

A Yes, sir.

Q Do you know when you did that?

A Well, it would have been about in this period of time, when we were dealing with problem.

MR. GRAHAM: It's right in this letter.

BY MR. HEBERLING:

Q Okay. At the bottom of page one you repeat the statement. You say at the very l sentence, "However, the asbestos dust in the the air is of considerable toxicity." Is that repeating a statement from the 1956 report'

A It's quoted from that, yes.
Q And then on page two you discuss -- Do you see where you discuss the Glenn Taylor case, and then about the middle of the page you repeat -- you state, "The final diagnosis of the man's case was, one, of histoplasmosis and, two, of questionable asbestosis"? Do you see that?
A Yes.
Q Now, is it fair to say that that's in error, that the final diagnosis was plain asbestosis, not questionable?
MR. MURPHY: Objection. It's been asked and answered.
THE WITNESS: I don't think this is a conflict, because while it's true it does say "Asbestosis" -- But there's a footnote there. It says he should return for a biopsy for that to be proven.
BY MR. HEBERLING:
Q Then on page three, second full paragraph, about two-thirds of the way down, do you see, "In the case of the employees where their x-rays interpretation showed some intrathoracic pathology, it was up to the doctors to determine whether further tests or examination or treatment should be

given. In the event that it was, this was to be at the employees' responsibility and expense"? Do you see that?
MR. MURPHY: I'm sorry. Where are you, which paragraph?
THE WITNESS: I don't --
MR. HEBERLING: This is about two-thirds of the way down. There's a small paragraph.
MR. MURPHY: I see that.
THE WITNESS: Yes. I see that.
BY MR. HEBERLING:
Q Was that the company's position at the time?
A Yes, sir. However, I would like to -- I would like to add, it states that, but we had employees' insurance for the employees, so that insurance, which the health insurance that the companies had, which was paid for by the company, would cover much of this expense.
Q Okay. Then on page three you discuss a meeting with the doctors, and I'll read part of this.
MR. GRAHAM: Which meeting, because there are two meetings discussed?

BY MR. HEBERLING:
Q "After all of the results of these x-rays were in, we again met with the doctors and with the radiologist and discussed what our situation actually was in regard to pulmonary diseases from our plant. The preliminary results of the interpretations made it appear that we had a high incidence of pulmonary disease among our employees. However, after the doctors had analyzed the results, the conclusion they came to was there was nothing to indicate that there was a higher incidence of pulmonary trouble among our people than there was among any other group in the geographical area." Do you see that?
A Yes, sir.
Q So even though you had 48 out of 130 abnormals -- Correct?
A Yes, sir.
Q Which is over a third abnormals?
A Yes.
Q Was it your understanding the doctors told you that this was not unusual?
A It's not my understanding at all. That's fact. That's what they told us at the meeting.
Q Is it possible you got it wrong?

A No, sir.
Q You're 100 percent of sure of that?
A Yes, sir.
Q Did you ever find out that the normal percentage of abnormal chests in a population is five percent at most?
A No, sir. I never found out any figures.
Q In the group of doctors -- Which local doctors would that have been --
A It would have been all of the doctors that were in the city of Libby at that time.
Q So would that be Dr. Cairns, Dr. Nelson, Dr. Seifert, Dr. Matthews and Dr. Little, the radiologist?
A Yes, sir.
Q Any others?
A Probably -- Probably or possibly Dr. MacKenzie.
Q Were any of those doctors lung specialists?
A No, sir.
Q Do you recall any presentation of normal figures for the incidence of abnormal chests?
A No, sir.
Q Now, Dr. Cairns, in his report, had warned

that an examination was necessary for a diagnosis of pulmonary disease; correct?

MR. GRAHAM: What was the number of that exhibit so that we can refer to it and see exactly what he said?

MR. MURPHY: And I object to the form of the question, "Warned," in particular.

BY MR. HEBERLING:

Q This is Exhibit 26. Would you refer back to that?

MR. GRAHAM: Thank you, Jon.

BY MR. HEBERLING:

Q Have you found it?

A Yes, sir.

Q Do you see in the second sentence where he's talking about the survey, "It is not accurate nor complete without a personal, physical differential diagnosis, which should be done on all cases showing any abnormal defects of the chest"?

A Yes, sir. It states that.

Q So is it fair to say that he cautioned that a full exam was necessary for the diagnosis?

MR. MURPHY: Objection to the form of the question. The document speaks for itself.

THE WITNESS: He made this

statement. I guess you can interpret that as you wish.

BY MR. HEBERLING:

Q Now, by the time you met with the doctors, did you have results of physical examinations, or was it still just the chest x-rays?

MR. GRAHAM: Vague and ambiguous as to who it is he's talking about. He or the doctors having the results of the tests, physical exams?

BY MR. HEBERLING:

Q Did you understand that I said, Did you have any results?

A If these doctors -- If these employees had physical examinations, we would not have received copies of the results of those examinations.

Q So does it appear, then, that this conclusion was drawn without physical examinations?

A No.

Q Was the conclusion based solely upon the x-ray results?

A Now, which conclusion are you talking about?

Q Page three of -- Back to Exhibit 33, which I read, "The conclusion they came to was there was nothing to indicate that there was a higher

incidence of pulmonary trouble among our people . there was among any other group in this geographic area."

A This was a conclusion of the doctors, and it was based upon all the information that they had available to them.

Q Do you know if they had full physical exams on these employees?

A No. I don't know what they had at all.

Q To your knowledge did the doctors produce anything written at this meeting where you receive this conclusion?

A No, sir. I don't believe they did.

Q Was this a lunch meeting?

A Yes, sir.

Q At this meeting was there any suggestion for a follow-up study?

A I don't recall whether there was at that meeting or not, but we had -- We had other discussions with Dr. Little and the doctors as to what we should do about a follow-up study.

Q What's your understanding about those discussions?

A One was -- There was not an agreement, as I remember, when it should be given, but we start

in 1964 to have annual chest x-rays of all of employees.

Q So that's three years after the -- No. It would be five years after the 1959 meeting?

A Yes, sir.

