## Page 196

1 Q And was the attached report of an
2 inspection of the dry mill also received with the
3 cover letter?
4 A I would assume so, yes, sir.
5 Q Okay. On page one, under "Description of
6 Operations," second sentence, it says, "The backs to
7 the screens have been replaced on nearly all
8 machines, and the rubbers on the screens were in
9 good shape, generally, although a few were broken."
10 Do you see that?
11 A Yes, sir.
12 Q And it says, "Those that were broken were
13 leaking dust badly." Do you see that?
14 A Yes.
15 Q And then in the next paragraph, it says,
16 "A new 35,000 CFM," cubic feet per minute, "fan
17 which discharged at ground level had been
18 installed. According to Mr. Vinion, the plant
19 expects, in addition, to have a south side fan, old
20 600, hooked up soon." Do you see that?
21 A Yes.
22 Q Okay. So the first reference to the
23 35,000 CFM fan is the big fan that was bought;
24 correct?
25 A Yes, sir.

## Page 197

1 Q That we talked about —
2 MR. GRAHAM: Object to the form of
3 the question.
4 Go ahead.
5 BY MR. HEBERLING:
6 Q And is that the big fan we talked about
7 earlier?
8 A Yes.
9 Q And then what about this south side old
10 600 fan? Was that ever hooked up?
11 A Yes, sir.
12 Q Okay. Do you know when?
13 A No, sir, I don't know. I don't recall.
14 Q And then on page one also, paragraph
15 three, under "Description of Operations," it states,
16 "It was noted that the rafters were heavily loaded
17 with dust." "It is unfortunate that the good work
18 that has been done in the ventilation system is
19 reduced by extremely poor housekeeping." Do you see
20 that?
21 A Yes.
22 Q And then a number of other problems are
23 discussed in the report; is that correct?
24 A Yes.
25 Q And did Zonolite dispute any of these

## Page 198

1 statements in the report?
2 MR. GRAHAM: Object to the form of
3 the question as to what is meant by the term
4 "Dispute".
5 Go ahead and answer it to the best of your
6 recollection.
7 THE WITNESS: No, sir. I don't
8 believe so.
9 BY MR. HEBERLING:
10 Q And then on the next page, do you see a
11 table of samples over the years '56, '59, '62,
12 '63, '64?
13 A Yes.
14 Q And if the standard is 20, is it fair to
15 say that almost all the samples in those years were
16 over 20?
17 MR. GRAHAM: I would object to the
18 form of the question on the basis that, if it's
19 meant the ones that are recounted here, that's one
20 thing. If it's meant all samples taken throughout
21 those years, that's another thing.
22 MR. HEBERLING: I'll restate the
23 question.
24 BY MR. HEBERLING:
25 Q Please focus on the standard for dust, not

## Page 199

1 asbestos, but just dust, generally, of 20. Do you
2 see that?
3 A Yes.
4 Q And if that standard is 20, is it fair to
5 say that almost all the samples over the years '56
6 to '64 listed on this table exceed the standard?
7 A The thing that is missing is, the maximum
8 allowable concentration of 20 was what the allowable
9 concentration was in 1964, and I do not believe that
10 that standard was the same in previous years, back
11 to 1956. I think in previous years -- some of the
12 previous years the allowable concentration was
13 higher than 20.
14 Q And was it your understanding that the
15 standard in 1964 at 20 was based on current
16 scientific knowledge at that time?
17 A Yes, sir.
18 MR. GRAHAM: Object to the
19 foundation.
20 BY MR. HEBERLING:
21 Q Then under "Toxicology," it says, "In a
22 recent article published in the Journal of the
23 American Medical Association, April 6, 1964, by
24 Selikoff and others, it is indicated that the
25 quote, 'Building trades insulation workers have

Page 200

1 relatively light, intermittent exposure to
2 asbestos. Of 632 insulation workers who entered the
3 trade before 1943 and were traced through '62, 45
4 died of cancer of the lung or pleura, whereas only
5 6.6 such deaths were expected. Three of the pleural
6 tumors were mesotheliomas.'" Do you see that?

7   A  Yes.

8      MR. GRAHAM: Objection. Improper
9 examination.

10 BY MR. HEBERLING:

11   Q  "Four mesotheliomas in a total of 255
12 deaths is an exceedingly high incidence for such a
13 rare tumor." Do you see that?

14   A  Yes.

15      MR. GRAHAM: Same objection.

16 BY MR. HEBERLING:

17   Q  And then at the end, "Twelve men died of
18 asbestosis."

19      MR. GRAHAM: Same objection.

20 BY MR. HEBERLING:

21   Q  Okay. Now, first of all, there's
22 reference to a light, intermittent exposure to
23 asbestos in building trades workers. Do you recall
24 that?

25   A  Yes.

Page 201

1   Q  And at Zonolite you had workers with heavy
2 exposure at times; correct?

3      MR. GRAHAM: Objection. Vague and
4 ambiguous in relation to what the document he's
5 being examined on says.

6      Go ahead and answer it if you can.

7      THE WITNESS: Yes, that would be
8 correct at times.

9 BY MR. HEBERLING:

10   Q  And have you also testified that at times
11 exposure in the dry mill was very great?

12   A  Yes, sir, I have.

13   Q  Have you also testified that the dry mill
14 was a terribly dusty place to work?

15   A  I don't know that I would have used those
16 exact words, but, yes, it was a very dusty place to
17 work.

18   Q  And did this continue up to 1974, when the
19 dry mill closed, that it was still a very dusty
20 place?

21   A  Yes, sir, it did.

22   Q  So did you understand in 1964, from the
23 excerpt in the American Medical Association article,
24 that with 45 men dying and about seven expected to
25 die of lung cancer that's a rate of six times normal

Page 202

1 for workers exposed to asbestos?

2      MR. MURPHY: Objection. Lack of
3 foundation.

4      THE WITNESS: Well, this was people
5 in the building trade, insulation workers, which had
6 nothing to do with our operation.

7 BY MR. HEBERLING:

8   Q  Now, did you have workers who had
9 relatively light, intermittent exposure to asbestos?

10   A  Well, yes.

11   Q  And did you have workers with more
12 exposure than light or intermittent?

13      MR. GRAHAM: Object to the form of
14 the question. The terms being utilized are vague
15 and ambiguous and not sufficiently defined to be
16 able to make an answer.

17      Go ahead and answer.

18      THE WITNESS: Yes, we would have.

19 BY MR. HEBERLING:

20   Q  And was it the company's position on
21 receiving this quote from the American Medical
22 Association article that this had nothing to do with
23 the Libby workers?

24      MR. MURPHY: Objection. Lack of
25 foundation.

Page 203

1      THE WITNESS: Well, I would think,
2 yes, it didn't have anything to do with Libby
3 workers, because it was a different class of people,
4 and it was different asbestos that they were exposed
5 to than what we had at Libby.

6 BY MR. HEBERLING:

7   Q  So to your knowledge the company didn't
8 consider this excerpt from the American Medical
9 Association journal significant?

10      MR. MURPHY: Objection. Lack of
11 foundation. He can't speak for the company.

12 BY MR. HEBERLING:

13   Q  To your knowledge?

14   A  To my knowledge I can't answer that
15 question because I don't know what they considered.

16   Q  Did you consider it significant?

17   A  Well, I considered it worthy of
18 consideration, yes, sir.

19   Q  But I take it you didn't consider it --

20 that it had any application to the workers in Libby?

21   A  No. There was no direct relationship to
22 the workers in Libby from this.

23   Q  So you would need something that would be
24 more in the way of a study of the workers in Libby
25 before you would consider the statement significant;

## Page 204

1 is that correct?

2       MR. MURPHY: Objection. Vague and

3 ambiguous.

4       THE WITNESS: That would be correct,

5 yes.

6 BY MR. HEBERLING:

7    Q  And in 1964 or the year after, did Grace

8 ever undertake a study of the workers in Libby as to

9 what workers may have died of?

10   A  Yes.

11   Q  In 1964 the company did?

12   A  No, sir. Not 1964, but I believe your

13 question was, 1964 or after.

14   Q  I think I said 1964 or 1965.

15   A  I'm sorry.

16      MR. MURPHY: I think you were right,

17 Mr. Lovick.

18 BY MR. HEBERLING:

19   Q  Okay. Let's clarify the question. In

20 1964 or '65, did Grace undertake a study of what the

21 Zonolite workers in Libby may have died of?

22   A  No, sir.

23   Q  Was that ever done in the 1960s?

24   A  No, sir.

25   Q  Was it done in the 1970s?

## Page 205

1    A  No, sir.

2    Q  Was it done by a grant from W.R. Grace in

3 1983, '84?

4    A  Yes, sir.

5    Q  Now, the word "Mesothelioma" appears

6 here. I think I read it back to you. Was that your

7 first understanding of what mesothelioma might be,

8 1964, when you received this Exhibit 53?

9    A  I don't recall when my first understanding

10 of what mesothelioma might have been — when I would

11 have — when it would have meant anything to me.

12   Q  So in 1964 were you aware that

13 mesothelioma was, in the opinion of some, related to

14 exposure to asbestos?

15   A  Yes, sir, I would have realized that in

16 '64.

17   Q  Did you have any information to the

18 contrary?

19   A  No, sir.

20   Q  And were you aware also that lung cancer,

21 as of 1964, was related to the exposure to

22 asbestos?

23      MR. GRAHAM: I'd object to the

24 form —

25      Well, go ahead and answer if you can.

## Page

1       THE WITNESS: I think I would have

2 realized that lung cancer could have been cause

3 asbestos, but not necessarily.

4 BY MR. HEBERLING:

5    Q  There are other things that cause lung

6 cancer?

7    A  Yes.

8    Q  And did you have any information

9 indicating that lung cancer was not caused by

10 asbestos?

11   A  I don't understand that question.

12   Q  In 1964 did you have any information

13 indicating that lung cancer was not caused by

14 asbestos exposure?

15   A  I'm sorry. I still don't understand what

16 the question is. I think it's ambiguous. It's

17 misleading.

18   Q  Well, did you —

19      MR. GRAHAM: Are you asking him

20 whether there are other causes of lung cancer?

21 Because that's the way —

22      MR. HEBERLING: No.

23      MR. GRAHAM: That's where I think th

24 confusion lies, Jon.

25 /////

## Page

1 BY MR. HEBERLING:

2    Q  Okay. In 1964 you got this article from

3 the Journal of the American Medical Associati

4 excerpt, which I read.

5    A  Uh-huh.

6    Q  And is it fair to say that this indicates

7 a relationship between asbestos exposure and l

8 cancer?

9    A  That's what this excerpt from the article

10 indicates, that there can be a relationship, yes,

11 sir.

12   Q  Okay. So then I'm asking whether you l

13 any information to the contrary as of '64.

14   A  No, sir.

15      MR. GRAHAM: Just so I can summari:

16 that, the question and answer is that he didn't

17 any information that asbestos couldn't cause l

18 cancer or didn't cause lung cancer? Is that —

19 still confused, and I would prefer —

20      MR. HEBERLING: I think the record is

21 clear, and you can ask questions later. Okay?

