

## CONDENSED TRANSCRIPT

---

DANIEL R. SCHNETTER and DELLA F. SCHNETTER

VS.

W.R. GRACE & CO., ET. AL.

Cause Nos. CDV-94-74

---

### TRANSCRIPT OF PROCEEDINGS

### TESTIMONY

### OF

### EARL LOVICK

April 29, 1997

Reported by Debra M. Hedman, RPR, RMR
Hedman, Asa & Gilman Reporting
974 South Main
P.O. Box 394
Kalispell, Montana 59901
(406)752-5751

**TRANSCRIPT OF PROCEEDINGS**   Condenselt!™   **SCHNETTER vs W.R. GRACE**

Page 1

```
 1        IN THE DISTRICT COURT OF THE NINETEENTH
 2      JUDICIAL DISTRICT FOR THE STATE OF MONTANA
 3        IN AND FOR THE COUNTY OF LINCOLN
 4   CAUSE NO. CDV-94-74
 5   DANIEL R. SCHNETTER and        )
     DELLA F. SCHNETTER,            )
 6                                  )
            Plaintiffs,             )
 7                                  )
          vs                        )
 8                                  )
     W.R. GRACE & CO. - CONN.,      )
 9                                  )
            Defendant.              )
10                                  )
11
12           Transcript of Proceedings
13                (Day two)
14   The Honorable James E. Purcell, Presiding
15
16
17
18
19
20           Lincoln County Courthouse
                   Libby, Montana
21            Tuesday, April 29, 1997
                   9:00 a.m.
22
23
24        Reported by Debra M. Hedman, RPR, RMR, and Notary
25   Public for the State of Montana, Flathead County.
```

Page 2

```
 1
 2
 3              A P P E A R A N C E S
 4
 5   Appearing on behalf of the Plaintiffs:
 6      Mr. Tom L. Lewis, Esq.
        J. David Slovak, Esq.
 7      Lewis, Huppert & Slovak
        P.O. Box 2325
 8      Great Falls, Montana 59403
 9      Mr. Thomas A. Baiz, Jr., Esq.
        Baiz Law Offices
10      P.O. Box 1828
        Great Falls, Montana  59403
11
     Appearing on behalf of the Defendant:
12
        Mr. Gary R. Graham, Esq.
13      Mr. Kelley M. Wills, Esq.
        P.O. Box 7909
14      Missoula, Montana 59807-7909
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2
 3                  I N D E X
 4
     EXAMINATION                              PAGE
 5   EXAMINATION OF EARL LOVICK
 6   Cross-Examination by Mr. Lewis            5
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1            THE COURT:  Do counsel agree that the
 2   jury is all present and accounted for?
 3            MR. LEWIS:  Yes, Your Honor.
 4            MR. GRAHAM:  Yes, Your Honor.
 5            THE COURT:  Very well, you may
 6   proceed.  Mr. Lewis.
 7            MR. LEWIS:  Thank you, Your Honor.
 8   Good morning.  Good morning, ladies and gentlemen of
 9   the jury.  The Plaintiff will call our first witness
10   now, Mr. Earl Lovick.
11            THE COURT:  Mr. Lovick, if you would
12   please stand and be sworn, please.
13
14            EARL D. LOVICK,
15   having been first duly sworn to tell the truth, the
16   whole truth, and nothing but the truth, testifies
17   upon his oath as follows:
18
19            MR. LEWIS:  May I approach the
20   witness, Your Honor?
21            THE COURT:  You certainly may.
22            MR. LEWIS:  There is some water.  May
23   I examine this witness as an adverse or hostile
24   witness, Your Honor?
25            THE COURT:  You may.
```

**TRANSCRIPT OF PROCEEDINGS**    CondenseIt!™    **SCHNETTER vs W.R. GRACE**

Page 5

1    MR. LEWIS: Thank you.
2
3        CROSS-EXAMINATION
4 BY MR. LEWIS:
5    Q  Mr. Lovick, would you state your full name
6 for the record, please.
7    A  Earl D. Lovick.
8    Q  And where do you reside?
9    A  1021 Idaho Avenue, Libby, Montana.
10    Q  How long have you resided there?
11    A  I've resided at that address since 1950.
12    Q  What is your occupation?
13    A  I am basically retired at this time.
14    Q  Well, actually that's not the full story,
15 is it?
16    A  From time to time I act as a consultant
17 for W.R. Grace and Company, and I'm paid for my time
18 when I do that.
19    Q  Well, not just from time to time, but
20 quite a bit, right?
21    A  I don't know what you mean by "quite a
22 bit."
23    Q  Well, like you have been to New York a few
24 times on behalf of W.R. Grace?
25    A  Yes, sir, over the last 13 years, I have

Page 6

1 been.
2    Q  Boston?
3    A  Yes, sir.
4    Q  Rochester?
5    A  Yes, sir.
6    Q  Los Angeles?
7    A  Yes, sir.
8    Q  Any other places?
9    A  Yes, I've been to Houston.
10    Q  And every time, you go there as a
11 representative of W.R. Grace in litigation; is
12 that true?
13    A  In those cases, yes, there has been
14 litigation involved.
15    Q  When did you say you retired?
16    A  1983.
17    Q  In 1983 then you lost your official
18 authority to act on behalf of W.R. Grace in any
19 capacity; is that correct?
20    A  Other than as a consultant on things that
21 I was called to do.
22    Q  Did you maintain an office after 1983 at
23 the W.R. Grace facility?
24    A  Yes, I did.
25    Q  And in that capacity, after 1983, even

Page 7

1 though you retired and were drawing your pension,
2 you initiated correspondence on behalf of W.R. Grace
3 on the W.R. Grace letterhead, true?
4    A  Yes, sir.
5    Q  A multitude of correspondence; is that
6 true?
7    A  I don't know what "multitude" means,
8 either.
9    Q  Okay.  A hundred times you initiated
10 correspondence?  How about that?
11    A  I don't know.
12    Q  Is that precise enough?
13    A  Possibly.
14    Q  Two hundred times?
15    A  I don't think so.
16    Q  Okay.  But in any event, you function to a
17 great degree as a professional witness on behalf of
18 W.R. Grace; is that correct?
19    A  Yes, sir.
20    Q  And are you still paid $300 a day or do
21 you get more now?
22    A  No, sir, I don't get any more.
23    Q  So when you -- you're on an airplane
24 traveling, you get $300 a day, right?
25    A  Yes, sir.

Page 8

1    Q  Plus all your expenses?
2    A  Yes, sir.
3    Q  In this trial, as you sit here, you get
4 $300 a day, right?
5    A  Yes, sir.
6    Q  When you go to Houston to testify for W.R.
7 Grace, $300 a day, right?
8    A  Yes, sir.
9    Q  LA, Boston, New York, all the same?
10    A  Yes.
11    Q  What was your job at W.R. Grace?
12    A  Well, I had various jobs.  I started out
13 as an accountant and I became assistant manager; for
14 about three years I was general manager of the Libby
15 operation; after that, I was manager of
16 administration.
17    Q  Did you have any involvement in the hiring
18 of Dan Schnetter?
19    A  I don't recall the hiring of people --
20 that came under -- The hiring of people came under
21 my jurisdiction, but I usually did not interview the
22 people and hire them or not.
23    Q  So the ordinary custom and practice would
24 have meant that you did not see Dan Schnetter at the
25 time he was hired, correct?

**Page 9**

1  A That's correct.

2  Q You have no independent recollection of

3  ever discussing anything with Dan Schnetter before

4  or contemporaneous with his hiring; is that

5  correct?

6  A No, sir, I did not.

7  Q And so if Dan Schnetter described what he

8  was told at the time of his hiring, you could not

9  refute what he said, correct?

10  A No, sir, I do not know.

11  Q You have no documents indicating what he

12  was told at the time he was hired, correct?

13  A No, sir. I do not have documents.

14  Q What kind of an employee was Dan

15  Schnetter?

16  A As my recollection, as far as I know, Dan

17  Schnetter was a good employee.

18  Q Had a reputation for honesty and decency?

19  A Yes, sir.

20  Q Did a good job for the company?

21  A As far as I know, yes, sir.

22  Q Do you know why he left the company?

23  A No, sir, I don't.

24      MR. LEWIS: Do you have that

25  document?

**Page 10**

1  BY MR. LEWIS:

2  Q Do you know a man named William McCaig?

3  A Yes, sir.

4  Q He's one of the witnesses identified by

5  W.R. Grace to testify in this case?

6  A I understand so, yes.

7  Q And was he formerly your supervisor?

8  A Yes, sir.

9  Q Was he the manager of Libby operations on

10  July 31 -- excuse me, July 30, 1981?

11  A Yes, sir.

12      MR. LEWIS: Could I have Plaintiffs'

13  Exhibit G-72, please.

14      THE COURT: Which one?

15      MR. LEWIS: G-72.

16      THE COURT: These are mine, but you

17  can --

18      MR. LEWIS: The clerk has the

19  official exhibits.

20      THE COURT: What's the number?

21      MR. LEWIS: G-72. I know we filed

22  the exhibits with the clerk, Your Honor. We filed

23  two sets, one for the judge --

24      THE COURT: This one was sent to me.

25  These are -- Here is the --

**Page 11**

1      MR. LEWIS: But we need the actual

2  exhibits so we don't take the judge's copy.

3      THE COURT: They won't be in that

4  one. It's in volume --

5      MR. LEWIS: Probably two. Must be in

6  the clerk's office.

7      MR. LEWIS: May we proceed with this

8  copy?

9      THE COURT: No problem.

10      MR. LEWIS: May I approach the

11  witness, Your Honor?

12      THE COURT: Let that be standing with

13  counsel that you may approach the witnesses and pass

14  freely in the courtroom.

15      MR. GRAHAM: Thank you.

16  BY MR. LEWIS:

17  Q Do you have in front of you a July 30,

18  1981, letter on the official W.R. Grace letterhead

19  signed by William J. McCaig?

20  A Yes.

21  Q To whom it may concern?

22  A Yes, sir, I have that.

23  Q Was that letter prepared in the ordinary

24  and usual course of business of W.R. Grace?

25  A I would assume so, yes, sir.

**Page 12**

1      MR. LEWIS: I'll offer this exhibit,

2  Your Honor. 71 -- 72. Excuse me.

3      MR. GRAHAM: No objection.

4      THE COURT: Very well, it may be --

5  G-72 will be admitted without objection.

6  BY MR. LEWIS:

7  Q Would you read that letter to the jury,

8  please.

9  A It is written, To whom it may concern, on

10  July 30, 1991. Subject: Employment recommendation

11  for Daniel Schnetter. Dan Schnetter has been

12  employed by W.R. Grace since May of 1973. He had

13  worked approximately 18 months as a common laborer

14  and a construction worker until he had reached a

15  point where he attained enough seniority to bid into

16  the electrical group.

17      Dan joined our electrical group in

18  December of 1974 and progressed rapidly through the

19  on-the-job training program, reaching the top rank

20  electrician in that department in June of 1976. Dan

21  is intelligent, has good work habits and attitude

22  and demonstrates a genuine concern for the effect

23  that his individual efforts have on the total

24  operation here in Libby.

25      I'm also acquainted with Dan on a personal

Page 13

1 level and hold him in high regard. His high moral
2 character, personal standards and artistic talents
3 make him a valuable member of the community as well
4 as make any prospective employer proud to include
5 him in their employment.
6     I regret Dan's decision to leave W.R.
7 Grace, and would be happy to consider him for rehire
8 should the occasion arise. Signed W.J. McCaig,
9 Manager, Libby operations.
10    Q  Thank you, sir. Can I assume that you
11 completely agree with what Mr. McCaig said about
12 Dan Schnetter?
13    A  Yes, sir.
14    Q  You have been identified by W.R. Grace as
15 the person most knowledgeable concerning the Libby
16 operations and the history of the Libby operations
17 of Zonolite and subsequently the W.R. Grace facility
18 on Vermiculite Mountain. Do you agree with that?
19    A  I think that's probably true.
20    Q  You are, at least, the one with the most
21 experience, correct?
22    A  Yes, sir.
23    Q  Would you describe for the jury what the
24 business operations of Zonolite and its successor,
25 W.R. Grace, were on Vermiculite Mountain? Just the

Page 14

1 general operation of the business, to assist and
2 help the jury understand what you folks did up there
3 to place this case in proper context.
4     A  The business operation of W.R. Grace at
5 Libby was to mine and concentrate vermiculite so
6 that it could be shipped to customers all over the
7 United States and throughout the world.
8         This mining consisted of digging it out of
9 the deposit, running it through a mill where it was
10 concentrated -- and by that I mean, the vermiculite
11 was separated from the total material that was
12 treated. And the part that was discarded was the
13 undesirable or extraneous minerals which were in
14 there, which covered a broad spectrum. There were
15 many other minerals.
16         And in its concentrated form, it was
17 loaded generally on rail cars -- that's how most of
18 the shipment was done out of Libby -- and shipped to
19 the plants, generally expanding plants, where it was
20 put into a form where it could be utilized and could
21 be sold on the market.
22    Q  Mr. Lovick, from 1948 to 1961, you worked
23 as an accountant for Libby?
24    A  Yes, sir.
25    Q  Or for W.R. Grace or Zonolite?

Page 15

1     A  Yes, sir.
2     Q  And where did you work?
3     A  In downtown Libby.
4     Q  How far is that from the vermiculite mine
5 and mill?
6     A  By road, about 12 miles.
7     Q  And how far as the crow flies?
8     A  Seven to nine miles.
9     Q  Is the headquarters of W.R. Grace, or was
10 the headquarters of W.R. Grace in downtown Libby?
11 Let me rephrase that. Was the headquarters for the
12 W.R. Grace facility in Lincoln County located in
13 downtown Libby?
14    A  Yes, sir.
15    Q  And then after you became -- you said you
16 became general manager for several years. Some
17 period of time. When was that?
18    A  In 1968.
19    Q  Okay. What did you do from '61 to '68?
20    A  I was assistant to the manager and
21 responsible primarily for the business aspects of
22 the operation here in Libby.
23    Q  Where was the manager located?
24    A  In downtown Libby.
25    Q  And so when you were assistant to the

Page 16

1 manager from '61 to '68, you were also working
2 primarily in downtown Libby?
3     A  Yes, sir.
4     Q  And after -- In the three years when you
5 were manager, you worked in downtown Libby.
6     A  Yes, sir.
7     Q  And then what happened after '72 or
8 whatever it was when you were no longer the manager?
9     A  I still worked in downtown Libby.
10    Q  Who did you work for then?
11    A  Bob Oliverio and later on Bill McCaig.
12    Q  How long did you work for Bob Oliverio?
13    A  From 1971 to 1979, I believe.
14    Q  Okay. And then after -- who took your
15 place as general manager in about '72?
16    A  Bob Oliverio.
17    Q  And then when did Mr. McCaig replace
18 Mr. Oliverio?
19    A  In 1979.
20    Q  Okay. What happened to Mr. Oliverio?
21    A  He left Libby and went to work for another
22 company in -- I believe in Florida.
23    Q  Now, this mine up on the hill there, was
24 it an open pit mine?
25    A  Yes, sir.

TRANSCRIPT OF PROCEEDINGS          Condenselt!™          SCHNETTER vs W.R. GRACE

Page 17

1  Q  What is an open pit mine?
2  A  Well, it means all the mining is done on
3  the surface, and in this case the surface means it
4  was literally on the top of the mountain.
5  Q  Did it remain an open pit mine throughout
6  its years of operation?
7  A  Yes, sir.
8  Q  Do you recall when W.R. Grace acquired the
9  Zonolite Company and the mine?
10  A  Yes, sir.
11  Q  When was that?
12  A  1963, in April.
13  Q  And you were still assistant manager at
14  that time?
15  A  Yes, sir.
16  Q  Was there ever a man named Raymond Bleich
17  that worked up there?
18  A  Yes, sir.
19  Q  What was his position?
20  A  Well, the last position he had, he was
21  general manager of the Libby operation.
22  Q  And when did he leave the company?
23  A  1968.
24  Q  Why did he leave the company?
25  A  He died.

