# EXHIBIT B

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - -

In Re:                    : Chapter 11
                          :
                          : Case No.
W.R. GRACE & CO., et al,  : 01-01139 JKF
                          :
                          : (Jointly
           Debtors        : Administered)


- - -

Thursday, May 7, 2009

- - -

          Oral deposition of GEORGE L.

PRIEST, taken pursuant to notice, was

held at the offices of DRINKER BIDDLE &

REATH, Two Logan Square, 18th & Cherry

Streets, Philadelphia, Pennsylvania

19103, commencing at 10:18 a.m., on the

above date, before Lori A. Zabielski, a

Registered Professional Reporter and

Notary Public in and for the Commonwealth

of Pennsylvania.    - - -

          MAGNA LEGAL SERVICES
             Seven Penn Center
            1635 Market Street
                8th Floor
      Philadelphia, Pennsylvania 19103
              866.624.6221

Page 22

1  expressed in this report?
2      A.   Correct.  I believe there
3  are no legal opinions given here.  I
4  meant to write a report that was based on
5  economics or custom and practice only.
6      Q.   Just for the record, what is
7  your economic training in the field of
8  economics?
9      A.   I attended the University of
10 Chicago Law School.  I took economics
11 courses that were taught in the law
12 school, and I also audited economic
13 courses taught in the economics
14 department.  I have studied the field of
15 economics extensively since then.  That's
16 the basic training.
17         But it's been reflected in
18 publication and peer review economic
19 journals.  I serve as a peer reviewer for
20 various economics journals.  My title at
21 Yale is Professor of Law and Economics.
22 I don't teach in the economics
23 department, but I have an economics
24 background.

Page 23

1      Q.   But you don't have an
2  advanced degree in the field of
3  economics; is that correct?
4      A.   That's correct.
5      Q.   And in paragraph 7 of your
6  report, you say you have held
7  appointments as a visiting professor in
8  the Department of Economics at the
9  University of Miami and the Department of
10 Economics, University of Toronto.
11         Could you tell us what sort
12 of professorships those were in --
13 visiting professor, I take it, means that
14 it wasn't a permanent employment.  But,
15 beyond that, in the Department of
16 Economics, you were teaching law in
17 economics or what were you doing in those
18 capacities?
19     A.   A visiting professor is
20 basically someone brought in to teach a
21 course, one or more courses, and I taught
22 at the University of Miami in one of the
23 subdivisions of the Department of
24 Economics, courses on industrial

Page 24

1  organization.  I don't know if I taught
2  an insurance course or not.  I taught
3  there for two or three summers.  And I
4  know there was an industrial organization
5  course, which was mostly economics, but I
6  did discuss some antitrust cases.  But it
7  was mostly economics.  I may have taught
8  a course on the economics of tort law --
9  I am not sure -- at Miami sometime ago.
10         In the Department of
11 Economics of the University of Toronto, I
12 taught a course on general principles of
13 insurance with application to private
14 insurance and governmental insurance.  It
15 was a course jointly listed in the
16 Department of Economics and the law
17 school.
18     Q.   With respect to the subject
19 of insurance, do you hold any
20 professional degrees or licenses or
21 titles in that field?
22     A.   No, I don't.  It's simply
23 been a subject of my study and research
24 for a long period of my career.

Page 25

1      Q.   Would it be fair to say that
2  your involvement in the field of
3  insurance has been either principally or
4  exclusively -- and you tell us which --
5  from the perspective of an academic role?
6      A.   I would say yes with the --
7  certainly, all of my -- I am an academic,
8  and so all of my activities have been
9  basically academic in nature.  On the
10 other hand, I have had, in my work in the
11 insurance field, various assignments at
12 one point or another that were more
13 practical.  And they were academic,
14 though certainly I think my academic
15 training and research and study was
16 brought to bear on those tasks.
17     Q.   Well, just to be a little
18 bit more specific, have you ever worked
19 directly for an insurance company?
20     A.   I have worked as a
21 consultant for an insurance company.  I
22 have not worked as an employee in a W-2
23 sense for an insurance company.
24     Q.   Have you worked, let's say,

