### SCHEDULE 1:  PRIMARY & EXCESS INSURANCE POLICIES THAT WERE OR ARE APPLICABLE TO ASBESTOS RELATED CLAIMS (sorted alphabetically)

| Policy Year Begin | End | Insurer | Policy Number | Layer |
|---|---|---|---|---|
| 06/30/76 | 06/30/77 | Mutual Reinsurance Co. Ltd. | 76DD1594C | 1 |
| 06/30/77 | 06/30/78 | Mutual Reinsurance Co. Ltd. | 76DD1594C | 1 |
| 06/30/78 | 06/30/79 | Mutual Reinsurance Co. Ltd. | 76DD1594C | 1 |
| 06/30/76 | 06/30/77 | Mutual Reinsurance Co. Ltd. | 76DD1595C | 2 |
| 06/30/77 | 06/30/78 | Mutual Reinsurance Co. Ltd. | 76DD1595C | 2 |
| 06/30/78 | 06/30/79 | Mutual Reinsurance Co. Ltd. | 76DD1595C | 2 |
| 06/30/77 | 06/30/78 | Mutual Reinsurance Co. Ltd. | 77DD1631C | 4 |
| 06/30/77 | 06/30/78 | Mutual Reinsurance Co. Ltd. | 77DD1632C | 5 |
| 06/30/78 | 06/30/79 | Mutual Reinsurance Co. Ltd. | 78DD1417C | 3 |
| 06/30/78 | 06/30/79 | Mutual Reinsurance Co. Ltd. | 78DD1418C | 4 |
| 06/30/79 | 06/30/80 | Mutual Reinsurance Co. Ltd. | 79DD1633C | 1 |
| 06/30/80 | 06/30/81 | Mutual Reinsurance Co. Ltd. | 79DD1633C | 1 |
| 06/30/81 | 06/30/82 | Mutual Reinsurance Co. Ltd. | 79DD1633C | 1 |
| 06/30/79 | 06/30/80 | Mutual Reinsurance Co. Ltd. | 79DD1634C | 2 |
| 06/30/79 | 06/30/80 | Mutual Reinsurance Co. Ltd. | 79DD1635C | 3 |
| 06/30/79 | 06/30/80 | Mutual Reinsurance Co. Ltd. | 79DD1636C | 4 |
| 06/30/80 | 06/30/81 | Mutual Reinsurance Co. Ltd. | 80DD1643C | 2 |
| 06/30/81 | 06/30/82 | Mutual Reinsurance Co. Ltd. | 80DD1643C | 2 |
| 06/30/80 | 06/30/81 | Mutual Reinsurance Co. Ltd. | 80DD1644C | 3 |
| 06/30/80 | 06/30/81 | Mutual Reinsurance Co. Ltd. | 80DD1645C | 4 |
| 06/30/82 | 06/30/83 | Mutual Reinsurance Co. Ltd. | KY017582 | 1 |
| 06/30/83 | 06/30/84 | Mutual Reinsurance Co. Ltd. | KY017582 | 1 |
| 06/30/84 | 06/30/85 | Mutual Reinsurance Co. Ltd. | KY017582 | 1 |
| 06/30/82 | 06/30/83 | Mutual Reinsurance Co. Ltd. | KY017782 | 2 |
| 06/30/83 | 06/30/84 | Mutual Reinsurance Co. Ltd. | KY017782 | 2 |
| 06/30/84 | 06/30/85 | Mutual Reinsurance Co. Ltd. | KY017782 | 2 |
| 06/30/82 | 06/30/83 | Mutual Reinsurance Co. Ltd. | KY017882 | 3 |
| 06/30/83 | 06/30/84 | Mutual Reinsurance Co. Ltd. | KY048183 | 3 |
| 06/30/84 | 06/30/85 | Mutual Reinsurance Co. Ltd. | KY048183 | 3 |
| 06/30/81 | 06/30/82 | Mutual Reinsurance Co. Ltd. | PY030181 | 3 |
| 06/30/81 | 06/30/82 | Mutual Reinsurance Co. Ltd. | PY030281 | 4 |
| 06/30/74 | 06/30/75 | National Casualty Co. of America | 74DD662C | 3 |
| 06/30/74 | 06/30/75 | National Casualty Co. of America | 74DD662C | 3 |
| 06/30/75 | 06/30/76 | National Casualty Co. of America | 74DD662C | 5 |
| 06/30/75 | 06/30/76 | National Casualty Co. of America | 74DD662C | 5 |
| 06/30/76 | 06/30/77 | National Casualty Co. of America | 74DD662C | 4 |
| 06/30/76 | 06/30/77 | National Casualty Co. of America | 74DD662C | 4 |
| 07/17/74 | 06/30/75 | National Casualty Co. of America | 74DD663C | 6 |
| 07/17/74 | 06/30/75 | National Casualty Co. of America | 74DD663C | 6 |
| 06/30/75 | 06/30/76 | National Casualty Co. of America | 74DD663C | 8 |
| 06/30/75 | 06/30/76 | National Casualty Co. of America | 74DD663C | 8 |
| 06/30/83 | 06/30/84 | National Casualty Co. of America | XU000042 | 5 |
| 06/30/77 | 06/30/78 | Natl Union Fire Pttsbrgh | 1228593 | 6 |
| 06/30/77 | 06/30/78 | Natl Union Fire Pttsbrgh | 1228593. | 7 |
| 06/30/77 | 06/30/78 | Natl Union Fire Pttsbrgh | 1228593.. | 8 |
| 06/30/78 | 06/30/79 | Natl Union Fire Pttsbrgh | 1231895 | 5 |
| 06/30/78 | 06/30/79 | Natl Union Fire Pttsbrgh | 1231895. | 6 |
| 06/30/78 | 06/30/79 | Natl Union Fire Pttsbrgh | 1231895.. | 7 |
| 06/30/81 | 06/30/82 | Natl Union Fire Pttsbrgh | 9602931 | 4 |
| 06/30/81 | 06/30/82 | Natl Union Fire Pttsbrgh | 9602931. | 5 |
| 06/30/81 | 06/30/82 | Natl Union Fire Pttsbrgh | 9602931.. | 6 |

### SCHEDULE 1:  PRIMARY & EXCESS INSURANCE POLICIES THAT WERE OR ARE APPLICABLE
### TO ASBESTOS RELATED CLAIMS (sorted alphabetically)

| Policy Year Begin | End | Insurer | Policy Number | Layer |
|---|---|---|---|---|
| 06/30/81 | 06/30/82 | Natl Union Fire Pttsbrgh | 9602931... | 7 |
| 06/30/82 | 06/30/83 | Natl Union Fire Pttsbrgh | 9603133 | 3 |
| 06/30/82 | 06/30/83 | Natl Union Fire Pttsbrgh | 9603133. | 4 |
| 06/30/82 | 06/30/83 | Natl Union Fire Pttsbrgh | 9603133.. | 5 |
| 06/30/83 | 06/30/84 | Natl Union Fire Pttsbrgh | 9607141 | 3 |
| 06/30/83 | 06/30/84 | Natl Union Fire Pttsbrgh | 9607141. | 4 |
| 06/30/83 | 06/30/84 | Natl Union Fire Pttsbrgh | 9607141.. | 5 |
| 06/30/79 | 06/30/80 | Natl Union Fire Pttsbrgh | 9782319 | 4 |
| 06/30/79 | 06/30/80 | Natl Union Fire Pttsbrgh | 9782319. | 5 |
| 06/30/79 | 06/30/80 | Natl Union Fire Pttsbrgh | 9782319.. | 6 |
| 06/30/79 | 06/30/80 | Natl Union Fire Pttsbrgh | 9782319... | 7 |
| 06/30/80 | 06/30/81 | Natl Union Fire Pttsbrgh | 9910362 | 4 |
| 06/30/80 | 06/30/81 | Natl Union Fire Pttsbrgh | 9910362. | 5 |
| 06/30/80 | 06/30/81 | Natl Union Fire Pttsbrgh | 9910362.. | 6 |
| 06/30/80 | 06/30/81 | Natl Union Fire Pttsbrgh | 9910362... | 7 |
| 06/30/75 | 06/30/76 | New Hampshire Insurance | 51750444 | 2 |
| 06/30/75 | 06/30/76 | New Hampshire Insurance | 51750445 | 3 |
| 07/17/74 | 06/30/75 | North Atlantic Ins. Co. Ltd. | 74DD663C | 6 |
| 06/30/75 | 06/30/76 | North Atlantic Ins. Co. Ltd. | 74DD663C | 8 |
| 06/30/76 | 06/30/77 | North Atlantic Ins. Co. Ltd. | 74DD663C | 7 |
| 06/30/77 | 06/30/78 | North Atlantic Ins. Co. Ltd. | 77DD1826 | 8 |
| 06/30/78 | 06/30/79 | North Atlantic Ins. Co. Ltd. | 78DD1418C | 4 |
| 06/30/78 | 06/30/79 | North Atlantic Ins. Co. Ltd. | 78DD1420C | 7 |
| 06/30/79 | 06/30/80 | North Atlantic Ins. Co. Ltd. | 79DD1638C | 7 |
| 06/30/80 | 06/30/81 | North Atlantic Ins. Co. Ltd. | 80DD1647C | 7 |
| 07/17/74 | 06/01/75 | North Star Reinsurance | NXS12398 | 6 |
| 06/30/75 | 06/30/76 | Northbrook Ins Co | 63001170 | 1 |
| 06/30/75 | 06/30/76 | Northbrook Ins Co | 63001171 | 2 |
| 06/30/75 | 06/30/76 | Northbrook Ins Co | 63001172 | 3 |
| 06/30/75 | 06/30/76 | Northbrook Ins Co | 63001173 | 6 |
| 06/30/76 | 06/30/77 | Northbrook Ins Co | 63002048 | 1 |
| 06/30/77 | 06/30/78 | Northbrook Ins Co | 63002048 | 1 |
| 06/30/78 | 06/30/79 | Northbrook Ins Co | 63002048 | 1 |
| 06/30/76 | 06/30/77 | Northbrook Ins Co | 63002049 | 5 |
| 06/30/77 | 06/30/78 | Northbrook Ins Co | 63003296 | 6 |
| 06/30/78 | 06/30/79 | Northbrook Ins Co | 63004784 | 5 |
| 06/30/79 | 06/30/80 | Northbrook Ins Co | 63005793 | 1 |
| 06/30/80 | 06/30/81 | Northbrook Ins Co | 63005793 | 1 |
| 06/30/81 | 06/30/82 | Northbrook Ins Co | 63005793 | 1 |
| 06/30/79 | 06/30/80 | Northbrook Ins Co | 63005794 | 2 |
| 06/30/79 | 06/30/80 | Northbrook Ins Co | 63005795 | 4 |
| 06/30/80 | 06/30/81 | Northbrook Ins Co | 63006854 | 2 |
| 06/30/80 | 06/30/81 | Northbrook Ins Co | 63006855 | 4 |
| 06/30/81 | 06/30/82 | Northbrook Ins Co | 63008153 | 2 |
| 06/30/81 | 06/30/82 | Northbrook Ins Co | 63008154 | 4 |
| 05/17/66 | 10/20/66 | Orion Ins. Co. Ltd. | 66/180390 | 8 |
| 10/20/66 | 10/20/67 | Orion Ins. Co. Ltd. | 66/180390 | 8 |
| 10/20/67 | 10/20/68 | Orion Ins. Co. Ltd. | 66/180390 | 8 |
| 06/30/84 | 06/30/85 | Pacific Employers Ins Co | XCC012283 | 2 |
| 06/30/84 | 06/30/85 | Pacific Employers Ins Co | XM0017204 | 1 |
| 06/30/81 | 06/30/82 | Protective Nat'l Ins Co | XUB1806925 | 7 |

**SCHEDULE 1:  PRIMARY & EXCESS INSURANCE POLICIES THAT WERE OR ARE APPLICABLE TO ASBESTOS RELATED CLAIMS (sorted alphabetically)**

| Policy Year Begin | End | Insurer | Policy Number | Layer |
|---|---|---|---|---|
| 06/30/82 | 06/30/83 | Protective Nat'l Ins Co | XUB1807108 | 5 |
| 06/30/83 | 06/30/84 | Protective Nat'l Ins Co | XUB1807216 | 5 |
| 06/30/76 | 06/30/77 | Prudential Reinsurance | DXC901145 | 2 |
| 06/30/76 | 06/30/77 | Prudential Reinsurance | DXC901146 | 5 |
| 06/30/76 | 06/30/77 | Prudential Reinsurance | DXC901147 | 6 |
| 06/30/77 | 06/30/78 | Prudential Reinsurance | DXCDX0250 | 3 |
| 06/30/77 | 06/30/78 | Prudential Reinsurance | DXCDX0251 | 4 |
| 06/30/77 | 06/30/78 | Prudential Reinsurance | DXCDX0252 | 5 |
| 06/30/83 | 06/30/84 | Republic Insurance Co | CDE0749 | 4 |
| 06/30/83 | 06/30/84 | Republic Insurance Co | CDE0750 | 5 |
| 06/30/77 | 06/30/78 | Reunion-Adriatica | EL2046 | 7 |
| 06/30/78 | 06/30/79 | Reunion-Adriatica | EL2787 | 6 |
| 06/30/79 | 06/30/80 | Reunion-Adriatica | EL794120 | 5 |
| 06/30/80 | 06/30/81 | Reunion-Adriatica | EL794416 | 5 |
| 04/01/60 | 04/01/61 | Royal Indemnity Company | RLG021620 | Primary |
| 04/01/61 | 04/01/62 | Royal Indemnity Company | RLG021621 | Primary |
| 04/01/62 | 04/01/63 | Royal Indemnity Company | RLG021622 | Primary |
| 04/01/59 | 04/01/60 | Royal Indemnity Company | RLG021629 | Primary |
| 04/01/55 | 04/01/56 | Royal Indemnity Company | RLG035805 | Primary |
| 04/01/56 | 04/01/57 | Royal Indemnity Company | RLG045762 | Primary |
| 04/01/57 | 04/01/58 | Royal Indemnity Company | RLG045836 | Primary |
| 04/01/58 | 04/01/59 | Royal Indemnity Company | RLG053959 | Primary |
| 03/31/53 | 03/31/54 | Royal Indemnity Company | RLG27635 | Primary |
| 03/31/54 | 04/01/55 | Royal Indemnity Company | RLG31840 | Primary |
| 06/30/83 | 06/30/84 | Royal Insurance Co | ED102071 | 5 |
| 06/30/83 | 06/30/84 | Royal Insurance Co | ED102071. | 4 |
| 06/30/84 | 06/30/85 | Royale Belge S.A. | 1251427 | 4 |
| 06/30/77 | 06/30/78 | Royale Belge S.A. | AVB102. | 8 |
| 06/30/78 | 06/30/79 | Royale Belge S.A. | AVB124. | 7 |
| 05/17/66 | 10/20/66 | Sphere Drake Ins. Co. Ltd. | 66/180390 | 8 |
| 10/20/66 | 10/20/67 | Sphere Drake Ins. Co. Ltd. | 66/180390 | 8 |
| 10/20/67 | 10/20/68 | Sphere Drake Ins. Co. Ltd. | 66/180390 | 8 |
| 05/17/66 | 10/20/66 | St. Helens Ins. Co. Ltd. | 66/180390 | 8 |
| 10/20/66 | 10/20/67 | St. Helens Ins. Co. Ltd. | 66/180390 | 8 |
| 10/20/67 | 10/20/68 | St. Helens Ins. Co. Ltd. | 66/180390 | 8 |
| 06/30/74 | 06/30/75 | St. Katherine Ins. Co. Ltd. | 74DD662C | 3 |
| 06/30/74 | 06/30/75 | St. Katherine Ins. Co. Ltd. | 74DD662C | 3 |
| 06/30/75 | 06/30/76 | St. Katherine Ins. Co. Ltd. | 74DD662C | 5 |
| 06/30/75 | 06/30/76 | St. Katherine Ins. Co. Ltd. | 74DD662C | 5 |
| 06/30/76 | 06/30/77 | St. Katherine Ins. Co. Ltd. | 74DD662C | 4 |
| 06/30/76 | 06/30/77 | St. Katherine Ins. Co. Ltd. | 74DD662C | 4 |
| 07/17/74 | 06/30/75 | St. Katherine Ins. Co. Ltd. | 74DD663C | 6 |
| 07/17/74 | 06/30/75 | St. Katherine Ins. Co. Ltd. | 74DD663C | 6 |
| 06/30/75 | 06/30/76 | St. Katherine Ins. Co. Ltd. | 74DD663C | 8 |
| 06/30/75 | 06/30/76 | St. Katherine Ins. Co. Ltd. | 74DD663C | 8 |
| 06/30/76 | 06/30/77 | St. Katherine Ins. Co. Ltd. | 76DD1594C | 1 |
| 06/30/76 | 06/30/77 | St. Katherine Ins. Co. Ltd. | 76DD1594C | 1 |
| 06/30/77 | 06/30/78 | St. Katherine Ins. Co. Ltd. | 76DD1594C | 1 |
| 06/30/77 | 06/30/78 | St. Katherine Ins. Co. Ltd. | 76DD1594C | 1 |
| 06/30/78 | 06/30/79 | St. Katherine Ins. Co. Ltd. | 76DD1594C | 1 |
| 06/30/78 | 06/30/79 | St. Katherine Ins. Co. Ltd. | 76DD1594C | 1 |

SCHEDULE 1:  PRIMARY & EXCESS INSURANCE POLICIES THAT WERE OR ARE APPLICABLE
TO ASBESTOS RELATED CLAIMS (sorted alphabetically)

| Policy Year Begin | End | Insurer | Policy Number | Layer |
|------|------|---------|---------------|-------|
| 06/30/76 | 06/30/77 | St. Katherine Ins. Co. Ltd. | 76DD1595C | 2 |
| 06/30/76 | 06/30/77 | St. Katherine Ins. Co. Ltd. | 76DD1595C | 2 |
| 06/30/77 | 06/30/78 | St. Katherine Ins. Co. Ltd. | 76DD1595C | 2 |
| 06/30/77 | 06/30/78 | St. Katherine Ins. Co. Ltd. | 76DD1595C | 2 |
| 06/30/78 | 06/30/79 | St. Katherine Ins. Co. Ltd. | 76DD1595C | 2 |
| 06/30/78 | 06/30/79 | St. Katherine Ins. Co. Ltd. | 76DD1595C | 2 |
| 06/30/77 | 06/30/78 | St. Katherine Ins. Co. Ltd. | 77DD1631C | 4 |
| 06/30/77 | 06/30/78 | St. Katherine Ins. Co. Ltd. | 77DD1631C | 4 |
| 06/30/77 | 06/30/78 | St. Katherine Ins. Co. Ltd. | 77DD1632C | 5 |
| 06/30/77 | 06/30/78 | St. Katherine Ins. Co. Ltd. | 77DD1632C | 5 |
| 06/30/78 | 06/30/79 | St. Katherine Ins. Co. Ltd. | 78DD1417C | 3 |
| 06/30/78 | 06/30/79 | St. Katherine Ins. Co. Ltd. | 78DD1418C | 4 |
| 06/30/79 | 06/30/80 | St. Katherine Ins. Co. Ltd. | 79DD1633C | 1 |
| 06/30/80 | 06/30/81 | St. Katherine Ins. Co. Ltd. | 79DD1633C | 1 |
| 06/30/81 | 06/30/82 | St. Katherine Ins. Co. Ltd. | 79DD1633C | 1 |
| 06/30/79 | 06/30/80 | St. Katherine Ins. Co. Ltd. | 79DD1634C | 2 |
| 06/30/79 | 06/30/80 | St. Katherine Ins. Co. Ltd. | 79DD1635C | 3 |
| 06/30/79 | 06/30/80 | St. Katherine Ins. Co. Ltd. | 79DD1636C | 4 |
| 06/30/80 | 06/30/81 | St. Katherine Ins. Co. Ltd. | 80DD1643C | 2 |
| 06/30/81 | 06/30/82 | St. Katherine Ins. Co. Ltd. | 80DD1643C | 2 |
| 06/30/80 | 06/30/81 | St. Katherine Ins. Co. Ltd. | 80DD1644C | 3 |
| 06/30/80 | 06/30/81 | St. Katherine Ins. Co. Ltd. | 80DD1645C | 4 |
| 05/17/66 | 10/20/66 | Stronghold Ins. Co. Ltd. | 66/180390 | 8 |
| 10/20/66 | 10/20/67 | Stronghold Ins. Co. Ltd. | 66/180390 | 8 |
| 10/20/67 | 10/20/68 | Stronghold Ins. Co. Ltd. | 66/180390 | 8 |
| 06/30/74 | 06/30/75 | Stronghold Ins. Co. Ltd. | 74DD662C | 3 |
| 06/30/75 | 06/30/76 | Stronghold Ins. Co. Ltd. | 74DD662C | 5 |
| 06/30/76 | 06/30/77 | Stronghold Ins. Co. Ltd. | 74DD662C | 4 |
| 07/17/74 | 06/30/75 | Stronghold Ins. Co. Ltd. | 74DD663C | 6 |
| 06/30/75 | 06/30/76 | Stronghold Ins. Co. Ltd. | 74DD663C | 8 |
| 06/30/76 | 06/30/77 | Stronghold Ins. Co. Ltd. | 74DD663C | 7 |
| 06/30/76 | 06/30/77 | Stronghold Ins. Co. Ltd. | 76DD1595C | 2 |
| 06/30/77 | 06/30/78 | Stronghold Ins. Co. Ltd. | 76DD1595C | 2 |
| 06/30/78 | 06/30/79 | Stronghold Ins. Co. Ltd. | 76DD1595C | 2 |
| 06/30/77 | 06/30/78 | Stronghold Ins. Co. Ltd. | 77DD1631C | 4 |
| 06/30/77 | 06/30/78 | Stronghold Ins. Co. Ltd. | 77DD1632C | 5 |
| 06/30/77 | 06/30/78 | Stronghold Ins. Co. Ltd. | 77DD1826 | 8 |
| 06/30/78 | 06/30/79 | Stronghold Ins. Co. Ltd. | 78DD1417C | 3 |
| 06/30/78 | 06/30/79 | Stronghold Ins. Co. Ltd. | 78DD1418C | 4 |
| 06/30/78 | 06/30/79 | Stronghold Ins. Co. Ltd. | 78DD1420C | 7 |
| 06/30/79 | 06/30/80 | Stronghold Ins. Co. Ltd. | 79DD1635C | 3 |
| 06/30/79 | 06/30/80 | Stronghold Ins. Co. Ltd. | 79DD1638C | 7 |
| 06/30/80 | 06/30/81 | Stronghold Ins. Co. Ltd. | 80DD1644C | 3 |
| 06/30/80 | 06/30/81 | Stronghold Ins. Co. Ltd. | 80DD1647C | 7 |
| 06/30/82 | 06/30/83 | Stronghold Ins. Co. Ltd. | KY017882 | 3 |
| 06/30/83 | 06/30/84 | Stronghold Ins. Co. Ltd. | KY048183 | 3 |
| 06/30/81 | 06/30/82 | Stronghold Ins. Co. Ltd. | PY030181 | 3 |
| 06/30/81 | 06/30/82 | Stronghold Ins. Co. Ltd. | PY030281 | 4 |
| 06/30/77 | 06/30/78 | Swiss Reinsurance | ZH/R4020/0601 | 8 |
| 06/30/78 | 06/30/79 | Swiss Reinsurance | ZH/R4020/0601 | 7 |
| 05/17/66 | 10/20/66 | Swiss Union Gen. Ins. Co. Ltd. | 66/180390 | 8 |

