## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO.,** *et al.*[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| **Debtors.** | ) | |
| | ) | |
| | ) | |
| | ) | |

### EXHIBIT 12 TO EXHIBIT BOOK
### FINANCIAL INFORMATION

**EXHIBIT 12**

Attached.

---

[1]     The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife  Boston Ltd., Alewife Land Corporation, Amicon, Inc.,  CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

# W. R. GRACE & CO. AND SUBSIDIARIES
# PRO FORMA AND PROSPECTIVE
# FINANCIAL INFORMATION

# FEBRUARY 27, 2009

## W. R. GRACE & CO. AND SUBSIDIARIES
## PRO FORMA AND PROSPECTIVE FINANCIAL INFORMATION

The following pro forma and prospective financial information (the "Financial Information") of W. R. Grace & Co. and its Subsidiaries ("Grace") has been prepared for the sole purpose of evaluating the feasibility of the proposed Joint Plan of Reorganization (as such plan may be amended or modified, the "Plan") under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") of W. R. Grace & Co., certain of its Subsidiaries, the Official Committee of Asbestos Personal Injury Claimants, the Personal Injury Future Claimants' Representative, and the Official Committee of Equity Security Holders. The Financial Information reflects Grace's estimate of its expected consolidated financial position, results of operations, and cash flows as if the Plan were adopted as proposed. The Financial Information was prepared on the basis of the global operations of Grace, which include certain domestic and international subsidiaries and affiliates that are not debtors under the Bankruptcy Code. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

**WHILE GRACE BELIEVES THAT THE ASSUMPTIONS UNDERLYING THE PRO FORMA AND PROSPECTIVE FINANCIAL INFORMATION, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE IS GIVEN THAT ANY OF THE FINANCIAL RESULTS WILL BE REALIZED. THIS FINANCIAL INFORMATION SHOULD NOT BE REGARDED AS A GUARANTEE OR WARRANTY BY GRACE, ITS ADVISORS, OR ANY OTHER PERSON, AS TO THE ACHIEVABILITY OF THE PRO FORMA OR PROSPECTIVE FINANCIAL POSITION, RESULTS OF OPERATIONS, EARNINGS PER SHARE OR CASH FLOWS. GRACE ASSUMES NO OBLIGATION OR UNDERTAKING TO UPDATE THE FINANCIAL INFORMATION TO REFLECT EVENTS OR CIRCUMSTANCES OCCURRING AFTER THE DATE OF THE FINANCIAL INFORMATION.**

The Financial Information contains forward-looking statements, that is, information related to future, not past, events. Such information generally includes the words "assumes," "believes," "plans," "intends," "targets," "will," "expects," "anticipates," "continues" or similar expressions. For these statements, Grace claims the protection of the safe harbor for forward-looking statements contained in the Private Securities Litigation Reform Act of 1995. All estimates and assumptions underlying the Financial Information were developed by Grace. Estimates of projected operating performance and cash flows were based upon Grace's current operating plans and strategic plans which include consideration of recent historic performance, expected future economic conditions, investment plans and other relevant factors. The assumptions disclosed herein are those that Grace believes are significant to the understanding and evaluation of the Financial Information. Although Grace believes the assumptions used are reasonable under the circumstances, Grace is subject to risks and uncertainties that could cause actual results to differ materially from the assumptions, estimates and results projected in

2

these forward-looking statements. Factors that could cause actual results to materially differ from the assumptions, estimates and results projected in these forward-looking statements include: Grace's bankruptcy and proposed plan of reorganization, the availability of financing for Grace's proposed plan of reorganization, Grace's legal proceedings (especially the Montana criminal proceeding and environmental proceedings), the cost and availability of raw materials and energy, Grace's unfunded pension liabilities, costs of environmental compliance, risks related to foreign operations, especially security, regulation and currency risks, and those factors set forth in Grace's most recent Annual Report on Form 10-K, quarterly report on Form 10-Q and current reports on Form 8-K, which have been filed with the United States Securities and Exchange Commission ("SEC") and are readily available on the Internet at www.sec.gov. Despite Grace's efforts to foresee and plan for the effects of changes in these circumstances, Grace cannot predict their impact with certainty. Consequently, actual financial results will likely vary from those shown in the Financial Information, and the variations could be material.

The Financial Information was prepared by Grace using guidelines promulgated by the SEC and the American Institute of Certified Public Accountants ("AICPA"); however, the Financial Information is prepared in a format that may not be comparable to information in our financial statements included in our filings with the SEC. As a result, investors in Grace common stock should not rely upon the Financial Information. The Financial Information has not been audited or reviewed by registered independent accountants.

## I. *FINANCIAL INFORMATION PRESENTED*

The Financial Information includes:

➢ Pro forma condensed consolidated balance sheet of Grace as of December 31, 2008, reflecting the accounting effects of the Plan as if it became effective on that date.

➢ Pro forma consolidated statements of operations of Grace for the year ended December 31, 2008 reflecting the accounting effects of the Plan as if it became effective on December 31, 2007.

➢ Projected condensed consolidated balance sheets of Grace as of December 31, 2009 and 2010, as if the Plan became effective on December 31, 2009, together with historical information as of December 31, 2006, 2007 and 2008.

➢ Projected consolidated statements of operations and analysis of continuing operations of Grace for the years ending December 31, 2009 and 2010, as if the Plan became effective on December 31, 2009, together with historical information for the years ended December 31, 2006, 2007 and 2008.

➢ Projected condensed consolidated statements of cash flows of Grace for the years ending December 31, 2009 and 2010, as if the Plan became effective on December

3

31, 2009, together with historical information for the years ended December 31, 2006, 2007 and 2008.

The Financial Information has been prepared in conformity with United States Generally Accepted Accounting Principles consistent with the accounting policies currently used by Grace in the preparation of its consolidated financial statements. A detailed explanation of Grace's accounting policies is provided in Grace's 2008 Form 10-K. The Plan will be accounted for in accordance with AICPA Statement of Position 90-7, "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code" ("SOP 90-7").

The Financial Information should be read in conjunction with the significant assumptions, qualifications and notes set forth herein and with the audited consolidated financial statements for the year ended December 31, 2008 contained in Grace's 2008 Form 10-K. The historical financial information included herein was derived from such document. The 2008 Form 10-K is available at www.grace.com or from the SEC's EDGAR system at www.sec.gov.

## II. THE PLAN OF REORGANIZATION

### A. GENERAL TERMS AND ASSUMPTIONS

The Plan is considered a "hypothetical assumption" (as defined under AICPA guidance for prospective financial information) until confirmed by the Bankruptcy Court. The Plan may change significantly as proceedings under Grace's Chapter 11 cases continue.

The Financial Information assumes that Grace will emerge from Bankruptcy on December 31, 2009 (the Effective Date) with a confirmed Plan that includes the following major terms:

### *Asbestos-Related Claims:*

➢ Asbestos personal injury claims ("Asbestos PI Claims") and asbestos property damage claims ("Asbestos PD Claims") will be resolved through the creation of two separate trusts (the "Asbestos PI Trust" and the "Asbestos PD Trust"), both established pursuant to section 524(g) of the Bankruptcy Code ("Section 524(g)"). The specific components of the Grace contribution to the Asbestos PI Trust are:

- Cash of approximately $392 million (plus interest) including $250 million pursuant to the asbestos personal injury settlement announced in April 2008 and approximately $142 million pursuant to the arrangement described below:

  In order to ensure that the Sealed Air Indemnified Parties and the Fresenius Indemnified Parties obtain Section 524(g) protection with respect to property damage claims, Cryovac and Fresenius will pay a total of approximately $142 million (plus interest and certain Trust expenses) to the Asbestos PD Trust, which amount would otherwise have been paid by Grace for resolved property damage

4

claims. As an offset, the Cryovac and Fresenius payments to the Asbestos PI Trust will be reduced and Grace's payment to the Asbestos PI Trust will correspondingly increase.

- Warrants ("Warrants") to acquire 10 million shares of Grace common stock at an exercise price of $17 per share expiring one year after the Effective Date.

- Deferred payments ("PI Deferred Payments") of $110 million per year for five years beginning January 2, 2019 and of $100 million per year for ten years beginning January 2, 2024.

- Rights to proceeds under Grace's asbestos-related insurance coverage.

➢ Asbestos PD Claims will be resolved as outlined in the Plan through the payment by Cryovac and Fresenius of approximately $142 million (plus interest and certain Trust expenses) to the Asbestos PD Trust. This amount includes the $30 million payment for US ZAI PD Claims to be made at the Effective Date. Grace will contribute to the Asbestos PD Trust:

- With respect to Class 7A Claims (Asbestos PD claims, excluding US and Canadian ZAI PD Claims), a deferred payment obligation to fund Allowed Claims resolved after the Effective Date and Asbestos PD Trust Expenses.

- With respect to Class 7B Claims (US ZAI PD Claims), a deferred payment obligation of $30 million payable on the third anniversary of the Effective Date (the "ZAI Deferred Payment") and up to ten contingent payments of $8 million per year during the 20-year period beginning on the fifth anniversary of the Effective Date. These contingent payments will be made only in the event certain conditions are met, including that the assets available in the Asbestos PD Trust to pay Class 7B Claims fall below $10 million in value.

- With respect to Canadian ZAI PD Claims, a payment of approximately CDN $6.5 million to the CDN ZAI PD Claim Fund.

➢ Cryovac will contribute directly to the Asbestos PI Trust and the Asbestos PD Trust a total of (i) cash of $512 million plus accrued interest of 5.5% from December 21, 2002, and (ii) 18 million shares of Sealed Air Corporation common stock.

➢ Fresenius will contribute directly to the Asbestos PI Trust and Asbestos PD Trust a total of $115 million.

***Other Claims and Emergence Contingencies:***

➢ Grace will pay approximately $1,083 million (estimated as of December 31, 2008) plus accrued interest to satisfy other claims payable at the Effective Date. In addition,

5

"Emergence Contingencies" in the amount of $100 million are assumed to be paid at the Effective Date.

***Ongoing Liabilities:***

➢ Grace will satisfy all other liabilities subject to compromise as they become due and payable after emergence. Such liabilities are estimated at approximately $381 million as of December 31, 2008 and include amounts for postretirement benefits, income tax contingencies, environmental contingencies, and probable and estimable payments to the Asbestos PD Trust.

The Financial Information assumes payment to Holders as set forth in the Plan. It assumes no payments for contingencies not contemplated by the Plan, including but not limited to default interest on Grace's pre-petition bank debt claims (as demanded by the pre-petition bank debt holders) and resolution of the Libby criminal case. (The Financial Information assumes that payments for Libby defense costs continue in 2009.) If any of such contingencies become probable and estimable, Grace intends to record a liability at that time.

## B. *EXIT FINANCING*

The Financial Information assumes that Grace will pay claims with existing cash and investments, future operating cash flow and borrowings under a new credit facility. The Financial Information assumes a new $1,250 million credit facility to fund allowed claims payable on the Effective Date and to provide working capital and letters of credit for post emergence operations. Of such amount, $1,000 million is assumed borrowed on the Effective Date, with $250 million of revolver capacity undrawn and available for future needs. For purposes of the pro forma balance sheet only, the exit financing requirement is $1,150 million. The difference of $150 million reflects the benefit of additional net cash flow assumed to be generated during 2009. We expect our actual exit financing requirement to be approximately $1,000 million.

The Financial Information assumes a 9% coupon rate on outstanding borrowings. The exit financing may be issued at a discount. The possibility of such a discount was considered in developing the amount of the assumed Emergence Contingency.

Obtaining exit financing in an amount and on terms satisfactory to Grace is a condition to the occurrence of the Effective Date. If we are unable to obtain the necessary financing on acceptable terms, Grace's emergence from Chapter 11 may be delayed.

## III. *PRO FORMA FINANCIAL INFORMATION*

**A. *PRO FORMA BALANCE SHEET*** – The pro forma balance sheet as of December 31, 2008 reflects the accounting effects of the Plan as if it became effective on that date. The income tax effects of the pro forma adjustments have been computed at a 35%

6

Federal tax rate (state deferred income tax assets carry a full valuation allowance and do not change).

Following is a description of the pro forma adjustments:

1. **Adjustment to Liability and Additional Expense** – Reflects a reduction of approximately $399 million of asbestos-related contingencies under the terms of the Plan, partially offset by a $100 million liability for Emergence Contingencies, which are assumed fully deductible for tax purposes. The reduction of total liabilities subject to compromise would reduce deferred tax assets.

2. **Borrowings Under New Credit Agreements** – For purposes of the pro forma balance sheet as of December 31, 2008 only, reflects $1,150 million of debt funded at emergence and the implementation of tax planning strategies that allow Grace to place up to $300 million of debt in its foreign subsidiaries on a tax efficient basis. The anticipated tax planning strategies are assumed to generate U.S. taxable income and to use approximately $105 million (on a tax-effected basis) of net operating loss ("NOL") carryforwards. The anticipated strategy is assumed to generate tax deductions in the foreign subsidiaries that would immediately reduce cash taxes in those subsidiaries.

For purposes of the projections, the exit financing requirement is assumed to be $1,000 million as of December 31, 2009. The difference of $150 million reflects the benefit of additional net cash flow assumed to be generated during 2009. We expect our actual exit financing requirement to be approximately $1,000 million.

3. **Disposition of COLI** – Reflects the net proceeds of the sale or surrender of corporate-owned life insurance polices to provide additional cash at emergence.

4. **Consideration to the Asbestos Trusts** – Reflects the transfer by Grace to the Asbestos PI Trust and the Asbestos PD Trust of (i) cash of approximately $397 million, (ii) the Warrants, (iii) the PI Deferred Payments, (iv) the PD Deferred Payment, and (v) rights to proceeds from Grace's product liability insurance policies. The cash payment includes $250 million pursuant to the asbestos personal injury settlement announced in April 2008, $112 million of asbestos property damage settlements, $30 million pursuant to the US ZAI settlement and CDN$6.5 million pursuant to the Canadian ZAI Settlement.

The Warrants are assumed to be valued at approximately $5 million. The value of the Warrants would be deductible for tax purposes when transferred to the Asbestos PI Trust. The related deferred income tax assets are reclassified from temporary differences to NOL carryforward.

Both the PI Deferred Payments and the $30 million ZAI Deferred Payment are valued using a 10% discount rate and have an aggregate estimated net present value of approximately $361 million as of December 31, 2008. Grace would recognize income tax deductions on the Deferred Payments when cash payments are made to the respective Asbestos PI and PD Trusts. We assume that payments of the US ZAI contingent payments are not probable, and no such payments are included in this amount.

7

The transfer of rights to insurance proceeds has no net tax effect as insurance income would be offset by deductions generated from the transfer to the Asbestos PI Trust.

5. **Payment of Remaining Pre-Petition Liabilities** – Reflects the payment of all remaining claims payable on the Effective Date, including the Emergence Contingencies. The related deferred income tax assets are reclassified from temporary differences to NOL carryforward.

6. **NOLs and Future Tax Deductions** – The Financial Information assumes that Grace will receive federal and state income tax deductions attributable to its payment of certain bankruptcy claims. After the pro forma adjustments to the December 31, 2008 balance sheet, NOL carryforwards are increased to approximately $561 million (tax effected at approximately $196 million), with future anticipated deductions of $1,580 million attributable to the PI Deferred Payments and the $30 million ZAI Deferred Payment. It is assumed that use of these tax benefits will be unrestricted and that a valuation allowance will not be established. However, the realization of the tax benefits depends on the amount and timing of future U.S. taxable income and the avoidance of limitation events that would apply in the event that Grace undergoes an "ownership change" (as defined by the Internal Revenue Code). If Grace were to undergo an ownership change, NOLs and future deductions could be severely restricted or even eliminated in whole or in part. Accordingly, the Plan provides the Board of Directors with authority, under certain prescribed circumstances, to impose restrictions on the transfer of Grace stock. These restrictions would generally only apply to certain 5% shareholders as provided in the Plan.

The pro forma balance sheet at December 31, 2008 also reflects the effects of anticipated tax planning strategies related to the placement of debt in Grace's foreign subsidiaries that would reduce cash taxes paid during the projection period.

***B. PRO FORMA STATEMENTS OF OPERATIONS*** – The pro forma statements of operations reflect the accounting effects of the Plan as if it became effective on December 31, 2007 for the year ended December 31, 2008

The pro forma income adjustments consist of:

1. Reduction of selling, general and administrative expenses to reflect lower insurance, legal and other non-continuing, non-core costs.

2. Elimination of interest expense for the pre-petition debt and the addition of interest expense for the exit financing. The Financial Information assumes a 9% coupon rate on outstanding borrowings under the new credit facility.

3. Imputed interest expense accrued on the PI and ZAI Deferred Payments, assuming a 10% accrual rate.

4. Reduction in Chapter 11 expenses (net of interest income) reflecting the conclusion of the Chapter 11 cases. Chapter 11 expenses incurred in the year after emergence are assumed to be $20 million.

