[THIS PAGE INTENTIONALLY LEFT BLANK]

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO.,** *et al.*[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| **Debtors.** | ) | |
| | ) | |
| | ) | |
| | ) | |

**EXHIBIT 15 TO EXHIBIT BOOK
W. R. GRACE & CO. GUARANTEE AGREEMENT (PI)**

**EXHIBIT 15**

Attached.

---

[1]   The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife  Boston Ltd., Alewife Land Corporation, Amicon, Inc.,  CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

**FORM OF W. R. GRACE & CO. GUARANTEE AGREEMENT (PI)**

**$1,550,000,000 Deferred Payment Agreement (PI)**

This W. R. GRACE & CO. GUARANTEE AGREEMENT (PI) (this "Guarantee (PI)") is made and entered into as of [ ], 2009, by and between W. R. Grace & Co., a Delaware corporation (together with any successor thereto pursuant to the terms and conditions of Section 16, the "Guarantor"), and the WRG Asbestos PI Trust (the "Trust (PI)"), a Delaware statutory trust established pursuant to §524(g) of the Bankruptcy Code in accordance with the Plan of Reorganization (as hereinafter defined). Unless otherwise defined herein or the context otherwise requires, capitalized terms used herein and defined in the Plan of Reorganization shall be used herein as therein defined.

This Guarantee (PI) is the "Parent Guarantee" described and defined in the Deferred Payment Agreement (PI) (as defined below) and is effective as of the Effective Date.

W I T N E S S E T H

In consideration of the terms and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.      Definitions; Rules of Interpretation.

(a)     As used in this Guarantee (PI), the following terms shall have the following meanings:

"Authorized Officer" means, with respect to any Entity, the chief executive officer, president, chief financial officer, controller, executive vice president or senior vice president of such Entity.

"Bona Fide Compensation Transaction" means any payment, grant or award, whether in cash, securities, options or other consideration, including without limitation salary or bonus, to or for the benefit of any director, officer or employee of any Transferor or any of its Affiliates made for legitimate, bona fide compensation and/or incentivization purposes; provided that compensation paid, granted or awarded to any one such individual in any Fiscal Year of Transferor whose aggregate value at the time or times of payment, grant or award is in excess of $15,000,000 shall be a Bona Fide Compensation Transaction only (i) if the relevant Transferor is then obligated to file or furnish, or is otherwise filing or furnishing, reports with the United States Securities and Exchange Commission pursuant to Section 13 or 15 of the Securities Exchange Act of 1934, it is approved by an independent committee of the Board of Directors of the Transferor (or other similar management body of the Transferor) or (ii) if the relevant Transferor is not then obligated to file or furnish, or is not otherwise filing or furnishing, reports with the United States Securities and Exchange Commission pursuant to Section 13 or 15 of the

Securities Exchange Act of 1934, a reputable independent compensation expert or consultant selected by the Transferor with the consent of the Permitted Holder (which consent shall not be unreasonably withheld, conditioned or delayed) shall have determined, in its reasonable, good faith judgment, that such payment, grant or award is reasonable and appropriate.  For purposes of the proviso in the previous sentence, (A) no payment or other value received in a given year pursuant to the terms of a grant or award in a previous year shall be taken into account for calculating the compensation in such given year; and (B) in the event of multiple payments, grants or awards in a given Fiscal Year, the independent committee approval, or independent compensation expert or consultant determination, as appropriate, shall be made with respect to each payment, grant or award beginning with the payment, grant or award that causes the compensation to be in excess of $15,000,000.

"Business Day" has the meaning set forth in the Deferred Payment Agreement (PI).

"Capital Stock" means, with respect to any Entity, any share of stock, or any depositary receipt or other certificate representing any share of stock, or any similar equity ownership interest, and any warrant, option, or any other security providing for the right to acquire any such share of stock or similar equity ownership interest.

"Claims" has the meaning set forth in Section 17(b).

"Collateral Agent" has the meaning set forth in the Deferred Payment Agreement (PI).

"Compliance Certificate" means a certificate in the form of Exhibit C.

"Control" means, as to any Entity, the power to direct the management and policies of such Entity directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "Controlling" and "Controlled" have meanings correlative to the foregoing.

"Controlled Affiliate" means, as to any Entity (the "Controlling Entity"), any Affiliate that is Controlled by such Controlling Entity.

"Default Rate" has the meaning set forth in the Deferred Payment Agreement (PI).

"Deferred Payment Agreement (PI)" means that certain Deferred Payment Agreement (PI), dated as of the date hereof, between Grace and the Trust (PI).

"Deferred Payment Date (PI)" has the meaning set forth in the Deferred Payment Agreement (PI).

"Deferred Payment Documents" has the meaning set forth in the Deferred Payment Agreement (PI).

2

"Deferred Payment Documents (PI)" means this Guarantee (PI), the Deferred Payment Agreement (PI) and the Share Issuance Agreement.

"Deferred Payment Documents (PD)" has the meaning set forth in the Deferred Payment Agreement (PI).

"Deferred Payment Documents (ZAI)" has the meaning set forth in the Deferred Payment Agreement (PI).

"Deferred Payment (PI)" has the meaning set forth in the Deferred Payment Agreement (PI).

"Demand for Issuance of the Section 524(g) Shares" has the meaning set forth in the Share Issuance Agreement.

"Designated Guarantor Senior Indebtedness" means Guarantor Senior Indebtedness issued, pursuant to a facility with an aggregate principal amount, commitments and/or other financial accommodations then outstanding and/or available (disregarding for purposes of this definition whether any conditions for draws thereunder have been satisfied), as of the relevant date of determination, of at least $25,000,000.

"Disposition Transaction" has the meaning set forth in Section 7(b).

"Disqualified Equity Interest" means that portion of any Equity Interest which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the sole option of the holder thereof on or prior to the final Deferred Payment Date (PI).

"EBITDA" means, for any Entity for any period, such Entity's and its Subsidiaries' consolidated net income (determined in accordance with GAAP) for such period plus, without duplication, in respect of any such item of such Entity and/or any of its Subsidiaries (i) to the extent deducted in determining such consolidated net income, the sum, without duplication, of (a) interest expense, (b) provisions for any income or similar taxes paid or accrued, (c) all amounts treated as expenses for depreciation and amortization of any kind, (d) cash and non-cash restructuring and reorganization, and other similar fees, costs, charges and expenses, including without limitation, as a result of, or in connection with, the Chapter 11 Cases and the Deferred Payment Documents, (e) items classified as extraordinary under Accounting Principles Board Opinion No. 30 (as amended, restated, supplemented, replaced or otherwise modified from time to time) incurred during such period, and (f) any non-cash charges minus (ii) to the extent included in determining such consolidated net income, the sum, without duplication, of (a) gross interest income received during such period and (b) items classified as extraordinary under Accounting Principles Board Opinion No. 30 (as amended, restated, supplemented, replaced or otherwise modified from time to time) realized during such period, all, in the cases of clauses (i) and (ii) above, as determined on a consolidated basis in accordance with GAAP.

3

"Equity Interest" means shares of capital stock or equity, equity securities or ownership interests in any Entity or any rights (including any (x) options, warrants or other rights to purchase or acquire any such stock, equity or interests (whether or not at the time exercisable), or (y) securities by their terms convertible into or exchangeable for any such stock, equity or interests (whether or not at the time so convertible or exchangeable) or options, warrants or rights to purchase such convertible or exchangeable securities.

"Event of Default" has the meaning set forth in the Deferred Payment Agreement (PI).

"Fiscal Quarter" means, in respect of any Entity, a fiscal quarter of such Entity as determined by it.

"Fiscal Year" means, in respect of any Entity, a fiscal year of such Entity as determined by it.

"GAAP" means generally accepted accounting principles in effect from time to time in the United States, applied on a consistent basis; provided, however, that as of such time, if any, when any Entity begins to provide financial information generally on the basis of IFRS, then any reference to GAAP with respect to such Entity shall be given effect as a reference to IFRS.

"Governing Documents" means, as to any Entity, its articles or certificate of incorporation and by-laws, its partnership agreement, its certificate of formation and operating agreement and/or the organizational or governing documents of such Entity.

"Governmental Authority" means the government of the United States of America or any other country, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, government (including any supra-national bodies such as the European Union or the European Central Bank).

"Grace" means W. R. Grace & Co.-Conn., a Connecticut corporation, and any successor to its obligations under the Deferred Payment Agreement (PI) pursuant to the terms and conditions of Section 16 thereof.

"Guaranteed Obligations (PI)" has the meaning set forth in Section 2(a).

"Guarantee Payment Blockage Notice" has the meaning set forth in Section 8(a)(ii).

"Guarantee Payment Blockage Period" has the meaning set forth in Section 8(a)(ii).

"Guarantor" has the meaning set forth in the introductory paragraph.

4

"Guarantor Senior Indebtedness" means any and all present and/or future, direct and/or indirect, indebtedness, liabilities and other obligations of the Guarantor owed to any Entity (whether as senior or subordinated indebtedness, as a first lien, second lien, any other position or priority, and any mezzanine, subordinated or other indebtedness) including any principal, interest and premiums, fees, investment points, reimbursement obligations, issuance discounts and/or other costs, indemnities, liabilities and/or expenses thereon or in connection therewith (including any interest accruing subsequent to the filing of a petition of bankruptcy at the rate provided for in the documentation with respect thereto, whether or not such interest is an allowed claim under applicable Law), in each case, under or with respect to (i) any credit or loan facilities (whether provided by one or more banks, insurance companies, financial institutions, private equity or hedge funds, lenders, and/or other Entities) and/or (ii) any debt, bonds, debentures, notes, repurchase, discount, securitization, factoring and/or other similar facilities providing for indebtedness, including any and all obligations of any nature in respect of loans, credit agreements, indentures, and bonds, together with obligations in respect of hedging arrangements (whether in respect of interest rates, currencies, commodities, equities, indebtedness and/or otherwise), in each case, entered into with banks, insurance companies, financial institutions, private equity or hedge funds, lenders and/or other Entities who are engaged in the business of providing financing (but not customers of or suppliers to the Guarantor to the extent constituting trade payables), notes, letters of credit, and synthetic letters of credit in connection therewith, and/or (iii) any reimbursement, payment, indemnities, fees, guarantees or other obligations in connection with any credit or loan facilities or indebtedness, liabilities and other obligations referenced in clauses (i) or (ii);

except in each case, for any indebtedness owed by the Guarantor (A) that by its express terms is not Guarantor Senior Indebtedness for purposes of the Deferred Payment Agreement (PI) and this Guarantee (PI) and is to be treated as *pari passu* or junior and subordinated with respect thereto in accordance with its terms, (B) for the avoidance of doubt, consisting of obligations to trade creditors and other trade payables in connection with the purchase of goods, materials or services, (C) owed to, or guaranteed by Grace or the Guarantor on behalf of, any director, officer or senior key employee of (1) Grace, (2) the Guarantor or (3) any Subsidiary or Affiliate of Grace or the Guarantor (D) represented by Disqualified Equity Interest, (E) owed to (1) Grace or (2) any Subsidiary or Affiliate of Grace or the Guarantor and (F) resulting from the Deferred Payment Documents (PD) or the Deferred Payment Documents (ZAI).

"Guarantor Senior Non-Payment Default" has the meaning set forth in Section 8(a)(ii).

"Guarantor Senior Payment Default" has the meaning set forth in Section 8(a)(i).

"Guarantor Senior Remedies" means, if an event of default has occurred and is continuing under the terms of any agreement or document relating to Guarantor Senior Indebtedness, any of the following by the holder (or any agent or trustee of the holder) of any Guarantor Senior Indebtedness:  (1) exercising or seeking to exercise any rights or remedies against Grace or the Guarantor with respect to such event of default or (2) instituting any action or proceeding with respect to such rights or remedies (including any action of foreclosure,

5

contest or protest) under any agreement or document relating to Guarantor Senior Indebtedness, or under such event of default or otherwise or (3) attempting to do any of the foregoing.

"IFRS" means the International Financial Reporting Standards as adopted by the International Accounting Standards Board and in effect from time to time, consistently applied.

"Insolvent" means the financial condition of the Guarantor and its Subsidiaries taken as a whole such that, as of the date specified, the sum of their liabilities is greater than a fair valuation of all of their property and assets.

"Intercreditor Agreement" means the Intercreditor Agreement, dated as of the date hereof, among the Trusts' Representative, the Trust (PI) and the Trust (PD).

"Laws" means, collectively, all applicable international, foreign, Federal, state and local statutes, treaties, rules, regulations, ordinances and codes, including the binding interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof.

"NASDAQ" shall mean The NASDAQ Stock Market (including any of its subdivisions such as the NASDAQ Global Select Market) or any successor market thereto.

"NYSE" shall mean The New York Stock Exchange or any successor stock exchange thereto.

"Ordinary Dividends" means, in respect of any Entity, ordinary cash dividends declared and paid out of surplus and/or net profits (as determined in accordance with applicable law) in accordance with the dividend policy of such Entity as in effect from time to time; provided, however, that notwithstanding the foregoing, the excess, if any, of (a) the aggregate amount of dividends declared and paid by such Entity in any Fiscal Year over (b) 50% of such Entity's and its Subsidiaries' consolidated net income (determined in accordance with GAAP) for the immediately preceding Fiscal Year shall not constitute "Ordinary Dividends" to the extent of such excess.

"Permitted Holder" has the meaning set forth in the Deferred Payment Agreement (PI).

"Permitted Payee" has the meaning set forth in the Deferred Payment Agreement (PI).

"Permitted Payor" has the meaning set forth in the Deferred Payment Agreement (PI).

"Plan of Reorganization" means that certain First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W. R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Future Claimants' Representative, and the Official Committee of Equity Security Holders Dated as of February 27, 2009, as filed by Grace and certain of its affiliates in their reorganization cases under chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court for the District of Delaware, and

6

as confirmed by order of that court dated as of [__], 2009, together with the exhibits and schedules thereto, each as amended, supplemented or otherwise modified from time to time in accordance with its terms.

"Post-Transaction Certificate" means a certificate in the form of Exhibit D.

"Post-Transaction Pro Forma Cash Balance" means with respect to any Entity as of any date of determination, the aggregate amount of such Entity's and its consolidated Subsidiaries' cash and cash equivalents as of such date (after giving effect to and assuming the consummation of any Significant Transaction with a Transaction Date occurring on or prior to such date, notwithstanding that such Significant Transaction may not have actually been consummated as of such date), other than cash and cash equivalents the disposition of which is subject to a material restriction for the benefit of Entities other than such Entity and its consolidated Subsidiaries.

"Post-Transaction Pro Forma EBITDA" means, with respect to any Entity for any four-Fiscal Quarter period and any specified Disposition Transaction, such Entity's Pro Forma EBITDA for such four-Fiscal Quarter period, computed assuming that such Disposition Transaction, and any other Significant Transaction the Transaction Date of which occurs on or prior to the Transaction Date of such Disposition Transaction and during the same Fiscal Quarter as the Transaction Date of such Disposition Transaction, were consummated on the same terms in effect on the respective Transaction Dates at the beginning of the four-Fiscal Quarter period most recently ended prior to the Transaction Date of such Disposition Transaction, and shall include adjustments which give effect to events that are (i) directly attributable to such Disposition Transaction and any such Significant Transactions, (ii) expected to have a continuing impact on the Entity, and (iii) factually supportable.

"Post-Transaction Pro Forma Guarantor Senior Indebtedness" means with respect to any Entity as of any date of determination, the aggregate outstanding principal amount of such Entity's and its consolidated Subsidiaries' Guarantor Senior Indebtedness as of such date (after giving effect to and assuming the consummation of any Significant Transaction (and any related incurrence, reduction or repayment of Guarantor Senior Indebtedness) with a Transaction Date occurring on or prior to such date, notwithstanding that such Significant Transaction (and any related incurrence, reduction or repayment of Guarantor Senior Indebtedness) may not have actually been consummated as of such date).

"Post-Transaction Pro Forma Valuation" means, with respect to any Entity as of any date of determination, the amount resulting from (a) the product of (i) such Entity's Post-Transaction Pro Forma EBITDA for the four-Fiscal Quarter period most recently ended, multiplied by (ii) seven (7), minus (b) such Entity's Post-Transaction Pro Forma Guarantor Senior Indebtedness as of such date, plus (c) such Entity's Post-Transaction Pro Forma Cash Balance as of such date.

"Proceeding" means, with respect to any Entity, any voluntary or involuntary insolvency, bankruptcy, receivership, custodianship, liquidation, reorganization, assignment for the benefit of creditors, appointment of a custodian, receiver, trustee or other officer with similar

7

powers or any other proceeding for the liquidation, or other winding up of such Entity or all or substantially all of the properties of such Entity.

"Pro Forma Cash Balance" means with respect to any Entity as of the last day of any four-Fiscal Quarter period, the aggregate amount of such Entity's and its consolidated Subsidiaries' cash and cash equivalents as of such date (after giving effect to and assuming the consummation of any Significant Transaction with a Transaction Date occurring during such four-Fiscal Quarter period, notwithstanding that such Significant Transaction may not have actually been consummated during such four-Fiscal Quarter period), other than cash and cash equivalents the disposition of which is subject to a material restriction for the benefit of Entities other than such Entity and its consolidated Subsidiaries.

"Pro Forma EBITDA" means, with respect to any Entity for any four Fiscal-Quarter period, such Entity's EBITDA for such four Fiscal-Quarter period, computed assuming that any Significant Transaction the Transaction Date of which occurred during the relevant four-Fiscal Quarter period was consummated, on the terms in effect on such Transaction Date, at the beginning of such four-Fiscal Quarter period most recently ended prior to the Transaction Date of such Significant Transaction, and shall include adjustments which give effect to events that are (i) directly attributable to any Significant Transactions the Transaction Date of which occurs during such four-Fiscal Quarter period, (ii) expected to have a continuing impact on the Entity, and (iii) factually supportable.

"Pro Forma Guarantor Senior Indebtedness" means with respect to any Entity as of the last day of any four-Fiscal Quarter period, the aggregate outstanding principal amount of such Entity's and its consolidated Subsidiaries' Guarantor Senior Indebtedness as of such date (after giving effect to and assuming the consummation of any Significant Transaction (and any related incurrence, reduction or repayment of Guarantor Senior Indebtedness) with a Transaction Date occurring during such four-Fiscal Quarter period, notwithstanding that such Significant Transaction (and any related incurrence, reduction or repayment of Guarantor Senior Indebtedness) may not have actually been consummated during such four-Fiscal Quarter period).

"Pro Forma Valuation" means, with respect to any Entity as of the last day of any four-Fiscal Quarter period, the amount resulting from (a) the product of (i) such Entity's Pro Forma EBITDA for such four-Fiscal Quarter period, multiplied by (ii) seven (7), minus (b) such Entity's Pro Forma Guarantor Senior Indebtedness as of such date, plus (c) such Entity's Pro Forma Cash Balance as of such date.

"Quarterly EBITDA and Valuation Certificate" means a certificate in the form of Exhibit B.

"Regulation S-X" means Regulation S-X promulgated by the United States Securities and Exchange Commission as in effect on the date hereof.

"Related Party" means in respect of an Entity (the "Affected Entity"): (a) any senior key employee, officer or director of the Affected Entity or, in respect of an officer or director, any person holding a similar position in an Affected Entity that is not a corporation (any such person, an "Insider"); (b) any spouse, child, parent or sibling of an Insider; (c) another

8

Entity which alone or together with other Entities under its Control directly or indirectly Controls or holds ten percent (10%) or more of the Equity Interests that (i) generally entitle the holders thereof to vote for the election of the board of directors or other governing body of the Affected Entity, or (ii) confer upon the holders thereof an interest in the capital or profits of the Affected Entity; (d) any Entity Controlled by the Affected Entity or by any Insider or in which the Affected Entity or any Insider Controls or holds ten percent (10%) or more of the stock or other equity interests which (i) generally entitle the holders thereof to vote for the election of the board of directors or other governing body of the Affected Entity or (ii) confer upon the holders thereof an interest in the capital or profits of such Affected Entity; or (e) any Controlled Affiliate of any Entity that is a Related Person by virtue of clause (d) of this definition; provided, however, that any direct or indirect 100% owned Subsidiary of the Guarantor shall not constitute a "Related Party" for purposes of this Guarantee (PI).

"Section 524(g) Shares" has the meaning set forth in the Share Issuance Agreement.

"Significant Transaction" means (a) any Disposition Transaction or (b) any transaction of the type described in Section 210.11-01(a)(1) or Section 210.11-01(a)(2) of Regulation S-X (disregarding, for purposes of clause (b) of this definition, whether the Entity entering into such transaction is at the time obligated to file or furnish, or is otherwise filing or furnishing, reports with the United States Securities and Exchange Commission pursuant to Section 13 or 15 of the Securities Exchange Act of 1934, as amended).

"Subsidiary" means, with respect to any Entity at any date, any corporation, limited or general partnership, limited liability company, trust, estate, association, joint venture or other business entity (i) the accounts of which would be consolidated with those of such Entity in such Entity's consolidated financial statements if such financial statements were prepared in accordance with GAAP or (ii) of which more than 50% of (A) the outstanding Capital Stock having (in the absence of contingencies) ordinary voting power to elect a majority of the board of directors or other managing body of such Entity, (B) in the case of a partnership or limited liability company, the interest in the capital or profits of such partnership or limited liability company or (C) in the case of a trust, estate, association, joint venture or other entity, the beneficial interest in such trust, estate, association or other entity business is, at the time of determination, owned or Controlled directly or indirectly through one or more intermediaries, by such Entity.

"Taxes" means any and all present or future taxes, levies, imposts, fees, assessments, levies, duties, deductions, charges, liabilities or withholdings (including interest, fines, penalties or additions to tax) imposed by any Governmental Authority.

"Threshold Amount" has the meaning set forth in the Deferred Payment Agreement (PI).

"Transaction Date" means, with respect to any Significant Transaction, (a) the date, if any, on which final, definitive documentation providing for such Significant Transaction is executed; provided, however, that the "Transaction Date" shall no longer be deemed to have occurred with respect to any Significant Transaction if the final, definitive documentation

9

providing for such Significant Transaction is terminated for any reason, or (b) if no such final, definitive documentation for such Significant Transaction is executed, the date on which such Significant Transaction is consummated.

"Transfer" has the meaning set forth in Section 7(b).

"Transferor" has the meaning set forth in Section 7(b).

"Trust (PD)" has the meaning set forth in the Deferred Payment Agreement (PI).

"Trust (PI)" has the meaning set forth in the introductory paragraph hereof.

"Trusts" has the meaning set forth in the Share Issuance Agreement.

"Trusts' Representative" has the meaning set forth in the Share Issuance Agreement.

"Valuation" means, with respect to any Entity as of the last day of any four-Fiscal Quarter period, the amount resulting from (a) the product of (i) such Entity's EBITDA for such four-Fiscal Quarter period, multiplied by (ii) seven (7), minus (b) the aggregate outstanding principal amount of such Entity's and its consolidated Subsidiaries' Guarantor Senior Indebtedness as of such date, plus (c) the amount of cash and cash equivalents of such Entity and its consolidated Subsidiaries as of such date other than cash and cash equivalents the disposition of which is subject to a material restriction for the benefit of Entities other than such Entity and its consolidated Subsidiaries.

(b)     Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  All references herein to Sections shall be deemed references to Sections of this Guarantee (PI) unless the context shall otherwise require.

(c)     Unless otherwise indicated, (i) the term "including" means "including without limitation", except when used in the computation of time periods, and (ii) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein).

(d)     For purposes of the computation of time periods, whenever this Guarantee (PI) provides for an event to occur "within" a specified number of days of a preceding event, it shall mean that the latter event shall occur before the close of business on the last of the specified days, and the day on which the preceding event occurs shall not be included in the computation of days elapsed. The word "from" means "from and including", "after" means "after and excluding", and "to" and "until" mean "to and including".

(e)     All terms defined in this Guarantee (PI) in the singular form shall have comparable meanings when used in the plural form and vice versa.

2.     Guarantee (PI).

10

(a)    For value received and in consideration of the transactions set forth in the Deferred Payment Agreement (PI) and in the Plan of Reorganization, the Guarantor hereby absolutely, irrevocably and unconditionally guarantees for the benefit of the Permitted Holder and each Permitted Payee, as a primary obligor and not merely as a surety, and pursuant to the terms and conditions of this Guarantee (PI), (i) the full and prompt payment when due (whether by acceleration or otherwise) of (A) all Deferred Payments (PI) and (B) all other amounts payable under the Deferred Payment Agreement (PI) (including interest at the Default Rate) accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) and at all times thereafter, and (ii) the due performance by Grace of all of its other obligations under the Deferred Payment Agreement (PI) (the obligations described in items (i) and (ii), the "Guaranteed Obligations (PI)").

(b)    The Guarantor hereby agrees that this Guarantee (PI) is an absolute, unconditional guarantee of payment and performance and is not merely a surety or guarantee of collection, and that the Guarantor and Grace are jointly and severally liable for the Guaranteed Obligations (PI), which liability is a continuing, absolute and unconditional obligation of payment or performance, as the case may be, regardless of the solvency or insolvency of Grace or the Guarantor at any time.

(c)    The obligations of the Guarantor hereunder are secured by the Guarantor's obligation to issue and deliver to the Trusts' Representative, for the benefit of the Trusts, the Section 524(g) Shares under the circumstances, and upon the terms and subject to the conditions, set forth in the Share Issuance Agreement.

(d)    If the acceleration of the Guaranteed Obligations (PI) is stayed in connection with any Proceeding commenced by or against Grace, all such Guaranteed Obligations (PI) shall nonetheless be payable by the Guarantor immediately upon demand by the Permitted Holder.

3.    Enforceability of Obligations.

(a)    Subject to Section 3(b), the Guarantor hereby agrees that its obligations in respect of this Guarantee (PI) shall be enforceable against the Guarantor irrespective of:

(i) the legality, validity, enforceability, avoidance or subordination of any of the Guaranteed Obligations (PI) or the Deferred Payment Agreement (PI);

(ii) any law, regulation, or order of any jurisdiction, or any other event, affecting any term of the Guaranteed Obligations (PI) or the Deferred Payment Agreement (PI);

(iii) the absence of any attempt by, or on behalf of, the Permitted Holder to collect, or to take any other action to enforce, all or any part of the Guaranteed Obligations (PI) whether from or against Grace or any other Entity;

11

(iv)  the election of any remedy available under the Deferred Payment Agreement (PI) or applicable Law or in equity by, or on behalf of, the Permitted Holder with respect to all or any part of the Guaranteed Obligations (PI);

(v)  any change in the corporate existence, structure or ownership of Grace or the Guarantor;

(vi)  any impairment of the capital of Grace or the Guarantor, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting Grace, the Guarantor or their assets, or any resulting release or discharge of the Guaranteed Obligations (PI);

(vii)  any amendment, waiver, consent, extension, forbearance or granting of any indulgence by, or on behalf of, the Permitted Holder with respect to any provision of the Deferred Payment Agreement (PI), or any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of Grace or the Guarantor, including any renewal or extension of the time or change of the manner or place of payment or performance, as the case may be, of the Guaranteed Obligations (PI);

(viii)  the disallowance, under Section 502 of the Bankruptcy Code, of all or any portion of the claims against Grace held by the Permitted Holder for payment or performance, as the case may be, of all or any part of the Guaranteed Obligations (PI);

(ix)  the existence of any right, claim, counterclaim, or right of set-off, whether arising from or relating to the Guaranteed Obligations (PI) or Grace or otherwise, that the Guarantor may have at any time against Grace, the Permitted Holder or any other Entity, whether in connection herewith or any unrelated transactions, provided, however, that nothing herein shall prevent the assertion of a separate suit or compulsory counterclaim;

(x)  the cessation for any reason of the liability of Grace under the Deferred Payment Agreement (PI) or any other circumstance which might otherwise constitute a legal or equitable discharge of Grace or the Guarantor; or

(xi)  any other act or circumstance which might or could be deemed a discharge or modification hereunder other than payment in full of the Guaranteed Obligations (PI).

(b)     Notwithstanding Section 3(a) and Section 4, or any other provision to the contrary in this Guarantee (PI), from and after such time, if any, that the Guarantor has notified the Permitted Holder in writing that Grace is no longer a Subsidiary or a Controlled Affiliate of the Guarantor, any amendment, waiver, modification, supplement, restatement or change in respect of the terms and conditions of the Deferred Payment Agreement (PI) or any other Deferred Payment Document (PI) shall require the prior written consent of the Guarantor.

4.     Waivers.  With respect to the Guaranteed Obligations (PI), the Guarantor hereby waives (subject to Section 3(b)) (a) acceptance, promptness, diligence, presentment, demand of payment, filing of claims with a court in the event of receivership or bankruptcy of Grace, protest or notice, all setoffs and counterclaims and all presentments, demands for

12

performance, notices of nonperformance, protests, notices of protest, notices of dishonor and notices of acceptance of this Guarantee (PI) or the Deferred Payment Agreement (PI) (and shall not require that the same be made on or given to Grace as a condition to the Guarantor's obligations hereunder), (b) any defense arising by reason of any disability or other defense of Grace or any other guarantor, or the cessation from any cause whatsoever (including any act or omission of the Permitted Holder or any other Entity) of the liability of Grace; (c) any right to, or to require the Permitted Holder to, proceed against Grace, proceed against or exhaust any security (including the Section 524(g) Shares) for the Guaranteed Obligations (PI), or pursue any other remedy in the power of the Permitted Holder whatsoever, (d) any benefit of and any right to participate in any security now or hereafter securing the Guaranteed Obligations (PI), (e) the benefits of all statutes of limitation, and (f) all other demands and defenses whatsoever (other than payment in full of all Guaranteed Obligations (PI)).

5.    Payments.

(a)    All payments to be made by the Guarantor pursuant to this Guarantee (PI) shall be made in lawful currency of the United States of America by wire transfer of immediately available funds to the Permitted Holder in accordance with such wire transfer instructions as are provided by the Permitted Holder in writing from time to time.   Subject to Sections 5(b), (c) and (d), all payments under this Guarantee (PI) shall be made in full, without any set-off, counterclaim or any deduction whatsoever.

(b)    If, after giving effect to any Disposition Transaction or any assignment, delegation or transfer by the Guarantor of its rights or obligations under this Guarantee (PI), the Guarantor shall be required by applicable Law to withhold any Taxes from any payments hereunder, and if such requirement would not have been imposed by such applicable Law but for such Disposition Transaction, assignment or transfer, then (i) the sum payable shall be increased as necessary so that after making all withholdings required by applicable Law (including withholdings applicable to additional sums payable under this Section 5(b)) the payee receives an amount equal to the sum it would have received had no such withholdings been made, (ii) the Guarantor shall make such withholdings and (iii) the Guarantor shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Law.  This Section 5(b) shall survive the termination of this Guarantee (PI) pursuant to Section 15.

(c)    If, after giving effect to any permitted assignment or Transfer by the Permitted Holder of its rights or obligations under this Guarantee (PI), the Guarantor shall be required by applicable Law to withhold any Taxes from any payments hereunder, and if such requirement would not have been imposed by such applicable Law but for such assignment or Transfer, then the obligation of the Guarantor or the Permitted Payor to make the relevant payment hereunder shall be discharged by making such payment net of such Taxes.  This Section 5(c) shall survive the termination of this Guarantee (PI) pursuant to Section 15.

(d)    If, due to either (i) the introduction of or any change in any law or regulation (or any change in the interpretation thereof) or (ii) the compliance with any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law), in each case adopted after the date hereof, the Guarantor or a Permitted Payor shall be required to withhold any Taxes from any payments hereunder, then the obligation of the

13

Guarantor or the Permitted Payor to make the relevant payment hereunder shall be discharged by making such payment net of such Taxes.  This <u>Section 5(d)</u> shall survive the termination of this Guarantee (PI) pursuant to <u>Section 15</u>.

6.      <u>Representations and Warranties</u>.  The Guarantor represents and warrants, as of the Effective Date, that:

(a)      The Guarantor is duly organized, validly existing and in good standing under the laws of the jurisdiction of the Guarantor's incorporation; <u>provided, however</u>, with respect to good standing, only to the extent the concept of good standing exists in such jurisdiction of incorporation.

(b)      The Guarantor has the corporate power and authority to execute and deliver this Guarantee (PI) and each other Deferred Payment Document (PI) to which it is a party.  This Guarantee (PI) and each other Deferred Payment Document (PI) to which the Guarantor is a party has been duly authorized by all necessary corporate action of the Guarantor and has been duly executed and delivered by the Guarantor.

(c)      This Guarantee (PI) and each other Deferred Payment Document (PI) to which the Guarantor is a party is a legal, valid and binding obligation of the Guarantor, enforceable against the Guarantor in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally, by the discretion of the court in which enforcement is sought, and/or by general equitable principles (whether enforcement is sought by proceedings at law or in equity).

(d)      The execution, delivery and performance by the Guarantor of this Guarantee (PI) and each other Deferred Payment Document (PI) to which the Guarantor is a party does not conflict with, result in a breach of any of the provisions of, or constitute a default under, the Governing Documents of the Guarantor.

7.      <u>Guarantor Covenants</u>. The Guarantor covenants and agrees that, from the Effective Date until all Guaranteed Obligations (PI) are  paid and performed in full:

(a)      <u>Affirmative Covenants</u>.  The Guarantor shall:

(i)      <u>Maintenance of Existence and Qualifications</u>.  Maintain and preserve in full force and effect its existence and good standing (to the extent the concept of good standing exists in the Guarantor's jurisdiction of incorporation) and all other rights, powers, franchises, licenses and qualifications necessary or desirable for its ownership or use of properties or the conduct of its business, except (A) as permitted by <u>Section 16</u>, and (B) where the failure to do so would not reasonably be likely to adversely affect the Guarantor's ability to make payments in respect of the Guaranteed Obligations (PI) or to perform its obligations under the Deferred Payment Documents (PI) to which it is a party.

(ii)      <u>Notice of Event of Default, Guarantor Senior Payment Default and Guarantor Senior Non-Payment Default</u>.  Furnish to the Permitted Holder (x) within five (5) days

14

after an Authorized Officer of the Guarantor shall first learn of an Event of Default, and (y) on or before the earlier of (A) the fifteenth (15th) day after an Authorized Officer of the Guarantor shall first learn of a Guarantor Senior Payment Default or Guarantor Senior Non-Payment Default and (B) the first Business Day following the date upon which a Guarantee Payment Blockage Notice is delivered pursuant to <u>Section 8(a)(ii)</u>, a written statement of an Authorized Officer of the Guarantor stating that an Event of Default, Guarantor Senior Payment Default or Guarantor Senior Non-Payment Default, as the case may be, has occurred, which written statement shall, to the extent known by the Guarantor, set forth in reasonable detail the facts giving rise to and status of such Event of Default, Guarantor Senior Payment Default or Guarantor Senior-Non Payment Default, as the case may be, and the actions, if any, the Guarantor is taking or proposes to take with respect thereto.

(iii)    <u>Information Covenants</u>.  If the Guarantor is not obligated to file or furnish, or is not otherwise filing or furnishing, reports with the United States Securities and Exchange Commission pursuant to Section 13 or 15 of the Securities Exchange Act of 1934, the Guarantor shall furnish to the Permitted Holder:

(A)    <u>Annual Financial Statements</u>.  As soon as available but in no event later than ninety (90) days after the last day of each of the Guarantor's Fiscal Years, its annual consolidated financial statements audited by a nationally recognized registered independent public accounting firm allowed to practice before the Securities and Exchange Commission or any successor Governmental Authority, consisting of a consolidated balance sheet of the Guarantor and its consolidated Subsidiaries as of the end of such year and consolidated statements of income, cash flows and stockholders equity for such year (all in reasonable detail and with all notes and supporting schedules); and

(B)    <u>Quarterly Financial Statements</u>.  As soon as available and in any event within forty-five (45) days after the end of each of the first three Fiscal Quarters in each Fiscal Year of the Guarantor, its consolidated balance sheet as of the end of such Fiscal Quarter, and consolidated statements of income and cash flows of the Guarantor and its consolidated Subsidiaries for such Fiscal Quarter, all in reasonable detail and certified by an Authorized Officer of the Guarantor to present fairly in all material respects the financial condition, results of operations and other information reflected therein and to have been prepared in accordance with GAAP (subject to year-end audit adjustments and the absence of footnotes).

(iv)    <u>Officer's Certificates</u>.  The Guarantor shall furnish to the Permitted Holder:

(A)    No later than ninety (90) days after the last day of each of the Guarantor's Fiscal Years and no later than forty-five (45) days after the end of each of the first three Fiscal Quarters in each Fiscal Year of the Guarantor, a Quarterly EBITDA and Valuation Certificate executed by an Authorized Officer of the Guarantor setting forth (I) if the Transaction Date of a Significant Transaction has occurred during the four-Fiscal Quarter period ending on the last day of such Fiscal Quarter or Fiscal Year, as the case may be, the Pro Forma EBITDA of the Guarantor for such four-Fiscal Quarter period and the Pro Forma Valuation of the Guarantor as of the last day of such four-Fiscal Quarter period or

15

(II) if the Transaction Date of a Significant Transaction did not occur during the four-Fiscal Quarter period ending on the last day of such Fiscal Quarter or Fiscal Year, as the case may be, the EBITDA of the Guarantor for such four-Fiscal Quarter period and the Valuation of the Guarantor as of the last day of such four-Fiscal Quarter period; provided, however, that the Guarantor shall not be required to furnish to the Permitted Holder a Quarterly EBITDA and Valuation Certificate under this subclause (A) if (x) the Guarantor is filing or furnishing reports with the United States Securities and Exchange Commission pursuant to Section 13 or 15 of the Securities Exchange Act of 1934, and (y)(1) if the Transaction Date of a Significant Transaction has occurred during the four-Fiscal Quarter period ending on the last day of the applicable Fiscal Quarter or Fiscal Year, the Pro Forma EBITDA of the Guarantor for such four-Fiscal Quarter period and the Pro Forma Valuation of the Guarantor as of the last day of such four-Fiscal Quarter period is readily ascertainable from such reports or (2) if the Transaction Date of a Significant Transaction did not occur during the four-Fiscal Quarter period ending on the last day of the applicable Fiscal Quarter or Fiscal Year, the EBITDA of the Guarantor for such four-Fiscal Quarter period and Valuation of the Guarantor as of the last day of such four-Fiscal Quarter period is readily ascertainable from such reports;

(B)    no later than ninety (90) days after the last day of each of the Guarantor's Fiscal Years, a Compliance Certificate executed by an Authorized Officer of the Guarantor for such Fiscal Year; and

(C)    no later than thirty (30) days after the consummation by a Transferor of a Disposition Transaction of the type described in clause (ii) or clause (iii) of Section 7(b), a Post-Transaction Certificate setting forth the Post-Transaction Pro Forma EBITDA of the Guarantor with respect to such Disposition Transaction executed and delivered by an Authorized Officer of the Guarantor.

(b)    Negative Covenant.  The Guarantor shall not, and shall cause each of its Subsidiaries and Controlled Affiliates (each, a "Transferor") to not, sell, assign, transfer, license, lease or otherwise dispose of (each, a "Transfer") any property and/or other assets and/or enter into any transaction or obligation, whether constituting or by way of merger, consolidation, sale of assets or other disposition, reorganization, recapitalization, dividend, other distribution, or otherwise, or any related series of the foregoing (any such Transfer other than Ordinary Dividends, Bona Fide Compensation Transactions and other Transfers in the ordinary course of business, a "Disposition Transaction"), if the Transferor (taken together with all of its direct and indirect wholly owned Subsidiaries) would (1) receive (directly or indirectly) less than a reasonably equivalent value in such Disposition Transaction, (2) become or be rendered Insolvent as a result of such Transfer and/or such Disposition Transaction, or (3) be engaged in business and/or transactions, and/or would be about to engage in business and/or transactions, for which the Transferor's (taken together with all of its direct and indirect wholly owned Subsidiaries) remaining property and other assets would be unreasonably small capital; provided, however, that notwithstanding the foregoing, a Transferor:

(i)    That is a direct or indirect wholly-owned Subsidiary of the Guarantor may make a Transfer to or engage in a Disposition Transaction exclusively with the Guarantor or any other direct or indirect wholly-owned Subsidiary of the Guarantor; provided further, that if such

16

Transferor is Grace or any of Grace's Subsidiaries or Controlled Affiliates, such Disposition Transaction shall be permitted under this <u>clause (i)</u> only if it is also permitted under Section 6(b) of the Deferred Payment Agreement (PI);

      (ii)    may engage in a Disposition Transaction whereby such Transferor (A) pays or makes (directly or indirectly) dividends or distributions (whether in cash, securities or other property) with respect to any of its Capital Stock (including by way of a spin-off or spin-out of any of its assets), or (B) repurchases its Capital Stock, provided that, in the case of any Disposition Transaction under <u>subclause (A)</u> or <u>(B)</u> above, all of the following conditions are satisfied:

      (1)    no Event of Default has occurred and is continuing at the time of, or would result from, such Disposition Transaction;

      (2)    as of the Transaction Date of such Disposition Transaction, (x) the Post-Transaction Pro Forma Valuation of the Guarantor shall equal or exceed the Threshold Amount or (y) the "Post-Transaction Pro Forma Valuation" (as defined in the Deferred Payment Agreement (PI)) of Grace shall equal or exceed the Threshold Amount; and

      (3)    if such Disposition Transaction exceeds $15,000,000 and is not publicly disclosed at least 10 days prior to the consummation of such Disposition Transaction, then the Guarantor shall provide the Permitted Holder with, at least 10 days' prior to the consummation of such Disposition Transaction, a written notice describing in reasonable detail the material terms of such Disposition Transaction and setting forth the Post-Transaction Pro Forma Valuation of the Guarantor as of the Transaction Date of such Disposition Transaction; and

      (iii)    other than as set forth in <u>Section 7(b)(ii)</u> above, shall not enter into any Disposition Transaction with a Related Party to the Transferor in which the aggregate value of the assets or other property Transferred in such Disposition Transaction to such Related Party exceeds $15,000,000 if the Transferor (taken together with all of its direct and indirect wholly owned Subsidiaries) would (1) receive (directly or indirectly) less than a reasonably equivalent value in such Disposition Transaction, as determined by a reputable investment bank or valuation firm jointly selected by the Guarantor and the Permitted Holder, (2) become or be rendered Insolvent as a result of such Transfer and/or such Disposition Transaction or (3) be engaged in business and/or transactions, and/or would be about to engage in business and/or transactions, for which the Transferor's (taken together with all of its direct and indirect wholly owned Subsidiaries) remaining property and other assets would be unreasonably small capital; <u>provided</u>, that if the aggregate value of the assets or other property Transferred to such Related Party in such Disposition Transaction exceeds $15,000,000 and the existence of such Disposition Transaction is not publicly disclosed at least 10 days prior to the consummation of such Disposition Transaction, then the Guarantor shall provide the Permitted Holder with, at least 10 days' prior to the consummation of such Disposition Transaction, a written notice describing in reasonable detail the material terms of such Disposition Transaction and setting forth the Post-Transaction Pro Forma Valuation of the Guarantor as of the Transaction Date of such Disposition Transaction;

17

provided further that if the Guarantor is not the surviving or succeeding Entity as a result of any Disposition Transaction (but in the case of a sale of assets, only if such sale involves a sale of all or substantially all of the assets of the Guarantor) otherwise permitted by the exceptions to this Section 7(b), such Disposition Transaction shall be permitted under this Section 7(b) only if the Guarantor shall comply with the requirements of Section 16(e).

8.    Subordination Terms.

Any and all obligations of the Guarantor in respect of the Guaranteed Obligations (PI) shall be subordinated and otherwise junior at all times in right of payment and in all other respects, in the manner and to the extent set forth herein, to any and all present and future obligations of the Guarantor in respect of any Guarantor Senior Indebtedness.

(a)    Blockage of Payments for Guaranteed Obligations (PI).

(i)    If any payment default occurs and is continuing beyond any applicable grace period pursuant to the terms and conditions of any Guarantor Senior Indebtedness (a "Guarantor Senior Payment Default"), then subject to Section 8(g), no payment or distribution of cash, securities or any other assets shall be made by the Guarantor with respect to the Guaranteed Obligations (PI) or this Guarantee (PI) for as long as such Guarantor Senior Payment Default is continuing.

(ii)    If any default other than a Guarantor Senior Payment Default occurs pursuant to the terms and conditions of any Designated Guarantor Senior Indebtedness that would allow the holders thereof to accelerate the maturity thereof (a "Guarantor Senior Non-Payment Default"), then subject to Section 8(g), no payment or distribution of cash, securities or any other assets shall be made by the Guarantor with respect to any Guaranteed Obligations (PI) or pursuant to this Guarantee (PI) during the period (the "Guarantee Payment Blockage Period") (x) beginning on the date that the Permitted Holder receives from the Entity entitled to give notice under any document evidencing such Designated Guarantor Senior Indebtedness (or from the Guarantor acting at the direction or request of such Entity) a written notice (a "Guarantee Payment Blockage Notice") that such a Guarantor Senior Non-Payment Default has occurred and is continuing and (y) ending on the earliest to occur of (1) 180 days from the date the Permitted Holder shall have received the Guarantee Payment Blockage Notice, (2) the date such Guarantor Senior Non-Payment Default shall have been cured or waived or shall have ceased to exist and (3) the date such Guarantee Payment Blockage Period shall have been terminated by written notice to the Permitted Holder from the Entity initiating such Guarantee Payment Blockage Period.

(iii)    Notwithstanding the foregoing, (A) in no event will a Guarantee Payment Blockage Period extend beyond 180 days from the date the Guarantee Payment Blockage Notice in respect thereof was received by the Permitted Holder, (B) there shall be a period of at least 180 consecutive days in each period of 360 consecutive days when no Guarantee Payment Blockage Period is in effect, and (C) no Guarantor Senior Non-Payment Default that existed or was continuing on the date of delivery of any Guarantor Payment Blockage Notice (whether or not such Guarantor Senior Non-Payment Default is with respect to the same issue of Designated Guarantor Senior Indebtedness) may be, or be made, the basis for a

18

subsequent Guarantor Payment Blockage Notice, unless such Guarantor Senior Non-Payment Default has been cured or waived for a period of not less than 90 consecutive calendar days.

(iv)    The payment of Guaranteed Obligations (PI) shall resume, and the payment of any Guaranteed Obligations (PI) not paid due to a suspension thereof pursuant to clause (i) or clause (ii) above shall be paid, together with accrued interest thereon at the Default Rate, when such suspension is no longer in effect (either due to cure or waiver of the relevant Guarantor Senior Payment Default or the expiration or termination of the Guarantee Payment Blockage Period pursuant to clause (i) or clause (ii) of this Section 8(a)) unless a subsequent Guarantor Payment Blockage Notice has been delivered in accordance with clause (iii) of this Section 8(a) and is not prohibited from being delivered by clause (iii) of this Section 8(a).

(b)    Proceedings.  Upon any payment made by the Guarantor, or any distribution of cash, securities or other assets of any kind of the Guarantor (other than securities issued in substitution for the obligation to make payments in respect of the Guaranteed Obligations (PI) that are subordinated to at least the extent described herein for the obligation to make payments in respect of the Guaranteed Obligations (PI), which Securities the Permitted Holder (or any Permitted Payee, if applicable) is specifically authorized to receive notwithstanding any other provision of this Section 8), to creditors in any Proceeding with respect to the Guarantor or its properties, all obligations due on all Guarantor Senior Indebtedness shall first be paid in full in cash before any payment or distribution is made on account of any Guaranteed Obligations (PI) or otherwise pursuant to this Guarantee (PI).

(c)    Improper Payments Held in Trust.  Any payments or property received by the Permitted Holder or any Permitted Payee in breach of this Section 8 shall be held by the Permitted Holder or such Permitted Payee in trust and promptly delivered in the form received to the holder of Guarantor Senior Indebtedness entitled to receive the same (any such payment or property delivered by the Permitted Holder or such Permitted Payee to any holder of Guarantor Senior Indebtedness, a "Guarantor Turnover Payment").  To the maximum extent permitted under applicable Law, the Guarantor agrees that any Guarantor Turnover Payment shall be treated as a payment by the Guarantor on account of such Guarantor Senior Indebtedness and shall not satisfy the Guarantor's obligation with respect to any amount due to the Permitted Holder or such Permitted Payee under this Guarantee (PI).  If, notwithstanding the preceding sentence, it is determined (by a court of competent jurisdiction or otherwise) that a Guarantor Turnover Payment is a payment by the Guarantor on account of, and satisfies any obligation of the Guarantor with respect to, any amount due to the Permitted Holder or any Permitted Payee under this Guarantee (PI), then, to the extent of the amount of such Guarantor Turnover Payment, the portion of the obligation which has been determined to be paid and satisfied by such Guarantor Turnover Payment shall be reinstated and shall continue to be in full force and effect as of the time immediately preceding the initial payment thereof by the Guarantor to the Permitted Holder or such Permitted Payee.  If, notwithstanding the preceding sentence, any portion of an obligation of the Guarantor in respect of such Guarantor Turnover Payment is not reinstated and continued to the extent of the amount of the relevant Guarantor Turnover Payment, then the Permitted Holder or the applicable Permitted Payee shall, upon the payment in full in cash of all Guarantor Senior Indebtedness owed to the holder thereof to whom the Permitted Holder or such Permitted Payee delivered such Guarantor Turnover Payment, be subrogated to the rights of such holder to receive payments or distributions applicable to such

19

Guarantor Senior Indebtedness, and for the purpose of such subrogation such Guarantor Turnover Payment shall not, as between the Guarantor and the Permitted Holder or such Permitted Payee, be deemed to be payment by the Guarantor to or on account of such Guarantor Senior Indebtedness.

(d)    Remedies Blockage.  Subject in any event to the other terms and conditions of this Section 8 (including Section 8(a) and Section 8(g)), if an Event of Default has occurred and is continuing and any Guarantor Senior Indebtedness is then outstanding, the Permitted Holder hereby agrees for itself and any assignee that it will not (1) exercise or seek to exercise any rights or remedies against Grace or the Guarantor with respect to such Event of Default or (2) institute any action or proceeding with respect to such rights or remedies (including any action of foreclosure, contest or protest) under any Deferred Payment Document (PI) or any agreement or document relating thereto, or under such Event of Default or otherwise or (3) attempt to do any of the foregoing (collectively, the "Remedies"), for a period commencing on the date that such Event of Default occurs and ending on the earliest to occur of (i) 180 days after the first date on which such Event of Default shall have occurred, (ii) the commencement of a Proceeding with respect to Grace, the Guarantor or their respective properties, (iii) the date that the holder (or any agent or trustee of the holder) of any Guarantor Senior Indebtedness commences exercising any Guarantor Senior Remedies with respect to such Guarantor Senior Indebtedness (including, without limitation, the acceleration of all or any portion of such Guarantor Senior Indebtedness) and (iv) the payment in full in cash of all Guarantor Senior Indebtedness.

(e)    Notwithstanding the foregoing, as applied to the Permitted Holder, the term "Remedies" shall not include, and the Permitted Holder shall not be impaired by this Section 8(d) from doing, any of the following:  (A) exercising rights and remedies for specific performance or injunctive relief to compel Grace or the Guarantor to comply with any non-payment obligations under the Deferred Payment Documents (PI) (including commencing any action contemplated by Section 16(f)), (B) instituting or maintaining any suit or action solely to prevent the running of any applicable statute of limitations, (C) accruing interest on the Deferred Payments (PI) at the Default Rate pursuant to the Deferred Payment Agreement (PI) and (D) giving any notice (including notice of an Event of Default) to the Guarantor under the Deferred Payment Documents (PI).

(f)    No Secured Obligation.  Except for this Guarantee (PI) and the share issuance obligation with respect to the Section 524(g) Shares as and to the extent contemplated in the Share Issuance Agreement, no credit support or security interest shall be granted by Grace, the Guarantor or any of its Subsidiaries in connection with, or otherwise support or secure any obligation set forth in, the Deferred Payment Documents (PI).  Notwithstanding the foregoing, the Permitted Holder may obtain to the extent permitted under applicable Law a judgment lien on the properties of Grace and/or the Guarantor to secure the payment and performance of a judgment obtained by the Permitted Holder against Grace and/or the Guarantor.

(g)    No Impairment of Right to Receive Section 524(g) Shares or Warrant Shares.  Nothing in this Section 8 shall impair the rights of the Trust (PI) (or its permitted successor or assigns) (i) acting through the Trusts' Representative pursuant to the Intercreditor Agreement, to deliver to the Guarantor a Demand for Issuance of the Section 524(g) Shares and

20

to receive the Trust (PI)'s percentage of the Section 524(g) Shares pursuant to the Share Issuance Agreement or (ii) to exercise all or any portion of the Warrant and to receive the shares of Common Stock in connection therewith.

(h)    Further Assurances.  At the reasonable request of the Guarantor, the Permitted Holder will, at the sole expense of the Guarantor, execute such agreements, documents, certificates and/or other instruments confirming the existence and extent of the subordination terms detailed in this Section.

9.    Defaults and Remedies.

(a)    Subject in each case to Section 8 of this Guarantee (PI), the Permitted Holder shall have the right, power and authority to do all things deemed necessary or advisable to enforce the provisions of this Guarantee (PI) and protect its rights under the Deferred Payment Agreement (PI) and, upon the occurrence and during the continuance of an Event of Default, the Permitted Holder may institute or appear in such appropriate proceedings permitted or not prohibited under this Guarantee (PI) as the Permitted Holder shall deem most effectual to protect and enforce any of its rights hereunder, whether for the specific enforcement of any covenant or agreement in this Guarantee (PI) or in aid of the exercise of any power granted herein or in the Permitted Holder, or to enforce any other proper remedy.

(b)    Each and every Event of Default or breach by the Guarantor of this Guarantee (PI) shall give rise to a separate cause of action hereunder, and separate actions may be brought hereunder as each cause of action arises.  For so long as such an Event of Default or such a breach is continuing, the Permitted Holder shall have the right to proceed first and directly against the Guarantor under this Guarantee (PI) without proceeding against any other Entity (including Grace), without exhausting any other remedies which it may have and without resorting to any other security (if any) (including the Section 524(g) Shares) held by the Permitted Holder to secure the Guaranteed Obligations (PI).

10.    Setoff.  Subject to Section 8 of this Guarantee (PI), at any time after all or any part of the Guaranteed Obligations (PI) have become due and payable or performable, as the case may be (by acceleration or otherwise), the Permitted Holder or any Permitted Payee may, without notice to the Guarantor and regardless of the acceptance of any security or collateral (if any) for the payment thereof, and up to the unpaid amount of the Guaranteed Obligations (PI) then due, appropriate and apply toward the payment or performance, as the case may be, of all or any part of the Guaranteed Obligations (PI) then owing to the Permitted Holder or such Permitted Payee (i) any indebtedness due or to become due from the Permitted Holder or such Permitted Payee to the Guarantor, and (ii) any moneys, credits or other property belonging to the Guarantor, at any time validly held by or coming into the possession of the Permitted Holder or such Permitted Payee.

11.    Financial Information.  The Guarantor hereby acknowledges that it has adequate means of, and assumes sole responsibility for, keeping itself informed of the financial condition of Grace including any circumstances bearing upon the risk of nonpayment or nonperformance of the Guaranteed Obligations (PI), or any part thereof, and the Guarantor hereby agrees that no Permitted Holder shall have any duty to advise the Guarantor of

21

information known to it regarding any such circumstances.  In the event the Permitted Holder in its reasonable discretion, undertakes at any time or from time to time to provide any such information to the Guarantor, the Permitted Holder shall be under no obligation (i) to undertake any investigation not a part of its regular business routine or (ii) to disclose any information which the Permitted Holder, pursuant to accepted or reasonable practices, wishes to maintain confidential.

12.   Reinstatement.  Notwithstanding any provision herein to the contrary, the Guarantor agrees that, to the extent that any Entity makes a payment or payments to the Permitted Holder on account of the Guaranteed Obligations (PI) which payments or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required or agreed to be repaid or returned by the Permitted Holder under any Law or in respect of any Proceeding or other litigation to which the Guarantor, the Permitted Holder or any Permitted Payee is subject, then, to the extent of the amount of such payments, the portion of the Guaranteed Obligations (PI) which has been paid, reduced or satisfied by such amount shall be reinstated and continued in full force and effect as of the time immediately preceding such initial payment, reduction or satisfaction.

13.   Distribution of Grace Assets in Proceeding; Subrogation.

(a)   Upon any distribution of assets of Grace to creditors in connection with any Proceeding relating to Grace or its property (but subject to Section 8), (i) the Permitted Holder and each Permitted Payee shall be entitled to receive payment in full of all Guaranteed Obligations (PI) before the Guarantor shall be entitled to receive any payment of principal of or interest on or any other amounts in respect of indebtedness of Grace in favor of the Guarantor; and (ii) until payment and performance in full of all Guaranteed Obligations (PI), any distribution of assets of any kind or character to which the Guarantor would otherwise be entitled shall be paid by Grace or by any receiver, trustee in bankruptcy, liquidating trustee, agents or other Entity making such payment or distribution to, or if received by the Guarantor, shall be held for the benefit of and shall be forthwith paid or delivered to, the Permitted Holder and each Permitted Payee on a pro rata basis according to the amount of all Guaranteed Obligations (PI) owing to the Permitted Holder and each such Permitted Payee.

(b)   The Guarantor hereby agrees that it will not assert, enforce, or otherwise exercise any rights which it may acquire against Grace or any guarantor pursuant to any other guaranties by way of subrogation pursuant to this Guarantee (PI), by any payment made hereunder or otherwise, until the Guaranteed Obligations (PI) shall have been paid in full.

14.   Amendments; Waivers.

(a)   No provision of this Guarantee (PI) may be waived, amended, supplemented or modified except by a written instrument executed by the Permitted Holder and the Guarantor.

(b)   No delay on the part of the Permitted Holder in the exercise of any right or remedy arising under this Guarantee (PI) or the Deferred Payment Agreement (PI) or otherwise with respect to all or any part of the Guaranteed Obligations (PI), any collateral (if any) or any

22

other guarantee of or security (if any) for all or any part of the Guaranteed Obligations (PI) shall operate as a waiver thereof, and no single or partial exercise by the Permitted Holder of any such right or remedy shall preclude any further exercise thereof.  Failure by the Permitted Holder at any time or times hereafter to require strict performance by Grace, the Guarantor or any other guarantor of all or any part of the Guaranteed Obligations (PI) or of any of the provisions, warranties, terms and conditions contained in the Deferred Payment Agreement (PI) shall not waive, affect or diminish any right of the Permitted Holder at any time or times hereafter to demand strict performance thereof.  No waiver of any Event of Default by the Permitted Holder shall operate as a waiver of any other Event of Default or breach of this Guarantee (PI) or the same Event of Default or breach of this Guarantee (PI) on a future occasion, and no action by the Permitted Holder permitted hereunder shall in any way affect or impair the Permitted Holder's rights and remedies or the obligations of the Guarantor under this Guarantee (PI).  The remedies herein provided are cumulative and not exclusive of any remedies provided by law or in equity or any other Deferred Payment Document (PI).

       15.    <u>Effectiveness; Termination</u>.  This Guarantee (PI) shall become effective against the Guarantor upon its execution by the Guarantor and the occurrence of the Effective Date and shall continue in full force and effect and may not be terminated or otherwise revoked until the Guaranteed Obligations (PI) shall have been paid in full.

       16.    <u>Consolidation, Successors and Assigns</u>.

       (a)    This Guarantee (PI) shall be binding upon the Guarantor and upon the successors and permitted assigns of the Guarantor and shall inure to the benefit of the Permitted Holder.  The successors and assigns of the Guarantor and Grace shall include, without limitation, their respective receivers, trustees or debtors-in-possession.

       (b)    If the Permitted Holder Transfers or grants a security interest in its rights in the Deferred Payment Agreement (PI) or any Deferred Payments (PI) upon the terms and subject to the conditions set forth in the Deferred Payment Agreement (PI), the Permitted Holder shall have the right to Transfer or grant a security interest in this Guarantee (PI) to such transferee or secured party without the consent of the Guarantor; <u>provided</u>, <u>however</u>, that in no event shall any person or Entity other than the Collateral Agent have, or have the ability to bring, or be able to enforce, any claim, right or cause of action against the Guarantor or any of its Affiliates under, in connection with or as a result of such security interest.

       (c)    Subject to <u>Section 16(d)</u>, the Guarantor may not Transfer its rights, interests, duties, liabilities or obligations under this Guarantee (PI) without the prior written consent of the Permitted Holder, which consent shall not be unreasonably withheld, conditioned or delayed.

       (d)    Subject to <u>Section 16(e)</u>, neither <u>Section 16(c)</u> nor anything else in this Guarantee (PI) shall prohibit or restrict the ability of the Guarantor to undertake any Disposition Transaction; <u>provided</u> that, unless the Permitted Holder otherwise consents in writing, (i) such Disposition Transaction shall not violate <u>Section 7(b)</u>, (ii) no Event of Default and, no event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default, exists at the time of, or would exist immediately following the consummation of such

23

Disposition Transaction, (iii) such Disposition Transaction does not conflict with, or result in a breach of, any of the provisions of, or constitute a default under, the Governing Documents of the Guarantor or such surviving or succeeding Entity and (iv) at least ten (10) days prior to consummation of such Disposition Transaction, the Guarantor shall, subject to reasonable confidentiality arrangements between the Permitted Holder and the Guarantor, deliver to the Permitted Holder written notice of its intention to consummate such Disposition Transaction.

(e) If the surviving or succeeding Entity as a result of any such Disposition Transaction (but in the case of a sale of assets, only if such sale involves a sale of all or substantially all of the assets of the Guarantor) is not the Guarantor, then prior to, or concurrently with, the consummation of any such Disposition Transaction, the surviving or succeeding Entity shall by written instrument substantially in the form of Exhibit A signed by such Entity, the Guarantor and, at its option, the Permitted Holder expressly assume the rights and obligations of the Guarantor hereunder, whereupon such Entity shall be the successor of all rights and obligations of the Guarantor hereunder, with the same effect as if it had been originally named herein (it being expressly acknowledged and agreed by the Guarantor and the Permitted Holder that such written instrument shall, and shall expressly provide that it shall, be binding upon, and inure to the benefit of, the Permitted Holder, the Guarantor and such surviving or succeeding Entity whether or not the Permitted Holder shall have executed such written instrument); provided, however, that the Guarantor shall not be discharged from, and shall remain liable for, any and all of its duties, liabilities and obligations under this Guarantee (PI).

(f) The Guarantor shall be responsible for, and shall pay promptly upon demand all documented and direct out-of-pocket costs and expenses incurred by the Permitted Holder (including legal fees and expenses of legal counsel) in connection with (i) enforcing its rights and/or interests under this Guarantee (PI) and (ii) challenging any Disposition Transactions proposed by the Guarantor pursuant to Section 16(d); provided, however, that in the case of clause (i) above, the Guarantor shall not be responsible for any such costs and expenses (including legal fees and expenses of legal counsel) unless the Permitted Holder is successful in enforcing its rights and/or interests under this Guarantee (PI) in a judicial or other proceeding, and in the case of clause (ii) above, the Guarantor shall not be responsible for any such costs and expenses (including legal fees and expenses of legal counsel) unless the Permitted Holder challenges such Disposition Transaction in a judicial or other proceeding or otherwise as being in breach of the provisions of this Guarantee (PI) or any of the Deferred Payment Documents (PI) and the Permitted Holder is successful in such challenge.

(g) Any assignment or transfer in breach of this Section 16 shall be null and void and not Transfer any interest in this Guarantee (PI) to any other Entity.

17. Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

(a) This Guarantee (PI) and the rights and obligations of the parties hereto shall be construed in accordance with the laws of the State of New York, without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

24

(b)    With respect to claims, suits, actions, proceedings, and other disputes arising out of, in respect of or relating to this Guarantee (PI) (such claims, suits, actions, proceedings, and other disputes, the "Claims") each of the parties to this Guarantee (PI) hereby irrevocably submits to the jurisdiction of the Bankruptcy Court for the District of Delaware or the United States District Court for the District of Delaware (the "Courts"), or, if both such Courts are not permitted under applicable Law to exercise jurisdiction with respect to the matter in question then to the jurisdiction of any other federal or state court in the state, county and city of New York, New York and each of the parties to this Guarantee (PI) agrees that any and all Claims may be brought, heard and determined in such courts.

(c)    Each of the parties to this Guarantee (PI) agrees that (i) venue shall be proper in the courts referenced in Section 17(b) and hereby waives any objection or defense which it may now or hereafter have to the laying of venue in such Courts, including any of the foregoing based upon the doctrine of *forum non conveniens*; and (ii) all process which may be or be required to be served in respect of any such Claim (including any pleading, summons or other paper initiating any such Claim or dispute) may be served upon it, which service shall be sufficient for all purposes, in the manner for the provision of notice under Section 19 and shall be deemed in every respect effective service of process upon such party when so given.

(d)    EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE DEFERRED PAYMENT DOCUMENTS (PI).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER DEFERRED PAYMENT DOCUMENTS (PI), AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PROVISION.

18.    Advice of Counsel. Each of the Guarantor and the Permitted Holder represent and warrant to the other that it has analyzed this Guarantee (PI) with, and has been advised as to its legal effects by, its legal counsel.

19.    Notices.  All notices required or permitted under this Guarantee (PI) must be in writing and will be deemed to be delivered and received (i) if personally delivered or if delivered by the United States Postal Service, facsimile or courier service, when actually received by the party to whom notice is sent or (ii) with respect to parties located other than within the United States, if deposited with the United States Postal Service (whether actually received or not), at the close of business on the seventh Business Day after the day when placed in the mail, postage prepaid, certified or registered with return receipt requested, addressed to the appropriate party or parties, at the address of such party or parties set forth below (or at such other address as such party may designate by written notice to all other parties in accordance with this Section 19):

25

| **If to the Guarantor:** | *With copies, which shall not constitute notice, to:* | Kirkland & Ellis LLP Citigroup Center 153 E. 53rd Street New York, NY 10022-4675 Attn: Theodore L. Freedman & Thomas W. Christopher Facsimile: (212) 446-4900 |
|---|---|---|
| W. R. Grace & Co. 7500 Grace Drive Columbia, MD 21044 Attn: Corporate Secretary Facsimile: (410) 531-4545 | | |
| **If to the Permitted Holder:** | *With copies, which shall not constitute notice, to:* | [Notice Street Address] [City], [State] [Zip] Attn: [ ] Facsimile: [ ] |
| WRG Asbestos Trust [Notice Street Address] [City], [State] [Zip] Attn: [ ] Facsimile: [ ] *(if sending overnight packages use zip code [ ])* | | |

20.  Severability. Wherever possible, each provision of this Guarantee (PI) will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Guarantee (PI) by any party hereto is held to be invalid, void, voidable, illegal or unenforceable in any respect under any applicable Law in any jurisdiction, such event will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, or the obligations of any other party to this Guarantee (PI), and this Guarantee (PI) will be reformed, construed and enforced in such jurisdiction as if such invalid, void, voidable, illegal, unenforceable or rejected provision had never been contained herein. The parties hereto further agree to use commercially reasonable efforts to replace such invalid, void, voidable, illegal, unenforceable or rejected provision of this Guarantee (PI) with a an effective, valid and enforceable provision which will achieve, to the fullest extent possible, the economic, business and other purposes of the invalid, void, voidable, illegal, unenforceable or rejected provision.

21.  Entire Agreement. This Guarantee (PI), together with the Deferred Payment Agreement (PI), the Share Issuance Agreement, the Plan of Reorganization and the Confirmation Order, embodies the complete agreement and understanding between the parties hereto in respect of the subject matter hereof and supersedes, preempts and terminates all other prior understandings, agreements or representations by or among the parties hereto, written or oral, to the extent relating thereto.

22.  Execution in Counterparts. This Guarantee (PI) may be executed (including by facsimile or portable document format (pdf)) in separate counterparts, each of which will be deemed to be an original and all of which taken together will constitute one and the same agreement.

23.  Further Assurances. At the reasonable request of the Permitted Holder, the Guarantor will, at the sole expense of the Permitted Holder, execute such agreements,

26

documents, certificates and/or other instruments confirming the existence of this Guarantee (PI), the obligations of the Guarantor hereunder and the rights of the Permitted Holder hereunder.

24.     <u>Specific Performance</u>.  Each of the parties hereto acknowledges and agrees that, in the event of any breach of, or any failure to perform, any specific provision of this Guarantee (PI), the non-breaching party would be irreparably and immediately harmed and could not be made whole by monetary damages.  It is accordingly agreed that, subject to <u>Section 8</u>, the parties hereto (a) shall be entitled, in addition to any other remedy to which they may be entitled at law or in equity, to compel specific performance of any specific provision of this Guarantee (PI) or to obtain injunctive relief to prevent breaches of any specific provision of this Guarantee (PI) exclusively in the Courts, (b) shall waive, in any action for specific performance or injunctive relief, the defense of the adequacy of a remedy at law, and (c) shall waive any requirement for the securing or posting of any bond in connection with the obtaining of any such specific performance or injunctive relief.  For the avoidance of doubt, the parties agree that the Permitted Holder shall be entitled to enforce specifically the terms and provisions of this Guarantee (PI) to prevent breaches of or enforce compliance with those covenants of the Guarantor set forth in <u>Section 7</u>.  Any party's pursuit of specific performance or injunctive relief at any time will not be deemed an election of remedies or waiver of the right to pursue any other right or remedy to which such party may be entitled, including the right to pursue remedies for liabilities or damages incurred or suffered by such party.

25.     <u>Other Remedies</u>.  Except as otherwise provided herein, any and all remedies herein expressly conferred upon a party shall be deemed cumulative with and not exclusive of any other remedy conferred hereby or by law on such party, and the exercise of any one remedy shall not preclude the exercise of any other.

[Signature page follows]

27

IN WITNESS WHEREOF, this Guarantee (PI) has been duly executed by the Guarantor as of the day and year first set forth above.

W. R. Grace & Co.

By_____

    Name:

    Title:

Acknowledged and agreed to
as of the _____ day of [ ], 2009.

WRG ASBESTOS PI TRUST


By:_____

   Name:
   Title:

EXHIBIT A

FORM OF

ASSUMPTION AGREEMENT

[To come]

EXHIBIT B

FORM OF

QUARTERLY EBITDA AND VALUATION CERTIFICATE

[To come]

EXHIBIT C

FORM OF

COMPLIANCE CERTIFICATE

[To come]

EXHIBIT D

FORM OF

POST-TRANSACTION CERTIFICATE

[To come]

[THIS PAGE INTENTIONALLY LEFT BLANK]

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO.,** *et al.*[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| **Debtors.** | ) | |
| | ) | |
| | ) | |
| | ) | |

## EXHIBIT 16 TO EXHIBIT BOOK
## NON-DEBTOR AFFILIATE SCHEDULE

**EXHIBIT 16**

Attached.

---

1    The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

## Non-Debtor Affiliates

1. A.A. Consultancy & Cleaning Company Limited
2. Advanced Refining Technologies GmbH
3. Advanced Refining Technologies K.K.
4. Advanced Refining Technologies LLC
5. Alltech Applied Science B.V.
6. Alltech Applied Science Labs (HK) Limited
7. Alltech Associates (Australia) Pty. Ltd.
8. Alltech Associates Applied Science Limited
9. Alltech Associates, Inc.
10. Alltech France S.A.R.L.
11. Alltech Grom GmbH
12. Alltech Italia S.R.L.
13. Alltech Japan Company Limited
14. Alltech Scientific (China) Limited
15. Alltech y Applied Science Para Mexico, S.A. de C.V.
16. Amicon B.V.
17. Amicon Ireland Limited
18. AP Chem Incorporated
19. Arral & Partners
20. Asian Food Investment Limited
21. Borndear 1 Limited
22. Borndear 2 Limited
23. Borndear 3 Limited
24. Carbon Dioxide Slurry Systems L.P.
25. CJCS Grace Kriz
26. Colowyo Coal Company L.P.
27. Construction Products Dubai, Inc.
28. Cormix Limited
29. Cormix Middle East LLC
30. Darex CIS LLC
31. Darex UK Limited
32. Davison Chemicals India Pvt. Ltd. (f/k/a Flexit Laboratories Private Ltd.)
33. Denac Nederland B.V.
34. Emerson & Cuming (Trading) Ltd.
35. Emerson & Cuming (UK) Ltd.
36. Emirates Chemicals LLC
37. Envases Industriales y Comerciales, S.A.
38. Exemere Limited
39. GEC Divestment Corporation Ltd.
40. GKA Company Limited

1

41. Grace (New Zealand) Limited
42. Grace AB
43. Grace Asia Pacific, Inc.
44. Grace Australia Pty. Ltd.
45. Grace Bauprodukte GmbH
46. Grace Brasil Ltda.
47. Grace Canada, Inc.
48. Grace Catalyst AB
49. Grace Chemicals K.K.
50. Grace Chemicals, Inc.
51. Grace China Ltd.
52. Grace Collections, Inc.
53. Grace Colombia S.A.
54. Grace Construction Products (Ireland) Limited
55. Grace Construction Products Limited
56. Grace Construction Products N.V.
57. Grace Construction Products S.A. (f/k/a Pieri S.A.)
58. Grace Container, S. A. de C. V.
59. Grace Darex GmbH
60. Grace Davison (Proprietary) Limited
61. Grace Davison Ltda.
62. Grace Energy GmbH  (f/k/a Grace Holding GmbH)
63. Grace Értékesito Kft.
64. Grace Europe Holding GmbH
65. Grace Germany Holdings, Inc.
66. Grace GmbH & Co. KG
67. Grace GP GmbH
68. Grace Hellas E.P.E.
69. Grace Japan Kabushiki Kaisha
70. Grace Korea Inc.
71. Grace Latin America, Inc.
72. Grace Management GP GmbH
73. Grace Management Services, Inc.
74. Grace Manufacturing GmbH & Co. KG
75. Grace Offshore Turnkey
76. Grace Produits de Construction SAS
77. Grace Quimica Compania Limitada
78. Grace Receivables Purchasing, Inc.
79. Grace S.A.  (f/k/a Grace N.V.)
80. Grace Silica GmbH
81. Grace Silica N.V.
82. Grace Sp. z o.o.

2

83. Grace Sweden AB
84. Grace Trading (Shanghai) Co., Ltd.
85. Grace Venezuela, S.A.
86. Grace Yapi Kimyasallari Sanayi ve Ticaret A.S.
87. Grace, S.A.
88. Ichiban Chemical Co., Inc.
89. Inverco Benelux N.V.
90. Inversiones GSC, S.A.
91. LC Service B.V.
92. NZ Alltech, Inc.
93. Papelera Camagueyana, S.A.
94. Paramont Coal Company
95. Pieri Especialidades, S.L.
96. Pieri U.K. Limited
97. PT. Grace Specialty Chemicals Indonesia
98. Servicised Ltd.
99. Société Civile Beau-Béton
100. Storm van Bentem en Kluyver B.V.
101. Trans-Meridian Insurance (Dublin) Ltd.
102. W. R. G.  Colombia S.A.
103. W. R. Grace & Co. (India) Private Limited
104. W. R. Grace & Co. Employees Disaster Relief Foundation, Inc.
105. W. R. Grace (Hong Kong) Limited
106. W. R. Grace (Malaysia) Sendiran Berhad
107. W. R. Grace (Philippines), Inc.
108. W. R. Grace (Singapore) Private Limited
109. W. R. Grace (Thailand) Limited
110. W. R. Grace Africa (Proprietary) Limited
111. W. R. Grace Argentina S.A.
112. W. R. Grace B.V.
113. W. R. Grace Finance (NRO) Ltd.
114. W. R. Grace Foundation, Inc.
115. W. R. Grace Holdings, S. A. de C. V.
116. W. R. Grace Italiana S.p.A.
117. W. R. Grace Limited
118. W. R. Grace N.V.
119. W. R. Grace S.A.
120. W. R. Grace Southeast Asia Holdings Limited
121. W. R. Grace Specialty Chemicals (Malaysia) Sdn. Bhd.
122. W. R. Grace Taiwan, Inc.
123. W. R. Grace Vietnam Company Limited
124. WRG Argentina, S.A.

[THIS PAGE INTENTIONALLY LEFT BLANK]

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO.,** *et al.*[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| **Debtors.** | ) | |
| | ) | |
| | ) | |
| | ) | |

## EXHIBIT 17 TO EXHIBIT BOOK
## PLAN REGISTRATION RIGHTS AGREEMENT

**EXHIBIT 17**

Attached.

---

[1]    The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

## FORM OF REGISTRATION RIGHTS AGREEMENT

THIS REGISTRATION RIGHTS AGREEMENT (this "Registration Rights Agreement") is entered into as of _____, 2009 by and between W. R. Grace & Co., a Delaware corporation (the "Company"), and the WRG Asbestos Trust (the "Trust"), a Delaware statutory trust established pursuant to §524(g) of Title 11 of the United States Code in accordance with the Plan of Reorganization (as defined below). Unless otherwise defined herein or the context otherwise requires, capitalized terms used herein and defined in the Plan of Reorganization shall be used herein as therein defined.

## R E C I T A L S

Pursuant to the Plan of Reorganization, on the Effective Date the Company will issue to the Trust , upon the terms and subject to the conditions set forth in the Warrant Agreement, Warrants (as defined below) to purchase shares of Common Stock (as defined below).

NOW, THEREFORE, in consideration of the terms and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## AGREEMENT

1. Definitions. Unless the context otherwise requires, the terms defined in this Section 1 shall have the meanings herein specified for all purposes of this Registration Rights Agreement, applicable to both the singular and plural forms of any of the terms herein defined.

"Affiliate" has the meaning given to that term pursuant to Rule 405 promulgated under the Securities Act.

"Business Day" means any day other than a Saturday, Sunday, or other day on which banks in the State of New York are authorized by law to remain closed.

"Commission" means the U.S. Securities and Exchange Commission and any successor agency thereto.

"Common Stock" shall have the meaning assigned to such term in the Warrant Agreement dated as of the date hereof, among the Company, the Trust and _____, as warrant agent.

"Eligible Market" means the American Stock Exchange, the New York Stock Exchange, Inc., the NASDAQ Global Select Market, the NASDAQ Global Market or the NASDAQ Capital Market.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Free Writing Prospectus" means a free writing prospectus, as defined in Rule 405 under the Securities Act.

"Grace" means W. R. Grace & Co.-Conn., a Connecticut corporation.

"Plan of Reorganization" means that certain First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W. R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Future Claimants Representative, and the Official Committee of Equity Security Holders Dated as of February 27, 2009, as filed by Grace and certain of its affiliates in their reorganization cases under Chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court for the District of Delaware, and as confirmed by order of that court dated as of [___], 2009, together with the exhibits and schedules thereto, each as amended, supplemented or otherwise modified from time to time in accordance with its terms.

The terms "register," "registered" and "registration" refer to a registration effected by preparing and filing a registration statement in compliance with the Securities Act, and the declaration or ordering of the effectiveness of such registration statement.

"Registration Date" means the fifth Business Day following the Effective Date.

"Registrable Securities" means (i) the Warrants and (ii) the Warrant Shares; *provided*, *however*, that such Warrants and Warrant Shares shall constitute Registrable Securities only so long as they have not been sold or otherwise disposed of by the Trust.

"Rule 144" means Rule 144 as promulgated under the Securities Act, as the same may be amended from time to time.

"Securities Act" means the Securities Act of 1933, as amended.

"Suspension Period" means any period during which the Company has exercised its rights to defer the filing or effectiveness of a Shelf Registration Statement pursuant to Section 2(b)(i) or when a Shelf Registration Statement may not be used to effect the resale of Registrable Securities as the result of the Company exercising its rights pursuant to Section 2(b)(ii).

"Warrants" shall mean the warrants to purchase shares of Common Stock issued to the Trust in accordance with the Plan of Reorganization and subject to the terms and conditions of the Warrant Agreement dated as of the date hereof, among the Company, the Trust and _____, as warrant agent.

"Warrant Shares" means shares of Common Stock and any other shares of capital stock or other securities of the Company issued or issuable as a result of any stock split, stock dividend, recapitalization, exchange or similar event or otherwise purchased or purchasable upon exercise of the Warrants (and, if the context requires, securities which may thereafter be issued by the Company in respect of any such securities so purchased, by means of any stock splits, stock dividends, recapitalizations, reclassifications or the like).

1.1.    Table of Defined Terms.

| **Term** | **Section Number** |
|---|---|

2

| Claims | Section 11.9 |
| Company | Preamble |
| Courts | Section 11.9 |
| Lock-Up Period | Section 9(a) |
| Registration Rights Agreement | Preamble |
| Required Period | Section 2(a) |
| Shelf Demand Notice | Section 2(a) |
| Shelf Registration Statement | Section 2(a) |
| Shelf Underwritten Demand Notice | Section 4(a) |
| Trust | Preamble |
| Underwritten Offering | Section 4(a) |

2.  Shelf Registration.

    (a) Subject to Section 2(b):

        (i)    Following the Registration Date, the Trust shall have the right to request, by delivery of a written notice to the Company (a "Shelf Demand Notice"), that the Company file a shelf registration statement (which registration statement shall be on Form S-3 under the Securities Act if the Company is eligible to register Registrable Securities on such form and shall be on Form S-1 if the Company is eligible to register Registrable Securities otherwise than on Form S-3) pursuant to Rule 415 under the Securities Act covering all of the Registrable Securities (a "Shelf Registration Statement") to enable the resale on a delayed or continuous basis of such Registrable Securities; *provided, however,* that the Trust may not deliver to the Company a Shelf Demand Notice at any time when (1) the Registrable Securities then held by the Trust consist only of Warrant Shares, (2) the Trust has satisfied the Rule 144(d)(1)(ii) one-year holding period applicable to such Warrant Shares following their issuance by the Company to the Trust, (3) the Trust is not an Affiliate of the Company, as determined by the Trust in its reasonable, good faith judgment, and (4) all such Warrant Shares are then capable of being sold by the Trust in a single transaction without restriction under Rule 144.

        (ii)    As soon as reasonably practicable but in no event later than fifteen (15) days after receiving a Shelf Demand Notice, the Company shall, subject to Section 3(b)(i), file with the Commission a Shelf Registration Statement on Form S-1 or S-3, as applicable;

        (iii)    The Company shall use its commercially reasonable best efforts to cause the Shelf Registration Statement to become effective as expeditiously as possible and to remain effective until the earlier of (x) the time all Registrable Securities subject thereto have been sold and (y) the fifth anniversary of the initial effective time of the Shelf Registration Statement (the "Required Period"), including by filing necessary post-effective amendments and prospectus supplements reasonably required by the Trust; *provided*, *however*, that the applicable time period during which the Shelf Registration Statement is to remain effective shall be extended by that number of days equal to the total number of days in all Suspension Periods.  In the event that the Shelf Registration

3

may not be used for the offer and sale of Registrable Securities due to the passage of time, the Company shall promptly file a new replacement registration statement (which, once filed, shall constitute a Shelf Registration Statement for purposes of this Registration Rights Agreement) and use its commercially reasonable best efforts to cause the same to become effective as expeditiously as possible and otherwise in accordance with this Registration Rights Agreement.

(b) Notwithstanding anything to the contrary in Section 2(a):

(i)     The Company shall have the right to defer the filing or the effectiveness of the Shelf Registration Statement for a period ending not more than 60 days after the date on which the Company would otherwise have been required to file the Shelf Registration Statement pursuant to Section 2(a)(ii) by delivery of a written notice to the Trust stating that the Company is exercising its right of deferral under this Section 2(b)(i).

(ii)     The Company shall have the right to prohibit the Trust from selling Registrable Securities pursuant to the Shelf Registration Statement for a period not to exceed 90 consecutive days and 90 days in the aggregate during any 12-month period by delivery of a written notice to the Trust stating that the Company is exercising its sales prohibition right under this Section 2(b)(ii) and demanding that the Trust ceases sales of Registrable Securities under the Shelf Registration Statement; *provided*, *however*, that any deferral of the filing or effectiveness of the Shelf Registration Statement resulting from the exercise by the Company of its rights pursuant to Section 2(b)(i) shall be counted towards the 90-day time periods provided in this Section 2(b)(ii) for the first twelve-month period.

(c) The Company may elect to register in the Shelf Registration Statement any additional shares of Common Stock (including, without limitation, any shares of Common Stock to be distributed in a primary offering made by the Company) so long as the inclusion of such Common Stock by the Company would not be reasonably likely to delay in any material respect the Trust's ability timely to sell the Registrable Securities pursuant to the Shelf Registration Statement.  Such election of the Company, if made, shall be made by the Company giving written notice to the Trust stating (A) that the Company proposes to include additional shares of Common Stock in such Shelf Registration Statement, and (B) the number of shares of Common Stock proposed to be included.

3.  Registration Procedures.

(a) If and whenever the Company is required by the provisions of Section 2 or Section 4 to effect the registration of Registrable Securities under the Securities Act, the Company, at its expense and as expeditiously as possible shall use its reasonable best efforts to effect such registration and:

4

(i)     in accordance with the Securities Act and all applicable rules and regulations promulgated thereunder, prepare and file with the Commission a registration statement with respect to such securities and use its reasonable best efforts to cause such registration statement to become and remain effective as provided herein, and prepare and file with the Commission such amendments and supplements to such registration statement and any prospectus contained therein as may be necessary to keep such registration statement effective and such registration statement and prospectus accurate and complete and to permit the Trust subject to such registration statement to sell such securities, until the earlier of (x) the time all Registrable Securities subject thereto have been sold and (y) the third anniversary of the initial effectiveness thereof, subject to the Company's rights to delay the effectiveness of the Shelf Registration Statement pursuant to Section 2(b)(ii) and cause the Trust to cease sales under an effective Shelf Registration Statement pursuant to Section 2(b)(ii)); *provided*, *however*, that the applicable time period during which the Shelf Registration Statement is to remain effective shall be extended by that number of days equal to the total number of days in all Suspension Periods; and *provided further,* that in the event that the Shelf Registration may not be used for the offer and sale of Registrable Securities due to the passage of time, the Company shall promptly file a new replacement registration statement (which, once filed, shall constitute a Shelf Registration Statement for purposes of this Registration Rights Agreement) and use its commercially reasonable best efforts to cause the same to become effective as expeditiously as possible and otherwise in accordance with this Registration Rights Agreement;

(ii)     furnish to the Trust such number of copies of the registration statement and each amendment and supplement thereto, preliminary prospectus, final prospectus, prospectus supplement and such other documents as the Trust may reasonably request;

(iii)     use its reasonable best efforts to register or qualify the securities covered by such registration statement under such state securities or blue sky laws of such jurisdictions as the Trust may reasonably request, except that the Company shall not for any purpose be required to execute a general consent to service of process or to qualify to do business as a foreign corporation in any jurisdiction where it is not so qualified;

(iv)     provide a transfer agent and registrar for all securities registered pursuant to this Registration Rights Agreement and provide a CUSIP number for all such securities, in each case not later than the effective date of such registration;

(v)     upon reasonable notice and at reasonable times during normal business hours, make reasonably available for inspection by a representative of the Trust, one firm of counsel for the Trust, the managing underwriter, if any, participating in any disposition of Registrable Securities and its counsel and any single accountant retained by the Trust or any such underwriter, all financial and other records, pertinent corporate documents and properties of the Company, and cause appropriate officers, directors and employees of the Company to make reasonably available for such inspection all such relevant information reasonably requested in writing by them in connection with a

5

Registration Statement as is customary for "due diligence" investigations of the type, nature and extent appropriate for an offering of the type contemplated; *provided*, that such Entity shall first agree in writing with the Company that any information that is reasonably designated by the Company as confidential at the time of delivery shall be kept confidential by such Entity and such Entity shall not engage in trading any securities of the Company until such material non-public information becomes publicly available, except nothing in such writing shall restrict (A) disclosure of such information if it is required by Law or (ii) sharing information with other underwriters, agents or dealers participating in the disposition of any Registrable Securities, subject to the execution by such other underwriters, agents or deals of reasonable non-disclosure agreements with the Company;

        (vi)    notify the Trust, promptly after it shall receive notice thereof, of the date and time when such registration statement and each post-effective amendment thereto has become effective or a prospectus or supplement to any prospectus relating to a registration statement has been filed;

        (vii)    notify the Trust promptly of any request by the Commission for the amending or supplementing of such registration statement or prospectus or for additional information;

        (viii)   prepare and file promptly with the Commission, and promptly notify the Trust of the filing of, such amendments or supplements to such registration statement or prospectus as may be necessary to correct any statements or omissions if, at the time when a prospectus relating to such securities is required to be delivered under the Securities Act, when any event has occurred as the result of which any such prospectus or any other prospectus as then in effect would include an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading;

        (ix)    in case the Trust is required to deliver a prospectus at a time when the prospectus then in circulation is not in compliance with the Securities Act or the rules and regulations promulgated thereunder, the Company shall use reasonable best efforts to prepare promptly upon request such amendments or supplements to such registration statement and such prospectus as may be necessary in order for such prospectus to comply with the requirements of the Securities Act and such rules and regulations;

        (x)    advise the Trust, promptly after it shall receive notice or obtain knowledge thereof, of the issuance of any stop order by the Commission suspending the effectiveness of such registration statement or the initiation or threatening of any proceeding for that purpose and promptly use its commercially reasonable best efforts to prevent the issuance of any stop order or to obtain its withdrawal if such stop order should be issued;

        (xi)    list the Registrable Securities (and to maintain such listing during the pendency of the relevant registration period) on any securities exchange on which the securities of the Company of the same class with Registrable Securities are listed or, if no

6

similar securities are then listed on any securities exchange, use commercially reasonable best efforts to cause all such Registrable Securities to be listed on an Eligible Market jointly agreed upon by the Company and the Trust; and

(xii)    make generally available to its security holders, and to deliver to the Trust, an earnings statement of the Company that will satisfy the provisions of Section 11(a) of the Securities Act covering a period of 12 months beginning after the effective date of such registration statement as soon as reasonably practicable after the completion of such 12-month period

(b) The Trust, at its expense and as expeditiously as possible, agrees to:

(i)    provide the Company with such information and assistance as reasonably requested by the Company to effect such registration under the Securities Act;

(ii)    keep confidential that the Company has exercised its rights under Section 2 and any other confidential information provided by the Company in connection with this Registration Rights Agreement; and

(iii)    comply with the prospectus delivery requirements and other provisions of the Securities Act and the Exchange Act and the respective rules and regulations promulgated thereunder applicable to the Trust, particularly Regulation M thereunder (or any successor rules or regulations), in connection with any offering by the Trust of Registrable Securities.

(c) The Trust acknowledges that it has been advised to consult its own independent securities law counsel regarding the consequences of demanding or requesting registration of Registrable Securities hereunder or being named or not being named as a selling securityholder in the registration statement and related prospectus.

4.    Underwritten Offerings.

(a) Following the effective date of the Shelf Registration Statement, the Trust shall have the right to request by delivery of a written notice to the Company (a "Shelf Underwritten Demand Notice") that the Company effect two (2) underwritten offerings of all or a portion of the Registrable Securities included in the Shelf Registration Statement (each an "Underwritten Offering"). Any such Shelf Underwritten Demand Notice must request an underwritten offering of Registrable Securities having an aggregate market value, based on the average per share closing price of the Registrable Securities as reported on the principal exchange or market on which the Common Stock is then traded over the ten (10) consecutive trading days prior to the date of the Shelf Underwritten Demand Notice, of not less than $15,000,000. Any prospectus supplement or other filing with the Commission including a plan or method of distribution of the securities subject to an Underwritten Offering pursuant to this Section 4(a) shall reflect the plan or method of distribution of such securities as shall be designated by the managing underwriter of the offering. The Company shall file with the Commission such amendments to the Shelf Registration Statement and such prospectus supplements or other filings that are necessary in connection with the Underwritten Offering of the Registrable Securities subject to the Shelf Underwritten Demand Notice as promptly as

7

practicable after receipt of such request, subject to <u>Section 2(b)</u>. Notwithstanding anything to the contrary herein, the Trust shall not deliver a Shelf Underwritten Demand Notice during the 120-day period following (i) the date of pricing of the prior Underwritten Offering or (ii) the date of termination of the prior Underwritten Offering pursuant to <u>Section 4(f)</u>.

(b) If the Company receives a Shelf Underwritten Demand Notice pursuant to <u>Section 4(a)</u>, it shall enter into such agreements (including an underwriting agreement containing representations and warranties and indemnity and contribution provisions of the type made in customary underwriting agreements for an underwritten public offering), in usual and customary form, and take such other actions as may be reasonably requested by the Trust or the managing underwriter to expedite the offer for sale or disposition of the Registrable Securities, and in connection therewith, upon such request and upon the date of closing of any sale of Registrable Securities in such underwritten registration:

(A) use its reasonable best efforts to obtain opinions of counsel to the Company (such counsel being reasonably satisfactory to the managing underwriter) and updates thereof covering matters customarily covered in opinions of counsel in connection with underwritten offerings, addressed to the Trust and the managing underwriter, in each case which opinion and updates thereof shall each state that it is being delivered at the request of the Company and solely in order to assist the Trust and the managing underwriter in establishing a "due diligence" defense;

(B) use its reasonable best efforts to obtain customary "comfort" letters from the independent certified public accountants of the Company (to the extent deliverable in accordance with their professional standards) addressed to the Trust (to the extent consistent with Statement on Auditing Standards No. 100 of the American Institute of Certified Public Accountants) and the managing underwriter, in customary form and covering matters of the type customarily covered in "comfort" letters in connection with underwritten offerings; and

(C) provide officers' certificates and other customary closing documents customarily delivered in connection with underwritten offerings reasonably requested by the managing underwriter;

*provided*, that the Company shall only be required to comply with this <u>Section 4(b)</u> in connection with two (2) Underwritten Offerings.

(c) No securities to be sold for the account of any Entity (including the Company) other than the Trust shall be included in an Underwritten Offering pursuant to this <u>Section 4</u> if the managing underwriter of the Underwritten Offering relating thereto advises the Trust that the total amount of Registrable Securities requested to be registered, together with such other securities that the Company and any other stockholders propose to include in such offering, is such as to adversely affect the successful marketing (including the pricing) of the securities included in such offering, in which case the Company shall include in such registration all Registrable Securities requested to be included therein, up to the full amount that, in the view of such managing underwriter can be sold without adversely affecting the success of such offering, before including any securities of any Entity (including the Company) other than the Trust.

8

(d) The Trust shall in its reasonable discretion and with the consent of the Company (which consent shall not be unreasonably withheld) select an investment banking firm of national standing to be the managing underwriter for any Underwritten Offering.

(e) If so requested (pursuant to a timely written notice) by the managing underwriter for the Underwritten Offering relating thereto, the Company shall not effect any underwritten public sale or distribution of any securities for its own account or the account of any Entity not a party hereto that are the same as, or similar to, the Registrable Securities, or any securities convertible into, or exchangeable or exercisable for, any securities of the Company that are the same as, or similar to, the Registrable Securities, during the 15-day period prior to, and during the 60-day period after the date of pricing of the Underwritten Offering.

(f) Notwithstanding the foregoing provisions of this Section 4, no request for the Company to effect an Underwritten Offering pursuant to this Section 4 will count for the purposes of determining the number of such underwritten offerings if (i) the Shelf Registration Statement relating to such request is not declared effective with one hundred eighty (180) days of the date such Shelf Registration Statement is first filed with the Commission (other than as a result of any action or inaction by the Trust, including any refusal by the Trust to proceed or provide any required information for inclusion therein) and the Trust withdraws its request prior to such Shelf Registration Statement being declared effective, (ii) prior to the sale of at least 90% of the Registrable Securities included in the applicable registration relating to such request, such registration is adversely affected by any stop order, injunction or other order or requirement of the Commission or other governmental agency or court for any reason (other than any reason caused by or primarily caused by the Trust) and the Company fails to have such stop order, injunction or other order or requirement removed, withdrawn or resolved to the Trust's reasonable satisfaction within thirty (30) days of the date of such order, (iii) any condition or conditions to closing specified in the underwriting agreement or purchase agreement entered into in connection with the registration relating to such request and solely with the control of the Company are not satisfied or (iv) the Trust determines in its reasonable, good faith judgment to withdraw an outstanding Shelf Underwritten Demand Notice due to market conditions; *provided*, that only one (1) withdrawal pursuant to this clause (iv) shall be excluded in determining the number of underwritten offerings. In addition, if the Company postpones the filing a Shelf Registration Statement pursuant to Section 2(b)(i) following a request for such filing made by the Trust pursuant to Section 4(a), the Trust will be entitled to withdraw a request for the filing of such Shelf Registration Statement and in such event such registration request will not count for the purpose of determining the number of underwritten offerings which the Company must effect pursuant to Section 4.

(g) If (i) the Shelf Registration Statement cease to be effective at any time during the Required Period, (ii) there are Registrable Securities outstanding and (iii) the Company proposes to register (including for this purpose a registration effected by the Company for holders of capital stock other than the Trust) any of its stock under the Securities Act in connection with the public offering of such securities solely for cash (other than a registration relating solely to the sale of securities to participants in a Company stock plan or a transaction covered by Rule 145 under the Securities Act, a registration in which the only stock being registered is Common Stock issuable upon conversion of debt securities which are also being registered, or any registration on any form which does not include substantially the same

9

information as would be required to be included in a registration statement covering the sale of the Registrable Securities), the Company shall, at such time, promptly give the Trust written notice of such registration.  Upon the written request of the Trust given within twenty (20) days after the Trust's receipt of such notice, subject to Section 4(h), the Company shall cause to be registered under the Securities Act all of the Registrable Securities that the Trust has requested to be registered.

(h)  In connection with any offering involving an underwriting of shares of the Company's capital stock, the Company shall not be required under Section 4(g) to include any of Registrable Securities in such underwriting unless the Trust accepts the terms of the underwriting as agreed upon between the Company and the underwriters selected by it (or by other Entities entitled to select the underwriters), and then only in such quantity as the underwriters determine in their reasonable judgment will not jeopardize the success of the offering by the Company.  If the total amount of securities, including Registrable Securities, requested by holders of capital stock to be included in such offering exceeds the amount of securities to be sold other than by the Company that the underwriters determine in their reasonable judgment is compatible with the success of the offering, then the Company shall be required to include in the offering only that number of such securities, including Registrable Securities, which the underwriters determine in their reasonable judgment will not jeopardize the success of the offering (the securities so included to be apportioned pro rata among the selling security holders according to the total amount of securities entitled to be included therein owned by each selling security holder or in such other proportions as shall mutually be agreed to by such selling security holders) but in no event shall (i) the amount of securities of the Trust included in the offering be reduced below 25% of the total amount of securities included in such offering or (ii) a greater number of securities from any security holder of the Company other than the Trust be included if any Registrable Securities are excluded.

(i)  Notwithstanding anything to the contrary herein, the Company shall have no obligation to effect more than two (2) Underwritten Offerings.

5.  Expenses.  In connection with the filing of any registration statement under this Registration Rights Agreement and the sale of Registrable Securities pursuant thereto, the Company shall pay for and bear all (i) registration, filing and New York Stock Exchange listing and other fees, listing and other fees of any other securities exchange upon which securities similar to the Registrable Securities are listed, fees and disbursements of printers, counsel and accountants for the Company and (ii) all legal fees and disbursements and other expenses of the Company complying with foreign, state securities or blue sky laws of any jurisdictions in which the securities to be offered are to be registered or qualified and (iii) the expenses incurred by the Company (but not the Trust) in connection with any "road show" undertaken as part of an Underwritten Offering.  For the avoidance of doubt, the Trust shall pay for all its own expenses, including fees and expenses of any counsel retained by it.

6.  Indemnification.

(a)  The Company hereby agrees to indemnify and hold harmless the Trust and each of the Trust's trustees, officers, employees, legal counsel and accountants, and each Entity which controls the Trust within the meaning of the Securities Act, from and against, and agrees

10

to reimburse the Trust, its trustees, officers, employees, legal counsel and accountants and such controlling Entities with respect to, any and all claims, actions (actual or threatened), investigations, proceedings, demands, losses, damages, liabilities, costs and expenses (including all costs of appearing as a witness in any claim, challenge, action, investigation or proceeding) to which the Trust, trustees, legal counsel and accountants may become subject under the Securities Act or otherwise, insofar as such claims, actions, investigations, proceedings, demands, losses, damages, liabilities, costs or expenses arise out of or are based upon (i) any untrue statement or alleged untrue statement of any material fact contained in a registration statement covering Registrable Securities, any prospectus related thereto (preliminary or final), any Free Writing Prospectus related thereto or any amendment or supplement thereto, (ii) the omission or alleged omission to state therein a material fact necessary to make the statements therein (in the case of a prospectus or Free Writing Prospectus, in light of the circumstances under which they were made) not misleading or (iii) any violation or alleged violation by the Company of the Securities Act, the Exchange Act, any federal or state securities law or any rule or regulation promulgated under the Securities Act, the Exchange Act or any federal or state securities law in connection with the offering and sale covered by such registration statement; *provided*, *however*, that the Company will not be liable to any such Entity to the extent that any such claim, action, investigation, proceeding, demand, loss, damage, liability, cost or expense is caused by an untrue statement or alleged untrue statement or omission or alleged omission of material fact so made in strict conformity with written information furnished by the Trust, its trustees, legal counsel and accountants, specifically for use in the preparation thereof.  Such indemnification shall remain in full force and effect regardless of any investigation made by or on behalf of the Trust.

(b) The Trust hereby agrees to indemnify and hold harmless the Company, its officers, directors, legal counsel and accountants and each Entity who controls the Company within the meaning of the Securities Act, from and against, and agrees to reimburse the Company, its officers, directors, employees, legal counsel, accountants and controlling Entity with respect to, any and all claims, actions, demands, losses, investigations, proceedings, damages, liabilities, costs or expenses to which the Company, its officers, directors, employees, legal counsel, accountants or such controlling Entity may become subject under the Securities Act or otherwise, insofar as such claims, actions, demands, losses, investigations, proceedings, damages, liabilities, costs or expenses arise out of or are based upon (i) any untrue or alleged untrue statement of any material fact contained in a registration statement covering Registrable Securities, any prospectus  (preliminary or final) related thereto, any Free Writing Prospectus related thereto or any amendment or supplement thereto, or (ii) the omission or the alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein (in the case of a prospectus or Free Writing Prospectus, in light of the circumstances under which they were made) not misleading, in each case to the extent, but only to the extent, that such untrue statement or alleged untrue statement or omission or alleged omission was so made in reliance upon and in strict conformity with written information furnished by the Trust specifically for use in the preparation thereof; *provided*, *however*, that the indemnity agreement contained in this Section 6(b) shall not apply to amounts paid in settlement of any such loss, claim, investigation, proceeding, damage, liability or action if such settlement is effected without the consent of the Trust, which consent shall not be unreasonably withheld or delayed; *provided*, *further*, that the total amounts payable in indemnity by the Trust under this Section 6(b) shall not exceed the net proceeds received by the Trust in the registered sale out of

11

which such claim, action, investigation, proceeding, demand, loss, damage, liability, cost, or expense arises.

(c) Promptly after receipt by a party indemnified pursuant to the provisions of Section 6(a) or Section 6(b) of notice of the commencement of any action involving the subject matter of the foregoing indemnity provisions, such indemnified party will, if a claim therefore is to be made against the indemnifying party pursuant to the provisions of Section 6(a) or Section 6(b), notify the indemnifying party of the commencement thereof; but the omission so to notify the indemnifying party will not relieve the indemnifying party from any liability which it may have to an indemnified party otherwise than under this Section 6 and shall not relieve the indemnifying party from liability under this Section 6 unless such indemnifying party is actually and materially prejudiced by such omission.  In case any such action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled to participate therein and, to the extent that it may wish, jointly with any other indemnifying parties similarly notified, to assume the defense thereof, with counsel reasonably satisfactory to such indemnified party; *provided*, *however*, that if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there may be legal defenses available to it and/or other indemnified parties which are different from, conflict with or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel (in which case the indemnifying party shall not have the right to direct the defense of such action on behalf of the indemnified party or parties).  Upon the permitted assumption by the indemnifying party of the defense of such action, and approval by the indemnified party of counsel, the indemnifying party shall not be liable to such indemnified party under Section 6(a) or Section 6(b) for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof (other than reasonable costs of investigation) unless (i) the indemnified party shall have employed separate counsel in connection with the assertion of legal defenses in accordance with the proviso to the next preceding sentence, (ii) the indemnifying party shall not have employed counsel reasonably satisfactory to the indemnified party to represent the indemnified party within a reasonable time, (iii) the indemnifying party and its counsel do not actively and vigorously pursue the defense of such action, or (iv) the indemnifying party has authorized the employment of counsel for the indemnified party at the expense of the indemnifying party.  No indemnifying party shall be liable to an indemnified party for any settlement of any action or claim without the consent of the indemnifying party and no indemnifying party may unreasonably withhold consent to any such settlement.  No indemnifying party will consent to entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by the claimant or plaintiff to the indemnified party of a release from all liability with respect to such claim or litigation.

(d) If the indemnification provided for in Section 6(a) or Section 6(b) is held by a court of competent jurisdiction to be unavailable to a party to be indemnified with respect to any claims, actions, demands, losses, damages, liabilities, costs or expenses referred to therein, then each indemnifying party under any such subsection, in lieu of indemnifying such indemnified party thereunder, hereby agrees to contribute to the amount paid or payable by such indemnified party as a result of such claims, actions, investigations, proceedings, demands, losses, damages, liabilities, costs or expenses in such proportion as is appropriate to reflect the relative fault of the

12

indemnifying party on the one hand and of the indemnified party on the other in connection with the statements or omissions which resulted in such claims, actions, investigations, proceedings, demands, losses, damages, liabilities, costs or expenses, as well as any other relevant equitable considerations.  The relative fault of the indemnifying party and of the indemnified party shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the indemnifying party or by the indemnified party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.  Notwithstanding the foregoing, the amount the Trust shall be obligated to contribute pursuant to this Section 6(d) shall be limited to an amount equal to the per share sale price multiplied by the number of shares of Registrable Securities sold by the Trust pursuant to the registration statement which gives rise to such obligation to contribute (less the aggregate amount of any damages which the Trust has otherwise been required to pay in respect of such claim, action, investigation, proceeding, demand, loss, damage, liability, cost or expense or any substantially similar claim, action, demand, loss, damage, liability, cost or expense arising from the sale of such Registrable Securities).

(e)  No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution hereunder from any person who was not guilty of such fraudulent misrepresentation.

(f)  The obligations of the Company and the Trust under this Section 6 shall survive the completion of any offering of Registrable Securities in a registration statement and termination of this Registration Rights Agreement.

7.  Stockholder Information.

The Company may request the Trust to furnish the Company with such information with respect to the Trust and the distribution of such Registrable Securities as the Company may from time to time reasonably request in writing and as shall be required by law or by the Commission in connection therewith, and the Trust agrees to promptly furnish the Company with such information.

8.  Forms.

All references in this Registration Rights Agreement to particular forms of registration statements are intended to include, and shall be deemed to include, references to all successor forms which are intended to replace, or to apply to similar transactions as, the forms herein referenced.

9.  Agreements.

(a)  The Trust agrees in connection with any registration of any securities for the account of the Company or any other person that, upon the request of the Company for a period beginning on a date not earlier than five (5) Business Days prior to the date of pricing of any such registration and ending not later than 90 days after the date of such pricing (the "Lock-Up Period"), it shall not directly or indirectly (i) offer, pledge, sell, contract to sell, grant any options for the sale of, seek the redemption of or otherwise transfer or dispose of (including pursuant to a

13

registration statement) any shares of Common Stock (or securities exchangeable or exercisable for any shares of Common Stock) or Warrants, (ii) enter into a transaction which would have the same effect, or enter into any swap, hedge or other arrangement that transfers, in whole or in part, any of the economic consequences of ownership of the shares of Common Stock or Warrants held by it, whether any such aforementioned transaction is to be settled by delivery of shares of Common Stock or such other securities, in cash or otherwise, or (iii) publicly disclose the intention to make any such offer, sale, pledge, transfer or disposition, or to enter into any such transaction, swap, hedge or other arrangement.

(b) The Trust represents that it has not prepared or had prepared on its behalf or used or referred to, and agrees that it will not prepare or have prepared on it behalf or use or refer to, any Free Writing Prospectus, and has not distributed and will not distribute any written materials in connection with the offer or sale of the Common Stock without the prior express written consent of the Company. The Company represents that it has not prepared or had prepared on its behalf or used or referred to, and agrees that it will not prepare or have prepared on it behalf or use or refer to, any Free Writing Prospectus, and has not distributed and will not distribute any written materials in connection with the offer or sale of the Common Stock without the prior express written consent of the Trust in connection with any registration which is effected pursuant to this Registration Rights Agreement.

(c) The Trust agrees to cease selling Registrable Securities pursuant to the Shelf Registration Statement if an event under Section 2(b)(ii) or Section 3(a)(ix) or Section 3(a)(xi) shall occur.

(d) The Company agrees that nothing in this Registration Rights Agreement shall prohibit the Trust, at any time and from time to time, from selling or otherwise transferring Registrable Securities pursuant to a private placement or other transaction which is not registered pursuant to the Securities Act. To the extent requested by the Trust, the Company shall take all commercially reasonable steps necessary to assist and cooperate with the Trust to facilitate such sale or transfer.

10. Transfer of Registration Rights.

The rights to cause the Company to register securities granted to the Trust pursuant to this Registration Rights Agreement may not be transferred or assigned to any other Entity.

11. Miscellaneous.

11.1. Waivers and Amendments.

(a) With the written consent of the Trust, the obligations of the Company and the rights of the Trust under this Registration Rights Agreement may be waived (either generally or in a particular instance, either retroactively or prospectively and either for a specified period of time or indefinitely), and with such consent the Company may enter into a supplementary agreement for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Registration Rights Agreement or of any supplemental agreement or modifying in any manner the rights and obligations hereunder of the Trust and the Company.

14

(b) Neither this Registration Rights Agreement nor any provision hereof may be changed, waived, discharged or terminated orally or by course of dealing, but only by a statement in writing signed by the party against which enforcement of the change, waiver, discharge or termination is sought. Specifically, but without limiting the generality of the foregoing, the failure of any party hereunder at any time or times to require performance of any provision hereof by the Company shall in no manner affect the right of such party at a later time to enforce the same. No waiver by any party of the breach of any term or provision contained in this Registration Rights Agreement, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such breach, or a waiver of the breach of any other term or covenant contained in this Registration Rights Agreement.

11.2.  <u>Rights of the Trust</u>.  The Trust shall have the absolute right to exercise or refrain from exercising any right or rights which the Trust may have by reason of this Registration Rights Agreement or any Registrable Security, including the right to consent to the waiver of any obligation of the Company under this Registration Rights Agreement and to enter into an agreement with the Company for the purpose of modifying this Registration Rights Agreement or any agreement effecting any such modification. The Company shall reimburse the Trust for all documented out-of-pocket costs and expenses arising out of, or incurred by the Trust in connection with, any successful action or proceeding brought against the Company by the Trust to enforce any provision in this Registration Rights Agreement

11.3.  <u>Notices</u>.  All notices required or permitted under this Registration Rights Agreement must be in writing and will be deemed to be delivered and received (i) if personally delivered or if delivered by the United States Postal Service, facsimile or courier service, when actually received by the party to whom notice is sent or (ii) with respect to parties located other than within the United States, if deposited with the United States Postal Service (whether actually received or not), at the close of business on the seventh Business Day after the day when placed in the mail, postage prepaid, certified or registered with return receipt requested, addressed to the appropriate party or parties, at the address of such party or parties set forth below (or at such other address as such party may designate by written notice to all other parties in accordance with this <u>Section 11.3</u>):

| **If to the Company:** | *With copies, which shall not constitute notice, to:* | Kirkland & Ellis LLP<br>Citigroup Center |
| --- | --- | --- |
| W. R. Grace & Co.<br>7500 Grace Drive<br>Columbia, MD 21044<br>Attn:  Corporate Secretary<br>Facsimile: (410) 531-4545 | | 153 E. 53rd Street<br>New York, NY 10022-4675<br>Attn:  Thomas W. Christopher<br>Facsimile:  (212) 446-4900 |
| **If to the Trust:** | *With copies, which shall not constitute notice, to:* | |
| Asbestos Trust<br>[Notice Street Address]<br>[City], [State] [Zip]<br>Attn:  [ ] | | [Notice Street Address]<br>[City], [State] [Zip]<br>Attn:  [ ]<br>Facsimile: [ ] |

15

Facsimile: [ ]
*(if sending overnight
packages use zip code [ ])*

11.4.   Severability.  Whenever possible, each provision of this Registration Rights Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Registration Rights Agreement by any party hereto is held to be invalid, void, voidable, illegal or unenforceable in any respect under any applicable Law in any jurisdiction, such event will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, or the obligations of any other party to this Registration Rights Agreement, and this Registration Rights Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, void, voidable, illegal, unenforceable or rejected provision had never been contained herein.  The parties hereto further agree to use commercially reasonable efforts to replace such invalid, void, voidable, illegal, unenforceable or rejected provision of this Registration Rights Agreement with a an effective, valid and enforceable provision which will achieve, to the fullest extent possible, the economic, business and other purposes of the invalid, void, voidable, illegal, unenforceable or rejected provision.

11.5.   Specific Performance.  Each of the parties hereto acknowledges and agrees that, in the event of any breach of, or any failure to perform, any specific provision of this Registration Rights Agreement, the non-breaching party would be irreparably and immediately harmed and could not be made whole by monetary damages.  It is accordingly agreed that the parties hereto (a) shall be entitled, in addition to any other remedy to which they may be entitled at law or in equity, to compel specific performance of any specific provision of this Registration Rights Agreement or to obtain injunctive relief to prevent breaches of any specific provision of this Registration Rights Agreement exclusively in the Courts, (b) shall waive, in any action for specific performance or injunctive relief, the defense of the adequacy of a remedy at law, and (c) shall waive any requirement for the securing or posting of any bond in connection with the obtaining of any such specific performance or injunctive relief.  Any party's pursuit of specific performance or injunctive relief at any time will not be deemed an election of remedies or waiver of the right to pursue any other right or remedy to which such party may be entitled, including the right to pursue remedies for liabilities or damages incurred or suffered by such party.

11.6.   No Third Party Beneficiaries.  Subject to Section 6, there are no third party beneficiaries of this Registration Rights Agreement and nothing in this Registration Rights Agreement, express or implied, is intended to confer on any Entity other than the parties hereto and their respective successors, and assigns, any rights, remedies, obligations or liabilities.

11.7.   Headings.  The headings of the sections, subsections and paragraphs of this Registration Rights Agreement have been inserted for convenience of reference only and do not constitute a part of this Registration Rights Agreement.

11.8.   Choice of Law.  It is the intention of the parties that the internal substantive laws, and not the laws of conflicts, of the State of New York should govern the

16

enforceability and validity of this Registration Rights Agreement, the construction of its terms and the interpretation of the rights and duties of the parties.

11.9.    Jurisdiction.  With respect to claims, suits, actions, proceedings, and other disputes arising out of, in respect of or relating to this Registration Rights Agreement (such claims, suits, actions, proceedings, and other disputes, the "Claims"), each of the parties to this Registration Rights Agreement hereby irrevocably submits to the jurisdiction of the United States Bankruptcy Court for the District of Delaware or the United States District Court for the District of Delaware, or, if neither of such are permitted under applicable law to exercise jurisdiction with respect to the matter in question, then to the jurisdiction of any other federal or state court in the state, county and city of New York, New York (the "Courts") and each of the parties to this Registration Rights Agreement agrees that any and all Claims may be brought, heard and determined in such courts.

11.10.  Venue.  Each of the parties to this Registration Rights Agreement agrees that venue shall be proper if determined pursuant to Section 11.9 and hereby waives any objection or defense which it may now or hereafter have to the laying of venue in such courts, including any of the foregoing based upon the doctrine of *forum non conveniens*.  Each of the parties hereto hereby agrees that all process which may be or be required to be served in respect of any Claim (including any pleading, summons or other paper initiating any such Claim) may be served upon it, which service shall be sufficient for all purposes, in the manner for the provision of notice under this Registration Rights Agreement and shall be deemed in every respect effective service of process upon such party when so given.

11.11.  No Jury Trial.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS REGISTRATION RIGHTS AGREEMENT.  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS REGISTRATION RIGHTS AGREEMENT, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PROVISION.

11.12.  Counterparts. This Registration Rights Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts (including by facsimile or portable document (pdf)), with the same effect as if all parties had signed the same document.  All such counterparts shall be deemed an original, shall be construed together and shall constitute one and the same instrument.

11.13.  Reports Under the Exchange Act.  In order to provide the Trust the use of Section 2, and so long as there are Registrable Securities outstanding, the Company will (i) file the reports required to be filed by it pursuant to the Securities Act and the Exchange Act and the rules and regulations promulgated thereunder, (ii) make and keep public information available,

17

as those terms are understood and defined in Rule 144 under the Securities Act, (iii) will take such further action as the Trust may reasonably request, all to the extent required from time to time to enable the Trust to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by Rule 144 or Rule 144A under the Securities Act, as such rules may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission, and (iv) take such other actions required by the Company's transfer agent to consummate any issuance and sale of Registrable Securities in accordance with such Rule 144 or Rule 144A.  Upon the request of the Trust, the Company will deliver to the Trust a written statement as to whether it has complied with such reporting and information requirements and, to the extent available, with a copy of the most recent annual or quarterly report of the Company, and such other reports and documents of the Company as the Trust may reasonably request in availing itself of any rule or regulation of the Commission allowing a holder to sell securities without registration only if such report is not available at www.sec.gov or on the Company's website.

11.14.  Entire Agreement/Effectiveness.

This Registration Rights Agreement, together with the Warrant Agreement and the Warrants, the Plan of Reorganization and the Confirmation Order, is intended by the parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the Company and the Trust in respect of the subject matter contained herein, and supersedes, preempts and terminates all other prior understandings, agreements or representations by or among the parties hereto, written or oral, to the extent relating thereto.

11.15.  Other Remedies.

Except as otherwise provided herein, any and all remedies herein expressly conferred upon a party shall be deemed cumulative with and not exclusive of any other remedy conferred hereby or by law on such party, and the exercise of any one remedy shall not preclude the exercise of any other.

[*Signature page follows*]

18

**[REGISTRATION RIGHTS AGREEMENT SIGNATURE PAGE]**

IN WITNESS WHEREOF, the parties hereto, intending to be bound by the terms of this agreement, have caused this Registration Rights Agreement to be executed by its duly authorized officer as of the date first above written.

W. R. Grace & Co.

By: _____
Name:
Title:

The WRG Asbestos Trust

By: _____
Name:
Title:

19

[THIS PAGE INTENTIONALLY LEFT BLANK]

## THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re: ) Chapter 11

)

W. R. GRACE & CO., *et al.*[1] ) Case No. 01-01139 (JKF)

) Jointly Administered

Debtors. )

)

)

)

## EXHIBIT 18 TO EXHIBIT BOOK
## REJECTED EXECUTORY CONTRACTS AND UNEXPIRED LEASES SCHEDULE

### EXHIBIT 18

The Debtors do not presently contemplate the rejection of any Executory Contracts or Unexpired Leases.

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO.,** *et al.*[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| **Debtors.** | ) | |
| | ) | |
| | ) | |
| | ) | |

## EXHIBIT 19 TO EXHIBIT BOOK
## RETAINED CAUSES OF ACTION SCHEDULE

**EXHIBIT 19**

Attached.

---

[1]   The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

## RETAINED CAUSES OF ACTION
## (ACCOUNTS RECEIVABLE)

Unicoat Technology
International, Inc.
804 Winkler
South Houston, TX 77587

Landmark Window Systems,
Inc.
806-808 Windsor Street
Hartford, CT 06120

Liberty Miron
282 Rt. 52 East
Liberty, NY 12754

RM Engineered Products
4854 O'Hear Avenue
North Charleston, SC 29405

Charles Redi Mix
P.O. Box 644
Wingate Road
Murphy, NC 28906

Thacker Smyrna
4755 North Church Lane SE
Smyrna, GA 30080

George Nutrients
P.O. Box 247
Canton, GA 30114

Plibrico
1800 N. Kingsbury Street
Chicago, IL 60614

U.S. Aggregates
Western Aggregates
c/o Mohave Concrete
147 West Election Road
Suite 110
Draper, UT 84020

U.S. Aggregates
Western Rock Product Corp.
147 West Election Road
Suite 110
Draper, UT 84020

U.S. Aggregates
Cox Rock Products Co.
P. 0. Box 220289
Centerfield, UT 84622

U.S. Aggregates
A Block Co.
147 West Election Road
Suite 110
Draper, UT 84020

Image Concrete
P.O. Box 1693
Roanoke, TX 76262

Peerless Tube Company
58-76 Locust Avenue
Bloomfield, NJ 07003

Norris Rader, Inc.
P.O. Drawer 10410
New Iberia, LA 70562

Containment Solutions/Hoover
Group
6740 Bay Meadow Drive
Glen Burnie, MD 21060

Warren Electric
2202 S. Battleground Road
P.O. Box 520
La Porte, TX 77571

Skagit Pacific
Building A1
500 Metcalf Street
Sedro Woolley, WA 98284

Irvin H. Whitehouse
P.O. Box 32670
Louisville, KY 40232

Rockland Materials
3636 South 43rd Avenue
Phoenix, AZ 85009

United Concrete Products
P.O. Box 676
Frederick, MD 21705

Hanover Materials
P.O. Box 896
Ashland, VA 23005

Kenny Manta
414 North Orleans Avenue
Suite 801
Chicago, IL 60610

AAA Ready Mix
P.O. Box 729
Reddick, FL 32686

IDC Corporation
11-40 Borden Avenue
Long Island City, NY 11101

Dolle's Hydraulics & Tools
128 S. Miami Avenue
Miamisburg, OH 45342

North American Wire Products
30000 Solon Road
Solon, OH 44139

Abilez Development
21205 S. E. 59th Street
Newalla, OK 74857-8338

Sheldon Concrete (Saboyd
Ents.)
P.O. Box 4787
Bryan, TX 77805

Oklahoma Mobil Mix
P.O. Box 245
Spencer, OK 73084

Norat Environmental
Road 862
KM 1.5 #I22
Bayamon, PR 00959

Site Mix Ready Mix
P.O. Box 60178
Colorado Springs, CO 80960-
0178

Bahl, Inc.
50 8th Street North
Sauk Rapids, MN 56379

Isla Nia Paving
Apartado 1552
Vieques, PR 00765

Dawson Ready Mix
5674 Highway 53 East
Dawsonville, GA- 30534

Jackson Stone
P.O. Box 5398
Jackson, MS 39216

Concretera Del Este
HC-01 BOX 16999
Humacao, PR 00791

Quick-Wright Associated
150 Cooper Road C-7
West Berlin, NJ 08091

D & G Brice Contractors, Inc.
P.O. Box 31846
Baltimore, MD 21207

North Shore Concrete LLC
45 Jefferson Avenue
Salem, MA 01970

MPI Ready Mix
P.O. Box 641
Overton, NV 89040

Advanced Concrete Innovations
15870 Johnson Memorial Drive
Jordan, MN 55352

Allied Ready Mix
106 Industrial Park Loop NE
Rio Rancho, NM 87124

DAC Art Louisiana LLC
6709 Perkins Road
Baton Rouge, LA 70808

Delta Concrete
P.O. Box 1092
Forrest City, AR 72336

Lee's Concrete
4315 N. Foster Drive
Baton Rouge, LA 70805

Rainbow Materials
P.O. Box 18838
Austin, TX 78760

Regional Concrete
Rt. 5, Box 5640
Palestine, TX 75801

Concretera Del Este
HC-01 BOX 16999
Humacao, PR 00791

Royal Cement
State Road 169
Logandale, NV 89021

Dinaso & Sons Building Supply
820 Mount Ephraim Avenue
Camden, NJ 08108

Lassiter Plastering
6939 Amaryllis Court
Elyria, OH 44035

Pro Tec Fireproofing, Inc.
1100 NE 249th Street
Ridgefield, WA 98642

Twisted Pair Communications
2511 Pan Am Blvd.
Elk Grove, IL 60007

P T Hutchins Co, Ltd.
P.O. Box 910916
Los Angeles, CA 90091

Thompson Hancock
Technologies, Inc.
P.O. Box 1963
Burlington, NC 27216

Vines Precast Services
233 Gatewood Circle West
Burleson, TX 76028

Intercat, Inc.
2399 Highway 34, Suite C-I
Manasquan, NJ 08736

Trenton Ready Mix
1017 East 38th Street
Chattanooga, TN 37407

Burks Concrete
P.O. Box 68
Hitchcock. TX 77563

Dump Master/Master Mix of NJ
7 Herrick Avenue
Staten Island, NY 10307

Quality Concrete
810 Fish Road
Tiverton, RI 02878

Southeastern Fireproofing
P.O. Box 101207
2512 Commerce Square West
Birmingham, AL 35210

Toman & Associates
P.O. Box 408
Poteet, TX 78065

2

**RETAINED CAUSES OF ACTION**
**(CLAIMS AGAINST CUSTOMERS)**

Johnson Matthey Catalysts
Formerly ICI/Synetix
Accounts Payable
Two Transam Plaza Drive
Suite 230
Oakbrook Terrace, IL 60181

Kellogg Brown & Root, Inc.
601 Jefferson Avenue
Houston, TX 77001

ConocoPhillips
600 North Dairy Ashford
Houston, TX 772 1 0

Sumitomo Osaka Cement Co., Ltd
6-28, Rokubancho
Chiyoda-Ku
Toyko 1 02-8465
Japan

3

## RETAINED CAUSES OF ACTION
## (CLAIMS AGAINST VENDORS)

DuPont Chemical Solutions
3419 Clearwater Court
Sugar Land, TX 77478

Microsoft Corporation
One Microsoft Way
Redmond, WA 98052-6399

Kansas City Southern/Kansas
City Southern Railway
427 W. 12th Street
Kansas City, MO 64105

Norfolk Southern Corporation
Three Commercial Place
Norfolk, VA 23510

APS Connections CC
Burman Road, FCU Building
Deal Party, Port Elizabeth
and
P.O. Box 2157
North End, Port Elizabeth 6056

Phil Smith
Burman Road, FCU Building
Deal Party, Port Elizabeth
and
P.O. Box 2157
North End, Port Elizabeth 6056

Antonia Mincheva
Burman Road, FCU Building
Deal Party, Port Elizabeth
and
P.O. Box 2157
North End, Port Elizabeth 6056

McAllister Towing of
Philadelphia, Inc.
PNVC, Commandment Building
4900 South Broad Street
Building 6
Philadelphia, PA 19112

Honeywell Burdick & Jackson
Honeywell International, Inc.
101 Columbia Road
Morristown, NJ 07962

Ennis Knupp
10 South Riverside Plaza
Suite 700
Chicago, IL 60606

Fidelity Investments
82 Devonshire Street V5A
Boston, MA 02109

Capital Guardian Trust
Company
1230 Peachtree Street
Suite 2550
Atlanta, GA 30309

Dwight Asset Management
Company
100 Bank Street
Suite 800
Burlington, VT 050401

Northern Trust
50 South LaSalle Street
Chicago, IL 60675

Fidelity Management Trust
Company
82 Devonshire Street
Boston, MA 02109

Wachovia Bank, NA
1 West 4th Street
Winston-Salem, NC 27101

JP Morgan Fleming Asset
Management
522 Fifth Avenue, Floor 11
New York, NY 10036

Barclays Global Investor
Services
45 Fremont Street
San Francisco, CA 94105

Standish Mellon Asset
Management
One Financial Center
Boston, MA 02111

T. Rowe Price
100 East Pratt Street
Baltimore, MD 21202

Penn Bottle & Supply Co.
7 10 E. Third Street
Essington, PA 19029

Ernst & Young
Metro Park
99 Wood Avenue South
Iselin, NJ 08830

Prudential Relocation
225 Crooked Creek Trail
Canton, GA 30115

Runzheimer International
Runzheimer Park
Rochester, WI 53167

Todd Organization
30 Oak Street, 4th Floor
Stamford, CT 06905

Wachovia Bank, NA
1 23 Broad Street
Philadelphia, PA 19109

ORREX
Odessa, TX

Greif Brothers
(Address Unknown)

APS Connections
Burman Road
FCU Building
Deal Party
Port Elizabeth, South Africa

Wachovia Bank, NA
1021 East Carey Street
6th Floor
Richmond, VA 23219

Wells Fargo
2701 Wells Fargo Way
6th Floor
Minneapolis, MN 55408

AON Consulting
1001 Brickell Bay Drive
Miami, FL 33131

4

AON Pension Service Center
1701 Golf Road
Tower 2, Suite 200
Rolling Meadows, IL 60008

Fidelity Institutional Retirement
Services Co.
300 Puritan Way
Marlborough, MA 01752

SystemMed, LLC
100 Parsons Pond Drive
Franklin Lakes, NJ 0741 7

Aetna
1302 Concourse Drive, #402
Linthicum, MD 21090

MetLife
501 US Highway 22
P.O. Box 6891
Bridgewater, NJ 08807

Tufts Member Services
333 Wyman Street
P.O. Box 91 12
Waltham, MA 02454

Palisades Communications, Inc.
800 Palisade Avenue, Suite 201
Ft. Lee, NJ 07024

HMO Illinois
300 East Randolph Street
Chicago, IL 60601

Kaiser of Mid-Atlantic States
2101 East Jefferson Street
Rockville, MD 20852

Kaiser of Northern California
Region
1950 Franklin Street
Oakland, CA 94612

Kaiser of Southern California
1950 Franklin Street
Oakland, CA 94612

Uniprise
450 Columbus Blvd., 11-NA
Hartford, CT 06103
EAP Systems
500 West Cummings Park
Woburn, MA 01801

Marsh USA, Inc.
1166 Avenue of the Americas
New York, NY 10036

Spectera
2811 Lord Baltimore Drive
Baltimore, MD 21244

EBenX, Inc.
5045 Ten Mills Road
Columbia, MD 21 044

Chapman Kelly
100 W. Court Avenue
Suite 200
Jeffersonville, IN 47130

CIGNA Healthcare
1111 Market Street
Chattanooga, TN 37402

Metasa Group - PSMI
164 Lott Court
W. Columbia, SC 29169

MAMSI Health Plans
20 West Rolling Crossroads
Suite 11
Baltimore, MD 21228

Triple S, Inc.
Avenida Roosevelt 1441
San Juan, PR 00920

Health Network America
187 Monmouth Parkway
West Long Branch, NJ 07764

Ceridian
6731 Columbia Gateway Dr.
First Floor
Columbia, MD 21046

Kronos
8850 Stanford Blvd.
Suite 2000
Columbia, MD 21 045

TALX
8600 LaSalle Road
Suite 200
Towson, MD 21286
National Bond and Trust
1725 Eye Street, NW
Suite 300
Washington, DC 20006

Chase Mellon
85 Challenger Road
Ridgefield Park, NJ 07660

Fidelity Investments
300 Puritan Way, MM1L
Marlborough, MA 01752

Merck Serono S.A. (formerly
Serono International S.A.)
9 Chemin des Mines
1211 Geneva 20, Switzerland

Abbott Laboratories
I00 Abbott Park Road
Abbott Park, Illinois 60064-
3500

Wyeth
5 Giralda Farms
Madison, NJ 07940

Biovail Corporation
7150 Mississauga Road
Mississauga, Ontario L5N 8M5
Canada

Biovail Technologies Ltd
700 Route 200/206
Bridgewater, N J 08807

Biovail Pharmaceuticals, Inc
700 Route 202/206
Bridgewater, NJ 08807

Elan Corporation plc.
Treasury Building
Lower Grand Canal Street
Dublin 2, Ireland

Elan Pharmaceuticals, Inc.
40 Parker Drive
Morris Plains, NJ 07950-2439

Teva Pharmaceutical Industries
5 Basel Street
Petach Tikva 49131
Israel

Teva Pharmaceuticals USA, Inc.
1090 Horsham Rd. P.O.B. 7090
North Wales. PA 19454

5

GlaxoSmithKline
One Franklin Plaza
P.O. Box 7929
Philadelphia, PA 19101

National Union Fire Insurance
Company of Pittsburgh, PA
175 Water Street
New York, NY 10038

Chubb Group of Insurance
Companies
15 Mountain View Road
Warren, NJ 07059

Axis Insurance Company
Connell Corporate Park
Three Connell Drive
P.O. Box 357
Berkeley Heights, NJ 07922-
0357

Allied World Assurance
Company, Inc
225 Franklin Street
Boston, MA 02110

6

**RETAINED CAUSES OF ACTION**
**(CLAIMS UNDER FEDERAL OR STATE SECURITIES LAWS)**

Protein Genetics, Inc.
1825 Infinity Drive
DeForest, WI 53532

Avantium Holding BV
Zekeringstraat 29
1014 BV
Amsterdam, The Netherlands

7

**RETAINED CAUSES OF ACTION
(CLAIMS FOR BREACH OF CONTRACT)**

Nalco Company
1601 W. Diehl Road
Naperville, IL 60563

Odyssey Logistics & Technology Corporation
39 Old Ridgebury Road
Danbury, CT 06810

Alstom Power Inc./Air Preheater Co.
4525 Weaver Parkway, Suite 250
Warrenville. IL 60555

G.O. Carlson, Inc.
350 Marshallton Thorndale Road
Downingtown, PA 19335

Proforma Global Printing &
Design Solutions, Inc.
2 Winters Lane
Baltimore, MD 21228

8

## RETAINED CAUSES OF ACTION
## (REAL ESTATE CLAIMS)

Cummings Properties
200 West Cummings Park
Woburn, MA 01801

Remington & Vernick Engineers, Inc.
232 Kings Highway East
Haddonfield, NJ 08033

Woolwich Township Planning Board
121 Woodstown Road
Woolwich Township, NJ 08085

Gloucester County Construction Board of Appeals
1 North Broadway
Woodbury, NJ 08097

Town of Acton
Town Hall
472 Main St.
Acton, MA 01720

Sheplers, Inc.
6501 W. Kellogg
Wichita, KS 67209

E. I. Dupont De Nemours and Company
1007 Market St.
Wilmington, DE 19898

9

**RETAINED CAUSES OF ACTION
(INSURANCE CLAIMS)**

Acc & Casualty Ins. of
Winterthur
750 7th Avenue, 2nd Floor
New York, NY 10019

Admiral Insurance
1255 Caldwell Road
P.O. Box 5725
Cherry Hill, NJ 08034

Aetna
1302 Concourse Drive
Linthicum, MD 21090

Aetna Casualty & Surety
c/o Travelers Insurance Co.
1 Tower Square, 2FG
Hartford, CT 06181

AG Belge de 1830
Blvd. Emile Jacqmain, 53
Brussels, 98 B-1000

Allianz Underwriters Ins.
3400 Riverside Drive, Suite 300
Burbank, CA 91505

Allied World Assurance
225 Franklin Street
Boston, MA 02110

American Centennial
3501 Silverside Rd.
203 Naamans Bldg
Wilmington, DE 19810

American Employers
2 Central Square
Cambridge, MA 02139-3311

American Home Assurance
750 7th Avenue, 22nd Floor
New York, NY 10019

American Int'l Underwriter
Excess Casualty Claims
Division
175 Water Street, 22nd Floor
New York, NY 10038

American Manufacturers Mutual
Central Claims Tube Station J- 1
Long Grove, IL 60049

American Reinsurance Co
American Re Plaza
555 College Rd. East
Princeton, NJ 08543-5241

Ancon Ins. Co. (U.K.)
750 7th Avenue, 22nd Floor
New York, NY10019

Andrew Weir Ins. Co. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

Argonaut Northwest Ins. Co.
750 7th Avenue, 22nd Floor
New York, NY 10019

Assicurazioni Generali S.p.A.
750 7'h Avenue, 22nd Floor
New York, NY 10019

Associated International
21 860 Burbank Blvd. Suite 380
Woodland Hills, CA 91367

Axis Reinsurance Company
Connell Corporate Park
3 Connell Drive
Berkeley Heights, NJ 07922

Bermuda Fire & Marine Ins. Co.
Ltd.
8 Wesley Street Craig Appin
House
Hamilton, BM HM JX

Birmingham Fire Ins Co
Excess Casualty Clms Div
175 Water Street, 22nd Floor
New York, NY 10038

Bishopsgate Ins. Co. Ltd.
7507 Avenue, 22nd Floor
New York, NY 10019

Boston Old Colony Ins Co
1100 Cornwall Road
Monmouth, NJ 08852-0906

British National Ins. Co. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

British Northwestern
60 St. Mary Axe

Bryanston Ins. Co. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

Buffalo Reinsurance
c/o Continental Ins. 40 Wall St.
New York, NY 10005

C.A.M.A.T.
750 7th Avenue, 22nd Floor
New York, NY 10019

California Union Ins Co
1601 Chestnut Street TLP-19-
Long Term Expos.
Philadelphia, PA 19192-2181

Centennial Ins Co
3 Giralda Farm Three Geralda
Farms
Madison, NJ 07940

Central National Ins Co
1601 Chestnut Street TLP-19-
Long Term Expos.
Philadelphia, PA 19192-2181

Century Indemnity Co
1601 Chestnut Street TLP-19-
Long Term Expos.
Philadelphia, PA 19192-2181

Chubb & Son, division of
Federal Insurance Company
82 Hopmeadow Street
Simsbury, CT 06070

Cie Europeene D'Ass.
Industrielles
750 7th Avenue, 22nd Floor
New York, NY 10019

CAN Reinsurance of London
Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

Continental Casualty Co.
333 S. Wabash, 19 South
Chicago, IL 60685

10

Continental. Casualty Company
333 S. Wabash, 19 South
Chicago, UL 60685

Continental Ins Co
1100 Cornwall Road
Monmouth, NJ 08852-0906

Dairyland Insurance Co
750 7th Avenue, 22nd Floor
New York, NY 10019

Dominion Ins. Co. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

Eisen Und Stahl
Karl Wiechert Allee
50 Postfach 610369
Hanover, GR D-30603

El Paso Ins. Co. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

Employers Comm'l Union
2 Central Square
Cambridge, MA 02139-3311

Employers Mutual Cas Co
c/o Mutual Marine
919 Third Ave-10th Floor
New York, NY 10022

English & American Ins. Co.
Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

European General
Anchorage House 2 Clove
Crescent
Leamouth, London, EG E 14
2BE

Federal Insurance Co
2201 Bryan Street, Suite 3400
Dallas, TX 75201 -3068

Fireman's Fund
Asbestos Claim Unit
777 San Marin Drive
Novato, CA 94998

First State Ins Co
150 Federal Street
Boston, MA 02110-1753

Folksam International Ins. Co.
Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

GEICO
GEICO Plaza
Washington, DC 20076-0001

General Insurance Company of
America
GEICO Plaza
Washington, DC 20076-0001

Gerling Konzern Ins
Anchorage House 2 Clove
Crescent
Leamouth, London, EG E 14
2BE

Gibraltar Cas. Co.
477 Martinsville Rd.
PO Box 830
Liberty Corner, NJ 0793 8

Granite State Ins
Excess Casualty Claims
175 Water St.- 22nd Floor
New York, NY 10038

Guarantee Insurance Co
650 Naamamf Road, Suite 301
Claymont, DE 19703

Haftpflichtverband
Anchorage House
2 Clove Crescent
Leamouth, London, EG E 14
2BE

Harbor Insurance Co
333 South Wabash, 19 South
Chicago, IL 60685

Hartford Insurance
Hartford Plaza
Hartford, CT 06115

The Hartford
Hartford Plaza C-2-45
Hartford, CT 06115

Highlands Ins. Co.
275 Phillips Blvd.
Trenton, NJ 08618

Home Insurance Co
c/o REM
59 Maiden Lane 5th F1.
New York, NY 10038

Ideal Mutual
123 Williams Street, 7th Fl.
New York, NY 10038

Illinois National
Excess Casualty Claims Div.
175 Water St.- 22nd Floor
New York, NY 10038

INA
1601 Chestnut Street TLP-19-
Long Tern Expos.
Philadelphia, PA 19192-2181

Insurance Co State of PA
Excess Casualty Claims Div
175 Water Street, 22nd Floor
New York, NY 10038

Integrity Insurance Co
Company in Liquidation
49 East Midland Ave
Paramus, NJ 07652-2920

Kraft Ins. Co. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

Lexington Ins. Co.
750 7th Avenue, 22nd Floor
New York, NY 10019

Lloyds Underwriters
750 7th Avenue, 22nd Floor
New York, NY 10019

London & Edinburgh General
Ins. Co.
750 7th Avenue, 22nd Floor
New York, NY 10019

London & Overseas Ins. Co.
Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

11

London Guarantee & Acc
1100 Cornwall Road
Monmouth, NJ 08852-0906

Louisville Ins. Co. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

Ludgate Ins. Co. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

Marsh Private Client Services
44 Whippany Road
Morristown, NJ 07962

Maryland Casualty Co.
Claims Division 3910 Keswick
Road
Baltimore, MD 21211

Maryland Casualty Company
Claims Division 3910 Keswick
Road
Baltimore, MD 21211

Mentor Ins. Co. (U.K.) Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

Midland Insurance Co.
123 Williams Street, 7th Floor
New York, NY 10038

Minster Ins. Co. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

Mission Insurance Co.
Dept of Conser & Liqtn
P.O. Box 26894
San Francisco, CA 94126-0894

Mutual Reinsurance Co. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

National Casualty Co. of
America
c/o Scottsdale Insurance
8877 N. Gainey Ctr. Dr.
Scottsdale, AZ 85258

National Union Fire Insurance
Company of Pittsburgh
AIG
175 Water Street
New York, NY 10038

Natl. Union Fire Pittsburgh
Excess Casualty Claims Div
175 Water Street, 22nd Floor
New York, NY 10038

New Hampshire Insurance
Excess Casualty Claims
175 Water Street, 22nd Floor
New York, NY 10038

North Atlantic Ins. Co. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

North Star Reinsurance
695 E. Main Street
Stamford, CT 06904-2354

Northbrook Ins. Co
3 Allstate Comm'l Plaza
51 W. Higgins Rd.-T2B
So Barrington, IL 60010

Orion Ins. Co. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

Pacific Employers Ins Co
1601 Chestnut Street TLP- 19-
Long Term Expos.
Philadelphia, PA 19192-2181

Protective Nat'l Ins Co
11128 John Galt Blvd. Suite 200
Omaha, NE 68137-6312

Prudential Reinsurance
477 Martinsville Road
Liberty Corner, NJ 07938-0830

Republic Insurance Co
2727 Turtle Creek Blvd.
Dallas, TX 75219

Reunion-Adriatica
C/O Chilington Int'l
I00 Commons Way Ste. 210
Holmdel, NJ 07737

Royal Indemnity Company
750 7th Avenue, 22nd Floor
New York, NY 10019

Royal Insurance Co
9140 Arrowpoint Boulevard,
Suite 440
Charlotte, NC 28273

Royale Belge S.A.
Anchorage House 2 Clove
Crescent
Leamouth, London, EG E 14
2BE

Sphere Drake Ins. Co. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

St. Helens Ins. Co. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

St. Katherine Ins. Co. Ltd.
750 7th Ave, 22nd Floor
New York, NY 10019

Stronghold Ins. Co. Ltd.
750 7 Avenue, 22nd Floor
New York, NY 10019

Swiss Reinsurance
Myuthenquai 50/60 CH 8022
Zurich

Swiss Union Gen. Ins. Co. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

Terra Nova Ins. Co. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

Transamerica Ins. Co.
250 Commercial St., Suite 5000
Manchester, NH 03101

Transit Casualty
CNA Plaza 37 South
Chicago, IL 60685

Turegum Ins. Co.
750 7th Avenue, 22nd Floor
New York, NY 10019

12

Twin City Fire Ins. Co.
Hartford Plaza
Hartford, CT 06115

Unigard Security
2 Central Square 2nd Floor
Cambridge, MA 02139

US Fire Insurance Co
305 Madison Avenue
P.O. Box 1973
Morristown, NJ 07960

Walbrook Ins. Co. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

Wausau Insurance Co
400 Westwood Drive
P.O. Box 8020
Wausau, WI 54402-8020

Winterthur Swiss Ins. Co.
750 7th Avenue, 22nd Floor
New York, NY 10019

World Auxiliary Ins. Cop. Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

Yasuda Fire & Marine Ins. Co.
Ltd.
750 7th Avenue, 22nd Floor
New York, NY 10019

Zurich Insurance Co
Anchorage House 2 Clove
Crescent
Leamouth, London EG E 14
2BE

13

## RETAINED CAUSES OF ACTION
## (CLAIMS AGAINST TAXING AUTHORITIES)

U.S. Customs and Border
Protection
Thomas A. Smith, Director
National Finance Center
Internal Revenue Service
409 Silverside Road
Wilmington, DE 19809

Internal Revenue Service
7850 SW 6th Court, Room 285
Plantation, FL 33324

Internal Revenue Service
Summit Building, Stop 202-D
Room 1520
401 W. Peachtree Street, N.W.
Atlanta, GA 30365

Internal Revenue Service
Atlanta Service Center
P.O. Box 47-421
Doraville, GA 30362

Attention: Stop 35-Beverly
Steed
Do Not Open In Mail Room
Commissioner
Department of Revenue
4112 Gordon Persons Building
50 N. Ripley Street
Montgomery, AL 36132

Commissioner
Department of Revenue
P.O. Box 110400
Juneau, AK 99811-0400

Director
Department of Revenue
1600 W. Monroe Street
Phoenix, AZ 85007

Commissioner
Dept. of Finance and
Administration
1509 W. 7th
Little Rock, AR 72201

State Controller and FTB Chair
Franchise Tax Board
P.O. Box 942840
Sacramento, CA 94240-0040

Executive Director
Department of Revenue
State Capitol Annex
1375 Sherman Street
Denver, CO 80261

Commissioner
Department of Revenue Services
25 Sigourney Street
Hartford, CT 06106

Director
Division of Revenue
Carve1 State Building
820 N. French Street
Wilmington, DE 19801

Chief Financial Officer
Office of Tax and Revenue
941 North Capitol Street, N.E.
Washington, DC 20002

Executive Director
Department of Revenue
104 Carlton Building
Tallahassee, FL 32399-0100

Commissioner
Department of Revenue
Trinity-Washington Building
270 Washington Street, SW
Atlanta, GA 30334

Director
Department of Taxation
P.O. Box 259
Honolulu, HI 96809-0259

Chairman
State Tax Commission
P.O. Box 36
800 Park Boulevard
Plaza IV
Boise, ID 83722-0036

Director
Department of Revenue
103 West Jefferson Street
Springfield, IL 62702

Commissioner
Department of Revenue
100 North Senate Avenue
Indiana Government Center
North
Indianapolis, IN 46204-2253

Director
Department of Revenue and
Finance
Hoover State Office Building
East 13th and Walnut
Des Moines, IA 50319

Secretary
Department of Revenue
Robert B. Docking State Office
Building
915 S.W. Harrison Street
Topeka, KS 66612-1588

Secretary
Revenue Cabinet
200 Fair Oaks Lane
Frankfort, KY 40620

Secretary
Department of Revenue
Box 3863
330 N. Ardenwood Drive
Baton Rouge, LA 70806

Executive Director
Revenue Services
24 State House Station
Augusta, ME 04333-0024

Comptroller
Goldstein Treasury Building
80 Calvert Street
Annapolis, MD 21404

Commissioner of Revenue
Department of Revenue
51 Sleeper Street, 8th Floor
Boston, MA 02114

State Treasurer
Department of Treasury
Treasury Building
430 W. Allegan Street
Lansing, MI 48922

14

Commissioner
Department of Revenue
600 North Robert Street
St. Paul, MN 55146

Chairman and
Commissioner of Revenue
State Tax Commission
1577 Springridge Road
Raymond, MS 391 54-9602

Director
Department of Revenue
301 West High Street
Jefferson City, MO 65105-0311

Director
Department of Revenue
455 Sam W. Mitchell Building
125 N. Roberts
P.O. Box 5805
Helena, MT 59604-5805

Tax Commissioner
Department of Revenue
301 Centennial Mall South
P.O. Box 94818
Lincoln, NE 68509-4818

Executive Director
Department of Taxation
1550 E. College Parkway
Carson City, NV 89706

Commissioner
Dept. of Revenue
Administration
45 Chennell Drive
P.O. Box 457
Concord, NH 03301

Director
Division of Taxation
50 Barrack Street
P.O. Box 240
Trenton, N3 08646-0240

Secretary
Taxation and Revenue
Department
P. 0. Box 630
1100 S. St. Francis Drive
Santa Fe, NM 87504-0630

Commissioner
Department of Taxation and
Finance
W.A. Harriman Campus
Building #9
Albany, NY 12227-0125

Commissioner of Finance
25 Elm Place
Brooklyn, NY 11201

Secretary
Department of Revenue
501 N. Wilmington Street
P.O. Box 25000
Raleigh, NC 27640-0640

Tax Commissioner
Tax Department
8th Floor
Capitol Building
600 E. Boulevard Avenue
Bismarck, ND 58505-0599

Commissioner
Department of Taxation
30 East Broad Street
P.O. Box 530
Columbus, OH 432 1 6-053 0

Chairman
State Tax Commission
2501 Lincoln Boulevard
Oklahoma City, OK 73194-000
I
Director
Department of Revenue
Revenue Building
955 Center Street, N.E.
Salem, OR 973 10

Acting Secretary
Department of Revenue
1133 Strawberry Square
Harrisburg, PA 17128-1100

Tax Administrator
Division of Taxation
One Capitol Hill
Providence, RI 02908-5800

Director
Department of Revenue
301 Gervais Street
Columbia, SC 29214

Secretary
Department of Revenue
Anderson Building
445 East Capital Avenue
Pierre, SD 57501-3185

Commissioner
Department of Revenue
Andrew Jackson State Office
Building
500 Deaderick Street
Nashville, TN 37242

Comptroller of Public Accounts
LBJ State Office Building
111 E. 17th Street
Austin, TX 78774

Executive Director, Chairman
State Tax Commission
210 North 1950 West
Salt Lake City, UT 84134

Commissioner
Department of Taxes
Pavilion Office Building
109 State Street
Montpelier, VT 05609

State Tax Commissioner
Department of Taxation
2220 W. Broad Street
Richmond, VA 23220-2008

Director
Department of Revenue
4 15 General Administration
Building
Washington Street East
Olympia, WA 98504-0090

Secretary
Department of Tax and Revenue
Building 1
State Capitol Building
Charleston, WV 25305

Secretary
Department of Revenue
P.O. Box 8933
125 South Webster Street
Madison, WI 53708

15

Director
Department of Revenue
Herschler Building
122 W. 25th Street
Cheyenne, WY 82002-0 1 10

Calcasieu Parish Sales and
Use Tax Department
P.O. Box 2050
Lake Charles, LA 70602

Department of the Treasury
Internal Revenue Service
Ogden, Utah 82401

Fresenius Medical Care
Holdings, Inc.
Two Ledgemont Center
95 Hayden Avenue
Lexington, MA 02493

Sealed Air Corporation
200 Riverfront Boulevard
Elmwood Park, NJ 07407

California Franchise Tax Board
P.O. Box 942840
Sacramento, California 94257

Alaska Department of Revenue
State Office Building, 11th Floor
333 Willoughby Avenue
Juneau, Alaska 99811

Arizona Department of Revenue
1600 West Monroe Street
Phoenix, Arizona 85007

District of Columbia Office of
Tax and Revenue
941 North Capital Street, NE
8th Floor
Washington, D.C. 20002

Georgia Department of Revenue
1800 Century Center Boulevard
Atlanta, Georgia 30345

Kentucky Department of
Revenue
200 Fair Oaks Lane
Frankfort, Kentucky 40620

Gamma Holdings, N.V.
Hoogeindsestraat 47
5705 AL Helmond
The Netherlands

Bekaert Textiles, N.V.
Deerlijkseweg 22
B-8790 Waregem
Belgium

Axa Bank Europe N.V.
I 170 Brussels
Vorstlaan 25
Belgium

Linklaters DeBandt
Rue Brederode
13 B-1000
Brussels, Belgium

Cyr Cambier N.V.
Deerlijkseweg 22
B-8790 Waregem
Belgium

Colowyo Coal Company, L.P.
5731 State Highway 13
Meeker, Colorado 81641

Rio Tinto Energy America
505 South Gillette Avenue
(82716)
P.O. Box 3009
Gillette, Wyoming 82717-3009

16

## RETAINED CAUSES OF ACTION
## (CLAIMS RELATING TO DEPOSITS)

Amerada Hess
P.O. Box 11510
Newark, NJ 07101-4510

Baltimore Gas & Electric Co.
P.O. Box 1431
Baltimore, MD 21203-143 1

City of Anaheim
P.O. Box 3069
Anaheim, CA 92803-3069

City of E. Chicago
Dept. of Water Works
P.O. Box 423
East Chicago, IN 463 12

Electric Power Bd. Of Chattanooga
P.O. Box 182255
Chattanooga, TN 37422-7255

Reliant Energy/Entex
P.O. Box 2628
Houston, TX 77252

South Carolina Electric & Gas
1426 Main Street
Columbia, SC 29201

17

## RETAINED CAUSES OF ACTION
## (ENVIRONMENTAL AND PRODUCT LIABILITY CLAIMS)

Burton Shaffer, Irving Shaffer,
Milton Shaffer, BIM Investment Corp.
Shaffer Realty Nominee Trust
c/o Solomon M. Felman
199 Wells Avenue, Suite 201
Newton. MA 02459

E.I. Du Pont De Nemours and Company
Corporate Real Estate
1007 Market Street
Wilmington, DE 19898

Covidien d/b/a Tyco Healthcare Group LP
675 McDonnell Blvd. 10-3-S
Hazelwood, MO 63042

18

**RETAINED CAUSES OF ACTION**
**(INTELLECTUAL PROPERTY RIGHTS CLAIMS)**

BP America, Inc.
4101 Winfield Road
Warrenville, IL 60555.

Colormatrix
3005 Chester Avenue
Cleveland, OH 44005

Amcor Whitecap Deutschland
GmbH Limited
Hansastrasse 4, D-30419
Hanover, Germany

Fosroc International
Coleshill Road
Tamworth
Staffordshire B78 3TL, England

Sika Technology AG
Branch Zurich
Tuffenweis 16 P.O. Box
CH-8048 Zurich
Switzerland

The Dow Chemical Company
P. 0. Box 1967
Midland, MI 48641 -1 967

Euco Fosroc
Gasteiz Bidea, 11
Spain

Access Business Group LLC
7575 Fulton Street East
Ada, Michigan 49355-0001

Anheuser-Busch
1 Busch Place
St. Louis, MO 631 18

Colgate-Palmolive Company
300 Park Avenue
New York, NY 10022

DA NanoMaterials LLC
2507 West Erie Drive
Tempe, Arizona 85282

Phenomenex
41 1 Madrid Avenue
Torrance, CA 90501

Promega Corporation
2800 Woods Hollow Road
Madison, WI 53711

19

## RETAINED CAUSES OF ACTION
## (PENDING AND POTENTIAL LITIGATION)

| Entity | Case No. | Plaintiff/ Case Name | Nature of Proceeding | Court or Agency | Status |
|---|---|---|---|---|---|
| Grace-Conn. | A.R.01/975/A | Bekaert Textiles N.V. | Tax | Court of First Instance, Bruges, Belgium | Pending |
| Grace-Conn. | A.R.01/975/A | Bekaert Textiles N.V. | Fraud, Breach of Contract | Court of First Instance, Bruges, Belgium | Pending |
| Grace-Conn. | A.R.01/975/A | Bekaert Textiles N.V. | Fraud, Breach of Contract | Court of First Instance, Bruges, Belgium | Pending |
| Grace-Conn. | A.R.01/975/A | Bekaert Textiles N.V. | Fraud, Breach of Contract | Court of First Instance, Bruges, Belgium | Pending |
| Grace Energy | 979-05135 | Grace Energy v. Kaneb Pipe Line | Contract | Dallas County, TX | Pending |
| W. R Grace Grace Energy | BC222456 | Petro Resources v. N.Y. Hillside | Environmental | Superior Court, Los Angeles County, CA | Pending |
| W. R. Grace-Conn. | 01-769 | Samson Investment | Indemnification | Dallas County, TX | Pending |
| W. R. Grace-Conn. | 97CIV8941 | Uniguard Security Ins. v. W. R. Grace & Co.-Conn. | Insurance | US District Court, S.D.N.Y. | Pending |
| W. R. Grace-Conn. | 98-CV-0838s(F) | W. R. Grace & Co. v. Zotos International, Inc. | Environmental | US District Court, Buffalo, NY | On Appeal |
| W. R. Grace-Conn. | 02CV495 | Estate of Jeffrey B. Chwala, et al. | Wrongful Death | Circuit Court, Eau Claire County, WI | Pending |
| W. R. Grace-Conn. | 88CIV4337 | Maryland Casualty Co. v. W. R. Grace & Co. and Continental Casualty Company | Insurance | US District Court, S.D.N.Y. | Settled |
| Gloucester New Communities Company, Inc. | L-1347-03 | Summit Ventures LLC | Real Estate | Superior Court of New Jersey Law Division Gloucester County | Pending (On Trial) |
| W. R. Grace & Co. W. R. Grace-Conn. | 95-CV-6400L | Seneca Meadows, Inc. Macedon | Environmental | U.S. District Court, W.D.N.Y. | Pending |

20

| | | Homes, Inc. | | | |
|---|---|---|---|---|---|
| W. R. Grace-Conn. Grace SA | | Fosruc Euco, SA | | The Mercantile Court of Bilbao, Spain | Pending |
| Grace Construction & Grace Darex Packaging Technologies | Action No. S036827 | Affordable Housing Charitable Assoc. et al. v. Weber & Associate Architectural Consultant Inc., et al. (Regent Place) | Products Liability | Supreme Court of British Columbia, New Westminster Registry | Pending |
| Grace Construction & Grace Darex Packaging Technologies | Action No. S015358 | Canada Mortgage & Housing Corporation v. Santos Enterprises, Ltd., et al. (Larchway Gardens) | Products Liability | Supreme Court of British Columbia, Vancouver Registry | Pending |
| Grace Construction & Grace Darex Packaging Technologies | CIV 446857 | Miramar Apartments v. Douglas Roses Construction, Inc. | Products Liability | Superior Court, State of California, County of San Mateo | Pending |
| Grace Construction & Grace Darex Packaging Technologies | | Anita Terrace Owners, Inc. v. Goldstein Associates Consulting Engineers, PLLC R&L Construction, Inc. et al. | Products Liability | Supreme Court of the State of New York, County of Queens | Pending |
| Grace Construction & Grace Darex Packaging Technologies | MICV2008-02079-J | 241 Boston Post Rd. v. Gleeson Powers, Inc. et al. | Products Liability | Superior Court for Middlesex County, MA | Pending |
| Grace Construction & Grace Darex Packaging Technologies | 08CA3790 | Gregory Dowdy v. River Oaks Dev. Corp., Troy Fans, Inc. et al. | Products Liability | Circuit Court of the 5th Judicial Circuit in and for Lake County, FL | Pending |
| Grace Construction & Grace | BC354827 | Zormaxx Corp., et al. v. Standard | Products Liability | Superior Court of California, County of Los Angeles | Pending |

21

| | | | | | |
|---|---|---|---|---|---|
| Darex Packaging Technologies | | Concrete Products, et al. Standard Concrete v. Grace, et al. | | | |
| Grace Construction & Grace Darex Packaging Technologies | | Ingram Readymix, Inc. v. Southern Contracting, et al. v. W. R. Grace & Co., et al. | Products Liability | District Court, 319th Judicial District of Nueces County, TX | Pending |
| Grace Construction & Grace Darex Packaging Technologies | | Scott Blaine Burdett v. Frederick Jordan, et al. | Motor Vehicle | Superior Court of Columbia County, State of Georgia | Pending |
| Grace Construction & Grace Darex Packaging Technologies | | Carissa Parker v. James E. Bush, W. R. Grace & Co. and John Doe Company, d/b/a Prudential Leasing | Motor Vehicle and Personal Injury | State Court of Douglas County, State of Georgia | Pending |
| Grace Construction & Grace Darex Packaging Technologies | | The Official Committee of Unsecured Creditors of Kenny Industrial Services, Inc., et al. v. W. R. Grace & Co. | Recovery of Alleged Preference Payments | U.S. Bankruptcy Court for the Northern District of Illinois Eastern Division | Pending |
| W. R. Grace, Inc. | | John Morgan, et al. | Appeal | Commonwealth of Massachusetts Appeals Court | Pending |
| W. R. Grace & Co.-Conn. | 13-C-08-074673 CN | Global Printing & Design Solutions, Inc. d/b/a Proforma Global v. W. R. Grace & Co.-Conn. | | Circuit Court for Howard County, Maryland | Pending |

22

## RETAINED CAUSES OF ACTION
### (CLAIMS AGAINST FORMER PROFESSIONALS)

Henk Vanhulle
LinkIaters De Bandt
Brederodestraat 13
Rue Brederode B-1000
Brussels, Belgium

Jose R. Alvarez
337 Gatewater Court, Apt. 202
Glen Burnie, MD 21060

Beverly J. Artale
3826 Sunflower Circle
Mitchelleville, MD 20721

Lewis R. Barber
200 Riverside Avenue
Chattanooga, TN 37405

Francis T. Bennett
2 Montrose Avenue
Arlington, MA 02174

Jorge Bonilla
7500 Grace Drive
Columbia, MD 21044

Christopher Bull
5525 Charles Street
Bethesda, MD 20814

Richard W. Collins
7733 Cove Ridge Drive
Hixson, TN 37343

Edward F. Connelly
12 Oceanwood Drive
Scarborough, ME 04074

Timothy M. Cremin
3 140 St. James Drive
Boca Raton, FL 33434

Marie C. Dunbar
41 28 Lonicera Loop
Jacksonville, FL 32259
John E. Feery
863 Sun Disk Place
Boynton Beach, FL 33436

Michael Freedman
5266 Fairway Woods Drive
Apt. 4011
Delray Beach, FL 33484

Walter Gregory, Jr.
1 583 Braebum Drive
Atlanta, GA 30316

Annette P. Kassa
494 Erin Garf.h
Severna Park, MD 21146

Apparao T. Lengade
3342 N. Chatham Road
Apt. L
Ellicott City, MD 21042

Roy D. Lyda
P.O. Box 104
Cross Anchor, SC 29331

Gretchen M. Mavrovouniotis
14 Sunliver
Irvine, CA 92614

Mary R. McGrath
25 Lawrence Lane
Arlington, MA 02474

Thomas E. Murray
16 Horseshoe Road
Chelmsford, MA 01 824

Thomas J. Murray
77 Tanya Drive
Mansfield, MA 02048

Charles D. Rabensbuxg
2920 Ozark Road
Chattanooga, TN 3741 5

Richard G. Remmes
1 15 Woolford Road
Wrentham, MA 02093

Ronald E. Ritter
55 Laguna Road
Lake Monticello, VA 22963

Steven M. Rotheim
800 Palisade Avenue, #201
Ft. Lee, NJ 07024

Nile R. Strohman
1 1504 Long Meadow Drive
Glen Allen, VA 23059

Dorothy T. Toohey
19 Cherokee Road
Arlington, MA 02474

Howard J. Troffkin
7808 Ivymount Terrace
Potomac, MD 20854

Robert Turner
30 Heritage Road
Acton, MA 01720

Diane M. Vaughan
50 Knowles Road
Watertown, MA 02472

Henry P. Zerhusen
5055 Dry Well Court
Columbia, MD 21045

23

**RETAINED CAUSES OF ACTION**
**(MISCELLANEOUS CONTRACT AND TORT CLAIMS)**

Air Liquide Industrial U S LP
158 Barre Way
Dandridge, TN 37725

Ed Slotwinski
Steeb Anwendungssysteme
GMBH
Heilbronner Str.4
74232 Abstattt
Germany

Richard A. Dolan
1716 Tangiers
Henderson, NV 89 102

Dr. Yehuda Shalon
1566 Hamilton Avenue
Palo Alto, CA

Dr. Tidhar Dari Shalon
Pinkas 54, Apt. 63
Tel Aviv 6226 1, Israel

Indopco, Inc.
10 Finderne Avenue
Bridgewater, NJ 08807

Kennecott Colorado Co.
James Belcher
Holland & Hart LLP
25 1 5 Warren Avenue
Suite 450
Cheyenne, WY 82001

Fidelity Management Trust
Company
82 Devonshire Street
Boston, MA 021 09

State Street Global Advisors
Fiduciary Services
Two International Place
Boston, MA 02 1 10

Gamma Holding, N.V.
C/O Mr. Meint Veninga
Hoogeindsestraat 47
5705 AL Helmond
The Netherlands

Bekaert Textiles, N.V.
Deerlijkseweg 22
8790 Waregem
Belgium

Pricewaterhouse Coopers LLP
200 South Biscayne Blvd.
Suite 1900
Miami, FL 33131

Pricewaterhouse Coopers LLP
1301 K Street N.W. 800W
Washington, DC 20005-3333

Lab Vantage
245 Highway 22 West
Bridgewater, NJ 08807

Kvaemer Process Systems US
7909 Parkwood Circle, 6th Floor
Houston, TX 77036

Rohm & Haas
100 Independence Mall West
Philadelphia, PA 191 06-2399

Flexia Corporation
369 Elgin Street
Brantford, Ontario N3S 7P5

Attention: Mr. Edward Bowles
President and CE
Phenomenex
411 Madrid Avenue
Torrance, CA 90501-1430

Promega
2800 Woods Hollow Road
Madison, WI 53711

Intercat, Inc
104 Union Avenue
Manasquan, NJ 08736

Norquay Technology, Inc.
800 West Front Street
Chester, PA 19013

KYSU, Inc.
800 West Front Street
Chester, PA 19013

Robert W. Heldt
c/o Norquay Techology, Inc.
800 West Front Street
Chester, PA 19013

BASELL USA INC.
912 Appleton Road
Elkton, MD 21921

Dr. Dinesh Gopinath Prabhu
C-104 Woodland near Gandhi
Bhavan
Kothrud, Pune 411029
lndia

Mrs. Asha Prabhu
C-104 Woodland near Gandhi
Bhavan
Kothrud, Pune 411029
lndia

Mr. Krishnakumar Dani
1109 Woodland Harmondy near
Gandhi Bhavan
Kothrud, Pune 411029
lndia

Cianbro
One Hunnewell Square
P.O. Box 1000
Pittsfield, ME 04967

SSOE, Inc.
1001 Madison Avenue
Toledo, OH 43604

Warren Environmental, Inc.
P.O. Box 1206
Carver, MA 02330

Engineered Crane Service of
America
2000 McFarland 400 Blvd.
Alpharetta, GA 30004

G. O. Carlson, Inc.
350 Marshalltown Thorndale
Road
Dowington, PA 19335-2063

Acme Industrial Piping
P.O. Box 72936
Chattanooga, TN 37407

Samson Hydrocarbons
Samson Plaza
2 W. 2nd Street
Tulsa, OK 741 03-3103

25

[THIS PAGE INTENTIONALLY LEFT BLANK]

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                                    )        Chapter 11
                                          )
**W. R. GRACE & CO., *et al.*[1]**        )        Case No. 01-01139 (JKF)
                                          )        Jointly Administered
**Debtors.**                              )
                                          )
                                          )
                                          )

## EXHIBIT 20 TO EXHIBIT BOOK
## SHARE ISSUANCE AGREEMENT

**EXHIBIT 20**

Attached.

---

[1] The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

# FORM OF SHARE ISSUANCE AGREEMENT

THIS SHARE ISSUANCE AGREEMENT (this "Share Issuance Agreement") is made and entered into as of [__], 2009 by and between (i) W. R. Grace & Co., a Delaware corporation (together with any successor thereto pursuant to the terms and conditions of Section 12, "Parent" or the "Obligor"), (ii) WRG Asbestos PD Trust acting on behalf of the Holders of the US ZAI PD Claims and the Holders of Asbestos PD Claims (in such capacity the "Trust (PD/ZAI)"), a Delaware statutory trust established pursuant to §524(g) of the Bankruptcy Code in accordance with the Plan of Reorganization (as hereinafter defined), (iii) WRG Asbestos Trust (the "Trust (PI)" and collectively with the Trust (PD/ZAI), the "Trusts" and each a "Trust"), a Delaware statutory trust established pursuant to §524(g) of the Bankruptcy Code in accordance with the Plan of Reorganization, and (iv) the Trust (PI), as representative for the Trusts pursuant to the terms of the Intercreditor Agreement (in such capacity, and together with its permitted successors pursuant to Section 2 of the Intercreditor Agreement, the "Trusts' Representative"). Unless otherwise defined herein or the context otherwise requires, all capitalized terms used herein and defined in the Plan of Reorganization shall be used herein as therein defined.

W I T N E S S E T H :

NOW, THEREFORE, in consideration of the premises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Section 1.  For purposes of this Share Issuance Agreement, the following terms shall have the meanings set forth below:

"Common Stock" means the common stock of the Obligor, par value $0.01 per share, and the common stock of any successor corporation thereto pursuant to the terms and conditions of Section 12 or any similar equity ownership interest in any other successor Entity thereto pursuant to the terms and conditions of Section 12.

"Controlled Affiliate" means, as of the relevant date of determination, any Entity (i) in which the Obligor, directly or indirectly, holds at least 10% of the Equity Interests of such Entity, and (ii) which directly or indirectly is subject to the control of the Obligor. For purposes of this definition, "control" as used with respect to any Entity means the possession of the power to direct or cause the direction of the management or policies of such Entity, whether through the ownership of Equity Interests, by agreement or otherwise.

"Deferred Payment" means each of (i) the Deferred Payments (PI) under the Deferred Payment Agreement (PI), (ii) the Deferred Payments (PD) under the Deferred Payment Agreement (PD) and (iii) the Deferred Payments (ZAI) under the Deferred Payment Agreement (ZAI).

"Deferred Payment Agreement" means any of the following agreements, each dated as of the date hereof: (i) the Deferred Payment Agreement between Grace and the Trust (PI), (ii) the Deferred Payment Agreement (Class 7(a) PD) between Grace and the Trust (PD/ZAI) and (iii) the Deferred Payment Agreement (Class 7(b) ZAI) between Grace and the Trust (PD/ZAI).

"Deferred Payment Documents" means, collectively, the Deferred Payment Documents (PD), the Deferred Payment Documents (PI) and the Deferred Payment Documents (ZAI), each as defined in the respective Deferred Payment Agreements.

"Demand for Issuance of the Section 524(g) Shares" means a written notice by the Trusts' Representative delivered to the Obligor in accordance with Section 2 of this Share Issuance Agreement stating that an Event of Default has occurred and is continuing and demanding issuance, transfer and delivery to the Trusts' Representative, on behalf of the Trusts, of the Section 524(g) Shares.

"Equity Interest" means shares of capital stock or equity, equity securities or ownership interests in any Entity or any rights (including any (x) options, warrants or other rights to purchase or acquire any such stock, equity or interests (whether or not at the time exercisable), or (y) securities by their terms convertible into or exchangeable for any such stock, equity or interests (whether or not at the time so convertible or exchangeable) or options, warrants or rights to purchase such convertible or exchangeable securities.

"Event of Default" means any Event of Default as defined in Section 8 of any Deferred Payment Agreement.

"Fair Market Value" means, with respect to each share of Common Stock:

(i)     If traded on the NYSE, NASDAQ or another stock exchange, the average sale price (as of the close of business of each relevant trading date) of the Common Stock on the NYSE, NASDAQ or such other exchange for the 30 trading days immediately prior to the date for which the value is to be determined (or if no sale took place on such trading date the average of the closing bid and ask prices of the Common Stock on such trading date);

(ii)     If traded over-the-counter other than on NASDAQ, the average of the closing bid and ask prices (as of the close of business of each relevant trading date) of the Common Stock for the 30 trading days immediately prior to the date for which the value is to be determined; and

(iii)     If there is no public market for the Common Stock, the fair market value of the Common Stock as of the day immediately prior to the date for which the value is to be determined, as determined by a reputable investment bank or valuation firm selected jointly by the Obligor and the Trusts' Representative (the "Independent Appraiser"). The Obligor and the Trusts' Representative shall instruct the Independent Appraiser to render its decision within thirty days of its acceptance of its selection. The fees and expenses of the Independent Appraiser shall be borne by the Obligor.

"Governing Documents" means, as to any Entity, its articles or certificate of incorporation and by-laws, its partnership agreement, its certificate of formation and operating agreement and/or the organizational or governing documents of such Entity.

"Governmental Authority" means the government of the United States of America or any other country, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising

2

executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, a government (including any supra-national bodies such as the European Union or the European Central Bank).

"Intercreditor Agreement" means the Intercreditor Agreement dated as of even date herewith among the Trust (PI), the Trust (PD/ZAI), and the Trust (PI), in its capacity as representative of the Trusts, upon the terms and conditions set forth in such Intercreditor Agreement.

"Laws" means, collectively, all applicable international, foreign, Federal, state and local statutes, treaties, rules, regulations, ordinances and codes, including the binding interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof.

"Lien" means any encumbrance, mortgage, pledge, hypothecation, charge or security interest of any kind.

"NASDAQ" shall mean The NASDAQ Stock Market (including any of its subdivisions such as the NASDAQ Global Select Market) or any successor market thereto.

"NYSE" shall mean The New York Stock Exchange or any successor stock exchange thereto.

"Parent Guarantee" means any of the following agreements, each dated as of the date hereof: (i) the W. R. Grace & Co. Guarantee Agreement between Parent and the Trust (PI), (ii) the W. R. Grace & Co. Guarantee Agreement (Class 7(a) PD) between Parent and the Trust (PD/ZAI) and (iii) the W. R. Grace & Co. Guarantee Agreement (Class 7(b) ZAI) between Parent and the Trust (PD/ZAI).

"Plan of Reorganization" means that certain Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W. R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Future Claimants Representative, and the Official Committee of Equity Security Holders Dated as of [__], 2008, as filed by Grace and certain of its affiliates in their reorganization cases under chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court for the District of Delaware, and as confirmed by order of that court dated as of [__], 2009, together with the exhibits and schedules thereto, each as amended, supplemented or otherwise modified from time to time in accordance with its terms.

"Section 524(g) Shares" means _____ shares of Common Stock, equal to fifty and one tenth (50.1) percent of the total number of shares of Common Stock issued and outstanding as of the Effective Date (after giving effect to any issuance of shares of Common Stock on the Effective Date), and all securities issuable in replacement of or in connection with such shares pursuant to an Adjustment Event, or otherwise in accordance with the terms and conditions of this Share Issuance Agreement.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority,

3

including without limitation any interest, additions to tax, penalties and any similar liabilities with respect thereto.

"Transaction" means, in respect of a specified Entity, any transaction or series of transactions consisting of or effected by means of merger, consolidation, Transfer of all or substantially all assets of such Entity, business combination, share exchange, reclassification, reorganization or recapitalization.

"Transfer" and "Transferred" means any sale, assignment, transfer, pledge, grant of a security interest, lease, license or other disposition of any property or assets.

"Trusts" has the meaning set forth in the introductory paragraph of this Share Issuance Agreement.

"Trusts' Representative" has the meaning set forth in the introductory paragraph of this Share Issuance Agreement.

All terms defined in this Share Issuance Agreement in the singular form shall have comparable meanings when used in the plural form and vice versa.

Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.

All references herein to Sections shall be deemed references to Sections of this Share Issuance Agreement unless the context shall otherwise require.

Unless otherwise indicated, (i) the term "including" means "including without limitation," except when used in the computation of time periods, and (ii) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein).

For purposes of the computation of time periods, whenever this Share Issuance Agreement provides for an event to occur "within" a specified number of days of a preceding event, it shall mean that the latter event shall occur before the close of business on the last of the specified days, and the day on which the preceding event occurs shall not be included in the computation of days elapsed. The word "from" means "from and including", "after" means "after and excluding", and "to" and "until" mean "to and including".

Section 2. <u>Share Issuance Obligation</u>. At any time upon the occurrence and during the continuance of an Event of Default, the Trusts' Representative may (but shall not be obligated to) provide the Obligor with a Demand for Issuance of the Section 524(g) Shares. Promptly upon the receipt by the Obligor of such Demand for Issuance of the Section 524(g) Shares, the Obligor shall issue the Section 524(g) Shares in consideration of a reduction (on a pro rata basis based upon the then outstanding Deferred Payments) of the amount of Deferred Payments as defined in each of the Deferred Payment Agreements, and shall transfer and deliver to the Trusts' Representative such Section 524(g) Shares by issuing, transferring and delivering to the Trusts'

4

Representative one duly issued stock certificate registered in the name of the Trusts' Representative representing the Section 524(g) Shares or, if the shares of Common Stock of the Obligor are at the time of the issuance hereunder permitted to be uncertificated and the Trusts' Representative so requests, the Obligor shall cause the Section 524(g) Shares to be credited to the name and account of the Trusts' Representative on the stock transfer books and records of the Obligor as maintained by the Obligor or its transfer agent.

Section 3.  Deferred Payment Obligations.  (a) The obligation to issue the Section 524(g) Shares shall secure and serve as support and credit enhancement for the prompt and complete payment when due (whether by acceleration or otherwise) of each Deferred Payment (including interest thereon, if any) to the Trusts and pursuant to the Deferred Payment Agreements, each as the same may from time to time be amended, modified, supplemented, extended, renewed, deferred, refinanced, replaced, refunded or restated, in whole or in part, in accordance with the terms and conditions thereof, by operation of Law or otherwise, in each case, with the consent of Parent and the applicable Trust (collectively, the "Deferred Payment Obligations").

(b) To the extent that the Trusts' Representative exercises its rights on behalf of the Trust (PI) under this Share Issuance Agreement and the Section 524(g) Shares are issued and delivered to it on behalf the Trusts, the amount of the remaining Deferred Payments shall be reduced by the Fair Market Value of the Section 524(g) Shares allocated to the Trusts in the manner set forth in Section 4 of the Intercreditor Agreement (as such Section 4 of the Intercreditor Agreement, together with any defined terms used (directly or indirectly) in such Section 4 are in effect as of the date hereof, or as amended or modified from time to time with the consent (not to be unreasonably withheld) of Grace and Parent Guarantor after the date hereof.

Section 4.  Representations and Warranties.  The Obligor hereby represents and warrants to each of the Trusts and to the Trusts' Representative that, as of the Effective Date and as of the time of issuance of the Section 524(g) Shares, the following are true and correct:

(a) The issuance of the Section 524(g) Shares has been duly and validly authorized as of the Effective Date and as of the time of such issuance.

(b) As of the Effective Date, the number of Section 524(g) Shares is equal to fifty and one tenth (50.1) percent of the total number shares of Common Stock issued and outstanding as of the Effective Date (after giving effect to any issuance of shares of Common Stock on the Effective Date).

(c) The rights granted hereunder to the Trusts' Representative for the benefit of each Trust to be issued the Section 524(g) Shares do not and will not conflict in any material respect with the rights granted to other holders of the Obligor's securities under any other agreements.

(d) As of the Effective Date, the Obligor's Board of Directors has approved this Share Issuance Agreement and the transactions contemplated hereby, including the issuance, upon the terms and subject to the conditions set forth in this Share Issuance Agreement, of the Section 524(g) Shares to the Trusts' Representative for the benefit of each Trust, and has taken all actions within its control to ensure that such issuance shall not be subject to the provisions or restrictions of Section 203 of Delaware General Corporation Law or any other business combination, interested stockholder, fair price, control share acquisition, or other Law regulating

5

mergers, acquisitions, change of control transactions, voting rights or share acquisitions which is in effect as of the Effective Date and applicable to such issuance.

Section 5.  Covenants.  The Obligor hereby covenants and agrees, with respect to each Deferred Payment Agreement until such time as the corresponding Deferred Payments Obligations thereunder have been paid in full, as follows:

(a) Upon issuance (if any) of the Section 524(g) Shares pursuant to a Demand for Issuance of Section 524(g) Shares, and assuming compliance by each of the Trusts and the Trusts' Representative with its obligations under the Plan of Reorganization, the Confirmation Order and Section 2 of this Share Issuance Agreement, the Section 524(g) Shares shall be duly authorized, duly and validly issued, fully paid and non-assessable, and free and clear of any Liens and any preemptive or similar rights.  In addition, to the extent permitted by applicable Law and listing requirements and regulations of any Governmental Authority and/or relevant securities exchanges, concurrently with the issuance of Section 524(g) Shares, such shares shall be listed for trading on the New York Stock Exchange (or any successor thereto) and all other securities exchanges upon which the Common Stock is listed or traded.

(b) The Obligor shall reserve and keep available, free from preemptive or similar rights (other than rights created pursuant to this Share Issuance Agreement, the other Deferred Payment Documents or the Plan of Reorganization), for issuance shares of Common Stock in an amount at least equal to the Section 524(g) Shares.  The Obligor shall promptly pay all Taxes, expenses and charges attributable to the issuance or delivery of the Section 524(g) Shares, but any Taxes, expenses or charges in connection with the issuance of such shares in any name other than that of the Trusts' Representative shall be paid by the Trusts' Representative.

(c) Neither the Obligor nor Grace shall create (other than pursuant to this Share Issuance Agreement, the other Deferred Payment Documents or the Plan of Reorganization) any Liens or any preemptive or similar rights on the Section 524(g) Shares).

(d) The Obligor shall take, or cause to be taken, all actions necessary to (i) comply with all applicable requirements of any material Law which may be imposed on the Obligor or any of its Controlled Affiliates with respect to the issuance of the Section 524(g) Shares to the Trusts' Representative; (ii) obtain any material consent, authorization, order or approval of, or any exemption by or from, and shall register or qualify with or provide any notice to, any Governmental Authority or Entity which is required or necessary pursuant to any material Law to be obtained, performed or made by the Obligor or any of its Controlled Affiliates in order to consummate the issuance of the Section 524(g) Shares to the Trusts' Representative on behalf of the Trusts; (iii) to the extent within the control of the Obligor and its Controlled Affiliates (through its or their boards of directors, stockholders, other governing bodies, managements or otherwise), cause the issuance of the Section 524(g) Shares to the Trusts' Representative on behalf of the Trusts not to be subject to and/or not to trigger, as the case may be, any (A) "poison pill," shareholder or stockholder rights plan, other anti-takeover or takeover defense provision contained in the Governing Documents of the Obligor or its Controlled Affiliates, (B) change of control or severance or "golden parachute" agreement, plan or provision of or to which the Obligor or any of its Controlled Affiliates is a party, (C) business combination, interested stockholder, fair price, control share acquisition, or other Law regulating mergers, acquisitions, change of control transactions, voting rights or share acquisitions, and (iv) to the extent within

6

the control of the Obligor and its Controlled Affiliates (through its or their boards of directors, stockholders, other governing bodies, managements or otherwise), cause the Trusts' Representative (acting for the benefit of each of the Trusts) ownership or voting rights with respect to the Section 524(g) Shares not to be limited, qualified, diluted or restricted by any plan, provision, agreement or Law referred to in clauses (iii)(A) through (iii)(C).

(e) The Obligor shall not enter into any agreement with respect to its securities which conflicts with the rights granted to the Trusts' Representative for the benefit of the Trusts pursuant to this Share Issuance Agreement or the provisions hereof.  The Obligor will not, by amendment of its Governing Documents or through any Transaction or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Obligor.

(f) Concurrently with the issuance of Section 524(g) Shares, the Obligor shall deliver to the Trusts' Representative an opinion of the Obligor's outside counsel on such customary and appropriate matters concerning due authorization, receipt of approvals, issuance and compliance with the securities laws as the Trusts' Representative may reasonably request.

Section 6.  Adjustment Events.  (a) If at any time after the date hereof the Obligor shall (a) issue a stock dividend in respect of shares of Common Stock, (b) effect a stock split or reverse stock split in respect of shares of Common Stock, (c) otherwise subdivide or combine shares of Common Stock and/or (d) amend its Governing Documents, or otherwise change or recapitalize its capital structure, in any manner that results in one share of Common Stock being converted into more or less than one share of Common Stock (each a "Mechanical Adjustment Event"), the number of Section 524(g) Shares issuable under this Share Issuance Agreement shall automatically be adjusted such that, upon issuance (if any), the Trusts' Representative shall be entitled to receive a number of Section 524(g) Shares equal to (a) in the case of a stock dividend, the sum of (i) the number of Section 524(g) Shares the Trusts' Representative would have been entitled to receive if the Section 524(g) Shares had been issued immediately prior to the consummation of such Mechanical Adjustment Event (the "Pre-Adjustment Number") plus (ii) the product obtained by multiplying (x) the Pre-Adjustment Number by (y) the number of shares of Common Stock to be issued as a stock dividend in respect of each outstanding share of Common Stock and (b) in the case of any other Mechanical Adjustment Event, the product obtained by multiplying (i) the Pre-Adjustment Number by (ii) the number of shares of Common Stock into which each share of Common Stock shall be converted in such Mechanical Adjustment Event.

(b)      In addition, if at any time after the date hereof the Obligor shall issue or sell any shares of Common Stock, other than Excluded Stock, or any rights (including any (x) options (other than Excluded Options), warrants or other rights to purchase or acquire Common Stock, other than Excluded Stock (whether or not at the time exercisable), or (y) securities by their terms convertible into or exchangeable for Common Stock, other than Excluded Stock (whether or not at the time so convertible or exchangeable) or options, warrants or rights to purchase such convertible or exchangeable securities), for no consideration or for a consideration per share that is less than the Fair Market Value of the Common Stock (a "Dilution Adjustment Event" and collectively with Mechanical Adjustment Events, "Adjustment Events"), the number of Section 524(g) Shares issuable under this Share Issuance Agreement shall automatically be adjusted such that, upon issuance (if any), the Trusts' Representative shall receive the greater of (i) a number of

7

Section 524(g) Shares having a Fair Market Value equal to the number of Section 524(g) Shares the Trust would have received had the Dilution Adjustment Event not occurred or (ii) a number of Section 524(g) Shares equal to the percentage of the total number of issued and outstanding shares of Common Stock the Trusts' Representative, on behalf of the Trusts, would have received had the Dilution Adjustment Event not occurred.  For purposes of this Section 6(b), (i) "Excluded Stock" means shares of Common Stock issued and sold in a registered firm commitment underwritten public offering pursuant to a registration statement declared effective in accordance with the Securities Act of 1933, as amended, or any successor statute thereto, (ii) "Excluded Options" means options to purchase shares of Common Stock issued to directors, officers, employees and consultants of Obligor or any of its Controlled Affiliates (x) pursuant to an option plan or arrangement approved by either the stockholders of Obligor or the Bankruptcy Court before which the chapter 11 proceedings of Obligor and certain of its affiliates were heard and (y) with an exercise price equal to the average of the high and low trading prices of Common Stock on the New York Stock Exchange (or if the Common Stock is not traded on the New York Stock Exchange, on the principal stock exchange on which it trades) on the date of grant of the option and (iii) Fair Market Value shall be determined as the of the last trading date immediately prior to the date of consummation of the issuance or sale constituting the Dilution Adjustment Event.

(c)   For the avoidance of doubt, and notwithstanding anything to the contrary in Section 6(a) or 6(b), in no event shall any issuance of any shares of Common Stock or other equity securities of the Obligor in any circumstance other than as specified in such immediately preceding two sentences constitute or result in an Adjustment Event, including (i) any sale or other issuance of Common Stock or other equity securities other than pursuant to a Dilution Adjustment Event, (ii) in connection with any purchase or other acquisition by the Obligor of, and/or as consideration for, the equity or debt securities or assets of any other Entity or (iii) in connection with any merger or consolidation of the Obligor or any of its subsidiaries with or into any other Entity.

Section 7.   Registration Rights.  Prior to or concurrently with the issuance of the Section 524(g) Shares, the Obligor shall (i) file a registration statement on the appropriate form to register the Section 524(g) Shares under the Securities Act of 1933 and shall use its reasonable best efforts to have such registration statement declared effective on or as soon as practicable following the date of issuance and (ii) make all necessary filings under and/or obtain all necessary exemptions pursuant to all other applicable United States and all state and foreign securities or blue sky Laws.  In connection with the filing of any such registration statement and the sale of the Section 524(g) Shares pursuant thereto, the Trusts' Representative shall pay for and bear on behalf of the Trusts (and be reimbursed by the Trusts pursuant to Section 8(b) of the Intercreditor Agreement) all (i) registration, filing and stock exchange listing fees, and reasonable fees and disbursements of printers and accountants for the Obligor; (ii) all legal fees and disbursements and other expenses of the Obligor complying with state securities or blue sky laws of any jurisdictions in which the securities to be offered are to be registered or qualified; and (iii) the reasonable fees and expenses of one counsel for the Obligor in connection therewith.

Section 8.   Waiver of Demand, etc.   The Obligor hereby waives demand, payment, notice of dishonor or protest and all other notices of any kind in connection with the Deferred Payment Obligations except the Demand for Issuance of the Section 524(g) Shares and any other notices

8

required by law or by this Share Issuance Agreement or any other agreement between the Obligor and the Trusts' Representative or either Trust.

Section 9. <u>Expenses</u>. The Obligor shall reimburse the Trusts' Representative promptly upon demand for all documented out-of-pocket costs and expenses, including all attorney's fees and expenses of legal counsel, arising out of or incurred by the Trusts' Representative in connection with the enforcement of any rights or actions of the Trusts' Representative under this Share Issuance Agreement, but only to the extent that the Trusts' Representative succeeds in enforcing this Share Issuance Agreement.

Section 10. <u>Modification</u>. No provision of this Share Issuance Agreement may be amended, supplemented or modified except by a written instrument executed by each of the Trusts' Representative, Parent and Grace. The Trusts' Representative and the Trusts agree not to amend, supplement or modify Section 2(f) and Section 12 of the Intercreditor Agreement, including any defined terms used therein or underlying defined terms, without the prior written consent of Parent and any amendment in breach of this Section 10 shall be null and void and have no force or effect.

Section 11. <u>Notices</u>. Except as otherwise expressly provided herein, all notices and other communications made or required to be given pursuant to this Share Issuance Agreement shall be made in accordance with the provisions of Section 18 of the Deferred Payment Agreement.

Section 12. <u>Assignment</u>.

(a) This Share Issuance Agreement shall be binding upon the Obligor and upon the successors and permitted assigns of the Obligor and shall inure to the benefit of the Trusts' Representative and the Trusts. The successors and assigns of the Obligor shall include their respective receivers, trustees or debtors-in-possession.

(b) Neither the Trusts' Representative nor any of the Trusts may Transfer this Share Issuance Agreement or any of its rights, interests, duties, liabilities or obligations under this Share Issuance Agreement without the prior written consent of the Obligor.

(c) Subject to <u>Section 12(d)</u> hereof, the Obligor shall not Transfer this Share Issuance Agreement or any of its rights, interests, duties, liabilities or obligations under this Share Issuance Agreement without the prior written consent of the Trusts' Representative.

(d) Subject to <u>Section 12(e)</u>, neither <u>Section 12(c)</u> nor anything else in this Share Issuance Agreement shall prohibit or restrict the ability of the Obligor to undertake any Transaction; <u>provided</u> that, unless the Trusts' Representative otherwise consents in writing, (i) such Transaction shall not violate Section 6(b) of any Deferred Payment Agreement or Section 7(b) of any Parent Guarantee; (ii) no Event of Default (as defined in the Deferred Payment Agreement) and, no event which, with the giving of notice or the passage of time, would constitute an Event of Default, exists at the time of, or would exist immediately following, the consummation of such Transaction; (iii) such Transaction shall not conflict with, or result in a breach of, any of the provisions of, or constitute a default under, the Governing Documents of the Obligor or the surviving or succeeding Entity that results from such Transaction; and (iv) at least ten (10) business days prior to consummation of such Transaction, the Obligor shall, subject

9

to reasonable confidentiality arrangements between the Trusts' Representative and the Obligor, deliver to the Trusts' Representative written notice of its intention to consummate such Transaction.

(e) If the surviving or succeeding Entity as a result of any such Transaction is not the Obligor, then prior to, or concurrently with, the consummation of any such Transaction, the surviving or succeeding Entity shall, by written instrument substantially in the form of Exhibit A, expressly assume the rights and obligations of the Obligor hereunder (it being expressly acknowledged and agreed by the Obligor, the Trusts and the Trusts' Representative that such written instrument shall, and shall expressly provide that it shall, be binding upon, and inure to the benefit of, the Trusts, the Trusts' Representative, the Obligor and such surviving or succeeding Entity whether or not the Trusts' Representative shall have executed such written instrument); provided, however, that the Obligor shall not be discharged from, and shall remain liable for, any and all of its duties, liabilities and obligations under this Share Issuance Agreement.  The provisions of Section 12(d) and Section 12(e) hereof shall apply to successive events constituting a Transaction.

(f) The Obligor shall be responsible for, and shall pay promptly upon demand all documented and direct out-of-pocket costs and expenses incurred by the Trusts' Representative (including legal fees and expenses of one legal counsel) in connection with any Transaction proposed by the Obligor if the Trusts' Representative challenges such Transaction in a judicial or other proceeding or otherwise as being in breach of the provisions of the Deferred Payment Documents and the Trusts' Representative is successful in such challenge.

(g) Any assignment or transfer in breach of this Section 12 shall be null and void and shall not Transfer any right, interest, duty, liability or obligation in or under this Share Issuance Agreement to any Entity.

Section 13.  Authorization to Disclose Information to Trusts.  The Obligor hereby authorizes the Trusts' Representative to disclose and furnish to the Trusts any information or documentation that the Trusts' Representative receives from the Obligor or any of its Subsidiaries or Affiliates in connection with or related to the Section 524(g) Shares, this Share Issuance Agreement and the other Deferred Payment Documents.

Section 14.  Severability.  Whenever possible, each provision of this Share Issuance Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Share Issuance Agreement by any party hereto is held to be invalid, void, voidable, illegal or unenforceable in any respect under any applicable Law in any jurisdiction, such event will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, or the obligations of any other party to this Share Issuance Agreement, and this Share Issuance Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, void, voidable, illegal, unenforceable or rejected provision had never been contained herein. The parties hereto further agree to use commercially reasonable efforts to replace such invalid, void, voidable, illegal, unenforceable or rejected provision of this Share Issuance Agreement with an effective, valid and enforceable provision which will achieve, to the fullest extent possible, the economic, business and other purposes of the invalid, void, voidable, illegal, unenforceable or rejected provision.

10

Section 15. <u>Further Assurances</u>.  The Obligor at its sole cost and expense shall execute, acknowledge and deliver all such instruments and take all such action as the Trusts' Representative from time to time may reasonably request in order to further effectuate the purposes of this Share Issuance Agreement and to carry out the terms hereof.

Section 16. <u>Survival of Representations and Warranties</u>.  All representations and warranties contained in this Share Issuance Agreement shall survive the execution and delivery of this Share Issuance Agreement, the Deferred Payment Agreements and the other Deferred Payment Documents.

Section 17. <u>Not a Security Agreement</u>.  The parties hereto acknowledge and agree that this Share Issuance Agreement does not constitute a security agreement, including without limitation a "security agreement" as defined in the Uniform Commercial Code of any relevant jurisdiction, and nothing herein or in any other Deferred Payment Document constitutes an authorization for the Trusts' Representative or any other Entity (including any Trust) to file a financing statement under the UCC or otherwise seek to perfect a purported security interest against Grace, the Obligor or any other Entity.

Section 18. <u>Captions</u>.  Captions and headings in this Share Issuance Agreement are for convenience only and in no way define, limit or describe the scope or intent of the provisions hereof.

Section 19. <u>Termination</u>.  Upon payment in full of the Deferred Payment Obligations (other than indemnities), this Share Issuance Agreement shall automatically terminate and shall become null and void and of no further force and effect, except for such provisions expressly stated to survive such termination.

Section 20. <u>Conflict</u>.  In the event that there is a conflict between any provision of this Share Issuance Agreement and the Deferred Payment Agreement, the provisions of the Deferred Payment Agreement shall control.

Section 21. <u>Governing Law; Jurisdiction</u>.

(a) This Share Issuance Agreement and the rights and obligations of the parties hereto shall be construed in accordance with the laws of the State of New York, without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

(b) With respect to all claims, suits, actions, proceedings and other disputes arising out of, in respect of or relating to this Share Issuance Agreement (such claims, suits, actions, proceedings, and other disputes, the "<u>Claims</u>") each of the parties to this Share Issuance Agreement hereby irrevocably submits to the jurisdiction of the Bankruptcy Court for the District of Delaware or the United States District Court for the District of Delaware, or, if both such Courts are not permitted under applicable Law to exercise jurisdiction with respect to the matter in question then, at the sole election of the Trusts' Representative, to the jurisdiction of any other federal or state court in the state, county and city of New York, New York (the "<u>Courts</u>"), and each of the parties to this Share Issuance Agreement agrees that any and all

11

Claims may be brought, heard and determined in such Courts.

(c) Each of the parties to this Share Issuance Agreement agrees that (i) venue shall be proper in such Courts and hereby waives any objection or defense which it may now or hereafter have to the laying of venue in such courts, including any of the foregoing based upon the doctrine of *forum non conveniens*; and (ii) all process which may be or be required to be served in respect of any such Claim (including any pleading, summons or other paper initiating any such Claim) may be served upon it, which service shall be sufficient for all purposes, in the manner for the provision of notice under Section 18 of the Deferred Payment Agreement and shall be deemed in every respect effective service of process upon such party when so given.

(d) EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS SHARE ISSUANCE AGREEMENT OR ANY OF THE DEFERRED PAYMENT DOCUMENTS.  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS SHARE ISSUANCE AGREEMENT AND THE OTHER DEFERRED PAYMENT DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PROVISION.

Section 22.  Specific Performance.  Each of the parties hereto acknowledges and agrees that, in the event of any breach of, or any failure to perform, any specific provision of this Share Issuance Agreement, the non-breaching party would be irreparably and immediately harmed and could not be made whole by monetary damages.  It is accordingly agreed that, subject to Section 7 of each Deferred Payment Agreement, the parties hereto (a) shall be entitled, in addition to any other remedy to which they may be entitled at law or in equity, to compel specific performance of any specific provision of this Share Issuance Agreement or to obtain injunctive relief to prevent breaches of any specific provision of this Share Issuance Agreement exclusively in the Courts, (b) shall waive, in any action for specific performance or injunctive relief, the defense of the adequacy of a remedy at law, and (z) shall waive any requirement for the securing or posting of any bond in connection with the obtaining of any such specific performance or injunctive relief. For the avoidance of doubt, the parties agree that the Trusts' Representative on behalf of each Trust shall be entitled to enforce specifically the terms and provisions of this Share Issuance Agreement to prevent breaches of or enforce compliance with (i) those covenants of the Obligor that require the Obligor to issue the Section 524(g) Shares if the conditions to the Obligor's obligations to issue such shares as set forth in Section 2 have been satisfied or waived and (ii) the covenants and agreements of the Obligor set forth in Section 5. The Trusts' Representative's pursuit of specific performance or injunctive relief at any time will not be deemed an election of remedies or waiver of the right to pursue any other right or remedy to which the Trusts' Representative or either Trust may be entitled, including without limitation the right to pursue remedies for liabilities or damages incurred or suffered by the Trusts' Representative or either Trust.

12

Section 23.  <u>Complete Agreement</u>.  This Share Issuance Agreement, together with the Deferred Payment Agreements, the Parent Guarantees, the Intercreditor Agreement, the Plan of Reorganization and the Confirmation Order, embodies the complete agreement and understanding between the parties hereto in respect of the subject matter hereof and supersedes, preempts and terminates all other prior understandings, agreements or representations by or among the parties hereto, written or oral, to the extent relating thereto.

Section 24.  <u>Waivers</u>.  Any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the party waiving compliance.  Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Share Issuance Agreement, in any one or more instances, shall not be deemed to be nor construed as a further or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Share Issuance Agreement.  No action taken pursuant to this Share Issuance Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, condition or agreement contained herein.

Section 25.  <u>Execution in Counterparts</u>.  This Share Issuance Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts (including, without limitation, by facsimile or portable document format (pdf)), each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

Section 26.  <u>No Third Party Beneficiaries</u>.  There are no third party beneficiaries of this Share Issuance Agreement and nothing in this Share Issuance Agreement, express or implied, is intended to confer on any Entity other than the parties hereto and their respective successors, and assigns, any rights, remedies, obligations or liabilities.

Section 27.  <u>Other Remedies</u>.  Except as otherwise provided herein, any and all remedies herein expressly conferred upon a party shall be deemed cumulative with and not exclusive of any other remedy conferred hereby or by law on such party, and the exercise of any one remedy shall not preclude the exercise of any other.

[Signature page follows]

13

IN WITNESS WHEREOF, the parties hereto have duly executed this Share Issuance Agreement as of the date first above written.

OBLIGOR:                              W. R. GRACE & CO.


By: _____
        Name:
        Title:

14

TRUST (PI):                         WRG ASBESTOS PI TRUST

By: _____
     Name:
     Trustee

TRUST (PD/ZAI):            WRG ASBESTOS PD TRUST,
on behalf of the Holders of the US ZAI PD Claims
and the Holders of Asbestos PD Claims

By: _____
     Name:
     Trustee

TRUSTS' REPRESENTATIVE:    WRG ASBESTOS PI TRUST,
as representative for the Trusts pursuant to the terms
of the Intercreditor Agreement

By: _____
     Name:
     Trustee

## EXHIBIT A

ASSUMPTION AGREEMENT

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| **In re:** | ) | Chapter 11 |
|  | ) |  |
| **W. R. GRACE & CO., *et al.*[1]** | ) | Case No. 01-01139 (JKF) |
|  | ) | Jointly Administered |
| **Debtors.** | ) |  |
|  | ) |  |
|  | ) |  |
|  | ) |  |

## EXHIBIT 21 TO EXHIBIT BOOK
## UNRESOLVED ASBESTOS PD CLAIMS SCHEDULE

**EXHIBIT 21**

Attached.

---

[1]  The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife  Boston Ltd., Alewife Land Corporation, Amicon, Inc.,  CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

**Total Remaining Active PD Claims and PD Claims on Appeal**

| | **I. Active PD Claims** |
|---|---|

| | **Speights Canadian Claims** |
|---|---|

| | **Claimant Name** | **Claim Number** | **Counsel** | **Firm Name** | **Building Name** | **Property Address** |
|---|---|---|---|---|---|---|
| 1 | 354401 Alberta LTD. C/O Redcliff Realty Management Inc. | 011620 | Daniel A Speights | Speights & Runyan | | 287 Broadway Winnipeg, MB R3c0r9 |
| 2 | Avalon East School Board | 012491 | Daniel A Speights | Speights & Runyan | | 391 Topsail Road St John's, NL A1e2b7 |
| 3 | Calgary Board Of Education | 012454 | Daniel A Speights | Speights & Runyan | James Fowler High | 4004-4th St. Nw Calgary, AB T2k1a1 |
| 4 | Calgary Board Of Education | 012457 | Daniel A Speights | Speights & Runyan | Kingsland Elementary | 7430 5th Street Sw Calgary, AB T2v1b1 |
| 5 | Calgary Board Of Education | 012443 | Daniel A Speights | Speights & Runyan | William Aberhart High | 3009 Morley Trail Nw Calgary, AB T2m4g9 |
| 6 | Calgary Board Of Education | 014885 | Daniel A Speights | Speights & Runyan | Altadore Elementary | 4506 16th Street SW Calgary, AB T2t4h9 |
| 7 | Calgary Board Of Education | 012442 | Daniel A Speights | Speights & Runyan | Wildwood Elementary | 120 45th Street Sw Calgary, AB T3c2b3 |
| 8 | Calgary Board Of Education | 012570 | Daniel A Speights | Speights & Runyan | Balmoral Junior High | 220 16th Avenue Calgary, AB T2m0h4 |
| 9 | Calgary Board Of Education | 012590 | Daniel A Speights | Speights & Runyan | Parkdale Elementary | 728 32nd Street NW Calgary, AB T2n2v9 |
| 10 | Calgary Board Of Education | 012591 | Daniel A Speights | Speights & Runyan | Queen Elizabeth High | 512 18th Street NW Calgary, AB T2n2g5 |
| 11 | Calgary Board Of Education | 012438 | Daniel A Speights | Speights & Runyan | Vincent Massey Junior High | 939 45th St Sw Calgary, AB T3c2b9 |
| 12 | Calgary Board Of Education | 012439 | Daniel A Speights | Speights & Runyan | Viscount Bennett | 2519 Richmond Road Sw Calgary, AB T3e4m2 |
| 13 | Calgary Board Of Education | 012412 | Daniel A Speights | Speights & Runyan | Cambrian Heights Elementary | 640 Northmount Dr Nw Calgary, AB T2k3j5 |
| 14 | Calgary Board Of Education | 012410 | Daniel A Speights | Speights & Runyan | Briar Hill Elementary | 1233 21st Street Nw Calgary, AB T2n2l8 |
| 15 | Canadian Imperial Bank Of Commerce | 012536 | Daniel A Speights | Speights & Runyan | | 215 Water Street St John's, NL A1c6c9 |
| 16 | City Of Edmonton | 012489 | Daniel A Speights | Speights & Runyan | Century Place | 9803 102a Avenue Edmonton, AB T5j3a3 |

| | Claimant Name | Claim Number | Counsel | Firm Name | Building Name | Property Address |
|---|---|---|---|---|---|---|
| 17 | City Of Vancouver | 012476 | Daniel A Speights | Speights & Runyan | Q.E. And Playhouse Theatres | 649-695 Cambie Vancouver, BC |
| 18 | City Of Vancouver | 012346 | Daniel A Speights | Speights & Runyan | Parkade | 700 Georgia Street Vancouver, BC |
| 19 | Edmonton Public Schools | 012549 | Daniel A Speights | Speights & Runyan | Wellington School | 13160 127 Street Edmonton, AB T5l1b2 |
| 20 | Edmonton Public Schools | 012557 | Daniel A Speights | Speights & Runyan | Eastglen School | 11430 68 Street Edmonton, AB T5b1p1 |
| 21 | Edmonton Public Schools | 012554 | Daniel A Speights | Speights & Runyan | Woodcroft School | 13750 Woodcroft Avenue Edmonton, AB T5t5x9 |
| 22 | Edmonton Public Schools | 012548 | Daniel A Speights | Speights & Runyan | Victoria School | 10210 108 Avenue Edmonton, AB T5h1a8 |
| 23 | Edmonton Public Schools | 012546 | Daniel A Speights | Speights & Runyan | Strathcona School | 10450 72 Avenue Edmonton, AB T6e0z6 |
| 24 | Edmonton Public Schools | 012542 | Daniel A Speights | Speights & Runyan | North Edmonton School | 6920 128 Avenue Edmonton, AB T5c1s7 |
| 25 | Edmonton Public Schools | 012576 | Daniel A Speights | Speights & Runyan | JA Fife School | 15004 76 Street Edmonton, AB T6c1c2 |
| 26 | Edmonton Public Schools | 012541 | Daniel A Speights | Speights & Runyan | Newton School | 5523 122 Avenue Edmonton, AB T5w1s3 |
| 27 | Edmonton Public Schools | 012394 | Daniel A Speights | Speights & Runyan | Bonnie Doon School | 8205 90 Avenue Edmonton, AB T6c1n8 |
| 28 | Edmonton Public Schools | 012377 | Daniel A Speights | Speights & Runyan | Delton School | 12126 89 Street Edmonton, AB T5b3w4 |
| 29 | Edmonton Public Schools | 012388 | Daniel A Speights | Speights & Runyan | Allendale | 6415 106 Street Edmonton, AB T6h2v5 |
| 30 | Edmonton Public Schools | 012537 | Daniel A Speights | Speights & Runyan | Parkview School | 14313 92 Street Edmonton, AB T5r3b3 |
| 31 | Edmonton Public Schools | 012503 | Daniel A Speights | Speights & Runyan | Sherbrooke School | 12245 131 Street Edmonton, AB T5l1m8 |
| 32 | Edmonton Public Schools | 012500 | Daniel A Speights | Speights & Runyan | Ritchie School | 9750 74 Avenue Edmonton, AB T6j1t4 |
| 33 | Edmonton Public Schools | 012498 | Daniel A Speights | Speights & Runyan | Queen Alexandra School | 7730 106 Street Edmonton, AB T6g0x4 |
| 34 | Edmonton Public Schools | 012496 | Daniel A Speights | Speights & Runyan | Prince Rupert School | 11515 113 Avenue Edmonton, AB T5g0j3 |

| | Claimant Name | Claim Number | Counsel | Firm Name | Building Name | Property Address |
|---|---|---|---|---|---|---|
| 35 | Edmonton Public Schools | 012501 | Daniel A Speights | Speights & Runyan | Ross Sheppard School | 13546 111 Avenue Edmonton, AB  T5m2p2 |
| 36 | Fairmall Leasehold Inc | 012396 | Daniel A Speights | Speights & Runyan | Fairview Mall | 1800 Sheppard Ave E, Ste330 P.O. Box 330 Willowdale, ON  M2j5a7 |
| 37 | Great West Life | 012534 | Daniel A Speights | Speights & Runyan | | 199 Bay Street, Commerce Court West Toronto, ON  M5l1e2 |
| 38 | Hamilton District School Board | 011684 | Daniel A Speights | Speights & Runyan | Westview School | 60 Rolston Drive Hamilton, ON  L9c3x7 |
| 39 | Hamilton District School Board | 011682 | Daniel A Speights | Speights & Runyan | Sir John A. Macdonald Secondary School | 130 York Boulevard Hamilton, ON  L8r1y5 |
| 40 | Hamilton District School Board | 011681 | Daniel A Speights | Speights & Runyan | Sir Alan MacNabb School | 145 Magnolia Drive Hamilton, ON  L9c5p4 |
| 41 | Hamilton District School Board | 011680 | Daniel A Speights | Speights & Runyan | Sherwood Heights School | 105 High Street Hamilton, ON  L8t3z4 |
| 42 | Hamilton District School Board | 011678 | Daniel A Speights | Speights & Runyan | Pauline Johnson Public School | 25 Hummingbird Lane Hamilton ON  L9a4b1 |
| 43 | Hamilton District School Board | 011322 | Daniel A Speights | Speights & Runyan | Sherwood Secondary School | 25 High Street Hamilton, ON  L8t3z4 |
| 44 | Hamilton District School Board | 011323 | Daniel A Speights | Speights & Runyan | Scott Park Secondary | 1055 King Street West Hamilton, ON  L8m1e2 |
| 45 | Health Care Corporation Of St.John's | 012493 | Daniel A Speights | Speights & Runyan | | 300 Prince Philip Drive St John's, NL  A1b3v6 |
| 46 | Mc Master University | 012368 | Daniel A Speights | Speights & Runyan | McMaster University | 1280 Main Street West Hamilton, ON  L8s4m3 |
| 47 | Morguard Investments Limited | 012427 | Daniel A Speights | Speights & Runyan | | 55 City Centre Drive Mississauga, ON  L5b1m3 |
| 48 | Oxford Properties Group | 012421 | Daniel A Speights | Speights & Runyan | | 10025-102 Avenue Edmonton, AB  T5j2z1 |
| 49 | Oxford Properties Group | 012422 | Daniel A Speights | Speights & Runyan | Edmonton City Centre East | Between 100/101/102 & 102a St Edmonton, AB  T5j2y8 |
| 50 | Oxford Properties Group | 012423 | Daniel A Speights | Speights & Runyan | | 10088-102 Avenue Edmonton, AB  T5j2z1 |
| 51 | School District 68 Nanaimo-Ladysmith | 011627 | Daniel A Speights | Speights & Runyan | Nanaimo Senior Secondary | 3955 Wakesiah Ave Nanaimo, BC  V9r3k5 |

| | Claimant Name | Claim Number | Counsel | Firm Name | Building Name | Property Address |
|---|---|---|---|---|---|---|
| 52 | School District 68 Nanaimo-Ladysmith | 011632 | Daniel A Speights | Speights & Runyan | Woodlands Secondary | 1270 Strathmore Street Nanaimo, BC V9s2i9 |
| 53 | Toronto District School Board | 012304 | Daniel A Speights | Speights & Runyan | Deer Park Junior And Senior School | 23 Ferndale Avenue Toronto, ON M4t2b4 |
| 54 | Atlantic Shopping Centres LTD | 012490 | Daniel A Speights | Speights & Runyan | | 2000 Barrington Street Halifax, NS B3j3k1 |
| 55 | Great West Life - London Life | 012533 | Daniel A Speights | Speights & Runyan | | 2001 University Street Montreal, QC H3a2a6 |

## Speights U.S. Claims

| | Claimant Name | Claim Number | Counsel | Firm Name | Building Name | Property Address |
|---|---|---|---|---|---|---|
| 1 | Anderson Memorial Hospital | 011008 | Daniel A Speights | Speights & Runyan | | 800 North Fant Anderson, SC 29261 |
| 2 | John Muir Hospital | 011026 | Daniel A Speights | Speights & Runyan | | 1601 Ygnacid Valley Road, Walnut Creek, CA 94598 |
| 3 | St. Joseph's Hospital | 011243 | Daniel A Speights | Speights & Runyan | | 555 E. Market Street, Elmira, NY |
| 4 | North Arkansas Regional Medical Center | 010995 | Daniel A Speights | Speights & Runyan | | 620 N. Willow, Harrison, AR 72601 |
| 5 | 211 Main Street Building | 011099 | Daniel A Speights | Speights & Runyan | | 211 Main Street, San Francisco, CA 94105 |
| 6 | Bergdorf Building | 011027 | Daniel A Speights | Speights & Runyan | | 80 Coventry Street, Hartford, CT 06112 |
| 7 | Chicago Historical Society | 011104 | Daniel A Speights | Speights & Runyan | | Chicago, IL |
| 8 | F.F. Thompson Continuing Care Center, Inc. | 006636 | Daniel A Speights | Speights & Runyan | | 350 Parish Street, Canandaigua, NY 14424 |
| 9 | Glen Oak Country Club | 010749 | Daniel A Speights | Speights & Runyan | | 151 Post Avenue, Old Westberry, NY |
| 10 | Gulf Atlantic Properties, Inc. | 006637 | Daniel A Speights | Speights & Runyan | | 100 1st Avenue, South Saint Petersburg, FL 33701 |
| 11 | Hyatt Corporation | 009915 | Daniel A Speights | Speights & Runyan | | 5 Embarcadero, Sam Francisco, CA 94111 |
| 12 | KARK-TV and Morris Multimedia, Inc. | 009912 | Daniel A Speights | Speights & Runyan | | Third and Louisiana Streets, Little Rock, AR 72201 |
| 13 | KARK-TV and Morris Multimedia, Inc. | 009913 | Daniel A Speights | Speights & Runyan | | Third and Center Streets, Little Rock, AR 72201 |

| | Claimant Name | Claim Number | Counsel | Firm Name | Building Name | Property Address |
|---|---|---|---|---|---|---|
| 14 | Olympus 555 Properties LLC | 009684 | Daniel A Speights | Speights & Runyan | | 555 Broad Hollow Road, Melville, NY  11747 |
| 15 | Allegheny Center | 011037 and 011036 | Daniel A Speights | Speights & Runyan | | Allegheny Center, Pittsburgh, PA  15212 |
| 16 | Presidential Towers Condo | 011428 | Daniel A Speights | Speights & Runyan | | 1836 Metserott Road, Adelphi, MD  20783 |
| | | | | | | |
| | | | | | | |

**Other U.S. Claim**

| | Claimant Name | Claim Number | Counsel | Firm Name | Building Name | Property Address |
|---|---|---|---|---|---|---|
| 1 | Sheldon H Solow, Solow Development Corp., et al. | 007020 | Edward J Westbrook | Richardson Patrick Westbrook & Brickman LLC | | 9 West 57th Street New York, NY  10019 |
| | | | | | | |

**II. PD Claims on Appeal**

**Anderson Memorial Class Claims**

| | Claimant Name | Claim Number | Counsel | Firm Name | Building Name | Property Address |
|---|---|---|---|---|---|---|
| 1 | Anderson Memorial Hospital | 009911 | Daniel A. Speights | Speights & Runyan | Various | Various locations worldwide |
| 2 | Anderson Memorial Hospital | 009914 | Daniel A. Speights | Speights & Runyan | Various | Various locations statewide South Carolina |
| | | | | | | |

**State of California Department of General Services**

| | Claimant Name | Claim Number | Counsel | Firm Name | Building Name | Property Address |
|---|---|---|---|---|---|---|
| 1 | State of California Dept of General Services | 010653 | Steven Mandelsberg | Hahn & Hessen, LLP | | 7650 South Newcastle Road Stockton, CA 95213 |
| 2 | State of California Dept of General Services | 010662 | Steven Mandelsberg | Hahn & Hessen, LLP | | 744 P Street Sacramento, CA  95814 |
| 3 | State of California Dept of General Services | 010661 | Steven Mandelsberg | Hahn & Hessen, LLP | | 31 East Channel Street Stockton, CA  95202 |
| 4 | State of California Dept of General Services | 010660 | Steven Mandelsberg | Hahn & Hessen, LLP | | End of Highway 202 at Cummings Valley Tehachapi, CA 93561 |

| | Claimant Name | Claim Number | Counsel | Firm Name | Building Name | Property Address |
|---|---|---|---|---|---|---|
| 5 | State of California Dept of General Services | 010659 | Steven Mandelsberg | Hahn & Hessen, LLP | | 1234 East Shaw Ave. Fresno, CA 93710 |
| 6 | State of California Dept of General Services | 010657 | Steven Mandelsberg | Hahn & Hessen, LLP | | 2501 Harbor Blvd. Costa Mesa, CA 92626 |
| 7 | State of California Dept of General Services | 010656 | Steven Mandelsberg | Hahn & Hessen, LLP | | End of Highway 202 at Cummings Valley Tehachapi, CA 93561 |
| 8 | State of California Dept of General Services | 010654 | Steven Mandelsberg | Hahn & Hessen, LLP | | 2501 Harbor Blvd. Costa Mesa, CA 92626 |
| 9 | State of California Dept of General Services | 010655 | Steven Mandelsberg | Hahn & Hessen, LLP | | 5100 O'byrnes Ferry Road, Jamestown, CA 95327 |
| 10 | State of California Dept of General Services | 010652 | Steven Mandelsberg | Hahn & Hessen, LLP | | 714 P Street Sacramento, CA 95814 |
| 11 | State of California Dept of General Services | 010651 | Steven Mandelsberg | Hahn & Hessen, LLP | | 1234 East Shaw Ave. Fresno, CA 93710 |
| 12 | State of California Dept of General Services | 010650 | Steven Mandelsberg | Hahn & Hessen, LLP | | 10333 El Camino Real Atascadero, CA 93423 |
| 13 | State of California Dept of General Services | 010649 | Steven Mandelsberg | Hahn & Hessen, LLP | | 1416 9th Street Sacramento, CA 95814 |
| 14 | State of California Dept of General Services | 010648 | Steven Mandelsberg | Hahn & Hessen, LLP | | 28 Civic Center Plaza Santa Ana, CA 92701 |
| 15 | State of California Dept of General Services | 010658 | Steven Mandelsberg | Hahn & Hessen, LLP | | 3100 Wright Road Camarillo, CA 93010 |

| | Claimant Name | Claim Number | Counsel | Firm Name | Building Name | Property Address |
|---|---|---|---|---|---|---|
| 16 | State of California Dept of General Services | 014411 | Steven Mandelsberg | Hahn & Hessen, LLP | | 7650 S. Newcastle Road, Stockton, CA 95213 |
| | | | | | | |
| **Macerich Fresno** | | | | | | |
| 1 | Macerich Fresno Limited Partnership | 012758 | Gerald George | Pillsbury Winthrop LLP | | 645 East Shaw Avenue Fresno, CA   93710 |
| | | | | | | |
| **Speights & Runyan Late Authority Claims** | | | | | | |
| 1 | Mission Towers f/k/a Foxridge Office Building | 010516 | Daniel A. Speights | Speights & Runyan | Mission Towers | 57th Broadmore, Kansas City, KS |
| 2 | Bethesda Rehabilitation Hospital | 010533 | Daniel A. Speights | Speights & Runyan | Bethesda Rehabilitation Hospital | St. Paul, MN |
| 3 | First Tennessee Bank | 010533 | Daniel A. Speights | Speights & Runyan | First Tennessee Bank | Memphis, TN |
| 4 | First Tennessee Bank | 010534 | | | First Tennessee Bank | Memphis, TN |
| 5 | Washington Township Health Care District | 010668 | Daniel A. Speights | Speights & Runyan | Washington Hospital | Fremont, CA |
| 6 | New Hanover Regional Medical Center | 010672 | Daniel A. Speights | Speights & Runyan | New Hanover Regional Medical Center | Wilmington, NC |
| 7 | First Health Montgomery Memorial Hospital | 010673 | Daniel A. Speights | Speights & Runyan | First Health Montgomery Memorial Hospital | Troy, NC |
| 8 | Pierre Laclede Center Nos. 1 & 2 | 010696 | Daniel A. Speights | Speights & Runyan | Pierre Laclede Center Nos. 1 and 2 | Clayton, MO |
| 9 | St. Joseph's Hill Infirmary Nursing Home | 010700 | Daniel A. Speights | Speights & Runyan | St. Joseph's Hill Infirmary Nursing Home | St. Louis, MO |
| 10 | IBM Metro Employees FCU | 010722 | Daniel A. Speights | Speights & Runyan | | Bridge Plaza North at 41st Street, Long Island City, NY |
| 11 | Palos Commmunity Hospital | 011066 | Daniel A. Speights | Speights & Runyan | Palos Community Hospital | Palos, IL |
| 12 | St. Mary's Medical Center | 010746 | Daniel A. Speights | Speights & Runyan | St. Mary's Medical Center | 1st Avenue & 29th Street, Huntingdon, WV |

| | Claimant Name | Claim Number | Counsel | Firm Name | Building Name | Property Address |
|---|---|---|---|---|---|---|
| 13 | Friendly Home Nursing Care & Rehabilitation | 010747 | Daniel A. Speights | Speights & Runyan | | 3156 East Avenue, Rochester, NY |
| 14 | 99 Founders Plaza | 010762 | Daniel A. Speights | Speights & Runyan | 99 Founders Plaza | Gilbert Street, Hartford, CT |
| 15 | Oneida County Office Building | 010767 | Daniel A. Speights | Speights & Runyan | Oneida County Office Building | Oneida, NY |
| 16 | Manor Oak Two | 010789 | Daniel A. Speights | Speights & Runyan | Manor Oak Two | Greentree, PA |
| 17 | Cayuga County Office Building | 010947 | Daniel A. Speights | Speights & Runyan | | Auburn, NY |
| 18 | St. Luke's Hospital | 010998 | Daniel A. Speights | Speights & Runyan | St. Luke's Hospital | Bethlehem, PA |
| 18 | Schuyler Hospital | 011003 | Daniel A. Speights | Speights & Runyan | Schuyler Hospital | Montour Falls, NY |
| 20 | Santa Teresa Medical Office Building | 011018 | Daniel A. Speights | Speights & Runyan | Santa Teresa Medical Office Building | San Jose, CA |
| 21 | Nebraska Skilled Nursing and Rehabilitation | 011046 | Daniel A. Speights | Speights & Runyan | | Omaha, NE |
| 22 | Virtua Health - West Jersey Hospital Voorhees | 011226 | Daniel A. Speights | Speights & Runyan | | Voorhees, NJ |
| 23 | Titusville Area Hospital / Farrell Hospital | 011106 / 011144 | Daniel A. Speights | Speights & Runyan | | Titusville, PA |
| 24 | Hotel Captain Cook - Tower # 2 | 011110 | Daniel A. Speights | Speights & Runyan | Hotel Captain Cook | 5th & K Street, Anchorage, AK |
| 25 | Gundersen Lutheran Medical Center | 011124 | Daniel A. Speights | Speights & Runyan | Gundersen Lutheran Medical Center | Lacrosse, WI |
| 26 | Arkansas Baptist Health Medical Center | 011128 | Daniel A. Speights | Speights & Runyan | Arkansas Baptist Medical Center | Little Rock, AR |
| 27 | Abbeville General Hospital | 011133 | Daniel A. Speights | Speights & Runyan | Abbeville General Hospital | Abbeville, LA |
| 28 | St. Anthony's Regional Hospital & Nursing Home | 011151 | Daniel A. Speights | Speights & Runyan | St. Anthony's Hospital | Carroll, IA |
| 29 | Fulton County Health Center | 011158 | Daniel A. Speights | Speights & Runyan | Fulton County Health Center | S. Snoop Ave., Wausein, OH |
| 30 | Ohio Savings Plaza | 011179 | Daniel A. Speights | Speights & Runyan | | 1801 E. Ninth Street, Cleveland, OH |

| | Claimant Name | Claim Number | Counsel | Firm Name | Building Name | Property Address |
|---|---|---|---|---|---|---|
| 31 | YWCA of Greater Des Moines | 011153 | Daniel A. Speights | Speights & Runyan | | 8th & Grand Ave., Des Moines, IA |
| 32 | Scottish Rite Cathedral | 011200 | Daniel A. Speights | Speights & Runyan | Scottish Rite Cathedral | West & Linden Streets, Allentown, PA |
| 33 | First Tennessee Bank | 011722 | Daniel A. Speights | Speights & Runyan | National Bank Building | Memphis, TN |
| 34 | Panda Prints | 011257 | Daniel A. Speights | Speights & Runyan | | |
| 35 | McKenzie Williamette Medical Center | 011262 | Daniel A. Speights | Speights & Runyan | | Eugene, OR |
| 36 | Keller Building | 011384 | Daniel A. Speights | Speights & Runyan | Keller Memorial Hospital | Fayette, MO |
| 37 | Virtua West Jersey Hospital Marlton | 011389 | Daniel A. Speights | Speights & Runyan | | Evesham Township, NJ |
| 38 | The Homeplace of Mondovi Hospital | 011422 | Daniel A. Speights | Speights & Runyan | Buffalo Memorial Hospital | Mondovi, WI |
| 39 | Dodge County Hospital | 011550 | Daniel A. Speights | Speights & Runyan | | |
| 40 | Carson Pirie Scott Store - Store # 537 | 011555 | Daniel A. Speights | Speights & Runyan | | Waukegan, IL |
| 41 | Harry C. Levy Gardens | 011572 | Daniel A. Speights | Speights & Runyan | | Las Vegas, NV |
| 42 | Jordan Hospital, Inc. | 011689 | Daniel A. Speights | Speights & Runyan | | |
| 43 | University of New England - Westbrook College Campus | 011701 | Daniel A. Speights | Speights & Runyan | | |
| 44 | 1199 SEIU | 011703 | Daniel A. Speights | Speights & Runyan | 310 W. 43rd Street Building | 310 W. 43rd St., New York, NY |

[THIS PAGE INTENTIONALLY LEFT BLANK]

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| **In re:** | ) | Chapter 11 |
|  | ) |  |
| **W. R. GRACE & CO.,** *et al.*[1] | ) | Case No. 01-01139 (JKF) |
|  | ) | Jointly Administered |
| **Debtors.** | ) |  |
|  | ) |  |
|  | ) |  |
|  | ) |  |

**EXHIBIT 22 TO EXHIBIT BOOK
SEALED AIR SETTLEMENT AGREEMENT**

**EXHIBIT 22**

Attached.

---

[1]     The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc.,  CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case Nos. 01-1139 through 01-1200 |
| W.R. GRACE & CO., et al., | ) | |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| OFFICIAL COMMITTEE OF | ) | |
| ASBESTOS PERSONAL INJURY | ) | |
| CLAIMANTS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| -against- | ) | Adv. No. 02-2210 |
| | ) | [LEAD DOCKET] |
| SEALED AIR CORPORATION | ) | |
| and CRYOVAC, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| OFFICIAL COMMITTEE OF | ) | |
| ASBESTOS PERSONAL INJURY | ) | |
| CLAIMANTS, et al., | ) | |
| | ) | Adv. No. 02-2211 |
| Plaintiffs, | ) | |
| | ) | |
| -against- | ) | |
| | ) | |
| FRESENIUS MEDICAL CARE, | ) | |
| HOLDINGS, INC., et al., | ) | This Document Pertains to Adv. No. |
| | ) | 02–2210 |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release, dated November 10, 2003, is made by and among the Official Committee of Asbestos Personal Injury Claimants, the Official Committee of Asbestos Property Damage Claimants, Sealed Air Corporation, a Delaware corporation, and Cryovac, Inc., a Delaware corporation.

## I.    <u>Definitions</u>

As used in this Agreement, the following capitalized terms shall have the following meanings (such meanings to be equally applicable to the singular and plural forms of the terms defined), unless a paragraph or subparagraph of this Agreement expressly provides otherwise:

a.    "Action" means the suit styled <u>Official Committee of Asbestos Personal Injury Claimants and Official Committee of Asbestos Property Damage Claimants of W.R. Grace & Co., suing in behalf of the Chapter 11 Bankruptcy Estate of W.R. Grace & Co., et al. v. Sealed Air Corporation and Cryovac, Inc.</u>, Adv. No. 02-2210 (D. Del.).

b.    "Actually Realized" shall have the meaning set forth in paragraph VI(h) of this Agreement.

c.    "Affiliate" means with respect to any Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.

d.    "Agreement" means this Settlement Agreement and Release and any exhibits, schedules, and annexes thereto, including, without limitation, the Registration Rights Agreement attached hereto as Exhibit 1 (the "Registration Rights Agreement").

e.    "Announcement" means an "Announcement" (including any successor name to an Announcement) published in the Internal Revenue Bulletin (including any successor publication).

f.    "Anti-Dilution" means the provisions set forth in Article III of this Agreement.

2

g.    "Asbestos Claims" means, collectively, Asbestos Personal Injury Claims, Asbestos Property Damage Claims, and any 'demand' related thereto as the term is defined in section 524(g)(5) of the Bankruptcy Code.

h.    "Asbestos Personal Injury Claims" means any and all Claims, Debts, and Damages for death, bodily injury, sickness, disease, medical monitoring, or other personal injuries (whether physical or not) caused or allegedly caused by, based on, arising out of, or attributable to, directly or indirectly, in whole or in part, the presence of or exposure at any time to asbestos or asbestos-containing material or products, mined, processed, consumed, used, stored, manufactured, designed, sold, assembled, distributed, disposed of, or installed by or on behalf of any Debtor or any of its predecessors, successors, or assigns, or any current or former Affiliate of any of the foregoing, including, without limitation, any Claims, Debts, and Damages for reimbursement, indemnification, subrogation, or contribution.

i.    "Asbestos Property Damage Claims" means any and all Claims, Debts, and Damages for or arising out of property damage, including, without limitation, the cost of inspecting, maintaining, encapsulating, abating, repairing, decontaminating, removing, or disposing of asbestos or asbestos containing materials or products in buildings or other structures, or other property caused or allegedly caused by, based on, arising out of, or attributable to, directly or indirectly, in whole or in part, the installation in, presence in, or removal of asbestos or asbestos-containing material or products mined, processed, consumed, used, stored, manufactured, designed, sold, assembled, distributed, disposed of, or installed by or on behalf of any Debtor or any of its predecessors, successors, or assigns, or any current or former Affiliate of any of the foregoing, including, without limitation, any Claims, Debts, or Damages for reimbursement, indemnification, subrogation, or contribution.

3

j.    "Asbestos-Related Claims" means any and all Claims, Debts, or Damages based on or arising from, in whole or in part, directly or indirectly:  (i) Asbestos Claims or (ii) Successor Claims based on or arising from, in whole or in part, directly or indirectly, the Cryovac Transaction.

k.    "Bankruptcy Code" means title 11 of the United States Code as in effect on the date of this Agreement.

l.    "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

m.    "Bankruptcy Termination Event" means, in the case of either of Sealed Air Corporation or Cryovac, Inc., (a) the filing by such entity of a voluntary petition for relief under the Bankruptcy Code or (b) the pendency against such entity of an involuntary petition for relief under the Bankruptcy Code (i) that has not been dismissed within ninety days of the filing or (ii) upon which an order for relief granting the involuntary petition has been entered.

n.    "CFO Annual Statement" shall have the meaning set forth in paragraph VI(j)(ii) of this Agreement.

o.    "Change in Circumstances" means (i) for U.S. federal income tax purposes, (x) any amendment to the Internal Revenue Code or the final or temporary regulations promulgated under the Internal Revenue Code, (y) a decision by any federal court, or (z) a Revenue Ruling, Notice, Revenue Procedure, or Announcement, which amendment is enacted, promulgated, issued, or announced, or which decision, Revenue Ruling, Notice, Revenue Procedure, or Announcement is issued or announced, in each case, after the Execution Date, and (ii) for financial accounting purposes, any amendment to or change in generally accepted accounting principles, which amendment is issued or announced or, which change occurs, in each case, after the Execution Date.

p.    "Chapter 11 Plan" means a confirmed plan or plans of reorganization of the Debtors.

4

q.    "Claims" means any and all claims, whether direct, indirect, derivative or otherwise, including, without limitation, 'claim' as the term is defined in section 101(5) of the Bankruptcy Code (except that a right to an equitable remedy shall also be considered a claim whether or not the breach gives rise to a right to payment), remedies, or causes of actions, liability, Debts, or Damages, known or unknown, now existing or hereafter arising, that have been, could have been, may be, or could be alleged or asserted now or in the future by any Person against the Debtors, their predecessors, successors, assigns, or any current or former Affiliate of any of the foregoing, or the Released Parties, of whatsoever kind or nature, whether alleged or asserted or not, whether founded in law, equity, admiralty, tort, contract, statute, or otherwise, and includes, without limitation, demands, liability, suits, judgments, and all legal or equitable theories of recovery whether arising under the common law or any statute, ordinance, or regulation.  Without limiting the generality of the foregoing, Claims shall include any and all claims, causes of action, Debts, or Damages under or attributable to:  (i) chapter 5 of the Bankruptcy Code; (ii) successor liability, piercing the corporate veil, alter ego liability, agency liability, transferee liability, or other similar claims or causes of action seeking to hold a Person liable for the debts or obligations of another Person; (iii) chapter 176 of title 28 of the United States Code or any other similar statutes; (iv) any debtor-creditor, fraudulent transfer or fraudulent conveyance statutes; or (v) any other similar claims or causes of action (all such Claims, causes of action, Debts, or Damages under or attributable to (i) through (v), collectively, "Successor Claims").

r.    "Confirmation Order" means an order or orders confirming the Chapter 11 Plan.

s.    "Contrary Opinion" means (i) a written opinion from a nationally recognized law firm experienced in Tax matters that states that, as a result of a Change in Circumstances, there is no "reasonable basis", as defined under section 6662 of the Internal Revenue Code (or successor

5

provision thereof), for the taking of, or the failure to take, a Defined Action referred to in paragraph II(c)(ix), (x), or (xi), VI(b) or VI(g), of this Agreement, as the case may be, by such Plaintiff, 524(g) Trust, Debtor or Non-Debtor Affiliate, as the case may be, or (ii) a written opinion from nationally recognized accounting firm that states that, as a result of a Change in Circumstances, the taking, or the failure to take, a Defined Action referred to in paragraph II(c)(ix), (x), or (xi), VI(b) or VI(g), of this Agreement, as the case may be, by such Plaintiff, 524(g) Trust, Debtor or Non-Debtor Affiliate, as the case may be, will be inconsistent with generally accepted accounting principles.

t.      "Court" means the court in which the Action is pending or, if no longer pending, the Bankruptcy Court.

u.      "Cryovac Cash Amount" shall have the meaning set forth in paragraph II(a) of this Agreement.

v.      "Cryovac Remaining Amount" means an amount of cash and the number of shares of Sealed Air Common Stock equal to the excess, if any, of (i) the Cryovac Total Amount over (ii) the Cryovac 524(g) Trust Amount.

w.      "Cryovac Total Amount" means the sum of the Cryovac Cash Amount and the Fair Market Value of the Settlement Shares, provided, however, that this sum shall be subject to any setoff or reduction pursuant to paragraph II(j) of this Agreement.

x.      "Cryovac 524(g) Trust Amount" means an amount of cash and the number of shares of Sealed Air Common Stock equal in the aggregate to the lesser of (i) the Cryovac Total Amount and (ii) the 524(g) Trust Total Amount less the Grace Specialty Initial Contribution.

y.      "Cryovac 524(g) Trust" means any 524(g) Trust to which all or a portion of the Cryovac Cash Amount or the Settlement Shares will be directly transferred by Cryovac, Inc. pursuant to paragraph II(a) of this Agreement.

6

z.    "Cryovac Transaction" means the transfers of assets, the distributions of stock, the merger, and all predecessor, related, and ancillary transactions, agreements, transfers, and distributions relating to the transactions described in, referred to, or contemplated by Form S-4 Registration Statement filed by W.R. Grace & Co. with the Securities and Exchange Commission under the Securities Act of 1933, as amended, on or about February 13, 1998, SEC File No. 333-46281, including all attachments, exhibits, and schedules thereto.

aa.    "Damages" means any and all potential elements of recovery or relief, including, without limitation, those that are known, unknown, certain, uncertain, anticipated, or unanticipated, that have been, could have been, may be, or could be alleged or asserted now or in the future against the Released Parties, whether alleged, unalleged, asserted, or unasserted by Plaintiffs or by any other Person under any legal, regulatory, administrative, or equitable theory against the Released Parties, and includes, without limitation, equitable relief, declaratory relief, actual damages (whether for successor liability, fraudulent transfer, fraudulent conveyance, alter ego liability, agency liability, property damage, environmental liability, Tax liability, economic loss, loss of profits, medical expenses, medical monitoring, personal injury, loss of consortium, wrongful death, survivorship, or compensatory, proximate, consequential, general, incidental, or special damages, or any other liability, loss, or injury), statutory or treble, or multiple or penal or punitive or exemplary damages, attorneys' fees, interest, expenses, and costs of court.

bb.    "Debtors" means W.R. Grace & Co., W.R. Grace & Co.-Conn., and related entities that have filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, each of their estates, any trustee or examiner that may be appointed in any of the Debtors' cases under the Bankruptcy Code, and the reorganized Debtors and includes, without limitation, any new corporation or other entity to which the stock or the assets of any of the Debtors,

7

or any combination thereof, are transferred pursuant to the Chapter 11 Plan (other than a 524(g) Trust, or an unrelated third-party that has purchased assets from a Debtor pursuant to section 363 of the Bankruptcy Code).

cc.    "Debts" means any liability or obligation arising from, based on, or attributable to any Claim.

dd.    "Defined Action" means any action, including the filing of any Tax Return, a Protective Claim or other information with respect to Taxes, making any statement in any public or regulatory filing or press release or otherwise, relating to any obligation of a Person set forth or referred to in paragraph II(c)(ix), (x), or (xi), VI(b) or VI(g), of this Agreement, provided, however, that a Defined Action shall not include the making of a statement by any of the Plaintiffs or the Debtors in a court document filed in the Debtors' chapter 11 cases or in an oral statement to the court in the Debtors' chapter 11 cases if, with respect to such Defined Action, such Plaintiff or Debtor has used its best efforts to satisfy its obligations set forth or referred to in paragraphs II(c)(ix), (x), and (xi), VI(b) or VI(g), of this Agreement, and provided, further, that a Defined Action shall not include (x) the preparation and execution of a Grace Protective Claim by the Debtors pursuant to and in accordance with paragraph VI(h) of this Agreement and (y) the pursuit by the Debtors of a Grace Protective Claim pursuant to and in accordance with the third sentence of paragraph VI(i) of this Agreement.

ee.    "Effective Date" means the date that is ten business days after the Confirmation Order becomes a Final Order or, if later, the date by which transfers to the 524(g) Trusts must be made pursuant to the Chapter 11 Plan and Confirmation Order.

8

ff.     "Excluded Fees" means costs and expenses (including lawyer's fees, expert's fees, and accountant's fees) incurred by the Released Parties in defending the Action or any other proceedings or controversies arising out of or based upon Asbestos-Related Claims prior to the Effective Date.

gg.     "Execution Date" means November 10, 2003.

hh.     "Fair Market Value" means (i) with respect to each of the Settlement Shares the last sale price on the New York Stock Exchange of a share of Sealed Air Common Stock, regular way, one business day before the Effective Date, and (ii) with respect to other property, the value assigned to such property in the disclosure statement approved by a Final Order of the Bankruptcy Court pursuant to section 1125(b) of the Bankruptcy Code with respect to the Chapter 11 Plan.

ii.     "Final Determination" means any assessment or resolution of liability for any Tax for any taxable period with respect to a Tax Claim against such Person required to take, or prohibited from taking, a Defined Action pursuant to the provisions set forth or referred to in this Agreement (i) by a decision, decree or other order by a court of competent jurisdiction, which has become final and unappealable or (ii) by any other means (including a closing agreement or accepted offer in compromise under section 7121 or 7122 of the Internal Revenue Code) if Cryovac, Inc. has consented to such other means, which consent shall not be unreasonably withheld or delayed.

jj.     "Final Order" means an order or judgment, the operation or effect of which has not been stayed, reversed, or amended and as to which order or judgment (or any revision, modification, or amendment thereof) the time to appeal or to seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed, or if filed, remains pending.

kk.     "Fresenius" means Fresenius Medical Care Holdings, Inc., its Affiliates, and any and all of their predecessors, successors, and assigns.

9

ll.     "Fresenius Release" means a duly executed release in the form annexed hereto as Exhibit 5, with appropriate insertions thereto.

mm.     "Fresenius Transaction" means the transfer of assets, the distributions of stock, and the merger and all predecessor related and ancillary transactions, agreements, transfers, and distributions relating to the transactions described in, referred to, or contemplated by Form S-4 Registration Statement filed by W.R. Grace & Co. with the Securities and Exchange Commission under the Securities Act of 1933, as amended, on or about August 2, 1996, SEC File No. 333-09497, including all attachments, exhibits and schedules thereto.

nn.     "Government Plaintiff" means the United States of America, acting for and on behalf of the United States Environmental Protection Agency.

oo.     "Government Release" means a release in the form annexed hereto as Exhibit 2, with appropriate insertions therein.

pp.     "Grace New York" means  W.R. Grace & Co., a New York corporation (now  known as Fresenius Medical Care Holdings, Inc.) (Taxpayer Identification Number 13-3461988).

qq.     "Grace New York Group" means that group of corporations, including, without limitation, W.R. Grace & Co.-Conn., Cryovac, Inc., and Sealed Air Corporation, that were members through (and including) September 28, 1996 or December 31, 1996, as applicable, of the affiliated group of corporations within the meaning of section 1504 of the Internal Revenue Code, and the Treasury Regulations, of which Grace New York was the common parent, and, with respect  to Taxes of other jurisdictions (domestic or foreign), that group of corporations that included Grace New York or one or more members of the Grace New York Group with respect to any combined, consolidated, joint, or similar Tax Return under the laws of any jurisdiction (domestic or foreign).

10

rr.    "Grace Protective Claim" shall have the meaning set forth in paragraph VI(h) of this Agreement.

ss.    "Grace Specialty" means W.R. Grace & Co. (formerly known as Grace Specialty Chemicals, Inc.) (Taxpayer Identification Number 65-0773649), or its successor.

tt.    "Grace Specialty Initial Contribution" means, with respect to the 524(g) Trusts in the aggregate, the "voting shares of" and "rights" in (as those terms are used in section 524(g)(2)(B)(i)(III) of the Bankruptcy Code) Grace Specialty or one or more other Debtors to be received by such 524(g) Trusts pursuant to section 524(g)(2)(B)(i)(III)(aa), (bb), or (cc), as the case may be, which voting shares and rights, if exercised, would entitle such 524(g) Trusts to own the lesser of (i) 50.1% of the voting shares of such entity or entities or (ii) the percentage of voting shares of such entity or entities that are to be received by the 524(g) Trusts.

uu.    "Grace Taxes" means all Taxes imposed on or with respect to, or related or attributable to, the Grace New York Group or any member thereof for or attributable to any taxable period (or any portion thereof) ending on or before December 31, 1996.

vv.    "Indemnified Taxes" means all Taxes and other amounts that W.R. Grace & Co.-Conn. or any other Debtor is responsible for or required to pay, or is required to indemnify any Released Party for or in respect thereto, pursuant to the 1998 Tax Sharing Agreement and including, without limitation, all Grace Taxes.

ww.    "Internal Revenue Code" means the Internal Revenue Code of 1986.

xx.    "IRS" means the Internal Revenue Service.

yy.    "Material Draft" means each of (i) the first draft of a Trust Document circulated to any Person who is not in an attorney-client relationship with the draftsman, (ii) the first draft of a Trust Document circulated following the draft of such Trust Document that Cryovac, Inc. or its

11

representatives provided comments with respect thereto, pursuant to and in accordance with the last sentence of paragraph VI(a) of this Agreement (such comments, the "Cryovac Language"), (iii) the first draft of a Trust Document that contains the Cryovac Language (or any variation thereof), (iv) any draft of a Trust Document which contains changes to the Cryovac Language (as the same may be amended or modified), or language inconsistent with the Cryovac Language or paragraphs II(c)(ix), (x), and (xi) of this Agreement, (v) the draft of a Trust Document that the Plaintiffs or the Debtors, as the case may be, reasonably believe is the penultimate draft of such document and (vi) the final draft of a Trust Document.

zz.      "Non-Debtor Affiliates" means the Affiliates of the Debtors that are not debtors or debtors in possession under the Bankruptcy Code.

aaa.      "Notice" means a "Notice" (including any successor name to a Notice) published in the Internal Revenue Bulletin (or successor publication).

bbb.      "Paragraph II(a) Proviso" shall have the meaning set forth in paragraph II(a) of this Agreement.

ccc.      "Paragraph VI(f) Issue" shall have the meaning set forth in paragraph VI(f) of this Agreement.

ddd.      "Person" means any individual, corporation, company, partnership, limited liability company, firm, association, joint venture, joint stock company, trust, estate, business trust, unincorporated organization, any other entity, and any 'governmental unit' (as that term is defined in section 101(27) of the Bankruptcy Code).

eee.      "Plaintiffs" means the Official Committee of Asbestos Personal Injury Claimants and the Official Committee of Asbestos Property Damage Claimants of W.R. Grace & Co., suing in behalf of the Chapter 11 Bankruptcy Estate of W.R. Grace & Co.

12

fff.    "Preliminary Injunction" means the preliminary injunction issued by the Bankruptcy Court on May 3, 2001, as modified on January 22, 2002, in W.R. Grace & Co. v. Chakarian, Adversary No. A-01-771 (Bankr. D. Del.), staying all actions arising from alleged exposure to asbestos indirectly or directly allegedly caused by Debtors or alleging fraudulent transfer or fraudulent conveyance claims that were filed or pending against Sealed Air Corporation, Cryovac, Inc., or certain of their Affiliates and staying all such future actions upon filing and service against Sealed Air Corporation, Cryovac, Inc., or certain of their Affiliates.

ggg.    "Protective Claim" means a Form 1120X (Amended U.S. Corporation Income Tax Return) or similar state or local tax form, which is prominently and clearly labeled on every page thereof with the words "Protective Claim Only" and which clearly and prominently states that the Person filing such form asserts its right to the claimed Tax benefits conditionally or contingently, and only in the event that such Tax benefits are denied in full to Cryovac, Inc. (or the consolidated, combined, unitary or similar group of which Sealed Air Corporation is the common parent) by a decision, decree or other order by a court of competent jurisdiction, which has become final and unappealable, or by a closing agreement or accepted offer in compromise under section 7121 or 7122 of the Internal Revenue Code entered into by Sealed Air Corporation and the Internal Revenue Service.

hhh.    "Qualified Settlement Fund" shall have the meaning set forth in paragraph II(c)(ix) of this Agreement.

iii.    "Release" means a release, in the form annexed hereto as Exhibit 3, with appropriate insertions therein.

jjj.    "Released Parties" means Sealed Air Corporation, Cryovac, Inc., and all of their parent corporations, subsidiary corporations, joint venturers, Affiliates, and sister corporations, and

13

any and all of their past, present, and future agents, servants, officers, directors, employees, successors, assigns, heirs, executors, administrators, legal representatives, beneficiaries, insurers (but solely to the extent of coverage procured by Sealed Air Corporation (after March 31, 1998) or Cryovac, Inc. (after such date) of any liabilities of Sealed Air Corporation or Cryovac, Inc. for Asbestos-Related Claims), or any of them, including any Person acting on behalf of or at the direction of any of them, but specifically excluding (i) the Debtors, (ii) all Non-Debtor Affiliates, (iii) Fresenius (to the extent of any and all Claims, Damages, or Debts arising out of the Fresenius Transaction), and (iv) any and all insurers of the Debtors or the Non-Debtor Affiliates to the extent that they have provided coverage for Asbestos-Related Claims now or hereafter asserted or which could have been asserted at any time against the Debtors or the Non-Debtor Affiliates.

kkk.    "Relevant Tax Year" shall have the meaning set forth in paragraph VI(h) of this Agreement.

lll.    "Revenue Procedure" means a "Revenue Procedure" (including any successor name to a Revenue Procedure) published in the Internal Revenue Bulletin (or successor publication).

mmm.    "Revenue Ruling" means a "Revenue Ruling" (including any successor name to a Revenue Ruling) published in the Internal Revenue Bulletin (or successor publication).

nnn.    "Sealed Air Common Stock" means the voting common stock, par value $0.10 per share, of Sealed Air Corporation.

ooo.    "Sealed Air Opinion" means, with respect to any Contrary Opinion obtained by any Plaintiff, Cryovac 524(g) Trust, Debtor, or Non-Debtor Affiliate, as the case may be, with respect to a Defined Action (i) if such Contrary Opinion is with respect to a Tax issue, a written opinion addressed to such Plaintiff, Cryovac 524(g) Trust, Debtor or Non-Debtor Affiliate, as the case may be, from a nationally recognized law firm experienced in Tax matters that states that there is

14

"substantial authority", as defined under section 6662 of the Internal Revenue Code (or successor provision thereof), for the taking of, or the failure to take, such Defined Action or, (ii) if such Contrary Opinion is with respect to an accounting issue, a written opinion addressed to such Plaintiff, Cryovac 524(g) Trust, Debtor or Non-Debtor Affiliate, as the case may be, from nationally recognized accounting firm that states that the taking, or the failure to take, such Defined Action will not be inconsistent with generally accepted accounting principles.

ppp.    "Settlement Shares" shall have the meaning set forth in paragraph II(a) of this Agreement.

qqq.    "SOL" shall have the meaning set forth in paragraph VI(h) of this Agreement.

rrr.    "Successor Claims" shall have the meaning set forth in the definition of Claims.

sss.    "Tax" or "Taxes" means all taxes, customs, duties, levies, fees, tariffs, imports, deficiencies, or other charges or assessments of any kind whatsoever, including all net income, gross income, capital gains, gross receipt, property, franchise, sales, use, excise, withholding, payroll, employment, social security, worker's compensation, unemployment, occupation, severance, capital stock, ad valorem, value added, transfer, gains, profits, net worth, asset, transaction, business consumption or other taxes, and any interest, penalties, fines, additions to tax or additional amounts with respect thereto, imposed by any governmental authority (whether domestic or foreign).

ttt.    "Tax Benefit" shall have the meaning set forth in paragraph VI(h) of this Agreement.

uuu.    "Tax Benefit Accountant" shall have the meaning set forth in paragraph VI(j) of this Agreement.

vvv.    "Tax Benefit Dispute Notice" shall have the meaning set forth in paragraph VI(j) of this Agreement.

15

www.  "Tax Benefit Report" shall have the meaning set forth in paragraph VI(j) of this Agreement.

xxx.  "Tax Benefit Start Date" shall have the meaning set forth in paragraph VI(j)(ii) of this Agreement.

yyy.  "Tax Benefit Statement" shall have the meaning set forth in paragraph VI(j) of this Agreement.

zzz.  "Tax Claim" shall have the meaning set forth in paragraph VI(c) of this Agreement.

aaaa.  "Tax Return" means all returns, reports and information (including elections, declarations, disclosures, schedules, estimates and information returns) required to be supplied to a Tax Authority relating to Taxes.

bbbb.  "Transfer" shall have the meaning set forth in paragraph VI(h) of this Agreement.

cccc.  "Transferor" shall have the meaning set forth in paragraph II(c)(ix) of this Agreement.

dddd.  "Treasury Regulations" means the treasury regulations (including temporary regulations) promulgated pursuant to the Internal Revenue Code.

eeee.  "Trust Document" means, for each trust to which all or any portion of the Cryovac Cash Amount or the Settlement Shares is directly transferred by Cryovac, Inc. pursuant to paragraph II(a) of this Agreement, each of the plan of reorganization of the Debtors, and any document pursuant to which such trust is organized or created (and any amendments thereto).

ffff.  "524(g) Trust" means any trust established pursuant to 11 U.S.C. § 524(g), as provided in the Chapter 11 Plan and the Confirmation Order.

gggg.  "524(g) Trust Total Amount" means the sum of the aggregate amount of cash and the Fair Market Value of all property to be contributed to all of the 524(g) Trusts, as provided in the Chapter 11 Plan and the Confirmation Order.

16

hhhh.  "1998 Tax Sharing Agreement" means the Tax Sharing Agreement by and among W.R. Grace & Co., W.R. Grace & Co.-Conn., and Sealed Air Corporation, dated as of March 30, 1998.

## II.    Settlement Agreement and Release of All Claims

a.    On the Effective Date, Cryovac, Inc. shall, subject to paragraph II(j) of this Agreement, transfer in the aggregate (i) the sum of $512.5 million in cash, plus interest thereon from December 21, 2002 until the Effective Date, at a rate of 5.5% per annum compounded annually (the "Cryovac Cash Amount"), and (ii) nine million shares of Sealed Air Common Stock, as adjusted for Anti-Dilution (the "Settlement Shares").  Such transfer shall be made as directed in the Confirmation Order; provided, however, that each of the Plaintiffs shall use its best efforts to require the Chapter 11 Plan (whether confirmed under section 1129(a) or (b) of the Bankruptcy Code) to provide that the Cryovac Cash Amount and the Settlement Shares shall be transferred by Cryovac, Inc. directly to one or more of the 524(g) Trusts for Asbestos Claims, unless the 524(g) Trust Total Amount reduced by the Grace Specialty Initial Contribution is less than the Cryovac Total Amount, in which case, the Chapter 11 Plan shall provide that Cryovac, Inc. shall transfer (x) in the aggregate directly to one or more of the 524(g) Trusts for Asbestos Claims, an amount of cash and shares of Sealed Air Common Stock equal, in the aggregate, to the Cryovac 524(g) Trust Amount, in the same proportion that the Cryovac Cash Amount and the Fair Market Value of the Settlement Shares, respectively, bears to the sum of both, and (y) directly to Grace Specialty, an amount of cash and shares of Sealed Air Common Stock equal, in the aggregate, to the Cryovac Remaining Amount, in such same proportions (this proviso, the "Paragraph II(a) Proviso").  The provisions of paragraph II(b) of this Agreement shall apply first with respect to the Plaintiffs' obligations set forth in the Paragraph II(a) Proviso.  If the Chapter 11 Plan cannot be confirmed in accordance with both the Paragraph II(a)

17

Proviso and paragraph II(b) of this Agreement, then each of the Plaintiffs shall use its best efforts to require that the Chapter 11 Plan (whether confirmed under section 1129(a) or (b) of the Bankruptcy Code) (x) maximize the initial funding of one or more of the 524(g) Trusts from the Cryovac Cash Amount and the Settlement Shares, and provide for the transfer of such funding by Cryovac Inc. directly to such 524(g) Trusts for Asbestos Claims and (y) provide that such amounts not transferred by Cryovac Inc. directly to such 524(g) Trusts will be transferred by Cryovac Inc. directly to Grace Specialty, and paragraph II(b) of this Agreement shall apply anew to these obligations.  If the transfers made pursuant to this paragraph II(a) are directed to more than one 524(g) Trust, then the portion of the entire amount to be transferred to such 524(g) Trusts shall be allocated among each of such 524(g) Trusts pursuant to and in accordance with the Confirmation Order.  Under no circumstances shall any fractional shares of Sealed Air Common Stock be transferred pursuant to this Agreement or any Person be the transferee of less than one thousand shares of Sealed Air Common Stock pursuant to this Agreement, provided, however, that in no event shall the Cryovac 524(g) Trusts incur any costs or expenses associated with such one thousand share limitation, nor shall such limitation affect the apportionment, if any, of the Settlement Shares and the Cryovac Cash Amount that may be allocated between the Cryovac 524(g) Trusts, on the one hand, and Grace Specialty, on the other hand.  Sealed Air Corporation irrevocably, absolutely and unconditionally guarantees the performance of the obligations of Cryovac, Inc. set forth in this paragraph II(a) and the right of the Plaintiffs to enforce this guaranty shall not require the Plaintiffs first to proceed against Cryovac, Inc.

      b.     In furtherance of the Plaintiffs' obligations pursuant to paragraph II(a) of this Agreement, each of the Plaintiffs shall: (i) support the approval of a disclosure statement(s) that relates to a Chapter 11 Plan that satisfies the provisions set forth in paragraph II(a) of this Agreement

18

(such a Chapter 11 Plan, the "Conforming Plan"), as long as the Conforming Plan meets the requirements for confirmation set forth in sections 524 and 1129 of the Bankruptcy Code, regardless of whether confirmation may be obtained under section 1129(a) or (b) of the Bankruptcy Code; (ii) recommend to the creditors and parties in interest the interests of which are represented by it to vote in favor of the confirmation of the Conforming Plan; (iii) oppose the approval of any disclosure statement that relates to a non-Conforming Plan; (iv) recommend to the creditors and parties in interest the interests of which are represented by it to vote against the confirmation of a non-Conforming Plan; (v) not take any action, of whatever kind and nature, to oppose, or designed to prevent confirmation of, the Conforming Plan; and (vi) take any action, of whatever kind and nature, that is necessary, required or appropriate in order to confirm the Conforming Plan, provided, however, that the Plaintiffs shall not be required to support or recommend a Conforming Plan which, in the exercise of Plaintiffs' respective fiduciary obligations, is determined to be unacceptable (other than as to provisions required by the terms of this Agreement), and provided, further, that the Plaintiffs shall not be bound by the provisions of paragraphs II(b)(i) through (vi) of this Agreement if (x) the Bankruptcy Court determines in a Final Order, on a motion brought by a party in interest, and on notice to Sealed Air Corporation and Cryovac, Inc., seeking an order excusing their performance under the provisions contained in paragraphs II(b)(i) through (vi) of this Agreement, that the Conforming Plan cannot meet the confirmation requirements set forth in sections 524 and 1129 of the Bankruptcy Code, or (y) the Bankruptcy Court refuses to confirm the Conforming Plan, except if such refusal relates to issues unrelated to the requirements contained in paragraph II(a) of this Agreement.  The provisions of this paragraph II(b) shall apply as set forth in paragraph II(a) of this Agreement.

19

c. As a condition to the obligations of Cryovac, Inc. set forth in paragraph II(a) of this Agreement, each of the Confirmation Order and the Chapter 11 Plan shall expressly provide that:

(i) each of the Plaintiffs and the Debtors shall execute and deliver the Release, and the Government Plaintiff shall execute and deliver the Government Release;

(ii) in consideration of the transfers made pursuant to paragraph II(a) of this Agreement, each of the Non-Debtor Affiliates irrevocably releases, acquits, and forever discharges the Released Parties from any and all Asbestos-Related Claims, and any and all Claims, Debts, and Damages on the basis of, arising from, or attributable to (in whole or in part, directly or indirectly) the Fresenius Transaction, that have accrued or been asserted or that hereafter might accrue or be asserted against the Released Parties, and that each Non-Debtor Affiliate shall not institute, participate in, maintain, maintain a right to or assert against the Released Parties, either directly or indirectly, on its own behalf, derivatively, or on behalf of any other Person any and all Asbestos-Related Claims, and any and all Claims, Debts, and Damages on the basis of, arising from, or attributable to (in whole or in part, directly or indirectly) the Fresenius Transaction;

(iii) the Action shall be dismissed with prejudice;

(iv) each of the Release and the Government Release is approved;

(v) the Plaintiffs shall deliver the Fresenius Release;

(vi) the Released Parties shall receive the full benefit of an injunction under sections 524(g) and 105(a) of the Bankruptcy Code, which injunction shall be in form and substance reasonably acceptable to Sealed Air Corporation and Cryovac, Inc. and which injunction shall include, without limitation, provisions enjoining any and all Persons from taking any and all legal or other actions (including, without limitation, the continued prosecution of pending 'Actions' or the commencement of future 'Actions' as such term is defined in the Preliminary Injunction) or making any demand (as such term is defined in section 524(g)(5) of the Bankruptcy Code) for the purpose of, directly or indirectly, claiming, collecting, recovering, or receiving any payment, recovery or any other relief whatsoever from any of the Released Parties with respect to any and all Asbestos-Related Claims;

(vii) (A) the Debtors shall, jointly and severally, at their sole expense, indemnify, defend, and hold-harmless the Released Parties from and against (1) any and all Asbestos-Related Claims and all Indemnified Taxes, (2) any and all losses, costs, and expenses incurred as a result of any breach of any of the Debtors' or Non-Debtor Affiliates' obligations, covenants, and agreements set forth or referred to in this Agreement, including, without limitation, any such obligation, covenant, or agreement of any Debtor or Non-Debtor Affiliate set forth in the Chapter 11 Plan or Confirmation Order, (3) if any Non-Debtor Affiliate has not executed and delivered a Release, any and all Asbestos-Related Claims based on, arising out of, or attributable to, directly or indirectly, in whole or in part, such Non-Debtor Affiliate and (4)

20

any and all attorneys' fees or costs and expenses attributable to any Indemnity Claim, provided, however, that in each case such indemnification shall not apply to Excluded Fees (such indemnity obligations, collectively, the "Debtors' Indemnity Obligation"; any and all Claims, Debts, or Damages that could be asserted by any of the Released Parties under Debtors' Indemnity Obligation, the "Indemnity Claims"), and provided, further, that nothing in this Agreement shall adversely affect any rights of any Person to file and pursue, or object to, a proof of claim for Excluded Fees in the Debtors' chapter 11 cases, (B) each Debtor shall execute and deliver an indemnity agreement in favor of the Released Parties in the form annexed hereto as Exhibit 6 (the "Indemnification Agreement"), (C) the Debtors' Indemnity Obligation (and the obligations, covenants, and agreements of each of the Debtors and Non-Debtor Affiliates set forth or referred to in this Agreement, including, without limitation, any such obligation, covenant, or agreement of any Debtor or Non-Debtor Affiliate set forth in the Chapter 11 Plan or Confirmation Order) shall not be discharged, expunged, estimated, or otherwise adversely affected in the Debtors' bankruptcy cases or by the confirmation of the Chapter 11 Plan, and (D) the Debtors' Indemnity Obligation (and  the obligations, covenants, and agreements of each of the Debtors and Non-Debtor Affiliates set forth or referred to in this Agreement, including, without limitation, any such obligation, covenant, or agreement of any Debtor or Non-Debtor Affiliate set forth in the Chapter 11 Plan or Confirmation Order) shall continue unaffected as a post-confirmation obligation of each of the reorganized Debtors;

(viii) there shall be established under state law the 524(g) Trusts, each of which shall be subject to the continuing jurisdiction of the Bankruptcy Court;

(ix) if one or more Cryovac 524(g) Trusts is established, then each Cryovac 524(g) Trust shall be established to qualify as a "qualified settlement fund" for federal income tax purposes within the meaning of Treasury Regulations section 1.468B (each, a "Qualified Settlement Fund"), and, unless otherwise required by a Final Determination, the Plaintiffs and the Cryovac 524(g) Trusts (A) shall file all Tax Returns required to be filed by such Person, if any, consistent with the provisions of this paragraph II(c)(ix) and shall take all other Defined Actions that are reasonably requested by Sealed Air Corporation and consistent with the provisions of this paragraph II(c)(ix) and (B) shall be prohibited from taking any Defined Action that may result in the disqualification of any Cryovac 524(g) Trust as a Qualified Settlement Fund or be inconsistent with Cryovac, Inc. being treated as a "transferor" (as defined under Treasury Regulations section 1.468B-1(d)) ("Transferor") to each Cryovac 524(g) Trust of the cash and Settlement Shares transferred by Cryovac, Inc. directly to such Cryovac 524(g) Trust or each Cryovac 524(g) Trust constituting a Qualified Settlement Fund, provided, however, that a Person shall not be required to take, or be prohibited from taking, as the case may be, a Defined Action as required pursuant to this paragraph II(c)(ix) if each of the following four requirements has been previously satisfied (I) such Person has fully performed all of its obligations set forth in paragraph VI(f) of this Agreement, (II) such Person has received a Contrary Opinion with respect to such Defined Action required or prohibited pursuant to this paragraph II(c)(ix), (III) such Person has provided a copy of such Contrary Opinion to Sealed Air Corporation, and (IV) within forty-

21

five days of the receipt by Sealed Air Corporation of such Contrary Opinion, Sealed Air Corporation has not provided such Person with a Sealed Air Opinion;

(x) if one or more Cryovac 524(g) Trusts is established, then unless otherwise required by a Final Determination, the Cryovac 524(g) Trusts shall treat for all Tax purposes any and all payments by Cryovac, Inc. directly to the Cryovac 524(g) Trusts pursuant to paragraph II(a) of this Agreement as a direct payment by Cryovac, Inc. to the Cryovac 524(g) Trusts for Asbestos Claims that constitutes an ordinary and necessary expense of Cryovac, Inc., and the Plaintiffs and the Cryovac 524(g) Trusts (A) shall be prohibited from taking any Defined Action that is inconsistent with the foregoing provisions of this paragraph II(c)(x), and (B) shall take all Defined Actions that are reasonably requested by Sealed Air Corporation and consistent with the provisions of this paragraph II(c)(x); provided, however, that a Person shall not be required to take, or be prohibited from taking, as the case may be, a Defined Action as required pursuant to this paragraph II(c)(x) if each of the following four requirements has been previously satisfied (I) such Person has fully performed all of its obligations set forth in paragraph VI(f) of this Agreement, (II) such Person has received a Contrary Opinion with respect to such Defined Action required or prohibited pursuant to this paragraph II(c)(x), (III) such Person has provided a copy of such Contrary Opinion to Sealed Air Corporation, and (IV) within forty-five days of the receipt by Sealed Air Corporation of such Contrary Opinion, Sealed Air Corporation has not provided such Person with a Sealed Air Opinion;

(xi) if one of more Cryovac 524(g) Trusts is established, then unless otherwise required by a Final Determination, the Cryovac 524(g) Trusts shall treat for all Tax purposes all payments, if any, by Cryovac, Inc. to Grace Specialty pursuant to paragraph II(a) of this Agreement as ordinary income of Grace Specialty, and the Plaintiffs and the Cryovac 524(g) Trusts (A) shall file all Tax Returns required to be filed by such Person, if any, consistent with the provisions of this paragraph II(c)(xi) and shall take all other Defined Actions that are reasonably requested by Sealed Air Corporation and consistent with the provisions of this paragraph II(c)(xi) and (B) shall be prohibited from taking any Defined Action that is inconsistent with the foregoing provisions of this paragraph II(c)(xi) or that is inconsistent with any such payment being treated as an ordinary and necessary expense incurred by Cryovac, Inc.; provided, however, that a Person shall not be required to take, or be prohibited from taking, as the case may be, a Defined Action as required pursuant to this paragraph II(c)(xi) if each of the following four requirements has been previously satisfied (I) such Person has fully performed all of its obligations set forth in paragraph VI(f) of this Agreement, (II) such Person has received a Contrary Opinion with respect to such Defined Action required or prohibited pursuant to this paragraph II(c)(xi), (III) such Person has provided a copy of such Contrary Opinion to Sealed Air Corporation, and (IV) within forty-five days of the receipt by Sealed Air Corporation of such Contrary Opinion, Sealed Air Corporation has not provided such Person with a Sealed Air Opinion; and

(xii) the 1998 Tax Sharing Agreement is an assumed agreement of each of the Debtors (including, without limitation, Grace Specialty and W.R. Grace & Co.-Conn.) pursuant to section 365 of the Bankruptcy Code, and nothing contained in or contemplated by this

22

Agreement, the Chapter 11 Plan, or the Confirmation Order shall adversely affect the rights of Sealed Air Corporation or any of its Affiliates under the 1998 Tax Sharing Agreement.

d.      Simultaneously with and in exchange for the transfers contemplated by paragraph II(a) of this Agreement, the Plaintiffs shall deliver to Cryovac, Inc. and Sealed Air Corporation:  (i) the Release duly executed by each of the Plaintiffs and the Debtors; (ii) a copy of the Chapter 11 Plan; (iii) a copy of the Confirmation Order; (iv) a duly executed Stipulation of Dismissal With Prejudice of the Action, in the form annexed hereto as Exhibit 4, denying any other recovery against the Released Parties; and (v) the Registration Rights Agreement, in the form annexed hereto as Exhibit 1, with appropriate insertions therein, duly executed by the Initial Holders.

e.      The Released Parties shall not seek indemnity, contribution, or reimbursement for any payments made under paragraph II(a) of this Agreement from any source, including, without limitation, the insurers of the Debtors (but solely to the extent of coverage procured by the Debtors or any of its predecessors).

f.      The transfers made pursuant to paragraph II(a) of this Agreement shall be made in full compromise and settlement of any and all Asbestos-Related Claims against any and all of the Released Parties.

g.      Any order of the Court approving this Agreement shall provide that the Preliminary Injunction shall remain in full force and effect through and including the Effective Date.

h.      Neither this Agreement nor any of the transactions contemplated hereby is, or shall be construed as, an admission of liability, fault or wrongdoing by the Released Parties, who have denied and continue to deny any liability, fault, or wrongdoing, but, instead, is a compromise settlement of disputed claims, made in order to avoid the further substantial expense, burden, and

23

inconvenience of protracted litigation and appeal that may occur in further proceedings relating to these actions or any future actions, by which the Released Parties have forever bought their peace.

i.      The Plaintiffs do hereby and the Confirmation Order shall expressly provide that the Debtors, the Plaintiffs, and the Non-Debtor Affiliates fully understand and agree that Cryovac, Inc. and Sealed Air Corporation have entered into this Agreement in order to settle, release, extinguish, and terminate fully, finally, and forever any and all further controversy respecting any and all Asbestos-Related Claims against any and all of the Released Parties. The Plaintiffs do hereby and the Confirmation Order shall expressly provide that the Debtors, the Plaintiffs, and the Non-Debtor Affiliates acknowledge and agree that this provision is an essential and material term of this Agreement and the compromise settlement leading to this Agreement, and that, without such provision, neither Cryovac, Inc. nor Sealed Air Corporation would have executed this Agreement and the compromise settlement would not have been accomplished.

j.      Notwithstanding anything in this Agreement to the contrary, Cryovac, Inc., and Sealed Air Corporation as guarantor, shall have a right of setoff or reduction against, the payments and transfers required by paragraph II(a) of this Agreement or otherwise for, and upon the payment by any of the Released Parties of, the amount of any Indemnified Taxes or any obligation of any of the Debtors or the 524(g) Trusts set forth or referred to in this Agreement, including, without limitation, any Indemnity Obligation required to be provided in the Confirmation Order and Chapter 11 Plan that any of the Debtors has failed to pay to the Released Parties.

k.      Each of Sealed Air Corporation, Cryovac, Inc., and the Plaintiffs (upon court approval) represents and warrants, as to itself, that this Agreement has been duly authorized, and executed and delivered, constitutes the valid and binding obligation of such party, enforceable in accordance with its terms, except as the enforcement thereof may be limited by bankruptcy,

24

insolvency (including, without limitation, all laws relating to fraudulent transfers), reorganization, moratorium or other similar laws relating to or affecting enforcement of creditors' rights generally, or by general principles of equity (regardless of whether enforcement is considered in a proceeding in equity).

III.    **Anti-Dilution**

a.      In the event Sealed Air Corporation should at any time after the date of this Agreement but prior to the Effective Date fix a record date for (i) the effectuation of a split or subdivision of the outstanding shares of Sealed Air Common Stock, or (ii) the payment of a dividend or making of a distribution on Sealed Air Common Stock in additional shares of Sealed Air Common Stock, then as of such record date, the number of Settlement Shares to be transferred by Cryovac, Inc. on the Effective Date shall be increased in proportion to the increase in the aggregate number of shares of Sealed Air Common Stock outstanding immediately following such action.

b.      If the number of shares of Sealed Air Common Stock outstanding after the date of this Agreement but prior to the Effective Date is decreased by a combination of the outstanding shares of Sealed Air Common Stock or a reverse stock split, then following the record date for such combination or reverse stock split, the number of Settlement Shares transferable by Cryovac, Inc. upon the Effective Date shall be decreased in proportion to the decrease in the aggregate number of shares of Sealed Air Common Stock outstanding immediately following such action.

c.      In the event Sealed Air Corporation, after the date of this Agreement but prior to the Effective Date, declares a distribution payable to all holders of Sealed Air Common Stock in shares of capital stock of Sealed Air Corporation or its subsidiaries (other than Sealed Air Common Stock), or evidences of its indebtedness or other assets (excluding quarterly cash dividends) or options or rights not referred to in paragraph III(a) above, then in each such case, on the Effective Date, holders

25

of Settlement Shares shall be entitled to any such distribution as if the Effective Date had occurred immediately prior to the record date fixed for the determination of the holders of Sealed Air Common Stock entitled to such distribution.

d.     In case of any reclassification of the Sealed Air Common Stock, any consolidation of Sealed Air Corporation with another entity, or merger of another entity into Sealed Air Corporation (other than a merger that does not result in any reclassification, conversion, exchange, or cancellation of outstanding shares of Sealed Air Common Stock), or Sealed Air Corporation into another entity, any sale or transfer of all or substantially all of the assets of Sealed Air Corporation or any compulsory share exchange pursuant to such share exchange, the Sealed Air Common Stock is converted into other securities, cash, or property, then lawful provision shall be made as part of the terms of such transaction, whereby on the Effective Date, holders of Settlement Shares shall be entitled to receive from Cryovac, Inc. the kind and amount of securities, cash, and other property receivable upon the reclassification, consolidation, merger, sale, transfer, or share exchange as if the Effective Date had occurred immediately prior to the reclassification, consolidation, merger, sale, transfer or exchange.  The provisions of this paragraph III(d) shall similarly apply to successive reclassifications, consolidations, mergers, sales, transfers, or share exchanges.

IV.    **Investment Representations**

a.     Each of the Plaintiffs, and the Confirmation Order shall expressly provide that each of the Debtors, acknowledges and agrees with Sealed Air Corporation that the Settlement Shares have not been and, upon delivery as provided in (ii) of the first sentence of paragraph II(a) of this Agreement, will not be registered under the Securities Act of 1933, as amended (the "Securities Act"), and that the certificates for the Settlement Shares will bear a legend to that effect.  Each of the Plaintiffs, and the Confirmation Order shall expressly provide that each of the Debtors, also

26

understands that any transfer of Settlement Shares to the 524(g) Trusts or Grace Specialty is being made pursuant to an exemption from registration contained in the Securities Act, based in part upon their respective representations contained in this Agreement.

b.      The Confirmation Order shall expressly provide that, upon any transfer of the Settlement Shares to the 524(g) Trusts or Grace Specialty, the trustee(s) of each such 524(g) Trust or Grace Specialty, as applicable, shall represent and warrant, and agree on behalf of the 524(g) Trust or Grace Specialty with Sealed Air Corporation, that: (i) the 524(g) Trust or Grace Specialty, as applicable, is acquiring the Settlement Shares for its own account for investment and not with a view toward distribution in a manner which would violate the Securities Act; and (ii) the 524(g) Trust or Grace Specialty, as applicable, and its respective transferees will comply with all filing and other reporting obligations under all applicable laws which shall be applicable to such 524(g) Trust or Grace Specialty with respect to the Settlement Shares.

c.      Upon delivery of the Settlement Shares, Cryovac, Inc. and Sealed Air Corporation shall represent and warrant to the Plaintiffs and the Debtors (and deliver a certification to that effect upon the transfer of the Settlement Shares to the 524(g) Trusts or Grace Specialty) that all adjustments to the Settlement Shares have been made in compliance with the Anti-Dilution provisions of this Agreement.

## V.      **Covenant Not to Sue and Tolling**

a.      Subject to paragraph V(c) of this Agreement, unless ordered otherwise by this Court, none of the Plaintiffs, and any order of the Court approving this Agreement shall provide that none of the Debtors, shall sue or prosecute, institute or cooperate in the institution, commencement, filing, or prosecution of any suit, administrative proceeding, demand, claim or cause of action, whether asserted individually or derivatively against any of the Released Parties for any Asbestos-Related

27

Claims, pending confirmation of a Chapter 11 Plan consistent with the terms of this Agreement. The Final Order approving this Agreement shall provide that the Debtors are bound by the terms of this paragraph.

      b.      (i) In the event that the payment and transfer obligations of Cryovac, Inc. set forth in paragraph II(a) of this Agreement are not satisfied, the Plaintiffs (but not Sealed Air Corporation or Cryovac, Inc.) shall have the option jointly to terminate this Agreement by providing written notice thereof to Sealed Air Corporation and Cryovac, Inc.  (ii) Upon the occurrence of a Bankruptcy Termination Event, before the payment and transfer obligations of Cryovac, Inc. set forth in paragraph II(a) of this Agreement have been completely performed, the Plaintiffs may seek relief from the automatic stay to reinstitute the Action in the Court and neither Cryovac, Inc. nor Sealed Air Corporation shall (x) object to such relief being granted, or (y) seek to enforce the terms of this Agreement against the Debtors' estate.  (iii) In the event the Plaintiffs' obligations set forth in paragraph II(a) or the provisions of paragraph II(b), (c), or (d), or VI, of this Agreement are not satisfied, Sealed Air Corporation and Cryovac, Inc. shall have the option jointly to terminate this Agreement by providing written notice thereof to the Plaintiffs.  (iv) Any termination right exercised pursuant to this Agreement, other than upon the occurrence of a Bankruptcy Termination Event, shall become effective on the date (the "Termination Date") ten days following receipt of a notice of intention to terminate by the party exercising such termination right to the other parties to this Agreement, which notice shall specify the reasons for termination; provided, however, that such notice provided by the Plaintiffs shall not become effective if the payment and transfer obligations of Cryovac, Inc. set forth in  paragraph II(a) of this Agreement shall have been satisfied prior to the Termination Date.

28

c.     If this Agreement is terminated by any party, then within 120 days from the Termination Date a proper representative of the Debtors' estate may seek to have the Court reinstate the Action on the active docket, it being expressly agreed that the Court is the appropriate venue in all instances, including, without limitation, upon the occurrence of a Bankruptcy Termination Event. For purposes of statutes of limitation, statutes of repose, and any procedural bars to the prosecution of claims, as long as the Court reinstates the Action, all claims, counterclaims, cross-claims and claims for contribution or indemnity will be deemed to have been tolled during the time period between the date of this Agreement and the Termination Date.

## VI.     <u>Tax Matters</u>

a.     Each of the Plaintiffs shall use its best efforts to, and shall use its best efforts to cause the Confirmation Order and Chapter 11 Plan expressly to provide that each of the Debtors shall use its best efforts to, (i) cause each of the trusts to which all or any portion of the Cryovac Cash Amount or the Settlement Shares is directly transferred by Cryovac, Inc. pursuant to paragraph II(a) of this Agreement to qualify, and to maintain its status, as a Qualified Settlement Fund, and (ii) structure the transactions contemplated by this Agreement to achieve favorable tax treatment to Cryovac, Inc. and its Affiliates, as set forth in paragraphs II(a) and (b) of this Agreement, <u>provided</u>, <u>however</u>, that nothing herein shall in any way be construed as a representation, warranty, or covenant concerning the treatment for federal income tax purposes of any transfer by Cryovac, Inc. pursuant to paragraph II(a) of this Agreement.  Without limiting the foregoing, each of the Plaintiffs shall use its best efforts to, and shall use its best efforts to cause the Confirmation Order and Chapter 11 Plan expressly to provide that each of the Debtors shall use its best efforts to, cause the constitutive document(s) of each of the trusts to which all or any portion of the Cryovac Cash Amount or the Settlement Shares is directly transferred pursuant to paragraph II(a) of this Agreement to contain

29

provisions, reasonably satisfactory to Cryovac, Inc., qualifying and maintaining its status as a Qualified Settlement Fund, and providing that Cryovac, Inc. or its designee shall be a Transferor to each such trust. Each of the Plaintiffs shall, and shall use its best efforts to cause the Confirmation Order and Chapter 11 Plan expressly to provide that each of the Debtors shall (i) promptly provide to Cryovac, Inc. all Material Drafts of each Trust Document (but excluding or redacting the claims resolution procedures), provided, however, that any Plaintiff or Debtor shall not be required to provide any draft of a Trust Document that such Plaintiff or Debtor, as the case may be, does not have in its possession, custody, or control, and provided, further, that Cryovac, Inc. shall keep any such Material Draft confidential and shall disclose any such Material Draft only to Sealed Air Corporation, and officers, employees, and advisors of Cryovac, Inc., Sealed Air Corporation, or its Affiliates, and only after such Person agrees to keep such Material Draft confidential, and (ii) incorporate promptly (if such party is the party drafting such Trust Document), or if otherwise, urge the party drafting such Trust Document promptly to incorporate, into any such document each provision with respect to the subject matter set forth or referred to in paragraphs II(c)(ix), (x), and (xi), and VI(g), and clauses (i)(A) through (D) of paragraph VI(c), of this Agreement that are reasonably requested by Cryovac, Inc. Notwithstanding anything to the contrary contained in the immediately preceding sentence, Cryovac, Inc. and officers, employees, advisors and other agents of Cryovac, Inc., Sealed Air Corporation, or its Affiliates may disclose to any and all Persons, without limitation of any kind, the tax treatment and any facts that may be relevant to the tax structure of the transactions contemplated by this Agreement.

b.    Each of the Plaintiffs shall, and shall use its best efforts to require the Confirmation Order and Chapter 11 Plan expressly to provide that each of the Debtors and the Non-Debtor Affiliates shall, (i) take all Defined Actions required to be taken pursuant to, or that are reasonably

30

requested by Sealed Air Corporation and consistent with the provisions of, paragraphs II(c)(ix), (x), or (xi), or VI(g), of this Agreement and (ii) be prohibited from taking any Defined Action prohibited from being taken pursuant to, or that is inconsistent with the provisions of, paragraphs II(c)(ix), (x), or (xi), or VI(g), of this Agreement, provided, however, that a Person shall not be required to take, or be prohibited from taking, as the case may be, a Defined Action as required pursuant to this sentence if each of the following four requirements has been previously satisfied (I) such Person has fully performed all of its obligations set forth in paragraph VI(f) of this Agreement, (II) such Person has received a Contrary Opinion with respect to such Defined Action required or prohibited pursuant to this paragraph VI(b), (III) such Person has provided a copy of such Contrary Opinion to Sealed Air Corporation, and (IV) within forty-five days of the receipt by Sealed Air Corporation of such Contrary Opinion, Sealed Air Corporation has not provided such Person with a Sealed Air Opinion. Each of the Plaintiffs shall use its best efforts, and shall use its best efforts to cause the Confirmation Order and Chapter 11 Plan expressly to provide that each of the Debtors shall use its best efforts, not to make any statement in a court document filed in the Debtors' chapter 11 cases or in any oral statement to the court in the Debtors' chapter 11 cases that is prohibited by, or inconsistent with the provisions of, paragraphs II(c)(ix), (x), or (xi), or VI(g), of this Agreement, provided, however, that a Person shall not be required to take, or be prohibited from taking, as the case may be, a Defined Action as required pursuant to this sentence if each of the following four requirements has been previously satisfied (I) such Person has fully performed all of its obligations set forth in paragraph VI(f) of this Agreement, (II) such Person has received a Contrary Opinion with respect to such Defined Action required or prohibited pursuant to this sentence, (III) such Person has provided a copy of such Contrary Opinion to Sealed Air Corporation, and (IV) within forty-five days of the receipt by Sealed Air Corporation of such Contrary Opinion, Sealed Air Corporation has not

31

provided such Person with a Sealed Air Opinion. Each of the Plaintiffs shall use its best efforts to require the Confirmation Order and Chapter 11 Plan expressly to provide that each of the Debtors shall cause each of the Non-Debtor Affiliates to perform and satisfy fully all obligations, covenants, and agreements of such Non-Debtor Affiliate set forth or referred to in this Agreement, including, without limitation, any such obligation, covenant, or agreement of any Non-Debtor Affiliate set forth in the Chapter 11 Plan or Confirmation Order.

c.    Each of the Plaintiffs shall use its best efforts to require the Confirmation Order and Chapter 11 Plan expressly to provide that (i) each of the Debtors and their Affiliates shall promptly notify Cryovac, Inc. and Sealed Air Corporation upon receipt by any Debtor or any Affiliate of any Debtor of any notice of any pending or threatened audit or assessment, suit, litigation, proposed adjustment, deficiency, dispute, administrative or judicial proceeding or other similar Claim involving any Debtor or any Affiliate of any Debtor from any Tax authority or any other Person challenging (A) the qualification of any Cryovac 524(g) Trust as a Qualified Settlement Fund, (B) the qualification of Cryovac, Inc. as a Transferor to any Cryovac 524(g) Trust, (C) the payment by Cryovac, Inc. to one or more 524(g) Trusts pursuant to paragraph II(a) of this Agreement as a direct payment by Cryovac, Inc. to such 524(g) Trusts for Asbestos Claims that constitutes an ordinary and necessary expense of Cryovac, Inc., and (D) the payment, if any, by Cryovac, Inc. to Grace Specialty pursuant to paragraph II(a) of this Agreement as an ordinary and necessary expense of Cryovac, Inc. or as income of Grace Specialty (any such audit or assessment, suit, litigation, proposed adjustment, deficiency, dispute, administrative or judicial proceeding or other similar Claim, a "Tax Claim"), (ii) Cryovac, Inc. and Sealed Air Corporation shall be entitled to participate at their expense in the defense or prosecution of any Tax Claim (including to participate in all discussions with the Tax authorities regarding such Tax Claims and to be allowed to provide affirmative suggestions or

32

comments with respect to any written submissions or communications to the Tax authorities regarding such Tax Claims, which comments and suggestions shall be incorporated into such written submissions or communications with the consent of the Debtors, such consent not to be unreasonably withheld), and the Debtors and their Affiliates shall consult with Cryovac, Inc. and Sealed Air Corporation in connection with the defense or prosecution of any such Tax Claim and provide such cooperation and information as Cryovac, Inc. and Sealed Air Corporation shall reasonably request with respect to any such Tax Claim, (iii) each of the Debtors and its Affiliates shall agree to use its best efforts to attempt to sever any Tax Claim from other issues raised in any audit or assessment, suit, litigation, proposed adjustment, deficiency, dispute, administrative or judicial proceeding or other similar Claim, (iv) in furtherance of the obligations of the Debtors set forth in this paragraph VI(d), W.R. Grace & Co.-Conn. and W.R. Grace & Co. shall, and shall instruct their respective Chief Executive Officer, Chief Financial Officer, and Director of Taxes, and shall cause each of their Affiliates, to (A) deliver, promptly after the receipt of any document received from the IRS relating to a Tax Claim, a copy of such document to Cryovac, Inc. and Sealed Air Corporation, (B) deliver to Cryovac, Inc. and Sealed Air Corporation any document delivered to the IRS with respect to a Tax Claim promptly after such document is delivered to the IRS, provided, however, that, if such document was prepared in response to a request by the IRS, then prior to the delivery of such document to the IRS, Cryovac, Inc. and Sealed Air Corporation shall be allowed to provide affirmative suggestions or comments with respect to any such document, as provided in paragraph VI(c)(ii) of this Agreement, (C) provide Cryovac, Inc. and Sealed Air Corporation, at least five days prior to any meeting or conference (whether in person or by teleconference) scheduled with the IRS during which a Tax Claim may be discussed, with written notice of such scheduled meeting or conference, and an opportunity to attend the portions of such meeting or conference during which

33

any Tax Claim is discussed, and (D) provide Cryovac, Inc. and Sealed Air Corporation with cooperation and information reasonably requested by Cryovac, Inc. or Sealed Air Corporation in connection with any Tax Claim, including, at Cryovac, Inc.'s or Sealed Air Corporation's request, status updates with respect to all Tax Claims, (v) any document to be provided by the Debtors to Cryovac, Inc. or Sealed Air Corporation in furtherance of the obligations set forth in this paragraph VI(c) may be redacted by the Debtors to exclude information not pertinent to the Tax Claim and (vi) unless otherwise required by a Final Determination, none of the Debtors or any of their Affiliates shall settle or otherwise dispose of any Tax Claim.

d.      The obligations of each Plaintiff contained in paragraphs II(c)(ix), (x), and (xi), and VI(a) and (b) of this Agreement shall survive until such Plaintiff has ceased to exist.

e.      Each of the Plaintiffs shall use its best efforts to cause the Confirmation Order and Chapter 11 Plan expressly to provide an acknowledgment and agreement of each of the Debtors that (i) to the extent that any of the Debtors are required, pursuant to generally accepted accounting principles, to accrue a liability for asbestos which liabilities are satisfied by Cryovac, Inc. by a transfer made by Cryovac, Inc. directly to the Cryovac 524(g) Trusts pursuant to this Agreement and such Debtor is required pursuant to generally accepted accounting principles to reverse such accrual, to the extent that there is more than one methodology under generally accepted accounting principles pursuant to which the Debtors are allowed to reverse any such accrual, such Debtor shall adopt the methodology, if any, not inconsistent with the provisions of paragraphs VI(b) and VI(g) of this Agreement, (ii) any payment or transfer by Cryovac, Inc. directly to a 524(g) Trust shall not be treated, for financial accounting purposes, as resulting in an expense or deduction of any Debtor or Non-Debtor Affiliate and (iii) to the extent that any payment or transfer by Cryovac, Inc. directly to a Cryovac 524(g) Trust results, for financial accounting purposes, in income to any Debtor, Debtors

34

shall treat such income as income from the cancellation of indebtedness or liabilities of the Debtors. Sealed Air Corporation and Cryovac, Inc. acknowledge and agree that the obligation of the Debtors to reverse any accrual referred to in paragraph VI(e)(i) of this Agreement shall not be a breach of such Debtor's obligations set forth or referred to in this Agreement.

f.    If any of the Plaintiffs, and each of the Plaintiffs shall use its best efforts to require the Confirmation Order and Chapter 11 Plan expressly to provide that if, any of the Debtors, the Non-Debtor Affiliates, or the Cryovac 524(g) Trusts, has determined that an issue (a "Paragraph VI(f) Issue") may exist with respect to its taking, or the failure to take, a Defined Action as required pursuant to paragraph II(c)(ix), (x), or (xi), or VI(b) or VI(g), of this Agreement, then, prior to delivering a Contrary Opinion to Sealed Air Corporation with respect to such Defined Action in accordance with the provisos set forth in paragraph II(c)(ix), (x), or (xi), VI(b) or VI(g) of this Agreement, as the case may be, (i) such Person shall provide to Sealed Air Corporation, as promptly as practicable, a written notice identifying such Defined Action and describing in detail the Paragraph VI(f) Issue and (ii) such Person shall, and shall cause its advisors (including accountants and tax attorneys, as the case may be) to,  and Sealed Air Corporation shall, consult and act in good faith to determine and resolve (A) if such issue relates to a Tax issue, whether, as a result of a Change in Circumstances, there is no "reasonable basis", as defined in section 6662 of the Internal Revenue Code (or successor provision thereof), for the taking of, or the failure to take, such Defined Action by such Person or (B) if such issue relates to an accounting issue, whether, as a result of a Change in Circumstances, the taking, or the failure to take, such Defined Action is inconsistent with generally accepted accounting principles.

g.    Each of the Plaintiffs shall use its best efforts to require the Confirmation Order and Chapter 11 Plan expressly to provide that:

35

(i) unless otherwise required by a Final Determination, the Debtors and the Non-Debtor Affiliates (A) shall file all Tax Returns required to be filed by such Person, if any, consistent with the provisions of paragraph II(c)(ix) of this Agreement and shall take all other Defined Actions that are reasonably requested by Sealed Air Corporation and consistent with the provisions of paragraph II(c)(ix) of this Agreement and (B) shall be prohibited from taking any Defined Action that may result in the disqualification of any Cryovac 524(g) Trust as a Qualified Settlement Fund or be inconsistent with Cryovac, Inc. being treated as a Transferor to each Cryovac 524(g) Trust of the cash and Settlement Shares transferred by Cryovac, Inc. directly to such Cryovac 524(g) Trust or each Cryovac 524(g) Trust constituting a Qualified Settlement Fund, provided, however, that a Person shall not be required to take, or be prohibited from taking, as the case may be, a Defined Action as required pursuant to this paragraph VI(g)(i) if each of the following four requirements has been previously satisfied (I) such Person has fully performed all of its obligations set forth in paragraph VI(f) of this Agreement, (II) such Person has received a Contrary Opinion with respect to such Defined Action required or prohibited pursuant to this paragraph VI(g)(i), (III) such Person has provided a copy of such Contrary Opinion to Sealed Air Corporation, and (IV) within forty-five days of the receipt by Sealed Air Corporation of such Contrary Opinion, Sealed Air Corporation has not provided such Person with a Sealed Air Opinion;

(ii) if one or more Cryovac 524(g) Trusts is established, then unless otherwise required by a Final Determination, the Debtors and the Non-Debtor Affiliates shall treat for all Tax purposes any and all payments by Cryovac, Inc. directly to the Cryovac 524(g) Trusts pursuant to paragraph II(a) of this Agreement as a direct payment by Cryovac, Inc. to the Cryovac 524(g) Trusts for Asbestos Claims that constitutes an ordinary and necessary expense of Cryovac, Inc., and the Debtors and Non-Debtor Affiliates (A) for financial accounting or any other regulatory purpose, shall be prohibited from treating any payment by Cryovac, Inc. directly to a Cryovac 524(g) Trust as a payment by Cryovac, Inc. to any of the Debtors or Non-Debtor Affiliates, or as a payment by any Debtor or Non-Debtor Affiliate to any Person (including any 524(g) Trust) (or treating such payment as, or resulting in, an expense or deduction of any Debtor or Non-Debtor Affiliate), (B) for Tax purposes, shall be prohibited from claiming that any payment by Cryovac, Inc. directly to a Cryovac 524(g) Trust results in or gives rise (directly or indirectly) to the accrual or allowance of a deduction or expense, or income to, or any other transfer of any type to, any Debtor or Non-Debtor Affiliate, (C) shall take all Defined Actions that are reasonably requested by Sealed Air Corporation and consistent with the provisions of this paragraph VI(g)(ii), (D) shall not take any position inconsistent with the foregoing on any Tax Return or with any Tax authority, and (E) shall not make any statement in any public or regulatory filing or release or otherwise, or take any other Defined Action, that is inconsistent with the obligations of such Person pursuant to this paragraph VI(g)(ii); provided, however, that a Person shall not be required to take, or be prohibited from taking, as the case may be, a Defined Action as required pursuant to this paragraph VI(g)(ii) if each of the following four requirements has been previously satisfied (I) such Person has fully performed all of its obligations set forth in paragraph VI(f) of this Agreement, (II) such Person has received a Contrary Opinion with respect to such Defined Action required or prohibited pursuant to this paragraph VI(g)(ii), (III) such Person has provided a copy of such Contrary Opinion to Sealed Air Corporation,

36

and (IV) within forty-five days of the receipt by Sealed Air Corporation of such Contrary Opinion, Sealed Air Corporation has not provided such Person with a Sealed Air Opinion; and

(iii) unless otherwise required by a Final Determination, the Debtors and the Non-Debtor Affiliates shall treat for all Tax purposes all payments, if any, by Cryovac, Inc. to Grace Specialty pursuant to paragraph II(a) of this Agreement as ordinary income of Grace Specialty, and the Debtors and the Non-Debtor Affiliates (A) shall file all Tax Returns required to be filed by such Person, if any, consistent with the provisions of this paragraph VI(g)(iii) and shall take all other Defined Actions that are reasonably requested by Sealed Air Corporation and consistent with the provisions of this paragraph VI(g)(iii) and (B) shall be prohibited from taking any Defined Action that is inconsistent with the foregoing provisions of this paragraph VI(g)(iii) or that is inconsistent with any such payment being treated as an ordinary and necessary expense incurred by Cryovac, Inc.; provided, however, that a Person shall not be required to take, or be prohibited from taking, as the case may be, a Defined Action as required pursuant to this paragraph VI(g)(iii) if each of the following four requirements has been previously satisfied (I) such Person has fully performed all of its obligations set forth in paragraph VI(f) of this Agreement, (II) such Person has received a Contrary Opinion with respect to such Defined Action required or prohibited pursuant to this paragraph VI(g)(iii), (III) such Person has provided a copy of such Contrary Opinion to Sealed Air Corporation, and (IV) within forty-five days of the receipt by Sealed Air Corporation of such Contrary Opinion, Sealed Air Corporation has not provided such Person with a Sealed Air Opinion.

h.      The Debtors may prepare and execute (but not file with the IRS or other governmental authority, which filing shall be effected only by Cryovac, Inc. pursuant to and in accordance with this Agreement) a Protective Claim (a "Grace Protective Claim") for the taxable year of the Debtors in which the payments and transfers provided in paragraph II(a) of this Agreement (the "Transfer") are made, or for any other prior (solely with respect to a carryback from the taxable year of the Transfer) or subsequent taxable year in which the Tax Benefits realized as a result of such Transfer may be claimed by the Debtors (any such taxable year, a "Relevant Tax Year"), and require Cryovac, Inc. to file such Grace Protective Claim with the IRS or other governmental authority for and on behalf of the Debtors, provided, however, that a Grace Protective Claim shall not be required to be filed by Cryovac, Inc. at any time prior to 15 days before the expiration (taking into account all extensions thereof) of the applicable statute of limitations for the Debtors to file an amended return ("SOL") for

37

the Relevant Tax Year, and provided, further, that, notwithstanding anything to the contrary set forth in this paragraph VI(h), the Debtors may prepare and execute a Grace Protective Claim, and require Cryovac, Inc. to file such Grace Protective Claim with the IRS or other governmental authority for a Relevant Tax Year, only if each of the following requirements has been previously satisfied:

(i) (A) the Debtors have granted each extension (and each further extension) to the applicable SOL for such Relevant Tax Year that has been requested by the IRS; (B) at the time of each such request by the IRS referred to in this paragraph VI(h)(i), above, to extend (or further extend) the applicable SOL for such Relevant Tax Year, the Debtors shall have used their best efforts to extend (and cause the IRS to agree to extend) such SOL for a period of two (2) years or longer; (C) in the event that the IRS has not requested the Debtors to extend (or further extend) the applicable SOL for such Relevant Tax Year prior to 180 days prior to the end of such SOL, the Debtors shall have used their best efforts to extend (and cause the IRS to agree to extend) such SOL for a period of two (2) years or longer, and (D) the Debtors shall have provided to Cryovac, Inc. a written statement by their Chief Financial Officer that each of the requirements set forth immediately above in paragraphs VI(h)(i)(A), (B) and (C) of this Agreement has been satisfied in all respects; and

(ii) each of the Confirmation Order and the Chapter 11 Plan expressly provide the provisions of this paragraph VI(h) in its entirety, the provisions of paragraphs VI(i) through VI(l) set forth below in their entirety, and that: (A) in addition to the obligation of Cryovac, Inc. to file a Grace Protective Claim if required by the Debtors in accordance with and subject to the conditions set forth in this paragraph VI(h), Sealed Air Corporation may file a Grace Protective Claim with the IRS or other taxing authority for a Relevant Tax Year at its election, and in connection therewith, the Debtors shall prepare and execute such Grace Protective Claim; (B) the Debtors shall pay to Cryovac, Inc. in immediately available funds fifty (50) percent of the amount of any Tax Benefit realized as a result of the Transfer no later than ten (10) days after such Tax Benefit has been deemed to have been Actually Realized pursuant to this paragraph VI(h); (C) if requested by Sealed Air Corporation, the Debtors shall use their best efforts to extend (and cause the IRS to agree to extend) the applicable SOL for any Relevant Tax Year; (D) other than any obligation of Cryovac, Inc. expressly set forth in paragraphs VI(h) through VI(l) of this Agreement,  no obligations relating to the subject matter set forth in paragraphs VI(h) through (l) shall be undertaken or deemed to be undertaken by Cryovac, Inc. or any of its affiliates pursuant to paragraphs VI(h) through VI(l) of this Agreement or otherwise, and (E) the language to be included in Part II of Form 1120X (or applicable section of any similar state or local tax form) of a Grace Protective Claim shall include the language set forth on Exhibit 7 and only such other language as may be mutually agreed to by the Debtors and Cryovac, Inc.

For purposes of this Agreement, "Tax Benefit" shall mean the amount of any reduction of the actual Tax liability (after giving effect to any alternative minimum or similar Tax) of the Debtors to the

38

appropriate governmental authority for a taxable year as a result of the Transfer (including, without limitation, as a result of a deduction, loss, credit, or exclusion, whether available in the current taxable year, as an adjustment to the taxable income in any other taxable year or as a carryforward or carryback, as applicable, or as an offset or reduction to any assessment), increased by any interest (on an after-Tax basis) received from such governmental authority relating to such reduction in Tax liability; it being understood that the amount of such reduction of the actual Tax liability of the Debtors to the appropriate governmental authority for a taxable year shall take into account, without duplication, the amount of any correlative increase in Tax liability of the Debtors (including as a result of any correlative inclusion, gain, reduction in a credit, or as an increase to any assessment) for such taxable year as a result of the Transfer.  For purposes of this Agreement, a Tax Benefit shall be deemed to have been "Actually Realized" at the time any refund of Taxes is actually received or applied against other Taxes due (including all assessments by any governmental authority), or at the time of the filing of a Tax Return (including any Tax Return relating to estimated Taxes) on which a deduction, loss or other Tax item is applied to reduce the amount of Taxes which would otherwise be payable.  The determination of any Tax Benefit Actually Realized as a result of the Transfer shall be deemed to have been utilized based on the order that the deductions, losses, credits, exclusions or other Tax items realized as a result of the Transfer are considered to be utilized by the Debtors pursuant to the ordering rules set forth in the Internal Revenue Code and the Treasury Regulations.

i.      The Debtors shall withdraw all Grace Protective Claims upon a Cryovac Final Determination that the Transfer results in a Tax Benefit to Cryovac, Inc. (or the affiliated group filing a consolidated Tax Return of which Sealed Air Corporation is the common parent), and the Debtors shall provide a written statement to Cryovac, Inc. signed by the Chief Financial Officer of the Debtors stating that all Grace Protective Claims have been withdrawn.  Cryovac, Inc. shall notify the

39

Debtors to pursue all Grace Protective Claims upon a Cryovac Final Determination that the Transfer results in no Tax Benefit to Cryovac, Inc. (or the affiliated group filing a consolidated Tax Return of which Sealed Air Corporation is the common parent). Upon receipt of such notice referred to in the preceding sentence or if otherwise requested in writing by Cryovac, Inc., the Debtors shall use reasonable best efforts to pursue all Grace Protective Claims, and the Debtors shall keep Cryovac, Inc. fully informed of, and Cryovac, Inc. shall be entitled to participate in, all developments with respect to all such Grace Protective Claims in a manner consistent with the provisions set forth in paragraphs VI(c)(ii) through (vi) of this Agreement. For purposes of this Agreement, "Cryovac Final Determination" means the later of (i) sixty days after the expiration of the statute of limitations (taking into account all extensions thereof) of the Sealed Air Corporation affiliated group filing a consolidated Tax Return for the taxable year in which Cryovac, Inc. makes the Transfer and (ii) if the IRS has challenged the ability of the Sealed Air Corporation affiliated group filing a consolidated Tax Return to claim any deduction or loss as a result of the transactions set forth in or contemplated by this Agreement, sixty days after the final resolution of the last of all such issues by a decision or other order of a court of competent jurisdiction, which has become final and unappealable, or the execution by Sealed Air Corporation of a closing agreement or accepted offer in compromise under section 7121 or 7122 of the Internal Revenue Code.

  j.  For purposes of determining any Tax Benefit that is Actually Realized by the Debtors as a result of the Transfer:

   (i)  No later than ten (10) days after the Debtors shall have Actually Realized a Tax Benefit as a result of the Transfer, the Debtors shall provide Cryovac, Inc. with a detailed statement (the "Tax Benefit Statement") specifying (A) the amount of the Tax Benefit that was Actually Realized by the Debtors and any information relevant to the computation thereof (including

40

full access to any applicable Tax Return, non-proprietary work papers and other materials and information of the Debtors and their accountants), (B) the date that such Tax Benefit was Actually Realized, (C) the amount of deduction, loss, credit or exclusion initially claimed by the Debtors as a result of the Transfer (the "Initial Tax Benefit Item"), (D) the amount of the Initial Tax Benefit Item that is utilized by the Debtors to create such Tax Benefit Actually Realized (including as a result of all or a portion of the Initial Tax Benefit Item being carried back or forward), and (E) the amount of the Initial Tax Benefit Item not yet utilized by the Debtors (to create a Tax Benefit Actually Realized) that will be carried forward.

(ii)    No later than 30 days after the Debtors have filed their U.S. federal consolidated income Tax Return for each year beginning the year that includes the Tax Benefit Start Date, the Debtors shall deliver to Cryovac, Inc. an annual statement (the "CFO Annual Statement"), signed by their Chief Financial Officer under penalties of perjury, that sets forth (A) the amount of the Tax Benefits Actually Realized, if any, by the Debtors as a result of the Transfer during the preceding taxable year (including, without limitation, as a result of an amended return for any taxable year, a loss or deduction being utilized for such preceding taxable year, a loss or credit carryback from such preceding taxable year, or a loss or credit carryforward to such preceding taxable year), (B) the date (or dates) such Tax Benefits were Actually Realized during such taxable year, (C) the amount of the Initial Tax Benefit Item, (D) the amount of the Initial Tax Benefit Item that is utilized by the Debtors to create such Tax Benefit Actually Realized, and (E) the amount of the Initial Tax Benefit Item not yet utilized by the Debtors (to create a Tax Benefit Actually Realized) that will be carried forward.  The Debtors shall also provide Cryovac, Inc. with all information relevant to the computation of such Tax Benefits Actually Realized by the Debtors set forth in paragraph VI(j)(ii)(A) of this Agreement (including full access to any applicable Tax Return, the non-

41

proprietary work papers, and other materials and information of the Debtors and their accountants). For purposes of this Agreement, "Tax Benefit Start Date" means the date on which the Debtors are required to pursue all Protective Claims pursuant to the third sentence of paragraph VI(i) of this Agreement.

(iii)    If Cryovac, Inc. disagrees in any respect with the Debtors' computation of the amount of the Tax Benefit Actually Realized that is set forth on the Tax Benefit Statement or the CFO Annual Statement, Cryovac, Inc. may, on or prior to forty-five (45) days after the receipt of either such statement from the Debtors, deliver a notice to the Debtors setting forth in reasonable detail the basis for Cryovac, Inc.'s disagreement therewith ("Tax Benefit Dispute Notice"). If no Tax Benefit Dispute Notice is received by the Debtors on or prior to the forty-fifth (45th) day after Cryovac, Inc.'s receipt of the Tax Benefit Statement or the CFO Annual Statement, as the case may be, from the Debtors, the Tax Benefit Statement or the CFO Annual Statement, as the case may be, shall be deemed accepted by Cryovac, Inc.

(iv)    Within fifteen (15) days after the Debtors' receipt of a Tax Benefit Dispute Notice, unless the matters in the Tax Benefit Dispute Notice have otherwise been resolved by mutual agreement of the parties, the Debtors and Cryovac, Inc. shall jointly select a nationally-recognized independent certified public accountant (the "Tax Benefit Accountant"); provided, however, if the Debtors and Cryovac, Inc. are unable to agree upon the Tax Benefit Accountant within such fifteen (15) day period, then the Debtors and Cryovac, Inc. shall each select a nationally-recognized independent certified public accountant which shall then jointly choose the Tax Benefit Accountant within fifteen (15) days thereafter. The Tax Benefit Accountant shall conduct such review of the work papers and such other materials and information, and the Tax Benefit Dispute Notice, and any supporting documentation as the Tax Benefit Accountant in its sole discretion deems necessary, and

42

the Tax Benefit Accountant shall conduct such hearings or hear such presentations by the parties or obtain such other information as the Tax Benefit Accountant in its sole discretion deems necessary. The Tax Benefit Accountant shall, as promptly as practicable and in no event later than forty-five (45) days following the date of its retention, deliver to the Debtors and Cryovac, Inc. a report (the "Tax Benefit Report") in which the Tax Benefit Accountant shall, after reviewing disputed items set forth in the Tax Benefit Dispute Notice, determine what adjustments, if any, should be made to the amount of the Tax Benefit Actually Realized.  The Tax Benefit Report shall set forth, in reasonable detail, the Tax Benefit Accountant's determination with respect to the disputed items or amounts specified in the Tax Benefit Dispute Notice, and the revisions, if any, to be made to the amount of the Tax Benefit Actually Realized, together with supporting calculations.  All fees and expenses relating to this work of the Tax Benefit Accountant shall be borne equally by the Debtors and Cryovac, Inc.  Absent manifest error, the Tax Benefit Report shall be final and binding upon the Debtors and Cryovac, Inc., and no party shall seek further recourse to courts, other arbitral tribunals or otherwise.  The Debtors shall pay to Cryovac, Inc. in immediately available funds no later than five (5) days after delivery of the Tax Benefit Report to the Debtors and Cryovac, Inc. the sum of (x) the excess, if any, of fifty (50) percent of the amount of the Tax Benefit Actually Realized set forth in the Tax Benefit Report over the amount previously paid, if any, by the Debtors to Cryovac, Inc. with respect thereto and (y) interest with respect to any such excess, as provided for in paragraph VI(k) of this Agreement.

(v)     If a loss, deduction, credit or exclusion that resulted in Tax Benefit that was Actually Realized by the Debtors is later denied by a Taxing authority by (x) a decision, decree or other order by a court of competent jurisdiction, which has become final and unappealable or (y) any other means (including a closing agreement or accepted offer in compromise under section 7121

43

or 7122 of the Internal Revenue Code) if Cryovac, Inc. has consented to such other means, which consent shall not be unreasonably withheld or delayed, the Debtors shall provide a written statement, signed under penalties of perjury by the Chief Financial Officer of the Debtors, that states (A) the amount of such loss, deduction, credit or exclusion that was denied, (B) the amount of the Tax Benefits Actually Realized that was initially determined and paid by the Debtors to Cryovac, Inc. for such taxable period, and (C) the revised amount of the Tax Benefit Actually Realized for such taxable period taking into account the denial of such loss, deduction, credit or exclusion. The Debtors shall also provide to Cryovac, Inc. any information relevant to the computation of such initial and revised amount of the Tax Benefits Actually Realized by the Debtors (including full access to any applicable Tax Return, the non-proprietary work papers, and other materials and information of the Debtors and their accountants). If Cryovac, Inc. disagrees in any respect with the Debtors' computation of such revised amount of the Tax Benefit Actually Realized by the Debtors for such taxable period, the principles of the dispute resolution mechanism set forth in paragraphs VI(j)(iii) and VI(j)(iv) shall apply. No later than five (5) days after final resolution of the amount of the revised Tax Benefits Actually Realized for such taxable period, Cryovac, Inc. shall pay to the Debtors in immediately available funds fifty (50) percent of the excess, if any, of the amount of Tax Benefits Actually Realized that was initially determined for such taxable period and paid by the Debtors to Cryovac, Inc. over the amount of the Tax Benefit Actually Realized for such taxable period as revised. Any amount that is not paid within the period set forth in this paragraph VI(j)(v) shall accrue interest in accordance with paragraph VI(k) of this Agreement.

  k.  Notwithstanding anything to the contrary set forth in this Agreement, any amount of Tax Benefit Actually Realized that is required to be paid by the Debtors to Cryovac, Inc. pursuant to this Agreement and that is not paid within the period set forth in paragraph VI(h) of this

Agreement shall accrue interest at the prime rate announced from time to time by Bank of America, N.A., compounded annually.

l.       In the event of a conflict between this Agreement and the 1998 Tax Sharing Agreement, this Agreement shall govern and control.

## VII.    **General Matters and Reservations**

a.       In addition to other conditions set forth in this Agreement, the obligation of the parties to conclude the proposed settlement set forth in this Agreement is subject to and contingent upon the entry of a Final Order by this Court approving this Agreement, pursuant to Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure.

b.       This Agreement (as amended, modified, or supplemented) sets forth the sole and entire agreement among the parties with respect to its subject matter, and may not be waived, amended, modified, or supplemented except by written instrument executed by duly authorized representatives of each of the parties and entitled "Modification of Settlement Agreement and Release." This Agreement supercedes any prior agreement, understanding, or undertaking (written or oral) by and among the parties regarding the subject matter of this Agreement.

c.       All parties agree that the terms of this Agreement were drafted jointly by counsel for the parties following extensive arm's length negotiations.  In the event there arises an ambiguity or question of intent or interpretation of this Agreement or any provision thereof, the Agreement (and each of its provisions) shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

45

d.      The article and section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties, and shall not, in any way, define, limit, extend, or otherwise affect the scope, meaning, intent, or interpretation of this Agreement or any provision thereof.

e.      Without affecting any determination as to the law applicable to the Action, this Agreement and the rights and obligations of the parties hereunder shall be governed by and construed in accordance with the laws of the State of Delaware (without giving effect to its provisions on conflict of laws).

f.      Nothing in this Agreement shall preclude any action to enforce any of the terms of this Agreement; provided, however, that any such action shall be brought exclusively in this Court, which shall retain jurisdiction of this matter and of the parties to this Agreement for the purposes of enforcing and implementing the terms and conditions of this Agreement and resolving disputes as to the rights and obligations of the parties under this Agreement; provided, further, that section 524(g)(2) shall govern jurisdiction over any proceeding that involves any injunction issued in accordance with this Agreement under section 524(g) of the Bankruptcy Code.  The parties to this Agreement submit to the jurisdiction of this Court for these purposes.

g.      This Agreement may be executed in any number of identical counterparts, any of which may contain the signatures of less than all parties and all of which together shall constitute a single agreement.

h.      All parties to this Agreement shall jointly move this Court within thirty days of its execution for full and complete approval of this Agreement, and as applicable agree to enter into the Registration Rights Agreement, the Release, the Indemnity Agreement, and the ancillary documents when and as contemplated in this Agreement.

46

i.      This Agreement shall be binding upon and inure to the benefit of each of the Plaintiffs, each of the Released Parties, and any and all of their respective heirs, legal representatives, administrators, successors and assigns, provided that (i) neither this Agreement nor any substantial right or obligation hereunder may be assigned by Sealed Air Corporation or Cryovac, Inc. without the written consent of the other parties that have signed this Agreement, which consent shall not be unreasonably withheld and (ii) none of the Debtors shall transfer or agree to transfer a substantial part of its assets (in one or a series of transactions, whether or not related) to any Person or Persons without a prior determination of the Court by Final Order that at the time of each such transaction such Debtors, collectively with any such successors who will be jointly and severally liable for the obligations of such Debtors, will have the ability to pay and satisfy in the ordinary course of business their respective obligations and liabilities, including, without limitation, all Indemnified Taxes and all obligations set forth or referred to in this Agreement, including, without limitation, all such obligations set forth in the Chapter 11 Plan or Confirmation Order, and provided, further, that paragraph VII(i)(ii) of this Agreement shall not apply at any time when the following two conditions in paragraphs VII(i)(ii)(A) and (B) of this Agreement are both satisfied: (A)(1) as a result of the expiration of the applicable statutes of limitation, assessment against and collection of Indemnified Taxes from each of the Released Parties (including assessment and collection pursuant to section 6901 of the Internal Revenue Code) is barred by such statutes of limitation and (2) all Indemnified Taxes have been paid by the Debtors in accordance with the 1998 Tax Sharing Agreement and the Released Parties have received from the Debtors (or adequate provision satisfactory to the Released Parties has been made for the payment of) all indemnification and other payments claimed by the Released Parties against any of the Debtors in respect of Indemnified Taxes and related matters in accordance with the 1998 Tax Sharing Agreement; and (B) the injunctions required pursuant to

47

paragraph II(c)(vi) of this Agreement shall be in effect and there shall not be pending any lawsuit, action or other judicial or administrative proceeding (1) alleging an Asbestos-Related Claim and seeking to impose liability on one or more of the Released Parties notwithstanding the existence and continuing operative effect of such injunctions or (2) challenging in any manner the continuance and operative effect of such injunctions in respect of the Released Parties.

      j.      Without prejudice to any rights or remedies otherwise available to any party to this Agreement, each party to this Agreement acknowledges that damages would be an inadequate remedy for any breach of the provisions of this Agreement and agrees that the obligations under this Agreement shall be specifically enforceable.

      k.      All notices and other communication hereunder shall be in writing and shall be deemed to have been duly given upon receipt if:  (i) mailed by certified or registered mail, return receipt requested, (ii) sent by Federal Express or other express courier, fee prepaid, (iii) sent via facsimile with receipt confirmed, or (iv) delivered personally, addressed as follows or to such other address or addresses of which the respective party shall have notified the other.

      A.      If to the Plaintiffs, to:

      Official Committee of Asbestos Property Damage Claimants
      c/o Bilzin Sumberg Baena Price & Axelrod LLP
      200 South Biscayne Boulevard
      Suite 2500
      Miami, Florida 33131
      Attention: Scott L. Baena
      Telephone: (305) 350-2403
      Facsimile: (305) 374-7593

      -and-

      Official Committee of Asbestos Personal Injury Claimants
      c/o Caplin & Drysdale, Chartered
      One Thomas Circle, NW
      Washington, D.C.  20005

Attention: Peter V. Lockwood
Telephone: (202) 862-5000
Facsimile: (202) 429-3301

B.    If to the Released Parties, to:

Sealed Air Corporation/Cryovac, Inc.
Park 80 East
Saddle Brook, New Jersey  07663
Attention:  General Counsel and Secretary
Facsimile:  (201) 703-4113

with copies to:

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York  10036-6522
Attention:  Sheila L. Birnbaum
Telephone:  (212) 735-3000
Facsimile:  (212) 735-2000

49

NOV-11-2003 10:18     SPEIGHTS & RUNYAN                    8039434599  P.02/02

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date

written above.

OFFICIAL COMMITTEE OF ASBESTOS
PERSONAL INJURY CLAIMANTS

By: _____
Print Name: _____
Title: _____


OFFICIAL COMMITTEE OF ASBESTOS
PROPERTY DAMAGE CLAIMANTS

By: _____
Print Name: Daniel A. Speights
Title: Co-Chair


SEALED AIR CORPORATION

By: _____
Print Name: _____
Title: _____


CRYOVAC, INC.

By: _____
Print Name: _____
Title: _____


50

TOTAL P.02

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date written above.

OFFICIAL COMMITTEE OF ASBESTOS
PERSONAL INJURY CLAIMANTS

By: _____
Print Name: Perry Weitz
Title: Co-Chairman

OFFICIAL COMMITTEE OF ASBESTOS
PROPERTY DAMAGE CLAIMANTS

By: _____
Print Name: _____
Title: _____

SEALED AIR CORPORATION

By: _____
Print Name: _____
Title: _____

CRYOVAC, INC.

By: _____
Print Name: _____
Title: _____

50

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date written above.

OFFICIAL COMMITTEE OF ASBESTOS
PERSONAL INJURY CLAIMANTS

By: _____
Print Name: _____
Title: _____

OFFICIAL COMMITTEE OF ASBESTOS
PROPERTY DAMAGE CLAIMANTS

By: _____
Print Name: _____
Title: _____

SEALED AIR CORPORATION

By: _____
Print Name:  David H. Kelsey
Title: Vice President and Chief Financial Officer

CRYOVAC, INC.

By: _____
Print Name: David H. Kelsey
Title: Vice President and Chief Financial Officer

50

**Exhibit 1:  REGISTRATION RIGHTS AGREEMENT**

(The remainder of this page has been intentionally left blank.)

[THIS PAGE INTENTIONALLY LEFT BLANK]

<u>REGISTRATION RIGHTS AGREEMENT</u>

This REGISTRATION RIGHTS AGREEMENT (the "Registration Rights Agreement") is made and entered into as of _____, 200__, by and between SEALED AIR CORPORATION, a Delaware corporation, the Initial Holders (as defined below), and any other Person who later becomes a party to this Registration Rights Agreement by executing and delivering a Joinder Agreement in the form attached as Exhibit A hereto (the "Joinder Agreement"), in connection with the issuance of 9,000,000 shares of Sealed Air Common Stock (as defined below), as more fully set forth in the Settlement Agreement (as defined below).

ARTICLE I

Certain Definitions

All capitalized terms not otherwise defined in this Registration Rights Agreement shall have the meanings ascribed thereto in the Settlement Agreement. As used in this Registration Rights Agreement, the following terms shall have the meanings ascribed to them below:

1.1 "<u>Acquisition Blackout Period</u>" shall have the meaning set forth in Section 2.1(e).

1.2 "<u>Blackout Period</u>" shall have the meaning set forth in Section 2.1(e).

1.3 "<u>Commission</u>" shall mean the Securities and Exchange Commission or any federal agency at the time administering the Securities Act.

1.4 "<u>Exchange Act</u>" shall mean the Securities Exchange Act of 1934, as amended, or any federal statute then in effect which has replaced such statute.

1.5 "<u>Holder</u>" shall mean any Person, including any Initial Holder, who is a holder of record or beneficial owner of Registrable Securities for so long as such Person is a holder of record or beneficial owner of any Registrable Securities.

1.6 "<u>Holder Post-Effective Amendment</u>" shall have the meaning set forth in Section 2.1(d).

1.7 "<u>Initial Holder</u>" shall mean any Person to whom Cryovac, Inc. transfers the Settlement Shares on or after the Effective Date.

1.8 "<u>Maximum Blackout Period</u>" shall have the meaning set forth in Section 2.1(e).

1.9 "<u>Piggyback Registration</u>" shall have the meaning set forth in Section 2.2(a).

1.10 "<u>Registrable Securities</u>" shall mean the Settlement Shares and any other securities described in Section 8.1(ii); provided that such securities shall cease to be Registrable

1