# EXHIBIT C

# WR Grace

Bankruptcy Form 10

Index Sheet

SR00000568

| Claim Number: | 00009560 | Receive Date: | 03/28/2003 |
| --- | --- | --- | --- |

## Multiple Claim Reference

Claim Number _____
- ☐ MMPOC — Medical Monitoring Claim Form
- ☐ PDPOC — Property Damage
- ☐ NAPO — Non-Asbestos Claim Form
- ☐ Amended

Claim Number _____
- ☐ MMPOC — Medical Monitoring Claim Form
- ☐ PDPOC — Property Damage
- ☐ NAPO — Non-Asbestos Claim Form
- ☐ Amended

## Attorney Information

| Firm Number: | 00325 | Firm Name: | Bingham McCutchen |
| --- | --- | --- | --- |
| Attorney Number: | 00201 | Attorney Name: | Matt Lesnick |

Zip Code: 90071-3106

Cover Letter Location Number: SR00000568

| Attachments Medical Monitoring | Attachments Property Damage | Non-Asbestos |
| --- | --- | --- |
| ☐ TBD | ☐ TBD | ☒ Other Attachments |
| ☐ TBD | ☐ TBD | |
| ☐ TBD | ☐ TBD | |
| ☐ TBD | ☐ TBD | |
| ☐ TBD | ☐ TBD | |
| | ☐ Other Attachments | |
| **Other** | ☐ Non-Standard Form | |
| | ☐ Amended | |
| | ☐ Post-Deadline Postmark Date | |

Box/Batch: WRBF0039/WRBF0156

Document Number: WRBF007779

| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF Delaware | | GRACE NON-ASBESTOS PROOF OF CLAIM FORM |
|---|---|---|

**Name of Debtor:**[1] W.R. Grace & Co. - Conn.      **Case Number** 01-1179

NOTE: Do not use this form to assert an Asbestos Personal Injury Claim, a Settled Asbestos Claim or a Zonolite Attic Insulation Claim. Those claims will be subject to a separate claims submission process. This form should also not be used to file a claim for an Asbestos Property Damage Claim or Medical Monitoring Claim. A specialized proof of claim form for each of these claims should be filed.

**Name of Creditor** (The person or other entity to whom the Debtor owes money or property):

Casmalia Resources Site Steering Comm.

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

THIS SPACE IS FOR COURT USE ONLY

**Name and address where notices should be sent:**
c/o Matt Lesnick, Esq.
Bingham McCutchen, LLP
355 South Grand Avenue, Suite 4400
Los Angeles, CA 90071

**Account or other number by which creditor identifies Debtor:**

Check here ☐ replaces
if this claim ☐ amends a previously filed claim, dated:_____

**Corporate Name, Common Name, and/or d/b/a name of specific Debtor against whom the claim is asserted:**

**1. Basis for Claim**
☐ Goods sold
☐ Services performed
☐ Environmental liability
☐ Money loaned
☐ Non-asbestos personal injury/wrongful death
☐ Taxes
☒ Other See Attachment

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (fill out below)

Your SS #:_____
Unpaid compensation for services performed
from _____ to _____ (date)

**2. Date debt was incurred:** 1980 to 1988

**3. If court judgment, date obtained:**

**4. Total Amount of Claim at Time Case Filed:**      $ Approx. $22,255.44.

If all or part of your claim is secured or entitled to priority, also complete Item 5 below.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Classification of Claim.** Under the Bankruptcy Code all claims are classified as one or more of the following: (1) Unsecured Nonpriority, (2) Unsecured Priority, (3) Secured. It is possible for part of a claim to be in one category and part in another. CHECK THE APPROPRIATE BOX OR BOXES that best describe your claim and STATE THE AMOUNT OF THE CLAIM AT TIME CASE FILED.

☐ SECURED CLAIM (check this box if your claim is secured by collateral, including a right of setoff.)

Brief Description of Collateral:

☐ Real Estate      ☐ Other (Describe briefly)

Amount of arrearage and other charges at time case filed included in secured claim above, if any: $_____

Attach evidence of perfection of security interest

☒ UNSECURED NONPRIORITY CLAIM

A claim is unsecured if there is no collateral or lien on property of the debtor securing the claim or to the extent that the value of such property is less than the amount of the claim.

☐ UNSECURED PRIORITY CLAIM - Specify the priority of the claim.

☐ Wages, salaries, or commissions (up to $4650), earned not more than 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4).

☐ Taxes or penalties of governmental units - 11 U.S.C. § 507(a)(7).

☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a(_____).

**6. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**7. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**8. Acknowledgement:** Upon receipt and processing of this Proof of Claim, you will receive an acknowledgement card indicating the date of filing and your unique claim number. If you want a file stamped copy of the Proof of Claim form itself, enclose a self addressed envelope and copy of this proof of claim form.

This Space is for Court Use Only

**Date**
3/27/03

Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):

See Attachment

WR Grace      BF.39.156.7779
00009560
SR=568

**REC'D MAR 2 8 2003**

[1] See General Instructions and Claims Bar Date Notice and its exhibits for names of all Debtors and "other names" used by the Debtors.

# SPECIFIC INSTRUCTIONS FOR COMPLETING
## GRACE NON-ASBESTOS PROOF OF CLAIM FORMS

*The instructions and definitions below are general explanations of the law. In particular types of cases or circumstances, there may be exceptions to these general rules.*

This Proof of Claim form is for Creditors who have Non-Asbestos Claims against any of the Debtors. Non-Asbestos Claims are any claims against the Debtors as of a time immediately preceding the commencement of the Chapter 11 cases on April 2, 2001 other than Asbestos Personal Injury Claims, Asbestos Property Damage Claims, Zonolite Attic Insulation Claims, Settled Asbestos Claims or Medical Monitoring Claims, as defined on the enclosed General Instructions. More specifically, Non-Asbestos Claims are those claims against one or more of the Debtors, whether in the nature of or sounding in tort, contract, warranty or any other theory of law or equity for, relating to or arising by reason of, directly or indirectly, any injury, damage or economic loss caused or allegedly caused directly or indirectly by any of the Debtors or any products or materials manufactured, sold, supplied, produced, specified, selected, distributed or in any way marketed by one or more of the Debtors and arising or allegedly arising directly or indirectly, from acts or omissions of one or more of the Debtors, including, but not limited to, all claims, debts, obligations or liabilities for compensatory and punitive damages.

**Administrative Expenses:** Those claims for, among other things, the actual, necessary costs and expenses of preserving the estate as defined in Section 503 of the Bankruptcy Code that arose after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to Section 503 of the Bankruptcy Code. This form should not be used to make a claim for an administrative expense.

**Secured Claim:** A claim is a secured claim to the extent that the creditor has a lien on property of the debtor (collateral) that gives the creditor the right to be paid from that property before other creditors who do not have liens on the property. Examples of liens are a mortgage on real estate and a security interest in a car, truck, boat, television set, or other item of property. A lien may have been obtained through a court proceeding before the bankruptcy case began; in some states a court judgment is a lien. In addition, to the extent a creditor also owes money to the debtor (has a right to setoff), the creditor's claim may be a secured claim. (See also Unsecured Claim.)

**Unsecured Claim:** If a claim is not a secured claim, it is an unsecured claim. Unsecured claims are those claims for which a creditor has no lien on the debtor's property or the property on which a creditor has a lien is not worth enough to pay the creditor in full.

**Unsecured Nonpriority Claim:** Certain types of unsecured claims are given priority, so they are to be paid in bankruptcy cases before most other unsecured claims (if there is sufficient money or property available to pay these claims). The most common types of priority claims are listed on the proof of claim form. Unsecured claims that are not specifically given priority status by the bankruptcy laws are classified as Unsecured Nonpriority Claims.

**Information about Creditor:** Complete this section giving the name, address, and telephone number of the creditor to whom the debtor owes money or property, and the debtor's account number, if any. If anyone else has already filed a proof of claim relating to this debt, if you never received notices from the court which sent notice, or if this proof of claim replaces or amends a proof of claim that was already filed, check the appropriate box on the form.

1.  **Basis for Claim:** Check the type of debt for which the proof of claim is being filed. If the type of debt is not listed, check "Other" and briefly describe the type of debt. If you were an employee of the debtor, fill in your social security number and the dates of work for which you were not paid.

2.  **Date Debt Incurred:** Fill in the date the debt was first owed by the debtor.

3.  **Court Judgments:** If you have a court judgment for this debt, state the date the court entered the judgment.

4.  **Amount of Claim:** Insert the amount of claim at the time the case was filed in the appropriate box based on your selected Classification of Claim in item 5. If interest or other charges in addition to the principal amount of the claim are included, check the appropriate place on the form and attach an itemization of the interest and charges.

5.  **Classification of Claim:** Check either Secured, Unsecured Nonpriority or Unsecured Priority as appropriate. (See Definitions above.)

    **Unsecured Priority Claim:** Check the appropriate place if you have an unsecured priority claim, and state the amount entitled to priority. (See Definitions, above). A claim may be partly priority and partly nonpriority if, for example, the claim is for more than the amount given priority by the law. Check the appropriate place to specify the type of priority claim.

6.  **Credits:** By signing this proof of claim, you are stating under oath that in calculating the amount of your claim, you have given the debtor credit for all payments received from the debtor.

7.  **Supporting Documents:** You must attach to this proof of claim form, copies of documents that show the debtor owes the debt claimed or, if the documents are too lengthy, a summary of those documents. If documents are not available, you must attach an explanation of why they are not available.

*Be sure to date the claim and place original signature of claimant or person making claim for creditor where indicated at the bottom of the claim form. Please type or print name of individual under the signature. Be sure all items are answered on the claim form. If not applicable, insert "Not Applicable".*

RETURN CLAIM FORM (WITH ATTACHMENTS, IF ANY) TO THE FOLLOWING CLAIMS AGENT FOR THE DEBTORS:

> Claims Processing Agent
> Re: W. R. Grace & Co. Bankruptcy
> P.O. Box 1620
> Faribault, MN 55021-1620

The Bar Date for filing all NON-ASBESTOS CLAIMS against the Debtors is March 31, 2003 at 4:00 p.m. Eastern Time.

*In re W.R. Grace & Co.-Conn.* [Case No.01-1179]
Attachment to Proof of Claim filed on behalf of
the Casmalia Resources Site Steering Committee

1.      This Proof of Claim is filed on behalf of the Casmalia Resources Site
Steering Committee (the "Committee"). Attached as Exhibit A hereto and incorporated herein
by this reference is a list identifying the name of each current member of the Committee. This
Proof of Claim is for W.R. Grace & Co.-Conn.'s ("Debtor's") share of expenses, damages and
response costs in connection with the Casmalia Resources Hazardous Waste Disposal Facility,
located in the County of Santa Barbara, California (the "Site" or "Facility"). The Site is an
inactive waste treatment, storage and disposal facility which, from approximately 1973 until
1989, accepted waste, including solid and liquid waste designated by the United States
Environmental Protection Agency ("EPA") as hazardous substances as defined by Section
101(14) of the Comprehensive Environmental Response, Compensation and Liability Act
("CERCLA"), 42 U.S.C. Section 9601(14).

2.      According to EPA, hazardous substances deposited at the Site have been
released into the soil, groundwater, surface water and ambient air, posing an imminent and
substantial endangerment to the public health and the environment. In 1992, EPA initiated a
response action to stabilize and maintain the Site.

3.      In March of 1993, EPA notified approximately 65 alleged former
customers of the Facility of their potential liability under federal law for response costs incurred
and to be incurred at the Facility. Fifty-four of these public and private entities formed the
Committee to negotiate with EPA. Without admitting liability, the members of the Committee
subsequently reached a settlement with EPA, which was memorialized in a federal Consent
Decree approved and entered by the United States District Court of the Central District of
California on June 27, 1997. A copy of the Consent Decree is attached hereto as Exhibit B.

4.      Pursuant to the Consent Decree, the Committee has incurred and will
continue to incur substantial costs to maintain and close the Facility in accordance with federal
law. The Committee has also reimbursed and committed to reimburse EPA for certain past and
future response costs incurred as a result of a release or threatened release of hazardous
substances at the Site.

5.      Debtor has been identified as a potentially responsible party pursuant to
federal and state law with respect to the Site. Debtor was a generator of hazardous substances
deposited at the Site. Based on its status as a generator, Debtor is liable to the Committee under
federal and state law for costs incurred and to be incurred in addressing the serious
environmental problems at the Site. To date, Debtor has not contributed any sums to the costs
incurred and to be incurred in addressing the serious environmental problems at the Site.

6.      The Committee was organized in 1993 by certain of its members for the
purpose of cooperating in a common response to or defense of claims arising out of the Site. The
Committee has engaged the law firm of Bingham McCutchen LLP (formerly known as
McCutchen, Doyle, Brown & Enersen, LLP) to serve as common counsel to the Committee.

7.    Under CERCLA and/or its state law counterparts, Debtor is jointly and severally liable for all response costs associated with the cleanup of the Site consistent with the national contingency plan, which costs are currently estimated to be $271.9 million. The Committee is informed that EPA has already incurred costs associated with cleaning up the Site in an unknown amount.

8.    While Debtor is liable for the full $271.9 million described above, the Committee is willing to claim only $22,255.44. This amount represents one method of calculating Debtor's fair share of $271.9 million, based on the amount of waste Debtor disposed of at the Site. Records show that Debtor disposed of approximately 368,332 pounds of waste at the Site.

9.    The Committee is unaware of any claim of the Committee or of its members which was acquired within one year of the filing of Debtor's petition.

10.    The Committee is unaware of any sale or other disposition of the claims of the Committee or any of its members.

11.    It is impractical for the Committee to provide full documentation here regarding its claim against Debtor because the documentation is extensive and, further, some of it is in the exclusive possession of EPA or is otherwise not in the possession of the Committee. The Committee reserves the right to amend this Proof of Claim at such time as further information regarding its claim becomes available. Without limiting the generality of the foregoing, if an objection to its claim is filed, the Committee reserves the right to assert the full amount of its claim, currently estimated to be $271.9 million.

12.    The Committee is empowered to act on behalf of its members pursuant to a joint defense agreement, which has been withheld as privileged and confidential.

13.    Nothing in this proof of claim is a waiver of any of the Committee's rights, including, without limitation, the right to request payment of chapter 7 or chapter 11 administrative expenses. The Committee reserves the right to amend this claim and to supply further supporting documentation, including amendment to increase or specify the amount and priority of the claim. The Committee also reserves the right to assert this claim against affiliated Debtor entities in related bankruptcy cases.

Casmalia Resources Site Steering Committee

By:  BINGHAM McCUTCHEN LLP

By: _____
    for James J. Dragna

# Exhibit A

## EXHIBIT A

### Members of Casmalia Resources Site Steering Committee

- ABB Vetco Gray Inc.
- Aerochem, Inc.
- Aerojet General Corporation
- BP America, Inc. for Atlantic Richfield Company ("ARCO")
- Boeing North American, Inc., formerly known as Rockwell International Corporation
- Chevron Texaco Corporation
- City of Los Angeles
- City of Los Angeles Harbor Department, acting by and through its Board of Harbor Commissioners
- City of Oxnard
- Clairol, Inc.
- El Paso Prodcution Oil & Gas Co. for Coastal Oil & Gas Corporation
- Conoco Inc.
- County of Los Angeles
- Department of Airports, acting through and on behalf of the City of Los Angeles
- Department of Water & Power of the City of Los Angeles
- Everest & Jennings International
- Exxon Mobil Corporation
- Gemini Industries, Inc.
- General Dynamics Corporation
- General Electric Company
- General Motors Corporation
- Sanmina-SCI Corporation for Hadco Santa Clara, Inc., formerly known as Zycon Corporation
- Raytheon Company for Hughes Aircraft Company
- Lever Brothers Company
- Lockheed Martin Corporation (merged entity for Lockheed Corporation and Martin Marietta Corporation)
- McDonnell Douglas Corporation
- New VICI, Inc.
- Northrop Grumman Corporation (successor to Northrop Corporation)
- Waste Management, Inc. for Oil & Solvent Process Company
- Pacific Gas & Electric Company
- Sempra Energy for Pacific Offshore Pipeline Company
- Reynolds Metals Company
- R.G.G.L. Corporation
- Rhodia Inc. for Rhone-Poulenc Inc.
- Goodrich Corporation for Rohr, Inc., formerly Rohr Industries
- Romic Environmental Technologies Corporation
- Shell Oil Company
- Rohm & Haas for Shipley Company, Inc.
- Southern California Gas Company

- Union Pacific Railroad for Southern Pacific Transportation Company
- Square D Company
- Teleflex Incorporated
- Texaco Inc.
- The Deutsch Company
- The Dow Chemical Company
- The Procter & Gamble Manufacturing Company
- Todd Pacific Shipyards Corp.
- Union Oil Company of California dba Unocal
- Union Pacific Railroad Company for itself
- Anadarko Petroleum Corporation for Union Pacific Resources Company
- Clean Harbors Environmental Services for Solvent Service
- Zeneca Inc.

# Exhibit B

LOIS J. SCHIFFER
Assistant Attorney General
Environment and Natural Resources Division

LESLIE ALLEN, Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 514-4114

NORA M. MANELLA
United States Attorney for the
Central District of California
LEON W. WEIDMAN
Chief, Civil Division
KURT ZIMMERMAN
Assistant United States Attorney
300 North Los Angeles Street
Los Angeles, California 90012
(213) 894-2434

NANCY J. MARVEL
Regional Counsel
JOANNE S. MARCHETTA
Assistant Regional Counsel
U.S. Environmental Protection Agency
75 Hawthorne Street
San Francisco, California 94105
(415) 744-1315

Attorneys for Plaintiff United States

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA

        Plaintiff,

    v.                                CIVIL ACTION NO.

ABB VETCO GRAY INC.;
AEROCHEM, INC.;
AMCAST INDUSTRIAL CORPORATION;
ATLANTIC RICHFIELD COMPANY (ARCO);
CASPIAN INC.;
CHEVRON CORPORATION;
CITY OF OXNARD;
CLAIROL, INC.;
COASTAL OIL & GAS CORPORATION;
CONOCO INC.;
DEUTSCH COMPANY;
THE DOW CHEMICAL COMPANY;

CONSENT DECREE

EVEREST & JENNINGS INTERNATIONAL;
GEMINI INDUSTRIES, INC.;
GENERAL DYNAMICS CORPORATION;
GENERAL ELECTRIC COMPANY;
GENERAL MOTORS CORPORATION;
HUGHES AIRCRAFT COMPANY, and its
  subsidiaries;
LAYNE BROTHERS COMPANY;
LOCKHEED MARTIN CORPORATION,
  (merged entity for LOCKHEED
  CORPORATION and MARTIN MARIETTA
  CORPORATION);
MCDONNELL DOUGLAS CORPORATION;
MOBIL OIL CORPORATION;
NEW VICI INC. (for GONZALES/
  MONTEREY VINEYARD);
NORTHROP GRUMMAN CORPORATION;
OIL & SOLVENT PROCESS COMPANY,
  subsidiary of CHEMICAL WASTE
  MANAGEMENT, INC.;
PACIFIC GAS & ELECTRIC COMPANY;
PACIFIC OFFSHORE PIPELINE COMPANY;
THE PROCTOR & GAMBLE MANUFACTURING
  COMPANY;
REYNOLDS METALS COMPANY;
R.S.O.L. CORPORATION;
RHONE-POULENC INC.;
ROCKWELL INTERNATIONAL
  CORPORATION;
ROHR, INC., formerly ROHR
  INDUSTRIES, INC.;
ROMIC ENVIRONMENTAL TECHNOLOGIES
  CORPORATION;
SHELL OIL COMPANY;
SOUTHERN COMPANY INC.;
SOUTHERN CALIFORNIA GAS COMPANY;
SOUTHERN PACIFIC TRANSPORTATION
  COMPANY;
SQUARE D COMPANY;
TELEFLEX INCORPORATED;
TEXACO INC.;
TODD PACIFIC SHIPYARDS CORP.;
UNION OIL COMPANY OF CALIFORNIA,
  (aka UNOCAL);
UNION PACIFIC RESOURCES COMPANY;
UNION PACIFIC RAILROAD COMPANY;
USPCI (or SOLVENT SERVICE);
ZENECA INC.; and
ZYCON CORPORATION,

        Defendants.

02-0067472

TABLE OF CONTENTS

| I. | DEFINITIONS | 4 |
|---|---|---|
| II. | JURISDICTION | 16 |
| III. | DENIAL OF LIABILITY | 17 |
| IV. | PARTIES BOUND | 18 |
| V. | SITE BACKGROUND | 20 |
| VI. | PURPOSE AND REGULATORY FRAMEWORK | 23 |
| VII. | WORK TO BE PERFORMED | 27 |
| | A. Phase I Work | 27 |
| | B. Phase II Work | 32 |
| | C. Failure to Perform | 32 |
| | D. 10-Year Operation and Maintenance | 32 |
| | E. Post-30 Year Decision and Maintenance | 33 |
| | F. Operational and Response Costs | 33 |
| | G. General Provisions | 35 |
| | H. Compliance With Applicable Laws | 35 |
| | I. Permits | 36 |
| | J. Selection of Work Contractor | 36 |
| VIII. | ADDITIONAL RESPONSE ACTIONS | 38 |
| IX. | QUALITY ASSURANCE, SAMPLING, AND DATA ANALYSIS | 40 |
| X. | SITE ACCESS | 42 |
| XI. | REPORTING REQUIREMENTS | 44 |
| XII. | SUBMISSIONS REQUIRING AGENCY APPROVAL | 49 |
| XIII. | PROJECT COORDINATORS | 51 |
| XIV. | CERTIFICATIONS OF COMPLETION | 51 |
| XV. | EMERGENCY RESPONSE | 54 |
| XVI. | INDEMNIFICATION AND INSURANCE | 56 |
| XVII. | ESCROW ACCOUNTS/FINANCING THE WORK | 59 |
| XVIII. | COST ESTIMATES AND FUND TRANSFERS | 59 |
| | A. Cost Estimates and Funding Limits | 65 |
| | B. Fund Transfers | 74 |
| XIX. | REIMBURSEMENT OF RESPONSE COSTS | 78 |
| XX. | FORCE MAJEURE | 87 |
| XXI. | DISPUTE RESOLUTION | 90 |
| XXII. | STIPULATED PENALTIES | 97 |
| XXIII. | COORDINATED ENFORCEMENT RECOVERY | 102 |
| XXIV. | LEAD AGENCY | 108 |
| XXV. | COVENANTS NOT TO SUE/RESERVATIONS OF RIGHTS | 111 |
| | A. United States' Covenants Not To Sue | 111 |
| | B. Settling Defendants' Covenants Not To Sue | 117 |
| | C. United States' Reservation of Rights | 118 |
| | D. Settling Defendants' Reservation of Rights | 122 |
| XXVI. | EFFECT OF SETTLEMENT; CONTRIBUTION PROTECTION | 124 |
| XXVII. | ACCESS TO INFORMATION | 124 |
| XXVIII. | RETENTION OF RECORDS | 128 |
| XXIX. | NOTICES AND SUBMISSIONS | 131 |
| XXX. | EFFECTIVE DATE | 133 |
| XXXI. | RETENTION OF JURISDICTION | 134 |
| XXXII. | APPENDICES | 135 |
| XXXIII. | COMMUNITY RELATIONS | 136 |
| XXXIV. | MODIFICATION | 137 |
| XXXV. | LODGING AND OPPORTUNITY FOR PUBLIC COMMENT | 138 |
| XXXVI. | SIGNATORIES AND SERVICE | 139 |
| XXXVII. | SECTION HEADINGS | 140 |
| XXXVIII. | COUNTERPARTS | 141 |

02-0067473

## CASMALIA CONSENT DECREE

1
2  WHEREAS, the United States of America ("United States"), on
3  behalf of the Administrator of the United States Environmental
4  Protection Agency ("EPA"), has filed concurrently with this
5  Consent Decree ("Consent Decree" or "Decree") a complaint in this
6  matter pursuant to the Comprehensive Environmental Response,
7  Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., as
8  amended by the Superfund Amendments and Reauthorization Act of
9  1986, Pub. L. No. 99-499, 100 Stat. 1613 (1986) ("CERCLA"),
10  seeking to compel the Settling Defendant in this action to
11  perform certain response actions and to pay certain response
12  costs that may be incurred by the United States in response to
13  alleged releases and threatened releases of hazardous substances
14  from a facility as defined in Section 101(9) of CERCLA, 42 U.S.C.
15  § 9601(9), known as the Casmalia Resources Hazardous Waste
16  Management Facility ("the Casmalia facility" or "the facility"),
17  located in Santa Barbara County, California; and
18  WHEREAS, the United States' complaint also seeks to compel
19  the Settling Defendant to take certain actions under the
20  Resource Conservation and Recovery Act, as amended ("RCRA"),
21  pursuant to Section 7003, 42 U.S.C. §§ 6973; and
22  WHEREAS, pursuant to CERCLA § 121(f)(1)(F), the State of
23  California was given notice of EPA's negotiations with the
24  Settling Defendant and was provided with opportunities to
25  participate in such negotiations and be a Party to this Consent
26  Decree; and
27  WHEREAS, the State of California has indicated its support
28  of EPA in acting as the lead governmental regulatory and

Casmalia Consent Decree

-5-

1  enforcement agency with respect to matters relating to the Site
2  as provided herein notwithstanding that the State is authorized
3  to implement portions of the federal RCRA program in lieu of EPA;
4  and
5  WHEREAS, this Consent Decree is intended to govern all Site
6  regulatory and enforcement activities; and
7  WHEREAS, the United States contends that the presence of
8  solid wastes, hazardous wastes, hazardous constituents and/or
9  hazardous substances in the soil, groundwater, surface water and
10  air at the facility resulted from the past or present handling,
11  storage, treatment and/or disposal of solid wastes, hazardous
12  wastes, hazardous constituents and/or hazardous substances at the
13  facility, and may present an imminent and substantial
14  endangerment to health or the environment, within the meaning of
15  Section 7003 of RCRA, 42 U.S.C. § 6973; and
16  WHEREAS, the United States contends that the presence of
17  hazardous wastes, hazardous constituents, and/or hazardous
18  substances at the facility constitutes a release from the
19  facility, as defined in Section 101(22) of CERCLA, 42 U.S.C.
20  § 9601(22), which release may present an imminent and substantial
21  endangerment to the public health or welfare or the environment,
22  within the meaning of Section 106 of CERCLA, 42 U.S.C. § 9606,
23  and the actions required by this Consent Decree are necessary to
24  protect public health, welfare and the environment; and
25  WHEREAS, the Settling Defendants are "persons" subject to
26  liability under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a),
27  and Section 7003 of RCRA, 42 U.S.C. § 6973; and
28  WHEREAS, pursuant to Section 122 of CERCLA, 42 U.S.C.

