## THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Hearing Date: September 29, 2009 at 10:30 a.m.** |
| | ) | **Objection Deadline: September 4, 2009 at 4:00 p.m.** |

## MOTION FOR AN ORDER (A) APPROVING THE AGREEMENTS BY AND BETWEEN W. R. GRACE & CO.-CONN. AND THE RECTORSEAL CORPORATION; (B) AUTHORIZING THE SALE OF CERTAIN ASSETS OF W. R. GRACE & CO.-CONN.'S FIRESTOPPING AND ABATEMENT BUSINESS TO BUYER FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT TO BUYER OF CERTAIN EXECUTORY CONTRACTS; AND (D) GRANTING CERTAIN RELATED RELIEF

W. R. Grace & Co.-Conn. (the "Selling Debtor" or "Seller," and together with the other

above-captioned debtors, the "Debtors"), hereby files this motion (the "Sale Motion") requesting

entry of an order, in substantially the form attached hereto as **Exhibit A** (the "Sale Order"),

authorizing the sale to The RectorSeal Corporation (the "Buyer") of certain assets of its Grace

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food >N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

Construction Products Firestopping and Abatement Business (the "Firestop Business") and related relief.

The Firestop Business, currently based in Hatfield, Pennsylvania, is a manufacturer and seller of products and systems to restore the fire rating of fire-rated building construction assemblies (walls, floors, ceilings, joints and partitions) by sealing openings made by pipes, HVAC ducts and electrical installations. The products are designed to compartmentalize and contain fire and smoke within a building. As part of the product line, the business also manufactures encapsulant and post-removal lockdown products used in asbestos and lead abatement, and products that protect underground and above ground high voltage power cables.

In the first quarter of 2009, the Selling Debtor began considering strategic alternatives for the Firestop Business.[2] The Debtors concluded that a sale of the business would be in the best interests of their estates. This decision was based on a number of factors, of which the major factors were that the Firestop Business (i) is not complementary to the Debtors' other businesses; (ii) is very small (less than one half of 1% of the Debtors' sales) but requires significant management attention; and (iii) would be most attractive to a buyer which is already in the Firestop Industry and to which the business would offer potential synergies not available to the Debtors. The Debtors believe the sale of the Firestop Business will generate value to the Selling Debtor's estate while enabling senior management to focus on higher-return, core activities.

The Selling Debtor began marketing and soliciting potential buyers for the Firestop Business in February 2009. These marketing efforts, which are described below, culminated in Agreements for which the Selling Debtor seeks approval from this Court. The Buyer has agreed

---

[2]  See the Affidavit of Paul W. Hanlon in support of the Sale Motion, a copy of which is attached as **Exhibit B** hereto.

2

to purchase certain assets of the Firestop Business pursuant to Bankruptcy Code sections 105, 363 and 365 through a private sale process for $5.1 million in cash subject to certain post-closing adjustments. The Buyer has expressed and demonstrated its strong desire to close the sale expeditiously. Because of the Selling Debtor's previous marketing efforts and the very limited interest in the business that they demonstrated, the attractiveness of the Buyer's bid and the absence of competing bids, and the inherent instability created by the marketing of the Firestop Business, the Selling Debtor has determined to move forward with a private sale. Otherwise, the Debtors would have to continue marketing the Firestop Business and repeat an auction sale process that in effect has already occurred, which would subject the estate to significant market risk with a low probability of identifying a higher and better offer, and thereby risking the erosion of the Firestop Business's potential value. Accordingly, the Selling Debtor believes that the sale is in the best interests of its estate and creditors, and will serve to maximize the value realized for the Firestop Business.

Therefore, the Debtors seek entry of the Sale Order:

(1)     approving the Asset Purchase Agreement, dated August 18, 2009, between the Selling Debtor and Buyer (the "Sale Agreement," a copy of which is attached as **Exhibit A** to the proposed Sale Order), and the other agreements to be entered into between the parties as contemplated therein (the "Ancillary Agreements" and together with the Sale Agreement, the "Agreements");

(2)     authorizing the sale (the "Sale") of certain assets of the Firestop Business (the "Transferred Assets") to the Buyer free and clear of all liens, claims, encumbrances, and other interests (collectively, the "Liens") except Permitted

Liens (as such term is defined in the Sale Agreement) in accordance with the terms and conditions set forth in the Agreements;

(3)     authorizing the assumption by the Selling Debtor and the assignment to the Buyer of certain related executory contracts (the "Transferred Contracts") in connection therewith;

(4)     taking effect immediately by virtue of this Court's waiving the 10-day stay under Bankruptcy Rules 6004(h) and 6006(d); and

(5)     granting certain related relief.

## JURISDICTION

1.      This Court has jurisdiction over this Sale Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). Venue of this proceeding and this Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are sections 105(a), 363(b), (f), (m) and (n), and 365 of the Bankruptcy Code, sections 2002(a)(2), 6004(a), (b), (c), (e), (f) and (h), 6006(a), (c) and (d), 9006 and 9014 of the Bankruptcy Rules, and Rules 2002-1(b) and 9006-1 of the District of Delaware Local Rules.

