# EXHIBIT A

K&E 15442459.6

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Re: Docket No. _____** |
| | ) | **9/21/09 Agenda Item No. __** |

## ORDER (A) APPROVING THE AGREEMENTS BY AND BETWEEN W. R. GRACE & CO.-CONN. AND THE RECTORSEAL CORPORATION; (B) AUTHORIZING THE SALE OF CERTAIN ASSETS OF W. R. GRACE & CO.-CONN.'S FIRESTOPPING AND ABATEMENT BUSINESS TO THE RECTORSEAL CORPORATION, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT TO THE RECTORSEAL CORPORATION OF CERTAIN EXECUTORY CONTRACTS; AND (D) GRANTING CERTAIN RELATED RELIEF

This matter coming on to be heard on the motion[2] dated August 18, 2009 [Docket No.

_____] (the "Sale Motion") of W. R. Grace & Co.-Conn., as debtor and debtor in possession (the

"Selling Debtor" and together with the other above-captioned debtors, the "Debtors") for entry of

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn, A-1 Bit &, Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc, Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp, Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

[2] Capitalized terms used, but not otherwise defined herein, shall have the meanings ascribed to them in the Sale Agreement (as defined below) and the Sale Motion, and to the extent of any inconsistency, the Sale Agreement shall govern.

K&E 15442459.6

an order (i) approving the Asset Purchase Agreement, dated August 18, 2009 between the Selling

Debtor and The RectorSeal Corporation (the "Buyer") appended hereto as Exhibit A (the "Sale

Agreement" and, together with all related exhibits, attachments and ancillary agreements, the

"Agreements");[3] (ii) authorizing the sale of certain assets (the "Acquired Assets") to the Buyer

free and clear of all Liens, claims, and other interests in accordance with the terms and

conditions set forth in the Sale Agreement; (iii) authorizing the assumption by the Selling Debtor

and the assignment to the Buyer of certain related executory contracts (the "Transferred

Contracts"); (iv) taking effect immediately by virtue of this Court waiving the 10-day stay under

Bankruptcy Rules 6004(h) and 6006(d); and (v) granting certain related relief (collectively, the

"Sale Order"); the Selling Debtor having executed the Sale Agreement; all interested parties

having been afforded an opportunity to be heard with respect to the Sale Motion and all relief

related thereto; and it appearing that the Court has jurisdiction over this matter; the Court having

reviewed and considered the Sale Motion and the objections thereto, if any; it appearing that the

relief requested in the Sale Motion and approval of the Sale to Buyer of the Acquired Assets,

including the Selling Debtor's assumption and assignment to Buyer of the Transferred Contracts,

is in the best interests of the Selling Debtor, its affiliates, their estates, creditors and other parties

in interest; and based on the Sale Motion and the record in these cases; and after due deliberation

thereon; and good cause appearing therefore, it is hereby

    FOUND AND DETERMINED THAT:[4]

---

[3] Due to their voluminous and/or confidential and proprietary nature, the exhibits and schedules to the Sale Agreement are intentionally omitted from Exhibit A, but are included for the purposes of applicability of this Sale Order, by this reference.

[4] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

### *Jurisdiction, Final Order and Statutory Predicates*

A.     This matter is a core proceeding within the meaning of 28 U.S.C. § 157(h)(2) and this Court has jurisdiction under 28 U.S.C. §§ 157 and 1334 over the Sale Motion and each of the transactions contemplated by the Agreements (collectively, the "Sale").   Venue of this proceeding and the Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.     This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and expressly directs entry of judgment as set forth herein.

C.     The statutory predicates for the relief requested in the Sale Motion are sections 105(a), 363(b), (f), (m) and (n), and 365 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. as amended (the "Bankruptcy Code"), Rules 2002(a)(2), 6004(a), (b), (c), (e), (f) and (h), 6006(a), (c) and (d), 9006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1(b) and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

### *Notice of the Sale and Cure Amounts*

D.     Actual written notice of the Sale Hearing, the Sale Motion, the Sale and the assumption and assignment of the Transferred Contracts, and a reasonable opportunity to

33

object or to be heard with respect to the Sale Motion and the relief requested therein has been afforded to all interested parties and entities, including, but not limited to; (i) the U.S. Trustee; (ii) counsel to the Committees and the FCRs; (iii) counsel to the administrative agents for the Debtors' prepetition lenders; (iv) counsel to the Debtors' postpetition lenders; (v) all parties that have requested special notice pursuant to Bankruptcy Rule 2002; (vi) the Buyer and its counsel; (vii) all persons or entities known or reasonably believed to have asserted a Lien on any of the Acquired Assets; (viii) federal, state and local taxing authorities who have a reasonably known interest in the relief requested by this Motion, including the Internal Revenue Service; (ix) the U.S. Environmental Protection Agency and the Pension Benefit Guaranty Corporation; (x) the counterparty to each of the Transferred Contracts; (xi) all persons or entities known or reasonably believed to have expressed an interest in acquiring assets of the Selling Debtor that are the subject of the Sale Agreement; and (xii) the United States Attorneys for the Districts of Delaware, Pennsylvania and Maryland.

E.      As evidenced by the certificate of service previously filed with the Court, (i) proper, timely, adequate and sufficient notice of the Sale Motion, the Sale Hearing, and the Sale, including, without limitation, the assumption and assignment of the Transferred Contracts, has been provided in accordance with sections 102(1), 105(a), 363 and 365 of the Bankruptcy Code and Rules 2002, 6004, 6006 and 9014 of the Bankruptcy Rules, (ii) such notice was good and sufficient, and appropriate under the particular circumstances, and (iii) no other or further notice of the Sale Motion, the Sale Hearing or the Sale, including, without limitation, the assumption and assignment of the Transferred Contracts and the proposed cure amounts, is or shall be required.

F.      As part of the Sale Motion, the Selling Debtor has served notice of the Cure Amounts (as such term is defined below), if any, upon each non-Debtor counterparty to the Transferred Contracts that the Selling Debtor seeks to assume and assign to the Buyer on the Closing Date.    The service of such notice was good, sufficient and appropriate under the circumstances and no further notice need be given in respect of establishing a Cure Amount for the respective Transferred Contracts.    Non-Debtor counterparties to the Transferred Contracts have had an opportunity to object to the Cure Amount, if any, set forth in the notice.

G.      The disclosures made by the Selling Debtor concerning the Agreements, the Sale, and the Sale Hearing were good, complete and adequate.

### *Good Faith of Buyer*

H.      The Buyer is not an "insider" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

I.      The Sale Agreement and each of the other Agreements was negotiated, proposed and entered into by the Selling Debtor, on the one hand, and the Buyer, on the other hand, without collusion, in good faith, and from arm's length bargaining positions.    Neither the Selling Debtor nor the Buyer has engaged in any conduct that would cause or permit all or any part of the Sale or any obligation of the Selling Debtor under the Agreements to be avoided under section 363(n) of the Bankruptcy Code.

J.      The Buyer is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby, and otherwise have proceeded in good faith in all respects in connection with this proceeding in that: (a) the Sale Agreement provides that Seller is free to take any action with respect to any offer

35

that it may receive prior to the entry of the Sale Order for a sale of the business and/or the Acquired Assets to a third party; (b) all payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale have been disclosed; (c) the Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction; (d) no common identity of directors or controlling stockholders exists between the Buyer, on the one hand, and the Debtors, on the other hand; and (e) the negotiation and execution of the Sale Agreement and other Agreements related thereto was at arm's-length and in good faith. The Buyer will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the Sale.

### *Highest and Best Offer*

K.     The Selling Debtor has thoroughly and effectively marketed the Acquired Assets for sale in an appropriate manner that was designed to maximize the value received by the Selling Debtor for the Acquired Assets.

L.     The consideration provided by the Buyer pursuant to the terms of the Agreements: (i) is fair and reasonable, (ii) is the highest and otherwise best offer for the Acquired Assets, and (iii) will provide a greater recovery for the Selling Debtor's estate than would be provided by any other available alternative.

M.     The Selling Debtor's determination that the Agreements constitute the highest and best offer for the Acquired Assets, including the Transferred Contracts, constitutes a valid and sound exercise of the Selling Debtor's business judgment pursuant to section 363(b) of the Bankruptcy Code.

K&E 15442459.6

N.     Approval of the Sale Motion and the Agreements and the consummation of the Sale contemplated thereby at this time are in the best interests of the Selling Debtor, its affiliates, their creditors, their estates and other parties in interest.

O.     The Selling Debtor has demonstrated compelling circumstances and a good, sufficient and sound business purpose and justification for the Sale prior to, and outside of, a plan of reorganization.

P.     No consents or approvals, other than those expressly provided for in the Sale Agreement, are required for the Selling Debtor to consummate such Sale.

### *No Fraudulent Transfer*

Q.     The Purchase Price constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.

### *Validity of Transfer*

R.     The Sale has been duly and validly authorized by all necessary corporate action of the Selling Debtor, which has full corporate power and authority to execute and deliver the Sale Agreement and each of the other Agreements.  Except as expressly set forth therein, no further consents or approvals are required for the Selling Debtor to consummate the Sale contemplated by the Agreements.

S.     On the date of closing of the Sale Agreement (the "Closing Date"), the Selling Debtor's transfer of the Acquired Assets, including its assumption and assignment to the Buyer of the Transferred Contracts, will be a legal, valid and effective transfer that, except for

37

the "Transferred Liabilities" and any "Permitted Liens" (each as defined in the Sale Agreement),

will vest the Buyer with all of the Debtors' rights, title, and interests in the Acquired Assets free

and clear of all liens, claims, encumbrances, mortgages, Liens (as defined in the Sale

Agreement), security interests, conditional sale or other retention agreements, pledges, rights,

guarantees, judgments, demands, easements, charges, defects, options, ownership interests,

liabilities, obligations, interests, taxes, levies, charges, assessments, defenses, setoffs,

recoupments, title retention contracts, leases, subleases, agreements, commitments, options to

purchase, rights of first refusal and restrictions of all kinds, and any other claims or

encumbrances of whatever kind or nature, whether known or unknown, contingent or otherwise,

whether arising prior to or subsequent to the commencement of these bankruptcy cases, and

whether imposed by agreement, understanding, law, equity or otherwise (collectively, the

"Interests"), including but not limited to those (i) arising under doctrines of successor liability,

(ii) that purport to give to any party a right or option to effect any forfeiture, modification, right

of first refusal or termination of the Debtors' or the Buyer's interest in such assets or contracts,

or any similar rights and/or (iii) that relate to taxes arising under or out of, in connection with, or

in any way relating to the operation or use of the Acquired Assets prior to the Closing Date

(including, without limitation, any and all liens which may arise under any state and federal law

statute by reason of the Debtors' or Buyer's failure to comply with any other applicable statute

relating to bulk or bulk sales laws).

