# EXHIBIT B

K&E 15442459.6

THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.[4] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

**AFFIDAVIT OF PAUL W. HANLON IN SUPPORT OF DEBTORS'
MOTION FOR AN ORDER (A) APPROVING THE AGREEMENTS
BY AND BETWEEN W. R. GRACE & CO.-CONN. AND THE RECTORSEAL
CORPORATION; (B) AUTHORIZING THE SALE OF CERTAIN ASSETS OF W. R.
GRACE & CO.-CONN.'S FIRESTOPPING AND ABATEMENT BUSINESS TO BUYER
FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER
INTERESTS; (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT TO
BUYER OF CERTAIN EXECUTORY CONTRACTS AND
UNEXPIRED LEASES; AND (D) GRANTING CERTAIN RELATED RELIEF**

1.  I am the Vice President Ventures and Business Development of Grace Construction Products (one of the Debtors' two operating segments), which has offices located at 62 Whittemore Avenue, Cambridge, Massachusetts 02140. I submit this Affidavit in support of the Debtors' *Motion for an Order (A) Approving the Agreements by and between W. R. Grace & Co.-Conn. and The RectorSeal Corporation; (B) Authorizing the Sale of W. R. Grace & Co.-*

---

[4] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food >N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

*Conn.'s Firestopping and Abatement Business to Buyer Free and Clear of Liens, Claims, Encumbrances and Other Interests; (C) Authorizing the Assumption and Assignment to Buyer of Certain Executory Contracts and Unexpired Leases; and (D) Granting Certain Related Relief* (the "Sale Motion"). Capitalized terms not defined herein shall have the meaning ascribed to such terms in the Sale Motion.

2. I am responsible among other things for Grace Construction Products' acquisition and divestment activities. In that capacity, I have reviewed the Sale Motion and the Agreements, and am familiar, directly or through the Debtors' personnel, attorneys, and financial advisors, with the information contained therein and in the exhibits annexed thereto. Except as otherwise noted, I have personal knowledge of the matters set forth herein.

3. The Firestop Business is a manufacturer and seller of products and systems to restore the fire rating of fire-rated building construction assemblies (walls, floors, ceilings, joints and partitions) by sealing openings made by pipes, HVAC ducts and electrical installations. The products are designed to compartmentalize and contain fire and smoke within a building. As part of the product line, the business also manufactures encapsulant and post-removal lockdown products used in asbestos and lead abatement, and products that protect underground and above ground high voltage power cables. The major competitive advantage of the Firestop Business is its established brand and long term customer and distributor relationships.

4. As of July 31, 2009, the Firestop Business had nine full-time employees, eight of whom are located at its production facility in Hatfield, Pennsylvania. In addition, some internal sales personnel devote part of their time to the business. Only one employee is expected to be employed by the Buyer. The production facility, which is leased, will not be assumed and

assigned to the Buyer, which will move the other assets of the business to the Buyer's existing facilities.

5. In the first quarter of 2009, I participated with management in the decision to sell the Firestop Business. This decision was based on a number of factors, of which the major factors were that the Firestop Business (i) is not complementary to the Debtors' other businesses; (ii) is very small (less than one half of 1% of the Debtors' sales) but requires significant management attention; and (iii) would be most attractive to a buyer to who is already in the Firestop Industry and to which the business would offer potential synergies not available to the Debtors. The Debtors believe the sale of the Firestop Business will generate value to the Selling Debtor's estate while enabling senior management to focus on higher-return, core activities

6. In April 2009, under my supervision, certain of the Selling Debtor's employees started pursuing the sale of the Firestop Business. Based on its experience in the relatively small market space in which the business operates, the Selling Debtor identified 15 companies with similar or complementary businesses. After more detailed examination of the 15 companies, the Selling Debtor contacted eight potential strategic buyers, and also one potential financial buyer which had solicited information about the business. Other financial buyers were not solicited because it was concluded that they would be unable to compete with the cost synergies that strategic buyers could obtain by adding the Firestop Business to their existing production.

7. A verbal summary of the purchase opportunity was provided to seven strategic and the one financial potential buyers. Of these, five potential buyers entered into confidentiality agreements and received a detailed information memorandum, and three submitted preliminary indications of interest including preliminary purchase prices. Based on the purchase prices in the preliminary indications of interest, two potential buyers were invited to and participated in a tour

of the Hatfield manufacturing facility, and presentations by the management of the Firestop Business, followed by substantial due diligence through access to an electronic data room and follow-up questions that were answered by the Selling Debtor's management..

8. The Buyer then submitted a revised firm bid, subject to negotiation of a definitive agreement for the transaction, which I reviewed. The other potential buyer declined to participate further.

