Page 518

1  litigation concerning the applicability
2  of and injunction similar to the Asbestos
3  Insurance Entity Injunction in any other
4  case?
5        MR. WISLER: Can you repeat
6    that? I didn't hear you, Dan.
7  BY MR. COHN:
8      Q.  Are you aware of any
9  litigation concerning the scope of the
10 asbestos or an injunction similar to the
11 Asbestos Insurance Entity Injunction in
12 any other case?
13     A.  The only litigation that I
14 am aware of that's remotely similar --
15 and I don't profess to know all the
16 litigation that might be floating around
17 out there -- is actually litigation over
18 an entity that is closer to the Asbestos
19 Permanent Channelling Injunction. And
20 it's the Travelers injunction that's
21 presently before the United States
22 Supreme Court. To be more specific, it's
23 the Manville injunction that Travelers is
24 litigating about.

Page 519

1      Q.  Has Maryland Casualty
2  Company paid or agreed to pay any money
3  or other consideration in order to be
4  covered by the Asbestos PI Channelling
5  Injunction?
6      A.  Well, that depends on how
7  you use the term "pay."
8         The basis, which I take it
9  which is what you are asking for, for
10 Maryland Casualty being a protected party
11 to this Plan is that in the past,
12 Maryland Casualty Company has paid a lot
13 of money to Grace and entered into a
14 settlement agreement with Grace which
15 releases that coverage and which Grace
16 indemnifies it against claims.
17        As I testified, I believe,
18 on Friday, Grace, as part of this deal,
19 Grace has had two positions that it has
20 taken that we have -- we being the
21 committee and its representative --
22 accepted. Number one is a claim for
23 indemnity from a settled insurer based on
24 claims against that insurer that are

Page 520

1  asbestos personal injury claims against
2  or arising out of Grace is something that
3  has to be channelled to the Trust because
4  it fits within the definition of an
5  asbestos personal injury claim under
6  524(g), and that in order that Grace be
7  protected from such indemnity claims, the
8  roughly $3 billion that Grace and various
9  related parties are paying to this Plan
10 is, in part, on behalf of those settled
11 insurers.
12        So if the question means, is
13 Maryland Casualty Company paying
14 something over and above what Grace is
15 paying, the answer is not to my
16 knowledge.
17     Q.  Is there a benefit to the
18 Grace Bankruptcy Estate or to the
19 Asbestos PI Trust from having the
20 Asbestos PI Channelling Injunction
21 protect Maryland Casualty Company?
22        MR. FINCH: Object to that
23     question to the extent that it
24     calls for speculation.

Page 521

1        Mr. Wisler: Could you read
2     the question back, please?
3        MR. SCHIAVONI: Objection to
4     form; objection, calls for waiver;
5     objection, calls for legal
6     conclusion.
7        MR. FINCH: I disagree that
8     it calls for waiver.
9        But you can answer.
10       THE WITNESS: Could you
11    reread the question?
12       MR. COHN: Let's go off the
13    record for a second.
14       (There was a discussion held
15    off the record at this time.)
16       (The reporter read from the
17    record as requested.)
18       Mr. Wisler: I object to
19    form.
20       THE WITNESS: Yes.
21 BY MR. COHN:
22     Q.  What is that benefit?
23       MR. FINCH: You can answer
24    the question to the extent that it

Page 522

1  ==doesn't reveal privileged or work==
2  ==product information.==
3  ==THE WITNESS: The benefit to==
4  ==the Grace Estate is that it==
5  ==eliminates potential claims by==
6  ==Maryland Casualty Company against==
7  ==the Debtor and its Estate. That's==
8  ==the benefit.==
9  BY MR. COHN:
10  Q. Is there any agreement
11  between Grace and Maryland Casualty
12  Company which requires Grace to indemnify
13  Maryland Casualty Company for its own
14  misconduct?
15  MR. FINCH: Objection to the
16  extent that calls for a legal
17  opinion. And object to the extent
18  that there is information
19  responsive to this question that's
20  privileged, I instruct you not to
21  answer if it would reveal
22  privileged communications.
23  If you can answer the
24  question without revealing

Page 523

1  privileged communications, you can
2  do so --
3  MR. SCHIAVONI:
4  Mr. Lockwood, I think --
5  MR. FINCH: Tank, let me
6  finish.
7  MR. SCHIAVONI: Oh, I am
8  sorry.
9  MR. FINCH: But I still
10  object to the extent that it calls
11  for a legal opinion.
12  MS. BAIER: I also object.
13  You have asked Mr. Lockwood
14  whether he knows about -- you
15  haven't asked him about whether he
16  knows. You asked him is there an
17  agreement between Grace and
18  Maryland Casualty Company. I
19  object to the form. You are now
20  asking Mr. Lockwood to get into
21  the head of W.R. Grace.
22  MR. SCHIAVONI: I am sorry,
23  Mr. Finch. I didn't mean to
24  interrupt you before.

