# EXHIBIT C

IN  THE  UNITED  STATES  BANKRUPTCY  COURT
FOR  THE  DISTRICT  OF  DELAWARE

—   —   —

In Re:                          :  Chapter 11
                                :
                                :  Case No.
W.R.  GRACE  &  CO.,  et al,  :  01-01139 JKF
                                :
                                :  (Jointly
             Debtors        :  Administered)

—   —   —

Thursday,  June 11, 2009

—   —   —

           Oral deposition of JAY W.
HUGHES, JR., ESQUIRE, taken pursuant to
notice, was held at the offices of
KIRKLAND & ELLIS, 665 Fifteenth Street,
NW, Washington, DC  20005, commencing at
9:07 a.m., on the above date, before Lori
A. Zabielski, a Registered Professional
Reporter and Notary Public in and for the
Commonwealth of Pennsylvania.

—   —   —

MAGNA LEGAL SERVICES
Seven Penn Center
1635 Market Street
8th Floor
Philadelphia, Pennsylvania 19103

```
 1    APPEARANCES:
 2
 3    LEWIS SLOVAK KOVACICH, P.C.
      BY:   TOM L. LEWIS, ESQUIRE
 4    725 Third Avenue North
      Great Falls, Montana  59401
 5    406.761.5595
      (tom@lsklaw.net)
 6    Representing the Libby Claimants
 7
 8    COHN WHITESELL & GOLDBERG, LLP
      BY:   DANIEL C. COHN, ESQUIRE
 9    101 Arch Street
      Boston, Massachusetts 02110
10    617.951.2505
      (cohn@cwg11.com)
11    Representing the Libby Claimants
12
13    KIRKLAND & ELLIS, LLP
      BY:   BARBARA M. HARDING, ESQUIRE
14    655 Fifteenth Street, N.W.
      Washington, DC  20005-5793
15    202.879.5081
      (barbara.harding@kirkland.com)
16    Representing the Debtors and Witness
17
18    KIRKLAND & ELLIS, LLP
      BY:   THEODORE L. FREEDMAN, ESQUIRE*
19         (*VIA TELECONFERENCE)
      601 Lexington Avenue
20    New York, New York  10022
      212.446.4800
21    (theodore.freedman@kirkland.com)
      Representing the Debtors
22
23
24
```

```
 1    APPEARANCES (continued)
 2
 3    THE LAW OFFICES OF JANET S. BAER, P.C.
      BY:   JANET S. BAER, ESQUIRE
 4    70 West Madison Street
      Suite 2100
 5    Chicago, Illinois  606002
      312.641.2162
 6    Representing the Debtors
 7
 8    SPEIGHTS & RUNYAN
      BY:   DANIEL H. SPEIGHTS, ESQUIRE*
 9         (*VIA TELECONFERENCE)
      200 Jackson Avenue East
10    P.O. Box 685
      Hampton, South Carolina  29924
11    803.943.4444
      (dspeights@speightsrunyan.com)
12    Representing Anderson Memorial Hospital
13
14
      DRINKER BIDDLE & REATH, LLP
15    BY:   MICHAEL F. BROWN, ESQUIRE
      One Logan Square
16    18th & Cherry Streets
      Philadelphia, Pennsylvania  19103-6996
17    215.988.2988
      (brownmf@dbr.com)
18    Representing OneBeacon America Insurance
      Company, Seaton Insurance Company,
19    Government Employees Insurance Company,
      Republic Insurance Company n/k/a Starr
20    Indemnity & Liability Company
21
22
23
24
```

```
 1    APPEARANCES (continued)
 2
 3    CAPLIN & DRYSDALE, CHARTERED
      BY:  JEFFREY A. LIESEMER, ESQUIRE
 4    One Thomas Circle N.W.
      Suite 1100
 5    Washington, DC  20005
      202.862.7801
 6    (jal@capdale.com)
      Representing Grace, Official Committee of
 7    Asbestos Personal Injury Claimants
      ("ACC")
 8
 9
      ANDERSON KILL & OLICK, P.C.
