consent, license, approval or authorization of, or registration or declaration with, any Governmental Authority is required to be obtained by any Loan Party in connection with the execution, delivery, performance, validity or enforceability of this Agreement and any Notes.

6.3 No Legal Bar. The execution, delivery and performance of this Agreement, the Notes and the other Loan Documents, the borrowings hereunder and the use of the proceeds thereof, will not violate or contravene any material provision of any Requirement of Law or material Contractual Obligation of the Parent, the Company or any of its Subsidiaries and will not result in, or require, the creation or imposition of any material Lien (other than Liens permitted under subsection 9.2) on any of its or their respective properties or revenues pursuant to any such Requirement of Law or Contractual Obligation.

6.4 No Material Litigation. There is no legal action, administrative proceeding or arbitration (whether or not purportedly on behalf of the Parent or the Company or any of its Subsidiaries) presently pending, or to the knowledge of the Parent or the Company threatened, against or affecting the Parent or the Company or any of its Subsidiaries which would reasonably be expected to have a Material Adverse Effect, except that the foregoing is subject to the fact that the Parent and the Company cannot predict at this time the results and impact, if any, of (i) those investigations and litigations incorporated by reference in Item 3 of the Parent's Annual Report on Form 10-K for the fiscal year ended December 31, 1997 referred to in subsection 6.6 to the extent that inability to make such a prediction or determine liability is stated in Item 3 and (ii) the governmental investigation and related matters described in Note 3 to the Consolidated Financial Statements referred to in Item 3.

6.5 Ownership of Properties. Each of the Parent, the Company and each of its Subsidiaries is the tenant under valid leases or has good title to substantially all its properties and assets, real and personal (except defects in title and other matters that would not reasonably be expected to have a Material Adverse Effect), subject to no Lien except as permitted to exist under subsection 9.2.

6.6 Financial Condition. The consolidated balance sheet of the Parent (or its predecessor) and its Subsidiaries as at December 31, 1997 and the related consolidated statements of operations, shareholders' equity and of cash flows (together with the related notes), included or incorporated in the Parent's Annual Report on Form 10-K filed with the SEC for the fiscal year ended December 31, 1997, present fairly in all material respects the financial position of the Parent (or its predecessor) and its Subsidiaries as at such dates and the results of their operations and their cash flows for the fiscal years then ended. All of such financial statements, including the notes to such financial statements, have been prepared in conformity with GAAP (subject, in the case of interim statements, to normal year-end adjustments and to the fact that such financial statements may be abbreviated and may omit footnotes or contain incomplete footnotes) consistently applied throughout the periods involved except as stated therein.

6.7 Disclosure of Contingent Liabilities. To the best of the knowledge and belief of the Parent, neither the Parent nor any of its Subsidiaries has any contingent obligation, liability for taxes, long-term leases, unusual forward or other liabilities, which are material in amount in relation to the consolidated financial condition of the Parent and its Subsidiaries taken as a whole

CC-BLG000041

and which are not disclosed in the financial statements (including the related notes) described in subsection 6.6 above.

6.8 ERISA. Each Plan that is intended to qualify under Section 401(a) of the Code satisfies in all material respects the applicable requirements for qualification under that Code Section. No Reportable Event has occurred and is continuing with respect to any such Plan, and neither the Parent nor any of its Subsidiaries has incurred any liability to the PBGC under Section 4062 of ERISA with respect to any such Plan that would reasonably be expected to have a Material Adverse Effect.

6.9 Certain Federal Regulations. Neither the Company nor any of its Subsidiaries is engaged in or will engage in the business of extending credit for the purposes of "purchasing" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U of the Board, and no part of the proceeds of any Loan will be used for any purpose which violates, or which would be inconsistent with, the provisions of Regulation U or X of the Board.

6.10 No Default. Neither the Parent nor any of its Subsidiaries is in default under or with respect to any of its Contractual Obligations in any respect which would reasonably be expected to have a Material Adverse Effect. No Default or Event of Default has occurred and is continuing.

6.11 Taxes. (a) Each of the Parent and its Subsidiaries has filed or caused to be filed all tax returns which, to the knowledge of the Parent, are required to be filed and has paid all taxes shown to be due and payable on said returns or on any assessments made against it or any of its property and all other taxes, fees or other charges imposed on it or any of its property by any Governmental Authority (other than any the amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which adequate reserves to the extent required in conformity with GAAP, have been provided on the books of the Parent or its Subsidiaries, as the case may be) except insofar as the failure to make such filings or payments would not reasonably be expected to have a Material Adverse Effect; and (b) no tax Lien (other than a Lien permitted under subsection 9.2(a)) has been filed, and, to the knowledge of the Parent, no claim is being asserted, with respect to any such tax, fee or other charge which would reasonably be expected to have a Material Adverse Effect.

6.12 Investment Company Act; Other Regulations. None of the Parent, the Company or any of its Subsidiaries is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended. None of the Parent, the Company or any other Borrower is subject to regulation under any Federal or State statute or regulation which limits its ability to incur Indebtedness.

6.13 Purpose of Loans. The proceeds of the Loans shall be used by the Borrowers for general corporate purposes (which may include purchases by the Parent of its capital stock).

CC-BLG000042

6.14 Environmental Matters. To the best of the knowledge of the Parent, the operations of the Parent and its Subsidiaries and all parcels of real estate owned or operated by the Parent or its Subsidiaries are in compliance with all Environmental Laws, except where the failure to so comply would not reasonably be expected to have a Material Adverse Effect.

6.15 Principal Subsidiaries. Set forth on Schedule II are all of the Principal Subsidiaries as of the date hereof.

6.16 Year 2000. Any reprogramming relating to the year 2000 required to permit the proper functioning, in and following the year 2000, in all material respects, of (i) the computer systems of the Parent and its Subsidiaries and (ii) any material equipment of the Parent and its Subsidiaries containing embedded microchips and the testing of all such systems and equipment, as so reprogrammed, is expected to be completed by June 30, 1999. The aggregate cost to the Parent and its Subsidiaries of such reprogramming and testing and of the reasonably foreseeable consequences of year 2000 to the Parent and its Subsidiaries (including, without limitation, reprogramming errors and the failure of others' systems or equipment) is not expected to result in a Default or a Material Adverse Effect.

SECTION 7. CONDITIONS PRECEDENT

7.1 Conditions to Effectiveness. The parties hereto acknowledge that the effectiveness of this Agreement is subject to the satisfaction of the following conditions precedent:

(a) Loan Documents. The Administrative Agent shall have received (i) this Agreement, executed and delivered by a duly authorized officer of each of the Loan Parties, with a counterpart for each Bank, (ii) for the account of each Bank so requesting, a Revolving Credit Note and a Bid Loan Note conforming to the requirements hereof and executed by a duly authorized officer of the Borrowers and (iii) an incumbency certificate of each of the Loan Parties which covers such officers.

(b) Corporate Proceedings. The Administrative Agent shall have received, with a counterpart for each Bank, a copy of the resolutions, in form and substance satisfactory to the Administrative Agent, of the Board of Directors of each of the Loan Parties authorizing (i) the execution, delivery and performance of the Loan Documents to which it is or will be a party and (ii) the borrowings contemplated hereunder (in the case of each Borrower), certified by the Secretary or an Assistant Secretary of such Loan Party as of the Closing Date, which certificate shall state that the resolutions thereby certified have not been amended, modified, revoked or rescinded and shall be in form and substance satisfactory to the Administrative Agent.

(c) Existing Credit Agreement. All commitments of the lenders under the Existing Credit Agreement shall have been terminated, all outstanding loans thereunder shall have been repaid in full, all unpaid fees thereunder shall have been paid in full and such agreement shall have been terminated.

CC-BLG000043

(d) Legal Opinions. The Administrative Agent shall have received, with a counterpart for each Bank, the following executed legal opinions:

(i) the executed legal opinion of counsel to the Company and the Parent who may be the General Counsel of the Company, substantially in the form of Exhibit F-1;

(ii) to the extent required pursuant to subsection 13.15(a)(ii), the executed legal opinion of counsel to any other Borrower, in form and substance reasonably satisfactory to the Administrative Agent; and

(iii) the executed legal opinion of Simpson Thacher & Bartlett, counsel to the Administrative Agent, substantially in the form of Exhibit F-2.

Each such legal opinion shall cover such other matters incident to the transactions contemplated by this Agreement as the Administrative Agent may reasonably require.

(e) Officer's Certificate. The Administrative Agent shall have received, with a counterpart for each Bank, a certificate respecting accuracy of representations and warranties, the absence of events having a Material Adverse Effect and the absence of Defaults and Events of Default, substantially in the form of Exhibit G hereto, signed by a Responsible Officer on behalf of each of the Company and the Parent.

