UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                           .      Case No.   01-1139 (JKF)
                                 .
W.R. GRACE & CO.,                .
et al.,                          .      USX Tower - 54th Floor
                                 .      600 Grant Street
                                 .      Pittsburgh, PA 15219
            Debtors.   .
                                 .      January 14, 2008
. . . . . . . . . . . . . ..            8:50 a.m.

                    TRANSCRIPT OF TRIAL
        BEFORE HONORABLE JUDITH K. FITZGERALD
        UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:          Kirkland & Ellis, LLP
                          By:  DAVID BERNICK, ESQ.
                               BARBARA HARDING, ESQ.
                               JANET BAER, ESQ.
                               BRIAN STANSBURY, ESQ.
                               RAINA JONES, ESQ.
                               HENRY THOMPSON, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601


For the Debtors:          Kirkland & Ellis, LLP
                          By:  THEODORE FREEDMAN, ESQ.
                          Citigroup Center, 153 East 53rd St.
                          New York, NY  100


For the ACC:              Caplin & Drysdale, Chartered
                          By:  PETER LOCKWOOD, ESQ.
                               NATHAN FINCH, ESQ.
                          One Thomas Circle, NW
                          Washington, D.C.  20005


Audio Operator:           Cathy Younker


Proceedings recorded by electronic sound recording, transcript
               produced by transcription service.

_____

            J&J COURT TRANSCRIBERS, INC.
                 268 Evergreen Avenue
               Hamilton, New Jersey 08619
            E-mail:  jjcourt@optonline.net

         (609)586-2311      Fax No. (609) 587-3599

TRIAL EXHIBIT 10
CC-BLG000359-000553

CC-BLG000359

APPEARANCES (CONT'D):

For the Debtors:          By:  SCOTT McMILLAN, ESQ.


For the Debtors:          ARPC
                          By:  AMY BROCKMAN, ESQ.


For W.R. Grace:           W.R. Grace
                          By:  MARK SHELNITZ, ESQ.
                               JAY HUGHES, ESQ.
                               WILLIAM CORCORAN, ESQ.
                          7500 Grace Drive
                          Columbia, MD  21044

For the Committee:        Caplin & Drysdale, Chartered
                          By:  ELIHU INSELBUCH, ESQ.
                          375 Park Avenue, #3505
                          New York, NY  10152

For the Equity            Kramer Levin Naftalis & Frankel
Committee:                By:  GREGORY HOROWITZ, ESQ.
                          919 Third Avenue
                          New York, NY  10022


For the                   Stroock & Stroock & Lavan
Unsecured Creditors'      By:  KENNETH PASQUALE, ESQ.
Committee:                     ARLENE KRIEGER, ESQ.
                               180 Maiden Lane
                               New York, NY  10038-4982

For the Property
Damage Committee:         Bilzin Sumberg Baena Price &
                             Axelrod LLP
                          By:  MATTHEW KRAMER, ESQ.
                          200 South Biscayne Boulevard
                          Suite 2500
                          Miami, FL  33131


**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D)

| | |
|---|---|
| For the Ad Hoc<br>Committee of Equity<br>Sec. Holders: | Dewey & LeBoeuf, LLP<br>By:  JENNIFER WHITENER, ESQ.<br>125 West 55th Street<br>New York, NY  10019 |
| For the FCR: | Orrick, Herrington & Sutcliffe<br>  LLP<br>By:  ROGER FRANKEL, ESQ.<br>     ANTHONY KIM, ESQ.<br>     RAYMOND MULLADY, ESQ.<br>     JOHN ANSBRO, ESQ.<br>Washington Harbour<br>3050 K Street, N.W.<br>Washington, D.C.  20007 |
| For Committee of<br>Asbestos Personal<br>Injury Claimants: | Campbell & Levine<br>By:  MARK T. HURFORD, ESQ.<br>800 North King Street<br>Suite 300<br>Wilmington, DE  19701 |
| For Maryland Casualty: | Connelly Bove Lodge & Hutz, LLP<br>By:  JEFFREY WISLER, ESQ.<br>The Nemours Building<br>1007 North Orange Street<br>Wilmington, DE  19899 |
| For MCC: | Eckert Seamans Cherin & Mellott, LLC<br>By:  EDWARD LONGOSZ, II, ESQ.<br>1747 Pennsylvania Avenue, N.W.<br>Suite 1200<br>Washington, D.C.  20006 |
| For : | STB<br>By:  STERLING MARSHALL, ESQ. |
| For Sealed Air: | Skadden, Arps, Slate, Meagher & Flom<br>  LLP<br>By:  MARK CHEHI, ESQ.<br>One Rodney Square<br>Wilmington, DE  19801 |
| For Sealed Air: | NERA<br>By:  STEPHANIE PLAUCICH, ESQ. |

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000361

4

APPEARANCES (CONT'D):

For W.R. Grace:          NERA
                         By:  ELENA ZAPRYANOVA, ESQ.


For Serengeti:           Vinson & Elkins LLP
                         By:  AMY BERMAN, ESQ.
                         Trammell Crow Center
                         2001 Ross Avenue, Suite 3700
                         Dallas, TX  75201

For Serengeti:           By:  BILLAL SIKANDER


For :                    Silver Point
                         By:  JOHN KI


For the Debtors:         Pachulski, Stang, Ziehl &Jones
                         By:  JAMES O'NEILL, ESQ.
                         919 North Market Street
                         17th Floor
                         Wilmington, DE  19899-8705

For W.R. Grace           Kirkland & Ellis
                         By:  SAL BIANCA, ESQ.
                         200 East Randolph Drive
                         Chicago, IL  60601

TELEPHONIC APPEARANCES:

For the Unsecured        Strook & Strook & Lavan
Creditors' Committee:    By:  LEWIS KRUGER, ESQ.
                         180 Maiden Lane
                         New York, NY 10038

For Ad Hoc Committee:    Weil, Gotshal & Manges
                         By:  M. JARRAD WRIGHT, ESQ.
                         1300 Eye Street NW, Suite 900
                         Washington, D.C.  20005

For Official Committee   Kramer Levin Naftalis & Frankel
of Equity Holders:         LLP
                         By:  PHILLIP BENTLEY, ESQ.
                         919 Third Avenue
                         New York, NY  10022

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

| | |
|---|---|
| For Official Committee of Asbestos Property Damage Claimants: | Dies & Hile LLP<br>By:  MARTIN DIES, ESQ.<br>1601 Rio Grande, Suite 330<br>Austin, TX  78701 |
| For Various Claimant Firms: | Stutzman, Bromberg, Esserman & Plifka<br>By:  DAVID J. PARSONS, ESQ.<br>     VAN J. HOOKER, ESQ.<br>     SANDER L. ESSERMAN, ESQ.<br>2323 Bryan Street<br>Suite 2200<br>Dallas, TX  75201 |
| For Fireman's Fund: | Stevens & Lee, P.C.<br>By:  JOHN DEMMY, ESQ.<br>     DAVID R. BEANE, ESQ.<br>1105 North Market Street, 7th Fl.<br>Wilmington, DE  19801 |
| For the PD Committee: | Bilzin Sumberg Baena Price &<br>  Axelrod LLP<br>By:  SCOTT BAENA, ESQ.<br>200 South Biscayne Boulevard<br>Suite 2500<br>Miami, FL  33131 |
| For Owens-Illinois: | McCarter & English<br>By:  KATHARINE MAYER, ESQ.<br>Renaissance Centre, 405 N. King St.<br>Wilmington, DE  19801 |
| For David T. Austern: | Piper Jaffray & Co.<br>By:  JONATHAN BROWNSTEIN, ESQ. |
| For Asbestos Property Damage Claimants: | Scott Law Group<br>By:  DARRELL SCOTT, ESQ.<br>1001 East Main Street, Suite 500<br>Sevierville, TN  37864 |

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000363

TELEPHONIC APPEARANCES (CONT'D):

For National Union Fire        Zeichner Ellman & Krause, LLP
Insurance Co.:                 By:  MATTHEW RUSSELL, ESQ.
                                    ROBERT GUTTMANN, ESQ.
                                    MICHAEL DAVIS, ESQ.
                               575 Lexington Avenue
                               New York, NY  10022

For the FCR:                   Orrick, Herrington & Sutcliffe
                                  LLP
                               By:  DEBRA FELDER, ESQ.
                                    JOSHUA CUTLER, ESQ.
                               Washington Harbour
                               3050 K Street, N.W.
                               Washington, D.C.  20007 For

For Federal Insurance          Cozen O'Connor
Company:                       By:  JEFFREY WAXMAN, ESQ.
                               Chase Manhattan Centre
                               1201 North Market Street
                               Wilmington, DE  19801

For Federal Insurance          Cozen O'Connor
Company:                       By:  JACOB C. COHN, ESQ.
                               1900 Market Street
                               Philadelphia, PA  19103

For Allstate Insurance:        Cuyler Burk, LLP
                               By:  ANDREW CRAIG, ESQ.
                               Parsippany Corporate Center
                               Four Century Drive
                               Parsippany, NJ  07054

For W.R. Grace:                Kirkland & Ellis LLP
                               By:  ELLEN AHERN, ESQ.
                               200 East Randolph Drive
                               Chicago, IL  60601

For W.R. Grace:                Kirkland & Ellis LLP
                               By:  DAVID MENDELSON, ESQ.
                               6555 Fifteenth Street, N.W.
                               Washington, DC  20005

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000364

TELEPHONIC APPEARANCES (CONT'D):

For State of Montana        Womble Carlyle Sandridge & Rice
Department of               By:  FRANCIS MONACO, ESQ.
Environmental Quality:      222 Delaware Avenue
                            Suite 1501
                            Wilmington, DE  19801

For Official Committee      Anderson Kill & Olick
of Asbestos Personal        By:  ROBERT M. HORKOVICH, ESQ.
Injury Claimants:           1251 Avenue of the Americas
                            New York, NY  10020-1186

For W.R. Grace:             Cohn Whitesell & Goldberg, LLP
                            By:  CHRISTOPHER M. CANDON, ESQ.
                            101 Arch Street
                            Boston, MA  02110

For CNA:                    Goodwin Procter, LLP
                            By:  DANIEL GLOSBAND, ESQ.
                            Exchange Place
                            Boston, MA  02109-2881

For Grace Certain           Montgomery, McCracken, Walker &
Cancer Claimants:                 Rhoads LLP
                            By:  NATALIE D. RAMSEY, ESQ.
                            300 Delaware Avenue, Ste. 750
                            Wilmington, DE  19801

For David T. Austern,       Phillips, Goldman & Spence, P.A.
the Future Claimants'       By:  JOHN C. PHILLIPS, ESQ.
Representative:             1200 North Broom Street
                            Wilmington, DE  19806

For W.R. Grace:             Pachulski, Stang,Ziehl & Jones LLP
                            By:  TIMOTHY P. CAIRNS, ESQ.
                            919 North Market Street
                            17th Floor
                            Wilmington, DE  19899-8705

J&J COURT TRANSCRIBERS, INC.

CC-BLG000365

TELEPHONIC APPEARANCES (CONT'D):

For the ACC:                Caplin & Drysdale, Chartered
                            By:  WALTER SLOCOMBE, ESQ.
                                 BERNARD BAILOR, ESQ.
                                 JEANNA RICKARDS, ESQ.
                                 JAMES WEHNER, ESQ.
                                 LESLIE KELLEHER, ESQ.
                            One Thomas Circle, NW
                            Washington, D.C.  20005

For the ACC:                Ferry Joseph & Pearce, P.A.
                            By:  THEODORE TACCONELLI, ESQ.
                            824 Market Street, Suite 19899
                            Wilmington, DE  19899

For Ford, Marrin,          Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer           Gleser
& Gleser:                   By:  SHAYNE SPENCER, ESQ.
                            Wall Street Plaza
                            New York, NY  10005

For Pepsi:                  Butler Rubin Salfarelli & Boyd LLP
                            By:  KIRK T. HARTLEY, ESQ.
                            70 West Madison Street
                            Suite 1800
                            Chicago, IL  60602

For Official Committee     Duane Morris LLP
of Unsecured Creditors:     By:  MICHAEL LASTOWSKI, ESQ.
                            1100 North Market Street, Suite 1200
                            Wilmington, DE  19801-1246

For Official Committee     Brandi Law Firm
of Asbestos Property        By:  TERENCE D. EDWARDS, ESQ.
Damage Claimants:           44 Montgomery St., Suite 1050
                            San Francisco, CA  94104

For the State of CA,       Hahn & Hessen LLP
Dept. of Gen. Services:     By:  STEVEN J. MANDELSBERG, ESQ.
                            488 Madison Avenue, 14th Fl.
                            New York, NY  10022

For Baron & Budd,          Hogan Firm Attorneys at Law
et al.:                     By:  DANIEL K. HOGAN, ESQ.
                            1311 Delaware Avenue
                            Wilmington, DE  19801

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000366

TELEPHONIC APPEARANCES (CONT'D):

For the PD Committee:        Speights & Runyan
                             By:  DANIEL SPEIGHTS, ESQ.
                             200 Jackson Avenue, East
                             Hampton, SC  29924

For Royal Insurance:         Wilson Elser Moskowitz Edelman
                                & Dicker LLP
                             By:  CATHERINE CHEN, ESQ.
                                 150 East 42nd Street
                                 New York, NY  10017

For David T. Austern:        Piper Jaffray & Co.
                             By:  JASON SOLGANICK

For Scott Company:           Vorys, Sater, Seymour & Pease, LLP
                             By:  TIFFANY COBB, ESQ.
                             52 East Gay Street
                             Columbus, OH  43216

For London Market            Mendes & Mount, LLP
Companies:                   By:  ALEXANDER MUELLER, ESQ.
                             750 Seventh Avenue
                             New York, NY  10019-6829

For Official Committee       LECG
of Asbestos Property         By:  ALAN MADIAN, ESQ.
Claimants:

For Official Committee       Richardson Patrick Westbrook &
of Asbestos Property            Brickman, P.C.
Claimants:                   By:  EDWARD J. WESTBROOK, ESQ.
                             174 East Bay Street
                             Charleston, SC  29401

For Ivory Investment:        Ivory Investment
                             By:  DHANANJAY PATWARDHAN

J&J COURT TRANSCRIBERS, INC.

