uses is she compares five to an overall index of industry, an overall industry (indiscernible). Does propensity make more sense there? No. It's still a simple ratio. It's not a ratio of how much people prefer to sue Grace as opposed to within the industry as a whole. Out of how many meso cases in the industry as a whole, those people decide to make their penance with Grace.

What about the calibration period? Calibration period remember she could have chosen any one of the years in the ratio (indiscernible) the propensity to not change. She chose to use a '99 to '01 why there is no statistical formula, no model, no nothing. She simply chose it based upon her judgment.

What does she do now in connection with the propensity going forward? Slide 62. She's another smoother. She uses Manville but she smooths just like Dr. Peterson does. So what do you get? You get a nice little flat line of propensity goes and goes and goes. The bubble all along stays there.

But what is interesting about her is her analysis is a little different. Let's go to Slide 64. To apply her propensity we now see that her curve, that's her industry benchmark. It's not smooth like (indiscernible-cough). It's not a disease. It's not a feature of epidemiology. It's literally something that she pieces together to represent the

1  overall industry rate. How does she do it? She uses a sample.
2  How does she actually get there? She starts out using her
3  calibration period with rates ending up being right here in the
4  calibration period. Her prediction using this therefore it is
5  important to begin way up high, way up high, but not
6  propensity. Here it's used but that's to maintain a
7  relationship between Grace and the industry filing for
8  Fernando.
9       How is that put together, that overall curve that
10 drives the estimate just like (indiscernible) does? It's kind
11 of like you are in the second grade finds some type of prints
12 of a new creature and it turns out to be the hoof part of a
13 couple of different insects. But the first part of the
14 analysis it is a smooth Manville rate of '06. Then she says
15 but between '06 and '09 because the smoothing only takes you to
16 '06, I'll just continue it to '09. How does she just continue
17 it to '09? I'll just fill it in to '09.
18      And then beginning in '09 she gets this decay, this
19 decay here. That comes from Dr. Stallard (phonetic) who has
20 applied the rate to the Manville Trust as a whole. So it
21 purports to be Manville but saying it's Manville doesn't really
22 mean very much because it starts on Grace but then turns to
23 Manville. It turns to Manville smooth but then it's a poor
24 number from '06 to '09 and it is then Dr. Stallard's
25 (indiscernible).

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000438

1    In the interest of time here I'm going to talk a
2 little bit about the overall flaws in the system of how they
3 get to their impact. Let's take a look at 69. That's not 69.
4    Methodology. What we have here is not a methodology
5 that is known to science. It is not the analysis of causes of
6 behavior. It's not the analysis of trends of disease. It's
7 neither one. It's surfing the trend literally. You watch the
8 trend as it develops and you went along with your calibration
9 period, whatever that trend is you assume that the world is
10 never going to change. The wave is never going to crest, the
11 bubble is never going to burst and this is all going to remain
12 the same. That's the methodology. No one thinks change. She
13 doesn't deny it. Then it's, oh I guess it's changed so I'll
14 look for the next trend.
15    Calibration. They chose the highest point so that
16 the bubble never bursts. Benchmarks of future propensity.
17 They say that they are looking for what Grace would be like in
18 the tort system, but in fact they adopt as their benchmark a
19 bankruptcy trust that hasn't been in the court system for years
20 and years and years and has controlled them for the benefit of
21 claimants by a group of people that is basically selected by
22 its lawyers.
23    Dismissal and payment rates. Take a number, 40
24 percent made sense for Armstrong, 15 percent sounds better for
25 Grace. And on the settlement amounts God knows you take the

1  peak and then you escalate it and you escalate it more and
2  there is this money forever coming out of the settlement
3  analysis. That is not science. What is the effect of it all?
4  The effect of it is pronounced.
5        I want to go back to this bubble and what it ends up
6  incorporating and I'm going to put a few things there. What is
7  under this bubble? What does it serve to perpetuate and
8  provide money for? I got four items.
9        One is it is not driven by the merits and we know
10 that by the admission of their own experts. So I'm not going
11 to cover that again. We've got three other items that are
12 major interests. One, is joint and several liability. Joint
13 and several liability is a creature of the tort system and
14 applies in various states. But it's not a creature that
15 applies in this case. Indeed the plaintiff's have been candid
16 in this case to say that what is relevant here, and they said
17 this when they were resisting discovery, of all those exposures
18 they just said it's just several liability.
19       Well are any of these data data for several
20 liability? Are they just carved out to be the Grace share
21 historically in the system? The answer to that is no. Because
22 in certain states, many states, there is joint and several
23 liability. So while these folks or their clients go about it
24 to negotiate with clients like Grace and Grace is in the
25 system, a state with joint and several liability and Grace is