1 faced with the prospect of picking up the Manville share.  The

2 Manville share is big and there insolvent so you can't go get

3 them.

4        Well what is Grace going to do?  Well maybe they will

5 be put upon in suggesting to them, you want to set up Grace for

6 my money, this price, because if you go to trial you may have

7 to pick up joint several liability of Johns Manville shares.

8 Of course, they are doing their job.  The clients of the ACC

9 and FCR must, must, seek exact money for joint liability not

10 simply several liability.

11        Junk Medicine.  Let's just do it.  A couple of quick

12 quotes on junk medicine.  Let's look at 77, Slide 77.  Dr.

13 Harron.  Tens of thousands of screens.  Flip to the next one.

14 Thirty thousand.  That slide.  Foster, thousands, tens of

15 thousands.  Next one.  Heath Mason, tens of thousands. Levine.

16 Levine is interesting.  He did not take the fifth. He filled

17 out at least 22,000 forms but he submitted to questioning on

18 written deposition.  He attested in that deposition none of my

19 reports I believe, no reform from any other B reader can or

20 should be remodified or considered as a clinical diagnosis on

21 asbestos related disease or any occupational dust disease.

22        Next slide.  Dr. Philip Lucas, 13,000 asbestos

23 related claims.  We were going to play the transcript but we

24 ran out of time.  He fails to rule on his own testimony there

25 are hundreds of other causes of diseases that can cause

**J&J COURT TRANSCRIBERS, INC.**

1  interstitial conditions that would show up on a B read.  He

2  didn't intend to rule out any of those.  Why?  In his own

3  words, I'm just taking, he says you know what the people have

4  hired me to do this.  They weren't really interested in those

5  other conditions.  They were only interested in asbestos.

6           Finally Dr. Gaziano gave us 22,000 and he basically

7  says did he actually take the exposure history himself?  Did he

8  ever verify the reliability of the exposure history somebody

9  else took?  It was not his common practice.  Did he actually

10  use the standards in all of these?  No.  I didn't do that.  So

11  when it is getting perpetuated going forward, when you simply

12  carry forward the settlement history, we are paying again for

13  junk medicine.

14           But I'd like to close in talking about the answer to

15  the question that I posed a little while ago which is, why

16  would it be that we don't get taken to trial all if that's the

17  way that more money would be paid?  Why would that be?  And

18  that's where we get into the question of what else was behind

19  this --

20                    (Audio malfunction)

21           THE COURT:  Are the parties on the phone trying to be

22  heard?

23           UNIDENTIFIED SPEAKER:  Hello?

24           THE COURT:  Hello?  Brian are you there?

25                    (No audible response)

CC-BLG000442

1          MR. BERNICK: I posed the question Your Honor.  What
2  was going on during this spike period at the time.  And the
3  claimant's experts were obtained to figure out some reason why
4  that spike was specific and had something to do with Grace.
5  They came up with theories that it was driven by Libby
6  liability.  Dr. Peterson testified he did a quasi experiment
7  that indicated that it was Libby.  What was the quasi
8  experiment?  He said well there is Libby publicity at the same
9  time there is a spike so the two things must be related.

10          That's a lot of science there.  So if they couldn't
11  demonstrate that, they couldn't demonstrate that there was
12  something unique.  It turns out that Dr. Peterson ultimately
13  had to admit, ultimately had to admit, that there was in fact a
14  general upward trend in propensity that is the same claimants.
15  Now there were claimants that were coming into the system for
16  meso but not very many.  The bulk of the spike means that more
17  of the same population is suing more companies.  That's why
18  Grace's propensity would all of a sudden jack knife because
19  more people with meso are suing it.

20          If it turns out that there is a jack knife against
21  other companies, that tends to confirm it.  Sure enough if you
22  look at Slide 72, you can see that there is a jack knife of
23  claims against people that have never been sued before.  All of
24  a sudden their propensity has gone up.  Next slide after that,
25  71.  This is Babcock and Locox, Owens Corning and Grace.  You

CC-BLG000443

1 can see them all go up.  This says that everybody else's

2 propensity are -- a lot of the companies' propensities are

3 increasing.

4         So what does that tell you?  That tells you that

5 Grace is now seeing claims that were in prior years not have

6 been pressed against them.  That is more people are suing or

7 the same people are suing more companies.  You get confirmation

8 of that in Grace's propensity.  Take a look at it, it's Slide

9 73.

10         Slide 73 indicates the propensity of Manville in 2001

11 was 58 percent, 58 percent of all claimants sued Manville for

12 mesothelioma.  What about Grace?  Grace is 45 percent.  Now

13 Manville accepts the claims of anybody exposed to any asbestos.

14 That's it.  If you were exposed to asbestos, you get in.  If

15 Grace is coming close to Manville, what does that tell you?  It

16 tells you that Grace is being sued for a lot of other people's

17 asbestos.

18         Now we get to the kicker.  What happens to the

19 dismissal rates?  It may be that if all these claims are going

20 out and propensity is going up, if Grace is being sued by more

21 people and it got many more dismissals then they net out okay.

22 But if they are not able to manage their docket because they

23 are overwhelmed and their dismissal rate remains constant which

24 these folks have assumed, then what does that mean?

25         That means that Grace is paying more people than

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000444

1   that. It is being sued for other people's asbestos and it is

2   paying those people.  Now you then go back to the perspective

3   of the claimant.  The claimant is sitting there saying, hmm, do

4   I want to go to trial or do I want to settle?  If I go to

5   trial, I can only recover against the people who actually

6   exposed me to their asbestos.  Then the rules of liability

7   apply, joint and several liability apply, allocation applies.

8   I can only recover the total amount of my loss as determined

9   once.

10          But if I never go to trial, if I threaten people with

11  trial and they don't have the ability to deal with me because

12  they are overwhelmed I can go after A, B, C, D, E, F, multiple

13  times and I am better off.  The law firms are better off, the

14  claimants are better off.  That is exactly what that propensity

15  comparison tells the Court.  The truly devastating impact, tens

16  of billions of dollars have now been put in trust to

17  perpetuate.

18          This now brings me to Slide 85, 86 and 87.  Let's do

19  85.  Last chapters of law written in this case and that has

20  actually been an informative process because in this chapter

21  Your Honor has seen the evolution of the other side's position

22  from being first, oh we can't look at this issue. It's already

23  been settled.  To now having to explain in detail based upon

24  the code and the case law why it is that the system that they

25  perpetuated for so many years has any basis of the law.

CC-BLG000445

1       As the briefs have evolved, the theories and the

2  struggle with what the provides and the cases provide are the

3  best evidence, but they can't find grounding in the legal

4  system.  This diagram sets out very simply the two issues and

5  the two answers that exist under the code and that they don't

6  have any proper response to.

7       Issue one, what should be estimated?  It should be

8  how should it be estimated?  Federal bankruptcy law effectively

9  serves as a choice of law on this.  It doesn't say here is how

10 you do estimation uniquely under federal law.  It doesn't say

11 what should be estimated in the sense of defining liability

12 under federal law.  It's not a creature of bankruptcy.  Federal

13 bankruptcy law points to two sources.

14      One is under the allowable claim section, 502B, it

15 points to state law.  It says state law still applies.  Not the

16 state tort system, state law, which is fault based liability.

17 That's where you go.  It's the travelers decision not the

18 supreme court.  This exact analysis following 502B, the state

19 law and contract law can say even though the fees were incurred

20 in the course of a federal bankruptcy proceeding, the

21 entitlement to fees is not the fees or indeed affected by the

22 factors of the proceeding, they are governed by state law.

23 That is what the Supreme Court decided following exactly what

24 502B says.

