1  juries and the courts that have jurisdiction of those claims.

2          If you take what Grace is doing here at face value,

3  it never intended from the day it filed this case to use this

4  Chapter 11 proceeding for the normal purpose of restructuring

5  its business through arrangements with its creditors that the

6  Bankruptcy Code contemplates.  In violation instead of the

7  spirit if not the letter of the Third Circuit's decision in the

8  SGL Carbon case, Grace is simply attempting to convert the

9  bankruptcy -- its bankruptcy case into a form of aggregate mass

10  tort litigation that it couldn't accomplish outside of

11  bankruptcy, and in the process it's basically trying to

12  convince this Court that the normal rules in claims allowance

13  that allow the claimant to -- you know, you've got to have an

14  objection to the claim.

15          I mean here under the bar date, Your Honor, Grace has

16  never objected to these claims.  They're all deemed allowed

17  right now, because there's never been an objection filed.  All

18  the claims were filed under POCs and the bar date.  I mean,

19  obviously, they're not allowed, but I mean the whole notion of

20  a claim, an objection, a hearing, a right to defend yourself,

21  put your claim forward, a right to elect who your trial expert

22  is going to be as opposed to some guy who you might have gotten

23  some x-ray from while you were considering filing a lawsuit

24  against somebody, everything of that is just tossed out the

25  window, and it is simply not possible under the Bankruptcy

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000489

1 Code.  It's not a legitimate use of the Bankruptcy Code, and

2 I'm sure at the end of the day this Court will not countenance

3 it.

4          That said, I rather suspect that the Court is not

5 going to Daubertize any of the witnesses.  We've been through a

6 process in some other cases before Your Honor, and so while I'm

7 going to turn the podium over now to others to address some of

8 that, particularly given the fact that Mr. Bernick didn't spend

9 a lot of time on most of the witnesses, hopefully, we will be

10 able to avoid having too much further discussion on that

11 subject.  Thank you.

12          THE COURT:  Mr. Finch.

13          MR. FINCH:  Nathan Finch for the Asbestos Claimants

14 Committee.  Don't show any graphics unless I tell you to.

15          The -- let's talk about what's not disputed here.

16 There is well-established epidemiology for the projected future

17 course of mesothelioma.  Dr. Nicholson's projections, you heard

18 Mr. Bernick say that they were sound science.

19          Second, we know that 27 million Americans have been

20 occupationally expoed to asbestos.

21          Third, we know that Grace made asbestos-containing

22 products that were broadly used in a wide variety of places.

23 Their Monokote III, which is the asbestos spray on insulation

24 product, has been called one of the -- it become the dominant

25 fireproofing product in the country and was the focus of most

CC-BLG000490

1  of the litigation.  They also made insulating cement and made

2  acoustical plaster, all of which had chrysotile asbestos that

3  was infected with Trimolite from the Canadian mines.  They

4  have --

5          UNIDENTIFIED SPEAKER:  Excuse me.  If you could just

6  lean a -- I can hardly hear.

7          MR. FINCH:  Sure.  Excuse me, Your Honor.  They have

8  admitted that -- testified -- their witnesses have testified

9  that Grace products have been identified by plaintiffs as being

10  on any kind of construction or industrial site.  It runs the

11  whole gamut except for possibly shipyards.  And, in fact, they

12  have actually lost some cases arising out of shipyards.

13          So you've got this huge toll of disease nationwide.

14  The United States government statistics show that the

15  mesothelioma incidence rate, what they actually count, is still

16  going up.  I mean it's basically been flat for a long time, but

17  it's still going up.  We've got, you know, 26/27 hundred

18  mesothelioma deaths in the United States now.  The death rate

19  from asbestosis is going up, and the number of people who die

20  from asbestosis is only a very small fraction of the people

21  actually ultimately who have the disease.

22          And so the question is how do you estimate that

23  liability on Grace's part.  And I'm going to first talk a

24  little bit about their methodology and explain why -- in

25  addition to the reasons Mr. Lockwood articulated, why it's just

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000491

1 not reliable and doesn't fit the law.  What Grace is ultimately

2 trying to do is take Daubert and turn it into a substantive

3 rule of decision under state law.  Forty-six states have

4 Daubert or a version of Daubert.  They call it Havner in Texas.

5 They call it High in Maryland.  But the point is the scientific

6 basis for getting an expert's report or expert's opinion in

7 front of a jury, there's a mechanism to challenge that or has

8 been for many, many years after 1993 and in some states before

9 that.

10         So what they're trying to do is they're trying to say

11 only if you believe our experts, are -- would any case

12 conceivably get to a jury, and that's making a factual

13 determination that -- it's going to depend on the facts and

14 circumstances of each of the 100,000 individual cases.  You

15 can't do it globally, and they're inconsistent with the law.

16 And a couple of the cases that we cited in our reply papers,

17 I'll just read you the quotes.

18         The first is the Rutherford case from California,

19 which the substantive rule in California says, "If plaintiff's

20 prove causation in asbestos-related cancer cases by

21 demonstrating that the plaintiff's exposure to the defendant's

22 asbestos-containing product in reasonable medical probability

23 was a substantial factor in contributing to the aggregate dose

24 of asbestos the plaintiff or decedent inhaled or ingested and,

25 hence, to the risk of developing asbestos-related cancer."

J&J COURT TRANSCRIBERS, INC.

CC-BLG000492

1  There's no requirement that there's a doubling of the risk for

2  each exposure or each particular product.

3          The Berger vs. Amkin (phonetic) case, which is a case

4  in New York by the judge who has all of the asbestos cases in

5  New York, who listened to the testimony of Dr. Mogavkar, one of

6  Grace's experts here, and a lot of other experts trying to

7  Daubertize the -- or New York state law equivalent -- the

8  expert testimony from plaintiff experts in braverker cases,

9  which is a lower exposure and a different type of exposure than

10 the types of exposure we're talking about here.  What the Court

11 wrote in that opinion, and this is at 818 New York South 2d

12 762, "Scientists and physicians use various means to establish

13 causation in particular situations, not the least of which are

14 toxicological and pathological studies and documented case

15 studies.  While epidemiology may be the gold standard, it can't

16 be the only standard in an area where caustion is both

17 particularistic and well established.  Federal courts have also

18 held that epidemiological evidence is not necessary to

19 establish causation.  It is not really important to have an

20 epidemiology study to determine whether the risk of cancer is

21 increased by asbestos exposure in every occupation."

22          That's what Grace is trying to do here.  The ACC and

23 the FCR are going to call on medical experts, Dr. Laura Welch,

24 who is an industrial medicine doctor and an epidemiologist

25 who's run the largest screening epidemiological study of sheet

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000493

1  metal workers, 17,000 workers over the past 20 years, Samuel

2  Hammar, a pathologist, a Dr. Rodwi (phonetic), another

3  pathologist, Arnold Brirody (phonetic), a cell biologist.  All

4  of them basically take issue with Grace's threshold idea that

5  you need to have -- that only people who have personally mixed

6  or personally installed asbestos could be possibly be exposed

7  to enough Grace asbestos to cause their disease.

8          The fact is each case turns on its own individual

9  facts.  The plaintiff in each of those cases would be able to

10  hire his or her own expert for the purposes of proving up a

11  case against Grace, and the medical literature -- there is

12  medical literature.  Grace discounts the studies relied upon by

13  the doctors that the ACC and the FCR will put on, but the fact

14  is they do show an excess risk or a doubling or quadrupling of

15  the risk with fiber exposures down to well below one fiber a

16  year of exposure.  And, you know, Grace can take issue with the

17  peer review medical literature, but that's a function of cross

18  examination that would come up in each individual case, and

19  Your Honor is not going to sit here and try 100,000 cases.

20          How much exposure and whether someone has an

21  asbestos-related disease turns on the facts and circumstances

22  of the case.  And in a mesothelioma case -- and most of what

23  I'm talking about here is mesothelioma, and it's real --

24  there's not a dispute about the disease.  It's just did the

25  defendant's asbestos contribute to the causation of the

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000494

1  disease?  And there's not -- it doesn't have to be that the

2  defendant's asbestos was the sole cause of the disease, or that

3  the defendant's asbestos doubled the risk, because it's

4  cumulative asbestos exposure which ultimately causes disease.

5  So that's their mix and install criteria for mesothelioma.

6          Another criteria they have is you have to have

7  radiologically diagnosable asbestosis in order to attribute

8  lung cancer to asbestos exposure.  And the consensus medical

9  view by the Helsinki criteria, which is a group of experts with

10  over 1,000 years studying asbestos-related disease, have said

11  that you can have asbestos-related lung cancer if you have

12  sufficient exposure, but you don't need to have radiologically

13  diagnosable asbestosis.  And, in fact, Grace's criteria don't

14  even permit someone to prove pathologically that they have

15  asbestosis, and I think Grace's experts would admit that if you

16  have asbestosis pathologically, it may not show up on an x-ray,

17  but you definitely have asbestosis.

18          And so even if you were to say that you need

19  underlying asbestos to attribute lung cancer to asbestos

20  exposure, which the medical literature says you don't need --

21  there's a lot of medical literature that says you don't need --

22  Grace's criteria rule out even the people who can prove it

23  pathologically.

24          The -- Mr. Bernick, quote, testified or talked about

25  various aspects of the tort system, and in the tort system --

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000495

1 what people did and didn't do in the tort system.  Whatever Mr.

2 Bernick says, whatever I say, whatever any of the lawyers say

3 up here is not evidence.  We're going to -- you're going to

4 hear evidence from Steve Snyder, who's -- who has represented

5 companies in the tort system for over 20 years, from Dan Meyer,

6 who's a claims adjuster who's settled over -- he or his group

7 have settled over 200,000 asbestos claims, from Peter Krause

8 and John Cooney, who represent primarily mesothelioma victims,

9 about what the standards are in the tort system, what Grace

10 required in order to settle cases.

11         Mr. Bernick would have you believe that Grace settled

12 any case that came in the door without regard to whether it

13 posed a risk to it.  In fact, for every case that Grace paid

14 money to -- and here I'd like to -- well, I'll pass on the

15 graphic.  Grace required proof of exposure to a Grace product

16 sufficient to satisfy it and proof of disease to satisfy it,

17 and it paid the plaintiff the amount of money that was

18 something less than what he would recover at trial.  Something

19 far less than what he would recover at trial, but both sides

20 are basically hedging their bets as to what might happen if

21 discover played out.

22         And the defense lawyers from Grace testified at

23 deposition, which is going to be their trial testimony -- since

24 they haven't been listed by witnesses, and we can't compel them

25 here by subpoena -- that the reason they chose to settle these

CC-BLG000496

1  cases and the standards they used to settle these cases was the

2  best way to minimize the liability.

