UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              .      Case No.  01-1139 (JKF)
                                    .
W.R. GRACE & CO.,                   .
et al.,                             .      USX Tower - 54th Floor
                                    .      600 Grant Street
                                    .      Pittsburgh, PA 15219
              Debtors.   .
                                    .      January 16, 2008
. . . . . . . . . . . . . .         9:40 a.m.

                    'TRANSCRIPT OF TRIAL
        BEFORE HONORABLE JUDITH K. FITZGERALD
        UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:          Kirkland & Ellis, LLP
                          By:  DAVID BERNICK, ESQ.
                               BARBARA HARDING, ESQ.
                               JANET BAER, ESQ.
                               BRIAN STANSBURY, ESQ.
                               SALVATORE BIANCA, ESQ.
                               HENRY THOMPSON, ESQ.
                               SCOTT McMILLAN, ESQ.
                               ELLI LEIBSTEIN, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601

For W.R. Grace:           Kirkland & Ellis LLP
                          By:  DAVID MENDELSON, ESQ.
                          6555 Fifteenth Street, N.W.
                          Washington, DC  20005


Audio Operator:           Cathy Younker

Proceedings recorded by electronic sound recording, transcript
            produced by transcription service.

---

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609)586-2311     Fax No. (609) 587-3599

D117862

TRIAL EXHIBIT 11
CC-BLG000554-000814

CC-BLG000554

APPEARANCES (CONT'D):

For the Asbestos
Creditors Committee:      Caplin & Drysdale, Chartered
                              By:  PETER LOCKWOOD, ESQ.
                                  NATHAN FINCH, ESQ.
                                  WALTER SLOCOMBE, ESQ.
                                  ADAM VAN GRACK, ESQ.
                          One Thomas Circle, NW
                          Washington, D.C.  20005

                          Caplin & Drysdale, Chartered
                          By:  ELIHU INSELBUCH, ESQ.
                          375 Park Avenue, #3505
                          New York, NY  10152

For the Debtors:           ARPC
                          By:  AMY BROCKMAN, ESQ.

For W.R. Grace:           W.R. Grace
                          By:  JAY HUGHES, ESQ.
                                    RICHARD FINKE, ESQ.
                          7500 Grace Drive
                          Columbia, MD  21044

For the Equity
Committee:               Kramer Levin Naftalis & Frankel
                          By:  GREGORY HOROWITZ, ESQ.
                                    PEGGY Farber, ESQ.
                          919 Third Avenue
                          New York, NY  10022

For the
Unsecured Creditors'
Committee:               Stroock & Stroock & Lavan
                        By:  ARLENE KRIEGER, ESQ.
                          180 Maiden Lane
                        New York, NY  10038-4982

for the Property
Damage Committee:     Bilzin Sumberg Baena Price &
                           Axelrod LLP
                        By:  MATTHEW KRAMER, ESQ.
                        200 South Biscayne Boulevard
                        Suite 2500
                        Miami, FL  33131

For :                 Drinker Biddle & Reath LLP
                        By:  ROBERT K. MALONE, ESQ.
                        500 Campus Drive
                        Florham Park, NJ  07932-1047

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000555

APPEARANCES (CONT'D):

| | |
|---|---|
| For the Ad Hoc Committee of Equity Sec. Holders: | Dewey & LeBoeuf, LLP<br>By:  JENNIFER WHITENER, ESQ.<br>125 West 55th Street<br>New York, NY  10019 |
| For the Future Claimants Representatives: | Orrick, Herrington & Sutcliffe LLP<br>By:  ROGER FRANKEL, ESQ.<br>     ANTONY KIM, ESQ.<br>     RAYMOND MULLADY, ESQ.<br>     JOHN ANSBRO, ESQ.<br>     ANNIE WEISS, ESQ.<br>     GARRETT RASMUSSEN, ESQ.<br>     JOSHUA M. CUTLER, ESQ.<br>Washington Harbour<br>3050 K Street, N.W.<br>Washington, D.C.  20007<br><br>Orrick, Herrington & Sutcliffe LLP<br>By:  CATHARINE ZURBRUGG, ESQ.<br>666 Fifth Avenue<br>New York, NY  10103-0001 |
| For Committee of Asbestos Personal Injury Claimants: | Campbell & Levine<br>By:  MARK T. HURFORD, ESQ.<br>800 North King Street<br>Suite 300<br>Wilmington, DE  19701 |
| For Maryland Casualty: | Connelly Bove Lodge & Hutz, LLP<br>By:  JEFFREY WISLER, ESQ.<br>The Nemours Building<br>1007 North Orange Street<br>Wilmington, DE  19899 |
| For Travelers: | STB<br>By:  STERLING MARSHALL, ESQ. |
| For the Debtor: | NERA Economic Consulting<br>By:  STEPHANIE PLANCICH<br>1166 Avenue of the Americas<br>28th Floor<br>New York, NY  10036 |
| For Serengeti: | By:  BILLAL SIKANDER |

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000556

4

APPEARANCES (CONT'D):

| | |
|---|---|
| For Silver Point Capital: | Silver Point Capital<br>By: JOHN KU |
| For Halcyon: | Halcyon<br>By: JOHN GREENE |
| For the Debtors: | Pachulski, Stang, Ziehl &Jones<br>By: JAMES O'NEILL, ESQ.<br>919 North Market Street<br>17th Floor<br>Wilmington, DE  19899-8705 |
| For the Asbestos Creditors Committee: | Caplin & Drysdale, Chartered<br>By: BERNARD BAILOR, ESQ.<br>JAMES WEHNER, ESQ.<br>One Thomas Circle, NW<br>Washington, D.C.  20005 |

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For the Unsecured Creditors' Committee: | Strook & Strook & Lavan<br>By: LEWIS KRUGER, ESQ.<br>180 Maiden Lane<br>New York, NY 10038 |
| For Ad Hoc Committee: | Weil, Gotshal & Manges<br>By: M. JARRAD WRIGHT, ESQ.<br>1300 Eye Street NW, Suite 900<br>Washington, D.C.  20005 |
| For Official Committee of Asbestos Property Damage Claimants: | Dies & Hile LLP<br>By: MARTIN DIES, ESQ.<br>1601 Rio Grande, Suite 330<br>Austin, TX  78701 |
| For Various Claimant Firms: | Stutzman, Bromberg, Esserman & Plifka<br>By: DAVID J. PARSONS, ESQ.<br>VAN J. HOOKER, ESQ.<br>SANDER L. ESSERMAN, ESQ.<br>2323 Bryan Street<br>Suite 2200<br>Dallas, TX  75201 |
| For Fireman's Fund: | Stevens & Lee, P.C.<br>By: JOHN DEMMY, ESQ.<br>DAVID R. BEANE, ESQ.<br>1105 North Market Street, 7th Fl.<br>Wilmington, DE  19801 |

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000557

TELEPHONIC APPEARANCES (CONT'D):

For the Debtors:            Kirkland & Ellis, LLP
                            By:  THEODORE FREEDMAN, ESQ.
                            Citigroup Center, 153 East 53rd St.
                            New York, NY  10022

For the PD Committee:       Bilzin Sumberg Baena Price &
                              Axelrod LLP
                            By:  SCOTT BAENA, ESQ.
                            200 South Biscayne Boulevard
                            Suite 2500
                            Miami, FL  33131

For Owens-Illinois:         McCarter & English
                            By:  KATHARINE MAYER, ESQ.
                            Renaissance Centre, 405 N. King St.
                            Wilmington, DE  19801

For David T. Austern:       Piper Jaffray & Co.
                            By:  JONATHAN BROWNSTEIN, ESQ.

For Asbestos Property       Scott Law Group
Damage Claimants:           By:  DARRELL SCOTT, ESQ.
                            1001 East Main Street, Suite 500
                            Sevierville, TN  37864

For National Union Fire     Zeichner Ellman & Krause, LLP
Insurance Co.:              By:  MATTHEW RUSSELL, ESQ.
                                 ROBERT GUTTMANN, ESQ.
                                 MICHAEL DAVIS, ESQ.
                            575 Lexington Avenue
                            New York, NY  10022

For the Future             Orrick, Herrington & Sutcliffe
Claimants                    LLP
Representatives:            By:  DEBRA FELDER, ESQ.
                                 JOSHUA CUTLER, ESQ.
                            Washington Harbour
                            3050 K Street, N.W.
                            Washington, D.C.  20007 For

For Federal Insurance       Cozen O'Connor
Company:                    By:  JEFFREY WAXMAN, ESQ.
                            Chase Manhattan Centre
                            1201 North Market Street
                            Wilmington, DE  19801

J&J COURT TRANSCRIBERS, INC.

CC-BLG000558

```
TELEPHONIC APPEARANCES (CONT'D):

For Federal Insurance        Cozen O'Connor
Company:                     By:  JACOB C. COHN, ESQ.
                             1900 Market Street
                             Philadelphia, PA  19103


For Allstate Insurance:      Cuyler Burk, LLP
                             By:  ANDREW CRAIG, ESQ.
                             Parsippany Corporate Center
                             Four Century Drive
                             Parsippany, NJ  07054


For W.R. Grace:              W.R. Grace
                             By: WILLIAM CORCORAN, ESQ.
                             7500 Grace Drive
                             Columbia, MD  21044


For W.R. Grace:              Kirkland & Ellis LLP
                             By:  ELLEN AHERN, ESQ.
                             200 East Randolph Drive
                             Chicago, IL  60601


For State of Montana         Womble Carlyle Sandridge & Rice
Department of                By:  FRANCIS MONACO, ESQ.
Environmental Quality:       222 Delaware Avenue
                             Suite 1501
                             Wilmington, DE  19801


For Official Committee       Anderson Kill & Olick
of Asbestos Personal         By:  ROBERT M. HORKOVICH, ESQ.
Injury Claimants:            1251 Avenue of the Americas
                             New York, NY  10020-1186


For W.R. Grace:              Cohn Whitesell & Goldberg, LLP
                             By:  CHRISTOPHER M. CANDON, ESQ.
                             101 Arch Street
                             Boston, MA  02110


For CNA:                     Goodwin Procter, LLP
                             By:  BRIAN MUKHERJEE, ESQ.
                             Exchange Place
                             Boston, MA  02109-2881
```

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000559

TELEPHONIC APPEARANCES (CONT'D):

| | |
|---|---|
| For Grace Certain Cancer Claimants: | Montgomery, McCracken, Walker & Rhoads LLP<br>By:  NATALIE D. RAMSEY, ESQ.<br>300 Delaware Avenue, Ste. 750<br>Wilmington, DE  19801 |
| For David T. Austern, the Future Claimants' Representative: | Phillips, Goldman & Spence, P.A.<br>By:  JOHN C. PHILLIPS, ESQ.<br>1200 North Broom Street<br>Wilmington, DE  19806 |
| For W.R. Grace: | Pachulski, Stang, Ziehl & Jones LLP<br>By:  TIMOTHY P. CAIRNS, ESQ.<br>919 North Market Street<br>17th Floor<br>Wilmington, DE  19899-8705 |
| For the Asbestos Creditors Committee: | Caplin & Drysdale, Chartered<br>By:  JEANNA RICKARDS, ESQ.<br>LESLIE KELLEHER, ESQ.<br>One Thomas Circle, NW<br>Washington, D.C.  20005 |
| For the Asbestos Creditors Committee: | Ferry Joseph & Pearce, P.A.<br>By:  THEODORE TACCONELLI, ESQ.<br>824 Market Street, Suite 19899<br>Wilmington, DE  19899 |
| For Ford, Marrin, Esposito, Witmeyer & Gleser: | Ford, Marrin, Esposito, Witmeyer & Gleser<br>By:  SHAYNE SPENCER, ESQ.<br>Wall Street Plaza<br>New York, NY  10005 |
| For Pepsi: | Butler Rubin Salfarelli & Boyd LLP<br>By:  KIRK T. HARTLEY, ESQ.<br>70 West Madison Street<br>Suite 1800<br>Chicago, IL  60602 |
| For Official Committee of Unsecured Creditors: | Duane Morris LLP<br>By:  MICHAEL LASTOWSKI, ESQ.<br>1100 North Market Street, Suite 1200<br>Wilmington, DE  19801-1246 |

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000560

TELEPHONIC APPEARANCES (CONT'D):

For Official Committee Brandi Law Firm
of Asbestos Property By:  TERENCE D. EDWARDS, ESQ.
Damage Claimants: 44 Montgomery St., Suite 1050
 San Francisco, CA  94104

For the State of CA, Hahn & Hessen LLP
Dept. of Gen. Services: By:  STEVEN J. MANDELSBERG, ESQ.
 488 Madison Avenue, 14th Fl.
 New York, NY  10022

For Baron & Budd, Hogan Firm Attorneys at Law
et al.: By:  DANIEL K. HOGAN, ESQ.
 1311 Delaware Avenue
 Wilmington, DE  19801

For the PD Committee: Speights & Runyan
 By:  DANIEL SPEIGHTS, ESQ.
 200 Jackson Avenue, East
 Hampton, SC  29924

For Royal Insurance: Wilson Elser Moskowitz Edelman
  & Dicker LLP
 By:  CATHERINE CHEN, ESQ.
  150 East 42nd Street
  New York, NY  10017

For David T. Austern: Piper Jaffray & Co.
 By:  JASON SOLGANICK

For Scott Company: Vorys, Sater, Seymour & Pease, LLP
 By:  TIFFANY COBB, ESQ.
 52 East Gay Street
 Columbus, OH  43216

