1  Q    On Page 300 of Dr. Nicholson's paper, do you still have

2  that in front of you, --

3  A    Oh yes.

4  Q    --Dr. Ory?  The statement about asbestosis deaths about

5  the lower risk population --

6  A    Yes.

7  Q    -- that Dr. Nicholson puts in quotes, do you see that?

8  A    Yes.

9  Q    Of the 27.5 million individuals Dr. Nicholson and the

10 others at Mount Sinai estimated that 18.8 million of them had

11 asbestos exposures higher than two to three fiber years of

12 exposure, correct?

13 A    Yes.

14 Q    Can you explain to the Court what is meant by fiber year

15 of exposure?

16 A    If you work in an environment say that has one fiber per

17 cc concentration on a time-weighted average and you do that for

18 a year, you have one fiber year exposure.  If you do it for

19 three years, you have a three-fiber year exposure.

20 Q    And you helped -- you reviewed the slides that we were

21 showing today, correct?

22 A    I created most of them.

23 Q    You created most of them.  Turn on the elmo (phonetic)

24 please.  Do you recognize this as something you helped create

25 as well?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000639

1  A    Yes.

2          THE COURT:  Could you identify it for the record

3  please?

4          MR. FINCH:  This is a slide that I was given by

5  counsel for the debtor yesterday.

6          THE COURT:  It doesn't have an exhibit number?

7          MR. FINCH:  It doesn't have an exhibit number.

8  Q    Doctor --

9          THE COURT:  Could you mark as --

10          MS. HARDING:  These are our draft slides that we

11  didn't use, but --

12          MR. BERNICK:  I would have a fundamental problem,

13  Your Honor -- this is David Bernick for Grace -- that we have

14  an arrangement that was specifically entered into to provide

15  notice to the other side regarding what might be used.  If

16  we're going to have cross examination with respect to these

17  draft slides, then I am no longer in any kind of agreement

18  whatsoever that we'll have an advance exchange of

19  demonstratives.

20          MR. FINCH:  Your Honor, there was never any --

21          MR. BERNICK:  Excuse me.  That is a complete breach

22  of an agreement made with counsel.  This is now the third time

23  in the last week that there have been express breaches of

24  agreements.  Our agreement to that is withdrawn.  We will not

25  submit any more unless Your Honor, of course, orders us to.


**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000640

1  It's a wholly improper use of an accommodation to counsel.

2          MR. FINCH:  Your Honor, there was never any agreement

3  that you couldn't cross examine an expert based on the draft of

4  his demonstratives.  This was -- I'm perfectly happy to forego

5  the exchange of demonstratives.  There was never an agreement

6  with that.  It was an agreement that you get the draft

7  demonstratives.  This is a demonstrative that comes directly

8  out of Dr. Ory's report, the demonstrative, but the statements

9  come in his report and so I think it's perfectly fair on cross

10 examination of an opposing witness to ask him about statements

11 that were in his report that were reduced to graphical form in

12 an exhibit that he helped oversee.

13          UNIDENTIFIED SPEAKER:  I don't care.

14          MR. BERNICK:  And I would further add, Your Honor,

15 that under the stipulation that was entered into in this case

16 in connection with experts, there was to be no discovery with

17 respect to draft reports and this is totally in harmony with

18 exactly the same arrangement.  I'm happy not to have any

19 exchange of demonstratives.  That is fine with me.  This is

20 something I agreed to purely as an accommodation to counsel.

21          THE COURT:  I'm not sure exactly what the point is.

22 I mean the reason that drafts were not being exchanged is

23 because they were drafts.  They were not the final witness's

24 presentation.  That's why the finals were exchanged, so --

25          MR. FINCH:  Your Honor, this is not his report.  Q

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000641

1    Let's put it this way, Dr. Ory, do you have your report?

2  A    I do.

3  Q    Okay, could you turn to Page --

4         UNIDENTIFIED SPEAKER:  (Inaudible).

5  Q    Could you turn to Page 34 of your report?

6  A    Yes.

7  Q    Okay, the report has been marked, for purposes of

8  identification, as ACC FCR 561.  Could you show 561, Page 34?

9  There you write Nicholson considered low dose exposures to be

10 between two to three fiber years of cumulative lifetime

11 exposure, correct?

12 A    Yes.

13 Q    All right, he didn't actually call them low dose exposures

14 in the paper.  That's your terminology, correct?  He called

15 them lower in dose?

16 A    That's true.

17 Q    Okay now, would you agree with me -- you have a statement

18 there that if someone has mesothelioma, the odds are 50 to 1

19 that he developed it due to an exposure greater than two to

20 three fiber years, correct?

21 A    That's correct.

22 Q    And in the -- and you would agree with me that two to

23 three fiber years is what Dr. Nicholson considered -- an

24 epidemiologists consider as a high dose exposure for asbestos?

25         MS. HARDING:  Object to form.

**J&J COURT TRANSCRIBERS, INC.**

1          THE WITNESS:  All he said there was this was a lower

2    risk population.

3    Q    Okay, but not a no risk population?

4    A    He called it a lower risk population.

5    Q    Okay, and so if someone has mesothelioma, would you agree

6    with me that it is more likely than not they were exposed to at

7    least two to three fiber years cumulative dose of asbestos?

8    A    If someone -- if you showed me -- it's the way you're

9    constructing your words.  If you showed me a person who has

10   mesothelioma and told me nothing more about the person, I would

11   say there's a 98 percent chance that that person had more than

12   a three-fiber year exposure to asbestosis.

13   Q    Three-fiber year exposure to asbestos?

14   A    I'm sorry, to asbestos.

15   Q    Cumulative exposure?

16   A    Cumulative exposure, three fiber years.

17   Q    You still have your report?  One of the papers you cite at

18   the back of your report is a paper written in 2004 by Bertram

19   Price and Adam Ware?

20   A    Yes.

21   Q    Okay, could I have ACC 560 please?

22          MR. FINCH:  Your Honor, may I approach the bench and

23   the witness?

24          THE COURT:  Yes.

25   Q    Dr. Ory, do you have the Price and Ware paper in front of

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000643

1 you which has been premarked for identification of ACC 560?

2 A    I do.

3 Q    Okay, the first paragraph in the third sentence, I don't

4 know if they're doctors but Misters or Doctors Price and Ware

5 write, "Mesothelioma projections also provide a foundation for

6 estimating the number of potential lawsuits from persons

7 claiming occupational exposure to asbestos or exposure

8 resulting from use of previously-manufactured

9 asbestos-containing products, do you see that?

10 A    Yes.

11 Q    One of the experts reports who you reviewed in this case

12 is Dr. Mark Peterson, correct?

13 A    Yes.

14          MR. FINCH:  Can I have Peterson's report taped up?

15 Let's put the whole report up, the whole report.  Your Honor,

16 may I approach the witness and the bench?

17          THE COURT:  Yes.  You don't need to keep asking, Mr.

18 Finch, when you need to show him an exhibit.

19          MR. FINCH:  Okay.

20          THE COURT:  Thank you.

21 Q    Now, you criticize Dr. Peterson's report about --

22 basically, your testimony here boils down to that whatever he

23 was projecting, it wasn't the number of medically-plausible

24 asbestosis cases, correct?

25 A    Yes.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000644

1  Q    All right, and you're familiar with Dr. Peterson's report

2  because you had to review it in order to do your report,

3  correct?

4  A    Yes.

5  Q    Okay, could you turn to Page 76 in Dr. Peterson's report?

6  It's going to be that page.  Do you see that?

7  A    I'm getting there.  Just a moment, okay?  I'll get there

8  in a minute.

9                          (Pause)

10         THE WITNESS:   Okay, I'm sorry, Page 76?

11  Q    Page 76, do you have that in front of you?

12  A    All right, yes.

13  Q    Do you see Figure 24?

14  A    Yes.

15  Q    That's Dr. Peterson's projection of -- it has Dr.

16  Nicholson's meso forecast and then Dr. Peterson's projection of

17  mesothelioma claims against Grace, correct?

18  A    Yes.

19  Q    You didn't offer any opinion about whether the number of

20  mesothelioma claims he's projecting are medically plausible or

21  not, correct?

22  A    I offer no opinion about that.

23  Q    Okay, and Dr. Peterson is not projecting a flat line,

24  straight number of mesothelioma claims going out for the next

25  30 years, is he?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000645

1          MS. HARDING:  Your Honor, I'm just going to object

2   because the doctor has already testified that he's not offering

3   opinions about it so I don't know why he's going to ask him

4   about it.

5          MR. FINCH:  Your Honor, this is cross examination.

6   It goes to what he did and what he didn't do and his

7   credibility.  I have two more questions on this topic.

8          THE COURT:  I don't know how what Dr. Peterson did or

9   didn't do affects this witness's credibility.  That's not a

10  (indiscernible) question.

11         MS. HARDING:  And he also said he didn't suggest

12  claims so I don't know why he's asking him about Dr. Peterson's

13  claims.

14         MR. FINCH:  Okay, his report was submitted as a

15  rebuttal report to Dr. Peterson and Dr. Welch.  I don't know

16  why they put him on in their case in chief.  He was submitted

17  as a rebuttal -- he was submitted as a rebuttal expert so I

18  think it's fair for me to cross examine him based on what he

19  did and didn't do in his report.

20         MS. HARDING:  Your Honor, his report was submitted as

21  a rebuttal, that it was submitted with respect to certain

22  aspects of Dr. Peterson's report that had clearly to do with

23  diseased cases.  It had nothing to do with the projection of

24  claims.

25         THE COURT:  This witness has testified that he did

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000646

1 nothing to predict claims, that he was looking at predictions

2 of actual mesothelioma cases, medical cases that would be

3 diagnosed, not claims that could be filed.  He's been very

4 clear about that.

5            MR. FINCH:  Okay, but he said that Dr. Peterson's

6 projections of future asbestosis claims is medically

7 implausible.  The point I'm trying to make is that he doesn't

8 believe that Dr. Peterson's projections of mesothelioma claims

9 is medically implausible.

10            MS. HARDING:  He did not offer that testimony, Your

11 Honor.  He did not offer an opinion about Dr. Peterson's future

12 claims of asbestosis.

13            THE COURT:  You may ask him if he has an opinion on

14 that subject first.  Let's start with that.

15 Q    Okay, is it correct, Dr. Ory, that you don't have an

16 opinion about whether Dr. Peterson's --

17            THE COURT:  You have to state it affirmatively, Mr.

18 Finch, and find out if he does have an opinion.  You can't ask

19 him if he doesn't have an opinion.  How are we going to know --

20 Q    Dr. Ory, do you have any opinion at all about whether Dr.

21 Peterson's projections of mesothelioma claims are medically

22 plausible?

23 A    I believe in my report on the bottom of Page 3 and the top

24 of Page 5 I restrict my comments to Peterson about asbestosis.

25 Q    Okay.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000647

1     MR. FINCH:  Your Honor, at what point would you

2  contemplate taking a lunch break?  I know I have another half

3  hour to go and I'm sure that Mr. Ansbro has questions as well.

4

5     THE COURT:  Well then this will be fine.  We'll take

6  an hour for lunch.  We'll reconvene at 1:25.

7     MR. BERNICK:  Could we get an estimate on cross

8  examination?  We have Mr. Rodricks -- Dr. Rodricks who's

9  waiting in the wings here.

10     MR. FINCH:  I have another half hour.  I'm not sure

11  what John has.

12     MR. ANSBRO:  I'd say up to 45 tops.

13     MR. BERNICK:  Forty-five tops, okay.  So we should be

14  able to get Rodricks' direct on at least.  I mean --

15     UNIDENTIFIED ATTORNEY:  We'll just deal with that on

16  the break.

17     MR. BERNICK:  Okay, that's fine, Your Honor.

18     THE COURT:  All right, we'll be in recess until 1:25.

19                       (Recess)

20     THE COURT:  Doctor, you're still under oath.  Mr.

21  Finch?

22  Q    Good afternoon, Dr. Ory.

23  A    Good afternoon.

24  Q    Turn on the elmo.  One of the slides that you showed in

25  your direct examination, Dr. Ory, this is the age-adjusted

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000648

1  death rates from asbestosis?

2  A    That's correct.

3  Q    Okay, may I approach, Your Honor?

4        THE COURT:  Yes.

5  Q    Dr. Ory, do you recognize what has been marked as ACC 571

6  as something you brought with you to your deposition that

7  demonstrated where you got the figures for the age-adjusted

8  death rates?

9  A    That's correct.

10 Q    This is from the CDC NIOSH occupational deaths due to

11 asbestosis?

12 A    That's correct.

13       MR. FINCH:  Your Honor, I offer 571.

14       THE COURT:  Any objection?

15       MS. HARDING:  Just say what it is again, I'm sorry.

16       MR. FINCH:  Sure, this is what Dr. Ory brought to the

17 deposition, the CDC NIOSH government statistics of deaths from

18 asbestosis.  It derives the foundation for the death rates

19 shown in his chart, GG2048.

