1  use the regulatory risk models by themselves to make

2  assessments of whether disease occurred in an individual as a

3  result of an exposure?

4  A    No, the regulatory models which use the same general

5  framework and data sources have a different focus.  They also,

6  for reasons I think I will try to explain later, have built in

7  a number of assumptions that go beyond science that really get

8  into policy, and they're really not focused on individuals.

9  They are focused on populations only.

10 Q    When you talk about the scientific risk models, do they or

11 do they not have value in assessing whether people in the group

12 have gotten sick as a result of exposure?

13 A    Not only do they have value, they are essential.

14 Q    Okay.  Now, this doubling of risk, I want to come back to

15 that for half a moment.  If you do not have a doubling of risk

16 -- let's say -- let's go back to our hypothetical and say that

17 the increased risk was 1.5 or a 50 percent increase.  If in

18 its, you know, replicated consistent quality where you have a

19 relative risk of less than 2, can you still make the statement

20 that the disease in the group was more likely than not drug

21 related?

22 A    No, because less than half of the cases -- epidemiologists

23 sometimes call this the attributable fraction or risk.  But

24 less than half of the cases for any risk -- any relative risk

25 below 2 would've come from the drug.  So, therefore, for any

CC-BLG000724

1 individual it would've been less than a 50 percent chance that

2 the disease came from the drug.

3 Q    That's not my question.  I want you to assume that the

4 legal standard for causation -- I want you to make the

5 assumption that the legal standard for causation, that is

6 whether an individual got sick as a result of a drug, is a more

7 likely than not standard.  I want you to make that assumption.

8 In your experience with risk assessment is there any way that

9 science has to establish whether a given toxic material or a

10 given drug more likely than not has caused disease?  Is there

11 any other way to do it other than to look for the doubling

12 dose?

13 A    Not to my knowledge.  You rely on the epidemiology data,

14 the dose response data, look at the doubling dose.  I know of

15 no other way to look at that question.

16 Q    Okay.  Has this been a subject that you specifically have

17 been involved in personally in your work for the Federal

18 Judicial Center?

19 A    It's one of the topics the manual -- there's actually a

20 scientific manual prepared to provide scientific understanding

21 to judges.  That's its purpose.  It's really not a legal

22 document, as far as I understand it.  It's full of scientific

23 chapters, and --

24 Q    Is the testimony that you're giving regarding relative

25 risk of 2 or more, is it consistent or inconsistent with what

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000725

1  that manual says?

2  A     That manual --

3          MR. FINCH:  Objection, Your Honor.  This is invading

4  the province of your court.  He is offering testimony that I

5  believe is intended to be later argued to demonstrate that the

6  case law or the Federal Judicial Center manual requires what he

7  is testifying to about risk assessment.  That is a question of

8  law, what is required to prove causation -- general causation,

9  which is all this is about, in a case, and I think it's not

10  proper for a expert witness to testify about a document that

11  was created as a reference manual for judges.

12          THE COURT:  Well --

13          MR. BERNICK:  That's not the -- if I could explain,

14  Your Honor.  That's not the proffer at all.  At some point

15  there has to be an intersection between science and law, and

16  all that I've done is to elicit that when it comes to their

17  legal requirement, I've given that to him.  This is what

18  science has to say, and I think he very properly pointed to the

19  Federal Center manual as being the effort of scientists to do

20  precisely that.  The manual doesn't dictate law, but the manual

21  captures the view of scientists about how to meet the legal

22  standards.

23          THE COURT:  Well, actually, it was the effort of the

24  Federal Judicial Center at the request of some judges for

25  information about how to evaluate cases and -- that come before

**J&J COURT TRANSCRIBERS, INC.**

1  them that deal with certain types of scientific evidence, and

2  so it's neither.  Nonetheless, I understand what the purpose of

3  the manual is, and so I'm not sure where we're going with this.

4  It's --

5           MR. BERNICK:  I just want to establish that his

6  testimony is totally consistent with the manual.  That's all

7  that I'm --

8           MR. FINCH:  And that's part of my objection, Your

9  Honor.  His --

10          MR. BERNICK:  Well, but there's no other person who

11  can do that except for him.

12          THE COURT:  I think that's a function of this Court,

13  to determine whether his testimony and the manual are

14  consistent, but what's the relevance?  The manual is a

15  reference guide.  Whether the manual says A, B, or C is wholly

16  irrelevant to the evidence that's going to be presented here.

17  It's a guide for judges.

18          MR. BERNICK:  That's fine.  I don't want to belabor

19  it, Your Honor.  I think that the witness' testimony is people

20  who put together -- I mean you're talking about consensus

21  science.  He can talk about consensus science, and the manual

22  -- I think the witness' testimony is that whatever the original

23  motivation was for the Center to commission it, they've

24  solicited the input of scientists, and they --

25          THE COURT:  They have indeed.


**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000727

1      MR. BERNICK:  -- it supports his credibility when he

2  offers testimony that doubling dose is it.  It supports his

3  credibility, because there are a bunch of other scientists who

4  apparently thought the same thing and helped put it in the

5  manual.  That's all the purpose of the proffer is.

6      THE COURT:  I understand what is available in the

7  manual.  I understand the witness' testimony.  I understand

8  that there is a guide that the Federal Judicial Center has

9  kindly put together to help judges who may not be informed

10  about these matters or who may be in formed about these

11  matters.  The reference manual is a reference manual, and I --

12  and it has that validity or that value I suppose within the

13  confines of the federal judiciary.  I don't think this question

14  really is relevant --

15      MR. BERNICK:  That's fine.

16      THE COURT:  -- to the area.

17      MR. BERNICK:  That's fine.

18  BY MR. BERNICK:

19  Q    I want to turn now to a different question which has to do

20  with variations in dose, and I want to talk about how

21  epidemiology deals not with a drug that's got a set dose but

22  with a toxic agent or potentially toxic agent as to which there

23  are variable doses or variable exposures.  Are you with me?

24  A    Yes.

25  Q    And I want to kind of go through a similar hypothetical

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000728

1  exercise.

2          MR. BERNICK:  And if we could show the Court GG-2011?

3  Q    I want to take the Court in your testimony through on the

4  strength of a series of assumed studies --

5          MR BERNICK:  And at this point T.J., you can take

6  this one down.

7          THE COURT:  With respect to the evidentiary question

8  that I reserved, Mr. Finch, at this point, based on the ruling

9  that I've just made, I don't see any problem with the

10 particular reference of the judicial manual on the chart that

11 the witness has prepared.  I think I understand that it is a

12 reference manual and nothing else, and so to that -- and I will

13 interpret the information on that chart -- the icon on the

14 chart to be for that purpose.

15         MR. FINCH:  That's fair.

16         MR. BERNICK:  That was his only purpose.

17         THE COURT:  All right.

18         THE WITNESS:  May I clarify one point?

19         MR. BERNICK:  At your peril of irritating the Court,

20 but go ahead.

21         THE WITNESS:  Well, it's just I think you might have

22 said that I had something to do with the existing manual, and I

23 did not.

24         MR. BERNICK:  Well, I didn't mean to suggest that.  I

25 meant what you referred to.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000729

1          THE WITNESS:  Okay.  I'm advising on the future, but

2    I had nothing to do with the existing one.  I think that may

3    have leaked out but --

4          MR. BERNICK:  Yea, it --

5          THE WITNESS:  Okay.

6          MR. BERNICK:  It could've.

7          THE WITNESS:  Okay.  I'm sorry.

8    BY MR. BERNICK:

9    Q    On GG --

10         THE COURT:  The judges appreciate all help on all

11   scientific matters --

12         THE WITNESS:  All right.

13         THE COURT:  -- from anyone.

14         THE WITNESS:  All right.

15   Q    GG-2011.  I've asked you when we put this together to

16   assume the first study with a dose of 18, a risk of 3.5, and

17   that it's statistically significant.  That is the confidence

18   interval does not include one.  A second study that's got

19   greater exposure, a greater point estimate for risk, also

20   statistically significant; a third study, exposure that's much

21   lower at 6, a risk point estimate of 1.4 not statistically

22   significant; a fourth study that's got yet another dosage, also

23   statistically significant positive, and then other studies with

24   important limitations.  And I've tried to display them on this

25   chart, which is Exhibit --

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000730

1    MR. BERNICK:  Does anybody know the exhibit number?

2    UNIDENTIFIED SPEAKER:  Two 0 one one.

3    MR. BERNICK:  Two -- no, not 2011.

4    THE WITNESS:  Two 0 one one.

5    UNIDENTIFIED SPEAKER:  Five eighty-one.

6    MR. BERNICK:  Five eighty-one which is a magnetic

7 board that we're going to be peeling things off.

8 Q    So we have on the board the same hypothetical as GX-0581,

9 and we tried to reflect the same results now with a series of

10 plots.  Are you with me on my hypothetical trying to do this

11 promptly in order to get you out of here today and get us done

12 with this?

13 A    I'm completely with you, yes.

14 Q    Okay.  Now, I want to talk now about the question of dose

15 response.  In your experience in working with epidemiological

16 studies does this kind of -- I don't want to say represent a

17 typical, but is this an illustrative series of data points that

18 would help you explain what epidemiology does with dose

19 response?

20 A    It is.

21 Q    Okay.  Now, I see that all these data points are plotted

22 individually, and there's no line or no curve or anything about

23 that.  Is there such a thing now as scientific modeling of dose

24 response?

25 A    There is.  One -- a model is simply -- usually a

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000731

1  mathematical not a graphical, but you can do it graphically,

2  but better mathematically, a description of what you've

3  observed, to try to take what you've observed and construct a

4  mathematical picture, if you'd like, of what you've observed.

5  So that's called modeling.

6  Q    Okay.

7  A    It goes on all the time in science.

8  Q    Why did people in the field of risk assessment who aren't

9  focused just on regulation or prevention but are focused on

10 understanding the scientists -- science -- why do scientists do

11 risk modeling?

12 A    Because this relationship between exposure and disease is

13 critical to understanding disease causation.  It even has other

14 uses, but that's critical to this causation analysis, yes.

15 Q    It has been said in this court that once it's established

16 that an agent can cause disease, sometimes what's referred to

17 as generic causation, that that means that it's no longer

18 important to see whether it can cause disease under other --

19 under various circumstances.  I want you to assume that that's

20 been said.

21 A    Okay.

22         MR. FINCH:  Objection.  Lack of foundation.

23         MR. BERNICK:  Well, no, actually, assertion was made

24 here, but I'm asking him to make the assumption.

25 Q    I want you to assume the position has been taken that once

CC-BLG000732

1  an agent has been established to be causes of disease under

2  certain circumstances, the only issue left is whether it caused

3  disease on an individual basis.  I want you to assume that that

4  statement's been made.  From a scientific point of view, is

5  that correct?

6  A    No, you've got to understand the dose response

7  relationship and where exposures fall on that relationship

8  Q    Just because --

9  A    -- for individuals or groups of individuals, yes.

10 Q    Let me put it to you again.  Just because it's been

11 established that an agent caused disease at high doses, does

12 that mean it's been scientific -- it is scientifically

13 established that it can cause disease at low doses?

14 A    Absolutely not.  No.  That's why risk assessment came into

15 being, because that mistake was being made a lot.  We needed a

16 framework, going back now 30 years to try to get better

17 quantitative understanding of how the dose affected the rate of

18 disease or the risk of disease.

19 Q    I want you to assume for illustrative purposes that a

20 model has been developed, and it finds a dose response

21 relationship, the curve that is the one now indicated --

22         UNIDENTIFIED SPEAKER:  Your Honor, may I stand up?

23         THE COURT:  Yes, sir.

24         UNIDENTIFIED SPEAKER:  I can't see --

25         MR. BERNICK:  Oh, I'm sorry.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000733

1    UNIDENTIFIED SPEAKER:   -- from where I'm sitting.

2  Q    I want you to assume that the relationship that's now been

3  modeled as dose response relationship, as indicated on GX-0581,

4  now that we've peeled off the strip, again for illustrative

5  purposes does that assist you in explaining to the Court what

6  modeling does?

7  A    That's exactly what modeling does.  As I said, it's

8  usually expressed as a mathematical formula, but this graphic

9  presentation is perfectly adequate.  You're doing as best fit

10  you can to the data trying to make that curve explain the data

11  basically.

12  Q    Okay.  Now, we know that three of the studies -- Studies

13  1, 2, and 4 -- found positive statistically significant

14  associations, and we see that the curve is drawn through them.

