UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                        .    Case No.  01-1139 (JKF)
                              .
W.R. GRACE & CO.,             .
et al.,                       .    USX Tower - 54th Floor
                              .    600 Grant Street
                              .    Pittsburgh, PA 15219
              Debtors.  .
                              .    January 22, 2008
. . . . . . . . . . . . ..    9:07 a.m.


TRANSCRIPT OF TRIAL
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:          Kirkland & Ellis, LLP
                          By:  DAVID BERNICK, ESQ.
                               BARBARA HARDING, ESQ.
                               BRIAN STANSBURY, ESQ.
                               SALVATORE BIANCA, ESQ.
                               HENRY THOMPSON, ESQ.
                               SCOTT McMILLAN, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601


Audio Operator:           Janet Heller


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609)586-2311     Fax No. (609) 587-3599

TRIAL EXHIBIT 12
CC-BLG000815-001061

CC-BLG000815

2

APPEARANCES (CONT'D):

For the Asbestos
Creditors Committee:        Caplin & Drysdale, Chartered
                          By:  NATHAN FINCH, ESQ.
                               BERNARD BAILOR, ESQ.
                               ADAM VanGRACK, ESQ.
                          One Thomas Circle, NW
                          Washington, D.C.  20005

                          Caplin & Drysdale, Chartered
                          By:  ELIHU INSELBUCH, ESQ.
                          375 Park Avenue, #3505
                          New York, NY  10152

For the
Unsecured Creditors'      Stroock & Stroock & Lavan
Committee:                By:  ARLENE KRIEGER, ESQ.
                          180 Maiden Lane
                          New York, NY  10038-4982

For the Property
Damage Committee:         Bilzin Sumberg Baena Price &
                             Axelrod LLP
                          By:  MATTHEW KRAMER, ESQ.
                          200 South Biscayne Boulevard
                          Suite 2500
                          Miami, FL  33131

For the Ad Hoc            Dewey & LeBoeuf, LLP
Committee of Equity       By:  JENNIFER WHITENER, ESQ.
Sec. Holders:             125 West 55th Street
                          New York, NY  10019

For the Future            Orrick, Herrington & Sutcliffe
Claimants                    LLP
Representatives:          By:  ROGER FRANKEL, ESQ.
                               RAYMOND MULLADY, ESQ.
                               JOHN ANSBRO, ESQ.
                          Washington Harbour
                          3050 K Street, N.W.
                          Washington, D.C.  20007

For Committee of          Campbell & Levine
Asbestos Personal         By:  MARK T. HURFORD, ESQ.
Injury Claimants:         800 North King Street
                          Suite 300
                          Wilmington, DE  19701

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

For Travelers:            STB
                          By:  STERLING MARSHALL, ESQ.


For Serengeti:            By:  BILLAL SIKANDER


For W.R. Grace:           W.R. Grace
                          By:  JAY HUGHES, ESQ.
                          7500 Grace Drive
                          Columbia, MD  21004

For the Debtors:          Pachulski, Stang, Ziehl &Jones
                          By:  JAMES O'NEILL, ESQ.
                          919 North Market Street
                          17th Floor
                          Wilmington, DE  19899-8705

TELEPHONIC APPEARANCES:

For Vinson & Elkins,      Vinson & Elkins LLP
LLP:                      By:  ARI BERMAN, ESQ.
                          Trammell Crow Center
                          2001 Ross Avenue, Suite 3700
                          Dallas, TX  75201

For DebtWire:             DebtWire
                          By:  SETH BRUMBY


For the Unsecured         Strook & Strook & Lavan
Creditors' Committee:     By:  LEWIS KRUGER, ESQ.
                          180 Maiden Lane
                          New York, NY 10038


For Ad Hoc Committee:     Weil, Gotshal & Manges
                          By:  M. JARRAD WRIGHT, ESQ.
                          1300 Eye Street NW, Suite 900
                          Washington, D.C.  20005

CC-BLG000817

TELEPHONIC APPEARANCES (CONT'D):

For Official Committee    Dies & Hile LLP
of Asbestos Property    By:  MARTIN DIES, ESQ.
Damage Claimants:    1601 Rio Grande, Suite 330
   Austin, TX  78701

For Various Claimant    Stutzman, Bromberg, Esserman & Plifka
Firms:    By:  DAVID J. PARSONS, ESQ.
   2323 Bryan Street
   Suite 2200
   Dallas, TX  75201

For Fireman's Fund:    Stevens & Lee, P.C.
   By:  DAVID R. BEANE, ESQ.
   1105 North Market Street, 7th Fl.
   Wilmington, DE  19801

For the PD Committee:    Bilzin Sumberg Baena Price &
    Axelrod LLP
   By:  SCOTT BAENA, ESQ.
   200 South Biscayne Boulevard
   Suite 2500
   Miami, FL  33131

For Owens-Illinois:    McCarter & English
   By:  KATHARINE MAYER, ESQ.
   Renaissance Centre, 405 N. King St.
   Wilmington, DE  19801

For David T. Austern:    Piper Jaffray & Co.
   By:  JONATHAN BROWNSTEIN, ESQ.

For Asbestos Property    Scott Law Group
Damage Claimants:    By:  DARRELL SCOTT, ESQ.
   1001 East Main Street, Suite 500
   Sevierville, TN  37864

For National Union Fire    Zeichner Ellman & Krause, LLP
Insurance Co.:    By:  MATTHEW RUSSELL, ESQ.
    ROBERT GUTTMANN, ESQ.
    MICHAEL DAVIS, ESQ.
   575 Lexington Avenue
   New York, NY  10022

CC-BLG000818

APPEARANCES (CONT'D):

| | |
|---|---|
| For the Future Claimants Representatives: | Orrick, Herrington & Sutcliffe LLP<br>By:  DEBRA FELDER, ESQ.<br>       JOSHUA CUTLER, ESQ.<br>Washington Harbour<br>3050 K Street, N.W.<br>Washington, D.C.  20007 For |
| For Federal Insurance Company: | Cozen O'Connor<br>By:  JEFFREY WAXMAN, ESQ.<br>Chase Manhattan Centre<br>1201 North Market Street<br>Wilmington, DE  19801 |
| For Federal Insurance Company: | Cozen O'Connor<br>By:  JACOB C. COHN, ESQ.<br>1900 Market Street<br>Philadelphia, PA  19103 |
| For Allstate Insurance: | Cuyler Burk, LLP<br>By:  ANDREW CRAIG, ESQ.<br>Parsippany Corporate Center<br>Four Century Drive<br>Parsippany, NJ  07054 |
| For W.R. Grace: | W.R. Grace<br>By: WILLIAM CORCORAN, ESQ.<br>7500 Grace Drive<br>Columbia, MD  21044 |
| For W.R. Grace: | Kirkland & Ellis LLP<br>By:  ELLEN AHERN, ESQ.<br>       JANET BAER, ESQ.<br>200 East Randolph Drive<br>Chicago, IL  60601 |
| For the Debtors: | Kirkland & Ellis, LLP<br>By:  THEODORE FREEDMAN, ESQ.<br>Citigroup Center, 153 East 53rd St.<br>New York, NY  10022 |
| For W.R. Grace: | Kirkland & Ellis LLP<br>By:  DAVID MENDELSON, ESQ.<br>6555 Fifteenth Street, N.W.<br>Washington, DC  20005 |

J&J COURT TRANSCRIBERS, INC.

TELEPHONIC APPEARANCES (CONT'D):

For State of Montana          Womble Carlyle Sandridge & Rice
Department of                 By:  FRANCIS MONACO, ESQ.
Environmental Quality:        222 Delaware Avenue
                              Suite 1501
                              Wilmington, DE  19801


For Christopher M.            Cohn Whitesell & Goldberg, LLP
Candon:                       By:  CHRISTOPHER M. CANDON, ESQ.
                              101 Arch Street
                              Boston, MA  02110


For CNA:                      Goodwin Procter, LLP
                              By:  DANIEL GLOSBAND, ESQ.
                              Exchange Place
                              Boston, MA  02109-2881


For David T. Austern,         Phillips, Goldman & Spence, P.A.
the Future Claimants'         By:  JOHN C. PHILLIPS, ESQ.
Representative:                1200 North Broom Street
                              Wilmington, DE  19806


For W.R. Grace:               Pachulski, Stang, Ziehl & Jones LLP
                              By:  TIMOTHY P. CAIRNS, ESQ.
                              919 North Market Street
                              17th Floor
                              Wilmington, DE  19899-8705


For the Asbestos              Caplin & Drysdale, Chartered
Creditors Committee:          By:  WALTER SLOCOMBE, ESQ.
                                   JEANNA RICKARDS, ESQ.
                                   PETER LOCKWOOD, ESQ.
                                   JAMES WEHNER, ESQ.
                                   LESLIE KELLEHER, ESQ.
                              One Thomas Circle, NW
                              Washington, D.C.  20005


For the Asbestos              Ferry Joseph & Pearce, P.A.
Creditors Committee:          By:  THEODORE TACCONELLI, ESQ.
                              824 Market Street, Suite 19899
                              Wilmington, DE  19899


**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000820

APPEARANCES (CONT'D):

| | |
|---|---|
| For Ford, Marrin, Esposito, Witmeyer & Gleser: | Ford, Marrin, Esposito, Witmeyer & Gleser<br>By:  SHAYNE SPENCER, ESQ.<br>Wall Street Plaza<br>New York, NY  10005 |
| For Pepsi: | Butler Rubin Salfarelli & Boyd LLP<br>By:  KIRK T. HARTLEY, ESQ.<br>70 West Madison Street<br>Suite 1800<br>Chicago, IL  60602 |
| For Official Committee of Asbestos Property Damage Claimants: | Brandi Law Firm<br>By:  TERENCE D. EDWARDS, ESQ.<br>44 Montgomery St., Suite 1050<br>San Francisco, CA  94104 |
| For the State of CA, Dept. of Gen. Services: | Hahn & Hessen LLP<br>By:  STEVEN J. MANDELSBERG, ESQ.<br>488 Madison Avenue, 14th Fl.<br>New York, NY  10022 |
| For the PD Committee: | Speights & Runyan<br>By:  DANIEL SPEIGHTS, ESQ.<br>200 Jackson Avenue, East<br>Hampton, SC  29924 |
| For David T. Austern: | Piper Jaffray & Co.<br>By:  JASON SOLGANICK |
| For Scott Company: | Vorys, Sater, Seymour & Pease, LLP<br>By:  TIFFANY COBB, ESQ.<br>52 East Gay Street<br>Columbus, OH  43216 |
| For London Market Companies: | Mendes & Mount, LLP<br>By:  ALEXANDER MUELLER, ESQ.<br>750 Seventh Avenue<br>New York, NY  10019-6829 |
| For Official Committee of Asbestos Property Claimants: | LECG<br>By:  ALAN MADIAN, ESQ.<br>      ELIZABETH DEVINE, ESQ. |

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000821

APPEARANCES (CONT'D):

| | |
|---|---|
| For Official Committee of Asbestos Property Claimants: | Richardson Patrick Westbrook & Brickman, P.C.<br>By:  EDWARD J. WESTBROOK, ESQ.<br>174 East Bay Street<br>Charleston, SC  29401 |
| For O'Conner: | O'Conner<br>By:  John R. Wollen |
| For the Blackstone Group: | The Blackstone Group<br>By:  JOHN O'CONNELL |
| For Anchorage Advisors: | Anchorage Advisors<br>By:  JONATHAN LEWINSOHN |
| For Lehman Brothers: | Lehman Brothers<br>By:  ANDREW CHAN |
| For Caxton Associates: | Caxton Associates, LLC<br>By:  JAMES RIEGER |
| For Dow Jones News Wires: | Dow Jones News Wires<br>By:  PEG BRICKLEY |
| For Citadel Investment Group: | Citadel Investment Group<br>By:  BEAU HARBOUR |
| For Durham Asset Management: | Durham Asset Management<br>By:  JEFFREY A. ROSENKRANZ |
| For Murray Capital Management | Murray Capital Management, Inc.<br>By:  MARTI MURRAY |
| For Korn Capital, LLC: | Korn Capital, LLC<br>By:  STEPHANIE KWONG |
| For Irwin H. Zandman: | Irwin H. Zandman<br>By:  IRWIN H. ZANDMAN |

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000822

## INDEX

**WITNESSES**                                                    **PAGE**

DR. DAVID WEILL
   Direct Examination by Mr. Bernick              15
   Voir Dire by Mr. Bernick                        17
   Direct Examination by Mr. Bernick              20
   Cross Examination by Mr. Finch                  99
   Cross Examination by Mr. Mullday               126
   Redirect Examination by Mr. Bernick            139
   Recross Examination by Mr. Finch               153

