1  seven percent as applied to people who had x-rays submitted.

2  With respect to people who did not have -- who had no x-rays

3  but also know -- they didn't state that they relied on x-rays.

4  That they actually pathology as an example or a CT.  Would they

5  have fallen in the category of no x-rays but not relied upon x-

6  rays?

7          MR. FINCH:  Objection.  Lack of foundation.  He's

8  asking this witness to testify what Dr. Florence did.

9          MR. BERNICK:  Well, I'll ask him to assume that

10 that's exactly what Dr. Florence did.

11 Q    I want you to assume, Dr. Weill, that Dr. Florence not

12 only applied the seven percent to people who had submitted x-

13 rays but also let pass through his filter people who did not

14 have x-rays but had not said that they were relying on x-rays.

15 I want you to assume that seven percent of those also were

16 allowed in.  If that approach had been taken, would that have

17 provided room in the estimate for people who relied upon

18 pathology or other techology?

19         MR. FINCH:  Objection.  Lack of foundation.  This

20 isn't -- he's offering -- he's asking him to opine on what

21 people should be included or not included in the estimate not

22 on what this witness did.

23         MR. BERNICK:  Well, I'll put it more precisely.

24 Q    Would it have been appropriate if we wanted to capture

25 company -- Grace wanted to capture people who relied upon

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000898

1 pathology or other technology that is not x-rays and did not

2 say that they're relying on x-rays -- would using seven percent

3 across the board have been an appropriate way, from your point

4 of view as a doctor, to let those people pass through the

5 filter?

6 A    Yes, I think it would --

7         MR. FINCH:  Objection.  Lack of foundation.

8 Argumentative.  He is asking this witness to opine on what

9 people may or may not use to prove their claims, whether it's

10 pathology or not.  He's also asking this witness to basically

11 walk through a hypothetical that he had nothing to do with.

12         MR. BERNICK:  No, this doctor is being asked -- he is

13 asked whether there are other technologies that are available.

14 He said that there were.  I'm now asking if we want to have

15 people who do have evidence from pathology or from CTs -- if we

16 want them still to qualify, whether it would be appropriate to

17 have a -- them pass through in the same way as people who

18 would've qualified with a radiograph.  That's all that I'm

19 asking.

20         MR. FINCH:  Objection.  Lack of expertise to answer

21 that question.

22         THE COURT:  I think that's the problem.  I'm not

23 certain where this witness' qualifications come in that

24 estimation field.

25         MR. BERNICK:  Okay.  I'm not asking him to sign off

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000899

1  on the seven percent.  I'm asking whether it would be

2  appropriate if we wanted from a medical point of view to have

3  people pass a medical screening if they had appropriate

4  pathology evidence or an appropriate alternative technology

5  like CT, would it have been appropriate to make provisions for

6  them to pass through the screen if we wanted the screen to be

7  medically sound.

8              THE COURT:  Yes, but you're asking him specifically

9  about the seven percent --

10              MR. BERNICK:  Not -- forget --

11              THE COURT:  -- and I think that's the issue.

12              MR. BERNICK:  Forget the seven percent.

13              THE COURT:  Then restate the question.

14              MR. BERNICK:  Yeah, I'll restate the question.

15  BY MR. BERNICK:

16  Q    Would it have been appropriate if we wanted to have the

17  screen be medically sound to make room in the screen for people

18  who had other evidence in the form of either (a) pathology or

19  (b) an appropriate CT scan?

20  A    Yes.

21              MR. BERNICK:  That's my only real question, Your

22  Honor.

23                         (Pause)

24  Q    If Dr. Florence's estimate incorporated the seven percent

25  number from Dr. Henry's work and applied that to people who had

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000900

1 submitted x-rays, and if he also made a provision for people

2 who had evidence through pathology or through CT, would that

3 approach be consistent or inconsistent with your own view of

4 what constitutes medically reliable evidence of asbestos

5 relation for lung cancer?

6           MR. FINCH:  Objection.  Lack of expertise.  Lack of

7 foundation.  Misstates what Dr. Florence actually did.

8           MR. BERNICK:  Well, there -- first of all, there can

9 be no expertise, because we qualified him to be expert in

10 precisely this area.  He's already testified for an hour in

11 this area.  All we're doing is creating a nexus between what he

12 has testified to and what I'm asking him to assume is Dr.

13 Florence's approach.

14           THE COURT:  Well, you said if Dr. Florence

15 incorporated the seven percent estimate from the x-rays --

16           MR. BERNICK:  Right.

17           THE COURT:  -- and also made provision for people who

18 had evidence of pathology or CT scans but not necessarily the

19 seven percent, as I understand, is that consistent with this

20 witness' view of what's medically reliable evidence of lung

21 cancer?

22           MR. BERNICK:  What's medically reliable evidence of

23 the link between --

24           THE COURT:  Oh, the link.

25           MR. BERNICK:  -- lung cancer and asbestos exposure.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000901

1          THE COURT:  I'm sorry.  And what's the -- and the

2   objection is that this witness isn't qualified to answer that

3   question?

4          MR. FINCH:  No, the objection is that it's -- it

5   misstates what Dr. Florence did, and he has a lack of

6   foundation to offer any opinions about whether what Dr.

7   Florence did is medically appropriate.

8          MR. BERNICK:  That is an entirely frivolous

9   objection.  Every day of the week you have testimony that's

10  elicited from an expert on the assumption of another expert

11  coming in and establishing something.  That's exactly what I'm

12  doing.

13         THE COURT:  I -- that objection is overruled.  I

14  think this witness is qualified to offer that opinion.

15  BY MR. BERNICK:

16  Q    Consistent or inconsistent?

17  A    Consistent.

18  Q    Thank you.  Let's talk about other cancer.  Have you

19  looked to see whether there is -- hang on for half a second.

20         MR. BERNICK:  I'm sorry, Your Honor.

21                      (Pause)

22         MR. BERNICK:  In the interest of time, I can move on

23  to the last topic, Your Honor.

24  Q    Let's talk a little bit about the diagnostic criteria for

25  asbestosis.  I think you testified previously, Dr. Weill, that

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000902

1  there are criteria, and they're set out as recommendations by

2  the American Thoracic Society?

3  A    Yes, I did.

4  Q    Okay.  I want to show you demonstrative GG-2151 and ask

5  you whether these are the elements that are either recommended

6  or recognized by the American Thoracic Society as important to

7  a differential diagnosis of non-malignant disease from

8  asbestos.

9  A    This is a fair depiction of that.

10 Q    Okay, so we have -- and again in the interest of time,

11 those that are recommended by the ATS include exposure history

12 and imaging, those that are recognized as having importance, or

13 physical exam, medical history and lung function tests?

14 A    yes.

15 Q    And then based upon that, the doctor is supposed to

16 conduct a differential diagnosis?

17 A    That's right.

18 Q    I want to ask you now for your opinion, whether in order

19 to perform a reliable diagnosis of asbestos-related illness of

20 the lung, whether compliance with the ATS recommendations is

21 required or not.

22 A    I think it is required.

23 Q    Okay.  Exposure history, what qualifies as an exposure

24 history under the ATS recommendations?

25 A    ATS recommends that a complete and thorough exposure

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000903

1  history is obtained.

2  Q    Okay.

3  A    It doesn't specify exactly how that's done, but it clearly

4  states that it should be done.

5  Q    I want to show you GG-2152 and ask whether this is an

6  excerpt of the language that the ATS document uses in talking

7  about the exposure history?

8  A    It is.

9  Q    Okay.  That refers to, "It's to be obtained, whatever

10 possible, directly from the patient that defines duration,

11 intensity, time of onset, setting of exposure experienced by

12 the patient.  Occupational title is not enough as the names of

13 many occupations and trades are uninformative."  Is that what

14 it says?

15 A    Yes.

16 Q    I want to come back to that one in a minute.  Let me ask

17 about lung function.  Are there standardized methodologies for

18 determining lung function?

19 A    There are.

20        MR. BERNICK:  And at this point, Your Honor, we would

21 show the witness Exhibits GX-0322, 0323, and 0135, and they're

22 in the binders, Your Honor.

23 Q    And let me ask you, Dr. Weill, are those exhibits -- do

24 they comprise the standards determining how pulmonary function

25 testing should be performed?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000904

1  A    Yes.

2             MR. BERNICK:  We offer them.

3             THE COURT:  Any objection?

4             MR. FINCH:  No objection, Your Honor.

5             THE COURT:  They're admitted.

6  Q    Dr. Weill, did you perform a study in connection with this

7  case of pulmonary function results that were submitted by

8  claimants in connection with the PIQ process?

9  A    Yes, I did.

10 Q    I want to show you Exhibit GG-2153.  Does this

11 demonstrative go through the stages of the analysis that you

12 did?

13 A    Yes, it does.

14            MR. FINCH:  Objection.  Relevance.  I object to the

15 relevance of any testimony or analysis of the pulmonary

16 function tests submitted in response to the personal injury

17 questionnaire for the two grounds I stated previously.

18            THE COURT:  All right.  Overruled.

19 Q    Okay.  In your own words could you just tell us basically

20 what you did in order to perform your study regarding PFTs?

21 A    Sure.  Our first purpose was to determine the reliability

22 of the sample of PFTs that were submitted by a variety of law

23 firms in this bankruptcy matter.

24 Q    Okay.  Go ahead.

25 A    As our methods, we determined or defined a random sample

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000905

1  of these PFTs in non-malignant claims only.  We then developed

2  a flow sheet that had as its basis a protocol to develop an

3  assessment about whether or not patients were compliant with

4  ATS criteria, and we reviewed each PFT to evaluate compliance

5  in order to do this.  And our results were, just to get to the

6  conclusion, that none of the 150 PFTs that we analyzed met ATS

7  requirements for the three standard lung function measurements.

8  Q    I want to show you what we've marked as Exhibits GX-425,

9  GX-426, and GX-427 and ask you whether these documents are

10 summaries of the data that you obtained during the course of

11 your lung function study.

12 A    Yes, they are.

13           MR. BUCHBINDER:  We offer them as summaries, Your

14 Honor.

15           MR. FINCH:  Objection.  Relevance.

16           THE COURT:  Overruled for the same reason.  They'll

17 be accepted only as summaries.

18 Q    What did you find with respect to all the PFT studies or

19 PFT measures that you reviewed during the course of your work

20 from these different claimants?

21 A    The none of the 150 PFTs met all three ATS criteria.

22 Q    Is failure to -- does failure to meet the PFT criteria,

23 does that bear upon the scientific reliability of the results?

24 A    It does.

25 Q    Tell us how it bears upon the scientific reliability of

**J&J COURT TRANSCRIBERS, INC.**

1  the results?

2  A    The performance of pulmonary function tests is highly

3  technical, and in order for those tests to be repeatable and

4  accurate, they must be performed properly, and to do that the

5  ATS has developed these three documents that explain in a fair

6  amount of detail about exactly how that should be done.

7  Q    Okay.  In your view, based on the results of your work,

8  were any of the PFTs that you reviewed -- did any of them

9  constitute reliable medical evidence?

10 A    No.

11 Q    Do you have illustrations of two of the problems -- some

12 of the problems that were identified during the course of the

13 PFT studies?

14 A    I do.

15 Q    Showing you Exhibit 2154 and 2155 -- well, actually, let's

16 go through 2154 and 2155.  What is reflected on 2154 as an

17 illustrative?

18 A    And again these are just examples.  And so what this

19 example shows is the failure on spirometric analysis to meet

20 ATS criteria, and what the failure is is that during the

21 patient's effort -- during the spirometric effort, which in

22 this case is inspiratory and expiratory, the patient coughed,

23 and so it disrupts the measurement while the patient's

24 coughing.

25 Q    Okay.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000907

1 A    And so to accept that spirogram is to accept information

2 that is not valid.

3 Q    If somebody wanted to, could they just redo the test?

4 A    Sure.

5 Q    Okay.  Showing you 2166, what's the problem illustrated on

6 2155?

7 A    So again this is -- as part of the spirometric evaluation

8 you do what is called the volume over time measurement where

9 time is on one axis, in this case the horizontal axis, and the

10 volume a patient expires is on the vertical access.  And what

11 the ATS criteria designate is that there should be three

12 efforts of at least six second duration when a patient blows

13 out and a plateau should be reached of at least one second.

14 Failure to meet that is a failure to meet one of the

15 spirometric requirements that the ATS puts forth.

