1  or five decades which are used in the evaluation of

2  conventional chest radiographs for patients who may have been

3  exposed to various dust in the workplace.

4  Q    Are the ILO guidelines recognized internationally as a

5  standard to be used when classifying chest x-rays?

6  A    Yes, sir.

7  Q    What is the purpose of the classification system?

8  A    The purpose is to standardize the process of evaluation so

9  that it can be reproducible and reliable in terms of the

10 evaluation of various patients and in terms of the

11 communication from body, or one physician, to another.

12          MR. McMILLAN:  If I could have the next slide,

13 please?

14 Q    This is GG-2072.  Could you explain to us briefly how the

15 ILO classification system works, please?

16 A    Well, first of all, one must familiarize oneself with the

17 ILO guidelines, namely the process, as well as the group of

18 standard radiographs which come with the guidelines which

19 depict the pathology that is commonly seen with the various

20 inhalations of dust, and then once one does that one must take

21 the claimant or subject radiograph and compare it to the

22 standard and determine whether there is evidence of abnormality

23 or not and then, if so, abnormality being present, then to

24 quantify it through the process of the ILO system, including

25 the image quality, which is very important, the presence of

**J&J COURT TRANSCRIBERS, INC.**

1 tissue abnormalities or parenchymal abnormalities, pleural

2 involvement and other possible abnormalities that may be

3 related to the pneumoconiotic process.

4 Q    Now, when you say that you grade the abnormalities, could

5 you explain to us, what do you mean by grading abnormalities?

6 A    Well, basically, the ILO process is a way of standardizing

7 the quantification of the abnormalities.

8            MR. McMILLAN:  If we could turn to the next slide?

9 Q    This is GG-2073.  Can you tell us what this is, Dr. Henry?

10 A    This is basically an evaluation form, or a pneumoconiosis

11 surveillance form that's piloted (sic) on the ILO form.

12 Q    Is the one that we have in GG-2073 the actual ILO form

13 that you used as part of your study?

14 A    Yes, sir.

15            MR. McMILLAN:  I want to quickly go through the

16 components of this, so if you could show the next slide.

17 Q    In GG-2074, we've blown up Section 1A of the ILO form.

18 What does this record, doctor?

19 A    This is the evaluation of the image quality, and you'll

20 see that on the far left-hand side, there are four categories,

21 one through three, and then U/R, which means it's an unreadable

22 study.

23 Q    Why is it important to grade the film quality?

24 A    Because the quality of the study will have a bearing on

25 the accuracy of the interpretation.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000983

1  Q    And why is that?

2  A    Because the presence of artifacts, under or overexposure,

3  could conceal or enhance the detection of abnormalities.

4           MR. McMILLAN:  Could I have the next slide, please?

5  Q    This is GG-2075.  We've now highlighted Section 2A and B

6  which relate to parenchymal abnormalities.  What are

7  parenchymal abnormalities?

8  A    These are basically abnormalities of the lung tissue

9  itself which are presented as small opacities, which is

10  referred to in 2B.

11  Q    And how would you record that on the ILO form?

12  A    Well, as you can see, the -- 2B is divided into several

13  sections, and your first responsibility is to determine whether

14  the small opacities present are either rounded, which are

15  commonly associated with silica and coal workers

16  pneumoconiosis, or irregular or linear, more frequently

17  associated with asbestos exposure.

18  Q    What is an opacity?

19  A    An opacity is a small density which occurs on the x-ray

20  which is indicative of underlying pathology related to the

21  inhalation of dust.

22  Q    I see that under 2B there's a small C that says,

23  "profusion."  What is profusion?

24  A    Well, as you can see -- actually, we should start with the

25  prior diagram which is zones that each lung is divided into,

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000984

1 three zones, an upper, middle and lower zone on each side, left

2 and right, and then the person who classifies the study is

3 asked to then determine what the concentration or profusion of

4 the small opacities are within each individual zone and come up

5 with a summary of the entire profusion for the entire chest.

6 Q    I see that there are 12 boxes under profusion.  Can you

7 explain what you're doing when you're trying to select the

8 appropriate box?

9 A    Well, this is a scale.  You see in the upper left-hand

10 corner there is zero/naught, which means the study is

11 absolutely cold, normal.  There are no opacities.  And as you

12 go from left to right and then down the various columns, you'll

13 see that the numbers increase, and with the increasing numbers

14 that implies that you have a larger concentration of

15 abnormality of opacities.

16       MR. McMILLAN:  If we could turn to the next slide,

17 GG-2076?

18 Q    We've highlighted Sections 3A and B from the ILO form.  I

19 notice this refers to pleural abnormalities.  What are pleural

20 abnormalities?

21 A    Pleural abnormalities are basically the manifestations of

22 exposure which might impact the parietal pleura, or the lining

23 of the thoracic cavity itself, or the visceral pleura or the

24 lining that's around the lung.

25 Q    And just to be clear, Section 3 relates to the pleura,

CC-BLG000985

1  where Section 2 relates to the parenchyma.  Just is broad-brush

2  terms, what's the difference?

3  A    Well, the difference is, is that Section 2 relates to the

4  lung tissue itself, and the -- Section 3 relates to the lining

5  of the thoracic cavity on -- in either hemithorax, left and

6  right, as well as the lining around the lung itself.  So, it's

7  distinctly different from the more internal parts of the lung

8  or the lung tissue itself.

9  Q    Now, I see in Section 3B that there's a space to record

10 information about pleural plaques.  What are pleural plaques?

11 A    Pleural plaques are basically areas of focal fibrosis with

12 -- usually within parietal pleura.

13 Q    And I see that you have, "In profile, face-on and

14 diaphragm."  What's the difference?

15 A    The difference is that in profile, there's a plaque that

16 appears along the lateral edges of the chest, which is visible,

17 there in profile, as opposed to a plaque which exists on the

18 front or the back of the chest, which on a frontal chest x-ray

19 would be seen face-on or "on fas" (phonetic).

20         MR. McMILLAN:  Can we move to the next slide, please,

21 GG-2077?

22 Q    We've now highlighted Sections 3C and 3D of the ILO form.

23 Could you explain what gets recorded here, please?

24 A    This again is a continuation of the evaluation of the

25 pleura, and it relates to the area of the lung called the

CC-BLG000986

1  costophrenic angle, which is where the diaphragm, which

2  separates the chest cavity from the abdominal cavity, occurs,

3  and in the upright individual on a chest x-ray, shall we say,

4  it's the angle where the diaphragm meets the chest wall.

5  Q    Okay.  And what does it mean if that angle is blunted?

6  A    If that angle is blunted, then one would certainly have to

7  consider the presence of diffuse pleural thickening, the theory

8  being that diffuse pleural thickening generally arises

9  following a pleural effusion, which would occupy that angle,

10 and therefore if there was a residual of pleurator (phonetic)

11 thickening that angle would be blunted and therefore would be a

12 sign that there could be the presence of diffuse pleural

13 thickening.

14 Q    What is diffuse pleural thickening?

15 A    It again is a fibrotic process that occurs in the visceral

16 pleural, which is the lining of the lung itself, as opposed to

17 a plaque, which involves the parietal pleura, or the lining of

18 the chest wall.

19 Q    And what does it mean when the pleura is thickened?

20 A    It's an indicator of a fibrotic process in a particular

21 lining of the lung and that you want to be able, hopefully, to

22 distinguish that from a pleural plaque basically.

23 Q    And is blunting of the costophrenic angle one of the

24 features that you look at to try and differentiate between the

25 two?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000987

1  A    By convention that the fact that pleural plaques rarely

2  ever involve the costophrenic angles, whereas diffuse pleural

3  thickening does, that's how we distinguish one from the other.

4           MR. McMILLAN:  Could I have the next slide, GG-2078,

5  please?

6  Q    You'll see here we've highlighted Sections 4A and 4B from

7  the ILO form.  Could you explain what gets recorded here,

8  please?

9  A    This is basically a shorthand that the reader would use to

10  connote the presence of other abnormalities.  If you note, on

11  the far right-hand line, on the line in the far right, there's

12  the abbreviation, "TB," which means if you thought there was

13  tuberculosis present, you would check that particular box.

14  Somewhere in the center there, there is the abbreviation, "EM,"

15  which stands for emphysema.  On the far left is another

16  abbreviation, "AA," which stands for atherosclerotic aorta,

17  which is another radiographic finding.  And in between are

18  several other abbreviations which connote the presence of

19  various findings which are sometimes associated with an

20  inhalational dust disorder.  Others are not, such as the

21  abbreviation of "CO," which simply means that the heart is

22  enlarged, which may be totally unrelated and probably is

23  unrelated to dust inhalation.

24  Q    Doctor --

25  A    So it's a shorthand to prevent a lot of handwriting

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000988

1 basically.

2 Q     Dr. Henry, the form that we've been looking at here, this

3 is the actual form that the independent B-readers you retain

4 used when evaluating x-rays in this case?

5 A     Yes, sir.

6 Q     And is this based on the ILO form that NIOSH uses when

7 they are certifying B-readers?

8 A     Yes, sir.

9       MR. McMILLAN:  I'd like to move on to the next slide,

10 please, which is GG-2079.

11 Q     Dr. Henry, what is the purpose of the ILO classification

12 system that we have just been reviewing?

13 A     Basically it's to provide a standardized process of

14 evaluation and quantification of the abnormalities present on a

15 chest radiograph and a person who may have been exposed to

16 inhalational dust.

17 Q     Has the ILO Classification System been adopted in the

18 U.S.?

19 A     Yes, sir.

20       MR. McMILLAN:  Could I have the next slide, please?

21 Q     How has it been adopted in the United States?  This is GG-

22 2080.

23 A     Following a mining tragedy in the late '60s, the federal

24 government mandated the U.S. Public Health Service develop a

25 system to evaluate chest radiographs of miners at that time who

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000989

1 might be exposed and -- in terms of a preventive measure and

2 for compensation, and so they realized that there were not --

3 there was not a group of readers out there, or people who were

4 familiar with this process.  So they commissioned the Public

5 Health Service to develop a process of teaching these

6 physicians the various methods of evaluating these studies.

7 Q     And did the Public Health Service -- how did they go about

8 teaching a group of physicians how to use the classification

9 system?

10 A     The Public Health Service at that time turned to the

11 American College of Radiology and asked them to become

12 instructors and to develop a course of instruction to better

13 promote the understanding of how the system would be utilized.

14 Q     And is that course that you currently today are a faculty

15 member for?

16 A     It's not quite the same course, but basically, yes.

17 Q     How many different faculty members are there today who

18 teach the asbestos-related portion of the ACR course for the

19 B-reader exam?

20 A     Those duties are split by myself and one other person.

21 Q     Did there come a point in time when the Public Health

22 Service turned over this classification program to NIOSH?

23 A     Whenever NIOSH became an entity, and I'm not -- I think

24 was in the early '70s, they handed off the ball to NIOSH,

25 Public Health handed it off to NIOSH and NIOSH then is

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000990

1   responsible and has been for the last several years.

2            MR. McMILLAN:  If we can go to the next slide,

3   please, GG-2081?

4   Q    We've talked a bit about B-readers, but could you just

5   explain what is the B-reader program?

6   A    The B-reader program is a program that the NIOSH -- that

7   NIOSH orchestrates and governs, and it relates to individuals,

8   physicians, licensed physicians, who wish to be certified for

9   the interpretation of pneumoconiosis studies using the ILO

10  system.

11  Q    And that is the purpose of the B-reader system?

12  A    Well, basically it's to hopefully guarantee a more

13  reliable and accurate interpretation of these studies.

14  Q    Is there an examination that is part of becoming a

15  B-reader?

16  A    Yes, sir.

17  Q    Can you tell me a little about that?

18  A    Anyone wishing -- or I should say a licensed physician

19  wishing to become a B-reader must take a six-hour examination,

20  which is comprised of classification of 125 studies.

