UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                    .      Case No.  01-1139 (JKF)
                          .
W.R. GRACE & CO.,         .
et al.,                   .      USX Tower - 54th Floor
                          .      600 Grant Street
                          .      Pittsburgh, PA 15219
             Debtors.     .
                          .      January 23, 2008
. . . . . . . . . . . . . .      8:38 a.m.

TRANSCRIPT OF TRIAL
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:            Kirkland & Ellis, LLP
                            By:  DAVID BERNICK, ESQ.
                                 BARBARA HARDING, ESQ.
                                 SALVATORE BIANCA, ESQ.
                                 HENRY THOMPSON, ESQ.
                                 SCOTT McMILLAN, ESQ.
                                 ELLEN AHERN, ESQ.
                            200 East Randolph Drive
                            Chicago, IL  60601

For the Asbestos
Creditors Committee:        Caplin & Drysdale, Chartered
                            By:  NATHAN FINCH, ESQ.
                                 ADAM VAN GRACK, ESQ.
                            One Thomas Circle, NW
                            Washington, D.C.  20005



Audio Operator:             Cathy Younker

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609)586-2311     Fax No. (609) 587-3599

TRIAL EXHIBIT 13
CC-BLG001062-001156                                    CC-BLG001062

APPEARANCES (CONT'D):

| | |
|---|---|
| For the Asbestos<br>Creditors Committee: | Caplin & Drysdale, Chartered<br>By:  ELIHU INSELBUCH, ESQ.<br>375 Park Avenue, #3505<br>New York, NY  10152 |
| For W.R. Grace: | W.R. Grace<br>By:  JAY HUGHES, ESQ.<br>7500 Grace Drive<br>Columbia, MD  21044 |
| For the Equity<br>Committee: | Kramer Levin Naftalis & Frankel<br>By:  GREGORY HOROWITZ, ESQ.<br>919 Third Avenue<br>New York, NY  10022 |
| For the<br>Unsecured Creditors'<br>Committee: | Stroock & Stroock & Lavan<br>By:  ARLENE KRIEGER, ESQ.<br>180 Maiden Lane<br>New York, NY  10038-4982 |
| For the Property<br>Damage Committee: | Bilzin Sumberg Baena Price &<br>  Axelrod LLP<br>By:  MATTHEW KRAMER, ESQ.<br>200 South Biscayne Boulevard<br>Suite 2500<br>Miami, FL  33131 |
| For the Ad Hoc<br>Committee of Equity<br>Sec. Holders: | Dewey & LeBoeuf, LLP<br>By:  JENNIFER WHITENER, ESQ.<br>125 West 55th Street<br>New York, NY  10019 |
| For the Future<br>Claimants<br>Representatives: | Orrick, Herrington & Sutcliffe LLP<br>By:  ROGER FRANKEL, ESQ.<br>     RAYMOND MULLADY, ESQ.<br>     JOHN ANSBRO, ESQ.<br>Washington Harbour<br>3050 K Street, N.W.<br>Washington, D.C.  20007 |

J&J COURT TRANSCRIBERS, INC.

CC-BLG001063

APPEARANCES (CONT'D):


For Maryland Casualty:        Connelly Bove Lodge & Hutz, LLP
                              By:  JEFFREY WISLER, ESQ.
                              The Nemours Building
                              1007 North Orange Street
                              Wilmington, DE  19899

For Travelers:                STB
                              By:  STERLING MARSHALL, ESQ.


For Serengeti:                By:  BILLAL SIKANDER

For the Debtors:              Pachulski, Stang, Ziehl & Jones
                              By:  JAMES O'NEILL, ESQ.
                              919 North Market Street
                              17th Floor
                              Wilmington, DE  19899-8705



TELEPHONIC APPEARANCES:

For Committee of              Campbell & Levine
Asbestos Personal             By:  MARK T. HURFORD, ESQ.
Injury Claimants:             800 North King Street
                              Suite 300
                              Wilmington, DE  19701

For the Asbestos              Caplin & Drysdale, Chartered
Claimants Committee:          By:  PETER LOCKWOOD, ESQ.
                                   BERNARD BAILOR, ESQ.
                                   JEANNA RICKARDS, ESQ.
                                   WALTER SLOCOMBE, ESQ.
                                   JAMES WEHNER, ESQ.
                                   LESLIE KELLEHER, ESQ.
                              One Thomas Circle, NW
                              Washington, D.C.  20005

For the Unsecured             Strook & Strook & Lavan
Creditors' Committee:         By:  LEWIS KRUGER, ESQ.
                              180 Maiden Lane
                              New York, NY 10038



**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001064

TELEPHONIC APPEARANCES (CONT'D):

For Ad Hoc Committee:          Weil, Gotshal & Manges
                               By:  M. JARRAD WRIGHT, ESQ.
                               1300 Eye Street NW, Suite 900
                               Washington, D.C.  20005

For Official Committee         Dies & Hile LLP
of Asbestos Property           By:  MARTIN DIES, ESQ.
Damage Claimants:              1601 Rio Grande, Suite 330
                               Austin, TX  78701

For the Future                 Orrick, Herrington & Sutcliffe LLP
Claimants                      By:  JOSHUA M. CUTLER, ESQ.
Committee:                          DEBRA FELDER, ESQ.
                               Washington Harbour
                               3050 K Street, N.W.
                               Washington, D.C.  20007

For Fireman's Fund:            Stevens & Lee, P.C.
                               By:  DAVID R. BEANE, ESQ.
                               1105 North Market Street, 7th Fl.
                               Wilmington, DE  19801

For W.R. Grace:                Kirkland & Ellis LLP
                               By:  DAVID MENDELSON, ESQ.
                               6555 Fifteenth Street, N.W.
                               Washington, DC  20005

For the Debtors:               Kirkland & Ellis, LLP
                               By:  THEODORE FREEDMAN, ESQ.
                               Citigroup Center, 153 East 53rd St.
                               New York, NY  10022

For the PD Committee:          Bilzin Sumberg Baena Price &
                                 Axelrod LLP
                               By:  SCOTT BAENA, ESQ.
                               200 South Biscayne Boulevard
                               Suite 2500
                               Miami, FL  33131

For Owens-Illinois:            McCarter & English
                               By:  KATHARINE MAYER, ESQ.
                               Renaissance Centre, 405 N. King St.
                               Wilmington, DE  19801

J&J COURT TRANSCRIBERS, INC.

CC-BLG001065

TELEPHONIC APPEARANCES (CONT'D):

For David T. Austern:          Piper Jaffray & Co.
                               By:  JONATHAN BROWNSTEIN, ESQ.


For Asbestos Property          Scott Law Group
Damage Claimants:              By:  DARRELL SCOTT, ESQ.
                               1001 East Main Street, Suite 500
                               Sevierville, TN  37864

For National Union Fire        Zeichner Ellman & Krause, LLP
Insurance Co.:                 By:  MATTHEW RUSSELL, ESQ.
                                    ROBERT GUTTMANN, ESQ.
                                    MICHAEL DAVIS, ESQ.
                               575 Lexington Avenue
                               New York, NY  10022

For Federal Insurance          Cozen O'Connor
Company:                       By:  JEFFREY WAXMAN, ESQ.
                               Chase Manhattan Centre
                               1201 North Market Street
                               Wilmington, DE  19801

For Federal Insurance          Cozen O'Connor
Company:                       By:  JACOB C. COHN, ESQ.
                               1900 Market Street
                               Philadelphia, PA  19103

For Allstate Insurance:        Cuyler Burk, LLP
                               By:  ANDREW CRAIG, ESQ.
                               Parsippany Corporate Center
                               Four Century Drive
                               Parsippany, NJ  07054

For W.R. Grace:                W.R. Grace
                               By:  WILLIAM CORCORAN, ESQ.
                               7500 Grace Drive
                               Columbia, MD  21044

For State of Montana           Womble Carlyle Sandridge & Rice
Department of                  By:  FRANCIS MONACO, ESQ.
Environmental Quality:         222 Delaware Avenue
                               Suite 1501
                               Wilmington, DE  19801

CC-BLG001066

TELEPHONIC APPEARANCES (CONT'D):

For W.R. Grace:                  Cohn Whitesell & Goldberg, LLP
                                 By:  CHRISTOPHER M. CANDON, ESQ.
                                 101 Arch Street
                                 Boston, MA  02110

For CNA:                         Goodwin Procter, LLP
                                 By:  BRIAN MUKHERJEE, ESQ.
                                 Exchange Place
                                 Boston, MA  02109-2881

For David T. Austern,            Phillips, Goldman & Spence, P.A.
the Future Claimants'            By:  JOHN C. PHILLIPS, ESQ.
Representative:                  1200 North Broom Street
                                 Wilmington, DE  19806

For W.R. Grace:                  Pachulski, Stang, Ziehl & Jones LLP
                                 By:  TIMOTHY P. CAIRNS, ESQ.
                                 919 North Market Street
                                 17th Floor
                                 Wilmington, DE  19899-8705

For the Asbestos                 Ferry Joseph & Pearce, P.A.
Creditors Committee:             By:  THEODORE TACCONELLI, ESQ.
                                 824 Market Street, Suite 19899
                                 Wilmington, DE  19899

For Ford, Marrin,                Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer                Gleser
& Gleser:                        By:  SHAYNE SPENCER, ESQ.
                                 Wall Street Plaza
                                 New York, NY  10005

For Pepsi:                       Butler Rubin Salfarelli & Boyd LLP
                                 By:  KIRK T. HARTLEY, ESQ.
                                 70 West Madison Street
                                 Suite 1800
                                 Chicago, IL  60602

For Official Committee           Brandi Law Firm
of Asbestos Property             By:  TERENCE D. EDWARDS, ESQ.
Damage Claimants:                44 Montgomery St., Suite 1050
                                 San Francisco, CA  94104

For the State of CA,             Hahn & Hessen LLP
Dept. of Gen. Services:          By:  STEVEN J. MANDELSBERG, ESQ.
                                 488 Madison Avenue, 14th Fl.
                                 New York, NY  10022

J&J COURT TRANSCRIBERS, INC.

CC-BLG001067

TELEPHONIC APPEARANCES (CONT'D):

| | |
|---|---|
| For the PD Committee: | Speights & Runyan<br>By:  DANIEL SPEIGHTS, ESQ.<br>200 Jackson Avenue, East<br>Hampton, SC  29924 |
| For David T. Austern: | Piper Jaffray & Co.<br>By:  JASON SOLGANICK |
| For Scott Company: | Vorys, Sater, Seymour & Pease, LLP<br>By:  TIFFANY COBB, ESQ.<br>52 East Gay Street<br>Columbus, OH  43216 |
| For London Market<br>Companies: | Mendes & Mount, LLP<br>By:  ALEXANDER MUELLER, ESQ.<br>750 Seventh Avenue<br>New York, NY  10019-6829 |
| For Official Committee<br>of Asbestos Property<br>Claimants: | LECG, LLC<br>By:  ALAN MADIAN, ESQ.<br>        ELIZABETH DEVINE, ESQ. |
| For Official Committee<br>of Asbestos Property<br>Claimants: | Richardson Patrick Westbrook &<br>  Brickman, P.C.<br>By:  EDWARD J. WESTBROOK, ESQ.<br>174 East Bay Street<br>Charleston, SC  29401 |
| For the Blackstone<br>Group: | The Blackstone Group<br>By:  JOHN O'CONNELL |
| For Anchorage Advisors: | Anchorage Advisors<br>By:  JONATHAN LEWINSOHN |
| For Lehman Brothers: | Lehman Brothers<br>By:  ANDREW CHAN |
| For Caxton Associates: | Caxton Associates, LLC<br>By:  JAMES RIEGER |
| For Citadel Investment<br>Group: | Citadel Investment Group<br>By:  BEAU HARBOUR |

J&J COURT TRANSCRIBERS, INC.

CC-BLG001068

TELEPHONIC APPEARANCES (CONT'D):

| | |
|---|---|
| For Murray Capital<br>Management | Murray Capital Management, Inc.<br>By:  MARTI MURRAY |
| For Millennium Partners: | Millennium Partners<br>By:  IGOR VOLSHTEYN |
| For One East Partners: | One East Partners<br>By:  SINA TOUSSI |
| For Vinson & Elkins: | Vinson & Elkins<br>By:  ARI BERMAN, ESQ. |

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001069

# I N D E X

|  |  | **ID.** | **PAGE**<br>**EVD.** |
|---|---|---|---|
| **EXHIBITS** | | | |
| GX-168 | Prescription | 17 | |
| GX-170 | Business Record | 17 | |
| GX-172 | Mr. Gonzalin B-Read | 18 | |
| GX-196 | Document | | 44 |
| GX-408 | Report Summary | | 81 |
| Ex. 409 | Report Summaries | | 82 |
| GX-410, 411 & | | | |
| 412 | Report Summaries | | 83 |
| GX 414 | C.V. of Dr. Levine | | 83 |
| GX-131 | Brochure | | 84 |
| GX-133 | Customer List | | 85 |
| GX-134 | Atty. Selection Sheet | | 85 |
| GX0119 | RTS Contracts | | 85 |
| GX0120 | RTS Contracts | | 86 |
| GX0121 | Intake Forms | | 87 |
| GX0122 | Intake Forms | | 87 |
| GX0123 | Settlement Sheets | | 87 |
| GX 0125 | | | 89 |
| GX 0126 & | | | |
| 0127 | Med. Records | | 90 |
| GX-0159 | Invoices | | 90 |
| GX 0160 | Letter | | 90 |
| Ex. 0161 | Med. Records | | 90 |
| Ex. 0162 | Memorandum | | 90 |

CC-BLG001070

1          THE COURT:  This is a continuation of the personal

2    injury estimation trial in W.R. Grace, 01-1139.  The

3    participants by phone, John O'Connell, Terence Edwards,

4    Elizabeth Devine, Robert Guttmann, Matthew Russell, Jonathan

5    Lewinsohn, Jacob Cohn, Tiffany Cobb, Christopher Candon, Joshua

6    Cutler, James Rieger, Martin Dies, Kirk Hartley, Alex Mueller,

7    Steven Mandelsberg, Andrew Craig, Janet Baer, Ellen Ahern,

8    Andrew Chan, William Corcoran, David Mendelson, Theodore

9    Freedman, Bernard Bailor, Walter Slocombe, Leslie Kelleher,

10   Jeanna Rickards, Mark Hurford, Elihu Inselbuch, Peter Lockwood,

11   Shayne Spencer, James Wehner, Theodore Tacconelli, Jonathan

12   Brownstein, Debra Felder, Scott Baena, Alan Madian, Michael

13   Davis, Katharine Mayer, Daniel Speights, Timothy Cairns, Jeff

14   Waxman, Edward Westbrook, David Beane, Jarrad Wright, Sina

15   Toussi, Marti Murray, David Parsons, Beau Harbour, Brian

16   Mukherjee, Darrell Scott, John Phillips, Jason Solganick, Igor

17   Volshteyn, Francis Monaco, Lewis Kruger and Ari Berman.  And

18   I'll take entries in Court.  Good morning.

19          MS. HARDING:  Good morning, Your Honor.  Barbara

20   Harding on behalf of Grace.

21          MR. BERNICK:  David Bernick for Grace.

22          MS. AHERN:  Ellen Ahern for Grace.

23          MR. McMILLAN:  Scott McMillan for Grace.

24          MR. FINCH:  Good morning, Your Honor.  Nathan Finch

25   for the Asbestos Claimants' Committee.

