UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          .      Case No.   01-1139 (JKF)
                                .
W.R. GRACE & CO.,               .
et al.,                         .      USX Tower - 54th Floor
                                .      600 Grant Street
                                .      Pittsburgh, PA 15219
                Debtors.  .
                                .      March 25, 2008
. . . . . . . . . . . . . ..           9:09 a.m.


TRANSCRIPT OF TRIAL
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:          Kirkland & Ellis, LLP
                          By:  DAVID BERNICK, ESQ.
                               BARBARA HARDING, ESQ.
                               JANET BAER, ESQ.
                               BRIAN STANSBURY, ESQ.
                               SAL BIANCA, ESQ.
                               RAINA JONES, ESQ.
                               HENRY THOMPSON, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601

For the Debtors:          Kirkland & Ellis, LLP
                          By:  THEODORE FREEDMAN, ESQ.
                          Citigroup Center, 153 East 53rd St.
                          New York, NY  10022


Audio Operator:           Cathy Younker


Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.

---

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609)586-2311      Fax No. (609) 587-3599

DI 18439

2

APPEARANCES (Contd'):

| | |
|---|---|
| For the Asbestos Creditors Committee: | Caplin & Drysdale, Chartered<br>By:  PETER LOCKWOOD, ESQ.<br>      NATHAN FINCH, ESQ.<br>One Thomas Circle, NW<br>Washington, D.C.  20005 |
| | Caplin & Drysdale, Chartered<br>By:  ELIHU INSELBUCH, ESQ.<br>375 Park Avenue, #3505<br>New York, NY  10152 |
| For the Debtors: | ARPC<br>By:  AMY BROCKMAN, ESQ. |
| For W.R. Grace: | W.R. Grace<br>By:  MARK SHELNITZ, ESQ.<br>      JAY HUGHES, ESQ.<br>      WILLIAM CORCORAN, ESQ.<br>7500 Grace Drive<br>Columbia, MD  21044 |
| For the Equity Committee: | Kramer Levin Naftalis & Frankel<br>By:  GREGORY HOROWITZ, ESQ.<br>919 Third Avenue<br>New York, NY  10022 |
| For the Unsecured Creditors' Committee: | Stroock & Stroock & Lavan<br>By:  KENNETH PASQUALE, ESQ.<br>      ARLENE KRIEGER, ESQ.<br>180 Maiden Lane<br>New York, NY  10038-4982 |
| For the Property Damage Committee: | Bilzin Sumberg Baena Price &<br>   Axelrod LLP<br>By:  MATTHEW KRAMER, ESQ.<br>200 South Biscayne Boulevard<br>Suite 2500<br>Miami, FL  33131 |

J&J COURT TRANSCRIBERS, INC.

3

APPEARANCES (Contd')

For the Ad Hoc             Dewey & LeBoeuf, LLP
Committee of Equity        By:  JENNIFER WHITENER, ESQ.
Sec. Holders:              125 West 55th Street
                           New York, NY  10019

For the Future             Orrick, Herrington & Sutcliffe
Claims                        LLP
Representatives:           By:  ROGER FRANKEL, ESQ.
                                ANTHONY KIM, ESQ.
                                RAYMOND MULLADY, ESQ.
                                JOHN ANSBRO, ESQ.
                           Washington Harbour
                           3050 K Street, N.W.
                           Washington, D.C.  20007

For Committee of           Campbell & Levine
Asbestos Personal          By:  MARK T. HURFORD, ESQ.
Injury Claimants:          800 North King Street
                           Suite 300
                           Wilmington, DE  19701

For Maryland Casualty:     Connelly Bove Lodge & Hutz, LLP
                           By:  JEFFREY WISLER, ESQ.
                           The Nemours Building
                           1007 North Orange Street
                           Wilmington, DE  19899

For Maryland Casualty:     Eckert Seamans Cherin & Mellott, LLC
                           By:  EDWARD LONGOSZ, II, ESQ.
                           1747 Pennsylvania Avenue, N.W.
                           Suite 1200
                           Washington, D.C.  20006

                           STB
                           By:  STERLING MARSHALL, ESQ.

For Sealed Air:            Skadden, Arps, Slate, Meagher & Flom,
                              LLP
                           By:  MARK CHEHI, ESQ.
                           One Rodney Square
                           Wilmington, DE  19801

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001159

4

APPEARANCES (Contd'):

For Sealed Air:            NERA Economic Counsulting
                           By:  STEPHANIE PLANCICH
                           1166 Avenue of the Americas
                           28th Floor
                           New York, NY  10036

For W.R. Grace:            NERA
                           By:  ELENA ZAPRYANOVA
                                LINDA SHEN

For Serengeti:             Vinson & Elkins, LLP
                           By:  AMY BERMAN, ESQ.
                           Trammell Crow Center
                           2001 Ross Avenue, Suite 3700
                           Dallas, TX  75201

For Serengeti:             By:  BILLAL SIKANDER

For Silver Point
Capital:                   Silver Point Capital
                           By:  JOHN KU

For the Debtors:           Pachulski, Stang, Ziehl &Jones
                           By:  JAMES O'NEILL, ESQ.
                           919 North Market Street
                           17th Floor
                           Wilmington, DE  19899-8705

TELEPHONIC APPEARANCES:

For the Unsecured          Strook & Strook & Lavan
Creditors' Committee:      By:  LEWIS KRUGER, ESQ.
                           180 Maiden Lane
                           New York, NY 10038

For Ad Hoc Committee:      Weil, Gotshal & Manges
                           By:  M. JARRAD WRIGHT, ESQ.
                           1300 Eye Street NW, Suite 900
                           Washington, D.C.  20005

For Official Committee     Kramer Levin Naftalis & Frankel, LLP
Equity Holders:            By:  PHILLIP BENTLEY, ESQ.
                           919 Third Avenue
                           New York, NY  10022


                   J&J COURT TRANSCRIBERS, INC.

TELEPHONIC APPEARANCES (Contd'):

For Official Committee      Dies & Hile, LLP
of Asbestos Property        By:  MARTIN DIES, ESQ.
Damage Claimants:           1601 Rio Grande, Suite 330
                            Austin, TX  78701


For Various Claimant        Stutzman, Bromberg, Esserman & Plifka
Firms:                      By:  DAVID J. PARSONS, ESQ.
                                 VAN J. HOOKER, ESQ.
                                 SANDER L. ESSERMAN, ESQ.
                            2323 Bryan Street
                            Suite 2200
                            Dallas, TX  75201


For Fireman's Fund:         Stevens & Lee, P.C.
                            By:  JOHN DEMMY, ESQ.
                                 DAVID R. BEANE, ESQ.
                            1105 North Market Street, 7th Fl.
                            Wilmington, DE  19801


For the PD Committee:       Bilzin Sumberg Baena Price &
                               Axelrod, LLP
                            By:  SCOTT BAENA, ESQ.
                            200 South Biscayne Boulevard
                            Suite 2500
                            Miami, FL  33131


For Owens-Illinois:         McCarter & English
                            By:  KATHARINE MAYER, ESQ.
                            Renaissance Centre, 405 N. King St.
                            Wilmington, DE  19801


For David T. Austern:       Piper Jaffray & Co.
                            By:  JONATHAN BROWNSTEIN, ESQ.


For Asbestos Property       Scott Law Group
Damage Claimants:           By:  DARRELL SCOTT, ESQ.
                            1001 East Main Street, Suite 500
                            Sevierville, TN  37864


**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001161

TELEPHONIC APPEARANCES (Contd'):

For National Union Fire   Zeichner Ellman & Krause, LLP
Insurance Co.:          By:  MATTHEW RUSSELL, ESQ.
                       ROBERT GUTTMANN, ESQ.
                       MICHAEL DAVIS, ESQ.
          575 Lexington Avenue
          New York, NY  10022

For the Future       Orrick, Herrington & Sutcliffe,LLP
Claimants           By:  DEBRA FELDER, ESQ.
Representatives:         JOSHUA CUTLER, ESQ.
          Washington Harbour
          3050 K Street, N.W.
          Washington, D.C.  20007

For Federal Insurance   Cozen O'Connor
Company:            By:  JEFFREY WAXMAN, ESQ.
          Chase Manhattan Centre
          1201 North Market Street
          Wilmington, DE  19801

For Federal Insurance   Cozen O'Connor
Company:            By:  JACOB C. COHN, ESQ.
          1900 Market Street
          Philadelphia, PA  19103

For Allstate Insurance:  Cuyler Burk, LLP
            By:  ANDREW CRAIG, ESQ.
          Parsippany Corporate Center
          Four Century Drive
          Parsippany, NJ  07054

For W.R. Grace:       W.R. Grace
          By: WILLIAM CORCORAN, ESQ.
          7500 Grace Drive
          Columbia, MD  21044

          Kirkland & Ellis, LLP
          By:  ELLEN AHERN, ESQ.
          200 East Randolph Drive
          Chicago, IL  60601

          Kirkland & Ellis, LLP
          By:  DAVID MENDELSON, ESQ.
          6555 Fifteenth Street, N.W.
          Washington, DC  20005

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001162

TELEPHONIC APPEARANCES (Contd'):

For State of Montana          Womble Carlyle Sandridge & Rice
Department of                 By:  FRANCIS MONACO, ESQ.
Environmental Quality:        222 Delaware Avenue
                              Suite 1501
                              Wilmington, DE  19801

For Official Committee        Anderson Kill & Olick
of Asbestos Personal          By:  ROBERT M. HORKOVICH, ESQ.
Injury Claimants:             1251 Avenue of the Americas
                              New York, NY  10020-1186

For W.R. Grace:               Cohn Whitesell & Goldberg, LLP
                              By:  CHRISTOPHER M. CANDON, ESQ.
                              101 Arch Street
                              Boston, MA  02110

For CNA:                      Goodwin Procter, LLP
                              By:  DANIEL GLOSBAND, ESQ.
                              Exchange Place
                              Boston, MA  02109-2881

For Grace Certain             Montgomery, McCracken, Walker &
Cancer Claimants:                Rhoads, LLP
                              By:  NATALIE D. RAMSEY, ESQ.
                              300 Delaware Avenue, Ste. 750
                              Wilmington, DE  19801

For David T. Austern,         Phillips, Goldman & Spence, P.A.
the Future Claimants'         By:  JOHN C. PHILLIPS, ESQ.
Representative:               1200 North Broom Street
                              Wilmington, DE  19806

For W.R. Grace:               Pachulski, Stang, Ziehl & Jones, LLP
                              By:  TIMOTHY P. CAIRNS, ESQ.
                              919 North Market Street
                              17th Floor
                              Wilmington, DE  19899-8705

For the Asbestos              Caplin & Drysdale, Chartered
Creditors Committee:          By:  WALTER SLOCOMBE, ESQ.
                                   BERNARD BAILOR, ESQ.
                                   JEANNA RICKARDS, ESQ.
                                   JAMES WEHNER, ESQ.
                                   LESLIE KELLEHER, ESQ.
                              One Thomas Circle, NW
                              Washington, D.C.  20005


                    J&J COURT TRANSCRIBERS, INC.

