UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                        .    Case No.  01-1139 (JKF)
                              .
W.R. GRACE & CO.,             .
et al.,                       .    USX Tower - 54th Floor
                              .    600 Grant Street
                              .    Pittsburgh, PA 15219
                Debtors.      .
                              .    March 26, 2008
. . . . . . . . . . . . . ..       8:38 a.m.


TRANSCRIPT OF TRIAL
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:          Kirkland & Ellis, LLP
                          By:  DAVID BERNICK, ESQ.
                               BARBARA HARDING, ESQ.
                               JANET BAER, ESQ.
                               BRIAN STANSBURY, ESQ.
                               SAL BIANCA, ESQ.
                               RAINA JONES, ESQ.
                               HENRY THOMPSON, ESQ.
                               SCOTT McMILLAN, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601

For the Debtors:          Kirkland & Ellis, LLP
                          By:  THEODORE FREEDMAN, ESQ.
                          Citigroup Center, 153 East 53rd St.
                          New York, NY  10022


Audio Operator:           Cathy Younker

Proceedings recorded by electronic sound recording, transcript
            produced by transcription service.

_____

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609)586-2311     Fax No. (609) 587-3599

*D1 18491*

2

APPEARANCES (CONT'D):

For the Asbestos
Creditors Committee:          Caplin & Drysdale, Chartered
                              By:  PETER LOCKWOOD, ESQ.
                                   NATHAN FINCH, ESQ.
                              One Thomas Circle, NW
                              Washington, D.C.  20005

                              Caplin & Drysdale, Chartered
                              By:  ELIHU INSELBUCH, ESQ.
                              375 Park Avenue, #3505
                              New York, NY  10152

For the Debtors:              ARPC
                              By:  AMY BROCKMAN, ESQ.

For W.R. Grace:               W.R. Grace
                              By:  MARK SHELNITZ, ESQ.
                                   JAY HUGHES, ESQ.
                                   WILLIAM CORCORAN, ESQ.
                              7500 Grace Drive
                              Columbia, MD  21044

For the Equity
Committee:                    Kramer Levin Naftalis & Frankel
                              By:  GREGORY HOROWITZ, ESQ.
                              919 Third Avenue
                              New York, NY  10022

For the
Unsecured Creditors'          Stroock & Stroock & Lavan
Committee:                    By:  KENNETH PASQUALE, ESQ.
                                   ARLENE KRIEGER, ESQ.
                              180 Maiden Lane
                              New York, NY  10038-4982

For the Property
Damage Committee:             Bilzin Sumberg Baena Price &
                                 Axelrod LLP
                              By:  MATTHEW KRAMER, ESQ.
                                   SCOTT BAENA, ESQ.
                                   JAY SAKALO, ESQ.
                              200 South Biscayne Boulevard
                              Suite 2500
                              Miami, FL  33131

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001375

APPEARANCES (CONT'D):

| | |
|---|---|
| For the Ad Hoc Committee of Equity Sec. Holders: | Dewey & LeBoeuf, LLP<br>By: JENNIFER WHITENER, ESQ.<br>125 West 55th Street<br>New York, NY 10019 |
| For the Future Claimants Representatives: | Orrick, Herrington & Sutcliffe LLP<br>By: ROGER FRANKEL, ESQ.<br>ANTHONY KIM, ESQ.<br>RAYMOND MULLADY, ESQ.<br>JOHN ANSBRO, ESQ.<br>Washington Harbour<br>3050 K Street, N.W.<br>Washington, D.C. 20007 |
| For Committee of Asbestos Personal Injury Claimants: | Campbell & Levine<br>By: MARK T. HURFORD, ESQ.<br>800 North King Street<br>Suite 300<br>Wilmington, DE 19701 |
| For Maryland Casualty: | Connelly Bove Lodge & Hutz, LLP<br>By: JEFFREY WISLER, ESQ.<br>The Nemours Building<br>1007 North Orange Street<br>Wilmington, DE 19899 |
| For Maryland Casualty: | Eckert Seamans Cherin & Mellott, LLC<br>By: EDWARD LONGOSZ, II, ESQ.<br>1747 Pennsylvania Avenue, N.W.<br>Suite 1200<br>Washington, D.C. 20006 |
| | STB<br>By: STERLING MARSHALL, ESQ. |
| For Sealed Air: | Skadden, Arps, Slate, Meagher & Flom, LLP<br>By: DAVID TURETSKY, ESQ.<br>One Rodney Square<br>Wilmington, DE 19801 |

**J&J COURT TRANSCRIBERS, INC.**

4

APPEARANCES (CONT'D):

For Sealed Air:                 NERA Economic Consulting
                                By:  STEPHANIE PLANCICH
                                1166 Avenue of the Americas
                                28th Floor
                                New York, NY   10036

For W.R. Grace:                 NERA
                                By:  ELENA ZAPRYANOVA
                                     LINDA SHEN

For Serengeti:                  Vinson & Elkins, LLP
                                By:  ARI BERMAN, ESQ.
                                Trammell Crow Center
                                2001 Ross Avenue, Suite 3700
                                Dallas, TX   75201

For Serengeti:                  By:  BILLAL SIKANDER

For Silver Point
Capital:                        Silver Point Capital
                                By:  JOHN KU

For the Debtors:                Pachulski, Stang, Ziehl &Jones
                                By:  JAMES O'NEILL, ESQ.
                                919 North Market Street
                                17th Floor
                                Wilmington, DE   19899-8705

TELEPHONIC APPEARANCES:

For the Unsecured              Strook & Strook & Lavan
Creditors' Committee:          By:  LEWIS KRUGER, ESQ.
                                180 Maiden Lane
                                New York, NY 10038

For Ad Hoc Committee:           Weil, Gotshal & Manges
                                By:  M. JARRAD WRIGHT, ESQ.
                                1300 Eye Street NW, Suite 900
                                Washington, D.C.  20005

For Official Committee          Kramer Levin Naftalis & Frankel
of Equity Holders:               LLP
                                By:  PHILLIP BENTLEY, ESQ.
                                919 Third Avenue
                                New York, NY   10022

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

| | |
|---|---|
| For Official Committee<br>of Asbestos Property<br>Damage Claimants: | Dies & Hile, LLP<br>By:  MARTIN DIES, ESQ.<br>1601 Rio Grande, Suite 330<br>Austin, TX  78701 |
| | ELIZABETH DEVINE, ESQ. |
| For Various Claimant<br>Firms: | Stutzman, Bromberg, Esserman & Plifka<br>By:  DAVID J. PARSONS, ESQ.<br>     VAN J. HOOKER, ESQ.<br>     SANDER L. ESSERMAN, ESQ.<br>2323 Bryan Street<br>Suite 2200<br>Dallas, TX  75201 |
| For Fireman's Fund: | Stevens & Lee, P.C.<br>By:  JOHN DEMMY, ESQ.<br>     DAVID R. BEANE, ESQ.<br>1105 North Market Street, 7th Fl.<br>Wilmington, DE  19801 |
| For Owens-Illinois: | McCarter & English<br>By:  DANIEL SILVER, ESQ.<br>Renaissance Centre, 405 N. King St.<br>Wilmington, DE  19801 |
| For David T. Austern: | Piper Jaffray & Co.<br>By:  JONATHAN BROWNSTEIN, ESQ. |
| For Asbestos Property<br>Damage Claimants: | Scott Law Group<br>By:  DARRELL SCOTT, ESQ.<br>1001 East Main Street, Suite 500<br>Sevierville, TN  37864 |
| For National Union Fire<br>Insurance Co.: | Zeichner Ellman & Krause, LLP<br>By:  MATTHEW RUSSELL, ESQ.<br>     ROBERT GUTTMANN, ESQ.<br>     MICHAEL DAVIS, ESQ.<br>575 Lexington Avenue<br>New York, NY  10022 |

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001378

TELEPHONIC APPEARANCES (CONT'D):

| | |
|---|---|
| For the Future Claimants Representatives: | Orrick, Herrington & Sutcliffe, LLP<br>By: DEBRA FELDER, ESQ.<br>JOSHUA CUTLER, ESQ.<br>Washington Harbour<br>3050 K Street, N.W.<br>Washington, D.C.  20007 For |
| For Federal Insurance Company: | Cozen O'Connor<br>By: JEFFREY WAXMAN, ESQ.<br>Chase Manhattan Centre<br>1201 North Market Street<br>Wilmington, DE  19801 |
| For Federal Insurance Company: | Cozen O'Connor<br>By: JACOB C. COHN, ESQ.<br>1900 Market Street<br>Philadelphia, PA  19103 |
| For Allstate Insurance: | Cuyler Burk, LLP<br>By: ANDREW CRAIG, ESQ.<br>Parsippany Corporate Center<br>Four Century Drive<br>Parsippany, NJ  07054 |
| For W.R. Grace: | W.R. Grace<br>By: WILLIAM CORCORAN, ESQ.<br>7500 Grace Drive<br>Columbia, MD  21044 |
| | Kirkland & Ellis, LLP<br>By: ELLEN AHERN, ESQ.<br>200 East Randolph Drive<br>Chicago, IL  60601 |
| | Kirkland & Ellis, LLP<br>By: DAVID MENDELSON, ESQ.<br>6555 Fifteenth Street, N.W.<br>Washington, DC  20005 |
| For State of Montana Department of Environmental Quality: | Womble Carlyle Sandridge & Rice<br>By: FRANCIS MONACO, ESQ.<br>222 Delaware Avenue<br>Suite 1501<br>Wilmington, DE  19801 |

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001379

TELEPHONIC APPEARANCES (CONT'D):

| | |
|---|---|
| For Official Committee of Asbestos Personal Injury Claimants: | Anderson Kill & Olick<br>By:  ROBERT M. HORKOVICH, ESQ.<br>1251 Avenue of the Americas<br>New York, NY  10020-1186 |
| For W.R. Grace: | Cohn Whitesell & Goldberg, LLP<br>By:  NATHAN SOUCY, ESQ.<br>101 Arch Street<br>Boston, MA  02110 |
| For CNA: | Goodwin Procter, LLP<br>By:  DANIEL GLOSBAND, ESQ.<br>Exchange Place<br>Boston, MA  02109-2881 |
| For Grace Certain Cancer Claimants: | Montgomery, McCracken, Walker &<br>   Rhoads, LLP<br>By:  NATALIE D. RAMSEY, ESQ.<br>300 Delaware Avenue, Ste. 750<br>Wilmington, DE  19801 |
| For David T. Austern, the Future Claimants' Representative: | Phillips, Goldman & Spence, P.A.<br>By:  JOHN C. PHILLIPS, ESQ.<br>1200 North Broom Street<br>Wilmington, DE  19806 |
| For W.R. Grace: | Pachulski, Stang, Ziehl & Jones, LLP<br>By:  TIMOTHY P. CAIRNS, ESQ.<br>919 North Market Street<br>17th Floor<br>Wilmington, DE  19899-8705 |
| For the Asbestos Creditors Committee: | Caplin & Drysdale, Chartered<br>By:  WALTER SLOCOMBE, ESQ.<br>     BERNARD BAILOR, ESQ.<br>     JEANNA RICKARDS, ESQ.<br>     JAMES WEHNER, ESQ.<br>     LESLIE KELLEHER, ESQ.<br>One Thomas Circle, NW<br>Washington, D.C.  20005 |
| For the Asbestos Creditors Committee: | Ferry Joseph & Pearce, P.A.<br>By:  THEODORE TACCONELLI, ESQ.<br>824 Market Street, Suite 19899<br>Wilmington, DE  19899 |

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001380

TELEPHONIC APPEARANCES (CONT'D):

| | |
|---|---|
| For Ford, Marrin,<br>Esposito, Witmeyer<br>& Gleser: | Ford, Marrin, Esposito, Witmeyer &<br>  Gleser<br>By: SHAYNE SPENCER, ESQ.<br>Wall Street Plaza<br>New York, NY 10005 |
| For Pepsi: | Butler Rubin Salfarelli & Boyd, LLP<br>By: KIRK T. HARTLEY, ESQ.<br>70 West Madison Street<br>Suite 1800<br>Chicago, IL 60602 |
| For Official Committee<br>of Unsecured Creditors: | Duane Morris, LLP<br>By: MICHAEL LASTOWSKI, ESQ.<br>1100 North Market Street, Suite 1200<br>Wilmington, DE 19801-1246 |
| For Official Committee<br>of Asbestos Property<br>Damage Claimants: | Brandi Law Firm<br>By: TERENCE D. EDWARDS, ESQ.<br>44 Montgomery St., Suite 1050<br>San Francisco, CA 94104 |
| For the State of CA,<br>Dept. of Gen. Services: | Hahn & Hessen, LLP<br>By: CHRISTINA J. KANG, ESQ.<br>488 Madison Avenue, 14th Fl.<br>New York, NY 10022 |
| For Baron & Budd,<br>et al.: | Hogan Firm Attorneys at Law<br>By: DANIEL K. HOGAN, ESQ.<br>1311 Delaware Avenue<br>Wilmington, DE 19801 |
| For the PD Committee: | Speights & Runyan<br>By: DANIEL SPEIGHTS, ESQ.<br>200 Jackson Avenue, East<br>Hampton, SC 29924 |
| For Royal Insurance: | Wilson Elser Moskowitz Edelman<br>  & Dicker, LLP<br>By: CATHERINE CHEN, ESQ.<br>  150 East 42nd Street<br>  New York, NY 10017 |
| For David T. Austern: | Piper Jaffray & Co.<br>By: JASON SOLGANICK |

