1  fill gaps, so that rule making can go forward.
2  Q    Thank you.  I want to now turn to how it is that you used
3  -- if we could go back to 2262, you said that you used Dr.
4  Moolgavkar's benchmarks.  I want to talk about how it is that
5  you applied or used those benchmarks by reference to the
6  cumulative doses that you determine in part on the basis of Dr.
7  Lees' with an S work.  And I want to show you Exhibit 2285 and
8  ask you whether this would assist you in explaining to the
9  Court the comparison that you did.  The answer to that is yes
10 or no.
11 A    Yes, I think it will assist us.
12 Q    Okay, so now could you explain how -- what it is that is
13 reflected in 2285?
14 A    Yes, the values that we saw earlier and which are
15 displayed here as the dose cumulative exposure values can now
16 be compared to these benchmarks to give us some guidance as to
17 what they mean.  We see for the A category an accedence of
18 these conservative screens of the 15.  We see for the B
19 category an accedence of no benchmark.  For the C category the
20 maximum is a 12, so it's below the 15.  It's in the zone of
21 inference.  It's above the relative risk, a modeled calculation
22 for Libby Fibers, but it's -- well, let's move on to D.  D and
23 E are very small exposures relative to the benchmarks, and they
24 are under all of the benchmarks.
25 Q    Okay.  This compare --

1  A    And I should note that the 3.2 number is a mixed fiber
2  number that includes chrysitolite, which is the most potent of
3  the fibers and is not in the Grace product, so I don't take
4  that benchmark to be particularly useful.
5  Q    That's the one that's --
6            THE COURT:  Which one?  I'm sorry.  Which one.  I'm
7  sorry?
8            THE WITNESS:  Three point two.
9            THE COURT:  Point two.
10           THE WITNESS:  It's referred to as meso-relative risk
11 to mixed fibers.
12           THE COURT:  Okay.
13           THE WITNESS:  My understanding from speaking with Dr.
14 Moolgavkar is that's taken from --
15           MR. MULLADY:  Objection, Your Honor.
16           THE WITNESS:  -- an EPA --
17           MR. MULLADY:  Objection, Your Honor, the witness is
18 about to tell us about a conversation she had with Dr.
19 Moolgavkar about these fiber concentrations.  That's hearsay.
20           THE COURT:  She is, but --
21           MR. BERNICK:  No, it --
22           THE COURT:  -- Dr. Moolgavkar's already made that
23 same statement yesterday on the stand.
24           MR. BERNICK:  Right, but it's -- she's an expert.
25           THE COURT:  He also testified to that same fact on

1 the stand yesterday.  The record will substantiate that.  He
2 made the same statement on the stand yesterday.
3             MR. BERNICK:  Right.
4 BY MR. BERNICK:
5 Q    Just to review briefly, we have marked here the 2.8, which
6 he said came from the auto workers study or the risk was not
7 observed, the relative risk calculation -- relative risk of 2
8 with respect to mixed fibers, the 3.2, the working lifetime
9 exposure, the OSHA fell 4.5, the relative risk of 2 for --
10 based on modeling for Libby fibers and meso, 15 which is the
11 lowest observed average exposure for meso, and then ranging way
12 up to asbestosis threshold, chrysotile, relative risk of 2 and
13 the like.  Now, does Exhibit 2285 accurately summarize the
14 comparative data that you used in connection with benchmarking
15 the dose -- the cumulative doses with respect to the five
16 categories?
17 A    Yes, it does.
18 Q    I want to turn to ask you and show you 2286.  Could you
19 explain, based upon the comparison that you did, what
20 determinations you made with respect to the exposures as
21 determined in accordance with your risk assessment?  What
22 assessment did you make with respect to the exposures of people
23 who worked in occupations A, B, C, D, and E?  What decision or
24 what determination did you make?
25 A    Well, I found unequivocally that people in Categories B,

1  D, and E are well below all of the benchmarks and need not be
2  considered further.  The Categories A and C claimants I have
3  suggested should be further evaluated despite the fact that the
4  C category is below the observed benchmark, and they have
5  passed through -- if we want to call this a screening exercise,
6  those two categories have passed through for further analysis
7  but not B, D, and E.
8  Q    I want to take the last step now that we see on the board,
9  2296, which we see it's called Risk for Claimants.  Why is it
10 that risk assessment goes beyond the comparison of calculated
11 doses in benchmarks?  Why is it that the risk assessment takes
12 another step?
13 A    I'm not sure I understand the question.
14 Q    Yes.  Well, why do we have another step to take here?
15 A    Oh.
16 Q    Why another step?
17 A    Well, I mean the important issue, as I understand it, is
18 what are the merits of these claims going forward, and the
19 information that I have now provided, as I understand it, will
20 go into a claims review analysis for further evaluation.  So
21 the results of this analysis now go to the claims reviewers and
22 Dr. Florence.
23 Q    So we're talking about a risk for a population of people.
24 A    That's right.
25 Q    Okay.  Now, in order to get into this area could you tell

1 the Court whether or not at your direction the PIQs -- a
2 certain number of PIQs and a certain number of closed claims
3 were reviewed?
4 A    Yes, they were.
5 Q    Okay, and showing you 2289, does this reflect -- 2289
6 first.  Does this reflect the claims that were reviewed by
7 people in your organization at your direction for purposes of
8 figuring out what categories they belong?
9 A    Yes.
10 Q   Okay, and we have 15 hundred 96 mesothelioma claims, 32
11 lung cancer claims, 115 laryngeal cancer claims, 152
12 non-malignant disease claims, and then with respect to the
13 closed claims, 350 mesothelioma claims, is that right?
14 A    That's correct.
15 Q    Okay.  Now was there a procedure -- were there procedures
16 established for purposes of this review?
17 A    Yes, there were very strict procedures established with
18 the team who did the review?
19 Q    Showing you 2288, does this slide -- would this slide
20 assist you in explaining the procedures or the steps that were
21 taken in order to conduct this review?
22 A    Yes, it does.  We first needed to and did design a
23 protocol to insure the proper assignment of claimants to the
24 nature of exposure categories that would be consistent with Dr.
25 Lees' definitions of exposure.

CC-BLG001462

1  Q    Okay.  Let's -- Dr. Lees' defined the categories on the
2  basis of those definitions looked for corresponding industrial
3  hygiene data, and then in order -- and then in doing the claims
4  review to find out what categories people belonged in, tell us
5  why it was important for the same definitions to be used; that
6  is, not just the definitions that somebody else might think of
7  like a claimant or a worker or anybody, but why was it
8  important to use Dr. Lees' definitions in reviewing the claim
9  files?
10 A    Because we were assigning these claimants to a nature of
11 exposure category, and he had defined that category and
12 collected the data, analyzed the data, and presented the data.
13 So the two had to mesh.  They had to be identical, as close as
14 we could get them.
15 Q    Okay.  Why don't you continue to go on and talk about the
16 steps that were undertaken thereafter in connection with the
17 review?
18 A    Well, next the review team was identified, obviously
19 choosing people with appropriate experience and credentials.
20 We established training sessions.  We established quality
21 control procedures.  We had double review.  And the actual
22 claims review proceeded along the following lines.  Obviously,
23 the claims were inconsistent, and there were times when things
24 were not quite as simple as other times, but we, first of all,
25 accepted the self-identified claimants.  If they checked the