1 box that they were asked to check, A, B, C, D, or E, we

2 accepted that.  If they checked more than one box, we elevated

3 their exposures to the highest exposure category.  So they'd

4 become an A or C instead of if they checked all boxes.

5          If a claimant did not self-identify, then we bent

6 over backwards to review the attached materials referred to

7 here as best evidence.  We wanted to try as hard as we could to

8 classify the claimants from that attached material.  So we did

9 review the attachments, and we looked for identifying

10 statements of what kind of product they were exposed to, how

11 they were exposed, and over what durations.

12 Q    Okay.

13 A    If, in fact, there was insufficient information after all

14 of the review we called it insufficient, allocated it to

15 insufficient category, and I've already mentioned always

16 elevating to the highest category if they mentioned several

17 possible exposures.

18 Q    I want to focus on one particular feature, which you've

19 just talked about, and use Slide 2290 to do that.

20          MR. BERNICK:  Could you show 2290, PJ?

21 Q    There have been questions asked about, well, what if

22 somebody says here's what my job was, and so I -- and I want

23 you to explain how it is that you figured out what category a

24 claimant belonged in, where they had actually checked off the

25 box on the form or not checked off the box on the form.

CC-BLG001464

1  A     Well, if they checked off the box on the form, we call

2  that the claimant's identified the nature of exposure.  We did

3  not question that.  If they checked the box, we accepted it.

4  Q     Or if their lawyer checked the box, and they signed off on

5  it?

6  A     That's right.

7  Q     Okay.

8  A     Whoever checked the box, it was accepted.  We then went to

9  the attached materials where there was no self-identification,

10 and we reviewed the claimant's information that was attached.

11 And I think I've discussed some of the elements of that review.

12 If there were inconsistencies, if there were questions, we had

13 a key senior team to help answer those questions about what had

14 been found.

15 Q     Okay.  Showing you 2291, based upon the results that came

16 from this review process, were you later able to compare and

17 see whether there was a significant difference between the

18 self-identifieds and the best evidence claimants when it came

19 to these different categories?  And just explain 2291, if you

20 would.

21 A     Yes, on the left-hand side there is a pie chart that shows

22 the percentages of nature of exposure categories that the

23 self-identified claimants fell into.  So we see 77 percent of

24 the B, D, and E, 19 percent fell into the A/C category, and 4

25 percent into the other category.  On the right-hand side we see

CC-BLG001465

1  a pie chart that reflected what I'm referring to as the best

2  evidence.  This means there was no self-identification.

3         We had to go to the attached materials and analyze

4  the attached materials in order to assign a nature of exposure

5  category, and we see here the very similar results.  We had 90

6  -- 79 percent B, D, and E's versus 77.  The A's and C's turned

7  out to be pretty much identical, and the opposite two percent

8  difference.  So this gave us confidence that we had a pattern

9  that was evolving and was repeated in the best evidence review.

10 Q    Okay.  Is 2291 an accurate summary of the data that exists

11 on that subject?

12 A    Yes, it is.

13 Q    Turning to 2292, what did you find out after the -- let me

14 just ask, did you have the opportunity to look at the results

15 of the review to gather further information about how these --

16 how these claimants based upon their attachments compared to

17 the benchmarks that applied to your work?

18 A    Yes, and this slide summarizes that work.  We did the same

19 kind of review for the lung cancer claimants and the -- for the

20 laryngeal cancer claimants, and we find the results of those

21 analyses all were below the benchmarks --

22 Q    Okay.  Well, let's be --

23 A    -- they did not exceed the benchmarks.

24 Q    Let's be clear about this.  Were you able to -- this slide

25 reflects a comparison between the results of your review, on

CC-BLG001466

1  the one hand, and the benchmarks on the other.  Were you able

2  to make that comparison with respect to all people who made

3  claims that you reviewed for lung cancer; that is, is the

4  comparison one that you were able to make for all the claimants

5  that you looked at?

6  A    Yes, we could -- well, I don't recall how many did not

7  provide sufficient information.

8  Q    Okay, so this is where they had sufficient information to

9  make --

10  A    Well, we had sufficient information, yes.

11  Q    Okay.

12  A    We did the very same thing we did with the other reviews.

13  Q    Okay, and you said all claims did not exceed benchmarks

14  with respect to both lung cancer and laryngeal cancer?

15  A    That's right.  And you'll recall that those are very high

16  benchmarks on Dr. Moolgavkar's benchmark chart.

17  Q    What did you find out with respect to their status as

18  smokers?

19  A    Well, we found, of course, there's a confounder with

20  smoking, and we found that all of the lung cancer claimants but

21  one was a smoker, and about 90 percent of the claimants who

22  claimed laryngeal cancer were smokers.

23  Q    Could you tell us to what extent -- strike that.  2292,

24  does it accurately summarize the data that you gathered with

25  respect to the comparison of claimants to benchmarks on lung

J&J COURT TRANSCRIBERS, INC.

1  cancer and laryngeal cancer?

2  A    Yes.

3  Q    And also their smoking status?

4  A    Yes.

5  Q    Okay.  Turning to 2293, let's turn to mesothelioma and

6  mesothelioma for people in Categories A and C, the ones that

7  passed through the filter.  Could you tell us in cases where it

8  was possible to make the determination based upon the data that

9  you had how the A -- the mesothelioma claimants who fell into

10 Categories A and C, how they compared with the benchmarks?

11 A    Yes, this was interesting because for those claimants who

12 gave us information about that duration of exposure, we were

13 able to adjust the duration from 45 years to the number of

14 years they gave us and, of course, then we had to go back to

15 that rolling average, those tables, and select for that time

16 period that they gave us, what the exposures would be.  But in

17 essence what we find for the A's and C's is that 98 percent are

18 lower than 15 fibers per mil year, and 16 percent are lower,

19 and that's the benchmark that's at the bottom of the range of

20 observation.  And we found 69 percent are lower than the 8.9

21 fibers per mil year.

22 Q    What about --

23 A    So that's just one adjustment from the very high screening

24 values we used.  All of the others are in here, the 100 percent

25 exposure, frequency 250 days a year.  The only adjustment is

J&J COURT TRANSCRIBERS, INC.

CC-BLG001468

1  just the duration adjustments we could claim.

2  Q    I want to make that very clear.  You went back to the

3  PIQs, and based on the review you looked to the people who had

4  fallen into Categories A and C and had mesothelioma, and where

5  the information regarding duration was available you

6  substituted in your risk assessment calculation the actual

7  duration as reflected in PIQ?

8  A    Correct.

9  Q    But, when it came to the other assumptions that you made;

10  that is, regarding the product that they were exposed to where

11  you maximized the product concentration and the very -- and the

12  other assumptions that you used, did you change those

13  conservative assumptions to be in a sense actual based upon the

14  PIQ data, or did you continue to make those other conservative

15  assumptions?

16          MR. MULLADY:  Your Honor, objection.

17  A    Continued to make all of the other conservative --

18          MR. MULLADY:  Objection, Your Honor.  Excuse me.

19  I've been pretty tolerant of the leading up to this point, but

20  this is a very important area of the case.  I think we just

21  heard Mr. Bernick testify for about five minutes.

22          MR. BERNICK:  Well, actually, if you want to have the

23  record read back, the witness said exactly the same point; that

24  is, that she had kept the other matters constant, and I wanted

25  to make sure that the details of that were evident to the

J&J COURT TRANSCRIBERS, INC.

CC-BLG001469

1 | Court.

2 |     Q    Happy to have the question rephrased, so that she can

3 | explain exactly what it is that you meant when you said in

4 | response to my prior question that you altered the duration

5 | alone.  Just explain to the Court what you meant.

6 | A    All right.  The only thing that we could glean from the

7 | questionnaire data that could be useful to this analysis that

8 | would alter the analysis in any way was the duration

9 | information.  So we altered the 45 years to match the actual

10 | years that the claimants provided for us.  We continued to use

11 | all of the other conservative assumptions, and the only other

12 | thing we did is to match -- for those years they claimed, we

13 | have to go back to that rolling, instead of 45-year, that time

14 | period, select the highest value for the year -- for each year

15 | in the time period and do that analysis.  All of the other

16 | maximum values were retained, nothing else is adjusted.

17 | Q    Okay.  On the basis of this analysis what conclusion did

18 | you reach with respect to the A/C claimants?

19 | A    I concluded that on the -- I wrote this to -- on the

20 | right-hand side that there's a very high probability that many

21 | or most of the A's and C's that we are saying should be further

22 | valued actually are generously passed through the screen and

23 | passed on for further evaluation, because we see here just the

24 | impact of the alteration of one very conservative factor.

25 | Q    Let's -- go ahead.  Let's turn to 2294.  Does this slide

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001470

1 now relate to the B, D, and E mesothelioma claimants?

2 A    Yes, it does.

3 Q    And could you tell us what it is that this slide reflects?

4 A    All right.  This slide is a similar analysis.  This is for

5 the B's, D's, and E's, and in those claimant questionnaires

6 where they gave us their duration of exposure, we did the very

7 same thing.  We went back and took that duration of exposure,

8 went to the data tables for the history of the products that

9 were in trades of commerce during that block of identified

10 years, again selected the highest value for each year in the

11 identified block, did the rolling average, and kept the highest

12 value for those claimants.  And we altered absolutely nothing

13 else.

14          We kept all of the maximum values, and what you see

15 here is a shifting of the numbers downward; a hundred percent

16 or less than the background -- I mean less than the benchmark

17 except background, and I made a very similar conclusion here

18 but an opposite one, and that is a very low probability, and no

19 scientific evidence whatsoever that any of these B's, D's, and

20 E's would exceed the benchmarks.

21 Q    Okay, and does 2294 accurately summarize the data that

22 came from that comparison?

23 A    Yes, it does.

24 Q    Turning to 2295, did you also look to see -- you had --

25 you told us that you assumed that people spent their entire

J&J COURT TRANSCRIBERS, INC.

1  lives -- working lives eight hours a day working with Grace

2  product.  Based upon your review of the PIQs, what did you find

3  about what the actual evidence showed?

4  A    Well, in the PIQs I found that 94 percent of the claimants

5  in Category A and C asserted other claims against other

6  entities, and 93 percent of the B's, D's, and E's asserted

7  claims against other entities.  So this tells me that the 45

8  years is certainly too much.  If they were doing other

9  occupations, they could not have had that much exposure most

10 likely.

11 Q    And what would that have done to your cumulative

12 calculations by category if they actually had factored in this

13 actual data?

14 A    Well, if they left the workforce of exposure to Grace

15 products and went into the workforce of exposure to other

16 products, these numbers would be lowered in a commensurate way.

17 Q    Were you able to make this comparison or derive these data

18 with respect to all the claimants that you looked at; that's

19 all the mesothelioma claimants?

20 A    I can't recall, but I think most of them that we reviewed

21 did provide -- we were able to make this comparison.

22 Q    Okay.  Let's go back to then our board, 2296.

23           THE COURT:  Mr. Bernick --

24           MR. BERNICK:  Yes.

25           THE COURT:  -- you said 15 minutes 40 minutes ago.  I

Anderson - Direct                                    100

1 | think what we're going to do is take the recess if you're going
2 | to be much longer.  How long are you going to be?
3 |          MR. BERNICK:  Is it really that bad, Your Honor?
4 |          THE COURT:  Yes, it is.
5 |          MR. BERNICK:  Well, I apologize.  I have this
6 | question.  The last strip, and I've got three questions.
7 |          THE COURT:  All right.  We'll finish.
8 |          MR. BERNICK:  I know if I didn't make a
9 | representation about how much longer it would take --
10 | Q    Are we now in a position to peel off the last magnet and
11 | show the balance of the assessments that you did as reflected
12 | now in 2296?
13 | A    Yes.
14 | Q    Okay.  And what conclusion did you reach with respect to
15 | Categories A and C when it came -- comes to the evidence that
16 | came from the PIQ review?
17 | A    Yes, I alluded to earlier, we have suggested that there's
18 | some scientific evidence that those claims should be further
19 | reviewed.  For the B's, D's, and E's, we found no such
20 | evidence.
21 | Q    Okay.  Question 1; have you reached any conclusion as to
22 | whether the process that you followed in conducting your risk
23 | assessment analysis complies with accepted methods for
24 | assessing whether there's scientific support for the claims
25 | that have been made against Grace and that you reviewed?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes, this is certainly accepted scientific methodology.

2  Q    Are you aware of any other accepted or any other accepted

3  or reliable scientific method for determining whether claims --

4  asbestos claims or claims of exposure and causation from

5  asbestos, whether they are supported by reliable science?  Is

6  there any other accepted or reliable method for reaching that

7  assessment?

8  A    I am under -- I'm unaware of any other method that would

9  allow one to answer that essential question I posed in the

10 beginning, and that is our -- the claimants exposure groups

11 getting their disease from Grace product exposure.  Without

12 doing this assessment, I have no idea alternatively how any

13 methodology can answer that question.

14 Q    Okay.  With respect to the claims that fall into

15 Categories B, D, and E, do you have an opinion on whether there

16 is reliable science supporting those claims of disease as being

17 caused in whole or in part by exposure to Grace asbestos?  Do

18 you have an opinion?

