Anderson - Cross/Mullady                    181

1  higher than average exposures?  Isn't it the case that their

2  exposures are not going to converge to the average over time?

3          MR. BERNICK:  I'm sorry.  I understand the second

4  part of the question that there are other people who will never

5  converge to the average?

6          MR. MULLADY:  Correct, because they are always going

7  to be above the average.

8  A    I think within these job categories there is no evidence

9  that I have that that individual that I said earlier is in the

10 wrong place at the wrong time all the time.  I showed the

11 distribution of the data and I said I find it highly unlikely

12 that there is someone far out on that distribution data that

13 gets exposed to the highest level all the time.

14         Now if they are, some people don't converge entirely

15 to the mean.  If there are a few exceptions it's not going to

16 change this analysis.

17 Q    Can you cite to me any literature for the proposition that

18 there is convergence to the individual cumulative exposure --

19 excuse me, can you cite to me any literature supporting the

20 proposition or containing any data supporting the proposition

21 that there is convergence of individual cumulative exposures to

22 the overall mean for any occupational groups who have been

23 studied for asbestos exposure?

24         MR. BERNICK:  That again is now -- so it's specific

25 to asbestos and its research demonstrating that with respect to

**J&J COURT TRANSCRIBERS, INC.**

1 an asbestos group there is convergence on the mean?

2          MR. MULLADY:  Yes, that's what I'm asking.

3 Q    If you can cite to me any literature that would support

4 the proposition that there is convergence to the average over

5 time?

6 A    I can cite certainly literature for any containment over

7 time that has supported, and I already have, that has supported

8 the concept that over time when you are trying to measure what

9 the exposure is to a job, any job, whether it's these jobs or

10 other jobs that it is the approved scientific method over time

11 to observe over a long enough period of time.  And this has

12 been observed that the variables cancel and in fact you can

13 define that over a long enough period of time that the mean

14 concentration is the most acceptable way to define a

15 concentration for that job category.

16 Q    Okay.  We talked about how each PIQ has different jobs

17 included within -- each PIQ category has different jobs

18 included within that category.  You have agreed with that,

19 correct?

20 A    Some of then, yes, do.

21 Q    And each job has a TWA exposure associated with it.  Would

22 you agree with that?

23 A    Not necessarily because they were in these areas.  Like

24 the Category B when someone is cutting to put in an electric

25 wire or cutting to put in a piece of plumbing equipment, it's

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001555

Anderson - Cross/Mullady                183

1  not as if they are highly variable jobs.  The data that we have

2  is Peter Lees domain to characterize those exposures for that

3  entire job category.

4  Q    Right.  I understand why over time workers in a job, doing

5  a job, a specific job, will have their exposures converge to

6  the mean for that job.  But what I don't understand is how over

7  time workers' exposures in a category will converge to the

8  average of that category.  Can you explain that?

9  A    Because workers who are -- the nature of exposure

10 categories are of like activities.

11 Q    They are of like activities?

12 A    That's right.  And the Category D with the person at the

13 site, they can be doing different things but if they are the

14 same distance from the activity, they are going to experience

15 the same exposures.  Likewise, someone in the space.  If they

16 are in the space they are going to experience like exposures

17 from the activities that are going on in the space even though

18 they may be doing a variety of different things.

19        So these categories are designed to capture like

20 exposures.  That's why they are nature of exposure categories.

21 Q    Are you aware that the data that Dr. Lees provided you

22 show that for sprayers and helpers within the same job

23 category, there was a factor of three to six fold difference in

24 exposure in the samples that he provided to you?  Are you aware

25 of that?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001556

1  A    I'm not sure what -- you are speaking of variability in

2  his data.  Is that what you are speaking of?

3  Q    I'm speaking of TWA exposure measurements for sprayers and

4  helpers in the same job category where the exposure values for

5  sprayers were three to six times higher than exposure values

6  for helpers.  Are you aware of that data?

7  A    I have not discussed specifically that data with Dr. Lees.

8  And I don't know that you are representing it exactly the way

9  he intended in his analysis.  So I have relied on him for the

10  analysis.

11  Q    But your view would be that over time because the sprayers

12  and the helpers are in the same job category that their

13  exposures will converge to the average for that category.

14  A    That's right.

15  Q    Not necessarily to the average of the job they are doing?

16         MR. BERNICK:  Objection to the form of the question.

17  Objection to the form of the question.  The question is just

18  because they are in their jobs that they will converge --

19         MR. FINCH:  Your Honor, I think Mr. Bernick's

20  objection to form is sufficient.

21         MR. BERNICK:  No, to the contrary.  We've now been

22  over this like -- this is not to be a question of whether the

23  question can be reformulated the ninth time in order to urge a

24  proposition on the witness that has already been answered eight

25  times.  And that question talked about job categories.  It

CC-BLG001557

1  didn't talk about actual job experience.

2          THE COURT:  I --

3          MR. MULLADY:  That was the last question on the

4  subject, Your Honor.  I'm ready to move on to another area.

5          THE COURT:  We didn't get an answer first of all or a

6  ruling.  First of all this witness doesn't need to be coached.

7  She's doing fine on her own.

8          MR. MULLADY:  Totally agree.

9          THE COURT:  Secondly, I don't think, Mr. Bernick,

10 that I always need a long explanation, but I occasionally do.

11 But I think I can ask for it when I do so we can make

12 objections and state the specifics of the objection and then if

13 I need argument -- this applies to all of you -- I'll ask for

14 it so that we don't have that problem.

15          With respect to this one, this objection, I don't

16 know if you are going to remember this question because frankly

17 I don't.  But nonetheless the objection is overruled.  I think

18 you can reask this question.  I'm not sure you remember it, Dr.

19 Anderson.  If you do, you can answer it.

20 A    I don't think I know what the question is.

21          THE COURT:  All right.

22 Q    I think the question was simply, assuming that I

23 represented the Lees data accurately, it would be your view

24 that the cumulative average exposures for the sprayers would

25 converge -- strike that.  Assuming I've represented the Lees

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001558

1 data accurately, it would be your view that notwithstanding the

2 disparity in the TWA measurements between sprayers and helpers,

3 that over time the exposure of helpers and the exposures of

4 sprayers would both converge to the average for that group.

5 A    Again, may I answer your question in three parts?  One, I

6 do not think I should be asked to reevaluate Dr. Lees data.

7 One, I'm not an industrial hygienist.  Two, he's presented his

8 data so I don't know why I should be asked to assume certain

9 things about it.  And, three, I am very accustomed to seeing

10 highly, highly variable environmental data.  Sometimes the data

11 can go from zero to very, very high values.  So you see wide

12 variations in data.  The whole point is to have some

13 representative sites and you don't have to sample every

14 building or every situation that representative data to define

15 what is going on in that particular category.

16       Beyond that, I can not unravel Dr. Lees work.  I

17 think he was here for you to ask him those questions.  And I

18 have known him for many years.  I have the highest regard for

19 his work.  He is a very respected industrial hygienist and I

20 have the confidence to use his work.

21 Q    Well, let me ask you about --

22       THE COURT:  And for the record, if I recall correctly

23 it was either Dr. Lees or Dr. Moolgavkar, and I apologize

24 offhand I don't recall which, who indicated specifically the

25 variation because it was not all three to six times.  In some

CC-BLG001559

1 instances it was two and two and a half times that that was

2 well within the range of categorizing categories together for

3 sprayers and helpers, and that he himself did not think it

4 inappropriate to put those categories of sprayers and helpers

5 together.  So this witness is quite correct that from her point

6 of view that Dr. Lees' on testimony was that from his point of

7 view he had appropriately characterized the evidence.  So I

8 just want the record to reflect that the witness in that

9 respect I don't think was being asked to reevaluate Dr. Lees'

10 data, but should know that Dr. Lees' own view of his own

11 analysis was different from what is being represented.  You can

12 continue.

13 Q    All right, well, let's discuss whether in your view Dr.

14 Lees gave you the true average, the correct average to use for

15 your work.  Did you check to see whether Dr. Lees calculated

16 the standard error for the averages he reported to you?

17          MR. BERNICK:  I object to the prefatory statement.

18 Let's see if he did it the right way and then he went on to say

19 a standard deviation thereby assuming in his question that the

20 standard deviation was necessary in order to figure out whether

21 it was done the right way.

22          MR. MULLADY:  Let me rephrase it.

23          THE COURT:  All right.

24 Q    Dr. Anderson, did you check to see whether Dr. Lees

25 calculated the standard error for the averages he reported to

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001560

1 you?

2 A    No, I didn't.

3 Q    Can we have ACC/FCR-307?

4 A    And I should add that is not material to the way I would

5 use this data.

6 Q    No, I didn't ask you that ma'am and I would move to strike

7 that statement.

8         THE COURT:  No, I will not have it stricken because

9 Dr. Lees also testified that it would not be customary

10 depending on the use of the data to make that calculation.

11 Q    Let's see 3007.  This is the Judicial Reference Manual on

12 Scientific Evidence.  Are you familiar with that work?

13 A    What?

14 Q    Are you familiar with the Judicial Reference Manual on

15 Scientific Evidence?

16         MR. BERNICK:  I would object to that question being

17 asked as a yes or no answer, but depending on what the answer

18 is.

19 A    I'm not fully familiar with this document and I'm

20 certainly not going to comment on a sentence out of the middle

21 out of context.

22 Q    It has the definition of standard error.  Let me ask you,

23 without reference to this, what do you understand --

24         MR. BERNICK:  Your Honor, can we take it off the

25 screen.  There was a vigorous objection to my getting into

**J&J COURT TRANSCRIBERS, INC.**

1  experts with experts, specifically Dr. Roberts that has

2  anything to do with the law and on voir dire, voir dire here I

3  guess, Mr. Mullady was at pains to point out that this witness

4  didn't have expertise in the law and in fact they've objected

5  with respect to all of our witnesses to commenting on that.

6          MR. MULLADY:  It has nothing to do with the law, Your

7  Honor.  I really think.  If you could just relax and wait for

8  the questions, this would go a lot faster.

9          THE COURT:  It probably would.  You can ask the

10 witness what her understanding is.

11 Q    What is your understanding of what standard error means?

12         THE COURT:  If she has one.

13         MR. MULLADY:  Well I'll ask a foundation question.

14 Q    You have some understanding of statistics and you apply

15 statistical principles in your work, correct?

16 A    I use regularly outcomes of statistical analysis and I

17 have some familiarity with the statistical analysis.  So I

18 don't know, what are you trying to ask me?

19 Q    Well I'm asking you what your understanding of standard

20 error is.  Are you familiar with that concept in statistics?

21 A    Not specifically just standard error.  I'm familiar with

22 at various times for various reasons needing to put confidence

23 and it rolls around let's say epidemiology outcomes.

24 Q    Are you familiar with standard error being a tool that is

25 used for analyzing the reliability of an average?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001562

1  A    It depends upon why you would do that.  You wouldn't do

2  that for purposes that I use these data because of what I just

3  discussed.  Using mean and variables cancel because of the long

4  term assumptions I'm making.  So I would not have used any

5  information about ranges around these data sets because as I

6  say I've seen such broad, broad variability in environmental

7  data.  It's routine that you do see very broad variation.

8        And the question is when one uses it in risk

9  assessment, how do you account for it.  And if it's a short

10  term exposure as I discussed before I do one thing.  If it's a

11  long term exposure as I've done here, it's quite a different

12  matter and that's why the mean is very appropriate to long term

13  exposure risk assessment.

14  Q    I understand that's your opinion.

15  A    It's not only my opinion.  It is a documented method of

16  operation in the whole risk analysis world.

17  Q    Would your opinion hold on -- I think you said there

18  wouldn't be any reason to calculate standard error on the basis

19  of what Dr. Lees provided to you.  Would you still hold that

20  view if I were to represent to you that Dr. Lees based his

21  Category E exposures for Vermiculite and Chrysotile products on

22  only five observations?

23  A    I think these are questions for Dr. Lees.  I've used his

24  analysis and he is the industrial hygienist.  And I think he

25  had used the data that are available.  I think he used all of

J&J COURT TRANSCRIBERS, INC.

CC-BLG001563

1  the data that are available.  I think he qualified it before he

2  used it and I think his analysis are sound and I should ask to

3  channel your questions to him about his data sets.

4           MR. MULLADY:  Just one more question and then, Your

5  Honor, I will be ready to move to a different area, if the

6  Court would like to take your afternoon recess, we can do that.

7  Q    Is it fair to say, ma'am, that because you didn't check to

8  see if Dr. Lees, Dr. Lees with an S, calculated the standard

9  error, you do not know whether the estimate of the average for

10 his Category E exposures has a large sampling error?

