UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          .    Case No.  01-1139 (JKF)
                                .
W.R. GRACE & CO.,               .
et al.,                         .    USX Tower - 54th Floor
                                .    600 Grant Street
                                .    Pittsburgh, PA 15219
                    Debtors.    .
                                .    March 31, 2008
. . . . . . . . . . . . .       .    8:44 a.m.

TRANSCRIPT OF TRIAL
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:            Kirkland & Ellis, LLP
                            By:  DAVID BERNICK, ESQ.
                            200 East Randolph Drive
                            Chicago, IL  60601

For the Equity              Kramer Levin Naftalis & Frankel
Committee:                  By:  GREGORY HOROWITZ, ESQ.
                            919 Third Avenue
                            New York, NY  10022

For the                     Stroock & Stroock & Lavan
Unsecured Creditors'        By:  KENNETH PASQUALE, ESQ.
Committee:                  180 Maiden Lane
                            New York, NY  10038-4982


Audio Operator:             Cathy Younker

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609)586-2311      Fax No. (609) 587-3599

TRIAL EXHIBIT 16
CC-BLG001644-001913

CC-BLG001644

APPEARANCES (CONT'D):

| | |
|---|---|
| For the Asbestos<br>Creditors Committee: | Caplin & Drysdale, Chartered<br>By:  NATHAN FINCH, ESQ.<br>One Thomas Circle, NW<br>Washington, D.C.  20005 |
| | Caplin & Drysdale, Chartered<br>By:  ELIHU INSELBUCH, ESQ.<br>375 Park Avenue, #3505<br>New York, NY  10152 |
| For the Future<br>Claimants<br>Representatives: | Orrick, Herrington & Sutcliffe<br>   LLP<br>By:  RAYMOND MULLADY, ESQ.<br>     JOHN ANSBRO, ESQ.<br>     ROGER FRANKEL, ESQ.<br>Washington Harbour<br>3050 K Street, N.W.<br>Washington, D.C.  20007 |

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For Ford, Marrin,<br>Esposito, Witmeyer<br>& Gleser: | Ford, Marrin, Esposito, Witmeyer &<br>   Gleser<br>By:  SHAYNE SPENCER, ESQ.<br>Wall Street Plaza<br>New York, NY  10005 |
| For Deutsche Bank: | Deutsche Bank<br>By:  MATT DOHENY<br>60 Wall Street<br>New York, NY 10005 |
| For the Debtors: | Pachulski, Stang, Ziehl &Jones<br>By:  JAMES O'NEILL, ESQ.<br>919 North Market Street<br>17th Floor<br>Wilmington, DE  19899-8705 |
| For London Market Co.: | Mendes & Mount<br>By:  ALEXANDER MUELLER, ESQ.<br>750 Seventh Avenue<br>New York, NY 10019 |

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For State of Montana        Womble Carlyle Sandridge & Rice
Department of               By:  FRANCIS MONACO, ESQ.
Environmental Quality:      222 Delaware Avenue
                            Suite 1501
                            Wilmington, DE  19801

For National Union Fire     Zeichner Ellman & Krause, LLP
Insurance Co.:              By:  ROBERT GUTTMANN, ESQ.
                                 MATTHEW RUSSELL, ESQ.
                                 MICHAEL DAVIS, ESQ.
                            575 Lexington Avenue
                            New York, NY  10022

For Caxton Associates:      Caxton Associates, LLC
                            By:  JAMES RIEGER, ESQ.

For the Asbestos            Ferry Joseph & Pearce, P.A.
Creditors Committee:        By:  THEODORE TACCONELLI, ESQ.
                            824 Market Street, Suite 19899
                            Wilmington, DE  19899

For the Asbestos            Caplin & Drysdale, Chartered
Creditors Committee:        By:  WALTER SLOCOMBE, ESQ.
                                 BERNARD BAILOR, ESQ.
                                 JEANNA RICKARDS, ESQ.
                                 JAMES WEHNER, ESQ.
                                 LESLIE KELLEHER, ESQ.
                                 PETER LOCKWOOD, ESQ.
                            One Thomas Circle, NW
                            Washington, D.C.  20005

For Vinson & Elkins:        Vinson & Elkins, LLP
                            By:  ARI BERMAN, ESQ.
                            Trammell Crow Center
                            2001 Ross Avenue, Suite 3700
                            Dallas, TX  75201

For Dune Capital Mgmt:      Dune Capital Management
                            By:  GUY BARON

For Grace Certain           Montgomery, McCracken, Walker &
Cancer Claimants:              Rhoads, LLP
                            By:  NATALIE D. RAMSEY, ESQ.
                            300 Delaware Avenue, Ste. 750
                            Wilmington, DE  19801

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001646

TELEPHONIC APPEARANCES (CONT'D):

| | |
|---|---|
| For Royal Insurance: | Wilson Elser Moskowitz Edelman<br>  & Dicker, LLP<br>By:  CATHERINE CHEN, ESQ.<br>     150 East 42nd Street<br>     New York, NY  10017 |
| For Official Committee<br>of Unsecured Creditors: | Duane Morris, LLP<br>By:  MICHAEL LASTOWSKI, ESQ.<br>1100 North Market Street, Suite 1200<br>Wilmington, DE  19801-1246 |
| For DebtWire: | DebtWire<br>By:  SETH BRUMBY |
| For the Debtors: | Kirkland & Ellis, LLP<br>By:  JANET BAER, ESQ.<br>200 East Randolph Drive<br>Chicago, IL  60601 |
| For Owens-Illinois: | McCarter & English<br>By:  DANIEL SILVER, ESQ.<br>Renaissance Centre, 405 N. King St.<br>Wilmington, DE  19801 |
| For the Scotts Company: | Vorys, Sater, Seymour & Pease<br>By:  MATTHEW DAIKER, ESQ.<br>52 East Gay Street<br>Columbus, OH 43216 |
| For Murray Capital<br>Management | Murray Capital Management, Inc.<br>By:  MARTI MURRAY |
| For David T. Austern,<br>the Future Claimants'<br>Representative: | Phillips, Goldman & Spence, P.A.<br>By:  JOHN C. PHILLIPS, ESQ.<br>1200 North Broom Street<br>Wilmington, DE  19806 |
| For Official Committee<br>of Asbestos Property<br>Claimants: | Richardson Patrick Westbrook &<br>  Brickman, P.C.<br>By:  EDWARD J. WESTBROOK, ESQ.<br>174 East Bay Street<br>Charleston, SC  29401 |

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

| | |
|---|---|
| For the Future<br>Claimants<br>Representatives: | Orrick, Herrington & Sutcliffe,<br>  LLP<br>By:  DEBRA FELDER, ESQ.<br>Washington Harbour<br>3050 K Street, N.W.<br>Washington, D.C.  20007 For |
| For David T. Austern: | Piper Jaffray & Co.<br>By:  JASON SOLGANICK |
| For Official Committee<br>of Asbestos Personal<br>Injury Claimants: | Anderson Kill & Olick<br>By:  ROBERT M. HORKOVICH, ESQ.<br>1251 Avenue of the Americas<br>New York, NY  10020-1186 |
| For Rajeev Narang: | Old Lane Law Office<br>By:  RAJEEV NARANG |
| For Various Claimant<br>Firms: | Stutzman, Bromberg, Esserman & Plifka<br>By:  DAVID J. PARSONS, ESQ.<br>2323 Bryan Street<br>Suite 2200<br>Dallas, TX  75201 |
| For the Debtors: | Kirkland & Ellis, LLP<br>By:  THEODORE FREEDMAN, ESQ.<br>Citigroup Center, 153 East 53rd St.<br>New York, NY  10022 |
| For WR Grace<br>Shareholder: | Tocqueville Asset Management<br>By:  PETER SHAWN |
| For Official Committee<br>of Asbestos Property<br>Damage Claimants: | Dies & Hile, LLP<br>By:  MARTIN DIES, ESQ.<br>1601 Rio Grande, Suite 330<br>Austin, TX  78701 |
| | Bilzin, Sumberg, Baena, Price &<br>  Axelrod<br>By:  MATTHEW KRAMER, ESQ.<br>     SCOTT L. BAENA, ESQ.<br>     JAY SAKALO, ESQ.<br>Wachovia Building, 200 South Biscayne<br>  Boulevard<br>Miami, FL 33131 |

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001648

TELEPHONIC APPEARANCES (CONT'D):

                          LECG
                          By:  ALAN MADIAN
                               ELIZABETH DEVINE, ESQ.

For Fireman's Fund:       Stevens & Lee, P.C.
                          By:  DAVID R. BEANE, ESQ.
                          1105 North Market Street, 7th Fl.
                          Wilmington, DE  19801

For Asbestos Claimants:   Brayton Purcell
                          By:  CHRISTINA SKUBIC, ESQ.
                          222 Rush Landing Road
                          Novato, CA 94948

For Travelers Indemnity:  Simpson, Thacher & Bartlett
                          By:  SUNG W. CHOI, ESQ.
                          425 Lexington Avenue
                          New York, NY 10017

For Sealed Air:           Skadden, Arps, Slate, Meagher & Flom,
                             LLP
                          By: DAVID TURETSKY, ESQ.
                          One Rodney Square
                          Wilmington, DE  19801

For Asbestos Property     Scott Law Group
Damage Claimants:         By:  DARRELL SCOTT, ESQ.
                          1001 East Main Street, Suite 500
                          Sevierville, TN  37864

For the PD Committee:     Speights & Runyan
                          By:  DANIEL SPEIGHTS, ESQ.
                          200 Jackson Avenue, East
                          Hampton, SC  29924

For Citadel Investment    Citadel Investment Group
Group:                    By:  BEAU HARBOUR

For Committee of          Campbell & Levine
Asbestos Personal         By:  MARK T. HURFORD, ESQ.
Injury Claimants:         800 North King Street
                          Suite 300
                          Wilmington, DE  19701

For the State of CA,      Hahn & Hessen, LLP
Dept. of Gen. Services:   By:  CHRISTINA J. KANG, ESQ.
                          488 Madison Avenue, 14th Fl.
                          New York, NY  10022

                   **J&J COURT TRANSCRIBERS, INC.**

CC-BLG001649

TELEPHONIC APPEARANCES (CONT'D):

For Official Committee          Brandi Law Firm
of Asbestos Property            By:  TERENCE D. EDWARDS, ESQ.
Damage Claimants:               44 Montgomery St., Suite 1050
                                San Francisco, CA  94104

For Allstate Insurance:         Cuyler Burk, LLP
                                By:  ANDREW CRAIG, ESQ.
                                Parsippany Corporate Center
                                Four Century Drive
                                Parsippany, NJ  07054

For King Street Capital         King Street Capital Management
Management:                     By:  KIM CHRISTENSEN

For CNA:                        Goodwin Procter, LLP
                                By:  BRIAN MUKHERJEE

Capital:                        Silver Point Capital
                                By:  JOHN KU

For Lehman Brothers:            Lehman Brothers
                                By:  ANDREW CHAN

For David T. Austern:           Piper Jaffray & Co.
                                By:  JONATHAN BROWNSTEIN, ESQ.

For W.R. Grace:                 Cohn Whitesell & Goldberg, LLP
                                By:  CHRISTOPHER M. CANDON, ESQ.
                                101 Arch Street
                                Boston, MA  02110

For the Unsecured               Strook & Strook & Lavan
Creditors' Committee:           By:  LEWIS KRUGER, ESQ.
                                180 Maiden Lane
                                New York, NY 10038

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001650

I N D E X

| WITNESSES | PAGE |
|---|---|
| B. THOMAS FLORENCE | |
| Direct Examination by Mr. Bernick | 42 |
| Voir Dire Examination by Mr. Finch | 48 |
| Voir Dire Examination by Mr. Mullady | 54 |
| Continued Direct Examination by Mr. Bernick | 55 |
| Cross Examination by Mr. Finch | 118 |
| Cross Examination by Mr. Mullady | 227 |
| Redirect Examination by Mr. Bernick | 250 |
| Recross Examination by Mr. Finch | 265 |

| EXHIBITS | | ID. | EVD. |
|---|---|---|---|
| 2316, 2317, 2318, 2321, 2322, 2324, 2325, | | | |
| 2331, 2336, 2338, 2341, 2301, 2327, | | | |
| 2328, 2329 | Summaries | | 118 |
| ACC-109 | Florence Report, May 1997 | 160 | |
| ACC-175 | Letter | 163 | |
| ACC-469 | Dr. Florence's work papers | | 199 |
| ACC-472 | Halpain File | | 200 |
| ACC-2062 | Document | | 199 |
| ACC-FCR-3024 - Extraction from Reliance Material | | | 267 |

