1  A     There were.
2  Q     So, we have people who supplied them, people who had a
3  certification, and people who did not have a certification or
4  the X-ray?
5  A     Correct.
6  Q     The 8.5 percent, which particular category does that
7  relate to; the ones, or the twos which are certification of
8  destruction, the threes, which are neither one, or the fours,
9  which are other evidence, where does the 8.6 percent belong?
10 A     Well, it's the certified X-rays where ILOs were alleged,
11 or relied upon.
12 Q     And we'll come back to that one in a minute. Let's go
13 down to other cancers. Could you tell us what criteria --
14 medical criteria was applied with respect to other cancers?
15 A     The other medical criteria that was applied was whether
16 the other cancer was a laryngeal cancer.
17 Q     Was that a criteria that you developed?
18 A     It was not.
19 Q     Okay. So, that was another criteria that you assumed from
20 an expert?
21 A     Correct.
22 Q     Okay. How was that criteria then applied to determine how
23 many laryngeal cancers could be isolated?
24 A     Well, again, we started with the -- we have to look at the
25 PIQs in order to determine what the alleged injury is. So, we

1  started -- first, if you look at the example here -- we started
2  with an initial sample that we took of attachments to the PIQ.
3  As you remember, not all of the PIQs were completely filled
4  out.  Attachments were included with some of the PIQs.  In
5  order to do -- to manage those attachments in a way that was
6  rigorous, we actually drew a sample of claims early on in the
7  process, and used those claims and tracked them all the way
8  through the attachment process.  So, in other words, these were
9  an initial claim sample of 5250.  There were 5,250 claims that
10 we initially sampled.  Then there's a certain proportion of
11 those claims that had a POC.
12 Q    Okay.
13 A    And then we looked at the -- of that proportion of claims
14 that had a POC, the number that had alleged that they had other
15 cancer of any sort.
16 Q    Okay.  That's the 133?
17 A    That's correct.
18 Q    Okay.  And what's the 105?
19 A    Well, we allowed the possibility that -- let me back up.
20 There were certain of those claims that we couldn't determine
21 what type of other cancer they were alleging.  So, of the 133,
22 there were really only 105 of them that had an other cancer
23 type that was listed where we could determine whether it was
24 laryngeal or non-laryngeal cancer.
25 Q    Okay.  And then what's the 17 that comes out?

1  A    Of that 105, there were 17 that alleged laryngeal cancer.
2  Q    Okay.  Then you have another segment which now works not
3  with the initial sample but all pending claims, was that the
4  same kind of process, or was it a little bit easier in that
5  case?
6  A    We moved on all pending claims that had a proof of claim
7  form filed, and in the personal injury questionnaire they
8  checked the box that indicated that they had laryngeal cancer.
9  Q    Okay.  And there were 98 of those?
10 A    There were 98 of those.
11 Q    And in order to get to the 115 laryngeals that we have at
12 the end of the slide, again, is a question of addition?
13 A    It's merely a question of adding them together, yes.
14 Q    Let's talk about non-malignant.  Just walk us through
15 non-malignant, but before, again, we get to the details of how
16 the data was analyzed, what were the basic criteria that were
17 used for non-malignant claims?
18 A    The non-malignant claim criteria were generally that the
19 ILO supporting the claim, the X-ray reading, had to come from a
20 reliable physician, and that the determination as to whether
21 the non-malignant claim was a severe asbestosis claim, or an
22 asbestosis claim, or an unimpaired claim had to meet certain
23 pulmonary function test criteria.
24 Q    Okay.  And who actually was the source of the analysis of
25 the pulmonary function tests?

1  A    That was Dr. Weill.

2  Q    And you relied upon him for that purpose?

3  A    I did. Yes.

4  Q    Now, with the benefit of that general statement about the
5  criteria, take us through the general sequence -- the actual
6  sequence followed in analyzing the claims?

7  Q    Well, we began, again, with this sample, this attachment
8  sample of 5250 total claims. Of those that had a proof of
9  claim form filed, there were 2568 that had sufficient
10 information on which to evaluate whether the doctor was a
11 reliable physician or not. And based on the evaluation, it was
12 determined that 686 were from a physician that was reliable.

13 Q    Now, let me take a step out. Did you make the
14 determination about what physicians were reliable and which
15 ones were not?

16 A    I did not.

17 Q    Okay. So, that was an assumption that you made?

18 A    It was a criteria that was provided to us; an assumption
19 that I made.

20 Q    And what kinds of information were supplied -- what were
21 the sources, I should say, of the list of the doctors that were
22 felt not to be -- that you were told to assume were not
23 reliable?

24 A    We were provided the list by Grace and Grace counsel.

25 Q    Okay.

CC-BLG001732

1     MR. BERNICK: And, Your Honor, there will be
2  independent evidence that's already been submitted as to what
3  that -- as to what the list is.
4  Q     Do you have a summary showing 2321 of the doctors who were
5  -- you were asked to assume were not reliable and the number of
6  claims as to which they had submitted diagnoses?
7  A     This is the list of doctors who were given, yes.
8  Q     And does 2321 accurately summarize the input that these
9  different doctors had with respect to numbers of matched proofs
10 of claim?
11 A     This illustrates the number of matched proofs of claim
12 with personal injury questionnaires.
13 Q     Okay. Now I want to get to the next question which is
14 focused specifically on lung cancer and showing you 2341. You
15 told us that the 8.6 percent number that came out of Dr.
16 Henry's study actually related to claimants who said that they
17 relied upon X-rays, produced an existing ILO that was done
18 replicated, do you recall that?
19 A     I do.
20 Q     Does that mean that your analysis then gave no weight to
21 people who were relying on X-rays but couldn't find them and
22 certified that they were destroyed or lost? Did you give them
23 no weight?
24 A     No, we said that if they were certified as lost or
25 couldn't be found they were assumed to pass at the same rate as