Q And at this meeting with the doctors, tl lunch meeting, had anyone collected the med literature on asbestosis?

MR. MURPHY: Objection to the forn the question.

THE WITNESS: I don't recall. I don't know.

BY MR. HEBERLING:

Q To your knowledge were any of the dc familiar with medical literature on asbestosi

A I have no idea what the doctors were familiar with.

Q Except for Dr. Little, who is a radiologist, were all the others general practitioners?

A Yes, sir. Well, they all had general practices. The only specialist was Dr. Nels was a surgeon.

Q At the meeting was there a consensus what to do next?

Page 145

A Well, I don't -- I don't recall, but there were -- I don't recall that there was a consensus or any differing of opinions on it.

Q To your knowledge, after this meeting in Libby, was there any effort by the company to consult with specialists in Chicago, where the company headquarters were?

A I don't know. I'm not aware of any, but I don't know.

Q Then at page four, second sentence at the top says, "There were people where some condition of fibrosis or pulmonary emphysema showed up who had been with us only a very short period of time." Do you see that?

A Yes, sir.

Q Did that cause you concern?

A No. What this meant to us is that they came to us with these conditions, and it could not have been our responsibility for causing them.

Q And that's how you interpreted that?

A Yes, sir.

Q Was that on the advice of any medical person?

A Well, I don't recall that it was. I think it's a matter of common sense. These things don't

Page 146

happen overnight. There's always a latency period of some length.

Q Now, again, on page four of this Exhibit 33, in the middle of the page there's a large paragraph about -- Let's see. There's a paragraph on respirators, and here you say, "For quite a few years now, our employees at the dry mill, loading station and other points in the operation where dust exposure is high have been required to wear respirators." Were you aware as of 1961 that there were difficulties wearing respirators in hot weather?

A Yes, sir.

Q Were you aware that it was difficult to communicate while wearing a respirator?

A Yes, sir.

Q Were you aware that the respirators had problems that they'd get plugged up with dust?

A Yes, sir.

Q Did you know Peter Kostic?

A Yes, sir.

Q And was he the safety supervisor for Grace beginning 1963 and thereafter?

A Yes, sir.

Q Okay. Let's refer to --

Page 147

MR. MURPHY: You said earlier your interest was in making an accurate record. You just asked him, Was he the safety supervisor from a certain date thereafter? And there's been earlier testimony from Mr. Lovick at some point in time Mr. Eschenbach joined the company, and you asked him several questions as to what their respective responsibilities were once Eschenbach joined, the point being that earlier today he testified that Kostic was a safety engineer at some point in time and Eschenbach was his supervisor.

MR. HEBERLING: I understand that.

BY MR. HEBERLING:

Q Let's refer to Exhibit 85.

A 85?

Q Yes. Now, at page five, just above the word "Summary," the last sentence, Mr. Kostic makes the statement, "Respirators are fine for short periods of time, but to get a man to wear one eight hours a day is next to impossible." Do you see that?

A No, sir, I don't.

Q Just above "Summary," at the bottom of the page, the sentence just above that.

A Yes, sir, I see that.

Page 148

Q Would you agree with Mr. Kostic on that statement?

A Yes, sir.

Q And let's refer to Exhibit 71. Who was Mr. Rupp, R-U-P-P?

A He was the treasurer of the Zonolite division of W.R. Grace & Company.

Q Okay. Mr. Rupp has made the statement, "Employees are often inclined to remove them," meaning respirators, "when a supervisor is not present." Do you see that on the first page of Exhibit 71, toward the bottom?

A Yes, sir.

Q Do you agree with that?

A Yes, sir.

Q And did you know Walt Baker?

A Yes, sir.

Q Was he the mill superintendent?

A He was the dry mill foreman, yes, sir.

Q Was he ever superintendent, or was he --

A No, he was never superintendent, but he was dry mill supervisor.

Q Okay. So he was management?

A Yes, sir.

Q Were you aware that he rarely wore a

Page 149

respirator?
A No, sir, I'm not. I don't know that.
Q Now, if we bring in a dozen witnesses who are ex-workers who will testify that most of the time the workers in the dry mill and elsewhere did not wear respirators in the '60s and '70s, would you dispute that?
MR. GRAHAM: Objection to the form of the question.
MR. MURPHY: Objection. Lack of foundation. Argumentative.
THE WITNESS: It was previously stated that I spent maybe five percent of my time at the mining and milling operation. If you brought in the witnesses who worked in the mill and made a statement about what happened there, I would not be in a position to dispute that statement from personal observation.
BY MR. HEBERLING:
Q In the 1960s did you ever tell employees the reason for wearing respirators, mainly, that asbestos dust is toxic?
MR. MURPHY: Objection to the form of the question.
THE WITNESS: I don't recall -- I

Page 150

don't recall that employees would have been told they should wear respirators for that reason.
BY MR. HEBERLING:
Q And was that true in the early '70s as well?
A Probably.
Q Up to the time of the smoking ban in '79?
MR. MURPHY: Object to the form of the question.
THE WITNESS: Probably, but there are some things that shouldn't be a need to be explain. You shouldn't have to tell an employee that they shouldn't put their fingers to a piece of red hot iron either, and we never told them that.
BY MR. HEBERLING:
Q Okay. Back to Exhibit 33. Let's see. I'll eliminate a few questions here. You talk about, in the middle of the page, on the x-ray follow-up -- In the middle of the page, it says, "At that time it was the feeling of the radiologist that a minimum of two years should elapse before the follow-up should be made, and it would probably be better to wait a longer period where there would be more likelihood of some conclusions showing up." Do you see that?

Pa

A Yes, sir.
Q Was that the company's position that you're stating here?
A No. I'm stating that this was the feelin of Dr. Little, and we were relying on the judg of Dr. Little rather than coming to conclusior our own, because Dr. Little was much more more knowledgeable about that sort of thing t were.
Q Then the last sentence, "It is probable, therefore, that in the next two or three years v may schedule a follow-up blanket survey so can be compared." Do you see that?
A Yes, sir.
Q Did you know as of '61 that it was goi to be yet two or three more years before anot of x-rays was taken?
A I state that in that letter.
Q So had there been some kind of decisic that point by management not to do one for t three more years?
MR. GRAHAM: I object to the form c the question in that it requires a misstatemen what the letter itself says in stating that it is probable.