22      MR. GRAHAM: Okay. Because of you

23 invitation, I will try not to interrupt anymore i

24 clarification purposes, and the jury can unders

25 that I'll have a chance to later clarify matters,

## Page 208

1 and the reason I can't now is because counsel wishes
2 to proceed with his examination at this point, and
3 that's fine.
4     MR. HEBERLING: Okay. And I'm asking
5 what his understanding was as a result of this AMA
6 article and not his opinions on what causes lung
7 cancer. Okay?
8 BY MR. HEBERLING:
9   Q  Now, after you received this excerpt of
10 the American Medical Association article, was there
11 an effort in Libby to obtain a copy of it?
12   A  Not that I recollect, no, sir.
13   Q  Did you receive any directives from
14 W.R. Grace as a result of this report, the 1963
15 State Board of Health report? 1964. Excuse me.
16   A  Not that I recall, no, sir.
17   Q  Did this report further support your view
18 that the asbestos and the dust in the air was a
19 serious hazard?
20   A  Yes. I would say that it did.
21   Q  Then, at the top of the next page, there's
22 a further quote from the American Medical
23 Association article referencing a study in
24 South Africa. I'll just read it.  "'The recent
25 demonstration by South African and British

## Page 209

1 investigators of pleural and peritoneal neoplasms
2 among individuals who had chance environmental
3 exposure to asbestos many years before raises the
4 very important question of possible widespread
5 carcinogenic air pollution.'  It was also
6 demonstrated that asbestos bodies were found in a
7 man not employed in an industry but living next door
8 to an asbestos factory."  Do you see that?
9   A  Yes.
10     MR. GRAHAM: Objection. Improper
11 examination.
12 BY MR. HEBERLING:
13   Q  Now, in 1964 Zonolite had its expanding
14 plant down by the railroad on the edge of town;
15 correct?
16   A  Yes, sir.
17   Q  And that was near the ball fields?
18   A  Yes, sir.
19   Q  And was there also the municipal swimming
20 pool down there?
21   A  Yes, sir.
22   Q  And by 1964 Zonolite also had a bagging
23 plant in that same area, did it?
24   A  Yes, sir.
25   Q  What was done at the bagging plant?

## Page 210

1   A  The vermiculite concentrate was bagged and
2 shipped out.
3   Q  What kind of bag? Were those like --
4   A  They were 100-pound paper bags.
5   Q  Okay. And in 1964 did Zonolite also have
6 its experimental lab down by the railroad tracks on
7 the edge of town?
8   A  Yes, sir.
9   Q  In the 1950s and '60s, were you aware that
10 children played on piles of the ore near the
11 railroad tracks?
12     MR. MURPHY: Objection. Irrelevant
13 to the issues in this case.
14     THE WITNESS: We had --
15 BY MR. HEBERLING:
16   Q  Well, let me address this objection.
17     MR. HEBERLING: We're using this
18 deposition for all pending cases, and it includes
19 some cases where people had exposure as children
20 playing on piles of it, so that's where I'm going.
21 BY MR. HEBERLING:
22   Q  Okay. So were you aware in the '50s or
23 '60s that children played on piles of the ore near
24 the railroad track?
25   A  We had one storage bin where vermiculite

## Page 211

1 concentrate was stored, and it was an open bin, in
2 effect, and there was one pile of material in there,
3 and we knew that from time to time people, children
4 particularly, did get on that pile of ore. We were
5 not successful in keeping them away.
6   Q  And were you aware that the kids enjoyed
7 sliding on the pile?
8     MR. GRAHAM: I would object on the
9 basis of the form of the question because it calls
10 for speculation as to what was the state of mind of
11 those people who were sliding on the pile, if there
12 were any.
13     MR. HEBERLING: I'll rephrase the
14 question.
15 BY MR. HEBERLING:
16   Q  Did you ever see the kids sliding on the
17 pile?
18   A  No, sir.
19   Q  Did your kids ever do that?
20   A  Not to my knowledge, no, sir.
21   Q  Is it possible they went down there
22 without you knowing it?
23   A  Certainly it's possible, but I doubt that.
24   Q  Did they play down by the ball fields?
25   A  No.

## Page 212

1    Q  Okay.  Were you aware that it was a faster
2 slide down the ore pile than it would be on sand --
3        MR. GRAHAM:  Objection.
4 BY MR. HEBERLING:
5    Q  -- because the ore was somewhat slippery?
6        MR. GRAHAM:  Object to the form of
7 the question.
8        THE WITNESS:  I don't know.
9 BY MR. HEBERLING:
10    Q  Were you aware that it was fun for that
11 reason?
12        MR. GRAHAM:  Objection.
13        THE WITNESS:  No.  I don't know
14 that.
15 BY MR. HEBERLING:
16    Q  Okay.  Would it surprise you if a large
17 number of people in Libby could testify that they
18 played on those piles as children?
19        MR. GRAHAM:  Object to the form and
20 the fact that it's an improper examination trying to
21 elicit -- present hearsay testimony to the jury.
22        Go ahead and answer it, if you can.
23        THE WITNESS:  May I hear the question
24 again, please?
25 /////

## Page 213

1 BY MR. HEBERLING:
2    Q  I'll rephrase it.  Would you be surprised
3 to hear that quite a few children played on the
4 piles of vermiculite ore?
5    A  I don't know what "Quite a few children"
6 means, but I would not be surprised if some children
7 hadn't played on that.
8    Q  In the '50s and '60s, did the company ever
9 fence the kids out of the company areas?
10    A  I don't believe so, no, sir.
11    Q  In the '70s?
12        MR. GRAHAM:  I would object on the
13 basis of vagueness as to what you mean by "Company
14 areas".
15        MR. HEBERLING:  Okay.  I'll rephrase
16 that.
17 BY MR. HEBERLING:
18    Q  In the '50s and '60s, did the company ever
19 fence the kids out of the company areas where the
20 bagging plant, expanding plant and storage area was
21 near the railroad near the edge of town?
22    A  No, sir.
23    Q  In the '70s did they do that?
24    A  No, sir.
25    Q  Are you aware that even today there's no

## Page [214]

1 fence in the area?
2    A  No, I don't believe there is a fence in
3 the area.
4    Q  In the '50s and '60s, were you aware that
5 children would get the vermiculite ore and pop it by
6 setting a match to it?
7    A  No, I'm not specifically aware that that
8 happened.
9    Q  You never saw kids doing that?
10    A  No, sir.
11    Q  In the '50s and '60s, did the company ever
12 have warning signs about asbestos hazards on comp
13 property anywhere?
14    A  I don't really recall when they put up
15 warning signs, but at some point there were warning
16 signs put up, but I don't believe there were any in
17 the '50s and '60s.
18    Q  Is it probable that that was the late
19 '70s?
20    A  It's probable that it was in the '70s, but
21 I -- I can't be more specific than that.
22    Q  And to your knowledge did the company eve
23 notify neighbors, meaning the people in the houses,
24 say, within a quarter mile of the facilities near
25 the railroad tracks near the edge of town, that

## Page [215]

1 inhaling asbestos was a serious health hazard?
2        MR. GRAHAM:  Object to the form of
3 the question based on the implication that it has.
4        Go ahead and answer the question.
5        MR. MURPHY:  And, then, also, vague
6 and ambiguous in that there's absolutely no eviden
7 on this or many other similar questions as to
8 duration, intensity, type of asbestos exposure.
9        THE WITNESS:  I have no knowledge of
10 any such notification, no, sir.
11 BY MR. HEBERLING:
12    Q  To your knowledge did the company ever
13 notify the public in the Libby community that
14 inhaling asbestos was a serious health hazard?
15        MR. GRAHAM:  Same objection.
16        MR. MURPHY:  Same objection as to the
17 last question.
18        THE WITNESS:  Not to my knowledge.
19 BY MR. HEBERLING:
20    Q  Back to the 1964 report, page three,
21 paragraph two.  I think that's the same page we wc
22 still on there.  Do you see where it says, "The
23 asbestos content of the material with which you ar
24 working appears to provide some serious potential
25 for the development of disease, if not properly

**EARL D. LOVICK (VOL. 1)**                CondenseIt!™                **HURLBERT VS. W.R. GRACE**

---

### Page 216

1  controlled"?
2          MR. GRAHAM: Is that the same
3  sentence that starts out "While the above situation
4  does not apply specifically to operations at your
5  plant"?
6          MR. HEBERLING: Yes.
7          MR. GRAHAM: Okay.
8          THE WITNESS: Yes, sir, I see that.
9  BY MR. HEBERLING:
10      Q  And did you understand that as a reference
11  that there was a serious potential for the
12  development of disease, not only to the workers, but
13  to the community as well?
14          MR. MURPHY: Objection. Lack of
15  foundation.
16          THE WITNESS: No, sir. I was not
17  aware that there was any potential for a large --
18  for a problem in the community.
19  BY MR. HEBERLING:
20      Q  Where the report talks about asbestos
21  bodies found in a man living next door to an
22  asbestos factory and asbestos air pollution, did you
23  understand that that meant a possible danger to the
24  community?
25          MR. GRAHAM: Same objection.

### Page 217

1          MR. MURPHY: Objection. Asked and
2  answered. Argumentative.
3          THE WITNESS: You're comparing our
4  operation to an asbestos operation, and the amount
5  of asbestos or tremolite that was found in that
6  concentrate that would be liberated into the air in
7  the area would be extremely small amounts, and I
8  don't -- didn't believe -- understand then and I
9  don't believe now that it would be of such quantity
10  that it would be a threat.
11  BY MR. HEBERLING:
12      Q  Did Grace ever test the air for asbestos
13  in the neighborhoods near the Grace facilities, near
14  the railroad tracks on the edge of town?
15      A  Yes, they did.
16      Q  They did?
17      A  Yes.
18      Q  And what was the result of that?
19      A  As I recall, they could never come up with
20  any figures, any asbestos fibers being present.
21      Q  When was that done?
22      A  Oh, in the -- Probably in the '60s and
23  certainly in the '70s.
24      Q  And have you recently seen any documents,
25  say, in the last five years at any of these

### Page 218

1  depositions regarding those tests of the air on the
2  edge of Libby?
3      A  No, sir.
4      Q  But you recall that being done; is that
5  correct?
6      A  Yes, sir.
7      Q  Did you ever see days where there was dust
8  drifting from the Grace facilities across the ball
9  fields to town?
10      A  No, sir.
11      Q  Where was your office downtown? What was
12  the address of that?
13      A  It was in the 300 block of Mineral Avenue,
14  which is the main street of Libby. 317 Mineral was
15  the specific address.
16      Q  In the '60s or '70s, do you recall any
17  public meetings regarding effects on the community
18  from asbestos exposure?
19      A  No, sir.
20      Q  Then on the same page of the '64 report,
21  Item 3, there's a recommendation "That the blower
22  discharged, presently at ground level, be elevated
23  to such a degree that reentry is not so prevalent".
24  Do you see that.
25      A  Yes, sir.

### Page 219

1      Q  And then above "Conclusions," do you see
2  where it says, "In addition, the discharge of large
3  volumes of asbestos-laden dust at ground level sets
4  up a condition where all members of the plant can be
5  exposed in addition to those who work in the dry
6  mill"?
7          MR. MURPHY: Where are you reading
8  from now?
9  BY MR. HEBERLING:
10      Q  Do you see that above the "Conclusions and
11  Recommendations" section, in the paragraph?
12      A  I see it, yes.
13      Q  Okay. Now, this ground level discharge,
14  is that related to the new 35,000 CFM fan?
15      A  Yes, sir.
16      Q  And did it have a stack on it?
17      A  At that time when it was installed, it did
18  not have a stack, or if it had a stack, it was a
19  very short stack. I don't recall whether there was
20  a stack or not. I don't believe there was.
21      Q  Well, was there a horizontal -- Shall we
22  call it a stack? A conduit that the fan discharged
23  out?
24      A  As I recall, yes.
25      Q  And did that discharge dust over into the

---

**HEDMAN & ASA REPORTING - (406)752-5751**

## Page 220

1 service areas?

2   A  It could, yes.

3   Q  And what buildings were in the service

4 areas?

5   A  Well, there were several buildings over

6 there. The warehouse and the machine shop and the

7 construction shop and the sheet metal shop and the

8 garage and the offices up there. They were all in

9 the service area.

10   Q  And were their workers in each of these

11 buildings?

12   A  Generally, yes.

13   Q  And after this discharge at ground level

14 was set up, could you see dust going into the

15 service areas?

16   A  I don't recall that you could see dust

17 going into them, no, sir, but I just don't remember

18 seeing any dust going in.

19   Q  At this point did you know that this dust

20 was 20 or perhaps even 30 percent asbestos?