Page 18

1  Q  What did he die of?
2  MR. GRAHAM:  Objection, relevance.
3  THE COURT:  Overruled.  He may
4  answer.
5  THE WITNESS:  He died of lung
6  cancer.
7  BY MR. LEWIS:
8  Q  And then you became general manager for a
9  period of time after that?
10  A  Yes, sir.
11  Q  Now, your primary function was the
12  business end of the company, correct?  Your primary
13  work was the business end of the company?
14  A  Well, when I was general manager, the
15  primary function was -- I was in charge of all of
16  the operations in Libby.
17  Q  Well, would it be fair to say that you
18  spent very little time on the mountain itself?
19  A  Well, again, I don't know what "very
20  little" means, but I certainly spent the majority of
21  my time in Libby.  Every -- in town in Libby.
22  Q  Did you spend the vast majority of your
23  time in the office?
24  A  Again, I don't know what "vast majority"
25  means, but I spent the major part of my time in

Page 19

1  town -- in the downtown office, yes.
2  Q  You don't understand what "the vast
3  majority" means?
4  A  No, sir, I don't.
5  Q  Do you recall testifying in a case in
6  Missoula on August 23rd, 1990?
7  A  I think so.
8  Q  Did you have any difficulty understanding
9  what the vast majority of your time meant --
10  MR. GRAHAM:  Objection,
11  argumentative, Your Honor.
12  THE COURT:  Well, he remembers --
13  overruled.  If he remembers the time and place, he
14  can say "yes" or "no".
15  THE WITNESS:  Well, I remember
16  testifying in Missoula, yes.
17  BY MR. LEWIS:
18  Q  Well, maybe I'm quibbling a bit.  Let's go
19  on to something that's important.  Your exposure to
20  dusts at the mine was much less than a line workman
21  up at the mine; is that true?
22  A  Yes, sir.
23  Q  Did you become -- Did you have asbestos-
24  related disease as a result of your work at Libby?
25  A  Yes, sir.

Page 20

1  Q  When did that occur?
2  A  Well, it occurred -- it was first
3  noticed -- I don't know the exact date.  It would
4  have been in the late 1960s.
5  Q  Did you have surgery as a result of that?
6  A  Yes, sir, I had surgery for -- in, I
7  believe, 1972.
8  Q  You haven't had any problems since then?
9  A  No, sir.
10  Q  Did you file a claim against the company
11  at the time you retired concerning that --
12  concerning lung disease?
13  A  Yes, sir.
14  Q  So in 1983 you filed a claim against your
15  company for your lungs?
16  A  Yes, sir.
17  Q  Was there ever any significant change in
18  the mining operations on Vermiculite Mountain from
19  the time you first were hired up until the time you
20  left?
21  A  Well, at the mining operations, again,
22  depending on the definition of "significant change,"
23  the basic means of mining continued the same
24  throughout the entire period.  However, the
25  equipment that was used differed, because from time

**TRANSCRIPT OF PROCEEDINGS**   CondenseIt!™   **SCHNETTER vs W.R. GRACE**

Page 21

1 to time it was replaced with new equipment. And
2 generally, when something was replaced, it was
3 replaced with something with more capacity, larger
4 size.
5    Q  Well, what kind of mill did you have when
6 you came to work at W.R. Grace?
7    A  The only mill that was there was the dry
8 mill.
9    Q  Has that been referred to as the old dry
10 mill?
11    A  Yes, sir.
12    Q  Now when -- were there any changes to the
13 old dry mill?
14    A  Over time, yes, there were changes made to
15 it. There were additions put on to it. There was
16 changes made internally for the handling of the
17 material.
18    Q  How long did W.R. Grace continue to use
19 the dry mill?
20    A  It was used until the new mill was built
21 and put on stream in 1974.
22    Q  Are you sure that the mill was put on
23 stream with success in 1974?
24    A  Yes, sir, I am.
25    Q  Were there any problems that caused the

Page 22

1 dry mill to continue to operate through 1976?
2    A  No, sir.
3    Q  So in 1974, the old dry mill was
4 completely shut down and no further work was
5 performed; is that your testimony under oath?
6    A  As I recall, that's my testimony.
7    Q  Then after that, what process did you
8 use -- what did you used to process the ore?
9    A  Well, it was processed in the new mill
10 which was built.
11    Q  And that was a wet mill process?
12    A  Basically, the concentration was all done
13 by wet process, yes, sir.
14    Q  What is the difference between a dry mill
15 process and a wet mill process?
16    A  Well, a wet mill process, the material is
17 handled and concentrated generally in water. In a
18 dry mill process, there is no -- there is no water
19 used. It's processed and concentrated by screening
20 and crushing, without the addition of any water or
21 any moisture.
22    Q  Okay. When the old dry mill was
23 operating, what amount of ore would be processed
24 through that mill on an ordinary day?
25    A  In my memory -- and this could be off

Page 23

1 somewhat, there -- the amount of concentrate coming
2 out of the dry mill was about 500 tons, average, and
3 the amount of material that would be processed to
4 gain that 500 tons would probably be between 2,500
5 and 3,000 tons.
6    Q  And what would determine how much raw
7 material would be required to yield the 500 tons a
8 day of vermiculite?
9    A  The capacity of the equipment to process
10 the material in the mill.
11    Q  Perhaps my question was imprecise. What
12 I'm trying to find out is, why would it take more on
13 some days to get the 500 tons than on other days?
14 Why would it take more raw ore?
15    A  Well, because some days the feed to the
16 mill, which is what was entered into the mill, would
17 be of lower grade than other days. And when I say
18 "lower grade," there would be a smaller percentage
19 of vermiculite in it than other days. And the
20 ruling factor would be what the mill could handle
21 when it entered -- when it entered the mill and went
22 through the process.
23    Q  Well, would it mean that -- If it took
24 more ore to get 500 tons of vermiculite, that meant
25 there were more contaminants in the ore; is that

Page 24

1 correct?
2    A  Well, yes, but I think you misunderstood
3 me. We were kind of bound by the amount of ore that
4 we could put into the mill, and the difference would
5 come as to what the output would be.
6    Q  Okay. I think I understand what you're
7 saying now. You didn't always get 500 tons a day.
8 That was the average?
9    A  Yes, sir. Some days it would be more,
10 some days it would be less.
11    Q  It would depend on the quality of the
12 ore?
13    A  Yes, sir.
14    Q  And the ability of the equipment to handle
15 the capacity?
16    A  Yes, sir.
17    Q  Okay. As time went by, did the amount of
18 ore processed at the mill increase?
19    A  To some extent, yes, there were things
20 done at various times to increase the amount of
21 material that could be handled.
22    Q  When you retired in 1983, how much ore was
23 being -- excuse me, how much concentrated -- how
24 many tons of concentrated vermiculite were being
25 produced each day?

Page 25

1    A  An average of about 1,000 tons.
2    Q  And that was an approximate average
3  again?
4    A  Yes, sir.
5    Q  Some days you got 900 tons, some days you
6  got 1,100 tons?
7    A  Yes, sir.
8    Q  Do you agree that as of 1967, you knew you
9  had a serious asbestos-related disease problem in
10  the mill?
11    A  We -- I think we realized we had a problem
12  in the mill because of -- because of the dust.
13    Q  Well, do you agree that at least by 1967
14  there was significant evidence that asbestos or
15  asbestos-related disease was a serious health hazard
16  to your employees?
17    A  Well, I don't know that we realized what
18  significance -- how serious a significance the
19  asbestos was in the dust.
20    Q  I'm going to hand you a trial transcript
21  of your testimony in the case of Mildred Johnson
22  versus W.R. Grace.  Direct your attention to page
23  53, line 8.  Do you -- Question:  Do you agree that
24  at least by 1967 there was significant evidence that
25  asbestosis or asbestos elicited disease was a

Page 26

1  serious health hazard to your employees?
2         Answer:  I think it's true that by 1967 we
3  recognized that there was -- that there was a
4  problem with asbestosis with some of our employees,
5  yes.  Is  that -- Was that your testimony in that
6  trial?
7    A  Yes, sir.
8    Q  Do you think that you knew about that for
9  many years before 1967?
10    A  I don't know.  I don't know whether we
11  knew about that for many years or not.
12    Q  You don't think you knew about that as
13  early as 1956, as your counsel suggested in his
14  opening statement?
15    A  We were told that asbestos was a toxic
16  substance in 1956.
17    Q  What do you understand "toxic substance"
18  to mean?
19    A  Something that's unhealthy.
20    Q  Well, if asbestos was a toxic substance,
21  then by definition, your definition, it would mean
22  that it would be something that was unhealthy,
23  right?
24    A  Yes, sir.
25    Q  You knew your men were being exposed to

Page 27

1  high levels of asbestos as early as 1956, correct?
2    A  We knew that they were being exposed to
3  asbestos, yes, sir.
4    Q  And you knew that from 1956 up to 1974,
5  when the old mill closed, that in the old mill, at
6  least, that was a terribly dusty place, correct?
7    A  It was a very dusty place, yes, sir.
8    Q  You described it as a terribly dusty
9  place, correct?
10    A  Okay.  Yes.
11    Q  And you knew that in that terribly dusty
12  place, there were high amounts of asbestos fibers,
13  correct?
14    A  Yes, sir.
15    Q  Floating in the air?
16    A  Yes.
17    Q  Correct?  Now, asbestos fibers themselves,
18  are they visible to the naked eye?
19    A  No.
20    Q  So what the men were really seeing in this
21  dust was what you folks referred to as "nuisance
22  dust," correct?  What was visible was nuisance
23  dust?
24    A  I don't know that that's a true statement,
25  no, sir.  What we knew in there was dust, but I

Page 28

1  don't know that we ever classified it as nuisance
2  dust.
3    Q  You never used the term "nuisance dust"?
4    A  Oh, yes.
5    Q  Did you ever represent to any of the
6  employees, at any time while you were working at
7  W.R. Grace, that all they were dealing with up there
8  was nuisance dust?
9    A  No, I never used a term like -- I never
10  made a statement like that.
11    Q  Did you ever tell any of the employees
12  that this nuisance dust -- that all this was was
13  nuisance dust and it was harmless to them?
14    A  No, sir.
15    Q  I ask you, under your oath, did you ever
16  make such statements?
17    A  Not to my recollection, no, sir.
18    Q  Did you ever participate in safety
19  meetings?
20    A  Yes, sir.
21    Q  Did you participate in safety meetings
22  throughout your employment at W.R. Grace?
23    A  Well, throughout much of it, yes, sir.
24    Q  And you participated in safety meetings
25  from 1963 through 1981?

TRANSCRIPT OF PROCEEDINGS                Condenselt!™                SCHNETTER vs W.R. GRACE

---

Page 29

1   A  Yes, sir.
2   Q  And by safety meetings, usually safety
3  meetings where both management and some line
4  employees were present, correct?
5   A  Yes, sir.
6   Q  Do you recall in your opening -- in his
7  opening statement, Mr. Graham saying that there was
8  a dust problem at the mill?
9   A  I believe so, yes, sir.
10   Q  But the truth of the matter is, the
11  problem really wasn't a dust problem at all.  It was
12  an asbestos problem, correct?
13   A  We always considered it a dust problem.
14   Q  As opposed to an asbestos problem?
15   A  Yes, sir.
16   Q  Now, one could be a farmer and have a dust
17  problem, correct?
18   A  Yes.
19   Q  One could work in a feed plant and have a
20  dust problem, correct?
21   A  Yes.
22   Q  But that wouldn't necessarily lead to
23  exposure of dangerous levels of asbestos, correct?
24   A  Possibly.  Possibly not.
25   Q  Well, surely not levels of asbestos like

---

Page 30

1  your men were exposed to up at Vermiculite Mountain?
2   A  I wouldn't expect so, no, sir.
3   Q  You know, as you sit here, the levels of
4  asbestos exposure that were present in the old dry
5  mill are among the highest ever known to man; is
6  that true?
7   A  No, sir.
8   Q  You know, as you sit here, that you folks
9  at W.R. Grace were repeatedly told, from many
10  different authorities, that you had an
11  extraordinarily high amount of asbestos in the air
12  at the old dry mill, correct?
13   A  Yes, sir, we were told that.
14   Q  Over and over you were told that the
15  levels of asbestos in that mill exceeded any
16  acceptable level, correct?
17   A  We were told that, at times, yes, sir.
18   Q  But in the safety meetings, you never even
19  discussed asbestos, did you?
20   A  That's not true, no, sir.
21   Q  Now you -- Sir, I asked you, under your
22  oath, did the subject of the dangers inherent in
23  asbestos come up at any of those safety committee
24  meetings, at any time?
25   A  I don't recall.

---

Page 31

1   Q  You just said you did recall and they came
2  up.  Now, which is it?
3   A  We certainly discussed -- We certainly
4  discussed the dust problems, and asbestos was one of
5  the components of the dust.
6   Q  There is a big difference between a dust
7  problem and an asbestos problem, correct?  Right?
8   A  Yes.
9   Q  The men could see the dust, right?
10   A  Yes.
11   Q  But they couldn't see the asbestos,
12  right?
13   A  Yes.
14   Q  Okay.  Now sir, just to put it in its
15  proper perspective, could I have Mr. -- Where is
16  the deposition -- I need his deposition -- Do we
17  have his deposition filed?
18      (A discussion was held off the record.)
19  BY MR. LEWIS:
20   Q  But I want to ask you one more question.
21  You really, at these safety meetings, just talked
22  about nuisance dust; is that correct?
23   A  We talked about dust.
24   Q  You didn't ever talk about asbestos dust,
25  did you?

---

Page 32

1   A  I don't know.  I would assume that we did,
2  yes, sir.  But --
3   Q  That's just an assumption on your part?
4   A  I don't recall specifically, no, sir.
5   Q  Do you remember your deposition now, after
6  reflecting on this?
7   A  No, sir, I don't know what deposition --
8   Q  Do you remember saying in your deposition,
9  I don't recall that the dangers of asbestos would
10  have come up, but I know that the problem of dust
11  exposure came up?
12   A  Isn't this what I just said?
13   Q  But dust exposure is not asbestos
14  exposure, per se, is it?
15   A  No, sir.
16   Q  Okay.  And then you were asked again, You
17  don't recall ever attending a safety meeting where
18  the dangers of asbestos dust were discussed, but
19  there were discussions of nuisance dust that you
20  earlier discussed.  That's what really happened at
21  these safety meetings.  You talked about nuisance
22  dust, right?
23   A  We talked about dust in general, yes, sir.
24   Q  Did you talk about nuisance dust?
25   A  Possibly.  Possibly that word was used

---

Page 33

1 from time to time, but generally we were concerned
2 about total dust.
3    Q  Total dust?
4    A  Total dust.
5    Q  And you personally never ever brought up
6 the subject of asbestos at a safety meeting; is that
7 true?
8    A  I don't recall, no, sir.
9    Q  You don't recall one way or the other?
10    A  Yes, sir.
11    Q  Well, now, that's inconsistent with what
12 you said a little while ago when you said it was
13 brought up.
14        MR. GRAHAM: Objection,
15 argumentative, Your Honor.
16        MR. LEWIS: I'll withdraw the
17 question.
18 BY MR. LEWIS:
19    Q  You were on the safety committee and there
20 were -- you were on that committee for many years,
21 right?
22    A  Various -- It wasn't the same committee
23 the whole time, but yes, I was on the safety
24 committee for many years.
25    Q  But in any event, as you sit here right

Page 34

1 now, knowing how important this asbestos issue was,
2 back in the '50s and '60s, and certainly into the
3 '70s and '80s, you can't recall a single time where
4 you brought up the subject of the dangers of
5 asbestos at a safety meeting; is that true?
6    A  Yes, sir, that's true.
7    Q  Would you agree with me that for every ton
8 of vermiculite concentrate, it took about 22 tons of
9 ore?
10    A  Well, I would have to ask at what -- in
11 what period of time? At what period of time?
12    Q  Well, I'm just talking about an average.
13 In an average, over the long haul.
14    A  Again, I would have to ask what period of
15 time, because that amount varied from the time --
16 from the old mill until we got -- from what it was
17 in the new mill.
18        MR. LEWIS: Could I have
19 Exhibit G-42, please. (Pause.) Thank you, Your
20 Honor.
21 BY MR. LEWIS:
22    Q  I'm handing you what has been marked as
23 Exhibit G-42. Have you ever seen that document
24 before?
25    A  Yes, I have.