Page 26

```
 1   in the underwriting department of an
 2   insurance company?
 3       A.   Not in the underwriting
 4   department.  On the other hand, I have
 5   been retained by insurance companies at
 6   various points to advise them on
 7   underwriting issues.  But I have not
 8   worked as an underwriter, no.
 9       Q.   Did the advice that you gave
10   with respect to underwriting issues
11   concern evaluating risks with respect to
12   coverage that the insurance company
13   employing you was considering issuing
14   insurance to cover?
15       A.   Yes.
16       Q.   And without getting into
17   anything confidential, including even the
18   identity of the insurance company, could
19   you tell us sort of broadly what that
20   risk analysis involved?
21       A.   Yes.  In general, it
22   involved estimating the risks created by
23   the expansion of tort liability in one
24   context or another.
```

Page 27

```
 1       Q.   And did that involve you in
 2   consulting with the -- I let me back up.
 3            This was one insurance
 4   company and one engagement or were there
 5   multiple?
 6       A.   There were multiple
 7   engagements and more than one insurance
 8   company.
 9       Q.   And is it possible --
10       A.   Well, let me add one thing
11   just to be totally complete.  I have also
12   been retained by insurance companies to
13   advise them on regulatory, on insurance
14   regulatory issues, so beyond simply
15   underwriting -- we were talking about
16   underwriting.  I don't know if we are
17   still on underwriting or if you are
18   talking about my experience more
19   completely, but I have advised insurance
20   companies on regulatory issues as well.
21       Q.   Well, focusing back for the
22   moment on the underwriting activities,
23   did you participate in evaluating the
24   premiums that should be charged for
```

Page 28

```
 1   coverage of tort liabilities as part of
 2   these engagements?
 3       A.   Well, obviously the
 4   discussions implicated premium levels,
 5   but I was not involved in setting
 6   specific premiums for particular policy
 7   owners.  It rather was -- my retention
 8   and the advice I provided was at a
 9   somewhat more general level.
10       Q.   Now, you said it had to do
11   with changes in tort law.  Are you an
12   expert in tort law?
13       A.   Yes, I believe I am.
14       Q.   And is that as an academic
15   or have you actually practiced tort law?
16       A.   No, I have never practiced
17   at all.  I am not a practicing attorney.
18   So the answer is yes, as an academic.
19       Q.   And I realize this follows
20   pretty much automatically, but just to
21   make the record complete, you have never
22   litigated a tort case or settled a tort
23   case on behalf of a plaintiff or a
24   defendant?
```

Page 29

```
 1       A.   Litigated or settled, no, I
 2   haven't.  I have been involved -- I was
 3   involved as a special master in the
 4   settlement of a very large litigation
 5   that could be called a tort litigation.
 6   But I wouldn't say I settled it.  I would
 7   say I facilitated the settlement.
 8       Q.   That is the reference in
 9   paragraph 12 of your expert report, is
10   it?
11       A.   Yes.
12       Q.   And just for completeness,
13   you say it's a class action.  What was
14   the class claims that were involved in
15   that?  I mean, what was the ravelment of
16   the complaint, if you will?
17       A.   The complaint was a set of
18   employees of the former Continental Can
19   Company were illegally laid off to
20   prevent their pensions from vesting.
21       Q.   In the second sentence of
22   paragraph 18 of your report, you state,
23   "As I shall explain, from an economic
24   standpoint, although the Plan states that
```

Page 34

1  its insurers specifically.
2      A.   Yes, I think that's fair.
3      Q.   Have you done any
4  investigation or review of the insurance,
5  for want of a better word, what I will
6  call insurance position or status of W.R.
7  Grace under its CGL policies as of the
8  time it filed for bankruptcy?
9          MR. BROWN:  Object to the
10     form.
11         THE WITNESS:  I am not sure
12     what you mean by insurance
13     position or status.
14 BY MR. LOCKWOOD:
15     Q.   Well, okay.  Let me be more
16 specific.
17         Do you have any knowledge as
18 to how Grace and its insurers were
19 handling claims against Grace in the tort
20 system in terms of insurance coverage and
21 insurer involved in that process as of
22 the date that Grace entered bankruptcy?
23         MR. BROWN:  Object to the
24     form.