**SCHEDULE 1:  PRIMARY & EXCESS INSURANCE POLICIES THAT WERE OR ARE APPLICABLE TO ASBESTOS RELATED CLAIMS (sorted alphabetically)**

| Policy Year Begin | End | Insurer | Policy Number | Layer |
|---|---|---|---|---|
| 10/20/66 | 10/20/67 | Swiss Union Gen. Ins. Co. Ltd. | 66/180390 | 8 |
| 10/20/67 | 10/20/68 | Swiss Union Gen. Ins. Co. Ltd. | 66/180390 | 8 |
| 06/30/74 | 06/30/75 | Terra Nova Ins. Co. Ltd. | 74DD662C | 3 |
| 06/30/75 | 06/30/76 | Terra Nova Ins. Co. Ltd. | 74DD662C | 5 |
| 06/30/76 | 06/30/77 | Terra Nova Ins. Co. Ltd. | 74DD662C | 4 |
| 06/30/84 | 06/30/85 | Transamerica Ins Co. | USE13397786 | 3 |
| 06/30/79 | 06/30/80 | Transit Casualty | SCU955191 | 3 |
| 06/30/79 | 06/30/80 | Transit Casualty | SCU955192 | 4 |
| 06/30/79 | 06/30/80 | Transit Casualty | SCU955193 | 5 |
| 06/30/80 | 06/30/81 | Transit Casualty | SCU955565 | 2 |
| 06/30/80 | 06/30/81 | Transit Casualty | SCU955566 | 3 |
| 06/30/80 | 06/30/81 | Transit Casualty | SCU955567 | 4 |
| 06/30/80 | 06/30/81 | Transit Casualty | SCU955568 | 5 |
| 06/30/81 | 06/30/82 | Transit Casualty | SCU955978 | 2 |
| 06/30/81 | 06/30/82 | Transit Casualty | SCU955979 | 3 |
| 06/30/81 | 06/30/82 | Transit Casualty | SCU955980 | 4 |
| 06/30/81 | 06/30/82 | Transit Casualty | SCU955981 | 5 |
| 06/30/81 | 06/30/82 | Transit Casualty | SCU955982 | 6 |
| 06/30/82 | 06/30/83 | Transit Casualty | SCU956259 | 2 |
| 06/30/82 | 06/30/83 | Transit Casualty | SCU956260 | 3 |
| 06/30/82 | 06/30/83 | Transit Casualty | SCU956261 | 4 |
| 06/30/83 | 06/30/84 | Transit Casualty | SCU956535 | 2 |
| 06/30/83 | 06/30/84 | Transit Casualty | SCU956536 | 3 |
| 06/30/83 | 06/30/84 | Transit Casualty | SCU956537 | 4 |
| 06/30/84 | 06/30/85 | Transit Casualty | SCU956881 | 2 |
| 06/30/84 | 06/30/85 | Transit Casualty | SCU956882 | 4 |
| 06/30/82 | 06/30/83 | Transit Casualty | UMB950239 | 1 |
| 06/30/83 | 06/30/84 | Transit Casualty | UMB950239 | 1 |
| 06/30/84 | 06/30/85 | Transit Casualty | UMB950239. | 1 |
| 07/17/74 | 06/30/75 | Turegum Ins. Co. | 74DD663C | 6 |
| 06/30/75 | 06/30/76 | Turegum Ins. Co. | 74DD663C | 8 |
| 06/30/76 | 06/30/77 | Turegum Ins. Co. | 74DD663C | 7 |
| 06/30/76 | 06/30/77 | Turegum Ins. Co. | 76DD1595C | 2 |
| 06/30/77 | 06/30/78 | Turegum Ins. Co. | 76DD1595C | 2 |
| 06/30/78 | 06/30/79 | Turegum Ins. Co. | 76DD1595C | 2 |
| 06/30/77 | 06/30/78 | Turegum Ins. Co. | 77DD1631C | 4 |
| 06/30/77 | 06/30/78 | Turegum Ins. Co. | 77DD1632C | 5 |
| 06/30/78 | 06/30/79 | Turegum Ins. Co. | 78DD1417C | 3 |
| 06/30/78 | 06/30/79 | Turegum Ins. Co. | 78DD1418C | 4 |
| 06/30/83 | 06/30/84 | Twin City Fire Ins Co | 97CXS100005 | 5 |
| 02/27/73 | 06/30/73 | Unigard Security | 1-0589 | 5 |
| 06/30/73 | 06/30/74 | Unigard Security | 1-0589 | 5 |
| 06/30/74 | 06/30/75 | Unigard Security | 1-0589 | 4 |
| 06/30/74 | 06/30/75 | Unigard Security | 1-2517 | 1 |
| 10/20/68 | 10/20/69 | US Fire Insurance Co | XS2108 | 4 |
| 10/20/69 | 10/20/70 | US Fire Insurance Co | XS2108 | 4 |
| 10/20/70 | 06/30/71 | US Fire Insurance Co | XS2108 | 4 |
| 06/30/74 | 06/30/75 | Walbrook Ins. Co. Ltd. | 74DD662C | 3 |
| 06/30/75 | 06/30/76 | Walbrook Ins. Co. Ltd. | 74DD662C | 5 |
| 06/30/76 | 06/30/77 | Walbrook Ins. Co. Ltd. | 74DD662C | 4 |
| 07/17/74 | 06/30/75 | Walbrook Ins. Co. Ltd. | 74DD663C | 6 |

**SCHEDULE 1:  PRIMARY & EXCESS INSURANCE POLICIES THAT WERE OR ARE APPLICABLE TO ASBESTOS RELATED CLAIMS (sorted alphabetically)**

| Policy Year Begin | End | Insurer | Policy Number | Layer |
|---|---|---|---|---|
| 06/30/75 | 06/30/76 | Walbrook Ins. Co. Ltd. | 74DD663C | 8 |
| 06/30/76 | 06/30/77 | Walbrook Ins. Co. Ltd. | 76DD1594C | 1 |
| 06/30/77 | 06/30/78 | Walbrook Ins. Co. Ltd. | 76DD1594C | 1 |
| 06/30/78 | 06/30/79 | Walbrook Ins. Co. Ltd. | 76DD1594C | 1 |
| 06/30/76 | 06/30/77 | Walbrook Ins. Co. Ltd. | 76DD1595C | 2 |
| 06/30/77 | 06/30/78 | Walbrook Ins. Co. Ltd. | 76DD1595C | 2 |
| 06/30/78 | 06/30/79 | Walbrook Ins. Co. Ltd. | 76DD1595C | 2 |
| 06/30/77 | 06/30/78 | Walbrook Ins. Co. Ltd. | 77DD1631C | 4 |
| 06/30/77 | 06/30/78 | Walbrook Ins. Co. Ltd. | 77DD1632C | 5 |
| 06/30/78 | 06/30/79 | Walbrook Ins. Co. Ltd. | 78DD1417C | 3 |
| 06/30/78 | 06/30/79 | Walbrook Ins. Co. Ltd. | 78DD1418C | 4 |
| 06/30/79 | 06/30/80 | Walbrook Ins. Co. Ltd. | 79DD1633C | 1 |
| 06/30/80 | 06/30/81 | Walbrook Ins. Co. Ltd. | 79DD1633C | 1 |
| 06/30/81 | 06/30/82 | Walbrook Ins. Co. Ltd. | 79DD1633C | 1 |
| 06/30/79 | 06/30/80 | Walbrook Ins. Co. Ltd. | 79DD1634C | 2 |
| 06/30/79 | 06/30/80 | Walbrook Ins. Co. Ltd. | 79DD1635C | 3 |
| 06/30/79 | 06/30/80 | Walbrook Ins. Co. Ltd. | 79DD1636C | 4 |
| 06/30/80 | 06/30/81 | Walbrook Ins. Co. Ltd. | 80DD1643C | 2 |
| 06/30/81 | 06/30/82 | Walbrook Ins. Co. Ltd. | 80DD1643C | 2 |
| 06/30/80 | 06/30/81 | Walbrook Ins. Co. Ltd. | 80DD1644C | 3 |
| 06/30/80 | 06/30/81 | Walbrook Ins. Co. Ltd. | 80DD1645C | 4 |
| 06/30/82 | 06/30/83 | Walbrook Ins. Co. Ltd. | KY017582 | 1 |
| 06/30/83 | 06/30/84 | Walbrook Ins. Co. Ltd. | KY017582 | 1 |
| 06/30/84 | 06/30/85 | Walbrook Ins. Co. Ltd. | KY017582 | 1 |
| 06/30/82 | 06/30/83 | Walbrook Ins. Co. Ltd. | KY017782 | 2 |
| 06/30/83 | 06/30/84 | Walbrook Ins. Co. Ltd. | KY017782 | 2 |
| 06/30/84 | 06/30/85 | Walbrook Ins. Co. Ltd. | KY017782 | 2 |
| 06/30/82 | 06/30/83 | Walbrook Ins. Co. Ltd. | KY017882 | 3 |
| 06/30/83 | 06/30/84 | Walbrook Ins. Co. Ltd. | KY048183 | 3 |
| 06/30/84 | 06/30/85 | Walbrook Ins. Co. Ltd. | KY048183 | 3 |
| 06/30/81 | 06/30/82 | Walbrook Ins. Co. Ltd. | PY030181 | 3 |
| 06/30/81 | 06/30/82 | Walbrook Ins. Co. Ltd. | PY030281 | 4 |
| 07/17/74 | 06/30/75 | Wausau Insurance Co | 053700086732 | 6 |
| 06/30/75 | 06/30/76 | Wausau Insurance Co | 053700086732 | 8 |
| 06/30/76 | 06/30/77 | Wausau Insurance Co | 053700086732 | 7 |
| 06/30/77 | 06/30/78 | Winterthur Swiss Ins. Co. | 77DD1631C | 4 |
| 06/30/77 | 06/30/78 | Winterthur Swiss Ins. Co. | 77DD1632C | 5 |
| 06/30/78 | 06/30/79 | Winterthur Swiss Ins. Co. | 78DD1417C | 3 |
| 06/30/78 | 06/30/79 | Winterthur Swiss Ins. Co. | 78DD1418C | 4 |
| 06/30/80 | 06/30/81 | Winterthur Swiss Ins. Co. | 80DD1643C | 2 |
| 06/30/81 | 06/30/82 | Winterthur Swiss Ins. Co. | 80DD1643C | 2 |
| 06/30/80 | 06/30/81 | Winterthur Swiss Ins. Co. | 80DD1644C | 3 |
| 06/30/80 | 06/30/81 | Winterthur Swiss Ins. Co. | 80DD1645C | 4 |
| 06/30/82 | 06/30/83 | Winterthur Swiss Ins. Co. | KY017582 | 1 |
| 06/30/83 | 06/30/84 | Winterthur Swiss Ins. Co. | KY017582 | 1 |
| 06/30/84 | 06/30/85 | Winterthur Swiss Ins. Co. | KY017582 | 1 |
| 06/30/82 | 06/30/83 | Winterthur Swiss Ins. Co. | KY017782 | 2 |
| 06/30/83 | 06/30/84 | Winterthur Swiss Ins. Co. | KY017782 | 2 |
| 06/30/84 | 06/30/85 | Winterthur Swiss Ins. Co. | KY017782 | 2 |
| 06/30/82 | 06/30/83 | Winterthur Swiss Ins. Co. | KY017882 | 3 |
| 06/30/83 | 06/30/84 | Winterthur Swiss Ins. Co. | KY048183 | 3 |

Page 19 of 20

### SCHEDULE 1:  PRIMARY & EXCESS INSURANCE POLICIES THAT WERE OR ARE APPLICABLE TO ASBESTOS RELATED CLAIMS (sorted alphabetically)

| **Policy Year** | | | | |
|---|---|---|---|---|
| **Begin** | **End** | **Insurer** | **Policy Number** | **Layer** |
| 06/30/84 | 06/30/85 | Winterthur Swiss Ins. Co. | KY048183 | 3 |
| 06/30/81 | 06/30/82 | Winterthur Swiss Ins. Co. | PY030181 | 3 |
| 06/30/81 | 06/30/82 | Winterthur Swiss Ins. Co. | PY030281 | 4 |
| 05/17/66 | 10/20/66 | World Auxiliary Ins. Corp. Ltd. | 66/180390 | 8 |
| 10/20/66 | 10/20/67 | World Auxiliary Ins. Corp. Ltd. | 66/180390 | 8 |
| 10/20/67 | 10/20/68 | World Auxiliary Ins. Corp. Ltd. | 66/180390 | 8 |
| 06/30/75 | 06/30/76 | Yasuda Fire & Marine Ins. Co. Ltd. | 74DD662C | 5 |
| 06/30/76 | 06/30/77 | Yasuda Fire & Marine Ins. Co. Ltd. | 74DD662C | 4 |
| 06/30/75 | 06/30/76 | Yasuda Fire & Marine Ins. Co. Ltd. | 74DD663C | 8 |
| 06/30/76 | 06/30/77 | Yasuda Fire & Marine Ins. Co. Ltd. | 74DD663C | 7 |
| 06/30/76 | 06/30/77 | Zurich Insurance Co | IRDSR4010 | 7 |
| 06/30/77 | 06/30/78 | Zurich Insurance Co | IRDSR401072 | 7 |
| 06/30/78 | 06/30/79 | Zurich Insurance Co | Z17052/3 | 6 |
| 06/30/79 | 06/30/80 | Zurich Insurance Co | Z17052/4 | 6 |
| 06/30/83 | 06/30/84 | Zurich Insurance Co | ZIB-70-631-83-C | 4 |
| 06/30/84 | 06/30/85 | Zurich Insurance Co | ZIB70631-84-C | 4 |
| 06/30/84 | 06/30/85 | Zurich Insurance Co | ZIB70964-84-C | 3 |
| 06/30/80 | 06/30/81 | Zurich Insurance Co | ZIB7434/5 | 6 |
| 06/30/81 | 06/30/82 | Zurich Insurance Co | ZIB7631-81-C | 6 |
| 06/30/82 | 06/30/83 | Zurich Insurance Co | ZIB7631-82-C | 4 |
| 06/30/81 | 06/30/82 | Zurich Insurance Co | ZIB7632-81-C | 7 |

## SCHEDULE 2

### SCHEDULE OF ASBESTOS INSURANCE SETTLEMENT AGREEMENTS

| INSURER | DATE OF AGREEMENT |
|---|---|
| Admiral Insurance Company | 8/24/1995 |
| Aetna Casualty and Surety Company | 2/20/1992 |
| Allstate Insurance Company | 6/7/1994 |
| American Centennial Insurance Company | 5/26/1995 |
| American Re-Insurance Insurance Company | 11/1/1995 |
| Ancon Insurance Company (UK) Limited | 11/12/1999 |
| Bermuda Fire & Marine Insurance Company Limited | 5/18/1998 |
| Continental Casualty Company | 8/1/1990 |
| Continental Casualty Company | 2/18/1997 |
| Commercial Union | 5/14/1993 |
| Commercial Union | 10/7/1998 |
| English & American Insurance Company Limited | 10/15/1998 |
| Federal Insurance Company | 11/17/1997 |
| Fireman's Fund Insurance Company | 12/30/1996 |
| Fireman's Fund Insurance Company | 9/22/1995 |
| General Insurance Company of America | 3/3/1994 |
| Gerling Konzern | 11/17/2000 |
| Guarantee Insurance Company | 6/3/1998 |
| Home Insurance Company | 9/27/1993 |
| Home Insurance Company and other Home Companies | 11/14/1997 |
| Insurance Company of North America and other CIGNA Companies | 3/3/1994 |

| INSURER | DATE OF AGREEMENT |
|---|---|
| KWELM Companies | **8/19/1996** |
| KWELM Management Services Ltd as Agent of Bryanston | **3/25/1998** |
| KWELM Companies | **8/20/2004** |
| Lloyd's Underwriters | **11/21/2006** |
| Ludgate Insurance Company, Ltd. | **4/3/1998** |
| Maryland Casualty Company | **9/1/1991** |
| Maryland Casualty Company | **3/18/1996** |
| Maryland Casualty Company | **3/18/1996** |
| Minster Insurance Ltd. | **11/17/1995** |
| Prudential Reinsurance Company and Gibraltar Casualty Company | **10/8/1993** |
| Royal Indemnity Company | **1/5/1995** |
| Royal Indemnity Company | **5/11/1994** |
| Swiss Union Gen. Ins. Co. Ltd. | **11/17/1995** |
| Transit Casualty Company in Receivership | **1/5/2000** |
| Unigard Security Insurance Company | **8/6/1992** |
| Unigard Security Insurance Company | **5/15/1995** |
| United States Fire Insurance Company | **9/11/1995** |

## SCHEDULE 3

### SCHEDULE OF ASBESTOS INSURANCE REIMBURSEMENT AGREEMENTS

| INSURER | DATE OF AGREEMENT |
|---|---|
| Aetna Casualty and Surety Company | **5/22/1996** |
| Allstate Insurance Company | **2/9/1996** |
| American Home Assurance Company and other AIG Companies | **11/17/1995** |
| American Home Assurance Company and other AIG Companies | **11/2/2000** |
| American Re-Insurance Insurance Company | **6/14/1996** |
| Continental Casualty Company | **5/22/1997** |
| Gerling Konzern | **11/3/1998** |
| Hartford Accident and Indemnity Company and other Hartford Company | **10/8/1998** |
| Highlands Insurance Company | **12/1/1998** |
| Eagle Star Insurance Company and Underwriters at Lloyd's London and certain London Market Insurance Companies | **11/17/1995** |
| Mutual Marine Office (EMC) | **8/28/1998** |
| TIG Insurance Company | **7/18/2000** |
| Zurich International (Bermuda) Ltd. | **6/25/1999** |

## SCHEDULE 3

### SCHEDULE OF ASBESTOS INSURANCE REIMBURSEMENT AGREEMENTS

| INSURER | DATE OF AGREEMENT |
|---|---|
| Aetna Casualty and Surety Company | **5/22/1996** |
| Allstate Insurance Company | **2/9/1996** |
| American Home Assurance Company and other AIG Companies | **11/17/1995** |
| American Home Assurance Company and other AIG Companies | **11/2/2000** |
| American Re-Insurance Insurance Company | **6/14/1996** |
| Continental Casualty Company | **5/22/1997** |
| Gerling Konzern | **11/3/1998** |
| Hartford Accident and Indemnity Company and other Hartford Company | **10/8/1998** |
| Highlands Insurance Company | **12/1/1998** |
| Eagle Star Insurance Company and Underwriters at Lloyd's London and certain London Market Insurance Companies | **11/17/1995** |
| Mutual Marine Office (EMC) | **8/28/1998** |
| TIG Insurance Company | **7/18/2000** |
| Zurich International (Bermuda) Ltd. | **6/25/1999** |

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| **In re:** | ) | Chapter 11 |
|  | ) |  |
| **W. R. GRACE & CO.,** *et al.*[1] | ) | Case No. 01-01139 (JKF) |
|  | ) | Jointly Administered |
| **Debtors.** | ) |  |
|  | ) |  |
|  | ) |  |
|  | ) |  |

## EXHIBIT 7 TO EXHIBIT BOOK

**EXHIBIT 7**

Intentionally Left Blank.

---

[1]   The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc.,  CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| **In re:** | ) | Chapter 11 |
|  | ) |  |
| **W. R. GRACE & CO.,** *et al.*[1] | ) | Case No. 01-01139 (JKF) |
|  | ) | Jointly Administered |
| **Debtors.** | ) |  |
|  | ) |  |
|  | ) |  |
|  | ) |  |

**EXHIBIT 8 TO EXHIBIT BOOK
BEST INTERESTS ANALYSIS**

**EXHIBIT 8**

Attached.

---

[1]    The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife  Boston Ltd., Alewife Land Corporation, Amicon, Inc.,  CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

## BEST INTERESTS ANALYSIS

## INTRODUCTION

Pursuant to section 1129(a)(7) of the Bankruptcy Code,[1] each Holder of an impaired Claim or Equity Interest must either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such non-accepting Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code (often referred to as the "Best Interests Test").  In connection with this requirement, the following hypothetical liquidation analysis (the "Liquidation Analysis") has been prepared so that the Bankruptcy Court may determine that the Plan is in the best interests of all classes impaired by the Plan.