5. Reclassification of interest income from Chapter 11 expenses to other income to reflect the accounting classification expected to be used after emergence.

6. Tax effects of the pro forma adjustments at a 35% effective tax rate.

## IV. PROSPECTIVE FINANCIAL INFORMATION – SIGNIFICANT ASSUMPTIONS

### A. GENERAL ECONOMIC AND INDUSTRY FACTORS

The prospective financial information has been prepared at a time of heightened global economic uncertainty. Economic growth has slowed or turned negative in North America, Europe and the other regions in which we operate. We experienced a sharp decline in customer demand during the fourth quarter of 2008, and we assume customer demand in 2009 will remain well below trend levels. Raw materials and energy costs have increased and become more volatile. We experienced very significant cost increases through most of 2008. The cost of certain materials has since moderated, but many costs remain high. Foreign currency exchange rates have become more volatile. The U.S. dollar/euro exchange rate has traded over a wide range since the beginning of 2008. The U.S. dollar/euro exchange rate was $1.40/euro on December 31, 2008, and was $1.27/euro as of February 26, 2009. Credit markets have experienced significant disruptions since the third quarter of 2008. In addition, the U.S. and foreign governments have initiated or are considering policy initiatives that may further impact economic conditions. Together, these factors make forecasting future economic trends difficult.

Grace has made assumptions about economic growth, inflation, and currency exchange rates in order to develop the prospective financial information. Although Grace believes the assumptions made are reasonable under the circumstances, such assumptions are subject to significant uncertainties. Actual economic conditions will likely vary from those assumed in the prospective financial information, and such variations could have a material effect on Grace's actual consolidated financial position, results of operations, and cash flows.

Grace's sales are affected by the rate of economic growth and general economic conditions in the regions in which it operates and the level of demand in the petroleum refining industry and the construction industry (among other industries). Both industries are currently experiencing increased uncertainty with respect to overall industry conditions and reduced demand for certain products and in certain regions. Economic growth in North America and Europe is assumed to be negative in 2009. Growth in these regions in 2010 is assumed to be moderately positive.

Inflation on raw materials (excluding metals) and energy costs totaled approximately $160 million in 2008, an increase of approximately 15% compared with 2007. Certain

9

raw materials costs began to decline by late fourth quarter, and we assume that this deflationary trend continues through 2009. Raw materials and energy costs are assumed to increase moderately in 2010 assuming global economic conditions begin to recover in that year.

Grace manages its operations to maximize sales, earnings and cash flow based on actual and expected economic conditions. The prospective financial information assumes operating strategies appropriate to the economic assumptions described above. As economic conditions further develop in 2009 and 2010, Grace will adjust its operating strategies as appropriate. Actual operating strategies may vary from those assumed in the prospective financial information, and such variations could have a material effect on Grace's results.

In 2008, we began managing cash flow more aggressively in order to reduce our exit financing requirements and in response to declining customer demand. During the fourth quarter, we reduced net working capital by approximately $132 million driven by improvements in inventory management, extended payment terms with our suppliers, and more effective collection efforts. Significant additional working capital improvements are targeted in 2009. In 2009, we expect our annual incentive compensation program to be focused primarily on operating free cash flow.

## B. CURRENCY

Grace operates in over 40 countries and generates more than two-thirds of its sales outside the United States. Accordingly, Grace is exposed to currency exchange rate fluctuations that impact reported sales, earnings, and cash. Grace's most significant foreign currency exposure is to the euro. The Financial Information assumes a U.S. dollar/euro exchange rate of $1.30/euro for the projected periods of 2009 and 2010. The U.S. dollar/euro exchange rate as of February 26, 2009 was $1.27/euro. The average U.S. dollar/euro exchange rate used by Grace in 2008 was $1.51/euro. No other foreign currency accounts for more than 5% of Grace's sales or earnings.

## C. SALES

Sales are assumed to decrease approximately 11% from 2008 to 2009 and to increase almost 6% from 2009 to 2010. The assumed 2009 decrease in sales is primarily based on assumed weaker customer demand and assumed unfavorable foreign currency translation effects. Partially offsetting these effects is the assumed benefit of price increases implemented in 2008 and 2009, and the assumed benefit of Grace's growth strategies, including increasing business with existing customers, acquisition of new customers, commercialization of new products, and penetration of new geographic regions. Sales growth in 2010 is assumed to benefit from an improvement in economic conditions and customer demand. Grace expects sales growth to return to historical levels as global economic growth returns to its trend levels, although this is expected to occur after 2010.

## D. COST OF GOODS SOLD AND OPERATING EXPENSES

Cost of goods sold is assumed to decrease in 2009. Gross profit percentage is assumed to increase to 30.9% from 29.5% in 2008 based primarily on assumed declines in raw

materials and energy costs and assumed productivity initiatives. Many raw materials are expected to decrease in cost in 2009, however, raw materials such as caustic soda and some rare earths remain high. In response to high raw materials costs, we are reviewing pricing in our contracts with suppliers more frequently, and we have accelerated programs to identify alternate suppliers and to qualify substitute raw materials where doing so will help us further reduce costs. Gross profit percentage is assumed to increase to 31.7% in 2010 to reflect the assumed benefit of increased volumes and continuing productivity improvement initiatives.

Raw materials and energy costs reached a peak for Grace in the fourth quarter of 2008. These high costs will be included in cost of goods sold in 2009, significantly unfavorably affecting gross profit as discussed further in Note L below. We assume reduced levels of production in 2009 in order to further reduce inventory levels, continuing the strategy we implemented in the fourth quarter of 2008. As a result, manufacturing costs that were or would otherwise have been capitalized in inventories will be charged to cost of goods sold.

Selling, general and administrative expenses are assumed to decrease in 2009 and 2010 reflecting cost reduction actions, including the restructuring actions announced in 2009.

Together with cost reduction actions completed in 2008, these actions are expected to yield approximately $40 million of annualized cost savings by 2010. Grace expects to record a charge of approximately $20 million in the first quarter of 2009 related to these restructuring actions.

### E. EARNINGS

Pretax income from core operations ("Core EBIT") is assumed to decrease approximately 20% from 2008 to 2009 and to increase approximately 14% from 2009 to 2010. Pre-tax income from core operations before depreciation and amortization ("Core EBITDA") is assumed to decrease approximately 15% and to increase approximately 10% over the same periods. The decline in Core EBITDA is assumed to be greater than the decline in sales in 2009 primarily due to the decrease of manufacturing costs capitalized in inventory, increased pension expense, and the restructuring charge. Core EBITDA growth is assumed to exceed sales growth in 2010 primarily due to improved gross profit percentage from higher production volumes. Earnings growth rates during the projection period reflect the unfavorable effect of the global economic downturn. Grace expects earnings growth to return to historical levels as global economic growth returns to its trend levels, although this is expected to occur after 2010.

### F. INTEREST EXPENSE

The Financial Information assumes a 9% coupon rate on outstanding borrowings under the new debt facility. The exit financing may be issued at a discount. The possibility of such a discount was considered in developing the assumed amount of the Emergence Contingency, but is not reflected in the assumptions regarding interest expense.

11

### G. *CHAPTER 11 EXPENSES*

Chapter 11 expenses are projected in 2009 based upon expected levels of activity in the Chapter 11 cases. Chapter 11 expenses incurred in 2010 are assumed to be $20 million.

### H *INCOME TAXES*

The effective tax rate on income before taxes and minority interest is approximately 33% in 2009 and 34% in 2010. The increase in tax rate is caused primarily by the effect of placing debt in non-U.S. jurisdictions where the tax rate is lower than the U.S. rate. Placing debt in non-U.S. subsidiaries generates net cash tax savings since, due to the availability of NOLs, Grace does not expect to pay cash taxes in the U.S. in 2009 or 2010. Foreign subsidiaries are assumed to pay cash taxes in the amount expensed each year.

### I. *CASH FLOW*

We assume net cash provided by operating activities before Chapter 11 expenses and settlements to be $343 million in 2009 and $278 million in 2010. We assume significant improvements in net working capital during the projection period, reflecting improvements in inventory management, extended payment terms with our suppliers, and more effective collection efforts.

Capital expenditures are assumed to decrease over 20% in 2009 reflecting reduced investments in new capacity and reduced maintenance requirements due to reduced production levels. Capital expenditures are assumed to increase in 2010 as we invest in new capacity to support expected growth in 2010 and 2011.

The Financial Information assumes that we generate approximately $25 million in earnings and approximately $46 million in cash flow in 2009 from sales of non-strategic assets. The proceeds of these sales are assumed to reduce our exit financing requirements.

Based on these efforts and others, the Financial Information reflects a reduction of $500 million in the assumed level of exit financing and a reduction of $45 million in the assumed level of annual interest expense when compared to previous estimates. Such reductions also reflect improvements in cash forecasting and cash management within Grace, permitting us to operate with lower levels of cash on hand.

### J. *PENSIONS*

The Financial Information assumes that Grace will continue to fund all minimum required payments under our U.S. qualified plans and to fund non-U.S. pension plans based on applicable legal requirements and actuarial and trustee recommendations. It is assumed that unfunded pay-as-you-go plan benefits will continue to be paid as they become due. The Financial Information assumes cash payments of $59 million for the pension plans in 2009 and $88 million in 2010, compared to $68 million in 2008. The 2010 funding levels assume that Grace elects to smooth losses incurred in 2008 over a three year period as permitted under ERISA for U.S. qualified plans. These amounts are

not expected to vary significantly as a result of any changes in the returns on pension assets or the discount rates used to measure pension obligations; however changes in U.S. or foreign regulations over funding requirements could impact these projections.

The Financial Information assumes pension expense of $89 million in 2009 and 2010. Pension expense for 2010 could vary significantly from this amount based on the actual return on pension assets in 2009 compared to the assumed returns and the actual discount rate used to measure pension obligations in 2010 compared to the assumed rate. Changes in service cost and other actuarial assumptions may also affect pension expense in subsequent periods.

## K.  WARRANTS

Our advisors have estimated the equity value of Grace as of the Effective Date using the methodology described in Section 2.11 of the Disclosure Statement. Based on such methodology, our advisors have estimated the per share equity value of Grace to be between $5.96 and $11.38 as of the Effective Date. These estimates are hypothetical values developed solely for purposes of the Plan and may not reflect actual trading prices. The actual closing price on the New York Stock Exchange of Grace's common shares averaged $6.40 for the ten trading days preceding the filing of this Financial Information.

We assume a mid-point value for the Warrant of approximately $5 million at the Effective Date. We assume that the valuation of Grace's common stock will improve as we approach the Effective Date and significant remaining uncertainties related to our Chapter 11 cases and the Montana criminal proceeding are resolved.

We assume that the Warrant is exercised on December 31, 2010, and that the proceeds are used to repay outstanding debt. We assume that the valuation of Grace's common stock will improve after the Effective Date as our Chapter 11 cases become final and our growth and earnings prospects improve with improvements in global economic conditions.

## L.  FIRST QUARTER, 2009

For the full year 2009, we assume Core EBIT of $241 million and net cash provided by operating activities before Chapter 11 expenses and settlements of $343 million.

For the first quarter of 2009, however, we assume Core EBIT to be negative. We assume first quarter earnings to be unfavorably affected by three significant factors.

First, we assume sales volumes to be lower in the first quarter than in the remaining quarters of the year. Sales volumes in our construction products segment are typically lowest in the first quarter of each year due to seasonal factors.

Second, we expect our cost of goods sold in the first quarter to reflect the peak raw materials and energy costs experienced in the fourth quarter of 2008 (which costs were capitalized in inventory in the fourth quarter of 2008). In addition, we assume reduced levels of production in order to further reduce inventory levels, continuing the strategy

13

we implemented in the fourth quarter of 2008. As a result, we will experience less favorable fixed cost absorption resulting in lower gross profit. Together, these effects are assumed to reduce first quarter gross profit by over $50 million when compared to the first quarter of 2008. These effects are assumed to not be material in the second quarter of 2009 and are assumed to begin to have a significant positive effect by the third quarter.

Third, we assume restructuring charges of approximately $20 million in the first quarter resulting from previously announced restructuring actions.

We assume Core EBIT will improve in the remaining quarters of 2009 as sales volumes improve in our seasonal construction products segment and as high cost inventory is sold.

We assume cash flow to be positive for the first quarter. We assume significant improvements in net working capital, including the reduction in inventories referenced above, and a significant reduction in capital expenditures. Further, we assume that first quarter Core EBIT will include over $30 million of non-cash costs, including the expensing of inventory costs capitalized in prior quarters and the non-cash increase in pension expense.

14

**W. R. Grace & Co. and Subsidiaries**
**Proforma Condensed Consolidated Balance Sheet**

| In millions | December 31, 2008 Reported | Adjustment to Liability and Additional Expense | Borrowings Under New Credit Agreements | Disposition of COLI | Consideration to the Asbestos Trusts | Payment of Remaining Pre-Petition Liabilities | December 31, 2008 Proforma |
|---|---|---|---|---|---|---|---|
| ASSETS | | | | | | | |
| Current Assets | | | | | | | |
| Cash and cash equivalents | $ 460.1 | | $ 1,150.0 | $ 67.2 | $ (397.3) | $ (1,182.7) | $ 97.3 |
| Investment securities | 21.6 | | | - | | | 21.6 |
| Cash value of life insurance policies, net of policy loans | 67.2 | | | (67.2) | | | - |
| Trade accounts receivable, net | 462.6 | | | | | | 462.6 |
| Inventories | 354.8 | | | | | | 354.8 |
| Deferred income taxes | 45.8 | | 10.5 | | | | 56.3 |
| Other current assets | 86.1 | | | | | | 86.1 |
| Total Current Assets | 1,498.2 | | 1,160.5 | | (397.3) | (1,182.7) | 1,078.7 |
| Properties and equipment, net | 710.6 | | | | | | 710.6 |
| Goodwill | 117.1 | | | | | | 117.1 |
| Deferred income taxes: | | | | | | | |
| Net operating loss carryforward | - | | (105.0) | (2.9) | 140.8 | 163.5 | 196.4 |
| Temporary differences | 851.7 | (104.8) | 94.5 | 2.9 | (140.8) | (151.2) | 552.3 |
| Asbestos-related insurance | 500.0 | | | | (500.0) | | - |
| Overfunded defined benefit pension plans | 48.6 | | | | | | 48.6 |
| Other assets | 149.3 | | | | | | 149.3 |
| Total Assets | $ 3,875.5 | $ (104.8) | $ 1,150.0 | $ - | $ (897.3) | $ (1,170.4) | $ 2,853.0 |
| LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT) | | | | | | | |
| Current Liabilities | | | | | | | |
| Debt payable within one year | $ 11.2 | | | | | | $ 11.2 |
| Accounts payable | 230.4 | | | | | | 230.4 |
| Other current liabilities | 291.5 | | | | | | 291.5 |
| Total Current Liabilities | 533.1 | | | | | | 533.1 |
| Debt payable after one year | 0.6 | | 1,150.0 | | 361.1 | | 1,511.7 |
| Deferred income taxes | 7.1 | | | | | | 7.1 |
| Minority interests in consolidated entities | 73.1 | | | | | | 73.1 |
| Underfunded defined benefit pension plans | 392.3 | | | | | | 392.3 |
| Unfunded pay-as-you-go defined benefit pension plans | 136.7 | | | | | | 136.7 |
| Other liabilities | 46.6 | | | | | (0.7) | 45.9 |
| Total Liabilities Not Subject to Compromise | 1,189.5 | | 1,150.0 | | 361.1 | (0.7) | 2,699.9 |
| Pre-petition bank debt plus accrued interest | 823.5 | | | | | (823.5) | - |
| Drawn letters of credit plus accrued interest | 30.0 | | | | | (30.0) | - |
| Income tax contingencies | 121.0 | | | | | (26.3) | 94.8 |
| Asbestos-related contingencies | 1,700.0 | (399.3) | | | (1,263.4) | | 37.3 |
| Environmental contingencies | 152.2 | | | | | (80.2) | 72.0 |
| Postretirement benefits | 169.7 | | | | | (17.0) | 152.7 |
| Other liabilities and accrued interest | 116.5 | | | | | (92.8) | 23.7 |
| Other nonoperating liabilities, including emergence contingencies | - | 100.0 | | | | (100.0) | - |
| Total Liabilities Subject to Compromise | 3,112.9 | (299.3) | | | (1,263.4) | (1,169.7) | 380.5 |
| Total Liabilities | 4,302.4 | (299.3) | 1,150.0 | | (902.3) | (1,170.4) | 3,080.4 |
| Shareholders' Equity (Deficit) | | | | | | | |
| Common stock issued | 0.8 | | | | | | 0.8 |
| Paid-in capital | 436.6 | | | | 5.0 | | 441.6 |
| Accumulated deficit | (246.6) | 194.5 | | | | | (52.1) |
| Treasury stock, at cost | (57.4) | | | | | | (57.4) |
| Accumulated other comprehensive income (loss) | (560.3) | | | | | | (560.3) |
| Total Shareholders' Equity (Deficit) | (426.9) | 194.5 | | | 5.0 | | (227.4) |
| Total Liabilities and Shareholders' Equity (Deficit) | $ 3,875.5 | $ (104.8) | $ 1,150.0 | $ - | $ (897.3) | $ (1,170.4) | $ 2,853.0 |

| W. R. Grace & Co. and Subsidiaries<br>Proforma Consolidated Statements of Operations | | Proforma<br>Year Ended<br>December 31, 2008 | | |
|---|---|---|---|---|
| In millions, except per share amounts | Note | As<br>Reported | Proforma<br>Adjustments | Proforma |
| Net sales | | $ 3,317.0 | $ - | $ 3,317.0 |
| Cost of goods sold | | 2,338.7 | - | 2,338.7 |
| Selling, general and administrative expenses | 1 | 595.0 | (7.2) | 587.8 |
| Research and development expenses | | 82.7 | - | 82.7 |
| Defined benefit pension expense | | 56.8 | - | 56.8 |
| Interest expense and related financing costs | 2 | 54.2 | 49.3 | 103.5 |
| Interest accrued on deferred payments | 3 | - | 33.9 | 33.9 |
| Provision for environmental remediation | | 14.6 | - | 14.6 |
| Chapter 11 expenses, net of interest income** | 4,5 | 65.8 | (45.8) | 20.0 |
| Other (income) expense, net | 5 | (32.0) | 2.2 | (29.8) |
| | | 3,175.8 | 32.4 | 3,208.2 |
| Income before income taxes and minority interest | | 141.2 | (32.4) | 108.8 |
| Benefit from (provision for ) income taxes | 6 | (4.3) | 11.0 | 6.7 |
| Minority interests in consolidated entities | | (15.4) | - | (15.4) |
| Net income | | $ 121.5 | $ (21.4) | $ 100.1 |
| Basic earnings per share: | | | | |
| Net income | | $ 1.69 | $ - | $ 1.39 |
| Weighted average number of basic shares | | 72.0 | - | 72.0 |
| Diluted earnings per share: | | | | |
| Net income | | $ 1.68 | $ - | $ 1.38 |
| Weighted average number of diluted shares | | 72.5 | - | 72.5 |

** $20.0 million represents estimated reorganization expenses that are assumed to be incurred post-emergence,
and does not include any offset for interest income on filing entity cash balances.