§ 9622, and Section 7003 of RCRA, 42 U.S.C. § 6973, the United
States and the Settling Defendants have stipulated and agreed to
the making and the entry of this Consent Decree prior to the
taking of any testimony, and in settlement of the claims alleged
against the Settling Defendants in the complaint; and

WHEREAS, these agreements have been made without any
admission or finding of liability or fault as to any allegation
or matter; and

WHEREAS, the United States and the Settling Defendants
agree, and the Court by entering this Consent Decree finds, that
the settlement of these claims is made in good faith and in an
effort to avoid expensive and protracted litigation, and that
this Consent Decree is fair, reasonable, and in the public
interest;

NOW, THEREFORE, it is ORDERED, ADJUDGED, AND DECREED as
follows:

-7-

Casmalia Consent Decree 3

# I. DEFINITIONS

Unless otherwise expressly provided herein, terms used in
this Consent Decree which are defined in CERCLA or RCRA or in
regulations promulgated under CERCLA or RCRA shall have the
meaning assigned to them in CERCLA, RCRA, or in such regulations.
Whenever terms listed below are used in this Consent Decree or in
the appendices attached hereto and incorporated hereunder, the
following definitions shall apply:

"Administrative Costs" shall mean, with respect to the
Settling Defendants, the costs associated with the Casmalia
Resources Site Steering Committee ("CRSSC") organization and
administration or any successor organization and its
administration, including attorneys fees and legal support costs
associated with such organization and administration.
Administrative Costs shall not include the costs of the Settling
Defendants' Supervising Contractor or Project Coordinators,
unless such Supervising Contractor or Project Coordinator is an
active employee of a Settling Defendant.

"Cashout Settlement(s)" shall mean the procedure(s) to be
implemented by EPA whereby substantially all remaining
potentially responsible parties associated with the Casmalia Site
are notified by EPA and provided with an opportunity to pay
specified sums toward resolution of their potential Casmalia Site
liabilities under CERCLA and RCRA. Settlement proceeds from the
Cashout Settlement(s) shall be deposited to the Casmalia Consent
Decree Escrow Account to be used to pay for performance of
certain Work and to pay for certain Response Costs in accordance
with the terms of this Consent Decree.

02-0067475

-8-

Casmalia Consent Decree 4

1  "Casmalia Consent Decree Escrow Account" or "Escrow Account"
2  shall mean the Accounts, together with any and all Sub-Accounts,
3  established pursuant to Section XVII. (Escrow Accounts/Financing
4  The Work), for the purpose of holding and allocating funds
5  received from the Cashout Settlements; proceeds of any actions,
6  claims, settlement, or other efforts pursuant to Section XIII.
7  (Coordinated Enforcement Recovery); and funds from other sources
8  not precluded by this Consent Decree, to be used to pay for
9  performance of the Initial Phase II Work and O&M and for
10 specified Response Costs.
11     "Casmalia Entities" shall mean Casmalia Resources; Hunter
12 Resources; and Kenneth Hunter, Jr., and any related entities or
13 individuals with potential liability in connection with the
14 ownership or operation of the Casmalia Site.
15     "CERCLA" shall mean the Comprehensive Environmental
16 Response, Compensation, and Liability Act of 1980, 42 U.S.C.
17 §§ 9601 et seq., as amended by the Superfund Amendments and
18 Reauthorization Act of 1986, Pub. L. No. 99-499, 100 Stat. 1613
19 (1986].
20     "Consent Decree" shall mean this Decree, all appendices
21 attached hereto (listed in Section XXXII.), and any additions and
22 modifications to this Consent Decree and its appendices made in
23 accordance with its terms. In the event of conflict between this
24 Consent Decree and any appendix, this Consent Decree shall
25 control.
26     "Day" shall mean a calendar day, unless expressly stated to
27 be a Working Day. "Working Day" shall mean a day other than a
28 Saturday, Sunday, or Federal holiday. In computing any period of

Casmalia Consent Decree

-4-

1  time under this Consent Decree, where the last day would fall on
2  a Saturday, Sunday, or Federal holiday, the period shall run
3  until the close of business of the next Working Day.
4     "Defendants" shall mean Settling Defendants.
5     "Deliverable" shall mean all submissions and/or milestone
6  events required of the Settling Defendants under Section 4.0. of
7  the SOW, including any additions and modifications to this
8  Section of the SOW made in accordance with the terms of this
9  Consent Decree.
10    "DTSC" shall mean the Department of Toxic Substances Control
11 of the State of California and any successor departments or
12 successor agencies.
13    "Element(s) of Work" shall mean the specific work elements
14 as set forth in the Statement of Work attached at Appendix A.
15 Each Element of Work may have multiple Components as specified in
16 the SOW.
17    "EPA" shall mean the United States Environmental Protection
18 Agency or its authorized representative(s) and any successor
19 departments or successor agencies of the United States.
20    "Escrow Account" -- See Casmalia Consent Decree Escrow
21 Account.
22    "Final Cost Estimate" shall mean the final revision of the
23 cost estimates established pursuant to Section XVIII. Paragraph
24 A.3. (Cost Estimates and Fund Transfers) and Section 2.15 of the
25 SOW of the total present worth costs to be incurred to complete
26 30-Year O&M Work and Post-30 Year O&M Work and associated
27 governmental/regulatory oversight determined in accordance with
28 the terms of this Consent Decree and the SOW. The Final Cost

Casmalia Consent Decree

Estimate shall be separated into sub-components of cost as set

forth in Section 2.15. of the SOW.

"Final Past Response Costs Summary" shall mean the

accounting of the United States' Past Response Costs, pursuant to

Section XIX, Paragraph B.1. (Reimbursement of Response Costs),

that shall supersede the Initial Past Response Costs Estimate for

purposes of establishing the Escrow Account Funding Limits

pursuant to Section XVII, Paragraph E. (Escrow Accounts/Financing

The Work).

"Full Funding Option(s)" shall mean the Settling Defendants'

right to obtain a covenant not to sue for 30-Year O&M and/or

Post-30 Year O&M as provided under Section XXV, Paragraph A.3.a.

or A.3.b. and A.4.a. or A.4.b. (Covenants Not To Sue/Reservations

of Rights) of this Consent Decree.

"Funded Future Response Costs" -- see Future Response Costs.

"Funding Limit(s)" shall mean the authorized monetary

limits, as provided in Section XVII, Paragraph E. (Escrow

Accounts/Financing The Work), to which each Account and Sub-

Account in the Camella Consent Decree Escrow Account may be

funded from proceeds of the Cashout Settlements, if available;

proceeds of actions, claims, settlements, or other efforts

pursuant to Section XXIII. (Coordinated Enforcement Recovery)) or

other funding sources not precluded by this Consent Decree. The

Funding Limits for Work Phases shall be established on the basis

of cost estimates for performance of the Work pursuant to Section

XVIII, Paragraph A. (Cost Estimates and Fund Transfers). The

Funding Limit for Past Response Costs shall be established

pursuant to Section XIX, Paragraph B.2. and Paragraph E.

Camella Consent Decree

-11-

(Reimbursement of Response Costs). The Funding Limit for the

Phase II Future Response Costs Sub-Account of the Phase II

Account shall be established in accordance with the terms of

Section XIX, Paragraph D. (Reimbursement of Response Costs) and

Section XVIII, Paragraph A. (Cost Estimates and Fund Transfers).

The Funding Limits for the 30-Year and Post-30 Year O&M Oversight

Sub-Accounts shall be established in accordance with the terms of

Section XVIII, Paragraph A. (Cost Estimates and Fund Transfers).

"Future Response Action(s)" shall mean those activities

undertaken by the United States and its authorized

representatives associated with removal and remedial action in

connection with the Camella Site, including but not limited to,

enforcement and governmental/regulatory oversight of any tasks

and activities undertaken by Settling Defendants and other

response actions performed pursuant to this Consent Decree or

otherwise in connection with the Site.

"Future Response Costs" shall mean all costs of response,

including but not limited to direct and indirect costs and

interest, that the United States will incur in connection with

the Site beginning on the thirtieth (30th) day following entry of

this Consent Decree. Future Response Costs may be either Funded

or Unfunded. "Funded Future Response Costs" shall mean any costs

payable and paid to EPA (a) by Settling Defendants pursuant to

Section XIX, Paragraph C. (Reimbursement of Response Costs) and

(b) from the Phase II Account of the Camella Consent Decree

Escrow Account pursuant to Section XIX, Paragraph D.

(Reimbursement of Response Costs). "Unfunded Future Response

Costs" shall mean all Future Response Costs that are not Funded

Camella Consent Decree

-12-

02-0067477

Future Response Costs and shall include any unreimbursed or
uncollected costs of response associated with the United States'
Future Response Actions, including costs that the United States
incurs in actions against Third Parties that are not reimbursed
pursuant to Section XXIII. (Coordinated Enforcement).

"Initial Cost Estimate" shall mean the preliminary estimates
established pursuant to Section XVIII, Paragraph A.1. (Cost
Estimates and Fund Transfers) and Section 2.15. of the SOW of the
total present worth costs to be incurred to complete all Site
Work and Future Response Actions determined in accordance with
the terms of this Consent Decree and the SOW. The Initial Cost
Estimate shall be separated into sub-components of cost as set
forth in Section 2.15, of the SOW.

"Initial Past Response Costs Estimate" shall mean the United
States' estimate of Past Response Costs, pursuant to Section XIX.
Paragraph B.1. (Reimbursement of Response Costs), incurred in
connection with the Casmalia Site up to, but not including, the
thirtieth (30th) day following entry of this Consent Decree. The
Initial Past Response Costs Estimate shall be effective for the
purpose of establishing the Funding Limits for Section XVII.
Paragraph E. (Escrow Accounts/Financing The Work) until
superseded by EPA's Final Past Response Costs Summary and/or any
adjustments, pursuant to Section XIX, Paragraphs B.2. and E.
(Reimbursement of Response Costs).

"Initial Phase II Work" shall mean all Phase II Work, except
for the O&M Base Period Work. Initial Phase II Work shall be
complete as of the date set forth in EPA's written acceptance of
the Initiation of Operation Report, O&M Base Period Component of

Casmalia Consent Decree

-13-

Work, pursuant to Section 5.7.4. of the SOW.

"Interim Cost Estimate" shall mean the revised cost
estimates established pursuant to Section XVIII, Paragraph A.2.
(Cost Estimates and Fund Transfers) and Section 2.15, of the SOW
of the total present worth costs to be incurred to complete all
Site Work and Future Response Actions determined in accordance
with the terms of this Consent Decree and the SOW. The Interim
Cost Estimate shall be separated into sub-components of cost as
set forth in Section 2.15, of the SOW.

"National Contingency Plan" or "NCP" shall mean the National
Oil and Hazardous Substances Pollution Contingency Plan, dated
March 8, 1990 (55 Fed. Reg. 8813), promulgated pursuant to
Section 105 of CERCLA, 42 U.S.C. § 9605.

"Operation and Maintenance" or "O & M" shall mean all tasks
and activities required to maintain the effectiveness of the
response actions implemented under the Phase I and Initial Phase
II Work. For purposes of this Consent Decree, O&M will be
divided into three time periods: (a) O&M activities performed by
Settling Defendants during the first five (5) years of O&M ("O&M
Base Period Work"); (b) O&M activities performed for the next
thirty (30) years (i.e. years 6 through 35 of O&M ("30-Year O&M
Work"); and (c) O&M activities to be performed after the 30-Year
O&M Work ("Post-30 Year O&M Work"). Except as set forth in
Section XVII. (Escrow Accounts/Financing The Work), Section
XVII. (Cost Estimates and Fund Transfers), Paragraphs A.3. and
A.4. of Section XXV. (Covenants Not to Sue/Reservations of
Rights), and Section XXVI. (Effect of Settlement/Contribution
Protection), Operation and Maintenance (O&M) shall not include

-14-

1. the costs or performance of governmental/regulatory oversight,
2. including enforcement, of the O&M Work.
3.   "O&M Base Period" shall mean the five (5) year period
4. beginning on the date set forth in EPA's written acceptance of
5. the Initiation of Operation Report, Operation and Maintenance
6. Base Period Component of Work, pursuant to Section 5.7.4, of the
7. SOW.
8.   "O&M Base Period Work" shall mean the implementation of all
9. tasks and activities of the Operation and Maintenance Base Period
10. Component of Work, pursuant to Section 2.10.5, of the SOW,
11. necessary to complete the O&M performed during the O&M Base
12. Period.
13.   "Paragraph" shall mean a portion of this Consent Decree
14. identified by an upper case letter or an Arable numeral.
15.   "Parties" shall mean the signatories to this Consent Decree
16. -- the United States and the Settling Defendants.
17.   "Past Response Costs" shall mean all costs of response,
18. including but not limited to direct and indirect costs and
19. interest, that the United States incurs in connection with the
20. Site from March 1, 1992 up to, but not including, the thirtieth
21. (30th) day following entry of this Consent Decree. Past Response
22. Costs shall also include Unfunded Future Response Costs that may
23. periodically be added as an adjustment to the Past Response Costs
24. Funding Limit pursuant to Section XIX, Paragraph E.
25. (Reimbursement of Response Costs).
26.   "Performance Standards" shall mean those cleanup standards,
27. standards of control, and other substantive requirements,
28. criteria or limitations to be achieved by the Settling Defendants

Camnelia Consent Decree
11

-15-

1. in implementing the Elements and Components of Work. The
2. Performance Standards for the Phase I and Phase II Work are
3. specified in Section 2.0, of the SOW. To the extent not defined
4. in the attached SOW, Performance Standards shall be set forth, as
5. appropriate, in a future EPA ROD or other response action
6. decision document(s), later amendment(s) to the SOW, or in EPA
7. approvals and decisions made under the SOW.
8.   "Phase I Work" shall mean the performance of all tasks and
9. activities necessary to implement the Elements and Components of
10. Work listed in Section 1.2.13. of the SOW, and any modifications
11. thereto, in accordance with the requirements of this Consent
12. Decree. The completion of all tasks and activities in Phase I
13. Work is not a pre-requisite to initiating tasks and activities in
14. the Phase II Work.
15.   "Phase II Work" shall mean any Work to be implemented at the
16. Site that is not within Phase I Work or 30-Year and Post-30 Year
17. O&M Work. Phase II Work shall mean the performance of all tasks
18. and activities necessary to implement the Elements and Components
19. of Work listed in Section 1.2.14. of the SOW; any modifications
20. thereto, in accordance with the requirements of this Consent
21. Decree; and any response actions selected by EPA under a future
22. ROD or other response action decision document(s), as appropriate
23. and necessary. Except as set forth in Section XVII. (Escrow
24. Account/Financing The Work) and Section XVIII. (Cost Estimates
25. and Fund Transfers), Phase II Work shall not include the costs or
26. performance of governmental/regulatory oversight, including
27. enforcement.
28.   "Plaintiff" shall mean the United States.

Camnelia Consent Decree
12

02-0067479          -16-

1 "Post-30 Year O&M Work" -- See Operation and Maintenance.

2 "RCRA" shall mean the Solid Waste Disposal Act, as amended,

3 42 U.S.C. §§ 6901 et seq. (also known as the Resource

4 Conservation and Recovery Act).

5 "RCRA Trust Fund" shall mean any trust fund, and any

6 amendments thereto, established pursuant to the financial

7 responsibility provisions of RCRA § 3004(t), 42 U.S.C.

8 § 6924(t), as promulgated in regulations at 40 C.F.R. § 265.143,

9 for the benefit of the Casmalia Site, or any superseding account

10 holding monies from any such Trust Fund.

11 "Record of Decision" or "ROD" shall mean the EPA decision

12 document(s) prepared after completion of the Remedial

13 Investigation/Feasibility Study Component of Work pursuant to

14 Section 2.10.2. of the ROW.

15 "Section" shall mean a portion of this Consent Decree

16 identified by a roman numeral.

17 "Settling Defendants" shall mean all Parties listed in

18 Appendix C and any related entities specifically identified

19 therein and in Appendix D, as provided in Section IV. (Parties

20 Bound).

21 "Site" or "Casmalia Site" shall mean generally the Casmalia

22 Resources Hazardous Waste Management Facility, encompassing

23 approximately 252 acres, located approximately 10 miles southwest

24 of Santa Maria and one and a half miles north of Casmalia in

25 Santa Barbara County, California and depicted generally on the

26 map attached at Appendix B. Site shall include the areal extent

27 of contamination that is presently located in the vicinity of the

28 Casmalia facility and all suitable areas in very close proximity

Casmalia Consent Decree 13

-17-

1 to the contamination necessary for the implementation of the

2 response action and any areas to which such contamination

3 migrates.

4 "State" shall mean the State of California, including all of

5 its departments, agencies, boards, and divisions.

6 "Statement of Work" or "SOW" shall mean the document

7 appended to and incorporated into this Consent Decree at Appendix

8 A, and any modifications and amendments thereto made in

9 accordance with this Consent Decree, detailing the requirements

10 for performance of the Work.

11 "Supervising Contractor" shall mean the principal contractor

12 retained by the Settling Defendants to supervise and direct the

13 implementation of the Phase I and Phase II Work under this

14 Consent Decree.

15 "Support Costs" shall mean those costs incurred by the

16 Settling Defendants to implement the tasks and activities

17 required in Section 2.14. of the Statement of Work and shall not

18 include any Administrative Costs.

19 "Third Party shall mean any potentially responsible party

20 who is not a signatory to this Consent Decree or who is a

21 signatory and has not resolved its liability hereunder.

22 "30-Year O&M Work" -- See Operation and Maintenance.

23 "Unfunded Future Response Costs" -- see Future Response

24 Costs.

25 "United States" shall mean the United States of America.

26 "Waste Material" shall mean (1) any "hazardous substance"

27 under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (2) any

28 pollutant or contaminant under Section 101(33), 42 U.S.C.

-18-



§ 9601(33)); (3) any hazardous waste under Section 1004(5) of RCRA or hazardous constituent as defined at 40 C.F.R. § 260.10 pursuant to RCRA; (4) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27); and (5) any hazardous substance under California Health and Safety Code §§ 25316 and 25317.

"Work" shall mean any or all tasks and activities included or to be included in Phase 1 Work, Initial Phase II Work and O&M under this Consent Decree, except those required by Section XVII. (Retention of Records). Except as provided otherwise in this Consent Decree, Work shall not include the costs of performance of governmental/regulatory oversight, including enforcement.

-19-

Casmalia Consent Decree 15

## XXI. JURISDICTION

This Court has jurisdiction over the subject matter of this action pursuant to 42 U.S.C. §§ 9606, 9607, and 9613(b); 42 U.S.C. § 6973; and 28 U.S.C. §§ 1331 and 1345. This Court also has personal jurisdiction over the Settling Defendants. Solely for the purposes of the entry and enforcement of this Consent Decree, Settling Defendants waive all objections and defenses that they may have to jurisdiction of the Court or to venue in this District. Settling Defendants shall not challenge the terms of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree.

02-0067481

-20-

Casmalia Consent Decree 16

## III. DENIAL OF LIABILITY

The Settling Defendants deny any and all legal or equitable liability under any federal, state, or local statute, regulation or ordinance, or common law, for any claim related to the site. Except as otherwise provided, nothing in this Consent Decree shall constitute an admission or waiver of any kind. Nothing in this Section shall alter Settling Defendants' agreement not to challenge the Court's jurisdiction as set forth in Section II. (Jurisdiction).

Camalia Consent D----    17

-21-

## IV. PARTIES BOUND

1
2   A.   The Parties to this Consent Decree are its signatories
3   -- the United States of America and the Settling Defendants.
4   B.   This Consent Decree applies to and is binding upon the
5   United States and upon Settling Defendants and their successors
6   and assigns. Any change in ownership or corporate status of a
7   Settling Defendant shall in no way alter such Settling
8   Defendant's responsibilities under this Consent Decree.
9   C.   Other parties potentially responsible for the Camalia
10  Site are identified in a customer data base and associated
11  records that had previously been maintained by Camalia Resources
12  at the Camalia facility. A complete listing of such parties has
13  been reviewed by an authorized representative of each Settling
14  Defendant, and affiliated or otherwise related entities to the
15  Settling Defendants have been identified and listed in Appendix
16  D. To the extent an affiliate of, or entity otherwise related
17  to, any Settling Defendant is not specifically identified in
18  Appendix D, it shall not be deemed to be a party to this Consent
19  Decree, and shall not be subject to any of the rights, benefits,
20  obligations, or requirements of this Consent Decree.
21  D.   Settling Defendants shall provide a copy of this
22  Consent Decree, as entered, and all relevant additions and
23  modifications to this Consent Decree, as appropriate, to each
24  person, including all contractors retained by Settling Defendants
25  to perform the Work required by this Consent Decree and to each
26  person representing any Settling Defendant with respect to the
27  Site or the Work within thirty (30) days of retention. Settling
28  Defendants shall require all such persons to perform their duties

02-0057487                    Camm        Conn.    Decr.    18

## V. SITE BACKGROUND

The following is a summary of the Site background as alleged by the United States which, for purposes of this Consent Decree, the Parties neither admit nor deny:

A. The Casmalia Resources Hazardous Waste Management Facility in northern Santa Barbara County, California is an inactive commercial hazardous waste treatment, storage and disposal facility, which accepted large volumes of Waste Materials from 1973 to 1989. The facility is located on approximately 252 acres and consists of former surface impoundments, a number of inactive waste landfills, on-site treatment systems used during the facility operating period, and several engineering control structures put in place during the facility's operational years. See Appendix B.