## BACKGROUND

A.      **The Debtors' Chapter 11 Cases and the Firestop Business**

3.      The Debtors are engaged in specialty chemicals and specialty materials businesses on a worldwide basis through two operating segments: Grace Davison, which includes silica- and alumina-based catalysts and materials used in a wide range of industrial applications as well as materials used for rigid food and beverage packaging; and Grace Construction Products, which includes specialty chemicals and materials used in commercial and residential construction.

4

Both divisions have global operations with sales throughout North America, Europe, the Asia-Pacific region, and Latin America.

4.      Grace Davison accounted for $2.2 billion of sales in 2008, constituting 67% of the Debtors' consolidated revenue.  Grace Construction Products had $1.1 billion in sales accounting for 33% of the Debtors' consolidated revenue.  The Firestop Business is a business of Grace Construction Products and had sales of approximately $6.7 million in 2008.  Thus, the Firestop Business represented less than one half of 1% of the Debtors' consolidated 2008 revenue.

5.      The Firestop Business, currently based in Hatfield, Pennsylvania, is a manufacturer and seller of products and systems to restore the fire rating of fire-rated building construction assemblies (walls, floors, ceilings, joints and partitions) by sealing openings made by pipes, HVAC ducts and electrical installations.  The products are designed to compartmentalize and contain fire and smoke within a building.  As part of the product line, the business also manufactures encapsulant and post-removal lockdown products used in asbestos and lead abatement, and products that protect underground and above ground high voltage power cables.

6.      The Firestop Business sells its products by a combination of internal sales, independent representatives, and private label and direct sales.

7.      The major competitive advantage of the Firestop Business is its established brand and long term customer and distributor relationships.

8.      The Firestop Business has nine full-time employees, eight of whom are located at the Hatfield facility.  In addition, some internal sales personnel devote part of their time to the business. Only one employee is expected to be employed by the Buyer. The production facility, which is leased, will not be used by the Buyer, and the lease for such facility will not be assumed

5

by the Selling Debtor and assigned to the Buyer. The Buyer will move the assets of the business to the Buyer's existing facilities.

**B.    The Selling Debtor's Extensive Marketing and Sales Efforts**

9.    In February 2009, the Debtors began pursuing the sale of the Firestop Business. Based on its experience in the relatively small market space in which the business operates, the Selling Debtor identified 15 companies with similar or complementary businesses. After more detailed examination of the 15 companies, the Selling Debtor contacted eight potential strategic buyers, and also one potential financial buyer which had solicited information about the business. Other financial buyers were not solicited because it was concluded that they would be unable to compete with the cost synergies that strategic buyers could obtain by adding the Firestop Business to their existing production.

10.    A verbal summary of the purchase opportunity was provided to seven strategic and the one financial potential buyers. Of these, five potential buyers entered into confidentiality agreements and received a detailed information memorandum, and three submitted preliminary indications of interest including preliminary purchase prices. Based on the purchase prices in the preliminary indications of interest, two potential buyers were invited to and participated in a tour of the Hatfield manufacturing facility, and presentations by the management of the Firestop Business, followed by substantial due diligence through access to an electronic data room and follow-up questions that were answered by the Selling Debtor's management.

11.    The Buyer then submitted a revised firm bid, subject to negotiation of a definitive agreement for the transaction. The other potential buyer declined to participate further. In evaluating the Buyer's bid, the Selling Debtor considered primarily the dollar amount of the bid, Seller Debtor's confidence that the bid would hold up, the bid's required closing conditions, and relative ease of transition of the Firestop Business to the potential buyer's organization.

12.     The Buyer has a business that is similar to the Firestop Business and therefore was able to quickly understand and evaluate many aspects of the Firestop Business. Because the Buyer's proposal will not include use of the real estate of the business and the Buyer will be moving the assets to its own facility, the Buyer will not require significant transitional assistance from the Debtors.

13.     Based on the foregoing considerations, the Selling Debtor concluded that the prompt consummation of a transaction with the Buyer is in the best interests of the Selling Debtor and its affiliates, their creditors, and their estates, and will maximize the value received for the assets of the Firestop Business.

14.     Therefore, the Selling Debtor negotiated and entered into the Agreements with the Buyer, contingent upon Court approval, for which it now seeks approval from this Court.

### C.     Terms and Conditions of the Sale Agreement with the Buyer

15.     On August 18, 2009, after approximately two months of arms-length negotiations, the Selling Debtor and the Buyer executed the Sale Agreement, which is subject to this Court's approval. As more fully described in the Sale Agreement, the Selling Debtor proposes to sell certain assets of the Firestop Business to the Buyer on the following terms and conditions:[3]

| Selling Debtor | W. R. Grace & Co.-Conn. |
|---|---|
| Buyer | The RectorSeal Corporation |
| Purchase Price (Section 2.05) | $5,100,000.00, subject to post-closing adjustment. |

---

[3]   Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the Sale Agreement, a copy of which is attached as **Exhibit A** to the proposed Sale Order. This chart and the other descriptions herein are a summary only. The terms and conditions of the Sale Agreement and Sale Order shall control and govern in all circumstances.