    T.  The Buyer would not have entered into the Sale Agreement and would not

consummate the Sale contemplated thereby, thus adversely affecting the Debtors, their estates,

and their creditors, if the transfer of the Acquired Assets were not, except for the Transferred

Liabilities and any Permitted Liens, free and clear of all Interests of any kind or nature whatsoever, or if the Buyer would, or in the future could, be liable for any of the Interests.

***Section 363(f) is Satisfied***

U.    The Selling Debtor may sell the Acquired Assets free and clear of all Interests (other than Permitted Liens and Transferred Liabilities) because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those non-Debtor parties with Interests in the Acquired Assets who did not object, or who withdrew their objections, to the Sale Agreement, the Sale or the Sale Motion are deemed to have consented pursuant to sections 363(f)(2) and 365 of the Bankruptcy Code. Those non-Debtor parties with Interests in the Acquired Assets who did object fall within one or more of the other subsections of sections 363(f) and 365 of the Bankruptcy Code and are not entitled to adequate protection or are adequately protected by having their Interests, if any, attach to the cash proceeds of the Sale ultimately attributable to the property against or in which they claim an interest.

V.    Except as expressly set forth in the Sale Agreement, the transfer of the Acquired Assets to the Buyer shall in no way impose any liability or obligation upon the Buyer for Interests related to the Debtors' operation of its businesses or use of the Acquired Assets. The Buyer shall not be deemed, as a result of any action taken in connection with the purchase of the Acquired Assets or the assignment of the Transferred Contracts, to: (i) be a successor (or other such similarly situated party) to any of the Debtors (other than with respect to the Transferred Liabilities and any obligations arising under the Transferred Contracts from and after the Closing Date as expressly stated in the Sale Agreement); or (ii) have, *de facto* or otherwise, merged with or into any of the Debtors. The Buyer is not acquiring or assuming any liability,

39

warranty or other obligation of the Debtors, except as expressly set forth in the Sale Agreement with respect to the Transferred Liabilities.

W.    Except for the Transferred Liabilities, the transfer of the Acquired Assets to the Buyer, including the Selling Debtor's assumption and assignment to the Buyer of the Transferred Contracts, will not subject the Buyer to any liability whatsoever with respect to the operation of the Debtors' businesses prior to the Closing Date or by reason of such transfer under the laws of the United States, any state, territory or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, in any theory of law or equity, including, without limitation, any theory of antitrust, successor or transferee liability.

### *Assumption and Assignment of the Transferred Contracts*

X.    The Selling Debtor has demonstrated that it is an exercise of its sound business judgment to assume and assign the Transferred Contracts in connection with the consummation of the Sale, and the Selling Debtor's assumption and assignment to the Buyer of the Transferred Contracts is in the best interests of the Selling Debtor, its affiliates, their estates and their creditors. The Transferred Contracts being assigned to the Buyer are an integral part of the Acquired Assets purchased by the Buyer and, accordingly, the assumption and assignment of the Transferred Contracts is reasonable, enhances the value of the Selling Debtor's estate and does not constitute unfair discrimination.

Y.    Pursuant to and in accordance with the Sale Agreement, the Selling Debtor and/or the Buyer have (i) cured any default existing prior to the date hereof under each of the Transferred Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code; (ii) provided compensation or adequate assurance of compensation to any party for any actual

40

pecuniary loss to such party resulting from a default prior to the date hereof under any of the Transferred Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code; and (iii) provided adequate assurance of its future performance of and under the Transferred Contracts, within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

### *Compelling Circumstances for an Immediate Sale*

Z.    To maximize the value of the assets and recovery to the Selling Debtor's estate, it is essential that the Sale occur within the time constraints set forth in the Sale Agreement. Time is of the essence in consummating the Sale.

### *Other*

AA.    The Sale does not constitute a *de facto* plan of reorganization or liquidation or an element of such a plan for any of the Debtors, as it does not and does not propose to: (i) impair or restructure existing debt of, or equity interests in, the Debtors; (ii) impair or circumvent voting rights with respect to any future plan proposed by the Debtors; (iii) circumvent chapter 11 plan safeguards, such as those set forth in sections 1125 and 1129 of the Bankruptcy Code; or (iv) classify claims or equity interests, compromise controversies or extend debt maturities.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

### *General Provisions*

1.    The relief requested in the Sale Motion is granted and approved, and the Sale contemplated thereby is approved as set forth in this Sale Order.

41

2.      All objections to the entry of this Sale Order or the relief provided herein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.

### *Approval of the Agreements*

3.      The Agreements, and all of the terms and conditions thereof, are hereby approved.

4.      Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Selling Debtor is authorized and directed to consummate the Sale in accordance with the terms and conditions of the Agreements.

5.      The Selling Debtor is authorized and directed to execute and deliver, and empowered to perform under, consummate and implement the Agreements, including all instruments and documents that may be reasonably necessary or desirable to implement the Sale as contemplated by the Sale Agreement, and to take all further actions as may be reasonably requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer or reducing to possession, the Acquired Assets, including the Transferred Contracts, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Sale Agreement.  Any amounts that become payable by the Selling Debtor pursuant to the Agreements shall (a) constitute administrative expenses of the Selling Debtor's estates; (b) be paid by the Selling Debtor without further order of this Court and in the time and manner provided for in the Agreements; and (c) not be discharged, modified, or otherwise affected by any plan of reorganization or liquidation for the Debtors.

42

6.      The terms and provisions of this Sale Order shall be binding in all respects upon the Selling Debtor, its affiliates, their estates, all known or unknown creditors of, and all known or unknown holders of equity interests in, the Debtors, any holders of Interests against, in or on all or any portion of the Acquired Assets, all non-Debtor parties to the Transferred Contracts, the Buyer and all successors and assigns of the Buyer, and any trustees, if any, subsequently appointed in any of the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code of any of the Debtors' cases. This Sale Order and the Agreements shall inure to the benefit of the Selling Debtor, its affiliates, their estates, their creditors, the Buyer, its affiliates, and their respective successors and assigns. The Agreements shall not be subject to rejection.

### *Transfer of the Acquired Assets*

7.      Pursuant to sections 105(a), 363(f) and 365 of the Bankruptcy Code, the Selling Debtor is authorized to transfer the Acquired Assets on the Closing Date (the "Closing"). Such assets shall be transferred to the Buyer and shall constitute a legal, valid, binding and effective transfer of such assets and, upon the Selling Debtor's receipt of the Purchase Price, shall be, free and clear of all Interests (other than Permitted Liens and Transferred Liabilities), with all such Interests of any kind or nature whatsoever to attach to the net proceeds of the Sale ultimately attributable to the property against or in which such Interests are held with the same validity, priority, force and effect that they now have, subject to any claims and defenses the Selling Debtor may possess with respect thereto.

8.      Except as expressly permitted or otherwise specifically provided by the Sale Agreement or this Sale Order, all persons and entities holding Interests in the Acquired Assets (other than Permitted Liens and Transferred Liabilities), arising under or out of, in

43

connection with, or in any way relating to, the Debtors, the Acquired Assets, the Transferred Contracts, the operation of the Debtors' businesses prior to the Closing Date, or the transfer of the Acquired Assets or the Transferred Contracts to the Buyer, hereby are forever barred, estopped and permanently enjoined from asserting against the Buyer, its successors or assigns, property or assets, such persons' or entities' Interests. On the Closing Date, each creditor and holder of any Interest is authorized and directed to execute such documents and take all other actions as may be necessary to release Interests (other than Permitted Liens and Transferred Liabilities) on the Acquired Assets, if any, as provided for herein.

9.      The transfer of the Acquired Assets, including the Transferred Contracts, to the Buyer pursuant to the Sale Agreement constitute a legal, valid and effective transfer of such assets and contracts, and shall vest the Buyer with all right, title and interest of the Selling Debtor in and to such assets and contracts free and clear of all Interests of any kind or nature whatsoever.

### *Assumption by Selling Debtor and Assignment to the Buyer of the Transferred Contracts*

10.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing, the Selling Debtor's assumption and assignment to the Buyer of the Transferred Contracts, is hereby approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

11.     The Selling Debtor is hereby authorized and directed in accordance with sections 105(a) and 365 of the Bankruptcy Code to (a) assume and assign to the Buyer, effective upon the Closing, the Transferred Contracts free and clear of all Interests of any kind or nature

whatsoever, and (b) execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Transferred Contracts to the Buyer.

12.    The Transferred Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Buyer in accordance with their respective terms, notwithstanding any provision in any such Transferred Contract that prohibits, restricts or conditions such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, the Selling Debtor shall be relieved from any further liability with respect to the Transferred Contracts after such assignment to and assumption by the Buyer.

13.    The Selling Debtor may assume and assign each of the Transferred Contracts in accordance with, sections 363 and 365 of the Bankruptcy Code, and any provisions in any of the Transferred Contracts that prohibits, restricts or conditions the assignment of such Transferred Contract, or allow the party to such Transferred Contract to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assumption or assignment of such Transferred Contract constitute unenforceable anti-assignment provisions which are void and of no force and effect.

14.    All other requirements and conditions under section 363 and 365 of the Bankruptcy Code for the assumption and assignment to the Buyer of each of the Transferred Contracts have been satisfied.  Upon Closing, in accordance with sections 363 and 365, the Buyer shall be fully and irrevocably vested in all right, title and interest of each of the Transferred Contracts.

K&E 15442459.6

15.    As of the Closing Date, each of the Transferred Contracts will be in full force and effect and not subject to termination or cancellation by the non-Debtor party thereto based upon any act, omission or failure that may have occurred or arisen prior to the Closing.

16.    All defaults or other obligations of the Selling Debtor under any Transferred Contract arising or accruing prior to the date of this Sale Order (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be deemed cured by the Selling Debtor upon payment at the Closing of the Sale or as soon thereafter as practicable of the cure amount, if any, set forth on Exhibit B hereto with respect to those Transferred Contracts set forth on Exhibit B (the "Cure Amounts"). After the payment of the relevant Cure Amounts, neither the Selling Debtor nor the Buyer shall have any further liabilities to the non-Debtor parties to the Transferred Contracts other than the Buyer's obligations under the Transferred Contracts that become due and payable on or after the Closing Date. There shall be no rent accelerations, assignment fees, increases (including advertising rates) or any other fees charged to Buyer or the Selling Debtor as a result of the assumption and assignment of the Transferred Contracts.

17.    Except for the obligation of the Selling Debtor and/or Buyer to pay the Cure Amounts, if any, each non-Debtor party to a Transferred Contract hereby is forever barred, estopped and permanently enjoined from asserting against the Selling Debtor or the Buyer, or the property of any of them, any default existing as of the date of the Sale Hearing; or, against the Buyer, any counterclaim, defense, setoff or any other claim asserted or assertable against the Debtors. Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, all parties to the Transferred Contracts are forever barred and permanently enjoined from raising or asserting against the Selling Debtor or the Buyer any assignment fee, default, breach or claim or pecuniary

46

loss or condition to assignment, arising under or related to the Transferred Contracts existing as of the Closing Date or arising by reason of the Closing.