9. In evaluating the Buyer's bid, the Selling Debtor considered primarily the dollar amount of the bid, Seller Debtor's confidence that the bid would hold up, the bid's required closing conditions, and relative ease of transition of the Firestop Business to the potential buyer's organization. The Buyer has a business that is similar to the Firestop Business and therefore was able to quickly understand and evaluate many aspects of the Firestop Business. Because the Buyer's proposal will not take the real estate of the business, but move the other assets to its own facility, the Buyer will not require significant transitional assistance from the Debtors. The Buyer had provided a firm bid and was ready to begin negotiations. Based on the foregoing considerations, the Selling Debtor concluded that the prompt consummation of a transaction with the Buyer is in the best interests of the Selling Debtor and its affiliates, their creditors, and their estates, and will maximize the value received for the assets of the Firestop Business.

10. In my best business judgment, the Buyer's offer represents the most attractive option along several dimensions. The Buyer offered an acceptable purchase price. Moreover, to the best of my knowledge and belief, I have determined that the Buyer has the capability and operating expertise to close the transaction and integrate the Firestop Business into its own operations with only limited transitional assistance from the Debtors. Therefore, I recommended

authorization of the Selling Debtor's entry into the Agreements with the Buyer for which the Selling Debtor now seeks approval from this Court.

11. Based on my business judgment, I believe that the most prudent course of action is to seek approval of the Sale to the Buyer as provided for in the Sale Motion. Among other reasons, I believe that further delays in completing the Sale could lead to deteriorating financial performance of the Firestop Business and eroded potential value.

12. I have determined that the Sale of the Firestop Business by private sale to the Buyer will obtain the highest and best offer for this business thereby maximizing the value to the Selling Debtor's estate. The Agreements represent the culmination of comprehensive, arms-length negotiations for the Sale of the Firestop Business in exchange for what, I believe, is the highest and best consideration available for such business. The Sale will generate value to the estate while enabling the Selling Debtor's management to focus on higher-return, core activities. Therefore, I believe that the Sale is in the best interests of the Selling Debtor and its affiliates, their estates, and their creditors.

13. The Selling Debtor also believes that the amount of the consideration received for the Firestop Business is fair and reasonable. The extensive marketing efforts have demonstrated that the offer made by the Buyer is the best offer that the Debtor has received for such assets. I believe that the fairness and reasonableness of the consideration to be paid by the Buyer ultimately has been demonstrated by adequate "market exposure" and a fair marketing process – the best means for establishing whether a fair and reasonable price is being paid.

14. If the Sale Agreement is not approved, then management will be forced to evaluate options that are not as attractive as the current offer. The alternative to the proposed Sale is to continue to market the Firestop Business, which would subject the estate to significant

K&E 15442459.6

market risk with a low probability of identifying a higher and better offer. I believe that further delays in completing the Sale could lead to deteriorating financial performance of the Firestop Business and eroded potential value. Moreover, I believe that employees and customers of the Firestop Business would face uncertainty regarding the future of the Firestop Business. This uncertainty could potentially lead to loss of employees, weakened financial performance, and the further erosion of value.

15. The parties to the Agreements have always negotiated at arm's-length, and in good faith, and the Buyer has not exerted control or undue influence over the Selling Debtor. To the best of my knowledge and belief, I have determined that the Buyer is completely and wholly unrelated to the Selling Debtor. Extensive negotiations were held between the parties involving substantial time and energy by the parties and their professionals, and the Agreements reflect give-and-take and compromises by both sides.

16. To the best of my knowledge and belief, I have determined that the Buyer does not, and will not, share any common incorporators, officers, directors, or controlling stockholders with the Selling Debtor, and that the Buyer is not an insider of the Selling Debtor.

17. The Sale contemplates the assumption and assignment of certain executory contracts of the Firestop Business to the Buyer, which are necessary to the Buyer for the continuation of the Firestop Business and, at the same time, will enhance the value of the Sale to the Selling Debtor's estate by curtailing further administrative liability to the estate. The estimated cure payments associated with all of the Transferred Contracts total $0; therefore, the maximum liability of the Selling Debtor is $0.

18. I am further informed that, to the extent necessary, the Buyer is able and willing, at the Sale Hearing, to demonstrate to the satisfaction of this Court that adequate assurance of

future performance is present. Accordingly, the Selling Debtor submits that the assumption of the Transferred Contracts by the Selling Debtor and assignment to the Buyer should be approved.

19. To preserve the value of the Firestop Business by bringing certainty to the sale process, and because both the Selling Debtor and Buyer desire to close the Sale on or before September 30, 2009, the Selling Debtor seeks to close the Sale as soon as possible after all closing conditions have been met or waived. Accordingly, the Selling Debtor requests that any order approving the Agreements be effective immediately.

The information contained in this Affidavit is true and correct to the best of my knowledge and belief.

_____
Paul W. Hanlon
Vice President
Ventures and Business Development
Grace Construction Products

Subscribed and sworn to before me
this 18th day of August, 2009

_____

SUSAN R. BREHM
Notary Public, State of Ohio
My Commission Expires
May 1, 2011

K&E 11819961.2