Page 524

1  Mr. Schiavoni for Arrowood.
2  We join your objection, and we
3  would also say this is outside the
4  scope of the designation and that
5  Mr. Lockwood doesn't have to
6  answer every single question no
7  matter what it is. This is not in
8  the designation.
9  MR. FINCH: Can we hear back
10  the question?
11  (The reporter read from the
12  record as requested.)
13  THE WITNESS: In my
14  understanding, there is an
15  agreement between Grace and
16  Maryland casualty company which
17  contains indemnification
18  provisions. I am not in a
19  position to express an opinion on
20  what the scope of that
21  indemnification is, much less
22  whether or not Grace and Maryland
23  Casualty agree on what the scope
24  of that indemnification is.

Page 525

1  BY MR. COHN:
2  Q. Is it the position of the
3  Asbestos PI Committee that if the
4  indemnification provisions are construed
5  to protect Maryland Casualty from its own
6  misconduct, that such provisions would be
7  enforceable?
8  MR. FINCH: Object to form,
9  calls for a legal conclusion.
10  THE WITNESS: It actually
11  calls for speculation.
12  MR. FINCH: That, too.
13  THE WITNESS: In addition.
14  The committee's
15  understanding of the way this Plan
16  works, which is what expresses the
17  committee's position, is that it's
18  a legal question which, assuming
19  that a dispute on this subject
20  arises at some point in the
21  future, will be determined by
22  litigation over, A, what exactly
23  is the basis for the claim against
24  Maryland Casualty, legal and

Case 01-01139-AMC    Doc 22901-7    Filed 08/20/09    Page 3 of 7

27 (Pages 550 to 553)

Page 550

1  Linda Casey. I am with Pepper Hamilton.
2  I represent BNSF Railway Corporation.
3      Mr. Lockwood, are you aware
4  that BNSF asserts that Grace purchased
5  insurance policies that named BNSF as the
6  at that name insurer upon which Grace was
7  not also a named insured?
8      MR. FINCH: Object to form,
9  foundation.
10     THE WITNESS: I believe I
11 recall seeing Grace make such an
12 assertion.
13     MS. BAIER: Objection.
14     THE WITNESS: I am not sure,
15 frankly, however, whether it was
16 Grace that made the assertion or
17 BNSF made the assertion. I know
18 somebody has made the assertion.
19 BY MS. CASEY:
20     Q. Okay. The follow-up
21 question I have on that is, is it the
22 ACC's position that as to settled
23 insurance companies, settled asbestos
24 insurance companies, to the extent that

Page 551

1  they had, in fact, issued policies to be
2  in BNSF where BNSF is the named insurer,
3  that the channelling injunction will
4  enjoin BNSF post-confirmation from
5  asserting coverage claims against the
6  settled asbestos insurance company under
7  those policies?
8      MR. FINCH: Objection --
9      MS. BAIER: Objection to
10 form.
11     MR. PERNICONE: Objection.
12     MR. FINCH: -- form,
13 speculation.
14     To the extent you can
15 answer the question without
16 revealing privileged
17 communications or work product,
18 you can do so.
19     MR. SCHIAVONI: This is
20 Schiavoni. I object to form, and
21 I also object to this being
22 outside the scope of the
23 designation, and calling for a
24 legal conclusion.

AR's OBJ:
LF
CFS
CLC
IH

Page 552

1      THE WITNESS: As I hear the
2  question and as I interpret the
3  Plan, an insurance policy
4  purchased by Grace for BNSF, which
5  did not provide coverage to Grace,
6  only provided coverage to BNSF,
7  claims by BNSF would not be
8  enjoined unless Grace had somehow
9  or another indemnified that
10 settled insurer against claims by
11 BNSF.
12     And then in that
13 hypothetical situation, since I
14 haven't seen the policies and have
15 no idea what, if any,
16 indemnifications they have in
17 them, there might be a situation
18 in which if the claim by BNSF
19 against that policy was an
20 asbestos personal injury claim and
21 Grace had indemnified that insurer
22 against that claim, then under
23 those circumstances, as I
24 understand the Plan, that claim

AR's OBJ:
LF
CFS
CLC
IH

AR's: CDC

Page 553

1  might well be channelled to the
2  Trust. But, as I said before, I
3  have no idea whether any such
4  indemnification provision exists
5  or not.
6  BY MS. CASEY:
7      Q. I am not sure if I
8  understand your answer.
9      The claim that BNSF would
10 have against the insurer would be
11 channelled or the claim the insurer would
12 have against Grace for indemnification
13 would be channelled, or both?
14     MS. BAIER: Objection as to
15 form. It's a hypothetical,
16 speculative question.
17     MR. SCHIAVONI: Also, I
18 think it calls for speculation
19 given the nature of the answer
20 that was given.
21     THE WITNESS: Well, it
22 clearly calls for speculation.
23     The answer is, in theory,
24 both; in reality, only the first.