10    BY:  ROBERT M. HORKOVICH, ESQUIRE*
           (*VIA TELECONFERENCE)
11    1251 Avenue of the Americas
      New York, New York 10020
12    212.278.1322
      (rhorkorvitz@andersonkill.com)
13    Representing the ACC
14
15    SIMPSON THACHER & BARTLETT, LLP
      BY:  ELISA ALCABES, ESQUIRE*
16         (*VIA TELECONFERENCE)
      425 Lexington Avenue
17    New York, New York  10017-3954
      212.455.3133
18    (ealcabes@stblaw.com)
      Representing Travelers Casualty and
19    Surety Company
20
21    VORYS, SATER, SEYMOUR AND PEASE, LLP
      BY:  PHILIP F. DOWNEY, ESQUIRE*
22         (*VIA TELECONFERENCE)
      52 East Gay Street
23    Columbus, Ohio  43215
      330.208.1152
24    (pdowney@vorys.com)
```

```
 1   APPEARANCES (continued)
 2
 3   MENDES & MOUNT, LLP
     BY:  EILEEN T. McCABE, ESQUIRE
 4   750 Seventh Avenue
     New York, New York  10019
 5   212.261.8262
     (eileen.mccabe@mendes.com)
 6   Representing AXA Belgium as Successor to
     Royale Belge SSA
 7
 8
     MENDES & MOUNT, LLP
 9   BY:  ALEXANDER MUELLER, ESQUIRE
     750 Seventh Avenue
10   New York, New York  10019-6829
     212.261.8296
11   (alexander.mueller@mendes.com)
     Representing London Market Companies
12
13
     FORD MARRIN ESPOSITO & WITMEYER & GLESER
14   BY:  ELIZABETH M. DeCRISTOFARO, ESQUIRE
     Wall Street Plaza
15   New York, New York  10005-1875
     212.269.4900
16   Representing Continental Casualty Company
     and Continental Insurance Company
17
18
     STROOCK & STROOCK & LAVAN, LLP
19   BY:  KENNETH PASQUALE, ESQUIRE*
          (*VIA TELECONFERENCE)
20   180 Maiden Lane
     New York, New York  10038-4982
21   212.806.5400
     (kpasquale@stroock.com)
22   Representing Official Committee of
     Unsecured Creditors
23
24
```

```
 1    APPEARANCES (continued)
 2
 3    CROWELL & MORING, LLP
      BY:   NOAH S. BLOOMBERG, ESQUIRE*
 4          (*VIA TELECONFERENCE)
      1001 Pennsylvania Avenue NW
 5    Washington, DC  20004-2595
      202.624.2913
 6    (nbloomberg@crowell.com)
      Representing Fireman's Fund Insurance
 7    (Surety Bond)
 8
 9    STEVENS & LEE, P.C.
      BY:   MARNIE E. SIMON, ESQUIRE
10    1818 Market Street, 29th Floor
      Philadelphia, Pennsylvania  19103-1702
11    215.751.2885
      (mes@stevenslee.com)
12    Representing Fireman's Fund Insurance
13
14    ECKERT SEAMANS CHERIN & MELLOTT, LLC
      BY:   EDWARD J. LONGOSZ, II, ESQUIRE
15    1747 Pennsylvania Avenue, NW
      12th Floor
16    Washington, DC  20006
      202.659.6619
17    (elongosz@eckertseamans.com)
      Representing Maryland Casualty and Zurich
18
19
      WILEY REIN, LLP
20    BY:   RICHARD A. IFFT, ESQUIRE
      1776 K Street NW
21    Washington, DC  20006
      202.719.7520
22    (rifft@wileyrein.com)
      Representing Maryland Casualty and Zurich
23
24
```

```
 1    APPEARANCES (continued)
 2
 3    COZEN O'CONNOR
      BY:  JACOB C. COHN, ESQUIRE
 4    1900 Market Street
      Philadelphia, Pennsylvania  19103-3508
 5    215.665.2147
      (jcohn@cozen.com)
 6    Representing Federal Insurance Company
 7
 8    ORRICK HERRINGTON & SUTCLIFFE, LLP
      BY:  PERI N. MAHALEY, ESQUIRE
 9    Columbia Center
      1152 15th Street, N.W.
10    Washington, DC  20005-1706
      202.339.8516
11    (pmahaley@orrick.com)
      Representing Future Claimants
12    Representative
13
14    CUYLER BURK, P.C.
      BY:  STEFANO V. CALOGERO, ESQUIRE
15    Parsippany Corporate Center
      4 Century Drive
16    Parsippany, New Jersey  07054
      973.734.3200
17    (scalogero@cuyler.com)
      Representing Allstate Insurance Company
18
19
      WILSON ELSER MOSKOWITZ EDELMAN & DICKER,
20    LLP
      BY:  CARL PERNICONE, ESQUIRE
21    150 East 42nd Street
      New York, New York  10017-5639
22    212.915.5656
      (carl.pernicone@wilsonelser.com)
23    Representing Arrowood Indemnity Company
24
```

```
 1   APPEARANCES (continued)
 2
 3   O'MELVENY & MYERS, LLP
     BY:  TANCRED SCHIAVONI, ESQUIRE
 4   Times Square Tower
     7 Times Square
 5   New York, New York 10036
     212.326.2267
 6   (tschiavoni@omm.com)
     Representing Arrowood Indemnity Company
 7
 8
     WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
 9   BY:  KEVIN J. MANGAN, ESQUIRE
     222 Delaware Avenue
10   Suite 1501
     Wilmington, Delaware  19801
11   302.252.4361
     (kmangan@wcsr.com)
12   Representing State of Montana
13
14   PEPPER HAMILTON, LLP
     BY:  LINDA J. CASEY, ESQUIRE
15   3000 Two Logan Square
     Philadelphia, Pennsylvania  19103
16   215.981.4000
     (caseyl@pepperlaw.com)
17   Representing BNSF Railway Company
18
                     -   -   -
19
20
21
22
23
24
```

```
 1                    -   -   -

 2                  I  N  D  E  X

 3                    -   -   -

 4

 5   Testimony of:

 6           JAY W.  HUGHES, JR., ESQUIRE

 7
```

```