(f) Additional Matters. All corporate and other proceedings, and all documents, instruments and other legal matters in connection with the transactions contemplated by this Agreement shall be satisfactory in form and substance to the Administrative Agent, and the Administrative Agent shall have received such other documents and legal opinions in respect of any aspect or consequence of the transactions contemplated hereby or thereby as it shall reasonably request.

(g) Fees. The Administrative Agent shall have received, on behalf of itself, the Banks and the Arranger, the fees to be received on the Closing Date referred to in subsection 5.2.

7.2 Conditions to Each Loan. The agreement of each Bank to make any Loan requested to be made by it on any date is subject to the satisfaction of the following conditions precedent:

(a) Representations and Warranties. Each of the representations and warranties made by each of the Loan Parties in or pursuant to subsections 6.1, 6.2, 6.3, 6.5, 6.9, 6.10, 6.11, 6.12 and 6.13 of this Agreement and in or pursuant to any other Loan Document to which it is or will be a party, shall be true and correct in all material respects on and as of such date as if made on and as of such date, and the representation and warranty made

CC-BLG000044

pursuant to subsection 6.6 shall be true and correct in all material respects with respect to the financial statements most recently delivered pursuant to subsection 8.1, mutatis mutandis, as if such financial statements delivered pursuant to subsection 8.1 were the financial statements referred to in subsection 6.6.

(b) No Default. No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the Loans requested to be made on such date.

Each borrowing by the Borrowers hereunder shall constitute a representation and warranty by the Loan Parties as of the date of such Loan that the conditions contained in this subsection 7.2 have been satisfied.

## SECTION 8. AFFIRMATIVE COVENANTS

Each of the Company and the Parent hereby agrees that, so long as the Commitments remain in effect, any Note remains outstanding and unpaid or any other amount is owing to any Bank or the Administrative Agent hereunder, each of the Company and the Parent shall and the Company (except in the case of delivery of financial information, reports and notices) shall cause each of its Principal Subsidiaries to:

8.1 Financial Statements. Furnish to each Bank:

(a) as soon as available, but in any event within 120 days after the end of each fiscal year of the Parent, a copy of the consolidated balance sheet of the Parent and its Subsidiaries as at the end of such year and the related consolidated statements of operations, shareholders' equity and cash flows for such year (as included or incorporated by reference in the Parent's Annual Report on Form 10-K or successor form filed with the SEC for each such fiscal year), setting forth in each case in comparative form the figures for the previous year, reported on without a "going concern" or like qualification or exception, or qualification arising out of the scope of the audit, by Price Waterhouse LLP or other independent certified public accountants of nationally recognized standing not unacceptable to the Majority Banks; and

(b) as soon as available, but in any event not later than 75 days after the end of each of the first three quarterly periods of each fiscal year of the Parent, the unaudited consolidated balance sheet of the Parent and its Subsidiaries as at the end of such quarter and the related unaudited consolidated statements of operations for such quarter and the related unaudited consolidated statements of operations and cash flows for the portion of the fiscal year through the end of such quarter (as included in the Parent's Quarterly Report on Form 10-Q or successor form filed with the SEC for each such period), setting forth in each case in comparative form the figures for the corresponding period of the previous year, certified by a Responsible Officer as being fairly stated in all material respects when considered in relation to the consolidated financial statements of the Parent and its Subsidiaries.

CC-BLG000045

All such financial statements shall be prepared in conformity with GAAP (subject, in the case of interim statements, to normal year-end adjustments and to the fact that such financial statements may be abbreviated and may omit footnotes or contain incomplete footnotes) applied consistently throughout the periods reflected therein and with prior periods (except as disclosed therein).

8.2  Certificates; Other Information.  Furnish to each Bank:

(a) concurrently with the delivery of the financial statements referred to in subsection 8.1(a), a certificate of the independent certified public accountants reporting on such financial statements stating that in making the examination necessary therefor no knowledge was obtained of any Default or Event of Default, except as specified in such certificate;

(b) concurrently with the delivery of the financial statements referred to in subsections 8.1(a) and 8.1(b), a certificate of a Responsible Officer of the Parent in his capacity as such officer stating that, (i) to the best of such Officer's knowledge, each of the Borrowers and the Parent during such period has observed or performed all of its covenants and other agreements, and satisfied every condition contained in this Agreement and in the Notes and the other Loan Documents to which it is a party to be observed, performed or satisfied by it, (ii) to the best of such Officer's knowledge, the representation and warranty contained in subsection 6.16 is true and correct as of the date of delivery of such financial statements and certificate and (iii) that such Officer has obtained no knowledge of any Default or Event of Default except as specified in such certificate and showing in detail the calculation of compliance with subsections 9.1 and 9.2;

(c) concurrently with the delivery of the financial statements referred to in subsection 8.1(a), a list of the Principal Subsidiaries as of the corresponding fiscal year end, certified by a Responsible Officer in his capacity as such officer;

(d) within ten Business Days after the same are sent, copies of all financial statements and reports which the Parent sends to its shareholders generally relating to the business of the Parent and its Subsidiaries, and within ten Business Days after the same are filed, copies of all reports on Forms 10-K, 10-Q, 8-K, 8 and 10, and Schedules 13D, 13E-3, 13E-4, 13-G, 14D-1 and 14D-9, or successor forms or schedules, and the final prospectus in each effective registration statement (other than registration statements on Form S-8) and each post-effective amendment to such registration statement which the Parent may make to, or file with, the SEC; and

(e) promptly, subject to reasonable confidentiality requirements agreed to by the Company and such Bank, such additional financial and other information as any Bank may from time to time reasonably request.

8.3 Payment of Obligations. Pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all its obligations of whatever

CC-BLG000046

nature, except where the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves, to the extent required in conformity with GAAP with respect thereto, have been provided on the books of the Parent or its Subsidiaries, as the case may be, and except to the extent that the failure to so pay, discharge or otherwise satisfy such obligations would not result in a Default or Event of Default under Section 10(e)(i).

8.4 Conduct of Business and Maintenance of Existence. Preserve, renew and keep in full force and effect its corporate existence and take all reasonable action to maintain all corporate rights, privileges and franchises necessary or desirable in the normal conduct of its business, except as otherwise permitted pursuant to subsection 9.3; comply with all Contractual Obligations and Requirements of Law except to the extent that failure to comply therewith would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

8.5 Insurance. Maintain with financially sound and reputable insurance companies (which may include, without limitation, captive insurers), such insurance coverage as is reasonable for the business activities of the Parent and its Subsidiaries; and furnish to the Administrative Agent, upon written request, such information as the Administrative Agent may reasonably request as to its insurance program.

8.6 Inspection of Property, Books and Records; Discussions. Permit representatives of any Bank (subject to reasonable safety and confidentiality requirements) to visit and inspect any of its properties and examine and make abstracts from any of its books and records at any reasonable time and as often as may reasonably be desired and to discuss the business, operations, properties and financial and other condition of the Parent and its Subsidiaries with officers and employees of the Parent and its Subsidiaries and, provided representatives of the Parent are given an opportunity to participate, with its independent certified public accountants.

8.7 Notices. Promptly give notice to the Administrative Agent and each Bank of:

(a) the occurrence of any Default or Event of Default;

(b) any (i) default or event of default under any Contractual Obligation of the Parent or any of its Subsidiaries or (ii) litigation, investigation or proceeding which may exist at any time between the Parent or any of its Subsidiaries and any Governmental Authority, which in either case, would reasonably be expected to have a Material Adverse Effect;

(c) any litigation or proceeding affecting the Parent or any of its Subsidiaries in which the then reasonably anticipated exposure of the Parent and its Subsidiaries is $10,000,000 or more and not covered by insurance, or in which injunctive or similar relief is sought which is then reasonably anticipated to have an adverse economic effect on the Parent and its Subsidiaries of $10,000,000 or more;

(d) the following events, as soon as possible and in any event within 30 days after the Company or the Parent knows or has reason to know thereof: (i) the occurrence or

CC-BLG000047

expected occurrence of any Reportable Event with respect to any Plan, or any withdrawal from, or the termination, Reorganization or Insolvency of any Multiemployer Plan or (ii) the institution of proceedings or the taking of any other action by the PBGC or the Company or the Parent or any Commonly Controlled Entity or any Multiemployer Plan with respect to the withdrawal from, or the terminating, Reorganization or Insolvency of, any Plan, where in connection with any of the events described in (i) or (ii) above the liability to the Company or a Commonly Controlled Entity would reasonably be expected to be $10,000,000 or more;

(e) any upgrading, downgrading or cessation in the rating of the long term senior unenhanced, unsecured debt of the Company by the rating agency or agencies whose rating on such debt is then being used to determine the Applicable Margin and the Facility Fee Rate; and

(f) a development or event which would reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this subsection shall be accompanied by a statement of a Responsible Officer setting forth details of the occurrence referred to therein and stating what action each of the Company and the Parent proposes to take with respect thereto.