TELEPHONIC APPEARANCES (CONT'D):

For Linden Advisors:        Linden Advisors, LP
                            By:  CRAIG GILBERT


For O'Conner:               O'Conner
                            By:  John R. Wollen

For Credit Suisse           Credit Suisse First Boston
First Boston:               By:  TIM McARDLE

For King Street             King Street Capital Management, LLC
Capital Management,         By:  MITCHELL SOCKETT
LLC:

For the Blackstone          The Blackstone Group
Group:                      By:  JOHN O'CONNELL


For Dune Capital Mgmt:      Dune Capital Management
                            By:  GUY BARON

For Anchorage Advisors:     Anchorage Advisors
                            By:  JONATHAN LEWINSOHN

For Lehman Brothers:        Lehman Brothers
                            By:  ANDREW CHAN

For Caxton Associates:      Caxton Associates, LLC
                            By:  JAMES RIEGER

For Dow Jones               Dow Jones News Wires
News Wires:                 By:  PEG BRICKLEY

For Citadel Investment      Citadel Investment Group
Group:                      By:  BEAU HARBOUR


**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000368

TELEPHONIC APPEARANCES (CONT'D):

For Durham Asset                 Durham Asset Management
Management:                      By:  JEFFREY A. ROSENKRANZ


For Murray Capital               Murray Capital Management, Inc.
Management                       By:  MARTI MURRAY


For Korn Capital, LLC:           Korn Capital, LLC
                                 By:  STEPHANIE KWONG


For Irwin H. Zandman:            Irwin H. Zandman
                                 By:  IRWIN H. ZANDMAN

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000369

1  (Audio malfunction - Attorneys on Microphones 2 and 3 difficult

2  to discern)

3         THE COURT:  Good morning.

4         THE CLERK:  All rise.

5         THE COURT:  Please be seated.  This is the matter of

6  W.R. Grace, 01-01139.  The participants I have listed by phone:

7  Dhananjay Patwardhan, Lewis Kruger, Jarrad Wright, Craig

8  Gilbert, Philip Bentley, Martin Dies, John Wollen, David

9  Parsons, Tim McArdle, John Demmy, Scott Baena, Katharine Mayer,

10 Jonathan Brownstein,  Mitchell Sockett, John O'Connell, Guy

11 Baron, Matthew Russell, Jonathan Lewinsohn, Darrell Scott,

12 Robert Guttmann, Elizabeth Devine, Debra Felder, Andrew Chan,

13 James Rieger, Peg Brickley, Jeff Waxman, Jacob Cohn, Andrew

14 Craig, Beau Harbour, Theodore Freedman, Ellen Ahern, David

15 Mendelson, Douglas Mannal, Janet Baer, Francis Monaco, Robert

16 Horkovich, Christopher Candon, Natalie Ramsey, Daniel Glosband,

17 David Beane, Jeffrey Rosenkranz, John Phillips, Timothy Cairns,

18 Bernard Bailor, Walter Slocombe, Theodore Tacconelli, Peter

19 Lockwood, Mark Hurford, William Corcoran, Jeanna Rickards,

20 Steven Eisman, Peter Shawn, Shayne Spencer, Kirk Hartley, Van

21 Hooker, Michael Lastowski, Joshua Cutler, Marti Murray, Terence

22 Edwards, Stephanie Kwong, Steven Mandelsberg, Daniel Hogan,

23 Irwin, Zandman, Daniel Speights, Catherine Chen, Jason

24 Solganick, Alex Mueller, Tiffany Cobb, James Wehner, Elihu

25 Inselbuch, Leslie Kelleher, Jennifer Whitener, Alan Madian,

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000370

1    Edward Westbook, Michael Davis, and Sander Esserman.  I'll take

2    entries in Court, please.  Good morning.

3            MR. BERNICK:  Good morning, Your Honor.  David

4    Bernick for Grace.

5            MS. HARDING:  Good morning, Your Honor.  Barbara

6    Harding for Grace.

7            MR. McMILLAN:  Good morning, Your Honor.  Scott

8    McMillan for Grace.

9            MR. FREEDMAN:  Theodore Freedman for Grace.

10           MR. LOCKWOOD:  Your Honor, Peter Lockwood for the

11   Asbestos Claimants' Committee.

12           MR. INSELBUCH:  Your Honor, Elihu Inselbuch for the

13   committee.

14           MR. FINCH:  Your Honor, Nathan Finch for the

15   committee.

16           MR. MULLADY:  Good morning, Your Honor.  Raymond

17   Mullady for the future claimants' representative.  I'd also

18   like to introduce Roger Frankel and Richard Wyland, who are

19   seated behind me.

20           MR. ANSBRO:  Good morning, Your Honor.  John Ansbro,

21   representing the future claimants' representative also.

22           MR. HOROWITZ:  Good morning, Your Honor.  Gregory

23   Horowitz for the equity committee.

24           MR. PASQUALE:  Good morning, Your Honor.  Ken

25   Pasquale from Stroock for the unsecured creditors' committee.

CC-BLG000371

1          MS. KRIEGER:  Good morning, Your Honor.  Arlene

2    Krieger from Stroock on behalf of the unsecured creditors'

3    committee.

4          MR. KRAMER:  Good morning, Your Honor.  Matt Kramer

5    on behalf of the property damage committee.

6          UNIDENTIFIED ATTORNEY:  Your Honor, with apologies, I

7    neglected to mention one member of our trial team, Mr. Kim.

8          THE COURT:  Good morning.

9          MR. KIM:  Good morning.

10         THE COURT:  Mr. Kim, representing the future claims

11   rep?  Okay.  Yes.  Ms. Baer?

12         MS. BAER:  Janet Baer on behalf of W.R. Grace.

13         THE COURT:  Anyone else entering appearances?  Okay.

14   Mr. Bernick?

15         MR. BERNICK:  Yes, Your Honor.  I think that there

16   are some -- I've been told to be careful because you have a new

17   system here, so I won't be able to use the portable mike.  I

18   think that will probably, you know, undercut my (indiscernible)

19   this morning.  But I guess the main event today is the -- are

20   the opening arguments and a Daubert argument with respect to

21   (indiscernible) away for now (indiscernible).  The opening

22   arguments and Daubert arguments with respect to the estimation

23   there are some -- there are a couple other matters that I hope

24   we'll have time to take up this afternoon, but I think that the

25   main business is the estimation and the Daubert arguments, and

J&J COURT TRANSCRIBERS, INC.

CC-BLG000372

1  we ought to proceed with that.

2          I believe that we've reached  agreement among counsel

3  that the side of the room that stands for truth and justice

4  over here gets two hours, and then the other side of the room

5  that stands for truth and justice gets two hours, and then we

6  all will have an hour for rebuttal.  That's a half hour per

7  side, so -- I'll be going this morning for about two hours, and

8  I'd like to take a break I think halfway through that process

9  to catch my breath and to set up a couple of different things,

10  and then I'll finish up, and they'll go a half hour

11  (indiscernible) --

12          THE COURT:  That's fine.

13          MR. BERNICK:  I understand that the video system is

14  hooked up, so the next thing is --

15          THE CLERK:  You can't step away, sir.

16          MR. BERNICK:  Maybe just put on the screen, it will

17  be visible to Your Honor, and visible back on those screens,

18  and then all those (indiscernible).

19          Let me start out with some introductory remarks, Your

20  Honor.  I'm not going to go back, because of the long history

21  of the case.  We've done enough of that in this courtroom.  But

22  I want to make an observation that really lies at the heart of

23  the estimation issue that brings us here, which is that Your

24  Honor is going to hear about a very unusual bubble, a bubble

25  that drives the estimation that's being done by the plaintiffs

CC-BLG000373

1 in this case, and that drives the estimation literally billions

2 of dollars worth of claims that have now been dealt with in the

3 course of bankruptcy, and also drives, therefore, literally

4 billions of dollars that have now been set up in a series of

5 trusts.

6          The bubble really began just before Grace went into

7 Chapter 11, and that was a bubble of claims.  It was a very

8 dramatic increase of claims.  It was an overwhelming increase

9 of claims.  It was an unmanageable increase of claims.  It was

10 an increase in claims that we know today had absolutely no

11 basis in medicine, and no basis in law.  But the fact of the

12 matter was that Grace and its various constituencies didn't

13 really have an alternative to try to deal with that problem.

14 The fact of the matter was that it couldn't be managed, and the

15 only recourse was, therefore, Chapter 11.  Sometime,

16 ironically, about the same time, there was another problem.

17 That was the stock market bubble.  And that also was --

18 (indiscernible) exuberant.  It was unmanageable.  It seemed

19 like it might go on forever.  Nobody knew what, ultimately,

20 would come of it.  But the time came when that bubble burst,

21 and people were in denial for a period of time, but eventually

22 they got up and about their business, and they went on to

23 create another (indiscernible) we'll call the real estate

24 bubble.  That's a story for a different day.

25          The claimants here, both the ACC and the FCR, have

**J&J COURT TRANSCRIBERS, INC.**

1 been in denial ever since 2001, when Grace went into Chapter

2 11.   And in the construct that they've adopted in this case

3 they have a bubble that's driven by that period of rampant

4 increase of claims that brought about this Chapter 11 that they

5 insist still exists today with respect to the most valuable

6 claims, the mesothelioma claims.   And indeed, according to

7 their models, will never pop that bubble that arose suddenly,

8 precipitously, will remain in effect for the entire life of the

9 asbestos litigation process.   It's a bubble that cannot burst.

10        Now, they insist that this bubble is there, that it

11 remains live (indiscernible), that it will continue unchanged.

12 And they go further.   They insist that it constitutes Grace's

13 legal liability.   They go so far as to say settlement history

14 equals legal liability.   And they even advance the proposition

15 that not only does settlement history equal legal liability,

16 and therefore you follow that bubble up (indiscernible), and it

17 never bursts, and you're liable for the whole thing, but if

18 Grace wants to emerge from Chapter 11 under 524(g), it will

19 never, ever, ever get the opportunity to actually contest the

20 aggregate liability, that we must swallow that settlement

21 history as if there were no other rule of law, and if we want

22 to litigate even the aggregate liability, how big is it, we

23 have no choice but to go through individual jury trial after

24 individual jury trial.   And they, of course, they then assert

25 we never get out of Chapter 11.   We never get out of Chapter

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000375

1 11.  Oh, but -- but if you want -- you can get out of Chapter

2 11 and just go back to the State Courts and --

3          THE CLERK:  (Indiscernible) the mike, please.

4          MR. BERNICK:  Go back to the State Court system that

5 is more satisfactory.  Bankruptcy means nothing.  It is simply

6 a shill in the State Court system.  The Code means nothing.  We

7 simply go back to the system.

8          There's a cynicism, Your Honor, that pervades this

9 case.  And let's just be blunt about it.  The cynicism is that

10 the Federal Courts don't really govern the bankruptcy of

11 asbestos.  They simply have to step to one side, allow the

12 evidence to come in about overwhelming the so-called liability

13 was in the State Court system, and that creates a unique law of

14 its own, a unique law for asbestos couched in a certain number

15 of cases where the issue was never completely litigated

16 (indiscernible) a unique law of asbestos, a law, ironically,

17 that would be of the Federal Court's creation, and therefore

18 would stand in derogation of the principle that states

19 (indiscernible) law controls.  That is the enterprise that they

20 want to pursue.

21          Now, I'd like to take a quick look at this core

22 problem, the bubble and what constitutes it before I go on to

23 then address it in a little bit more detail.  If we could get

24 Slide 2?

25          THE COURT:  Are you going to have hard copies, paper

**J&J COURT TRANSCRIBERS, INC.**

1  copies --

2          MR. BERNICK:  yes.

3          THE COURT:  -- of these?  Okay.

4                  (Pause)

5          MR. BERNICK:  Here we have, on Slide 2, the actual

6  Court Grace historical filings.  And you can see how, in the

7  years 2000 and 2001, we get this bubble beginning, due to the

8  spike.  Let's turn to Slide 3.  This is the central measure

9  that is incorporated in the models that are used by the ACC and

10 FCR, the central measure on the basis of which they base their

11 projections of what the future would have brought if Grace

12 remained in the tort system.  And we can see how the

13 propensity, which we're going to talk about in a little bit,

14 sharply rises, again in that same period of time, 2000 and

15 2001, as the claims rise, because all the propensity is is a

16 relationship between the number of claims that are being filed

17 against the given company on the one hand, and on the other the

18 overall incidents of disease, in this case mesothelioma.  And I

19 will add, Your Honor, virtually all of the slides you'll see

20 today focus on mesothelioma.  There are some slides and some

21 presentations that deal with other claims, but this

22 presentation that I'm making focuses on the core issue of the

23 estimation of mesothelioma claims.  You can see how that

24 propensity skyrocketed during the same period of time.