25      What is the choice of law with respect to how?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000446

1 | That's methodology.  That's the rules of evidence and the rules
2 | of procedure based on our government.  Theory and the state,
3 | but that's it, there's nothing else.  What did they do?  They
4 | have some moves.  You say oh well it's not the state law, it's
5 | the state court system.  It's not fault fees, it's a settlement
6 | phase.  What state law says that the settlement governs five
7 | million.  No state law says that.  That's basically encumbered
8 | to create a federal body of law that displaces state law rather
9 | than applies it.  It's one of the real ironies of the argument
10 | is that they actually chase their tail and end up swallowing
11 | it.

12 | They end up saying state law governs, but then they
13 | introduce a law of federal entitlement for liability based upon
14 | something.  Nothing says under federal law it sure doesn't
15 | exist under state law.  What does it end with?  Not so well.
16 | Estimation.  Estimation takes place and estimation actually
17 | alters the outcome of state law because in estimation you don't
18 | look at the liability under state law.  You look to liability
19 | under the state tort system.  Well since when did estimation as
20 | a methodology alter 502B and state the state law doesn't
21 | control.  It does no such thing.

22 | Let me say now, if you want closure under 524G you've
23 | got to say you have no choice really unless you want to get out
24 | the bankruptcy system all together and let everything pass
25 | through, you've got no choice but to settle.  Effectively that

CC-BLG000447

1  means to get closure under 524G.  For it to mean anything

2  you've got to settle rather than litigate.  524G sets up no

3  sort of (indiscernible).  524G does not say that your only

4  alternatives are to settle up or go back to state court.  It

5  doesn't say any such thing.  524G says you can have a plan.  It

6  doesn't say what the trust does.  It doesn't say when the

7  litigation takes place.  It doesn't set out the rules of

8  litigation.  524G is not a new body of the federal law of

9  liability.

10      Finally we come to these asbestos cases.  Well the

11  asbestos cases really set the rules of the road.  And you know

12  the code be damned, let's take a look at the asbestos cases.

13  The asbestos case is very interesting.  That's the chart.  The

14  chart after that, last line.  The asbestos cases that they cite

15  are uniform, absolutely uniform.  They embark on a series of

16  different analysis and different theories.  But what is most

17  important about them is what they held.  What they held under

18  the facts and issues that were presented to them.

19      In none of those cases was anybody coming in and

20  saying we can test liability.  Let's build the liability up

21  based on the evidence and have an estimation that is driven by

22  the rules of state law and the federal rules of civil

23  procedure.  No one ever did that.  No one came in with an

24  alternative proposed methodology.  Not a single one.  Everybody

25  came in with a settlement history.  They tweaked it different

CC-BLG000448

1  ways.  They adjusted it different ways.  They did not come in

2  with an alternative.  They didn't dispute liability and

3  therefore it wasn't even necessary for the Court to address the

4  filing to the issue.

5           So Your Honor, I would say that there is a very

6  simple answer to all those cases that doesn't do violence to

7  them at all.  The answer to those cases is they didn't reach

8  because they didn't have to reach.  The issue that is proposed

9  here.  That one picture there was requested, Your Honor.

10          THE COURT:  All right.

11          MR. BERNICK:  So what is interesting about those

12  cases is sure they are great.  They are making the proposition

13  that you can come in with a basic agreement.  It's a settlement

14  model.  All they are worried about is how to adjust the model.

15  The Court is not going to reach the issues that are addressed

16  in this case.  Those cases are not pressed because they don't

17  reach the issue that we have here.

18          THE COURT:  Well the debtor always has the option of

19  paying claims that might have been discharged.

20          MR. BERNICK:  I'm sorry?

21          THE COURT:  The debtor always has the option of

22  paying claims that might have been discharged.  And it can do

23  that through agreeing to pay into a 524G trust as well as it

24  could by agreeing to pay a creditor directly after a discharge.

25  Can't it?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  I would believe that that is correct.

2          THE COURT:  And I don't think 524G says anything

3  other than that.  So does the Court after noticing a hearing

4  may enter an injunction, may enter an order confirming a plan

5  and may issue in connection with such an order an injunction in

6  accordance with this subsection to supplement the injunctive

7  effect of a discharge under this section.  That's all 524G

8  essentially does is supplements the discharge.  So if the

9  debtor decides in a particular case that its settlement history

10  is an appropriate standard for what it is willing to pay into a

11  trust, then it has that option.  If it decides that it is

12  willing to pay claims that would otherwise be discharged, it

13  has that option.

14          MR. BERNICK:  Absolutely.

15          THE COURT:  All right.

16          MR. BERNICK:  I regret that I too a little bit too

17  much time, Your Honor, but I am done.  I will save whatever

18  time I have for a short rebuttal.

19          THE COURT:  All right.  Shall we take a lunch recess

20  now, gentlemen?  How much time would you -- oh committee.

21          MR. PASQUALE:  Can I have about 30 seconds?  Now is

22  probably a good time.

23          THE COURT:  Sure.

24          MR. PASQUALE:  Thank you, Your Honor.  Ken Pasquale

25  for the official creditors committee.  Your Honor, just for the

CC-BLG000450

1  record since this is opening statement time, the creditors

2  committee fully supports the debtor's arguments and positions

3  and as a result we will not have an independent direct case in

4  chief.  We do reserve the right and the opportunity to cross

5  examine witnesses.  I don't see that we will need that

6  opportunity until later in the case with respect perhaps to Dr.

7  Peterson and Ms. Biggs.

8          THE COURT:  All right.

9          MR. PASQUALE:  We have one witness in rebuttal, but

10 again that will be much later in the process.

11         THE COURT:  All right.

12         MR. PASQUALE:  Thank you, Your Honor.

13         MR. HOROWITZ:  Your Honor, Greg Horowitz of Kramer

14 Levin for the equity committee.  I just want to say virtually

15 exactly the same thing Mr. Pasquale just did.  The equity

16 committee obviously fully supports the debtor's approach to

17 estimation and also supports and is joined in the debtor's

18 Dalbert motion.  I think as Your Honor can tell from the way

19 that the equity committee has conducted itself, we have no

20 desire to unduly prolonged proceedings.  In our view our

21 clients are paying for this so we'd want to keep it as short as

22 possible.

23         We likewise because our clients obviously have an

24 enormous interest in these proceedings reserve our right to

25 question witnesses and our sole witness Dr. Heckman whose

J&J COURT TRANSCRIBERS, INC.

CC-BLG000451

1  expert report we've put before the Court would be a rebuttal

2  witness.  We note that Dr. Heckman was not the subject of a

3  Dalbert challenge and so the equity committee never answered

4  any Dalbert motion that was made against us.

5       THE COURT:  All right.

6       MR. HOROWITZ:  That's it.  Thank you, Your Honor.

7       THE COURT:  Okay.  How long do you think it will take

8  you for lunch to get wherever you are going to go?  I mean to

9  get everyone out and back I think it usually takes about an

10  hour so I mean keep it as short as you like, but I think much

11  less than an hour doesn't work in this building very well.  An

12  hour, okay see you back at one o'clock then.  We are in recess

13  until one.

14                    (Lunch recess)

15       THE COURT:  Please be seated.  Who is next?

16       MR. LOCKWOOD:  I am Your Honor.  I will be right

17  there.

18       THE COURT:  Okay, Mr. Lockwood.

19       MR. LOCKWOOD:  Good afternoon, Your Honor.

20       THE COURT:  Good afternoon.

21       MR. LOCKWOOD:  This is somewhat unusual combination

22  of occurrences here because unlike the normal situation where

23  you would have motions in limine/Dalbert type exercises

24  separate from opening statements, as Mr. Bernick has

25  demonstrated and as we agreed we are basically combining the

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000452

1 two.  You might ask yourself why is that?  It's sort of an odd

2 way to proceed.  Well I think the answer is that if you look at

3 the parties contentions concerning the portion of the Dalbert

4 briefs and arguments that dealt with the question of fit, it

5 becomes abundantly clear that the two sides here are presenting

6 the Court with two starkly different cases.