3           MR. BERNICK:  Yes, I'm remimded that the testimony

4  that Mr. Finch is reciting --

5           THE CLERK:  I'm not picking you up, sir.

6           MR. BERNICK:  I'm reminded that the testimony that

7  Mr. Finch is citing is testmiony that was taken I believe

8  subject to a confidentiality order, because it relates to

9  settlement materials, and I believe that that was one of the

10  conditions pursuant to which we agreed to allow that discovery

11  to take place.  So to the extent that Mr. Finch wants to get

12  into that, and I would I guess suggest that I believe that some

13  of this -- I'm not sure this is covered in the briefs, but to

14  the extent that Mr. Finch would want to get into it, I think

15  that we have an open court here, and I'm not sure that that

16  would be appropriate.  I really don't want to spend a huge

17  amount of time on this, but I am compelled to point out that I

18  believe those are the terms of the order.

19           THE COURT:  All right.

20           MR. FINCH:  I'll pass that.  That's the only

21  reference I'm going to have to this, Your Honor.  I'm not going

22  to show any of the documents.  Suffice it to say there's a lot

23  of them, and we'll put them into evidence at the appropriate

24  time.

25           We do have -- Grace did try some asbestos cases.  It

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000497

1 tried about 80 cases to judgment.  It won about two thirds of

2 them, but the ones that lost, the judgments were catastrophic

3 compared to settlement averages.

4        Let's talk about the Peterson and Biggs estimation

5 methodology.  The fact is that it is generally accepted in non

6 -- both in litigation and non-litigation settings.  One of the

7 things we attached to our brief was an expert report from Tom

8 Florence in the Vellumoid case where he testified in the

9 Federal-Mogul cases this summer about Vellumoid's asbestos

10 liabilities, about the asbestos liabilities of Pneumo Abex,

11 about other asbestos liabilities, and in each and every one of

12 those reports he said, and I quote, that, "His estimates were

13 based on generally accepted forecasting methods and pre-

14 petition filing trends."  And he goes on to describe, "The

15 forecasting processes incorporated the methods illustrated in

16 Nicholson and Perkel --" John, can we show this?

17        "The forecasting process incorporated the methods

18 illustrated in Nicholson, Perkel, and Selikoff, the courts have

19 accepted this or similar -- the same or similar methodologies

20 for forecasting future asbestos claims in numerous

21 proceedings."

22        And Dr. Peterson has studied asbestos litigation and

23 mast tort litigation for over 25 years.  He's a Trustee of the

24 Manville Trust.  He is a Trustee of the Fuller-Austin Trust.

25 He was a founding member of the Rand Institute for Civil

CC-BLG000498

1  Justice.  He has been an expert for the courts in valuing

2  asbestos claims on four occasions.  He has about as much

3  experience in studying the tort system as anyone out there.

4         Ms. Biggs has worked for insurance companies and

5  estimated liabilities using methodologies somewhat different,

6  but the basic -- fundamentally it's the same as Dr. Peterson.

7         Dr. Florence has that expertise, has the ability to

8  estimate liability of asbestos companies.  In their briefs

9  Grace called Dr. Florence a statistician.  I think he might be

10 somewhat offended by that.  His -- he holds himself out and is

11 an expert in what's the liability of a company facing asbestos

12 claims.

13        And what Grace ignores in its _Daubert_ challenges on

14 Dr. Peterson and Ms. Biggs is there are many types of science

15 and there are many types of specialized language, and the Rule

16 702 doesn't mean you have to be able to run a laboratory

17 experiment.  You can have scientific, technical, or other

18 specialized knowledge to assist the trier of fact.

19        And, ultimately, the -- _Daubert_ boils down to does

20 the expert employ in the courtroom the same level of

21 intellectual rigor that characterizes the practice of an expert

22 in a relevant field?  And the answer to you, Your Honor, is

23 that is exactly what Dr. Peterson has does here, and that is

24 what Ms. Biggs has done here.  They use the same methodologies

25 here they do in non-litigation settings outside of court.

J&J COURT TRANSCRIBERS, INC.

CC-BLG000499

1     And why does the Nicholson methodology produce the
2  most reliable and the best estimates of a future liability of
3  an asbestos company?  Three things that haven't changed for 25
4  years -- although Mr. Bernick talks about changes in the legal
5  system, what he's -- what Dr. Peterson's testimony was is you
6  can't predict today what the law is going to be in a particular
7  jurisdiction tomorrow, whether the federal government is going
8  to pass the fair act tomorrow.  What we do know that over the
9  past -- ever since Borrell (phonetic) in 1973 that the law has
10  compensated mesothelioma claims and asbestos claims.  We do
11  know the asbestos-related epidemiology.  We know the future
12  time course of the asbestos-related cancers.  And, finally, we
13  know that the best evidence of what a company's likely to pay
14  to reduce the judgment and settle cases tomorrow is what it's
15  paying today, taking into account the most recent trends.  So
16  we have the disease curve.  Now --
17     THE COURT:  Would you say that last sentence for me
18  again?  I'm sorry.
19     MR. FINCH:  The best evidence of what a company is
20  going to pay to deal with asbestos liabilities tomorrow just is
21  what it is paying today taking into account the trends that
22  line up to where it is.  Just like the best estimate of what
23  you're going to have to spend on gasoline next week is what
24  you're paying this week not what you're paying ten years ago.
25  The best evidence going forward is you take the most recent

CC-BLG000500

1  time and you project it forward based on what you know today

2  about the trends and what has happened since.

3          So what do we know about Dr. Peterson's methodology

4  and those trends?  Could I have Dr. Peterson's report, the page

5  showing the claiming history?

6          THE COURT:  Just a second, Mr. Finch.  They have this

7  on a screen that's not facing me, and I can't see it.  So hold

8  on one second, please.

9                    (Pause)

10         THE COURT:  Okay.  Thank you.

11         MR. FINCH:  I'll focus on the mesothelioma.  That's

12 Grace's history of how many mesothelioma claims it got.  Nobody

13 really disputes that.  It's a continuing upward trend.  Whether

14 you want to go back to 1980 or 1990 or 1995, it's a continuing

15 upward trend.  Mr. Bernick makes a big deal out of the

16 2000/2001 period, but, in fact, the trend was apparent long

17 before that, and it's continued to go up.

18         Well, we have also Dr. Peterson and Ms. Bigg's

19 knowledge about the litigation environment.  We have the Rand

20 report on asbestos litigation which has the total numbers of

21 claimants, various broken down by disease, and this -- you

22 know, Mr. Bernick said, oh, there aren't new claimants coming

23 in the system.  Well, he's just wrong about that.  You can see

24 from the 1990 all the way up through 2002 there's more

25 claimants coming into the system for mesothelioma.  So that's

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000501

1  the pattern for the data that we have.  And so Dr. Peterson and

2  Ms. Biggs, to a greater or lesser extent, say, okay, we don't

3  have data for Grace after 2001, but we know the trends are up.

4  We know there's an upper limit, which is in the Nicholson

5  disease curve, whatever percentage of that.  So there's nothing

6  that says that there's going to be a reversal of the trend in

7  Grace.

8          We do have data about the market generally, and the

9  reason people focus on the Manville Trust is, because

10 ultimately the Manville Trust gets 90 or 100 percent of the

11 asbestos claims.  And the Manville Trust data shows that even

12 if you leave out 2003 for the U.S. exposures for mesothelioma,

13 the numbers and claims the Manville Trust were getting between

14 2004 and 2006 are about 20 percent higher than the last three

15 years to which we would have Grace data, which is 1998 to 2000.

16 And so people use the Manville Trust as a benchmark in non-

17 litigation settings as well as litigation settings.

18         I mean Dr. Dunbar, in a presentation he made to a

19 bunch of financial analysts, looked at the Manville Trust as

20 sort of a proxy for the market.  Just like when you're valuing

21 a company, you look at the S&P 500 or the Dow Jones Industrial

22 Average as a proxy for the market.  Well, you look to the

23 Manville experience here.

24         And so Dr. Peterson, using his expertise and his

25 knowledge and the knowledge of the trends, takes that and

CC-BLG000502

1  projects the future liability using Grace's historical values

2  taking into account the fact that just like its claim numbers

3  were going up the values were going up not just for Grace but

4  for many asbestos defendants.  And the -- you know, they say

5  they have confidential data that shows that claim values have

6  declined somewhat.

7          One thing I would caution Your Honor is that in

8  viewing the evidence and listening to the testimony, they tend

9  to mix apples and oranges.  So they go back and forth from

10  mesothelioma only to all types of claims and all values.  It's

11  certainly the case that non-malignant claims have declined

12  substantially over the past three years, but the mesothelioma

13  values, there's no real evidence from any kind of publicly

14  available public source.  Companies don't break out their

15  mesothelioma settlements in their financial statements.

16          The one thing we do know, if you turn to Page 29 of

17  Dr. Peterson's report, this shows Grace's history at the top.

18  Keep the whole page, John, the whole thing.  Grace's history at

19  the top, which shows increasing mesothelioma values, increasing

20  lung cancer values, and what Dr. Peterson regards as comparable

21  companies.  These are companies that were in the construction

22  industry that made construction-type products, USG, Turner, and

23  Newell.

24          And if you look at the bottom, there's a company

25  called Union Carbide, which has become one of the dominant

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000503

1  asbestos defendants today.  And if you look at the dollars out
2  the door -- this is from Union Carbide's financial statements.
3  It's publicly available.  Dollars out the door, which is really
4  what we're trying to figure out here.  Look at the dollars out
5  the door Union Carbide was paying in 2001, which is $39
6  million, compared to the dollars out the door it's paying now,
7  which is about $120 million.  It's tripled, and there were some
8  years it was paying two or three hundred million dollars a
9  year.

10          So the idea that in the tort system companies are in
11  some kind of much better world I think is refuted by the
12  evidence and refuted by the testimony of the knowledgeable
13  witnesses, and I would urge Your Honor to listen to Dr.
14  Peterson's testimony, listen to Ms. Biggs' testimony, and focus
15  on the point that even under Grace's methodology they're
16  predicting what's going to happen over the next 40 or 50 years.
17  Sure, nobody can predict what the stock market's going to do
18  next week or next month or next year, but over the past 100
19  years the S&P 500 has gone up an average of 8 or 9 percent a
20  year.  If you're trying to do a forecast of the next 30 or 40
21  years, you look at the long-term trends, and it would be a
22  pretty good estimate to say I believe, all things being equal,
23  20 years from now that the whole market is going to be 20
24  percent higher -- I mean ten -- eight percent higher per year
25  going over 20 years than what it was today.  And so you start

CC-BLG000504

1  with the most recent period, and you project forward.