For London Market Mendes & Mount, LLP
Companies: By:  ALEXANDER MUELLER, ESQ.
 750 Seventh Avenue
 New York, NY  10019-6829

For Official Committee LECG, LLC
of Asbestos Property By:  ALAN MADIAN, ESQ.
Claimants:  ELIZABETH DEVINE, ESQ.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000561

TELEPHONIC APPEARANCES (CONT'D):

For Official Committee       Richardson Patrick Westbrook &
of Asbestos Property             Brickman, P.C.
Claimants:                   By:  EDWARD J. WESTBROOK, ESQ.
                             174 East Bay Street
                             Charleston, SC  29401

For Ivory Investment:        Ivory Investment
                             By:  DHANANJAY PATWARDHAN

For Linden Advisors:         Linden Advisors, LP
                             By:  CRAIG GILBERT

For O'Conner:                O'Conner
                             By:  John R. Wollen

For King Street              King Street Capital Management, LLC
Capital Management,          By:  MITCHELL SOCKETT
LLC:

For the Blackstone           The Blackstone Group
Group:                       By:  JOHN O'CONNELL

For Dune Capital Mgmt:       Dune Capital Management
                             By:  GUY BARON

For Anchorage Advisors:      Anchorage Advisors
                             By:  JONATHAN LEWINSOHN

For Lehman Brothers:         Lehman Brothers
                             By:  ANDREW CHAN

For Caxton Associates:       Caxton Associates, LLC
                             By:  JAMES RIEGER

For Dow Jones                Dow Jones News Wires
News Wires:                  By:  PEG BRICKLEY

For Citadel Investment       Citadel Investment Group
Group:                       By:  BEAU HARBOUR

For Murray Capital           Murray Capital Management, Inc.
Management                   By:  MARTI MURRAY

For Korn Capital, LLC:       Korn Capital, LLC
                             By:  STEPHANIE KWONG



**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000562

TELEPHONIC APPEARANCES (CONT'D):

For Millennium Partners:  Millennium Partners
                          By:  IGOR VOLSHTEYN

For Cetus Capital:        Cetus Capital
                          By:  GENTRY KLEIN

For Shareholder for       Tocqueville Asset Management
W.R. Grace & Co.          By:  PETER SHAWN

For Milbank Tweed         Milbank Tweed Hadley & McCloy
Hadley & McCloy:          By:  JEREMY HOLLEMBEAK, ESQ.
                          One Chase Manhattan Plaza
                          New York, NY  10005-1413

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000563

## I N D E X

| | PAGE |
|---|---|
| **WITNESSES FOR THE DEBTORS** | |
| HOWARD WILLIAM ORY | |
|     Direct Examination by Ms. Harding | 14 |
|     Voir Dire Examination by Mr. Finch | 26 |
|     Voir Dire Examination by Mr. Ansbro | 29 |
|     Continued Direct Examination by Ms. Harding | 37 |
|     Cross Examination by Mr. Finch | 73 |
|     Cross Examination by Mr. Ansbro | 112 |
|     Redirect Examination by Ms. Harding | 130 |
| | |
| DR. JOSEPH RODRICKS | |
|     Voir Dire Examination by Mr. Bernick | 146 |
|     Direct Examination by Mr. Bernick | 152 |
|     Cross Examination by Mr. Finch | 198 |
|     Cross Examination by Mr. Rasmussen | 235 |

| **EXHIBITS** | | **ID.** | **EVD.** |
|---|---|---|---|
| GG-2036 | Chart | 41 | 42 |
| GG-2037 | Table | 46 | 47 |
| GG-2040 | Document | 47 | 48 |
| GG-2041 | Document | 49 | 51 |
| GG-2043 | Document | 58 | 59 |
| GG-2044 | Document | 59 | 60 |
| GG-2045 | Document | 60 | 61 |
| GG-2047 | Document | | 64 |
| GG-2048 | Document | 66 | 67 |
| GG-2050 | Document | | 73 |
| ACC-571 | CDC NIOSH Deaths | 97 | |
| Ex. 614 | NIOSH CDC Report | 98 | |
| GX-580 | Risk Assessment Guidelines of 1986 (EPA) | | 188 |

1    (Audio malfunction; speakers at microphones 2 and 3 difficult

2    to discern)

3              THE CLERK:  All rise.

4              THE COURT:  Good morning.  Please be seated.  This is

5    the continuation of the personal injury estimation trial in

6    W.R. Grace, 01-01139.  The participants I have listed by phone

7    are Jennifer Whitener, Jarrad Wright, Daniel Hogan, Katharine

8    Meyer, John O'Connell, John Phillips, Igor Volshteyn, John

9    Demmy, Gentry Klein, John Wollen, Terence Edward, David

10   Parsons, Matthew Russell, Steven Mandelsberg, James Rieger, Peg

11   Brickley, Darrell Scott, Alex Mueller, Natalie Ramsey, Lewis

12   Kruger, Jonathan Brownstein, Andrew Craig, David Mendelson,

13   Ellen Ahern, Dhananjay Patwardhan, Stephanie Kwong, Daniel

14   Speights, Marti Murray, Brian Mukherjee, Michael Davis, Van

15   Hooker, William Corcoran, Janet Baer, Jonathan Lewinsohn, Mark

16   Hurford, Walter Slocombe, Peter Lockwood, Elihu Inselbuch,

17   Jeanna Rickards, Bernard Bailor, Leslie Kelleher, Theodore

18   Freedman, Jeff Waxman, Guy Baron, Scott Baena, Jason Solganick,

19   Christopher Candon, Joshua Cutler, Shayne Spencer, Peter Shawn,

20   Tiffany Cobb, Theodore Tacconelli, Andrew Chan, Craig Gilbert,

21   Robert Horkovich, Elizabeth Devine, David Beane, Alan Madian,

22   Michael Lastowski, Sander Esserman, Timothy Cairns, Kirk

23   Hartley, Debra Felder, Catherine Chen, Jacob Cohn, James

24   Wehner, Beau Harbour, Edward Westbrook, Martin Dies, Francis

25   Monaco, Robert Guttmann, Mitchell Sockett and Jeremy

                    J&J COURT TRANSCRIBERS, INC.

13

1  Hollembeak.  I'll take entries in Court.

2          MS. HARDING:  Barbara Harding, on behalf of the

3  debtors, Your Honor.

4          MR. BERNICK:  David Bernick for Grace.

5          MR. STANSBURY:  Brian Stansbury for Grace.

6          MR. McMILLAN:  Scott McMillan for Grace.

7          MR. FINCH:  Nathan Finch for the Asbestos Claimants'

8  Committee, Your Honor.

9          MR. INSELBUCH:  Elihu Inselbuch for the Asbestos

10 Committee.

11          MR. LOCKWOOD:  Peter Lockwood for the Asbestos

12 Committee.

13          MR. MULLADY:° Raymond Mullady for the Future

14 Claimants' Representative.

15          MR. ANSBRO:  Good morning, Your Honor.  John Ansbro,

16 also for the FCR.

17          MR. KRIEGER:  Good morning, Your Honor.  Arlene

18 Krieger from Stroock & Stroock & Lavan on behalf of the

19 Official Committee of Unsecured Creditors.

20          MR. HOROWITZ:  Good morning, Your Honor.  Gregory

21 Horowitz from Kramer, Levin, on behalf of the Official Equity

22 Committee.

23          MR. KRAMER:  Good morning, Your Honor.  Matt Kramer,

24 on behalf of the Property Damage Committee.

25          THE COURT:  Excuse me one second.  Okay.  Thank you.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000566

1   Good morning.

2          MR. FRANKEL:  Good morning, Your Honor.  Roger

3   Frankel for the Future Claimants' Representative.

4          THE COURT:  Thank you.

5          MR. RASMUSSEN:  Good morning, Your Honor.  Garrett

6   Rasmussen for the Future Claimants' Representative.

7          MR. KIM:  Good morning, Your Honor.  Antony Kim for

8   the FCR.

9          THE COURT:  Anyone else entering an appearance?

10  Okay.  Ms. Harding?

11         MS. HARDING:  Thank you, Your Honor.  The debtors

12  would like to call Dr. Howard Ory, please.

13         THE COURT:  Dr. Ory?

14         THE CLERK:  Could you raise your right hand, please?

15      DR. HOWARD WILLIAM ORY, DEBTORS' WITNESS, SWORN

16         THE CLERK:  Please be seated.

17                    DIRECT EXAMINATION

18  BY MS. HARDING:

19  Q    Good morning, Dr. Ory.

20  A    Good morning.

21  Q    Could you state your name for the record, please?

22  A    Howard William Ory.

23  Q    And what is your (indiscernible)?

24  A    I'm an epidemiologist.

25  Q    Where have you spent the majority of your career working

**J&J COURT TRANSCRIBERS, INC.**

Ory - Direct/Harding                                    15

1  as an epidemiologist?

2  A    At the U.S. Centers for Disease Control in Atlanta.

3  Q    The CDC, is that commonly referred to?   The CDC?

4  A    Yes.

5  Q    Where did you receive a degree in epidemiology?

6  A    From the Harvard School of Public Health.

7  Q    Now, you are also a medical doctor, correct?

8  A    That's correct.

9  Q    Where did you receive your medical degree?

10  A    Tufts University Medical School.

11  Q    Are you board certified or licensed to practice medicine?

12  A    I'm board certified in preventive medicine and licensed to

13  practice medicine in Georgia.

14  Q    How did you come to be involved in this matter?

15  A    Um --

16  Q    If you recall?

17  A    Well, I received a phone call from you asking if it would

18  be possible, if I would consider looking into the issue of

19  whether or not I could make an estimate of how much asbestosis

20  occurred in the U.S.

21          MR. FINCH:   Your Honor, before he gets into the

22  substance of his testimony, she hasn't proffered him as an

23  expert.   I have some voir dire in his qualifications before she

24  proffers him as an expert.

25          THE COURT:   All right.


**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000568

1     MS. HARDING:  I was intending to go through his

2  qualifications and training before I proffered him.

3     MR. FINCH:  Okay.  I thought she was going into the

4  substance of his opinion.

5     THE COURT:  All right.  Go ahead.

6  Q    The question I think I had asked you, Dr. Ory, is do you

7  recall why it if that you were contacted by me?

8  A    I believe it was because I did a -- performed a similar

9  function with regard to silicosis in a case before Judge

10  Jack.

11  Q    Okay.  Did you recall that I had seen your name in a

12  footnote of an opinion?

13  A    Yes.  I -- the analysis that I did was cited in her

14  opinion.

15  Q    Now, before we go into all of your qualifications and

16  training, I wanted to play for you, so you can listen, I'm

17  going to ask you a question about it, some statements were made

18  during oral argument on Monday in this case.  So, if we could

19  play that first clip?

20     THE COURT:  Is the screen --

21     THE CLERK:  It's on.  It's --

22     (Audio played)

23  Q    Dr. Ory, do you have opinions regarding the rates of

24  asbestosis and the rates of mesothelioma in the United States?

25  A    Yes.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000569

1          MR. FINCH:  Your Honor, he still hasn't been

2    qualified him as an expert.

3          MS. HARDING:  I'm not asking him to offer what his

4    opinions are yet.  I'm asking him to explain to the Court what

5    the substance and the subject matter of his opinions will be.

6    Q    And, Dr. Ory, is that the -- that kind of analysis that

7    you did in this case that -- that actually attempts to estimate

8    the incidence of asbestosis and mesothelioma currently and in

9    the future?  Is that right?

10   A    That is correct.

11   Q    Now, with respect to your qualifications to render

12   opinions on those issues, how long did you work at the CDC, Dr.

13   Ory?

14   A    23 years.

15   Q    What was your main work at the CDC?

16   A    Well, I'm an epidemiologist, and I did what

17   epidemiologists do at CDC.  I do disease surveillance, disease

18   causation, disease prevention.

19         MS. HARDING:  Put up Slide 2, please.

20   Q    You prepared a series of slides in this case, is that

21   right?

22   A    Correct.

23   Q    Do they accurately represent -- you've reviewed all of the

24   slides that we might put on the board today?

25   A    Yes, I have.

CC-BLG000570

1  Q     Do they accurately represent the opinions that you've

2  reached in the case?

3  A     They do.

4  Q     And do you think they'll assist the Court in understanding

5  your testimony?

6  A     I hope so.

7  Q     Okay.  Just explain, essentially, what an epidemiologist

8  does.

9  A     Right.  Well, the first thing an epidemiologist has to do

10 is determine how many cases of something are occurring -- say,

11 in the United States, and to determine -- and verify that those

12 are actually real cases.  And then -- that's sort of the

13 enumerator.  And then the denominator is that those cases occur

14 in some population, so you estimate the incidence rate, say, of

15 a disease in a population.  And then, studying the distribution

16 and causes of human disease, a large part of what we do is

17 causal research, attempting to determine, for example, does

18 asbestosis -- does asbestos cause mesothelioma?  Does high

19 blood pressure cause heart attacks?

20 Q     Okay.  I'm going to walk over and just ask you -- with

21 respect to the top, count and verify the number of people with

22 various diseases, is that often referred to as surveillance?

23 A     That would be disease surveillance.

24 Q     So, in disease surveillance at CDC, did you often have to

25 verify cases before you could determine how much disease there

J&J COURT TRANSCRIBERS, INC.

1  is?

2  A    Absolutely.  Very often we would be called and told

3  there's an epidemic occurring somewhere, and it's sort of the

4  first rule is you go out and you establish a case definition,

5  and then you count how many cases of the disease are actually

6  occurring.