20       THE COURT:  He copies these numbers onto his chart.

21       MS. HARDING:  No, no, Your Honor, I was trying to

22 figure out -- at first I thought it was an extra page and I was

23 just trying to figure out -- if Dr. Ory has represented that

24 it's the entire part of his exhibit that he offered at the

25 deposition.  I don't have any objection.  That was me.  I'm not

**J&J COURT TRANSCRIBERS, INC.**

Ory - Cross/Finch                    97

1  sure if it was part of the exhibit.  That's my only question.

2           UNIDENTIFIED ATTORNEY:  I believe it was.

3           MS. HARDING:  He said it was an exhibit at the

4  deposition.  That's why I wasn't sure.  I thought his exhibit

5  was only one page, but it could have been two.

6           MR. FINCH:  Your Honor, it is the deposition exhibit,

7  the whole three-page document was a deposition exhibit.

8           MS. HARDING:  On that representation, we won't

9  object, Your Honor.

10          MR. FINCH:  Okay.

11          THE COURT:  It's admitted.

12 Q    All right now, the CDC and NIOSH also keep statistics for

13 the occupationally-related mesothelioma deaths, correct?

14 A    They keep statistics on mesothelioma deaths.

15          MR. FINCH:  Okay, and may I approach the witness,

16 Your Honor?

17          THE COURT:  Yes.

18          MR. FINCH:  Your Honor, Exhibit 614 --

19 Q    You have Exhibit 614 in front of you, Dr. Ory?

20 A    I do.

21 Q    And the first two pages are a certification from the

22 United States government that this is a true and accurate copy

23 of records collected and reported pursuant to official

24 government authorities?

25 A    Yes.


                    **J&J COURT TRANSCRIBERS, INC.**

CC-BLG000650

1 Q    And then the third page is a page that looks like this?

2 A    Yes.

3 Q    And that's the counts of mesothelioma death in the -- as

4 determined by NIOSH CDC from 1999 to 2004?

5 A    Right, for both sexes.

6 Q    Okay, and it shows 2,484 in 1999?

7 A    That's correct.

8 Q    Rising to 2,657 in 2004?

9 A    That's correct.

10 Q    So if someone read that and said U.S. government

11 statistics show that the mesothelioma count is actually going

12 up, it's been a flat a long time but it's still going up,

13 that's not accurate -- that is accurate based on this

14 government data, correct?

15 A    If they said deaths were going up.

16 Q    Mesothelioma deaths are actually going up?

17 A    Yes.

18 Q    Okay.

19 A    In men and women totaled.

20          MR. FINCH:  Your Honor, I would offer Exhibit 614.

21          MS. HARDING:  No objection, Your Honor.

22          THE COURT:  It's admitted.

23 Q    Now, do you still have 571 with you, Dr. Ory?

24 A    Let's see, the first one you gave me?

25 Q    That's the one that you brought with you to your

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000651

1 deposition.

2 A    Yes.

3 Q    Okay, the first page of that shows the death -- the

4 numbers of deaths and the death rate between 2000 and 2004,

5 right?

6 A    That's correct.

7 Q    Okay, and the third page is this page, shows the deaths

8 from asbestosis and the age-adjusted death rate for each year

9 between 1990 through 2004, correct?

10 A    That's correct.

11 Q    Okay, would you agree with me that the date that -- do you

12 have the understanding the date we're interested in is what was

13 Grace's asbestos liability on the day it went into bankruptcy?

14        MS. HARDING:    Objection.    I don't think the

15 foundation --

16 Q    Okay, would you agree with me that the deaths and the

17 age-adjusted death rates were rising between 1990 and 2000?

18 A    Yes.

19 Q    And that the age-adjusted death rates and the total

20 numbers of deaths between 2001 and 2004 are still higher than

21 they were in 1996, 1997, 1998 and 1999?

22 A    We're talking now about 571?

23 Q    That's right.

24 A    I would say that the age-adjusted death rate from 1990 to

25 '99 was trending slightly upwards, that's correct.    And what's

J&J COURT TRANSCRIBERS, INC.

CC-BLG000652

1  the second part of your question?

2  Q     And that it peaked around 2000?

3  A     The death rate?

4  Q     The death rate peaked around 2000?

5  A     Yes.

6  Q     And then the death rate has declined somewhat since 2000

7  but it's still higher in 2004 than it was in 1999?

8  A     That's correct.

9  Q     And that the numbers of deaths between 2000 and 2004

10 average around 1,410 a year, correct?

11 A     Yes.

12 Q     And that's not substantially lower than the numbers of

13 deaths in 2000, correct?

14 A     Well, I mean, yeah, the numbers of deaths are slightly

15 lower in 2003 and 4 say than in 2000 and 2001.

16 Q     Okay, and the -- Dr. Nicholson's projections of

17 mesothelioma deaths expected at the mesothelioma incidents the

18 United States would peak in the 2000 and 2004 time period,

19 correct?

20 A     Right.

21 Q     And it declined gradually thereafter, correct?

22 A     You're talking about mesothelioma deaths?

23 Q     Mesothelioma deaths.

24 A     Yes, he had them peaking around 2002.

25 Q     And then the curves that we showed in your demonstratives

J&J COURT TRANSCRIBERS, INC.

CC-BLG000653

1 showed that the shape of Dr. Nicholson's projections over the

2 next 20 some years is basically a long, slow decline for

3 mesothelioma?

4 A    Well, it declined slowly at first and then it picks up

5 speed.

6 Q    It picks up speed in --

7 A    Yes.

8 Q    -- twenty or thereabouts.

9 A    It picks up speed every five-year interval.

10 Q    Every five-year interval after 2002?

11 A    Right.

12 Q    But there's still -- he still is projecting 900 deaths

13 from mesothelioma in the year 2027?

14 A    Right, which I would say then marked down by 20 percent.

15 Q    Okay, if you're just looking for men, but if you're

16 looking for men and women, you wouldn't mark it down by 20

17 percent?

18 A    Well, he's only projecting men.

19 Q    He was projecting from a population that included men and

20 women using the death rates for men, correct?

21 A    It's very clear when I pointed it out in my deposition the

22 two or three places where he explicitly says he's projecting

23 men and, in fact, when he compares his own curve to SEER data,

24 he compares it to SEER males.  So it's very clear to me that

25 he's projecting men.


J&J COURT TRANSCRIBERS, INC.


CC-BLG000654

1  Q     But as we both agreed before, there are deaths from

2  mesothelioma in women as well?

3  A     That's correct.

4  Q     Okay, could you explain to the Court the difference

5  between incidents and prevalence?

6  A     Yes and I'm wondering.  I have a slide to do that.

7  Q     Well, let me ask in a leading question manner so maybe we

8  could go a little bit faster.  Would you agree that incidents

9  is the number of new cases in a -- of disease in a given

10 population?

11 A     In a given time period, yes.

12 Q     In a given time period.  And prevalence is the number of

13 people who have the disease when you observe them at some point

14 in time.  It's not necessarily a number of new cases.  It's a

15 number of people either still alive or people who have died

16 from a disease at some point in time.

17 A     It's more like a cumulative number.

18 Q     Okay, and I take it that you are not claiming that you

19 have any expertise in projecting claims, correct?

20 A     That's correct.

21 Q     And so you don't have any opinion about whether for non

22 malignant disease it is better to use the prevalence of disease

23 in a population as compared to the incidents of disease in a

24 population?

25        MS. HARDING:  I'm just going to object to form of non

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000655

 1 malignant disease.

 2          THE COURT:  I can't hear you.

 3          MS. HARDING:  I'm sorry, Your Honor.  I'm going to

 4 object to form with respect to non malignant disease in terms

 5 of what Mr. Finch is talking about.

 6 Q    Okay, let me rephrase that.  You don't have any opinion

 7 that when someone is projecting the numbers of non malignant

 8 claims, whether one should be looking at prevalence or

 9 incidents?

10 A    When one is trying to predict new cases of disease, one

11 should use incidents.

12 Q    But the question was not new cases of disease.  The

13 question was new lawsuits.  You don't have an opinion --

14 A    I don't have an opinion about predicting new lawsuits,

15 period.

16 Q    Okay, so you don't have an opinion when you're predicting

17 -- when one is set to the task of predicting new lawsuits

18 whether the proper metric to use for purposes of that

19 prediction is to look at the incidents data for non malignant

20 claims or the prevalence of the disease in the population?

21 A    I don't have an opinion about how to predict claims.

22 Q    And that would include non malignant claims, correct?

23 A    All claims.

24 Q    Okay now, the mortality data that we have shows that for

25 mesothelioma people tend to die within a year or two of

                    **J&J COURT TRANSCRIBERS, INC.**

CC-BLG000656

1 contracting the disease, correct?

2 A    That's correct.

3 Q    And for asbestosis, people generally do not die from that

4 disease, correct?

5 A    Not these days, no.

6 Q    And, in fact, isn't it the case that maybe only three

7 percent of the people who contract asbestosis ever die from it?

8 A    I don't know that for a fact?

9 Q    It's less than one in 20?

10 A    It depends when you're talking about.  I mean if you're

11 talking about the turn of the 1900's, almost everybody died

12 from it.  So it's a time-dependent statement.

13 Q    We're talking about --

14 A    For example, in the insulator cohort, half the people in

15 the insulator cohort were dead by 65 years of age.

16 Q    But they didn't all die from asbestosis?

17 A    That's true.

18 Q    Okay, when you talked about the insulator cohort, you are

19 referring, I take it, to the population studied by Dr.

20 Nicholson and Dr. Selikoff at the Mount Sinai studies?

21 A    Yes.

22        MR. FINCH:  Okay, could I have ACC FCR 2036?

23 Q    And you testified, I believe, when I was asking you

24 questions on voir dire that you had read what you regarded as

25 the relevant -- you had read a lot of literature about the

J&J COURT TRANSCRIBERS, INC.

CC-BLG000657

1  incidents and prevalence of asbestos-related disease, correct?

2  A     That's correct.

3          MR. FINCH:  May I approach, Your Honor?

4  Q     This is a publication that I'm sure you came across

5  relating to the predictors of mortality from asbestosis in the

6  North American insulator cohort?  You reviewed this paper as

7  part of your work here?

8  A     Yes, I'm familiar with it.

9  Q     Okay, if you could turn to Page 103, Table 2 has data

10 about asbestosis deaths in the population?

11 A     Yes.

12 Q     And that shows that whatever the sum of 25 plus 22 plus 19

13 are the people that died from asbestosis in this population as

14 of the date measured?

15 A     There are so many studies of this.  Let me check.  Let me

16 see if I can determine the date.

17 Q     This was the date as of 1991.

18 A     That's correct, okay.

19 Q     Okay, and so as of 1991 about 70 of them have died from

20 asbestosis?

21 A     Many more had died from asbestosis by that time.  My

22 recollection is, let's see, 66, 76 -- actually, by '86, 400 and

23 some odd had died from asbestosis.

24 Q     Where is that data presented in this?

25 A     It's not in here.  It's in Sideman and Selikoff.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Okay, but this is looking at -- actually, this study is

2  dated 1991 but it's looking at how many have died by 1983,

3  correct?

4  A    By 1983 -- I'm saying I know that by 1986 over --

5  somewheres in the neighborhood of 400, almost 500 had died by

6  1986 so --

7  Q    Died from all causes or from --

8  A    No, from asbestosis.

9  Q    -- just from asbestosis.  Okay.  And if you look at the

10 numbers of people with asbestosis, there's well over 1,500 of

11 them with asbestosis, correct, as of the date of this study?

12 A    That's correct.

13 Q    And the mortality rate for asbestosis you would expect to

14 be lower in cohorts that were less heavily exposed than the

15 insulator population, correct?

16 A    That's probably true, yes.

17 Q    Okay, so for the insulators, maybe a third of the people

18 that had asbestosis eventually had died from it, correct?

19 A    I'm not quite sure if that's correct, but it's of that

20 order.

21 Q    Okay, but for populations like sheet metal workers or

22 other types of asbestos-exposed workers, the percentage of

23 people who die from asbestosis as compared to the percentage of

24 people who have asbestosis is much lower than that, right?

25 A    Well, you know, this is a carefully-studied cohort and the

J&J COURT TRANSCRIBERS, INC.

CC-BLG000659

1 problem when you switch to less carefully-studied cohorts is

2 you get into the problem of who really has asbestosis.  And,

3 you know, these numbers are based on careful followup of a

4 cohort.

5 Q    You were shown the sheet metal workers study in your

6 deposition, do you recall that?

7 A    That's correct.

8         MR. FINCH:  Can I have ACC 395?

9 Q    This is a population of sheet metal workers studied by the

10 National Sheet Metal Examination Group?

11 A    Yes.

12 Q    Includes David Michaels and Laura Welch as authors of the

13 study?