15  And the title at the top is "Observations From Epidemiological

16  Studies."  I now want to go down to the last study that was

17  there, Study 3, which finds at lower dose a relative -- a point

18  estimate of 1.4 that is not statistically significant -- and so

19  the record is clear, the blue model line ends at that data

20  point, and that further, we have a couple studies, which are

21  the other studies with important limitations, that fall towards

22  the low end and are indicated also on the chart.  And I'm --

23  with all that kind of out there, I want to ask you what it

24  means to say that there is a zone of inference between the

25  observed positive studies on the one hand and the negative

CC-BLG000734

1 study where there was not a statistically significant

2 association found on the other?  What does it mean to say that

3 that's a zone of inference?

4 A    Well, we've got some measurements in this zone, but we've

5 said they're not reliable, and then we have one at the low end

6 which is not different from the background.  So we've go

7 uncertainty in this area about the true shape of the model.  It

8 becomes less certain in what you see at the higher exposures.

9 So the statisticians who will be modeling there will admit that

10 this is -- they're making some inferences that -- to fill in

11 that model in that area.  It's not -- it depends on each

12 circumstance how certain that is, but it's less certain than

13 the higher area.

14 Q    When you're drawing the curve -- the dose response curve

15 down below the last points of a positive association into an

16 area where you don't have reliable studies showing a positive

17 association, statistically significant, is it wrong -- is it

18 scientifically wrong to draw that curve?

19 A    No, you've got to be very careful in delineating them.

20 Lay out all your assumptions for other people to look at, but

21 it's done all the time, yes.

22 Q    It's done all the time.

23 A    Yes.

24 Q    Is it proven scientifically that that relationship holds

25 in that area?  Recognizing it's not wrong to do it, I'm kind of

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000735

1 flipping the other way around. Under the hypothetical that I

2 have given you is it proven that there is, in fact, a dose

3 response relationship in that zone?

4 A    It's not proven in anything like that same sense it's

5 proven for the higher range of observation.

6 Q    Now, I want to go even further into the unobserved range,

7 which is the area that is below your last study, which is a

8 negative study.  That is you didn't find an association.  It

9 says, "unobserved range."  What does that mean?

10 A    Well, it is a range in which we either have not studied --

11 where we have some studied but have not found any significant

12 finding.  But usually it means once you're below that low

13 point, it's a range that has not been studied.

14 Q    Can science tell us in this area where it's below the last

15 point of observation -- the last point of observation was

16 negative.  Can science tell us that there is a causal

17 relationship of any kind?  That is the agent being studied is

18 causal, below that last study in that unobserved range?

19 A    Can science tell us?  No.

20 Q    Can science tell us that?

21 A    No, and science remember is basically empirical.  You have

22 to have data and a model to describe the data, but once you get

23 beyond the data you are not in the realm of science.  You're in

24 the realm of hypothesis.

25 Q    Does the fact that there's not observation in that area --

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000736

1    does that rule out the possibility that there is a risk?

2    A    It rules out a significant risk, a large risk, certainly,

3    but it's possible that there may be some risk as you go below

4    this region.  We don't know where it ends.  We don't just have

5    knowledge there, but you -- we wouldn't assume that the risk

6    just ends at the point where you happen to measure.  But it's

7    certainly going to be small, and as I say, we really don't know

8    how it behaves, what the dose response looks like.

9    Q    Under the hypothetical that I've given you, which is at

10   the high or high dose end of that unobserved range, there is an

11   observation, and it's a negative one.  That is there's no an

12   association.  What does -- under my hypothetical what does the

13   available scientific evidence say about whether there is real

14   risk in this unobserved range?

15   A    If you interpreted this scientifically, you would say

16   there is no observation of excess risk at 1 point -- at the

17   dose -- the lowest dose that we have studied here, and it could

18   -- that no effects dose actually could be even higher as you go

19   up that curve.  We're not quite sure where the dividing line

20   is, but that certainly is a no -- we call it in toxicology or

21   epidemiology a no observed adverse effect dose.

22   Q    Now, I want to talk about regulators, and I want to talk

23   about regulators, because we said back at the outset, remember,

24   you made a distinction between risk assessment models that are

25   used by regulators and risk assessment models that are purely

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000737

1  scientific.  You made a statement they're not necessarily the

2  same.

3  A    Right.

4  Q    When you deal in the real world of talking to regulators,

5  will regulators necessarily consider this kind of data point

6  that is a negative study at an area of positive dose?  Will

7  they necessary consider that to be definitive?

8  A    Not necessarily.  They might.  If it were very well

9  established through many studies, they would find that

10 definitive.  They tend to err on the side of caution, and in

11 most cases they would say, well, there could be risk below this

12 area.  We have a public health protection mandate that makes us

13 want to look at where populations are exposed typically at very

14 low doses.

15 Q    So they might say --

16 A    So they make the assumption that, well, there might be

17 something going on here.

18 Q    They might say there is not a point at which science can

19 be considered sufficient to say no risk.

20 A    Correct.

21 Q    Okay, and have you written about that yourself?

22 A    Quite a bit, yes.

23 Q    Okay.  Let's now talk about what the regulators do.

24        MR. BERNICK:  And I'm going to move through this

25 quickly, Your Honor, in an effort to finish here.  I want to

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000738

1  show the Court Exhibit GG-2023.

2  Q    Could you use Exhibit -- would GG-2023, Dr. Rodricks,

3  assist you in explaining what regulators often do in this

4  unobserved range area?

5  A    I think it does.  Yes, I hope it does.

6  Q    Okay.  Could you tell the Court what that demonstrative

7  shows?

8  A    Well, regulators are concerned about very low risks, risks

9  that are well below the range of observation.  They might be

10  concerned about relative risks of let's say not 1.4 but 1.0004.

11  They interpret their legal mandates to be highly protective to

12  want to protect populations at very, very low levels of risk.

13  So they can't measure these.  These are below the range of

14  observation, so it's become practice to assume -- to apply so

15  called extrapolation models.  Extrapolation means you're going

16  from the data into the unknown.  And we don't know the truth

17  about how the dose response curve varies below that zone of

18  observation.  We just don't know.

19        So regulators look at the possible ways it might vary

20  and have selected routinely what I tried to show on this here

21  with the yellow line, where there's a straight line drawn from

22  the lowest observed -- or the lowest unobserved risk down to

23  zero risk.  And that line is chosen; because we have quite

24  convincing argument at least based on statistics that any real

25  risk that's down there in that zone would be -- it would be

CC-BLG000739

1  very unlikely to be greater than that risk.  You can't prove

2  that absolutely, but with very high confidence we could say

3  that's going to put an upper limit on the risk.  It's not going

4  to be greater than that.  It could be a lot less, and I tried

5  to show with one of the lines that it could actually be zero.

6  It could drop rather quickly to zero risk.  We just don't know.

7  Q    Have agencies like the EPA been candid in expressing the

8  kinds of limitations that you have now articulated to the

9  Court?

10  A    I think they have.  I think the -- if you look at what

11  agencies say, they're pretty honest about what they're doing

12  here.  They do it for public health protection purposes.  I do

13  it every day for the same purpose but not for disease

14  causation.  These are very, very small risks, and they are

15  known risks.

16  Q    Are you familiar with the Risk Assessment Guidelines of

17  1986 as issued in August, 1987 by the EPA?

18  A    Yes.

19  Q    Is that a government study -- government-issued document

20  by the EPA?

21  A    The EPA describes how they do risk assessment and their

22  assumptions, yes.

23  Q    Is that a formal pronouncement of an authorized agency of

24  the United States?

25  A    It is.

CC-BLG000740

1      MR. BERNICK:  We offer GX-580, which is the Risk

2 Assessment Guidelines of 1986 issued in August of 1987 by the

3 US EPA.

4      THE COURT:  Do you have it marked as an exhibit?

5      MR. BERNICK:  It's Exhibit -- yes, it is.  It's

6 Exhibit GX-580.

7      THE COURT:  Any objection?

8           (No verbal response)

9      THE COURT:  It's admitted.

10      UNIDENTIFIED SPEAKER:  No objection from the Future

11 Claimants.

12      MR. BERNICK:  I'm sorry?

13      UNIDENTIFIED SPEAKER:  No objection.

14      MR. BERNICK:  Okay.

15      THE COURT:  It's admitted.

16

17 BY MR. BERNICK:

18 Q    I'm showing you GG-2024.  Is this a quote taken from the

19 EPA's pronouncement?

20 A    Yes, it's a direct quote.

21 Q    It says, "It should be emphasized that the linearized,

22 multi-stage procedure leads to a plausible upper limit to the

23 risk that is consistent with some proposed mechanism of

24 carcinogenesis.  Such an estimate, however, does not

25 necessarily give a realistic prediction of the risk.  The true

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000741

1  value of the risk is unknown and may be as low as zero."  Do

2  you see that?

3  A    I do.

4  Q    Is that consistent or inconsistent with your own testimony

5  about what regulators often do in risk assessment framework?

6  A    It's completely consistent.  The -- this technical term,

7  linearized multi-stage procedure, is just another name for that

8  straight line that I described.

9  Q    Let's now -- I want to take you through the last series of

10  questions about these data points, and then I want to close

11  with a few questions and turn you over to their tender mercies

12  at the other side of the courtroom.  If we go on the dose

13  response axis -- on the dose axis, under our hypothetical we go

14  from zero exposure all the way to the exposure associated with

15  that negative study.  Based upon science -- scientific data you

16  say that that dose actually carries with it any risk, based on

17  science?

18  A    The dose corresponding to the risk of 1.4?

19  Q    The dose -- yes, as --

20  A    I'm sorry.

21  Q    All doses that lead up to that data point of 1.4.  You say

22  that any risk has been demonstrated be associated with that

23  dose?

24  A    There's no demonstration of risk here.  That's -- there is

25  none.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    If we now go -- and we're on our curve -- to doses that

2  are greater -- doses that go all the way up to your positive

3  results, that curve looks nice and neat and solid, like there's

4  every little bit -- every -- like we went in with a microscope

5  -- every little bit more would carry with it some additional

6  risk.  Is it true, necessarily, that because you have a dose

7  response model, that every item of increment up that curve,

8  including in the observed areas, carries with it an increment

9  of risk?

10 A    No, you have to be very careful as you go up the curve to

11 see where you are.  You have to take into account if you --

12 like with the mathematician or bio-statistician would call the

13 imprecision of that curve.  Remember, it's built from a few

14 points with some inferences, and there's a confidence interval

15 actually on the whole curve that tells you something about what

16 I call the precision of that analysis.  It's not a real precise

17 curve, so it depends on the increment of dose whether or not it

18 becomes a statistically significant increment.

19 Q    Okay.  I'd like to show you GG-2017.  So, I want to ask

20 you a new hypothetical here.  So, we assume that there's an

21 exposure from some other source that puts a group along the

22 dose response curve as indicated in 2017 at a dose of 17, and I

23 want you to assume that at that dose there's data that says

24 that, yes, there is a positive statistically significant risk.

25 That's the beginning of the hypothetical, is we have a dose

CC-BLG000743

1  from another source that carries with it real risk.

2       I now want to show you 2018 and in 2018 we've now added

3  more, we've gone from 17 to 22.   Can you tell from the way

4  that that chart is drawn, where we have another study 22, can

5  you tell whether or not that incremental dose has been

6  scientifically shown to present an observable increased risk?

7  A    I can tell, yes.  We're looking now -- we started with a

8  does of what we call what, 17 and now we're asking about the

9  increment up to 22 for this curve.

10  Q    Yes.

11  A    Is that a significant increase, you could --

12  Q    Is that an observed significant increase?

13  A    Oh, I'm sorry, it's not observed.

14  Q    Okay.  And why do you say it's not observed?

15  A    Well, we don't have an observation point at that point.

16  We have a model and the model would say, we could calculate an

17  increase but you also have too look at the confidence interval

18  on that model.

19  Q    Okay.  Given the model can you say it is the model tells

20  you that, in fact, there is an increase?

21  A    Not in fact.

22  Q    And tell the Court now, making reference to that chart,

23  why that is so.

24  A    The values predicted by the model with confidence

25  intervals, do not differ statistically.  So, that's a

CC-BLG000744

1  reflection of how precise this curve is, if you like, so you

2  could say, yes, you could calculate that one risk is X and one

3  risk is somewhat above X but statistically they are

4  indistinguishable.

5  Q    So, if we go over to the chart over here, what you're

6  saying is that the model itself has confidence intervals.  That

7  within 95 percent confidence interval, the truth is somewhere

8  in between, but it may not be at exactly these points?

9  A    That's one way to put it, yes.

10  Q    And, if you go from the point at 17 to the point at 22,

11  what's the key feature of the confidence intervals that tells

12  you that that is not statistically significant?

13  A    Well, they overlap.  You remember the discussion earlier

14  of when it overlapped, the value of one or not, same idea here.

15  Do they overlap?  If they overlap then they're really not

16  distinguishable.