DANIEL HENRY
   Voir Dire Examination by Mr. McMillan          159
   Direct Examination by Mr. McMillan             166
   Cross Examination by Mr. Bailor                201
   Cross Examination by Mr. Mullady               216
   Redirect Examination by Mr. McMillan           225
   Recross Examination by Mr. Bailor              232

| **EXHIBITS** | **I.D.** | **EVD.** |
|---|---|---|
| GX-0280 American Thoracic Society 1986 statement | -- | 45 |
| GX-0274 American Thoracic Society December 12, 2003 statement | -- | 45 |
| GX-0322/0323/0135 Standards of pulmonary function testing | -- | 91 |
| GX-425/426/427 Summaries of data | -- | 92 |
| GG-2155 GX7.1681352 | -- | 95 |
| GG-2156 8939695 | -- | 95 |
| GG-2092 Reproduction chart (Dr. Henry) | -- | 193 |
| GX-284 Protocol used in study (Dr. Henry) | -- | 193 |
| GX-285 Protocol used in study (Dr. Henry) | -- | 194 |
| GX-286 Data collected in study (Dr. Henry) | -- | 194 |
| GX-327 Data collected in study (Dr. Henry) | -- | 194 |
| GX-104 Data collected in study (Dr. Henry) | -- | 194 |
| GG-2094 Replication of a table | -- | 198 |
| GX-582 Data sets | -- | 198 |
| GX-583 Data sets | -- | 198 |

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  This is the continuation of the personal

2   injury estimation trial in W.R. Grace, Bankruptcy Number 01-

3   1139.  The participants I have listed by phone, James Rieger,

4   Alan Madian, Lewis Kruger, Daniel Glosband, John Wollen,

5   Jonathan Brownstein, Daniel Speights, Sina Toussi, Kirk

6   Hartley, David Beane, Debra Felder, Janet Baer, Andrew Craig,

7   David Mendelson, Ellen Ahern, Jonathan Lewinsohn, John

8   O'Connell, Theodore Freedman, Mark Hurford, Jeanna Rickards,

9   Steven Mandelsberg, Jeff Waxman, Bernard Bailor, Peter

10  Lockwood, Elihu Inselbuch, Walter Slocombe, James Wehner,

11  Michael Davis, Terence Edwards, Edward Westbrook, Andrew Chan,

12  Joshua Cutler, Timothy Cairns, Jacob Cohn, William Corcoran,

13  John Phillips, Ari Berman, Seth Brumby, Katharine Mayer,

14  Christopher Candon, Alex Mueller, Tiffany Cobb, Scott Baena,

15  Jarrad Wright, David Parsons, Darrell Scott, Martin Dies,

16  Theodore Tacconnelli, Leslie Kelleher, Beau Harbour, Elizabeth

17  Devine, Jason Solganick, Matthew Russell, Robert Guttman,

18  Francis Monaco, and Shayne Spencer.

19          I'll take entries in court.  Good morning.

20          MR. BERNICK:  Good morning.  David Bernick for Grace.

21          MR. STANSBURY:  Brian Stansbury for Grace.

22          MS. HARDING:  Barbara Harding for Grace.

23          THE COURT:  Excuse me one second, please.  Okay.

24  Thank you.

25          MR. BIANCA:  Salvatore Bianca for Grace.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000824

1          THE COURT:  Good morning.

2          MR. FINCH:  Nathan Finch for the Asbestos Claimants

3 Committee.

4          MR. BAILOR:  Bernard Bailor for the Asbestos

5 Claimants Committee.

6          MR. INSELBUCH:  Elihu Inselbuch for the Committee.

7          MR. MULLADY:  Good morning, Your Honor.  Ray Mullady

8 for the Future Claimants Representative.

9          MR. ANSBRO:  John Ansbro, also for the Future

10 Claimants Representative.

11          THE COURT:  Good morning.

12          MS. KRIEGER:  Good morning, Your Honor.  Arlene

13 Krieger from Stroock and Stroock and Lavan on behalf of the

14 Official Committee of Unsecured Creditors.

15          THE COURT:  Good morning.

16          MR. HOROWITZ:  Good morning, Your Honor.  Greg

17 Horowitz from Kramer Levin on behalf of the Equity Committee.

18          MR. KRAMER:  Good morning, Your Honor.  Matt Kramer,

19 Bilzin Sumberg on behalf of the Property Damage Committee.

20          MR. FRANKEL:  Good morning, Your Honor.  Roger

21 Frankel on behalf of the Future Claimants Representative.

22          THE COURT:  Folks, I have two housekeeping matters to

23 discuss with you before we begin.  One concerns the schedule

24 for tomorrow.  I have a family matter, which means that I have

25 to leave here at 5:00, so whatever schedule adjustments you

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000825

1 need tomorrow, we have to be finished at 5:00 tomorrow.

2            The second has to do with the schedule for March the

3 3rd and the 5th.  Something has come up.  I'm not going to be

4 able to be here those two days, so I propose to cancel the

5 trial on March the 3rd and the 5th and instead change the days

6 to May 13th and May 14th, if you're available those two days.

7 So could you please check.  I've done some readjustment to my

8 schedule, so we can fill those two days in if those two days

9 are satisfactory with you.  I understand that you may be asking

10 for some additional trial days.  I'm not sure if that's going

11 to be necessary or not.  Perhaps you can all talk and let me

12 know.  If you are -- if you do think you're going to need trial

13 days, frankly, I think we better discuss that soon, because I

14 have another matter that's also going to get heated up very

15 soon that's going to take some very lengthy trial days, and I'm

16 not going to be able to do them both at the same time.  So we

17 need -- I'm going to need some planning.

18            MR. BERNICK:  Fine.

19            THE COURT:  Okay.  Mr. Bernick.  Oh, sorry.

20            MR. MULLADY:  Your Honor, I have one procedural issue

21 to take up with the Court.

22            THE COURT:  Yes, Mr. Mullady.

23            MR. MULLADY:  Good morning, Your Honor.

24            THE COURT:  Good morning.

25            MR. MULLADY:  Just a small procedural point that I

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000826

1  don't think will be controversial.  It's just a -- it's a

2  procedural request and suggestion for the Court that stems from

3  some moments we had last week during the examination of Dr.

4  Rodricks.  I think it's fair to say that counsel for both sides

5  made statements in the presence of the witness that we believe

6  should've been communicated at sidebar.  We propose that going

7  forward if counsel feel they need to make a statement or an

8  argument or an objection that's more than just to state the

9  objection and the grounds, that we ask the Court for a sidebar,

10  or that the witness be excused, so we can have the airing of

11  that discussion.

12        We don't seek a tactical advantage here.  We seek

13  really to just have a level playing field and to insure that we

14  have a process that has the integrity to it that, you know, we

15  think should be followed, which is that witnesses shouldn't be

16  educated by statements or pushed in one direction or another by

17  statements of counsel.  And, obviously, the Court has the

18  authority to institute a procedure like this under Federal Rule

19  of Evidence 611(a), which gives the Court discretion to -- in

20  fact, the obligation to control the method of examining a

21  witness and the preparation -- or the presentation of evidence.

22  Thank you.

23        THE COURT:  All right.  Is this controversial?

24        MR. BERNICK:  I -- it's never been raised with me,

25  Your Honor.  I just heard it for the first time this morning,

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000827

1  so I don't have any issue with -- if there -- if it's expected

2  there will be matters that require some significant discussion

3  approaching the Court at sidebar, I also don't believe that

4  this is, frankly, that big a deal, and I don't think that it

5  would make sense to have a rigid rule that says that if you say

6  more than objection, that calls for or objection to form, then

7  immediately we then have to have a sidebar conference, which I

8  think generally takes time to get organized and interrupt the

9  flow of the examination that way.

10        THE COURT:  All right.  I think I'll let it up to

11  counsel to ask if they think that something is going to require

12  a sidebar to ask for it.  I'm not going to do it if it's

13  simply, you know, an objection to the hearsay rule.  Frankly, I

14  think most of your witnesses, to the extent that they're

15  experts, have already been educated by counsel in the requests

16  that you've been making of them beforehand anyway.  They're not

17  new, most of them, to this process.  They either testified or

18  been involved in writing reports in many cases not just this

19  one.  So I doubt that they're very surprised by most of

20  counsel's opinions, but I'm not opposed to their request in an

21  appropriate circumstance.

22        MR. MULLADY:  Thank you, Your Honor.  And, obviously,

23  we're not -- the purpose of this request isn't to curb simple

24  objections of that nature, but I think if the Court were to go

25  back and read the transcript from last week -- and I'm sure

**J&J COURT TRANSCRIBERS, INC.**

1 Your Honor recalls -- there was a lot more than that that was

2 said, and it was on both sides.  Again, this is not -- we're

3 not pointing fingers.  We're not on a high horse.  All we're

4 asking for is that if this sort of thing has to be aired, that

5 it be aired outside the presence of the witness.

6         THE COURT:  All right.  That's a fair request, and

7 I'll let it up to -- as I said, to both counsel to ask for it

8 when you think the circumstances -- on all sides that is -- to

9 ask for it when you think the circumstances are appropriate.

10         MR. MULLADY:  Thank you, Your Honor.

11         THE COURT:  Anything else before we begin?

12         MR. BERNICK:  May we proceed, Your Honor?

13         THE COURT:   Yes, sir.

14         MR. BERNICK:  We call as our next witness Dr. David

15 Weill.  Dr. Weill is here.  If you could take the stand?

16         THE CLERK:  Please stand and raise your right hand.

17         DR. DAVID WEILL, DEBTORS' WITNESS, SWORN

18         MR. BERNICK:  Good morning, Dr. Weill.

19         DIRECT EXAMINATION

20 BY MR. BERNICK:

21 Q    Could you please just tell the Court at the outset what

22 the principal focus of your testimony will be here this

23 morning?

24 A    My principal focus is to speak about the attribution of

25 lung cancer by asbestos.

CC-BLG000829

1          MR. BERNICK:  Okay.  There was a chart that we showed

2     in opening here.  If we could call up GG-2121?

3     Q    Do you have that in front of your screen there, Dr. Weill?

4     A    I do.

5     Q    I explained to -- I presented to the Court what we

6     intended to do with respect to the -- what we called the

7     exposure filters part of the analysis, and I distinguished it

8     from what you see down in the bottom right-hand corner as the

9     disease filters part of the analysis.  What specific matters

10    will you be focused on here?

11    A    I'll be speaking about the disease matters.

12    Q    Okay.  Will you be offering -- will you also be addressing

13    today -- let me just ask a couple more specific points.  Will

14    you be addressing certain aspects of the diagnostic criteria

15    for asbestosis?

16    A    As they relate to the pulmonary function testing

17    specifically.

18    Q    Okay.  Apart from the pulmonary function test, will you be

19    addressing today the practices of the litigation screening

20    doctors?

21    A    No, I will not.

22         MR. BERNICK:  Thank you.  With the benefit of that,

23    Your Honor, we'd like to go through some of the witness'

24    background and qualifications if the Court and the witness can

25    be shown GG-2117?

**J&J COURT TRANSCRIBERS, INC.**

1                          VOIR DIRE

2  BY MR. BERNICK:

3  Q    Looking at this demonstrative, Dr. Weill, could you please

4  just take the Court briefly through your educational background

5  and your medical training?

6  A    I received my undergraduate degree from Tulane University

7  in New Orleans in 1985.  I then went to Tulane Medical School

8  and graduated in 1990.

9  Q    Okay.

10 A    After residency training at the University of Texas

11 Southwestern I did my pulmonary and critical care fellowship in

12 the early nineties at the University of Colorado.

13 Q    Okay.

14 A    I also did an additional one-year fellowship in lung

15 transplantation.

16       MR. BERNICK:  Okay.  Let's show the witness and the

17 Court GG-2118.

18 Q    And again if you could simply continue on, Dr. Weill, and

19 review your further training as reflected in that

20 demonstrative?

21 A    My current position is Director of the Lung and Heart/Lung

22 Transplant at Stanford University.  I'm an Associate Professor

23 in the Division of Pulmonary and Critical Care Medicine.  I am

24 board certified in pulmonary medicine.

25 Q    On a day-to-day basis, Dr. Weill, could you tell the Court

                    **J&J COURT TRANSCRIBERS, INC.**

CC-BLG000831

1 what it is that you do?

2 A    We have a varied practice where we're referred a large

3 number of patients with a variety of advanced and early stage

4 lung diseases that are amenable either to novel medical therapy

5 or surgical therapy.

6 Q    Okay, and what is it that you do in connection with that

7 practice?

8 A    I specifically diagnose patients, provide a second opinion

9 about some of the lung disease issues, and then recommend a

10 treatment scheme that could either be medical or surgical

11 depending on the patient's needs.

12 Q    Okay.  Let's focus on asbestos.  Do you have a background

13 in asbestos-related matters?

14 A    Yes.

15         MR. BERNICK:  I'd like to show the witness the next

16 demonstrative, which is 2119.

17 Q    And again using that as our menu, Dr. Weill, if you could

18 walk the Court through the background that's reflected on 2119?

19 A    I'm a NIOSH Certified B Reader which indicates proficiency

20 in interpreting x-rays for the pneumoconiosis.  I also

21 participated in a visiting professorship in China at the

22 National Institute of Occupational Medicine and Poison Control.

23 I've also provided testimony in a few different governmental

24 bodies, including twice in the United States Senate and once in

25 the Texas State Legislature.  And I've published in the medical

CC-BLG000832

1  literature on a variety of end-stage lung diseases, including

2  specifically in transplantation, transplant medicine, asbestos-

3  related diseases, and lung cancer.