16 Q    I want to show you Exhibits GX -- I apologize for the

17 length of the number here.  Your Honor it is GX7.1681352.  And

18 the second one is GX7.893695.  So the first one was 1681352,

19 second one is 8939695.  Can I show you these and particularly

20 the flagged pages that I've identified here?  Are these the PIQ

21 submissions for the two individuals whose PFTs you used for

22 illustrative purposes and Exhibits 2155, GG-2155 and GG-2154?

23 A    Yes, they are.

24          MR. BERNICK:  We offer them, Your Honor.

25          MR. FINCH:  Objection, relevance.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000908

1          THE COURT:  Overruled.

2   Q    Why don't we come back to differential diagnosis, if we

3   can show 2156 and I want to come back to the discussion that we

4   had a few moments ago with the Court about the significance of

5   exposure history?  In differential diagnosis, could you tell us

6   what it is that the doctor in general terms does in

7   differential diagnosis?

8   A    What a physician is doing when generating a differential

9   diagnosis is considering all possible causes of whatever

10  objective evidence the patient presents.

11  Q    Okay.

12  A    And then, I'm sorry, just to expand a little bit on that.

13  Then there's a process that goes through the physician's mind

14  where he or she is excluding and ruling in possibilities

15  constantly.

16  Q    Okay, now you have here on 2156 that when it comes to

17  differential diagnosis we are talking conditions that are

18  asbestos related, you say other conditions mimic the

19  radiographic appearances of asbestosis and plural abnormalities

20  and other diseases cause restrictive impairment.  What are you

21  getting at when you make reference to those points?  What's the

22  relevance of that?

23  A    So even from an imaging and physiologic, that's the

24  pulmonary function test standpoint, there are diseases that

25  look exactly like the asbestos related diseases.  And so if we

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000909

1 were to go back to the x-rays that I flashed up earlier looking

2 at these asbestos related changes, one couldn't necessarily

3 determine that those were asbestos related.  If you took those

4 changes just in isolation.

5 Q    So showing you GG-2157, is this a list of some of the

6 conditions that as you say mimic the radiographic appearances

7 of asbestosis?

8 A    Yes.

9 Q    We see a whole variety of them there?

10 A    Yes.

11 Q    Turning to 2158, is this a similar list with respect to

12 conditions that mimic the radiographic appearance of diffused

13 plural thickening?

14 A    Yes, it is.

15 Q    And with respect to 2159, same thing with respect to

16 plural plaques?

17 A    Yes.

18 Q    Would it or would it not be fair, Dr. Weil, to say that in

19 all cases that is with respect to asbestosis, plural plaques

20 and diffused plural thickening that there are a wide variety of

21 other non-asbestos related conditions that can cause

22 radiographs that could be confused or similar to the

23 radiographs that are associated with those asbestos related

24 conditions?

25 A    That's a fair statement.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000910

1  Q    Okay.  Now you've told us before that when it comes to

2  differential diagnosis, one of the tools that you have at your

3  disposal to determine whether a condition of the lung is

4  asbestos related or not, that is it might be one of these other

5  things, is to look for an exposure history.  Do you recall

6  that?

7  A    Yes.

8  Q    And again in order to bring us up to where we are in this

9  examination I think you also told us that the quality of the

10 exposure information obtained on patient history can be

11 variable.

12 A    That's right.

13 Q    I want to show you GG-2160 and ask whether this would

14 assist you in describing what some of the different kinds of

15 exposure information can comprise?

16 A    Yes.  On the left side of the slide, I've labeled what is

17 called anecdotal information.  And that information comes from

18 the patient himself and it varies from patient to patient.

19 Some patients give a very detailed information, others don't.

20 But it varies.  Now that information has to be compared to the

21 epidemiologic evidence that is available about exposure that's

22 much more carefully performed.

23        That evidence is usually occupation specific and

24 quantitative in nature.  And so it provides a level of evidence

25 that is very good.  And from a physician's standpoint it

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000911

1   provides a background or framework to think about that

2   individual patient's exposure.

3   Q    Okay.  Now let's focus on this for just a moment.  If you

4   have -- if you, as a doctor, have only anecdotal information

5   and it's general.  I saw some dust in the air, et cetera, et

6   cetera, does that mean that a differential diagnosis is just

7   impossible?

8   A    It's very difficult under those circumstances.

9   Q    Depending upon the level of detail associated with the

10  anecdotal information might still become at some point, based

11  on anecdotal information alone, to perform some kind of

12  differential diagnosis?

13  A    Yes.  You just have to do the best you could.

14  Q    I now want you to assume for purposes of my question that

15  the information that is obtained from the patient is of

16  sufficient specificity, that is as you showed in your prior

17  slide under the ATS, you know, intensity, duration, et cetera,

18  such that it can be matched up with the epidemiological

19  studies.  I want you to make that assumption.  What does that

20  do to the differential diagnosis?

21  A    Well it raises your level of evidence about the exposure

22  history and makes the evidence more firm that you have an

23  adequate exposure history to increase the risk of developing

24  asbestosis.

25  Q    Okay.  Now I then want to ask you whether -- in a sense,

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000912

1  the question I want to get you to is you know does it -- if

2  you've got the exposure data from the claimant that is here is

3  where I worked and how long I worked and you can fit it into

4  the epidemiological science, is there any way that a

5  differential diagnosis by an individual doctor somehow traps

6  the learning of epidemiology?

7  A     No, it doesn't.

8  Q     And why is that?

9  A     Because the epidemiology has been done on a larger group

10  of patients.  It's usually been done, if done properly, in a

11  quantitative dose fashion and so that the level of evidence and

12  the information you have about exposure is more precise.

13         MR. BERNICK:  I pass the witness, Your Honor.

14         THE WITNESS:  Your Honor, would it be possible to --

15         THE COURT:  Certainly.  We'll take a ten minute

16  recess.  I'm going to correct a note here that I need to

17  correct so please take your recess.

18                        (Recess)

19         THE COURT:  Everyone back?  Okay, Mr. Finch.  Doctor,

20  are you ready?  Okay.  Mr. Finch.

21         MR. FINCH:  Thank you, Your Honor.

22                  CROSS EXAMINATION

23  BY MR. FINCH:

24  Q     Good morning, Dr. Weil.  My name is Nathan Finch.  I am

25  counsel to the asbestos claimant's committee in the Grace

                **J&J COURT TRANSCRIBERS, INC.**

1  Bankruptcy.

2  A    Good morning.

3  Q    Is it true that you only have one publication related to

4  asbestos?

5  A    Yes.

6  Q    And that was a letter to the editor in response to the

7  2004 American Thoracic Society statement on the diagnosis and

8  initial management of asbestos related non-malignant diseases?

9  A    That's right.

10  Q    That was not a peer reviewed publication, correct?

11  A    It was reviewed by their editorial board.

12  Q    But it was not a statement -- it was not a study of

13  asbestos related diseases, correct?  It was a commentary on the

14  2004 ATS standards, right?

15  A    That's right.

16  Q    And you've never participated in any research regarding

17  asbestos, correct?

18  A    That's also correct.

19  Q    And when you have testified in occupational lung cases

20  it's been most commonly for defendants, correct?

21  A    That's correct.

22  Q    And somewhere between 20 to 25 percent of your income in

23  the past two years has been from matters in which you've been

24  working for W.R. Grace?

25  A    That's correct also.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000914

1  Q     Now I have heard your testimony about differential

2  diagnosis and the importance of taking individual case

3  histories.  Would you agree that the question of whether or not

4  a particular exposure to an asbestos containing material has

5  played a role in an individual's development of an asbestos

6  related disease depends on the careful analysis of all the

7  facts and circumstances relating to that particular individual?

8  A     Yes.

9  Q     That's true for every asbestos disease?

10         MR. BERNICK:  Your Honor, I don't know who the

11 individual is over here but unless that was -- maybe it was --

12         THE COURT:  For my --

13         MR. BERNICK:  Oh, it's to you.  I apologize.  Just

14 saw a thumbs up and was wondering what was going on.

15         MR. FINCH:  Let the record reflect there was no

16 attempt to give a thumbs up to the witness.  It is a

17 technological issue as to which I'm probably incompetent to

18 handle myself.

19         THE COURT:  But for my edification, could you repeat

20 the last question please?  While that was going on, I too was a

21 bit distracted.

22 Q     Sure.  Okay, Dr. Weil, would you agree that the question

23 of whether or not a particular exposure to an asbestos

24 containing material played a role in an individual's

25 development of an asbestos related disease depends on a careful

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000915

1  analysis of all the facts and circumstances relating to that

2  particular individual?

3  A     Yes.

4  Q     That's true for every asbestos disease?

5  A     Yes.

6  Q     That's true for the each exposure?

7  A     Yes.

8  Q     And that's true for each individual's medical situation?

9  A     That's also true.

10 Q     Now the letter to the ATS you referred to in response to

11 one of my earlier questions, you were co-author of that letter

12 with a Dr. Hans Weill, correct?

13 A     That's right.

14 Q     And Mr. Bernick on direct exam elicited that you are Dr.

15 Hans Weill's son, correct?

16 A     That's right.

17 Q     And you were relying on some of his research for your

18 opinions here, correct?

19 A     I am.

20 Q     Is it fair to say that you and he are in general agreement

21 on issues relating to asbestos related medicine?

22 A     As long as you make that specification, yes.

23 Q     So you would agree with him that may asbestos disease

24 patients are exposed to asbestos from a variety of sources?

25       MR. BERNICK:  Objection.  If there's going to be

CC-BLG000916

1  purported impeachment of the witness using testimony from his

2  father, that'd be a very interesting kind of impeachment.  But

3  I think that the fact that he agrees with his father's view or

4  Dr. Weill, Sr.'s views does not provide an adequate foundation

5  for then attempting to impeach him using Dr. Weill Sr.'s

6  testimony.

7         MR. FINCH:  I wasn't trying to impeach him, Your

8  Honor.  I was asking him does he agree that many asbestos

9  disease patients are exposed to asbestos from a variety of

10  sources.

11         MR. BERNICK:  The problem is that is now counsel's

12  testimony that that is Dr. Weill Sr.'s view and there is no

13  foundation for that.  If he wants to provide a copy and give

14  the witness an opportunity to review it, he can then-- there

15  can then be a record of the fact that Dr. Weill Sr. said that

16  on examination.  Otherwise, all this is is reading from some

17  other person's statement and saying do you agree with Dr.

18  Weill.  There's no record of evidence that Dr. Weill said that.

19         MR. FINCH:  Okay, may I approach the witness, Your

20  Honor?

21         THE COURT:  Yes.

22  Q    Let me ask the question this way.  Dr. Weill, leaving your

23  father completely out of it, would you agree that many asbestos

24  disease patients are exposed to asbestos from a variety of

25  sources?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000917

1  A    I think some are and some aren't.

2  Q    But many are, correct?

3  A    I'm not really sure what you mean by many.  I think just

4  some are and some aren't.

5  Q    Would you agree that it's not possible to do an

6  epidemiological forecast just as the people who were exposed to

7  one particular company's asbestos product?

8            MR. BERNICK:  Objection.  Lack of foundation.  Also

9  goes beyond the scope of his examination.  He's now trying to

10 turn this witness into an epidemiologist with respect to a

11 different question that this witness never addressed.  I'm

12 sorry, this is an improper question.  This goes outside the

13 scope of the examination.  It attempts to turn this witness

14 into an expert on epidemiology concerning Grace specific

15 exposure.  He was never proffered for that purpose.  It goes

16 beyond the scope of direct and seeks to make him now the ACC's

17 witness.  This is totally improper.

18            THE COURT:  I don't think the witness is qualified on

19 epidemiology or forecasting.  He was qualified with respect to

20 certain issues concerning asbestos and lung diseases and I'm

21 not sure how this fits into that, Mr. Finch.  Do you want to

22 lay a foundation for me?

23            MR. FINCH:  Your Honor, he did testify about his use

24 of epidemiological studies.

25            THE COURT:  He did.

                    **J&J COURT TRANSCRIBERS, INC.**

1            MR. FINCH:  In making a differential diagnosis.

2  Q    And would you agree with me, Dr. Weill, that the

3  epidemiological studies that you looked to in making a

4  differential diagnosis do not in general provide the names of

5  the products to which the people were exposed?

6  A    It does provide the type of exposure they had.  Sometimes

7  product specific, sometimes not.