21  Q    Is there a re-certification requirement?

22  A    Re-certification occurs every four years with a smaller

23  group of films.  Basically I think it's a three-hour test, and

24  you interpret or classify 50 studies.

25  Q    Is there a difference in the type of x-rays or studies

                    **J&J COURT TRANSCRIBERS, INC.**

CC-BLG000991

1  you're evaluating on re-certification from the initial exam?

2  A   . Yes.

3  Q    What is the difference?

4  A    The initial study -- the certification study involves a

5  larger scale of more common abnormalities, and the

6  re-certification exam is a little more focused on the subtle

7  abnormalities that are sometimes -- sometimes encountered.

8  Q    How long have you been a B-reader?

9  A    Since 1985.

10 Q    How many times have you had to take the re-certification

11 exam?

12 A    Five times I believe.

13      MR. McMILLAN:  If we could go to the next slide,

14 please, which is GG-2082?

15 Q    Does NIOSH have a recommendation on whether or not the ILO

16 Classification System applies in contested matters?

17 A    Yes.  They have the Website, which you see presented here

18 which presents recommendations for a variety of settings where

19 the ILO system may be employed, contested proceedings being one

20 of them.

21 Q    So, in the first bullet we have here on the ILO system,

22 NIOSH recommends or states that it's necessary, to ensure

23 fairness and equity in contested proceedings, to use the ILO

24 Classification System.  Is that right?

25 A    That's correct.

J&J COURT TRANSCRIBERS, INC.

CC-BLG000992

1  Q    What does NIOSH recommend in terms of the number of

2  readers that should be used when doing classifications in a

3  contested matter?

4  A    They require -- or they suggest a minimum of two, and most

5  likely three, to determine if there is a lack of agreement.

6  Q    Does NIOSH have a recommendation about whether readers

7  should be blinded when reading in a contested matter?

8  A    Yes, sir.

9  Q    What's that recommendation?

10  A    Well, it is that they should be blinded to the exposure

11  history and the identity of the individual and any other

12  information which might bias their interpretation.

13  Q    Doctor, is it important when you are attempting to conduct

14  a reliable study to follow the ILO and NIOSH recommendations?

15  A    I believe so, yes.

16         MR. McMILLAN:  Could I have the next slide, please,

17  GG-2083?

18  Q    Why is it necessary?

19  A    Well, if you want to have an accurate and reliable

20  outcome, it's important to incorporate the standardized process

21  that's been accepted in the literature, including the ILO

22  guidelines and the suggestions and recommendations of NIOSH.

23  Q    Well, let's go through this.  Why is it important to blind

24  the readers when you're attempting to do a reliable study?

25  A    In order to prevent any bias that might creep in.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Why is it necessary to use standard films when attempting

2  to do a reliable classification study?

3  A    Well, standard films are a critical part of the ILO

4  system, and it allows one to compare the claimant, or subject

5  radiograph, to a standard radiograph in order to develop a more

6  confident evaluation and classification of that particular

7  study.

8  Q    Why is it important to use three independent readers when

9  attempting to do a reliable classification study?

10  A    Again, from experience, I believe NIOSH has recognized,

11  and you find this repeated in the literature and many papers,

12  that the multiple readers I think provides a better sense of

13  reliability and accuracy than just a single reader.

14  Q    And finally, why is film quality important when attempting

15  to do a reliable classification study?

16  A    As I discussed earlier when we talked about film quality

17  on the B-reader form, it can alter the impression and the

18  interpretation of small opacities which may be very subtle and

19  could be obscured or could be enhanced by the various

20  techniques employed in conventional radiography.  So good film

21  quality is essential.

22  Q    Doctor, I want to switch topics briefly.  When conducting

23  reviews under the ILO system, what is a positive result for

24  asbestosis?

25        MR. McMILLAN:  Could I have the next slide, please?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000994

1  A    Well, currently it's the determination that the small

2  opacities present reach a threshold greater than or equal to

3  1/0.

4  Q    Now, was that recommendation of the American Thoracic

5  Society in 2004?

6  A    Yes, sir.

7  Q    Prior to that date had the American Thoracic Society taken

8  a position on what level of profusion was necessary to diagnose

9  asbestosis?

10  A    Yes, sir.  In 1986, the guidelines, again from the ATS,

11  stipulated a threshold of 1/1.

12  Q    And when they changed it 2004, did they provide the

13  scientific evidence or rationale for that change?

14  A    In my opinion, no.

15  Q    Why is that?

16  A    Well, if you look at the fine print when they make this

17  recommendation, they say that there is no clear-cut distinction

18  between 0/1, which would be a negative study, and 1/0, which in

19  their eyes would be a positive study.  Secondly, there is no

20  1/0 standard.  This is a total arbitrary decision that the

21  reader makes on his or her own.  And third, it's a

22  determination that can be very much affected by film quality

23  and by the possibility of opacities from other sources

24  unrelated to dust exposure entering into the evaluation and

25  producing findings that would simulate the earliest findings of

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000995

1  an asbestos or another pneumoconiotic process.

2  Q    Now, you said a moment ago there's no 1/0 standard film.

3  Is there a 1/1 standard film?

4  A    Yes, sir, there is.

5  Q    Does that factor into why you believe it's more reliable

6  to use a 1/1 for diagnosing asbestosis?

7  A    Well, I'm falling back on the '86 guidelines, which I

8  think are valid, and also the presence of the 1/1 standard,

9  which then takes away the arbitrary determination of the

10 reader.

11 Q    You also said a moment ago that there are other conditions

12 that could mimic a 1/0.  What were you referring to?

13 A    Well, this is a controversial area.  However, there are

14 studies out there which suggest that there are individuals who

15 have had no dust exposure, other small opacities, primarily due

16 to smoking, which can simulate the earliest findings of

17 dust-related diseases.

18 Q    So are you saying -- what do you see as the utility of a

19 1/0 reading?

20 A    Well, I think it has a limited utility except in vary

21 unique circumstances.  I am very enthusiastic about the

22 earliest detection that we can possibly make of abnormality or

23 disease.  However, I think we have to recognize the limitations

24 of this particular process of using that standard for the

25 reasons I alluded to earlier.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000996

1 Q    Doctor, what are medical screenings in the broad sense of

2 the term?

3 A    Medical screenings are tools used to evaluate the early

4 presentation of an abnormality or dysfunction in hopes of

5 promoting an intervention of some type that would then arrest

6 the process (indiscernible).

7 Q    I'm sorry?

8 A    That would arrest the process or possibly cure it.

9         MR. McMILLAN:  Could I see GG-2085, please?

10        THE COURT:  Wait, I'm sorry.  Medical screenings are

11 used to evaluate the early detection, and then I lost it.  I'm

12 sorry.

13        THE WITNESS:  Okay.  The early detection of a

14 pathologic process or dysfunction in terms of promoting an

15 intervention which might then arrest the process or possibly

16 cure it.

17 Q    What are some examples of medical screening?

18 A    Mammography is probably the commonest and most readily

19 recognized type of screening tool.

20 Q    And are these useful techniques in most circumstances?

21 A    I think there's been abundant literature which supports

22 it, yes.

23 Q    Have you had any personal experience with screenings in

24 the litigation context?

25 A    Yes, I have.

CC-BLG000997

1  Q    What is that experience?

2  A    In the late '90s, I was contacted by a representative from

3  N & M Company and requested to evaluate and do B-reads, if you

4  will, on 300 chest radiographs.

5  Q    Did you review those radiographs?

6  A    I did.

7  Q    What did you find?

8  A    I found that they were for the most part negative.  I

9  found also that their film quality was poor and that the films

10  had already been pre-read.

11  Q    How did you know the films had already been pre-read?

12  A    There were notations on the jackets.

13  Q    And was their any indication of what the prior reading

14  was?

15  A    Yes, sir.

16  Q    And what was it?

17  A    They were positive.

18  Q    And did you agree or disagree with those prior findings?

19  A    I disagreed with the majority of the prior findings.

20  Q    Did you relay your reads to N & M?

21  A    Yes, sir, I did.

22  Q    What was their reaction?

23  A    There -- I --

24           MR. BAILOR:  Objection; hearsay.

25           THE COURT:  What he told somebody else is hearsay?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000998

1        MR. BAILOR:  No, what they told him is hearsay.

2        THE COURT:  Oh, yes.  That is hearsay.

3        MR. McMILLAN:  Understood, Your Honor, but we are

4   offering it for the purpose of Dr. Henry's experience with a

5   litigation screening and how that impacted his understanding of

6   the reliability of those screenings.

7        THE COURT:  What's the difference?  It's still

8   hearsay.

9        MR. McMILLAN:  But I'm not offering it for the truth

10  of the matter.  I'm offering it for the impact it had on this

11  witness and his understanding of the reliability of these

12  litigation screens.

13       THE COURT:  I think I understand from his prior

14  testimony already what the impact would have been.  It's still

15  hearsay.  The objection is sustained.

16  Q    Based on your experience with N & M, did you have an

17  impression of the reliability of the prior reads that you saw

18  on those x-rays?

19  A    Well, they didn't agree with my interpretations.

20  Q    Doctor, have there been other studies of the reliability

21  of x-ray reads from litigation screenings?

22  A    Yes, sir, there have.

23  Q    Can you tell me a little about them?

24  A    There's a study in the late '90s from Penn State which

25  evaluated the Manville Trust, audited the radiographic

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG000999

1 findings, and there was the so-called Gitlin study, which was

2 published in 2004, which evaluated the comparison of claimant

3 readings versus an independent panel.

4 Q    And in broad terms what did those two studies find?

5 A    They found significant disparity --

6 Q    Disparity --

7 A    -- between the original readings and the readings done by

8 an independent panel.

9 Q    And by "original readings" are you referring to readings

10 that came out of litigation screenings?

11 A    I presume that was the case, yes, sir.

12 Q    Around the time that those studies came out, were there

13 other factors that you, as a thoracic radiologist, became aware

14 of that caused you to question the reliability of

15 litigation-related x-ray readings?

16 A    Well, there were some legal proceedings in Texas, I

17 believe.  There were congressional hearings.  There was

18 somewhat of a general buzz, if you will, for a lack of a better

19 way to explain it, among by colleagues and other B-readers that

20 we knew there were some things that were occurring that we were

21 kind of concerned about.  There was an instance, I believe,

22 reported in one of the trade journals where a radiologist was

23 approached at a national meeting and offered money to sign a

24 blank B-reader form.  So there were things of that type which

25 created some sense of concern and caution on my part.

CC-BLG001000

1  Q    Were you subsequently asked to conduct a study of the

2  reliability of the claimants' x-ray reads in this case?

3  A    Yes, sir.

4  Q    What were you asked to do?

5  A    Again, we were asked to evaluate or draw up a protocol to

6  evaluate the presence or absence of asbestosis or interstitial

7  fibrosis in a group of claimants who espoused that they had a

8  malignancy and then radiographic evidence of asbestos exposure.

9  Q    So, the group of claimants that you were looking at were

10 claimants who were alleging that they had radiographic evidence

11 of asbestos exposure to link their malignancy to asbestos?

12 A    Yes, sir.  My screen is gone here, by the way.

13 Q    Yes, that's okay.

14 A    All right.

15 Q    In accepting that project, what was your goal?

16 A    Well, based upon the issues that were in the literature

17 and some of the more ambient concerns I had about the process,

18 the B-reader process, and the fact that I had been engaged with

19 it for over 20 years, I wanted to design the most precise and

20 scientific process I possibly could in hopes of developing a

21 reliable result, regardless of what it was, in terms of the

22 study we were going to undertake.

23         MR. McMILLAN:  I'd like to skip ahead to GG-2087,

24 please.