CC-BLG001071

1          MR. VAN GRACK:  Adam Van Grack, Your Honor, for the

2    Asbestos Claimants' Committee.

3          MR. INSELBUCH:  Elihu Inselbuch for the committee.

4          MR. MULLADY:  Good morning, Your Honor.  Ray Mullady

5    for the FCR.

6          MR. ANSBRO:  John Ansbro for the FCR.

7          MS. KRIEGER:  Good morning.  Arlene Krieger from

8    Stroock for the Official Committee of Unsecured Creditors.

9          MR. HOROWITZ:  Good morning, Your Honor.  Greg

10   Horowitz from Kramer Levin for the Equity Committee.

11         MR. KRAMER:  Your Honor, Matt Kramer, Bilzin Sumberg,

12   on behalf of the Property Damage Committee.

13         MR. FRANKEL:  Good morning, Your Honor.  Roger

14   Frankel on behalf of the FCR.

15         THE COURT:  Excuse me one second.

16                         (Pause)

17         THE COURT:  Okay.  Thank you.  Ms. Harding?

18         MS. HARDING:  Good morning, Your Honor.

19         THE COURT:  Good morning.

20         MS. HARDING:  The parties have worked diligently

21   through the evening to condense the designations, and I'm happy

22   to report that we have resolved all of our differences with

23   respect to the testimony, so there will be no testimonial

24   objections during the playing of the various witness testimony.

25         THE COURT:  All right.

J&J COURT TRANSCRIBERS, INC.

12

1           MS. HARDING:  So, the way we intend to proceed is

2   that we will play each witness.  At the conclusion -- and we'll

3   play both the debtors' designations and the ACC and FCR's

4   designations, and at the conclusion of each witness the debtors

5   will have certain exhibits that we will move for admission.

6   I'm told that there may be some objections to those documents,

7   and then we'll have to discuss that with Your Honor.

8           THE COURT:  All right.

9           MS. HARDING:  Okay.  If that's acceptable to the

10  Court, then we'll begin with the testimony.  I do -- I think it

11  would be helpful to the Court -- Exhibit GG-2094, which was

12  admitted yesterday, Your Honor --

13          THE COURT:  All right.

14          MS. HARDING:  I have a copy if that would -- may I

15  approach?

16          THE COURT:  Yes.  I think if you just leave them

17  there -- well, if you just keep them on the floor.  I probably

18  will not be looking at the binders while the videos are playing

19  anyway.  Thank you.  I take it I'm not going to need the

20  binders while the videos are playing, correct?

21          MS. HARDING:  That's correct.

22          THE COURT:  All right.

23          MS. HARDING:  Because the binders do include certain

24  exhibits, we won't be offering them to the Court until the end

25  of the day, and we know which exhibits have been admitted.

J&J COURT TRANSCRIBERS, INC.

CC-BLG001073

1          THE COURT:  All right.

2          MS. HARDING:  Okay.  And just for the Court's

3    reference, some of the doctors were referred to in the chart

4    prepared by Dr. Henry yesterday.  The first witness is Dr.

5    Phillip Lucas, who I believe is the fourth from the bottom

6    doctor listed on Dr. Henry's chart.

7          THE COURT:  All right.  One second.

8          MS. HARDING:  And with that, Your Honor, we'll just

9    start the playing, and then we'll move for the admission of the

10   documents at the end.

11         THE COURT:  Okay.  Thank you.

12    (Videotaped deposition of Dr. Lucas played into the record)

13         THE COURT:  Whoever is using a Blackberry, or some

14   other device, I thought they were all taken.  It's on the tape.

15         UNIDENTIFIED SPEAKER:  Your Honor, it's on the tape.

16         THE COURT:  It's on the tape?

17         UNIDENTIFIED SPEAKER:  It's on the tape.

18         THE COURT:  Okay.  Sorry.  Start again, please.  I

19   apologize.

20         MR. BERNICK:  Do you want to have the question read

21   back?

22         THE COURT:  No.  I'm following.  Thank you.

23    (Videotaped deposition of Dr. Lucas played into the record)

24         THE COURT:  I'm sorry.  Now I'm not following.  I

25   can't understand it now.  I'm sorry.

**J&J COURT TRANSCRIBERS, INC.**

1     UNIDENTIFIED SPEAKER:  That section, an audio problem
2  on the tape itself --
3     THE COURT:  Could you just back it up so that I can
4  read it, then?  Because it goes too fast.  I can hear it, but I
5  can't read it.
6     UNIDENTIFIED SPEAKER:  Okay.
7  (Videotaped Deposition of Dr. Lucas played into the record)
8     UNIDENTIFIED SPEAKER:  (Indiscernible).
9     THE COURT:  I'm sorry.  Where did you back up to?
10     UNIDENTIFIED SPEAKER:  Forty-one twenty.
11     THE COURT:  I'm sorry.  I'm not taking -- I don't
12  know what the designations are.  Where I was.  How about -- can
13  you go back to re -- Exhibit 4, where the guidelines for ILO
14  classification were?  Because I got that.  And so -- whatever
15  comes after that, where I didn't pick it up, I --
16     UNIDENTIFIED SPEAKER:  46, Line 4.
17  (Videotaped deposition of Dr. Lucas played into the record)
18     THE COURT:  You can keep going.  It's fine.
19     UNIDENTIFIED SPEAKER:  Yes, but that's the -- that
20  concludes Lucas.
21     MS. HARDING:  No.  There's one more.  There's one
22  more that was -- actually, I think that's the (indiscernible)
23  that wasn't included.
24     UNIDENTIFIED ATTORNEY:  There is more?
25     UNIDENTIFIED SPEAKER:  (Indiscernible).

J&J COURT TRANSCRIBERS, INC.

CC-BLG001075

1    UNIDENTIFIED SPEAKER:  No.

2    UNIDENTIFIED SPEAKER:  Are we done with it?

3                    (Pause)

4    UNIDENTIFIED SPEAKER:  Barbara, is there more?

5    MS. HARDING:  Yes, as I understand it, there is a

6  couple lines that were evidently cut out, and --

7    UNIDENTIFIED SPEAKER:  Why don't we just read them?

8    UNIDENTIFIED SPEAKER:  (Indiscernible).

9    MS. HARDING:  Okay.  Go ahead.  Thank you, Tim.

10   (Videotaped deposition of Dr. Lucas played into the record)

11   MS. HARDING:  That's it.  Your Honor, may I approach

12  and hand you the binder for Dr. Lucas so you could see the

13  document we'll be seeking to admit?

14   THE COURT:  Yes.

15   MS. HARDING:  Thank you.

16   THE COURT:  Thank you.

17                    (Pause)

18   THE COURT:  I take it -- because I didn't ask

19  earlier, so I'll just ask this question generally that all of

20  these witnesses were appropriately sworn because none of -- the

21  tape started after the swearing in, so, is that going to be

22  true for all of these witnesses, they would have been sworn in

23  by the reporter at the time that the deposition started?

24   MS. HARDING:  Yes, Your Honor.

25   THE COURT:  Okay, thank you.


J&J COURT TRANSCRIBERS, INC.

CC-BLG001076

1          MS. HARDING:  And Your Honor, the debtors will be

2  -- during the course of the trial -- be presenting summaries of

3  the information submitted by claimants in this case with

4  respect to various doctors, the numbers of times that they've

5  been listed as diagnosing doctors and the number of times that

6  they've enlisted as B-readers just on the face of the

7  questionnaire.  It doesn't include the times that they've

8  included their documents as the diagnosing doctors or B-readers

9  and their attachments, as well -- as well as further testimony

10  from witnesses concerning various practices of various doctors.

11          THE COURT:  All right.

12          MS. HARDING:  Okay.  Your Honor, based on Dr. Lucas'

13  testimony, we do have several exhibits that we'd like to move

14  for admission.  The first one, it's in your notebook, is

15  GX0170.  There's been no objection noted to date.

16          THE COURT:  Any objection?  This is?

17          MS. HARDING:  This is the -- it's a document that is

18  the -- Dr. Lucas' prescription for a group of individuals to

19  get x-rays.

20          MR. FINCH:  That's not --

21          THE COURT:  This one just says, Donald Par Hunnicut

22  (phonetic)

23          MR. FINCH:  Yes, Donald Hunnicut.

24          MS. HARDING:  I apologize, I'm looking at the wrong

25  one.  I apologize.

CC-BLG001077

1          THE COURT:  Any objection?

2          MR. FINCH:  I need to know what the exhibit is.  I

3    don't think so, but I need to know the right --

4          MS. HARDING:  I'm sorry.

5          THE COURT:  You need to use the microphone, Mr.

6    Finch.

7          MR. FINCH:  Sure.  I don't think so, but I need to

8    know the right exhibit number.

9          THE COURT:  170.

10          MR. FINCH:  Well, except the 170 is not the

11    prescription.

12          MS. HARDING:  I apologize.  170 is just a medical

13    record -- I'm sorry, a business record of Dr. Lucas that lists

14    information about his diagnosis of a particular patient.

15          THE COURT:  Are you offering 170?

16          MS. HARDING:  Yes, we're offering 170.

17          MR. FINCH:  Okay.  No objection to Number 170

18    -- Grace 170.

19          THE COURT:  It's admitted.

20          MS. HARDING:  The debtors move to admit 168 which is

21    the prescription for a group of individuals to get --

22          MR. FINCH:  No objection to Grace 168.

23          THE COURT:  All right, just a second.  All right,

24    it's admitted.

25          MS. HARDING:  The debtors move for the admission of

J&J COURT TRANSCRIBERS, INC.

CC-BLG001078

1   GX0172 which is Dr. Lucas' B-read of Mr. Gonzalin (phonetic).

2           MR. FINCH: No objection to 172.

3           THE COURT: One second. It's admitted.

4           MS. HARDING: The last exhibit, Your Honor, is

5   GX0007.000943-000 which is the complete PIQ associated with

6   Exhibit 16 discussed in the deposition of Dr. Lucas.

7           MR. FINCH: We do object to that one. May I approach

8   the podium, Your Honor?

9           THE COURT: Yes.

10           MR. FINCH: To state the basis.

11           THE COURT: May I see where this is first? This is

12   the last exhibit in the binder, the one that starts final cover

13   sheet?

14           MS. HARDING: Yes, Your Honor.

15           THE COURT: Okay, yes, Mr. Finch?

16           MR. FINCH: It's 0009430. There's a few other

17   documents in my binder, Ms. Harding, you're not intending to

18   offer those Exhibits 166 and 167?

19           MS. HARDING: That's right. We're just -- just the

20   ones I've listed.

21           MR. FINCH: Okay. As to Exhibit 7 a bunch of zeros,

22   9430, this is a personal injury questionnaire. We have two

23   bases for this objection. The first is a relevance objection,

24   the same objection that we made yesterday. We think, under the

25   governing law, the questionnaires are irrelevant to the

CC-BLG001079

1  question of what was Grace's liability for costs it would incur

2  to resolve claims in the tort system.

3          The second objection is based on the fact that other

4  than the piece of the exhibit, which is what Dr. Lucas did

5  which he described in his testimony, everything else in here is

6  hearsay.

7          THE COURT:  All right, one second.

8                          (Pause)

9          THE COURT:  All right, and why is this not hearsay?

10         MS. HARDING:  Your Honor, the first reason we're

11  seeking to admit them, they are admissions of claimants in this

12  case --

13         THE COURT:  Yes.

14         MS. HARDING:  -- their medical records, their

15  statements about their medical condition.  And they should be

16  admitted because they are their admissions.

17         THE COURT:  They aren't at issue in this case.  The

18  claimants are not defendants in this action.  This is an

19  estimation proceeding.

20         MS. HARDING:  But their medical conditions are at

21  issue in the estimation.  Additionally, they are -- the medical

22  information -- the medical documents attached to the

23  questionnaire are -- should be admissible under the business

24  records exception.

25         THE COURT:  These are not --

J&J COURT TRANSCRIBERS, INC.

CC-BLG001080

1          MS. HARDING:  And they're also --

2          THE COURT:  I understood it though, not Dr. Lucas'

3   medical records.

4          MS. HARDING:  No, the medical record that was

5   discussed in the deposition is indeed Dr. Lucas' B-read of the

6   patient.

7          THE COURT:  Yes, and that part I think is admissible.

8   He's testified --

9          MR. FINCH:  I didn't object to the one piece of paper

10  that was Dr. Lucas'.

11         THE COURT:  Correct.

12         MR. FINCH:  What I objected to, Your Honor, is the

13  rest of the questionnaire.  What I objected to, Your Honor, was

14  the rest of the questionnaire and the other documents attached

15  to it as to which -- the document's attached to it, there's no

16  foundation, business records of anybody.  And the questionnaire

17  is hearsay.

18         And may I respond to the --

19         THE COURT:  She's not finished yet.

20         MR. FINCH:  Sure.  Okay, fine.

21         MS. HARDING:  No, I mean, it's the -- the PIQ is a

22  discovery response, Your Honor.