CC-BLG001163

TELEPHONIC APPEARANCES (Contd'):

For the Asbestos              Ferry Joseph & Pearce, P.A.
Creditors Commtittee:         By:  THEODORE TACCONELLI, ESQ.
                              824 Market Street, Suite 19899
                              Wilmington, DE  19899


For Ford, Marrin,             Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer              Gleser
& Gleser:                     By:  SHAYNE SPENCER, ESQ.
                              Wall Street Plaza
                              New York, NY  10005


For Pepsi:                    Butler Rubin Salfarelli & Boyd, LLP
                              By:  KIRK T. HARTLEY, ESQ.
                              70 West Madison Street
                              Suite 1800
                              Chicago, IL  60602

For Official Committee        Duane Morris, LLP
of Unsecured Creditors:       By:  MICHAEL LASTOWSKI, ESQ.
                              1100 North Market Street, Suite 1200
                              Wilmington, DE  19801-1246

For Official Committee        Brandi Law Firm
of Asbestos Property          By:  TERENCE D. EDWARDS, ESQ.
Damage Claimants:             44 Montgomery St., Suite 1050
                              San Francisco, CA  94104

For the State of CA,          Hahn & Hessen, LLP
Dept. of Gen. Services:       By:  STEVEN J. MANDELSBERG, ESQ.
                              488 Madison Avenue, 14th Fl.
                              New York, NY  10022


For Baron & Budd,             Hogan Firm Attorneys at Law
et al.:                       By:  DANIEL K. HOGAN, ESQ.
                              1311 Delaware Avenue
                              Wilmington, DE  19801


For the PD Committee:         Speights & Runyan
                              By:  DANIEL SPEIGHTS, ESQ.
                              200 Jackson Avenue, East
                              Hampton, SC  29924


J&J COURT TRANSCRIBERS, INC.

CC-BLG001164

TELEPHONIC APPEARANCES (Contd') :

For Royal Insurance:          Wilson Elser Moskowitz Edelman
                                 & Dicker, LLP
                              By:  CATHERINE CHEN, ESQ.
                              150 East 42nd Street
                              New York, NY  10017

For David T. Austern:         Piper Jaffray & Co.
                              By:  JASON SOLGANICK

For Scott Company:            Vorys, Sater, Seymour & Pease, LLP
                              By:  TIFFANY COBB, ESQ.
                              52 East Gay Street
                              Columbus, OH  43216

For London Market             Mendes & Mount, LLP
Companies:                    By:  ALEXANDER MUELLER, ESQ.
                              750 Seventh Avenue
                              New York, NY  10019-6829

For Official Committee        LECG
of Asbestos Property          By:  ALAN MADIAN, ESQ.
Claimants:

For Official Committee        Richardson Patrick Westbrook &
of Asbestos Property             Brickman, P.C.
Claimants:                    By:  EDWARD J. WESTBROOK, ESQ.
                              174 East Bay Street
                              Charleston, SC  29401

For Ivory Investment:         Ivory Investment
                              By:  DHANANJAY PATWARDHAN

For Linden Advisors:          Linden Advisors, LP
                              By:  CRAIG GILBERT

For O'Conner:                 O'Conner
                              By:  John R. Wollen

For Credit Suisse             Credit Suisse First Boston
First Boston:                 By:  TIM McARDLE


**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001165

TELEPHONIC APPEARANCES (Contd'):

| | |
|---|---|
| For King Street Capital Management, LLC: | King Street Capital Management, LLC<br>By: MITCHELL SOCKETT |
| For the Blackstone Group: | The Blackstone Group<br>By: JOHN O'CONNELL |
| For Dune Capital Mgmt: | Dune Capital Management<br>By: GUY BARON |
| For Anchorage Advisors: | Anchorage Advisors<br>By: JONATHAN LEWINSOHN |
| For Lehman Brothers: | Lehman Brothers<br>By: ANDREW CHAN |
| For Caxton Associates: | Caxton Associates, LLC<br>By: JAMES RIEGER |
| For Dow Jones News Wires: | Dow Jones News Wires<br>By: PEG BRICKLEY |
| For Citadel Investment Group: | Citadel Investment Group<br>By: BEAU HARBOUR |
| For Durham Asset Management: | Durham Asset Management<br>By: JEFFREY A. ROSENKRANZ |
| For Murray Capital Management | Murray Capital Management, Inc.<br>By: MARTI MURRAY |
| For Korn Capital, LLC: | Korn Capital, LLC<br>By: STEPHANIE KWONG |
| For Irwin H. Zandman: | Irwin H. Zandman<br>By: IRWIN H. ZANDMAN |

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001166

I N D E X

**WITNESS**                                                              **PAGE**
SURESH MOOLGAVKAR
  Direct Examination by Ms. Harding                              14
  Voir Dire Examination by Mr. Finch                              23
  Continued Direct Examination by Ms. Harding                     26
  Cross Examination by Mr. Finch                                  82
  Cross Examination by Mr. Ansbro                                163
  Redirect Examination by Ms. Harding                            177
  Recross Examination by Mr. Finch                               199
  Recross Examination by Mr. Ansbro                              203

| **EXHIBITS** | | **ID.** | **EVD.** |
|---|---|---|---|
| GG-2244 | Summary | -- | 79 |
| GG-2246 | Summary | -- | 80 |
| GG-2249 | Summary | -- | 81 |
| GG-2258 | Summary | -- | 81 |
| GG-2262 | Summary | -- | 82 |
| GG-2094A | Henry X-ray study | -- | 209 |
| GG-2179 | Rule 106 Summary | -- | 210 |
| GG-2180 | Rule 106 Summary | -- | 210 |
| GG-2187 | Rule 106 Summary | -- | 212 |
| GG-2188 | Rule 106 Summary | -- | 212 |
| GG-2189 | Rule 106 Summary | -- | 212 |
| GG-2190 | Rule 106 Summary | -- | 212 |
| GG-2191 | Rule 106 Summary | -- | 212 |
| GG-2192 | Rule 106 Summary | -- | 212 |
| ACC/FCR-2086-1 | Dr. Peto's Formula (Line 2) | --- | 155 |
| ACC/FCR-2086-2 | Solved for lifetime risk of mesothelioma | --- | 155 |
| ACC/FCR-2086-3 | Solved for fiber concentration | --- | 156 |
| ACC/FCR-2086-4 | Solved for doubling-dose | 156 | 156 |
| ACC/FCR-2086-6 | Formula for variables | --- | 157 |
| ACC/FCR-2086-8 | Second half of document | 161 | 161 |

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001167

1    THE COURT:  Good morning.  This is a continuation of

2  the evidentiary hearing on the personal injury estimation trial

3  in W.R. Grace 01-1139.  Participants by phone, Andrew Chan,

4  Beau Harbour, James Wehner, Francis Monaco, Andrew Hain, David

5  Turetsky -- Turetsky, I'm sorry, Jonathan Alden, Alan Madian,

6  John Green, David Parsons, Debra Felder, Andrew Craig, William

7  Wagner, Matthew Kramer, Daniel Speights, James Rieger, Alex

8  Mueller, Lewis Kruger, David Beane, Ari Berman, Shayne Spencer,

9  Guy Baron, Walter Slocombe, Bernard Bailor, Elihu Inselbuch,

10  Jeanna Rickards, Peter Lockwood, Mark Hurford, Leslie Kelleher,

11  Michael Lastowski, Christima Kang, Robert Horkovich, Catherine

12  Chen, Janet Baer, John Phillips, Marti Murray, Jason Solganick,

13  Brian Mukherjee, John Ku, Tiffany Cobb, Nathan Soucy, Theodore

14  Tacconelli, Matthew Daiker, William Corcoran, Michael Scott,

15  Matt Doheny, Michael Davis, Jonathan Brownstein, Darrell Scott,

16  Elizabeth Devine, Scott Baena, Timothy Cairns, Martin Dies, Jay

17  Sakolo, Edward Westbrook, Natalie Ramsey, Kim Christensen, Ken

18  Pasquale, Peter Shawn, Katharine Mayer, William Sparks, Terence

19  Edwards and Christina Skubic.

20    Have any parties changed in court this morning

21  entries from yesterday?  All right, we'll just proceed --

22    MS. HARDING:  Well, actually, Your Honor --

23    MR. STANSBURY:  Brian Stansbury for W. R. Grace.

24    THE COURT:  Anyone else changed?  I'm sorry.  I can't

25  see anybody behind you.

**J&J COURT TRANSCRIBERS, INC.**

1          MS. HARDING:  Scott McMillan is not here at counsel
2    table for Grace, Your Honor.
3          THE COURT:  Anyone else?  Okay.  Thank you.  Ms.
4    Harding?  Oh, actually we've got a court reporter change and
5    she may not know you, so maybe I better have you enter
6    appearances.  Cathy, we do need to do that.  I'm sorry.  I
7    apologize.  We do need to enter appearances.  One second
8    please, let me get -- thank you, go ahead.
9          MS. HARDING:  Barbara Harding on behalf of Grace.
10         MR. BERNICK:  David Bernick on behalf of Grace.
11         MR. STANSBURY:  Brian Stansbury on behalf of Grace.
12         MR. FINCH:  Nathan Finch on behalf of the ACC.
13         MR. BAILOR:  Bernard Bailor on behalf of the ACC.
14         MR. INSELBUCH:  Elliot Inselbuch on behalf of the
15   ACC.
16         MR. MULLADY:  Ray Mullady for the FCR.
17         MR. ANSBRO:  Good morning, Your Honor, John Ansbro
18   for the FCR.
19         MR. HOROWITZ:  Good morning, Your Honor, Greg
20   Horowitz on behalf of the equity committee.  I will be on the
21   posters today.
22         MS. KRIEGER:  Good morning, Your Honor.  Arlene
23   Krieger from the Official Committee of Unsecured Creditors.
24         MR. KRAMER:  Good morning, Your Honor.  Matt Kramer
25   on behalf of the Property Damage Committee.

CC-BLG001169

1           MR. FRANKEL:  Good morning.  Roger Frankel on behalf

2  of the FCR.

3           THE COURT:  Is that it?  Okay, Ms. Harding.

4           MS. HARDING:  Good morning, Your Honor.  Grace would

5  call Dr. Suresh Moolgavkar to the stand please.

6           THE COURT:  All right.  Will you please spell that

7  for the record please, Dr. Moolgavkar's name?

8           MS. HARDING:  Yes, Suresh, S-u-r-e-s-h, Moolgavkar,

9  M-o-o-l-g-a-v-k-a-r.

10           THE COURT:  Thank you.

11  S U R E S H   M O O L G A V K A R, WITNESS, SWORN

12                    DIRECT EXAMINATION

13  BY MS. HARDING:

14  Q    Good morning, Mr. Moolgavkar.

15  A    Good morning.

16  Q    Pull the mic down a little bit more.  Could you state your

17  name for the record please?

18  A    Yes, my name is Suresh Moolgavkar.

19  Q    Dr. Moolgavkar, what is your profession?

20  A    I am an epidemiologist.

21  Q    How long have you been an epidemiologist?

22  A    For something over 30 years.

23  Q    Did you prepare any slides to assist you with your

24  testimony today?

25  A    Yes, I did.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Did you prepare a slide on your professional credentials?

2  A    Yes, I did.

3       MS. HARDING:  Could we see G-2230 please?

4  Q    Where have you spent the majority of your professional

5  life?

6  A    The majority of my professional life has been spent in

7  Seattle at the Fred Hutchinson Cancer Research Center and the

8  University of Washington.

9  Q    What were your academic -- what is your academic

10 appointment at the University of Washington?

11 A    I'm a professor in the Department of Epidemiology and

12 adjunct professor in the Department of Biostatistics and an

13 adjunct professor in the Department of Applied Mathematics.

14 Q    And what is your position at the Fred Hutchinson Research

15 Center?

16 A    I'm a member of the Fred Hutchinson Cancer Research Center

17 which is a title that is equivalent to that of full professor

18 at an academic institution.

19 Q    And what is your current status at both University of

20 Washington and the Fred Hutchinson Cancer Research Institute?

21 A    Currently I am on leave of absence from both the Fred

22 Hutchinson Cancer Research Center and the University of

23 Washington while I have -- from the 1st of April 2007.

24 Q    Okay, so for approximately the past year?

25 A    Yes.

1  Q    I know that -- I understand that in biostatistics and

2  quantitative epidemiology there is a model called the

3  Moolgavkar Benson Knudson model, the MBK model, is that

4  correct?