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001381

TELEPHONIC APPEARANCES (CONT'D):

For Scott Company:            Vorys, Sater, Seymour & Pease, LLP
                              By:  TIFFANY COBB, ESQ.
                              52 East Gay Street
                              Columbus, OH  43216

For London Market            Mendes & Mount, LLP
Companies:                    By:  ALEXANDER MUELLER, ESQ.
                              750 Seventh Avenue
                              New York, NY  10019-6829

For Official Committee       LECG
of Asbestos Property         By:  ALAN MADIAN, ESQ.
Claimants:

For Official Committee       Richardson Patrick Westbrook &
of Asbestos Property           Brickman, P.C.
Claimants:                    By:  EDWARD J. WESTBROOK, ESQ.
                              174 East Bay Street
                              Charleston, SC  29401

For Ivory Investment:        Ivory Investment
                              By:  DHANANJAY PATWARDHAN

For Linden Advisors:         Linden Advisors, LP
                              By:  CRAIG GILBERT

For O'Conner:                O'Conner
                              By:  John R. Wollen

For Credit Suisse            Credit Suisse First Boston
First Boston:                By:  TIM McARDLE

For King Street              King Street Capital Management, LLC
Capital Management,          By:  KIM CHRISTENSEN, ESQ.
LLC:

For the Blackstone           The Blackstone Group
Group:                       By:  JOHN O'CONNELL

For Dune Capital Mgmt:       Dune Capital Management
                              By:  GUY BARON


**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001382

TELEPHONIC APPEARANCES (CONT'D):

For Anchorage Advisors:     Anchorage Advisors
                            By:  JONATHAN LEWINSOHN

For Lehman Brothers:        Lehman Brothers
                            By:  ANDREW CHAN

For Caxton Associates:      Caxton Associates, LLC
                            By:  JAMES RIEGER

For Dow Jones               Dow Jones News Wires
News Wires:                 By:  PEG BRICKLEY

For Citadel Investment      Citadel Investment Group
Group:                      By:  BEAU HARBOUR

For Durham Asset            Durham Asset Management
Management:                 By:  JEFFREY A. ROSENKRANZ

For Murray Capital          Murray Capital Management, Inc.
Management                  By:  MARTI MURRAY

For Korn Capital, LLC:      Korn Capital, LLC
                            By:  STEPHANIE KWONG

For Irwin H. Zandman:       Irwin H. Zandman
                            By:  IRWIN H. ZANDMAN

For Venor Capital:          MICHAEL SCOTT, ESQ.
                            Washington, DC

For Asbestos Claimants:     Brayton Purcell, LLP
                            By:  CHRISTINA SKUBIC, ESQ.
                            222 Rush Landing Road
                            Novato, CA  94948

For Halycon Asset
Management LLC:             Halcyon Asset Management, LLC
                            By:  JOHN GREENE

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001383

TELEPHONIC APPEARANCES (CONT'D)

For The Scotts Co.:        Vorys, Sater, Seymour and Pease,
                              LLP
                           By:  MATTHEW DAIKER, ESQ.
                           52 East Gay Street
                           P.O. Box 1008
                           Columbus, OH  43216

For Private Investors:     WILLIAM M. WAGNER

For Bank of New York:      ANDREW HAIN, ESQ.


For WR Grace
Shareholder:               Tocqueville Asset Management
                           By:  PETER SHAWN

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001384

I N D E X

**WITNESS FOR THE DEBTOR**                                    PAGE

  Dr. Elizabeth Anderson
    Direct Examination by Mr. Bernick              33
    Voir Dire Examination by Mr. Mullady           41
    Continued Direct Examination by Mr. Bernick    48
    Cross Examination by Mr. Mullady               115
    Cross Examination by Mr. Finch                 210
    Redirect Examination by Mr. Bernick            233
    Recross Examination by Mr. Mullady             252


**EXHIBITS**                                                  EVD.

  GG-2276   Summaries                              114
  GG-2277   Summaries                              114
  GG-2279   Summaries                              114
  GG-2282   Summaries                              114
  GG-2291   Summaries                              114
  GG-2292   Summaries                              114
  GG-2293   Summaries                              114
  GG-2294   Summaries                              114
  GG-2295   Summaries                              114
  GG-2296   Summaries                              114

  GX-155                                           268

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001385

1          THE COURT:  Good morning, please be seated.  This is

2  the continuation of the personal injury estimation trial in

3  W.R. Grace, 01-1139.  Participants by phone, Alex Mueller,

4  James Reiger, Matt Doheny, Theodore Tacconelli, Michael Davis,

5  Francis Monaco, Matthew Russell, Shayne Spencer, Lewis Kruger,

6  James Wehner, Elihu Inselbuch, Walter Slocumbe, Leslie

7  Kelleher, Peter Lockwood, Bernard Bailor, Guy Baron, Ari

8  Berman, Michael Lastowski, Janet Baer, Marti Murray, Jason

9  Solganick, Debra Felder, Nathan Soucy, Natalie Ramsey, Terrence

10  Edwards, Daniel Silver, Edward Westbrook, Kim Christensen,

11  William Wagner, Andrew Hain, Andrew Craig, David Parsons, Ken

12  Pasquale, Martin Dies, Peter Shawn, Jonathan Brownstein, Scott

13  Baena, Darrell Scott, Jay Sakalo, David Turetsky, Timothy

14  Cairns, Elizabeth Devine, Michael Scott, John Phillips, Daniel

15  Speights, Matthew Kramer, Christina Skubic, Mark Hurford, Beau

16  Harbour, Jeanna Rickards, Robert Guttmann, Christina Kang,

17  Catherine Chen, Alan Madian, David Beane, John Greene, Matthew

18  Daiker, John Ku, Andrew Chan, William Corcoran, Robert

19  Horkovich.

20          I'll take entries in Court for the court reporter,

21  please.  Good morning.

22          MR. BERNICK:  Good morning, Your Honor, David Bernick

23  for Grace.

24          MR. McMILLAN:  Good morning, Your Honor, Scott

25  McMillan for Grace.

**J&J COURT TRANSCRIBERS, INC.**

1   MS. AHERN:  Good morning, Ellen Ahern for Grace.

2   MS. HARDING:  Barbara Harding for Grace.

3   MR. FINCH:  Nathan Finch for the ACC, Your Honor.

4   MR. INSELBUCH:  Elihu Inselbuch for the ACC.

5   MR. MULLADY:  Good morning, Your Honor, Raymond

6 Mullady for the FCR.

7   MR. ANSBRO:  John Ansbro for the FCR.

8   MR. KIM:  Anthony Kim for the FCR.

9   MS. KRIEGER:  Good morning, Your Honor, Arlene

10 Krieger for the Unsecured Creditors.

11   MR. KRAMER:  Good morning, Your Honor, Matt Kramer

12 for the PD Committee.

13   MR. HOROWITZ:  Good morning, Your Honor, Greg

14 Horowitz for the Official Equity Committee.

15   MR. FRANKEL:  Good morning, Your Honor, Roger Frankel

16 for the FCR.

17   THE COURT:  Give me one second, Mr. Bernick, please.

18       (Pause)

19   THE COURT:  Folks, I had my staff up this morning.

20 Mr. Finch, did you explain to people about the microphones by

21 any chance?

22   MR. FINCH:  Not yet, Your Honor,

23   THE COURT:  Okay.  Looking at the microphone issue

24 and your conferences, it turns out in trying to get the system

25 fixed so that we don't have the feedback, apparently what's

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001387

1  happened is that the microphones are now very sensitive, so in
2  order to have conferences that are not picked up, you have to
3  do one of two things; either hold the push button, that little
4  button that makes the light go off the entire time that you're
5  doing your conference, which is virtually impossible, or it
6  works if you simply turn the microphones, all of them, at your
7  table around, so that they face the opposite direction while
8  you're doing your conference because they're conical mikes and
9  as a result they will not pick up the sound while you're doing
10 the conference.  We tested it this morning and the other table
11 can't hear while you're talking, while you turn the microphones
12 around.  So, I think that will protect all of you.  If you will
13 take that effort this morning.

14         MR. BERNICK:  I appreciate that.  Your Honor, it
15 reminds me many, many years ago we tried the San Juan DuPont
16 Plaza fire case in San Juan, Puerto Rico and there were so many
17 defendants in the case that they built a special jury box that
18 isolated the jury so that you didn't have to have all the
19 lawyers going up for a side conference.  They put microphones
20 on all the tables and you had to activate them.  So, what would
21 happen, in the middle of the testimony somebody in the vast
22 hoards of the defense lawyers would want to object, so they
23 would pull the microphone forward and activate it, but of
24 course, when they did it, the swizzle stick would squeak and so
25 there's this squeak objection.  But this is -- I appreciate

CC-BLG001388

1  this is a much better system under any set of circumstances.  I

2  think we'll just have to deal with it.

3          THE COURT:  All right.

4          MR. BERNICK:  Your Honor, in terms of what we have

5  today, we obviously have Dr. Anderson's testimony, which will

6  take the bulk of the day and we'll begin with that.  We had

7  planned on offering into evidence a series of summaries.  These

8  are summaries of deposition testimony, picking up on Your

9  Honor's suggestion to that effect, as well as case law that

10 says that that's very appropriate.

11         We've had some difficulty in trying to reach

12 resolution with the ACC and the FCR concerning the use of these

13 summaries and mostly it's general issues that have been raised

14 concerning whether it's appropriate to have these kind of

15 summaries.

16         What I would propose and what I've already told Mr.

17 Mullady and Mr. Finch, is that it might be worthwhile if Your

18 Honor were to simply glance through these at some point during

19 the day and then really give us feedback on whether this is

20 useful.  If it's not useful and you'd rather just have the

21 depositions read in, we've got the designations and the

22 counters and all the rest of that, we can do it that way.  We

23 would very, very much prefer to do it this way because it's

24 much more meaningful, but if Your Honor doesn't find it to be

25 useful, it's not worth going to the step then of arguing the

J&J COURT TRANSCRIBERS, INC.

CC-BLG001389

1 issues about admissibility.  We'd be prepared to defer to

2 whatever it is that Your Honor finds to be most appropriate.

3          So, these are 1006 summaries, based upon the

4 deposition testimony.  I don't believe that there's really an

5 issue about whether the excerpts that we are summarizing are

6 appropriately excerpted, there are issues about whether the

7 process is appropriate; that is, whether you can do this.  They

8 would also like to have their counter designations in some

9 fashion included and they're not.                      .

10          And then there's a specific issue with respect to

11 invocation of the Fifth Amendment which we can take up as well.

12 So, what I suggest, we just tender these to the Court.  Your

13 Honor can flip through and let us know.  If it is something

14 that you believe would be appropriate, then we can take up the

15 issue later on this afternoon of the objections that have been

16 lodged specifically to these and proceed accordingly, and that

17 would take some time this afternoon.

18          THE COURT:  All right.  Let me make sure I

19 understand.  What you're going to give me is a summary of a

20 deposition; that is, an excerpt from the deposition that is

21 like a question and answer by line that the debtors intend to

22 use but does not have the counter designations from the other

23 side.

24          MR. BERNICK:  Yes.

25          THE COURT:  And the purpose is simply to see whether

**J&J COURT TRANSCRIBERS, INC.**

1  this is an appropriate process.  If it is, then the other side

2  wants to do the same process?

3          MR. FINCH:  Correct, Your Honor.

4          MR. BERNICK:  And if you could just flip on the ELMO

5  very briefly, I'll just give you an example.

6          THE COURT:  All right.

7          MR. BERNICK:  But the idea is that there are

8  excerpts, they're also listed by topics and we tried to make

9  the topics non-argumentative so that they are simply topics.

10  Obviously, the summary itself are our summary, it's not their

11  summary, is there a -- there we go.  And if they want to make

12  their own summaries and submit their own summaries, we wouldn't

13  have a problem with that.  We don't think it's appropriate, if

14  we're tendering our summary, that we have to include their

15  designations because it's our summary.  So, they can do their

16  own summary if they want, we have no issue with that if they

17  want to put that in.

18          But Your Honor can see that with respect to Ray

19  Harron, we have the exposure topic, testimony in prior cases,

20  testimony in this case.  This presents the Fifth Amendment

21  issue which we're happy to argue, but that's essentially how

22  they work, is a topic, a Q&A and then in the prior case, and a

23  Q&A in this case.  If we took another example, here you have --

24  this is Dr. Gaziano's testimony regarding diagnostic practices.

25  Here are the different topics and then here are the quotes from

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001391

1  the deposition, including the cites.

2         So, we think it's a much more useful way of digesting

3  a lot of information that otherwise would take a lot of time to

4  present to the Court.  We have case law to support the

5  proposition that this is totally appropriate.  But, again, our

6  guiding principle in the first instance is whether Your Honor

7  would find it to be more useful than simply taking three hours

8  to play all these depositions and encounters.

9         THE COURT:  All right.  And then the question then

10  is, are all of the summaries by Q&A, in Q&A format, they are

11  not somebody's summary of the witness' testimony, they are

12  actually Q&As?

13         MR. BERNICK:  In some cases, they're in Q&As and in

14  some cases -- you can see right here, just the statement does

15  not quote, exclude, so it is an effort to capture the essence

16  of the words and we are prepared to demonstrate in each case,

17  that that is the appropriate -- no objection has been made that

18  says, well, you've got that wrong.  They've said that they're

19  too busy doing other things.  I don't want to get into that.