19            THE COURT:  We -- I'm sorry.

20            MR. MULLADY:  Objection for --

21            THE COURT:  We --

22            MR. MULLADY:  Objection for the record, Your Honor.

23            THE COURT:  Will you read the question for me again,

24 please?

25            MR. BERNICK:  Yes.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Do you have an opinion about whether there is reliable

2  science to support the proposition that the claims falling into

3  B, D, and E were caused in part or in whole by exposure to

4  Grace asbestos?  Do you have an opinion?

5  A    Yes, I do.

6  Q    And what is your opinion?

7           MR. MULLADY:  Objection.  For the record, Your Honor,

8  the objection is to foundation.  This witness is -- and this

9  will be borne out on cross examination.  But for the record,

10 the opinion is incompetent and without foundation, because the

11 witness has not worked with any actual exposure data from any

12 actual Grace claimants in this case.  She has not taken time

13 waited average exposure samples, or I should say Dr. Lees did

14 not take time waited average exposure samples from any actual

15 Grace claimants.  She's not been presented with that data.

16           She has been provided with instead the results of

17 point-in-time studies and a very -- of a very small number of

18 studies done by Dr. Lees of other workers in the vicinity of

19 Grace products at different times who were not claimants in

20 this case.  Average or mean values were taken by Dr. Lees from

21 those limited numbers of studies and provided to the witness.

22 She has in turn then used that data to make judgments about the

23 merits of actual claimants' cases on the basis of that evidence

24 and not the evidence submitted by the claimants themselves

25 insofar as their time waited average exposures and quantitative

CC-BLG001475

1  metrics are concerned.

2          I could make -- I could say a lot more about this

3  issue, but I think that's the essence of the foundational

4  objection to the offer of this opinion.

5          MR. BERNICK:  Well, the foundational objection would

6  be properly lodged, although I didn't hear it, under Rule 702

7  and 703 of the Federal Rules of Evidence.  Now, I asked the

8  witness a very simple question in order to address any

9  remaining or any -- just to address the objection.

10 BY MR. BERNICK:

11 Q    In all the work that you did in coming to the point where

12 you were about to answer the question that I just asked you, I

13 take it from your testimony that you relied upon Dr. Lees'

14 work, Dr. Moolgavkar's work, and you relied upon the PIQ

15 analysis.  Is that right?

16 A    That's correct.

17 Q    Okay, and I just want you to tell me whether the work and

18 the materials that you relied upon for purposes of offering an

19 opinion on whether these claims are supported by reliable

20 science, are those materials and is that -- are they the kind

21 of information and evidence that people within the field of

22 risk assessment find to be reliable for purposes of offering

23 opinions of doing scientific work in that area?

24 A    Absolutely.

25 Q    Okay.  Is there any respect in which you believe that the

J&J COURT TRANSCRIBERS, INC.

CC-BLG001476

1 materials that you've relied upon don't satisfy that

2 requirement; that is, the requirement that they be the kind of

3 materials that experts within your field find reliable for

4 purposes of their expert work?

5 A    I found them reliable.  It's what I would expect, and I

6 would not have used them otherwise.

7 Q    Thank you.  And based upon that foundation and based upon

8 the work that you have done, could you tell us what your

9 opinion is as to whether there is reliable science as to claims

10 falling within A and C -- whether there is reliable science to

11 say that those claims of injury were caused by Grace exposure

12 either in part or in whole?  Is there such reliable science?

13            MR. MULLADY:  Objection.

14 A    For A's and C's --

15            THE COURT:  Just a minute.  I believe that this would

16 go to the weight not to the admissibility.  Once again, I'm

17 going to have to consider all of this when I get all of this

18 testimony in and have an opportunity to look at the entire

19 record, but I -- so for now I'm going to overrule it.  I

20 believe this will go to weight not admissibility.

21            MR. MULLADY:  Your Honor, just one more statement for

22 the record --

23            THE COURT:  Yes.

24            MR. MULLADY:  -- to clarify our position.  The

25 objection is not to under Rule 702 and 703 in the sense that

CC-BLG001477

1 the witness cannot rely on the opinions of these other experts.

2 It is not -- that is not the basis for the objection.  The

3 basis for the objection is that the work of these other experts

4 does not put this witness in a position to draw the conclusions

5 that she is drawing.  In effect, the underlying predicate for

6 the opinion she's giving is incompetent to deliver the result

7 that she wants to present before the Court.

8          THE COURT:  Your --

9          MR. BERNICK:  There's no such things as --

10          THE COURT:  Your objection, if I understand it,

11 essentially is going to the medical condition of the particular

12 claimants involved.  If I understand what you're saying, you're

13 attempting, I think, to get to whether or not each individual

14 claimant has a condition that is founded on a Grace product?

15          MR. MULLADY:  Not exactly, Your Honor.

16          THE COURT:  No.  Okay.

17          MR. MULLADY:  This more goes to the issue of

18 exposure.

19          THE COURT:  All right.

20          MR. MULLADY:  The exposure estimates that she's using

21 are averages of exposure TWA fiber concentrations gathered by

22 Dr. Lees from a limited sample of observations of people who

23 work around -- who have worked around Grace products.  It's our

24 position that in order to express a competent opinion on

25 causation in this case, whatever witnesses Grace would tender

J&J COURT TRANSCRIBERS, INC.

CC-BLG001478

1  this opinion through, would have to testify that on the basis

2  of actual quantitative data from actual claimants and a review

3  of those claimants' actual exposure histories, there is or

4  there is not scientific causation.  We do not have that from

5  this witness, and we certainly didn't hear it from Dr. Lees or

6  Dr. Moolgavkar, and that's the basis for our objection.

7       MR. BERNICK:  Yes, well, the interesting thing is,

8  Your Honor, that this is an argument that -- this is an

9  argument in part is -- reflects an issue of their own creation.

10 We asked them for all of what they had to support these claims.

11 This witness' people were given the results of that request.

12 Your Honor will well-recall how arduous our efforts were to

13 find anything else.

14       In this particular case we have industrial hygiene

15 data that describes the categories.  We take exactly the

16 definition for those categories that was used to collect that

17 or organize that industrial hygiene data, and then her people

18 go and review the PIQs where the PIQs say I was an X, then we

19 take it at face.  Where they say -- don't say it, we then

20 review the attachments to see what category they've fallen in.

21       What counsel's argument says is that you can't -- you

22 don't even have -- you know, it's not a question of competent

23 evidence.  It has nothing to do with the issue of competence.

24 The question is whether it is probative evidence, relevant

25 evidence that you have an industrial hygienist who has studied

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001479

1 and gathered data with respect to what is definitionally the

2 same exposure, or whether in every single asbestos case you

3 have to have somebody -- industrial hygienist that was there at

4 the time and walked around with each individual claimant to get

5 their particular exposure at the time.

6         Now, he may say, well, that's what really is

7 necessary to do an industrial hygiene analysis.  Maybe that's

8 what he wants to say.  It's completely different from what

9 they've said in every other context, which is that none of this

10 really matters scientifically.

11        But that would be a position that would go to the

12 weight of the industrial hygiene data for its application to

13 this group of people.  It does not go to admissibility, and not

14 only that, it's completely impossible and a farfetched notion

15 of relevance, but whatever it is, it's a question of probative

16 value.  It is not a question of admissibility.  Admissibility

17 is governed completely and utterly by Rule 702 and 703.

18        This witness was qualified as an expert with respect

19 to risk assessment.  She has now said that the basis of her

20 opinion is the information that was provided by the industrial

21 hygienist; 702 and 703 govern the totality of that equation.

22 So I just don't understand what it is that the objection is,

23 but I'd like to get the witness' answer to my question finally,

24 so that we can go on and conclude.

25        THE COURT:  Well, I understand the basis for the

CC-BLG001480

1  objection.  I think, however, you know, the -- as we keep

2  talking in this case about the sauce for the goose and sauce

3  for the gander, well, it's going to be a problem on the other

4  side, too.  So I know your evidence isn't going to come in the

5  same way, but nonetheless, at some point in time these

6  claimants have to prove exposure.

7        And at this point in time these plants don't operate

8  with this product in place anymore, so we're going to have a

9  trust at some point, folks, that have to pay claims, and I'm

10  here to tell you at this point the evidence is in.  The PIQs

11  are finished.  The X-rays have been submitted, and this Court's

12  order was very clear, the current claims don't get a second

13  bite at this apple.

14        MR. FINCH:  I join in Mr. Mullady's objection.  I

15  would note for the record though that the personal injury

16  questionnaires do not ask the claimants to identify who their

17  testifying experts would be as an industrial hygienist for the

18  purposes of working up an individual exposure assessment for

19  that individual person.  None of your orders ordered them to --

20        THE COURT:  That's correct.

21        MR. FINCH:  -- identify their testifying experts.

22  That is an individual exposure assessment question --

23        THE COURT:  Yes, it is.

24        MR. FINCH:  -- that would be at issue in an

25  individual case.

.

**J&J COURT TRANSCRIBERS, INC.**

Anderson - Direct                                    109

1          THE COURT:  Yes, it would.

2          MR. FINCH:  Our basic objection is the relevance of

3    risk-based population estimates are relevant to the question of

4    individual causation in each individual case as to which no

5    plaintiff has been required to put on their causation proof

6    through the questionnaires.  That's the basis for the

7    objection.

8          MR. BERNICK:  I'd be happy to debate -- I'm sorry.

9          THE COURT:  The individuals have not been required to

10   produce that type -- that level of witness identification.

11   They have been required to file their proofs of claim and to

12   address the information by way of discovery in response to the

13   PIQs, and this Court's orders have been very clear with respect

14   to the fact that they have been required to provide that

15   information.  The objections are noted.  I still believe this

16   is going to go to weight.  Nonetheless, I am going to take this

17   -- as I said before, when I get the whole record, I will take a

18   look at all of these objections in the context when I have a

19   chance to take a look at the whole record.  Mr. Mullady.

20         MR. MULLADY:  Yes, Your Honor.  Respectfully, I do

21   respect the Court's ruling.  One additional basis for my

22   objection.  We represent the future claimants in this case, as

23   the Court is aware.  Our future claimants, of course, did not

24   submit information in the form of PIQs.

25         THE COURT:  Yes, sir.


                **J&J COURT TRANSCRIBERS, INC.**

CC-BLG001482

Anderson - Direct                                     110

1              MR. MULLADY:  We, therefore, would object to the

2     admissibility of this evidence as to us in its entirety, and

3     failing that -- well, we would object on that basis and

4     principally under Rule 403, because whatever probative value

5     that evidence would have as to future claimants is greatly

6     outweighed by the prejudicial effect of using, for example,

7     mean averages of exposures taken from actual claimants and

8     applying those averages to screen current claimants which are

9     then extrapolated to exclude the claims and disallow in effect

10    the claims of thousands of future claimants.

11             THE COURT:  Now, wait.

12             MR. BERNICK:  Now, yes.

13             THE COURT:  First of all, I am in no way disallowing

14    any future client's claims or current -- future demand holders'

15    claims.  We've had that information on this record for quite

16    some time.  That's premise number one.  Premise --

17             MR. MULLADY:  I said in effect.  I'm sorry.

18             THE COURT:  Premise number two is that you're here

19    representing those people who obviously are currently alive.

20    Whether or not they know that they have a particular asbestos

21    disease, they are alive.  They had to have worked or been

22    exposed to a Grace product, and this evidence is as clearly

23    relevant to them as it is to a current claim holder.  And

24    that's why you're here, Mr. Mullady.  You stand in their shoes,

25    and every bit of discovery work you did is for their benefit.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001483

Anderson - Direct                                     111

1 So the fact that they are not here and don't know that they may

2 exist right now, that's why you're here, sir, and as a result,

3 your work is clearly as relevant, and you stand in their shoes,

4 and that objection is overruled on that basis.  Mr. Bernick.

5              MR. BERNICK:  Yes, I'm tempted to respond

6 substantively.

7              THE COURT:  You don't need to respond.  You just won

8 that objection temporarily --

9              MR. BERNICK:  Yes, I --

10             THE COURT:  -- and if there's an issue down the road,

11 you'll brief it.

12             MR. BERNICK:  Well, we'll -- we're looking forward to

13 getting into that so --

14             THE COURT:  All right.  You may answer it, doctor.

15             MR. BERNICK:  So, can I get some --

16 BY MR. BERNICK:

17 Q    Dr. Anderson, the question is whether in your view as to

18 Categories B, D, and E --

19             THE COURT:  No, it was to A and C, actually.

20 Q    Okay.  Well, to A and C -- I happened to begin with A and

21 C.  I'm going to get to all of them.  What is your opinion on

22 whether there is reliable science to support -- based upon the

23 information that you have to support the proposition that their

24 diseases may have been caused in part or in whole by exposure

25 to Grace asbestos?

                    **J&J COURT TRANSCRIBERS, INC.**

1  A    For the A's and C's, as I've said before, I think I have

2  been very generous, but I have said that those claims should be

3  evaluated further.   That there is some reliable scientific

4  evidence that points in that direction.