11          MR. BERNICK:  Objection, lack of foundation.

12          THE COURT:  No, I don't think so.  Overruled.

13 A    If you are talking about variability in his data, I have

14 said that I have seen very large variability.  It's routine in

15 environmental data sets.  These are industrial hygiene data

16 taken specifically in at job sites and circumstances that are

17 mimicking these nature of exposure categories.  There's going

18 to be some variation, I would expect it.

19 Q    You -- excuse me, I'm sorry.

20 A    But because of the long term assumption I've made and the

21 nature of the exposure category definitions and the fact that

22 I'm characterizing the exposure for those categories, not for

23 any individual who happened to be some odd outlier, but for the

24 category I would not have used any standard deviation

25 measurements.  That's why they are not asked for in this kind

J&J COURT TRANSCRIBERS, INC.

1  of analysis and not asked for in environmental risk assessment

2  when we're dealing with long term exposures.

3  Q    You have done nothing to determine whether his Category E

4  exposures has a sampling error or doesn't.  Is that fair?

5           MR. BERNICK:  Done nothing independently of Dr. Lees?

6           MR. MULLADY:  Yes.

7  A    You think I should have independently have reevaluated his

8  data to see if he has a standard error in his data?

9  Q    You are changing my question.  All I asked you was did you

10  do any work to determine whether his exposures, his Category E

11  exposures, has a sampling error?  Yes or no?

12  A    I did not redo Dr. Lees' work, no.

13  Q    You didn't redo his work is a little broader than what I

14  asked you.  I asked you if you performed any statistical

15  analysis to determine whether there is a sampling error in his

16  average for Category E?  Did you do that?

17  A    I have not redone his work.  I've accepted his highest

18  mean concentrations.  I think I've made that statement before.

19           MR. MULLADY:  Thank you.  Your Honor, I'm ready to

20  move to a different area.  Would you like to take a break?

21           THE COURT:  Yes, we'll take a ten minute recess.

22           MR. BERNICK:  Can we have an estimate from counsel

23  for the ACC/FCR about how much longer they are going to do?

24           THE COURT:  Yes.

25           MR. MULLADY:  We can do that in about five minutes.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  Thank you.

2    (Recess)

3          THE COURT:  Mr. Mullady.

4          MR. BERNICK:  Do we have an estimate?

5    Q    Dr. Anderson, the last question I asked you related to the

6    subject of --

7    A    I'm sorry, I have a loud breeze about me.

8          THE COURT:  It's going off.

9    A    Okay.  I'm not hearing you very well.

10   Q    I'll try to speak louder.  Okay, I'm sorry.  Just

11   continuing briefly on this issue of Category E and the

12   observations that Dr. Lees used that were reported up to you

13   for that category, I'll represent to you that he only had five

14   observations and that these five observations were short term.

15   One hour, one day, in other words eight hour TWA averages on

16   the samples that he took.

17         Do you have an opinion that those five samples is

18   enough to give you an accurate average to use for your

19   analysis?

20   A    Well, there certainly can be.  And evidently Dr. Lees, who

21   is far more experienced in the meaning of industrial hygiene

22   data than I, thought they were.  Sometimes we don't even have

23   that many samples and it depends on the nature and quality of

24   work and I relied on him for those data that I subsequently

25   used.

**J&J COURT TRANSCRIBERS, INC.**

1 Q    Isn't it true though that the only way to -- the way to

2 determine whether that is a proper sample or not is to conduct

3 a statistical sampling error analysis?

4 A    No, that wouldn't tell me anything except you know the

5 variability of the data one way or the other.  And I've already

6 said variability is dealt with by my assumption of 11,250 days

7 and that the reasons for the variability cancel out over time.

8 So that's why I didn't ask him for it and that's why I didn't

9 look to see if he did it because it doesn't matter.  It doesn't

10 change the mean.  It just means we're getting a statement of

11 deviation around the mean and it wouldn't change my work at

12 all.

13 Q    I think we're talking about two different things and it's

14 probably my fault for not being clear.  I'm not asking you

15 about variability among the exposures that would then converge

16 to the average.

17 A    I thought you were talking about the data.

18 Q    I am talking about the data but I'm not talking about the

19 data in the sense of variability of data.  I'm asking you about

20 whether the average that you were given to work with was the

21 proper average to use.  In other words, was it derived through

22 a proper process of having enough samples so that statistically

23 the average isn't subject to a large sampling error?  That's

24 what I'm asking you about?

25 A    Did you ask Dr. Lees about this?  This is really his area,

CC-BLG001567

1 but as for my experience being the recipient of data for many

2 years we're trying to characterize in the case of the E,

3 someone who is in the space with activities going on where

4 asbestos is being used.  It's being applied, it's being

5 installed or something is going on there.  So within that space

6 we have information about someone who could be there passing

7 through, who could be there for a longer time.

8         We have assumed that that person is in that space as

9 a professional bystander.  That someone is in that space for 45

10 years, 11,250 days in the year and I think that regardless of

11 the variability in the data and also regardless of -- well, he

12 qualified the data he had.  You seem to be saying that you

13 don't agree that he qualified it correctly or you don't think

14 he had enough samples.  But these are the data.  These are

15 historic data and it's his purview to characterize this

16 information and he thought that his data were perfectly usable.

17 And I think you have to discuss it with him.

18 Q    Well, we tried to get into that with him a little bit.  I

19 think there was an objection and we were directed to discuss

20 some of this with you.  But leaving that aside.

21         MR. BERNICK:  Move to strike the statement.

22         MR. MULLADY: I think Mr. Rasmussen, my partner, asked

23 some questions of Dr. Lees about this and was, an objection was

24 raised.

25         MR. BERNICK:  I do agree --

**J&J COURT TRANSCRIBERS, INC.**

1      THE COURT:  This is not the area, I believe, that was
2 inquired of Dr. Lees and in which the objection was sustained.
3 I don't believe that is the case.

4      MR. BERNICK:  In any event, Your Honor, whether it
5 happened it is not an appropriate subject for commentary by
6 counsel.

7      THE COURT:  Well that's true too.  And I believe that
8 the issue was her use of the data that was going to be inquired
9 of this witness, not how Dr. Lees characterized the data.

10 Q    Let me just try this, Dr. Anderson, how this relates to
11 your work is as follows.  Would you agree with me that if
12 hypothetically five samples for Category E was too few a number
13 of samples to derive the true average of the exposures
14 cumulatively for workers in that category because that was
15 subject to a large sampling error statistically, isn't it true
16 that that would compromise the scientific reliability of the
17 average that you've used for Category E for purposes of your
18 analysis?

19      MR. BERNICK:  Objection to the form of the question.
20 This is --

21      MR. MULLADY:  We have the objection.

22      MR. BERNICK:  Objection to the form of the question.
23 What does true average mean?  Is that a statistical term?  Is
24 it a scientific term?  Can we clarify what that question means?

25      MR. MULLADY:  The proper average, the correct average

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001569

1  to use.

2       MR. BERNICK:  For what?  Again this is a setup for

3  somebody else to come in and talk about true average and I

4  think you ought to ask the witness a fair and open question so

5  that she understands what it is that he's getting at.

6       THE COURT:  I don't know what true average means.  I

7  just don't know what that means.

8       MR. MULLADY:  I'll try the question again.

9  Q    I want you to assume hypothetically Dr. Anderson that Dr.

10 Lees use of five samples for Category E subjected those samples

11 to a large sampling error.  Do you agree that if those -- if

12 that average drawn from a sample set with a large sampling

13 error is not a proper average to use, that that affects your

14 use of that average for purposes of ruling claims as either

15 meritorious or not?

16      MR. BERNICK:  I think if you are going to ask that

17 there is a lack of foundation.  We now have this characterized

18 as a sampling issue.  If this witness agrees that this should

19 have been a sampling effort, I think that's an appropriate

20 question.

21      MR. MULLADY:  That's what this has been about for the

22 last 30 minutes.

23      MR. BERNICK:  No, sorry.  You've assumed in your

24 questions, because you have another expert, that this is a

25 sampling issue, that is, that there was an effort to sample and

**J&J COURT TRANSCRIBERS, INC.**

1  presumably come up with some representative number.  You

2  haven't established to this witness that that has anything to

3  do with her understanding of how this should be done.  So I

4  think that there's a lack of foundation for that question.

5  Q    You accepted Dr. Lees average for Category E that he gave

6  you, correct?

7  A    That's correct.

8  Q    All right.  But you didn't test to see whether it was

9  subject to a sampling error, correct?

10 A    No, I didn't test any of his data to see if it was subject

11 to a sampling error.

12 Q    If it was subject to a sampling error, it was the wrong

13 average to have given you, wasn't it?

14        MR. BERNICK:  Objection to the form of the question

15 and foundation.

16 A    I think that there is a basic flaw in what you are asking.

17 And that flaw is you want me to assume something detrimental to

18 Dr. Lees when he's not here to answer the question about his

19 data, when he's not here to answer that question either.  And

20 about the number of samples.  Well, it depends very much on how

21 the samples are taken, where they are taken, and how

22 representative they are.

23        I was not the one who made those judgments.  Those

24 are Dr. Lees' judgments.  If I were to go back and sit with

25 him, you know, that would be a different matter.  If he had

CC-BLG001571

1 thought that he didn't have representative data, that it was

2 not useful, I don't think he would have given it to me.

3          And the second thing is that the data are what they

4 are.  We have these data for products to evaluate and sometimes

5 we don't have the luxury of going back and collecting

6 additional data.  So these are the data we have.  He thought

7 that they were perfectly good data for this purpose.  He did

8 his analysis and he gave them to me.  I do not think it's

9 within my domain to go back and reanalyze his data.  And I

10 don't think that I am comfortable answering hypothetical

11 questions about his data.

12 Q    If the mean that he gave you for Category E has a large

13 error, then using that mean could result in erroneous analysis

14 by you, correct?

15 A    I have no reason to think that his data had a large error.

16 Q    But if they did, that could result in erroneous analysis

17 by you, correct?

18          MR. BERNICK:  Objection to the form of the question

19 and it lacks foundation.

20          THE COURT:  This is a hypothetical question and I

21 believe the witness has said she has no basis on which to

22 assume that there is any such error. But she is an expert and

23 she is -- it is proper to ask her a hypothetical question.  If

24 you will lay the assumptions on which you want her to answer

25 your hypothetical question, and do it properly so that we can

**J&J COURT TRANSCRIBERS, INC.**

1 get through it without any objections, she will answer your

2 question.

3          MR. MULLADY:  I thought I did that but I'll try

4 again.

5 Q    The average that Dr. Lees reported to you has a large

6 sampling error and using that average could result in erroneous

7 analysis by you for the Category E claimants?

8 A    Let me answer this way.  In any risk analysis work if the

9 underlying data have serious flaws then they will be reflected

10 in the next step in the analysis.  I have no reason to think

11 that Dr. Lees data had any such flaw.

12 Q    Thank you.  I want to ask you now about PCM and PCME.

13 You, as I understand it, do not use the PCM measurements from

14 Dr. Lees report as your exposure levels for the Grace

15 claimants, correct?

16 A    That's correct.  That has been traditional in all of the

17 EPA risk assessments that are done.

18 Q    You instead use conversions of those measurements and do

19 what Dr. Lees calls PCM equivalents or PCME, correct?

20 A    Yes.  And that's proper and it's stated in the EPA IRIS

21 file that if you are going to deal with the dose response

22 information that's supplied in that file that the proper

23 attention should be given to the representativeness of PCM

24 measurements when they are taken in environmental situations.

25 Q    The PCM measurements are reductions of the fiber counts

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001573

1  observed through PCM which is phase contrast microscopy to

2  eliminate from the fiber counts the fibers that are not

3  asbestos, right?

4  A     It's routine in environmental -- when samples are taken in

5  environmental circumstances.  I can explain this to you.

6  Because PCM measures all the fibers whether they are asbestos

7  or not.  When the original epidemiology studies were done in

8  the asbestos rich environments where production was going on

9  with asbestos products, it is thought that the PCM

10  measurements, that that metric and those environments were

11  predominantly asbestos.

12        We now know when we move to environmental

13  environments we get varying levels of asbestos but PCM sees all

14  of the fibers in those environments.  And the only way to make

15  the adjustment and to use EPA's work is to compare apples and

16  apples.  So the PCM values need to be adjusted and the way they

17  are adjusted is to use TEM to see how many of those fibers are

18  asbestos and how many are not for a particular circumstance,

19  and then do some conversion.