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001651

1        THE COURT:  This is the continuation of the personal

2   injury estimation trial in W.R. Grace, 01-1139.  The

3   participants by phone are Shayne Spencer, Matt Doheny, James

4   O'Neill, Alex Mueller, Francis Monaco, Robert Guttmann, James

5   Rieger, Theodore Tacconelli, James Wehner, Jeanna Rickards,

6   Elihu Inselbuch, but I see him here, Walter Slocombe, Leslie

7   Kelleher, Peter Lockwood, Matthew Russell, Ari Berman, Guy

8   Baron, Natalie Ramsey, Catherine Chen, Michael Lastowski, Seth

9   Brumby, Janet Baer, Daniel Silver, Matthew Daiker, Marti

10  Murray, John Phillips, Edward Westbrook, Debra Felder, Jason

11  Solganick, Robert Horkovich, Rajeev Narang, David Parsons,

12  Theodore Freedman, Peter Shawn, Martin Dies, David Beane,

13  Matthew Kramer, Christina Skubic, Alan Madian, Elizabeth

14  Devine, Sung Choi, David Turetsky, Darrell Scott, Daniel

15  Speights, Beau Harbour, Bernard Bailor, Mark Hurford, Michael

16  Davis, Christina Kang, Terence Edwards, Andrew Craig, Kim

17  Christensen, Brian Mukherjee, John Ku, Andrew Chan, Jonathan

18  Brownstein, Scott Baena, Jay Sakalo, Lewis Kruger, and

19  Christopher Candon.

20          I'll take entries in court, please.  Good morning.

21          MR. BERNICK:  Good morning, David Bernick for Grace.

22          MR. HOROWITZ:  Gregory Horowitz for the Equity

23  Committee.

24          MR. PASQUALE:  Ken Pasquale for the Unsecured

25  Creditors Committee.


                    **J&J COURT TRANSCRIBERS, INC.**

1          MR. FINCH:  Nathan Finch for the Asbestos Claims
2    Committee.
3          MR. INSELBUCH:  Elihu Inselbuch for the Asbestos
4    Creditors Committee.
5          MR. MULLADY:  Raymond Mullady for the FCR.
6          MR. ANSBRO:  Good morning, Your Honor, John Ansbro
7    for the FCR.
8          THE COURT:  Wait.  Sorry.  Okay.  Thank you.  Good
9    morning.
10         MR. FRANKEL:  Good morning, Your Honor, Roger Frankel
11   for the FCR.
12         THE COURT:  Okay.  Start with the arguments.
13         MR. BERNICK:  Good morning, Your Honor.  I think the
14   first order of business is the argument with respect to the
15   Rule 408 motion that was filed by the ACC and the FCR.  So I
16   guess they'll be --
17         MR. INSELBUCH:  Do you want me to go first?
18         MR. BERNICK:  By all means.
19                       (Pause)
20         THE COURT:  Good morning.
21         MR. INSELBUCH:  Good morning, Your Honor.  Elihu
22   Inselbuch for the Asbestos Creditors Committee.  As you are
23   aware the 408 issue has been the subject of motions in limine
24   that have been filed before Your Honor earlier.  We made this
25   motion because in the course of Dr. Florence's testimony today

CC-BLG001653

1  we anticipate that a 408 issue will come up.  And we raise the

2  issue again now only to seek Your Honor's confirmation that

3  whatever your ruling will be with respect to 408 it will apply

4  equally to the witnesses that we present and the witnesses that

5  the debtor presents; as a matter of what's sauce for the goose

6  is sauce for the gander.

7          Now, to begin, I would ask that the Court remember

8  why we're here in the first place.  This is not a contest where

9  we are trying to establish liability for any claim at all nor

10 for claims in the aggregate.  This is an estimation in the aid

11 of plan confirmation in order to determine what amount of funds

12 needs to be set aside to fund a trust which by definition has

13 liabilities that can't be specifically determined, because

14 that's the language of the bankruptcy code.

15         In order to be fair not only to those claimants who

16 would come before that trust to seek compensation ultimately

17 for their claims, but also to all the other constituencies in

18 this bankruptcy, because if we were to over fund that trust we

19 would be taking the money from other constituencies.  If we're

20 to under fund that trust we would be unfair to the claimants

21 who would have to come to receive their compensation from that

22 court -- from that trust.

23         And, in fact, as Your Honor said on December 5th,

24 2006 at Page 58, "It seems to me that the estimation is to do

25 two things.  It's to try to figure out how many claims of a

J&J COURT TRANSCRIBERS, INC.

1  particular type are currently pending, and to use that and

2  whatever other information the experts will use to extrapolate

3  out what the demands against the debtor will be in the future."

4  So it's to look at in absolute terms a number of claims that

5  are likely to be filed.  And my eminent colleague said that's

6  correct.  The Court went on to say, "Okay.  Then it is to

7  figure out what the value of those claims is so that I know

8  what the debtor has to put into a fund in order to pay those

9  claims."

10        So I don't think that there's any real question that

11  the estimation is not here to determine liability.  Now, Grace

12  in doing it's calculation of what that estimation should show

13  has put together a presentation which says what we must look at

14  -- what the Court should look at is the cases that were pending

15  and unresolved as of the date of the bankruptcy and look at

16  those and put them -- what we call, we Grace, call liability

17  filters and determine which of those claims would satisfy our

18  liability filters and then use that number of claims as

19  basically part of the formula from which they then would

20  develop how many claims there ultimately will be.

21        Interestingly enough once they do that they would

22  value all of the claims based upon value amounts, settlement

23  amounts that come from the settlement history.  We on the other

24  hand, although you haven't seen the presentation as yet, but of

25  course Your Honor has been inundated, shall I say, with expert

CC-BLG001655

1 reports and other materials telling you what this case will

2 ultimately show, do the calculation in a different way, in a

3 way that's been done in all the other cases where we have also

4 presented the need for estimating 524(g) trust values by

5 looking at the settlement history not to determine what the

6 liability was, because in fact in 98 percent of all the cases

7 or more this debtor never went to judgment.  It resolved its

8 claims.  It resolved its claims.  In effect it bought its peace

9 from these claims.  Some of them I'm sure it thought it had

10 good defenses.  Some of it, it had lesser defenses to.  But its

11 way of solving its problem was to resolve those claims for

12 money and make them go away.

13        Our concept of how we estimate the future, what would

14 have occurred had there not been a bankruptcy is to say we look

15 at what they did in the past, we make whatever adjustments need

16 to be made for changes in the system that we were in and then

17 we say this will be replicated going forward.  And that's why

18 we look at these materials, and that's what they're for.

19        Now, when you estimate things normally you would look

20 to comparable things.  The Court is familiar with estimation.

21 I mean, oftentimes you have to estimate the value of a plot of

22 real estate.  Well, you look for a comparable piece of real

23 estate, look at what it sold for and then you would -- and if

24 you looked at a few comparables you satisfy yourself that

25 somewhere in that mix of values you'll have a fair estimate for

CC-BLG001656

1  the property in question.

2          When my kids were small we used to have a jar we put

3  coins in.  And when the jar was full and we had to empty it out

4  and we had to go to the bank we would all guess how much money

5  would come out of this jar of coins.  And, you know, after

6  awhile the guesses got pretty good.  Because if you look at the

7  same jar and fill it with coins over time and if you remember

8  how many coins were in the jar you can come up with a pretty

9  good estimate.  The problem we have here is we don't have

10 another Grace or something to look to, and I doubt very much

11 that the Court would accept evidence of what the estimates were

12 for other defendants in the tort system, because all of those

13 situations are different.

14          There is no comparable like that to look at.  The

15 closest thing we can come to is what have they done prior to

16 the bankruptcy, and that's what we would propose to resolve.

17 Now, I would like to take a minute to look at the text of 408

18 with the Court.  Could I have the ELMO?  I'm not sure I know

19 how to work this either.  Do I have to do something here?

20          UNIDENTIFIED SPEAKER:  Power.

21          MR. INSELBUCH:  Power.  Did I do it?

22          UNIDENTIFIED SPEAKER:  You did.

23          MR. INSELBUCH:  Thank you.  Now, how do I get --

24          UNIDENTIFIED SPEAKER:  Minus.

25          MR. INSELBUCH:  Minus?  That is Rule 408.  And what

J&J COURT TRANSCRIBERS, INC.

CC-BLG001657

1  does it talk about, Your Honor?  It talks about compromise and

2  offers to compromise.  And I think the words in this rule to

3  focus on for our purposes are first when does the rule operate?

4  It doesn't operate all the time.  The evidence that it talks

5  about is not admissible when offered to prove liability for

6  invalidity of or amount of a claim.  And what is the evidence

7  that you can't use?  Basically showing that you offered money

8  to settle a claim or that you talked about offering to settle a

9  claim, but what claim is it?  It's the claim.  The claim.

10         And what was the purpose of the rule?  The purpose of

11  the rule is to reflect the policy that our system would like

12  people to resolve their controversies and encourage them to

13  have settlement negotiations.

14         THE COURT:  Could I send you to the back room and

15  lock you in until you settled this case?

16         MR. INSELBUCH:  You've done it before.

17         THE COURT:  I'd like to try it again.

18         MR. INSELBUCH:  Well, could I finish my argument

19  first?

20         THE COURT:  All right.

21         MR. INSELBUCH:  And then send me with Mr. Bernick.

22         MR. BERNICK:  No, wait a minute, just you.

23         MR. INSELBUCH:  I'm not sure it would help if I went

24  by myself though, Judge.

25         THE COURT:  Okay.

CC-BLG001658

1          MR. INSELBUCH:  It's to encourage people to do that

2  and relieve them of the problem that they would be confronted

3  with if the negotiations failed of then having somebody come on

4  the witness stand and say, he must be liable for this claim, or

5  the amount of this claim must be at least so and so amount

6  because that's what he offered me in the back room.  But,

7  that's, as I said, not what we're doing here.  We've filed lots

8  of briefs.  Everybody's filed a lot of briefs which cited a lot

9  of cases.  I will leave it to the Court to read the cases

10  should the Court find that necessary, but I think you'll find

11  that the cases fall into several groups.

12          First, there are a bunch of cases that simply say

13  what I just said, that the purpose of this rule is to encourage

14  settlement discussion so that when you get to litigating a

15  claim where settlement failed you can't use what people have

16  said in the discussions to prove the liability for or the

17  amount of the claim.  That's a whole bunch of cases.  They go

18  back into the 19th century.

19          There are a small handful of cases that deal with a

20  situation where it's not the claim but an identical claim

21  that's being discussed or litigated.  For example --

22          THE COURT:  Excuse me.  Mr. Inselbuch, pardon me just

23  one minute.

24          MR. INSELBUCH:  Sure.

25          THE COURT:  I need to take a phone call.  Excuse me.

CC-BLG001659

1 Take about five minutes.

2                    (Five minute recess)

3           THE COURT:  ... for interrupting your argument.  I

4 lost you with the cases that deal with the situation that talk

5 about it's not the claim.

6           MR. INSELBUCH:  Sure.  We were talking about how the

7 cases fall into groups.  The first group merely says pretty

8 much what I said.  It tells you what the rule says.  It says it

9 applies to the case the people were negotiating.  Then there

10 are some cases that deal with identical situations.  I guess

11 the classic would be you have an automobile accident and you

12 have two people in one car and one person in the other car and

13 the one person is the defendant, the two plaintiffs sue.  He

14 settles with one of the plaintiffs and the other plaintiff now

15 would like to use that settlement as an admission of liability.

16 And the courts probably won't allow them to do that either

17 because that's the identical claim and it would violate the

18 policy.  He wouldn't be able to settle with anybody if you

19 permitted that in.

20           And there are a number of cases that say also what I

21 say about the rule that if you offer the material for a

22 different purpose than to show liability or the amount of the

23 claim in a particular case they'll let it in.  For example,

24 there's this wonderful Hutsmith v. The Commission of Internal

25 Revenue case that's cited where the issue was the value of

CC-BLG001660

1 timber taken from a particular forest.  And there were two

2 taxpayers.  They both took the timber from the same forest yet

3 the IRS had some expert estimator who came up with very

4 different numbers.  And the different numbers were shown or

5 were admitted by the Court to show bias on the part of the

6 estimator.  And that's of course exactly what I'm saying where

7 you're going to show some other purpose to be shown for the

8 evidence than the rules plainly permits it.

9        And, in fact, I think the Court recognizes once again

10 on December 5th that we were not -- this evidence was not being

11 offered for liability, but for some other purpose.  At Page 41

12 and 42 of the transcript -- this is December 5th, 2006, Your

13 Honor.  Mr. Bernick had been arguing that Rule 408 could not be

14 clearer.  This applies to this without any question.  The Court

15 said, "But I think the settlement history has a different

16 purpose regardless of liability.  I don't take a settlement to,

17 especially one that says which most of the ones I've seen in

18 other cases if not this case say that there's no admission of

19 liability."  And that's certainly the case, Your Honor.

20        "So I'm certainly not going to deem it to be an

21 admission of liability.  But I think it does have some value

22 with respect to whether or not the debtor is willing to settle

23 claims, and if so at what levels for whatever purpose the

24 debtor chooses to settle those claims."  My learned colleague

25 said, "But that is only -- that is not germane in this

CC-BLG001661

1 proceeding." And the Court said, "Well, sure it is. From the

2 asbestos creditors committee side it is because the standard, I

3 think, is pretty clear that the Court has to look to what would

4 be the likely outcome of the claims in the tort system if no

5 bankruptcy had been filed."

6       Now, there is one case at least that is directly on

7 point. And that is Judge Brown's decision in the Babcock &

8 Wilcox case in New Orleans where Mr. Bernick and I were

9 adversaries once before. And Mr. Bernick made the same

10 argument there that 408 precluded the use of settlement history

11 to estimate the asbestos liability. Now, there we weren't

12 estimating for the purpose of a plan. It was a fraudulent

13 conveyance piece of the bankruptcy and we were estimating what

14 was the reasonable liability. The reasonable estimate of the

15 liability or not the liability of the amount of the asbestos

16 claims present and future as of a particular date when a

17 transfer was made. That's what we were doing. And we said

18 well, the way you look at that is the same way you look at it

19 in all these other cases. You look at what the history was and

20 you project it forward as of that date because you've got to

21 estimate the presence and the futures.