P

Go ahead and answer it to the extent y can.
BY MR. HEBERLING:
Q Do you know of any decision as to wh have a follow-up exam?
A Well, I don't -- I don't recall specifically how the decision was reached o but I state this in the letter, and that would b been the consensus of the management at Li that's what we would do.
Q Okay. Let's refer to Exhibit 34, and this appear to be a letter from Mr. Pratt to y dated August 11, 1961?
A I -- Yes. Yes.
Q Did you receive this at or about its da
A Yes, sir.
Q Okay. Then we'll move on to Exhibi and does this appear to be a report of the B Mines dated October 11, '61?
A Yes, sir.
Q Did you receive this in Libby in 1961
A Yes, sir.
Q Would that be at or about the date of report?
A Yes, sir.

Q Okay. Then on page two there's mention as "E.D. Lovick, personnel manager". Were you, in fact, administration manager, or what was your title then?

MR. MURPHY: It's page one of the report, isn't it, not page two?

MR. HEBERLING: Right.

MR. MURPHY: I think he's not looking at the same page you're asking him about.

THE WITNESS: Well, I think probably my official title in 1961 was assistant manager or assistant to the manager or something like that.

BY MR. HEBERLING:

Q Okay. Then on page two of the report, in the last paragraph, do you see where it says, "The mill operated (on) three, eight-hour shifts a day, five days a week"?

A Yes, sir.

Q Was that typical at the time?

A Yes, sir.

Q Was that typical for the 1950s?

A Yes, sir.

Q Was it typical for the 1960s?

A Yes, sir.

Q And then three lines from the bottom

they're talking about numbers of workers. It says "Five on construction". Do you see that?

A Yes, sir.

Q Did they handle repairs and construction at the mine and mill?

A Yes, sir.

Q Go to Exhibit 36. This is a letter by Ben Wake to Mr. Keenan at the Occupational Health Research & Training Facility in Cincinnati dated March 13, 1962. Is that what it appears to be?

A Yes.

Q Did you receive this in Libby in 1962?

A I don't recall that I did, no, sir.

Q Do you think you've seen it before?

A I don't recall having seen it before.

Q When did you learn that the type of asbestos in the ore at Libby was tremolite asbestos?

A I don't really know, but it would have been -- Well, I don't really know. It would have been probably in the late 1950s.

Q Here we go. Then let's refer next to Exhibit 37, and does this appear to be a letter from Mr. Keenan of the Public Health Service to Ben Wake dated April 13, 1962?

A Yes, sir.

Q And did you see this in Libby in April 1962?

A Not that I recall, no, sir.

Q Do you recall a document from the State showing a sample that was 40 percent asbestos in airborne dust?

A Well, I recall -- I recall a letter from the State on the 40 percent asbestos, and I don't remember specifically how it was defined, but, yes, I remember that.

Q But you don't recall seeing this particular letter, which is Exhibit 37?

A No, sir, I don't.

Q Refer to Exhibit 38, and does this appear to be a letter of April 19, 1962 from John Anderson, M.D., of the Montana Board of Health to Mr. Bleich, manager, Zonolite?

A Yes, sir, I do.

Q And was this received in Libby in 1962?

A Yes, sir, I believe so.

Q And was that at or about the date of April 19th?

A Yes, sir.

Q And did you -- I'll ask it this way. In the fifth line do you see where it says, "We were

instructed by the board at that time to invite from time to time certain of those who had not complied with previous recommendations to meet with the board"? Do you see that?

A Yes, sir.

Q Did you understand -- Was it your understanding that the Board of Health's position was that Zonolite had not complied with previous recommendations?

A Apparently, that's what this infers, yes, sir.

Q And did you understand that the company was invited to explain itself at the next Board of Health meeting?

A Yes, sir. I was aware of that.

Q Did you do so?

A Mr. Bleich met with them. I did not.

Q Do you want to take a break at this point?

A No.

Q Okay. Let me know if you do.

Let's refer to Exhibit 39, and does this appear to be an April 19, 1962 report of an industrial hygiene study by the Montana State Board of Health?

A Yes, sir.

Page 157

Q Was this received in Libby in 1962?
A Yes, sir.
Q Was that at or about the date of the report?
A Yes.
Q Okay. Then on the first page, third paragraph up from the bottom, do you see where it says, "During the time of this study, all of the plant was in operation such that the dust samples and other samples indicated should represent normal working conditions"? Do you see that?
A Yes, sir.
Q To your knowledge did the company dispute that or any other statement in this report?
A No, sir. Not to my knowledge.
Q Have you testified that you always had notice when Ben Wake would come or the Board of Health would come to inspect?
A I don't believe I ever testified to that. I don't believe that -- When the Bureau of Mines came, we never received notice. It was their policy. And I really don't remember whether we had notice from Ben Wake that he was coming or not. I just don't recall what their procedure was.
Q I'm now showing you your deposition of

Page 158

May 27, 1992, and at page 274 we see the question, So if a witness said, We always had advance notice when Ben Wake would come or the Department of Health would come to inspect us, you could not refute that one way or the other?
And the answer, Well, I'd say that's true.
Do you see that?
MR. GRAHAM: I'd object to -- While the witness is studying that, I would object to two things. One is the improper impeachment, and the second one is that the objections that were made to the question at that time have not been referred to and would be repeated at this time.
BY MR. HEBERLING:
Q So I read the question and the answer. Was that the testimony you gave at that time?
A That's what I said at that time. Perhaps I remembered something then that I don't now, but I really don't remember what the procedure of the Board of Health was.
Q Now, you mentioned when the Bureau of Mines came you didn't have advance notice; is that correct?
A No, sir, we did not.