21   A  No.

22       MR. MURPHY: Objection. Lack of

23 foundation.

24       THE WITNESS: No. I didn't know what

25 percentage of asbestos it would be.

## Page 221

1 BY MR. HEBERLING:

2   Q  Now, we've discussed various percentages

3 for the airborne dust, and would those same

4 percentages apply to the discharge from the ground

5 level -- the ground level discharge from the 600

6 fan?

7       MR. MURPHY: Objection. Lack of

8 foundation.

9 BY MR. HEBERLING:

10   Q  And did you just nod your head?

11   A  I don't know, but it would be reasonable

12 to think that the percentages would be similar.

13   Q  Okay. And that range was, what, 10 to

14 30 percent?

15   A  Yes, sir. That was one of the figures

16 that was used.

17   Q  Okay. Now, after you got this report in

18 1964, do you recall any discussions of fixing the

19 problem by using, instead of a horizontal stack, a

20 vertical stack?

21   A  Yes.

22   Q  And what was the result of that?

23   A  We installed a vertical stack.

24   Q  And why did it take over three years to do

25 that?

## Page

1   A  I don't know.

2   Q  You have no idea?

3   A  No.

4   Q  Were there arguments within management as

5 to whether to spend money on this?

6   A  Yes, sir.

7   Q  Were you pushing the idea of spending

8 money to have a vertical stack?

9   A  Yes, sir.

10   Q  Do you know who was opposed for it --

11 opposed to it?

12   A  No. I don't remember specifically.

13   Q  The local management people in Libby, were

14 they in favor of having a vertical stack?

15   A  I believe so, yes, sir.

16   Q  And did the opposition come from Grace

17 executives in Massachusetts?

18   A  No. I think not.

19   Q  Where did it come from? Do you know?

20   A  It came from the people in Libby.

21   Q  Do you know what Mr. Bleich's position was

22 on having a vertical stack?

23   A  I think he favored it.

24   Q  If he favored it and he was plant manager

25 and you favored it and you're assistant manager, wl

## Page

1 didn't it happen?

2   A  I don't know.

3   Q  In 1964 did -- Strike that. Do you know

4 what position Mr. Kostic took on having a vert

5 stack for that big fan?

6   A  No, I don't.

7   Q  Okay. Then on the same page of the '64

8 report, No. 1, do you see where it says, "That a

9 careful program of housekeeping be instituted :

10 that (the) dust collected on rafters does not rea

11 the subsidence point"? Do you see that?

12   A  Yes, sir.

13       MR. GRAHAM: Let me do one thing, a

14 then maybe it will keep me from interrupting.

15 objecting to your form of examination by read

16 question and then just saying, "See that?" and I

17 virtue of doing that, you're getting in hearsay

18 testimony before the jury. That's what I'm

19 objecting to, and the question I have is, Can I l

20 a continuing objection to that particular object

21 to the form of the question so that I won't be

22 interrupting you on that issue any longer?

23       MR. HEBERLING: Yes, you may, and l

24 understand the objection.

25       MR. GRAHAM: Okay. We disagree on

**Page 224**

1 it.

2 MR. HEBERLING: This exhibit will be

3 in evidence.

4 MR. GRAHAM: I understand.

5 BY MR. HEBERLING:

6 Q. Okay. I was going to ask you, what does

7 "The subsidence point" mean with regard to the dust

8 on the rafters?

9 A. Where does it say that?

10 Q. Item 1.

11 MR. MURPHY: Under "Conclusions".

12 BY MR. HEBERLING:

13 Q. Under "Conclusions and Recommendations".

14 A. I don't know.

15 Q. Okay. Then it says, "Careful cleaning of

16 the floors should be done on a sufficiently frequent

17 and routine basis as to prevent dust from falling

18 off the rafters or from collecting on the floor to

19 such a degree that this dust is a contributor to the

20 overall load generated by the machines." Do you see

21 that?

22 A. Yes.

23 Q. And in the dry mill, if the floors were

24 not to contribute to the overall load, that would

25 require frequent cleaning, wouldn't it?

**Page 225**

1 A. Yes.

2 Q. And at this point, in 1964, had a vacuum

3 been purchased as yet?

4 A. I don't recall.

5 Q. Then No. 2 talks about putting in this

6 additional fan by the first of September, '64?

7 A. Yes.

8 Q. Okay. And then at the cover page for the

9 report, I don't see a "Confidential" sticker or

10 stamp. Was this report also kept confidential to

11 management?

12 A. I don't believe there's a cover page here,

13 but I would say, yes, that it was kept confidential.

14 Q. And up to this point, had there been any

15 notice to the employees regarding the dangers of

16 inhaling asbestos?

17 A. No. Not specifically I don't believe, no,

18 sir.

19 Q. Then please refer to Exhibit 54, and does

20 this appear to be a "Report of Spirometry Tests,

21 Libby Zonolite Employees" by Dr. Nelson?

22 A. Yes, sir.

23 Q. And did you receive this in Libby in 1964?

24 A. This -- I don't see Dr. Nelson's name on

25 here anywhere.

**Page 226**

1 Q. Okay. We'll connect that up. There's a

2 letter later where he refers to it.

3 A. Okay.

4 Q. I guess the current question is whether

5 you received this report in 1964 at Zonolite.

6 A. Yes.

7 Q. And there's mention of pulmonary function

8 tests here. What's your understanding as to what

9 those are?

10 A. Well, they're pulmonary function tests of

11 individual employees which were conducted by

12 Dr. Nelson and his staff by spirometer readings.

13 Q. Okay. And that involved blowing into

14 balloons and that sort of thing?

15 A. Blowing into a tube, not a balloon.

16 Q. Okay. Was Dr. Nelson hired by Grace to do

17 this?

18 A. No, sir. He did this on his own.

19 Q. Was he paid for it?

20 A. No, sir. He never was paid.

21 Q. Now, on page two there's reference to

22 x-rays on 140 employees. Was that the 1964 regular

23 examination of employees, or did Dr. Nelson do a

24 separate one?

25 A. It would have been from our program, and I

**Page 227**

1 don't know whether this would have been the 1964

2 program or not, but on the heading of the paper, it

3 says, "In May and June of 1964, spirometry

4 measurements ... were carried out on 140 men

5 employed at Zonolite in Libby." So there's every

6 indication that that would have been based on the 1964

7 x-rays.

8 Q. Then at page two, under Item 2, do you see

9 where it says, "30 employees of the 140 had definite

10 pneumoconiotic changes on x-ray"?

11 A. Yes, sir.

12 Q. And is that, basically, the same as

13 abnormal?

14 MR. MURPHY: Objection. Lack of

15 foundation. He's not a doctor.

16 THE WITNESS: I don't know what

17 "Abnormal" means.

18 BY MR. HEBERLING:

19 Q. And then would such changes in your

20 understanding include fibrosis?

21 MR. MURPHY: Objection. Lack of

22 foundation.

23 THE WITNESS: Yes, it would include

24 fibrosis, I would say.

25 /////

## Page 228

BY MR. HEBERLING:

Q   And then of the 30 abnormals or the 30 with definite changes on x-ray, do you see where Dr. Nelson says, "Only four of the 30 men in the pneumoconiotic group had forced vital capacity of above 90 percent," meaning -- and is it your understanding that that's -- above 90 percent would be normal?

A   I don't see that.

Q   Let's go back to the first page, then. Four lines up from the bottom, do you see where it says, "FVC percentage and FEV1 percentage of less than 90 percent was considered probably abnormal"?

A   Yes, I see that.

Q   Okay. So we have a group of 30 men with definite changes, and out of that 30 only four had normal pulmonary function tests? Do you see that?

A   Yes, sir.

MR. MURPHY: Well, I object. You made the statement and asked him, Did you see that? and the statement that you made doesn't appear anywhere in this document.

MR. HEBERLING: Okay. I'll rephrase the question.

/////

## Page 229

BY MR. HEBERLING:

Q   Did you understand that as what the doctor is saying here?

MR. GRAHAM: I'll still object on the basis that "Probably abnormal" doesn't mean abnormal, and there might be normal -- Anyway, the language is vague and ambiguous and undefined.

Go ahead and answer it if you can, Earl.

MR. MURPHY: Frankly, I'm lost, so I don't know where the witness might be. Could we hear the question he's supposed to answer now, please?

MR. HEBERLING: May I have a continuing objection to having two attorneys object at a deposition?

MR. GRAHAM: We're representing different people.

MR. MURPHY: Of course you can, but it's not unusual, and it's been my experience, when you are suing a corporation and you have a witness, that the corporation be represented and the witness be represented by different people. It's not an uncommon event, but, anyway, you made your objection.

MR. HEBERLING: The point is that the

## Page

corporation is paying for both lawyers.

MR. MURPHY: That doesn't have anything to do with it, but rather than waste more time debating among ourselves, my point simply w Could I hear the question?

THE REPORTER: I can go back and look.

MR. HEBERLING: I'll restate it, if that's easier.

THE REPORTER: It went up off my screen.

BY MR. HEBERLING:

Q   We went through the percentages, and was it -- And then I asked, Did you see that? There wa an objection, and then I followed by saying, Was that your understanding? meaning that there were only four of the 30 men in the pneumoconiotic gro which had normal pulmonary function tests.

MR. GRAHAM: I still have the same objection as I made to the earlier question.

THE WITNESS: Well, four of the men in that group had above 90 percent of standard, bu those 30 were also included in the 140 people, so you could say that only four of the 140 involved had -- 26 of the 140 had less than

## Pag

standard, 90 percent.

BY MR. HEBERLING:

Q   Okay. And that's your understanding?

A   Yes.

Q   Now let's read the next sentence. "Only three of" -- Let's see. I guess we aren't told for the other group, the 110, how many had abnormal pulmonary function tests. Do you see any indicat: of how many from that group are abnormals?

A   I read this as -- on the non-pneumoconiotic group, that 90 percent of the 110 employees were standard or above.

Q   Well, is it possible that that's an average?

MR. MURPHY: Objection to the form of the question.

BY MR. HEBERLING:

Q   I don't think we'll resolve this here. We don't need to --

A   I don't think "Average" means anything.

Q   Okay. Then at the bottom of page two, do you see where the doctor says, "I would conclude that a serious hazard for pneumoconiosis exists to the employees at Libby"? Do you see that?

A   Yes.

## Page 232

1  Q  Did Grace dispute that conclusion?

2  A  Not that I recall, no.

3  Q  And the version of this report that we
4  have as Exhibit 54 is two pages. At past
5  depositions or at any other time, have you seen a
6  longer version of this report, particularly
7  attaching names of workers?

8  A  Not that I recall.

9  Q  And after receiving this report, did Grace
10  do anything to notify the 26 workers who were
11  abnormal on both the x-rays and the pulmonary
12  function test?

13  A  Well, they were notified as to what the
14  results of their tests were.

15  Q  Do you know that? Do you have personal
16  knowledge that each one of the 26 was notified?

17  A  Well, I guess I don't have personal
18  knowledge that every one of them were, but it would
19  be my belief that they were.

20  Q  And is your belief -- Is it your belief
21  based upon the notice by sending the copies to the
22  family doctors?

23  A  Yes, sir.

24  Q  Through that procedure?

25  A  Yes, sir.

## Page 233

1  Q  Okay. Was there any attempt to move these
2  26 to jobs with less asbestos exposure?

3  A  No, sir.

4  Q  Then let's refer to Exhibit 55. Does this
5  appear to be a letter of Ben Wake to Robert Vinion
6  dated June 30, '64?

7  A  Yes, sir.

8  Q  Did you receive that in Libby
9  June 19 -- well, in July 1964?

10  A  Yes, sir.

11  Q  Then let's refer to Exhibit 56, and does
12  this appear to be a letter of Dr. Nelson to Joseph
13  Kelley, president of Zonolite, dated August 25,
14  1964?