Page 35

1    Q  And what is it?
2    A  It's a letter to C.M. Graf from R.M.
3 Vining dated July 24, 1969.
4    Q  The first page is a cover letter,
5 correct?
6    A  Yes.
7    Q  And how is that marked in capital bold
8 print at the top?
9    A  Confidential.
10    Q  And who was Mr. R.M. Vining?
11    A  He was president of Construction Products
12 Division, which was responsible for -- of which the
13 Zonolite operation was a part of.
14    Q  A very high company official?
15    A  Yes, sir.
16    Q  And who was C.M. Graf?
17    A  I believe he -- At that time, he was
18 either president or executive vice president of W.R.
19 Grace and Company.
20    Q  Even higher than Mr. Vining?
21    A  Yes, sir.
22    Q  And would Mr. Vining's job encompass what
23 had formerly been Zonolite operations?
24    A  Yes, sir.
25    Q  Okay.  To this cover letter he attached a

Page 36

1 vermiculite ore report called -- or, let me change
2 that.  Actually it's called a Zonolite Vermiculite
3 Ore Review, correct?
4    A  Yes.
5    Q  And that was prepared by Harry A. Brown
6 and O. Floyd Stewart, correct?
7    A  Yes, sir.
8    Q  July 24, 1969?
9    A  Yes.
10    Q  Who is Harry A. Brown?
11    A  He was executive vice president of
12 Construction Products Division.
13    Q  And all of these gentlemen were back
14 east?
15    A  Yes, sir.
16    Q  At Boston?
17    A  Mr. Brown was in Boston, Mr. Stewart was
18 in South Carolina.
19    Q  What was Mr. Stewart's position?
20    A  Well, I believe at that time he had the
21 title of Manager of Mines and he was in -- had
22 jurisdiction over the Libby operation.
23    Q  I would like you to turn to page IV-1.
24 Roman numeral IV-1. Down on the bottom there is
25 some paragraphs there -- paragraph 3, do you see

Page 37

1  that?
2      A  Yes.
3      Q  Read that to the jury, please.
4          MR. LEWIS:  Let me offer this exhibit
5  into evidence.  Plaintiffs' Exhibit 42 is offered.
6          THE COURT:  Do you have any
7  objection, Counsel?
8          MR. GRAHAM:  No, Your Honor.
9          THE COURT:  Plaintiffs' Exhibit 42
10  will be admitted without objection.
11  BY MR. LEWIS:
12      Q  Mr. Lovick, what does number 3 --
13  subparagraph 3 near the bottom of the page say?
14      A  It says, "A higher mine waste to ore ratio
15  exists at Libby.  At Libby, the mine moves
16  approximately 22 tons of material for each ton of
17  concentrate produced whereas at South Carolina the
18  ratio is 10 to 1."
19      Q  So would you agree with me that for every
20  ton of vermiculite concentrate you folks processed
21  through the mill, it took about 22 tons of ore?
22      A  At this point in time, yes.
23      Q  Did that change from time to time?
24      A  It changed after that -- when the new mill
25  was built, it changed.

Page 38

1      Q  Did it take more or less?
2      A  It took more.
3      Q  How much more?
4      A  I don't really remember.
5      Q  So there was a greater amount of waste
6  product after the new mill was built?
7      A  In the mill feed, yes, sir.
8      Q  In any event, if we assume that we only
9  had, in this case, 21 tons of waste product out of
10  every 22 that were produced, that would be a fair
11  estimate at this time, correct?
12      A  Yes, sir.
13      Q  What is the Construction Products
14  Division?
15      A  It was a division of W.R. Grace and
16  Company which was headquartered in Cambridge.  They
17  had responsibility for the Libby operation, the
18  South Carolina operation, the various expanding
19  plants throughout the company, and plus, they were
20  involved in some other businesses of W.R. Grace.
21      Q  These records -- These documents, Exhibit
22  Number 42, were these prepared in the ordinary and
23  usual course of business?
24      A  I would assume so, yes, sir.
25      Q  They were intended to be accurate

Page 39

1  representations of the true facts that existed at
2  the time the report was prepared?
3          MR. GRAHAM:  Objection, foundation.
4          THE WITNESS:  I would assume so, yes,
5  sir.
6  BY MR. LEWIS:
7      Q  Well, let me -- Let me change the
8  question.  I think the objection was fair.  You
9  answered before he had a chance to rule.  Did you
10  take these reports --
11      A  No, sir.
12      Q  Okay.  Do you take these reports now as
13  being accurate and correct?  Do you accept them as
14  being accurate and correct?
15      A  Yes, sir.
16      Q  What percentage of that ore was tremolite
17  asbestos?
18      A  Well, that would vary from time to time,
19  actually probably from day to day, depending on
20  where they were mining.  But, I would make an
21  estimate that probably -- probably between 3 and
22  5 percent.
23      Q  Well, let's just assume it's 3 percent.
24  That would be the lowest level -- Is that the lowest
25  level it would be?

Page 40

1      A  No, it could be lower than that.
2      Q  What was the average?  What would be the
3  average, in your opinion, amount of tremolite
4  asbestos in each -- whatever volume of ore?
5      A  That's very hard to judge, but I think an
6  estimate of 3 percent would be fair.
7      Q  And there is official records that say
8  that the average was 3 percent, correct?
9          MR. LEWIS:  Would you hand me
10  Plaintiffs' Exhibit 40.1.
11          THE COURT:  40 --
12          MR. LEWIS:  40.1.  I'm sorry, Your
13  Honor.
14          THE COURT:  That's fine.  No
15  problem.  I assume that's it, Counsel.
16          MR. LEWIS:  Thank you.
17          THE COURT:  It says 1-5 on the tab.
18  Is that the one you wanted?
19          MR. LEWIS:  Yes.
20          THE COURT:  Do you want to put a
21  staple in it?
22          MR. LEWIS:  Yes, please.
23          THE COURT:  Thank you.
24  BY MR. LEWIS:
25      Q  I'm handing you what has been marked as

Page 41

1  Plaintiffs' Exhibit 40.1. Would you describe that
2  document for the jury, please.
3      A  Well, this is a letter to R.M. Vining from
4  R.E. Schneider dated March 3rd, 1969. The subject
5  is Insitu and Environmental Dust Control for
6  Vermiculite Mining and Expanding Operations.
7      Q  Anywhere in that report that says that the
8  vermiculite is 3 percent? To help you -- the
9  percentage of asbestos in the vermiculite is
10  3 percent, to help you with your conundrum of
11  whether it's 3 or 5 percent. (Pause.) Why don't
12  you go back to the previous exhibit, 42. Look at
13  page 2 of that exhibit. Now look at page 4.
14      A  Are you talking about 1, 4 or 1, 2?
15      Q  See, what the problem is, your exhibit is
16  not numbered like mine is. Let me help you find
17  it. Well, can we agree that it's 3 percent at
18  least? That there was 3 percent contamination of
19  tremolite asbestos in the ore?
20      A  I would have to qualify that by saying
21  approximately 3 percent.
22      Q  Okay. Good enough. So if there was a
23  production -- so if the production was a thousand
24  tons of concentrated vermiculite a day, as it was
25  later on, near the time that Dan Schnetter went to

Page 42

1  work there, how much ore would it take to get a
2  thousand tons a day?
3      A  Well again, I don't remember. It would
4  take more than the 22,000.
5      Q  So what do you think -- How much ore do
6  you think a day would be required at the time that
7  Dan Schnetter was employed up there at the old dry
8  mill?
9      A  During the period that the dry mill was
10  running, and he went to work in '73 when it was,
11  until '74, the 22,000 tons would be --
12      Q  Would be accurate?
13      A  -- would be accurate, yes, sir.
14      Q  Okay. And in that 22,000 tons of ore that
15  was waste material, how many tons of that would be
16  pure tremolite asbestos?
17      A  Well, it would be -- It would be more than
18  3 percent, but I can't tell you how much more.
19      Q  And 3 percent is how many tons? Three
20  percent is how many tons of asbestos?
21      A  It would be 660.
22      Q  Okay. And now so it would be at least 600
23  tons of pure asbestos fibers -- or, pure asbestos
24  was having to be discarded on that hill every single
25  day of operation, correct?

Page 43

1      A  Well, it would be -- it would be slightly
2  less than that, but, yes, it would have to be -- it
3  would have to be discarded, if you will. That would
4  include the amount that was in the waste and the
5  amount that was in the concentrate.
6      Q  So some of it would remain in the
7  concentrate, because you could never get that
8  completely out, correct?
9      A  Yes, sir.
10      Q  So the concentrate that you were selling
11  to the public, the vermiculite concentrate, was
12  contaminated with asbestos fibers, right?
13      A  Contaminated with asbestos, yes, sir.
14      Q  And it was never -- You were never able to
15  get that completely out, even up until the time you
16  shut down the mill?
17      A  That's correct.
18      Q  But you were able to get some of it out,
19  right?
20      A  Oh, yes.
21      Q  And that's where the vast majority of that
22  660 tons per day of pure tremolite asbestos stayed
23  up on the hill, right?
24      A  Yes, sir.
25      Q  And some of it turned into fibrous dust

Page 44

1  that the men breathed, right?
2      A  Some of it would turn into fibrous dust,
3  yes.
4      Q  That was invisible to the men?
5      A  Yes, sir, basically.
6      Q  And then some of it Mr. Graham referred --
7  In his opening statement, he said something like, It
8  was put over the mountain, right?
9      A  Yes, sir.
10      Q  And if you look up on the mountain and you
11  see that big gash up there, that's where that --
12  those tailings, those -- that discarded ore was
13  placed on the mountain, right?
14      A  That's where a good part of it is, yes,
15  sir.
16      Q  You had about a mile down the hill on one
17  side, right?
18      A  Yes, sir, roughly.
19      Q  And a mile on the other side?
20      A  Yes, sir.
21      Q  Did you have a tailings pond up there?
22      A  Yes, sir.
23      Q  When did you put that in?
24      A  I believe in 1970.
25      Q  Before that, what happened to the

Page 45

1 tailings?
2    A  It was discharged into Rainy Creek.
3    Q  Right into the creek?
4    A  Well, it ended up in the creek, yes, sir.
5    Q  So you had asbestos going right into the
6 creek?
7    A  Yes, sir.
8    Q  And the creek ran into the Kootenai River?
9    A  Yes, sir.
10        MR. GRAHAM: Objection, relevancy,
11 Your Honor.
12        THE COURT: Overruled.
13 BY MR. LEWIS:
14    Q  And that ran right through town, right?
15    A  Well, it ran past the town, yes, sir.
16    Q  And where did the rest of the asbestos --
17 the tremolite go?
18    A  It remained on the mountain -- on the side
19 of the mountain.
20    Q  Did some of it go up the smoke stack or
21 anything like that?
22    A  Yes, some of it would.
23    Q  Go up into the atmosphere?
24    A  Yes, sir.
25    Q  Are you aware of publications that

Page 46

1 indicate that it's well known that people living as
2 far as a half a mile from asbestos plants were
3 getting asbestosis or lung disease?
4    A  Yes, sir, I've seen articles.
5    Q  You knew that back in the '60s, right?
6    A  I believe so, yes, sir.
7    Q  Did you ever tell any of your employees
8 that?
9    A  I don't recall, no, sir.
10    Q  You don't recall or you did not?
11    A  I don't recall that we did.
12    Q  Well, is that -- Don't recall that we did,
13 is that a "yes" or a "no"? I don't understand --
14    A  Well, that would be a "no." But I would
15 like to point out that we had nobody living within a
16 half a mile of that mine.
17    Q  But your employees worked within a half a
18 mile of it every day.
19    A  Yes.
20    Q  This is a case of an employee against your
21 company, right?
22    A  Yes.
23    Q  And all of your employees were within a
24 half a mile of the old dry mill, just about, right?
25    A  Yes, sir.

Page 47

1    Q  Everybody up there was working within that
2 area, right?
3    A  Yes.
4    Q  And you didn't require respirators for
5 everybody up there, did you?
6    A  No.
7    Q  When you were up there walking across the
8 grounds, did you wear a respirator?
9    A  No, sir.
10    Q  And you were within a half a mile of this
11 operation, right?
12    A  Yes.
13    Q  And would you agree with me, at least,
14 that this operation was one of the biggest
15 operations in the country that had asbestos waste in
16 the air?
17    A  No, sir, I don't know that to be a fact.
18    Q  You don't?
19    A  No.
20    Q  Anyplace else in the United States where
21 they had tremolite asbestos?
22    A  I don't know.
23    Q  You don't know one way or the other?
24    A  No, sir.
25    Q  Okay. Mr. Graham made a lot in his

Page 48

1 opening statement about respirators. Do you recall
2 him talking about respirators in his opening
3 statement?
4    A  Yes, sir.
5    Q  And did you know a lot about respirators?
6    A  Well, I knew about respirators.
7    Q  Did you know if they worked?
8    A  Yes, sir, I understood that they did, from
9 what we had been told.
10    Q  Did you ever talk to Mr. Melcher about
11 that?
12    A  I don't recall specifically, no, sir.
13    Q  Did you know that it was very, very
14 difficult for your men to work in the old dry mill
15 and wear a respirator all day long?
16    A  Yes, sir, I knew that.
17    Q  Did the company know very well that it was
18 impossible to get the men to wear respirators eight
19 hours a day?
20    A  I certainly knew it was very difficult,
21 yes.
22    Q  And isn't it a fact that the respirators
23 you had up there were good for nuisance dust, but
24 absolutely useless for asbestos fibers?
25    A  No, sir, that's not a true statement.

**TRANSCRIPT OF PROCEEDINGS**  CondenseIt!™  **SCHNETTER vs W.R. GRACE**

Page 49

```
 1    Q  Did you ever test them independently to
 2  find out if they got out the asbestos fibers?
 3    A  No, sir.  I don't know how we would do
 4  that.
 5    Q  Well, who would have a greater obligation
 6  to your employees to do that than you?
 7        MR. GRAHAM:  I would object,
 8  argumentative.
 9        MR. LEWIS:  I'll rephrase the
10  question, Your Honor.
11  BY MR. LEWIS:
12    Q  These were your employees, right?
13    A  Yes.
14    Q  You knew, long before you hired Dan
15  Schnetter, for at least a couple of decades, that
16  you had a significant health problem at the mill and
17  the mine, correct?
18    A  Yes.
19    Q  You knew that the health problem was
20  tremolite asbestos fibers in the air, correct?
21    A  Yes.
22    Q  And that these fibers were invisible to
23  the men, correct?
24    A  Yes.
25    Q  You knew that what they saw in the old dry
```

Page 50

```
 1  mill was nuisance dust, something other than
 2  asbestos fibers, right?
 3    A  Yes.
 4    Q  You knew that when they were outside away
 5  from what was nuisance dust, there might be asbestos
 6  fibers in the air, but they couldn't see them,
 7  correct?
 8    A  Yes.
 9    Q  You knew that when they were not in the
10  old dry mill, they weren't required to wear
11  respirators, correct?
12    A  Most places, yes, sir.
13    Q  You didn't wear a respirator there,
14  correct?
15    A  Not -- most places where I was, no, sir.
16    Q  You knew that the men could not work and
17  wear those respirators eight hours a day in the dry
18  mill, correct?
19    A  No, we didn't know that they couldn't.  We
20  knew it was very difficult for them to do it.
21    Q  You knew that this asbestos in the air was
22  destroying your men's lungs before Dan Schnetter was
23  hired, correct?
24    A  We knew that it was causing problems to
25  some of our employees' lungs, yes, sir.
```

Page 51

```
 1    Q  You knew that men were getting fibrosis of
 2  the lungs, correct?
 3    A  Yes, sir.
 4    Q  That's a symptom -- That's a condition
 5  caused by asbestos, correct?
 6    A  Possibly.
 7    Q  You knew your men were getting asbestosis
 8  before Dan was hired, correct?
 9    A  Yes, sir.
10    Q  You knew that they were getting cancer
11  before Dan was hired, correct?
12    A  Yes, sir.
13    Q  You even knew that they were getting
14  mesothelioma before Dan was hired, correct?
15    A  Yes, sir.
16    Q  And you knew that mesothelioma was a
17  signature disease caused only by asbestos, correct?
18    A  Excuse me, sir.  I think that that is an
19  incorrect statement that I just made.  I don't know
20  that -- We did not know of any cases of mesothelioma
21  before Dan Schnetter was -- was hired.
22    Q  You knew in the literature that
23  mesothelioma was a signature disease, correct?
24    A  Yes.
25    Q  So you're changing your testimony, you're
```

Page 52

```
 1  saying you didn't know about mesothelioma?
 2        MR. GRAHAM:  Objection, argumentative
 3  at this point, Your Honor.
 4        MR. LEWIS:  I examined him.  He
 5  testified two different ways, Judge.
 6        THE COURT:  Proceed, Counsel.
 7  Overruled.
 8  BY MR. LEWIS:
 9    Q  So you testified once that you knew about
10  mesothelioma and now you say you didn't know about
11  mesothelioma?
12    A  That was a mistake.  The first case that
13  we knew of, of one of our employees -- or
14  ex-employees having mesothelioma was, I believe,
15  in 1979.
16    Q  1979?
17    A  Yes.
18    Q  Okay.  Did you suspect -- Did you have
19  records that suggested that mesothelioma would be
20  caused by your asbestos before Dan was hired?
21    A  I don't understand your question.
22    Q  Did you have records in your possession
23  that indicated that mesothelioma was caused by
24  exposure to asbestos fibers before you hired Dan
25  Schnetter?
```

TRANSCRIPT OF PROCEEDINGS      Condenseit!™      SCHNETTER vs W.R. GRACE

Page 53

1  A I'm not sure whether we had any records in
2  our -- that would indicate that or not. I mean,
3  certainly it would be in the literature before that
4  that we would have seen.
5  Q Let me ask you this. The literature
6  clearly established that mesothelioma is a signature
7  disease related to asbestos exposure, correct?
8  A Yes, sir.
9  Q A signature disease means it can only be
10 caused by asbestos exposure, correct?
11 A I'm not sure that that's a true
12 statement.
13 Q What about asbestosis? Is that a
14 signature disease?
15 A Would you define "signature disease" for
16 me, please.
17 Q Do you know what "signature disease" is?
18 A No, sir.
19 Q I define signature disease as something
20 that is specific to a particular insult. In other
21 words, there is a specific cause and effect
22 relationship between an exposure and the disease.
23 Do you know anything else besides asbestos that
24 causes asbestosis?
25 A No, sir.