Page 35

1          THE WITNESS:  I have no
2      personal knowledge of that at all.
3      I believe the attorneys, one or
4      more of the attorneys for whom
5      have retained me, indicated that
6      some insurers have made agreements
7      with Grace for Grace to conduct
8      its own defense.  But that's all.
9      I don't know anything about beyond
10     simply that statement, and I am
11     not sure that statement -- I have
12     no way of verifying or
13     contradicting that statement
14     itself.  But that's all I know
15     about it.
16 BY MR. LOCKWOOD:
17     Q.   So, for example, if Grace
18 was paying out of its own pocket and not
19 through insurance more than 50 percent of
20 the judgment and settlement and defense
21 costs that it was incurring as of the
22 date of bankruptcy because of exhaustion
23 of coverage, gaps in coverage,
24 insolvencies of insurers, you don't know

Page 36

1  anything about that; is that correct?
2      A.   No, I don't have specific
3  knowledge of that at all.
4      Q.   In paragraph 22 of your
5  report, you state, quote, In the context
6  of a liability claim, and according to
7  our system of tort law, there is an
8  adversarial relationship between insurers
9  and the policyholder on one side, and the
10 claimants on the other.
11         What do you mean by that?
12     A.   Just for the record, you
13 added one word to it.
14     Q.   I am sorry.
15     A.   It's not important.
16         What I am is that where a
17 claim of liability is filed against a
18 policyholder who has insurance which may
19 cover that, provide coverage for that
20 claim, the structure of the insurance
21 policy provides that the insurer and the
22 policyholder will look together on one
23 side in response to the claimant on the
24 other side.

Page 37

1      Q.   But there are instances in
2  which on the basis of particular facts,
3  that dichotomy of insurer/insured on the
4  one side and the claimant on the other
5  side does not necessarily hold true, even
6  from an economic perspective, aren't
7  there?
8          MR. BROWN:  Object to the
9      form.
10         THE WITNESS:  I can't think
11     of them to be honest with you.  I
12     am not sure that there are.
13 BY MR. LOCKWOOD:
14     Q.   Well, let's assume that a
15 claim is made under a policy and the
16 insurer believes that it's covered by the
17 policy and the insured believes that it's
18 not.  Are the insurer and insured linked
19 economically with respect to how that
20 claim should be handled?
21     A.   Well, they are once the
22 coverage decision is made.  Certainly, as
23 between an insurer and a policyholder,
24 there can be differences.  But once the

23636f60-98d2-40fb-b3f5-a8ecc1592966

1  quote, As explained, these various
2  provisions create a structure of economic
3  rights and responsibilities that serves
4  the important societal function of
5  controlling and, at best, minimizing the
6  economic effects of losses suffered in
7  the society, close quote.
8        Have I read that correctly?
9     A.   Yes.  You have done a very
10 good job on this reading.  You only
11 missed one.
12    Q.   I am trying to make a record
13 here.
14        When you refer to minimizing
15 the effects of losses suffered in this
16 society, whose economic effects are being
17 minimized by these provisions?
18    A.   Well, this is a general
19 statement or proposition that relates
20 the -- that is intended to relate the
21 interests of the policyholder and the
22 insurer in their agreement to the terms
23 of the policy, showing how that agreement
24 among those parties as other agreements

1  in market context, creates overall
2  societal economic benefits.
3        So the minimization of
4  economic effects would refer to the
5  minimization of the losses charged
6  against the policyholder and the insurer.
7     Q.   And it would not intend to
8  suggest it would minimize the losses
9  suffered by claimants against the
10 policies?
11    A.   No.  Again, at various other
12 points, -- and I am sure you have seen
13 this -- there are other paragraphs of
14 this report.  I make the point that,
15 while it is in the pecuniary interest of
16 policyholders and insurers to minimize
17 pay-outs to claimants, we have a system
18 of control in our legal system that
19 provides that that minimization will be
20 fair and take into account the interest
21 of claimants.
22    Q.   Now, again, with respect to
23 paragraph 32, wherein the -- let me back
24 up.