THE LIQUIDATION ANALYSIS IS AN ESTIMATE OF THE PROCEEDS THAT MAY BE GENERATED AS A RESULT OF A HYPOTHETICAL CHAPTER 7 LIQUIDATION OF THE ASSETS OF THE DEBTORS AND NON-DEBTOR AFFILIATES.  UNDERLYING THE LIQUIDATION ANALYSIS ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC, COMPETITIVE, AND OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF MANAGEMENT AND ITS ADVISORS.  ADDITIONALLY, VARIOUS LIQUIDATION DECISIONS UPON WHICH CERTAIN ASSUMPTIONS ARE BASED ARE SUBJECT TO CHANGE.  ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE ASSUMPTIONS AND ESTIMATES EMPLOYED IN DETERMINING THE LIQUIDATION VALUES OF THE DEBTORS' AND NON-DEBTOR AFFILIATES' ASSETS WILL RESULT IN THE PROCEEDS WHICH WOULD BE REALIZED WERE THE DEBTORS AND NON-DEBTOR AFFILIATES TO UNDERGO AN ACTUAL LIQUIDATION, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.  THIS ANALYSIS HAS NOT BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AICPA.

## GENERAL ASSUMPTIONS

For purposes of this analysis, the Effective Date is assumed to be December 31, 2009.  A summary of the assumptions used by management and its advisors in preparing the Liquidation Analysis follows.

### Asset Sale Methodology

The Liquidation Analysis assumes that the hypothetical chapter 7 liquidation is effected via the orderly sale of the businesses of the Debtors and Non-Debtor Affiliates as going concerns. Because the Asbestos PI Channeling Injunction and Asbestos PD Channeling Injunction would not be available in a chapter 7 liquidation, the value realized from the orderly sale of the

---

[1]    All capitalized terms used in this Liquidation Analysis that are not otherwise defined herein shall have the meanings ascribed to them in the Plan.

businesses in all likelihood would be reduced as a result of a buyer's concern regarding the risk of asbestos liability in the acquisition of the assets.  Further, the lack of the Asbestos PI Channeling Injunction and the Asbestos PD Channeling Injunction may preclude an orderly sale of the businesses as going concerns, in which case an actual liquidation of assets would be required.  In that case, values realized would be further reduced.

**Estimates of Cost of Liquidation**

Conversion of the Chapter 11 Cases to chapter 7 would likely result in additional costs to the Debtors' estates.  Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee and other professionals retained by the trustee, including attorneys, financial advisors and consultants; asset disposition expenses; litigation costs related to possible fraudulent transfer actions and the resolution of asbestos and other Claims; all unpaid expenses incurred by the Debtors in the Chapter 11 Cases that are allowed in the chapter 7 cases; and Claims arising from the operations of the Debtors during the pendency of the Chapter 11 Cases.

In addition, liquidation costs could be higher, and the value of any distributions could be lower, if the chapter 7 cases were not completed within the 12-month period assumed in the Liquidation Analysis.  In the event that litigation were necessary to resolve claims asserted in the chapter 7 cases, any delay could be further prolonged and administrative expenses further increased.  The effects of this potential delay on the value of distributions under the hypothetical liquidation have not been considered.

# DETAILED LIQUIDATION ANALYSIS

The table below provides a comparison of the recoveries under a hypothetical chapter 7 liquidation and under the Chapter 11 Cases reorganization in accordance with the provisions of the Plan. The accompanying footnotes should be read in connection with the table.

*(unaudited, $ in millions)*

| | Note | Chapter 7 Liquidation | | Chapter 11 Cases Reorganization | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| **Calculation of Estimated Value Available:** | A | | | | |
| Estimated Value of Reorganized Debtors and Non-Debtor Affiliates | | $ 2,100 | $ 2,500 | $ 2,100 | $ 2,500 |
| Less: Discount Factor | | (1,050) | (1,250) | - | - |
| Estimated Value of Reorganized Debtors and Non-Debtor Affiliates | | 1,050 | 1,250 | 2,100 | 2,500 |
| | | | | | |
| Plus: | | | | | |
| Cash | B | 787 | 787 | 787 | 787 |
| Fresenius Payment | C | - | 105 | 115 | 115 |
| Cryovac Payment | C | - | 873 | 953 | 953 |
| Insurance Recovery | D | 500 | 500 | 500 | 500 |
| | | | | | |
| **Estimated Value Before Provision for Chapter 7 Costs, Chapter 11 Costs, Administrative Expenses and Claims** | | 2,337 | 3,515 | 4,456 | 4,856 |
| | | | | | |
| Less: | | | | | |
| Costs Associated with Chapter 11 Reorganization | | - | - | 100 | 100 |
| Costs Associated with Chapter 7 Liquidation | E | | | | |
| Professional Fees ($2.0 million / month for 12 months) | | 24 | 24 | - | - |
| Trustee Fees (1.5% of cash and estimated proceeds less other fees) | | 27 | 45 | - | - |
| Additional Brokerage Fees (0.5% of estimated proceeds) | | 5 | 6 | - | - |
| | | | | | |
| Administrative Expenses | | 26 | 26 | 31 | 31 |
| Priority Tax Claims and Priority Claims | | 39 | 39 | 39 | 39 |
| Secured Claims | | 5 | 5 | 5 | 5 |
| | | | | | |
| **Estimated Value Before Provision for General Unsecured Claims, Asbestos PI and PD Claims and Equity Interests** | | 2,211 | 3,371 | 4,280 | 4,680 |
| | | | | | |
| Provision for General Unsecured Claims | | 999 [1] | 999 [1] | 1,387 [2] | 1,387 [2] |
| Provision for Asbestos PI and PD Claims | | - [3] | - [3] | 2,773 [4] | 2,424 [4] |

(1) Plus post-petition interest, if any value available
(2) Includes post-petition interest for General Unsecured Claims as set forth in their treatment under the Plan
(3) Assumes Asbestos PI and PD Claims would be in dispute
(4) Represents value of the treatment of Asbestos PI Claims and Asbestos PD Claims under the Plan (obligations under the Deferred Payment Agreements discounted at approximately 5% in the low case and 10% in the high case)

3

## FOOTNOTES TO LIQUIDATION ANALYSIS

A summary of the assumptions used in the Liquidation Analysis is set forth below.

### NOTE A – PROCEEDS FROM ORDERLY SALE OF BUSINESSES

The Liquidation Analysis assumes the businesses of the Debtors and Non-Debtor Affiliates would be sold as going concerns for cash in one transaction.    The proceeds from this sale transaction are assumed to equal the range of the Reorganized Enterprise Value of the Reorganized Debtors and Non-Debtor Affiliates, as further described in Section 2.11 of the Disclosure Statement, less a discount factor of 50%. Unlike a chapter 11 reorganization, chapter 7 does not provide for the issuance of the Asbestos PI Channeling Injunction or Asbestos PD Channeling Injunction.    Notwithstanding a presumed ability to sell assets in a sale under Bankruptcy Code §363 or the availability of an injunction under Bankruptcy Code §105, the discount factor quantifies the probability that the businesses could not be sold for fair value or at all because of the perceived risk that the asbestos liability would follow the assets sold.

U.S. taxes due on the gain from the orderly sale of the Debtors' and Non-Debtor Affiliates' businesses are assumed to be offset by existing tax attributes and deductions generated by payments made to Claimants in the chapter 7 cases.  To the extent that the payment of claims did not occur within twelve months from the sale of the assets, the estate would incur cash tax obligations subject to future refunds.  The orderly sales of businesses in foreign countries are assumed to be structured as stock sales to minimize foreign taxes.

### NOTE B – CASH

Cash represents cash projected to be available at December 31, 2009.  Excess cash flow generated from operations during the liquidation sale process is assumed to be reinvested into the operations of the Debtors and Non-Debtor Affiliates.

### NOTE C – FRAUDULENT TRANSFER ACTIONS

Amounts from fraudulent transfer actions reflect the value, in the form of cash and securities, to be realized under litigation settlements with Fresenius and Cryovac, Inc., a subsidiary of Sealed Air (the "Fresenius Settlement Agreement" and the "Sealed Air Settlement Agreement," respectively, and collectively the "Agreements").    Pursuant to the Fresenius Settlement Agreement and the Sealed Air Settlement Agreement, respectively, and the provisions of the Plan, Fresenius shall make the Fresenius Payment and Cryovac shall make the Cryovac Payment. The Agreements specifically require the existence of the Asbestos PI Channeling Injunction and Asbestos PD Channeling Injunction.  Because the Asbestos PI and PD Channeling Injunctions are not available in a chapter 7 liquidation, the Liquidation Analysis assumes these settlement payments would not be made.  It is assumed, however, that a chapter 7 trustee would pursue similar litigation actions which resulted in the Agreements.  Because the outcome of this litigation cannot be known, a range is shown from zero (at the low end) to a level of Sealed Air proceeds equal to the Cryovac Payment and Fresenius proceeds equal to the Fresenius Payment on a present value basis assuming a discount rate of 3% and a three-year time period to collect

4

the proceeds (at the high end).  The discount rate is used to capture the time element of the future payment but not the risk of collection.

**NOTE D – INSURANCE**

At December 31, 2008, taking into account existing settlement agreements with various insurance carriers, excess coverage with other insurers including certain insolvent carriers, and previous reimbursements, there remains approximately $916 million of excess insurance coverage.  In a chapter 7 liquidation and the Chapter 11 Cases reorganization, the Insurance Recovery is based on the current book value of the insurance asset ($500 million).  The ultimate amount of insurance received will depend on a number of factors that will only be determined at the time claims are paid including the nature of the claim, the relevant exposure years, the timing of the payment, the solvency of insurers and the legal status of policy rights.  A more detailed description of these insurance policies can be found in Grace's Annual Report on Form 10-K for the year ended December 31, 2008.

**NOTE E – COSTS ASSOCIATED WITH A CHAPTER 7 LIQUIDATION**

The costs associated with a chapter 7 liquidation are assumed to include fees and costs for professionals retained by the chapter 7 trustee, including legal, financial and claims processing advisors, estimated at $2.0 million per month for twelve months.  In addition, it is assumed the chapter 7 trustee would receive payments equal to 1.5% of the estimated total proceeds from sale of businesses and available cash less other chapter 7 expenses.  Additional brokerage fees would be necessary for the orderly sale of the Debtors' businesses and other costs.  Brokerage fees are calculated at 0.5% of estimated total proceeds from the sale of businesses.

5

[THIS PAGE INTENTIONALLY LEFT BLANK]

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

In re:                                    )        Chapter 11
                                          )
**W. R. GRACE & CO.**, *et al.*[1]        )        Case No. 01-01139 (JKF)
                                          )        Jointly Administered
            **Debtors.**                  )
                                          )
                                          )
                                          )

**EXHIBIT 9 TO EXHIBIT BOOK**
**CDN ZAI MINUTES OF SETTLEMENT**

**EXHIBIT 9**

Attached.

---

[1]   The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife  Boston Ltd., Alewife Land Corporation, Amicon, Inc.,  CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

Court File No. 01-CL-4081

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**COMMERCIAL LIST**

**IN THE MATTER OF S. 18.6 OF THE *COMPANIES'
CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-
36, AS AMENDED**

**AND IN THE MATTER OF GRACE CANADA, INC.**

## <u>CDN ZAI MINUTES OF SETTLEMENT</u>

### OVERVIEW

1.    The Parties to these Minutes of Settlement ("**Minutes**") agree to be bound by the following terms.

2.    Capitalized terms used herein and not otherwise defined have the meaning ascribed to them in Appendix A.

### BACKGROUND AND PURPOSE

3.    Certain of the Grace Parties have been named as defendants in the actions listed in Appendix B (the "**Actions**") in which the plaintiffs therein seek damages for, *inter alia*, CDN ZAI Claims.

4.    Pursuant to an Order of the CCAA Court dated November 15, 2005, the Modified Preliminary Injunction of the U.S. Court was recognized in Canada and the Actions were stayed.

- 2 -

5.　Pursuant to an Order of the CCAA Court made on February 8, 2006, Lauzon Belanger S.E.N.C.R.L. and Scarfone Hawkins LLP were appointed as CCAA Representative Counsel to represent the interests of, *inter alia*, CDN ZAI Claimants in Canada and, as such, have the authority to enter into the Minutes on behalf of CDN ZAI Claimants.

6.　The purpose of the Minutes is to achieve and conclude a full and final resolution of all CDN ZAI Claims against the Grace Parties.

**NO ADMISSION OF LIABILITY**

7.　Grace and Grace Canada in agreeing to the Minutes, do not admit liability of any kind in relation to CDN ZAI Claims.  The Parties acknowledge that Grace and Grace Canada are entering into these Minutes for settlement purposes only and that nothing in the Minutes constitutes an admission by the Grace Parties that they have any liability under Canadian or US law on account of the presence of or exposure to ZAI or that any person with ZAI in a home in Canada has any valid claim against the Grace Parties under Canadian or US law.  By entering into the Settlement, Grace and Grace Canada are not waiving any of their defences to liability.  The Parties further acknowledge that none of the Grace Parties who are not signatories hereto have waived any of their defences to liability.

8.　The CCAA Representative Counsel, on behalf of the CDN ZAI Claimants, agrees that it will not publicly disparage, impugn or malign the acts or omissions of any

- 3 -

of the other Parties or the Grace Parties who are not signatories hereto with respect to CDN ZAI Claims.

**TERMS OF SETTLEMENT WITH GRACE PARTIES**

9.    On the Effective Date (as that term shall be defined in the Plan), Grace shall contribute the amount of six million five hundred thousand Canadian dollars (CDN$6,500,000) less any amounts that have been paid by Grace pursuant to the Fee Order (the "**Grace Funds**") to the CDN ZAI PD Claims Fund.

10.   Grace shall provide in its Plan for the creation of a separate class of CDN ZAI PD Claims and for the establishment of the CDN ZAI PD Claims Fund, which shall administer and make payments in respect of CDN ZAI PD Claims in accordance with the terms of this Settlement.

11.   Grace shall provide in its Plan that any CDN ZAI PI Claimant shall be entitled to file his or her claim against the Asbestos Trust to be created for asbestos personal injury claims pursuant to the Plan, the Trust Agreement and the TDP and shall be entitled to payments as provided thereunder.  CDN ZAI PI Claimants shall be entitled to the same rights to recover legal fees and expenses as part of their claims against the Asbestos Trust established for payment of Asbestos PI Claims (as defined in the Plan) pursuant to the Plan as all other Asbestos PI Claimants.

12.   Pursuant to the Canadian Settlement Approval, CCAA Representative Counsel shall vote, on behalf of CDN ZAI Claimants, in favour of Grace's Plan incorporating this Settlement.

- 4 -

**CANADIAN SETTLEMENT APPROVAL**

13.    Upon execution of the Minutes, Grace shall as soon as reasonably practicable:

(a)    advise the U.S. Court of this Settlement; and

(b)    bring a motion in the CCAA Court for the Canadian Settlement Approval which shall,

(i)    approve the Settlement;

(ii)    authorize CCAA Representative Counsel to vote as proxy and power of attorney for CDN ZAI Claimants on the Plan;

(iii)    order, on the Effective Date (as such term shall be defined in the Plan), (A) releases in favour of the Grace Parties from the CDN ZAI Claimants of all claims and causes of action of any kind whatsoever relating to CDN ZAI Claims including, without limitation, any claims or causes of actions asserted against the Grace Parties as a result of the CDN ZAI Claims advanced by CCAA Representative Counsel against the Crown as a result of which the Crown is or may become entitled to contribution or indemnity from the Grace Parties; (B) the discharge and extinguishment of all CDN ZAI Claims against the Grace Parties (collectively, the "**Releases**"); and (C) a stay of the Actions until the Actions are amended to remove the Grace Parties as named defendants as provided for herein;

- 5 -

(iv)     order that all CDN ZAI Claims, whether present or future, suffered directly or indirectly, from the manufacture, sale, or distribution of ZAI products in Canada, against the Crown are not released or in any way affected by the terms of this Settlement, except to the extent released in Section 13(b)(iii) above. For greater certainty, nothing contained in these Minutes shall serve to discharge, extinguish or release CDN ZAI Claims asserted against the Crown and which claims seek to establish and apportion independent and/or several liability against the Crown; and

(v)     address other matters required in order to implement the Settlement.

14.     Provided that the Canadian Settlement Approval is obtained, Grace agrees that it will support, to the fullest extent permitted by law, a one time fee application by U.S. counsel to CCAA Representative Counsel to the U.S. Court for the approval and payment of its reasonable attorney's fees and expenses incurred up to the date of these Minutes in connection with the Chapter 11 cases provided that no request shall exceed the amount of US$350,000. In the event that the U.S. Court grants an Order (the "**Fee Order**") approving such application, any amounts paid by Grace to U.S. counsel to CCAA Representative Counsel shall be deducted from the amount payable pursuant to paragraph 20(a) herein.

15.     In the event that either the Canadian Settlement Approval or the U.S. Confirmation Order is not obtained, this Settlement will be considered to be null and void.

- 6 -

## CONDITIONS OF FUNDING

*Grace Conditions to Funding*

16.    The Grace Parties' obligation to contribute the Grace Funds is subject to the following conditions (the "**Grace Funding Conditions**"):

(a)    The Canadian Settlement Approval shall have been obtained;

(b)    The U.S. Court shall have granted an Order approving the CDN ZAI PD Claims Notice Program on the terms set out herein, which shall, *inter alia,* provide for the CDN ZAI PD Claims Bar Date, which Order shall have been recognized by the CCAA Court;

(c)    The Plan shall incorporate the terms of this Settlement and such other matters required to implement the Settlement and shall include, in particular, the discharge and extinguishment of all CDN ZAI Claims against the Grace Parties;

(d)    CCAA Representative Counsel shall have voted in favour of the Plan; and

(e)    all conditions of Plan implementation being satisfied, including the issuance of: (i) a Final Order (as such term shall be defined in the Plan) approving confirmation of the Plan (the "**U.S. Confirmation Order**"); and (ii) an Order of the CCAA Court (and the time for any appeal with respect to such Order shall have expired and no appeal shall be pending or outstanding) recognizing and implementing the U.S. Confirmation Order in Canada.

- 7 -

17.  Upon payment of the Grace Funds:

(a)  All CDN ZAI Claims against the Grace Parties shall be forever disallowed and expunged;

(b)  CCAA Representative Counsel shall cause the Actions to be amended such that no CDN ZAI Claims are asserted against the Grace Parties as named defendants; and

(c)  CDN ZAI Claimants shall no longer have recourse in respect of CDN ZAI PD Claims against the Grace Parties, but shall have recourse only to the CDN ZAI PD Claims Fund.  Thereafter none of the Grace Parties shall have any liability for the CDN ZAI Claims whatsoever, and, for greater certainty, no CDN ZAI Claimant shall have any further recourse against any of the Grace Parties.

18.  In the event that (a) the U.S. Confirmation Order is not granted prior October 31, 2009; or (b) the Plan, as confirmed, does not reflect the terms of this Settlement, then this Settlement shall be considered null and void.

**PRESERVATION OF CDN ZAI CLAIMS AGAINST THE CROWN**

19.  All CDN ZAI Claims, whether present or future, suffered directly or indirectly, from the manufacture, sale, or distribution of ZAI products in Canada, against the Crown are not released or in any way affected by the terms of this Settlement, except to the extent released in Section 13(b)(iii) above.  For greater certainty, nothing contained in these Minutes shall serve to discharge, extinguish or

- 8 -

release CDN ZAI Claims asserted against the Crown and which claims seek to establish and apportion independent and/or several liability against the Crown.

## USE OF FUNDS IN THE CDN ZAI PD CLAIMS FUND

20. The CDN ZAI PD Claims Fund shall be used for the following purposes and the funds shall be distributed as follows:

(a) On the Effective Date, two million Canadian dollars (CDN$2,000,000) less any amounts paid by Grace pursuant to a Fee Order, shall be paid to CCAA Representative Counsel in respect of legal fees and disbursements;

(b) On the Effective Date, two hundred fifty thousand Canadian dollars (CDN$250,000) shall be set aside by the Fund to pay CCAA Representative Counsel in respect of future legal fees and disbursements incurred for the purposes of carrying out their duties in respect of the CDN ZAI PD Claims Notice Program and the CDN ZAI PD Claims Procedure, which legal fees and disbursements shall be paid upon application to and approval by the CCAA Court;

(c) The Fund shall be authorized to pay a Claims Administrator up to eight hundred fifty thousand Canadian dollars (CDN$850,000) for fees and disbursements incurred for the purposes of administering the CDN ZAI PD Claims Procedure and the Fund;

(d) The Fund shall be authorized to pay up to one hundred fifty thousand Canadian dollars (CDN$150,000) to a qualified expert to be jointly

- 9 -

selected by CCAA Representative Counsel and the Claims Administrator to provide expert and consulting services to assist in establishing procedures for the identification of ZAI, remedial measures that might be undertaken by a CDN ZAI PD Claimant and the development of the CDN ZAI PD Claims Procedure (the "**Qualified Expert**");  and

(e)     The remainder of the monies in the Fund plus interest earned therein and any monies not used for the purposes outlined in sections (b)-(d) above, shall be available to be distributed to the holders of Allowed CDN ZAI PD Claims in full and complete satisfaction and payment of their CDN ZAI PD Claims.

**CDN ZAI PD CLAIMS NOTICE AND BAR DATE PROGRAM**

21.    As an integral part of this Settlement, CCAA Representative Counsel shall agree to the broad-based media CDN ZAI PD Claims Notice Program, with certain further modifications to be made as agreed to by the Parties to outline the terms of this Settlement.  Grace shall bear the costs of the CDN ZAI PD Claims Notice Program.

22.    Under the CDN ZAI PD Claims Notice Program, all CDN ZAI PD Claimants seeking to preserve or pursue CDN ZAI PD Claims will be required to file a proof of claim on or before a CDN ZAI PD Claims Bar Date.

23.    Only those CDN ZAI PD Claimants who file a proof of claim by the CDN ZAI PD Claims Bar Date (the "**Timely CDN ZAI PD Claims**") shall be entitled to seek

- 10 -

compensation from the Fund, which entitlement shall be determined in accordance with the CDN ZAI PD Claims Procedure.

24.    Any CDN ZAI PD Claim that is not a Timely CDN ZAI PD Claim shall be forever barred and expunged.

25.    The Parties agree that the order of the U.S. Court approving the CDN ZAI PD Claims Notice Program will provide for a CDN ZAI PD Bar Date that is not earlier than 180 days following substantial completion of the CDN ZAI PD Claims Notice Program.