**W.R. Grace & Co. and Subsidiaries**
**Consolidated Statements of Operations**
**As Reported and Projected**

| *In millions, except per share amounts* | As Reported Year Ended December 31, | | | Projected Year Ending December 31, | |
|---|---|---|---|---|---|
| | 2006 | 2007 | 2008 | 2009* | 2010 |
| Net sales | $ 2,826.5 | $ 3,115.2 | $ 3,317.0 | $ 2,957 | $ 3,123 |
| Cost of goods sold | 1,946.8 | 2,127.9 | 2,338.7 | 2,044 | 2,132 |
| Selling, general and administrative expenses | 593.8 | 600.6 | 595.0 | 578 | 555 |
| Research and development expenses | 65.6 | 79.5 | 82.7 | 80 | 81 |
| Defined benefit pension expense | 63.7 | 52.6 | 56.8 | 89 | 89 |
| Interest expense and related financing costs | 73.2 | 72.1 | 54.2 | 44 | 90 |
| Interest accrued on deferred payments | - | - | - | - | 37 |
| Interest on initial payments to the Asbestos Trusts | - | - | - | 27 | - |
| Provision for environmental remediation | 30.0 | 17.0 | 14.6 | - | - |
| Chapter 11 expenses, net of interest income | 49.9 | 86.4 | 65.8 | 45 | 20 |
| Restructuring charges | - | - | - | 20 | - |
| Reduction of asbestos-related contingencies | - | - | - | (341) | - |
| Emergence contingencies, including legal expenses | - | - | - | 100 | - |
| Other (income) expense, net | (34.3) | (33.1) | (32.0) | (25) | (0) |
| | 2,788.7 | 3,003.0 | 3,175.8 | 2,661 | 3,004 |
| Income before income taxes and minority interest | 37.8 | 112.2 | 141.2 | 296 | 119 |
| Benefit from (provision for ) income taxes | (2.8) | 1.1 | (4.3) | (97) | (41) |
| Minority interest in consolidated entities | (26.4) | (24.5) | (15.4) | (8) | (13) |
| **Net income** | $ 8.6 | $ 88.8 | $ 121.5 | $ 192 | $ 66 |
| **Basic earnings per share:** | | | | | |
| Net income | $ 0.13 | $ 1.27 | $ 1.69 | $ 2.66 | $ 0.91 |
| Weighted average number of basic shares | 67.9 | 70.1 | 72.0 | 72.0 | 72.0 |
| **Diluted earnings per share:** | | | | | |
| Net income | $ 0.13 | $ 1.24 | $ 1.68 | $ 2.64 | $ 0.91 |
| Weighted average number of diluted shares | 68.3 | 71.6 | 72.5 | 72.5 | 72.5 |

**W.R. Grace & Co. and Subsidiaries**
**Consolidated Analysis of Continuing Operations**
**As Reported and Projected**
*In millions*

| | As Reported Year Ended December 31, | | | Projected Year Ending December 31, | |
|---|---|---|---|---|---|
| | 2006 | 2007 | 2008 | 2009* | 2010 |
| Total Grace net sales | $ 2,826.5 | $ 3,115.2 | $ 3,317.0 | $ 2,957 | $ 3,123 |
| Pre-tax income from core operations | 225.4 | 297.2 | 299.7 | 241 | 274 |
| Pre-tax income (loss) from noncore activities | (97.7) | (58.6) | (57.7) | 163 | (21) |
| Interest expense, including interest accrued on deferred payments | (73.2) | (72.1) | (54.2) | (71) | (127) |
| Interest income | 6.8 | 7.6 | 3.8 | 1 | 0 |
| Income before Chapter 11 expenses and income taxes | 61.3 | 174.1 | 191.6 | 334 | 126 |
| Chapter 11 expenses, net of interest income | (49.9) | (86.4) | (65.8) | (45) | (20) |
| Benefit from (provision for) income taxes | (2.8) | 1.1 | (4.3) | (97) | (41) |
| **Net income (loss)** | $ 8.6 | $ 88.8 | $ 121.5 | $ 192 | $ 66 |
| **Key Financial Measures:** | | | | | |
| Pre-tax income from core operations as a percentage of sales | 8.0 % | 9.5 % | 9.0 % | 8.1 % | 8.8 % |
| Pre-tax income from core operations as a percentage of sales adjusted for profit sharing of joint ventures: | 8.9 % | 10.3 % | 9.5 % | 8.4 % | 9.2 % |
| Pre-tax income from core operations before depreciation and amortization | $ 338.9 | $ 410.6 | $ 418.4 | $ 357 | $ 392 |
| As a percentage of sales | 12.0 % | 13.2 % | 12.6 % | 12.1 % | 12.6 % |
| Depreciation and amortization | $ 113.5 | $ 113.4 | $ 118.7 | $ 116 | $ 118 |
| Gross profit percentage (sales less cost of goods sold as a percent of sales): | 31.1 % | 31.7 % | 29.5 % | 30.9 % | 31.7 % |

* Assumes plan of reorganization effective as of December 31, 2009.

| W. R. Grace & Co. and Subsidiaries<br>Condensed Consolidated Statements of Cash Flows<br>As Reported and Projected<br>*In millions* | As Reported<br>Year Ended December 31, | | | Projected<br>December 31, | |
|---|---|---|---|---|---|
| | **2006** | **2007** | **2008** | **2009\*** | **2010** |
| ***Operating Activities*** | | | | | |
| Net income | $    8.6 | $    88.8 | $    121.5 | $    192 | $    66 |
| Depreciation and amortization | 113.5 | 113.4 | 118.7 | 116 | 118 |
| Reduction of asbestos-related contingencies | - | - | - | (341) | - |
| Payments for emergence contingencies | - | - | - | 100 | - |
| Chapter 11 expenses, net of interest income | 49.9 | 86.4 | 65.8 | 45 | 20 |
| (Benefit from) provision for income taxes | 2.8 | (1.1) | 4.3 | 97 | 41 |
| Income taxes paid, net of refunds | (51.6) | (51.1) | (42.4) | (20) | (32) |
| Minority interests in consolidated entities | 26.4 | 24.5 | 15.4 | 8 | 13 |
| Dividends paid to minority interests in consolidated entities | (6.7) | (12.0) | (13.4) | (20) | (13) |
| Interest accrued on pre-petition liabilities subject to compromise | 71.3 | 70.9 | 49.4 | 39 | - |
| Interest on deferred payments | - | - | - | - | 37 |
| Net (gain) loss on sales of investments and disposals of assets | (0.6) | (1.9) | (14.1) | (24) | - |
| Defined benefit pension expense | 63.7 | 52.6 | 56.8 | 89 | 89 |
| Payments under defined benefit pension arrangements | (121.5) | (105.7) | (67.7) | (59) | (88) |
| Payments under postretirement benefit plans | (13.9) | (5.0) | (6.6) | (7) | (7) |
| Net income from life insurance policies | (4.1) | (5.4) | (3.0) | - | - |
| Provision for (recovery of) uncollectible receivables | 3.5 | (0.4) | 2.2 | - | - |
| Provision for environmental remediation | 30.0 | 17.0 | 14.6 | - | - |
| Expenditures for environmental remediation | (10.9) | (9.5) | (4.9) | (15) | (7) |
| Expenditures for retained obligations of divested businesses | (3.6) | (1.0) | (1.1) | (1) | (1) |
| **Changes in assets and liabilities, excluding effect of businesses**<br>    **acquired/divested and foreign currency translation:** | | | | | |
|       Working capital items (trade accounts receivable, inventories,<br>          and accounts payable) | 29.1 | (67.1) | 56.2 | 119 | 34 |
|       Other accruals and non-cash items, including changes in deferred income taxes | 17.1 | (2.8) | (28.8) | 26 | 7 |
| **Net cash provided by operating activities before Chapter 11**<br>    **expenses and settlements** | 203.0 | 190.6 | 322.9 | 343 | 278 |
| Cash paid to resolve contingencies subject to Chapter 11 | - | (10.3) | (252.0) | (1,643) | (17) |
| Chapter 11 expenses paid | (50.3) | (92.1) | (69.3) | (45) | (20) |
| **Net cash provided by operating activities** | **152.7** | **88.2** | **1.6** | **(1,345)** | **241** |
| ***Investing Activities*** | | | | | |
| Capital expenditures | (119.2) | (136.9) | (132.2) | (104) | (139) |
| Investments in short term debt securities | - | (124.7) | - | - | - |
| Proceeds from sales of investment securities | - | - | 70.7 | - | - |
| Purchases of equity investment | - | (6.3) | (4.0) | - | - |
| Businesses acquired, net of cash acquired | (19.6) | (5.5) | - | - | - |
| Proceeds from sale of business/product line | - | 21.8 | - | 46 | (1) |
| Proceeds from termination of life insurance policies | 0.3 | 14.8 | 12.7 | 67 | - |
| Net investment in life insurance policies | (0.5) | (1.2) | (0.1) | - | - |
| Proceeds from sales of investments and disposals of assets | 9.6 | 31.1 | 21.8 | 12 | 10 |
| **Net cash used for investing activities** | **(129.4)** | **(206.9)** | **(31.1)** | **20** | **(130)** |
| ***Financing Activities*** | | | | | |
| Net payment of loans secured by cash value of life insurance policies | (0.1) | (0.1) | - | - | - |
| Net (repayments) borrowings under credit arrangements | 0.3 | 8.3 | 6.7 | 1,000 | (170) |
| Fees paid under debtor-in possession credit facility | (2.4) | (2.6) | (2.3) | - | - |
| Proceeds from exercise of warrants and stock options | 24.1 | 40.1 | 9.6 | - | 170 |
| **Net cash provided by (used for) financing activities** | **21.9** | **45.7** | **14.0** | **1,000** | **-** |
| Effect of currency exchange rate changes on cash and cash equivalents | 16.4 | 17.2 | (4.9) | - | - |
| **Increase (decrease) in cash and cash equivalents** | **61.6** | **(55.8)** | **(20.4)** | **(326)** | **111** |
| Cash and cash equivalents, beginning of period | 474.7 | 536.3 | 480.5 | 460 | 134 |
| **Cash and cash equivalents, end of period** | **$    536.3** | **$    480.5** | **$    460.1** | **$    134** | **$    245** |

\* *Assumes plan of reorganization effective as of December 31, 2009.*

| W.R. Grace & Co. and Subsidiaries<br>Condensed Consolidated Balance Sheets<br>As Reported and Projected<br>*In millions* | As Reported<br>December 31, | | | Projected<br>December 31, | |
|---|---|---|---|---|---|
| | 2006 | 2007 | 2008 | 2009* | 2010 |
| **ASSETS** | | | | | |
| **Current Assets** | | | | | |
| Cash and cash equivalents | $    536.3 | $    480.5 | $    460.1 | $    134 | $    245 |
| Investment securities | 2.3 | 98.3 | 21.6 | 10 | - |
| Cash value of life insurance policies, net of policy loans | - | 77.1 | 67.2 | - | - |
| Trade accounts receivable, net | 426.3 | 500.6 | 462.6 | 406 | 409 |
| Inventories | 324.5 | 362.9 | 354.8 | 278 | 276 |
| Deferred income taxes | 37.8 | 37.7 | 45.8 | 52 | 38 |
| Other current assets | 81.4 | 80.8 | 86.1 | 87 | 87 |
| **Total Current Assets** | **1,408.6** | **1,637.9** | **1,498.2** | **967** | **1,055** |
| | | | | | |
| Properties and equipment, net | 664.5 | 706.1 | 710.6 | 699 | 720 |
| Goodwill | 116.5 | 122.3 | 117.1 | 117 | 117 |
| Deferred income taxes: | | | | | |
| Net operating loss carryforwards | 66.8 | - | - | 258 | 257 |
| Temporary differences and tax credit carryforwards | 646.4 | 747.5 | 851.7 | 523 | 529 |
| Asbestos-related insurance | 500.0 | 500.0 | 500.0 | - | - |
| Overfunded defined benefit pension plans | 38.4 | 54.1 | 48.6 | 49 | 49 |
| Other assets | 220.7 | 140.5 | 149.3 | 104 | 105 |
| **Total Assets** | **$    3,661.9** | **$    3,908.4** | **$    3,875.5** | **$    2,716** | **$    2,832** |
| | | | | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT)** | | | | | |
| **Current Liabilities** | | | | | |
| Debt payable within one year | $    3.3 | $    4.7 | $    11.2 | $    11 | $    11 |
| Accounts payable | 172.7 | 191.3 | 230.4 | 215 | 251 |
| Other current liabilities | 272.6 | 325.1 | 291.5 | 302 | 301 |
| **Total Current Liabilities** | **448.6** | **521.1** | **533.1** | **528** | **563** |
| | | | | | |
| Debt payable after one year | 0.2 | 0.3 | 0.6 | 1,000 | 830 |
| Deferred payments | - | - | - | 395 | 432 |
| Deferred income taxes | 58.9 | 32.7 | 7.1 | 7 | 7 |
| Minority interests in consolidated entities | 61.1 | 73.2 | 73.1 | 61 | 61 |
| Underfunded defined benefit pension plans | 222.9 | 169.1 | 392.3 | 384 | 346 |
| Unfunded pay-as-you-go defined benefit pension plans | 126.7 | 137.9 | 136.7 | 128 | 128 |
| Other liabilities | 43.3 | 46.2 | 46.6 | 47 | 47 |
| **Total Liabilities Not Subject to Compromise** | **961.7** | **980.5** | **1,189.5** | **2,549** | **2,414** |
| | | | | | |
| Pre-petition bank debt plus accrued interest | 723.1 | 783.0 | 823.5 | - | - |
| Drawn letters of credit plus accrued interest | 16.4 | 26.9 | 30.0 | - | - |
| Income tax contingencies | 141.2 | 89.3 | 121.0 | 94 | 95 |
| Asbestos-related contingencies | 1,700.0 | 1,700.0 | 1,700.0 | 37 | 39 |
| Environmental contingencies | 361.1 | 394.7 | 152.2 | 57 | 50 |
| Postretirement benefits | 158.9 | 172.7 | 169.7 | 146 | 139 |
| Other liabilities and accrued interest | 120.9 | 110.9 | 116.5 | 24 | 11 |
| **Liabilities Subject to Compromise*** * | **3,221.6** | **3,277.5** | **3,112.9** | **358** | **335** |
| **Total Liabilities** | **4,183.3** | **4,258.0** | **4,302.4** | **2,907** | **2,748** |
| | | | | | |
| **Shareholders' Equity (Deficit)** | | | | | |
| Common stock issued | 0.8 | 0.8 | 0.8 | 1 | 1 |
| Paid-in capital | 423.8 | 431.5 | 436.6 | 442 | 612 |
| Retained earnings/(accumulated deficit) | (459.1) | (368.1) | (246.6) | (55) | 11 |
| Treasury stock, at cost | (96.0) | (63.7) | (57.4) | (57) | (57) |
| Accumulated other comprehensive income (loss) | (390.9) | (350.1) | (560.3) | (521) | (482) |
| **Total Shareholders' Equity (Deficit)** | **(521.4)** | **(349.6)** | **(426.9)** | **(191)** | **84** |
| **Total Liabilities and Shareholders' Equity (Deficit)** | **$    3,661.9** | **$    3,908.4** | **$    3,875.5** | **$    2,716** | **$    2,832** |

\* *Assumes plan of reorganization effective as of December 31, 2009.*

\*\* *2009 projected amounts represent pre-petition liabilities that are assumed to be reinstated but not paid*
*at emergence. We retain the current presentation here for transparency to these amounts.*

[THIS PAGE INTENTIONALLY LEFT BLANK]

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO.,** *et al.*[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| **Debtors.** | ) | |
| | ) | |
| | ) | |
| | ) | |

## EXHIBIT 13 TO EXHIBIT BOOK
## FRESENIUS SETTLEMENT AGREEMENT

**EXHIBIT 13**

Attached.