B. The Site is located in the Santa Maria Basin of coastal California near the southern end of the Casmalia Hills and about a mile and a half north of the town of Casmalia. The facility itself, located within the Shuman Canyon drainage sub-basin, is on a southern facing slope traversed by three small canyons. Casmalia Creek, about 500 feet west, is the nearest surface water to the site. This creek flows to the southwest to join Shuman Creek about one mile southwest of the town of Casmalia. Shuman Creek continues southward and westward, eventually discharging to the Pacific Ocean. See Appendix B.

C. The uppermost water bearing formation underlying the Site is the Todos Santos Claystone Member of the Sisquoc Formation. The upper weathered claystone layer is highly fractured and ranges in thickness between 30 to 60 feet. The

Casmalia Consent Decree
-24-

02-00674483

20

---

with respect to the Site and the Work in compliance with the terms of this Consent Decree. Settling Defendants, or their contractors, shall provide written notice of the Consent Decree, and any additions or modifications, to all subcontractors retained or assigned to perform any portion of the Work required by this Consent Decree. Settling Defendants shall nonetheless be responsible for ensuring that their contractors and subcontractors perform the Work contemplated herein in accordance with this Consent Decree.

Casmalia Consent Decree
-25-

19

lower unweathered claystone beneath the weathered layer is less
fractured. The pervasive fracturing of the upper claystone layer
results in localized flow variations throughout the Site, but the
hydraulic conductivity of the unweathered claystone is
significantly less than that found in the weathered claystone.

D. There have been and continue to be actual and
threatened releases of Waste Materials at the Site. The Site now
presents and may continue to present a threat to human health and
the environment.

E. During the facility's operation, the owners/operators
accepted billions of pounds of commercial and industrial wastes
from thousands of generators that include large and small private
entities and numerous federal, state, local and municipal
government entities.

F. From 1980 to 1989, the Casmalia facility was operated
under federal interim status pursuant to RCRA. Because of
continuing deficiencies in the facility operations, no final RCRA
permit has been granted, and the facility has not been adequately
closed in accordance with requirements of RCRA.

G. In late 1989, the owners/operators ceased accepting
shipments of off-site waste and, in 1991, ceased all active
efforts to clean up and close the facility asserting that they
have insufficient monies to pay for cleanup or closure
activities.

H. The facility's closure trust fund, the RCRA Trust Fund,
which as of June 1996 totals approximately $10 million, set aside
by the facility owners/operators, is insufficient to cover
closure and post-closure activities at the Site.

Casmalia Consent Decree

I. Since the facility ceased accepting waste in 1989, the
owners/operators have progressively reduced site maintenance
activities. In response to unstable and deteriorating conditions
at the site, in August 1992, EPA initiated a removal action,
pursuant to CERCLA section 104, 42 U.S.C. § 9604, to implement
certain interim stabilization actions, prevent further
deterioration of site conditions, and control the most immediate
threats. The Site continues to pose an imminent and substantial
endangerment within the meaning of Section 106 of CERCLA and
Section 7003 of RCRA. 42 U.S.C. § 9606, 42 U.S.C. § 6973.

J. Because the owners/operators of the Site have failed to
perform sufficient closure and remediation activities, in March
1993, under CERCLA and RCRA authorities, EPA notified a group of
approximately 65 Casmalia waste generators, representing some of
the largest disposers of waste, of their potential liability for
site remediation. Approximately 50 of the first 65 notified
generators formed the Casmalia Resources Site Steering Committee
("CRSSC"). EPA negotiated with the CRSSC and other potentially
responsible parties ("PRPs") to secure implementation of response
actions at the Site as detailed by the terms of this Consent
Decree.

K. EPA intends that all Work performed at the Site will be
consistent with the requirements of CERCLA and the National
Contingency Plan ("NCP").

02-0067484

Casmalia Consent Decree

## VI. PURPOSE AND REGULATORY FRAMEWORK

A. The fundamental purposes of this Consent Decree are to:

(1) provide a CERCLA framework for a comprehensive, coordinated and site-wide response to all conditions at the Site that may present an imminent and substantial endangerment to public health, welfare and the environment caused by the disposal of Waste Materials at the Site and to protect public health, welfare and the environment from any releases or threatened releases of Waste Material from the Site through (a) the investigation of conditions at the Site, (b) the selection, design, construction, and implementation of response actions necessary to close or otherwise remediate the Site and to achieve applicable or relevant and appropriate requirements ("ARARs") and other performance standards described in the SOW, and in any ROD or other response action decision documents issued by EPA, as appropriate and necessary, pursuant to this Consent Decree, in order to complete remediation of the entire Site in accordance with the NCP and (c) monitoring, operation and maintenance of these response actions for a specified period of time after completion;

(2) provide comprehensive and integrated arrangements for funding and performance of the Work to be performed at the Site pursuant to this Consent Decree including, but not limited to, collecting funds from other potentially responsible parties to pay for certain portions of the Work; and

(3) except as noted in Section XXV. (Covenants Not To Sue/Reservation of Rights), provide a settlement of any and all potential civil claims among and between the Settling Defendants

Camsalia Consent Decree

-27-

and the United States in connection with the Camsalia Site; and provide the Settling Defendants with statutory protection against claims as provided herein.

B. The CERCLA framework provided by this Consent Decree incorporates the requirements of other federal and State laws through the identification and enforcement of ARARs as an integral part of the remedy for the Site. Because the Site was operated as an interim status hazardous waste management facility, potential ARARs will include RCRA closure and corrective action requirements. Accordingly, this Consent Decree shall govern all activities that take place on the Site after entry of this Consent Decree, and shall upon entry supersede or take precedence over all State or local enforcement actions or orders issued against the Settling Defendants or Third Parties who resolve their liabilities with the Parties with respect to the Site during the pendency of this Consent Decree, except for any State or local permits or other authorizations issued in accordance with applicable law for response activities undertaken pursuant to this Consent Decree that are not conducted entirely on the site.

C. The Work to be performed under this Consent Decree will provide a comprehensive remedy for the Site that will address existing and anticipated future Site conditions. Based upon presently existing data, the RCRA operating and closure history of the Site, and the long-term response actions taken at similar large landfill sites, EPA believes that the likely Site remedy will consist of controlling the migration of contaminated groundwater and containing the contaminated land masses. In

Camsalia Consent Decree

-28-

02-0067485

1 order to assure that the remedy provides adequate protection of

2 human health and the environment and meets ARARs and other

3 performance standards set forth in this Consent Decree, this

4 early assessment shall be subject to confirmation by EPA

5 following completion of the early response actions, the RI/CA and

6 the RI/FS to be performed for the entire Site in accordance with

7 this Consent Decree. In accordance with the NCP, EPA's decision

8 concerning the final Site remedy will be set forth in a ROD taken

9 together, if appropriate and necessary, with other EPA decision

10 documents.

11 D. The Parties acknowledge that the Settling Defendants

12 are entering this Consent Decree and undertaking to perform the

13 Work as persons who have arranged for disposal of Waste Materials

14 at the Site, and neither entry into this Consent Decree nor

15 performance of all or part of the Work at the Site shall be

16 deemed to grant legal possession and control of the Site to

17 Settling Defendants or cause Settling Defendants to be deemed

18 owners or operators of the Site.

19 E. The State by agreement with EPA turned over the lead

20 agency responsibility for the management of the

21 closure/remediation of the Casmalia Site to EPA, notwithstanding

22 that, with certain exceptions, the State is authorized to

23 implement the federal RCRA program in lieu of EPA, after

24 consultation with the State, determined that the best means to

25 implement such closure/remediation was to establish a

26 comprehensive regulatory and enforcement program for the Site as

27 provided by this Consent Decree. The Parties intend that the

28 regulatory framework and relationship between EPA and the State

Casmalia Consent Decree

-5-

1 be managed as provided herein. The State of California, pursuant

2 to CERCLA § 121(f)(1)(F), was given notice of EPA's negotiations

3 with the Settling Defendant and was provided with opportunities

4 to participate in such negotiations and be a Party to this

5 Consent Decree, to among other things, identify the rights and

6 responsibilities between EPA and the State. Although the State

7 declined to become a Party to the Consent Decree, the State has

8 been consulted on the technical approach detailed in the ROW and

9 the management of the Site pursuant to the approach in this

10 Consent Decree. The State has indicated its support of this

11 Consent Decree's reliance upon a CERCLA framework to implement a

12 comprehensive response to conditions at the Site and EPA's role

13 as the lead governmental regulatory agency.

14 F. The preservation of the RCRA Trust Fund for use toward

15 30-Year O&M Work at the Site is an integral provision of this

16 Consent Decree. It is intended that this Consent Decree shall

17 govern the management and disbursement of funds from the RCRA

18 Trust Fund. EPA agrees not to request or to otherwise use the

19 RCRA Trust Fund for anything other than 30-Year O&M Work. This

20 obligation shall be effective upon lodging of this Consent

21 Decree. The Parties agree to work cooperatively to ensure that

22 the RCRA Trust Fund is transferred to the Escrow Account, and

23 managed in a manner consistent with the terms of this Consent

24 Decree.

25

26 02-0067486

27

28

Casmalia Consent Decree

26

## VII. WORK TO BE PERFORMED

A. **Phase I Work**

1. Settling Defendants shall perform, at their expense and without limitation as to its cost or duration, the Phase I Work. The Phase I Work shall be performed in accordance with this Consent Decree, including, but not limited to, the SOW attached at Appendix A; all standards, plans, specifications, and schedules set forth in or developed pursuant to this Consent Decree and the SOW, and any modifications or amendments thereto made pursuant to the terms of this Consent Decree.

2. Except as provided in Section XIV, Paragraphs C. and D. (Certifications of Completion), Settling Defendants' obligation to perform and pay for Phase I Work shall cease as of the effective date of EPA's written acceptance of the Completion of Phase I Work Report (Section 5.4.) of the SOW. Pursuant to Section XIV. (Certifications of Completion), the following Elements or Components of Work shall cease to be Phase I Work obligations and become Phase II Work as follows: (a) the Short-Term and Interim Collection/Treatment/ Disposal of Contaminated Liquid Components of Work shall cease to be Phase I Work as of the effective date of EPA's written acceptance of the "Phase I Completion of Obligation Report for Short-Term and Interim Collection/Treatment/Disposal of Contaminated Liquids Components of Work," as set forth in Section 5.4. of the SOW; (b) the Routine Site Maintenance Element of Work shall cease to be Phase I Work as of the effective date of EPA's written acceptance of the "Phase I Completion of Obligation Report for Routine Site Maintenance Element of Work," as set forth in Section 5.4. of the

Caamalla Consent Decree

-31-

SOW; (c) the Routine Groundwater Monitoring Element of Work shall cease to be Phase I Work as of the effective date of EPA's written acceptance of the "Phase I Completion of Obligation Report for Routine Groundwater Monitoring Element of Work," as set forth in Section 5.4. of the SOW; (d) the Community Relations Support Element of Work shall cease to be Phase I Work as of the effective date of EPA's written acceptance of the "Phase I Completion of Obligation Report for Community Relations Support Element of Work," as set forth in Section 5.4. of the SOW.

3. Settling Defendants shall begin performance of the Work, as set forth in the SOW, including its schedules, at Appendix A, no later than seven (7) days after lodging of this Consent Decree. Settling Defendants shall not, however, be required to commence construction of any permanent facilities until the Consent Decree has been entered by the Court or unless such construction is agreed to by EPA and the Settling Defendants. In the event that the Consent Decree is not entered by the District Court within twelve (12) months from the date of its lodging, the Settling Defendants' obligation to perform or to finance any Work prior to entry of this Consent Decree shall terminate, at the Settling Defendants' option, until the date of entry of this Consent Decree by the District Court. Any delay in the commencement of construction of permanent facilities or in the implementation of other tasks, activities, and obligations caused by a delay in the entry of the Consent Decree shall extend, pro tanto, the dates in the schedule under Section 5.0. of the SOW.

02-0067487

Caamalla Consent Decree

-32-

## B. Phase II Work

1. The Settling Defendants shall perform Phase II Work, not otherwise performed by Third Parties, using monies received from the Cashout Settlement(s) from actions, claims, settlements or other efforts pursuant to Section XXIII, (Coordinated Enforcement Recovery), and/or from other sources not precluded by this Consent Decree. Settling Defendants shall not be obligated under the terms of this Consent Decree to pay for any Phase II Work, except that Settling Defendants shall pay their Administrative Costs associated with and relating to the Phase II Work and shall not be entitled to withdraw or use funds from the Casmalia Consent Decree Escrow Account to pay these Costs. Nothing in this Paragraph B, shall be construed to preclude the assessment of stipulated penalties against, or payment of stipulated penalties by, the Settling Defendants for violations related to Phase II Work as provided under Section XXII, (Stipulated Penalties).

2. The detailed scope of the Elements and Components of Phase II Work shall be determined in accordance with this Consent Decree and the SOW. The full scope of response actions associated with the Phase II Work shall be set forth by EPA in an EE/CA Action Memorandum or other EPA response action decision document, after completion of the EE/CA Component of Work at Section 2.9.2. of the SOW, and a ROD, after completion of the RI/FS Component of Work at Section 2.10.2. of the SOW, which taken together and with other response action decision documents, as appropriate and necessary, will determine the final remedy for the Site. Settling Defendants shall perform Phase II Work in

Casmalia Consent Decree,

-33-

accordance with this Consent Decree, including, but not limited to, the SOW attached at Appendix A; all applicable standards, plans, specifications, and schedules set forth in or developed pursuant to this Consent Decree and the SOW; any applicable modifications or amendments thereto made pursuant to the terms of this Consent Decree; and any future EPA ROD or other response action decision document(s), as appropriate and necessary.

3. Settling Defendants are not obligated to begin Phase II Work until $3 million is available for performance of the Phase II Work.

4. Settling Defendants are not obligated to perform Phase II Work absent the receipt of sufficient funds. However, in the event of insufficient funds, Settling Defendants shall perform that Work that can be performed with available funds pursuant to the determination in Section 1.3.10. of the SOW. The Settling Defendants shall be authorized to withdraw advance payments from the Phase II Work Account as set forth below to fund the Phase II Work.

a. The Escrow Agreement shall instruct the Escrow Manager to disburse money from the Phase II Work Account to the Settling Defendants quarterly as authorized by the Annualized Phase II Work Budget Estimate, including updates thereto, required to be submitted by the Settling Defendants pursuant to Section XVII, Paragraph J.3. (Escrow Accounts/Financing The Work) and Sections 3.17., 4.1.1., and 5.4. of the SOW. Although any quarterly payment to the Settling Defendants may exceed the budgeted amount for that quarter after notice to EPA, the Escrow Agreement shall instruct the Escrow

Casmalia Consent Decree

-34-

02 :5674...

Manager not to disburse money over four consecutive quarters that is in excess of the Annualized Phase II Work Budget Estimate in the absence of written approval by EPA.

If the Settling Defendants request money from the Phase II Work Account in excess of the Annualized Phase II Work Budget Estimate, the Settling Defendants shall submit to EPA for approval justification of the need for funds in excess of such budget and steps to be taken to bring the project back within budget. If possible, and to minimize future cost overruns, Settling Defendants shall maintain records accounting for all Work expenditures paid for by money from the Escrow Account and detailing Site operations related to Escrow Account expenditures. EPA shall be entitled, upon reasonable notice to the Settling Defendants, to audit Settling Defendants accounting and operations records related to the Escrow Account expenditures.

b. If insufficient money is available in the Phase II Work Account to fund the Work pursuant to Paragraph 4.a. above, Settling Defendants shall notify EPA as specified in Section 5.4. of the SOW of the unavailability of funds. In the event that the insufficient funding results in suspension of performance of the unfunded Phase II Work, Settling Defendants shall re-start the Work as soon as practicable after such additional funds become available. Settling Defendants shall not unreasonably delay re-starting the Work under this Paragraph.

5. Settling Defendants' obligations under this Consent Decree to perform Phase II Work will cease on the effective date, as provided in Section XIV. (Certifications of Completion), for the Phase II Work.

Camella Consent Decree 31

---

c. Failure to Perform

In the event Settling Defendants fail to perform all or portions of the Phase I or Phase II Work as required, the Settling Defendants shall be subject to stipulated penalties as set forth in Section XXII, Paragraph D. (Stipulated Penalties). If EPA perform all or a portion of the Work because of Settling Defendants' unauthorized failure to perform, monies in the appropriate Account of the Escrow Account shall be paid to EPA upon demand into a Camella Site-specific special account (a) to be used to reimburse EPA for any Work performed or (b) to be used by EPA to perform the Work. If the Settling Defendants' failure to perform Work is the subject of a dispute pursuant to Section XXI. (Dispute Resolution), the failure to perform shall not be considered unauthorized until the dispute is resolved and the Settling Defendants' position is rejected, unless Settling Defendants' specific work stoppage results in an imminent and substantial endangerment to public health, welfare or the environment beyond the general allegations in the complaint, necessitating response action, as determined by EPA, in which case, advance payments or reimbursements requested by EPA shall be payable from the appropriate Account of the Escrow Account for such response action.

D. 30-Year Operation and Maintenance

1. The obligations to perform and to oversee the 30-Year O&M Work are not resolved by this Consent Decree.

2. The specific tanks and activities to be performed during the 30-Year O&M Work are not specified under the SOW or this Consent Decree.

02-0067489                    Camella Consent Decree 32

E. **Post-30 Year Operation and Maintenance.**

1. The duration of, and the obligations to perform and oversee, Post-30 Year O&M Work are not resolved by this Consent Decree.

2. The specific tasks and activities to be performed during the Post-30 Year O&M Work are not specified under the SOW or this Consent Decree.

F. **Oversight**

The United States will oversee the Settling Defendants' performance of the Work until Certification of Completion of Phase II Work. The designation of the lead agency for the governmental/regulatory oversight of the 30-Year and Post-30 Year O&M Work is not resolved by this Consent Decree, but is subject to resolution as set forth in Paragraph C. of Section XXIV. [Lead Agency].

G. **General Provisions**

1. Notwithstanding any approvals that may be granted by the United States or other governmental entities, the Settling Defendants shall not be relieved of any liability arising from or related to their acts or omissions or the acts or omissions of any of their contractors, subcontractors, or any other person acting on their behalf in the performance of the Work or their failure to perform or complete the Work.

2. The SOW, any modifications to the SOW, and any future EPA ROD or other EPA response action decision documents related to the Carmalia Site are hereby incorporated by reference and made a part of this Consent Decree and are enforceable hereunder.

Carmalia Consent Decree

-17-

3. Neither the SOW, the plans, any standards, specifications, and schedules, nor any approvals, permits or other permissions that may be granted by EPA related to this Consent Decree constitute a warranty or representation of any kind by the United States that the SOW, plans, standards, specifications, schedules, or ROD or other EPA response action decision documents, when implemented, will achieve the Performance Standards established or to be established, and shall not foreclose the United States from seeking performance of all terms and conditions of this Consent Decree or any EPA ROD or other EPA response action decision, the enforcement of which is not otherwise precluded by this Consent Decree. The Work performed by the Settling Defendants pursuant to this Consent Decree shall include the obligation to achieve the Performance Standards.

4. Except as otherwise permitted by law and as approved by EPA, any facilities constructed or put in place under the terms of this Consent Decree shall not be used to treat Waste Materials other than those associated with the Site.

5. Settling Defendants shall be jointly and severally responsible for the performance of the Settling Defendants' obligations under this Consent Decree. In the event of the insolvency or other failure of any one or more Settling Defendants to implement the Work, tasks and activities provided for under this Consent Decree, the remaining Settling Defendants shall complete all such requirements.

H. **Compliance With Applicable Laws**

All Work, tasks and activities undertaken by Settling

Carmalia Consent Decree

-20-

Defendants pursuant to this Consent Decree shall be performed in accordance with the requirements of all applicable federal and state laws and regulations. Except as allowed by CERCLA and the NCP, Settling Defendants shall also comply with applicable or relevant and appropriate requirements ("ARARs") under federal environmental or state environmental or facility siting laws as determined by EPA pursuant to this Consent Decree and as authorized by law. Only those State standards that are promulgated, are identified by the State in a timely manner, and are more stringent than federal requirements may be applicable or relevant and appropriate. The Court finds that the Work and activities conducted pursuant to this Consent Decree, if approved by EPA, shall be considered to be consistent with the applicable requirements of CERCLA, RCRA, and the NCP.

I. Permits

1. As provided in Section 121(e) of CERCLA and § 300.5 of the NCP, no Federal, State or local permit shall be required for any portion of the Work conducted entirely on-site. For purposes of this Consent Decree, the term "on-site" means the areal extent of contamination and all suitable areas in very close proximity to the contamination necessary for implementation of the response action. Where any portion of the Work requires a Federal or State permit or authorization, Settling Defendants shall submit timely and complete applications and take all other actions necessary to obtain all such permits or authorizations. Settling Defendants or their designee shall be required to obtain and hold any permits needed for implementation of the Phase I and Phase II Work.

2. The Settling Defendants may seek relief under the provisions of Section XX (Force Majeure) of this Consent Decree for any delay in the performance of the Work resulting from a failure to obtain, or a delay in obtaining, any permit required for the Work.

3. This Consent Decree is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

J. Selection of Work Contractor

1. All aspects of the Phase I and Phase II Work to be performed by Settling Defendants pursuant to this Consent Decree shall be under the direction and supervision of the Settling Defendants' Supervising Contractor, the selection of which shall be subject to disapproval by EPA. Within five (5) days after the lodging of this Consent Decree, and at any time Settling Defendants propose to change a Supervising Contractor, Settling Defendants shall notify EPA in writing of the name, title, and qualifications of any contractor proposed to be the Supervising Contractor. Unless EPA disapproves of the proposed Supervising Contractor pursuant to Paragraph J.2., below, Settling Defendants may proceed.

2. If EPA disapproves a proposed Supervising Contractor, EPA will notify Settling Defendants in writing within seven (7) days of receipt of Settling Defendants written notification to EPA in Paragraph J.1., above. Within thirty (30) days of receipt of EPA's disapproval, Settling Defendants shall notify EPA of the name and qualifications of the proposed replacement Supervising Contractor.

## VIII. ADDITIONAL RESPONSE ACTIONS

1 
2    A.   With respect to the Phase II Work, if EPA determines
3    that response actions in addition to or modifying the Work
4    specified in the ROD or other EPA decision document(s) and/or in
5    Deliverables developed pursuant to the ROD or other EPA decision
6    document(s) are necessary to achieve and/or maintain the
7    Performance Standards or to carry out and/or maintain the
8    effectiveness of the remedy set forth in a ROD or other EPA
9    decision document(s), EPA may require that such additional or
10   modified response action (which may include the submission of
11   additional or modified Plans) be incorporated into the SOW and/or
12   such Deliverables. Unless the additional or modified response
13   actions are performed by Third Parties, Settling Defendants shall
14   be required to complete as Phase II Work the additional or
15   modified response actions in accordance with plans,
16   specifications, and schedules approved or established by EPA
17   pursuant to this Consent Decree. Provided, however, that
18   additional or modified response actions may only be required
19   pursuant to this Paragraph to the extent that they are consistent
20   with the scope of the remedy selected in the ROD or other EPA
21   decision document(s), as applicable.
22        B.   If Settling Defendants object to any additional or
23   modified response action required by EPA pursuant to Paragraph
24   A., above, they may seek dispute resolution pursuant to Section
25   XXI. Paragraph D. (Dispute Resolution). The SOW and/or related
26   Deliverables shall be modified in accordance with final
27   resolution of the dispute, and Settling Defendants shall then
28   perform the additional or modified response actions in accordance

Cement's Consent Decree    38

02-0067492

1    3.   If EPA disapproves of the proposed replacement
2    Supervising Contractor and such disapproval prevents the Settling
3    Defendants from meeting one or more deadlines in a plan,
4    Deliverable, or other written submission approved by EPA pursuant
5    to this Consent Decree, Settling Defendant may seek relief under
6    the provisions of Section XI. (Force Majeure).

Cemalia Consent Decree    37

-41-

with Paragraph A., above.

C.    Nothing in this Section shall be construed to limit EPA's authority to require performance of additional or modified response actions as otherwise provided in this Consent Decree.

-43-

---

IX.    QUALITY ASSURANCE, SAMPLING, AND DATA ANALYSIS

A.    The Settling Defendants shall use quality assurance, quality control, and chain of custody procedures for all samples in accordance with Quality Assurance and Project Plans and Sampling Plans developed pursuant to Sections 3.0. and 5.0. of the SOW.