7

| **Transferred Assets (Section 2.01)** | (i) machinery and equipment; (ii) inventory; (iii) accounts receivable; (iv) intellectual property; (v) books and records; (vi) rights under the Transferred Contracts; and (vii) other assets used exclusively in the Firestop Business, but excluding the real property used in the Firestop Business and the other Excluded Assets. |
|---|---|
| **Excluded Assets (Section 2.02)** | (i) cash and cash items; (ii) tax refunds; (iii) intercompany receivables; (iv) insurance policies and policy refunds; (v) employee benefit plans and related funds and refunds; (vi) records relating to any of the Excluded Liabilities; (vii) the names "Grace" and "Construction Products"; (viii) except as scheduled, all machinery and equipment located at any facility other than the Plant; and (ix) all real property. |
| **Transferred Contracts (Exhibit 5.13)** | The Contracts identified in Schedule 5.13. |
| **Transferred Liabilities (Section 2.03)** | Buyer shall assume and be liable for only the following obligations and liabilities: (i) liabilities of any Seller Entity under the Transferred Contracts that relate to events arising exclusively on or after the Closing Date; (ii) liabilities and obligations of any Seller Entity arising out of the operation or ownership of the Transferred Assets on and after the Closing Date; (iii) all liabilities and obligations arising from Environmental Matters arising from the Transferred Assets on and after the earlier to occur of the Removal Date or with respect to all or any portion of the Transferred Assets, the commencement of the Removal of such Transferred Assets; (iv) Taxes related to the ownership or operation of the Transferred Assets for any tax period or portion thereof beginning on or after the Closing Date; and (v) fees of Buyer's broker, finder or financial advisor. |
| **Excluded Liabilities (Section 2.04)** | The Excluded Liabilities include among other things accounts payable, certain environmental, health and safety liabilities arising with respect to relating to circumstances existing prior to the Removal Date or the Removal of the Transferred Assets; Taxes for periods prior to the Closing Date; liabilities related to Seller's employees; and all liabilities and obligations arising out of the Transferred Contracts prior to the Closing Date. |
| **Closing Date (Section 3.01)** | The first Business Day after conditions to Closing (other than conditions that are required to be fulfilled at the Closing) have been fulfilled or waived, but not before September 24, 2009, or as the Parties shall otherwise agree in writing. |
| **Closing Conditions (Articles 10, 11)** | The Sale Order has been entered; all covenants and agreements required to be performed before the Closing have been performed; no Material Adverse Effect has occurred. |

K&E 15442459.6

| | |
|---|---|
| **Termination of the Sale Agreement (Article 12)** | The Sale Agreement may be terminated: at any time prior to the Closing by mutual written agreement of Seller and Buyer; by either Party if the Sale Order has not been entered by September 30, 2009; by either Party if the Bankruptcy Court enters an order approving competitive bidding procedures for the Transferred Assets; by Buyer if any of the conditions in Article 10 are not capable of being satisfied by September 30, 2009; by Seller if any of the conditions in Article 11 are not capable of being satisfied by September 30, 2009; by either Party if the Closing has not occurred by September 30, 2009 (provided that no Party may terminate if the failure to close is the result of a breach of the Sale Agreement by that Party); by either Party if the Bankruptcy Court approves an order authorizing the sale of the Transferred Assets to another Person. |
| **Indemnification (Article 13)** | • With customary exceptions, most representations and warranties expire 18 months after the Closing.<br>• Each of Seller's and Buyer's indemnification obligations for breach of representations and warranties are subject to a deductible per occurrence of $5,000 with a $20,000 aggregate deductible and will be limited to and not exceed 10% of the Purchase Price, provided that certain fundamental representations and warranties are not subject to the foregoing limitations. |
| **Covenant not to Compete (Section 14.07)** | No member of the Seller Group at any time from and after the Closing Date and through the fifth (5th) anniversary of the Closing Date shall directly or indirectly engage in the manufacture and sale of scheduled products in the Western Hemisphere, Europe, the Middle East, Australia, Asia and the Far East. |

## **RELIEF REQUESTED**

16.    By this Sale Motion, pursuant to sections 105(a), 363(b), (f) and (m), and 365 of the Bankruptcy Code, the Selling Debtor (a) seeks entry of an order by this Court approving the Agreements with the Buyer and authorizing the sale of certain assets of the Firestop Business to the Buyer free and clear of all Liens (except the Permitted Liens), upon the terms set forth in the Agreements and Sale Order, (b) seeks authority for the Selling Debtor to assume and assign to the Buyer the Transferred Contracts, (c) requests that the Sale Order be effective immediately by waiving the 10-day stay under Bankruptcy Rule 6004(h) and 6006(d), and (d) requests such other and further relief as is just and proper.