### *Additional Sale Provisions*

18.    On the Closing Date of the Sale, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its Interests, if any, in the Acquired Assets, including the Transferred Contracts, as such Interests may have been recorded or may otherwise exist.

19.    This Sale Order (a) shall, be effective as a determination that, on the Closing Date, all Interests of any kind or nature whatsoever existing with respect to the Selling Debtor, the Acquired Assets or the Transferred Contracts prior to the Closing have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) shall he binding upon and shall govern the acts of all entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials and all other persons and entities who may he required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of such assets or contracts.

20.    No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the transactions authorized herein.

47

21. Each and every federal, state and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Sale Agreement.

22. If any person or entity, that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Liens with respect to the Debtors, the Acquired Assets or the Transferred Contracts shall not have delivered to the Selling Debtor and the Buyer prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Liens which the person or entity has with respect to the Selling Debtor, the Acquired Assets, the Transferred Contracts, or otherwise, then (a) the Selling Debtor is hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to such assets and contracts, and (b) the Buyer is hereby authorized to file, register or otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Liens and termination of all Interests in the Acquired Assets and Transferred Contracts of any kind or nature whatsoever.

23. All entities who are presently, or on the Closing Date may be, in possession of some or all of the Acquired Assets are hereby directed to surrender possession of the Acquired Assets to the Buyer on the Closing Date.

24. Except for the Transferred Liabilities, the Buyer shall have no liability or responsibility for any liability or other obligation of the Debtors arising under or related to the Debtors' businesses or the Transferred Contracts. Without limiting the generality of the

48

foregoing, and except as otherwise specifically provided herein and in the Sale Agreement, the Buyer shall not be liable for any claims against the Debtors or any of their predecessors or affiliates, and the Buyer shall have no successor or vicarious liabilities of any kind or character whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, but not limited to, (1) liabilities on account of any taxes arising, accruing or payable under, out of, in connection with or in any way relating to the operation of the Debtors' businesses prior to Closing Date and (2) liabilities based on any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger or substantial continuity.

25.     Under no circumstances shall the Buyer be deemed a successor of or to the Debtors for any Interest against or in the Debtors, the Debtors' businesses or Transferred Contracts of any kind or nature whatsoever. Except for the Transferred Liabilities, the sale, transfer, assignment and delivery of the Acquired Assets, including the Transferred Contracts, shall not be subject to any Interests, and Interests of any kind or nature whatsoever shall remain with, and continue to be obligations of, the Selling Debtor. Except for persons holding Transferred Liabilities or Permitted Liens (but only to the extent of such Transferred Liabilities or Permitted Liens), all persons holding Interests against or in the Debtors or the Acquired Assets or Transferred Contracts of any kind or nature whatsoever (including, but not limited to, the Selling Debtor and/or its successors (including any trustee)), creditors, employees, unions, former employees and shareholders, administrative agencies, governmental units, secretaries of state, federal, state and local officials, including those maintaining any authority relating to any environmental, health and safety laws, and the successors and assigns of each of the foregoing)

49

shall be, and hereby are, forever barred, estopped and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Interests of any kind or nature whatsoever against the Buyer, its property, its successors and assigns or the Acquired Assets or Transferred Contracts, as an alleged successor or otherwise, with respect to any Interest of any kind or nature whatsoever such person or entity had, has or may have against or in the Debtors, their estates, officers, directors, shareholders or the Acquired Assets or Transferred Contracts. Following the Closing Date, no holder of an Interest in the Debtors shall interfere with the Buyer's title to or use and enjoyment of the Acquired Assets or the Transferred Contracts based on or related to such Interest, or any actions that the Debtors may take in their chapter 11 cases.

### *Additional Provisions*

26.    This Court retains exclusive jurisdiction over any matter or dispute arising from or relating to the implementation of this Sale Order as well as to enforce and implement the terms and provisions of the Agreements, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Acquired Assets to the Buyer, (b) resolve any disputes arising under or related to the Agreements, except as otherwise provided therein, (c) interpret, implement, and enforce the provisions of this Sale Order and (d) protect the Buyer against any Interest in the Debtors, the Acquired Assets or the Transferred Contracts, of any kind or nature whatsoever, attaching to the proceeds of the Sale.

27.    Nothing contained in any plan confirmed in these cases or any order of this court confirming such plan shall conflict with or deviate from the provisions of the Sale Agreement or the terms of this Sale Order.

28.     The transactions contemplated by the Sale Agreement are undertaken by the Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale as to the Buyer except to the extent such authorization is duly stayed pending such appeal prior to such consummation. The Buyer is a buyer in good faith of the Acquired Assets, including the Transferred Contracts, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

29.     The consideration provided by the Buyer under the Sale Agreement (a) constitutes, and shall be deemed to constitute, reasonably equivalent value and fair consideration, and (b) is fair and reasonable and may not be avoided under section 363(n) or any other provision of the Bankruptcy Code, or otherwise.

30.     The terms and provisions of the Agreements and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Selling Debtor, its affiliates, their estates, the Buyer and its affiliates, successors and assigns, and shall be binding in all respects upon any affected third parties including, but not limited to, all persons asserting Interests in such assets and contracts to be sold or assigned to the Buyer pursuant to the Agreements, notwithstanding any subsequent appointment of any trustee(s) or similar party under any chapter of the Bankruptcy Code, as to which trustee(s) or similar party such terms and provisions likewise shall be binding.

31.     The failure specifically to include any particular provision of an Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Sale Agreement and each of the Agreements be authorized

51

and approved in their entirety. Likewise, all of the provisions of this Sale Order are nonseverable and mutually dependent.

32.    The Sale Agreement and any other Agreement may be modified, amended or supplemented by the parties thereto, in a writing signed by all parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

33.    Notwithstanding Bankruptcy Rules 7062, 9014, 6004(h) and 6006(d), this Sale Order shall not be stayed for 10 days after the entry of the Sale Order and shall be effective and enforceable immediately upon entry.

Dated:_____, 2009

                                        _____
                                        Judith K. Fitzgerald
                                        United States Bankruptcy Judge

# **<u>Exhibit A</u>**

*Execution*

## ASSET PURCHASE AGREEMENT

by and between

## W. R. GRACE & CO.-CONN,

as Seller

and

## THE RECTORSEAL CORPORATION,

as Buyer

August 18, 2009

*Execution*

## TABLE OF CONTENTS

Page No.

**Article 1. Definitions** ................................................................................................ 6
  1.01. General. ........................................................................................................ 6
  1.02. Defined Terms .............................................................................................. 7
**Article 2. Sale of Business, Purchase Price** ......................................................... 17
  2.01. Purchase and Sale of Transferred Assets .................................................. 17
  2.02. Excluded Assets ......................................................................................... 19
  2.03. Transferred Liabilities ................................................................................ 20
  2.04. Excluded Liabilities ................................................................................... 21
  2.05. Amount and Payment of Consideration .................................................... 22
  2.06. IRS Form 8594 ........................................................................................... 22
  2.07. Assumption and Assignment of Transferred Contracts ............................ 23
**Article 3. Closing.** ................................................................................................ 22
  3.01. Closing Date ............................................................................................... 23
  3.02. Time and Place of Closing, Simultaneity .................................................. 23
  3.03. Transfers at the Closing; Payments ........................................................... 23
  3.04. Further Assurances of Buyer ..................................................................... 24
  3.05. Further Assurances of Seller ...................................................................... 24
**Article 4. Purchase Price Adjustments** ............................................................... 25
  4.01. Definitions .................................................................................................. 25
  4.02. Initial Payment - Working Capital Adjustment. ....................................... 26
  4.03. Deferred Payment - Deferred Payment Adjustment .................................. 25
**Article 5. Seller's Representations and Warranties** ............................................ 26
  5.01. Corporate Organization and Existence ...................................................... 26
  5.02. Corporate Power ........................................................................................ 26
  5.03. Authorization .............................................................................................. 27
  5.04. Execution and Delivery .............................................................................. 27
  5.05. No Conflict .................................................................................................. 27
  5.06. Consents and Approvals ............................................................................. 27
  5.07. Binding Effect ............................................................................................ 28
  5.08. Financial Information ................................................................................. 28
  5.09. Sufficiency of Assets ................................................................................. 28
  5.10. Real Property Title to Transferred Assets; Liens; Permits. ...................... 29
  5.11. Inventory .................................................................................................... 29
  5.12. Litigation; Investigations ........................................................................... 29
  5.13. Contracts. ................................................................................................... 30
  5.14. Employment ............................................................................................... 30
  5.15. Intellectual Property ................................................................................... 30
  5.16. Conduct of Business .................................................................................. 33
  5.17. Compliance with Laws .............................................................................. 33
  5.18. Brokers ....................................................................................................... 33
  5.19. Taxes .......................................................................................................... 33
  5.20. Product Recalls; Warranties ...................................................................... 34
  5.21. Material Adverse Effect ............................................................................. 34
**Article 6. Buyer Representations and Warranties** .............................................. 35

*Execution*

**TABLE OF CONTENTS**

Page No.

6.01. Corporate Status..................................................................................................35
6.02. Authorization.....................................................................................................35
6.03. No Conflict.........................................................................................................35
6.04. Consent and Approvals ......................................................................................36
6.05. Binding Effect....................................................................................................36
6.06. Sufficient Funds.................................................................................................36
6.07. Brokers...............................................................................................................36
6.08. Litigation............................................................................................................36
**Article 7.  Buyer's Investigation ............................................................................37**
7.01. Investigation.......................................................................................................37
7.02. Financial Information..........................................................................................36
7.03. No Additional Representations............................................................................36
**Article 8.  Covenants of Seller and Buyer............................................................38**
8.01. Bankruptcy Court Actions. ................................................................................38
8.02. Notices to Third Parties .....................................................................................38
8.03. Commercially Reasonable Efforts ......................................................................38
8.04. Waiver of Bulk Sales Law Compliance ..............................................................39
8.05. Mail or Other Communications Received After Closing .....................................39
8.06. Taxes..................................................................................................................39
8.07. Listing, Testing and Code Agency Agreements ..................................................39
**Article 9.  Conduct of Business Prior to the Closing ..........................................40**
**Article 10.  Conditions Precedent to Buyer's Obligations....................................40**
10.01. Accuracy of Representations and Warranties ....................................................40
10.02. Performance of Covenants and Agreements.......................................................41
10.03. Consents, etc. ....................................................................................................41
10.04. Litigation...........................................................................................................41
10.05. Certificates of Seller. ........................................................................................41
10.06. Bankruptcy Court Approval...............................................................................42
**Article 11.  Conditions Precedent to Seller's Obligations ...................................42**
11.01. Accuracy of Representations and Warranties ....................................................42
11.02. Performance of Covenants and Agreements.......................................................42
11.03. Consents, etc. ....................................................................................................43
11.04. Litigation...........................................................................................................43
11.05. Certificates of Buyer. ........................................................................................43
11.06. Bankruptcy Court Approval...............................................................................44
**Article 12.  Termination ...........................................................................................44**
12.01. Rights to Terminate............................................................................................42
12.02. Consequences of Termination.............................................................................42
**Article 13.  Indemnification......................................................................................45**
13.01. Definitions..........................................................................................................45
13.02. Seller's Indemnification.....................................................................................46
13.03. Buyer's Indemnification.....................................................................................46
13.04. Limitations. ........................................................................................................47
13.05. Defense of Third-Party Claims. .........................................................................48