AR's OBJ 5

Page 554

AR'S OBJ: LF CLC S H

1  as my colloquy with Mr. Brown on
2  Friday, I believe, expressed,
3  which is that if the claim were,
4  in fact, an asbestos personal
5  injury claim that was indemnified
6  by Grace, then the claim by BNSF
7  against the insurer would be
8  enjoined.
9     Once the claim is enjoined,
10 there will be no opportunity for
11 the insurer to in turn. Have an
12 indemnity claim against Grace.
13    If the claim is somehow or
14 another not enjoined, then it
15 wouldn't be channelled to the
16 Trust because the only basis on
17 which it could not be enjoined was
18 that it was not an asbestos
19 personal injury claim in the first
20 place. And the Trust picks up
21 indemnity liabilities with respect
22 to Grace for claims that arise out
23 of asbestos personal injury
24 claims.

Page 555

AR'S OBJ: LF CLC S H

1     But, again, I have no idea
2  what kind of claims we are talking
3  about here, so this is purely at a
4  theoretical level of how the Plan
5  would work on unspecified facts
6  and unspecified contractual
7  undertakings.
8  BY MS. CASEY:
9     Q.  Let me ask it a different
10 way then.
11    Is it the ACC's position
12 that the Plan under any circumstances can
13 enjoin BNSF from asserting its contract
14 rights against the insurers where Grace
15 purchased the policy but has not been a
16 beneficiary under the policy?
17    MR. FINCH: Objection, form.
18    MS. DeCRISTOFARO: Objection
19 to form.
20    MR. SCHIAVONI: Objection to
21 form, calls for a legal
22 conclusion, calls for speculation.
23    THE WITNESS: It is very
24 hard for me to imagine that

Page 556

AR'S OBJ: CLC S LF H

1  scenario, but I cannot flatly say
2  that there is no conceivable
3  combination of facts that might
4  preclude that result from taking
5  place.
6     BNSF is suing, by
7  hypothesis, for coverage of a
8  claim against BNSF. What is that
9  claim? If somehow or another that
10 claim fell within the definition
11 of asbestos personal injury claim,
12 as defined in the Plan, which I
13 don't know whether it would or
14 wouldn't, but theoretically it
15 might, and if BNSF were held
16 liable on that asbestos personal
17 injury claim, brought a suit
18 against that insurer on the
19 separate policy, the insurer
20 somehow or another produces what
21 seems to me to be highly unlikely,
22 which is an indemnity from Grace,
23 saying that not only did we
24 purchase this insurance policy for

Page 557

AR'S OBJ: CLC S LF H

1  BNSF's benefit but we gave the
2  insurer an indemnity that it would
3  never have to pay any money on the
4  policy, then it's possible that
5  that claim could wind up being
6  enjoined because it gave rise to
7  an indemnity or would give rise to
8  an indemnity claim against Grace
9  for an asbestos personal injury
10 claim.
11    The problem is it is so
12 inconceivable to me that Grace
13 could give an indemnity to an
14 insurer for a policy that didn't
15 cover Grace but was purchased for
16 BNSF and which hypothesis had
17 never been exhausted. I can't
18 imagine how that could come about.
19    So you are forcing me, when
20 you give me these hypotheticals,
21 to dream up scenarios under which
22 the hypothetical might possibly
23 apply, no matter how unrealistic
24 the scenario appears to me to be.

AR'S
OBJ:
—
CLC
S
LF
H

Page 558

1   And that scenario to me appears to
2   be extraordinarily unrealistic, if
3   not impossible.
4   BY MS. CASEY:
5       Q.  I would like you to turn to
6   Exhibit ACC Exhibit-11.
7       MR. FINCH:  The TDP?
8       MS. CASEY:  Yes, the TDP.
9       THE WITNESS:  Okay.  I have
10  it.
11  BY MS. CASEY:
12      Q.  And specifically 5.12.
13      A.  I have it.
14      Q.  Okay.  5.12 by its terms
15  applies to claims that BNSF and others
16  would have against settled asbestos
17  insurance companies.  Let me ask an
18  initial question.
19      It is the ACC's position
20  that the Asbestos Insurance Entity
21  Injunction also enjoins asbestos claims
22  as defined by the Plan from being
23  asserted against unsettled asbestos
24  insurance companies, correct?