 8   By Mr. Lewis              Page  13, 424

 9   By Mr. Mangan             Page  211

10   By Ms. Casey              Page  240

11   By Mr. Brown              Page  296, 479

12   By Mr. Jacob Cohn         Page  344

13   By Ms. Simon              Page  358

14   By Ms. McCabe             Page  360

15   By Mr. Schiavoni          Page  361, 483

16   By Mr. Ifft               Page  380

17   By Ms. DeCristofaro       Page  386

18   By Ms. Alcabes            Page  388

19   By Mr. Speights           Page  397

20   By Mr. Downey             Page  418
```

```
21

22

23

24
```

```
 1                        -   -   -
 2                    E X H I B I T S
 3                        -   -   -
 4    NO.    DESCRIPTION                        PAGE
 5    Hughes-1
             Monthly Asbestos Litigation
 6           Summary - March                     86
 7    Hughes-2
             Letter dated 3/27/01 to
 8           Allan McGarvey from Terry
             MacDonald                          168
 9
      Hughes-3
10           Exhibit 4 to Exhibit Book
             Trust Distribution Procedures  211
11
      Hughes-4
12           Documents bearing Bates stamps
             GCO 000023 through 000026      242
13
      Hughes-5
14           Documents bearing Bates stamps
             GCO 000081 through 000091      254
15
      Hughes-6
16           Document bearing Bates stamp
             GCO 000174                     257
17
      Hughes-7
18           Documents bearing Bates stamps
             GCO 000111 through 000112      275
19
      Hughes-8
20           Document bearing Bates stamp
             GCO 000173                     280
21
      Hughes-9
22           Document bearing Bates stamp
             GCO 000140                     281
23
24
```

```
 1    EXHIBITS (continued)
 2
      NO.    DESCRIPTION                    PAGE
 3
      Hughes-10
 4            Documents bearing Bates stamps
              GCO 000207 through 000215     282
 5
      Hughes-11
 6            Letter dated 4/25/09 to Counsel
              from Barbara Harding with
 7            attachment                    296
 8    Hughes-12
              Exhibit 6 to Exhibit Book
 9            Asbestos Insurance Transfer
              Agreement                     299
10
      Hughes-13
11            Document bearing Bates stamp
              GCO 000219                    362
12
      Hugbhes-14
13            Documents bearing Bates stamps
              GCO 000199 through 000200     367
14
      Hughes-15
15            Exhibit 5 to Exhibit Book
              Schedule of Settled Asbestos
16            Insurers Entitled to 524(g)
              Protection                    479
17
18                        -   -   -
19
20
21
22
23
24
```

```
 1                      -   -   -

 2           DEPOSITION SUPPORT INDEX

 3                      -   -   -

 4

 5   Direction to Witness Not to Answer:

 6   Page    Line            Page      Line

 7   408     22

 8

 9

10   Request for Production of Documents:

11   Page    Line            Page      Line

12   NONE

13

14

15   Stipulations:

16   Page    Line            Page      Line

17   NONE

18

19

20   Area(s) Marked Confidential:

21   Page    Line            Page      Line

22

              (Mr. Speights dropped of

23              teleconference from:)

24   285     01      to    299       24
```

```
 1        A.    Yes.

 2        Q.    I know at least one -- I

 3   think that Burlington Northern has filed

 4   an objection to the Plan in which they

 5   contend that there is coverage that was

 6   available that's not listed here.  I

 7   think it was specifically with respect to

 8   Royal Indemnity.

 9             Are you aware of that?

10             MS. HARDING:  Aware of their

11        objection; is that the question?

12             MR. LEWIS:  Yes, the

13        objection.

14             THE WITNESS:  I am generally

15        aware of the objection.

16   BY MR. LEWIS:

17        Q.    Is there a claim that there

18   were earlier policies issued to Zonolite

19   that are not addressed by this Plan?

20             MS. HARDING:  Just object to

21        the form to the extent that the

22        objection speaks for itself.

23             But to the extent you

24        recall, go ahead and answer.
```

```
 1                    THE WITNESS:  I don't

 2           recall.

 3                    MR.  LEWIS:  Let me look at

 4           my notes.  I think I am finished.

 5                    I will pass the witness.

 6                    MS.  HARDING:  Could I just

 7           have two minutes?  Just give me

 8           two minutes.

 9                    MR. LEWIS:  Sure.

10                    (There was a break from 1:18

11           p.m. to 1:26 p.m.)

12                    (Hughes-3 marked for

13           identification at this time.)