8.8  Environmental Laws.

(a) Comply with all Environmental Laws and obtain and comply with and maintain any and all licenses, approvals, registrations or permits required by Environmental Laws, except to the extent that failure to do so would not be reasonably expected to have a Material Adverse Effect; and

(b) Defend, indemnify and hold harmless the Administrative Agent and the Banks, and their respective employees, agents, officers and directors, from and against any claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature known or unknown, contingent or otherwise, arising out of, or in any way relating to the violation of or noncompliance with any Environmental Laws applicable to the real property owned or operated by the Company, the Parent or any of the Company's Subsidiaries, or any orders, requirements or demands of Governmental Authorities related thereto, including, without limitation, attorney's and consultant's fees, investigation and laboratory fees, court costs and litigation expenses, except to the extent that any of the foregoing arise out of the gross negligence or willful misconduct of the party seeking indemnification therefor.

8.9  Year 2000 Compliance. Complete, by June 30, 1999, any reprogramming relating to the year 2000 required to permit the proper functioning, in and following the year 2000, of (i) the computer systems of the Parent and its Subsidiaries and (ii) any material equip ment of the Parent and its Subsidiaries containing embedded microchips and the testing of all such systems and equipment, except to the extent that failure to do so would not be reasonably expected to have a Material Adverse Effect.

CC-BLG000048

## SECTION 9. NEGATIVE COVENANTS

The Parent hereby agrees that, so long as the Commitments remain in effect, any Note remains outstanding and unpaid or any other amount is owing to any Bank or the Administrative Agent hereunder, it shall not, and (except with respect to subsections 9.1 and 9.5(b)) shall not permit any of its Subsidiaries to, directly or indirectly:

9.1  Financial Condition Covenants.

(a) Consolidated Debt to EBITDA. Permit on the last day of any fiscal quarter of the Company commencing with June 30, 1998, the ratio of Consolidated Debt as at the end of such fiscal quarter to EBITDA for the period of four consecutive fiscal quarters then ended to be greater than 3.5 to 1.0.

(b) Interest Coverage. Permit for any period of four consecutive fiscal quarters ending on the last day of any fiscal quarter of the Company commencing with June 30, 1998, the ratio of EBIT for such four fiscal quarter period to Consolidated Interest Expense for such four fiscal quarter period to be less than 2.0 to 1.0.

9.2 Limitation on Liens. Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues (which property, assets or revenues are or would be reflected from time to time on the consolidated financial statements of the Parent and its Subsidiaries in accordance with GAAP), whether now owned or hereafter acquired, except for:

(a) Liens for taxes or other governmental charges not yet due or which are being contested in good faith by appropriate proceedings, provided that adequate reserves with respect thereto are maintained on the books of the Parent or its Subsidiaries, as the case may be, to the extent required in conformity with GAAP;

(b) carriers', warehousemen's, mechanics', materialmen's, repairmen's, vendors', landlords', brokers', bankers' and other like Liens arising in the ordinary course of business relating to obligations which are not overdue for a period of more than 60 days or which are being contested in good faith and Liens arising out of judgments or awards that are either discharged within 60 days after entry or execution of which has been stayed pending the outcome of appeal or review proceedings;

(c) pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation and deposits securing liability to insurance carriers under insurance or self-insurance arrangements;

(d) pledges, deposits and similar arrangements in connection with or to secure performance of bids, tenders, leases and other deposits to secure the performance of bids, trade contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business and contractual rights of other Persons to make set-offs and to

CC-BLG000049

require security in connection with letters of credit, currency, commodity and interest rate contracts, surety bonds, leases, banking and brokerage agreements and other transactions in the ordinary course of business;

(e) leases, easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business which would not reasonably be expected to have a Material Adverse Effect;

(f) Liens on the property, assets or revenues of a Person which becomes a Subsidiary after the date hereof, to the extent that (i) such Liens existed at the time such Person became a Subsidiary and were not created in anticipation thereof, (ii) any such Lien is not extended to cover any property, assets or revenues of such Person after the time such Person becomes a Subsidiary, and (iii) the amount of Indebtedness secured thereby is not thereafter increased;

(g) Liens arising in connection with (i) industrial development, pollution control or other tax exempt financing transactions, provided that such Liens do not at any time encumber any property other than the property financed by such transaction and other property, assets or revenues related to the property so financed on which Liens are customarily granted in connection with such transactions, or (ii) conveyances of any production payment or other obligation to make a production payment (A) which is to be made solely from production from oil, gas or other underground mineral properties dedicated thereto or (B) as to which production payment amount the obligee's sole recourse is to such properties;

(h) Liens (including, without limitation, Liens incurred in connection with Capitalized Leases, operating leases and sale-leaseback transactions) securing Indebtedness of the Parent and its Subsidiaries incurred to finance the acquisition of fixed or capital assets, and refinancings thereof, provided that (i) such Liens do not at any time encumber any property other than the property financed by such Indebtedness and other property, assets or revenues related to the property so financed on which Liens are customarily granted in connection with such financings or refinancings, and (ii) the principal amount of Indebtedness secured by any such Lien shall at no time exceed 100% of the greater of the original purchase price of such property at the time it was acquired and the fair market value of such property as reasonably determined by a Responsible Officer of the Company in good faith thereafter, plus fees and other costs related to the financing or refinancing thereof which have been agreed upon in an arm's length manner;

(i) Liens incurred in connection with accounts receivable sale transactions entered into by the Parent or its Subsidiaries;

(j) Liens securing Contractual Obligations of any Subsidiary to the Parent, the Company or any Domestic Subsidiary;

(k) Liens on the property, assets or revenues of any Foreign Subsidiary or any Excluded Subsidiary; and

CC-BLG000050

(1) Liens (not otherwise permitted hereunder) which secure obligations in an aggregate amount at any time outstanding not exceeding an amount equal to 5% of the amount recorded opposite the caption "Properties and equipment, net" (or the equivalent caption) on the consolidated balance sheet of the Parent and its Subsidiaries most recently delivered to the Administrative Agent pursuant to subsection 8.1.

9.3 Limitation on Fundamental Changes. Convey, sell, lease, assign, transfer or otherwise dispose of (including by merger, consolidation, sale of stock, liquidation or dissolution) all or substantially all of the property, assets or business of the Parent and its Subsidiaries taken as a whole.

9.4 Limitation on Asset Transfers to Foreign Subsidiaries. With respect to the Parent or any Domestic Subsidiary, convey, sell, lease, assign, transfer or otherwise dispose of (collectively, a "transfer") any of its property, business or assets (including, without limitation leasehold interests), whether now owned or hereafter acquired, to any Foreign Subsidiary, except such transfers which, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

9.5 Limitation on Subordinated Debt. Permit any Subsidiary of the Parent (other than the Company) to create, incur, assume or suffer to exist any subordinated indebtedness other than (a) subordinated indebtedness of a Person which becomes a Subsidiary after the date hereof to the extent such indebtedness existed at the time such Person became a Subsidiary and was not incurred in anticipation thereof and any refinancings of such indebtedness after such time so long as the principal amount thereof is not increased or (b) subordinated indebtedness of such Subsidiary held by the Parent or any other Subsidiary of the Parent.

## SECTION 10. EVENTS OF DEFAULT

If any of the following events shall occur and be continuing:

(a) Any Borrower shall fail to pay any principal of any Loan or Note when due in accordance with the terms thereof or hereof; or any Borrower shall fail to pay any interest on any Loan or Note, or any other amount payable hereunder, within five Business Days after any such interest or other amount becomes due in accordance with the terms thereof or hereof; or

(b) Any representation or warranty made, or pursuant to subsection 7.2, deemed made, by any Loan Party herein or in any other Loan Document or which is contained in any certificate, document or financial or other statement furnished at any time under or in connection with this Agreement shall prove to have been incorrect in any material adverse respect on or as of the date made or deemed made; or

(c) The Parent or any Subsidiary shall default in the observance or performance of any agreement contained in subsection 9.1, 9.3, 9.4 or 9.5; or

CC-BLG000051

(d) Any Loan Party shall default in the observance or performance of any other agreement contained in this Agreement (other than as provided in paragraphs (a) through (c) of this Section), and such default shall continue unremedied for a period of 30 days; or