25          How is the bubble preserved for all time?  They take

J&J COURT TRANSCRIBERS, INC.

1  both Ms. Biggs and Dr. Peterson, take that spike that you see,

2  and after averaging for the last two years, which is why it

3  seems to drop some, they perpetuate that spike forever, all the

4  way out through the life of the model.  So, you get a

5  theoretical construct that basically says after you take 2000

6  and 2001 for Dr. Peterson, in 1999 through 2001 for ·Dr. Biggs,

7  and you average them, because that's the calibration period,

8  therefore you begin a little bit down here to reflect the

9  average.  Once you take that, there's no change.  Now, I say,

10  well, that must be an elaborate formula, or -- how do you get

11  that straight line?  And the answer is pretty simple.   The

12  straight line, that is the idea, and it continues on forever,

13  is basically born of an assumption, an untested assumption.

14  There's no science that says that.  There's no scientific model

15  that says that.  It's an assumption.  So, you get the on-going

16  permanent bubble.

17          Now, all of these individuals, both of these

18  individuals, those that stand in service of their knowledge,

19  all of them say we're doing science.  This is not a case in

20  which somebody is saying, oh, well, gee, we're not scientists,

21  therefore we shouldn't be held by the rules of science.   These

22  people want to take the stand and they want to pronounce

23  science to the Court, therefore, presumably they've got to

24  follow their rules.  Well, what kind of model is it, what kind

25  of science is it?  What flavor, or stripe, or brand operates

CC-BLG000378

1  with such simplicity and (indiscernible)?  Is it data driven?

2  Well, there is data that deals with what's happened to the

3  spike of claims against various companies after 2001, two, and

4  three.  There's data.  It's not in their models.  It's not in

5  their propensity calculations.  There's data.  There's data

6  from actual companies that are out there.  We'd even present

7  them with the data.  This is not a data driven model.

8            And what, then, do they use as a substitute?  Well, I

9  asked Your Honor to think about how many times they've come

10 here before the Court and in their briefs have said we, as

11 experts, we are estimating what Grace would have seen in the

12 tort system if it had never filed for bankruptcy.  That's what

13 our benchmark is.  We said, you'd expect them, then, to figure

14 out comparable company, and look to a comparable company to see

15 what happened to a comparable company.  They don't do that

16 They don't do that.  What is it they do?  They use the

17 experience of bankruptcy trusts, the Manville Trust.  That

18 propensity curve is the only curve that they have, and that's

19 driven by the experience of the Manville Trust.

20           Now, is a Manville Trust like Grace would have been

21 but for the bankruptcy?  I don't think so.  Let's see the next

22 slide.  Let's talk about the Manville Trust.  It's a bankruptcy

23 trust.  It never litigates.  It pays not only for exposure to

24 Manville asbestos, it pays for exposure to any kind of

25 asbestos.  It is controlled ultimately by its beneficiaries for

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000379

1  claimants.  What would Grace be without a bankruptcy?  It

2  wouldn't be a bankruptcy trust.  It would be in the tort

3  system.  It would be litigated.  It would be paying presumably

4  for its own exposure, and it wouldn't be controlled by the

5  claimants.  How in the world do you have a scientist saying,

6  ah, my test is but for the bankruptcy I'm now going to look for

7  Manville.  That piece of information is so bizarre that even

8  the lawyers sitting here at this table a few weeks ago made fun

9  of us for focusing on the history of the Manville Trust because

10  they even realize that their own models depended vitally on the

11  Manville Trust.

12          But it gets worse.  Data driven.  Do they even stick

13  to the Manville data?  It turns out that they don't.  Let's go

14  to Slide 6.  This comes from Dr. Peterson's report.  Just Slide

15  6, please.  That's seven?  That's the one I want.  Just stay

16  there for a second.  You'll see at the upper right hand corner

17  of this slide that this is the Manville meso curve.  You see

18  that all of a sudden, after 2002, or thereabouts, it kind of

19  goes, boo, boo, and then, splat.  Well, that flat thing looks

20  kind of like one of those curves that goes on forever.  Is that

21  real?  It's not?  It's smooth.  It's smooth.  It's not a real

22  curve.  It's not driven by real data.  It's somebody's

23  calculation based upon the data.  It's just a (indiscernible).

24  Now, it's kind of nice for them, because if we go back -- go

25  back a couple slides before.  That one.  If you want to have

J&J COURT TRANSCRIBERS, INC.

1 that bubble to go on forever, it would be kind of neat to have

2 the propensity curve that you used based on Manville remain

3 kind of flat.  That way that spike, that bubble, it goes on

4 forever.

5        Let's take a look at the Manville data itself on

6 meso.  Let's go forward one slide.  Next slide.  Next slide.

7 This is the actual mesothelioma filings for Manville.  You can

8 see how it goes up, just like some of the other companies do.

9 It peaks in '03, then in every year thereafter it's down, down,

10 down.  Now, what would happen if you didn't smooth that curve?

11 Well, what would happen is, go back to the slide before, that

12 would go up, then it would start to come down.  It wouldn't be

13 flat.  What would happen to the overall meso curve?  Go back to

14 the slide before that.  That wouldn't be flat anymore.  Maybe

15 it would be downward trended, like some of the companies,

16 indeed, a lot of the companies that were actually in the tort

17 system, it would be downward trended.  But that's not what they

18 do.  They end up with a smooth, flat curve.  Let's go

19 (indiscernible).  There we go.  There it is again.  Now, they

20 may say, oh, well, gee, people were just filing meso claims

21 here in '03 that they would otherwise have filed in '04.

22 Mesothelioma claims are filed almost immediately after

23 diagnosis.  It turns out that the big lump that came in '03

24 were actually older rather than newer mesothelioma claims.  And

25 in four, five, and six, and we understand it's continuing on

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000381

1 | today.  Meso filings against the Manville Trust are now
2 | declining.  Declining.
3 |         Now, this is a slide that's interesting, because this
4 | is actually our expert's data here, talking about other
5 | companies that have SEC filings, and showing what SEC filings
6 | have done.  But this particular version here actually comes out
7 | of one of the briefs.  This is something that one of the -- one
8 | of the (indiscernible) briefs did (indiscernible) Dr.
9 | Peterson's forecast really came down below those companies.
10 | So, what did he tell you about it?  And the answer is yes, they
11 | came down because they use an average calibration period, but
12 | they then fix it, and this goes on flat forever, whereas the
13 | actual curve of these other companies is coming down, down,
14 | down.  As you get into '07, '08, '09, down, down, down.  And we
15 | don't have -- we don't have an impregnable, iron-clad bubble
16 | that lasts forever.  We have a bubble that was going down.  And
17 | the Manville data itself is fully consistent with this.
18 |         What kind of flavor of science is this?  What kind of
19 | science do we have where we have to smooth instead of just
20 | presenting the data?  Is it real, or is it made up?  Is it
21 | reliable?  Reliability is the key, Your Honor, because as Your
22 | Honor is well familiar, and it's not disputed here, reliability
23 | is the test of the scientific -- of the standard for the
24 | admissibility of scientific evidence under Daubert.  How do we
25 | test reliability?  Well, we test reliability one way by saying

CC-BLG000382

1 does this model, does this approach, does it have predictive

2 value?  And that's an appropriate test because it is a test

3 that everybody agrees, their own experts agree, Dr. Staylor

4 agrees that one of the standards for judging the quality of

5 scientific work is this predictive value.  Biggs, measure of

6 predictiveness is an admirable goal.  Peterson, he agrees that

7 predictive value, that is the value of the model being

8 predictive, that that's an important test for your work.  With

9 that one test, that central test of reliability, is there any

10 evidence, any evidence in this case that this model, these

11 models are reliable in the sense that they're predictive?  Your

12 Honor will see that not only is there not any positive evidence

13 to speak of, that the evidence that's there all goes the

14 opposite way.

15          Let's take a look at historical predictions.  That

16 is, has this model been successful in predicting historic

17 trends?  Well, we can see that there were significant changes

18 in historic trends over time, in the '80's, the '90's, and then

19 most recently in the early 2000's, and Dr. Peterson admitted

20 that he did not predict a single one of those major moves.  And

21 he was so adamant in 2003 that there was really no change at

22 all until he was confronted with the data that he insisted

23 under oath in another case, it's all speculative, it's all

24 conjectural.  Even as the data in 2003 was already coming in

25 and saying it's happening, he still wouldn't accept it.  What's

CC-BLG000383

1 predictive?  That was the easy answer in the past, but oh,

2 yeah, (indiscernible) predictive.  It's always been worse.

3 Well, that doesn't say that it's scientifically reliable.  It

4 just says that it didn't happen to come out a way, it's against

5 the interest of your client, until 2003, when it didn't come

6 out the other way, and there was massive over prediction of the

7 numbers of claims that would be coming in.  It is so bad, Your

8 Honor, this reliability point, that Dr. Peterson could not even

9 bring himself to say it, that his models had been shown, the

10 estimates had been shown to be predictive for more than five to

11 seven years.  Let's do Peterson 46 and 47.

12                         (Pause)

13          UNIDENTIFIED SPEAKER:  Peterson?

14          MR. BERNICK:  46, 47.  Maybe it's -- it could be --

15 yes.  Do you know of any scientific model that's been

16 demonstrated to reliably predict changes in the legal

17 environment?  Answer:  Over modest periods of time there have

18 been models of claiming and claim resolutions that had

19 reliability predicated -- predicted -- reliably predicted

20 subsequent changes.  Yes."  "Question:  Okay.  What's the

21 maximum period of time?"  Next page.  "Six, seven years."  He

22 could not even bring himself to say that there was

23 predictability for even ten years, to say nothing of the 40, 35

24 and 40 years covered by the models.  But then it turns out that

25 that statement was an older statement, because we then got

CC-BLG000384

1  into, well, what was the basis for that statement?  And it
2  turns out that the basis of that statement was not this --
3  having established that the estimates were predictive of a
4  company still in the tort system, but rather they were
5  predictive of the experience of a bankruptcy trust, which, of
6  course, has a much different situation in established criteria.
7  It has pay outs that are all fixed in amount with -- subject to
8  some adjustments over time, a totally different beast from the
9  huge volatility that a litigant sees during the course of the
10 litigation process.  it turns out that there was only one
11 estimate, one estimate that he could even think of of a company
12 that he had done at a company still in the tort system where he
13 said it still had some predictive value.  And that was a
14 private estimate that he says that he did of W.R. Grace, never
15 been published, never been reviewed.
16         So, if we go to Peterson 80, we now see -- any others
17 beyond Grace.  (Indiscernible) any other forecast for a company
18 not (indiscernible) bankruptcy that's been shown to be accurate
19 for a period of five years or more?  Answer:  "I've done
20 forecasts for other companies, but I don't know whether or not
21 -- I haven't had a chance to look at the back up data, so I
22 can't answer that yes or no."  No record of predictability.
23 Only a record of unpredictability.
24         Why is it that it should be so difficult to predict
25 even a few years out?  The answer is very simple.  The

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000385

1   enterprise that the claimants and their experts have embarked

2   upon is empirically flawed.  Let me be clear about why that is

3   so.  These are models and estimates that don't have to measure

4   real liability.  They only attempt to measure claiming the

5   (indiscernible).  If it were real liability, they would have to

6   figure out, well, what disease was actually caused by the

7   company?  And the disease course would be a guide.  But they

8   specifically disavowed looking at real liability.  They are

9   only focused on claiming behavior, settlement behavior.

10  Settlement behavior has a variety of causes, like many human

11  behaviors, and in this case a particularly complex series of

12  causes because people settle and litigate in the context of a

13  system that's enormously complex, it's subject to the

14  vicissitudes of litigation, of the law, changes in

15  jurisdictions, a whole host of factors that have been well

16  identified.  That becomes very difficult, though, to determine

17  what is the impact that those factors have at any given time,

18  because at any given time they can change, and change there has

19  been.  That is why we get these enormous shifts, as you see in

20  claiming behavior, because there are factors that underpin

21  those changes, and those factors need to be understood before

22  you can make a prediction.  They have never studied the

23  underlying causes of the changes in behavior.  All that they

24  are doing is looking for trends.  And so, like anybody who

25  plays the stock market and looks for trends, unless you've got

J&J COURT TRANSCRIBERS, INC.

CC-BLG000386

1   the underlying causes, you're going to get burned, because as

2   soon as the status changes, and the causes change, and the

3   impact changes, your model no longer works.  And all of this

4   has now been admitted, very clearly.  I'm going to play a few

5   clips from Ms. Biggs' testimony so you can see the actual

6   admissions, and we'll just take them, first, with Biggs 3.