7         On the one hand you have Mr. Bernick presenting

8 Grace's so-called merits based estimation which as the Court

9 has just heard is really essentially a form of mass tort

10 litigation.  And on the other hand you have the ACC FCR

11 approach relying on the Owens Corning, Armstrong, Federal

12 Mogul.  You picture model which is essentially historical

13 estimation in the sense that you look at the debtor's previous

14 claims resolution history which is primarily settlements.  But

15 it includes as Dr. Peterson will tell you judgments as well as

16 the measure of the estimation.  And those two approaches are

17 reflected in, obviously, the experts that the parties are

18 proffering in support of and in rebuttal of those.

19         There is a certain category of ships passing in the

20 night about all of this.  In prior hearings in this case, we

21 referred to these different approaches as sort of involving

22 competing views of the methodology of estimation.  But in

23 reality the two approaches are based on profoundly different

24 views of what the legal issues are ultimately in front of this

25 Court.  And how those issues to the extent that they deal with

CC-BLG000453

1  estimation are governed by both substantive and procedural law.

2       I think in order to sort of get our arms around what

3  is going on here with both the Dalbert and opening statement

4  portions of this, we need to have a certain amount of context.

5  What is this estimation that we're doing here after all?  I

6  mean why are we here?  There is no sort of tree standing

7  bankruptcy code provisions that says thou shalt have an

8  estimation.

9       Well in the present status of the case we find

10  ourselves in the situation in which we have both sides have

11  filed their own plans of reorganization here.  Grace's plan

12  reorganization is conditioned on the Court estimating its

13  present and future asbestos personal injury liability and no

14  more than $1.6 billion of which conveniently some $1 billion

15  would be provided by the Sealed Air Corporation, a predecessor

16  of Grace.  And the balance would be I believe Grace hopes

17  reimbursed by its insurers.  So effectively Grace can use other

18  people's money to resolve its asbestos problems.

19       The committee's plan of reorganization in contrast is

20  predicated on the Court estimating Grace's aggregate personal

21  injury liability as at least $4 billion.  And I overlooked

22  something about the Grace plan.  The $1.6 billion covers both

23  the aggregate personal liability and the aggregate property

24  damage liability.  And while -- and it also strangely sets up

25  two different classes of asbestos personal injury claimants who

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000454

1  would be treated both by going to a trust, but would vote

2  separately.

3        In any event, neither of these plans is currently

4  consensual.  Both of them provide the debtor with Section 524G

5  protection and both of them implicitly, and this is the

6  important part here, contemplate cramming down non-consenting

7  classes of claims or interests.

8        The debtor's plan and this estimation implicitly

9  contemplate cramming down the asbestos PI and PD claimants and

10  our plan implicitly contemplates cramming down the equity.

11  Under some circumstances it could even amount to cram down of

12  the unsecured creditor class although that's not presently what

13  the numbers are expected to work out to do.

14        Okay, what is therefore the bankruptcy code framework

15  for into which this estimation and the plans fit?  And we've

16  heard a lot about the code and how we have to conform to the

17  code from Mr. Bernick's presentation.  The bankruptcy code and

18  asbestos case provides basically two alternative methods of

19  proceeding.  And a third which I would call a theoretical

20  hybrid.

21        The first and sort of most common one is the creation

22  of a trust which accompanied by an injunction which would

23  effectively channel all of the present and future asbestos

24  personal injury claims to the trust, which would succeed to the

25  debtor's liability for those claims.  And those claims and the

CC-BLG000455

1  future demands as they became claims in the future would be

2  resolved by the trust long after the bankruptcy case had been

3  concluded.

4        And in particular those plans do not generally and

5  indeed I think pretty much invariably envision any form of

6  allowance or disallowance process of asbestos personal injury

7  claims in the bankruptcy court itself.  The other alternative

8  which was actually illustrated by one of Mr. Bernick's charts

9  where he listed all the bankruptcies and the money and there

10  was one at the bottom that you may have noticed didn't have any

11  money by it with the name Dana Corporation, is to pass through

12  the asbestos personal injury liabilities and deal with them

13  later.  And that's exactly what the Dana plan, that chart,

14  proposes to do with the 88,000 claims that were pending against

15  Dana at the time they filed this petition.  And some

16  indeterminate and unestimated number  of future claims.

17        What I call the theoretical hybrid which I've never

18  actually seen anybody try and do is would address the problem

19  that you can't allow or disallow demands because they are not

20  claims.  That is all the bankruptcy court has jurisdiction to

21  deal with under the code is claims.  Theoretically if you

22  really believed what you were up to but you for whatever reason

23  didn't want to pass everything through you could set up some

24  sort of allowance, disallowance process to deal with the

25  present claims.  And simply just ignore the future claims and

CC-BLG000456

1  not have a 524G trust.  That would get rid of your asbestos

2  liability to the extent that it was feasible to do that which

3  we'll talk about in a minute, that are your actual claim

4  creditors as of the date of bankruptcy.  And you would deal

5  with the futures as any debtor that has potential future

6  liabilities, warranties for example and things of that nature

7  that routinely don't get treated in bankruptcy, even if you

8  could theoretically argue that they might be a claim but they

9  get passed through.

10        Both of the plans here purport on their face to be

11  the 524G plan because they both purport to set up a trust and

12  have the trust resolve the claims and even though at the moment

13  they are not consensual.  So, okay, where does that -- so how

14  does the estimation fit into that?  What is it that we're doing

15  there?  well there is a number of provisions in the bankruptcy

16  code that either explicitly or implicitly deal with estimation.

17        The first one is Section 502C which provides with

18  respect to by its terms individual claims that it would take,

19  which the liquidation of which would unduly delay the

20  reorganization can be estimated for purposes of allowance.  So

21  502C is allowance mechanism.  Then, and this is why I used the

22  phrase implicitly earlier, in the definition of court

23  proceedings in Section 157B(2)(b) of Title 28, there are

24  references -- there are provisions that permit the bankruptcy

25  court to engage in the estimation of claims for the purpose of

J&J COURT TRANSCRIBERS, INC.

CC-BLG000457

1   confirming a plan.

2          But which go on to state that the bankruptcy court

3   does not have core jurisdiction for the estimation of

4   contingent or unliquidated personal injury tort or wrongful

5   death claims for purposes of distribution.  Then finally you've

6   got 524G(4)(b)(2) which requires the Court as part of the

7   confirmation of a 524G plan to determine that the funding of

8   the plan and the trust is fair and equitable to the holders of

9   demands in light of the amounts being contributed to the

10  Section 524G trust on behalf of the debtor.

11         There again there is some notion that the Court is

12  going to have to compare an aggregate amount the funding of the

13  trust with the aggregate claims that future demand holders can

14  make and make a determination that that is fair and equitable.

15  the 157B(2)(b) definition doesn't really tell you anything

16  about what estimation for purposes of plan confirmation is.  It

17  just sort of is a jurisdictional provision.  But the provisions

18  in Section 1129 themselves are presumably what is being

19  referred to.  And particularly in non-consensual plans the

20  relevant provisions that would or could contemplate some

21  aggregate estimation of the claims of a class as opposed to an

22  allowance process for individual claims include the two -- the

23  situations set forth in Section 1129B(2) of the code which deal

24  with cram downs.

25         Under 1129B(1) for example the Court with respect to

J&J COURT TRANSCRIBERS, INC.