2            And, finally, Your Honor, I'll wrap up my time, so

3  that Mr. Mullady can focus on some specific points relating to

4  Ms. Biggs.  Grace used the methodology to estimate asbestos

5  liabilities taking its past history in non-bankruptcy settings.

6            If you could put up the -- Tom Florence's -- excuse

7  me.  If you could -- could I have, John, please ACC-89?

8            This is the estimate that Dr. Florence did for 1997

9  for business planning purposes at the time of the Sealed Air

10  decision.  This will be an exhibit in the case.  If you back up

11  one page -- back up to the other one.  This is -- if you look

12  at the estimate of the indemnity arising from VI claims as

13  obtained I, that is the exact type of methodology.  You know,

14  leaving aside some individual tweaks that Dr. Peterson and Ms.

15  Biggs use and what Dr. Peterson -- what Dr. Florence himself

16  does and contacts other than this case where he's being asked

17  just to count up the numbers.

18            When Grace -- the management wanted to estimate the

19  liability for pending claims at the same time, which is BD-605,

20  same document, they had 104,000 pending claims.  This has been

21  shown in open court before, Ms. Baer.

22            MS. BAER:  There was one that flashed by that wasn't.

23            MR. FINCH:  Okay.  This chart was shown in open

24  court, Your Honor.  This chart was produced to the United

25  States government pursuant to a subpoena.  I don't think

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000505

1  there's any confidentiality left to that.

2         Grace had 100,000 cases pending in 1997.  At the

3  time, as you'll see from Dr. Peterson's estimates, Grace was

4  paying about a third as much in meso cases and half as much as

5  lung cancer cases, and yet they still estimated the liability

6  for pending cases at $325 million, which is almost as much as

7  what they're estimating for all their liability here under

8  their methodology.

9         And, finally, I will close, Your Honor, with two

10 thoughts.  Number one, if Grace believed that this methodology

11 is so unreliable.  Why does it -- and we -- in our briefs we

12 pointed this out to Your Honor.  As late as December, 2006 it

13 was inviting one of its insurance companies to go look at Dr.

14 Peterson's estimate of liability in order to get money from an

15 insurance company.  They said you can go get it.  We can copy

16 Dr. Peterson's report from Sealed Air, which estimated

17 liability north of $3 billion as of 1998.  We can copy the

18 report, or you can get it from the bankruptcy docket.  If Grace

19 thought -- this is Grace's in-house head of insurance.  If

20 Grace thought that its -- the Peterson methodology was so

21 unreliable, why does it use it to get insurance coverage, to

22 get money for its -- from its insurers?

23        The final thought, Your Honor, that I'll leave you

24 with is Dr. Florence's methodology that he uses here and

25 Grace's whole methodology basically identifies the cases where

CC-BLG000506

1 Grace's experts can see that the plaintiff has a disease that

2 could be caused solely by exposure to Grace asbestos.  When a

3 claim is found to be valid under tort law in our system of

4 justice, how much does a defendant pay?  The defendant doesn't

5 pay a settlement value.  The defendant pays what a jury

6 determines are the damages in the case.  And we have evidence

7 of what juries have determined are the damages in cases

8 involving Grace where there is liability.

9          And I -- we have demonstrated to you and we will

10 demonstrate to you that if you buy into everything else about

11 Grace's methodology, which we disagree with and think is wrong,

12 and contrary to the Bankruptcy Code, if you value what's left

13 by reference of the judgments, which is the only methodology

14 which is consistent with a merits-based estimation, the

15 liability is at least $12 billion.  And with that I will turn

16 the lectern over to Mr. Mullady and sit down.

17          THE COURT:  Why don't we take a ten-minute recess,

18 and then we'll start again, Mr. Mullady?

19          MR. MULLADY:  Good suggestion, Your Honor.  Thank

20 you.

21          THE COURT:  Okay.

22          MR. BERNICK:  Your Honor, for planning purposes,

23 about what do you have left on the clock (indiscernible).

24          UNIDENTIFIED SPEAKER:  We --

25          MR. BERNICK:  I think you started about --

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000507

150

1                          (Recess)

2                    THE CLERK:  Please be seated.  Will the Court come to

3    order?

4                    THE COURT:  Mr. Mullady.

5                    MR. MULLADY:  Thank you, Your Honor.  Good afternoon.

6    If it please the Court, Ray Mullady for the Future Claimants

7    Representative.

8                    THE COURT:  Just a minute, Mr. Mullday.  Moana, do

9    you know how to turn that off?  Do you -- the fan off --

10                   THE CLERK:  Just turn the --

11                   THE COURT:  -- that button off?  I'm going to turn it

12   off, so we can hear you, Mr. Mullady, other -- and I apologize,

13   folks.  It'll probably get hot.  If some -- if you really start

14   to die, let me know, and I'll turn it back on, and we'll not

15   hear Mr. Mullady too well, but, hopefully, that won't change.

16   That should shut down in a few minutes.  Go ahead, Mr. Mullady.

17                   MR. MULLADY:  Thank you, Your Honor.  Good afternoon.

18   Once again, Ray Mullady for the Future Claimants

19   Representative, who is Mr. David Austern, who is in the

20   courtroom today seated back there next to Mr. Frankel.  He may

21   have to get up and leave during my presentation.  It's not out

22   of disinterest, but not coincidentally in connection with his

23   duties as claims administrator for the Dow Corning Trust, he

24   has an obligation to attend to later.

25                   MR. BERNICK:  Which that client is very grateful.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000508

1          MR. MULLADY:  I'd like to begin, Your Honor, by

2    reminding the Court of the magnitude of Grace's liability to

3    future asbestos personal injury claimants.  By the consensus of

4    all of the individuals who have estimated Grace's liability in

5    this case, the future claims liability is over 80 percent of

6    the total liability.  Ms. Biggs has it at 90 percent.  Mr.

7    Peterson has it at 89 percent.  Even Dr. Florence, whose

8    estimate obviously is much lower, has it at 82 percent.  And

9    Grace in its SEC filings most recently, it's 10k for the period

10   ending 12/31, 2000, projected that 84 percent of the liability

11   would fall in the future years.

12          Thus, Your Honor, if Grace's liability for asbestos

13   personal injury claims is channeled to a Section 524(g) trust,

14   by everyone's consensus over 80 percent of the assets in the

15   trust will be used to pay future claimants.  For this reason,

16   the due process rights of future claimants who are absent

17   parties here are paramount.  The U.S. Supreme Court has long

18   recognized that constitutional due process limits a court's

19   ability to rule on the merits of the claims of absent parties.

20   And that case is -- the case cite is Hansbury vs. Lee at 311 US

21   32, a 1940 case.

22          Thus, Your Honor, the due process rights of future

23   claimants limits this Court's ability to estimate Grace's

24   liability in a way that would involve ruling on the merits of

25   future claims.  That's very important, yet this is what Grace's

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000509

1  estimation methodology contemplates.  The Bankruptcy Code also

2  insures that the rights of future claimants are protected in

3  cases involving a 524(g) trust, as the Court knows.  That

4  section provides that the trust, "will value and be in a

5  position to pay," present and future claims, "in substantially

6  the same manner."

7        So we've heard a lot about merits-based estimation,

8  but make no mistake Grace's estimation methodology does not

9  assess the actual merits of future claims.  Instead it

10 arbitrarily eliminates thousands of future claims and in the

11 process tramples the due process rights of claimants that we

12 just talked about.  Can we have Exhibit 4, Tom?

13        This is a chart from Grace's _Daubert_ opposition brief

14 at Page 32.  The sliver of pending claims after Grace's

15 winnowing process is shown right down here.  They start with

16 pending claims here.  They eliminate those without a proof of

17 claim.  They further eliminate claims that do not meet their

18 exposure criteria, and this last one here, no asbestos-related

19 disease.  So what starts as a pending group here of claims,

20 becomes this tiny sliver here.  Exhibit 5, Tom, please.

21        After this winnowing process is completed, we have

22 the future estimate down here.  The Nicholson disease inputs

23 curve is up here.  The only way this delta gets as wide as it

24 is in the Grace estimation is if history is completely

25 disregarded and new criteria are imposed to screen out claims

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000510

1  that Grace traditionally paid pre-petition.  And that is the

2  vagary of the process that they are using here with respect to

3  future claimants.  So as to future claimants, the screening

4  process begins with the Grace PIQs, which were not completed by

5  future claimants, so the Court has no data on individual future

6  claims, only assumptions by Grace and their experts as to the

7  number of claims that will be filed, and a second assumption,

8  an unscientific prediction, about how many future claims will

9  be meritorious.

10        Now, we know that Dr. Florence allocates zero value

11  to thousands of future claims.  This is undisputed.  He does

12  this by failing to include large numbers of claimants in the

13  claim base that he uses for his future projections.  But, as we

14  will see, his exclusions are unfair and deny claimants --

15  excuse me -- future claimants their due process rights.

16  Exhibit 6, please.

17        Now, Your Honor, this is a demonstrative.  It's a

18  little bit playful.  I hope Your Honor will give me a little

19  creative license here.  But the concept is very, very serious,

20  and this is the best way I thought we could depict this.  What

21  we show here in this first cut is a hypothetical game board.

22  The players are current asbestos personal injury claimants.

23  The object of the game is to reach the 524(g) trust here and be

24  eligible for compensation.  Hypothetical future claimants are

25  shown here awaiting the outcome of the game, because under

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000511

1  Grace's estimation methodology their fate is dictated by the

2  ability of future claimants -- excuse me -- current claimants

3  to reach the finish line here.

4          So the first player begins and gets to the first

5  question did I file a POC, a proof of claim.  He did not, and

6  his claim is not paid.  The future claimants are affected by

7  this denial, because the exclusion of this player and many

8  other players who did not file a proof of claim or the many who

9  did file proofs of claim that Dr. Florence could simply not

10 match to the CMS database, they're all used to under estimate

11 the number of future claims.  This in turn results in fewer

12 assets being allocated to the 524(g) trust under Grace's

13 estimation, and note that the money bag has shrunk somewhat.

14         Our next player proceeds through the claim filter but

15 is asked whether he entered his claim in CMS before the

16 petition date.  He answers no, and he's denied payment.  The

17 524(g) trust shrinks even more.  Future claimants ask

18 themselves why the value of their claims suffers as a result.

19 They didn't have pre-petition claims.  They were not

20 responsible for Grace not timely entering claims into CMS.