7  Q    When you count how many cases of the disease are

8  occurring, how do you -- what kind of information do you use to

9  verify that there are cases of disease in a particular

10 population?

11 A    Well, you would use all sorts, but generally you would use

12 medical information, you would use medical charts, you would

13 use laboratory information, and so forth.

14 Q    In your 23 years at the CDC, did you or anyone else at the

15 CDC, any other scientists, have you ever used litigation claims

16 to verify the existence of disease?

17 A    I never did, and I don't recall ever seeing an example

18 like that.

19 Q    Now, Dr. Ory, how many scientific papers have you

20 authored?

21 A    More than 100.

22 Q    And do any of those papers involve asbestos?

23 A    No.

24 Q    Does the fact that none of the papers involve asbestos

25 render you to be somehow (indiscernible) to this Court about

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000572

1 the incidence of asbestosis and mesothelioma in the United

2 States?

3          MR. FINCH:  Objection, Your Honor.  That's a question

4 for the Court to determine.

5          THE COURT:  That is a question for the Court.  That's

6 an ultimate conclusion.  Sustained.

7 Q    Dr. Ory, in the course of your work at CDC, how often did

8 you encounter diseases that you were asked to investigate their

9 causes, their incidence, where you had not previously dealt

10 with that disease before?

11 A    Almost all the time.  For example, when I first came to

12 CDC I began to study the association of oral contraceptives and

13 cervical cancer.  Obviously I had no personal knowledge of oral

14 contraceptives, and cervical cancer, my training is in internal

15 medicine, so maybe I had seen a case or two of cervical cancer,

16 but it was not a disease that I knew intimately.  So, as we

17 always do, as any epidemiologist would have to do, I had to

18 learn the epidemiology of cervical cancer in order to study

19 that association.  The next thing I looked at was oral

20 contraceptives and blood clots.  And I certainly knew almost

21 nothing about the clotting system, and so I had to learn the

22 epidemiology related to blood clotting.  Likewise, when I

23 studied oral contraceptives and breast cancer, and ovarian

24 cancer, and uterine cancer, those are not the purview of an

25 internist.  Those are the purview of a gynecologist.  And so, I

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000573

1  had to learn all about the epidemiology of breast cancer,

2  ovarian cancer, and cervical cancer.  And so it is with every

3  disease I looked at.  When the director of CDC asked me to be

4  on the panel overseeing the study of Agent Orange that CDC

5  performed, I had to learn about Agent Orange.  When the

6  Director of CDC asked me to evaluate a report that the ATSDR

7  had written on TCE, I had to learn about TCE.

8  Q    Now, Dr. Ory, with respect to conducting your work as an

9  epidemiologist, count and verify the number of people with

10 diseases, estimate occurrence of disease, and compilations, the

11 study of (indiscernible) causes, are there standard

12 methodologies associated with the work of an epidemiologist in

13 those areas?

14 A    Yes, there are.  And -- there certainly are.

15 Q    And do you apply the same kind of methodology to the study

16 of each different disease in the same way, or in a different

17 way?

18 A    No.  They are more or less applied in the same way, just

19 altered to account for the particular disease you're dealing

20 with, but you're applying the same methods no matter what

21 disease you're studying.

22                          (Pause)

23 Q    (Indiscernible) summarize some of your work at the CDC.

24 I'm going to ask you just to (indiscernible) coordinate the

25 nationwide disease surveillance activity.  What was that?

CC-BLG000574

1  A     Every week every county in the United States submits data

2  on disease occurrences, I think it's about 200 diseases, that

3  occur, and it goes up through the county, to the state, to CDC,

4  and it's collected and collated.  And for part of my time at

5  CDC I was in the unit that was responsible for coordinating

6  that surveillance activity.

7  Q     You also taught (indiscernible) CDC, is that right?

8  A     Yes.  At that same time, actually, I was -- for two or

9  three years was responsible for overseeing the training of all

10 incoming EIS officers, and generally through the rest of the

11 time I was at CDC I was often involved in (indiscernible)

12 continuing education courses for senior staff.

13 Q     Now, you mentioned that you published over 100 --

14 A     Yes.

15 Q     -- scientific articles (indiscernible)?

16 A     Yes.

17          THE CLERK:  Excuse me.  Could you switch to that

18 mike?  You're getting a little choppy.

19          THE COURT:  You have to take the levelier (phonetic)

20 off, or we're going to get --

21                              (Pause)

22 Q     Okay, Dr. Ory, I'm sorry.  I think I was about to ask you

23 about your publications.  Can you just generally broadly

24 characterize the types of publications and research that you

25 did that was published in peer review literature?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000575

1 A    I published a lot of reports on causal epidemiology, that

2 is determining whether or not, say, oral contraceptives cause

3 breast cancer.  I published reports on surveillance-related

4 activities such as after we instituted surveillance at CDC to

5 determine the complications arising from hysterectomy and tubal

6 ligation I published on that subject.

7 Q    Are your publications typically types of epidemiological

8 studies, case control, or cohort, or that type of study?

9 A    Yes.  A lot of them are that.  Some of the work that I did

10 was quite similar to what I've been asked to do here.  And in

11 silica, where -- take information from one set of data and

12 estimate what might happen in another set of data, applying

13 that.  I would call that modeling.

14 Q    Okay.  Could you show 2033, please?  Now, this slide lists

15 some of your professional affiliations, and I think you've

16 already said that you're board certified in preventative

17 medicine, and you're also licensed to practice, is that in

18 Georgia?

19 A    That's correct.

20 Q    Okay.  And what is the society of epidemiologic research?

21 A    It's a society of epidemiologists.

22 Q    Okay.  So, it's other epidemiologists that are in that

23 society?

24 A    Yes.

25 Q    With respect to the American Epidemiologic Society, is

CC-BLG000576

1 that a society that you can just join, or do you have to be

2 invited by the members of the society to join?

3 A    You have to be invited and elected.

4 Q    And the American College of Preventative Medicine, what

5 does that body do?

6 A    Well, they -- that's who certifies me in preventative

7 medicine, and they do other activities in terms of prevention,

8 trying to promote prevention in the United States.

9 Q    Have you regularly given lectures to some of these groups?

10 A    In the past, yes.

11 Q    Okay.  After you left the CDC, I think -- was that 1994?

12 A    Yes.  I left in '94.

13 Q    What did you do upon leaving CDC?

14 A    I went to work for the Prudential Center for Healthcare

15 Statistics.

16 Q    And what did you do for Prudential?

17 A    I evaluated healthcare delivery information to try and use

18 it to feed back and improve healthcare delivery.

19 Q    Okay.  And when you say healthcare delivery information,

20 what kind of information were you reviewing?

21 A    Well, for example, like looking at medical outcomes, and

22 seeing if they were good outcomes or bad outcomes, and trying

23 to look at, like, different physicians, and see who had the

24 better rates, the kind of standard things that HMOs do these

25 days.

CC-BLG000577

1  Q     Okay.  When you left Prudential, what did you do next?

2  A     Actually, while I was at Prudential I began -- I started

3  doing independent consulting in epidemiology.

4  Q     Okay.  And have you been doing that ever since?

5  A     Yes.

6  Q     Okay.  And has most of your consulting been in the area of

7  litigation?

8  A     Most of it has, yes.

9  Q     Okay.  Have you -- about how many times have you testified

10 in Court, approximately?

11 A     I -- don't hold me to this, but I'm saying 12, 15,

12 somewhere in that order of magnitude.

13 Q     Okay.  Were you involved in the -- actually, let me ask

14 you this -- generally what kind of subject matters have you

15 consulted on and offered testimony in Court on in the past?

16 A     I've consulted on breast implants, pharmaceuticals --

17 those are the two that jump to mind.

18 Q     Okay.  With respect to breast implants, were you involved

19 in the Rule 706 panel and litigation before Judge Pointer?

20 A     Yes, I was.

21 Q     Okay.  What was your role in that litigation?

22 A     I was the testifying epidemiologist for the defense.

23 Q     Okay.  What opinion, or conclusion did you reach that you

24 offered to that panel?

25 A     In short, that the -- based on a giant body of

CC-BLG000578

1  epidemiologic evidence, there was no association between breast

2  implants and autoimmune diseases.

3  Q    Did the Rule 706 panel agree or disagree with your

4  conclusions?

5  A    They agreed.

6  Q    Dr. Ory, in the course of your consulting work have you

7  also continued to consult for the CDC?

8  A    Yes.  From time to time the director of CDC would call me

9  back to help with the -- on the issue of disease surveillance.

10            MS. HARDING:  Okay.  Your Honor, at this time I would

11  like to proffer Dr. Ory as an expert in the field of

12  epidemiology.

13            MR. FINCH:  Brief voir dire?

14            THE COURT:  All right.

15                    VOIR DIRE EXAMINATION

16  BY MR. FINCH:

17  Q    Good morning, Dr. Ory.  My name is Nathan Finch.  I

18  represent the Asbestos Personal Injury Claimants' Committee.

19  It's correct that you had never been recognized by a Court

20  anywhere as an expert on the subject matter of asbestos-related

21  diseases, correct?

22  A    That's correct.

23  Q    It's also correct that you have never treated a patient

24  with mesothelioma since you were in medical school in the

25  1960's, and that was one patient, right?

                    **J&J COURT TRANSCRIBERS, INC.**

1  A    I may have seen patients with asbestosis and mesothelioma

2  in medical school and internship.

3  Q    But you haven't treated any of them since -- from then to

4  now?

5  A    That's correct.

6  Q    And you've never been asked to render a diagnosis as to --

7  or, an opinion as to the cause of a particular person's

8  mesothelioma or asbestosis, correct?

9  A    In Court, that's correct.

10  Q    And you've never -- you've never conducted a study on the

11  epidemiology, or survey on the epidemiology of asbestos-related

12  disease, correct?

13          THE COURT:  I'm sorry.  Would you repeat that for me?

14          MR. FINCH:  Yes.

15  Q    You have never personally conducted any studies on the

16  epidemiology of asbestos-related disease, correct?

17  A    That's correct.

18  Q    And you have never published your opinions about the

19  incidence of asbestosis in any kind of peer reviewed medical

20  journal, correct?

21  A    That's correct.

22  Q    You've never published any opinions about the incidence or

23  prevalence of any asbestos-related disease in any journal in

24  the world ever, correct?

25  A    That's correct.  As it relates to asbestos.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000580

1  Q    As it relates to asbestos?

2  A    Yes.

3  Q    And you did not do a survey of all of the medical

4  literature that exists in the world that has statistics about

5  the incidence or prevalence of mesothelioma or asbestosis for

6  purposes of doing your work here, correct?

7  A    I've read an enormous amount of literature about

8  asbestosis and mesothelioma, and -- asbestos, mesothelioma, and

9  asbestosis.

10  Q    So, you've read everything -- all the literature that you

11  believe is relevant to this topic?

12          MS. HARDING:  Object to -- object, Your Honor, to

13  form.  It's overly broad.

14          THE COURT:  No, it's a fair question.  The doctor can

15  certainly answer --

16  A    I've read the literature that, to me, appears relevant to

17  this issue, yes.

18  Q    You read the insulator studies that Dr. Selikoff, and the

19  prevalence of asbestosis, and the incidence of mesothelioma,

20  and those studies?

21  A    Yes.

22  Q    The Mt. Sinai studies?

23  A    Yes.

24          MR. FINCH:  That's all the voir dire I have.

25          THE COURT:  Anyone else?

J&J COURT TRANSCRIBERS, INC.

1        MR. ANSBRO:  A couple of questions, Your Honor.

2                VOIR DIRE EXAMINATION

3   BY MR. ANSBRO:

4   Q    Good afternoon, Dr. Ory.

5   A    Good morning.

6   Q    Good morning.  Let's not get ahead of ourselves.

7            THE CLERK:  Your name again, please?

8            MR. ANSBRO:  John Ansbro for the FCR.

9   Q    Just following up on a couple of Mr. Finch's questions,

10  you've also not published any articles with respect to the

11  plausibility of asbestosis, have you, sir?

12  A    I don't know what you mean by the plausibility of

13  asbestosis.

14  Q    Plausible claims.  I anticipate that you're going to

15  testify here today, I've read in your report that you have

16  drawn opinions about the number of plausible cases of

17  asbestosis in the United States, correct?

18  A    I just would like to separate the two.  I am going to draw

19  opinions about the plausible cases.  I am not drawing an

20  opinion about how many claims there are.  I'm talking about how

21  many medical -- medically plausible cases, how many human

22  beings might actually have asbestosis, not how many people have

23  claims for asbestosis.

24  Q    You do, then -- we'll get to that in just a bit.  But with

25  respect to your opinions about the plausibility, medical

**J&J COURT TRANSCRIBERS, INC.**

1  plausibility, you have not written any articles on that topic,

2  correct?

3  A     That's correct.

4  Q     And with respect to the literature that exists over the

5  past 20, 25 years on the topics of mesothelioma, epidemiology,

6  and mesothelioma, causation of mesothelioma, causation of

7  asbestosis, you have not been a reviewer, a peer reviewer of

8  any of those articles either, have you?

9  A     Could you hold that question?  Could we go back to the

10 previous question?  Could you ask the previous question again?

11 I want to expand my answer.

12 Q     The question about plausibility of asbestos?

13 A     Yes.

14 Q     Asbestosis?

15 A     Yes.  Could you just read the previous question?

16           MR. ANSBRO:  May we have it back?

17                    (Pause)

18 Q     Well, let me just -- my question was, if I'm recalling it

19 right, that you had not authored any --

20           MS. HARDING:  I think he just wants to hear the

21 question back.