14 A    Yes.

15 Q    This is another study where there's been a long time

16 followup of the cohort under examination and they were examined

17 for medical screening purposes?

18 A    Not at all the same.  This is a cross sectional study.

19 They invited a number of people.  I think 40 percent of them

20 showed up and then many of those were not examined.  This is a

21 completely different situation than a carefully-followed

22 cohort.

23 Q    Would you agree with me that the mortality from asbestosis

24 depends on the cohort you're studying, correct?

25 A    The mortality from asbestosis depends on the exposure to

**J&J COURT TRANSCRIBERS, INC.**

1  asbestosis -- to asbestos.

2  Q    One of the things that you relied upon is the 2004

3  American Thoracic Society statement on the diagnosis in an

4  issue management of non malignant diseases related to asbestos?

5  A    That's correct.

6         MR. FINCH:  Can I have that on the screen, 389?

7  Q    You are not a pulmonologist or a clinician, correct?

8  A    That's correct.

9  Q    And you didn't interview the British doctors who made up

10  the group that you studied about what diagnostic practices they

11  followed to diagnose asbestosis, correct?

12  A    That's correct.

13  Q    So you don't know whether they followed American Thoracic

14  Society guidelines or some other guidelines, correct?

15  A    That's correct.

16  Q    And the American Thoracic Society does not require lung

17  function decline in order to diagnose asbestosis, correct?

18  A    Yes.

19  Q    Now, could you turn to Page 702 in this document?  You

20  would agree with me that there are non malignant diseases

21  caused by exposure to asbestos in addition to asbestosis,

22  correct?

23  A    Yes.

24  Q    And the RAND data that you looked at didn't divide the

25  300,000 plus claims for disease, non malignant disease into

                  J&J COURT TRANSCRIBERS, INC.

CC-BLG000661

1 asbestosis or pleural disease or anything else?  They just

2 called them non malignant claims, correct?

3 A    The RAND data did not.  I did that by applying the Grace

4 historical claims that 81 percent figure for asbestosis to the

5 RAND data.

6 Q    Okay, you didn't review any of the Grace historical

7 claimants' medical records to see whether they had asbestosis

8 or pleural plax, for example, correct?

9 A    No, but if they said they had asbestosis and the claim was

10 settled for that, I took that to be asbestosis.

11 Q    Well, you didn't review any of the complaints to see

12 whether they said asbestosis or just non malignant disease,

13 correct?

14 A    Correct.

15 Q    You didn't talk to the Grace claims in putters to know

16 whether they typed in asbestosis for insurance purposes versus

17 non malignant disease versus pleural plax?  You don't know what

18 kind of criteria for how they typed in the disease?

19 A    These are claims that were settled and they were settled

20 for asbestosis.  I don't think it's a matter of entering the

21 data.  They were settled as asbestosis, weren't they?

22 Q    You don't have any independent knowledge of that fact, do

23 you?

24 A    No.

25 Q    Okay now, the 2004 American Thoracic Society -- would you

CC-BLG000662

1 also agree with me that in an asbestos-exposed cohort, some

2 percentage of population will contract asbestosis, probably a

3 larger percent of the population will contract pleural plax and

4 then a much smaller percentage will contract mesothelioma or

5 lung cancer?

6 A    Well again, that all depends on the dose, how well that

7 works out and where you are in time, but I will agree that the

8 people exposed to asbestosis can get pleural plax asbestosis

9 and mesothelioma.

10 Q    You would agree that people exposed to asbestos could get

11 pleural plax --

12 A    Did I say that again?

13 Q    -- and asbestosis and mesothelioma?

14 A    Right.  I'm sorry.

15 Q    And you would also agree based on -- I mean obviously it

16 depends on the cohort you're studying, the relative percentages

17 between the three, but generally speaking, far more people

18 contract pleural plax than mesothelioma, correct?

19 A    That's probably true.

20 Q    And the ratio between pleural plax and asbestosis depends

21 on the cohort you're studying, correct?

22 A    Probably, and then it probably depends on how they're

23 examined and depends on many things.

24 Q    Okay, at the bottom of Page 702 the American Thoracic

25 Society, the very last line states, "Pleural plax consistent

CC-BLG000663

1 with asbestos exposure appear in chest films of 2.3 percent of

2 U.S. males, a percentage that has been -- and it skips over two

3 more pages -- remarkably stable, both for the general

4 population in the early 70's and the veterans in the 1990's."

5 Do you see that?

6 A    Yes.

7 Q    2.3 percent of United States males is over two million

8 people, correct?

9 A    Yes.

10 Q    And that's a picture of pleural plax?

11 A    No, it's like text.  If you represent it as that -- are

12 you showing me Figure 13?

13 Q    Figure 12.

14 A    Figure 12.

15 Q    Can you read the caption for Figure 12?

16 A    Gross appearance at autopsy of asbestos-associated pleural

17 plax overlaying the lateral thoracic wall.

18 Q    One final thing, Doctor, before I pass the witness.  You

19 would agree with me that the lengthy period for mesothelioma

20 can be as long as 60 years, correct?

21 A    Probably 50.

22 Q    And you've reviewed the expert claim projections from Dr.

23 Peterson in this case, correct?

24 A    Yes.

25 Q    And the numbers of future mesothelioma claims decline

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000664

1 after the year 2007, don't they?

2          MS. HARDING:  Objection again, Your Honor.  I think

3 that the witness has already said he hasn't offered any

4 opinions on Dr. Peterson's claims projections.

5          MR. FINCH:  He is offering opinions on the claims

6 projections.  He's offering opinions that the numbers of claims

7 that Dr. Peterson projects for non malignant disease are not

8 medically plausible.  That's sort of the sum and substance as I

9 understand his --

10          THE COURT:  But you just asked him about meso claims.

11          MR. FINCH:  He creates his non malignant disease by a

12 ratio to mesothelioma.

13          MS. HARDING:  He didn't ever talk about claims in

14 terms of future.  He didn't offer no testimony on Dr.

15 Peterson's estimates of future claims.  Today in the courtroom

16 he did not.

17          MR. FINCH:  Okay, with that, I'll pass the witness.

18          THE COURT:  Just a second please.  Okay, thank you.

19          MR. ANSBRO:  May I proceed, Your Honor?

20          THE COURT:  Yes, sir, thank you.

21                         CROSS EXAMINATION

22 BY MR. ANSBRO:

23 Q    Good afternoon, Dr. Ory.  At your deposition we agreed

24 that you're not familiar with the term severe asbestosis, is

25 that right?

**J&J COURT TRANSCRIBERS, INC.**

1 A    That's correct.

2 Q    And your analysis in this case does not seek to

3 distinguish cases of so-called severe asbestosis from less

4 severe asbestosis, correct?

5 A    Right, as we discussed in my deposition, asbestosis is

6 asbestosis.

7 Q    And you did not attempt to break out separately an

8 impaired asbestosis versus what's commonly referred to as an

9 unimpaired asbestosis, is that right?

10 A    Not in the GPRD, no.

11 Q    In your report you did not make any distinction between

12 those two?

13 A    That's correct.

14 Q    But correct that you did not make any inquiry to study

15 what are the distinctions in the levels of severity, the

16 medical distinctions?

17 A    Within the GPRD?

18 Q    Yes, sir.

19 A    That's correct.

20 Q    And nowhere else did you attempt to make inquiry about the

21 distinctions between the levels of seriousness of asbestosis?

22 A    Well, subsequent to the deposition you're presenting me

23 with information from the U.K. mesothelioma registry, I looked

24 at that and I looked at the U.K. mesothelioma -- I'm sorry, the

25 U.K. asbestosis compensation registry --

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000666

1        MR. FINCH:  Your Honor, I would object to the witness

2   offering testimony that was not in his report.

3        THE COURT:  He was asked what he looked at.  He's

4   just answering the question.  Overruled.  He was asked whether

5   he looked at -- whether he -- I'm sorry, I cannot restate the

6   question.  I did not write it down word for word.  The first

7   question regarded whether or not he inquired in the GPRD about

8   distinctions in the medical levels of severity regarding

9   asbestosis and he answered no, and whether he then looked at

10  the other data and his answer was -- he began to answer after

11  the deposition he did and he was answering the question.  You

12  may continue, Doctor.

13  Q    If you could look please at --

14       THE COURT:  He may continue the answer.

15  Q    Had you completed your answer, Doctor?

16  A    So after the deposition I looked at the U.K. mesothelioma

17  registry which you crossed me with and then I went back and

18  looked at the U.K. asbestosis compensation registry and I

19  learned that the U.K. asbestosis compensation registry requires

20  only a one percent disability to be registered and compensated.

21  So I have now a comparison of the U.K. compensation registry to

22  the ball U.K. mesotheliomas which would be -- people have at

23  least one percent disability so I have a ratio there, as well

24  as the ratio I have from the GPRD which makes no mention of

25  severity as we've agreed.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000667

1 Q    The GPRD information is input by physicians in the United

2 Kingdom, correct?

3 A    That's correct.

4 Q    Are they -- have you done an examination as to what

5 criteria they used before they determined whether something was

6 diagnosed and labeled as asbestosis put into their reports?

7 A    No, again, this is like the answer I gave about, you know,

8 how is breast cancer diagnosed in the United States and the

9 study I did of breast cancer.  I have to accept the treating

10 physician's diagnosis of breast cancer there, and in the U.K. I

11 have to accept the treating physician's diagnosis of

12 asbestosis.

13 Q    To be clear, you don't know on what basis or what criteria

14 or what scales the United Kingdom may look to or not look to

15 before they make a diagnosis of asbestosis?

16 A    That's correct.

17 Q    And with respect to the compensation values that you just

18 mentioned, is it correct to say that the physicians who input

19 diagnoses of asbestosis into the GPRD, that is uninfluenced by

20 these compensation tables to which you're referring?

21 A    I'm sorry, ask the question again?

22 Q    The compensation tables that you're talking about with

23 respect to mesothelioma and asbestosis, does that have any

24 impact insofar as you're aware as to how physicians diagnose

25 asbestosis?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000668

1  A    No, I think it's the other way around.  I think that

2  they're required to report mesothelioma deaths in asbestosis

3  cases to the registries.

4  Q    There's no a connection between those two, however?

5  A    That's the best answer I can give you.

6  Q    Turn to what's been previously marked as ACC FCR Exhibit

7  561.  This is your report.  I believe you have it up there,

8  Doctor.  I'd ask you to turn to Table Four Nine.  Excuse me, I

9  pointed you to the wrong --

10  A    You're talking about my rebuttal report?

11  Q    We'll get to that in just a moment.  I misspoke.  We want

12  to go now to Exhibit ACC FCR 462.

13  A    Which is?

14  Q    Which is the September 25th report on Grace's expert

15  Thomas Florence.

16  A    Actually, turn to Table --

17        MS. HARDING:  Objection, Your Honor.  I think that

18  counsel should ask Dr. Ory if he's reviewed --

19        MR. ANSBRO:  I will do that.

20        MS. HARDING:  -- it, presented it and offered

21  opinions on it.

22        MR. ANSBRO:  (Indiscernible) those foundational

23  questions.

24  Q    Have you read Dr. Florence's September 25th report before

25  today?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000669

1  A    No.

2  Q    Had you read his earlier report of June 18?

3  A    I'm not sure.  I may have read one report of his.  I'm not

4  sure which one it would have been.

5  Q    It's fair to say then you're not that familiar with it?

6  A    That's true.

7  Q    Let me ask you to turn please to Page 14, Table Four Nine.

8        MS. HARDING:  Your Honor, if he hasn't reviewed it, I

9  don't understand what the questioning would be about.

10        THE COURT:  We'll find out.

11  Q    You see at Table Four Nine, Doctor, there's a breakout

12  between these three categories of asbestosis, the first being

13  severe, the next one described as asbestosis and the last

14  unimpaired?

15  A    Yes, I see that.

16  Q    I think I know what the answer to this question is going

17  to be, but do you have any understanding as to why those three

18  categories are broken out separately --

19  A    I do not.

20  Q    -- by Grace's expert?

21  A    I do not.

22  Q    With respect to the distinction between these three types

23  of diseases, am I correct in understanding that you're not

24  saying that any of these categories of asbestosis is by

25  definition medically implausible, is that correct?

**J&J COURT TRANSCRIBERS, INC.**

1          MS. HARDING:  I'm just going to object again, Your

2     Honor, with respect to him asking about a statement in Dr.

3     Florence's report with respect those categories of diseases

4     when he hasn't had any input in the definition there and he

5     said he hadn't seen this particular report.  So I don't have an

6     objection to him talking to him about the categories of the

7     severity of disease but I don't understand the distinction.