17  Q    Okay.  Now, what if you wanted to, I want to ask you,

18  let's go to 2019.  Let's look at 2019 and we've shifted further

19  up from 17 to 26.  Tell me now whether the model with its

20  confidence intervals tells you that there's been an observed

21  increased risk?

22  A    In this case, with this example, you are clearly in a

23  different zone and the confidence intervals do not overlap, so

24  you'd say here, that difference, that increase in dose gave

25  rise to a statistically significant increase in risk.

CC-BLG000745

1  Q    Okay.

2  A    So, in this case you've reached that point.  You've sort

3  of overcome the imprecision in the model, the difference are

4  large enough that the imprecision doesn't matter that much.

5  Q    Okay.  We now want to go to the question, have you become

6  familiar, have you had exposure in your work to the term

7  substantial, that is a substantial contributing factor?

8  A    I have, yes, seen that term.

9         MR. FINCH:  Objection, Your Honor, to the extent he's

10  offering a legal opinion, or legal testimony of what it means

11  to be a substantial contributing factor.  I think it invades

12  the province of a court.

13         THE COURT:  So far the only question is, has he heard

14  the term and he said.

15  Q    Okay.  From a scientists point of view, do you have a way

16  of looking at does response relationships, do you as a

17  scientist have a meaning for the term substantial when it comes

18  to incremental risk associated with incremental dose?

19  A    Well, I use the term, for the risk doubling concept, that

20  to me, any risk doubling, would be a substantial increase in

21  risk.

22  Q    And, why do you use risk doubling as a benchmark for

23  substantial?

24  A    For the same reason I described earlier, that once you've

25  reached that point, you can say that most of the cases you

CC-BLG000746

1  observed in that population are due to the exposure not the

2  background.

3  Q    Last few questions.  Tell us whether or not you find that

4  risk assessment is as reliable method based upon your expertise

5  for determining causation by an agent for disease in groups of

6  people.  Is it a reliable method?

7  A    It is reliable and as far as I know, it's the only method

8  for doing that.

9  Q    Let's ask you the same question about dose.  Tell us what

10  your view is as to whether risk assessment is a reliable

11  scientific method for determining the dose at which an agent is

12  proven to cause disease in groups or individuals.

13  A    I believe it is, yes.

14  Q    Are you aware of any other method that reliably enables a

15  determination about whether a given toxic agent causes disease

16  in groups of people and the dose at which it does?

17  A    I am aware of no other method.

18  Q    Let's talk a little bit about acceptance.  Tell us whether

19  or not risk acceptance is accepted within the scientific

20  community for the purposes I've just asked about, that is

21  determining causation and dose of causation for groups of

22  people and individuals.

23       MR. FINCH:  Objection, lack of foundation.  He's

24  asking about the -- for determining causation in groups of

25  people, he's asking about it in the context of a tort case and

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000747

1  I don't think this witness is entitled to answer that.

2          MR. BERNICK:  Your Honor, I asked him no such

3  question.  I asked him as a scientist within his community of

4  sciences.  I mean, scientific causation.  That's my question.

5  As a scientist tell us whether or not risk assessment as you've

6  described it, is accepted within your scientific community as

7  being a reliable method for determining causation in groups and

8  individuals.

9          THE COURT:  I think he's competent to answer that

10 question and to offer an expert opinion about that.  The

11 objection is overruled.

12 Q    Yes, go ahead.

13 A    The answer is yes, for sure.  I would add one small

14 modification.  Some scientists who go through the process and

15 may not label that process risk assessment, but the steps of

16 the analysis that I showed in risk assessment they do follow.

17 So, I would say with that very minor twist, yes, the answer to

18 the question is definitely yes.

19 Q    Are you aware of any other scientific method that is

20 accepted as reliable for those purposes?

21 A    I'm aware of no other method.

22 Q    Let's talk about consensus.  Does the term scientific

23 consensus have meaning to you within your field of risk

24 assessment?

25 A    Yes.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000748

Rodricks - Direct/Bernick                    196

1  Q    Okay.  And what does scientific consensus mean?

2  A    It means that, technically, it means that every scientist

3  accepts the method.  That's really the case with any scientific

4  principle, but it means a vast majority of scientists who work

5  in the area will accept the method, I think.

6  Q    Okay.  Is this, again, if I ask the question, the same

7  question, that is the use of risk assessment reliable for the

8  purposes of determining causation of a toxic agent, is there a

9  formal consensus that's been announced to that?

10 A    A formal one?

11 Q    Yes.

12 A    No, no, not that I know of.

13 Q    Okay.  Do you believe as an expert in the area that there

14 is essentially, not complete consensus, but substantial

15 consensus, in fact?

16 A    I do.  I do.

17         MR. BERNICK:  Okay.  I have no further questions.

18         THE COURT:  Mr. Finch?

19         MR. FINCH:  Can we take a short recess to reset this

20 courtroom?

21         THE COURT:  Yes.  Would you tell me just how long you

22 two think you will be on cross-exam?

23         MR. FINCH:  I'm probably an hour.

24         MR. RASMUSSEN:  And I'm probably half an hour.

25         THE COURT:  I do not think we will finish tonight.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000749

197

1        MR. BERNICK:  I just really -- (indiscernible),

2   Court's decision, we really committed to Mr. Rodricks that we

3   would get him out today, if at all possible.

4        THE COURT:  I cannot keep staff her until seven

5   o'clock tonight.  I just can't do it.  And that's how long it

6   will take.

7        MR. BERNICK:  It would be six, Your Honor.

8        MR. FINCH:  It would be six, Your Honor.

9        THE COURT:  Well, we'll stay until six, but you folks

10  have to limit your examination and Mr. Bernick, that includes

11  you on redirect.

12        MR. FINCH:  Now wait a minute, wait a minute, Your

13  Honor.

14        THE COURT:  Until six.  If we're going to be done at

15  six, we are going to leave at six.

16        MR. FINCH:  That's fine, but if there is additional

17  topics that Mr. Rasmussen has --

18        THE COURT:  For us to leave at six, you have to limit

19  your examination, so that we can be finished at six, otherwise

20  you need to tell the witness so that he can make other

21  arrangements, so that he can be here again, another day.

22  That's what I'm saying.

23        MR. BERNICK:  I mean, this is an ongoing problem that

24  Your Honor (indiscernible) but we did get specific time

25  estimates.  The time estimate was given to us in advance for

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000750

1   cross-examination was between an hour and an hour and a half

2   for both cross-examinations.

3           THE COURT:  That's what you just heard.

4           MR. FINCH:  And that's what we just said, but we --

5           MR. BERNICK:  Well, there's always -- turns out to

6   be, just like they did with the cross of the last witness, it's

7   more than that and I'm obviously concerned, we go an hour and a

8   half and then it'll all be used up and we still have to bring

9   him back.

10          THE COURT:  Well, gentlemen if we continue to bicker

11  about how long it's going to take, you're going to cut into the

12  time that you have available.  In order to be finished tonight,

13  we are going to leave at six.  So, plan yourselves accordingly.

14  I hope, sir, that we will be able to excuse you.

15          THE WITNESS:  Thank you.

16          THE COURT:  Okay.  We're in recess for five minutes,

17  and literally five minutes.

18              (Short break in proceedings)

19          COURT CLERK:  Judge wants to come on.

20          THE COURT:  Please be seated.

21          COURT CLERK:  Please be seated.

22          THE COURT:  All right, Mr. Finch, go ahead.

23          MR. FINCH:  Nathan Finch for the Asbestos Claimants

24  Committee.

25                      CROSS-EXAMINATION


                    J&J COURT TRANSCRIBERS, INC.

CC-BLG000751

Rodricks - Cross/Finch                                    199

1  BY MR. FINCH:

2  Q    Good afternoon, Dr. Rodricks.

3  A    Hello.

4  Q    Could you turn on the ELMO please.  This is one of the

5  slides that Mr. Bernick showed you.  Is it correct that to do

6  this kind of an analysis you need an accurate measure, accurate

7  measure of the dose received?

8  A    Generally, yes.  Yes.

9  Q    You need a quantitative measure of the dose received?

10  A    Well, if you're asking, you want to know what the risk

11  might be at a given dose, you --

12  Q    Yes.

13  A    -- yeah, you should have a good idea of what that dose is,

14  yes.

15  Q    And, you also need an accurate identification of what the

16  background rate of disease is, or what the rate of disease

17  could be caused by their factors to make a risk assessment?

18  A    Well, in construction of this dose response created,

19  you've already taken that background into account.  So, the

20  dose response take the background into account already, and now

21  we're just asking the question for a given dose what calculated

22  risk would you find, what elevation.

23         MR. FINCH:  I don't know if Your Honor can hear but

24  it might be good if -- can you hear okay?

25         THE COURT:  I can -- are you having trouble hearing?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000752

1          MR. FINCH:  It's hard to hear back here.

2          THE COURT:  All right.

3  Q    All right.  Here you have two different measures of dose

4  --

5               (Microphones malfunctioning)

6          THE COURT:  I'm sorry there have to be two

7  microphones on somewhere.  (Indiscernible).

8                    (Pause)

9          THE COURT:  I'm sorry, Mr. Finch, go ahead.

10  Q    In this hypothetical you have two different observed

11  measurements of dose with 95 percent confidence intervals that

12  don't overlap, correct?

13  A    Correct.

14  Q    Okay.  And, you would say that that is a significant

15  increase in risk if the confidence intervals don't overlap,

16  correct?

17  A    Yes, that is a measurable increase, significant increase

18  in risk, at that point.

19  Q    You've mentioned the concept of relative risk.  There's

20  also a concept in epidemiology, a risk assessment called Odds

21  ratio, correct?

22  A    For a particular kind of study, yes, that's correct.

23  Q    And, would you agree that if the disease is relatively

24  rare in the general population, about 5 percent or less, the

25  Odds ratio is a good approximation of the relative risk, which

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000753

1 means there -- excuse me, that the Odds ratio is a good

2 approximation of the relative risk?

3 A     Yeah.   The Odd ratio is used in something called case

4 control studies which are generally focusing on rare conditions

5 and they're calculated in a somewhat different way than

6 relative risk but, again, as you said for low risk they are

7 considered to be -- they are approximately the same measure,

8 yes.

9 Q     As relative risk.

10 A     Yes.

11 Q     Okay.   To save time, I was going to draw like Mr. Bernick,

12 but I'll use the ELMO.   He likes to draw.   All right.   I want

13 you to assume from my hypothetical that there's a carcinogen

14 where you have data points that shows at a dose of less than

15 0.5 units of measurement, the relative risk is 1.1 and the 95

16 percent confidence interval is 0.8 to 1.7.   At a dose which is

17 greater than 0.5, but less than 1, the relative risk is 4 and

18 the 95 percent confidence interval is 1.7 to 9.7.

19          THE COURT:   I'm sorry, I can't see the left column.

20 What is the second line, please?

21          MR. FINCH:   The second line is 1.0 greater than dose,

22 greater than 0.5.   Do you see that, Dr. Rodricks?

23          THE WITNESS:   I think I understand what you -- yes.

24 Q     Okay.   And the 95 percent confidence interval is 1.7 to

25 9.7.

CC-BLG000754

1  A    Right.

2  Q    And the third line you have does less than 10, greater

3  than 1 and the relative risk for that is 4.0 and the 95 percent

4  confidence interval is 2.2 to 7.2.  Do you see that?

5  A    I see it -- could you move the paper just a little bit?

6  Q    Which direction?

7  A    Well, because you're cutting off the confidence interval

8  there.  That's --

9  Q    There.

10  A    Okay. I think I see it.

11  Q    Okay.

12  A    Would you agree with me if that's what the data shows,

13  that would be a significant increase in risk if you went from

14  does 0.5 to a dose greater than 1?

15  A    So, you're starting with a dose at .5, is that the

16  premise?

17  Q    You're starting with a dose -- of a dose at less than .5,

18  the relative risk is 1.1.

19  A    Right.

20  Q    When you move the does greater than .5, but less than 1

21  the relative risk is 4.0 but you have a 95 percent confidence

22  interval of 1.7 to 9.7.

23  A    So, that would be a statistically significant increment in

24  the risk, yes.

25  Q    So, going from 0.5 to between -- less than 0.5 to between

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000755

1  0.5 and 1 would be a statistically significant increase in the

2  risk.

3  A    In the datas that you've written here, yes.

4  Q    And, going from a dose of less than 0.5 to above 1, would

5  be substantially significant increase in the risk, correct?  It

6  would put all of the confidence intervals above the doubling

7  dose of 2.2, correct?

8  A    Well, you're almost correct.

9  Q    Okay.

10  A    Relative to the original .5, the increase going from 1 to

11  10 that range, you have a significant increase above the .5,

12  but not above the .5 to 1 range.  They're in the same range.