4  Q    Focusing on your experience in China and turning your

5  attention to Slide 2120, could you talk about what you did in

6  China and the relationship, if any, that that has to your

7  experience with asbestos?

8  A    I was interested in seeing a more varied patient group

9  that had been exposed to a variety of occupational substances

10  and went to China for approximately one month to consult with

11  the Chinese doctors who were interested in the same field.

12  Q    Okay, and what is it that you had an opportunity to do

13  there?

14  A    I saw patients that had a variety of occupational lung

15  diseases.  Most commonly asbestos-related diseases or silica-

16  related diseases and was able to not only see the patients

17  themselves but also review a large number of radiographs.

18  Q    Okay.  Have you had any activities in the area of

19  litigation?  Have you served as an expert in connection with

20  litigation?

21  A    Yes, I have.

22  Q    Could you just describe for the Court in general terms

23  what your litigation-related activities have comprised?

24  A    Over the last five to six years I've provided deposition

25  testimony and expert opinion regarding individual cases

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000833

1  primarily.

2  Q    Okay.  Have you ever actually had the opportunity to

3  testify at trial, or is this your first -- your first testimony

4  in trial?

5  A    I've testified once in an occupational lung disease matter

6  at trial.

7         MR. BERNICK:  Okay.  Your Honor, we would proffer Dr.

8  Weill as an expert in pulmonary medicine.

9         THE COURT:  Any voir dire?

10         MR. MULLADY:  No, Your Honor.  No objection.

11         MR. FINCH:  No, Your Honor.

12                    DIRECT EXAMINATION

13  BY MR. BERNICK:

14  Q    Let's talk about the principal focus of your testimony --

15         THE COURT:  Would you like --

16         MR. BERNICK:  I'm sorry.  I'm trying to get through

17  this this morning, and it's bright and early.

18         THE COURT:  Without objection, the witness may offer

19  an expert opinion in the field of pulmonary medicine.  Okay.

20         MR. BERNICK:  Thank you, Your Honor.  I'm sorry.

21  BY MR. BERNICK:

22  Q    Let's talk about -- let's focus immediately on the primary

23  focal point of your testimony, which is the relationship

24  between lung cancer and asbestos exposure.  And I'd like to

25  just have you give a brief explanation of lung cancer to the

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000834

Weill - Direct/Bernick                    21

1  Court showing you GG-2122.  Would this demonstrative assist you

2  in explaining particularly the locus of lung cancer?

3  A    Lung cancer exists within the lung parenchyma, which is

4  the lung meat itself.  It has many causes but is most commonly

5  causes by cigarette smoking around 90 percent of the time.  The

6  issue that I was asked to address is its attribution to

7  asbestos exposure, and we'll spend the majority of my time

8  talking about that today.

9  Q    Now, you indicated that lung cancer arises in the

10 parenchyma or the meat of the lung.  Is that consistent with

11 what's indicated as the yellow box on 2122?

12 A    Yes, it is.

13 Q    Okay, and are we going to talk, as we go forward today,

14 about anatomically distinct in different areas within the area

15 of the lung?

16 A    Yes.

17 Q    Okay.  Let's talk then about asbestos directing your

18 attention to Exhibit GG-2123.  Is this a parallel slide that

19 deals with asbestosis?

20 A    Yes.

21 Q    Okay.  Well, let me just take you through this a little

22 bit more deliberately.  First of all, location.  When we talk

23 about asbestos, what location in the lung are we talking about?

24 A    So when we're --

25        MR. FINCH:  Objection, form of the question.


**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000835

1 Asbestosis.

2         MR. BERNICK:  I said asbestosis.  Didn't I?

3         MR. FINCH:  I thought you said asbestos.

4         MR. BERNICK:  Oh, I apologize.  Asbestosis.  Thank

5 you.

6 Q    What location are we talking about when we talk about the

7 location of asbestosis?

8 A    So like lung cancer, asbestosis is also a parenchyma lung

9 disease, meaning as the yellow box indicates, it's actually

10 existing in the meat of the lung.

11 Q    Okay, and parenchyma, what -- that's a longer term.  Just

12 what does that refer to?

13 A    It refers to the lung tissue itself.

14 Q    Okay.  It says fibrosis.  That asbestosis is a fibrosis.

15 What does fibrosis mean?

16 A    Scarring of the lung, quite literally, and a fibrotic

17 process is anything that scars a lung and is not specific to

18 asbestos-related diseases.

19 Q    Okay.  Now, are there other areas within the vicinity of

20 the lung that can also experience or sustain a fibrotic

21 condition as a result of asbestos exposure?

22 A    Yes, that's the covering of the lung or the pleura.

23 Q    Is that indicated also here on 2123?  That is the

24 difference between parenchyma and pleura.

25 A    The pleura in this slide would be the outside covering of

J&J COURT TRANSCRIBERS, INC.

CC-BLG000836

1  the lunch where the arrows are pointing.

2  Q    Okay.  Okay.  Now, let's go through -- do we have some

3  examples of x-rays showing what it is that you're looking for

4  when you're looking for asbestos, showing you 2124?

5           THE COURT:  I'm sorry.  Would you repeat the question

6  for me, please?

7           MR. BERNICK:  Yes.

8  Q    Showing you 2124 -- GG-2124, would that help you explain

9  to the Court the conditions that you observe in x-rays where

10 there is asbestosis present?

11 A    Sure.  On the left side of the panel you see a normal

12 lung, and what you're looking for are the aerated portions of

13 the lung which are black.  There's also white parts of the lung

14 in a normal situation which are blood vessels that are running

15 through the lung, and that's normal.  On the right side of the

16 panel you're seeing a lung that's affected by asbestosis.

17 Q    Okay.  In what -- and in particular, so the record is

18 clear, there's a part that's marked as -- with a circle saying

19 fibrosis.  What is it that's being seen through the x-ray in

20 that portion of the x-ray?

21 A    What you're looking at in the area that's circled, they're

22 small linear opacities, areas of the lung that are scarred by

23 asbestosis.

24 Q    You said opacities.  Does that have it's common meaning

25 that it's something that you have a hard time seeing through?

J&J COURT TRANSCRIBERS, INC.

CC-BLG000837

1 A    Yes, it's white.  It shows up white in the lung.

2 Q    Okay.  Let's now talk about the relationship between these

3 two conditions that you've described, asbestosis and lung

4 cancer.  Can there be asbestosis without lung cancer?  Does

5 that condition arise?

6 A    Yes.

7 Q    Okay.  Are they different diseases?  That is is lung

8 cancer a different disease then asbestosis?

9 A    Yes.

10 Q    Okay.  What about the other way around?  Can you have lung

11 cancer without asbestosis?

12 A    Yes.

13 Q    Okay, and most common cause?

14 A    Cigarette smoking.

15 Q    Okay.  Now, I want to focus on the particular kind of lung

16 cancer that is asbestos related -- that is asbestos-related

17 lung cancer.  In your opinion, which we'll pursue, can you have

18 asbestos-related lung cancer in the absence of asbestosis?

19 A    No.

20 Q    Okay.  Do you have a slide that frames in more precise

21 terms that question.  That is --

22        MR. BERNICK:  Could we show GG-2125?

23 Q    And I'll ask you to simply go through with the Court how

24 this slide frames the issue that you've addressed.

25 A    What the essential question is, I believe, is whether or

CC-BLG000838

1  not asbestos exposure alone increases one's risk for developing

2  lung cancer, so in the absence of asbestosis.  And then the

3  second part of that analysis is whether or not asbestosis is a

4  necessary prerequisite to attribute asbestos exposure or lung

5  cancer to asbestos exposure.

6  Q    Okay.  Are there studies that have been done -- research

7  that has been done that bears upon that question?  That is

8  whether asbestos exposure alone without asbestosis causes lung

9  cancer?

10  A    Yes.

11  Q    Showing you 2126, does this provide a list of the kinds of

12  studies that you've examined that relate to this question?

13  A    Yes.

14  Q    Could you just explain to the Court the difference between

15  these studies and whether there are any differences in the

16  quality of -- let me take that back.  Whether some of the

17  studies are better and some of the studies are less good in

18  terms of speaking to the particular issue that you are here to

19  address?

20  A    Yeah, there are varying levels of evidence around this

21  question, as you might imagine, and even within these

22  categories there's different levels of evidence.  Some of the

23  scientific literature, even say in the longitudinal area, are

24  better than others.

25  Q    Okay.  Let's just go through what's the difference between

**J&J COURT TRANSCRIBERS, INC.**

1  the longitudinal study and the case control study?

2  A    A longitudinal study is defined by an exposed cohort, and

3  that cohort is followed prospectively, and causal relationships

4  are then ascertained by following that cohort for a number of

5  years.

6  Q    Okay.  What about case control?  Doesn't case control

7  involve cohorts?

8  A    It does, and the co --

9  Q    So what's the difference then?

10  A    There is a difference in that the case control, as the

11  name implies, is defined by having a disease itself rather than

12  necessarily having an exposure itself.

13  Q    Okay.  What about time sequence?  In case control studies

14  do you have the ability to follow a group over time?

15  A    You don't, because the case itself is defining the cohort,

16  and so what you're left with is actually looking at the disease

17  that you're interested in studying, and sometimes looking

18  backwards to determine causal relationships, for instance.

19  Q    So it's like you begin at the end of the line with people

20  who are sick, and then working with that group you look to

21  antecedents?

22  A    Correct.

23  Q    Okay, or you look to factors?

24  A    That's right.

25  Q    Okay.  What about the autopsy studies?  What are -- what

**J&J COURT TRANSCRIBERS, INC.**

1  do they involve, and why are they different from longitudinal

2  and case control studies?

3  A    Autopsy studies are studies that have lung tissue as its

4  very basis.  So they look at patients that have passed away,

5  lung tissue is examined, and causal relationships are attempted

6  to be determined by looking at that lung tissue and then

7  finding out more about the patients that passed away.

8  Q    Okay.  Now with respect to the longitudinal studies, let

9  me just ask you, how do these different kinds of studies stack

10  up in terms of which ones are, you know, more useful and more

11  productive to examine in order to address your questions, case

12  control, longitudinal, or autopsy?

13  A    Generally speaking, the longitudinal studies are the best,

14  although their quality varies within that subgroup.  But,

15  generally speaking, longitudinal studies are the best.

16  Q    Are there a lot of longitudinal groups that have been

17  examined over time that relate to this issue?

18  A    Unfortunately not.  They're very difficult to perform

19  because of their time course, how long it takes to get to the

20  answer, and very few research units are able to look at these

21  factors over a period of time and collect data on the cohort.

22  Q    Turning your attention to Slide GG-2127, what does this

23  slide now do with respect to the issue that you've addressed

24  here?

25  A    So in terms of the attribution of lung cancer, I've put on

CC-BLG000841

1  this slide longitudinal studies, case control studies, and

2  autopsy studies that I think address this issue.

3  Q    Okay, and then what you have is 1 and 2.  What are the

4  columns?  What do they refer to?

5  A    They refer to the initial question that I framed, the two

6  groups of thought regarding attribution of lung cancer to

7  asbestos.  Is asbestos exposure alone that's necessary, or is

8  it the presence of asbestosis?

9  Q    Okay.  Let's begin with the insulator studies.  How far

10 back do the insulator -- does the insulator group go in terms

11 of the group that was being studied?

12 A    Dr. Selikoff at the Mt. Sinai Group really developed this

13 cohort in the 1960s and followed it for a number of years

14 afterwards.

15 Q    Okay.  Now, you have under the question, "Does asbestosis

16 cause lung cancer?  Yes, but do the -- does asbestos exposure

17 alone cause lung cancer, question mark."  Could you explain to

18 the Court what you were able to learn and what you were not

19 able to learn from the insulator studies.

20 A    When you look at Dr. Selikoff's insulator studies, you do

21 see an increased rate of lung cancer.  However, what's

22 important about those studies is that he was not able to ferret

23 out who was just asbestos exposed alone versus who had

24 asbestosis.

25 Q    And why was that?

**J&J COURT TRANSCRIBERS, INC.**

1  A    He did make that effort initially with a cohort to make

2  that distinction.

3  Q    Okay.  In other words, would it be fair to say -- was the

4  study originally designed -- was the insulator study originally

5  designed to address the specific issue that was of interest to

6  you?

7  A    No, it was not.

8  Q    Okay, and what in particular was missing from the design

9  that would've enabled that study to speak more directly to the

10 issue that you were interested in?

11 A    It was the lack of information regarding who has

12 asbestosis, the parenchymal lung disease, and who is just

13 asbestos exposed.

14 Q    Why then did you fill in the column under 2, "Does

15 asbestosis cause lung cancer?  Yes?"

16 A    If you follow Dr. Selikoff's work -- now we're up into the

17 late eighties -- there were publications coming out of that

18 group that tried to answer that question specifically in whom

19 radiographic and pathologic evidence was available.

20 Q    Okay, and what did that evidence tend to show?

21 A    The evidence showed that in 100 percent of the cases where

22 lung tissue was available, 100 percent of the lung cancer cases

23 had asbestosis by lung tissue.