8  Q    Can you point to any source in the epidemiological

9  literature that lists the names of the products to which the

10 workers were exposed?  The Selikoff studies don't name all the

11 products that were exposed --

12            MR. BERNICK:  That's two questions, which question?

13 Q    Okay.  You would agree with me that the Selikoff insulator

14 studies don't list the names of the products, correct?

15 A    They don't.

16 Q    And the Hans Weill and Hughes study of the cement workers

17 in New Orleans doesn't list all of the names of all of the

18 various asbestos products those people were exposed to,

19 correct?

20 A    That's also correct.

21 Q    And as you sit here today, isn't it the case that the vast

22 majority of the epidemiological literature doesn't name the

23 products?  They might name the types of products, but they

24 don't name the products which the workers were exposed to?

25            MR. BERNICK:  I think this is outside scope.  Let him

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000919

1  answer it and move on.

2  A    By naming the product, you mean company name?

3  Q    Yes.

4  A    No, they do not.

5  Q    And so would you agree with me for that reason it's not

6  possible to do a product specific epidemiological assessment or

7  projection of disease?

8            MR. BERNICK:  That question is no different than the

9  question he asked five minutes ago and has the same defect.  He

10  is now making this witness into an expert in epidemiology and

11  seeking to elicit testimony in support of a proposition that

12  was not placed at issue on the direct examination.

13            MR. FINCH:  Your Honor, I stand by my question.  Can

14  I have a ruling?

15            THE COURT:  Well this witness -- this is well outside

16  the scope of this witness's testimony and I'm not sure, unless

17  there is something in his report that I don't recall reading,

18  Mr. Finch, so it may be there and I may have forgotten it.  I

19  don't recall that this witness offered an opinion on this type

20  of area.

21            MR. FINCH:  Okay.  I'll move on, Your Honor.  Thank

22  you.

23  Q    You have -- I believe I placed a copy of your first report

24  on the ledge in front of you.  Do you have that?

25  A    Yes.

J&J COURT TRANSCRIBERS, INC.

CC-BLG000920

1  Q    Dr. Weill.  And for purposes of identification we've

2  marked this as ACC-597.  I don't intend to offer it Your Honor,

3  but I do have some questions for the witness from it.  Do you

4  have your first report, ACC-597 in front of you, Dr. Weill?

5  A    Yes.

6  Q    Okay, could you turn to Page 19 of that report?

7  A    Got it.

8  Q    Okay.  At the last paragraph, is it correct that you wrote

9  while there is widespread agreement about the role of cigarette

10 smoking and causing lung cancer, the relationship between

11 asbestos exposures, asbestosis and lung cancer has been

12 intensely debated both in the academic and legal arenas.  The

13 opinions regarding this relationship can be divided into three

14 positions.  One exposure to asbestos of any amount increases

15 the lung cancer risk; two, exposure to asbestos of amounts

16 sufficient to cause asbestosis are necessary to attribute lung

17 cancer to exposure and three, asbestosis either rated

18 graphically evident or president on histologic material is

19 necessary to attribute lung cancer to asbestos exposure in an

20 individual case.  You wrote those words?

21 A    Yes.

22 Q    And so that's the debate in the medical literature,

23 correct?

24 A    Yes.

25 Q    Could we go to the powerpoints?  All right, one of the --

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000921

1  while we're waiting for that, one of the articles you cited in

2  your report, and I believe it's Reference 84 in your report, is

3  an article by Gustovson, correct?

4  A    Yes.

5  Q    Okay, now at Page 23 of your report, if you turn to Page

6  23 of your report, Dr. Weill?

7  A    Yes.

8  Q    You write, some studies have indicated there is a dose

9  response relationship between asbestos exposure and lung cancer

10 risk, even at low levels of exposure.  And that's reference 84,

11 right?

12 A    Right.

13 Q    That's the Gustovson study?

14 A    right.

15 Q    Okay.  Could you turn in your notebook to Exhibit 331?

16 A    I've got it.

17 Q    All right.  Exhibit 331 is the article by Per Gustovson

18 that you cited for the proposition that some experts believe

19 that there is a dose response relationship between asbestos

20 exposure and lung cancer risk even at low levels of exposure?

21 A    Yes.

22 Q    And that was an article that was published in the American

23 Journal of Epidemiology?

24 A    Yes.

25 Q    That's a peer reviewed medical journal?

CC-BLG000922

1  A     It is.

2  Q     And what those researchers found in the middle of the

3  abstract is that lung cancer risk increased almost linearly

4  with cumulative dose of asbestos.  The risk at a cumulative

5  dose of four fiber years is 1.90, 95 percent confidence,

6  interval 1.32 to 2.74.  That's what they found, correct?

7  A     Yes.

8  Q     Now there is, if we go to the powerpoint, okay, so there

9  is lung cancer caused by asbestos three views.  One is what

10 I'll call the Gustovson view that lung cancer plus asbestos

11 exposure.  Second view is -- you are familiar with the Helsinki

12 criteria.  You talked about them a little bit on direct,

13 correct?

14 A     Yes.

15 Q     Those criteria were developed by a group of approximately

16 20 scientists who have expertise in asbestos related medical

17 issues, correct?

18 A     Yes.

19 Q     One of them was Dr. John Parker?

20 A     That's right.

21 Q     He's one of Grace's experts here?

22 A     As I understand it.

23 Q     One of them is Dr. Victor Rodley who is one of the FCR's

24 experts here?

25 A     Yes.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000923

1  Q    And the authors of the Helsinki criteria had collectively

2  between them published hundreds of papers in the peer view

3  medical literature on asbestos related diseases, correct?

4  A    That's correct.

5  Q    In your book on Page 398 there is the summary title from

6  the -- excuse me, Exhibit 398.  Are you at Exhibit 398 Dr.

7  Weill?

8  A    Yes.

9  Q    John, can we get back to Exhibit 398?  That's the summary

10  page and the summary article from what is commonly known as the

11  Helsinki criteria, correct?

12  A    Yes.

13  Q    Okay.  And could you turn to Page 314 of that article?

14  And the authors of the Helsinki criteria concluded, did they

15  not, that relative risk is roughly doubled for cohorts exposed

16  to asbestos fibers at a cumulative exposure of 25 fiber years

17  and with an equivalent occupational history at which level

18  asbestosis may or may not be present or detectable?  Heavy

19  exposure in the absence of radiologically diagnosed asbestosis

20  is sufficient to increase the risk of lung cancer.  Cumulative

21  exposures below 25 fiber years are also associated with an

22  increased risk of lung cancer but to a less extent.  That's the

23  opinions of the authors of the Helsinki criteria, correct?

24  A    That's correct.

25  Q    Back to the slide show.  Now the third point of view is

                    **J&J COURT TRANSCRIBERS, INC.**

CC-BLG000924

Weill - Cross/Finch                               111

1  the view that your father had and that you have which is that

2  in order to attribute lung cancer to asbestos exposure, you

3  have to have lung cancer and asbestosis, correct?

4  A    Yes.

5  Q    So if you have a patient with lung cancer and asbestosis,

6  you would attribute their lung cancer in whole or in part to

7  asbestos exposure?

8  A    That's right.

9  Q    Okay.  Now One way you confirm the presence of asbestosis

10 or can, and this is the way your father did it in the Hughes

11 Weill's study was by looking at x-rays of people, correct?

12 A    That's right.

13 Q    Another way  to confirm the presence of asbestosis is to

14 confirm it by pathology correct?

15 A    Also correct.

16         THE COURT:  Again, this is saying asbestos but you

17 mean asbestosis, correct?

18         MR. FINCH:  I mean asbestosis.  There's a typo in

19 Number 3, Your Honor.  I apologize for that.

20         THE COURT:  Okay.

21         MR. FINCH:  I'm not going to offer these.  These are

22 for demonstrative purposes.

23 Q    With that, you understood my question Dr. Weill?  The two

24 ways to confirm the presence of asbestosis.  One is you can

25 confirm the presence of asbestosis by looking at an x-ray,

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000925

1  correct?

2  A    Correct.

3  Q    And the second way is to do it by pathology, correct?

4  A    That's correct.

5  Q    Now on direct examination Mr. Bernick showed you a list of

6  some studies.  One of them is something called the Kipen study.

7  Are you familiar with that?

8  A    Yes.

9  Q    All right.  Would you agree with me that the Kipen study

10 stands for the proposition that asbestosis can be present

11 pathologically even if an x-ray is completely normal?

12 A    Yes, I'd say that.

13 Q    And if you go to your book, Exhibit 623 in your book?

14 A    I've got it.

15 Q    Okay Exhibit 623, ACC FCR 623, that's what is commonly

16 known as the Kipen study that was published in the British

17 Journal of Industrial Medicine?  ·

18 A    Yes.

19 Q    And what those authors found in the abstract and what they

20 found in their study is that these were 138 people where they

21 had a tissue specimen that people have died from lung cancer,

22 right?

23 A    Yes.

24 Q    And all of them had parenchymal fibrosis determined

25 pathologically even though 18 percent of that group had no

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000926

Weill - Cross/Finch                                113

1  radiologic -- they had no radiographic evidence of parenchymal

2  fibrosis, right?

3  A     That's right.

4  Q     Okay.  Can you go back to the powerpoint?

5           THE COURT:  I'm sorry, would you say that again

6  please.

7  Q     What that means Dr. Weill is that --

8           THE COURT: No could you just restate the statement

9  for me.  I thought you said they died of it but they had no

10  evidence of it.  Is that what you said?

11           MR. FINCH:  NO, they died of lung cancer.

12  Q     That's correct, Dr. Weill?

13  A     They did.

14  Q     And they had pathology specimens on 138 of those people,

15  that's right?

16  A     Also right.

17  Q     Okay.  And for all 138 of those people when you looked at

18  the pathology -- pathology involves taking a specimen of tissue

19  and putting it under a microscope, right?

20  A     Right.

21  Q     When they looked at the pathology, all 138 of those people

22  had asbestosis, right?

23  A     Yes.

24  Q     Would you agree with me that if asbestosis is detected by

25  pathology, it's there?  There's no dispute whether it's

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000927

1  asbestosis or not?

2  A    There might be a pathological dispute but not as a

3  clinician, a dispute with me.

4  Q    If you heard -- have you used the statement that pathology

5  is the gold standard for diagnosis asbestosis?

6  A    Certainly heard that, yes.

7  Q    Okay, and so what this found is that in 18 percent of

8  those people they had normal chest x-rays but they in fact had

9  asbestosis?

10  A    Right.

11  Q    Now back to the powerpoint.  So I believe you just said

12  pathology is the gold standard?

13  A    Yes.

14  Q    Okay.  I want you to assume that a person has lung cancer

15  and asbestosis that is confirmed by pathology but is not

16  detectable on an x-ray.  Make that assumption?

17  A    I can.

18  Q    You would attribute that person's lung cancer to the

19  asbestos exposure at least in whole or in part, correct?

20  A    That's correct.

21  Q    To say that lung cancer in this person could not be caused

22  by exposure to asbestos is medically wrong, isn't that right?

23  A    That's right.

24  Q    Now what is the American Thoracic Society?  We talked

25  about the document which was shown to you by Mr. Bernick which

J&J COURT TRANSCRIBERS, INC.

CC-BLG000928

Weill - Cross/Finch                          115

1  is Grace Exhibit 274.   What is the American Thoracic Society?

2  A    It's a society of primarily chest physicians.

3  Q    And the publish statements about such things as what

4  criteria are necessary to run an appropriate lung function test

5  for example?

6  A    That's right.

7  Q    And you relied on those in doing your analysis for PFTs?

8  A    Right.

9  Q    And they also published statements about what diagnostic

10 criteria are necessary to diagnose asbestosis and other non-

11 malignant diseases, correct?

12 A    Yes.

13 Q    The -- could you turn in your book to ACC FCR 389.

14 A    I've got it.

15 Q    That's the same -- Your Honor, for the purposes of the

16 record that's the same document as Grace 274.

17         THE COURT:  All right.

18 Q    This is the American Thoracic Society statement regarding

19 the diagnosis and initial management of non-malignant diseases

20 related to asbestos, is that correct?

21 A    Yes.

22 Q    Okay.  The -- back to the powerpoint.  Would you agree

23 with me that the American Thoracic Society statement allows for

24 a diagnosis of asbestosis to be made with a 1/0 on the ILO

25 scale, correct?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000929

1  A    In the proper exposure setting.

2  Q    In the proper exposure setting.  Adequate asbestos

3  exposure, correct?