25 Q    Doctor, could you walk us through the process you used


                J&J COURT TRANSCRIBERS, INC.

CC-BLG001001

Henry - Direct/McMillan                            188

1  during your x-ray study?

2  A     Okay.  We began with 5,438 claimants that were identified

3  on the questionnaire, and that group was then reduced to

4  twenty-eight hundred and fifty-seven by various filters that

5  were added, such as the timing of when the chest radiographs

6  were obtained or submitted, various other demographic data and

7  compliance with -- I think there were some certifications that

8  had to be filed with the films and so forth.  So, we came down

9  to a study pool of twenty-eight hundred and fifty-seven

10 claimant studies.

11 Q     So, if I understand, the fifty-four hundred claimants were

12 the number in the PIQs that alleged they had radiographic

13 evidence to link their cancer to asbestos --

14 A     That's correct.

15 Q     -- and that you got it down to twenty-eight fifty-seven

16 based on various criteria?

17 A     That's correct.

18 Q     In addition, was -- did part of it depend on which

19 claimants actually submitted x-rays?

20 A     Well, there were claimants who claimed they were going to

21 submit x-rays which did not, so there were actually some

22 instances where there were no x-rays.

23 Q     And then once you had the twenty-eight fifty-seven

24 claimants, what did you do with that group?

25 A     Well, at this point we wanted to derive a sample, which

J&J COURT TRANSCRIBERS, INC.

1 would be representative, of approximately 500 examinations or

2 evaluations of the chest x-rays, and so we had a goal of

3 developing 500 in each category.  One category would be those

4 who had filed an x-ray with an accompanying B-reader form, and

5 the other group would be those that just simply filed x-rays

6 without B-reader forms, but would be representative of all law

7 firms which had submitted claims.  So we took 500 and we

8 divided by twenty-eight fifty-seven, and you come up with

9 approximately .175.  You multiply .175 by the number of x-rays

10 that were produced by a given firm.  And that's how we arrived

11 at the numbers that we did in the various pools.  If someone --

12 we had at least one from each firm, if you will.  If they

13 didn't have a larger number -- if they just had one study then

14 they were incorporated so every firm would be represented.

15 Q    And by "firm" you mean law firm who had claimants

16 submitting radiographic evidence?

17 A    Yes, sir.

18 Q    So once you had your two samples of roughly 500 claimants,

19 what did you do next?

20 A    Well, we had them interpreted by three independent

21 readers.

22 Q    And then what did you do with the results of those

23 interpretations?

24 A    We tabulated them.

25        MR. McMILLAN:  Let's skip to GG-2090.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Dr. Henry, in devising the protocol for your x-ray study,

2  do you believe that you designed a reliable study protocol?

3  A    It was my goal to design and oversee the most stringent

4  and scientific process possible, given the limitations of what

5  we had of time and so forth.

6  Q    Can you tell us what you did in the design of your

7  protocol that was meant to maximize the reliability of your

8  study?

9  A    Well, we used three independent readers, three blind and

10  independent readers.  The readers were -- they didn't even know

11  who the other readers were.  We kept them separate.  They were

12  told not to talk to one another.  If they did encounter one

13  another, do not discuss any of the cases.  They were never told

14  for whom they were reading the studies.  They didn't know the

15  end goal of the project at all.  They were just asked to

16  provide B-readings.

17  Q    Did you determine the number of readers in advance of

18  conducting your study?

19  A    We did.  In accordance with NIOSH guidelines, we

20  determined up-front that we were going to use three readers and

21  then use a majority, or consensus, reading.

22  Q    How did you select the three readers for your study?

23  A    These individuals were persons known to me as academic

24  physicians who were B-readers of at least 20 years who I knew

25  were highly qualified.

CC-BLG001004

1  Q    Who provided the x-rays that you used during your study?

2  A    All of the x-rays were provided by claimant law firms.

3  Q    And did you use control films as part of your analysis?

4  A    Yes, sir.  As an additional quality assurance measure, I

5  introduced, unknown to the readers, 47 control studies.

6           MR. McMILLAN:  I'd like to flip to the next slide,

7  please, which is GG-2091.

8  Q    What are control films, Dr. Henry?

9  A    Control films are those that we have incorporated, which

10 are both normal and abnormal, to determine the reading

11 tendencies of our readers.

12 Q    So I take it that you know in advance -- or you selected

13 the control films?

14 A    I did.

15 Q    And what was the purpose of inserting those control films?

16 A    Mainly to be certain that someone wasn't (indiscernible)

17 over-reading or under-reading the images.

18 Q    And did you then compare your three independent readers'

19 reads to what you knew to be the results for those control

20 films?

21 A    Yes, we did.

22 Q    And what did you find?

23 A    Well, they correctly identified the positive studies 86

24 percent of the time and the negative studies 88 percent of the

25 time.

J&J COURT TRANSCRIBERS, INC.

CC-BLG001005

1  Q    And what was your takeaway from that?

2  A    That there was very little under-reading or over-reading

3  tendency on the part of our readers.

4  Q    And did that give you confidence in the results of the

5  other readings that your B-readers were doing?

6  A    It would enhance it significantly, yes.

7          MR. McMILLAN:  I'd like to go to the next slide,

8  please, which is GG-2092.

9  Q    Dr. Henry, is GG-2092 a reproduction of a chart from your

10 expert report that summarizes the results of your x-ray study?

11 A    Yes, sir.

12 Q    Is this a complete and accurate portrayal of the results

13 from your x-ray study?

14 A    Yes, sir.

15         MR. McMILLAN:  Your Honor, I would move GG-2092 into

16 evidence.

17         MR. BAILOR:  Your Honor, we would object on the

18 relevance grounds previously stated.

19         THE COURT:  It's overruled on that basis.  It's

20 accepted as a summary.

21 Q    Doctor, before I ask you about this, I would like you to

22 just look in your binder for one moment, please, and do you see

23 the tabs for GX284 and GX285?

24 A    I do.

25 Q    If you could look at those briefly, can you tell me, are

CC-BLG001006

1  those the protocols that you used in conducting your x-ray

2  study?

3  A    Yes, sir, they are.

4  Q    Are they true and accurate copies of the protocols you

5  used in conducting your study?

6  A    Yes, sir.

7           MR. McMILLAN:  I would move GX284 and 285 into

8  evidence, Your Honor.

9           MR. BAILOR:  Objection; relevance.

10          THE COURT:  Same ruling; overruled on the same basis.

11 Q    And finally, doctor, would you look at GX286, GX327 and --

12          THE COURT:  Wait.  I'm sorry.  What was the first

13 one, 286?

14          MR. McMILLAN:  286.

15          THE COURT:  All right.

16          MR. McMILLAN:  GX327.

17          THE COURT:  All right.

18          MR. McMILLAN:  And GX104.

19                       (Pause)

20 Q    Do you see those, doctor?

21 A    Once again?

22 Q    GX286, 327 and 104.

23 A    I must be overlooking it, but I don't see 104 here.

24          THE COURT:  It's --

25 Q    Look at the very beginning.

**J&J COURT TRANSCRIBERS, INC.**

1   A    Very beginning?  Okay.  Sorry.

2   Q    Have you seen them now?

3   A    I have, yes.

4   Q    Are those three exhibits copies of the data that you

5   collected as part of your B-reader study?

6   A    Yes, sir, they appear to be.

7   Q    And are they true and accurate compilations of the data

8   that you used to prepare the chart that we have in evidence as

9   GG-2092?

10  A    Yes, sir.

11          MR. McMILLAN:  I would move to enter Exhibits GX286,

12  GX327 and GX104 into evidence.

13          MR. BAILOR:  Continuing relevance objection.

14          THE COURT:  Same ruling.  They're admitted.

15  Q    Doctor, I want to turn to GG-2092, please.  And you said a

16  moment ago that these are the results of your x-ray study.  I'd

17  like to start on Line 1 with the ILO firm sample.  Can you

18  explain to us what the result of your x-ray study was for the

19  ILO firm sample?

20  A    We had 471 claimants who provided chest radiographs with

21  an ILO form, and our three independent readers identified 33

22  out of the 471 that had a profusion of small opacities that

23  were greater than or equal to 1/0, for a total of seven percent

24  of the total.

25  Q    How does that compare to the B-reads that had been

**J&J COURT TRANSCRIBERS, INC.**

1  submitted by those claimants for the very same x-rays?

2  A    As you can see further on the first row there, or first

3  column, excuse me, not first row, out of 471 studies that were

4  evaluated, the claimant readers found that 383 of 471 had

5  findings of -- indicating a profusion of greater than or equal

6  to 1/0, or approximately 81 percent.

7  Q    What was the result that you found for the all firm

8  sample?

9  A    Well, as you can see, when we had 507 evaluations, a

10 positivity of 37, for a percentage of positivity of 7.3

11 percent.

12 Q    Is that consistent with the result that you found for the

13 ILO firm sample?

14 A    Well, it's very, very close, as you can see, 7.1 -- 7.01,

15 7.3 percent, very, very close.

16 Q    Doctor, when you got the results for the ILO firm sample

17 and saw that your independent readers found seven percent had a

18 1/0 or greater compared to over 80 percent for the ILO -- for

19 the readers from the claimants, what was your reaction?

20 A    Well, this was very unexpected.  We were -- I was

21 basically shocked to see this difference.

22 Q    And why is that?

23 A    I just didn't think there would be that much of

24 discrepancy.  I might have expected something -- some

25 discrepancy, but nothing of this magnitude.

CC-BLG001009

1      MR. McMILLAN:  Well, let's look at the next slide for

2  a moment, please.

3  Q    This is GG-2093.  If we start on the left-most column,

4  doctor, what was the population that you were starting with,

5  the population of people who could potentially participate in

6  your study?

7  A    The purple column is the claimants alleging radiographic

8  evidence of asbestos exposure, basically.

9  Q    So all of the claimants who were potentially eligible were

10  people who were alleging they had radiographic evidence of

11  asbestos-related exposure to link their malignancy to asbestos?

12  A    That's my understanding, yes, sir.

13  Q    And then when a subset was selected that had their own

14  claimant B-reads, what was the result of their own claimants'

15  reads of those x-rays?

16  A    Well, they found in the samples that we previously

17  mentioned that they had an 81 percent positivity rate.

18  Q    And how does that compare to what your independent readers

19  found for those very same individuals?

20  A    Again, we had a positivity rate of approximately seven

21  percent across all categories.

22  Q    Now, the difference between 81 percent that their

23  claimants -- their claimant readers found and the seven percent

24  that your independent readers found, is that kind of difference

25  something that can be accounted for with inter-reader

CC-BLG001010

1  variability?

2  A    I don't believe so.  I mean, inter-reader variability is

3  always a factor in any type of a comparison evaluation.

4  However, in my interpretation of the literature of a similar

5  type of study, I did not encounter or have not encountered to

6  this point anyway, anything of this magnitude that could be

7  explained by inter-reader variability.

8  Q    How you found any published article or any study where

9  people are looking at the same x-rays and found a difference of

10  over an order of magnitude in the positive rate due to

11  inter-reader variability?

12  A    Not to the best of my knowledge, no.

13  Q    Dr. Henry, following up on the results that we just looked

14  at, did you do an additional analysis that compared your

15  independent readers to specific claimant B-readers?

16  A    I'm sorry, I didn't understand your question.

17  Q    Did you follow-up the data that we just went through by

18  comparing your independent panel reads to specific physicians

19  who were claimant B-readers?

20  A    Yes, sir, we did.

21        MR. McMILLAN:  Can I see GG-2094?

22  Q    Doctor, is GG-2094 a replication of a table that appears

23  in your July 2007 expert report?

24  A    Yes, sir.

25  Q    Is this a true and accurate portrayal of the results of

CC-BLG001011

1  your analysis comparing your panel of B-readers or your

2  independent B-readers to specific claimant B-readers?