23         THE COURT:  Yes, of a person who's not here.  I mean

24  it's a discovery response of a claimant, not of the ACC and not

25  of the FCR.

CC-BLG001081

1          MS. HARDING:  Well --

2          UNIDENTIFIED ATTORNEY:  Barb?

3          MS. HARDING:  Hold on one second.

4          UNIDENTIFIED ATTORNEY:  Okay.

5          MS. HARDING:  Excuse me one second, I want to confer

6  with counsel.

7                    (Off the record discussion)

8          MS. HARDING:  Your Honor, I think as we've discussed

9  before with the Court, the claimants in this case are parties.

10  They have filed proof of claim forms.  And they are parties to

11  the case -- to the estimation.  We've -- they're under the

12  control of the ACC.  They represent them.  If we don't --

13          THE COURT:  They clearly don't represent the parties

14  here.

15          MS. HARDING:  Well --

16          THE COURT:  The parties -- the individual claimants

17  are not parties to the estimation.  Some of their information

18  is clearly relevant and it is the kind of information that

19  experts may use in the course of their work in terms of

20  estimating the liability.  But, that doesn't mean that the

21  substantive work itself is admissible as a document upon which

22  this Court has any basis to admit the substantive evidence.

23  Just because the expert relies on it, doesn't mean that the

24  document itself is admissible.  It's hearsay.  Those parties --

25  these claimants are not parties to the estimation.  Their

CC-BLG001082

1   information is clearly relevant to what your experts wish to

2   do, but that doesn't mean that the information itself is not

3   hearsay.  It is.

4          The experts are entitled to rely upon hearsay.  The

5   rules clearly provide for that.  And your witnesses have been

6   quite clear about the fact that medical information is clearly

7   of the nature that they would consider in the course of their

8   duties.  But that doesn't mean that the information itself

9   isn't hearsay, it is, except for the findings that Dr. Lucas

10  himself has made.  That clearly is a business record of Dr.

11  Lucas', and it is admissible.

12          So, Dr. Lucas' -- that one page that he identified,

13  that document is admissible and will be admitted.  But I don't

14  see how the rest of the questionnaire itself is admissible.

15          MS. HARDING:  Your Honor -- well --

16          MR. FINCH:  Your Honor, what about the one counsel

17  per --

18          THE COURT:  I'm going to ignore it for now, Mr.

19  Finch.  Mr. Bernick, if you want to take a shot at this.

20          MR. BERNICK:  Yes, I understand.

21          THE COURT:  I'll give you a chance and I'll ignore

22  the one counsel rule for this purpose.

23          MR. BERNICK:  I understand where I think Your Honor

24  is going.  And obviously, the thrust of what I take Your Honor

25  to be saying is the PIQ information witness, what happened

CC-BLG001083

1 yesterday and the like, is appropriate material for an expert

2 to rely on --

3          THE COURT:  Yes.

4          MR. BERNICK:  -- but doesn't have to come in

5 independently.  And I appreciate that and I appreciate the fact

6 that we will be able to have the expert testimony come in from

7 that point of view.

8          But there are many aspects of the case where I think

9 it's going to be important to have the underlying information

10 be a matter of record.  And I'm concerned that the -- if the

11 -- while it seems at this point that it may be that the

12 entirety of the case is expert opinion, I do believe that the

13 claimants -- the ACC itself will be proffering testimony indeed

14 through their own experts who they seek to make fact witnesses

15 regarding the underlying facts that pertain to these claims.

16          In this particular case, I don't --

17          THE COURT:  Why won't that be hearsay?

18          MR. BERNICK:  Yes, it may well be.

19          THE COURT:  What's sauce for the goose is sauce for

20 the gander.

21          MR. BERNICK:  I understand that.  And what I -- but

22 I'm loathe to follow the path of least resistance and embrace

23 the fact that it may be least resistance also for the other

24 side under a circumstance where I think it's relatively clear

25 that this is not hearsay.


                    J&J COURT TRANSCRIBERS, INC.

24

1          And I say that for two reasons.  (1) I don't believe
2     that there is a separate case called the estimation case.
3     There is a proceeding in a trial called the estimation
4     proceeding and trial.  The case is the bankruptcy case.
5          THE COURT:  Well, sure.
6          MR. BERNICK:  And these individuals are parties to
7     the bankruptcy case.  They have made claims in the bankruptcy
8     case.  Their counsel have filed 29 team statements appearing on
9     their behalf in the bankruptcy case.  These are pleadings in
10     the bankruptcy case.  They are all of them signed by the
11     claimants.  I don't think it gets much better that they are
12     parties to the case.  They may not be parties to this
13     proceeding, but they are part --
14          THE COURT:  But you have to make them parties to the
15     proceeding, otherwise there's no due process right that
16     attaches.
17          MR. BERNICK:  I don't -- the rule --
18          THE COURT:  This is not an objection to claim
19     process.  If you want them to be a party to a proceeding,
20     you've got to join them in some fashion to a proceeding.
21          MR. BERNICK:  I don't believe that the rules have
22     anything to do with the distinction between different kinds of
23     proceedings within a case.  If you are a party to the
24     bankruptcy case, you are a party for purposes of the rule on
25     admissions.  These people are parties.  It may be that they're

CC-BLG001085

25

1  represented by the ACC and the FCR, but we're dealing very,

2  very strictly with the rule of evidence.

3          And the rule of evidence says, it's hearsay unless

4  it's a statement by a party.  There's no distinction within

5  that exception -- actually, it's not even an exception to the

6  hearsay rule, it is non-hearsay under the Federal Rules of

7  Evidence if it's a statement made by a party.  There's not a

8  distinction made under the Federal Rules of Evidence between a

9  party who participates in one proceeding as part of a case and

10 a party who does not participate.

11          Indeed, I think it's even conceivable that if the

12 claimants had wanted to, they've made the election not to

13 participate in this process, and they're represent -- their

14 interests are represented by the ACC and FCR.  But I would

15 under -- I would imagine that if any claimant actually wanted

16 to participate in this case through counsel to express whatever

17 view they wanted as they have throughout the process, think of

18 all of the times the claimants' counsel have come before this

19 Court in connection with a discovery that was directly relevant

20 to and part of this estimation proceeding.

21          THE COURT:  Sure.  There is no doubt that if they

22 chose to be here, the Court would permit them to be here.  I'll

23 take a brief from all parties on this issue.  I'll reserve

24 ruling.

25          MR. BERNICK:  Okay.

CC-BLG001086

1      THE COURT:  And this is what I'll do.  To the extent

2  that it is somehow necessary until I get these briefs for

3  somebody to make reference to these documents, I'll permit it

4  subject to a motion to strike.  This isn't a jury trial.  I can

5  certainly discount this evidence later.  It's not the first

6  time I will have seen these PIQs in the case anyway.  So, I'm

7  certain that I can put it aside if I need to.  So, I'll let you

8  make use of it.  But I want briefs on this issue --

9      MR. BERNICK:  That's fine.

10     THE COURT:  -- because the Federal Rule of Evidence

11 in this instance does not really fit exactly with the type of

12 proceeding that we've got going.

13     MR. BERNICK:  And I appreciate that.  And that's

14 fine.  And I think that that's fine.  The only other two things

15 I'll just say and I'll sit down, so we can get on with things,

16 is that there was no objection made to this PIQ until like last

17 night.  And I do remember very vividly and this is one of the

18 reasons that I wanted to stand up -- before we actually

19 embarked upon this trial, there was a lot of discussion about

20 how -- what would be involved in getting documents into

21 evidence.  And it was very, very clear that we were not going

22 to have a situation where at the last minute objections would

23 be made; would then require that we go out and take somebody's

24 deposition or take evidence.

25     THE COURT:  That's true.

CC-BLG001087

1        MR. BERNICK:  So, we have gone through this entire

2 process.  And now we face a technical object that could be

3 resolved if we actually had to by going out and taking the

4 depositions of these doctors and actually going through the

5 business records exception, et cetera, et cetera.  Or for that

6 matter, taking the depositions of the claimants because the

7 claimants could be deposed and they could be then asked to

8 verify what they submitted discovery on.

9        Instead, we get an objection that's made less than 12

10 hours before the appearance of this information.  And it's an

11 objection that is a technical objection that could easily be

12 cured, and we can't cure it.  And the last point is

13        THE COURT:  I'll give you time to cure it if that's

14 the necessary issue.

15        MR. BERNICK:  I hope it's not.  Now, then the last

16 thing --

17        THE COURT:  If it's a last minute objection --

18        MR. BERNICK:  Because the other people that would be

19 able to do it are the law firms.  And of course we went down

20 that road.

21        The last point is that -- as Ms. Harding indicated

22 -- that in the case of this last witness, there are literally

23 hundreds and indeed thousands of PIQs that identify these

24 people.  In the case of Mr. Lucas, it's probably over 400

25 times.  He was listed as the diagnosing, not presumptive or not

CC-BLG001088

1  -- the diagnosing doctor.  We want to be able to offer in a

2  very simple summary.  Under 1006 that says, here's all the

3  times the PIQ said that.

4          I don't want to have to deal with, well, can a

5  summary be -- come in if it's a summary of information that's

6  not independently admissible but is information that would be

7  usable by an expert under 702, 703.  Can you have a 1006

8  summary of evidence that's usable by an expert?

9          THE COURT:  Yes.

10          MR. BERNICK:  I hope so, but that's part of -- it's

11  kind of what I'm thinking about is that I'm very reluctant to

12  say we're it's so clear, it shouldn't be independently

13  admissible because it will come in through an expert.  If we

14  can work that out, maybe that would also help this out.  I

15  don't want to --

16          THE COURT:  That one, I don't have any issue about

17  because I've had to rule on that issue before many years ago.

18  And I'm relatively sure that the case law will support the fact

19  that if the expert can use it, you can use the summary.  This

20  witness was very clear that he himself is not a diagnosing

21  physician.  And if somebody is treating him that way, it seems

22  to me that the PIQs or other information that list him as

23  diagnosing physician can be summarized to show that somebody

24  thinks he's a diagnosing physician when he himself is (a) not

25  forming a patient relationship from his point of view, and (b)

CC-BLG001089

1  is not using himself as a diagnosing physician.  And it doesn't

2  seem to me that it's inappropriate to use a summary for that

3  purpose.

4          MR. BERNICK:  Okay.  I appreciate that.  And we will

5  be happy to submit a brief.  I don't know, would Your Honor

6  like to have simultaneous briefs on the issue?

7          THE COURT:  Yes, I think simultaneous briefs are

8  fine.

9          MR. BERNICK:  Ten days or --

10         THE COURT:  Or Mr. Finch -- it's Mr. Finch's

11 objection.

12         MR. FINCH:  Sure.

13         THE COURT:  If you want him to go first, he has to go

14 first.

15         MR. FINCH:  Ten days from -- ten days from today.

16         MR. BERNICK:  Ten days from today.

17         THE COURT:  That's fine.

18         MR. FINCH:  Simultaneous briefs of ten pages.

19         MR. BERNICK:  Well, I hope it's not 10 or 15 pages.

20         THE COURT:  I doubt they're going to find that many

21 cases.  Ten pages ought to be fine.

22         MR. BERNICK:  That's right.

23         MR. FINCH:  I understand that.  But can I respond

24 briefly about something Mr. Bernick said?

25         THE COURT:  Yes.


                    J&J COURT TRANSCRIBERS, INC.

CC-BLG001090

1          MR. FINCH:  Under the case management order that is

2  in place, January 4th, 2007 was the deadline for all parties

3  filing authenticity objections to exhibits and stipulations

4  regarding the admissibility of exhibits.  This wasn't an

5  authenticity objection.  This was a hearsay objection.  There

6  is no deadline in the CMO to identify hearsay objections.

7  And --

8          THE COURT:  Well, you've got one now.

9          MR. FINCH:  Absolutely.

10          THE COURT:  And it's ten days from now.

11          MR. FINCH:  I understand that.  But the second point

12  relating to the parties' issue.  This is a contested matter

13  within the bankruptcy case.  When your Court entered the order

14  scheduling the hearing, you said this was core proceeding

15  pursuant to 28 U.S.C 157(b)(2).

16          28 U.S.C 157(b)(2) makes clear that a core proceeding

17  includes but is not limited to the allowance or disallowance of

18  claims against the estate or exemptions of property of the

19  estate and estimation of claims or interest for the purposes of

20  confirming a plan under Chapter 11, 12, or 13 of Title 11, but

21  not the liquidation or estimation of contingent or unliquidated

22  personal injury tort or wrongful death claims against the

23  estate for purposes of distribution in a case under Title 11.

24          The individual circumstance -- the individual

25  claimants are not parties to a proceeding that would allow or

CC-BLG001091

1  disallow their individual claims.

2             THE COURT:  Right.

3             MR. FINCH:  Therefore, I don't they're parties within

4  this contested proceeding in this bankruptcy within the meaning

5  of the Federal Rules of Evidence.  If there was a contested

6  proceeding involving John Smith -- claimant Smith, Mr. Bernick

7  would have to file an objection to claimant Smith's claims.

8  And that would tee off a whole level of procedural rights that

9  that claim won't have the right to do, including discovery from

10 Grace.  They would set a schedule in the district court to

11 identify experts for trial.  And you would get a trial in front

12 of a jury.  That's our basic position, Your Honor.

13            THE COURT:  Well, I think I agree with that basic

14 position.  That's why I'm going to have you give me briefs on

15 that issue and on whether or not these PIQs are hearsay within

16 the meaning of the Federal Rules of Evidence or whether or not

17 because the claimants are clearly parties to the bankruptcy

18 here, there's no doubt about that, that automatically makes

19 them parties to every proceeding regarding a plan confirmation

20 that they somehow or other deal with a claim that they may hold

21 in that bankruptcy.  I don't think that's the way it's going to

22 come out, but it may.

23            MR. FINCH:  Or for purposes solely of the question of

24 the usability of their statements as evidence.

25            THE COURT:  Exactly.  Yes.  Just for purposes of

CC-BLG001092

1 whether or not these statements are admissions against their

2 interest as the debtor is classifying this statement at the

3 moment.  That's the purpose, yes.