5  A    That's correct.

6  Q    Is the Moolgavkar that's referred to in that model, is

7  that you?

8  A    Yes, it is.

9  Q    What is your -- if we could go to 2231 please.  What is

10 your -- you said you are on a leave of absence.  What is your

11 current professional status?

12 A    Currently I work for Exponent which is a large

13 international consulting company.  I am the Director of the

14 Center for Epidemiology, Biostatistics and Computational

15 Biology, and I'm also a corporate vice president.

16 Q    Prior to joining Exponent last year had you worked as a

17 consultant with Exponent in the past?

18 A    Yes.  Prior to joining Exponent full time on April 1, 2007

19 I was a consultant.  I used to do consulting on the side and

20 some of that consulting I did through Exponent.

21 Q    What kind of consulting work does Exponent do at the

22 center that you direct?  And -- I'm sorry, go ahead.

23 A    Yes, I direct the Center for Epidemiology, Biostatistics

24 and Computational Biology.  And as the name suggests we do work

25 in epidemiology, biostatistics and computational biology.  So

CC-BLG001172

1  the work involves work both for industry and some work for

2  government.   It involves the conduct of epidemiological studies

3  and biostatistical analysis.   It also involves some consulting

4  work of the type I'm doing here today; litigation support and

5  so on.   But, it involves working with environmental issues such

6  as air pollution and things, and work of that nature.

7       Q    2232 please.   In addition to your work at The

8  University of Washington, The Fred Hutchinson Cancer Research

9  Center, have you had other academic appointments, as well?

10 A    Yes, I've been on the faculties of The John Hopkins

11 University, Indiana University, The University of Pennsylvania

12 and The Fox Chase Cancer Center.   By way of explanation The

13 University of Pennsylvania and The Fox Chase Cancer Center have

14 very close collaborations and affiliation agreements.   Both are

15 located in Philadelphia.   And then --

16 Q    Is that the same type of arrangement that The Fred

17 Hutchinson Center has with The University of Washington?

18 A    Pretty similar, yes.   And so for the last 24 years I have

19 been with The Fred Hutchinson Cancer Research Center and The

20 University of Washington.

21 Q    Okay.   How many years did you spend at The Fox Chase

22 Cancer Center and The University of Pennsylvania?

23 A    I was there for seven years.

24 Q    I think you've already talked about your title at

25 University of Washington.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001173

1    Q    2233 please.  Dr. Moolgavkar, have you been invited

2 to appear on various panels around the world with respect to

3 the issue of biostatistics and epidemiology?

4 A    Yes.  I've been on various panels and working groups.  I

5 have been on several panels for IARC which is the International

6 Agency for Research on Cancer.  That is the cancer research arm

7 of the World Health Organization.  I was a member of the

8 working group on the monograph for tobacco smoking.  I was a

9 member of the working group and senior editor of the monograph

10 on quantitative estimation and prediction of human cancer risk.

11    Q    Slide 2233.  Does it list many of the panels that

12 you've appeared on?

13 A    Yes, it does.

14 Q    Okay.  You didn't want to put it in a slide, but I

15 understand that you've also received several awards for your

16 work in the field of quantitative epidemiology, is that right?

17 A    That's correct.

18 Q    Could you tell us what the founders award was?

19 A    The founders award was given to me by the Chemical

20 Industry Institute of Toxicology Centers for Health Research in

21 North Carolina for my work on developing the MBK model.

22 Q    And previously I understand there were other eminent

23 scientists that have received that award?

24 A    Yes.  That award was also given to Dr. Henry Peto who was

25 the director of the McCardel Lab at the University of

CC-BLG001174

1 Wisconsin.  It was given to my colleague Alfred Kinutsin.  It

2 has also been given to Sir Richard Gall an eminent

3 epidemiologist.

4 Q    Have you also been an editor for several important peer

5 review journals?

6 A    Yes.  I have served on the editorial board to several

7 journals.

8     Q    Okay.  Sorry, 2234.  Does this list some of the

9 journals on which you have been an editor?

10 A    Yes.  I am currently an associate editor of "Risk

11 Analysis."  I'm on the editorial board of "Inhalation

12 Toxicology" and on the editorial board of "Biology Direct."  I

13 served for about half a dozen years as an associate editor of

14 "Genetic Epidemiology."  And I am the senior editor for three

15 volumes, three books that is on epidemiology biostatistics and

16 risk assessment.

17 Q    Actually that was my next question.  I wanted to ask you

18 about the books.  So you have been an editor on several books

19 as well?

20 A    Yes.

21 Q    What is the role of an editor of a volume or a book of the

22 type that you work, you described there?

23 A    These books actually were articles that arose from a

24 meeting, a week long meeting that I had organized on the topics

25 of epidemiology, biostatistics and risk assessment.  And the

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001175

1  role of the editor there is to invite the speakers and to

2  solicit chapter contributions from them, to see that they are

3  properly being reviewed and then to either accept or reject

4  those articles for publication in the book.

5  Q    With respect to the books that you've edited, you said

6  you organized the panels, who asked you to do that?

7  A    Well the organizers of the conference asked me to do that

8  and most of these conferences were, I believe they were funded

9  at least in part by the Department of Energy.  And so this was

10 more than 10 years ago so I don't recall all the details, but

11 the funding came from the Department of Energy I believe.

12     Q    Could you go to 2236 please?  Does 2236 list the

13 journals in which your publications have appeared?

14 A    Yes, that is correct.

15 Q    And about how many published -- how many papers have you

16 published in the field of biostatistics and quantitative

17 epidemiology?

18 A    I've published approximately 150 papers in those fields.

19 About 26 of them directly involve cohort or case control

20 studies and 18 involve analysis of registered data.

21 Q    Now, Dr. Moolgavkar, I know I have heard you previously

22 say I am not an expert on asbestos, what do you mean by that?

23 A    What I mean by that is that I am not an expert on the

24 mineralogy or the chemical properties of asbestos.  I'm not an

25 expert on the electron microscopy of asbestos.  I'm not an

CC-BLG001176

1 industrial hygienist.  I don't know how to measure asbestos

2 fibers.  But, I do consider myself an epidemiology (sic) in the

3 area of asbestos epidemiology.

4 Q    I think you meant expert.

5 A    I do consider myself an expert in the area of asbestos

6 epidemiology, yes.

7 Q    Have you listed on Slide 2237 your experience in the area

8 of fiber carcinogenosis?

9 A    Yes, I have.

10 Q    Could you just briefly talk a little bit about -- you've

11 got several papers on fiber carcinogenosis, what do those

12 generally relate to?

13 A    Well, one of the topics of interest to me over the years

14 has been how biopersistence -- that means how long fibers

15 persist in the body -- how that is related to the toxicity of

16 the fiber.  So these are five papers that I wrote on the

17 subject of biopersistence.  Basically the central theme of

18 these papers is the role of biopersistence and fiber length in

19 determining the toxicity of the fibers.

20 Q    Okay.  You were also an invited expert by WHO at a

21 workshop.  What is WHO?

22 A    That's the World Health Organization.

23 Q    And what was the discussion topic at that workshop?

24 A    Well, it was a workshop on mechanisms of fiber

25 carcinogenosis.  So some of the basic biological properties of

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001177

1  fibers and how they are toxic.  The mechanism by which they are

2  toxic were discussed, as well as an assessment of substitutes

3  for chrysotile asbestos to see whether there are -- whether the

4  manmade fibers are less or more important or less or more toxic

5  than chrysotile.

6  •    Q    And were you also invited by the Chrysotile Institute

7       to give a -- to participate in a panel there, as well?

8  A    That is correct.

9  Q    Okay, and was that related to the same issue you just

10 discussed?

11 A    Yes, it was.  I basically discussed the epidemiology of

12 asbestos and cancer and also some of my own work on fiber

13 biopersistence.

14 Q    It says here that you have an extensive review of the

15 asbestos literature.  About -- if you can quantify it -- about

16 how many publications in the field of epidemiology have you

17 read relating to asbestos and carcinogensis?

18 A    I would say scores or hundreds of papers in asbestos

19 epidemiology.

20       ' MS. HARDING:  Could you put up 2238, please?

21 Q    Dr. Moolgavkar, how would you characterize your primary

22 scientific research and investigative work at The Fred

23 Hutchinson Cancer Research Center?

24 A    I would say that if there is one central theme in my

25 research is the understanding of the relationship between

CC-BLG001178

1  fundamental biological processes occurring in the cell and the

2  epidemiology of human cancer.  That I would say is my central

3  interest.  So I'm interested in seeing how events occurring at

4  the level of the cell such as mutations and pertubations of

5  cell proliferation affect cancer rates in human populations.

6  Q    And have you also developed models and methods for

7  understanding cancer risk?

8  A    Yes.  As a part of that process of understanding the link

9  between cell biology and cancer I have developed mathematical

10  models that I've used for the analysis of epidemiological data

11  in human populations.  So that involves the development of the

12  appropriate statistical tools and the computational tools for

13  doing such analysis.

14  Q    And what is the IARC monograph that is up on the slide

15  here?

16  A    Well this is a monograph in which I was a senior editor

17  and dealt with the topic of quantitative estimation in

18  prediction of human cancer risk.

19        MS. HARDING:  Your Honor, at this time I move that

20  Dr. Moolgavkar be accepted as an expert in the field of

21  biostatistics and quantitative epidemiology.

22        MR. FINCH:  Voir Dire, Your Honor?

23        THE COURT:  Yes.

24                  VOIR DIRE EXAMINATION

25  BY MR. FINCH:

CC-BLG001179

1 Q    Good morning, Mr. Moolgavkar.

2 A    Good morning.

3 Q    My name is Nathan Finch.  I represent the Asbestos

4 Claimants Committee in this case.  You are not licensed to

5 practice medicine, are you, sir?

6 A    No, I'm not.

7 Q    You are not board certified in any medical speciality,

8 correct?

9 A    That's correct.

10 Q    You have a PhD in mathematics, correct?

11 A    That's correct.

12 Q    You don't have a professional degree in epidemiology,

13 correct?

14 A    No.  I have post doctorate training, but no professional

15 degree.

16 Q    You have never conducted any studies in asbestos

17 epidemiology, have you?

18 A    No, I'm not.

19         THE COURT:  I'm sorry.  He has not done what?  I

20 apologize.

21         MR. FINCH:  He has never conducted any study in

22 asbestos epidemiology.

23 Q    You haven't done that.

24 A    That's correct.

25 Q    You've never designed an epidemiological study looking at

CC-BLG001180

1  asbestos as a cause of disease, correct?

2  A    That's correct.

3  Q    None of your publications relate to asbestos as a cause of

4  mesothelioma, correct?

5  A    No, not mesothelioma.

6  Q    None of your publications relate to asbestos fibers, isn't

7  that also correct?

8  A    Well, there is at least one publication that compares the

9  biopersistence of asbestos fibers and its toxicity with the

10 other manmade fibers.

11 Q    But, it doesn't compare that specifically with reference

12 to mesothelioma, correct?

13 A    No, with reference to lung cancer.

14 Q    You have never diagnosed anyone with mesothelioma?

15 A    That's correct.

16 Q    And the first time you started to do any work with respect

17 to asbestos as a cause of disease was around 2000 or 2001?

18 A    Well I knew the general literature before then, but I got

19 involved more deeply in it around 2000 or so.

20 Q    And you first got involved more deeply in it when you were

21 hired by W.R. Grace Company in an EPA cleanup action, correct?