20  They've been coming here with 14 --

21         MR. MULLADY:  That's not right, Your Honor.

22         MR. BERNICK:  -- well, we've got the e-mails, 14

23  lawyers everyday sitting here in court and they can't work on

24  this.  They're giving us their own designations for their case

25  that hasn't even started.  I won't get into that, the point is

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001392

1  that there's no issue that's been raised concerning the

2  accuracy of any of the excerpts that have been made.

3         But, again, we can argue about that this afternoon.

4  The threshold issue is whether this is more useful to the Court

5  than reading the depositions.  So, if we have to read the

6  depositions, we will read all the depositions.  It'll take

7  three and a half or four hours, we're basically talking about

8  pushing back the closing of our case a day.

9         THE COURT:  All right.

10        MR. MULLADY:  May I be heard, Your Honor?

11        THE COURT:  Yes, sir.

12        MR. MULLADY:  I'd be happy to fully address this

13 issue this afternoon, Your Honor.  I didn't want to take the

14 Court's time or delay the witness presentation.  But I do think

15 it's important for the Court to know that we made a proposal

16 last night to Grace which we think satisfies both our concern

17 about these being improper Rule 1006 summaries because they

18 attempt to summarize deposition that has already been admitted

19 into evidence in some cases and in other cases, is the subject

20 of fully designated deposition testimony which has not been

21 offered, where our counter designations are there.

22        But, the proposal we made was, if the purpose of this

23 is to assist the Court and to streamline Your Honor's review

24 and to make it easier for you to get through all of this, these

25 can be demonstrative exhibits which can be offered as

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001393

1    demonstratives, not in evidence under Rule 1006 and then the

2    full deposition designations that both sides spent a lot of

3    time this weekend working on, including counter designations

4    and a discussion about whether exhibits should go in, all of

5    that should just go into evidence and then Your Honor can have

6    the demonstratives to assist you in identifying what the debtor

7    feels is important testimony for you to review and we could do

8    the same thing when we get to our case.

9          THE COURT:  Doesn't that work?

10         MR. BERNICK:  No.  It doesn't work for two reasons.

11   First of all, they've made a lot of counter designations.  We

12   gave them this stuff Saturday night, so the idea that they

13   didn't know this was happening is ridiculous.

14         Secondly, with respect to the demonstratives, the

15   demonstratives will not be part of the record.  And what will

16   be part of the record is the depositions.  And then what we

17   have to do is actually read the deposition testimony into the

18   record.  So, we're talking about three and a half or four

19   hours.

20         THE COURT:  Well, can't I accept the written

21   depositions without having them read into the record?  I mean,

22   I can read them myself.

23         MR. BERNICK:  Well, but --

24         MR. MULLADY:  Of course you can.

25         MR. BERNICK:  Excuse me.  The summary will not be --

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001394

1  Your Honor, you would have to incorporate -- if you were to

2  write any opinion, you'd have to incorporate, you'd have to go

3  back and actually read this stuff.  The depositions --

4          THE COURT:  I would expect to read this stuff.

5          MR. BERNICK:  Yes, but if we don't play it -- Your

6  Honor expressed a concern that if we don't play it, we're

7  postponing issues of admissibility and we don't really know

8  what's there.  This way you have only those portions that we

9  want to use.  And if there are issues about admissibility, they

10 get raised with respect to a handful of summaries.  These

11 summaries are not voluminous and we can go through and deal

12 with the objections, if there are objections, as to the

13 admissibility of the evidence very, very quickly.  And Your

14 Honor then knows exactly what is of relevance in those

15 depositions.  Otherwise, I believe that what Your Honor has

16 observed is that the problem is that you will then get, and

17 we'll have the same kind of issue with respect to the Grace

18 depositions as well, a bunch of transcripts and nobody really

19 knows what is in and what is out, and they are characterized

20 differently and the issue of what's admissible and not has been

21 deferred.  The whole idea of doing these summaries is precisely

22 to focus on the what counts.  And, again, if they want to do

23 their own, we have no issue with that.

24          Now, I said what's useful to the Court is our

25 benchmark because if Your Honor doesn't find it useful, then

CC-BLG001395

1  we'll go back the other way.  But, as a matter of what's

2  admissible under the rules, this is plainly admissible under

3  the rules.  1006 doesn't say you can't summarize deposition

4  testimony or any other kind of evidence.  Your Honor actually

5  suggested that we do down this road on January the 23rd in the

6  course of a hearing and we have since looked into the case law

7  and there's case law squarely on point that says you can do

8  this.  So, when they came back and said last night, after they

9  didn't have time to deal with this issue on a substantive

10  basis, and said, well, why don't you just take demonstratives.

11  That's another way of saying, no, you can't get it into

12  evidence.  And if that's their position, it's not really a

13  compromise at all, we could always have it tendered in as a

14  demonstrative, we didn't need their permission to do that.  So,

15  if this is going to happen as a piece of evidence, let them

16  come back and say as a piece of evidence, you know, we will do

17  this, if you will permit us to do our own summaries of counter

18  designations, no quarrel with that.  But the idea that because

19  they're too busy, we can't tender on a totally legitimate

20  basis, the essence of these depositions which will otherwise

21  take hours and then deal with the relevance issues, I think is

22  wrong and I want these summaries to be part of the record for

23  all purposes in the case.  And I think we're entitled to make

24  that proffer.

25          THE COURT:  Okay.  I will take a look over the lunch

CC-BLG001396

1    recess at whether or not what has been submitted is helpful.  I

2    have not ever looked at the concept of a summary of deposition

3    testimony.  I just have never been presented with that issue.

4    Frankly, if it's helpful, it's probably a great way to proceed

5    because there are numerous depositions in the case and if it

6    works, and if it's admissible, it would probably be a good way

7    to proceed.  Whether it is admissible, I don't know, and have

8    you done briefs on this issue, because if you have, I haven't

9    seen them?

10         MR. MULLADY:  Well, Your Honor -- we haven't briefed

11   it, Your Honor, but we did last night, when I communicated with

12   Mr. Bernick's team about this issue, we had an ALR citation in

13   front of us and cases from a number of circuits saying that

14   these are not admissible for purposes of summarizing deposition

15   testimony.  And we'll have those authorities this afternoon, if

16   Your Honor would like to hear about them.

17         I want to make one other point, which is that

18   yesterday, Mr. Bernick offered into evidence, without

19   objection, with our express agreement, certain summaries that

20   we did not find objectionable.  And so, the notion that we --

21   you know, we've been too busy to focus on this, or give

22   attention to the request by the debtors, you know, is just a

23   false charge.

24         And, Your Honor, I really wish we could elevate the

25   level of the discourse in this courtroom to what is actually

**J&J COURT TRANSCRIBERS, INC.**

1  occurring in these discussions with counsel, which have been

2  very amicable.  I had two very nice conversations last night

3  with Mr. Bernick's team, he was not on the phone, I understand

4  he was preparing Dr. Anderson, as I was trying to, but the

5  point is, we did work with them to try to resolve this issue.

6  We're not too busy for the matters that Mr. Bernick would like

7  to bring before the Court.  We've never been so and it's unfair

8  for him to say that repeatedly.  Thank you.

9        THE COURT:  Okay.

10       MR. BERNICK:  Well, you know, Your Honor, I have to

11  say that Mr. Mullady is absolutely misrepresenting the tone of

12  the dialogue.  The tone of the dialogue, and we have the

13  e-mails and we can show it to the Court --

14       THE COURT:  It's okay.

15       MR. BERNICK:  -- is that they didn't want to talk

16  with us.

17       THE COURT:  Folks.  Gentlemen, it's fine.  I will

18  look at these over the lunch recess and make a determination as

19  to whether, first of all it's helpful.  I am not over the lunch

20  recess going to do legal research on this issue.  I am trying

21  in this case to get four opinions out in the next two weeks and

22  as a result, what I'm going to be doing, in addition to looking

23  at this, is working with my two law clerks to try to get two of

24  those opinions out, hopefully tomorrow, if I can.  So, that is

25  how I'm going to be spending my lunch recess in this case, not

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001398

1  working on this issue.  I already have plans for what I'm doing

2  over the lunch hour today.  So, that's -- I will take a look at

3  this to see whether it's helpful

4      With respect to a brief, if you can give me some

5  citations for this afternoon, I will be happy to hear argument

6  if you can do it this afternoon, but I am not going to be

7  looking at those citations today, I can assure you.  Between

8  now and when you're back before me for the next round of trial

9  issues, I will give you a ruling, but I will not be doing it

10 today, I guarantee.  It will not be today.

11     MR. BERNICK:  Okay.  Well, then Your Honor, we will

12 give you the citations right now.   Which is 304 --

13     THE COURT:  I'm sorry, 304 --

14     MR. BERNICK:  F.3rd. 237.

15     THE COURT:  All right.

16     MR. BERNICK:  It's a Third Circuit decision, 2002,

17 United States v. Velasquez and Headnotes 1 and 2 deal with this

18 issue.  There are other citations that we can supply.

19     Your Honor, this is -- after today, there are only

20 two pieces of evidence left in our case, which is Dr. Florence

21 on Monday, and this.

22     THE COURT:  Yes.

23     MR. BERNICK:  So, if we can't do it this way, we are

24 talking really about probably using Monday in order to deal

25 with this issue and then call Dr. Florence on Tuesday, in which

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001399

1  case we're not talking about pushing our resting back to

2  Tuesday afternoon.  If that's the way this goes, that's fine,

3  but this did not have to occur.  We raised this over the

4  weekend, on Saturday, and we've repeatedly asked for the

5  opportunity to meet and confer and we were told repeatedly that

6  they were not available for this.

7         And at the same time, we are getting deposition

8  designations as part of their case.  They've still got 12

9  people here today, sitting here in court, instead of working on

10 this.  And this, I don't think, is the way to proceed here.  If

11 we're going to have to finish our case, we need their resources

12 available to respond.

13         MR. MULLADY:  We've responded.

14         THE COURT:  Okay.  I will, as I said, take a look at

15 this.  Mr. Mullady, do you have a cite because if so I'll have

16 law clerks right now who are probably listening in and if not

17 I'm going to take a two second recess to give them the cites.

18         MR. MULLADY:  I do not, Your Honor.  They're back at

19 our work room.  I can have them for you in half an hour.

20         THE COURT:  Fine.  Get somebody to do them and as

21 soon as you have the cites, I will get a law clerk to take a

22 look at these cases.

23         MR. MULLADY:  Yes, ma'am.

24         THE COURT:  One second please.  And maybe I can give

25 you a ruling later.  All right.  There's one binder or two

CC-BLG001400

1  binders?

2          MR. BERNICK:  There's two binders; one for the Court

3  and one for Your Honor.  And they're just behind each of the

4  individual tabs.

5          THE COURT:  They're duplicates?

6          MR. BERNICK:  They're duplicates, that's correct.

7          THE COURT:  Okay.  Thank you.  Jan, let me have the

8  other one so I can give it to Mona, please.  Thank you.

9          MR. BERNICK:  The other matter that we had scheduled

10 to be taken up this afternoon is the arguments on the Rule 408

11 issue.

12         THE COURT:  Yes.

13         MR. BERNICK:  We would like to do that.  It's the

14 same kind of problem.  Pertains to our witness on Monday.

15 We're going to be prepared to do that, I believe we'll be able

16 to finish Dr. Anderson in time to be able to do these things,

17 although the 106 issue is -- well, I think we can probably get

18 it done.  So, that's our goal today and then we would do Dr.

19 Anderson on Monday and we would rest.

20         THE COURT:  Dr. Florence?

21         MR. BERNICK:  Not Anderson.  Dr. Anderson today, Dr.

22 Florence on Monday, and then rest.

23         THE COURT:  Yes.  Okay.

24         MR. BERNICK:  So, with that, unless there's other

25 business the Court would like to take up, we'll call Dr.

J&J COURT TRANSCRIBERS, INC.

CC-BLG001401

1  Anderson to the stand.

2        THE COURT:  Anything before Dr. Anderson?  All right.

3  Dr. Anderson.

4        MR. BERNICK:  Oh, one last -- I'm sorry.  ZAI, we

5  should also talk about this afternoon.  We got a boat trip and

6  a vacation that are taking two people who want to be part of

7  the property damage argument out on May and on June, so we, for

8  some reason can't seem to get people to show up for the ZAI

9  hearing.   This is on the issue of the bar date.

10        THE COURT:  Oh.

11        MR. BERNICK:  I got a conflict because I have to be

12  in court for an argument that's been scheduled for three months

13  on April 22, payable on April 21.  On April 22, Your Honor

14  can't do it, so you gave us a date at the end of May.  Mr.

15  Baena has got a vacation planned.  You then gave us another

16  date for the early part of June, Mr. Westbrook has got a boat

17  trip and this thing is really being --

18        THE COURT:  Why couldn't I do it on April 22?

19        MR. BERNICK:  I don't know.

20        THE COURT:  I thought it was just April 21 because

21  you were here on the omnibus?

22        MS. BAER:  Your Honor, we asked about April 22 and

23  you indicated that you have, I think, the Federal Mogul -- not

24  Federal Mogul, Flintkote disclosure statement hearing in

25  Delaware, and so it was a very full day.

                    J&J COURT TRANSCRIBERS, INC.