5  Q    Okay.   Same question with respect to B, D, and E.

6  A    For B's, D's, and E's, the cumulative exposure values --

7  the maximum of cumulative exposure values are so small.   They

8  are so very small as to not exceed any benchmark.   I do not

9  think there is such evidence, and I do not think they need to

10  be considered in the next evaluation.

11          MR. BERNICK:   Thank you.   Now, Your Honor, I do --

12          THE COURT:   Does that mean, doctor, that your view is

13  that there is no reliable scientific evidence to support the

14  proposition that exposure to Grace's product caused any

15  person's disease in Categories B, D and E?

16          THE WITNESS:   That's correct.

17          THE COURT:   Thank you.

18          MR. BERNICK:   Your Honor, I -- just -- maybe we can

19  take up the issue after lunch, but I would tender as summaries,

20  and I think established the predicate from the witness already

21  on the Rule 1006 requirements for Exhibits 2276, 2277, 2279,

22  228 --

23          THE COURT:   Wait.   I'm sorry.   2276, 2277?

24          MR. BERNICK:   2279, 2282 and 2291 to 96.   I'd ask

25  that each and every case, whether the exhibit -- and I only

J&J COURT TRANSCRIBERS, INC.

1  picked out the ones that reflect the data -- whether they

2  accurately reflected the data that she had mustered relating to

3  the topic reflected in the exhibit.  So, we would make that

4  proffer.  I don't know if there's an objection now, or if you'd

5  like to take that up after the break.  Either way is fine.

6          UNIDENTIFIED ATTORNEY:  After the break.

7          MR. BERNICK:  And subject to that we would pass the

8  witness.

9          THE COURT:  All right.  We'll return with the

10  question of admissibility of 2276, 77, 79, 82, 91 through 96

11  after lunch.  And --

12          MR. BERNICK:  I would note that my examination this

13  morning, after we factor in about 25 minutes of colloquy,

14  lasted for about an hour and 50 minutes --

15          UNIDENTIFIED ATTORNEY:  Two hours and ten minutes.

16          THE COURT:  Two hours and ten minutes.

17          MR. BERNICK:  Well, after you take into consideration

18  the 20 minutes that we just spent on one objection and the voir

19  dire, which took ten minutes.

20          UNIDENTIFIED ATTORNEY:  Congratulations.

21          THE COURT:  All right.  We will be in recess until

22  1 p.m.

23          MR. BERNICK:  Thank you, Your Honor.

24          THE COURT:  Do you have your case cite --

25                  (Recess)


                  **J&J COURT TRANSCRIBERS, INC.**

1        THE CLERK:  -- come to order.

2        THE COURT:  Please be seated.  Mr. Bernick?

3        MR. BERNICK:  Yes.  I think -- we've given the other

4  side the --

5        THE CLERK:  Mr. Bernick, talk into the mic, please.

6        MR. BERNICK:  Yes.  I'm sorry.  We've given the other

7  side the opportunity to take a look at Exhibits 2276, 77, 79,

8  82, 91 and -- 91 through 96, which are proffered as summaries

9  under Rule 1006.  I'm told that beyond preserving -- making and

10  therefore preserving the prior objection that was lodged as to

11  the conversion from PCM to PCME, that with that exception there

12  is no objection to the proffer, and therefore we would ask to

13  have those admitted, and ask Your Honor to, again, overrule the

14  objection that now is being made for preserving the record to

15  the -- to anything that's based in any way, shape, or form

16  under the -- on PCM conversion.

17        THE COURT:  All right.  Well, Exhibits 2276, 77, 79,

18  82, 91 through 96 are admitted.  I have previously overruled

19  that objection, but as I indicated I am going to be looking at

20  all of these objections, every objection, when I get the whole

21  transcript and the case ready for decision.

22        MR. BERNICK:  There are two other small matters

23  before Mr. Mullady starts his cross examination of Dr. Anderson

24  -- I think you may want to help move things along -- with

25  respect to scheduling the ZAI hearing, I am told by Mr. Kramer

**J&J COURT TRANSCRIBERS, INC.**

1  that Mr. Baena is available on the 22nd, as is Mr. Scott.

2  Messages have been left with Mr. Westbrook's office.

3  Apparently Mr. Westbrook has an enviable schedule, because he's

4  on vacation today, as well.  So -- but people are optimistic

5  that he'll be able to respond promptly and will be able to do

6  this on the 22nd.  My proposal would be that we schedule it on

7  that basis, and if it turns out that Mr. Westbrook is not

8  available on that date, that we'll let the Court know, and then

9  I guess we'll have to have a short call to try to schedule an

10 alternative date.

11         THE COURT:  All right.  That's fine.

12         MR. BERNICK:  With respect to Rule 1006, I know that

13 Your Honor has received our cases and the other side's cases.

14 Mr. Ansbro gave me another case, U.S. v. Goss (phonetic), which

15 --

16         THE COURT:  Yes.  I just looked a it.

17         MR. BERNICK:  -- which we'd be happy -- that's the

18 case where there -- the underlying evidence for the summary was

19 excluded on hearsay grounds, and essentially you couldn't

20 revive it.  But be that as it may, we have not had an

21 opportunity to otherwise look at this case, but that's not a

22 problem.  So, we're happy to take Your Honor's ruling.

23         THE COURT:  All right.  Let's finish the evidence.

24 I'll deal with the issues of Rule 1006 and the 408 issue after

25 the witness is finished today.  Do you have any other questions

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001488

1  for Dr. Anderson?

2           MR. BERNICK:  No, we don't.  We would now pass the

3  witness.

4           THE COURT:  All right.  Mr. Mullady?

5           MR. MULLADY:  Thank you, Mr. Bernick.

6                         CROSS EXAMINATION

7  BY MR. MULLADY:

8  Q    Good afternoon, Dr. Anderson.

9  A    Good afternoon.

10 Q    I want to begin by reviewing the sequence of your analysis

11 for your disposition of mesothelioma claims.  And I've put on

12 the ELMO here the same exhibit that we have in the exploded

13 version in front of you.  As I understand what you did, you put

14 all the PIQ claimants into these five categories, A through E,

15 correct?

16 A    Not exactly.

17 Q    All right.  Well, they were assigned either by

18 self-identification, or by review of their underlying back-up

19 material, they were assigned a category?

20 A    Yes, to the extent that was possible.

21 Q    To the extent possible.

22 A    Yes.

23 Q    Thank you.  And then, in terms of the duration of their

24 exposure, you have assumed a 45-year full occupational exposure

25 of the highest exposure product for the maximum of any 45-year

J&J COURT TRANSCRIBERS, INC.

CC-BLG001489

1 period, correct?

2 A    That's correct.

3 Q    And you've concluded, on the basis of your entire

4 analysis, not just the two pieces that I articulated, that it

5 is not scientifically plausible that for anyone in the B, D,

6 and E categories, with 45 years of exposure to Grace asbestos

7 products to have contracted mesothelioma from that exposure.

8 Did I understand that correctly?

9 A    I think that's, in essence, what I said.  But the first

10 part of your question you said "anyone", and I'm addressing

11 these exposure -- nature of exposure categories, and -- but I

12 think the answer is yes, if I understand your question.

13 Q    Very good.  Now, you also discussed this exhibit, 2291,

14 which I have placed on the ELMO, which you told us was the

15 percentage breakdown of mesothelioma claimants by nature of

16 exposure, the self-identified versus those who were placed into

17 the B, D, and E, or A and C, or F categories on the basis of

18 best evidence, correct?

19 A    That's correct.

20 Q    And you told us that the results are similar, 77 percent

21 for the self-identified in B, D, and E, and 79 percent for the

22 best evidence in B, D, and E, correct?

23 A    That's right.

24 Q    So, what you've got here is you've allocated 77 to 79

25 percent of all Grace mesothelioma claimants in these categories

CC-BLG001490

1  B, D, and E, where according to you they could not plausibly

2  have contracted mesothelioma, is that right?

3  A    No.  I didn't say they couldn't plausibly have attracted

4  (sic) mesothelioma.  I said the scientific evidence that they

5  contracted it from exposure to Grace products is not there,

6  there's no such evidence.

7  Q    It would have been scientifically implausible for anyone

8  in these categories to have contracted mesothelioma from Grace

9  product exposure, right?

10  A    For these exposures I said that that is the reliable

11  scientific evidence, and I've said that there is no scientific

12  evidence that I have that would suggest that that would not be

13  the case.

14  Q    Yet --

15  A    It would be a very low probability event that someone

16  would be at a more extreme exposure to a Grace product than has

17  been displayed in this analysis.

18  Q    Yet --

19  A    For those categories.

20  Q    I'm sorry.

21  A    Sorry.

22  Q    I don't mean to step on your answers.  Yet, 77 to 79

23  percent of these mesothelioma claimants against Grace who

24  you've put into these -- into this category, who put the -- or

25  who put themselves there, have mesothelioma, correct?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001491

1  A    I didn't -- they were labeled as such.  I'm not a

2  physician.  I did not diagnose them.

3  Q    Well, recognizing that you did not diagnose them, if 79

4  percent of them have mesothelioma, and you've assumed 45 years

5  of continuous occupational exposure to asbestos, and you've

6  considered as part of your analysis that even if it wasn't

7  Grace exposure, you would assume it was Grace exposure?  This

8  79 percent of people have mesothelioma, which, in your view,

9  was not occupationally related to asbestos exposure?

10       MR. BERNICK:  Objection to the form of the question.

11 It's about three or four questions, more of an argument than a

12 question.

13       THE COURT:  No.  I think that's proper cross.

14 Overruled.

15 Q    Do I have that right, ma'am?

16 A    I didn't quite -- what is the exact question?

17 Q    I'm asking you if you've concluded that 79 -- 77 to 79

18 percent of all of the people with mesothelioma who have claimed

19 against Grace, that it's scientifically implausible that they

20 got that mesothelioma exposure from 45 years of occupational

21 exposure to asbestos -- Grace asbestos?

22 A    That's not correct.

23 Q    Why is that incorrect?

24 A    I said that it's implausible that they got their

25 mesothelioma from 45 years of exposure, eight hours a day,

                       **J&J COURT TRANSCRIBERS, INC.**

CC-BLG001492

1 every day, to a Grace product.

2 Q    Right.  But, where the plaintiffs had evidence of exposure

3 to non-Grace asbestos, you've concluded that it was all Grace

4 exposure, have you not?

5         MR. BERNICK:  Objection to the form of the question.

6 A    I don't quite understand the question.

7 Q    One of the conservative, as you've coined it in your

8 reports, aspects of your analysis, I thought, was that you

9 assumed that a claimant had exposure to Grace asbestos for the

10 entire course of his working life, even if he had exposure to

11 non-Grace asbestos, correct?

12 A    I think we're getting it a little bit twisted.  I said

13 that I did not take a discounting value for buildings that

14 might have had -- or for situations that might have involved

15 non-Grace products.  I didn't scale the values down by assuming

16 that only 20 percent of the buildings had non -- had -- only 20

17 percent of the buildings had even sprayed on or troweled on

18 products and 80 percent didn't.  So, I could have scaled back,

19 saying, you know, it's a probability that people didn't go

20 every day to one of those 20 percent buildings, but I didn't.

21 It would also have been conceivable to collect information to

22 try to get what was Grace's share of that 20 percent.  I did

23 not do that, either.  So, if you mean that in this analysis I

24 assumed for these job categories that for that occupational

25 category it was a Grace exposure, that's correct.

CC-BLG001493

1  Q    Continuously over 45 years?

2  A    That's right.

3  Q    Okay.  And despite that continuous exposure over 45 years

4  to Grace asbestos, counting no other exposures to anybody

5  else's asbestos, it's your view that 77 to 79 percent of these

6  people cannot scientifically plausibly claim that they got

7  their mesothelioma from that exposure?

8          MR. BERNICK:  I'm going to object to the form of the

9  question.

10  Q    Is that right?

11          MR. BERNICK:  Excuse me.  Object to the form of the

12  question.  If the question is whether her analysis assumes all

13  exposure to Grace asbestos, I understand that.  If the question

14  is her analysis assumes all exposure to Grace asbestos plus

15  whatever other asbestos exposure was, that's a different

16  question.  And I think we have to be clear in asking the

17  witness which hypothetical or which assumption we're asking her

18  to verify.

19          MR. MULLADY:  I don't think it's unclear at all.  And

20  the witness hasn't told me she didn't understand the question.

21  A    Well, I -- what I wanted to be clear --

22          Q    Excuse me.  I think there's a motion pending.

23          THE COURT:  Okay.  I think you need to restate the

24  question to make sure that it is clear which question you're

25  asking her, because I think in the process of her prior answer

**J&J COURT TRANSCRIBERS, INC.**

1 it did get a little muddled.  I'm not sure your question did,

2 but I think --

3          MR. MULLADY:  I'd be happy to rephrase it, Your

4 Honor.

5          THE COURT:  All right.

6 Q   Dr. Anderson, you've assumed for the Grace mesothelioma

7 claimants that for the 45 years that they have worked in the

8 construction trades, they have worked around Grace asbestos --

9 well, strike that.  Let me start over.  You've assumed that for

10 the 45 years of occupational experience of these construction

11 workers who have made claims against Grace that their only

12 asbestos exposure has been to Grace products, is that correct?