20  Q     Okay.

21  A     That's typical of what is done.

22  Q     I think you told us on direct that it's your view that

23  EPA's Integrated Risk Information System, which goes by the

24  acronym IRIS, requires a conversion from PCM to PCME.

25  A     And I said it says to use with caution PCM data when it's

CC-BLG001574

1  collected in an environmental circumstance.

2  Q    Can we have 3019 please?

3  A    And I know this language, I wrote it.  I had a large part

4  in dealing with this and I did asbestos risk assessments for

5  years and one has to make these conversions.  And the work that

6  was commissioned by EPA, the Berman & Crump report they

7  emphasize the importance of these.  This is just routine.  It's

8  very simplistic.

9  Q    Let's look at some of your language from the IRIS report.

10  A    It says, Use With Caution.

11        MR. BERNICK:  Do we have that document?

12        MR. MULLADY:  3019, you should.

13        MR. BERNICK:  We have 3018.

14        MR. MULLADY:  Sorry.

15  Q    Let's go to Page 6.

16  A    What are we looking at?

17  Q    We're at Page 6 of the IRIS report, Roman II, Letter C,

18  Paragraph 3.  "Risks have been calculated for males and females

19  according to smoking habits for a variety of exposure

20  scenarios.  The unit risk value is calculated for the additive

21  combined risk of lung cancer and mesothelioma and is calculated

22  as a composite value for males and females."  We're skipping

23  down.

24        I really meant to read the second paragraph here

25  where it is talking about the unit risk and how it's measured.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001575

1  "The unit risk is based on fiber counts made by phase contrast

2  microscopy PCM and should not be applied directly to

3  measurements made by other analytical techniques.  The unit

4  risk uses PCM fibers because the measurements made in the

5  occupational environment uses this method."

6  A     That's what I just said.

7  Q     Okay.  And it also says at the top of Page 7, "Likewise,

8  the correlation between PCM fiber counts and TEM fiber counts

9  is very uncertain and no generally applicable conversion factor

10  exists for these two measurements."  Do you agree with that

11  statement?

12  A     That's correct and that's why you need to do it for each

13  environmental circumstance to get an appropriate conversion for

14  that circumstance if possible.

15  Q     Let's look at 3020, the Berman & Crump article that you

16  referenced a moment ago.  The final draft of the EPA paper.

17  Let's go to Page 5.2 at the bottom under the heading, Human

18  Epidemiological Studies.

19          THE COURT:  What's the exhibit please?

20          MR. MULLADY:  ACC/FCR-3020.

21  Q     You cited this paper I think in your report, Doctor,

22  correct?

23  A     I don't recall whether it's cited in this report or not.

24  I can look.

25  Q     Well, that's okay.  I just want to read you some language

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001576

1  from this.

2  A    I mean I have cited this work.

3  Q    Right.

4              MR. BERNICK:  What page are we on?

5              MR. MULLADY:  5.2.

6  Q    It says, "Impinger measurements are sometimes related to

7  fiber counts based on PCM using side by side measurements of

8  total dust and fiber counts collected during a relatively brief

9  period of time."  And there's a citation to the Dement article

10 from 1983 and McDonald.

11             "However, the correlation between fiber counts and

12 total dust is sometimes poor within a plant, i.e. a single

13 study environment."

14 A    I'm sorry, where are you reading?

15 Q    We have it on the screen.  It's highlighted at the bottom

16 here.

17 A    Oh, I don't have it on my screen.  Are you moving to Page

18 53?

19 Q    Your screen doesn't have what's on this screen?

20             THE COURT:  It does.  Where the yellow is

21 highlighted.

22 A    Where are you?  What you just read that in continued.

23 Q    I'll start again.  I'm just reading the highlighted

24 language on the screen.  "However the correlation between fiber

25 counts and total dust is sometimes poor within a plant, i.e. a

CC-BLG001577

1  single study environment and generally poor between plants.

2  See for example <u>U.S. EPA 1986.</u>  Thus, conversions based on

3  limited sets of -- limited sets of paired measurements are of

4  questionable validity."  Do you agree with that statement?

5  A    Well, I think we have to see what they are talking about.

6  They tell you dust, they could be talking about asbestos by

7  weight and I don't know.

8  Q    Well, isn't it true that OSHA regulations require

9  analytical laboratories to use PCM or an equivalent method for

10  collecting and analyzing fiber samples?

11  A    Yes, and they go on to make provisions for making the

12  conversion when appropriate, using, I think it's method 7204

13  for TEM measurements to adjust PCM to PCME.  I've given you the

14  logic.  Sometimes you can only understand things if you -- if

15  you understand the logic behind them.  And PCM was the method

16  that was available in these old epidemiology studies.  So it

17  was the metric that was used in the dose response work in the

18  1986 EPA risk assessment.

19          When we moved beyond those times when PCM was used

20  and we start to use TEM we find that when we get in these mixed

21  environmental environments we can be measuring on no asbestos.

22  We can be measuring one percent.  So you have to make some

23  adjustments and you have to make -- there has to be some

24  judgment about those environments and that's why the IRIS file

25  says use with caution.  But if you are in certain environments,

CC-BLG001578

1  you need to at least test your data to see if you are measuring

2  predominantly asbestos or something else.  And if you are going

3  to use the data quite seriously in an analysis like this, it's

4  absolutely essential to make the conversion because otherwise

5  you don't know what you are counting.

6  Q    But if the measurements or the conversions are based on

7  limited samples of paired measurements such as between plants,

8  they are of questionable validity?

9  A    Well this is talking about --

10       MR. BERNICK:  Objection.

11 A    -- between plants and total dust and I'm not sure but this

12 could be talking about mass weight rather than particles on --

13 I mean, you've given me this one excerpt.  And I suspect that

14 is what they are talking about.  Also PCM between plants, they

15 could be talking about just variable measurements between

16 plants which would not be surprising which is an entirely

17 different topic.  Would you expect the same PCM measurements in

18 one facility doing one kind of work compared to another

19 facility doing a different kind of work?

20 Q    Let's go to 3018.  I want to pull up the OSHA regulation.

21 This is 29 CFR Section 1926.1101.

22       THE COURT:  Mr. Mullady, I apologize.  I didn't get

23 the exhibit number.

24       MR. MULLADY:  It's ACC/FCR 3018.

25       THE COURT:  Thank you.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Okay, this is the OSHA regulation.  Can we explode it a

2  little bit so it's readable.  Okay, 1926.1101, Construction, at

3  the top here.

4           THE COURT:  This is the new one?

5           MR. MULLADY:  Yes.

6  Q    Construction, Alteration, Repair, Maintenance et cetera.

7  I want to go down and refer you to the section Appendix A, OSHA

8  Reference Method Mandatory.  "This mandatory appendix specifies

9  the procedure for analyzing air samples for asbestos and

10 specifies quality control procedures that must be implemented

11 by laboratories performing the analysis.  The sampling and

12 analytical methods described below represent the elements of

13 the available monitoring methods such as Appendix B of this

14 regulation.  The most current version of the OSHA method id-160

15 or the most current version of the NIOSH method 7400.  All

16 employers who are required to conduct air monitoring under

17 Paragraph F of the standard are required to utilize analytical

18 laboratories that use this procedure or an equivalent method

19 for collecting and analyzing samples."  Did I read that

20 correctly?

21 A    Yes, you did.

22 Q    Now these options listed here, Appendix B of OSHA,

23 Appendix B OSHA, Method id-160 and NIOSH method 7400 are all

24 PCM methods, aren't they?

25 A    I am not an expert on OSHA methods so I can't tell you

CC-BLG001580

Anderson - Cross/Mullady                                                 208

1  exactly the numbers, but I do know that in mixed environment

2  following the logic that I've just described that OSHA makes a

3  provision and I believe it's 7204 for conversion when you are

4  in these mixed environments.  So I don't know.  You can read me

5  all of the OSHA regulations but it's not exactly my field.

6  Q    I understand and I understand that --

7  A    I do know the logic and I do know that OSHA has the same

8  provisions as EPA does.  The same logic because it only makes

9  sense.

10  Q    Let's go to the third page of this document.  "A great

11  deal of experience is required to routinely and correctly

12  perform differential counting.  It is discouraged unless it is

13  legally necessary."  Do you see that?

14  A    Yes, I see that.

15  Q    What is your understanding of what is meant by

16  differential counting?

17  A    I think that for you to give me one sentence at a time

18  from OSHA regulations isn't helpful.  Because it would have to

19  be read in context.  Because I know the logic that OSHA uses.

20  I know the logic that EPA uses and to read me one sentence at a

21  time I think can be very misleading.

22  Q    Well let's -- and I don't want to mislead and I will read

23  more because -- and maybe that's necessary to put this in

24  context.  At the top of this page it reads as follows.  "As

25  previously mentioned in Section 1.3 PCM does not provide

CC-BLG001581

1 positive confirmation of asbestos fibers.  Alternate

2 differential counting techniques should be used if

3 discrimination is desirable.  Differential counting may include

4 primary discrimination based on morphology, polarized light

5 analysis fibers or modification of PCM data by scanning

6 electron or transmission electron microscopy."

7        I'll stop there for a second.  Transmission electron

8 microscopy is also known as TEM, correct?

9 A    Correct.

10 Q    Then it goes on to say, the regulation does, "A great deal

11 of experience is required to routinely and correctly perform

12 differential counting.  It is discouraged unless it is legally

13 necessary.  Then only if a fiber is obviously not asbestos

14 should it be excluded from the count.  Further discussion of

15 this technique can be found in reference 8.10."  That is OSHA's

16 position, correct?

17 A    I would not characterize this as the totality of OSHA's

18 position because there is something wrong here that is

19 discouraged unless it is legally necessary.  I know that -- I

20 know the logic that OSHA uses and there is something wrong.

21 I'm not seeing the entire regulation.  I don't know about the

22 date.  But I do know that there is the same logic at OSHA as

23 there is at EPA, and that is when you are in a mixed

24 environment you do need -- and when you do need to do risk

25 assessment work and you do need to know if you are counting

CC-BLG001582

Anderson - Cross/Mullady                    210

1  asbestos fibers they need to be converted to PCME.

2  Q    Thank you.

3         MR. MULLADY:  I'll pass the witness.

4         THE COURT:  Pardon me, Mr. Mullady.  I'd like to ask

5  the witness a question based on the OSHA regulation.  I know

6  Dr. Anderson, you don't profess to be an expert in the OSHA

7  regulations.  I understand that, but is the policy not

8  consistent with the EPA policy that you are looking for the

9  maximum possible counts so that you can ensure public health?

10        DR. ANDERSON:  Yes, but if it's not asbestos fibers

11 there is a provision made for using the TEM to find out if you

12 are dealing with an asbestos fiber or if you are dealing -- PCM

13 can just count all kinds of fibers beside a road when people

14 are doing roadwork and there can be virtually none or none as

15 far as asbestos counts are concerned.

16        So once you know the environment you are dealing

17 with, then maybe you don't need to use it.  But if you are

18 going to try to identify what's asbestos it's essential to use

19 some method that can identify it when you are not in an

20 asbestos rich environment.  And when you are in construction

21 trades and transportation trades you can have a predominance of

22 other kinds of fibers that would be seen by PCM.

23        THE COURT:  All right, thank you.  Mr. Mullady, do

24 you have any follow up based on my question to the witness?

25        MR. MULLADY:  No, I think to the extent we would have

J&J COURT TRANSCRIBERS, INC.

CC-BLG001583

1  any more inquiry on that Mr. Finch is quite capable of

2  following up.

3              THE COURT:  All right, thank you.  Mr. Finch.

4              MR. FINCH:  Nathan Finch for the Asbestos Claimant's

5  Committee.

6                        CROSS EXAMINATION

7  BY MR. FINCH:

8  Q    Just one follow up.  Dr. Anderson, you are not a

9  microscopy expert and you are not professing an expertise in

10 that area, correct?

11 A    That's correct.  And I have looked through these

12 microscopes and I do know what microscopists do.

13 Q    You were asked some questions by Mr. Mullady about the

14 review of the person injury questionnaires.  Do you recall

15 those questions, that Exponent did?

16 A    Yes.

17 Q    Okay, is it correct that unless someone either in their

18 questionnaire or their questionnaire attachments said that they

19 personally mixed or personally installed a Grace containing

20 product they would have been put in the B, D or E categories?

21 A    Not necessarily.  You are saying if they didn't self-

22 identify as an A or C.