22       And Babcock & Wilcox through Mr. Bernick said no, you

23 can't do that, 408 precludes that. And Judge Brown said, and

24 this is a 274 Bankruptcy Reporter on Page 256. "Finally,

25 defendant's argument that 408 of the Federal Rules of Evidence

CC-BLG001662

1 prevents the Court from considering B&W's prior settlement

2 history and protocol is also without merit.  Rule 408 prohibits

3 use in trial of evidence of a settlement, 'To prove liability

4 for an invalid or invalidity of the claim or its amount;'

5 with a footnote.  Rules 408 applies to the use of evidence of

6 compromise to prove the validity or invalidity of the claim

7 that is the subject of the compromise.  And clearly here, the

8 claims that are the subject of this compromise are the closed

9 claims.  We're not estimating those claims here today.  They

10 have been resolved.  Thus a particular plaintiff in a tort case

11 against a particular defendant cannot establish liability in

12 that case by using evidence of attempts to settle that case,

13 et cetera."

14        And what he went on to say is, "Consequently the

15 Court in determining whether B&W's future estimation of tort

16 liabilities was reasonable can consider both settlements by B&W

17 and other case histories against other asbestos defendants as

18 part of the grounds for its decision.  To do otherwise would

19 close one's eyes to the realties that existed in 1998;" Judge

20 Brown.  And, of course, we've had several estimations.  We've

21 had Armstrong, Federal Mogul, Owens Corning Fiberboard before

22 Judges Fulham, Rodriguez and Robreno, all Third Circuit

23 District Judges, and they have all done it this way.

24        Mr. Bernick will say well, nobody argued about it.

25 Nobody raised 408.  Well, maybe that's for the very good reason

CC-BLG001663

1  that people did not perceive it to be a valid objection.  But

2  in any event that's the way we did it.  Finally, on 408 at the

3  end of its brief Grace argues that they should be permitted to

4  use some proof out of the settlement history, but the asbestos

5  creditors committee and the FCR should not be.  And that's

6  really why we raise this immediately today before Mr.

7  Florence's testimony -- Dr. Florence's testimony.

8          Now, why do they want to do that?  Well, they want to

9  value their estimate of what they call liability based upon the

10 settlement history.  As it turns out as you'll hear based on

11 six mesothelioma settlements.  And why do they want to do that?

12 Well, it makes the numbers much, much smaller, doesn't it, if

13 we do it based on a settlement history rather than on the

14 judgment history.  If they based their estimate doing it their

15 way on the judgment history we wouldn't need to have these

16 hearings because the number would be so large and we would

17 agree to it.

18         But that case is interesting, because they cite you

19 to a place in the Federal Court, a Second Series at Page 912.

20 They cite you to Page 581 with a citation to the Second

21 Circuit.  I would ask you to --

22         THE COURT:  Wait, I'm sorry.  I didn't get the cite.

23 I'm sorry.

24         MR. INSELBUCH:  The citation is 912 F.2d, initial

25 Page is 563.  The page that they cite to is 581 and they quote

CC-BLG001664

1  at that page.  And they cite it to the Second Circuit in 1990.

2  And I'd like the Court to open this book to Page 581.  May I

3  hand it up?

4         THE COURT:  Thank you.

5         MR. INSELBUCH:  What you will see when you turn to

6  that page is the material that is cited to is not from the

7  Second Circuit, but from an appendix to the Second Circuit's

8  opinion which is a magistrate's decision which was ultimately

9  affirmed.  And frankly in that case what the Magistrate had

10  before him was at the foot of a consent decree that the

11  American Society of Composers, Authors and Publishers has been

12  operating under for, I think, since 1940 is a rate making

13  process, licenses for the performance of musical compositions.

14  People who use lots of music want a blanket license to use that

15  music.  And the dispute was with something called Show Time the

16  movie channel.  And they wanted to show what a settlement offer

17  which had been made by ASCAP to license HBO had been to prove

18  what their license would be worth, or should have been or would

19  have been a fair thing evidentiary.

20         Now, the magistrate let that in, ironically, and then

21  decided it had no probative value.  But in any event all I'm

22  saying is there are lots of cases that say well, for a

23  different purpose we can see it and that's what we're doing

24  here because it certainly wasn't there to show that HBO had

25  liability.  But, I just would point out that I was struck by

CC-BLG001665

1  the citation because it would lead one to believe that it was

2  language from the Second Circuit, which it is not.

3           Finally, in passing, we remark that even if there

4  were any validity to the argument about Rule 408, experts who

5  have historically done these processes in this way rely on the

6  evidence or the materials that they rely on irrespective of

7  whether the materials can come into evidence.  That's the

8  learning of Rule 703.  And since this is material that these

9  experts including Dr. Florence, when you hear from Dr. Florence

10 what he's done over the past 20 years in this field would rely

11 on in doing an estimate then they can rely on it irrespective

12 of whether it satisfies other rules of evidence.

13          Now, the argument is made that oh, you can't trump

14 408 with 703.  Well, you're not trumping any rule with 703

15 because the fact that the expert can rely on it doesn't bring

16 it into evidence for purposes of 408.  Now the Court has

17 authority under 703 to do whatever the Court feels is necessary

18 to make use of the material fair in the circumstances.  But 703

19 is an entirely different approach to the issues that are in

20 question.  And I would close by just arguing to the Court that

21 what is sauce for the goose is sauce for the gander.  If we are

22 not to be permitted to show -- to use the enormous history of

23 how Grace went about resolving its disputes over personal

24 injury claims in the past to show how they would most likely

25 have come out in the future then for sure Grace cannot be

CC-BLG001666

1 permitted to use the settlement values that come out of that

2 same pile of material for purpose of showing what they say is

3 their liability.  Thank you.

4           THE COURT:  Mr. Ansbro.

5           MR. ANSBRO:  Thank you, Your Honor.  I'll be brief.

6 I realize our side's time is short at this point.  Your Honor,

7 I just would really rate from the perspective of the future

8 claimants' representative as Mr. Elihu Inselbuch has pointed

9 out we're not here in this estimation hearing to prove

10 liability.  And in fact the FCR's estimation expert Jennifer

11 Bigg does not, contrary to Grace's arguments, use Grace's

12 settlement data to prove liability.  Ms. Biggs, as you will

13 hear and have read in her expert report gives her best estimate

14 as to the anticipated liabilities that Grace would be expected

15 to face, that Grace would be expected to face in the tort

16 system.

17           Consistent with all of the prior precedent in

18 contested asbestos bankruptcies and asbestos estimations the

19 tort system is the basis upon which the estimation proceeds.

20 And so Ms. Biggs, by estimating the anticipated liabilities is

21 estimating the dollar amounts that Grace would be expected to

22 pay to claimants in order to monetize and resolve the pending

23 and future asbestos personal injury claims against it.  It is

24 for that purpose that she uses the settlements here.  She's not

25 proving liability.  She doesn't assume legal fault or liability

CC-BLG001667

1 by virtue of that information.  Thank you, Your Honor.

2             THE COURT:  All right.  Thank you.  Mr. Bernick.

3             MR. BERNICK:  Yes, Your Honor.  I'd like to begin

4 with what I think really is a central argument that's being

5 made here at the outset that's more or less a play on words

6 rather than a substantive analysis.  Both the ACC and the FCR

7 have urged strenuously over time that the purpose of this

8 proceeding is not a "determination of liability."  And that is

9 correct.  We are not ruling or the Court is not being asked to

10 rule on the liability of Grace with respect to any individual

11 claimant.  But, that's not to say that liability is irrelevant

12 to this proceeding.  It is not to say that liability is not the

13 touchstone of this proceeding.  It is.

14             This is an estimation of liability.  It's not an

15 estimation of any other thing.  It is an estimation of what

16 Grace's obligation to pay will be.  An obligation to pay under

17 the rules comes down to allowability, and allowability is

18 determined on the basis of actual legal liability under state

19 law.  So the touchstone of the estimation is in fact liability.

20 They can't get around it.  This is something that we briefed in

21 the trial briefs that were submitted at the beginning of the

22 case, and it remains so today.  It is their preference rather

23 than to estimate the liability by reference to actual facts of

24 liability to use the settlements as a proxy as they have done

25 in the past.  That is their decision.

CC-BLG001668

1       But then they have to wrestle with whether it

2 comports with the rules.  If in fact the prior settlements are

3 not being used as evidence of liability then they are

4 irrelevant to the standard that brings us here today which is

5 allowability under the rules.  If they are seeking to proffer

6 the prior settlement as settlements of liability therefore

7 their position is germane to the issue under the rules, then

8 they have to abide by Rule 408.  It's just that simple.  You

9 can't have settlements be introduced for purposes other than

10 liability still be found to be relevant or they're educed for

11 purposes of liability and not have to comply with Rule 408.

12 Rule 408 actually deals with the issue of liability.  So,

13 that's the first problem is, is there something that because

14 this is an estimation takes this issue outside of Rule 408 and

15 the answer is no there is not.

16       We then come to two basic problems.  Problem number

17 one is factual.  And there's no amount of argument about the

18 law or indeed argument about Rule 408, or 702, or 703 or

19 anything else that can alter the facts.  And the underlying

20 facts here are that the settlements that were reached by their

21 terms said that they were not admissions of liability and could

22 not be used for that purpose, and all of the parties to the

23 settlements so stipulated.

24       Now, on the basis of what principle of law can a fact

25 which doesn't exist be made to exist by virtue of any kind of

CC-BLG001669

1  argument?  There is absolutely no evidence before the Court
2  other than what we introduced in our brief, and we'd be happy
3  to give the Court summaries of all of the settlements that are
4  out there that we can lay our hands on if that's what the Court
5  wants.  The only evidence before the Court is that the
6  settlements specifically disclaim admissions of liability.
7  Well, what principle of law now turns them factually into
8  admissions of liability?  Absolutely none has been cited.
9       Now, we could agree that they are.  In other cases
10  folks have agreed that they are.  But, that is an agreement
11  that essentially is now a new agreement that changes the
12  historical fact.  We've not made any such agreement.  We're
13  prepared to have this historical fact the rest, or what it was
14  at the time, which is that it was not an admission of
15  liability.  They have no answer to that proposition whatsoever.
16  It is an end of the matter.
17       To the extent that the Court gets into the rule all
18  that the rule constitutes is essentially a belt and suspenders
19  saying that now also as a matter of law if the prior
20  settlements in fact were admissions of liability as a matter of
21  law they cannot be introduced for that purpose.  That's what
22  Rule 408 says.  It executes a principle of legal public
23  policies that says that they're not admissible.
24       The only argument that is made with respect to the
25  rule in this application is Mr. Inselbuch ably put that box

1   around "the", the claim as if to say Rule 408 only governs the

2   disposition -- the evidence relating to the claim actually

3   litigated in the case which would have the effect of meaning

4   that it is only where negotiations between the parties in the

5   case at bar break down that Rule 408 then precludes the use of

6   those settlement negotiations in a subsequent trial on the

7   merit; that is to say, Rule 408 is really confined to

8   precluding offers of settlement and settlement negotiations as

9   opposed to completed settlements, because if there were

10  completed settlements the case wouldn't exist.

11          That interpretation of Rule 408 has been specifically

12  -- was specifically addressed by the advisory committee itself

13  in the 1970 proposed rules.  In 1970 the advisory committee in

14  its notes specifically addressed that question and stated,

15  "While the rule is ordinarily phrased in terms of offers of

16  compromise it is apparent that a similar attitude must be taken

17  with respect to completed compromises when offered against a

18  party thereto.  The latter situation will not of course

19  ordinarily occur except when a party to the present litigation

20  is compromised with a third person."  Plain as day.  That is

21  also the rule that was articulated and adopted by the Third

22  Circuit in the Petrusi case in 1993 where the Court

23  specifically held that prior anti-trust actions would not be

24  admissible, and that rule of law in the Third Circuit remained

25  sound.

CC-BLG001671

1          Mr. Inselbuch, my learned colleague, cites the
2 Huntspeth case as if the Huntspeth case helps their position.
3 It does not.  That's a Ninth Circuit case where Rule 408 was
4 held to bar third party compromises.  The net result if the
5 rule were otherwise would be really the rule would have almost
6 no utility and particularly in toxic court cases where the same
7 defendant is present on multiple occasions and if the defendant
8 enters into a settlement with respect to one plaintiff that
9 settlement would then be used forever.  And we know that that
10 doesn't happen.  It doesn't even happen in asbestos cases.  The
11 prior settlements are introduced as evidence of liability.
12          So there's no way that consistent with the language
13 and the rule or the policy of the rule, the rule can be read to
14 be so limited and so useless.  There's a citation to Armstrong
15 and other cases.  Mr. Inselbuch properly concedes that those
16 are cases that didn't raise the issue.  In the Babcock case the
17 issue was raised, and I want to come back to the Babcock case
18 because it's instructive with respect to the second issue
19 that's before the Court which is the debtors' use of settlement
20 history.
21          In the Babcock case essentially the fact was whether
22 the settlement -- whether the estimate that had been made by
23 Babcock & Wilcox historically was a reasonable settlement or
24 not.  That was the issue in the case.  And while we did argue a
25 broader legal proposition, the Court in the very language that

CC-BLG001672

1  Mr. Inselbuch cites came back to the proposition that the fact
2  at issue was a liability estimate where the debtor itself used
3  settlement.  So if you wanted and had to resolve the question
4  of whether the debtor's estimate was reasonable you had to be
5  talking about the settlements.  There was no way to avoid it.

6          And very, very importantly, and this is a fact that
7  Mr. Inselbuch didn't touch on, but Judge Brown was at pains in
8  his opinion and it actually rebounded to the benefit of the
9  claimants because otherwise they would have been stuck with
10 that opinion in connection with plan negotiations said that
11 when we get to things like estimation, i.e., we're here today
12 talking about estimates, the rules can be completely different.
13 So that's a fraudulent conveyance case.  It doesn't really have
14 anything to do with why it is we're here today.