Page 159

Q Now, the Bureau of Mines did spot inspections; is that correct?
A I don't know what that means.
Q Okay. We'll look at some of the documents later.
Now, Don Riley, construction supervisor, has testified that he always had notice ahead of time, and there was an effort to clean up ahead of time before an inspection. Do you dispute that?
A Yes, sir, I do.
Q Page two. Let's look at page two of Exhibit 39, which is the 1962 report, and at the bottom do you see "Maximum Allowable Concentration, five"?
A Yes, sir.
Q And that would be million particles per cubic foot?
A Yes.
Q And then is it fair so say that out of the first 16 samples from the dry mill 15 of them violated that standard?
MR. MURPHY: Would you read that back, please?
(The reporter then read back the preceding question.)

Page 160

THE WITNESS: Well, according to this report, this file, that's what it states. However, I would like to point out that this states the asbestos concentrates are calculated. They are not measured, and they're calculated by taking the 40 percent of the total of the million particles per cubic foot of dust that was in the air, and I think that that 40 percent is subject to question.
BY MR. HEBERLING:
Q Isn't it true that the standard would be violated even if 20 percent asbestos was used?
A In some cases, yes.
Q Were you aware that as of 1962 the standard in the literature was five for asbestos?
MR. MURPHY: Objection to the form of the question.
THE WITNESS: Yes, I was aware of that.
BY MR. HEBERLING:
Q Okay. Then page three, the first sentence, it says, "A review of Table I indicates concentrations of dust in the dry mill as being extremely high and substantially over the maximum allowable concentration for either an asbestos dust, mica dust and even, in most cases, a nuisance

14:05:24 dust." Did the company dispute that?
14:05:24 A Not to my knowledge, no, sir.
14:05:26 Q Did that statement alarm you back then?
14:05:30 A Probably, yes.
14:05:34 Q Did Mr. Bleich give you any directive
14:05:36 after he received the report?
14:05:38 A Not that I recall, no, sir.
14:05:52 Q And on the cover page for the report, do
14:05:52 you see the usual statement of confidentiality?
14:05:52 A Yes, sir.
14:05:52 Q And was this report kept so my management?
14:05:54 A I would assume so, yes.
14:05:56 Q Was it disseminated to the employees?
14:05:56 A No, sir.
14:06:00 Q Up to this point had there been any notice
14:06:02 to the employees regarding the serious hazards of
14:06:14 asbestos exposure?
14:06:16 A Not that I recall, no, sir.
14:06:28 Q Did you refer this report or its subject
14:06:28 matter to the safety committee after you received
14:06:28 it?
14:06:56 A Not to my knowledge, no, sir.
14:06:56 Q Did Mr. Bleich die in 1968?
14:07:02 A Yes, sir.
14:07:04 Q And that's when you took over as general

14:07:04 manager?
14:07:04 A Yes, sir.
14:07:04 Q Did he die of lung problems?
14:07:10 A Yes, sir.
14:07:10 Q As of '62, was it fair to say that
14:07:12 Mr. Bleich was in denial over the asbestos problem?
14:07:12 MR. GRAHAM: Objection to the form of
14:07:12 the question.
14:07:12 MR. MURPHY: Objection to the form of
14:07:14 the question. Lack of foundation.
14:07:14 THE WITNESS: I don't know what the
14:07:14 question means.
14:07:14 BY MR. HEBERLING:
14:07:16 Q You were with Mr. Bleich a lot as
14:07:16 assistant manager --
A Yes, sir.
14:07:16 Q -- and general manager? What was his
14:07:18 attitude toward the dust -- the asbestos problem in
14:07:18 the early '60s?
14:07:18 A Well, I think he was concerned about it,
14:07:20 like all of us were.
14:07:20 Q Did he recognize that it was significant?
14:07:20 A Certainly.
14:07:22 MR. GRAHAM: Same objection.
14:07:22 /////

BY MR. HEBERLING:
14:07:22 Q Did you push for any improvements at the
14:07:24 plant or the areas where storage of the ore was
14:07:24 done --
14:07:24 MR. MURPHY: Object to the --
BY MR. HEBERLING:
14:07:26 Q -- that he put a hold on?
14:07:30 MR. MURPHY: Read that back, please.
(The reporter then read back the
preceding question.)
14:07:40 MR. MURPHY: Object to the form of
14:07:40 the question.
14:07:46 THE WITNESS: Well, no, sir, but I'd
14:07:50 like to clarify something about pushing for
14:07:54 improvements because of this. We were all concerned
14:08:04 about the high dust incidence and wanted to improve
14:08:08 it, but in large part no one knew how to do this.
14:08:16 So we did what we could, but there was a big lack in
14:08:18 technology and the knowledge as to how we could
14:08:20 accomplish what was desired.
14:08:22 BY MR. HEBERLING:
14:08:24 Q Did you make some inquiries to determine
14:08:28 that no one knew how to approach this?
14:08:34 A Well, certainly it was discussed with many
14:08:38 people as to what could be done, and so in that

14:08:42 sense, yes, we would have been making inquiries.
14:08:46 Q I believe you've testified that, through
14:08:50 the '60s and maybe -- If I'm wrong, please tell me,
14:08:56 but I believe you've testified that no industrial
14:08:56 hygiene engineer was consulted. Is that correct?
14:08:58 A Yes, sir.
14:09:06 Q As far as maintenance is concerned,
14:09:08 wouldn't it have been feasible to simply add more
14:09:10 men on to maintenance?
14:09:12 A Yes, and I think that that was done in
14:09:14 large part.
14:09:16 Q And since the dry mill was down at least
14:09:20 one day a week, was it feasible to do some
14:09:22 maintenance or cleanup on those days?
14:09:26 A There was that work done on those days.
14:09:28 Q Was it feasible to do more than what was
14:09:30 done?
14:09:32 MR. MURPHY: Objection to the form of
14:09:32 the question.
14:09:36 THE WITNESS: Well, I can't answer
14:09:38 that question. You can always say it's possible to
14:09:44 have done more for whatever circumstance.
14:09:44 BY MR. HEBERLING:
14:09:50 Q Did you know -- In 1965 the bigger fan was
14:09:52 bought; correct?