15  A  Yes, sir.

16  Q  And did you receive this in Libby in
17  August 1964?

18  A  I don't know.

19  Q  Is it probable?

20  A  I don't know.

21  Q  Have you seen this before?

22  A  Yes, I have, but I don't know when I saw
23  it the first time.

24  Q  Do you recall a follow-up effort by
25  Dr. Nelson to do a further study of the workers at

## Page 234

1  Libby who had abnormal chest x-rays or pulmonary
2  function tests?

3  A  Well, I recall -- I recall Dr. Nelson
4  proposing that further studies be done on -- I think
5  on all employees in Libby. I don't think it would
6  have been confined to only the people with pulmonary
7  problems or spirometer problems, but I'm not certain
8  of that.

9  Q  Were you consulted by Mr. Kelley or
10  somebody from the Chicago office with regard to
11  Dr. Nelson's efforts to set up a further study?

12  A  I don't recall that I was, no, sir.

13  Q  Do you recall a meeting regarding
14  Dr. Nelson's findings where the consensus of local
15  medical opinion was that an important increased
16  incidence of chronic respiratory diseases existed in
17  Zonolite employees?

18  A  No, I don't recall such a meeting.

19  Q  Is Joseph Kelley still alive?

20  A  No, sir.

21  Q  Do you recall Dr. Nelson suggesting and
22  offering to carry out a further study of lung
23  function on the employees?

24  A  Yes, but -- I do, but I don't recall when
25  I first heard of this. I don't remember if it was

## Page 235

1  at the time or somewhat later that I heard about it,
2  but I do recall him offering to do this.

3  Q  Were you aware of an offer by Dr. Nelson
4  to do this work in Chicago without pay but with
5  expenses for the work paid by Grace?

6  A  Yes. That's what I recall.

7          MR. GRAHAM: Including the loss --

8          income lost for the time involved?

9  BY MR. HEBERLING:

10  Q  Was Dr. -- Is it your understanding that
11  Dr. Nelson was asking for some compensation for his
12  time?

13  A  Well, when he proposed -- When he proposed
14  following this up, he stated that he would have to
15  go for additional training and he should be
16  compensated for loss of income during the period
17  that he was away from his practice. So I don't know
18  if you define that as compensation or not, but that
19  was what his proposal was.

20  Q  Let's refer to Exhibit 57, and does this
21  appear to be a letter by Dr. Nelson to -- No. A
22  letter from F.W. Rupp, treasurer, to Dr. Nelson?

23  A  Yes, sir.

24  Q  And is it likely that this was dated 1964
25  based on the content of the letter?

HURLBERT VS. W.R. GRACE                  Condenseit!                    EARL D. LOVICK (VOL

| Page 236 |
|---|

15:59:18  1    A  Yes, sir.

15:59:26  2    Q  Who was -- Let's see.  I think I asked who

3  Mr. Rupp was.  You explained that he was the

15:59:30  4  treasurer of the company?

5    A  Who?

15:59:32  6    Q  Mr. Rupp was the treasurer of the company?

15:59:40  7    A  Yes.  Yes.  Yes.

15:59:44  8    Q  Did you see this letter at Libby at

15:59:44  9  Zonolite in 1964?

15:59:46 10    A  I don't recall.

15:59:50 11    Q  Now, Maryland Casualty Company is referred

15:59:54 12  to here.  Was that Zonolite's insurance company?

15:59:58 13    A  Yes.  They handled our industrial

16:00:04 14  accident -- industrialization insurance.

16:00:14 15    Q  And do you recall Dr. Nelson's proposal

16:00:14 16  for further work being referred to the insurance

16:00:14 17  company?

16:00:14 18    A  No, I don't recall.

16:00:18 19    Q  You didn't have anything to do with that

16:00:18 20  part of it?

16:00:18 21    A  No.  No.

16:00:46 22    Q  Let's refer to Exhibit 61.  Does this

16:00:48 23  appear to be a letter by Dr. Nelson dated

16:00:56 24  November 20, 1964 to Mr. Kelley, Zonolite executive?

16:00:52 25    A  Yes, sir.

| Page 237 |
|---|

16:01:00  1    Q  And did you see this letter in Libby in

16:01:02  2  1964?

16:01:04  3    A  I don't recall.  I don't recall whether I

16:01:04  4  did or not.

16:01:08  5    Q  Is it your recollection that you were not

16:01:12  6  copied in on this correspondence with Dr. Nelson?

16:01:16  7    A  Yes.  That's a true statement.  I don't

16:01:18  8  recall being copied in.

16:01:20  9    Q  And do you recall discussing Dr. Nelson's

16:01:28 10  proposal with him in '64?

16:01:28 11    A  No, I don't recall.

16:01:32 12    Q  Do you recall Dr. Nelson recommending

16:01:34 13  Dr. Thatcher Hubbard of Spokane as being qualified

16:01:38 14  to do the study?

16:01:42 15    A  Yes, sir.  I've seen this letter somewhere

16:01:44 16  at some time, and I don't remember what point in

16:01:44 17  time it was.  I don't remember whether it was then

16:01:48 18  or whether it would have been in connection with

16:01:48 19  some of these depositions.

16:01:48 20    Q  Then let's refer to Exhibit 62, and does

16:02:00 21  this appear to be a memo from George Blackwood to

16:02:04 22  J.A. Kelley?

16:02:04 23    A  Yes, sir.

16:02:12 24    Q  And who was Mr. Blackwood in 1964?

16:02:14 25    A  He was president of Dewey-Almy Chemical

| Page |
|---|

16:02:18  1  Division of which our Grace operations were a part

16:02:18  2  of.

16:02:22  3    Q  So was he further up the chain of command

16:02:22  4  than Mr. Kelley?

16:02:24  5    A  Yes, sir.

16:02:22  6    Q  Did you receive this memorandum, a copy of

16:02:30  7  it, in Libby in 1964?

16:02:32  8    A  I doubt it very much.

16:02:34  9    Q  Do you recall inquiries by the Grace

16:02:42 10  executives as to why Dr. Nelson was making these

16:03:04 11  proposals?

16:03:04 12    A  No, sir, I don't.

16:03:32 13    Q  Okay.  Let's go back to Exhibit 58.  Does

16:03:32 14  this appear to be -- Well, let me ask one further

16:03:40 15  question.  Whatever became of Dr. Nelson's proposal

16:03:44 16  for a further study of the Libby employees in 1964,

16:03:48 17  '65?

16:03:50 18    A  I don't know whatever happened to it, but

16:03:50 19  it was never done.

16:03:54 20    Q  Do you know why it wasn't ever done?

16:03:54 21    A  No.

16:04:06 22    Q  Does Exhibit 58 appear to be a letter from

16:04:12 23  Ben Wake of the State of Montana Board of Health

16:04:14 24  Mr. Bleich, manager, Zonolite, dated October 2, '64

16:04:16 25    A  Yes, sir.

| Page |
|---|

16:04:18  1    Q  Did you receive that in Libby in October

16:04:20  2  '64?

16:04:26  3    A  Yes, sir.

16:04:26  4    Q  Okay.  Then on page one do you see whe

16:04:30  5  four samples were taken of the air in the dry m

16:04:30  6    A  Yes, sir.

16:04:36  7    Q  And does it appear that two of them wer

16:04:36  8  over the standard?

16:04:38  9    A  Yes, sir.

16:04:42 10    Q  Then on page two, at the bottom, do you

16:04:48 11  see where it says, "It was further noted that th

16:04:54 12  dust discharged at ground level from the main

16:05:00 13  collection fan was continuously contaminating

16:05:02 14  whole plant work area and needs to be raised

16:05:06 15  substantially so that the dust-laden air dischar

16:05:10 16  substantially above the plant area or that clear

16:05:12 17  be provided"?  Do you see that?

16:05:12 18    A  Yes, sir.

16:05:14 19    Q  Now, is this the same problem of groun

16:05:20 20  level discharge that we discussed before?

16:05:18 21    A  Yes, sir.

16:05:32 22    Q  Then on page two is there a list of dust

16:05:32 23  producers with particular machine numbers a

16:05:32 24  forth?  Do you see that?

16:05:32 25    A  Yes.

Page 240

1  Q  Then let's refer to Exhibit 59. Does that
2  appear to be an excerpt from a newspaper article?
3  A  Yes, sir, it appears to be a copy of a --
4  Q  Was this sent to you in Libby in 1964?
5  A  I believe not. It was sent to -- It was
6  sent to R.A. Bleich, but I don't ever remember
7  seeing it.
8  Q  If it was sent to R.A. Bleich, is it
9  likely that it arrived and was received by him?
10  A  Yes.
11       MR. MURPHY: Could we take a very
12  short break?
13       MR. HEBERLING: Sure.
14       MR. MURPHY: We've been going about
15  an hour and twenty minutes.
16       THE VIDEOGRAPHER: Going off the
17  record at 4:06.
18       (Brief recess.)
19       THE VIDEOGRAPHER: We're back on the
20  record approximately 4:14.
21  BY MR. HEBERLING:
22  Q  Let's refer to Exhibit 60, and does this
23  appear to be a letter from Mr. Park of the insurance
24  company to W.R. Grace dated November 5, 1964?
25  A  Yes.

Page 241

1  Q  And I'll represent to you that it's
2  difficult to read, but it relates to respirators,
3  and it refers to Wilders, Kentucky. Do you see
4  that?
5  A  Yes.
6  Q  Did you receive this or a similar letter
7  relating to Libby --
8  A  No.
9  Q  -- and the use of respirators?
10  A  No. Not that I recall.
11  Q  And let's refer to Exhibit 63, and does
12  this appear to be a letter of Mr. Park of the
13  insurance company, once again, to W.R. Grace, again,
14  relating to Wilders, Kentucky and respirators?
15  A  Yes.
16  Q  Did you receive this or a similar letter
17  relating to use of respirators in Libby in 1964,
18  '65, early '65?
19  A  Not that I recall. I believe not.
20  Q  Do you recall receiving any kind of
21  indication of a respirator program from the
22  insurance company, say, in early '65?
23  A  No, sir.
24  Q  Then let's refer to Exhibit 65. Does this
25  appear to be a memo from Mr. Bleich to Mr. Kelley

Page 242

1  relating to dust control at Libby?
2  A  Yes, sir.
3  Q  Did you see this memo in Libby at or about
4  its date?
5  A  I believe so, yes, sir.
6  Q  Okay. Paragraph one on the first page,
7  there's mention of a Joy Drillmobile. What was
8  that?
9  A  It was a machine that was used in the mine
10  to drill holes for blasting.
11  Q  And how long -- Up until what time was it
12  used?
13  A  I don't recall the --
14  Q  Did this rotary drill replace the
15  Joy Drillmobile?
16  A  Yes.
17  Q  Paragraph two on the first page, there's
18  mention of road dust and mention that the use of --
19  Was it your understanding that the use of water on
20  the roads at the mine was not a sufficient dust
21  control?
22  A  Well, yes.
23  Q  And then you started oiling the roads?
24  A  Yes, sir.
25  Q  And did that provide better control?

Page 243

1  A  Yes, sir.
2  Q  Could you still see dust as the trucks
3  came down the roads, generally, in dry days?
4  A  At times, yes.
5       The water, of course, evaporated very
6  fast, and the oil was longer lasting. That's why it
7  would make a difference.
8  Q  And were you aware in the '60s that dust
9  on the roads would include some asbestos dust?
10  A  Yes, sir.
11  Q  And would that be from ore falling off the
12  trucks?
13  A  Well, the roads were right over the --
14  right over the pit itself, right -- the material
15  that was being mined, and so it would -- The
16  asbestos found in the mine would also be where the
17  roads were.
18  Q  And is it likely that there was some
19  asbestos in the dust on the road down to the river
20  as well?
21  A  It's very possible there could have been
22  some asbestos in that dust, yes.
23  Q  Then paragraph three on the first page, it
24  says, "The actual digging and loading is no
25  problem." Did you agree with that statement when it

Page 244

16:20:04 1 was made?