Page 54

1  Q Okay. Smoking doesn't cause asbestosis,
2  does it?
3  A No, sir.
4  Q And you don't suggest that Dan's
5  asbestosis is caused by smoking, do you?
6  A No, sir.
7      THE COURT: Would this be a
8  convenient place for you to take a break, Counsel?
9      MR. LEWIS: Yes, I would appreciate
10 that.
11     THE COURT: Ladies and gentlemen, you
12 are admonished not to discuss this case amongst
13 yourselves or allow anyone to discuss the case with
14 you, nor should you express or form any opinion
15 regarding the matter until it's finally submitted to
16 you. We will take a 10 minute recess.
17     (A recess was held in the proceedings.)
18     THE COURT: Counsel, you may
19 continue.
20     MR. LEWIS: Thank you, Your Honor.
21 I am happy to announce that the clerk has found the
22 exhibits that we sent to her a couple weeks ago.
23 She found them in the clerk's office. But I'm sure
24 it was just one of those things. We should have
25 checked it, and I apologize, because it's delayed

Page 55

1  the trial here a few minutes not having those
2  exhibits.
3      THE COURT: That's fine. Those
4  things will happen.
5
6      CROSS-EXAMINATION CONTINUED
7  BY MR. LEWIS:
8  Q Mr. Lovick, what was the first written
9  notice that you had of the dangers of asbestos
10 exposure?
11 A The first written notice that I recall was
12 a notice from the Montana State Board of Health,
13 written by one Benjamin Wake in 1956, that pointed
14 out that the asbestos was a material of -- a toxic
15 material.
16 Q And did you review his report?
17 A Well, yes, sir.
18 Q Did you look it over carefully?
19 A I don't recall.
20 Q Did W.R. Grace contest the report?
21 A No, sir.
22 Q So it assumed that it was an accurate
23 report?
24 A Yes, sir.
25 Q Did you understand at that time what the

Page 56

1  term "toxic" meant?
2  A Well, I don't know --
3  Q Did you understand that the fact that
4  asbestos was toxic in 1956 meant that it was harmful
5  to humans?
6  A I would think that we would, yes, sir.
7  Q And what did you do to bring that
8  awareness of that hazard to the attention of the
9  workers and their families?
10 A I don't recall that anything specifically
11 was done.
12 Q You did nothing; is that correct?
13 A So far as I recall, yes.
14 Q And you -- Who was the general manager at
15 that time?
16 A Mr. R.A. Bleich.
17 Q Do you recall if Mr. Bleich did anything
18 to bring this toxic -- knowledge of toxic asbestos
19 to the employees and their families?
20 A Not that I recall.
21     MR. GRAHAM: We would make an
22 objection as to relevancy, and could we have a
23 continuing objection as to relevancy as to these
24 specific reports to employees?
25     MR. LEWIS: Well, Your Honor,

Page 57

1 continuing objections in a trial are very
2 difficult.
3        THE COURT: I think you better,
4 Counsel.
5        MR. GRAHAM: Okay.
6        THE COURT: The objection is
7 overruled.
8 BY MR. LEWIS:
9    Q  Now, just -- this nuisance dust thing.
10 You folks classified the dust out there as a
11 nuisance dust; is that correct?
12    A  Yes, sir, I believe that would be
13 correct.
14    Q  So if you classified this as a nuisance
15 dust, did that classification apply to all the
16 management people?
17    A  Well, I can't speak for all of the
18 management people.
19    Q  You just said you agreed that you folks up
20 there at the mill classified it as nuisance dust.
21 Would that be a term that people would use all the
22 time up there?
23    A  Well, I think that we would refer to the
24 dust that was present.  I don't know that it would
25 be particularly identified as nuisance dust or toxic

Page 58

1 dust or anything else.  It would just be referred to
2 as the dust levels that we have.
3    Q  Well, you just said a minute ago that you
4 agreed that you classified it as a nuisance dust.
5 Those were my words.  I put them in your mouth.  But
6 you agreed to that.  I'm offering you an opportunity
7 to change your testimony, if you want.  Do you say
8 now that you didn't classify it as nuisance dust?
9    A  Well, generally, I would say that we
10 considered it a nuisance dust.
11    Q  Okay.  And that's what just about
12 everybody considered it, a nuisance dust, correct?
13    A  Yes, sir.
14    Q  Now, nuisance keynotes something far
15 different from toxicity or toxic; do you agree with
16 that?
17    A  Yes.
18    Q  So if you referred to it as nuisance dust
19 and told the men, and referred to it as nuisance
20 dust, would that be something that they should be
21 alarmed about?
22        MR. GRAHAM: Object as to the
23 relevancy unless time and place is established, Your
24 Honor.
25        MR. LEWIS: I'll lay some more

Page 59

1 foundation.
2        THE COURT: Rephrase the question.
3        MR. LEWIS: I don't mind that at
4 all.
5 BY MR. LEWIS:
6    Q  This was a term, nuisance dust, that was
7 used throughout the term of your employment up
8 there, correct?
9    A  Yes.
10    Q  So right up until 1983, the dust up there
11 was referred to as nuisance dust, correct?
12    A  Yes.
13    Q  And the men referred to it as nuisance
14 dust, correct?
15    A  I don't know how they would refer to it --
16    Q  Well, if the management referred to it as
17 nuisance dust, did the men refer to it as nuisance
18 dust?
19    A  Yes, sir.
20    Q  Does "nuisance" imply anything harmful or
21 dangerous, like something that's toxic?
22    A  No.
23    Q  So if the men overheard management saying,
24 this is just nuisance dust, would it be reasonable,
25 in your mind, for them to assume that it was just a

Page 60

1 nuisance and relatively harmless?
2    A  Well, yes.
3    Q  So right up until 1983, when you left, the
4 men had a right to assume that this nuisance dust
5 was essentially harmless; do you agree with that?
6    A  Yes.
7    Q  And one of the men was Dan Schnetter,
8 correct?
9    A  Yes.
10    Q  And he left employment with W.R. Grace in
11 1981, correct?
12    A  Yes, sir.
13    Q  On very good terms, as suggested in the
14 letter that you read to the jury?
15    A  Yes, sir.
16    Q  And at the time that he left in 1981, he
17 had no reason to believe that he was diseased by
18 asbestos, correct?
19    A  Not that I know of, no, sir.
20    Q  There were no x-rays that said that he had
21 any asbestos-related diseases; is that correct?
22    A  I don't recall, no, sir.
23    Q  You folks got the x-ray reports, right?
24    A  Yes, sir.
25    Q  And all of the tests that you did, you got

Page 61

1  those reports, and none of those indicated that Dan
2  Schnetter, at that time, was diseased, correct?
3      A  I don't know if that's correct or not.
4  I certainly can't remember what all of those x-ray
5  reports stated, because we had, you know, at that
6  time two, three hundred each year, and over a period
7  of years, so I can't recall what they all said.
8      Q  That's fair enough, you can't recall all
9  of them, but now you know -- you knew that this
10  trial involved Dan Schnetter, correct?
11      A  Well, yes, sir.
12      Q  And you looked at documents relating to
13  Dan Schnetter, correct, in preparing for your
14  testimony?
15      A  Yes, sir.
16      Q  And you met with counsel for W.R. Grace
17  repeatedly concerning this case, correct?
18          MR. GRAHAM: Object as to relevancy
19  and competency if the question -- well --
20          MR. LEWIS: I didn't ask what he
21  said, Your Honor.
22          THE COURT: Overruled.
23          MR. LEWIS: That's the only question
24  I'm going to ask about it, Your Honor.
25  BY MR. LEWIS:

Page 62

1      Q  You met with counsel repeatedly concerning
2  Dan Schnetter's case, correct?
3      A  Yes, sir.
4      Q  You didn't make it -- You didn't check to
5  see if Dan had any disease before he left the
6  company in 1981?
7      A  No, sir.
8      Q  But as you sit here now, you don't know of
9  any evidence that he had any disease in his lung
10  before he left the company, right?
11      A  No, sir, I don't.
12      Q  And all of this test and lung capacity
13  tests -- lung function tests and his x-rays, as far
14  as you know, were normal, correct?
15      A  Seems to me that one of his lung function
16  tests showed a slight deficiency on -- in one area.
17      Q  Before he left the company?
18      A  Yes, sir.
19      Q  Did you tell him about that?
20      A  Well, I didn't take that particular test,
21  I don't believe.  But whoever did would have told
22  him.
23          MR. LEWIS: Wait a second.  Wait,
24  wait.  I asked him if he told him about it, and I
25  move to strike any hearsay that he's trying to get

Page 63

1  in here.
2          THE COURT: Okay, just answer the
3  question "yes" or "no," Mr. Lovick.
4          THE WITNESS: No, sir, I did not take
5  that test.  I don't believe I did.  If I had taken
6  that test, I would have not -- told him about it.
7  BY MR. LEWIS:
8      Q  In any event, we know one thing, that
9  he was one of the employees that left the company
10  in '81 and he, like all the other employees, had a
11  right to rely on the idea that nuisance dust would
12  not harm him, correct?
13      A  Yes.
14      Q  So when we talked about dust, we had dust
15  meetings or we discussed dust, do you agree with me
16  that may not bring home the fact to the employees
17  that that dust has something very harmful in it?
18      A  Yes, I would agree with that.
19      Q  Did you ever observe Mr. Bleich tell
20  anybody that this dust had toxic substances in it?
21      A  No, sir, not that I recall.
22      Q  Did the management of W.R. Grace or its
23  predecessor in interest, Zonolite Company, ever
24  attempt to keep official records concerning the
25  dangers of asbestos in the workplace confidential

Page 64

1  and for the eyes of management only?
2      A  The reports that we received from the
3  State Board of Health were marked by them,
4  Confidential, For Management Only -- For Management
5  Use Only.
6      Q  And you kept those reports confidential?
7      A  Yes, sir.
8      Q  Did you give a copy of the report to each
9  of the employees?
10      A  No, sir.
11      Q  And the contents of those reports were not
12  disseminated directly to the employees; is that
13  correct?
14      A  No, sir.
15      Q  Is that correct?
16      A  Yes, that's correct.
17          MR. LEWIS: Okay.  Could I have
18  Exhibit G-10.1.  (Pause.)  Thank you very much.
19  BY MR. LEWIS:
20      Q  Would you just take a moment to look at
21  G-10.1 and satisfy yourself as to what it is and
22  then I'll ask you a couple questions about it.
23  (Pause.)  I'm just going to ask you a few questions.
24  This is a Discharge Summary for the hospitalization
25  of Glenn Taylor, correct?

Page 65

1  A  Yes, sir.
2  Q  He was an employee of W.R. -- of
3 Zonolite?
4  A  Yes, sir.
5  Q  And he was discharged on February 11,
6 1959; is that correct?
7  A  Well, he was admitted on --
8  Q  I apologize.  He was admitted.
9  A  -- on February --
10  Q  Go ahead.
11  A  He was, yes, sir.
12  Q  He was admitted on February 11, 1959?
13  A  Yes, sir.
14  Q  And turn to page 2.  He was discharged on
15 March 20, 1959, correct?
16  A  Yes, sir.
17  Q  And the final diagnosis on discharge was
18 hystoplasmosis and asbestosis, correct?
19  A  Yes, sir.
20  Q  When would you have received a copy of
21 this medical report?
22  A  Shortly after that.  But I would like to
23 call your attention to the recommendation which
24 follows that final diagnosis, if I might.
25  Q  Oh, yeah.

Page 66

1  A  Could I read that?
2  Q  Sure you can.
3  A  "Recommendation:  Patient should return
4 for a lung biopsy, which he did not prefer to have
5 done at this time, to determine definitely the
6 diagnosis of asbestosis."
7  Q  What happened to Mr. Taylor?
8  A  He died.
9  Q  Of asbestosis?
10  A  Well, I'm not sure what --
11  Q  Did he die of lung disease?
12    MR. GRAHAM:  Objection, foundation.
13    THE WITNESS:  Well --
14    MR. LEWIS:  Do you know?
15    THE COURT:  If he knows the answer.
16 BY MR. LEWIS:
17  Q  Do you know if he died of lung disease?
18  A  I don't know what his death certificate --
19 I don't remember what his death certificate stated.
20  Q  In any event, was that your first
21 knowledge that you had that one of your employees
22 had been diagnosed with asbestosis?
23  A  To my knowledge, yes.
24  Q  Okay.  Did you tell any of your employees
25 about that?  Did you tell any of your employees that

Page 67

1 one of your -- one of their brethren had been
2 diagnosed with asbestosis?
3  A  I don't recall that we did, no, sir.
4  Q  Did you folks institute a periodic x-ray
5 program up there at the mill?
6  A  Yes, sir.
7  Q  When did you do that?
8  A  Well, we instituted a periodic x-ray
9 annually starting in 1964.
10  Q  Did you also start a pre-employment x-ray
11 process?
12  A  Yes, sir.
13  Q  And when did you start that?
14  A  The same time, I believe.
15  Q  And the truth of the matter is, the
16 purpose of that x-ray was to protect the company; is
17 that true?
18  A  Well, I don't know that that would be
19 true.  We wanted the employees to -- we wanted to
20 know the lung condition of the employees when we
21 hired them and whether it changed during the periods
22 that they worked.  And if there were -- The
23 employees were notified of the results of all of
24 these, and if there were any changes, they were
25 advised of these.  And so from that standpoint, we

Page 68

1 were also protecting the employees.
2  Q  But the primary purpose of instituting the
3 x-ray program, according to your testimony in our
4 cases, is to protect the company, correct?
5  A  We wanted to know the condition of the
6 employees and have a record of that.
7  Q  But the reports never went to the
8 employees, right?
9  A  That's not true.  The reports never --
10 In some cases, they went to the employees, but each
11 employee was to have received a report on what the
12 x-ray interpretation showed, and if they chose to
13 have a copy, if they asked for a copy, they were
14 given one.
15  Q  You got -- You folks got a copy of the
16 report, right?
17  A  Yes, sir.
18  Q  But the men were not routinely given
19 copies of the x-ray reports, correct?
20  A  No, but they were all advised of what the
21 results were.
22  Q  And if they were -- the results were
23 normal, they felt good about that, right?  You felt
24 good about that?
25  A  I would assume so, yes, sir.