1        Paragraph 32 at the end of
2  the first sentence talks about the
3  context that mass torts where claims
4  against the policyholders amount to tens
5  of thousands, as is the case with Grace.
6  So there is a reference to Grace there.
7        Then you have several
8  sentences about how the importance of the
9  insurer involvement in claims settlement
10 is.
11       My question to you is, do
12 those sentences apply on the facts of the
13 W.R. Grace case as they existed when
14 Grace went into bankruptcy?
15       MR. BROWN:  Object to form.
16       THE WITNESS:  Again, I think
17    I answered this before.  I don't
18    have any specific facts about
19    Grace's position at the point it
20    entered bankruptcy.  But I think
21    the broader economic point applies
22    generally, yes.
23 BY MR. LOCKWOOD:
24    Q.   Well, as a broad economic

1  point, if you have an insured, like
2  Grace, who is paying for two-thirds of
3  its mass tort liability out of its own
4  pocket and has been handling the claims
5  against it for a number of years with the
6  consent of the insurers that are then
7  potentially liable for those claims, how
8  does that square with this insistence
9  expressed in paragraph 32 that only the
10 insurers have the necessary expertise to
11 create the economic benefits that you
12 posit here?
13       MR. BROWN:  Object to the
14    form.
15       THE WITNESS:  Well, first, I
16    didn't -- in applying -- in
17    reading this paragraph, I think
18    it's important -- I have been
19    insisting on this throughout -- to
20    recognize that this is a broad
21    economic analysis, trying to
22    explain to the court or anyone
23    else why policies are written the
24    way they are and what the economic

Page 134

1  more to it than the insolvency clause I
2  am thinking of it. It's not a legal
3  opinion. It's simply a backdrop for the
4  economic analysis.
5       Q.   You have already told us to
6  some extent the economic analysis depends
7  on the legal rules that are embodied in
8  and reflected in the policy provisions
9  themselves, haven't you?
10      A.   I have.
11      Q.   So the legal rules are part
12 of the context for the economic analysis.
13      The insolvency clause, as
14 you have testified on its face, says that
15 an insurer cannot use the bankruptcy of
16 the insured as an excuse for getting out
17 from under the policy obligations.
18      Supposing a court were to
19 say that because 524(g) is part of the
20 bankruptcy code and contemplates
21 channelling insured asbestos claims to a
22 trust for resolution, that invocation of
23 the consent to assignment clause to
24 refuse to permit insurance rights to be

Page 135

1  transferred for a trust was inconsistent
2  with the insolvency clause, how would
3  that affect your economic analysis?
4       A.   It wouldn't arriving my
5  economic analysis.
6       Q.   You would just decide that
7  that was a bad decision from an economic
8  point of view because it took away some
9  of the carefully crafted structure that
10 you have described in your expert report
11 that deals with that topic?
12      A.   Well, you will note, I am
13 pretty sure, that there is no place in
14 this report that I use the word "bad."
15 There is no place in the word that I use
16 the word "bad" with regard to a decision
17 or with regard to a legal rule.
18      The economic analysis
19 certainly must take place in the context
20 or be applied in a context where there is
21 some legal structure. And according to
22 the economic analysis presented in this
23 report, which I think is standard
24 run-of-the-mill economic analysis -- it's

Page 136

1  not rocket science -- there is no
2  necessary inconsistency between the
3  insolvency clause and the provisions of
4  Section 524(g), and according to this
5  economic analysis, no reason that the
6  insolvency clause ought to be regarded as
7  inconsistent with the various inhibitions
8  of 524(g) or inconsistent with the
9  consent to assignment clause.
10      So that the court decision
11 that you are implying can be subjected to
12 economic analysis, but the initial
13 economic analysis would say I don't see
14 it, I don't see the inconsistency.
15      Q.   Have you made any effort to
16 determine whether or not the handling of
17 the claims of the Trust under the Trust
18 documents that you referred to will
19 produce economic outcomes to the insurers
20 that are less favorable to them than what
21 would have occurred had Grace not gone
22 into bankruptcy and continued to handle
23 claims in the manner with its insurers in
24 the manner that it was handling them

Page 137

1  prior to the petition date?
2       MR. BROWN:  Object to form.
3       THE WITNESS:  No.  In terms
4       of a specific counterfactual
5       analysis of that, I have not done
6       that.
7       I have suggested that
8       because the economic incentives
9       are different, they are likely to
10      be different results, but I
11      haven't done the factual analysis.
12 BY MR. LOCKWOOD:
13      Q.   With respect to paragraph
14 43, you talk about the management
15 structure of the trustees, the Trust
16 Advisory Committee, and the futures
17 representative, none of which who
18 represent insurers, and you particularly
19 single out the members of the Trust
20 Advisory Committee and the Futures
21 Representative.  And then you assert in
22 your final statement, "By these
23 provisions, collusion between the Trust
24 as successor to the policyholder Grace

35 (Pages 134 to 137)