26.    The Parties shall cooperate in their efforts to finalize the form and content of the CDN ZAI PD Claims Notice Program, in accordance with the terms of the Settlement, to allow Grace to submit a motion for the approval of the Notice Program to the U.S. Court within 30 days of the execution of these Minutes by all Parties.  CCAA Representative Counsel shall support this motion as well as any motion before the CCAA Court to recognize and implement the CDN ZAI PD Claims Notice Program in Canada.

27.    CCAA Representative Counsel shall be entitled to seek the Information Orders in accordance with the *Privacy Act* and if such Orders are granted and the Crown provides the Information, Grace shall use the Information to provide actual and direct notice to the extent possible as a result of the disclosure of the Information as well as any other Canadian homes known or believed to contain ZAI in the possession of CCAA Representative Counsel.

- 11 -

28.    Grace shall not oppose any motions for the Information Orders or related relief sought by CCAA Representative Counsel against the Crown.

### CDN ZAI PD CLAIMS PROCEDURE

29.    CCAA Representative Counsel and the Claims Administrator shall develop and implement the CDN ZAI PD Claims Procedure.    The CDN ZAI PD Claims Procedure shall include the following:

(a)    CDN ZAI PD Claims shall be submitted initially through the proof of claim form that is part of the CDN ZAI PD Claims Notice Program.    The Fund may then require CDN ZAI PD Claimants with Timely CDN ZAI PD Claims to submit a further questionnaire, a sample of the insulation that forms the basis of the claim or other necessary information in order to determine whether such claim should be allowed and paid by the Fund.

(b)    In order to qualify as an Allowed CDN ZAI PD Claim, a CDN ZAI PD Claimant must prove on a summary basis that:

(i)    the dwelling unit for which the CDN ZAI PD Claimant is making a Claim was or is insulated with ZAI;

(ii)    the CDN ZAI PD Claimant undertook measures and incurred or assumed costs to identify and prove the existence of ZAI, and to remediate the dwelling unit to avoid possible adverse effects to occupants and others of exposure to ZAI;

- 12 -

(iii)    the CDN ZAI PD Claimant incurred or assumed the costs of identifying ZAI and/or the costs of other measures undertaken to remediate the dwelling unit to avoid possible adverse effects of exposure to ZAI; and

(iv)    any other criteria as agreed upon by the CCAA Representative Counsel and the Claims Administrator, with the benefit of advice and consultation from the Qualified Expert as necessary, have been met.

(c)    Each CDN ZAI PD Claim shall be categorized, administered, quantified and paid, if applicable, through the CDN ZAI PD Claims Procedure as follows:

(i)    Category I – NO ZAI AND/OR NO REMEDIAL MEASURES -- NO COMPENSATION – the CDN ZAI PD Claimant fails to prove the existence of ZAI and/or fails to prove that costs were incurred or assumed to identify and/or fails to prove that costs were incurred or assumed to remediate the dwelling unit to avoid possible adverse effects to occupants and others of exposure to ZAI. All Category I claims will be disallowed by the Claims Administrator. Category I claims shall be disallowed in full;

(ii)    Category II – ZAI IDENTIFICATION AND MINOR REMEDIAL MEASURES – 50% OF THE COSTS OF REMEDIAL MEASURES UP TO CDN $300.00 – the CDN ZAI PD Claimant proves the

- 13 -

existence of ZAI, proves that costs were incurred or assumed to identify and prove the existence of ZAI, and proves that costs were incurred or assumed for minor remedial measures undertaken to the dwelling unit to avoid possible risks of exposure to ZAI to occupants and others;

(iii)    Category III -- ZAI IDENTIFICATION AND MAJOR REMEDIAL MEASURES – 50% OF THE COSTS OF REMEDIAL MEASURES UP TO CDN$600.00 – the CDN ZAI PD Claimant proves the existence of ZAI, proves that costs were incurred or assumed to identify and prove the existence of ZAI, and proves that costs were incurred or assumed for major remedial measures undertaken to remediate the dwelling unit to avoid possible adverse effects of exposure to ZAI to occupants and others;

(d)    The CCAA Representative Counsel and the Claims Administrator shall act reasonably, in consultation with the Qualified Expert as necessary, to establish and agree upon such other criteria to determine what is necessary to satisfy and establish an Allowed CDN ZAI PD Claim, including, but not limited to establishing specific criteria to determine what constitutes minor or major remedial measures.

- 14 -

30.    Payments on Allowed CDN ZAI PD Claims shall be as provided for in paragraph 29 above.  However:

(a)    in the event the Fund does not have enough monies to pay the maximum amount recoverable for Allowed CDN ZAI PD Claims, each CDN ZAI PD Claim shall be paid based upon a pro-rated distribution of each claim in relation to all Allowed CDN ZAI PD Claims made against the CDN ZAI PD Claims Fund. For greater certainty, aside from the Grace Funds, under no circumstances shall the Grace Parties have an obligation to contribute further monies to the Fund; and

(b)    if the Fund is not exhausted after the administration of the CDN ZAI PD Claims Procedure is complete, such funds shall be used:

(i)    first, to make a further allowance to holders of Allowed CDN ZAI PD Claims on a pro rata basis up to the maximum amount of the Allowed ZAI PD Claim; and

(ii)    thereafter, if the Fund has not been exhausted as a result of the further allowance in 29(b)(i), for such charitable or education purposes as the Claims Administrator, in consultation with CCAA Representative Counsel, deems appropriate.

31.    Each of the Parties acknowledges and agrees that this Settlement is subject only to the conditions outlined herein and is not subject to or conditional upon a settlement of any claims related to ZAI outside of Canada being reached by the Grace Parties nor shall the terms of it be affected by any such settlement.

- 15 -

**W. R. GRACE & CO. on its own behalf and on behalf of the other debtors in possession in the Chapter 11 cases**

Per:   *Mark A. Shelnitz*

Name:  Mark A. Shelnitz

Title:  VP, Gen. Counsel & Secretary

Per:   _____

Name:

Title:


**GRACE CANADA, INC.**

Per:   *W B McGowan*

Name: W. Brian McGowan

Title:  President

Per:   _____

Name:

Title:


**SCARFONE HAWKINS LLP on its own behalf and, in its capacity as representative counsel, on behalf all holders of CDN ZAI Claims**

Per:   _____

Name:

Title:

Per:   _____

Name:

Title:

- 16 -

**LAUZON BELANGER S.E.N.C.R.L. on its own behalf and, in its capacity as representative counsel, on behalf all holders of CDN ZAI Claims**

Per: _____

Name: CAREEN HANNOUCHE

Title: LAWYER          AUGUST 31, 2008

Per: _____

Name:

Title:

- 17 -

# APPENDIX A

## DEFINED TERMS

"**Actions**" has the meaning ascribed to it in paragraph 3;

"**Allowed CDN ZAI PD Claims**" means a Timely CDN ZAI PD Claims allowed by the Claims Administrator pursuant to the CDN ZAI PD Claims Procedure;

"**Canadian Settlement Approval**" means the Order of the CCAA Court as described in paragraph 13(b) and all appeal periods of such Order shall have expired and no appeal shall be pending or outstanding;

"**CCAA Court**" means the Ontario Superior Court of Justice;

"**CCAA Representative Counsel**" means Lauzon Belanger S.E.N.C.R.L. and Scarfone Hawkins LLP in their capacity as representative counsel to the Canadian ZAI Claimants pursuant to an Order of the CCAA Court made on February 8, 2006;

"**CCAA Representative Counsel's Claims**" means the Chapter 11 claims of the CCAA Representative Counsel, identified as claims nos. 17754, 17753 and 17764 filed on April 7, 2006 against the Chapter 11 estates of Grace;

"**CDN ZAI Claimants**" means CDN ZAI PD Claimants and CDN ZAI PI Claimants.

"**CDN ZAI Claims**" means Canadian ZAI PI Claims and Canadian ZAI PD Claims.

"**CDN ZAI PD Claimants**" means a holder of a CDN ZAI PD Claim;

"**CDN ZAI PD Claims**" means claims arising out of or in any way connected to property damages arising, directly or indirectly, from the manufacture, sale or distribution of ZAI in Canada as more particularly defined in the Plan and includes, without limitation all past, present and future claims against the Grace Parties described in or arising from the Actions, including any ZAI PD Claims asserted or to be asserted by the Crown;

"**CDN ZAI PD Claims Bar Date**" means the date set out in the CDN ZAI PD Claims Notice Program by which CDN ZAI PD Claims must be filed in order to qualify as Timely CDN PD Claims or else be forever barred and extinguished;

"**CDN ZAI PD Claims Fund**" or the "**Fund**" means the fund to be established for the administration, adjudication and distribution of funds with respect to CDN ZAI PD Claims;

"**CDN ZAI PD Claims Notice Program**" means the broad-based media program for CDN ZAI PD Claims currently contained within the Bar Date and Notice program Grace filed with the Bankruptcy Court on March 18, 2008 [Docket No. 18328] as amended on April 10, 2008 [Docket No. 18495] and May 23, 2008 [Docket No. 18784];

- 18 -

"**CDN ZAI PD Claims Procedure**" means procedures established by the Claims Administrator and the CCAA Representative Counsel for the Fund to review, administer, adjudicate and pay Allowed CDN ZAI PD Claims as appropriate;

"**CDN ZAI PI Claimants**" means holders of CDN ZAI PI Claims;

"**CDN ZAI PI Claims**" means claims arising out of or in any way connected to personal injuries arising, directly or indirectly, from the manufacture, sale or distribution of ZAI in Canada and as more particularly defined in the Plan and includes, without limitation, all past, present and future claims against the Grace Parties described in or arising from the Actions set out in Appendix B;

"**Claimant**" means a holder of a CDN ZAI PD Claim or a CDN ZAI PI Claim as the case may be;

"**Claims Administrator**" means a person appointed by CCAA Representative Counsel and approved by the U.S. Court to administer the Fund in accordance with this Settlement and any subsequent Fund administration agreement or other related document;

"**Crown**" means the Attorney General of Canada (Her Majesty the Queen in Right of Canada);

"**Crown's ZAI PD Claims**" means the Chapter 11 claims of the Crown, identified as claim nos. 17613 and 17656 filed by the Crown against the Chapter 11 estates of Grace on January 30 and 31, 2006;

"**Fee Order**" shall have the meaning ascribed to it in paragraph 14;

"**Grace Canada**" means Grace Canada, Inc.

"**Grace Funding Conditions**" has the meaning ascribed to it in paragraph 16;

"**Grace Funds**" has the meaning ascribed to it in paragraph 9;

"**Grace Parties**" means Grace, Sealed Air (Canada) Co./CIE, Sealed Air Corporation, Cryovac, Inc. and Grace Canada and each of their parent corporations, subsidiary corporations, joint ventures, affiliates, sister corporations, and any and all of their past, present, and future agents, servants, officers, directors, employees, predecessors, successors, assigns, heirs, executors, administrators, legal representatives, beneficiaries and insurers;

"**Grace**" means W. R. Grace & Co. and its 61 U.S. subsidiaries filed under the Chapter 11 cases;

"**Information Orders**" means one or more orders of the CCAA Court, the U.S. Court or another court of competent jurisdiction enabling or directing the Crown to disclose the Information;

- 19 -

"**Information**" means:

(a)    the addresses from the EnerGuide Program or EnerGuide for Houses Retrofit Incentive Program database whose dwellings are listed as containing vermiculite attic insulation;

(b)    the addresses of the fourteen (14) parties who have been identified as participants in the Canadian Home Insulation Program that indicated that ZAI was installed in their dwelling; and

(c)    the names and addresses of Band Officials which are used as points of contact for providing notice of Canada's First Nations peoples; and

(d)    other relevant information about the location of ZAI in homes in Canada.

"**Modified Preliminary Injunction**" means the Order granted to Grace on January 22, 2002, that provided injunctive relief to affiliated entities;

"**Parties**" means CCAA Representative Counsel, Grace and Grace Canada;

"**Plan**" means Grace's plan of reorganization under Chapter 11 of the Bankruptcy Code to be prepared and filed in Grace's Chapter 11 cases;

"**Qualified Expert**" has the meaning ascribed to it in paragraph 20(d);

"**Releases**" has the meaning ascribed to it in paragraph 13(b)(iii)

"**Settlement**" means the terms of settlement set out in the Minutes;

"**Timely CDN ZAI PD Claims**" has the meaning ascribed to it in paragraph 23;

"**U.S. Confirmation Order**" has the meaning ascribed to in paragraph 16(e);

"**U.S. Court**" means the United States Bankruptcy Court for the District of Delaware;

"**ZAI**" means Zonolite Attic Insulation, which is loose-fill, non-roll vermiculite home attic insulation, which may contain naturally occurring asbestos manufactured and sold by the Grace Parties and installed in homes and buildings that are located in Canada.

## APPENDIX B

### LIST OF ACTIONS IN CANADA

1.  Association des Consommateurs pour la Qualité dans la Construction,

    Viviane BROSSEAU & Léontine ROBERGE-TURGEON v. Attorney General of Canada; Superior Court of Québec; court no. 500-06-000286-050

2.  NORDICK, Merv et al v. Attorney General of Canada, W.R. Grace & Co. et al.; Federal Court of Canada; court no. T-1503-05

3.  THUNDERSKY, Raven and BRUCE, Rebecca v. the Attorney General of Canada, W.R. Grace & Co. et al.; Manitoba Queen's Bench; court no. CI04-01-39818

4.  Association des Consommateurs pour la Qualité dans la Construction etJean-Charles DEXTRAS v. Grace Canada Inc. and Attorney General of Canada; Superior Court of Québec; court no. 500-06-000258-042

5.  NORDICK, Merv et al v. Attorney General of Canada, W.R. Grace & Co. et al.; Superior Court of Québec; court no. 550-06-000020-058

6.  NORDICK, Merv et al v. Attorney General of Canada, W.R. Grace & Co. et al.;Saskatchewan Queen's Bench; court no. 696-2005

7.  NORDICK, Merv et al v. Attorney General of Canada, W.R. Grace & Co et al.; Alberta Queen's Bench; court no. 0501-07100

8.  NORDICK, Merv et al v. Attorney General of Canada, W.R. Grace & Co et al.; B.C. Queen's Bench; court no. L-052352

9.  SPENCER, Ernest et al. v. Attorney General of Canada, W.R. Grace & Co et al.; Ontario Superior Court of Justice; court no. 5-CV-32367

10. SPENCER, Ernest et al. v. Attorney General of Canada, W.R. Grace & Co et al.; Manitoba Queen's Bench; court no. C1-05-01-44628

11. Her Majesty in Right of the Province of Manitoba v. Attorney General of Canada, W.R. Grace & Co et al.; Manitoba Queen's Bench; court no. C1-05-01-41069

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO.,** *et al.*[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| **Debtors.** | ) | |
| | ) | |
| | ) | |
| | ) | |

**EXHIBIT 10 TO EXHIBIT BOOK**
**COOPERATION AGREEMENT**

**EXHIBIT 10**

Attached.

---

[1]   The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife  Boston Ltd., Alewife Land Corporation, Amicon, Inc.,  CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

## W. R. GRACE ASBESTOS PERSONAL INJURY SETTLEMENT TRUST

**[insert date]**
**[To be executed and delivered on the Effective Date]**

W. R. Grace & Co.
Attn:  General Counsel
7500 Grace Drive
Columbia, Maryland  21044

      Re:     Cooperation Agreement Between the W. R. Grace Asbestos Personal Injury Trust (the "**Asbestos Trust**") and the Grace Reorganized Debtors

Dear Counsel:

Pursuant to the First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W. R. Grace & Co., *et al*., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders, as may be amended or modified (the "**Plan**"), this letter sets forth the agreement between the Asbestos Trust and the Reorganized Debtors regarding the Asbestos Trust's access to certain Documents (as defined herein) pertaining to Asbestos PI Claims and certain related facilities maintained by the Debtors during their Chapter 11 Cases and thereafter by the Reorganized Debtors as provided herein (the "**Cooperation Agreement**").[1]

1.     As used in this Cooperation Agreement, the term "**Document**" means any written record or electronically-stored information, including any writings, drawings, graphs, charts, photographs, sound recordings, images, and other data, data compilations, or databases.

2.     Under the procedures set forth in this Cooperation Agreement, the Reorganized Debtors shall provide, or cause to be provided, to the Asbestos Trust all Documents described below that are within the possession, custody, or control of the Reorganized Debtors, including responsive Documents held on their behalf by any of the Reorganized Debtors' Affiliates or Representatives.  The Reorganized Debtors acknowledge and represent that they have succeeded to possession, custody, or control of the responsive Documents that the Debtors maintained during their Chapter 11 Cases, and those that were held on the Debtors' behalf by their Representatives during the Chapter 11 Cases.

3.     The Asbestos Trust shall be entitled to the following Documents under the procedures set forth in this Cooperation Agreement:

---

[1]     All capitalized terms not otherwise defined herein have the meanings defined in the Plan.  As used in this Cooperation Agreement, the term "**Debtors**" refers to the debtors and debtors-in-possession in the jointly-administered bankruptcy cases styled In re W. R. Grace & Co., *et al.,* Case No. 01-1139 (JKF) (Bankr. D. Del.), together with all of their predecessors-in-interest.  As defined in more detail in the Plan, "**Asbestos PI Claims**" refers to certain claims against the Debtors.

(a)     In the course of defending Grace in pre-petition asbestos personal injury and property damage lawsuits, Grace collected all known Documents responsive to discovery requests in those lawsuits in a document archive in Boston, Massachusetts.  Non-privileged Documents in that archive have been made available to counsel for the Official Committee of Asbestos Personal Injury Claimants and the Asbestos PI Future Claimants' Representative in the estimation proceedings in the Chapter 11 Cases.  The Reorganized Debtors agree to continue to maintain those non-privileged Documents in the Boston archive and to make them available for review and copying by the Asbestos Trust;

(b)     Grace also created during the course of defending pre-petition asbestos personal injury and property damage lawsuits a coded "Searchlink" database of documents relating to Grace's manufacture and sale of asbestos-containing products (including product invoices and other sales records) produced in those lawsuits.  The Reorganized Debtors will provide to the Asbestos Trust (i) a copy of that database and (ii) user names, passwords and instructions to enable the Asbestos Trust to utilize the associated software search mechanism;

(c)     In the course of defending and settling pre-petition asbestos personal injury claims, Grace maintained a collection of personal injury claims files at its Boca Raton, Florida office, and at off-site storage facilities in Florida.  Those personal injury claim files typically included the complaint or other form of written claim, and for settled claims, the claims files included exposure affidavits and/or other documentation of the alleged exposure to Grace's asbestos containing products and medical records of the alleged injury resulting from that exposure, and evidence of the disposition of the claim.  Grace also maintained a Claims Management System ("CMS") computer database of those personal injury claims, and issued Monthly Asbestos Litigation Summaries ("MALS").  The Reorganized Debtors agree to maintain these Boca Raton personal injury claims files, the CMS database of personal injury claims and the MALS and to make them available to the Asbestos Trust for inspection and on-site copying;

(d)     In order to assist the Asbestos Trust with its insurance recovery efforts, Grace either has provided or the Reorganized Debtors agree to provide to the Asbestos Trust the following compilations to the extent that they already exist and are readily available and the following Documents to the extent they exist and are within the Reorganized Debtors' possession, custody, or control:

(i)            Contact information for the insurance companies with whom Grace has corresponded over the years

2

to the extent Grace already has this information assembled;

(ii)        Correspondence files with the insurance companies, brokers, or other entities regarding insurance coverage for asbestos liabilities, including all Documents relating to settlement of insurance coverage claims for asbestos liabilities;

(iii)       Information with respect to past expenses maintained in the CMS system that were used to separate indemnity costs from defense costs;

(iv)        Grace has already provided documents describing Grace's allocation program and coverage-in-place agreement policy registers for all settled carriers;

(v)         All computer programs relating to Grace's asbestos insurance allocation models;

(vi)        Support for the "Impairment of Limits" spreadsheet and the "Policy Register Estimated Erosion Amounts By Insurer Coverage In Place Agreements" worksheet and all other data relating to the exhaustion or impairment of the limits of Grace's liability insurance policies;

(vii)       Correspondence reflecting notice of asbestos claims and demands for payment of asbestos claims, specifically including:  Grace's notification to its insurers of its filing for Chapter 11;

(viii)      Grace will provide written authorization for the Asbestos Trust to obtain access to (a) any Grace insurance files maintained by its former broker Marsh and (b) the insurance files and insurance related memos and pleadings maintained or stored by Grace's previous insurance recovery counsel;

(ix)        An Excel spreadsheet showing the asbestos insurance receipts and a copy of the programming source code for the administration of the coverage-in-place agreements; and

(x)         Grace has already provided copies of all liability insurance policies issued pre-petition to the Debtors.

3

(e)     The Reorganized Debtors shall provide to the Asbestos Trust copies of all Documents pertaining to any supersedeas bonds or similar assurances of payment posted and outstanding as of the commencement of the Chapter 11 Cases with respect to any judgment entered against any of the Debtors on an Asbestos PI Claim;

(f)     The Reorganized Debtors shall provide to the Asbestos Trust copies of all databases of ballots submitted in the Chapter 11 Cases for Class 6 Claims, including imaged copies of all such ballots and all databases and compilations created for the Bankruptcy Court regarding voting; and

(g)     The Reorganized Debtors shall provide to the Asbestos Trust copies of all Documents previously produced by Grace in connection with the asbestos personal injury estimation during the Chapter 11 Cases.

4.      The Asbestos Trust shall also be entitled to access to the facilities referred to in Paragraph 3 above relating to the above-described Documents, under the procedures set forth in this Cooperation Agreement.  More specifically, the Reorganized Debtors shall provide the Asbestos Trust with:

(a) access at reasonable times to all physical repositories ("**Repositories**") of the Documents identified in Paragraph 3 herein for the purpose of inspecting or copying such Documents;

(b) copies of any electronic and paper indexes of the above-described Documents maintained in such Repositories; and

(c) permission to copy, or cause the copying of, any and all Documents located or stored in such Repositories, including permission to remove any and all Documents from such Repositories for the purpose of copying or causing the copying of any and all such Documents.