---

[1]  The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife  Boston Ltd., Alewife Land Corporation, Amicon, Inc.,  CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al., | ) | Case Nos. 01-1139 through 01-1200 |
| | ) | |
| Debtors. | ) | |
| ———————————————————— | ) | |
| | ) | |
| OFFICIAL COMMITTEE OF ASBESTOS | ) | |
| PERSONAL INJURY CLAIMANTS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| -against- | ) | Adv. No. 02-2210 |
| | ) | [LEAD DOCKET] |
| SEALED AIR CORPORATION and | ) | |
| CRYOVAC, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————————— | ) | |
| | ) | |
| OFFICIAL COMMITTEE OF ASBESTOS | ) | |
| PERSONAL INJURY CLAIMANTS and | ) | |
| OFFICIAL COMMITTEE OF ASBESTOS | ) | |
| PROPERTY DAMAGE CLAIMANTS OF | ) | |
| W.R. GRACE & CO., suing in behalf of the | ) | |
| Chapter 11 Bankruptcy Estate of W.R. | ) | |
| GRACE & CO., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| -against- | ) | Adv. No. 02-2211 |
| | ) | |
| FRESENIUS MEDICAL CARE HOLDINGS, | ) | Affects Docket 02-2211 only |
| INC. and NATIONAL MEDICAL CARE, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED SETTLEMENT AGREEMENT
## AND RELEASE OF CLAIMS

First Amended Settlement Agreement
and Release of Claims

This Settlement Agreement and Release of Claims (the "Agreement") is made as of the 6th day of February, 2003, by and among Fresenius Medical Care Holdings, Inc. (taxpayer identification number 13-3461988) ("FMCH"), National Medical Care, Inc. (taxpayer identification number 04-2835488) ("NMC"), the Official Committee of Asbestos Personal Injury Claimants (the "PI Committee"), and the Official Committee of Asbestos Property Damage Claimants (the "PD Committee," and collectively with the PI Committee, the "Asbestos Committees"), both of the Asbestos Committees in their respective capacities as plaintiffs on behalf of the estates of the Debtors in the Asbestos Claimants' Adversary Proceeding.

## ARTICLE I

### DEFINITIONS

Capitalized terms used in this Agreement shall have the meanings (such meanings to be equally applicable to both the singular and the plural forms of the terms defined) assigned to such terms in Appendix A attached hereto or in the Preamble above. Appendix A is incorporated herein by reference, and is fully part of this Agreement.

## ARTICLE II

### TERMS OF SETTLEMENT OF CLAIMS

2.01    Moving Parties to Seek Approval of Settlement.  Within forty-five (45) days of the Settlement Execution Date, the Moving Parties shall move the Court to enter an order binding on all of the Estate Parties (including the Settling Parties) approving this Agreement and obligating each of the Estate Parties to the terms and conditions of this Agreement as if each of the Estate Parties had executed this Agreement.

2.02    Preconditions to Settlement Payment Obligation.  As a condition precedent to the obligation of the NMC Defendants to make the Settlement Payment, each and every of the

First Amended Settlement Agreement
and Release of Claims

following preconditions shall have occurred, unless the NMC Defendants, in their sole discretion, have provided written notice to the other Settling Parties and the Court that they waive one or more of the preconditions:

        (A)    <u>Releases by the Estate Parties</u>. The Plan of Reorganization shall provide that: (i) upon the making of the Settlement Payment, the Asbestos Committees and the Estate Parties will fully, finally, and forever release, relinquish and discharge each and every of the NMC Defendants from any and all Grace-Related Claims that the Asbestos Committees or the Estate Parties have asserted or could have asserted in this or any other forum against any of the NMC Defendants; and (ii) prior to the making of the Settlement Payment, the Asbestos Committees and the Estate Parties will deliver to the NMC Defendants the Release that is attached as <u>Appendix B</u> hereto, which by its terms shall become effective upon the making of the Settlement Payment.

        (B)    <u>Releases by Plan Claimants</u>. The Plan of Reorganization shall provide that any Person that votes in favor of the Plan or that receives property under the Plan shall thereby be deemed, upon the making of the Settlement Payment, to have fully and finally released each and every of the NMC Defendants from all Grace-Related Claims that such Person has asserted or could have asserted in this or any other forum against any of the NMC Defendants.

        (C)    <u>Releases by Trust Claimants</u>. The Plan of Reorganization shall provide for the establishment of a trust or trusts under state law and pursuant to Section 524(g) of the Bankruptcy Code (the "Asbestos Trust"), and the Plan of Reorganization further shall provide that any Person that receives property from the Asbestos Trust shall thereby be deemed, upon and after the making of the Settlement Payment, to have fully and finally released each and every

-2-

First Amended Settlement Agreement
and Release of Claims

of the NMC Defendants from all Grace-Related Claims that the Person has asserted or could have asserted in this or any other forum against any of the NMC Defendants.

(D)     Bar Order.  The Court shall have issued, pursuant to Section 105(a) of the Bankruptcy Code, a Final Order, effective upon the making of the Settlement Payment, permanently and forever enjoining, restraining and barring any Person from commencing or continuing any suit, action or other proceeding, or from taking any other action, for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, or with respect to, any Grace-Related Claim against any of the NMC Defendants.

(E)     Channelling Injunction. In addition to the injunction described in (D) above, the Final Order confirming the Plan of Reorganization shall provide that, effective upon the making of the Settlement Payment, the NMC Defendants shall receive the full benefits and protections of an injunction entered pursuant to section 524(g) of the Bankruptcy Code, which injunction shall permanently bar any Person from commencing or continuing any suit, action, or other proceeding, or from taking any other action for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, or with respect to, any Asbestos-Related Claim that the Person asserted or could have asserted, against any of the NMC Defendants.

(F)     Indemnification.  The Plan of Reorganization shall provide that the Estate Parties, jointly and severally, upon the making of the Settlement Payment, shall indemnify, defend and hold harmless the NMC Defendants for any loss, cost or expense (including attorneys' fees and other costs of defense) arising out of any and all Grace-Related Claims, commenced or continued in this or any other forum against any of the NMC Defendants.  Such indemnification specifically shall not apply to the costs and expenses (including lawyers' fees and accountants' fees) incurred by the NMC Defendants in (i) defending the Asbestos Claimant's

-3-

Adversary Proceeding or any other proceedings or controversies arising out of or based upon

Asbestos-Related Claims prior to the Settlement Execution Date, or (ii) defending any

proceedings or controversies arising out of or based upon Grace-Related Claims, other than

Asbestos-Related claims, prior to the Settlement Effective Date.

        (G)   Dismissals. Upon the filing of timely motions to dismiss by the NMC

Defendants, and the best efforts of the other Settling Parties in support of such motions, each

court with jurisdiction over the following actions shall have dismissed by Final Order, effective

upon the making of the Settlement Payment, each of the following actions with prejudice as

against the NMC Defendants:

        (i)   *Mesquita v. W.R. Grace & Co., et al.*, amended as *Abner v. W.R.*

*Grace & Co. et al.*, No. 315465, Superior Court of California, County of San Francisco,

(since transferred to the Court as Adversary Proceeding No. 01-08883);

        (ii)   *Woodward v. Sealed Air Corporation (US) et al.*, No. 01-10547

PBS, U.S. District Court, District of Massachusetts, (since transferred to the Court as

Case No. 01-CV-412);

        (iii)   *Lewis v. W.R. Grace & Co. et al.*, U.S. Bankruptcy Court, District

of Delaware, Bkr. Case No. D. Del. 01-001139/Adv. Case No. 01-08810; and

        (iv)   The Asbestos Claimants Adversary Proceeding.

        (H)   Successors. The Final Order confirming the Plan of Reorganization shall

include a determination by the Court that, as of the Plan Effective Date, the Estate Parties have

the ability to pay and satisfy in the ordinary course of business their respective obligations and

liabilities, including without limitation, all Indemnified Taxes and all obligations under this

Agreement.

-4-

First Amended Settlement Agreement
and Release of Claims

(I)  Court Approval.  The Court by Final Order shall approve this Agreement, and each of the Estate Parties shall become obligated to, and entitled to the benefits of, the terms and conditions of this Agreement.

(J)  Implementation.  Prior to the Settlement Approval Date, none of the Estate Parties shall take any action that would be a breach of such Person's duties under Article III of this Agreement if such action had been taken after the Settlement Approval Date.

2.03  Payment Obligations of the NMC Defendants.  Within five (5) business days of the Settlement Effective Date the NMC Defendants shall wire transfer, subject to the provisions of Section 3.08, one hundred fifteen million dollars ($115,000,000) cash as designated by the Court in the Final Order approving the Plan of Reorganization.

2.04  Release of Sealed Air Defendants.  Upon the Settlement Effective Date, the NMC Defendants will execute a release, acceptable in form and substance to the NMC Defendants, that fully, finally, and forever releases, relinquishes and discharges Sealed Air and Cryovac from any and all Tax claims or Asbestos-Related Claims (including but not limited to claims for lawyers' fees and the costs of litigation related thereto) that the NMC Defendants have asserted or could have asserted in this or any other forum against Sealed Air or Cryovac.

2.05  Publicity.  Before making any public statements or announcements prior to the Settlement Approval Date, each of the Settling Parties shall obtain approval from the other Settling Parties of the text of any such public statement or announcement (including in any filing not under seal in the Court) to be made by such party or its parents, which approval shall not be unreasonably withheld.  If the Settling Parties are not able to agree on or approve the text of such a public statement or announcement and the legal counsel for any party proposing to make a

-5-

public statement or announcement is of the opinion that such public statement or announcement is required by law or the rules of any stock exchange on which such party's securities, or the securities of a parent corporation of such party, are traded, then such party or the parent may make or issue the legally required statement or announcement.

2.06   The NMC Defendants Solely Responsible for Settlement Payment.

Notwithstanding any other provision of this Agreement, or any prior Agreements, the NMC Defendants will not seek indemnification from the Estate Parties, Sealed Air, or Cryovac for the Settlement Payment.

2.07   Purpose of Payment and Consistency of Treatment.   The Settling Parties agree, and the Plan of Reorganization shall provide that the Estate Parties acknowledge and agree, that FMCH and NMC have entered into this Agreement for the purpose of settling and terminating any and all controversies relating to the assertion of Asbestos-Related Claims, as well as other Grace-Related Claims against the NMC Defendants. The Settlement Payment is intended and shall be treated by the Settling Parties as a payment by the NMC Defendants of an ordinary and necessary expense incurred by the NMC Defendants and as income of the Estate Parties in the same amount. Any indemnification payments made by Grace-Conn. to the NMC Defendants, to the extent the indemnified obligation would have been an ordinary and necessary expense if incurred directly by Grace-Conn., shall be treated by the Settling Parties as a payment by Grace-Conn. of an ordinary and necessary expense incurred by Grace-Conn. and, to the extent the indemnified obligation was itself deducted as an ordinary and necessary expense of the NMC Defendants, as income of the NMC Defendants. None of the Settling Parties shall take a position inconsistent with the foregoing in any Tax Return or with any tax authority.

-6-

First Amended Settlement Agreement
and Release of Claims

2.08    No Limitation on Estate Parties' Ability to Propose Plan.    Notwithstanding any

other provision of this Agreement, it shall not be a breach of this Agreement, act of bad faith,

tortious interference with a contractual relationship, or any other malfeasance for the Estate

Parties to propose or support a plan of reorganization that does not provide for the establishment

of an Asbestos Trust or the issuance of an injunction pursuant to Section 524(g) of the

Bankruptcy Code, provided however, the Estate Parties shall use their best efforts to cause all of

the preconditions set forth in Section 2.02, other than those set forth in paragraphs (C) and (E) of

Section 2.02, to occur.  For the avoidance of doubt, if the Plan of Reorganization, as well as the

Final Order of confirmation respecting the Plan of Reorganization, do not satisfy the

preconditions set forth in paragraphs (C) and (E) of Section 2.02, the NMC Defendants may in

their sole discretion waive or decline to waive, as set forth in Section 2.02, the failure of those

preconditions as conditions precedent to the Settlement Payment.

2.09    Best Efforts By Asbestos Committees Respecting Plan.  The Asbestos

Committees shall use their respective best efforts to cause the occurrence of all the preconditions

to the obligation of the NMC Defendants to make the Settlement Payment set forth in Section

2.02, except to the extent the NMC Defendants may in their sole discretion waive, as set forth in

Section 2.02, the failure of those preconditions as conditions precedent to the Settlement

Payment.

## ARTICLE III

## SPECIFIED DUTIES REGARDING TAXES.

3.01    Termination of TSIA.  From the Settlement Execution Date through the

Settlement Effective Date, as among the Settling Parties, the terms of this Agreement shall

supercede the terms of the TSIA, except that Section 4.04 of the TSIA shall remain in force and

First Amended Settlement Agreement
and Release of Claims

is incorporated by reference herein. Upon the Settlement Effective Date, the TSIA shall be terminated and no party to such TSIA shall have any obligation to any other party to such TSIA in respect thereof, whether such obligation shall have accrued before or after the Settlement Approval Date, except that Section 4.04 of the TSIA shall remain in force and is incorporated by reference herein.

3.02   Estate Parties' Duty to Pay Indemnified Taxes. From and after the Settlement Approval Date, the Estate Parties promptly shall pay any Indemnified Taxes as such Taxes become due and payable to tax authorities pursuant to a Final Determination, provided that the Estate Parties have obtained authorization from the Court to pay currently any such Indemnified Taxes. To the extent Indemnified Taxes become due and payable, the Estate Parties shall use their best efforts to obtain authorization from the Court to pay currently such Indemnified Taxes. The other Settling Parties shall cooperate in the Estate Parties' efforts to obtain such authorization from the Court to pay currently such Indemnified Taxes, provided however, that the foregoing does not modify the obligations of members of the FMCH Group as set forth in Section 3.04(A). The Settling Parties agree that any such payments by the Estate Parties of Indemnified Taxes are, for purposes of this Agreement and the administration of the Debtors' estates, the payment of the Taxes of the Estate Parties.

3.03   Grace-Conn. Control of Indemnified Tax Matters.

(A)   Grace-Conn. Authority over Indemnified Taxes. Upon the Settlement Approval Date, subject to the limitations in Sections 3.03(B) and (C), Grace-Conn. solely shall be authorized to act for the Grace New York Group in its sole discretion with respect to Indemnified Taxes. Notwithstanding the authority granted in the previous sentence, Grace-Conn. and the other Estate Parties shall use their respective best efforts to defer any Final

-8-

First Amended Settlement Agreement
and Release of Claims

Determination of any Indemnified Taxes until such time as the Estate Parties have obtained

authorization from the Court to pay currently such Indemnified Taxes, and the other Settling

Parties shall cooperate in the effort to defer any Final Determination of any Indemnified Taxes

prior to authorization from the Court to pay such Indemnified Taxes, provided however, that the

foregoing does not modify the obligations of members of the FMCH Group as set forth in

Section 3.04(A). FMCH will provide to Grace-Conn. and its agents from time to time Powers of

Attorney with respect to Indemnified Taxes so that Grace-Conn. can act as the agent of the Grace

New York Group with respect to Indemnified Taxes. The NMC Defendants agree that, pursuant

to the cooperation obligations set forth in Section 3.04(A), they will respect such authority of

Grace-Conn. and do nothing to derogate from such authority with respect to Indemnified Taxes,

and, so long as none of the Estate Parties are in breach of this Agreement, the NMC Defendants

will not initiate communications with any tax authority concerning Indemnified Taxes without

obtaining the written consent of Grace-Conn. or the permission of the Court. As requested by

Grace-Conn., amendments to Consolidated Tax Returns for or attributable to all Tax Periods of

the Grace New York Group ending on or before December 31, 1996 shall be prepared by Grace-

Conn. and filed by FMCH on behalf of Grace-Conn.