B.    In accordance with the schedule in the SOW Section 5.0., Settling Defendants shall submit for EPA's approval the Quality Assurance Project Plans ("QAPPs"), and any addenda thereto, that are consistent with the SOW, the NCP, and applicable guidance documents.

C.    If relevant to the proceeding, validated sampling data generated in accordance with the QAPP(s) and reviewed and approved by EPA shall be admissible as evidence, without objection, in any proceeding under this Consent Decree.

D.    Settling Defendants shall make it a requirement of their contract(s) with laboratories for Work performed pursuant to this Consent Decree that EPA be allowed access to the laboratories during normal business hours. In addition, Settling Defendants shall require such laboratories to analyze all samples submitted in connection with the Work pursuant to the approved QAPPs, and any addenda thereto, for quality assurance monitoring and to perform all analyses required in connection with the Work according to accepted EPA methods. Settling Defendants shall require all laboratories they use for analysis of samples taken pursuant to this Consent Decree to participate in an EPA or EPA-equivalent QA/QC program. Settling Defendants shall nonetheless be responsible for the Work pursuant to this Section being in

-44-

02-0067493

1 compliance with this Consent Decree.

2 E. Upon request, the Settling Defendants shall allow split

3 or duplicate samples to be taken by EPA or its authorized

4 representatives. In addition, EPA shall have the right to take

5 any additional samples that EPA deems necessary. Upon request,

6 EPA shall allow the Settling Defendants to take split or

7 duplicate samples of any samples taken as part of EPA's oversight

8 of the performance of the Phase I and Phase II Work. Settling

9 Defendants and EPA shall notify the other not less than twenty-

10 eight (28) days in advance of any sample collection activity

11 unless shorter notice is agreed to by them.

12 F. Unless specified otherwise in an approved deliverable

13 or other written submission required by this Consent Decree,

14 Settling Defendants shall submit to EPA three (3) copies, in

15 accordance with the SOW, of the results of all sampling and/or

16 tests or other data obtained or generated by or on behalf of

17 Settling Defendants with respect to the implementation of this

18 Consent Decree. EPA shall provide to Settling Defendants copies

19 of its results from any split or duplicate samples taken pursuant

20 to Paragraph E., above.

21 G. Notwithstanding any provision of this Consent Decree,

22 the United States hereby retains all of its information gathering

23 and inspection authorities and rights, including enforcement

24 actions related thereto, under CERCLA, RCRA and any other

25 applicable statutes or regulations.

26

27

28

Camella Consent Decree    11

-5-

---

## X. SITE ACCESS

1

2 A. For the duration of the Settling Defendants'

3 obligations to perform the Phase I and Phase II Work, to the

4 extent that the Site or any other property to which access is

5 required for the implementation of this Consent Decree is owned

6 or controlled by persons other than those bound by this Consent

7 Decree, the Settling Defendants shall use best efforts to secure

8 from such persons access for Settling Defendants, as well as for

9 the United States and its representatives including, but not

10 limited to, their contractors, as necessary to effectuate this

11 Consent Decree, including but not limited to access for the

12 following activities:

13     1. oversight of the Work;

14     2. verifying any data or information submitted to the

15 United States;

16     3. conducting investigations relating to contamination

17 at or near the Site;

18     4. obtaining samples;

19     5. assessing the need for, planning, or implementing

20 additional response actions at or near the Site;

21     6. inspecting and copying records, operating logs,

22 contracts, or other documents maintained or generated by Settling

23 Defendants or their agents, consistent with Section XXVI;

24 (Access to Information); and

25     7. assessing Settling Defendants' compliance with

26 this Consent Decree.

27 B. If any access required to complete the Phase I or Phase

28 II Work is not obtained within forty-five (45) days of the date

2-0-749(

Camella Consent Decree

of lodging of this Consent Decree, or within forty-five (45) days
of the date EPA notifies the Settling Defendants in writing that
additional access beyond that previously secured is necessary,
Settling Defendants shall promptly notify the United States, and
shall include in that notification a summary of the steps
Settling Defendants have taken to attempt to obtain access. The
United States may, as it deems appropriate, assist Settling
Defendants in obtaining access. Response costs incurred by the
United States to assist the Settling Defendants to obtain access
shall be added to the United States' Final Past Response Costs
Summary total and be reimbursed in accordance with the terms of
Section XVIII. (Cost Estimates and Fund Transfers). Costs
incurred by the Settling Defendants to obtain access for Phase II
Work shall be considered Phase II Work costs.

C. Notwithstanding any provision of this Consent Decree,
the United States retains all of its access authorities and
rights, including enforcement authorities related thereto, under
CERCLA, RCRA and any other applicable statutes or regulations.

## XI. REPORTING REQUIREMENTS

A. Certain reporting required of the Settling Defendants'
pursuant to this Consent Decree is specified in the SOW. Unless
otherwise specified in the SOW, a submitted and approved
Deliverable under the SOW, or in another writing by EPA, Settling
Defendants shall submit to EPA three (3) copies of all
Deliverables required to be submitted by the SOW, in accordance
with the schedules set forth in Section 5.0. of the SOW. One (1)
additional copy of final Deliverables shall be sent to public
information repositories as specified by EPA.

B. If an event occurs during performance of the Phase I
and Phase II Work that Settling Defendants are required to report
pursuant to Section 103 of CERCLA or Section 304 of the Emergency
Planning and Community Right to Know Act (EPCRA), Settling
Defendants shall, within 24 hours after the on-set of such event,
orally notify the EPA Project Coordinator. In the event that the
EPA Project Coordinator is unavailable, the Settling Defendants
shall notify the Emergency Response Section, Region IX, United
States Environmental Protection Agency. These reporting
requirements are in addition to the reporting required by CERCLA
Section 103 or EPCRA Section 304.

C. Within twenty (20) days after the on-set of such an
event, Settling Defendants shall furnish to the United States a
written report, signed by the Settling Defendants' Project
Coordinator, setting forth the events which occurred and the
measures taken, and to be taken, in response thereto. Within
thirty (30) days after the conclusion of such an event, Settling
Defendants shall submit a report setting forth all actions taken

02-0067495                    -48-

XII.  SUBMISSIONS REQUIRING AGENCY APPROVAL

A.  After submittal of any Deliverable or other submission that requires EPA approval pursuant to this Consent Decree, EPA shall: (1) approve in whole or in part, the submission; (2) approve the submission upon specified conditions; (3) disapprove, in whole or in part, the submission, directing that the Settling Defendants modify the submission; or (4) any combination of the above.

B.  Following receipt of EPA's approval or approval upon conditions, pursuant to Paragraph A.(1) or (2), above, Settling Defendants shall proceed to take any action required by the Deliverable or other submission, as approved by EPA, subject only to their right to invoke the dispute resolution procedures set forth in Section XXI. (Dispute Resolution) with respect to the modifications required or conditions imposed by EPA. Nothing in this Paragraph B., shall require the Settling Defendants to perform any Work not otherwise required pursuant to this Consent Decree.

C.  Following receipt of EPA's notice of disapproval pursuant to Paragraph A.(3), above, Settling Defendants shall, within fourteen (14) days, or within such other period specified by EPA in the SOW or in the notice, correct the deficiencies and resubmit the Deliverable or other submission for approval.

Notwithstanding the receipt of a notice of disapproval pursuant to Paragraph A.(3), above, Settling Defendants shall proceed, at the direction of EPA, to take any action required by any non-deficient portion of the submission, as long as such action is not precluded or rendered impracticable by the disapproved

In response thereto unless all such actions were previously reported.

D.  All Deliverables and other submissions by Settling Defendants to EPA which purport to document Settling Defendants' compliance with the terms of this Consent Decree shall be signed by an authorized representative of the Settling Defendants.

Camille Command Dec    -5

-110-

v2-0067496

1 portion. Implementation of any non-deficient portion of a
2 submission shall not relieve Settling Defendants of any liability
3 for stipulated penalties under Section XXII. (Stipulated
4 Penalties).
5    D. No stipulated penalties shall accrue during the first
6 opportunity to cure a Deliverable's or submission's
7 deficiency(ies). In the event that a resubmitted Deliverable or
8 other submission, or portion thereof, is again disapproved by
9 EPA, stipulated penalties shall begin to accrue from the date of
10 the resubmittal, and EPA may again require the Settling
11 Defendants to correct the deficiencies, in accordance with the
12 preceding Paragraphs. EPA also retains the right to amend or
13 develop the Deliverable or other submission required under this
14 Consent Decree to correct the deficiency(ies).
15    E. If upon resubmission, a Deliverable or other submission
16 is disapproved by EPA due to a material defect and the Settling
17 Defendants fail to cure the defect, Settling Defendants shall be
18 deemed to have failed to submit such Deliverable or other
19 submission timely and adequately subject only to the Settling
20 Defendants' invocation of the dispute resolution procedures set
21 forth in Section XXI. (Dispute Resolution). The provisions of
22 Section XXI. (Dispute Resolution) and Section XXII. (Stipulated
23 Penalties) shall govern the implementation of the Phase I and
24 Phase II Work and accrual and payment of any stipulated penalties
25 during Dispute Resolution. If EPA's disapproval or modification
26 of a Deliverable or other submission is upheld, stipulated
27 penalties shall accrue for such violation from the date of the
28 resubmittal, as provided in Paragraph D., above.

Camsella Consent Decree

-51-

47

1    F. All Deliverables or other submissions required to be
2 submitted to EPA under this Consent Decree shall, upon approval
3 by EPA, be enforceable under this Consent Decree. In the event
4 EPA approves or requires Settling Defendants to modify a portion
5 of a Deliverable or other submission required under this Consent
6 Decree, the approved or modified portion shall be enforceable
7 under this Consent Decree.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25 02-0067497
26
27
28

Camsella Consent Decree

-52-

48

XIII. PROJECT COORDINATORS

A. Within thirty (30) days after lodging of this Consent Decree, the Settling Defendants will designate two Project Coordinators. The specific Elements of Work to be managed by each Project Coordinator are subject to EPA's approval. After two (2) years from the date of entry of the Consent Decree, Settling Defendants may propose that two (2) separate Project Coordinators are no longer necessary. Within five (5) days after selection of, and at any time the Settling Defendant propose to change, a Project Coordinator, Settling Defendants shall notify EPA, in writing, of the name, title, qualifications, address and telephone number of the proposed Project Coordinator(s). Unless EPA disapproves of a proposed Project Coordinator pursuant to Paragraph B., below, the Settling Defendants may proceed.

B. If EPA disapproves a proposed Project Coordinator, EPA will notify Settling Defendants in writing within seven (7) days after receipt of Settling Defendants' written notification to EPA in Paragraph A., above. Within thirty (30) days after receipt of EPA's disapproval, Settling Defendants shall notify EPA of the name and qualifications of the proposed replacement Project Coordinator.

C. If EPA disapproves of the proposed replacement Project Coordinator and such disapproval prevents the Settling Defendants from meeting one or more deadlines in a Plan, Deliverable, or other written submission approved by EPA pursuant to this Consent Decree, Settling Defendants may seek relief under the provisions of Section XX. (Force Majeure).

D. Within thirty (30) days after lodging of this Consent

Camsalia Consent Decree (?)

Decree, EPA will notify Settling Defendants, in writing, of the name, address, and telephone number of EPA's Project Coordinator(s), if different from the person identified in Section XXIX. (Notices and Submissions).

B. If EPA changes a Project Coordinator, the identity of the successor will be given to the Settling Defendants at least five (5) Working Days before the change occurs, unless impracticable, but in no event later than the actual day the change becomes effective. A verbal notification will be followed in writing.

F. EPA may designate other representatives, including, but not limited to, EPA employees, and federal contractors and consultants, to observe and monitor the progress of any Work undertaken pursuant to this Consent Decree. EPA's Project Coordinators shall have the authority lawfully vested in a Remedial Project Manager (RPM) and an On-Scene Coordinator (OSC) by the National Contingency Plan, 40 C.F.R. Part 300. In addition, EPA's Project Coordinators shall have authority consistent with the National Contingency Plan to halt any Work required by this Consent Decree and to take any necessary response action when s/he determines that conditions at the Site constitute an emergency situation or may present an immediate threat to public health or welfare or the environment due to release or threatened release of Waste Material.

02-0067498

Camsalia Consent Decree

Resolution). During the period of EPA's determination of whether
the Phase I Work, pursuant to Paragraph A.(1) or A.(2), above,
has been completed in accordance with this Consent Decree,
Settling Defendants shall perform the continuing Work under the
relevant Element or Component of Work as Phase II Work.
Provided, however, if the Phase I Obligation or Work is not
accepted by EPA as complete, Settling Defendants shall reimburse
any amounts drawn from the Escrow Account and expended after the
date of Settling Defendants' submittal of their completion report
to perform the tasks and activities to complete the Phase I
Obligation or Work.

D. 1. The Final Cost Estimate, pursuant to Section
XVIII, Paragraph A.3. of the Consent Decree, and the Cost
Estimates and Funding Limits Element of Work at Section 2.15. of
the SOW, and the Waste Database Support and Other Assistance
Element of Work at Section 2.14. of the SOW are Phase I Work, but
their completion shall not be a condition precedent to the
certification of completion of Phase I Work. Provided, however,
that notwithstanding the certification of completion of Phase I
Work pursuant to this Section XIV., the Settling Defendants shall
remain obligated to pay for, perform, and complete the Final Cost
Estimate and the Waste Database Support and Other Assistance
Element of Work in accordance with Sections 2.15. and 2.14. of
the SOW, respectively.

2. The pendency of any dispute on the Final Cost
Estimate shall not prevent EPA from certifying completion of
Phase II Work, provided EPA has accepted in writing, pursuant to
Section 5.4. of the SOW, the Final Cost Estimate.

Camella Consent Decree 53

-54-

02-0067499

---

## XIV.   CERTIFICATIONS OF COMPLETION

A. EPA shall certify completion of each of the following:
(1) the Phase I portion of the Short-Term and Interim
Collection/Treatment/Disposal of Contaminated Liquids Components
of Work, and the Phase I portion of the Routine Site Maintenance,
Routine Groundwater Monitoring, and Community Relations Support
Elements of Work, specified in Section 1.2.13. of the SOW
("Obligations"); (2) all Phase I Work; (3) all Phase II Work
(i.e., including the O&M Base Period Work).

B. After complete performance of all tasks and activities
required to complete a Phase of Work or Obligation under a Phase
of Work specified in Paragraph A., above, Settling Defendants
shall submit to EPA a Completion of Work Obligation Report or
Completion of Work Phase Report as specified in Sections 3.0. and
5.0. of the SOW. Written acceptance of each such Report by EPA
shall be deemed to be EPA's certification that the Phase of Work
or Obligation has been fully performed in accordance with this
Consent Decree. The effective date of each such certification
shall be the date EPA mails, or otherwise transmits, its written
acceptance to Settling Defendants.

C. If EPA determines that the relevant Phase of Work or
Obligation, or any portion thereof, has not been completed in
accordance with this Consent Decree, EPA will notify Settling
Defendants in writing of the tasks and activities that must be
undertaken to complete the Phase of Work or Obligation. Settling
Defendants shall perform all tasks and activities described in
the notice, subject to their right to invoke the dispute
resolution procedures set forth in Section XXI. (Dispute

Camella Consent Decree 51

-55-

E. EPA shall not unreasonably delay taking any action or making any decision under this section.

XV. EMERGENCY RESPONSE

A. If any action or occurrence during the performance of Phase I or Phase II Work causes or threatens a release of Waste Material from the Site that constitutes an emergency situation or may present an immediate threat to public health or welfare or the environment, Settling Defendants shall, subject to Paragraph B., below, and at their expense if such situation occurs during Phase I Work, immediately take all appropriate action to prevent, abate, or minimize such release or threat of release, and shall immediately notify EPA's Project Coordinator(s). If that person is, or those persons are, unavailable, then the Settling Defendants shall notify the EPA Emergency Response Section, Region IX. Settling Defendants shall take such actions in consultation with EPA's Project Coordinator or other available authorized officer, and in accordance with all applicable provisions of the Health and Safety Plans and any other applicable plans or documents developed pursuant to the SOW. In the event that Settling Defendants fail to take appropriate response action as required by this section, EPA or its designee may take such action instead; and EPA reserves any rights it may have to seek to recover its response costs from Settling Defendants in this or another action, and Settling Defendants reserve any rights they may have to oppose such action.

B. Nothing in the preceding Paragraph shall be deemed to limit any authority of the United States to take; direct, or order all appropriate action or to seek an order from the Court to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste



Material on, at, or from the Site.

## XVI.  INDEMNIFICATION AND INSURANCE

1   A.   Indemnification by Settling Defendants. The United
2  States assumes no liability by entering into this Consent Decree
3  or by virtue of any designation of Settling Defendants as EPA's
4  authorized representatives under Section 104(e) of CERCLA.
5  Settling Defendants shall indemnify, save and hold harmless the
6  United States and its officials, agents, employees, contractors,
7  subcontractors, or representatives for or from any and all claims
8  or causes of action arising from, or on account of, acts or
9  omissions of Settling Defendants their officers, directors,
10 employees, agents, successors, assigns, contractors,
11 subcontractors, or any persons acting on their behalf or under
12 their control, in carrying out any activities pursuant to this
13 Consent Decree, including, but not limited to, any claims arising
14 from any designation of Settling Defendants as EPA's authorized
15 representatives under Section 104(e) of CERCLA.  Further,
16 Settling Defendants agree to pay the United States all reasonable
17 expenditures it incurs for litigation and settlement arising
18 from, or on account of, claims made against the United States
19 based on acts or omissions of Settling Defendants, their
20 officers, directors, employees, agents, contractors,
21 subcontractors, or any persons acting on their behalf or under
22 their control, in carrying out activities pursuant to this
23 Consent Decree.  The United States shall not be held out as a
24 party to any contract entered into by or on behalf of Settling
25 Defendants in carrying out Work or activities pursuant to this
26 Consent Decree.  Neither the Settling Defendants nor any such
27 contractors shall be considered an agent of the United States.

Camilla Consent Decree

-40-

Camilla Consent Decree

-59-

1 Nothing in this Section shall result in an indemnification of the
2 United States for actions, omissions or for conditions resulting
3 from the negligence of the United States or its authorized
4 representatives.
5    B.  Subject to Section VII, Paragraph B. (Work To Be
6 Performed), the Settling Defendants waive all claims against the
7 United States for damages or reimbursement or for set-off of any
8 payments made or to be made to the United States, arising from or
9 on account of any contract, agreement, or arrangement between any
10 one or more of the Settling Defendants and any person for
11 performance of the Work, including, but not limited to, claims on-
12 account of construction delays. In addition, the Settling
13 Defendants shall indemnify and hold harmless the United States
14 with respect to any and all claims for damages or reimbursement
15 arising from or on account of any contract, agreement, or
16 arrangement between any one or more of Settling Defendants and
17 any person for performance of the Work, including, but not
18 limited to, claims on account of construction delays.
19    C.  No later than fifteen (15) days before commencing any
20 on-site Work, Settling Defendants shall secure, and shall
21 maintain until the first anniversary of EPA's Certification of
22 Completion of Phase II Work pursuant to Section XIV,
23 (Certifications of Completion), comprehensive general liability
24 insurance and automobile insurance with limits of $1 million
25 dollars per occurrence, combined single limit, naming as
26 additional insured the United States. In addition, for the
27 duration of their obligations under this Consent Decree, Settling
28 Defendants shall satisfy, or shall require that their contractors

Camells Consent Decree 7

-1-

1 or subcontractors satisfy, all applicable laws and regulations
2 regarding the provision of worker's compensation insurance for
3 all persons performing the Work on behalf of Settling Defendants
4 in furtherance of this Consent Decree. Prior to commencement of
5 the Work under this Consent Decree, Settling Defendants shall
6 provide to EPA certificates of such insurance and a copy of each
7 insurance policy. Settling Defendant shall resubmit such
8 certificates and copies of policies each year on the anniversary
9 of the effective date of this Consent Decree. Settling
10 Defendants may demonstrate by evidence satisfactory to EPA that
11 they, or any contractor or subcontractor, maintain insurance or
12 other protection equivalent to that described above. Settling
13 Defendants need provide only that portion of the insurance
14 described above that is not maintained by the contractor or
15 subcontractor. The United States must seek recovery under this
16 Section from Settling Defendants' insurance policies as an
17 additional insured prior to seeking compensation under the
18 indemnities set forth in Paragraph A. of this Section.

02-0067502

-62-

XVII. ESCROW ACCOUNTS/FINANCING THE WORK

A. Settling Defendants shall establish the "Casmalia
Consent Decree Escrow Account" ("Escrow Account") no later than
ninety (90) days after the date of entry of this Consent Decree.
Settling Defendants shall provide a copy of the Escrow Agreement
establishing the Escrow Account to EPA as soon as possible, and
in no event more than seven (7) days thereafter, for approval
primarily to ensure that the escrowed funds will be handled as
set forth by this Consent Decree. EPA does not, through any
approval of the terms of the Escrow Account, guarantee the
sufficiency of the funds in the Escrow Account established by
this Section for performance of the Work.

B. The Escrow Account shall have six (6) interest-bearing
Accounts: (a) "Cash Account"; (b) "Phase II Account"; (c) "30-
Year O&M Account"; (d) "Past Response Costs Account"; (e) "Post-
30 Year O&M Account"; and (f) "Support Costs Account." The Phase
II Account shall have two Sub-Accounts, the "Phase II Future
Response Costs Sub-Account" and the "Phase II Work Sub-Account."
The 30-Year O&M Account shall have two Sub-Accounts, the "30-Year
O&M Work Sub-Account" and the "30-Year O&M Oversight Sub-
Account." The 30-Year O&M Work Sub-Account shall include a
segregated Sub-Account to hold monies transferred from the RCRA
Trust Fund to the Escrow Account. The Post-30 Year O&M Account
shall have two Sub-Accounts, the "Post-30 Year O&M Work Sub-
Account" and the "Post-30 Year O&M Oversight Sub-Account." These
Accounts and Sub-Accounts shall be segregated from one another.

C. Unless otherwise provided in this Consent Decree, the
Cash Account shall serve as an interim account to hold all funds

Casmalia Consent Decree 59

-65-

received pursuant to this Consent Decree until those funds are
disbursed according to the priorities in this Section and Funding
Limits established in Section XVIII. (Cost Estimates and Fund
Transfers). The Cash Account shall also hold any excess funds
after all other Accounts are fully funded pursuant to Paragraphs
E.1. through E.7., below, and until any excess is disbursed
pursuant to Paragraph F., below.

D. Except as provided otherwise in Paragraph I., below,
and Section XVIII. (Cost Estimates and Fund Transfers):

1. Money in the Phase II Account shall be used to
fund the performance of the Phase II Work and Future Response
Costs as specified in Section XIX. Paragraph D. (Reimbursement of-
Response Costs);

2. The RCRA Trust Fund after transfer to the Escrow
Account, all money subject to the transfer limitations in Section
XXIII. Paragraphs C.1. and C.3. (Coordinated Enforcement
Recovery) and the money in the 30-Year O&M Work Sub-Account shall
be used to pay for 30-Year O&M Work.

3. Money in the Post-30 Year O&M Work Sub-Account
shall be used to pay for Post 30-Year O&M Work.

4. Money in the 30-Year O&M Oversight Sub-Account and
Post-30 Year O&M Oversight Sub-Account shall be used, in
accordance with the provisions of Section XXIV. Paragraph C.
(Lead Agency), to pay for the costs of governmental/regulatory
oversight after Phase II Work is certified complete.

5. The monies to be disbursed from the Cash Account
that are attributable to the Past Response Costs Account shall be
immediately disbursed to the Hazardous Substance Superfund in

Casmalia Consent Decree 60

-64-

02-0067503

accordance with Section XIX. (Reimbursement of Response Costs) to
reimburse Past Response Costs and Unfunded Future Response Costs
not otherwise recovered.

6.   Nothing in this Paragraph D. shall preclude other
monies obtained for the Site and not precluded by this Consent
Decree from being used by the United States to finance the Work
or the governmental/regulatory oversight.