## BASIS FOR RELIEF

17.    In accordance with Bankruptcy Rule 6004, sales of property rights outside the ordinary course of business may be conducted by private sale or public auction. The Selling Debtor has determined that the Sale of the Firestop Business by private sale to the Buyer will produce the highest and best offer for this business (thereby maximizing the value to its estate) and is in the best interests of the Selling Debtor and its affiliates, their estates, and their creditors.

18.    The Agreements represent the culmination of a comprehensive, arms-length negotiation for the Sale of certain assets of the Firestop Business in exchange for the highest and best consideration available for such business. In the Selling Debtor's business judgment, the Selling Debtor believes that the Sale will provide a larger recovery for the Selling Debtor's estate than would be provided by any other viable alternative. The bases for the relief requested in this Sale Motion are founded in a number of provisions of the Bankruptcy Code and Bankruptcy Rules. These bases are discussed in detail below.

A.    **Bankruptcy Code Section 363 Permits The Sale Of The Firestop Business Outside The Ordinary Course Of Business.**

19.    Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, the bankruptcy courts routinely authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor. See, e.g., Meyers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); The Official Committee of Unsecured Creditors v. The LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992); Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070-71 (2d Cir. 1983); In re

10

Delaware & Hudson Railway Co., 124 B.R. 169, 176 (D. Del. 1991). Indeed, the Delaware & Hudson Railway court rejected the pre-Code "emergency" or "compelling circumstances" standard, finding the "sound business purpose" standard applicable and, discussing the requirements of that test under Lionel, observing:

> A non-exhaustive list of factors to consider in determining if there is a sound business purpose for the sale include: the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the likelihood that a plan of reorganization will be proposed and confirmed in the near future; the effect of the proposed disposition of the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value.

124 B.R. at 176. The Delaware & Hudson Railway court further held that:

> [o]nce a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the proposed purchaser is proceeding in good faith.

Id.

20.    Furthermore, once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." The Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). Thus, if a debtor's actions

11

satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1).

21.    The Selling Debtor has proposed the Sale of the Firestop Business after thorough consideration of all viable alternatives, and has concluded that the Sale is supported by a number of sound business reasons. As previously discussed, the Firestop Business (i) represents less than 1% of the Debtors' revenues and (ii) is a non-core operation. Thus, the Selling Debtor seeks to sell the Firestop Business at this time to generate value to the estate while enabling the Debtors' senior management to focus on higher-return, core activities.

22.    The Selling Debtor also believes that the amount of the consideration received for certain assets of the Firestop Business is fair and reasonable. The fairness and reasonableness of the consideration to be paid by the Buyer ultimately has been demonstrated by adequate "market exposure" and a fair marketing process – the best means for establishing whether a fair and reasonable price is being paid.

23.    The Selling Debtor's marketing efforts have demonstrated that there is a limited market for the Firestop Business and that the offer made by the Buyer is the best offer that the Debtor has received for such assets. The timing contemplated by this Sale Motion -- an expected closing date on or before September 30, 2009 -- will eliminate any potential uncertainty surrounding the Firestop Business and mitigate the risk that its financial performance and hence the value of the Firestop Business might suffer from this uncertainty. Accordingly, the Selling Debtor, in its business judgment, believes that the Agreements are in the best interests of the estate and its creditors. The Selling Debtor requests that this Court make a finding in the Order that the proposed Sale is a proper exercise of the Selling Debtor's business judgment and is duly authorized.

**B.    The Sale Of The Firestop Business Free And Clear Of Liens And Other Interests Is Authorized By Section 363(f).**

24.    The Selling Debtor further submits that it is appropriate to sell the Firestop Business free and clear of Liens (except the Permitted Liens) pursuant to section 363(f) of the Bankruptcy Code, with any such Liens attaching to the net sale proceeds of the Firestop Business to the extent applicable.  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of any interest in such property of an entity other than the estate if:

(1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

25.    This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

26.    Because Bankruptcy Code section 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Firestop Business "free and clear" of liens and interests.  In re Dundee Equity Corp., 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); In re Elliott, 94 B.R. 343, 345 (E.D. Pa. 1988) (same).

13

27.    The Selling Debtor believes that one or more of the tests of section 363(f) are satisfied with respect to the transfer of the Firestop Business pursuant to the Sale Agreement. In particular, the Selling Debtor believes that at least section 363(f)(2) will be met in connection with the transactions proposed under the Sale Agreement because each of the parties holding liens on the Firestop Business will consent, or absent any objection to this Sale Motion, will be deemed to have consented to, the Sale. Any lienholder also will be adequately protected by having its Liens, if any, in each instance against the Selling Debtor or its estate, attach to the cash proceeds of the Sale ultimately attributable to the Firestop Business in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor's liens had prior to the Sale, subject to any claims and defenses the Selling Debtor and its estate may possess with respect thereto. Accordingly, section 363(f) authorizes the transfer and conveyance of the Firestop Business free and clear of any Liens (other than the Permitted Liens).

C.    **The Transferred Assets And Transferred Contracts Should Be Sold Free And Clear Of Successor Liability.**

28.    Under the terms of the Sale Agreement, the Buyer is not liable for any of the Selling Debtor's liabilities as a successor to the Selling Debtor's business or otherwise (the "Excluded Liabilities"), unless expressly assumed. Extensive case law exists providing that claims against a buyer are directed to the proceeds of a free and clear sale of property and may not subsequently be asserted against a buyer.