-iii-
*Asset Purchase Agreement*

*Execution*

## TABLE OF CONTENTS

**Page No.**

13.06. Unsuccessful Indemnification Claims; Damages ........................................................48
13.07. No Consequential or Lost Profit Damages; Exclusive Remedy ...........................49
13.08. Characterization of Indemnity Payment for Tax Purposes ...........................................50
**Article 14.  Post-Closing Matters..................................................................................50**
14.01. Mutual Cooperation. ....................................................................................................50
14.02. Preservation of Files and Records...............................................................................51
14.03. Reports ..........................................................................................................................51
14.04. Renewal of Guaranteed Items .....................................................................................51
14.05. "Grace" and "Grace Construction Products" Names ....................................................51
14.06. Intercompany Agreements ...........................................................................................52
14.07. Covenant Not to Compete.............................................................................................53
14.08. Nonsolicitation..............................................................................................................52
14.09. Confidentiality. .............................................................................................................53
14.10. Obligations for Accounts Receivable and Inventory After Closing.......................54
14.11. Removal/Disposal of Transferred Assets....................................................................55
**Article 15.  Expenses ....................................................................................................57**
15.01. Expenses ........................................................................................................................57
15.02. Transfer Taxes ..............................................................................................................58
15.03. Property Prorations.......................................................................................................56
**Article 16.  Notices .....................................................................................................57**
16.01. Notices ..........................................................................................................................58
**Article 17.  General .....................................................................................................59**
17.01. Entire Agreement ..........................................................................................................59
17.02. Governing Law .............................................................................................................59
17.03. Submission to Jurisdiction ...........................................................................................59
17.04. Third-Party Beneficiaries.............................................................................................60
17.05. Assignment; Successors...............................................................................................60
17.06. Amendments and Waivers ...........................................................................................60
17.07. Counterparts..................................................................................................................60
17.08. Time is of the Essence ..................................................................................................59
17.09. Attorney's Fees ............................................................................................................59

*Execution*

**Exhibits and Schedules**

<u>Exhibits</u>

A.               Closing Assumption Agreement
B.               Form of Sale Order

<u>Schedules</u>

| | |
|---|---|
| 1.02 | Products |
| 2.01(a) | Certain Tangible Personal Property |
| 2.01(e) | Code Testing Approvals |
| 2.02(k) | Certain Excluded Assets |
| 2.05 | Seller Wire Transfer Instructions |
| 4.01(a) | Seller Accounting Policies |
| 4.01(c) | Deemed Salable Inventory |
| 5.05 | No Conflict |
| 5.06 | Consents and Approvals |
| 5.08(a) | Seller Financial Schedules |
| 5.08(b) | Seller P&L Statement |
| 5.08(c) | Seller Accounts Receivable |
| 5.09 | Sufficiency of Assets |
| 5.10(a) | Manufacturing Sites |
| 5.10(c) | Permits of Seller |
| 5.11 | Off-site Inventory |
| 5.13 | Transferred Contracts |
| 5.15(a) | Scheduled Intellectual Property |
| 5.15(b) | Intellectual Property Infringements or Conflicts |
| 5.15(c) | Transferred Patent and Application Listings |
| 5.15(d) | Transferred Trademark Registrations |
| 5.15(e) | Transferred Copyrights |
| 5.15(f) | Third Party Rights to Transferred Intellectual Property |
| 5.15(g) | Transferred Intellectual Property |
| 5.15(i) | Licensed Intellectual Property |
| 5.20 | Product Recalls |
| 14.07(b) | Buyer Scheduled Products |

*Execution*

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is made as of August 18, 2009, by and between W. R. Grace & Co.-Conn., a Connecticut corporation ("Seller") and The RectorSeal Corporation, a Delaware corporation ("Buyer, and collectively with Seller, the "Parties" and each, a "Party"). Capitalized terms used herein have the meanings specified in Section 1.02 or elsewhere in this Agreement.

## RECITALS:

WHEREAS, Seller wishes to sell to Buyer, and Buyer wishes to acquire from Seller, certain assets associated with the manufacture and sale of the Products;

WHEREAS, upon the terms and subject to the conditions hereinafter set forth and in order to consummate the desired transfer of the Transferred Assets (as hereinafter defined), the Parties desire that Seller sell, assign and transfer to Buyer, and that Buyer purchase and acquire from Seller, the Transferred Assets, and that Buyer assume the Transferred Liabilities; and

WHEREAS, Seller intends that the transactions contemplated by this Agreement shall be implemented through the filing of the Sale Motion pursuant to Sections 105, 363 and 365 of the Bankruptcy Code seeking approval of the transactions contemplated by this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the Parties hereby agree as follows:

## Article 1.

## Definitions

1.01. General.

(a)     This Agreement and the Transaction Documents are the result of the joint efforts of Buyer and Seller, and there is to be no construction against either Party based on any presumption of that Party's involvement in the drafting thereof.

(b)     All Article and Section numbers, and Exhibit and Schedule references, used in this Agreement refer to Articles and Sections of this Agreement, and Exhibits and Schedules

*Execution*

attached hereto or delivered simultaneously herewith, unless otherwise specifically stated. The captions used in this Agreement are for convenience of reference only and shall not be considered in the interpretation of the provisions hereof.

(c)    Any of the terms defined in this Agreement and the Transaction Documents may be used in the singular or the plural. In this Agreement and the Transaction Documents, unless otherwise specifically stated, "hereof," "herein," "hereto," "hereunder" and the like refer to this Agreement or a Transaction Document, as the case may be, as a whole and not merely to the specific Section, Article, paragraph or clause in which the word appears. Except as otherwise expressly provided, any noun or pronoun used in this Agreement or the Transaction Documents shall be deemed to include the plural as well as the singular and to cover all genders, and the terms "include" and "including" shall be deemed to be followed by the following phrase "without limitation."

(d)    The terms "dollars" and "$" in this Agreement or the Transaction Documents shall mean United States dollars.

1.02.  Defined Terms.  For purposes of this Agreement, including the Exhibits and Schedules, the following defined terms have the meanings set forth in this Section.

"Affiliate" of any Person shall mean any other Person, which, directly or indirectly, controls or is controlled by or is under common control with such Person. Solely for purposes of this definition of Affiliate, a Person shall be deemed to "control," be "controlled by" or be "under common control with" another Person if such other Person possesses, directly or indirectly, power to direct or cause the direction of the management or policies of such Person whether through the ownership of voting securities or other ownership interests, by contract or otherwise.

"Agreement" has the meaning given to such term in the preamble.

"Bankruptcy Code" means 11 U.S.C. § 101 *et seq.*

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or any other court of competent jurisdiction having jurisdiction over the Chapter 11

*Execution*

Case or over any appeal of an order entered in the Chapter 11 Case that relates to the Transactions.

"Book Value" has the meaning given to such term in Section 4.02.

"Bulk Sales Law" has the meaning given to such term in Section 8.04.

"Business" means the manufacture and sale of the Products as conducted by Seller immediately prior to the date of this Agreement.

"Business Day" means a day that is not a Saturday or Sunday, nor a day on which banks are generally closed in New York City.

"Business Executive" means John Goga.

"Buyer" has the meaning given to such term in the preamble.

"Buyer Entity" means Buyer, any of its Subsidiaries, its ultimate parent, and any of its ultimate parent's direct or indirect Subsidiaries.

"Buyer Group" means all the Buyer Entities.

"Buyer Indemnitees" has the meaning given to such term in Section 13.02.

"Buyer's Claim" has the meaning given to such term in Section 13.04.

"Buying Companies" means, collectively, Buyer and any and all designees of Buyer to whom Transferred Assets are transferred pursuant to this Agreement.

"Chapter 11 Cases" means *In re: W. R. Grace & Co. et al., Debtors*, Chapter 11, Cases Nos. 01-1139 et al. (JKF) (Jointly Administered) in the Bankruptcy Court.

"Claim" has the meaning given to such term in Section 13.01.

"Closing" has the meaning given to such term in Section 3.01.

"Closing Assumption Agreement" means the assumption agreement to be executed and delivered by Buyer at the Closing in substantially the form attached hereto as Exhibit A.

*Execution*

"Closing Current Assets" has the meaning given to such term in Section 4.01.

"Closing Date" has the meaning given to such term in Section 3.02.

"Closing Transfer Documents" means such bills of sale, assignments and other instruments of sale, transfer and assignment in order to effectively transfer to Buyer or its designees all right, title and interest of Seller in the Transferred Assets as Buyer shall reasonably request.

"Code" means the Internal Revenue Code of 1986, as amended.

"Code Testing Approvals" has the meaning given to such term in Section 2.01.

"Confidential Information" has the meaning given to such term in Section 14.09.

"Confidentiality Agreement" means the Confidentiality Agreement dated March 10, 2009, between Seller and Capital Southwest Corporation as amended on June 23, 2009 to include Buyer as a party thereto.

"Contamination" means the emission, discharge, placement, presence or release of any Hazardous Substance to, on, onto or into the Environment and the effects of such emission, discharge, placement, presence or release, including the presence or existence of any such Hazardous Substance.

"Control" in respect to Seller's or another Seller Entity's interest in Intellectual Property, shall mean that Seller or another Seller Entity (1) has the right to transfer ownership, make available, and/or grant licenses under such Intellectual Property without accounting to others, or (2) has the right to transfer ownership of, make available, and/or license such Intellectual Property, subject to royalty or other obligations or restrictions on which the exercise of Seller's or another Seller Entity's right is contingent, which Seller or another Seller Entity shall satisfy without any commitment by Buyer.

*Execution*

"Copyrights" has the meaning given to such term in the "Intellectual Property" definition in Section 1.02.

"Damages" has the meaning given to such term in Section 13.01.

"Deemed Salable Inventory" has the meaning give to such term in Section 4.01.

"Deferred Payment" has the meaning give to such term in Section 2.05.

"Deferred Payment Adjustment" has the meaning given to such term in Section 4.03.

"Deferred Payment Date" has the meaning give to such term in Section 2.05.

"Direct Claims" has the meaning given to such term in Section 13.01.

"Disposal" has the meaning given to such term in Section 14.11.

"Due Diligence Information" has the meaning given to such term in Section 7.02.