Page 559

1       A.  In general, that's true.
2   The language is very specific as to what
3   kind of claims that it enjoins against
4   non-settled insurers, but subject to the
5   caveat that you have to look at the
6   definition to know exactly which kind of
7   claims you are talking about, yes.
8       Q.  Does the TDP have a
9   provision by which BNSF Railway can
10  assert its enjoined claims against the
11  unsettled asbestos insurance companies?
12      MR. SCHIAVONI:  Objection to
13  form.
14      THE WITNESS:  At the moment,
15  I can't think of anything.
16  BY MS. CASEY:
17      Q.  Okay.  My final questions
18  concern the contribution that Grace is
19  allegedly providing to the Plan on behalf
20  of the insurance companies for the
21  benefit of the 524(g) injunction.
22      I understand the cash
23  portion -- at least I understand the
24  argument that the ACC is present

AR'S
OBJ:
—
S
H

Page 560

1   regarding cash portion.  I am not sure I
2   understand the basis for saying that the
3   channelling of the indemnification claims
4   constitutes a substantial contribution to
5   the Plan or a benefit to the Plan, to the
6   asbestos claimants.
7       Can you explain how that
8   constitutes a benefit?
9       MR. FINCH:  Objection,
10  mischaracterizes prior testimony.
11      THE WITNESS:  I don't
12  believe I testified that that was
13  a benefit to the Trust.
14      The channelling of the
15  claims, the indemnity claims,
16  against Grace, I testified was a
17  benefit to the Grace Estate.
18      The statute, in general,
19  says that a protected party has to
20  have something contributed on its
21  behalf to the Trust in exchange
22  for the injunction.  That's a very
23  broad paraphrase to the statute.
24      So the protection for the

Page 561

1   settled insurance company is the
2   injunction.  The benefit to the
3   Trust, which if it, in effect,
4   purchases that protection, is the
5   Grace contribution, which Grace is
6   making on behalf of itself and
7   multiple other entities.
8   BY MS. CASEY:
9       Q.  The cash contribution?
10      A.  Well, the entirety of the
11  contribution.  There is cash; there is
12  notes; there is warrant; there is
13  insurance; and there is the Grace
14  Estate's claim against Fresenius and
15  Sealed Air.
16      You will recall that
17  Fresenius and -- the committee -- the two
18  committees, the PI and the PD committees,
19  brought claims against Sealed Air and
20  Fresenius on behalf of the Grace Estate.
21  So when those claims were settled, they
22  were not only settled by the entities
23  against which they were brought, namely,
24  Sealed Air and Fresenius, but, to the

Page 562

1  extent that the proceeds of those
2  settlements wind up in the Grace Trust as
3  opposed to the Grace Estate for
4  distribution to other people, they are a
5  settlement part of Grace's contribution
6  to the Trust.
7     Q.  Has the ACC attempted to
8  apportion or value those portions of the
9  contributions made by Grace that are upon
10 Grace's behalf versus upon the insurer's
11 behalf?
12    MR. FINCH:  You can answer
13 that yes or no.
14    THE WITNESS:  Well, I will
15 answer it no and add I am not sure
16 how anybody could go about doing
17 that.  It's what is known as a
18 lump sum deal.
19    MS. CASEY:  I have no
20 further questions.
21    MR. SCHIAVONI:  Actually,
22 could we let Mr. Speights from
23 South Carolina go first.
24    MR. FINCH:  You are up, Dan.

Page 563

1           - - -
2        EXAMINATION
3           - - -
4  BY MR. SPEIGHTS:
5     Q.  Mr. Lockwood, were you
6  involved in the negotiation of the 524 --
7  strike that.
8        Were you involved in the --
9     MS. BAIER:  Dan, can you
10 speak up or come closer to the
11 phone or something?
12    THE WITNESS:  Nobody can
13 hear you.
14    MR. SPEIGHTS:  I picked up
15 the phone.  I am not on speaker.
16    MR. FINCH:  Now we can hear
17 you.
18    THE WITNESS:  That's better.
19    MR. FINCH:  That's better.
20 BY MR. SPEIGHTS:
21    Q.  Let me start over again.
22 Mr. Lockwood, were you involved in the
23 negotiation of the 524(g) statute?
24    A.  Me personally?