14                      -   -   -

15                    EXAMINATION

16                      -   -   -

17   BY MR. MANGAN:

18           Q.    Good afternoon, Mr. Hughes.

19   Kevin Mangan on behalf of the State of

20   Montana.

21                    Mr. Hughes, are you

22   familiar -- and I know Mr. Lewis had

23   asked you a few questions regarding

24   various defendants in litigation relating
```

```
 1   to Montana.
 2                Are you familiar with the
 3   claims against the State of Montana by
 4   the Libby claimants?
 5        A.   Yes.
 6        Q.   Okay.  Do you need me to
 7   identify or define what I mean by the
 8   Libby claimants?
 9        A.   Yes.
10        Q.   Okay.  Mr. Lewis is among
11   other attorneys that represent plaintiffs
12   in state court actions pending in
13   Montana, including Lincoln County.
14                And you are familiar with
15   those?
16        A.   Yes.
17        Q.   Okay.  Are you aware that
18   the State of Montana has been named as a
19   defendant in over 140 cases in the
20   various Montana state courts?
21        A.   I know that there are cases
22   against the State of Montana in Montana
23   state courts.  I didn't know the number.
24        Q.   And you testified earlier
```

```
 1    that you are aware that the State of
 2    Montana has filed a contribution
 3    indemnification claim against Grace in
 4    this bankruptcy proceeding; is that
 5    correct?
 6            A.    Yes.
 7            Q.    Do you know what the basis
 8    is for this contribution indemnification
 9    claim?
10            A.    I think that Grace's
11    operations, that the exposures and the
12    injuries that are the subject of the
13    State of Montana claims were a result of
14    Grace's operations and that the State of
15    Montana, to the extent it has to
16    reimburse these people or compensate
17    these people for these injuries, are
18    entitled to recover some portion of that
19    under theories of indemnification and
20    contribution from W.R. Grace.
21            Q.    And would these claims have
22    arisen from mining and processing of
23    vermiculite within Montana?
24                  MR. LEWIS:  Objection as to
```

```
 1              what do you mean by these claims?
 2                   MR. MANGAN:  I am sorry.
 3              The Libby claims.
 4                   MS. HARDING:  Object to form
 5              and foundation.  To the extent you
 6              know, whatever the claims are, if
 7              they have been filed, they speak
 8              for themselves.
 9                   But go ahead.
10                   THE WITNESS:  My
11              understanding is that they are the
12              result of Grace's vermiculite
13              mining and processing operations
14              in Lincoln County, Montana.
15      BY MR. MANGAN:
16              Q.   Mr. Hughes, are you aware
17      that the State of Montana has denied
18      liability with regard to claims brought
19      by the Libby claimants against the State?
20              A.   Not specifically, no.
21              Q.   Are you aware of whether the
22      State of Montana has paid any claims --
23      strike that.
24                   Are you aware of whether the
```

```
 1    State of Montana has paid with regard to

 2    claims, whether it be through settlement

 3    or verdict?

 4          A.    I am not familiar with the

 5    history up there so far.

 6          Q.    Mr. Hughes, are you aware of

 7    the basis which the Libby claimants have

 8    sued the State of Montana?

 9          A.    Yes.

10          Q.    And what is that?

11          A.    I think I testified --

12                MS. HARDING:  Object, asked

13          and answered.

14                THE WITNESS:  -- earlier.

15          It's that the State of Montana in

16          exercising its regulatory power

17          over the operations in Lincoln

18          County conducted inspections of

19          the mine and mill facility through

20          various couple of different

21          agencies over time, and that in so

22          doing, they created a duty between

23          the State and the individuals

24          working at the mine.  And as a
```

```
 1              result of -- somehow the

 2              inspections breached that duty,

 3              and they are entitled to

 4              compensation and damages as a

 5              result of the breach.

 6   BY MR. MANGAN:

 7              Q.    And do those allegations

 8   form the basis for the State's claims for

 9   contribution indemnification against

10   Grace?

11              A.    Yes, they are related to the

12   claims.

13              Q.    And will you agree with me

14   that the State of Montana has filed a

15   timely proof of claim within this

16   bankruptcy case?

17                    MS. HARDING:  Object to the

18              form.

19                    MR. LIESEMER:  Object to the

20              form.

21                    MS. HARDING:  And with

22              respect to the respect it calls

23              for a legal conclusion.

24                    If you can answer, go ahead.
```

```
 1                THE WITNESS:   My
 2           understanding is that it had, but,
 3           again, I would be more comfortable
 4           if we could verify that.  But yes.
 5  BY MR. MANGAN:
 6           Q.   But you are aware that the
 7  State has filed a proof of claim?
 8           A.   It's my understanding that
 9  the State has filed a proof of claim.
10           Q.   How are the claims of State
11  of Montana for contribution
12  indemnification being treated under the
13  Plan?
14                MS. HARDING:  I am just
15           going to object to the extent that
16           this witness wasn't designated for
17           that purpose.  Mr. Finke was, and
18           I think he's testified, as has
19           Mr. Lockwood and other folks.
20                But to the extent you know,
21           go ahead.