(e) The Parent or any of its Subsidiaries (other than the Excluded Subsidiaries) shall (i) default in any payment of principal of or interest on, or any other amount payable with respect to, any (A) Domestic Indebtedness (other than the Notes and Loans) in an aggregate principal amount for all such Domestic Indebtedness of $10,000,000 or more, or (B) Foreign Subsidiary Indebtedness (other than the Notes and Loans) in an aggregate principal amount for all such Foreign Subsidiary Indebtedness of $20,000,000 or more, beyond the period of grace (not to exceed 30 days), if any, provided in the instrument or agreement under which such Indebtedness was created; or (ii) default in the observance or performance of any other agreement relating to any such Indebtedness in the amounts specified in clause (i) above or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist in any case which continues uncured or unwaived (and, if waived, without any change in the material terms of such Indebtedness) after the expiration of all applicable grace periods, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity; or

(f) (i) The Parent or any Principal Subsidiary (other than the Excluded Subsidiaries) shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets, or the Parent or any such Principal Subsidiary shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against the Parent or any such Principal Subsidiary any case, proceeding or other action of a nature referred to in clause (i) above which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of 60 days; or (iii) there shall be commenced against the Parent or any such Principal Subsidiary any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of an order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within 60 days from the entry thereof; or (iv) the Parent or any such Principal Subsidiary shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii) or (iii) above; or (v) the Parent or any such Principal Subsidiary shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; or

CC-BLG000052

(g) (i) Any Person shall engage in any non-exempt "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan, (ii) any "accumulated funding deficiency" (as defined in Section 302 of ERISA), whether or not waived, shall exist with respect to any Plan, (iii) a Reportable Event shall occur with respect to, or judicial proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Single Employer Plan, which Reportable Event or commencement of judicial proceedings or appointment of a trustee is, in the reasonable opinion of the Majority Banks, likely to result in the termination of such Plan for purposes of Title IV of ERISA, (iv) any Single Employer Plan shall terminate for purposes of Title IV of ERISA, (v) the Company or any Commonly Controlled Entity shall, or in the reasonable opinion of the Majority Banks is likely to, incur any liability in connection with a withdrawal from, or the Insolvency or Reorganization of, a Multiemployer Plan or (vi) any other event or condition shall occur or exist, with respect to a Plan; and in each case in clauses (i) through (vi) above, such event or condition, together with all other such events or conditions, if any, could reasonably be expected to subject the Company or any of its Subsidiaries to any tax, penalty or other liabilities which in the aggregate would have a Material Adverse Effect; or

(h) One or more judgments or decrees shall be entered against the Parent or any of its Subsidiaries in aggregate amounts (not paid or fully covered by insurance) of $10,000,000 or more and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within 60 days from the entry thereof; or

(i) The Parent shall cease to own directly or indirectly of record and beneficially free and clear of Liens at least 75% of the shares of the issued and outstanding capital stock of the Company;

then, and in any such event, (A) if such event is an Event of Default specified in clause (i), (ii) or (iii) of paragraph (f) above with respect to any of the Borrowers, automatically the Commitments to such Borrower shall immediately terminate and the Loans made to such Borrower hereunder (with accrued interest thereon) and all other amounts owing under this Agreement and the Notes of such Borrower shall immediately become due and payable, and (B) if such event is any other Event of Default, either or both of the following actions may be taken: (i) with the consent of the Majority Banks, the Administrative Agent may, or upon the request of the Majority Banks, the Administrative Agent shall, by notice to the Company declare the Commitments of any or all of the Borrowers to be terminated forthwith, whereupon such Commitments shall immediately terminate; and (ii) with the consent of the Majority Banks, the Administrative Agent may, or upon the request of the Majority Banks, the Administrative Agent shall, by notice of default to the Company and the Parent, declare the Loans hereunder made to any or all of the Borrowers (with accrued interest thereon) and all other amounts owing by such Borrower under this Agreement and the Notes of such Borrower to be due and payable forthwith, whereupon the same shall immediately become due and payable. Except as expressly provided above in this Section, presentment, demand, protest and all other notices of any kind are hereby expressly waived.

CC-BLG000053

SECTION 11. THE ADMINISTRATIVE AGENT

11.1 Appointment. Each Bank hereby irrevocably designates and appoints Chase as the Administrative Agent of such Bank under this Agreement and the other Loan Documents, and each such Bank irrevocably authorizes Chase, as the Administrative Agent for such Bank, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Bank, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent.

11.2 Delegation of Duties. The Administrative Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. The Administrative Agent shall not be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

11.3 Exculpatory Provisions. Neither the Administrative Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except for its or such Person's own gross negligence or willful misconduct) or (ii) responsible in any manner to any of the Banks for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or the Notes or any other Loan Document or for any failure of any Loan Party to perform its obligations hereunder or thereunder. The Administrative Agent shall not be under any obligation to any Bank to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party.

11.4 Reliance by Administrative Agent. The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, consent, certificate, affidavit, letter, cablegram, telegram, telecopy, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including, without limitation, counsel to the Company, the Parent or any other Borrower), independent accountants and other experts selected by the Administrative Agent. The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been

CC-BLG000054

filed with the Administrative Agent. The Administrative Agent shall be fully
justified in failing or refusing to take any action under this Agreement or any
other Loan Document unless it shall first receive such advice or concurrence of
the Majority Banks as it deems appropriate or it shall first be indemnified to
its satisfaction by the Banks against any and all liability and expense which
may be incurred by it by reason of taking or continuing to take any such
action. The Administrative Agent shall in all cases be fully protected in
acting, or in refraining from acting, under this Agreement and the Notes and
the other Loan Documents in accordance with a request of the Majority Banks,
and such request and any action taken or failure to act pursuant thereto shall
be binding upon all the Banks and all future holders of the Notes.

        11.5 Notice of Default. The Administrative Agent shall not be
deemed to have knowledge or notice of the occurrence of any Default or Event of
Default hereunder unless the Administrative Agent has received notice from a
Bank or any Loan Party referring to this Agreement, describing such Default or
Event of Default and stating that such notice is a "notice of default". In the
event that the Administrative Agent receives such a notice, the Administrative
Agent shall give notice thereof to the Banks. The Administrative Agent shall
take such action with respect to such Default or Event of Default as shall be
reasonably directed by the Majority Banks; provided that unless and until the
Administrative Agent shall have received such directions, the Administrative
Agent may (but shall not be obligated to) take such action, or refrain from
taking such action, with respect to such Default or Event of Default as it
shall deem advisable in the best interests of the Banks.

        11.6 Non-Reliance on Administrative Agent and Other Banks.
Each Bank expressly acknowledges that neither the Administrative Agent nor any
of its officers, directors, employees, agents, attorneys-in-fact or Affiliates
has made any representations or warranties to it and that no act by the
Administrative Agent hereinafter taken, including any review of the affairs of
the Loan Parties, shall be deemed to constitute any representation or warranty
by the Administrative Agent to any Bank. Each Bank represents to the
Administrative Agent that it has, independently and without reliance upon the
Administrative Agent or any other Bank, and based on such documents and
information as it has deemed appropriate, made its own appraisal of and
investigation into the business, operations, property, financial and other
condition and creditworthiness of the Loan Parties and made its own decision to
make its Loans hereunder and enter into this Agreement. Each Bank also
represents that it will, independently and without reliance upon the
Administrative Agent or any other Bank, and based on such documents and
information as it shall deem appropriate at the time, continue to make its own
credit analysis, appraisals and decisions in taking or not taking action under
this Agreement and the other Loan Documents, and to make such investigation as
it deems necessary to inform itself as to the business, operations, property,
financial and other condition and creditworthiness of the Loan Parties. Except
for notices, reports and other documents expressly required to be furnished to
the Banks by the Administrative Agent hereunder, the Administrative Agent shall
not have any duty or responsibility to provide any Bank with any credit or
other information concerning the business, operations, property, condition
(financial or otherwise), prospects or creditworthiness of the Loan Parties
which may come into the possession of the Administrative Agent or any of its
officers, directors, employees, agents, attorneys-in-fact or Affiliates.

11.7 Indemnification. The Banks agree to indemnify the Administrative Agent in its capacity as such (to the extent not reimbursed by the Loan Parties and without limiting the obligation of the Parent, the Company and any other Borrower to do so), ratably according to the respective amounts of their Commitments as in effect on the date on which the claim for indemnity by the Administrative Agent is sought, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever which may at any time (including, without limitation, at any time following the payment of the Notes) be imposed on, incurred by or asserted against the Administrative Agent in any way relating to or arising out of this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by the Administrative Agent under or in connection with any of the foregoing; provided that no Bank shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting solely from the Administrative Agent's gross negligence or willful misconduct. The agreements in this subsection shall survive the payment of the Notes and all other amounts payable hereunder.

11.8 Administrative Agent in Its Individual Capacity. The Administrative Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with the Parent, the Company or any other Borrower as though the Administrative Agent were not the Administrative Agent hereunder and under the other Loan Documents. With respect to its Loans made or renewed by it and any Note issued to it, the Administrative Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Bank and may exercise the same as though it were not the Administrative Agent, and the terms "Bank" and "Banks" shall include the Administrative Agent in its individual capacity.