7                    (Audiotape played)

8         MR. BERNICK:  Can you turn it up?  Let me start over.

9                        (Pause)

10        THE COURT:  If we turn it up, we're probably going to

11  get feedback in the rest of the system.  Does anybody have any

12  difficulty hearing it?

13        MR. BERNICK:  Can you hear it, Judge?

14        THE COURT:  Oh, I can hear it fine.

15        MR. BERNICK:  Oh.  Okay.  Fine.

16                   (Audiotape played)

17        MR. BERNICK:  Next clip.  So, you've got to ask for

18  the factors, factors as caused.  Next clip.

19                   (Audiotape played)

20        MR. BERNICK:  There you go.  All that you have is

21  that line going straight across.  All of the factors are simply

22  predicted, in quotes, to remain the same.  There's no effort to

23  try to predict whether the factors are going to change, and

24  therefore the model is a static model, and it will, in fact, be

25  wrong if there is any change.  As we know, historically there

J&J COURT TRANSCRIBERS, INC.

1  has always been change.  If there is any change to the

2  underlying causes.  And we therefore get to the question, the

3  ultimate <u>Daubert</u> question, is there a method, is there even a

4  method that could be used, or that they know about or have

5  used, to make the predictions of those future cases?  Is there

6  a method, a scientific method, if they're going to take that

7  line all the way out, what is the science that says that that

8  is real?  Let's play clip five.

9                          (Audiotape played)

10            MR. BERNICK:  Where is the scientific model?  If we

11  have the history that says change, change, change.  And this is

12  only there because this is an effort to predict behavior,

13  settlement litigation behavior.  If that's what the enterprise

14  is, and we know that there's change that is (indiscernible),

15  the only way to be able to make a prediction scientifically is

16  to look for the cause.  You'll hear that from all kinds of

17  witnesses on the stand.  That is the nature of economics.

18  Economics is a quantitative isolation of the causes and whether

19  they'll remain the same or whether they'll change.

20            Where is the analysis of the causes of what they want

21  to predict, which is whether there will increase, decrease,

22  constancy in claiming behavior?  There is no model.  And

23  instead, what you get are judgments, these neat lines that go

24  extrapolating forever, and carry with them billions and

25  billions of dollars.  And that is the toll of all this, Your

CC-BLG000388

1  Honor.  This methodology -- if we can go to Slide 10?  This

2  methodology has driven a whole series of trusts.  Since 2003,

3  when the market began to change, we saw that Dr. Peterson

4  resisted, and resisted, (indiscernible) presented to the

5  Courts, for example, in Armstrong Industries, presented to the

6  Court vast estimates of liability.  Dr. Peterson, Dr. Peterson,

7  Dr. Peterson, billions, and billions, and billions of dollars,

8  all of it now driving the creation of trust worth somewhere in

9  the neighborhood of 25 billion dollars.  Where is the toll?

10  The toll is written all over that page.  All without real

11  contest on the underlying model.  In fact, I venture to say,

12  Your Honor, that the first time that you even observe that

13  model being questioned was on cross examination of Dr. Wyant

14  (phonetic) in the ADD case.  Under all other circumstances in

15  every single one of these cases nobody took issue with the idea

16  of a settlement driven model.  The settlement driven model has

17  never been questioned, never been questioned, with the

18  exception of this case.

19          The only other context in which there was an issue

20  raised was in Babcock & Wilcox in connection with the

21  fraudulent conveyance case, and that was a totally different

22  setting.  Why?  Because Babcock & Wilcox itself used settlement

23  history to fix and reserve its asbestos liability in the time

24  of the transactions that were at issue, and therefore -- and

25  presented to the Court the argument that those were reasonable

J&J COURT TRANSCRIBERS, INC.

CC-BLG000389

1  estimates.  Well, having -- we did this, having relied upon our

2  estimate as being reasonable, we couldn't then say, oh, well,

3  gee, now it's all irrelevant because there is no liability that

4  was pre-bankruptcy, in the tort system in connection with

5  fraudulent conveyance.  There was no necessity and there was no

6  analysis of 502(b).  There was no analysis of 502(b) in any of

7  those cases.  There was no alternative model in any of those

8  cases.  So, now finally we have accountability, Your Honor.  We

9  have accountability for the methodology that's being used to

10 drive those kinds of numbers.

11            I'm going to talk about three kinds of accountability

12 here today.  One is accountability to the real science.  There

13 is real science out there, established science out there on the

14 basis of which it is possible to make meaningful projections,

15 and that science is science that we rely upon for our model.

16 Number two, they should be accountable, the ACC and the FCR

17 should be accountable for their approach that -- how their

18 approach deviates from science.  And we'll explore in a little

19 more detail exactly how their model goes astray from science.

20 It has no scientific underpinning.  And finally, they should be

21 accountable to the law because the law clearly and specifically

22 forecloses the effort that they've undertaken here.  What they

23 seem to do here is to not only be in denial that the bubble has

24 changed, but they also deny the fundamental idea that the rules

25 of this Court should govern what Grace's liability is, not

CC-BLG000390

1  simply their references to what they believe are the halcyon

2  days in the State Court system.  This is a federal proceeding

3  governed by federal law.  Effectively by pursuing their theory

4  there is no bankruptcy solution.  There is no bankruptcy

5  resolution for asbestos liabilities.  So, I'm going to focus

6  first on the science, next on their model, and finally I'm

7  going to talk a little bit about the law.

8              Beginning with the scientific part of the --

9              THE COURT:  Wait.  Give me one second, Mr. Bernick,

10 please.

11                        (Pause)

12             THE COURT:  Okay.  Thank you

13             MR. BERNICK:  Thank you, Your Honor.  Let's begin

14 with Slide 12.  Before we get to the details of the slide, I

15 wanted to just take a moment to visit on the history of the

16 science, because as it turns out, the science that's relevant

17 here, the foundation -- scientific foundation for actually

18 doing projections of future claims of the future disease, that

19 that scientific foundation has been out there literally for

20 decades.  If we go back 25 years ago, in a landmark study that

21 was done by Dr. Nicholson in 1982, at that time he published a

22 very famous study.  The study was built upon established

23 science, and that science was epidemiology.  And again, in

24 1982, epidemiology by then had become very well accepted.

25 Epidemiology had been used in the early days of asbestos.  It

**J&J COURT TRANSCRIBERS, INC.**

1  had been used in the early days of radiation science as a
2  result of the bombing over Japan in World War 2, and the atomic
3  bomb survivor study.  And the most famous use of epidemiology
4  that put it on the map as a new model for causation, which
5  previously had been regarded as something that couldn't be
6  proven statistically, was in tobacco.  The studies that were
7  done of tobacco smokers in the '50's and '60's drove the
8  decision of the U.S. Government Public Health Service about the
9  wholly new definition of causation that could be satisfied with
10 epidemiology.  So, the use of epidemiology had already been
11 established in those other venues, and also specifically in
12 connection with asbestos.
13          Well, what is it that Dr. Nicholson decided to do?
14 He decided to try to measure what the future incidents of
15 mesothelioma were going to be across the country.  And what he
16 did was to rely upon very established principles of science and
17 epidemiology.  And those principles said that you first
18 determine who is sick, you then determine what their exposure
19 and dose is.  And then on the basis of that you can calculate
20 what their risk is.  That's what epidemiology does, look at
21 groups, figure out who is sick, and based upon exposure and
22 dose, which are the operative parameters that you're study is,
23 doesn't make a difference, determine whether there's excess
24 risk.  That had been done through the insulators, very famous
25 studies going back to the '50's and to the '60's with silica

CC-BLG000392

1 study, so he had data.  He had epidemiological data that gave

2 him basic risk factors.

3          And in order to figure out the national disease

4 curve, he basically took a whole series of other occupations,

5 which are indicated in the lower lines (indiscernible) end of

6 this curve, and he adopted certain assumptions about exposure

7 and dose, comparing them to the insulators, and then the

8 associated risk, in order to build up that overall national

9 curve.  That's how the overall national curve was determined.

10 Now, with that curve he was predicting the future, how many new

11 cases of disease would happen after 1982.  He was doing it on

12 an industry-wide basis.  All companies, all asbestos products,

13 all occupations, covering 27.5 million people in 12 industries.

14 That's the scope of his study.

15          Well, he did the study, and after the study he had

16 the opportunity, as did many others, to see did that curve --

17 how predictive is it?  And he found out it was pretty

18 predictive.  That is, every year information would be gathered

19 about how many cases of mesothelioma had been diagnosed, and

20 every year, or every five years, or every couple of years you

21 could make a comparison.  And the curve turned out to be pretty

22 good, and it became a validated curve.  And so valid is it that

23 in the context of this case Dr. Peterson himself recognizes

24 that that is authoritative science.  And if we could take a

25 look at Page  37 of the transcript.  Peterson.  "What you're

J&J COURT TRANSCRIBERS, INC.

CC-BLG000393

1  saying is essentially Nicholson has done -- the Nicholson model

2  has held up over time, that as judged in light of its

3  predictive value it's been found to have high predictive

4  value?" Answer: "Yes." "Would you agree with me that using

5  epidemiological knowledge, that when it comes to asbestos-

6  related illness, disease, it has been and is today possible to

7  predict the future to a reasonable degree of certainty?"

8  Answer: "Yes." So, we now have a very solid epidemiological

9  basis for then asking the next question. The next question is

10  this. Well, if Nicholson focused on the industry as a whole,

11  and products as a whole, what would be the answer if you look

12  not simply for all disease caused by asbestos nationally, but

13  you tried to tease out what disease was caused (indiscernible)

14  by -- by Grace asbestos? How would you go about doing that?

15  Could you go about doing that using exactly the same essential

16  structure, not exactly the same calculation, but the same type

17  of approach, that is looking at diagnosis of disease, who is

18  sick, who was exposed to Grace's asbestos. What was the

19  exposure and dose? What are their risk -- what are their risk

20  components, and then isolating the group of people who, in

21  fact, have gotten sick as a result of Grace asbestos, and using

22  the same risk factors going forward you can predict the future

23  course of illness due to Grace asbestos. That is exactly the

24  project that we undertook.

25          Let's take a look at Slide 12. We took those same

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000394

basic parameters, exposure, dose, risk and diagnosis of
disease.  We then used, we deployed exactly the right and very
well established scientific disciplines, industrial hygiene,
epidemiology, and quantitative statistics, and medicine, and
here are the experts that we have brought to bear in connection
with this work.  Lee and Lees (phonetic), Mugavaker (phonetic)
and Anderson, Weill, and Henry Parker, all people who are
experts in these underlying disciplines.  Notably, there is not
a single expert in this case on the other side in any of these
disciplines who has sought and undertaken to perform the same
kind of analysis.  These people are all available, but you
don't see any of them saying, oh, well, gee, we have developed
a different epidemiological model, and here's the output.  They
quarrel with (indiscernible) from our analysis, they propose no
alternative model, no alternative estimate based upon an
alternative deployment of these established scientific
disciplines.  At the end of the day their whole model says
forget all of that stuff.  We've got a person named Dr.
Peterson who is a Ph.D. and a lawyer.  We've got a person named
Ms. Biggs, who has a background in statistics, I believe.  We
have Mr. Staylor, who has got a background in statistics.  We
don't have people who actually go through and construct this
kind of model because we're not engaging in that enterprise.

          The next slide.  This flow chart that we've developed
is probably extremely difficult to ascertain from the expert

CC-BLG000395

1   reports, but we've laid it out here.  And essentially what
2   we're doing is we're taking -- remember, we see the same
3   building blocks, exposure, dose, risk, and diagnosis of
4   disease.  So, we start out by taking a look at the kinds of
5   activities in which claimants against Grace as of April of '01,
6   the kinds of activities in which they engaged, in terms of did
7   they mix asbestos containing products, did they remove their
8   (indiscernible), did they install, they were at a site, or they
9   were in a space?  And, of course, the questionnaires asked for
10  this information flat out, and we know that almost nobody
11  filled out the questionnaires because they decided they didn't
12  want to.  So, what we had to do, and again focusing
13  specifically on mesothelioma, we actually read all the
14  mesothelioma files in order to find out, well, what is it that
15  they said they did with Grace asbestos?
16          Now, it will be said, oh, well, there's all kinds of
17  evidence that might be introduced with respect to what these
18  people actually did, that maybe we wouldn't have gotten until
19  the time of trial, and that's been a constant refrain.  There
20  are two answers to that, actually, three.  And we'll take them
21  up in more detail later.  But the key thing about what we did
22  with exposure, we did with exposure, is we relied upon the
23  claimants themselves to say what they did, and certainly the
24  claimants themselves ought to be able to say what they did.
25  That doesn't take time to evolve for trial.  That comes from

CC-BLG000396

1  the claimant.  Now, the calculations based upon that, that's
2  more involved.  We rely upon them for the calculations.  We
3  relied upon them to simply talk about what it is that they did.
4  And they are the best sorts of information with respect to what
5  it is that they did.