CC-BLG000458

1  a descending impaired class is required for cram down to

2  determine that that plan doesn't discriminate unfairly with

3  respect to that plan, which the case law has generally read to

4  me.  The class generally gets treated pro rata in the

5  distributions that are going to be made to claims in that class

6  compared with the other classes that it is contesting or being

7  treated in some way or another better.

8        The second requirement is under Section 1129B(2)

9  which is the fair and equitable requirement that has to be met.

10  That is basically you have two alternatives for satisfying fair

11  and equitable.  One is that each -- showing that each member of

12  the class will receive 100 percent of the allowed amount of his

13  or her claim.  Or under 1129B(2)(b) that no equity interest

14  holder is receiving or retaining any property under the plan

15  with respect to that interest.

16        There is a third category where you might conceivably

17  have an estimation and that would be under Section 1129A(11)

18  the feasibility requirement.  If the plan provided what I'll

19  call an uncapped 100 percent payment obligation for tort claims

20  where the feasibility of the reorganized debtor's ability to

21  pay those uncapped amounts could be a problem depending upon

22  what the potential amount of those claims was in comparison to

23  the assets available to pay them.  So there could be a contest

24  about that and the Court might well be required to again make a

25  judgment about the aggregate amount of these potential claims

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000459

1 | to see whether the debtor's plan would in fact be feasible or
2 | whether it would be amount to a Chapter 22 situation where the
3 | debtor would turn around and be -- wind up being back in
4 | bankruptcy because it was unable to pay those claims.

5 | Okay, what sort of an estimation in the context of
6 | this framework is Grace asking the Court to do here?  Most
7 | recently and succinctly stated in its Dalbert reply brief.
8 | It's a reply in support of its motion to exclude some of the
9 | witnesses of the ACC and FCR.  And as you have heard again from
10 | Mr. Bernick earlier today what Grace asserts, is that what is
11 | being estimated here is its legal liability which it defines as
12 | what Grace is obliged or alternatively "can be compelled" to
13 | pay personal injury creditors as a Chapter 11 debtor.

14 | That legal liability in turn Grace contends must be
15 | determined under Section 502B of the code which as the Court is
16 | well aware is the section governing the allowance of claims in
17 | a bankruptcy case.  Based on this Section 502B argument Grace
18 | then sort of effortlessly concludes that this Court must
19 | estimate its aggregate liability for over 100,000 separate
20 | pending asbestos claims en mass by using a combination of the
21 | following mechanisms that Grace has caused to occur in this
22 | bankruptcy.

23 | The first mechanism was the creation of a claims bar
24 | date which the Court will well remember the debate over and
25 | which the Court ultimately agreed to do notwithstanding the

CC-BLG000460

1  fact that as a general proposition you don't have bar dates in

2  524G plan context because there is no perk if you are not -- if

3  the trust is going to resolve the claims and not the bankruptcy

4  court.  The purpose of a bar date is generally in a bankruptcy

5  case to indemnify the claim so that they can then be allowed or

6  disallowed and that was not going to be the purpose for this.

7       Instead the purpose was to enable the Court to have

8  jurisdiction to award sanctions if it felt they were

9  appropriate against claimants who declined and failed to take

10 the second mechanism, or to accomplish a second mechanism which

11 Grace has in this bankruptcy which is the personal injury

12 questionnaire or PIQ.

13       That PIQ again after much debate in front of the

14 Court was set out and was for the expressed and stated purpose

15 by Grace and has been argued throughout Mr. Bernick's

16 presentation today and in his papers, for the purpose of

17 generating information that would supposedly provide the

18 necessary, in Grace's view, evidence that would tell the Court

19 whether the claim of the person filling out the questionnaire

20 was or was not valid.

21       The third mechanism that Grace is proposing in its

22 so-called merit based or legal liability estimation is that

23 Grace is submitting the testimony of a group of experts in

24 medicine, industrial hygiene and risk analysis.  To opine on

25 the legal inadequacy from the standpoint of their particular

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000461

1 disciplines, medicine, risk analysis, industrial hygiene of
2 tens of thousands of claims.  And the final step in this
3 process is the submission of the wrap it up testimony of an
4 expert Dr. Thomas Florence who jettisons as the record will
5 show, Your Honor, when we get to the actual evidence in this
6 case, who jettisons his customary methodology of doing
7 estimations to do what amounts to really a fairly simple
8 mathematical tally of all of the claims purportedly invalidated
9 by the experts, the previous group of experts.  And then it
10 takes the percentage of the surviving valid claims which is
11 needless to say very low and extrapolates that to the future to
12 allegedly demonstrate that the simpler, very low percentage of
13 claims in the future would be legally valid.

14        It should be noted that none of these witnesses
15 assuming that they could otherwise do it, which I don't believe
16 they could, none of these witnesses is a lawyer.  None of these
17 witnesses is going to tell the Court, assuming that the Court
18 will permit them to do so, what the actual legal requirements
19 are and how those legal requirements and the state courts where
20 these claims were filed and whose law the Court is obligated to
21 apply, how that law fits, if you will, with these opinions
22 about medicine, risk analysis, industrial hygiene.

23        The -- after having sort of put Dr. Florence on the
24 number and these other experts for the number and amounts of
25 the present and future claims and the validity, the validity of

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000462

1 those claims and sort of rejecting out of hand the expert

2 testimony from the ACC and FCR as not fitting because they

3 aren't opining as to the legal liability of Grace.  And the

4 basis of which their testimony is generally being rejected is a

5 combination of it relates to the tasks where the tort system

6 was broken, not is anymore but was broken, and to Rule 408

7 which we'll discuss later.

8          But having done all of that Grace then has to put a

9 dollar figure on these claims.  How does it do that?  Well it

10 gets Dr. Florence to value this reduced universe of legally

11 valid claims that he's come up with here by using the amounts

12 paid in settlements.  Not judgments where juries and courts can

13 determine the legal validity of the claim or the amount that

14 the defendant Grace could be legally obligated to pay for the

15 claim.  No settlements and more only settlements of six cases.

16 Now Mr. Bernick went through a long to do about how gee, if he

17 used more cases he could have come up with lower values.  So

18 they are really getting generous to us in using six cases as

19 the starting point for the valuation.  And as another one of

20 Mr. Bernick's charts demonstrated all the other values for all

21 the other claims are in Dr. Florence's methodology, while they

22 are not obtained by valuing those other claims by the

23 historical amounts, they are claimed by deriving the values as

24 ratios of the value, the settlement value of those other claims

25 to the settlement value of the six mesothelioma claims.

CC-BLG000463

1       So everything, the entirety of this number that Dr.

2   Florence comes up with here is dependent upon the value.   (A)

3   the values on these six meso claims and (B) the proposition

4   that they can use those settlement values for that purpose,

5   notwithstanding their insistence that this is a merits based

6   analysis which presupposes that some courts and/or jury

7   somewhere is going to decide whether the claim is valid and

8   what it is worth.

9       Then where is Grace going to go with that number if

10  the Court accepts it?   Well as long as the Court comes up with

11  a number that is no more than the $1.6 billion for whatever the

12  PI portion of the combined PI PD number is, we don't -- since

13  we don't know yet what the PD number is the PI portion of that

14  is kind of a moving target.   But it's obviously somewhere south

15  of 1.4 billion because Grace has already settled a couple of

16  hundred million dollars worth of PD claims.

17      Grace is going to cram that down on the asbestos

18  classes.   And assuming that it can do that, the effect of it

19  would be to fund the 524G trust with the PI portion of the $1.6

20  billion, which the Court will have presumptively ruled as

21  Grace's legal liability for present and future claims.   Then

22  one of two things is going to happen with respect to the trust.