21         The next player, he's asked whether his PIQ said that

22 he personally mixed or personally installed a Grace asbestos

23 product.  He answers no.  His claim is denied, and future

24 claimants ask the question why should we be affected.  We

25 didn't file a PIQ.  His PIQ said he didn't personally mix or

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000512

1  install.  We weren't sent PIQs.  We aren't bound by Grace's

2  exposure criteria by any court.  Even if in the future a 524(g)

3  trust is established, what are the odds that Grace's exposure

4  criteria will be used?  They're not the law that they state,

5  and the trust criteria will have to be negotiated between the

6  debtor and the personal injury claimants and the futures rep.

7  Next, please.

8          The next player gives the wrong answer to the

9  question whether he identified a Grace product in his PIQ

10 response.  He's sent to the do not pay category.  The trust

11 shrinks further.  Future claimants wonder why they are being

12 affected by the response of a claimant to a PIQ where the

13 claimant's case had not been fully developed at the time of the

14 Grace bankruptcy petition and where the automatic stay

15 prevented that claimant from taking any discovery against

16 Grace.

17         The next player is a pending claimant who did not

18 comply with Your Honor's x-ray order.  My goodness, we heard

19 enough about that order over the last two or three years.  His

20 claim is denied.  The trust shrinks further.  The future

21 claimants ask themselves why their recovery's been diluted.

22 They weren't subject to the Court's x-ray order.

23         When all is said and done, Your Honor, and, of

24 course, many claimants can pass through the various Grace

25 liability filters and make it to a position where they're

**J&J COURT TRANSCRIBERS, INC.**

1 eligible for payment under the trust, but for every claimant
2 that doesn't make it, numbers of future claimants by
3 extrapolation for the Dr. Florence methodology will not receive
4 full compensation for their claims.  And at the end of the day
5 the money that is not paid to the future claimants is returned
6 Grace shareholders.  It moves over there.  And what was once
7 the province of future claimants becomes the province of Grace
8 shareholders.  This is the game that Grace is playing here, and
9 this is why we thought this demonstrative was a good way to
10 depict it.

11        The future claimants, Your Honor, will submit their
12 claims against the trust over the next 50 years.  This Court is
13 bound to estimate Grace's liability by taking into account the
14 future and as yet unasserted claims against Grace, and those
15 claims must be treated fairly and equitably.  As we just saw,
16 Dr. Florence's methodology does just the opposite.

17        Now, of course, Dr. Florence disclaims all
18 responsibility for the assumptions that underlie his
19 calculation of the number of pending and future claims.  He
20 instead follows the lead of Dr. Elizabeth Anderson, who opines
21 that certain categories of claims, as we've heard, have
22 insufficient exposure to Grace products to have a plausible
23 claim against Grace.

24        Dr. Anderson eliminates all claimants except those
25 who personally mixed or personally installed Grace asbestos

CC-BLG000514

1 products, as we've heard.  Moreover, she does so in an

2 unscientific way, as I will discuss in a moment.

3       Now, Dr. Anderson in turn relies on Dr. Peter Lees,

4 who has computed the asbestos exposure rates for various

5 classes of Grace workers, but remarkably and unscientifically,

6 Dr. Lees does not even report the variations from the averages

7 that he calculates.  That's an important point.

8       Now, Dr. Anderson also relies on Dr. Mugavkar.  He's

9 the one who's collected the benchmark exposure levels to

10 asbestos that, according to Dr. Anderson, are then necessary to

11 attribute asbestos-related diseases to the exposure.  Now, we

12 submit we've argued in our Daubert papers that Dr. Anderson's

13 opinion that only workers who personally mixed or personally

14 installed Grace asbestos products could have been exposed to

15 sufficient levels of asbestos to cause disease.  We've argued

16 that that opinion is unreliable and inadmissible.

17       She arrives at this opinion by improperly assuming,

18 Your Honor, that the average asbestos exposure of cohorts in

19 each of the PIQ categories -- those categories that Mr. Bernick

20 referred to, A through F.  She assumes that the average

21 exposure of the cohorts in those categories is representative

22 of all workers in that category.  She does not account for

23 individual exposure levels at all.

24       So, for example, Dr. R.J. Lees underlying data shows

25 that the average exposure for a worker -- quote, worker -- is

CC-BLG000515

1  much higher than the exposure for a, quote, helper, and that

2  only makes sense, because the worker is more directly working

3  with the product than the helper in the same job category.  Yet

4  Dr. Anderson uses the average of the workers and helpers, so

5  that, of course, dilutes the workers' exposure, and by doing

6  this what she does is she eliminates workers even though the

7  average exposures for the workers over 45 years exceed her

8  thresholds.

9         Now to make things worse, she ignores the fact that

10  not all workers in a category have average cumulative exposure.

11  Some have much higher than average cumulative exposures, but

12  she doesn't consider this, which is surprising.  If Grace is to

13  be believed that what they're doing here is determining the

14  merits of individual claims on a claim-by-claim basis, then she

15  should be considering these claimants individually and not

16  grouping them and using averages.

17         Now, Your Honor, this is a complicated area of the

18  case.  It requires some study.  We recommend that the Court

19  carefully read the declarations of Professor Eric Stallard that

20  are attached to the FCR's Daubert papers.  Professor Stallard's

21  an expert in demographic risk modeling.  In his declarations he

22  explains the importance of accounting for heterogeneity, which

23  is the differences in individual exposures, and he explains how

24  important it is to account for heterogeneity when studying the

25  exposures of individual members of a population, which is what

J&J COURT TRANSCRIBERS, INC.

1  Grace purports to be doing here.  Instead, Dr. Anderson's

2  calculating average exposures and ignoring everyone above the

3  average.

4         Now, Professor Stallard also exposes as unscientific

5  and flawed Dr. Anderson's assumption that workers in the same

6  job categories will have, quote, independent exposures.  Now,

7  this is a different concept, but it's equally important.  So,

8  in other words, she assumes that each day that a worker in one

9  of her groups comes to work, and he has an equal chance of

10  doing any of the jobs in the work category as any other worker

11  just as every flip of a coin has an equal chance of coming up

12  heads as it does coming up tails.  That's the independence

13  assumption.  So under Dr. Anderson's assumption an exposed

14  worker has an equal chance of doing the job of a helper on any

15  given day, and that's just counterfactual.

16         Dr. Stallard explains why the independence assumption

17  is not scientifically valid, and it's not consistent with

18  accepted scientific practice for the purpose of rejecting

19  individual claims on the premise that they have insufficient

20  exposures to asbestos to cause disease.  Your Honor, this is

21  very important.  If Dr. Anderson's independence assumption is

22  wrong, then her exclusion of thousands of claimants is wrong,

23  and Dr. Florence's estimate is wildly inaccurate and

24  unreliable.

25         I'd like to talk about Ms. Biggs' methodology.  We

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000517

1  heard some commentary about it this morning, but let me tell

2  you a little bit about Ms. Biggs.  She'll be here to testify,

3  but it may not be until March.  She'll be testifying in our

4  case in chief.  Can we have that still, Exhibit 8?

5          This is Jenni Biggs.  She's a principal of Towers

6  Perrin.  It's a leading actuarial firm.  She leads the asbestos

7  practice of that firm's Tillinghast Division.  Her long list of

8  credentials includes having qualified the potential asbestos

9  liabilities for insurers, for reinsurers, for asbestos

10  defendants.  She's the co-author of the Tillinghast study

11  regarding the $200 billion asbestos universe that was published

12  in 2001.  She's chaired the American Academy of Actuaries mass

13  torts working group which created a public policy monograph on

14  the overview of asbestos issues and trends, which was

15  originally published back in Decmeber of '01 and was updated

16  just last summer in August.  And she's testified before the

17  Senate Committee on the Judiciary on Asbestos Issues.

18          Now, Grace's attack on her is that, you know, she's

19  unscientific.  She hasn't done peer review work.  There are no

20  standards governing her work.  It's not generally accepted.

21  All those charges are false, and we demonstrated this in our

22  papers, but I'd just like to mention a few reasons why those

23  are false assertions.

24          Her actuarial estimate bares all of the key hallmarks

25  of a reliable methodology that's admissible in federal trials.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000518

1  It's based on published peer reviewed modeling concepts, and
2  you will hear about those.  It was prepared in strict
3  compliance with the standards of actuarial science.  It's
4  closely related to estimation methodologies that have been
5  accepted by courts in prior estimation proceedings, and it's
6  long been relied on in non-judicial settings by insurers,
7  reinsurers, and solvent asbestos defendants when setting
8  billions of dollars in asbestos reserves.  So unlike Dr.
9  Florence's methodology, which was created for litigation and
10  has never been used even by himself outside of litigation, Ms.
11  Biggs' work finds equal place outside the courtroom as it does
12  within, which is one of the criteria and key indicia of
13  reliability under the Paoli decision in the Third Circuit.

14          Can we have Exhibit 9, please?  There are standards
15  governing what actuaries do, very specific standards, very
16  exacting standards.  This is Casualty Actuarial Society
17  definition of what actuaries do.  They're known for their
18  scientific approach and demanding standards.

19          Can I have 10, please?  They apply their mathematical
20  expertise, and Ms. Biggs was a math major, and she has a degree
21  in mathematics.  Their mathematical expertise, their
22  statistical knowledge, their economic and financial analyses,
23  and problem solving skills to a wide range of business
24  problems.  They estimate the costs of uncertain future events.
25  That's what we're here to do.  We are here to estimate the cost

CC-BLG000519

1 of uncertain future events.  To hear Grace discuss the subject,

2 that's not possible.  One can't do that and be scientific.

3 Actuaries would beg to disagree.

4          Can we have 11, please?  More importantly, Your

5 Honor, Ms. Biggs' work is governed by the Actuarial Standards

6 of Practice.  This is -- or ASOPs to use the acronym.

7 Actuarial Standard of Practice 12 provides that, "An actuary

8 should select risk characteristics that are capable of being

9 objectively determined and based on readily verifiable,

10 observable facts."  Ms. Biggs will testify that her estimation

11 methodology complies with these and other ASOPs.

12          Let's go to 13.  As we noted -- well, I haven't noted

13 it yet, so I'll note it for the first time, Ms. Biggs' estimate

14 of the liability in this case -- her best estimate is $3.8

15 billion discounted.  How did she arrive at that figure?  Grace

16 claims that he made a bunch of ad hoc judgments, and that her

17 estimate is the product of assertion and not scientific

18 analysis.  That's from their brief -- their reply brief at Page

19 32.