22           THE WITNESS:  The previous question, not this one.

23           THE COURT:  All right.  You can't keep talking and

24 have the Court reporter go back.  So, either you have to be

25 quiet and let her go back and get the record, or else you have

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000583

1  to re-ask the question.  You can't do both.  So, pick one.

2          MR. ANSBRO:  May we go back to the question before I

3  turned to the mesothelioma?

4          THE COURT:  All right.

5                         (Pause)

6          MR. ANSBRO:  May I read what I've --

7          THE COURT:  No, sir.

8                         (Pause)

9                    (Audio played back)

10         MS. HARDING:  That's the video of Dr. Biggs.

11         UNIDENTIFIED ATTORNEY:  That's the Biggs again.

12         THE COURT:  I know.  Cathy, do you not know how to do

13 it?

14         THE CLERK:  It's just not working, Your Honor.

15         THE COURT:  Kevin, Cathy needs some help replaying a

16 piece of the tape.  Could you please come up?  She said the

17 system isn't functioning properly, and there are Court

18 reporters here who are taking the record, but I can't use them

19 because it's not the official transcript, so if you could

20 please come up for a second?  Thank you.

21                         (Pause)

22         THE COURT:  That was going back to nine o'clock

23 yesterday, Cathy, not today.

24         THE CLERK:  No.  It went back to nine o'clock

25 (indiscernible).

                    **J&J COURT TRANSCRIBERS, INC.**

CC-BLG000584

1          THE COURT:  Okay.  Well, what was playing before was

2   Mr. Bernick.

3          THE CLERK:  I have the right date (indiscernible).

4          THE COURT:  All right.

5                          (Pause)

6          THE COURT:  Why don't we take a five minute recess?

7   It's apparently going to take a few minutes to get this done,

8   so we might as well get the system fixed.  All right.  Thank

9   you.

10                         (Recess)

11                     (Audiotape played)

12         THE COURT:  All right.  Cathy, can you stop this so I

13  can call the case back on the record?

14         THE CLERK:  Pardon me?

15         THE COURT:  You need to stop it so I can get the case

16  back on the record.  All right.  Is everyone back?

17         UNIDENTIFIED SPEAKER:  I believe so.  We're ready to

18  proceed, Your Honor.

19         MS. HARDING:  We're ready to proceed.

20         THE COURT:  All right, Cathy.  I think we can start

21  again, because it will come up quickly enough at this point.

22  Doctor and Mr. Ansbro, are you ready?

23         THE WITNESS:  I am.

24         THE COURT:  All right.  Okay, Cathy.

25         THE CLERK:  Do you want me to play it?

CC-BLG000585

1          THE COURT:  Yes.  I want you to -- do you know where

2    the question is?  Do you have go to --

3                    (Audiotape played)

4          MR. ANSBRO:  We can stop there.

5          THE COURT:  Now, Cathy, can you stop, please, and go

6    to the -- go to where you can start recording again.  All

7    right, Doctor, now you can --

8              CONTINUED VOIR DIRE EXAMINATION

9    BY MR. ANSBRO:

10   A    It was the question -- you asked that question, what was

11   the medical plausibility of asbestosis.  I didn't -- actually,

12   I don't understand what that question meant.

13   Q    I was asking you about whether you had published any

14   articles on the topic of the medical plausibility of the

15   incidence of asbestosis in the United States, let's say.

16   A    I still don't understand the question.

17   Q    What is it about my question that you don't understand?

18   A    Are you asking me if I published articles about the

19   incidence of asbestosis in the United States?

20   Q    We'll start with that one.  Sure.

21   A    I have not.

22   Q    Okay.  Now, with respect to what you characterize as the

23   medical plausibility of cases of asbestosis, which is the topic

24   of your report here, have you published any materials outside

25   of this case on this topic?

                    **J&J COURT TRANSCRIBERS, INC.**

CC-BLG000586

1  A     Well, let me --

2          MS. HARDING:  I'm just going to object to the

3  (indiscernible) term, medical plausibility.  I think that

4  there's a little bit of a disconnect.  I don't --

5          THE CLERK:  We're not picking you up.

6          MS. HARDING:  -- I think it mis-characterizes --

7          UNIDENTIFIED SPEAKER:  She's not -- you have to speak

8  into the mike.

9          THE COURT:  You have to speak into a microphone.

10          MS. HARDING:  I think it mis-characterizes the report

11  in terms of the use of medical plausibility.  I think he's --

12  plausibility of --

13          THE COURT:  The witness has already said he doesn't

14  know what you mean by medical plausibility, so the objection is

15  sustained.

16  Q     Dr. Ory, in your report you make reference to what you

17  characterize as medically plausible incidence of asbestosis,

18  yes?

19  A     Yes.

20  Q     What did you mean by that?

21  A     I mean a number of cases that could reasonably exist in

22  the United States, the number of actual cases of asbestosis

23  that could reasonably be held to exist in the United States.

24  Q     Okay.  And just so that we're clear, then, Doctor, so when

25  you -- when I use the term, and as you use the term medically

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000587

1  plausible, you're referring to a case that could reasonably

2  exist?  That's a real case that's been diagnosed and is --

3  that's asbestosis --

4  A    And I'm thinking here of sort of, like, when I count --

5  when I did a study of oral contraceptives and breast cancer, I

6  used the SEER data to tell me how many cases of breast cancer

7  existed in the United States as diagnosed and collected -- as

8  diagnosed by physicians and then collected by SEER and compiled

9  that way.

10 Q    Okay.  In this case, then -- let me -- when you use the

11 term medically plausible, then, are you suggesting that that's

12 something other than the patient actually has the disease by a

13 reliable diagnosis?

14 A    No.  That's what I'm suggesting, that the patient has the

15 disease by a reliable diagnosis by a physician.

16 Q    And am I correct in understanding that for cases that you

17 refer to as not medically plausible, in your view, is the case

18 that they do not have the disease, correct?

19        .    MS. HARDING:  Object --

20 A    All I'm talking about is how many cases -- I'm making an

21 estimate of the number of cases, as we've said before, that

22 could be diagnosed in a reliable fashion by a physician.  What

23 the other cases are, if there are cases above that, I don't

24 know what they are, but they don't fit my definition.  If there

25 are, for example, claims above that that suggests there are

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000588

1 more cases, I don't know what those might be.

2 Q    Understood.  Now, Doctor, I'm correct, am I not, that you

3 have not examined any of the current claimants in this case,

4 the claimants that have pre-petition lawsuits against Grace?

5 You have not undertaken any review of their medical records?

6 A    That's correct.

7 Q    And you have not reviewed the medical records that were

8 submitted in connection with the PIQ process, correct?

9 A    That's correct.

10 Q    With respect to the RAND claiming data, you make some

11 reference there to the RAND claiming information in your

12 report.  You have not undertaken a review of any of the medical

13 records of any of those claimants, have you?

14          MS. HARDING:  Your Honor, I'm going to object to this

15 line of questioning.  This is supposed to be a voir dire about

16 his qualifications to the analysis.

17          THE COURT:  You're getting into the merits.  That's

18 sustained.

19          MR. ANSBRO:  That's all I have, then, Your Honor.

20          THE COURT:  All right.  Anyone else?  Ms. Harding?

21          MS. HARDING:  Your Honor, I proffer the witness as an

22 expert in the field of epidemiology.  I don't know if there's

23 an objection.

24          THE COURT:  Anyone objecting?  There is no objection.

25 The witness will be permitted to offer an expert opinion in the

CC-BLG000589

1 field of epidemiology.

2                    CONTINUED DIRECT EXAMINATION

3 BY MS. HARDING:

4 Q    Dr. Ory, you conducted several different analyses

5 concerning mesothelioma and asbestosis rates of incidence in

6 the United States in this matter.  Is that correct?

7 A    That's correct.

8 Q    I'd like to just walk up to the board and talk about the

9 first inquiry.  Okay?

10 A    Okay.

11          THE CLERK:  I'm sorry (indiscernible).

12 A    Before you begin, could I ask you a question?  There was a

13 line of questioning you started down before we were interrupted

14 by the qualification question.  Did you want to go back to

15 that?

16 Q    I frankly don't remember what it was.

17 A    About the opening statements yesterday.

18 Q    No, we already -- I --

19 A    Okay.  About the opening --

20 Q    I think I've already asked you that.

21 A    Okay.

22 Q    Yes.  For now.  I'm going to come back to that.  Thank you

23 --

24 A     Okay.

25 Q    -- Dr. Ory.  The first analysis that you looked at in this

CC-BLG000590

1  case is you attempted to estimate the incidence of male

2  asbestosis that occurred in the U.S. from 1989 to 2001.  Is

3  that correct?

4  A    That's correct.

5  Q    How did you go about conducting that analysis?  What's the

6  first step that you took?

7  A    Well, the first step was attempting to look in the United

8  States to see if there was any information about the incidence

9  of asbestosis in the U.S., and I couldn't find any, and almost

10 anyone who has written on it said there are no reliable

11 information on that subject.

12 Q    Okay.  Was that the end of your inquiry?  Were you kind of

13 stuck?

14 A    No.  I began to think of an alternative way to do it.  I

15 know that there's excellent information in the United States on

16 mesothelioma incidence.  I know that mesothelioma incidence is

17 certainly a proxy for asbestos exposure.  That is the whole

18 guts of the Nicholson projection, for example, is based on that

19 fact.  And so, I know that asbestosis and mesothelioma are

20 caused by the same substance, and I figured there must be a way

21 to derive a ratio of asbestosis to mesothelioma.

22 Q    Okay.  The deriving ratios and calculating ratios, and

23 investigating studies, and looking for ratios, is that the work

24 of epidemiologists?

25 A    It's probably the bread and butter of epidemiology.  Every

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000591

1  study you read has a rate ratio in it.  Every occupational --

2  every occupational epidemiologic study probably uses an SMR,

3  which is called a standardized mortality ratio, so ratios are

4  ubiquitous in epidemiology.

5  Q    Is there any precedent in the scientific literature for

6  the creation of such a ratio between asbestosis and

7  mesothelioma?  The reason I ask that question is because you've

8  -- in your deposition you were asked questions about whether

9  what you did was novel.  And then I think you explained that,

10  yes, generally, it was.  But with respect to the idea and the

11  scientific credibility of doing it, is there any precedent for

12  that?

13  A    Again, as I mentioned earlier, the entire Nicholson

14  analysis is based on ratios.  Nicholson mostly didn't have

15  available exposure data, and so he made ratios of various

16  levels of mesothelioma rates in different occupational groups,

17  and used that to estimate the exposure.  So, in this field of

18  asbestos, and looking at future illness, there is considerable

19  precedent for doing this.

20  Q    Once you decided upon your methodology, what did you do

21  next?

22  A    I needed a database that had reliable, accurate, and

23  complete information on mesothelioma, and asbestosis, to create

24  such a ratio, and from previous work that I had done at the

25  CDC, I knew of the Boston Collaborative -- the BCDSP, the

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000592

1  Boston Collaborative Drug Surveillance Program, and I knew they

2  maintained a database that would probably have this kind of

3  information.

4  Q    Okay.  Could you tell the Court a little bit about -- is

5  it the GPRD?  Is that correct?

6  A    Right.  The --

7  Q    What kind of database is it?  What does it collect?

8  A    Right.

9  Q    What kind of information?  And where does it collect it

10  from?

11  A    Right.  The people in Boston work with the people in the

12  U.K.  In the U.K., the general practitioners are the

13  gatekeepers of healthcare, much like an HMO in this country, at

14  least for the National Health Service.  And so, they have

15  information on the entire medical treatment of all the people

16  in their practices.  And starting about 1989, this information

17  was computerized, and constantly validated, and massaged, and

18  made to be useful for epidemiology.  I think currently there's

19  some 500 epidemiologic studies published from the GPRD

20  database.  So, this is a highly reliable, accurate, complete,

21  validated data set in the U.K.

22  Q    Why was it particularly suited, or was it particularly

23  suited for your purpose?

24  A    Well, the main thing was after one phone call I determined

25  that, yes, they had information on both mesothelioma and

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000593

Ory - Continued Direct/Harding                    41

1  asbestosis in numbers sufficient enough to allow me to make a

2  fairly robust estimate.

3  Q    Okay.  So, did you use standard methods in creating this

4  -- the ratio between asbestosis and mesothelioma with respect

5  to the GPRD?

6  A    Very standard in the sense that I counted the cases of

7  mesothelioma -- the incident cases of asbestosis and I counted

8  the incident cases of mesothelioma, and divided the two numbers

9  and came up with a ratio.  That's pretty straightforward.

10 Q    Okay.

11      MS. HARDING:  Could you show 2036, please?

12 Q    Dr. Ory, could you take a look at this?  Is this the chart

13 that appears on -- 2036, is this an accurate representation of

14 the -- of your -- the conclusions and the final result of your

15 analysis of the GPRD for a ratio of asbestosis to mesothelioma?

16 A    Yes.  This looks like Table 1 in my report, and the main

17 part of it, really, is highlighted in yellow.  There were 751

18 incident cases of asbestosis in men, there were 794 incident

19 cases of mesothelioma in men in this time period.  That gives a

20 ratio of .95, and that -- and I then broke it down further by

21 age and time period, and the ratio didn't change at all.  I

22 made sure there was no confounding by age, or time trends.  The

23 unadjusted ratio and the adjusted ratio are both .95.