8          THE COURT:  So far this witness has not articulated

9     that he agrees that there are categories of this disease so I

10    don't think you've got foundation for the question.

11    Q    Doctor, you see that the Grace's expert report lays these

12    three out?  Aside from this expert's report, are you familiar

13    with, in the literature, that it is commonly broken out by

14    severe asbestosis and asbestosis and unimpaired asbestosis?

15    A    From the standpoint of the epidemiologic analysis that I

16    did, I accepted the diagnosis of asbestosis as it was written.

17    It's sort of -- and as I told you in the deposition, the ICD

18    codes for asbestosis only recognize one asbestosis.  It's 501

19    in ICD Nine.  There's not 501.1, .2, .3 that says anything

20    else.  So as an epidemiologist studying asbestosis, I'm taking

21    the physician's diagnosis.  It's coded with a single code so

22    it's sort of -- I hate to use a legal word, but it's sort of

23    moot to me whether there are or are not categorizations because

24    I don't see them in the data that I analyze.

25    Q    Have you seen them generally in the literature and

**J&J COURT TRANSCRIBERS, INC.**

1  background information that you've reviewed in connection with

2  this case?

3  A    I have seen asbestosis broken down into different

4  categories, yes.

5  Q    Those three categories often include, and sometimes more,

6  but at a minimum severe and then asbestosis and unimpaired

7  asbestosis, yes?

8  A    Probably.

9  Q    Of the descriptions, and broken down in those categories,

10 of all of those the three types of diseases that I've just

11 listed, they can be medically plausible, do you agree with

12 that?

13 A    I just feel like we're talking at angles here.  We talked

14 earlier this morning about to me what medically plausible

15 meant.  It meant that someone was diagnosed by a physician

16 using proper methods to have asbestosis whether that -- and I'm

17 saying that the GPRD physicians made the diagnosis of

18 asbestosis and I accept it that way.

19 Q    You would agree with me then that aside from the overall

20 definition that you're using, am I correct in understanding

21 that to the extent that those diagnoses embrace categories such

22 as these, you're not saying that those are medically

23 implausible?

24         MS. HARDING:  It's confusing, Your Honor.  I don't

25 understand.

CC-BLG000672

1          THE COURT:  I apologize, if you could restate the

2     question, I think that would be helpful.

3          MR. ANSBRO:  I'll withdraw the question, Your Honor.

4     Q    You can set that aside, Doctor.  With respect to the one

5     to one ratio that you derive as between mesothelioma and

6     asbestosis, is it true that no researcher or epidemiologist

7     before you has sought to establish that ratio, is that right?

8     A    That's probably correct although I noticed in reviewing

9     papers I saw Alec Walker did attempt to do such a thing but he

10    did it -- it wasn't an incidents ratio exactly the way I did.

11    It was more of a prevalence.

12    Q    Yours is the first that you're aware of?

13    A    Doing incidents, yes.

14    Q    Your work in this case has not been peer reviewed,

15    correct?

16    A    That's correct.  Let me rephrase that.  If what you're

17    talking about is the ratio, the one to one ratio, that's not

18    been peer reviewed.  But as we talked in my deposition, I

19    believe all the methods that I've used are standard methods.

20    Q    Well, you refer in your deposition to the Nicholson

21    epidemiology analysis?

22    A    Yes.

23    Q    My question is with respect to drawing the one to one

24    ratio as you have done it, drawing upon United Kingdom data and

25    then making a comparison with United States data, that is an

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000673

1 exercise that has not been done before, correct?

2 A    Drawing the one to one asbestosis to mesothelioma ratio

3 has not been done before.  But as I stated in my deposition,

4 Nicholson's, and as I stated earlier here, Nicholson's entire

5 method, the entire projection, that rather accurate projection

6 that he's made is totally based on ratios.

7 Q    The answer to my question is correct, right?  It's not

8 been done before, the one to one ratio that you have derived

9 here?

10 A    The one to one ratio has not been done.

11 Q    And your work has not been peer reviewed?

12 A    Insofar as it relates to the one to one, yes, that's

13 correct.

14 Q    Now, am I correct in understanding that some patients have

15 both of these diseases, mesothelioma and asbestosis?

16 A    That's correct.

17 Q    And I believe you testified at your deposition that you

18 weren't sure what percentage overall shared both those

19 diseases?

20 A    That's correct.

21 Q    Did you make an effort -- you made no effort to identify

22 that information before you did your report, correct?

23 A    That's not correct.  I told you that I did a sample and

24 determined that it would be in the low single digits based on

25 my sample.

CC-BLG000674

1  Q    You excluded that sample from your analysis?

2  A    I did not.

3  Q    Made the allocation?

4  A    No.  Can I answer the question more fully?

5  Q    I'll tell you what, I'm going to -- in two topics from now

6  it'll come up again, we'll have an opportunity to talk about

7  that.

8  A    Okay.

9        MS. HARDING:  Your Honor, if the witness would like

10 to answer the question, I think he should be permitted.

11        THE COURT:  It's coming up later.  That's fine.

12        MS. HARDING:  That's fine, okay.

13        MR. ANSBRO:  Let's see Exhibit ACC FCR 1071 please.

14 Q    Exhibit ACC FCR 1071 is an article, Ultrastructural

15 Pathology is the publication.  This is an article lead authored

16 by Victor L. Roggli.  Title of the Article is, "Malignant

17 Mesothelioma and Occupational Exposure to Asbestos, a Clinical

18 Pathological Correlation of 1,445 Cases."  Have you seen this

19 article before, Doctor?

20 A    I have not.

21 Q    I ask you to turn please -- first, before we do that,

22 you're aware that in the literature there is a wide range of

23 ratios of asbestosis to mesothelioma in the literature?

24        THE COURT:  I'm sorry, I didn't hear you.  Would you

25 restate that please?

CC-BLG000675

1  Q    In the literature, generally are you aware that there are

2  descriptions of wide ranges of the ratios as between asbestosis

3  and mesothelioma depending on job category, for example?

4  A    Oh, I would say it's much more dependent on -- the answer

5  is yes, and it's much more dependent on how early in the

6  epidemic the study was done because of the nature of the timing

7  of asbestosis to mesothelioma.  If you have a heavy dose,

8  you're going to get asbestosis early and you may die before you

9  even have a chance to express mesothelioma.  So, for example, I

10 looked at the three publications ten years apart of the

11 insulator cohort and in the first cohort the ratio of

12 asbestosis to mesothelioma is 30 to 1.  In the next two it's

13 basically one to one.  So in 1966 it was 30 to 1;  in '76 it

14 was one to one, and in '86 it was one to one.

15         And again, you have to be very careful about

16 distinguishing incidents and prevalence here as to whether

17 we're talking about an incident ratio or a prevalence ratio.

18 Q    I direct your attention to Page 55 of the abstract.  The

19 upper right hand corner tells us about what the study

20 addresses.  Third line down from the top sentence beginning,

21 "This study."  See that?  The introduction reads, "This study

22 reports findings in 1,445 cases of mesothelioma with known

23 exposure, 268 of these also had fiber burden analysis.  The

24 1,445 cases of mesothelioma were subclassified into 23

25 predominate occupational or exposure categories."  Do you see

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000676

1 that, Doctor?

2 A    Yes.

3 Q    If I could ask you to turn to Page 59?

4 A    Without reading this study and understanding his methods,

5 it's going to be very hard for me to comment on it.

6 Q    I won't ask you necessarily to comment on it, Doctor, just

7 to -- let's look at some of the information in here and ask you

8 whether or not you considered it in the course of deriving your

9 ratio.  At Table 6 on the far right-hand corner we see ratios

10 among the various industries and occupations of asbestosis to

11 mesothelioma.  Do you see that?

12 A    I'm sorry.  What are we looking at?

13 Q    Table 6 --

14 A    Uh-huh.

15 Q    -- Page 59.

16 A    Uh-huh.  Yes.

17 Q    Right-hand column.

18 A    Yes.

19 Q    As it goes down the right side it shows a variety of

20 ratios depending on the industry we're in or the occupation.

21 Now, the ratios are as between asbestosis and mesothelioma.

22 A    I see what you're pointing to.

23 Q    We see a broad range there. Correct, Doctor?  For

24 example, the insulators in this study, the ratio of both those

25 diseases is 58 percent.

**J&J COURT TRANSCRIBERS, INC.**

1  A    I mean I really can't -- I can't even understand the

2  footnote that describes asbestosis C.  I really don't know what

3  I'm looking at here, and I have read a number of studies by Dr.

4  Rogli.  I find them very difficult to understand, and without

5  having adequate time to read and study this, I can't comment on

6  it.

7  Q    Let me refer you quickly then to the top of -- or to Page

8  60, if we could?  Lower one quarter of the page, the sentence

9  beginning, "Logistic," on the left side.

10           THE COURT:  You need to stay closer to the

11  microphone.  We can't pick you up.

12  Q    I just show you this one sentence, Doctor.  "Logistic

13  regression analysis demonstrated that although the category of

14  exposure was significantly associated with asbestos --

15  asbestosis, P less than .0001, close paren, there was no

16  pattern of one category or another that could be identified as

17  having either a high or a low prevalence of asbestosis.  Do you

18  see that?

19  A    Yes.

20  Q    Do you agree that that means the ratio of asbestosis to

21  mesothelioma varies greatly depending on occupational category

22  of exposure?

23  A    Well, first of all, the word prevalence is in there, and

24  I've told you I've done an incidence study.  And the second

25  thing is I would like to just read the first sentence of the

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000678

1  materials and methods.  It says, "The consultation files of one

2  of the authors, V.L.R., were reviewed for all cases of

3  mesothelioma."  And this is simply -- from an epidemiologic

4  point of view, this is a mishmash.

5           It's just a -- no, that's not an epidemiologic words,

6  but it's just a collection of cases.  We don't know where they

7  come from.  We don't know anything about them.  It's not the

8  kind of information from which I would be comfortable drawing

9  conclusions, probably even if I've read the paper, but having

10 not read the paper, I am just -- I'm willing to draw any

11 conclusions.

12 Q    But would you agree with me that this paper addresses

13 people who have the disease?  Yes?

14 A    I don't know what this paper addresses --

15 Q    All right.

16 A    -- because I haven't read it.

17 Q    Fair enough.  Now, I want to turn back to one of the

18 slides that was shown to you earlier by Grace's counsel.  It's

19 Number 2037.

20                      (Pause)

21           MR. ANSBRO:  It's a Grace slide, yes.

22           THE COURT:  Could we get Grace to put the slide up?

23 Two zero --

24           MR. ANSBRO:  I'll put it on the ELMO, Your Honor.

25           THE COURT:  Oh, on the ELMO?


                    **J&J COURT TRANSCRIBERS, INC.**

Ory - Cross/Ansbro                                    127

1        MR. ANSBRO:  It's 2037.

2                    (Pause)

3  Q    Doctor, this is the table that shows the samples that you

4  reviewed, correct, of the UK data?

5  A    I'm sorry.  This is the table in which I applied the ratio

6  of asbestosis to mesothelioma -- to the mesothelioma cases in

7  the U.S. and project --

8  Q    Right.  My mistake.

9  A    -- asbestosis.

10        MR. ANSBRO:  Actually, Your Honor, let's now look at

11  Grace Slide 2036.

12  Q    This shows the breakout of the global resolution -- the

13  GPRD data into the two categories of the sample that you

14  analyzed.  Is that right?

15  A    That's correct.

16  Q    And, Doctor, am I correct that some of the patients that

17  were in your sample set had both diseases?

18  A    That's correct.

19  Q    Now, you've got the two diseases discreetly broken out.

20  Correct?

21  A    Yes.

22  Q    And so to be clear, the patients who had both diseases in

23  the sample are included here, you have categorized them in one

24  disease or another.  Correct?

25  A    Subsequent to this line of questioning on the deposition,

**J&J COURT TRANSCRIBERS, INC.**

1  I looked into this matter exactly, and, in fact, both are --

2  there are 28 people who overlap, and they're in both groups.

3  Q    What did you go back to after the deposition to learn

4  that?

5  A    I went back to the GPRD and asked them to run me another

6  data set keeping both diseases on the same record, so if they

7  were present, I could count them.

8  Q    And so have you made that adjustment here?

9  A    If I make an adjustment, it would lower the ratio to .91.

10  Q    I want to talk now just about this exhibit which formed

11  the basis of your analysis.  At some point you wanted to know

12  that if someone had both of those two diseases, which would

13  they be more likely to claim in the lawsuit.  Correct?

14  A    I mentioned that in the -- yea, in the deposition.  Yes.

15  Q    And to get an answer to that question you asked Grace's

16  counsel.  Correct?

17  A    Yes.

18  Q    And as I understand your testimony from your deposition,

19  Kirkland and Ellis advised you that in a situation where a

20  patient had both diseases that person would be more likely to

21  claim for mesothelioma.