13  So, those are indistinguishable.

14  Q    Okay.  But the risk is certainly greater if you go from --

15  once you get above the 0.5 threshold.

16  A    Yes.

17  Q    Okay.  And would you agree that as a matter of statistics

18  it is possible, is it not, that two measurements which differ,

19  which have overlapping confidence intervals are still -- can be

20  significant, correct?

21        MR. BERNICK:  Objection to the form of the question.

22  as too ambiguous.

23        COURT CLERK:  Come to the mike.

24        THE COURT:  Sustained.

25        MR. BERNICK:  Objection to the form of the question.

**J&J COURT TRANSCRIBERS, INC.**

1  He just set out a very detailed hypothetical and now, I don't

2  know if that has a reference to the hypothetical or something

3  else.

4          MR. FINCH:  No, I'm just asking as a matter of

5  statistics, the -- even if there is an overlapping confidence

6  interval at the 95 percent confidence interval, you can have

7  one dose that's higher than another.  And it may be

8  significant, it just may not fall within the statistically

9  significant.

10         MR. BERNICK:  I would object to the form of that

11 question.  I don't understand how can it be significant but not

12 statistically significant, and it's ambiguous.

13         THE COURT:  I apologize, but I don't understand the

14 question either.  Could you please rephrase it?

15         MR. FINCH:  All right.  I'll back up.

16 Q   There are -- this is a higher dose than this.

17         THE COURT:  That's not on (indiscernible), Mr. Finch.

18 Q   This is a higher dose than this, correct?

19 A   Yes, that's correct.

20         THE COURT:  Wait.

21         THE WITNESS:  I'm sorry.

22         THE COURT:  For the record, you're going to have to

23 say what you're pointing at.

24 Q   I'm pointing to the chart that's been marked GX 05, GX

25 0581.  And, it shows a data point of 4.9 and 3.2 with a range

**J&J COURT TRANSCRIBERS, INC.**

 1  of 3.9 to 5.8 versus 2.2 to 4.0.  That's what we're looking at.

 2  A    That was my example, yes.

 3  Q    Okay.  And the 4.9 dose is higher than the 3.2 dose,

 4  correct?

 5  A    Well, just the way you said it, those are not doses.  The

 6  doses that give rise to those risks --

 7  Q    The doses that you -- excuse me, the doses that give rise

 8  to that risk, the 4.9 risk is higher than the 3.2 risk,

 9  correct?

10  A    Yes.  That's he measured value from the study.

11  Q    And, each time you add to the dose, the sign of the risk,

12  meaning whether it's positive or negative, increases, correct?

13          MR. BERNICK:  Objection to the form of the question.

14  Are we talking about the point estimate, are we talking above

15  overall risk?

16          MR. FINCH:  I'm talking about the point estimate.

17          THE WITNESS:  So, you're asking, let's say we begin

18  at the dose that gives rise to the 3.2 on my chart?

19  Q    Yes.

20  A    And, now we're going to add to that?   .

21  Q    Yes.

22  A    What I tried to say is that you could calculate from the

23  blue line in the model that there is some increment but you

24  also have to consider the imprecision in that blue lien to see

25  whether that increment is statistically.  So, the increment all

J&J COURT TRANSCRIBERS, INC.

CC-BLG000758

1 the way -- in this particular example, all the way up to the

2 next measured point, none of those increments would be

3 statistically significant relative to the 3.2.  That was what I

4 tried to say.

5 Q   Okay.  But the additional increased in the dose are

6 additive to the risk for a dose response disease, correct?

7           MR. BERNICK:  Objection to the form of the question.

8           COURT CLERK:  Speak into the microphone.

9           MR. BERNICK:  Objection to the form of the question.

10 I don't know how that's different from the prior ones he just

11 answered.  What's the difference?

12           MR. FINCH:  The difference is that he was asking

13 about point estimates, now I'm asking about the overall curve.

14           MR. BERNICK:  Then what's -- Your Honor, I don't mean

15 to be obstructive, I don't know what the precise question being

16 put -- the overall curve what?

17           MR. FINCH:  The overall dose response curve.

18           THE COURT:  Would you restate the question, Mr.

19 Finch, please.

20           MR. FINCH:  Sure.

21 Q   Would you agree with me that for -- strike that.  I'll

22 rephrase the question when I get to the document.  May I

23 approach?

24           THE COURT:  Yes.  Thank you.

25 Q   And, Dr. Rodricks, this is an article which you wrote in

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000759

1  2006, correct?

2  A    It is, yes.

3  Q    Could you turn to Page 40.

4  A    Okay.  Yes.

5  Q    Would you agree with the statement that, and this is in

6  the first paragraph, about seven lines down, "Exposure analysis

7  which is a critical component of the valuation of causation may

8  be relatively straightforward in the case of certain products

9  but may become exceedingly complex if it involves

10  reconstructing exposures arising from contaminated

11  environments, especially where there is evidence that the

12  exposures have been ongoing for long periods of time.  Experts

13  in exposure violation come from many disciplines, chemistry,

14  chemical, environmental and engineering modeling of the

15  movement of chemicals through the air and water into the food

16  supply and industrial hygiene, and even a partial discussion of

17  the nature of their work would significantly distract from the

18  principle concerns of this paper.  For this presentation, it is

19  assumed that accurate medical diagnosis can be achieved and

20  that reasonably accurate estimate of plaintiffs exposures can

21  be derived."  Do you agree with that?

22  A    You're asking me to read what I wrote here?

23  Q    Yes.

24  A    Yes, I do.  I mean, what I said is, I'm not going to

25  discuss exposure assessment in any detail.  I was going to

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000760

1  focus on what I earlier described as the causation analysis,

2  the dose response analysis, but I'm just saying that you cannot

3  complete an assessment without some measure of the exposures as

4  well.

5           MR. BERNICK:  Your Honor, I'm happy to have this --

6           COURT CLERK:  Speak into the mike please.

7           MR. BERNICK:  Sorry.  I'm happy to have the

8  examination continue with this document, but there was

9  strenuous objection to our getting into any feature of his

10 interface with the tort system or tort lawsuits.  This article

11 is in the legal journal and it's all about it.

12          THE COURT:  Then on redirect you'll have a ball.

13 Q    On Page 42 you write, you're scribing in the article,

14 "Part 2 addresses how public health and regulatory scientists

15 evaluate the potentially adverse health consequences of

16 chemical exposures within a framework called risk assessment.

17 That same framework is useful for evaluating disease causation

18 in individuals but we shall see that some of the types of

19 scientific evidence used commonly in the regulatory context may

20 not be appropriate for evaluating causation in individuals."

21 Do you agree with that?

22 A    Yes.

23 Q    In Part 1, Page 42 you write that there is a -- this

24 common understanding has resulted from half a century of

25 scientific dialogue --

**J&J COURT TRANSCRIBERS, INC.**

1  A    I'm sorry, could you tell me where we are?

2  Q    Yes.  Under the --

3  A    Oh, yes, I see.  Go ahead.

4  Q    Much of it guided by many expert reports on this topic

5  issued by various arms of the national academy since the early

6  1980's.  What you're talking about is scientific -- scientists

7  undertaking toxicological risk assessments in a regulatory

8  setting, correct?

9  A    In that case, yes, that's correct.

10  Q    Okay.  And that there's a common understanding among

11  scientists, although they may disagree about the particulars of

12  the way to conduct toxicological risk assessments in a

13  regulatory setting, right?

14  A    Correct.

15  Q    Okay, but then you write, "No such history of scientific

16  discourse has informed the risk assessment process as it

17  relates to disease causation in individuals and it is difficult

18  to discern anything remotely like a scientific consensus on how

19  different types of scientific evidence should be used in

20  assessments".   I take it you believe that to be true?

21  A    Yes.

22  Q    Then you state, what is presented here, and here this is

23  the paper you're talking about evaluating disease causation in

24  humans exposed to toxic substances and a framework for doing

25  that from a risk assessment perspective, right?  That's what

CC-BLG000762

1 the paper is about.

2 A    Yes, it is, yes.

3 Q    Okay.  And when you say what is presented here might

4 represent the thinking of most scientists, but no scientists

5 writing on this topic would claim that it represents a

6 consensus or that there are no alternative approaches that

7 might have utility.  I take it you believe that to be true.

8 A    Yes.  Let me explain.  That has to do with the use of

9 different kinds of evidence within the risk assessment

10 framework.  I did say, and I think I testified, that the

11 framework itself, as a method, I do believe there is consensus

12 on.  I was talking about a slightly different topic here.

13 Q    On Page 45, you write, "Toxic responses are a function of

14 the magnitude of the dose and it is established with high

15 certainty that toxic responses do not appear until a so called

16 threshold dose is exceeded.  They increase in incident

17 severity, or both, as the dose increases above the threshold.

18 But we are protected from harm if the threshold dose is not

19 exceeded."  Do you agree with that?

20 A    Yes.

21 Q    Okay.  Then you write: "This threshold hypothesis well

22 documented although it is not possible to claim the hypothesis

23 holds for every chemical or type of toxicity.  In fact, as

24 shall be seen below, there is evidence it may be incorrect for

25 certain types of carcinogens."  Do you agree with that?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000763

1  A    Yes, that's correct.

2  Q    Now, there is something called the World Health

3  Organization International Agency for Research on Cancer?

4  A    Yes.

5  Q    It's called IARC?

6  A    Correct.

7  Q    The IARC lists 95 substances, mixtures or occupations as

8  causally related to cancer, based on epidemiological data?

9  A    That sounds right, yes.  The latest listing.

10  Q    There are different categories of carcinogens, correct, or

11  classes?

12  A    Well, the categories of evidence.  Is that what you're

13  referring to?

14  Q    No.  The IARC divides, the I-A-R-C divides carcinogens

15  into various categories, correct?

16  A    Well, I just have to be sure what you're talking about.

17  There are different classes of chemicals but there are also

18  different classes of evidence.  So, you have to tell me which

19  of those you're referring to.

20  Q    The chemicals.

21  A    The chemicals.  Okay, yeah, they do.

22  Q    Okay.  Turn to Page 49 of your article.

23  A    Yes, I have it.

24  Q    Do you agree that the IARC, I-A-R-C list of carcinogens is

25  promulgated by one of the most authoritative scientific bodies

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000764

Rodricks - Cross/Finch                                    212

1  that evaluate carcinogenity?

2  A    Yes.  It's in that category.

3  Q    Asbestos is a category 1 carcinogen, correct?

4            MR. BERNICK:  Objection, goes beyond the scope.

5            MR. FINCH:  Your Honor, this is an article he wrote

6  that I can cross-examine him --

7            MR. BERNICK:  It makes no difference whether it's a

8  article he wrote, it's on a subject --

9            COURT CLERK:  Speak into the mike.

10           MR. BERNICK:  --  if it's on a subject that goes

11 beyond the scope of my direct examination, if they want to call

12 him adversely in their case, and try to make an expert on

13 asbestos they're more than welcome to do that, there may be an

14 issue about that but that's what they're doing now, is to

15 examine him on a subject that was not the subject of direct

16 examination.

17           THE COURT:  This is outside the scope of the direct

18 and so far, unless you're going to raise some credibility

19 issue, which I'm not sure what that is at the moment, based on

20 where you've gone so far, I think it is outside the scope.

21           MR. FINCH:  Okay.

22 Q    Would you agree with me that categories -- materials that

23 have been listed as category 1 or category 2 by IARC, one can

24 presume that general causation is established?

25           MR. BERNICK:  Objection.  Objection to the form of

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000765

1  the question of the word presume, but, again, this is just a

2  Trojan horse for exactly the same question, because he knows

3  that he's going to pick up in that the categorization of IARC

4  for asbestos.  So, what he's really asking this witness to do

5  is to vouch for the accuracy, I'm not sure how that came out,

6  is to vouch for the accuracy of IARC's categorization and his

7  characterization of asbestos.  I'm not --

8          MR. FINCH:  That -- I'm sorry.  That was not my --

9          MR. BERNICK:  That goes beyond -- well, I don't know

10  what else the proffer is.

11          MR. FINCH:  That was not my question.  My question --

12  this was, all of your testimony about risk assessment relates

13  to general causation in the first instance and into specific

14  causation, correct?

15          THE COURT:  And, in fact, you objected to his being

16  proffered as an expert when it came specifically to asbestos,

17  and now you're opening the door, Mr. Finch.