24 Q    Okay.  Let's turn to the second study that you have or the

25 second group, the asbestos cement studies.  Could you describe,

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000843

1  first of all, who performed those studies and when they were

2  performed?

3  A    This was performed -- this study was performed by a group

4  of researchers at Tulane University beginning following the

5  cohort in the late sixties and following the cohort really

6  through their publication in the early 1990s.

7  Q    Now, Tulane sounds familiar.

8  A    Yes.

9  Q    That's where you went to school?

10 A    It is.

11 Q    One of the authors also has a familiar name, Weill.

12 A    Yes.

13 Q    Is there any relation?

14 A    He's my father.

15 Q    Okay, so if you could describe for us the workers who were

16 studied in this Tulane study, who were they?

17 A    They were a group of asbestos workers, 839 workers, who

18 had mixed asbestos exposure, meaning some to chrysotile-type

19 fibers and some to amphibole-type fibers.

20 Q    Okay, and then what happened during the course of the

21 study?  What did the study comprise?

22 A    The researchers were able to prospectively follow this

23 group in a longitudinal fashion where they had well-defined

24 exposure categories and radiographic information.

25 Q    Okay, and now you have the columns -- both columns filled

CC-BLG000844

1    out in this case.  Under the column dealing with, "Does

2    asbestosis cause lung cancer," you have a yes, and now you've

3    also filled in the first column, "Does asbestos exposure cause

4    lung cancer," and you have it filled in no.  What was different

5    -- what, if anything, was different about this group in this

6    study that enabled you to answer the first question whereas the

7    insulator studies did not permit you to answer that question?

8    A    Because the insulator studies were never set up that way,

9    they were never able to answer the first question.  The

10   asbestos cement studies were specifically set up to answer that

11   question, is asbestosis a necessary prerequisite for lung

12   cancer development.

13   Q    Okay.  Are there a couple slides that would help you walk

14   through the actual data from those studies, give two slides

15   that have been prepared here?

16   A    Yes.

17   Q    Okay.  Showing you, first of all, 2129 -- that is GG-2129

18   -- could you describe for the Court -- first of all, is this

19   slide -- the data here, is it taken directly from the published

20   article itself?

21   A    Yes, it is.

22        MR. BERNICK:  Okay.  And, incidentally, the published

23   article, Your Honor, for the record is Exhibit 590.  That is

24   GX-0590.  We won't be offering it, because it's a learned

25   treatise, and it comes in in support of his opinion.  But, for

CC-BLG000845

1  the record, this demonstrative --

2  Q    Is it correct, this demonstrative is based upon the

3  article?

4  A    Yes.

5  Q    Okay.  What is it that 2129 -- that is GG-2129 shows the

6  Court?

7  A    So on the horizontal axis of this graph there's cumulative

8  exposure in fiber years.  So that's a way that researchers,

9  when they're doing epidemiologic studies, can quantitate the

10  asbestos exposure.

11  Q    Okay.  What then would the data points that you have as

12  displayed in this graph tell you about the relationship between

13  exposure in fiber years and the relative risk for lung cancer?

14  A    So what it can tell you is that as the exposure --

15  cumulative exposure dose goes up, the risk of developing lung

16  cancer increases as well.

17  Q    Okay.  Is that a continuous relationship down to zero?

18  A    No, it's not.

19  Q    Well, then tell us what is it that happens when you get

20  down to lower exposures?

21  A    The shape of the relationship or the shape of the curve

22  becomes uncertain at the lower exposure levels.

23  Q    Okay.  Well, there's been discussion in connection with

24  the opening statements in this case regarding threshold models.

25  Actually, also in connection with the testimony that was

CC-BLG000846

1  offered by Dr. Rodricks last week.  Do you have an

2  understanding of about what a threshold model is?

3  A    Yes.

4  Q    Okay.  Could you just explain to the Court what a

5  threshold model is?

6  A    A threshold in epidemiologic and occupational medicine is

7  the concept that a certain level of exposure is necessary to

8  attribute risk of developing whatever disease you're interested

9  in.

10 Q    Okay.  In where you have the threshold, do you -- are you

11 able to see increased risk all the way down to small exposures?

12 A    You're not, because you're not certain, as this slide

13 indicates, of the dose response relationship, i.e., what dose

14 gives you what response.

15 Q    Okay.

16 A    And you're uncertain at these lower exposure levels what

17 that response is.

18 Q    Okay.  Now, based upon this data -- that is that at higher

19 exposures there was an increased risk of lung cancer --

20 wouldn't that tend to suggest higher does lung cancer?  Going

21 back to your question, yes, there is a relationship between

22 asbestos exposure alone and lung cancer.

23 A    The researchers looked at that issue --

24 Q    Okay.

25 A    -- and what they found is is that it wasn't a distinction

J&J COURT TRANSCRIBERS, INC.

CC-BLG000847

1  between dose that really mattered.  In other words, it wasn't

2  that every single increasing dose increased your risk for

3  developing cancer.  Instead, what they found is that the dose

4  was not the distinguishing factor.  The presence of

5  radiographic asbestosis was when we look at lung cancer risk.

6  Q    Turning your attention to Slide 2128, is this a further

7  slide that was taken from the Hughes and Weill study?

8  A    Yes.

9  Q    And what does this slide show, and how does it relate to

10 what you just said?

11 A    On the vertical axis again it's looking at risk and

12 standardized mortality rates, and on the horizontal axis,

13 you're looking at various abnormalities of x-rays.  So various

14 profusion categories, to use the ILO lingo.

15 Q    Okay, so if we go from the left to the right, we have the

16 first data area.  It says, "No abnormal less than 21 years."

17 What does that mean?

18 A    So there were no chest radiographic abnormalities in that

19 group, and these were people that worked less than 21 years --

20 Q    Okay.

21 A    -- in the cement industry.

22 Q    And did they have an increased risk of lung cancer?

23 A    No.

24 Q    Let's now talk about the people who worked for a long

25 time.  Would that mean that they have higher or lower

CC-BLG000848

1  exposures?

2  A    Higher.

3  Q    Because the people that have higher exposures but who also

4  did not have radiographic abnormalities, is that the second

5  data point?

6  A    Yes.

7  Q    And what was found with respect to them?  Did the people

8  with higher exposures but no abnormalities, did they or did

9  they not have an increased risk of lung cancer?

10  A    No increased risk in that group.

11  Q    What about pleural?  That is people who have pleural

12  abnormalities.  First of all, are those people who have the

13  opacities in the meat of the lung that we were talking about,

14  or they are the ones who have a condition in the pleura?

15  A    Abnormalities of the pleura.

16  Q    Okay.  Was that found to be tied to lung cancer risk?

17  A    No.

18  Q    Now, we have small opacities.  What are we referring to

19  now?

20  A    In this instance we're referring to patients who have --

21  again to use the ILO lingo -- a zero slash one chest

22  radiograph.

23  Q    Okay.  Zero slash one, we're going to get to that, but is

24  that a strong indicator of there being opacities?

25  A    No, everyone really considers that a normal film.

CC-BLG000849

1  Q    Okay.  Now, once we get to the people who have small

2  opacities with the one slash zero plus, who are those people?

3  That is what are we getting at when there's a reference to

4  small opacities with a one slash zero plus?

5  A    So those people clearly have radiographic evidence of

6  asbestosis.

7  Q    Okay, and with respect to the people who have radiographic

8  asbestosis -- evidence of asbestosis, what, if any, observation

9  did you make as to whether that was related to an increased

10  risk of lung cancer?

11  A    The researchers found that it did increase the lung cancer

12  risk over four times.

13  Q    Okay.  Showing you then Slide 2130 -- GC-2130, is there --

14  together with the statistical evidence, tell us whether there

15  is any theory -- mechanistic theory that would draw a

16  relationship between lung fibrosis and lung cancer.

17  A    Researchers have been interested in the fibrosis question

18  from a biochemical standpoint for some time, greater than 20

19  years.  The slide here really depicts a plausible hypothesis

20  for how lung cancer has as its prerequisite fibrosis, and I can

21  walk through the slide, if you'd like.

22  Q    Yeah, just -- if you'd just do that.  Spare us I guess.  A

23  little bit briefly.  It's here in the morning --

24  A    I understand.

25  Q    -- and I'm very confident that Dr. Mullady over there will

J&J COURT TRANSCRIBERS, INC.

1  have detailed questions on this part of your examination.

2  A    Anybody that wants more information can see me afterwards.

3  Q    Okay.

4  A    The stimulus in this case is asbestos, and so what

5  asbestos does, as the slide depicts, is cause an inflammatory

6  process in the lung.  Most inflammatory processes, whatever

7  they're caused by, can be repaired in the lung, and that's why

8  every exposure and everything that happens to us doesn't cause

9  disease.  But what can happen when the defense strategies are

10 overwhelmed, these inflammatory processes can get unchecked and

11 out of control, and various mediators, including things like

12 growth factors and cytokines that I won't bore you with, cause

13 a lung injury pattern, and they have -- and fibrosis and lung

14 cancer have these mediators in common.  And so when we look at

15 the epidemiologic evidence, we're looking at the causal

16 association, which I think makes sense, but then this develops

17 the why part.  Why is lung cancer attribution -- why is

18 asbestosis a necessary prerequisite?  And I think what you get

19 from this model is a biologically plausible explanation that

20 they're common mediators that lead to both diseases.

21 Q    Okay.  Now is there anything else in the literature in

22 other areas besides asbestosis that would be consistent with

23 the model for fibrosis-related cancer that you've just

24 described?

25 A    Yes, there are.


                    J&J COURT TRANSCRIBERS, INC.

CC-BLG000851

1  Q    Okay.  Showing you 21 -- GG-2131, does this slide again

2  provide a list of those areas of research?

3  A    Yes, it does.

4  Q    Okay.  Can you just explain those entries briefly?

5  A    The literature on fibrotic lung disease has as one of its

6  components the concept that diffuse fibrosis of other causes

7  apart from asbestos exposure like idiopathic pulmonary

8  fibrosis, scleroderma, or sarcoidosis.  All are associated with

9  an elevated cancer risk.  And I think this was initially shown

10 probably most elegantly by Dr. Turner-Warwick and her group in

11 London 1980 when she looked at the cryptogenic fibrosing

12 alveolitis group, which in America we call IPF, idiopathic

13 pulmonary fibrosis.  And she found a fourteenfold increase in

14 lung cancer rates in those patients that had that condition.

15 Q    Okay, and what about Weill and McDonald?  Did they -- did

16 that paper also bear upon this?

17 A    It did.  It looked at an occupational-exposed group in

18 this case, workers that had silicosis, and their opinion was

19 that also -- the presence of silicosis increased the cancer

20 risk.

21 Q    Okay.  Turning back to our original question, Dr. Weill,

22 and Slide 2132, how do you ultimately answer the question about

23 whether asbestos exposure alone without asbestosis causes lung

24 cancer?

25 A    So based on what we've talked about so far, I've been able

CC-BLG000852

1  to conclude from my review of the literature and my

2  understanding of it, that asbestos exposure alone does not

3  increase the risk of developing lung cancer.

4  Q    Are you aware of any reliable scientific work that

5  specifically addresses this issue that is exposure alone versus

6  asbestosis -- and I want to focus on this -- produces reliable

7  data that is specific to this issue -- specific to this issue

8  which shows the contrary?  That is it's not asbestosis.  It's

9  asbestos exposure alone.

10  A    No.

11  Q    Are there other authors -- other authors of papers who

12  have expressed opinions on this subject that are consistent

13  with your own?

14  A    Yes.

15  Q    Showing you GG-2138, is this a list of some of the other

16  papers that reflect opinions that are consistent with your own?

17  A    Yes, it is.

18  Q    Now, I want to turn from the conclusion that you've

19  express to talking about a couple of other related issues.

20  First of all, have you or have you not considered the concept

21  of synergy as applied to this issue?

22  A    I have considered that.

23  Q    Okay, and do you have a slide that illustrates the concept

24  of synergy?

25  A    Yes.

J&J COURT TRANSCRIBERS, INC.

CC-BLG000853

Weill - Direct/Bernick                    40

1  Q    Showing you GG-2133, could you explain what 2133

2  delineates and why that would be relevant to the question of

3  whether asbestos alone can cause lung cancer -- asbestos

4  exposure alone can cause lung cancer?

5  A    This slide again depicts what was concluded from the

6  Selikoff insulator studies, and if you look at the left side of

7  the slide, it looks at the relationship between asbestos

8  exposure alone and cigarette smoking.  And Selikoff and his

9  group concluded that those two factors work synergistically to

10 increase the risk of lung cancer.

11 Q    Okay.  If that is true, that is if the synergy is between

12 asbestos exposure alone and smoking, what relationship, if any,

13 would that -- have that -- would that bear to your basis

14 question, which is whether asbestos exposure alone can cause

15 lung cancer?

16 A    It doesn't really answer that question, because again it

17 doesn't ferret out the patients or identify the patients

18 specifically who have reliable evidence of asbestos.

19 Q    Is there a slide, showing you GG-2134, which talks about

20 whether the Selikoff insulator studies support the idea that

21 asbestos exposure alone together with smoking but absent

22 asbestosis, whether that can cause lung cancer?