4  A    Yes.

5  Q    Appropriate latency?

6  A    Yes.

7  Q    And latency is usually stated as more than 10 years,

8  correct?

9  A    Some state it more than 10 years, some say more than 20.

10  Q    Okay.  And the latency period for asbestosis can be 40 or

11  50 years in some cases, correct?

12  A    That's also correct.

13  Q    And then you exclude other causes, right?

14  A    Yes.

15  Q    Could you turn in the -- leave the powerpoint up, we'll

16  just go through the books.  Could you turn in your book to

17  Exhibit 389, the ATS statement to Page 696?

18  A    I've got it.

19  Q    Now one way to look for interstitial fibrosis in the meat

20  of the lung, as you put it, is to look at an x-ray, correct?

21  A    That's right.

22  Q    Another way to do it is to look at high resolution CT

23  scans, correct?

24  A    That's correct.

25  Q    HRCT.  And would you agree with me that the American

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000930

1 Thoracic Society is determined that HRCT is much more sensitive

2 in detection of asbestosis than plain chest radiographs?

3 A    That's what they concluded.

4 Q    Okay.  So what that means is that if you look at an HRCT

5 scan you are much more likely to see the changes, the

6 interstitial changes that can be asbestosis than if you just

7 look at an old x-ray, right?

8 A    I don't agree with that.  I think what you are more likely

9 to see are changes and I would stop there.

10 Q    Okay, so you disagree with the ATS about that?

11 A    I disagree and I don't think that they were trying to

12 imply that the HRCT scanning is absolutely specific for

13 asbestosis.  I agree with their statement regarding its

14 sensitivity.  It's a very sensitive clinical and refurbished

15 tool.

16 Q    Don't they also say at the top of Page 697 that HRCT is

17 more specific than plain chest radiographs excluding conditions

18 such as emphysema, thistle prominence, overlapping plural

19 disease, bronchiostasis which may confound radiographic

20 interpretation?

21 A    I agree with their statement that it's more specific when

22 excluding those diseases.  What I don't agree with is that it

23 is more specific in excluding other fibrodic lung disease.

24 Q    So you differ with them on that, correct?

25 A    No, I don't.  I actually agree with that statement.  But

CC-BLG000931

1 those diseases that they list are not fibrodic lung diseases.

2 Those are diseases that look entirely different on HRCT

3 scanning.  So where I differ is that HRCT scanning as a tool is

4 unable to distinguish between the over 150 causes of fibrodic

5 lung disease.

6 Q    And you differ with the American Thoracic Study on that

7 particular aspect?

8 A    I don't.  What they are saying is that it is very specific

9 -- a very specific tool when you are talking about

10 differentiating between obstructive lung diseases that they

11 list here for instance and changes due to asbestosis, which are

12 very fibrodic lung disease.

13 Q    But would you agree with me that the American Thoracic

14 Society allows clinicians to use HRCT to diagnose asbestosis?

15 A    What I think the discussion really included in the

16 statement is that HRCT scanning is a very sensitive tool for

17 looking at lung disease.  That's what I took away from it.

18 Q    Okay, and -- but it is permissible to use an HRCT  to

19 diagnose asbestosis, correct?

20       MR. BERNICK:  Wait.  Permissible or consistent with

21 the guidelines that are before the witness?

22 Q    Would you agree with me that it's consistent with the

23 guidelines for a clinician to use HRCT to diagnose asbestosis?

24 A    It's in the guidelines.

25 Q    So it is consistent?

J&J COURT TRANSCRIBERS, INC.

CC-BLG000932

1  A    Yes.

2  Q    Would you also agree that the American Thoracic Society

3  does not require lung function impairment to diagnose

4  asbestosis?

5  A    That's correct.

6  Q    Would you agree that the American Thoracic Society does

7  not require more than one B reader to read an x-ray to diagnose

8  asbestosis?

9           MR. BERNICK:  Objection to the form of the question.

10 That assumes that the ATS standard addresses the issue.

11 Q    Do you agree with me that there is nothing in the ATS

12 standard that says you need more than one B reader to read an

13 x-ray to diagnose asbestosis?

14 A    I don't remember their weighing in on that subject one way

15 or the other.

16 Q    And I believe you agree that the proposition that the

17 American Thoracic Society allows doctors to use HRCT to detect

18 asbestosis?

19           THE COURT:  I'm sorry, would you repeat that?

20 Q    Would you agree with me that the American Thoracic Society

21 allows doctors to use HRCT to detect asbestosis?

22 A    Sure.

23 Q    Okay.  Now, let's talk briefly about --

24           THE COURT: I'm sorry, Mr. Finch.  May I ask a

25 question about the HRCT please?  Doctor, you just said that the

CC-BLG000933

1 HRCT is a specific disease that helps you diagnose obstructive

2 lung diseases, but that's not what asbestosis is.

3          THE WITNESS:  Right.

4          MR. FINCH:  So I'm sorry, did you have a specific

5 question you wanted me to --

6          THE COURT:  Yes, So the ATS allows you to use that

7 function to diagnose a disease for which it is not intended to

8 be used?

9          THE WITNESS:  I'm sorry I didn't make that clear.

10 What I was really trying to point out is that the -- there is

11 two broad categories of lung disease both obstructive and

12 restrictive.  The HRCT being a very sensitive tool, meaning

13 it's trying to include everybody that has possible lung disease

14 fulfills that criteria.  It's very sensitive.  What -- while it

15 allows us to distinguish between different categories of the

16 disease, ones who are within one category of disease, i.e.

17 fibrosis in our discussion, it breaks down.  It's not able to

18 give us enough specificity to allow us to distinguish between

19 asbestosis and the other causes of fibrosis.

20          THE COURT:  So it's not specific within the

21 categories once you get to a category, restrictive versus

22 obstructive.

23          THE WITNESS:  That's correct.

24          THE COURT:  Okay, thank you.

25 Q    But it does allow clinicians to use HRCT to diagnosis

                **J&J COURT TRANSCRIBERS, INC.**

CC-BLG000934

1 asbestosis, correct?

2 A    I think it suggests it as an aid in that process, yes.

3 Q    Okay.  Were you aware that in Dr. Henry's study they

4 ignored any HRCT images that came in with the sample of x-rays?

5 A    I can't speak specifically to how they handled HRCT

6 scanning in that study.

7 Q    Let's talk about the health effects of asbestosis.  One of

8 the things that was found in your father's study of the cement

9 workers is that people who had asbestosis were four times more

10 likely to die of lung cancer than people who did not, is that

11 correct?

12 A    That's correct.

13 Q    So that's one consequence if you are diagnosed with

14 asbestosis, you are four times more likely to die of -- to get

15 lung cancer, correct?

16 A    Yes.

17 Q    And most people who get lung cancer eventually die of it,

18 right?

19 A    That's right.

20 Q    Would you also agree with me that asbestosis is a chronic

21 condition?  There is no way to cure it.

22 A    That is also correct.

23 Q    Do you also agree with me that if you have asbestosis, you

24 are more susceptible to respiratory infections?

25 A    I'm not aware of any studies that look at asbestosis

**J&J COURT TRANSCRIBERS, INC.**

Weill - Cross/Finch                                    122

1  specifically although it's true of any chronic lung condition.

2  Q    So any kind of chronic interstitial fibrosis can make you

3  more susceptible to lung -- to infections?

4  A    I would agree with that.

5  Q    Okay.  Would you agree that asbestosis causes a lung

6  function decline in some people?

7  A    Yes.

8  Q    Would you agree with me that most people who get

9  asbestosis don't die from it?

10          MR. BERNICK:  Your Honor, I object to this line of

11  questioning.  I don't know what it has to do with the witness's

12  direct examination.

13          THE COURT:  He's an expert in -- he's been qualified

14  as an expert in this area.  I think this is clear that it's

15  cross examination.  It's overruled.

16  A    I'm sorry.  Could you repeat the question?

17  Q    Would you agree that most people who contract asbestosis

18  don't die from it?

19  A    It depends.  It really depends on the severity of the

20  disease.  So I can't give you a percentage in the broad

21  category of asbestosis how many die and how many don't.

22  Q    Would you agree that a person can have asbestosis without

23  knowing it?

24  A    Yes.

25  Q    And on the pulmonary function test scores, one of those

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000936

1  measurements is force vital capacity?

2  A    Right.

3  Q    And that is expressed as a percentage of predicted value?

4  A    That's also right.

5  Q    So in order for someone to show up as abnormal on a

6  pulmonary function test for force vital capacity, FVC, you have

7  to be below 80 percent of predicted is one way they calculate

8  that, correct?

9  A    That's one way.

10 Q    Another way to calculate it is below the lower limits of

11 normal meaning two standard deviations from the mean, correct?

12 A    Also correct.

13 Q    Okay.  And so --

14        MR. BERNICK:  Your Honor, again this witness offered

15 testimony about how to perform the pulmonary lung function test

16 period.  He was not offered for purposes of getting into any

17 other aspects of lung function and how to deal with it.  Now it

18 may be that we could have him testify about that but that's not

19 -- his nickel is part of his case, not my case.

20        THE COURT:  But it's still cross examination and he's

21 still an expert in this area.

22        MR. BERNICK:  Sure, but what he can't go to cross

23 examination -- it can't be cross examination and go to his

24 credibility or use for impeachment unless he has said something

25 in his direct that is contradictory.  And he didn't address

CC-BLG000937

1 this in direct.

2            THE COURT:   Well he hasn't address this specifically

3 in his direct.   I'll give you a little leeway Mr. Finch, but

4 you are going pretty far afield on this testimony.

5            MR. FINCH:   I have two more questions about this

6 topic and then I'll move to one other topic and that'll be it.

7 Q    Would you agree with me in the measuring of lung function

8 decline, let's say a person starts out at 110 percent of

9 predicted.   Okay, let's say that they are a world class runner.

10 And their lung function declines from that to 85 percent of

11 predicted on forced vital capacity.   Understand that

12 hypothetical?

13 A    I do.

14 Q    That person is still going to show up as normal on a lung

15 function test?

16            MR. BERNICK:   Objection.   This is the same -- this is

17 a hypothetical that has no tie to anything in particular.

18 Again if he wants to do this he can do this as part of his

19 case, not this case.

20            THE COURT:   That's sustained.

21            MR. FINCH:   All right, Your Honor.   One other thing.

22 Q    In terms of the American Thoracic Society Mr. Bernick

23 asked you about the 1986 American Thoracic Society statement.

24 Do you recall some questions about that?

25 A    I do.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000938

1  Q    Could you turn in your book to an exhibit that's been

2  marked ACC FCR 621?

3  A    I've got it.

4  Q    This was previously marked as Grace 280, Your Honor.  This

5  is the 1986 American Thoracic Society Statement?

6  A    Yes, it is.

7  Q    Could you turn on the elmo quickly?  Do you remember Mr.

8  Bernick showing you this list of -- zoom it out.  Right there.

9  Do you remember Mr. Bernick showed this list of conditions that

10 mimic the radiographic appearance of asbestosis?

11 A    Yes, I do.

12 Q    Could you turn in the American Thoracic Society 1986

13 guidelines on Page 367?

14 A    I've got it.

15 Q    The last paragraph above the summary.  It's Exhibit 621.

16 A    Yes.

17 Q    The last paragraph above the summary the American Thoracic

18 Society writes there are diseases unrelated to asbestos

19 exposure but with similar symptoms.  These may occur in some

20 persons with asbestos exposure.  However, given a clear history

21 of exposure to asbestos, a diffuse interstitial fibrosis can be

22 assumed to be due to the asbestos as other forms of

23 interstitial fibrosis are relatively uncommon.  Is that the

24 ATS's views?

25 A    Yes.

J&J COURT TRANSCRIBERS, INC.

CC-BLG000939

1  Q    And they haven't changed that view?

2  A    I don't think so, no.

3         MR. FITCH:  Your Honor, I pass the witness.  Thank

4  you, Dr. Weill.

5         THE WITNESS:  Thank you.

6         THE COURT:  Mr. Mullady.

7         MR. MULLADY:  Thank you, Your Honor.

8                    CROSS EXAMINATION

9  BY MR. MULLADY:

10  Q    Good afternoon, Dr. Weill.

11  A    Good afternoon.

12  Q    Is the elmo still up?  Thank you very much.  On direct

13  examination, you discussed the Hughes Weill study on asbestos

14  as a precursor of asbestos related lung cancer.  Is that

15  correct?