3  A    Yes, sir.

4           MR. McMILLAN:  Your Honor, I would move this in

5  evidence.

6           MR. BAILOR:  Objection.  Relevance.

7           THE COURT:  Overruled on the same basis.

8  Q    And one last point before I get into it, Dr. Henry, if you

9  look in your binder, do you see GX-582 and GX-583?

10 A    Yes, I do.

11 Q    Are GX-582 and 583 the data sets that you relied on in

12 putting together the table that is GG-2094?

13 A    Yes, sir.

14 Q    And are those true, accurate, and complete versions of the

15 data sets that you used to create GG-2094?

16 A    They appear to be, yes.

17          MR. McMILLAN:  Your Honor, I would move them in

18 evidence.

19          MR. BAILOR:  Again, we object.

20          THE COURT:  Same ruling.  They're admitted.

21 Q    Doctor, if we look at GG-2094 for a moment, can you

22 explain what you did here?

23 A    Basically, we took any individual reader who had a minimum

24 of 15 interpretations and determined the percent of positivity,

25 and then compared it to our readers to determine what the

CC-BLG001012

1 percentage of over-read was.

2 Q    Okay.  If we take an example -- if we take Phillip Lucas

3 about two-thirds of the way down, can you use that as an

4 example to explain exactly how this works?

5 A    Right.  Lucas read 20 studies.  Had a reading of -- all of

6 them were -- (indiscernible) all of them as positive for a 100

7 percent positivity rating which would then be 100 percent

8 over-read as compared to our readers who found all of them

9 negative.

10 Q    Okay.  So, he found them all positive and your panel found

11 them all negative?

12 A    Right.

13 Q    What about Jay Segarra (phonetic) near the bottom?  What

14 happened with Dr. Segarra?

15 A    As I recall, he had -- well, he had 17 interpretations,

16 one of which was negative and 16 were positive.  And so,

17 therefore, he had a positivity rate of approximately 94

18 percent.  And then, according to our readers, an over-read of

19 approximately 94 percent.

20 Q    Doctor, as a result of your x-ray study, both the table

21 that we looked at from -- that compared overall percentages of

22 greater than 1/0 -- greater than or equal to 1/0 from your

23 study compared to the claimant readers, as well as the study

24 looking at specific claimant physicians, did you reach any

25 conclusions?

CC-BLG001013

1  A    Well, I think we did a very good study, number one.  I

2  think we followed the appropriate guidelines and produced a

3  high quality scientific study.

4  Q    Well, if I -- well, (indiscernible).  If I could look at

5  GG-2095, doctor, what are your conclusions with regard to the

6  quality of the study that you did?

7  A    Well, as I said, we followed accepted scientific methods.

8  We employed the appropriate number of B-readers, and we

9  determined that the percentage of abnormality, if you will, of

10  studies that were greater than or equal to 1/0 which is

11  approximately seven percent.

12  Q    What's the takeaway from your study?

13  A    Well, we had a very small number of patients who presented

14  with positive findings.

15  Q    And what does it mean to present a positive finding?

16  A    Well, basically that they reached a threshold of

17  abnormality that was predetermined as 1/0.

18  Q    So, is it fair to say that the patients who -- only seven

19  percent of your patients had greater than or equal to a 1/0,

20  correct?

21  A    That's correct.

22  Q    So, are those the only ones who can show that they have

23  radiographic evidence of asbestosis based on their chest x-ray?

24  A    Based upon their chest x-rays, yes, sir.

25  Q    And so, are they the -- those seven percent the only

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001014

1  individuals who can show that there is actual damage to the

2  lung tissue based upon their chest x-ray?

3  A     That could be one interpretation, yes, sir.

4  Q     Did you reach any conclusions with regard to the

5  reliability of the claimant readers?

6  A     Well, I think based upon the significant magnitude of

7  differences between the three independent readers and the

8  claimant readers, it would give me great pause regarding the

9  reliability of those readings.

10 Q     Did you reach any conclusions with regard to the

11 reliability of readings that come out of litigation screenings?

12 A     Again, I think it would give me great pause based upon my

13 own personal experience that there would be -- that they're not

14 accurate.

15 Q     And with regard to diagnoses of asbestos-related disease

16 that are based upon these claimant B-reads, do you have an

17 opinion about the reliability of those diagnoses?

18 A     If those diagnoses are predicated on the evaluation of the

19 claimant x-rays, then I think they would also be suspect.

20 Q     Thank you.

21           MR. McMILLAN:  I have no further questions at this

22 time.

23                        CROSS EXAMINATION

24 BY MR. BAILOR:

25 Q     Good afternoon, doctor.  How are you?

                    **J&J COURT TRANSCRIBERS, INC.**

CC-BLG001015

1  A    I'm fine.

2  Q    Doctor, your study was not any random study, was it?

3  A    It was a random setting.  These cases were selected

4  randomly from the pool.

5  Q    But, you divided the x-rays up into various pools designed

6  to get a certain specific number of law firms, is that not

7  correct?

8  A    We did a -- we had a target of a particular number of

9  cases to make a representative sample, but all of the cases

10 were randomly selected in both pools.

11 Q    Now, you mentioned that digital x-rays were becoming much

12 more common.  You excluded digital x-rays from your study, did

13 you not?

14 A    No, we did not exclude digital x-rays, we excluded

15 miniaturized x-rays.

16 Q    How about x-rays that were on CD-ROM?

17 A    No, sir.  We had no way of evaluating them.

18 Q    And you also did not include computer topography studies

19 or high resolution computed topography studies, did you?

20 A    I excluded them, yes, sir.

21 Q    Now, you said you discussed the subject of bias in the

22 selection of your readers and said one of the reasons why

23 multiple readers were recommended was to eliminate the

24 possibility of bias, is that correct?

25 A    That helps, but it's not the only reason you have three

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001016

1  readers.

2  Q    Now, you didn't follow the (indiscernible) recommendation

3  of selecting your readers from the largest available pool of

4  B-readers, did you?

5  A    I selected the B-readers from the largest pool that I

6  knew.

7  Q    And how many is that?

8  A    Fifty, 60, 70.  Something like that.

9  Q    And you selected academic B-readers?

10  A    I did.

11  Q    And now, what steps did you take to ensure that your

12  academic B-readers were not biased?

13  A    Well, the most important step was the blinding of the

14  readers to any knowledge of why we were doing the study, who

15  was sponsoring it, what the outcome might be and so forth.

16  Q    Now, Dr. Lee Syder was one of your readers, was he not?

17  A    He was.

18  Q    Were you aware of the fact that Dr. Lee Syder has

19  testified for defendants in 26 cases?

20  A    No, I was not.

21  Q    Dr. John Parker is one of your B-readers, is he not?

22  A    He certainly was.

23  Q    Yes.  And he's one of Grace's expert witnesses in this

24  estimation proceeding, is he not?

25  A    I believe he is.

CC-BLG001017

1  Q     And he's also testified adversely to asbestos claimants

2  before the U.S. Senate.

3  A     Perhaps.  I don't know that.

4  Q     He testified on behalf of (indiscernible) insurance

5  companies, are you aware of that?

6  A     No, sir, I was not.

7  Q     Now, you testify that one of the reasons of the perfusion

8  study is to ascertain if there's radiographic evidence of

9  asbestos exposure, is that correct?

10 A     Say that again, I'm sorry?

11 Q     If I understood you correctly, one of the purposes of the

12 perfusion reading is to determine if there is radiographic

13 evidence of asbestos exposure, correct?

14 A     The perfusion --

15        MR. McMILLAN:  I'm going to object that this

16 characterizes the witness testimony who's looking for whether

17 or not there was perfusion.

18        UNIDENTIFIED SPEAKER:  We can't hear you.

19        MR. McMILLAN:  He was looking at whether or not

20 there's perfusion greater than 104 asbestosis.

21        THE COURT:  I think the witness was about to correct

22 the statement and can clearly answer on his own.  The

23 objection's overruled.

24 A     The perfusion deals with the presence or absence of

25 (indiscernible) tissue abnormalities, and they're very

J&J COURT TRANSCRIBERS, INC.

1   non-specific.  And I think they should be distinguished form

2   radiographic findings such as pleural plaque or a calcification

3   which is much more specific in terms of attributing the

4   exposure to asbestos.

5   Q    Okay.  So, you would agree with me that pleural plaque

6   shows evidence of exposure to asbestos?

7   A    Most of the time.  There are other etiologies for pleural

8   plaques, but the vast majority of them are asbestos exposure.

9   Q    How many of your films showed evidence of pleural plaques?

10  A    It wasn't the focus of our study, and I have to recall

11  from memory, but I think it was in the vicinity of 20, 22

12  percent, something like that.

13  Q    So, 22 percent of the films did show evidence of

14  significant --

15  A    I'm guessing because it wasn't the focus of this

16  presentation, so I'm recalling from memory from several months

17  ago.

18  Q    Now, you discussed on your direct examination what you

19  called screening examinations.

20  A    Yes, sir.

21  Q    What is (indiscernible) recommendation as to the number of

22  readers who should be present on -- should be utilized for a

23  screening exam?

24  A    I don't know.

25       MR. BAILOR:  May I approach the witness?  I'm handing

J&J COURT TRANSCRIBERS, INC.

CC-BLG001019

1  the witness what's been marked as ACC/FCR/2041.

2            THE COURT:  Thank you.

3  Q    Is this the NIOSH standard that you were referring to when

4  you discussed the practice in contested proceedings?

5  A    Yes, sir, it is.

6  Q    This does not deal with screening examinations, does it?

7  A    No, I don't believe I said that, did I?

8  Q    No, this standard does not apply to screening examinations

9  at all?

10 A    I don't believe so, no.

11 Q    I will now hand you ACC/FCR/2040, another NIOSH study.

12 Doctor, can you identify what ACC/FCR/2040 is?

13 A    I believe this is a reprint from the NIOSH website

14 entitled "Chest radiography," and then subheading, "Recommended

15 practices for reliable classification of chest radiographs by

16 B-readers."

17 Q    Now, I would like to call your attention, doctor, down to

18 the heading, "Worker monitoring and surveillance."  Do you see

19 what I'm referring to there?

20 A    I see it there, yes, sir.

21 Q    And I would like to specifically invite your attention to

22 Paragraph 4 of that.  Now, when we talk about worker monitor

23 known surveillance, is that your understanding of what is known

24 as a screening examination?

25            MR. McMILLAN:  I'm going to object, Your Honor, to

                    **J&J COURT TRANSCRIBERS, INC.**

1  the extent that there's a false characterization that

2  litigation screenings done to file claims is something other

3  than a contested matter.

4        MR. BAILOR:  There is no evidence, Your Honor, that

5  the initial screenings of these people were done necessarily to

6  file claims.  Some may have been, some may not have been.

7        THE COURT:  That's the case.  I don't think I have

8  any evidence about what the initial classification was for --

9  initial screening was for.

10        MR. BERNICK:  A point of fact, and I don't mean to

11  interrupt for Mr. McMillan is here, but -

12        MR. BAILOR:  Your Honor, I object --

13        THE COURT:  That's sustained, too.  You've got a

14  person who's making objections.  My understanding is that you

15  get one person making objections, you don't get a house.  So,

16  you can talk to counsel if you want.

17        MR. BERNICK:  Very well.

18        THE COURT:  Let me -- in any event, the objection is

19  overruled.  I don't believe I have any evidence with respect to

20  how initial x-rays were put together, beside which I believe

21  this witness is very confident to answer this question.  Go

22  ahead.