4         MR. FINCH:  Okay.  We will file a brief.  I'm not

5 sure whether ten days from today on a weekend.

6         UNIDENTIFIED ATTORNEY:  It's a Saturday.

7         MR. FINCH:  It does.  So, what's the next day?

8         UNIDENTIFIED ATTORNEY:  Friday, February 1.

9         THE COURT:  Today is the 23rd, so --

10        MR. FINCH:  Monday the 4th, would that be acceptable,

11 Your Honor?

12        THE COURT:  Yes, that's fine because --

13        MS. HARDING:  It's fine.

14        THE COURT:  -- I mean, this issue is probably not

15 going to -- I think it -- we have until the end of this trial

16 until we need to know the result of this, although it would

17 probably be better to get it resolved before then if possible.

18 So, if --

19        MR. FINCH:  Thank you, Your Honor.  May we take a

20 short recess now for --

21        THE COURT:  Yes, but I would like one -- to make one

22 statement before we start this.  I think this process is going

23 to be helpful, but frankly, folks, that was an hour and a half

24 of testimony that could have been 45 minutes.  There was an

25 awful lot of duplication.  I know you probably think that I'm

CC-BLG001093

1 not the brightest bulb on the planet, but I really don't need

2 to hear things three and four times.  Once, and maybe twice

3 will do it.  Please get the duplication out of this record.  It

4 will expedite things an awful lot in the future.

5          MR. FINCH:  Okay.

6          THE COURT:  Once is generally satisfactory.  Twice

7 will definitely be enough.  And if I still don't ask it -- you

8 know I'm verbal enough.  If I don't understand it by then, I'm

9 verbal enough, I'll ask.

10          MR. BERNICK:  Yes, the problem is -- Ms. Harding may

11 have something to add -- is just the usual kind of designation,

12 counter-designation.  I think that that probably created the

13 duplication.  I was reading through.  I think that that's where

14 it happened.  It was in the, you know, the back and forth

15 process.  And I think that what really is necessary is for us

16 to spend more time talking with one another so that we can

17 reduce the total amount of time.

18          THE COURT:  I think so, too, because this estate is

19 paying for a lot of you to be here.  And it's -- it's wholly

20 unnecessary.  And if a witness were on the stand, I would not

21 permit the same question and the same answer to be asked five

22 and six times.  I would not do it, and I'm not going to do it

23 again in these -- after today because I understand that you had

24 to go through this process last night.  But those are your

25 marching orders for the rest of these depositions.  One time

CC-BLG001094

1 through fine.  If for some reason, somebody thinks the question

2 or the answer wasn't clear, okay, twice, fine.  And once on

3 cross examination, that's three times.  If all of us can't get

4 it after three times, we don't deserve to be here.  And if I

5 still don't understand, as I said, I'll ask.  But no more than

6 twice on direct, once on cross, that's it.  Please, get it out.

7 Get all the duplication out.  And then I don't think we'll have

8 to be here quite so long for this purpose.

9          Okay, we'll take a ten minute recess.

10          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

11                    (Recess)

12          THE COURT:  Please be seated.  Ms. Harding, are there

13 other exhibits?

14          MS. HARDING:  No further exhibits with Dr. Lucas,

15 Your Honor.

16          THE COURT:  Yes, okay.

17          MR. FINCH:  Just one point of clarification?  Your

18 Honor, one point of clarification.  On February 4th, it was my

19 understanding that the parties would exchange their file briefs

20 on the issue of the admissibility of that particular

21 questionnaire and the extent to which questionnaire responses

22 would be treated as admissions of parties for purposes of this

23 case.

24          THE COURT:  Correct.

25          MR. FINCH:  What was not clear to me is whether or

J&J COURT TRANSCRIBERS, INC.

CC-BLG001095

1  not the Court also wanted the parties to exchange any

2  objections to exhibits beyond authenticity?  The CMO did not

3  require that.  It's oftentimes hard to know whether you have a

4  substantive objection to some exhibit until you see the purpose

5  for which it's being offered.

6         THE COURT:  Well, you may not know about relevance

7  objections, but you certainly know about hearsay objections.

8  So, I think if you got hearsay objections, you ought to be

9  making those.  So, we can deal with those in advance because

10 for the most part, those are going to be legal issues that

11 ought to be able to be briefed in advance.  Relevancy can't

12 -- I can't give you rulings about relevance until I know the

13 context.  So --

14        MR. FINCH:  So, we have a relevance objection,

15 obviously, to all the questionnaires.  But for hearsay

16 purposes, you would have to assume that every document on the

17 other side's exhibit list is being offered for the truth of the

18 matter when in fact they may not be doing that.  So, would you

19 rather me just assume that all of the documents they're

20 offering are for truth and object on hearsay grounds if I think

21 it's hearsay?

22        THE COURT:  You've been through two and half years of

23 discovery and you don't know at this point and time whether the

24 documents are going to be offered for the truth, or is

25 demonstrative exhibits, or whatever else is going to happen?

CC-BLG001096

1      MR. FINCH:  Not necessarily, Your Honor, until you

2  see how the witness is approached with the document and the

3  purpose for which it's offered.

4      THE COURT:  Then you need to meet and confer.  So, I

5  think you folks need to meet and confer with respect to your

6  documents.

7      MR. BERNICK:  Your Honor?  Your Honor said on the

8  record, and appropriately so, that this should be -- these

9  objections should be made so we can get immediately to the

10  question of what needs to be done to cure these if they are

11  proper -- which we doubt that they are -- technical objections.

12  There's not -- I don't -- I'm happy to meet and confer, but I

13  don't think that should have the effect of deferring the

14  deadline for making the objections.

15      MR. FINCH:  That's fine.

16      MR. BERNICK:  We can -- excuse me -- so we that we

17  can get on with business.  You know there are many courts in

18  which you are required to make all objections before the trial

19  even begins.

20      THE COURT:  That's normally my practice.

21      MR. BERNICK:  And Your Honor has been flexible about

22  that.  So, this is not a particularly big deal.  We'll meet and

23  confer.  But I think that, what did Your Honor say, by February

24  14th, we should have -- something like that -- was it February

25  14th?

CC-BLG001097

1  THE COURT:  Well, I said the 4th, but when -- I think
2  maybe the best thing to do in thinking about this is, you've
3  got an omnibus date sometime in February.  I don't know when
4  that is.  Does anybody --

5  UNIDENTIFIED ATTORNEY:  25th.

6  THE COURT:  Oh, that might be a little late.

7  MR. BERNICK:  Yes, the difficulty, Your Honor, is
8  that we are on a hiatus.  But time is not on our side if we're
9  going to have to figure out some way to deal with these hearsay
10  objections.  They've got maybe a thousand exhibits.  It's not
11  particularly difficult if they want to really lodge a hearsay
12  objection to go ahead and lodge it.  And I think that while we
13  can meet and confer and all the rest of that, we should know
14  what their objections are particularly in areas other than
15  relevance.  I understand they're going to object to everything
16  that we do on relevance grounds.  That's been established.

17  But when it comes to hearsay and other things that we
18  can cure, I think that Your Honor ought to set a deadline.  If
19  it's February 15, it's February 15.  And both sides will just
20  -- will go through and make the draws.  It's not rocket
21  science.

22  THE COURT:  Well --

23  MR. FINCH:  That's perfectly acceptable to us, Your
24  Honor, if we just have a deadline of February 14th or --

25  THE COURT:  Well, I had originally said the 4th, but

CC-BLG001098

1   perhaps what I was going to say is -- maybe the 14th is a

2   weekday, too.  What I was going to suggest is maybe a date that

3   is in advance of the next omnibus date in February makes sense

4   so that we can address any objections at that omnibus and not

5   take up a trial date for it.  Your omnibus date seemed to not

6   be being used for a lot of matters, so maybe we could address

7   objections at the omnibus.

8           MS. HARDING:  I'm told it's the 25th, Your Honor,

9   February 25th.

10          MR. BERNICK:  And so if we agreed to say the 15th or

11  something like that, would --

12          MR. FINCH:  That's fine.

13          MR. BERNICK:  Yes, so, we'll do --

14          THE COURT:  All right, wait, let me check my

15  calendar.

16          MR. BERNICK:  The 15th is the date to exchange the

17  subject objections --

18          MR. FINCH:  Yes.

19          MR. BERNICK:  -- other than relevance.

20          THE COURT:  Well, let me check my calendar.

21          MR. BERNICK:  Okay.

22          THE COURT:  The 15th, I think, is going to be the day

23  that the agenda will be due because that's the Friday before

24  the 25th.  So, I think you actually need to exchange them the

25  14th so that the could be included in the binder on the 15th.

CC-BLG001099

1          MR. FINCH:  That's fine.  We'll exchange the

2 objections to each other's exhibits lists on the February 14th.

3 And the briefs that we're talking about on the hearsay issue,

4 we will file with the Court on February the 4th.

5          THE COURT:  Yes.

6          MR. BERNICK:  Right.

7          MR. FINCH:  Okay.  Thank you, Your Honor.

8                         (Pause)

9          THE COURT:  One second.  Okay, I'm with you again.

10 Thank you.

11          MS. HARDING:  Thank you, Your Honor.  I'd just like

12 to give you just a preview of what's coming so you know for

13 your scheduling purposes.

14          THE COURT:  Right.

15          MS. HARDING:  We've got Dr. Gaziano who is nearly an

16 hour.  There's about 25 minutes from us and about 33 from the

17 other side.  Dr. Oaks, which is about 47 minutes.  Mr. Heath

18 Mason is about eight minutes.  Mr. Charley Foster is about

19 eight minutes.  James Ballard is about ten minutes.  Ray Harron

20 is about ten minutes.  And then we have the one transcript

21 which is not on video, which is the one we were going to read,

22 which -- I don't know if Your Honor wants us do that or not,

23 but that one is a physical document.  And that will take about

24 an hour, we timed it trying to do the reading as fast as we

25 could.  And that's about an hour.


                    J&J COURT TRANSCRIBERS, INC.

1          THE COURT:  All right.

2          MS. HARDING:  Okay?  All right.  So, the next doctor

3   is Dr. Gaziano on Exhibit GG2094, Dr. Henry's chart.  He is

4   listed the third doctor down on Dr. Henry's chart.

5          THE COURT:  All right.

6          MS. HARDING:  Okay?  Thank you.

7   (Videotaped deposition of Dr. Gaziano played into the record)

8          THE COURT:  I'm sorry, can you back up?  It's

9   starting to go too fast and I can't get the questions.  Just to

10  the last -- whatever the last question was.

11  (Videotaped deposition of Dr. Gaziano played into the record)

12         THE COURT:  Now, I can't understand it.

13         UNIDENTIFIED SPEAKER:  No, no.  She couldn't

14  understand that.  Is that the best the sound is?

15         UNIDENTIFIED SPEAKER:  That's what it is.

16         UNIDENTIFIED SPEAKER:  Okay, would it be helpful for

17  us to just to read the question for Your Honor?

18         THE COURT:  It may be because it's so verbal that I

19  can't pick it up.  And on top of that, whoever is asking is now

20  going like a house on fire and so it's -- on top of getting it

21  garbled, I just can't pick the words out.

22         MR. BERNICK:  Well, the last question that was

23  garbled is at Line 147 -- excuse me -- Page 147, Line 6.

24  "Q   Are you aware that the ATS Guidelines indicate that

25  differential diagnosis is an important criteria for

CC-BLG001101

1  non-malignant asbestos disease?"

2          And there then follows, Your Honor, the -- what's now

3  going to be a relatively long answer from the witness.

4          THE COURT:  All right, well, we can try it and see if

5  I can get it from there.

6          MR. BERNICK:  He -- go ahead.

7  (Videotaped deposition of Dr. Gaziano played into the record)

8          MR. BERNICK:  I think that it was, Your Honor, at

9  Line 4, Page 187, "Would you agree -- well, do you believe that

10 an occupational title is sufficient to determine whether a

11 person was sufficiently exposed to asbestos containing products

12 to cause non-malignant asbestos-related disease" if you missed

13 the question.

14          :   THE COURT:  All right.

15          MR. BERNICK:  If you can try to pick up, T.J.  Wait,

16 187, Line 9.

17 (Videotaped deposition of Dr. Gaziano played into the record)

18          MR. BERNICK:  Could you stop?

19          MR. BERNICK:  I'm sorry, Your Honor, that was kind of

20 garbled, do you want me to read --

21          ·  THE COURT:  No, I got it.

22          ·  MR. BERNICK:  Okay.

23          ·  THE COURT:  Thank you.

24 (Videotaped deposition of Dr. Gaziano played into the record)

25          THE COURT:  Now, I can't understand the tape.


                    J&J COURT TRANSCRIBERS, INC.

1        MR. BERNICK:  Yes, that is Page 249, Line 13.  We are

2   getting towards the end here, Your Honor.  "I think this

3   morning, it may have been this morning before the lunch break,

4   I believe you testified in the course of answering another

5   question that you do not -- I believe your testimony was that

6   you do not need an occupational history to make a diagnosis of

7   asbestosis in certain venues.  Do you recall that testimony?"

8   And then we would pick up at Page 249, Line 20.

9    (Videotaped deposition of Dr. Gaziano played into the record)

10       MR. BERNICK:  Okay, it says -- stop.  "In fairness,

11   that was -- so it is your testimony that you do need an

12   occupational history in order to make a diagnosis of

13   asbestosis."

14       And the answer was at Line 7 of Page 250, "Yes,

15   ma'am."

16       So, why don't you pick up at 250 Line 18?

17    (Videotaped deposition of Dr. Gaziano played into the record)

18       MR. BERNICK:  Your Honor, would you just like me to

19   read it?

20       THE COURT:  No, I got it.

21    (Videotaped deposition of Dr. Gaziano played into the record)

22       THE COURT:  Do we have to do this, again?  This is

23   like 18 times through this.  Stop this please, so we can back

24   it up.  Folks, this is at least the sixth witness now who had

25   been through the ILO standards.  I really don't want to hear it

CC-BLG001103

43

1  any more.