22 A    That's right, yes.

23 Q    And over the past five or six years you worked for

24 something called Exponent and the vast majority of your work

25 related to asbestos as a consultant for automobile companies,

CC-BLG001181

1 correct?

2 A    That is not correct.  I have not worked for Exponent for

3 the past five or six years.

4 Q    Okay, you worked for Exponent for the past few years --

5 three years, correct?

6 A    No that's not correct either.  I worked for Exponent.

7 I've been -- I was a consultant to Exponent for a few months

8 before I joined it full-time which was on April 1 of 2007.

9 Q    Is it correct that since 2001 you have worked primarily as

10 a consultant for car companies and W.R. Grace in asbestos

11 matters?

12 A    Yes, that would be correct.

13         MR. FINCH:  Your Honor, we have a _Daubert_ motion with

14 respect to Dr. Moolgavkar to the extent that he is offering any

15 opinion, a threshold opinion, that some level of exposure to

16 asbestos cannot cause mesothelioma.  We believe that is outside

17 of mainstream science and we have filed _Daubert_ papers with

18 respect to that.  I don't think he's qualified to offer an

19 opinion that any level of asbestos exposure cannot cause

20 mesothelioma.

21              CONTINUED DIRECT EXAMINATION

22 BY MS. HARDING:

23 Q    Dr. Moolgavkar, how long have you been a professor of

24 epidemiology?

25 A    For more than 30 years.


**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001182

1          MS. HARDING:  And I'd like to -- may I approach, Your

2   Honor?

3          THE COURT:  Yes.

4   Q    I'd just like to point you to this first exhibit that we

5   haven't actually talked about yet.  It's called the scientific

6   method.  Do you see that?

7   A    Yes, I do.

8          MR. FINCH:  Your Honor, you haven't ruled on the

9   Daubert motion.

10         THE COURT:  She's cross examining with respect to

11  voir dire.

12  Q    And, Dr. Moolgavkar, what are the methods that

13  epidemiologists use to understand risk of disease regardless of

14  the disease and regardless of the potential carcinogen?

15  A    Well, I think the two most important elements in coming to

16  any epidemiological conclusions is first the development of a

17  hypothesis and then the design and the conduct of property

18  controlled epidemiological studies.  That is absolutely

19  fundamental.  It's the central theme in drawing any conclusions

20  from epidemiological research, and it cuts across all kinds of

21  exposures whether it is asbestos, or radiation or arsenic.  The

22  same basic epidemiologic methods are used to study and

23  investigate the issue of the association between the

24  environmental agent and the disease in question.

25  Q    And have you spent the last 30 years of your life

CC-BLG001183

1  investigating potential carcinogens in the environment?

2  A    Not only have I spent the last 30 years of my life

3  investigating carcinogens in the environment, a lot of my focus

4  has been on developing models and methods for low dose risk

5  extrapolation.  So that I'm very familiar with all the methods

6  that are used to investigate risks at low exposure to

7  environmental agents.

8          MS. HARDING:  Your Honor, I again move for Dr.

9  Moolgavkar to be accepted as an expert in the field of

10  biostatistics and quantitative epidemiology.

11          THE COURT:  Well I think he is qualified to express

12  an opinion in those areas, whether or not that area encompasses

13  expressing an opinion with respect to whether or not a person

14  can develop mesothelioma based upon a particular level of

15  exposure, I don't know yet.  So I think within the broad

16  parameter of his expertise he's certainly qualified in the

17  field of biostatistics and epidemiology.  There is, I think, no

18  question with respect to that.  Whether we get to the ultimate

19  conclusion I think remains to be seen.

20          So at this point I don't know.  I haven't heard

21  enough to know.  Raise the objection again when the opinion is

22  offered and by then I will have heard the testimony and I will

23  be prepared to rule.  But with respect to the gentleman's

24  qualifications, he's clearly qualified to offer opinions within

25  the field of his expertise.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001184

1          MR. FINCH:  Thank you, Your Honor.

2   BY MS. HARDING:

3   Q    Dr. Moolgavkar --

4          MS. HARDING:  I'm sorry, could you put up 2239

5   please?

6   Q    Could you describe what you were -- you summarize what you

7   were asked in this case?

8   A    Yes.  First I was asked to review the epidemiological data

9   on asbestos and human disease and to identify the diseases that

10  have been demonstrated by scientifically rigorous methods to be

11  associated with or caused by asbestos exposure.

12         I was also asked to look at dose response

13  relationships for asbestos associated diseases and to draw

14  conclusions regarding the effects of asbestos exposures at

15  various doses in humans, and finally to note what these dose

16  response models might have to say for asbestos related doses

17  below the range of observations in epidemiological studies.

18  Q    I have actually listed those three things here on this

19  sheet here so we can just kind of keep track.

20         MR. FINCH:  Your Honor, can I see that?

21         THE COURT:  Yes, certainly.

22         MS. HARDING:  It's the same thing as the study -- as

23  the slide.

24         MR. FINCH:  Oh.  Okay.

25         MS. HARDING:  I just don't want to have to keep

**J&J COURT TRANSCRIBERS, INC.**

1  coming back to the slide.

2          MR. FINCH:  Oh.

3          MS. HARDING:  I just wanted to write it here so we

4  know what we're going to talk about.

5          MR. FINCH:  Oh, all right.

6  Q    With respect to those three questions, Dr. Moolgavkar, or

7  those inquiries, and let's focus first on the first one, the

8  review of epidemiological data identified diseases demonstrated

9  scientifically to be caused by asbestos exposure.  How does the

10 field of epidemiology, or how do epidemiologists, scientists,

11 answer that question and the other questions that you been

12 asked to address today?

13 A    Yes.  As I said earlier the first step in the scientific

14 method is to formulate a hypothesis and then to design properly

15 controlled studies to investigate that hypothesis.  In

16 epidemiology generally one positive study only suggests that

17 the disease might be associated with the exposure.  The study

18 needs to be repeated several times and if consistent results

19 are obtained in all the studies then you might conclude that

20 the disease is causally associated with the exposure.

21          One corollary of that is that the totality of the

22 epidemiological evidence must be taken into account when

23 drawing any conclusions regarding the association of an

24 exposure with the disease.

25 Q    Dr. Moolgavkar, will your testimony here today be limited

**J&J COURT TRANSCRIBERS, INC.**

1  to opinions based upon a reasonable degree of scientific

2  certainty based upon scientific methods that you have employed

3  throughout your life in all of your areas of investigation?

4  A    Yes.  Insofar as any conclusions regarding the association

5  of asbestos to disease in the range of observations is

6  concerned that opinion will be offered with reasonable degree

7  of scientific certainty.  But there are areas of exposure

8  called putative exposure or presumed exposure with no

9  observations at all in the epidemiological literature.  And in

10  that case mathematical modeling or extrapolation procedures

11  have been used, and here the findings are much less certain.

12  Q    Now, when you say no epidemiological observations at all,

13  by that do you mean no particular study or no reliable body of

14  epidemiological data to allow you to reach a conclusion?

15  A    Well, there is no reliable body of data on exposures that

16  might allow you to come to conclusions regarding an exposure

17  response relationship at very low exposure levels.

18  Q    Now, with respect to the very first question here, the

19  review of the epidemiological data and the identification of

20  diseases demonstrated to be caused by asbestos, what have

21  numerous case control and cohort studies investigated that

22  question concerning asbestos exposure in cancers?

23  A    Yes, they have.

24  Q    And what have those studies found?

25        MS. HARDING:  Could you put up 2240 please?

CC-BLG001187

1  A    Yes.  I think there is little doubt epidemiological

2  studies have shown that asbestos increases the risk of

3  mesothelioma and lung cancer at sufficiently high doses.  I

4  don't think there is any question about that.

5  Q    What about other cancers?

6  A    Well, there is some concern about other cancers, as well.

7  And there is an indication there was a recent study by The

8  Institute of Medicine that concluded that the range of cancer

9  was probably caused by asbestos exposure.

10            MS. HARDING:  Okay.  Could you put up 2241 please?

11  A    Yes.  This is a summary of The Institute of Medicine

12  study.

13  Q    Does this Slide 2241 reflect the results of The Institute

14  of Medicine's review of the epidemiological data concerning

15  asbestos exposures and other cancers?

16  A    Yes, it does.

17  Q    Okay.  What did they find with laryngeal cancer?

18  A    Well with respect laryngeal cancer they found that the

19  evidence was sufficient to conclude that asbestos was causally

20  associated with laryngeal cancer.

21  Q    Okay.  And do you generally accept that opinion?

22  A    Well, there are other strong risk factors for laryngeal

23  cancer, namely smoking and alcohol, and in my opinion the

24  evidence still falls short of being sufficient, but I would be

25  willing to accept that laryngeal cancer is caused by asbestos

CC-BLG001188

1  exposure.

2  Q    What type of epidemiological data were reviewed by the IOM

3  when they investigated these other cancers?  They have

4  laryngeal cancer, pharyngeal cancer, stomach cancer, colorectal

5  cancer and esophageal cancer, correct?

6  A    Yes.

7  Q    What was the data that the -- what was the epidemiological

8  data that The Institute of Medicine reviewed?

9  A    Yes, they reviewed the epidemiological data both what are

10  called cohort and case control studies to come to these

11  conclusions.

12  Q    With respect to pharyngeal, stomach, colorectal and

13  esophageal cancers, the IOM concluded that the evidence was

14  suggestive of inadequate, is that correct?

15  A    Well for esophageal cancer it was inadequate, but for the

16  other three that you mentioned pharyngeal, stomach, colorectal

17  there was suggestive evidence that The Institute of Medicine

18  Committee decided that there wasn't sufficient evidence to

19  conclude a causal relationship.

20  Q    Okay.  And in connection with those cancers, what types of

21  studies were reviewed by the IOM?

22  A    The same types of studies that they reviewed for laryngeal

23  cancer; cohort and the case control studies.

24  Q    And indeed with respect to each of those other cancers

25  where the IOM found that there was insufficient evidence and

CC-BLG001189

1  that the evidence was inadequate, does that mean that there

2  were no studies that they reviewed where the investigators

3  found a statistically significant positive association between

4  those cancers and asbestos exposure?

5  A    Not necessarily.  What the committee made the decision on,

6  they based that decision on the totality of epidemiological

7  evidence of each one of these cancer sites.

8  Q    Indeed, if you were to go out into the literature or into

9  the world into hospitals or anywhere, you would find people,

10 individuals, who are -- who have pharyngeal, stomach,

11 colorectal cancer and esophageal cancer who have been exposed

12 to asbestos, correct?

13 A    That's correct.

14 Q    And indeed you might even have case reports that people

15 that have those cancers have been exposed to large amounts of

16 asbestos indeed or low amounts, correct?

17         MR. FINCH:  Object to the leading, Your Honor.

18         THE COURT:  It is leading.

19 Q    Dr. Moolgavkar, would there -- would you find in the

20 population or in the literature potentially case reports or

21 cases of disease in those areas where individuals have been

22 exposed to asbestos?

23 A    Yes.

24         MR. FINCH:  Objection, leading, Your Honor.

25         THE COURT:  It's still leading.


**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001190

1  Q    Are there case reports involving asbestos exposure and

2  pharyngeal, stomach, colorectal, esophageal cancer?

3  A    Yes, there are.

4  Q    Okay.  And, doctor, on the steps in the scientific method

5  where do case reports falls in the scientific method, in

6  scientists' understanding of this issue; carcinogensis?

7  A    I would say in the very first step.  The case reports are

8  observations that might lead to the development of a

9  hypothesis.

10 Q    Are they ever, ever considered design -- a controlled

11 study?