1          THE COURT:  Okay.  Just --

2          MR. BERNICK:  Yes.  That, I can tell Your Honor will

3  be -- I'm going to argue part of that, if not -- well --

4          THE COURT:  How long is that going to take?

5          MR. BERNICK:  I don't think -- I mean, that really

6  has got a couple issues, it's not a dink, dink, dink, dink,

7  through the disclosure statement.  There are legal issues that

8  I think are going to be raised.

9          THE COURT:  Yes.

10          MR. BERNICK:  So, I don't think that that's going to

11  take all that long.  How much time did you have that down for?

12          THE COURT:  I don't think I have access to my

13  Delaware calendar here.  Let me see.

14          MR. BERNICK:  I just wanted to flag it to Your Honor

15  so that --

16          THE COURT:  What I know is, that I have to leave

17  court that day by 1:30 in order to catch the only flight out

18  that I was able to get home that day.  So --

19          MR. BERNICK:  Flintkote is set for nine o'clock or --

20          THE COURT:  Pardon me just a minute.

21                          (Pause)

22          THE COURT:  It looks like Flintkote is scheduled at

23  9:30 and I think the parties told me that it was going to take

24  a about two hours to argue, is that a good estimate?

25          MR. BERNICK:  I don't think it should take that long,

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001403

1  but I mean, I know that our argument will not last that long.

2  There are --

3           THE COURT:  All right.  So, if I schedule -- and how

4  long will ZAI take?

5           MR. BERNICK:  I think that ZAI will probably take an

6  -- well, given the way things usually go, it'll take an hour

7  and a half.  But the -- Your Honor has been through all the

8  stuff before on ZAI, so I think actually it might be -- I know

9  that we can arrange to have our side available on Flintkote

10 earlier in the morning, if we could start at nine or something

11 like that.

12          THE COURT:  I've got things starting at 8:30 and

13 there are rules -- Chapter 13 issues -- Owens.  There's

14 something scheduled in ABB or in Combustion, I think there are

15 two things scheduled in Owens.  I don't think we're going to

16 get started on Flintkote before 9:30.

17          MR. BERNICK:  I think I can get rid of that one.

18          THE COURT:  Okay.  Well --

19          MR. BERNICK:  I don't know what the schedule may be.

20          THE COURT:  Okay.  I just don't think we're going to

21 get started on Flintkote before 9:30.  So, if we say until

22 11:30 on Flintkote, and I put ZAI on at 11:30, but I have to

23 leave at 1:30.  So, I can give you --

24          MR. BERNICK:  I think that that should -- oh, that

25 would be -- well, how about if we raise that with Baena and

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001404

1  Westbrook and who is the other guy, Scott?

2          THE COURT:  Mr. Baena and Mr. Westbrook, are you on

3  the phone?  All right.

4          MR. BERNICK:  I think somebody from Mr. Baena's

5  office is here.

6          THE COURT:  That's the debtor's cite.  The ACC or FCR

7  is coming back later with the cite.  If you can turn your thing

8  on, as soon they do it, I'll let you know.

9          MR. BERNICK:  That's fine.

10          MR. KRAMER:  Your Honor, Matt Kramer, I'll check with

11  them during the next break.

12          THE COURT:  All right.

13          MR. KRAMER:  And see if that works for them.

14          THE COURT:  Okay.  Thank you.

15          MR. BERNICK:  And then we'll check with Scott --

16          MS. HARDING;  Darrell Scott.

17          MR. BERNICK:  Darrell Scott, yes.

18          THE COURT:  Okay.  Well, temporarily, I'll put ZAI on

19  at 11:30 on April 22nd then.  And Ms. Baer can do the notice if

20  everybody agrees and if not, will you let me know?

21          MS. BAER:  I will.

22          THE COURT:  Okay.

23          MR. BERNICK:  These are our Rule 1006 cases, Your

24  Honor.  Copies.  We've given a copy to the other side.

25          THE COURT:  Oh.  I'm not sure Mona has her speaker on

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001405

1  yet.  Mona, if you have your speaker on, can you come back in,

2  there are copies of cases here for you?

3              MR. BERNICK:  With that, I think we're prepared to

4  call Dr. Anderson to the stand, if Your Honor would like to

5  proceed.

6              THE COURT:  All right.  Dr. Anderson.

7              THE CLERK:  Please stand and raise your right hand.

8        DR. ELIZABETH ANDERSON, DEBTOR'S WITNESS, SWORN

9              THE CLERK:  You may be seated.  Please speak into the

10  microphone.

11                        DIRECT EXAMINATION

12  BY MR. BERNICK:

13  Q    Good morning, Dr. Anderson.  We apologize for -- we

14  apologize for the delay in the elevator and then making you sit

15  through scheduling matters, but we'll get to your testimony

16  now.

17              Could you tell the Court briefly what it is that you

18  are here to address this morning?

19  A    Yes.  Your Honor, I am here to address the essential

20  question of whether exposures to Grace products have caused the

21  diseases that the claimants have introduced.

22  Q    Okay.  With that as an introduction, could you tell us a

23  little bit about your educational background and we would show

24  at this point Demonstrative 2264.  Go ahead, Dr. Anderson.

25  A    Yes.  My academic training began at the College of William

CC-BLG001406

1 and Mary where I was a pre-med student planning to go to
2 medical school, in my fourth year.  I decided to not do that,
3 but I had equivalent training in biology and chemistry and
4 chose chemistry as my major.  I was solicited by fellowship to
5 go to the University of Virginia to continue in the training in
6 organic chemistry, mechanistic organic chemistry, where I
7 completed my Masters Degree work.  And during that time I
8 taught the pre-med sections of the laboratories in organic
9 chemistry, and continued my academic training under a Defense
10 Department fellowship which dictated that I do my research at a
11 military base in concert with an academic institution.
12 Completed by Ph.D. work in 1970.
13 Q    Thank you.  The Court has heard about risk assessment
14 already in this trial and, indeed, heard very specifically from
15 Dr. Joseph Rodricks.  Do you know Dr. Rodricks?
16 A    Yes.  Dr. Rodricks and I were colleagues as early as the
17 mid-70s.  He was the functional head of the risk assessment
18 activities at the FDA, Food Drug Administration, and I was the
19 counterpart at EPA.
20 Q    How far back, and maybe you've already identified that,
21 but how far back do you go in the field of risk assessment?
22 And I don't mean to ask embarrassing questions, but it's
23 designed to find out what the extent of your background is.
24 A    Yes.  I go back to origins of the first applications of
25 risk assessment, to judgments about environmental agents,

CC-BLG001407

1  incorporating for the first time in 1975 the concepts of

2  exposure, past, current and future exposures, to understand the

3  potential for disease causation.

4  Q    Did your experience include a series of years spent at the

5  EPA, the Environmental Protection Administration?

6  A    Yes.  As soon as I was released from my Defense Department

7  fellowship obligations, I went directly to EPA in its first

8  year of operation --

9  Q    I'm going to show you --

10  A    -- in 1971.

11  Q    I'm sorry.  I want to show you Demonstrative 2265 and ask

12  you whether that would help you go through your activities at

13  the EPA relating to risk assessment?

14  A    Yes.  And, in the early years, I had begun working with

15  the then administrator Bill Ruckelshaus on a series of issues

16  involving carcinogens.  It was a period of time in the nation's

17  history where there was thought to be an epidemic of cancer

18  caused by environmental agents.  So, the focus at EPA in 1971

19  was on suspect carcinogenic agents.  We worked on a series of

20  pesticides, became aware of a series of air pollutants where

21  there were tumors in animals or humans and we had pursued a

22  policy of zero tolerance because the application of safety

23  factors and threshold levels for safety for carcinogens had not

24  been accepted and the origin of that policy came from the Food,

25  Drug and Cosmetic Act, the Delaney clause, which it said if

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001408

1    there were tumors in animals or humans there was no tolerable

2    risk.

3          Trying to follow that policy at EPA had not worked

4    and I was asked to direct the first committee to address a

5    functional cancer policy.  That was in the fall of 1975.  I was

6    the executive director of that committee.  We reported at the

7    first use of risk assessment and risk management that had ever

8    been reported or adopted by any agency in the United States.

9          That policy called for, for the first time, if you

10   can imagine, exposure assessment, does response modeling, in

11   addition to what had been done in the past.  The concept of

12   evaluating how likely an agent is to be a carcinogen based on

13   human data supplemented by animal studies.  These first

14   guidelines called for a systematic approach to evaluating the

15   weight of evidence and exposure and likelihood of risk to human

16   populations.  It also called for creating a group within the

17   agency to carry out these responsibilities.

18          I founded and directed that group, it was called the

19   Carcinogen Assessment Group and rapidly, after the success of

20   that group, I founded the Exposure Assessment Group, the

21   Productive Effects Group, and the expanded office for all of

22   the risk assessment activities.  I directed that office for ten

23   years and I am co-author of EPA cancer policy with the then

24   administrator Russell Train.  It was published in the Journal

25   of the National Cancer Institute.  We performed hundreds of

CC-BLG001409

1 risk assessment.  I co-authored those risk assessments during

2 that period.

3 Q     Thank you.  I want to ask you about -- turning to

4 Demonstrative 2266.  There's been a reference made, I believe,

5 by Dr. Rodricks, concerning the red book.  Could you tell us

6 about the red book and what your involvement, if any, in the

7 red book was?

8 A     Yes.  The EPA experience had formed a lightening rod for

9 discussions about using dose response extrapolations, exposure

10 assessment and estimation of risk for public policy decisions.

11 It was one of the major, I would say, stimulus, for the

12 convening of the National Academy's Committee to address the

13 appropriateness of these policies, could risk assessment and

14 risk management work on a broader basis, and by that time my

15 group at EPA had published more than 150 risk assessments.  So,

16 we were very far down the road.  This committee and this

17 publication, to which I was an advisor and visited many times

18 because our work was one of the cornerstones of their

19 deliberations, is the landmark book that's established the

20 paradigm for risk assessment.  It's cited all the time, cited

21 by parties and interested organizations all over the world and

22 in many subsequent National Academy documents.

23 Q     Thank you.  Turning to Demonstrative 2006, which is also a

24 demonstrative that we used in connection with Dr. Rodricks

25 testimony, could you tell us briefly how it is that the science

CC-BLG001410

1  of risk assessment has evolved, particularly in the last two or

2  three decades?

3  A    Yes, I can.  I often think of risk assessment as

4  originating with Koch's principles.  These principles sought to

5  answer questions of causation for infectious disease, isolating

6  the organism from the host, cultivating the organism and then

7  reinserting it in the host and if the host responded to the

8  original disease, causation was established.

9          Also, going on pre-1964, in the public health

10 regulatory communities were these simplistic safety factor

11 approaches that established no observed effect levels or other

12 means of establishing a level that was regarded as safe and in

13 the scientific community, there were early observational

14 studies we call case reports in epidemiology that addressed the

15 results that some medical doctors had diagnosed in their

16 patients, certain diseases that might be associated with

17 occupational exposures.

18         By 1964, we were seeing several different things

19 happening.  One of the critical events in 1964 was the

20 publication of the Bradford Hill criteria which for the first

21 time gave a real structure to what was expected of epidemiology

22 studies if they were going to establish causality between the

23 agent and the disease and these principles addressed

24 consistency across the studies, the temporal issues and other

25 issues.

CC-BLG001411

1    These principles promptly became useful, as I

2  understand, to the interface of judicial use, which is not my

3  field, but I understand that structure was useful.  But they

4  were useful in other ways, because they stimulated the conduct

5  of structured epidemiology studies.  So, studies became more

6  structured, they became more useful in many different ways.  Of

7  course, human data still remain the best source of information.

8  But following the regulatory approach of what I call the Public

9  Health Agency approach, during the 70s is just what I've

10  discussed.  We've encountered the situation with suspect

11  carcinogens and the rejection by the scientific community of

12  just willy-nilly applying safety factors.  And so the

13  quantitative based risk assessment process was established.

14  But, here were see a divergence between what Public Health

15  Agencies were doing to carry out their missions to be

16  preemptive and protective and what was really called for in

17  establishing causality.  So, it's been an interesting period

18  and interesting that I've been able to participate in a good

19  deal of it.

20  Q    Well, let's talk a little bit about that divergence.  I

21  know we're going to return to it later, but since you've

22  mentioned it, what exactly was the divergence that you just

23  referred to that began to evolve in the 1970s?

24  A    Yes.  The process of risk assessment that was defined by

25  EPA in 1975 simply sought to answer two questions.  How likely

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001412

1 is an agent to cause disease or if a disease is already caused,

2 what is the dose that -- what is the circumstance that might

3 have caused the disease or if a disease is -- if a dose is

4 current, would you expect that there might be impacts on

5 populations in the future.

6           In that case, the Public Health Agencies essentially

7 have to fill data gaps and the red book that I mentioned

8 earlier details those gaps and calls them inference judgments.

9 So when, for example, the EPA did their risk assessments when I

10 was there, we followed guidelines and said where the science

11 stops we will fill the gaps with very precautionary

12 assumptions.  So, we were seeking to establish plausible upper

13 bounds on risk, recognizing that the risk could be considerably

14 less, even approaching zero, but to make decisions to preempt

15 and protect the public.  It's a very different process from

16 establishing causality which is -- as I understand, causality

17 needs to be science based and not inference judgment based.