13 A   That's --

14 Q   Occupationally.

15 A   I have not addressed what other asbestos exposures they

16 may have had, and if that's the point of confusion -- this

17 analysis deals with the concentration data that comes from

18 these job categories that goes into my analysis without

19 discounting the possibility that some of these products could

20 have been non-Grace products.  These claimants may have had

21 other alternative exposures.  I did not deal with other

22 alterative exposures.

23 Q   But I thought you assumed that for the exposures -- for

24 the jobs that they were performing for the life of their

25 employment, that to the extent they had exposure to asbestos it

CC-BLG001495

1  was Grace asbestos, am I wrong about that?

2  A    For this nature of exposure categories in this analysis,

3  we were analyzing the job-specific exposure concentration data,

4  the exposure frequency duration for these jobs for those

5  categories.  That's correct.

6  Q    Okay.  You've been doing consulting work for W.R. Grace

7  for over 20 years, is that right, Dr. Anderson?

8  A    I have had some -- I have worked for W.R. Grace

9  periodically at one point, and then not for a long period of

10 time at another point, so --

11 Q    Fair enough.  I think you told us at deposition that the

12 first case that you worked on many years ago was the school

13 class action case in the late 1980s?

14 A    Yes.  I did that, and then many, many, many years elapsed

15 before I worked for W.R. Grace again.

16 Q    In addition to working on that case for Grace, you've

17 worked on the ZAI attic insulation case, correct?

18 A    That's right.

19 Q    You've worked on the environmental cost recovery case for

20 Grace?

21 A    Correct.

22 Q    And now you're working for Grace on this estimation case,

23 is that right?

24 A    Yes.

25 Q    Other than Grace, as I understand it you've done

CC-BLG001496

1  asbestos-related consulting work for the big three automakers;

2  Ford, Daimler-Chrysler, and GM, is that right?

3  A    Yes.

4  Q    You've never been retained by an individual asbestos

5  plaintiff or plaintiff attorney in an asbestos case, or offered

6  testimony in an asbestos personal injury case at the request of

7  a plaintiff's attorney, is that correct?

8  A    No, I haven't.  I've never been asked.

9  Q    Is it fair to say that all of your asbestos-related work

10  for litigation purposes has been done for defendants, and none

11  of it has been done for plaintiffs?

12  A    No.

13  Q    It's not fair to say, or that's true?

14  A    That's not true.  I did litigation-related work on

15  asbestos while I was at EPA, and that's not for defendants, so

16  I don't know how you classified it.  But I was very active in

17  the Reserve Mining case, which was an early -- the earliest, I

18  think, environmental case involving asbestos exposure,

19  particularly by ingestion.

20  Q    If I confine my question to your private practice, would

21  that be a correct statement?

22  A    Then -- would you ask me the question again?

23  Q    Yes.

24  A    Sorry.

25  Q    That in your non-governmental private consulting practice

CC-BLG001497

1  you've never undertaken to consult for the plaintiff's side of

2  an asbestos matter, is that correct?

3  A    I said I've never been asked.  That's correct.

4  Q    And you never -- okay.  Fair enough.  Something, as I

5  understand it, you've also never done for Grace before this

6  estimation proceeding is to use risk assessment to opine in an

7  individual personal injury asbestos case that a plaintiff

8  bringing a claim against Grace did or did not have a

9  meritorious claim, is that correct?

10  A    That's correct.

11  Q    Do you agree, doctor, that the point of all risk

12  assessment modeling is to determine population risk, not

13  individual risk?

14  A    No.

15  Q    Did you review the expert reports of Dr. Peter Lees in

16  this case?

17  A    Yes, I did.

18        MR. MULLADY:  Can we have ACC/FCR-535, please?

19        MR. BERNICK:  Do we have a copy of any of these

20  exhibits that you're going to use?

21        MR. MULLADY:  Jim?  Sorry.

22        THE COURT:  What's the exhibit number, please?

23        MR. MULLADY:  535.

24        THE COURT:  All right.

25        MR. BERNICK:  Can we get a bunch of them, so we don't

CC-BLG001498

1 have to keep on doing this?

2          MR. MULLADY:  We can give you the deck.  Give one to

3 the Court.  Thank you.

4 Q    What we have on the screen, Dr. Anderson, Dr. Lees' -- I'm

5 looking for the date --

6          MR. BERNICK:  Can we get the rest?  I'm sorry.

7          MR. MULLADY:  I'm sorry.  We didn't have the -- okay.

8          MR. BERNICK:  Okay.  Go ahead.  I'm sorry.  Go ahead.

9 Q    We have Dr. Lees' July rebuttal report to the report of

10 Steven Hays (phonetic) on the screen.  At Page 6 Dr. Lees

11 writes in response to something Mr. Hays had said, "The point

12 of all risk assessment modeling, and in particular that

13 conducted by others as part of this case," and he's referring

14 to the estimation case, "is to determine population risk, not

15 individual risk.  Thus, the appropriate exposure assessment is

16 for the population, not individuals."

17          MR. BERNICK:  Your Honor, I would object to this line

18 of examination.  First of all, there can't be impeachment

19 because it's not her statement.  Second, if it's offered for

20 the truth of the matter asserted in the report, that's

21 improper.  And further, it violates the stipulation.  Under the

22 stipulation in this case, whatever it is that the witness has

23 reviewed but not relied upon cannot be used for any purpose in

24 connection with the examination of the witness.  I don't think

25 it's been established that she relied upon this report.

                    **J&J COURT TRANSCRIBERS, INC.**

1      MR. MULLADY:  That grossly overstates the

2  stipulation, Your Honor.  In no way --

3      MR. BERNICK:  Well, let's get the stipulation,

4  because I believe that's exactly --

5      MR. MULLADY:  Mr. Bernick?  Excuse me.  There is no

6  limitation on the use of impeachment material in cross

7  examination of experts.

8      THE COURT:  Well, that may be, but this is not proper

9  impeachment.  This isn't this witness' statement, so you can't

10  impeach her with somebody else's statement.

11      MR. MULLADY:  Fine.  I'll move on, Your Honor.  Thank

12  you.

13  Q    Have you read the trial testimony of your former

14  colleague, Dr. Rodricks, in this case?

15  A    No, I haven't.

16  Q    Are you aware of what Dr. Rodricks' views are with respect

17  to risk assessment?

18  A    I'm sorry.  I'm not quite hearing you.  Am I aware of?

19  Q    I'm sorry.  Are you aware of Dr. Rodricks' testimony about

20  the use of risk assessment that he gave in this trial, in this

21  proceeding?

22  A    I'm not entirely aware of exactly what he said.  I've

23  known Dr. Rodricks for so many years.  We've served on so many

24  panels together, I know his views.  I can probably imagine what

25  he said, but I have not seen the transcript.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001500

1  Q    Do you agree with the general proposition that regulatory

2  risk-based standards are not useful to evaluate disease

3  causation in particular individuals?

4  A    Not as a declarative sentence, and I can tell you why.  It

5  is useful and proper to use the approaches and guidelines of

6  public health agencies if you can -- if you are seeking to rule

7  out a risk; that is, you would calculate the upper-bound risk,

8  and if the risks don't exceed that, then you know that you

9  don't have a risk.  But if they are lower than that, you can't

10  use the public health agencies' approaches to define a real

11  risk because they are overstatements.  But if your risk is

12  lower than that, you can be quite certain that you're not

13  dealing with a risk.  And I did something similar here with the

14  screening exercise.

15  Q    Do you agree that to assess disease causation in an

16  individual you have to look at that specific individual's

17  exposure?

18  A    Well, not necessarily, because if an individual -- I mean,

19  everybody would like to know exactly all the details of every

20  situation, whether it's an individual or a population.  It's

21  usually not possible.  But in this exercise the analysis

22  addressed exposure to jobs, job categories.  If an individual

23  is in one of these job categories, I think it's a fair

24  appraisal of the data, fair analysis of the data to say if this

25  person is in this job, this would be the likely exposure to

**J&J COURT TRANSCRIBERS, INC.**

1  that person if they had the long-term exposure, and so forth.

2  Q    All right.  Well, we're going to spend some time on that

3  in a few minutes.  Let me ask you first, though, before we get

4  to that, about the methods that you used to review and comment

5  on the information submitted by the mesothelioma claimants

6  against Grace.

7  A    Okay.

8  Q    As I understand it from your report, you reviewed

9  materials submitted by 1596 people who have filed claims

10  against Grace alleging that they developed mesothelioma because

11  of exposure to asbestos in Grace products, correct?

12  A    That's right.

13        MR. MULLADY:  And could we have ACC/FCR-432, please?

14  Actually, we don't need that.  You can take that down.

15  Q    The material that you reviewed, as I understand it,

16  consisted of PIQs that were submitted by the claimants, along

17  with any attachments and supporting material, correct?

18  A    We did review that, yes.

19  Q    Yes.

20        MR. MULLADY:  Could we go to the ELMO, please?

21  Q    Now, before I get into my questions about your analysis of

22  that data, I want to get something -- make something perfectly

23  clear for the record that I saw -- that you had actually given

24  us on this C, orhart 2291, which is on the ELMO, and that is

25  that 66 percent of the mesothelioma claimants against Grace did

J&J COURT TRANSCRIBERS, INC.

1 not provide sufficient information to put them into a nature of

2 exposure category.  Is that correct?

3 A    That's correct.

4 Q    So, your analysis concerns less than half, specifically,

5 44 percent of the mesothelioma claimants who have brought their

6 claims in this bankruptcy case against Grace.  Is that correct?

7 A    The slide says that 66 percent of those claimants did not

8 provide sufficient information to be classified.

9 Q    So, 66 percent of the data that would have been -- strike

10 that.  And then your procedure was, if a mesothelioma claimant

11 identified a nature of exposure code for his direct exposure in

12 Part 3 of the PIQ, that you accepted that definition as an

13 accurate determination of his nature of exposure?

14 A    That's right.

15         MR. BERNICK:  Let me -- if they filled out the form

16 that way, or what was the --

17         MR. MULLADY:  I'll repeat the question.

18         MR. BERNICK:  I'm sorry.

19         MR. MULLADY:  For counsel's benefit I'll repeat the

20 question.

21         MR. BERNICK:  Thank you.

22 Q    If a meso claimant identified a nature of exposure code

23 for his direct exposure in Part 3 of the PIQ, you accepted that

24 identification as an accurate determination of his nature of

25 exposure?

**J&J COURT TRANSCRIBERS, INC.**

1  A    I put -- that person would have gone into that nature of

2  exposure category.  I didn't say it was accurate.  I said we

3  didn't second guess what the SEF identifiers checked.  We

4  didn't try to prove or disprove that they checked the correct

5  box.

6  Q    Understood.  I just want to make sure -- let's go to

7  ACC/FCR-432 to your report.

8           UNIDENTIFIED SPEAKER:  It's off the ELMO.

9           MR. MULLADY:  This ELMO versus big screen is the

10 aptitude test in this courtroom for the lawyers, and we all

11 fail it.

12 Q    We have your report on the screen.

13           UNIDENTIFIED ATTORNEY:  Speak for yourself.

14 A    Which of my reports?

15 Q    This is the July 31 report, I believe --

16 A    Okay.

17 Q    -- is that correct?  And I want to look at Page 11, where

18 I took the language from the question I just asked you.  Only

19 363 of the 1596 mesothelioma claimants identified a nature of

20 exposure code for their direct exposure in Part 3 of the PIQ.

21 That wasn't what I was looking for.  I'm looking for --

22           (Pause)

23           MR. BERNICK:  You may try the paragraph right above

24 that one.  I thought that had a -- "I did not further review

25 the materials submitted.  I accepted the state of exposure

J&J COURT TRANSCRIBERS, INC.

CC-BLG001504

1  categories."

2          MR. MULLADY:  Well, that wasn't exactly the language

3  that I -- but let's move on past this point.

4  Q    Is it correct that if there was a code identified you did

5  not further review the materials submitted by these claimants,

6  and you accepted the nature of exposure category they

7  identified in support of their claims.  Is that correct?

8  A    That's right.

9  Q    All right.  Now, in assigning the remaining 1233 claimants

10 to the nature of exposure categories on the basis of the

11 material in the PIQs and attachments, you instructed your team

12 to use their best judgment and take a series of steps which are

13 set out on the slide I'll bring up now, which is ACC/FCR-432.

14 It's part of your July report, third paragraph.  Okay.  If the

15 exposure -- these are the three steps you told your reviewers

16 to use, correct?  And one of which was to examine the PIQ --

17         MR. MULLADY:  We need to see all three steps.  Let's

18 go to Paragraph 4.  I think that's what I'm looking for.