23 Q    In review of the backup materials you couldn't tell if

24 they were an A or in a C, then they would most likely have been

25 in the B, D, or E category.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001584

1    MR. BERNICK:  Objection to the form of the question.

2 A  No.  I don't think so at all.  I think we -- there was

3 equal weight to end up in any one of the categories from the

4 background review of the materials.  It just depended on what

5 was in the background review.  There was no bias as to if they

6 didn't self-identify then they weren't going to be -- to have

7 an opportunity to be placed in an A category.  That was not the

8 approach.

9 Q  I think you misunderstood my question.

10 A  I'm sorry.

11 Q  If someone said, let's say that they are an electrician

12 and they didn't say that they personally mixed or personally

13 installed a Grace containing product then they would be

14 categorized as someone who is in a space or in a site or

15 removed or cut the product a B, D or E, correct?

16    MR. BERNICK:  Again, I'm objecting, I'm sorry, object

17 to that form of the question.  You are saying that they

18 identify a job title but they don't have anything in the backup

19 that relates to or talks about their actual, what other

20 category they would fall into in terms of contact with

21 asbestos?

22 A  Is that the question?

23 Q  They identify themselves as an electrician and they don't

24 have anything further.

25 A  We did not classify anyone according to just a job title.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Okay.  Could you turn to your July 31st expert report?

2  It's in the notebook up there but it's ACC/FCR-432.  Page 12.

3  So if the PIQ or the attachments included the relevant key word

4  such as mix or move, cut or install, you would put them in the

5  appropriate category, correct?

6  A    That's correct.

7  Q    So if someone said that they mixed Grace Zonolite plaster,

8  then they should have been put in the Category A, correct?

9  A    If the rest of the materials, you know, supported that.  I

10 mean the whole file had to be read, but if that's what the file

11 said in its totality that's where they would have been placed.

12 And if they had two job experiences.  Let's say they were at

13 some point at a site where something was being done but at

14 another time they actually were a mixer and that's what the

15 totality of the materials, the backup materials said, and if

16 they also identified they had been exposed to a Grace product,

17 they would have been elevated to the highest exposure category.

18 Q    Okay, if there was insufficient information from which to

19 tell whether they were an A through an E, then you categorized

20 the people with insufficient information in the same ratio as

21 if they did have information, correct?

22 A    I think if I understand your question correctly, the

23 answer is no.  If they had information and they were clearly

24 either an A or E, and we didn't know which one we put them in

25 the A.  We wouldn't have put them in insufficient and that is

CC-BLG001586

1 if the information showed through other factors that they were

2 exposed to a Grace product and the whole file supported the

3 information, not just some word that was not supported by other

4 information in the file, or there were contradictions in the

5 file or that kind of thing.  But no, we wouldn't have put them

6 in insufficient merely because at one point they did one job

7 and at another point they did another job.  If they were

8 exposed to --

9 Q    If they were a construction laborer and they said that

10 they were in the vicinity of someone who was mixing Monokote,

11 then they would not be treated as a mixer or installer,

12 correct?  They would be put either at a site or at a space?

13 A    I think that has to be --

14 Q    Well, could --

15 A    I think I can't generalize.  It would depend on the file.

16        MR. BERNICK:  Your Honor, the protocol was being

17 displayed to the witness in the court and all of a sudden, the

18 screen went blank.

19        MR. FINCH:  We put the screen back up.  Sorry.

20 BY MR. FINCH:

21 Q    Would you -- you also reviewed about 350 closed, settled

22 mesothelioma claims, is that correct, Exponent did?

23 A    Exponent did.  They're not in my report.

24 Q    But they did that for purposes of Dr. Florence's later

25 analysis, correct?

**J&J COURT TRANSCRIBERS, INC.**

1  A    I understand that they are going to be provided to him.  I

2  don't really know very much about them.

3  Q    Okay, obviously, the settled mesothelioma claims don't

4  have questionnaires, correct?

5  A    I believe that's correct.

6  Q    Okay, so in that case what the Exponent people did is they

7  reviewed whatever materials Grace provided to them and put the

8  person in the appropriate A through E classification, correct?

9  A    That's my understanding.

10  Q    And they were supposed to use the same protocol for

11  reviewing the settled claims files as for reviewing the

12  questionnaires in terms of whether someone was a mixer or an

13  installer or one of the other categories, correct?

14          MR. BERNICK:  I'm sorry, Your Honor.  At this point

15  the witness is being asked about work that her firm didn't do

16  and I don't believe that she is relying on them.  If I am

17  mistaken about that, I'd like to know, but I think --

18          MR. FINCH:  That's not correct.

19  BY MR. FINCH:

20  Q    Dr. Anderson, your firm did review 350 settled

21  mesothelioma questionnaires, correct?

22  A    I have said they did but it's not part of my report and

23  it's not part of my analysis.

24  Q    Do you know to the extent to which Dr. Florence relied on

25  that review of the settled claims?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001588

1  A    No.

2          MR. BERNICK:  Object.

3  BY MR. FINCH:

4  Q    If a document in the settled claims file said the worker

5  personally mixed a Grace asbestos product, they should have

6  been categorized as an A, correct?

7          MR. BERNICK:  Objection to the form of the question

8  and foundation and it goes beyond the scope of this witness's

9  testimony and her opinions in this case and he's now seeking to

10 get this witness to comment on work that may or may not have

11 been done in connection with Dr. Florence's work.  He should

12 ask the question of Dr. Florence and not ask this witness to

13 express opinions that he can then use to impeach --

14         THE COURT:  I think what I said earlier was I would

15 take the objection in a short summary of the basis for it.  I

16 don't need the argument, I think, unless I ask for it.  Mr.

17 Finch, I think the witness has said she doesn't know how this

18 was done.

19         MR. FINCH:  Your Honor, Dr. Florence also said he

20 didn't know how this was done.  It was her firm that did the

21 work.

22         THE COURT:  Well, that doesn't mean you know

23 everything that's happening in your firm.  Sometimes it would

24 be nice if you did.  If you want to lay a foundation, fine, but

25 so far --                                    .

**J&J COURT TRANSCRIBERS, INC.**

1  BY MR. FINCH:

2  Q    Okay, would you agree with me that the Exponent people

3  reviewed whatever documents Grace gave them for reviewing the

4  settled mesothelioma claims files?

5        MR. BERNICK:  I object to this question.  It's going

6  beyond the scope of my examination and any other cross.  He's

7  seeking to use this witness now to express opinions that go

8  beyond the scope of her appearance here.  If he wants to call

9  her as part of his case, he can do that but he doesn't do it on

10 our time as --

11       MR. FINCH:  I'm not asking her to express an opinion.

12 I'm asking her did they do this or did they not do this.

13       THE COURT:  You can ask her if she knows.

14 BY MR. FINCH:

15 Q    Do you know if they did this?

16 A    I said I am aware that some closed claims were reviewed.

17 I did not include the analysis in my report.  I don't know the

18 results of those analyses.

19 Q    And you're aware that the same people who reviewed -- the

20 same people at Exponent who reviewed the questionnaires also

21 reviewed the claims -- the closed claim files?

22 A    That's right.

23 Q    And they were given the same protocols?

24 A    As far as I understand it.

25 Q    Do you have a big, fat notebook in front of you, Dr.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001590

1  Anderson?  On direct examination you were asked about Dr.

2  Moolgavkar's 3.2 benchmark, do you recall that?

3  A    Yes.

4  Q    Okay, and you said that was based on the all fibers

5  calculation from the 1986 EPA Airborne Asbestos Health

6  Assessment update document?

7  A    I think that Dr. Moolgavkar has discussed this in detail

8  in his report.  I prefer to rely on him for that analysis.

9  Q    Could you turn your book to Grace Exhibit 188?  It's also

10 ACC/FCR 298.  Are you familiar with this document?

11 A    Yes, I am.

12 Q    It was authored by Dr. William Nicholson under contract

13 for the EPA?

14 A    Yes.

15 Q    This is the same William Nicholson who published projected

16 future mesothelioma incidence in the United States paper in

17 1982?

18 A    Yes, it is.

19 Q    Could you turn to Page 90?  You understand that -- you see

20 the table at the top there, Dr. Anderson?

21 A    Yes.

22 Q    You understand that K Sub-M is the relative potency factor

23 for various types of asbestos fiber?

24 A    It's a potency constant.

25 Q    It's a potency constant.  And the 1.0 times ten to the

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001591

1  minus eight is the all fibers constant, correct?

2  A    I'm not sure that that's correct because what Dr.

3  Nicholson did to derive his dose -- I don't think that's

4  correct.

5  Q    You testified on direct that you thought that the 3.2

6  benchmark wasn't appropriate because it included chrysitolite,

7  correct?

8  A    That came from Dr. Moolgavkar.  My understanding is --

9  what you're looking at is the data table that has the summary

10 of the four studies that Dr. Nicholson used to merge the

11 studies to get K Sub-M for mesothelioma from these four studies

12 and then he used the K Sub-M ratio to the K Sub-L to use the

13 other -- these were the only studies he could qualify for the

14 meso analysis.  So then he used the ratio to the K Sub-L to go

15 back and pick up the other studies so he used ten studies and

16 he used one dose response curve and it was from that EPA dose

17 response curve that I believe this three point number was

18 derived and Dr. Moolgavkar has discussed that.

19 Q    Okay, you don't know whether the --

20 A    He didn't use one study out of one of the four studies

21 that was used as the basis for the derivation of the single

22 curve that Dr. Nicholson presented that's in the EPA IRIS --

23 the basis for the EPA IRIS file.

24 Q    The basis for the EPA IRIS is the 1.0 times ten to the

25 minus eight.  That's within the EPA, correct?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001592

1  A    No.

2  Q    That's not what the EPA used?

3  A    No, this is a summary of the four studies that were used

4  to derive the K Sub-M factor for EPA's dose response work and

5  then the ratio was used -- Dr. Nicholson derived only one dose

6  response curve for cancer for all fiber types.

7  Q    Isn't it true that the average value of K Sub-M in the

8  1986 EPA paper is thus 1.0 times ten to the minus eight?

9  A    No.

10  Q    Would you turn to Page --

11  A    What you're talking about -- you're trying to take the

12  parameter, the single parameter and equate it to the dose

13  response curve that Dr. Suresh Moolgavkar used in his analysis

14  and that EPA has used for years for the dose response curving.

15  What he was doing was a doubling of risk using that curve which

16  is based on all of these studies to derive that --

17  Q    I understand that, but --

18  A    And so you have to ask him about what he did.  It's his --

19  Q    Okay well, I asked Dr. Moolgavkar what he did yesterday

20  and we'll move on.  Would you agree with me that this table on

21  page 90 shows a K Sub-M for insulation workers that is higher

22  than 1.0 times ten to the minus eight, correct?

23  A    I think he displays all of his K Sub-M for the four

24  studies that he used here so --

25  Q    And would you agree with me that 1.5 times ten to the

**J&J COURT TRANSCRIBERS, INC.**

1 minus eight is a higher potency factor than 1.0 times ten to

2 the minus eight?

3 A    This isn't a potency factor.  It's a constant that's used

4 in the equation.

5 Q    Would you agree that it's a larger constant?

6 A    Yes, it's a larger constant.

7 Q    Okay, and would you -- do you agree that the insulator

8 cohort that is referenced there with the potency constant was

9 exposed only to chrysotile and amosite fibers and not to

10 chrysitolite?

11 A    I'm going to ask you to have this discussion with Dr.

12 Moolgavkar.  This is what is in his expert report.  It is not

13 in my expert report.  I relied entirely on his work and I'm not

14 going to get into his dose response work in my testimony.

15 Q    Okay well, you have the document in front of you.  Could

16 you turn to Page 13 in the 1986 EPA document?  You are familiar

17 with this document because you have relied upon it from time to

18 time in your own work, correct?

19 A    Yes, and I also commissioned the work and I was director

20 of the office when the work was done but that doesn't mean that

21 I presumed to do the dose response work myself and I'm not

22 going to redo Dr. Moolgavkar's work.  And if you asked him

23 about it yesterday, you have his answers.

24 Q    Could you turn to Page -- the bottom -- it talks -- the

25 study of U.S. and Canadian insulation workers by Selikoff, do

CC-BLG001594

1  you see that, 3.2 mortality associated with asbestos exposure?

2  A    I'm not sure where you are.

3  Q    Bottom of the document.  The study of U.S. and Canadian

4  insulation workers by Selikoff, et al.

5  A    Yes.

6  Q    Okay, the last sentence on the page reads, "The mortality

7  experience of 17,800 asbestos insulation workers was studied

8  prospectively from January 1, 1967 through December 31st, 1976.