15         As to the idea that 702 and 703 somehow create a
16 carve-out from Rule 408, there is nothing and anything to do
17 with 702, 703 that somehow design to trump or create an
18 exception to Rule 408.  And indeed they proceed on the basis of
19 completely different jurisprudential considerations.  408 is an
20 issue about whether certain evidence should be admissible
21 because to admit it would violate or create a problem with
22 legal public policy.  Rule 702, 703 has nothing to do with it.
23 It has to do with the quality of reliability that must attach
24 to evidence before it can be used as a foundation for expert
25 opinion.

CC-BLG001673

1          So I'd like to talk a little bit then about the
2    second part of this equation.  And Mr. Inselbuch's citation to
3    the sauce for the goose, sauce for the gander rule is in
4    certain parts of the mid-Atlantic is referred to the saucy
5    rule.  I don't know if there's a southern version for that.  I
6    tried a case where everybody referred to it as the saucy rule.
7    But really the rule that we have to deal with here is not a
8    rule of sauce, it's a rule of swords and shields.  And let me
9    get into the good stuff.
10          We have a settlement that took place between Grace as
11   a defendant and Plaintiff A in some prior litigation.  The
12   policy -- Rule 408 is designed to give protection to the
13   participants in this process and it does so by saying that Rule
14   408 essentially creates a shield -- that's my little shield --
15   both for Grace and for the plaintiff in that case such that
16   whatever they do can't be used as admission.  Now, here the
17   stipulations in the settlement is so stated.  But that's the
18   policy of Rule 408.
19          We now move forward to the present case.  Grace is
20   now present here and we have a bunch of folks who are here as
21   Claimants 1 through N.  What is important about the people here
22   is that they don't participate in the sauce rule.  The sauce
23   rule or the shield's rule protects those people who were
24   involved in an actual settlement that is being placed at issue
25   in an evidentiary way.  These people, there are four things

CC-BLG001674

1  that relate to them; (1) is that they were not parties to the

2  settlement, (2) is that they are not protected by the policy of

3  Rule 408.   None of these people actually were involved in the

4  settlements at all.   They are totally different parties.   And

5  because they're different parties there's nothing about these

6  prior settlements which we are using for purposes of their

7  dollar value, there's nothing about their negotiations or their

8  interests in the negotiation process that is in any way, shape

9  or form compromised.   They are not parties, they are not

10  protected by the policy, they were never involved.

11         And that is clear and that is also the force of the

12  Show Time decision out of the Second Circuit which was -- we do

13  cite the magistrate's opinion and the magistrate's opinion is

14  in fact appended to a Second Circuit decision that upholds the

15  determination that was reached.

16         But the process doesn't even start here -- stop here.

17  This is also not a situation where anybody wants to litigate

18  the settlements on the merits insofar as their dollar amount is

19  concerned.   The claimants here aren't coming in and saying, oh,

20  we want to prove up that all of these -- all of our claims in

21  terms of their dollar value are really worth X dollars because

22  of, you know, compensatory loss, you know, emotional -- all of

23  the soft damages aspect of their claim.   They're not seeking to

24  litigate on the merits.

25         The whole purpose of Rule 408 is to protect

CC-BLG001675

1  litigation on the merits so that if either side to this

2  controversy wanted to actually litigate damages on the merits

3  and either party were a party to the prior determinations based

4  upon settlement, well, then Rule 408 would not allow you to

5  displace litigation on the merits with litigation which used

6  instead the settlement value.  That's not taking place here.

7  There's no evidence that we will hear from the claimants here

8  with respect to the class of claims that we're dealing with

9  that says, oh, here's what their real value is based upon a

10 merits analysis.

11         And obviously this then brings us to the last

12 situation.  This is not a situation where 408 is being used as

13 a shield.  Everybody, everybody in this case agrees that the

14 dollar amounts assigned to the claims should be driven by

15 settlement history.  In that respect this is exactly like the

16 Babcock case.  In the Babcock case everybody agreed that the

17 issue was whether the estimate that had been reached by Babcock

18 was a reasonable estimate and it used settlement information.

19         Likewise with respect to dollars here that is the

20 claim value these are all situations on both sides, all the

21 parties here are saying we all agree that the settlement

22 history should be the benchmark.  So we don't have anybody who

23 wants to litigate on the merits.  Everybody wants to litigate

24 on the basis of the settlements.  And what is it that the other

25 side now comes in and says?  They come in and say well, we

CC-BLG001676

1 really don't like what Grace is doing on the liability side.

2 We really don't like that.  And even though we agree with what

3 they're doing on the damages side, we would rather toss out the

4 entire enterprise and wipe out all of Grace's evidence on

5 liability by saying oh, well, they can't use the damages part

6 of the equation.  That's effectively what they're saying.

7       If we weren't going with our approach on liability;

8 that is, liability determined on the merits, they wouldn't be

9 making a peep about the use of the settlement dollars for

10 valuation purposes.  It is only by way of reprisal that they

11 are here saying that we can't use the settlement dollars.

12      Well, one thing is quite clear which is that Rule 408

13 is not a sword.  It is a shield.  It is protective.  These

14 people aren't entitled to protection, only Grace is.  They are

15 certainly not entitled to use this as a sword by way of

16 creating a threat against Grace's damages case in order to

17 obtain the result that they seek which is to throw out Grace's

18 liability case.  This is a perversion of Rule 408.  It's got

19 nothing to do with its protective policies, they don't enjoy

20 those policies.  It's got nothing to do with their wanting to

21 litigate on the merits.  They don't want to litigate on the

22 merits with respect to any issue in the case.  This all has to

23 do with what they call the sauce rule, but it's really a sword

24 rule.  And that rule cannot be found within the confines of

25 Rule 408.

J&J COURT TRANSCRIBERS, INC.

CC-BLG001677

1              THE COURT:  Mr. Inselbuch.

2              MR. INSELBUCH:  Mr. Bernick began by talking about

3    allowability of claims.  And I would go back and remind the

4    Court that we're not here in an allowance proceeding.  No claim

5    will come out of this estimation allowed.  We couldn't begin to

6    allow future claims.  We can't be allowing either Mr. A's claim

7    or Mr. B's claim because at least for the future claims we

8    don't even know who they are.  And in fact if we were in that

9    mode, if we were actually going to litigate the legal liability

10   with respect to any of those claims, with all due respect to

11   this Court, we would have to be in the District Court because

12   every one of these claimants would be entitled to a jury trial.

13             I'm puzzled by what Mr. Bernick was writing over

14   there.  I wonder whether he would also argue that if you had

15   another litigant, if they were not in bankruptcy, if they were

16   in the tort system and they had all of this pile of settlements

17   in the past and some new litigant came in to try a case against

18   Grace that litigant isn't entitled apparently to the policies

19   of 408.  That litigant didn't settle anything.  That litigant

20   wasn't party to the settlement.  Could they offer the

21   settlement values from other cases against that litigant?  I

22   think not.  I think it wouldn't be probative.

23             We're not here saying that they can't use settlement

24   values because they're using a merits based argument.  We're

25   saying simply that if all of that information that resides in

CC-BLG001678

1  that history which we submit is the best evidence of what would

2  happen in the future with all of the unknown cases that might

3  arise in the future, if we can't use that then they shouldn't

4  be able to either, irrespective of what their theory is.  The

5  rule is unitary.  It doesn't talk about liability separately

6  from value.  It talks about them together.  You can't use one,

7  you can't use the other.  You can use one, you can use both.

8  And we're not here to prove liability at all.  They know that,

9  we know that.  We're here to estimate what amount of money

10 needs to be set aside in order to properly fund the trust which

11 by definition we can't tell what the liability is.  Thank you.

12          THE COURT:  Mr. Ansbro.

13          MR. ANSBRO:  Your Honor, if I may, maybe just inject

14 a different point of view here and perhaps put what Grace's --

15 put Grace's motion into context here.  Your Honor is aware that

16 these two sides are presenting diametrically different

17 methodologies here.  We're in the tort system.  We're using the

18 term liability to couch costs of these settlements.  Grace has

19 taken a completely different view.  The motion -- and in that

20 context, Your Honor, as Mr. Inselbuch has pointed out Your

21 Honor has said that you will allow both sides to present their

22 cases fully and then Your Honor will take on board all of the

23 evidence that's presented and determine what's really going on

24 here.  Is it liability according to Grace's theory or liability

25 according to the claimant's theory?

CC-BLG001679

1          What this motion does is try to cut the legs out from

2    under the claimant's case altogether.  If you were to grant

3    this motion we would essentially have no expert opinions to

4    offer to Your Honor.  That would leave Your Honor with only one

5    choice, as to how to fund or to make an estimation that would

6    fund this trust.  We submit, Your Honor, with left with only

7    one it would severely under trust -- under fund the trust.

8          A different way to look at this is if we had brought

9    a motion in limine, we've already brought these motions by way

10   of Daubert, but the same arguments could be made from our side

11   based upon the tort system; that is to say, we could have

12   brought motions in limine seeking to bar Dr. Anderson's

13   opinions about causation and about thresholds that she adopted

14   from Dr. Moolgavkar.  None of the threshold and the criteria

15   applied by Grace's experts exist in the tort system.  They

16   aren't the law.  They are Grace's theory here in this case.

17         And Your Honor has allowed Grace to present its case

18   in full when a motion by us would have been grounded in tort

19   law which exists in 50 states to say what they are proposing

20   here isn't the law, it has no place, it's not a fit here.

21   That's our Daubert argument.  This is nothing more than the

22   same thing they are doing by way of motion in limine.  It's

23   inappropriate, Your Honor should hear both cases in full, make

24   a determination on that basis.

25         MR. BERNICK:  Your Honor, I just have a very brief

J&J COURT TRANSCRIBERS, INC.

1  comment which is that I literally am totally perplexed by the

2  argument that just got made.  I think that I don't have

3  anything to say further in response to Mr. Inselbuch's

4  argument, but Mr. Ansbro just got up and said, geez, you know,

5  why don't you let everything come in and then consider these

6  matters.  And we've stated our position, we've objected to

7  their evidence on the grounds of Rule 408.  We did so in the

8  briefs that we filed at the outset.  We didn't make the motions

9  before the Court here today.

10        The motion that was made before the Court here today,

11  as I read it, is by the ACC and the FCR.  It was Mr. Ansbro and

12  his client and Mr. Inselbuch and his client that wanted Your

13  Honor to go forward and rule on these matters today presumably

14  with the view of cutting the legs out from under our case.  So

15  we are content to have these matters, the 408 matter be before

16  the Court.  We've made the -- we've stated our position both in

17  response to this motion but previously in the trial papers.  We

18  will object to their use of settlement data.  We are the only

19  ones who are entitled to do that.  They are not entitled to do

20  that.  We'll make that objection.

21        I expect that Your Honor will let all of that

22  evidence in and consider the matter at the end of the case.  So

23  if the purpose in this was to simply say, oh, we object, well,

24  that's fine, but they didn't just do that.  They moved in

25  limine to prevent our evidence from going forward.  And it's

CC-BLG001681

1 | not just the ACC that did it, it's Mr. Austern and Mr. Ansbro
2 | who did it, as well.  So we're happy to have the arguments out
3 | before the Court.  We don't think it's even close.  But we're
4 | also happy to proceed with the case and have both sides put
5 | their evidence in and then Your Honor make a determination at
6 | the end of the day with the benefit of a full record about how
7 | these rules are going to be applied.

8 | THE COURT:  All right.  Well, I think consistent with
9 | everything else that I've been doing I am going to allow the
10 | evidence to go forward and make the determinations at the end
11 | of the case.  It appears to me that based on the theories that
12 | both of you -- both sides are constructing and you're obviously
13 | correct, Mr. Inselbuch, the ACC and FCR haven't started their
14 | cases yet, and so what I know about the structure of the case
15 | is what I've been able to read from the expert reports and the
16 | arguments and opening statements and so forth.  So I have some
17 | conception of what you intend to do, but in terms of evidence
18 | obviously I haven't heard it yet.

19 | It does seem to me however that the settlement and
20 | history construction both that the debtor intends to present
21 | and that the ACC and FCR tend to present, although somewhat
22 | different in scope, nonetheless are both relevant to your
23 | respective cases.  So in terms of relevance I think the
24 | evidence is relevant.  Whether it is admissible under Rule 408
25 | certainly the other judges who have done estimations in the

CC-BLG001682

1  Delaware cases have found it to be so, as did the original case

2  -- I think the original case anyway, one of the original cases,

3  Eagle Picher, that took a look at this issue.

4          Eagle Picher also, I think that's the appropriate

5  case, goes so far as to say that settlement histories with

6  respect to the non-debtor involved though are not relevant

7  unless there is some very good evidence that ties both the

8  product, the work history and so forth to the same type of

9  industry that the debtor itself was in.  So there are some uses

10 of settlement histories that may or may not be appropriate

11 within the context of the given trial.

12         It's a little difficult sitting as a trial judge with

13 three District Court Judges who have looked at the same issue

14 in the same district having allowed this evidence to come in to

15 say that it's not admissible for the theory of the case that

16 the ACC and the FCR want to use it in.  But, I'm not sure that

17 the Rule 408 issue was addressed by those courts.  It may be

18 because no one thought that it was relevant.  It may be because

19 no one challenged the use of the settlement histories for the

20 purposes for which they were being argued in that case -- those

21 cases; plural.

22         Nonetheless, for now I am going to let both sides

23 present it.  I am going to decide at the end of the cases,

24 plural, what the relevance and admissibility of the evidence

25 will be because as I've said earlier I want to get the case

CC-BLG001683

1  done, and I will take it all under advisement at the end.  We

2  don't have a jury here and I think I can separate it all out

3  when I have an opportunity to consider it at the end.