Page 165

A Uh-huh.
Q Now, as of 1962, wasn't it feasible to get more fans, more ventilating capacity to get the dust out of the dry mill?
A Possibly, yes, it could have been.
Q Do you recall disagreeing with Mr. Bleich on the approach to dust control?
A No, sir.
Q Let's refer to page four of the 1962 report from the Board of Health. At the top it states, "At the time of this study, there was no attempt made to determine each of the locations which were contributing to dustiness in the building, as was done in the past study of 1958, since, on the observation, it was clear that all of the locations enumerated during the 1958 study were still in existence and, perhaps, even others were added to this group." Do you see that?
A Yes, sir.
Q Did the company dispute that statement?
A No, sir.
Q And then under "Conclusions," the first sentence, do you see where it says, "As indicated in the findings of this study, it appeared that no progress had been made in reducing dust

Page 166

concentrations in the dry mill to an acceptable level and that, indeed, the dust concentrations had been increased substantially over those in the past"? Do you see that?
A Yes, sir.
Q And did the company dispute that statement?
A No, sir.
Q Then the next page is a cover letter for the report. Do you see that? It's a letter from Ben Wake to Mr. Bleich, manager, Zonolite?
A Yes, sir.
Q Was that received at Zonolite in Libby in 1962?
A Yes, sir.
Q And it says in the middle paragraph, "We appreciate your interest and cooperation in the performance of the study but are disappointed with the lack of progress made in dust control." Do you see that?
A Yes, sir.
Q And do you recall discussing this with Mr. Wake at the time?
A No, sir, I don't recall.
Q Then let's go to Exhibit 40. Does this

Page 167

appear to be a letter from Ben Wake to Mr. Bleich, manager of Zonolite, dated May 21, 1962?
A Yes, sir.
Q And was this received at Zonolite in May of 1962?
A Yes, sir.
Q Let's refer to Exhibit 41. Does this appear to be a memo from you to Mr. Kelley dated September 25, 1962?
A Yes, sir.
Q Are you the author of this memo?
A Yes, sir.
Q At the top, first sentence, it says, "John, Dan and I have gone through the proposed asbestos circuit trying to get an estimate of capital expenditures required as well as operating costs for mills of various capacities." Do you see that?
A Yes, sir.
Q What was the proposed asbestos circuit?
A Well, at that time we were investigating the possibility of adding an asbestos circuit or building an asbestos mill for the purpose of concentrating asbestos which could be used as a commercial product and sold as asbestos.

Page 168

Q Back then was Zonolite adding asbestos to its final product, the products you described, the cement and the fireproofing products?
A Not in Libby.
Q Was that done elsewhere?
A Yes, sir.
Q And so was it the purpose to have an asbestos circuit to produce pure asbestos?
A Yes, sir. That was the object. We were purchasing asbestos, and we wanted to determine two things: No. 1, whether we could recover asbestos from the Libby deposit, which would be a form of asbestos which would be a marketable, usable product, which we could use in our own plants and possibly have for sale to others.
Q Then in the middle paragraph of that letter, do you see, "Estimated capital investment for this size mill, (680,000) for production of two or three tons per hour"?
A This copy I have is very difficult to read, and I don't see that. What paragraph number is it in?
Q The third one.
A Oh, I see it. I see.
Q So that would be $680,000 for a mill with

an asbestos circuit in it?
A Well, the mill would be an asbestos mill.
Q It would be a separate building?
A Yes, sir.
Q And where was that going to be placed?
A We didn't know. We never did determine that. It couldn't really be established until we had -- until we had the circuitry worked out and the flow sheet developed to know how much space it would take and where would be a practical place to have it.
Q Then at page two of this same memo, second line, it says "From work done so far in the laboratory". Do you see that?
A No, I don't.
Q It's the second line of page two of the memo.
A Okay.
Q "From work done so far in the laboratory".
A Okay.
Q What I want to ask is, is this the experimental lab down by the railroad tracks by the edge of town?
A No.
Q Which laboratory was being used?

A A laboratory up in the mill area next to the mill.
Q Was there also work done in the, I think it was called -- the experimental laboratory down by the railroad tracks by the edge of town?
A Not on this -- Not on this there wouldn't have been.
Q Okay. Now, Les Skramstad will testify that he worked on some kind of pure asbestos project in the years '59 to '61 in the experimental lab down by the railroad tracks by the edge of town. What could that have been?
A I don't know what that would have been.
Q Did David Robinson have a role in the asbestos project that's being discussed in these memos?
A No, sir, he did not. There was a David Robinson, but his function was the development of expanding furnaces, which work was done in the area that you're talking about.
Q Okay. And the area that I'm talking about, is that now a woodworking company, Montana Woodwork Company or something like that?
A Yes. Yes.
Q And so the building is still there?

A The building is still there.
Q Is David Robinson still alive?
A Yes.
Q Do you know where he lives?
A Great Falls. No. He lives in Lakeside, Montana.
Q Is he David W. Robinson?
A Yes, sir.
Q Okay. Let's refer to Exhibit 42. Does this appear to be a memo, Lovick to Kelley, dated October 9, 1962?
A Yes, sir.
Q Are you the author of this?
A Yes, sir.
Q The first line says, "The asbestos pilot plant was in partial operation last week." Do you see that?
A Yes.
Q Was that a pilot project for the asbestos circuit that you've described?
A Yes, sir.
Q Where was that located?
A It was located up near the mill -- next to the mill, actually, in one of the mill buildings.
Q Okay. Then let's refer to Exhibit 43.