16:20:04 2   A  Yes, sir.

16:20:08 3   Q  So you agreed that there was really no
16:20:12 4 problem as to digging and loading as far as creating
16:20:12 5 dust?

16:20:12 6   A  Yes, sir.

16:20:16 7   Q  Isn't it true that when the ore is loaded
16:20:20 8 into the trucks dust is created?

16:20:24 9   A  Not in the mine, no, sir.  Not generally,
16:20:28 10 because it states here that that ore is always
16:20:30 11 slightly damp.

16:20:34 12   Q  And when the trucks were dumped at the
16:20:36 13 transfer point, was there dust then?

16:20:38 14   A  Very little.

16:20:38 15   Q  If there's ore by the transfer point and a
16:21:04 16 worker watching how the truck is dumping at the
16:21:06 17 transfer point -- Can you envision that?

16:21:08 18   A  Uh-huh.

16:21:10 19   Q  Okay.  Under those circumstances would the
16:21:16 20 worker be standing in some asbestos dust?

16:21:16 21   A  Very possibly --

16:21:18 22      MR. MURPHY:  Objection.  Your
16:21:20 23 question is hypothetical.

16:21:22 24      THE WITNESS:  Very possibly the
16:21:24 25 ground that he was standing on could contain

Page 245

16:21:30 1 asbestos, but as far as standing in asbestos dust, I
16:21:34 2 don't know whether that would be true.

16:21:44 3 BY MR. HEBERLING:

16:21:50 4   Q  Then still on page one, it says, The
16:22:00 5 Mill.  "The dust problem in the mill is entirely
16:22:00 6 concentrated in the dry mill."  Did you agree with
16:22:02 7 that statement?

16:22:02 8   A  Yes, sir.

16:22:06 9   Q  And does that mean that there was no dust
16:22:10 10 problem in the wet mill or the mill feed bins?

16:22:12 11   A  Yes, sir.

16:22:14 12   Q  You considered that there was no problem
16:22:14 13 in the wet mill?

16:22:14 14   A  Yes, sir.

16:22:18 15   Q  And there were no dusty areas in the wet
16:22:18 16 mill?

16:22:18 17   A  No, sir.

16:22:22 18   Q  If workers testify -- workers who worked
16:22:34 19 in there in the '60s testified that there were --
16:22:38 20 there was dust in the wet mill, would you dispute
16:22:38 21 that?

16:22:30 22      MR. MURPHY:  Objection.
16:22:32 23 Hypothetical.

16:22:32 24      THE WITNESS:  I'd have to hear their
16:22:36 25 testimony as to where the dust was supposed to have

Page 246

16:22:36 1 been.

16:22:36 2 BY MR. HEBERLING:

16:22:38 3   Q  Was there mist in the wet mill?

16:22:40 4   A  Yes, sir.

16:22:42 5   Q  And is it likely that that mist contained
16:22:44 6 asbestos dust or asbestos particles?

16:22:50 7      MR. MURPHY:  Which?  Objection.
16:22:52 8 Compound.

16:22:52 9      THE WITNESS:  I don't know.

16:23:04 10 BY MR. HEBERLING:

16:23:04 11   Q  And as to the mill feed bins, was there
16:23:08 12 some dust created there?

16:23:10 13   A  No.  I would say generally not.

16:23:22 14   Q  So based on what you know today, would
16:23:24 15 you -- is it your position that there was really no
16:23:30 16 problem with the mill feed bins or the wet mill?

16:23:32 17      MR. GRAHAM:  Objection.  Asked and
16:23:32 18 answered.

16:23:34 19      THE WITNESS:  Yeah.  I've stated
16:23:36 20 that.  I don't think there was a problem there.

16:23:40 21 BY MR. HEBERLING:

16:23:48 22   Q  Now, in the last paragraph on page one,
16:23:50 23 Mr. Bleich goes through the number of fans and the
16:23:54 24 exhaust capacity for the dry mill.  Do you see that?

16:23:54 25   A  Yes.

Page 247

16:24:04 1   Q  There's 8,000, 12,000, 15,000, 40,000, and
16:24:08 2 if we add those up, that would be 75,000 cubic feet
16:24:12 3 per minute total ventilating capacity for the dry
16:24:12 4 mill?

16:24:12 5   A  Yes.

16:24:16 6   Q  To your knowledge was that a correct
16:24:18 7 statement of the ventilating capacity at the time?

16:24:20 8   A  Yes, I believe so.

16:24:20 9   Q  And did this 75,000 ventilating capacity
16:24:34 10 remain the same up until the dry mill closed?

16:24:42 11   A  I believe it would have, basically,
16:24:44 12 remained the same, yes.

16:24:54 13   Q  Then page two, paragraph two, the second
16:24:54 14 sentence, do you see where it says, "However, in no
16:25:00 15 instance" --

16:25:00 16   A  Excuse me.  I'm sorry.

16:25:02 17      MR. MURPHY:  I don't have a
16:25:02 18 page two.

16:25:04 19      THE WITNESS:  I don't have a
16:25:04 20 page two.

16:25:04 21      MR. GRAHAM:  I think what happened is
16:25:10 22 that they are not in the right order.  If you go
16:25:10 23 back --

16:25:10 24      MR. HEBERLING:  Let's go off the
16:25:10 25 record.  We have an exhibit problem.

## Page 248

16:25:16  1    THE VIDEOGRAPHER: We're going off
16:26:24  2  the record at 4:24.
16:26:28  3    (Discussion off the record.)
16:26:28  4    THE VIDEOGRAPHER: Back on the record
16:26:30  5  at 4:26.
16:26:30  6  BY MR. HEBERLING:
16:26:30  7    Q  Okay. We've fixed the exhibit problem,
16:26:38  8  and at page two of Exhibit 65, do you see where it
16:26:40  9  says in Mr. Bleich's report on dust control,
16:26:44 10  "However, in no instance has there actually been a
16:26:48 11  surplus of fan capacity so that an increase of
16:26:54 12  airflow throughout each individual system as a whole
16:26:54 13  could be made"? Do you see that?
16:26:54 14    A  Yes.
16:27:02 15    Q  So was it your understanding that there
16:27:05 16  was no excess fan capacity in the ventilating system
16:27:10 17  in the dry mill?
16:27:10 18    A  Yes, sir. That's what this indicates.
16:27:18 19    Q  So if that is so, why wasn't more fan
16:27:20 20  capacity added? Was that ever considered?
16:27:22 21    Excuse me. That's two questions. Answer
16:27:24 22  the first one.
16:27:24 23    A  I don't know.
16:27:28 24    Q  Do you remember discussions through the
16:27:32 25  '60s and up until the time of the closing of the

## Page 249

16:27:36  1  dry mill of possibly adding more fans or larger
16:27:36  2  fans?
16:27:40  3    A  No, sir. I don't remember any such
16:27:40  4  discussions.
16:27:46  5    Q  From '68 to '71, when you were general
16:27:50  6  manager, you would likely have been in on any such
16:27:52  7  discussion; correct?
16:27:54  8    A  Probably.
16:27:58  9    Q  And if money was going to be spent on a
16:28:02 10  large fan in any other year, you would have been
16:28:06 11  involved in a decision to spend that money; correct?
16:28:08 12    A  Yes, sir.
16:28:10 13    MR. GRAHAM: Objection. Vague and
16:28:12 14  ambiguous as to time and date.
16:28:14 15    THE WITNESS: Yes, sir.
16:28:14 16  BY MR. HEBERLING:
16:28:16 17    Q  And in the question I was referring to in
16:28:18 18  any other year from 1964 to '74, when the dry mill
16:28:22 19  was closed.
16:28:22 20    A  Yes.
16:28:24 21    Q  Did you understand that?
16:28:24 22    A  Yes.
16:28:26 23    Q  Okay. Then in the same paragraph two, it
16:28:38 24  says, "Another factor contributing to the
16:28:38 25  inefficiency of the system has been the loss of air

## Page 250

16:28:44  1  effectiveness by leaks in flexible connections,
16:28:48  2  holes in elevator casings, open hand holes and
16:28:50  3  chutes, et cetera." Do you see that?
16:28:54  4    A  Yes.
16:28:56  5    Q  Were some of those holes cut to free rocks
16:28:56  6  that got stuck in the system?
16:29:00  7    A  Not to my knowledge, no, sir.
16:29:04  8    Q  What was an open hand hole?
16:29:04  9    A  I don't know.
16:29:10 10    Q  What was Mr. Bleich's background?
16:29:12 11    A  He was an engineer.
16:29:12 12    Q  Do you know what kind?
16:29:16 13    A  Mechanical, I believe.
16:29:14 14    Q  Was this problem of leaks and holes in the
16:29:34 15  areas referenced in the sentence I just read -- Was
16:29:42 16  that a continuing problem at the dry mill?
16:29:44 17    A  Yes.
16:29:48 18    Q  Was if ever completely solved?
16:29:56 19    A  No. It would be solved only by continuing
16:29:58 20  maintenance of the equipment, which is what was
16:30:00 21  done.
16:30:04 22    Q  I'm wondering why each of these reports
16:30:04 23  seems to find leaks and holes.
16:30:04 24    A  I don't know.
16:30:04 25    Q  Okay. Then Item 1 on page two talks about

## Page 251

16:30:32  1  the ground level discharge, and it says, "An
16:30:36  2  excessive amount of dust and larger particles are
16:30:40  3  being discharged from the fan outlet which adds to
16:30:44  4  the air pollution within the general shop and
16:30:44  5  service area." Do you see that?
16:30:46  6    A  Yes, sir.
16:30:50  7    Q  And this is that ground level discharge
16:30:52  8  from the big 600 fan?
16:30:52  9    A  Yes.
16:30:54 10    Q  Do you recall any discussion with Grace
16:31:02 11  executives over fixing this problem at this point
16:31:02 12  when this memo was done?
16:31:04 13    A  No, sir.
16:31:54 14    Q  And on page three of the memo, Item 4, do
16:31:58 15  you see a discussion of the buildup of dust on
16:32:02 16  rafters and so forth?
16:32:04 17    A  Yes, sir.
16:32:06 18    Q  And then at the end it says, "A monthly
16:32:14 19  'Sweepdown' interval is now effect." Do you see
16:32:14 20  that?
16:32:16 21    A  Yes, sir.
16:32:16 22    Q  Do you know when that went into effect?
16:32:20 23    A  Well, it would have been prior to the
16:32:20 24  writing of this letter, but I don't know exactly
16:32:22 25  when it would have been.

## Page 252

1  Q  The same year, in '64?

2  A  Probably, yes.

3  Q  What was the sweepdown interval before

4  that?

5  A  Well, they didn't -- When this was put

6  into effect, it was on a regular basis, and they

7  didn't have one on a regular basis prior to that.

8  Q  Okay. And what is a sweepdown? Would you

9  describe what happened during a sweepdown?

10  A  They would sweep the dust off of the top

11  of the rafters where it had settled.

12  Q  And was there a sweep of the floors at the

13  same time?

14  A  Yes, sir. The dust that was swept off of

15  the rafters would have to be cleaned up.

16  Q  And was this done at a time when the mill

17  was closed?

18  A  No. It would have been ongoing.

19  Q  So it might be done while the mill was

20  running?

21  A  That's possible, yes.

22  Q  Was it sometimes done on a Sunday --

23  A  Yes.

24  Q  -- when the mill was not open?

25  A  Yes. It could have been done on a

## Page 253

1  Saturday or Sunday, when the mill was not running.

2  Q  And you recall it happening on weekends at

3  times?

4  A  Well, I don't recall, but we always had

5  maintenance crews on duty during periods when the

6  mill was not running, so it's a strong likelihood

7  that it would have been done then.

8  Q  How long did this monthly sweepdown

9  interval continue after '64?