TRANSCRIPT OF PROCEEDINGS          CondenseIt!™          SCHNETTER vs W.R. GRACE

Page 69

1  Q  Did you ever share with those people who
2  had normal x-rays the fact that you had determined
3  by this process that you had a significant health
4  problem existing with your employees?
5  A  No, I don't recall that that would have
6  been done.
7  Q  So somebody like Dan Schnetter, whose
8  x-rays were normal, would think everything is okay
9  and he might not know about the 40 or 50 or 60 who
10 were diseased, right?
11 A  He might not. He might, also.
12 Q  But you folks did nothing to bring that to
13 his attention, right?
14 A  No, sir.
15     MR. LEWIS: I would offer Plaintiffs'
16 Exhibit 10.1.
17     THE COURT: Any objection?
18     MR. LEWIS: G-10.1, excuse me.
19     THE COURT: Any objection?
20     MR. GRAHAM: No objection.
21     THE COURT: G-10.1 will be admitted
22 without objection.
23 BY MR. LEWIS:
24 Q  I want to direct your attention back again
25 to Plaintiffs' Exhibit G-40.1, which has already

Page 70

1  been admitted into evidence. Would you read that --
2  First of all, would you tell us what the date of
3  that letter is.
4  A  The date is March 3rd, 1969.
5  Q  And who is it addressed to?
6  A  It's addressed to R.M. Vining.
7  Q  He was the head of the -- essentially of
8  what had been Zonolite, right?
9  A  He was president of Construction Products
10 Division, which Zonolite was a part of.
11     MR. GRAHAM: Excuse me, Counsel.
12 What is the exhibit number?
13     MR. LEWIS: It's G-40.1.
14     MR. GRAHAM: Thank you.
15 BY MR. LEWIS:
16 Q  And copies -- Who was that from?
17 A  From R.E. Schneider.
18 Q  Who is R.E. Schneider?
19 A  He was chief engineer for the Construction
20 Products Division.
21 Q  Okay. And is this document marked
22 Personal and Confidential?
23 A  Yes, sir.
24 Q  And copies went to who?
25 A  R.T. Sterrett.

Page 71

1  Q  Who is he?
2  A  He was a -- an official in the
3  Construction Products Division.
4  Q  John Murphy?
5  A  He was also an officer in Construction
6  Products Division; R.A. Brown, who was executive
7  vice president of Construction Products Division;
8  W.R. Wright, who was -- I don't remember what his
9  title was. He was in charge of expanding plants in
10 the division.
11     O.F. Stewart was the manager of the mine
12 in South Carolina; Earl Lovick, which was myself;
13 Ray Kujawa, who was an engineer and geologist at
14 Libby; Peter Kostic, who was safety engineer for
15 Construction Products Division; and F.W. Eaton, who
16 was on the engineering staff of Construction
17 Products Division.
18 Q  So this document went to virtually every
19 high official in the Construction Products Division
20 plus you and Mr. Kujawa in Libby, correct?
21 A  Yes, sir.
22 Q  The date of the report is March 3, 1969?
23 A  Yes, sir.
24 Q  Would you read that report to the jury,
25 please.

Page 72

1      MR. SLOVAK: Excuse me, I don't think
2  G-40.1 has been offered.
3      MR. LEWIS: We would offer it now,
4  Your Honor.
5      THE COURT: Do you have any
6  objection, Counsel?
7      MR. GRAHAM: No objection.
8      THE COURT: Very well. 40.1 is
9  admitted without objection.
10     THE WITNESS: The attached report on
11 Dust Control for Vermiculite Mining and Expanding
12 Operations authored by Messrs. Eaton, Kujawa and
13 Kostic is the result of their initial studies of the
14 dust control problems of the Zonolite operations.
15     The inclination of public agencies to
16 protect the worker at any expense, parenthesis,
17 usually the employer's, end of parentheses, seems to
18 be a firmly entrenched political phenomenon which
19 should be of considerable concern to us.
20     Our recent experience at Libby, viewed in
21 light of this public policy, may well create for us
22 a significant financial liability. We also should
23 be concerned with the obligation of our employees,
24 namely, permitting them to perform their services
25 under working conditions which we have good reason

Page 73

1  to believe are hazardous.
2      The report recommends testing and
3  monitoring procedures with an expenditure of some
4  $423,000 $23,000, parentheses, admittedly a guess
5  estimate, end of parentheses, and indicates a
6  continuing monitoring cost of approximately $14,000
7  per year. I estimate the additional costs of
8  capital equipment at approximately 5 percent for
9  $20,200 per year.
10      I would suggest you read the attached copy
11  of an article from the October 12th, 1968, issue of
12  the New Yorker magazine. This kind of publicity
13  cannot help but engender sympathy for anyone working
14  under conditions such as those present in our
15  Zonolite operation.
16      I do not believe we should ignore the
17  possibility we may be subjected to substantial
18  financial liability over the next few years as we
19  continue to gather information as to the potential
20  hazards at Libby and elsewhere in Zonolite, we must
21  be concerned about our moral obligations to our
22  employees. Current evidence dictates that we must
23  take prompt action.
24      It is my recommendation that authorization
25  be granted to proceed with the program outlined in

Page 74

1  the report. It's signed R.E. Schneider.
2  BY MR. LEWIS:
3      Q  You received a copy of this report a few
4  days after it was authored, I assume?
5      A  Yes, sir.
6      Q  And did you agree that you had a moral
7  obligation to your employees to protect them from
8  this dangerous asbestos?
9      A  Yes, sir.
10      Q  Did you tell any of your employees about
11  this personal and confidential letter?
12      A  I don't recall that I did, no, sir.
13      Q  Did anybody else from your company?
14      A  I don't know.
15      Q  Are any of the people that are on the
16  letterhead copied on this workers?
17      A  No, sir.
18      Q  Okay. Were you concerned about
19  financial -- the financial aspects of protecting the
20  men against asbestos exposure?
21      A  No, sir, that was not my concern.
22      Q  But obviously somebody was?
23      A  Yes, sir.
24      Q  Did they go ahead with this program that
25  was --

Page 75

1      A  Pretty much, I believe, yes, sir.
2      Q  Okay. Did you hear Mr. Graham say in his
3  opening statement that you folks at Libby did not
4  know about the dangers of cigarette smoking and lung
5  disease until about '79 and they changed it to '76,
6  do you recall that?
7          MR. GRAHAM: I would object to that
8  being a misstatement of the opening statement.
9          MR. LEWIS: I'll let the jury
10  decide --
11          THE COURT: You may proceed.
12  Overruled counsel.
13  BY MR. LEWIS:
14      Q  Did you hear something -- Did you hear
15  that?
16      A  Yes.
17      Q  That's what he said, wasn't it?
18      A  Yes.
19      Q  But actually, you knew in 1969, 10 years
20  before you commenced your no smoking policy, you
21  knew that smoking and asbestos had a synergistic
22  effect and created a very difficult health problem
23  for your employees, correct?
24      A  No, sir, I don't recall that I knew.
25      Q  You didn't know that in 1969?

Page 76

1      A  No, sir.
2      Q  When did you first learn about that?
3      A  I don't really know when I first learned
4  about it. But I know when it was brought home
5  sharply to me.
6      Q  When was it brought home sharply to you?
7      A  I believe that would have been either in
8  1977 or 1978.
9      Q  Okay. Now, you don't know of any company
10  document that identifies the dangers of smoking with
11  asbestos in 1969?
12      A  I don't recall any, no, sir.
13      Q  You say that under oath?
14      A  Yes, sir.
15      Q  Did anybody from management headquarters
16  suggest that a no smoking policy should be
17  instituted by 1970?
18      A  I don't recall. I know that it was
19  recommended, but I don't recall that it was done by
20  1970. I really don't remember when that was.
21      Q  Well, if the company -- if there was
22  evidence of the synergistic effect between smoking
23  and asbestos within the knowledge of management in
24  1969, do you think it was appropriate to wait 10
25  years to do something about it?

Page 77

1    A  Well, that would seem -- that would seem
2  to be a long time.
3    Q  Management instituted its own non-smoking
4  policy about a year and a half before it did it for
5  the employees; is that right?
6    A  Yes, sir.
7    Q  Did you tell the employees about that
8  management policy?
9    A  Yes, sir.
10    Q  We will come back to that issue in a
11  little bit. I can't find anything. (Pause.) Do
12  you have the photographs? Do you have any
13  photographs?
14      MR. GRAHAM: I don't have -- I think
15  they are in the exhibits we filed.
16      MR. LEWIS: I would like to have the
17  photographs, please. Do you have the original
18  photographs or just --
19      THE COURT: Here are Defendant's
20  exhibits.
21      (A discussion was held off the record.)
22      MR. GRAHAM: Not even mine are
23  working for you. I thought they were filed with the
24  clerk, but --
25      MR. LEWIS: I need them. Maybe we

Page 78

1  could get them after the next break.
2      MR. GRAHAM: I think that's the only
3  group.
4      MR. LEWIS: You didn't bring the
5  originals with you?
6      MR. GRAHAM: I thought they were in
7  there.
8      MR. LEWIS: Okay.
9      MR. GRAHAM: I thought they were sent
10  to the clerk to be filed.
11  BY MR. LEWIS:
12    Q  Look at Exhibit 40.1 again, please. Does
13  that refer to an October 12, 1968, article in the
14  New Yorker magazine?
15    A  Yes, sir.
16    Q  Does that New Yorker magazine refer to the
17  dangers -- the synergistic effect between smoking
18  and asbestos?
19    A  Mr. Lewis, I don't ever remember receiving
20  a copy of that issue of the New Yorker magazine with
21  this letter.
22    Q  So you just got a copy of the cover
23  letter?
24    A  As I -- I think of the cover letter, and
25  the -- the attached correspondence. But I don't

Page 79

1  ever recall receiving a copy of that New Yorker
2  article and I don't ever remember reading it.
3    Q  Did --
4      MR. LEWIS: Could I have
5  Exhibit G-47.1.
6  BY MR. LEWIS:
7    Q  For the record, I'm handing you what has
8  been marked as G-47.1. Could you identify that for
9  the jury, please.
10    A  This is a letter to O.F. Stewart from H.A.
11  Brown dated --
12    Q  What's the subject?
13    A  It was dated March 31st, 1971 and the
14  subject is smoking at Libby.
15    Q  Would you just read that to yourself
16  without reading that to the jury. That might speed
17  up this process. (Pause.) Did that letter indicate
18  to you that Mr. Brown, who was a high official in
19  W.R. Grace understood as of March 31st, 1971, that
20  smoking was a particularly bad problem for workers
21  exposed to asbestos at the Libby facility?
22      MR. GRAHAM: Objection, competency,
23  Your Honor.
24      THE COURT: Overruled.
25      THE WITNESS: This seems to indicate

Page 80

1  that, yes, sir.
2      MR. LEWIS: I'll offer Plaintiffs'
3  Exhibit G-47.1.
4      MR. GRAHAM: Objection, foundation,
5  competency, Your Honor.
6      MR. LEWIS: I'll lay some foundation,
7  Your Honor.
8      THE COURT: Proceed.
9  BY MR. LEWIS:
10    Q  Did you know Mr. H.A. Brown?
11    A  Yes, sir.
12    Q  What was his position with the company?
13    A  He was vice president of the construction.
14    Q  Did you know O.F. Stewart?
15    A  Yes, sir.
16    Q  Does this appear to be -- was he within
17  the company, also?
18    A  Yes, sir.
19    Q  Does this appear to be a document that was
20  prepared in the ordinary and usual course of the
21  business of W.R. Grace and Company?
22    A  It appears to be, yes, sir.
23    Q  Do you have any reason to question the
24  accuracy of this document?
25    A  No, sir.

Page 81

1    MR. LEWIS: Reoffer G-47.1.
2        MR. GRAHAM: Same objection. Doesn't
3 satisfy the exceptions to the hearsay rule.
4        THE COURT: Objection is overruled.
5 It may be admitted.
6 BY MR. LEWIS:
7    Q  That letter specifically states that there
8 is a problem with asbestos -- smoking in an asbestos
9 atmosphere, correct?
10   A  It appears to indicate that, yes, sir.
11   Q  Do you know -- Did you ever see that
12 document before today?
13   A  I don't really know whether I have or
14 not. I did not receive a copy of it.
15   Q  At that time you were the general manager
16 in Libby, right?
17   A  Yes, sir.
18   Q  The highest official in Libby, and the
19 people in Boston didn't tell you about that?
20   A  I never received a copy of this letter, as
21 it indicates.
22   Q  At least people in Boston knew there was a
23 problem here, but they didn't tell you, right?
24       MR. GRAHAM: I would object again.
25 Argumentative again, Your Honor.

Page 82

1        THE COURT: Sustained. It is
2 argumentative.
3 BY MR. LEWIS:
4    Q  Does this indicate to you that the people
5 in Boston, the high officials, knew about the
6 synergistic effect of smoking and asbestos?
7    A  It appears so, yes, sir.
8    Q  Did they tell you about that problem in
9 1971?
10   A  I don't recall it, no, sir.
11   Q  The men that were diseased before Dan
12 Schneider was hired, in 1973 -- Were there men that
13 were diseased?
14   A  Yes, sir.
15   Q  A large number of them?
16   A  Well, there were men diseased. I don't
17 know what a large number means.
18   Q  Well, had there been men who had died from
19 asbestos exposure by then?
20   A  Yes, sir.
21   Q  Had there been men who contracted
22 asbestosis before Dan Schneider was hired?
23   A  Yes, sir.
24   Q  Had there been men that had interstitial
25 fibrosis before Dan was hired?

Page 83

1    A  Yes, sir.
2    Q  Do you know if anybody told Dan about that
3 before he was hired?
4    A  I don't know.
5    Q  Now Peter Kostic was a resident of Libby,
6 correct?
7    A  No, sir.
8    Q  Where did he reside?
9    A  Cambridge, Massachusetts.
10   Q  What was his position with the company?
11   A  He was a safety engineer for Construction
12 Products Division.
13   Q  Do you know whether he kept track of
14 health-related problems in Libby?
15   A  No, sir, I don't know.
16   Q  You remember Bleich, right?
17   A  Yes, sir.
18   Q  Who was his boss?
19   A  Well, at what point?
20   Q  When the company was initially acquired by
21 W.R. Grace.
22   A  J.A. Kelley.
23   Q  Who succeeded Kelley as president?
24   A  R.W. Sterrett.
25   Q  Were those men all advised of the reports

Page 84

1 from the Montana Health Department -- Montana State
2 that you had a serious health problem concerning
3 asbestos exposure at your Libby facility?
4    A  I believe so, yes, sir.
5    Q  Did they do anything to bring it to the
6 attention of the employees?
7    A  Not that I recall, no, sir.
8    Q  In fact, they told you to keep it
9 confidential; is that correct?
10   A  No, sir.
11   Q  Did they give you any directions to tell
12 the men about the problems?
13   A  No, sir.
14   Q  Did they take any action whatsoever to
15 address the problem?
16   A  Well, yes, sir, we were continuously
17 taking steps to improve the atmosphere of the
18 industrial environment for our people by making
19 improvements in controlling dust at the operation.
20   Q  But at least as of the latest report from
21 the State, Dan Schnetter's hiring, you continued to
22 have a significant health problem in the old dry
23 mill, correct?
24   A  We continued to have a dust problem, yes,
25 sir.

Page 85

1　Q　A dust problem.
2　A　Yes, sir.
3　Q　You didn't have an asbestos problem?
4　A　Asbestos is one of the ingredients in the
5　dust.
6　Q　Okay. But it wasn't the dust that was
7　killing these men, it was the asbestos, correct?
8　A　Well, asbestos was the bad actor in the
9　dust.
10　Q　Right. It was the bad actor. And you
11　knew at the time that Dan Schneider was hired that
12　your men were being exposed daily to this asbestos
13　hazard, correct?
14　A　Yes, sir.
15　Q　You knew that there was no way that --
16　when they were working in the dry mill, to protect
17　them from that hazard, correct?
18　A　No, sir.
19　Q　Well, if they couldn't see it and they had
20　to breathe, weren't they going to get asbestos up
21　there?
22　A　They were required to wear respirators
23　when they were working in the dry mill, and
24　respirators were approved as an application where
25　the harmful dust would be removed.