23636f60-98d2-40fb-b3f5-a8ecc1592966

Page 142

1  off the record at this time.)
2        - - -
3        (There was a luncheon recess
4  from 1:28 p.m. to 2:06 p.m.)
5        - - -
6        AFTERNOON SESSION
7        - - -
8  BY MR. LOCKWOOD:
9        Q.   We talked briefly about
10 paragraph 43 before the break, Professor
11 Priest, and I am going to ask you some
12 questions about the next succeeding
13 paragraphs where you talk about various
14 provisions in the Plan, and specifically
15 let's use paragraph 44 as a starting
16 point.
17        You are discussing there the
18 TDP and its payment matrix and the fact
19 that it hasn't been consented to by the
20 insurers.  And you, in substance, say
21 that's a, quote, direct violation of the
22 economic allocation of rights in the
23 policies and violate the economic
24 principle of comparative advantage, close

Page 143

1  quote.
2        First, I think you testified
3  earlier that you have no basis for
4  comparing the provisions in the matrix
5  with the criteria and values utilized by
6  Grace and its insurers for settling
7  claims prior to its bankruptcy petition?
8        MR. BROWN:  Object to form.
9  BY MR. LOCKWOOD:
10       Q.   Is that correct?
11       A.   I said I had no factual
12 basis for making that comparison, yes.
13       Q.   So, as far as you know, the
14 TDP matrix could actually be more strict
15 or stringent than the criteria that Grace
16 and its insurers were using prior to the
17 bankruptcy?
18       MR. BROWN:  Object to form.
19       THE WITNESS:  That question
20 misses the nature of my economic
21 analysis.  The economic analysis
22 is that the allocation of economic
23 rights in the policies give the
24 right to the insurer to associate

Page 144

1  with the resolution of these
2  claims.
3        If Grace has worked out a
4  better deal than could be done,
5  than they had been achieving in
6  other contexts, maybe the insurers
7  would agree to the matrix and to
8  the settlement of the claims on
9  that basis.  But, again, for good
10 economic reasons, that's their
11 right.
12 BY MR. LOCKWOOD:
13       Q.   So from your perspective,
14 what you are saying is that,
15 economically, the actual outcome of
16 claims resolution under the TDP is
17 irrelevant; what matters is that the TDP
18 by its terms was not presented to and
19 agreed to by the insurers, end of
20 discussion?
21       A.   Not that it's irrelevant.
22 According to the economic analysis, the
23 TDP and the matrix is likely to be
24 different if the insurers were involved

Page 145

1  than if the insurers are not involved.
2  That's what the burden of the report is.
3  So it's not that the outcome of is
4  irrelevant.  It's likely to be different
5  for the good economic reasons I present
6  in the report.
7        Now, we don't know because
8  the insurers weren't given an opportunity
9  to become involved.  But you can ask a
10 counterfactual question.  If Grace is
11 getting such a great deal with this
12 matrix and with the TDPs, why did it not
13 involve the insurers and get their
14 consent, and all of this would have gone
15 away.
16       Q.   Is part of economic analysis
17 consideration of opportunistic behavior?
18       A.   Yes.
19       Q.   And so have you made any
20 analysis of whether or not it would be in
21 the economic advantage of insurers to
22 attempt to adopt an unreasonable position
23 toward consenting to either a settlement
24 or claims handling procedures or an

Page 162

1    Q.    Well, to the extent that
2 it's not hortatory, does it express
3 anything more than your personal opinion
4 that settling disputes is better than
5 litigating them?
6    A.    It depends upon the terms.
7 I don't have a personal opinion about the
8 preference of settlement over litigation.
9    Q.    Well --
10   A.    Settlement often is more
11 efficient than litigation. I am all for
12 that. Other times, litigation is the
13 appropriate way to resolve cases.
14   Q.    Well --
15   A.    I have just studied the
16 process of settlement and litigation.
17   Q.    Doesn't this sentence say
18 that the more realistic resolution of
19 these issues is to have Grace and the
20 insurers and the other Plan proponents
21 reach some kind of a settlement?
22   A.    Yes. That's the more
23 realistic resolution from an economic
24 standpoint.