5.      Within thirty (30) calendar days after receipt of a written request, the Reorganized Debtors shall provide the Asbestos Trust with (a) copies of any Documents described in Paragraph 3 above, and (b) access to any Repository described in Paragraph 4 above.  When providing such Documents or access, the Reorganized Debtors shall also provide the Asbestos Trust with any available electronic and paper index that identifies or describes the contents of any disc, database, or box of Documents provided, and all digital collections of such Documents. To the extent any Documents in digital form are stored in a format with full text or other searchable capabilities, the Reorganized Debtors shall provide any and all search engines, software and programs to fully enable all potential search functions.  Any responsive Document that consists of a database or data compilation in electronic or digital form shall be produced in computer-readable format and shall include descriptions of data tables and fields used in the database or compilation.

6.      Beyond the Documents to be provided or made available to the Asbestos Trust by the Reorganized Debtors hereunder, the Reorganized Debtors will cooperate with the Asbestos

4

Trust in the Asbestos Trust's insurance coverage recovery and actions. The Reorganized Debtors will provide reasonable access to the Reorganized Debtors' personnel for interviews, depositions and trials if necessary. The Reorganized Debtors will authorize and encourage the cooperation of the Reorganized Debtors' defense counsel and consultants to provide their insurance related documents to the Asbestos Trust and to make themselves reasonably available for interviews, depositions and trials in insurance coverage recovery proceedings if necessary, compensation for which will have to be agreed upon by the Asbestos Trust and the respective defense counsel and consultants.

7.      Within thirty (30) calendar days after the execution of this Cooperation Agreement, the Reorganized Debtors shall identify to the Asbestos Trust in writing its present and former agents or Representatives who likely have significant knowledge about the Documents or subject matters described in Paragraph 3 above (the "**Designated Representatives**"). Upon request by the Asbestos Trust, the Reorganized Debtors shall use commercially reasonable efforts to make the Designated Representatives available to the Asbestos Trust, including, without limitation, (a) those Designated Representatives whose knowledge and familiarity with the Documents might enable the Asbestos Trust to utilize the Documents more effectively and/or more efficiently and (b) those Designated Representatives whose information may be necessary to authenticate or prove the chain of custody for admissibility purposes in court or other proceedings. To the extent that the Reorganized Debtors have the ability to direct any Designated Representative or other agent or officer to cooperate with the Asbestos Trust, the Reorganized Debtors agree to do so. The Asbestos Trust shall reimburse the Reorganized Debtors for all lost time and reasonable expenses incurred in making such persons available, including but not limited to reimbursement for the Designated Representatives' fees or pro rata salary. Compensation for lost time shall be at rates mutually agreed upon by the Asbestos Trust and the Reorganized Debtors. The Reorganized Debtors shall not take any action intended to dissuade any person from cooperating with the Asbestos Trust. The Reorganized Debtors do not object to the Asbestos Trust contacting its former officers and employees and/or third parties, and the Reorganized Debtors agree to provide any available contact information for such persons as may be requested by the Asbestos Trust.

8.      If at any time a Reorganized Debtor decides to terminate the employment or retention of a Designated Representative, the Reorganized Debtor shall provide the Asbestos Trust with at least fourteen (14) days' advance notice of such termination, in which event, at the sole option and request of the Asbestos Trust, the Reorganized Debtors and the Asbestos Trust shall confer in good faith to negotiate, if possible, an arrangement whereby a Reorganized Debtor will continue the employment or retention of the Designated Representative at the expense of the Asbestos Trust; *provided, however*, that nothing in this Cooperation Agreement shall preclude or bar the Asbestos Trust from separately retaining the services of a Designated Representative as a consultant or advisor to the Asbestos Trust after the Designated Representative's employment or retention with any of the Reorganized Debtors has been terminated or otherwise concluded.

9.      In responding to the Asbestos Trust's requests pursuant to Paragraphs 1 through 8 above, the Reorganized Debtors shall provide the Asbestos Trust with a written certification that they have used their reasonable efforts to comply with those requests, or, if unable to so comply,

shall provide a written explanation of reasons.  Except as expressly provided in this Cooperation Agreement, nothing herein shall be interpreted as requiring the Reorganized Debtors to create any new Documents or to update or revise any of the information described herein.

10.     The Asbestos Trust shall reimburse the Reorganized Debtors for all reasonable costs and expenses that any of the Reorganized Debtors incur on or after the date of execution of this Agreement in complying with the Asbestos Trust's requests for access to Documents or Repositories under this Cooperation Agreement, including the out-of-pocket expenses of making copies of any Documents at the Asbestos Trust's request; *provided, however,* that the Reorganized Debtors shall maintain the Documents and the Repositories at their own expense for the duration of this Cooperation Agreement, subject to the provisions of Paragraph 16 hereof regarding the right of the Reorganized Debtors to provide the Asbestos Trust with one hundred eighty (180) days' advance written notice with respect to Documents and/or Repositories that the Reorganized Debtors wish to dispose of or destroy and the right of the Asbestos Trust to then take possession of such Documents and/or Repositories at its own expense.

11.     The Asbestos Trust shall use the Documents and information provided under this Cooperation Agreement only for purposes of (a) its processing, resolution, and defense of Asbestos PI Claims channeled to the Asbestos Trust under the Plan; (b) its pursuit of the Asbestos Trust Causes of Action; (c) its pursuit of the Asbestos Insurance Rights; and (d) settlement discussions with any Asbestos Insurance Entity; *provided, however,* that the Asbestos Trust may share the Documents and information with the holders of the Asbestos PI Claims. Notwithstanding any other provision of this Agreement, under no circumstances shall documents provided pursuant to this Agreement be used by the Asbestos Trust as a basis for or in support of any claim against the Reorganized Debtors, the Sealed Air Indemnified Parties, or the Fresenius Indemnified Parties.  Subject to the non-waiver provisions of paragraph 13 below, the preceding sentence shall not preclude the Asbestos Trust, in any future litigation against the Reorganized Debtors, from seeking discovery of any document or information provided pursuant to this Agreement.

12.     Neither the Reorganized Debtors nor any of their Representatives shall have any liability to the Asbestos Trust or its Representatives arising out of or relating to the use of the Documents or any errors or omissions resulting therefrom; *provided, however*, that such exculpation shall not pertain to any breach by any of the Reorganized Debtors of the duties created by this Cooperation Agreement or any of the Plan Documents.

13.     By entering into this Cooperation Agreement, and providing the Asbestos Trust with access to or copies of the Documents, the Reorganized Debtors are not waiving any attorney-client privilege pertaining to the Documents; *provided, however*, that the retention of such privilege shall neither inhibit nor prevent the Reorganized Debtors from fulfilling their obligations hereunder.  Nevertheless, to enable the Asbestos Trust to fulfill the purposes outlined in Paragraph 11 above, the Reorganized Debtors hereby waive any work product immunity or privilege that might attach to any of the Documents or information described in Paragraph 3 above, including, without limitation, Documents containing attorney mental impressions or trial preparation materials.  Notwithstanding any other provision of this paragraph or this Agreement,

6

nothing in this Agreement shall waive any attorney-client privilege or work product immunity for documents related to asbestos property damage claims or lawsuits.

14.     This Cooperation Agreement is the entire agreement between the Asbestos Trust and the Reorganized Debtors with respect to the subject matter hereof, and supersedes all prior representations and agreements between the parties as to such subject matter.  Any modification, waiver, or amendment of any provision of this Cooperation Agreement must be in writing and signed on behalf of the Asbestos Trust and the Reorganized Debtors, and no waiver of any term or breach of this Cooperation Agreement shall be deemed a waiver of such term for the future or any subsequent or other breach hereof.  No failure or delay by any party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof, or the exercise of any other right, power, or privilege hereunder.  This Cooperation Agreement, and the terms hereof, shall be binding upon each of the Reorganized Debtors, the Asbestos Trust, and each of their respective successors and assigns.  Should there be any litigation with respect to the Asbestos Trust's access to Documents or information under this Cooperation Agreement in which the Asbestos Trust prevails, the Reorganized Debtors (or each of their successors or assigns, as the case may be) shall reimburse the Asbestos Trust for its reasonable attorneys' fees and costs.

15.     This Cooperation Agreement shall be construed in accordance with the laws of the State of Delaware, without regard to any conflict of law principles.

16.     This Cooperation Agreement shall expire on December 31, 2020, unless renewed in writing at least one hundred and twenty (120) days prior thereto by mutual consent of the parties; *provided, however*, that the Reorganized Debtors, their successors, and assigns shall remain obligated to provide the Asbestos Trust with access to the Documents and Repositories for as long as such entities remain in possession or control thereof; and *provided, further*, until the expiration date of this Cooperation Agreement, the Reorganized Debtors, their successors, and assigns shall not dispose of or destroy the Documents or Repositories without providing at least one hundred and eighty (180) days' advance written notice to the Asbestos Trust, within which one hundred and eighty (180) day period the Asbestos Trust shall be entitled to take possession of the Documents at its own expense.

17.     The following rules of construction shall apply to this Cooperation Agreement:

(a)  the words "include," "including," and any variation thereof are not limiting;

(b)  the word "or" is not exclusive;

(c)  the word "and" includes "or"; and

(d)  the plural includes the singular, and vice-versa.

18.     Notices hereunder shall be sent for overnight delivery either by courier or certified mail, return receipt requested, addressed to:

7

(a) If to the Asbestos Trust:

**[insert name and address]**

with copies to the following Representatives:

**[insert name and address]**

(b) If to the Reorganized Debtors:

**[insert name and address]**

with copies to the following Representatives:

**[insert name and address]**

Please acknowledge your agreement to the terms of this Cooperation Agreement by signing in the space provided below, and returning one copy of the signed Cooperation Agreement to the Asbestos Trust, whereupon this Cooperation Agreement shall become a binding agreement between the Asbestos Trust and the Reorganized Debtors.

Very truly yours,

_____
Trustee

_____
Trustee

_____
Trustee

**AGREED AND ACCEPTED:**
this ___ day of _____, 20__, by:

**THE REORGANIZED DEBTORS**
W. R. GRACE & CO., on behalf of itself and its subsidiaries
and affiliates that are Reorganized Debtors under the Plan

By: _____
Name:
Title:

8

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO., *et al.*[1]** | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| **Debtors.** | ) | |
| | ) | |
| | ) | |
| | ) | |

# EXHIBIT 11 TO EXHIBIT BOOK
## ASBESTOS PI DEFERRED PAYMENT AGREEMENT

### EXHIBIT 11

Attached.

---

[1]   The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife  Boston Ltd., Alewife Land Corporation, Amicon, Inc.,  CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

**FORM OF DEFERRED PAYMENT AGREEMENT (PI)**

THIS DEFERRED PAYMENT AGREEMENT (PI) (this "Deferred Payment Agreement (PI)") is made and entered into as of [__], 2009 by and between W. R. Grace & Co.-Conn., a Connecticut corporation (together with any successor thereto pursuant to the terms and conditions of Section 16, "Grace"), and the WRG Asbestos PI Trust (the "Trust (PI)"), a Delaware statutory trust established pursuant to §524(g) of the Bankruptcy Code in accordance with the Plan of Reorganization (as hereinafter defined). Unless otherwise defined herein or the context otherwise requires, all capitalized terms used herein and defined in the Plan of Reorganization shall be used herein as therein defined.

NOW, THEREFORE, in consideration of the premises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.   **Definitions; Rules of Interpretation**.

(a) The following terms are defined as follows:[1]

"Administrative Agent" has the meaning set forth in Section 16(d)(3).

"Authorized Officer" means, with respect to any Entity, the chief executive officer, president, chief financial officer, controller, executive vice president or senior vice president of such Entity.

"Bona Fide Compensation Transaction" means any payment, grant or award, whether in cash, securities, options or other consideration, including without limitation salary or bonus, to or for the benefit of any director, officer or employee of any Transferor or any of its Affiliates made for legitimate, bona fide compensation and/or incentivization purposes; provided that compensation paid, granted or awarded to any one such individual in any Fiscal Year of Transferor whose aggregate value at the time or times of payment, grant or award is in excess of $15,000,000 shall be a Bona Fide Compensation Transaction only (i) if the relevant Transferor is then obligated to file or furnish, or is otherwise filing or furnishing, reports with the United States Securities and Exchange Commission pursuant to Section 13 or 15 of the Securities Exchange Act of 1934, it is approved by an independent committee of the Board of Directors of the Transferor (or other similar management body of the Transferor) or (ii) if the relevant Transferor is not then obligated to file or furnish, or is not otherwise filing or furnishing, reports with the United States Securities and Exchange Commission pursuant to Section 13 or 15 of the Securities Exchange Act of 1934, a reputable independent compensation expert or consultant selected by the Transferor with the consent of the Permitted Holder (which consent shall not be unreasonably withheld, conditioned or delayed) shall have determined, in its reasonable, good faith judgment, that such payment, grant or award is reasonable and appropriate. For purposes of the proviso in the previous sentence, (A) no payment or other value received in a given year

---

[1]   To the extent that any of these definitions are contained in the Plan of Reorganization, they will be deleted here.

pursuant to the terms of a grant or award in a previous year shall be taken into account for calculating the compensation in such given year; and (B) in the event of multiple payments, grants or awards in a given Fiscal Year, the independent committee approval, or independent compensation expert or consultant determination, as appropriate, shall be made with respect to each payment, grant or award beginning with the payment, grant or award that causes the compensation to be in excess of $15,000,000.

"Business Day" means any day other than a Saturday, Sunday, or any other day on which banks are authorized or required to close in New York, New York or Columbia, Maryland.

"Capital Stock" means, with respect to any Entity, any share of stock, or any depositary receipt or other certificate representing any share of stock, or any similar equity ownership interest, and any warrant, option, or any other security providing for the right to acquire any such share of stock or similar equity ownership interest.

"Claims" has the meaning set forth in Section 17(b).

"Collateral Agent" has the meaning set forth in Section 16(d)(3).

"Common Stock" has the meaning set forth in the Share Issuance Agreement.

"Compliance Certificate" means a certificate in the form of Exhibit C.

"Control" means, as to any Entity, the power to direct the management and policies of such Entity directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "Controlling" and "Controlled" have meanings correlative to the foregoing.

"Controlled Affiliate" means, as to any Entity (the "Controlling Entity"), any Affiliate that is Controlled by such Controlling Entity.

"Courts" has the meaning set forth in Section 17(b).

"Default Rate" means a floating rate equal to the Prime Rate plus 2.00% per annum.

"Deferred Payments" means, collectively, the Deferred Payments (PI), the Deferred Payments (PD) and the Deferred Payments (ZAI).

"Deferred Payment Agreement (PD)" means the Deferred Payment Agreement (Class 7(a) PD) dated as of even date herewith between Grace and the Trust (PD) (as defined in the Deferred Payment Agreement (PD)).

"Deferred Payment Agreement (PI)" has the meaning set forth in the introductory paragraph hereof.

2

"<u>Deferred Payment Agreement (ZAI)</u>" means the Deferred Payment Agreement (Class 7(b) ZAI) dated as of even date herewith between Grace and the Trust (ZAI) (as defined in the Deferred Payment Agreement (ZAI)).

"<u>Deferred Payment Date (PI)</u>" means, in respect of a Deferred Payment (PI), each corresponding date set forth in <u>Section 2(a)</u>.

"<u>Deferred Payment Documents</u>" means the Deferred Payment Documents (PI), the Deferred Payment Documents (PD) (as defined in the Deferred Payment Agreement (PD)) and the Deferred Payment Documents (ZAI) (as defined in the Deferred Payment Agreement (ZAI)).

"<u>Deferred Payment Documents (PI)</u>" means this Deferred Payment Agreement (PI), the Parent Guarantee (PI) and the Share Issuance Agreement.

"<u>Deferred Payment (PD)</u>" has the meaning set forth in the Deferred Payment Agreement (PD).

"<u>Deferred Payment (PI)</u>" means each payment to be made on a Deferred Payment Date (PI) as set forth in <u>Section 2</u>.

"<u>Deferred Payment (ZAI)</u>" has the meaning set forth in the Deferred Payment Agreement (ZAI).

"<u>Demand for Issuance of the Section 524(g) Shares</u>" has the meaning set forth in the Share Issuance Agreement.

"<u>Designated Senior Indebtedness</u>" means Senior Indebtedness issued, pursuant to a facility with an aggregate principal amount, commitments and/or other financial accommodations then outstanding and/or available (disregarding for purposes of this definition whether any conditions for draws thereunder have been satisfied), as of the relevant date of determination, of at least $25,000,000.

"<u>Disposition Transaction</u>" has the meaning set forth in <u>Section 6(b)</u>.

"<u>Disqualified Equity Interest</u>" means that portion of any Equity Interest which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the sole option of the holder thereof on or prior to the final Deferred Payment Date (PI).

"<u>Dollars</u>" and "<u>$</u>" means the legal currency of the United States of America.

"<u>EBITDA</u>" means, for any Entity for any period, such Entity's and its Subsidiaries' consolidated net income (determined in accordance with GAAP) for such period plus, without duplication, in respect of any such item of such Entity and/or any of its Subsidiaries (i) to the extent deducted in determining such consolidated net income, the sum, without duplication, of (a) interest expense, (b) provisions for any income or similar taxes paid or

3

accrued, (c) all amounts treated as expenses for depreciation and amortization of any kind, (d) cash and non-cash restructuring and reorganization, and other similar fees, costs, charges and expenses, including without limitation, as a result of, or in connection with, the Chapter 11 Cases and the Deferred Payment Documents, (e) items classified as extraordinary under Accounting Principles Board Opinion No. 30 (as amended, restated, supplemented, replaced or otherwise modified from time to time) incurred during such period, and (f) any non-cash charges minus (ii) to the extent included in determining such consolidated net income, the sum, without duplication, of (a) gross interest income received during such period and (b) items classified as extraordinary under Accounting Principles Board Opinion No. 30 (as amended, restated, supplemented, replaced or otherwise modified from time to time) realized during such period, all, in the cases of clauses (i) and (ii) above, as determined on a consolidated basis in accordance with GAAP.

"Equity Interest" means shares of capital stock or equity, equity securities or ownership interests in any Entity or any rights (including any (x) options, warrants or other rights to purchase or acquire any such stock, equity or interests (whether or not at the time exercisable), or (y) securities by their terms convertible into or exchangeable for any such stock, equity or interests (whether or not at the time so convertible or exchangeable) or options, warrants or rights to purchase such convertible or exchangeable securities.

"Event of Default" has the meaning set forth in Section 8.

"Fair Market Value" means, with respect to each share of the Common Stock:

(i)     If traded on the NYSE, NASDAQ or another stock exchange, the last reported sale price of the Common Stock on the NYSE, NASDAQ or such other exchange on the trading day immediately prior to the date on which the Section 524(g) Shares are issued;

(ii)    If traded over-the-counter other than on NASDAQ, the average of the closing bid and ask prices of the Common Stock on the trading day immediately prior to the date on which the Section 524(g) Shares are issued; and

(iii)   If there is no public market for the Common Stock, the fair market value of the Common Stock as of the day immediately prior to the date on which the Section 524(g) Shares are issued, as determined by a reputable investment bank or valuation firm selected jointly by Grace and the Trusts' Representative (the "Independent Appraiser").  Grace and the Trusts' Representative shall instruct the Independent Appraiser to render its decision within thirty days of its acceptance of its selection. The fees and expenses of the Independent Appraiser shall be borne by Grace.  Unless otherwise agreed to by Grace and the Trusts' Representative, no investment bank or valuation firm, nor any of its Affiliates or Subsidiaries, shall perform a valuation pursuant to this clause (iii) if such bank or firm has rendered services to Grace, the Parent Guarantor or any of their Affiliates or Subsidiaries within the last three years prior to performing such valuation or has or is reasonably likely to have an agreement with Grace, the Parent Guarantor or any of its Affiliates to render such services within the following year.

"Fiscal Quarter" means, in respect of any Entity, a fiscal quarter of such Entity as determined by it.

4

"Fiscal Year" means, in respect of any Entity, a fiscal year of such Entity as determined by it.

"GAAP" means generally accepted accounting principles in effect from time to time in the United States, applied on a consistent basis; provided, however, that as of such time, if any, when any Entity begins to provide financial information generally on the basis of IFRS, then any reference to GAAP with respect to such Entity shall be given effect as a reference to IFRS.

"Governing Documents" means, as to any Entity, its articles or certificate of incorporation and by-laws, its partnership agreement, its certificate of formation and operating agreement and/or the organizational or governing documents of such Entity.

"Governmental Authority" means the government of the United States of America or any other country, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, government (including any supra-national bodies such as the European Union or the European Central Bank).

"Grace" has the meaning set forth in the introductory paragraph hereof.

"IFRS" means the International Financial Reporting Standards as adopted by the International Accounting Standards Board and in effect from time to time, consistently applied.

"Insolvent" means the financial condition of the Parent Guarantor, its Subsidiaries and Grace taken as a whole such that as of the date specified, the sum of their liabilities is greater than a fair valuation of all of their property and other assets.

"Intercreditor Agreement" means the Intercreditor Agreement, dated as of the date hereof, among the Trusts' Representative, the Trust (PI) and the Trust (PD).

"Laws" means, collectively, all applicable international, foreign, Federal, state and local statutes, treaties, rules, regulations, ordinances and codes, including the binding interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof.

"NASDAQ" shall mean The NASDAQ Stock Market (including any of its subdivisions such as the NASDAQ Global Select Market) or any successor market thereto.

"NYSE" shall mean The New York Stock Exchange or any successor stock exchange thereto.

"NY UCC" means the Uniform Commercial Code, as enacted and in effect in the State of New York from time to time.