      (B)    Limitations on Agreement To Final Determinations. Neither Grace-Conn.

nor any other Estate Party shall voluntarily agree to the payment, assessment, resolution or other

Final Determination of any Indemnified Tax prior to the Settlement Effective Date, except to the

extent the Estate Parties have obtained authorization from the Court to pay promptly in full any

such Indemnified Taxes, or to the extent FMCH hereafter has consented in its sole discretion in

writing to the Estate Parties' agreement to such payment, assessment, resolution or other Final

Determination.

-9-

(C)    Tax Refunds. Grace-Conn. shall control any Tax Refund of the Grace New York Group with respect to any Tax Period ending on or before December 31, 1996, credited or payable to any member of the Grace New York Group, except that:

(i) any such Tax Refund credited or paid to any member of the Grace New York Group prior to the time the Estate Parties have received authority from the Court to make payments under Section 3.02 above of Indemnified Taxes as they become due and payable shall be repaid to the tax authority as a payment of Indemnified Taxes (whether or not then due and payable) if, in the reasonable determination of FMCH, Indemnified Taxes are expected to become due and payable to such tax authority, provided however, if there is a dispute as to whether additional Indemnified Taxes are expected to become due and payable to such tax authority Grace-Conn. shall first have the opportunity to seek a determination from the Court that additional Indemnified Taxes are not expected to become due and payable to such tax authority and Grace-Conn. therefore should be permitted by the Court to receive and retain such refund; and

(ii) any Tax Refund attributable to the NMC Business with respect to any Tax Period ending on or before December 31, 1996, (I) shall first be applied to satisfaction of NMC Indemnified Taxes and (II) thereafter shall be applied to the satisfaction of Indemnified Taxes or if there are no such NMC Indemnified Taxes or Indemnified Taxes then due and payable, or in the reasonable determination of Grace-Conn. expected to become due and payable within eighteen (18) months, promptly shall be paid to FMCH. None of the Estate Parties shall seek the refund of any previously paid Taxes of the Grace New York Group with respect to any Tax Period ending on or before December 31, 1996, if in the reasonable determination of either FMCH or Grace-Conn. Indemnified Taxes are expected to become due and payable to such tax authority for Tax Periods ending on or before December 31, 1996.

-10-

First Amended Settlement Agreement
and Release of Claims

3.04    Cooperation.

(A)    Cooperation by FMCH.  From and after the Settlement Approval Date, FMCH from time to time shall provide such cooperation as Grace-Conn. shall reasonably request, including (i) the implementation of its rights and responsibilities under this Agreement with respect to Indemnified Taxes, and (ii) provide such Powers of Attorney as provided in Section 3.03(A), and FMCH will not seek indemnification for the costs and expenses (including lawyers' fees and accountants' fees) of such cooperation, provided that FMCH will not be required to incur any unreasonable cost or expense in respect of such cooperation.  Whenever FMCH or other member of the FMCH Group receives notice or demand from any tax authority with respect to any Tax Item which could increase or decrease the liability for, or give rise to a Tax Refund with respect to, any Indemnified Tax, FMCH shall in good faith promptly give notice to Grace-Conn. of such Indemnified Tax related issue, in accordance with Section 5.07.

(B)    Cooperation by Estate Parties.  Upon the request of FMCH, each of the Estate Parties from time to time shall provide such cooperation as FMCH shall reasonably request, including (i) the implementation of its rights and responsibilities under this Agreement with respect to NMC Indemnified Taxes and (ii) provide such Powers of Attorney relating to NMC Indemnified Taxes as FMCH shall request with respect to Tax Periods ending on or before December 31, 1996, and the Estate Parties will not seek indemnification for the costs and expenses (including lawyers' fees and accountants' fees) of such cooperation, provided that the Estate Parties will not be required to incur any unreasonable cost or expense in respect of such cooperation.  Whenever any of the Estate Parties receives notice or demand from any tax authority with respect to any Tax Item which could increase or decrease the liability for, or give rise to a Tax Refund with respect to, any NMC Indemnified Tax, Grace-Conn. shall in good faith

-11-

promptly give notice to FMCH of such NMC Indemnified Tax related issue, in accordance with Section 5.07. Grace-Conn. shall provide prompt notice from time to time to FMCH of (i) revenue agents' reports, adjustments to Tax Items that may increase Indemnified Taxes, demands for payment of Indemnified Taxes, notices of proposed assessments and Final Determinations respecting Indemnified Taxes and similar correspondence, notices and demands from tax authorities and (ii) confirmation that Indemnified Taxes have been paid by the Estate Parties.

3.05    FMCH Group Protection for Indemnified Taxes. The Estate Parties jointly and severally shall indemnify, defend and hold harmless FMCH and each member of the FMCH Group from and against any loss in respect of (i) Indemnified Taxes or (ii) any action by any Person, including any tax authority, seeking payment by or reimbursement from FMCH or any of the other NMC Defendants for any Indemnified Taxes, provided however, that there shall be no duty to indemnify for costs and expenses (including lawyers' fees and accountants' fees) except in the event of a breach of this Agreement and pursuant to the terms of Section 3.09 below.

3.06    Estate Parties' Protection for NMC Indemnified Taxes. FMCH and the other members of the FMCH Group jointly and severally shall indemnify, defend and hold harmless each of the Estate Parties from and against any loss in respect of (i) NMC Indemnified Taxes or (ii) any action by any Person, including any tax authority, seeking payment by or reimbursement from any of the Estate Parties for any NMC Indemnified Taxes, provided however, that there shall be no duty to indemnify for costs and expenses (including lawyers' fees and accountants' fees) except in the event of a breach of this Agreement and pursuant to the terms of Section 3.09 below.

3.07    Payment of Indemnified Taxes by FMCH. Notwithstanding the obligations of the Estate Parties in Section 3.02, in the event that any tax authority shall demand of FMCH or any

-12-

other members of the FMCH Group payment of any Indemnified Taxes, and FMCH or such other members of the FMCH Group pays such Indemnified Taxes, each of the Estate Parties promptly and unconditionally shall be obligated jointly and severally to and shall repay such amount of the Indemnified Taxes to FMCH or the other members of the FMCH Group, as applicable, with interest from the date of payment at the Hot Interest Rate. To the extent such Indemnified Taxes and interest are not set off against the payment required by Section 2.03 or any other payment required of FMCH or any member of the FMCH Group under this Agreement or otherwise pursuant to Section 3.08 below, FMCH or the other members of the FMCH Group, as applicable, shall have an allowed claim to the extent of such payment, including interest thereon at the Hot Interest Rate, against the estates of the Debtors. On and after the Settlement Effective Date, in addition to any other rights and remedies under this Agreement, each such claim for Indemnified Taxes and interest shall be an Allowed Administrative Claim against the Estate Parties.

3.08   Right of Setoff. Notwithstanding anything herein to the contrary, FMCH and each member of the FMCH Group shall have a right of setoff or recoupment, including a right of setoff under Section 553 of the Bankruptcy Code, against the payment required by Section 2.03 or any other payment required of FMCH or any member of the FMCH Group under this Agreement or otherwise, for the amount of any obligation of any of the Estate Parties under this Agreement, including without limitation indemnification obligations for Indemnified Taxes, that any of the Estate Parties has failed to pay to FMCH or the members of the FMCH Group.

3.09   Remedies for Breach. In the event of any breach of this Agreement, including any obligation for indemnification, (i) by the Estate Parties or any member of the New Grace Group, then the Estate Parties shall be jointly and severally liable for and shall indemnify, defend

-13-

First Amended Settlement Agreement
and Release of Claims

and hold harmless the NMC Defendants from and against any Taxes, loss, cost or expense (including without limitation reasonable lawyers' fees and reasonable accountants' fees) attributable to such breach, and the NMC Defendants shall have, among other remedies, an allowed Administrative Claim against each of the Estate Parties for any Taxes, loss, cost or expense (including without limitation reasonable lawyers' fees and reasonable accountants' fees) attributable to such breach; or (ii) by the NMC Defendants or any member of the FMCH Group, then the NMC Defendants shall be jointly and severally liable for and shall indemnify, defend and hold harmless the Estate Parties from and against any Taxes, loss, cost or expense (including without limitation reasonable lawyers' fees and reasonable accountants' fees) attributable to such breach.

3.10   Preservation of Rights.  In the event that a member of the New Grace Group, or their respective successors or assigns, shall fail to perform any obligation to indemnify, defend and hold harmless FMCH or any member of the FMCH Group, as provided in this Agreement, or prior to its termination, the TSIA, nothing herein shall preclude or estop such member of the FMCH Group from asserting any causes of action on the grounds that one or more of the members of the New Grace Group or of the Sealed Air/Grace Group is primarily liable for such obligation under general principles of law determined without reference to this Agreement or the TSIA.

## ARTICLE IV

## COVENANTS NOT TO SUE AND TOLLING.

4.01   Claims Against the NMC Defendants.  The Asbestos Committees and the Estate Parties shall not commence or prosecute, or cooperate in the commencement or prosecution of, any suit, demand, claim, or cause of action, whether asserted directly or derivatively, against any

-14-

First Amended Settlement Agreement
and Release of Claims

of the NMC Defendants for any Grace-Related Claims, including the Asbestos Claimants'

Adversary Proceeding, except (i) as permitted in Section 4.03 below or (ii) to enforce this

Agreement.

      4.02    Sealed Air Indemnity Litigation.  In connection with the Sealed Air Settlement

Agreement, the Asbestos Committees shall use their best efforts to obtain from Sealed Air and

Cryovac, an agreement acceptable in form and substance to the NMC Defendants, which

provides for the stay, and if necessary the reinstatement, of the Sealed Air Indemnity Litigation

pending the Settlement Effective Date.  If Sealed Air and Cryovac do not agree to a stay of the

Sealed Air Indemnity Litigation, then notwithstanding any other provision of this Agreement,

prior to the Settlement Effective Date the NMC Defendants shall remain free to pursue all rights

and remedies they may have against Sealed Air and Cryovac, in any court of competent

jurisdiction.

      4.03    Reinstatement of Litigation Upon Failure of Conditions Precedent.  The Asbestos

Committees or the Estate Parties may reinstate the Asbestos Claimants Adversary Proceeding on

the active docket if the Court determines by Final Order (the "Litigation Reinstatement Date")

that despite the best efforts of the Estate Parties and the Asbestos Committees one or more

conditions in Section 2.02 above will not be able to be satisfied, and the failure of such

precondition has not been waived by the NMC Defendants.  For purposes of statutes of

limitation, statutes of repose, and any procedural bars to the prosecutions of claims, all claims,

counterclaims, cross-claims, and claims for contribution or indemnity the Settling Parties have

asserted or could have asserted in the Court or any other forum will be deemed to have been

tolled during the time period between the Settlement Execution Date and the Litigation

Reinstatement Date.

-15-

# ARTICLE V

## MISCELLANEOUS PROVISIONS.

5.01   <u>Expenses</u>.  Unless otherwise expressly provided in this Agreement, each Person shall bear any and all expenses (including legal and accounting) that arise from its respective obligations under this Agreement.

5.02   <u>Amendment; Agency</u>. This Agreement may not be amended except by an agreement in writing, signed by the Settling Parties with the approval of the Court.  The Settling Parties agree that FMCH shall be entitled to receive notices and to act on behalf of each member of the FMCH Group and each of the NMC Defendants and that Grace-Conn. shall be entitled to receive notices and to act on behalf of New Grace, the other Estate Parties and the New Grace Group, and each member of the New Grace Group, in respect of all matters under this Agreement.

5.03   <u>Settlement Inadmissible for Other Purposes</u>.  The Settling Parties agree that the terms of this Agreement reflect a good faith settlement of the Grace-Related Claims and of the other terms and conditions contained herein, reached voluntarily after consultation with experienced legal counsel.  Neither this Agreement nor the settlements contained herein, nor any act performed, document executed, or statement made pursuant to or in support of or in furtherance of this Agreement or the settlements contained herein: (i) is or may be deemed to be or may be used as an admission of, or evidence of, the validity or amount of any Grace-Related Claim or any other claim, or of any wrongdoing or liability; or (ii) is or may be deemed to be or may be used as an admission of, or evidence of, any fault or omission of any Settling Party in any proceeding in any court, administrative agency, or other tribunal.  Any Settling Party or other Person released by the terms or

-16-

First Amended Settlement Agreement
and Release of Claims

implementation of this Agreement may file this Agreement in any other action that may be brought against them in order to support a defense or counterclaim based on principles of *res judicata,* collateral estoppel, release, good faith settlement, accord and satisfaction, bar order, channelling injunction, judgment bar or reduction, or any theory of claim preclusion or issue preclusion or similar defense or counterclaim. The Settling Parties may file this Agreement in any proceeding brought to enforce any of its terms.

5.04    Signed Counterparts. This Agreement may be executed in one or more counterparts. All executed counterparts and each of them shall be deemed to be one and the same instrument. Counsel for the Settling Parties shall exchange among themselves signed counterparts of this Agreement.

5.05    Confidentiality of Information. All agreements made between and among the Settling Parties and orders entered during the course of the Asbestos Claimants Adversary Proceeding relating to the confidentiality of information shall survive this Agreement.

5.06    Agreement Drafted Equally. This Agreement shall not be construed more strictly against one party than another merely because it, or any part of it, may have been prepared by counsel for one of the parties. The Settling Parties acknowledge and agree that the Agreement is the result of arm's-length negotiations between the parties and all parties have contributed substantially and materially to the preparation of this Agreement.

5.07    Notices. All notices and other communications hereunder shall be in writing and shall be delivered by hand including overnight business courier or mailed by registered or certified mail (return receipt requested) to the parties at the following addresses (or at such other addresses for a party as shall be specified by like notice) and shall be deemed given on the date on which such notice is received:

-17-

First Amended Settlement Agreement
and Release of Claims

To Grace-Conn. or any member of the New Grace Group:

> W.R. Grace & Co.
> 7500 Grace Drive
> Columbia, Maryland  21044
> Attention:        Secretary
> Phone:  (410) 531-4212
> Fax:      (410) 531-4783

With a copy to:

> David M. Bernick
> Kirkland & Ellis
> 200 East Randolph Drive
> Chicago, Illinois  60601
> Phone: (312) 861-2000
> Fax (312) 861-2200
> Email: david_bernick@chicago.kirkland.com

To the Official Committee of Asbestos Personal Injury Claimants :

> Peter Van N. Lockwood
> Caplin & Drysdale, Chartered
> 1 Thomas Circle N.W.
> Washington, D.C.  20005
> Phone: (202) 862-5000
> Fax (202) 429-3301
> Email: pvnl@capdale.com

To the Official Committee of Asbestos Property Damage Claimants:

> Scott L. Baena
> Bilzin Sumberg Baena Price & Axelrod LLP
> 200 South Biscayne Blvd., Suite 2500
> Miami, Florida 33131
> Phone: (305) 374-7580
> Fax: (305) 374-7593
> Email: sbaena@bilzin.com

-18-

First Amended Settlement Agreement
and Release of Claims

To FMCH or any member of the FMCH Group:

> c/o Fresenius Medical Care North America
> Corporate Headquarters
> General Counsel
> Corporate Law Department
> 95 Hayden Avenue
> Lexington, MA 02420-9192
> Phone: (781) 402-9000
> Fax: (781) 402-9713

With a copy to:

> David S. Rosenbloom
> McDermott, Will & Emery
> 227 W. Monroe, Suite 4400
> Chicago, Illinois 60606
> Phone: (312) 372-2000
> Fax: (312) 984-7700
> Email: drosenbloom@mwe.com

5.08    Resolution of Disputes.  Any claim or dispute arising out of or relating in any way to this Agreement must be brought before the Court, which shall retain jurisdiction of this matter and the Settling Parties for the purposes of enforcing and implementing the terms and conditions of this Agreement and resolving disputes as to the rights and obligations of the Settling Parties hereunder, provided however that section 524(g)(2) shall govern jurisdiction over any proceeding that involves any injunction entered in accordance with section 524(g) of the Bankruptcy Code. The Settling Parties submit to the jurisdiction of the Court for these purposes.

5.09    Titles and Headings.  Titles and headings to sections herein are inserted for the convenience of reference only and are not intended to be a part or to affect the meaning or interpretation of this Agreement.

5.10    Legal Enforceability.  Without prejudice to any rights or remedies otherwise available to any party hereto, each party hereto acknowledges that damages would be an

First Amended Settlement Agreement
and Release of Claims

inadequate remedy for any breach of the provisions of this Agreement and agrees that the obligations of the Settling Parties hereunder shall be specifically enforceable.