E.   Distribution Priorities and Funding Limits.  The Escrow
Agreement shall instruct and authorize the Escrow Manager to
disburse the money in the Cash Account according to the following
distribution priority and subject to the Funding Limits set forth
below, in Section XVIII, Paragraph A. (Cost Estimates and Fund
Transfers).

1.   When the balance in the Cash Account first reaches
or exceeds $3 million, the Escrow Manager shall make a deposit of
$3 million to the Phase II Work Sub-Account.  Thereafter the
Escrow Manager shall make quarterly deposits of funds accumulated
in the Cash Account during the previous quarter as follows: (a)
fifty percent (50%) to the Phase II Work Sub-Account and fifty
percent (50%) to the Phase II Future Response Costs Sub-Account
until the Phase II Future Response Costs Sub-Account is filled to
the Funding Limit established by Section XVIII, Paragraph A.1.
(Cost Estimates and Fund Transfers) and then (b) one-hundred
percent (100%) to the Phase II Work Sub-Account until the Phase
II Account is filled to the Initial or Interim Cost Estimate, as
applicable, for Phase II Work.

2.   After the deposits to the Phase II Account under
Paragraph E.1., above, are complete, the Escrow Manager shall

Camsile Consent Decree    61

make quarterly deposits of funds accumulated in the Cash Account
during the preceding quarter as follows: the 30-Year O&M Work
Sub-Account shall be filled until the amount remaining to be
filled equals the Past Response Costs Funding Limit as determined
under Section XIX, Paragraph B.2. (Reimbursement of Response
Costs), unless the amount needed to fill the 30-Year O&M Work
Sub-Account is less than the Past Response Costs Funding Limit,
in which event the Past Response Costs Account shall be filled
until the amount remaining to be filled equals the amount
remaining to be filled in the 30-Year O&M Work Sub-Account.
Except as provided below, the RCRA Trust Fund and monies received
from the Camsile Entities and/or the State pursuant to Section
XXIII, Paragraphs C.2. and C.3. (Coordinated Enforcement
Recovery) (including accrued interest and income) shall not be
counted toward satisfaction of the 30-Year O&M Work Sub-Account
Funding Limit until after the Interim Cost Estimate becomes
effective and any and all transfers, pursuant to Paragraph B.1.
of Section XVIII. (Cost Estimates and Fund Transfers) have been
made. After the Interim Cost Estimate becomes effective, the
RCRA Trust Fund shall not be counted unless it has been
transferred into the 30-Year O&M Work Sub-Account or is
available, without impediment, for the 30-Year O&M Work. Prior
to the effective date of the Interim Cost Estimate, funds
received from the Camsile Entities and/or the State pursuant to
Section XXIII, Paragraphs C.2. and C.3. (Coordinated Enforcement
Recovery) (including accrued interest and income) shall be
counted toward satisfaction of the 30-Year O&M Work Sub-Account
Funding Limit upon receipt of such funds in the 30-Year O&M Work

Camsile Consent Decree

02 .167...

Sub-Account of the Escrow Account only for determining whether a
transfer of funds can be made pursuant to Section XVIII.
Paragraph B.2. (Cost Estimates and Fund Transfers).

3. After the deposits under Paragraph E.1., above,
are complete, the Escrow Manager shall make quarterly deposits of
funds accumulated in the Cash Account during the preceding
quarter as follows: fifty percent (50%) to the 30-Year O&M Work
Sub-Account and fifty percent (50%) to the Past Response Costs
Account until the 30-Year O&M Work-Sub Account is funded to the
Initial, Interim, or Final Funding Limit, as applicable, and the
Past Response Costs Account is funded to its Funding Limit as
determined under Section XIX. Paragraph B. (Reimbursement of
Response Costs). Except as provided below, the RCRA Trust Fund
and monies received from the Casmalia Entities and/or the State
pursuant to Section XXIII. Paragraphs C.2. and C.3. (Coordinated
Enforcement Recovery) (including accrued interest and income)
shall not be counted toward satisfaction of the 30-Year O&M Work
Sub-Account Funding Limit until after the Interim Cost Estimate
becomes effective and any and all transfers, pursuant to
Paragraph B.1. of Section XVIII. (Cost Estimates and Fund
Transfers) have been made. After the Interim Cost Estimate
becomes effective, the RCRA Trust Fund shall not be counted
unless it has been transferred into the 30-Year O&M Work Sub-
Account or is available, without impediment, for the 30-Year O&M
Work. Prior to the effective date of the Interim Cost Estimate,
funds received from the Casmalia Entities and/or the State
pursuant to Section XXIII. Paragraphs C.2. and C.3. (Coordinated
Enforcement Recovery) (including accrued interest and income)

Casmalia Consent Decree

-67-

shall be counted toward satisfaction of the 30-Year O&M Work Sub-
Account Funding Limit upon receipt of such funds in the 30-Year
O&M Work Sub-Account of the Escrow Account only for determining
whether a transfer of funds can be made pursuant to Section
XVIII. Paragraph B.2. (Cost Estimates and Fund Transfers).

4. After the deposits to the 30-Year O&M Work Sub-
Account and the Past Response Costs Account under Paragraph E.3.,
above, are complete, the Escrow Manager shall make quarterly
deposits of funds accumulated in the Cash Account during the
preceding quarter to the 30-Year O&M Oversight Sub-Account until
it is filled to the Initial, Interim, or Final Cost Estimate, as
applicable, for the 30-Year O&M Oversight Funding Limit.

5. After the deposits to the 30-Year O&M Oversight
Sub-Account under Paragraph E.4., above, are complete, the Escrow
Manager shall make quarterly deposits of funds accumulated in the
Cash Account during the preceding quarter to the Post-30 Year O&M
Work Sub-Account until it is filled to the Initial, Interim, or
Final Cost Estimate, as applicable, for the Post-30 Year O&M
Work.

6. After the deposits to the Post-30 Year O&M Work
Sub-Account under Paragraph E.5., above, are complete, the Escrow
Manager shall make quarterly deposits of funds accumulated in the
Cash Account during the preceding quarter to the Post-30 Year O&M
Oversight Sub-Account until it is filled to the Initial, Interim,
or Final Cost Estimate, as applicable, for the Post-30 Year O&M
Oversight Funding Limit.

7. After the deposits to the Post-30 Year O&M Account
under Paragraph E.6., above, are complete, the Escrow Manager

Casmalia Consent Decree

-68-

02-0067505

shall make quarterly deposits of funds accumulated in the Cash
Account during the preceding quarter to the Support Costs Account
until it is filled to the limit as determined under Section 2.15.
of the SOW. Settling Defendants shall be entitled to draw from
this Account only after the 30-Year O&M and Post-30 Year O&M
Accounts are fully funded based upon the Final Cost Estimate and
they have received a covenant not to sue, as provided for in
Section XXV, Paragraphs A.3. and A.4. (Covenants Not To
Sue/Reservations of Rights), for all 30-Year and Post-30 Year O&M
Work and associated governmental/regulatory oversight of the
United States. Any withdrawals by Settling Defendants from the
Support Costs Account shall be made only after demonstration,
based upon an accounting and adequate supporting documentation,
that Support Costs have been incurred pursuant to this Consent
Decree but not reimbursed.

8.  Unless otherwise agreed to in writing by EPA and
the Settling Defendants and except as provided above in
Paragraphs E.2. and E.3. concerning accounting for the RCRA Trust
Fund and other restricted funds, the cumulative deposits to any
Account shall not exceed the applicable and effective funding
Limit as set forth in this Consent Decree at Section XVIII.
Paragraph A. (Cost Estimates and Fund Transfers), except as a
result of interest accumulation. Interest accumulation shall be
administered according to the terms of Paragraph I., below.

F.  Excess Funding

After (i) the Final Cost Estimate and associated Final
Funding Limit(s) become effective, (ii) the Cashout Settlements
are completed, and (iii) all deposits pursuant to Paragraph E.,

Camralia Consent Decree

-63-

65

---

above, or Section XVIII, Paragraph B. (Cost Estimates and Fund
Transfers) so that each of the Accounts and sub-Accounts referred
to in Paragraph H., above, are fully funded, the Escrow Manager
shall deposit all recoveries of monies from Third Parties under
Section XIII. (Coordinated Enforcement Recovery) and any excess
funds remaining in the Cash Account to the Post-30 Year O&M
Account to be held in trust, together with any interest accrual
or income, to pay for performance of the Post-30 Year O&M Work.

G.  Phase II Account Disbursements

1.  The Escrow Agreement shall instruct and authorize
the Escrow Manager to disburse funds from the Phase II Work Sub-
Account as follows:

a.  to pay for the Phase II Work to be performed
by the Settling Defendants pursuant to Section VII. Paragraph B.
(Work To Be Performed).

b.  to pay to EPA requested amounts as Funded
Future Response Costs upon exhaustion of funds in the Phase II
Future Response Costs Sub-Account.

c.  to fund or to reimburse EPA's performance of
Phase I or Phase II Work in the event that Settling Defendants
fail to perform such Work pursuant to Section VII. Paragraph C.
(Work To Be Performed) or Section XXV. Paragraph C.4. (Covenants
Not To Sue/Reservations of Rights).

d.  to pay for other matters upon written
agreement of EPA and the Settling Defendants.

2.  The Escrow Agreement shall instruct the Escrow
Manager to disburse funds from the Phase II Future Response Costs
Sub-Account as follows:

Camralia Consent Decree

-10-

0- :06;...

a.  upon request by EPA, to pay EPA for Funded
Future Response Costs associated with the Phase II Work.

b.  upon request by EPA, to pay for Phase II Work
upon exhaustion of unrestricted funds in the other Accounts.

c.  to pay for other matters upon written
agreement of EPA and the Settling Defendants.

H.  After Certification of Completion of Phase II Work
pursuant to Section XIV, (Certifications of Completion), any
monies remaining in the Phase II Account shall be distributed to
the remaining Accounts in the priority specified in Paragraphs
E.2. through 7., above, or in accordance with Paragraph V.,
above, as applicable.

I.  Interest.  Interest received on each Account in the
Escrow Account shall be paid into the Account on which it is
earned, and may be used first to pay for the Account fees charged
by the Escrow Manager to administer the Escrow Account.
Remaining accumulations of Interest then shall be used in the
same manner and for the same purposes as the other funds in the
Escrow Account.

J.  Reports

1.  The Escrow Agreement shall require the Escrow
Manager to prepare and submit to the Settling Defendants and EPA
quarterly statements summarizing (a) monies received and
disbursed in the prior quarter from and to the Escrow Account,
each of the Accounts and Sub-Accounts, and to the Hazardous
Substance Superfund; and (b) the balances in each Account and
Sub-Account as of the date of each quarterly statement.  The
Escrow Agreement shall also require the Escrow Manager to submit

Caonalia Consent Decree 67

an annual report to EPA and the Settling Defendants, which shall
include a summary of monies received and disbursed in the
preceding twelve (12) month period, for the Escrow Account
including each Account and Sub-Account.  The reporting periods
for the Escrow Account quarterly statements and the annual
financial reports, pursuant to this Paragraph J.1., and the
overall Project Quarterly Reports and the Annualized Phase II
Work Budget Estimate reports, required at SOW Section 5.4., shall
be conformed to use common reporting periods to the maximum
extent practicable.

2.  The Settling Defendants shall, submit to EPA for
approval and in accordance with the schedule at SOW Section 5.4.,
an annual work budget ("Annualized Phase II Work Budget
Estimate"), and updates thereto, setting forth the monies
estimated to be necessary to satisfy the Phase II Work Sub-
Account expenses described in Section VII, Paragraph B.4. (Work
To Be Performed), and Section 3.0. of the SOW.

02-0067507

Caonalia Consent Decree 68

XVII. COST ESTIMATES AND FUND TRANSFERS

A. Cost Estimates and Funding Limits

1. Initial Cost Estimate

a. Within thirty (30) days of the date of entry of this Consent Decree, the Settling Defendants shall submit to EPA a proposed Initial Cost Estimate, separated into sub-components of cost, for the Work under this Consent Decree, as set forth in Section 2.15. of the SOW. Portions of the proposed Initial Cost Estimate shall be provided by EPA pursuant to sub-Paragraphs 1.b. and 1.c., below. The Initial Cost Estimate shall be based upon available data, and will be used to establish Initial Funding Limits for the Accounts and Sub-Accounts of the Camsails Consent Decree Escrow Account provided for under Section XVII. (Escrow Accounts/Financing The Work). The Initial Cost Estimate shall also be used as the starting point for development, before inclusion of all applicable premiums and other cost elements, of the cost estimate for the Cashout settlement procedure.

b. Until updated pursuant to Section XIX. Paragraph B.2. (Reimbursement of Response Costs), the Initial Past Response Costs Estimate established pursuant to Section XIX. Paragraph B.1. (Reimbursement of Response Costs) shall be used as the Initial Past Response Costs Funding Limit for the Past Response Costs Account.

c. EPA shall provide an estimate of Future Response Costs for Future Response Actions associated with Phase II Work, which estimate shall be used as the Initial Funding Limit for the Phase II Future Response Costs Sub-Account of the Camsails Consent Decree

- 45 -

Phase II Account. EPA shall also provide estimates of governmental/regulatory oversight costs for 30-Year and Post-30 Year O&M Work, which estimates shall be the Initial Funding Limits for the 30-Year O&M Oversight Sub-Account and Post-30 Year O&M Oversight Sub-Account, respectively.

d. The cost estimates established under this Paragraph will be re-evaluated according to the procedures in Paragraphs A.2. and A.3., below, and the revised cost estimates may necessitate or permit changes in the Funding Limits for use in accordance with Section XVII. (Escrow Accounts/Financing The Work). The Initial Cost Estimate shall be effective until the Interim Cost Estimate and associated Interim Funding Limits become effective; or in the case of Past Response Costs, until such costs are updated pursuant to Section XIX, Paragraphs B. and E. (Reimbursement of Response Costs) or in the case of the Funded Future Response Costs estimate for Future Response Actions associated with the Phase II Work or the costs of governmental/regulatory oversight for the 30-Year and Post-30 Year O&M Work, until a proposed revised estimate is final pursuant to Paragraph A.2., below.

e. EPA shall: (i) approve in whole or in part, (ii) approve upon specified conditions, (iii) disapprove, in whole or in part, or (iv) any combination of the above, the proposed Initial Cost Estimate pursuant to Section XII. (Submissions Requiring Agency Approval). If EPA and the Settling Defendants cannot reach agreement on the Initial Cost Estimate, then the matter shall be subject to dispute resolution under the dispute resolution procedures of Section XXI. (Dispute Resolution). The

Initial Cost Estimate shall become effective on the later of the
date thirty (30) days after EPA approves in writing the Initial
Cost Estimate submitted by Settling Defendants or the date of
final resolution of any dispute pursuant to this Paragraph A.1.e.
("effective date"); except that any undisputed portion of the
Initial Cost Estimate shall become effective as of the date
thirty (30) days after EPA's approval.

2. Interim Cost Estimate

a. As part of the Phase I Work, Settling
Defendants shall re-evaluate the Initial Cost Estimate, taking
into account, at least, the information obtained and findings
from the Remedial Investigation/Feasibility Study Component of
Work, and submit to EPA proposed Interim Cost Estimate separated
into sub-components of costs, for Work under this Consent Decree
as specified in Paragraph A.1., above, and Section 2.15, of the
SOW. Portions of the proposed Interim Cost Estimate shall be
provided by EPA pursuant to sub-Paragraph 2.b., below.

b. Past Response Costs shall be updated by the
United States as provided in Section XIX, Paragraphs B. and E.
(Reimbursement of Response Costs). Further, EPA shall re-
evaluate and, if necessary, propose changes to the estimates of
Funded Future Response Costs associated with the Phase II Work
and governmental/regulatory oversight costs for 30-Year and Post-
30 Year O&M Work, which revised estimates shall be the proposed
Interim Funding Limits for the 30-Year O&M Oversight Sub-Account
and Post-30 Year O&M Oversight Sub-Account, respectively.

c. EPA shall: (i) approve in whole or in part,
(ii) approve upon specified conditions, (iii) disapprove, in

whole or in part, or (iv) any combination of the above, the
proposed Interim Cost Estimate pursuant to Section XII.
(Submissions Requiring Agency Approval). If the proposed Interim
Cost Estimate is different from the Initial Cost Estimate, in
whole or in part, and EPA and the Settling Defendants cannot
reach agreement on the new estimates, then the matter shall be
subject to dispute resolution under the dispute resolution
procedures of Section XII. (Dispute Resolution). The Interim
Cost Estimate shall become effective on the later of the date
thirty (30) days after EPA approves in writing the Interim Cost
Estimate submitted by Settling Defendants or the date of final
resolution of any dispute pursuant to this Paragraph A.1.c.
("effective date"); except that any undisputed portion of the
Interim Cost Estimate shall become effective as of the date
thirty (30) days after EPA's approval.

d. The Interim Cost Estimate shall be used to
establish Interim Funding Limits that will remain effective until
superseded by the Final Cost Estimate and associated Final
Funding Limits.

3. Final Cost Estimate

a. As part of Settling Defendants' Phase I Work
obligation, Settling Defendants shall re-evaluate the Interim
Cost Estimate, taking into account, at least, the information
obtained as a result of completion of Initial Phase II Work and
the experience gained and costs incurred during performance of
the O&M Base Period Work, and submit to EPA proposed Final Cost
Estimate, separated into sub-components of costs, for the 30-Year
O&M Work and Post-30 Year O&M Work as specified in Section 2.15.

**B.    Fund Transfers**

The Escrow Agreement shall instruct the Escrow Manager

to transfer funds among Accounts as follows:

1.    **Transfers Based Upon Cost Estimates**

a.    As soon as practicable after the Interim and

Final Cost Estimate and associated Interim and Final Funding

Limits become effective, pursuant to this Section XVIII.

Paragraph A. (Cost Estimates and Fund Transfers), all Accounts

will be reviewed and, to the extent any Account which had

previously been considered fully funded based upon the initial or

Interim Cost Estimate, as applicable, is now under-funded, monies

from the Cash Account, if available, shall be deposited to the

under-funded Accounts in the priority order set forth in Section

XVII. Paragraphs E.1. through E.7. (Escrow Accounts/Financing The

Work) until each Account, in turn, is funded to the Interim or

Final Funding Limit or, as to the Past Response Costs Account, to

the Funding Limit established under Section XIX. Paragraph B.

(Reimbursement of Response Costs) as adjusted by Section XIX.

Paragraph E. (Reimbursement of Response Costs).

To the extent monies are not available in the Cash

Account to fund each Account, in priority order, to the revised

Funding Limits, then, except for restricted funds under Paragraph

B.3., below, transfers shall be made from the lowest priority

Account with available funds to the highest priority Account

requiring additional funds until all Accounts are funded, to the

extent possible, to the revised Funding Limit.

b.    If based upon the Interim or Final Cost

Estimate revisions, an Account is over-funded, except for

0- .067.-- -    - 76 -    74

---

of the SOW. Portions of the proposed Final Cost Estimate shall

be provided by EPA pursuant to sub-Paragraph 3.b., below.

b.    Past Response Costs shall be updated by the

United States as provided in Section XIX, Paragraphs B. and E.

(Reimbursement of Response Costs). Further, EPA shall re-

evaluate and, if necessary, propose changes to the estimates of

governmental/regulatory oversight costs for 30-Year and Post-30

Year O&M Work, which revised estimates shall be the proposed

Final Funding Limits for the 30-Year O&M Oversight Sub-Account

and Post-30 Year O&M Oversight Sub-Account, respectively.

c.    EPA shall: (i) approve in whole or in part,

(ii) approve upon specified conditions, (iii) disapprove, in

whole or in part, or (iv) any combination of the above, the

proposed Final Cost Estimate pursuant to Section XII.

(Submissions Requiring Agency Approval). If the proposed Final

Cost Estimate is different from the Interim Cost Estimate, in

whole or in part, and EPA and the Settling Defendants cannot

reach agreement on the new estimates, then the matter shall be

subject to dispute resolution under the dispute resolution

procedures of Section XXI. (Dispute Resolution). The Final Cost

Estimate shall become effective on the later of the date thirty

(30) days after EPA approves in writing the Final Cost Estimate

submitted by Settling Defendants or the date of final resolution

of any dispute pursuant to this Paragraph A.3.c. ("effective

date").

d.    The Final Cost Estimate shall be used to

establish Final Funding Limits for each of the remaining Accounts

and Sub-Accounts of the Escrow Account.

Gravelle Consent De----    - 77 -

restricted funds under Paragraph B.3., below, monies from the over-funded Accounts shall be transferred to higher priority under-funded Accounts until all Accounts are funded, to the extent possible, to the revised Funding Limits, and after higher priority transfers are satisfied, then to equal or lower priority under-funded Accounts until those Accounts are funded, to the extent possible, to the revised Funding Limits.

c. Transfer of monies pursuant to Paragraph B.1.e. or B.1.b., above, based upon newly effective Funding Limits is not subject to dispute resolution.

2. Transfers Prior to Certification of Completion of Phase II Work

a. At any time prior to Certification of Completion of Phase II Work, EPA may, but is not required to, request transfers of monies, if available, in priority order. from the Support Costs Account, the Sub-Account of the Post-30 Year O&M Account, the Sub-Account of the 30-Year O&M Account, subject to the restrictions of Paragraph B.3. of this Section; or the Future Response Costs Sub-Account of the Phase II Account to the Phase II Work Sub-Account if there are insufficient funds in the Phase II Work Sub-Account to finance the Phase II Work. Any decision by EPA whether or not to transfer monies pursuant to this Paragraph B.2. is not subject to dispute resolution.

b. To the extent a deposit to the 30-Year O&M Work Sub-Account of the restricted funds, pursuant to Paragraph B.3. of this Section, overfunds the Account, unrestricted monies from the Account shall be transferred to higher priority under-funded Accounts until all such Accounts are funded, to the extent

possible, to the applicable Funding Limits, and after higher priority transfers are satisfied, then to equal or lower priority under-funded Accounts until those Accounts are funded, to the extent possible, to the applicable Funding Limits; provided, however, no transfers pursuant to this sub-Paragraph 2.b. shall be made to equal or lower priority under-funded Accounts until the Interim Cost Estimate is effective and any and all transfers, pursuant to Paragraph B.1., based upon the newly effective Interim Cost Estimate are made.

3. Restrictions on Transfers

Unless Settling Defendants agree otherwise, all funds in the RCRA Trust Fund after transfer to the Escrow Account and all monies in the 30-Year O&M Account subject to the transfer limitations in Section XIII. (Coordinated Enforcement Recovery) shall be reserved exclusively for 30-Year O&M Work as provided in Section XVII. Paragraph D.2. (Escrow Accounts/Financing The Work) and, notwithstanding any other provision of this Consent Decree, may not be transferred. Unrestricted funds, as authorized by Paragraph C.3. of Section XIII. (Coordinated Enforcement Recovery), may be transferred from the 30-Year O&M Account in accordance with the Paragraph B.

4. Other Transfers

Other transfers of monies not specified above may be made prior to Certification of Completion of Phase II Work provided that EPA and the Settling Defendants agree in writing.

5. The availability of monies in, or transfer of monies between or among, Accounts and Sub-Accounts of the Escrow Account shall not be construed to preclude or otherwise affect

02-0067511

enforcement or cost recovery actions or claims by the United States or the Settling Defendants against Third Parties under CERCLA, RCRA, or other appropriate laws.

XIX.  REIMBURSEMENT OF RESPONSE COSTS

A.   The United States has incurred, and will continue to incur, costs in connection with response actions at the Site. The United States and the Settling Defendants intend, through this Consent Decree, to: (a) create a mechanism for the potential recovery by the United States of Past Response Costs; and (b) create mechanisms to pay certain Future Response Costs that will be incurred by the United States after the entry of this Consent Decree. Subject to the Settling Defendants' reservation of rights (Section XXV, Paragraph D.), and for purposes of this Consent Decree only, the Settling Defendants agree that the United States may recover its Past Response Costs as provided for in this Consent Decree.

B.   Past Response Costs

1.   From March 1, 1992, the United States has incurred Past Response Costs for CERCLA response actions in connection with the Casmalis Site. Within six (6) months after entry of this Consent Decree, the United States shall provide to the Settling Defendants a summary in the form of the Superfund Cost Recovery Enhancement System ("SCORES") Report, or any superseding summary report, of these Past Response Costs ("Initial Past Response Costs Estimate"). The United States shall update and finalize the Initial Past Response Costs Estimate no later than twelve (12) months after the date of entry of this Consent Decree ("Final Past Response Costs Summary").