29.    Although section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code. Folger Adam Security v. DeMatteis/MacGregor JV, 209 F.3d 252, 257 (3d Cir. 2000). In the case of In re Trans World Airlines. Inc., 322 F.3d 283, 288-89 (3d Cir. 2003),

14

the Third Circuit specifically addressed the scope of the term "any interest." The Third Circuit

observed that while some courts have "narrowly interpreted that phrase to mean only in rem

interests in property," the trend in modern cases is towards "a more expansive reading of

'interests in property' which 'encompasses other obligations that may flow from ownership of

the property.'" Id. at 289 (citing 3 Collier on Bankruptcy 363.06[1]).  As determined by the

Fourth Circuit in In re Leckie Smokeless Coal Co., 99 F.3d 573, 581-582 (4th Cir. 1996), a case

cited approvingly and extensively by the Third Circuit in Folger, the scope of section 363(f) is

not limited to in rem interests.  Thus, the Third Circuit in Folger stated that Leckie held that the

debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise

would have arisen under federal statute." Folger, 209 F.3d at 258.

30.    Courts have consistently held that a buyer of a debtor's assets pursuant to a

section 363 sale takes free from successor liability resulting from pre-existing claims. See The

Ninth Avenue Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716, 732 (Bankr. N.D. Ind.

1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest

that could be brought against the bankruptcy estate during the bankruptcy); MacArthur Company

v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 93-94 (2d Cir. 1988)

(channeling of claims to proceeds consistent with intent of sale free and clear under section

363(f) of the Bankruptcy Code); In re New England Fish Co., 19 B.R. 323, 329 (Bankr. W.D.

Wash. 1982) (transfer of property in free and clear sale included free and clear of Title VII

employment discrimination and civil rights claims of debtor's employees); In re Hoffman, 53

B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest

permissible even though the estate had unpaid taxes); American Living Systems v. Bonapfel (In

re All Am. Of Ashburn, Inc.), 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product liability claims

precluded on successor doctrine in a sale of assets free and clear); <u>WBQ Partnership v. Virginia</u>
<u>Dept. of Medical Assistance Services (In re WBQ Partnership)</u>, 189 B.R. 97, 104-05 (Bankr.
E.D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is an "interest" as
used in section 363(f)).

31.    Here, the Debtors' chapter 11 cases were filed in good faith.  The Buyer has
engaged in arm's-length negotiations with the Selling Debtor and has not exerted control or
undue influence over the Selling Debtor.  The Buyer is completely and wholly unrelated to the
Selling Debtor.  The Buyer does not, and will not, share any common incorporators, officers,
directors, or controlling stockholders with the Selling Debtor, and the Buyer is not an insider of
the Selling Debtor.  <u>See</u> 11 U.S.C. § 101(31).

32.    In addition, no other person or entity (or persons or entities) has offered to enter
into an agreement or series of agreements as favorable to the Selling Debtor as the Sale
Agreement.  If the Sale Agreement is not approved, then management will be forced to evaluate
options that are not as attractive as the current offer.  For obvious reasons, the very purpose of an
order purporting to authorize the transfer of assets free and clear of all "interests" would be
frustrated if claimants could thereafter use the transfer as a basis to assert claims against a
purchaser arising from a seller's pre-sale conduct.

33.    Furthermore, the Selling Debtor is providing notice of the proposed sale to all
known parties in interest that may assert claims or interests relating to the Transferred Assets
against the Selling Debtor, including, but not limited to, trade creditors, contract counterparties,
lenders and other parties known to the Selling Debtor to be asserting claims of any kind relating
to the Transferred Assets.  Under section 363(f) of the Bankruptcy Code, the Buyer is entitled to
know that the Transferred Assets are not infected with latent claims that will be asserted against

16

the Buyer after the proposed transaction is completed.  Accordingly, consistent with the above-cited case law, the order approving the Sale should state that the Buyer is not liable as a successor under any theory of successor liability, for claims that encumber or relate to the Transferred Assets.

      **D.**     <u>**The Buyer Is A Good Faith Buyer And Is Entitled To The Full Protection Of Section 363(m) Of The Bankruptcy Code, And The Transfer Of The Firestop Business Does Not Violate Section 363(n).**</u>

34.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  While the Bankruptcy Code does not define "good faith," the Third Circuit in <u>In re Abbotts Dairies of Pennsylvania, Inc.</u>, 788 F.2d 143 (3d Cir. 1986) held that:

> [t]he requirement that a buyer act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a buyer's good faith status at a judicial sale involves fraud, collusion between the Proposed Buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted).

35.     In the present case, the Sale is an intensively-negotiated transaction in which the Buyer has, at all times, acted in good faith under the <u>Abbotts Dairy</u> standards.  In addition to a fair and reasonable value offered by the Buyer, the proposed sale also is the product of arms-length, good faith negotiations, in which the Selling Debtor bargained for the maximum possible purchase price for certain assets of the Firestop Business.  Extensive negotiations were held

K&E 15442459.6

between the parties involving substantial time and energy by the parties and their professionals, and the Agreements reflect give-and-take and compromises by both sides.