"Environment" means navigable waters, waters of the contiguous zone, ocean waters, surface waters, groundwater, surface and subsurface land, outdoor and indoor air and any other environmental medium or natural resource.

"Environmental Laws" means, collectively, any and all applicable Laws, directives, authorizations, notices, Permits, or other requirements of a Governmental Authority, relating in any way to Contamination, protection of the Environment, protection of natural resources or protection of human health and safety, including those relating to emissions, discharges, releases or threatened emissions, discharges or releases to, on, onto or into the Environment of, or exposures or threatened exposures to, any Hazardous Substance.

"Environmental Matters" means any matter arising out of or relating to (a) Contamination; (b) Environmental Laws and compliance with Environmental Laws; or (c) protection of the Environment (indoor or outdoor).

"Estimate" has the meaning given to such term in Section 4.02.

*Execution*

"Excluded Assets" has the meaning given to such term in Section 2.02.

"Excluded Liabilities" has the meaning given to such term in Section 2.04.

"Final Order" means any order of the Bankruptcy Court after all opportunities for rehearing, reargument, petition for certiorari and appeal are exhausted or expired and any requests for rehearing have been denied, and that has not been revised, stayed, enjoined, set aside, annulled, reversed, remanded, modified or suspended, with respect to which any required waiting period has expired, and to which all conditions to effectiveness prescribed therein or otherwise by law or order have been satisfied.

"Financial Schedules" has the meaning given to such term in Section 5.08.

"Governmental Authority" means an entity, including contractors and agents acting on behalf of an entity, exercising executive, legislative, judicial, regulatory or administrative functions of government, including, but not limited to, agencies, departments, boards, commissions, and other instrumentalities thereof, whether national, federal, state, local or foreign.

"Hazardous Substance" means any element, substance, compound or mixture whether solid, liquid or gaseous, that is subject to regulation or control under any Environmental Law.

"Inclusion Notice" has the meaning given to such term in Section 2.03.

"Indemnification Claim" has the meaning given to such term in Section 13.01.

"Indemnified Party" has the meaning given to such term in Section 13.01.

"Indemnifying Party" has the meaning given to such term in Section 13.01.

"Information" has the meaning given to such term in the "Intellectual Property" definition in Section 1.02.

"Initial Payment" has the meaning given to such term in Section 2.05.

*Execution*

"Intellectual Property" or "IP" means any and all of the following:

(a)    United States and foreign patents, patent disclosures and patent applications, including all reissues, divisions, continuations, continuations-in part, divisionals, revisions, utility models, representations, substitutions, or extensions of any of the foregoing (collectively, "Patent Rights");

(b)    (1) internet domain names, (2) W. R. Grace website content regarding the Business, (3) trademarks, service marks, trade names, brand names, trade dress, logos, and designs, assumed names and other indications of origin, whether registered or unregistered, and any applications or renewals therefor, and (4) all goodwill symbolized thereby or associated with subsection (3) (collectively, "Trademark Rights");

(c)    United States and foreign copyrightable works and all copyrights, whether registered or unregistered, and any applications and registrations therefor or renewals or derivatives thereof (collectively, "Copyrights"); and

(d)    all inventions, invention disclosures, trade secrets and confidential Business information, discoveries, work papers in the possession of Seller, lab manuals, lab notes, technical information, formulae, processes, designs, drawings, know-how, show-how, technical data, specifications, manufacturing know-how, trade secrets, computer software and sales data, technical manuals and documentation which are not embodied within subparagraphs (a), (b) and (c) (collectively, "Information").

"Inventory" means inventories and supplies of raw materials, works-in-process, finished goods, spare parts, packaging inventories and other inventory items owned by Seller, wherever located.

"Laws" means all federal, state, provincial, local and foreign laws, statutes, ordinances, rules, regulations, orders, judgments, decrees, writs, arbitral orders, settlement agreements, conciliation agreements, injunctions or other requirements of all applicable governmental, judicial, legislative, executive, administrative and regulatory authorities.

*Execution*

"Lien" means any pledge, security interest, deed of trust, charge, option, claim, covenant, condition, right of first refusal, transfer restriction or other lien or encumbrance other than a Permitted Lien.

"Litigation Expenses" has the meaning given to such term in Section 13.01.

"Material Adverse Effect" means any circumstance, change or effect that is materially adverse to the Transferred Assets or the business, financial condition or results of operations of the Business, in each case taken as a whole; provided however, a Material Adverse Effect shall not include any failure on the part of any Party or its Affiliates: (i) to transfer any Code Testing Approval to Buyer; or (ii) to transfer any rights and incidents in, to and under the Transferred Contracts to Buyer.

"Movers" has the meaning given to such term in Section 14.11.

"Noncompetition Term" has the meaning given to such term in Section 14.07.

"Nonsolicitation Term" has the meaning given to such term in Section 14.08.

"P&L Statements" has the meaning given such term in Section 5.08.

"Patent Rights" has the meaning given to such term in the "Intellectual Property" definition in Section 1.02.

"Party" and "Parties" have the meanings given to such terms in the preamble.

"Permits" means licenses, permits, registrations, orders and approvals required by applicable Laws or Governmental Authorities (including those relating to Environmental Laws).

"Permitted Liens" means (i) any Liens securing Taxes, or (ii) any claims of materialmen, carriers, landlords and like Persons, in each case, which are not yet due and payable.

*Execution*

"Person" means any individual, partnership, firm, trust, association, company, limited liability company, corporation, joint venture, unincorporated organization, other business entity or Governmental Authority.

"Plant" means the real property owned by Seller and located at 1330 Industry Road, Hatfield, Pennsylvania 19440.

"Post-Petition Loan Agreement" means the Post-Petition Loan and Security Agreement dated as of April 1, 2001, as amended, among the financial institutions named therein as the Lenders, Bank of America, N.A., as the Agent and W. R. Grace & Co. and the Subsidiaries of W. R. Grace & Co. named therein, as Debtors and Debtors in Possession, as the Borrowers.

"Proceeding" means any action, suit, investigation or proceeding, including, but not limited to, any workers compensation claim, litigation commenced by or on behalf of employees, environmental, condemnation, expropriation, eminent domain or similar proceeding, or any proceeding seeking to revoke, cancel, suspend or modify any provision of a permit, by or before a Governmental Authority other than the Bankruptcy Court.

"Products" means the products listed on Schedule 1.02.

"Purchase Price" has the meaning given to such term in Section 2.05.

"Related Person" has the meaning given to such term in Section 13.01.

"Removal" has the meaning given to such term in Section 14.11.

"Removal Date" has the meaning given to such term in Section 14.11.

"Removal Plan" has the meaning given to such term in Section 14.11.

"Sale Motion" means a motion that shall include a form of sale order in substantially the form attached hereto as Exhibit B, which Seller shall file with the Bankruptcy Court seeking approval for the Transactions.

*Execution*

"Sale Order" means the order of the Bankruptcy Court approving the consummation of the Transactions.

"Scheduled Closing Date" has the meaning given to such term in Section 3.01.

"Seller" has the meaning given to such term in the preamble.

"Seller Accounting Policies" has the meaning given to such term in Section 4.01.

"Seller Entity" means Seller, any of its Subsidiaries, its ultimate parent and any of its ultimate parent's direct or indirect Subsidiaries.

"Seller Executives" means D. Andrew Bonham, William T. Seeley, Philip Zanghi and Paul Hanlon.

"Seller Group" means all the Seller Entities.

"Seller Indemnitees" has the meaning given to such term in Section 13.03.

"Seller Marks" means any company names, product names, logos or trademarks of Seller that are not included in the Transferred Intellectual Property.

"Seller's Claim" has the meaning given to such term in Section 13.04.

"Seller's Knowledge" means the actual knowledge of any of the Seller Executives after reasonable inquiry.

"Specified Rate" means a fixed rate of interest per annum equal to the U.S. prime rate, as reported by *The Wall Street Journal,* plus ten percent (10%), compounded monthly.

"Storage Fee" has the meaning given to such term in Section 14.11.

"Subsidiary" of a Person means any other Person in which the first Person directly or through one or more intermediaries owns securities or other equity interests representing more than 50% of the voting power of all such securities or other equity interests.

*Execution*

"Tangible Personal Property" means machinery and associated switch gear, equipment, quality control lab equipment, tools, dies, molds, formulations, trade show equipment, test equipment, tooling and other tangible personal property.

"Target Assets" has the meaning given to such term in Section 4.02.

"Tax" means (i) any federal, state, provincial, local or foreign net income, gross income, gross receipts, windfall profits, severance, production, property, sales, use, license, excise, franchise, employment, payroll, withholding, alternative or add-on minimum, *ad valorem,* value added, transfer, stamp, environmental, registration or inventory tax, or any other tax, custom, duty, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or penalty, imposed by any Governmental Authority, and (ii) any liability for the payment of amounts with respect to any tax, duty, fee, assessment and charge described in clause (i) as a result of being a member of an affiliated, consolidated, combined or unitary group, or as a result of any obligation under any tax sharing arrangement or tax indemnity agreement or as a result of transferee or successor liability.

"Tax Return" means any return, statement, report or form required to be filed or submitted to any Governmental Authority in connection with the determination, assessment, collection or payment of any Tax or in connection with the administration, implementation or enforcement or compliance with any law relating to any Tax.

"Third-Party" means any Person other than the Seller Group and the Buyer Group.

"Third-Party Bid" has the meaning given to such term in Section 8.01.

"Third-Party Claim" has the meaning given to such term in Section 13.01.

"Trademark Rights" has the meaning given to such term in the "Intellectual Property" definition in Section 1.02.

*Execution*

"Transaction Documents" means this Agreement and the documents to be executed pursuant to Section 3.03, including the Closing Assumption Agreement and the Closing Transfer Documents.

"Transactions" shall mean the transactions contemplated by the Transaction Documents.

"Transferred Assets" has the meaning given to such term in Section 2.01.

"Transferred Accounts Receivable" has the meaning given to such term in Section 4.02.

"Transferred Contracts" means the contracts listed on Schedule 5.13, and all purchase orders for any of the Products accepted by Seller between the date of this Agreement and the Closing Date, in the ordinary course of the business, where the related finished goods have not been shipped by the Closing Date.

"Transferred Intellectual Property" means Intellectual Property Controlled by Seller or another Seller Entity that is used exclusively in the Business or has been developed or is under development exclusively for use in the Business.

"Transferred Inventory" has the meaning given to such term in Section 4.01.

"Transferred Liabilities" has the meaning given to such term in Section 2.03.

"Uncollectable Accounts Receivable" has the meaning given to such term in Section 4.01.

"Unsalable Inventory" has the meaning given to such term in Section 4.02.

"Working Capital Adjustment" has the meaning given to such term in Section 4.01.