Page 564

1     MR. FINCH:  Objection,
2  foundation.
3  BY MR. SPEIGHTS:
4     Q.  Yes, you personally.
5     A.  No.
6     Q.  Was your law firm?
7     MR. FINCH:  Objection, form,
8  foundation, relevance.
9     THE WITNESS:  It depends on
10 how you define negotiations when
11 it comes to dealing with a
12 congressional enactment.  My
13 partner, Mr. Inselbuch, to my
14 knowledge, had at least one
15 meeting with Senator Heflin on the
16 subject of the statute.
17    What other discussions,
18 either in committee or outside
19 committee or whatever,
20 Mr. Inselbuch might have been
21 involved with, I really don't
22 know.  But he's being deposed on
23 June 12th, and I guess you could
24 ask him.

Page 565

1  BY MR. SPEIGHTS:
2     Q.  Would you agree with me that
3  the 524(g) statute always refers to the
4  word "Trust" in singular rather than
5  plural?
6     A.  I would have to go back and
7  look at the statute to be sure of that.
8  If you tell me it does, I am not going to
9  argue with you about it.
10    Q.  Well, I am actually not
11 going to tell you anything.  But if you
12 don't recall without looking at the
13 statute, I certainly would accept that
14 answer.
15    A.  I do not specifically recall
16 without looking at the statute.
17    Q.  Do you recall any bankruptcy
18 that was contested and provides for two
19 asbestos trusts, two or more asbestos
20 trusts?
21    A.  Do you mean a bankruptcy
22 where the Plan proposed to create two
23 trusts, and somebody said there could
24 only be one and that was the contest and

Page 634

1   the same position and give the
2   same instruction.
3       If you ask about questions
4   that Libby claimants have taken in
5   papers filed in the court, for
6   example, in a Disclosure Statement
7   objections and the bullet point
8   Plan objections and the
9   committee's responses made to that
10  in open court, I will permit
11  Mr. Lockwood certainly to answer
12  those questions.
13      But anything that gets into
14  communications with between the
15  Libby claimants with the rest of
16  the ACC or counsel for the ACC
17  about their respective views of
18  insurance coverage, I am going to
19  take the position as privileged.
20      And so I think you have to
21  do it on a question-by-question
22  basis, but that's my general
23  position.
24  BY MR. SCHIAVONI:

Page 635

1       Q.  Okay. Mr. Lockwood, I just
2   have one other brief topic. And here is
3   the first question on that: Does the
4   Plan purport to release claims that may
5   exist between insurers and Non-Debtors?
6       MR. FINCH: Objection, form,
7   broad, vague.
8       THE WITNESS: Phrased as
9   broadly as you have, I think the
10  answer is yes.
11      MR. SCHIAVONI: Okay. Thank
12  you. I have no further questions.
13      MR. FINCH: Is there anyone
14  else in the room who has
15  questions?
16      MR. BROWN: I have some
17  follow-ups.
18      MR. FINCH: Is there anyone
19  else on the telephone who has not
20  asked questions yet who has
21  questions?
22      (No response.)
23      MR. FINCH: Hearing no
24  affirmative response, I will let

Page 636

1   you have follow-up until we run
2   out of time.
3       (There was a discussion held
4   off the record at this time.)
5       (There was a break from 3:55
6   p.m. to 4:03 p.m.)
7       - - -
8       EXAMINATION
9       - - -
10  BY MR. BROWN:
11      Q.  Mr. Lockwood, just a couple
12  of follow-ups. The court reporter is
13  actually going to read back a question
14  and answer. I think it's probably easier
15  to do that, and then I will ask my
16  follow-up question. It was end of
17  Mr. Wisler's questioning of you.
18      A.  Okay.
19      (The reporter read from the
20  record as requested.)
21  BY MR. BROWN:
22      Q.  And after that,
23  Mr. Lockwood, Mr. Wisler asked you a
24  follow-up as to what type of claim it

Page 637

1   would be.
2       And is it correct that the
3   ACC does not have a position on what type
4   of claim it would be if it's not a Class
5   6 claim?
6       A.  Well, the ACC doesn't, as
7   such, have positions on hypothetical
8   questions. So, yes, the ACC doesn't have
9   a position on that issue. The ACC --
10  well, I will leave it at that.
11      Q.  On Friday, Mr. Cohn asked
12  you a question, who drafted the TDP.
13  That was the question, and you gave an
14  answer which I am happy to show you the
15  full answer. But I WANT to repeat a
16  portion of your answer. You said: "The
17  participants that did it were basically
18  counsel for the ACC, counsel for the FCR,
19  and members of the ACC itself in terms of
20  reviewing and commenting on things, and
21  the FCR himself."
22      When you said the ACC
23  itself, what did you mean?
24      A.  I meant --