22                THE WITNESS:  Well, they are
23           treated as asbestos personal
24           injury claims, and within the
```

```
 1              asbestos personal injury claim,

 2              there are asbestos derivative

 3              claims.  And they would be

 4              channelled to the Trust and

 5              treated in accordance with the

 6              Trust Distribution Procedures.

 7              There are provisions of the Trust

 8              Distribution Procedures that deal

 9              with derivative asbestos claims.

10  BY MR. MANGAN:

11         Q.    Would that be Section 5.6?

12         A.    I believe so.

13         Q.    Let me mark as an exhibit or

14  it already has been marked.  Excuse me.

15  Hughes-3.  Could you take a look at that?

16         A.    Sure.

17         Q.    Could you identify what

18  Hughes-3 is, sir?

19         A.    It's Exhibit 4 to the

20  Exhibit Book, it says here, with I

21  believe the Plan, and it's a copy of the

22  Trust Distribution Procedures that are

23  part of the proposed Plan in the Grace

24  bankruptcy.
```

```
 1         Q.    Okay.  And I believe you had

 2   testified earlier that you have reviewed

 3   that in preparation of this deposition?

 4         A.    Yes.

 5         Q.    And I think you had

 6   testified to this, but I just want to be

 7   clear.  You did not draft this; is that

 8   correct?

 9         A.    Yes.

10         Q.    You only reviewed it?

11         A.    Yes.

12         Q.    And who was the draftsman of

13   this document?

14               MS. HARDING:  Object to form

15         and foundation.

16               To the extent that you know,

17         go ahead.

18               THE WITNESS:  I don't know

19         specifically who was the

20         draftsman.  I think Peter

21         Lockwood, when he testified, may

22         have provided more information

23         about that.

24   BY MR. MANGAN:
```

```
 1              Q.    Does the Plan or the TDP
 2     make any distinction between contribution
 3     indemnification claims versus personal
 4     injury, wrongful death, or property
 5     damage claims?
 6                    MS. HARDING:  Object to
 7              form.  The Plan speaks for itself.
 8                    To the extent that you
 9              know...
10                    THE WITNESS:  Well, it
11              certainly has -- 5.6 deals with
12              indirect PI Trust claims, so there
13              is certainly some provisions that
14              recognize a difference between,
15              you know, direct claims, personal
16              injury plaintiffs and injured
17              parties, and claims that arise
18              from some sort of obligation of
19              Grace to indemnify parties or
20              contribution claims.
21     BY MR. MANGAN:
22              Q.    Would you consider Montana's
23     claims of a different nature than a
24     typical personal injury, wrongful death
```

```
 1    or property damage claim?
 2                 MS. HARDING:  Objection,
 3           calls for a legal conclusion.
 4                 MR. LIESEMER:  I join in the
 5           objection.
 6                 THE WITNESS:  Again, I agree
 7           with those who have objected that
 8           it calls for a legal conclusion,
 9           but they are certainly different.
10           The State of Montana is the State
11           of Montana, and individual
12           claimants are individual
13           claimants.
14    BY MR. MANGAN:
15           Q.    To your understanding, are
16    the Montana claims based on different
17    acts from the types of claims which other
18    asbestos PI claims relate?
19           A.    I don't know what you mean
20    by different acts.
21                 MS. HARDING:  Object the
22           form.
23                 MR. LIESEMER:  Object to
24           form.
```

```
1                    MS. HARDING:  Again, I think
2            it calls for a legal conclusion.
3     BY MR. MANGAN:
4            Q.    You testified earlier that
5     you believe that claims were based on a
6     failure to warn; is that correct?
7                    MS. HARDING:  Object to
8            form, and I think it --
9                    THE WITNESS:  I don't think
10           I said that.
11                   MS. HARDING:  I don't think
12           he said anything about a failure
13           to warn.
14                   THE WITNESS:  Do you mean
15           the claims against State of
16           Montana?
17    BY MR. MANGAN:
18           Q.    Yes, sir.
19           A.    I thought I said the State,
20    in exercising its right to power to
21    regulate the operations of Grace in
22    Montana, undertook to inspect the
23    facilities, and as a result of that
24    activity, they had duties vis-a-vie the
```

```
 1    employees in that it's alleged that there
 2    is a breach of these duties, whether it
 3    be a failure to warn or other things of
 4    things.  I don't know I said anything
 5    about that.  And I don't know the
 6    details.
 7              MS. HARDING:  And I am just
 8              going to object to the extent that
 9              this witness is being asked to
10              characterize other claimants'
11              claims and issues that can be
12              readily read from a document that
13              describes the claim.
14              I don't know what relevance
15              it has to have this witness
16              characterize somebody else's
17              claims in light of the fact that
18              we are trying to get out of here.
19              But go ahead.
20              MR. MANGAN:  I will be
21              brief.
22              MS. HARDING:  I am trying to
23              let him answer everything.