11.9 Successor Administrative Agent. The Administrative Agent may resign as Administrative Agent upon 10 days' notice to the Banks. If the Administrative Agent shall resign as Administrative Agent under this Agreement and the other Loan Documents, then the Majority Banks shall appoint from among the Banks a successor agent for the Banks, which successor agent shall be approved by the Company, whereupon such successor agent shall succeed to the rights, powers and duties of the Administrative Agent, and the term "Administrative Agent" shall mean such successor agent effective upon its appointment, and the former Administrative Agent's rights, powers and duties as Administrative Agent shall be terminated, without any other or further act or deed on the part of such former Administrative Agent or any of the parties to this Agreement or any holders of the Notes. After any retiring Administrative Agent's resignation as Administrative Agent, the provisions of this subsection shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement and the other Loan Documents.

11.10 Co-Agents. None of the Co-Agents shall have any rights or obligations under this Agreement except in its capacity as a Bank hereunder.

SECTION 12.  GUARANTEES

12.1 Parent Guarantee. The Parent hereby unconditionally and irrevocably guarantees to the Administrative Agent and the Banks the prompt and complete payment and performance by each of the Borrowers when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations owing to the Administrative Agent and the Banks by such Borrowers. This guarantee (the "Parent Guarantee") shall remain in full force and effect until the Obligations of each of the Borrowers are indefeasibly paid in full, notwithstanding that from time to time prior thereto any Borrower may be free from any Obligations. The Parent agrees that whenever, at any time, or from time to time, it shall make any payment to the Administrative Agent or any Bank on account of its liability under this Parent Guarantee, it will notify the Administrative Agent and such Bank in writing that such payment is made under this Parent Guarantee for such purpose. No payment or payments made by any Borrower or any other Person or received or collected by the Administrative Agent or any Bank from any Borrower or any other Person by virtue of any action or proceeding or any offset or appropriation or application, at any time or from time to time, in reduction of or in payment of the Obligations of such Borrower shall be deemed to modify, reduce, release or otherwise affect the liability of the Parent under this Parent Guarantee, which shall remain obligated under this Parent Guarantee, notwithstanding any such payment or payments until the Obligations are paid in full.

12.2 Company Guarantee. The Company hereby unconditionally and irrevocably guarantees to the Administrative Agent and the Banks, the prompt and complete payment and performance by each of the other Borrowers when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations owing to the Administrative Agent and the Banks by such Borrowers. This guarantee (the "Company Guarantee") shall remain in full force and effect until the Obligations of each such Borrower are indefeasibly paid in full, notwithstanding that from time to time prior thereto any such Borrower may be free from any Obligations. The Company agrees that whenever, at any time, or from time to time, it shall make any payment to the Administrative Agent or any Bank on account of its liability under this Company Guarantee, it will notify the Administrative Agent and such Bank in writing that such payment is made under this Company Guarantee for such purpose. No payment or payments made by any such Borrower or any other Person or received or collected by the Administrative Agent or any Bank from any such Borrower or any other Person by virtue of any action or proceeding or any offset or appropriation or application, at any time or from time to time, in reduction of or in payment of the Obligations of such Borrowers shall be deemed to modify, reduce, release or otherwise affect the liability of the Company under this Company Guarantee, which shall remain obligated·under this Company Guarantee, notwithstanding any such payment or payments until the Obligations of such Borrowers are paid in full.

12.3 No Subrogation, Contribution, Reimbursement or Indemnity. Notwithstanding anything to the contrary in the Parent Guarantee and the Company Guarantee (together, the "Guarantees", each a "Guarantee"), the Parent and the Company (together, the "Guaranteeing Parties," each a "Guaranteeing Party") hereby irrevocably waives all rights which may have arisen in connection with its Guarantee to be subrogated to any of the rights (whether contractual, under the Bankruptcy Code, including Section 509 thereof, under common law or otherwise) of the Administrative Agent or any Bank against the Company or any other

CC-BLG000057

Borrowers (together, the "Guaranteed Parties", each a "Guaranteed Party") for the payment of the Obligations. Each Guaranteeing Party hereby further irrevocably waives all contractual, common law, statutory or other rights of reimbursement, contribution, exoneration or indemnity (or any similar right) from or against any Guaranteed Party or Parties or any other Person which may have arisen in connection with its Guarantee. So long as the Obligations remain outstanding, if any amount shall be paid by or on behalf of any Guaranteeing Party to the Guaranteeing Party on account of any of the rights waived in this subsection, such amount shall be held by such Guaranteeing Party in trust, segregated from other funds of such Guaranteeing Party, and shall, forthwith upon receipt by such Guaranteeing Party, be turned over to the Administrative Agent in the exact form received by such Guaranteeing Party (duly endorsed by such Guaranteeing Party to the Administrative Agent, if required), to be applied against the Obligations of such Guaranteed Party or Parties, whether matured or unmatured, in such order as the Administrative Agent may determine. The provisions of this subsection as they apply to each of the Guaranteeing Parties shall survive the payment in full of the Obligations of its Guaranteed Party or Parties.

12.4 Amendments, etc., with respect to the Obligations. Each Guaranteeing Party shall remain obligated under its Guarantee notwithstanding that, without any reservation of rights against such Guaranteeing Party, and without notice to or further assent by such Guaranteeing Party, any demand for payment of any of the Obligations made by the Administrative Agent or any Bank may be rescinded by the Administrative Agent or such Bank, and any of the Obligations continued, and the Obligations, or the liability of any other party upon or for any part thereof, or any collateral security or guarantee therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or released by the Administrative Agent or any Bank, and this Agreement, the Notes and the other Loan Documents may be amended, modified, supplemented or terminated, in whole or in part, as the Administrative Agent or the Banks (or the Majority Banks, as the case may be) may deem advisable from time to time in accordance with the provisions of subsection 13.1(a), and any collateral security, guarantee or right of set-off at any time held by the Administrative Agent or any Bank for the payment of the Obligations may be sold, exchanged, waived, surrendered or released. Neither the Administrative Agent nor any Bank shall have any obligation to protect, secure, perfect or insure any Lien at any time held by it as security for the Obligations or for the obligations of any Guaranteeing Party under its Guarantee or any property subject thereto.

12.5 Guarantee Absolute and Unconditional. Each Guaranteeing Party waives any and all notice of the creation, renewal, extension or accrual of any of the Obligations and notice of or proof of reliance by the Administrative Agent or any Bank upon its Guarantee or acceptance of its Guarantee; the Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon the Guarantees; and all dealings between the Borrowers and the Parent, on the one hand, and the Administrative Agent and the Banks, on the other, shall likewise be conclusively presumed to have been had or consummated in reliance upon the Guarantees. Each Guaranteeing Party waives diligence, presentment, protest, notice of intent to accelerate, notice of acceleration, demand for payment and notice of default or nonpayment to or upon any Guaranteed Party or such Guaranteeing Party with respect to the Obligations. The Guarantees shall be construed as a continuing, absolute and

CC-BLG000058

unconditional guarantee of payment without regard to (a) the validity or enforceability of this Agreement, any Note, any other Loan Document, any of the Obligations or any collateral security therefor or guarantee or right of set-off with respect thereto at any time or from time to time held by the Administrative Agent or any Bank, (b) any defense, offset or counterclaim (other than a defense of payment or performance) which may at any time be available to or be asserted by any of the Guaranteed Parties against the Administrative Agent or any Bank or (c) any other circumstance whatsoever (with or without notice to or knowledge of any of the Guaranteed Parties or such Guaranteeing Party) which constitutes, or might be construed to constitute, an equitable or legal discharge of any of the Guaranteed Parties for the Obligations of such Guaranteed Party, or of such Guaranteeing Party under its Guarantee, in bankruptcy or in any other instance. When the Administrative Agent is pursuing its rights and remedies hereunder against any Guaranteeing Party, the Administrative Agent or any Bank may, but shall be under no obligation to, pursue such rights and remedies as it may have against its Guaranteed Party or any other Person or against any collateral security or guarantee for the Obligations or any right of offset with respect thereto, and any failure by the Administrative Agent or any Bank to pursue such other rights or remedies or to collect any payments from such Guaranteed Party or such other Person or to realize upon any such collateral security or guarantee or to exercise such right of offset or any release of such Guaranteed Party or such other Person or of any such collateral security, guarantee or right of offset, shall not relieve such Guaranteeing Party of any liability under its Guarantee, and shall not impair or affect the rights and remedies, whether express, implied or available as a matter of law, of the Administrative Agent and the Banks against such Guaranteeing Party.