6          We then took the next step.  We now need exposure and
7  dose.  Let's go back to that first slide.  We're going to fill
8  it in.  We're going to find out, okay, what's the exposure and
9  dose associated with these activities?  What, then, is the
10 maximum lifetime exposure?  And we assumed that these people,
11 and they said they did, we assumed that they did it for an
12 entire lifetime.  What, then, is the ultimate risk that comes
13 from the epidemiological studies?  Then we take a look at
14 diagnosis of disease, the medical screen, and we'll talk about
15 that.  And then we took both of the outputs in order to create
16 a grid of considerations that then applied to each claimant
17 pursuant to the P.I. cues.  So, we have exactly a by the book,
18 exposure, dose, risk assessment, screening process, using
19 exactly the same disciplines that have been at the core of
20 epidemiology, industrial hygiene, and diagnostic medicine for
21 years, and years, and years.

22         When we find out the exposure and dose -- next slide,
23 please.  That's Slide 13.  This table indicates down at the
24 bottom A through E, those are the exposure categories, what the
25 industrial hygienist did is to look at all of the available

CC-BLG000397

1 industrial hygiene data to find out, well, what is -- what
2 would be the mean eight hour that is time weighted average air
3 concentration that these individuals would be exposed to?
4 Following an absolutely traditional analysis.  And what we can
5 see is that here's a figure from Nicholson.  Here's the
6 Nicholson construction trace 58 to 72, 73 to 79.  You can see
7 how high they were for construction as compared to these
8 people.  These people didn't have that kind of exposure.  And
9 it may well be that they had exposure later on.  But in any
10 event, these are people who were involved in construction
11 trades.  The application of this kind of product, in the
12 cutting and removal, etcetera, etcetera, being at the site, is
13 a lower level activity than many of the other construction
14 trades, which would have included people who were actually
15 working with insulation and other more toxic products.  So, the
16 industrial hygiene data was all illustratives down here.
17        If we focus on B, D, and E, see how small they are?
18 We're now going to zoom in on get bigger on B, D, and E.  We
19 can see that even there, this is now the OSHA permissible
20 exposure limit, .1.  These are trades that are below even the
21 (indiscernible).  This is what the data actually shows in all
22 cases.  So, this now gave us a rubric of data.  We now had to
23 apply it to create a lifetime dose.  That's the next step.
24 Next slide, please.
25        So, what did Dr. Anderson assume?  She'll be

J&J COURT TRANSCRIBERS, INC.

CC-BLG000398

1  testifying about this.  She assumed that all of the exposures
2  were only to Grace products.  Any exposure we had was to a
3  Grace product, as long as it's indicated there.  If you worked
4  with a non-Grace product any day of the -- 11,250 is lifetime
5  exposure, obviously that's very conservative, and if you worked
6  with any non-Grace product, that would take a day away from the
7  Grace exposure.  If you worked in an alternative occupation,
8  then the cumulative exposure associated with Grace products
9  actually declined.  So, these are the assumptions, extremely
10 conservative.  Next slide.
11            On the basis of these assumptions you then end up
12 with a certain number of 45 year, that is lifetime cumulative
13 exposures, assuming that constant exposure driven by the
14 industrial hygiene data, you can see, now, A is 17, B is 2.1, C
15 is 12, D is 1.3, and 1.5.  Now, when it comes to B, D, and E,
16 which are so low, we took a further look to see, well, how many
17 people actually, under the plaintiff population, the ones who
18 gave us enough data for us to determine how long they were
19 actually exposed, how many of them actually were exposed at
20 that level?  Are these numbers skewed by a few cases of higher
21 exposures?  And we found out that the latter was true.  This is
22 --
23            THE COURT:  Would you go back?  I'm sorry.  Go back
24 to the prior slide for a minute, please.
25                         (Pause)


                 J&J COURT TRANSCRIBERS, INC.

1          THE COURT:  Okay.  Thank you.

2          MR. BERNICK:  Thank you, Your Honor.  And we found

3   out, as it turns out to be true, that you can actually take the

4   people who gave us enough information for us to actually find

5   out how long they actually did work with the product, that what

6   we find out is that the actual numbers for B, D, and E are not

7   as high as indicated on the prior slide, that overwhelmingly

8   they're below one fiber per millimeter a year.  So, it's below

9   one for it looks like about anywhere -- anywhere close to --

10  maybe 95 percent of the cases.  So, the numbers you saw on the

11  prior page are actually extremely conservative numbers.

12          What, then, does that enable us to do?  Well, now,

13  with those kinds of risks -- go back to the prior slide,

14  please.  With these kinds of lifetime exposures, what is the

15  risk that's associated with that?  That's the next step.  Very

16  traditional next step.  Risk assessment analysis used by the

17  federal government in a thousand different offices every hour

18  of every day of every year.

19          Let's go to the next slide.  What we've done here is

20  display the epidemiology, because epidemiology tells you about

21  risk.  And under the epidemiology, what you're always looking

22  for is a dose and a response.  So, here we have, on the

23  horizontal axis, we have the dose, the cumulative dose,

24  (indiscernible) units, and here we have response in the sense

25  of do you have an excess of disease in the population, which is

**J&J COURT TRANSCRIBERS, INC.**

1  what the epidemiology look to.  That is, in each given dose we

2  have data that says that that dose, down here, here's what the

3  relative risk is, the relevant risk would be over on the

4  vertical column.  What we've done is, you see, we now have a

5  very nice dose response curve.  Gee, that's just terrific.  And

6  what that says is that there's actually a regularity in the

7  relationship between dose and response, exactly what you'd

8  expect with a well established potential carcinogen, based upon

9  epidemiological data.  But we see, in fact, that there are

10 limits to what you can observe.  We have a limit in the sense

11 of what the actual data points in the studies establish.  These

12 are mostly studies that took place at very, very high levels.

13 That's where the dose response relationship was well observed.

14 At lower doses the robustness of the data, that is, do you even

15 have data that shows that there's an increased risk, diminishes

16 significantly.  And when you get down here, that is we don't

17 know if we're seeing -- actually seeing something that is real,

18 and as you get down -- way down here, this is very interesting.

19 In this we actually have studies that looked for risks and

20 didn't find them, that is, that measured those actual doses and

21 said we do not see an excess.  So, you would say that at that

22 level a variety of different things might occur.  And we're

23 going to get to that in the next slide.  So, this is

24 observation.  This is now inference.  The data is not hard.

25 This you've got hard data that says you don't actually have a

CC-BLG000401

1 | risk.

2 |         What do we do about this low area, this inference --
3 | inference, in a sense negative area?  The answer is that a lot
4 | of very smart people spent their lives working on that very
5 | question for the last 20, 25 years.  What do you do about
6 | exposures that are in an area where there is not scientifically
7 | observable relationships?  You don't find statistically     .
8 | significant associations using reliable data?  What do you do
9 | in that area?  And it's a real issue, because we have chemicals
10 | that are present in the environment, and in the workplace.  And
11 | radiation, you had people working in the (indiscernible), and
12 | the power utility complex, all exposed to low levels.  You can
13 | say, well, we don't want to have anything, and then the
14 | operation would shut down.  So, people spent a long time
15 | saying, well, where do we really think that the key lies here?
16 | What should we do?  Go to the next slide, please.

17 |         And so, you have this kind of problem, the data here.
18 | You then have a limitation.  What do you do in the zone of
19 | interest?  Next slide, please.  The answer is that for public
20 | health purposes, like the EPA, they develop models that have no
21 | threshold, that go all the way down to zero dose and find, not
22 | find, but state that they are assuming that there is a risk,
23 | whereas the actual potential response is, that is what the
24 | truth might be, could be beyond that line, or below that line,
25 | it could be above that line, conceivably.  Actual responses,

CC-BLG000402

1   though, are not known.  So, the models, which also have been

2   quoted for the proposition that, well, every little dose

3   carries with it risk.  Sure, that's true in a modeling health

4   protective sense.  It is not true in a scientific sense when

5   you get down to doses that are that low.

6          So, how does this, then, now relate back to our

7   problem?  Next slide.  The other sides' experts, all of them,

8   admit, Dr. Wadley (phonetic) admits, next slide, Dr. Hammar

9   (phonetic) admits, another one of their experts, next slide,

10  Dr. Lehman (phonetic), that's another one of their experts,

11  they all admit that there probably is a threshold, that is, it

12  really doesn't go all the way down to zero.  It kind of goes

13  along the bottom line, and then it pops up some.  So, it's a

14  threshold situation.  What they disagree about, they disagree

15  about how low that threshold goes.  So, Your Honor will see --

16  this is the next slide -- that there are different studies that

17  are being used.  We believe that we have all of the studies

18  that matter.  They also uniformly -- we have an area where risk

19  is not measurable, not detectable, not present.  They have a

20  few studies that, Your Honor, we would submit, even -- show the

21  next slide -- they even confess -- next slide -- that they have

22  limitations on what can actually ascertained from their data.

23  So, we have a series of limitations.  Number one, they don't

24  use actual industrial hygiene data.  For example, they report

25  as fiber millimeters per year, with quotes, indicating that

CC-BLG000403

1  they actually haven't measured it.  They -- going down -- they
2  use job titles instead of having actual airborne asbestos
3  information, which you would need.  The results are generic.
4  They are unable to make distinctions of risks for different
5  fiber characteristics.  They can't render opinions with any
6  degree of scientific certainty.  The (indiscernible), in many
7  cases, say it would be assumed that the measured levels -- the
8  levels that are being used are assumed, not measured, and
9  therefore they have reliability issues.
10        But under any set of circumstances, we are talking
11  about a situation where everybody agrees that the fact that
12  there is a threshold, and where it is clear -- let's put up
13  that slide -- that we are talking about risks that are
14  extremely small.  Next slide, please.
15        So, what do we reach as a conclusion with regard to
16  these types of exposures?  With respect to B, D, and E, they
17  cannot be demonstrated in a scientifically sound manner that
18  these people had sufficient cumulative exposures to cause
19  disease.  Exposures have not been demonstrated scientifically
20  to contribute to a risk of disease, and therefore these claims
21  are being set aside.  They don't make it past the Daubert
22  standard that says it has to be scientifically demonstrable.
23  The (indiscernible) of the -- disciplines, the methodologies
24  established in this area say it is not scientifically
25  observable.  Do we say, however, that we consider whether they

J&J COURT TRANSCRIBERS, INC.

CC-BLG000404

1 might substantially contribute, or are we relying upon the
2 doubling of dose standard to say we're excluding these people?
3 And the answer is we are not excluding B, D, and E, based upon
4 the doubling of risk dose.  We are, in fact, considering
5 whether there is evidence that they would -- these exposures
6 were a substantial contributing factor.  That's what Dr.
7 Anderson does.  They have mis-characterized Dr. Anderson's
8 report, and her testimony to say otherwise.  Dr. Anderson
9 specifically considered whether the data showed substantial
10 contribution, and given the very minuscule levels of exposure
11 that we're talking about here, her conclusion was that it did
12 not -- there was not scientifically ascertainable evidence that
13 there was a substantial contribution.

14         Now, does that mean that there is no theoretical
15 risk?  Well, of course there's always a theoretical risk.  The
16 EPA model assumes theoretical risk.  The EPA model assumes that
17 every little bit that you add causes or has an effect.  But the
18 line is a policy statement, and the line is a guidance that is
19 stronger than the science.  The science doesn't take you down
20 to these very low levels, and show a positive increase of risk.
21 (Indiscernible) studies do not show you a positive increased
22 risk.  And even at higher levels, that last solid line that you
23 see doesn't say that as you get down, tiny, tiny, tiny, in each
24 fiber, that, in fact, there is a detectable increase in risk.
25 It doesn't say that.  It says that for purpose of establishing

CC-BLG000405

1    a general relationship of dose and response, yeah, higher

2    levels of exposure have been shown to have higher levels of

3    risk.   It doesn't say that if we had .5, or one fiber

4    millimeter per year, that, in fact, you observed any increase

5    of risk.

6            Your Honor I will also observe that if you take those

7    -- let's go back a couple of slides.   Back more.   Dose.   Dose.

8    More.   Ah.   If you assume the models, you go all along that

9    curve and assume it's totally solid, it -- and you had studies

10   at each and every point along the way to measure, measure,

11   measure.   Let's assume that you had that.   And you assumed,

12   therefore, that every increment of exposure carried with it an

13   actual risk as opposed to a theoretical risk, you're talking

14   about risk contributions that are not substantial.   You're

15   talking about risk contributions that are minuscule risks,

16   risks that are of the order of magnitude of dying by drowning

17   in your lifetime.   Those are the kinds of risks that we're

18   talking about.   They are not -- the idea that any increase,

19   theoretically, in risk, means substantial contribution enjoys

20   no support in the law, and enjoys no support scientifically.

21   The data doesn't get you there.   There is no study that starts

22   here and then goes -- let's go a little (indiscernible) -- that

23   defines -- oh, yes, by God, we can see a risk.   That's not the

24   way the science works.

25            So, then, we then go to the -- let's go through a

J&J COURT TRANSCRIBERS, INC.

CC-BLG000406

1   couple more slides, back to where we were.  Beyond that.