23  Either the trust agreement and the TDP will have to provide

24  that the values and the criteria which Grace has persuaded the

25  Court to accept as the basis for the legal liability

CC-BLG000464

1  determination will have to be baked into the trust distribution

2  procedure so that the numbers will match.  In other words, the

3  trusts -- the Court's valuation will be the same as the trust's

4  obligation to pay claims.  That's one alternative.

5       The other alternative is that notwithstanding the

6  fact that the trust -- the Court found that Grace's legal

7  liability was $1.6 billion minus X, the trust will wind up

8  having an obligation to pay more than $1.6 billion minus X to

9  claimants when it resolves these claims over the many years

10 into the future that the trust will exist.  In which event, the

11 claimant's will not get 100 cents on the dollar.

12       Those are the two alternatives.  I personally can't

13 figure out any other way of doing it.  Since the Grace plan

14 proposes to pay all its non-asbestos creditors 100 cents on the

15 dollar plus post-petition interest and proposes that a

16 shareholder should retain their equity interests, the second

17 possibility which is that the trust might not pay 100 cents on

18 the dollar can't work.  Because it would violate the absolute

19 priority rule as well as potentially, depending upon how far

20 short it fell, potentially violate the unfair discrimination

21 provision code.

22       So the Court effectively can't confirm a plan that

23 would have that possibility in it.  So that means basically the

24 only option here is that the trust is going to have to be

25 legally required only to pay those claims that the Court has

J&J COURT TRANSCRIBERS, INC.

CC-BLG000465

1 supposedly determined are legally valid using its experts here

2 as the guidelines for that or the determinants for that.  And

3 only the amounts that Dr. Peterson -- excuse me, Dr. Florence

4 has put up as the per claim value.  Now admittedly those

5 amounts are average values so there could be some mechanism for

6 upper and under, but the average is going to have to be

7 maintained.

8          This analysis, if I am correct about it, puts the why

9 to Grace's constant attempts to assure the Court.  For example

10 in its opposition to our Dalbert motion at Pages 9 to 10 that,

11 "No individual claims will be disallowed  that in fact what is

12 going on here is in fact an estimation using Grace's approach

13 of claims for purposes of distribution because the trust will

14 have to pay only those amounts and only those claims that this

15 Court has determined are valid under its approach."  You can --

16 Mr. Bernick can talk all he wants to about oh, we're just

17 talking about an estimation of the aggregate liability, Judge.

18 But that's just not the way this plan and the bankruptcy code

19 are going to work here.

20          So the question then becomes what is the authority

21 for doing that?  And I find, I find it interesting that we

22 didn't hear anything about the case, in his oral presentation,

23 about the case that most closely resembles what he's trying to

24 do here.  I mean he blows off all the asbestos estimations as,

25 oh, those lawyers that contested the estimation in that case

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000466

1  they were all pretty stupid.  They are not clever like me.

2  They didn't realize that they can actually have a merit based

3  estimation and parade a whole bunch of experts in here and get

4  the Court to listen to the experts and conclude that all these

5  claims are bogus and worthless.

6        They went ahead and they said oh, well, we'll just

7  sign up with the incompetent Dr. Peterson and the inexperienced

8  Ms. Biggs and we'll have just one of these settlement based

9  estimations that are clearly, you know, violate Dalbert, the

10  infrastructure of the bankruptcy code and we'll just agree to

11  do that because hey it'd be too much work I guess to actually

12  have a merits based estimation.  Remember every one of those

13  estimations was contested by somebody, a creditor class who

14  felt they were being unfairly discriminated against.  Every one

15  of them had incentive to track what was the best way to produce

16  a --

17                    (Audio malfunction)

18        There is nothing that Grace has presented to this

19  Court that suggests that somehow the arguments that it's making

20  about bad doctors and exposure minimums and relative risk and

21  requirements at 2.0 and all that kind of stuff wouldn't apply

22  to the asbestos claims that were being estimated in those

23  cases.  So basically it's Mr. Bernick who is the only lawyer in

24  the country who has been smart enough to figure out that this

25  is the way to do it and these other cases are not the way to do

J&J COURT TRANSCRIBERS, INC.

CC-BLG000467

1 it.

2      Well okay, what's his authority for the fact that he

3 can do it?   Well in his papers he cited two cases Dow-Corning

4 (phonetic) which he litigated and A.H. Robinson, which is not

5 an asbestos case.  Well Dow-Corning is a particularly

6 interesting case and I really ask Your Honor to read it.  It's

7 very long but it is extremely informative on the issues that

8 we're talking here.

9      For openers, the parties in Dow-Corning, both sides

10 asked the Court to do a mass estimate of the best impact

11 claims.  Judge Spector said no, I'm not going to do that.  Why

12 did he say he was going to do it -- not going to do it?  Well

13 among other things he said that because the Dow-Corning plan

14 like the Grace plan here proposed to put a cap on the amount

15 that would go to fund the breast implant claims for disease.

16 The explanation scarring et cetera  those claims were not at

17 issue here.  Because it was going to cap that liability $2

18 billion, he concluded that that would be an estimation for

19 purposes of distribution because if the claims came in over

20 that amount of money they wouldn't get paid somehow.  Whether

21 it would be some claims that wouldn't get paid any or all

22 claims would get paid a percentage or whatever.  He said he

23 couldn't do that.

24      And he relied -- this was largely -- there were a

25 number of reasons why he couldn't do it.  One of them was that

CC-BLG000468

1 only the district court could do it under 28 USC 157B(2)(B).

2 Another was that you have to have a jury trial on the issues

3 because it was an estimation for purposes of distribution under

4 28 USC 1411.  And another was ironically that he didn't need to

5 do an estimation because he can do an allowance process.  And

6 the only reason to do an estimation is if it is going to save

7 you time over doing an allowance and he concluded that he could

8 do an allowance.

9          Okay.  What -- how was he going to go about doing the

10 allowance?  Here he believed, and the parties appear to agree

11 although there was some dispute from the tort claimant's side,

12 that there was uniquely at least compared with asbestos

13 uniquely, a single overarching common issue that could be

14 litigated in <u>Dow-Corning.</u>  And that was what we call here a

15 general causation issue, namely did the silicone gel used in

16 breast implants was it capable of causing disease?  And if it

17 wasn't, as Mr. Bernick's client Dow-Corning was asserting

18 capable of causing a disease, then there were no claims,

19 period, for those diseases, which I said earlier was the guts

20 of the case.

21          Well the allowance never took place but Judge Spector

22 how he thought it should take place.  As he characterized it,

23 and I'm going to quote here, he was accepting the parties'

24 invitation to provide "serious recommendations intended to

25 nudge the parties toward an agreement on how this case can be

CC-BLG000469

1  resolved fairly but expeditiously." That's Page 570 -- 211
2  Bankruptcy Reporter at 574, Note 29.
3         Judge Spector at Pages 574 to 597 which is a lot of
4  pages so I'm not going to go through in detail, but basically
5  he concluded that he could do potentially have a Rule 42 common
6  issues trial on this general causation issue that would be
7  based on an omnibus motion that Dow-Corning had filed objecting
8  to all claims with respect to this silicone gel causing
9  disease. That's a heck of an omnibus objection I might add.
10  I'm not sure in Delaware even with the Court's ability to have
11  omnibus objections that you could have a substantive omnibus
12  objection against 100,000 claims. But be that as it may, Dow-
13  Corning had filed one, Judge Spector was prepared to look at
14  it, and he further thought there was a possibility because
15  Judge -- because Dow-Corning had filed a concurrent motion for
16  summary judgment that he would have jurisdiction to rule on
17  summary judgment on that day on that issue.
18         However, he went on to discuss at some length what
19  would have to happen if he couldn't grant summary judgment on
20  that motion which again I might add he never did.  He
21  identified a host of problems with what we have including the
22  need for multiple trials, the need for juries, the need for
23  individual determinations of specific causation and damages, ie
24  if he determined the general causation requirement favorably to
25  the plaintiffs then the issue would be would how much of dosage

J&J COURT TRANSCRIBERS, INC.