20          Well, let's review what she did.  She has a six-step

21 methodology following a peer reviewed actuarial model.  You

22 heard Mr. Bernick make reference to the peer reviewed basis for

23 the model this morning in his opening.  This is the peer

24 reviewed methodology she followed.  Step 1 was to compile basic

25 claims information, and she started with Grace's own CMS

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000520

1 historical data base, which Grace developed in the 1980s and

2 has used it throughout the years to track the hundreds of

3 thousands of personal injury claims.  This is actual historic

4 data.

5       Next, please.  What she first had to do was there

6 were all these disease categories in CMS.  She consolidated all

7 the non-malignant claims down to one category of non-malignant

8 which left her with seven categories of disease types.

9 Ultimately, that gets reduced to four, as we'll see in a

10 moment.

11       Next, please.  But what she found was that in CMS

12 there were many, many missing records.  For some claimants

13 social security numbers were missing.  For many, many claimants

14 disease information was missing.  So rather than be content

15 with less than a robust database to use at the juimping off

16 point for her estimatation, she went to the Manville database

17 and matched claimant by claimant, a very meticulous process of

18 bringing over the information that was not in CMS to fill out

19 the data on these claimants.  And along the way she made many

20 conservative assumptions and selections.  Grace refers to them

21 as ad hoc judgments.  She had to make judgments about how to do

22 this, and I think you'll hear that in many more cases than not

23 she took the most conservative judgment that would enure to

24 Grace's benefit and to her client.

25       To fill in some of these other holes, she looked at

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000521

1    the PIQ POC database and match further to that.  And at the end

2    of the process she came up with one complete data set of

3    claims.

4              Let's go to Step 2.  And that completed her

5    compilation of basic claims information.  The next step was to

6    estimate future claim filings.  This is a chart with respect to

7    mesothelioma future claim filings.  This graph shows the number

8    of mesothelioma claims that were filed along -- and on the

9    vertical axis the number and then the years in which they were

10   filed.  The upper line is Ms. Biggs' industry benchmark which

11   is based on research that -- and data from Tillinghast.  Mr.

12   Bernick said this morning that there's no company data in the

13   Biggs and Peterson models, and I think with respect to Biggs,

14   he was referring to this industry benchmark data.  Well, that's

15   just false.

16             The Biggs industry benchmark derives from corporate

17   defendant disclosures, from SEC filings, from Tillinghast

18   confidential client data, and various public information such

19   as the en banc database, which is itself a collection of data

20   gathered from courthouses all over the country on the number of

21   claims that are being filed, and that is truly representative

22   of what's happening to the industry.  So the industry benchmark

23   is a compilation of what's happening outside the world of

24   Grace.  She also looks at Grace's actual filings over a

25   historical period.

CC-BLG000522

1          Now note this shaded area here between 1997 and 2001.
2   Starting with roughly 1997, Grace had moratorium agreements
3   with various plaintiffs' firms.  Certain plaintiffs' firms in
4   exchange for group settlements were agreeing not to sue Grace
5   for a certain period of time.  This tended to dampen the number
6   of filings in the late 1990s, as you can see here.  And then,
7   of course, the claim filings go up in 2000, as Mr. Bernick
8   explained.
9          Next slide, please.  These are the moratorium
10  agreements that expired in 1999 that are highlighted in yellow.
11  You can see how many there were.  Where now these firms are
12  backing the business, theoretically at least, of suing Grace.
13  And so, of course, it stands to reason that once these
14  moratorium agreements end we see an upswing in claims against
15  Grace.
16         Mr. Bernick asked rhetorically why Ms. Biggs has
17  selected 1997 -- strike that.  Let's go to the next slide,
18  please.  There's a calibration period here that Ms. Biggs uses
19  for purposes of her estimate of future claim filings.  The
20  calibration period is '97 to 2001.  Mr. Bernick said it was an
21  arbitrary choice that she made to use those years, and it
22  reflects selection bias is what he said.  Well, that's not true
23  either.  She chose that period to account for the aberrations
24  in the annual ratios of claims that were filed due to the
25  moratorium agreements that Grace had with these plaintiffs'

J&J COURT TRANSCRIBERS, INC.

CC-BLG000523

1  firms which tended to understate claim filings in the late

2  nineties but then led to a surge of claim filings in 2000 and

3  2001.  So to correct for the annual aberrations she selected

4  shares based on the '97 to 2001 calibration period.

5          Interestingly, Your Honor, when she testifies here,

6  you can ask her if she had gone back to 1992 and used the

7  calibration period from '92 to 2001.  Let's go to the next

8  slide, please, Tom.  One more.  She calculates ultimately that

9  Grace had 58.4 percent of the total industry claim filing

10 experience.  In other words, more than half of the claims that

11 are being filed are included in Grace.  If she had used her

12 calibration period going back to 1992, it would -- Grace's

13 share would still be something north of 50 percent -- in the

14 low fifties somewhere.

15         Okay.  Let's go to the next slide, please.  Okay.

16 Let's go further.  I'm trying to get to the next step after

17 she's estimated the future claim filings showing Grace's share

18 in comparison to the industry benchmark and Grace actual.  One

19 more.  She has to look at -- she has to estimate the data first

20 exposure.  Well, she has to factor in the data first exposure

21 and use the decay rates that Mr. Bernick mentioned that were

22 given to her by Professor Stallard.  And but this series of

23 graphs shows -- and we'll go through these quickly, Tom -- is

24 that because Grace was introducing asbestos products later than

25 most other defendants and these years reflect when people are

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000524

1 being exposed to asbestos -- and you can see that the later the

2 exposure, the later the claims are being filed in time, and

3 that they don't run off until around 2059, according to Mr. --

4 Professor Stallard.

5          Next one, please.  This is their total industry, and

6 you can see the shape of the curve on the run off that Stallard

7 has calculated.

8          Next.  And this is Grace's share.  Note how this

9 difference between the green and the blue gets narrower as we

10 go forward in time.  And this is showing how Grace's later

11 dates of first exposure are producing claims against it in the

12 future for much longer than the rest of the industry.

13          Let's go to Step 3.  She's got to now estimate claim

14 dismissals.  Obviously, Grace isn't going to be expected to pay

15 every claim.  They didn't pay every claim in the past.  They're

16 not expected to pay every claim in the future.  Ms. Biggs

17 calculates dismissal rates for non-malignant and malignant

18 claims separately, and she does it by jurisdiction.  She uses

19 the jurisdiction's medical criteria.  She looks at judicial

20 legislative changes to such criteria and Grace's actual history

21 of claims resolution.  For malignant claims, she starts with

22 historical dismissal rates by disease and by jurisdiction.

23          Next.  And she assumes that the same dismissal rates

24 will apply in the future.  In other words, there's nothing in

25 the changes in the legal system that are going to cause Grace

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000525

1   to dismiss or not pay more malignant claims in the future than

2   they did in the past.  Now, it's a different story with non-

3   malignant claims.  In the past Grace was dismissing a small

4   percentage of those claims.  Ms. Biggs has calculated and

5   determined that in the future going forward Grace's dismissal

6   rate on non-malignant claims is going to be much higher.  For

7   example, in the State of Mississippi Ms. Biggs assumes that the

8   dismissal rate for non-malignant future claims will be 99

9   percent after 2004.  So that's Step 3.

10          Step 4 is to calculate the average payment values.

11  What she does here, as with her dismissal rates, she calculates

12  average payment -- value payments by disease type and

13  jurisdiction.  She starts with the historical values that Grace

14  was paying, and then she considers factors that are expected to

15  either increase or decrease those values over time.

16          Now, Mr. Bernick -- and, of course, these are shown

17  here on this chart, historical trends, increases in plaintiff

18  demands, and so forth.  Decreases, tort system changes, she's

19  factoring in the lack of a broken tort system and claimant

20  aging.  Now, Mr. Bernick displayed some charts this morning

21  showing mesothelioma claim values and how those have been

22  trending recently.  An example was the one at Page 57 of the

23  slide copies that Your Honor handed up -- were handed up to

24  Your Honor by Mr. Bernick.  That's the one that says Peterson

25  Mesothelioma Settlement Values.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000526

1       One line of that chart shows the average settlement

2  value of confidential companies studied by Dr. Dunbar, and it

3  shows a downward trend over the last few years.  Well, but Ms.

4  Biggs has confidential client data as well.  If I can switch --

5  could I switch to the ELMO for a minute?  Is that possible?

6                     (Pause)

7       MR. MULLADY:  Okay.  This is a little bit hard to

8  read on the screen, Your Honor.  I apologize for that.  I'll

9  see if I can make it clearer.

10      The three different examples that are provided by Ms.

11  Biggs -- is that going to work?  Yea -- here, Example 1,

12  Example 2, Example 3, there's actual Grace, and then there is

13  selected Grace.  And what is this -- what does this -- what is

14  this telling us?  Well, it's telling us that of the

15  confidential company data Ms. Biggs studied what we see here is

16  far from falling off a ledge in terms of values the way Mr.

17  Bernick claims the data show.  There are some defendants here

18  that actually experienced increases recently.  This little

19  spike here and another one right here, those are upward

20  trending values for mesothelioma claims.

21      And Grace is down here.  Her assumption for Grace is

22  this green line, selected Grace here.  So I think you'll see

23  when she comes here that she's made very conservative judgments

24  about the values of mesothelioma claims.  It's consistent with

25  the data that she has, and, obviously, there's a little bit of

**J&J COURT TRANSCRIBERS, INC.**

1  a dispute here between Dr. Dunbar and Ms. Biggs about what the

2  confidential company data is showing on mesothelioma values.

3  But there's no denying, from the chart that Mr. Finch showed

4  the Court this morning, that mesothelioma values have been

5  going up for some time.

6          The last step -- if we can go back to the regular

7  screen?  Take this down.  There are two more little steps in

8  her calculations.  Step 5 of her methodology --

9                          (Pause)

10          MR. MULLADY:  Step 5 is where she calculates the

11  future and pending claim liability.  She does this by year.

12  We're showing 2002 just as an example.  She takes the number of

13  claims estimated for that year.  She then eliminates claims

14  based on her calculated dismissal rates by disease type and by

15  jurisdiction.

16          Next, please.  And that leaves the claims on which

17  Grace would be liable to pay or the claims to pay.  And she

18  next averages or applies the average payment value that was

19  calculated for the year in question, and she multiplies the two

20  variables, the claims to pay by the average payment to get to

21  the total liability.

22          Next.  She does this for each and every year of

23  Grace's future liability, all the way to 2059.  We won't show

24  every year.

25          Next, please.  Resulting in -- no, I'm sorry.  We

CC-BLG000528

1  have to go back just to -- we got a little ahead of ourselves.