24 Q    What does the ratio of .95 to one, asbestosis to

25 mesothelioma, within this population, tell you?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000594

1  A    I means, essentially, that in this population essentially

2  for every person diagnosed with mesothelioma, there will be

3  about one, or slightly less than one diagnosed with asbestosis.

4  Q    Slide 2036, I think I asked this already, but I want to

5  just double check.  It accurately reflects the conclusion that

6  you reached in the analysis that you did with respect to the

7  ratio of asbestosis to mesothelioma in the GPRD.  Is that

8  correct?

9  A    Yes.

10       MS. HARDING:  Okay.  Your Honor, the debtors would

11  move into Evidence GG-2036.

12       THE COURT:  It's admitted.

13       UNIDENTIFIED ATTORNEY:  No objection.

14       UNIDENTIFIED ATTORNEY:  No objection, Your Honor.

15  Q    Dr. Ory, in getting to the ultimate question here, which

16  was what is the incidence of asbestosis in the United States

17  from 1989 to 2001, what did you do next with respect to the

18  ratio that you had derived from the GPRD data?

19  A    Well, I looked to see if the mesothelioma incidence in the

20  U.K. was higher or lower than it is in the United States, and

21  determined that the incidence in the U.K. was almost two and a

22  quarter, two and a half times higher than that in the U.K.

23       THE COURT:  Wait.  I'm sorry.  Would you say that

24  again?

25       THE WITNESS:  My answer?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000595

1       THE COURT:  Yes, please.

2           THE WITNESS:   looked to see if the incidence of

3   mesothelioma in the United Kingdom and in the GPRD was higher

4   or lower than the incidence of mesothelioma in the United

5   States.

6           THE COURT:  Yes.

7  Q    Why did you do that?

8           THE COURT:  No, I understand that that.  I just

9   didn't know which was higher, the U.S. or the U.K.

10          THE WITNESS:  The U.K. is higher.

11          THE COURT:  All right.  Thank you.

12 Q    And why did you look for that, and what did the fact that

13 it was higher tell you?

14 A    I wanted to make sure that the ratio that I developed was

15 not an underestimate.  I wanted to make sure that the ratio

16 that I developed was at least equal to the ratio in the United

17 States, or an overestimate.  And since asbestosis and

18 mesothelioma -- asbestosis is more dose dependent mesothelioma,

19 so if the mesothelioma rates are higher, I know the asbestosis

20 rates are probably even higher than that, so my opinion is that

21 the .95 to one ratio that I have developed in the U.K., in

22 fact, over represents the ratio in the United States.

23 Q    It was suggested in your deposition, Dr. Ory, that the

24 GPRD data did not capture as many asbestosis cases that were

25 actually occurring in that population.  What is your opinion

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000596

1  with respect to that criticism?

2  A    Well, first of all, the GPRD, you know, is a large study.

3  It has -- it covers information on three million people.  And

4  secondly, I now have compared the proportion of asbestosis

5  cases that the GPRD collects relative to that proportion --

6  relative to the number in the U.K., and I know that the

7  proportion that the GPRD collects is higher.  I'm not saying

8  this very clearly.  The GP -- let me start again, please?

9  Q    Sure.  That's fine.  It's a difficult concept.

10 A    The GPRD represents about 3.7 percent -- the GPRD monitors

11 about 3.7 percent of the people in the United Kingdom.  If --

12 so, if the number of asbestosis cases that the GPRD collects is

13 higher than 3.7 percent of the cases in the U.K., then I know

14 that the GPRD is not under representing asbestosis.  And I have

15 made that comparison, and, in fact, the GPRD collects about

16 two-and-a-half times as many cases as you would expect

17 proportionately.

18 Q    Okay.

19 A    Sorry.  That was not --

20 Q    That's okay.  Once you were certain that the ratio from

21 the U.K. did not -- would not underestimate the number of

22 asbestosis cases in the United States, what did you do to

23 derive or calculate the incidence of asbestosis in the United

24 States?

25 A    As I said, we knew the mesothelioma data in the United

J&J COURT TRANSCRIBERS, INC.

CC-BLG000597

1  States is very good, so I used the SEER mesothelioma data,

2  derived an estimate of the total number of mesotheliomas

3  occurring in the United States between 1989 and 2001, and then

4  applied the -- and that number was about 29,000, and then I

5  applied the .95 to one ratio to that, and that yielded about

6  27,970, or about 28,000 cases of asbestosis.

7  Q    And what time period would that cover?

8  A    That's 1989 to 2001.

9  Q    Before I ask you a little bit more about the final

10  analysis, the SEER data, you mentioned the SEER data, that's

11  the data that you used to -- for the incidence of mesothelioma

12  in the United States, is that right?

13  A    That's correct.

14  Q    Okay.  Is that data set a reliable data set for this

15  purpose?

16  A    SEER data is considered the gold standard of cancer

17  surveillance in the United States.

18  Q    Have you read many of the expert reports in this case,

19  both from the debtors as well as from the future claimants and

20  the asbestos claimants?

21  A    Yes, I have.

22  Q    Okay.  Are you aware whether or not the -- all of the

23  experts in this case used the SEER data with respect to

24  mesothelioma?

25  A    All the experts do.  The ones I've read, and certainly

CC-BLG000598

1  everyone who writes about this subject, and the literature also

2  uses SEER data.

3          MS. HARDING:  Could you put up 2037, please?

4  Q    Dr. Ory, if you'll look at this?  Is 2037, the table that

5  appears there, does that accurately reflect your final analysis

6  with respect to the mesothelioma -- I'm sorry -- the asbestosis

7  mesothelioma ratio and the incidence of asbestosis in the

8  United States from 1989 to 2001?

9  A    Yes, it does.

10          MS. HARDING:  Your Honor, we would move 2037 into

11  Evidence.

12          MR. ANSBRO:  No objection.

13          THE COURT:  It's admitted.

14          THE COURT:  Cathy, can you by any chance move that

15  piece of white paper?  I can't see the clock figures, so I

16  can't get an estimate of -- thank you -- of the slide numbers.

17  Thank you.  Of the clock counter.

18  Q    Dr. Ory, moving on to task two, and I'm going to pull this

19  up first and then I want to ask you some questions before we

20  start.  You were asked some questions in the voir dire exercise

21  about claims and cases, and I want to try to get the

22  terminology right before we start this discussion, because it

23  can get confusing, as you and I know from talking about this.

24  What is a case?  When you talk about a case, what are you

25  talking about?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000599

1  A    I'm talking about a person who has asbestosis diagnosed by

2  a physician.

3  Q    Okay.. And when you talk about plausible number of cases,

4  that's exactly what you mean?  Is that right?

5  A    Yes.

6  Q    Okay.  What was your task, or what inquiry did you take to

7  -- with respect to number two here?

8  A    In trying to estimate the plausible number of individuals

9  with the disease asbestosis among the Grace claims, I used two

10  data sets.  I used what I referred to as the Grace historical

11  claims data, and you may give it a more proper name, and the

12  RAND report on individual claimants -- the RAND report on

13  individual claimants.  And putting those two -- using the

14  information from both those data sets, I was able to estimate

15  that there are approximately 380,000 claims for asbestosis in

16  1989 to 2001 among men.

17          MS. HARDING:  Could you put up 2040, please?

18  Q    Doctor, what does 2040 reflect?

19  A    2040 reflects, by time period, the number of claims filed,

20  and the number of cases that I consider that we're referring to

21  as plausible, medically diagnosed cases of asbestosis.  I'm

22  sorry.  I'm color blind.  You'll have to tell me what color the

23  bar on the right is.

24  Q    The bar on the right is orange, and the one on the left is

25  blue.

**J&J COURT TRANSCRIBERS, INC.**

1  A    Blue.  Right.  The orange line represents the claims for

2  asbestosis, and the blue line represents plausible medical

3  cases.  And basically, if you look at the total, that's the

4  380,000 cases, and that's the 28,000 of people who could

5  plausibly have asbestosis, and that ratio is 14 to one.

6  There's 14 times more claims than there are plausible cases.

7  Or, you can flip that around, and it's 7.4 percent of the

8  claims could plausibly be medically plausible cases.  I'm

9  sorry.  I used the word twice.

10 Q    Dr. Ory, does this exhibit, 2040, accurately represent

11 your analysis of the plausible number of asbestosis cases in

12 the United States as compared to the number of claims for

13 asbestosis that have been made?

14 A    It does.

15        MS. HARDING:  Your Honor, we would move 2040 into

16 Evidence.

17        MR. FINCH:  No objection, Your Honor.

18        MR. ANSBRO:  No objection, Your Honor.

19        THE COURT:  It's admitted.

20 Q    Dr. Ory, did you then attempt to -- did you then actually

21 apply the same ratio to the claims in this bankruptcy matter?

22 A    Yes.  That's exactly what I did.

23 Q    And what did your analysis, what was the conclusion of

24 your analysis?

25 A    I think you have a slide.  Could you --

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000601

1 Q    Yes.  It's -- I'm sorry.  2041.

2 A    I was informed that there was 63,400 claims against Grace

3 where I -- I forgot -- the PIQ was, where the PIQ was filled

4 out.  And so, of those 63,400 claims, 7.4 percent of them is

5 4,800, so that would represent my best estimate of medically

6 plausible people who could plausibly have asbestosis.

7 Q    Okay.  With respect to the actual number of claims in the

8 bankruptcy against Grace, current claims in a bankruptcy

9 against Grace, you relied upon data that you were provided by

10 ARPC with respect to that number, correct?

11 A    That's correct.

12 Q    And you are not offering any opinion about whether that

13 number should be higher or lower, correct?

14 A    That's correct.

15 Q    Okay.  With respect to the ratio that should be applied to

16 the claims that had been filed against Grace, and that are

17 before the Court, do you have -- can you explain again, just

18 quickly, what that ratio would be?

19 A    That ratio is 7.4 percent.

20 Q    Okay.

21 A    That is the -- derived from the previous slide.  That's

22 the -- from 1989 to 2001, that's the 14 to one ratio, or seven

23 percent applied here.  I have had an afterthought that if you

24 go back to the previous slide you see that the -- in the time

25 period closest to where we are now, the ratio -- that ratio,

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000602

1 actually, is 20 to one, not 14 to one.  I could have applied

2 that ratio too.  It would, in some ways, make more sense.  But

3 again, being conservative on this issue, I just took the ratio

4 of that from the whole time period.

5 Q    Actually, I was going to ask you, did you do anything to

6 validate or confirm your conclusion that you had not

7 underestimated the plausible number of disease cases with

8 respect to Grace claims, and is that -- is that what you did?

9 A    That would be my answer to that question.

10 Q    Okay.  Can you explain one more time why it is that that

11 confirms, in your mind, as a scientist, that you have not

12 underestimated the number of plausible cases of disease in the

13 Grace claim population?

14 A    Well, if I took the estimate of 20 to one, I would -- that

15 was from the most recent time period, which is probably most

16 applicable to the cases still -- whatever the words are --

17 still in settlement, or -- I'm not sure what the right words

18 are -- pending, still pending.  So, if I took the ratio from

19 the most recent time period, which would probably be more

20 relevant, that would have been a five percent ratio, and I

21 would have applied five percent instead of seven percent, and

22 gotten a number below 4,800.  So, 4,800 is not a low estimate.

23 Q    With respect to Exhibit 2041, does it accurately reflect

24 your conclusion with respect to the plausible Grace asbestosis

25 claims compared to total Grace asbestosis claims with respect

CC-BLG000603

1 to plausible numbers of disease cases?

2 A     It does.

3          MS. HARDING:  I would like to move 2041 into

4 Evidence, Your Honor.

5          UNIDENTIFIED ATTORNEY:  No objection, Your Honor.

6          MR. FINCH:  Your Honor, the chart says asbestos

7 claims, not asbestosis claims.

8          THE COURT:  Yes.  I believe the title needs to be

9 corrected, and I will understand that the title should say

10 Grace asbestosis claims compared to Grace asbestosis claims,

11 not asbestos claims.  With that correction is there nay

12 objection?

13          MR. FINCH:  No, Your Honor.  Just for -- I guess this

14 is Mr. Bernick's (indiscernible) rule, these are demonstrative

15 exhibits coming into Evidence.  I am not objecting to them

16 coming in for demonstrative purposes.  When my experts are on

17 the stand I'd tend to do a similar sort of thing.  So, what's

18 good for the goose is good for the gander, as long as the

19 expert confirms this is what his conclusions are.

20          THE CLERK:  Stay close to the microphone, please.

21          THE COURT:  Right now there is no objection to

22 Exhibit 2041.  It is admitted.

23          MS. HARDING:  Your Honor, just to clarify, I -- we're

24 moving to admit the demonstratives that Dr. Ory has confirmed

25 are the accurate results of his analysis, and not just

CC-BLG000604

1  everything.  Only the ones that reflect his analysis and the

2  underlying analysis and conclusions that he reached from his

3  analysis.

4           THE COURT:  Yes.

5           MR. FINCH:  With the understanding that they're being

6  offered for demonstrative purposes.

7           MS. HARDING:  No.  They're being moved into Evidence.

8           THE COURT:  Well then, they're summary charts,

9  because obviously that's all they can be is summary charts.

10           MS. HARDING:  Yes.

11           MR. FINCH:  With that understanding, there's no

12  objection.