22  A    Yes.

23  Q    Okay, and on that basis, with respect to this table, were

24  those people who had both diseases, you put them into the

25  mesothelioma category.  Correct?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000681

1  A     No, I have just corrected myself.  I said subsequent to

2  the deposition I went back and checked.  I put them in both

3  categories.  Had I only -- I put them in both categories.  This

4  -- as it stands here, the 28 people who share the diagnosis

5  show up in both groups.

6  Q     So that when you testified at your deposition that you

7  had, in fact, moved such a person into the mesothelioma

8  category, that was not correct?

9  A     In my deposition I said I wasn't certain.  I said that I

10  thought that's what I did.  In fact, that's not what I did.  I

11  did what I just told you I did.

12  Q     Turn to the Nicholson forecast as it has been adjusted by

13  KPMG in consultation with Dr. Nicholson.  That is a update of

14  his 1982 work that runs the projection of mesothelioma claims

15  out to 2049.  Do you understand that?

16  A     Which projection?  Which KPMG one?

17  Q     The piece authored by Vasquez.  Have you seen that?

18  A     I've seen the 1999 one -- 1991 one.

19  Q     You are aware that there has been a subsequent update to

20  the Nicholson '82 work that further projects mesothelioma

21  incidence beyond 2027?

22  A     I'm aware there has been a KPMG update, and I think there

23  have been two, actually.

24  Q     Okay.  You're aware that Nicholson was a consultant to at

25  least one of those exercises?

**J&J COURT TRANSCRIBERS, INC.**

Ory - Redirect/Harding                    130

1  A    Yes.

2  Q    You have nevertheless chosen to not use that updated

3  Nicholson work.  Is that correct?

4  A    That's correct.  I've chosen to go with the one that's

5  published in the scientific literature.

6  Q    Are you saying that the later work by KPMG is not

7  scientific in some way or not reliable?

8  A    No, I said it wasn't -- to use your words, it wasn't

9  published and peer reviewed, so I stuck with Nicholson's '82

10 projection.

11         MR. ANSBRO:  That's all I have for the moment, Your

12 Honor.

13         MS. HARDING:  Your Honor, can I have about two or

14 three minutes just to gather my materials?

15         THE COURT:  Yes.  Let me find out is any -- is there

16 anyone else cross examining?

17                  (No verbal response)

18         THE COURT:  All right.  Why don't we take a five-

19 minute recess?  I'll think that will help.  And then we'll

20 reconvene on redirect.

21                      (Recess)

22         THE CLERK:  Please be seated.  Let the court come to

23 order.

24         THE COURT:  Doctor.  Ms. Harding.

25                 REDIRECT EXAMINATION


**J&J COURT TRANSCRIBERS, INC.**

1  BY MS. HARDING:

2  Q    Doctor, is there any study, any question, anything

3  presented to you today at all that changed your analysis or

4  ultimate conclusion with respect to the exhibits and analysis

5  that we talked about today in your direct examination?

6  A    There were none.

7            MS. HARDING:  Could you show me the first one,

8  please?

9            THE WITNESS:  I said there were none.

10           MS. HARDING:  No.  I'm sorry.  I was talking to T.J.

11           T.J.:  The first one?

12           MS. HARDING:  The first one admitted.

13           T.J.:  Okay.

14           MS. HARDING:  I'm sorry.  I'll give the number, 2036.

15  BY MS. HARDING:

16  Q    This is your creation of the asbestosis and mesothelioma

17  ratio.  Has anything that you were confronted with today

18  changed or altered your analysis or your alternate opinion

19  about the reliability of your ratio?

20           MR. ANSBRO:  Objection.  That's been asked and

21  answers.

22  A    No.

23           THE COURT:  Yes, that's sustained.  He's asked and

24  answered.  We're not going to run through these.  That's a

25  waste of everybody's time.  He testified quite clearly.  I

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000684

1  understood it.

2          MS. HARDING:  Okay.

3          THE COURT:  They've asked.  We don't need to do this.

4          MS. HARDING:  Fair enough, Your Honor.  I understand.

5  Q    Dr. Ory, with the exception of the article by Dr. Rogli,

6  had you reviewed in detail all of the material -- except for

7  the expert reports that you hadn't seen, had you reviewed the

8  studies that had been presented to you and you were asked

9  questions about?

10  A    Yes.

11  Q    Had you considered the information in those studies in

12  rendering your analysis and the methods that you used and your

13  conclusions?

14  A    Yes, I did.

15  Q    With respect to the study -- I believe it's a case series

16  or a series of case reports from Dr. Rogli, that I can't find

17  -- I'll ask you about that if I can find it.

18                    (Pause)

19  Q    You were asked a number of questions at the beginning of

20  your testimony about the inclusion or exclusion of women in

21  your analysis.  Correct?

22  A    That's correct.

23  Q    And you explained that -- as I understand your testimony,

24  you explained that it would not have been appropriate to

25  include women in your analysis, because Dr. Nicholson did not

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000685

1  include women in his analysis.  Correct?

2  A    Yes.

3  Q    And Mr. Finch asked you a series of -- asked you a couple

4  times, but there were women in his population.  Correct?

5  A    That's correct.

6  Q    Okay, and as I understand, is it -- is what's meant by

7  that that within a workforce at the -- during the time period

8  covered there might have been some women involved in working in

9  areas or occupations where they might have been exposed to

10 asbestos?

11 A    That's correct.

12 Q    Okay.  Dr. Nicholson recognized that.  Right?

13 A    Absolutely.  He discussed it.

14 Q    But when he -- when he conducted his study and derived

15 ratios and risks and all of the things that drive his study --

16 A    Right.

17 Q    -- he used male mortality ratios.  Correct?

18        MR. FINCH:  Object to the leading, Your Honor.

19        THE COURT:  That's sustained.

20 Q    Okay.  Did Dr. Nicholson use male mortality ratios -- male

21 mortality data?

22 A    Yes.

23        MR. FINCH:  Same objection.

24        MS. HARDING:  Did.  I said did -- did he.

25        THE COURT:  That doesn't make it non-leading.  That's

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000686

1  sustained.

2  Q    Doctor -- Dr. Ory, what did Dr. Nicholson do that is

3  relevant to the issue of whether you should, in using his

4  forecast, without correcting his entire work do when comparing

5  to mesothelioma incidence data?

6  A    Well, I stated clearly that Dr. Nicholson projected male

7  mesothelioma rates, and not only does he say he did that, but

8  further along in his analysis at one point he compares his --

9  he compares the data that he had so far to SEER -- and he

10  compared it to SEER male rates, so I'm quite certain that he

11  was projecting men.

12  Q    Just for clarification, Dr. Ory, I'm going to ask you --

13  I'm just going to show you Page 297 of Dr. Nicholson's paper.

14  A    Right.

15  Q    Is that the part of Dr. Nicholson's study that you're

16  referring to?

17  A    It doesn't look it, but let me --

18  Q    No?  Okay.

19                    (Pause)

20  A    Oh, I'm sorry.  The second paragraph --

21  Q    Yes, I'm sorry.  Yes.

22  A    -- where he says, "The number of mesothelioma is estimated

23  by this procedure as approximately 40 percent greater than

24  those that would've been estimated to occur nationwide using

25  data of the SEER Program for white males during 1978, personal

                    **J&J COURT TRANSCRIBERS, INC.**

1  communication from SEER."

2  Q    So when Dr. Nicholson was comparing his own estimates in

3  his study and some of the work he had already done in it, he

4  used male mortality data to compare it to them from SEER.

5  Correct?

6  A    Absolutely.

7  Q    Now if you had included women in your analysis, how would

8  that have affected your ultimate conclusion?

9  A    I would've had a lower incidence ratio.

10  Q    Thank you, Dr. Ory.  The next question I have is with

11  respect to a study you were shown by Markowitz Morabia.

12  A    Yes.

13  Q    This study here.  I'll show you.  Do you know which one

14  I'm referring to?

15  A    Yes.

16  Q    Okay.  You've seen that study before.  Correct?

17  A    Yes.

18  Q    Did this study involve a co -- well, let me see this.

19  What were the death intervals that were involved in this study?

20            MR. FINCH:  Objection.  Lack of foundation.

21            THE COURT:  He said he's read the study.

22            MR. FINCH:  Is this the Rogli study?

23            MS. HARDING:  No.

24            MR. FINCH:  Markowitz study.  Oh.

25            THE COURT:  No, it's Markowitz.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000688

1  A    It looks like there was a ten-year followup study.

2  Q    Okay, and what does that mean to you in connection or what

3  relevance does that have with respect to whether or not the

4  information in this study is relevant to the work that you did

5  in this case?

6  A    Well, I was very interested in the insulated cohort, and

7  that's why I looked at all three papers that -- four actually

8  if you include this one.  But there was done every ten years,

9  and I looked -- maybe there's one after that.  I hadn't found

10  it.  But I was very curious about how the insulated cohort

11  changed over time.

12  Q    Just because it was so helpful to me when you showed it to

13  me, could you show on the board what you saw when you looked at

14  the insulated cohort over time?

15  A    If I remember.

16  Q    There's a pen right up there.

17  A    Yes.

18  Q    You have to -- well, you have to write it first maybe?

19         MR. FINCH:  Objection, Your Honor.  This wasn't in

20  Dr. Ory's report.

21         THE COURT:  This is redirect.  This is fair.  He's

22  asked -- you asked -- somebody asked him about the Markowitz

23  study and certain parts of the mortality tables and also about

24  the insulator studies about which he testified on cross

25  examination and the three times that he used them in '76, '86,

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000689

1  and '66, and now he's following up.  This is proper redirect.

2           MR. FINCH:  Even though it's new --

3           MS. HARDING:  He didn't rely upon it in forming his

4  own analysis, but he knows about it, and he was asked questions

5  about it, and he's explaining why he -- why -- what he found in

6  it that he thought was important.

7           MR. FINCH:  Very well.

8           THE COURT:  Go ahead, sir.

9  A    Well, it's what I said in my testimony.  That in 1966 I

10 believe there were 339 cases of asbestosis and ten cases of

11 mesothelioma.  In the '76 followup -- and these numbers are

12 approximate -- there are 170 cases of asbestosis and

13 mesothelioma, and by '86 there were something like 480 -- about

14 460 cases of asbestosis and about 480 mesotheliomas.  So what

15 my point was on that was if you looked here, you would've seen

16 an asbestosis to mesothelioma ratio of 30 to 1, but it's these

17 two are one to one as the cohort went on, and the -- I imagine

18 the people who were very ill from asbestosis died, and that the

19 mesothelioma cases -- well, more of the -- look at the rise in

20 the meso -- strike the first comment.

21           The real difference is look at the rise in the meso

22 cases.  There's nothing biologic about the one-to-one ratio.

23 It just happens to depend on where you are in time.  I mean

24 that -- that's not well said.  The one-to-one ratio is based on

25 the biology that asbestos causes both asbestosis and

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000690

1 mesothelioma, but what that ration is is depend -- is very time

2 dependent on where you are in the asbestosis epidemic.

3 Q    Is that -- you explained the distinction early on about

4 why you looked for an incident approach as opposed to a

5 prevalence approach.  Is that why?

6 A    That's one of the reasons, yes.

7 Q    You were asked some questions about the low -- lower-

8 exposed group of workers in the Nicholson study.  Do you recall

9 those -- that line of questioning?

10 A    Yes.

11 Q    I'd like to --

12            MS. HARDING:  May I approach the witness, Your Honor?

13            THE COURT:  Yes.

14            MS. HARDING:  Thank you.

15                          (Pause)

16            MS. HARDING:  I'll wait until I have copies, Your

17 Honor.

18            THE COURT:  What's the exhibit number?

19            MS. HARDING:  It's the ACC FCR's 1097 exhibit.

20            THE COURT:  All right.  Thank you.

21                          (Pause)

22            THE COURT:  That was the witness' copy.

23 BY MS. HARDING:

24 Q    Have you seen this study before, Dr. Ory?

25 A    Oh, yes.

J&J COURT TRANSCRIBERS, INC.

CC-BLG000691

1  Q    What is it?

2  A    This is a presentation of an early version -- earlier

3  version of Nicholson's model to Branberry (phonetic)

4  conference.  I think it was presented a year earlier.

5  Q    If you could turn to Page 106, please?

6  A    Yes.

7              THE COURT:  Could we get it up on the screen?

8              MS. HARDING:  I'm looking for that page, Your Honor.

9  I'm sorry.  Oh, there we go.

10             THE COURT:  And may I have a copy?

11                         (Pause)

12             THE COURT:  Thank you.

13  Q    Dr. Ory, what is the figure on Page 106, if you know?

14  A    Figure 7 is the estimated and projected numbers of

15  mesothelioma per year from 1940 through 1999 from the

16  occupational asbestos exposure.