18          MR. FINCH:  I'm not asking him about asbestos.

19          THE COURT:  You are asking him about asbestos.  The

20  first question was, is asbestos a category 1 carcinogen and the

21  second question was, if I look at category 1 carcinogens, is

22  there a presumption that certain things will happen.  You are

23  definitely asking him about asbestos and you are outside the

24  scope of your own objection to this witness being able to

25  testify as to an expert opinion on that very subject.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000766

1  Q    Leaving asbestos completely out of it, would you agree

2  with me that from a risk assessment perspective, if the

3  International Agency for the Research on Cancer has labeled

4  something as a category 1 carcinogen, that that is sufficient

5  to establish general causation?

6  A    I would agree with that.

7         MR. BERNICK:  Objection to the form.  Objection to

8  the form of the question, including the use of general -- it

9  really is the same thing all over again, Your Honor.  It's just

10 kind of a game here about what we're doing

11        MR. FINCH:  Your Honor, it's not the same thing all

12 over again.  Your Honor, I said take asbestos completely out of

13 it.

14        MR. BERNICK:  Well, then what's the purpose for the

15 proffer?

16        THE COURT:  Exactly.

17        MR. FINCH:  What's the purpose of the witness who is

18 not testifying -- he was talking about general causation and

19 specific causation, Your Honor.  I am getting -- this is a

20 fundamental question going to the question of, if something is

21 -- if this witness believes that something listed on the IARC

22 registry as a class 1 carcinogen, whether from a risk

23 assessment perspective general causation has been proven.

24    .    THE COURT:  All right.  That's within the field of

25 his expertise.  Overruled.

                    **J&J COURT TRANSCRIBERS, INC.**

CC-BLG000767

1              MR. BERNICK:  Well, okay, Your Honor.  I really think

2     that if he wants to try to tie this witness' testimony to IARC,

3     he would have to present the foundation that says that IARC's

4     classification bears upon the criteria that he used and they

5     haven't done that yet.

6              THE COURT:  He has not tied anything about IARC to

7     this case.  In fact, there has been an objection to this

8     witness saying anything about asbestos in the case.  The

9     witness was called to explain the risk assessment models which

10    he has done.  But, nonetheless, this question appears to be

11    within the scope of his expertise.  The objection is overruled,

12    would you state the question again so the witness can answer

13    it, please.

14    Q    Would you agree with me that if IARC, the International

15    Agency for Research on Cancer has classified something as a

16    category 1 carcinogen, in your opinion as a risk assessment

17    expert, that is sufficient to establish that the general

18    causation of that carcinogen?

19    A    Just to explain a little bit, generally, yes, yes.

20    Substances or other things get into category 1 when the IARC

21    committees look at the evidence, the way I described, they look

22    at the quality of the studies, they apply the Hill criteria and

23    make a judgment, then, based on the criteria about whether the

24    associations are causal.

25         I think it's generally reliable, but I think I would -- if

                    **J&J COURT TRANSCRIBERS, INC.**

1  you ask me about any specific agent, I would wan to look at it

2  separately to see if they've done it properly.  If I wanted to

3  make a serious inquiry.  But generally, I would assume that

4  they've done ir properly, but, again, serious inquiry on any

5  specific agent I'd want to look at the underlying data myself.

6  Q    Okay.  Could you turn to Page 57 in your article?

7  A    The first paragraph you write, "It is not possible to

8  determine, except in unusual circumstances, which actual and

9  individuals in a population are at the high end of sensitivity

10 and also at the high end of exposure."  Do you agree with that?

11 A    Again, we're talking about a population, that is correct.

12 Q    Okay.  All right.  Then on Page 58, under heading 3 you

13 talk about general and specific causation in actual

14 individuals.

15         THE COURT:  I'm sorry, what page, please?

16         MR. FINCH:  Page 58, of the same article.  Actually,

17 before we get there, on Page 57 you write, "a final point

18 regarding the regulatory risk assessments is that the so called

19 safe levels are derived from the epidemiological or

20 experimental toxicity data by the use of assumptions that have

21 the effect of placing those levels at a very small fraction of

22 the observed threshold levels, do you see that?

23 A    I'm sorry, I guess I don't.  Where are you?  On --

24 Q    I am --

25 A    Start with 57, sorry.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000769

1  Q    57, I'm sorry.

2  A    And, again, could you just cite the final point?

3  Q    Yes.  You're writing a final point regarding the

4  regulatory risk assessments is that so called safe levels are

5  derived from the epidemiological or experimental -- you see

6  where I'm reading from.

7  A    Yes.

8  Q    Okay.  That was the subject of some of your direct

9  testimony today, correct?

10         MR. BERNICK:  Again, I object.  You -- you read half

11  a sentence that ends in a note.  I mean, is your intention to

12  ask just about the first part sentence, or the whole sentence?

13         MR. FINCH:  I will ask about the whole sentence.

14  Q    Mr. Bernick pointed out that it ends in footnote, correct?

15         MR. BERNICK:  Well, actually, even the end of the

16  sentence, you continue on.  By the use of assumptions that have

17  the effect of placing those levels, at a very small fraction of

18  the observed threshold levels, and then there is a footnote.

19  Q    Okay.  I take it you agree with the text, that's my

20  question Dr. Rodricks.

21  A    Yes.

22  Q    All right.  And in the footnote you write "Regulators

23  assume in the absence of evidence to the contrary, that

24  carcinogenic chemicals (indiscernible) mechanisms that disobey

25  the general threshold rule for toxicity, this does not

CC-BLG000770

1 translate to the sometimes expressed view that any level of a
2 carcinogenic exposure can cause cancer.  Citing sources.
3 Instead, it means only that any exposures to carcinogens will
4 increase cancer risk and that the magnitude of the risk
5 increases with increasing exposures".  Did I read that
6 accurately?

7 A    Yes.  And that's what I described earlier.  That straight
8 line, if you recall the straight line extrapolation, the one
9 that was yellow, that assumes no threshold.  That assumes that
10 even the smallest dose will increase risk, that's an assumption
11 that regulators make for carcinogens, unless they have some
12 evidence that it's wrong.

13    My point here was that that no threshold idea is commonly
14 interpreted to mean any exposure that causes disease.  And that
15 is completely fallacious.

16 Q    Okay.

17 A    That's not what the no threshold idea means, at all.  So,
18 that's the point I was trying to make here.

19 Q    Okay.  All it means is that any exposures to carcinogens
20 will increase cancer risk and that the magnitude of the risk
21 increases with increasing exposures.

22 A    Right.  The assumption that -- the threshold assumption
23 leads to that picture, yes.

24 Q    Okay.  Now, on Pages 58 and 59, you have a framework for
25 evaluating general and specific causation.  Do you see that,

CC-BLG000771

1  Dr. Rodricks?

2  A    Yes.

3  Q    Okay.  And you break it out into a series of Romanettes.

4  The first is, to what chemical was the plaintiff exposed, then

5  the second is, is there sufficient evidence in the scientific

6  literature to support a causal relationship between exposure to

7  the chemical and the specific type of injury or disease the

8  plaintiff has incurred.  That's general causation, correct?

9  A    It's usually called that, yes.

10 Q    Okay.  And so, if the answer to number 2 is no, that

11 usually ends the inquiry.  If the answer to number 2 is yes,

12 then the inquiry continues and that's where you get into the

13 area of specific causation, correct?

14 A    Yes.

15 Q    Okay.  Then Romanette 3 is, what is the likelihood that

16 someone having the plaintiff's characteristics, age, sex, race,

17 smoking habits, alcohol consumption rates, et cetera, would

18 have the specific injury or disease, in the absence of exposure

19 to the suspect chemical.  That's what is known as specific

20 causation, correct?

21 A    Well, it's one of the issues, but this is the dose

22 response relationship and what the background risk is and how

23 it would change as you increase dose.

24 Q    And, would you agree with me that that determination is

25 based on the individual facts and circumstances of the

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000772

1  plaintiff's situation, at least in part?

2          MR. BERNICK:  I'm sorry, just referring to Romanette

3  3, not the rest of the criteria later on for specific

4  causation?

5          MR. FINCH:  Yes, yes.

6          THE WITNESS:  Could you repeat the question, I'm

7  sorry.

8  Q    In order to answer the question that Romanette 3 poses,

9  you have to have data about the plaintiff's individual

10 characteristics and that data is going to be dependent on the

11 individual facts and circumstances of the plaintiff's

12 situation, correct?

13 A    Yes.  The point I was making is that if you were going to

14 take the dose response model and say where does a particular

15 exposure group sit on that curve, you'd want to be reasonably

16 sure that their characteristics match those of the population

17 that you studied to get the curve.  If they're different, I

18 think I answered a question about alternative causes for

19 specific individuals where you might have some other

20 explanation.  That's the point I was trying to make here, yes.

21 Q    Then you write, about halfway down in paragraph -- the

22 next paragraph, "Plaintiffs condition may be very rare in which

23 the likelihood of demonstrating specific causation inquiry 4,

24 increases."  Do you agree if the condition which the plaintiff

25 has is very rare, but there's general causation established

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000773

1 between the plaintiff's condition and exposure to a toxic

2 chemical that it is the likelihood of being able to demonstrate

3 specific causation increases?

4         MR. BERNICK:  At this pont it really is unfair and

5 incomplete.  We've gone through three Romanettes, we now have

6 an inquiry, Romanette 4, that Mr. Finch hasn't even put into

7 the equation and the specifically referred to in that sentence.

8 It's a very misleading question.

9         THE COURT:  I think from -- well, this -- I mean, the

10 doctor wrote the article, so he probably is able to ferret out

11 whether or not the question is misleading and if it is, to ask

12 that it be rephrased.  It seems to me that the Romanette 4 does

13 ask a specific question, and, let's see.  Romanette 4, I do not

14 believe is incorporated within your question.  The objection is

15 sustained.

16 Q   Okay.  Incorporating Romanette 4 within my question, do

17 you agree, Dr. Rodricks, that if the plaintiff's condition is

18 very rare, and he is exposed to a toxic chemical which is known

19 to cause that condition, the likelihood of being able to

20 demonstrate specific causation increases?

21 A   Only in the sense that it would take -- for rare

22 conditions it would generally take less exposure to double the

23 background risk than for, say, a very common.  Only in that

24 sense.

25 Q   On Page 60 and 61, you give a hypothetical example.  I'm

**J&J COURT TRANSCRIBERS, INC.**

1  looking at the second paragraph on Page 60, and you write,

2  "Thus, for example, if a specific plaintiff's risk of

3  developing his or her specific disease, in the absence of

4  exposure to the suspect chemical is 1 in 1,000, examination of

5  the dose response data from epidemiological data can reveal the

6  magnitude of the dose necessary to increase risk by a factor of

7  1 in 1,000."  Did you write that?

8  A    Yes.

9  Q    Okay.  If the exposure experts can demonstrate that the

10 plaintiff incurred exposures leading to a dose of at least that

11 magnitude, what did you mean by that magnitude?

12 A    One in 1,000.

13 Q    Okay.  Then it can be concluded that exposure to the

14 suspect chemical increased plaintiff's disease risk to a level

15 of at least 2 in 1,000, which is 1 in 500, right?

16 A    Yes.

17 Q    Thus, it may be concluded that since the plaintiff

18 actually has the disease, then the risk has been realized and

19 it is more likely that it was caused by the chemical than by

20 whatever other factors caused the condition.  Is that your

21 view?

22 A    That's what I had testify to earlier, yes.

23 Q    Okay.  Next paragraph you write, "This sketch of how the

24 analysis of specific causation may proceed is meant to describe

25 the type of analysis necessary, the scientific method to be

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000775

1  used and is not intended to describe a strict set of inflexible

2  criteria (such as for example, a strict risk doubling

3  standard).  A degree of scientific judgment is necessarily

4  involved especially since the data required to conduct a

5  careful, quantitative evaluation of the plaintiff's exposures

6  and epidemiological dose response relationships are almost

7  never without uncertainty."  Do you agree with that?

8  A    Yes.

9  Q    The next page, Page 62, you have a heading called Limits

10  Improving Causation.

11  A    Yes.

12  Q    Do you have that section?

13  A    I do.

14  Q    The second paragraph, although the general process

15  described here for undertaking an evaluation, you write

16  "Although the general process described here for undertaking an

17  evaluation of general and specific causation may have broad

18  acceptance.  It seems clear that nothing approaching the

19  uniformity of scientific approaches that can be discerned in

20  the regulatory context, exists in connection with the

21  evaluation of individual exposures and responses.  The relative

22  weights given to different types of scientific information may

23  vary greatly among experts and there appears to have been

24  little substantive discussion of the problem of individual

25  disease causation in the scientific as against the legal

CC-BLG000776

1  literature."  I take it you agree with that.

2  A    I do, in the sense that that takes away nothing from my

3  statement earlier that the general method of application here

4  is perfectly appropriate, it does have consensus.  There are

5  going to scientific quarrels over the underlying data, what the

6  best dose response might be.  So there you will run into,

7  perhaps, a lack of consensus, but the method to me is quite

8  clear.