23 A    There is not an ability from the information in the

24 insulator studies to examine that specific question, and so, in

25 my opinion, they were not able to make the synergistic

J&J COURT TRANSCRIBERS, INC.

CC-BLG000854

1  relationship that this slide depicts.

2  Q     Okay.  Now again is that the same kind of limitation that

3  you described before as the limitation on being able to tease

4  out the asbestotics from the people who were simply exposed to

5  high levels?

6  A     That's right.

7  Q     Okay.  Likewise, going through to Slide 2135, when it came

8  to the Hughes-Weill study, did the Hughes-Weill study provide

9  specific information on this issue?

10  A    It did.

11  Q     And could you, using 2135, explain to the Court what

12  specific information was supplied by the Hughes-Weill study and

13  how it bore upon the question of whether -- of what the synergy

14  was?

15  A     So since all of the lung cancers in the asbestos cement

16  cohort existed in smokers, and the risk of developing lung

17  cancer due to asbestos exposure was confined to the

18  asbestotics, a synergistic relationship was able to be

19  demonstrated not between asbestos exposure alone in cigarette

20  smoking but instead asbestosis and cigarette smoking.

21  Q     Okay, and has that been illustrated in Slide GG-2136?

22  A     Yes, it is.

23  Q     Okay.  Now, the synergistic relationship between smoking

24  and asbestosis, would that or would that not be consistent with

25  the biological mechanism that you described to the Court?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000855

Weill - Direct/Bernick                              42

1  A    It is consistent.

2  Q    Okay.  There's been reference here in this case to the

3  Helsinki criteria.  Are you familiar with the Helsinki

4  criteria?

5  A    Yes, I am.

6  Q    And have you considered the Helsinki criteria when it

7  comes to addressing the question of whether asbestos alone is

8  causally -- asbestos exposure alone is causally related to lung

9  cancer?

10 A    I have.

11 Q    And what consideration have you given to it?

12 A    The Helsinki criteria, as it's stated, is a consensus

13 opinion among people working in the field about, among other

14 things, the lung cancer/asbestos story.

15 Q    Okay, and what weight do you give that in your assessment

16 of the actual epidemiological data?

17 A    It's not an epidemiologic study itself.  It's an opinion

18 piece of people that have worked in the field came together to

19 discuss these issues.

20 Q    Okay.  Have you looked to see what some of the purposes

21 were that drove this consensus effort?

22 A    Yes.

23 Q    Showing you Slide 2137, does that reflect whether or not

24 compensation was one of the factors that was a goal in

25 connection with the Helsinki criteria?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000856

1  A    Yes, it was.

2           MR. FINCH:  Objection.  Lack of foundation.  He

3  wasn't a member of the Helsinki criteria.  He doesn't know what

4  was in the -- this is a snippet of a multi-hundred-page

5  document.  The summary is a ten-page document.  I don't believe

6  he has the foundation to explain to the Court what was the goal

7  of the Helsinki.

8           MR. BERNICK:  Well --

9           THE COURT:  Mr. Bernick.

10          MR. BERNICK:  -- it's very simple.  I --

11 BY MR. BERNICK:

12 Q    Does this come from the Helsinki document?

13 A    Yes.

14 Q    Okay, and do the words say appropriate compensation?

15 A    Yes, they do.

16 Q    Are they the basis for the assessment that you made based

17 upon your expertise regarding what assessment or what weight to

18 give to the Helsinki criteria?

19 A    Yes.

20          MR. BERNICK:  Okay.

21          THE COURT:  All right.  Just a second.  Let me read

22 it.

23                     (Pause)

24          THE COURT:  All right.  This is the type of

25 information that an expert in his field would consider in

**J&J COURT TRANSCRIBERS, INC.**

1  issuing an opinion.  So although the question as stated I agree

2  was objectionable, I believe at this point Mr. Bernick has

3  cured that objection by asking whether or not now this

4  information serves as a basis for this expert's opinion, and

5  now that objection has been cured.  Okay.

6          MR. BERNICK:  Thank you.

7  BY MR. BERNICK:

8  Q    Now, I want to turn a little bit now to talking about

9  making the transition from what you've told us about the

10 relationship between asbestosis and lung cancer and the work

11 that has been done specifically in connection with this

12 estimation.  And I want to go back to -- let me just ask you a

13 general introductory question.  Are there published criteria

14 for the diagnosis of asbestosis?

15 A    Yes, there are.

16 Q    Okay.  Who has published -- what group has published

17 criteria with respect to the diagnosis of asbestosis?

18 A    Primarily, the American Thoracic Society.

19 Q    Have you examined the history of the American Thoracic

20 Society publications to determine whether or not there has been

21 any change or evolution in those criteria?

22 A    I have.

23          MR. BERNICK:  Okay.  Your Honor, at this point we

24 would offer GX-0280 and 0274.

25          THE COURT:  Wait.  I'm sorry.  What are you offering?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000858

1        MR. BERNICK:  Well, I -- I'll tell you we'll do it

2   the old-fashioned way.  I'm sorry.  These are in the binders.

3   They are GX-0280 and GX-0274.  And may I approach the witness?

4            THE COURT:  Yes.

5                      (Pause)

6   Q     Are you familiar with those documents, Dr. Weill?

7   A     Yes, these are the ATS statements.

8   Q     Okay, and is Exhibit GX-0280 the 1986 statement, and is

9   GX-0274 the December 12, 2003 statement?

10  A     Yes.

11  Q     And are these recognized statements within the field of

12  pulmonary medicine?

13  A     Yes.

14           MR. BERNICK:  We would offer them, Your Honor.

15           MR. FINCH:  No objection, Your Honor.  I think there

16  is duplicative exhibit labeling.  I mean the ACC and FCR have

17  also identified these as exhibits, so at an appropriate time

18  we'll give you the ACC and FCR number that is the same

19  document.  We have no objection to the admissibility of either

20  document.

21           MR. MULLADY:  No objection.

22           THE COURT:  All right.  GX-0280 and GX-0274 are

23  admitted.

24           MR. BERNICK:  Okay.

25  BY MR. BERNICK:


**J&J COURT TRANSCRIBERS, INC.**

1  Q    Now has there been any change in the diagnostic criteria

2  for asbestosis reflected in these documents?  That is from the

3  eighties until more current times.

4  A    There have been.

5  Q    Okay.  Could you just describe to the Court what has

6  happened to the diagnostic criteria for asbestosis that is of

7  relevance to your testimony here?

8  A    Some of the components are similar, but probably the most

9  distinct difference is with regards to the degree of

10  radiographic abnormality that each statement supports.

11         MR. BERNICK:  Okay.  I want to approach, if I can?

12  Do we have a marker?  And I'll just slide this over here.  Is

13  this all right, Your Honor?

14         THE COURT:  Yes.

15         MR. BERNICK:  Thank you.

16  Q    B-readers read what?

17  A    Radiographic -- x-rays from people that are exposed to

18  various dust-related diseases.

19  Q    Is there a classification or rating system that the B-

20  readers use in doing their evaluation?

21  A    There is.

22         MR. BERNICK:  Can we -- you know what you might do is

23  just -- do you have a clip -- a big clip?  I think if you put

24  it down further it might be a little bit easier, or not?  Okay.

25  Okay.  No.  Well, I'll just hold onto it.  Okay.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    The B-readers when they're doing x-rays, do they have a

2  rating system?

3  A    Yes.

4  Q    And what's the -- does it -- is it comprised basically of

5  two numbers with a slash in between?

6  A    Yes, but in terms of the profusion category, the

7  parenchymal abnormalities, yes.

8  Q    When it comes to parenchymal, we're now again in the meat

9  of the lung --

10 A    Right.

11 Q    -- and we're looking for abnormalities.

12 A    Correct.

13 Q    Okay, and you've made reference to opacities.  Is that

14 what we're looking for?

15 A    Yes.

16 Q    Okay, so we're looking at the x-ray, and we're saying do

17 we see opacities or not.

18 A    That's right.

19 Q    And is this a system that's designed to rate the degree to

20 which opacities are being found?

21 A    Yes.

22 Q    What's -- what are the numbers that -- what's the range of

23 numbers?

24 A    So there's 12 categories from zero slash zero all the way

25 to three slash three --

CC-BLG000861

1  Q      Okay.

2  A      -- with all the steps along the way.

3  Q      And the higher the number means more opacities.

4  A      That's right.

5  Q      What does the first number refer to versus the second

6  number?

7  A      The first number is to indicate what the reader has the

8  most confidence in in terms of the profusion category.

9  Q      Okay.  Now, under the ATS standards -- the earlier ATS

10  standards, was there or was there not a guidance or a

11  recommendation about the minimum finding of opacities that

12  would support a diagnosis of asbestosis?

13  A      There was.

14  Q      Okay, and what was it?

15  A      One slash one.

16  Q      Which means?

17  A      That the reader first considered the x-ray abnormal to the

18  degree of one, and that he did not or she did not consider any

19  other profusion category.

20  Q      Okay.  What was the change?  As we went forward with the

21  diagnostic criteria as recommended by the ATS, what changed?

22  A      The 2004 statement indicates that a profusion category of

23  one slash zero is sufficient to make the diagnosis.

24  Q      And that would be -- mean what?

25  A      That the reader had the most confidence in a profusion

CC-BLG000862

1 category of one, would also consider that the x-ray was normal,

2 i.e., a profusion category of zero.

3 Q    Okay.  Now, I want to ask you a question that's very, very

4 specific here.  Is there any -- is the category -- there's only

5 one -- two lower categories, right, the zero slash one and the

6 zero slash zero.

7 A    Right.

8 Q    Are either of those categories or ratings considered to be

9 abnormal?

10 A    No, they're normal.

11 Q    Okay, so am I correct that under the new standard any

12 reliable B read which finds any changes in the parenchyma

13 equals asbestosis today?

14 A    That's right.

15 Q    So as long as there's any reliable radiographic evidence

16 showing changes of the parenchyma, bingo, asbestosis?

17 A    That's right.

18 Q    Okay.  I guess it doesn't really matter that much anymore.

19 Let's go back to GG-2139 and spend a minute walking through

20 what 2139 illustrates.  We have your same old icons.  We have

21 asbestos exposure alone.  We have asbestosis, which you say has

22 been tied to lung cancer.  That's the yes.  But it then says --

23 it then has asbestosis kind of growing as a category, and it

24 says today includes reliable radiographic evidence of any

25 asbestosis-related parenchymal lung change.  Is that or is that

CC-BLG000863

1  not accurate?

2  A    Yes, it is.

3  Q    And given what the -- what's happened to the diagnostic

4  recommendations of the ATS, when you talk about asbestosis, are

5  you talking about a smaller group than was true historically,

6  the same group, or a broader group?

7  A    Likely a broader.

8  Q    Thank you.  In light of that, today does, quote,

9  asbestosis exclude anybody who has reliable radiographic

10 evidence of any parenchymal lung change?

11 A    Yes, it does.

12 Q    Who does it exclude?

13 A    It excludes anybody with a normal chest radiograph.

14 Q    Okay, so I think I've probably -- you didn't hear my

15 question or answer it the right way.  Does the diagnosis of

16 asbestosis exclude anybody with reliable radiographic evidence

17 that they do have a lung change?

18 A    No, it doesn't include anybody.

19 Q    Okay.  Let's turn then to the Henry study.  Are you

20 familiar with the Henry study?

21        MR. BERNICK:  And for the record, the Henry study,

22 Your Honor, is comprised with -- by a series of exhibits.

23 They'll be offered in through Dr. Henry.  They are GX-284, 285,

24 286, 317 --

25        THE COURT:  I'm sorry, Mr. Bernick, you're going too

**J&J COURT TRANSCRIBERS, INC.**

1  fast for me.

2          MR. BERNICK:  I'm sorry.

3          THE COURT:  Could you start the numbers again?

4          MR. BERNICK:  Yes, it's -- Henry is GX -- let me do

5  them in order, 104, 284, 285, 286, 317, and 582.

6          MR. FINCH:  Are you offering them now?

7          MR. BERNICK:  No, they'll be offered through Dr.

8  Henry.

9          THE CLERK:  Mr. Finch, please find a microphone.

10         MR. FINCH:  Sure.  My question is was he offering

11 them now.  And since he's not offering them now, I don't have

12 any basis to object now.

13         MR. BERNICK:  Okay.  Did you -- do you want me --

14         THE COURT:  I will ask something.  May I ask a

15 question, because I think I got off on a track somewhere, and

16 I've gone -- I got confused.  Doctor, do I understand your

17 testimony that the parenchymal changes can only be caused by an

18 exposure to dust -- to some dust product?

19         THE WITNESS:  If we're talking about the disease

20 asbestosis, yes.  Fibrotic lung conditions can happen due to a

21 variety of reasons.  There's over 150 causes.

22         THE COURT:  Okay, but you're testimony today is

23 related only to asbestos exposures.  Correct?

24         THE WITNESS:  Yes.

25         THE COURT:  So your testimony with respect to the

            **J&J COURT TRANSCRIBERS, INC.**

1 Thoracic -- American Thoracic Society changes is specific to

2 exposures to asbestos?