16  A    Yes.

17  Q    We're showing the article on the elmo at this time,

18  correct?

19  A    Yes.

20         THE COURT: I'm sorry.  What's the exhibit Mr.

21  Mullady?

22         MR. MULLADY:  This is GX-590.

23         THE COURT:  Thank you.

24  Q    And you told us, Doctor, that this article provides a

25  biologically plausible hypothesis linking lung fibrosis and

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000940

1 cancer as common mediators, correct?

2 A    Actually this article provided epidemiologic evidence.

3 Not so much biologic plausibility.

4 Q    Understood.

5        MR. BERNICK: If you could get a little close to the

6 mic, it would be easier for us to hear.

7 A    Sorry, I was mentioning that this article and my testimony

8 about it provided epidemiologic evidence regarding the

9 attribution question not so much the biologic plausibility

10 issue.

11 Q    Understood.  You showed us this slide illustrating your

12 hypothesis, GX-2130.  Do you recall this?

13 A    Yes.

14 Q    And the theory is essentially that asbestos is a lung

15 carcinogen because of its ability to cause lung fibrosis,

16 right?

17 A    Yes, in part, yes.

18 Q    And that theory is actually discussed in the Hughes Weill

19 article toward the end of the paper.  Do you recall that?

20 A    Yes.

21 Q    The study authors had this to say about the theory.  The

22 current study is the latest in emerging body of evidence

23 supporting the view that asbestos is a lung carcinogen because

24 of its ability to cause lung fibrosis.  Nevertheless, further

25 results and support of these findings is necessary before a

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000941

1  firm conclusion concerning such a mechanism can be reached.

2  Did I read that correctly?

3  A    You did.

4  Q    So it's only a hypothesis. Further study is needed,

5  correct?

6           MR. BERNICK:  Objection.  What is a hypothesis?

7  Objection to the form of the question.  I'm not sure everybody

8  understands or not.  What is the reference about what is the

9  hypothesis?

10 Q    I'm referring, Doctor, to the hypothesis that is discussed

11 in the article as opposed to your biologically plausible

12 hypothesis.

13          MR. BERNICK:  Again, I would then object.  He's

14 directed the witness to a particular paragraph dealing with a

15 particular feature that is being discussed in that article, not

16 the article as a whole.  If the reference is to the what is

17 discussed in that paragraph, I understand the question.

18          THE COURT:  Restate the question, Mr. Mullady,

19 specific as to what the hypothesis is you are referring to

20 please.

21 Q    Doctor, let's just take a step back.  You would agree that

22 the study authors here characterize their work as the latest in

23 an emerging body of evidence supporting the view that asbestos

24 is a lung carcinogen because of its ability to cause lung

25 fibrosis?

CC-BLG000942

1  A    I don't think the -- I don't think the authors were

2  suggesting a biologic explanation for their findings.

3  Q    That wasn't my question.

4  A    I'm not sure what it is then.

5  Q    I'm simply asking you if the Hughes Weill authors stated

6  in their paper that their study which they refer to as the

7  current study was at that time the latest in an emerging body

8  of evidence supporting the view that asbestos is a lung

9  carcinogen because of its ability to cause lung fibrosis?

10  A    Yes.

11  Q    And they go on to say nevertheless further results in

12  support of these findings are necessary before a firm

13  conclusion concerning such a mechanism can be reached, correct?

14  A    That's what they conclude.

15  Q    Right.  So the mechanism that they are hypothesizing in

16  this article, you would agree that they were saying that that

17  is a hypothesis and that further study is needed to confirm it?

18  A    That's what they are saying, but remember this is over 15

19  years ago that this article was published.  So there's been

20  more recent work on the molecular aspects of this question.

21  Q    But it is still fair to say, isn't it Doctor, that to date

22  the medical and scientific community has not reached a firm

23  conclusion concerning the hypothesized mechanism?

24  A    The hypothesized mechanism?

25  Q    Correct.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000943

Weill - Cross/Mullady                    130

1 A    I think what can be said is that since 1991 there's been

2 additional evidence and additional research that's proved

3 informative.  Now to say that it is completely worked out and

4 perfectly understood would be an overstatement.

5 Q    You testified that it's your opinion that you can't have

6 asbestos related lung cancer in the absence of asbestosis,

7 correct?  We talked about that?

8 A    Yes.

9 Q    In other words, you believed asbestos exposure alone does

10 not cause lung cancer, correct?

11 A    Yes.

12 Q    But asbestos exposure alone can certainly cause

13 asbestosis.  You don't disagree with that?

14 A    No, I do not.

15 Q    And asbestosis can cause lung cancer, correct?

16 A    Yes.

17 Q    And putting on the elmo here a slide that you used in your

18 direct.  This is 2130, GX-2130.

19         THE COURT:  I think it's 2139.

20         MR. MULLADY:  Oh, I'm sorry.

21 Q    2139, 39. And here you are indicating that as between

22 asbestosis and lung cancer there is a direct connection and you

23 put the word yes here for that reason, correct?

24 A    Yes.

25 Q    But we could also draw an arrow from asbestosis exposure

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000944

1  alone to asbestos -- excuse me, I'll restart this question

2  again.  We could also draw a line from asbestos exposure alone

3  to asbestosis and we could put yes next to that as well,

4  couldn't we?

5  A    You could put yes.  But you would also have to have a

6  pathway of course that says no.  Because not everybody that is

7  asbestos exposed is going to develop asbestosis.

8  Q    But with that caveat you would be comfortable making that

9  connection and using the word yes?

10 A    In that very narrow sense, yes.

11 Q    I want to ask you some questions about your testimony on

12 the taking of an exposure history.  I think you told us in your

13 report that the proper taking of a careful exposure history is

14 vital when diagnosing an asbestos related condition, correct?

15 A    Yes.

16 Q    Can we have 597 please?  I'm having your expert report

17 pulled up from October of 2006 where you discussed the history

18 that a clinician should take from a person presenting with a

19 possible asbestos related disease.  Do you recall that in your

20 report?

21 A    Yes.

22 Q    Okay, we have it on the screen.  At Page 52, excuse me,

23 yes 52 we can go there under exposure history.  You told us

24 that the history should not simply contain job titles and the

25 company name of where one worked but rather comprehensive

CC-BLG000945

1  information about the chronology of workplace exposures,

2  frequency of exposures, type of respiratory protection used and

3  proximity to others using asbestos products in the work

4  environment, correct?

5  A     That's correct.

6  Q     Can we have 407 please?  This is the W.R. Grace asbestos

7  personal injury questionnaire that was given to claimants in

8  this case, Doctor.  I just want to refer you to Part 3 on Page

9  9 of this form which is where the claimants were asked to

10  provide evidence of their direct exposure to Grace asbestos

11  containing products.  It's a little bit small.  I hope you can

12  read it.

13  A     I'm sorry, where am I looking?

14  Q     Top of this Page 9, Part 3, direct exposure to Grace

15  containing asbestos -- Grace asbestos containing products.  Do

16  you see that?

17  A     Yes.

18  Q     And we see here that the Grace claimants were asked to

19  provide information in the nature of exposure column on the far

20  right of the chart and we're going to blow this up a little bit

21  so you can see it.  It's a little dark but I think you can make

22  out the words nature of exposure.  Do you see that?

23  A     I do.

24  Q     They were asked, if we can go back up to the top on the

25  instructions, they were asked to indicate the letters

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000946

Weill - Cross/Mullady                              133

1  corresponding to whether the claimant was in "any of the

2  following" during his exposure and the choices are listed in

3  Paragraphs A through E.  Do you see that?

4  A    Yes.

5  Q    Now --

6        MR. BERNICK:  Your Honor, this does go beyond the

7  scope of the direct examination and all I can say is the door

8  is now open to the witness testifying about the -- about what

9  actually happened in filling out these forms.  I'm happy to do

10 that but this goes beyond the scope. I feel obliged to say this

11 goes beyond the scope of direct examination and opens the door

12 to another area of inquiry that I intend to pursue.

13       MR. MULLADY:  I think Mr. Bernick is a little bit

14 ahead of himself.  I think when he sees what I'm doing with

15 this he might not have this concern.

16       THE COURT:  All right.

17 Q    Directing your attention to Paragraph, I think that's E, a

18 worker in a space -- a worker in a space where Grace asbestos

19 containing products were being installed, mixed, removed, or

20 cut by others.  Do you see that?

21 A    Yes.

22 Q    Now Doctor, given that one of the elements of an

23 appropriate history, exposure history, in your view is to

24 determine whether the worker was in, as you say, proximity to

25 others using asbestos products in the work environment.  Does

J&J COURT TRANSCRIBERS, INC.

CC-BLG000947

1 knowing that the worker was in a space where asbestos products

2 were being used, without more, give you a basis as a clinician

3 to conclude that the worker has an asbestos related disease?

4          MR. BERNICK:  Objection.  Is that the sole piece of

5 information in the hypothetical, just that?

6          MR. MULLADY:  Yes.

7 A    As I understand, you are asking if I would consider that

8 information as part of the whole?

9 Q    No.  I'm saying that if that's all you knew that the

10 worker worked in a space where Grace asbestos products were

11 being used by others, as a clinician would that be enough of an

12 appropriate exposure history to determine whether that worker

13 has an asbestos related disease?

14 A    It really depends on the exposure.  I don't think I can

15 make a generic comment about that.

16 Q    But would you agree that as a clinician trying to

17 determine if this individual, this hypothetical individual, has

18 an asbestos related disease you would want to know about the

19 size of the space or just how closely the patient worked to

20 asbestos?  Wouldn't you?

21          MR. BERNICK: Objection to the form of the question

22 and lacks.foundation.

23          THE COURT:  Overruled.

24 Q    I think you answered it.  Can you repeat your answer?

25 A    I think that would be helpful information.


                J&J COURT TRANSCRIBERS, INC.

CC-BLG000948

1 Q    You agree that clinicians should quantitate --

2 qualitatively figure out if the patient you are talking to has

3 enough exposure to increase the risk of disease because it's

4 impossible to accurately quantify the individual's exposure.

5 Is that correct?

6         MR. BERNICK:  That question is compound number one.

7 Number two, the second part of it exceeds at least based upon

8 the proffer so far, the scope of his expertise.

9         THE COURT:  Let me see if I got this correct because

10 if I did, I have to sustain this objection.  Do you want to

11 restate the question?

12        MR. MULLADY:  I'll withdraw the question and just

13 refer the witness to his deposition testimony.

14        THE COURT:  Okay.

15 Q    Do you recall giving deposition in this case, Doctor?

16 A    Yes, I do recall it.

17        MR. BERNICK:  Your Honor, the fact that he's given a

18 deposition is relevant if it's impeachment, the impeachment of

19 a statement.  What's the statement that's being impeached.

20        THE COURT:  That's sustained too.

21 Q    Do you agree, Doctor, that a clinician assessing whether a

22 patient has an asbestos related condition should qualitatively

23 determine if the patient has had enough exposure to asbestos to

24 increase the risk of disease?

25 A    To the extent that you are unable to do it quantitatively,

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000949

1 the answer is yes.

2 Q    And often as a clinician you are unable to quantify the

3 amount of asbestos and you must make that qualitative judgment,

4 is that correct?

5 A    In an individual case, that is true.

6 Q    You showed us a demonstrative, this is 2160, if we can

7 have the elmo back up please.  This demonstrative discussed the

8 components and methodology for generating a reliable diagnosis.

9 Do you recall this?

10 A    Yes.

11 Q    And this is where you put into two categories different

12 types of exposure evidence.  Some anecdotal and those which

13 would fall under the rubric of epidemiologic evidence, correct?

14 A    Yes.

15 Q    My question is with reference to the question on the PIQ

16 about whether the worker is or was in a space, would it be fair

17 to say that would be another type of anecdotal information that

18 would go over here?  I was in a space.  Would you agree with

19 that?

20 A    .I would certainly agree with that.  What I'm unsure of is

21 that is the only information you have because I'm not familiar

22 with what studies are available regarding Grace exposure

23 quantitatively in a space.

24 Q    With that qualification, what I've written there that's

25 the appropriate place for it.  It's in the anecdotal category.