23  A    Your question again, sir?

24  Q    I would invite your attention, doctor, to Paragraph Number

25  4.  It says, "Number of readers and summary classifications.  A

**J&J COURT TRANSCRIBERS, INC.**

1  Symbol B-reader classification of an east chest radiograph is

2  generally sufficient.  Additional independent classifications

3  may be needed to ensure reliability within the program."  Does

4  that -- is that consistent with your understanding of what is

5  required when we have a worker monitoring a program as opposed

6  to a reading for a contested proceeding?

7  A    That's their documentation, yes, sir.  That's what they're

8  saying.

9  Q    And when they're doing worker monitoring, I would invite

10  your attention to Paragraph 5 with respect to blinding.  There

11  is says, if I read this correctly, "Blinding; in order to

12  facilitate disease detection in environments where individuals

13  are potentially at risk, blinded classification is not

14  desirable."  Did I read that correctly?

15  A    You did.

16  Q    Do you know why that is?

17  A    I wouldn't know why they would put that in there.

18  Q    Is it more important in a screening environment to detect

19  disease early?

20  A    It's always important to detect disease early.

21  Q    That's because the earlier you detect it --

22  A    Regardless of the circumstances.

23  Q    You have a little better shot at treating it, right?

24  A    Correct.

25  Q    Right.  So, if you want to have a bias in a monitoring

CC-BLG001022

1  program, it would be towards early detection, would it not?

2  A    I'm not sure you want a bias.  I'm not sure that's what

3  they're saying, that they want to introduce bias.

4  Q    Now, doctor, when you conducted your study, did you review

5  any medical histories of any of these claimants?

6  A    Myself?  No.

7  Q    Do you have any idea what their exposure histories were?

8  A    No, sir.

9  Q    Do you agree that a chest x-ray will not necessarily

10 detect all cases of asbestosis?

11 A    It is possible that in certain circumstances that would be

12 the case, yes, sir.

13 Q    And I believe you mentioned in your report that you have

14 been at studies where you have -- I'm sorry -- you've been in

15 conferences where you have observed very experienced qualified

16 B-readers argue vehemently over the classification of a film,

17 is that not correct?

18 A    Over the classification of a film is 1/0.

19 Q    Yes.

20 A    Not over other classifications, but that particular

21 threshold has been problematic for a very long time.

22 Q    So, there is a great deal of disagreement, is there not,

23 among the thoracic imaging community as to when a film is 1/0

24 or not?

25 A    I wouldn't say there's a great deal of disagreement in the

CC-BLG001023

1  community.  I think everybody recognizes the difficulty and

2  some of the pitfalls in making that determination.  But, I

3  wouldn't say there was a great deal of disagreement.

4  Q    There was disagreement among your own readers as to

5  whether or not films were 1/0 or not, was there not?

6  A    Disagreement among our own readers is a healthy sign, I

7  believe.  It's a sign of their independent abilities.  If they

8  were all reading the same thing all the time, then one would be

9  suspect if there was something wrong.

10  Q    Do you know the number of times in your study when a --

11  one reader read the film as 1/0, whereas the other two

12  disagreed?

13  A    No, not off the top of my head, but that wouldn't surprise

14  me.

15  Q    Sixty-five cases sound too high?

16  A    No.  Again, you're going to have that when you read a

17  large number of studies with three readers.  You're going to

18  have some disagreements and we recognize that.  But, again, I

19  think that portrays the independent behavior of the readers as

20  a good sign that they are reading independently and not biased

21  or being influenced one by the other.  If they all read the

22  same things all the time, then I would be very suspect that

23  there was bias or there was some communication or something was

24  awry.

25  Q    All right.  How many -- are you aware of the number of

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001024

1 cases in your study where the three readers -- all three

2 disagreed on the classification of the film?

3 A    Not specifically, no.  But, I'm sure it happens.

4 Q    How about 73 times?

5 A    I'm not sure what you mean by disagreement.  I mean, can

6 you be more specific?

7 Q    All three had different perfusion readings for the film.

8 A    Well, that might be 0001010, which are all within two or

9 three minor categories.  So, disagreement of that scale is not

10 necessarily a bad thing.

11 Q    How many occasions did your readers agree on whether or

12 not the film was completely negative?

13        MR. McMILLAN:  Objection.

14 A    Are we talking now about the individual readers or are we

15 talking about the consensus reading here?  What are you

16 referring to?

17 Q    Well, let's start out with individual readings.

18 A    Well, we didn't conduct a study that actually looked at

19 that.  We conducted a study at the outset which determined that

20 we would accept the profusion and the reading for the study as

21 a majority reading.  So, we're not looking at individual

22 readers here.  We're looking at the majority reading and that's

23 what I reported on.

24 Q    All right.  Now, my question was, how many of your readers

25 found the films were completely negative?

CC-BLG001025

1 A    I don't know.  I don't have that information off the tip

2 of my fingers.

3 Q    Did you dally it?

4         MR. McMILLAN:  I would object to the (indiscernible)

5 to what he means by completely negative.

6         THE COURT:  Yes, that's sustained.  I don't

7 understand the question either.

8         MR. BAILOR:  There is a question on the ILO form that

9 was on the screen earlier.  I forget the number of it.  But, it

10 asks the question of the reader, "Is the film completely

11 negative?"

12 Q    Is that not correct, doctor?

13 A    That's correct.

14 Q    All right.  Now, let's take the case of Dr. Parker.  How

15 many films did he find were completely negative?

16 A    I don't know.

17 Q    Would it surprise you to learn that he found 664 films

18 were not completely negative?

19 A    Well, that might be.  I don't know.

20 Q    And are you aware of the fact that Dr. Robert Tarver

21 (phonetic) found 581 films were not completely negative?

22 A    That's possible.

23 Q    And Dr. Syder found 500 films were not completely

24 negative?

25 A    Well, I think it should be kept in mind that there are

CC-BLG001026

1  other things on that study which would indicate that the film

2  was abnormal other than a dust related abnormality.

3  Q    It could also include pleural plaques, could it not?

4  A    I think I eluded to the fact earlier that we already

5  covered that there was approximately a 20 percent detection of

6  pleural plaques.

7  Q    And some of the readers noted cancer?

8  A    I believe so.

9  Q    And these were, of course, films submitted in conjunction

10  with a claim for lung cancer, right?

11  A    The readers didn't know that.

12  Q    But, the films were submitted in connection with a claim

13  for lung cancer, correct?

14  A    That's true, but in some cases those patients developed

15  cancer after the time the study was performed, or they had had

16  surgery to remove that cancer.  So, that's --

17  Q    That's right.  And you also excluded from your study the

18  post-operative films where the lung cancer had already been

19  removed, hadn't you not?

20  A    We did that to prevent the confusion with post-operative

21  or post-therapy changes, yes.

22  Q    Do you agree with the American Thoracic Society's view

23  that high resolution computed topography is much more sensitive

24  than the detection of asbestosis than plain chest radiographs?

25  A    Yes.


**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001027

1  Q    And you had no high resolution computer topography in your

2  study, is that correct?

3  A    We excluded them.

4  Q    Now, going back to NIOSH's practice in contested

5  proceedings, NIOSH recommends that there be agreement reached

6  up front on the study criteria, do they not?

7  A    I'm sorry.  I'm not sure I understand you.  Up front -- I

8  think it suggests that you determine the number of readers at

9  the outset.  Is that what you mean?

10  Q    Not quite.  Could I invite your attention back to

11  ACC/FCR/2041?

12  A    Yes, sir.

13  Q    I would like to invite your attention to Paragraph 3 on

14  the second page.  I'm sorry, Paragraph 4 on the second page at

15  that exhibit.  It says, "To avoid any implication of bias, it

16  is necessary to specify from the outset the number of readers

17  that will be used."  Did you discuss the number of readers with

18  the claimants?

19  A    With the claimants?  No, sir.

20  Q    Do the claimants have any role in constructing the design

21  of the study?

22  A    No, sir.

23  Q    Doctor, did you review any pulmonary function tests of any

24  of the claimants?

25  A    No, sir.

CC-BLG001028

1  Q    Do you agree with me that in order to make an accurate

2  diagnosis of asbestos, you cannot make such a diagnosis solely

3  from the chest x-ray?

4        MR. McMILLAN:  I'm going to object to an accurate

5  diagnosis of asbestos.

6        THE COURT:  That's sustained.

7        MR. BAILOR:  I'm sorry?

8        THE COURT:  An accurate diagnosis of asbestos?

9        MR. BAILOR:  I'm getting it myself.

10 Q    Do you agree, doctor, that you cannot accurately diagnose

11 asbestosis based solely on a chest x-ray?

12 A    Certainly there are findings which would be consistent

13 with that diagnosis, but it is not a diagnostic study.

14 Q    And would you agree that in order to diagnose asbestosis

15 there should be a physical examination performed?

16 A    That's not within the realm of my expertise, sir.

17 Q    Do you know how many of these claimants actually, in fact,

18 have a asbestos-related condition?

19 A    No, sir, I don't.

20 Q    And how does this assist this Court in making an

21 estimation?

22 A    My responsibility, basically, was to evaluate the studies

23 that I was given to evaluate in terms of the presence or

24 absence of, in this case, an interstitial (indiscernible)

25 processor asbestosis which is what I've done.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001029

1  Q    So, based on what -- you can provide no information at all

2  as to whether or not any one of these individuals has an

3  asbestos-related condition?

4  A    It's not within the purview of imaging to do that under

5  any circumstances.

6            MR. BAILOR:  Can I have a moment, Your Honor?

7            THE COURT:  Yes, sir.

8            MR. BAILOR:  No further questions, Your Honor.

9            THE COURT:  Mr. Mullady, how long will you be, Mr.

10 Mullady?

11           MR. MULLADY:  Ten, 15 minutes.

12           THE COURT:  Would you like a ten-minute break first,

13 doctor?  Do you want to keep going?  All right, Mr. Mullady, go

14 ahead.

15           MR. MULLADY:  I'm just pausing for a moment to let

16 Mr. Ryan get set up, Your Honor.

17           THE COURT:  All right.

18           MR. MULLADY:  The Court's indulgence.

19                     CROSS EXAMINATION

20 BY MR. MULLADY:

21 Q    Dr. Henry, good afternoon.

22 A    Good afternoon.

23 Q    I represent the interests of future claimants against

24 Grace.  Your study involved films submitted by current

25 claimants against Grace, obviously, correct?

                  **J&J COURT TRANSCRIBERS, INC.**

1  A    Yes, sir.

2  Q    You're not here to opine that because only seven percent

3  of the films of current claimants were read by your readers as

4  having reliable radiologic evidence of asbestosis or damage to

5  lung tissue, that that means that only seven percent of future

6  claimants against Grace will have such evidence, are you?

7  A    I can only comment on the studies that I perform.

8  Q    You're not here to make any such extrapolation and you

9  haven't done so, is that correct?

10  A    No, sir.

11  Q    Now, you also have no opinion on how many of the 93

12  percent of current claimants whose films the Grace panel found

13  to be negative would have obtained a second x-ray had they

14  taken their cases to trial against Grace, correct?

15         MR. McMILLAN:  Objection.  That calls for

16  speculation, Your Honor.

17         THE COURT:  He's an expert.  That's what he does.

18  A    One more time, please?

19  Q    Sure.  Of the 93 percent of claimants --

20  A    Ninety-three percent who had negative findings by our

21  readers?

22  A    Yes.  You're not here to say, and you're not here to opine

23  that 93 percent of -- that that 93 percent would not have

24  obtained a second x-ray had they taken their cases to trial

25  against Grace?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001031

1  A    I have no opinion about that.

2  Q    And you have no opinion about how many of those claimants

3  would've been able to obtain a positive x-ray had they

4  endeavored to obtain additional x-rays, is that fair?

5  A    No, I don't have an opinion on that, no.

6  Q    Okay.  Now --

7           MR. MULLADY:  Do we have the Elmo on?  If we could go

8  to that, please.