2          MR. BERNICK:  Well, you're looking over here, Your

3  Honor, that's not --

4          THE COURT:  I'm looking at whoever.  I do not want to

5  hear another witness go through what the ILO standards are,

6  what they have to do, you know, how they've been prepared, what

7  they're for, or the ATS standards and guidelines.  I've got it.

8  I can probably quote it from any of the other witnesses that

9  you intend at this point to present.  So, I don't want to hear

10 any more witnesses about that point unless they're going to say

11 something different from what the prior six have already told

12 me.  If what you want to do is summarize for me something like,

13 and I'm just going to make this up, just simply for

14 illustrative purposes, Henry Anderson, James Ballard and James

15 Scutero, all say at Page 86 of their depositions that the ILO

16 standards say X, Y, Z, I will accept that as a summary chart, I

17 do not want to hear one more witness say this.  It is

18 cumulative, I understand it, I believe them all.  I do not want

19 to hear more witnesses about it.  Okay.  I will finish with

20 this witness, no more.  Back it up to the beginning of Page --

21          MS. HARDING:  I think it was the end, Your Honor.

22          THE COURT:  -- back it up to the beginning of Page,

23 let's say the middle of Page 269, where I asked whether I had

24 to go through this again.

25          MR. BERNICK:  It's actually 269, line 22.

                    **J&J COURT TRANSCRIBERS, INC.**

CC-BLG001104

1        THE COURT:   Thank you.

2              (Deposition played into record)

3        MS. HARDING:   Your Honor, the Debtors offer GX-0196

4  and I believe Mr. Finch has already said there's no objection,

5  but I'll confirm that.

6        THE COURT:   One second, please.   0196.

7        MR. FINCH:   We have no objection to Grace Exhibit

8  196.

9        THE COURT:   All right, it's admitted.

10        MS. HARDING:   Thank you, Your Honor.   We are, in

11  light of Your Honor's comments, kind of reviewing things.   We

12  are not going to offer Dr. Oaks testimony today.   I think it

13  will be cumulative.   And we've got the testimony from the

14  witnesses that took the 5th Amendment, which is much shorter.

15  And then we have the one transcript which is a reading of the

16  transcript which I suggested maybe over lunch -- we have 20

17  minutes, they have 40 minutes.   We'll try to cut ours down even

18  further and maybe the ACC can do the same with theirs.

19        THE COURT:   All right.   Do you want to take a lunch

20  recess now or do you want to go forward with the couple of

21  witnesses with respect to the 5th Amendment?

22        MR. BERNICK:   I suppose it really -- we should just

23  take the break and then we'll be able to finish it up.   On the

24  witnesses as to whom -- as to which their testimony the take

25  the 5th Amendment, our approach is to have just a couple, a

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001105

1  clip of each one because they're going to say the same thing

2  over again.    The reason that we have, then, more significant

3  transcripts and we would propose that those not be read because

4  they are simply the same invocations, but the reason that we

5  need them is that there are a whole series of questions and

6  we've tried to limit them, but there are a series of questions

7  as to which the 5th Amendment is taken and that we will seek an

8  adverse inference with respect to those.    So that's the reason

9  why the transcripts are longer than the little clips, unless

10 Your Honor wants to hear those transcripts read.    What we would

11 propose is that we simply play the clips and then tender the

12 transcripts and we can make a record of what portion of the

13 transcripts we're tendering so that Your Honor then can have

14 that as part of the record.

15          THE COURT:    I think that's fine.    I don't see if

16 they're going to say -- they're going to assert the 5th

17 Amendment as to each question, I don't see the need to ask each

18 question, and just have the witness assert the 5th, unless,

19 counsel, you see some reason to do that.    That seems not to be

20 a productive use of anybody's time.    All right, there's no

21 objection to that process.    So, that's fine.

22          MR. BERNICK:    We'll get that all arranged and maybe

23 that'll mean that our session after lunch is not all that long.

24          THE COURT:    All right.    Okay, we'll take an hour?

25          MS. HARDING:    Thank you, Your Honor.

CC-BLG001106

1    THE COURT:  All right, 1:30 we'll recess until 1:30.

2    MR. BERNICK:  Thank you, Your Honor.

3                    (Luncheon recess)

4    THE COURT:  Please be seated.  Ms. Harding.

5    MS. HARDING:  Good afternoon, Your Honor.

6    THE COURT:  Good afternoon.

7    MS. HARDING:  We're going to proceed as follows.

8  We've met and conferred with counsel and with respect to Dr.

9  Levine, we have reduced our designations from 25 questions to 7

10  questions, the ACC has reduced theirs from 40 to 28, I think.

11  I'm going to read our questions, my colleague Mr. Mendelson is

12  going to be Dr. Levine on the stand and answer the questions

13  both for me and Mr. Finch.

14    THE COURT:  All right.

15    MS. HARDING:  Okay.  Dr. Levine, agreed through

16  counsel to respond to a subpoena by answering through

17  deposition by written question.

18    THE COURT:  All right.

19    MS. HARDING:  Thank you.  May I sit at the table?

20    THE COURT:  Sure.  Just make sure you speak into the

21  microphone so I can hear you.

22    MS. HARDING:  I will, okay.  And I think we need

23  about one minute to just --

24    THE COURT:  Okay.

25    MS. HARDING:  -- took the last minutes to kind of get

**J&J COURT TRANSCRIBERS, INC.**

1  -- take off the questions for everybody, so it'll take us one

2  minute.

3            THE COURT:  Okay.

4            MR. FINCH:  Your Honor, is it acceptable to the Court

5  if I read the questions from here, rather than ping ponging

6  with Ms. Harding going back and forth to the podium?

7            THE COURT:  Yes, that's fine.  Dr. Levine.

8            MS. HARDING:  Your Honor, this is my partner, David

9  Mendelson.  Your Honor, we're going to start, there was a

10 general statement in the beginning, if you could read that,

11 please.

12           MR. MENDELSON:  Sure.

13           THE COURT:  First of all, what's Dr. Levine's first

14 name, please?

15           MR. MENDELSON:  Richard B. Levine.

16           THE COURT:  All right, thank you.

17           MR. MENDELSON:  "Pursuant to Federal Rule of Civil

18 Procedure 31(a), non-party, Richard B. Levine provides the

19 following answers to written questions submitted by Debtor,

20 W.R. Grace and Company.  General statement of Richard B.

21 Levine, M.D.  According to generally accepted medical

22 principles, a positive B-read simply does not equate to a

23 clinical diagnosis of an occupational dust disease.  To render

24 medical diagnoses that are conclusive, much more than a B-read

25 is required.  The B-reader interprets densities or shadows on

CC-BLG001108

1  the chest x-ray.   The densities or shadows can be caused by any
2  number of disease processes and may not indicate a disease
3  process at all.   Reading shadows is subjective and
4  non-conclusive.    Moreover, the B-reader system was not
5  established either as a clinical diagnostic tool or for use in
6  litigation, but rather as one part of a general surveillance
7  program implemented in Great Britain to determine whether coal
8  workers should be transferred to lower dust environments.
9         Finally, the B-read is a radiologists impression
10  based upon comparisons to the International Labor Organization
11  classification system.   The ILO system was primarily devised to
12  have standards against which epidemiologic research and
13  analysis could be accomplished across the borders of many
14  nations.   The guidelines, but their own terms, are not designed
15  for or intended to be used to clinically diagnose the presence
16  or absence of an occupational dust disease.   Yet, apparently
17  certain persons are equating B-reads with clinical diagnoses of
18  occupational dust diseases including asbestosis.   Certain
19  persons are apparently using my B-reads for that purpose.   Such
20  use is bad science and unauthorized by me.   Such use has
21  resulted in my having to defend the integrity of my B-reads
22  only because certain people have misused my B-reads for
23  purposes for which they were never intended by me or the ILO or
24  NIOSH, evidence of a political diagnosis of occupational dust
25  disease.

CC-BLG001109

1    I resent having to expend my resources responding to
2    claims I have never made, and would have disavowed if asked.    A
3    B-read is not a clinical diagnosis of the presence or absence
4    of an occupational dust disease.    I am a board certified
5    radiologist, and have been so since 1974. I am a NIOSH
6    certified B-reader and have been since 1985.    I take my
7    responsibilities as a NIOSH certified B-reader quite seriously.
8    For example, within the last several months, I have
9    bene asked to and have provided services to prosecuting
10    attorneys and their agencies investigating alleged misuses and
11    abuses of B-reads in connection with occupational dust
12    diseases.
13    My areas of expertise and practice as a radiologist
14    extend to nuclear medicine, mammography, and diagnostic
15    radiology imaging, as well as occupational dust disorders as a
16    B-reader.    I've practiced my radiologic specialty as a NIOSH
17    certified B-reader by interpreting x-rays for findings
18    consistent or inconsistent with previous occupational exposure
19    to dust.    My interpretation is based upon my training as a
20    radiologist and my certification.
21    During the past several years I spent approximately 5
22    to 10 percent of my practice time as a B-reader, reviewing
23    x-rays for the presence or absence of occupational dust
24    diseases and writing reports based upon my observations.    The
25    larger portion of that percentage of my time reviewing x-rays

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001110

1 has been expended in reviewing them for the presence or absence

2 of findings consistent with previous occupational exposure to

3 asbestos.

4      My role is limited to performing a screening triage

5 function.  The screening helps determine whether a work

6 environment may be in need of upgrading or whether an

7 individual should undergo a complete clinical examination by a

8 pulmonologist or other qualified physician, without which no

9 conclusive diagnosis of any occupational dust disease can be

10 made.  I am not so qualified.

11      On many occasions, I have received x-rays sent from

12 imaging companies, unions, law firms, or even manufacturers of

13 asbestos products for my review within areas of my

14 specialization.  Undoubtedly, many of the x-rays sent to me for

15 my review from each of these sources sought my opinion as a

16 NIOSH certified B-reader as to whether my findings were

17 consistent or inconsistent with previous occupational exposures

18 to dust.  On receiving these x-rays I rarely know that any of

19 my reads are intended to be used in connection with litigation

20 much less whether the reports are to be utilized by plaintiffs

21 or defendants, should litigation ensue.  The only exception

22 occurs if a law firm sends me a series of x-rays taken over a

23 period of years, of the lungs of a person who is by then more

24 often than not deceased.  In such circumstances, I am often

25 asked to opine on whether the series of x-rays disclose the

CC-BLG001111

1 existence and progression of dust caused disease process and/or

2 cancer.

3 　　　　　In those circumstances, I function as a board

4 certified radiologist and not limited to performing a B-read

5 function. In those circumstances, I do assume that any B-read

6 report included within my work, is sought along with the

7 reports of other specialists to enable the law firm to

8 determine whether the death is related to an occupational dust

9 disease.

10 　　　　　I would expect that were my B-read report

11 inconsistent with occupational dust disease, no litigation

12 would ensue because that person as a plaintiff, based in whole

13 or in part on my report.  Were my B-read report consistent with

14 such disease, then I would expect that person would undergo

15 whatever test and examinations are necessary to enable a

16 qualified physician to make a clinical diagnosis of the

17 presence or absence of such disease.  Regardless of whether the

18 report had been sought by a union, or manufacturer or law firm

19 or imaging company, I expect there should be a clinical

20 diagnosis of occupational dust disease to support any such

21 claims.  My triage function does not provide such a diagnosis

22 nor am I trained to make such a clinical diagnosis or to treat

23 persons with such diseases.  None of my reports are intended to

24 and none can be used as a sole evidence of the presence or

25 absence of any occupational dust disease.  No such diagnosis

CC-BLG001112

1  can be made from a B-read, regardless of the skill or expertise

2  of the B-reader.

3         Should a report regarding any specific x-ray conclude

4  that there are observations consistent with such prior

5  exposure, the presence or absence of such a disease can only be

6  established after a full examination and history by a

7  pulmonologist or other appropriate specialist.

8         My findings are intended to, and do serve a triage

9  function enabling the person or entity sending the x-ray to me

10  to obtain my radiologic impression so that such persons can

11  direct the individuals whose x-rays I reviewed to a

12  pulmonologist or other specialist for procedures necessary to

13  make the clinical diagnosis.  Should -- lower lung bilateral

14  interstitial fibrosis with irregular linear interstitial

15  markings delineated and/or fertile thickening are other

16  indications consistent with asbestosis or make findings

17  consistent with some other occupational dust disease.

18         Any person who reports to rely upon my B-reading or

19  results in a report, as a clinical diagnosis of asbestos or

20  silicosis, is wrong as a matter of science and does so without

21  my authorization.

22         As a NIOSH certified B-reader, I have been asked to

23  review chest x-rays to determine whether they suggest a

24  presence or absence of occupational dust diseases.  Such

25  diseases are not limited to asbestosis, or silicosis.  To the

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001113

53

1  contrary, they include a coal workers pneumoconiosis, heavy

2  metal disease caused by a vanadium laid in alloys or

3  beryliosis, among others.

4       Intriguingly, based upon x-rays, radiologic

5  impression are not necessarily limited to suggestions of only

6  one occupational dust disease.  For example, coal workers

7  pneumoconiosis and silicosis may show similar x-ray changes,

8  thus it is simply bad science to make the clinical diagnosis of

9  occupational dust disease such as asbestosis or silicosis,

10  based upon a radiologic impression only.  After all, the

11  radiologic impression may well be indicative of one or even two

12  dust diseases, or no occupational dust disease whatsoever.

13       Moreover, even if a radiologic impression does not

14  disclose suggestions of an occupational dust disease, the

15  person may well have such disease.

16       Finally, even if a radiologic impression does present

17  suggestions of an occupational dust disease, the person may

18  well have no such disease.  On being asked to review chest

19  x-rays as a B-reader, rarely do I know if litigation is

20  contemplated or underway, as I am reading the x-rays.  However,

21  I will assume that when asked by, for example, Johns Manville

22  to review x-rays, as I was during the 1990's, my reviews would

23  likely be for the defense side were litigation to ensue or to

24  enable Johns Manville to investigate the workplaces in which

25  persons whose x-rays I reviewed had worked or were working.  If

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001114

1 others sent x-rays for me to read, it could be that my reports
2 would be utilized to facilitate the screening of persons who
3 would be plaintiffs or companies in opposition to plaintiffs
4 whose x-rays had been reviewed by other B-readers or for other
5 reasons unrelated to litigation.