12 A    No.

13 Q    Okay.  Dr. Moolgavkar, simply because the IOM found that

14 there was sufficient evidence that laryngeal cancer can be

15 caused by asbestos, does that mean that it can be caused by any

16 level of asbestos exposure?

17            MR. FINCH:  Objection, leading.

18            THE COURT:  It's leading.

19 Q    Dr. Moolgavkar, did the IOM, Institute of Medicine, when

20 it found that laryngeal cancer, that there was sufficient

21 evidence for the presence or absence of a causal relationship

22 to asbestos, did they address the issue of the levels of

23 exposure that could cause that disease?

24            MR. FINCH:  Objection, leading.

25            THE COURT:  Ms. Harding, it is leading.  You are

CC-BLG001191

1 asking him every question that can be answered yes or no rather

2 than letting him answer the question.  You are assuming an

3 answer and asking him a question that can be answered yes or

4 no.  So why don't we get to the point where he's answering the

5 questions?

6 Q    What did the IOM report with respect to the levels of

7 asbestos exposure that are sufficient to cause laryngeal

8 cancer?

9 A    Well the IOM did not have any specific levels of exposure

10 to asbestos that would cause laryngeal cancer, but these

11 cancers are found in cohorts with very high levels of exposure.

12 Q    Dr. Moolgavkar, I'd like to move now to the second

13 question that you were asked to address which relates to the

14 quantifying the levels of asbestos exposure observed at

15 epidemiologically caused disease?

16 A    Yes.

17 Q    In this litigation do you have an understanding of the

18 relevance of the quantification of asbestos exposures that have

19 been demonstrated reliably to cause risk?

20 A    Yes.

21          MR. FINCH:  Lack of foundation and leading.

22          THE COURT:  This is a foundation question so it's

23 clearly appropriate, but I missed part of it.  Would you

24 restate it for me please?

25          MS. HARDING:  Actually I'm going to ask an earlier

CC-BLG001192

1  question first.

2  Q    From a public health or regulatory perspective, why is it

3  important to understand the -- or, is it important to

4  understand the levels of asbestos exposure that have been

5  demonstrated to cause risk, and if so, why?

6  A    Yes, it's important to understand the levels of any

7  environmental agents that have been demonstrated to cause risk

8  because after all one of the goals of environmental

9  epidemiology is to protect the public against environmental

10 agents.  And so, it is important to understand what the risk

11 might be to agents that occur commonly in the environment and

12 to which people might be exposed to.  So for to understand that

13 it is not sufficient to understand what the exposure does at

14 high doses.  It is also important to try and understand what it

15 does at low doses.

16 Q    In this litigation do you have an understanding of the

17 relevance of the quantification of asbestos exposures that have

18 been demonstrated reliably to cause risk?

19          MR. FINCH:  Objection to the extent she's asking

20 what's relevant and not relevant in the context of litigation.

21          THE COURT:  I can't hear you, Mr. Finch.

22          MR. FINCH:  Objection to the extent she's asking

23 what's relevant and not relevant in the context of this

24 litigation.  He can offer opinions about epidemiology but not

25 what's relevant to this case.

CC-BLG001193

1      THE COURT:  She's only asked him whether he has an

2  understanding of the relevance.  That objection is overruled.

3  A    Yes.  My understanding is that the --

4      THE COURT:  You can only answer yes or no to this

5  question, doctor.  I'm sorry.

6  A    Okay.

7  Q    What is your understanding, Dr. Moolgavkar?

8  A    My understanding is that claims have been filed against

9  Grace by claimants who allege exposure to Grace products at

10  various concentrations.  And therefore clearly the

11  understanding of what these levels of exposure how they might

12  be associated with the diseases that asbestos is known to cause

13  at high doses is clearly important.

14  Q    Do you have an understanding that Dr. Anderson, Dr. Betty

15  Anderson -- do you know Dr. Betty Anderson?

16  A    Yes, I know Dr. Betty Anderson.

17  Q    Okay.  How do you know Dr. Anderson?

18  A    Well she is also a member of the Exponent staff.

19  Q    Do you have an understanding that Dr. Anderson has relied

20  upon some of your estimates and analysis for understanding

21  potential risk of exposure to asbestos and disease?

22  A    Yes.

23  Q    And what is that understanding?

24  A    My understanding is that she has taken some of the

25  calculations that I have done and used them in her own work.

CC-BLG001194

1  Q    And, Dr. Moolgavkar, I'd like to talk about those analysis

2  and those estimates now, okay.  And you and I together

3  prepared a board to discuss the various aspects of those

4  analysis, is that reflected in front of you there?  I can't

5  read the number from here -- GG-2262?

6  A    Yes.

7  Q    Okay.  Let's --

8            THE COURT:  Ms. Harding, is there a binder that has

9  all these exhibits in them somewhere?

10           MS. HARDING:  Yes, Your Honor.  I'm sorry.  I did not

11 know that you hadn't received it.  I apologize.  Sorry.

12           THE COURT:  Thank you.

13           MR. FINCH:  Robert, 2262 is not in my binder.  Do you

14 have an extra copy of it so I can --

15           MS. HARDING:  I'm sure we do somewhere.  I'm sorry.

16 Q    Okay, Dr. Moolgavkar, first I'd like to talk about we're

17 in this area here about quantifying the levels of asbestos

18 exposure observed epidemiologically to risk.  And I want to

19 talk first about lung cancer.  And are there -- who are the

20 primary researchers who have investigated the dose response

21 relationship between lung cancer and asbestos exposure?

22 A    Well, I would say that since the early to mid-1980s there

23 have been three very important publications that have appeared

24 since that time.  One is the "Nicholson Study" which was done

25 for the Environmental Protection Agency and I believe that

CC-BLG001195

1  appeared in 1986.  A second extremely important publication

2  appeared in 2000, that is a paper by Hodgson & Darnton which in

3  some ways is one of the most important papers to have appeared

4  in the study of the dose response relationship between asbestos

5  and mesothelioma and lung cancer.

6          And the third study that appeared in 2003, it was a

7  study commissioned by the EPA and was authored by Berman and

8  Crump.

9  Q    Have you prepared a slide that describes -- that lists the

10 studies that have been relied upon by the EPA and Hodgson &

11 Darnton to investigate the dose response relationship between

12 lung cancer and asbestos exposure?

13 A    Yes, I have.

14          MS. HARDING:  Okay.  Could you show us 2246 please?

15 Q    Are these the studies, Dr. Moolgavkar?

16 A    Yes.  In the left-hand column you have all the studies

17 that were looked at by Hodgson & Darnton.  These are all cohort

18 studies.  There are no case control studies in this group of

19 studies.  And the studies marked in red were the ones that

20 Nicholson and the EPA considered in 1986.

21 Q    Okay.  And what have these studies found with respect to

22 levels of asbestos exposure?

23 A    Well, first of all, these are cohort studies and Hodgson &

24 Darnton report the average cumulative exposure in these

25 cohorts.  The first thing that one notes is that the exposures

CC-BLG001196

1  are extremely high.  The cohort with the lowest exposure, that

2  is the Sweden Cement Manufacturers cohort had a cumulative

3  exposure level of about 13 fiber per mil years.  So that's a

4  pretty high exposure.

5           The other cohorts had extremely high exposures.  So

6  that's the first thing one can say.  And a corollary of that

7  observation is that any kind of a dose response relationship

8  that can be actually investigated in the range of observations

9  can only be investigated in this high dose cohort.  So, there

10 is no direct information on exposure response or dose response

11 relationships below this level of cumulative exposure.

12 Q    Dr. Moolgavkar, going up to the board here to 2262 there

13 is a circle here at 15.  How does that relate to the testimony

14 you just provided?

15 A    That circle at 15 is the approximate lowest observed

16 average exposure in the cohorts or in the studies that have

17 been used to characterize the dose response relationship both

18 for lung cancer and mesothelioma.

19 Q    Can you tell us if there is -- is there a reliable body of

20 epidemiological data supporting the conclusion that there is

21 significant risk at levels below that in the literature?

22 A    There is no body of data that supports a significant risk

23 below that level of exposure.

24 Q    When you say there is no body of data, are you saying that

25 there are no epidemiological studies out there that don't

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001197

1   report a statistically significant risk at a lower level?

2   A    No, I'm not saying that.  I should be more precise.  There

3   might be individual studies that indicate a significant risk,

4   but if you look at the totality of evidence there is no

5   evidence of an increased risk below that level of exposure.

6   Q    You said, I think a little bit earlier, that the studies

7   that are used by these investigators to understand dose

8   response or cohort studies.  Why are they cohort studies?

9   A    Well the EPA, Hodgson and Darnton and Berman and Crump all

10  have criteria for using studies for the dose response analysis.

11  These criteria have to do with the -- basically with the

12  availability of reasonable to good exposure information on

13  asbestos exposures.  And these were the studies that they

14  selected that met their criteria.

15          These are cohort studies.  One of the characteristics

16  of these studies is these are occupational cohorts so they are

17  workers who are exposed to asbestos in a pretty controlled

18  environment.  Their exposures can be more precisely measured

19  than the exposures, for example, in case control studies where

20  workers might move from one job to another.  So I think that

21  was one of the reasons that they chose these cohort studies.

22  Exposures were available so that an exposure response

23  relationship could be performed.

24  Q    With respect -- I know this slide is difficult to read,

25  it's small.  But, in looking at the cohorts that were studied

CC-BLG001198

1  and the asbestos in the workplace there, what type of work

2  environments are represented by these cohorts?

3  A    Many of them are mining and milling cohorts in which

4  asbestos was mined or milled.   There are textile cohorts, there

5  are cement workers cohorts and so on.   Many of these cohorts

6  are cohorts in which there was fairly clear indication of

7  exposure primarily to asbestos and not to other kinds of

8  fibers.

9  Q    Now I'd like to move onto the discussion, still in this

10  section here quantifying the levels of asbestos exposure

11  observed epidemiologically to cause disease and ask you about

12  mesothelioma.   Similar to lung cancer, what types of studies

13  are used to investigate the dose response relationship between

14  mesothelioma and asbestos exposure?

15  A    The investigation of the dose response relationship for

16  mesothelioma and asbestos exposure has also been done primarily

17  in cohort studies.   There have been some attempts to look at

18  dose response relationships in case control studies.   But in my

19  opinion they fall short because of a number of methodological

20  problems.

21         MS. HARDING:   Is this GG-2246?   You already have that

22  up there?   Okay.

23  Q    Is this the same list of studies that you -- that were

24  used by the researchers in the lung cancer context?

25  A    Yes, these are the same studies that were used by the

CC-BLG001199

1   researchers in the lung cancer context.  But this is -- these

2   are the -- the cohorts in red here are the mesothelioma cohorts

3   that were studied by the EPA.  So the EPA looked at more lung

4   cancer cohorts than mesothelioma cohorts.

5   Q    So the only distinction in substance with respect to 2246

6   as opposed to I think it's 2244 was the highlighting of the

7   studies that the EPA used in their dose response model?

8   A    That's correct.

9            THE COURT:  Wait, I'm sorry.  I'm confused.  2246 --

10  I thought the reds were the studies that the EPA used with

11  respect to lung cancer, but that's not correct, that's the

12  studies used with respect to meso?

13           MS. HARDING:  Yes, if you go back to 2244, Your

14  Honor.  There we go.  The title you will see has lung cancer.

15           THE COURT:  All right.  We've only seen 2246, 2244

16  wasn't up before.

17           MS. HARDING:  I'm sorry.  I put up the wrong slide

18  then.

19           THE COURT:  All right.  Wait til I go back and get my

20  notes corrected.

21  Q    Dr. Moolgavkar, we were talking about lung cancer studies

22  and I thought it was 2244 because there was so much red, but

23  2244 is the slide that describes the cohort studies that have

24  been used by the EPA and Hodgson & Darnton to investigate lung

25  cancer, is that right?