18 Q    Okay.  And I know that we're going to return to that.

19 Turning to slide, or Demonstrative 2267, have you been involved

20 in developing literature in the field of risk assessment?

21 A    Yes, I have.  I have published, I have participated in

22 founding the leading society in risk assessment.  I served as

23 its president from 1984 to 1985.  I have held other posts in

24 that society, but I think the most exciting one has been as

25 editor and chief of the journal, Risk Analysis and

J&J COURT TRANSCRIBERS, INC.

CC-BLG001413

1  <u>International Journal</u> which I think is undeniably the leading

2  journal in the field of risk assessment.

3           It has a world-wide circulation of 4,000.  It goes to

4  about 80 countries and its board and its editorial staff are

5  made up of scientists from the academic communities,

6  governmental bodies, and international representatives in the

7  private sector.  It is ranked high in the impact factor and

8  it's also ranked very high in the social science citation

9  index.  We've been as high as number two of 65 journals, I

10 believe, within the last six years and as high as number four,

11 more recently listed in the Interdisciplinary and Mathematics

12 citation index.

13          MR. BERNICK:  Your Honor, at this time, we would

14 proffer Dr. Anderson as an expert in the field of the risk

15 assessment of toxic agents or potentially toxic and toxic

16 agents, including specifically asbestos.

17          MR. MULLADY:  Brief voir dire, Your Honor?

18          THE COURT:  Yes.

19                    VOIR DIRE EXAMINATION

20 BY MR. MULLADY:

21 Q    Good morning, Dr. Anderson.

22 A    Good morning.

23 Q    Your doctoral degree is in organic chemistry, is that

24 correct?

25 A    Yes.  Mechanistic organic chemistry.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001414

1  Q    Your expertise in risk assessment, as I understand it from

2  your CV, has been in the context of regulatory and legal

3  matters, is that right?

4  A    I think it's in the scientific context of evaluating

5  multi-disciplinary information to address issues of how likely

6  an agent is to cause disease, to address issues of dose

7  response characteristics; that is, at what level could that

8  disease occur and then to address issues of exposure and then

9  to wed the two, to address the essential questions of how

10 likely is there to be an association between that exposure and

11 disease.

12 Q    May I see 433 please?  Exhibit 433 on the screen here is a

13 copy of your CV which I believe you appended to one of your

14 expert reports in this case.  And I was reading from the second

15 sentence in the first paragraph which says, "She specializes,"

16 referring to you, "in risk assessment as a basis for addressing

17 the complex problems that arise in the context of regulatory

18 and legal matters, related to health and the environment for

19 national, international companies and governments."  Is that

20 accurate?

21      MR. BERNICK:  Your Honor, I don't believe that's

22 proper impeachment.

23      THE COURT:  I --

24      MR. BERNICK:  There's nothing that's inconsistent

25 about that.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001415

1          THE COURT:  This witness can answer the question if

2  it's coming from hers.  I'm not sure it's inconsistent, but I'm

3  sure the witness can answer this question.

4  Q    Is that an accurate statement of your credentials, ma'am?

5  A    Well, I don't think any single declarative sentence can

6  accurately reflect my credentials.  I think this sentence

7  reflects some of what I've done.

8  Q    Now, you have no formal medical training, is that right,

9  ma'am?

10  A    I have not been to medical school, if that's what you're

11  asking me.  No.

12  Q    Yes.  You also have no legal training, correct?

13  A    Correct.

14  Q    And you're not an industrial hygienist, right?

15  A    I am not an industrial hygienist.

16  Q    And you're not a bio-statistician, correct?

17  A    I've had courses in statistics.  I have used statistics in

18  my work, but I would not say I'm a bio-statistician.

19  Q    Okay.  And as I understand it, none of the risk

20  assessments that you've done, that have dealt with asbestos,

21  have been published in a peer-reviewed journal, is that right?

22  A    That's wrong.

23  Q    That's wrong?  What risk assessments on asbestos that

24  you've done have been published in peer-reviewed journals?

25  A    Risk assessment has many steps.  I would say the work that

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001416

1  I did at EPA passes more scrutiny than the several -- in our

2  journal we have three to four peer reviewers.  So the work I

3  did at EPA was certainly carefully scrutinized.  I did the risk

4  assessment work on the first issue of Ingestion of Asbestos

5  over a period of time in the 70s, from '73 to '78, to determine

6  whether or not amosite from reserved mining might be a

7  causative agent of any health issues for people who consumed

8  the water from Lake Superior.

9           In 1978, I was co-author of the first risk assessment

10 work for EPA's air programs.  In 1980 -- late 84, I believe, is

11 the date, I was responsible for commissioning the work with Dr.

12 Nicholson to do the cancer chapter for the 1986 publication of

13 EPA's risk assessment.

14           MR. MULLADY:  Excuse me, Your Honor, but --

15           THE WITNESS:  I'm getting there.

16           MR. MULLADY:  Excuse me, ma'am.  I believe the

17 question, Your Honor, was very simply, have any of her risk

18 assessments been published in a peer-reviewed journal.

19 A     I'm getting there.  I said these --

20      Q     Well, that was the question.

21 A     -- these risk assessments that I'm a part of received far

22 more scrutiny than just a risk assessment journal.  So, to

23 dismiss them is not appropriate.  But in my resume', you will

24 see that I published one of the earliest papers, if not the

25 earliest papers, inspecting a part of the risk assessment

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001417

1  process which is the proposed six different mechanisms of

2  action, very critical to both the hazard identification and to

3  exposure and dose response.

4         Later, within the next year, I published comparative

5  risk assessment investigating the risk associated with asbestos

6  in place and asbestos removal.  So, it was a comparative risk

7  assessment.  So, those two --

8  Q    And what peer-reviewed journal was that published in,

9  ma'am?

10 A    Pardon.  Yes --

11        MR. BERNICK:  Excuse me.

12     Q    No --

13 A    It's on my resume'.

14        MR. BERNICK:  Excuse me.  She said she can answer the

15 question.  She's already given you two examples, we're now onto

16 the third.  If you want to ask what journal it's been published

17 in, Your Honor, she can -- that's a follow up question.  He

18 shouldn't be interrupting the witness.

19        THE COURT:  I think you did ask, so I think she

20 should be entitled to answer the question.

21 Q    I'm sorry, ma'am, have you finished your answer?

22 A    Yes.  I was just citing these publications.  They're on my

23 resume' and they were peer-reviewed journals and they were some

24 of the first work done in risk assessment on asbestos, both on

25 mechanisms of action, one of the very important questions to

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001418

1 risk assessment, and one on full comparative risk assessments

2 in particular circumstances on asbestos exposures and disease.

3 Q    I asked you the same -- well, my partner, Garret Rasmussen

4 or Mr. Slocum, I can't remember which, asked you this same

5 question at your deposition.  Can we take a look at Pages 27 to

6 28, please.  Let's go back up a little bit further in the text.

7 A    I was speaking to the EPA risk assessments.

8 Q    Excuse me, ma'am, I haven't asked you a question yet.

9 A    That they were not published -- well, you put this in

10 front of me.

11 Q    I'm about to ask you a question and then I'll be happy to

12 listen to your answer.  At deposition, were asked the following

13 question; "Do any of your publications attempt to assess

14 whether exposure to asbestos caused an individual's illness?"

15 And your answer was; "I have worked with asbestos and risk

16 assessment since the earliest days at EPA starting in the

17 1970s.  One does not generally publish a risk assessment and I

18 don't think I have attempted to publish any of my risk

19 assessments that have dealt with asbestos."  I'm sorry, the

20 question was -- and let's go further in, so we see the full

21 context here.  The question is a publication that addresses

22 whether exposure to asbestos caused an individual's illness as

23 opposed to assessments of the risk to a general population.

24 And you asked, "When you say published, what do you mean?"

25 And, the question was;  "Well, let's start out, published in a

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001419

1 peer-reviewed journal?" And your answer was; "No, I don't

2 think I have published any of my risk assessments in a

3 peer-reviewed journal. All of my risk assessments address risk

4 to individuals as well as risk most all, risk to individuals as

5 well as a risk to populations." Was that the testimony that

6 you gave in deposition, ma'am?

7 A    Yes, and he was asking me about the EPA risk assessments

8 and I was explaining that those risk assessments normally are

9 not published in peer-reviewed journals. Today I'm saying,

10 those risk assessments are under more scrutiny than articles in

11 peer-reviewed journals because they are read by so many

12 different parties and scrutinized by so many scientists.

13 Q    Thank you, ma'am.

14 A    And, he had my resume', so he certainly knew my

15 publications otherwise.

16        MR. MULLADY:  I think we understand your answer.

17 Thank you, ma'am.  No objection to the proffer.

18        MR. BERNICK:  Nate?  I take it from Mr. Finch's

19 shaking his head that you don't -- the ACC does not have an

20 objection.

21        MR. FINCH:  No, objection to the proffer.

22        MR. BERNICK:  Thank you.

23        THE COURT:  All right.  The witness may express an

24 expert opinion as proffered.

25               CONTINUED DIRECT EXAMINATION

                   J&J COURT TRANSCRIBERS, INC.

CC-BLG001420

1  BY MR. BERNICK:

2  Q    Dr. Anderson, could you just tell us -- and we're going to

3  get right to the risk assessment that we're going to be talking

4  about in this case here, on the very next questions -- but

5  could you just tell us what the basic elements of a risk

6  assessment are as a general matter, and I'd like to show

7  Demonstrative 2268.

8  A    Yes.  I think as I said earlier, the first question is,

9  can an agent cause disease and, of course, we know asbestos in

10  certain situations considering fiber size and type, can

11  absolutely cause disease.  The dose response assessment is the

12  next critical step, that's been discussed, I think here.

13  Exposure assessment is then the evaluation of the cumulative

14  exposure that individuals and populations receive and the

15  fourth step is the characterization, wedding all the previous

16  three steps together to address the essential question and in

17  this case, are exposures to Grace product groups responsible

18  for claimants' disease.

19  Q    Thank you.  Now, we've already heard from Dr. Lees.  Did

20  he participate in the risk assessment that was associated, or

21  that's been done for Grace in this case?

22  A    Yes, he did.

23  Q    Okay.  And just indicate for the Court where you're going

24  generally, what role, if any, did you play, what was the nature

25  of your role in connection with the risk assessment that was

CC-BLG001421

1  done for purposes of this case?

2  A    My role, I suppose is, I integrated the information from

3  the first part of exposure assessment, the concentration data

4  from the industrial hygiene studies I received from Dr. Lees.

5  I added the frequency and duration portions of the exposure

6  assessment to arrive at a cumulative exposure.  Dr. Moolgavkar

7  has discussed, I believe the dose response characteristics for

8  asbestos and has identified certain levels that I've called

9  benchmarks, so I could have the benchmarks for the risk

10 characterization.  I have then gone forward to evaluate the

11 cumulative exposures for groupings, we call nature of exposure

12 groups, and then compared their exposures to Dr. Moolgavkar's

13 benchmarks.

14         I have then organized the outcome of that comparison

15 to pass that outcome on for the next analysis which I

16 understand is Dr. Florence's analysis.

17 Q    Thank you.  I want to show you what we have as a

18 demonstrative, and we've put it in the form of a big magnetic

19 board, Your Honor, we will also tender the demonstrative as a

20 slide or a smaller version of this after it's completed, as

21 2296, for its files.

22         UNIDENTIFIED MALE SPEAKER:  What was the number for

23 that, Dave?

24         MR. BERNICK:  2296.

25 Q    But, Dr. Anderson, looking to the portion of 2296 that's

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001422

1  displayed on the magnetic board, does this show the sequence

2  of, or the different steps of the risk assessment that you

3  participated in, in connection with this case?

4  A    Yes, it does.  As I said, the concentration information

5  for the exposed claimants' groupings was provided, analyzed and

6  provided to me by Dr. Lees.  I performed the -- I completed the

7  exposure assessment by using his concentration values.  I added

8  the exposure frequency and duration to arrive at cumulative

9  exposures of dose and then I compared those cumulative

10  exposures of dose to benchmarks from Dr. Moolgavkar's work and

11  from the literature that he used to define benchmarks for

12  comparison.

13  Q    Okay.  This formula that appears at the top of 2296,

14  concentration times exposure frequency times duration equals

15  dose, and then to proceed to look at dose response and then to

16  risk, is that a sequence and a formula that is unique to this

17  case?

18  A    No, it is not.  This has been the sequence and formula, if

19  you will, that has been consistently used since the origins of

20  risk assessment in my background since 1976, codified in the

21  four steps by the National Academy in 1983.

22  Q    Okay.  Let's begin with the first part of that formula,

23  which is dose, the calculation of dose.  Turning to Exhibit

24  2270, could you explain for us the central question that was

25  addressed in the risk assessment for this case, as concerns the

CC-BLG001423

1  calculation of dose?

2  A    Yes.  The central question is how our accepted methods,

3  used to calculate the doses resulting from exposure to Grace

4  products and the ingredients of that analysis are listed here,

5  the concentration multiplied by the frequency, by the duration

6  of exposures, provide the cumulative exposure for the

7  individual or the claimant group.

8  A    Okay.  Now, we've already heard from Dr. Lees but I want

9  to talk first of all about the concentration part of it and ask

10 you just to give the Court an overview of what it is that Dr.

11 Lees did as you understood it, in order to provide a foundation

12 for how it is that you then pick up from his work and what you

13 did with it.  So could you just give the Court a very brief

14 overview of your understanding of what it is that Dr. Lees did?