19 Q    "Examine the PIQ and all attachments for any information

20 regarding the nature of exposure to Grace products in order to

21 assign the claimant to an appropriate category.  If the

22 description provided included the relevant keywords, such as

23 mix, remove, cut or install, or otherwise provided information

24 that could be reasonably -- could be reasonably interpreted to

25 mean that the claimant engaged in these activities, the

                    **J&J COURT TRANSCRIBERS, INC.**

1  appropriate nature of exposure was checked." Did I read that

2  correctly?

3  A    Yes.

4  Q    So, the PIQs asked the claimants to provide information

5  -- strike that.  The PIQs did ask claimants to provide

6  information on non-Grace exposure, as well as Grace exposure,

7  correct?

8  A    I think, yes.

9  Q    And I think you told us on direct that your task was to

10  look for the Grace exposure and consider that, and that you

11  didn't consider the non-Grace exposure, but let's take a look

12  at one of the PIQs just to get a reference point for where this

13  question was asked about non-Grace exposure.

14            MR. MULLADY:  Can we have ACC/FCR-3017?

15            MR. BERNICK:  I don't understand the preparatory

16  statement made by counsel, but if it -- if it's not material to

17  the question, I guess I don't have an objection.

18            THE COURT:  I'm sorry.  What exhibit is this, please?

19            MR. BERNICK:  There was a preparatory statement made

20  by counsel as an introduction to showing this particular

21  document, and I didn't understand the preparatory statement,

22  but if it doesn't have anything to do with the question that's

23  now going to be asked, I guess it's not a problem.  It's a

24  little bit confusing.

25            THE COURT:  What exhibit are we looking at, please?

**J&J COURT TRANSCRIBERS, INC.**

1           MR. MULLADY:  I'll begin again.

2    Q    Did you tell us on direct examination, Dr. Anderson, that

3    you did not consider the claimant's non-Grace exposure in

4    performing your analysis?

5           MR. BERNICK:  Objection to the form of the question.

6    A    Well, I mean, it was not part of the analysis, but I did

7    present some information in my report, and I mentioned today

8    those claimants that had filed other claims claiming other

9    exposures.

10   Q    But the instructions you gave to your reviewers were to

11   look for evidence of exposure to Grace asbestos-containing

12   products and only Grace asbestos products, correct?

13   A    Well, the whole -- as I defined the initial question

14   today, the question was, did these claimants have the

15   mesothelioma disease from exposure to a Grace product group,

16   and that is the question I sought to answer.

17   Q    All right.  And where I was a minute ago I was asking --

18   about to ask you about the questionnaire's inquiry about

19   non-Grace exposure.  Even though the PIQs asked the claimants

20   to provide information on non-Grace exposure, that was not

21   considered by you in assigning a claimant to a nature of

22   exposure category, correct?

23   A    That's correct, because the nature of exposure categories

24   were specifically to Grace products.

25   Q    So, in the case of the claimant who submitted the PIQ

CC-BLG001507

Anderson - Cross/Mullady                    135

1 that's on the screen, which is ACC/FCR-3017, Section 3, or Part

2 3, would have been the place where he would have identified

3 himself, or not, into one of the PIQ categories, correct?  I

4 have the wrong section.

5           MR. BERNICK:  Well, I also -- I mean, I -- we have

6 not received any notice of this before.  It is a very

7 substantial document.  I'll note that there were objections to

8 our proffering any of these PIQ responses into evidence, and we

9 now have one that's being shown to the witness --

10          MR. MULLADY:  I haven't offered it.

11          MR. BERNICK:  I don't -- I'm sorry?

12          MR. MULLADY:  I haven't offered it, and I don't

13 intend to.

14          MR. BERNICK:  Well, I don't understand on what basis

15 it's coming before the witness.  It's not an impeachment

16 document.

17          THE COURT:  How can she use it if you're not offering

18 it?

19          MR. MULLADY:  No.  It's marked for identification

20 purposes, and we're using it to establish a reference point for

21 her analysis.  It's --

22          THE COURT:  Okay.  I don't know where we're going.

23 Let's just get the evidence in and find out what we're doing

24 with this.

25          MR. MULLADY:  Okay.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001508

1  Q    So, this particular claimant identified --

2            THE COURT:  What section are we looking at?

3            MR. BERNICK:  Could we make sure --

4            MR. MULLADY:  We're in Part 3 of the PIQ.

5            THE COURT:  All right.

6            MR. MULLADY:  This is the PIQ of John Wiesniewski,

7  (phonetic), Sr.

8  Q    And Mr. Wiesniewski, as his direct exposure to Grace

9  asbestos-containing products, lists his nature of exposure as D

10 and E.  Do you see that?

11 A    I see that that's what this seems to say.

12           MR. BERNICK:  What page are we on?  I'm sorry.  Okay.

13 I'll find it.  I'll find it.

14 Q    Now let's go to Part 5 on Page 11.  This is the section

15 asking the PIQ claimant about his exposure to non-Grace

16 asbestos-containing products.  And you see here where Mr.

17 Wiesniewski identified his exposure at site of exposure one the

18 nature of exposure he listed was A.  Do you see that?

19 A    I see that.

20 Q    He was a mixer of asbestos-containing products?

21           MR. BERNICK:  Non-Grace --

22 Q    Non-Grace.  Correct?

23 A    I can't know, because this is an entire file.  This would

24 appear, just from this much information out of a whole file, to

25 say that he was an A when he was working with Johns Manville

J&J COURT TRANSCRIBERS, INC.

1 products, I suppose, but that's pure speculation because I

2 can't sit here and review this whole file.

3 Q    Of course.  And I'm not going to quiz you about this file.

4 The purpose of -- my question is to understand your process.

5 Your process would have been that your reviewers would not have

6 considered this A designation by Mr. Wiesniewski for his

7 non-Grace exposure in determining what category to place Mr.

8 Wiesniewski for purposes of this case, correct?

9         MR. BERNICK:  For --

10 A    Well, I can't say that without seeing the whole file,

11 certainly not with this line that says he was a sprayer with

12 the Johns Manville product.  I don't know what else is in this

13 file.

14 Q    Okay.  We can take this down.  And would you agree with

15 me, Dr. Lees -- excuse me -- Dr. Anderson, that the data that

16 you got from Dr. Lees also only deals with exposure to Grace

17 products?

18 A    That was the intention.

19 Q    All right.  Now, I want to ask you now about your use of

20 Dr. Moolgavkar's doubling dose benchmarks.  You understood

21 those benchmarks to represent levels of exposure that, by

22 themselves, would be sufficient to cause disease, correct?

23 A    No.

24 Q    Okay.  Let's take a look at your report -- let me ask a

25 predicate question.  Would you agree with me that some of Dr.

CC-BLG001510

1  Moolgavkar's benchmarks, such as the 3.2 fiber years for mixed

2  asbestos fibers, that that benchmark represents a level of

3  exposure where the relative risk would be two?  In other words,

4  referencing a doubling dose of the amount of asbestos necessary

5  to cause mesothelioma.

6  A    I believe, first of all, that's misidentified.  I don't

7  believe that benchmark is Dr. Moolgavkar's, but I would like to

8  get back to my benchmark.  I think that's the mixed fiber

9  benchmark --

10 Q    Yes.

11 A    -- that came from the EPA analysis, and not from Dr.

12 Moolgavkar.  And I believe I previously stated that that one is

13 not an appropriate benchmark, really, because it contains

14 chrysitolite fibers that are known to be greatly more potent

15 than the tremolite and chrysotile fibers that we are dealing

16 with here.

17 Q    All right.  I heard you say that on direct.  I'm simply

18 asking you if that benchmark represents mesothelioma with a

19 relative risk of two.

20 A    I think that was calculated by EPA from their data with

21 the mixed fibers, but I don't have the benchmarks here.  Just a

22 minute.  Let me find them.

23                    (Pause)

24        MR. BERNICK:  That would be -- you need an exhibit

25 number, Dr. Anderson?  Or --

J&J COURT TRANSCRIBERS, INC.

CC-BLG001511

1          THE WITNESS:  Yes.  It was on the exhibits, so I can

2    find it, perhaps.

3    Q    I don't know if this is the one you're looking for, Dr.

4    Anderson, but I've put GG-2285 on the ELMO.  This is the

5    comparison of screening to benchmarks.

6    A    Yes.  And that is the one --

7    Q    All right.  And you see --

8    A    -- that I mentioned earlier.

9    Q    Yes.  And you see where, on this slide that you prepared

10   --

11   A    Um-hmm.

12   Q    -- for us, you have the 3.2, and then you say meso, RR,

13   that means relative risk, correct?

14   A    Relative risk of two.  I just wanted to be absolutely

15   certain.  That's taken from the EPA analysis --

16   Q    Right.

17   A    -- for the mixed fibers that contain chrysitolite.

18   Q    Let's go to Dr. Anderson's report at Page 8, please, the

19   July report.

20          MR. BERNICK:  Is that 432?

21          MR. MULLADY:  432.

22   Q    You addressed benchmarks on this page of your July report,

23   and I'd like to refer you to the section of benchmarks under

24   the heading relative risk, RR of two.  And for the record, what

25   we have here are four benchmarks, correct?

**J&J COURT TRANSCRIBERS, INC.**

1    A    Yes.

2    Q    Four different diseases in different fiber types, correct?

3    A    Yes.

4    Q    And let's go up to the paragraph that leads in this

5    section.  A number of these levels were taken from Dr.

6    Moolgavkar's review of relevant epidemiological literature, and

7    his analysis of dose response relationships.

8    A    Correct.

9    Q    Do you know how many of the RR of two benchmarks that we

10    just referenced were taken from Dr. Moolgavkar's review of the

11    relevant epi literature, and his analysis of dose response

12    relationships?

13    A    Yes.  I think so.  He did the Libby fibers work -- the 8.9

14    came from his work.  I am not certain that he did the original

15    work, or if he was reviewing and agreeing with the work of

16    others for the benchmark 79.0 and 100 to 278.  I think those

17    have been previously mentioned by others, and I think he

18    derived his own, as well.

19    Q    Now, a doubling of the risk, am I correct that that

20    implies that the probability of the disease being caused by the

21    exposure is greater than 50 percent, that is, it is more likely

22    than not that the disease was caused by the exposure?

23              MR. BERNICK:  Objection to form.  What disease?

24    A    That is a theoretical statement when you're in this -- and

25    I'll tell you why.  When you're in the inference zone that I

**J&J COURT TRANSCRIBERS, INC.**

1  spoke about earlier, the only way to calculate that relative

2  risk of two is to assume some shape to the dose response curve.

3  And I mentioned earlier that in 1976 when we adopted that

4  linear non-threshold curve, and this whole concept of

5  extrapolating outside of a range where we had actual

6  information, it was novel at the time.  We said it was a

7  default approach to establish an upper bound on the risk, so to

8  use these modeling exercises to establish a relative risk of

9  two in those zones does have inherent uncertainties that are

10 modeled that are not based on scientific information but must

11 rely on modeling information, an assumed shape to the model.

12        MR. MULLADY:  Sorry.  I did it again.  Can we have

13 ACC/FCR-431, please?

14        UNIDENTIFIED ATTORNEY:  Which one is that?

15        MR. MULLADY:  This is the June report of Dr.

16 Anderson, at Page 4.

17 Q    This is the supplemental report that you did in this case.

18 You had three reports for the estimation proceedings, as I

19 understand it.  And --

20 A    I'm sorry.  Which report is this?

21 Q    This is the June report, Dr. Anderson.  And in this report

22 you gave us some background on relative risk, which we see

23 here.  You give us a definition, and then you tell us what a

24 doubling of the risk implies.  I believe it's beginning with

25 the sentence "As Dr. Suresh Moolgavkar indicated in his expert

J&J COURT TRANSCRIBERS, INC.

1  report, the standard linear relative excess risk model used by

2  EPA for lung cancer --" No, that's not what I was looking for.

3                          (Pause)

4  Q    Ah.  I'm sorry.  The paragraph before this.  "A relative

5  risk greater than two is equivalent to the excess risk from the

6  exposure being greater than the risk without the exposure."

7  First of all, is that a true statement?

8  A    That is generally true in the abstract, and if you go down

9  to just where you were, you will see what I'm talking about,

10  where it says using models employed by EPA at the very bottom

11  of that page, the first thing outside that observed range that

12  I say there, and quoting what he did, is that he assumed a no

13  threshold dose response model, and that's what I was trying to

14  address.  Yes, conceptually that's what a relative risk of two

15  is.  How one gets there when they must rely on an assumed shape

16  to a model that we know is not confirmed, is not scientifically

17  confirmed, adds that degree of uncertainty to that relative

18  risk of two.

19  Q    Sure.

20  A    One is a definition of the relative risk of two, and I

21  just spoke to, in some cases, what one must do to make that

22  calculation.

23  Q    Right.  And right after the sentence I just read, you

24  wrote in your report, and I quote, "It implies that the

25  probability of the disease being caused by the exposure is

J&J COURT TRANSCRIBERS, INC.

CC-BLG001515

1  greater than 50 percent, i.e., it is more likely than not that

2  the disease was caused by the exposure." Did I read that

3  correctly?

4  A    Conceptually that's correct.

5  Q    Now, I want to turn back to your July report, 432, at Page

6  9, where you talk about the B, D, and E claimants' exposure.