9  The workers were exposed primarily to chrysotile prior to 1940,

10 to chrysotile and amosite from 1940 through 1965 and largely to

11 chrysotile thereafter.  No chrysitolite is known to have been

12 used in the U.S. insulation materials.  Selikoff, et al.,

13 1970."  You don't dispute the facts as stated in this 1986 EPA

14 document, do you?

15 A    This is one of ten studies that Dr. Nicholson used to

16 derive his merge to curve for -- for his cancer dose response

17 curve.  Now as I've said, I'm not going to discuss Dr.

18 Moolgavkar's dose response work.  I think you had him here

19 yesterday to ask him his questions.  He has characterized this

20 work in his report.  He has characterized this 3.2 as

21 containing chrysitolite.  My understanding is that the relative

22 risk of two was calculated from this very conservative EPA dose

23 response curve that's an upper bound.  And as I said earlier,

24 there are a host of factors to be discussed when one wants to

25 discuss this relative risk factor and I've already listed a

J&J COURT TRANSCRIBERS, INC.

CC-BLG001595

1  number of them.  As to the dose response work, I am certainly

2  deferring to Dr. Moolgavkar.

3  Q    But you are saying that you believe the 3.2 dose response

4  isn't applicable here?

5  A    Yes.

6  Q    Because you believe it contains chrysitolite.  And I'm

7  pointing out to you that the insulation potency factor is

8  higher than the one that Dr. Moolgavkar used and it's a cohort

9  of people that were not exposed to chrysitolite, correct?

10 A    Dr. Nicholson did not derive his dose --

11        MR. BERNICK:  Objection.  Objection to -- I'm sorry,

12 Dr. Anderson.  I object to the form of the question.  It's

13 compound and it assumes a record with regard to Dr.

14 Moolgavkar's testimony that's not been before this witness.

15        THE COURT:  No, I think that's not what it assumes.

16 I think the basic question which was based on this document

17 which I think the witness did not answer which is whether or

18 not she accepts the proposition that's stated in this document

19 and that's really the appropriate question.

20        MR. FINCH:  That's the question.

21        THE COURT:  Let's go back to that question.

22        MR. BERNICK:  So what statement are we talking about?

23        THE COURT:  The statement on Pages --

24 BY MR. FINCH:

25 Q    Do you accept the proposition, that the insulator cohort

CC-BLG001596

1  of the study by Selikoff from 1967 to 1976, "that these workers

2  were exposed primarily to chrysotile products to 1940, to

3  chrysotile and amosite from 1940 through 1965 and largely to

4  chrysotile thereafter, no chrysitolite is known to have been

5  used in the U.S. insulation material." Do you accept that

6  factual statement in this document, Dr. Anderson?

7        MR. BERNICK:  Objection, lack of foundation.

8        THE WITNESS:  I said -- you've read it correctly but

9  Dr. Nicholson used ten studies to derive a common dose response

10 curve.

11 BY MR. FINCH:

12 Q    Dr. Nicholson didn't use --

13 A    And I don't see what bearing that has --

14 Q    Dr. Nicholson used the four studies in here, correct?

15 A    But then he derived a ratio so that he could go back and

16 pick up the other studies to complete his dose response work.

17 Dr. Moolgavkar has discussed this in detail in his report and I

18 don't wish -- I don't want to and I don't feel it necessary for

19 me to try to invade his territory.  But you read that statement

20 correctly.

21 Q    And you don't dispute that it's factually accurate?

22       MR. BERNICK:  It's the same question that he's now

23 put to her four different times --

24       THE WITNESS:  You read the statement --

25       MR. BERNICK:  -- and there's no foundation for it now

**J&J COURT TRANSCRIBERS, INC.**

1  and there wasn't foundation for it before.

2            THE COURT:  Well, I don't know the foundation for it.

3  I don't know whether she has any personal knowledge of the

4  facts.  So if she does, she can answer the question.  If she

5  has no personal knowledge of the facts, she'll state so.  Dr.

6  Anderson, do you have any personal knowledge of the facts

7  within this report?

8            THE WITNESS:  I do and I know that he's reading

9  correctly one summary statement from one of the ten studies

10 that were eventually used.  And I said that the eventual dose

11 response work involved a number of studies and that's what Dr.

12 Moolgavkar -- that's his specialty and that's what he has

13 discussed and it is not my specialty.

14 BY MR. FINCH:

15 Q    All right, this is a graphic that -- would you put the

16 ELMO on please?

17           UNIDENTIFIED SPEAKER:  I'm sorry, what?

18           MR. FINCH:  Put the ELMO on please?

19 BY MR. FINCH:

20 Q    Dr. Anderson, this is one of the graphics that Mr. Bernick

21 showed you, is that correct?

22 A    Yes.

23 Q    Okay, you have various what you call benchmarks on the

24 right-hand side here, correct?

25 A    Yes, and they are truncated because there are ones that

**J&J COURT TRANSCRIBERS, INC.**

1  are higher.

2  Q     Right, the scale is broken on the right-hand side, right?

3  A     Right.

4  Q     Now, in your view, someone who has been exposed -- is it

5  correct that someone who has mesothelioma, who has been exposed

6  to cumulative fiber years of exposure to Grace asbestos of 17,

7  that their mesothelioma could have resulted from that exposure

8  to the Grace products?

9             MR. BERNICK:  Objection to the form of the question.

10            THE WITNESS:  No, that's not what this analysis

11  shows.  What I said is using these screening analysis

12  techniques -- now, later on I looked at the information I had

13  and I saw that just by adjusting even one parameter which was

14  the duration from the PIQ's, you see very different patterns

15  emerge.  But I said using a very severe upper bound

16  conservative screen, that I would recommend that the A's and

17  the C's be further analyzed.

18  Q     Okay, so it's at least possible that those -- that you

19  would admit that those could have been caused by exposure to

20  Grace asbestos?

21            MR. BERNICK:  Objection.  Calls for speculation, lack

22  of foundation.

23            THE WITNESS:  I was not addressing causality.  This

24  is a screening process and what I have said is there could be

25  some reliable scientific information behind these claims and

CC-BLG001599

1 they should be looked at further.

2 BY MR. FINCH:

3 Q    Okay, what about -- do you believe that -- is it your

4 opinion that someone who is exposed to 4.5 fiber years of

5 exposure to Grace asbestos that that person's mesothelioma

6 could not under any circumstances be attributed to the Grace

7 asbestos exposure?

8            MR. BERNICK:  Objection.  What person are we talking

9 about?

10            THE COURT:  Yes.

11            MR. FINCH:  A hypothetical person.

12            MR. BERNICK:  A hypothetical person under what

13 particular circumstances?

14            MR. FINCH:  Your Honor, may I get an answer to my

15 question?

16            MR. BERNICK:  Your Honor, I really --

17            THE COURT:  No, you can get a ruling on the

18 objection.  Gentlemen, both of you have to stop this.  All of

19 you have to stop it.  The ruling on the objection is that the

20 objection is sustained.  The hypothetical at this point does

21 not fit the facts.  You may restate the question.

22 BY MR. FINCH:

23 Q    Dr. Anderson, is it your view that someone who is exposed

24 to 4.5 fiber years cumulative exposure to Grace products does

25 not have a scientifically plausible claim that their

CC-BLG001600

1  mesothelioma was caused by the Grace exposure?

2  A    All right, if we take this completely away from my

3  analysis because I did not do individual analysis, I am not

4  trying to establish causality.  I was trying to establish a

5  viable screen at a very severe upper bound conservative level

6  from the analysis.  But if you ask me if I think that someone,

7  anyone with this kind of exposure has -- what did you say?

8  Q    Has a mesothelioma that has a scientifically valid claim

9  that their mesothelioma could have been caused by exposure to

10  Grace asbestos.

11            MR. BERNICK:  I object to the form of the question.

12            THE COURT:  That's sustained.

13            THE WITNESS:  Certainly not.

14            THE COURT:  It's sustained.  This witness is not

15  doing individual causation analysis.  There is no foundation on

16  this record for that.

17  BY MR. FINCH:

18  Q    Okay, so in your view someone who has 4.5 fiber years of

19  exposure to Grace asbestos and has mesothelioma, that person

20  cannot scientifically, validly attribute their mesothelioma to

21  the Grace exposure?

22  A    I said I was willing to answer in the abstract.  That's

23  not the subject of my analysis.  But we are on the inference

24  part of that curve.  I presented all of these benchmarks to

25  give a feel for just how low these values are or how high they

**J&J COURT TRANSCRIBERS, INC.**

1 are.  I had the benchmarks and then I assembled the data.  But

2 when you're speaking of these very low levels that are vastly

3 lower than the observed range, I can tell you what, I think,

4 that is, that we are getting very far away from the scientific

5 basis for making that judgment.  And that's what I've said in

6 my deposition.  I'm being consistent.

7        But this is not -- I'm not doing individual causality

8 analysis in this work I've done.  I'm looking again --

9 Q    So you're not doing -- you're not offering any opinion

10 that someone with any particular exposure to Grace products,

11 that their mesothelioma couldn't have been caused by that

12 exposure?

13        MR. BERNICK:  Objection to the form of the question.

14 Are we talking about a specific individual?  Are we talking

15 about individuals within a group?

16        MR. FINCH:  Any individual.

17        MR. BERNICK:  I don't think that addresses the issue.

18 Your Honor, at this point I think this witness has been here

19 for a long time.  This is argumentative --

20        MR. FINCH:  Your Honor, this is an argumentative

21 objection.  He should either object to form or not object to

22 form.

23        THE COURT:  Mr. Finch, the witness has testified

24 repetitiously that she has been doing analyses within

25 categories, that she is not looking at individual analyses --

**J&J COURT TRANSCRIBERS, INC.**

Anderson - Cross/Finch                                230

1          MR. FINCH:  Okay, let me ask three more questions.

2   BY MR. FINCH:

3   Q     You have something called OSHA PEL on there as a

4   benchmark, correct?

5   A     Yes.

6   Q     Is it your view that the OSHA PEL is -- that there is no

7   excess risk of mesothelioma from exposure to asbestos at that

8   level?

9   A     Using public health protective risk analysis, there have

10  been some statements, hypothetical statements of risk

11  associated with that.  They're not that high.  It's what OSHA

12  accepts.  What I have said is that if we're dealing with

13  scientific-based information, we would need to be above the

14  observed range, about 25 fibers per milliliter year.  And as we

15  go down that curve, the competence that there is any

16  association becomes less and this is very low on that

17  competence curve.  So I'm not establishing causality.  I was

18  providing this information for a screen and against that screen

19  I was using an exceptionally severe set of assumptions.  And so

20  I think you are -- I don't think I can answer individual claim

21  questions.

22          The second part of that answer has to be, for any

23  individual claim, I think one must look at, if anyone is doing

24  this which I am not as far as risk analysis is concerned, you'd

25  have to look at the whole set of circumstances, how long a

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001603

1 person has been exposed, what are the alternative exposures.

2 And just to say if someone was exposed at 4.5 and the inference

3 zone of a hypothetical dose response curve where the curve is

4 uncertain in the inference zone anyway and it's uncertain by

5 factors -- Nicholson said factor of 20 on either side -- I

6 don't think that this OSHA number is created to establish

7 causality.  That's my view.

8 Q    Are you aware that OSHA's preamble to the regulation

9 states that OSHA's risk assessment also show that reducing

10 exposures to 0.1 fiber per cc would reduce excess cancer risk

11 to 3.4 per 1,000 workers?

12 A    That is -- that's what I was talking about earlier when I

13 talked about the divergence between causality and

14 inference-based judgments.  OSHA is speaking as a public health

15 protective agency.  They're charged with protecting worker

16 health.  They're using the same precautionary dose response

17 curves I used at EPA and that's what they mean.  They're

18 reading that value off of this hypothetical default curve that

19 I described earlier that I described as a plausible upper bound

20 on the risk, meaning the risk could be considerably lower even

21 approaching zero.

22         So they're saying if I go down that curve somewhat

23 more, I would get a smaller number.  But, in fact, we don't

24 know that there's any cancer caused, or mesothelioma or any

25 cancer, caused on this linear non threshold curve.  And the

CC-BLG001604

1  desire in all of risk analysis for carcinogens now is to

2  understand the mechanisms of action so that we can better

3  describe the slow dose range.  So these are hypothetical upper

4  bound risk estimates and that's all they are.

5  Q    And you didn't make any attempt to analyze causation on an

6  individual claimant level, correct?

7  A    Correct.

8  Q    And you did not -- you didn't make any attempt to estimate

9  any exposure to asbestos that these individuals would have had

10 from sources other than Grace, correct?