4         MR. INSELBUCH:  I have just a brief question.  Do you

5  envision then that we would make, when necessary, brief

6  protective objections --

7         THE COURT:  Yes.  Please.

8         MR. INSELBUCH:  Thank you.

9         THE COURT:  Okay.  Mr. Bernick.

10        MR. BERNICK:  Do they have to be repeated?  I mean,

11 virtually every question --

12        THE COURT:  Just raise them the first time in the

13 record where they appear, and then just indicate that you've

14 got a continuing objection so that when I get to that point in

15 the record I know that that's where the objection comes up.

16        MR. INSELBUCH:  Understood, Your Honor.

17        THE COURT:  With respect to any witness for whom you

18 intend to raise the objection.

19        MR. INSELBUCH:  Understood.

20        MR. BERNICK:  Grace calls Dr. Tom Florence as its

21 next witness.

22        B. THOMAS FLORENCE, GRACE'S WITNESS, SWORN

23        COURT DEPUTY:  Please be seated.

24        THE COURT:  Mr. Inselbuch, is this your volume or is

25 it --


J&J COURT TRANSCRIBERS, INC.

1           MR. INSELBUCH:  Yes, it is, Your Honor.

2           THE COURT:  May I return it, please so I don't

3  forget.

4           MR. INSELBUCH:  Thank you.

5                      (Pause)

6           MR. BERNICK:  May I proceed, Your Honor?

7           THE COURT:  Yes.

8           MR. BERNICK:  Has the witness been sworn?

9           THE COURT:  Yes.

10          MR. BERNICK:  Okay.

11                  DIRECT EXAMINATION

12  BY MR. BERNICK:

13  Q    Good morning, Dr. Florence.  Could you please tell us how

14  long you've been doing claims estimation, roughly?

15  A    I think that the first piece of work I did for claims

16  estimation was for the Ace Robbins Company, probably mid-80s.

17  Q    Okay.  Ace Robbins didn't involve asbestos, did it?

18  A    It did not.

19  Q    What was the nature of the litigation that gave rise to

20  that estimation process?

21  A    Well, there was a couple.  One is -- I think the very

22  first project I did for Robbins was they were still a solvent

23  defendant in the tort system and we were asked to estimate

24  liability as it related to contingent liability for their

25  financial statements.  Subsequent to that Robbins filed for

J&J COURT TRANSCRIBERS, INC.

CC-BLG001685

1 bankruptcy.  And I also worked for Robbins in the bankruptcy

2 process.

3 Q     Was the litigation -- the underlying litigation, was the

4 focus of it the Dalkon Shields claims?

5 A     It was.

6 Q     Yes.  You may want to --

7 A     IUD.

8 Q     I'm getting a little bit of raspiness.  You may want to --

9 A     That may be my voice.

10 Q     A fine voice, but I think you may be just a tad too close

11 to the microphone.  Could you describe -- I want to get a

12 little bit more into the experience that you had with

13 estimations.  But, could you describe your educational

14 background.  At this point I'd like to show Exhibit 2302 for

15 demonstrative purposes.

16 A     Yes.  I have a Bachelor of Business Administration from

17 University of Kentucky.  I have an MA and PhD from Michigan

18 State University.

19 Q     Okay.  And I see that you have recorded here the basic

20 periods of your professional experience, could you just go

21 through those and describe what it is that you did in those --

22 what those different entities are and what it is that they were

23 focused on?

24 A     From 1970 -- roughly 1978 to 1994 I was a vice president

25 with RPC, Resource Planning Corporation.  It was a research and

CC-BLG001686

1  consulting firm headquartered in Washington, DC.  The work I

2  did there was primarily social research of some sort.  Some

3  operations were -- some for the FTC for clients that were in

4  litigation, some for the federal government.  In 1994 ARPC --

5  I'm sorry -- RPC was purchased by KPMG; Peat Marwick.  I went

6  to KPMG as a principal.  While at KPMG I was a principal with

7  the firm and also was the national director of their litigation

8  practice.  The work there was primarily the same type of work

9  that I did at RPC.  I was there for three years.  When I left

10  KPMG, I went out and was one of the founding members of ARPC

11  which is a research and consulting firm.  Since 1997 I've been

12  the president of ARPC.

13  Q    Okay.  You mentioned that you did -- were involved in

14  estimations relating to Dalkon Shields beginning in the

15  mid-1980s, could you tell us what, if any, other estimations

16  that you've done that are not focused on asbestos?

17          MR. BERNICK:  And let's show 2303 for that purpose.

18  A    Well, I mentioned the Dalkon Shields.  We also did -- have

19  done estimates of the timing and the value of claims related to

20  breast implants.  We did a study for the -- Judge Pointer in

21  the court for Baxter/3M class action, I believe it was.

22          THE COURT:  Pardon me, doctor.  Could you push the

23  microphone down below your mouth?  I think that may help a

24  little.  We're still getting the feedback.  Try that.

25          THE WITNESS:  Okay.  Is that better?

J&J COURT TRANSCRIBERS, INC.

CC-BLG001687

1          THE COURT:  No.

2          THE WITNESS:  Then maybe I have to raise my voice.

3          THE COURT:  No.  I think it's the microphone.

4          MR. BERNICK:  Yeah.  Though I have to say you're the

5    first one where we've had this problem.  Go ahead.

6          THE COURT:  I'm sorry.  For Judge Pointer, would you

7    pick up again what you did with Judge Pointer, please?

8    A    Yes.  We were asked by the Court to estimate the value of

9    the claims related to implants produced by Bristol Baxter or 3M

10   Corporation.  And the purpose of that I think the Court was

11   trying to determine the feasibility of a settlement proposal.

12   Q    Okay.  I see that we actually have what I'll generously

13   characterize as a typo on this line because non-asbestos does

14   include asbestos.  Could you give us, with the exclusion of

15   that, and we'll submit a conforming slide, just give us a brief

16   overview of some of the other non-asbestos tort estimates that

17   you've done.

18   A    We worked for the Special Master in <u>Albuterol</u> class action

19   case.  We were asked to estimate the value and timing of the

20   claims in that <u>Albuterol</u> case.

21   Q    Okay.

22   A    In the <u>TCE</u> case we worked for the -- it was actually a

23   bankruptcy case involving Met-Coil.  We were asked to estimate

24   the value of the claims that arose out of exposure to TCE.  In

25   <u>Love Canal</u> we were hired by the -- we actually worked for the

CC-BLG001688

Florence - Direct                                    46

1  insurance carriers in attempting to estimate the volume and

2  value of environmental claims coming out of Love Canal.  And in

3  the Pedicle Screw case we were asked to determine the

4  feasibility of conducting an estimate of the number of claims

5  arising out of the Pedicle Screw litigation.

6  Q    Let's turn to asbestos.  Have you or have you not been

7  involved in working with trusts whose focus has been to pay

8  claims relating to asbestos?

9  A    I have.

10 Q    Okay.  In what capacities have you done work in connection

11 with asbestos trusts?

12 A    Well, we've served as consultants to trusts on operational

13 issues.  We've served as consultants to trusts on estimation

14 issues.  And we've actually -- I've actually served as an

15 interim administrator in some of the trusts.

16 Q    Okay.  Just in order to move through these quickly, let's

17 show you 2304.  Does this list the trusts with respect to which

18 you've acted as an executive director?

19 A    Yeah.  These are the trusts that I'm currently serving as

20 the executive director for.

21 Q    Okay.  Tell us whether or not estimates of liability,

22 claims estimates, I should say -- tell us whether claims

23 estimates have been done in connection with trust operations.

24 A    Yes.  Claims estimates are normally done in relation to

25 trust operations.

J&J COURT TRANSCRIBERS, INC.

CC-BLG001689

1  Q    I'm showing you 2305.  Does this indicate estimates for

2  asbestos trusts that you've been involved in?

3  A    It does.  Yes.

4  Q    Have you also been involved in doing estimates for

5  bankruptcy cases?

6  A    I have.

7  Q    I'm showing you 2306.  Does this indicate retentions, and

8  then also within the retentions, bankruptcy cases where you

9  have testified regarding estimation?

10  A    It does.  The clients with a T are those where I

11  testified.

12  Q    I'm showing you 2307 --

13           THE COURT:  Wait.  You're going too fast for me.  I'm

14  sorry.

15           MR. BERNICK:  That's all right.

16                          (Pause)

17           THE COURT:  Okay.  Thank you.

18           MR. BERNICK:  Thank you.

19  Q    What about for companies that are not in bankruptcy, but

20  are still in the tort system?  Tell the Court whether or not

21  you've done estimates of claims, asbestos claims, in connection

22  with companies that are still in the tort system?

23  A    We have.  I have.

24  Q    I'm showing you 2307.  Does, this indicate those companies

25  for whom you have done estimates while they are still in the

CC-BLG001690

1  tort system, including those that are confidential so that you

2  can't indicate them by name?

3  A    Yeah, it does.

4           MR. BERNICK:  Your Honor, we would proffer Dr.

5  Florence as an expert in claims estimation.

6           MR. FINCH:  Voir dire, Your Honor?

7           THE COURT:  Yes, sir.

8           MR. FINCH:  May I approach the witness, Your Honor?

9           THE COURT:  Yes, sir.

10          MR. BERNICK:  How long is this going to be?  I don't

11 want to stand up --

12          MR. FINCH:  Five minutes, ten minutes, tops.

13          MR. BERNICK:  Ten minutes?  I'll sit down.

14                 VOIR DIRE EXAMINATION

15 BY MR. FINCH:

16 Q    Nathan Finch for the Asbestos Creditors' Committee.  Dr.

17 Florence, we have met before, correct?

18 A    Yes.

19 Q    Many times?

20 A    Yes.

21 Q    You're not a doctor, medical doctor?

22 A    I am not.

23 Q    You're not an epidemiologist?

24 A    I am not.

25 Q    You are not a lawyer?

CC-BLG001691

1  A    I am not.

2  Q    You're not an industrial hygienist?

3  A    I am not.

4  Q    You are not an insurance claims adjuster?

5  A    I am not.

6  Q    You are not a statistician?

7  A    I know statistics, but I don't have a formal degree out of

8  statistics.

9  Q    I asked you in your deposition what is your field of

10 expertise, and what you told me was at this point you're a

11 liability estimator, or a forecaster, correct?

12 A    I think -- yes.  Most of the work I do is estimation work.

13 Q    Could you turn in your book to what's behind Tab 2?

14         THE COURT:  I'm sorry.  I --

15         MR. FINCH:  Sorry.  May I -- sorry, Your Honor.

16 John, could you show on the screen ACC-462?

17 Q    Dr. Florence, do you recognize ACC --

18         UNIDENTIFIED SPEAKER:  Turn off the ELMO.

19         UNIDENTIFIED SPEAKER:  You're going to switch?

20         UNIDENTIFIED SPEAKER:  How did I know that?

21         UNIDENTIFIED SPEAKER:  You're a quick study.

22                      (Pause)

23 Q    This is the second expert report you did in this case, Dr.

24 Florence?

25 A    It appears to be.  Yes.

CC-BLG001692

1 Q    And the second report is -- was intended to replace the

2 first report, correct?

3 A    It was.

4 Q    Okay.  Could you turn to the last text page, Page 24?  And

5 this lists the things you are relying on for purposes of

6 forming your opinions in this case?

7 A    Page 24?

8 Q    Yes.  In reaching the opinions and conclusions that are

9 set forth in this report, you list various things, items of

10 data, reports, articles, et cetera, do you see that?

11 A    Yes.

12 Q    Okay.  So, the -- one of the things you're relying on for

13 your opinions is your knowledge of asbestos claims forecasting,

14 correct?

15 A    Correct.

16 Q    And you developed that knowledge in your work as

17 estimating -- in estimating asbestos claims, for example, in

18 the Babcock case, correct?

19 A    I estimated claims in the Babcock case, correct.

20 Q    And as part of that, that's how you developed your

21 knowledge and how to do it, you're relying on your past

22 experience in estimating claims for your work here, correct?

23 A    I assume -- yes, some of my work is a function of

24 experience I've gained over the years.

25 Q    And you gained that experience in the Armstrong case, for

CC-BLG001693

1  example?

2         MR. BERNICK:  Your Honor, I object.  What aspect of

3  his expertise does this go to?  If he is getting into what it

4  is that he's done in this case, that's a different matter.

5  This is -- should be focused on his expertise --

6         MR. FINCH:  Okay.  Let me tie it up, Your Honor.

7         MR. BERNICK:  I really want to know if there's --

8  maybe -- if there's an objection here?

9         THE COURT:  I don't know.  He said he'll tie it up.

10 Let's see.

11 Q    Could you turn to Page 1 of your report?  That report.

12 That report.  And you say, in the second paragraph -- by "we"

13 you're referring to you, or the companies your work for,

14 correct, the companies that you've owned; ARPC or RPC?

15 A    ARPC.

16 Q    Okay.  We have estimated current and future

17 asbestos-related health claims and liabilities in connection

18 with <u>Babcock & Wilcox</u>, <u>48 Insulations</u>, <u>Eagle Picher Industries</u>,

19 and it goes on through a fairly long list, do you see that?

20 A    I do.

21 Q    Okay.  And you're relying on the experience and knowledge

22 you've gained in doing those estimations, at least in part, for

23 your expertise, correct?

24 A    Sure.  I am what I am today, I guess, as a function of

25 what I've worked on.  Correct.

CC-BLG001694

1  Q    Okay.  Now, in this particular estimation, you were given

2  a series of assumed criteria, correct, that's shown on Page 2

3  to your report --

4           MR. BERNICK:  I object at this point, Your Honor.  We

5  all know where this is going.  This goes to cross examination

6  on what he actually did in this case.  It does not go to his

7  qualifications.  Indeed, all that counsel has done is to

8  establish and reiterate some of the very same qualifications

9  that I brought out in connection with my examination.