Does this appear to be a memo, Lovick to Kelley, dated December 10, 1962?
A Yes, sir.
Q Are you the author of this?
A Yes, sir.
Q Okay. The second paragraph says, "In March of this year, it was decided that Libby would go ahead and develop a process for concentrating asbestos." Do you see that?
A Yes, sir.
Q And was this the same project as the asbestos circuit?
A Yes, sir.
Q And then in this memo are you reporting to Mr. Kelley in Chicago as to the progress of this project?
A Yes, sir.
Q Then the last paragraph, the last half of the last paragraph on the first page here says, "Considering the asbestos faces which averaged 32 percent". Do you see that?
A Yes, sir.
Q What does that mean, "Asbestos faces which averaged 32 percent"?
A Well, the asbestos which was in these

faces, in these dikes, averaged 32 percent asbestos.
Q And what are dikes?
A A wide vein.
Q And then you say "A recovery figure of 33 1/3 percent, production to be 5,000 tons per year," and that would be 5,000 tons of asbestos?
A Yes, sir.
Q And on page two of that memo, the second paragraph, it says, "Our laboratory studies were directed toward a program for selective flotation on the tremolite from the feed. The first efforts were to float the asbestos." Do you see that?
A Yes, sir.
Q Were you eventually successful in floating the asbestos?
A Yes, sir.
Q And was that so that tremolite could be used in lieu of other forms of asbestos in building materials?
A Yes, sir.
Q And on page four of the memo, last paragraph, it says, "We have been in contact with several engineering firms." Do you see that?
A Yes.
Q Is it fair to say that Zonolite sought

outside help when it needed it?
A Yes, sir.
Q Then paragraph -- No. The next exhibit is 44. If you'd refer to that. Does that appear to be a memo from Kelley to Lovick dated February 7, 1963, and did you -- Does it appear to be what I said it is?
A Yes, sir.
Q And did you receive that on or about its date?
A Yes, sir.
Q Now, in the last paragraph do you see where Kelley says, "Let us get a little more steam into this thing"? Do you see that?
A Yes, sir.
Q What was your understanding of what that meant?
A Well, my understanding is what he says. He had the feeling that there was not the enthusiasm for getting this project going that there had been, and he wanted that enthusiasm renewed.
Q Was there a Superior Asbestos Company formed?
A Yes, sir.
Q When was that?

A About then, about 1960.
Q '60 to '63, in there?
A Somewhere in there, yes.
Q And who was the owner of Superior Asbestos Company?
A Zonolite Company.
Q What was the purpose of that company?
A It was an independent company, a subsidiary that was set up for the purpose of investigating this asbestos project.
Q Okay. And you mentioned that the asbestos was not finally produced. Why was that?
A Well, I need a definition of that question, please. When you say "Finally produced" --
Q Did you ever go into production and sale of pure asbestos?
A No, we did not. No, we did not.
Q Why not?
A Because it was felt there was not the market for the material, that we couldn't sell the material at a price which would be -- justify making the capital expenditure that was required.
Q Okay. Then was it a factor that Libby was so far away from markets?

A Well, that would probably be a factor. I'm not sure that that would have been the controlling factor. As I recall, it was felt that there just weren't the markets available anywhere to make it.
Q Was it due in part --
MR. MURPHY: Excuse me. Had you finished your answer, Mr. Lovick?
THE WITNESS: I think so.
BY MR. HEBERLING:
Q Sorry. I don't mean to interrupt you.
A No. That's fine.
Q Was it due in part to the fact that tremolite asbestos fibers are shorter than other asbestos fibers?
A Well, that's one of the reasons. The tremolite fibers are short, and there's not the market for short fiber asbestos that there is for longer fiber asbestos, such as chrysotile.
Q Let's refer to Exhibit 45, and does that appear to be a letter from Ben Wake to Mr. Bleich, manager, Zonolite, dated May 23, 1963?
A Yes, sir.
Q Was this received in Libby in May 1963?
A I would assume so, yes.

Q Is it probable?
A Yes.
Q And as part of the exhibit, there's attached a report of an industrial hygiene study by the Montana State Board of Health dated April 11, 1963. Do you see that?
A Yes, sir.
Q And, again, on the face of the report, it states "Confidential". Do you see that?
A Yes, sir.
Q And was this report kept within management?
A Yes, sir. To the best of my --
Q Was it disseminated to the employees?
A No, sir.
Q And up to this point had there been any notice to the employees that asbestos in the dust was a hazardous substance?
A Not that I recall, no, sir.
Q Then at page two, under "Description of Operations" -- Probably the next page.
A Yes, sir.
Q In the middle of that paragraph, do you see where it says, "In general, there appeared to be little, if any, improvement at any point in the

plant"? Do you see that?
A Yes, sir.
MR. GRAHAM: Could you read the rest of the sentence?
MR. HEBERLING: Okay.
BY MR. HEBERLING:
Q "Except, perhaps, at the voll grinder". What is a voll grinder?
A It should be roll, R-O-L-L. That "V" is a misprint.
Q What is a roll grinder?
A Well, it's a machine to grind ore, and there are two -- made up of two rolls, generally two rolls which revolve, and the ore falls in between them, and as it goes through those rolls which are revolving, it is crushed.
Q And does that cause dust?
A Yes, sir.
Q Then on page --
MR. GRAHAM: I would object. The full sentence hasn't finally been read, but I'd just make that objection. You don't have to read it if you don't want to, but I just want to point out that it hasn't been read.
/////

BY MR. HEBERLING:
Q Then continuing on that page, is there a listing of first floor, fourth floor, third floor and so forth?
A Yes, sir.
Q And are these many of the same problems that were discussed before, in 1956, '58, '62?
A Yes, sir.
Q And does this include the backs being off some screens?
A Yes, sir.
Q And leaks here and there?
MR. GRAHAM: I'd object to the form of the question because it's unclear as to whether you're referring to whether those things that you specifically mentioned are problems that occurred in precisely the same location formerly. I think the question is vague and ambiguous.
MR. HEBERLING: Okay. I'll rephrase it.
BY MR. HEBERLING:
Q Do you see in the discussion of the second floor, "No. 34 screen still leaked badly"? Do you see that?
A Yes, sir.