10  A  I think forever probably.

11  Q  Was it ever more frequent than that?

12  A  I don't know. I don't recall.

13  Q  Was there any reason why the sweepdown

14  couldn't have been done every Sunday when the mill

15  was closed?

16  A  No.

17  Q  Item 5 on page three talks about, "A dust

18  count apparatus identical (to) that used by the

19  State Board of Health is on hand." As of the end of

20  '64, had the company begun its own dust counts?

21  A  Yes, sir.

22  Q  Okay. I think you reported in a later

23  summary that the dust counts began in 1965. Is that

24  correct?

25  A  I don't know. I don't recall.

## Page 254

1  Q  I'm now showing you Exhibit 192, which we

2  looked at before. Does that appear to be a memo

3  from you to Mr. Eschenbach dated November 18, 1980?

4  A  Yes.

5  Q  And were you the author of that memo?

6  A  Yes.

7  Q  Then do you see where it states, "We

8  started sampling with the impinger method in about

9  1965"?

10  A  Yes.

11  Q  Did you sample by any other method before

12  1965, or was that the first sampling that was done?

13        MR. GRAHAM:  I'd object to the form

14  of the question in that the question -- the

15  predicate to the question is the statement you just

16  read, and it said "About 1965".

17        Go ahead and answer the question if you

18  can.

19        THE WITNESS:  No. The impinger

20  method was the first method that we used, and if I

21  said that we started in 1965, that must have been an

22  error, because this letter, which is dated

23  December 30th, 1964, it said that that testing

24  program was in effect at that time.

25  /////

## Page 255

1  BY MR. HEBERLING:

2  Q  So you could have started a few months

3  before the beginning of '65?

4  A  Yes, sir.

5  Q  And on page four, paragraph one, under

6  "Hauling" -- No. Under -- Right at the top it

7  says, "The skipping operation is not a dust-free

8  operation, but (it) is not a hazardous operation."

9  Do you see that?

10  A  Yes.

11  Q  Is it fair to say if there was dust

12  present then there was asbestos in the dust?

13  A  Yes.

14  Q  As we sit here now, do you see any problem

15  with Mr. Bleich's statement in 1964 that the skip

16  operation was not a hazardous operation?

17  A  No, I don't see any problem.

18  Q  Now, under "Hauling" -- let's see -- it

19  says, "The dumping the skip cars into the lower ore

20  bins creates dust, as does any handling of

21  vermiculite concentrates." Do you see that?

22  A  Yes, sir.

23  Q  Did you agree with that in 1964?

24  A  Yes, sir.

25  Q  Do you agree with that now?

Page 256

1  A Yes, sir.

2  Q So can we infer from that that any

3 handling of vermiculite concentrates will create

4 dust, any movement of them?

5       MR. MURPHY: Objection to the form of

6 the question.

7       THE WITNESS: It would be correct to

8 say it could create dust.

9 BY MR. HEBERLING:

10  Q All right. It's also possible that it

11 would be a rainy day and it could be raining so much

12 there wouldn't be any dust; right?

13       MR. MURPHY: Objection.

14 Argumentative.

15       THE WITNESS: In the operation I

16 don't know how that could happen. The concentrates

17 wouldn't be that wet, I don't think, but there could

18 be conditions where, if they were wet from rain or

19 whatever, then there would be no free dust in the

20 vicinity.

21 BY MR. HEBERLING:

22  Q Okay. And vermiculite concentrates are

23 what is -- what emerge from the dry mill; correct?

24  A Yes, sir.

25  Q And then it's handled, goes down the

Page 257

1 mountain on the skip; correct?

2  A Yes.

3  Q And then trucked to the river storage;

4 correct?

5  A Yes.

6  Q And then goes on the conveyors across the

7 river; correct?

8  A Yes.

9  Q So every time it was moved is it fair to

10 say that dust would be created in most instances?

11  A Yes, sir.

12  Q Okay. But as I understand your position,

13 you're saying the raw ore when moved or dumped from

14 a truck at the transfer point would be -- in most

15 cases would not create dust; is that correct?

16  A That's correct, yes, sir.

17  Q Then paragraph two, there's talk of,

18 "Loading of the Kenworth truck beneath the lower

19 ore bins is a dusty operation in a somewhat confined

20 space." Do you see that?

21  A Yes.

22  Q And is it likely that there would be

23 asbestos in this dust?

24  A Yes.

25  Q And is it likely, then, that anyone who

Page 258

1 enters that space for repairs or whatever reason

2 would be standing in asbestos dust?

3       MR. MURPHY: Objection. Lack of

4 foundation. Hypothetical.

5       THE WITNESS: I don't know what that

6 question means. I don't know what you mean. When

7 that truck is being loaded, there is dust created,

8 but that's only for a very short period of time, and

9 there's no person there that's exposed to that dust

10 at that time. He opens the gates, and he gets out

11 of the way.

12 BY MR. HEBERLING:

13  Q Then, as a matter of common sense, does

14 the dust settle on the ground?

15  A I suppose it would, yes.

16  Q And would any worker who later came to the

17 area and stood at that same spot be standing in

18 asbestos dust?

19       MR. MURPHY: Objection to the form of

20 the question.

21 BY MR. HEBERLING:

22  Q Is that likely?

23  A That's possible, yes.

24  Q Okay. Then in the second paragraph, still

25 talking about the loading of the Kenworth truck, it

Page 259

1 says, "The ventilation problem is immense." Would

2 you agree with that?

3  A Yes.

4  Q Was the problem of dust at the lower ore

5 bins ever solved? The ventilation -- Was the

6 ventilation problem at the lower ore bins ever

7 solved?

8  A No.

9  Q Paragraph four, still under "Hauling," do

10 you see where it says, "The dumping of the Kenworth

11 truck into either the river loading hoppers or the

12 horizontal storage creates dust in considerable

13 quantities"? Do you see that?

14  A Yes, sir.

15  Q Now, the horizontal storage, is that a

16 building that's closed on three sides, more or less?

17  A More or less, yes.

18  Q And is that where a nursery is currently

19 in operation?

20  A Yes, sir.

21  Q And the storage building that is there,

22 does that currently contain boats?

23  A I don't know what it contains.

24  Q At any rate, is it your understanding that

25 the building is still there?

Page 260

1 A Yes, sir. I know it's still there.
2 Q And when the operation -- When the mine
3 and mill were still operating, would anyone who
4 would be standing in the area, say within 30 feet of
5 that building, be standing -- Is it likely that they
6 would be standing in asbestos dust?
7 MR. MURPHY: Objection to the form of
8 the question, the reference to "Asbestos dust,"
9 which was the basis of my objection the last time.
10 THE WITNESS: It's possible they
11 could be standing in dirt or in dust with asbestos
12 in it, but there would not be piles of dust laying
13 around in these areas.
14 BY MR. HEBERLING:
15 Q Is that because the dust would be cleaned
16 up, or why would that be?
17 A No. There would not be that much dust
18 generated and settled.
19 Q And at the horizontal storage, how --
20 Okay. A truck dumped the ore -- let's say the
21 vermiculite concentrate --
22 A Yes.
23 Q -- at the horizontal storage?
24 A Yes.
25 Q And then how did the concentrate get into

Page 261

1 the conveyors?
2 A The conveyors were on the floor underneath
3 this concentrate, and there were gates on these
4 conveyors that would be opened, and they were opened
5 from a remote location so the ore would fall down
6 through them onto a conveyor belt.
7 Q And the place where the conveyors were,
8 was that called the tunnels?
9 A Yes, sir.
10 Q And at times did a dozer operator push the
11 concentrate into the area of the tunnels?
12 A Yes, sir.
13 Q And at times did workers shovel
14 concentrate which fell off the conveyor back onto
15 the conveyor?
16 A Yes, sir.
17 Q And what kind of ventilation did the
18 tunnels have in the '60s, just natural?
19 A No. They had -- They had fans that sucked
20 air out of the tunnels and exhausted it.
21 Q Do you know how big the fan or fans were?
22 A No, sir.
23 Q And, then, later, in the '70s, was a
24 different ventilation system applied there?
25 A Well, the ventilation system always --

Page 262

1 Basically, the same system would have applied, but
2 there was an improvement made, and I don't --
3 improvements made, and I don't know when it would
4 have been. Probably in the '60s the bag houses were
5 installed so that when the dust was picked up it
6 would be collected in these bag houses.
7 Q Okay. So how did the fan pick up the
8 dust, or how was the dust picked up? Let me ask it
9 that way.
10 A Well, there would be ducts under there
11 that the air would flow into these ducts and carry
12 the dust with it.
13 Q And what's your understanding of when the
14 bag house was applied there?
15 A In the '60s.
16 Q And was there ever something called a
17 super sucker built for the tunnels?
18 A I don't know. I don't know.
19 Q Butch Hurlbert, who worked there and
20 worked on installing it, called it a super sucker,
21 which was some kind of ventilation system for the
22 area of the conveyor in the tunnels. You don't know
23 it by that name?
24 A No, sir.
25 Q Do you know of any kind of major

Page 263

1 improvement of the ventilation system in the tunnels
2 in 1975 or 1976?
3 A No. I know that it was improved. I don't
4 know what -- I don't know when in time it would have
5 been done.
6 Q Okay. Back to the December 30, 1964 memo,
7 and under "Storage," it says, "The unloading of the
8 horizontal storage bins requires the use of the
9 Cat 955 loader-dozer. This is a dusty operation."
10 Is this what you described before?
11 A Yes, sir.
12 Q Where the dozer pushes the concentrate
13 onto the conveyor belts?
14 A Yes.
15 Q And what are the load-out gates?
16 A Well, they are the gates that are in the
17 tunnels that the concentrate falls through when it
18 falls onto the conveyor belt.
19 Q Okay. So that would be a gate in the
20 ceiling of the tunnels which would be opened to
21 allow the concentrate to fall in?
22 A Yes, sir.
23 Q Then in the last paragraph of page four,
24 there's mention of silo-type storage bins built
25 during the period of March '59 to December '61.

Page 264

1 What were those?
2     A  A silo-type bin.
3     Q  How did the ore get up into the silos?
4     A  By an elevator and a conveyor belt across
5 the top of the silos.
6     Q  How did the operators select which ore to
7 put into the horizontal storage and which ore to put
8 into the silos?
9     A  The fine ore, No. 4, was put into the
10 silos, and two, three and four were put into the
11 horizontal storage.
12     Q  Okay.  Then at the top of page five, still
13 on the silos, it says, "Although there is no
14 ventilation system on the screw and belt conveyor
15 galleys across the top of the bins, there is no
16 personnel exposure because bin changes ... are made
17 during down time."  As we sit here today, do you
18 agree with that statement?
19     A  Yes, sir.
20     Q  If any personnel were in there repairing,
21 performing repairs or making this bin change,
22 wouldn't they be standing in asbestos -- asbestos
23 dust as they worked?
24          MR. MURPHY:  Objection to the form of
25 the question.

Page 265

1          THE WITNESS:  I don't know.
2 Possibly.
3 BY MR. HEBERLING:
4     Q  Okay.  Then under "Loading," it's
5 mentioned at the end, the last little paragraph,
6 "The downtown storage and loading facilities are
7 comparable to the river storage and loading.  All
8 truck dumping is into open hoppers which reduces the
9 hazard.  Except for truck loading, all loading is
10 bagged.  The bagging equipment is ventilated."  Do
11 you see that?
12     A  Yes, sir.
13     Q  And so here the workers would be moving
14 the concentrate, and there would be some dust
15 involved, wouldn't there?
16     A  Yes, sir.
17     Q  And that would mean some asbestos
18 exposure, would it not?
19     A  Yes, sir.
20     Q  Now, there are no controls suggested for
21 these facilities by the railroad tracks by the edge
22 of town, at least by Mr. Bleich; is that correct?
23     A  Yes.
24          MR. GRAHAM:  I'd object to the form
25 of the question on the basis of the description of

Page 266

1 the location, but it's already been answered.
2 BY MR. HEBERLING:
3     Q  How was the bagging equipment ventilated
4 in 1964?
5     A  There was a ventilating fan at the bagging
6 facility, and it discharged -- went into a bag
7 house.
8     Q  And then under "Expanding Plant," it says,
9 "The expanding plant, including the special verxite
10 equipment".  What is verxite equipment?
11     A  It's a form of highly concentrated
12 expanded material that they made.
13     Q  So would that be a very fine dust?
14     A  No, it's not a dust at all.  It was a --
15 It was a product that was made from, basically,
16 No. 4 ore, which was highly concentrated and
17 treated.
18     Q  Okay.  So it goes on, "The expanding
19 plant ... is no better or no worse than any normal
20 commercial plant.  Complete dust control will be
21 designed into any new installation."  Do you see
22 that?
23     A  Yes, sir.
24     Q  Was there ever a new installation?
25     A  Not at Libby, no, sir.