Page 86

1　Q　Well, if these respirators work so
2　good, how come all these guys got asbestosis and
3　disease --
4　　　　MR. GRAHAM: Objection, argumentative
5　again, Your Honor.
6　BY MR. LEWIS:
7　Q　Do you know how they got asbestosis if
8　they worked --
9　A　Is there an objection pending here?
10　　　　THE COURT: The other objection --
11　He changed his question, Mr. Lovick. The first
12　objection in fact I sustained -- I didn't say it,
13　but I sustained it because he changed his question.
14　　　　THE WITNESS: Thank you, Your Honor.
15　BY MR. LEWIS:
16　Q　Do you know how they got asbestos if
17　they -- if it wasn't dangerous up there?
18　A　Well, no, they got asbestos from
19　breathing -- they got asbestosis from breathing
20　asbestos dust.
21　Q　You followed the company rules, I assume?
22　A　Yes, sir.
23　Q　And you got it?
24　A　Yes, sir.
25　Q　And all the other management officials

Page 87

1　followed the rules and a number of them got it,
2　right?
3　A　Yes, sir.
4　Q　Mr. Melcher got it?
5　A　Yes, sir.
6　Q　Mr. McCaig got it?
7　A　Yes, sir.
8　Q　And you all followed the rules, right?
9　A　I think so, yes, sir.
10　Q　But you all knew about it, didn't you?
11　A　Yes.
12　Q　And the men weren't told, were they?
13　A　Well, I don't know that they were not told
14　specifically --
15　Q　You didn't tell them, did you?
16　A　No. And again, I guess at what point in
17　time?
18　Q　Well, you didn't tell them on the safety
19　committee right up until the time you left in 1983.
20　You have already testified to that. You never
21　brought up the subject of asbestos in the safety
22　committee. You agreed to that about a hour and a
23　half ago; do you recall that?
24　A　Yes, sir.
25　Q　Where else would you bring it up if you

Page 88

1　didn't bring it up in the safety committee? It was
2　a safety issue, right?
3　A　Yes, sir.
4　Q　Forgive me, but I have got to go through
5　some documents here to get them in evidence here,
6　and I think we will about wrap it up.
7　　　　MR. LEWIS: Could I have Plaintiffs'
8　Exhibit G-5, please. Is G-9 in evidence? I would
9　offer G-9.
10　　　　THE COURT: That was 10, wasn't it?
11　　　　MR. SLOVAK: No, 9.
12　　　　THE WITNESS: Here is 10.
13　　　　MR. LEWIS: I think you're right -- I
14　think G -- I don't think G-9 has been -- Do you have
15　G-5 and G-9?
16　BY MR. LEWIS:
17　Q　I'm going to hand you G-5. Have you ever
18　seen that document before?
19　A　No, sir, I don't ever recall seeing this
20　document.
21　Q　Did that appear in the records of W.R.
22　Grace or Zonolite?
23　A　I don't know.
24　Q　You don't know where it came from?
25　A　No, sir.

Page 89

1  Q  G-9?  Is G-9 a 1956 State report, first
2  identifying to you that asbestos was a toxic
3  substance?
4  A  (Pause.)  Is there a question?
5  Q  Yes.  Is G-9 the State report -- 1956
6  State report that first identified for you the fact
7  that asbestos was a toxic substance?
8  A  Yes, sir.
9  Q  And that you had this toxic substance as a
10 by-product of your vermiculite mining operation?
11 A  Yes, sir.
12 Q  G-7?
13        MR. LEWIS:  G-13, G-13.3 and G-15,
14 16, 17.
15 BY MR. LEWIS:
16 Q  I'm handing you what has been marked as
17 G-13.  Do you recognize that document?
18 A  Yes, sir.
19 Q  Is that a 1963 report from the State?
20 A  Yes, sir.
21 Q  And does -- Did you receive that?
22 A  Yes, sir.
23 Q  As you received G-9, correct?
24 A  Yes.
25 Q  What does G-13 purport to be?

Page 90

1  A  It's stated that it's an industrial
2  hygiene study made at the Zonolite company at Libby,
3  Montana.
4  Q  And did you folks quarrel with that
5  report?
6  A  No, sir.
7  Q  And in the Conclusions and Recommendations
8  in that State report, "As noted in all previous
9  reports, considerable effort should be made,
10 immediately, to improve the dust control procedures
11 in the plant to reduce dustiness to an acceptable
12 level." Does it say that?
13 A  Yes, sir.
14        MR. LEWIS:  I would offer G-9 and
15 G-13, Your Honor.
16        THE COURT:  Any objection?
17        MR. GRAHAM:  No objection.
18 BY MR. LEWIS:
19 Q  I'm handing you what has been marked as
20 G-13.3.  Have you ever seen that document?
21 A  Yes, sir.
22 Q  And what is that?
23 A  It's a letter from Woodrow Nelson, MD, to
24 Maryland Casualty Company dated 14th of February of
25 1964.

Page 91

1  Q  Did you receive a copy of that within a
2  short period of time after that, February 14, 1964?
3  A  I believe so, yes, sir.
4  Q  Did it identify the fact that Eitel Ludwig
5  was diagnosed with a disease because of asbestos
6  exposure?
7  A  It does not -- Yes, he's suffering from
8  pneumoconiosis, almost certainly from the asbestos
9  content of the dust.
10 Q  That's what it said and you got that and
11 you knew about that?
12 A  Yes, sir.
13 Q  And neither you nor any other management
14 official told the employees about that, correct?
15 A  No, sir.
16 Q  You didn't tell anybody; is that correct?
17 A  Yes, sir, that's correct.
18        MR. LEWIS:  I would offer Plaintiffs'
19 G-13.3.
20        MR. GRAHAM:  No objection.
21        THE COURT:  13.3 will be admitted
22 without objection.
23        MR. LEWIS:  I'm sorry, I need G-14
24 also.
25 BY MR. LEWIS:

Page 92

1  Q  I'm handing you Exhibit G-14.  Would you
2  identify that for the jury -- or, for the Court.
3  A  It's a letter to J.A. Kelley, General
4  Manager of Zonolite Division, W.R. Grace, Chicago
5  arcs, and it's written by an a C.A. Graf.  It's on
6  the letter of Western Mineral Products Company,
7  Minneapolis.
8  Q  Did you receive a copy of that letter?
9  A  Yes, sir.
10 Q  It says on the bottom, it says cc Mr. E.D.
11 Lovick?
12 A  Yes, sir.
13 Q  And the subject of the letter is
14 vermiculite dust health hazard; is that correct?
15 A  Yes, sir.
16 Q  April 2, 1964?
17 A  Yes, sir.
18 Q  What did you do in response to receiving a
19 copy of this letter?
20 A  I -- As I recall, I wrote to Mr. Pratt
21 about the vermiculite dust health hazard in Libby.
22 Q  What did you tell him?
23 A  Well, I told him what the situation was as
24 far as we knew it.
25 Q  Did you tell him that you had a hazard?

Page 93

1    A I don't recall that I would have used
2 those words.
3    Q Now, he's inquiring about a vermiculite
4 dust health hazard?
5    A Yes.
6    Q Did you confirm or deny that you folks had
7 a vermiculite dust health hazard?
8    A I don't recall.
9    Q But you did receive this letter; is that
10 correct?
11    A Yes, sir.
12        MR. LEWIS: Offer Plaintiffs' G-14.
13        MR. GRAHAM: No objection.
14        THE COURT: Any objection?
15        MR. GRAHAM: No objection, Your
16 Honor.
17 BY MR. LEWIS:
18    Q Handing you what has been marked as G-15,
19 did you receive a copy of that document?
20    A I was the author of this document.
21    Q Okay, and is that your response?
22    A Yes, sir.
23    Q Okay. Now, as part of G-14 -- We should
24 go back. There is another letter, correct? An
25 April 1 letter?

Page 94

1    A Yes, sir.
2    Q And you were responding to these two
3 letters by G-15; is that correct?
4    A Yes, sir.
5    Q And the second letter was actually -- is
6 dated April 1; is that correct?
7    A Yes.
8    Q And in that letter to Mr. Pratt, the City
9 of Minneapolis, Division of Public Health, is making
10 inquiry concerning your asbestos problem; is that
11 correct?
12    A Well, this opening paragraph of this
13 letter states, "The death of an employee of another
14 company who had a long exposure to vermiculite dust
15 has renewed our interest in the importance of
16 vermiculite dust in the causation of lung disease."
17 I don't see anything where it says anything about
18 asbestos.
19    Q Vermiculite dust could only cause
20 asbestosis or lung disease if it had asbestos in it,
21 correct?
22    A I believe that would be correct, yes,
23 sir.
24    Q So you weren't mining asbestos up there,
25 you were mining and processing vermiculite, right?

Page 95

1    A Yes, sir.
2    Q As you said earlier, the vermiculite that
3 went out of this facility never was able to be
4 completely decontaminated from tremolite asbestos,
5 correct?
6    A Yes, sir.
7    Q When you responded to this -- these
8 letters in Exhibit 15, did you inform Mr. Pratt of
9 Western Mineral Products Company of the fact that
10 you had a problem with asbestos in 1964?
11    A Yes, sir.
12    Q Did you tell him that you had by then men
13 who were diseased from being exposed to your
14 facility?
15        MR. GRAHAM: Objection, the document
16 speaks for itself.
17        THE COURT: Sustained.
18 BY MR. LEWIS:
19    Q Let me ask you this. You sent a letter to
20 Mr. Pratt informing him that a man had died from
21 lung problems, or you had some positive x-rays,
22 correct?
23    A Yes, sir.
24    Q Mr. Pratt was from Western Mineral
25 Companies, a totally different company than yours,

Page 96

1 right?
2    A Yes.
3    Q Did you do business with that company?
4    A Yes, sir.
5    Q And you were providing vermiculite to that
6 company, right?
7    A Yes, sir.
8    Q Mr. Pratt was concerned that this employee
9 that he had had got -- had been poisoned from your
10 vermiculite, right?
11        MR. GRAHAM: Object. Again, the
12 documents speak for themselves.
13 BY MR. LEWIS:
14    Q Is that your understanding?
15        THE COURT: That's overruled, that
16 question.
17        THE WITNESS: Would you repeat the
18 question, please.
19 BY MR. LEWIS:
20    Q Was it your understanding that Mr. Pratt
21 was inquiring as to whether the cause of this man's
22 disease was your vermiculite?  Correct?
23    A I believe so, yes, sir.
24    Q And you wanted to continue to do business
25 with that company, correct?

Page 97

1    A  Yes, sir.
2    Q  And you told him about the problem,
3  correct?
4    A  Yes.
5    Q  But you didn't tell your employees at the
6  same time, didn't you?
7    A  No, sir.
8    Q  I'm handing you what has been marked as
9  Plaintiffs' G-16. Have you seen Plaintiffs'
10  Exhibit G-16 before?
11    A  Yes, sir.
12    Q  What is it, please?
13    A  It's a letter from Mr. Wake in which he
14  encloses a copy of a study of the dry mill section
15  of the plant in Libby.
16    Q  Did you receive this document?
17    A  Yes, sir.
18    Q  Would it have been around May 11th, 1964?
19    A  Yes, sir.
20    Q  And it was addressed to your manager,
21  Mr. Bleich, correct?
22    A  Yes, sir.
23    Q  Did it identify any more significant
24  health problems?
25    A  I don't know.  I would have to review it.

Page 98

1    Q  Look at the top of the third page of the
2  document.  Or actually look at the second
3  paragraph.  Does it say that -- Does it again remind
4  you that your operation -- the asbestos content of
5  the material at your operations creates a
6  significant health risk for your employees?
7        MR. GRAHAM:  Object again.  The
8  document speaks for itself, Your Honor.
9        THE COURT:  What page are you
10  referring to, counsel?
11        MR. LEWIS:  Page 3 of 5.  Second
12  paragraph.
13        THE COURT:  Overruled.  He may
14  answer.
15        THE WITNESS:  I wonder if I could ask
16  you to repeat that question, please.
17  BY MR. LEWIS:
18    Q  Did this document, in general, remind you
19  again that you had a significant health problem with
20  asbestos at your facility according to the State
21  authorities?
22    A  Yes, sir, it did.
23    Q  And did you give that to your employees?
24    A  No, sir.
25    Q  I'm handing you what has been marked as

Page 99

1  G-17.
2        MR. LEWIS:  I haven't offered
3  Plaintiffs 15 or 16, have I?
4        MR. SLOVAK:  No.
5        MR. LEWIS:  Offer Plaintiffs'
6  Exhibit 15 and 16.
7        MR. GRAHAM:  No objection.
8        THE COURT:  15 and 16 will be
9  admitted without objection.
10  BY MR. LEWIS:
11    Q  Have you seen this document, Plaintiffs'
12  Exhibit G-17 before today?
13    A  Yes, sir.
14    Q  And what is it, please?
15    A  This is a letter from Woodrow Nelson, MD,
16  dated 8-25-64, to Joseph Kelley, with the Zonolite
17  Division.
18    Q  So he wrote directly to the president.
19  And what did he offer to do, generally?
20    A  He offered to carry out an analysis of the
21  data concerning x-ray studies on our employees.
22    Q  In the second paragraph does he document a
23  meeting of doctors and Libby Zonolite personnel?
24    A  Yes, sir.
25    Q  Did you attend that meeting?

Page 100

1    A  Yes, sir.
2    Q  And did he correctly state here that at
3  this meeting the consensus of local medical opinion
4  was that an increased incidence of chronic
5  respiratory disease existed in Zonolite employees
6  who had prolonged exposure to dust?
7    A  I don't recall that, but this is what he
8  states, so it probably was correct.
9    Q  You don't have any reason to question that
10  then?
11    A  No, sir.
12    Q  And what did Mr. Kelley do about this?
13    A  I don't know.
14    Q  Did Mr. Kelley ever contact you or the
15  management in Libby as far as you know to try to
16  address this problem that Dr. Nelson had identified
17  for you?
18    A  I don't recall, no, sir.
19    Q  And at that time Mr. Kelley was still in
20  Chicago?
21    A  Yes, sir.
22    Q  But this was after the acquisition of
23  Zonolite by W.R. Grace, correct?
24    A  Yes.
25        MR. LEWIS:  I'll offer Plaintiffs'

Page 101

1 Exhibit G-17.
2        MR. GRAHAM: No objection.
3        THE COURT: G-17 will be admitted
4 without objection.
5 BY MR. LEWIS:
6    Q  Who was George W. Blackwood?
7    A  George Blackwood was president of Dewey
8 and Almy Chemical Division which, initially,
9 Zonolite Company came under when we first were
10 acquired by W.R. Grace.
11    Q  Okay. So Dewey and Almy, was that the
12 precursors to the Construction Products Division?
13    A  Well, in a sense, yes. The Construction
14 Products Division was set up after the acquisition
15 of Grace and they split off from Dewey and Almy, and
16 I think operations at a couple of the other
17 divisions also went into the makeup of Construction
18 Products Division.
19    Q  In 1964, was Mr. Blackwood a high official
20 for W.R. Grace and Company?
21    A  Yes, sir, he was president of Dewey and
22 Almy Chemical Division.
23    Q  Do you know of anything that Mr. Blackwood
24 did at that time to minimize or insulate Grace's
25 exposure from liability for asbestos-related disease

Page 102

1 to its employees?
2    A  No, sir, I don't.
3    Q  Did Mr. Blackwood ever correspond with
4 you?
5    A  Not with me, no, sir.
6    Q  Do you know if he corresponded with
7 Mr. Kelley?
8    A  I'm sure he did, yes, sir.
9    Q  Who was Mr. Cahalane? I'm not sure if I
10 pronounced that right.
11    A  Cahalane is correct. He was an employee
12 in the Construction Products Division. He was in
13 charge of cash management and he was in charge of
14 insurance, among other things.
15    Q  Did he work closely over the years with
16 you?
17    A  Well, yes, he worked with us somewhat.
18    Q  And did he work with Mr. Eschenbach?
19    A  I can't answer that. I don't know.
20    Q  Did you work with Mr. Eschenbach?
21    A  Yes.
22    Q  What was Mr. Eschenbach's position with
23 the company?
24    A  He was in charge of toxicology in the
25 Construction Products Division.