Page 163

1    Q.    But, as you sit here today,
2 you have no personal knowledge or ability
3 to describe what that settlement would be
4 or the likelihood that the parties could
5 agree to it; is that correct?
6    A.    From a factual standpoint,
7 that's correct. But, again, it's
8 something I view, for good economic
9 reasons, commanded by the insurance
10 policies and something that should have
11 been attempted or perhaps should be
12 attempted in the future.
13   Q.    Is it fair to say that if I
14 asked you similar questions about
15 paragraph 46 of the TDP relating to
16 whether or not the insurance neutrality
17 provisions of the Plan apply to the
18 contractual breach assertions that you
19 make in paragraph 46, that your answers
20 would be the same as we just went through
21 with respect to paragraph 44?
22       MR. BROWN: Object to the
23   question on the basis of the term
24   "similar questions." I don't know

Page 164

1    what that means.
2        MR. LOCKWOOD:  Okay.  We
3    will do it the long way.
4        THE WITNESS:  Could I just
5    respond to the question one way?
6    I don't think I refer in paragraph
7    46 to contractual breach, which I
8    regard as a legal opinion.
9 BY MR. LOCKWOOD:
10   Q.    Well, let me put it to you
11 this way:  You say in paragraph 46 that
12 the Plan overturns economic relationships
13 in Grace's insurance policies, and then
14 you go on.
15       When you say the Plan
16 overturns the economic relationships, and
17 putting aside whether that's a legal
18 opinion, but from an economic point of
19 view, even if the insurance neutrality
20 provisions preserve the insurers' rights
21 to argue that they don't have to pay on
22 any of their policies as a result of
23 Section 8.1 of the TDP, you would still
24 be of the view that the Plan was not

Page 165

1    insurance neutral from an economic
2 perspective; is that correct?
3    A.    I see the point of your
4 question.
5        First of all, you began the
6 question with putting aside the legal
7 opinion. Well, I don't want to put aside
8 the legal opinion. I don't want to
9 render a legal opinion. Far from putting
10 it aside, I want to eliminate it from the
11 discussion.
12       When I use the term
13 "overturn the economic relationships," I
14 mean that in an economic sense, not in a
15 legal sense. A court can decide whether
16 overturning the economic relationships
17 has legal significance.
18       But with regard to the
19 remainder of your question about
20 insurance neutrality and the provision
21 that insurers can have a total coverage
22 defense for the overturning of these
23 relationships, my answer would be the
24 same as we had before.

Page 178

1  always in an empirical sense but
2  generally less favorable to insurers.
3        See, here is our difference.
4  I am starting to see this now what's
5  going on here.  We know there are some
6  set of insurers that are objecting to the
7  matrix and to the settlement and to the
8  Plan.
9        Now, if this were so much
10 better a deal than they could have gotten
11 if Grace had not sought bankruptcy and
12 continued to litigate, my question would
13 be why are they objecting to this?  Now
14 your answer appears to be, well, they are
15 engaged in opportunistic behavior, and
16 they are trying to exploit the
17 circumstance of the insolvency to get a
18 yet even better deal.  That's our
19 difference.
20       So I am not -- I don't see
21 the evidence of opportunistic behavior,
22 and so barring the presentation of that
23 evidence, I think my economic analysis
24 that it would be less favorable to the

Page 179

1  insurers than if the insurers were
2  involved continues to hold.
3     Q.   But your inability to see
4  evidence is, in large part, the result of
5  your failure to have examined any
6  evidence, one way or the other; you are
7  just making economic assumptions about
8  the generalities of insurer conduct and
9  the generalities of insured's conduct and
10 the economic incentives you associate
11 with those generalities?  Isn't that
12 true?
13    A.   Yes, I am presenting -- I
14 was asked to present a general economic
15 analysis of the situation, yes.
16    Q.   Turning to paragraph 50, the
17 last sentence of this and the last clause
18 in the last sentence of paragraph 50
19 states that the assignment of Grace's
20 policy rights to the Trust, quote, puts
21 control of the settlement process in the
22 hands of the Trust whose fiduciaries have
23 every incentive to pay all asbestos
24 claims, regardless of whether they are

Page 180

1  deserving of payment.
2        Now, you are aware from
3  reading the Plan, I take it, and the
4  Disclosure Statement that the Trust is
5  going to have a limited amount of assets
6  to begin with, correct?
7     A.   Yes.
8     Q.   And you are also aware that
9  it is contemplated that those assets will
10 have to be divided between people who
11 presently have claims against Grace and
12 people who will have claims in the
13 future, correct?
14    A.   Correct.
15    Q.   And you are aware that the
16 amount, number, and value of the future
17 claims cannot be determined as of now,
18 correct?
19    A.   Correct.  I expect it.  I am
20 sure it's true.
21    Q.   And you are aware that the
22 Trust does not propose to pay one hundred
23 cents on the dollar to claims presented
24 to it by present claimants, correct?