"Ordinary Dividends" means, in respect of any Entity, ordinary cash dividends declared and paid out of surplus and/or net profits (as determined in accordance with applicable

5

law) in accordance with the dividend policy of such Entity as in effect from time to time; provided, however, that notwithstanding the foregoing, the excess, if any, of (a) the aggregate amount of dividends declared and paid by such Entity in any Fiscal Year over (b) 50% of such Entity's and its Subsidiaries' consolidated net income (determined in accordance with GAAP) for the immediately preceding Fiscal Year shall not constitute "Ordinary Dividends" to the extent of such excess.

"Parent Guarantee (PI)" means the W. R. Grace & Co. Guarantee Agreement (PI) dated as of even date herewith by the Parent Guarantor in favor of the Trust (PI).

"Parent Guarantor" means W. R. Grace & Co., a Delaware corporation, and any successor guarantor of the obligations of Grace (or a successor Entity) arising under this Deferred Payment Agreement (PI) pursuant to the terms and conditions of the Parent Guarantee (PI).

"Payment Blockage Notice" has the meaning set forth in Section 7(a)(ii).

"Payment Blockage Period" has the meaning set forth in Section 7(a)(ii).

"Permitted Holder" means, as of any date of determination, collectively, (a)(i) if the Trust (PI) has not, as of such date, assigned any of its rights or privileges under this Deferred Payment Agreement (PI) (other than granting a security interest in its rights and privileges under this Deferred Payment Agreement (PI)), the Trust (PI) and (ii) otherwise, the Administrative Agent and (b) the Collateral Agent.

"Permitted Payee" means, as of any date of determination, the Permitted Holder or any permitted assignee of all or any portion of the Deferred Payments (PI) and the rights and interests therein and thereto pursuant to the terms and conditions of Section 16.

"Permitted Payor" means any Entity (other than Grace but including the Parent Guarantor) acting on behalf of, or designated by Grace.

"Plan of Reorganization" means that certain First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W. R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Future Claimants' Representative, and the Official Committee of Equity Security Holders Dated as of February 27, 2009, as filed by Grace and certain of its affiliates in their reorganization cases under chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court for the District of Delaware, and as confirmed by order of that court dated as of [__], 2009, together with the exhibits and schedules thereto, each as amended, supplemented or otherwise modified from time to time in accordance with its terms.

"Post-Transaction Certificate" means a certificate in the form of Exhibit D.

"Post-Transaction Pro Forma Cash Balance" means with respect to any Entity as of any date of determination, the aggregate amount of such Entity's and its consolidated Subsidiaries' cash and cash equivalents as of such date (after giving effect to and assuming the consummation of any Significant Transaction with a Transaction Date occurring on or prior to

6

such date, notwithstanding that such Significant Transaction may not have actually been consummated as of such date), other than cash and cash equivalents the disposition of which is subject to a material restriction for the benefit of Entities other than such Entity and its consolidated Subsidiaries.

"Post-Transaction Pro Forma EBITDA" means, with respect to any Entity for any four-Fiscal Quarter period and any specified Disposition Transaction, such Entity's Pro Forma EBITDA for such four-Fiscal Quarter period, computed assuming that such Disposition Transaction, and any other Significant Transaction the Transaction Date of which occurs on or prior to the Transaction Date of such Disposition Transaction and during the same Fiscal Quarter as the Transaction Date of such Disposition Transaction, were consummated on the same terms in effect on the respective Transaction Dates at the beginning of the four-Fiscal Quarter period most recently ended prior to the Transaction Date of such Disposition Transaction, and shall include adjustments which give effect to events that are (i) directly attributable to such Disposition Transaction and any such Significant Transactions, (ii) expected to have a continuing impact on the Entity, and (iii) factually supportable.

"Post-Transaction Pro Forma Senior Indebtedness" means with respect to any Entity as of any date of determination, the aggregate outstanding principal amount of such Entity's and its consolidated Subsidiaries' Senior Indebtedness as of such date (after giving effect to and assuming the consummation of any Significant Transaction (and any related incurrence, reduction or repayment of Senior Indebtedness) with a Transaction Date occurring on or prior to such date, notwithstanding that such Significant Transaction (and any related incurrence, reduction or repayment of Senior Indebtedness) may not have actually been consummated as of such date).

"Post-Transaction Pro Forma Valuation" means, with respect to any Entity as of any date of determination, the amount resulting from (a) the product of (i) such Entity's Post-Transaction Pro Forma EBITDA for the four-Fiscal Quarter period most recently ended, multiplied by (ii) seven (7), minus (b) such Entity's Post-Transaction Pro Forma Senior Indebtedness as of such date, plus (c) such Entity's Post-Transaction Pro Forma Cash Balance as of such date.

"Prime Rate" means as of any date of determination, the *per annum* rate publicly announced on such date as the daily "U.S. prime rate" by The Wall Street Journal (National Edition) for transactions in Dollars. Any change in the Default Rate resulting from a change in the Prime Rate shall become effective on the Business Day on which each change in the Prime Rate is publicly announced by The Wall Street Journal (National Edition).

"Proceeding" means, with respect to any Entity, any voluntary or involuntary insolvency, bankruptcy, receivership, custodianship, liquidation, reorganization, assignment for the benefit of creditors, appointment of a custodian, receiver, trustee or other officer with similar powers or any other proceeding for the liquidation, or other winding up of such Entity or all or substantially all of the properties of such Entity.

"Pro Forma Cash Balance" means with respect to any Entity as of the last day of any four-Fiscal Quarter period, the aggregate amount of such Entity's and its consolidated

7

Subsidiaries' cash and cash equivalents as of such date (after giving effect to and assuming the consummation of any Significant Transaction with a Transaction Date occurring during such four-Fiscal Quarter period, notwithstanding that such Significant Transaction may not have actually been consummated during such four-Fiscal Quarter period), other than cash and cash equivalents the disposition of which is subject to a material restriction for the benefit of Entities other than such Entity and its consolidated Subsidiaries.

"Pro Forma EBITDA" means, with respect to any Entity for any four Fiscal-Quarter period, such Entity's EBITDA for such four Fiscal-Quarter period, computed assuming that any Significant Transaction the Transaction Date of which occurred during the relevant four-Fiscal Quarter period was consummated, on the terms in effect on such Transaction Date, at the beginning of such four-Fiscal Quarter period most recently ended prior to the Transaction Date of such Significant Transaction, and shall include adjustments which give effect to events that are (i) directly attributable to any Significant Transactions the Transaction Date of which occurs during such four-Fiscal Quarter period, (ii) expected to have a continuing impact on the Entity, and (iii) factually supportable.

"Pro Forma Senior Indebtedness" means with respect to any Entity as of the last day of any four-Fiscal Quarter period, the aggregate outstanding principal amount of such Entity's and its consolidated Subsidiaries' Senior Indebtedness as of such date (after giving effect to and assuming the consummation of any Significant Transaction (and any related incurrence, reduction or repayment of Senior Indebtedness) with a Transaction Date occurring during such four-Fiscal Quarter period, notwithstanding that such Significant Transaction (and any related incurrence, reduction or repayment of Senior Indebtedness) may not have actually been consummated during such four-Fiscal Quarter period).

"Pro Forma Valuation" means, with respect to any Entity as of the last day of any four-Fiscal Quarter period, the amount resulting from (a) the product of (i) such Entity's Pro Forma EBITDA for such four-Fiscal Quarter period, multiplied by (ii) seven (7), minus (b) such Entity's Pro Forma Senior Indebtedness as of such date, plus (c) such Entity's Pro Forma Cash Balance as of such date.

"Quarterly EBITDA and Valuation Certificate" means a certificate in the form of Exhibit B.

"Regulation S-X" means Regulation S-X promulgated by the United States Securities and Exchange Commission as in effect on the date hereof.

"Related Party" means in respect of an Entity (the "Affected Entity"): (a) any senior key employee, officer or director of the Affected Entity or, in respect of an officer or director, any person holding a similar position in an Affected Entity that is not a corporation (any such person, an "Insider"); (b) any spouse, child, parent or sibling of an Insider; (c) another Entity which alone or together with other Entities under its Control directly or indirectly Controls or holds ten percent (10%) or more of the Equity Interests that (i) generally entitle the holders thereof to vote for the election of the board of directors or other governing body of the Affected Entity, or (ii) confer upon the holders thereof an interest in the capital or profits of the Affected Entity; (d) any Entity Controlled by the Affected Entity or by any Insider or in which the

8

Affected Entity or any Insider Controls or holds ten percent (10%) or more of the stock or other equity interests which (i) generally entitle the holders thereof to vote for the election of the board of directors or other governing body of the Affected Entity or (ii) confer upon the holders thereof an interest in the capital or profits of such Affected Entity; or (e) any Controlled Affiliate of any Entity that is a Related Person by virtue of clause (d) of this definition; provided, however, that any direct or indirect 100% owned Subsidiary of Grace shall not constitute a "Related Party" for purposes of this Deferred Payment Agreement (PI).

"Section 524(g) Shares" has the meaning set forth in the Share Issuance Agreement.

"Senior Indebtedness" means any and all present and/or future, direct and/or indirect, indebtedness, liabilities and other obligations of Grace and/or the Parent Guarantor owed to any Entity (whether as senior or subordinated indebtedness, as a first lien, second lien, any other position or priority, and any mezzanine, subordinated or other indebtedness), including any principal, interest and premiums, fees, investment points, reimbursement obligations, issuance discounts and/or other costs, indemnities, liabilities and/or expenses thereon or in connection therewith (including any interest accruing subsequent to the filing of a petition of bankruptcy at the rate provided for in the documentation with respect thereto, whether or not such interest is an allowed claim under applicable Law), in each case, under or with respect to (i) any credit or loan facilities (whether provided by one or more banks, insurance companies, financial institutions, private equity or hedge funds, lenders, and/or other Entities) and/or (ii) any debt, bonds, debentures, notes, repurchase, discount, securitization, factoring and/or other similar facilities providing for indebtedness, including any and all obligations of any nature in respect of loans, credit agreements, indentures, and bonds, together with obligations in respect of hedging arrangements (whether in respect of interest rates, currencies, commodities, equities, indebtedness and/or otherwise), in each case, entered into with banks, insurance companies, financial institutions, private equity or hedge funds, lenders and/or other Entities who are engaged in the business of providing financing (but not customers of or suppliers to Grace and/or the Parent Guarantor to the extent constituting trade payables), notes, letters of credit, and synthetic letters of credit in connection therewith, and/or (iii) any reimbursement, payment, indemnities, fees, guarantees or other obligations in connection with any credit or loan facilities or indebtedness, liabilities and other obligations referenced in clauses (i) or (ii);

except in each case, for indebtedness of Grace and/or the Parent Guarantor (A) that by its express terms is not Senior Indebtedness for purposes of this Deferred Payment Agreement (PI) and the Parent Guarantee (PI) and is to be treated as *pari passu* or junior and subordinated with respect thereto in accordance with its terms, (B) for the avoidance of doubt, consisting of obligations to trade creditors and other trade payables in connection with the purchase of goods, materials or services, (C) owed to, or guaranteed by Grace or the Parent Guarantor on behalf of, any director, officer or senior key employee of (1) Grace, (2) the Parent Guarantor or (3) any Subsidiary or Affiliate of Grace or the Parent Guarantor, (D) represented by Disqualified Equity Interests, (E) owed to (1) Grace, (2) the Parent Guarantor or (3) any Subsidiary or Affiliate of Grace or the Parent Guarantor and (F) resulting from the Deferred Payment Documents (PD) or the Deferred Payment Documents (ZAI).

"Senior Non-Payment Default" has the meaning set forth in Section 7(a)(ii).

9

"Senior Payment Default" has the meaning set forth in Section 7(a)(i).

"Senior Remedies" means, if an event of default has occurred and is continuing under the terms of any agreement or document relating to Senior Indebtedness, any of the following by the holder (or any agent or trustee of the holder) of any Senior Indebtedness: (1) exercising or seeking to exercise any rights or remedies against Grace or the Parent Guarantor with respect to such event of default or (2) instituting any action or proceeding with respect to such rights or remedies (including any action of foreclosure, contest or protest) under any agreement or document relating to Senior Indebtedness, or under such event of default or otherwise or (3) attempting to do any of the foregoing.

"Significant Transaction" means (a) any Disposition Transaction or (b) any transaction of the type described in Section 210.11-01(a)(1) or Section 210.11-01(a)(2) of Regulation S-X (disregarding, for purposes of clause (b) of this definition, whether the Entity entering into such transaction is at the time obligated to file or furnish, or is otherwise filing or furnishing, reports with the United States Securities and Exchange Commission pursuant to Section 13 or 15 of the Securities Exchange Act of 1934, as amended).

"Subsidiary" means, with respect to any Entity at any date, any corporation, limited or general partnership, limited liability company, trust, estate, association, joint venture or other business entity (i) the accounts of which would be consolidated with those of such Entity in such Entity's consolidated financial statements if such financial statements were prepared in accordance with GAAP or (ii) of which more than 50% of (A) the outstanding Capital Stock having (in the absence of contingencies) ordinary voting power to elect a majority of the board of directors or other managing body of such Entity, (B) in the case of a partnership or limited liability company, the interest in the capital or profits of such partnership or limited liability company or (C) in the case of a trust, estate, association, joint venture or other entity, the beneficial interest in such trust, estate, association or other entity business is, at the time of determination, owned or Controlled directly or indirectly through one or more intermediaries, by such Entity.

"Taxes" means any and all present or future taxes, levies, imposts, fees, assessments, levies, duties, deductions, charges, liabilities or withholdings (including interest, fines, penalties or additions to tax) imposed by any Governmental Authority.

"Threshold Amount" means, as of any date of determination, the sum of (a) $2,000,000,000 minus (b) the aggregate amount of Deferred Payments (PI) made by Grace and any Permitted Payor under this Deferred Payment Agreement (PI) on or prior to such date plus (c) the aggregate amount of Deferred Payments (PI) received by the Permitted Holder or any Permitted Payee under this Deferred Payment Agreement (PI) from Grace or any relevant Permitted Payor that have subsequently been invalidated, declared to be fraudulent or preferential, set aside and/or required or agreed to be repaid or returned by the Permitted Holder or such Permitted Payee under this Deferred Payment Agreement (PI) as of such date under any Law or in respect of any Proceeding or other litigation to which Grace, the relevant Permitted Payor, the Permitted Holder or any Permitted Payee is subject plus, without duplication, (d) the aggregate amount of Deferred Payments (PI) received by the Permitted Holder or any Permitted Payee that the relevant Permitted Holder or such Permitted Payee has delivered to the holders of

10

any Senior Indebtedness pursuant to <u>Section 7(c)</u> of this Deferred Payment Agreement (PI) as of such date.

"<u>Transaction Date</u>" means, with respect to any Significant Transaction, (a) the date, if any, on which final, definitive documentation providing for such Significant Transaction is executed; <u>provided</u>, <u>however</u>, that the "Transaction Date" shall no longer be deemed to have occurred with respect to any Significant Transaction if the final, definitive documentation providing for such Significant Transaction is terminated for any reason, or (b) if no such final, definitive documentation for such Significant Transaction is executed, the date on which such Significant Transaction is consummated.

"<u>Transfer</u>" has the meaning set forth in <u>Section 6(b)</u>.

"<u>Transferor</u>" has the meaning set forth in <u>Section 6(b)</u>.

"<u>Trust (PD)</u>" means the WRG Asbestos PD Trust, a Delaware statutory trust established pursuant to § 524(g) of the Bankruptcy Code in accordance with the Plan of Reorganization, on behalf of the Holders of Asbestos PD Claims.

"<u>Trust (PI)</u>" has the meaning set forth in the introductory paragraph hereof.

"<u>Trusts</u>" has the meaning set forth in the Share Issuance Agreement.

"<u>Trusts' Representative</u>" has the meaning set forth in the Share Issuance Agreement.

"<u>Valuation</u>" means, with respect to any Entity as of the last day of any four-Fiscal Quarter period, the amount resulting from (a) the product of (i) such Entity's EBITDA for such four-Fiscal Quarter period, <u>multiplied</u> <u>by</u> (ii) seven (7), <u>minus</u> (b) the aggregate outstanding principal amount of such Entity's and its consolidated Subsidiaries' Senior Indebtedness as of such date, <u>plus</u> (c) the amount of cash and cash equivalents of such Entity and its consolidated Subsidiaries as of such date other than cash and cash equivalents the disposition of which is subject to a material restriction for the benefit of Entities other than such Entity and its consolidated Subsidiaries.

(b) Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  All references herein to Sections shall be deemed references to Sections of this Deferred Payment Agreement (PI) unless the context shall otherwise require.

(c) Unless otherwise indicated, (i) the term "including" means "including without limitation," except when used in the computation of time periods, and (ii) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein).

11

(d) For purposes of the computation of time periods, whenever this Deferred Payment Agreement (PI) provides for an event to occur "within" a specified number of days of a preceding event, it shall mean that the latter event shall occur before the close of business on the last of the specified days, and the day on which the preceding event occurs shall not be included in the computation of days elapsed.  The word "from" means "from and including", "after" means "after and excluding", and "to" and "until" mean "to and including".

(e) All terms defined in this Agreement or any other Deferred Payment Documents (PI) in the singular form shall have comparable meanings when used in the plural form and vice versa.

2.      **Payment of Deferred Payments (PI)**.

(a) Subject to Sections 2(b), 3(c), (f) and (g) and Section 7, Grace agrees to make each Deferred Payment (PI) in full in the amount set forth below to the Permitted Holder (or, if the Permitted Holder directs in writing, to one or more other Permitted Payees pursuant to such written direction received by Grace pursuant to Section 16) not later than 12:00 noon New York City time on the payment date specified in the table below (each a "Deferred Payment Date (PI)"):

| Deferred Payment No. | Deferred Payment Date (PI) (if not a Business Day, to be the immediately following Business Day) | Deferred Payment (PI) |
|---|---|---|
| 1 | January 2, 2019 | $110,000,000 |
| 2 | January 2, 2020 | $110,000,000 |
| 3 | January 2, 2021 | $110,000,000 |
| 4 | January 2, 2022 | $110,000,000 |
| 5 | January 2, 2023 | $110,000,000 |
| 6 | January 2, 2024 | $100,000,000 |
| 7 | January 2, 2025 | $100,000,000 |
| 8 | January 2, 2026 | $100,000,000 |
| 9 | January 2, 2027 | $100,000,000 |
| 10 | January 2, 2028 | $100,000,000 |
| 11 | January 2, 2029 | $100,000,000 |
| 12 | January 2, 2030 | $100,000,000 |
| 13 | January 2, 2031 | $100,000,000 |
| 14 | January 2, 2032 | $100,000,000 |
| 15 | January 2, 2033 | $100,000,000 |

12

(b) To the extent that the Trusts' Representative exercises its rights on behalf of the Trust (PI) under the Share Issuance Agreement and the Section 524(g) Shares are issued and delivered to the Trust (PI) (or its permitted successors or assigns), the amount of the remaining Deferred Payments (PI) shall automatically be reduced, in the order directed by Grace, by the Fair Market Value of the portion of the Section 524(g) Shares allocated to the Trust (PI) pursuant to Section 4 of the Intercreditor Agreement (as such Section 4 of the Intercreditor Agreement, together with any defined terms used (directly or indirectly) in such Section 4 of the Intercreditor Agreement are in effect as of the date hereof, or as amended or modified from time to time with the consent (not to be unreasonably withheld) of Grace and the Parent Guarantor after the date hereof.

3.   **Payments**.

(a) All payments to be made hereunder or in respect hereof shall be made in Dollars by wire transfer of immediately available funds to the Permitted Holder in accordance with wire transfer instructions provided by the Permitted Holder in writing from time to time.  Upon request by the Permitted Holder, Grace shall provide, or cause to be provided, the Federal Reserve Bank wire reference numbers and other wire information related to any payments hereunder.

(b) Subject to Sections 2(b), 3(c), (f) and (g), all payments hereunder or in respect hereof shall be made in full, without any reduction, set-off or counterclaim.

(c) Whenever any payment to be made under this Deferred Payment Agreement (PI) (including a Deferred Payment (PI) on a Deferred Payment Date (PI)) shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day.

(d) All payments made hereunder or in respect hereof (i) during the existence of an Event of Default shall be applied, first to pay any fees, costs and expenses payable by Grace pursuant to Section 16(h) and Section 19, second, to any unpaid interest accrued on the Deferred Payments (PI) and, third,  to the Deferred Payments (PI) in direct order of maturity, and (ii) at any other time, as directed by the Permitted Payor.

(e) If, after giving effect to (y) any Disposition Transaction or any assignment, delegation or transfer by Grace of its rights or obligations under this Deferred Payment Agreement (PI) or (z) any election to have a Permitted Payor make any payment on behalf of Grace pursuant to Section 4(a), Grace, any successor Entity to Grace or such Permitted Payor shall be required by applicable Law to withhold any Taxes from any payments of Deferred Payments (PI) or interest at the Default Rate hereunder, and if such requirement would not have been imposed by such applicable Law but for such Disposition Transaction, assignment or transfer, then (i) the sum payable on account of Deferred Payments (PI) or interest at the Default Rate shall be increased as necessary so that after making all withholdings required by applicable Law (including withholdings applicable to additional sums payable under this Section 3(e)) the Permitted Payee receives an amount equal to the sum it would have received on account of Deferred Payments (PI) or interest at the Default Rate had no such withholdings been made, (ii) Grace or such successor Entity, shall, or shall cause such Permitted Payor to, make such withholdings; and (iii) Grace or such successor Entity shall, or shall cause such Permitted Payor to, timely pay the full

13

amount deducted to the relevant Governmental Authority in accordance with applicable Law. This Section 3(e) shall survive the termination of this Deferred Payment Agreement (PI) pursuant to Section 11.

(f)  If, after giving effect to any permitted assignment or Transfer by the Permitted Holder of its rights or obligations under this Deferred Payment Agreement (PI), Grace or a Permitted Payor shall be required by applicable Law to withhold any Taxes from any payments of Deferred Payments (PI) or interest at the Default Rate hereunder, and if such requirement would not have been imposed by such applicable Law but for such assignment or Transfer, then the obligation of Grace or the Permitted Payor to make the relevant payment of a Deferred Payment (PI) or interest at the Default Rate hereunder shall be discharged by making such payment net of such Taxes.  This Section 3(f) shall survive the termination of this Deferred Payment Agreement (PI) pursuant to Section 11.