5.11    Governing Law. This Agreement shall be governed by the laws of the State of Delaware (without giving effect to its provisions on conflict of laws), and without affecting any determination as to the law applicable to the Asbestos Claimants' Adversary Proceeding.

5.12    Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of the Settling Parties, including without limitation the other Estate Parties; provided that (i) neither this Agreement nor any substantial right or obligation hereunder may be assigned by FMCH, on the one hand, and New Grace or Grace-Conn., on the other, without the consent of the other Settling Parties, which consent shall not be unreasonably withheld, and (ii) none of the Estate Parties shall transfer or agree to transfer a substantial part of their respective assets (in one or a series of transactions, whether or not related) to any Person or Persons, without a prior determination of the Court by Final Order that at the time of each such transaction New Grace and Grace-Conn., or any such successors who agree to be jointly and severally liable for the obligations of New Grace and Grace-Conn., will have the ability to pay and satisfy in the ordinary course of business their respective obligations and liabilities, including without limitation, all Indemnified Taxes and all obligations under this Agreement; provided, however, that this clause (ii) shall not apply at any time when the following two conditions in subclauses (x) and (y) are both satisfied: (x) (I) as a result of the expiration of the applicable statutes of limitation, assessment against and collection of Indemnified Taxes from each of the NMC Defendants (including assessment and collection pursuant to Section 6901 of the Code) is barred by such statutes of limitations and (II) all Indemnified Taxes have been paid in accordance with Section 3.02 of this Settlement Agreement

-20-

and the NMC Defendants have received from the Estate Parties (or adequate provision satisfactory to the NMC Defendants has been made for the payment of) all indemnification and other payments claimed by the NMC Defendants against the Estate Parties in respect of Indemnified Taxes and related matters in accordance with Sections 3.03, 3.05, and 3.07 of this Settlement Agreement; and (y) the injunctions required by Sections 2.02(D) and (E) of this Settlement Agreement shall be in effect and there shall not be pending any lawsuit, action or other judicial or administrative proceeding (I) alleging a Grace-Related Claim and seeking to impose liability on one or more of the NMC Defendants notwithstanding the existence and continuing operative effect of such injunctions or (II) challenging in any manner the continuance or operative effect of such injunctions in respect of the NMC Defendants.

First Amended Settlement Agreement
and Release of Claims

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written, on their own behalf and as authorized agents for each member of their respective affiliated groups.

THE OFFICIAL COMMITTEE OF
ASBESTOS PERSONAL INJURY
CLAIMANTS

By: _____

Name

_____
Title

_____
Date
3/19/03

THE OFFICIAL COMMITTEE OF
ASBESTOS PROPERTY DAMAGE
CLAIMANTS

By: _____

Name

_____
Title

_____
Date

-22-

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written, on their own behalf and as authorized agents for each member of their respective affiliated groups.

THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS

By: _____
     Name

     _____
     Title

     _____
     Date

THE OFFICIAL COMMITTEE OF ASBESTOS PROPERTY DAMAGE CLAIMANTS

By: _____
     Name

     *Counsel*
     Title

     *4-11-03*
     Date

-22-

FRESENIUS MEDICAL CARE HOLDINGS, INC.

By: _____
Name

Senior Vice President
Title

4/14/03
Date

NATIONAL MEDICAL CARE, INC.

By: _____
Name

Senior Vice President
Title

4/14/03
Date

-23-

W.R. GRACE & CO.

By: _____

Name   Robert M. Tarola
Senior Vice President and
Chief Financial Officer
_____
Title

April 14, 2003
_____
Date

W.R. GRACE & CO.—CONN.

By: _____

Name   Robert M. Tarola
Senior Vice President and
Chief Financial Officer
_____
Title

April 14, 2003
_____
Date

-24-

First Amended Settlement Agreement
and Release of Claims

(as to each other Debtor)

By: _____

Name   Robert M. Tarola
Vice President or
Authorized Representative
Title

April 14, 2003
Date

CH199 4061081-1.052942.0033

First Amended Settlement Agreement
and Release of Claims

-25-

**APPENDIX A**
## TO SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

## DEFINITIONS

As used in the Settlement Agreement and Release of Claims, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and the plural forms of the terms defined):

1.01    "Administrative Claim" shall mean a claim (as defined in Section 101(5) of the Bankruptcy Code) against the Debtors' chapter 11 bankruptcy estates for costs and expenses of administration under Sections 503(a) or 507(a)(1) of the Bankruptcy Code.

1.02    "Asbestos Claimants Adversary Proceeding" shall mean the adversary proceeding captioned, *Official Committee of Asbestos Personal Injury Claimants and Official Committee of Asbestos Property Damage Claimants of W.R. Grace & Co., suing in behalf of the Chapter 11 Bankruptcy Estates of W.R. Grace & Co., et al., Plaintiffs v. Fresenius Medical Care Holdings, Inc. and National Medical Care, Inc.*, Adversary Proceeding No. 02-2211, which the Court consolidated with Adversary Proceeding No. 02-2210, by Order dated March 28, 2002.

1.03    "Asbestos-Related Claim" shall mean any claim, (including but not limited to personal injury, wrongful death, property damage or medical monitoring) whether sounding in tort, contract, warranty, statute, or any other theory of law or equity, based on or arising by reason of direct or indirect damages allegedly caused by consumption, use, storage, manufacturing, assembly, distribution, installation, exposure to, or the presence of asbestos or asbestos containing products or by-products, or products which contain asbestos in any form, consumed, used, stored, manufactured, assembled, distributed, disposed of, or installed by or on behalf of any Grace-Conn. Business.

A-1

First Amended Settlement Agreement
and Release of Claims

1.04    "Asbestos Trust" shall have the meaning ascribed to such term in Section 2.02(C).

1.05    "Bankruptcy Code" shall mean title 11 of the United States Code, as amended.

1.06    "Code" shall mean the Internal Revenue Code of 1986, as amended, and shall include corresponding provisions of any subsequently enacted federal income tax laws.

1.07    "Common Parent" shall mean the common parent, as defined in Treasury Regulation Section 1.1502-77, of those corporations that joined, or hereafter join, in filing a Consolidated Tax Return under Section 1501 of the Code, and the Treasury Regulations thereunder, or a Consolidated Tax Return under comparable provisions of Tax law of other jurisdictions (domestic or foreign).

1.08    "Consolidated Tax Return" shall mean (i) a federal consolidated income Tax Return, within the meaning of Section 1501 of the Code and the Treasury Regulations under Section 1502 of the Code, and (ii) any combined, joint, consolidated or other Tax Return respecting Taxes under the laws of any jurisdiction (domestic or foreign).

1.09    "Court" shall mean the court in which the Asbestos Claimants' Adversary Proceeding is pending, or if no longer pending, the United States Bankruptcy Court for the District of Delaware.

1.10    "Cryovac" shall mean Cryovac, Inc. (f/k/a Grace Communications, Inc.) (taxpayer identification number 13-2830262).

1.11    "Debtor" shall mean each of W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc.,

A-2

Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

     1.12   "Estate Parties" shall mean each of the Debtors, the estate of each Debtor, the post-confirmation estate of each Debtor, each of the reorganized Debtors, and any trustee that may be appointed in any of the Debtors' cases under the Bankruptcy Code.

A-3

1.13    "Final Determination" shall mean any assessment or resolution of liability for any Tax for a Tax Period, (i) by Form 870 or 870-AD or by Form 5701 (or any successor forms thereto), on the date of acceptance or agreement by or on behalf of the taxpayer, or by comparable forms respecting Taxes under the laws of other jurisdictions (domestic or foreign); (ii) by a decision, judgment, decree, or other order by a court of competent jurisdiction, which has become final and unappealable; (iii) by a closing agreement or accepted offer in compromise under Section 7121 or 7122 of the Code, or comparable agreements respecting Taxes under the laws of other jurisdictions (domestic or foreign); (iv) by any allowance of a refund or credit in respect of an overpayment of Tax, but only after the expiration of all periods during which such refund may be recovered (including by way of offset) by the Tax imposing jurisdiction (domestic or foreign); or (v) by any other final disposition, including by reason of Section 6213(b)(3) of the Code on account of an excessive tentative carryback allowance under Section 6411 of the Code or comparable provisions of other jurisdictions (domestic or foreign), the expiration of the applicable statute of limitations, or by mutual agreement of the parties.

1.14    "Final Order" shall mean an order or judgment of the Court , or other court of competent jurisdiction with respect to the subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought.

1.15    "FMCH Group" shall mean that group of corporations, immediately after December 31, 1996, that were members of the affiliated group of corporations of which FMCH

First Amended Settlement Agreement
and Release of Claims

(taxpayer identification number 13-3461988) was and on the date hereof continues to be the Common Parent.

1.16   "Form 1139" shall mean a Corporate Application for Tentative Refund on Internal Revenue Service Form 1139, or any successors to such form, or comparable forms for Taxes of any other jurisdiction (domestic or foreign).

1.17   "Grace-Conn." shall mean W.R. Grace & Co.—Conn. (taxpayer identification number 13-5114230).

1.18   "Grace-Conn. Business" shall mean all of the businesses and operations of Grace-Conn. and its parents or subsidiaries at any time, other than the NMC Business.

1.19   "Grace New York" shall mean W.R. Grace & Co., a New York corporation, now known as FMCH, (taxpayer identification number 13-3461988).

1.20   "Grace New York Group" shall mean that group of corporations, including Grace-Conn., Cryovac, and Sealed Air, that were members through September 29, 1996 or December 31, 1996, as applicable, of the affiliated group of corporations within the meaning of Section 1504 of the Code, and the Treasury Regulations thereunder, of which Grace New York was the Common Parent, including, with respect to Taxes of other jurisdictions (domestic or foreign), that group of corporations which included Grace New York or one or more of the members of the Grace New York Group with respect to a Consolidated Tax Return.

1.21   "Grace-Related Claim" shall mean, collectively, all claims (including unknown claims), demands, rights, liabilities and causes of action of every nature and description whatsoever, known or unknown, direct or indirect, whether concealed or hidden, from the beginning of time up to and including the Settlement Effective Date, asserted or that might have been asserted (including without limitation claims for fraudulent conveyance, successor liability, piercing of

A-5

First Amended Settlement Agreement
and Release of Claims

corporate veil, negligence, gross negligence, professional negligence, breach of duty of care,

breach of duty of loyalty, breach of duty of candor, fraud, breach of fiduciary duty,

mismanagement, corporate waste, breach of contract, negligent misrepresentation, contribution,

indemnification, any other common law or equitable claims, and violations of any state or federal

statutes, rules or regulations), which are either Asbestos-Related Claims or that are based upon or

arise out of the NMC Transaction, or the conduct or operations of any Grace-Conn. Business,

including without limitation, any liability or obligation of a Grace-Conn. Business under

environmental law, but not including any claims based on or arising out of the conduct or

operations of the NMC Business or any act or omission of the NMC Defendants in connection

with the operation of the NMC Business.

  1.22 "Hot Interest Rate" shall mean the rate of interest charged from time to time on

Taxes under Section 6621(c)(1) of the Code.

  1.23 "Indemnified Taxes" shall mean all Taxes for or attributable to Tax Periods

ending on or before December 31, 1996, other than NMC Indemnified Taxes.

  1.24 "Litigation Reinstatement Date" shall have the meaning ascribed to such term in

Section 4.03.

  1.25 "Moving Parties" shall mean each of FMCH, NMC, the PI Committee, and the

PD Committee.

  1.26 "New Grace" shall mean W.R. Grace & Co., f/k/a Grace Specialty Chemicals,

Inc. (taxpayer identification number 65-0773649).

  1.27 "New Grace Group" shall mean that group of corporations, including Grace-

Conn., that were, or hereafter become, members of that affiliated group of corporations under

Section 1504 of the Code, and the Treasury Regulations thereunder, that joined, or hereafter join,

A-6

in filing a Consolidated Tax Return of which New Grace, or any successor to New Grace, including any reorganized Debtor successor to New Grace, was or is the Common Parent.

1.28    "NMC Business" shall mean all of the worldwide healthcare business and operations conducted by NMC and the NMC Subsidiaries at any time, whether prior to or after September 29, 1996.

1.29    "NMC Defendants" shall mean FMCH, NMC, and each of their respective present and former subsidiaries, parents, affiliates, officers, directors, employees, partners, trustees, shareholders, beneficiaries, agents, attorneys, predecessors, successors, and assigns, including but not limited to Fresenius Medical Care AG and Fresenius AG, but not including the Estate Parties, Sealed Air and Cryovac.

1.30    "NMC Group" shall mean NMC and the NMC Subsidiaries, whether members of the Grace New York Group or members of the FMCH Group.

1.31    "NMC Indemnified Taxes" shall mean all Taxes of or attributable to any Tax Period arising from Tax Items relating to the NMC Business conducted by a member of the FMCH Group (net of benefits from Tax Items relating to the NMC Business from one or more Tax Periods not previously paid to, or applied for the benefit of, any member of the FMCH Group) which have not previously been paid to (i) one of the Estate Parties, (ii) Grace New York prior to the NMC Transaction or (iii) the applicable tax authority, by any member of the FMCH Group.

1.32    "NMC Subsidiaries" shall mean all direct and indirect subsidiaries of NMC through which Grace New York or FMCH conducts or conducted the NMC Business.

1.33    "NMC Transaction" shall mean the series of transactions that became effective on September 27 - 30, 1996, whereby, *inter alia,* (i) NMC distributed approximately $2.3 billion in

A-7

cash and assumed debt to Grace-Conn; (ii) Grace-Conn. distributed 100% of the common shares of NMC stock to Grace-New York; (iii) Grace New York contributed 100% of the common shares of Grace-Conn. stock to Sealed Air; (iv) Grace New York distributed 100% of the common shares of Sealed Air stock to its shareholders; and (v) Grace New York merged with a subsidiary of Fresenius Medical Care AG, all of which are more fully described in that certain Distribution Agreement dated as of February 4, 1996, among Grace New York, Grace-Conn. and Fresenius AG, and that certain Contribution Agreement dated as of February 4, 1996, among Fresenius AG, Sterilpharma GmbH, and Grace-Conn.

     1.34    "Person" shall mean a natural person, individual, corporation, partnership, limited partnership, limited liability partnership, limited liability company, association, joint venture, joint stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, and any business or legal entity and their spouses, heirs, executors, administrators, predecessors, successors, representatives, or assigns.

     1.35    "Plan Effective Date" shall mean the date specified as such in the Plan of Reorganization.

     1.36    "Plan of Reorganization" shall mean the plan of reorganization of the Debtors under the Bankruptcy Code approved by a Final Order of confirmation of the Court.

     1.37    "Power of Attorney" shall mean any agency under a power of attorney or other authorization which authorizes a Person to act on behalf of another Person with respect to Taxes, including Form 2848.

     1.38    "Sealed Air" shall mean Sealed Air Corporation, f/k/a Grace Holding, Inc. (taxpayer identification number 65-0654331).

A-8

1.39    "Sealed Air/Grace Group" shall mean the group of corporations, including but not limited to Cryovac, Inc., that were from on or about September 29, 1996, or hereafter become, members of the affiliated group of corporations under Section 1504 of the Code, and the Treasury Regulations thereunder, that joined, or hereafter join, in filing a Consolidated Tax Return of which Sealed Air Corporation, or any successor to Sealed Air, was or is the Common Parent.

1.40    "Sealed Air Indemnity Litigation" shall mean the litigation captioned *Sealed Air Corporation vs. Fresenius Medical Care AG, Fresenius Medical Care Holdings, Inc.; National Medical Care, Inc.; and Fresenius USA, Inc.*, (No. 600300/02 N.Y. Sup. Ct.).

1.41    "Sealed Air Settlement Agreement" shall mean the definitive agreement implementing the settlement of the adversary proceeding captioned, *Official Committee of Asbestos Personal Injury Claimants and Official Committee of Asbestos Property Damage Claimants of W.R. Grace & Co., suing in behalf of the Chapter 11 Bankruptcy Estates of W.R. Grace & Co., et al., Plaintiffs v. Sealed Air Corporation. and Cryovac, Inc.*, Adversary Proceeding No. 02-2210, which settlement is reflected in the Acknowledgement of principal terms filed with the Court on November 27, 2002.

1.42    "Settlement Approval Date" shall mean the date the Court enters the orders described in Section 2.01.

1.43    "Settlement Effective Date" shall mean the later of: (i) the Plan Effective Date, or (ii) the satisfaction of all preconditions to payment described in Section 2.02, to the extent each such precondition has not been waived by the NMC Defendants.

1.44    "Settlement Execution Date" shall mean February 6, 2003.

A-9

1.45    "Settling Parties" shall mean (i) each of FMCH, NMC, the PI Committee, and the PD Committee, and (ii) either upon the satisfaction of the precondition in Section 2.02(I) or upon the execution of this Agreement by New Grace and Grace-Conn, New Grace and Grace-Conn., and (iii) the respective members of the affiliated groups of each of the other Settling Parties.