2.   The Final Past Response Costs Summary, together with any accrued interest under Paragraph B.3., below, shall be the Past Response Costs Funding Limit pursuant to Section XVIII.

-dl-

Paragraph A. (Cost Estimates and Fund Transfers) for the Past Response Costs Account. In accordance with the provisions of Paragraph E. of this Section XIX., additional amounts of Future Response Costs not otherwise reimbursed may periodically be added as an adjustment to the Past Response Costs Funding Limit.

3. Subject to the Settling Defendants' reservation of rights at Section XXV. (Covenants Not To Sue/Reservations of Rights), the United States may recover prejudgment interest on the amount of unreimbursed Past Response Costs identified in Paragraph B.2., above, until the date the entire amount is reimbursed to the Superfund pursuant to Section XVII. (Escrow Account/Financing The Work). Such prejudgment interest shall accrue from the first day of the month following lodging of this Consent Decree, and such interest on unreimbursed amounts shall accrue at the rate established pursuant to 42 U.S.C. § 9607(a) or any subsequently enacted superseding provision of law. Interest accrued shall be added annually to the Past Response Costs Funding Limit until all principle and interest amounts are recovered pursuant to Section XVII. (Escrow Account/Financing The Work).

4. Payment Instructions. Whenever the Escrow Manager receives monies that are attributable to the Past Response Costs Account under the terms of Section XVII. Paragraph E. (Escrow Account/Financing The Work), such funds up to the amount of the then applicable Past Response Costs Funding Limit, shall be paid immediately to the Superfund in the form of an electronic funds transfer according to instructions to be provided by EPA or by a certified check or checks made payable to the "EPA Hazardous

Casmalia Consent Decree 79

Substance Superfund" and referencing the EPA Region and site name and number, "Casmalia/091H" and DOJ Case Number 90-7-1-611A. The Escrow Manager shall ensure that any payments by certified checks are forwarded to

U.S. Environmental Protection Agency
Region IX, Superfund Accounting
Box No. 360810M
Pittsburgh, PA 15251

The Escrow Manager shall also ensure that copies of each check, together with the transmittal letter, are sent to EPA as specified in Section XXIX. (Notices and Submissions).

C. Funded Future Response Costs -- Phase I

1. Subject to the limitations below in this Paragraph C., Settling Defendants shall pay the United States the following sums for Future Response Costs incurred primarily during the first six (6) years after entry of the Consent Decree. Subject to the payment provisions in Paragraph C.2., below, the Settling Defendants shall pay annually at least the Annual Base Amount, but in no event more than the Annual Limitation.

| Year | Annual Base | Annual Discretionary Increment | Annual Limitation (Total) |
|---|---|---|---|
| 1 | $800,000 | $400,000 | $1,200,000 |
| 2 | $800,000 | $400,000 | $1,200,000 |
| 3 | $600,000 | $300,000 | $900,000 |
| 4 | $600,000 | $300,000 | $900,000 |
| 5 | $200,000 | $100,000 | $300,000 |
| 6 | $200,000 | $100,000 | $300,000 |

Casmalia Consent Decree 80

02-0067513

Both the Annual Base Amount and the Annual Limitation shall be
adjusted annually on the anniversary date of Consent Decree entry
for inflation by a factor equal to the current year's Consumer
Price Index. Payment of these Funded Future Response Costs is
not subject to dispute resolution except as specified in
Paragraph C.3., below.

2. Payment of the Funded Future Response Costs
pursuant to Paragraph C.1., above, shall be made by semi-annual
payments as follows: Within thirty (30) days after entry of this
Consent Decree, Settling Defendants shall pay to the EPA half of
the Annual Base Amount for Year 1. On the first day of the month
every six months thereafter, until the payment obligations under
this Paragraph terminate, Settling Defendants shall pay the next
semi-annual installment equal to one-half the applicable Annual
Base Amount, and shall continue such semi-annual installment
payments through the last semi-annual installment payment
required of the Settling Defendants. This payment schedule may
be modified by the written agreement of EPA and the Settling
Defendants.

3. For any year in which the Settling Defendants are
obligated to pay the Annual Base Amount in Paragraph C.1., above,
at any time after the second semi-annual installment payment for
that year, EPA may request additional payments up to the Annual
Limitation ("Annual Discretionary Increment") for that year.
EPA's written request for payment of sums or all of the Annual
Discretionary Increment will include a written budget statement
describing the activities for which the Annual Discretionary
Increment is intended to be used. Payment of sums demanded from

Casmalia Consent Decree

-65-

the Annual Discretionary Increment under this Paragraph C.3. are
due, as set forth in Paragraph C.4., below, at the time of the
next semi-annual payment or within twenty-one (21) days after the
date of receipt by the Settling Defendants of EPA's written,
certified mail request and budget explanation, whichever is
earlier. Settling Defendants' obligation to pay the requested
amount of the Annual Discretionary Increment is not subject to
dispute resolution except for disputes as to whether the monies
are intended to be used for Future Response Actions associated
with the Phase I Work. In the event of such a dispute, the
disputed payment must be made by the Settling Defendants
notwithstanding the dispute. Formal dispute resolution, if
necessary, of any such dispute shall be governed by Section XXI.
(Dispute Resolution), Paragraph D. In the event that Settling
Defendants prevail in the dispute, EPA shall not be required to
repay the disputed amount; instead, the amount shall be applied
as a credit to the next semi-annual installment due or to
Settling Defendants' liability for Unfunded Future Response
costs.

If, in any year, EPA elects not to request some or all of
the Annual Discretionary Increment, the unrequested and unpaid
amount shall accrue as a cumulative credit toward the Annual
Discretionary Increment available to EPA in later years. At any
time up through but not including the sixth anniversary date of
entry of the Consent Decree, payment of the credited amount may
be demanded by EPA from the Settling Defendants in writing,
together with a budget statement describing the activities for
which the funds are intended to be used. Settling Defendants

1  shall pay the demanded amount, provided, however, that any

2  cumulative credit associated with the Annual Discretionary

3  Increment shall not be payable after the thirtieth (30th) day

4  from the sixth anniversary date of entry of the Consent Decree,

5  excluding funds necessary for activities that have been

6  identified, budgeted and are substantially in progress during the

7  six (6) year period.

8      4.  Payment Instructions

9          a.  Settling Defendants shall pay the United

10 States for all monies owed under this Paragraph C., in the form

11 of an electronic funds transfer according to Instructions to be

12 provided by EPA or by a certified check or checks, accompanied by

13 a transmittal letter, made payable to the "EPA Hazardous

14 Substance Superfund" and referencing the EPA Region and Site Name

15 and Number, "Camalia/093H" and the DOJ Case Number 90-7-1-611A.

16 The Settling Defendants shall forward the certified check(s) to

17         U.S. Environmental Protection Agency
           Region IX
           Superfund Accounting
18         Box No. 360859M
19         Pittsburgh, PA 15251

20 Copies of each check together with the transmittal letter shall

21 be sent to EPA as specified in Section XXIX. (Notices and

22 Submissions). The monies received by EPA shall be placed in an

23 EPA site-specific Camalia account.

24         b.  Notwithstanding any other provision of this

25 Consent Decree, in the event any monies received under this

26 Paragraph C. remain unexpended thirty (30) days after the sixth

27 anniversary date of entry of the Consent Decree, EPA shall not be

28 precluded from using such monies for Future Response Actions.

Camalia Consent Decree

-87-

83

---

1  Work, or Future Response Costs, provided, however, EPA may not,

2  pursuant to sub-Paragraph A.6.b. of Section XXV. (Covenants Not

3  To Sue/Reservations of Rights), recover such costs from Settling

4  Defendants.

5      5.  Funded Future Response Costs paid to EPA pursuant

6  to this Paragraph C. are for the exclusive use of the United

7  States (including federal contractors and consultants) for

8  performance of Future Response Actions and may not be used by any

9  entity not a Party to this Consent Decree, unless EPA and the

10 Settling Defendants agree otherwise in writing.

11     D.  Funded Future Response Costs -- Phase II

12         1.  In addition to the amounts received pursuant to

13 Paragraph C., above, EPA may request, and is entitled to receive,

14 disbursements of monies from the Future Response Costs Sub-

15 Account of the Phase II Account until Certification of Completion

16 of the Phase II Work. EPA's written request for a specified sum

17 shall authorize the Escrow Manager to disburse to EPA the

18 requested amount subject only to the availability of funds in the

19 Future Response Costs Sub-Account as determined pursuant to

20 Section XVII. Paragraph A. (Cost Estimates and Fund Transfers).

21 To the extent funds in the Future Response Costs Sub-Account are

22 insufficient to satisfy EPA's payment request under this

23 Paragraph, the Escrow Manager shall pay the requested amount from

24 monies in the Phase II Work Sub-Account, pursuant to Section

25 XVII. Paragraph G. (Escrow Accounts/Financing The Work). Payment

26 to EPA under this Paragraph D.i. shall be made pursuant to the

27 provisions of Paragraph C.4.a., above. Any monies that remain in

28 the Future Response Costs Sub-Account after Certification of

Camalia Consent Decree

-88-

84

02-0067515

dispute with respect to the amount of the Unfunded Future

Response Costs shall be resolved pursuant to Section XXI.

(Dispute Resolution), Paragraph S. Subject to the Settling

Defendants reservation of rights at Section XXV. (Covenants Not

To Sue/Reservations of Rights), the United States may recover

prejudgment interest in accord with the provisions of Section

XXII, Paragraph B.3. (Reimbursement of Response Costs) on any

adjustment to the Past Response Costs Funding Limit made under

this Paragraph from the date that the costs were incurred.

Completion of Phase II Work shall be distributed to the remaining

Accounts in the priority established under Section XVII.

Paragraph E. (Escrow Accounts/Financing The Work).

    3.   Funded Future Response Costs provided to EPA

pursuant to this Paragraph D. are for the exclusive use of the

United States (including federal contractors and consultants) for

the performance of Future Response Actions and may not be used by

any entity not a Party to this Consent Decree, unless EPA and the

Settling Defendants agree otherwise in writing.

    E.   Unfunded Future Response Costs

        Future Response Costs incurred by the United States

beginning on the thirtieth (30th) day after entry of this Consent

Decree not funded pursuant to Paragraph C. or D. above, or not

reimbursed pursuant to Section XXIII. (Coordinated Enforcement

Recovery), shall be considered Unfunded Future Response Costs and

shall be added periodically to the Past Response Costs Funding

Limit to be reimbursed to EPA pursuant to the priorities

established in Section XVII. Paragraph E. (Escrow

Accounts/Financing The Work). The United States shall establish

the amount of any adjustment to the Past Response Costs Funding

Limit by providing to the Settling Defendants a written summary,

in the form of the Superfund Cost Recovery Enhancement System

("SCORES") Report, or any superseding summary report, of Unfunded

Future Response Costs. The total amount of the summary, or the

undisputed amount in the event of a dispute, shall be added to

the Past Response Costs Funding Limit thirty (30) days after the

United States' written transmittal of the summary to the Settling

Defendants or resolution of the dispute, as applicable. Any

Carmella Consent Decree    15

-65-

02-0067516

## XX. FORCE MAJEURE

A. "Force majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of the Settling Defendants or of any entity controlled by Settling Defendants, including, but not limited to, their contractors and subcontractors, that delays or prevents the performance of any obligation under this Consent Decree despite Settling Defendants' best efforts to fulfill the obligation. The requirement that the Settling Defendants exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any potential force majeure event (1) as it is occurring and (2) following the potential force majeure event, such that the delay is minimized to the greatest extent possible. "Force Majeure" does not include financial inability to complete the Work or a failure to attain the Performance Standards.

B. If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a force majeure event, the Settling Defendants shall notify orally EPA's Project Coordinator or, in his or her absence, the Director of the Hazardous Waste Management Division, EPA Region IX, or any designee or successor, within 72 hours of when Settling Defendants first knew of the event and that the event might cause a delay. Within fourteen (14) days thereafter, Settling Defendants shall provide in writing to EPA an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for

Cannalla Consent Decree

-91-

implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; the Settling Defendants' rationale for attributing such delay to a force majeure event if they intend to assert such a claim; and a statement as to whether, in the opinion of the Settling Defendant, such event may cause or contribute to an endangerment to public health, welfare or the environment. The Settling Defendants shall include with any notice all available documentation supporting their claim that the delay was attributable to a force majeure. Failure to comply with the above requirements shall preclude Settling Defendants from asserting any claim of force majeure for that event for the period of time of such failure to comply, and for additional delay caused by such failure. Settling Defendants shall be deemed to have notice of any circumstance of which their contractors or subcontractors had or should have had notice.

C. If EPA agrees that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended for such time as is necessary to complete those obligations. EPA will notify the Settling Defendants in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event. An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation.

D. If EPA does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, EPA will notify the Settling Defendants in writing of its decision.

Cannalla Consent Decree

-92-

02-0067517

If EPA determines that the event did not constitute force
majeure, then any deadline missed as a result of the event
claimed to be force majeure by the Settling Defendants shall
constitute a violation of the Consent Decree and Settling
Defendants shall be subject to stipulated penalties as provided
in Section XXII. (Stipulated Penalties).

E. If the Settling Defendants elect to invoke the dispute
resolution procedures set forth in Section XXI. (Dispute
Resolution), they shall do so no later than fifteen (15) days
after receipt of EPA's notice under Paragraph C. or D., above.
Any dispute concerning the application of force majeure that
proceeds to formal dispute resolution shall be resolved pursuant
to Paragraph 8. of Section XXI. (Dispute Resolution). In any
such proceeding, Settling Defendants shall have the burden of
demonstrating by a preponderance of the evidence that the delay
or anticipated delay has been or will be caused by a force
majeure event, that the duration of the delay or the extension
sought was or will be warranted under the circumstances, that
best efforts were exercised to avoid and mitigate the effects of
the delay, and that Settling Defendants complied with the
requirements of this Section.

Casmelle Consent Decree 89

-43-

## XXI. DISPUTE RESOLUTION

A. General Provisions

Unless otherwise expressly provided for in this Consent
Decree, the dispute resolution procedures of this Section shall
be the exclusive mechanism to resolve disputes arising under or
with respect to this Consent Decree. However, the procedures set
forth in this Section shall not apply to actions by the United
States to enforce obligations of the Settling Defendants that
have not been disputed in accordance with this Section.

B. Informal Dispute Resolution

1. Any dispute which arises under or with respect to
this Consent Decree shall in the first instance be the subject of
informal negotiations between the parties to the dispute. The
period for informal negotiations shall not exceed twenty (20)
days from the time the dispute arises, unless it is modified by
written agreement of the parties to the dispute. The dispute
shall be considered to have arisen when one party notifies the
other party in writing that there is a dispute.

2. In the event that the parties cannot resolve a
dispute by informal negotiations under the preceding paragraph,
then the position advanced by EPA shall be considered binding
unless, within thirty (30) days after the conclusion of the
informal negotiation period, Settling Defendants invoke the
formal dispute resolution procedures of this Section by serving
on the United States a written Statement of Position on the
matter in dispute, including, but not limited to, any factual
data, analysis or opinion supporting that position and any
supporting documentation relied upon by the Settling Defendants.

02 :3775_.    -49-    :Case    :Conn    :Decr    90

the Statement of Position shall specify the Settling Defendants'
position as to whether formal dispute resolution should proceed
under Paragraph D., E., or F., below. Settling Defendants'
decision to invoke dispute resolution shall not in and of itself
constitute a force majeure event under Section XX. (Force
Majeure).

C. Formal Dispute Resolution Procedures

1. Formal dispute resolution for disputes under this
Consent Decree shall proceed pursuant to the provisions set forth
in this Paragraph C.

2. Within thirty (30) days after receipt of Settling
Defendants' Statement of Position, EPA will serve on Settling
Defendants its Statement of Position, including, but not limited
to, any factual data, analysis, or opinion supporting that
position and all supporting documentation relied upon by EPA.
EPA's Statement of Position shall include a statement as to
whether formal dispute resolution should proceed under Paragraph
D., E., or F., below.

3. If there is disagreement between EPA and the
Settling Defendants as to whether dispute resolution should
proceed under Paragraph D., E., or F., below, the parties to the
dispute shall follow the procedures set forth in the paragraph
determined by EPA to be applicable. However, if the Settling
Defendants ultimately appeal to the court to resolve the dispute,
the Court shall determine which paragraph is applicable in
accordance with the standards of applicability set forth in
Paragraph D., E., or F., below.

D. Formal dispute resolution for disputes pertaining to

Camalla Consent Decree
-95-
91

the selection or adequacy of any response action shall be
conducted pursuant to the procedures set forth in this Paragraph
D. For purposes of this Paragraph, the adequacy of any response
action includes, without limitation: (1) the adequacy or
appropriateness of plans and procedures to implement plans; and
(2) the adequacy of the performance of response actions taken
pursuant to this Consent Decree.

i. An administrative record of the dispute shall be
maintained by EPA and shall contain all statements of position,
including supporting documentation, submitted pursuant to this
Paragraph D. and Paragraph B., above (i.e., informal dispute
resolution). The Settling Defendant and EPA may supplement the
record as authorized by applicable law.

2. The Director of the Hazardous Waste Management
Division, EPA Region IX, or any designee or successor, will issue
a final administrative decision resolving the dispute based on
the administrative record described in Paragraph D.i. This
decision shall be binding upon the Settling Defendants, subject
only to the right to seek judicial review pursuant to Paragraphs
D.3. and D.4.

3. Any administrative decision made by EPA pursuant
to Paragraph D.2. shall be reviewable by this Court, provided
that a notice of judicial appeal is filed by the Settling
Defendants with the Court and served on all Parties to the
dispute within thirty (30) days of receipt of EPA's decision.
The notice of judicial appeal shall include a description of the
matter in dispute, the efforts made by the parties to resolve it,
the relief requested, and the schedule, if any, within which the

Camalla Consent Decree
-96-
92

02-0067519

dispute must be resolved to ensure orderly implementation of this
Consent Decree. The United States may file a response to
Settling Defendants' Motion of judicial appeal.

4. In proceedings on any dispute governed by this
Paragraph, Settling Defendants shall have the burden of
demonstrating that the decision of the Hazardous Waste Management
Division Director, or any designee or successor, is arbitrary and
capricious or otherwise not in accordance with law. Judicial
review of EPA's decision shall be on the administrative record
compiled pursuant to Paragraph D.1.

E. Formal dispute resolution for disputes pertaining to
the establishment of Cost Estimates pursuant to Section XVIII.
Paragraph A. (Cost Estimates and Fund Transfers) shall be
governed by this Paragraph. A dispute of a cost estimate shall
not challenge the underlying selection or adequacy of a response
action. Remedy selection/adequacy disputes shall be resolved
pursuant to Paragraph D., above, before any related cost estimate
dispute is addressed.

Notwithstanding the provisions of this Paragraph E.,
any dispute as to EPA's estimate for the Phase II Future Response
Costs Sub-Account of the Phase II Account, pursuant to Section
XIX., Paragraph D. (Reimbursement of Response Costs) shall be
governed by the procedures of Paragraph D. of this Section. For
purposes of this Consent Decree only, the Parties agree that EPA
is entitled to collect such Future Response Costs, and any
dispute as to them shall be limited to the appropriate amount of
the Phase II Future Response Costs Sub-Account Funding Limit
rather than EPA's entitlement to such monies.

Camilla Consent Decree

-17-

Any and all disputes as to a Cost Estimate shall be
brought within thirty (30) days of EPA's written approval,
pursuant to Section 5.11. of the SOW, of such Cost Estimate. If
EPA includes governmental/regulatory oversight costs in the Cost
Estimate, the Settling Defendants may dispute EPA's right to
include such costs; provided, however, that such dispute may be
raised only with respect to the Final Cost Estimate.

Notwithstanding the provisions of Paragraph D.4. of Section XVII.
(Escrow Accounts/Financing The Work), if Settling Defendants
prevail in the dispute, any amounts in the 30-Year and Post-30
Year O&M Oversight Sub-Accounts shall be transferred to other
Accounts in priority order pursuant to Paragraph E. of Section
XVII. (Escrow Accounts/Financing The Work), and payment of
governmental/regulatory oversight costs shall not be required for
Settling Defendants to obtain the covenant not to sue at
Paragraphs A.3. and A.4. of Section XXV. (Covenants Not To
Sue/Reservations of Rights).

1. Following receipt of the Statements of Position
submitted pursuant to Paragraph C., the Director of the Hazardous
Waste Management Division, EPA Region IX, or any designee or
successor, will issue a final decision resolving the dispute.
The Hazardous Waste Management Division Director's decision shall
be binding on the Settling Defendants unless, within thirty (30)
days of receipt of the decision, the Settling Defendants file
with the Court and serve on the parties to the dispute a notice
of judicial appeal setting forth the matter in dispute, the
efforts made by the parties to resolve it, the relief requested,
and the schedule, if any, within which the dispute must be

Camilla Consent Decree

-18-

1  resolved to ensure orderly implementation of the Consent Decree.
2  The United States may file a response to Settling Defendants'
3  notice of judicial appeal.
4
5       2.  In proceedings under this Paragraph, Settling
6  Defendants shall have the burden of demonstrating that their
7  position is supported by a preponderance of the evidence.
8       F.  Formal dispute resolution for disputes not governed by
9  Paragraphs D. or E., above, shall be governed by this Paragraph.
10      1.  Following receipt of Settling Defendants'
11 Statement of Position submitted pursuant to Paragraph C., the
12 Director of the Hazardous Waste Management Division, EPA Region
13 IX, or any designee or successor, will issue a final decision
14 resolving the dispute.  The Hazardous Waste Management Division
15 Director's decision shall be binding on the Settling Defendants
16 unless, within thirty (30) days of receipt of the decision, the
17 Settling Defendants file with the Court and serve on the parties
18 a notice of judicial appeal setting forth the matter in dispute,
19 the efforts made by the parties to resolve it, the relief
20 requested, and the schedule, if any, within which the dispute
21 must be resolved to ensure orderly implementation of the Consent
22 Decree.  The United States may file a response to Settling
23 Defendants' notice of judicial appeal.
24      2.  Judicial review of any dispute governed by this
25 Paragraph shall be governed by applicable provisions of law.
26      G.  Work Obligations During Dispute Resolution
27      The invocation of formal dispute resolution procedures
28 under this Section shall not extend, postpone or affect in any

way (a) the implementation of any ROD or other EPA decision

Casmalia Consent Decree

- 95 -

1  document or final Deliverable not directly in dispute, and (b)
2  any obligation of the Settling Defendants under this Consent
3  Decree not directly in dispute, unless EPA or the Court agrees
4  otherwise.
5       H.  Obligations After Resolution of Dispute
6       1.  Stipulated penalties with respect to the disputed
7  matter shall continue to accrue as allowed in Section XXII.
8  (Stipulated Penalties), but payment shall be stayed pending
9  resolution of the dispute as provided in Section XXII, Paragraph
10 J. (Stipulated Penalties).  Notwithstanding the stay of payment,
11 stipulated penalties shall accrue from the first day of
12 noncompliance with any applicable provision of this Consent
13 Decree as provided in Section XXII, Paragraph F. (Stipulated
14 Penalties).
15      2.  If Settling Defendants do not prevail in the
16 disputed matter, they shall, if applicable, then implement the
17 disputed matter as resolved and perform the Work which was the
18 subject of the dispute, if required.  Any Deliverable or other
19 submission required under this Consent Decree should be amended,
20 if applicable, to reflect the resolution of the dispute.
21      3.  In any dispute in which the Settling Defendants
22 prevail, (a) any affected deadlines or schedules shall be
23 extended to account fully for any delays attributable to the
24 dispute resolution procedure; and (b) any penalties which would
25 otherwise have accrued for Consent Decree violations shall be
26 void.
27
28

Casmalia Consent Decree

- 96 -

## XXII. STIPULATED PENALTIES

A. Settling Defendants shall be liable to the United States for stipulated penalties in the amounts set forth in Paragraphs B. and C., below, for failure to comply with the requirements of this Consent Decree specified in Paragraphs B. and C., below, unless excused under Section XII. (Force Majeure), or pursuant to Section XII. (Dispute Resolution). "Compliance" by Settling Defendants shall include submission of Deliverables and other submissions required by this Consent Decree and completion of the tasks and activities under this Consent Decree in the manner, and within the time, established by, and/or approved under, this Consent Decree.