36.    In addition, the Buyer is not an "insider" of any of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code. There is absolutely no indication of fraud or improper insider dealing of any kind. The Sale Agreement does not constitute an avoidable transaction pursuant to section 363(n) and the Buyer should receive the protections afforded good faith purchasers by section 363(m). Accordingly, the Selling Debtor requests that the Court make a finding at the hearing that the Buyer is entitled to the full protections of Bankruptcy Code section 363(m).

**E.    Assumption And Assignment Of The Transferred Contracts Is Authorized By Section 365 Of The Bankruptcy Code.**

37.    The Sale contemplates the assumption and assignment of certain executory contracts of the Firestop Business to the Buyer, which are necessary to the Buyer for the continuation of the Firestop Business and, at the same time, will enhance the value of the Sale to the Selling Debtor's estate by curtailing further administrative liability to the estate and eliminating certain rejection claims. Specifically, the Debtors propose to assume and assign to Buyer those Transferred Contracts set forth on **Exhibit B** to the proposed Sale Order (the "List of Transferred Contracts"). The List of Transferred Contracts also sets forth next to each Transferred Contract the proposed Cure Amount that the Selling Debtor proposes to pay to each counterparty. The Debtors believe that most of the Transferred Contracts were entered into post-petition and in any event, the Debtors believe they are current on all outstanding obligations under the Transferred Contracts and that no cure amounts are owing. In an abundance of caution and to the extent applicable, the Selling Debtor requests approval to assume and assign the Transferred Contracts to the Buyer pursuant to section 365(f) of the Bankruptcy Code,

18

notwithstanding any provisions in the Transferred Contracts, including those described in sections 365(b)(2) and (f)(1) and (3) of the Bankruptcy Code, that prohibit such assignment.

38.    Section 365(f) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if –
>
> > (A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and
> >
> > (B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).    Under section 365(a), a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b) (1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
> > (A)    cures, or provides adequate assurance that the trustee will promptly cure, such default ….;
> >
> > (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> >
> > (C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(l).

39.    The standard applied by a court in determining whether the assumption or rejection of an executory contract pursuant to section 365(a) should be approved is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection

would be beneficial to its estate.  See, e.g., In re Group of Institutional Investors, Inc. v. Chicago,

Milwaukee, St. Paul and Pac. R.R. Co., 318 U.S. 523, 550 (1943) ("the question [of assumption]

is one of business judgment"); Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion

Pictures Corp.), 4 F.3d 1095, 1098-99 (2d Cir. 1993) (to decide a motion to assume the court

must put itself in the position of the trustee and determine whether such assumption would be a

good decision or a bad one).

    40.    Courts generally will not second-guess a debtor's business judgment concerning

the assumption of an executory contract.  See In re Paolo Gucci, 193 B.R. 411, 414 (S.D.N.Y.

1996); see also Sharon Steel Corp. v. National Gas Fuel Distrib. Corp. (In re Sharon Steel Corp.),

872 F.2d 36, 40 (3d Cir. 1989); In re III Enter., Inc., 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994)

("Generally, a court will give great deference to a debtor's decision to assume or reject an

executory contract.  A debtor need only show that its decision to assume or reject the contract is

an exercise of sound business judgment—a standard which we have concluded many times is not

difficult to meet.").

    41.    In the present case, the Selling Debtor's assumption and assignment of the

Transferred Contracts to the Buyer meets the business judgment standard and satisfies the

requirements of section 365 of the Bankruptcy Code.  As discussed above, the transactions

contemplated by the Agreements will provide significant benefits to the Selling Debtor's estate.

Because the Selling Debtor cannot obtain the benefits of the Sale Agreement without the

assumption of the Transferred Contracts referenced above, the assumption of these Transferred

Contracts is undoubtedly a sound exercise of the Selling Debtor's business judgment.

    42.    Further, a debtor in possession may assign an executory contract or an unexpired

lease of the debtor if it assumes the agreement in accordance with section 365(a), and provides

20

adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. See 11 U.S.C. § 365(f)(2). Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 56 B.R. at 605-06 (stating that adequate assurance of future performance is present when the prospective assignee of a lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

43.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." EBG Midtown South Corp. v. McLaren/Hart Envtl. Engineering Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), aff'd, 993 F.2d 300 (2d Cir. 1993); Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989).

44.    The assignee, i.e., the Buyer, has sufficient assets to continue performance under the Transferred Contracts from and after the Closing Date. To the extent necessary, the Buyer is able and willing, at the Sale Hearing or earlier to a party upon request, to demonstrate to the satisfaction of this Court that adequate assurance of future performance is present. The Sale Hearing will therefore provide the Court and other interested parties, to the extent any interested parties have filed objections to the Sale Motion, with the opportunity to evaluate and, if necessary, challenge the ability of the Buyer or other successful bidder to provide adequate assurance of future performance under the Transferred Contracts. Accordingly, the Selling

21

Debtor submits that the assumption and assignment of the Transferred Contracts as set forth herein should be approved.