## Article 2.

### Sale of Business, Purchase Price

2.01. Purchase and Sale of Transferred Assets. On the terms and subject to the conditions hereof, and subject to the exclusions set forth in Section 2.02, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Buyer free and clear of all Liens to the

*Execution*

maximum extent permissible under Section 363 of the Bankruptcy Code, and Buyer shall purchase, acquire and accept from Seller, all of the right, title and interest of Seller in, to and under any and all of the following assets, properties, rights, contracts and claims of Seller whether tangible or intangible, real, personal or mixed (collectively, the "Transferred Assets"):

(a)    all Tangible Personal Property: (i) that is owned by any Seller Entity, used in the Business and located at the Plant; or (ii) listed on Schedule 2.01(a);

(b)    the Transferred Inventory;

(c)    the Transferred Accounts Receivable;

(d)    the Transferred Intellectual Property;

(e)    books and records (other than Tax Returns and related work papers), third-party non-governmental code testing certifications and approvals held by any Seller Entity to the extent related to the Products and set forth on Schedule 2.01(e) ("Code Testing Approvals") solely to the extent transferrable, files (including without limitation, all files related to the Code Testing Approvals), call reports, customer lists, prospect lists, quality control records, external and internal product test reports, product and packaging designs, mailing lists, distributor and manufacturer's representative lists, accounting records, tapes, disks, manuals, keys (other than for real property) reports, plans, catalogs, sales, marketing and promotional materials, and all other printed and written materials and general intangibles, in each case, to the extent pertaining exclusively to the Business, other than any of the foregoing that relate to any Excluded Asset or Excluded Liability;

(f)    rights under or pursuant to all warranties, representations and guarantees, whether express or implied, made by suppliers, manufacturers, contractors and other Third Parties with respect to any of the Transferred Assets, other than any of the foregoing that relate to any Excluded Asset or Excluded Liability;

(g)    rights and incidents in, to and under the Transferred Contracts;

*Execution*

(h)    all proceeds received by Seller from claims under insurance policies of Seller resulting from losses incurred by Seller between the date of this Agreement and the Closing Date related exclusively to any Transferred Asset; and

(i)    all other assets, properties, rights, contracts and claims of Seller, wherever located, whether tangible or intangible, real, personal or mixed, other than the Excluded Assets, as and to the extent such are used exclusively in the Business;

but, in any event, in clauses (a) through (i) above, excluding the Excluded Assets.

2.02.  Excluded Assets.  Notwithstanding anything to the contrary contained in Section 2.01, the Parties expressly understand and agree that the Transferred Assets shall not include, and Seller is not selling, assigning, transferring or conveying to Buyer, any right or title to or interest in, any of the following assets, properties, rights, contracts and claims, whether tangible or intangible, real, personal or mixed (collectively, the "Excluded Assets"):

(a)    cash and cash items;

(b)    refunds of Taxes related to taxable periods ending before the Closing Date;

(c)    amounts receivable from any unit of Seller other than the Business, or from any other Seller Entity;

(d)    all insurance policies of Seller, claims with respect to insurance policies of Seller and proceeds therefrom (except proceeds received by Seller from claims under insurance policies of Seller resulting from losses incurred by Seller between the date of this Agreement and the Closing Date related exclusively to any Transferred Asset) and refunds of amounts previously paid or prepaid on account of insurance policies of Seller;

(e)    all information received from or relating to a Third-Party that is subject to a confidentiality agreement that prohibits the transfer of such information unless consent of the counterparty to transfer of such information is obtained prior to the Closing;

(f)    records relating to any of the Excluded Assets or Excluded Liabilities;

*Execution*

(g)    the names "Grace" and "Grace Construction Products," whether alone or in combination with each other or with other words, including in any tradename, trademark or service mark;

(h)    all items that would otherwise be included in the Transferred Assets pursuant to Section 2.01 that if included in the Transferred Assets would reasonably be expected to result in a breach by a Seller Entity of an agreement or obligation of a Seller Entity to a customer or supplier of the Business;

(i)    all Tangible Personal Property located at any Seller facility other than the Plant except as listed on Schedule 2.01(a);

(j)    the Seller's real property and the Seller's rights to real property (i.e. leases to real property), including without limitation the Plant and all fixtures; and

(k)    all items that would otherwise be included in the Transferred Assets pursuant to Section 2.01 that are set forth on Schedule 2.02(k).

2.03.    Transferred Liabilities.    At the Closing, Buyer shall assume and be liable for, and shall pay, perform and discharge, only the following obligations and liabilities (collectively, the "Transferred Liabilities"):

(a)    all liabilities of any Seller Entity in, to and under the Transferred Contracts that relate to events arising exclusively on or after the Closing Date;

(b)    all liabilities and obligations of any Seller Entity arising out of the operation or ownership of the Transferred Assets on and after the Closing Date;

(c)    all liabilities and obligations arising from Environmental Matters arising from the Transferred Assets on and after the earlier to occur of (i) the Removal Date, or (ii) with respect to all or any portion of the Transferred Assets, the commencement of the Removal of the Transferred Assets or the commencement of the Removal of such portion thereof, *provided however*, that solely with respect to any Environmental Matters affecting the Plant, Seller informs Buyer (an "Inclusion Notice") of the occurrence or existence of facts or circumstances that may give rise to such potential liabilities or obligations on or before the date that is thirty

*Execution*

(30) days after the latest to occur of (A) the Removal Date, (B), with respect to all or any portion of the Transferred Assets, the completion of the Removal of the Transferred Assets or the completion of the Removal of such portion thereof, or (C) with respect to all or any portion of the Transferred Assets, the completion of the Disposal of the Transferred Assets or the completion of the Disposal of such portion thereof, and *provided further,* that if Seller fails to provide Buyer with an Inclusion Notice, all liabilities and obligations arising from Environmental Matters affecting the Plant shall be excluded from this Section 2.03(c);

(d)     Taxes related to the ownership or operation of the Transferred Assets for any tax period or portion thereof beginning on or after the Closing Date; and

(e)     any fee or commission or like payment owed to any Person for direct or indirect services as a broker, finder or financial advisor for Buyer in connection with the negotiations relating to the transactions contemplated by this Agreement pursuant to any agreement, arrangement or understanding made by or on behalf of Buyer.

but, in any event, in clauses (a) through (f) above, excluding the Excluded Liabilities.

2.04.  Excluded Liabilities.  It is expressly understood and agreed that, except for the Transferred Liabilities, Buyer is not assuming and shall not be liable for any other liability or obligation of Seller, any Seller Entity or the Business, including the following liabilities and obligations of Seller (collectively, the "Excluded Liabilities"):

(a)     all accounts payable of Seller;

(b)     Taxes for any tax period or portion thereof ending before the Closing Date;

(c)     except as otherwise provided in the Transaction Documents, amounts payable to Seller or to any other Seller Entity;

(d)     premiums or any other charges under any insurance policy;

(e)     all liabilities and obligations, including any liability arising from claims for injury to persons or property, arising out of the Transferred Assets or the Business (other than Transferred Contracts) prior to the Closing Date;

*Execution*

(f)     all liabilities and obligations arising from Environmental Matters arising from the Transferred Assets prior to the earlier to occur of (i) the Removal Date, or (ii) with respect to all or any portion of the Transferred Assets, the commencement of the Removal of the Transferred Assets or the commencement of the Removal of such portion thereof;

(g)     all liabilities and obligations related to Seller's employees;

(h)     all liabilities of Seller in, to and under the Transferred Contracts that relate to events arising exclusively prior to the Closing Date; and

(i)     any fee or commission or like payment owed to any Person for direct or indirect services as a broker, finder or financial advisor for Seller in connection with the negotiations relating to the transactions contemplated by this Agreement pursuant to any agreement, arrangement or understanding made by or on behalf of Seller.

2.05.  Amount and Payment of Consideration.  The consideration payable by the Buyer for the purchase of the Transferred Assets (the "Purchase Price") consists of:  (a) an initial payment of $4,800,000 as adjusted by the Working Capital Adjustment (computed as set forth in Article 4) (the "Initial Payment"); and (b) a deferred payment of $300,000 less the amount of any Deferred Payment Adjustment (computed as set forth in Article 4) (the "Deferred Payment"). Buyer shall pay to Seller the Initial Payment and the Deferred Payment by wire transfer of immediately available funds to the Seller's account set forth on Schedule 2.05.  Buyer shall pay to Seller the Initial Payment at the Closing.  Buyer shall pay to Seller the Deferred Payment on the date that is one hundred eighty (180) days following the Closing Date (the "Deferred Payment Date").  In the event that the Deferred Payment is not received by Seller on or before the Deferred Payment Date, interest shall be paid on the unpaid amount of the Deferred Payment from the Deferred Payment Date to the date of payment, at the Specified Rate determined as of the Deferred Payment Date.

2.06.  IRS Form 8594.  Buyer shall retain Enterprise Appraisal, a certified appraisal firm that is independent of the Buyer, to appraise certain of the Transferred Assets in accordance with Section 1060 of the Code and FASB 141-R.  Buyer shall be responsible for all fees associated with such appraisal.  Each Party agrees to prepare and timely file U.S. Internal Revenue Service

*Execution*

Form 8594 (Asset Acquisition Statement) in accordance with Section 1060 of the Code with respect to the Transferred Assets and to cooperate in every reasonable way with the other Party in the preparation of such form. The Parties agree that the Purchase Price shall be allocated in accordance with Schedule 2.06, as such Schedule shall be updated post-Closing in accordance with the appraisal and the calculation of the Deferred Payment Adjustment.

2.07. <u>Assumption and Assignment of Transferred Contracts</u>. At the Closing, Seller shall assume and assign to Buyer and Buyer will assume all of the Transferred Contracts subject to the requirement that Buyer will be liable only for any liabilities arising under such contracts exclusively on and after the Closing Date.

### Article 3.

### Closing.

3.01. <u>Closing Date</u>. The Parties shall undertake the closing of the Transactions contemplated hereunder (the "Closing") on: (a) the first Business Day after the date on which the conditions to Closing set forth in <u>Articles 10</u> and <u>11</u> (other than <u>Sections 10.05</u> (Certificates of Seller) and <u>11.05</u> (Certificates of Buyer)) shall have been fulfilled or waived; provided however, that the Closing shall not occur prior to 12:01 AM on September 24, 2009; or (b) such other Business Day as the Parties may mutually agree to in writing in accordance with <u>Section 17.06</u> (the "Scheduled Closing Date").

3.02. <u>Time and Place of Closing, Simultaneity</u>. The Closing shall commence at 10:00 a.m. local time on the Scheduled Closing Date at the offices of Seller, 7500 Grace Drive, Columbia, Maryland, or remotely via the exchange of documents and signatures, or at such other time and place as the Parties may mutually agree to in writing. All of the actions to be taken and documents to be executed and delivered at the Closing shall be deemed to be taken, executed and delivered simultaneously, and no such action, execution or delivery shall be effective until all actions to be taken and executions and deliveries to be effected at the Closing are complete. The "Closing Date" is the date on which the Closing is effective. The Closing shall be deemed to have occurred at 12:01 AM on the Closing Date.