24              MR. MANGAN:  Thank you.  And
```

```
 1              I just want to note that I believe

 2              he was identified with regard to

 3              claims, specifically the claims of

 4              the State of Montana and other

 5              BNSF and MCC, as well as others.

 6              So to the extent --

 7                   MS. HARDING:  Let's just go

 8              on.  He's certainly not identified

 9              to be the lawyer for anybody else

10              but W.R. Grace.

11                   MR. MANGAN:  Fair enough.

12                   MS. HARDING:  Go ahead.  I

13              am not trying to be difficult.

14  BY MR. MANGAN:

15              Q.   What is your understanding

16  how contribution indemnification claims

17  would be eventually paid pursuant to the

18  Trust?  In what form would the payment

19  take?

20                   MS. HARDING:  Object to

21              form.

22                   MR. LIESEMER:  Object to

23              form.

24                   MS. HARDING:  The document
```

```
 1              speaks for itself, and it calls
 2              for speculation.
 3                   But go ahead.
 4                   THE WITNESS:  I am not sure
 5              I understand the question.  What
 6              do you mean by what form?
 7    BY MR. MANGAN:
 8         Q.    Would contribution
 9    indemnification claims be paid through
10    cash payment or stock or some other form
11    of payment?
12         A.    I think they would be paid
13    pursuant to the Trust Distribution
14    Procedure, and I think the people are
15    paid in cash generally.
16         Q.    At what point in time
17    pursuant to the Trust Distribution
18    Procedures would a contribution
19    indemnification claim be made?
20                   MS. HARDING:  Object to
21              form.  It calls for speculation.
22                   THE WITNESS:  Pardon?
23    BY MR. MANGAN:
24         Q.    Within the TDP, at what
```

```
 1   point in time would payments be made to
 2   avail a contribution indemnification
 3   claim?
 4                MS. HARDING:  I am just
 5           going to object to form.  I think
 6           to the extent the document
 7           addresses that, it speaks for
 8           itself.  I am just not sure I
 9           understand the question.
10                But go ahead, if you
11           understand.
12                THE WITNESS:  I am not sure
13           I understand.  I think as a
14           general rule, it would be when the
15           indirect personal injury -- the
16           holder of the indirect personal
17           injury claim, its liability to the
18           underlying claimant and it would
19           become, for lack of a better term,
20           fixed.
21   BY MR. MANGAN:
22           Q.   Okay.  Claims under the TDP,
23   are they processed on a
24   first-in/first-out basis?
```

```
 1                    MS. HARDING:  Object to
 2            form.
 3                    THE WITNESS:  Generally,
 4            there is a first-in/first-out
 5            process, but the Trust
 6            distribution procedure describes
 7            in much more detail.  There is a
 8            lot of exceptions and different
 9            kind of -- the details of how the
10            first-in/first-out queue operates.
11  BY MR. MANGAN:
12            Q.   Is that also true for when
13  claims would be paid under the Trust?
14            A.   Again, the document speaks
15  for itself, but, yes, there are
16  differences when claims would be paid.
17            Q.   Is it fair to say that
18  claims that are, as you said, fixed
19  earlier in the process would be paid
20  earlier than other claims later in the
21  process?
22                    MR. LIESEMER:  Object to
23            form.
24                    MS. HARDING:  Object to
```

```
 1            form.
 2                    THE WITNESS:  You will have
 3            to ask the question again.
 4    BY MR. MANGAN:
 5            Q.    Is it fair to say that
 6    claims under the Trust that are made
 7    under the Trust, they could be paid at an
 8    earlier time than other claims that start
 9    in the process later?
10                    MS. HARDING:  Object to
11            form.
12                    THE WITNESS:  I think there
13            is that possibility, but, again, I
14            think the agreement in the Trust
15            Distribution Procedures in the
16            document speak for themselves.
17    BY MR. MANGAN:
18            Q.    Is it your understanding
19    that any of the claims that Montana might
20    have against the Debtor for their
21    contribution indemnification are based on
22    independent conduct on the part of the
23    State?
24                    MR. LIESEMER:  Object to the
```

```
 1            form, legal conclusion.
 2                 MS. HARDING:  Object to the
 3            form.  It calls for a legal
 4            conclusion.
 5                 THE WITNESS:  It's based on
 6            the -- they are based on the
 7            State's conduct, and I think that
 8            the Montana Supreme Court decision
 9            is probably where you -- it
10            defines that conduct and defines
11            the legal basis for the claims
12            against the State.
13  BY MR. MANGAN:
14            Q.   Does the Trust make any
15  distinction between claims that would be
16  derivative as opposed to claims that
17  might not otherwise be derivative?
18            A.   You will have to ask the
19  question again.  I am not sure I
20  understand it.
21            Q.   I will strike that.
22                 Under 5.6 of the TDP, are
23  you familiar with that section, sir?
24            A.   Generally, yes.
```

```
 1              Q.    Okay.   And that's relating
 2    to the indirect PI Trust claims?