12.6 Reinstatement. Each Guarantee shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Obligations of any Guaranteed Party thereunder is rescinded or must otherwise be restored or returned by the Administrative Agent or any Bank upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of such Guaranteed Party or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, such Guaranteed Party or any substantial part of any of its property, or otherwise, all as though such payments had not been made.

12.7 Payments. Each Guaranteeing Party hereby agrees that the Obligations will be paid to the Administrative Agent for the benefit of the Administrative Agent and the Banks, as the case may be, without set-off or counterclaim in Dollars or Alternative Currency, as appropriate, in immediately available funds at the office of the Administrative Agent, c/o Loan and Agency Services Group (Clearing Account No. 144810547) located at One Chase Manhattan Plaza, 8th Floor, New York, New York 10081.

SECTION 13. MISCELLANEOUS

13.1 Amendments and Waivers; Replacement of Banks. (a) Neither this Agreement, any Note, any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this subsection. With the written consent of the Majority Banks, the Administrative Agent, the Parent and the

Company may, from time to time, enter into written amendments, supplements or modifications hereto and to the Notes, if any, and the other Loan Documents for the purpose of adding any provisions to this Agreement or the Notes, if any, or the other Loan Documents or changing in any manner the rights of the Banks, the Parent or of the Borrowers hereunder or thereunder or waiving, on such terms and conditions as the Administrative Agent may specify in such instrument, any of the requirements of this Agreement or the Notes, if any, or any other Loan Documents or any Default or Event of Default and its consequences; provided, however, that no such waiver and no such amendment, supplement or modification shall (i) reduce the amount or extend the maturity of any Loan or Note or any installment thereof, or reduce the rate or extend the time of payment of interest thereon, or reduce any fee payable to any Bank hereunder, or change the amount of any Bank's Commitment, in each case without the consent of the Bank affected thereby, or (ii) amend, modify or waive any provision of this subsection or reduce the percentage specified in the definition of Majority Banks, or consent to the assignment or transfer by the Parent or any Borrower of any of its rights and obligations under this Agreement and the other Loan Documents, or amend, modify or waive any provision of Section 12, in each case without the written consent of all the Banks, or (iii) amend, modify or waive any provision of Section 11 without the written consent of the then Administrative Agent. Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Banks and shall be binding upon the Parent, the Borrowers, the Banks, the Administrative Agent, all future holders of the Notes, if any, and all future obligees under the Loans. In the case of any waiver, the Parent, the Borrowers, the Banks and the Administrative Agent shall be restored to their former position and rights hereunder and under the outstanding Loans or Notes, if any, and any other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

(b) Notwithstanding anything to the contrary contained in subsection 13.1(a), so long as no Default or Event of Default has occurred and is continuing the Borrowers and the Parent shall be permitted in their discretion (but, if any Revolving Credit Loans are then outstanding, with the consent of the Majority Banks (which consent shall not be unreasonably withheld)) to amend this Agreement to replace one or more Banks without the consent of any Bank to be so replaced pursuant to this subsection 13.1(b) (a "Replaced Bank") and to provide for (w) the termination of the Commitments of such Replaced Bank, (x) the addition to this Agreement of one or more other banking institutions, or an increase in the Commitments of one or more of the other Banks (with the consent of such other Banks), so that the total Commitments after giving effect to such amendment shall be in the same amount as the total Commitments immediately before giving effect to such amendment, (y) if any Loans are outstanding at the time of such amendment, the making of such additional Loans by such new financial institutions or other Bank or Banks, as the case may be, as may be necessary to repay in full the outstanding Loans of such Replaced Bank together with interest thereon and all accrued fees and indemnities with respect thereto immediately before giving effect to such amendment and (z) such other modifications to this Agreement as may be necessary to effect the replacement of such Replaced Bank.

(c) Notwithstanding anything to the contrary contained in paragraph (a) or (b) of this subsection 13.1, if as a result of a change in any Requirement of Law after the date hereof

CC-BLG000060

any Borrower or the Parent has become obligated to, or reasonably believes that it will become obligated to pay to any Bank any increased amount pursuant to subsection 5.11, 5.12 or 5.13, and such Bank shall not have waived payment of such increased amounts, then the Borrowers and the Parent may, if no Default or Event of Default has occurred and is continuing and payment of any such increased amounts as have become due has been made or appropriately provided for, upon five Business Days' notice to the Administrative Agent and such Bank, amend this Agreement, without the consent of any Bank or the Administrative Agent, to replace any one or more of the Banks to which such increased amounts have become payable or would become payable and to provide for the matters referred to in clauses (w), (x), (y) and (z) of subsection 13.1(b), and such replaced Bank or Banks shall be deemed to be Replaced Banks for purposes of such clauses.

13.2 Notices. All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made on receipt, addressed as follows in the case of the Company, the Parent and the Administrative Agent, as set forth in paragraph 5 of the Notice of Additional Borrower relating to any Borrower other than the Company, in the case of such other Borrower, and as set forth in Schedule I in the case of the other parties hereto, or to such other address as may be hereafter notified by the respective parties hereto and any future holders of the Notes, if any, or any future obligees under the Loans:

|  |  |
|---|---|
| The Company: | W. R. Grace & Co.-Conn<br>One Town Center Road<br>Boca Raton, Florida  33486-1010<br>Attention:  Treasurer<br>Telecopy:   (561) 362-1944<br>Telephone: (561) 362-1949 |
| The Parent: | W. R. Grace & Co.<br>One Town Center Road<br>Boca Raton, Florida  33486-1010<br>Attention:  Treasurer<br>Telecopy:   (561) 362-1944<br>Telephone: (561) 362-1949 |

CC-BLG000061

The
Administrative
Agent:                  The Chase Manhattan Bank
                        270 Park Avenue
                        New York, New York  10017
                        Attention:  Mary Elisabeth Swerz
                        Telecopy:  (212) 270-4142
                        Telephone: (212) 270-7939

With a copy
to:                     Loan and Agency Services Group
                        One Chase Manhattan Plaza, 8th Floor
                        New York, New York  10081
                        Attention:  Margaret Swales
                        Telecopy:  (212) 552-5662
                        Telephone: (212) 552-7472

The Arranger:           Chase Securities Inc.
                        270 Park Avenue
                        New York, New York  10017
                        Attention:  Michael J. McGovern
                        Telecopy:   (212) 270-3906
                        Telephone:  (212) 270-1063

13.3 No Waiver; Cumulative Remedies. No failure to exercise and no delay in exercising, on the part of the Administrative Agent or any Bank, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

13.4 Survival of Representations and Warranties. All representations and warranties made hereunder and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the Notes, if any.

13.5 Payment of Expenses and Taxes. The Company agrees (a) to pay or reimburse the Administrative Agent for all its out-of-pocket costs and expenses incurred in connection with the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement and any Notes and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including, without limitation, the fees and disbursements of counsel to the Administrative Agent, (b) to pay or reimburse each Bank and the Administrative Agent for all its costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, any Notes,

CC-BLG000062

the other Loan Documents and any such other documents, including, without limitation, fees and disbursements of counsel to the Administrative Agent and to the several Banks, and (c) to pay, indemnify, and hold each Bank and the Administrative Agent harmless from, any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and other transactional taxes, if any, which may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, any Notes, the other Loan Documents and any such other documents, and (d) to pay, indemnify, and hold each Bank and the Administrative Agent harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery and performance by the Loan Parties, and administration and enforcement by the Administrative Agent and the Banks of this Agreement, any Notes and the other Loan Documents and any such other documents [all the foregoing, collectively, the "indemnified liabilities"), provided, that the Company shall have no obligation hereunder to the Administrative Agent or any Bank with respect to indemnified liabilities arising from (i) the gross negligence or willful misconduct of the Administrative Agent or any such Bank, (ii) legal proceedings commenced against the Administrative Agent or any such Bank by any security holder or creditor thereof arising out of and based upon rights afforded any such security holder or creditor solely in its capacity as such, or (iii) legal proceedings commenced against the Administrative Agent or any such Bank by any other Bank or by any Transferee (as defined in subsection 13.6). The agreements in this subsection shall survive repayment of the Loans or Notes, if any, and all other amounts payable hereunder.

13.6 Successors and Assigns; Participations; Purchasing Banks.

(a) This Agreement shall be binding upon and inure to the benefit of the Parent, the Borrowers, the Banks, the Administrative Agent, all future holders of the Notes, if any, all future obligees under the Loans and their respective successors and assigns, except that neither the Parent nor any Borrower may assign or transfer any of its rights or obligations under this Agreement without the prior written consent of each Bank.