2   Disease screens.  We're not going to spend as much time on

3   disease screens.  Your Honor is familiar with this.  These are

4   the screens that we used.  It would have to be a one slash

5   zero, and to have the circumstances, must be greater than --

6   has to be one slash zero or more, not greater than.  And it has

7   to be -- x-rays have to be done in compliance with the actual

8   standards that are set forth by the ILO.  The same thing with

9   the PFD.  And then we have a screen for (indiscernible) cancer.

10           We have taken out the screens that are litigation

11   screens as unreliable.  And why did we do that?  Let's go

12   through the next couple of slides.   The ILO, which talks about

13   how these x-rays are to be used, actually sets out a standard

14   for how they should be conducted.  So, we've (indiscernible)

15   Daubert, and reliable evidence, we go to a set standard that's

16   established by the ILO and NIOSH themselves about what must be

17   done in order to produce a reliable result.  And this says --

18   we'll take the next slide -- where you have a contested

19   proceeding, NIOSH recommends a minimum of two independent

20   classifications by appropriately selected readers with a third

21   classification if the first two disagree.  You have to have

22   three different readings, two of which got to be right.  And

23   they should be blinded.  They should be blinded.

24           So, what is it that we did?  Next slide, please.  We

25   did a study, the Henry study.  Remember, we asked for all those

CC-BLG000407

1  x-rays.  And we sent them out to be re-read.  We sent them out

2  on a blinded basis, the number of readers was determined in

3  advance, not ad hoc.  We (indiscernible) with strong

4  credentials, and controlled inputs, that is, we sent -- the

5  plaintiffs' lawyers sent in the actual x-rays.  And then we

6  also did something else.  We used control films, so we could

7  see whether the readers were over-reading or under-reading in

8  some kind of biased fashion.  And we found out, in fact, that

9  they didn't.  So, what, then, happened?  What were the results?

10  If we take plaintiffs' alleging radiographic evidence of

11  asbestos related disease, we used x-rays, all of which came

12  from plaintiffs, who said that they were relying upon the x-ray

13  in order to establish that their lung cancer was asbestos-

14  related, that is to establish evidence of fibrosis.  In 82

15  percent of the cases, the claimants' readers made a finding of

16  one slash zero.  How many of those were establishable in

17  accordance with the standard?  Seven percent.  So, when you

18  actually comply with the standard, the data that's being

19  submitted, although it says 82 percent actually show an ILO

20  positive reading, we only had seven that are replicated in

21  accordance with the standards.  And we would note that 90

22  percent of those have a significant smoking history.  There

23  were a variety of things that could cause the finding on a B

24  Read.

25          Next slide.  We also, then, in the study, eliminated

CC-BLG000408

1  those people -- took a look at how many of those people

2  actually were seen by doctors who are no longer accepted by the

3  trusts, or B Reads, or other doctors who we know by virtue of

4  their testimony and how they actually -- depositions were

5  taken, we know how they actually conducted the B Reads, and

6  they didn't do the B Reads in accordance with the standards by

7  their own admission.  So, we took those folks out, as well.

8       Next slide.  What then happens?  This is now -- the

9  flow chart has been filled out.  We have the A, B, E, D, and E,

10  the different exposure categories, the eight hour PWA's, the

11  maximum exposures over the lifetime, and therefore, then, using

12  our risk models, we said with respect to B, D, and E, they are

13  too low to have even scientifically observe the -- even

14  present, even to exist.  With respect to A and C, we say there

15  is a potential risk.  We don't enough to say that it's there,

16  but it's good enough for this case, so we let them through.

17  And then we then apply to the population the screens that we've

18  indicated.

19       What, then, comes out at the other end?  At the other

20  end, therefore, we have, using the same basic elements of risk

21  assessment, we go through those plaintiffs who have claims

22  pending as of the filing of bankruptcy.  We know that a certain

23  number of them did not actually complete the PIQ, or the proof

24  of claim.  Because they're -- if they haven't picked up a proof

25  of claim, they're not included under Bankruptcy Rules, and they

J&J COURT TRANSCRIBERS, INC.

CC-BLG000409

1  were excluded.  And then we applied the different criteria.
2  What we can see is a very modest number of people, 5,870 people
3  out of the group, actually satisfy these basic criteria.  It
4  then remains to do a projection of how many of those people
5  will have claims in the future, and that projection -- and
6  that's how many out of the claiming population are sick today,
7  how many will then be sick in the future.  And to do that we
8  use the National Meso Projection.  There were certain
9  modifications that were performed in the Nicholson curve that
10  will be explained to the Court, and that basically using that
11  epidemiological framework, we then traced out how many future
12  claims of people sick from Grace asbestos can be expected in
13  the future.
14          There was then one last step, and that's -- how to
15  calculate the value to give to those claims that pass through.
16  Now, there we're recognizing, for purposes of the analysis,
17  that we expect that there will be live (indiscernible).  So,
18  the remaining question is, well, what are the claims worth?
19  And to figure that out we went back to the tort system.  We're
20  not contesting the liability.  So, how does the tort system
21  value it?  There's been a lot of discussion that our case turns
22  on this number down here, that only six people really drive the
23  whole result.  That's false.  What we actually did is we
24  settled all of the claims, 285 claims were sampled out of the
25  number, these are all meso -- this is meso, meso, meso.  What

J&J COURT TRANSCRIBERS, INC.

CC-BLG000410

1  we found, we (indiscernible) to expect that the claims that met
2  the criteria that's the same criteria that we had applied to
3  the PIQ claims as a whole, we would expect that those that met
4  the criteria would be given a greater value because they had
5  stronger claims against Grace.  What we found out, though, was
6  that -- go back a slide, please.  What we found out was that
7  there wasn't a huge difference between those who met the
8  criteria and those who didn't meet the criteria.  You can see
9  that where we had data for 27 people with respect to whom we
10  could even figure out that we had enough data to be able to
11  imply the criteria, there was no statically significant
12  difference those who met the criteria and those who didn't meet
13  the criteria.  All the rest of the claims didn't give us
14  exposure -- sufficient exposure information, which is a huge
15  problem with respect to the plaintiff population as a whole.
16  So, these are the people who passed the screen.  These are the
17  people that gave us enough information to see whether they
18  passed the screen, but did not, and then, lo and behold, it
19  turns out that they were not statistically significant.    If
20  you take the whole number, 100 percent, the average would be
21  96.
22          But what do we do?  Next slide.  We found that there
23  was no statistically significant difference, the level of
24  exposure was not a driver of values, and therefore, it would
25  have been reasonable to use an average settlement value.  But

J&J COURT TRANSCRIBERS, INC.

CC-BLG000411

1  because it was increasing, that is the trend which you see on

2  the prior slide was increasing, albeit not statistically, we

3  used the top number, that is, the number for the claims that

4  did pass the criteria.  So, we could have used the average, 96.

5  We could have use the ones that didn't pass the criteria on the

6  theory that somehow the criteria were (indiscernible).  We used

7  the top value.  We assumed the absolute top number that was

8  found on average of the people that passed the criteria.  That

9  became the number that we used for purposes of the calculation.

10  Next slide, please.

11         Based upon meso, we then filled out, based on

12  historical relationships, what the other claims would be, and

13  we then went to go ahead and value the claims as a whole for

14  purposes of the analysis.

15         Now, a couple things should be noted with respect to

16  this analysis.  One is that we looked for value, obviously, in

17  the state settlements.  We did not simply focus on the six.  We

18  focused on the whole group.  They say, the other side says,

19  well, wait a minute.  If the criteria had been established, if

20  there's no select criteria, then claims the method criteria

21  would become much more valuable because they say it would be

22  certain that they would get paid.  Certainty of payment, the

23  idea that there is risk in the current -- and there's a

24  discount for risk.  We know that argument is false.  We know

25  the argument is false because today, or historically, in the

J&J COURT TRANSCRIBERS, INC.

CC-BLG000412

1 | tort system, claims -- whether claims get stronger merit or

2 | not, that is whether they were more certain or not to be paid,

3 | did not have a lot of effect on the claim value.  This is

4 | actually Dr. Peterson himself who states this, in

5 | (indiscernible) at Page 170.  "So, now I want to ask you about

6 | things that do contribute to the value of the tort system with

7 | an individual claim.  I think you said that there are many

8 | things that contribute, as we all know -- we all know that,

9 | correct?"  Answer: "Yes."  Next page.  "One of the things

10 | would be jurisdiction, right?"  Answer: "Yes.  It can have an

11 | important effect."  "The lawyer?"  "Yes."  "And the merits of

12 | the case."  "(Indiscernible) assume that the merits of the case

13 | are stronger, more certainty of payment, and therefore the

14 | value would be higher."  Just what they're saying.  Their

15 | question, that is, their theory that says, oh, if these

16 | criteria were there, they ought to be worth more money, assumes

17 | that something to do with the merits of the claim actually

18 | drives value.  But, in fact, they say, no, their own guys says

19 | no.  He says, I can't quantify that.  And negotiations, of

20 | course, (indiscernible) look at that, but merits is not a

21 | variable that can be subject to economic analysis or the kind

22 | of analysis that I do.  And, in fact, what he says is that when

23 | you actually take a look at the claims, because there are

24 | several in volume, merits just doesn't have much to do with it.

25 | What about verdict (indiscernible)?  He says, verdict value?

CC-BLG000413

1 The case goes to trial, otherwise verdict value doesn't have
2 any direct effect on the values that (indiscernible).  So,
3 their theory that says, oh, well, those claims would then
4 become the more meritorious, they became the more meritorious.
5 They'd be more certain.  Certainty of payment is not what goes
6 on in this case.  What goes on in the State Court system is,
7 and we talked about it, the (indiscernible) where clients get
8 paid on a negotiated basis, disease and jurisdiction make much
9 more difference than exposure criteria, than a particular
10 strength of a case against a particular defendant.
11          Now, I'll note one other thing.  We, in a sense, did
12 a favor in this estimate by going down this road.  What do I
13 mean by that?  There was an alternative.  There was an
14 alternative to using State Court values.  We could have talked
15 about the values of cases that are in the MDL, the federal MDL.
16 We didn't talk about that at all.  Well, why?  Because those
17 cases, they don't settle.  Why don't they settle?  Well, they
18 don't get litigated.  You don't litigate a case, nobody is
19 under pressure to settle it, why don't they get litigated in
20 Federal Court?  I wonder why.  I wonder why.  But we didn't
21 take that into consideration.  We just used the settlement
22 values in the State Court.
23          Now, there are a series of criticisms, and we'll come
24 back to these in a little bit more detail, probably on
25 rebuttal, but I want to go through a few of them, and close off

J&J COURT TRANSCRIBERS, INC.

CC-BLG000414

1 on the discussion with respect to the Grace model, and what

2 sciences (indiscernible).  Let's go to Slide 44.  They say the

3 PIQ data is unreliable.  Well, can't -- can't use it.  Can't

4 use it.  Accuracy of decoding is, in fact, unchallenged.  The

5 ACC and FCR say, well, what about the stay?  They say the data

6 are unreliable because the stay prevented these people from

7 filling out the claim forms.  On cross examination their own

8 experts admit that this is false.  Mr. Meyers testified on

9 cross examination that nothing stops these people from talking

10 about their own exposures.  The part of the case that depends

11 upon -- where they put together what the exposures were is a

12 part of the case over which they have control.  And these are

13 cases that are being worked up against other clients.  It's not

14 like they are sitting blind.  So, they can sit there and do --

15 they take their basic work history as a matter of input into

16 their firm. They know what the exposures are.  They don't have

17 any effect on the stay.  It doesn't effect them.  Did they take

18 discovery?  Of course they've taken discovery.

19          The next issue.  They attack -- this is the point

20 where they use the settlement values as only for six cases, and

21 our response is pretty simple.  The number of claims selected

22 as the basis for average was appropriate because

23 (indiscernible) all the data that was there.  Use of the

24 overall mesothelioma settlement averages would result in a

25 lower value.  And if we hadn't cherry picked this, they say,

CC-BLG000415

1  the number would have gone down, not up.

2          Verdict criteria is not an appropriate alternative

3  because verdicts have no direct relationships to settlement.

4  Let's take a look at Peterson 173, 174.

5                          (Pause)

6          MR. BERNICK:  173, 174.  "So, you would agree that

7  the settlement process in mass asbestos litigation is not

8  necessarily driven by individual verdict value?"  Answer:  "It

9  can be.  There is an opportunity for it to be so, if either

10 defendant or the plaintiff chooses to do that, but most cases

11 are not resolved with those considerations.  No."  And it will

12 become clear why these cases don't go to trial.  First of all,

13 the verdict value doesn't necessarily mean that the money

14 changes hands.  There are a lot of other things involved.  Why

15 is it that so few cases to go trial?  You always hear from the

16 other side it's because well, the defendants just don't want to

17 try these cases.  And the answer is there's a lot of truth to

18 that, because the circumstances under which a trial takes place

19 are circumstances that are not desirable circumstances.

20 (Indiscernible) reasons.  If, in fact, the defendants --

21 they're the only ones that didn't want to go to trial, well,

22 these guys would take them to trial every day of the week,

23 because it means they get more money for their client.  So, the

24 fact that we don't have trials has to be looked at as a shared

25 agenda that they are better off, each and every one of their

J&J COURT TRANSCRIBERS, INC.