CC-BLG000470

1  or what have you, the same sort of specific causation issues

2  that are being addressed when we talk about, you know, do you

3  have enough asbestos in your lungs, do you have enough

4  exposure, et cetera, et cetera, to be a substantial

5  contributing factor to your disease.  Those are specific

6  causations because they are addressing the individual claim.

7          And at the end of the day he never resolved any of

8  that.  He just simply said I'm going to deny the estimation

9  motions.  I'm going to consider the debtor's motion for summary

10  judgment on its omnibus objections and conditionally if he

11  denied the causation -- the summary judgment motion on general

12  causation he was going to send his opinion to the district

13  court as a recommendation as to how that court should proceed

14  to litigate -- liquidate those claims.

15          Now if we apply the Dow-Corning decision to this case

16  what does it tell us?  Well it says first you can't use

17  estimation in the bankruptcy court which is where this

18  estimation proceeding is going on, can't use estimation to

19  impose the cap liability amount on a non-consenting class of

20  creditors in lieu of actual allowance or disallowance

21  procedures, which I might add Your Honor has repeatedly stated

22  that we are not allowing or disallowing claims.  You have no

23  intention to do that and Grace in its papers has agreed that we

24  are not allowing and disallowing claims.

25          Even if there was some mechanism for avoiding the

**J&J COURT TRANSCRIBERS, INC.**

1  individual allowance, disallowance problems identified by Judge

2  Spector, this Court would at most have the power to rule

3  favorably to Grace on a summary judgment motion on an omnibus

4  objection to all asbestos claims on the ground that asbestos

5  doesn't cause disease.  Not surprisingly, we haven't seen that

6  motion because there is no dispute that asbestos causes

7  disease.  The dispute is if somebody -- does somebody have an

8  asbestos related disease and if they do, did exposure to a

9  Grace product constitute a substantially contributing factor to

10 the development of that disease?  Both of which are the do you

11 have a disease is individual to the plaintiff, and do you have

12 exposure to a Grace product in sufficient amounts to have

13 contributed to that, to substantially contributed to that

14 disease?

15        Again it looks at the individual work history of the

16 individual claimant.  So there is just no mechanism for

17 achieving even the theoretically possible result in this Court

18 that Judge Spector thought he might be able to achieve in Dow-

19 Corning.  So under Dow-Corning if Grace actually wants to

20 litigate the merits of its liability for these claims in this

21 Court -- well first it can't do it in this Court.  It would

22 have to have the district court withdraw the reference because

23 as we've noted earlier this Court doesn't have the power to,

24 either through estimation or otherwise address the allowance of

25 personal injury claims.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000472

1          Secondly, the district court would then have to

2    identify and determine the consolidate -- the so called common

3    issues and you would have to address what, if any, issues could

4    be addressed on summary judgment.  You have to empanel juries

5    for all claims not summarily adjudicated and you then have to

6    try the resulting cases including individual issues such as

7    specific causation and damages.

8          Needless to say that is not what this Court

9    contemplates doing.  And I would note in that connection that

10   the Rule 42 approach was (A) tried by Mr. Bernick in the

11   Babcock and Wilcox case or was proposed and after Judge Vance

12   inquired of Mr. Bernick how many cases over how many years was

13   she as the district judge who he persuaded to withdraw the

14   reference for this purpose going to have to spend on these

15   cases and they requested further briefing on that subject.

16   That was the last anybody heard about the 42 trial, case

17   settled.

18          Secondly, he also originally proposed to do it in

19   this case.  But for reasons which I suspect have something to

20   do with his realization that it simply wouldn't work in

21   anybody's lifetime in this Court or Judge Woolan or whoever had

22   the case at the time wasn't going to be very receptive to that,

23   he withdrew that proposal.  And instead he moved to have an

24   aggregate estimation.  But when he moved to have an aggregate

25   estimation, he made sure to move to have an aggregate "merits

CC-BLG000473

1 based" estimation, notwithstanding the fact that that term

2 appears to have been invented by Mr. Bernick for purposes of

3 this case.

4        The only other case offered by Grace in support of

5 what it wants to do here is the one we heard about earlier

6 today which is the <u>A.H. Robins</u> case.  The Court can read the

7 A.H. Robins case for itself.  I submit to you that it is a

8 pretty slender read here.

9        First, the context of the case was in the fourth

10 circuit that the class of Dalcon Shield claimants whose claims

11 were being addressed in that estimation had voted 95 percent in

12 favor of that plan.  Notwithstanding the fact that the

13 disclosure statement expressly stated that the payments to

14 claimants under that plan were going to be limited to the

15 amount being contributed for that purpose by the debtor, some

16 $2.5 billion, that the estimation was inherently uncertain, and

17 that as a result it was possible that the claimants wouldn't

18 get their share of what that number was supposed to produce by

19 way of a recovery.

20        Indeed, the appeal was from a dissident group of

21 claimants and the actual grounds for appeal that they were

22 raising were 1129A(11) feasibility and 1129A(7) best interest.

23 And as for the feasibility objection since Robins was never

24 going to have to pay any more than the estimated amount and

25 since there was no dispute that it had the ability to pay the

CC-BLG000474

1 estimated amount, the feasibility objection is sort of

2 ridiculous on its face.  Of course it was feasible.  I mean,

3 all it had to do was pay the money and walk away.  That was the

4 end of it.

5        There would be no subsequent claims against Robins

6 because they were being cut off, discharged.  As for the best

7 interest test, the opinion is absolutely opaque as to what the

8 estimation issue was related to best interest.  I mean, I can't

9 -- I don't know what it was.  It certainly however didn't seem

10 to -- none of the issues, none of the arguments seem to involve

11 what we've got here which is a situation in which you had some

12 multi-expert, multi-disciplinary, multi-expert case that was

13 going to determine A.H. Robins legal liability for Dalcon

14 Shield claims for all time and all purposes in an aggregate

15 mass tort litigation.  Instead what can be gleaned from the

16 opinion was there were a number of different experts much as

17 there are in asbestos cases who come in and testify that in

18 their opinion the aggregate amount of the liability based on

19 whatever criteria they chose to bring to that assignment is in

20 their judgment this horrible term that Mr. Bernick keeps

21 saying, their judgment X dollars and the district court chose

22 among them.

23        He came -- the district court came up with a number

24 which happens to conform to Francine Rabinowitz who is a

25 typical asbestos expert who comes in and uses the same

CC-BLG000475

1  methodologies that Dr. Peterson and Dr. Biggs use usually and

2  yeah, she didn't -- she used the questionnaires to determine

3  that some of the claims weren't valid and beyond that who

4  knows.  But the bottom line is that number one, you can't tell

5  how it was done except to know it was done differently from

6  what Grace is doing here.  And secondly, it was a battle among

7  estimation experts, not among doctors and industrial hygienists

8  and what have you.

9          The final thing, I have to say is I would suggest

10 that Your Honor read Judge Spector's view of what happened in

11 A.H. Robins which appears at 211 Bankruptcy Reporter at 601 at

12 Note 60.  To put it mildly he had some questions about the

13 integrity of that entire process and how it played out.  In any

14 event, the -- what is going on here is in our judgment a

15 fundamentally illegitimate use of Dalbert in this sort of mass

16 aggregation context.

17         What is going on here is the experts are being asked

18 to testify about albeit in a sort of combined fashion about the

19 legal validity of whole classes of claims against Grace.  And

20 the -- as I've attempted to elaborate here the legal merits of

21 individual claims, even if they went into groups, is simply not

22 and cannot be an issue in this Court.