2  Should have -- okay.  One more.  Is that it?  Okay.  That's

3  Step 5.

4         Step 6 is to calculate the cash flow.  Grace's total

5  liability showing here on an undiscounted basis of 8.9 billion.

6  And based on the general time value of money principal, Ms.

7  Biggs applied a 5.25 discount rate to all future cash flows for

8  each year.  This process yields -- and this is again showing it

9  year by year and how it works.  This process yields a total

10 discounted liability for all asbestos claims of $3.8 billion.

11        The $3.8 billion -- if we can go to the next slide --

12 is broken out in this table by four disease categories that Ms.

13 Biggs reduced her claim matching to as set forth in these

14 column headers.  And you'll note -- if we can bring up the next

15 image?  You'll note, Your Honor, that 68 percent of the total

16 discounted liability of Grace, some 2.6 billion of the $3.8

17 billion is for mesothelioma liability.  This is why Mr. Bernick

18 said this morning all of his slides focus on mesothelioma for

19 this reason right here.  That number alone, that $2.6 billion,

20 is five times higher than Dr. Florence's estimate for all

21 claims, for all disease categories combined.

22        That's the magnitude of the difference in the

23 estimated liability that Grace seeks to impose through its

24 methodology.  That difference overwhelmingly impacts the future

25 claimants.  Thank you, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000529

172

1           THE COURT:  Mr. Bernick.

2                        (Pause)

3           MR. BERNICK:  Your Honor, I'm going to proceed in

4    reverse order and begin with the remarks that Mr. Mullady made

5    on behalf of the Futures Representative, and I'm just going to

6    go through the -- pretty much that sequence, but I want to make

7    sure that I return back to some of the legal questions that

8    Mr. --

9                        (Pause)

10          MR. BERNICK:  How about that?  Is that better?

11   Because I agree with Mr. -- Mr. Lockwood that, in fact, the

12   legal issues are very dominant issues and warrant the Court's

13   attention, because they drive an awful lot of what then appears

14   in the -- in the detail alone.

15          With respect to Ms. Biggs, the observation was made

16   that this is an analysis or a method that's not done for

17   litigation purposes like Mr. Florence's method is.  And, in

18   fact, we would submit, Your Honor, that the shoe is on the

19   other foot.  That Mr. Peterson's methodology, which, after all,

20   is actually prior in time to the Tillingnhast methodology and

21   set the model, in fact, was developed principally for

22   litigation purposes that isn't the context of disputes or

23   confirmations in court per claim.

24          Whereas, Dr. Florence's approach is not Dr.

25   Florence's approach.  That is a mistake that is made frequently

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000530

1  -- has been made frequently in the remarks here this afternoon.

2  Dr. Florence was the person who implemented the approach in

3  terms of looking at the data that satisfies the criteria that

4  were set by the scientists, which criteria are, in fact, the

5  criteria of science.  That is what hasn't been developed in the

6  courtroom.

7        There's a criteria of science that are dominant and

8  authoritative outside the courtroom and structures the entirety

9  of Grace's approach, whereas, if you look for those same

10 principles and criteria or the same analysis with respect to

11 the plaintiffs' estimation, it is not to be found.  Mr. Mullady

12 says that, well, gee, actuarial standards were designed to deal

13 with uncertain future events.  We would recognize that that's

14 true.  It just is a problem and a problem that's fundamental to

15 Ms. Biggs' analysis that in her case neither modeled nor

16 addressed future liability issues, that is legal liability

17 issues, nor was she qualified to develop such a model, nor does

18 she have a model, in fact, that even looks to the future events

19 that she purports to measure, which are not liability issues

20 but settlement activities in a way that follows the rule of

21 science.

22        The actuarial standard is read and is was very, very

23 clear.  It's general.  It gives broad permission.  The issue is

24 whether that method -- those standards, as applied in this

25 conduct -- context, meet the testing requirements of science.

J&J COURT TRANSCRIBERS, INC.

CC-BLG000531

1 She says she's -- she was attempting to be a scientist.  Dr.

2 Stallard says the same thing.  If you are going to measure

3 either settlements or future disease, you have to do so

4 scientifically.  The actuarials do not forgive you from

5 following science.  They permit you to follow science.

6         With respect to peer review, reference was made to

7 peer review, and again there has been no external peer review

8 of the model that you will hear about from Ms. Biggs.  The only

9 article that was made reference to is an older article.  The

10 older article -- if we could have the ELMO for just a second?

11 It's right here.  It's revealing, because when it comes to the

12 model that's being used -- it's hard to read here, but the

13 model that's being used simply uses selected annual severity

14 trends and trend severity, and it's basically arithmetic.  That

15 trend were -- nowhere considers under this article any of the

16 elements of her model, nowhere considers an industry benchmark,

17 nowhere considers epidemiological trends of any kind, nowhere

18 considers Manville, nowhere considers propensity.  All it does

19 is to look for a trend -- a very general trend.  This paper in

20 no way, shape, or form even reveals publicly what her model was

21 much less constitutes a peer review.

22         Mr. Mullady sought to correct the statement that I

23 made where I indicated that Ms. Biggs' were -- her propensity

24 were -- was not based upon public companies but rather the

25 Manville Trust.  Mr. Mullady says, well, the industry benchmark

**J&J COURT TRANSCRIBERS, INC.**

1    did consider other companies.  Yes, it's true.  With respect to
2    the historical industry benchmark, that was based upon Manville
3    and other companies.  The key is what is the future trend, and
4    when it comes to the future trend, the future trend that drives
5    this curve that is at issue, that curve -- the shape of that
6    curve is purely and simply a function of the Manville trust
7    taken first as a smooth process then as a (indiscernible) then
8    as a decay process never before seen the light of day.

9            There was reference made to the moratorium agreement
10   by way of explaining why the propensity of rates may have
11   shifted.  Ms. Biggs did talk about that in her deposition and
12   report.  She did no quantitative analysis that demonstrate that
13   the dip that took place in propensity or the spike was in any
14   way, shape, or form actually a function of the moratorium
15   agreement experiment.  She simply said it and didn't do the
16   analysis.  Dr. Dunbar did do the analysis.  The analysis shows
17   that that theory is false.

18           With respect to the selection of 1997 as the period
19   for calibration, that was purely and simply her judgment.
20   There was no statistical testing.  She didn't pick it out in
21   order to put boundaries on moratoria.  She picked it out to out
22   balance in some rough fashion the fact that there was this huge
23   aberrational spike.  But, of course, it wasn't sufficient to do
24   that.  She says or Mr. Mullady says that the date of first
25   exposure analysis indicates that because Grace products were

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000533

1  later in exposure, the whole curve should be shifted all the

2  way out to 2049.  In fact, according to the Nicholson analysis,

3  which drives Dr. Peterson's work, the continuing resonance of

4  the alleged date of first refusal -- first exposure requirement

5  should end about 2027 not 2049.

6          There's reference made to confidentiality -- this

7  confidential client data.  It's true that we knew it was

8  confidential client data, but what's different about our

9  analysis is that the confidential client data has actually a

10 deploy of curves.  She looks at confidential client information

11 and then doesn't deploy the curves.  She uses rather the

12 propensity, which is based upon the Manville analysis.  And

13 further, our confidential client information is then confirmed

14 and verified by publicly available information from both the

15 SEC filings and the very prominently important solvent

16 continuing companies in the tort system.

17          That then brings me to Union Carbide.  There was a

18 statement that was made with respect to Union Carbide.  Yes,

19 Union Carbide was considered by Dr. Peterson, maybe even been

20 considered by Ms. Biggs, but only as of 2001 neither one of

21 these individuals had taken the most solvent company still in

22 the tort system and actually plotted what its experience is.

23 We had to bring that out on cross examination of their expert.

24 It turns out that the Carbide experience is going down.  The

25 bubble is -- the bubble has burst.


**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000534

1          Finally with respect to the analysis of Ms. Biggs, it
2   was pointed out at great length in connection with her -- at
3   great length it was pointed out by Mr. Mullady that somehow
4   there's a due process problem in any effort to some of the
5   assigned future values or future demands at zero value is a due
6   process problem, but yet his own expert by his own admission --
7   that's what the graphics indicated -- basically takes people
8   out of the equation, and there's a reason for it.   Due process
9   does not require that you over fund or give people rights that
10  they don't have, give them values that they don't have.   Due
11  process requires -- is a procedural requirement.   It doesn't
12  actually indicate that you must come up with a value in any
13  way, shape or form.
14          Talking about Ms. Andersion, a reference was made
15  that Ms. Anderson uses an average rather than an accounting or
16  individual variation than the concentrations that individual
17  workers might experience, and, in fact, Ms. Anderson did use an
18  arithmetic mean, and the real issue is did that introduce bias.
19  That is because she used an arithmetic method that contemplates
20  that there will be elements -- there will data on both sides,
21  but the mean is still representative if you have an appropriate
22  distribution.   The statement was made this is counterfactual.
23  That there are people who, in fact, have higher exposures and
24  lower exposures.   The interesting thing is that's a statement
25  that's made by Mr. Stallard not on the basis of anything.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000535

1  There's not a single data point -- there's not a single

2  distribution analysis that's been done by the other side at

3  all.  This is simply a theory.  It's not counterfactual.  This

4  is, in fact, the way things are done.  They don't have data

5  that says otherwise.  In fact, the EPA actually and clearly

6  said that the average concentration is the most representative.

7  This is an EPA publication, 1992.  This is standard affairs,

8  standard approach.  The EPA uses it all the time.  Dr. Anderson

9  worked for the EPA.  It then turns out that, of course, Dr.

10 Stallard did not.

11      Finally with respect to remarks that were made by Mr.

12 Mullady.  He says that we assign no value to the future -- to

13 certain futures as if, of course, all futures must have some

14 value.  There's no requirement in the Code that all futures

15 must get some value.  The only requirement in the Code is that

16 futures be treated in the same fashion as the currents.  So

17 whatever the appropriate treatment is for the currents, that is

18 the entitlement of the futures.  They're not entitled to any

19 less, and they're not entitled to any more.

20      And that then brings me to the game board, and all

21 I've got to say about the game board is -- that's the wrong

22 board.  It's the wrong game.  That board describes nothing that

23 we're doing in this case.  We are not doing anything that says

24 with respect to futures you can't get this, you can't get that,

25 you must file this, you must file that.  That will be

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000536

1 determined by a plan.  The plan will spell that out within the

2 limits of the law.  In fact, the plan that's on file doesn't

3 actually hamstring the treatment of the futures in any way.