13           THE COURT:  All right.

14  Q   Dr. Ory, before we move away from Exhibit 2041, I just

15  want to clarify something that I think may have caused a little

16  confusion earlier on.  When you were offering this testimony

17  and you've rendered your opinion, you are looking at how many

18  of the claims, based on your analysis of how many asbestosis

19  cases there actually are in the United States could have been

20  real disease cases.  You're not rendering an opinion about

21  whether or not the claim is otherwise valid in some way legally

22  with respect to exposure, or some other requirement of a legal

23  claim, correct?

24  A   That's correct.

25  Q   Dr. Ory, you were next --

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000605

1  A    Everything just went dark.

2  Q    -- conducted an analysis of the future incidence of

3  mesothelioma and asbestosis in the United States.  Is that

4  correct?

5  A    That's correct.

6  Q    Okay.  I'm going to --

7                        (Pause)

8  Q    Let's talk, first, about your analysis of the future

9  mesothelioma incidents in the United States.  How did you go

10 about conducting that analysis?

11 A    I looked at all the projections of -- all the projections

12 of mesothelioma -- future mesothelioma in the United States,

13 and then I compared them with what the actual SEER and now

14 SEER/CDC shows on the actual number of mesotheliomas occurring

15 in the United States.  So, for example, Dr. Nicholson, in 1992,

16 he -- I'm sorry -- 1982, he made a projection, and probably a

17 bell-shaped curve is familiar to everybody in the room.  And I

18 was impressed that in 1982 he made a projection that showed

19 there would be 3,000 cases -- wold peak at about 3,000 in the

20 United States in the year 2002.  And the curve had a particular

21 shape.  And when I looked at the actual SEER data, and compared

22 it to Dr. Nicholson's projection, I was struck that the shape

23 of the curve was very close to Dr. Nicholson's shape, and the

24 only difference was the amplitude.  Dr. Nicholson said the

25 curve would peek at 3,000 cases, it actually peaked around

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000606

1 2,500.   In other words, I compared his projection made in 1982

2 to the actual data that -- the projections that he made of the

3 number of cases that would occur in 2002, and I compared that

4 with the actual number of cases that occurred in 2002, and

5 noted they were about 500 apart, but that the shapes of the

6 curve were very similar.

7 Q    Could you possibly show us that?  You've drawn it for me

8 before, and it helps me understand it.  I think it might help

9 the Court if you could show what the Nicholson --

10 A    Right.

11 Q    -- projection was, and then what the real data show.

12 A    I'm sorry.  So, starting in the -- in 19 --

13        THE CLERK:  You need to use the hand mike.

14 A    So, in 1982, Nicholson (indiscernible), and basically --

15        THE CLERK:  I don't think we're picking you up.

16 A    (Indiscernible).

17        THE COURT:  I hear it, too, Cathy.  He must not be

18 coming through your system.

19        THE CLERK:  (Indiscernible).

20        THE COURT:  The deck.

21        THE COURT:  Doctor, I don't know whether this

22 microphone will stretch over to where you are going.  Will you

23 see whether -- it should pull up and out.

24                     (Pause)

25        THE COURT:  But you have to get rid of the handheld

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000607

1 mike -- or it will cause the feedback.

2            THE WITNESS:  All right.  Does this help?

3            THE WITNESS:  Yes.

4 A         Okay.  So, in 1982, Nicholson made this projection,

5 and this is about 2002, up here, and Nicholson said the curve

6 for white males would peak at 3,000 mesothelioma cases in 2002,

7 and it would more or less have a shape like this.  Well, when

8 you look at the SEER data, you can compare this, and generally,

9 I'm smoothing this, generally the SEER data follows the shape

10 of the Nicholson curve, the only difference being in 2002 the

11 SEER data is just under 2,500.  So, I was very impressed by

12 this, that we have an accurate person who understood the

13 epidemiology of the relationship between asbestos exposure and

14 mesothelioma well enough to draw a curve that was this accurate

15 20 years into the future, and so, it seemed to me that there

16 really -- and it's published, and I can understand how he did

17 it, so it seemed to me this was the most appropriate projection

18 to use.  And I made a -- but I have to make a one-time

19 amplitude correction for this of about 20 percent, since it's

20 about 20 percent lower.  So, Nicholson -- the rest of

21 Nicholson's curve says there would be 55,000 more mesotheliomas

22 occurring, and if you correct that one time for 20 percent, you

23 would end up with this curve paralleling this curve, and being

24 20 percent lower, so you'd end up with 44,000 cases of

25 mesothelioma, taking into account this -- keeping everything

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000608

1  the same about Nicholson except making this one-time amplitude

2  correction.

3  Q    A couple of questions with respect to what you said.  You

4  mentioned the word smoothing of the curve.  And smoothing of

5  the curve, what you mean by that is you did the best fit for

6  the data, correct?

7  A    Actually, I just used a five-year moving average just to

8  -- so that the curve -- the real curve wouldn't look like a

9  picket fence, just so that, visually, when you look at it you

10  can just get a sense of the shape of the curve.

11  Q    And epidemiologists do that kind of exercise regularly,

12  correct?

13  A    Yes.

14  Q    Okay.  And there's a method for doing that, correct?

15  A    There are many methods.

16  Q    Okay.  And is -- would it be -- I'm going to have to

17  approach.

18                         (Pause)

19  Q    Would it be improper to take a curve and then extend it

20  out into the future without any data after having smoothed it a

21  certain way and making it go in a certain direction?  Do you

22  understand what I'm saying?

23  A    No, I don't.

24  Q    Let me see if I can figure out how to say this.  I'll ask

25  it --


                   **J&J COURT TRANSCRIBERS, INC.**

CC-BLG000609

1 A    Perhaps I could help?  The smoothing of the curve was just

2 simply for appearance's sake.  It has nothing to do with the

3 projection.  The projection only depends on the one-time

4 amplitude correction.

5 Q    Okay.  The smoothing of the curve had to do with the

6 actual data, the observed data in the SEER data set, correct?

7 A    That's correct.

8 Q    Okay.  And the smoothing had nothing to do with your

9 actual projection, which we'll talk about in a few minutes?

10 A    That's correct.

11 Q    Thank you.  Now, I want to ask you another question.  You

12 said you made a correction for the 20 percent over-prediction

13 by Dr. Nicholson, correct?

14 A    Yes.

15 Q    Before conducting your projection into the future?

16 A    That's correct.

17 Q    Okay.  Would it be appropriate, as an epidemiologist, to

18 see the SEER data, understand that it underestimates the

19 Nicholson projection, yet still use the Nicholson projection

20 without somehow at least correcting for that under --

21 overestimate?

22 A    I would think any time you make a model, you always want

23 to constrain it to reality, and I have a distinct advantage

24 that Nicholson didn't have, which is 20 years of SEER

25 experience, and it would be incorrect, probably, not to

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000610

1  constrain his projection to reality.

2  Q     Dr. Ory, Exhibit 2043 --

3       MS. HARDING:  Could you put that up, please?

4  A     Can we move this back so I can see the -- the conclusion

5  board there?

6                        (Pause)

7       MS. HARDING:  That's good.  Thank you.

8  Q     Dr. Ory, Exhibit 2043, could you explain what that

9  depicts?

10  A     That depicts sort of what I was trying to explain on the

11  board, that is, the top line, which I guess is blue, is

12  Nicholson's -- that's Nicholson's projection.  The left hand

13  side of the bottom line is the smoothed SEER data, and then

14  where it changes to open boxes, that is -- that's just applying

15  the Nicholson rate changes to the one time amplitude

16  correction, and showing what that curve would look like in the

17  future.

18  Q     Okay.

19  A     That's a -- what the projected mesotheliomas would look

20  like going into the future.

21  Q     This is your analysis of the SEER data using the Nicholson

22  projection methodology to come up with the total number of

23  mesothelioma cases into the future in the United States.  Is

24  that right?

25  A     That's correct.

                    **J&J COURT TRANSCRIBERS, INC.**

1  Q    Okay.   Could you --

2           MR. FINCH:   Your Honor, by cases he means

3  mesothelioma incidences or deaths, not --

4           THE CLERK:   Speak into the mike, please.

5           THE WITNESS:   I mean incident cases of mesothelioma

6  as recorded by SEER and CDC.

7           MR. FINCH:   He's not talking about lawsuits or

8  claims?   I just wanted to make that clarification.

9           THE WITNESS:   Right.   I'm talking about men diagnosed

10 with mesothelioma.

11 Q    Dr. Ory --

12          MS. HARDING:   Your Honor, we would move Exhibit 2043

13 into Evidence as an accurate reflection of Dr. Ory's analysis

14 of the SEER data, and using the Nicholson projection into the

15 future.

16          MR. ANSBRO:   No objection, Your Honor.

17          MR. FINCH:   No objection.

18          THE COURT:   It's admitted.

19 Q    Dr. Ory, the next slide, which is 2044, does that

20 accurately reflect I think what you just told the Court, that

21 your analysis predicts that there will be 44,000 men developing

22 mesothelioma in the U.S. between 2003 and 2027?

23 A    That's correct.

24 Q    And that analysis takes account of your observations that

25 are -- I'm sorry -- of the observations that are collected, the

**J&J COURT TRANSCRIBERS, INC.**

1 actual cases of disease that are collected in the United States

2 by the SEER data, is that right?                    .

3 A    That takes the actual SEER -- number of SEER cases and

4 corrects the Nicholson projection using the actual number of

5 SEER cases.

6 Q    Okay.

7         MS. HARDING:  We've move 2044 into Evidence.

8         UNIDENTIFIED ATTORNEY:  No objection.

9         UNIDENTIFIED ATTORNEY:  No objection, Your Honor.

10         THE COURT:  It's admitted.

11 Q    Dr. Ory, did you then conduct an analysis based on that

12 projection as to the asbestosis incidents in the United States

13 going forward?

14 A    Yes, I did.

15         MS. HADING:  2045, please.

16 Q    What was the result of that analysis?

17 A    I applied the .95 to one ratio to the 44,000 cases, and

18 came up with 42,000 cases of asbestosis that might be occurring

19 in men from 2003 to 2007.

20 Q    What is your -- did you do any test, or is there any

21 information that informs you as to whether or not that's likely

22 to be an over-prediction or an under-prediction?

23 A    Well, again, I believe it's really quite a large over-

24 prediction.

25 Q    And why is that?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000613

1  A    Well, again, first of all, I think the -- because the

2  mesothelioma rates, and hence the asbestos exposure in the U.K.

3  is higher than in the U.S., I believe the ratio is higher, and

4  so that -- if we had a more accurate ratio, a lower ratio, I

5  would have estimated fewer cases.

6  Q    I'm sorry.  Were you done?

7  A    No.  Yes, I'm done.

8  Q    Okay.

9        MS. HARDING:  Your Honor, we move 2045 into Evidence

10 as Dr. Ory's -- an accurate summary of Dr. Ory's conclusion

11 with respect to his analysis of the maximum number of cases of

12 asbestosis in the United States going into the future.

13        MR. FINCH:  No objection, Your Honor.

14        MR. ANSBRO:  No objection.

15        THE COURT:  It's admitted.

16 Q    Dr. Ory, at the beginning of your testimony here, I played

17 an audio of counsel's opening argument that stated that

18 asbestos diseases are still on the upswing in the United

19 States.  Do you recall that?

20 A    Yes, I do.

21 Q    Have you formed an opinion on that issue on the basis of

22 your analysis of asbestosis and mesothelioma incidence in the

23 United States?

24 A    I have.

25 Q    I'd like to talk with you about -- I'm going to actually

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000614

1  write it down.

2                          (Pause)

3  Q    Dr. Ory, let's first talk about asbestosis in the United

4  States and the future course of asbestosis.  You've just

5  testified about your prediction about the course of that

6  disease.  The first thing that I want to ask you is did you do

7  anything else to validate, other than what you've said already,

8  to further validate that conclusion?

9  A    I did a number of things.

10 Q    Did you look to data in the U.K. first to validate that?

11 A    That's the first thing I did.

12 Q    What did you do?

13 A    I looked at the age specific -- the incidence of -- I

14 looked at ratios -- could you put up the slide?  It would be a

15 lot easier for me to explain this from the slide.  It's

16 complex.  I looked at the ratio in the GPRD data, and I looked

17 at asbestosis rates over time by age, 1989 to 2005, and so, for

18 example, on the leftmost set of bars you can see that the

19 number of cases of asbestosis was much lower, the incidence was

20 much lower in -- as we went forward in time, and you can see

21 that pattern in 30 to 54 year olds.  You can see that pattern

22 in 55 to 65 year olds.  It flattens out in 65 to 74 year olds.

23 And it goes up rather markedly in 75 year olds.  And --

24 Q    Well, I was just going to ask you why was that observation

25 in the data important to you?

                    J&J COURT TRANSCRIBERS, INC.

CC-BLG000615

1  A    Well, what it -- the -- what's happening in the youngest

2  people, they're the canaries in the mine here.  They are

3  telling us that over time the asbestosis rates are dropping in

4  the youngest people.  So, it sort of tells me that -- you know,

5  they can't start going up.  They are dropping.  And they're

6  dropping quite dramatically, up through age 65, so it says to

7  me that there's -- that this epidemic is a decaying -- there's

8  a decay curve to this epidemic, that's the downslope, and there

9  are no new cases coming to fill it up again, that this is an

10 epidemic that's going to end, because there are no young people

11 coming to fill in the slots of the people who are dying.

12 Q    Is that a method that is commonly used at CDC to

13 understand the progression of the disease within a population?

14 A    Absolutely.  You -- the pattern by age often gives you

15 important clues as to what's happening to the epidemic.

16 Q    Was there particular significance in this data in light of

17 the fact that it was actually from the United Kingdom?