17  Q    Okay, and what did this study tell you about the inclusion

18  of the lower -- if anything, about the inclusion of the lower

19  dose category of exposed people in the Nicholson report and his

20  estimations on mesothelioma?

21  A    Well, what's -- this is one of the most curious things in

22  all the work that I did that I noticed.  If you read Conclusion

23  1 here and -- which accurately reflects what the paper says, it

24  says from 1940 to 1979 13 million individuals had significant

25  potential asbestos exposure to work, and what's really striking

**J&J COURT TRANSCRIBERS, INC.**

1 is a similar figure appears in the Nicholson '82 paper, which

2 you can put up.  And it's the identical figure in spite of the

3 fact that Nicholson has doubled his population -- his exposed

4 population to 27 million.  And do you want to show -- could you

5 show that?

6          MS. HARDING:  I'm looking for it.  Sorry.  I

7 apologize.  I thought I had it with me.

8                         (Pause)

9          THE WITNESS:  You could just put the Nicholson slide

10 upon the ELMO from --

11          MS. HARDING:  I'm looking for that, Dr. Ory.

12 Q    Do you recall what page it's on?

13 A    It's towards the end.

14          UNIDENTIFIED SPEAKER:  Page 298.

15          MS. HARDING:  No, that's not it.

16          THE WITNESS:  No.  No.

17          MS. HARDING:  That's not it.

18          UNIDENTIFIED SPEAKER:  Two ninety-eight.

19          MS. HARDING:  Thank you.

20          THE WITNESS:  Right.

21                         (Pause)

22 Q    Is that the same figure?  Is that the figure you're

23 referring to?  This is from Nicholson's report --

24 A    Right.

25 Q    -- paper now.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000693

1  A       Right.

2          THE COURT:  So you're looking at the ACC Exhibit 1

3  now, Page 298?  And --

4          MS. HARDING:  Yes, Your Honor.

5          THE COURT:  All right.  Thank you.

6          MS. HARDING:   Thank you.

7  A    And what's striking to me is this figure looks remarkably

8  similar to the figure presented the year before based on 13

9  million people.  This figure -- this paper that this figure

10 appears in is based on 27 million people, and yet the curve

11 doesn't seem to change.  So it would suggest to me that the 13

12 million people that were added didn't add very much in the way

13 of risk.  That it was the original 13 million people that

14 carried the risk.

15 Q    One last series of questions, Dr. Ory, just to make sure

16 the record's clear with respect to the issue of the data that

17 you used in -- with respect to the mesothelioma incidence in

18 the United States.  You were asked a series of questions about

19 the SEER data with respect to SEER 9 and SEER 17.  Is that

20 right?

21 A    Nine, 13, and 17.

22 Q    Nine, 13, and 17.  What's the -- could you maybe go to the

23 board and explain the distinction in the progression of the

24 SEER database?

25 A    SEER 9, which means it had 9 centers involved, it's just

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000694

1  -- started in '73, and it went until '89 I think.  I might be

2  wrong on that.  And it covered about 9 or so -- 9 and 10

3  percent of the population.  SEER 13 added more centers, and it

4  ran from -- well, actually, it runs -- they still produce the

5  data, so it runs from '73 on.  SEER 13, the additional centers

6  were added around 1991 or 2.  So let's say '91, and that

7  covered about 14 percent of the U.S. population.

8          SEER 17 added more centers, and it -- those centers

9  were added in 2000, and it covers about 25 percent of the U.S.

10  population.  At about the same time that was going on SEER and

11  CDC got together and they now publish something called the

12  USCS, the United States Cancer Surveillance, which now covers

13  98 percent of the U.S. population, and this runs from 1999.

14  The latest date is from 2004.

15          So the USCS includes all the SEER centers, plus it

16  goes out and gets the rest of the country.  So, you know, as

17  far as I'm concerned, from 1999 on, if SEER was the gold

18  standard, this is now the platinum standard.

19  Q    Thank you, Dr. Ory.  And you used the most -- the data

20  that had the most information in it -- the USCS data included

21  with the relevant SEER data in doing your analysis in this

22  case.  Correct?

23  A    Whenever possible from 1999 on, yes.  Whenever possible

24  from 1999 on.

25  Q    I'm sorry.  I want to -- I do want to go back to the

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000695

1 Branberry figure one more time -- the Branberry Nicholson.

2 This is the Nicholson figure.  Could you explain the

3 significance of that discovery -- you know, that finding that

4 when Dr. Nicholson added that many million workers who were on

5 the lower exposed end with respect to his projections of

6 mesothelioma?

7 A    Well --

8            MR. FINCH:  Objection.  Asked and answered.

9            THE COURT:  Well, it may be, but frankly, I'd like to

10 hear it anyway, so I'm going to overrule the objection for my

11 edification.  Go head.

12 A    If your study -- Nicholson's method says these 13 million

13 people carry all the risk, and he comes up with a curve that

14 seems to be quite the same as the curve we're all used to

15 seeing now that has 27 million people in it.  So I draw the

16 conclusion that the 13 million people that were added added a

17 vanishingly small amount of risk.  They must not have been very

18 exposed.

19 Q    And, Dr. Ory, could you --

20            MS. HARDING:  I'm sorry.  T.J. could you put up the

21 last slide of the direct examination, please?

22            THE COURT:  Excuse me.  May I ask?  I think what I'm

23 confused about about this testimony is the 13 or 14 million

24 people who were added are all the lower exposed people in the

25 Nicholson study?

                    **J&J COURT TRANSCRIBERS, INC.**

CC-BLG000696

1          THE WITNESS:  He doesn't say that explicitly.  I'm

2   drawing that conclusion, because how else can you add people

3   and not change the shape of the curve?

4          THE COURT:  All right.  Thank you.

5          MS. HARDING:  And perhaps this might help, Your

6   Honor, as well.

7   Q    Dr. Nicholson's estimates were based on risks relative to

8   insulators, and the -- for different categories of people

9   exposed, and the risk was lower as you went -- lower associated

10  with certain groups of people and higher with respect to other

11  groups of people.  Correct?

12         MR. FINCH:  Objection.  Leading.

13         THE COURT:  I -- this is a foundation question.

14         MS. HARDING:  Thank you, Your Honor.

15  A    The highest -- Nicholson -- as I said earlier, everything

16  was a ratio to Nicholson, and so he gave the risk and the

17  insulators to be one, and as people's exposure got lower, he

18  gave it as a fraction of that.  So like the lowest group got

19  one percent of the risk of the insulators.

20  Q    And as I understand it, I think is it fair to say that he

21  could not -- in other words, it's not possible in his model to

22  add people with lower -- with higher exposures in his model and

23  not get significantly more mesotheliomas.  Is that fair?

24  A    That would be my understanding.

25         MS. HARDING:  Did you -- do you have that last slide

**J&J COURT TRANSCRIBERS, INC.**

1  T.J.?   Thank you.

2  Q     I want to ask you, Dr. Ory, is the conclusion that you

3  drew from seeing those two curves from the earlier Nicholson

4  work in the Branberry report and the later Nicholson report, is

5  that supported or contradicted by the evidence that you -- that

6  we admitted in 2050?

7  A     Well, I think it's supported.  I mean this curve more than

8  any other exhibit that I've put up says to me that if you take

9  away asbestos exposure, you take away mesothelioma, and it

10 tells me it's been taken away in the young people.  Their risks

11 are plummeting.  And I guess the other really important thing

12 about this slide to me is it tells me there's no, whatever the

13 parlance is these days, no second wave or third wave, fourth

14 wave, because if there was a wave of people with enough

15 exposure to asbestos to be causing mesothelioma, we'd be seeing

16 it in the 20 to 54 year olds like we did in 1973 from the slide

17 that I showed.

18         MS. HARDING:  Thank you, Dr. Ory.  No further

19 questions.

20         THE COURT:  Any recross?

21         MR. FINCH:  No, Your Honor.

22         MR. ANSBRO:  Nothing further, Your Honor.

23         THE COURT:  You're excused, Doctor.  Thank you.  Mr.

24 Bernick.

25         MR. BERNICK:  Let's take the next witness?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000698

1      THE COURT:  Yes.  Well, Mr. Bernick, I'm sorry.  Do

2  you need a recess to get ready?

3      MR. BERNICK:  No, I --

4      THE COURT:  If you do, that's fine.

5      MR. BERNICK:  If you'll excuse me one moment.

6      THE COURT:  No.  Okay.  That's fine.

7      MR. BERNICK:  I don't know -- I'm not sure of the

8  Court's -- yea, well, let's start out with it.  Dr. Rodricks is

9  going to take the stand.

10                    (Pause)

11      MR. BERNICK:  Due to the insecurity of my height,

12  Your Honor, I would like to look over the podium if you'll

13  indulge me.

14      THE COURT:  We need to get the witness sworn.  You

15  need to call him, please.

16      MR. BERNICK:  We call Dr. Rodricks to the stand.

17      THE CLERK:  Would your raise your right hand?

18      DR. JOSEPH RODRICKS, DEBTOR'S WITNESS, SWORN

19      THE CLERK:  Please be seated.

20      MR. BERNICK:  Good afternoon, Dr. Rodricks.

21      THE WITNESS:  Hello.

22                    VOIR DIRE

23  BY MR. BERNICK:

24  Q    Could you just tell us, in order to acquaint the Court

25  with what you're here about this afternoon, what it is that

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000699

1  you've come here to talk with us about?

2  A    I've come to talk about the signs of risk assessment, its

3  application in the evaluation of causation of disease, and its

4  application in some regulatory public health context as well.

5  Q    In a few words -- and I know we'll have an opportunity to

6  go through more -- could you tell the Court what risk

7  assessment is?

8  A    Risk assessment is a rigorous scientific framework use to

9  evaluate research information, other complex scientific

10 information, to evaluate the likelihood that under certain

11 conditions people will be harmed by exposure to toxic agents.

12 Q    Do you  have a background in risk assessment, Dr.

13 Rodricks?

14 A    I do.

15 Q    Okay.  Let's begin with your education background.

16        MR. BERNICK:  And I'd like to show the Court Slide

17 GG-2002.

18 Q    Could you -- making reference to that demonstrative, could

19 you just go through briefly what you educational background is?

20 A    Briefly, I began life as a chemist out of MIT in 1960.  I

21 moved on to study at the University of Maryland.  I moved into

22 biochemistry for a PhD.  I did post-doctoral work in

23 biochemistry at the University of California, Berkeley as well.

24 Q    Okay.  Let's talk about your professional experience.

25        MR. BERNICK:  And if we could bring up GG-2003.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Again, in your own words looking to the slide, give the

2  Court an overview of your own professional experience.

3  A    Yes.  I spent 15 years -- my first position after

4  finishing graduate work was a -- as a scientist at the U.S.

5  Food and Drug Administration for 15 years specializing in the

6  analysis of risks from substances regulated by FDA.  I built on

7  that basic scientific background, and during this time period

8  was a period when these new tools of risk assessment were

9  beginning to be used, and I was there pretty early in that

10 process.  So I worked on a whole wide range of products.  And

11 my last four years at FDA -- three and a half years at FDA I

12 was in the Office of the Commissioner of FDA as an Associate

13 Commissioner for what we called health affairs at the agency.

14 Q    Go ahead.

15 A    Well, I began, as I got into the risk assessment field,

16 working from the sciences of toxicology and epidemiology as the

17 basic sciences.  I got into the risk assessment field, and

18 beginning in the mid-70s -- I guess 1977 -- I was asked to

19 serve on a Committee of the National Academy of Sciences.  The

20 National Academy is a knowing governmental entity that does

21 expert consultation for the government on all kinds of matters,

22 and I have since served on more than 20 expert committees of

23 the Academy in that period looking at a very wide range of

24 issues related to hazardous substances and the risks they pose

25 to health.

CC-BLG000701

1  Q    Okay.  Let's talk about Environ.

2  A    Environ's a firm I'm now with.  I've been there since

3  1982.  We're a 25-year-old consulting firm with offices around

4  the globe doing a very wide range of scientific consulting

5  again on matters of risk to health from substances in the

6  environment and the workplace, in consumer products.  It's

7  quite varied in context.  Some of it related to regulation of

8  those products.  Some of it related to issues of disease

9  causation.

10 Q    Okay, and finally Johns Hopkins.

11 A    I was -- in the mid-1990s I was asked to join the faculty

12 as a visiting professor at the school in Baltimore, and I teach

13 there a course in quantitative risk assessment methods.  It is

14 called public health.

15 Q    Let's turn to some of your publications.  I want to turn

16 to GG-2004.  What's the Red Book?