9  Q    But there will be -- there could very well be lots of

10  disputes about what dose the plaintiff was exposed to, or what

11  dose is necessary is to have any increased risk of disease or

12  whether you can determine specific causation in a particular

13  case.  Those are always going to be subject of expert disputes

14  in an individual case.

15  A    For working within --

16        MR. BERNICK:  I'm sorry, excuse me.  Those are three

17  different questions.

18        THE COURT:  Yes, they are.

19  Q    Would you agree with me that there could be disputes in an

20  individual case about the amount of exposure the plaintiffs

21  cover, correct?

22  A    The general -- when working with risk assessment

23  methodology I described, is you look at the data and try to

24  build models.  Some scientists may come up with a slightly

25  different model, or it could be a substantially different

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000777

1 model.  There will be those kinds of scientific debates.  I

2 don't know about this particular case, but in some cases that

3 happens.  That has nothing to do with method, the method here

4 is solid.  And so, I was focusing here on the possibility that

5 there could be a debate about some of the intricacies of this

6 application.

7        MR. FINCH:  May I approach the witness, Your Honor?

8        THE COURT:  Yes.

9 Q    Dr. Rodricks, do you have what's been marked Exhibit 589

10 in front of you?

11 A    Yes.

12 Q    This is an article that you wrote in 1997?

13 A    Published in 98, yes.

14 Q    Published in 1998?

15 A    Right.

16        MR. BERNICK:  Again, Your Honor, I can't help but

17 point out, the title of the article is Toxicological Risk

18 Assessments in the Courtroom.

19        MR. FINCH:  Your Honor, there are statements in the

20 article that go to his testimony here that have nothing to do

21 with trying to provide a legal framework.  There are statements

22 about science.

23        THE COURT:  Let's just -- Mr. Finch, we'll take

24 objections to questions as they come.

25        MR. FINCH:  Okay.  Well, he objected to -- I thought

**J&J COURT TRANSCRIBERS, INC.**

1 he was objecting to the article.

2          THE COURT:  That was a statement, not an objection.

3 Let's go.

4 Q    Okay.  On Page 24 of this article, you write, in Romanette

5 6, "If the observed toxic response is carcinogenicity, a

6 different set of assumptions is adopted.  High dose cancer

7 studies at practicable size can detect excess lifetime cancer

8 risks no lower than about 1 in 10, where as public health goals

9 generally call for protective limits corresponding to very much

10 lower risks.  Extrapolation to the low dose, low risk range is

11 thus require if ay statement about risk is to be made."  Do you

12 agree with that?

13 A    Yes, that's what I said earlier in my testimony,

14 basically.

15 Q    And, in the United States a linear no threshold dose

16 response model has been traditionally used, although

17 alternative models, including threshold models have been

18 advocated for some substances, based on data concerning their

19 modes of biological action, correct?

20 A    That is correct and it's truer 10 years later than it was

21 then, yes.  A lot of certain threshold hypothesis now

22 (indiscernible), based on biological studies.

23 Q    Could you turn to Page 28.  The first full paragraph you

24 write "With respect to epidemiology findings it is important to

25 remember that population based epidemiology evidence can

CC-BLG000779

1  establish only general causation, i.e., is the agent capable of

2  causing the disease and not specific causation, i.e., did the

3  agent cause disease in a given individual." I take it you

4  agree with that.

5  A    Yeah.  If you find that something causes disease, you just

6  can't assume that it always causes disease under every

7  circumstance.  That's why you need to proceed further.

8  Q    Would you agree with the proposition that if there is no

9  epidemiological evidence at all that shows that a given

10  substance can double the risk of disease, then in making a --

11  let me back up.  Here's my hypothetical.  You've got exposure

12  to substance A, which is a category 1 carcinogen listed by

13  IARC.

14  A    Okay.

15  Q    Then you have exposure to some substance B, as to which

16  there is no epidemiology at all that shows any doubling of the

17  risk at any dose.  As between the two, would it be sound

18  science to totally discount the possibility that substance 2

19  could have contributed to the plaintiff's disease?

20        MR. BERNICK:  Object to the form of the question

21  insofar as it references IARC.  That's number one.  And, number

22  two, I don't even understand the comparisons being drawn.

23  Totally disregard this doesn't have any meaning to it.  If we

24  could have a precise question put that's not designed to back

25  door the asbestos classification, maybe we could get an answer

J&J COURT TRANSCRIBERS, INC.

CC-BLG000780

1 to the question.

2          MR. FINCH: I didn't ask him about asbestos at all,

3 Your Honor.

4          THE COURT:   No, you didn't but you did ask about

5 something that is obviously known to contain asbestos on a

6 list, after having objected to this witness's qualification to

7 answer the question.  The objection is sustained.  Restate the

8 hypothetical.

9 Q    Okay.  Let me ask it this way.  Assume that there are more

10 than 10 studies that show for carcinogen A there's a doubling

11 of the risk of cancer.

12 A    I'm sorry, at a particular dose?

13 Q    At a particular dose.

14 A    Okay.

15 Q    And, assume that for substance B there is no

16 epidemiological evidence at all that shows that there is a

17 doubling of the risk of the same disease that is caused by

18 carcinogen A.  Do you have that hypothetical in your mind?

19 A    I guess what I don't understand is with substance B, is

20 there any evidence showing it's a carcinogen at all below a

21 doubling?

22 Q    There is no evidence at all showing that it doubles the

23 risk of disease.

24 A    Does it increase the risk at all of disease.  That's what

25 I don't understand.

CC-BLG000781

1  Q    There's no evidence that it increases --

2  A    So, it's not a carcinogen.

3  Q    Correct.

4  A    Okay.

5  Q    There's no epidemiological evidence that suggests that it

6  is.  Some people have asserted that it is.

7  A    Okay.

8  Q    In that circumstance, would it be within sound science for

9  someone who presents the disease, for their medical

10 professional to totally discount the chances that the disease

11 was caused by substance B?  If they were exposed to substance A

12 and there was more than 10 epidemiological studies that show

13 that substance A can cause the disease and nothing that shows

14 that substance B can cause the disease.

15         MR. BERNICK:  Again, I --

16         THE COURT:  It's all right, Mr. Bernick, the witness

17 can answer this question.

18         THE WITNESS:  Well, in spite of --

19         THE COURT:  If you can understand it, you can answer

20 it.

21         MR. BERNICK:  Okay.

22         THE WITNESS:  I'd have to kind of restate it to be

23 sure -- I think you're saying we have a well established

24 carcinogen, we know the risk doubling dose, we know the clear

25 evidence of carcinogenicity, and there's some other substance

CC-BLG000782

1  where we have no evidence of carcinogenicity, now, you're

2  saying if somebody -- well, I don't see how B is relevant to

3  any question.  Maybe I just don't understand it, I'm sorry.

4  Q    No, the question is, if someone in making a specific

5  causation determination decides that there is no way that

6  substance B could have possibly caused or contributed to this

7  person's cancer, that would be within the realm of sound risk

8  assessment science.

9  A    Given the facts you stated, yeah, you wouldn't say that B

10 had any risk of cancer, right.  Any known risk of cancer.

11 Q    On Page 29, under number 3, the bottom of the first

12 paragraph you write:  "It is nevertheless obvious that reaching

13 a scientific consensus on the methods to evaluate chemical dose

14 is not to be expected, especially when the objective is to

15 estimate doses to specific individuals and not to generic

16 populations.  Indeed, some experts offer the view that the

17 magnitude and duration of dose do not matter, especially for

18 carcinogens, the mere fact of exposure is sufficient to

19 conclude the presence of increased risk or in some cases actual

20 causation."  Did you write that?

21 A    I don't see where you're looking.  I mean, if you're

22 quoting me, I wrote it.  Now, the question is, I hope I

23 discounted that idea.

24 Q    You hope you what?

25 A    Discounted that idea as incorrect.  Could you tell me

CC-BLG000783

1  where you're reading here?

2  Q    Yes, at the -- it's highlighted on the ELMO.

3        MR. BERNICK:  Give him the page, Page 29.

4  Q    Page 29, paragraph 3.

5  A    I'm just having -- I apologize.  Oh, okay, I'm sorry.

6  It's the first paragraph under --

7  Q    Yes.

8  A    Okay.

9        THE COURT:  This is talking specifically about levels

10 of lead in the blood?

11       MR. BERNICK:  Well, even more than that.  If you read

12 up further in the paragraph, it's about -- basically it's a

13 statement about a problem that experts who are toxicologists

14 have trying to be experts in dose reconstruction.  I don't --

15 Q    You're a toxicologist, correct?

16 A    Yes.

17 Q    All right.  Would you agree that there is not a scientific

18 consensus on the methods to evaluate chemical dose?

19       MR. BERNICK:  Your Honor, I would specifically and

20 vehemently object to that question.  It is totally misleading

21 because he's taking it out of context in an article that's all

22 about experts who are called in litigation.  This is an

23 improper use, it's not proper impeachment.

24       THE COURT:  It is an improper use of this article,

25 but I think if you'd heard the witness' answer, you probably

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000784

1  wouldn't be objecting of vehemently.   Nonetheless, the

2  objection is sustained.

3  Q    All right.   Let's turn to Page 30.   Do you agree that most

4  toxicologists would not adopt the view that doses already

5  documented as toxics are the only doses likely to cause

6  toxicity?

7  A    Where are you at, I'm sorry?

8  Q    I'm just asking him in general, does he agree with the

9  proposition that most toxicologists would not adopt the view

10 that doses already documented as toxic are the only doses

11 likely to cause toxicity?

12 A    I'd be careful with the word cause here.   I wrote that,

13 but I was referring to what I was asked about earlier, that you

14 measure -- you fail to find effects, you believe that the

15 effects simply disappear at the point where you failed to find

16 them, and I think most would say, well, there's going to be

17 some risk of toxicity as you go below those doses, we don't

18 know what the shape of the dose response curve is, we don't

19 know how quickly they go to zero, but qualitatively we might

20 say there's some risk but I think it's going to be a very small

21 risk and I think I tried to say that earlier.   That's the point

22 I was trying to make here.

23       MR. FINCH:   May I consult with my colleagues for a

24 second?

25       THE COURT:   Yes, sir.


**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000785

1                    (Pause)

2          MR. FINCH:  Your Honor, I would just offer at this

3  time the two articles, 589, and what's the other one?

4          UNIDENTIFIED MALE SPEAKER:  588.

5          THE COURT:  588.

6          MR. FINCH:  588.

7          THE COURT:  They're admitted?

8          MR. BERNICK:  No, well --

9          THE COURT:  They're the witness's articles.

10         MR. BERNICK:  They are the witness's articles but the

11  fact that the witness authored the articles doesn't make them

12  any more admissible as underlying materials for expert

13  testimony.  Underlying materials for expert testimony --

14         MR. FINCH:  I'm not offering --

15         MR. BERNICK:  Excuse me.  Are inadmissible.  The fact

16  that they're used on cross-examination and that he wrote them,

17  doesn't make them admissible.  I mean, they're only used for

18  impeachment purposes and then you quote them, use them for

19  impeachment purposes, the rest of the article doesn't come. in.

20         THE COURT:  Well, that is a fair statement and,

21  frankly, there wasn't much impeachment material, based on what

22  this witness testified to.  He was basically affirming what he

23  had testified to on examination.  So, I'm not sure what the

24  purpose is.  I would think, however, Mr, Bernick, based on the

25  fact that this Court cannot take 100 percent accurate notes,

CC-BLG000786

Rodricks - Cross/Finch                                    234

1  and at some point I know I'll get a transcript, but I don't

2  know when, I would at least like to have the pages referred to

3  by the witness.

4         MR. BERNICK:  I would -- Your Honor, and the only

5  reason I stand on what I think is an appropriate technical

6  objection is, I'm just very sensitive about establishing

7  precedence in the case that will then lead to people offering

8  all kinds of stuff in, just because it was used on

9  cross-examination.

10         THE COURT:  Well, and I agree.

11         MR. BERNICK:  I'm happy to have Your Honor have the

12 whole thing.

13         THE COURT:  I agree with the principle, if it's not

14 substantive evidence, but to the extent that somebody is going

15 to refer to it as a portion of cross-examination, I would like

16 a reference point to have it available, but I agree.

17         MR. FINCH:  With that amendment, then I would offer

18 for purposes of impeachment, the sections of the article that I

19 used with him on cross-examination, not the entire article.

20         THE COURT:  Well --

21         MR. BERNICK:  You don't offer -- again, they are not

22 offered separately.  They are used for impeachment, or they're

23 not and whatever you read out of them is the impeachment but,

24 again, I have no quarrel with the Court having, indeed, the

25 full document so that the Court doesn't have any confusion

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000787

1  about what it is that was said on the record.