3          THE WITNESS:  Yes.

4          THE COURT:  Okay.  Thank you.

5 BY MR. BERNICK:

6 Q    And again, to be clear, so long as there is any reliable

7 evidence on B read that there's any change whatsoever to the

8 parenchyma, that would be -- that would support a diagnosis of

9 asbestosis.

10 A    That's correct.

11 Q    Okay.  Now, presumably, the diagnosing doctor would also

12 have to be told if the individual has worked with asbestos.

13 A    That's right.

14          MR. BERNICK:  Okay.

15          THE COURT:  Yes, that was my confusion, because I was

16 slinking -- I was missing the link between the diagnostic

17 change and I guess the work history.

18          MR. BERNICK:  Yeah.

19          THE COURT:  Okay.

20 BY MR. BERNICK:

21 Q    And this is a very important point, so that -- you have a

22 one slash zero, and there was a day -- in the earlier

23 asbestosis one one smaller group.  There?

24 A    Yes.

25 Q    We then have people who have one slash zero today, larger

CC-BLG000866

1  group, and then we have people who have no -- have one slash

2  zero but no asbestos exposure.  They don't say that they're

3  exposed to asbestos.  Is your testimony that provided somebody

4  -- a patient comes in and says I worked with asbestos, so long

5  as they have this -- any evidence -- reliable evidence of any

6  change to the parenchyma on examination of x-ray therein?

7  A    Yes.

8  Q    Now did Dr. Henry study people who had submitted x-rays in

9  B reads in this case?

10 A    Yes.

11            MR. FINCH:  Objection.  Relevance.  May I state the

12 basis of --

13            THE CLERK:  You have to use a microphone.

14            MR. FINCH:  Sure.  May I state the basis of the

15 relevance objection, Your Honor?

16            THE COURT:  Yes, but before you go into this -- I'm

17 sorry.  My mind is still a little bit behind you folks, so

18 before you get into this I'd still like to follow up with where

19 I am.  Is this a presumption, Doctor, that the one slash zero

20 with the asbestos exposure is presumed to have asbestosis, or

21 is it simply taken as a statement of fact that if you have one

22 slash zero, you have asbestosis if you also had exposure to

23 asbestos?

24            THE WITNESS:  If you have one slash zero or above,

25 profusion category in the presence of an exposure that the

J&J COURT TRANSCRIBERS, INC.

1 physician thinks elevates the risk of developing asbestosis,

2 then you've got the diagnosis.

3         THE COURT:  So there is a value judgment by the

4 physician that has to be added to this component.

5         THE WITNESS:  Absolutely.

6 BY MR. BERNICK:

7 Q    But is -- let me just -- and we're going to pursue that,

8 Your Honor, in detail when we get to -- is what the Court just

9 asked you about, Dr. Weill, an issue of differential diagnosis?

10 A    Right.

11 Q    Okay, so we have a one slash zero.  Is it fair to say that

12 the one slash zero could be due to asbestos but also could be

13 due to something that's not asbestos.

14 A    Yes.

15 Q    And a doctor doing a differential diagnosis, finds the one

16 slash zero, has to inquire about exposure.

17 A    That's right.

18 Q    Tell the Court whether or not there is variability in the

19 quality -- in the quality of information that a doctor can get

20 about exposure.

21 A    There's a wide variety in the quality of the information.

22 Some of the information comes from the patient himself, of

23 course, and that can vary from patient to patient.  Some of the

24 information comes from the epidemiologic studies that address

25 the exposures in a specific occupation, and that information

CC-BLG000868

1 has to be considered strongly as well, because it gives you a
2 background for what that patient might have been exposed to.
3 Q    Okay.  Do you -- does a doctor necessarily have enough
4 information about exposure to compare that patient to the epi
5 studies?
6 A    No, often not.
7 Q    Now, let's get back to -- we're going to talk -- are we
8 talking a bit more about this as we get towards the end?
9 A    Yes.
10 Q    Okay, but when it comes -- and I think t his is the --
11 maybe I should've been clearer.  When it comes to the
12 radiograph itself, is the radiograph -- is the radiograph -- if
13 it's one plus zero or greater, does the radiograph exclude
14 anybody who's got any reliable evidence of changes in the
15 parenchyma?
16 A    No, it doesn't.
17 Q    Okay, so might there be exclusion based upon exposure
18 history?
19 A    Yes.
20 Q    Okay, but in terms of the radiograph itself, if you have
21 evidence of any change there in the parenchyma from the point
.22 of view of that diagnostic tool, you're in?
23 A    Yes.
24          MR. BERNICK:  Okay.  Is that -- I don't know if
25 that --

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000869

1            THE COURT:  Yes, that helps.  Thank you.

2            THE WITNESS:  It's a very objective piece of

3  evidence.

4            MR. BERNICK:  Right.

5            THE COURT:  That helps.  Thank you.

6            MR. BERNICK:  Okay.

7  BY MR. BERNICK:

8  Q   Now, let's talk about Dr. Henry's study.  Did Dr. Henry's

9  study look to see who within the group that he sampled had

10 asbestosis by radiograph and who did not?

11 A   Yes, he did.

12           MR. FINCH:  Objection.  Relevance.  And I think this

13 may be an appropriate time to either take a sidebar or excuse

14 the witness.  I think I can state the basis of the objection

15 rather succinctly, but I don't want to influence the witness'

16 testimony or to have any debate of this matter in the presence

17 of the witness, so would --

18           MR. BERNICK:  Well, whatever --

19           MR. FINCH:  -- Your Honor --

20           MR. BERNICK:  I don't care.  I mean --

21           THE COURT:  All right.  Doctor, I'm going to ask you

22 to take a very short five-minute recess, if you wouldn't mind,

23 sir, please?

24           MR. BERNICK:  This is on your time now.  Right?

25           MR. FINCH:  This is on my time, Mr. Bernick.  Start

                    J&J COURT TRANSCRIBERS, INC.

CC-BLG000870

1  the stop watch right now.

2          THE COURT:  Just a minute.

3                      (Pause)

4          THE COURT:  All right, Mr. Finch.

5          MR. FINCH:  The ACC objects to the introduction into

6  evidence of any or all of the questionnaires, proof of claim

7  forms, x-ray materials, and any analysis or testimony based

8  upon them on relevance grounds, and we have two substantive

9  reasons.  First --

10         THE COURT:  Those in this case?

11         MR. FINCH:  First --

12         THE COURT:  You object to the proofs of claim and the

13 PIQs in this case?

14         MR. FINCH:  Your Honor, may I state the basis for the

15 objection?

16         THE COURT:  Yes, please.

17         MR. FINCH:  First, under the settled law of this

18 district, what is to be estimated here is the cost that Grace

19 would incur over time to resolve its asbestos personal injury

20 and death cases that are not resolved as of the petition -- the

21 time the bankruptcy petition was filed and which would

22 thereafter arise in the tort system going forward in the

23 future.  That estimation, pursuant to the same settled case law

24 -- and by that I'm referring to Owens-Corning and Armstrong,

25 Eagle Picher and Federal-Mogul -- is to be based on the cost

CC-BLG000871

1 which Grace bore to resolve thousands of similar cases prior to

2 the petition date subject to modification to reflect any

3 obvious changes that have happened in the tort law -- in the

4 tort system.  If we are correct that this is the law, and if we

5 are correct that this is the method by which the Court must

6 estimate that liability, those costs, then the material in the

7 files of the unsettled claimants, the people who were -- had

8 claims that hadn't been settled as of the time Grace went into

9 bankruptcy developed and maintained in their files after the

10 petition date, has not relevance, since the evidence for the

11 cost of the liability is found in Grace's history of tens of

12 thousands of already resolved cases and not in the various

13 materials in the process of development in the unsettled cases.

14         We have a second basis for our relevance objection.

15 Even if, as the debtor argues, it is appropriate for the Court

16 to consider the so-called, quote, legal liability of claims

17 pending against Grace at the time the petition was filed, which

18 have not yet been settled or resolved, the material that may

19 have been collected from time to time in the files of the

20 claimants in a period during which litigation and prosecution

21 of their cases against Grace has been stayed is not relevant

22 proof of what would be developed by way of evidence by the same

23 claimants should their claims have actually proceeded to trial.

24 Indeed, there will be evidence that will be -- witnesses who

25 will testify to that very proposition.

J&J COURT TRANSCRIBERS, INC.

CC-BLG000872

Weill - Direct/Bernick                    59

1            The Court should be well aware that no court has set

2    a trial date for the trial of any asbestos personal injury

3    claim for either trial by allowance or trial by jury.  The

4    Court has never set a deadline to the -- require any personal

5    injury claimant to identify the testifying experts they would

6    rely on in trial, the industrial hygienists, the

7    epidemiologists, the toxic tort experts, in a case involving

8    Grace, nor could the Court do so under the estimation CMO,

9    since the August 29th, 2005 order that Your Honor entered

10   authorizing the estimation proceeding says it is a core

11   proceeding.  And I'll remind the Court that under 28 USC

12   Section 157(b)(2) a core proceeding cannot be something that is

13   the allowance or disallowance of individual claims for purposes

14   of distribution.

15           Third, the questionnaire does not ask any personal

16   injury claimant to identify the expert and fact witnesses that

17   will testify in a trial involving their case, nor does it

18   require the claimants to identify every document or piece of

19   evidence that they would introduce into evidence in a trial

20   involving Grace.  Therefore, whatever was in their file when

21   Grace served discovery on them, the interrogatories and the

22   document requests which are part of the questionnaire, and

23   that's what were produced in response to that, is what their

24   file showed at a moment in time in the bankruptcy and is not

25   evidence of what those very same claimants would prove in a

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000873

1  trial involving Grace.  It would be as if that at the beginning

2  of the case we had served document requests and interrogatories

3  on W.R. Grace on April 2nd, 2001 and said produce what you have

4  to prove your estimation case when they haven't hired all the

5  experts they're going to be parading in front of you.

6          THE COURT:  They wouldn't be proving an estimation

7  case.

8          MR. FINCH:  They are arguing about the methodology

9  and the proof.  Your Honor, the point is it's an objection

10 based on lack of relevance for the grounds that I have stated,

11 and we would like a ruling on this to protect the record.

12         THE COURT:  It's overruled.  The evidence is clearly

13 relevant.  With respect to the numbers of claims that the

14 debtor will have to reconcile pre-petition going forward, there

15 has been a bar date, and whether or not a claimant has

16 satisfied the proof of claim information and the PIQ was ruled

17 by this Court to be appropriate discovery in support of that

18 proof of claim.  That, in fact, substantiates the proofs of

19 claim and the claims that, as of now, are the -- I'll call them

20 in quotes, and I do mean in quotes.  I'm not making a ruling --

21 the allowed claim base upon which the debtor has to reconcile

22 what the present claims are and whether or not it will have a

23 future claims base based upon the claims base that it now knows

24 it has to face from its pre-petition past.

25         So in terms of numbers of claims, that is a relevant

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000874

1  universe.  This proof of claims database is it --

2          MR. FINCH:  But this --

3          THE COURT:  -- and if the claimant didn't file a

4  proof of claim against this estate, it's not going to be filed

5  in one against the trust.

6          MR. FINCH:  The -- but the -- there's a difference

7  between filing a proof of claim --

8          THE COURT:  Yes.

9          MR. FINCH:  -- in the bankruptcy, but -- and what

10 Grace is seeking to do here, which is to argue that the

11 materials produced in discovery in response to the

12 questionnaire tells you anything at all about Grace's legal

13 liability for those individual cases.

14         THE COURT:  I don't know what Grace is going to do

15 yet.  You're objecting to relevance to the question did Dr.

16 Henry look to see who had asbestos or not.  That's the

17 objection to relevance.  I don't even know who Dr. Henry is

18 yet.  There hasn't been any evidence as to who Dr. Henry is, so

19 this whole objection on the basis of this record as to

20 relevance at the moment, I have to overrule.  I have no idea

21 why this question as to whether Dr. Henry, whoever he is, on

22 the basis of this record looked to see who had asbestosis or

23 not isn't relevant.

24         MR. FINCH:  May I have a continuing objection on

25 relevance grounds to any analysis of the materials submitted

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000875

1  pursuant to the questionnaires?

2          THE COURT:  No, we don't even have -- I don't even

3  know what these documents are.  They haven't been offered.  I

4  haven't --

5          MR. FINCH:  Okay, then we'll --

6          THE COURT:  -- had them identified.

7          MR. FINCH:  Then we'll take them up on a document-by-

8  document basis but --

9          THE COURT:  We're going to have to until we get some

10 offer as to what the documents are, then I'll incorporate this

11 argument, Mr. Finch, and see where you want to go with it.  But

12 in terms of relevance as to the proof of claim -- proofs of

13 claim in this case, they are highly relevant to set what the

14 current base upon which Grace's number of claims will be

15 estimated is.

16          Now, in terms of liability, we're not there yet.  But

17 numbers of claims, they are very relevant, and the personal

18 injury questionnaire, that is discovery based upon those proofs

19 of claim, that has to have some relevant data.  Whether it will

20 be relevant in the connection in which a particular question is

21 offered, I don't know.  I can only examine that in light of the

22 evidence as it comes in.