CC-BLG000950

1          MR. BERNICK:  Objection.  First of all that doesn't

2    even properly quote Category E.  B, it takes it out of context

3    of the other questions that were asked with respect to it.  So

4    to the extent that that question purports to refer to the

5    questionnaire, it is misleading and it is incomplete.

6          THE COURT:  Well the question proffered to the

7    witness was not incomplete but the statement that was just

8    added to the chart does not reflect what was on the PIQ.  So to

9    the extent that you want something added to the chart that is

10   reflective of the PIQ right now I'll understand that to be the

11   shorthand explanation of what is on the PIQ.  But you are going

12   to have to write out what was on the PIQ.  If that is what you

13   are attempting to do.  The witness has said it's anecdotal

14   except he doesn't know whether there are any quantitative

15   studies to back up the data.  So I think the record is clear.

16         MR. MULLADY:  I don't think I need to rewrite it but

17   let me just ask the witness.

18   Q    You would consider it to be anecdotal if the worker said I

19   was in a space where Grace asbestos containing products were

20   being installed, mixed, removed or cut by others?

21         MR. BERNICK: And that is the only information that

22   was provided?

23         MR. MULLADY:  Correct.

24   A    If that's the only thing a patient says, it's anecdotal.

25   Q    Thank you.

J&J COURT TRANSCRIBERS, INC.

CC-BLG000951

1      MR. MULLADY:  That's all I have for the witness.

2  Thank you, Your Honor.

3      THE COURT:  All right.  Mr. Bernick, are you going to

4  have redirect?

5      MR. BERNICK:  I will.

6      THE COURT:  How long?

7      MR. BERNICK:  Probably around 15, 20 minutes max.

8      THE COURT:  Why don't you do it and then we'll take a

9  lunch break?

10      MR. BERNICK: If I could ask it's just going to take

11  time to get things together.  I know it will go more quickly if

12  we take a lunch break.

13      THE COURT:  All right.  We'll recess until 1:30

14      MR. BERNICK: Is there anybody else that has --

15      MR. FINCH:  Your Honor, does the rule on witnesses

16  apply in Delaware?  I would ask that the witness not be allowed

17  to consult.

18      THE COURT:  Oh yes, Doctor, you are not allowed to

19  consult with counsel concerning your testimony during the lunch

20  recess.  All right.  We'll be in recess until 1:30.

21                     (Lunch Break)

22      THE COURT:  You are still under oath, Dr. Weill.  Mr.

23  Bernick.

24                  REDIRECT EXAMINATION

25  BY MR. BERNICK:


                    **J&J COURT TRANSCRIBERS, INC.**

1  Q    If we could show TJ -- 2125.  If we took a look at this
2  fundamental slide that posed the issue that you framed for us,
3  Dr. Weill, which is does asbestos exposure alone without
4  asbestosis cause lung cancer. I want to deal with a couple of
5  the studies that were discussed with you on cross examination
6  to see how it is that they fit in.  In fact what I might do is
7  if I could switch over to the elmo a second and use a hard copy
8  of the same document.  So the question -- it should be on.  Is
9  there any reason why it's not?  No it looks to be on but I
10 don't get anything here.  Nothing like rebooting. Rebooting
11 solves all the problems in the world, right.
12            So where -- the two questions that you posed or the
13 question that you posed was is asbestos exposure alone tied to
14 lung cancer or must their be asbestosis or put differently,
15 without asbestosis that is with asbestos exposure alone do you
16 get lung cancer?  Is that a correct statement of the question?
17 A    That's correct.
18 Q    Now you talked about two basic studies.  There was the
19 Selikoff study or the insulators.  Where do I put the
20 insulators if I want to ask the question what did the
21 insulators tell me about?
22 A    So on this slide, this would be Category 1 that there is
23 only asbestos exposure alone.
24 Q    For the insulators?
25 A    For the insulators.

CC-BLG000953

1  Q    But then what about when you get to the insulators as

2  updated by the Kipen work?

3  A    If you then follow the Kipen work and get pathologic

4  information as in Kipen you see that the asbestotics were at

5  higher risk in that cohort for lung cancer.

6  Q    Now once you know that from Kipen, where does the cohort

7  belong?  Does this cohort tell us about what happens for lung

8  cancer with asbestos alone?  Asbestos exposure alone or is this

9  a cohort that tells us about workers who have asbestosis as

10 well?

11 A    Once you have Kipen it's asbestosis.

12 Q    So we put the insulators over here.  But through the

13 insulators can you find out about asbestos exposure alone?

14 That is now with the benefit of Kipen, is there any way to go

15 back to the insulators and figure out if asbestos alone is

16 enough to get you there?

17 A    No.  There's no way to figure that out.

18 Q    Now let's talk about the Hughes Weill study.  Where does

19 the Hughes Weill study fit in?

20 A    That would be in the category that shows an arrow between

21 asbestosis and lung cancer.

22 Q    Okay.  And this is now the asbestos cement workers?

23 A    Yes.

24 Q    Okay.  Does that same study though also give us

25 information about asbestos exposure alone, that is without

                    **J&J COURT TRANSCRIBERS, INC.**

CC-BLG000954

1  asbestosis?

2  A     It does.

3  Q     And on the basis of the asbestos cement workers, is that

4  what then leads you to answer the question here yes and the

5  question that is asbestos alone no?

6  A     Correct.

7  Q     Now I want to ask you about a different study that was put

8  to you on cross examination which is the Per Gustovson study.

9  Are you familiar generally with this study?

10 A     Yes.

11 Q     And I've got a copy here in case you need to make

12 reference to it.  But in this study is there anywhere in this

13 study that there is sufficient specificity in the data to

14 enable us to answer the question of whether asbestosis is tied

15 to lung cancer?

16 A     No.

17           MR. FINCH:  Objection leading.

18 Q     You tell me if that study belongs number 2, number 1 or

19 actually someplace else.

20 A     No, it belongs in number 1.  It's an asbestos expose

21 cohort and that's the information you have in that study.

22 Q     On the basis of that study though can you tell whether

23 it's asbestos exposure alone or whether there is also

24 asbestosis?

25 A     No.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000955

Weill - Redirect/Bernick                    142

1     MR. FINCH:  Objection, leading.

2  Q    Now if we have -- if this is a situation where there is

3  high asbestos exposure or just say asbestos exposure.  In that

4  case it's low.  Asbestos exposure and asbestosis, both at the

5  same time, but all that's being reported is the asbestos

6  exposure.  First of all, is that what's going on in that study?

7     MR. FINCH:  Objection.  Leading.

8     THE COURT:  It is leading Mr. Bernick.  You are going

9  to have to --

10    MR. BERNICK:  Well I'm just trying -- it's really

11 foundational to another question.

12 Q    I'll put it to you very simply.  Tell us whether or not

13 you can find out from that study whether or not the people in

14 that study also had asbestosis?

15 A    There's no information in that study on that point.

16 Q    On the basis of that study, is it possible to test or to

17 answer with specificity the question that you have posed here?

18 A    No.

19 Q    Is that study unique that way or is that also true of

20 other studies?

21 A    Also true of other studies.

22 Q    Now Mr. Mullady made a little diagram.  He said --

23    MR. MULLADY:  Objection to little.

24 Q    Okay, we'll blow it up real big.  GC-2140 and he said well

25 isn't it true that where you have asbestos exposure you have a

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000956

Weill - Redirect/Bernick                    143

1  risk of asbestos?  And you do this one here and you say well

2  yeah, there are a certain number of people who have asbestos

3  exposure, get asbestosis and a certain number of people with

4  asbestosis on your theory get lung cancer.  You said that's

5  true.

6        Now does this idea that is because you can't get

7  asbestosis without asbestos and because with asbestos you may

8  get lung cancer, does that tell you the answer to the question

9  at all about whether asbestos exposure alone and the absence of

10 asbestosis contributes to or has associated with it a risk of

11 lung cancer?

12 A    No.

13 Q    Tell us why not?

14 A    Because remember as I pointed out in the response to that

15 question there is another arrow that has to lead off into the

16 no category.  In other words those that were asbestos exposed

17 but did not develop asbestosis.  So there is a yes and a no

18 leading from asbestos exposure alone.

19 Q    Therefore in order to answer this question, this direct

20 that is what about the people who have asbestos exposure as a

21 group, do they have an increased risk of lung cancer, that is

22 asbestos alone --

23        MR. FINCH:  Objection leading.

24        MR. MULLADY:  I didn't ask the question yet.

25 Q    I said in order to answer the question, tell us what you

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000957

1  have to do?

2  A    Without the presence or the absence of asbestosis and

3  information on that you are not able to say.

4  Q    Now turning back to 2142 I want to tee up this question.

5  If we go back to the period of time when asbestosis the

6  criteria for asbestosis were narrower in the group of people

7  called true asbestotics were narrower, a narrower group of

8  people.  Was there or was there not in fact controversy based

9  upon science as to whether having that asbestosis, that

10 stricter asbestosis, was a prerequisite for getting lung cancer

11 due to asbestos?

12 A    There was some controversy on that point.

13 Q    Now that the definition of asbestosis has been expanded to

14 include as you've indicated anyone who demonstrates actual

15 physical evidence of any impact on the lung per se, with that

16 broad definition, tell me whether there is significant science

17 that says only thing that is clear is a history of exposure.

18 No objective evidence of impact on the lung and there is still

19 a risk of lung cancer.  Tell me is there a large body of

20 sciences out there that says that?

21           MR. FINCH: Objection.  Leading, compound.

22           THE COURT:  It is Mr. Bernick.

23 Q    In your own words, I want to frame the issue.  Now that

24 we're solely taking the people who cannot qualify for asbestos

25 because they have no objective measurements of any effect on

J&J COURT TRANSCRIBERS, INC.

CC-BLG000958

1 the lung for asbestos.  Focusing on those people, tell me in

2 your own words the state of whether there is lots of science,

3 little science that actually links those kinds of people to

4 lung cancer.

5          MR. FINCH:  Objection.  Compound and leading.

6          MR. BERNICK:  No.

7          THE COURT:  It's not leading and it's not compound

8 enough.  This witness can answer the question.

9 A    I think the reliable scientific evidence demonstrates that

10 without the presence of asbestosis you cannot attribute lung

11 cancer to asbestos exposure.  So on the question of just the

12 asbestos exposed patients without information either pathologic

13 or radiographic, you can't say.  You just can't determine

14 whether or not you have an asbestos contributable lung cancer.

15 Q    Okay.  Are you aware of any kind of consensus statement

16 that says no, there really is science that robustly

17 demonstrates that relationship?  Have you heard of any such

18 consensus statement?

19          MR. FINCH:  Objection, leading.

20 A    No.

21          THE COURT:  No, it's are you aware.  That's not

22 leading.

23 Q    Has any such study been pointed out to you here today?

24 A    No.

25 Q    Let's talk about HRCT.  HRCT I think you talked about as

CC-BLG000959

1  being, and Mr. Finch I believe read to you some portions of the

2  2004 ATS statement with regard to the diagnosis of non-

3  malignant disease.  In the greater sensitivity, I would like to

4  see in fact if I can dig that out at some point.  But tell me

5  whether the -- today there is anything either an ATS

6  recommendation or some other document that sets out the grading

7  to follow in using an HRCT that runs parallel to the grading

8  that you have for x-rays into the ILO?

9  A    No, that's never been done.

10 Q    Is that -- I just want to direct your attention -- turning

11 to GX-0274 in evidence. I want to direct your attention to this

12 language where it says a proposal zoom -- a proposal has been

13 put forward for a classification system analogous to that of

14 the ILO system for plain chest radiograms.  But none has been

15 widely adopted.  Do you see that statement there in the more

16 current ATS statement?

17 A    Yes, I do.

18 Q    Absence such a grading system, is there a way to use HRCT

19 to do the kind of epidemiological study that was done of the

20 cement workers?

21 A    No, not in my opinion.

22 Q    What about pathology?  Is pathology something that was

23 available to be used to do the kind of epidemiological analysis

24 that was done of the asbestos cement workers?

25 A    No, it wasn't available.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000960

1 Q    Based upon the currently available technology of the fact

2 that there is now currently available technology for HRCT but

3 with no classification system or pathology, does that in any

4 way diminish the significance or reliability of the findings

5 that were made in the asbestos cement study?