9  Q    Putting GG-2087 on the Elmo.  This is your slide depicting

10 the process used in the Henry study.  Do you recall this?

11 A    Yes, sir.

12 Q    You started with 5,438 claimants who alleged radiographic

13 evidence of asbestos-related disease, correct?

14 A    That's correct.

15 Q    But, of those 540038, only 2857 had submitted x-rays with

16 certification and demographic information, correct?

17 A    That's correct.

18 Q    So, only 2800 of the 5400 actually submitted films that

19 you could even review?

20 A    Well, there were more than that, but some didn't have

21 proper identification.  Some didn't have the proper

22 certifications.  Some didn't meet the deadlines prescribed by

23 the Court.

24 Q    Fair enough.  But, in any case, that's over half of the

25 claimant population that you study.  I represent to you it's

1  about 52 percent, is that -- sound right?

2  A    Of the original persons identified on the PIQs, yes.

3  Q    Right.  Now, you're not here to opine that 52 percent of

4  future claimants who will be claiming against Grace will have

5  no x-rays to support their claims?

6  A    No, sir, I'm not.

7  Q    Let me ask you some questions about opinions that I think

8  you are here to offer.  Do you agree that if a qualified

9  B-reader assessed a patient's chest x-ray with a profusion

10 rating of 1/0, that that would be a clinically significant

11 finding that the patient's malignancy may be attributable to

12 asbestos exposure?

13 A    That's not my area of expertise, sir.  I have no opinion

14 about that.

15 Q    Okay.  Do you have an opinion as to whether a clinician

16 holding an x-ray with a profusion rating of 1/0 should or

17 should not ignore that assessment just because another B-reader

18 disagrees?

19 A    In other words, the B-readers don't agree on the

20 profusion?  Is that what you're saying?

21 Q    Right.  Does that make the first profusion any less

22 clinically significant?

23 A    I would probably get a third reading.

24 Q    Do you agree that reasonable B-readers can disagree as to

25 whether a given x-ray should be assessed at an ILO rating of

J&J COURT TRANSCRIBERS, INC.

CC-BLG001033

1 1/0 or higher?

2 A    I think they can disagree at 1/0 at a higher level that's

3 less likely there would be disagreement.

4 Q    It's a question of fact, isn't it, whether a particular

5 x-ray should've been assessed at a 1/0 rating or higher?

6 A    I'm sorry?  I don't understand.

7 Q    It's a question of fact, isn't it?

8         MR. McMILLAN:  I'm going to object that he's asking

9 for a legal question of the witness.

10        THE COURT:  Sustained.

11 Q    Doctor, I'd like to ask you some questions about x-ray

12 quality which is a topic that you addressed in your expert

13 report.

14        MR. MULLADY:  If we could have ACC/FCR Exhibit 476,

15 please?  And we'll have to switch off the Elmo.

16 Q    You wrote on Page 14 of your October 2006 report on this

17 issue of x-ray quality, doctor, that "Film quality has plagued

18 the classification process for decades and is a factor in

19 reader variability."  Do you see that?

20 A    Yes, sir.

21 Q    Do you stand by that statement?

22 A    I do.

23 Q    Poor film quality can lead a reader to over or under read,

24 correct?

25 A    That's correct.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Do you agree that it is harder to get a good quality x-ray

2  from a larger person?

3  A    You meaning larger, meaning BMI, meaning six-foot seven,

4  meaning --

5  Q    Well, let's take you to the place in your report where you

6  refer to this, Page 14, where you were discussing larger

7  individuals.  "Film quality in larger patients is always a

8  challenge," you wrote.  "Many workers who perform physical

9  labor are large people."  Did I read that correctly?

10 A    That's true.

11 Q    And that was your opinion at the time?

12 A    It is.

13 Q    I assume it still is.

14 A    It is.

15 Q    It's a major challenge to maintain -- excuse me.  Another

16 issue with obtaining a quality x-ray is whether the equipment

17 is properly maintained, is that correct?

18 A    That's correct.

19 Q    And I think you addressed this at Page 15 of your report

20 where you wrote that "It is a major challenge to maintain

21 equipment in a portable environment in sufficient working order

22 to obtain good quality x-rays."

23 A    That's true.

24 Q    Small facilities like private doctor's offices, factories,

25 and other non-healthcare facilities struggle with film quality,

CC-BLG001035

1  isn't that correct?

2  A    That is true.

3  Q    Doctor, on the issue -- shifting gears here again -- on

4  the issue of the number of B-readers that is necessary or

5  recommended in contested proceedings, I want to go back to two

6  slides that you showed us.  And you prepared these slides

7  yourself as opposed to counsel, is that correct?

8  A    I'm sorry?

9  Q    These demonstratives that you used in your testimony, you

10 prepared these yourself, right?

11 A    I participate on their development, but I did not prepare

12 them.

13 Q    I see.  Well, I want to ask you about one statement on

14 2083, "X-rays should be classified by three independent

15 readers."  Do you agree with that statement?

16 A    Yes, sir.

17 Q    Under the NIOSH recommendations?

18 A    For contested reading, yes, sir.

19 Q    Is this a derivation of that statement, GG-2082?

20 A    That's from the same area of that report, yes.  Yes, sir.

21 Q    And this slide, unlike the prior slide, actually quotes

22 from the NIOSH publication, correct?

23 A    That's correct.

24 Q    And this slide states, "NIOSH recommends a minimum of two

25 independent classifications by appropriately selected readers

J&J COURT TRANSCRIBERS, INC.

CC-BLG001036

1 with a third classification if the first two disagree,"

2 correct?

3 A    That's correct.

4 Q    That's a little different than saying that x-rays should

5 be classified by three independent readers, isn't it, sir?

6 A    The bottom line is, that for practicality sake,

7 recognizing that the inter-reader variability, that there's

8 going to be a necessity to have a third reader.  And we may

9 have taken a little bit of license there, but the bottom line

10 is in finishing out that sentence, that a third reader would be

11 called in to determine if there was a disagreement.

12 Q    A little bit of license.

13           MR. MULLADY:  I have no further questions.  Thank

14 you.

15           THE COURT:  Doctor, please, can you explain from the

16 corpuses of your study for me, please, the significance of the

17 1/0 read?

18           THE WITNESS:  The significance?

19           THE COURT:  Yes.

20           THE WITNESS:  If a chest x-ray is determined to

21 demonstrate a profusion of 1/0, that is alleged to indicate the

22 earliest signs of an asbestos or another occupational lung

23 disease affecting the lung tissue.  It would be the earliest

24 stages of what is probably a fibrotic process.  However, it

25 should be kept in mind that this is a non-specific study that

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001037

Henry - Cross/Mullady                                          224

1  many things present similar findings.  Many other things other

2  than asbestos produce a fibrotic reaction in the lung.  So,

3  while we find that 1/0 is a threshold that's been commonly

4  employed to say that somebody has the earliest signs of an

5  asbestos-related disorder in this venue, that it is, however,

6  not specific.

7            THE COURT:  And you used 1/0 as the test that you

8  were -- for your purposes for what reason?

9            THE WITNESS:  We use that because it was recommended

10  by the 2004 ATS guidelines which are currently, I guess, the

11  point of the realm.

12            THE COURT:  All right.  Thank you.  Anybody have any

13  questions as a result of the questions I've just asked this

14  witness?

15            MR. MULLADY:  No, Your Honor.

16            THE COURT:  Anything further?

17            MR. McMILLAN:  Brief redirect, Your Honor.

18            THE COURT:  Limited to the recross?

19            MR. McMILLAN:  Yes.

20            THE COURT:  Okay.  Or, I'm sorry.  This is redirect.

21  I apologize -- wrong witness.  I'm sorry.

22            MR. MULLADY:  Your Honor, if this is going to be more

23  than a few minutes could we take a short recess?

24            MR. McMILLAN:  I imagine it will be ten to 15

25  minutes, but I'm happy to do a short break.

J&J COURT TRANSCRIBERS, INC.

1          THE COURT:  Let's take a ten-minute recess.  We'll

2    take a ten-minute recess.

3          MR. MULLADY:  Thank you, Your Honor.

4          MR. McMILLAN:  Thank you, Your Honor.

5                    (Recess)

6          THE COURT:  Mr. McMillan.  Doctor, ready?  Okay.

7                    REDIRECT EXAMINATION

8    BY MR. McMILLAN:

9    Q    Dr. Henry, do you recall being asked questions by Mr.

10   Bailor relating to the NIOSH standards that would apply to

11   worker surveillance classifications as compared to contested

12   matter classifications?

13   A    Yes, sir.

14   Q    And if you had a matter that was a worker screening and

15   the result of that screening was to be used to press a claim in

16   court for asbestos-related disease, which classification system

17   would apply to those types of screenings?

18         MR. BAILOR:  Objection.  Calls for a legal

19   conclusion.

20         MR. McMILLAN:  Your Honor, I think I'm asking the

21   exact same question as Mr. Bailor.

22         THE COURT:  Well, he may have, but if you ask the

23   same question then it's been asked and answered.  Otherwise,

24   the way you asked it, it calls for a legal conclusion.

25   Sustained.


                    J&J COURT TRANSCRIBERS, INC.

CC-BLG001039

1          MR. McMILLAN:  Okay.

2    Q    Dr. Henry, when you have a worker surveillance screen that

3    only calls for one classification, is that the type of matter

4    where the claim is then used in a contested proceeding?

5    A    It's possible.

6    Q    If the claim was a worker screening, but the intent was to

7    use the result of the worker screening to press in a contested

8    matter, would the contested matter classification guidelines

9    apply?

10   A    I would think so.  If you were going to move into that

11   venue, yes, then I think the contested guidelines would be

12   appropriate.

13   Q    And certainly when you conducted your study in this case,

14   this is a contested matter, right?

15   A    There's no question.

16   Q    So, what was the appropriate procedure for you to follow

17   when you were designing the guidelines for your study?

18   A    Well, we employed the contested reading guidelines of

19   multiple readers.

20   Q    Mr. Bailor also asked you a little bit about inter-reader

21   variability, and specifically about some of the variability in

22   the reads of your independent readers.  Do you recall that?

23   A    Yes, sir.

24   Q    I want to talk a moment about when you have readings at

25   1/1.  When you have readings at 1/1, would you expect more

CC-BLG001040

1  agreement then when you have readings at 1/0?

2  A    Yes, sir, I would.

3  Q    And would you expect less variability among your

4  independent readers at 1/1?

5  A    Yes, I would.

6  Q    Would that be in part because there's a 1/1 standard?

7  A    In part, yes.

8  Q    And what would other reasons be why you would expect less

9  variability at 1/1?

10  A    I think there's a less arbitrary decision on the part of

11  the interpreter to arrive at a 1/1 classification.

12  Q    So, would you be more confident in results where you had

13  replicated 1/1 readings?

14  A    Personally, yes, I would.

15  Q    Now, would you expect there to be more variability at 1/0?

16  A    Yes, I would.

17  Q    And is that expected because of the understanding that

18  people who are B-readers have about inter-reader variability?

19  A    There is some -- probably some contribution from

20  inter-reader variability, but it plays to the concept of the

21  1/0 as being an arbitrary decision.  Since there is no 1/0

22  standard, you're almost inviting inter-reader variability.

23  Q    Is that one of the reasons that you use three B-readers?

24  A    Yes, sir.

25  Q    And the point of that is to minimize variability by having

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001041

1 multiple people look at the x-ray?

2 A    It's to address that fact, yes.

3 Q    And is it more critical, then, to follow the NIOSH

4 recommendations and ILO standards when you're looking at a film

5 that is a 1/0 where accuracy is even harder to attain?

6 A    Well, I don't know that it's more important.  I mean,

7 certainly it would seem appropriate to do so.  I think it's

8 appropriate to follow the guidelines at all levels, but I think

9 it would be most advantageous, or probably particularly

10 advantageous at low level of profusion.