6      My role, however, is limited to the screening triage
7 function.  My role is reflected in my form contract, a copy of
8 which is attached hereto as Exhibit 1.  That contract states
9 that my B-reader service is restricted to "my opinion whether
10 the chest x-rays are consistent or inconsistent with previous
11 exposure to occupational dust".  I do not need occupational
12 histories or durations and quantities of potential dust
13 exposures to perform my contract.

14      Moreover, since I am not purporting to render a
15 diagnosis under HCS guidelines, I need not obtain such
16 information nor need I refer to it even if it is sent to me.
17 The contract specifies that my B-reader report or ILO report is
18 not a clinical diagnosis of the presence or absence of any
19 occupational disease or condition and moreover, that no such
20 disease or condition can be diagnosed simply by a B-read.  This
21 specification is simply good science.

22      My contract also recites that the presence" -- excuse
23 me.  That the presence -- I'm sorry, my copy is missing a Page
24 7.

25      MS. HARDING:  That may be because -- is it not

CC-BLG001115

1 designated?

2       MR. MENDELSON:  I don't think that --

3       UNIDENTIFIED MALE SPEAKER:  I don't think there was

4 anything designated on Page 7.

5       MS. HARDING:  I think that's probably why.  I don't

6 think anybody designated anything from 7.

7       MR. MENDELSON:  All right.  Picking up on Page 8, the

8 paragraph "I have never made a clinical diagnosis of silicosis

9 or asbestosis.  If any person used by B-read report to do so,

10 it was without my knowledge and contrary to the contract,

11 pursuant to which I've served as a B-reader.

12       The restrictions and limitations upon the B-read

13 which I have made as part of my practice are not only

14 consistent with, but compelled by the inherent limitations and

15 restrictions imposed by science upon the use and functions of

16 B-reads and ILO reports.

17       MS. HARDING:  Okay.  So, I guess the last paragraph

18 is not designated, that's why.  All right.  Could you --

19       "Q   What is Dr. Levine's education background?

20       "A   I received my BA cum laude in Biology from

21 Hofstra College in June of 1965.  I received my MD degree from

22 Albert Einstein College of Medicine in June of 1969.  I

23 interned in medicine at Colorado General Hospital of the

24 University of Colorado and Denver, Colorado and did my

25 residency in radiology with a specialization in nuclear

J&J COURT TRANSCRIBERS, INC.

1 medicine at the Montefiore Hospital  in the Bronx, New York.

2 See my CV attached hereto as Exhibit 2 for additional

3 information."

4          MS. HARDING:  Mr. Mendelson, just a reminder because

5 I know that with respect to some answers, only certain portions

6 are designated.  So, just -- it's fine, it's not a big deal

7 here, but I think later the ACC has designated just certain

8 portions.

9          Question Number 3 "What are Dr. Levine's professional

10 certifications, if any?

11          "A   I was certified by the American Board of

12 Radiology and Diagnostic Radiology and Nuclear Medicine in

13 1974.   I obtained my NIOSH ILO B certification in 1985 and have

14 been recertified in 1989, 1993, 1995, 2001 and 2005.  See my CV

15 attached hereto as Exhibit 2."

16          Question Number 6:  "Has Dr. Levine's B-reader

17 certification ever been revoked, and if so, please explain the

18 circumstances?

19          "A   No.

20          Question Number 22:  "In his non-hospital based

21 B-reading practice approximately how many x-rays has Dr. Levine

22 found to be positive for the presence of an asbestos related

23 disease?  Please express answer both as a total volume number

24 and as a percentage of Dr. Levine's total non-hospital based

25 B-reading practice?

                  **J&J COURT TRANSCRIBERS, INC.**

CC-BLG001117

1           "A    I incorporate my general statement, my contract

2  template and my response to written deposition question number

3  21 as if fully set forth.  I have note ever attempted to break

4  down the percentages of positive or negative radiologic

5  impressions, or by non-hospital B-reading and practice by

6  occupational dust disease.  Be it asbestos related, silicosis

7  related, beryliosis, coal workers pneumoconiosis or another

8  dust.  The best that I can recall is that of the x-rays sent to

9  me for the application of my skills as a NIOSH certified

10 B-reader and regardless of whether the x-rays has been

11 submitted to me by persons on the 'claimant' side, or the

12 'defendant' side, of these self-selected groups of persons

13 x-rayed, I am comfortable estimating that I generally find

14 radiologic impressions consistent with occupational dust

15 disease between 15 to 24 percent of the time.  This figure is

16 in excess of what I would expect to find in the general

17 population.  It does not seem to me to be surprisingly high or

18 low in view of the likelihood that many x-rays provided to me

19 for B-reads are of chests of people more likely to have lung

20 disclosing radiologic indications consistent with occupational

21 dust diseases.

22           Question Number 23:  "How much does Dr. Levine charge

23 per x-ray reviewed as part of his non-hospital based B-reading

24 practice?  If there is a variation in the amounts Dr. Levine

25 charges for such services, please explain the response in

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001118

1  detail.

2       "A    I have no set rate per x-ray reviewed as part of

3  my non-hospital based B-reading practice as you have defined

4  it.  If the provider of the x-rays seeks a B-read narrative

5  report, but not an ILO report, the charge is generally less per

6  person than for the B-read narrative and the ILO report.  If a

7  provider sends only one view, my charges are less than for two

8  views or four views.  My charges increase as the number of view

9  increase.  For certain persons who have been submitting x-rays

10  for my review for mane years, I may charge less per x-ray

11  review than those who are new sources.  My current charge per

12  x-ray as part of my non-hospital based B-reading practice as

13  you have defined it, is in the range of $10 to $45.

14       Question Number 24:  "Does Dr. Levine's compensation

15  for reviewing x-rays as part of his non-hospital based

16  B-reading practice vary depending on the results of his review?

17       "A    No, nor has it ever.  I resent having to respond

18  to this question.

19       Question Number 25: "Has Dr. Levine ever been paid

20  more for rendering a finding that an x-ray is positive for or

21  consistent with an occupational dust disease?  If so, please

22  explain the circumstances.

23       "A    No, I resent having to respond to this question.

24       Question Number 26:  "Since the first year that he

25  began his non-hospital based B-reading practice, how much of

CC-BLG001119

1 Dr. Levine's annual income, per year, is attributable to the

2 x-ray readings he performs as part of his non-hospital based

3 B-reading practice?

4          "A    I am unable to answer written deposition

5 question number 26 because I have never thought of my practice

6 as the compartmentalized structure that you have posed nor can

7 I possibly provide a responsible answer given the two plus

8 decades within which I have reviewed x-rays as NIOSH certified

9 B-reader.  My non-hospital based B-reading practice, as you

10 defined it, is a portion of my nuclear medicine, mammography

11 and diagnostic radiology imaging practice.   What I can

12 represent with some degree of confidence, is that for the last

13 several years I've expended approximately 5 to 10 percent of my

14 practice time as a B-reader.

15          Question Number 47:  "Did Dr. Levine ever discuss

16 with any lawyer, law firm or claimants firm methods to develop

17 screening practices that would cause a high percentage of the

18 individuals screened to be found positive for an asbestos

19 related disease?

20          "A    No, I resent being asked this question.  By way

21 of further answer, I have never discussed with any person or

22 entity, methods of developing screening practices, much less

23 the methods that would cause high percentages of individual

24 screens to be found positive for any disease, including an

25 asbestos related disease.

J&J COURT TRANSCRIBERS, INC.

1       Question 68:  "And, did Dr. Levine ever place any

2  restrictions on the use his B-reads, or B-reading reports

3  generated as a result of his non-hospital based B-reading

4  practice and if so, please identify all such restrictions.

5       "Yes.  See my general statement above.  I perform

6  B-reads only after a contract has been entered into.  A

7  template of my contract is attached hereto as Exhibit 1.  The

8  contract specifies that no ILO or B-read report is a clinical

9  diagnosis of the presence or absence of any occupational dust

10  disease or condition.  That no such condition can be diagnosed

11  simply by a B-read,  That the presence or absence of such a

12  disease any only be established after a full clinical

13  examination and history undertaken by a pulmonologist or other

14  specialist.  That my reports are not intended to and cannot be

15  used as the sole evidence of the presence or absence of an

16  occupational dust disease.  The person seeking my radiologic

17  diagnostic impression should utilize my ILO, or B-read reports

18  in order to determine who should be directed to a pulmonologist

19  or other specialist, or alone qualified to make a clinical

20  diagnosis.

21       Prior to my requiring a written contract and during

22  the applicable time frame set forth by your definitions, I

23  provided by B-read services subject to similar conditions,

24  limitations and restrictions, based upon all contracts with the

25  source requesting my application of my expertise as a B-reader.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001121

1    Question Number 71:  "Is Dr. Levine aware that he was

2  named as a diagnosis doctor by law firms in response to the

3  W.R. Grace asbestos personal injury questionnaire?  See

4  attached Exhibit A which is a composite exhibit of

5  representative W.R. Grace asbestos personal injury

6  questionnaire responses?

7    "A    Not until being informed by W.G. Grace's

8  counsel.  I incorporate my general statement above. I do not

9  know the definition of diagnosis doctor on the questionnaire.

10  I would expect that no person listing me as their diagnosing

11  doctor was purporting to represent that I had made a clinical

12  diagnosis.  Such a representation, based only upon my B-read is

13  both bad science and beyond my contract.

14    By way of further response, I have no present

15  recollection of ever having authorized any lawyer to identify

16  me as the diagnosing doctor in response to a W.R. Grace

17  personal injury questionnaire, nor did I ever know that there

18  were such questionnaires until being contacted by W.R. Grace

19  counsel.

20    Most importantly, I have never made such a clinical

21  diagnosis of asbestosis or any asbestos related disease or of

22  any occupational dust disease.  I would assume that some of the

23  lawyers or law firms had contracted directly with me for my

24  services as a B-reader, but I believe that many did not.  Had

25  they so contracted with me, they could not reference me as a

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001122

1  diagnosing doctor without breaching their contact with me,

2  unless they have intended to mean that my B-reading impression

3  was limited to a radiologic diagnosis, and that at some

4  appropriate time a clinical diagnosis would be provided by

5  someone other than me.

6          I assume many of the lawyers and law firms have never

7  sought my services as a B-reader.  I have no idea why my B-read

8  round up with such a firm --"

9          MS. HARDING:  I'm sorry, actually can you start over

10 there, I think you misread -- start with I assume.

11         "I assume many of the lawyers and law firms have

12 never sought my services as a B-reader.  I have no idea how by

13 B-reader wound up with each such firm or why such firm was not

14 provided with the terms and conditions of my B-read contract.

15 Regardless, I am not a diagnosis doctor as you have defined

16 that term because I've acted only as a B-reader of x-rays and

17 therefore, can and have recited only my radiologic diagnostic

18 impression and not made a clinical diagnosis.

19         Question Number 73, and I think the first part of the

20 answer is the only -- the first paragraph is the only part

21 that's designated by either party right now.  "In your opinion,

22 is the use of your name or x-ray reports in this matter, see

23 attached Exhibit A which is a composite exhibit of

24 representative W.R. Grace asbestos personal injury

25 questionnaire responses, appropriate?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001123

1    "A    Not if the use of my name or reports is intended

2  to connote either that I had made a clinical diagnosis or that

3  I had authorized the use of my name or work as a B-reader in

4  the W.R. Grace & Company proceeding.  See my general statement

5  above and my response to written question numbers 68 to 71

6  above.

7        The use of my B-reader skills result solely in a

8  radiologic diagnostic impression.  It is not a clinical

9  diagnosis, was never intended by ILO or NIOSH or me to be a

10 clinical diagnosis, nor should it be treated as such.

11       Question Number 87:  "What does Dr. Levine understand

12 to be the criteria for the diagnosis of asbestosis?

13       "A    I have no understanding at to the criterial for

14 making a clinical diagnosis of asbestos.  As I represented in

15 my general statement, I am not qualified to make such a

16 clinical diagnosis, nor have I ever made such a clinical

17 diagnosis.

18       Question Number 99:  "When reviewing x-rays for his

19 non-hospital based B-reading practice, including x-rays for

20 Grace claimants, did Dr. Levine observe all standards put

21 forward by the International Labor Organization that were in

22 effect at the time?

23       "A    Hopefully that was my intention.

24       Question Number 101:  "Did Dr. Levine assess quality

25 assurance and quality control over the x-rays that he reviews

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001124

64

1  this -- when reviewing x-rays for his non-hospital based

2  B-reading practice, including x-rays of Grace claimants?

3          THE COURT:  I'm sorry, Mr. Finch, I didn't get that.

4  Would you repeat that?

5          MR. FINCH:  Yes, I think there's a typo in the

6  question.  I'll reread the question.

7          "Q   Did Dr. Levine assess quality assurance and

8  quality control over the x-rays that he reviews this -- when

9  reviewing x-rays for his non-hospital based B-reading practice,

10  including x-rays of Grace claimants?

11          "A   I do not know the identity of the Grace

12  claimants, nor am I responsible for assessing quality control

13  or quality assurance.  See my general statement and my contact

14  template.  Nonetheless, I evaluate the quality of each x-ray

15  film sent to me for my review as a B-reader and check the

16  appropriate box on each ILO form I prepare.  I also incorporate

17  by reference herein my response to written question number 106.

18          MS. HARDING:  109.

19          MR. FINCH:  109?  I think we withdrew 109, Barbara.

20          MS. HARDING:  Oh, okay.  It's not on ours.

21          Question 161:  "Are you qualified to render a

22  clinical diagnosis of asbestos related disease?

23          "A   No, nor have I ever done so.

24          Question number 162:  "Should any court or tribunal

25  rely on any of your reports, whether it be ILO worksheets,

**J&J COURT TRANSCRIBERS, INC.**

1 narrative radiographic reports, or any other reports you may
2 have rendered to establish a clinical diagnosis of asbestos
3 related disease?