**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001200

1  A    That's correct.

2  Q    And the red, what does the red describe?

3  A    In this slide, the red describes the subset of these

4  studies that were used by the EPA in 1986.

5        THE COURT:  All right, so 2244 is lung cancer, but

6  the red still indicates what the EPA used.  2246 is meso and

7  the red indicates what the EPA was looking at.

8        THE WITNESS:  Yes, Your Honor.

9        THE COURT:  Okay, thank you.

10       MS. HARDING:  Just to be clear, Your Honor, 2244 are

11 the studies used by Hodgson & Darnton.

12       THE COURT:  Correct.

13       MS. HARDING:  And the red --

14       THE COURT:  Is what the EPA also looked at.

15       MS. HARDING:  Is what the EPA also used, yes.

16       THE COURT:  It's the same set of studies only 2244 is

17 lung cancer, 2246 is meso.  It's just that before it was only

18 2246 that was up and it should have been 2244.

19       MS. HARDING:  That's right, Your Honor.

20       THE COURT:  Okay.  I got it.  Thank you.

21 Q    Okay.  So going back to 2246 please, to mesothelioma.  And

22 the red highlighted slides on 2246, Dr. Moolgavkar, what do

23 they represent just so that the record is clear?

24 A    Yes, those represent the studies that were used in 1986 by

25 EPA to come up with risk estimates for mesothelioma.


**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001201

1  Q    Okay.  And what conclusions can be drawn from this body of

2  epidemiological, if any -- this body of epidemiological

3  evidence and a dose response relationship of mesothelioma and

4  asbestos exposure?

5  A    Well, what this data clearly shows is that high levels of

6  exposure to asbestos are associated with the occurrence of

7  mesothelioma.  It also shows quite clearly that the different

8  kinds of asbestos fibers have different potencies so that the

9  amphiboles are a lot more potent than chrysotile in causing

10 mesothelioma.  And there is some evidence that that's true also

11 for lung cancer.

12 Q    Is there with respect to mesothelioma, a reliable body of

13 epidemiological evidence that supports the conclusion that

14 there is significant risk of mesothelioma of asbestos exposures

15 below that level of 15 that you've indicated on the chart?

16 A    There is not.

17 Q    Now some of the experts on -- that have appeared for the

18 written reports for the ACC have, you know, oh my goodness, Dr.

19 Moolgavkar, how could you say that?  How could you say that

20 that's the case?  There are -- there is evidence of exposure

21 lower than that demonstrating a significant risk of

22 mesothelioma.  What's your response?

23          MR. FINCH:  Objection, leading.

24          THE COURT:  No, that was not a leading question.  She

25 was stating the question saying that the ACC was saying that

CC-BLG001202

1  there is evidence of exposure below that level and what is his

2  response.  That is not leading.  Go ahead, doctor, you may

3  answer.

4  A    I believe that the studies on which those conclusions are

5  based are fatally flawed and do not support those conclusions.

6  Q    Now I want to ask you another question, a similar

7  question, a related question.  I think I'll go up here.

8          MS. HARDING:  Can you see, Your Honor?

9          THE COURT:  Yes.

10         MS. HARDING:  Can you all see?

11 Q    I want to ask you about something that's what I think is

12 referred to as incremental dose.  And if you were talking about

13 asbestos exposures three fiber years and six fiber years or

14 asbestos exposures at 15 fiber years or 18 fiber years and

15 asbestos exposures at 100 fiber years or 103 fiber years.

16         Is there a body of reliable epidemiological evidence

17 that demonstrates that there is a statistically different risk

18 between exposures, asbestos exposures, at the level of three as

19 opposed to the level of six?

20 A    No.  There is absolutely no evidence, no direct evidence

21 to suggest.  No epidemiological studies that show a

22 significantly increased risk at those small differences in

23 exposure levels that you have indicated in this black board.

24 Q    Regardless of where the exposure level is?

25 A    Regardless of where the exposure level is.  It is entirely

**J&J COURT TRANSCRIBERS, INC.**

1   possible theoretically that small increments in dose lead to

2   increments in risk.  But, this increment in risk would be so

3   small that it would be undetectable in any epidemiological

4   study.

5   Q     Why is that?

6   A     Because of the -- I think basically for two reasons.  One

7   is the difficulties in measuring exposures precisely so because

8   of the difficulties of exposure measurement error, and secondly

9   because of the heterogeneity of human populations.  I think any

10  difference, even if there is one, would be completely buried in

11  the noise.

12  Q     In the noise.  What do you mean when you say that?

13  A     In the background noise, the statistical fluctuations that

14  you get in disease frequency in any epidemiological study.

15  Q     Now the next slide, 2247, I think I understood that to be

16  a summary of your opinions with respect to low exposures of

17  mesothelioma.  Is there any -- does that summarize your

18  opinions or is there anything else that you wanted to say about

19  that?

20  A     No, that pretty much summarizes my -- it pretty much

21  summarizes my conclusions.  I say that most inferences at lower

22  exposures are based on mathematical extrapolation which I'm

23  going to discuss later in this testimony.  As I've said

24  earlier, epidemiological studies that claim to report risks at

25  low exposure levels have very serious limitations and the

CC-BLG001204

1  contention that every exposure above background contributes

2  significantly to risk is simply not scientifically defensible.

3  Q    Okay, with respect to --

4          THE COURT:  Wait.  Could you stop there for a minute

5  please?

6                          (Pause)

7          THE COURT:  All right, thank you.

8  BY MS. HARDING:

9  Q    Dr. Moolgavkar, with respect to the last statement you

10 just made, could you explain what you mean by that?  Is that

11 what you were just talking about when I asked you the questions

12 about the doses there, or is that something different?

13 A    No, that's part of it.  There are some risks that are so

14 trivial that they would never be picked up in any

15 epidemiological study.  So I can give examples.  If somebody

16 smoked say two packs a day of Marlboro's for 20 years and

17 developed lung cancer but just happened to borrow a Pall Mall

18 from a friend one day and -- a Pall Mall cigarette contributed

19 significantly to his lung cancer risk.  It's a similar

20 situation.

21 Q    I'd like to ask you now about the second bullet you have

22 up there, the studies purporting to report risks at low levels

23 of exposure.  Did you prepare a slide to discuss that issue?

24 A    I have a slide for that, yes.

25 Q    That's GG-2248, is that right?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001205

1  A    Yes.

2  Q    What -- are these the studies that the others have

3  suggested demonstrate that there is increased risk for

4  mesothelioma at lower levels?

5  A    Yeah.  These are the case control studies that have been

6  widely used to suggest that there is a strong dose response

7  relationship for mesothelioma at low levels of exposure.  And

8  so these are four case control studies and they all have

9  basically pretty serious limitations.  First of all, none of

10 them have any reliable industrial hygiene estimates of exposure

11 and that is actually recognized by the authors of the papers

12 themselves.  So, for example, "Iwatsubo", et al., every time

13 they report a fiber per mil a year cumulative exposure, they do

14 it quotes.  And at several places in the paper they say they

15 never had any direct measurements, that their measurements were

16 reconstructed by industrial hygienists who also did not have

17 any direct measurements of the products they were looking at.

18       The second limitation is that these studies, even if

19 they attempt to reconstruct asbestos exposures, have absolutely

20 no information on what type of fiber these individuals might

21 have been exposed to or what mixture of fibers they might have

22 been exposed to.  And other than that, they also have some

23 serious methodological limitations insofar as these statistical

24 analyses are concerned.  And so I simply don't find that the

25 findings or the conclusions of these studies are credible.

CC-BLG001206

1        And finally, the last study by Roland Natale

2   (phonetic) which is often quoted is not a full study, at all.

3   It's just an abstract, and I'm unable to evaluate that study

4   because I have not been able to find a full text of that study.

5   Q    With respect to the Category 2 that you have up there, the

6   -- meet the criteria for inclusion of the EPA, Hodgson and

7   Darnton, and Berman and Crump for inclusion in their studies to

8   investigate dose response?

9   A    Yes.

10  Q    Okay.  Would these studies, or studies like them, have

11  been able to meet that criteria that are included in those

12  studies?

13  A    Well, they were clearly not included.  Obviously, none of

14  these studies were available to Nicholson in 1986 but certainly

15  Iwatsubo was available to Hodgson and Darnton in 2000.  And all

16  these, Hans and Natale (phonetic) would have been available to

17  Hodgson and Darnton, as well.  All three studies would have

18  been available to Berman and Crump in 2003, but were not

19  included.

20  Q    Why -- aside from the fact that some of them weren't

21  available, are there reasons why they wouldn't have been

22  included?

23  A    Well, I think --

24       MR. FINCH:  Lack of foundation.  He didn't author the

25  Hodgson and Darnton or Berman and Crump before the EPA 1986

CC-BLG001207

1  risk assessment.  I don't think he can testify as to what those

2  individuals thought about why they included a study or didn't

3  include a study.

4         THE COURT:  Well, that's true.  I think he cannot

5  testify as to why someone else may not have included them, but

6  he can specify what the criteria were.

7  BY MS. HARDING:

8  Q    Did the EPA, Hodgson and Darnton and Berman and Crump

9  discuss criteria for studies that they included in their

10  analysis?

11  A    Yes.  As I said earlier in my testimony, they do have

12  criteria and those criteria have to do with the quality of the

13  exposure assessment.  And they don't say specifically why these

14  studies were not included, but it seems to me that these

15  studies don't meet those criteria.

16  Q    Okay.  And why don't they meet the criteria?

17  A    As I've said, because they themselves, the authors

18  themselves recognized the limitations of their exposure

19  assessments.  They have no direct measurements of exposure.

20  Q    So based on the EPA, Hodgson and Darnton and Berman and

21  Crump, is there a scientific method for determining risk at

22  varying levels of asbestos exposure?

23  A    Yes.  There is -- different dose response models have been

24  developed.  For lung cancer they use more or less the same

25  models, the EPA, Hodgson and Darnton and Berman and Crump use

CC-BLG001208

1  very similar models for lung cancer.  But, for mesothelioma,

2  Hodgson and Darnton use models that are very different from the

3  EPA and the Berman and Crump model.

4  Q    And would these -- has that method been deployed in

5  studies such as the ones that are on this table to quantify a

6  level of statistical significant risk below that 15 that you

7  have on your chart?

8           THE COURT:  I'm sorry, Ms. Harding, I don't know what

9  method we're talking about.  There are several methods.  I

10 don't know which one we're talking about.

11 BY MS. HARDING:

12 Q    Okay.  Berman and Crump, Hodgson and Darnton and EPA all

13 investigated the issue of dose response from asbestos exposure

14 and disease, correct, is that right?

15 A    That's correct.

16 Q    And in terms of understanding exposures below the 15 that

17 you've indicated on the chart here, are there reliable

18 epidemiological studies that have been done like the ones that

19 are on the charts and used by Berman and Crump, the EPA, and

20 Hodgson and Darnton to find significant risk below the level

21 that you have on the chart?

22 A    No.

23 Q    Now, Dr. Moolgavkar, I want to ask you about another

24 benchmark you have here on this chart.  It says auto mechanic

25 exposure and then over here it says risk not observed and I'd

J&J COURT TRANSCRIBERS, INC.

1  like to ask you about that.  First of all, what -- when you say

2  -- what does the 2.8 represent first, let's start there?

3  A    Well, the 2.8 represents -- is a number taken, is a figure

4  taken from a recent paper, an industrial hygiene paper that

5  suggests or says, that concludes that 95 percent of the auto

6  mechanics were exposed to less than 2.8 fiber per mil years of

7  cumulative chrysotile exposure while working in that

8  profession.