15 A    Well, Dr. Less did several things.  The first thing he did

16 is, he defined or he flushed out the exposure definitions for

17 the nature of exposure Categories A through E.

18 Q    Okay.  Let's show 2269 and I want to ask you whether 2269

19 reflects the basic categories that Dr. Lees worked with?

20 A    It does and the Category A is the category of individuals

21 who mixed Grace products.  Category B, category of individuals

22 who were in areas to exercise their trade by removing or

23 cutting Grace products.  The C category is the category of

24 individuals involved in installing Grace products.  D is a

25 person at a site where these products were being used, but they

CC-BLG001424

1 were not in the room with, they were out of the line of sight,

2 most likely with the products in it.  Category E would be an

3 individual in the space when the products were being either

4 applied or sprayed.

5 Q    Now, in this chart it emphasizes that these are all job

6 activities that were analyzed as concerns Grace products.  For

7 purposes of the work, the risk assessment that was done in this

8 case, did you or others working with you analyze the exposures

9 that the claimants had with respect to -- or industrial hygiene

10 data that was available with respect to job activities relating

11 to non-Grace products?

12 A    No.  We did not have information relating to non-Grace

13 products.  So, we were focused on what exposure did these

14 particular claimants have from Grace products, per se.

15 Q    Okay.  Now, as an example, Dr. Lees talked about the fact

16 that when it came to the personal installation we have a person

17 who is spraying, what kind of product that Grace was being

18 analyzed when it came to the asbestos containing mixture being

19 sprayed from a hose?

20 A    Grace had fireproofing products that were being sprayed

21 and I understand from Dr. Lees that they were using a wet

22 method of application for their products.

23 Q    That's exactly what I was going to get to.  In connection

24 with the work that was done to do the risk assessment in this

25 case, did you all focus not on the wet application -- not only

CC-BLG001425

1  on the wet application pertaining to Grace product, but did you

2  also analyze dry applications of other kinds of products?

3  A    Dr. Lees is aware of the differences between the dry

4  applications which were not Grace products as I understand it,

5  and the wet application of Grace products.  We also analyzed --

6  or he analyzed the exposure data and we used that to analyze

7  further through the exposure duration and frequency the

8  exposures to individuals who were painting on or troweling on

9  Grace products.

10 Q    Okay.  But when you carried through the industrial hygiene

11 data, was that the data that related to the wet application or

12 the dry application done by others?

13 A    His work was related to the Grace installation per se.

14 The wet application.

15 Q    Okay.  Now, what kinds of values, what kinds of values did

16 Dr. Lees calculate after having reviewed the industrial hygiene

17 data with respect to these different job activities?  What kind

18 of calculations did he do?

19 A    Well, he first of all defined the exposure for the

20 categories.  He gathered the data, he qualified the data and he

21 provided his time weighted average mean concentrations by two

22 analyses.  One was what he called a stratified analysis where

23 he took each study and averaged the study to get the mean of

24 the study and he averaged them across the studies and the other

25 was what is, I think he referred to as a meta analysis when he

CC-BLG001426

1  averaged all the values across all the studies.  So, he

2  provided all of this to me.

3  Q    Okay.  Now, you just reused the word "mean", in talking

4  about a mean concentration, and mean also appears on the

5  overall exhibit, which is 2269.  Let's deal with this question

6  of the mean concentration.  Tell us whether or not industrial

7  hygiene data that is generally available in risk assessment,

8  tell us whether or not industrial hygiene data reflects to

9  varying degrees, variability, variability.

10 A    Well, certainly it does because industrial hygienists

11 collect their data on different days and different places when

12 environmental factors are changing, and there are variations in

13 those factors.  There will be some other variations in

14 collection methods and analytical methods and even in the way

15 some individuals work with the products.

16 Q    Showing you 2271, does this capture some of the reasons

17 why or the drivers for variations, and what kinds of effects

18 they can have on concentration values?

19        MR. MULLADY:  Objection, leading.

20        MR. BERNICK:  That's fine.

21 Q    Could you explain, please, Dr. Anderson, what it is that

22 Exhibit 2271, the demonstrative, reflects as concerns

23 variation?

24        MR. MULLADY:  Objection, leading.

25        THE COURT:  No, it is not leading.  Explain what the

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001427

1  slide reflects.  It is leading.  If anything.  You can correct

2  the statement, thank you, not leading.

3  Q    Go ahead, Dr. Anderson.

4            THE COURT:  You can answer.

5            THE WITNESS:  May I?

6            THE COURT:  Yes, please.

7  Q    Go ahead.

8  A    Well, I think the question is, why is that variation

9  measured data, and we've always dealt with this.  We dealt with

10 this very overtly at EPA in the early years when we were trying

11 to measure for the first time environmental data and use it for

12 exposure assessment.  We quickly found that we had variation in

13 sample technique, analytical technique, different people may

14 apply or do something as a receptor that's different from

15 another person, and we found that environmental variables were

16 very essential.  Which way the wind is blowing and where the

17 samples are taken, with respect to humidity, and open windows.

18 It's very difficult to get just samples that are not widely

19 influenced by these factors.

20           At the end of the day, I know that Dr. Lees has

21 stated that the environmental variables predominate by far.

22 From my experience I would agree with him, that's what I've

23 seen in the data that I've seen collected over the last 30

24 years.

25 Q    Now, Exhibit 2269 reflects that in the work that was done

CC-BLG001428

1  on concentration, the concentration data -- and I think you've

2  indicated the same thing -- focused on -- a mean was calculated

3  for the concentration data, is that accurate?

4  A    That is accurate.

5  Q    Okay.  Now, tell us why it is that the mean is something

6  that is of value, or that is the step that we're talking about

7  here, in the risk assessment, tell us why it is that the mean

8  is used.

9  A    Well, the mean is used and has been used, as I said, for

10 the last 30 years as the predominate way to capture

11 concentration in a risk assessment and that is because over a

12 long period of time, and that is for long term exposures, over

13 a long period of time, with the predominance of environmental

14 factors, they will cancel out.  If a person is doing the same

15 activity repeatedly, always a receptor and the same location

16 repeatedly, the variables and the environmental data will

17 cancel out and the person will be exposed over a long period of

18 time to that mean value.  So, that's why we've always used the

19 mean value for those kinds of analysis.

20 Q    Let's take a case where we have a factory that's emitting

21 a certain material of interest and we want to know what kind of

22 concentration for that material exists right at the border of

23 the factory, right at the fence line.  Could you give me an

24 example of a factor that would produce variability in the

25 results, but would tend to cancel out over time?

CC-BLG001429

1 A    Wind.

2 Q    I'm sorry?

3 A    Wind.

4 Q    Explain for us why it is that wind is one of those

5 variables.

6 A    Well, wind patterns are definable variables and over time,

7 if we have a monitor at a fence line and we have variable data

8 over a long enough period of time, all those variable in the

9 wind pattern, will be captured.

10 Q    Okay.

11 A    And that is why long term monitoring for air, for example,

12 is encouraged over short term monitoring.

13 Q    Okay.  And if the wind pattern tends to predominate; that

14 is, that overwhelmingly it's always in one direction, what

15 happens to that fact as time evolves?  What happens --

16         THE COURT:  I'm sorry, would you restate that?

17 Q    If there's a predominating direction for the wind, how

18 does that emerge over the long term?

19 A    Well, the concentration data that are collected will

20 eventually come to a mean concentration that will reflect the

21 predominance of that wind pattern.  But in different times and

22 different days, that's going to change.

23 Q    I want you to look at 2272 and we can show it on the

24 screen and ask whether this would assist you in explaining what

25 you've just described regarding variability and a mean over the

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001430

Anderson - Direct                                    58

1  long term, would that help you describe that to the Court?

2          MR. MULLADY:  Objection, foundation.  Your Honor, I

3  think with this witness we haven't yet heard that she created

4  these slides and that they would assist her in her testimony.

5          MR. BERNICK:  Well, I just asked her the latter and

6  it's irrelevant whether she created the slides.  You can cover

7  that on cross examination.  The foundation is whether it would

8  assist the Court.

9          THE COURT:  I think that is the foundation question,

10 whether it would assist, and that is the question he just posed

11 to the witness.  So, I need an answer to that question before I

12 can rule on the -- before there is an objection.  You may

13 answer.

14         THE WITNESS:  All right.  What we see here is --

15         MR. BERNICK:  No, no, no.

16         THE COURT:  Answer yes, or no.  Whether it will

17 assist you.

18 Q   Mr. Mullady is raising issues about the admissibility of

19 your testimony, so I want to just ask you, tell us whether this

20 demonstrative would assist you in explaining to the Court your

21 testimony regarding the mean?

22 A   I believe it will.

23         MR. BERNICK:  Okay.  And could you -- Your Honor, may

24 I have the witness address the Demonstrative 2272 for the

25 Court?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001431

1        THE COURT:  Yes.

2        MR. BERNICK:  Thank you.

3  Q    Go ahead, Dr. Anderson.

4  A    Yes.  I think what this helps us do is, we see on the

5  left-hand side the exposure variability.  If we were thinking

6  of that monitor at the fence line, we will see some days lower

7  exposures, some days a higher exposure and in the short term,

8  we see guidance from EPA that says, you can't really use those

9  data to characterize long term.  And if we're dealing with

10 short term risk assessments, we sometimes, depending on the

11 circumstance, use our professional judgment as to whether we

12 have to reflect that variation in short term cases, whether

13 it's acute or whether it's short term meaning very few events

14 over a long period of time.

15        But as we go across the bottom to the long term, what

16 we find is that those variable converge to the mean, that that

17 receptor, staying there long enough is the constant.  So that

18 receptor will get over time that mean concentration.

19 Q    I want to stop you right now and just focus on what you've

20 just said.  This receptor; that is, the person whose exposure

21 you're measuring, is a constant.  Tell us what you mean when

22 you say that person as a receptor is a constant over the long

23 term.

24 A    If that receptor is in a particular place, doing a

25 particular activity with respect to a product, or living in a

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001432

1  particular place with respect to a source, a factory, they

2  become a constant because they capture, they don't change what

3  they're doing, what changes around them that influences the

4  variability, the overwhelming variability, are these

5  environmental factors that cancel out as the person stays there

6  a long time.

7  Q    What have you indicated -- first let me just ask you, in

8  order to satisfy Mr. Mullady, did you or did you not

9  participate in the creation of this slide?

10 A    Yes, I did.

11 Q    What about the word "receptor", was that your word or

12 somebody else's word?

13 A    That's my word.

14 Q    Okay.  What about the word "mean", was that your word or

15 somebody else's word?

16 A    That is my word.

17 Q    What about all the words on this slide, are they your

18 words or somebody else's words?

19 A    Those are my words.

20 Q    Okay.  Now, what is indicated at the right-hand side when

21 you talk about the use of the product, the composition of the

22 product and the proximity up to the product?

23 A    Very specific to the evaluation in this case, we have the

24 use of the product, meaning the person who is spraying, or the

25 person who is mixing, or the bottom individuals and the

CC-BLG001433

1 categories that are bystanders to other applications, we have

2 them at a proximity to the product application.  These become

3 constant factors.  The composition of the product is going to

4 also be a constant factor as we take the exposures from that as

5 the source, as if it were the factory.

6 Q    That's fine.  Now, on the basis of this, could you tell

7 me, this analysis that you've gone through, do you have

8 experience and familiarity with what the -- well, let me take

9 -- let me strike that and go back.  You've said that the EPA

10 has now been involved in risk assessment for more than 30

11 years?

12 A    Starting in 1976.

13 Q    Okay.  And you've said that at the EPA you've participated

14 in literally hundreds of risk assessments?

15 A    Yes, I did.

16 Q    Okay.  Tell us whether the EPA, whether you're familiar

17 with what the EPA has said by way of guidance on this very

18 subject?

19 A    Well, the guidance on this subject comes from the logic

20 behind what I just discussed and the guidance consistently says

21 that the mean is the appropriate value to use when assessing

22 concentrations at the maximum exposed point under the Clean Air

23 Act.  It says the mean is the appropriate concentration for

24 evaluating site wide data when an individual has potential to

25 be exposed to variable data over that site.  The mean

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001434

Anderson - Direct                                         62

1  concentration is used in EPA's pesticide programs for the same

2  reasons, for the application and use of pesticides.  We see

3  this use of the mean based on the logic I just described, and

4  it's prevalent in EPA guidance.

5  Q    Showing you 2217, are there particular documents that have

6  reflected the EPA's guidance?

7  A    Yes, there are.  I think this is just one of many

8  excerpts.  Here we see from the 1992 risk assessment guidance

9  for superfund sites, the average concentration is most

10 representative of the concentration that would be contacted at

11 a site over time.  On the right-hand column we see that in the

12 EPA 1986 risk assessment, that the average concentrations were

13 used from the epidemiology studies in order to construct what

14 is still used -- this is the document I spoke of earlier --

15 what is still used by EPA as the dose response characterization

16 for asbestos.

17 Q    Thank you.  Showing you 2274, could you explain how this

18 bears upon the same subject?

19 A    Yes.  There has been -- this is a directive from the

20 deputy administrator of EPA that was issued in 1992, warning

21 against the overuse of maximums and suggesting that leaving

22 values at their mean is more appropriate.  Because if we

23 maximize everything we vastly -- we create a community of

24 numbers that have no relevance to the populations and that's

25 essentially what this is saying.