7  And you say that, "Furthermore, these exposures have not been

8  demonstrated scientifically to contribute to the risk of

9  disease even when added to other significant exposures." That

10 was your opinion, correct?

11 A    That's right.

12 Q    Now, let's go to table -- the figures in table section of

13 this report to Figure 2. And in this Figure 2 you show the

14 estimated cumulative exposures for B, D, and E claimants --

15 excuse me -- you show the estimated cumulative exposure for

16 mesothelioma claimants who provided sufficient information on

17 exposure in the B, D, and E categories to Grace products.

18 Correct?

19 A    That's right.

20 Q    Now, in Figure 2 you have not added any other, quote,

21 significant exposures, or, quote, other significant exposures,

22 to these claimants' Grace exposures. Isn't that right?

23 A    That's correct.

24 Q    Okay. In fact, nowhere in your analysis have you taken

25 the B, D, and E claimants' cumulative exposures to Grace

J&J COURT TRANSCRIBERS, INC.

CC-BLG001516

1 products and added in exposures to any non-Grace products.  Is

2 that correct?

3 A    That's correct, because I was addressing the specific

4 question that I stated earlier, what are the exposure to the

5 Grace product groups, and could they have been associated with

6 disease causation?  And what I said earlier is, when we found

7 that these levels are so low, so very, very low under such

8 extreme assumptions, it would be highly unlikely that these

9 very small incremental amounts would be meaningful in the

10 context of any kind of causal relationship.

11          MR. MULLADY:  All right.  Thank you, Dr. Anderson,

12 but Your Honor, I would move to strike everything after the

13 witness answered my question yes.

14          THE COURT:  No.  She's entitled to explain her

15 answer.  That's denied.

16 Q    All right.  Now, Dr. Anderson, I want to talk to you about

17 the concept of substantial contributing factor.  Substantial

18 contributing factor to you means that there is enough exposure

19 to have made a convincing case that the exposure was just that,

20 that it could cause the disease, or substantially contribute to

21 the causation of disease.  Is that correct?

22          MR. BERNICK:  Objection to the form of the question.

23 You've got at least two different questions in there.

24          THE WITNESS:  What I have said --

25          THE COURT:  I'm sorry.  I believe the objection is

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001517

1 sustained.  I think you do have a compound question.  Rephrase,

2 please.

3 Q    Does substantial contributing factor to you, Doctor, mean

4 that there's enough exposure to have made a convincing case

5 that the exposure could cause disease or substantially

6 contribute to the causation of disease?

7 A    May I give you a three-fold answer?  The first is, I think

8 the substantial contributing factor is something I've heard in

9 the legal context, not in the scientific context, so I -- I

10 don't speak to that issue legally.  I'm not an attorney.

11 Secondly, in the scientific context what I have said is I know

12 when we can observe information.  I mentioned that the National

13 Academy of Sciences committees convened under the Institute of

14 Medicine, routinely do this.  They consider that observed

15 range, and they quote this.  They get their protocol before

16 they start these studies, and I mentioned one study.  When

17 you're in that observed range, we have observed from, if the

18 studies are consistent, good epidemiology studies, well

19 conducted, well designed, and if we observe the relationship we

20 have a scientific basis for then saying that there is an

21 association between the exposure and the effect.  As we depart

22 from that observed range into the range of inference,

23 particularly down in very, very low ends of that range, that

24 can't be said.  So, I don't know if that can answer your

25 question, but that's kind of my three-part answer.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001518

1  Q    Well, assuming, hypothetically, that Dr. Moolgavkar's

2  doubling dose benchmarks represent a level of exposure that

3  would be sufficient by itself to cause disease, then logically,

4  some level of exposure less than the benchmark level could

5  contribute to the disease, could it not?

6             MR. BERNICK:  Objection to the form of the question.

7             THE COURT:  What's the objection?

8             MR. BERNICK:  Objection to the form of the question.

9  I mean, the first part of it was that assuming the doubling of

10  dose means that it can cause, then I think logically something

11  less than that could contribute.  I don't know what the -- what

12  the question asks for.  What kind of logic are we talking

13  about?  Are we talking about science?  Are we talking about

14  logic?  Are we talking about data?  And what does he now mean

15  by contribute?  He's started out with a legal term, substantial

16  contribution.  The witness says she doesn't deal in substantial

17  contribution.  What does he mean by contribute?

18             THE COURT:  Wait.  That was a different question.

19  This is a doubling dose question.  But --

20             MR. BERNICK:  But he then said -- presumably that

21  means, or logically that means that something less than the

22  doubling dose could contribute --

23             THE COURT:  Contribute.  Yes.

24             MR. BERNICK:  And that's the problem, is could

25  contribute.  And why is it logical?  Or is he asking a pure

J&J COURT TRANSCRIBERS, INC.

1 logic question, or is it based upon the witness's scientific --

2 I mean, what is it?

3          THE COURT:  All right.

4          MR. MULLADY:  I'll rephrase the question and try to

5 put it in scientific terms as a non-scientist.

6 Q    If the doubling dose benchmarks represent a level of

7 exposure that would be sufficient to be the sole cause of

8 disease, then isn't it scientifically plausible that some less

9 -- some exposure less than the benchmark could contribute

10 substantially to the cause of that disease?

11 A    I think I can agree with the first part of what you've

12 said, because I've just said the doubling dose information,

13 conceptually the first statement that you read to me is

14 correct.  In fact, when we are forced to make, or when Dr.

15 Moolgavkar is forced to make doubling dose calculations and

16 inference part of the knowledge base that we have, and he must

17 employ this linear non-threshold model, the first part of your

18 statement is uncertain.  I mean, we can't assume that that's

19 the exact level at which we would assume a disease to occur.

20 And if you're asking me if a very small amount as I've defined

21 and found in this analysis for the B, C and D -- I mean, sorry,

22 the B, D and E categories would be substantially contributing,

23 I think from this analysis we see as we even get the additional

24 duration data that we have such very, very low exposures that I

25 think it's highly improbable that they can make any

CC-BLG001520

1 contribution.  And that's been my testimony before.

2 Q    I want you to assume, nonetheless, hypothetically --

3 hypothetically, that a Court could find that a two percent

4 contribution to a claimant's risk of disease is sufficient for

5 legal liability.  All right?  That's the hypothetical

6 assumption I'm asking you to make for purposes of my questions

7 only.  With that assumption, I want to look at Dr. Moolgavkar's

8 benchmark of three -- or, the benchmark of 3.2 fiber years for

9 the doubling dose for mesothelioma for chrysotile and amphibole

10 fibers.

11          MR. MULLADY:  Can we have ACC/FCR-432, the July

12 report, at Page 8, please?

13 Q    Two percent of the 3.2 fiber years benchmark would be .064

14 fiber years.  I've done the math.  Does that sound about right?

15 A    I'm sorry?

16 Q    Two percent of 3.2 fiber years I've calculated as .064

17 fiber years.  I would represent to you that's the way the math

18 comes out.  Does that sound right to you?

19          MR. BERNICK:  Is it zero point six four?

20          MR. MULLADY:  Yes.

21          THE WITNESS:  I don't have a calculator --

22          MR. BERNICK:  That can't be right.

23          MR. MULLADY:  .064.  I can't read my own notes.

24 .064.

25 A    I don't know what you're asking me.  First of all, I've

CC-BLG001521

1  said that that benchmark is -- they are just for completeness

2  sake.  It doesn't apply in this case because of the

3  chrysitolite term, and I have said in my deposition, and I feel

4  very strongly as a scientist that in the abstract I can't make

5  statements about some --

6  Q    I haven't asked you your question yet, ma'am.

7  A    Well, you asked -- I thought you asked me if that

8  percentage --

9  Q    I've just asked you if the math -- if you will accept my

10  math, that two percent of 3.2 is .064.  And then I'm going to

11  ask you a question.

12  A    I hate to tell you this, but I virtually never accept

13  somebody telling me something.  I don't have a calculator here.

14  If someone -- have we verified that?

15          MR. BERNICK:  For purposes of this question, Dr.

16  Anderson, we'll stipulate that Mr. Mullady did the calculation

17  right so we can proceed.

18          MR. MULLADY:  Even though I couldn't say it --

19          MR. BERNICK:  Even if you couldn't say it, .064

20  sounds like it is two percent of 3.2.

21          THE WITNESS:  Okay.

22          MR. MULLADY:  I think it is.  All right.

23  Q    So, let's look at your Figure 2, and I will have a

24  question for you in a minute, I promise.  Let's go to Figure 2

25  from your July report.  Each one of these bars represents your

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001522

1  estimate of the number of B, D, and E claimants that fall

2  within each of the cumulative exposure ranges, correct?

3          MR. BERNICK:  As of the time of the report or today?

4          MR. MULLADY:  As of the time of the report.

5  Q    Is that correct?

6  A    That's right.

7  Q    All right.  And there are 330 B, D, and E claimants total

8  represented in this figure, right?

9  A    I think that's right.

10  Q    Okay.  Now, based on your calculations, all claimants to

11  the right of this first bar here, so beginning with the number

12  57, and adding all of these individuals across the graph, have

13  exposures of greater than .1 fiber years, correct?

14  A    I'm sorry.  Where are you?

15  Q    All of the people to the right of this first bar here,

16  beginning with this group in the --

17  A    All right.

18  Q    -- in the .1 to .2 range, and all the way down, have

19  exposures greater than .1, is that right?

20  A    That's right.

21  Q    Okay.  So, if a Court were to accept .064 fiber years as

22  sufficient to be a substantially contributing factor, that

23  would pull in all of the B, D, and E claimants on your chart to

24  the right of the first bar?  72 percent of these claimants, by

25  my math.  Would that be correct?

CC-BLG001523

1  A    I don't see how you're getting there at all.

2  Q    Well, I'm just asking you for purposes of my hypothetical

3  question.  If a Court were to determine that .064 fiber years,

4  which is two percent of the benchmark of 3.2, is sufficient to

5  be considered a substantial contributing factor for

6  mesothelioma causation, that that would bring into the mix, as

7  opposed to excluding them, 72 percent of the B, D, and E

8  claimants on whose -- who you've identified in this chart?

9          MR. BERNICK:  Your Honor, we'd let the witness

10  answer, but --

11  A    That's --

12          MR. BERNICK:  Go ahead, answer.

13  A    That's so incredibly unlikely --

14  Q    I'm not asking you to agree with the hypothetical.  I'm

15  just asking you if that would be the result if the hypothetical

16  assumptions were correct.

17  A    I -- I think that giving me an implausible hypothetical

18  and asking me to agree with it is not something I'm comfortable

19  doing.

20  Q    Maybe --

21  A    To me it makes no scientific sense to form that

22  hypothetical because you're talking about, one, a benchmark

23  that doesn't apply to the data; and two, a two percent part of

24  that benchmark.  And, first of all I've said that even a

25  doubling dose is not something that I consider in the abstract

J&J COURT TRANSCRIBERS, INC.

CC-BLG001524

1  a causal benchmark.  I've presented them all because when

2  they're outside the observed range the modeling that's

3  necessary renders a great degree of uncertainty.  I think all

4  of this in the aggregate, as we depart from the observed range

5  and goes down does provide information.  I think to say

6  hypothetically that a two percent of a doubling dose number in

7  the inference zone would be a substantial contributing factor

8  is highly unlikely.

9  Q    Well, but --

10         MR. BERNICK:  I don't think the witness has answered

11 the question.  I really think that if you go back and take a

12 look at the chart you made a -- just made a mistake in looking

13 at that number.  It's .06.

14         THE COURT:  It's .064, not .64.

15         UNIDENTIFIED ATTORNEY:  That would pick up a hundred

16 percent.

17         THE COURT:  Yes.  He corrected that.  But then I

18 don't think he corrected it on -- in his question.

19         MR. BERNICK:  The chart -- the chart says greater

20 than zero and less than .1.  So, all of it --

21         MR. MULLADY:  Yes.

22         MR. BERNICK:  -- would be within that first bar --

23         MR. MULLADY:  That's correct, Mr. Bernick.  Correct.

24 They would all -- it would be a hundred percent.

25 Q    Doctor, on the two percent I think you've told us that you

CC-BLG001525

1  don't -- you're not here to tell the Court what the legal

2  standard is for substantial contributing factor, correct?

3  A    I said that I know what I would regard as a scientist to

4  have contributed or not.

5  Q    I didn't ask you that.  I asked you whether you're here to

6  express a view on the legal standard for substantial

7  contributing factor causation, and you're not, correct?

8  A    I can express scientific opinions and not express any

9  legal standards.

10 Q    All right.  And so, you can't express an opinion that a

11 two percent standard is or is not reasonable.  That's not just

12 something you're here and capable of discussing if that is --

13 A    I said --

14 Q    -- a legal standard?

15 A    I said scientifically I find it implausible.

16 Q    Fair enough.  All right.  Now, I'd like to look at just

17 three slides that review the criteria on which you conclude

18 that certain claimants don't have merit against Grace.  And the

19 purpose of these next slides is to -- for me and the Court to

20 get a clear understanding of how you determined that these B,

21 D, and E claimants' claims were not meritorious.  So, let's

22 have FCD-104, please.  All right.  At the top we say "non-

23 meritorious claim?"  Meaning, the construct here is this is a

24 claim that you and your staff at Exponent are being asked to

25 consider and rule either in or out on the basis of the evidence

J&J COURT TRANSCRIBERS, INC.