11 A    That's correct.

12          MR. BERNICK:  Objection.

13          THE WITNESS:  I made note in my expert report only of

14 alternative claims and then also I did make note of those

15 claimants that I particularly made the assertion that they were

16 exposed in shipyards.

17 BY MR. FINCH:

18 Q    Okay, if the category B claimants showed cumulative

19 asbestos exposure of 4.5 fiber years, would you have concluded

20 that those claims in that category should be subject to further

21 review?

22          MR. BERNICK:  I'm sorry, could I have the question

23 read again?

24 BY MR. FINCH:

25 Q    If the category B claimants showed that they had

J&J COURT TRANSCRIBERS, INC.

1  cumulative exposure to Grace products of 4.5 fiber years, would

2  you have concluded that those claims in that category should be

3  subject to further review to determine whether Grace --

4          MR. BERNICK:  Objection.

5          MR. FINCH:  -- could have caused their mesothelioma?

6          MR. BERNICK:  Objection to the form of the question.

7  Is he asking about if there was one person in the category or

8  whether the mean dose in that category was 4.5?

9  BY MR. FINCH:

10 Q    If the mean dose in that category was 4.5 instead of 2.1.

11 A    It would depend on the product, the product mix and a view

12 of all the benchmarks.  I wouldn't do it necessarily just

13 because -- that's if you're exposed to the OSHA standard for 45

14 years and that does not mean that OSHA has set a standard, that

15 they think, in an occupational setting would cause

16 mesothelioma, nor do I.  But I think before that judgment could

17 be made, one would have to look at the entire nature of

18 exposure category, what the product is that one is being

19 exposed to and make judgments against all of the benchmarks.

20 But probably not.

21         MR. BERNICK:  Your Honor, at this point I would note

22 that Mr. Finch has now doubled his 15 minutes and their

23 estimate of two and a half hours is wrong by 35 minutes and

24 they have now doubled the time that I spent on direct

25 examination and I'm concerned about finishing today.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001606

1    MR. FINCH:  Your Honor, I don't have any more

2 questions.

3          THE COURT:  Redirect?

4          MR. BERNICK:  Let's do a couple of things here this

5 afternoon quickly.  Could I have the ELMO on please for just a

6 moment?  Thank you very much.

7                    REDIRECT EXAMINATION

8 BY MR. BERNICK:

9 Q    Referring you to that same table which is contained in

10 GX-188 that had the K-M factors that Mr. Finch talked about, he

11 asked you a lot about this one here which is insulation workers

12 which is 1.5 times ten to the minus eight, do you recall that?

13 A    Yes.

14 Q    And if we take a look at the insulation workers and in

15 fact the description that Mr. Finch directed you to, it was at

16 Section 3.2, and the continuing on or the continuing language

17 on Page 14 was, "These workers were exposed primarily to

18 chrysotile prior to 1940, to chrysotile and amosite or from

19 1940 to 1965, and largely to chrysotile thereafter."  You see

20 where it refers to exposure to chrysotile and amosite for 25

21 years?

22 A    Yes.

23 Q    Does that or does not include the war years?

24 A    It does.

25 Q    And were the insulators -- tell us what role, if any, the

**J&J COURT TRANSCRIBERS, INC.**

1 insulators played during the war years in terms of their work

2 on insulation.

3           MR. FINCH:  Objection.  Lack of foundation.

4           MR. BERNICK:  You opened the door.

5           MR. FINCH:  No, you objected on lack of foundation.

6 He did not lay a foundation that she studied the insulator

7 population to know what they were doing during World War II.

8 Dr. Selikoff and Dr. Nicholson did that work, not this witness.

9           THE COURT:  You can ask her if she has knowledge of

10 the facts.  If she does, we'll go forward.  If she doesn't, we

11 won't.

12 BY MR. BERNICK:

13 Q    Do you know about that, whether the insulators were

14 involved in the war effort?

15 A    Certainly they were.

16 Q    Thank you.  Now, Mr. Finch didn't ask you any questions

17 about the proportion of chrysotile and amosite that the

18 insulators were exposed to, did he?

19 A    No, he didn't.

20 Q    Do you know what the proportion is?

21 A    I don't know exactly but I believe it was --

22 Q    If you don't -- it's up to you.  I'm not asking you to

23 speculate.  If you know, you know.  If you don't, you don't.

24 A    I don't know exactly.

25 Q    Did he ask you to compare the proportion of amosite that

CC-BLG001608

1 these folks were exposed to for 25 years with the proportion of

2 any amphibole that was in Grace's product?  Did he ask you to

3 do that comparison?

4 A    No.

5 Q    Is that something that's within the scope of your

6 testimony or work in this case?

7 A    It could be.

8 Q    That is, to make those detailed comparisons of how much --

9 A    No.

10 Q    Now, he then didn't ask you about this figure of the table

11 which is the cement factory workers.  He wanted to point out

12 that 1.5 was greater than 1?  Remember he asked you that

13 question?

14 A    Yes.

15 Q    He didn't take you down to this one.  Which is bigger, 1.2

16 times ten to the minus seven or any of these numbers times ten

17 to the minus eight?

18 A    The 1.2 times ten to the minus seven, of course.

19 Q    Of all the studied data, of all the K-M factors, which one

20 actually is the largest factor of the set?

21 A    The one for the cement factor workers.

22 Q    If we go back to GX-188 and Section 3.9.14, we see in this

23 table here where it talked about that vector, there was

24 citation, "Cement Factory Workers, Finkelstein 1983," do you

25 see that?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001609

1  A    Yes.

2  Q    Is there also a Page 76 then, a reference to Finkelstein

3  1983 and the asbestos cement products?

4  A    Yes.

5  Q    Is there a description that appears here as to whether

6  chrysitolite was involved in the study that produced the

7  largest K-M factor?

8  A    Yes, it was.

9  Q    Is that consistent or inconsistent with the testimony that

10  you earlier provided based upon the advice that you had

11  received from Dr. Moolgavkar?

12  A    It's consistent with the advice from Dr. Moolgavkar.

13  Q    Let's talk about another detailed item.  With respect to

14  ACC/FCR 3020, do you recall being directed by Mr. Mullady to

15  the bottom of Page 52 where he read, quote --

16          THE COURT:  I'm sorry, what exhibit is this please?

17          MR. BERNICK:  This is ACC/FCR 3020, Your Honor.

18          THE COURT:  Thank you.

19  BY MR. BERNICK:

20  Q    He read the quote that says, "However, the correlation

21  between fiber counts and total dust is sometimes poor within

22  the plant, i.e., a single study environment, and generally poor

23  between plants," and there's a citation to EPA publication in

24  1986.  Do you see that this paragraph relates to samples

25  collected prior to the mid 1960's were often analyzed by

**J&J COURT TRANSCRIBERS, INC.**

1 measuring total dust in units of millions of particles per

2 cubic feet using impingers or thermal precipitators, do you see

3 that?

4 A    Yes.

5 Q    Does that have any relationship to the broader statement

6 that appears below?

7 A    Certainly.

8 Q    What is that relationship?

9 A    Well, it means that the fibers collected earlier by the

10 impinger technique is the measurement.  I wasn't quite sure

11 because I didn't read that.  But it means that that's the basis

12 for the discrepancy.

13 Q    Yes.  I'd like to take you back to a couple other small

14 things and then ask you a couple of broader questions.  Where

15 you have --

16         MR. BERNICK:  This is kind of a little bit

17 interesting if I could approach the witness, Your Honor?

18         THE COURT:  Yes.

19 BY MR. BERNICK:

20 Q    Mr. Mullady started out his examination and he said, You

21 have assumed, have you not, 45 years of Grace exposure and you

22 then observed that in whatever category it was, maybe it was

23 more general, but when it came to a category, 77 percent of the

24 people had mesothelioma.  And he asked you whether you had in

25 some fashion considered whether a logical explanation for all

CC-BLG001611

1  of this mesothelioma was the assumed 45 years of Grace

2  exposure.  Do you remember that line of questioning?

3  A    Yes.

4  Q    Okay, the -- your analysis, does it work from the

5  observation of meso back to Grace exposure or does it work the

6  other way around, that is, the observation of Grace exposure

7  and the question of whether it could cause that level of

8  mesothelioma?

9  A    Certainly, the latter was the subject of my analysis.

10         MR. MULLADY:  Objection to the leading -- objection

11  to the leading nature --

12         MR. BERNICK:  It's not leading at all.  I asked for

13  two alternatives.

14         THE COURT:  I'm sorry, Mr. Mullady --

15         MR. MULLADY:  Could I make my objection?

16         THE COURT:  Yes, please.  I didn't hear you.  I'm

17  sorry.

18         MR. MULLADY:  I object to leading the witness.

19         MR. BERNICK:  Your Honor, I asked for two

20  explanations.  It either goes this way or that way.  Two picks.

21         THE COURT:  I don't think that's leading.  But if it

22  is, I think at this point in the day, Mr. Mullady, I'm too

23  tired to know.  So I'm overruling the objection.  I don't

24  believe it's a leading question.  But if it is, frankly, Mr.

25  Bernick would be able to restate it and this witness would be

**J&J COURT TRANSCRIBERS, INC.**

1  able to figure it out anyway.  So at this point I'm going to

2  assume that --

3              MR. MULLADY:  At this point, that's true, Your Honor.

4              THE COURT:  -- that the witness will be able to

5  answer that question.

6              MR. MULLADY:  Now that we've had it laid out for her,

7  I'm sure she could.

8              THE COURT:  Go ahead and answer, Dr. Anderson.

9              THE WITNESS:  Yeah.

10  BY MR. BERNICK:

11  Q    Which way does your analysis go?

12  A    Well, the whole subject was the first question I stated

13  which is, could the exposures to Grace products be responsible

14  for the mesothelioma?

15  Q    If we had the observations that we have a high rate of

16  mesothelioma and we wanted to work the other way around, what,

17  if any, other factors could be present in your view that might

18  provide an alternative explanation for the mesothelioma, an

19  alternative to exposure to Grace products?

20  A    Well, certainly exposure to other products.

21  Q    Now, that then leads to my next set of questions.  Mr.

22  Mullady and, I believe, Mr. Finch, principally Mr. Mullady,

23  said well, if we assume 45 years of exposure to Grace products

24  and that is what you assumed for purposes of your analysis, you

25  address the question of whether, based upon your analysis and

CC-BLG001613

1  the cumulative doses, you answered the question whether that

2  provided a reliable scientific evidence that Grace exposure

3  caused disease in whole or in part, do you remember your

4  testimony, as to whether the -- based upon the cumulative doses

5  over 45 years, whether under your analysis there was reliable

6  science to say that Grace caused disease either in whole or in

7  part, do you remember that?

8  A    Yes.

9  Q    And I think we know what your conclusion was.  What was

10  your conclusion as to whether there was reliable scientific

11  evidence in support of that proposition?

12  A    That there's no such evidence for B, D's and E's.

13  Q    Now, I want you to assume that it's not 45 years of Grace

14  exposure.  I now want you to assume a different case which is

15  there's non-Grace exposure as well.  What would that do to the

16  cumulative doses that you analyzed?

17  A    It would proportionally reduce those cumulative doses

18  because we would be subtracting years from Grace exposure.

19  Q    Now tell me, if we're reducing the cumulative doses, what,

20  if anything, will that do to the possibility or probability

21  that Grace asbestos caused the diseases at issue in whole or in

22  part in categories B, D and E?

23  A    It would decrease the cumulative exposure levels

24  proportional to the number of years that are subtracted from

25  the 45 years.

CC-BLG001614

Anderson - Redirect/Bernick                242

1  Q    And what effect, if any, would that have on the

2  probability that Grace exposure could cause those diseases?

3  A    It would make it even less probable.

4  Q    Now I believe you said, and I just want to be clear, that

5  when it came to this question of whether Grace exposure was 45

6  years or not, your model did, in fact, assume 45 years?

7  A    Correct.

8  Q    I want to show Exhibit 2215 if we could.  That is the

9  wrong exhibit.  The right one is 2295.  Sorry, T.J.  What is it

10  that you actually found when you went to the actual PIQ data

11  that was available?  Did you find that the exposure was, in

12  fact, exclusively to Grace or did you find otherwise?

13  A    I found otherwise as I explained when we discussed this

14  slide.

15  Q    And what again would that do if we now look at the PIQ

16  data itself, what would that do to the possibility that the

17  Grace exposure caused disease?

18  A    It would make it less probable because for every year that

19  these claimants worked in another environment, and 94, 93

20  percent of them said that they did not get Grace exposure.