10          MR. FINCH:  Your Honor, may I make -- the line of

11 questions is three more questions, and I have an objection to

12 the proffer.

13 Q    Dr. Florence, is it correct that the assumptions shown on

14 the screen on Page 2, you have never applied those assumptions,

15 those specific assumptions, to any of the other estimates of

16 asbestos claims and costs that you've done before?

17 A    These particular assumptions?

18 Q    Yes.

19 A    On some of these we have.  For example, in doing trust

20 forecasts we would apply assumptions having to do with ILO and

21 PFT scores.  I mean, those would be criteria that are part of

22 the trust criteria that would go into the estimation.

23 Q    But these specific criteria, one of them would include the

24 -- for example, the worker has to personally mix or personally

25 install a Grace asbestos-containing product.  You've never

CC-BLG001695

1 applied in any other case a criteria that the worker has to

2 personally mix and personally install a Grace product in order

3 to make your estimates, correct?

4 A     Certainly not with regard to Grace, no.

5 Q     And you certainly haven't applied a mix or install

6 criteria anywhere else either, have you?

7 A     Well, mix or install would be a subset of criteria that

8 we've applied other places.  Again, there are trusts that have

9 exposure requirements where mix and install would be one of the

10 factors that would qualify for the --

11 Q     But they're not exclusive factors, correct?

12 A     They would not be exclusive factors.  Correct.

13 Q     So, people could qualify if they even if they didn't mix

14 or install in the trusts for Owens-Corning, and Armstrong, and

15 USG, for example?

16         MR. BERNICK:  Objection.  Again, we have a

17 foundational issue.

18         THE COURT:  That's sustained.  This is going beyond

19 expertise --

20         MR. FINCH:  Okay.

21         THE COURT:  -- to the specifics of what he did here.

22         MR. FINCH:  All right.  Then, Your Honor, I will just

23 -- I'll object for -- to Dr. Florence's qualifications to do

24 the estimate that he did here on the ground that he is using a

25 set of criteria here that he has not -- well, actually -- does

CC-BLG001696

1  Mr. Mullady have any voir dire?

2          MR. MULLADY:  One question.

3          MR. FINCH:  Okay.  I'll let Mr. Mullady have voir

4  dire, and then I'll make my --

5          THE COURT:  Mr. Mullady?

6                  VOIR DIRE EXAMINATION

7  BY MR. MULLADY:

8  Q    Just one question, Dr. Florence, and I'll ask it from

9  here.  I'm Ray Mullady.  I represent the FCR.  Good morning.

10 A    Good morning.

11 Q    Are you an actuary, sir?

12 A    I am not.

13 Q    Thank you, sir.

14         THE COURT:  All right.  Mr. Finch?

15         MR. FINCH:  We object to Dr. Florence's

16 qualifications to do the estimate that he is doing here on the

17 grounds that he has not done an estimate applying these

18 criteria in toto anywhere else in his past experience.

19         MR. MULLADY:  The FCR joins the objection.

20         THE COURT:  All right.  That's overruled.  The

21 specific criteria used don't go to his qualifications to use

22 particular criteria.  It may go to the weight to be attributed

23 to the valuation done, but it doesn't have anything to do with

24 his qualifications to address the issue.  So, the objection is

25 overruled.  Dr. Florence may -- is qualified to express an

                J&J COURT TRANSCRIBERS, INC.

1  expert opinion in the area of claims estimation.

2          MR. BERNICK:  Thank you, Your Honor.

3              CONTINUED DIRECT EXAMINATION

4  BY MR. BERNICK:

5  Q    Dr. Florence, I want to create a little bit of groundwork

6  before we go to the Grace estimation specifically.  And just

7  let me ask you this.  Could you just describe in the most

8  general terms what the basic elements of estimation are?

9  A    Well, normally they are -- can I address claims

10 estimation?

11 Q    Sure.  Yes.  That's what I'm getting at.

12 A    Normally estimation would involve looking at a set of

13 historical experiences, historical data, for example, and

14 organizing that data in a way that could be analyzed, and then

15 applying to that data a set of assumptions or criteria, and

16 I'll -- for the lack of a better term, I'll say assumptions,

17 and then, based on those assumptions, extending that data to

18 the estimation itself, so making a calculation which would

19 provide the estimation.

20 Q    Okay.  Is estimation of claims always done in exactly the

21 same way?

22 A    I think the conventional approach, it's always done that

23 way.  Right.

24 Q    Okay.  Done the way that you've just described?

25 A    Correct.

J&J COURT TRANSCRIBERS, INC.

1  Q    Okay.  But getting beyond just the basic steps that you

2  outline, at the detail level is estimation always done in

3  exactly the same way?

4  A    You mean the calculations themselves?

5  Q    Yes.  The assumptions that are used, the data that's

6  analyzed, and the calculations that are analyzed?

7  A    Absolutely not.

8          MR. FINCH:  Objection.  Compound.

9          UNIDENTIFIED ATTORNEY:  And leading.

10         MR. FINCH:  And leading.

11         THE COURT:  Well --

12         MR. BERNICK:  You're --

13         THE COURT:  -- it's not -- I think the witness was

14 asking for clarification.  To the extent that it was clarifying

15 -- it may be leading, but it was clarifying, that's all right.

16 To the extent that it's compound, it is compound.

17         MR. BERNICK:  I'll be happy to break it up and

18 proceed accordingly.

19 Q    Tell us whether or not the estimations always work with

20 exactly the same kind of data?

21 A    No, they don't.

22 Q    Tell us whether or not the estimations work with exactly

23 the same assumptions.

24 A    They don't.

25 Q    Tell us whether or not the estimations work with exactly

CC-BLG001699

1  the same calculations of current and future claims.

2  A    They don't.

3  Q    Thank you.  Let's talk about two particular types of

4  estimation that you've done in the past.  I believe in

5  connection with your qualification questions that we just posed

6  to you, you said that you had done estimates for -- in

7  connection with trusts, do you recall that?

8  A    I do.

9  Q    And you also talked about doing estimates in connection

10  with companies that were still not in bankruptcy, they were

11  still in the tort system, do you recall that?

12  A    I do.

13  Q    I'd like to review a little bit about the elements that

14  characterize -- or the elements that characterize those

15  different types of estimation.  If we can show 2310.  Would

16  this demonstrative assist you -- I think we're going to have to

17  switch back to the PowerPoint, please -- would this

18  demonstrative assist you in explaining to the Court the basic

19  elements that are involved in estimation for funding trusts on

20  the one hand, and estimation of future tort system costs on the

21  other?

22  A    Well, in the trust situation frequently you're faced with

23  -- starting with data, you're faced with historical claims

24  information.  And that claims information would reflect the

25  nature of the claims, the details regarding those claims, the

1 status of the claims, the outcome of the claims.  So, there's

2 normally a database of some sort, usually electronic, that

3 characterizes the historical experience.

4 Q    Let me stop you here.  What is the basic purpose?  Where

5 do you want to get to at the end of the day when you do the

6 estimation for trust funding purposes?  What are you trying to

7 accomplish?

8 A    You're actually trying to estimate the volume, the timing,

9 and the cost of current and future asbestos claims against the

10 trust.

11 Q    And why is that important to the operation of the trust?

12 A    Most trusts, or all trusts, I guess, have limited

13 resources.  And normally the trustees are charged with

14 evaluating the liability of the trust against the assets of the

15 trust, and calculating a ratio to determine what percentage of

16 the liability that the trust has, do they have assets to

17 actually pay?

18 Q    Okay.

19 A    And so the normal focus of these forecasts for trusts is

20 to forecast the liability, compare that to the assets that the

21 trust has and determine what percentage of the liability or the

22 cost does the trust have the ability to pay.

23 Q    Okay.  So -- I interrupted you.  You said you have a data

24 component, which is a claims history on your chart.  You then

25 talk about a TDP.  What is a TDP, and how is it relevant to

CC-BLG001701

1  estimating in connection with funding a trust?

2  A    Well, TDP is -- stands for trust distribution procedures.

3  They are normally procedures that have been approved by the

4  Court.  From the standpoint of a trust, we always look at them

5  as the bible, that this is the charter of the trust.  And in

6  that TDP it establishes the criteria by which claims are to be

7  evaluated, how claims are to be filed, how claims are to be

8  valued, how claims are to be treated if there is a dispute over

9  the value of the claim.  It really -- it's intended to cover

10 the entire gambit.  But, the most important for estimation is

11 probably the claims evaluation criteria, and the valuation

12 criteria.

13 Q    Okay.  Now, you've got claims history.  You then have the

14 TDP.  If you have a trust, is the TDP, in a sense that it's a

15 bible, is it something that is handed down at the beginning of

16 the trust that you have to follow?

17 A    It is.

18 Q    Okay.  So, what you said, if you've got the claims

19 history, and you've got the TDPs, how do you then get to the

20 point of actually working with pending claims and future

21 claims?  How does that proceed?

22 A    Well, pending claims, normally what you look at is how

23 many of the pending claims would be qualified under the

24 criteria that are specified in the TDP.  That allows you then

25 to have a pretty good picture of both historical claims that

CC-BLG001702

1 have been evaluated and paid, as well as pending claims that

2 have not yet been evaluated and paid.  It gives you a full

3 history of the claims history of the trust, so it basically

4 says these are the claims that have been paid.  These are the

5 claims that met certain criteria.  Then using that as a base,

6 under the assumption that there is a similarity between these

7 -- the patterns that we're looking at and the epidemiology, for

8 example, in asbestos, their forecasts are usually done using

9 that pending claim and closed claim group as a base to forecast

10 how many claims you're likely to get in the future.

11 Q    Okay.  And that's where you have -- on 2310, you bring to

12 bear an epidemiological model?

13 A    Correct.

14 Q    Okay.  You've got both Peto and Nicholson.  Are there two

15 different models that you deploy?

16 A    There are two that we use.  Right.

17 Q    Okay.  Now, I want to switch to talking about estimates

18 that are done of a company that's still in the tort system and

19 wants to know what its expected future costs are.  Again, could

20 you go through, just in your own words, the basic sequence of,

21 or elements of the estimation process there?  What's the same

22 and what's different?

23 A    Sure.  Well, the data are the same.  In essence it's --

24 you're beginning with a history of the claims that were filed

25 and evaluated in the tort system, and the outcome of those

CC-BLG001703

Florence - Direct                                    61

1  evaluations.  So, the first stage, although the data may be

2  different in terms of the specific data, what the -- generally

3  what -- the scope and what's included is probably the same for

4  tort system estimates and trust estimates.

5  Q     Okay.  Do you have TDPs, though, where the defendant is --

6  defendant doesn't have TDPs, I mean, it's the simple fact of

7  the matter, right?

8  A     You don't.  Correct.

9  Q     Okay.  So, what is it that's used in place of TDPs in

10 figuring out what the stream of payments is going to be?  If

11 you don't have the bible, do you have something else in its

12 place?

13 A     Well, you usually have a couple things.  One is if the --

14 if it's a claim in the tort system, you may have the outcome of

15 the application of some criteria.  In other words, the

16 defendant may use some criteria in evaluating the claim, either

17 evaluating its -- whether it's a compensable claim or not, or

18 its value.  But, the defendant may use some criteria.

19 Sometimes you don't know those specific criteria, so really all

20 you're able to look at is, well, whatever those criteria are is

21 kind of a black box.  What is the outcome of applying those

22 criteria?  For example, what percentage of the claims might be

23 paid, and what percentage of the claims might be rejected for

24 payment?

25         The other thing you have, I think, that may be

J&J COURT TRANSCRIBERS, INC.

CC-BLG001704

1  different with a tort system estimate is, at least in the ones

2  that we've done, occasionally there are assumptions that are

3  applicable to a particular forecast, or a particular

4  estimation.  For example, when we first look at the claims

5  information from a tort defendant, we will look for patterns in

6  that information.  And there may be questions that arise after

7  that analysis.  We usually will go back to the defendant and

8  say, are there assumptions that we should apply in doing this

9  analysis, and making this estimate?  For example, there have

10 been situations where we've been told to assume that because of

11 a particular agreement it's been negotiated by the defendant

12 and plaintiffs there will be no more cases from Region X, or

13 State Y, or because of some legislative impact there may be no

14 cases in the future from Jurisdiction D.  So, there are those

15 kind of assumptions that may arise, and that's usually

16 something we do on the front end of the estimation, is to talk

17 to the defendant about those assumptions.

18 Q    Okay.  Do you still get to the point, then, of ultimately

19 framing that type of historical information and those

20 assumptions into an input to a model?

21 A    We do -- we usually, much like I described with the trust,

22 we come up with a claims history that includes both pending and

23 closed claims, and use that as an indicant of what future

24 claims may look like, and lay that against an epidemiological

25 model of some sort.

CC-BLG001705

1  Q    Mr. Finch got up and said, are you an expert as a lawyer?

2  Do you remember that?

3  A    I do.

4  Q    And your answer was no.  And he also asked you were you an

5  expert as an epidemiologist.  Do you remember that?

6  A    I do.

7  Q    And your answer there was no.  And yet, I'll go to it,

8  when it comes to settlement practices, do you hold yourself out

9  as being an expert in how lawyers, for various reasons, reach

10 agreements with regard to settlements?  Is that an area of your

11 expertise?

12 A    No.

13 Q    Are you an expert in how lawyers negotiate, based upon the

14 merits of claims, or legal issues surrounding those claimants?

15 Are you an expert in how lawyers negotiate TDPs?

16 A    No.

17 Q    Are you an expert when it comes to the epidemiology -- are

18 you an expert epidemiologist?

19 A    No.

20 Q    When it comes to all of these different features that are

21 inputs to the model, such as the TDPs, the settlement

22 practices, and the epidemiological models, do you actually

23 verify the merits of the epidemiology or the merits of the

24 settlement practices yourself?