Q "And there was no improvement in this area since last study"? Do you see that?
A Yes, sir.
Q And then on the first floor, it says, "Leaks from all pipes should be stopped and ventilation applied where dust cannot be controlled by stopping." Do you see that?
A Yes, sir.
Q Then on page three, after the discussion of the first floor where the specific problems were, do you see this paragraph which states, "The size distribution of the dust in the air as determined by the U.S. Public Health Service indicates an average size of about 3.44 microns. It should be noted that these small diameter particles can be deposited in the deep lung tissue and are more apt to be of physiological significance than those above 10 microns. In any case, over 60 percent of the particles were five microns or less, and 75 percent were less than 10 microns, all indicating a serious dust concentration, particularly in view of the quantity of asbestos known to be in the mixture." Do you see that?
A Yes, sir.
MR. GRAHAM: Objection. Improper

examination.
BY MR. HEBERLING:
Q Okay. Now, do you know what size particles were visible? Was that over five?
A No, sir, I don't know.
Q Was it your understanding that the State is telling you that 60 percent of the particles are not visible?
A No, sir. I don't know. I don't know what they're trying to tell us.
Q Did you understand that the smallest ones were not visible to the naked eye?
A Yes, sir.
Q But you didn't know what size that was?
A That's correct. I don't know what size that is.
Q Have you testified that you always knew that it was the smallest ones which are the most dangerous?
A Well, I don't recall, but I think that that's not an accurate statement. The small particles are the most dangerous, but it would have to be defined as to how small is small, and I can't tell you what size that would be, and I don't think I would ever have been able to say.

Q Was this 1963 report when you first learned that the small diameter particles are more apt to be dangerous, or did you know that before '63?
A Oh, I'm sure I knew it before '63.
Q Okay. Then do you see on page -- the same page a table with a series of samples taken with a maximum allowable concentration of five and all the samples exceeding that?
A Yes, sir.
Q So all eight samples were over the maximum?
A Yes, sir.
Q And did you understand that where it's over the maximum that's hazardous to a worker's health?
A Yes, sir.
Q Then, also, at the bottom of the table, it says there's calculations on the basis of 40 percent asbestos in the airborne dust. Do you see that?
A Yes.
Q Is this where you learned about the 40 percent test or the 40 percent result that somebody got?
MR. GRAHAM: I'd object on the basis

of foundation to the question.
Go ahead and answer.
THE WITNESS: Well, one of the reports from the State board is where I heard t... 40 percent, and I don't know if this report is t... first time I've heard of it or not.
BY MR. HEBERLING:
Q Okay. Then under "Conclusions and Recommendations," do you see, "As noted in ... previous reports, considerable effort should be... immediately to improve the dust control"? Do... see that?
A Yes, sir.
Q And at the end do you see where it says, ... "Dust control measures will have been applied ... that the hazardous condition existing at this pla... is eliminated"? Do you see that?
A Yes, sir.
Q Did you have any doubt in 1963 as to wh... the State Board of Health was telling you?
A I don't think so.
THE VIDEOGRAPHER: Excuse me. We'... going to have to stop to change the tape.
MR. HEBERLING: Okay.
THE VIDEOGRAPHER: Going off the

Page 184

record at approximately 2:34.

MR. MURPHY: We've been going for an hour and a half. Let's take a five-minute break, at least, anyway.

(Brief recess.)

THE VIDEOGRAPHER: We're back on the record at approximately 2:51.

BY MR. HEBERLING:

Q Was it about April 15, 1963 that the Zonolite Company was merged into W.R. Grace?

A Yes, sir.

Q And was that a stock-for-stock transaction?

A Yes, sir.

Q Did you own stock in Zonolite at the time?

A Yes, sir.

Q And after that, did you own stock in Grace?

A Yes, sir.

Q Do you still?

A No, sir.

Q When did you sell?

A Within the last ten years.

Q And after April 15, 1963, did Mr. Bleich continue as plant manager in Libby?

Page 185

A Yes.

Q And did Mr. Kelley continue as the person to whom Mr. Bleich reported?

A Yes.

Q And did you continue in the same position you'd been in?

A Yes, sir.

Q And that was assistant manager?

A Yes.

Q And did all other Libby employees continue in their positions as well?

A Yes.

Q Now, while Mr. Kelley was president of Zonolite approximately '55 to '63, was he kept informed of what was happening in Libby?

A I think so, yes, sir.

Q And did he visit Libby a few times a year?

A Yes, sir.

Q And then after April 15, 1963, I believe you testified that Mr. Kostic was safety supervisor?

A Yes, sir.

Q And after April of '63, was Mr. Kostic kept informed of what was happening in Libby?

A Yes, sir.

Q And did Mr. Kostic visit two or three

Page 186

times a year?

A Well, he visited periodically. I don't know what kind of a schedule he was on, but, yes, he did.

Q Was it, generally, more than once a year?

A Yes.

Q And when he did visit, did he make a safety inspection?

A Yes, sir.

Q Did you ever see any reports produced by Mr. Kostic as to safety inspections on Zonolite?

A Well, I certainly saw reports of -- reporting on his visit. I don't know if you'd say that they were results of his safety inspection, but in a broad sense it would be.

Q Did you see reports that he prepared about his visits?

A Yes, sir.

Q Do you know where these are now?

A No, sir.

Q Have you seen any in the last ten years in these depositions?

A I don't recall.

Q And in the years both before 1963 and after 1963, did you send all governmental inspection

Page 187

reports to company headquarters?

A Yes, sir.

Q Was that a, Yes?

A Yes.

Q Okay. Let's refer to Exhibit 46, and does that appear to be a letter by Ben Wake to Mr. Bleich, manager, Zonolite, dated July 3, 1963?

A Yes.

Q And was this received in Libby in July 1963?

A Yes, sir.

Q And in the first paragraph it says -- There's an examination of six vermiculite samples. Do you see that?

A Yes.

Q Was that the ore or the product?

A I don't know.

Q Well, the percentage tremolite came out to be a range of six to 22 percent. Does that seem to tell you that it's the ore?

A It would have to be the ore, yes.

Q Then please refer to Exhibit 47. Does that appear to be a letter of Dr. Woodrow Nelson to Zonolite's insurance company, Maryland Casualty, dated February 14, 1964?

Page 188

A Yes, sir.
Q And did you receive this in Libby in February 1964?
A I don't recall when we would have received it.
Q Is it likely that you received it at or about its date?
A It's very possible, yes.
Q Is it likely?
MR. GRAHAM: Object.
MR. HEBERLING: It's not foundationed unless he says it's probable or something.
MR. GRAHAM: He can't foundation it unless he knows.
MR. HEBERLING: Right.
MR. GRAHAM: And he's testified he doesn't know when he received it.
BY MR. HEBERLING:
Q This is a document that you've seen a number of times?
A Yes, it is.
Q And is it probable that it was received in 1964 at Zonolite in Libby?
A Probably, yes.
MR. GRAHAM: Object as to form.