Page 267

1     Q  And the expanding plant continued to
2 operate until what year?
3     A  About 1969, but the operation of that
4 should be defined.  It operated very little.  The
5 primary purpose of that expanding plant was for
6 research into more efficient means of expanding the
7 ore, exfoliating the ore.  It was not operated as a
8 commercial plant.
9     Q  Then under "Laboratory," it says, "The
10 regular mill testers do not wear respirators in the
11 laboratory."  Do you see that?
12     A  Yes, sir.
13     Q  And the laboratory was not in the dry
14 mill; right?
15     A  No.
16     Q  It was a separate building?
17     A  Yes, sir.
18     Q  Okay.  Is it fair to say that most people
19 in the 1960s who worked outside the dry mill did not
20 wear respirators?
21     A  Yes, sir.
22     Q  Was that true in the '70s as well?
23     A  Yes, sir.
24     Q  Was this extensive review by Mr. Bleich
25 dated December 30, 1964 -- Is this the most detailed

## Page 268

1 evaluation of dust control at the Grace mine and
2 mill that you saw while working there?
3          MR. GRAHAM: Object to the form of
4 the question.
5          Go ahead.
6          THE WITNESS: I believe so, yes.
7 BY MR. HEBERLING:
8     Q   Did you ever see a similar step-by-step
9 review done by Mr. Kostic or anyone else?
10    A   I don't recall, no, sir.
11    Q   Beyond the use of respirators and repairs
12 in the dry mill, was anything done in 1965 as a
13 result of this report?
14    A   I don't recall.
15    Q   Let's refer to Exhibit 66. Does this
16 appear to be --
17          MR. MURPHY: Could I just, before you
18 go to the next exhibit, inquire of the witness?
19          Are you okay? You look like you're
20 getting a little tired, and it's five o'clock, and
21 we'll go to five-thirty if you're up to it as
22 agreed, or if you're tired, we'll certainly break.
23 You strike me as you're winding down a little bit,
24 but you tell me. I just wanted to give you the
25 opportunity to say -- How are you doing?

## Page 269

1          THE VIDEOGRAPHER: This may be a good
2 time to go off the record. We're about out of
3 tape.
4          MR. MURPHY: If I knew that, I would
5 have waited.
6          THE VIDEOGRAPHER: We're going off
7 the record at 4:55.
8          (Brief recess.)
9          THE VIDEOGRAPHER: We're back on the
10 record. It's approximately 4:57.
11 BY MR. HEBERLING:
12    Q   Let's refer to Exhibit 66. Does this
13 appear to be a memo from Mr. Bleich to Mr. Kelley
14 dated January 2, 1965?
15    A   Yes, sir.
16    Q   And was this a memo generated by Zonolite
17 in Libby at or about this date?
18    A   It was apparently generated by Mr. Bleich,
19 yes, sir.
20    Q   Then it starts off, "Earl has sent two
21 copies of all reports we have from Montana State
22 Board of Health on the dust problem." Do you see
23 that?
24    A   Yes, sir.
25    Q   And you are Earl; is that right?

## Page 270

1    A   That's right.
2    Q   Then the second paragraph, "In going over
3 these reports, I can only say that it presents a
4 very sorry record." There is still some
5 improvement -- Excuse me. "There is some
6 improvement indicated during 1964, but still totally
7 inadequate." Do you see that?
8    A   Yes, sir.
9    Q   Did you agree with that statement when it
10 was made?
11    A   Well, I don't recall. This was
12 Mr. Bleich's statement. I don't have any comment on
13 it.
14    Q   Do you agree with it now?
15    A   Well, I don't know that I do, no. I think
16 that we did the best that we could.
17    Q   Let's refer to Exhibit 67, and does that
18 appear to be a memo from you to Mr. Kelley dated
19 January 2, 1965?
20    A   Yes, sir.
21    Q   Are you the author of this memo?
22    A   Yes, sir.
23    Q   And was this memo written pursuant to a
24 direction from Mr. Blackwood, who's high up in
25 Grace, to present an evaluation of dust control and

## Page 271

1 the history of it?
2    A   Yes, sir.
3    Q   Then page two, in the middle of the first
4 paragraph, it says, "In order to protect ourselves
5 and place ourselves on record as ... the condition
6 of our employees, as of the effective date of the
7 law," referring to the occupational disease law, "we
8 instituted a program whereby all of our employees
9 would have x-rays at the local hospital." Do you
10 see that?
11    A   Yes.
12    Q   Is that a correct statement of what
13 happened?
14    A   Yes, sir.
15    Q   Then on page three at the bottom, it says,
16 "Upon completion of the x-rays and interpretations
17 by Dr. Little, the reports were again turned over to
18 the employees' personal doctors for notification of
19 results as before. In this survey there were 143
20 x-rays taken, which included 21 salaried supervisory
21 people. Of the 143, 92 have had more than five
22 years' employment with us. Of these, 30 show some
23 emphysema or fibrotic respiratory condition." Do
24 you see that?
25    A   Yes, sir.

Page 272

1   Q  Who did this analysis of all the x-rays?

2   A  Dr. William Little.

3   Q  And did he --

4   A  I should qualify that. In 1965 I believe

5 he did them all. He later on took over one or two

6 associates that may have interpreted them, but they

7 were in Dr. Little's office.

8   Q  What I'm wondering is, who did the

9 statistical review? Was this done by you or

10 somebody at Zonolite, based on the reports, or did

11 Dr. Little do the statistical work?

12   A  Now, what statistical work?

13   Q  Well, for example, saying, for the 92

14 employees with more than five years' employment, "Of

15 these, 30 show some emphysema or fibrotic

16 respiratory condition."

17   A  I probably did that, based on Dr. Little's

18 interpretations.

19   Q  So you had all the reports?

20   A  Yes, sir.

21   Q  And you just used the conclusions in the

22 reports?

23   A  Yes, sir.

24   Q  Okay. Then further down it says, "39 have

25 over ten years' employment with us. Of this 39, the

Page 273

1 radiologist interprets 21 of them to have normal

2 chests and 18 to have abnormal chests." Do you see

3 that?

4   A  Yes, sir.

5   Q  And, again, you did this statistical

6 review?

7   A  Yes, sir.

8   Q  Then the next page do you see a listing of

9 normal chests and abnormal chests?

10   A  Yes, sir.

11   Q  Of the abnormal chests, do you see Allen

12 Boothman?

13   A  Yes.

14   Q  Did he die of lung disease?

15   A  I don't recall what he died from. He

16 died. I know that, but I don't recall what his

17 cause of death was.

18   Q  The next one, Robert Cohenour, did he die

19 of lung disease?

20   A  Yes, sir.

21   Q  Floyd Cole, did he die of lung disease?

22   A  I believe not, but I'm not really -- I

23 don't really know what he died from. It was after I

24 left the employ of the company.

25   Q  Did you testify in a deposition in his

Page 274

1 case against Grace?

2   A  I don't know.

3   Q  Okay. We've referred to a deposition --

4 I'm not going to dig that out right now.

5     Jack Garrison, did he die of lung disease?

6   A  Yes, sir.

7   Q  Ernie Hamilton, did he die of lung

8 disease?

9   A  Yes, sir. I believe so.

10   Q  Louis Hoppe, did he die of lung disease?

11   A  No. He drowned.

12   Q  And Michael McNair, did he die of

13 mesothelioma?

14   A  Yes, sir.

15   Q  Which is a lung disease?

16   A  Yes, sir.

17     MR. MURPHY: Objection to the form of

18 the last question.

19 BY MR. HEBERLING:

20   Q  Lloyd Miller, did he die of lung disease?

21   A  Yes, sir.

22   Q  Richard Rayome, did he die of lung

23 disease?

24   A  Yes, sir.

25   Q  Stuart Risley, did he die of lung disease?

Page 275

1   A  I don't know.

2   Q  Harold Shrewsberry, did he die of lung

3 disease?

4   A  I don't know.

5   Q  And L.D. Welch -- that would be Lylus

6 Welch -- did he die of lung disease?

7   A  Well, certainly a contributing factor.

8   Q  And then of the normal chests,

9 W.D. Fields, did he die of lung disease?

10   A  I don't know.

11   Q  Do you know his widow, Lila Fields?

12   A  Yes, I do.

13   Q  But you don't know the circumstances of

14 Mr. Fields's death?

15   A  No, sir, I don't.

16   Q  James Gidley, did he die of lung disease?

17   A  Yes, sir.

18   Q  And Donald Johnson, has he had asbestosis

19 for some time?

20   A  He has a lung disease. I don't know what

21 it is.

22   Q  And Harvey Noble, did he die of lung

23 disease?

24   A  Yes, sir.

25   Q  Derward Preston, did he die of lung

Page 276

1 disease?

2    A  I don't know.

3    Q  Arnold Smith, did he die of lung disease?

4    A  I can't say.

5    Q  James Smith, did he die of lung disease?

6    A  No, sir.

7    Q  And Edward Wittlake, did he die of lung

8 disease?

9    A  I don't know.  On all of these cases where

10 I said, "I don't know.  I don't recall," I probably

11 knew at one time.

12    Q  And were all these employees whose names I

13 just read exposed to asbestos dust?

14    A  Yes, sir, they would have been.

15    Q  And at any point -- No.  At this point, in

16 1965, was any information given to these employees

17 that inhaling asbestos dust could be dangerous and

18 hazardous to their health?

19    A  Well, you have asked this question before

20 today, and, specifically, I don't know that we gave

21 any specific information on the hazards of asbestos

22 or whatever, but there's every reason to think that

23 these employees were aware of it.  Among other

24 things, the union, which they all belonged to, had

25 information on the hazards of asbestos to their

Page 277

1 welfare, and --

2    Q  Do you have any personal knowledge of any

3 discussion at a union meeting --

4        MR. MURPHY:  Excuse me,

5 Mr. Heberling.  I don't think the witness had

6 finished his answer.  I believe you interrupted

7 him.  If he's finished, fine, but I don't believe he

8 was finished.

9 BY MR. HEBERLING:

10    Q  If you have more, please go ahead.

11    A  No.  I'll stop there.

12    Q  Okay.  Do you have any personal knowledge

13 of a union meeting where asbestos hazards were

14 discussed as of the 1960s?

15    A  Well, I certainly was never in any

16 attendance at any union meetings except --

17    Q  Except by -- Excuse me.

18    A  -- one that I presented some information.

19 It had nothing to do with this, but I have seen

20 copies of union meeting minutes where the asbestos

21 problem was discussed in the union meetings.

22    Q  Do you know the dates of those minutes?

23    A  No, sir.

24    Q  And do you know if those minutes refer to

25 the dust problem or exactly what the reference is

Page 278

1 to?

2    A  Well, some of the references are to

3 inspections by the State Board of Health, which

4 addressed the dust problems, but other than that, I

5 can't say specifically what it would be.

6    Q  Okay.  As of 1965, did W.R. Grace have a

7 policy of keeping asbestos dust away from its

8 employees?

9        MR. MURPHY:  Objection to the form of

10 the question.