Page 103

1    Q  So you don't know one way or the other
2 whether Mr. Cahalane or Mr. Eschenbach worked
3 together on claims matters?
4    A  No, sir, I don't.
5    Q  Or whether they worked together on
6 occupational toxic exposure?
7    A  I just don't know what their relationship
8 would have been.
9    Q  Okay. Fair enough. I'll get on to
10 another question. But you worked with Mr. Cahalane,
11 correct?
12    A  Yes, sir.
13    Q  What did you do with Mr. Cahalane?
14    A  Mr. Cahalane was responsible for cash
15 management, as I said, and we got our cash from the
16 Construction Products Division, if you will, and so
17 we worked back and forth on that -- on the balances
18 we would keep in the Libby bank. And I also worked
19 with Mr. Cahalane, who was responsible for, I
20 believe, all of the insurance for the Construction
21 Products Division. If we had any insurance
22 problems, I would work with him.
23    Q  So Mr. Cahalane was primarily responsible
24 for hanging on to the company's money, right?
25    A  Well, I --

Page 104

1    Q  Would that be correct?
2    A  I'm sure that any money he had, he would
3 have to see that it was safeguarded, yes, sir.
4    Q  He was a financial man. He was trying to
5 see that the money was spent wisely and they weren't
6 spending too much money for things such as
7 occupational exposure to chemicals or substances,
8 right?
9        MR. GRAHAM: Objection, foundation.
10 Argumentative.
11        THE COURT: Rephrase the question,
12 Counsel.
13 BY MR. LEWIS:
14    Q  Mr. Cahalane was -- One of the principle
15 parts of his job, since you worked with him rather
16 closely, was to limit the company's liability for
17 occupational exposures that resulted in disease,
18 correct?
19    A  Well, he was responsible for the insurance
20 which would cover the company in that regard, yes,
21 sir.
22    Q  Who was Mr. Kingery?
23    A  I don't know exactly, except he was an
24 officer of W.R. Grace in New York.
25    Q  Who was Mr. C.F. Krauter?

**TRANSCRIPT OF PROCEEDINGS**    CondenseIt!™    **SCHNETTER vs W.R. GRACE**

Page 105

1    A  I don't know.
2    Q  Mr. Samuels?
3    A  Mr. Samuels was an officer of one of the
4  other divisions in Cambridge, I believe.  I'm not
5  even sure which division.
6    Q  Mr. Stover?
7    A  I don't know.
8    Q  Mr. Taggart?
9    A  Mr. Taggart at one time was the president
10  of Dewey and Almy Chemical Division.
11    Q  All of these individuals I've mentioned
12  were very high officials within the W.R. Grace
13  family of companies, right?
14    A  Yes, sir.
15    Q  Okay.
16       MR. LEWIS:  Could I have G-19.1,
17  please.
18  BY MR. LEWIS:
19    Q  I'm handing you what has been marked and
20  identified as Plaintiffs' G-19.1, which purports to
21  be a December 16, 1964, letter from George Blackwood
22  to J.A. Kelley.  Do you see that?
23    A  Yes, sir.
24    Q  Does that document appear to be a document
25  prepared in the ordinary and usual course of the

Page 106

1  business of W.R. Grace and Company?
2    A  Yes, sir, it would appear to be.
3    Q  Would it be an ordinary and usual thing
4  for Mr. Blackwood to correspond with Mr. Kelley
5  concerning important financial matters?
6    A  Well, I don't think it would be unusual
7  for him to correspond with Mr. Kelley at all because
8  I believe at that time Mr. Blackwood was Joe
9  Kelley's boss.
10    Q  That was the next question.  When
11  Mr. Blackwood talked to Mr. Kelley, he was supposed
12  to do something about it, right?
13    A  Yes, sir.
14    Q  Okay.
15       MR. LEWIS:  I move the admission of
16  G-19.1.
17       MR. GRAHAM:  Objection, foundation,
18  hearsay.  Doesn't fall within the exception to the
19  hearsay rule -- business records exception to the
20  hearsay rule.
21       THE COURT:  Overruled.  It may be
22  admitted.
23  BY MR. LEWIS:
24    Q  Does the third paragraph of this letter
25  state, "We cannot solely rely on Maryland Casualty

Page 107

1  Company's doctor to be 'interested in this problem.'
2  Zonolite, and you particularly, must direct the
3  effort to minimize Grace's exposure."  Is that what
4  it says?
5    A  Yes, sir.
6    Q  And we have gone through the Maryland
7  Casualty doctor's report.  Did you get a copy of
8  this document?
9    A  No, sir.
10    Q  Did Mr. Kelley ever contact you regarding
11  minimizing Grace's exposure?
12    A  Well, I don't -- I don't recall that he
13  ever would have contacted me on that particular --
14  in those particular words.
15    Q  Well, did anybody from W.R. Grace, higher
16  officials, ever contact you concerning limiting your
17  exposure to liability for asbestos claims for your
18  workers?
19    A  No, sir, but I would like to point out
20  that I am not the one that Mr. Kelley would have --
21  would have directed that sort of thing to.  He would
22  have directed that to the Libby manager, who at that
23  time was Mr. Bleich.
24    Q  Okay.
25       MR. LEWIS:  I would like exhibit

Page 108

1  number G-20.
2  BY MR. LEWIS:
3    Q  Handing you what has been marked as
4  Exhibit Number G-20, this is a letter to Mr. Kelley
5  from Mr. Bleich.
6    A  Yes, sir, that's what it is.
7    Q  Did that appear to be responsive to the
8  previous letter we were just talking about, which
9  was G-19?
10       MR. GRAHAM:  Objection, calls for
11  speculation.
12       THE COURT:  If he knows, he may
13  answer.
14       THE WITNESS:  I don't know that it is
15  a response to that letter.
16  BY MR. LEWIS:
17    Q  It's a January 2, 1985 (sic), letter,
18  correct?
19    A  Yes.
20    Q  From Mr. R.A. Bleich, Libby Manager, to
21  Mr. J.A. Kelley, the president at the home office in
22  Chicago, at that time?
23    A  Yes.
24    Q  Was that letter prepared in the usual and
25  ordinary course of business in the W.R. business?

Page 109

1  A  Yes, sir.
2      MR. SLOVAK: Tom, 1965.
3      MR. LEWIS: I apologize if I said
4  1975. It's 1965.
5      THE WITNESS: That's correct. Yes,
6  sir.
7      MR. LEWIS: And it says -- I'm going
8  to offer G-20.
9      MR. GRAHAM: I would object on the
10  basis of competency, hearsay, and not falling within
11  the hearsay -- or the business records exception to
12  the hearsay rule, Your Honor.
13      THE COURT: Overruled. It may be
14  admitted.
15  BY MR. LEWIS:
16  Q  The letter states, in the first two
17  paragraphs, "Dear Joe. Earl has sent to you copies
18  of all reports we have from Montana State Board of
19  Health on the dust problem. In going over these
20  reports, I can only say that it represents a very
21  sorry record. There is some improvement indicated
22  during 1964 but still totally inadequate."
23      Do you agree with Mr. Bleich's assessment
24  of your performance as of January, 1965?
25  A  I don't know -- That's what -- That's what

Page 110

1  Mr. Bleich states.
2  Q  Do you agree with that?
3  A  That's apparently his opinion. I don't
4  know that I would agree with it in total, no, sir.
5  Q  He was your supervisor?
6  A  Yes, sir.
7  Q  And he references the fact that you had
8  sent copies of all of the reports to Mr. Kelley,
9  correct?
10  A  Yes, sir.
11  Q  You routinely did that?
12  A  Yes, sir.
13  Q  You routinely made copies of those reports
14  identifying the serious health hazard to the
15  president of your company in every case, correct?
16  A  I believe so, yes, sir.
17  Q  But you didn't do it -- You didn't send
18  them to the employees, did you?
19  A  No, sir.
20  Q  Correct?
21  A  That is correct, we did not send them to
22  the employees.
23      MR. LEWIS: Plaintiffs'
24  Exhibit 20.1.
25  BY MR. LEWIS:

Page 111

1  Q  I'm handing you a document marked
2  Plaintiffs' Exhibit 20.1. What's the date of that
3  document?
4  A  January 2nd, 1965.
5  Q  And that happens to be exactly the same
6  date that Mr. Bleich wrote to Mr. Kelley, as
7  evidenced by G-20, correct?
8  A  Yes, sir.
9  Q  And you wrote this interoffice
10  correspondence of January 2, 1965, to Mr. Kelley,
11  correct?
12  A  Yes, sir.
13  Q  And the subject is what?
14  A  Dust at Libby.
15  Q  In this letter or this report that you
16  wrote to Mr. Kelley, did you intend it to be
17  accurate?
18  A  Yes, sir.
19  Q  He was the highest official in the
20  Zonolite division, correct?
21  A  Yes, sir.
22  Q  And did you intend to give him some
23  guidance as to what to do with this health problem?
24  A  I don't know. I think it was my intent to
25  tell him what the situation was.

Page 112

1  Q  Do you remember when I asked you earlier
2  whether or not you instituted the x-ray program for
3  the benefit of the employees or for the benefit of
4  company? Do you recall that?
5  A  Yes, sir.
6  Q  Did you say in this report, "In order to
7  protect ourselves and place ourselves on record as
8  to the condition of our employees, as of the
9  effective date of the law, we instituted a program
10  whereby all of our employees would have x-rays at
11  the local hospital." Did you say that?
12      MR. GRAHAM: Excuse me, Counsel.
13  Could you point out where that is?
14      MR. LEWIS: That's fair.
15      MR. GRAHAM: For my edification and
16  for the witness'.
17  BY MR. LEWIS:
18  Q  We're starting with that. Read that
19  sentence there (indicating).
20      THE COURT: What page, Counsel?
21      MR. LEWIS: Page 2.
22      THE WITNESS: Page 2.
23      THE LEWIS: "In order to protect
24  ourselves and place ourselves on record as to the
25  condition of our employees, as of the effective date

## Page 113

1 of the law, we instituted a program whereby all of
2 our employees would have x-rays at the local
3 hospital."
4         MR. GRAHAM: We would request that in
5 fairness to the jury, to understand what the context
6 is, that the preceding portion of the statement be
7 read, too, because otherwise it's -- We would object
8 to it as being only a partial and unintelligible
9 statement of what the witness was addressing.
10         MR. LEWIS: I have absolutely no
11 objection to that. I'll start with, "This law
12 specified..." Is that satisfactory?
13         MR. GRAHAM: At the beginning of the
14 paragraph.
15 BY MR. LEWIS:
16     Q In 1956 we started requiring -- Well, I
17 don't know what that is.
18         MR. GRAHAM: No, the paragraph at the
19 top of the page.
20         MR. LEWIS: All right.
21 BY MR. LEWIS:
22     Q "Montana has had for many years an
23 Industrial Accident law, but it was not until 1959
24 that they passed an industrial disease law. This
25 law specified certain specific industrial diseases

## Page 114

1 for which employers would be responsible. The only
2 specified disease which we felt could apply to us
3 was silicosis.
4         "The law stated that employers would not
5 be responsible for anything which had been
6 contracted by their employees prior to the date that
7 the law became effective. However, they would be
8 responsible for any contraction of disease after
9 that date or any aggravation of the condition which
10 existed in the employee due to industrial conditions
11 which existed in a particular plant.
12         "In order to protect ourselves and place
13 ourselves on record as to the condition of our
14 employees, as of the effective date of the law, we
15 instituted a program whereby all of our employees
16 would have x-rays at the local hospital. We made
17 arrangements with the hospital to schedule these
18 x-rays and in turn we arranged to have the employees
19 there at the stipulated time. All x-rays were
20 interpreted by a radiologist and a report written on
21 each one."
22         So does that refresh your recollection as
23 to why you instituted the x-ray program?
24     A Yes, sir.
25     Q You instituted that x-ray program for W.R.

## Page 115

1 Grace, not for the employees; is that true?
2     A Yes, but the employees could also benefit
3 from this.
4     Q But it was merely an incidental benefit;
5 is that true?
6     A It would be an additional benefit.
7     Q Now, did this program directly advise the
8 employees of the results of their x-rays?
9     A Yes, sir.
10     Q Didn't they have to go to their doctors to
11 get the x-rays?
12     A Yes, sir.
13     Q And that was, you did not have to give any
14 information to the employees as to their physical
15 condition so that you would not be liable for in any
16 way of giving out information, right?
17     A No, sir, that's not true at all.
18     Q Read the last two -- Just read the last
19 sentences of the second paragraph. Read it to the
20 jury, please.
21         MR. GRAHAM: Again --
22         MR. LEWIS: This directly impeaches,
23 Your Honor.
24         THE COURT: You said the last two
25 sentences.

## Page 116

1         MR. LEWIS: The last sentence.
2         THE WITNESS: In the second
3 paragraph.
4         MR. GRAHAM: I would make the same
5 objection, Your Honor. It's incomplete and
6 misleading to the jury.
7         THE COURT: Is it all right if he
8 reads the other part, Counsel? I think that's what
9 you're objecting to.
10         MR. GRAHAM: Yes.
11         THE COURT: He wants the preceding
12 paragraphs, I'm assuming.
13         MR. LEWIS: Preceding paragraphs?
14         THE COURT: Preceding sentences.
15         MR. LEWIS: Yeah, I have no objection
16 to that.
17         MR. GRAHAM: Starting with, "The
18 doctors ..."
19         MR. LEWIS: Your Honor, this is my
20 examination, not his, okay.
21         THE COURT: He can ask if he wants.
22 Overruled. Proceed, Counsel.
23 BY MR. LEWIS:
24     Q Read the last two sentences, please.
25     A "This applied to all employees, even those

Page 117

1 whose x-ray interpretations showed normal chests.
2 In this way, we did not give any information to the
3 employees as to their physical condition, so we
4 could not be responsible for or liable in any way
5 for giving out information which might be construed
6 as misleading."
7    Q Did the preliminary results of these
8 x-rays indicate a high incidence of pulmonary
9 disease among your employees?
10   A I don't know.
11   Q Would you read the last paragraph on the
12 page, please.
13   A "After all the results of these x-rays
14 were in, we again met with the doctors and with the
15 radiologist and discussed what our situation
16 actually was in regard to pulmonary diseases from
17 our operation. The preliminary results of the
18 interpretations made it appear that we had a high
19 incidence of pulmonary disease among our employees.
20   "However, after the doctors had analyzed
21 the results, the conclusion they came to was that
22 there was nothing to indicate that there was a
23 higher incidence of pulmonary trouble among our
24 people than there was among any other group in this
25 geographical area.

Page 118

1    "In other words, they felt that they
2 could not come to any conclusion as to whether our
3 mill operation presented an above-normal occurrence
4 of respiratory trouble. The radiologist who had had
5 industrial disease experience in the coal mine
6 fields of Indiana could offer nothing constructive
7 in the way of a conclusion either."
8    Q Read the rest of the paragraph. There is
9 another sentence on the other page. Well, read the
10 next two lines.
11   A "In this regard, Libby itself has an air
12 pollution problem. Enclosed is a copy of a news
13 release from the local paper on the subject."
14   Q Okay. In 1965, you're writing to
15 President Kelley and you're telling him that you
16 don't have any more problem there than anybody else
17 in Libby.
18   A No, sir, I'm not telling them at all --
19 him that at all. I'm telling him what the consensus
20 of the doctors in Libby were.
21   Q Did you meet with the doctors?
22   A Yes, sir.
23   Q These doctors were paid by you folks to do
24 this study?
25   A No, sir.