Page 181

1        MR. BROWN:  Could you just
2  read that back?
3        (The reporter read from the
4  record as requested.)
5        MR. BROWN:  Object to the
6  form.
7        THE WITNESS:  Yes, I am
8  aware of that.
9  BY MR. LOCKWOOD:
10    Q.   And you have stated
11 elsewhere that the trustees of the Trust
12 are fiduciaries, correct?
13    A.   Yes, especially members of
14 the Trust Advisory Committee.
15    Q.   But you have acknowledged as
16 to the latter that they do not have any
17 role in the resolution of individual
18 claims, correct?
19    A.   Except as it comes -- as I
20 understand it, except with regard to an
21 amendment of the TDPs.
22    Q.   Dealing with the TDPs as
23 they presently exist, is it not true that
24 the trustees have an obligation to

Page 214

1  testimony, I have spent a large part of
2  my career studying insurance and the
3  insurance industry. I also spent a large
4  part of my career studying the
5  development of tort law. I have written
6  articles on the history of tort law in
7  the 20th century and its development. I
8  have studied and offered courses on the
9  development of asbestos liability in tort
10 law, more generally.
11        And so the consulting that I
12 described in that question was this:
13 From time to time, although it's been
14 less common recently, I will get a call
15 from an insurance company, particularly
16 upper management in the insurance
17 company, that wants to talk with me about
18 developments in the law and what I see as
19 happening in the law.
20        And so I have -- there have
21 been different formats. Sometimes I am
22 simply discussing matters with senior
23 management of the firm, but at other
24 points, I am asked to give a talk to a

Page 215

1  large set of officers within the firm,
2  including underwriters and others about
3  what's going on. These talks are
4  usually -- well, obviously, if it's a
5  small discussion, there is back and forth
6  and question and answer and so forth, and
7  what's your basis and so on.
8        A larger talk, there are
9  more people in the room, would have many
10 more questions and more discussion. But
11 that's been the that it of the work.
12    Q.   Okay. And when you say
13 developments in the law, you are talking
14 about developments in the tort law in
15 terms of tort reform and that type of
16 thing?
17    A.   Less tort reform than the
18 expansion of tort liability by courts.
19 Now, I have studied tort reform as well,
20 and I have testified many times about
21 tort reform. But I don't view tort
22 reform as -- the insurers that have
23 retain me have not, along with me, have
24 not thought that significant tort reform

Page 216

1  is likely to occur.
2    Q.   And I believe you said you
3  also have been retained by insurance
4  companies to advise on insurance
5  regulatory issues?
6    A.   Yes.
7    Q.   Could you give an example or
8  two of the type of insurance regulatory
9  issue you have been retained to advise
10 on?
11    A.   Yes. First off, I have been
12 advise on general regulatory issues, such
13 as the effective state regulation versus
14 federal regulation, an issue that is
15 becoming more prominent recently.
16        I have also been asked to
17 advise on various particular state
18 efforts to regulatory efforts. I
19 testified -- I was retained to testify
20 before a Senate subcommittee on the
21 antitrust suits that were filed against
22 many of the property casualty insurers in
23 the late '80s.
24        So I do follow insurance

Page 217

1  regulation, and I have given talks at
2  NAIC. And I have been retained to give
3  talks to smaller groups of insurance
4  commissioners and their staff. So
5  regulation of insurance is another issue
6  then which I have brought in testimony.
7    Q.   Is it correct that the work
8  that you have done advising insurance
9  companies on regulatory matters was not
10 related to asbestos bankruptcy matters?
11    A.   Yes, that would be fair.
12    Q.   Appendix II in your report
13 lists deposition and trial testimony that
14 you have given; is that right?
15    A.   Nearly completely.
16    Q.   That was going to be one of
17 my questions. We established earlier
18 that you had given a deposition in a
19 Federal-Mogul case that's not listed
20 here.
21        In the course of
22 Mr. Lockwood asking you questions about
23 that, did that prompt you to recall any
24 other testimony that's not listed here?