(g)  If, due to either (i) the introduction of or any change in any law or regulation (or any change in the interpretation thereof) or (ii) the compliance with any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law), in each case adopted after the date hereof, Grace or a Permitted Payor shall be required to withhold any Taxes from any payments of Deferred Payments (PI) or interest at the Default Rate hereunder, then the obligation of Grace or the Permitted Payor to make the relevant payment of a Deferred Payment (PI) or interest at the Default Rate hereunder shall be discharged by making such payment net of such Taxes.  This Section 3(g) shall survive the termination of this Deferred Payment Agreement (PI) pursuant to Section 11.

4.    **Permitted Payor; Prepayments**.

(a)  The obligation of Grace to make all or any portion of any Deferred Payment (PI) may be satisfied by direct payment of such amounts by a Permitted Payor.

(b)  To the extent any Deferred Payment (PI) is timely paid by a Permitted Payor, and except as set forth in Section 4(d), the obligation of Grace in respect of the amounts paid shall be deemed satisfied in full, Grace shall have no further obligation in connection therewith and Grace shall not be considered in default in respect of such amounts so paid.

(c)  Any Permitted Payor and Grace may at any time and from time to time prepay any Deferred Payment (PI) in whole or in part without penalty, premium or discount.  Any such prepayment(s) shall be applied to the Deferred Payments (PI) as directed by Grace.

(d)  To the extent that any Entity makes a payment to the Permitted Holder or any Permitted Payee on account of this Deferred Payment Agreement (PI) that (in whole or in part) is subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required or agreed to be repaid or returned by the Permitted Holder or such Permitted Payee under any Law or in respect of any Proceeding or other litigation to which Grace, the relevant Permitted Payor, the Permitted Holder or any Permitted Payee is subject, then, to the extent of the amount of such payment, the portion of the obligations under this Deferred Payment Agreement (PI) which has been paid, reduced or satisfied by such amount shall be reinstated and continue to be in full force and effect as of the time immediately preceding such initial payment, reduction or satisfaction.

14

5.     **Representations and Warranties**.  Grace hereby represents and warrants to the Trust (PI) that as of the Effective Date:

(a) Grace is duly organized and validly existing under the laws of the State of Connecticut.

(b) Grace has the corporate power and authority to execute and deliver each Deferred Payment Document (PI) to which it is a party.  Each Deferred Payment Document (PI) to which Grace is a party has been duly authorized by all necessary corporate action of Grace and has been duly executed and delivered by Grace.

(c) Each Deferred Payment Document (PI) to which Grace is a party is a legal, valid and binding obligation of Grace, enforceable against Grace in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally, by the discretion of the court in which enforcement is sought, and/or by general equitable principles (whether enforcement is sought by proceedings at law or in equity).

(d) The execution, delivery and performance by Grace of each Deferred Payment Document (PI) to which it is party does not conflict with, result in a breach of any of the provisions of, or violate the Governing Documents of Grace.

6.     **Covenants**.  Grace covenants and agrees that, from the Effective Date until this Deferred Payment Agreement (PI) terminates in accordance with Section 11:

(a) Affirmative Covenants.  Grace shall:

(i)     Maintenance of Existence and Qualifications.  Maintain and preserve in full force and effect its existence and all other rights, powers, franchises, licenses and qualifications necessary or desirable for its ownership or use of properties or the conduct of its business, except (A) as permitted by Section 16, and (B) where the failure to do so would not be reasonably likely to adversely affect Grace's ability to make the Deferred Payments (PI) under this Deferred Payment Agreement (PI) or to perform its obligations under the Deferred Payment Documents (PI) to which it is a party.

(ii)     Notices of Event of Default, Senior Payment Default and Senior Non-Payment Default.  Furnish to the Permitted Holder (x) within five (5) Business Days after an Authorized Officer of Grace shall first learn of an Event of Default, and (y) on or before the earlier of (A) the fifteenth (15th) day after an Authorized Officer of Grace shall first learn of a Senior Payment Default or Senior Non-Payment Default and (B) the first Business Day following the date on which a Payment Blockage Notice is delivered pursuant to Section 7(a)(ii), the written statement of an Authorized Officer of Grace setting forth the material details of such Event of Default, Senior Payment Default or Senior Non-Payment Default, as the case may be, and the actions that Grace proposes to take with respect thereto.

(iii)     Financial Statements.  If (x) the financial statements of Grace are no longer consolidated with the financial statements of the Parent Guarantor and (y) Grace is not obligated to file or furnish, or is not otherwise filing or furnishing, reports with the United States

15

Securities and Exchange Commission pursuant to Section 13 or 15 of the Securities Exchange Act of 1934, Grace shall furnish to the Permitted Holder:

(A) Annual Financial Statements.  As soon as available but in no event later than ninety (90) days after the last day of each of Grace's Fiscal Years, its annual consolidated financial statements audited by a nationally recognized registered independent public accounting firm allowed to practice before the Securities and Exchange Commission or any successor Governmental Authority, consisting of a consolidated balance sheet of Grace and its consolidated Subsidiaries as of the end of such year and consolidated statements of income, cash flows and stockholders equity for such year (all in reasonable detail and with all notes and supporting schedules); and

(B) Quarterly Financial Statements.  As soon as available and in any event within forty-five (45) days after the end of each of the first three Fiscal Quarters in each Fiscal Year of Grace, its consolidated balance sheet as of the end of such Fiscal Quarter, and consolidated statements of income and cash flows of Grace and its consolidated Subsidiaries for such Fiscal Quarter, all in reasonable detail and certified by an Authorized Officer of Grace to present fairly in all material respects the financial condition, results of operations and other information reflected therein and to have been prepared in accordance with GAAP (subject to year-end audit adjustments and the absence of footnotes).

(iv)    Officer's Certificates.  Grace shall furnish to the Permitted Holder:

(A) If the financial results of Grace are no longer consolidated with the financial results of the Parent Guarantor, no later than ninety (90) days after the last day of each of Grace's Fiscal Years and no later than forty-five (45) days after the end of each of the first three Fiscal Quarters in each Fiscal Year of Grace, a Quarterly EBITDA and Valuation Certificate executed by an Authorized Officer of Grace setting forth (I) if the Transaction Date of a Significant Transaction has occurred during the four-Fiscal Quarter period ending on the last day of such Fiscal Quarter or Fiscal Year, as the case may be, the Pro Forma EBITDA of Grace for such four-Fiscal Quarter period and the Pro Forma Valuation of Grace as of the last day of such four-Fiscal Quarter period or (II) if the Transaction Date of a Significant Transaction did not occur during the four-Fiscal Quarter period ending on the last day of such Fiscal Quarter or Fiscal Year, as the case may be, the EBITDA of Grace for such four-Fiscal Quarter period and the Valuation of Grace as of the last day of such four-Fiscal Quarter period; provided, however, that Grace shall not be required to furnish to the Permitted Holder a Quarterly EBITDA and Valuation Certificate under this subclause (A) if (x) Grace is filing or furnishing reports with the United States Securities and Exchange Commission pursuant to Section 13 or 15 of the Securities Exchange Act of 1934, and (y)(1) if the Transaction Date of a Significant Transaction has occurred during the four-Fiscal Quarter period ending on the last day of the applicable Fiscal Quarter or Fiscal Year, the Pro Forma EBITDA of Grace for such four-Fiscal Quarter period and the Pro Forma Valuation of Grace as of the last day of such four-Fiscal Quarter period is readily ascertainable from such reports or (2) if the Transaction Date of a Significant Transaction did not occur during the four-Fiscal Quarter period ending on the last day of the applicable Fiscal Quarter or Fiscal Year, the EBITDA of Grace for such four-Fiscal Quarter period and Valuation of Grace as of the last day of such four-Fiscal Quarter period is readily ascertainable from such reports;

16

(B) no later than ninety (90) days after the last day of each of Grace's Fiscal Years, a Compliance Certificate executed by an Authorized Officer of Grace for such Fiscal Year; and

(C) no later than thirty (30) days after the consummation by a Transferor of a Disposition Transaction of the type described in clause (ii) or clause (iii) of Section 6(b), a Post-Transaction Certificate setting forth the Post-Transaction Pro Forma EBITDA of Grace with respect to such Disposition Transaction executed and delivered by an Authorized Officer of Grace.

(b) Negative Covenant.  Grace shall not, and shall cause each of its Subsidiaries and Controlled Affiliates (each, a "Transferor") to not, sell, assign, transfer, license, lease or otherwise dispose of (each, a "Transfer") any property and/or other assets and/or enter into any transaction or obligation, whether constituting or by way of merger, consolidation, sale of assets or other disposition, reorganization, recapitalization, dividend, other distribution, or otherwise, or any related series of the foregoing (any such Transfer other than Ordinary Dividends, Bona Fide Compensation Transactions and other Transfers in the ordinary course of business, a "Disposition Transaction"), if the Transferor (taken together with all of its direct and indirect wholly owned Subsidiaries) would (1) receive (directly or indirectly) less than a reasonably equivalent value in such Disposition Transaction, (2) become or be rendered Insolvent as a result of such Transfer and/or such Disposition Transaction, or (3) be engaged in business and/or transactions, and/or would be about to engage in business and/or transactions, for which the Transferor's (taken together with all of its direct and indirect wholly owned Subsidiaries) remaining property and other assets would be unreasonably small capital; provided, however, that notwithstanding the foregoing, a Transferor:

(i)     that is a direct or indirect wholly-owned Subsidiary of Grace may make a Transfer to or engage in a Disposition Transaction exclusively with Grace or any other direct or indirect wholly-owned Subsidiary of Grace;

(ii)     may engage in a Disposition Transaction whereby such Transferor (A) pays or makes (directly or indirectly) dividends or distributions (whether in cash, securities or other property) with respect to any of its Capital Stock (including by way of a spin-off or spin-out of any of its assets), or (B) repurchases its Capital Stock, provided that, in the case of any Disposition Transaction under subclause (A) or (B) above, all of the following conditions are satisfied:

1.   no Event of Default has occurred and is continuing at the time of, or would result from, such Disposition Transaction;

2.   as of the Transaction Date of such Disposition Transaction, the Post-Transaction Pro Forma Valuation of (x) the Parent Guarantor or (y) Grace shall equal or exceed the Threshold Amount; and

3.   if such Disposition Transaction exceeds $15,000,000 and is not publicly disclosed at least 10 days prior to the consummation of such Disposition Transaction, then Grace shall provide the Permitted Holder with at least 10 days prior to the consummation of

17

such Disposition Transaction, a written notice describing in reasonable detail the material terms of such Disposition Transaction and setting forth the Post-Transaction Pro Forma Valuation of Grace as of the Transaction Date of such Disposition Transaction; and

(iii)     other than as set forth in Section 6(b)(ii) above, shall not enter into any Disposition Transaction with a Related Party to the Transferor in which the aggregate value of the assets or other property Transferred in such Disposition Transaction to such Related Party exceeds $15,000,000 if the Transferor (taken together with all of its direct and indirect wholly owned Subsidiaries) would (1) receive (directly or indirectly) less than a reasonably equivalent value in such Disposition Transaction, as determined by a reputable investment bank or valuation firm jointly selected by Grace and the Permitted Holder, (2) become or be rendered Insolvent as a result of such Transfer and/or such Disposition Transaction or (3) be engaged in business and/or transactions, and/or would be about to engage in business and/or transactions, for which the Transferor's (taken together with all of its direct and indirect wholly owned Subsidiaries) remaining property and other assets would be unreasonably small capital; provided, that if the aggregate value of the assets or other property Transferred to such Related Party in such Disposition Transaction exceeds $15,000,000 and the existence of such Disposition Transaction is not publicly disclosed at least 10 days prior to the consummation of such Disposition Transaction, then Grace shall provide the Permitted Holder with at least 10 days' prior to the consummation of such Disposition Transaction, a written notice describing in reasonable detail the material terms of such Disposition Transaction and setting forth the Post-Transaction Pro Forma Valuation of Grace as of the Transaction Date of such Disposition Transaction;

provided further that if Grace is not the surviving or succeeding Entity as a result of any Disposition Transaction (but in the case of a sale of assets, only if such sale involves a sale of all or substantially all of the assets of Grace) otherwise permitted by the exceptions to this Section 6(b), such Disposition Transaction shall be permitted under this Section 6(b) only if Grace and the Parent Guarantor shall comply with the requirements of Section 16(g).

7.     **Subordination Terms**.  Any and all obligations of Grace in respect of Deferred Payments (PI) and this Deferred Payment Agreement (PI) shall be subordinated and otherwise junior at all times in right of payment and in all other respects, in the manner and to the extent set forth herein, to any and all present and future obligations of Grace in respect of any Senior Indebtedness.

(a) Blockage of Deferred Payments (PI).

(i)     If any payment default occurs and is continuing beyond any applicable grace period pursuant to the terms and conditions of any Senior Indebtedness (a "Senior Payment Default"), then subject to Section 7(g), no payment or distribution of cash, securities or any other assets shall be made by Grace with respect to any Deferred Payments (PI) or pursuant to the Deferred Payment Documents (PI) for as long as such Senior Payment Default is continuing.

(ii)     If any default other than a Senior Payment Default occurs pursuant to the terms and conditions of any Designated Senior Indebtedness that would allow the holders thereof to accelerate the maturity thereof (a "Senior Non-Payment Default"), then subject to Section 7(g), no payment or distribution of cash, securities or any other assets shall be made by Grace

18

with respect to any Deferred Payments (PI) or pursuant to the Deferred Payment Documents (PI) during the period (the "Payment Blockage Period") (x) beginning on the date that the Permitted Holder receives from the Entity entitled to give notice under any document evidencing such Designated Senior Indebtedness (or from Grace acting at the direction or request of such Entity) a written notice (a "Payment Blockage Notice") that such a Senior Non-Payment Default has occurred and is continuing and (y) ending on the earliest to occur of (1) 180 days from the date the Permitted Holder shall have received the Payment Blockage Notice, (2) the date such Senior Non-Payment Default shall have been cured or waived or shall have ceased to exist and (3) the date such Payment Blockage Period shall have been terminated by written notice to the Permitted Holder from the Entity initiating such Payment Blockage Period.

(iii)    Notwithstanding the foregoing, (A) in no event will a Payment Blockage Period extend beyond 180 days from the date the Payment Blockage Notice in respect thereof was received by the Permitted Holder, (B) there shall be a period of at least 180 consecutive days in each period of 360 consecutive days when no Payment Blockage Period is in effect, and (C) no Senior Non-Payment Default that existed or was continuing on the date of delivery of any Payment Blockage Notice (whether or not such Senior Non-Payment Default is with respect to the same issue of Designated Senior Indebtedness) may be, or be made, the basis for a subsequent Payment Blockage Notice, unless such Senior Non-Payment Default has been cured or waived for a period of not less than 90 consecutive calendar days.

(iv)    The making of Deferred Payments (PI) or other payments pursuant to this Deferred Payment Agreement (PI) shall resume, and any Deferred Payments (PI) or other payments pursuant to this Deferred Payment Agreement (PI) not paid due to a suspension thereof pursuant to clause (i) or clause (ii) of this Section 7(a) shall be paid, together with accrued interest thereon at the Default Rate, when such suspension is no longer in effect (either due to cure or waiver of the relevant Senior Payment Default or the expiration or termination of the Payment Blockage Period pursuant to clause (i) or clause (ii) of this Section 7(a)) unless a subsequent Payment Blockage Notice has been delivered in accordance with clause (iii) of this Section 7(a) and is not prohibited from being delivered by clause (iii) of this Section 7(a).

(v)    The failure of Grace to make any Deferred Payments (PI) or to pay any other amounts under this Deferred Payment Agreement (PI) by reason of the operation of this Section 7(a) shall not be construed as preventing the occurrence of an Event of Default or from characterizing any Deferred Payments (PI) as "past due" for purposes of Section 9(c).

(b) Proceedings.    Upon any payment made by Grace, or any distribution of cash, securities or other assets of any kind of Grace (other than securities issued in substitution for the obligation to make Deferred Payments (PI) that are subordinated to at least the extent described herein for Deferred Payments (PI), which Securities the Permitted Holder (or any Permitted Payee, if applicable) is specifically authorized to receive notwithstanding any other provision of this Section 7), to creditors in any Proceeding with respect to Grace or its properties, all obligations due on all Senior Indebtedness shall first be paid in full in cash before any payment or distribution is made on account of any Deferred Payments (PI) or otherwise pursuant to the Deferred Payment Documents (PI).

19

(c) <u>Improper Payments Held in Trust</u>.   Any payments or property received by the Permitted Holder or any Permitted Payee in breach of this <u>Section 7</u> shall be held by the Permitted Holder or such Permitted Payee in trust and promptly delivered in the form received to the holder of Senior Indebtedness entitled to receive the same (any such payment or property delivered by the Permitted Holder or such Permitted Payee to any holder of Senior Indebtedness, a "<u>Turnover Payment</u>").   To the maximum extent permitted under applicable Law, Grace agrees that any Turnover Payment shall be treated as a payment by Grace on account of such Senior Indebtedness and shall not satisfy Grace's obligation with respect to any amount due to the Permitted Holder or such Permitted Payee under this Deferred Payment Agreement (PI).   If, notwithstanding the preceding sentence, it is determined (by a court of competent jurisdiction or otherwise) that a Turnover Payment is a payment by Grace on account of, and satisfies any obligation of Grace with respect to, any amount due to the Permitted Holder or any Permitted Payee under this Deferred Payment Agreement (PI), then, to the extent of the amount of such Turnover Payment, the portion of the obligation which has been determined to be paid and satisfied by such Turnover Payment shall be reinstated and shall continue to be in full force and effect as of the time immediately preceding the initial payment thereof by Grace to the Permitted Holder or such Permitted Payee.   If, notwithstanding the preceding sentence, any portion of an obligation of Grace in respect of such Turnover Payment is not reinstated and continued to the extent of the amount of the relevant Turnover Payment, then the Permitted Holder or the applicable Permitted Payee shall, upon the payment in full in cash of all Senior Indebtedness owed to the holder thereof to whom the Permitted Holder or such Permitted Payee delivered such Turnover Payment, be subrogated to the rights of such holder to receive payments or distributions applicable to such Senior Indebtedness, and for the purpose of such subrogation such Turnover Payment shall not, as between Grace and the Permitted Holder or such Permitted Payee, be deemed to be payment by Grace to or on account of such Senior Indebtedness.

(d) <u>Remedies Blockage</u>.   Subject in any event to the other terms and conditions of this <u>Section 7</u> (including <u>Section 7(a)</u> and <u>Section 7(g)</u>), and not in abrogation thereof, if an Event of Default has occurred and is continuing and any Senior Indebtedness is then outstanding, the Permitted Holder hereby agrees for itself and its assigns that it will not (1) exercise or seek to exercise any rights or remedies against Grace or the Parent Guarantor with respect to such Event of Default or (2) institute any action or proceeding with respect to such rights or remedies (including any action of foreclosure, contest or protest) under any Deferred Payment Document (PI) or any agreement or document relating thereto, or under such Event of Default or otherwise or (3) attempt to do any of the foregoing (collectively, the "<u>Remedies</u>"), for a period commencing on the date that such Event of Default occurs and ending on the earliest to occur of (i) 180 days after the first date on which such Event of Default shall have occurred, (ii) the commencement of a Proceeding with respect to Grace, the Parent Guarantor or their respective properties, (iii) the date that the holder (or any agent or trustee of the holder) of any Senior Indebtedness commences exercising any Senior Remedies with respect to such Senior Indebtedness (including, without limitation, the acceleration of all or any portion of such Senior Indebtedness) and (iv) the payment in full in cash of all Senior Indebtedness.

(e) Notwithstanding the foregoing, as applied to the Permitted Holder, the term "Remedies" shall not include, and the Permitted Holder shall not be impaired by <u>Section 7(d)</u> from doing, any of the following:  (A) exercising rights and remedies for specific performance or injunctive relief to compel Grace or the Parent Guarantor to comply with any non-payment

20

obligations under the Deferred Payment Documents (PI) (including commencing any action contemplated by Section 16(h)), (B) instituting or maintaining any suit or action solely to prevent the running of any applicable statute of limitations, (C) accruing interest on the Deferred Payments (PI) at the Default Rate pursuant to Section 9(c) and (D) giving any notice (including notice of an Event of Default) to Grace under the Deferred Payment Documents (PI).

(f) No Secured Obligation. Except for the Parent Guarantee and the share issuance obligation with respect to the Section 524(g) Shares as and to the extent contemplated in the Share Issuance Agreement, no credit support or security interest shall be granted by Grace, the Parent Guarantor or any of its Subsidiaries in connection with, or otherwise support or secure any obligation set forth in, the Deferred Payment Documents (PI). Notwithstanding the foregoing, the Permitted Holder may obtain to the extent permitted under applicable Law a judgment lien on the properties of Grace and/or the Parent Guarantor to secure the payment and performance of a judgment obtained by the Permitted Holder against Grace and/or the Parent Guarantor.

(g) No Impairment of Right to Receive Section 524(g) Shares or Warrant Shares. Nothing in this Section 7 shall impair the rights of the Trust (PI) (or its permitted successor or assigns) (i) acting through the Trusts' Representative pursuant to the Intercreditor Agreement, to deliver to the Parent Guarantor a Demand for Issuance of the Section 524(g) Shares and to receive the Trust (PI)'s percentage of the Section 524(g) Shares pursuant to the Share Issuance Agreement or (ii) to exercise all or any portion of the Warrant and to receive the shares of Common Stock in connection therewith.

(h) Further Assurances. At the reasonable request of Grace or the Parent Guarantor, the Permitted Holder will, at the sole expense of Grace and the Parent Guarantor, execute such agreements, documents, certificates and/or other instruments confirming the existence and extent of the subordination terms detailed in this Section.