1.46    "Settlement Payment" shall mean the payment by the NMC Defendants provided for in Section 2.03, as reduced by the items of setoff or recoupment, if any, referred to in Section 3.08.

1.47    "Taxes" shall mean all forms of taxation, whenever created or imposed, and whether of the United States or elsewhere, and whether imposed by a local, municipal, governmental, state, foreign, federation or other body, and without limiting the generality of the foregoing, shall include income (including alternative minimum), sales, use, *ad valorem*, gross receipts, license, value added, franchise, transfer, recording, withholding, payroll, employment, excise, occupation, unemployment insurance, social security, business license, business organization, stamp, environmental, premium and property taxes, together with any related interest, penalties and additions to any such tax, or additional amounts imposed by any taxing authority (domestic or foreign) upon the FMCH Group, the New Grace Group, the Grace New York Group, the Sealed Air Group or any of their respective members or divisions or branches.

1.48    "Tax Item" shall mean any item of income, gain, loss, deduction, credit, provisions for reserves, recapture of credit, net operating loss, net capital loss, tax credit, sales, revenues, property or asset values, capital or any other item which increases or decreases Taxes paid or payable, including an adjustment under Code Section 481 (or comparable provisions of the Tax law of any other jurisdiction (domestic or foreign)) resulting from a change in accounting method, the allowance or disallowance in whole or in part of, or assessment with

A-10

First Amended Settlement Agreement
and Release of Claims

respect to, a tentative allowance of refund claimed on Form 1139, the allowance or disallowance in whole or in part of a net operating loss, net capital loss or tax credit claimed on a Tax Return, an amended Tax Return or claim for refund, or an adjustment attributable to a quick refund of overpayment of estimated tax.

1.49    "Tax Period" shall mean any period for, or with respect to, which a Tax Return is or has been filed, is required to be filed or may be filed.

1.50    "Tax Refund" shall mean an overpayment of, refund of, or credit against, Taxes, including a tentative allowance of refund claimed on Form 1139.

1.51    "Tax Return" shall mean any return, filing, questionnaire, information return or other document required or permitted to be filed, including requests for extensions of time, filings made with estimated tax payments, claims for refund, Forms 1139 and amended returns, that has been, or hereafter may, be filed for any Tax Period with any tax authority (whether domestic or foreign) in connection with any Tax (whether or not a payment is required to be made, or an overpayment, refund, or credit may be allowed, with respect to such filing).

1.52    "TSIA" shall mean that certain Tax Sharing and Indemnification Agreement made as of September 27, 1996, by and among Grace New York, Grace-Conn., and Fresenius AG, an Aktiengesellshaft organized under the laws of the Federal Republic of Germany and an indirect parent of FMCH.

A-11

First Amended Settlement Agreement
and Release of Claims

[THIS PAGE INTENTIONALLY LEFT BLANK]

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO.,** *et al.*[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| **Debtors.** | ) | |
| | ) | |
| | ) | |
| | ) | |

**EXHIBIT 14 TO EXHIBIT BOOK
FRESENIUS SETTLEMENT ORDER**

**EXHIBIT 14**

Attached.