B. The following stipulated penalties shall be payable per violation per day to the United States for failure to submit timely or adequate Deliverables or for any noncompliance under Paragraph D., below:

| Penalty Per Violation Per Day | Period of Noncompliance |
| --- | --- |
| $ 1000 | Day 1 through 5 |
| $ 2500 | Day 6 through 30 |
| $ 5000 | Day 31 and each day thereafter |

C. The following stipulated penalties shall be payable per violation per day to the United States for any other noncompliance with the Consent Decree or SOW that is not covered by Paragraph B., above. For purposes of this Section XXII., "Deliverable" shall mean all submissions or milestone events required of the Settling Defendants under Section 4.0. of the SOW including any additions and modifications made in accordance with the terms of this Consent Decree.

| Penalty Per Violation Per Day | Period of Noncompliance |
| --- | --- |
| $ 500 | Day 1 through 5 |
| $ 1000 | Day 6 through 30 |
| $ 2500 | Day 31 and each day thereafter |

D. In the event that Settling Defendants suspend performance of the Phase I or Phase II Work without authorization as determined by EPA or in the event that EPA or a designee, assume performance of a portion or all of the Phase I or Phase II Work as a result of Settling Defendants unauthorized failure to perform, as determined pursuant to Paragraph C. (failure to Perform) of Section VII. (Work To be Performed) or Paragraph C.4. of Section XIV. (Covenants Not To Sue/Reservations of Rights), Settling Defendants shall be liable for stipulated penalties in the amounts set forth in Paragraph B., above, until such time as the suspended Work has been completed by EPA.

E. The Settling Defendants are jointly and severally liable for any stipulated penalties pursuant to the provisions of this Section. The dollar amounts specified for penalties are not subject to Section XII. (Dispute Resolution).

F. All penalties shall begin to accrue on the first day of noncompliance with any applicable provision of this Consent Decree and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity. However, stipulated penalties shall not accrue: (i) during the 14-day grace period provided in Section XII. Paragraph C. (Submissions Requiring Agency Approval); (2) with respect to a ...

deficient submission under Section XII. (Submissions Requiring
Agency Approval), during the period, if any, beginning on the
31st day after EPA's receipt of such submission until the date
that EPA notifies Settling Defendants of any deficiency; (3) with
respect to a decision by the Director of the Waste Management
Division, EPA Region IX, or any designee or successor, under
Paragraph D.2., E.1., or F.1. of Section XII. (Dispute
Resolution), during the period, if any, beginning on the 31st day
after the date that Settling Defendants' reply to EPA's Statement
of Position is received until the date that the Director issues a
final decision regarding such dispute; or (4) with respect to
judicial review by this Court of any dispute under Section XII.
(Dispute Resolution), during the period, if any, beginning on the
31st day after the Court's receipt of the final submission
regarding the dispute until the date that the Court issues a
final decision regarding such dispute. Nothing herein shall
prevent the simultaneous accrual of separate penalties for
separate violations of this Consent Decree.

G. Following EPA's determination that Settling Defendants
have failed to comply with a requirement of this Consent Decree,
EPA may give Settling Defendants written notification and
describe the noncompliance. EPA may send the Settling Defendants
a written demand for the payment of the penalties. However,
Settling Defendants are subject to stipulated penalties as
provided in the preceding Paragraph regardless of whether EPA has
notified the Settling Defendants of a violation.

H. All penalties owed to the United States under this
section shall be due and payable within thirty (30) days of the

Cammalia Consent Decree 99

-103-

Settling Defendants' receipt from EPA of a demand for payment of
the penalties, unless Settling Defendants invoke the dispute
resolution procedures under Section XII. (Dispute Resolution).
All payments under this Section shall be paid to the United
States according to instructions to be provided by EPA before
payment. Copies of check(s) paid or certifications of electronic
funds transfers pursuant to this Section, and any accompanying
transmittal letter(s), shall be sent to the United States as
provided in Section XIII. (Notices and Submissions) within ten
(10) days of such payment.

I. The payment of penalties shall not alter in any way
Settling Defendants' obligation to complete the performance of
the Work required under this Consent Decree.

J. Penalties shall continue to accrue as provided in
Paragraph F., above, during any dispute resolution period, but
need not be paid until the following:

1. If the dispute is resolved by agreement or by a
decision of EPA that is not appealed to this Court, accrued
penalties determined to be owing shall be paid according to the
terms of Paragraph H., above, within fifteen (15) days of the
agreement or the receipt of EPA's decision or order;

2. If the dispute is appealed to this Court and the
United States prevails in whole or in part, Settling Defendants
shall pay, according to the terms of Paragraph H., above, all
accrued penalties, determined by the Court to be owed, within
thirty (30) days of receipt of the Court's decision or order,
except as provided in sub-Paragraph J., below;

3. If the District Court's decision is appealed by

Cammalia Consent Decree 100

-104-

any party to the dispute, Settling Defendants shall pay all
accrued penalties determined by the District Court to be owing to
the United States into an interest-bearing escrow account within
sixty (60) days of receipt of the Court's decision or order.
Penalties shall be paid into this account as they continue to
accrue, at least every sixty (60) days. Within fifteen (15) days
of receipt of the final appellate court decision, the escrow
agent shall pay the balance of the account to the United States
according to instructions to be provided by EPA before payment,
or to Settling Defendants, to the extent that they prevail.

K. 1. If Settling Defendants fail to pay stipulated
penalties when due, the United States may institute proceedings
to collect the penalties, as well as interest. Settling
Defendants shall pay interest on the unpaid balance, which shall
begin to accrue on the date of demand made pursuant to Paragraph
H., above, at the rate established pursuant to Section 107(a) of
CERCLA, 42 U.S.C. § 9607.

2. Nothing in this Consent Decree shall be construed
as prohibiting, altering, or in any way limiting the ability of
the United States to seek any other remedies or sanctions
available by virtue of Settling Defendants' violation of this
Decree or of the statutes and regulations upon which it is based,
including, but not limited to, penalties pursuant to Section
122(l) of CERCLA.

L. Notwithstanding any other provision of this Section,
the United States may, in its sole discretion, waive any portion
of the stipulated penalties that have accrued pursuant to this
Consent Decree.

## XXIII. COORDINATED ENFORCEMENT RECOVERY

A. This Section is intended to provide the framework for
(a) the approach to and enforcement against Third Parties who
have not resolved their liabilities for the Site pursuant to the
Cashout Settlement(s), and (b) for the distribution in accordance
with this Consent Decree of monetary proceeds obtained through
actions, claims, settlements, judgments and other efforts from
Third Parties in accordance with this Consent Decree.

B. To the extent consistent with prosecutorial and
litigation discretion, the United States and the Settling
Defendants agree to act in good faith to coordinate their
approach in any enforcement, cost recovery, or other claim
against Third Parties.

C. Except as provided below, any monetary recovery
obtained by the United States or the Settling Defendants from any
Third Party in any action or claim relating to the financing or
performance of Site activities or recovery of Site response costs
shall be deposited into the Cash Account of the Cannella Consent
Decree Escrow Account to be distributed to other Accounts of the
Escrow Account according to the funding priorities established
under this Consent Decree at Section XVII, Paragraph E. [Escrow
Accounts/Financing the Work].

1. Reimbursement of Expenditures

a. Except as provided in Paragraph C.3. and
C.3., below, if the United States or the Settling Defendants
obtain monetary recovery from a Third Party that does not resolve
its liability pursuant to the Cashout Settlement(s), then the
funds recovered may be first used to reimburse the United States

and the Settling Defendants for all expenditures each such party has made in pursuing such recovery. After the Parties have been fully reimbursed for such costs, then the remaining amount of the monetary recovery shall be deposited in the Cash Account of the Escrow Account for distribution according to the priorities set forth in Section XVII, Paragraph E. (Escrow Accounts/Financing The Work) of this Consent Decree. Except as provided below, expenditures subject to reimbursement shall begin to accrue as to each Third Party after the deadline has passed for resolution of that Third Party's Site liability through the Cashout Settlements.

b.   In the event that both the United States and the Settling Defendants have made expenditures for pursuit of a claim against a Third Party, the monetary proceeds received shall be distributed equally between the United States and the Settling Defendants until one party's expenditures are fully satisfied after which the other party's expenditures shall be fully reimbursed, if possible.

c.   In order to obtain reimbursement of expenditures pursuant to this Paragraph C., within thirty (30) days of judgment or settlement or other receipt of funds, the United States and the Settling Defendants shall submit to the other a claim for reimbursement of the expenditures which have occurred with respect to the Third Party claim, including sufficient documentation supporting and justifying payment of the claim. The United States may dispute a claim of the Settling Defendants' based upon allegations (a) of an accounting error, (b) that the costs are unreasonable or excessive in relation to

the recovery, or (c) that the claimed cost is not recoverable under this Section's terms or not related to the Third Party recovery. The Settling Defendants may dispute a claim of the United States under this Paragraph C. based upon allegations (a) of an accounting error, (b) that the cost item is inconsistent with the NCP, or (c) that the claimed cost was not related to the Third Party recovery. Any dispute with respect to a claim shall be resolved pursuant to Section XXI., Paragraph B. (Dispute Resolution). In the event of such a dispute, the disputed funds shall be deposited with the Escrow Manager in a separate interest bearing account pending resolution of the dispute.

2.   Recovery Against The State

All monetary recoveries obtained from resolution in whole or in part of the State of California's potential liabilities associated with the Casmalia Site shall be deposited in the Cash Account and then transferred in full to the 30-Year O&M Work Sub-Account subject only to the following exceptions:

a.   3-May Settlement On Or Before Fifteen Months
If the monetary recovery is (i) authorized or obtained by settlement agreement signed by the United States, the State, and the Settling Defendants or (iii) is otherwise received in the Escrow Account without objection of any Party on or before the date fifteen (15) months following lodging of the Consent Decree, EPA may, in its discretion authorize and direct the Escrow Manager to transfer up to seventy-five percent (75%) of the monetary recovery, including any associated interest accrual and income, to the Phase II Account.

b. **2-Way Settlement On Or Before Fifteen Months**

If the monetary recovery is authorized or obtained by settlement agreement signed by only the United States and the State on or before the date fifteen (15) months following lodging of the Consent Decree, EPA may, in its discretion, authorize and direct the Escrow Manager to transfer up to one hundred percent (100%) of the monetary recovery, including any associated interest accrual and income, to the Phase II Account. ;

c. **Settlement or Judgment After Fifteen Months**

If the monetary recovery is authorized (i) by settlement agreement signed by the United States and/or the Settling Defendants or (ii) by an entered judgment after the date fifteen (15) months following lodging of the Consent Decree, EPA may, in its discretion, authorize and direct the Escrow Manager to transfer up to seventy-five percent (75%) of the monetary recovery, including any associated interest accrual and income, to the Phase II Account.

d. **Allocation of Expenditures.** (i) If the monetary recovery obtained from the State is authorized pursuant to a settlement agreement signed by the United States and/or Settling Defendants or an entered judgment after the date fifteen (15) months following lodging of the Consent Decree, Settling Defendants and the United States may be reimbursed from any such recovery for all expenditures attributable to preparation for litigation against the State incurred by the Settling Defendants and/or the United States after the date fifteen (15) months following lodging of the Consent Decree. The reimbursement shall be subject to the terms of Paragraph C.i.b. and C.i.c., above.

Casella Consent Decree 5

-9-

(ii) If the monetary recovery obtained from the State is authorized pursuant to a settlement agreement signed by the United States and/or the Settling Defendants or an entered judgment on or before the date fifteen (15) months following lodging of the Consent Decree, the Settling Defendants and the United States shall not be reimbursed from the recovery, subject to Paragraph E. below, for any expenditures, and the proceeds of the recovery shall not be subject to the terms of Paragraph C.i., above.

3. **Recovery Against The Casmalia Entities**

All monetary recoveries obtained from the Casmalia Entities shall be deposited in the Cash Account and then transferred in full to the 30-Year O&M Work Sub-Account subject only to the following exceptions: (i) the Settling Defendants and the United States shall be entitled to reimbursement from the recovery proceeds in accordance with the terms of Paragraph C.i.b. and C.i.c., above, for all expenditures attributable to settlement with or litigation against the Casmalia-Entities incurred after lodging of this Consent Decree; and (ii) EPA may, in its discretion, authorize and direct the Escrow Manager to transfer up to twenty-five percent (25%) of the net monetary recovery (i.e. after the allocation under (i) above, including any associated interest accrual or income, to the Phase II Account.

b. Except for actions against third Parties already initiated or ongoing, the provisions of this Section XXIII. (Coordinated Enforcement Recovery) shall terminate three (3) years from the effective date, provided in Paragraph A.3. of

Casmalia Conser... Decre ...

-110-

02-0067526

## XXIV. LEAD AGENCY

A. As used in this Section, CERCLA shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601 et seq., as amended by the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499, 100 Stat. 1613 (1986), and "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan, dated March 8, 1990 (55 Fed. Reg. 8813), promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. §§ 9605.

B. This Consent Decree is intended to govern all Site regulatory and enforcement activities. EPA is the lead agency for the governmental/regulatory oversight of the Phase I and Phase II Work. As the lead agency, pursuant to its authority under CERCLA, EPA shall make all decisions, including but not limited to, remedy selection, ARARs determinations, technical determinations and acceptance or approval of the Work, Consent Decree compliance, and enforcement matters related to this Consent Decree. Pursuant to CERCLA and the NCP, EPA intends to provide an opportunity for State involvement in CERCLA response activities. Unless notified otherwise by the State, EPA intends to rely upon the California Department of Toxic Substances Control ("DTSC"), as the Support Agency responsible for coordinating and interacting with EPA on matters related to this Consent Decree and the Site.

C. The designation of the lead regulatory agency for the governmental/regulatory oversight of the 30-Year O&M and Post-30 Year O&M Work is not resolved by the terms of this Consent Decree. Nothing in or under this Consent Decree, including EPA's

---

Section XVIII. (Cost Estimates and Fund Transfers), of the Final Cost Estimate.

E. Nothing in this Section is intended to authorize recoveries from Third Parties that are not otherwise recoverable pursuant to Sections 106 and 107 of CERCLA or other applicable law. Further, the United States reserves its rights against the Settling Defendants, as provided in Section XXV, Paragraph C. (Covenants Not To Sue/Reservations of Rights), and/or against Third Parties to recover any Response Costs incurred in connection with actions against Third Parties that are not reimbursed or otherwise recovered pursuant to this Section.

Consent Decree shall not be affected by the designation of a new
lead agency pursuant to this Section XXIV.

1 role as the lead regulatory agency for the governmental/

2 regulatory oversight until Certification of Completion of Phase

3 II Work or the pendency of any dispute concerning the Final Cost

4 Estimate after Certification of Completion of Phase II Work shall

5 create any presumption that EPA is, or require that EPA be, the

6 lead regulatory agency for the 30-Year O&M and Post-30 Year O&M

7 Work. No later than the fourth anniversary date of the

8 initiation of the O&M Base Period Work, EPA shall make a good

9 faith attempt to resolve with the State and other governmental

10 entities, as appropriate, the designation of the lead regulatory

11 agency for the governmental/regulatory oversight of the 30-Year

12 O&M and Post-30 Year O&M Work.

13    If EPA is designated the lead regulatory agency for the

14 governmental/regulatory oversight of the 30-Year O&M and/or Post-

15 30 Year O&M Work, monies in the 30-Year and/or Post-30 Year O&M

16 Oversight Sub-Accounts shall be transferred to EPA upon notice to

17 the Escrow Manager of EPA's designation. Upon approval of the

18 Parties, monies in the 30-Year and/or Post-30 Year O&M Oversight

19 Sub-Accounts may be transferred to the State if the State is

20 designated the lead regulatory agency for governmental/regulatory

21 oversight of the 30-Year O&M and/or Post-30 Year O&M Work. If

22 EPA is not designated the lead regulatory agency, absent approval

23 of the Parties to transfer such monies to the new lead agency,

24 monies in the 30-Year and Post-30 Year O&M Oversight Sub-Accounts

25 shall be distributed to other Accounts of the Escrow Account in

26 priority order pursuant to Section XVII. Paragraph E. (Escrow

27 Accounts/Financing The Work).

28    D. Settling Defendants' rights and obligations under this
Cananlia Consent Decree.

02-0067528

XXV. COVENANTS NOT TO SUE/RESERVATIONS OF RIGHTS

A. United States' Covenants Not To Sue

1. Phase I Work. In consideration of the actions that will be performed and the payments that will be made by the Settling Defendants under the terms of the Consent Decree in accordance with Paragraph A.7. below and except as specifically provided in Paragraph C. of this Section, the United States covenants not to sue or to take administrative action against Settling Defendants pursuant to CERCLA, RCRA, and common law relating to the performance of the Phase I Work.

2. Phase II Work. In consideration of the actions that will be performed and the payments that will be made by the Settling Defendants under the terms of the Consent Decree in accordance with Paragraph A.7. below and except as specifically provided in Paragraph C. of this Section, the United States covenants not to sue or to take administrative action against Settling Defendants pursuant to CERCLA, RCRA, and common law relating to the performance of the Phase II Work. In the event EPA performs or funds any or all of the Phase II Work pursuant to Section XXV, Paragraph C.4. (Covenants Not To Sue/Reservations of Rights), response costs incurred by EPA for such Phase II Work shall not be recoverable from Settling Defendants. Subject to the preceding sentence, EPA reserves its rights as specified in Paragraph C.3.d. of this Section against the Settling Defendants.

3. 30-Year O&M

When referred to under this Paragraph A.3., 30-Year O&M includes both the 30-Year O&M Work and associated governmental/regulatory oversight by the United States for the

Camsilla Consent Decree

- 115 -

111

30-Year O&M Work. Subject only to the final resolution of any related cost estimate disputes pursuant to Section XXI, Paragraph E. (Dispute Resolution), receipt of the covenant not to sue under this Paragraph A.3. shall require full funding of both the 30-Year O&M Work Sub-Account and the 30-Year O&M Oversight Sub-Account.

In consideration of the actions that will be performed and the payments that will be made by the Settling Defendants under the terms of the Consent Decree, in accordance with Paragraph A.7. below and except as specifically provided in Paragraph C. of this Section, the United States shall covenant not to sue or to take administrative action against the Settling Defendants pursuant to CERCLA, RCRA and common law relating to 30-Year O&M as follows:

a. At any time within three years after the Final Cost Estimate becomes effective and after any and all transfers under Section XVIII. (Cost Estimates and Fund Transfers) are made, the Settling Defendants shall receive a covenant not to sue for 30-Year O&M if the amount in the 30-Year O&M Account is equal to or greater than the Final Cost Estimate. The covenant will become effective when the 30-Year O&M Account is fully funded based upon a fully effective Final Cost Estimate as provided in Section XVIII, Paragraph A.3.c. (Cost Estimates and Fund Transfers). After the covenant not to sue becomes effective, excess funds in the 30-Year O&M Account, if any, will be transferred to the next Account with equal or higher priority as set forth in Section XVII, Paragraph E. (Escrow Account#/Financing The Work).

Camsilla Consent Decree

- 116 -

112

02-00067529

b.  If, at any time within three years after the
Final Cost Estimate becomes effective and after any and all
transfers under Section XVIII. (Cost Estimate and Fund
Transfers) are made, there is a shortfall of funds in the 30-Year
O&M Account, the Settling Defendants may receive a covenant not
to sue for 30-Year O&M if they elect to fund the shortfall.  For
the election to be effective, the Settling Defendants must pay
the unfunded amount into the 30-Year O&M Account no later than
sixty (60) days after the third anniversary of the effective date
of the Final Cost Estimate for 30-Year O&M.  The covenant not to
sue shall be effective upon receipt of the money in the 30-Year
O&M Account of the Escrow Account.

c.  If the Settling Defendants do not receive a
covenant not to sue pursuant to Paragraph 3.a or 3.b. above, they
shall be entitled to a covenant not to sue for 30-Year O&M Work
until an amount equal to the annualized cost of two years of O&M
Work, as determined by the Final Cost Estimate, remains in the
30-Year O&M Work Sub-Account, at which time, the Settling
Defendant's covenant not to sue for 30-Year O&M Work shall
expire.

d.  The money in the RCRA Trust Fund shall be
included in the calculations made pursuant to this Paragraph 3.,
only if it has been transferred into the 30-Year O&M Work Sub-
Account or is otherwise available, without impediment, for the
30-Year O&M Work.

e.  Settling Defendants shall only be entitled to
exercise the Full Funding Option pursuant to this Paragraph
A.3.a. or A.3.b. based upon a fully effective Final Cost Estimate

Casmalia Consent Decree

- 117 -

---

for 30-Year O&M.

4.  Post-30-Year O&M

When referred to under this Paragraph A.4., Post-
30 Year O&M includes both the Post-30 Year O&M Work and
associated governmental/regulatory oversight by the United States
for the Post-30 Year O&M Work.  Subject only to the final
resolution of any related cost estimate disputes pursuant to
Section XXI, Paragraph E. (Dispute Resolution), receipt of the
covenant not to sue under this Paragraph A.4. shall require full
funding of both the Post-30 Year O&M Work Sub-Account and the
Post-30 Year O&M Oversight Sub-Account.

In consideration of the actions that will be performed
and the payments that will be made by the Settling Defendants
under the terms of the Consent Decree, in accordance with
Paragraph A.7. below and except as specifically provided in
Paragraph C. of this Section, the United States shall covenant
not to sue or to take administrative action against the Settling
Defendants pursuant to CERCLA, RCRA and common law relating to
Post-30 Year O&M as follows:

a.  At any time within three years after the
Final Cost Estimate becomes effective and after any and all
transfers under Section XVIII. (Cost Estimate and Fund
Transfers) are made, the Settling Defendant shall receive a
covenant not to sue for Post-30 Year O&M if the amount in the
Post-30 Year O&M Account is equal to or greater than the Final
Cost Estimate.  The covenant will become effective when the Post-
30 Year O&M Account is fully funded based upon a fully effective
Final Cost Estimate as provided in Section XVIII, Paragraph

Casmalia Consent Decree

- 118 -

02-00677530

114

1 A.3.c. (Cost Estimates and Fund Transfers). After the covenant
2 not to sue becomes effective, excess funds in the Post-30 Year
3 O&M Account, if any, will be transferred to the Account with the
4 next highest priority as set forth in Section XVII, Paragraphs E.
5 and F. (Escrow Accounts/Financing The Work).
6  b. If, at any time within three years after the
7 Final Cost Estimate becomes effective and after any and all
8 transfers under Section XVIII. (Cost Estimates and Fund
9 Transfers) are made, there is a shortfall of funds in the Post
10 30-Year O&M Account, the Settling Defendants may receive a
11 covenant not to sue for Post-30 Year O&M if they elect to fund
12 the shortfall. For the election to be effective, the Settling
13 Defendants must pay the unfunded amount into the Post-30 Year O&M
14 Account no later than sixty (60) days after the third anniversary
15 of the effective date of the Final Cost Estimate for Post-30 Year
16 O&M. The covenant not to sue shall be effective upon receipt of
17 the money in the Post-30 Year O&M Account of the Escrow Account.
18  c. Settling Defendants shall only be entitled to
19 exercise the Full Funding Option pursuant to this Paragraph
20 A.4.a. or A.4.b. based upon a fully effective Final Cost Estimate
21 for Post-30 Year O&M.
22  5. Past Response Costs
23  In consideration of the actions that will be
24 performed and the payments that will be made by the Settling
25 Defendants under the terms of this Consent Decree, in accordance
26 with Paragraph A.7. below and except as provided in Paragraph C.
27 of this Section, the United States covenants not to sue or to
28 take administrative action against the Settling Defendants under

Cammalls Consent Decree 115

1 CERCLA, RCRA, or common law (a) until three (3) years from the
2 date of entry of this Consent Decree for recovery of Past
3 Response Costs, and (b) for Past Response Costs that are
4 reimbursed pursuant to this Consent Decree.
5  c. Future Response Costs
6  In consideration of the actions that will be
7 performed and the payments that will be made by the Settling
8 Defendants under the terms of this Consent Decree, in accordance
9 with Paragraph A.7. below and except as specifically provided in
10 Paragraph C. of this Section,
11  a. the United States covenants not to sue or to
12 take administrative action against Settling Defendants pursuant
13 to CERCLA, RCRA, or common law for recovery of Unfunded Future
14 Response Costs incurred up through but not including the date
15 three (3) years from the date of entry of this Consent Decree;
16 and
17  b. the United States covenants not to sue or to
18 take administrative action against Settling Defendants pursuant
19 to CERCLA, RCRA, or common law for recovery of Funded Future
20 Response Costs paid by the Settling Defendants and received by
21 EPA pursuant to Paragraph C. of Section XIX. (Reimbursement of
22 Response Costs); and
23  c. the United States covenants not to sue or to
24 take administrative action against Settling Defendants pursuant
25 to CERCLA, RCRA, or common law for the recovery of Funded Future
26 Response Costs drawn out of the Future Response Costs Sub-Account
27 or the Phase II Work Sub-Account and received by EPA pursuant to
28 Section XIX, Paragraph D. (Reimbursement of Response Costs).