45.     To assist in the assumption, assignment and sale of the Transferred Contracts, the Selling Debtor also requests that the Court enter an order providing that anti-assignment provisions in the Transferred Contracts shall not restrict, limit or prohibit the assumption, assignment and sale of the Transferred Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

46.     Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign contracts free from such anti-assignment restrictions:

> [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

11 U.S.C. § 365(f)(l).

47.     Section 365(f)(l), by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired lease. See, e.g., Coleman Oil Co., Inc. v. The Circle K Corp. (In re The Circle K Corp.), 127 F. 3d 904, 910-11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365"). Section 365(f)(3) goes beyond the scope of section 365(f)(1) by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof. See, e.g., In re Jamesway Corp., 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (section 365(f)(3) prohibits enforcement of any lease clause creating right to terminate lease because it is being assumed or assigned, thereby indirectly barring

22

assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

48.    Other courts have recognized that provisions that have the effect of restricting assignments cannot be enforced.  See In re Rickel Home Centers, Inc., 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 365(f), courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions.").  Similarly, in In re Mr. Grocer, Inc., the court noted that:

> [the] case law interpreting § 365(f)(l) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves ipso facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987).  Thus, the Selling Debtor requests that any anti-assignment provisions be deemed not to restrict, limit or prohibit the assumption, assignment and sale of the Transferred Contracts and be deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

### F.    A Private Sale Of The Firestop Business Is Authorized Under Bankruptcy Rule 6004.

49.    Bankruptcy Rule 6004(f)(1) provides that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction."  Fed. R. Bankr. P. 6004(f)(1).  Courts often allow chapter 11 debtors to sell assets outside the ordinary course of business by private sale when the debtors demonstrate that the sale is permissible pursuant to section 363(b) of the Bankruptcy Code.  See, e.g., Palermo v. Pritam Realty, Inc. (In re Pritam Reality, Inc.), 233 B.R. 619 (D.P.R. 1999) (upholding the bankruptcy court's approval of a private sale conducted by a chapter 11 debtor); In re Condere Corp., 228 B.R. 615 (Bankr. S.D. Miss. 1998) (approving a

23

private sale of a chapter 11 debtor's assets where the standards of § 363(b) were met); <u>In re</u> <u>Embrace Systems Corp.</u>, 178 B.R. 112, 123 (Bankr. W.D. Mich. 1995) ("A large measure of discretion is available to a bankruptcy court in determining whether a private sale should be approved. The court should exercise its discretion based upon the facts and circumstances of the proposed sale."); <u>In re Wieboldt Stores, Inc.</u>, 92 B.R. 309 (N.D. Ill. 1988) (affirming right of chapter 11 debtor to transfer assets by private sale).

50.     Here, the Selling Debtor proposes to proceed with the sale of the Firestop Business by way of a private sale without incurring the cost and delay associated with conducting a public auction. An auction is not required under section 363(b) of the Bankruptcy Code. *In re Trans World Airlines, Inc.*, 2001 WL 18202326, at *4 (Bankr. D. De. 2001) (noting that "a 363(b) sale transaction does not require an auction procedure. The auction procedure has developed over the years as an effective means for producing arm's length fair value transaction."). As discussed above, the Selling Debtor extensively marketed the Firestop Business and conducted a detailed bidding process to obtain the highest and best offer therefor. As a result, the Selling Debtor submits that the Buyer's offer is the highest and best that the Selling Debtor has received, and constitutes fair market value, given the limited market for the Firestop Business.

51.     The alternative to the proposed Sale is to continue to market the Firestop Business and conduct another auction sale process, which would subject the estate to significant market risk with a low probability of identifying a higher and better offer. The Selling Debtor believes that further delays in completing the Sale could lead to deteriorating financial performance of the Firestop Business and eroded potential value. Moreover, employees and customers of the Firestop Business would continue to face uncertainty regarding the future of the Firestop

Business. This uncertainty could potentially lead to loss of employees, weakened financial performance, and the erosion of value.

52.     Because a private sale is specifically authorized under Bankruptcy Rule 6004 and the Selling Debtor believes that the Buyer's offer is the highest and best offer for the Firestop Business, the Selling Debtor requests that this Court approve the proposed private sale of certain assets of the Firestop Business to the Buyer in accordance with the Agreements.

### G.     Notice Of The Proposed Sale Satisfies Bankruptcy Rule 2002.

53.     A copy of this Sale Motion and the Notice of Sale Motion and Hearing will be served on: (i) the U.S. Trustee; (ii) counsel to the Committees and the FCRs; (iii) counsel to the administrative agents for the Debtors' prepetition secured lenders; (iv) counsel to the Debtors' postpetition lenders; (v) all parties that have requested special notice pursuant to Bankruptcy Rule 2002; (vi) the Buyer and its counsel; (vii) all persons or entities known or reasonably believed to have asserted a Lien in any of the assets of the Firestop Business; (viii) federal, state and local taxing authorities who have a reasonably known interest in the relief requested by this Sale Motion; (ix) the counterparty to each of the Transferred Contracts; (x) all persons or entities known or reasonably believed to have expressed a serious interest in acquiring the Firestop Business; and (xi) the United States Attorneys for the Districts of Delaware, Pennsylvania and Maryland (collectively, the "Notice Parties").