3.03. <u>Transfers at the Closing; Payments</u>. At the Closing:

*Execution*

(a)    Seller shall execute, acknowledge and deliver to Buyer the Closing Transfer Documents.

(b)    Buyer shall pay to Seller's account the Initial Payment by wire transfer of immediately available funds.

(c)    Title and risk of loss with respect to the Transferred Assets shall transfer to Buyer and Buyer shall be deemed to have possession of the Transferred Assets whether or not Buyer removes the Transferred Assets, or any of them, from the Plant or other facilities where the Transferred Assets are located pursuant to Section 14.11 or otherwise.

(d)    Buyer shall execute, acknowledge and deliver to Seller the Closing Assumption Agreement in order to effectively assume the Transferred Liabilities in the form agreed upon by the Parties.

(e)    All consents obtained by Seller with respect to the Transferred Contracts shall be delivered to Buyer.

(f)    Seller will deliver the executed Sale Order to Buyer.

3.04.  Further Assurances of Seller.  At any time and from time to time after the Closing, at the request and expense of Buyer, each Seller Entity shall execute and deliver, or cause to be executed and delivered, all such deeds, assignments, and other documents, and take or cause to be taken all such other actions, as Buyer reasonably deems necessary or advisable in order to put Buyer or its designees in actual possession or operating control of the Transferred Assets, or to more fully and effectively vest in Buyer or its designees, or to confirm their title to and possession of, the Transferred Assets.

3.05.  Further Assurances of Buyer.  At any time and from time to time after the Closing, at the request and expense of Seller, Buyer shall execute and deliver, or cause to be executed and delivered, all such documents, and take or cause to be taken all such other actions, as Seller reasonably deems necessary or advisable in order to more fully and effectively divest Seller of responsibility for the Transferred Liabilities and incidents of ownership of the Transferred Assets.

*Execution*

## Article 4.

## Purchase Price Adjustments.

4.01.  <u>Definitions</u>.

(a)    "<u>Closing Current Assets</u>" means the aggregate amount, as of the Closing Date, of the Transferred Inventory and the Transferred Accounts Receivable computed on a going concern basis in accordance with the accounting policies and procedures (applied consistently) set forth in <u>Schedule 4.01(a)</u> (the "<u>Seller Accounting Policies</u>").

(b)    "<u>Uncollectible Accounts Receivable</u>" means the Transferred Accounts Receivable that are not collected by Buyer within one hundred eighty (180) days from the Closing Date.

(c)    "<u>Deemed Salable Inventory</u>" means all Transferred Inventory that is:  (i) of the type and up to the quantity (to the extent a quantity is specified) included on <u>Schedule 4.01(c)</u>; (ii) acquired or manufactured by Seller on or after the date of this Agreement at the request of Buyer; and (iii) used in the manufacture or packaging of the Transferred Inventory specified in clauses (i) and (ii) of this Section 4.01(c).

(d)    "<u>Transferred Inventory</u>" means Inventory wherever located that is owned by Seller as of the Closing Date and is exclusively used in the Business (other than Inventory consisting of raw materials packaging that contains Seller Marks that Seller, in its sole discretion, determines cannot be covered or removed).

(e)    "<u>Unsalable Inventory</u>" means Inventory included in the Transferred Inventory, other than Deemed Salable Inventory, that the Parties agree:  (1) is or was obsolete, defective, damaged, aged beyond usable shelf life or otherwise outside specifications; and (2) cannot or could not be sold within one hundred eighty (180) days after the Closing Date.

4.02.  <u>Initial Payment—Working Capital Adjustment</u>.  On the Closing Date, the value of the Closing Current Assets will equal one million two hundred sixty-two thousand thirteen dollars and no cents ($1,262,013.00) (the "<u>Target Assets</u>"), with any variation being an adjustment of the Purchase Price as set forth in this <u>Section 4.02</u> (the "<u>Working Capital Adjustment</u>").  As of the Closing Date, Buyer and Seller shall make a good faith estimate of the

*Execution*

value of the Closing Current Assets (the "Estimate"), including a list of all accounts receivable exclusive to the Business (the "Transferred Accounts Receivable"), and the Book Value of Transferred Inventory. If the amount of the Estimate is less than the Target Assets, the Initial Payment shall be reduced by an amount equal to the Target Assets less the amount of the Estimate. If the amount of the Estimate is greater than the Target Assets, the Initial Payment shall be increased by an amount equal to the amount of the Estimate less the Target Assets. If the amount of the Estimate equals the Target Assets, the Initial Payment shall not be adjusted. For purposes of this Agreement, the term "Book Value" in respect of Transferred Inventory or Unsalable Inventory shall mean the calculation of the book value of such Inventory pursuant to the Seller Accounting Policies.

4.03. Deferred Payment—Deferred Payment Adjustment. On the one hundred eightieth (180th) day following Closing, Buyer shall pay Seller the Deferred Payment, subject to adjustment as set forth in this Section 4.03 (the "Deferred Payment Adjustment"). If, as of the date that is one hundred eighty (180) days following the Closing Date, any Transferred Accounts Receivable is Uncollectible Accounts Receivable or if any Transferred Inventory is Unsalable Inventory, the Deferred Payment shall be reduced by the amount of such Uncollectible Accounts Receivable and the Book Value set forth in the Estimate of such Unsalable Inventory and Buyer shall assign to Seller such Unsalable Inventory, Uncollectible Accounts Receivable and all records included in the Transferred Assets related thereto.

## Article 5.

### Seller Representations and Warranties

Seller represents and warrants to Buyer as follows:

5.01. Corporate Organization and Existence. Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Connecticut. Seller is duly licensed or qualified to conduct the Business as a foreign corporation in the State of Pennsylvania.

5.02. Corporate Power. Subject to entry of the Sale Order and it becoming a Final Order, Seller has full corporate power to enter into this Agreement and the other Transaction Documents to which it is or will be a party and perform its obligations hereunder and thereunder.

*Execution*

5.03. <u>Authorization</u>. Subject to entry of the Sale Order and it becoming a Final Order, the execution and delivery by Seller of this Agreement and the other Transaction Documents to which it is or will be a party and its performance of its obligations hereunder and thereunder have been duly authorized by all required corporate action.

5.04. <u>Execution and Delivery</u>. Subject to entry of the Sale Order and it becoming a Final Order, Seller has duly and validly executed and delivered this Agreement and the other Transaction Documents to which it is a party and which are being executed and delivered simultaneously with this Agreement. The remaining Transaction Documents to which Seller will be a party, when executed and delivered at the Closing, will be duly and validly executed and delivered by Seller.

5.05. <u>No Conflict</u>. Except as set forth in <u>Schedule 5.05</u>, and subject to the entry of the Sale Order and it becoming a Final Order, the execution and delivery by Seller of this Agreement and the other Transaction Documents to which it is or will be a party, and its performance of its obligations hereunder and thereunder, do not (a) conflict with its certificate of incorporation or by-laws; (b) result in any violation, breach or termination of, or constitute a default or give rise to any right of consent, cancellation, termination or acceleration or right to increase the obligations or otherwise modify the terms under any Material Contract; or (c) result in the creation or imposition of any Lien upon Seller or the Transferred Assets; (d) violate any Law applicable to any of Seller or the Transferred Assets; (e) result in any violation or breach of any of the provisions of, or constitute a default under, any law or regulation, judgment, order or decree, to which it is a party or by which it is bound, which violation, breach or default would materially adversely affect its ability to execute and deliver this Agreement or any other Transaction Document to which it is or will be a party or perform its obligations hereunder or thereunder.

5.06. <u>Consents and Approvals</u>. Except as set forth in <u>Schedule 5.06</u>, subject to entry of the Sale Order and it becoming a Final Order, no consent, waiver, approval, order, Permit or authorization of, or declaration or filing with, or notification to, any Governmental Authority (other than the Bankruptcy Court) is required on the part of Seller in connection with the

*Execution*

execution and delivery of this Agreement or the Transaction Documents, the consummation of the Transactions or the compliance by Seller with any of the provisions hereof or thereof.

5.07.  Binding Effect.  Upon entry of the Sale Order and subject to it becoming a Final Order, this Agreement constitutes and, when executed and delivered at the Closing, each of the Transaction Documents to be executed by Seller will constitute, a valid and legally binding obligation of Seller, enforceable in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether in equity or at law).

5.08.  Financial Information.

(a)    Schedule 5.08(a) contains a schedule of the fixed assets exclusively used in the Business as of June 30, 2009 and schedule of Inventory exclusively used in the Business as of December 31, 2008 and June 30, 2009, each as prepared by Seller's management (the "Financial Schedules").    The Financial Schedules (i) were prepared in accordance with the Seller Accounting Policies from the books and records of Seller; and (ii) reflect accurately in all material respects in accordance with the Seller Accounting Policies the fixed assets and Inventory as of the dates set forth therein.

(b)    Schedule 5.08(b) contains the unaudited profit and loss statements of the Business for the year ended December 31, 2008 and the six (6) month period ended June 30, 2009 as prepared by Seller's management (the "P&L Statements").  The P&L Statements were prepared in accordance with the Seller Accounting Policies on the basis of the books and records of Seller.

(c)    Schedule 5.08(c) contains a list of certain accounts receivable exclusive to the Business as of June 30, 2009.  All of such accounts receivable represent sales actually made in the ordinary course of business of the Business, are not subject to any defense or offset and are collectible in the ordinary course of business of the Business.

5.09.  Sufficiency of Assets.  Except as set forth on Schedule 5.09, the Transferred Assets and the Transaction Documents provide Buyer with all the Tangible Personal Property and Intellectual Property necessary to operate the Business immediately following the Closing in

*Execution*

substantially the same manner as Seller conducted the Business in the twelve (12) months prior to the Closing.

5.10. <u>Real Property; Title to Transferred Assets; Liens; Permits</u>.

(a)    Except as set forth on <u>Schedule 5.10(a)</u>, the Plant comprises all of the real property used in the direct manufacturing operations of the Business.

(b)    Seller has good and marketable title to all of the personal property included in the Transferred Assets free and clear of all Liens except Liens under the Post-Petition Loan Agreement and Liens related to the Chapter 11 Cases. All of the Transferred Assets will be transferred to Buyer free and clear of all Liens except Permitted Liens.

(c)    Set forth on <u>Schedule 5.10(c)</u> is a list of all material Permits of Seller exclusively related to the Transferred Assets or the Business other than Permits issued by the Commonwealth of Pennsylvania or any Governmental Authority located therein or affiliated therewith.

5.11. <u>Inventory</u>. Seller is not in possession of any Inventory of the Business that is not owned by Seller. Except as set forth on <u>Schedule 5.11</u>, no Third-Party is in possession of Inventory of the Business owned by Seller, other than transporters in the ordinary course of the Business. Except as set forth on <u>Schedule 5.11</u>, all Inventory of the Business is located at the Plant.