 3              A.    Yes.
 4              Q.    Is there a provision in
 5    there that these indirect claims would
 6    proceed or process in accordance with
 7    procedures to be developed at a later
 8    point in time?
 9                    MS. HARDING:  Object to
10              form.  Is there a particular
11              language you want him to look at?
12              It would just be helpful.
13                    MR. MANGAN:  Okay.  Let me
14              go back to that in a second.
15    BY MR. MANGAN:
16              Q.    If you could turn to page 32
17    of the Trust, Section 5.4(a), that's
18    relating to extraordinary claims.
19              A.    Yes.
20              Q.    Could you tell me what are
21    the requirements for a claimant to bring
22    an extraordinary claim?
23                    MS. HARDING:  Object to
24              form.
```

```
 1                    MR. MANGAN:  Generally.

 2                    MS. HARDING:  Do you want

 3            him to -- in his own words?

 4     BY MR. MANGAN:

 5            Q.    What is your understanding

 6     of that, sir?

 7            A.    My understanding is that

 8     there are people who -- excuse me --

 9     whose exposure occurred primarily at a

10     Grace facility or that at least 75

11     percent of their asbestos exposure was

12     the result of exposure to Grace products,

13     and to some other language about Grace

14     conduct for or conduct for which Grace

15     had legal responsibility.  And then there

16     is a subgroup that also requires 95

17     percent exposure to Grace products.

18            Q.    And is one of the conditions

19     also that there would be little

20     likelihood of substantial recovery

21     elsewhere?

22            A.    Yes.

23            Q.    What is meant by that term?

24                    MS. HARDING:  Object to
```

```
1              form.
2                   MR. LIESEMER:  Objection to
3              form.
4                   MS. HARDING:  And
5              foundation.
6    BY MR. MANGAN:
7         Q.   Are you familiar with that
8    phrase and why that was put into the
9    Trust?
10        A.   Yeah.  I mean, it's
11   logically consistent with the idea that
12   seven people who have 75 percent or 95
13   percent of their exposure to asbestos
14   from Grace products or conduct for which
15   Grace had legal responsibility, therefore
16   where these are primarily Grace exposure
17   cases, the logic behind that is that
18   Grace would therefore have a higher level
19   of responsibility for claims and,
20   therefore, these people are entitled to
21   additional compensation.
22                   If claims of this group, for
23   example, have 75 to 95 percent, if it
24   develops over the course of time, have
```

      1    other sources of compensation, then it
      2    seems to me the logic for these claims
      3    being treated as extraordinary claims --
      4    an individual claim collapses, and that's
      5    why that language is there.
      6               So you don't have a series
      7    of people coming in who have already been
      8    compensated, who are receiving
      9    substantial amounts of money from other
     10    parties, being able to come in and claim
     11    extraordinary claim status under the TDP.
     12               But, again, all of this, all
     13    of this is really a question about the
     14    operations of the Trust, and the Trust
     15    hasn't even been formed, let alone be in
     16    operation.  And I think while the Trust
     17    Distribution Procedures set forth kind of
     18    a roadmap of what's going to happen, some
     19    of these questions and some of your
     20    questions really are questions that are
     21    kind of operational.  And you would have
     22    to see how it operates in practice once
     23    the Trust is up and running.
     24          Q.    So there are a lot of issues

```
 1    that need to be ironed out with

 2    operations of this Trust?

 3              MS. HARDING:  Object to

 4         form.

 5              THE WITNESS:  There is with

 6         any contract.  I think this is a

 7         fairly detailed one in an effort

 8         to kind of govern it.  But when

 9         you are setting up a Trust or any

10         process, the document can only do

11         so much.  Some of the specific

12         issues that come up are going to

13         have to be dealt with once the

14         Trust becomes operational.

15    BY MR. MANGAN:

16         Q.    And who would be making

17    those decisions when the Trust becomes

18    operational?

19              MS. HARDING:  Object to

20         form, foundation, speculation, and

21         it's overly broad in terms of what

22         issues.

23              THE WITNESS:  The Trust.

24    BY MR. MANGAN:
```

```
 1            Q.    And the Trust is yet to be
 2    created, right?
 3            A.    Yes.
 4            Q.    If you could flip to Section
 5    5.5, sir, Secondary Exposure Claims, do
 6    you see that section?
 7            A.    Yes.
 8            Q.    Does this provision relate
 9    to family members or does it also relate
10    to people who live in the community?
11                 MR. LIESEMER:  Object to
12            form.
13                 MS. HARDING:  Object to
14            form.  Again, the document speaks
15            for itself.
16                 THE WITNESS:  I don't think
17            it would be necessary to relate it
18            to family members.  But in
19            virtually -- in most cases, it
20            would be, because I think it's
21            dealing with situations where the
22            individual who has exposure is the
23            result of proximity to another
24            individual, spouse, and therefore
```

```
 1              it's appropriate to use the same

 2              criteria in terms of just

 3              measuring their exposure to the

 4              exposure of the person to be a

 5              related occupationally exposed

 6              person.