(b) Any Bank may, in the ordinary course of its commercial banking business and in accordance with applicable law, at any time sell to one or more banks or other entities ("Participants") participating interests in any Loan owing to such Bank, any Note held by such Bank, any Commitments of such Bank or any other interest of such Bank hereunder and under the other Loan Documents. In the event of any such sale by a Bank of participating interests to a Participant, such Bank's obligations under this Agreement to the other parties to this Agreement shall remain unchanged, such Bank shall remain solely responsible for the performance thereof, such Bank shall remain the holder of any such Note, if any, and the obligee under any such Loan for all purposes under this Agreement and the other Loan Documents, and the Parent, the Borrowers and the Administrative Agent shall continue to deal solely and directly with such Bank in connection with such Bank's rights and obligations under this Agreement and the other Loan Documents. The Parent and each of the Borrowers agrees that if amounts outstanding under this Agreement and the Loans or the Notes, if any, are due or unpaid, or shall have been

CC-BLG000063

declared or shall have become due and payable upon the occurrence of an Event of Default, each Participant shall be deemed to have the right of set-off in respect of its participating interest in amounts owing under this Agreement and any Loan or Note to the same extent as if the amount of its participating interest were owing directly to it as a Bank under this Agreement or any Loan or Note, provided that such Participant shall only be entitled to such right of set-off if it shall have agreed in the agreement pursuant to which it shall have acquired its participating interest to share with the Banks the proceeds thereof as provided in subsection 13.7. The Parent and each of the Borrowers also agrees that each Participant shall be entitled to the benefits of subsections 5.11, 5.12, 5.13 and 13.5 with respect to its participation in the Commitments and the Loans outstanding from time to time; provided, that no Participant shall be entitled to receive any greater amount pursuant to such subsections than the transferor Bank would have been entitled to receive in respect of the amount of the participation transferred by such transferor Bank to such Participant had no such transfer occurred.

(c) Any Bank may, in the ordinary course of its commercial banking business and in accordance with applicable law, at any time sell to any Bank or any affiliate thereof and, with the consent of the Company and upon notice to the Administrative Agent, to one or more additional banks or financial institutions ("Purchasing Banks") all or any part of its rights and obligations under this Agreement and the Loans or the Notes, if any, pursuant to a Commitment Transfer Supplement, substantially in the form of Exhibit H, executed by such Purchasing Bank (and, in the case of a Purchasing Bank that is not then a Bank or an affiliate thereof, by the Company and the Administrative Agent) and delivered to the Administrative Agent for its acceptance and recording in the Register. Upon such execution, delivery, acceptance and recording, from and after the Transfer Effective Date determined pursuant to such Commitment Transfer Supplement, (x) the Purchasing Bank thereunder shall be a party hereto and, to the extent provided in such Commitment Transfer Supplement, have the rights and obligations of a Bank hereunder with a Commitment as set forth therein, and (y) the transferor Bank thereunder shall, to the extent provided in such Commitment Transfer Supplement, be released from its obligations under this Agreement (and, in the case of a Commitment Transfer Supplement covering all or the remaining portion of a transferor Bank's rights and obligations under this Agreement, such transferor Bank shall cease to be a party hereto). Such Commitment Transfer Supplement shall be deemed to amend this Agreement to the extent, and only to the extent, necessary to reflect the addition of such Purchasing Bank and the resulting adjustment of Commitment Percentages arising from the purchase by such Purchasing Bank of all or a portion of the rights and obligations of such transferor Bank under this Agreement and the Loan or the Notes, if any. On or prior to the Transfer Effective Date determined pursuant to such Commitment Transfer Supplement, the relevant Borrower, at its own expense, if the Purchasing Bank so requests, shall execute and deliver to the Administrative Agent in exchange for any surrendered Revolving Credit Note and Bid Loan Note a new Revolving Credit Note and Bid Loan Note to the order of such Purchasing Bank in an amount equal to the Commitment assumed by it pursuant to such Commitment Transfer Supplement and, if the transferor Bank has retained a Commitment hereunder, new Notes to the order of the transferor Bank in an amount equal to the Commitment retained by it hereunder. Such new Notes shall be dated the Closing Date and shall otherwise be in the form of the Notes replaced thereby. Any Notes surrendered by the transferor Bank shall be returned by the Administrative Agent to the Company marked "cancelled".

(d) The Administrative Agent shall maintain at its address referred to in subsection 13.2 a copy of each Commitment Transfer Supplement delivered to it and a register (the "Register") for the recordation of the names and addresses of the Banks and the Commitment of, and principal amount of the Loans owing to, each Bank from time to time. The entries in the Register shall be conclusive, in the absence of manifest error, and the Parent, the Borrowers, the Administrative Agent and the Banks may treat each Person whose name is recorded in the Register as the owner of the Loan recorded therein for all purposes of this Agreement. The Register shall be available for inspection by the Parent, the Borrowers or any Bank at any reasonable time and from time to time upon reasonable prior notice.

(e) Upon its receipt of a Commitment Transfer Supplement executed by a transferor Bank and Purchasing Bank (and, in the case of a Purchasing Bank that is not then a Bank or an affiliate thereof, by the Company and the Administrative Agent) together with payment to the Administrative Agent of a registration and processing fee of $3,500, the Administrative Agent shall (i) promptly accept such Commitment Transfer Supplement (ii) on the Transfer Effective Date determined pursuant thereto record the information contained therein in the Register and give notice of such acceptance and recordation to the Banks and the Company.

(f) The Parent and the Borrowers authorizes each Bank to disclose to any Participant or Purchasing Bank (each, a "Transferee") and any prospective Transferee any and all financial information in such Bank's possession concerning such Borrower and its affiliates which has been delivered to such Bank by or on behalf of the Parent, the Company or such Borrower pursuant to this Agreement or which has been delivered to such Bank by or on behalf of the Parent, the Company or such Borrower in connection with such Bank's credit evaluation of such Borrower and its affiliates prior to becoming a party to this Agreement.

(g) If, pursuant to this subsection, any interest in this Agreement or any Note is transferred to any Transferee which is organized under the laws of any jurisdiction other than the United States or any state thereof, the transferor Bank shall cause such Transferee, concurrently with the effectiveness of such transfer, (i) to represent to the transferor Bank (for the benefit of the transferor Bank, the Administrative Agent, the Parent and the Borrowers) that under applicable law and treaties no taxes will be required to be withheld by the Administrative Agent, the Parent, the Borrowers or the transferor Bank with respect to any payments to be made to such Transferee in respect of the Loans, (ii) to furnish to the transferor Bank (and, in the case of any Purchasing Bank registered in the Register, the Administrative Agent, the Parent and the Company) either U.S. Internal Revenue Service Form 4224 or U.S. Internal Revenue Service Form 1001 (wherein such Transferee claims entitlement to complete exemption from U.S. federal withholding tax on all interest payments hereunder) and (iii) to agree (for the benefit of the transferor Bank, the Administrative Agent, the Parent and the Company) to provide the transferor Bank (and, in the case of any Purchasing Bank registered in the Register, the Administrative Agent, the Parent and the Company) a new Form 4224 or Form 1001 upon the expiration or obsolescence of any previously delivered form and comparable statements in accordance with applicable U.S. laws and regulations and amendments duly executed and completed by such Transferee, and to comply from time to time with all applicable U.S. laws and regulations with regard to such withholding tax exemption.

CC-BLG000065

(h) Nothing herein shall prohibit any Bank from pledging or assigning any Note to any Federal Reserve Bank in accordance with applicable law.

13.7  Adjustments; Set-off.

(a) If any Bank (a "benefitted Bank") shall at any time receive any payment of all or part of its Revolving Credit Loans, or interest thereon, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off, pursuant to events or proceedings of the nature referred to in Section 10(f), or otherwise), in a greater proportion than any such payment to or collateral received by any other Bank, if any, in respect of such other Bank's Revolving Credit Loans, or interest thereon, such benefitted Bank shall purchase for cash from the other Banks such portion of each such other Bank's Loan, or shall provide such other Banks with the benefits of any such collateral, or the proceeds thereof, as shall be necessary to cause such benefitted Bank to share the excess payment or benefits of such collateral or proceeds ratably with each of the Banks; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such benefitted Bank, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest. Each Borrower agrees that each Bank so purchasing a portion of another Bank's Loan may exercise all rights of payment (including, without limitation, rights of set-off) with respect to such portion as fully as if such Bank were the direct holder of such portion.

(b) In addition to any rights and remedies of the Banks provided by law, each Bank shall have the right, without prior notice to the Parent and the Borrowers, any such notice being expressly waived by the Parent and the Borrowers, to the extent permitted by applicable law, upon any amount not being paid when due and payable by any Borrower hereunder or under the Notes (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Bank or any branch or agency thereof to or for the credit or the account of the Parent or such Borrower. Each Bank agrees promptly to notify the Parent, the Borrowers and the Administrative Agent after any such set-off and application made by such Bank, provided that the failure to give such notice shall not affect the validity of such set-off and application.