CC-BLG000416

1 clients, each and every one, is better off not going to trial,

2 because otherwise they would be ethically bound to take each

3 case to trial, and for that matter, to take fewer cases as a

4 firm, because otherwise they would be sacrificing the interests

5 of their client.  Under what circumstances could it be true,

6 under what circumstances could it be true that it's more

7 (indiscernible) of a client not to go to trial than to settle,

8 particularly if they are such believers in the idea of verdict

9 value?  The answer is their clients make much more money.

10 We'll get back to the question of what that says about the

11 system when we get to their model.  Why would their clients

12 make more money on settlements, the same settlements that they

13 seek to perpetuate here by keeping the cases away from trial?

14          Let's move to Slide 47, and then I'll be able to

15 finish up, and take a break, Your Honor, I'd appreciate it.

16 Issue -- Grace's model uses flawed exposure related

17 (indiscernible) criteria.  The response is that we use all

18 available historical data not just selected historical data.

19 Average exposure?  That's appropriate in light of the frequency

20 and duration of something, as accepted by the EPA.  What about

21 the benchmarks showing the actual -- the levels that we used?

22 That's based upon actual data.  Now, they'll say, well, but

23 wait a minute.  The tort system doesn't approve those criteria.

24 Where is the State Court case that says that that's

25 appropriate?  And the answer is we'll talk all about the law in

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000417

1  a minute.   The State Court law of relevance is the substantive

2  requirement of causation, either (indiscernible) substantial

3  contributing factor, or the (indiscernible) the same.   It is

4  only in the Federal Courts that we look to the question of how

5  causation is established.   The like to quote the cases that

6  say, well, it's -- if the guy was there at the site, it's okay

7  in State Court.   Or, frequency, duration, and intensity, that's

8  all you need.   Those are (indiscernible) we'll deal with.

9  Modality or method of proof.   They're not the standard, they're

10 the language the standard is satisfied.   Is being at the site,

11 is that enough to make a prima facie case?   The Lorman

12 (phonetic) test, frequency, duration, and intensity, that's

13 another formulation.   But in Federal Court, under the Federal

14 Rules, under Daubert, you have to do it scientifically, and

15 it's not sufficient to say, well, the State Court

16 (indiscernible).   The State Court precedents don't say that

17 because Daubert may not apply in State Court.

18        Let's talk about the federal precedence of how to

19 prove cause under the Federal Rules of Evidence, precedence

20 would be in effect.   If we had a trial tomorrow, we'd be

21 applying to this Court federal evidentiary and procedural law

22 under the Federal Rules.

23        Let's finally go to a point that I would like to make

24 about this whole methodology that we use.   Next slide, please.

25 There's been much made of the fact, the alleged fact, that this

CC-BLG000418

1   is all -- Mr. Bernick has got this, and that, and where has

2   this ever been done before?  And it's so outrageous.  It's so

3   outrageous.  And the answer is that not only is it not

4   outrageous, not only is it by the book, scientifically, but

5   it's actually very good precedent for doing exactly what it is

6   that's being done here, as the <u>Dalkon Shield</u> case.  Now,

7   there's other legal precedent, but to get to a level of

8   refinement in terms of methodologies and how they work, <u>Dalkon</u>

9   <u>Shield</u>.  Well, what about the use of a bar date?  That was done

10  in <u>Dalkon Shield</u>.  What about the use of the POC's?  Well,

11  obviously that's associated with (indiscernible).  This

12  terrible questionnaire that we had here, and we had to litigate

13  for the better part of two years, 14 pages, there was a 50-page

14  questionnaire in <u>Dalkon Shield</u>.  And then, how are the

15  estimates done?  They -- well, we don't really know what Judge

16  Merich (phonetic) did.  That's just -- that's a little bit less

17  than candid, Your Honor.  There was a whole range of estimates,

18  and we know that the estimate that was chosen, the estimate

19  that was actually used for purposes of the trust, was about

20  $2.5 million, and that was almost right on the money for Ms.

21  Robinovitz's estimate.  Hers was about $2.4 billion.

22          Now, what did she do?  Well, she excluded people who

23  didn't satisfy the bar date requirement.  She excluded people

24  who didn't consider -- didn't have evidence that they had used

25  the product.  And with respect to those that had, she had a

1 series of weighing factors that were used, applied, from

2 answers from the questionnaire.  In other words, it was a

3 merits based assessment, not simply a, well, what are you --

4 you settled before, you settled again.  Liability was very,

5 very much on the table.  Now, Mr. Florence was also present in

6 that case.  He came out with a different estimate.  He

7 originally came with a lower estimate, but then upped his

8 estimate.  And his analysis was similar except that he actually

9 based upon the answers that went into the merits, he filtered

10 out claims, just like he has done here, using the criteria.

11 Now his number was lower, and it wasn't accepted.  But the very

12 interesting thing is that when all the dust settled, at the end

13 of the day in that case, all of the claims that were lodged

14 against the trust in that case, be they litigated, settled

15 claims, were ultimately resolved for about $1.5 million, and

16 there was money left over, so they had an extra distribution to

17 the claimants beyond what they settled for or proved their

18 entitlement to.  The number was too high.  Too high.  It was

19 high.  And actually, Dr. Florence's number proved to be a more

20 correct analysis.

21          Now, maybe it will have turned out the same way, but

22 we're talking about a reliable methodology, and what we have

23 done here is straight down the road of science, and straight

24 down the road of precedent.  In those cases where there was a

25 truly contested, bottom's up procedure, every step of the way

CC-BLG000420

1  in that procedure was contested, ultimately it went up to the
2  Fourth Circuit.  And at the end of the day, are there limits to
3  the Grace analysis?  Yes.  One of the most pronounced has been
4  the source of unbelievable time spent by the Court and by the
5  litigants is a very concerted effort to say, yes, Your Honor
6  has ordered that this be done, but no, we're just not going to
7  do it, to the point of people representing thousands, and tens
8  of thousands of plaintiffs simply not responding, or coming in,
9  law firm, after law firm, after law firm, saying can't have,
10  can't have, can't have, no one has ordered, I'm still not going
11  to give it to you.  And the questionnaire itself, massive non-
12  compliance, so that we had to get the underlying data from the
13  medical files themselves.
14        There are limitations.  That limitation is the
15  creature of their own creation.  But at the end of the day,
16  whatever limitations were produced by that effort, this is the
17  only show in town.  It is the only show.  It is the only
18  process that uses established science.  It is the only process
19  that uses established science that is embedded in everything
20  that we do today from a safety point of view.  All of the air
21  regulations, all of the chemical regulations, the exposure
22  regulations, in the workplace, much like (indiscernible), they
23  are all based upon the risk assessment which uses the tools of
24  dose, and risk, industrial hygiene.  This is it.  We don't go
25  sitting there today and say, oh, I guess we'll figure out

1 whether it's safe to work here or not based upon the theory

2 that one fiber of asbestos actually causes to real people

3 incremental risk.  That's not how this is conducted today, but

4 their analysis doesn't even get on the page.  They don't have a

5 single step of a merits based risk assessment analysis.  The

6 only world in which they bring to the Court here is the world

7 of asbestos deals, and asbestos deals don't apply to the rules.

8         Your Honor, if I could take a break?  I think I've

9 used up an hour and 25 minutes.  And I'll be able to finish the

10 rest within two hours.

11         THE COURT:  All right.  We'll take a ten minute

12 recess.

13                      (Recess)

14         THE COURT:  Please be seated.  Mr. Bernick?

15         MR. BERNICK:  May I proceed?  Thank you, Your Honor.

16 I'd like to turn, Your Honor, to the second question that I

17 posed at the outset.  We've gone through what we believe to be

18 the established -- the only reliable path that science points

19 out, and we explained how that path underpins -- drives the

20 estimation model, and the approach that Grace has used in the

21 case.  Now, I want to talk about how it is that the claimants'

22 estimation approach deviates from that path.  And what's

23 interesting is that the deviation from the path can be seen in

24 the context of the estimation model itself that they use.  And

25 to illustrate that I'd like to begin with Slide 50, please.

J&J COURT TRANSCRIBERS, INC.

1          Slide 50 illustrates -- this is purely a chart that
2    we had in our briefs, and the lines are not in contrast to the
3    other lines that we're displaying here, which are, in fact,
4    data driven lines.  These were solely for illustrative
5    purposes, but they are important illustrative purposes.  The
6    deviation from the path of science takes place in the context
7    of their estimation model as reflected even in this basic
8    slide, because in the case of Peterson, and I'm going to deal
9    with Peterson first, and then with Ms. Biggs.  Science is the
10   top line.  That is a line that is derived from -- it is the
11   Nicholson (indiscernible), the case of (indiscernible).  So,
12   this is a line that's driven by science, dictated by science,
13   and yet, when it comes to actually dealing with their estimate,
14   we have a line of a different color, or stripe, and that's the
15   deviations right there, is that they begin with a disease curve
16   that they actually seek to do their analysis focused on a
17   claims or behavioral curve.  Now, why do they do that?  Well, I
18   guess the true answer to that is lost somewhere in the mists of
19   time, and probably is known only to Mr. Inselbuch, who is
20   gracing us with his presence here today.  But we can see what
21   the effect of it is.  The effect is twofold.  First, it enables
22   this Dr. Peterson to say I am using established science.  There
23   is a patina, literally, a green patina in the case of this
24   slide.  There's a patina of science that's conferred --
25   inferred by the use of that curve.  More importantly, it serves

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000423

1 to achieve a very basic blunt effect, which is to enable them

2 to generate these enormous numbers.  These cases are not driven

3 by the value of current claims.  I mean, value of current

4 claims is important, but it is largely dwarfed by the estimate

5 of future claims.  So, the ACC and the FCR lock hands here in

6 Court to develop estimates that are enormous, that they -- they

7 have a shared interest in that enterprise.  But in point of

8 fact, the current claimants have a relatively modest stake in

9 that exercise.  They get to vote.  They're the only ones who

10 can vote.  But they like to be able to vote on the basis of

11 being able to say, oh, well, gee, this doesn't provide

12 adequately for future claimants, so we're not going to vote in

13 favor.  What is it about the disease curve that enables this

14 argument to be made?  Well, it's apples and oranges.  Disease

15 and claims, they have almost nothing to do with one another.

16 Indeed, we have, in the sense that, I'm sure there are people,

17 unquestionably in the case of meso who are ill, but in the

18 sense of claims, the question of causation is not addressed by

19 the claims.  It's -- the causal link, the whole science

20 (indiscernible) does not obtain.  But once you have the claims

21 established at a higher level based on propensity, effectively

22 that disease curve becomes the backbone of the overall curve,

23 and therefore drives all of the volume of money and claims that

24 their estimate would call for in the curve.  So, once you get

25 strapped on to that curve up there, your propensity drops.

J&J COURT TRANSCRIBERS, INC.

CC-BLG000424

1    You're up there now.  And you can't change that propensity.

2    It's there forever.  You ride, and ride, and ride -- you ride,

3    and ride, and ride, going into the future, and all the space

4    under your feet is the money that you're going to pay, and your

5    roller coaster always stays flat.  That propensity curve always

6    stays flat.  It never comes down again.  So, that little

7    engraphment there of a disease curve is used to support the

8    shape of the claims curve as enormous economic (indiscernible).

9          Okay.  So, let's go through a little bit of the

10   details of this exercise that takes place.  First, you have

11   that basic curve.  Peterson.  Slide 51.  You next have the

12   question of propensity.  And all propensity is is a ratio

13   between the actual claims and the national trend.  It's purely

14   a ratio.  And as the -- the filings change, boy, that

15   propensity just changes, too, except, as we know, it turns out

16   the filings go down, and the propensity curve never changes

17   because it's locked in according to their model.  So, once you

18   actually go out of the system, you are locked into whatever

19   that arithmetic relationship happens to be.

20         Now, that simple ratio, just take the ratio itself,

21   propensity, that is who decides to sue whom.  Who decides to

22   sue Grace.  Who decides to sue another company.  Does it mean

23   that they are sick from Grace asbestos?  No.  There are experts

24   who will concede absolutely unequivocally that they don't know.

25   Does it mean that the propensity means that there is more merit

CC-BLG000425

1  to the claims?  The answer to that is no.  Is propensity
2  stable?  Not necessarily.  We see massive instability here.
3  And historically it can go up and down, although by and large
4  propensity has gone up after 2003.  We know (indiscernible) it
5  has gone down.  Is it predictable?  No, it's not predictable.
6  If it were predictable, Dr. Peterson would have been able to
7  give very different testimony than what he gave.  He gave
8  testimony that said that as these trends have developed over
9  time, he didn't predict any of the big ones, which means that
10 his propensity model didn't predict any of the big ones.  So
11 propensity is not a scientific construct, it's not a sensitive
12 construct, it's not a data driven construct in the sense that
13 once it's fixed it always remains fixed.  It's not stable, it's
14 not predictable.  It is pure arithmetic but it provides the
15 excuse to hook debtor's filings, claims, natural trends which
16 go out over years and years and years.  Quite a tool.
17        Next step is calibrations like 51.  Calibration
18 raises the question well as of what time do you fix the
19 propensity to be used hereinafter for the rest of time?  Now it
20 seems like -- calibrations sounds like somebody is under with a
21 Swiss tool kind of making sure the lines go up just the right
22 way, like it is precise.  It is anything but precise.  It's
23 anything but objective.  All it is, is an opportunity for the
24 expert to look back over that history and say, hey you know
25 what which period of time do I want to use?  Now the fact that

J&J COURT TRANSCRIBERS, INC.