23         Secondly, the experts while it can give opinions

24 about medicine and risk analysis of law, excuse me, and

25 industrial hygiene they cannot come in here and usurp the

CC-BLG000476

1  powers of the court or the jury in telling the Court whether

2  claims are legally valid or not.  But that is exactly what is

3  happening here because what you are being asked to take these

4  criteria that Grace is positing in here and do one of two

5  things with them through these experts.

6          One is since Dr. Florence simply zeros out everything

7  that they say isn't valid, that's a legal judgment.  Because

8  the questions of what is the evidence needed to support a

9  personal injury claim at the end of the day is something that a

10  judge determines or a jury or a combination of the two.  It's

11  not something -- and the expert can opine on the medicine and

12  the components of it.  But they can't say and I'm right and

13  this claim isn't any good and that is what they are doing.

14          The alternative is what Grace might be arguing, is

15  that no other expert in the world could have credible

16  difference of opinion on these subjects.  This is the Dalbert

17  angle.  Dalbert as you know doesn't decide the law.  I mean

18  Dalbert isn't a rule that says an expert that the trial judge

19  determines whether some expert's testimony is a correct

20  statement of law.  Dalbert is an issue about whether or not

21  expert testimony is admissible in the trial of a contested

22  issue of fact.  And if there is two sets of experts whose

23  testimony is both admissible then the trier of fact ultimately

24  decides on the basis of the particular case in front of it

25  which of those experts is more credible on the facts of that

CC-BLG000477

120

1  case.

2         Grace seems to be suggesting at points in its

3  argument that because it -- the experts in-house are so

4  credible and so persuasive and so credentialed that no other

5  expert could possibly be admitted in the case, in an individual

6  case to controvert their finding, if you will, that a plaintiff

7  not meeting their criteria doesn't have a valid case.  And

8  again, that's not what this Court is here to do nor could it.

9         Even if in some way or another you could try and

10 argue that there was some basis for having this mass allowance

11 disallowance process done in this Court, the ACC and the FCR

12 aren't the parties that could do that.  As the <u>Kensington</u> case

13 in the third circuit clearly held, the ACC and the FCR do not

14 -- excuse me, not the ACC, official committees do not bind by

15 their actions individual members of their constituency.  And

16 while in the case, in that case the issue was whether they were

17 bound by failing to raise and objection or something and in

18 this case it is a different issue.  The principle is the same.

19        We can't -- I remember at one point in one of the

20 charts Mr. Bernick had he said the ACC and the FCR could have

21 taken discovery on all of these claims.  That was his response

22 to our argument that the personal injury questionnaires didn't

23 afford individual claimants the full panoply of protections

24 that they would normally have in a trial to get discovery

25 against the defendant.  For example, to find product ID

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000478

1  evidence that the product was used at their work site, even

2  though they themselves might not have personal knowledge of

3  that.

4          He said oh the ACC and FCR can take discovery about

5  that.  Wrong.  We are not -- we don't have the legal capacity

6  to litigate that issue, A.  And B, the notion that we're going

7  to try 100,000 individual claims on behalf of 100,000

8  individual claimants, even if they are put into baskets or

9  groups so that we don't have to try 100,000 separately we can

10 maybe only try, I don't know, I don't know what the number of

11 permutations and combinations are of medical evidence, exposure

12 evidence, risk analysis.  There's going to be a lot of

13 different issues being tried.

14          And at the end of the day, the notion is that those

15 trials would bind the individual claimants with respect to

16 their claims because their claims in this so called estimation

17 would not be funded by Grace in the 524G trust.

18          As a result the testimony of these experts in Grace

19 does not meet the Dalbert fit.  It's not that somehow or

20 another they are not competent to testify or that even the

21 subjects on which they propose to testify are not the subjects

22 that experts could testify about.  I mean obviously there is

23 disputes about individual aspects in the testimony.  But there

24 is a general proposition.  Nobody is here saying you can't have

25 expert testimony about medicine or industrial hygiene or risk

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000479

1  analysis.  That's done all the time in individual cases.

2        The lack of fit here arises from the fact that what

3  they are doing is telling the Court how the Court should

4  resolve the merits of these individual claims and that's not

5  what the whole Court is or can be here to do.  In contrast,

6  what sort of estimation are the ACC and the FCR asking the

7  Court to do?  We're not asking the Court to estimate anybody --

8  the merits of anybody's individual claims.  But under 28 USC

9  157B(2)(b) as I noted earlier this Court does have the ability

10  to estimate claims including PI claims for purposes of

11  confirmation.

12        The committee and the ACR -- excuse me, the committee

13  and the FCR's plan does contemplate a cram down on equity.  If

14  the Court using the estimation methodologies for estimating

15  aggregate claims against the debtor for purposes of confirming

16  the plan over the objections of other creditors who are

17  claiming unfair discrimination for example, were to determine

18  that through the testimony of our experts and the experts of

19  the debtor and the equity committee and the unsecured creditors

20  committee.  There's at least two other experts in here, Mr.

21  Dunbar, Dr. Dunbar and Dr. Chambers that have the same type of

22  approach to estimation.  And who make the same kinds of

23  judgments.  And there, there is just a dispute among those

24  experts as to how you arrive at the right number using these

25  approaches and what the right number should be.

**J&J COURT TRANSCRIBERS, INC.**

1     But if the Court were to determine for example the

2 number of proposed in the committee's FCR joint plan was no

3 less than the amount of the estimated liability, then the

4 committee's plan would be confirmable.  And remember

5 exclusivity has been lifted in this case.  So there's two plans

6 out there and short of a consensual resolution which those two

7 plans become one plan, those -- both of them theoretically

8 would eventually have to be sent out for a vote and both of

9 them the Court would have to consider whether they can be

10 confirmed or not.

11     So from the committee's point of view the type of

12 estimation that we're seeking here or we're sponsoring, if you

13 will, does in fact have some utility under the bankruptcy code.

14 It is within the jurisdiction of this Court and can

15 appropriately be carried out.

16     While Mr. Finch, my partner and Mr. Mullady for the

17 futures rep is going to address the specific attacks that have

18 been made on Dr. Peterson and Ms. Biggs, I did want to make a

19 couple of points about that.  The -- since, as we mentioned

20 earlier, you not only have to potentially make a cram down

21 estimation on these plans but you also have to make a fair and

22 equitable determination under Section 524G that the trust is

23 being adequately funded.

24     There is, while 524G creates the opportunity to avoid

25 years if not decades of individual allowance and disallowance

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000481

1  procedures, and also gives you the ability to deal with future

2  demands which an allowance process would not, it also

3  contemplates by definition estimating large numbers of present

4  and future unliquidated claims whose validity and value must be

5  predicted under state law which can change and those

6  predictions of the numbers and values of future claims are by

7  definition not susceptible to scientific answers.

8           There's a lot of talk here of science.  There's a lot

9  of things bankruptcy courts do in the way of deciding issues

10 and under various code provisions that don't involve science.

11 I mean incumbent valuations which is the other part of

12 confirmation issue.  It's not science to have some experts up

13 here telling you what they think the company is worth.  And

14 indeed, Mr. Bernick's analogy earlier of the stock market.  In

15 fact when you value a company even though you don't -- to some

16 extent you are being the stock market.  You are being the

17 substitute for the stock market.  What is this company going to

18 be worth?

19          Everybody in the room knows that the minute the

20 company no matter what you valued it at, emerges from

21 bankruptcy and starts trading things are going to happen.  The

22 value of The stock even -- first they turn out that The market

23 differs and The value of The stock that The bankruptcy judge

24 valued at $10 a share turns out to trade at 8 or 12.  Secondly,

25 over a period of time a lot less than five to seven years, it

CC-BLG000482

1  could be months, the values of that stock are going to

2  fluctuate because market conditions, economic conditions, the

3  competence of management, whatever.  You know going in that

4  that value is not going to be The same forever.  And The people

5  who do it use judgments, they don't use science.