4 What it says is that futures will not be obliged to settle or

5 to litigate.  They will have an option.  Current claimants will

6 not be obliged to settle or litigate.  They will have an

7 option.  So no criteria are being imposed upon them in advance.

8 If they want to, just like the current claimants today, they

9 can litigate.  That is entirely within the purpose and intent

10 of the Code.

11    That then brings me to remarks that were made by Mr.

12 Finch, and I will be brief with respect to Mr. Finch, because I

13 do only have a couple minutes to talk about the law.  With

14 respect to Mr. Finch, he says, well, now, Dr. Peterson, we said

15 that there weren't more claimants, but, in fact, there were

16 more claimants coming into the system.  We never said that

17 there weren't more claimants.  What we said is that you can't

18 account for the increaed propensity against Grace by new people

19 coming into the system.  You can only count for them by having

20 -- that is magnitude in spike by the same number of existing

21 claimants actually proceeding against Grace and other companies

22 that they wouldn't have been proceeding before.  It's the whole

23 idea of the same basic number, maybe slightly increased,

24 increasing the number of people that they sue thereby driving

25 up the propensity of all the defendants.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000537

1       Mr. Finch indicated, well, we used Johns Manville,

2  because Manville gets 90 to 100 percent of the cases.  That's

3  the whole problem.  They're treating Grace as if Grace is

4  liable for all of Manville's liability.  Manville accepts

5  liability for all products, not just Grace, for everybody.  So

6  by treating Grace the same way as Manville, we are treating --

7  they are treating Grace as if it's responsible for the asbestos

8  liability stemming from any exposure whatsoever.

9       Mr. Finch says, well, we did look at other -- Dr.

10 Peterson did look at other companies.  USG and Turner and

11 Newell as of 2001.  Well, that's intersting.  USG was on the

12 verge of bankruptcy in 2001.  Turner and Newell through

13 Federal-Mogul was on the bridge of bankruptcy in 2001.  What

14 about companies after 2001?  Dr. Peterson didn't consider a

15 single company after 2001.  All he considered was the Manville

16 Trust.

17      Union Carbide in 2001 -- Union Carbide was -- had

18 just been basically targeted by the plaintiffs' bar.  Their

19 propensity was skyrocketing.  What about Union Carbide in '03,

20 '04, and '05 when they got control of their litigation, and the

21 propensity against them fell like a stone?  Nowhere considered

22 by Dr. Peterson.

23      What about Grace?  Mr. Finch says, well, late in 2006

24 insurance executives at W.R. Grace actually sent the Peterson

25 report to the insurance companies, thereby indicating, oh,

J&J COURT TRANSCRIBERS, INC.

CC-BLG000538

1  well, I guess we're signing on to Dr. Peterson for purposes of

2  the insurance reserves.  That's completely false.

3          That memo, which we will show to the Court, actually

4  said in exactly the same breath here's so and so.  Here are

5  some of the Peterson reports.  You can follow on the rest of

6  the exhibits on bankruptcy filings along with all of the other

7  expert reports.  He's simply saying, you want this stuff?  It's

8  here.  You can take a look at it.  We want our money from you.

9  Yes, actually, it says, "I can copy the Peterson report

10  approximately (indiscernible), or you can find the report and

11  all other filings on the Grace bankruptcy on the Delaware

12  Bankruptcy Court's website."

13          That then brings me to Mr. Lockwood, and I think Mr.

14  Lockwood has raised some -- an interesting analysis of the law,

15  and I think actually the track that he traces through some of

16  the law, I would agree with a lot.  It's just that like their

17  model it deviates at just all the critical parts.  He indicates

18  that with respect to these companies, well, why -- you know,

19  it's just crazy.  Is this some bright idea?  No, the companies

20  have had different perspectives.  Armstrong World Industries

21  never set out on the road with these cases to define or resolve

22  through some definition what its liability was.  The company

23  made a deliberate decision at the very beginning of the case

24  just for peace and to get the case behind them in part because

25  they didn't believe that their liability picture was such that

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000539

1 it would make a difference (indiscernible) liability.  Owens-

2 Corning, same thing.  The -- Owens-Corning had done deals with

3 the claimants bar going back to the mid-1990s.  They were never

4 going to go into Chapter 11 to dispute liability.  Federal-

5 Mogul was so swamped with so many other liability problems, the

6 asbestos problem would've made a difference.

7          By contrast, USG and Grace -- USG and Grace are two

8 companies that were very robust companies, very solvent

9 companies, and very well high performing companies but for the

10 asbestos.  It is not surprise that USG and Grace then decided

11 to go forward and try to use the Chapter 11 to define and

12 resolve the liabilities.  USG emerged, Gob bless them, with

13 very, very significant equity after lots of protestations from

14 Dr. Peterson.  USG emerged following an effort to define its

15 liabilities, and we know Judge Wolin's opinion in connection

16 with (indiscernible).  Grace is going down the same road.

17          Mr. Lockwood then says, well, what then is the

18 authority that we have for this idea.  He cites <u>Dow-Corning</u> and

19 <u>Dow-Corning</u> actually provides a very instructive lesson that

20 I'll cover very briefly.  It is true that both sides there

21 asked for an estimation.  It is true that Judge Spector there

22 decided no, and that he decided no, because he felt that the

23 most appropriate way to deal with this issue was through actual

24 litigation of the allowance process.  He also did, in fact,

25 decide, as Mr. Lockwood indicates, that that litigation would

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000540

1 | turn out common issues, and, therefore, it deployed a Rule 42.
2 | And it's also true that he didn't decide that, but then it kind
3 | of trailed off.  He just didn't do it, and that really misses
4 | the picture of the key part of Dow-Corning, which is he decided
5 | that that would be handled -- best handled by the District
6 | Court, in part because the District Court was also handling the
7 | Dow Chemical cases that had been transferred to the District
8 | Court -- the shareholder cases.

9 | Elsewhere in the MDL where proceedings were under way
10 | against other (indiscernible) manufacturers, there was a 706
11 | panel that had been empaneled.  So there was a likelihood that
12 | at some the District Court sitting in connection with the Dow
13 | Chemical cases would take up exactly the same issue, and for
14 | that reason he felt it was appropriate to send the whole thing
15 | upstairs, which he did.  And then the motions for sumamry
16 | judgment based on Daubert were pending bofre the District
17 | Court.  Indeed, I argued them to the District Court, and at
18 | that time, because what the 706 panel did -- prices came down
19 | in the marketplace.  There was a big push by the claimants to
20 | reduce their demands, and the case resolved.  The plan also
21 | wasn't struck.

22 | So what do we see from Dow-Corning?  Number one, the
23 | allowance and disallowance process focuses on the merits.
24 | Number two, estimation focuses on the merits.  It doesn't focus
25 | on anything else.  They're birds of the same kind of feathers.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000541

1  Different procedures.  The same focus, which is the merits.

2  Mass tort is amenable to be handled pursuant to those kinds of

3  procedures.  Common issues work particularly on generic

4  causation, although there's nothing there that says it can't be

5  used for what I'll call common issues that affect the specific

6  causation.

7          So Dow-Corning takes us way down the road saying it's

8  the merits, merits, merits, whether it's estimation or

9  allowance.  It also helps, Dow-Corning indicates, that you

10 focus on the merits in order to get plan resolution, in order

11 to get consensus, because it helps focus the controversy and

12 what real liability is.

13          Dow-Corning also supplies the answer to the other

14 basic question that Mr. Lockwood raised.  That basic question

15 is, well, what are we doing here.  He says here there's no

16 agreement.  That's correct.  Here, because there's no

17 agreement, the question that we impose is what's the legal

18 liability.  That is what can we be obliged to pay?  Yes, that's

19 right.  And your answer to that -- that's our position.  I

20 didn't hear an answer to that.  He then says our view is that

21 502(b) governs, because that deals with allowance.  We said

22 yes, we believe that's right, because it tells us what the

23 standard is.  We didn't hear an answer to the 502(b) analysis.

24          He then says, well, there are a bunch of mechanisms

25 that we put in place, bar date, PIQ, experts.  Yes, those are

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000542

1  all mechanisms that are designed to focus on the merits,

2  traditional litigation.  Didn't hear any question about that

3  those are not the traditional methods that are used in

4  discovery and litigation.  The only criticism we heard is that

5  none of our experts is a lawyer.  Well, they don't have to be

6  lawyers.  We are the ones that are telling them here's the

7  issue.  It's then their job to find out the scientific answer

8  to that issue.  Dr. Florence doesn't have to be a lawyer, and

9  we don't have to bring in a whole set of lawyers like Mr.

10  Snyder ot tell us what the stsandard is that ought to govern

11  science, because we're all lawyers.  We're capable and the

12  Court's capable of understanding the standards of the law to

13  which the science must fit.

14          Where is Grace going with its number?  That was the

15  next question that was posed.  The answer is very simple.  Just

16  as Your Honor indicated, Grace is going with its number towards

17  the plan formulation -- plan formulation.  What plan?  Well, we

18  have a plan on file, but we've been candid that that plan could

19  be revised.  We hope that their plan would also be revised.

20  What will that plan call for?  We'll see.  That's not before

21  the Court here.

22          However, Mr. Lockwood, inviting scrutiny down the

23  road and kind of looking (indiscernible) and says, well, it's

24  clear right now.  There can only be two alternatives.  Either

25  the criteria are baked into the TDP of the trust, or if they're

CC-BLG000543

1 not, more is paid, and the trust runs out of money.  He said I

2 can't think of another alternative.

3         There is another alternative.  You don't have to bake

4 the criteria into the TDP.  You can use the criteria in order

5 to have a TDP that says if people want to settle it on the

6 basis of those criteria and pricing, that's an option.  And if

7 people do not want to settle, they are still free to litigate

8 their claims.  And that's an option that is clearly out there.

9 You know what?  That's exactly what the Dow-Corning plan did.

10 It set out the criteria.  It says you can go in, you can buy

11 in, you can settle, or you can litigate.  Here's the case

12 management order.  It will all take place in Federal Court

13 pursuant to rules that are applicable in Federal Court.  That

14 was the one that was approved over objection.  That's the one

15 that's now in place, and I'm happy to tell the Court, as Mr.

16 Austern will be able to attest, that over, over, overwhelmingly

17 the Dow-Corning claimants are not opting for litigation.

18 They're opting for settlement, and the trust has been a

19 successful trust.

20         Will there be a cap?  There may be a cap.  If there

21 is a cap, the Code nowhere says we can't have a cap, but it

22 does say that we would have to raise that issue with the

23 District Court.  We are not raising that issue now.  We are

24 trying to get the estimate out, so we can get a plan.