18 A    Right.  Exactly.  Well, yes.  Let me tell you.  The U.K.,

19 of course, as we've already -- as I've already noted, has

20 higher asbestos exposure than the U.S., so in spite of that,

21 we're still seeing that there's no evidence of a coming wave of

22 asbestos cases, in fact, quite the opposite.  In spite of the

23 higher exposure, in spite of the higher mesothelioma rates.

24        MS. HARDING:  Your Honor, we would move 2047 into

25 Evidence.


**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000616

1          MR. FINCH:  No objection, Your Honor.

2          MR. ANSBRO:  No objection.

3          THE COURT:  2047 is admitted.

4    Q    Now, Dr. Ory, with respect to the asbestosis rates in the

5    United States, as I understand your previous testimony you

6    don't have the same kind of good data on asbestosis in the

7    United States as you have in the United Kingdom.  Is that

8    correct?

9    A    There are no incident rates in the United States.  That's

10   correct.

11   Q    Is there any data at all that you can look at, or look to,

12   to get some idea, even though it may not be as accurate as the

13   data in the U.K., to understand asbestosis death rates in the

14   United States?

15   A    You can look at asbestosis death rates in the United

16   States.

17   Q    Okay.  What are the limitations of looking at asbestosis

18   death rates?

19   A    The death rates are not incident cases, and they certainly

20   measure, with respect to asbestos disease, what happened a long

21   time ago in terms of exposure, so it doesn't give us any

22   inclination of the formation of new cases.  What it tells us

23   more, I think, is that whether or not the epidemic is waxing or

24   waning.

25   Q    Okay.  Does it -- are there also limitations associated to

**J&J COURT TRANSCRIBERS, INC.**

1 how the information is collected?

2 A    Death certificates for any disease in the United States

3 are notoriously suspect.  they are not collected with the kind

4 of rigor that some other information is.  I mean, for example,

5 when you compare mesothelioma death rates to incident rates,

6 the death rates are generally three quarters to 80 percent.

7 So, on a very dramatic disease such as mesothelioma, you know,

8 you're not collecting the same information as incident cases.

9 Q    Okay.  And with respect to the disease of asbestosis in

10 the United States in particular, are there any particular

11 problems associated with the information from death

12 certificates on asbestosis?

13 A    Well, I mean, the whole reason that you can't conduct

14 surveillance on asbestosis is there's no agreed upon

15 surveillance definition, and so, what one person calls

16 asbestosis and mentions on a death certificate might not be

17 what another person calls asbestosis and mentions on a death

18 certificate.  So, it's sort of -- it gives you pause when you

19 look at that data.

20 Q    Is there anything -- other information that you've learned

21 in the course of your work on the silica cases, as well as on

22 these cases with respect to asbestosis claims and their ratio

23 to actual disease that also gives you pause with respect to

24 using death certificate data for asbestosis?

25 A    Well, I mean, the whole conclusion of my findings are that

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000618

1 there may be as many as 14 times -- given, say, that the -- the

2 medically plausible cases of asbestosis, there may be as many

3 as 14 times that many who have been told, perhaps from an x-ray

4 reading, that they have asbestosis when, in fact, they may not.

5 So, it's quite possible that because of the situation we find

6 ourselves in in the United States right now, that death

7 certificates for asbestosis are particularly difficult to

8 interpret.

9 Q    Dr. Ory, the -- counsel for the ACC said in their opening

10 statement that death rates from asbestosis are increasing, and

11 even looking at the death certificate data with all of its

12 limitations that you've just described, is that accurate?

13 A    No.  And I've prepared a slide to that effect.

14          MS. HARDING:  2048, please.

15 A    In this slide I took the age adjusted death rates per

16 million from asbestosis, that's any mention of asbestosis, and

17 I used the NIOSH NORMS web site to get this data.  It's readily

18 available.  And the age standardized death rates dropped from

19 17 consistently down to 15-and-a-half from 2000 to 2004, and

20 that certainly suggests to me that in five consecutive years

21 the death rates from asbestosis are declining.

22          MS. HARDING:  Your Honor, we would move in 2048 into

23 Evidence.

24          THE COURT:  Any objection?

25          MR. FINCH:  No objection, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. ANSBRO:  No objection.

2          THE COURT:  It's admitted.

3   Q    Finally, Dr. Ory, I wanted to ask you about mesothelioma

4   incidents in the United States.  You've reviewed the SEER data.

5   You've talked about it here today.  What have you found in the

6   SEER data that leads you to the conclusion that the

7   mesothelioma rates are declining as well?  I'm not sure if I

8   said that correctly, but correct me if I didn't.

9   A    Well, again, SEER data is readily and easily available on

10  the web and there are actually two sort of ways of looking at

11  it.  If you put up the first slide showing the --

12  Q    2049?  Let's see if that's it.

13  A    That's it, yes.  In this slide I looked at the first and

14  last five years of SEER data and in the first five years of

15  SEER data you can see that people age 20 to 54 had accounted

16  for 28 percent of the mesotheliomas in that -- excuse me -- in

17  that time period, whereas those over 75 accounted for only 16

18  and a half percent.  As we move forward to the most recent

19  five-year time period, the people 20 to 54 now account for only

20  a third of what they used to account for.  And the older people

21  are accounting for almost half.

22          And this is sort of the same point that I was making

23  when we looked at the asbestos data in the GPRD.  Again,

24  there's no wave of young people coming to fill in the epidemic.

25  The epidemic has been, as Nicholson really described it, a

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000620

1 cohort of exposed people who have lived out their lives and

2 have, as they've grown older, gotten mesothelioma, and that's

3 what this shows.

4 Q     Before you -- I think you have one other slide you wanted

5 to talk about.  Before you get there I wanted to ask you about

6 actual numbers of mesothelioma because I think that was part of

7 the discussion on Monday was the numbers of people getting

8 mesothelioma, the actual incident cases that were still going

9 up.  Could you show what you found with respect to the actual

10 numbers of mesothelioma, actually -- I should probably -- Your

11 Honor, is it okay if Dr. Ory --

12          THE COURT:  Yes.

13 Q     Okay, thank you.  So you're going to show us what the data

14 show with respect to the numbers of mesothelioma cases in the

15 recent history.

16 A     I'll speak into the mic.  I'm just going to -- I'll draw

17 the numbers and I'll come back and state -- I couldn't remember

18 them.  I write them down.  These are numbers from my

19 projections of mesothelioma from SEER and CDC data to the whole

20 U.S.

21 Q     Okay, but with respect to the actual -- oh, from -- in

22 other words, these are actual cases of mesothelioma that have

23 been counted in the United States up until the most recent

24 period?

25 A     This is the same mechanism I used in Table 2, of the same

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000621

1  process I used in Table 2 of my report where I take the SEER

2  incidents rates and apply them to the U.S. population and

3  estimate the total number of mesotheliomas as we agreed was the

4  standard way that everybody does it.

5  Q    Okay, this comes then directly from the SEER data?

6  A    That's right, SEER data and U.S. population data.  So in

7  1990 there were about 2,080 --

8  Q    You're going to have to talk into the mic.

9  A    Oh, okay.

10  Q    Want to draw it first and then explain it?

11  A    Yes.  These are the actual number of mesothelioma cases

12  that have occurred in the United States as counted by SEER and

13  then the Center for Disease Control which has taken over and

14  includes the SEER data and captures almost 95 percent, 98

15  percent of the cases in the U.S.  So the curve was rising

16  pretty sharply from 2000 or so in 1990 to 2,200 in '95 and then

17  in 1999 it was 2,419.  It reached the peak between, in this

18  data, between 2000 and 2002, 2,452, 2,393, 2,453 and then in

19  the last two years it's dropped a bit, 2,370, 2,409.  In fact,

20  if you --

21          MR. FINCH:  Your Honor, is this in men or all cases?

22          THE WITNESS:  This is men.

23  Q    Dr. Ory, we should probably -- your analyses in this case

24  have been about men with mesothelioma, correct?

25  A    Always about men.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000622

1 Q    And men with asbestosis, correct?

2 A    Right.  And so, for example, just to take the most recent

3 two years, if you take the average of what's occurred here,

4 that's 2,389 cases on average in those two years and if you

5 take these four years, 2,429 have occurred and that actually is

6 -- these two years are, in fact, 1.6 percent lower than these

7 four years.  So I don't think it would be proper to describe

8 this curve as rising.  It's plateaued and appears to be falling

9 to me.

10 Q    Dr. Ory, with respect -- before I ask you about kind of

11 what you understand about the numbers and the expected course

12 of them over time, the question about whether or not it's just

13 women, you --

14         THE COURT:  Wait, I'm sorry, what's just women?

15         MS. HARDING:  That Dr. Ory's analysis in this case

16 have all related to mesothelioma rates and incidents and

17 asbestosis rates and incidents of men in the United States.

18 Q    And, Dr. Ory, why would you conduct your analysis on men?

19 A    First because when I made my -- first when I made my --

20 well, whether you use claims data or the GPRD data or deaths

21 data, 95 to 96 percent of cases of asbestosis occur in men and

22 actually, according to Grace data anyhow, about 96 percent of

23 the claims are in men.  So clearly this is -- and we're talking

24 about an occupational cohort and it applies mainly to men.  And

25 Nicholson recognizes this because several places in his paper,

J&J COURT TRANSCRIBERS, INC.

CC-BLG000623

1  in his '82 paper, he points out that when he goes to -- that

2  he's projecting using male rates.

3  Q    Okay, did the -- first of all, you don't hold the opinion

4  that there aren't any women in the United States who could

5  develop mesothelioma or asbestosis as a result of asbestos

6  exposure, correct?

7  A    I do not hold that opinion, that's correct.

8  Q    Okay, it's fair to say, as I understand your testimony

9  that you -- if you had included women in any of the analyses

10  that you did, would it have changed your opinions and your

11  ultimate conclusions with respect to the data?

12  A    The only thing it would have done is it would have given

13  me a lower asbestos to meso ratio and so again, to be -- to

14  stack the deck against myself, I thought it was better to use

15  the higher ratio derived for men only.

16  Q    Okay, Dr. Ory, the last thing I want to ask you about is

17  on 2050 which is the last slide.  You talked just now about the

18  change that you described with respect to the actual number of

19  cases.  With respect to the incidents of mesothelioma, the rate

20  of mesothelioma, what change have you observed and what does it

21  tell you from the data?

22  A    This is really a profound slide.  When I saw this slide it

23  really reassured me that the thrust of my analysis is correct

24  because what this is saying is if you look at the right hand

25  bar, that among people of all ages over the ten-year period,

J&J COURT TRANSCRIBERS, INC.

CC-BLG000624

1  men of all ages over the period 1994 to 2003, the incidents

2  rate of new cases of mesothelioma has fallen almost between one

3  and a half and two percent per year.  That's overall, the bar

4  on the right.

5          And then, even more importantly, when you look at the

6  data in an age specific fashion as we've talked about several

7  times before, you see this enormous fall in 20 to 54 year-olds,

8  almost eight percent per year.  That means every year there are

9  eight percent fewer incident cases of mesothelioma in the

10 United States than there were the year before.

11         And from what we saw before in the previous slide, we

12 saw that in the beginning of this epidemic, the epidemic was --

13 the 20 to 54 year-olds were a large part of the epidemic.  And

14 here we see no evidence whatsoever that there could be a sort

15 of follow on epidemic.  In fact, we see exactly the opposite,

16 that the youngest group of people, the canaries in the mine, if

17 you will, are telling us that this epidemic is going away.  And

18 the 55 to 64 and 65 to 74 are also showing sharp decreases.

19 The only increase are in the  75 and above and that's

20 completely consistent with the concept of people who were

21 exposed a long time ago now manifesting with a long waiting

22 period their mesothelioma.

23         So as to me, I can't overemphasize that to me as an

24 epidemiologist this slide really assures me that I've been on

25 the right track.


                    **J&J COURT TRANSCRIBERS, INC.**

CC-BLG000625

1          MS. HARDING:  Your Honor, we would move -- I can't

2    read the exhibit number and I already put it away.

3          THE COURT:  2050.

4          MS. HARDING:  Thank you.  2050 into evidence.

5          MR. FINCH:  No objection, Your Honor.

6          MR. ANSBRO:  No objection.

7          THE COURT:  It's admitted.

8          MS. HARDING:  And, Your Honor, I tender the witness

9    to the claimants.

10          THE COURT:  Mr. Finch?

11          THE WITNESS:  Could I take a break?

12          THE COURT:  Yes, we'll take a five-minute recess.

13   All right, thank you.

14                    (Recess)

15          THE COURT:  All right, please be seated.  Doctor?

16   Mr. Finch?

17          MR. FINCH:  May I approach the witness, Your Honor?

18          THE COURT:  Yes.

19                  CROSS EXAMINATION

20   BY MR. FINCH:

21   Q    Dr. Ory, do you recognize ACC FCR Exhibit 1 as Dr.

22   Nicholson's paper that forms the basis of some of your

23   testimony here?

24   A    I do.

25   Q    And you regard this as a reliable source for projections

CC-BLG000626

1  of asbestos-related mesothelioma and lung cancer?

2  A    Yes, at least mesothelioma.  I've really not examined it

3  for lung cancer.

4  Q    Okay, with respect to mesothelioma you regard it as

5  reliable?

6  A    Yes.

7  Q    And sound science?

8  A    Yes.

9  Q    And in the abstract Dr. Nicholson and other researchers at

10 Mount Sinai write that 18.8 million people had exposure in

11 excess of that equivalent to two months' employment in primary

12 manufacturing or as an insulator, greater than --

13          THE COURT:  Mr. Finch, I'm sorry, you're going way

14 too fast.