17 A    This is a shorthand term for a book which has a red cover,

18 but it's quite a prominent work in the field of risk

19 assessment.  There was a lot of turmoil in the science of risk

20 assessment during the 1970s.  Congress asked for a National

21 Academy of Science study in the early eighties of the whole

22 process by which we look at risks to health and the scientific

23 tools for doing that.  The Red Book -- I served on this

24 committee.  I reproduced a volume in 1983 from the National

25 Academy which has set the stage for almost everything that has

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000702

1  followed by way of risk assessment in regulatory agencies and

2  many other institutions.  The framework for risk assessment

3  that we now use was originally formulated there.  So this is

4  quite similar work.  I was very both fortunate and pleased to

5  be on that committee.

6  Q    Have you also done some writing in work in connection with

7  risk assessment or its applications in toxic tort litigation?

8  A    I have.  I began in the eighties when I first got

9  introduced to this issue.  Most of my early work with risk

10 assessment was in the regulatory context, but increasingly

11 during the eighties issues of tort arose where there had to be

12 some scientific evaluation.  So I got interested in this and

13 began writing and thinking about the problem at that time.  So

14 I have a couple of early papers from the eighties that I think

15 I list there.  Yes, on the bottom.

16 Q    Okay.

17 A    And then I -- my thinking had advanced quite a ways by

18 1998, and that paper in '98 was I think a -- I hope a

19 substantial contribution to this field, but I -- it was a look

20 at the state of the science and its interaction with some of

21 the legal standards at that time.

22 Q    Continuing on to GG-2005, what do these publications

23 relate to?

24 A    This might be a bit redundant.  The same topics basically.

25 I have a book on the subject of risk assessment in general, the

CC-BLG000703

1 one at the top, and I just recently -- in the second edition I

2 introduced a whole new chapter on the issue of causation and

3 tort.  It had not been in the first edition back in the early

4 ninties.  And this Journal of Law and Policy article evolved

5 from a seminar I gave at Brooklyn Law School -- seminar for

6 judges.  This is a bit redundant, but it's more on this topic,

7 which I've spent quite a bit of time looking at.

8 Q    Have you had any involvement in recent years in connection

9 with activities of the Federal Judicial Center?

10 A    I have.  I gave a talk to a gathering at Georgetown

11 University last summer on issues of the use of toxicology and

12 related information and analysis of causation.  I met one of

13 the editors of that journal there, and he invited me to sit on

14 an advisory panel.  There's a third edition coming out I guess.

15 I'm not sure when it'll come out.  We're just beginning to look

16 at a third edition of the manual, so I'm advisory.  I don't

17 think I'm asked to write anything but to advise on the content

18 of it, yes.

19 Q    Have you been asked, Dr. Rodricks, to testify today

20 regarding the specifics of risk assessment for asbestos in

21 particular?

22 A    Not for asbestos in particular, no.  I'm talking about the

23 general methods for evaluating causation using that framework.

24        MR. BERNICK:  Okay.  Your Honor, we would offer Dr.

25 Rodricks as an expert in risk assessment.

J&J COURT TRANSCRIBERS, INC.

Rodricks - Direct/Bernick                              152

1          THE COURT:  Any objection?  Any voir dire?

2          MR. MULLADY:  No, Your Honor, not from the future

3    claimants.

4          MR. FINCH:  No, Your Honor, as long as it's limited

5    to risk assessment generally and not risk assessment in the

6    asbestos context.

7          THE COURT:  He's --

8          MR. BERNICK:  I think all the questions will be posed

9    with respect to risk assessment generally, and we will later be

10   building on that in our case on what he's indicated.  We want

11   to establish the (indiscernible) cases (indiscernible).

12         THE COURT:  Dr. Rodricks, without objection, may

13   offer an expert opinion in the area of risk assessment.

14                      DIRECT EXAMINATION

15   BY MR. BERNICK:

16   Q    Let's talk for -- at the outset, Dr. Rodricks, about this.

17   Does risk assessment deal with causation of disease by

18   potentially toxic agents?

19   A    That's one of its applications, yes.

20   Q    Are you familiar in general terms with the basic evolution

21   of the criteria for causation by toxic agents?

22   A    The general evolution.  Yes, I am.

23   Q    Okay.  Do you have a --

24         MR. BERNICK:  We have a demonstrative that's been

25   prepared that would assist the Court in walking through that

                    J&J COURT TRANSCRIBERS, INC.

CC-BLG000705

1 basic evolution.  I would like to show the Court and counsel

2 GG-2006 as a demonstrative.

3        MR. FINCH:  Your Honor, I would object to this

4 demonstrative to the extent that it has anything about the

5 Federal Judicial Center manual on it.  This is a witness who

6 didn't write that.  That's a legal text.  I believe that it --

7 it's a legal authority no different than a brief for a case.  I

8 believe it fades the province of Your Honor for him to be

9 offering any testimony about the Federal Judicial Center manual

10 or to be giving testimony about what should or should not be

11 required in a court of law to establish causation.  I think

12 that's a legal opinion.  It's not something that's a proper

13 subject for a witness.

14        MR. BERNICK:  You don't mind if I -- that's really

15 not the purpose of the proffer at all.

16        THE COURT:  Well, may I see it, because since I don't

17 know what specifically you're referring to --

18        MR. BERNICK:  All it is at this point is an icon.  It

19 says, "Federal Judicial Center Manual."

20        THE COURT:  Right.  I will take your objection under

21 advisement when the witness explains what it's doing there, Mr.

22 Finch, because until I hear it, I'm not sure what the purpose

23 of this is, since it's demonstrative.  So I will give you a

24 ruling when I understand the nature of the objection in the

25 context of this document, because just seeing an icon there

CC-BLG000706

1 does not necessarily tell me that it is an improper use of an

2 icon.  So I will rule on the objection when I hear what the

3 icon's purpose is.

4          MR. BERNICK:  Thank you.

5 BY MR. BERNICK:

6 Q    If you could begin at the left-hand side of the chart, and

7 I want to, first of all, focus on causation criteria where it

8 refers to Koch's Postulates.  In the period before 1964, were

9 there postulates called Koch's postulates that related to

10 causation?

11 A    Yes, these were the earliest attempts by scientist

12 physicians to set forth some criteria to understand -- lined to

13 understand when you apply them, aspects of disease causation.

14 They actually emerged in the late 19th century.

15 Q    Okay.  It says infectious disease model.  What does that

16 mean?

17 A    Well, they were based on what was then, when they were

18 developed, the key concerns about disease causation, and that

19 were -- those were related to infectious agents.  Tuberculosis

20 was one of the major issues at that time.  And the model was

21 based on the notion that one infectious causes one disease, and

22 it had some very simple criteria for establishing when you were

23 sure you could establish causation between an agent and a

24 particular infectious disease.  So that was a model which was

25 well received and stood for those classes of diseases -- acute

CC-BLG000707

1 infectious diseases.  They stood a long time.

2 Q    Okay.  At this point in time, that's prior to 1964 and

3 going back into the thirties and forties, what was the status

4 of epidemiological review or research regarding toxic agents?

5 A    Well, there was a lot of interest in the subject of toxic

6 agents often focused on occupations or medicines where there

7 were reports of adverse events, but most of those were not

8 really studies.  They were reports by physicians.  We call them

9 case reports where they have an individual with a disease, and

10 they think they can sort of establish what might have caused

11 it, or they may have a series of diseases.  They're not

12 controlled studies, but they were the earliest attempts to

13 understand relationships between exposure and disease.

14 Q    As we go to the later period of time coming up, fifties

15 and 1960s, what, if anything, happened regarding the strength

16 of the observational studies?

17 A    They increased.  Some very inventive scientists in England

18 and in this country focusing primarily on smoking in the

19 1950s/early 1960s.  Also radiation.  Radiation, of course, was

20 a major issue during that same period, and some very inventive

21 scientists thought of new ways to observe populations that have

22 exposure, and you cannot create the exposure intentionally, but

23 you can observe where it's occurring and try to set up

24 something like a controlled study.  They're never perfectly

25 controlled.  You can't do that.  So these studies began to

CC-BLG000708

1  emerge in the 1950s and sort of really advanced the field.

2  Q    Okay.  Now did a time come when as a result of the

3  increased strength of sophistication of this epidemiological --

4  did the time come when that had an impact on the scientific

5  community's assessment of when causation could be or how

6  causation could be proven?

7  A    Yes, it had a very strong impact.  The smoking studies in

8  particular.  I'm sorry.

9  Q    What was that impact, and when did it occur?

10  A    Well, there was a lot of controversy over those early

11  smoking studies, and whether a -- they established what are

12  called associations between smoking and certain diseases.  And,

13  actually, some of the early studies showed several diseases.

14  And so one of the issues that raised was whether the old idea

15  of the one agent/one disease idea held up anymore.  And a lot

16  of people said this is contrary to Koch's Postulates.  And

17  there are other issues, too.  These were now mostly chronic

18  diseases.  Some of them have other causes.

19       Remember with infectious there are no other causes of

20  tuberculosis except the agent, but all of these diseases that

21  emerge with smoking had other causes.  So that -- a group got

22  together under the surgeon general of the U.S. at that time

23  saying what do we make of all this kind of evidence, which

24  looks good, but we also know it's limited?  So they developed

25  and published in 1964 -- is a seminal.  That's why I put it

CC-BLG000709

1 there -- the so-called Bradford Hill criteria that

2 epidemiologists still used today to evaluate scientific

3 epidemiology information to see whether it moves from

4 associations and studies, so real causation -- disease

5 causation.

6 Q    Does this chart or this demonstrative then go into, I

7 guess for want of a better phrase, the ripple effect of the

8 endorsement of new criteria for causation?

9 A    I tried to illustrate in the third column, yes.

10 Q    Okay.  And I know that once we get to that judicial

11 interface, I'm very controversial here, so let's begin with the

12 easy stuff.  First of all, what, if any, effect did the option

13 of the Bradford Hill criteria have on the scope of --

14          THE CLERK:  Can you use the mike?

15 Q    -- on the scope of epidemiological research?

16 A    It has strong effect, because now once these criteria

17 gained wide acceptance, the epidemiologist had to begin

18 thinking about designing studies to give information that could

19 be evaluated using those criteria if you had any hope of

20 establishing causation.  So the studies changed.  They came up

21 with different protocols for studies, different ways to look at

22 population retrospectively or prospectively, new ways to

23 measure exposure in those populations, and that's still

24 expanding.  It's become quite quantitative.  It has ways to go,

25 but it's really quite an advanced science now.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000710

1  Q    When focused on regulatory approaches, is this an area in

2  which you now make reference -- is this an area where your own

3  activities had focused after I'll say after the 1960s and going

4  forward to the seventies and eighties that is the impact of

5  epidemiology on regulatory promotions?

6  A    Absolutely.  The regulators have a very wide mandate to

7  protect public health in a lot of different contexts, and we

8  knew and regulators knew well that all chemical substances --

9  I'm focusing on chemicals -- can be hazardous under some

10 conditions, and we also know that they're not hazardous under

11 other conditions, and we needed some good tools -- a good

12 framework to analyze whether under specific conditions the

13 toxic properties would express themselves, how likely it was,

14 and how like -- and then where that likelihood got to be very

15 small.  So this risk assessment model evolved during this

16 period, and it's still evolving, but it has now very, very wide

17 use in this sort of context.

18 Q    Okay.  All right.  The models -- and I -- we'll just focus

19 on this a little bit really as a marker.  There's been a lot of

20 discussion already in this trial about models.  Are all risk-

21 based models for regulatory purposes -- are they identical?

22 Are they identical in scope with scientific models, or are

23 there differences sometimes between regulatory risk models and

24 scientific risk models?

25 A    Well, they're all done within the same risk assessment

**J&J COURT TRANSCRIBERS, INC.**

1  framework, but they're emphasizing different aspects of the

2  science.  The causation models tend to focus on -- should focus

3  on the real observed science.  Regulators will go beyond the

4  observed science in many cases and introduce assumptions for

5  public health protection.  So the same framework, the same data

6  sources apply, but then there are differences in application.

7  Q    More of that in a moment.  Today is there or is there not

8  a widely accepted framework for risk assessment within your

9  opinion?

10 A    There is a widely accepted framework for risk assessment,

11 yes, and it is very widely used.

12 Q    Now when we went through the history that you just

13 discussed, we focused on the development of epidemiology and

14 how epidemiology affected causation criteria which in turn had

15 impact on risk modeling.  Does epidemiology play a basic role

16 in risk assessment?

17 A    It is one of the fundamentals of risk assessment.  There

18 are other aspects of science, but it is a fundamental piece of

19 the risk assessment process.

20 Q    I'm showing you for illustrative purposes GG-2007.  Does

21 this set out in very broad terms -- does this set out the

22 elements of the risk assessment framework?

23 A    It does, and to be accurate about it, the framework itself

24 is on the right-hand side of the dotted line.  I put some

25 information on the left side of the dotted line that talks

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000712

1  about the sources of information.  The questions being posed,

2  if you like, and the analysis -- the evaluation occurs in the

3  steps that I've shown there on the right side of the dotted

4  line.