2          MR. FINCH:  That's my only concern, Your Honor.  I

3  just want the Court to be able to refer to the actual article

4  that I used, even if it doesn't substantively come into

5  evidence.

6          THE COURT:  That's what I would like to be able to

7  use the articles for, not as substantive evidence, but simply

8  to make sure that I do have a complete record because it's

9  going to be very difficult as we get through 18 days of this,

10  to keep track of what witnesses are referring to what.  So,

11  they will not be admitted into substantive evidence.  I am

12  going to maintain copies in the file so that I do have a record

13  of the specific portions that were referred to by any one in

14  this case and the witness.  All right.

15          MR. FINCH:  I'll pass the witness, Your Honor.

16          THE COURT:  All right.

17          MR. RASMUSSEN:  Good evening, Your Honor.

18          THE COURT:  Good evening.

19          MR. RASMUSSEN:  I'm Garret Rasmussen for the Future

20  Claimants.  My first time in the court, so I'm happy to meet

21  you.  And Dr. Rodricks, my first time to meet you as well.  I

22  think we'll probably have a lot to agree upon and my

23  cross-examination will not be a long one.

24                      CROSS-EXAMINATION

25  BY MR. RASMUSSEN:

                   J&J COURT TRANSCRIBERS, INC.

1  Q    I want to start out by asking you some questions about

2  risk assessment and the relevance of risk assessment to the

3  evaluation of disease in individuals.  So, risk assessment,

4  first of all, focuses on likelihood of adverse affects

5  occurring in exposed populations, correct?

6  A    It will vary, it can do that, yes, for sure.

7  Q    Right.  And a populations risk of a disease is not the

8  same thing as the risk to each and every individual in that

9  population, is it?

10 A    It's not identical, no.

11 Q    Correct.  A populations risk is only the same as every

12 individuals risk is all the individuals have identical

13 exposures and identical sensitivities to the particular toxin,

14 isn't that right?

15 A    Well, not exactly that.  We would say that if we're

16 talking about a group of individuals who experience exposures

17 similar to those where we have observation of excess risk, and

18 there's nothing that would distinguish them otherwise from the

19 studied groups, then what you find for the population ought to

20 apply to those individuals, but it applies in a probabilistic

21 way.  I think I described that with the drug example earlier.

22 That was my testimony and that's what I believe.

23 Q    Would you agree, Dr. Rodricks, that regulatory risk based

24 standards are not useful to evaluate disease causation in

25 particular individuals?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000789

1  A    They are not designed to do that, they should not be used

2  for that purpose.

3            MR. BERNICK:  Regulatory -- counsel, the question is

4  regulatory risk levels?

5            MR. RASMUSSEN: Yes, yes.  Yes, it was.

6  Q    And, it's true isn't it, that the assumptions and models

7  used in regulatory risk assessment are not known to apply to

8  any actual individuals, correct?

9  A    They are not designed to work in that way.  They try to

10  focus on hypothetical, most sensitive individuals, whoever they

11  are, we don't know who they are, most highly exposed.  So, they

12  have a number of assumptions that would be very -- it would be

13  just wrong to apply to individuals, when you're dealing with

14  those assumptions.

15  Q    Okay.  So to assess the disease causation in an

16  individual, you would have to look at that specific individuals

17  exposure, isn't that right?

18  A    Yes.  Among other things, but yes.

19  Q    Yes, it's not enough just to look at a group cumulative

20  exposure, is it?

21  A    Well, you could do it on a group basis as well.  If you

22  have -- the important thing is the general causation and the

23  dose response relationship, but now we could look at some group

24  that has some range of exposures and that you could --

25  Q    But you couldn't do it --

CC-BLG000790

1          MR. BERNICK:  Excuse me, let him finish.

2          MR. RASMUSSEN:  Yes.  Keep going.

3          THE WITNESS:  What I'm saying is, you could do it.

4 Often cases arise where there's an individual or cases maybe

5 small groups of individuals, or large groups who have similar

6 exposures.  So, you could do it in all of those -- I'm sorry.

7 Go ahead.

8          MR. RASMUSSEN:  Finish, please finish.

9          THE WITNESS:  Well, you could to it in all of those

10 circumstances.

11 Q    Are you familiar with the concept of a heterogenous group?

12 A    Well, it has a couple of meanings.  Those variability in

13 the population, yes.

14 Q    So, if it is a heterogenous group with variability in the

15 population, then you can't use the group cumulative risk

16 exposure to make a prediction about an individual, could you?

17          MR. BERNICK:  Objection to the form of the question.

18 It's very ambiguous and it's got several elements to it.  If

19 you understand, go ahead and answer, but I --

20          MR. RASMUSSEN:  I think it's actually a very precise

21 questions and asked very precisely and I think the witness

22 understands it.

23          THE COURT:  Well, would you repeat it for me because

24 I only got half of it.  A heterogenous group with variability

25 in a population, that's how it started comma, cannot use and

                    J&J COURT TRANSCRIBERS, INC.

Rodricks - Cross/Rasmussen                    239

1 that's where it lost it.

2 Q    Okay.  Cannot use a cumulative -- cannot use a risk

3 exposure calculated for a group, as opposed to for an

4 individual.  For a population as opposed to an individual.

5           MR. BERNICK:  That same -- it's even worse now.

6           MR. RASMUSSEN:  Well, we'll get back to that -- we'll

7 start with that general question and we'll get more precise as

8 we go on.

9           THE COURT:  If you understand this question, Doctor,

10 you can answer it.

11           THE WITNESS:  I thought I did but now I'm not sure,

12 so maybe it needs to be repeated.

13 Q    Okay.  Let me come about it a different way.

14 A    Okay.

15 Q    I mean, I'll just start asking about cumulative exposures

16 because I think I really want to get to the cumulative exposure

17 point.

18 A    Okay.

19 Q    The point that you did understand.  So, you would agree

20 that there's a positive relationship between cumulative

21 asbestos -- well, I don't want to use asbestos.  That's a word

22 I can't use.  You'd agree that there's a positive relationship

23 between cumulative exposure to a toxant and a risk of getting a

24 disease because of that exposure?

25           MR. BERNICK:  I'm sorry.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000792

1          THE WITNESS:  That's the first premise?

2          MR. RASMUSSEN:  Yes, that's the first premise.

3          MR. BERNICK:  He's being asked to assume that as a

4  hypothetical?

5          MR. RASMUSSEN:  No, I'm asking him if he agrees with

6  that.

7          MR. BERNICK:  I don't know what he's agreeing with.

8          MR. RASMUSSEN:  Well, let's ask him.

9          MR. BERNICK:  What --

10          THE COURT:  The question is, does he agree that there

11  is a positive relationship between the cumulative exposure to a

12  toxant and the risk of getting a disease from that exposure,

13  but I'm not sure what the cumulative exposure means.  I'm

14  sorry.

15  Q    Okay.  The exposure -- the dosage is really what it means.

16  Q    Yes, yes.

17          THE COURT:  But you were talking about heterogenous

18  populations.  You've backed off that and now you're talking

19  about individuals with more than one --

20          MR. RASMUSSEN:  No, I'm doing it step by step.  I'm

21  going to get back to the heterogenous population, but I want to

22  first start out with the concept of what dosage means.

23  Q    Dosage -- and --

24          THE COURT:  So, now, you're now talking about an

25  individual with more than one exposure.  That's what you're

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000793

1 talking about dose, cumulative exposures?

2          MR. RASMUSSEN:  No, no, I don't want to talk about --

3 we're getting ahead of ourselves.  I'm going to go back and lay

4 the foundation.

5          THE COURT:  All right.

6 Q    Each individual, individuals in a group can have

7 different exposures to a toxant, correct?

8 A    There would be variability, yes.  Well, a group, when you

9 say a group, let's say who are all doing one kind of job

10 exposed to a chemical, there would be some variability on any

11 given day, right.

12 Q    Right.  And also there could be some variability

13 cumulatively over the course of a year if they were doing

14 different jobs, isn't that right?

15 A    If their jobs were -- quite different jobs with the same

16 chemical, let's say?

17 Q    Yes.

18 A    Sure.  Yes.  So, we'd want to classify, if there were

19 different jobs, you'd probably want to look at them separately.

20 Q    And sometimes even people doing the same job could have

21 different cumulative exposures, not just a daily exposure, but

22 cumulative, over the course of a year if, indeed, they do the

23 same job in a different way.

24          MR. BERNICK:  These are all hypothetical questions,

25 not grounded -- you're asking him to assume that?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000794

1          THE COURT:  They are hypotheticals, yes.

2          MR. RASMUSSEN:  Correct.

3          THE WITNESS:  Yes, I don't know the answer to that.

4     I mean, that really gets to be, say, an industrial hygiene or

5     chemists question.

6     Q    I'm not asking you whether that could happen, but if it

7     did happen --

8     A    You're assuming that it does happen.

9     Q    Yes, yes.

10    A    Right.

11    Q    And, if it did happen, then the exposure of an individual

12    could differ from the exposure -- well, then the risk to the

13    individual could differ from the average risk to the group,

14    isn't that right?

15    A    Given your hypothetical --

16         MR. BERNICK:  I'm sorry.  The question is whether an

17    individual may be -- an individual's exposure may be different

18    from a calculated average, is that the question?

19         MR. RASMUSSEN: Yes, yes.

20         MR. BERNICK:  You're asking whether it can possibly

21    happen?

22         MR. RASMUSSEN: Whether it can happen in a group of

23    people, each doing the same job, because they're doing the same

24    job in a different way, over the course of a year, not just in

25    one day.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000795

1        MR. BERNICK:  I think this really, again, falls

2   outside of his scope of expertise, but if he can answer it,

3   it's very vague.

4        THE WITNESS:  I don't really -- this really is beyond

5   my real experience.  I mean, I know there's variability from

6   day to day, I know that when I look at exposures as a risk

7   assessor, it's usually the long term exposure, either for a

8   certain group because that's usually the best measure of the

9   average exposure over a long period of time, if it's that long

10  term exposure that matters, and in most risk assessments that's

11  what matters.

12        There may be variability around that day to day for

13  individual to individual, but if you're looking at the group,

14  it's that long term average that is the best, most probable.

15  We're talking about what's most likely to be correct.  It's not

16  actually every single individual.  That's my point about going

17  from groups to individuals, we're not talking about absolute

18  prediction, we're talking about what's more likely than not, or

19  more probable than not.  I'm sorry, I kind of lectured, I

20  apologize.

21  Q    No, no, that's fine.  But the individuals in that group,

22  an individual in that group could have a cumulative exposure,

23  in other words a long term exposure over the course of a year

24  that differed from the average exposure of that group, over the

25  course of the year.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000796

1          MR. BERNICK:  Your Honor, I just --

2          THE WITNESS:  You can't deny that, sure.

3          THE COURT:  If that weren't possible, we couldn't get

4     an average.

5          MR. RASMUSSEN:  Beg pardon?

6          THE COURT:  If that weren't possible, we couldn't get

7     an average.

8          MR. RASMUSSEN:  Right.  That's my point.

9          THE COURT:  Okay, so let's move on to something.

10         MR. RASMUSSEN:  So, some people would be higher than

11    the average and some would be below.

12         THE COURT:  So, let's move on.

13         MR. RASMUSSEN:  Okay.

14         MR. BERNICK:  (Indiscernible) what an average means.

15    Q    Relative risk.  In order to tell whether anyone in an

16    exposed group has sufficient cumulative exposure to a toxant to

17    achieve a risk doubling exposure, you would want to look at the

18    distribution of cumulative exposures in the group, wouldn't

19    you?

20    A    I'm sorry, could I -- I don't want to have the question

21    read back.  Could you just restate it, I'm sorry.

22    Q    Yes.  In order to -- with respect to relative risk, in

23    order to tell whether anyone in the exposed group, exposed

24    group to a toxant, had sufficient cumulative exposure to the

25    toxant to achieve a risk doubling exposure, you would want to

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000797

1 look at the distribution of cumulative exposures in that group,

2 correct, so you'd know whether some people are above the

3 average and some might be below.

4           MR. BERNICK: Objection. I think that is -- this is

5 only pursuing the same question which is the degree of

6 variability of exposures in a group. And, again, I think it's

7 outside the scope of his expertise. I know it's outside the

8 scope of my examination. He's trying to use this individual to

9 create a predicate for a declaration that Dr. Stallard

10 introduced in this case, too late in the day, and this actually

11 violates yet again, yet again, the agreement that was reached,

12 that the testimony by declaration of Dr. Stallard would be used

13 solely for Daubert purposes and would never make its way into

14 this trial. And now it's not only being done back door through

15 cross-examination of a witness, it's not even in the area.