23          MR. FINCH:  Thank you, Your Honor.

24          MR. BERNICK:  I do --

25          THE COURT:  Why don't we all take a five-minute

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000876

1 recess, and then we'll --

2           MR. BERNICK:  Yes, what I --

3           THE COURT:  I'm sorry.

4           MR. BERNICK:  -- thought I would do while we're still

5 on the record -- I'm sorry, Your Honor -- is that I would

6 really -- I think I know what Mr. Finch is doing, which is that

7 he is making his record, and that's fine.  He wants to make his

8 record on his objection.  I would like to not have this

9 interfere with the witness continuing, so I would like to do is

10 to put squarely what the Henry study is.  That it is a study

11 that, in fact, does relate to materials submitted in connection

12 with the PIQs, so that Your Honor can, I'm presuming, rule then

13 with respect to this witness' ability to testify about the

14 Henry study.  And if -- at least we'll be done with that, so

15 that we don't have to go through this all as a hypothetical

16 exercise.  So as soon as he comes back, I will elicit that

17 testimony, and then maybe if Mr. Finch wants to make an

18 objection, he can make an objection, and we can go on.

19           I'm really concerned -- I mean this is all I think

20 much more efficiently handled -- if he wants to make an

21 objection, we don't need their whole brief all over again.  He

22 can simply say, well, you know, our position in this case is X,

23 Y, Z, Your Honor can rule, and we can get on with business.

24           MR. FINCH:  That's my intention, Your Honor.  I think

25 -- but I do have to protect the record, so that the District

**J&J COURT TRANSCRIBERS, INC.**

1  Court or whatever court's ultimately going to review this --

2          THE COURT:  We protect the record at the appropriate

3  time not out of time, so that I can take it in the context.

4  When you make a relevance objection, I need it relevant to

5  something not to did Dr. Henry look to see whether or not there

6  was asbestosis.  Mr. Mullady.

7          MR. MULLADY:  Yes, Your Honor, just in the spirt of

8  Mr. Bernick's comment to keep the flow of the trial going and

9  not to have a continuous discussion about this, the FCR joins

10  the objection as stated by Mr. Finch on behalf of the ACC.

11  When the Henry evidence is admitted, we will simply object on

12  relevance grounds for the reasons Mr. Finch has articulated.  I

13  will not reiterate those reasons unless the Court wants me to.

14          THE COURT:  Well, with respect to the ACC and the

15  FCR, why don't I presume that if Mr. Mullady, you, or you, Mr.

16  Finch, or whoever trial counsel is for a particular witness,

17  makes an objection on behalf of either the ACC or the FCR, both

18  of you join in that objection, unless you tell me to the

19  contrary?

20          MR. MULLADY:  That's fine, Your Honor.

21          THE COURT:  Because your exhibits are joint, your

22  witnesses for the most part are joint.

23          MR. FINCH:  That's fine, Your Honor.

24          THE COURT:  Is that agreeable to both sides?

25          MR. MULLADY:  That's acceptable.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. FINCH:  That's acceptable.

2          THE COURT:  Fine.  So I will assume that it is a

3    joint objection from now on unless you tell me to the contrary.

4    If you tell me to the contrary, then I will obviously not

5    assume that it is a joint objection.

6          MR. FINCH:  Thank you, Your Honor.

7          MR. MULLADY:  Thank you, Your Honor.

8          THE COURT:  Now, Mr. Bernick, let's go back.  All

9    right.  The Henry study, tell me what your proffer is --

10          MR. BERNICK:  Yes, the Henry study --

11          THE COURT:  -- and let's do it by way of proffer.

12          MR. BERNICK:  Yeah, the Henry -- that's fine.  The

13   Henry study is, in fact -- Dr. Henry will testify next.  He

14   took the x-rays that were submitted pursuant to the Court's

15   order, and he extracted a sample of those x-rays.  These are x-

16   rays of people who have a claim for lung cancer.  The world is

17   lung cancer claimants.

18          In this case we took the x-rays that  those folks

19   provided.  Dr. Henry took a sample of those x-rays and reviewed

20   those x-rays to determine whether the ILO standards, that is

21   how to have a reliable read -- and there's a standard that

22   deals with that -- to see whether they were met.  That is could

23   you -- were these reads -- were these x-rays when read in

24   compliance with the standards, which requires, you know,

25   replicated readings, were they x-rays that properly showed a

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000879

1  rating of one slash zero or greater.  So Dr. Henry took the

2  recommendations of the ATS, applied them to this group, looked

3  for reliable B reads that met the one slash zero applying the

4  relevant ILO guidance on that question, and came up with the

5  result that in only seven percent of the lung cancer cases was

6  there a reliable that is replicable read of asbestosis defined

7  as the minimal criteria of one slash zero.

8           That seven percent was then used by Dr. Florence, and

9  it was used by Dr. Florence in two ways.  He limited the

10 estimate -- that is the claims that would clear that threshold

11 -- to seven percent of the claims where those people -- where

12 the people had submitted an x-ray.  Where they had not

13 submitted an x-ray, and they were supposed to -- that is they

14 had stated that -- that they were relying on the x-ray, those

15 were excluded.  And where the claimant did not say that they

16 were relying on the x-ray but didn't have anything else that

17 they submitted by way of radiographic evidence, the same seven

18 percent was applied to that group on the theory that, well, if

19 they had submitted an x-ray, or maybe they had pathology, they

20 had committed to being relying on x-rays.  So as a buffer seven

21 percent of those folks were allowed.  So, essentially, the

22 seven percent figure coming out of the Henry study was used in

23 the estimation to draw a line between asbestosis claims that

24 were properly supported by reliable radiographic evidence and

25 ones that were not.

CC-BLG000880

1          THE COURT:  Okay.  Now you're objection now, Mr.

2 Finch.

3          MR. FINCH:  With that proffer, I think the Court can

4 consider my objection in a framework that it's tied not only to

5 Dr. Henry but also to Tom Florence in the overall estimate.

6          My first objection -- the basis of the objection is

7 relevance, and, as I said before, there are two grounds.

8 Number one, we believe the controlling case law says you

9 estimate based on the history of resolving cases in the past.

10 It's clear that prior to the time that Grace went into

11 bankruptcy it did not require lung cancer claimants to

12 demonstrate a one slash zero x-ray to prove a case against

13 Grace.

14          Secondly -- and that the settlement rules that Grace

15 -- that Grace had placed as a cost in monetizing the claims'it

16 faced is the basis for what we think the Court has the ability

17 to estimate here.

18          But, secondly, even under Grace's theory, the

19 claimants have produced x-rays and other radiographic images,

20 which Grace hasn't reviewed in the Henry study in response to

21 the Court's order and Grace's discovery.  That in no way means

22 that those claimants, if their case went to trial, wouldn't, if

23 they're still alive -- although, frankly, not a whole lot of

24 them are alive -- wouldn't be able to go back and get another

25 x-ray or a high resolution CAT scan, which is a lot more

CC-BLG000881

1  sensitive for identifying asbestos stuff or pathology or having

2  an expert come in and testify in their case that, in my

3  opinion, you don't need to have radiologically diagnosable

4  asbestosis in order to attribute the lung cancer to the

5  asbestos exposure.  That's a big debate in the medical

6  literature.  This -- Dr. Weill has one opinion on that score.

7  There are many, many other reputable experts, epidemiologists,

8  pathologists, the people who wrote the Helsinki criteria who

9  have thousands of peer reviewed medical articles to their name,

10 who have a very different opinion.

11          THE COURT:  Well --

12          MR. FINCH:  And so to the extent that Grace is using

13 this study --

14          THE COURT:  The problem with the x-ray submission is

15 that several times during the course of this case I ordered

16 that if there were going to be reliance on an x-ray study, that

17 it be produced now, beuase at some point in the process the

18 claimant -- the current claimant would have to produce an x-

19 ray.  And if it had to produce it to the trust, it could

20 produce it now, and if it hasn't been done, then I said that

21 the assumption for the purpose of this estimation trial would

22 be that it did not exist if it has not been produced.  I'm not

23 going to back off that ruling now.  That happened several

24 times.  The claimants have been given numerous opportunities to

25 produce the evidence of their disease either by x-ray or by

**J&J COURT TRANSCRIBERS, INC.**

Weill - Direct/Bernick                              69

1 something else, and if they have chosen -- if they have chosen

2 to produce an x-ray, as they were given that opportunity, and

3 have not done it, then at this point they simply do not have

4 that option any longer.

5           MR. FINCH:  But the order said for the estimation

6 trial, which is an estimate of Grace's --

7           THE COURT:  Yes.

8           MR. FINCH:  -- aggregate liability to claimants not

9 any individual --

10          THE COURT:  Yes.

11          MR. FINCH:  -- claimants.  X-rays change over time.

12 People get sicker.  People die.  People might get pathology

13 when they didn't have pathology before.

14          THE COURT:  Yes.

15          MR. FINCH:  The point is, Your Honor, that by setting

16 a deadline in March of what you had in your files at this time

17 in a proceeding that everyone was told would (a) not result in

18 the allowance or disallowance of their individual claims, and

19 (b) was for the purpose of estimating Grace's aggregate

20 liability, tells you nothing about the cases would be worth

21 when, as, and if they were resolved by Grace or by a trust or

22 in the tort system, and so we --

23          THE COURT:  Well, certainly, it does, Mr. Finch,

24 because to the extent that somebody is going to get more sick,

25 they're either more sick now than they were when the case was

**J&J COURT TRANSCRIBERS, INC.**

1  filed in 2001, and to the extent that they -- they're certainly

2  not going to get less sick than they were in 2001.  So, if

3  anything, they would be more sick than they were in 2001.

4         MR. FINCH:  And they may be more sick in 2008 --

5         THE COURT:  They may.

6         MR. FINCH:  -- or 2009 --

7         THE COURT:  They may.

8         MR. FINCH:  -- or 2010.

9         THE COURT:  They may.

10        MR. FINCH:  And that's why this -- that's the basis

11 for our relevance objection.  May I have a -- I think to

12 protect the record under Evidence Rule 103, all I need to do is

13 state the objection as to any testimony based on the

14 questionnaire analysis the first time it comes up and maybe do

15 it on a witness-by-witness basis.  There's sort of two aspects

16 of Dr. Weill's testimony.  One is this stuff.  The other is his

17 PFT statement.  Will the Court understand that when I stand up

18 and object on relevance grounds to that, so I don't have to go

19 through this entire spiel?  That's what I'm trying to avoid,

20 and I think Mr. Bernick has an interest --

21        THE COURT:  Yes.

22        MR. FINCH:  -- in trying to avoid that, too.

23        THE COURT:  If --

24        MR. FINCH:  As long as the record is clear that

25 that's the basis for our objection.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000884

1          THE COURT:  First of all, with respect to the

2     objection concerning the controlling case law on how to resolve

3     claims, the purpose of this testimony is -- as I understand it,

4     is -- at the moment with this witness is not how to resolve

5     claims.  This witness is not resolving claims.  And so the

6     testimony is not being proffered for that point, and,

7     therefore, the relevance is not to that point.  So as to this

8     witness, the relevance objection is not relevant.  So it's

9     overruled.  You may re-raise that objection when and if a

10    different witness comes up and the proffer is to a different

11    point.  You are going to have to do it on a witness-by-witness

12    basis.

13         MR. FINCH:  Okay, on a witness-by-witness basis.  So

14    when Mr. -- Dr. Florence comes in and relates what this witness

15    or Dr. Henry testified to the resolution of claims --

16         THE COURT:  Yes.

17         MR. FINCH:  -- that is again when we'll raise the

18    relevance objection.

19         THE COURT:  Yes.

20         MR. FINCH:  But I do think we have to raise it on a

21    witness-by-witness basis.  This is the relevance objection to

22    this witness, and I'll stand on that objection.  I understand

23    it's been overruled.  Thank you, Your Honor.

24         MR. BERNICK:  If you --

25         MR. MULLADY:  One additional point of distinction for

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000885

1  the future claimants, Your Honor.  To the extent that there is

2  a relevancy objection here, that relevancy point is even one

3  step further removed from the future claimants.  The future

4  claimants haven't submitted any x-ray films for review by

5  Grace's experts, yet Dr. Florence's methodology assumes that

6  future claimants in the future will be unable to demonstrate

7  radiographic proof of asbestosis --

8            THE COURT:  I understand, but this isn't --

9            MR. MULLADY:  -- as an extrapolation from the current

10 claimants.

11            THE COURT:  -- Dr. Florence.  This isn't the time for

12 that.

13            MR. MULLADY:  Understood.

14            THE COURT:  Can we please get the objections with the

15 witness who is on the stand at the time the witness is

16 testifying?  This is a different witness for a different

17 purpose, and I'm not going to give you advanced rulings with a

18 witness who's not on the stand.  So let's get it in the context

19 with the witness who's on the stand.  If this is the purpose

20 for trying to get these sidebars, folks, we're not going to do

21 this anymore.

22            MR. MULLADY:  That's not the purpose, Your Honor.

23            THE COURT:  All right.  Then let's limit it to the

24 witness who's on the stand in the context of the witness'

25 testimony.  I'm not doing this any longer, folks.  This is

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000886

1  ridiculous.