6 A    No.

7 Q    I want you to assume that there was a more sensitive

8 technique that was available to do the work that was done in

9 the asbestos cement study.  You know, more sensitive, could

10 pick up asbestos more readily and you could classify it and do

11 everything that you wanted to rate.  And that the result of

12 that was that more asbestosis was found in that study than was

13 picked up by the x-ray reads.  Would that necessarily -- would

14 that have had any necessary effect one way or another on the

15 outcome of that study?

16         MR. FINCH:  Objection.  Leading.

17 A    It likely would have had an effect --

18         MR. BERNICK:  Well wait.

19 Q    Would it have had an effect one way or another --

20         THE COURT:  No, overruled.

21 A    It likely would have had an effect but not in a

22 predictable way.

23 Q    And what do you mean by that?

24 A    Well, anytime you employ a more sensitive test to include

25 more people in the possibility of having disease, you're going

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000961

1  to change the dynamics of the study.  So when doing that you

2  can't really predict how the study is going to come out.

3  You've changed diagnostic tools, particularly one that's much

4  more sensitive, as in the case of HRCT, and you'll likely

5  change results in some unpredictable way.

6  Q    Well, but differently.  If radiograms, or reading x-rays,

7  is less precise, does that fact give a bias one way or another

8  in the outcome of the Asbestos Networker study?

9  A    No.

10  Q    If -- for Dr. Henry's study he looked at the x-rays and

11  weather -- which of the x-rays were found to comply with the

12  standards and which not.  In aid of that issue, would pathology

13  -- using pathology had fit into his study?

14  A    No.

15  Q    Mr. Mullady asked you a bunch of questions about this

16  particular language that appears as part of GX0590, which was

17  not in evidence but was referred to.  He said, "Do you see

18  where it says, 'The current study is the latest in the emerging

19  body of evidence supporting the view that asbestosis is a long

20  carcinogen because of its ability to cause lung fibrosis;

21  nevertheless, further results in support of these findings are

22  necessary before a firm conclusion concerning such a mechanism

23  can be found?'"  Do you remember being asked a whole bunch of

24  questions about that?

25  A    Yes, I do.


**J&J COURT TRANSCRIBERS, INC.**

1 Q    Does that statement in some fashion diminish the analysis

2 of data that was set forth in this study?

3 A    No.  As I mentioned, this study speaks to the epidemiology

4 regarding causation.  The mechanism, or the biologic factors

5 taking place, is an entirely different question.

6 Q    I also want to go on and say -- do you see where he goes

7 on to say, "Finally, these data may provide further evidence to

8 support the common practice of attributing lung cancer to

9 exposure to asbestos only if asbestosis is also present.

10 Otherwise, these tumors are, in most instances, due to

11 cigarette smoking."  Do you see that statement?

12 A    Yes.

13 Q    Where you have asbestos exposure alone, no asbestosis --

14 I'm now pointing to G12140 -- and you have smoking, so asbestos

15 exposure alone and smoking and a case of lung cancer, tell me,

16 you know, just how -- tell me the significance of the presence

17 of smoking as an explanation for the lung cancer?

18 A    It would be very significant.

19 Q    How strong is that risk factor?

20 A    Cigarette smoke is a very strong carcinogen, and even with

21 say a 20 pack year cigarette smoking history, which would be

22 considered I think a moderate smoking history, the risk of

23 developing lung cancer is 20 fold versus those who don't smoke.

24 So it's a very strong carcinogen.

25 Q    You were asked a question about whether the ATS statement

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000963

1 made any requirement about having multiple B-reads.  Do you

2 recall that?

3 A    Yes, I do.

4 Q    Is there or is there not an independent requirement that

5 bears upon that question?

6 A    I'm not sure I understand the question.

7 Q    Is there a separate standard, a separate and independent

8 standard, that bears upon that question?

9 A    Yes, the NIOSH.

10 Q    And was that the basis of your testimony on direct?

11 A    Yes.

12 Q    Okay.  Finally, with regard to the questions that were

13 asked of you regarding exposure, I believe that Mr. Mullady

14 elicited testimony from you that when it comes to doing a

15 diagnosis, a careful analysis of all the facts that bear upon

16 the individual who's being diagnosed, that a careful analysis

17 is appropriate, and you agreed with him.  Do you recall that?

18 A    Yes.

19 Q    Okay.  Once you've done that careful analysis, that's once

20 the data is all there, does all of the data that may be

21 gathered carry equal weight?

22 A    Not necessarily, no.

23 Q    We showed -- or you showed the Court Exhibit 2160.  What

24 relevance, if any, did this document have in talking about once

25 you've got the individual data what weight to give to different

CC-BLG000964

1 parts of it?

2 A    Well, I think what the epidemiologic studies allow us to

3 do is develop a framework to evaluate the individual patient,

4 and so the epidemiologic studies are important to develop that

5 framework when used in combination with the anecdotal

6 information.

7 Q    Okay.  And is all of the -- I mean -- I think Your Honor

8 probably already understands well where this is going, so I'll

9 skip over it, and it's probably somewhat unnecessary to get

10 into this as well, but relating -- pertaining to Exhibit

11 ACC/FCR407, which was the questionnaire -- remember that Mr.

12 Mullady wanted to ask you a bunch of questions about it.  I

13 just want you to focus on this whole page.  Only assume that

14 this question is being asked, and he asks you, "Well,

15 essentially is that kind of limited information?" And you

16 agreed with him that it was.  I now want you to look at the

17 rest of page where you have all these other categories, and

18 then for each job description you've got different job

19 descriptions, products, basis for identification, dates and

20 frequencies of exposure, occupation codes, industry codes, and

21 then a further column that's marked there relating to the kind

22 of exposure.  I ask you the same question.  Is this or is this

23 not the kind of information that you would want to have in

24 reaching an assessment about how important the exposure was?

25 A    It is the kind of information you'd want.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000965

1 Q    I now further want you to assume that there's industrial

2 hygiene data that on the basis of these answers enables an

3 industrial hygienist to specify what the exposures are so that

4 you can compare them to the epidemiological studies.  With the

5 benefit of all of that information, what relevance is that --

6 what relevance, if any, does that have to performing a proper

7 differential diagnosis?

8 A    It's very relevant.

9          MR. MULLADY:  Objection, Your Honor.  Objection.  I

10 think we're now outside the scope of the cross.  I didn't ask

11 him about industrial hygiene --

12          MR. BERNICK:  Well, that's the whole point, is that

13 you excluded that from the question.

14          THE COURT:  It seems to me that this is fair with

15 respect to the issue of what the impact of the anecdotal data

16 compared to the epidemiological studies and the comparison of

17 the two, which seems to be the thrust of both the direct and

18 the redirect, so -- or the cross, pardon me -- so I'm going to

19 let a little leeway, but  --

20          MR. BERNICK:  It's the last --

21          THE COURT:  -- not too far, Mr. Bernick.

22          MR. BERNICK:  Yes.  Because I understand that Your

23 Honor probably well gets the drift of this.  I just want to

24 make sure that the record is clear.

25 Q    Where all of that is present, that is you have -- you have

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000966

1  the ability to know what the person did, what their jobs are

2  and the industrial hygiene data that is associated with that,

3  at that point is it satisfactory to simply aim for a

4  qualitative assessment, or do you want to aim for more?

5  A    You want to aim higher.

6  Q    Okay.  And if you can aim higher, what impact does that

7  have on the ability to conduct a meaningful differential

8  diagnosis, if any?

9  A    It just raises your certainty about the type of asbestos

10 exposure the worker got.

11            MR. BERNICK:  I have nothing further, Your Honor.

12            MR. FINCH:  Brief recross, Your Honor?

13            THE COURT:  Yes, sir.

14                    RECROSS EXAMINATION

15 BY MR. FINCH:

16 Q    Dr. Weill, do you still have the book that I gave you up

17 there?

18 A    Yeah.

19 Q    Okay.  Could you turn to the Hughes-Weill study?

20 A    Could you give me the number again?

21 Q    It's Exhibit Number 628.

22 A    I've got it.

23 Q    And in that study the dividing point for asbestosis was

24 1/0, correct?

25 A    That's right.


                    **J&J COURT TRANSCRIBERS, INC.**

CC-BLG000967

1  Q    So even though the ATS standard hadn't changed from 1/1 to

2  1/0, your father considered 1/0 sufficient to be asbestosis,

3  correct?

4  A    Yes.

5  Q    All right.  The Gustavsson study, that's Exhibit 331, Mr.

6  Bernick asked you some questions about that study on direct.

7  Do you recall that?

8  A    Yes.

9  Q    Could you turn to Page Ten Twenty of that study?  It is

10  Exhibit Number ACC-331.

11            MR. FINCH:  It's not in evidence, Your Honor.  I just

12  used it with him on cross examination --

13            THE COURT:  Okay.

14            MR. FINCH:  -- and Mr. Bernick had some questions

15  about this on redirect.

16            THE COURT:  Yes, sir.

17  Q    Do you have Page Ten Twenty in front of you --

18  A    Yes.

19  Q    -- Dr. Weill?

20  A    Yes.

21  Q    And that shows estimates of exposure for these various

22  people --

23  A    Yes.

24  Q    -- in the top column and the relative risk for nonsmokers

25  and then -- compared to various people who smoke?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000968

1  A    Yes.

2  Q    See that?

3  A    I do.

4  Q    And what this shows is that for people with fiber

5  exposures of between 1 and 2.49 fiber years, their relative

6  risk -- even if they were never smokers, their relative risk of

7  getting lung cancer was 2.7, correct?

8          MR. BERNICK:  I object.  Your question assumes that

9  there was even more than one person who fit that category.

10          THE WITNESS:  I think --

11          MR. BERNICK:  Do you know that that's so?

12  A    That's certainly what the table shows, and I can comment

13  further, though, regarding the confidence interval.

14  Q    The current smokers, or people who were exposed to

15  asbestos at greater than two and a half fiber years, shows 40

16  times the risk of -- excuse me -- confidence intervals of 4.6

17  to 40 as compared to 6.7 and 16.6 for unexposed people?

18  A    You're going to have to try again.

19  Q    Yes, sure.  In the current smokers, you've got people who

20  smoked from one to ten cigarettes a day.  People who were never

21  exposed to asbestos, the relative risk of dying is 10.5.  For

22  people who smoked greater than two and a half -- excuse me --

23  people who had more than two and a half fiber years of

24  exposure, the relative risk was 13.5, right?

25  A    I see that.

J&J COURT TRANSCRIBERS, INC.

CC-BLG000969

1  Q    Okay.  Would you agree with me that all of the exposures

2  shown on here, zero to .99, one to 2.49 and 2.5 are levels of

3  exposure unlikely to result in asbestosis?

4          MR. BERNICK:  Well, number one, the question is

5  falsely framed because it's not 2.5 --

6          MR. FINCH:  Your Honor, it's -- this is --

7          MR. BERNICK:  I'm sorry --

8          MR. FINCH:  -- seeking objection that is improper

9  under the rules.

10          MR. BERNICK:  Okay.  Object to form.  It misreads the

11  document.  If you're going to have a witness answer a question

12  concerning the document, it should be properly read.  2.5 is

13  greater than or equal to, it's not --

14          THE COURT:  The objection is that the statement does

15  not fairly -- the question does not fairly reflect the

16  information on the document, and that is sustained.

17  Q    Okay.  Would you agree with me that for fiber exposures of

18  one to 2.49, that's unlikely to result in asbestosis?

19          MR. BERNICK:  Objection; lack of foundation.

20  A    If the --

21          THE COURT:  Wait.  Wait, doctor.

22          THE WITNESS:  I'm sorry.

23          THE COURT:  This chart does not appear to relate to

24  asbestosis.  It's relative risk of lung cancer, not

25  specifically asbestosis.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000970

1          MR. FINCH: That's my point, Your Honor. My point is

2     that these people have an increased risk of lung cancer even at

3     levels of exposure far less than what one would expect to

4     contract asbestos.

5          MR. BERNICK: You're --

6          THE COURT: Well, I don't know. The doctor was about

7     to explain some issues he has with respect to the confidence

8     intervals in looking at this chart. Perhaps if you want him to

9     explain that answer, then maybe we can get to this question.

10    Otherwise, I'm not sure that that fairly reflects this issue.

11    A    First of all, the confidence intervals, so you mentioned

12    in the never smoking group the exposure categories that

13    included one as part of the confidence interval, and so from a

14    statistician's point of view that means that the increase in

15    relative risk may be or may not be due to chance. So that's

16    one statistical point that I have to make. Secondly, you had

17    questions regarding the likelihood of those exposure levels

18    causing asbestos or not, and that would depend a lot on fiber

19    type.