11 Q    Let me phrase it a different way.  At low levels of

12 profusion, would failing to follow the guidelines have a higher

13 propensity to result in variable readings?

14 A    Which guidelines now?

15 Q    The ILO and NIOSH guidelines.

16 A    In terms of multiple readers?

17 Q    Well, I'm just saying if you add lower profusion levels,

18 if you fail to follow the guidelines, is it going to result in

19 greater variability?

20 A    Yes, I think it would.

21 Q    Doctor, Mr. Bailor asked you briefly about whether or not

22 you use CTs or HRCTs as part of your study.  I believe you said

23 you did not.

24 A    I did.

25 Q    Why is that?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001042

1 A    Well, first of all, there are no standards for the

2 interpretation of a CT scan as it relates to the evaluation of

3 an occupational lung disease.  Some people use a slice

4 thickness of ten millimeters, some might use five, some might

5 use three.  It's hard to compare a standard CT done in, say,

6 five or three millimeters to a high resolution study which is

7 done at a one millimeter slice thickness.  So, you're all over

8 the map regarding what the technique employed might be.

9 Q    So, that is what -- you're saying there's no technique

10 standardization?

11 A    There is no technique standardization for either CT or

12 HRCT as it relates to the evaluation of industrial-related

13 disorder.  It's up to the individual, whatever is a prevalent

14 process at a particular institution or whatever.  Whether they

15 do them supine, that is with a patient laying on the back or

16 where they turn the patient over and do the prone which is

17 absolutely necessary, in my opinion, for patients in this

18 particular area.

19        So, recognizing the fact that there's no standardized

20 technique for the performance of these studies regarding slice

21 thickness, positioning, how much we're going to look at.  We're

22 going to look at the entire lung, the bottom of the lung, parts

23 of the lung, et cetera, it's an open book.  Secondly, to the

24 best of my knowledge, there is no agency out there that's

25 authorizing anybody to read HRCT or CT, and the same way that

CC-BLG001043

1  there's an agency which stipulate the people have proficiency

2  in reading chest x-rays as B-readers.

3  Q    So, has the ILO and NIOSH or any other government agency

4  issued any standards for the technique to conduct CTs or HRCTs?

5  A    No.

6  Q    Has NIOSH, ILO or any other government agency issued any

7  standards for how to interpret CTs or HRCTs for pneumoconiosis?

8  A    No.

9  Q    You mentioned earlier the lack of standardization in the

10 technique.

11 A    Yes.

12 Q    Is there any problem with lack of standardization in the

13 interpretation of x-rays for -- or, sorry -- CTs or HRCTs for

14 pneumoconiosis?

15 A    Well, again, it relates to the technique.  The technique

16 would be integral to how that standard would be implemented in

17 terms of what part of the lung you were examining, whether you

18 were examining the patient in a particular position, how many

19 slices would you look at?  I mean, with the chest x-ray you

20 have one image and that's all you have to deal with, but with

21 the CT, you can have multiple images.  And so, the problem

22 might arise of, well, what if we finding on one image, but it's

23 not on the other image at a different level of the lung.  Is

24 that a significant finding, is it not?  And nobody really knows

25 the answer to that.

CC-BLG001044

1          So, while I think CT is a very promising tool as HRCT

2   is, there are still a lot of significant challenges out there

3   regarding standardization, the protocol for the technique, the

4   interpretation and so forth that have yet to be resolved.

5   Q    Now, in terms of the study that you did, you were

6   examining chest x-rays that had been submitted by these

7   claimants, right?

8   A    That's correct.

9   Q    And you were comparing them to your independent read?

10  A    That's correct.

11  Q    So, the comparison of your reads to the claimant readers

12  reads, whether or not they were HRCTs, does that have any

13  impact on the validity of the comparison of your reads versus

14  the claimant reads on the exact same chest x-rays?

15  A    Well, our study was based on the comparison of the chest

16  radiographic readings.  It had nothing to do with CT or HRCT.

17  Q    One last point, doctor.  You were asked, I believe, by Mr.

18  Bailor about the box on the form to check whether or not the

19  x-ray was completely negative or not.

20  A    Correct.

21  Q    And I believe what you said is that there are other things

22  on the ILO form that do not relate to asbestos.

23  A    That's true.

24  Q    Was that what you said?  So, if someone checks the box

25  that says, "This is not completely negative," does that mean

J&J COURT TRANSCRIBERS, INC.

1  anything for whether or not the patient has an asbestos-related

2  abnormality?

3  A     No.

4  Q     In fact, the population that you were looking at is a

5  population of cancer claimants, right?

6  A     Correct.

7  Q     So, in general, what would your expectation be about the

8  level of abnormality in a population, all of whom had cancer,

9  many of whom had lung cancer?

10 A     Then I would expect the significant number of the studies

11 to be abnormal, and them to check that off as being abnormal.

12         MR. McMILLAN:  I have no further questions, Your

13 Honor.

14         MR. BAILOR:  Very briefly, Your Honor.

15                    RECROSS EXAMINATION

16 BY MR. BAILOR:

17 Q     Doctor, determining whether or not a chest x-ray is

18 negative or a positive, that is 1/0, or negative, that's really

19 a matter of opinion in many cases, isn't it?

20 A     It shouldn't be a matter of opinion.  I mean, it should be

21 that you function within the guidelines of the ILO system

22 utilizing the standard -- the radiographs.  So, it's more than

23 an opinion.  I mean, there should be some scientific process

24 going on that's based upon training and so forth.

25 Q     But, you have testified there is no standard for 1/0,

J&J COURT TRANSCRIBERS, INC.

CC-BLG001046

1  correct?

2  A    There is no radiographic standard for 1/0, that's correct.

3  Q    And the radiologist has to make a decision and form an

4  opinion as to whether not that radiograph is 1/0?

5  A    Well --

6            MR. McMILLAN:  Objection.  Compound.

7            THE COURT:  No, that's not compound.  Overruled.

8  A    The process would be, typically, to put the, say, the

9  claimant chest x-ray up on a view box and to put the standards

10  next to it of what she would reconsider either normal or

11  abnormal.  In this case, 0/0 and 1/1, and then make a

12  determination based upon your skill or whatever as to whether

13  it did reach the level of 1/0.

14  Q    And your skill or whatever includes your judgment?

15  A    In that case, yes, sir.

16  Q    Okay.  Now, reading a CT and HRCT is a matter of judgment,

17  too, isn't it?

18  A    Yes, sir.

19  Q    And a radiologist reading a CT scan or a high resolution

20  computer topography can also have an opinion as to whether or

21  not it demonstrates asbestos-related disease, can he not?

22  A    Yes, sir.

23            MR. BAILOR:  No further questions, Your Honor.

24            THE COURT:  Mr. Mullady?

25            MR. MULLADY:  No questions.

                    **J&J COURT TRANSCRIBERS, INC.**

CC-BLG001047

234

1          THE COURT:  Any --

2          MR. McMILLAN:  No further questions, Your Honor.

3          THE COURT:  You're excused, doctor.  Thank you.

4          MR. BERNICK:  Your Honor, I believe that that is our

5  last live witness.  We have matters to present to the Court

6  tomorrow by deposition, and Ms. Harding, and perhaps Mr. Finch

7  and Mr. Mullady can describe that, but we are done with the

8  live witnesses that we have prepared for today and tomorrow.

9  The examinations were on schedule and fairly, you know, within

10  schedule so that we're moving along just fine, so that's not a

11  cause for concern.  I think that things are moving along just

12  fine.  But, tomorrow we will have prepared -- it's not prepared

13  now -- a package to present to the Court, and if it would be

14  appropriate and Your Honor wants to learn about it, I'm sure

15  that Ms. Harding can explain what's going to be happening so

16  that you're prepared.

17          THE COURT:  That might be helpful so we can, perhaps,

18  go through that now rather than in the morning.

19          MS. HARDING:  Good afternoon, Your Honor.

20          THE COURT:  Good afternoon.

21          MS. HARDING:  We're currently scheduled to present by

22  deposition testimony, the testimony of eight doctors and

23  screeners who have created medical evidence that has been

24  offered by the -- some of the claimants in this case.  Per the

25  CMO, we have designed our portions of the transcript that we

J&J COURT TRANSCRIBERS, INC.

1  want to play for the Court.  The other side has

2  counter-designated, and we have prepared binders for the Court

3  with all of the information, including our designations, their

4  designations, any objections that either party had, as well as

5  the exhibits that are implicated by the testimony and any --

6  and objections, if any, to those exhibits.

7      So, those are prepared.  They're ready.  We'll give

8  those to you as soon as we conclude today.  In the meantime,

9  though, we've also -- that would -- if we played all of that,

10 if we did all of that tomorrow, all of the designations would

11 probably take the whole morning and a good part -- at least

12 part of the afternoon -- at least over four hours or so.

13     We've met and conferred -- the ACC, the FCR, and the

14 debtors have met and conferred, and we have agreed to, if

15 it's -- if Your Honor wants to proceed this way so as to save

16 court time, we have agreed to just play portions of each

17 witness that we -- each side chooses.  So, for the debtors

18 we've chosen roughly a total of 45 minutes total from the

19 entire list of designations that we've made that we would play

20 for the Court.  And the ACC and the FCR plan to

21 counter-designate a similar amount of time tomorrow, and the

22 entire -- but the entire testimony that the Court would want to

23 consider at some point will be offered.

24     So, that's the way we intend to proceed if that's the

25 way Your Honor would like us to proceed.  We were trying to

**J&J COURT TRANSCRIBERS, INC.**

236

1 kind of keep it efficient and keep the court time down on that

2 issue.

3          THE COURT:  Well, here's the problem.  And I agreed

4 to let the parties in Federal-Mogul do that.  But, the trouble

5 is, at the end of the day I still have to go through it all,

6 and frankly, it's harder to do it in the office then it is to

7 do it in court because then, all I have are boxes of documents

8 and CD-ROM, and it's much more difficult to get the time to do

9 it there then it is to get the time to do it here.  So --

10 because things like this trial interfere.  Well, I mean

11 interfere with that case, I don't mean interfere with this

12 case, obviously.  You know, you need the time and I'm -- I

13 didn't mean character assertions by any means.  I just mean

14 that in trying to figure out how you're going to budget your

15 time, you have to budget the time.  And you can only do one

16 thing at a time.  So, I can either do Federal-Mogul or I can do

17 this, but I can't do both at the same time.

18          MS. HARDING:  I understand, Your Honor.

19          THE COURT:  All right.  So, I would say that if you

20 really want to get this case done in the most expeditious

21 fashion, much as I hate to say this because I can read a whole

22 lot faster than I can listen, it would probably be better to

23 just do it all in sequence tomorrow.

24          MS. HARDING:  That's what we'll do, Your Honor.

25          THE COURT:  I mean, and start with the witnesses.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001050

1          MS. HARDING:  If that's what you'd like, that's what
2  we'll do.  Okay.
3          THE COURT:  So --
4          MR. BERNICK:  So, that would mean that Your Honor
5  would actually rule the objections.  How would you prefer,
6  then, that the matter be put before the Court?  Do we just have
7  people read and offer documents?
8          THE COURT:  Well, I haven't seen what you're going to
9  do, so I'm not sure.  These are all just deposition transcripts
10 with --
11         MR. BERNICK:  Yes.  They are marked up deposition
12 transcripts.  The only portion that has been -- well, I suppose
13 we could do the whole thing by video, but I think that the
14 videos have been focused on portions of the transcript.  You
15 say that Barb, but are you sure that you --
16         MS. HARDING:  We can do both.  We have video that we
17 could do either the snippets -- we can do the video of the
18 entire presentation where there is video available.  There's
19 one transcript where there's not video available.
20         THE COURT:  Videos take an awful long time.
21         MR. BERNICK:  Yes.  They take an awful long time.
22 And the difficulty, then, is you have to then make the
23 objection and, you know, before the thing rolls on, and then
24 the Court has got to rule.  So, what would be your -- we do
25 want to show some of the snippets of the people.