4          "A    No.  By way of further answer, as is set forth
5 in my general statement above, and as is reflected in the
6 template contract pursuant to which I render services as a
7 B-reader and my answer to written question numbers 67, 82 and
8 138 above, no clinical diagnosis of any occupational dust
9 disease including asbestosis or any asbestos related disease
10 can be made by a  B-read alone.  My B-read reports and ILO
11 worksheets are all bottomed upon my B-reads.  None constitute
12 clinical diagnosis mor are they ever intended to constitute
13 clinical diagnosis nor does science permit that any such
14 reports constitute clinical diagnosis.  Although I'm reluctant
15 to tell a court what it should or should not rely upon, I can
16 represent that in my view as board certified radiologist who is
17 also a NIOSH certified B-reader, it is a mistake to rely upon a
18 B-read for any purpose other than for which it was originally
19 designed and intended.

20          More specifically, no B-read can or does conclusively
21 or clinically establish the presence (or absence) of any
22 occupational dust disease.  Thus, none of my reports and I
23 believe no report from any other B-reader, can or should be
24 relied upon or considered as a clinical diagnosis of an
25 asbestos related disease or any occupational dust disease.

CC-BLG001126

1        Question number 167:  "In your opinion, do you need

2   to be a treating physician in order to read x-rays to determine

3   if they are consistent with asbestos?

4       .     "A     No.   In order to provide a radiologic impression

5   as a NIOSH certified B-reader, one need not be a treating

6   physician.   I incorporate by reference herein my general

7   statement above.

8        Question 168:  "What materials, e.g., medical

9   literature, your own training, et cetera, do you rely upon in

10  assessing an x-ray for purposes of determining whether it shows

11  any markings that the x-ray is consistent with asbestosis?

12       "A    The ILO standard films and a view box, together

13  with my training and experience.

14       Question 173:  'When you state that a B-reading is

15  consistent with asbestosis, what do you mean?

16       "A    I mean that on application of my skills as a

17  NIOSH certified B-reader, the film I'm reviewing discloses

18  findings that suggest a radiologic impression consistent with

19  asbestosis.  By way of further answer, I incorporate my general

20  statement and my responses to written question numbers 67, 82,

21  83, 94 and 138.

22       Question 174:  "Are all of your B-reads based on

23  generally accepted criteria in the scientific or medical

24  community?

25       "A    Yes.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001127

1          Question 176:  "In your experience, is it common for

2  a physician to rely on another physician's work in making a

3  diagnosis?

4          "A    It is common, indeed, essential, for physicians

5  to rely upon another physician's work in order to reach a

6  clinical diagnosis.

7          Question 178: "Have all your B-reads of x-rays been

8  completed to the best of your abilities with honesty and

9  without intention to defraud?

10          "A    I resent having to respond to this question.

11  Yes.

12          Question 179:  "Would you ever state that you have

13  read an x-ray as consistent with asbestosis or any other

14  asbestos related disease if you did not believe it to be true?

15          "A    I resent having to respond to this question.

16  No.

17          Question 180:  "Do you stand behind the quality and

18  accuracy of the B-reading work you have done involving the

19  reading of x-rays at the request of individuals who were

20  involved in asbestos personal injury litigation?

21          "A    I resent having to respond to this question.  I

22  stand beyond the quality and accuracy of all of my work as a

23  B-reader.   When performing my B-reads I am unaware whether the

24  persons whose films I am reviewing as a NIOSH certified

25  B-reader are involved in asbestos personal injury litigation or

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001128

1  whether the request for my review is from persons or entities

2  involved in asbestos personal injury litigation.

3       By way of further answer, I incorporate my general

4  statement above and my answers to written question numbers 37,

5  62, 82, 138, 94 and 68 to 70.

6       Question 185: "Can a person have asbestosis even if

7  it is not detectible on a chest x-ray?

8       "A   Yes.  I incorporate by reference my general

9  statement above and my answers to written question number 94,

10 among others.

11      Question 186:  "Can asbestosis be detectible by

12 pathology even if it is not detectable on a chest x-ray?

13      "A   Yes.  I incorporate by reference my general

14 statement above and my answer to written question number 94,

15 among others.

16      Question number 187:  "Please describe the phenomenon

17 of inter -- i-n-t-e-r reader variability.

18      "A   Generally speaking, two persons making different

19 findings on reading the same x-ray.  In view of the limitations

20 inherent in reaching conclusions from shadows or densities, as

21 they may appear on x-rays, and the subjective nature of

22 B-reading, it would be expected that there would necessarily be

23 inter-reader variability, the extent of the variability hinging

24 on many conditions, including the number of readers.

25      By way of further answer, I incorporate my general

**J&J COURT TRANSCRIBERS, INC.**

1  statement and my response to written question numbers 146, 148

2  and 149 above.

3          Question 188: "Please describe the phenomenon of

4  intra, i-n-t-r-a reader variability.

5          "A    Generally one person making different findings

6  on reading the same x-ray on two or more occasions over time.

7  I incorporate by reference by general statement above and my

8  answer to written question number 37.

9          Question number 190.  "Do you believe that applicable

10 medical standards require that your own B-reading opinions must

11 be confirmed by some other doctor before they can be relied

12 upon?

13          "A    I am unable to answer written question number

14 190 as written. The answer would hinge upon the purpose for

15 which my B-reading would be relied upon.  If the purpose is

16 limited to a doctor's reliance upon my radiologic impression,

17 the answer is no.  See e.g., my answers to written question

18 numbers 83, 138, 88, 82 and my general statement above.

19          Question number 191: "Do you believe that the ILO

20 2000 international classification of radiographs of

21 pneumoconiosis require that a B-reader's opinion concerning a

22 chest x-ray must be confirmed by a second B-reader before the

23 initial x-ray reading can be relied upon for medical or

24 diagnostic purposes?

25          "A    I am unable to answer written question 190 as

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001130

1  written.  (I think that's a typo).  The answer would hinge upon

2  the purpose for which my B-reading would be relied upon.  If

3  the purpose is limited to a doctor's reliance on my radiologic

4  impression, the answer is no.  See e.g., my answers to written

5  question numbers 83, 138, 88, 82 and my general statement

6  above."

7          MR. MENDELSON:  Shall I read the verification at the

8  end?

9          MS. HARDING:  Yes, if you would read the

10 verification, please, thank you.

11         MR. MENDELSON:  The last page says, verification, I

12 Dr. Richard B. Levine, under oath and penalty of perjury do

13 state that I have read my response to W.R. Grace and Company's

14 deposition by written question ("response") and know of the

15 contents thereof, that said response was prepared by me with

16 the assistance and advice of my counsel and that response is

17 the full and complete truth, to the best of my knowledge,

18 information and belief.  Signed, Dr. Richard B. Levine, sworn

19 and subscribed to before me, the undersigned notary public, in

20 and for Philadelphia County, Pennsylvania 9 -- January, 2007.

21 And then you have the notary's notation.

22         MR. FINCH:  Thank you, Dr. Levine.

23         MS. HARDING:  Thank you.  Your Honor, we have a few

24 documents we're going to seek to admit.

25         THE COURT:  All right.

                    **J&J COURT TRANSCRIBERS, INC.**

CC-BLG001131

1          MS. HARDING:   The first one is GX-0413, the contract

2     referred to by Dr. Levine.

3          MR. FINCH:   No objection, Your Honor.

4          THE COURT:   It's admitted.

5          MS. HARDING:   GX-0007.3048870, which is the composite

6     of the sample of PIQ's where claimants have indicated on the

7     questionnaire itself that Dr. Levine is the diagnosing doctor.

8          MR. FINCH:   We objection on relevance ground as to

9     questionnaire evidence and on hearsay grounds to the extent

10    that the questionnaires have materials that are not business

11    records of Dr. Levine.   The same objection we basically raised

12    to the questionnaire this morning, that we're going to brief,

13    Your Honor.

14         MS. HARDING:   And just one response, Your Honor.

15    With respect to, obviously, the first two questions of

16    relevance which is the one that we discussed yesterday, which I

17    think we've got kind of a standing ruling on that, but you may

18    revisit it later.   With respect to the question with respect to

19    the admissibility of the PIQ's themselves we're going to brief,

20    I won't respond to that now.

21         But I do think as a separate grounds for introduction

22    of this composite sample of questionnaires where claimants in

23    this matter have indicated that Dr. Levine is their diagnosing

24    doctor, it's not being offered, obviously, for the truth of the

25    matter that Dr. Levine actually diagnosed them with asbestosis,

CC-BLG001132

1  it's being offered for the purpose of demonstrating quite the

2  opposite.

3          THE COURT:  Okay.  So, the limitation on this offer

4  is simply to show that there is a composite exhibit in which

5  claimants have identified Dr. Levine as a diagnosing doctor,

6  although his testimony is that he is not and has never been a

7  diagnosing doctor for purposes of the W.R. Grace case.

8          MS. HARDING:  What I would say, Your Honor, is that

9  that's one -- that's one of the reasons we're seeking it, and

10  for that purpose I think it's admissible.  I'm not abandoning

11  the other reasons why we think the questionnaires are

12  admissible.

13          MR. FINCH:  Your Honor, I think they're still

14  offering it for the truth.  If a questionnaire written by John

15  Smith asks a question, who is your diagnosing doctor and John

16  Smith writes Dr. Levine, they're offering it to prove the truth

17  that claimant John Smith said Dr. Levine was his diagnosing

18  doctor.  That's offered for the truth, that's hearsay.

19          THE COURT:  Right.

20          MS. HARDING:  Well --

21          THE COURT:  Well, I think that's offered at this

22  point to show that Dr. Levine's testimony is that he isn't a

23  diagnosing doctor, but the evidence in the case that's being

24  submitted in support of the claims, that Grace is contending

25  are not claims that it should have to reconcile in or outside

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001133

1  the tort system because the diagnosing doctors listed by the
2  claimants are, in fact, not the diagnosing doctors because the
3  claimants say they're Dr. Levine.  And in fact, Dr. Levine is
4  saying he's not their diagnosing doctor.  So, the issue is
5  whether or not for purposes of counting claims, these claims
6  can be counted and it's highly relevant to that purpose, but
7  it's not relevant, that I can see at the moment, for any
8  purpose other than that, but it is relevant for that purpose
9  and it's also not hearsay for that purpose because in that
10 sense it is an admission against interest because this is, in
11 this instance, a claim that the Debtor has to reconcile to
12 determine whether or not it is a claim that the Debtor has to
13 pay for estimation purposes.
14        So, at this point in time, in the Debtor's theory of
15 the case, it seems to me that that piece of information is
16 relevant and this is the means by which the Debtor can go about
17 proving that piece of evidence on the Debtor's theory of the
18 case.  So, I think it's relevant and it's admissible and I
19 believe it's in a statement against the claimant who assets
20 that the claimant has a claim to be counted as a valid claim
21 that the Debtor would have to pay in a tort system, which is
22 the ACC's theory of the case at this point in time and it's the
23 ACC that's the party.  So, I think in this instance that
24 information is all relevant.
25        MR. FINCH:  Your Honor, it still doesn't cure the

CC-BLG001134

1 hearsay objection.  I don't think that the claimants are

2 parties, I think this is part of what we should be briefing to

3 Your Honor.

4        THE COURT:  Okay.  You can add that to the brief

5 issue, but I think in this instance this one probably survives,

6 it's for a different purpose.  But in any event, I'll take this

7 one also advisement.  I don't see any other purpose for the

8 proffer right now, but this, so Ms. Harding what other purposes

9 to this proffer are there?

10        MS. HARDING:  Your Honor, the purpose for which -- I

11 mean the purpose you identified is obviously one of the

12 purposes, but the other purpose is actually, this is an

13 estimation proceeding and we are having to estimate the

14 liability for claims.  And we think that the submission of

15 information to this Court by claimants that has been

16 demonstrated to not be -- to be false, or at least there's an

17 indicia of inaccuracy with respect at least to the information

18 provided to the Court in the questionnaires is information that

19 should be taken into consideration, in the Court's estimation

20 of Grace's liability in this case.

21        THE COURT:  Because somebody lists a doctor who gave

22 them a B-read as a treating physician, I'm supposed to

23 determine that the rest of the information is false?

24        MS. HARDING:  Well, Your Honor, it's just one piece

25 of evidence in a large, broader case that's going to be built

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001135

1   over time with pieces of evidence over time and I think it's a

2   relevant fact for the Court to consider in that process.

3             THE COURT:  I agree.  It would go to the weight, but

4   in this instance, these are not the lawyers filling out these

5   claim forms, at least the one I just happened to open to, as

6   part of this exhibit to see what the exhibit was.  This is a

7   person, who is filling out this form, and although the doctor

8   can undoubtedly not be a treating physician and understand what

9   that is, this is a claimant filling out this particular form.

10  So, yes, it may go to the weight, but just because somebody

11  puts down somebody's name as a treating physician and gets a

12  B-read and it's not a treating, I don't know that you're going

13  to get an inference from me that says that everything is false

14  because they list a doctor as a treating physician and he's

15  not.  That's going kind of far, Ms. Harding.

16            MS. HARDING:  I'm not asking for that at this time,

17  Your Honor.

18            THE COURT:  Okay.

19            MS. HARDING:  It's just one piece of evidence.

20            THE COURT:  Just so you know.  That's going a little

21  far.

22            MS. HARDING:  I understand.

23            THE COURT:  Okay.  And let me make a note, please, so

24  I know that I have to look at this one in conjunction with the

25  brief, so give me one second, please.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001136

1          Okay.  As I said, I will take this one, this

2 submission under advisement and see what happens when I get the

3 briefs.  Okay, next?

4          MS. HARDING:  Okay.  Thank you, Your Honor. I only

5 thing I did want to note is that if you look through the rest

6 of the composite exhibit you will see that they aren't all --

7 that there are law firms that were involved in the process of

8 submitting the claims.

9          THE COURT:  Yes, I understand that that's the case,

10 from having looked at some other of the PIQ's in other

11 instances, but the particular one that I happened to turn to

12 happened to be from a claimant.

13          MS. HARDING:  I understand, Your Honor.  The Debtors

14 move to submit GX-0408.

15          THE COURT:  And it is what?

16          MR. FINCH:  This is -- we have an objection on

17 relevant grounds.  It's a piece of a questionnaire, there's no

18 hearsay objection to this, however, because it's a medical

19 treatment record from Dr. Levine.