9  Q    And why is the auto mechanic exposure important in your

10 analysis here?

11 A    Well, there has been a great deal of concern that

12 automobile mechanics may be at increased risk of asbestos

13 induced disease like mesothelioma and lung cancer because they

14 deal on a daily basis with friction products like brakes and

15 gaskets and so on that contain small amounts of chrysotile

16 asbestos.  So, there has been this concern that NIOSH has had

17 and other agencies have had since the 1980s, at least.  And so

18 as a result of this there have been multiple epidemiological

19 studies of mesothelioma to see specifically whether automobile

20 mechanics are at an increased risk of either mesothelioma or

21 lung cancer.  And none of those studies has ever shown any

22 evidence of any increased risk.  And I think I have a slide for

23 that.

24        MS. HARDING:  Could you show 2249 please?

25 A    Yes, these are just the case control studies of risk of

CC-BLG001210

1  mesothelioma among auto mechanics.  And here I have ten case

2  control studies and, Your Honor, the blue dot represents what

3  is called a relative risk.  A relative risk of one means that

4  there is no increase in risk.  And the vertical lines through

5  the blue dots represent the so-called 95 percent confidence

6  interval.  And if one of the ends of the confidence interval

7  crosses that red line at one, it means that none of these

8  estimates are statistically significant.

9          So the interpretation of this slide is that there

10 were ten case control studies of the auto mechanics that were

11 conducted and none of these studies found a statistically

12 significant risk different from one.  So all the risks are

13 basically one, so no increase or decrease in risk.

14 Q    Dr. Moolgavkar, now you said those are case control

15 studies.  How can you use them for dose response information?

16 A    Well, there is no direct dose response information in

17 these studies.  They --

18 Q    Then, let me ask you a question before you go on.  Are you

19 using the auto mechanic case control studies for the

20 information on dose for auto mechanics?

21 A    Well, I'm not using these case control studies directly,

22 but there is one fairly unique feature of work as an automobile

23 mechanic and that is, namely there is pretty homogeneous

24 exposure.  They're exposed to friction products in the garages

25 where they work.  This is quite different from say construction

CC-BLG001211

1  work where a construction worker might move from one area to

2  another and he might be -- he or she might be exposed to

3  different kinds of asbestos fibers at different concentrations

4  in different areas.  So this is a pretty unique situation, but

5  here you can study the job, namely auto mechanics, arrive at a

6  conclusion regarding the risk and then use industrial hygiene

7  studies done by others to see what the levels of exposure might

8  have been.  And this is precisely what I've presented on this

9  graph here, on this -- the 2.8 represents the result of

10  recently published industrial hygiene study for auto mechanics.

11  Q    Aside from the recently published industrial hygiene study

12  with respect to exposure of auto mechanics, have there been

13  numerous, or are there other industrial hygiene studies

14  relating to auto mechanic exposure in the published literature?

15  A    Yes, there are numerous studies in the published

16  literature and I only have a nodding acquaintance with them

17  because I'm not an industrial hygienist.

18  Q    Okay, and so the data that's used to characterize exposure

19  is not the data from the case control studies, it's data from

20  the industrial hygiene studies, is that right?

21  A    That is correct.

22  Q    I do want to ask you one other benchmark that you have on

23  the slide here -- I'm sorry, on the board -- which is on 2262

24  which relates to the asbestosis and at 25.  Can you tell me

25  what that represents please?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001212

1  A    Yeah, the asbestosis is the most serious non-malignant

2  condition that is associated with asbestos exposure and I think

3  it's widely recognized.  I think I have a slide to show this.

4  It's widely recognized that below 25 fiber per mil years

5  asbestosis cannot occur.

6  Q    Could you show 2251?

7  A    So I think there's little disagreement on this point that

8  asbestosis does not occur below an exposure of about 25 fiber

9  per mil years.

10 Q    And what are the sources listed on this slide that support

11 that opinion?

12 A    This is the -- three government bodies.  There's the

13 Ontario Royal Commission 1984, Doll and Peto which also

14 undertook this work I think under commission from the UK

15 government, and our own EPA that came to the same conclusion.

16 Q    Now, we've been talking about the dose response

17 relationships of asbestos exposure and mesothelioma and lung

18 cancer that have been observed in the epidemiological data, is

19 that right?

20 A    That's correct.

21 Q    Now I'd like to move onto the last inquiry here and talk

22 about your investigation of the exposure response relationships

23 for asbestos related disease both in the range of observation

24 and in the model derived range of observations.  I want to talk

25 about the modeling that's been done with respect to asbestos

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001213

1   exposure and disease.   Okay?

2   A    Model derived range of extrapolation you mean?

3   Q    Yes, okay.   Are there methods that have been developed to

4   estimate risk at lower levels of asbestos exposure than those

5   actually observed in the epidemiological data?

6   A    Yes.   One uses basically mathematical models, mathematical

7   and statistical models to fit the data in the range of

8   observations and then those models are used to extrapolate down

9   to levels where there are no observations.

10  Q    And, Dr. Moolgavkar, is that type of modeling the kind of

11  modeling that you have been working with most of your

12  professional career?

13  A    Yes, that is exactly the kind of modeling that I have been

14  doing for 30 years.

15          MS. HARDING:   Could you put up 2252 please?

16  Q    And just to be clear, we've moved now from risk that's

17  been observed epidemiologically with the body of

18  epidemiological data to support it, is that right?

19  A    That's correct.

20  Q    To the model derived range of extrapolation, is that

21  right?

22  A    Yes.

23  Q    Okay.   And are you familiar with this slide?

24  A    Yes.   This slide was in one of my reports and it's a

25  schematic that simply shows the process of low dose


**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001214

1  extrapolation.  So what you have shaded in dark gray on the

2  right-hand side of this chart is the range of doses in the --

3  that are observed.  So in this range you have some range of

4  exposures of doses and you have some observations that is the

5  response or the disease data, the frequency of disease

6  occurrence, for example.  And what you can do is fit a

7  mathematical model to those points and then make some decision

8  as to how that risk is to be extrapolated down to the range

9  where there are no observations, at all.

10          And so there is a range of possible responses and it

11  is generally considered that the linear extrapolation down into

12  the unobserved range is the most protective, is conservative,

13  and the most protective of public health.  We have no idea that

14  it is correct, and the further away you get from the

15  observations, the more uncertain the results.  But that -- for

16  public health protection, that linearity often assumed by

17  agencies that are charged with protecting the public health,

18  but that doesn't mean that that is the correct model to use.

19  In fact, we don't know what the correct model is in that range.

20  Q    Are there different models that have been developed to fit

21  the data in the observed range to understand risk in the lower

22  range?

23  A    Yes, there are indeed different models that have been

24  developed that fit the data equally well in the observed range

25  but might actually diverge quite widely in the range of

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001215

1  extrapolation.

2           MS. HARDING:   Could you put up 2258 please?

3  Q    Does this slide try to summarize what you believe to be

4  the important factors that the Court needs to understand -- to

5  understand modeling in the unobserved range?

6  A    Yeah, I believe so and I --

7  Q    Could we -- let's walk through each one then.

8  A    Yes.

9  Q    The first one says mathematical models are used to

10 investigate dose response relationships both in the range of

11 observation and the range of extrapolation.  I think that just

12 described that process, right?

13 A    Yeah.  Well, I like this quote from the statistician

14 G.E.P. Box who said essentially all models are wrong but some

15 models are useful and I think that's the way in which models

16 should be treated.  Mathematical models are used to investigate

17 dose response relationships and one has to understand that this

18 is both in the range of observation and in the range of

19 extrapolation.  Now, both in the range of observation and in

20 the range of extrapolations, different models yield different

21 answers.  So sometimes one is able to choose a model that fits

22 the data better in the range of observations.  One would use

23 that model then.  But different models can yield different

24 answers in both ranges and what is important to realize is that

25 the further from the range of observations one gets, the more

CC-BLG001216

1  discrepant the models might become and the less certain the

2  results.

3  Q    I'm sorry, did I interrupt you?

4  A    Yes, I was just going to go through all the points.

5  Q    Well, I was just going to ask you about the next bullet

6  even in the range of observations prediction of monotone

7  increase in risk is based on models, what does that mean?

8  A    Even in the range of observations as I showed on the

9  previous slide, if we could go back to that for just a minute,

10  you can see that in the range of observations you have those

11  circles that represent the responses and some of them lie above

12  and some of them lie below the line that has been fit to it.

13  So the model suggests that there is a monotone increasing dose

14  response relationship; that is, as the dose increases, the

15  response increases, also.  That is the model that fits the data

16  -- how it would directly -- the data can fluctuate on both

17  sides of that line.

18           Could we go back to that slide?  Thank you.  So this

19  is what I mean.  Even in the range of observations, prediction

20  of monotone increase in risk is based on models.  And there

21  really is no direct observation that small increases in

22  exposure lead to increase in risk.  And I said earlier this

23  just reiterates a point I made earlier that one would not be

24  able to design an epidemiological study that would be able to

25  tease apart a small increase in risk.

CC-BLG001217

1  Q    Let's talk now about the models that have been -- that are

2  available and used in connection with asbestos exposure.

3        MS. HARDING:   Could you show 2254 please?

4  Q    And are these -- does this slide reflect the models that

5  are available in the area of asbestos exposure and lung cancer

6  and mesothelioma?

7  A    Yes, there are two distinctly different types of models

8  used for lung cancer and mesothelioma.  For lung cancer, most

9  lung cancers can be analyzed in the cohorts in the observable

10 range of data.  And one of the targets of estimation in cohort

11 studies is the relative risk.  So the relative risk is directly

12 estimated from the cohort studies.  So what the models can do

13 is that they can directly model the relative risk and so the

14 kind of model that is used is called a linear access relative

15 risk model for lung cancer.

16       Now for mesothelioma, this is not so easy because

17 mesothelioma is a rare cancer and relative risks are not

18 estimated from cohort studies.  You cannot estimate relative

19 risks from cohort studies simply because the background risks

20 are so small.  So one has to do mesothelioma modeling in a

21 different way.  One has to use what are called absolute risk

22 models and there are two that are generally available.  There's

23 the Peto model which the EPA used in 1986.  This was not a

24 fiber type specific model.  Namely, they threw in all kinds of

25 asbestos types, fiber types together in that model in 1986.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001218

1  And then there's the Berman and Crump model in 2003 which made

2  a distinction between chrysotile asbestos and amphiboles.  So

3  these are both versions of what I would call the Peto model.

4          The second kind of model was developed by --

5          THE COURT:  Sorry, doctor, the Berman and Crump made

6  a distinction between amphibole and what?

7          THE WITNESS:  And chrysotile.

8          THE COURT:  Okay, the two asbestos fibers?

9          THE WITNESS:  Yes.

10         THE COURT:  Thank you.  Was it specific to asbestos

11 fibers, that study?

12         THE WITNESS:  Specific to asbestos fibers.

13         THE COURT:  Okay, thank you.

14 A    Hodgson and Darnton developed a model based on average

15 cumulative exposures in cohorts and their model is of a

16 completely different type.  It's not the Peto model.  It's a

17 completely different type of model.

18 Q    Okay now, with respect to your analysis in this case --

19 but before we get there, let me ask you this.  What does the

20 term "doubling-dose" refer to, have you heard that term and

21 what does it mean?

22 A    The doubling-dose to me indicates the dose at which the

23 relative risk is equal to two.  Namely, that's the dose at

24 which you increase -- at which the exposure -- the probability

25 of developing the disease in the exposed population against the

CC-BLG001219

1  unexposed population is two.  That is also the demarcating line

2  if you will between -- about which it is more likely than not

3  that a disease can be attributed to the specific exposure that

4  you're thinking about.