J&J COURT TRANSCRIBERS, INC.

CC-BLG001435

1  Q    I'll take you back to 2272 for a moment, if we could do

2  that, PJ.   What if you had a -- I believe what you've done here

3  is a risk assessment that is -- or reconstructing as the risk

4  assessment relating to long term exposures?

5  A    Yes.

6  Q    What if you had a totally different mission in this case,

7  what if your mission in this case was not to talk about risk

8  over the long term, but to talk about risk for somebody who had

9  only very sporadic exposure to the product, would you follow

10 the same approach?

11 A    No, if they're over or under these either short-term

12 exposures or a few short-term events, I would probably express

13 both an average concentration and a maximum concentration,

14 because they're still on this left-hand part of the curve.

15 They have not had time enough to converge to the exposure of

16 the mean concentration.

17 Q    I'm showing you 2273.  Does this relate to the same

18 subject?

19 A    Yes.

20 Q    And could you just give a short explanation of how 2273

21 bears upon your testimony in this case?

22 A    Well, it's a demonstration of what we've been discussing.

23 In this particular case we're not talking about the short-term

24 exposures on the left.  The concentration and duration factors

25 have been set to very long-term maximums, so the risk

CC-BLG001436

1  assessment is dealing with -- the risk assessment exposure work

2  is dealing with chronic exposure, and the only appropriate

3  metric is the average concentration.

4  Q    Why is it that you focused on long-term exposure?  That is

5  to say -- we're going to talk about what you've done with

6  duration and cumulative exposure.  Why is it that you keep on

7  focusing on the long-term?  What is that -- what, if any,

8  relationship does that have to the kind of dose that you're

9  calculating?

10  A    In this particular case I thought it important to set up a

11  maximum screen.  Not to try to come to realistic factors, but

12  that's essentially the first question.  If we assume maximums;

13  that is, not just EPA's Exposure Factors Handbook maximum --

14  recommended maximum of 25 years for an occupation but 45.  If

15  we assume constant exposure over a full day, every day, eight

16  hours a day for that 45 occupational lifetime, we're talking

17  about 11,250 days or 90,000 hours of exposure.  So we are

18  clearly as far out on the long-term exposure curve as we can

19  get with any reasonable -- unreasonable, actually, assignment

20  of occupational exposures.

21  Q    Go back to 2272 for a moment.  If we now assume that the

22  long-term is 45 years, is there any sense from your point of

23  view in assuming that for 45 years a person was constantly -- a

24  constant person at the site was constantly exposed to the

25  maximal wind pattern, maximal exposure circumstance that might

CC-BLG001437

1  exist from time to time.  Is there any merit to that kind of

2  approach?

3  A    I think it's inconceivable that that person could be at

4  the wrong place at the wrong time all of the time for 45 years.

5  Q    So let's take, for example, wind.  If the wind is in the

6  direction such that say from the spray -- the spray is always

7  in -- is in your face, would that be on a given day?

8  A    Yes.

9  Q    Would that be the high concentration or the low

10  concentration?

11  A    That would be the high concentration.

12  Q    Is there any sense in assuming that wherever that person

13  is for 45 years the wind is kind of following them around, so

14  it's always in their face?

15  A    No.

16  Q    Let's show 2275 to get to the point at which you enter

17  into this process.  We have Dr. Lees, who has the product

18  descriptions, the definitions, and gives you the mean

19  concentrations.  What is it that you decided to do with the

20  mean concentrations?

21  A    Yes, for each of the nature of exposure categories defined

22  on the left-hand side that we discussed earlier, I selected the

23  highest mean value from Dr. Lees' analysis to assign to each of

24  those categories for each product type.

25  Q    Thank you.  And do we now -- are we now in the position --

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001438

1  we're taking off the magnet boards.  We see a summary of what

2  was done when it comes to concentration; that is, that we had

3  Categories A through E that Dr. Lee defined them, that Dr. Lee

4  gave you the mean concentrations, and then again what is it

5  that you did with the mean concentrations, which one did you

6  use to choose -- did you choose to use?

7  A    I chose to use the highest, because he presented two means

8  of evaluating his data.  I chose the highest from whichever the

9  data set was.

10 Q    Thank you.  Let's talk about frequency and duration.

11 Could you just describe in general terms what now -- how now

12 the risk assessment proceeds, what the next steps are in

13 general terms, and then we'll focus on how you implemented

14 those stages?

15 A    Yes.  To get to the cumulative exposure assessment I

16 needed to take his maximum concentrations and then ask the

17 question how much frequency of exposure would an individual in

18 these categories get and over what time period.  So those were

19 the next two steps in my analysis.

20 Q    Okay.  Could you just describe in your own words -- well,

21 let me just put it this way.  Tell us whether there was a

22 specific analysis that was done in order to provide the factual

23 predicate for your calculations.

24 A    Well, I did several levels of analysis.  Initially, I

25 thought it would be very important to really characterize how

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001439

1 often a Grace product might be in a building that a person

2 would contact or how often events might occur, or, in fact, how

3 many buildings actually have these kinds of products.  And for

4 the bi-standard categories, the D's and E's, how often would

5 they -- if they are visiting a site, how often are they likely

6 to overlap with an exposure circumstance at a site, and I did

7 those analyses, and they're reported in my report.

8          But, eventually, I decided that the most important

9 thing in this analysis is to make this a very conservative

10 screening analysis, meaning if I set all the parameters very

11 high, I could be very certain that there would be a low

12 probability that anybody would be exposed to anything any high

13 than those values.  So I have chosen in the screening analysis

14 that I have really used this final set of assumptions.

15 Q    Let's focus, first of all, on exposures to different kinds

16 of products.  I'm going to show you 2276 and ask you whether

17 this accurately summarizes the work that people working for you

18 did in order to analyze what products were available to the

19 marketplace over time; that is, what Grace products were

20 available over time to the marketplace.

21 A    Yes, this is a display.  If we look down the left-hand

22 side, we see the Grace product types, the vermiculite-only

23 products, then the next category of vermiculite with chrysotile

24 added, then the category of chrysotile-only products, and then

25 combined post-construction.  What the bars going across show is

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001440

1  the lifetime of those products in commerce, and what we did

2  with these data was to choose for any one year the maximum

3  concentration that any one in any of the nature of exposure

4  categories could've had to any of these products.

5           In other words, that person had a choice of getting

6  the highest exposure to any one of these products in that year,

7  and here I have chosen to illustrate that with the max to a D

8  exposure -- Category D in 1953 from acoustical plaster.  That

9  turned out in 1953 to be the highest exposure for a mean TWA

10  value used over the period of 250 days in the year for that

11  person in D exposure category.

12  Q    So the analysis that you've just talked about, you get the

13  products out there in use over time, you then figure out the

14  maximum by year.  Am I right from what you just said --

15  A    Yes.

16  Q    -- that this is done not for all categories together but

17  for each category separately?

18  A    Correct.

19  Q    Okay.  Now, what was the next step?  After you've done

20  that with the products, what was the next step?

21  A    The next step was to incrementally take 45-year rolling

22  blocks of exposure starting in 1920 when the first products

23  appeared and to calculate for each of the A, B, C, and D

24  categories blocks of 45 years of exposure that had three

25  maximums.  We maximized in the beginning the mean highest

CC-BLG001441

1  concentration.  We allow that person to be exposed to any one

2  of the products in a single year that had the highest

3  concentration for that year, and we maximized that

4  concentration for all days in that year.  Then we had the

5  rolling block of 45 years going forward through 2007, and then

6  we chose the highest one of those 45-year blocks to

7  characterize the exposure to that exposure -- nature of

8  exposure category individual group.

9  Q    I'm showing you 2277.  Does that chart summarize the data

10 that was used in the application of the parameters that you

11 just described?

12 A    Yes, it does.  It shows at the top the historical data of

13 when the products were on the market.  Next it shows an

14 illustration of the 45-year going forward blocks; 1920, 1965,

15 1921, 1966.  The last block of years going out in the analysis,

16 1963 to 2007.  So we have a cumulative exposure here of 100

17 percent of the time for frequency for every person for 250 days

18 -- occupational days in a year for a 45-year life span to not

19 only the highest mean concentration, but the highest mean

20 concentration to any product in the year.

21 Q    I'm showing you 2278.  Does this now reflect the inputs to

22 the does calculation formula that you used; that is, which

23 concentrations were selected, which frequency of exposure was

24 selected, and which duration was selected?

25 A    Yes, it does.  The frequency was set to 100 percent for

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001442

1  every day, 250 days per year.  I've already discussed the

2  concentration.  And the duration was set to an occupational

3  extreme upper bound of 45 years to the highest exposure product

4  for each year within the 45-year block, and then we chose the

5  maximum of the 45-year blocks to characterize the group.

6  Q    And I want to talk about conservatism; that is, you said

7  that you wanted to take a conservative approach.  Have you --

8  do we have a series of slides that go through the different

9  respects in which this approach is conservative?

10 A    (No verbal response from the witness.)

11 Q    You have to respond.

12 A    I'm sorry.  I didn't hear you.

13 Q    I said, do you have a series of slides that explain the

14 different respects in which this approach that you took was

15 conservative?

16 A    Yes, I do.

17 Q    Okay.  For purposes of kind of keeping the Court

18 remembering the part of this slide that matters, we have for

19 frequency exposure 100 percent and for duration 45 years,

20 highest exposure product for each year, and the maximum of any

21 45-year period.  Those -- that's the -- those are the

22 parameters that you've chosen?

23 A    Yes.

24 Q    I'm showing you Slide 2279.  Could you explain how -- is

25 this one of the slides that relates to the conservatism of your

CC-BLG001443

1  approach?

2  A     Yes.

3  Q     Could you explain to the Court how this slide relates to

4  the conservatism of your approach?

5  A     Yes.  In -- on the right-hand side just thinking now of

6  the frequency duration assumption wetted, we have 90,000 hours

7  for the individual claimants for exposure to Grace products.

8  Q     Now, where did that 90,000 come from?  This is Category B?

9  A     This is Category B, but we used it for everybody.

10  Q     Okay.

11  A     So we're taking Category B as an illustration and one

12  sub-group of occupational individuals in Category B would be in

13  the custodial maintenance trade.  In earlier work we've done

14  using data from the literature we find estimates of the hours

15  that custodial workers actually contact asbestos-containing

16  materials in buildings, and that number is 8,100.  And for the

17  same kind of workers coming in contact with VAI attic

18  insulation, we find that number is 692.  So in a very careful

19  analysis of how much contact there would actually be, we see

20  that by choosing for screening purposes the 90,000 hours for

21  this particular example, we have been extremely conservative

22  and have set a very high screen.

23  Q     Now for the Court's benefit, V refers to vermiculite?

24  A     That's right.

25  Q     Well, we've referred obviously to Zonolite.  So it's ZAI

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001444

1 and VAI are the same thing?

2 A    Yes.

3 Q    Okay.  Now, let's turn to Slide 2280, and on 2280 in order

4 to talk about conservatism we've included 100 percent and 45

5 years as the reminders of the approach that you used?

6 A    That's right.

7 Q    Could you explain what information you have, if any, as

8 reflected on this chart that reflects the conservatism of those

9 benchmarks; that is, 100 percent for 45 years?

10 A    Well, yes.  Again for the exposure frequency in earlier

11 work we find the building maintenance worker actually is in

12 contact with the ACM material 16 percent of the time, for attic

13 insulation, VAI, Zonolite, 1 percent of the time.  And also an

14 analysis we did in one of our early -- one of the earlier

15 analysis I mentioned before, is we found that if we used

16 published data, that the trawled-on and sprayed-on products for

17 those product categories, even if we assumed that all

18 trawled-on/sprayed-on products were Grace products, which

19 they're not, would be in only 20 percent of the buildings.

20         So here all of this cancels that, because we have

21 assumed 100 percent exposure.  So every building -- every time

22 one of these maintenance workers goes to a building, it is a

23 building with Grace products, not the 20 percent, and they're

24 not spending 1 percent of the time, they're spending 100

25 percent of the time, eight hours a day, five days a week, in

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001445

1  contact with the source of exposure depending on their labor

2  category.

3  Q    What about the 45 years, what, if any, comparisons did you

4  do in order to analyze the conservatism of the 45-year

5  parameter?

6  A    Yes, I mentioned earlier that EPA's guidance in the

7  Exposure Factors Handbook is for a maximum of 25 years, and

8  it's interesting when -- and I think we will discuss this

9  later, but when I reviewed -- our team reviewed the information

10 from the PIQs, we found that for those who reported the time

11 periods, the duration, we found that 100 percent were under 50

12 years, 98 percent under 45 years, and interestingly enough, 54

13 percent, the EPA number, under 25 years, and 27 percent under

14 10 years.  So this means that there's every indication that

15 we're vastly overestimating, and intentionally so, because we

16 set it up as a very conservative screen, the cumulative

17 exposures for individuals in these nature of exposure

18 categories.

19 Q    Now, this is for the A and C categories?

20 A    That's for A and C.

21 Q    And when you say 27 percent under 10 years, was that under

22 10 years of exposure to a Grace product or under 10 years of

23 exposure to all asbestos products?

24 A    It was under 10 years of exposure to Grace products.

25 Q    Okay.  Now, incidentally --


J&J COURT TRANSCRIBERS, INC.