1  before you. In the case of this first person we have a

2  claimant, and we'll -- first of all we're going to assume that

3  Dr. Moolgavkar's doubling dose benchmark for mesothelioma of

4  3.2 fiber years is correct. And I understand --

5  A    Everything about that is wrong.

6  Q    I understand you disagree with that, but again --

7  A    It's not his benchmark, and it's a doubling dose for

8  fibers that don't apply in this case.

9  Q    All right.

10                          (Pause)

11  Q    Yes. Just to clarify this issue of the 3.2 fiber years

12  benchmark, let's bring up your June report, at Page 5. And

13  I'll just make sure we have a clear record on this. You say at

14  the top of the page, "I used these values, as well as 3.2 fiber

15  years, a value calculated by Dr. Moolgavkar using a potency

16  determined by EPA to reflect both chrysotile and amphibole

17  fibers as benchmarks at which the risk of mesothelioma

18  doubles." Did I read that correctly?

19  A    Sir, where are you?

20  Q    It's highlighted on the screen for your ease of reference.

21           MR. BERNICK:  What exhibit is that? Which exhibit is

22  that?

23           MR. MULLADY:  431.

24           MR. BERNICK:  431?

25  Q    Do you see the highlighted language there, Dr. Anderson?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes.

2  Q    Okay.

3           MR. BERNICK:  What page is it?

4  Q    The value was calculated by Dr. Moolgavkar, but what

5  you're saying is that he used a potency determined by EPA?

6  A    That's right.

7  Q    Okay.

8  A    And that's that linear non-threshold for the mixed fibers.

9  Q    But Dr. Moolgavkar calculated it?  So, just so that's

10 clear --

11 A    I don't recall whether EPA calculated it in their

12 lifetime, or whether Dr. Moolgavkar re-calculated it here.  I

13 say he calculated it, and I don't remember exactly, but it's

14 the EPA dose response curve.

15 Q    All right.  Let's go back to the hypothetical here.

16 Assuming that the doubling dose benchmark of 3.2 is correct,

17 it's the correct doubling dose benchmark to use, and you had a

18 claimant who had a working career of 45 years, all with Grace

19 products at an annual level sufficient to reach the 3.2

20 benchmark.  As I understand how you did your analysis, you

21 would not have regarded this claim as non-meritorious and not

22 warranting any further consideration.  This would be a claim

23 that would warrant further consideration.  Is that correct?

24 A    That's not correct.

25 Q    Why is that incorrect?

**J&J COURT TRANSCRIBERS, INC.**

1 A      What I said is I regarded all the benchmarks, particularly

2 giving weight to the ones in the observed range, and the others

3 to give a full spectrum of what had been available from the

4 dose response modeling including this with all mixed fibers.

5 And I said, as we depart from that observed range, the

6 benchmarks become less convincing that there is any risk

7 associated with the low level exposures.  And then I said that

8 the exposures to the B, C, and D categories were below all of

9 the benchmarks, so I was -- and I said in my deposition that as

10 we departed from the 15 fiber years, we became less and less

11 certain.  But I didn't draw a bright line at any one of the

12 benchmarks, and certainly not at this one.

13       We happen to be well below it, but this is not the most

14 appropriate benchmark by any means because of the contamination

15 by the chrysitolite fibers.

16 Q      So, you would have excluded this claimant?  This would be

17 a claim that you would not give further consideration to?

18           THE COURT:  Mr. Mullady, I'm sorry, but I'm confused.

19 Are you asking her whether she would have considered this as

20 part of the statistics that she was calculating to put into her

21 cumulative exposures?  Or are you asking her whether if she

22 were somebody doing a claims review and on an individual basis

23 she would be looking at this individual as somebody on an

24 individual basis to get further review?  I'm confused as to

25 what you're asking.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. MULLADY:  I'm asking her if the exposure that was

2    used for Category B, D, and E, if the -- if the dose, if you

3    will, was 3.2, and it was at the benchmark, would that claim

4    have passed through the filter such that there would be some

5    reliable evidence or some reliable science that it would -- it

6    should be considered further, or would it not make it through

7    the screen under the theory that there's no such evidence?

8          THE COURT:  But she isn't doing an individual claims

9    analysis.  She's doing population screening.

10          MR. MULLADY:  Right.  Well, for purposes of the

11    population screening, then.

12          MR. BERNICK:  Your Honor, could I -- could I be just

13    heard at sidebar for just half a moment so that we can continue

14    here?  But -- just for a moment?

15          THE COURT:  Yes.  Counsel approach the bench.

16          (Off the record discussion at sidebar)

17    Q    Okay.  Dr. Anderson, I apologize for that delay.  Going

18    back to -- I want to go back to your report, because I want to

19    put this in the terminology that you used in your report.  At

20    Page 9 --

21          MR. BERNICK:  The same report, 431?

22          MR. MULLADY:  Actually, this is the July report,

23    which is 432.

24          MR. BERNICK:  432.

25          MR. MULLADY:  Sorry.

                    J&J COURT TRANSCRIBERS, INC.

1 Q    Okay.  Do you see where you write, in the second to last

2 paragraph here, Dr. Anderson, "For the benchmark signifying the

3 exposure at which the mesothelioma relative risk equals two, no

4 values for the B, D, or E claimants exceed 3.2 fiber millimeter

5 years, and exposure derived using EPA's value for potency,

6 which does not distinguish between chrysotile and amphibole

7 fibers."  And then, down further in this, the next paragraph --

8         MR. BERNICK:  For completeness could you read the

9 very next sentence?

10        MR. MULLADY:  Of course.

11 Q    "All the values are clearly below the doubling doses for

12 chrysotile and Libby amphibole of 79 and 8.9 fiber years,

13 respectively."  Okay?  "Based on these observations I conclude

14 that it is scientifically implausible that disease in Exposure

15 Categories B, D, or E can be attributed to exposure to any

16 Grace asbestos containing product.  As demonstrated above, for

17 claimants reporting exposure solely in categories B, D, or E,

18 it cannot be determined in a scientifically sound manner that

19 they had sufficient cumulative exposures from a Grace product

20 to cause disease.  Furthermore, these exposures have not been

21 demonstrated scientifically to contribute to the risk of

22 disease, even when added to other significant exposures.

23 Therefore, I conclude that these claims do not have merit, and

24 should not be considered further."  Now, going back to my

25 hypothetical, what I'm asking you is, since we have B, D, and E

CC-BLG001531

1  in the range of that doubling dose, it is not below it, as you

2  say in your report.  It is at it.  Would that have been a claim

3  that does not have merit and should not be considered further?

4  A    Well, first of all, we're not at it.  We're below it.

5  Second of all, that is not the -- I mean, I didn't take just

6  one benchmark.  I've already said that's a benchmark, it's the

7  lowest one.  It came from the EPA dose response data that

8  contained chrysitolite.  If we look to the other benchmarks

9  that were here, I was discussing all the benchmarks, and I was

10 discussing the relative risk.  I don't know where that is now.

11 But I was discussing the relative risk from the Libby data,

12 which would be applicable to the products that contained VAI

13 only, and I was discussing the 78 number, close to 80, which is

14 applicable to the chrysotile, and if you mix, for some of the

15 products that were mixed between the two, the potency would lie

16 somewhere between there, so the more appropriate comparison

17 would be to the 80 for the VAI -- I mean, to the 8.9 for the

18 VAI, to the 80 for the chrysotile only products, and these are

19 mixtures, and to the somewhere in between, probably around 40

20 for the products that are mixed between the Libby vermiculite

21 and the chrysotile.  And so, I probably would have it -- in

22 your hypothetical I probably would have said that there's no

23 such evidence.

24 Q    Okay.  Let me ask you this, Doctor, and this kind of goes

25 back to where I started my cross examination on the assumption

CC-BLG001532

1  you made about a continuous 45-year history of exposure, even

2  where you didn't have that evidence you did that to be

3  conservative.  I understand that's your opinion.

4  A    That's right.

5  Q    In the case of a worker, or let's say a group, a

6  designation, a category, if you had a certain period of

7  exposure to Grace products that was above the doubling dose

8  threshold, clearly comfortably above it, and you assumed --

9  strike that.

10            MR. MULLADY:  Let's go to FC-105.

11 Q    This is a little busy, this chart, and I'm going to walk

12 you through it.  We're trying to determine here how you would

13 have treated a claimant with exposure to non-Grace asbestos at

14 some point in his career, and Grace products.

15       What I've done here is asked you to assume that we have a

16 claimant who had an average TWA of .06, and he works 45 years

17 with Grace products and only Grace products.  Now, his

18 cumulative exposure would only be 2.7 fiber years, which is 45

19 times .06.  Does that make sense to you?

20 A    Well, first of all, this analysis is for these groups

21 exposed in these labor categories to Grace products.

22 Q    Right.

23 A    And if they got exposed to something else they didn't have

24 the 45 years for the Grace product.

25 Q    Okay.  Well, if they got exposed to something else,

CC-BLG001533

1  though, you would assume that they had full occupational

2  exposure to Grace during that period of time, correct?

3  A    Well, if they -- if they got --

4         MR. BERNICK:  I'm sorry.  The question is that --

5  you're asking her whether if it's true that, in fact, they were

6  exposed to non-Grace product --

7         MR. MULLADY:  Right.

8         MR. BERNICK:  -- she nonetheless analyzes them as

9  being exposed for 45 years only to Grace products.

10        MR. MULLADY:  Yes.

11  Q    That's what you did, right?

12  A    What are you asking me?  I assumed that they got exposed

13  to these -- in these nature of exposure job categories only to

14  Grace products for 45 years --

15  Q    For 45 years.

16  A    -- in order to answer the question of how likely is it

17  that the Grace product exposure categories caused their

18  illness.

19  Q    Okay.  And in this hypothetical there's a nine-year period

20  when we don't know what he's doing, and his -- but his overall

21  exposure is below your benchmark, and I would assume that for

22  this person if he were a category you would say there's no such

23  evidence and he doesn't pass through your filter?  Correct?

24        MR. BERNICK:  Given the question that was being

25  posed, that question then cannot be asked.  Your Honor, this is

**J&J COURT TRANSCRIBERS, INC.**

Anderson - Cross/Mullady                                  162

1   about the fifth time that he's been through it.  If you make an

2   assumption of 45 years it excludes everything else.  If you

3   then want to include something else, you can't make the

4   assumption anymore.  This is why these slides --

5              MR. MULLADY:  That's what the next slide is.

6              MR. BERNICK:  -- are a waste of our time.

7              MR. MULLADY:  They're not a waste of anybody's time.

8              THE COURT:  Well, that's what this slide is, too.

9   This witness has been very clear that she is assuming,

10  regardless of the fact that some individuals have acknowledged

11  that they have worked for other companies, filed claims against

12  other companies, had exposures to asbestos from other

13  companies, that in making these job description categories in

14  order to figure out whether Grace's product could have caused

15  the disease that the claimants are claiming against Grace, that

16  she assumed that they were exposed only to Grace's product

17  within those categories for 45 years.  That -- she said that at

18  least 15 times on the record.  So, the assumption that they

19  could have worked for anybody else in that 45-year period is

20  inconsistent with her assumptions.  Unless you want to say they

21  had a longer work history than 45 years, in which case all the

22  math changes.

23  Q    If you knew that the total cumulative exposure for a

24  category was above the doubling dose benchmark, but you also

25  knew that the Grace exposure represented -- embedded within

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001535

1  that total was below the benchmark, would it be your view that

2  the Grace exposure was a substantially contributing factor?

3  A    I think what I said earlier is exactly what I think is

4  appropriate.  This analysis was about looking specifically at

5  how -- at a very, very high screen value the Grace product

6  exposures could contribute.  Where anything was close, as in

7  the A's and C's, we said review on a case by case basis.  At

8  that point, it would be appropriate to look at other exposures.

9         In a hypothetical in the abstract, (1) this isn't an

10 individual review and (2) we could go through any number of

11 hypotheticals but that's just not going to help us and it

12 wasn't the subject of my analysis.  I have said that somewhere

13 else at some appropriate time these should be looked at on a

14 case by case basis.  And that's not what I was doing.

15 Q    Let me ask you about your use of Dr. Lees' work.  You told

16 us on direct examination you relied on data developed by Dr.

17 Lees, correct?

18 A    That is correct.

19 Q    You, yourself, however did not measure airborne asbestos

20 concentrations from application of Grace products in activities

21 such as spray on fireproofing.

22 A    No, I didn't and the hundreds and hundreds of risk

23 assessments I've done, I have not been the one to measure.

24 It's the usual circumstance.

25 Q    And you can't tell us about any site where you've ever

J&J COURT TRANSCRIBERS, INC.

CC-BLG001536

1  been to where Grace asbestos containing material was being used

2  by workers in the course of their jobs, correct?