21  They were in a different environment and worked getting some

22  other type of exposure.

23  Q    Okay, now I want to show you, if we could go back to the

24  ELMO for just a moment, ACC/FCR 3017 which was the PIQ file for

25  one of the claimants and I believe it was Mr. Mullady who

J&J COURT TRANSCRIBERS, INC.

CC-BLG001615

1  directed your attention to the fact that, indeed, when it came

2  to Grace exposure, this individual was a D and an E for

3  approximately eight years, do you see that?

4  A    Yes.

5  Q    Okay now, based upon the way that your model works, based

6  upon -- we have an individual who specifies on the claim form

7  that he is a D or an E --

8  A    -- for nine years.

9  Q    -- for nine years, how would that individual have been

10  treated under the model, under your assumed model?

11  A    He would have been treated as if he had 45 years of

12  exposure instead of nine years of exposure.

13  Q    And in point of fact when we take a look at the non-Grace

14  exposure, he says that he worked for two years as a category A

15  for Johns Manville and then he worked as a D and an E for

16  Container Corp in Philadelphia, do you see that?

17  A    Yes.

18  Q    If we now assume again that because a statement appears in

19  the body of the PIQ that is accurate, with respect to this

20  individual, would your model have been conservative or would

21  your model have cut against it?

22  A    It would have been highly, highly conservative because we

23  now reduce the years that he was exposed -- he was available to

24  have been exposed, and by his own admission, he was only

25  exposed nine years to Grace product.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001616

Anderson - Redirect/Bernick                    244

1  Q    A detailed question, it was pointed out on cross

2  examination that in about 66 percent of the cases there was

3  insufficient information that put people into categories, do

4  you recall those questions?

5  A    Yes.

6  Q    Do you know with respect to those people whether they

7  simply did not have evidence or whether they simply chose not

8  to disclose it, do you know one way or the other?

9  A    I don't.

10          MR. FINCH:  Objection.  Lack of foundation.

11          MR. BERNICK:  I just asked do you know.

12          THE WITNESS:  And I said we couldn't know.

13 BY MR. BERNICK:

14 Q    I want to talk about individuals for just a moment.  A lot

15 of questions that related to individuals in different ways.  I

16 want to make sure that we have the testimony clear.  As I

17 understand it, you take the top line of your chart 2296, we

18 have a job category or an exposure category leading to a mean

19 concentration which you max out leading to a dose and you then

20 have the benchmarks up here.  We're not yet at the last column

21 which are the claims review, at this point in your analysis, do

22 we have any individuals in the picture at all?

23 A    No.

24 Q    Now we go to the last column and we do the claims review.

25 Does that claims review relate to real world individuals?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001617

1  A    Yes.

2  Q    Okay.  With respect to those individuals, what was the

3  purpose of doing the individual claims review?  What was the

4  purpose of focusing on individuals at that point?

5  A    Because we were fitting together the nature of exposure

6  categories in those exposures now and the cumulative exposure

7  with the individuals from the PIQ so they could be placed into

8  the categories.

9  Q    Based upon your expertise in risk assessment, tell us

10  whether the scientific analysis that you had done for each of

11  these different categories, tell us whether or not it applied

12  to the individuals who after the claim file review were placed

13  in those categories.  Did it apply to them?

14  A    It applied to them once they were in the category because

15  then they were in the category with the job exposure.

16  Q    Now we know from your direct examination, I believe, that

17  after you did all that, you went back and considered the

18  question of whether your treatment of those individuals, that

19  is, whether your model as applied to all those individuals was

20  conservative or not?

21  A    That's correct.

22  Q    And part of that was to look for individual data.  Could

23  we go back to 2280?  Tell us whether -- explain to us how, if

24  at all, Exhibit 2280 bears on how, if at all, it shows how

25  looking at individual data relates to your analysis.

**J&J COURT TRANSCRIBERS, INC.**

1  Q   Well, we've already seen from the PIQ that as soon as we

2  start to look at individual data, we find lower duration of

3  exposure.  As soon as we did any analysis with the individuals

4  in category E who were maintenance workers or in building

5  maintenance categories, we found that they were exposed 16

6  percent of a lifetime instead of -- I mean 16 percent of a

7  working lifetime rather than  -- I mean 16 percent of 250 days

8  a year rather than 100 percent, and one percent in the case of

9  maintenance workers dealing with VAI insulation.  So --

10 Q   If we focus on the individuals that we actually have here,

11 the PIQ individuals --

12 A   And then in the PIQ we find --

13 Q   Just let me put a question to you.  What effect, if any,

14 in consideration of individual data have on your analysis when

15 you look at the PIQ data relating to duration in categories A

16 and C?

17 A   Well, as I would expect, as soon as we start to look at

18 individual data, these very high screens go down.  We see here

19 from the PIQ data the duration that we assume to be 100 percent

20 falls down rapidly, 98 percent are under 45 years, 54 percent

21 under 25 years.  So we see that these screening levels that

22 have established would go down as we get individual data and

23 would become lower levels, therefore, even further removed from

24 benchmarks.

25 Q   Let me ask you a very specific question.  If it turns out

CC-BLG001619

Anderson - Redirect/Bernick                    247

1  that the individual data for any particular individual is

2  inconsistent with what you assume in the model, does that mean

3  that the model itself is wrong?

4  A    No.

5  Q    Why not?

6  A    What that would likely mean from what we know from long

7  term experience and what we know from this exercise and what we

8  know from these very high upper bound assumptions, individual

9  data in all likelihood is going to make the cumulative exposure

10  for that individual far lower than the cumulative exposure that

11  I have created by these extreme assumptions for these nature of

12  exposure categories.

13  Q    Now, I want you to -- I want to put a chart up and push

14  you on that a little bit.  I want to show you what we've marked

15  as Exhibit 2300 for demonstrative purposes.

16          MR. BERNICK:  Have we given it to the other folks?

17          UNIDENTIFIED SPEAKER:  Yes, I did give it to them.

18          MR. BERNICK:  And T.J. has it?  Could we please

19  display that?

20  BY MR. BERNICK:

21  Q    I want to take a look at this chart for a moment and put a

22  question to you.  A lot of questions were asked of well, what

23  if it turned out that somebody in B, D or E was higher than the

24  mean would predict, do you remember that, those kinds of

25  questions?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001620

1  A    Yes, I do.

2  Q    Okay, is it possible that we could have in categories B, D

3  and E some individual that on analysis turns out to have been

4  the guy who was like, you know, always got the rain cloud over

5  his head, is always -- the asbestos is always with the wind

6  into his face, could we have possibly an individual, maybe more

7  than one individual like that?

8  A    I think I said earlier that it would, in my view, be a

9  very low probability event but certainly, anything is possible,

10  and it's possible.

11  Q    Okay, and under your analysis because you look at the

12  mean, if that possibility is actual, that's one person who got

13  included in B that shouldn't have been included in B, right?

14  A    Right.

15  Q    Okay.  Now, tell us whether or not the same is true with

16  respect to A and C.  Tell us whether there's a possibility that

17  with respect to the people who are in A and C can swell the

18  amount of that group, whether they were included even though

19  their exposures were far lower than the mean, is that also a

20  possibility?

21  A    I said earlier that that's a high probability.

22  Q    Well, first of all, is it a possibility?

23  A    It's a possibility.

24  Q    Okay.  Now, do we know whether that possibility is real?

25  A    Yes, we think it's in all likelihood because we see that

CC-BLG001621

1  we have several vectors that point that way and they were

2  displayed earlier, particularly in the duration data.

3  Q    And that would be 2293 if we could show that briefly.  Is

4  this one of the charts that is when you actually looked at the

5  individual duration data, keeping all of your other, you know,

6  max, max, max where it is, how does that -- how does this

7  relate in the question of whether there are people in category

8  A who may not really belong in an analysis that says maybe 15

9  fiber years?

10  A    Yes, I think this is a very important consideration.  We

11  see here that we have 98 percent of A's and C's are now under

12  the 15 fiber mil years where the scientific evidence ceases.

13  And we find that 69 percent are under the 8.9 Libby fiber based

14  doubling of risk.  And actually, these numbers are probably, in

15  many cases, more appropriately related to what would be

16  somewhere between the 80 benchmark for chrysotile and the 8.9

17  for the Libby amphibole fibers.  So it would probably be in the

18  range of about 40.  So I think here we see we have 69 percent

19  of these A's and C's going for further analysis who probably,

20  in all honesty, did not get their mesothelioma from these

21  exposures.  But we're pushing those forward.

22  Q    You were asked last seria, you were asked questions about

23  it, tell us where it is written that you should be looking for

24  long term exposures, you should be looking towards the mean, do

25  you remember those questions?

CC-BLG001622

1  A    Yes.

2  Q    I want to show again 22 -- refer to your experience, 30

3  years of experience, I want to ask you a question about a

4  publication and ask you whether this has any relationship to

5  the experience that you've just described.  I want to show

6  2217.  We showed this on your direct examination --

7  A    Yes.

8  Q    -- which was EPA guidances and documents.

9  A    Yes.

10  Q    What, if any, relationship does that have to the

11  experience that you recited with regard to using the mean?

12  A    Well, I cited long term experience.  I founded EPA's

13  exposure group.  It was the first exposure group founded.  And

14  in the very beginning a lot of our work was with air

15  measurements and then we moved to pesticide applicator and

16  those issues and then to superfund site and those issues.  And

17  we learned from experience from large data sets that the

18  average concentration is the most representative, particularly

19  for long term exposures.

20  Q    Now, finally, as part of the same examination, I've got a

21  couple more questions and we're done.  You were asked a bunch

22  of questions about sampling, that if you wanted to do a true

23  average, that somehow there had to be a proper sampling done.

24  Now, if we are talking about a site that exists today, we

25  wanted to characterize the site today, tell us whether or not

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001623

Anderson - Redirect/Bernick                    251

1  in terms of what the concentrations are, et cetera, et cetera,

2  et cetera.  If we're looking at a site today where we can go

3  ahead and do the sampling, is it or is it not desirable from

4  your point of view to have a thorough going sampling effort?

5  A    It certainly is and it depends on the particular

6  situation.  If it's air sampling, long term annual monitors are

7  placed around sources to monitor the variables over a long

8  period of time because short term samples do not reflect the

9  long term mean.

10 Q    But now, what if you're in a situation where, you know,

11 you're at the EPA or your not at the EPA but you got a site

12 that's a very, very old site and people no longer work there at

13 the jobs they used to have, they're trying to figure out what

14 their exposures were, is there any way that you can kind of

15 historically take yourself back in a little time capsule and go

16 and do a sampling analysis?

17 A    No, we can't do that.

18 Q    Is there anywhere that you know where EPA or any other

19 convention within the field of risk assessment says that before

20 you can calculate an average with respect to past exposures

21 where the sampling is no longer possible, that before you can

22 put pen to paper and calculate an average, you have to have a

23 proper statistically deviated whatever sample?  Is there any

24 requirement that says you've got to have that in order to do

25 your average?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001624

1  A    No.

2  Q    If it were true that EPA or anybody else could not

3  characterize past exposures where the work is no longer being

4  done without a statistical representative sample, would people

5  be able to do the work of figuring out risk associated with

6  past exposures?

7  A    No.

8  Q    If individuals who wanted to get compensation on the

9  theory that they were over exposed, couldn't get compensation

10 unless they get to do a true average based upon sampling, they

11 were exposed back in the 50s and 60s or maybe in the early 70s,

12 could they get compensation if somebody were to require that

13 they did a true statistically, significant deviated sample?

14         MR. MULLADY:  Your Honor, objection.  I think now

15 we're really far afield from the line of questions from which

16 this redirect is supposed to be emanating.

17         MR. BERNICK:  To the contrary.

18         THE COURT:  It's argumentative, Mr. Bernick.

19         MR. BERNICK:  It is a little bit argumentative and on

20 that note, I'll rest my question.

21         THE COURT:  All right.  Mr. Mullady?

22         MR. MULLADY:  Yes, just one question.

23                    RECROSS EXAMINATION

24 BY MR. MULLADY:

25 Q    I'll ask it from here, Dr. Anderson.  You had no long term

                    **J&J COURT TRANSCRIBERS, INC.**

CC-BLG001625

1  data from Dr. Lees, did you, to work with?

2  A    He was creating eight-hour annual averages -- TWA

3  averages.

4  Q    Right, single day point in time averages taken by him.

5        MR. BERNICK:  Objection, objection.  Creating a

6  single point average, I don't understand that question.