25 A    No, I don't.

CC-BLG001706

1  Q    What -- how is it that they become incorporated into your

2  work?

3  A    Well, use the tort system example I just gave you that --

4  we'll be talking about with the defense -- the defendant about

5  them, assumptions going forward.  Frequently we will meet with

6  counsel for the defendant and say is there anything that we

7  should assume about cases in this particular jurisdiction or

8  with this particular criteria?  We're not lawyers, but we'll

9  rely on their judgment as to what should be assumed going

10  forward.

11  Q    Okay.  Let's talk about the next slide, which is 2311.  I

12  framed those -- I've put a big box around the drivers of

13  payment fashioned as an input in the models, and I've said

14  they're assumptions.  Is that essentially what you've told us?

15  A    Yes, they are.  In a general sense they are assumptions,

16  correct.

17  Q    Now, let me just ask you, you have said that you actually

18  go talk with people, and you've become familiar, and you've got

19  a lot of experience.  Tell me whether or not these -- can you

20  just assume anything?  You just make the wildest assumption

21  that's possibly -- for example, could a tort defendant come to

22  you and say, Dr. Florence, I want you to assume the claims will

23  drop to zero within five years?  Is that an assumption that you

24  would find to be the kind of assumption that is customarily in

25  -- customary and reliable for an estimator in your field?

CC-BLG001707

1   A     It would not be a customary assumption, no.

2   Q     Okay.  The kinds of assumptions that you've talked about

3   making in connection with future trust funding and future tort

4   system costs, tell the Court whether or not they are the kinds

5   of assumptions that are customary and are customarily used as

6   reliable for estimation purposes in connection with your field?

7   A     I'm sorry.  The assumptions I've been asked to make in

8   this --

9   Q     With respect to so far, you know, trust funding, and

10  future tort system, we've boxed those as assumptions.  Are

11  those assumptions that are customary -- are customarily found

12  to be reliable for estimation purposes by people who do

13  estimation such as yourself?

14  A     Well, certainly the epidemiological assumptions are

15  customary, and are conventional.  The way, as you've labeled it

16  here, fashioned as input the methods for doing that are

17  relative, conventional and customary.  And then the claims data

18  are relative, conventional and customary.  The criteria that

19  are applied are normally, in the ones that I have done, are

20  conventional and customary criteria, yes.

21  Q     Okay.  Are they the kind -- to say, though, when you say

22  that they're conventional, you say that they've been done

23  previously; that is, TDPs and settlement practices, right?

24  A     Correct.

25  Q     Okay.  Now, apart from whether they are common, are they

CC-BLG001708

Florence - Direct                              66

1 the kind of -- and I'm asking this really for -- in a sense for

2 a legal reason, but it's still very important that you answer

3 it straight up based upon your expertise.  Are they the kinds

4 of drivers, are they the kinds of assumptions that are the type

5 that are found to be reliable for estimation purposes by people

6 in your field?  I'm not simply asking whether you do them all

7 the time, but whether they are the type -- the kind that are

8 found to be reliable?

9 A    Yes, they are.

10 Q    Okay.  And I want to talk about this case, and I want to

11 talk about -- take you to Slide 2312.  Would 2312 help you

12 explain, in a sense, the corresponding elements of the

13 estimations done here?

14 A    Yes.

15 Q    Okay.  If you could just go through those with the Court,

16 and then we'll go back over and ask you a few questions.

17 A    Well, in terms of the data, we began with data that was

18 supplied by the -- by Grace, having to do with its claims

19 history.

20 Q    Okay.

21 A    And those were data that conventionally -- they were very

22 conventional.  They looked like the same type of data we had

23 gotten from other defendants with regard to the claims that had

24 been filed and the disposition of those claims, and the details

25 about the claims.  In addition to the claims history, we had

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001709

1  information about -- from the personal injury questionnaire in

2  the bankruptcy case, this bankruptcy case, which was

3  information that was related to primarily the pending claims,

4  those claims that were pending at time of bankruptcy.  So, that

5  provided additional information to the information that we had

6  from the company.

7  Q    Well, of course we know that the PIQ has not been used in

8  any other case, at least to your knowledge?

9  A    To my knowledge it has not.  Right.

10 Q    What if we go beyond asbestos, are there cases in which

11 questionnaires, including detailed questionnaires, have been

12 used to gather data for estimation purposes outside of

13 asbestos?

14 A    In the Dalkon Shield case that I referred to there was a

15 proof of claim form that was quite extensive that sought to

16 gather additional information beyond what the company had.

17 Q    Okay.  The next step, you talk about drivers of payment.

18 What were the nature of the criteria, what kinds of criteria

19 were supplied to you in the case of the Grace estimation?

20 A    Well, we were supplied with information about the bar

21 date, and the filing of POC proofs of claim form by the bar

22 date, who filed that information, when it was filed.  We were

23 supplied with information -- with certain criteria on which to

24 evaluate the claims.  Those criteria covered both the exposure

25 and medical evaluation of claims.

CC-BLG001710

Florence - Direct                                            68

1  Q    Let me stop you there.  With respect to those kind of

2  criteria, that is dose criteria -- or exposure criteria, and

3  diagnostic or medical criteria, apart from the details of the

4  criteria, are the TDPs, and indeed, settlement practices, did

5  they often include exposure and medical criteria, as well?

6  A    Correct.  The TDPs normally include exposure and medical

7  criteria.

8  Q    Okay.  Claims data, what's -- in terms of requirements for

9  payment, when you say that those dealt in part with claims

10 data, what did that mean?

11 A    Well, what we now have as a result of the data that we --

12 I discussed earlier, we now have information about whether the

13 claimant, in effect, meets criteria that we were provided,

14 gives us an opportunity to analyze whether claims can meet

15 those criteria or not.

16 Q    Okay.  We also have, again, fashioned -- let me just kind

17 of try to cut to the chase -- having looked for the drivers of

18 payment, do you, in this case, have, in a sense, a parallel

19 process for translating that into inputs to a model?

20 A    Yes.

21 Q    Okay.  Now, all the things that we've talked about, let's

22 show 2313, I've got down 2313.  I've got those marked as

23 assumptions.  In this case, too, have you regarded these as

24 assumptions, or have you made some effort independently to

25 verify the accuracy -- or I should say the merit of the

J&J COURT TRANSCRIBERS, INC.

CC-BLG001711

1 criteria that you've applied?

2 A    No.  I've accepted these as assumptions.

3 Q    Now, we know that in this case, as Mr. Finch brought out,

4 that the particular requirements for payment and the particular

5 data haven't been used in connection with prior asbestos

6 estimations, would you agree with that?

7 A    I would.

8 Q    Okay.  And so, if we talk about what is "traditional" for

9 asbestos cases, would you agree with what I think is Mr.

10 Finch's suggestion that they're not the traditional ones?

11 A    Well, I think they are some of the criteria that are --

12 overlap what's -- what are "traditional" criteria, and there

13 are some that aren't.

14 Q    Let me ask you, in connection with the Dalkon Shield case,

15 non-asbestos case, were exposure data and criteria considered

16 in connection with that estimate?

17         MR. FINCH:  Objection.  Relevance as to why a Dalkon

18 Shield IUD is relevant to an asbestos case?

19         MR. BERNICK:  It's foundational.

20         THE COURT:  All right.  I'll accept it subject to it

21 connecting up.

22         MR. BERNICK:  I'll connect it up in just a moment.

23         THE COURT:  All right.

24 A    Well, exposure in the sense of -- in the case of the IUD,

25 exposure in the sense of use, was the device used, and was the

CC-BLG001712

Florence - Direct                                        70

1  claimant exposed in that sense.

2  Q    What about diagnostic criteria and data, tell us whether

3  or not they were an input to the Dalkon Shield's estimation?

4  A    They were.  There were levels of diagnostic criteria that

5  functioned to place a claimant in a disease category, or that

6  also placed a claimant in the category of being compensable or

7  non-compensable.

8  Q    Okay.  Now, what I want to know then is in terms of

9  whether the kinds of criteria -- the kinds of criteria that you

10 are working with here as assumptions, are they the kinds of

11 criteria that estimators such as yourself find to be and

12 consider to be reliable for estimation purposes?

13           MR. FINCH:  Objection.  Vague, over-broad.

14           THE COURT:  I'm sorry.  I apologize, but I didn't get

15 the question.  Could you repeat it?

16           MR. BERNICK:  It's a very simple question, and I

17 think we answered it with respect to the prior two.  I just

18 wanted to get it with respect to this one.

19 Q    Tell us whether or not the criteria, the kinds of criteria

20 that were used here in this case, are those kinds of criteria

21 the kinds that are considered to be reliable for estimation

22 purposes by people within your field?

23           MR. FINCH:  Objection.  Over-broad.

24           THE COURT:  All right.  He's already answered that

25 question, I believe.

J&J COURT TRANSCRIBERS, INC.

CC-BLG001713

1          MR. BERNICK:  He answered it with respect to the

2    prior two.  I just want to make sure that we got it with

3    respect to this one, as well.

4          THE COURT:  It is very broad, though.  I mean, you're

5    asking about all criteria.

6          MR. BERNICK:  In this particular case.

7          THE COURT:  Yes, but I'm not sure -- do we know what

8    all criteria are?

9          MR. BERNICK:  Well, we're going to -- yes, that's

10   true.  It's general.  I'd like to take his answer and then

11   we'll go through them, specifically.

12         THE COURT:  All right.

13   A    By their nature these are the same types of criteria that

14   have been used in the other cases that I've discussed.

15   Q    Thank you.  Let's go through now and talk about the actual

16   flow of how this worked; that is, how the estimation worked.

17   And first of all, I want to get a point of reference in terms

18   of time frame.  In order to get a baseline -- you've talked

19   about a baseline for purposes of the estimate in these

20   different cases -- in other to get a baseline, where did you go

21   in the Grace historical data to get a baseline analysis done?

22   A    Well, we assumed that the -- the cutoff point was, in

23   essence, the time that Grace filed for bankruptcy.

24   Q    Okay.

25   A    And therefore, our history would be that period prior to

CC-BLG001714

1 the bankruptcy filing.

2 Q    Okay.  Showing you 2314.  Does this demonstrative focus on

3 the baseline as of April 2001 when Grace filed, and then the

4 use of that baseline for purposes of projection going forward?

5 A    Yes.  We were -- in essence what we're focusing on here is

6 to determine of the pending claims, whether those claims meet

7 criteria or not.

8 Q    Okay.

9 A    And then using those pending claims in combination with

10 Grace's other history to try to determine or try to estimate

11 what the number of future claims that would meet those

12 criteria.

13 Q    Now, we're going to have a board here, 2301.  Do we have a

14 broad board that kind of lays out the different steps that

15 were followed in connection with your estimation?

16 A    We do, I guess.

17 Q    Okay.  What was the very first step?  If you want to begin

18 with your baseline analysis, what was the first step of the

19 work, what first work was done?

20 A    Well, after we had the claims data and had the claims

21 data, what I will call cleaned, or organized in a fashion that

22 would allow analysis, the first comparison was to determine

23 which of the cases were pending, which of the cases were not

24 pending, and then compare that to the cases for which we had

25 proofs of claim forms, POCs.

CC-BLG001715

1  Q    So, POC analysis?

2  A    Correct.

3  Q    Okay.  Who did the POC analysis?

4  A    Well, we did the analysis.  It was the comparison of the

5  records that were filed for -- the proofs of claim that were

6  filed with the historical records.

7  Q    Okay.  Showing you 2315, would this assist you in

8  describing to the Court the process that you followed in

9  determining what claims that were pending as of the time the

10 bankruptcy was filed also were the subject in a proof of claim?

11 A    Sure.  Yes, it would help.

12 Q    Could you just use that to explain the process?

13 A    We began this process with about 112,000 pending claims.

14 Those were claims that were pending at the time the company

15 filed for bankruptcy in April of '01.  We then had a computer

16 file, or a listing of those claims that were non-settled proofs

17 of claim.  They were claims -- proofs of claim that were filed

18 by claimants that had not settled with Grace.  So, our first

19 step was to match the pending claims with those POCs to

20 determine which of the pending claimants actually filed a proof

21 of claim form.

22 Q    Okay.  And what was the final result; that is, how many

23 matches were found?

24 A    Of the 112,000 there were roughly 84,000 that matched --

25 that had a POC -- that filed a POC.

**J&J COURT TRANSCRIBERS, INC.**

Florence - Direct                                    74

1  Q    Now, tell us whether or not the degree of match, or the

2  kind of match was the same in all cases.  Is that unclear?

3  A    I -- I'm not sure I --

4              MR. FINCH:  Objection.  Form.

5  A    I'm not sure I understand the question.

6  Q    Well, tell us whether the tests that -- tell us what tests

7  were used in connection with determining whether there was a

8  match or not.

9  A    Oh.  Well, the exercise of trying to match claims was a

10  pretty extensive exercise.  First we tend to try to match

11  claims based on the name of the claimant, the social security

12  number, allowing for the possibility that there might have been

13  data entry errors by the firm that received the proofs of

14  claim, or there might have been data entry errors in the

15  historical database.  Various combinations were used to try to

16  -- combinations of information were used to try to match

17  claimants, primarily name, social security number, law firm in

18  some instances.  Any data we could obtain that would allow us

19  to identify this pending claimant, this is their POC.

20  Q    Okay.  Were all the matches that you ended up with the

21  same in terms of what the basis for the match was?