Page 189

BY MR. HEBERLING:
Q In paragraph one -- Now, this is regarding Eitel Ludwig, a worker at Zonolite?
A Yes.
Q Did you know Mr. Ludwig?
A Yes, sir.
Q And paragraph one talks about a shortness of breath on exertion. Did you observe that with Mr. Ludwig as well?
MR. GRAHAM: Objection as to form. Time and place.
THE WITNESS: I can't recall that I specifically did on Mr. Ludwig, no.
BY MR. HEBERLING:
Q Okay. And then in the second full paragraph, in the middle, it says, "A marked advance in fibrosis is obvious." Do you see that?
A Yes.
Q And then page two, there's a doctor's conclusion, "In my opinion his lung condition is due to (pneumoconiosis), almost certainly from the asbestos content of the dust." Do you see that?
A Yes.
Q And is it fair -- Was it your understanding that pneumoconiosis is a dust disease?

Pa

A Well, it would be a lung disease. I don'
know that I knew it was a dust disease specifi
Q Did you discuss this doctor's conclusio
with anyone after you received it, do you thin
A I don't recall.
Q Was there any transfer of Mr. Ludwig f
his position to a safer one after this letter was received?
MR. GRAHAM: Objection as to the fo
of the question because of the lack of knowle
to this witness as to precisely when the letter
received.
Go ahead and answer it to the extent yo
can.
THE WITNESS: To my recollection there was no transfer of his duties, no, sir.
BY MR. HEBERLING:
Q Do you see where the doctor says at the
first part of page two, "The treatment recomm
at this time is that this man avoid as much as possible dust exposure"?
A Yes, sir.
Q Did Mr. Ludwig die of lung problems?
A I don't recall what his cause of death w
listed at, but Mr. Ludwig did die, yes, sir.

Pa

Q Do you know how long he worked after
A No, sir. I don't remember.
Q Let's refer to Exhibit 48, and does that
appear to be a letter of one, Dr. Park, to Mr. I
dated April 1, 1964?
A Yes, sir.
Q Did you receive a copy of this and then
later respond to the questions in it?
A I don't recall.
Q Okay. We'll perhaps clear that up. Le
refer to Exhibit 49. Does this appear to be a letter of Mr. Pratt of Western Mineral to Mr. Kelley, general manager, Zonolite?
A Yes, sir.
Q And is it dated April 2, 1964?
A Yes.
Q And was this received in Libby in Apri
1964?
A Yes, sir.
Q Okay. And Mr. Pratt is the president o
one of Zonolite's customers?
A He was a vice-president.
Q Okay. And would you agree that he is
acting responsibly in inquiring about health h
and asking follow-up questions?

MR. GRAHAM: Object to the form of the question. Vague and ambiguous as to, Responsible.

THE WITNESS: I would say, Yes.

BY MR. HEBERLING:

Q Okay. Then please refer to Exhibit 50, and does this appear to be a letter by you to Mr. Pratt dated April 9, 1964?

A Yes, sir.

Q Are you the author of this letter?

A Yes, sir.

Q And here do you answer the questions posed in the letter which is Exhibit 48, which we looked at earlier?

A Yes.

Q So is it likely, then, that you did receive a copy of the letter of April 1, 1964, which is Exhibit 48?

A Yes, sir.

Q Then Exhibit 51, does this appear to be a notice to employees signed by you?

A Yes, sir.

Q Are you the author of this notice?

A Yes, sir.

Q And does this relate to an x-ray survey

for 1964?

A Yes, sir.

Q Would this be posted, or was it sent out to each employee?

A It would be posted -- would have been posted.

Q Where would it have been posted?

A On bulletin boards in the operation.

Q And where were the bulletin boards back then?

A Throughout the operation in various places, in all departments. Each department had a bulletin board.

Q And how many departments were there, four or five?

A More than that.

Q So was there any other way that this -- that the prospective survey of chest x-rays was noticed to the employees?

A Yes. We made arrangements with the hospital to schedule so many people at a particular time and from each of the various departments, and the people in that department would be notified as to when they were to appear at the hospital. And it should be noted that we furnished transportation for

our employees from the town of Libby to the operation on a bus, and so we would assign the people on a particular shift riding in a particular bus that on Tuesday or whatever, at the termination of the shift, they were to go to the hospital at that time for their chest x-ray, and that would be scheduled in groups of about 20.

Q Okay. And as far as any notice to the employees, was this notice, which is Exhibit 51, the extent of it?

MR. MURPHY: Objection to the form of the question. Asked and answered.

THE WITNESS: Well, it would be this notice plus the notice as to when they were to report, and a schedule was kept as to who showed up for their x-rays, and anybody that did not show up when they were scheduled, if they were off work or whatever reason, they were notified to report at a different time.

BY MR. HEBERLING:

Q To your knowledge was any reason given to the employees for the x-ray survey?

A Well, just to evaluate their chest x-rays.

Q As stated on this notice, which is Exhibit 51?

A Yes.

Q And was this the same procedure you followed each year as far as how employees were notified of chest x-rays?

A Yes, sir.

Q To your knowledge did the company ever post a notice stating the reason for the chest x-rays in any more detail than is here?

A No, sir.

Q And that's true all the way up to '83, when you left?

A Yes, sir.

Q Let's refer to Exhibit 52. Does this appear to be a letter of Ben Wake to Bud Vinion at Zonolite dated May 8, 1964?

A Yes, sir.

Q Was this received at Zonolite in May 1964?

A I'm sure it was, yes, sir.

Q Then let's refer to Exhibit 53, and does this appear to be a letter of Ben Wake to Mr. Bleich, manager of Zonolite, dated May 11, 1964?

A Yes, sir.

Q Was this received at Zonolite in May of 1964?

A Yes, sir.