11        THE WITNESS:  Well, it's not possible

12 to have a policy to do that.  We did everything we

13 could to keep the dust exposure to all of the

14 employees that we had at the minimal that we could.

15 BY MR. HEBERLING:

16    Q  Okay.  And then at page six do you see a

17 list of enclosures?

18    A  Yes, sir.

19    Q  And No. 1, do you see "Dr. Woodrow

20 Nelson - Report of Spirometry Tests, 1964"?

21    A  Yes, sir.

22    Q  Go back to Exhibit 54.  Is this Exhibit 54

23 titled "Report of Spirometry Tests"?

24    A  Yes, sir.  I'd have every reason to

25 believe that the enclosure of Dr. Nelson's listed

Page 279

1 here is this report.

2    Q  "This report," and you're pointing at

3 Exhibit 54?

4    A  Yes, sir.

5    Q  Okay.  Then let's refer to Exhibit 68.

6 Does this appear to be a letter of Mr. Rupp,

7 treasurer, to the insurance company, Maryland

8 Casualty, dated January 6, '65?

9    A  Yes, sir.

10    Q  And down under "bc," for blind copy, do

11 you see "E.D. Lovick"?

12    A  Yes, sir.

13    Q  Did you receive a copy of this Exhibit 68

14 in 1965, January?

15    A  Yes, sir.

16    Q  Now we're back to talking about

17 Dr. Nelson's proposal for further study, and do you

18 understand from this letter that there was the

19 reference to the insurance company to undertake the

20 study?

21    A  Yes, sir.

22    Q  And the last sentences of the letter

23 appear to read, "Mr. Kelley then met with

24 Dr. Woodrow (Wilson) in Libby."  Do you recall

25 meeting with Mr. Kelley and Mr. Wilson in Libby?

**EARL D. LOVICK (VOL. 1)**   CondenseIt!™   **HURLBERT VS. W.R. GRACE**

---

Page 280

1      MR. GRAHAM: I probably should
2  correct that. "Woodrow Wilson" is a Freudian slip.
3  It probably should be Woodrow Nelson.
4      MR. HEBERLING: I don't know where
5  I've heard that name.
6      MR. MURPHY: Maybe I should have
7  asked Mr. Heberling if we should have quit at
8  five o'clock instead of Mr. Lovick.
9  BY MR. HEBERLING:
10  Q  Okay. It says, "Mr. Kelley then met with
11  Mr. Woodrow Nelson in Libby." Do you recall a
12  meeting between you and Mr. Kelley and Mr. Nelson?
13  A  No, sir, I don't.
14  Q  "And arranged for the forwarding of the
15  desired records. Mr. E. Lovick, assistant manager
16  of the Libby operation, today was handling the
17  (packaging) and shipping of the records." Did you
18  do that?
19  A  Yes, sir.
20  Q  And in doing so did you ship off the
21  results of Dr. Nelson's spirometry tests to the
22  Maryland Casualty Company?
23  A  I'm not sure about this particular time
24  what they wanted, but because the spirometry thing
25  was referred to here --

---

Page 281

1  Q  I think we can answer this with the next
2  letter.
3  A  Okay.
4      MR. MURPHY: I think you could go
5  back to --
6  BY MR. HEBERLING:
7  Q  Exhibit 69 --
8  A  Yes.
9  Q  -- does this appear to be a letter from
10  you to the insurance company dated January 6, '65?
11  A  Yes.
12  Q  And are you the author of this letter?
13  A  Yes, I am.
14  Q  And do you list what you sent off to the
15  insurance company?
16  A  Yes, sir.
17  Q  And was that a fairly complete set of what
18  Dr. Nelson had?
19  A  That was everything that -- everything
20  that he had, I'm sure.
21  Q  Then let's refer to Exhibit 70, and does
22  that appear to be a letter or a memo from Mr. Kelley
23  to Bleich and Lovick?
24  A  Yes, sir.
25  Q  Did you receive this on or about

---

Page 282

1  January 8, '65?
2  A  Yes, sir.
3  Q  And in the second paragraph, do you see
4  where it says, "I am very disappointed in the
5  slowness to react to the recommendations of the
6  Montana State Department of Health, and you are
7  hereby required and directed to bring the
8  recommendations into effect immediately"? Do you
9  see that?
10  A  Yes, sir, I see that.
11  Q  Did you interpret that as a reprimand from
12  Mr. Kelley?
13  A  Yes, sir.
14  Q  Then I believe -- In fairness, was there
15  any doubt that Mr. Kelley was aware of the problem
16  from 1956 on?
17      MR. GRAHAM: Object to the form of
18  the question. I don't understand it.
19      Go ahead and answer it if you can
20  understand it.
21      THE WITNESS: I don't either. I
22  don't understand it either. You say "That
23  Mr. Kelley was aware of the problem." I don't know
24  which problem you're talking about.
25  /////

---

Page 283

1  BY MR. HEBERLING:
2  Q  The problem of slowness to react or what
3  was being done in response to the recommendations of
4  the State Health Department.
5  A  Well, this was his feeling that this was a
6  problem. I don't know that I agreed or disagreed at
7  that time, but that was his reaction.
8  Q  And then it says, "Not later than
9  April 15 I expect you to request a resurvey by the
10  Montana State Department of Health"?
11  A  Yes.
12  Q  That's toward the bottom. Do you see
13  that?
14  A  Yes.
15  Q  Was that done?
16  A  I don't recall.
17  Q  Was there an inspection by the Montana
18  State Board of Health in 1965, to your knowledge?
19  A  I don't recall. If there was, there would
20  be a report on it.
21  Q  Now, one of the recommendations had been
22  to have this ground level exhaust from the 600 fan
23  raised up and, instead of having a horizontal stack,
24  have a vertical stack?
25  A  Yes.

---

**HEDMAN & ASA REPORTING - (406)752-5751**   Page 280 - Page 283

Page 284

17:16:48 1    Q  And since you were to bring the
17:16:50 2  recommendations into effect immediately and that was
17:16:54 3  one of the recommendations, why wasn't that yet done
17:16:54 4  for three more years?
17:16:56 5    A  I don't know.
17:17:00 6    Q  And they had recommended a vacuum system.
17:17:02 7  Do you recall that in the 1956 report?
17:17:04 8    A  Yes.
17:17:10 9    Q  And was that bought at this time, in '65?
17:17:12 10   A  I don't recall.
17:17:16 11   Q  And do you recall a recommendation to
17:17:18 12 clean the floors and rafters so that dust from the
17:17:22 13 floors and rafters was not a factor?
17:17:22 14   A  Yes, sir.  I recall that.
17:17:28 15   Q  And yet the monthly sweepdown was
17:17:28 16 continued, was it not?
17:17:30 17   A  Well, that was part of the program.
17:17:40 18   Q  Let's refer to Exhibit 71.  Does this
17:17:44 19 appear to be a letter of January 11, '65 by Mr. Park
17:17:46 20 of the insurance company to W.R. Grace?
17:17:50 21   A  Yes.
17:18:00 22   Q  Did you receive a copy of this in Libby in
17:18:02 23 January '65?
17:18:08 24   A  I don't believe so, no, sir.  I don't
17:18:08 25 recall.

Page 285

17:18:20 1        MR. HEBERLING:  Okay.  Let's stop
17:18:20 2  right here.
17:18:24 3        THE VIDEOGRAPHER:  We're going off
17:18:28 4  the record at 5:18 on the 19th to recess this
17:18:28 5  deposition until tomorrow morning.
6        (Whereupon, the deposition of
7  Earl D. Lovick was recessed at 5:18 a.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 286

1              CORRECTION PAGE
2  PAGE    LINE        CORRECTION
3
4
5
6
7
8
9
10
11
12
13
14    I have read the foregoing testimony and
15  believe the same to be true, except for the
16  corrections noted above.
17        DATED this ___ day of _____, 1997.
18
19          Earl D. Lovick
20  _____
   Subscribed and sworn to before me this ____ day
21  of _____, 1997.
22
23  Notary Public for the
   State of Montana.
24  Residing at _____
25        My Commission expires: _____

Page 287

1
2
3       REPORTER'S CERTIFICATE
4
5    I, Jolene Asa, Registered Professional
   Reporter and Notary Public for the State of Montana,
6  do hereby certify:
7        THAT I did report the foregoing transcript
   after having first duly sworn the witness to testify
8  to the truth;
9        THAT said transcript was taken at the time
   and place stated on the caption hereto; and
10
      THAT the testimony of the witness was
11 taken in shorthand by me and subsequently reduced to
   writing under my direction; and
12
      THAT the foregoing is a true and correct
13 description of all the testimony of said witness to
   the best of my ability.
14
      IN WITNESS WHEREOF, I have hereunto
15 subscribed my name and affixed my seal of office
   this 13th day of January, 1997.
16
17
18
19
   _____
   JOLENE ASA, RPR, and Notary Public
20 for the State of Montana.
   Residing in Flathead County, Montana.
21 My Commission expires 8/10/96
22
23
24
25

## LOVIC DEPOS DELIVERED PER HURLBERT RFP #1-4

12/20/83      <u>Greenville County School District v. United States Gypsum Company</u>, U.S. District Court, South Carolina, Greenville Division.

7/15/86      <u>Priest v. W.R. Grace & Company</u>, U.S. District Court, Montana, Missoula Division.

6/5/87      <u>Anchorage School District v. W.R. Grace & Co.</u>, U.S. District Court, District of Alaska.

10/29/87      <u>Adams-Arapahoe School District v. Celotex Corporation</u>, U.S. District Court, District of Colorado.

9/6/89      <u>Cole v. W.R. Grace and Company</u>, U.S. District Court, Montana, Missoula Division.

12/21/88      <u>Methodist Health Systems, Inc. v. W.R. Grace & Co.</u>, U.S. District Court, Western District of Tennessee, Western Division.

9/7/89      <u>Hagen v. Armstrong World Industries, Inc.</u>, U.S. District Court, District of South Dakota, Northern Division.

10/13/89      <u>The 3250 Wilshire Boulevard Building v. Metropolitan Life Insurance Company</u>, U.S. District Court, Central District of California.

7/26/90      <u>80 South Eighth Street Limited Partnership v. Armstrong World Industries, Inc.</u>, U.S. District Court of Minnesota, Third Division.

11/20/90      <u>Brevard County v. W.R. Grace & Company</u>, U.S. District Court, Middle District of Florida, Orlando Division.

5/8/91      <u>Plaza 600 Corporation v. W.R. Grace & Co.</u>, U.S. District Court, Western District of Washington at Seattle.

2/5/92      <u>Bunker Hill Towers Condominium Association v. The Prudential Insurance Company of America</u>, Superior Court of the State of California, County of Los Angeles.

C:\WPDOCS\ASBESTOS\DEPOLIST



EXHIBIT

A

PENGAD-Bayonne,N.J.

2/13/92          Farm Credit Bank of St. Paul v. W.R. Grace & Co., U.S.
                 District Court of Minnesota, Third Division.

3/17/92          Trizec Properties, Inc. V. United States Gypsum Company,
                 Superior Court of the State of California, County of Los
                 Angeles.

5/27/92          Robertson v. W.R. Grace and Company, 19th Judicial
                 District Court of Montana, Lincoln County.

6/10/92          South Carolina v. W.R. Grace & Company, U.S. District
                 Court of South Carolina, Columbia Division.

1/21/93          Prince George Center, Inc. V. United States Gypsum Co.,
                 Court of Common Pleas, Philadelphia County, Trial Division.

9/13/93          California Bank v. GAF Building Corporation, Superior Court,
                 State of California, County of Los Angeles.

1/29/93          Maryland Casualty v. W.C. Grace & Company, U.S. District
                 Court, Southern District of New York.

3/7/95           Block 145, Ltd. v. W.R. Grace & Co., 146th Judicial District
                 Court, Harris County, Texas.

9/7/95           Baron & Budd, District Court, Dallas County, Texas.