Page 119

1    Q Well, why would you meet with these
2 doctors?
3    A So that we could tell them what we were
4 doing and why we were doing it and ask their
5 cooperation about giving the results of these x-rays
6 to the employees of ours who had designated them as
7 their primary physicians. And they agreed to do
8 this.
9    Q None of them were pulmonologists, were
10 they?
11   A No, sir.
12   Q In fact, W.R. Grace never consulted a
13 pulmonary regarding the condition of their
14 employees; is that true?
15   A I don't know.
16   Q But in any event, were you trying to
17 convince Mr. Kelley that you didn't have a problem
18 in 1965?
19   A No, sir, I was not.
20   Q You knew very well you had a problem in
21 1965, correct?
22   A I was telling Mr. Kelley what we knew.
23   Q If you didn't have a problem, if these
24 doctors -- if you were accurately reporting what
25 these doctors were saying, why were you so worried

Page 120

1 about representations being made to the men? Why
2 couldn't you tell them directly?
3    A Very simple, Counselor. We had the
4 doctors tell the men. In the event that there were
5 any abnormal x-rays, the doctors were in the
6 position to advise them whether any follow-up work
7 should be done. Whatever the interpretations were,
8 the doctors could interpret those observations, the
9 radiologists, and tell them directly what it meant
10 and what the results were. We were not medically
11 trained to be able to do this and come to the
12 conclusions the doctors could as to what these
13 people should do.
14   Q Were these doctors medically trained in
15 this particular matter, if you know?
16   A They were medically trained.
17   Q Were they medically trained to handle
18 these kinds of conditions?
19   A I don't know.
20   Q You didn't request a specialist, correct?
21   A No, sir, we did not.
22   Q These were general practitioners in this
23 community?
24   A Yes, sir.
25   Q And they would just get an x-ray report or

**TRANSCRIPT OF PROCEEDINGS**      CondenseIt!™      **SCHNETTER vs W.R. GRACE**

Page 121

1 would they get the x-rays?
2    A  They got the x-ray reports.
3    Q  They didn't get the x-rays, did they?
4    A  They were at the hospital. But they were
5 not radiologists, either. These x-rays were
6 interpreted by a radiologist who is better equipped
7 to interpret them than the general practitioners
8 were.
9    Q  After the tests were normal, then what
10 happened? Nothing, right? If the x-rays were
11 normal, nothing happened? The men weren't told
12 about --
13    A  Oh, yes, they were. Oh, yes.
14    Q  They were told it was normal?
15    A  Yes, sir.
16    Q  Or they were told no change, right?
17    A  They were told both.
18    Q  Did any of those reports say anything
19 about the fact that their lung condition or lung
20 changes, abnormalities, were associated with
21 asbestos exposure?
22    A  Some of them said --
23    Q  Just a second. Did those reports say any
24 of the problems were secondary to asbestos exposure?
25        MR. GRAHAM: I would object to

Page 122

1 counsel interrupting the witness' answer, Your
2 Honor.
3        THE COURT: Overruled. You may
4 answer, Mr. Lovick.
5        THE WITNESS: So far as I recall,
6 there were never any statements made that the
7 results of their chest condition, if there was one,
8 was the result of asbestos exposure.
9 BY MR. LEWIS:
10    Q  And you don't know if any of the doctors
11 that reviewed those x-rays were qualified or had the
12 experience to determine whether or not abnormalities
13 in the x-rays were associated with asbestos
14 exposure; is that true?
15    A  Well, I don't think that's true.
16    Q  What do you know, is the question. Do you
17 know whether they were qualified?
18    A  No, I don't.
19    Q  Now, would you go to page 4. Does this
20 list some employees as of January 2 who had abnormal
21 chests?
22    A  Yes, sir.
23    Q  Were all of these workers or were some of
24 them management?
25    A  I don't see on here any people who were

Page 123

1 management at that time.
2    Q  Did you give this report to any of these
3 people listed on page 4?
4    A  No, sir.
5    Q  No question you're the author of this
6 report?
7    A  No question.
8        MR. LEWIS: Offer Plaintiffs' Exhibit
9 G-20.1.
10        MR. GRAHAM: No objection.
11        THE COURT: Admitted without
12 objection.
13 BY MR. LEWIS:
14    Q  Mr. Lovick, were there discussions as to
15 how to go about attacking your dust problem at W.R.
16 Grace?
17    A  Yes.
18    Q  Were there discussions at high management
19 level?
20    A  Oh, I believe so, yes, sir.
21    Q  Did you ever discuss how to go about
22 correcting the problem with J.A. Kelley or
23 Blackwood?
24    A  With J.A. Kelley, but not with Blackwood,
25 no, sir.

Page 124

1    Q  Do you know if Mr. Kelley prepared a
2 report to Mr. Blackwood based upon your report of
3 January 2, 1965?
4    A  I don't know.
5        MR. LEWIS: Could I see
6 Exhibit 20.2.
7 BY MR. LEWIS:
8    Q  Handing you what has been marked as
9 Exhibit 20.2. For purposes of identification, is
10 that an interoffice correspondence from Mr. J.A.
11 Kelley to Mr. G.W. Blackwood which was dictated
12 January 8, 1965, and finally dated January 13, 1965?
13    A  Yes, sir.
14    Q  Mr. Blackwood was in Cambridge,
15 Mr. Blackwood was in Chicago; is that correct?
16    A  Yes, sir.
17    Q  You remember earlier you folks said that
18 you sent all of the reports to Mr. Kelley, correct?
19    A  Yes, sir, I said that.
20    Q  Did you send -- You said that you sent the
21 reports to Mr. Kelley as they became available to
22 you?
23    A  I believe so, yes, sir.
24    Q  I would like you to read that whole letter
25 so we don't have any objections and everything is

Page 125

1 put in its proper context to the jury. But I'll
2 offer it first. This is a -- This report was
3 prepared in the ordinary and usual course of
4 business of W.R. Grace and Company, correct?
5    A I believe so, yes, sir.
6    Q It's on official Zonolite Division, W.R.
7 Grace and Company letterhead?
8    A Yes, sir.
9    Q You recognize Mr. Kelley and Mr. Blackwood
10 as you described for the jury, correct?
11    A Yes, sir.
12       MR. LEWIS: Offer G-20.2.
13       MR. GRAHAM: Objection, comprehensive
14 hearsay objection, and further object on the basis
15 that the document does not fall within the business
16 records exception of the hearsay rule.
17       THE COURT: Objection is overruled.
18 20.2 will be admitted without objection.
19       MR. SLOVAK: Over objection.
20       THE COURT: Or over objection.
21 Excuse me. I'm sorry, Counsel. My question is,
22 we're 5 minutes to. By the time Mr. Lovick reads a
23 two page letter, do you still have further questions
24 of him?
25       MR. LEWIS: Yes. After this I

Page 126

1 have --
2       THE COURT: Very well, we will take a
3 noon recess and he can begin -- he can read the
4 letter when we return.
5       Ladies and gentlemen of the jury, you're
6 admonished not to discuss this case amongst
7 yourselves or with anyone else, nor allow anyone to
8 discuss the case with you. Nor shall you express or
9 form any opinion regarding the matter until it's
10 finally submitted to you for your decision. We will
11 return at 1:30. Be here by about 20 after so we can
12 start right away. Thank you. Court will stand in
13 recess.
14       (A recess was held in the proceedings.)
15
16       THE COURT: Will counsel agree that
17 the jury is all present?
18       MR. LEWIS: Agreed.
19       MR. GRAHAM: Yes, Your Honor.
20       THE COURT: Very well, I think,
21 Mr. Lewis, you were talking about Exhibit 20.3 and
22 you were going to have Mr. Lovick read it.
23       MR. LEWIS: Has it been admitted?
24       THE COURT: I think it did get
25 admitted.

Page 127

1       MR. SLOVAK: Yes.
2       MR. LEWIS: Thank you, Your Honor.
3 Good afternoon.
4       CROSS-EXAMINATION CONTINUED
5 BY MR. LEWIS:
6    Q I'm not going to have Mr. Lovick read this
7 whole exhibit. I'm just going to ask him a couple
8 of questions and I'll try to speed this process up.
9 What did you folks do about Dr. Nelson's
10 suggestions?
11    A Concerning the study that he wanted to
12 make?
13    Q Yes, concerning the long term problem with
14 some of your employees.
15    A Well, I -- I'm not sure that I understand
16 your question. If it -- The major effort that we
17 put in was trying to improve conditions up at the
18 operation to cut down on the amount of dust that was
19 present --
20    Q This was in 1965 --
21       MR. GRAHAM: I would object, Your
22 Honor. He cut the witness off again before the
23 answer has been completed.
24       MR. LEWIS: You were finished
25 answering the question, weren't you, sir?

Page 128

1       THE WITNESS: Yes.
2 BY MR. LEWIS:
3    Q I apologize. And if I do that again, as
4 your counsel suggests, just put up your hand and
5 I'll stop. You're entitled to finish your answer if
6 I ask an open question like that. Okay?
7    A Okay.
8    Q Did this report or this letter from
9 Mr. Kelley to Mr. Blackwood confirm that asbestos
10 had a known record for harmfulness at your
11 facility?
12    A Yes, sir.
13    Q Okay. Was this report provided to any of
14 your employees, other than management officials?
15    A Well, I don't know that this report was
16 made available to anybody at Libby.
17    Q So it was definitely back in Chicago and
18 in Boston or Cambridge, Massachusetts, but you don't
19 know whether this was ever given to you or the
20 employees here in Libby concerning the known record
21 for harmfulness of this asbestos?
22    A No, sir, I don't.
23       MR. LEWIS: Exhibit 20.3 and 20.4,
24 please. Make it 20.5, too, while we're at it.
25 BY MR. LEWIS:

Page 129

1  Q  I'm going to hand to you, sir, Plaintiffs'
2  Exhibit G-20.3, G-20.4 and 20.5.  Starting with
3  20.3, have you ever seen this document?
4    A  I don't recall -- I don't recall whether I
5  ever have or not, no, sir.
6    Q  Did the University of Maryland review a
7  group of records of employees from the W.R. Grace
8  company associated with the Zonolite operation in
9  northwestern Montana?
10   A  As I recall, they reviewed a group of
11 x-rays from our employees.
12   Q  Did you provide those to the University of
13 Maryland?
14   A  Well, they were provided by the hospital
15 in Libby, gathered there.
16   Q  Do you know how this document came to be
17 part of the records of W.R. Grace?
18   A  No, sir, I don't.
19   Q  Do you know if it is part of the records
20 of W.R. Grace?
21   A  No, sir, I don't.
22   Q  Go to Plaintiffs' Exhibit 20.4.  Do you
23 recognize this as a document that was generated by
24 W.R. Grace and Company?
25   A  Yes, sir.

Page 130

1   Q  Now is this a February 9, 1965, letter
2  from Mr. O.F. Stewart to Mr. M.F. Bushell of Grant
3  Industries?
4    A  Yes, sir.
5    Q  That's a company in Vancouver, British
6  Columbia, Canada, correct?
7    A  Yes.
8    Q  Have you ever seen this document before?
9    A  Yes, sir, I have.
10   Q  This document was generated in the
11 ordinary and usual course of the business of W.R.
12 Grace; is that correct?
13   A  Yes, sir.
14   Q  And it would be found in the regularly
15 kept business records of W.R. Grace; is that also
16 correct?
17   A  I would assume so, yes, sir.
18   Q  And it pertains to Libby's asbestos
19 problems; is that correct?
20   A  In my rather hasty review of the document,
21 I see no reference to asbestos in here.
22   Q  Are we talking about the same February,
23 1965, letter?
24   A  I believe so.
25   Q  Would you look at the first full paragraph

Page 131

1  on page 2.  Does it not say, "A copy of 'Dusts,
2  fumes and mists in Industry' published by the
3  National Safety Council is enclosed which contains
4  some very good information.  The threshold limit or
5  concentration of dust for vermiculite is 50 mppcf
6  and for asbestos 5 mppcf."  Which means million
7  particles per cubic foot?
8    A  Yes, sir, I see that now.
9    Q  "Vermiculite is classified as a nuisance
10 dust whereas asbestos is usually considered as a
11 health hazard unless the dust is controlled."  Do
12 you see that?
13   A  Yes, sir.
14   Q  And it goes on to say, "The point I am
15 making is that Libby vermiculite does contain a
16 small amount of asbestos dust."  Correct?
17   A  Yes, sir.
18   Q  That means the processed, completed
19 vermiculite contains a small amount of asbestos
20 dust, right?
21   A  Yes, sir.
22   Q  That's what they are referring to here?
23   A  Yes, sir.  I believe so.
24   Q  And then it talks down below, there is two
25 paragraphs in a row, just before number 1 there.

Page 132

1  "There have been reports at Libby of men having
2  pulmonary trouble.  I also believe Western Mineral
3  Products have had a report or two.  I'm sure Earl
4  Lovick will cover this in his letter.  We have
5  adopted the position that ANY DUST is a health
6  hazard and should be kept within a safe limit.  We
7  are attacking this problem by several methods."
8  Do you see "ANY DUST" there is capitalized and
9  underscored?
10   A  Yes, sir, I do.
11   Q  Who was O.F. Stewart?
12   A  He was an employee of W.R. Grace.  He was
13 headquartered in South Carolina, but he had -- at
14 that time he had responsibility for the Libby
15 plant.
16   Q  Why would he have responsibility for the
17 Libby plant if he was in South Carolina?
18   A  That was the way the organization was set
19 up, because they also had the mine and mill in South
20 Carolina, and he was responsible for that, also.
21   Q  Were you his number one assistant here at
22 that time?
23   A  No, sir.
24   Q  Who was?
25   A  Mr. Bleich.

Page 133

1  Q  Okay. So Mr. Bleich was the manager in
2  residence, but Mr. Stewart had the ultimate
3  responsibility for this operation?
4  A  Yes, sir.
5  Q  Who was Mr. Bushell?
6  A  He was an employee of Grant Industries in
7  Vancouver.
8  Q  Were they one of your customers?
9  A  Yes, sir.
10  Q  And were you sending vermiculite to them?
11  A  Yes, sir.
12  Q  Would you send that by rail?
13  A  Yes, sir.
14  Q  Okay. On this first page, Mr. Stewart
15  says, In general, the dust control could be broken
16  down to two separate situations. 1. Inside the
17  plant - that effects the workers and other plant
18  personnel, and I can't read -- Can you read that
19  next --
20  A  No, sir, I can't.
21  Q  Oh, and then 2. -- personnel and
22  housekeeping; is that what that says?
23  A  I believe that's what it says, yes.
24  Q  And 2. Dust ejected outside the plant into
25  the atmosphere and neighborhood. This affects our

Page 134

1  neighbors. Correct?
2  A  It affects your neighbors, yes.
3  Q  That's correct. I'm sorry. Well, these
4  concerns then were well known in 1965?
5  A  Yes, sir.
6  Q  That asbestos dust could endanger workers
7  and other plant personnel?
8  A  Yes, sir.
9  Q  And that asbestos dust could effect and
10  endanger your neighbors, right?
11  A  Yes, sir.
12  Q  Did you tell any of your neighbors about
13  this problem?
14  A  Not that I recall, no, sir.
15  Q  Did you do -- ever do anything to keep it
16  from your neighbors at any time?
17  A  No, sir.
18  MR. GRAHAM: I would object, Your
19  Honor. Relevancy.
20  THE COURT: Overruled. He answered.
21  BY MR. LEWIS:
22  Q  Do you know a man named Mr. Eschenbach?
23  A  Yes, sir.
24  Q  You testified about that this morning.
25  He's a toxicologist or --

Page 135

1  A  Yes, sir.
2  Q  You know him pretty well?
3  A  Yes, sir.
4  Q  He used to come here?
5  A  Yes, sir.
6  Q  And you have met with him in Canada a few
7  times?
8  A  I took one trip into Canada with him, one
9  time, yes, sir.
10  Q  Montreal, Quebec?
11  A  Yes, sir.
12  Q  Was that after you retired and became a
13  consultant or before?
14  A  Yes, sir, it was after I retired.
15  Q  And you went up to Montreal to learn about
16  asbestos?
17  A  No, sir.
18  Q  You went up there to confer with
19  Mr. Eschenbach about a case?
20  A  No, sir.
21  Q  Did Mr. Eschenbach come out here quite a
22  bit?
23  A  He did. He came out here on a regular
24  basis.
25  Q  How frequently would you say he came out

Page 136

1  here?
2  A  Well, I don't know. He would come out, I
3  would -- I would say once or twice a year.
4  Q  Not any more than that?
5  A  Possibly. Possibly some years he could be
6  here more than that. He did not have a regular
7  schedule.
8  Q  Okay. Now, you said that you never -- you
9  folks at W.R. Grace, Libby plant, never did anything
10  to try to keep this asbestos health problem out of
11  the public eye?
12  A  Yes, sir, I said that.
13  Q  And you say that under oath?
14  A  Yes, sir.
15  Q  Is it perhaps possible that someone else
16  besides you tried to keep it out of the public eye?
17  A  Certainly it's possible.
18  Q  Somebody in high management somewhere?
19  A  I don't know.
20  Q  How about Mr. McCaig? Did Mr. McCaig ever
21  do anything that -- or, tried to keep the fact of
22  pulmonary problems and illness in the workers away
23  from the community?
24  A  Not to my knowledge, no, sir.
25  Q  Was Mr. McCaig the manager of this