8. **Events of Default**. The occurrence of any of the following events shall constitute an "Event of Default" under this Deferred Payment Agreement (PI):

(a) Neither Grace nor any Permitted Payor shall make (i) any Deferred Payment (PI) on any Deferred Payment Date (PI) and such failure shall continue for five (5) Business Days after the relevant Deferred Payment Date (PI) or (ii) any payment of interest at the Default Rate owing under this Deferred Payment Agreement (PI) within seven (7) Business Days after demand therefor by the Permitted Holder (or the Permitted Payee, if applicable) entitled thereto;

(b) Grace or the Parent Guarantor (A) shall institute any proceeding or voluntary case seeking to adjudicate it a bankrupt or insolvent, or seeking dissolution, liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts pursuant to any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for any such Entity or for any substantial part of its property, (B) shall be generally not paying its debts as such debts become due or shall admit in writing its inability to pay its debts generally, or (C) shall make a general assignment for the benefit of creditors;

21

(c) Any proceeding shall be instituted against Grace or the Parent Guarantor seeking to adjudicate it a bankrupt or insolvent, or seeking dissolution, liquidation, winding up, reorganization, arrangement, adjustment, protection, relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for any such Entity or for any substantial part of its property, and either such proceeding shall remain undismissed or unstayed for a period of sixty (60) consecutive days;

(d) Grace shall breach any covenant set forth in Section 6(a)(i), or the Parent Guarantor shall breach any covenant set forth in Section 7(a)(i) of the Parent Guarantee (PI), and in any such case such breach shall continue for thirty (30) days after the earlier of (A) any Authorized Officer of Grace obtains knowledge of such failure and (B) the Permitted Holder's written notice to Grace and the Parent Guarantor of such failure;

(e) Grace shall breach any covenant set forth in Section 6(a)(iv)(A), or the Parent Guarantor shall breach any covenant set forth in Section 7(a)(iv)(A) of the Parent Guarantee (PI), and in any such case such breach shall continue for ten (10) days after the Permitted Holder's written notice to Grace and the Parent Guarantor of such breach;

(f) Grace shall breach any covenant set forth in Section 6(b) (other than any notice requirement set forth therein), or the Parent Guarantor shall breach any covenant set forth in Section 7(b) of the Parent Guarantee (PI) (other than any notice requirement set forth therein), and in any such case, as of the Transaction Date of the Disposition Transaction that resulted in such breach, the Post-Transaction Pro Forma Valuation of the Parent Guarantor shall not exceed the Threshold Amount and the Post-Transaction Pro Forma Valuation of Grace shall not exceed the Threshold Amount;

(g) (i) Neither Grace nor the Parent Guarantor shall deliver the written notice required by Section 6(b) of this Deferred Payment Agreement (PI) or Section 7(b) of the Parent Guarantee (PI) with respect to a Disposition Transaction on or prior to the date required by Section 6(b) of this Deferred Payment Agreement (PI) or Section 7(b) of the Parent Guarantee (PI), as applicable, and (ii) as of the four-Fiscal Quarter period ended most recently prior to the consummation of such Disposition Transaction, either (A) if the Transaction Date of a Significant Transaction has occurred during such four-Fiscal Quarter period, the Pro Forma Valuation of Grace and the Pro Forma Valuation of Parent Guarantor were each less than the Threshold Amount, or (B) if the Transaction Date of a Significant Transaction has not occurred during such four-Fiscal Quarter period, the Valuation of Grace and the Valuation of the Parent Guarantor were each less than the Threshold Amount;

(h) Grace or the Parent Guarantor shall assert in writing that any Deferred Payment Document (PI) or any material term thereof is not a legal, valid and binding obligation of Grace or the Parent Guarantor, as the case may be, enforceable in accordance with its terms in any material respect; or

(i) A default occurs under the Deferred Payment Agreement (PD) or the Deferred Payment Agreement (ZAI) that causes any of the Deferred Payments due under either or both the Deferred Payment Agreement (PD) or the Deferred Payment Agreement (ZAI), respectively, to be accelerated and become due prior to its or their stated maturity.

9.    **Remedies**.

(a) Subject to <u>Section 7</u>, the Permitted Holder shall have the right, power and authority to do all things deemed necessary or advisable to enforce the provisions of, and protect its rights under, this Deferred Payment Agreement (PI) and upon the occurrence and during the continuance of an Event of Default the Permitted Holder may institute or appear in such appropriate proceedings permitted and not prohibited under this Deferred Payment Agreement (PI) as the Permitted Holder shall deem most effectual to protect and enforce any of its rights hereunder, whether for the specific enforcement of any covenant or agreement in this Deferred Payment Agreement (PI) or to enforce any other proper remedy.

(b) Subject to <u>Section 7</u>, without limiting the foregoing, upon the occurrence and during the continuance of an Event of Default, the Permitted Holder may declare the unpaid Deferred Payments (PI), together with all other amounts payable hereunder, to be immediately due and payable, whereupon such Deferred Payments (PI) and other amounts shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind (except that in the case of an Event of Default of the type described in subsection <u>(b)</u> or <u>(c)</u> under <u>Section 8</u>, such acceleration shall occur without any action of the Permitted Holder or any other Entity).

(c) In addition, upon the occurrence and during the continuance of an Event of Default, all Deferred Payments (PI) that are past due shall accrue interest at the Default Rate, which, subject to the terms of <u>Section 7</u>, shall be payable to the Permitted Holder on demand until such Event of Default shall have been cured or waived, or all remaining Deferred Payments (PI) shall have been paid in full.

10.    **Waiver**.  There shall be no implied waiver based upon any delay on the part of any party hereto in exercising any right or remedy such party may have pursuant to this Deferred Payment Agreement (PI).

11.    **Termination**.  Upon all of the Deferred Payments (PI) and other amounts payable hereunder having been paid in full, any and all obligations under this Deferred Payment Agreement (PI) shall be discharged and this Deferred Payment Agreement (PI) shall terminate without any further action by the parties thereto or any other Entity (except to the extent all or any portion of any Deferred Payment (PI) or such other amount is reinstated pursuant to <u>Section 4(d)</u> or to the extent any provision hereof expressly survives the termination of this Deferred Payment Agreement (PI)).  Promptly upon such termination, the Permitted Holder shall execute and deliver to Grace, at Grace's sole cost and expense, such documents as are reasonably requested by Grace to fully document the payment, termination and discharge of all obligations hereunder.

12.    **Severability**.  Whenever possible, each provision of this Deferred Payment Agreement (PI) will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Deferred Payment Agreement (PI) by any party hereto is held to be invalid, void, voidable, illegal or unenforceable in any respect under any applicable Law in any jurisdiction, such event will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, or the obligations of any other party to this Deferred Payment Agreement (PI), and this Deferred Payment Agreement (PI)

23

will be reformed, construed and enforced in such jurisdiction as if such invalid, void, voidable, illegal, unenforceable or rejected provision had never been contained herein. The parties hereto further agree to use commercially reasonable efforts to replace such invalid, void, voidable, illegal, unenforceable or rejected provision of this Deferred Payment Agreement (PI) with a an effective, valid and enforceable provision which will achieve, to the fullest extent possible, the economic, business and other purposes of the invalid, void, voidable, illegal, unenforceable or rejected provision.

13.  **Complete Agreement**.  This Deferred Payment Agreement (PI), together with the Parent Guarantee (PI), the Share Issuance Agreement, the Plan of Reorganization and the Confirmation Order, embodies the complete agreement and understanding between the parties hereto in respect of the subject matter hereof and supersedes, preempts and terminates all other prior understandings, agreements or representations by or among the parties hereto, written or oral, to the extent relating thereto.

14.  **Counterparts**.  This Deferred Payment Agreement (PI) may be executed (including by facsimile or portable document format (pdf)) in separate counterparts, each of which will be deemed to be an original and all of which taken together will constitute one and the same agreement.

15.  **No Third Party Beneficiaries**.  Other than the Parent Guarantor, there are no third party beneficiaries of this Deferred Payment Agreement (PI) and nothing in this Deferred Payment Agreement (PI), express or implied, is intended to confer on any Entity other than the parties hereto and their respective successors, and assigns, any rights, remedies, obligations or liabilities.

16.  **Assignment**.

(a) This Deferred Payment Agreement (PI) shall be binding upon Grace and its successors and permitted assigns and shall inure to the benefit of the Permitted Holder and its successors and permitted assigns.

(b)  Except as expressly permitted by <u>Section 16(c)</u> and <u>Section 16(d)</u> with respect to this Deferred Payment Agreement (PI), as expressly set forth in Section 16(b) of the Parent Guarantee (PI) with respect to the Parent Guarantor or as expressly set forth in Section 12(b) of the Share Issuance Agreement, in no event shall (i) any Deferred Payment Document (PI) or any rights, interests, duties, obligations or liabilities of the Permitted Holder under the Deferred Payment Documents (PI) (including this Deferred Payment Agreement (PI)), the Plan of Reorganization or the Confirmation Order be Transferred to, or assumed by, any Entity or (ii) the Permitted Holder grant a security interest in any right or interest it has or may have under any Deferred Payment Document (PI) (including this Deferred Payment Agreement (PI)), in each case, without the prior written consent of Grace and the Parent Guarantor.

(c)  Subject to compliance with <u>sub-clauses (d)(1)</u> and <u>(d)(2)</u> below, upon the occurrence and during the continuance of an Event of Default, the Permitted Holder shall have the right to Transfer, in whole or in part, or grant a security interest in, this Deferred Payment Agreement (PI) or all or any of its rights, interests, duties, liabilities or obligations under this Deferred

24

Payment Agreement (PI) without the prior written consent of Grace or the Parent Guarantor. Any such Transfer or grant, if made in compliance with this Section 16(c), shall be effective notwithstanding any subsequent cure or waiver of any Event of Default.

(d) Subject to compliance with sub-clauses (d)(1) through (d)(5) below, the Permitted Holder shall have the right, at any time and from time to time, to Transfer, in whole or in part, or grant a security interest in, this Deferred Payment Agreement (PI) or all or any of its rights, interests, duties, liabilities or obligations under this Deferred Payment Agreement (PI):

1. The Trust (PI) shall provide notice of such Transfer to Grace and the Parent Guarantor in accordance with NY UCC § 9-406 or any successor provision.

2. Unless expressly consented to in advance in writing by Grace and the Parent Guarantor, such Transfer or such grant of a security interest shall not adversely change the duty of, increase the burden, costs or risk imposed upon, or impair the chance of obtaining return performance of, either Grace or the Parent Guarantor under any of the Deferred Payment Documents (PI), as such terms are used, with respect to an assignment or other Transfer, in NY UCC § 2-210(2) or any successor provision, and any such Transfer or grant of a security interest shall not result in increased liabilities or costs for Grace and/or the Parent Guarantor (including on account of any Taxes).

3. Unless expressly consented to in advance in writing by Grace and the Parent Guarantor, upon and following such Transfer or such grant of a security interest, no more than one Entity on behalf of the Trust (PI) and all Entities to whom Transfers have been made (the "Administrative Agent") and one Entity on behalf of all recipients of grants of security interests (the "Collateral Agent") shall have, or shall have the ability to bring, or be able to enforce, any claim, right or cause of action against Grace, the Parent Guarantor or any of their respective Affiliates (other than the Trust (PI)) under this Deferred Payment Agreement (PI) or any document or instrument effecting or evidencing such Transfer or grant of a security interest, regardless of whether any such claim, right, cause of action, or enforcement right arises out of a contract, statute, law, in equity, common law or otherwise.

4. Any such Transfer or such grant of a security interest shall comply with all applicable Laws, including all applicable federal, state and foreign securities laws.

5. No such Transfer and no such grant of a security interest shall relieve the Trust (PI) of any of its duties or obligations under this Deferred Payment Agreement (PI), the other Deferred Payment Documents (PI), the Plan of Reorganization, the Confirmation Order or any agreements entered into by the Trust (PI) pursuant to the Plan of Reorganization or the Confirmation Order.

(e) Subject to Section 16(f), Grace may not Transfer its rights, interests, duties, liabilities or obligations under this Deferred Payment Agreement (PI) without the prior written consent of the Permitted Holder, such consent not to be unreasonably withheld, conditioned or delayed.

(f) Subject to Section 16(g), neither Section 16(e) nor anything else in this Deferred Payment Agreement (PI) or any other Deferred Payment Document (PI) shall prohibit or restrict

25

the ability of Grace to undertake any Disposition Transaction; provided that, unless the Permitted Holder otherwise consents in writing, (i) such Disposition Transaction shall not violate Section 6(b), (ii) no Event of Default and, no event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default, exists at the time of, or would exist immediately following, the consummation of such Disposition Transaction; (iii) such Disposition Transaction does not conflict with, or result in a breach of, any of the provisions of, or constitute a default under, the Governing Documents of Grace or the surviving or succeeding Entity that results from such Disposition Transaction; and (iv) at least ten (10) days prior to consummation of such Disposition Transaction, Grace shall, subject to reasonable confidentiality arrangements between the Permitted Holder and Grace, deliver to the Permitted Holder written notice of its intention to consummate such Disposition Transaction.

(g) If the surviving or succeeding Entity as a result of any such Disposition Transaction (but in the case of a sale of assets, only if such sale involves a sale of all or substantially all of the assets of Grace) as applicable, is not Grace, then prior to, or concurrently with, the consummation of any such Disposition Transaction, (i) the surviving or succeeding Entity shall by written instrument substantially in the form of Exhibit A signed by such Entity, Grace and, at its option, the Permitted Holder expressly assume the rights and obligations of Grace hereunder, whereupon such Entity shall be the successor of all rights and obligations of Grace hereunder, with the same effect as if it had been originally named herein (it being expressly acknowledged and agreed by Grace and the Permitted Holder that such written instrument shall, and shall expressly provide that it shall, be binding upon, and inure to the benefit of, the Permitted Holder, Grace and such surviving or succeeding Entity whether or not the Permitted Holder shall have executed such written instrument) and (ii) the Parent Guarantor shall confirm in writing to such Entity, Grace and the Permitted Holder that the Parent Guarantee (PI) shall remain in full force and effect after giving effect to such Disposition Transaction and the assumption by the surviving or succeeding Entity of all of the rights and obligations hereunder; provided, however, that Grace shall not be discharged from, and shall remain liable for, any and all of its duties, liabilities and obligations under this Deferred Payment Agreement (PI).

(h) Grace shall be responsible for, and shall pay promptly upon demand all, documented and direct out-of-pocket costs and expenses incurred by the Permitted Holder (including legal fees and expenses of legal counsel) in connection with any Disposition Transactions proposed by Grace pursuant to Section 16(f) if the Permitted Holder challenges such Disposition Transaction in a judicial or other proceeding or otherwise as being in breach of the provisions of the Deferred Payment Documents (PI) and the Permitted Holder is successful in such challenge.

(i) Any Transfer in breach of this Section 16 shall be null and void, and shall not Transfer any right, interest, duty, liability or obligation in or under this Deferred Payment Agreement (PI) to any other Entity.

17. **Governing Law; Submission to Jurisdiction; Waiver of Jury Trial**.

(a) This Deferred Payment Agreement (PI) and the rights and obligations of the parties hereto shall be construed in accordance with the laws of the State of New York, without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any

26

other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

(b) With respect to claims, suits, actions, proceedings, and other disputes arising out of, in respect of or relating to this Deferred Payment Agreement (PI) (such claims, suits, actions, proceedings, and other disputes, the "Claims") each of the parties to this Deferred Payment Agreement (PI) hereby irrevocably submits to the jurisdiction of the Bankruptcy Court for the District of Delaware or the United States District Court for the District of Delaware (the "Courts"), or, if both such Courts are not permitted under applicable Law to exercise jurisdiction with respect to the matter in question then to the jurisdiction of any other federal or state court in the state, county and city of New York, New York and each of the parties to this Deferred Payment Agreement (PI) agrees that any and all Claims may be brought, heard and determined in such courts.

(c) Each of the parties to this Deferred Payment Agreement (PI) agrees that (i) venue shall be proper in the courts referenced in Section 17(b) and hereby waives any objection or defense which it may now or hereafter have to the laying of venue in such courts, including any of the foregoing based upon the doctrine of *forum non conveniens*; and (ii) all process which may be or be required to be served in respect of any such Claim (including any pleading, summons or other paper initiating any such Claim) may be served upon it, which service shall be sufficient for all purposes, in the manner for the provision of notice under this Deferred Payment Agreement (PI) and shall be deemed in every respect effective service of process upon such party when so given.

(d) EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE DEFERRED PAYMENT DOCUMENTS (PI).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER DEFERRED PAYMENT DOCUMENTS (PI), AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PROVISION.

18.     **Notices**.  All notices required or permitted under this Deferred Payment Agreement (PI) must be in writing and will be deemed to be delivered and received (i) if personally delivered or if delivered by the United States Postal Service, facsimile or courier service, when actually received by the party to whom notice is sent or (ii) with respect to parties located other than within the United States, if deposited with the United States Postal Service (whether actually received or not), at the close of business on the seventh Business Day after the day when placed in the mail, postage prepaid, certified or registered with return receipt requested, addressed to the appropriate party or parties, at the address of such party or parties set forth below (or at such other address as such party may designate by written notice to all other parties in accordance with this Section 18):

27

| **If to Grace:** | *With copies,* | Kirkland & Ellis LLP |
| | *which shall not* | Citigroup Center |
| W. R. Grace & Co.-Conn. | *constitute* | 153 E. 53rd Street |
| 7500 Grace Drive | *notice, to:* | New York, NY 10022-4675 |
| Columbia, MD 21044 | | Attn:  Theodore L. Freedman & |
| Attn:  Corporate Secretary | | Thomas W. Christopher |
| Facsimile:  (410) 531-4545 | | Facsimile:  (212) 446-4900 |

| **If to the Parent** | *With copies,* | Kirkland & Ellis LLP |
| **Guarantor:** | *which shall* | Citigroup Center |
| | *not constitute* | 153 E. 53rd Street |
| W. R. Grace & Co. | *notice, to:* | New York, NY 10022-4675 |
| 7500 Grace Drive | | Attn:  Theodore L. Freedman & |
| Columbia, MD 21044 | | Thomas W. Christopher |
| Attn:  Corporate Secretary | | Facsimile:  (212) 446-4900 |
| Facsimile:  (410) 531-4545 | | |

| **If to the Permitted** | *With copies,* | [Notice Street Address] |
| **Holder:** | *which shall* | [City], [State] [Zip] |
| | *not constitute* | Attn:  [ ] |
| WRG Asbestos Trust | *notice, to:* | Facsimile: [ ] |
| [Notice Street Address] | | |
| [City], [State] [Zip] | | |
| Attn:  [ ] | | |
| Facsimile:  [ ] | | |
| *(if sending overnight* | | |
| *packages use zip code [ ])* | | |

19.   **Costs and Expenses**.  Grace agrees to reimburse the Permitted Holder promptly upon demand for all, documented and direct out-of-pocket costs and expenses, including all attorney's fees and expenses of legal counsel, which may be incurred by the Permitted Holder in enforcing this Deferred Payment Agreement (PI) or the Parent Guarantee (PI) or protecting the rights of the Permitted Holder hereunder or thereunder, but only to the extent that the Permitted Holder succeeds in enforcing this Deferred Payment Agreement (PI) or the Parent Guarantee (PI) or protecting the rights of the Permitted Holder hereunder or thereunder.

20.   **Amendments and Waivers**.  No provision of this Deferred Payment Agreement (PI) may be waived, amended, supplemented or modified except by a written instrument executed by the Parent Guarantor, Grace and the Permitted Holder.

21.   **Further Assurances**.  At the reasonable request of the Permitted Holder, Grace will, at the sole expense of the Permitted Holder, execute such agreements, documents, certificates and/or other instruments confirming the existence of this Agreement, the obligations of Grace hereunder and the rights of the Permitted Holder hereunder.

28

22.   **Specific Performance**.  Each of the parties hereto acknowledges and agrees that, in the event of any breach of, or any failure to perform, any specific provision of this Deferred Payment Agreement (PI), the non-breaching party would be irreparably and immediately harmed and could not be made whole by monetary damages.  It is accordingly agreed that, subject to <u>Section 7</u>, the parties hereto (a) shall be entitled, in addition to any other remedy to which they may be entitled at law or in equity, to compel specific performance of any specific provision of this Deferred Payment Agreement (PI) or to obtain injunctive relief to prevent breaches of any specific provision of this Deferred Payment Agreement (PI) exclusively in the Courts, (b) shall waive, in any action for specific performance or injunctive relief, the defense of the adequacy of a remedy at law, and (c) shall waive any requirement for the securing or posting of any bond in connection with the obtaining of any such specific performance or injunctive relief.  For the avoidance of doubt, the parties agree that the Permitted Holder shall be entitled to enforce specifically the terms and provisions of this Deferred Payment Agreement (PI) to prevent breaches of or enforce compliance with those covenants of Grace set forth in <u>Section 6</u>.  Any party's pursuit of specific performance or injunctive relief at any time will not be deemed an election of remedies or waiver of the right to pursue any other right or remedy to which such party may be entitled, including the right to pursue remedies for liabilities or damages incurred or suffered by such party.

23.   **Other Remedies**.  Except as otherwise provided herein, any and all remedies herein expressly conferred upon a party shall be deemed cumulative with and not exclusive of any other remedy conferred hereby or by law on such party, and the exercise of any one remedy shall not preclude the exercise of any other.

IN WITNESS WHEREOF, the parties hereto have executed this Deferred Payment Agreement (PI) as of the date first written above.

GRACE:                                    W. R. GRACE & CO.-CONN.


                                          By: _____
                                                Name:
                                                Title:

TRUST (PI):                          WRG ASBESTOS PI TRUST

By: _____

     Name:
     Title:  Trustee

Solely for purposes of <u>Section 20</u>:

<u>PARENT GUARANTOR</u>:             W. R. GRACE & CO.

By: _____

     Name:
     Title:

EXHIBIT A

FORM OF

ASSUMPTION AGREEMENT

[To come]

33

EXHIBIT B

FORM OF

QUARTERLY EBITDA AND VALUATION CERTIFICATE

[To come]

34

EXHIBIT C

FORM OF

COMPLIANCE CERTIFICATE

[To come]

35

EXHIBIT D

FORM OF

POST-TRANSACTION CERTIFICATE

[To come]