---

[1]     The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc.,  CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
IN RE:                        :    Chapter 11
                              :    Case Nos. 01-1139 through 01-1200
W.R. GRACE & CO., et al.,:
                              :
        Debtors.             :
--------------------------
OFFICIAL COMMITTEE OF        :    Adv. No. 02-2210
ASBESTOS PERSONAL INJURY :       [LEAD DOCKET]
CLAIMANTS and OFFICIAL       :
COMMITTEE OF ASBESTOS        :
PROPERTY DAMAGE              :
CLAIMANTS OF W.R. GRACE &:
CO., suing in behalf of      :
the Chapter 11 Bankruptcy:
Estate of W.R. GRACE &       :
CO., et al.,                 :
                             :
        Plaintiffs,          :
v.                           :
                             :
SEALED AIR CORPORATION       :
and CRYOVAC, INC.,           :
                             :
        Defendants.          :
--------------------------
OFFICIAL COMMITTEE OF        :    Adv. No. 02-2211
ASBESTOS PERSONAL INJURY :
CLAIMANTS and OFFICIAL       :
COMMITTEE OF ASBESTOS        :
PROPERTY DAMAGE              :
CLAIMANTS OF W.R. GRACE &:
CO., suing in behalf of      :
the Chapter 11 Bankruptcy:
Estate of W.R. GRACE &       :
CO., et al.,                 :
                             :
        Plaintiffs,          :
v.                           :
                             :
FRESENIUS MEDICAL CARE       :
HOLDINGS, INC. and           :
NATIONAL MEDICAL CARE,       :
INC.,                        :
                             :
        Defendants.          :
```

ORDER AUTHORIZING, APPROVING AND IMPLEMENTING SETTLEMENT
AGREEMENT BY AND AMONG PLAINTIFFS THE OFFICIAL COMMITTEE OF
ASBESTOS PROPERTY DAMAGE CLAIMANTS AND THE OFFICIAL COMMITTEE
OF ASBESTOS PERSONAL INJURY CLAIMANTS, THE DEBTORS,
AND DEFENDANTS FRESENIUS MEDICAL CARE HOLDINGS, INC. AND
<u>NATIONAL MEDICAL CARE, INC.</u>

On April 15, 2003, the Official Committee of Asbestos
Property Damage Claimants (the "PD Committee") and the Official
Committee of Asbestos Personal Injury Claimants (the "PI
Committee"; collectively, the PI Committee and the PD Committee
are referred to as the "Plaintiffs") of the above-captioned
debtors and debtors in possession (collectively, the "Debtors"),
and the Debtors, filed their motion (the "Motion") pursuant to §§
105(a), 362, and 363 of Title 11, United States Code (the
"Bankruptcy Code") and Rule 9019(a) of the Federal Rules of
Bankruptcy Procedure (the "Bankruptcy Rules") seeking an order
authorizing, approving and implementing the First Amended
Settlement Agreement and Release of Claims (the "Settlement
Agreement") by and among the Plaintiffs, the Debtors, Fresenius
Medical Care Holdings, Inc. ("FMCH") and National Medical Care,
Inc. ("NMC," and collectively with FMCH and certain non-defendant
affiliates of FMCH and NMC further identified in the Settlement
Agreement, the "NMC Defendants"), a copy of which Settlement
Agreement is attached to the Motion as Exhibit A; due, proper,

2

and sufficient notice of the Motion having been given pursuant to
Bankruptcy Rules 2002 and 9019(a) and the Local Rules of this
Court; and the Court having considered the Motion, the files and
records in these cases, the arguments and statements of counsel
offered at a hearing (the "Hearing") on the Motion, the evidence
proffered or adduced at the Hearing, and objections to the
Motion, if any; the Court hereby finds and concludes as follows:[1]

### Jurisdiction and Venue

A.      This Court has jurisdiction to hear and determine
the Motion and to grant the relief requested therein pursuant to
28 U.S.C. §§ 157 and 1334. The Motion gives rise to a core
proceeding pursuant to 28 U.S.C. § 157(b).

B.      Venue of these cases and the Motion is proper in
this Court pursuant to 28 U.S.C. §§ 1408 and 1409(a).

C.      The predicates for the relief granted by this Order
are Bankruptcy Code §§ 105(a), 362, and 363 and Bankruptcy Rule
9019(a).

---

[1]      The following shall constitute the Court's findings of
fact and conclusions of law as required by Bankruptcy Rule
7052(a). To the extent that findings of fact contain conclusions
of law, such findings shall constitute conclusions of law. To the
extent that conclusions of law contain findings of fact, such
conclusions shall constitute findings of fact.

3

### General Background

D.     On April 2, 2001 (the "Petition Date"), each of the Debtors commenced a voluntary case under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

E.     The Debtors' cases are being jointly administered pursuant to Bankruptcy Rule 1015.

F.     Since the Petition Date, the Debtors continue in possession of their properties and continue to operate their businesses pursuant to Bankruptcy Code §§ 1107(a) and 1108.

G.     No trustee or examiner has been appointed in the Debtors' chapter 11 cases.

H.     On April 12, 2001, the United States Trustee appointed the PD Committee, the PI Committee, and the Official Committee of Unsecured Creditors (the "Creditors' Committee").

### The Adversary Proceedings

**The Debtors' Complaint for Injunction and Motion for TRO.**

I.     On the Petition Date, the Debtors filed their Verified Complaint for Declaratory and Injunctive Relief (the "Complaint for Injunction"), captioned W.R. Grace & Co., et al. v. Margaret

4

Chakarian, et al., Adversary Proceeding No. 01-771. Contemporaneously with the Complaint for Injunction, the Debtors also filed their Motion for a Temporary Restraining Order and Preliminary Injunction Staying All Asbestos-Related and Fraudulent Transfer Claims Against Affiliated Entities (the "Motion for TRO").

J.    In the Complaint for Injunction and the Motion for TRO, the Debtors sought, among other things, to enjoin prosecution of pending and future fraudulent transfer claims

against certain non-debtors, including, without limitation, the NMC Defendants, Sealed Air Corporation ("Sealed Air"), and Cryovac, Inc. ("Cryovac," and collectively with Sealed Air, the "Sealed Air Companies").

K.    On the Petition Date, the Bankruptcy Court entered its Order Granting Temporary Restraining Order (the "TRO"), which effectively stayed all entities from filing any asbestos-related actions against certain non-debtors, including the NMC Defendants and the Sealed Air Companies.

L.    On April 12, 2001, the Bankruptcy Court entered its Order Extending the Temporary Restraining Order, which extended the TRO through and including April 24, 2001.

M.    At a status conference held by the Court on April 18, 2001, the Bankruptcy Court issued a preliminary injunction further

5

staying all entities from filing any asbestos-related actions against the NMC Defendants or the Sealed Air Companies through and including a hearing on the Complaint for Injunction.

N.    On May 3, 2001, the Bankruptcy Court conducted a hearing on the request for a preliminary injunction and entered an Order Granting Preliminary Injunction (the "Preliminary Injunction Order"), which stayed, _inter alia_, pending actions alleging certain fraudulent transfer claims against the NMC Defendants and the Sealed Air Companies. The Preliminary Injunction Order, however, did not stay future actions against the NMC Defendants and the Sealed Air Companies.

O.    On January 22, 2002, the Bankruptcy Court entered an order modifying the Preliminary Injunction Order. The January 22 order broadened the scope of the preliminary injunction and stayed both pending and future actions against the NMC Defendants and the Sealed Air Companies, other than by the Plaintiffs, as described below.

**Assignment of Causes of Action to the Plaintiffs.**

P.    On June 14, 2001, the PD Committee and the PI Committee filed their Joint Motion for Authority to Prosecute Fraudulent Transfer Claims (the "Motion to Prosecute") seeking authority to prosecute certain fraudulent transfer claims against, among others,

6

the NMC Defendants and the Sealed Air Companies (the "Fraudulent Transfer Actions").

Q.    At an omnibus hearing held before the Bankruptcy Court on January 29, 2002, the Bankruptcy Court informed the parties that this Court granted the Motion to Prosecute and authorized the PD Committee and the PI Committee to investigate and prosecute the Fraudulent Transfer Actions.

R.   On March 12, 2002, this Court entered an order withdrawing the reference with respect to the Fraudulent Transfer Actions and granting the Motion to Prosecute.

On March 12, 2002, this Court entered an order withdrawing the reference with respect to the Fraudulent Transfer Actions and granting the Motion to Prosecute.

**The Adversary Proceedings.**

S.    After an order granting the Motion to Prosecute had been entered, the parties participated in a case management conference to establish discovery and pleading deadlines.  After considerable negotiation and discussion, the parties submitted a draft case management order to this Court for approval. On March 12, 2002, this Court entered the first Case Management Order in the above-captioned adversary proceedings.

7

T.   On March 18, 2002, the Plaintiffs filed a complaint against the NMC Defendants alleging, _inter alia_, that the NMC Defendants were liable as successors for the asbestos liability of the Debtors and that the NMC Defendants were recipients of fraudulent transfers in respect of the W.R. Grace entities (the "Fresenius Adversary Proceeding").

U.   On March 18, 2002, the Plaintiffs also filed a complaint against the Sealed Air Companies alleging, _inter alia_, that the Sealed Air Companies were likewise liable as successors for the asbestos liability of the Debtors and that the Sealed Air Companies likewise were recipients of fraudulent transfers in respect of the W.R. Grace entities (the "Sealed Air Adversary Proceeding").

V.   On April 1, 2002, the NMC Defendants filed their answer in the Fresenius Adversary Proceeding.

W.   Thereafter, at a case management conference held by this Court, the Court granted the Plaintiffs' request to stay the Fresenius Adversary Proceeding pending the outcome of the Sealed Air Adversary Proceeding.

### The IRS Tax Audit

X.   The Debtors were members through September 29, 1996, of

8

the Grace New York Group[2] and included in the Grace New York Group's consolidated tax returns together with certain of the NMC Defendants for years ending on or before December 31, 1996. The Sealed Air Companies were also members of the Grace New York Group for certain tax years ending on or before December 31, 1996.

Y.    Each member of the Grace New York Group is severally and thus primarily liable for the income taxes (as well as other taxes) for the tax years during which such corporation was included as a member of the Grace New York Group.

Z.    The Debtors and certain NMC Defendants entered into that certain Tax Sharing and Indemnification Agreement dated September 27, 1996 (the "TSIA"), pursuant to which the Debtors obligated themselves to indemnify such NMC Defendants for certain tax deficiencies asserted by the tax authorities relating to the tax years ending on or before, or including, September 29, 1996 (e.g., the federal consolidated tax return of the Grace New York Group for the tax year ending December 31, 1996).

AA. In October, 1997, the Internal Revenue Service (the "IRS") commenced an examination of the consolidated tax returns of

---

[2] All capitalized terms used but not defined in this Order shall have the meanings set forth in the Settlement Agreement. To the extent that the terms of the Settlement Agreement conflict with any provision of this Order, the terms of the Settlement Agreement shall control.

9

the Grace New York Group with respect to the 1993 through 1996 tax periods (the "Tax Audit").

BB.    Under the TSIA, the Debtors have been acting as the agent of the Grace New York Group in dealing with the IRS during the Tax Audit.

CC.    In connection with the Tax Audit, the IRS has proposed certain adjustments to the Debtors.

DD.    The IRS has filed priority tax claims against the Debtors and their bankruptcy estates. Certain state taxing authorities have filed similar priority tax claims in the above-captioned cases. The amounts of these priority tax claims have not yet been adjudicated.

EE.    On September 24, 2002, the Debtors filed with this Court a Motion for the Entry of an Order Authorizing the Debtors to Enter Into a Settlement Agreement with the Internal Revenue Service in Connection with Interest Deductions Claimed with Respect to Corporate Owned Life Insurance (the "COLI Motion") to settle the largest adjustment proposed by the IRS.

FF.    Because the Sealed Air Companies were members of the Debtors' corporate family at the time the Debtors entered into the TSIA, the NMC Defendants have asserted that the Sealed Air Companies are liable to the NMC Defendants for indemnification and contribution with respect to various claims, including any tax

10

deficiencies arising out of the Tax Audit. Certain litigation among the Sealed Air Companies and the NMC Defendants is referred to in the Settlement Agreement as the "Sealed Air Indemnity Litigation."

### The Settlement Agreement

GG.    On November 27, 2002, at the direction of the Court, the Plaintiffs and the NMC Defendants participated in a lengthy settlement conference, during which the parties were able to successfully negotiate a settlement that addressed three separate areas: (i) settlement of the Fresenius Adversary Proceeding and protection for the NMC Defendants from current and future Grace-Related Claims; (ii) responsibility for the priority taxes arising out of the Tax Audit and for other taxes; and (iii) release of claims against the Sealed Air Companies by the NMC Defendants. This third component, the release of the Sealed Air Companies by the NMC Defendants, was a material part of the Plaintiffs' separate settlement agreement with the Sealed Air Companies, which settlement is expected to provide approximately $900 million of benefits to the Debtors' estates.

HH.    The outlines of the settlement reached at the settlement conference were memorialized in a term sheet executed on November

11

27, 2002. Pursuant to the Term Sheet, the NMC Defendants agreed to pay $15 million as directed by the Court, upon the confirmation of a Plan of Reorganization in respect of the Debtors. In addition, the NMC Defendants agreed to pay the net federal and state income tax liabilities of the Grace New York Group for years ending on or before December 31, 1996, subject to certain control and cooperation agreements. Pursuant to the Term Sheet, the NMC Defendants were to take control over the Tax Audit and all refunds for tax years ending on or before December 31, 1996. By Order dated November 27, 2002, the Court acknowledged the agreement in principle.

II.   Shortly after the November 27th settlement conference, representatives of the Plaintiffs, the Debtors, and the NMC Defendants jointly began negotiating and drafting the Settlement Agreement. During the course of this joint drafting of the definitive settlement documents, it became apparent that the design and documentation of the tax control and cooperation features of the settlement would be exceedingly cumbersome and difficult, and had the potential to create conflicts between tax positions taken by the Debtors in the future and positions taken by FMCH in years in which they were responsible for the tax payments under the settlement reflected in the Term Sheet. In addition, it became

12

clear that greater tax efficiencies could be achieved by restructuring portions of the settlement reflected in the Term Sheet. As a result, the Plaintiffs, the Debtors, and the NMC Defendants agreed to modify the terms of the settlement to provide economically similar benefits for the Debtors' estates without intricate tax provisions. The Settlement Agreement addresses the same three subject areas as the original Term Sheet, to wit: (i) settlement of the Fresenius Adversary Proceeding and protection for the NMC Defendants from current and future Grace-Related Claims; (ii) responsibility for the priority taxes arising out of the Tax Audit and for other taxes; and (iii) release of the claims against the Sealed Air Companies by the NMC Defendants.

JJ.  Under the Settlement Agreement, the NMC Defendants have agreed to make a one-time lump sum payment of $115 million in exchange for full protection from current and future Grace-Related Claims, including Asbestos-Related Claims, claims arising out of the Tax Audit, and other taxes.  In addition, the Settlement Agreement provides that the Debtors will retain control of, and responsibility to pay (or indemnify the NMC Defendants) for, Indemnified Taxes. Finally, the Settlement Agreement provides that the NMC Defendants will release the Sealed Air Companies for all Grace-Related Claims. As a consequence, the Debtors' estates may

13

realize an economic benefit equal to the amount of the settlement proceeds (i.e., $115 million), reduced only by the amount of Indemnified Taxes that the Debtors might otherwise have been able to avoid paying as priority tax claims or as indemnification claims to the NMC Defendants. In addition, the Debtors' estates are thus able to settle the Sealed Air Adversary Proceeding without having to indemnify the Sealed Air Companies for the contribution and indemnity claims the NMC Defendants would otherwise pursue against those entities in the Sealed Air Indemnity Litigation.

KK.  As more fully set forth in the Settlement Agreement, in resolution of all Grace-Related Claims, the Plaintiffs, the Debtors, and the NMC Defendants have agreed as follows:

(a)  Within five (5) days of the Settlement Effective Date, the NMC Defendants shall wire transfer $115 million, subject to certain rights of setoff and recoupment set forth in Section 3.8 of the Settlement Agreement, as directed by the Court in the Final Order approving the Plan of Reorganization.

(b)  As conditions precedent to the foregoing payment:

• The Plan of Reorganization shall provide that: (i) upon the making of the Settlement Payment, the Asbestos Committees and the Estate Parties will fully, finally, and forever release, relinquish and discharge each and every of the NMC Defendants from any and all Grace-Related Claims that the Asbestos Committees or the Estate Parties have asserted or could have asserted in this or any other forum against any of the NMC Defendants; and (ii) prior to the making of the Settlement Payment, the Asbestos Committees and the Estate Parties will deliver to the NMC Defendants the

14

Release that is attached as Appendix B to the Settlement Agreement, which by its terms shall become effective upon the making of the Settlement Payment.

- The Plan of Reorganization shall provide that, in consideration of the Settlement Payment, any Person voting in favor of the Plan or receiving property under the Plan shall thereby be deemed to have fully released each and every of the NMC Defendants from all Grace-Related Claims that such Person has asserted or could have asserted in this or any other forum against any of the NMC Defendants.

- The Plan of Reorganization shall establish a trust or trusts under state law and pursuant to Section 524(g) of the Bankruptcy Code (the "Asbestos Trust"), and shall further provide that, in consideration of the Settlement Payment, any Person that receives property from the Asbestos Trust(s) shall thereby be deemed to have fully released each and every of the NMC Defendants from all Grace-Related Claims that the Person has asserted or could have asserted in this or any other forum against any of the NMC Defendants.

- The Court shall have issued, pursuant to Section 105(a) of the Bankruptcy Code, a Final Order, enforceable upon the making of the Settlement Payment, permanently and forever enjoining, restraining and barring any Person from commencing or continuing any suit, action or other proceeding, or from taking any other action, for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, or with respect to, any Grace-Related Claim against any of the NMC Defendants.

- The Plan of Reorganization shall provide that the NMC Defendants shall receive the full benefits and protections of an injunction entered pursuant to section 524(g) of the Bankruptcy Code, enforceable upon the making of the Settlement Payment, which injunction shall permanently bar any Person from commencing or continuing any suit, action, or other proceeding, or from taking any other action for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, or with respect to, any Asbestos-Related Claim that the Person

15

asserted or could have asserted, against any of the NMC Defendants.

- The Plan of Reorganization shall provide that the Estate Parties, jointly and severally, upon the making of the Settlement Payment, shall indemnify, defend and hold harmless the NMC Defendants for any loss, cost or expense (including attorneys' fees and other costs of defense) arising out of any and all Grace-Related Claims, commenced or continued in this or any other forum against any of the NMC Defendants. Such indemnification specifically shall not apply to the costs and expenses (including attorneys' fees and accountants' fees) incurred by the NMC Defendants in defending the Asbestos Claimant's Adversary Proceeding or any other suit prior to the Settlement Execution Date.

- The actions identified in Section 2.02(G) of the Settlement Agreement shall have been dismissed with prejudice.

- The Plan of Reorganization shall contain a determination by the Court that the Estate Parties have the ability to satisfy all Indemnified Taxes, liabilities under the Settlement Agreement and ordinary course of business obligations as of the Plan Effective Date.

(c) The NMC Defendants will not seek indemnification from the Estate Parties, Sealed Air, or Cryovac for the Settlement Payment.

(d) Upon the Settlement Effective Date, the NMC Defendants will execute a release, acceptable in form and substance to the NMC Defendants, that fully releases the Sealed Air Companies from any and all Tax claims or Asbestos-Related Claims (including but not limited to claims for attorneys' fees and the costs of litigation related thereto) that the NMC Defendants have asserted or could have asserted in this or any other forum against the Sealed Air Companies.

(e) Notwithstanding any other provision of the Settlement Agreement, it shall not be a breach of the Settlement Agreement, act of bad faith, tortious interference with a contractual relationship or any other malfeasance, for the Estate Parties to

16

propose or support a plan of reorganization that does not provide for the establishment of an Asbestos Trust or the issuance of an injunction pursuant to Section 524(g) of the Bankruptcy Code; provided however, the Estate Parties shall use their best efforts to cause all of the preconditions set forth in Section 2.02 of the Settlement Agreement, other than those set forth in subsections 2.02 (C) and (E) to occur. For the avoidance of doubt, if the Plan of Reorganization, as well as the Final Order of confirmation respecting the Plan of Reorganization, do not satisfy the preconditions set forth in such paragraphs, the NMC Defendants may in their sole discretion waive or decline to waive, as set forth in Section 2.02, the failure of those preconditions as conditions precedent to the Settlement Payment.

(f)    The Plaintiffs shall use their respective best efforts to cause the occurrence of all the preconditions to the obligation of the NMC Defendants to make the Settlement Payment set forth in Section 2.02 of the Settlement Agreement, except to the extent the NMC Defendants may in their sole discretion waive, as set forth in Section 2.02, the failure of those preconditions as conditions precedent to the Settlement Payment.

(g)    From and after the Settlement Approval Date, the Estate Parties promptly shall pay any Indemnified Taxes as such Taxes become due and payable to tax authorities pursuant to a Final Determination, provided that the Estate Parties have obtained authorization from the Court to pay currently any such Indemnified Taxes. To the extent necessary, the Estate Parties will use best efforts to obtain such authorization and shall defer any Final Determination of any Indemnified Taxes until such time as the Estate Parties have obtained such authorization. Any Tax Refund of the Grace New York Group with respect to tax years ending on or before December 31, 1996, if credited or paid to any member of the Grace New York Group shall, under certain circumstances as more fully described in Section 3.03(C) of the Settlement Agreement, be repaid to the tax authority as a payment of Indemnified Taxes. On February 14, 2003, Fresenius received a wire transfer from the IRS in the amount of $7,203,630, which the Plaintiffs and the Debtors agree is the tentative refund with respect to the 1993 tax period generated in response to the Form 1139 filed by the Debtors in December 2002 (the "1993 Tentative Refund"). The Settlement Agreement requires Fresenius to repay the 1993 Tentative Refund to the IRS as a payment toward the Indemnified Taxes. Pending approval of such repayment by this Court, Fresenius has placed the 1993 Tentative Refund in a segregated interest bearing account (the

17

"Segregated Account"). The Plaintiffs and the Debtors have agreed that upon approval by the Court, which is requested in the Motion, Fresenius should repay the funds held in the Segregated Account to the IRS as a payment of Indemnified Taxes pursuant to the terms of the Settlement Agreement.

(h)  From the Settlement Execution Date, the terms of the Settlement Agreement generally supersede the terms of the TSIA.

(i)  Upon approval of the Settlement Agreement by Final Order, the Estate Parties shall become obligated to, and entitled to the benefits of, the terms and conditions of the Settlement Agreement.

## Notice of the Motion

LL.    As evidenced by the Certificate of Service of Theodore Tacconelli, actual written notice of the Motion and the Settlement Agreement, and a reasonable opportunity to object or be heard with respect thereto, has been afforded to all parties in interest, including: (a) the Office of the United States Trustee; (b) counsel to the Debtors' postpetition Lender; (c) counsel to the Creditors' Committee; (d) all parties to the Fresenius Adversary Proceeding; (e) all parties to the Sealed Air Adversary Proceeding; and (f) those parties requesting notice pursuant to Bankruptcy Rule 2002.

MM.    This Court finds and concludes that such notice satisfies the requirements of the Bankruptcy Code, the Bankruptcy Rules, due process, and other applicable law, and no further notice of the Motion or the Settlement Agreement is required under the circumstances.

18

## Approval of the Settlement Agreement

NN.    The Settlement Agreement is in the best interests of these bankruptcy estates and the creditors thereof.

OO.    The result obtained on behalf of these bankruptcy estates in the Settlement Agreement falls within the reasonable range of litigation possibilities in the Fresenius Adversary Proceeding.

PP.    At best, the likely outcome of the Fresenius Adversary Proceeding is uncertain. The Plaintiffs candidly admit to this Court and the parties that litigation risks abound, including, without limitation, that proof of the Debtors' alleged insolvency and proof of the alleged lack of reasonably equivalent value are especially challenging in respect of the fraudulent transfer claims against the NMC Defendants.

QQ.    The Fresenius Adversary Proceeding indisputably involves complex legal and factual issues.

RR.    Prosecuting the Fresenius Adversary Proceeding would create substantial expenses for these bankruptcy estates and the other parties to the Fresenius Adversary Proceeding. Although the litigants might achieve some economies through litigation of the Sealed Air Adversary Proceeding, the transactions involving the NMC Defendants and the Sealed Air Companies were sufficiently different

19

in time and nature that any savings would be marginal, if any.

SS.   Pursuing the Fresenius Adversary Proceeding would also likely entail the commitment of substantial human resources by key personnel of the Debtors. The commitment of such resources and the duration of the litigation would assuredly result in further delays in developing and confirming a plan of reorganization in the above-captioned cases.

TT.   Approval of the Settlement Agreement furthers the paramount interest of creditors in the above-captioned cases.

UU.   Approval of the Settlement Agreement could potentially increase the funds available to fund a plan of reorganization, both through the funds provided by the NMC Defendants and by facilitating settlement with the Sealed Air Companies.

VV.   Approval of the Settlement Agreement will permit the Plaintiffs and the Debtors to focus their attention on other important matters in the above-captioned cases, including developing and confirming a plan of reorganization.

WW.   Approval of the Settlement Agreement will avoid continued expense in the Fresenius Adversary Proceeding and the Sealed Air Adversary Proceeding, thereby resulting in a net economic benefit to these bankruptcy estates.

XX.   Based on the foregoing, the releases, protections, and

20

other benefits provided to the NMC Defendants are necessary to the reorganization in the above-captioned cases.

YY.    In exchange for the releases, protections, and other benefits provided to the NMC Defendants by the Settlement Agreement, the NMC Defendants are providing a substantial contribution and reasonably equivalent value to these bankruptcy estates and the creditors thereof.

ZZ.    The releases, protections, and other benefits provided to the NMC Defendants by the Settlement Agreement are fair to the Plaintiffs, these bankruptcy estates, and the creditors thereof.

AAA. The NMC Defendants are unwilling to settle the Fresenius Adversary Proceeding and provide the substantial contributions to these bankruptcy estates contemplated by the Settlement Agreement without the releases, protections, and other benefits provided to the NMC Defendants by the Settlement Agreement.

BBB. The Plaintiffs, the Debtors, and the NMC Defendants negotiated and entered into the Settlement Agreement in good faith and at arm's length.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED AS FOLLOWS:**

1.    The Motion is hereby GRANTED in its entirety, and the Settlement Agreement is hereby AUTHORIZED and APPROVED in all

21

respects.

2.    The Plaintiffs, the Debtors, and the NMC Defendants are hereby authorized, empowered, and directed to take all necessary acts to carry out and implement the Settlement Agreement in accordance with its terms without further order of the Court, including, without limitation, (i) FMCH is authorized to repay the 1993 Tentative Refund and the other funds in the Segregated Account to the IRS as a payment of Indemnified Taxes, (ii) the NMC Defendants, the Debtors, and the Estates Parties each are authorized to repay any additional Tax Refunds to the appropriate tax authority, pursuant to and subject to the terms of Section 3.03(C) of the Settlement Agreement; and (iii) pursuant to Section 3.03(B) of the Settlement Agreement, to the extent Grace-Conn. or any other Estate Party voluntarily agrees to the payment, assessment, resolution or other final determination of any Indemnified Taxes, the Debtors and the Estate Parties are authorized to pay promptly and in full any such Indemnified Taxes.

3.    Pursuant to Section 2.09 of the Settlement Agreement, the Plaintiffs are hereby authorized, empowered, and directed to use their best efforts to bring about the Settlement Effective Date and to cause the occurrence of all the preconditions to the obligation of the NMC Defendants to make the Settlement Payment that are set

22

forth in Section 2.02 of the Settlement Agreement, including, without limitation, seeking the injunctions and releases under Bankruptcy Code §§ 105(a) and 524(g) for the NMC Defendants. Pursuant to Section 2.08 of the Settlement Agreement, the Debtors are hereby authorized, empowered, and directed to use their best efforts to bring about the Settlement Effective Date, and to cause the occurrence of all the preconditions to the obligation of the NMC Defendants to make the Settlement Payment that are set forth in Section 2.02 of the Settlement Agreement, other than those set forth in paragraphs (C) and (E) of Section 2.02, including, without limitation, seeking the benefit of injunctions and releases under Bankruptcy Code § 105(a). In addition, if the Debtors and Estate Parties, in their discretion, choose to seek the protections of an injunction under Bankruptcy Code § 524(g), the Debtors and Estate Parties are authorized, empowered, and directed to seek the benefit of injunctions and releases under Bankruptcy Code § 524(g) for the NMC Defendants to the extent such injunctions are allowable under the law and to the extent they seek such injunctions and releases for the Debtors and the Estate Parties.

4.   The terms of the Settlement Agreement shall survive entry of this Order and shall supersede all other agreements relating to these matters, including, without limitation, the TSIA, except as

23

specifically provided otherwise in the Settlement Agreement.

     5.    The terms of the Settlement Agreement shall not be modified by provisions in any plan of reorganization in the above-captioned cases, or otherwise, without consent of the NMC Defendants.

     6. The terms of the Settlement Agreement and this Order shall be binding in all respects on the Debtors, their bankruptcy estates, all holders of claims and interests in the above-captioned cases, all parties in interest, and each of their respective successors and assigns, and upon entry of an order confirming a plan of reorganization in the above-captioned cases, any additional parties subject to the injunctions and releases provided through such a plan.

     7.    To the extent necessary, the Plaintiffs and the NMC Defendants are hereby granted relief from the automatic stay pursuant to Bankruptcy Code § 362(d) to carry out the provisions of this Order and the Settlement Agreement.

     8.    This Court hereby retains jurisdiction, even after the closing of these chapter 11 cases, to (i) interpret and enforce the terms and provisions of this Order and the Settlement Agreement and to adjudicate, if necessary, any and all disputes relating to the transactions contemplated by the Settlement Agreement; (ii) enter

24

orders in aid or furtherance of the transactions contemplated in the Settlement Agreement; and (iii) re-open the Debtors' chapter 11 cases to enforce the provisions of this Order.

9.    This Order shall become effective immediately upon entry and there shall not be any automatic stay of this Order pursuant to Bankruptcy Rule 7062 and 6004(g).  The provisions of this Order are non-severable and mutually dependant.


Dated:    JUNE 25    , 2003
     Wilmington, Delaware  VIA
    NEWARK, NEW JERSEY

_____
UNITED STATES DISTRICT JUDGE

25