Cammalls Consent Decree 116

02-0067531

7. Except with respect to future liability, the covenant not to sue set forth in Paragraphs 1., 2., 5., and 6., above, shall take effect upon the date of entry of this Consent Decree. With respect to future liability, these covenants not to sue shall take effect upon completion of the Initial Phase II Work. The covenant not to sue in Paragraphs 3. and 4. above shall take effect as described therein. Each of these covenants not to sue is conditioned upon the complete and satisfactory performance by Settling Defendants of any applicable obligations under this Consent Decree with respect to each covenant not to sue. These covenants not to sue extend only to the Settling Defendants and do not extend to any other person(s).

B. Settling Defendants' Covenant Not To Sue. Subject to the Settling Defendants' Reservations of Rights at Paragraph D. below, Settling Defendants hereby covenant not to sue and agree not to assert any claims or causes of action, either direct or collateral, against the United States with respect to the Site, any liabilities associated with the Site, or this Consent Decree, including but not limited to, (i) any claim for reimbursement from the Hazardous Substance Superfund (established pursuant to the Internal Revenue Code, 26 U.S.C. § 9507) through CERCLA Sections 306(b)(2), 111, 112, 113 or any other provision of law; or (ii) any claim against the United States, including any department, agency, subdivision, or instrumentality of the United States, under CERCLA or RCRA related to the Site. Nothing in this Consent Decree shall be deemed to constitute preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

Cannelle Consent De-----

-121-

C. United States' Reservations of Rights

1. Recovery

a. United States' Pre-Certification Reservations

Notwithstanding any other provision of this Consent Decree, the United States reserves, and this Consent Decree is without prejudice to, the right to institute proceedings in this action or in a new action, or to issue an administrative order seeking to compel Settling Defendant (1) to perform further response actions relating to the Site or (2) to reimburse the United States for additional costs of response if, after the final ROD and prior to completion of the Initial Phase II Work;

(i) conditions at the Site, previously unknown to EPA, are discovered, or

(ii) information, previously unknown to EPA, is received, in whole or in part,

and these previously unknown conditions or this information together with any other relevant information indicates that response actions implemented under this Consent Decree are not protective of human health or the environment. Provided, however, subject to the priorities and transfer restrictions in Sections XVII. (Escrow Accounts/Financing the Work) and XVIII. (Cost Estimate and Fund Transfer), if EPA determines, in its sole discretion, that adequate unrestricted funds are available to finance and perform the remaining Phase II Work and any additional work necessitated under the reopeners in this Paragraph C.1.a. ("reopener work"), upon notice from EPA, the Settling Defendants shall perform the reopener work using such funds, and upon acceptance of its completion by EPA, the United

States shall covenant not to sue Settling Defendants for the

reopener work performed.

   b.  United States' Past-Certification

reservations.  Notwithstanding any other provision of this

Consent Decree, the United States reserves, and this Consent

Decree is without prejudice to, the right to institute

proceedings in this action or in a new action, or to issue an

administrative order seeking to compel Settling Defendant (1) to

perform further response actions relating to the Site or (2) to

reimburse the United States for additional costs of response if,

subsequent to completion of the Initial Phase II Work:

   (i) conditions at the Site, previously unknown to EPA,

are discovered, or

   (ii) information, previously unknown to EPA, is

received, in whole or in part.

and these previously unknown conditions or this information

together with other relevant information indicate that response

actions implemented under this Consent Decree are not protective

of human health or the environment.

   2.  For purposes of Paragraph C.1.e., above, the

information and the conditions known to EPA shall include only

that information and those conditions set forth in the final

Record of Decision for the Site, together with other EPA response

action decision document(s) selecting the final remedy, and the

administrative record(s) supporting these response action

decision document(s).  For purposes of Paragraph C.1.b., above,

the information and the conditions known to EPA shall include

only that information and those conditions set forth in the final

Cannella Consent Decree
119

Record of Decision for the Site, together with other EPA response

action decision document(s) selecting the final remedy, and the

administrative record(s) supporting these response action

decision document(s), and any information received by EPA

pursuant to the requirements of this Consent Decree prior to

completion of the Initial Phase II Work.

   3.  United States' General Reservations of Rights.  The

United States' covenants not to sue set forth above do not

pertain to any matters other than those expressly specified in

Paragraph A., above.  The United States reserves, and this

Consent Decree is without prejudice to, all claims, rights, and

defenses against Settling Defendant with respect to all other

matters, including but not limited to, the following:

   a.  claims based on a failure by Settling

Defendants to meet a requirement of this Consent Decree;

   b.  liability arising from the past, present, or

future disposal, release, or threat of release of Waste

Materials outside of the Site;

   c.  liability for damages for injury to,

destruction of, or loss of natural resources;

   d.  except as provided in Paragraph A.2. of this

Section, after the expiration of the moratorium set forth in

Paragraph A.3., above, liability for Past Response Costs

(including any Unfunded Future Response Costs) relating to

the Site, not otherwise recovered, that have been incurred

by the United States by or through any of its departments,

agencies, instrumentalities, or subdivisions;

   e.  criminal liability;

Cannella Consent Decree
120

1         f. liability for violations of (federal) or state

2 law which occur during or after implementation of the Work;

3         g. liability for the 30-Year O&M Work for which

4 the Settling Defendants have not received a covenant not to

5 sue pursuant to this Consent Decree; and

6         h. liability for Post-30 Year O&M Work for which

7 Settling Defendants have not received a covenant not to sue

8 pursuant to this Consent Decree.

9         d. In the event EPA determines that Settling

10 Defendants have failed to implement any provisions of the Phase I

11 or Phase II Work in an adequate or timely manner, EPA may perform

12 any and all portions of such Work as EPA determines necessary.

13 Settling Defendants may invoke the procedures set forth in

14 Section XXI. (Dispute Resolution) to dispute EPA's determination

15 that the Settling Defendants failed to implement a provision of

16 the Phase I or Phase II Work in an adequate or timely manner as

17 arbitrary and capricious or otherwise not in accordance with law

18 pursuant to Section XXI. Paragraph D. (Dispute Resolution). Such

19 dispute shall be resolved on the administrative record.

20         5. Notwithstanding any other provision of this

21 Consent Decree, the United States retains all authority and

22 reserves all rights to take any and all response actions

23 authorized by law; provided however, that the United States shall

24 not take any such actions that would constitute Phase I Work,

25 except in accordance with Section VII. Paragraph C. (Work To Be

26 Performed) or Section XV. (Emergency Response).

27         6. In any dispute resolution proceeding pursuant to

28 Section XXI. (Dispute Resolution), the United States reserves all

Co. a Cr . : De: 121

1 rights to assert any and all defenses available under applicable

2 law.

3     D. Settling Defendants' Reservation of Rights

4         1. The Settling Defendants' covenants not to sue

5 set forth in Paragraph B. above, do not pertain to any matters

6 other than those expressly specified in such covenants. The

7 Settling Defendants reserve, and this Consent Decree is without

8 prejudice to, all rights against EPA with respect to all other

9 matters.

10         2. Except as otherwise provided in this Consent

11 Decree, the Settling Defendants reserve all of their claims,

12 rights and defenses with respect to the following:

13         a. the United States' right to recover

14 against the Settling Defendants any response, oversight, or

15 related cost, including interest and indirect costs, not

16 otherwise funded or reimbursed pursuant to this Consent

17 Decree;

18         b. liability of the Settling Defendants

19 arising from the past, present, or future disposal, release,

20 or threat of release of Waste Materials outside of the Site;

21         c. claims against any department, agency,

22 subdivision or instrumentality of the United States ("United

23 States") that has not resolved its liability for conditions

24 at the Site in the Cashout Settlements;

25         d. any claim against any Third Party that

26 does not resolve its liability pursuant to the Cashout

27 Settlements, the State of California, and the Cannaila

28 Entities;

Carmalla Consent Decree

e. any claim brought by the United States against the Settling Defendants that is otherwise not precluded by this Consent Decree; provided, however, that Settling Defendants may not assert any claim against any department, agency, instrumentality, or subdivision of the United States as to which contribution protection has been received pursuant to Section 113(f) of CERCLA, 42 U.S.C. § 9613(f).

f. Settling Defendants' obligation to perform the 30-Year and Post 30-Year O&M Work;

g. any matter relating to compliance with the terms of this Consent Decree;

h. any matter relating to any request by EPA to perform additional work pursuant to Section VIII. (Additional Response Actions) and Paragraphs C.1.a. and C.1.b. of Section XXV. (Covenants Not To Sue/Reservations of Rights);

i. any matter relating to the RCRA Trust Fund;

j. any negligence action against the United States pursuant to Section XVI. (Indemnification and Insurance); and

k. Settling Defendants' right to challenge any settlement between the United States and any Third Party, including the State and the Casmalia Entities, with respect to the Site.

## XXVI. EFFECT OF SETTLEMENT; CONTRIBUTION PROTECTION

A. Nothing in this Consent Decree shall be construed to create any rights in, or grant any causes of action to, any person not a Party to this Consent Decree. Except as provided in Section XXIII. (Coordinated Enforcement; Recovery), each of the Parties expressly reserves any and all rights (including, but not limited to, any right to contribution), defenses, claims, demands, and causes of action which each Party may have with respect to any matter, transaction, or occurrence relating in any way to the Site against any person not a Party hereto.

B. The Parties agree, and by entering this Consent Decree, this Court finds, that the Settling Defendants are entitled, as of the effective date of this Consent Decree, to protection from contribution actions or claims as provided by CERCLA Section 113(f)(2), 42 U.S.C. § 9613(f)(2), and any other applicable law, for matters addressed in this Consent Decree. For purposes of this Paragraph, "matters addressed" shall include liability pursuant to CERCLA, RCRA, and common law for Phase I Work, Phase II Work, 30-Year O&M (including 30-Year O&M Work and costs of governmental/regulatory oversight), Post-30 Year O&M (including Post-30 Year O&M Work and costs of governmental/regulatory oversight), Past Response Costs and Future Response Costs. Provided, however, the Settling Defendants' contribution protection for unreimbursed Past Response Costs (including Unfunded Future Response Costs) and 30-Year and Post-30 Year O&M (including 30-Year and Post-30 Year O&M Work and costs of governmental/regulatory oversight) shall expire on the expiration of the Full Funding Option elections, as provided pursuant to

03-00677575

Section XXV. Paragraphs A.3. and A.4. (Covenants Not To

Sue/Reservations of Rights), for matters for which the Settling

Defendants have not received a covenant not to sue under this

Consent Decree.

C. With respect to any suit or claim for contribution

brought against them for matters related to this Consent Decree

or the Cannelle Site, the Settling Defendants will notify the

United States in writing within seven (7) days of service of the

complaint on them. In addition, Settling Defendants shall notify

the United States within seven (7) days of service or receipt of

any dispositive motion and within seven (7) days of receipt of

any order from a court setting a case for trial.

D. In any subsequent administrative or judicial proceeding

initiated by the United States for injunctive relief, recovery of

response costs, or other appropriate relief relating to the Site,

as governed by Section XXV. (Covenants Not To Sue/Reservations of

Rights), Settling Defendants shall not assert, and may not

maintain, any defense or claim based upon the principle of a bar

due to a statute of limitations, waiver, res judicata, collateral

estoppel, issue preclusion, claim-splitting, or other defenses

based upon any contention that the claims raised by the United

States in the subsequent proceeding were or should have been

brought in the instant case; provided, however, that nothing in

this Paragraph affects the enforceability of the covenants not to

sue set forth in Section XXV. (Covenants Not To Sue/Reservations

of Rights).

Cannelle Consent Decree

-124-

---

XXVII. ACCESS TO INFORMATION

1

2 A. Settling Defendants shall provide to EPA, upon request,

3 copies of all documents and information, unless privileged,

4 within their possession or control or that of their contractors

5 or agents generated pursuant to the obligations of this Consent

6 Decree, relating to activities at the Site, or relating to the

7 implementation of this Consent Decree, including, but not limited

8 to, sampling, analysis, chain of custody records, manifests,

9 trucking logs, receipts, reports, sample traffic routing,

10 correspondence, or other documents or information related to the

11 Work; provided, however, that except with respect to documents or

12 information generated pursuant to the obligations of this Consent

13 Decree, Settling Defendants reserve any rights and defenses they

14 may have to challenge such requests pursuant to Section 104(e) of

15 CERCLA, 42 U.S.C. 1960(e). Settling Defendants shall also make

16 available to EPA for purposes of investigation, information

17 gathering, or testimony, their employees, agents, or

18 representatives with knowledge of relevant facts concerning the

19 performance of the Work. Any requests for additional documents

20 and information shall be governed by applicable law.

21 B. Settling Defendants may assert business confidentiality

22 claims covering part or all of the documents or information

23 submitted to EPA under this Consent Decree to the extent

24 permitted by, and in accordance with, Section 104(e)(7) of

25 CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b).

26 Documents or information determined to be confidential by EPA

27 will be afforded the protection specified in 40 C.F.R. Part 2,

28 Subpart B. If no claim of confidentiality accompanies documents

Cannelle Consent Decree

-125-

XXVIII.  RETENTION OF RECORDS

A.  Until seven (7) years after the Certification of Completion of Phase II Work pursuant to Section XIV. (Certification of Completion), each Settling Defendant shall preserve and retain all records and documents (not including duplicates) now in its possession or control, or which come into its possession or control, that relate in any manner to the performance of the Work or any ROD or other EPA response action decision document pursuant to this Consent Decree, or that relate to the liability of any person for response actions conducted and to be conducted at the Site, regardless of any corporate records retention policy to the contrary. For the same period, Settling Defendants shall also instruct their contractors and agents to preserve all documents, records, and information of whatever kind, nature or description (not including duplicates) relating to the performance of the Work.

B.  At the conclusion of this document retention period, Settling Defendants shall notify the United States at least ninety (90) days prior to the destruction of any such records or documents, and, upon request by the United States, Settling Defendants shall make available any such records or documents to EPA. The Settling Defendants may assert that certain documents, records and other information are privileged under the attorney-client privilege or any other privilege recognized by federal law. Any document as to which a privilege claim is or may be asserted shall be retained for five (5) additional years unless Settling Defendants have received a covenant not to sue pursuant to Section XXV. Paragraphs A.3. and A.4. (Covenant Not to

Casmalia Consent Decree
128

02-0067977

---

or information when they are submitted to EPA, or if EPA has notified Settling Defendants that the documents or information are not confidential under the standards of Section 104(e)(7) of CERCLA, the public may be given access to such documents or information without further notice to Settling Defendants.

C.  With respect to information disclosure to EPA under this Section, the Settling Defendants may assert that certain documents, records and other information are privileged under the attorney-client privilege or any other privilege recognized by federal law. If the Settling Parties assert such a privilege in lieu of providing documents, they shall provide EPA with the following: (1) the title of the document, record, or information; (2) the date of the document, record, or information; (3) the name and title of the author of the document, record, or information; (4) the name and title of each addressee and recipient; (5) a description of the contents of the document, record, or information and (6) the privilege asserted by the Settling Defendants. However, no documents, reports or other information created or generated pursuant to the requirements of the Consent Decree shall be withheld on the grounds that they are privileged.

D.  No claim of confidentiality shall be made with respect to any data, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, or engineering data.

Casmalia Consent Decree
127

-131-

1 Sue/Reservations of Rights) and are no longer potentially liable
2 for Past Response Costs. Upon request, for any documents as to
3 which the Settling Defendants have asserted a privilege claim,
4 they shall provide the United States with a privilege index that
5 includes the following information sufficient to determine
6 whether specific documents are relevant to any further claim(s)
7 related to the Site and the basis for the privilege asserted; the
8 title, date, name and title of authors, name and title of
9 addressees and recipients, description of the subject, and the
10 asserted privilege. No documents, reports or other information
11 created or generated pursuant to the requirements of the Consent
12 Decree shall be withheld from the United States on the grounds
13 that they are privileged.
14     C. To the best of its recollection and knowledge, each
15 Settling Defendant hereby certifies, individually, that it has
16 not knowingly or wilfully altered, mutilated, discarded,
17 destroyed or otherwise disposed of any records, documents or
18 other information relating to its potential liability regarding
19 the Site since notification of potential liability by the United
20 States.
21     D. EPA has obtained copies of certain original records
22 from the Casmalia facility, which records in the form of
23 microfiche, are in the possession of EPA. Settling Defendants
24 have in their possession a duplicate copy of the microfiche
25 records. Each set of microfiche comprises 2148 microfiche pages.
26 Each Settling Defendant hereby stipulates that to the best of its
27 knowledge the microfiche is an accurate reproduction of the
28 original Casmalia records. Each Settling Defendant further

Casmalia Consent Decree
-193-

1 stipulates that those copies of manifests, dump receipts, weigh
2 tickets, and other waste disposal records obtained from the
3 Casmalia facility, and recorded in microfiche form, that are
4 attributable to that Settling Defendant and all related entities
5 to that Settling Defendant listed in Appendix D are true and
6 accurate copies of the original records, authentic and admissibl(e)
7 as records of regularly conducted business activity within the
8 meaning of Rules 1001, 1004, 901, and 902(d) of the Federal Rules
9 of Evidence.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26 02-0067538
27
28

C    11a ...    nt D    13



## XXIX. NOTICES AND SUBMISSIONS

A. Whenever, under the terms of this Consent Decree, written notice is to be given or a Deliverable or other submission or document is required to be sent by one Party to another, it shall be directed to the individuals at the addresses specified below, unless these individuals or their successors give notice of a change to the other Parties in writing. All notices and submissions shall be considered effective upon receipt, unless otherwise provided. Written notice as specified herein shall constitute complete satisfaction of any written notice requirement of the Consent Decree with respect to the United States, EPA, and the Settling Defendants, respectively.

**As to the United States:**

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044-7611
Re: United States v. Casmalia Resources, et al
DJ # 90-11-3-611A

**As to EPA:**

Karen Ueno (or Successor)
EPA Project Coordinator [Casmalia Site]
United States Environmental Protection Agency
Region IX
Mail Code H-3
75 Hawthorne Street
San Francisco, California 94105

Joanne B. Marchetta (or Successor)
Assistant Regional Counsel - Casmalia Site
Office of Regional Counsel, RC-3
75 Hawthorne Street
San Francisco, California 94105

**As to the Settling Defendants:**

Cory Bartelson
Casmalia Site Project Manager
CB Consulting, Inc.
729 Los Pecos Drive
Lafayette, California 94549

Dan Hunter
Co-chair, Casmalia Site Steering Committee
Chevron Research and Technology Company
1003 West Cutting Blvd.
Richmond, California 94804

02-0067539

Casmalia Consent Decree
131

-135-

Casmalia Consent Decree
132

-136-



XXXI. **RETENTION OF JURISDICTION**

1
2    This Court retains jurisdiction over the subject matter of
3    this Consent Decree and the Settling Defendant and the United
4    States for the duration of the performance of the terms and
5    provisions of this Consent Decree for the purpose of enabling the
6    Settling Defendant and the United States to apply to the Court
7    at any time for such further order, direction, and relief as may
8    be necessary or appropriate for the construction or modification
9    of this Consent Decree, or to effectuate or enforce compliance
10   with its terms, or to resolve disputes in accordance with Section
11   XXI. (Dispute Resolution) hereof.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

02-0067540

XXX. **EFFECTIVE DATE**

1
2    The effective date of this Consent Decree shall be the date
3    upon which this Consent Decree is entered by the Court.

Cannelle Consent Decree

-37-

## XXII.  APPENDICES

The following appendices are attached to and incorporated into this Consent Decree:

"Appendix A" is the Statement of Work.

"Appendix B" is a Casmalia Site map and schematic diagram.

"Appendix C" is a list of Settling Defendants.

"Appendix D" is a list of Settling Defendants' Affiliates.

-134-

Casmalia Consent Decree
135

## XXIII.  COMMUNITY RELATIONS

Settling Defendants shall provide for community relations support activities as set forth in the Statement of Work at Appendix A.  Settling Defendants shall also cooperate with EPA in providing information regarding the Work to the public.  In accordance with the SOW, as requested by EPA, Settling Defendants shall participate in the preparation of such information for dissemination to the public and in public meetings which may be held or sponsored by EPA to explain activities at or relating to the Site.

02-0067541

Casmalia Consent Decree
136

## XXXV. LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

A.    This Consent Decree shall be lodged with the Court for a period of not less than thirty (30) days for public notice and comment in accordance with section 122(d)(2) of CERCLA, 42 U.S.C. § 9622(d)(2), and 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations which indicate that the Consent Decree is inappropriate, improper, or inadequate. Settling Defendants consent to the entry of this Consent Decree without further notice.

B.    If for any reason the Court should decline to approve this Consent Decree in the form presented, this agreement is voidable at the sole discretion of any Party and the terms of the agreement may not be used as evidence in any litigation between the Parties.

02-0067542

-142-



## XXXIV. MODIFICATION

A.    Modifications to the SOW or its schedules shall be made as provided therein. All such modifications shall be made in writing.

B.    Nothing in this Decree shall be deemed to alter the Court's power to enforce, supervise or approve modifications to this Consent Decree.

Casmalia Consent Decree

-141-

## XXXVI. SIGNATORIES AND SERVICE

1     A. Each undersigned representative of a Settling Defendant
2 to this Consent Decree and the Assistant Attorney General for
3 Environment and Natural Resources of the Department of Justice
4 certifies that he or she is fully authorized to enter into the
5 terms and conditions of this Consent Decree and to execute and
6 legally bind such Party to this Consent Decree.
7     B. All Parties agree not to oppose entry of this Consent
8 Decree unless, pursuant to Section XXIV. (Lodging and Opportunity
9 For Public Comment), the United States has notified the Settling
10 Defendants and the State in writing that it no longer supports
11 entry of the Consent Decree.
12     C. Each Settling Defendant shall identify, on the attached
13 signature page, the name, address, and telephone number of an
14 agent who is authorized to accept service of process by mail on
15 behalf of that Party with respect to all matters arising under,
16 or relating to, this Consent Decree. Settling Defendants hereby
17 agree to accept service in that manner and to waive the formal
18 service requirements set forth in Rule 4 of the Federal Rules of
19 Civil Procedure and any applicable local rules of this Court,
20 including, but not limited to, service of a summons.

## XXXVII. SECTION HEADINGS

1     The Section headings set forth in this Consent Decree and
2 its Table of Contents are included for convenience of reference
3 only and shall be disregarded in the construction and
4 interpretation of any of the provisions of this Consent Decree.

02-0067543



XXXVIII. COUNTERPARTS

This Consent Decree may be executed and delivered in any number of counterparts, each of which when executed and delivered shall be deemed to be an original, but such counterparts shall together constitute one and the same document.

SO ORDERED THIS _____ DAY OF _____,
19___.

_____
United States District Judge

SIGNATURE PAGES NOT INCLUDED
(PAGES 146 - 211 INCLUSIVE)

- 145 -                        Casmalia Consent Decree

# APPENDIX A:

# STATEMENT OF WORK

02-0067544

CASMALIA CONSENT DECREE
APPENDIX A:
STATEMENT OF WORK

- 212 -