54.     Several sections of the Bankruptcy Code dictate the sufficiency of notice and adequacy of service. As discussed below, the content and manner of service of this Sale Motion and the related notice satisfies all such requirements:

55.     Section 363 Notice: Section 363 of the Bankruptcy Code provides that a trustee may sell property "after notice and hearing." Under section 102(1) of the Bankruptcy Code, the phrase "after notice and hearing" means "notice as is appropriate in the particular circumstances,

25

and such opportunity for a hearing as is appropriate in the particular circumstances." 11 U.S.C. § 102(1)(A). As set forth above, by service and publication of this Sale Motion, all interested parties have been provided notice of the salient details regarding this Sale Motion and the Sale Hearing. Accordingly, notice is sufficient under section 363 of the Bankruptcy Code.

56.    <u>Bankruptcy Rule 2002</u>: Bankruptcy Rule 2002 requires twenty days notice of proposed sales of property other than in the ordinary course of business. In addition, Bankruptcy Rule 2002 provides that, as to sales, notice of a sale shall "include the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections." Fed. R. Bankr. P. 2002. Local Rule 2002-1(b) specifies the parties on whom a Sale Motion for a sale other than in the ordinary course of business must be served in cases pending in this jurisdiction. The Debtor believes that this Sale Motion and Notice of Sale Motion and Hearing contains the requisite information to reasonably notify parties in interest in satisfaction of the foregoing rules and requirements, and as discussed in detail herein, exigent circumstances necessitate the Selling Debtor to be able to have the Sale Motion approved as expeditiously as possible, but by no later than September 29, 2009, in order for the Debtor to be in a position to close the Sale on or before September 30, 2009). Indeed, by filing on August 18, 2009 for a September 29 hearing, the Selling Debtor is providing 42 days' notice of the Sale.

57.    <u>Bankruptcy Rules 6004 and 6006</u>: Bankruptcy Rule 6004 requires that notices of sales of property out of the ordinary course of business comply with Bankruptcy Rule 2002. As set forth above, the Debtor has complied with Bankruptcy Rule 2002. Bankruptcy Rule 6006 requires notice of a motion to assume or assign an executory contract to be served on the counterparty to such contract or lease, as well as on other parties in interest as this Court may direct. The list of Transferred Contracts, including cure amount, and notice of the Sale Motion

will be served on counterparties to the Transferred Contracts, and thus this requirement will be satisfied.

58.     Procedural Due Process: The notice of this Sale Motion that is being provided is "reasonably calculated" to apprise interested parties of the pendency of the matter and to afford them an opportunity to object. See Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Parties in interest have been or will be and should be found to have been afforded adequate notice of this Sale Motion and the Sale Hearing.

59.     The Debtor submits that the notice that they have provided of this Sale Motion and the Sale Hearing is reasonable and appropriate and should be approved by this Court as adequate and sufficient notice.

### H.     Relief Under Bankruptcy Rule 6004(h) is Appropriate.

60.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." The Selling Debtor requests that any order approving the Agreements be effective immediately by providing that the 10-day stay under Bankruptcy Rule 6004(h) is waived.

61.     The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 10-day stay period, Collier suggests that the 10-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev., ¶ 6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier provides that if an objection is filed and overruled, and the objecting party

27

informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

62.    To preserve the value of the Firestop Business by bringing certainty to the sale process, and because both the Selling Debtor and Buyer desire to close the Sale on or before September 30, 2009, the Selling Debtor seeks to close the Sale as soon as possible after all closing conditions have been met or waived.  Accordingly, the Selling Debtor hereby requests that the Court waive the 10-day stay period under Bankruptcy Rule 6004(h) and 6006(d) or, in the alternative, if an objection to the Sale is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal to allow the Sale to close.

**No Prior Request**

63.    No prior motion for the relief requested herein has been made to this or any other court.

K&E 15442459.6

WHEREFORE, the Selling Debtor requests that the Court grant it the relief requested herein and such other and further relief as is just and proper.

Dated: August 18, 2009

Respectfully submitted,

KIRKLAND & ELLIS LLP
Theodore L. Freedman
Deanna D. Boll
601 Lexington Ave.
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

THE LAW OFFICES OF JANET S. BAER, P.C.
Janet S. Baer, P.C.
70 W. Madison Street
Suite 2100
Chicago, IL 60602
Telephone: (312) 641-2162

and

PACHULSKI, STANG, ZIEHL & JONES LLP
Laura Davis Jones (Bar No. 4042)
James E. O'Neill (Bar No. 4042)
Timothy Cairns (Bar No. 4228)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

*Counsel for the Debtors and Debtors in Possession*