5.12. <u>Litigation; Investigations</u>. Other than the Chapter 11 Cases, there are no (a) Proceedings pending or, to Seller's Knowledge, threatened against Seller or (b) orders of any Governmental Authority to which Seller is subject that, in each case, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect, or seek to prevent or materially delay the consummation of the Transactions. Other than the Chapter 11 Cases, there are no Proceedings pending or, to Seller's Knowledge, threatened against the Transferred Assets and no orders of any Governmental Authority to which the Business or the Transferred Assets are subject.

*Execution*

5.13.  Contracts.  Schedule 5.13 lists certain contracts of Seller related exclusively to the Business.

5.14.  Employment.  Solely as of the date of this Agreement, to Seller's Knowledge, the Business Executive has made no threat or otherwise indicated any intent to cancel or otherwise terminate his relationship with Seller except as a result of employment with a Buyer Entity.

5.15.  Intellectual Property.

(a)     Except as set forth on Schedule 5.15(a), Seller owns all right, title and interest in, free and clear of all Liens, all Transferred Intellectual Property.  Each item of Transferred Intellectual Property will be owned or available for use by Buyer on identical terms and conditions immediately subsequent to the Closing hereunder.  Seller has taken all necessary action to maintain each item of Transferred Intellectual Property.

(b)     Except as set forth on Schedule 5.15(b), to Seller's Knowledge, in the past eight years:  in connection with the operation of the Transferred Assets and the Business, Seller has not interfered with, infringed upon, misappropriated or otherwise come into conflict with any Intellectual Property rights of any Third Person; and none of the directors and officers (and employees with responsibility for Intellectual Property matters) of Seller has received any charge, complaint, claim, demand or notice from any Governmental Authority or other Person alleging any such interference, infringement, misappropriation or conflict (including any claim that Seller must license or refrain from using any Intellectual Property rights of any other Person) arising from Seller's operation of the Transferred Assets or the Business.   To Seller's Knowledge, in the past eight years, no Person has interfered with, infringed upon, misappropriated or otherwise come into conflict with any of the Transferred Intellectual Property.

(c)     Schedule 5.15(c) identifies (i) each patent or patent registration which has been issued to Seller in the United States and all jurisdictions worldwide with respect to any item of Transferred Intellectual Property, and (ii) each pending patent application or application for patent registration which Seller has filed with respect to any item of Transferred Intellectual Property anywhere in the world (together with any exceptions).

*Execution*

(d)     Schedule 5.15(d) identifies (i) each trademark or trademark registration which has been issued to Seller in the United States and all jurisdictions worldwide that is included Transferred Intellectual Property, and (ii) each pending trademark application or application for trademark registration which Seller has filed anywhere in the world (together with any exceptions) that is included Transferred Intellectual Property. Schedule 5.15(d) also identifies each trade name or unregistered trademark that is included Transferred Intellectual Property.

(e)     Schedule 5.15(e) identifies (i) each copyright or copyright registration which has been issued to Seller in the United States and all jurisdictions worldwide that is included Transferred Intellectual Property, and (ii) each pending copyright application or application for copyright registration which Seller has filed that is included Transferred Intellectual Property.

(f)     Schedule 5.15(f) identifies each license, agreement or other permission which Seller has granted to any other Person with respect to any item that is included Transferred Intellectual Property in the United States and any jurisdictions worldwide. Seller has delivered to Buyer correct and complete copies of all such licenses, agreements and other permissions (as amended to date) and has made available to Buyer correct and complete copies of all written documentation evidencing the legality, validity and enforceability of each such license, agreement and other permission (if applicable).

(g)     Schedule 5.15(g) identifies all Transferred Intellectual Property.

(h)     With respect to each item of Transferred Intellectual Property:

(i)     such item is not subject to any outstanding injunction, judgment, order, decree, ruling or charge;

(ii)     no action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand is pending or, to Seller's Knowledge, threatened which challenges the legality, validity, enforceability, use or ownership of such item;

(iii)     all licenses, agreements and other permissions pertaining to such item and all other rights to which Seller is entitled with respect thereto are in

*Execution*

compliance in all respects with all applicable Laws in all jurisdictions worldwide, including those pertaining to remittance of foreign exchange and Taxes; and

(iv)    Seller has not made a previous assignment, sale, transfer or agreement constituting a present or future assignment, sale or transfer of, or granted any Lien on, such item, other than licenses granted in the ordinary course of business consistent with past practice (and each such license has been identified on Schedule 5.15(f)); nor has Seller granted any release, covenant not to sue or other non-assertion assurance to any Person with respect to such item which could reasonably be expected to have a material adverse effect on the aggregate value of the Transferred Intellectual Property.

(i)    Schedule 5.15(i) identifies each item of Transferred Intellectual Property that any Person (other than Seller) owns and that Seller uses pursuant to any license, sublicense, agreement or permission.  Seller has delivered to Buyer correct and complete copies of all such licenses, sublicenses, agreements and other permissions (as amended to date).  With respect to each item of Intellectual Property required to be identified on Schedule 5.15(i):

(i)    to Seller's Knowledge, the license, sublicense, agreement or other permission covering such item is legal, valid, binding, enforceable and in full force and effect;

(ii)    to Seller's Knowledge, such license, sublicense, agreement or other permission will continue to be legal, valid, binding, enforceable and in full force and effect on identical terms following the consummation of the Transactions;

(iii)    subject to the Chapter 11 Cases, no party to such license, sublicense, agreement or other permission is in breach or default thereof, and no event has occurred which with the giving of notice or the lapse of time or both would constitute such a breach or default thereof or permit termination, modification or acceleration thereunder;

(iv)    Seller has not received any notice that any party to such license, sublicense, agreement or other permission has repudiated any provision thereof;

*Execution*

(v)    Seller has not granted any sublicense or similar right with respect to such license, sublicense, agreement or other permission;

(vi)    with respect to each such sublicense, to Seller's Knowledge, the representations and warranties set forth in clauses (i) through (iv) above are true and correct with respect to the underlying license;

(vii)    to Seller's Knowledge, the underlying item of Intellectual Property is not subject to any outstanding injunction, judgment, order, decree, ruling or charge; and

(viii)    to Seller's Knowledge, no action, suit, proceeding, hearing, investigation, charge, complaint, claim or demand is pending or threatened which challenges the legality, validity or enforceability of the underlying item of Intellectual Property.

5.16. <u>Conduct of Business</u>.  Since December 31, 2008, with the exception of activities related to the Transactions, the Business has been conducted in the ordinary course of business.

5.17. <u>Compliance with Laws</u>.  For the past twelve (12) months:  (a) to Seller's Knowledge, Seller has complied in all material respects with all Laws that are applicable to the Business and the Transferred Assets and material to the operation thereof; and (b) no notice from any Governmental Authority has been served upon or, to Seller's Knowledge, threatened to be served upon, Seller with respect to the Business or the Transferred Assets claiming a material violation by Seller of any Law or order material to the operation thereof.

5.18. <u>Brokers</u>.  No Person has acted directly or indirectly as a broker, finder or financial advisor for Seller in connection with the negotiations relating to the transactions contemplated by this Agreement, and no Person is entitled to any fee or commission or like payment in respect thereof based in any way on any agreement, arrangement or understanding made by or on behalf of Seller.

5.19. <u>Taxes</u>.

*Execution*

(a)    Seller has: (i) duly and timely filed with the appropriate taxing authority (or there has been filed on its behalf) all Tax Returns required to be filed by it (taking into account all applicable extensions) with respect to the Business and the Transferred Assets; and (ii) paid all Taxes due on such Tax Returns when payable. All such Tax Returns are true and correct in all material respects.

(b)    There are no Liens for Taxes upon the Transferred Assets, except for Liens for Taxes not yet due and payable.

(c)    There is no audit, examination, deficiency, refund litigation, assessment, proposed adjustment pending or in progress or threatened with respect to any Taxes relating to the Business or the Transferred Assets.

(d)    Seller, with respect to the Business and the Transferred Assets, is in material compliance with all applicable information reporting and Tax withholding requirements under U.S. federal, state and local, and non-U.S. Tax Laws.

(e)    All monies required to be withheld by Seller (including from its employees for income Taxes, social security Taxes and other payroll Taxes) with respect to the Business and the Transferred Assets have been collected or withheld, and paid to the respective taxing authorities.

(f)    None of the Transferred Assets is properly treated as owned by any Person other than Seller for income Tax purposes.

(g)    None of the Transferred Assets is "tax-exempt use property" within the meaning of Section 168(h) of the Code.

5.20. Product Recalls; Warranties. Except as set forth on Schedule 5.20, to Seller's Knowledge, there are no facts, events or conditions (i) which could furnish a basis for the recall, withdrawal or suspension by any Governmental Authority of, or an injunction from or an award of Damages with respect to, any Product, or (ii) which would otherwise reasonably be expected to cause Seller to withdraw, recall or suspend or have enjoined any Product or to terminate or suspend testing of such Product. Schedule 5.20 contains an accurate and complete list of (x) all

*Execution*

Products that have been recalled at any time since January 1, 2006, and (y) all Proceedings (whether completed or pending) at any time since January 1, 2006 seeking the recall, withdrawal, suspension or seizure of any Product.

5.21.  Material Adverse Effect  Solely as of the date of this Agreement, except as set forth in the Schedules, there are no facts pertaining exclusively to Seller or the Business that would reasonably be expected to have a Material Adverse Effect.

## Article 6.

## Buyer Representations and Warranties

Buyer represents and warrants to Seller as follows:

6.01.  Corporate Status.  Buyer is a corporation duly organized and validly existing under the laws of the State of Delaware.  Buyer has full corporate power to enter into this Agreement and the other Transaction Documents to which it is or will be a party and perform its obligations hereunder and thereunder.  The execution and delivery by Buyer of this Agreement and the other Transaction Documents to which it is or will be a party, and its performance of its obligations hereunder and thereunder, have been duly authorized by all required corporate action.

6.02.  Authorization.  Buyer has duly and validly executed and delivered this Agreement and the other Transaction Documents to which it is a party which are being executed and delivered simultaneously with this Agreement. The remaining Transaction Documents to which Buyer will be a party, when executed and delivered at the Closing, will be duly and validly executed and delivered by Buyer.

6.03.  No Conflict.  The execution and delivery by Buyer of this Agreement and the other Transaction Documents to which it is or will be a party, and the performance by Buyer of its obligations hereunder and thereunder, do not (a) conflict with its certificate of incorporation or by-laws, or (b) result in any violation or breach of any of the provisions of, or constitute a default under, any law or regulation, judgment, order, decree or agreement to which it is a party or by which it is bound, which violation, breach or default would materially adversely affect its ability to execute and deliver this Agreement or any other Transaction Document to which it is or will be a party or perform its obligations hereunder or thereunder.