 7                   So it doesn't have to be a

 8              family member, but I don't think

 9              it would necessarily be applicable

10              to a community member as I read

11              it.  But, again, others may

12              differ.

13    BY MR. MANGAN:

14              Q.   Do you know what was the

15    history of this provision in the Trust?

16    Are you familiar with that.

17                   MS. HARDING:  Object to

18              form.

19    BY MR. MANGAN:

20              Q.   How did this get into the

21    Trust?

22                   MS. HARDING:  And

23              foundation.

24                   THE WITNESS:  Well, I think
```

```
 1                  secondary exposure issues have

 2                  been around the asbestos

 3                  litigation for years and is

 4                  something that has to be dealt

 5                  with by the Grace Trust and is

 6                  dealt with by the other Trust as

 7                  well.

 8      BY MR. MANGAN:

 9           Q.    Do you know whether this was

10      placed in there directly related to Libby

11      claimants?

12                  MS. HARDING:  Object to form

13                  to the extent it calls for Plan

14                  negotiations.

15                  But you can answer.

16                  THE WITNESS:  I don't know.

17      BY MR. MANGAN:

18           Q.    Could you turn to page 42?

19      I will direct you to 5.7(b)(3), Grace

20      Exposure.

21           A.    Yes.

22           Q.    Does this provision refer

23      only to Libby claims?

24                  MS. HARDING:  Object to
```

```
 1          form.

 2                   MR. LIESEMER:  Object to

 3          form.

 4                   THE WITNESS:  Refer only to

 5          Libby claims?

 6  BY MR. MANGAN:

 7          Q.   Yes sir.

 8          A.   No.

 9          Q.   Was it placed into the Trust

10  to address Libby claims?

11                   MS. HARDING:  Objection.

12                   THE WITNESS:  Some portion

13          of it was.

14                   MS. HARDING:  Objection to

15          form.

16                   MR. LIESEMER:  Objection to

17          form.

18  BY MR. MANGAN:

19          Q.   Is it necessary to read this

20  provision, 5.7(b)(3), together with 5.5,

21  which we discussed just a moment ago?

22                   MS. HARDING:  Object to the

23          form to the extent it calls for a

24          legal conclusion, and also the
```

```
 1              document speaks for itself.

 2                    But to the extent you know

 3         the answer, go ahead.

 4                    And what is the answer,

 5         whether it has to be read?

 6   BY MR. MANGAN:

 7         Q.    Do those two provisions need

 8   to be read together, sir?

 9         A.    Well, to the extent that

10   secondary exposure claims in 5.5 is a

11   reference to exposure to Grace products

12   and 5.7(b)(3) defines what's considered

13   Grace exposure, I suppose they have to be

14   read together.

15         Q.    Could you turn to page 44,

16   Section 5.9, Second Disease Claims?

17   Would you take a look at that for a

18   second?

19         A.    (Witness complies with

20   request.)

21         Q.    Were the Libby claimants in

22   mind when this was drafted?

23                    MR. LIESEMER:  Object to

24         form.
```

```
 1                    MS. HARDING:  Object to
 2           form.   The witness has already
 3           testified he didn't draft the
 4           document, so I object on
 5           foundation.  You are asking when
 6           it was drafted and was it drafted
 7           for that reason, then I object on
 8           foundation.
 9                    THE WITNESS:  It would seem
10           to me that the answer to your
11           question is no, but I don't know.
12                    MR. MANGAN:  That is all I
13           have, sir.
14                       -  -  -
15                    EXAMINATION
16                       -  -  -
17   BY MS. CASEY:
18           Q.   Good afternoon, Mr. Hughes.
19   My name is Linda Casey.  I represent BNSF
20   Railway Corporation.
21                    When I refer to BNSF, I am
22   going to be referring to BNSF Railway
23   Corporation and its predecessors,
24   including Great Northern and Burlington
```

```
 1   Northern Santa Fe.

 2              Is that acceptable?

 3         A.    Sure, that's great.

 4         Q.    And when I refer to Grace, I

 5   will be referring to W.R. Grace Company

 6   and its predecessors that operated at the

 7   mine, including Zonolite Corporation.

 8              Is that okay?

 9         A.    That's fine.

10         Q.    Are you aware of the

11   historical business relationship between

12   Grace and BNSF?

13         A.    Yes.

14         Q.    Would it be a fair and

15   accurate summary of that relationship to

16   say that from at least as early as 1942

17   Grace operated, through various leases

18   and agreements between BNSF and Grace, a

19   loading dock and suspension bridge over

20   the railway's right-of-way and also

21   transported vermiculite to be mined over

22   the railway tracks?

23         A.    Yes.

24         Q.    And do you have an
```