13.8 Counterparts. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. A set of the copies of this Agreement signed by all the parties shall be lodged with the Parent, the Company and the Administrative Agent.

13.9 Severability. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

13.10 Integration. This Agreement represents the agreement of the Parent, each Borrower, the Administrative Agent and the Banks with respect to the subject matter hereof, and there are no promises, undertakings, representations or warranties by the Administrative Agent or any Bank relative to subject matter hereof not expressly set forth or referred to herein, in the other Loan Documents or in any documentation entered into pursuant to subsection 3.1(b).

13.11 GOVERNING LAW. THIS AGREEMENT (INCLUDING SECTION 12) AND THE NOTES AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT AND THE NOTES SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

13.12 Submission to Jurisdiction; Waivers. (a) The Parent, each Borrower, the Administrative Agent and the Banks hereby irrevocably and unconditionally:

(i) submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the Courts of the State of New York sitting in New York County, the courts of the United States of America for the Southern District of New York, and the appellate courts from any thereof;

(ii) consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(iii) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the Parent or such Borrower at its address set forth in subsection 13.2 or, with respect to Borrowers other than the Company, the Notice of Additional Borrower relating to such Borrower or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(iv) agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(v) waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this subsection any special, exemplary, punitive or consequential damages.

(b) Each Borrower other than the Company hereby appoints and empowers the Parent and the Company, 1114 Avenue of the Americas, New York, New York 10036-7794, Attention: Treasurer, as its authorized agent (the "Process Administrative Agent") to receive on behalf of such Borrower service of any and all process and documents in any such legal action or

CC-BLG000067

proceeding brought in a New York state or federal court sitting in New York City. It is understood that a copy of such process served on the Process Administrative Agent will be promptly hand delivered or mailed (by registered or certified airmail if available), postage prepaid, to such Borrower at its address set forth in paragraph 5 of such Borrower's Notice of Additional Borrower, but the failure of such Borrower to receive such copy shall not affect in any way the service of such process on the Process Administrative Agent. If the Process Administrative Agent shall refuse or be prevented from acting as agent, notice thereof shall immediately be given by such Borrowers to the Administrative Agent by registered or certified airmail (if available), postage prepaid, and such Borrowers agree promptly to designate another agent in New York City, satisfactory to the Administrative Agent, to serve in place of the Process Administrative Agent and deliver to the Administrative Agent written evidence of such substitute agent's acceptance of such designation.

13.13 Acknowledgments. The Parent, each Borrower, the Administrative Agent and the Banks hereby acknowledge that:

(a) it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the Notes and the other Loan Documents;

(b) neither the Administrative Agent nor any Bank has any fiduciary relationship with or duty to the Parent or such Borrower, as the case may be, arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between Administrative Agent and Banks, on one hand, and the Parent and the Borrowers, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c) as to any matter relating to any Loan Documents, no joint venture exists among the Banks or among the Parent, the Borrowers and the Banks.

13.14 WAIVERS OF JURY TRIAL. THE PARENT, THE BORROWERS, THE ADMINISTRATIVE AGENT AND THE BANKS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR THE NOTES OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

13.15 Additional Borrowers. (a) Any Subsidiary of the Company shall have the right to become a "Borrower" hereunder, and to borrow hereunder subject to the terms and conditions hereof applicable to a Borrower and to the following additional conditions:

(i) the Company shall deliver a notice in substantially the form of Exhibit I hereto (a "Notice of Additional Borrower") signed by such Subsidiary and countersigned by the Parent and the Company to the Administrative Agent and the Banks stating that such Subsidiary desires to become a "Borrower" under this Agreement and agrees to be bound by the terms hereof. From the time of receipt of such Notice of Additional Borrower by the Administrative Agent and the Banks and subject to the satisfaction of each condition precedent contained in such Notice of Additional Borrower, such

CC-BLG000068

Subsidiary shall be a "Borrower" hereunder with all of the rights and obligations of a Borrower hereunder; provided, however, that the Company may revoke a Notice of Additional Borrower with respect to any Subsidiary (other than the Company) upon five Business Days' written notice to the Administrative Agent, so long as such Borrower has no Obligations outstanding. No Notice of Additional Borrower relating to a Subsidiary may be revoked as to amounts owed by such Subsidiary to the Banks under this Agreement or any Notes or when an irrevocable notice pursuant to subsection 2.3, or a notice of acceptance pursuant to subsection 3.1 or 4.2, has been given by such Subsidiary as a Borrower and is effective;

       (ii) if such Subsidiary is a Foreign Subsidiary, if reasonably requested by the Majority Banks, such Notice of Additional Borrower shall be accompanied by an opinion of counsel for such Subsidiary as specified in paragraph 4(a)(ii) of such Notice of Additional Borrower;

       (iii) and the other conditions set forth in such Notice of Additional Borrower shall have been satisfied (including the representations and warranties contained therein being true and correct as of the date thereof).

       (b) Promptly, upon receipt of any Notice of Additional Borrower by the Administrative Agent, the Administrative Agent shall notify each Bank thereof, and shall deliver to each Bank copies of each document delivered to the Administrative Agent pursuant to such Notice of Additional Borrower.

CC-BLG000069

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered in New York, New York by their proper and duly authorized officers as of the day and year first above written.

W. R. GRACE & CO.-CONN.

By: -------------------------------------
    Title:

W. R. GRACE & CO.

By: -------------------------------------
    Title:

THE CHASE MANHATTAN BANK, as Administrative Agent and as a Bank

By: -------------------------------------
    Title:

CHASE SECURITIES INC., as Arranger

By: -------------------------------------
    Title:

CC-BLG000070

FIRST UNION NATIONAL BANK OF
FLORIDA

By:
    ------------------------------------
    Title:

BANK OF AMERICA NATIONAL
TRUST AND SAVINGS ASSOCIATION

By:
    ------------------------------------
    Title:

NATIONSBANK, N.A.

By:
    ------------------------------------
    Title:

ABN AMRO BANK N.V.

By:
    ------------------------------------
    Title:

By:
    ------------------------------------
    Title:

THE BANK OF NEW YORK

By:
    ------------------------------------
    Title:

CC-BLG000071

THE BANK OF NOVA SCOTIA

By:
      ------------------------------------
      Title:


BARCLAYS BANK PLC

By:
      ------------------------------------
      Title:


CITIBANK, N.A.

By:
      ------------------------------------
      Title:


CREDIT SUISSE FIRST BOSTON

By:
      ------------------------------------
      Title:


By:
      ------------------------------------
      Title:


DRESDNER BANK AG, NEW YORK
AND GRAND CAYMAN BRANCHES

By:
      ------------------------------------
      Title:


By:
      ------------------------------------
      Title:


CC-BLG000072

MORGAN GUARANTY TRUST
COMPANY OF NEW YORK

By:
    ------------------------------------
    Title:

COMMERZBANK AG, ATLANTA
AGENCY

By:
    ------------------------------------
By: Harry P. Yergey
    Title:  SVP & Manager

By:
    ------------------------------------
By: Brian J. Campbell
    Title:  VP

CREDIT LYONNAIS ATLANTA
AGENCY

By:
    ------------------------------------
    Title:

MARINE MIDLAND BANK

By:
    ------------------------------------
    Title:

NORTHERN TRUST COMPANY
(CHICAGO)

By:
    ------------------------------------
    Title:


WACHOVIA BANK (ATLANTA)

By:
    ------------------------------------
    Title:

CC-BLG000074

SCHEDULE I

Commitments
--------------------------------------------

| BANK | COMMITMENT |
|------|-----------|
| The Chase Manhattan Bank | $21,470,588.24 |
| First Union National Bank of Florida | $21,470,588.24 |
| NationsBank, N.A. | $21,470,588.24 |
| Bank of America National Trust and Savings Assoc. | $21,470,588.24 |
| ABN AMRO Bank N.V., New York Branch | $14,705,882.35 |
| The Bank of New York | $14,705,882.35 |
| The Bank of Nova Scotia | $14,705,882.35 |
| Barclays Bank PLC | $14,705,882.35 |
| Citibank, N.A. | $14,705,882.35 |
| Credit Suisse First Boston | $14,705,882.35 |
| Dresdner Bank AG, New York and Grand Cayman Branches | $14,705,882.35 |
| Morgan Guaranty Trust Company of New York | $14,705,882.35 |
| Commerzbank AG, Atlanta Agency | $10,588,235.29 |
| Credit Lyonnais Atlanta Agency | $10,588,235.29 |
| Marine Midland Bank | $10,588,235.29 |
| Northern Trust Company (Chicago) | $7,352,941.18 |
| Wachovia Bank (Atlanta) | $7,352,941.18 |
| TOTAL | $250,000,000 |

i

CC-BLG000075