CC-BLG000426

1  period of time can be used, you can go back any number of

2  periods of time to use.  But what do you imagine they actually

3  -- what they actually do is particularly talking about

4  bankruptcy by and large claims always rise as you are getting

5  close to post-bankruptcy, lo and behold the calibration period

6  always turns out to be the highest theory of them all.

7          It is just inevitable in their calculus.  That in

8  fact is exactly what happens here.  I want to use the slide

9  that I think I -- if we can -- actually switch to the elmo.

10 I'll tell you what I'll hold it up.  Here it is.  There we go.

11         Now this is interesting because these are actually

12 the propensity curves, the historical propensity curves for

13 both Biggs and Peterson.  What is interesting is you can see

14 that according both to Peterson and to Biggs the period of the

15 mid-90s was actually extremely stable in terms of propensity.

16 So when you get that blip over here, statistically there is all

17 the sudden a relationship between this line here, earlier in 99

18 propensity and what we see thereafter.  This has got a very

19 strong positive slope afterwards.  This is basically flat for a

20 period of years.

21         Now what does Dr. Peterson believes.  Well you know

22 what I find '99 to 2001 just so darn probative I may use that.

23 So he takes that spike and makes it last forever.  What does

24 Ms. Biggs do? Well she goes back a little bit more.  She goes

25 back to '97.  But you can see '97 and '99 is flat so it's

J&J COURT TRANSCRIBERS, INC.

1 really 2000 that dominates.  Does she have a statistical test

2 that she uses?  A test that applies?  No.  That's just her

3 judgment.

4        We actually had her testify it is purely her

5 judgment.  This is purely Peterson's suggestion.  So

6 calibration sounds like it's something precise and in fact it

7 is precise.  It's called selection bias.  They bias it in favor

8 of a period of time designed to produced inevitably because

9 it's just on the eve of bankruptcy a higher propensity than

10 period calling the future.

11        Let's take a look at Slide 51 off the elmo.  That's

12 it.  It was the one before that.  So what does this then

13 actually -- as you get the propensity up, that is as you have a

14 propensity now established they then use that, attach it and

15 now start to ride the curve.  So the propensity, using the

16 propensity curves for Peterson.  It goes up like this and it

17 goes across.  We use Manville for purposes of getting to that

18 curve and if you -- that curve once it reaches '06 which is

19 when we he now says it's a steady state, he has calibration

20 period which produces an average.  These two years average out

21 to here.  With that average it fell a little bit below the

22 peak.

23        So what does he do, he says well I'll get back up to

24 the peak.  You can see how between '01 and '06 he gets them

25 propensity all the way back up to here.  So now it's the same

J&J COURT TRANSCRIBERS, INC.

CC-BLG000428

1  propensity as it was on the eve of bankruptcy.  There is no way

2  of saying gotta keep that bubble going, just got to keep it

3  going.  So on the basis of that, you now have the -- you now

4  have the claiming.  These are claiming curves.  You now have

5  the claiming curve because propensity increased, now it remains

6  flat so the claims increase and then they follow, you can see

7  how the shape of the claiming curve follows the shape of the

8  deceased curve that produces that beautiful bubble.

9         We now have effectively a bubble that began in '99

10  then wooo just nice big bubble propensity will last and last

11  and last.  If you actually use the Grace propensity that was

12  the average that is where the calibration stood, totally

13  different estimate.  Huge volume claims of money lost.  If you

14  actually looked at the data from other companies which was what

15  Grace did, the propensity of those companies comes down and

16  then if you then assume that that holds, that is the end of

17  that.  It doesn't go down any further, just stays where it is.

18  Look at the big build up it should have at the point.

19         So depending on whether you want to boost that

20  propensity and maintain it or whether you want to go with where

21  Grace was and it's calibrated peak or if you want to see what's

22  happened to the tort system since makes a difference in

23  hundreds of things and billions of dollars.  Future propensity,

24  all this is driven not by Grace.  Just remember not by Grace,

25  not by her companies, it's driven by Johns Manville.  That's

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000429

1  what drives a whole cart of Dr. Peterson's analysis is the
2  Manville Trust, giving us a long bubble.
3          Next step, Slide 53.  I've got to move here.  Now
4  there is a question of all these claims that are being filed,
5  how many of them get paid and how many of them get dismissed.
6  This I call a game of pick a number.  These are the historical
7  payment rates and you see how they are quite high.  Peterson
8  decides well you know what, in Armstrong and USG I've decided
9  to post '01, the payment rate that is the number of claims
10  filed that were paid to drop to 40 percent.  So he used 40
11  percent for USG and Armstrong.  Did he have an analysis that
12  said that?  No.  Did he have any kind of statistical driver?
13  No.  Did he have a model?  No.  He picked 40 percent.
14          Well having picked 40 percent, does he not want to
15  pick 40 percent for Grace?  No.  Well I think Grace is a little
16  different.  Let's give them 15 percent.  So you now get this
17  payment rate just selected as a single number carries forward.
18  If you look at the payment rate of actual people in the tort
19  system post bankruptcy, it turns out the payment rate is
20  completely different.  What's the effect of this next slide?
21          Well if the Peterson payment -- oh, this is yet
22  another slide.  This is the payment rate again for other
23  companies confidential information and this is publicly filing
24  companies.  It's not a disease, it's not meso, now all a
25  disease because the publicly public filing is no break out

CC-BLG000430

1  disease.  So this is all disease not just meso.  This shows how
2  deeply different the publicly reporting companies are that they
3  are parallel to the companies to which we have seen it.
4          This is kind of a footing exercise.  Companies to
5  which we have confidential information very similar to the
6  public companies.  Those confidential companies though also
7  have the meso data so we know they are not different here.
8  They are likely not different when it comes to meso.  So it
9  gives us confirmation that the meso specific number on the
10 slide was accurate.
11         What is the effectiveness of that slide?  Well these
12 are the filings predicting Grace meso and Grace -- sorry these
13 are filings predicted using the paid claim, I'm sorry.  So this
14 takes the number of paid claims to the top curve.  This is the
15 number of curves that Peterson says based upon his propensity
16 would actually be filed.  So the propensity number from before,
17 couple of charts ago, it's the same one.
18         Now take the percentage paid.  That's based upon the
19 dismissal rate from the just prior slide as we heard.  You look
20 puzzled.
21         THE COURT:  Yes, I lost you two slides ago.
22         MR. BERNICK:  We'll go back a couple of slides.
23 Propensity gives you the filing, the number of filings.  You
24 look on and that takes it forward.  We're now going to find out
25 how many of those filings were paid as a separate calculation.

J&J COURT TRANSCRIBERS, INC.

CC-BLG000431

1 | You now have to adjust the number filed by the payment rate,
2 | that is how many of them were dismissed without payment.
3 |     So that is now the next slide, is percentage paid.
4 | The next slide he uses a payment rate which is 15 percent
5 | payment.  A 15 percent dismissal rate based upon numbers from
6 | USG as adjusted for this case.  We have data on the dismissal
7 | rate from actual defendants in the system.  Their dismissal
8 | rate is much higher and fewer claims are paid.  So it's a lower
9 | curve.
10 |     We then take a look at the next slide at public
11 | filings to see if they were the same or different from our
12 | confidential companies.  They are not.  So that gives us
13 | confirmation that our line is correct.  Next slide.
14 |     We now go back and put the two things together.  This
15 | is the number of filings.  This is the number of actually paid
16 | claims using his dismissal calculation.  This is the number of
17 | paid claims using a different propensity that is our propensity
18 | rate based upon actual defendants in the system and our
19 | dismissal rate based upon actual defendants in the system.
20 |     So if you took and used instead of his propensity in
21 | his favor, the actual propensity of defendants in the system,
22 | the actual pay rate in the system, you can see that the overall
23 | number of claims that are assumed to be paid going forward
24 | drops from this level here all the way down to here.  That's a
25 | little bit better.  We're trying to get it all on the same page

CC-BLG000432

1  of what claims are actually being paid.

2          Next slide.  Now let's talk about settlement amounts.

3  Peterson begins with settlement amounts using a calibration

4  period that is again the highest settlement amounts you can

5  find are right there.  He gives right at that peak and if you

6  assume that it continued on with cost of living adjustment it

7  would go something like this, which would be beginning at the

8  highest peak.  If you use company confidential data, it turns

9  out the numbers actually are falling even for mesothelioma.

10          What does Peterson do?  He is not content with

11  beginning with the absolutely highest peak.  He has to come up

12  even further and he was a per claim settlement averages that

13  dramatically escalate over the next few years before they

14  steady out.  Now what is his source of information from that?

15  He has no source of information after 2001 actually based upon

16  companies that are in the tort system.  He simply decides that

17  he's going to use a different approach.  He uses multiple

18  regressions and the like in order to get extremely high

19  settlement rates.

20          What does this mean now in the aggregate?  Next

21  slide.  It means and if I can go over to the chart now, here.

22  Is this audible?  It means that he is basically doing the

23  following.  He's got the actual filings here, those are actual.

24  Based upon his propensity analysis which maintains the bubble,

25  he predicts this huge ongoing flow of claims going forward, the

J&J COURT TRANSCRIBERS, INC.

CC-BLG000433

1 big bubble.

2       He assumes that using his 15 percent payment number

3 that the percent paid as opposed to dismissed will ride that

4 bubble.  So he's now got everything under here is might.

5 Whereas if you actually took at the actual filings against

6 companies, not the trust, we can see that the propensity has

7 declined in a very significant fashion.  If we take a look at

8 the actual dismissal rate, not against the Manville Trust, but

9 the actual dismissal rate, that also is different.

10       So if you compare net net the difference between

11 Peterson's assumed paid claims and the paid claims that would

12 come from looking at actual companies in the tort system, there

13 is a huge difference there that is all claims all night and

14 that settlement.  And that he takes that settlement money and

15 he escalates it on a per settled claim basis so that you get

16 this huge, huge upward number.  A very, very dramatic effect.

17       Now this is how the system works.  This is the system

18 that has driven huge numbers of billions of dollars worth of

19 payments of trust.  What are the key elements?  Using the

20 national disease trend as an anchor for filings totally a

21 question of judgment.  There is no science to support that.

22 There is no nothing that supports that.  This is claim

23 behavior, specifically not measurement of disease caused by

24 Grace.  This is actual disease caused by asbestos on a

25 nationwide basis.  Is there any support to the judgment?  No.

J&J COURT TRANSCRIBERS, INC.

1 Is it correct?  No, it's wrong.

2          Propensity.  The whole idea of propensity that is

3 purely a question of his judgment.  There is no science that

4 supports the use of propensity.  All it is, is an arithmetic

5 ratio.  To pick out the past propensity and actually apply it

6 here, is again wrong.  There is no reason why the propensity

7 should hold.  There is no science that says that it should

8 hold.

9          What about the calibration period?  The calibration

10 period is not -- does not enjoy the status of being the output

11 of any statistical mathematic or other model.  It's purely a

12 question of choice.  In this case he chose exactly the wrong

13 period, one mostly affected by the prospect of bankruptcy and a

14 whole bunch of other things that we're going to be talking

15 about.  And that's wrong.

16          Future propensity simply projected to be a

17 continuation of the past but now driven by the Manville

18 Bankruptcy.  That's a choice that he made and it's completely

19 and utterly contrary to the whole assumption made in his

20 analysis which is he is looking for the operation of the tort

21 system as applied to Grace.  Why didn't he go to other

22 companies as to which there is data in the system?  What about

23 the dismissal rate?  Again, purely a question of judgment.  He

24 just picked the 15 percent as opposed to the 40 percent he used

25 for USG and for Armstrong.  What about using the settlement

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000435

1  that I used?  Again purely a question of judgment and again the

2  data does not support it.

3      Every step of the way the architecture of this model

4  from beginning to end is pure and simple judgment.  That's why

5  there is no degree that is involved with this area, no

6  training, no certification of being an asbestos estimator.

7  This is a role which Dr. Peterson has grown up and proffered

8  but it's not a science.

9      What about Ms. Biggs?  Ms. Biggs is different but she

10 is for analysis no better.  She got into a business  to be a

11 little bit competitive.  Dr. Peterson after all it's not fair

12 he should enjoy such relationships and prosperity, lead a

13 company this big comes into play.

14      (Audio malfunction)

15      This is what she says though.  She's developed an

16 alternative model that is very interesting because it has never

17 seen the light of day until this case.  No one has ever seen

18 her model until this case publicly and she says there internal

19 review that has never been subject to external review.  She

20 cites an article that makes kind of a general reference to a

21 basic approach.  It's none of the moves, none of the

22 calculations, none of the models and in fact originally the ST

23 objected to producing her model, even in this case.

24      While she uses propensity too, she does it a little

25 bit differently.  She uses propensity.  The propensity that she

CC-BLG000436