6          And what 524G requires us to do here is a practical

7  matter is something really quite similar to that.  Because it's

8  a practical focus.  We know, the statute itself Section

9  524G(2)(b)(2) requires the bankruptcy court to determine that

10  "The actual amounts, numbers and timing of such future demands

11  cannot be determined."  Right there in The statute.

12          By Grace and The equity committee, by seeking to

13  exclude testimony from Dr. Peterson and Mr. Biggs -- and Ms.

14  Biggs on The ground that it is not scientific is based on

15  judgments and assumptions and is inherently uncertain and

16  susceptible to being proven erroneous by future events are

17  effectively trying to create standards for aggregate tort

18  liability estimations in Section 524G that would effectively

19  make them impossible to accomplish.

20          And the effect of making them impossible to

21  accomplish would basically mean to render nugatory Section 524G

22  and any other provisions that we've been through here that

23  would require some kind of aggregate estimation to compare a

24  class of unliquidated claims treatment versus classes of

25  liquidated claims.

CC-BLG000483

1        The argument also ignores in its focus on science and

2    replicability and The challenge to The experts The fact that it

3    is undisputed in this case that outside of bankruptcy

4    corporations including Grace itself pre-petition, insurers and

5    others, investment bankers what have you, routinely use similar

6    methods to that used by Dr. Peterson and Ms. Biggs here for the

7    purpose of estimating company's present and future asbestos

8    liabilities for such purposes as trading in stock of those

9    companies, preparing financial statements for submission to the

10   SEC and the like.

11       This is not therefore the type of estimation which is

12   The made for litigation kind of expert opinion which is

13   frequently rejected by courts on The ground that it is not a

14   recognized discipline.

15       As for Grace's Rule 408 argument, it's never been

16   applied in any cases.  This is another example of Mr.

17   Bernick I guess being smarter than all The other lawyers around

18   that never thought about This one before.  The only case in

19   which it has ever even been discussed is another one of Mr.

20   Bernick's cases, Babcock and Wilcox in which Judge Brown

21   rejected The argument.  I mean he's got a lot of explanations

22   abut what else happened in The case.  The fact is The case

23   squarely holds Rule 408 doesn't bar estimation -- opinion

24   testimony by an expert like Dr. Peterson about a company

25   settlement history.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000484

1          We've argued that in our papers The technical aspects
2     of why Rule 408 doesn't apply.  Mr. Bernick's response in his
3     reply brief is pretty -- is a series of bullet points that
4     don't really provide any significant authority to The contrary
5     for The proposition that you can -- you could even admit all
6     these settlements as long as you are not trying to prove
7     liability for The invalidity of a claim or its amount.  The
8     testimony here is not taking a particular settlement or group
9     of settlements from The past and saying Grace has legal
10    liability for these particular settlements in The future.  Or
11    Grace has even legal liability for a case very similar to these
12    cases in The future.
13          It is simply a method of trying to figure out how
14    much money Grace, outside of bankruptcy, post bankruptcy if you
15    will, would have to pay for these cases.  And Mr. Bernick spent
16    a lot of time talking about how conservative his experts are.
17    Well The fact of The matter is that This is an extremely
18    conservative assumption because as Mr. -- as The evidence will
19    show in This case The reason Grace settled cases, The reason
20    that virtually all asbestos defendants settled The vast
21    majority of cases against them, is that they have made a
22    determination that it is cheaper for them than to try The
23    cases.
24          Sure if they try The cases they will win a lot more
25    of them.  But The problem is that The ones they lose they get

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000485

1 killed.  And as Dr. Peterson has pointed out in one of his

2 reports, he actually substituted The sort of -- The litigation

3 history which is The only thing resembling an actual merits

4 based history that Grace has.  If you substituted that history

5 for The settlement based history as opposed to combining The

6 two wherein The judgments The verdicts get, because they are

7 such a small percentage, The effect of them is dramatically

8 reduced.  But if you substituted them you would wind up with

9 Grace paying very, a lot fewer cases, a lot more money.  And

10 The total Grace liability would be way, way higher than The

11 highest number that Dr. Peterson or Ms. Biggs has come up with

12 here.

13       There are also -- they've also tried to blow off The

14 notion that Rule 703 allows an expert to testify about things

15 that would be inadmissable as The basis for opinions.  They

16 cite some cases.  Read The cases, Judge, they don't support

17 that notion here.  And particularly what they don't support is

18 whether Mr. Bernick likes it or not, The estimation methodology

19 utilizing This type of analysis is routinely used by experts in

20 This field for This purpose.

21       Now at their conclusions -- but the fact is it is

22 used and testified in a lot of cases that it is used outside of

23 litigations as I said earlier and under those circumstances for

24 them to use the same type of factual basis, whether it's

25 admissible as we say, or in admissible, as they argue, is

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000486

1 simply not prohibited under Rule 408.

2      The final point which continues to frankly just sort

3 of amaze me is Grace's own use of settlements notwithstanding

4 Rule 408.  I mean at one point in their reply brief they refer

5 to our raising this issue as a, quote, schoolyard taunt, which

6 I kind of like that.  That's cute.  It's not a schoolyard

7 taunt.  It's basically saying Grace cannot ask this Court to

8 rule the same -- opposite directions on the same issue at the

9 same time.

10      If Grace is right, then Rule 408 prohibits reliance

11 by an expert on settlements for amount.  The rule itself

12 specifically talks about prohibiting use of them for purposes

13 of determining the amount.  You can't go into -- in front of a

14 jury in a personal injury case and say, oh, well, you know, we

15 had discussions about -- I admit there's liability here, but I

16 had discussions with the plaintiff's lawyer, and he was willing

17 to agree to pay -- take $10 for this case that he now says he

18 wants a million dollars for.  And the only dispute is about the

19 value of the case.  You can't do that.

20      So if Rule 408 means what he says it does, then Mr.

21 -- Dr. Florence's testimony is out the window, and the only

22 evidence that would be available that wouldn't violate Rule 408

23 is the judgment values, which I just pointed out a few minutes

24 ago would produce a number way bigger than what Grace says its

25 liability here is.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000487

1           At the end of the day, Your Honor, all of these
2  problems that Grace asserts that the ACC and the FCR are
3  somehow creating for it in the position we're taking in this
4  bankruptcy and preventing Grace from sort of utilizing the
5  Bankruptcy Code in the way in which it was intended are of
6  Grace's making not ours.  Grace was the one that filed the
7  voluntary Chapter 11 proceeding.  Grace is the one that seeks
8  to get 524(g) protection against future claims that would
9  otherwise not be dischargeable in a Chapter 11 proceeding.
10 Grace is the one that has decided to attempt to use its Chapter
11 11 case as a vehicle for attempting to litigate the validity of
12 most of the asbestos PI claims against it.
13          If Grace's lawyers and experts are to be believed,
14 and Grace's asbestos personal injury liability is well under a
15 billion dollars, Grace can propose -- easily propose a plan
16 similar to the data plan which had 88,000 pending claims in
17 front of it and just passed through those claims to be
18 litigated.  And if the court system has been fixed through all
19 the tort reform that's out there and through all of these
20 expert witnesses that Grace could have brought to bear prior to
21 its Chapter 11 proceeding but elected not to use it except in
22 rare instances, but now they're going to come in and they're
23 going to say to the law -- the judges, federal judges, state
24 judges, whatever, you can't have a claim unless you meet these
25 criteria, then they can sell that to those judges and those

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000488