25         Very, very quickly a couple of other points, and I'm

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000544

1  done.  _Daubert_.  Two uses of _Daubert_.  Mr. Lockwood says, well,

2  gee, what we using it for?  Number one, it is a threshold

3  requirement to have any of the testimony that comes in on

4  estimation satisfy _Daubert_.  Regardless of what the claims are,

5  you can't do the estimate unless the estimate is done

6  scientifically.  Obviously, it is our view that they don't

7  satisfy the requirements of _Daubert_, because they don't follow

8  in a reliable methodology.  They disagree.  That's issue one.

9       Issue two is, well, what would happen if the cases

10  were litigated pursuant to the requirements of _Daubert_?  That

11  is in a follow on litigation process in Federal Court, which

12  ones would survive?  Again, the totally legitimate use, but we

13  do not seek to preclude those claims on that basis.

14       What about Rule 408?  Again there was reference to

15  the _Babcock_ case.  The holding of _Babcock_ was that in taking a

16  look at what the past liability was at the time of an alleged

17  fraudulent conveyance you could use the co-temporaneous

18  assessments of settlement liability to determine what it was in

19  that contest is past liability.  You could use past

20  settlements.

21       Here we're talking about something else, which is

22  using past settlements to say here's what the future disputed

23  liability is.  That is not what happened in the _Babcock_ case,

24  never spoke to it.  Indeed very specifically Judge Brown said

25  nothing that I'm doing in this opinion speaks to the question

CC-BLG000545

1  of what kind of estimates or what kind of liability
2  determinations will be made at a later stage in this case.
3  There was an indication that somehow the Judge -- Judge Vance
4  rejected the position that we're arguing for here saying it
5  just wasn't feasible.  I don't know.  I was in that case, and
6  that's not what Judge Vance did.

7          All of those objections were made in advance.  Mr.
8  Inselbrook stood up and gave a passionate speech about how it
9  was infeasible, couldn't be done, and she decided through the
10  bar date anyhow, and she decided through the claim forms
11  anyhow.  What happened was we then litigated fraudulent
12  conveyance.  We didn't litigate the motions for summary
13  judgment.  Litigation for fraudulent conveyances took place.
14  We were fortunate in prevailing.  The company then wanted to
15  seek a resolution instead of seeking out how long it would take
16  in court.  The Judge never ruled on the pending motions, never
17  said that they were not viable, but the settlement process took
18  over.  In fact, I'm sure that Mr. Inselbrook would applaud.

19          Finally, asbestos -- asbestosis not necessary.  This
20  is a point made by Mr. Finch.  Asbestosis is not necessary, and
21  this is the point.  For those people, either have asbestosis by
22  radiograph or by pathology, it is true pathology is another way
23  to go.  We specifically looked to see if there were a lot of
24  pathology samples.  There are very, very few.  So
25  overwhelmingly the alternative is x-ray.  That's why we focused

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000546

1  on x-ray to determine whether the information that was coming

2  from the B readers was sufficiently reliable to be -- pass the

3  Daubert standard.

4         A statement that was made that Mr. Dunbar somehow

5  does estimation their way, Mr. Dunbar has on occasion done

6  estimation their way when the inputs that are available require

7  it.  But when the inputs are different, estimations can be done

8  in different ways depending upon the issues that are posed.

9  And Mr. Dunbar is fully on board with this case with how this

10  case is run.

11         Finally with respect to Rule 702, Mr. Finch says you

12  don't have to do science under 702.  Well, that's true.  If you

13  don't purport to be doing science, 702 doesn't apply.  They

14  purport to be doing science.  Every single one of their experts

15  says I am doing science, and when you purport to do science,

16  you've got to do it.

17         They say, well, these methods are used not only

18  inside the litigation process, but they're also used outside.

19  And it's true, that would be a consideration, but it's a

20  minimum consideration.  That is if you don't even live up to

21  the standards that you have outside with what you're doing

22  inside, you've got a problem.  But just because you bring into

23  the courtroom a purported method that you use outside doesn't

24  mean that it somehow satisfies the Daubert standard.

25  Otherwise, if it's junky outside, it qualifies inside.  So it

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000547

1  has to be at least as good.

2          In the same fashion acceptance is important.  It

3  should be accepted, but the mere fact of acceptance doesn't

4  make it right.  The key thing is what are the standards for

5  science outside and inside, the standards, and there the

6  standards articulated by their own experts focus on

7  predictability, focus on reliability, focus on being data

8  driven, and they flunk those standards.  Again, there is no

9  data in this case -- no testimony in this case that these

10 methodologies had been shown to have any predictive value with

11 respect to a company still in the tort system.  Thank you, Your

12 Honor, for indulging us here this afternoon.

13          THE COURT:  Mr. Lockwood.  Mr. Bernick, if you need

14 to leave, you may leave.  I know that the debtor still has

15 other people here, so you -- if you need to go --

16          MR. LOCKWOOD:  He's finished --

17          MR. BERNICK:  Well, I'm mindful of our time limits,

18 and I will --

19          MR. LOCKWOOD:  According to the agreement he's

20 finished anyway, Your Honor.  You've got a main and a reply and

21 then you're done, so --

22          MR. BERNICK:  But under the agreement they also used

23 up all of their time.

24          MR. LOCKWOOD:  We did not.  We have --

25          MR. BERNICK:  Well, I think that that's --

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000548

1           MR. LOCKWOOD:  -- at least 20 minutes left.

2           MR. BERNICK:  Well, now see this is another -- this

3    is a problem we're having, Your Honor.

4           THE COURT:  I think by my calculation you actually

5    have ten, Mr. Lockwood.

6           MR. LOCKWOOD:  Okay.  Well, I'll take less than ten.

7    First, Mr. Bernick said that -- he recited his agreement with

8    me that, yea, they were insisting that their legal liability be

9    determined, and yea, they were relying on 502(b), and he says

10   we didn't have an answer to that.  Either he wasn't listening,

11   or I guess maybe I didn't make myself clear.  We do have an

12   answer for that.  Those are the tests for the allowance or

13   disallowance of claims, and that's not what is going on here.

14   That's the answer.  Five 0 two (b) is irrelevant.  Legal

15   liability is not the issue.

16          When discussing the issue of what the purpose of this

17   estimation is all about, Mr. Bernick's explanation was it's

18   about, quote, plan formulation, close quote.  Apparently, his

19   idea is that the parties in this case can come to a bankruptcy

20   judge and put on an 18-day trial for the purpose of the judge

21   giving him hints about what they ought to put in their plan.

22   I'm not aware of anything in the Bankruptcy Code that suggests

23   that that is an appropriate subject for a contested matter.

24   They've got a plan.  They formulated the plan.  If they think

25   it's got defects in it, they can change the plan.  When we get

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000549

1 the confirmation, if the Court says their plan isn't

2 confirmable, they can withdraw it and put in a new plan that

3 is.  Ditto for us.  That's the way it works.  We don't go out

4 and ask people for advice -- bankruptcy courts for advisory

5 opinions about how we ought to go about drafting plans that

6 meet confirmation standards.

7 　　　　　Apparently, he's so into advisory opinions that his

8 -- he wants to characterize Judge Brown's ruling on his 408

9 argument as an advisory opinion, because he says Judge Brown

10 wrote in his opinion that this -- I'm not deciding anything

11 anywhere about any matter that matters except for the purposes

12 of this case.  So, in other words, Rule 408, one ticket, one

13 ride.  That case only, can't be used for precedential effect

14 anywhere else, even though that's the only case that that has

15 been cited by the debtors in which anybody made a Rule 408

16 argument that remotely resembled the one that's being made

17 here, and it was rejected.

18 　　　　　Finally, he -- it's kind of cute the way he does this

19 what we're here about is science not what we're here about is

20 something other than science, a practice that doesn't -- isn't

21 physics.  And what is his source for the notion that when we

22 estimate the future liabilities of the debtor pursuant to

23 524(g), that's an exercise in science?  Let's see authority for

24 that.  Well, Dr. Peterson said that what he did he thought was

25 science, and Ms. Biggs said that she's -- she thought what she

CC-BLG000550

1 did was actuarial science, and, therefore, because they thought

2 what they were doing was science here, that means that it is

3 science.   It's pretty interesting that he's willing to take

4 their assertions on that point as gold and treat everything

5 else they have to say as dross.

6         The fact of the matter is Your Honor can figure out

7 perfectly well without the -- without testimony from either Mr.

8 -- Dr. Peterson or Ms. Biggs exactly what it is that's going on

9 here and trying to estimate the inherently unknowable.   It's an

10 estimation of something that's unknowable.   And with all due

11 respect to Dr. Peterson and Ms. Biggs and whatever bunch of

12 experts they may put up on their side, to say that that's an

13 exercise in science is ridiculous.   And, moreover, the -- by

14 that token, they haven't put on any expert of their own who has

15 testified that what they've done to exercise -- estimate their

16 liabilities is, quote, science.   What they've done is they put

17 on some people who say that their opinions on medicine and

18 industrial hygiene and risk analysis are some kind of science,

19 but those are only sort of pieces.

20         When it gets to Dr. Florence, I don't hear anything

21 about Dr. Florence talking about science.   And, moreover, even

22 if Dr. Florence did talk about science, at the end of the day,

23 as I said earlier in which Mr. Bernick has ignored, when he

24 says his experts aren't lawyers, but they don't have to be,

25 they're being asked collectively through Dr. Florence to tell

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000551

1  this Court what kind of a claim has legal validity, and that's

2  not science either.  Apart from the fact that it is an invasion

3  of the province of this Court to determine whether claims in a

4  proper setting under proper procedural protections for

5  allowance and disallowance do or do not meet the legal

6  standards for claim validity.  That's all I have, Your Honor.

7  Thank you.

8          THE COURT:  All right.

9          MR. FINCH:  Thank you very much, Your Honor, for

10  indulging us today.

11          THE COURT:  Okay.  We are -- Mr. Finch?

12          MR. FINCH:  No, we're --

13          THE COURT:  Okay.  We are adjourned until Wednesday

14  morning at 9:00.  Thank you.  Moana, will you hit that button

15  again, so it turns back on?  Okay.  Thank you.

16                          * * * * *

17

18

19

20

21

22

23

24

25

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000552

195

## C E R T I F I C A T I O N

We, TAMMY DeRISI, LYNN SCHMITZ, and PATRICIA C. REPKO, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

/s/ Tammy DeRisi                DATE:  January 17, 2008
TAMMY DeRISI

/s/ Lynn Schmitz_____
LYNN SCHMITZ

/s/ Patricia C. Repko_____
PATRICIA C. REPKO

J&J COURT TRANSCRIBERS, INC.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000553