15          MR. FINCH:  sure.

16 Q    On the first page Dr. Nicholson writes that 18.8 million

17 people had exposure in excess of that equivalent to two months'

18 employment in primary manufacturing or as an insulator, greater

19 than two to three fiber years, correct?

20 A    Yes.

21 Q    And this entire paper is based on cumulative exposure to

22 asbestos, correct?

23 A    Yes.

24 Q    There's no company specific or product specific

25 epidemiology in this work, correct?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000627

1  A    I believe that's correct.

2  Q    And isn't it the case there's no company specific product,

3  specific epidemiology in the medical literature?

4  A    In the published medical literature, that's probably

5  correct.  Well, there's probably aspects, for example, Alex

6  Walker published the estimate that he made for Manville, I

7  think, and I'm not sure actually as I sit here and think

8  whether that's just Manville or all cases so --

9  Q    As you sit here you can't think of any medical or

10  epidemiological literature has company specific exposures only?

11  A    Generally, that's probably true.

12  Q    Okay, could you turn to Page 300 of the Nicholson paper?

13  Excuse me, Page 296.  What Dr. Nicholson did is make estimates

14  of the population exposed to asbestos and apply that to that,

15  dose response rates to project the future, time course of

16  asbestos-related mesothelioma, correct?

17  A    I'm sorry, slow down?

18  Q    Sure.  What Dr. Nicholson did in this paper and his

19  colleagues did in this paper was to take -- make an estimate of

20  the total population of people occupationally exposed to

21  asbestos, apply to that assumptions about amount of exposure

22  and the dose response relationship that exists in the

23  epidemiological literature and project the future course of

24  asbestos-related mesothelioma in the United States?

25  A    That sounds about right, yes.

J&J COURT TRANSCRIBERS, INC.

1 Q    Okay, and the population, the estimated population exposed

2 was all workers and included both men and women to the extent

3 there are women in the labor force, correct?

4 A    That's correct.

5 Q    And so you had shown up here the SEER data for

6 mesothelioma that's among men and that's taken from a

7 combination of SEER 13 data and the CDC, is that correct?

8 A    Yes, and SEER 9, yes.

9 Q    And SEER 9, okay.  SEER has published updated data from --

10 related to mesothelioma and something called the SEER 17

11 registry?

12 A    That's correct.

13 Q    Could you explain to me the difference between the SEER 13

14 registry and the SEER 17 registry?

15 A    The SEER 17 registry covers about 25 percent of the U.S.

16 population.  The SEER 13 registry covers about 13 percent of

17 the U.S. population.  And then that, of course, has all been

18 superseded by the CDC which now covers almost 100 percent of

19 the population.

20 Q    And the -- and what's the relationship between -- you were

21 showing some slides, some exhibits that has something called

22 the Norms data base.  What's the Norms data base?

23 A    The Norms data base is non-occupational-related mortality

24 data base which is also part of CDC.

25 Q    And that's the actual counts of deaths based on death

CC-BLG000629

1  certificate data?

2  A    That's correct.

3  Q    Okay, and you regard the Norms data as informative in your

4  work here?

5  A    Well, as I said, I regard death certificate data as less

6  reliable than incidents data.

7  Q    So death certificate data will be less reliable than the

8  SEER incidents data, correct?

9  A    Than the SEER or CDC incidents data, yes.

10 Q    Okay, and the death certificate data, I believe you said

11 only capture about three-quarters to 80 percent of the

12 mesothelioma deaths, is that right?

13 A    Of the incident cases.  So if you look at any given, you

14 know, five-year period, maybe there'll, you know, be 10,000

15 incident cases of mesothelioma according to the CDC, United

16 States Cancer Surveillance and if you look at death

17 certificates for the same time there might be 7,500 or 8,000.

18       MR. FINCH:  Could I have Exhibits 2028 and 2033, if

19 we could show them both on the screen?  Your Honor, may I

20 please approach the bench and the witness?

21       THE COURT:  Yes.

22 Q    You said before in your direct testimony that you (1)

23 could go to the website for an answer for SEER and find the

24 SEER registries, correct?

25 A    That's correct.

J&J COURT TRANSCRIBERS, INC.

CC-BLG000630

1  Q    Do you recognize what's been marked as ACC-2033 as the

2  SEER 13 registry for showing the age-adjusted meso rate for

3  males and females between 1995 and 2004?

4  A    Yes, that's what the title says, yes.

5  Q    And the ACC-FCR-2028 shows the mesothelioma rate for all

6  ages from the SEER 17 for the 2000 and 2004 time period?

7  A    That's right.

8  Q    And would you agree with me that using SEER 17 data the

9  age adjusted rate for men is 2.05?

10         THE COURT:  I'm sorry, Mr. Finch, I apologize, but I

11  didn't follow.  Would you restate your question for me?

12         MR. FINCH:  Yes.

13  Q    Would you agree with me that the age adjusted rate of

14  mesothelioma incidents for men in using the SEER 17 registry

15  data which is ACC-FCR Exhibit 2028 shows an age adjusted

16  incidents rate of 2.05?

17  A    Yes, for 2000 to 2004.

18  Q    And 2.05 is --

19         MS. HARDING:  If you could just direct where you're

20  pointing to on the thing.

21         MR. FINCH:  Sure, sure.  For Your Honor --

22  Q    (Inaudible), correct?

23  A    Yes.

24  Q    If you look at the same column for the SEER 13 registry,

25  the age adjusted rate for men is, for the 1995 to 2004 time

J&J COURT TRANSCRIBERS, INC.

Ory - Cross/Finch                                    79

1  period, is 1.9179, right?

2  A     That's correct.

3  Q     And 2.05 is slightly higher than 1.91, correct?

4  A     That's correct.

5  Q     And the way you're getting to the calculations

6  (indiscernible)  age-adjusted rates broken down by age

7  (indiscernible) population to get to these --

8  A     Using the CDC data.

9  Q     So you didn't use the SEER 17 data.  You used the CDC

10  data?

11  A     That's correct.

12  Q     But you could do it using the SEER 17 data using estimates

13  of the U.S. population, correct?

14  A     I wouldn't do that because SEER 17 only has a quarter of

15  the U.S. population.  Why would I look at the quarter when I

16  have all of the U.S. population to look at?  I would regard the

17  CDC data as more accurate.

18  Q     CDC doesn't have data for --

19              UNIDENTIFIED SPEAKER:  Just use one mic.

20              MR. FINCH:  Sure.

21  Q     CDC doesn't have the data for 2006 or 2007, correct?

22  A     That's correct.

23  Q     And the incidents rate from the SEER data is a number of

24  cases per 100,000 of population, correct?

25  A     Or per million, whatever.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000632

1  Q    Well, isn't it per --

2  A    I mean I'd have to look.  I always do it per million.  I

3  don't know how you did it.

4  Q    Well, if you look at the last page of Exhibit 2028, for

5  example --

6  A    Okay, yes, these are per 100,000.

7  Q    Yes.

8  A    Yeah.

9  Q    And the mesothelioma age-adjusted rate in women is about

10 one-fifth as it is for men, correct?

11 A    Yes, that's correct.

12 Q    And so if you added the mesotheliomas in women to the

13 mesotheliomas in men, you would come up with a count of

14 mesothelioma deaths that's about 20 percent higher than what

15 you show on the chart there, correct?

16 A    That's correct.

17 Q    So for 2004 there would be about 2,800 mesothelioma

18 deaths?

19 A    Mesothelioma incident cases.

20 Q    Okay, and so if someone said that there were 2,600 or

21 2,700 mesotheliomas a year in the United States now, they would

22 be -- it wouldn't be wrong?

23 A    Oh, I see, you mean if they're counting women?

24 Q    Yes.

25 A    Yes, if they're counting women.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000633

1  Q    And women do get asbestos-related mesothelioma, correct?

2  A    Yes, they do.

3  Q    Now you, in your estimates of asbestosis, you related the

4  incidents rate of asbestosis to the incidents rate of

5  mesothelioma, correct, or actually, vice versa?

6  A    I've related the incidents of asbestosis to mesothelioma,

7  correct.

8  Q    Okay, and the reason you did that is because those are

9  both asbestos-related diseases, right?  You didn't compare the

10 incidents rate of mesothelioma to the incidents rate of breast

11 cancer cases, for example?

12 A    That's correct.

13 Q    And the reason you did that is because there are no

14 confounding causes of asbestosis other than exposure to

15 asbestos, correct?

16 A    Asbestosis is only caused by asbestos exposure, that's

17 correct.

18 Q    Okay, and there is no epidemiologically-established cause

19 of mesothelioma in the United States other than asbestos

20 exposure, correct?

21 A    Well, that's an odd way to say it.  I would say a large

22 majority of mesothelioma cases in the United States are caused

23 by asbestosis but not all of them.

24 Q    There's nothing that has been shown to double the risk for

25 mesothelioma in the United States other than asbestos exposure,

CC-BLG000634

1 correct?

2 A    That's true.

3 Q    Now --

4 A    I would just like to add -- let me add to that question.

5 You know, it just always comes up --

6        MR. FINCH:  Your Honor, there's not a question

7 pending.

8        THE WITNESS:  All right.

9        THE COURT:  The witness is entitled to explain his

10 answer if that's what he's going to do.  If you're going to

11 explain your answer --

12        THE WITNESS:  Right, yes.

13        THE COURT:  -- you may explain your answer.

14        THE WITNESS:  I mean there's no disease that I know

15 of that -- there's no cancer that I know of that has only a

16 single cause.  There's always, even in something like

17 mesothelioma where asbestosis causes a majority -- asbestos

18 causes a majority of cases, there has to be other causes

19 because -- just because we don't know them, it doesn't mean

20 they're not there.

21 Q    But there's nothing that has been scientifically

22 determined to double the risk of mesothelioma other than

23 asbestos?

24 A    That's correct.

25        THE COURT:  May I ask the witness a question please?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000635

1  Doctor, at one point you said meso cases caused by asbestosis,

2  in another you said by exposure to asbestos.  Did you mean by

3  asbestosis or did you mean by exposure to asbestos?

4              THE WITNESS:  I mean by exposure to asbestos.

5              THE COURT:  Thank you.

6  Q    In Dr. Nicholson's paper, in addition to showing

7  mesothelioma death rates, he also has projections of what he

8  calls excess lung cancers.  Do you see that in the paper when

9  you read it?

10 A    Yes.

11 Q    Could you define what's an excess lung cancer as Dr.

12 Nicholson used it?

13 A    Actually, it's a difficult thing to define because

14 obviously smoking is so strongly related to causing lung

15 cancer, I've always had some trouble understanding how one

16 determines excess deaths from asbestos-related lung cancer.

17 But I understand Nicholson did that in -- I understand he did

18 that.

19 Q    And he used the same basic methodology using the estimated

20 exposures and those response curves to project the excess lung

21 cancer deaths as he did for the mesotheliomas but using

22 different dose response because the dose response levels are

23 different, but the same approach.  You take the exposed

24 population, apply the dose response and project the future

25 deaths?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000636

1  A    That's true.  What I'm saying is I have trouble

2  understanding how you pick out the asbestos-related lung

3  cancers from the smoking-related lung cancers.  I understand

4  after he did that that yes, that he projected them forward.

5  Q    And you're aware that there's -- have you read medical

6  literature that states that there's a synergistic effect

7  between asbestos exposure and cigarette smoking on the

8  incidents of the lung cancer?

9  A    I am aware of that and I'm aware there's some, you know,

10 the exact level of synergy is certainly open to question.

11 Q    And by synergy, what that means is if you have a one out

12 of ten chance of getting lung cancer if you're -- or ten times

13 the background rate of getting lung cancer if you're a smoker

14 and double the background rate of getting lung cancer if you're

15 exposed to asbestos, when you combine the two, you have much

16 more than an additive effect.  It's much more than 12.  It's

17 more like 20 or 30, correct?

18 A    Some people use an additive;  some people use

19 multiplicative.  And some of the data here is more than

20 additive.  Some is multiplicative.  It's -- there's a lot of

21 data and it's hard for me to reach a consensus on it.

22 Q    Okay, would you agree with me there is a dispute in the

23 medical literature about whether or not asbestosis is a

24 necessary intermediary step to have asbestos-related lung

25 cancer?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000637

Ory - Cross/Finch                                          85

1  A    Yes.

2  Q    So there are experts on both sides of that question?

3  There's medical literature on both sides of that question?

4  A    Yes.

5  Q    I think -- could you explain your understanding of what I

6  meant by asbestosis being a necessary intermediary for

7  asbestos-related lung cancer?

8  A    I'm sorry?

9  Q    Could you explain -- let me rephrase my question.  When I

10 asked a question about asbestosis being a necessary

11 intermediary for asbestos-related lung cancer, what I meant is

12 that some medical literature and medical experts take the view

13 that lung cancer can be attributed to asbestos exposure only if

14 the patient has asbestosis, correct?

15 A    Yes.

16 Q    Other medical experts and medical literature takes the

17 view that you can have lung cancer that is caused by asbestos

18 exposure even if there is no detectable asbestosis in the

19 patient, correct?

20 A    Yes.

21 Q    And there are experts on both sides of that question?

22 A    I've read papers on both sides.

23 Q    You've read papers and peer reviewed medical journals on

24 both sides of that question?

25 A    Yes.

J&J COURT TRANSCRIBERS, INC.

CC-BLG000638