5  Q    What are the elements of the risk assessment framework

6  itself?

7  A    Well, first of all, the question which is on the -- I gave

8  one example here on the far left.  We're looking at in this

9  case a group of individuals.  They have a disease.  They claim

10 chemical exposure caused it.  The assessment framework -- if

11 you want to look at this question and evaluate it, you first

12 look at the underlying science, the epidemiology, even some

13 other sciences as well.  You look at exposure as you try to put

14 that all together, and the framework is a way to help you

15 organize and evaluate it.

16        So the first step under what I call -- those are the

17 terms used by scientists when they do the risk assessment, the

18 hazard identification, the dose response, how strong is the

19 evidence that the chemical causes the disease.  That would be

20 the first thing you'd want to look at.  In other words, we have

21 claims of disease where there's chemical.

22        If you found that there's no evidence the chemical

23 can cause the disease under any circumstances, then you might

24 stop your inquiry.  But if you begin to find evidence, you want

25 to see how strong it is.  Is it convincing?  And at the same

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000713

1  time you're also looking at this very, very important question,

2  the second one there called dose response.  That is how does

3  the rate of disease or the risk of disease change with dose?

4  Q    Let's focus then in more detail on epidemiology.

5            MR. BERNICK:  And I apologize, Your Honor.  Some of

6  this may already be well known to the Court, but I'd like to

7  make a record very, very briefly.

8  Q    Turning to Slide GG-2008, can you run for us through this

9  -- run through this for us briefly as an example that

10 illustrates how epidemiology works?

11 A    Well, it's a part example, but it's exactly what

12 epidemiologists try to do.  They look at people who have one

13 kind of exposure to an agent.  In this case I've shown smoking.

14 They try to then identify populations that do not have that

15 exposure and see if there are differences in disease rates in

16 the two.  That's basically it.  I -- in this case I've

17 emphasized that those studies -- individual studies of these

18 differences of disease rates are said to develop an association

19 or not between the exposure and the disease.  These studies by

20 themselves individually cannot establish causation, but only

21 whether the disease occurs more commonly in one population than

22 the other.  And if it's -- if that association exists, it's

23 called that.  The reason these are not association -- not

24 causal in a single study is that these are not perfectly

25 controlled studies.  The only way you get causation is with

**J&J COURT TRANSCRIBERS, INC.**

1 perfect controls, and observation doesn't allow that.  So you

2 have associations.

3 Q     Okay.  Now the Bradford Hill criteria that were adopted in

4 1964/1965, do they help us tell when the body of data is

5 sufficiently strong to be able to say causation?

6 A     That's exactly their purpose, yes.

7 Q     Okay.  Showing you GG-2009, are these the Bradford Hill

8 criteria?

9 A     Yes, these are the key criteria that one would look at.

10 You begin by collecting all of the studies together.  You

11 wouldn't apply this to a single study.  We know the single

12 study would never be enough, so you don't even have to think

13 about that.  But once you accumulated a body of evidence, you

14 then begin looking at that body of evidence.  This is usually

15 done by expert groups, and you look at things like how strong

16 the association is.  You tend to see the same association over

17 and over again or not.  Is it clear that the exposure always

18 precedes the disease?  Is there what's called a biological

19 gradient -- does the risk -- this is very important, because it

20 is well established in toxicology and epidemiology that the

21 more exposure the greater the risk.  So if you don't see

22 increasing risk with increasing exposure or dose, that would

23 reduce the reliability that the -- the likelihood of a causal

24 relationship.  So these are applied routinely now to establish

25 causation or not from the associations.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    We'll now walk through how epidemiological studies read

2  out in terms of results, and for those purposes I want to give

3  you a hypothetical example about epidemiology relating to a

4  drug.

5          MR. BERNICK:  Showing -- let's show the Court GG-2012

6  for illustrative purposes.

7  Q    Where you have an epidemiological study relating to a

8  drug, what are the two groups from which data is gathered?

9  A    Well, you'd -- this chart references what might be called

10 a clinical trial, which is one kind of very controlled

11 epidemiology study, but you could do this without a clinical

12 trial.  But, basically, people taking the drug, people who do

13 not have a drug -- do not have that drug, and you look again

14 for differences in disease rates in the two populations.

15

16 Q    Okay.

17 A    We refer to that difference as a relative risk.  You're

18 looking at the risk of disease in one versus another.

19 Q    Okay.  So let's assume we have the drug group here -- and

20 we put a big D for the drug group and a big P for the placebo

21 group -- and we take a look at the incidence of particular

22 diseases.  Let's say Disease A in both groups -- in both

23 groups, and we're going to be looking for a relative risk.  The

24 Court has heard about relative risk.  What do the -- what does

25 relative risk reflect with regard to the results of an

CC-BLG000716

1  epidemiological study of a drug?

2  A    It simply reflects the rate of the disease in one group

3  usually in a given period of time -- time is important --

4  versus the rate of disease -- same disease in the other group,

5  same period of time.

6  Q    If you have a relative risk of 1.0, what does that say

7  about the frequency of the Disease A and the two groups, that

8  is the drug group and the placebo group?

9  A    No difference in frequency.

10  Q    What if the drug group has 50 percent more?  That is

11  instead of -- let's assume that the placebo group has 100 cases

12  of Disease A and the drug group has 150 cases of Disease A,

13  what would the relative risk be?

14  A    Again, same time frame.  That would reduce to 1.5.

15  Q    Okay, and under those circumstances what would you say

16  about the -- whether Drug A carries with it -- based upon this

17  one study whether Drug A carries with it a risk of disease?

18  A    Well, one study is uusually not enough to establish

19  causation, but putting that aside, it would say by itself that

20  there's, as you put it, 50 percent more disease in one than the

21  other that suggests that there is a risk with the drug that's

22  -- that exceeds the background risk --

23  Q    Okay.

24  A    -- by 50 percent.

25  Q    Under those circumstances what would you say about cause?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000717

1  That is whether the Drug D can cause Disease A in some people.

2  A    In some people, you'd say -- this is well established, and

3  you've established the causation criteria, and this was

4  statistically significant.  You'd say that, yes, it would in

5  some people cause disease.

6  Q    What if it's 1.5, but it's not statistically significant?

7  A    It would remain an association -- well, I guess -- I'm

8  sorry.  It would not remain an association.  It would be -- you

9  could not say with any confidence -- not statistically

10 significant means you cannot with any confidence say it

11 differs from one.  That's basically what it means, and if that

12 were the case, then it would be imprudent to conclude any

13 causation or an effect there.  Imprudent is what I said.

14 Q    We've sometimes seen these confidence intervals where we

15 have a relative risk of one and a risk that -- or a relative

16 risk that reads out at say 1.5, so it's somewhere over here,

17 indicating on the chart, and we see a confidence interval

18 that's both -- it goes both above the point estimate and below

19 the point estimate.  What does the confidence interval stand

20 for?

21 A    Okay.  The -- you have a measured value which comes from

22 your study.  That's the circle.  The statistician is called in,

23 because we know there's error always in every measurement.  And

24 this is basically a way to estimate the possible error, and a

25 way to interpret the confidence interval is to say that within

CC-BLG000718

1  that interval we can be sure with high confidence that the true

2  value of the risk is somewhere in that interval, but we're not

3  sure what the true value is, but we're confident it's in that

4  interval.

5  Q    Okay.  If the confidence interval includes at either end

6  one is the relative risk, what does that tell you about

7  statistical significance?

8  A    If it overlaps on the bottom end, one, that would say for

9  this particular funding, given the error, we could not be

10  confident with any degree of scientific certitude that the

11  value, 1.5, was different from one.  In other words, you'd say

12  this is not a statistically significant finding.

13  Q    Let's now change our hypothetical.

14          MR. BERNICK:  Do we have a little eraser around here

15  someplace?

16                          (Pause)

17  Q    Let's change the hypothetical a little bit and now assume

18  that instead of having 100 cases of disease in the placebo

19  group and 150 in the drug group, we now have 200 cases -- make

20  it easier.  We have 210 cases of Disease A in the drug group

21  and only 100 in the placebo group.  And let's further assume

22  that this is replicated in high quality studies, so it's not

23  just one study.  It's a number of high quality studies.  Under

24  those circumstances, and it's statistically significant, what

25  would the relative risk be?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000719

1  A    It's the ratio again, so that would be reduced 2.1.

2  Q    Again under those circumstances what would you say about

3  cause?  That is does -- can Drug D in this group cause Disease

4  A?

5  A    Yes.  Given all the conditions you laid out, I would say

6  yes, it can cause.

7  Q    Okay.  I got that wrong.  Yes.  I want to ask you a series

8  of questions about the implications of this.  Are you familiar

9  with the term doubling dose?

10  A    I am.

11  Q    And what doubling dose mean?

12  A    Well, it means the dose of the causative agent that can be

13  shown through this kind of epidemiology data to double the

14  ordinary risk of the disease.  You have a -- all these diseases

15  have some background risk that we all have, and from the epi

16  data, if you have a finding like this, you would say that the

17  dose of this drug, whatever it was, was sufficient to double

18  the risk -- a little more double it, so you'd call that dose a

19  risk-doubling dose.

20  Q    Now I then want to ask you some questions about what the

21  implications of that result would be with respect to the

22  individuals who take the drug.  So I'm going to kind of blow

23  this box up big and assume that the group of people who took

24  that drug are all in the box, and let's say there are -- let's

25  say that there are 500 individuals who took the drug.  Does the

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000720

1 fact that you found or the study found an increased risk --

2 statistically significant increased risk of Disease A in this

3 population of 500 people -- does that or does that not have any

4 implications for those individuals?

5 A    It does.

6 Q    Can you tell us what the implications are for those

7 individuals?

8 A    The implications are the following.  That you would

9 conclude from the population itself, the finding of the study,

10 that the 210 cases you have here -- that more than half of

11 them, because we've doubled the risk now -- more than doubled

12 the risk.  More than have of those cases came from exposure to

13 the drug rather than from the background.  We don't know which

14 specific cases, but we know that more than half of them arose

15 from the drug.  We -- to get to your question about the

16 individual, what you would then say is that for each of the

17 individuals in that group you could claim that it is -- that

18 the disease they have is more likely to have come from the drug

19 than from whatever it is that caused their background risk.  In

20 other words, they have a greater than 50 percent chance that

21 the disease arose from the drug individually than from other

22 causes.

23 Q    So if we go through and we find out all 210 people who got

24 sick would that same statement apply, that it is more likely

25 than not drug related?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000721

1  A    Yes.  No -- again we don't know with each individual, but

2  you can say probabilistically for the group as a whole --

3  individually as a whole, I should say, that each one of them

4  has a greater than 50 percent chance of having contracted the

5  disease because of the drug.

6  Q    Now, is there anything more that you could do by looking

7  at them, examining them?  These are all people taking the same

8  drug, same dose.  Is there anything more than an individual

9  examination of those people could tell you that would establish

10 which ones of those people got sick from the drug and which

11 ones of the people got sick, because the disease happens in the

12 general population?

13 A    It depends on the drug and the effect.  I mean it's

14 possible that in some cases there may be alternative causes for

15 individual people that are more explanatory than the drug.  So

16 that's another question that could be raised.  If you --

17 Q    Okay, so let me -- what you're saying is that there may be

18 an alternative cause for disease.  If the studies, however,

19 controlled for the alternative cause -- that is made sure that

20 either there was no alternative cause in either of the

21 populations, or it was there for both populations, if this were

22 controlled for in the studies, is there any way that an

23 individual examination of these 210 people could establish

24 which ones of them got sick from the drug and which ones of

25 them got sick because of background conditions?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000722

1  A     Given your assumption that we could control for

2  alternative causes, no, they would be a population then very

3  much like the one studied.  And no -- the answer to the

4  question is no.

5  Q     Now to anticipate have you in your report -- you had did a

6  report in this case.  Did you not?

7  A     Yes.

8  Q     And in your report it says at Page 9 of the report, "The

9  assumptions and models used in regulatory risk assessments are

10  not known to apply to any actual individuals but are rather

11  generic in nature and apply only to certain hypothetical

12  individuals who share common characteristics regarding their

13  exposures and their potential sensitivities to asbestos."

14  Remember making that statement under the heading saying,

15  "Relevance of Regulatory Standards and Risk Assessments to

16  Evaluation of Disease Causation in Individuals?"

17  A     I do remember that statement, yes.

18  Q     And do you remember that in your deposition you were asked

19  about that sentence, and you said --

20         MR. FINCH:  Your Honor, I object to the -- he hasn't

21  been impeached of this.  It's --

22         THE COURT:  Sustained.

23         MR. FINCH:  -- proper.

24  Q     Let me ask you this question.  When it comes to the

25  regulatory risk models -- the regulatory risk models, can you

**J&J COURT TRANSCRIBERS, INC.**