16           THE COURT: All right. This witness has a good

17 understanding of his own expertise. If he thinks this is

18 outside the area of his expertise, he has been very quick to

19 state that. It seems to me that if this is outside the area of

20 his expertise, he will so state and otherwise, if he

21 understands the question, he may answer it. Doctor, you may

22 answer this question if you understand it and feel that it is

23 within your expertise.

24           THE WITNESS: Well, I'd like to hear it one more

25 time, though, because that discussion, I lost the question.

CC-BLG000798

1  Q     Sure, okay.  In order to tell whether anyone in an exposed

2  group had sufficient -- any one person in the exposed group,

3  had sufficient exposure to a toxant to achieve the risk

4  doubling exposure, you would want to look at the distribution

5  of cumulative exposures in that group, wouldn't you?

6  A     You're talking about a single person --

7  Q     Yes, I am.

8  A     I don't see how a distribution helps you deal with a

9  single person.

10 Q     If you want to try to figure out the causation for an

11 individual, the range of where an individual might lie, if you

12 want to figure out the extent to which an individual might have

13 a cumulative exposure over the course of say a year, and you

14 had an average for the course of the year, you'd want to know

15 the variant, the variation in order to tell how high the

16 individual might be or how low the individual might be relative

17 to the average.

18        MR. BERNICK:  Determining that variation for what

19 purpose?

20        THE COURT:  That was not a question, that was a

21 statement.  There is no question before this witness.  He has

22 said he doesn't think that's a significant factor, that was his

23 answer.  Could we please get a question before the witness?

24        MR. RASMUSSEN:  Okay.

25        THE COURT:  The statements are not evidence and

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000799

1 they're stricken.

2        MR. RASMUSSEN:  Okay.  Let me ask the question again,

3 or ask a question, I'm sorry, Your Honor.

4 Q    In order to tell whether anyone in the exposed group had

5 sufficient cumulative exposure to a toxant to achieve a risk

6 doubling exposure --

7        THE COURT:  You've asked that question.  He's

8 answered it.

9        MR. RASMUSSEN:  Okay.  Did we get --

10 Q    Okay.  If we've got the answer then I'll move on.

11 A    Well, I'll answer again if it helps.  I mean, I think the

12 answer is no, that if you have a distribution the average --

13 you don't know where any individual is on the distribution,

14 they could be on the high end, or the low end, the average is

15 the best measure over a long period of time.  If you had to say

16 what is the most likely exposure for an individual in that

17 group, you'd say it's the average.  I'm quite sure that's

18 right.

19 Q    Well, if you knew the average cumulative exposure of the

20 group, you couldn't tell from that whether any particular

21 individual within a group would have sufficient cumulative

22 exposure to the toxant to contract a disease because of that

23 exposure, could you?

24        MR. BERNICK:  Objection.  Wouldn't -- well answer it

25 if you can.

**J&J COURT TRANSCRIBERS, INC.**

1          THE WITNESS:  I'm working on what's probable.  The

2  average exposure for a group is te most probable exposure and

3  calculating the risk based on that exposure makes perfect sense

4  for the group and you would then say, probabilistically that is

5  the best estimate for any individual in that group.  The only

6  thing that would exclude that analysis was some other factor

7  about some individual which makes -- which says you have

8  evidence that that individual was somehow very different from

9  the rest.

10 Q    But there may be individuals in that group that will have

11 a cumulative exposure that is greater than the average, that's

12 my point.

13         MR. BERNICK:  Your Honor, we've been through that

14 like three times.

15         MR. RASMUSSEN:  Okay.  If that point is established

16 then I'll move on.  Do you agree with -- do we have agreement

17 on that?

18         THE WITNESS:  I suppose that could not be discounted,

19 but you're asking to do an assessment of the risk for the group

20 and what is most likely by way of exposure.  Unless you have

21 some other evidence, what is most likely is the average.

22 Q    But I'm asking for the individual.  I'm saying yes, that's

23 the average for the group, that's the most likely for an

24 individual in the group, but I'm asking you whether at the same

25 time there will be individuals in that group who will actually

**J&J COURT TRANSCRIBERS, INC.**

1  have a cumulative exposure that is above the average.

2  A    Right.  And I'm saying it doesn't matter.

3          MR. BERNICK:  Objection, that calls -- I'm sorry.

4  That calls at this point, whether -- complete speculation.

5          THE COURT:  Counsel, Doctor, in order to get the

6  average, as a mathematical proposition what do you have to do?

7          THE WITNESS:  Well, you have a job, you have a

8  chemical, you send in an industrial hygienist, they measure

9  daily or weekly, they do this over a long period of time for

10  people working that job, they can measure the direct breathing

11  zone or just the general area and they make an average.  And

12  you'd say for that job, unless you had some clear evidence that

13  something was very different for some employee, you'd say for

14  that job the average exposure is what determines the employee's

15  risk, on a probabilistic, you can never be absolutely sure, but

16  on a probabilistic, what's most likely to be true, the average

17  is most likely to be true.

18          THE COURT:  And, sir, if a range of exposures for any

19  particular individual within that group, hypothetically, ranged

20  from 1 exposure in a given period to 100 exposures in that same

21  period, and you took an average and the average exposure was

22  50, is it a fairs statement that there would be some people who

23  had less than 50 exposures, and some people who had more than

24  50 exposures?

25          THE WITNESS:  There may be on any given measurement

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000802

1  day.

2          THE COURT:  Yes.

3          THE WITNESS:  But on the long term, unless there were

4  some other circumstance that all ought to sort of balance out

5  and the --

6          THE COURT:  To the average.

7          THE WITNESS:  -- and the average is the best most

8  probable estimate of their exposure.  Yes.

9          THE COURT:  Thank you.

10 Q    But, it wouldn't balance out to the average over the long

11 term if the individual in the group were doing different jobs

12 within that job category, would they?

13 A    Well, that's a different matter, yes.

14 Q    Well, it's true, isn't it?  If they --

15         MR. BERNICK:  Objection,  objection.  Your Honor, at

16 this point, I really think he's badgering a witness who has

17 gone as far as he can in answering the questions.

18         THE COURT:  That question has been asked and

19 answered.

20 Q    Suppose that the risk doubling dose for toxant is 2, just

21 as you have in your graph this afternoon, you can't tell

22 whether any particular individual within a group would have a

23 sufficient cumulative exposure to the toxant to contract a

24 disease simply knowing that the cumulative average was

25 sufficient to get you to a 1.9 relative risk, could you?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000803

1        MR. BERNICK:  Objection.  This exact same question

2   was asked 15 minutes ago, and led down this whole path and I

3   really object, Your Honor, because this, again, is an effort to

4   use an analysis, now on cross-examination, that was

5   specifically agreed to be usable solely for Daubert purposes --

6        THE COURT:  Well, I don't know that.  It seems to me

7   that this whole line of questioning, this witness has been very

8   clear, we're going over ground that this witness is not

9   changing his opinion about.  Can we get to something new?

10       MR. RASMUSSEN:  I really would like the answer to

11  that question because I think, Your Honor, we'll find out later

12  in this trial that that question is a key question and that

13  other --

14       THE COURT:  Then if that is the key, you may

15  establish it in your case.  This witness has told you that he

16  is not measuring individual populations.  Now, you keep asking

17  him about individual populations.

18       MR. RASMUSSEN:  But I'm asking him about -- he's an

19  expert on risk assessment --

20       THE COURT:  Yes, he is.

21       MR. RASMUSSEN:  -- and his testimony is how you use

22  risk assessment and, indeed, he has a title in his report

23  called Relevance of Risk Assessment to a Valuation of Disease

24  Causation in Individuals.

25       THE COURT:   Yes, he does.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000804

1      MR. RASMUSSEN:  And I'm asking him about causation in

2  individuals based on risk assessment.  And I'm asking him about

3  the impropriety of using group, or at least the distinction,

4  maybe not the impropriety, the distinction between using a

5  group relative risk to apply it to an individual and I think --

6      THE COURT:  And he has been very consistent in

7  answering those questions.  You may ask one more question along

8  these lines.  Ask your question, again.  The doctor may answer

9  it, he is not changing his testimony about this.

10      MR. RASMUSSEN:  Okay.  One last question on this

11  line, it's a very important question.  I'd like to have an

12  answer, I think it's a fair question.

13  Q    Suppose the risk doubling dose for a toxin were 2 units,

14  which is what you testified about earlier this afternoon, and

15  the average cumulative lifetime exposure of a group were such

16  that the relative risk for the group was 1.9, which is below

17  the doubling dose standard, even though that's below the

18  doubling dose, you couldn't conclude that nobody in that group

19  had an exposure that could exceed the doubling dose and,

20  therefore, have causation, could you?

21  A    I can only -- it's the same answer I really gave to the

22  last exposure question.  If you're asking what is most likely,

23  the average exposure for the group is what's most likely for

24  any individual, most likely, it's not perfect, but most likely,

25  and you would say for a 1.9 increase that you do not meet the

**J&J COURT TRANSCRIBERS, INC.**

1 | more likely than not standard.

2 | Q    My question wasn't whether it's more likely for the group,

3 | it was whether knowing that the relative risk for the group is

4 | 1.9, you could not conclude from that knowledge that nobody in

5 | the group exceeded the double dose of 2 units.

6 | A    Well, I could not do that if you're seeking perfect

7 | knowledge, right.  In other words, if it's only a matter of

8 | absolute knowledge, then I can't.  I can talk about what's most

9 | likely.

10 | Q    But isn't it common sense as the Judge said, you have an

11 | average and some people are going to be above the average and

12 | some are going to be below the average?

13 | A    Well, I don't agree.

14 |         MR. BERNICK:  There's been almost no common sense in

15 | this line of examination.    Your Honor, we've been over this

16 | now for 25 minutes.

17 |         THE COURT:  I believe the relevant test is, what is

18 | the accepted scientific standard in the community within which

19 | this witness is permitted to offer an expert opinion.  So, why

20 | don't we get back to the test and ask your question within the

21 | framework within which he is permitted to offer an expert

22 | opinion.  If it's to a reasonable degree of scientific

23 | certainty that you're trying to get him to answer a question,

24 | then, perhaps that is the question that needs to be asked.

25 | Q    Okay.  I'll do that.  Suppose the risk doubling dose for a

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000806

1 toxin were 2, and suppose the average cumulative lifetime

2 exposure of a group was such that the relative risk was 1.9,

3 could you conclude with a degree of scientific certainty and

4 reasonableness that a person, that nobody, that no person in

5 that group exceeded the relative risk doubling dose of 2?

6 A    You're assuming the 1.9 is well validated as the average

7 and are you asking me to conclude with absolute certainty that

8 there's no --

9 Q    No.  Reasonable scientific certainty was my question.

10 A    All I can answer is the most scientifically responsible

11 and certain answer is that the average is what affects the risk

12 for the group.  And I couldn't go -- and that the most likely

13 exposure and risk for every individual, the most likely is

14 reflected by the average.

15 Q    So, therefore --

16 A    I don't know what else to say.

17 Q    So, therefore, am I correct in concluding that you cannot

18 say that nobody in that group exceeded the relative -- the risk

19 doubling dose of 2.

20        MR. BERNICK:  Your Honor, this is really --

21        THE COURT:  It's sustained.  He has now told you

22 everything he is going to tell you.

23        MR. RASMUSSEN:  With all due respect, Your Honor, I

24 think he answered a different question.  If you read back the

25 question and read back the answer, you'll see he didn't answer

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000807

1  the question, he answered a different question and talked about

2  the group.

3           MR. BERNICK:  With all due respect, this shows

4  disrespect for this witness and this process and I think we're

5  creating a very dangerous precedent in this case.

6           THE COURT:  Counsel, he has answered to the best of

7  his ability.  You can keep asking this question until the cows

8  come home, you're not going to get a different answer.  The

9  objection is sustained.  You have tried at least 15 ways to get

10 this answer -- this witness to give you a different answer,

11 he's not giving you a different answer, I'm sorry.  You've got

12 to live with the answer he's given you.

13          MR. RASMUSSEN:  Okay.  That actually brings on the

14 next question, it makes the next question even more

15 appropriate.

16 Q    Would you agree, sir, that risk assessors are, perhaps,

17 most delinquent in their failures adequately to convey the

18 uncertainties that accompany their evaluations?

19 A    I think I probably wrote that.

20 Q    So, you'd agree with it?

21 A    Yeah.

22 Q    And, you would agree that risk assessors should report the

23 range of uncertainty when a risk assessor reports her

24 conclusions wouldn't you?

25 A    I'm sorry, I didn't hear -- could you please repeat the

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000808