2          MR. BERNICK:  Okay.

3          THE COURT:  We'll take a five-minute recess.  Mr.

4  Bernick.

5          MR. BERNICK:  No, I'm happy to adapt to the recess.

6          THE COURT:  Do it now.

7          MR. BERNICK:  I rather it be clear, so that Your

8  Honor understands where we're going, and we get clarity.  First

9  of all, all the objections that go to, well, our experts would

10  say X or Y or Z -- that all goes to the weight of the evidence.

11  It doesn't go to whether it's relevant.

12          Secondly, we are making very spare use of the

13  information that was received in connection with the proof of

14  claim and PIQ process, so that we're working with underlying

15  evidence that ain't going to change with time.  Where the

16  witness worked, he knows, and by and large the x-ray evidence,

17  we're not even relying on the B reads.  We're looking at the

18  actual x-rays themselves.  And, as Your Honor indicated, that's

19  not subject to what experts go out and get.  An x-ray is an x-

20  ray.

21          So we're really using very extremely, you know, kind

22  of bedrock hard information that we're getting out of the PIQ.

23  To be clear to the Court, this witness' evidence is providing

24  the foundation for the seven percent, what it is that it means.

25  And based upon that, Dr. Florence will apply the seven percent.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000887

1  Grace is saying that the people who have submitted the PIQs do

2  not have in their x-rays a medical condition at the time of the

3  x-ray that would lead to liability.  It's not there.  And

4  because it's not there, the prospect of its ever being there --

5  you can never say never.  But for purposes of this estimation,

6  the only evidence in the record will be that these people did

7  not have radiographic x-ray that supported a diagnosis of

8  asbestosis.

9          And Your Honor has been fully consistent with this.

10  They're saying, oh, well, maybe way down the road there will be

11  more, but they're arguing that point in order to defend against

12  our estimate.  For purposes of this estimation, Your Honor has

13  indicated (a) they had to provide it, period, but (b) for

14  purposes of this estimation, that is the totality of the

15  record.  And so for them to argue that some day, some place the

16  record might be different, and, therefore, this is not

17  relevant, violates squarely the very words that they put in --

18  they suggested be in the order.

19          They're now saying, oh, we can now speculate that

20  there would be more evidence, or we can say the evidence you

21  have isn't any good, and that defeats the whole purpose of the

22  order, which is if you've got evidence, folks, in support of

23  your claim in these areas, you must submit it, otherwise, you

24  are barred from making the argument.  They're not making the

25  argument.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000888

Weill - Direct/Bernick                    75

1          So, yes, we will make -- we're proffering this

2    testimony in support of the ultimate exclusion of these claims

3    for the purposes of the estimate.  Yes, it's totally consistent

4    with Your Honor's order.  Yes, it is relevant under the case

5    law, and if they want to dispute whether a one slash zero

6    really is necessary to diagnose asbestosis -- if they want to

7    dispute that and say you don't even need that -- apart from

8    pathology, you don't need anything but a history, that goes to

9    the weight of the evidence.  We don't think that's correct, but

10   that goes to the weight of the evidence.  So that's our --

11   that's the full extent of our proffer, Your Honor.

12          THE COURT:  All right.  We'll take a five-minute

13   recess.

14          MR. BERNICK:  Thank you, Your Honor.

15                    (Recess)

16          THE COURT:  I'm sorry.  Please be seated.

17          MR. BERNICK:  Is it okay to have Dr. Weill present?

18          THE COURT:  Yes.  Yes.

19          MR. BERNICK:  Okay.

20                    (Pause)

21          THE COURT:  All right, Mr. Bernick.  Dr. Weill.

22          MR. BERNICK:  Thank you.

23               DIRECT EXAMINATION CONTINUED

24   BY MR. BERNICK:

25   Q    Are you familiar with the work that Dr. Henry did?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000889

1  A    Yes.

2  Q    Okay.  Do you know what criteria Dr. Henry -- well, first

3  of all, tell the Court what materials -- that is what x-rays

4  Dr. Henry had reviewed during the course of his study.

5  A    He examined x-rays that were submitted for a cancer claim.

6  Q    In this case?

7  A    Yes.

8  Q    Okay.  Now are you familiar with the criteria that Dr.

9  Henry applied in the course of the study that he did?

10  A    Yes.

11  Q    Okay.  I want to show you GG-2140, and had Dr. Henry took

12  a sample?  Is that correct?

13  A    Yes, he did.

14  Q    And he analyzed that sample to determine what?

15  A    He analyzed the sample to determine the prevalence of

16  radiographic asbestosis in the cancer claimants.

17  Q    Okay.  This chart reflects that he -- reflects a seven

18  percent number over the asbestos box and a 93 percent number

19  over asbestos exposure alone.  Does that square with your

20  understanding of the conclusion that Dr. Henry reached in his

21  study?

22  A    Yes, it does.

23  Q    Now, Dr. Henry will be here to address the details of that

24  study, but for purposes of our discussion here, in concluding

25  that only seven percent of his sample had asbestosis, what

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000890

1  criteria -- precise criteria did Dr. Henry have used during the

2  course of his study?

3  A    Dr. Henry, as I understand it, used radiographic profusion

4  category greater than one slash zero to determine if somebody

5  had radiographic evidence of asbestosis.

6  Q    Greater than one slash zero or greater than or equal to?

7  A    Greater than or equal to.

8  Q    Okay.  What would then that say about the other 93 percent

9  of Dr. Henry's sample?  That is if only seven percent showed

10  asbestosis, what would 93 percent -- what would you be able to

11  say about the 93 percent?

12  A    That they had no reliable evidence of parenchymal lung

13  disease, in this case, asbestosis.

14  Q    Say no reliable evidence.  That is radiological evidence

15  or all evidence?

16  A    Radiologic evidence.

17  Q    Okay.  Let's be clear.  So are you aware of any -- as you

18  sit here today, based upon Dr. Henry's work, is there with

19  respect to this group of claimants any reliable radiological

20  evidence that their asbestos exposure, if they had asbestos

21  exposure has had any actual impact on their lung tissue?

22  A    No, there's no reliable evidence.

23            MR. FINCH:  Objection.  Relevance.  Same --

24            THE COURT:  Yes, overruled.  You may answer, Doctor.

25  A    No, there's no reliable evidence of that.

CC-BLG000891

1  Q    Okay.  Now, apart from radiological evidence in the form

2  of the x-rays, is there other potential radiological evidence

3  that might be used?  That is are there other radiological

4  techniques that might be applied?

5  A    There are other types of changes in the lung that might be

6  attributable to asbestos exposure, namely, pleural changes.

7  Q    Okay.  Apart from pleural changes, which we're going to

8  get to, is there any other technique other than an x-ray that

9  would tell you whether there are radiological changes in the

10 meat of the lung?

11 A    No.

12 Q    Okay.  What about non-radiological evidence?  Is there

13 other non-radiological clinical evidence -- physical evidence

14 that could tell you that there were changes in the meat of the

15 lung?

16 A    You would need pathologic specimens to do that.

17 Q    Okay.  Did Dr. Henry's study relate to pathologic

18 evidence?

19 A    No, not at all.

20 Q    Okay.  Let's now go forward and take up the question of

21 other kinds of radiological evidence, and I want to direct you

22 to pleural changes.  Have you considered pleural changes in

23 relation to lung cancer?

24 A    Yes, I have.

25 Q    Showing you GG-2142, we've got a slide here that is the

J&J COURT TRANSCRIBERS, INC.

CC-BLG000892

1   same slide that is showing the seven percent asbestosis

2   evidence, the 93 percent where it's no reliable evidence of --

3   no reliable radiological evidence of lung changes, but then we

4   have a little box marked out for pleural changes.  Are pleural

5   changes changes to the lung?

6   A    No, they're the changes to the covering of the lung which

7   is called the pleura.

8   Q    Okay.  Let's talk about those a little bit more

9   specifically.  I want to show you GG-2143.  Does this slide

10  help you explain to the Court the phenomenon known as diffuse

11  pleural thickening?

12  A    Yes.

13  Q    Could you explain to the Court that phenomenon?

14  A    Diffuse pleural thickening is one of the benign asbestos-

15  related pleural diseases.  And diffuse pleural thickening, as

16  the name implies, is a very broad diffuse thickening of the

17  visceral pleura that does not involve the lung parenchyma

18  itself, and by definition, according to the most recent ILO

19  classification scheme put in place in 2000, involves blunting

20  of the costophrenic angle.  And I can explain that in more

21  detail, if you want.

22  Q    Okay.  First let's get our anatomy locations straightened

23  out.  You've talked about lung cancer and asbestosis as

24  effecting the meat of the lung.  Where we're talking about

25  pleural -- diffuse pleural thickening, where are we in the

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000893

1  anatomy?

2  A    So we're where the yellow box shows the arrows.  We're in

3  the covering part of the lung.

4  Q    And that's called the what?

5  A    Pleura.

6  Q    Okay.  Is that the same thing as the lung tissue, which is

7  subject to lung cancer and asbestosis?

8  A    No, it's distinct from that.

9  Q    Okay.  Is the condition known as visceral -- fibrosis of

10  the visceral pleura, is that asbestosis?

11  A    No, it's not.

12  Q    Is that lung cancer?

13  A    No, it's not.

14  Q    Is that a disease of the lung?

15  A    No, it's not.

16  Q    Does it reflect an impact of asbestos on the lung?

17  A    It reflects a change due to asbestos exposure.  It's a

18  marker --

19  Q    On the lung?

20  A    Not on the lung itself.

21  Q    Okay.  Now, let's talk about what the -- what that looks

22  like on radiograph.  Showing you GG-2144, does that help

23  illustrate what is seen on x-ray where diffuse pleural

24  thickening is present?

25  A    Yes, it does.

CC-BLG000894

1  Q    Okay.  Could you explain to the Court what it is that this

2  shows?

3  A    So on the left side of the panel again we have a normal

4  chest radiograph, and on the right side of the slide what we

5  see is that the left lung -- and remember it's reversed.  The

6  left is right, and right is left.  The left lung shows blunting

7  of the costophrenic angle and thickening of the pleura and

8  would qualify that as diffuse pleural thickening.  And it's

9  shown as that white part that's outlined by the dashed red

10 line.

11 Q    Okay.  What about pleural plaques?

12 A    Yes, I did.

13 Q    Showing you GG-2145, is this a demonstrative that would

14 help you explain what pleural plaques are?

15 A    It is.

16 Q    Could you use demonstrative 2145 in explaining to the

17 Court briefly what pleural plaques are and how they fit in

18 here?

19 A    Sure.  Again, we're not talking about lung tissue here.

20 What we're talking about is the covering of the lung.  And

21 opposed to diffuse pleural thickening, pleural plaques are a

22 discreet thickening the pleura itself.  So a focal

23 circumscribed thickening of the lung pleura.

24 Q    Did pleural plaques reflect a condition of the lung

25 itself?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000895

1  A    No.

2  Q    Did the pleural plaques reflect an impact of asbestos

3  exposure on the condition of the lung itself?

4  A    No.

5  Q    Does pleural plaques, are they even a disease?

6  A    No, they're markers of exposure.

7  Q    Okay.  Are they or are they not significantly associated

8  with the loss of lung function?

9  A    No, they're not.

10  Q    Are they or are they not an independent risk factor for

11  malignancy?

12  A    They're not.

13  Q    See radiograph 2146.  Would that help explain -- does that

14  help explain what a pleural plaques looks like?

15  A    Sure.  Again, normal left -- x-ray on the left side.

16  Right side of the slide shows a chest radiograph where there's

17  both right- and left-sided circumscribed pleural plaques, and

18  as the dash line indicates, there is an on-face pleural plaque,

19  meaning it's face on to the chest radiograph.

20  Q    Okay.  Turning to 2147, based upon consideration of

21  pleural changes, did you reach any conclusion as to whether

22  pleural changes constitute a risk factor for lung cancer?

23  A    Yes, I did.

24  Q    And what did you conclude?

25  A    That they do not increase the risk factor.

CC-BLG000896

1  Q    Now considering also pleural changes with respect to the

2  93 percent of the sample that Dr. Henry looked at concerning

3  these claimants, does it or does it not remain the case, in

4  your view, that there is no reliable radiographic evidence of

5  any impact on the lung itself of asbestos exposure with respect

6  to that 93 percent?

7  A    It does not affect it.

8  Q    Are you aware of any reliable scientific evidence in the

9  area of radiology that says that there would be such a change

10 given the results of his study --

11 A    No.

12 Q    -- assuming his study is accurate?

13 A    No, I'm not.

14 Q    Okay.  Now when the seven percent was applied -- are you

15 familiar with this fact?  That the seven percent number was

16 then applied in the course of the estimation that was done --

17 the estimate calculation that was done by Dr. Florence?

18 A    Yes, I am.

19 Q    Okay.  I want to show you -- well, first let me just ask

20 you in the following way.  We've talked about the fact that

21 there may be people who have other kinds of evidence to support

22 asbestosis, either pathology, slides, or are there other

23 techniques that are involved like CT scans and the like?

24 A    Yes, but not specific for asbestosis itself.

25 Q    Okay.  With respect to this seven percent, we have the

J&J COURT TRANSCRIBERS, INC.