20    Q    Okay. Well, you -- so you would agree with me the level

21    of exposure necessary to cause asbestosis depends on the

22    individual person's circumstances?

23         MR. BERNICK: Your Honor, at this point, the witness

24    is now being made into a witness on what the epidemiology is of

25    asbestosis, and that's being done in order to derive an

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000971

1  inference from this article.  Fair -- if he wants to do it,

2  fine, but then I'm going to have a short unfortunately

3  re-redirect --

4          MR. FINCH:  No, that --

5          MR. BERNICK:  -- based upon this article because that

6  goes beyond the scope of anything that I've asked him.

7          MR. FINCH:  All right.  I'll --

8          THE COURT:  It does.

9          MR. FINCH:  I'll withdraw the question, Your Honor.

10         THE COURT:  This is recross, so you're limited to

11 what was asked on redirect, and this was not.

12         MR. FINCH:  Okay.  Fine, Your Honor.

13 Q    One final question on the Hughes-Weill study, pathology

14 was not available for those workers, but pathology was a tool

15 that was available to doctors in the 1990s to diagnose

16 asbestosis, correct?

17 A    That's correct.

18         MR. FINCH:  Okay.  Thank you.

19         MR. MULLADY:  I have nothing.

20         THE COURT:  Mr. Mullady?

21         MR. MULLADY:  No, thank you.

22         THE COURT:  Mr. Bernick?

23         MR. BERNICK:  No, thank you.

24         THE COURT:  Doctor, you're excused.  Thank you.

25         MR. FINCH:  Your Honor, my partner Mr. Bailor is

J&J COURT TRANSCRIBERS, INC.

CC-BLG000972

1  going to handle the cross examination of this witness.

2              UNIDENTIFIED ATTORNEY:  Here, you can just take my

3  seat.  Do you need to -- I'm going to bounce down the line

4  here.

5              MR. McMILLAN:  Good afternoon, Your Honor.  Scott

6  McMillan for W. R. Grace.  We would like to call our next

7  witness, Dr. Daniel Henry.

8              THE COURT:  Dr. Henry?

9              THE CLERK:  Stand and raise your right hand.

10             DANIEL HENRY, DEBTORS' WITNESS, SWORN

11                   VOIR DIRE EXAMINATION

12  BY MR. McMILLAN:

13  Q    Good afternoon, Dr. Henry.  Could you please state your

14  full name for the record?

15  A    Daniel Henry.

16  Q    What is your occupation, Dr. Henry?

17  A    I'm a chest radiologist.

18  Q    And in general terms, what have you been asked to testify

19  about here today?

20  A    A study that I performed on a group of claimants that

21  espoused that they apparently suffered from a malignancy and

22  had radiographic evidence of asbestos exposure.

23             MR. BAILOR:  Your Honor, we would object on relevancy

24  grounds.

25             MR. McMILLAN:  Your Honor, the study that Dr. Henry

                   **J&J COURT TRANSCRIBERS, INC.**

1  did was based upon two orders that this Court entered in early

2  2007 ordering the claimants to turn over radiographic evidence

3  they had in support of their lung cancer and other cancer

4  claims explicitly for the purpose of allowing us to conduct an

5  analysis of that.  Indeed, if these are claimants who state

6  that they are relying upon this radiographic evidence in

7  support of their claim of lung or other cancer, it is entirely

8  within our purview to have our experts evaluate that

9  radiographic evidence and to present testimony to the Court on

10  the validity of that evidence.

11          THE COURT:  Well, I'm going to overrule the objection

12  for now.  I'm going to take all of this evidence under

13  advisement.  I am going to see -- as I indicated earlier in the

14  case, although I'm not sure I ever made rulings on the record,

15  that I am taking all expert opinions under advisement in the

16  case and I will rule on <u>Daubert</u> issues at the conclusion, and

17  so this witness, as all other witnesses, will be accepted --

18  the testimony will be accepted in that view.  Go ahead.

19          MR. McMILLAN:  Thank you.

20  Q    Dr. Henry, have you prepared any graphics in anticipation

21  of testifying today?

22  A    Yes, I have.

23  Q    Would it assist you in your presentation today to use

24  those graphics?

25  A    Yes, sir.

CC-BLG000974

1      MR. BAILOR:  Counsel, may I have a copy of the

2  graphics?

3      MR. McMILLAN:  Oh, I'm sorry.  I meant to give those

4  out.

5      UNIDENTIFIED ATTORNEY:  Thanks very much.

6      MR. McMILLAN:  Could I have GG-2066, please?

7  Q    Dr. Henry, could you please tell us about your education

8  and medical training briefly?

9  A    I'm a graduate of the St. Louis University School of

10  Medicine.  After an internship, I completed my training in

11  radiology at the Medical College of Virginia, or Virginia

12  Commonwealth University, in 1975.

13  Q    Could you pull the microphone --

14      MR. BAILOR:  Excuse me.  Could we have the doctor

15  pull the microphone a little closer?  I'm having a little

16  trouble hearing him.

17      THE COURT:  We'll try.  Did you -- do you need that

18  repeated?  He was explaining his educational background.

19      MR. BAILOR:  I don't think we need that repeated.

20      THE COURT:  All right.  Thank you.

21  Q    Doctor, after you completed your residency, where did you

22  go to work?

23  A    I was -- joined the United States Air Force where I was

24  accorded the rank of major and assigned to Wilford Hall Medical

25  Center as a teaching instructor to teach radiology residents in

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000975

1  the U.S. Air Force.

2            MR. McMILLAN:  Could we have the next slide, please,

3  which is GG-2067.  Dr. Henry, after you left the Air Force,

4  where did you go to work?

5  A    I assumed a position at the -- in the department of

6  radiology at the Medical College of Virginia.

7  Q    And is that the institution at which you currently work

8  today?

9  A    Yes, sir.

10 Q    What is your current position at that institution?

11 A    I'm section chief of the section of thoracic imaging.

12 Q    And do you also hold any faculty appointments?

13 A    I'm associate professor of radiology and medicine in the

14 School of Medicine at VCU.

15 Q    Have you been employed at the VCU School of Medicine

16 continually since about 1977 till the present?

17 A    Yes, sir.

18 Q    Could you please tell us which professional organizations

19 you are a member of?

20 A    I'm a member of the Radiological Society of North America,

21 the Society of Thoracic Radiology, and I'm a member and fellow

22 in the American College of Radiology.

23 Q    What is the American College of Radiology?

24 A    It's an organization that's devoted to the education and

25 other benefits of its members in the process of radiology.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000976

1 Q    Now, I see that you say that you are a member and fellow.

2 What does it take to become a fellow of the American College of

3 Radiology?

4 A    Well, it's somewhat of a secret process, but you're

5 usually elected to this post following some extraordinary

6 contribution to the welfare or benefit of the organization.

7 Q    Have you served on any committees or done other work for

8 the benefit of the American College of Radiology?

9 A    Yes.  I was invited to join the American College of

10 Radiology Committee on Pneumoconiosis in 1990, based upon my

11 activities as a B-reader and my teaching abilities.

12        MR. McMILLAN:  Could we turn to the next slide, GG-

13 2068, please?  I see you've got it up there.

14 Q    You used a term a moment ago which is "pneumoconiosis."

15 Could you please explain what pneumoconiosis is?

16 A    Pneumoconiosis is a medical term that is used to describe

17 the diseases related to the inhalation of organic or inorganic

18 dust.

19 Q    And is asbestos one of the dusts that can cause

20 pneumoconioses?

21 A    Yes, sir.

22 Q    I believe a moment ago you said that you were on a

23 committee or a task force that related to pneumoconiosis for

24 the ACR.  What did you do on that committee?

25 A    I was an instructor.  The American College of Radiology

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000977

1  provides courses for those wishing to become certified as a

2  B-reader or re-certified as a B-reader.

3  Q    And have you done any other work besides serving on that

4  committee for the ACR?

5  A    Well, I -- currently I'm the chairman of that committee,

6  but I also advise NIOSH on their teaching efforts as it relates

7  to pneumoconiosis and other activities that relate to their

8  home-study syllabus, the exams themselves and so forth.

9  Q    What is NIOSH?

10  A    NIOSH is the National Institute of Occupational Safety and

11  Health.

12  Q    And what role do they play with regard to B-readers and

13  the B-reader course that you are teaching?

14  A    They currently administer the examination and they run

15  surveillance programs around the country for patients who

16  perhaps might be exposed and might have pneumoconiosis.

17  Q    Do you participate in any of those surveillance programs?

18  A    Yes, sir, I do.

19  Q    What do you do?

20  A    I interpret films for them.  I also review their teaching

21  materials.  Currently we have a project that is ongoing as we

22  transition from analog, or basically plastic chest x-rays, to

23  the digital arena, which is much more common in today's

24  healthcare field.

25  Q    So are you working with NIOSH in the transition to digital

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000978

1  x-rays as they relate to the B-reader program and the

2  evaluation of pneumoconioses?

3  A    The B-reader program, the evaluation of potential

4  claimants, as well as the instructional process.

5  Q    Do you do any work for the Virginia Worker's Compensation

6  Commission?

7  A    Yes.

8  Q    What do you do?

9  A    We evaluate radiographs of individuals who bring claims to

10  the Commission.

11  Q    And is the work that you do for the Commission itself?

12  A    Yes, sir.

13  Q    Are you retained by any plaintiffs or defendants in front

14  of the Commission?

15  A    No, sir.

16  Q    Doctor, as part of your medical practice, do you have

17  experience with asbestos-related diseases?

18  A    Yes, I do.

19        MR. McMILLAN:  If we could have the next slide,

20  please, GG-2069.

21  Q    Could you tell us a little bit about your experience with

22  asbestos-related diseases?

23  A    My practice is dedicated entirely to thoracic imaging, or

24  chest radiology, and, in the course of the 30-year experience

25  that I've had, we encounter patients who had asbestos

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000979

Henry - Direct/McMillan                                      166

1  exposure.

2  Q     And I may not have asked you this previously.  Do you have

3  a certain specialty within the field of radiology?

4  A     Just thoracic imaging, or chest radiology.

5  Q     Do you have any educational duties or responsibilities

6  that relate to asbestos-related diseases?

7  A     Well, basically I'm an instructor or teacher to -- as a

8  physician in the school of medicine to radiology residents and

9  pulmonary fellows on all aspects of thoracic imaging, including

10 asbestos-related disorders.

11 Q     Have you ever published in peer reviewed literature

12 relating to pneumoconiosis or the ILO Classification System?

13 A     Yes.

14 Q     What have you published?

15 A     I was invited to write an article about five years ago on

16 the role of the ILO system and its current application in this

17 arena.

18         MR. McMILLAN:  Your Honor, at this point I would

19 tender Dr. Henry as an expert in thoracic radiology.

20         MR. BAILOR:  No objection, Your Honor.

21         THE COURT:  He may offer an expert opinion in the

22 field of thoracic radiology.

23         MR. McMILLAN:  Could we turn to GG-2070, please?

24 Q     Dr. Henry, does the chest x-ray play an important role in

25 thoracic radiology?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000980

1  A    The chest radiograph is a ubiquitous study and it's, for

2  all intents and purposes, the currency of healthcare.  It's a

3  very commonly ordered examination, commonly performed.

4  Q    Is that one of the techniques or pieces of medical

5  evidence that you deal with on a daily basis?

6  A    Yes, sir.

7  Q    What role does the x-ray play in the diagnosis of

8  asbestos-related disease?

9  A    Certain entities which could afflict the lung itself, the

10 lung tissue itself, or the pleural surfaces, as well as

11 malignancies associated with asbestos could be depicted on a

12 chest x-ray.

13 Q    I want to talk to you briefly about the standards for

14 reviewing and classifying x-rays.

15       MR. McMILLAN:  If I could have the next slide, which

16 is GG-2071?

17 Q    Doctor, what is the International Labor Organization?

18 A    The ILO, or the International Labor Organization, is an

19 arm of the United Nations which promotes for many years, or has

20 promoted for many years, health and safety in the workplace.

21 Q    And has the ILO issued any guidelines on the

22 classification of chest radiographs?

23 A    Yes, sir.

24 Q    Could you explain what they've issued to us?

25 A    The ILO has produced written guidelines for probably four

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000981