                    **J&J COURT TRANSCRIBERS, INC.**

1            THE COURT:  Yes.  And I would like to see some.  But,

2    I don't see why we have to do the whole thing by way of video,

3    especially if you get into some long argument in a deposition

4    that's basically not going to be relevant to what you're

5    arguing about here.

6            MR. BERNICK:  Then what I would propose, if this is

7    agreeable to everybody, is that in order to get through the

8    transcripts most quickly, we should begin at the beginning of

9    the transcripts and go through and basically take, you know,

10   Q's and A's, have it read, and Your Honor rule on the

11   objections.  The alternative is to proceed by counter -- by

12   designation and counter-designation in which case you're

13   flipping back and forth which is --

14           THE COURT:  Doesn't make sense.

15           MR. BERNICK:  It doesn't make any sense.  So -- I

16   mean, it's very -- I think that it's -- probably the fastest

17   way to get through is you literally begin at the beginning of

18   the deposition.  Somebody will be the reader.  It doesn't have

19   to be either side.  Somebody could be the reader -- designated

20   reader -- question and answer objections made, it comes in,

21   doesn't come in, and we just go through the transcripts in that

22   fashion.

23           THE COURT:  All right.  Well, with respect to the

24   objections, and this is why I'm asking, sometimes you make

25   objections for purposes of --

                    **J&J COURT TRANSCRIBERS, INC.**

1        MR. BERNICK:  Yes, I know.

2        THE COURT:  -- discovery depositions that have

3 absolutely nothing to do with the trial objections.  So, are

4 you saying that every objection that you raised in the course

5 of these depositions are things that you're now going to raise

6 at trial?

7        MR. BERNICK:  No.  Well, that shouldn't be the case.

8 It should be the case that people have exercised in judgment

9 about what it is that you're going to be objecting to.  I do

10 think that it probably makes sense in light of the fact that

11 this is not going to be an (indiscernible) exercise, that it

12 probably makes sense for both sides to go through the

13 transcripts tonight and figure out what objections they really

14 want to press because I'm assuming that Your Honor will then

15 expect the objection to be made and ruled upon in court before

16 the reading continues.

17        MS. HARDING:  I think, and they can correct me if I'm

18 wrong, but I think that the -- I think they've already -- the

19 ACC and FCR have already identified the portions that they're

20 actually going to object to, and we don't have to worry about

21 the ones that are on the transcript.

22        MR. BERNICK:  No, that's not the point.  The point is

23 that if you read the transcript the objections are going to

24 come up as the transcript is read.  So, whoever's reading it,

25 it'll be marked and then they'll make an objection.  And all

J&J COURT TRANSCRIBERS, INC.

CC-BLG001053

240

1  that I think is that in order to save the Court's time, we

2  ought to make sure, as I understand Your Honor's suggestion to

3  us, we want to make sure that those objections are real

4  objections that warrant taking up the Court's time as the

5  transcript is being read.

6          THE COURT:  Well, I guess the question -- let me

7  phrase it this way.  Let's assume that the deposition starts on

8  Page 1 and goes to Page 20.  The first objection comes up on

9  Page 5, Line 5.

10         MR. BERNICK:  Right.

11         THE COURT:  And nobody really cares about that

12 objection anymore.  Then I would assume that Page 5, Line 5 is

13 no longer part of the designation that anybody has had in the

14 transcript because it's an objection that nobody cares about,

15 so it shouldn't be part of the designated portion any longer.

16         MR. BERNICK:  You mean the objection itself?

17         THE COURT:  Right.  Or -- right.  The objection

18 itself.  So, it should be stricken and then we don't have to

19 read it and it's not something that anybody has to worry about.

20 Has it been done that way?

21         MR. BERNICK:  No.

22         THE COURT:  Have the designations been done that way?

23         MS. HARDING:  No, they have not, Your Honor.

24         MR. BERNICK:  I suspect that the designations are

25 actually Q's and A's, and that there's then an objection noted

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001054

1  by way of bracketing the question and answer or whatever it is,

2  and I think that then what will -- what ought to be read is the

3  question.  If somebody has an objection to the question, it

4  gets stated in court, and then Your Honor rules and then the

5  answer comes in or it doesn't come in depending upon the

6  ruling.

7          But, I really do think that it makes sense for people

8  to go back tonight and -- I know I want to go back tonight and

9  make sure that the depositions are worth taking up, you know,

10  live court time to be pursued.

11          MR. FINCH:  Well, then, what happens -- I'm not sure

12  I understand.  It seems like there's two things --

13          THE COURT:  I can't hear you, Mr. Finch.

14          MR. FINCH:  I'm not sure I understand what's going

15  on.  They have videotaped depositions and then we have

16  transcripts.  And we have tried to be sparing both as to what

17  we objected to and as to what we counter-designated.  And what

18  I think they're saying is that you basically start at Page 1 of

19  the transcript and you'd have somebody read the portions that

20  have been designed from Page 1 to Page, you know, whatever the

21  end is.  You know, there -- whether it is their designation or

22  our counter-designation or whatever it is, and if an objection

23  comes up during that process that anybody cares about, you rule

24  on the objections right then and there.

25          What I'm not clear about is how the videotape relates

**J&J COURT TRANSCRIBERS, INC.**

1  to that exercise.  And so, I guess I want some clarification

2  from counsel for the debtor as to how --

3        MR. BERNICK:  (Indiscernible) because we thought that

4  it was going to be played in court.  It would present some

5  element of duplication, and as a consequence, my own feeling is

6  that we ought to do is, we ought to go through the deposition

7  transcript, reading it in court as Mr. Finch indicates.  And

8  then at the conclusion of reading the deposition, if there are

9  particular -- there's particular little clips that show the

10  witness, you know, either in his or her finest or his or her

11  most embarrassing moments, provided that it's come in, the

12  Court can get a short viewing of the video clip.  Does that

13  make sense to the Court?

14        THE COURT:  Well, are any of the portions that we're

15  going to be shown in the depositions -- the video depositions,

16  portions that are objected to?  Because if the purpose is to

17  let me see the witnesses -- and frankly, I would like to see

18  the witnesses because it's a little easier when you're going

19  back six months later to put a face to the name and the

20  testimony, so I would like to see at least portions of them or

21  have maybe a clip of the video --

22        MR. BERNICK:  During the reading.

23        THE COURT:  -- just so there is -- yes.  Just submit

24  it so that --

25        MR. BERNICK:  We will try to do that.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  -- there is a recollection available
2 later.

3          MR. BERNICK:  I think we'll try to do that.  I'm not
4 sure how many objections there really are during --

5          MS. HARDING:  Well, we had selected video portions
6 that did not -- that were not -- they were not objected to by
7 the other side.

8          MR. BERNICK:  Okay.  Well, then we'll -- as we get to
9 them and the transcript --

10          THE COURT:  Just show --

11          MR. BERNICK:  -- we will just show them instead of
12 reading the transcript and we'll reflect what portion of the
13 transcript is appearing by video.  We'll play the video, and
14 then we'll move on.  If you all have -- if during your portions
15 and you want to show by video, you aren't as fortunate and
16 there are numerous well-taken objections.  Yes, I guess we'll
17 have to stop the video and get the ruling on the objections.
18 But, then the monkey's on our back to then object during the
19 course of the video being played and we'll just have to do that
20 if there are objections to your portion, that's all.

21          THE COURT:  All right.  It would seem if the
22 person -- if the purpose is to show the witness, then, a very
23 short snippet's going to do it, I think.

24          MR. BERNICK:  Yes.

25          THE COURT:  If the purpose is that you've got some

**J&J COURT TRANSCRIBERS, INC.**

1 particular portion of what the witness looked like, how he or

2 she reacted, that you'd want me to see, then I may need it in a

3 context of the objection.  Typically speaking, I don't think I

4 need the witness there while the objection's going on.  That's

5 usually a legal ruling, so I don't know why I need to see the

6 witness during the objection which typically shouldn't involve

7 the witness anyway.

8          So, if that -- if the portions that involve the

9 objections can be done by deposition, and the portions that

10 involve non-objected to testimony can be done by video, I think

11 we might get through it a little quicker.  And if we can do

12 this at least for tomorrow and see how it goes, if it's really

13 too painful, then I may see if we can work something else out

14 in the future.  But, I know the experience that I'm having with

15 Federal-Mogul is that I'm sorry that I did what I did because

16 it's just too voluminous a record and it's just too difficult

17 to get through.

18          MR. BERNICK:  It's too easy, also, for the lawyers to

19 say, well, we just --

20          THE COURT:  Yes, here it is.

21          MR. BERNICK:  -- designate the whole thing, yes.

22          THE COURT:  Yes.  And that's another problem.  So,

23 at -- frankly, you ought to do the work.

24          MR. BERNICK:  Yes, right.  So -- but, I think it

25 might be also wise if our technical people got coordinated

**J&J COURT TRANSCRIBERS, INC.**

1 after court here so that we maximize the chance that people's

2 video clips can be queued up very easily and we can kind of go

3 through and do it.

4          MS. HARDING:  Okay.  We'll work it out, Your Honor.

5 I think -- I mean, Nate, any other questions?  All right.

6          THE COURT:  All right.  So, is there anything you're

7 going to need back from me today still or no?

8          MS. HARDING:  No, Your Honor.  We'll just -- we'll

9 hand up the full binders with all the designations.  You can

10 have those today and then --

11          MR. FINCH:  Oh, actually, I would like to check those

12 before we --

13          THE COURT:  Hand them up.  Yes.

14          MR. FINCH:  -- submit them.

15          MS. HARDING:  Oh, absolutely.

16          THE COURT:  Okay.

17          MS. HARDING:  Okay.

18          THE COURT:  Now, based on the fact that we have to

19 end tomorrow, do you want -- and you're all here -- do you want

20 to start at eight-thirty or are you going to have enough work

21 to do that you still want to start at nine?  I know you're

22 coming from all over.

23          MR. BERNICK:  Well, Barb, I don't know -- do you

24 think how long it's going to take to read through all this

25 stuff?

**J&J COURT TRANSCRIBERS, INC.**

1            MS. HARDING:  I think based on the way that we've

2    wittled it down both sides, I think we'll be done by lunchtime,

3    Your Honor, no matter how we do it.

4            THE COURT:  Oh, all right.  So, do you want to start

5    at nine, then?

6            MR. BERNICK:  So, we have to get designated readers

7    with charming voices and -- we don't have a jury, so we don't

8    need to worry about --

9            THE COURT:  Yes, you may want to switch, too.  People

10   can sometimes get tired, so -- okay.  We'll be in recess till

11   nine o'clock, then.  Thank you.

12           MS. HARDING:  Thank you, Your Honor.

13           MR. BERNICK:  Thank you, Your Honor.

14                         *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25

                       **J&J COURT TRANSCRIBERS, INC.**

CC-BLG001060

247

# C E R T I F I C A T I O N

        We, Patricia Repko, Lynn Schmitz, Denise O'Donnell
and Kathleen Betz, court approved transcribers, certify that
the foregoing is a correct transcript from the official
electronic sound recording of the proceedings in the above-
entitled matter, and to the best of our ability.


/s/ Patricia Repko

PATRICIA REPKO


/s/ Lynn Schmitz

LYNN SCHMITZ


/s/ Denise O'Donnell

DENISE O'DONNELL


/s/ Kathleen Betz                   DATE:   January 25, 2008

KATHLEEN BETZ

J&J COURT TRANSCRIBERS, INC.




                    J&J COURT TRANSCRIBERS, INC.

CC-BLG001061