20          MS. HARDING:  I think it's the general relevance

21 objection discussed yesterday.

22          THE COURT:  Excuse me one second here.  0408, it's

23 marked as no objection.

24          MR. FINCH:  That was no authenticity objection, Your

25 Honor.  The --

                    J&J COURT TRANSCRIBERS, INC.

1          THE COURT:  Oh, I see.

2          MR. FINCH:  We don't object that it's -- we agree

3   it's authentic, but we object on relevance grounds.

4          THE COURT:  And what's the purpose?  What's the

5   purpose for this offer?

6          MS. HARDING:  I'm sorry, I'm looking, Your Honor.

7   Your Honor, the next -- the series of 0 -- I'm sorry 408, 409,

8   410 and 411 are just demonstrations of language used in Dr.

9   Levine's medical reports, the different kinds of reports that

10  he issues, that he discussed in his deposition by written

11  question.

12         MR. FINCH:  And, Your Honor, our objections to 409

13  and 410 are on relevance grounds because they are -- excuse me,

14  our objections to 408 and 409 are relevance grounds because

15  they are portions of a questionnaire.  As to 410 and 411, we

16  have no objection.

17         THE COURT:  Well wait, I need to do them one at a

18  time.  408 is simply a portion of a summary of somebody looking

19  at a chest x-ray and describing the report of the examination

20  of the chest x-ray, of a particular person.

21         MR. FINCH:  Right, but it's --

22         MS. HARDING:  It's by Dr. Levine, it's a medical

23  record of Dr. Levine's and we're offering it for the purpose of

24  understanding his testimony with respect to the language he

25  uses in his reports.

CC-BLG001138

1    MR. FINCH:  And the relevance objection is, Your

2  Honor, solely because if you see at the top it says, Grace PIQ

3  and we basically view anything that came in through the PIQ

4  process is irrelevant.

5    THE COURT:  Actually, I don't see that.

6    MR. FINCH:  There's a little bar code --

7    MS. HARDING:  Top right corner.

8    MR. FINCH:  Top right.

9    THE COURT:  Oh, I see, okay.

10    MR. FINCH:  That's the basis, you know. if that bar

11  code weren't on there, I wouldn't have an objection, but I have

12  to stand and make a record on the relevance grounds as to

13  anything that comes in through the questionnaire process.  So,

14  our objection to Exhibit Number 408 is a relevance objection.

15  The same objection we argued yesterday.

16    THE COURT:  Okay.  So, the issue is whether or not

17  the type of language that Dr. Levine says he uses in the report

18  is the language that he uses?

19    MS. HARDING:  Well, Your Honor, 408 and 409 are both

20  medical reports submitted by claimants in this case.

21    THE COURT:  Yes.

22    MS. HARDING:  That were authored and were prepared by

23  Dr. Levine.

24    THE COURT:  Yes.

25    MS. HARDING:  So, as I understand the objection, the

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001139

1 ACC don't have any objection to there -- the only objection

2 they have has to do with the issue of relevancy of getting in

3 PIQ information in this case.

4          THE COURT:  Yes.

5          MS. HARDING:  And I thought the Court didn't want us

6 to argue that any more.  And so, we weren't going to --

7          THE COURT:  But why are you offering it?

8          MS. HARDING:  We're offering it, Your Honor, in this

9 case to show how Dr. Levine's reports have been used by

10 claimants in this case, in ways that are sometimes contrary to

11 the way that Dr. Levine said they should be used.

12          THE COURT:  Okay.  So, this is another instance in

13 which, except this particular number 408 doesn't seem to

14 identify Dr. Levine as some treating physician, and it's signed

15 by him.

16          MS. HARDING:  No, Your Honor, we're simply offering

17 it as factual information about -- that gives information about

18 how Dr. Levine records his reports, what he does, how he does

19 it.

20          THE COURT:  Yes.

21          MS. HARDING:  And, that the information is being

22 submitted by claimants in this case and used in various ways.

23 We're not making any representations for us as to how it's

24 actually being used here.

25          THE COURT:  But it has to be relevant to something.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001140

1    Just because a claimant used it for something, doesn't mean

2    ti's relevant.  So, what is it relevant to?  Just because Dr.

3    Levine wrote a report doesn't mean it's relevant to something

4    and I'm missing the connection.

5            MS. HARDING:  Well it's --

6            THE COURT:  Having listened to the deposition, I

7    don't know what it's relevant to, I'm sorry, but I'm missing

8    the point.

9            MS. HARDING:  Well, it's relevant to this particular

10    claimant's medical condition.

11            THE COURT:  Okay.

12            MS. HARDING:  It's relevant to how the report was

13    used by other doctors in determining whether or not they

14    rendered a diagnosis or not.  It's a medical record --

15            THE COURT:  Well, it's relevant to whether he

16    rendered a diagnosis.

17            MS. HARDING:  Your Honor, the Debtor's position is

18    that medical records, medical evidence of the claimants in this

19    case is relevant.  It gets relevant to the underlying issue of

20    whether Grace has liability for claims --

21            THE COURT:  Look, this --

22            MS. HARDING:  and how -- I'm sorry.

23            THE COURT:  -- this particular document which is

24    signed by Dr. Levine says, interstitial fibrosis at the lung

25    bases indicating previous occupational asbestos exposure,

**J&J COURT TRANSCRIBERS, INC.**

1 | diagnostic of asbestosis.  That's what this report says.

2 | That's his report, that's what he says.

3 |             MS. HARDING:  Right.

4 |             THE COURT:  Okay.

5 |             MS. HARDING:  And Dr. Levine has indicated in his

6 | testimony that he never diagnosis, he says he does not know how

7 | to diagnose asbestos related disease.

8 |             THE COURT:  Okay.  Now, I understand.

9 |             MS. HARDING:  I'm sorry I was not clear, Your Honor.

10 |             THE COURT:  All right.  Now I see what you're doing.

11 | So, you're trying to use this report as impeachment for Dr.

12 | Levine's testimony.

13 |             MS. HARDING:  Yes.

14 |             THE COURT:  Okay.  Now, your report (sic) is that

15 | it's not relevant because it came in through a PIQ?

16 |             MR. FINCH:  Yes.  That's the --

17 |             THE COURT:  All right.  That's overruled.  It's

18 | clearly impeachment.

19 |             MS. HARDING:  I apologize, Your Honor.

20 |             THE COURT:  All right, now let me make a note.

21 |             MR. FINCH:  By PIQ, you meant P-I-Q, Your Honor, is

22 | that correct?

23 |             THE COURT:  Yes.

24 |             MR. FINCH:  Okay.

25 |             THE COURT:  So, Exhibit 408 is admitted.  Okay, next

**J&J COURT TRANSCRIBERS, INC.**

1 is 409?

2 MS. HARDING:  Yes, Your Honor, and we offer it for

3 the same reason.  If you refer to the language on the second

4 page of the exhibit.

5 MR. FINCH:  And we have a relevance objection on the

6 grounds that it was material produced in response to the

7 questionnaire discovery which we believe is not relevant to an

8 estimate of what Grace's cost to resolve tort claims would be,

9 had it not gone into bankruptcy.

10 THE COURT:  Okay.  This, again, however, is also

11 appropriate impeachment because it contains, essentially, the

12 same language "diagnostic of asbestos".  And so, therefore, it

13 is also appropriate impeachment for that purpose.  So, Exhibit

14 409 is also admitted and let me make a note.

15 Okay, thank you.  Next, 410?

16 MS. HARDING:  Yes, Your Honor, I'm just looking for

17 my --

18 MR. FINCH:  We have no objection to 410, Your Honor.

19 THE COURT:  All right, it's admitted.

20 MS. HARDING:  And 411.

21 MR. FINCH:  We have no objection to Grace Exhibit

22 411, Your Honor.

23 MS. HARDING:  And the final exhibit, Your Honor, is

24 412.

25 THE COURT:  411 is admitted.  412.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001143

1       MS. HARDING:  I think there's no objection.

2       MR. FINCH:  There's no objection to 412.

3       THE COURT:  412 is admitted.

4       MR. FINCH:  And, Your Honor, the ACC is going to

5   offer one exhibit through this witness, which has been marked

6   Grace Exhibit Number 414, that is the Curriculum Vitae of Dr.

7   Richard Levine, which he referred to in a couple places in his

8   deposition question responses.

9       THE COURT:  All right.

10      MS. HARDING:  No objection, Your Honor.

11      THE COURT:  It is admitted.  Okay.

12      MS. HARDING:  Your Honor, we're going to move now to

13  the playing of very short clips of the four individuals, two

14  doctors, two screeners, who have taken the 5th Amendment in

15  this case during their depositions.  As Mr. Bernick indicated

16  before the break, the entire designation we are providing to

17  the Court, but we are only going to play a short snippet.

18      THE COURT:  All right.

19      MS. HARDING:  Thank you.  Your Honor, the first is

20  Mr. Keith Mason, and we'll play a short snippet and we do have

21  a couple of exhibits we'll be seeking to admit.

22      THE COURT:  All right.

23      MS. HARDING:  Thank you.  And Mr. Mason was, I

24  believe -- well -- I'm sorry, Your Honor.  It was a 30(b)(6)

25  deposition of N&M which is a screening company and he was the

CC-BLG001144

84

1  representative.

2          THE COURT:  Okay, thank you.

3          MS. HARDING:  And I think he's also the principle at

4  the company.

5          THE COURT:  All right.

6      (Videotaped deposition of Keith Mason played into record)

7          MS. HARDING:  Your Honor, as Mr. Bernick indicated at

8  a later time, we may be seeking to seek adverse inferences with

9  respect to many of -- the information that was sought from Mr.

10 Mason during his deposition.  At this time though we just want

11 to move into admission Exhibit GX-0131 which was placed in

12 front of Mr. Mason during his deposition.

13         THE COURT:  And what is that?

14         MS. HARDING:  That is a brochure describing the

15 practices of N&M.

16         THE COURT:  Is there a copy somewhere?

17         MS. HARDING:  Yes, Your Honor, I'm sorry, it's in

18 your binder.

19         MR. FINCH:  No objection to Grace 131, Your Honor.

20         THE COURT:  All right.  I haven't seen it yet, just

21 one second please.  Thank you.  And this is 131?

22         MS. HARDING:  Yes, it is, Your Honor.

23         THE COURT:  All right, it's admitted, thank you.

24         MS. HARDING:  The Debtors proffer GX-0133, which is a

25 customer list of N&M.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. FINCH:  No objection.

2          THE COURT:  It's admitted.

3          MS. HARDING:  And the Debtors proffer GX-0134, which

4  is an attorney selection from N&M.

5          MR. FINCH:  No objection.

6          THE COURT:  It's admitted.

7          MS. HARDING:  Your Honor, the next video clip will be

8  from Mr. Charlie Foster, who also appeared as a 30(b)(6)

9  representative of the screening company RTS.

10          THE COURT:  All right.

11   (Videotaped deposition of Charlie Foster played into record)

12          MS. HARDING:  Your Honor, pursuant to the Court's

13  directive earlier today, we will submit summary exhibits with

14  respect to the various doctors and screeners that you've seen

15  today.

16          THE COURT:   All right.

17          MS. HARDING:  So, we do have five exhibits we'd like

18  to move in with respect to Mr. Foster's deposition.  The first

19  is GX-0119, which are RTS doctor contracts.

20          MR. FINCH:  No objection.

21          THE COURT:  One second.  All right, it's admitted.

22  Thank you.

23          MS. HARDING:  The next one is GX-0120, which are law

24  firm contracts with RTS.

25          MR. FINCH:  No objection.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001146

1          THE COURT:  Admitted.

2          MS. HARDING:  GX-0121 which are intake forms, or

3  commonly referred to as A sheets, from RTS.

4          MR. FINCH:  No objection.  I would note that there is

5  somebody's social security number at the top of the document.

6  I don't know how the Court wants to handle --

7          MS. HARDING:  Well, we have been trying to redact

8  those, Your Honor, so if that's there, that's just a mistake.

9          MR. FINCH:  This is Exhibit 121?

10         THE COURT:  I'll cross off the one on 121 that I have

11  in this binder.  Why doesn't everyone else do the same thing.

12         MR. FINCH:  Okay.  I think it's on both pages of the

13  exhibit.

14         THE COURT:  The last four digits should remain,

15  correct, but the rest of the social security number should be

16  redacted?  Is that the format that you've been using?

17         MR. FINCH:  It doesn't matter to me, Your Honor.

18         MS. HARDING:  We have generally been -- I think we've

19  been generally taking off the last four -- okay, last four,

20  Your Honor, yes.

21         THE COURT:  Letting the last four remain.

22         MS. HARDING:  Yes, letting the last four remain,

23  taking off the first.

24         THE COURT:  Okay.  That's what I've done with respect

25  to that.  So, 8801 remains and the rest is taken off.  Okay.

                    **J&J COURT TRANSCRIBERS, INC.**

1  One second.  Okay.  It's admitted.

2          MS. HARDING:  The next one, Your Honor, is GX-0122,

3  further intake forms or A sheets for RTS.

4          MR. FINCH:  No objection, Your Honor, but there is

5  this gentleman's social security number.

6          THE COURT:  Okay, one second.  Okay, this one is just

7  on one page, correct?

8          MR. FINCH:  It's only a one page exhibit.

9          THE COURT:  Yes.

10         MR. FINCH:  At least my copy is.

11         THE COURT:  Yes, okay.  I've taken off the first five

12 digits.  Okay, it's admitted.

13         MS. HARDING:  And GX-0123, which is an attorney

14 selection sheet, sheets.

15         MR. FINCH:  No objection, Your Honor, although --

16         MS. HARDING:  It's the same thing, I see the same

17 thing.

18         MR. FINCH:  There's some social security numbers on

19 this, too, on the second and third pages.

20         THE COURT:  All right, I've taken off the social

21 security numbers and it's admitted.

22         MS. HARDING:  Thank you, Your Honor.  We'll be

23 playing next the certain testimony from Dr. Ray Harron, who is

24 listed on the exhibit from Dr. Henry that I provided to the

25 Court earlier and it was admitted yesterday.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001148