5  Q    Are there methods available in the scientific literature

6  for calculating the doubling-dose observed or extrapolated in

7  the models?

8  A    There's one -- one would use models of this type to

9  calculate the doubling-dose.  For lung cancer one would use the

10 relative risk model.  For mesothelioma one has to use a two

11 step process which I think I have a slide for that.

12 Q    You do.  We're going to get there, I'm asking you about

13 lung cancer first.  But have you calculated the doubling-dose

14 estimates for asbestos, both using the models, both in

15 mesothelioma and lung cancer in this case?

16 A    Yes, I have.

17 Q    Okay, let's discuss those estimates.

18       MS. HARDING:  And if you could show 2255 please.

19 A    Okay, so as I said earlier, estimation of doubling-dose,

20 the dose for which relative risk equals to two for lung cancer

21 and mesothelioma depends upon the use of mathematical models.

22 There's other critical difference in that for lung cancer the

23 doubling-dose is directly estimated because the relative risk

24 is directly estimated in cohort studies.  For mesothelioma you

25 need a two-step process.  The doubling-dose for mesothelioma

CC-BLG001220

1  then involves applying what is called an absolute risk model

2  and what this model does is calculate or estimate for you the

3  total number of mesotheliomas that you would get for a specific

4  asbestos exposure, but that is the numerator.  But, you need a

5  denominator; namely, what is the background risk without

6  exposure to asbestos?  So the second step needs some

7  assumptions regarding the background lifetime probability of

8  developing mesothelioma.

9          Now when you have both these pieces in place, then

10 you can take the numerator, divide by the numerator -- by the

11 denominator and come up with an estimate of the doubling-dose.

12 Q    And is there information that allows you, sometimes at

13 least, to estimate doubling-dose information for different

14 fiber types?

15 A    Yes, the -- both the Berman and Crump version of the Peto

16 model and the Hodgson and Darnton formulas allow you to use --

17 make distinction by fiber type.  I prefer the Berman and Crump

18 formulation.  I prefer to use the Peto model.

19 Q    Okay, let's talk first about the relevant -- your relevant

20 doubling-dose estimates for lung cancer, okay?

21 A    Yes.

22         MS. HARDING:  And could you show 2256 please?

23 Q    I understand this to be the results of your estimates for

24 doubling-dose.  But, before I ask you about that, did you use

25 the standard methods that are available in quantitative

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001221

1  epidemiology and biostatistics for calculating the

2  doubling-dose of asbestos exposure and lung cancer?

3  A    Yes.   Yes, I did.   These are fairly standard methods.   For

4  lung cancer the so-called linear relative risk model has been

5  used for many, many years and I have laid out the details of

6  how this calculation is done in my reports.   But, what I come

7  up with are the following two estimates of doubling-dose.   For

8  EPA in 1986 which looked at mixed fibers, the doubling-dose

9  estimate is about 100 fiber per mil years.   For Libby miners,

10 based on an estimate of the potency for lung cancer reported in

11 McDonalds' 2004 paper, I estimate the doubling-dose to be about

12 278 fiber per mil years.

13 Q    With respect to the first number, the EPA 1986

14 doubling-dose number, what fibers are being -- what kinds of

15 asbestos fibers are being modeled there with respect to

16 doubling-dose?

17 A    I believe that the EPA -- the cohorts chosen by EPA were

18 rather heavy on amphibole asbestos exposure.

19 Q    Did they have mixed fiber environments?

20 A    Mixed fiber environment, but heavy on the amphiboles.

21 Q    Okay, did they include both chrysitolite and amosite

22 cohorts?

23 A    Some of them had chrysitolite also -- amosite and

24 chrysitolite.

25 Q    Dr. Moolgavkar, what is the relevance of trying to

CC-BLG001222

1  calculate the doubling-dose information for different fiber

2  types of asbestos?

3  A    Well, I would say it's a lot more important for

4  mesothelioma than for lung cancer.  But, as I said earlier,

5  there is some indication that for lung cancer the amphiboles

6  are maybe five to ten times more potent than chrysotile in

7  causing risk -- in increasing the risk of lung cancer.  For

8  mesothelioma it's a lot more important because the generally

9  reported figure in Hodgson and Darnton is that hemocyte is

10  about 100 times more potent than chrysotile and that

11  chrysitolite is something like 500 times more potent than

12  chrysotile.

13  Q    Let's move then to mesothelioma and talk about your -- the

14  doubling-dose estimates that you made with respect to

15  mesothelioma.  Now, before we actually get to the results of

16  your estimates, you indicated earlier that it's more difficult

17  to estimate the doubling-dose for mesothelioma, and could you

18  explain why that's so?

19  A    Well, as I said, it's more difficult because it's a

20  two-step process.  You cannot investigate the relative risk

21  directly so what you need to do is to use an absolute risk

22  model that gives you the number of mesotheliomas for some kind

23  of asbestos exposure.

24          MS. HARDING:  Could you show 2257 please?

25  A    So the absolute risk model that I like to use is Peto's

CC-BLG001223

1  formula which was used both by EPA in 1986 and by Berman and

2  Crump in 2003 and this is the basic form of this mathematical

3  expression.  I Sub-M is the incidence of mesothelioma at Dime

4  D where D is the duration of exposure to asbestos.  F is the

5  fiber concentration given to you in fibers per milliliter or

6  cubic centimeter.  K Sub-M is a constant that depends upon

7  fiber type.  So it's a constant that depends upon whether

8  you're dealing with chrysotile, or chrysitolite or amosite.

9  And D is the duration of exposure in years.

10          So, what one has to note from this formula, a couple

11  of things.  One, in terms of F, the fiber concentration, the

12  incidence is linear.  If you increase the fiber concentration

13  from say one fiber per cc to two fibers per cc while keeping

14  the duration constant, you will double the risk of

15  mesothelioma.  However, there is a strong non-linearity in

16  duration of exposure.  So let's ignore that -- pretend for the

17  moment that thaat creates a little bit of difficulty in

18  understanding.  That's the latency or the lag period in that

19  formula.  However, let's look at if duration of exposure is 11

20  years and you increase that to 12 instead of 11, then your risk

21  of mesothelioma will go up, not to twice the amount but will go

22  up eight fold because of that cubic term that duration of

23  exposure is multiplied by.

24  Q    Have you prepared a slide to help explain the appropriate

25  method for modeling doubling-dose for mesothelioma?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001224

1  A     Yes, I have a -- I think I have a slide that shows --

2  Q     Yes, 2258.

3         MS. HARDING:   Could you show 2258 please?

4  A     Yeah, this shows what happens with the Peto formula.   And

5  what you can see on the right-hand side of the panel on the

6  left you see that pretty sharp, straight line.   That is how the

7  risk increases with fiber concentration.

8  Q     I'm actually going to walk over to make sure we're talking

9  about the right thing.   This line here?

10 A     That line --

11 Q     Is that the line you're talking about there?

12 A     Yes.

13 Q     Okay, and what does that line -- why is that line

14 important, what does that tell you about modeling doubling-dose

15 for mesothelioma?

16 A     That line shows how the incidence of mesothelioma

17 increases with the concentration of fibers.   Now --

18 Q     And how would you describe that?

19 A     That's linear.   It's a straight line.   Now, if you look at

20 the other axis and see that curved line going up steeply,

21 that's how the incidence increases with duration of exposure.

22 So it's very clear that duration of exposure is much more

23 powerful in determining risk than in intensity of exposure.   I

24 have a simple example up there in that Post-it type note, so if

25 you look at an exposure of four fibers per cc for ten years so

J&J COURT TRANSCRIBERS, INC.

CC-BLG001225

1   that's a cumulative exposure of 40 fibers per cc years, that

2   yields an incidence of mesothelioma of 40 cases per million per

3   year.   Now, if on the other hand, you look at 148 fibers per cc

4   for three years, this is, of course, an extremely high exposure

5   concentration, 148 fibers per cc for three years, that yields

6   also the same risk.   It's also 40 cases per million per year.

7   And on the -- what you can see is the first scenario represents

8   a cumulative exposure of 40 fibers per cc years.   The next

9   scenario, the second one represents a cumulative exposure which

10  is ten times larger and yet they both yield the same risk.

11          What this is saying is that it is inappropriate -- to

12  treat the risk of mesothelioma has been linear in cumulative

13  exposure.   It is linear in concentration.   It is non-linear in

14  duration.   And because cumulative exposure consists of both

15  concentration, is made up of both concentration and duration of

16  exposure, cumulative -- the risk of mesothelioma is not linear

17  with cumulative exposure.

18  Q    I want to just make one clarification point.   I pointed to

19  this line over here as describing the line -- the linear line

20  that describes the response for concentration of asbestos, is

21  that right?

22  A    Yes.

23  Q    And it's also probably better reflected on this second

24  graph right here, is that right?

25  A    Yes.

CC-BLG001226

1  Q    Okay.  Now, with all of those methodological

2  considerations in place, did you then calculate the

3  doubling-dose for mesothelioma and asbestos exposure?

4  A    Yes, I did.

5           MS. HARDING:  Okay.  Could you show 2260 please?

6  A    Yes.  So, I present three estimates of doubling-dose here

7  assuming a 45-year duration of exposure.  So the duration of

8  exposure is chosen to be the one that OSHA usually considers.

9  For mixed fibers, the case of them is reported in Nicholson's

10  EPA document.  That's the constant that one requires to use the

11  Peto formula and that is reported to be ten to the minus eight.

12  And using that K Sub-M and assuming a 45-year exposure

13  duration, the cumulative exposure that leads to the doubling of

14  risk is 3.2 fiber per mil years.

15  Q    Dr. Moolgavkar, if you had used a lesser cumulative

16  exposure in your calculation, would that have lowered the

17  doubling-dose that you found?

18  A    I don't understand the question.

19  Q    Okay, all right, maybe I didn't understand.  But, the

20  duration of exposure you discussed earlier, you said that it

21  was important.  It was more important than concentration.

22  A    Right.

23  Q    Okay, and so I'm just trying to understand -- or actually,

24  maybe -- let's -- I'll move on.  The Libby Miners -- what was

25  the doubling-dose for Libby miners?

CC-BLG001227

1  A     Okay.  For the Libby miners now I have to use another

2  assumption made by EPA in 1986 because for the Libby miners,

3  K Sub-M is not available.  Nobody has really derived a K Sub-M

4  for tremolite fibers or the Libby-type fibers.  But one of the

5  assumptions made in EPA 1986 is that there is a fixed ratio

6  between the potency factor for lung cancer and the potency

7  factor for mesothelioma.  And so we have the potency factor

8  K Sub-L from the McDonald 2004 study which has found .0036.

9  We use the EPA assumption that K Sub-M is K Sub-L divided by

10  ten to the sixth and come up with the estimate of K Sub-M for

11  Libby fibers which is found .36 times ten to the minus eight.

12  So then using that K Sub-M, the cumulative exposure is 8.9

13  fiber per mil years.

14  Q     Okay.  And, again, you used cumulative exposure in that

15  estimate, as well?

16  A     Well, there's cumulative exposure, but assuming 45 years

17  of exposure.  Okay?  So the exposure concentration would be 8.9

18  divided by 45.

19  Q     Okay, now I understand.  With respect to chrysotile, did

20  you calculate a doubling-dose for asbestos?

21  A     Yes, the chrysotile doubling-dose comes from Berman and

22  Crump 2003 who present a separate K Sub-M which is what we need

23  for chrysotile and that is reported to be 0.04 times ten to the

24  minus eight.  And with that K Sub-M, the cumulative exposure

25  that doubles dose, again, assuming a 45-year exposure duration,

CC-BLG001228