CC-BLG001446

1  A    Well --

2         THE COURT:  Oh, wait.  Pardon me.  I'm sorry.  I

3  misunderstood.  Just a minute until I correct my note, please.

4                        (Pause)

5         THE COURT:  Okay.  Thank you.

6  A    I should add that in the review of the questionnaires we

7  accepted if someone self-identified as an AC, that they were

8  exposed to the Grace product.  And so, yes, we are assuming

9  that they're exposed to Grace products in the PIQ review.

10 Q    Okay.  But, do you actually know whether they were exposed

11 to Grace products alone or other products?

12 A    No.

13 Q    Okay.

14 A    No.

15 Q    Now, do you have one more slide that related to the

16 conservatism analysis?

17        MR. BERNICK:  Can we show the Court 2281?

18 Q    Could you explain how this slide relates to conservatism?

19 A    Well, first of all, as I've said, we don't give these

20 claimants any time to do anything else but be exposed to Grace

21 products, because this a full working lifetime of 11,250 days,

22 90,000 hours, and yet we know they had other exposures, which I

23 can talk about later.

24        Secondly, we -- if we worked with any non-Grace

25 product or non-exposed to a Grace product, of course, they had

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001447

1 no time to have that exposure, because they're -- all of

2 they're exposure time has been consumed.  And if they worked

3 less than the 11,250 days, of course, their exposures would

4 decline.  And we've seen the less-than hours in an earlier

5 exhibit.

6 Q    So put simply, you've assumed 45 years, eight hours a day

7 exposure to Grace product.  If it turns out that they worked

8 with other products, then what effect, if any, would that have

9 on -- what would that tell you about the duration that you've

10 assumed and the dose that results from it?

11 A    If they worked with other Grace products, of course,

12 then --

13 Q    But not -- of a non --

14 A    I mean other non-Grace product -- sorry -- in other

15 occupations.  Then -- or if they worked in other occupations

16 and had no other exposure, the number of hours would go down,

17 therefore, the cumulative exposure concentrations that have

18 been presented in this analysis would be lessened accordingly.

19 Q    On the basis of all the work that was then done with the

20 approaches you've described to the Court, did you, in fact,

21 come up with a maximum cumulative exposure for each of the

22 different categories?

23 A    Yes, I did.

24 Q    I want to show you Exhibit 2282 and have you explain that

25 to the Court.

CC-BLG001448

1          MR. FINCH:  Objection, Your Honor.  This data is

2    based on the PCM/PCME conversations.  I'm going to object on

3    lack of foundation and hearsay grounds.

4          MR. MULLADY:  Join

5          THE COURT:  Mr. Bernick.

6          MR. BERNICK:  Well, I'll respond to that as follows.

7    First of all, this witness has testified that she took the mean

8    concentration calculations from Dr. Lees and used those for

9    purposes of her analysis.  She has not expressed an opinion

10   that is the same or different from Dr. Lees' opinion.  Your

11   Honor resolved that issue in connection with Dr. Lees' opinion

12   and overruled it.

13         So all of the -- for them to come out and say, oh,

14   well, this witness here, who hasn't even expressed an opinion

15   on the matter, is using Dr. Lees' data is now subject to an

16   objection that you previously overruled with respect to Dr.

17   Lees, I don't understand where that comes from.  So they can

18   make the objection, but it's already been overruled, and I'm

19   not going to go back over each element of Dr. Lees' analysis

20   with this witness she's relying on.  Now, I can bring that out

21   if you'd like.

22         MR. FINCH:  Your Honor, I stand on the objection even

23   though the prior objection is overruled.  I believe that's in

24   error.  To protect my client's interest and their rights, I

25   stand on the objection that any testimony from this witness

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001449

1  that is based on Dr. Lees' estimates, which in turn are based

2  on the PCM to PCME conversions are, (a) objectionable, because

3  neither Ms. Anderson nor Dr. Lees with an S has the expertise

4  or the foundation to make those conversions, and secondly that

5  they're hearsay.  That's the basis of the objection.  I

6  understand the Court has overruled the objection with respect

7  to Dr. Lees with an S, but I need to preserve the objection

8  with respect to this witness as well.

9            MR. MULLADY:  Joined by the FCR.

10            MR. BERNICK:  Your Honor, I -- not only did Your

11  Honor overrule it, you overruled it after Dr. Lees with an S

12  testified very specifically about how the conversion was done,

13  and that he not only participated in the conversion, but

14  they're making something sound like a big deal that's a piece

15  of arithmetic.  But be that as it may, if their purpose is to

16  preserve their record as having made the objection, I don't

17  have any problem with that, but --

18            THE COURT:  All right.  The -- I think the objections

19  have a different purpose.  With respect to Dr. Lees, Dr. Lees

20  testified that he participated in designing what the conversion

21  was about and for, and I think the objection is different with

22  respect to that.  The objection as to this witness using that

23  data I think is objectionable for a different reason.  But I

24  think at this point in time the objection's also going to be

25  overruled.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001450

1          I'm going to take a look at all of this when I get

2     all of the evidence into the case and analyze at that point in

3     time how it all goes.  But nonetheless, for now we're going to

4     finish this trial with all the witnesses here, so that in the

5     event that I do at some point have to reconsider any of this,

6     I've at least got the evidence on the record.

7          So that you understand, I do not believe that I'm

8     going to reverse this decision when I see all the evidence, but

9     nonetheless, for now it's overruled.  And in the event that I

10    think I'm wrong when I do have all the evidence, I will on my

11    own reconsider whether it's appropriate.  So it's overruled.

12          MR. BERNICK:  Let me just ask, so that I'm sure that

13    my record is also good down the road.

14    BY MR. BERNICK:

15    Q    Dr. Anderson, tell us whether or not you relied upon the

16    concentrations determined -- the concentration calculations

17    determined by Dr. Lees.

18    A    Yes, I relied on the concentration values that he

19    provided, and, in fact, one can't really proceed with a risk

20    assessment in any other way.  If we look at the guidance that's

21    in the IRIS database at EPA, it cautions against not making

22    corrections.  So while I wouldn't make them myself, I don't

23    proceed with an asbestos-type risk assessment, unless this

24    factor has been taken into account by someone qualified to do

25    that work.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001451

1  Q    Is it customary for you in your field of expertise of risk

2  assessment to -- strike that.  Is the kind of information --

3  the information that you got from Dr. Lees regarding

4  concentration calculations including an adjustment for PCM and

5  PCME, is that the kind of information that is reliable --

6  considered to be reliable by people like yourself in the field

7  of risk assessment?

8  A    Yes, it is.

9  Q    Okay, and in Dr. Lees' case do you have any issue in your

10  mind whatsoever concerning the qualifications and expertise of

11  Dr. Lees to perform the mean concentration determinations?

12  A    No.

13  Q    Do you have any issue about the propriety of his decision

14  to in-turn rely upon a person who is expert in materials fiber

15  analysis who actually go look in the microscope once, go look

16  in the microscope twice to make the calculation?

17  A    This is routine -- routinely done in the world of risk

18  assessment for asbestos.

19  Q    Thank you.  Now I'd like to turn to Exhibit 2282 and have

20  you explain to the Court what it is that Exhibit 2282 reflects.

21  A    These are the resulting screening values that we have been

22  speaking of presented here for screening purposes for each of

23  the nature of exposure categories, with emphasis on the fact

24  that they are very high screens, meaning very, very

25  conservative screens, and at the bottom of this slide there's

CC-BLG001452

1  the repetition of the frequency and duration assumptions.

2  Q    Let me just ask, does Exhibit 2282 accurately summarize

3  the data that you have generated regarding the cumulative doses

4  for each of the categories there displayed, A through --

5  A    Yes, it does.

6  Q    Does this then bring us to the conclusion of the work on

7  your risk assessment up through dose?

8  A    Yes.

9  Q    Okay, and do we now see in Exhibit 2296 a summary of the

10  work that has taken place that brings you to the different

11  doses that we have as displayed under the first column?

12  A    Yes, it does.

13        MR. BERNICK:  Now, Your Honor, I have I think

14  probably about 15 minutes left in the direct examination.  I

15  can complete it, or if Your Honor would feel more comfortable

16  taking a morning break, either way is fine.

17        THE COURT:  Isn't it only eleven o'clock?

18        MR. BERNICK:  Yes.

19        THE COURT:  You want to take a recess?

20        MR. BERNICK:  I don't want to take a recess.  I'm

21  prepared to go -- take it to the end, but I just --

22        THE COURT:  I think -- why don't you finish, and then

23  we'll take a short recess and let the -- we'll take a recess

24  before cross.

25        MR. BERNICK:  Okay.  Fine.

J&J COURT TRANSCRIBERS, INC.

1 BY MR. BERNICK:

2 Q    What is the next step in the analysis, the risk assessment

3 analysis?

4 A    Well, of course, it's the risk characterization question

5 of what do these mean.  Do these -- what do these mean in terms

6 of the nature of exposure categories of claimants as far as

7 answering that initial question that I proposed?  Did they get

8 their illness from exposure to a Grace product?

9 Q    I'm showing you 2283.  Could you explain exactly why the

10 issue is framed in the way or question is framed in the way

11 reflected on 2283?

12 A    Yes, and the question really is exactly this question,

13 what does science say about the significance of doses resulting

14 from exposure to Grace products.

15 Q    In order to answer that question, I see that the next step

16 is reflected in 2269.  Just to compare the doses to these

17 benchmarks, could you describe in your own terms what is

18 involved in that exercise?

19 A    Yes, as I spoke of earlier, we spoke of the Koch

20 principles.  We spoke of the world of epidemiology and dose

21 response, and I know that this Court has heard from Dr.

22 Moolgavkar who works in this particular field, and the concept

23 of having now these cumulative exposures and asking this

24 essential question really is what does it mean in terms of

25 disease causation or these high levels, low levels, how can we

CC-BLG001454

1  compare them to some benchmarks that might give us guidance as

2  to their significance.

3  Q    What benchmarks did you use?

4  A    I used benchmarks from Dr. Moolgavkar's analysis, and I

5  think I emphasized in my deposition that I have the utmost

6  confidence in Dr. Moolgavkar, but there's a long history here.

7  There's a longer history than just his opinions, because this

8  work has been evolving over many, many years, and his work is

9  the essential work that brings all of this literature together,

10 but we find a great deal of support in the literature for his

11 work.

12 Q    Have you offered an independent opinion with respect to

13 the epidemiology, or are you relying upon Dr. Moolgavkar's

14 work?

15 A    I'm relying on Dr. Moolgavkar's work.

16 Q    I'm showing you 2262.  Is this --

17         MR. BERNICK:  I believe, Your Honor, it may actually

18 already be in evidence under a different number.

19 Q    But are these the benchmarks -- from what Dr. Moolgavkar,

20 but are these the benchmarks that you used in the course of

21 your analysis?

22 A    Yes, they are.

23 Q    Okay.  Now, Dr. Moolgavkar talked about the fact that

24 there were not reliable data -- observational data that was

25 gathered below 15 -- a burden of 15 fibers per mil per year.

CC-BLG001455

Anderson - Direct                                      83

1  Are you familiar with the 15 fiber per mil -- fiber per mil per

2  year concept?

3  A    Yes, I am.

4  Q    Okay, and he then further observed that once you get below

5  15, you're in, therefore, a range of the unobserved, and then

6  below 2.8, which came from the auto workers study or the auto

7  mechanics study, you were in a range of risk, in a sense,

8  affirmatively not being seen.  Now, I don't want to ask you

9  about the details of those different numbers.  I simply want to

10 ask you are you familiar with those basic concepts?  That is a

11 range of observed data -- reliably-observed data, a range where

12 there isn't reliable observational data, and then an area where

13 there is reliable observational data, but it doesn't show a

14 risk.

15 A    Yes, I am, and we have spoken of this concept since 1976.

16 Q    I want to show --

17 A    The range of observation --

18 Q    Wait.  Let me interrupt you for just a second --

19 A    Yes.

20 Q    -- and just put on the board 2284, which I believe already

21 has been used by Dr. Moolgavkar, but I'm -- my focus with you

22 is to simply have you, as you were beginning to say, provide

23 the historical regulatory perspective.  That's what I want you

24 to comment on, is the regulatory side of what is illustrated in

25 that chart.


**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001456

1  A    Yes, I spoke earlier on the earlier slide of the
2  divergence between evidence of causality and evidence that is a
3  preemptive public health policy-based approach.  And here the
4  first one of these curves was drawn when I was at EPA in 1976.
5  Conceptually, we see with agents an observed range from human
6  studies, sometimes only animal studies, but the important thing
7  is as we leave that range of observation, we regard that range
8  as science based.
9           As we go downward, EPA to this day -- and we created
10 this curve in 1976 as a means of establishing a plausible upper
11 bound on the risk, meaning the real risk could be less even
12 approaching zero, and we put that label on every document that
13 we wrote at EPA when I was there.  And I think the other
14 important thing is I've observed the use of this generic
15 approach by the National Academy of Sciences and the Institute
16 of Medicine.  I was familiar with and commented on some of
17 their work, and an example of that work is the Gulf War
18 veterans study where they actually made distinctions about
19 establishing causality from exposure for those individuals and
20 chose to use only the observed range for that work.
21 Q    Thank you.  And that gets back to the difference between
22 science --
23 A    That's right.
24 Q    -- and the regulatory guidance or rule?
25 A    That's right, and the inference judgments that I used to

CC-BLG001457