3  A    Not that I recall.

4  Q    All right.  Now you used Dr. Lees' figures for

5  concentration of asbestos that workers would be subject to as

6  shown in your July report Table 1, correct?

7  A    I used -- I think I -- I think I heard what you said.  I

8  used Dr. Lees' TWA mean concentrations as a source of the

9  concentration term in my analysis.  That is correct.

10 Q    Let's take a look at how you used Dr. Lees' data.  Can we

11 go to your Table 4 in Exhibit 432?

12 A    Which report are you at?

13 Q    July 31.  I want to -- first of all let's go to the top.

14 This is Table 4, this is the screening level maximum asbestos

15 cumulative exposure by category of exposure and product type.

16 Correct?

17 A    This is correct.  This is one of my other analysis.  I

18 said that I did several levels of analysis.

19 Q    Yes.

20 A    And this is one of the other levels of analysis.  The

21 screening level values I've presented here today were the most

22 extreme upper bound assumption values.

23 Q    Okay.  You have a category here vermiculite and

24 chrysotile.  My question for you is do you know how many

25 studies Dr. Lees relied on for all the products in the mixed

J&J COURT TRANSCRIBERS, INC.

CC-BLG001537

Anderson - Cross/Mullady                     165

1  vermiculite and chrysotile category?

2  A    I don't know how many.  I assume that Dr. Lees has

3  testified.  I don't recall exactly.

4  Q    If I were to represent to you that Dr. Lees only had seven

5  studies from ten work sites, would that sound about correct?

6           MR. BERNICK:  Object to the form of the question.

7  He's asking her to assume as a fact that that's what he said.

8  Object to the form of the question.  It purports to recite the

9  testimony of the witness.  I don't think it does so correctly.

10 If wants to have the witness assume that statement, I don't

11 have a problem with it.

12 Q    All right.  I'd ask you to assume that the data that Dr.

13 Lees provided for this product category consisted of seven

14 studies from ten sites, okay?

15 A    I don't like to assume anything about someone else's data.

16 It's in his report and I mean what are you going to ask me

17 about it?

18 Q    In the Monokote III test that Dr. Lees used, do you know

19 how many building measurements were taken in?  How many

20 buildings he took measurements from?

21 A    You are asking me to recite data from his report and I

22 don't' recall the data from his report.

23 Q    I'm just asking you if you know.

24 A    I just don't recall.

25 Q    I would represent to you and ask you to assume

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001538

1  hypothetically that it was ten buildings from which he took

2  measurements for Monokote III, okay?

3  A    That's a pretty good data base.

4  Q    Well Monokote III was used in thousands of buildings,

5  wasn't it?

6  A    I think what you are trying to ask me is could it be

7  representative to have --

8  Q    No, I asked you if Monokote III was used in thousands of

9  buildings?

10 A    I know it was widely used.  I don't know how many

11 buildings.

12 Q    Okay.  And Zonolite acoustical plaster was also used in

13 thousands of buildings, wasn't it?

14 A    That's correct.

15 Q    Same thing for Grace insulating cement, correct?

16 A    Large numbers of buildings.  I don't know how many.

17 Q    Do you know if Grace had any kind of a systematic or

18 scientific process to select the sites at which exposure data

19 was collected and then provided to Dr. Lees?

20 A    I believe that was in Dr. Lees -- that's in his purview

21 not mine.

22 Q    Okay, you don't know if they did or they didn't.

23 A    I don't recall.

24 Q    Okay.  I mean and do you know whether they, Grace,

25 randomly selected the sites?

J&J COURT TRANSCRIBERS, INC.

CC-BLG001539

1  A    I think you are asking me a lot of questions about Dr.

2  Lees report.

3          MR. BERNICK:  Objection, asks -- excuse me --

4  objection.  We all know what the answer -- she's already said

5  what she did and what she didn't do.

6          THE COURT:  Well --

7          MR. MULLADY:  She could know that they randomly

8  selected the sites.  I don't know that.

9          THE COURT:  You can keep asking her information about

10 Dr. Lees' reports, but I think her answer is since she's read

11 them but she doesn't really have -- she doesn't know

12 specifically what he did.  But you can keep asking.  She's read

13 the report.  She may know, she many not know.  You can answer

14 if you know Dr. Anderson.

15 A    I don't recall exactly how many buildings.  I can tell you

16 what I do recall.  We very often had very little information.

17 We are trying to characterize not these individuals that you

18 keep talking about, but these job categories.  This is about a

19 job specific or a site specific exposure.  Often the only thing

20 we can do is simulate but --

21         THE COURT:  No.

22 Q    But I didn't ask you that, ma'am.

23         MR. BERNICK:  Excuse me.  Let her finish the answer.

24         MR. MULLADY:  Well we're never going to complete this

25 examination.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001540

1          MR. BERNICK:  This may be true but for other reasons.

2   I think the witness is entitled to the courtesy of being -- of

3   not being interrupted.

4          THE COURT:  No, in this instance, Mr. Mullady is

5   correct.  The question was whether or not Grace had a

6   scientific way of choosing the data selected to give to Dr.

7   Lees.  She either knows or she doesn't know.  It's an either I

8   do know or I don't know.

9          Dr. Anderson, if you could just answer if you do or

10  don't know please and then maybe we can move on from there.

11  A    I don't know exactly how they chose the buildings.

12  Q    Thank you.  Can we have ACC/FCR-3015 please?  I want to

13  ask you if you've seen a particular -- if you are familiar with

14  a particular sample of Dr. Lees' data.  This is, this exhibit,

15  I would represent to you ma'am, is one of the ten measurements

16  that Dr. Lees relied on for his exposure averages in -- for his

17  exposure averages in this case.  This is the cover page for the

18  study and then there's a second page that has the data,

19  September 28, 1970.  The laboratory is Werby Labs.  There are a

20  list of samples and LA is a reference to the building from

21  which the samples came.

22         Are you familiar with this particular data set that

23  Dr. Lees supplied to you?

24  A    No.

25         MR. BERNICK:  I object.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  She said she's not familiar with it.  The

2    objection is overruled.

3    Q    Now, and I would represent to you -- strike that.  Don't

4    take this exhibit down.  I want to talk to you now about Dr.

5    Lees' average exposures for the A through E PIQ categories.

6    A    Okay.

7    Q    First of all, as I understand it neither you nor Dr. Lees

8    analyzed the actual TWA exposure to Grace products for any

9    individual claimant.  Is that correct?

10   A    That was not the point of the analysis, correct.

11   Q    And you didn't have any individual claimant TWA exposure

12   data from which to calculate the claimant's exposure?

13          MR. BERNICK:  Well, if the question is does she have

14   any individual claimant's TWA data, I understand that.  If the

15   question is whether that -- if the question, I believe, assumes

16   that it was part of her process to require that, then I think

17   that that is contrary to her testimony, so I object to the form

18   of the question.

19          THE COURT:  I believe that the question is contrary

20   to her testimony.  She did have PIQs available.  She has stated

21   that.

22          MR. MULLADY: Okay, fine.

23   Q    What you did, Dr. Anderson, was you calculated cumulative

24   average exposure values drawn from Dr. Lees average values,

25   correct?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001542

Anderson - Cross/Mullady                         170

1  A    No.   That's not correct.   I calculated maximum cumulative

2  exposures.

3  Q    Maximum cumulative exposures.   Let's go to 432, Table 11.

4  A    And I would like to tell you that I know there is one typo

5  mistake in one report where that was referred to as an average

6  cumulative -- average cumulative exposure and I apologize for

7  that error but these are maximum cumulative exposures using

8  average concentrations, average mean concentrations.

9  Q    The averages were supplied to you by Dr. Lees?

10  A    That's correct.

11  Q    Let's look at one of Dr. Lees' -- let's look at Table 11.

12        MR. BERNICK:  Where's this from?

13        MR. MULLADY:  432.

14        MR. BERNICK:  432, what page?

15        MR. MULLADY:  It's Table 1.  Do we know the page?  I

16  don't know that these pages are actually numbered in the back.

17  We're using tables, I don't think there are page numbers.

18        MR. BERNICK: Okay.  Go ahead.  I'm sorry.

19  Q    Okay.  Now are you telling us that -- can we have the

20  title of this first of all?  These are eight hour time weighted

21  average concentrations in fibers per millimeter, PCME, by

22  category of exposure and product type, correct?

23  A    Right.  And this is from my report, correct?

24  Q    From your report.

25  A    Right.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001543

Anderson - Cross/Mullady                         171

1  Q     Directing your attention to spray fireproofing on Table 1.

2  You have a TWA average of 0.3 -- excuse me, 0.033 -- 0.0338, do

3  you see that?

4  A     Yes.

5  Q     This is the average TWA for everyone in Category D for

6  that product, correct?

7  A     That's correct.

8  Q     That's not the maximum exposure for that group, it's the

9  average, correct?

10 A     This is the mean concentration which is one factor in

11 determining the cumulative exposure.

12 Q     And mean is another word for average, right?

13 A     That's correct.   For the concentration term.

14 Q     Yes.   Now PIQ Category D, like all the PIQ categories

15 encompasses a variety of distinct jobs.   Would you agree with

16 that?

17 A     It could be a variety of different people who happen to be

18 in this space, yes.

19 Q     Doing different jobs.

20 A     That's right.

21 Q     All right.   So for example, Category C you have both

22 sprayers and helpers in that category, right?

23 A     In Category C you have people who applied the product.   I

24 don't know about the helpers, it depends on what they were

25 doing.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001544

Anderson - Cross/Mullady                                172

1  Q    Okay.  Were you here when Dr. Lees was testifying about
2  sprayers and helpers?

3  A    No, I wasn't.

4  Q    Okay.  All right.  Now as I understand your analysis, you
5  are assuming that individuals who work in these PIQ categories
6  will have exposures that may vary from day to day or even from
7  year to year, but over time all individual TWA exposures will
8  converge to the average TWA exposures for everyone in the PIQ
9  category.  Is that correct?

10 A    For the job.  It's not for the people, it's for that job.
11 For what they are doing or for that space in proximity to a
12 variety of activities.  It's where they are with respect to
13 what's going on in the space.

14 Q    Well when you say job, you mean a mixer, a remover or
15 cutter, an installer.

16 A    That's right.

17 Q    An out-of-sight person or an in-a-space person.

18 A    That's right.  So it's for someone in a particular
19 proximity or someone in that job category.

20 Q    Now what, Dr. Anderson, what if any assumptions did you
21 make in calculating that the TWA exposures of individual
22 workers in these categories were converged to the average
23 exposure for all workers in the category?

24       MR. BERNICK:  Objection to the form of the question.
25 She just got done answering.

J&J COURT TRANSCRIBERS, INC.

Anderson - Cross/Mullady                    173

1    THE COURT:  I didn't understand that she calculated
2  the TWA means.  I thought she was provided with the TWA means.
3    MR. BERNICK:  She just got done saying it's for a
4  category.  You are assuming that she went backwards from
5  individuals and then finds the mean with respect to individuals
6  and she's testified on direct and on cross examination
7  precisely to the contrary.
8    THE COURT:  Just for purposes of making sure that I
9  understand the testimony, the question is what if any
10 assumptions did she make regarding the TWAs of individuals.  I
11 believe that doesn't fairly state the evidence.  But just so
12 I'm clear that that is in fact not what she did.
13    MR. MULLADY:  I'll go back and lay a foundation.
14 Q   What did you do with the average cumulative exposure
15 values that Dr. Lees provided to you?
16 A   I think that's exactly what I've talked about all morning.
17 I used the average, his maximum average TWA concentrations, for
18 the particular nature of exposure categories to define exposure
19 for that category.  That's for the claimants in that --
20 Q   You defined exposure for that category, using the average
21 that was provided to you by Dr. Lees?
22 A   The maximum mean concentration.
23 Q   Right.  And in order to use that average, you had to make
24 an assumption, didn't you, that despite the very nature of what
25 these people in these categories were doing from day to day

J&J COURT TRANSCRIBERS, INC.

1  that over time the exposure will be at that or around the

2  average?

3  A    Yes.  And I gave a fairly lengthy discussion about that

4  why that is the generally accepted way to do it and why I think

5  that's appropriate.

6  Q    Now in doing it that way though didn't you have to assume

7  that there was no aspect of a worker's exposure on any given

8  day that could be used to predict what that worker's exposure

9  would be on any subsequent day?

10          MR. BERNICK:  Object.  I'm sorry, can I have the

11  question read back please?

12          THE COURT:  Can you repeat, Mr. Mullady, otherwise

13  it's going to take us ten minutes.

14          MR. MULLADY:  Sure.  Anything to speed it along Your

15  Honor.

16  Q    In doing what you did you had to make an assumption,

17  didn't you that there is no aspect of a worker's exposure on

18  any given day that could be used to predict that worker's

19  exposure on any subsequent day?

20  A    I --

21          MR. BERNICK:  I'm sorry.  I object to the form of the

22  question.

23          THE COURT:  I think that is not a summary of what the

24  witness has testified to.

25          MR. BERNICK:  It's almost nothing --

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001547