7        THE WITNESS:  He was creating eight-hour mean

8  averages because of the nature of the work.  I was using them

9  to generate long term frequency and duration.  He was not

10 trying to measure -- conceptually, I think I know what you're

11 trying to address.  He's not trying to measure, conceptually, a

12 measurement from a facility that was operating over time.  He

13 was trying to capture in a job category where people work on a

14 daily basis an eight-hour time-weighted average and he had a

15 number of data sets, in some cases, many data sets, in some

16 cases, fewer, to capture that.

17        So we were trying to do an industrial hygiene study

18 here, not a long term average environmental monitoring study.

19 So here it's appropriate for him to try to capture as best he

20 can what those exposures are in an occupational setting

21 averaged as an eight-hour time-weighted average.

22        MR. MULLADY:  Nothing further.

23        THE COURT:  Mr. Finch?

24        MR. FINCH:  Nothing, Your Honor.

25        THE COURT:  Mr. Bernick?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001626

1          MR. BERNICK:  I have nothing further.

2          THE COURT:  You're excused, Doctor, thank you.

3          THE WITNESS:  Thank you.

4          THE COURT:  All right, folks, you told me you needed

5   to leave at five.  It's five to five.

6          MR. BERNICK:  This is true, Your Honor.  I guess

7   there are only two items to cover, potentially cover, and we're

8   not going to have time to do it now I suppose, but I'm not sure

9   exactly what we can do.

10         THE COURT:  Well, let me address --

11         MR. BERNICK:  The 408 -- sure.

12         THE COURT:  Let me address the Rule 1006.  I did have

13  a chance to take a look at that.  This is what I think the

14  outcome about the 1006 ought to be.  The cases, except for the

15  one from Texas, all seem to address writings and documents that

16  are admissible in and of themselves in some fashion.  The Texas

17  cases, the only one that actually, I think, addresses

18  testimonial evidence, at least it's the only one I had a chance

19  to look at -- if there are others out there, then I just didn't

20  get to them all.  I didn't get to them all, so I have to say

21  that, but to the extent that it addresses the testimonial

22  issue, it seems to me that the analysis ought to be, if there

23  are others out there and somebody can point me in a different

24  direction if I'm headed in the wrong one, that the testimony

25  itself should be admissible and probably admitted, otherwise

**J&J COURT TRANSCRIBERS, INC.**

1 you've got a hearsay problem.  And so probably, the depositions

2 have to come in anyway.  Once they're in, frankly, I don't have

3 any problem with the summaries because I think you are going to

4 summarize those anyway, either by way of proposed findings of

5 fact and conclusions of law or statements in your briefs

6 anyhow.  And that's just the reality.  That's what's going to

7 happen.  So I think the summaries would actually be helpful.

8        And the format of the summaries where you take the

9 topics that you think will be of relevance in your particular

10 theory of the case and summarize what witness -- witnesses you

11 think should be relevant and put together the collection of

12 exhibits, depositions, trial testimony, whatever the

13 substantive exhibits are that you think would be relevant to

14 those points actually is very helpful.  That would be helpful.

15        The difficulty may be that if it's depositions that

16 you're summarizing because of the hearsay problem, I think that

17 deposition probably has to be in evidence anyway.  As to the

18 documents and writings, I don't think those have to be actually

19 admitted.  They simply have to be admissible and you folks have

20 already been through those documents so you've probably got a

21 view as to whether they are or are not admissible.

22        But I think that's the issue and the way I've got to

23 focus on it.  So I don't think it's going to save much time in

24 terms of looking at the deposition testimony.  I have to either

25 read it to the extent that you want to submit it.  If you can

CC-BLG001628

1  eliminate portions of it -- frankly, if somebody is taking the

2  Fifth Amendment and it's nothing but a question and then an

3  assertion of the Fifth, I don't know why I need to read that

4  except to identify the witness.  You know, there's no evidence

5  before me in that sense.  Now, there may be inferences that can

6  be drawn and if you want the assertion of the inference later,

7  it appears, I think, you can simply point that out.  But why we

8  have to play a whole deposition transcript simply to watch

9  somebody take the Fifth, I don't know why I need to do that.  I

10  had enough Grand Jury experience watching people take the

11  Fifth.  I know what that's like.  I don't really need to spend

12  a whole day doing that, frankly.

13        But to the extent that you want to play a smattering

14  of the deposition just so there's a, you know, an

15  identification of the witness, I don't have any problem doing

16  that if that's valuable to you.  If you want me to sit there

17  and watch the witnesses take the Fifth, fine, you know, I'll do

18  it.  My time is your time.

19        MR. BERNICK:  We don't want to do any of that,

20  frankly.  With respect to the Fifth Amendment, we do want the

21  adverse inference and the way to do it, of course, is to submit

22  evidence --

23        THE COURT:  Right.

24        MR. BERNICK:  -- evidence is prior testimony so we've

25  got that there.  I guess, given Your Honor's ruling, the

**J&J COURT TRANSCRIBERS, INC.**

1  question is do we want to -- I guess we -- do you want us to

2  spend three hours playing this stuff?  Now, we, again, we have

3  no interest in that, but in order to be able to get the

4  testimony in evidence, Your Honor said before that you wanted

5  to have it take place real time in court.

6            THE COURT:  Yes, the reason for that is I know what

7  will happen.  If it's not done in court, it's going to sit back

8  there until I have an opportunity to get to it and that will

9  probably delay things.  And frankly, it seems to me that if --

10  and it will also force you to focus your energies on what

11  portions of these transcripts you actually think I need to see

12  rather than having me simply go through and read, you know,

13  lots of objections that are meaningless and lots of arguments

14  on the deposition transcripts that I really don't need to read

15  because you don't -- it's not really something that you're

16  going to offer.

17            So I think you folks can spend the time whittling

18  down the depositions to what you want me to actually either see

19  by video or read here.  I don't care which.  But I think it

20  should be done in court.  And then to the extent that the

21  depositions are admitted and the documents are admitted, I'm

22  happy to take the summaries thereafter.  The evidence will be

23  in.  I think Rule 1006 will provide for it.  That everybody can

24  do it, I think you'll be doing it anyway as part of your

25  proposed findings of fact and conclusions of law.  So whichever

CC-BLG001630

258

1 way it comes, I think will be fine.

2          MR. BERNICK:  Okay, so that then leaves us with the

3 Rule 408 issue and the question of what to do on Monday.

4          MR. MULLADY:  Excuse me, could I just get a

5 clarification of the Court's ruling?  I'm sorry, David.

6 There's something I'm just unclear about.  If the premise of

7 Your Honor's ruling is that for the summaries to be offered,

8 the underlying evidence has to be admitted --

9          THE COURT:  With respect to the deposition

10 transcripts.

11          MR. MULLADY:  Correct.

12          THE COURT:  Yes.

13          MR. MULLADY:  Some of these summaries refer to

14 depositions taken in other cases.

15          MR. BERNICK:  That's solely for purposes of the

16 adverse inference.  And for purpose of the adverse inference,

17 the testimony does not actually have to be admissible evidence.

18 That's what the rule says.  But you can argue that later on

19 with respect to people who take the Fifth Amendment, we'll have

20 to -- if you want to take issue with that, we can argue that --

21          MR. MULLADY:  That was --

22          MR. BERNICK:  I'm sorry, the bulk --

23          MR. MULLADY:  I was asking the Court for

24 clarification on that aspect of your ruling.

25          THE COURT:  Okay, Mr. Mullady, I'm sorry, in the

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001631

1 little bit of time I have, I'm not familiar with the fact that

2 some of these are coming up in other cases.  I think Mr.

3 Bernick has accurately stated the premise, but if you need to

4 brief that, then, you know, brief it.  My view right now is why

5 don't you see if you can't work through that particular issue

6 and see what we can do?  I think as -- I don't want a hearsay

7 problem, okay?

8          MR. MULLADY:  Understood.

9          THE COURT:  I want to get past the hearsay problem

10 with respect to the depositions.  I don't think that hearsay

11 problem exists because of the rule where the documents,

12 writings and recordings only have to be admissible in the Third

13 Circuit, not admitted.  I think the deposition issue is a

14 different issue because of the hearsay problem.

15          MR. BERNICK:  The difficult -- that's fine, Your

16 Honor.  We -- the deposition designation process has been under

17 way for some time.  If they wanted to move in limine on the

18 depositions, they should have done it a long time ago.  I'm

19 only reacting to Your Honor's invitation -- not invitation, but

20 suggestion that they may have the opportunity to brief.  This

21 matter is up.  It's a today thing, so --

22          THE COURT:  No, only with respect to the adverse

23 inference.  I don't know whether -- I don't know how that will

24 work with respect to a deposition in another case in the

25 adverse inference, that's all.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001632

1          MR. BERNICK:  So we have on Monday -- we have only

2  one live witness left, that's Dr. Florence.

3          THE COURT:  All right.

4          MR. BERNICK:  And we were going to call him on Monday

5  and rest.  It sounds to me like we're not going to be able to

6  rest because we have to do this process.  And I don't know, I

7  would always be optimistic and assume that there won't be very

8  much to be read, but right now the designations take in excess,

9  I think it's like two and a half or three hours.  So the

10 question then becomes, do we do the depositions and argue Rule

11 408 on Monday or do we call Dr. Florence, put him on and off

12 and then do the depositions?  But the problem is Rule 408.

13 What I would suggest is that we try to figure that out amongst

14 ourselves.

15         THE COURT:  That's fine.

16         MR. BERNICK:  But in any event, it doesn't seem to me

17 that -- and I don't want to put Dr. Florence in the position

18 where we do the doctors and then he can't finish or whatever,

19 and I don't know if he may have a scheduling issue or not.  In

20 any event, it will be either one or the other, either the

21 doctors or Dr. Florence and I'm assuming that we'll argue Rule

22 408 at some point during the day on Monday in any event if

23 that's appropriate from Your Honor's point of view.

24         MR. INSELBUCH:  I would think the 408 argument has to

25 be before the Florence testimony.

J&J COURT TRANSCRIBERS, INC.

CC-BLG001633

1        MR. BERNICK:  I would have said so too and we

2 intended to try to do that today, but -- and I think Your Honor

3 set what, 20 minutes aside on Rule 408?

4        THE COURT:  Yes.

5        MR. INSELBUCH:  We can do that Monday.  If the Court

6 start early, we could start earlier.

7        MR. BERNICK:  I don't --

8        THE COURT:  But I think the problem is you don't want

9 to bring Dr. Florence in the event that there's a ruling that

10 says he can't testify unless you can defer him till Tuesday.

11        MR. BERNICK:  That's not my concern.

12        THE COURT:  Okay.

13        MR. BERNICK:  My concern is that if we're going to be

14 doctor stuff in these depositions anyhow, maybe the better idea

15 is to argue Rule 408 on Monday, do the doctor stuff, and then

16 call Florence on Tuesday.  And that's why I say we can just --

17        MR. INSELBUCH:  I have no objection to that, Your

18 Honor, just so long as -- we have one witness that's only

19 available on April 1st, however, as I told you.

20        MR. BERNICK:  Well, that's the problem is that I

21 don't --

22        THE COURT:  Can we take that witness out of turn?

23 You don't know?  Because of Dr. Florence?

24        MR. BERNICK:  The answer to that is no, and the

25 reason is that this schedule has been hammered out and if Dr.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001634

1  Florence is, in fact, available on Monday, we --

2          THE COURT:  Can we do the deposition readings and the

3  408 argument at a later date?

4          MR. INSELBUCH:  No.

5          THE COURT:  Do Dr. Florence Monday subject to

6  objections --

7          MR. INSELBUCH:  No.

8          THE COURT:  --  do your witness Tuesday?

9          MR. INSELBUCH:  No.  We need Your Honor to rule on,

10 at least in part with respect to 408 before we deal with Dr.

11 Florence.  But what I would suggest we could do is we could do

12 the 408 argument at the beginning, we could have Dr. Florence

13 on Monday and the deposition exercise that Mr. Bernick is

14 talking about is one that could be inserted at any time.  It's

15 not something that's time-sensitive.  We have a witness that

16 must go Tuesday.

17         MR. BERNICK:  Who is that?

18         UNIDENTIFIED ATTORNEY:  Brody.

19         MR. INSELBUCH:  Brody.

20         MR. BERNICK:  I don't have a problem with that.  If

21 they want to do it --

22         MR. INSELBUCH:  If we take Brody when we can have

23 Brody, then we will certainly find time to do Mr. Bernick's

24 depositions however we work out that process.

25         THE COURT:  The following week.

**J&J COURT TRANSCRIBERS, INC.**