22  A    They weren't.  There were some that were very clear

23  matches.  Thomas Florence with the last four digits of the

24  Social Security Number 2140, those were easy matches.  Those

25  were definite matches.  There were some that the name might be

CC-BLG001717

1  slightly different.  For example, the E is dropped off

2  Florence, but the last four digits of the social security

3  number are the same, and the first part of the name is the

4  same.  So, those are not perfect matches, but what we would

5  call probable matches.

6          And then there's a group of claims that I guess you

7  could label as -- they were less clear a match, but there was

8  enough information to suggest that the claim -- it was a

9  possible match.  So, there were really -- there was a gradient

10  of matches from historical data to POC.

11  Q    Now, does 2316 provide a summary of the number of matches

12  that fall into those different categories?

13  A    It does.

14  Q    Okay.  Now, for purposes of the remainder of the analysis,

15  did you exclude any of the matches because they were only

16  probable?

17  A    No.

18  Q    For purposes of going forward in the analysis that you

19  did, did you exclude any matches because they were only

20  possible?

21  A    Well, we -- when it came to doing some of the analyses, a

22  possible match could include a match where there is one person

23  that's in the pending data.  For example, John Smith is in the

24  pending data.  And there are three John Smiths with POCs.  And

25  we can't distinguish which of those three -- we know there's a

CC-BLG001718

1 match, we think there's a match, but we can't distinguish which

2 of those three is the match.  So, in some instances when we

3 were doing the basic analysis we would have to exclude the

4 possible matches.  But when we wound up the analysis, when the

5 analysis was complete, we actually put those matches back in

6 and calculate the ultimate result, including possible matches.

7 Q    Thank you.  Now, on the basis of the matching, could you

8 -- did you also determine the kind of disease that each one of

9 those pending claimants had?

10 A    We did.

11 Q    Okay.  Was it possible in all cases to simply go to the

12 POC or to the pending database, was it possible in all cases to

13 do that, and simply read off the disease?

14 A    It was not.  No.

15 Q    Okay.  Is that an uncommon problem in your field?

16 A    Well, we don't normally have POC data, but it's not

17 uncommon for claims in the historic data to have either missing

18 or ambiguous statement of disease.

19 Q    Okay.  Showing you 2317, does this chart assist you in

20 explaining to the Court how it is that you took all of the

21 pending matched claims and placed them by disease?

22 A    Yes.  The actual process of doing that was a little more

23 complicated than the chart illustrates.  We started with the

24 disease that was either specified on the -- in the historic

25 database, or on the POC, if there was one specified on the POC.

CC-BLG001719

1  Q     That's from in the "known" column?

2  A     That would be the known column.

3  Q     Okay.  And then there -- basically, the numbers that we

4  have there could tell you the number of people who are known to

5  have meso, lung cancer, and the like?

6  A     Yes, but we also looked other places for -- to determine

7  whether it was known.  So, we also looked at places such as

8  that if a person had filed a PIQ, a personal injury

9  questionnaire, we looked to see if there was a specification of

10 disease on there.  We also went to the attachments.  In some

11 instances attachments were provided on the personal injury

12 questionnaire.  So, if the claimant -- if we still didn't have

13 a disease for a given claimant, we would look on the personal

14 injury questionnaire.  If, at that point, we still couldn't

15 determine the disease for the claimant, we actually used the

16 Manville Trust database.  It's a database of claims that have

17 been filed against the Manville Trust.  And we tried to

18 determine could we tell that claimant's disease as it was filed

19 against the Manville Trust?  That gave us a -- it actually gave

20 us the first column there.  So, whatever we could determine

21 from those sources we considered known diseases.

22 Q     Okay.  What then, is the allocation of the unknowns, what

23 does that refer to?

24 A     Well, that still left us with some claimants for which we

25 could not determine their disease.  We couldn't determine from

CC-BLG001720

1  any of the sources I mentioned earlier.  So, what we did was we

2  actually went back in Grace's history.  We had all this

3  historic data from prior work we've done with Grace.  And we

4  asked the question, well, what percentage of the claims that

5  were filed historically that began as unknown, where did they

6  end up?  Did an unknown most likely end up as a mesothelioma

7  claim, or as a lung cancer claim, or as an other cancer claim?

8  So, we calculated what we call a transition matrix, which was

9  -- or a percentage of unknown claims and where they normally

10 end up once you know the disease.  So, for that remaining group

11 of claims where we still didn't know the disease, we used

12 Grace's history for what percentage of unknown claims end up as

13 mesothelioma, lung cancer, other cancer, et cetera.

14 Q    Is that methodology a methodology that was developed just

15 for purposes of this case?

16 A    No.  It's a methodology that we've used when the data are

17 available in a number of cases.

18 Q    Thank you.  Based upon that analysis, I take it in order

19 to get the total number that is known and allocated unknowns,

20 that's a matter of addition?

21 A    It is.

22 Q    Does 2317 accurately summarize the categories and the

23 numbers of claims in the categories of disease for the Grace

24 case that resulted from your analysis?

25 A    It does.  That's the -- and that should total, going back

CC-BLG001721

1  to the matching of pending claims with POCs, that should total

2  the 83,000, et cetera.

3  Q   Mr. Inselbuch, my learned colleague, has a calculator, so

4  I'm sure that if that's not true I'll learn about it during the

5  course of cross examination.  Do you want to turn to the next

6  page of the analysis?  You told us before that you had criteria

7  that you looked at here, and I want to peel away this part of

8  the chart and ask you what kinds of criteria, just generally,

9  were then applied to the claims data, and who was involved in

10 it?  And we'll go through them in more detail, but give the

11 Court an overview of --

12         MR. FINCH:  Your Honor, I have to stand up so I can

13 see the --

14         THE COURT:  Certainly.  Yes.

15 Q   It's the last thing in your chart.  It's the last page.

16 You can see the whole thing all at once.  It's 2301.  Do you

17 have that there at the back?

18         UNIDENTIFIED ATTORNEY:  The suspense is --

19         MR. BERNICK:  2301.  Yes.  Mullady wants to wait

20 until it's all done.

21 Q   What kinds of criteria were used here, and who was

22 involved in applying -- developing and applying those criteria?

23 A   Well, the criteria really fell into two basic categories:

24 They were either criteria that dealt with exposure or criteria

25 that dealt with the disease diagnosis.

**J&J COURT TRANSCRIBERS, INC.**

1 Q    Okay.  Now, the Court has heard from Dr. Anderson.  Did

2 you actually develop any of the exposure and dose criteria, or

3 were you relying on Dr. Anderson?

4 A    I relied on Dr. Anderson.

5 Q    She also has told us that when she got to the end of her

6 chart she had people in her organization review the various

7 claims to determine whether they went into Category A or

8 Category C.  Did you independently do that review, or did you

9 rely upon what Exponent had done?

10 A    No, I relied on what Exponent did.

11 Q    When it comes to diagnosis of disease, we heard from Dr.

12 Weill about the standards for B-reading and the PFT standards.

13 Did you do anything to verify the standards that were used for

14 B-reads and for PFTs, or again, did you rely upon those as

15 assumptions that you were taking from other experts?

16 A    I relied on those from Dr. Weill.

17 Q    The same thing with respect to Dr. Henry?

18 A    Correct.

19 Q    And in terms of analyzing the claims data in this area, we

20 have that that wasn't Exponent, but it was Celotex, does that

21 square with your own understanding?

22 A    The -- yeah.  The Celotex trust reviewed an attachment

23 sample, or a sample of attachments, and some closed claims, and

24 based on that review coded that information, and we relied on

25 Celotex's coding of that information.

CC-BLG001723

1 Q    Okay.  And then you're kind of in the -- I guess it's kind

2 of the hub of the wheel.  Was it your job at ARPC to take all

3 these inputs and marry them into the model going forward?

4 A    It was, to take that data and marry it into an overall

5 estimate.

6 Q    Let's begin with the medical data, and in order to get to

7 the medical data or the medical criteria, could you tell us

8 whether or not the medical criteria were the same for each one

9 of the diseases, or were different?

10 A    The medical criteria were different.

11 Q    Okay.  I want to go to a somewhat complicated chart --

12 but, Your Honor, it is necessary -- which is 2318, and ask you

13 whether this chart would assist you in describing how the

14 medical data were applied?

15 A    It would.  Yes.

16 Q    You say that with kind of a wry smile.  Let's start with

17 the kind of top line, first.  Could you just describe, in your

18 own terms, what the basic medical criteria were for

19 mesothelioma?  What did it take for a mesothelioma claim to

20 qualify as being a mesothelioma claim, medically?

21 A    Well, with mesothelioma claims we began with the -- again,

22 with the claims that were pending and those claims that had a

23 proof of claim form filed and those claims that filed a

24 personal injury questionnaire.  And the reason the personal

25 injury questionnaire was important is to determine what the

CC-BLG001724

1  disease claim was.  So, in that instance if the claimant

2  specified either in the pending information, the POC, or the

3  personal information questionnaire, the personal injury

4  questionnaire, specified a diagnosis of mesothelioma, that

5  mesothelioma diagnosis was accepted and that yielded, of all

6  the pendings that filed a POC and had a POC with the necessary

7  statement of mesothelioma, tat was roughly 1596 claims.

8  Q    Okay.  So, basically if it said mesothelioma, if you had a

9  diagnosis, accepted at face value?

10 A    Correct.

11 Q    Okay.  Now, just to be sure, so that we anticipate

12 potential confusion, I want to go back to the prior slide.  I

13 hope it's the prior one.  We saw that your knowns were 1972 and

14 your unknowns were 454, and the total number that you had

15 recorded was 2400.  Why is that number different from the 1500

16 number that you just told us about?

17 A    Because we had to look at the information regarding the

18 diagnosis, or the claim diagnosis on the personal injury

19 questionnaire.  So, of the 2426, roughly 1596 had personal

20 injury questionnaires that we could analyze.

21 Q    Okay.  And do those questionnaires, then, enable you to

22 perform the rest of the screen?  In order to get to exposure,

23 do you need to have that population, or can you work with the

24 broader population?

25 A    I need to look at that population to determine whether, in

CC-BLG001725

1 fact, they have a mesothelioma allegation.

2 Q    Okay.  Now, let's go to the next category.  Let's flip

3 back to 2318.  And I want to ask about lung cancer now.  And

4 the first question I want to ask about lung cancer is just not

5 how you got to the number at the end here, but just the

6 criteria -- the medical criteria themselves.  For someone to

7 count as a lung cancer, what were the medical requirements?

8 A    That the ILO had to be a 1/0 or greater, and reproducible.

9 Q    Okay.  So, the ILO is -- the Court has already heard about

10 this, but to refresh the Court, the ILO is a rating applied to

11 an X-ray?

12 A    Correct.

13 A    Okay.  And it had to be 1/0 or greater, but then you say

14 it had to be replicated, what does replicated mean, as you

15 understood it?

16 A    It has to be reproducible, or more than one reading of the

17 X-ray would come up with that reading.

18 Q    Okay.  Now, this says Henry.  Could you tell us what, if

19 any, reliance was placed upon the Henry X-ray study about which

20 the Court has learned from Dr. Weill?

21 A    Well, where we got information on the number of claims

22 that would meet that criteria were based on the Henry X-ray

23 study.

24 Q    Okay.  Now, it says here that you started with all pending

25 claims.  You then looked to any kind of POC match, and then you

CC-BLG001726

1  got to a 312 number as being certified X-rays plus PIQ data.

2  Explain in your own words what this step was that worked from

3  the -- any POC match to then this particular set of parameters?

4  A    Based on the sample that Dr. Henry took, which was a

5  sample of certified X-rays, non-meso X-rays, that were not

6  meso.  If we look at those, that group of claims, the ones that

7  were lung cancer claims that had a certified X-ray were roughly

8  312 claims.

9  Q    Okay.  Now, you have the 312 going through the replication

10  process coming up with a 32 number.  What did that mean, where

11  did you get the 32 number and replication?

12  A    So, of those 312 claims that had a POC and were part of

13  the study and had lung cancer, or lung cancer claims, Dr. Henry

14  was able to replicate 32 of those 312.

15  Q    Okay.  Now, we have a line that comes down from the 312

16  and says that the 312 is then looked at to see whether each

17  existing ILO is greater than 1/0, and there are 175 of them.

18  Was that, again, a number that you relied upon Dr. Henry for?

19  A    It was.

20  Q    Okay.  And what was the -- do you know -- can you tell the

21  Court what you understood to be the purpose of looking for

22  whether there was an existing ILO of greater than 1/0?

23  A    We were really looking at did the claim rely on an

24  existing ILO, and was there an allegation that the claim relied

25  on an existing ILO of greater than -- greater than or equal to

CC-BLG001727

1 1/0.  So, of that 312 claims there were roughly 175 where there

2 was that reliance, and that ILO did exist.

3 Q     And then you looked to see whether those could be

4 replicated?

5 A     I did.

6 Q     And the 15 was what?

7 A     Of that 175, 15 were replicable by Dr. Henry.

8 Q     Okay.  And then you have an 8.6 number.  What does the 8.6

9 percent refer to?

10 A     That's the 15 divided by 175, so of the people that had an

11 existing ILO of 1/0 or greater, 15 were found to be qualified,

12 or 8.6 percent.

13 Q     Okay.  Just to -- and we're going to come back, I know, to

14 this, so I'll -- in a little bit.  We have people who say have

15 lung cancer and say it's due to asbestos, and say they're

16 relying on X-rays and an existing ILO.  Let me ask you, did all

17 people who had a claim for lung cancer say that they were

18 relying on X-rays and an ILO?

19 A     No.

20 Q     I'll put them down as other evidence.  Did all of the

21 people who said that they were relying on X-rays supply the

22 X-rays?

23 A     No.

24 Q     Were there people who didn't supply the X-rays, but

25 certified that they had been destroyed or lost?

J&J COURT TRANSCRIBERS, INC.