1  those that we were able to analyze.

2  Q    What about people who said that they were relying  upon

3  evidence other than an X-ray, did you exclude them from the

4  analysis?

5  A    No.  Those were assumed to pass at the same rate that the

6  people with X-rays passed.

7  Q    What about people who said that they were relying on

8  X-rays, but then neither supplied them nor provided the

9  certification that they were lost or destroyed, what did you do

10 with those folks?

11 A    Those folks were excluded.

12 Q    And on what grounds?

13 A    That there was no X-ray evidence and so if the rule was

14 that there was a reproducible X-ray required, there was no way

15 to make that real.

16 Q    Okay.  I want to go back for a moment to the slide that

17 you had 2318 and you said in a couple of different places, both

18 with respect to other cancers and non-malignants that there was

19 a screen done first of all to determine whether there was

20 sufficient data to even analyze for laryngeal or analyze for

21 non-malignant.  Do you recall that?

22 A    I do.

23 Q    What about the people that had said they had the disease

24 or fell into one of these categories, but where there was

25 insufficient data on the basis of which to determine whether

CC-BLG001734

1  their claims met the criteria or not, how did you deal with

2  them, the insufficient data people?

3  A   So you're saying the people that -- of the work, for

4  example using other cancer?

5  Q   Yes.

6  A   That group of 133 minus the 105.

7  Q   That's correct.  That is, the people who didn't have the

8  sufficient data, how were they factored in, if at all?

9  A   We said that the group that did not respond would, in

10  essence, in one of our estimates would qualify at the same

11  weight as those that did respond whether it was sufficient

12  information.

13  Q   Do you have a demonstrative in 2323 that illustrates the

14  basic approach that was taken with respect to people who --

15  where there was not sufficient data?

16  A   Yes.

17  Q   Could you just walk the Court through what was done to

18  account for the people -- the two different methods that were

19  used to account for the people who did not provide sufficient

20  data?

21  A   Well if you look under the data category you see that

22  there is a group of people that did not provide sufficient

23  information for which to evaluate the claim, on one or more of

24  these criteria.  And then there was a group where the

25  information was there that was necessary to evaluate the claim.

CC-BLG001735

1  If you look at the bottom of that chart, there was a certain
2  group of claimants that met the criteria and a certain group of
3  claimants that did not meet the criteria.  So for what we've
4  called Method 1, we said well that's one measure of how many
5  people would meet these criteria.
6  Q    So, these are met or did not meet, and if you did not meet
7  or if you didn't have sufficient data you just tell me how were
8  they counted?
9  A    So we would basically say that the group that met the
10 criteria is the only group that would meet the criteria.  So
11 non-sufficient to evaluate plus it did not meet, would fall
12 into the eliminate -- an eliminated category.
13 Q    What about Method 2, what was done in Method 2?
14 A    In Method we basically said we thought as an upper bound
15 we should look at the possibility that the people that did not
16 respond, what would happen if they looked like the people that
17 did respond.  In other words, those people that had sufficient
18 information to evaluate, what if the people that did not
19 provide information were able to qualify at the same rate?
20 Q    So you take the ratio of qualified versus not qualified
21 and now apply it to the insufficient data group?
22 A    That's correct.
23 Q    And then you have to then add the two together?
24 A    We use both methods, correct.
25 Q    Now as your analysis continued going forward did you carry

CC-BLG001736

Florence - Direct                                    94

1  that through the analysis; that is, including both cases the

2  Method 1 approach and the Method 2 approach.

3  A     We did.  Wherever there was a criteria that was applied,

4  where it was possible to do that, we estimated both the number

5  of claimants that met the criteria clearly and then estimated

6  the number of claimants that if they had, even though they

7  provided insufficient information, if they had qualified at the

8  same rate as those that provided information what number of

9  claimants that would imply.  So there was a Method 1 and 2 that

10 we've used throughout the analysis.

11 Q     Does 2324 reflect the application of that method to other

12 cancer?

13 A     It does.

14 Q     And does 2325 do the same thing for non-malignant disease?

15 Showing 2325.

16 A     It does, yes.

17 Q     Okay.

18 A     For the medical -- these medical criteria, correct.

19 Q     Showing you 2322, does this now reflect the total number

20 of claims that emerge once you've got your knowns plus your

21 allocation of unknowns and then apply the medical criteria

22 according to the two different methods where it's appropriate,

23 does 2322 summarize the total number of matched POC claims that

24 pass the medical criteria tests?

25 A     It does.

J&J COURT TRANSCRIBERS, INC.

CC-BLG001737

1 Q    And does this accurately reflect that?

2 A    It does, yes.

3           MR. BERNICK:  Let's go to the exposure criteria which

4 will then take us to total currents and maybe that would be an

5 appropriate time for a break, Your Honor.  I don't know.

6           THE COURT:  Give me a second please.

7                      (Pause)

8           THE COURT:  Okay, thank you.

9 Q    Let's now talk about the exposure criteria.  Do we have a

10 similar slide that relates to the exposure?  Well let's begin.

11 To do the exposure analysis, were you able to work with the

12 total number of claims in each disease category matched to

13 POCs, or did you work with some other group?

14 A    Well, since a claimant has to meet both the medical

15 criteria and the exposure criteria, then we really had to look

16 at for exposure purposes that subset of people that meet the

17 criteria in order for it to be -- in order for it not to run

18 into problems with estimating these probabilities.

19 Q    2326, tell us whether or not this reflects the groups of

20 claims that were then evaluated for exposure, the exposure

21 criteria?

22 A    It does.  It represents the groups that were evaluated.

23 In fact I think if you notice it, these are the same numbers

24 that appear on 2318.

25 Q    The right-hand column?

CC-BLG001738

1  A    The final column of 2318.  Those are people that met those
2  criteria.
3  Q    Showing ya 2327, does this chart reflect how the exposure
4  categories were applied?
5  A    It does.
6  Q    Could you walk us through the different steps that were
7  involved in applying the exposure categories from Dr.
8  Anderson's work?
9  A    If you notice each -- there are four segments to the chart
10 for each disease type and you see "Group Reviewed" is the first
11 column so for mesothelioma there were 1596 claims that met the
12 medical criteria that were reviewed, and all of these were
13 reviewed by Exponent.
14 Q    Okay.  Now it says sufficient data.  Were there sufficient
15 data to do an exposure review with respect to all 1596 mesos?
16 A    No, there wasn't.  So there's only a group of these and in
17 the case of mesos there were only 534 claims where there was
18 sufficient data to do an evaluation of whether the exposure
19 criteria were met.
20 Q    Do we see the same basic analysis done for lung cancer,
21 other cancers and non-malignants?
22 A    That's correct.
23 Q    Now, you then say who actually did the exposure review;
24 you've got Exponent and you've got the criteria.  They had to
25 be As or Cs and the Court has already heard more than enough

1 about those.  Again were these assumptions that you made; that

2 is, you assumed the accuracy of the Exponent data and you

3 assumed the application that they properly applied the exposure

4 categories?

5 A    We did, yes.

6 Q    Okay.  Now tell us what we see in the last two columns

7 under "Claims that pass".

8 A    Well if you look under -- the last two columns this

9 concept that I described earlier of Method 1 and Method 2.  So

10 that is, what's the rate at which people qualify of those that

11 provided -- of those that we could judge?  And then also what's

12 the rate at which people qualified for those that provided

13 information?  So what you see here is the number of people of

14 the claims that can be evaluated, the 534 that had sufficient

15 information, 102 were found to pass the criteria that is judged

16 by Exponent, and that 102 is roughly 6.4 percent of the 1596

17 claims that were evaluated.

18        In Method 2 remember we said that, when we

19 calculating a rate those claims, that only those claims had

20 sufficient information and apply that rate to all the claims.

21 And so in Method 2 what you see there is, it is the 102 claims

22 that met the criteria divided by 534 claims; that is, the

23 number of meso claims that had sufficient information.  That

24 gives you a rate of 19.1 percent for Method 2.

25 Q    Does 2327 accurately summarize the data and the pass rates

CC-BLG001740

1  that emerged from the exposure review?

2  A    It does, yes.

3  Q    Now we are -- you've pointed out that this review is done

4  only of certain groups.  How did you get from this analysis

5  back to all of the people who passed the medical review -- all

6  the people that passed the medical review as opposed to the

7  people in the sample who passed the medical review?  How did

8  you translate the results to the groups as a whole?

9  A    We used the rates that you see there in parenthesis for

10 Method 1 and Method 2, and applied those to the full group.

11 Q    So showing you 2328, does this now reflect the application

12 of those rates in order to calculate the numbers of people

13 within each group who qualified under both the medical and the

14 exposure criteria?

15 A    That's correct.  So, those are the rates multiplied by the

16 number of people in each of those groups.

17 Q    And you'd use again both methods?

18 A    We used both methods, correct.

19 Q    Then what is the -- what is in the column that is

20 reflected as overall median, what are those numbers?

21 A    That just provides the median value between the two

22 methods, between Method 1 and Method 2.

23 Q    Does this now bring us in your analysis to the numbers of

24 claims, matched claims, pending as of the time that Grace filed

25 for Chapter 11 that meet both the exposure and the medical

CC-BLG001741

1  criteria?

2  A     It does, yes.

3  Q     And turning now to 2301 --

4         MR. BERNICK:  Ray, this is -- you like these moments.

5  Q     Do we then have the information that appears as the

6  pending claims?

7         MR. BERNICK:  We may have a mistake here  That's both

8  criteria?  Oh, yeah, well, that's right.  But, I didn't show

9  that.  I've got the one that's on the board -- 310 -- no,

10  that's right.  310, 367 for the lung cancers.  No, that's not

11  right.  Is that just exposure?

12        UNIDENTIFIED ATTORNEY:  Yes, exposure.

13        MR. BERNICK:  No, this is just exposure.  Then this

14  one then has to be a mistake.  I've got the board that's just

15  got the pendings.  Give us a moment.

16        THE WITNESS:  Would this be a good time to take a

17  break, Your Honor?  I could use it.

18        THE COURT:  Yes.  All right.  We'll take a ten minute

19  recess.

20                    (Recess)

21        THE COURT:  All right.  Could you put that back up,

22  please?  Mr. Bernick?

23        MR. BERNICK:  Yes, thank you, Your Honor.

24  BY MR. BERNICK:

25  Q     Dr. Florence, I want to take you back to an error that was

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001742

1 my own.  We summarized 2328 and I was -- I misled myself by

2 looking at the 310 number for meso and described in my question

3 to you that this chart summarized the results of both criteria.

4 And I see now that it only describes the results of the

5 application of the exposure criteria, is that correct?

6 A    That's correct.

7 Q    Let's now get to the chart that I then skipped over in my

8 haste to reveal from the board.  Let's go to 2329 and my

9 question to you is whether this now shows us the summary --

10 accurately summarizes the number of pending claims in each of

11 the disease categories meeting all of the criteria including a

12 reflection of the use of the Method 1 and Method 2?

13 A    It does.  It summarizes the results of applying those

14 rates to the group of individuals that filed proofs of claim.

15 Q    Now if we take the two numbers for each of the disease

16 categories as reflected in 2329 and we calculate a median, does

17 that then get us to the column under pending claims for Exhibit

18 2301?

19 A    It does.  Yes.

20 Q    Let's then take the next step and talk about the valuation

21 of these claims.  When it comes to determining the valuation of

22 the claims that meet both criteria, where did you go in order

23 to obtain information relating to value?

24 A    We went back to the closed claim data base and the sample

25 we selected from that data base.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Okay.  Let's talk about -- well let me just ask you a

2  general question.  When you went back to the closed claims data

3  base and you looked at the closed claims data base, what

4  comparison, if any, did you make with the claims in the closed

5  claim data base and the claims that had been sorted out through

6  the application of the criteria --

7           MR. INSELBUCH:  Objection Your Honor.  This is where

8  we would enter our protective objection and ask for a continued

9  objection to anything that he has to say about this data base

10 and the settlements in that data base.

11          THE COURT:  All right.  The objection is noted and as

12 I indicated overruled so that we can get through this.  But I

13 will make official rulings after I get to the end of all of the

14 evidence in the entire case.

15          MR. INSELBUCH:  Thank you, Your Honor.

16          MR. MULLADY:  I want to join the objection.

17          THE COURT:  All right.  One second please.  Okay, now

18 the objection is made, but I need the question restated.  I

19 only got half of it.

20          MR. BERNICK:  It wasn't a great question anyhow, but

21 we'll put it again.

22 Q    You now want to get values, you said you go to closed

23 claims.  Could you just go to any closed claims or was there

24 some other process that was involved in looking to particular

25 closed claims?

J&J COURT TRANSCRIBERS, INC.

CC-BLG001744

1  A    We wanted to go to closed claims that met the criteria.

2  So those would be claims that had been previously settled or

3  closed by Grace that met the criteria we're looking at.

4  Q    Showing you 2330, does this reflect the -- with respect to

5  the settled meso claims, the results of reviewing those meso

6  claims both for the exposure and the medical or diagnostic

7  criteria?

8  A    It does.

9  Q    So you say of this 285 settled meso claims, six met the

10  criteria, 21 did not meet and with respect to 258 there was

11  insufficient information?

12  A    Yes.   This is related to mesothelioma.

13  Q    Right.

14  A    And as you recall the only criteria dealing with

15  mesothelioma was whether the mesothelioma claimant met the

16  exposure criteria.   So these claims, these settled claims were

17  reviewed by Exponent, as I understand, using the same

18  methodology to determine whether in fact they had sufficient

19  information to be judged to meet the exposure criteria on

20  whether they had insufficient information.   And so, this

21  categorization is really the categorization by Exponent of

22  those closed claims.

23  Q    Fine.   Now, you have different averages for the six that

24  met 155,000, for the 21 that did not meet about 127,000 and for

25  the 92 or -- the 258 where the information was not sufficient,

CC-BLG001745

1 $92,649 average per claim, where did those numbers come from?

2 A    That comes directly out of the claims data base provided

3 by Grace.   These represents the -- represents the positive

4 amounts paid by Grace in those cases.

5 Q    Okay.  What observations, if any, did you have with regard

6 to these numbers; that is, the 92,000, the 127 and the 155?

7 A    Well, yeah, this was a difficult analysis I think because

8 one dollar value that is not illustrated here is the average

9 for that entire group of settled claims which I think was about

10 $96,000.

11 Q    Okay.

12 A    When we looked at this, the first thing we did was looking

13 at the six cases that met, there was a feeling that that was a

14 relatively small number of cases, but we wanted to see if in

15 fact that value was somehow statistically different from either

16 the overall average or these other averages.   So that 155,000

17 we tested using statistical tests to determine whether

18 statistically it was different than the 127,000, the 92,000 and

19 the 96,000 that I mentioned.

20 Q    And what did you determine?

21 A    That it was not statistically different.  So in other

22 words you would expect this kind of variation totally due to

23 sampling error, and the error in the process.  So one of the

24 approaches we entertained was to value these cases at the

25 overall average, the $96,000.

CC-BLG001746

1  Q    Okay.  Why did you -- let me just before I -- I'm going to

2  ask you why you didn't, but let me just ask you another

3  question.  Did you make any observations as to whether varying

4  evidence of exposure made a difference to claims value; that

5  is, better evidence of exposure, the higher values, lower or

6  poorer evidence of exposure to Grace product led to lower

7  values?

8        MR. FINCH:  Objection, lack of foundation as to --

9  and to form as to better or less evidence of exposure.

10       MR. BERNICK:  I'll rephrase it.

11 Q    First of all, was there evidence regarding exposure that

12 was presented to you as a result of this process; that is, with

13 respect to these claims?

14 A    Yes.  We had the determination by Exponent of which of

15 these 285 claims met the exposure requirement and which didn't

16 and which had sufficient information to even judge the exposure

17 requirement.

18 Q    What conclusion did you reach as to whether proof of

19 exposure to Grace product made a difference or did not make a

20 difference with respect to claim value for mesothelioma claims?

21       MR. FINCH:  Objection as to form.  By proof of

22 exposure to Grace product, is he talking about mixing,

23 installing, or any proof at all of exposure to Grace product?

24       MR. BERNICK:  Your Honor, with all due respect I just

25 created a foundation.  The foundation was the Exponent review.

CC-BLG001747

1  The Exponent review has now been put into the record by two

2  different witnesses and it was on the basis of the Exponent

3  review that I asked him the question.

4          THE COURT:  Well if we're basing it on Categories A

5  and C since that seemed to be what he testified about earlier,

6  is that the case?

7          MR. BERNICK:  Yes, well that is what he testified.

8          THE COURT:  Fine.  Overruled.

9  A    I'm sorry.  Could I hear the question again?

10 Q    Yes, the question is now -- we'll try it again.  Could you

11 tell us what, if any, observations you have made as to the

12 impact of proof of exposure to Grace product as that proof was

13 presented to you through Exponent, what difference, if any, it

14 made to settlement value?

15 A    Well this slide itself shows one conclusion which was that

16 where the information was unfortunately non-existent, the

17 claims average that was 258 claims they averaged $92,000.

18 Where the claims information was available but did not meet the

19 AC criteria, the average was $127,000.  And in those six claims

20 where the information was available and they did meet the AC

21 criteria, the average was 155,000.  So one conclusion was that

22 there was -- there did seem to be some trend, but when we

23 tested the statistical significance of that trend we basically

24 said -- we were able to determine that there really was no

25 statistically significant basis for distinguishing between

CC-BLG001748

1  92,000 and 155,000.

2  Q    Okay.  I see from the slide that ultimately the 155 was

3  selected then for use?

4  A    It was.

5  Q    Okay.  How then did you get to the valuations for the

6  other categories, the other disease categories as lung cancer,

7  other cancers, non-malignant disease?

8  A    Well, we didn't have the same type of data on lung

9  cancers, other cancers and non-malignant disease on the closed

10 population as we did on the meso group.  So we had to derive

11 some additional method of trying to value that group of claims.

12 Q    And what was that method?

13 A    What we did was we looked at the TDPs, trust distribution

14 procedures, that have been promulgated in bankruptcies over the

15 last, I guess it was probably two years and we looked at the

16 relationship of those values to mesothelioma value.  For

17 example, if looking across all these TDPs there is a pattern

18 that would indicate lung cancers tend to be valued at a lesser

19 percentage than mesos and that percentage tends to be -- I

20 don't remember the exact number, but let's say 62 percent.  And

21 other cancers in those TDPs tend to be valued at some

22 percentage of meso and let's say that number tends to be 32

23 percent.

24         So we use that pattern that existed in the trust

25 distribution procedures of other bankrupts to set the values

J&J COURT TRANSCRIBERS, INC.

CC-BLG001749

Florence - Direct                    107

1 for the claims other than mesothelioma.  So using the 155,000

2 as the average for mesothelioma we said the other values would

3 follow this pattern, the pattern that we saw in the other TDPs.

4 Q    Is what you've just said now accurately summarized in

5 Exhibit 2331?

6 A    It is.

7 Q    Okay.  If we then want to take that out to the ultimate

8 valuation of all of the pending claims, I'm assuming that

9 that's a question of multiplication?

10 A    It's purely arithmetic at that point, yes.

11 Q    Okay.  Showing you the other -- the last -- the next two

12 columns on 2301; that is, claim value, are the numbers that

13 appear here the same values per claim that you've just

14 described in Exhibit 2331?

15 A    They are.  The non-malignant claims are in a little

16 different order, but the same value, same numbers.

17 Q    Okay.  And if we then express the pending claims times

18 claim value, do we get then the total pending claim values for

19 meso, lung cancer, other cancers and non-malignant that are

20 reflected in the total pending values expressed in millions, so

21 the total would be 81 million for total pending?

22 A    That's correct.  With remembering that that pending claim

23 column is the median value between Method 1 and Method 2.

24 Q    Okay.  Now peeling one more thing off the top, are we now

25 going to want to go talk about future claims, is that the next

CC-BLG001750

1  step in the process?

2  A    It is.

3  Q    Okay.  Was the first step of being able to project future

4  claims against Grace -- what was the first step involved in

5  that process?

6  A    It was to characterize the historical population of claims

7  against Grace whether they be pending or resolved as claims

8  that would or would not meet these criteria.

9  Q    Okay.  So let's begin with mesos.  What population of

10 mesos did you work with in creating your baseline for the

11 future projection, showing you 2333?

12 A    Well, we started with the pending cases which we've

13 already talked about.

14 Q    That's the 310?

15 A    That's the 310, correct.

16 Q    We see that right on the board there?

17 A    Right.

18 Q    Okay.  Then what was the next component?

19 A    We went back to the resolved claims and said if those

20 claims had met the criteria at the same rate that the claims

21 that were pending met the criteria, then there would be 688

22 resolved claims that would meet the criteria.

23 Q    Now, you have 998 total meet criteria from 1980 to 2000,

24 what does that represent?

25 A    That's just the sum of the pending claims and the resolved

CC-BLG001751

1 claims.  So, it gives you the full historical data base in

2 terms of mesos that would meet the criteria.

3 Q    Now earlier in the day you talked about the necessity of

4 creating an input to your futures model.  How -- can you tell

5 us how it is that on the basis of defining this population of

6 meso claimants you were able to create an input to the model?

7 A    Well, that tells us for historical claims and for year

8 periods within that historical period for each year how many

9 claims were filed in that year that would have met the criteria

10 that were specified to us.

11 Q    So what then is the -- now knowing the total number of

12 claims by year that met the criteria, what's the next step in

13 creating your calculation of futures?

14 A    We look back to -- first we go to the most recent history

15 under the belief, and I think the belief that is shared by most

16 forecasters, that most recent history is probably the best

17 indicant of what is going to happen in the future.  We go to

18 that most recent historical period and we look at how many

19 claims were filed there that met that criteria.  And in that

20 period we look at we normally call a calibration period, that's

21 the period of interest to us.

22 Q    Showing you 2334, does this illustrate the calibration

23 period that you use which is 1996 to 2000?

24 A    Right.  We actually used a number of calibration periods

25 that ranged from '96 to 2000.  So we actually used a five-year

CC-BLG001752

1  calibration period.   One was a five-year calibration period

2  that ranged from '96 to 2000; '96, '97, '98 '99, 2000 all the

3  way down to 1999 and 2000.  So there's groups of years that

4  we're looking at.  And the idea here is you don't -- it's

5  possible in doing an analysis like this, that one year or

6  another year might be anomalous in some way.  So by combining

7  years you hope to minimize the effect of any anomaly.

8  Q    Showing you 2235, does this reflect the varying

9  calibrations that you did and the varying calibration periods

10 that you used in connection with the process of building your

11 model for future meso claims?

12 A    Right.  And when I say building my model we actually are

13 building multiple models here.  We're building a model for each

14 calibration period.  So we're saying what if the future looked

15 like the period '96 through 2000?  What if the future looked

16 like the period '97 to 2000, '98 to 2000, '99 to 2000?

17 Q    Okay.  In order to go forward from these calibrations to

18 the future, how do you fill in the mesothelioma trend based

19 upon these varying calibrations?

20 A    Well, the trend is reasonably captured in the calibration

21 periods.  So, in other words, by picking alternative

22 calibration periods if there is a trend it will be captured.

23 Q    My mistake.  How do you extend that trend out into the

24 future in years beyond 2000 using your model?

25 A    I think that's when we really look to the epidemiological

CC-BLG001753

1  models that I think were referred to earlier, and those are

2  generally models by either -- that were either developed by

3  Nicholson or a model developed by Peto.  So we really look at

4  two different models.

5  Q    Okay.  I'm showing you 2337, does this describe in just

6  general terms the two different models?

7  A    Yes, it describes the -- it certainly describes the

8  Nicholson KP&G model.  I'm sorry.  I'm on the wrong slide.

9  Q    I switched them on you.

10 A    Yes, it talks about -- there's really two models;

11 Nicholson and Peto.

12 Q    Okay.  Now, if we go back to the calibration periods I

13 think that you've said that you run more than one model and

14 more than one calibration period.

15 A    We do.

16 Q    Showing you 2336, does this illustrate just what we talked

17 about; that is using different calibration periods and then

18 running different models for each of the calibration periods in

19 order to project out the Grace specific mesothelioma future

20 trend?

21 A    That's correct.  What you are really looking at, and this

22 is -- this curve at the top is the, what we call the Nicholson

23 KP&G curve, it's the curve that was originally developed by Dr.

24 Nicholson as enhanced by work from KP&G.  For a given

25 calibration period, you are looking at what's the ratio of

CC-BLG001754

1  qualified claims in that calibration period to the number of

2  claims that Dr. Nicholson and KP&G estimated would be filed

3  during that period due to occupational exposure to any

4  asbestos.

5  Q    Okay.  And so now what are you doing with respect to

6  Grace?

7  A    I'm sorry?

8  Q    You said that that is occupational exposure as a whole,

9  what are we doing with respect to the Grace projections?

10 A    Well, for each calibration period we're looking at what

11 proportion of the total forecasted occupational exposures were

12 exposures that resulted from claims filed against Grace that

13 met these criteria.  And so that ratio then uses the curve as

14 you see it going past 2000 and it assumes that same ratio going

15 forward.  So, it provides us with an estimate of if these

16 claims track this epidemiological curve and there were the same

17 proportions we've historically determined in the calibration

18 period met the criteria, this is what the forecast would look

19 like.

20 Q    Now, you said you assumed that ratio remains constant.  Is

21 that an assumption or is that something that you verified that

22 is for the next 30 or 40 years is going to remain the same?

23 A    That's really an assumption.

24 Q    Okay.  Based upon those analyses, does 2338 list the

25 different calibration periods, the different estimation methods

CC-BLG001755

Florence - Direct                                          113

1  and the different net present values for future mesothelioma

2  claims for Grace?

3  A    It does.  So if you look down the left-hand column you see

4  the forecasting method is either Nicholson or Peto.   The

5  calibration period you notice the differences there from '96 to

6  2000, '97 to 2000.  And then for each of these -- so we have a

7  different forecast for each calibration period and each method

8  and that provides us, for mesothelioma, with eight forecasts.

9  Right?

10  Q    Okay.

11  A    Then you'll notice that that forecast is done on the

12  Method 1 data.  So in other words assuming that the people that

13  responded to the information and qualified are the only people

14  that would qualify and then using Method 2 data, it's under the

15  assumption that people that didn't respond and didn't provide

16  sufficient data would qualify at the same rate as the people

17  that responded and had sufficient information.  So this shows

18  you the variation, at least for mesothelioma, of all of those

19  forecasts.

20  Q    Okay.  If we then want to sum up; that is, both pendings

21  and futures on an NPV basis, I want to show you 2340 and ask

22  you whether this is an accurate summary of the NPV values for

23  pendings, futures and then pendings and futures for each of the

24  different categories using each of the Method 1, Method 2 and

25  then stated as median values and millions of dollars.

J&J COURT TRANSCRIBERS, INC.

CC-BLG001756

1  A      This is really a table of the kind of medians of medians.

2  That line there on Method 1, just to make it clear, we're

3  pricing the present and future claims as if they were qualified

4  under the assumptions of Method 1.  The pending claims are

5  worth, I think we valued earlier the present value at $24

6  million.

7          The futures is actually multiple forecasts because we

8  were looking at Method 1 using these alternative methods,

9  right, and alternative calibration periods.  So that 128 is

10  really a median of multiple forecasts.  So when you add those

11  together it gives you 152 million, and then the bottom line

12  there is a median of medians.  It's just a midpoint of all

13  those midpoints.

14  Q      Does this now give us the last two columns of 2301 which

15  are the valuations for futures on a median basis and then the

16  valuations for pendings and futures NPV on a median basis

17  resulting in a total of $468 million NPV?

18  A      NPV on a median basis, correct.

19  Q      Okay.  Dr. Florence, after -- I take it that a tremendous

20  amount of work has gone into this process and we've seen that,

21  I mean, is that true?

22  A      Yes, I would agree with that.

23  Q      Okay.  And we see that different techniques have been used

24  depending upon the availability of the data?

25  A      Yes.

CC-BLG001757

1  Q    Based upon the assumptions that you've made in this

2  process and based upon the methods that you have deployed, are

3  you aware of any other more reliable way to estimate Grace's

4  current and future asbestos liability than the one that you

5  have chosen to present here?

6  A    Assuming that liability is based on these criteria.

7  Q    Yes.

8  A    I have no better -- this is the best way I could come up

9  with, yes.  I know of no better way.

10         MR. BERNICK:  Your Honor, we will offer in certain of

11  the demonstratives as summaries.  I will provide a list of

12  those to counsel before the lunch break.  I am assuming that we

13  will probably take a lunch break now, is that appropriate?

14         THE COURT:  Yes, that's fine.

15         MR. BERNICK:  And then we'll make the formal proffer

16  after we come back from lunch and then I'll pass the witness to

17  opposing counsel.

18         THE COURT:  All right.  We'll be in recess until

19  1:05.

20         MR. BERNICK:  Thank you.

21                          (Lunch recess)

22         THE COURT:  Please be seated.  Dr. Florence, just a

23  reminder that you are still under oath.  And, Mr. Bernick, you

24  were going to offer some exhibits.

25         MR. BERNICK:  Thank you, your Honor.  TJ, if you

CC-BLG001758

1 could show 233.  We're offering in as summaries the following.

2 This list has been provided to counsel for the ACC and the FCR

3 2316 through 18, 2321, 22, 24, 25, 27 through 29, 31, 36, 38

4 and 40, along with 2301.  If Your Honor would like me to go

5 back over those, I can.

6          THE COURT:  I have them.

7          MR. BERNICK:  Okay.  I understand from Mr. Finch that

8 he has a concern with the slope of 2336, that is the Nicholson

9 KPMG curve.  It appears to come down rather precipitously.  And

10 I am told, and will represent to the Court, that that is an

11 accurate slope given the scale from 2000 going forward.  It's

12 all very compressed but it is different, the scale is different

13 than before 2000.  There was more space before 2000.  So when

14 you see it kind of going over the edge like a roller coaster,

15 that is simply a function of the different scale on the

16 horizontal access before and after 2000, but it is otherwise

17 accurate after 2000.

18          MR. FINCH:  My objection, Your Honor, is that as

19 depicted one would draw the conclusion that the scale to the

20 right of the year 2000 is the same as the scale to the left of

21 the year 2000 in terms of years and that is absolutely not the

22 case, which leads to a projection of the Nicholson incidents

23 curve that appears to drop off rapidly after the year 2000 when

24 in fact it is a very, very gradual decline.

25          THE COURT:  Well isn't that curve in several of his

1  reports that are in exhibits both in the debtor's and the ACC's

2  and the FCR's exhibits?

3       MR. FINCH:  Not in Dr. Florence's -- that curve

4  doesn't appear in any of Dr. Florence's reports, Your Honor.

5  It occurs in Dr. Nicholson's -- excuse me, in Dr. Peterson's

6  report.  My objection is just solely to the scale on the right

7  side of the line.  If it's clear from the record that the scale

8  on the right side of the line is much more compressed than the

9  scale of years on the left side of the line, then I don't have

10 an objection to the exhibit.

11      THE COURT:  Okay.  All I want to make sure, I thought

12 that in Dr. Nicholson's reports themselves that his own curves

13 were reported and that his reports are in evidence before me

14 somewhere.  I thought his 1982, '86 reports were --

15      MR. BERNICK:  In fairness to Mr. Finch, the Nicholson

16 KPMG curve is an adjustment or a modification of the Nicholson

17 curve, so that is Nicholson KPMG.

18      THE COURT:  I see, okay.

19      MR. BERNICK:  So we would be happy if Mr. Finch wants

20 to provide for the Court in evidence the KPMG curve itself, you

21 know, on a broader scale, but --

22      MR. FINCH:  We will put that into evidence with Dr.

23 Peterson's testimony, Your Honor.

24      THE COURT:  All right.  I will -- I understand that

25 the scale to the right of the 2000 year axis is not the same

1  scale as to the left of that axis.  I've made a note and that

2  this -- that the curve is in that sense a steeper curve than

3  would otherwise be the situation and that you will put a

4  representation of the curve itself as another exhibit.  Let me

5  just make a note.

6        MR. BERNICK:  Okay.  And I believe that that then

7  takes care of the sole objection to the exhibits, the summaries

8  that I've listed, and we would offer those into evidence as

9  summaries.

10       MR. FINCH:  No objection to the rest of them, Your

11 Honor.

12       THE COURT:  All right, so Exhibit -- so I'm admitting

13 Exhibit 2336 with that explanation and --

14       MR. MULLADY:  For the record, Your Honor, no

15 objection by the FCR joining the comments of the ACC's counsel

16 with respect to 2236.

17       THE COURT:  2336.

18       MR. MULLADY:  2336, excuse me.

19       THE COURT:  Okay, thank you, same ruling.  All right

20 and exhibits 2316, 17, 18, 21 and 22, 24, 25, 27, 28, 29, 31,

21 36, 38, 40 and 2301 are all admitted.

22       MR. BERNICK:  Thank you, Your Honor.  And with that,

23 we would pass the witness.

24       THE COURT:   All right.  Give me one second, Mr.

25 Finch.

CC-BLG001761

1                     (Pause)

2                THE COURT:  Okay, thank you.

3                MR. FINCH:  Ready to proceed.  Nathan Finch for the

4    Asbestos Claimants Committee.

5                        CROSS EXAMINATION

6    BY MR. FINCH:

7    Q    Good afternoon, Dr. Florence.

8    A    Good afternoon.

9    Q    Dr. Florence, just --

10                MR. FINCH:  Could you put the ELMO back on please?  Q

11        Since what lawyers say is not evidence, you would agree

12   with me, would you not, sir, that the timescale to the right of

13   the year 2000 is much more compressed than the timescale to the

14   left of the year 2000?

15   A    I would agree, yes.

16                THE COURT:  Just for the record, you are talking

17   about Exhibit GG-2336.

18                MR. FINCH:  Yes, GG-2236 -- 2336.

19   Q    Correct?

20   A    I would agree, yes.

21   Q    Do you still have your notebook of the two reports that I

22   handed to you when I was voir diring you?

23   A    I do.

24   Q    Could you open that notebook to your second report?

25                MR. FINCH:  What's the ACC exhibit number?

                    **J&J COURT TRANSCRIBERS, INC.**

1      THE COURT:  462.

2  Q    462.  462, Page 2, do you have those?

3  A    I do.

4      MR. FINCH:  Can we switch?  Excuse me, could we

5  switch off the ELMO to the -- John?

6  Q    Okay.  You were asked to assume that the only claimants

7  whose claim -- the only claimants whose claims met the

8  following criteria would be able to sustain their burden of

9  proof that their claims against Grace are valid and therefore

10 that their claims should be valued as a part of the estimation

11 process, is that correct?

12 A    That's correct.

13 Q    And focusing on the nature of the minimum exposure

14 criteria and focusing on mesothelioma claims, you assumed that

15 the only valid mesothelioma claims that you gave value to were

16 from workers who personally mixed Grace asbestos containing

17 products and workers who personally installed Grace asbestos

18 containing products, correct?

19 A    That's correct.

20 Q    And on the questionnaires the mixer is Category A and the

21 installer is Category C?

22 A    I believe that is correct, yes.

23 Q    You didn't make any assessment of the validity of that

24 assumption, did you sir?

25 A    I did not, no.

CC-BLG001763

1  Q    You made no independent judgment as to whether any of

2  these assumptions as to what claims would be compensable or

3  valid assumptions or invalid assumptions, correct?

4  A    Correct.  The assumptions were provided to me.

5  Q    You didn't have any input to them?

6  A    Correct.

7  Q    You weren't consulted about them?

8  A    Correct.

9  Q    You don't have any opinion one way or the other as to

10 whether these criteria are valid assumptions for a Court to

11 adopt in estimating Grace's asbestos liability?

12 A    Correct.

13 Q    You don't have any opinion as to whether these criteria

14 could successfully have been applied by Grace if it had not

15 gone into bankruptcy?

16 A    I have no opinion.

17 Q    And you don't have any opinion about whether people who do

18 not meet these criteria could successfully prosecute a claim to

19 judgment in the tort system, do you?

20       THE COURT:  I'm sorry, Mr. Finch, would you repeat

21 that please?

22 Q    Yes.  You don't have any opinion about whether people who

23 do not meet the criteria you were asked to assume could

24 successfully prosecute a claim to judgment in their favor

25 against Grace in the tort system?

CC-BLG001764

1  A    I have no opinion, correct.

2  Q    Okay.  With respect to the mesothelioma criteria of

3  personally mixed and personally installed, that was one of the

4  criteria you were asked to assume, correct?

5  A    It was, yes.

6  Q    As part of your work in this case you reviewed some

7  deposition transcripts of Grace's in-house lawyers, correct?

8  A    I read them some time ago, quite long ago.

9  Q    Okay.  You would agree with me that historically Grace

10  paid mesothelioma claims that did not meet the mix or install

11  criteria?

12          MR. BERNICK:  Objection to -- objection to the

13  question on grounds of lack of foundation, number one, and to

14  the extent that this is based upon the testimony of Grace

15  employees.  I further object that it violates the stipulation.

16  They are not reliance materials and he's offered no opinion.

17          THE COURT:  I can't hear you, Mr. Bernick.  I'm

18  sorry.

19          MR. BERNICK:  I object on grounds of lack of

20  foundation, and further object to the extent that he is being

21  asked about the deposition testimony of Grace employees that

22  goes beyond the scope of his direct examination.  He's offered

23  no opinion regarding that.  And it also violates the terms of

24  the stipulation which say that unless something is actually

25  relied upon in connection with the opinion that's offered it's

CC-BLG001765

1  not subject to discovery merely because it was reviewed.

2  Q    Dr. Florence, can you turn to your second report, Pages

3  1-1 and 1-2 at the very back?

4  A    I-1?

5        MR. BERNICK:   I-1?

6  Q    I-1.  It's about the fourth page from the end of the

7  document.

8  A    Yes.

9  Q    This says --

10        MR. FINCH:   Keep going, John.  It's Exhibit 1.

11        THE COURT:   Appendix 1?

12        MR. FINCH:   It's Exhibit 1.  It's after Appendix J,

13  Appendix K, Appendix L and then it becomes -- there's an

14  Exhibit 1 and there's an Exhibit 2.

15        THE COURT:   You are talking Page 2-1 not I-1?

16        MR. FINCH:   I'm talking Page 1-1, Exhibit 1-1.

17  A    It's an exhibit, not an appendix.

18  Q    It's an exhibit.  Do you have the exhibit in front of you,

19  Dr. Florence?

20  A    I do.

21  Q    And at the top it says Exhibit 1, Documents Relied Upon?

22  A    Yes.

23  Q    And listed in the documents relied upon, Number 10 is the

24  testimony of Robert Beber taken February 21, 2007.  Number 11

25  is the testimony of Jay Hughes taken February 22, 2007.  Number

CC-BLG001766

1  20 is the testimony of Robert Beber taken July 30th, 2002.

2  Number 21 is the testimony of David Siegel taken September 19,

3  2002?

4  A    Yes.

5  Q    And Number 18 is the testimony of Jay Hughes taken July

6  19th, 2002?

7  A    Yes.

8  Q    And you have done work in estimating asbestos claims and

9  the costs of those claims for the W.R. Grace company for more

10  than ten years, correct?

11        MR. BERNICK:  At this point, Your Honor, first of all

12  the work that he did for Grace in connection with their reserve

13  estimate has not been before the Court in connection with this

14  witness' testimony.  Secondly, while it is true that these

15  documents were listed as reliance materials he was specifically

16  asked about this in his deposition and clarified that he simply

17  was asked to read them and doesn't really know why and that

18  they were not used.  So, they are not reliance materials.

19        MR. FINCH:  Your Honor, Dr. Florence testified that

20  he -- on my voir dire that he was relying on all of his past

21  experience in estimating asbestos liabilities for here.  Mr.

22  Bernick asked him specifically about estimates for defendants

23  done in the tort system and included on that list is W.R.

24  Grace.

25        I would submit to you that the reliability of an

CC-BLG001767

1 | expert's work and the credibility of an expert's work is always
2 | within the scope of direct examination.  Mr. Bernick asked him
3 | about the work he did for Grace on direct exam and I think I am
4 | perfectly entitled to cross examine Dr. Florence about his
5 | prior work in the Grace case and in other cases.

6 |      The expert stipulation doesn't bar this.  The
7 | stipulation Mr. Bernick has referred to has nothing to do with
8 | this.  And, in fact, during a hearing on May 2nd, 2007 I
9 | specifically raised this issue with the Court.  I made very
10 | clear that I never agreed that I couldn't use Grace's past work
11 | that Florence did to impeach him or to impeach the company.
12 | That is critical to the ACC's ability to impeach him at trial.
13 | I never agreed to that and later in the transcript Mr. Bernick
14 | says, "We're not taking the position you can't impeach Dr.
15 | Florence with prior testimony, prior contrary testimony as Dr.
16 | Peterson was impeached in the Babcock & Wilcox case based upon
17 | his prior sworn testimony in that case."

18 |      And later on in the same transcript I say, "I can
19 | impeach the company.  The company is the one who is presenting
20 | an estimate of liability.  I am certainly entitled to show how
21 | they did it in the past."  And the Court responded, "Sure, you
22 | can show how they did it in the past, but that is, as I
23 | understand it, was the scope of the depositions in the past."

24 |      So I think his methodology that he used in the past
25 | for Grace is certainly relevant to the estimate that you are

CC-BLG001768

1 being asked to accept here.  It's no different than in a real

2 estate valuation case.  If a real estate expert, an appraiser,

3 had a long history of valuing Black Acre by comparables in the

4 same neighborhood and then he comes into Court and says this

5 time I'm basing the value of Black Acre on astrology.  You

6 could certainly go back and impeach him with his prior work.

7 And it's not covered by the expert stipulation.

8        MR. BERNICK:  Your Honor, (a) there is no impeachment

9 at least as of this point in time, there is no impeachment

10 whatsoever, (b) it is -- we had a stipulation, the stipulation

11 governed this particular situation.  There are all kinds of

12 materials I could have used to impeach Dr. Peterson and their

13 other experts, but because they didn't rely upon them, I'm not

14 permitted to do that.

15        What they want, they want to establish that the

16 company has taken an inconsistent position.  They can certainly

17 seek to establish that through their own witnesses and witness

18 for the company if the company appears here.  But, the whole

19 purpose of the stipulation was to control the cross examination

20 and the discovery to those matters that the expert actually

21 chose to rely upon.  This expert has specifically disclaimed in

22 his deposition using the prior testimony for purposes of his

23 work in this case.  The only testimony that he's now offered is

24 that his experience is that they want the basis for his work.

25 Well, of course that is always true.

J&J COURT TRANSCRIBERS, INC.

CC-BLG001769

1        The purpose of the stipulation was to limit the scope

2 of discovery in cross examination.  We have abided by it.  They

3 should abide by it.  And if they want to make their own record

4 about their views of our approach, they can do so through their

5 own witness.  But, you can't take a witness that I've put on

6 the stand who has talked about a specific opinion based upon

7 specific work.  And I'll say for all purposes this witness is

8 going to be open to "cross examination" that's all designed to

9 explore their model.  The model -- their model, is not before

10 the Court.  His model is.

11        MR. FINCH:  Your Honor, the stipulation says that

12 simultaneous with the service of the expert reports, the

13 experts produce their reliance material.  The only things that

14 are outside of the scope of permissible discovery are any notes

15 or other writings taken or prepared by or for an expert witness

16 in connection with this matter, including correspondence or

17 memos to and from, the notes of correspondence with the

18 expert's assistants and/or clerical support path, one or more

19 other expert witnesses or non-testifying expert, consultants,

20 or one or more attorneys for the party offering the testimony

21 of such expert witness, unless the expert witness is relying

22 upon those notes or other writings in connection with the

23 expert's witnesses opinions, draft reports, any/all

24 communications between the expert and the expert's staff,

25 unless the expert is relying upon those communications, the

CC-BLG001770

Florence - Cross/Finch                    128

1  software constituting or underlying any computer model, and any

2  confidential information disclosed to the expert in a prior

3  engagement by another client or entity.

4          This -- his prior work, both for Grace and others,

5  don't fall into any of those categories.  And to the extent

6  they -- they just don't.  And these questions were put to Dr.

7  Florence at his deposition about his prior work for Grace and

8  his prior work in other cases and I submit to you it's highly

9  relevant and highly informative to the Court, and not within

10 the purview of the expert stipulation, his prior work.

11         THE COURT:  It seems to me that the particular

12 question that -- we've gotten so far afield of what the

13 particular question was at this point.  The question was that

14 he had estimated claims and costs of those claims for the

15 debtor for more than ten years.  And then there was an

16 objection.  I mean, to the extent that the objection is, you

17 know, whether he has estimated claims for the debtor for more

18 than ten years, I don't see that that's an objectionable

19 question.  To the extent that after that we're going to get

20 into work that -- and what it is that he has done for the

21 debtor, to the extent that you're going to ask him questions

22 about the reserve work and what that has -- what relevance that

23 may have to do with the debtor, I don't know if what happened

24 ten years ago and what's reserved for financial statements is

25 at issue.

CC-BLG001771

1        This is not a fraudulent conveyance trial.  This is

2   an estimation trial for what the debtor has to put into this

3   trust to get through this particular -- or some other entity if

4   the debtor is not the successful plan proponent -- has to get

5   into this trust in order to get this case through confirmation.

6   So what may have been relevant in an estimation trial on

7   fraudulent conveyance issues and estimations for liability

8   depending on what the debtor did with particular financial data

9   and that type of a trial may not be relevant here at all.

10  Nonetheless, this witness can surely answer whether he has

11  worked for Grace estimating tort claims for the last ten years.

12  That objection is overruled.  Dr. Florence, you may answer that

13  question.

14  BY MR. FINCH:

15  A    Yeah.  We've done work for Grace -- I say we -- the firm

16  has done for Grace since about 1995.

17  Q    And the work you have done for Grace was to estimate the

18  cost that Grace would bear -- prior to the time that Grace went

19  into bankruptcy, each of the times you've worked for Grace, you

20  were estimating the cost that Grace would bear to resolve

21  asbestos personal injury claims while it continued in the tort

22  system, correct?

23  A    I believe so.  We were asked on most of those occasions,

24  except for, I think, the last engagement in 2000, to estimate

25  the volume and the timing and the value of claims, both pending

CC-BLG001772

1  and future, that would be filed against Grace, assuming they

2  stayed in the tort system.

3  Q    And in the 2000 engagement, you estimated the number of

4  claims but not the value, correct?

5  A    That's my recollection.  Yes.

6  Q    Okay.  And the work you did for Grace in 1997, do you know

7  what purpose they used that work for?

8  A    I don't.

9  Q    Do you know that they used your estimates -- do you know,

10  one way the other, whether they used your estimates to evaluate

11  their solvency for purposes of spinning off the Sealed Air

12  packaging business?

13  A    I don't know precisely how they used my work.

14  Q    In all the times you did work for Grace in the past, was

15  -- strike that.  I'll do it in a more specific basis.  In fact,

16  would you agree that there is no TDP that you're aware of that,

17  for the mesothelioma criteria, restricts payment only to people

18  who personally mix or personally install asbestos containing

19  products?

20  A    That is --

21            MR. BERNICK:  A TDP in existence in connection with

22  the trust?

23            MR. FINCH:  Yes.

24  A    I think I answered that earlier, about -- I think it is

25  non-explicitly, only as a subset of some other criteria.  At

CC-BLG001773

1  least my recollection is of the TDP's I've worked with.

2  Q    Isn't it true that there is -- is there any TDP that you

3  are aware of that has, for the mesothelioma criteria, that

4  restricts payment only to the people who personally mix or

5  personally install asbestos containing products?

6  A    I think I said no.  I mean, is that explicit, only those

7  two?  No.

8  Q    So -- okay.  So the TDP's for mesothelioma allow valid

9  claims from people even though they don't personally mix or

10 personally install asbestos containing products?

11        MR. BERNICK:  Objection to the form of the question.

12 Invalid.

13        THE COURT:  Sustained.

14 BY MR. FINCH:

15 Q    And isn't it correct that you're not aware of any solvent

16 defendant in the tort system that restricts payments in

17 mesothelioma cases solely to people who can demonstrate that

18 they've personally mixed or personally installed an asbestos

19 containing product?

20        MR. BERNICK:  Objection.  A) lack of foundation.  B)

21 that most certainly violates the terms of the stipulation and,

22 not only that, but implicates potentially confidential

23 information that this witness may have because he does

24 consulting for those other clients.

25        MR. FINCH:  Your Honor, I asked him exactly that

CC-BLG001774

1 question in his deposition so, to the extent -- I wasn't asking

2 about confidential information.  The question is, does he know

3 one way or the other, not what the criteria are, but does he

4 know of any solvent defendant that restricts payment in

5 mesothelioma cases solely to people who can demonstrate that

6 they personally mixed or personally installed an asbestos

7 containing product.

8           MR. BERNICK:  And the answer to that question is it's

9 plainly barred by the stipulation because to explain or deal

10 with his answer, we would then have to go into materials that

11 he has not relied upon in order to demonstrate what it was that

12 he was talking about, and that was the whole purpose of the

13 stipulation, is to avoid that inquiry.

14           MR. FINCH:  Your Honor, in the deposition, he

15 answered that he knows of none.

16           MR. BERNICK:  It makes no difference what it is in

17 his deposition.  It's not -- we should not be opening the door

18 to an improper line of inquiry at this trial.

19           THE COURT:  The deposition testimony, I think, at

20 this point, is not necessarily the question.  You know, if you

21 wish to try to introduce his deposition testimony, that's a

22 different line of inquiry that you may have the opportunity to

23 do.  But while he's here, I think the issue is whether or not,

24 at this point, there is some privilege.  I don't see that there

25 is a privilege that's been asserted.  I'm not aware of whether

CC-BLG001775

1 that's going to violate the confidential sources.  At the

2 moment, it's a yes or no answer.  I don't see how that's going

3 to violate confidential information.

4        MR. BERNICK:  Because, Your Honor, in order for us to

5 deal with that testimony that he's now said no, we would then

6 have to unpack what kind of clients it is that he has and what

7 the basis for his knowledge is in order to explore how broad or

8 how limited it might be because they will take -- they could

9 argue on the basis of this answer that, gee, it's not there,

10 there's no evidence of it, whereas, in fact, the basis for his

11 testimony is much more limited.  I can't go down that road

12 because I can't ask him to breach his confidences and I don't

13 have -- shouldn't have to deal with that inference because the

14 question itself is improper under the stipulation.  Dr.

15 Peterson has all kinds of information that we've not been able

16 to get into because it's covered by this stipulation.  Ms.

17 Biggs has got all kinds of information that we can't get into

18 because it's covered by the stipulation.  We should not have to

19 deal with this line of examination.  Mr. Finch can't sit there

20 and pick where he wants to stand by the stipulation and where

21 he doesn't want to.

22        THE COURT:  All right.  How is this covered by the

23 stipulation?

24        MR. BERNICK:  Because it's an inquiry into matters

25 that are part of his experience that he is not relying upon for

CC-BLG001776

1 purposes of his testimony.

2          THE COURT:  Of making his estimate with respect to --

3          MR. BERNICK:  That's correct.

4          THE COURT:  -- Grace's part?

5          MR. FINCH:  Your Honor, I -- the stipulation does not

6 preclude you from cross examining an expert about stuff he

7 didn't rely upon.  All it says is you can't discover five

8 limited categories of things.  And the five limited categories

9 of things are what I read to Your Honor earlier.  It does not

10 -- it is not -- it does not preclude me from cross examining

11 him about stuff he's relied upon in other places and he's not

12 relying upon here.  I mean, that's what you do with an expert;

13 you cross examine him about the stuff you think he should have

14 relied upon but didn't.

15          MR. BERNICK:  That's correct.  And ordinarily the

16 rules provide for broad cross examination of reliance materials

17 as well as things that have been reviewed but not relied upon.

18 That is not the rule that we've adopted in this case.

19          MR. FINCH:  It is.

20          THE COURT:  Somebody is going to have to show me the

21 stipulation.  I'm sorry.

22          MR. FINCH:  Your Honor, I'll move on and I'll pack it

23 up in a few minutes.

24          THE WITNESS:  Can I have water, please?

25          MR. FINCH:  It's right here.

J&J COURT TRANSCRIBERS, INC.

CC-BLG001777

1           THE WITNESS:  Thank you.

2           THE COURT:  Let me read it, please.

3           MR. FINCH:  Sure.

4                        (Pause)

5           THE COURT:  All right.  Well, the only part of this

6  stipulation that I can see that would apply is 5, "Any

7  confidential information disclosed to the expert in a prior

8  engagement by another client or entity if, in fact, this would

9  be information that was disclosed by another client or entity."

10 So -- and I can't tell that from the question specifically.  So

11 I guess, Mr. Finch, first of all, what we're going to have to

12 establish is whether or not he -- I suppose we can get as far

13 as saying whether·he is or is not aware of any solvent

14 defendant who makes this restriction.  But then the next

15 question is going to have to be, as a follow-up, you know,

16 whether the basis for that information is confidential

17 information.  And if it is, that's going to end this inquiry.

18          MR. BERNICK:  Right.

19          MR. FINCH:  That's fine.  My question, as posed, is

20 is he or is he not aware of any solvent defendant that

21 restricts payment in mesothelioma cases to people -- to only

22 those people who personally mix or personally install asbestos

23 containing product.

24          THE COURT:  And regardless of the outcome, the next

25 question is whether the basis for his information is based on

CC-BLG001778

1  confidential information and whether he is or is not so aware.

2  If it's based on information that is confidential, that ends

3  the inquiry.

4           MR. FINCH:  I understand, Your Honor.

5           THE COURT:  So at that point in time, if it's based

6  on confidential information, I will be striking the testimony.

7           MR. BERNICK:  Yeah.  Well, the other -- I'm sorry,

8  Your Honor.  I think that the other way of doing it is simply

9  ask whether the question potentially implicates confidential

10 information.

11          THE COURT:  That's --

12          MR. BERNICK:  If it does, that's the end of it.

13          THE COURT:  That's true too.

14          MR. BERNICK:  But the other thing is that I would

15 hasten to point out to the Court, the little three, or whatever

16 it is, Romanette iii, picks up any materials that have been

17 furnished, any oral or written communication between an expert

18 witness and dah, dah, dah, dah, one or more attorneys for the

19 party offering the testimony of such witnesses.  So any

20 materials, be they oral or written, that have come from Grace's

21 counsel -- I would imagine that includes all of this testimony

22 -- that also is picked up by Romanette iii, unless the expert

23 witness is relying upon it.

24          THE COURT:  All right.  So I think if you

25 substantiate the basis first for where information is coming

J&J COURT TRANSCRIBERS, INC.

CC-BLG001779

1  from, Mr. Finch, we would probably be in safer grounds.

2  BY MR. FINCH:

3  Q    Dr. Florence, your reliance materials that you produced in

4  this case, would you agree me that experts' work needs to be --

5  in order to be reliable, it needs to be replicable?

6  A    I would think so.  Sure.

7  Q    And so in order for the ACC and FCR experts to replicate

8  your work, you produced a lot of back-up materials, correct?

9  A    I did.  Yes.

10 Q    And you included within the back-up materials the stuff

11 you relied on, were the deposition transcripts that I showed

12 you in Exhibit 1, correct?

13      MR. BERNICK:  I object to the -- that's a compound

14 and misleading question.  He produced the reliance materials

15 presuming that, because it was produced as reliance materials,

16 it then is responsive or is linked to the prior question which

17 asks about reproducibility.  This is just -- Your Honor, this

18 is playing around.  We ought to just get to the core of the

19 issue and have him find out, you know, how he got these

20 deposition transcripts.

21      MR. FINCH:  Your Honor, I'll move on.  The deposition

22 transcripts were relied upon by Dr. Florence.  They said -- he

23 wouldn't have had to produce them if he wasn't relying on them.

24 BY MR. FINCH:

25 Q    Dr. Florence, sticking with your first report --

CC-BLG001780

1                        (Pause)

2  Q    All right.  Dr. Florence, without relying on any

3  confidential material from any source whatsoever, are you aware

4  of a single defendant in the tort system that restricts payment

5  in mesothelioma cases solely to people who can demonstrate that

6  they personally mixed or personally installed an asbestos

7  containing product?

8             MR. BERNICK:  Again, Your Honor, that presumes that

9  he, a) can set that to one side; b) we would then find out what

10  he had to set to one side; and, c) to the extent that it's

11  Grace, Grace's materials are independently protected by little

12  Romanette iii of the stipulation.

13             THE COURT:  No.  The question was, any solvent

14  defendant in the tort system.  I think we can assume that Grace

15  is, a) not a solvent defendant --

16             MR. BERNICK:  No.

17             THE COURT:  -- and, b) not in the tort system at the

18  moment.

19             MR. BERNICK:  But that's not true. It's the materials

20  that were provided that is the -- this witness was provided

21  with materials during the -- that relate back to the period of

22  time in which Grace was in the tort system.

23             THE COURT:  Wait.  Are we talking currently?

24             MR. BERNICK:  Yes.

25             THE COURT:  The question was are you aware,

J&J COURT TRANSCRIBERS, INC.

1  currently, of any solvent defendant in the tort system.

2          MR. BERNICK:  Today?  Yes.

3          THE COURT:  Yes.  That's the question.

4          MR. BERNICK:  If that --

5  BY MR. FINCH:

6  Q    Without relying on any confidential information, Dr.

7  Florence, are you aware of solvent defendant in the tort system

8  that restricts its payments in mesothelioma cases just to

9  people who personally mix or personally install an asbestos

10 product?

11         THE COURT:  You may answer that.

12 BY MR. FINCH:

13 A    I think, as I said in my deposition, I'm not really an

14 expert on what all the solvent defendants do in terms of the

15 negotiation posture but I think an answer, I'm not aware of

16 any, though I'm not aware of a lot in that regard.

17 Q    Okay.  Now, sticking with your expert report, the lung

18 cancer criteria --

19         THE COURT:  The second one or the first one?

20         MR. FINCH:  The second.

21         THE COURT:  All right.

22         MR. FINCH:  The second one.  The one dated September

23 25, 2007.

24         THE COURT:  Okay.  Thank you.

25 BY MR. FINCH:

CC-BLG001782

1 Q    The minimum causation criteria for lung cancer is number

2 three on Page 2, correct, Dr. Florence?

3 A    Correct.

4 Q    It says, "Minimum causation criteria for lung cancer

5 claims of diagnosis of asbestos based on the B-reader report of

6 a reliable B-reader, and a reproducible ILO score of 1/0 or

7 greater," correct?

8 A    That's correct.

9 Q    Isn't it true that Grace's assumed criteria do not allow

10 for the possibility that the claimant could have a qualifying

11 lung cancer claim based on pathology as opposed to X-rays?

12 A    With regard to our estimate?

13 Q    Yes.

14 A    No, they could.  In fact, I was rereading my deposition

15 and I think I must have misunderstood your question then.  What

16 we did, and I think what this handwritten chart covered, was if

17 a claimant said they were relying on pathology evidence, then

18 we assumed that that evidence -- though it was not specifically

19 reviewed, we assumed that that evidence would qualify at the

20 same rate that the X-ray evidence would have qualified.

21 Q    Okay.

22 A    So, to that extent, the pathology evidence would have been

23 accepted.

24         MR. FINCH:  Can I have the ELMO, please?

25                 (Pause)

J&J COURT TRANSCRIBERS, INC.

CC-BLG001783

1  BY MR. FINCH:

2  Q    So you assumed that, for people who were relying on

3  pathology, they would only qualify at the same rate as the

4  people who were relying on X-rays, the 8.6 percent rate,

5  correct?

6          MR. BERNICK:  Objection to the form of the question.

7  The little header that you have there doesn't say anything

8  about pathology.  If you want to display that document, I think

9  the witness' -- the question to the witness should change.

10          MR. FINCH:  Your Honor, he just testified that the

11 people who qualified based on pathology would qualify at the

12 same rate as the people who qualified for X-rays.

13 BY MR. FINCH:

14 Q    Isn't that right, Dr. Florence?

15          MR. BERNICK:  That's not the point, Your Honor.  The

16 category is -- the 8.6 percent is applied to the category, not

17 to the pathology specifically.

18 BY MR. FINCH:

19 Q    Dr. Florence, what percentage of people who were relying

20 on pathology did you assume would qualify?

21 A    We assumed that, meeting the other criteria, that if the

22 reliance was on a pathology report, they would be qualified at

23 the same rate, the 8.6 percent, as the individuals that had

24 X-ray proof.

25 Q    So is it correct that --

CC-BLG001784

1  A      Reproducible X-ray proof.

2  Q      So you were assuming that only 8.6 percent of the people

3  who said their lung cancer was related to asbestos based on

4  pathology would qualify?

5  A      That's correct.

6  Q      Did you hear Dr. Weill's testimony that pathology was the

7  gold standard for diagnosing asbestosis?

8  A      I did not -- was not present for Dr. Weill's testimony.

9  Q      Are you aware that if something is diagnosed based on

10 pathology, there is no dispute that the asbestosis is present?

11 A      I was not present for Dr. Weill's testimony.  Correct.

12 Q      Who told you to use the 8.6 percent for the people who

13 were relying on pathology?

14 A      I think that was a judgment that we made.

15 Q      I take it you didn't discuss that with Dr. Weill or any of

16 the medical experts?

17 A      I did not discuss it with Dr. Weill.

18 Q      To the extent that there are differences in the criteria

19 that Grace required before making payments on a claim prior to

20 the time it went into bankruptcy and the criteria that you've

21 been asked to apply now, you made no attempt to reconcile the

22 two in your report, correct?

23        MR. BERNICK:  Can I have the question read back,

24 please?

25        MR. FINCH:  There's no read-back.  I'll just repeat

CC-BLG001785

1 the question.

2 Q    To the extent that there were differences in the criteria

3 that Grace used to pay claims before it went into bankruptcy

4 and the specified assumptions you were asked to assume here,

5 you made no attempt to reconcile the two in your report,

6 correct?

7 A    That's correct.  Our job was to estimate the number of

8 claims that would meet the criteria and what those claims'

9 value might be.

10 Q    And you haven't done any analysis as to whether Grace paid

11 any historically settled claims using the specified criteria

12 that you've been asked to assume here as a prerequisite to

13 payment, have you?

14          THE COURT:  I'm sorry.  I apologize, Mr. Finch.

15          MR. FINCH:  Sure.

16          THE COURT:  I need this one -- did no analysis to see

17 --

18 BY MR. FINCH:

19 Q    You have done no analysis of whether Grace used the

20 specified criteria that you're applying here as a prerequisite

21 to paying money to resolve claims in the tort system?

22 A    I have done no analysis of Grace's methods for paying

23 claims in the tort system.  In other words, what analysis they

24 may have done on those claims did not fall within the scope of

25 what I was asked to do.

CC-BLG001786

1 Q    Okay.  And it's correct that you did not attempt to

2 estimate the liability for pending and future asbestos claims

3 that Grace would face if it had continued in the tort system

4 after April 2001, correct?

5 A    I was not asked to estimate if they had continued in the

6 tort system.  That was not an assumption.  Correct.

7 Q    And you don't have any opinion as to what Grace's

8 liability for pending and future asbestos personal injury

9 claims as of April 2001 would be if it hadn't gone into

10 bankruptcy?

11 A    I haven't done that analysis.  No, I don't have an

12 opinion.

13        MR. FINCH:  Can I have the ELMO?

14                  (Pause)

15 BY MR. FINCH:

16 Q    Okay.  You were asked some questions by Mr. Bernick about

17 the data that you rely on in two different situations.  Do you

18 recall this graphic?

19        MR. FINCH:  And, for the record, it's GG-2310.

20 BY MR. FINCH:

21 A    I do.

22 Q    Okay.  First of all, the first one, Future Trust Funding,

23 isn't it correct that what you used the TDP analysis for is not

24 to determine the amount of funding that goes into the trust but

25 to determine the payment percentage that the trust would pay

CC-BLG001787

1  out on claims, given the relationship between its assets and

2  projected liabilities?

3  A    Correct.  I think that's what I tried to say.  I may not

4  have said it very artfully.

5  Q    Okay.  So if we struck Funding from this and instead put

6  Future Trust estimated payment percentage, that would be

7  accurate, correct?

8  A    I believe so.  Yes.

9  Q    Okay.  Now, for trusts --

10  A    I'm sorry.  The only clarification would be this graphic

11  has two options that have Trust and Tort.  And I guess -- I'm

12  not quite sure where bankruptcy would fall so --

13  Q    Okay.  But for --

14  A    It could fall under trust; it could fall under -- I don't

15  know.  I guess it can't fall under tort so --

16  Q    You've done two types of estimates historically in your

17  career.  One is to estimate the future tort system costs of

18  some asbestos defendant, correct?

19  A    We've estimated tort system costs.  Correct.

20  Q    Right.  And you didn't do that work here in this case,

21  this estimation case?

22  A    That's correct.  We didn't.

23        MR. BERNICK:  I'm sorry.  The question presumes, by

24  tort system, this has been used in a very general kind of way,

25  a return to the state court administered tort system.  That's a

CC-BLG001788

Florence - Cross/Finch                                         146

1    clear question.

2    BY MR. FINCH:

3    Q    By tort system, I mean that Grace would continue to

4    resolve the cases in whatever form it found itself in for

5    litigating asbestos personal injury claims, whether it's state

6    courts or federal courts, wherever the cases were pending at

7    the time it went into bankruptcy.

8              MR. BERNICK:  Objection.  That's a misleading

9    question that lacks foundation.

10             THE COURT:  I am not certain what that question

11   means.

12   BY MR. FINCH:

13   Q    Dr. Florence, what do you mean by future tort system

14   costs?

15   A    That would be the cost that a defendant might incur by

16   settling or litigating claims in the tort system --

17   Q    And what do you mean --

18   A    -- in the future.

19   Q    What do you mean by the tort system?

20   A    In the court system.

21   Q    In the courts in which the cases historically are pending,

22   correct?

23   A    In the court system, whatever that may be; federal, state,

24   city.  I make no distinction.

25   Q    Okay.  Now, for the future trust projections, what you're

J&J COURT TRANSCRIBERS, INC.

1 doing is trying to estimate the cost that a trust would incur

2 to resolve claims over time in the future, correct?

3 A    I'm usually trying to estimate -- right -- the volume, the

4 timing, and the cost of resolution of claims against the trust.

5 Q'   Okay.  And here you have drivers of payments, you have

6 claims data, and you have criteria.  The TDP criteria, that's

7 not an assumption, that's the rules that the trust says, we

8 will pay these claims and not pay those claims, correct?

9 A    Correct.  The TDP usually specifies, obviously sometimes

10 with verbiage, what should be paid and what shouldn't be paid.

11 Q    Okay.

12 A    And so those are the criteria.

13 Q    Okay.  And the claims data under the TDP, once a trust has

14 had its doors open for a couple of years, you have empirical

15 data as to how many claims got filed against the trust and how

16 many of them got paid by the trust, correct?

17 A    We do.  We would have data on, in essence, the equivalent

18 of claims history for the trust.

19 Q    Okay.  And so you would have empirical data as to the

20 claims history and empirical data as to the criteria where a

21 trust has been in operation for some period of time and you

22 would use that to project the future liability of the trust,

23 correct?

24 A    Correct.

25 Q    Okay.  And for trusts that just open their doors, the ones

CC-BLG001790

1  that -- say, the Federal Mogul Trust, if it opens its doors in

2  three months or something, the TDP criteria are -- they're not

3  an assumption; they're a given?  I mean, they are -- there is

4  empirical data as to what the TDP are, correct?

5  A    The TDP are assumptions.

6  Q    Well, they're not assumptions?  They are criteria that the

7  trust will follow?  You have those criteria, correct?

8  A    That's right.  Those are specified.

9  Q    Okay.  And then where do you get the claims history for a

10  trust that hasn't yet started operation yet?

11  A    Well, for a trust that's just opening its doors, you try

12  to get it from the claims history up until that time.

13  Q    The claims history of the company prior to the time it

14  went into bankruptcy?

15  A    Correct.

16  Q    Okay.  For future tort system costs, you have claims data.

17  What does that refer to?

18  A    Which one?  Trust or --

19  Q    Future tort system costs claims data.  What does that

20  refer to, Dr. Florence?

21  A    That would be the history of the defendant in the tort

22  system as reflected in the information about the claimants and

23  the status of those claims and the outcome of the claims.

24  Q    And that's empirical data, correct?

25  A    It is.

CC-BLG001791

1 Q    That's not an assumption, correct?

2 A    The data is an empirical base.   Correct.

3 Q    Okay.  And then you have the criteria that the defendant

4 actually applied to resolve claims in the tort system, correct?

5 A    Sometimes you do and sometimes you don't.  Sometimes it's

6 a black box process and sometimes it's more clear than others.

7 Q    Okay.  But -- I think I wrote this down -- sometimes you

8 know what the criteria are; i.e., we will pay mesothelioma

9 claims if they meet the following criteria, and they have that

10 in a settlement agreement and sometimes you don't know that and

11 you can see the outcome of what applying those criteria would

12 do, correct?

13         MR. BERNICK:  I object to the form of the question.

14 Also, I think the question assumes that those are the only two

15 alternatives.

16 BY MR. FINCH:

17 Q    What did you mean, Dr. Florence, about the outcome of

18 applying the criteria where it was a black box to you?

19 A    There may be instances where you don't know -- either you

20 don't know the specific criteria that was used against -- in

21 evaluating a specific claim or a group of claims.  And in that

22 instance, all you know is this group of claims had these

23 characteristics and they were paid or not paid a particular

24 amount of money.  I mean, so it's -- in essence, you may not

25 know specifically what the criteria were in judging those

1 claims but you know that they were closed or closed for some

2 amount of money.

3 Q    Okay.  So you know what percentage of them got paid, for

4 example?  You can tell that, right?

5 A    Well, sure.  You can find out what percentage of claims

6 are paid but I guess the distinction I was trying to draw is

7 there may be groups of claims, segments of claims, in this

8 claims history, some of which you know the criteria for, some

9 of which you don't know the criteria for, some of which all you

10 know is the outcome of the claim.

11 Q    But for all of them, whether you know the criteria or not,

12 you have empirical data as to the outcome of the company's

13 application of whatever criteria it was using to resolve

14 claims, correct?

15            MR. BERNICK:  Objection.  Lack of foundation.  This

16 is a very abstract --

17            MR. FINCH:  He just testified to it on direct, Your

18 Honor.

19            THE COURT:  Yes.  Overruled.

20            MR. BERNICK:  No, that's not what he testified to --

21            THE COURT:  I think that's clear enough.

22            MR. BERNICK:  -- but go ahead.

23            THE COURT:  You may answer, Dr. Florence.

24 BY MR. FINCH:

25 A    I'm sorry.

1        THE COURT:  Whether you have empirical data for the

2  outcomes of all the claims.

3  BY MR. FINCH:

4  A    You usually have -- you usually have data on what the

5  status of the claim is and, if the claim is closed, you usually

6  have data on whether it was closed for money or -- and, if so,

7  how much, or whether it was not closed for money.

8  Q    And from that, you can calculate what percentage

9  historically of claims the defendant paid money to resolve,

10  correct?

11  A    You could.  You could calculate a simple percentage.

12  Right.

13  Q    And that's -- and you can calculate what the average value

14  of the claims that got paid, received from that defendant,

15  correct?

16  A    Sure.

17  Q    And those two parameters, the percentage of claims that

18  get paid and the value paid to those claims, that's empirical

19  data that you can analyze?  It's not an assumption, correct?

20  A    Well, with regard to criteria, I guess you're making the

21  underlying assumption that there was commonality in the

22  criteria that was used, whatever they were.

23  Q    And generally speaking, in estimating the future tort

24  system costs of a defendant, you assume going forward there

25  will be -- they will apply the same criteria they had

CC-BLG001794

1 historically, correct?

2          MR. BERNICK:  I'm sorry.  Was the question you will

3 assume?

4 BY MR. FINCH:

5 Q    That you -- in making a forecast for a tort system

6 defendant, you look to the past history of what percentage of

7 claims they paid and how much they paid them for, correct?

8 A    That's one of the things you look at.  Sure.

9 Q    And then, to estimate the liability going forward, you

10 project that cost by using the empirical data you have as to

11 the historically closed claims as the basis for making the

12 forecast?

13 A    Well, I think I agree, with the understanding that that

14 may not be true for all of the claims.  In other words, in the

15 tort system, we've frequently been in situations where, as an

16 assumption, the client may say, we have this going on for this

17 attorney, or we have this agreement in this jurisdiction, and

18 therefore it's -- the simple average calculation of what we

19 paid for the last six months or the last six years in this

20 state is not applicable.  Or we have a settlement agreement

21 with the Florence firm and the Florence firm specifies these

22 criteria in this amount of money.  So I guess in answer to your

23 question, in general, you look to the history and then the

24 criteria.  Some of those criteria are explicit, like the ones

25 I've given you.  Some of the criteria are kind of black box and

CC-BLG001795

1 all you know is some criteria was applied and I know the result

2 of those criteria.

3 Q    And you rely on the company's historical experience in the

4 tort system for making an estimate of what its liability would

5 be in the tort system because it's an empirical demonstration

6 of what has actually happened with that company, correct?

7          MR. BERNICK:  Objection to the form of the question.

8 Actually happened to that company in what regard?

9          MR. FINCH:  In the tort system.

10          MR. BERNICK:  Well, that's the same problem.  It's

11 the same problem.

12          THE COURT:  That is the same problem.

13          MR. BERNICK:  And at this point, Your Honor, I think

14 that there have been 25 minutes worth of questions all dealing

15 with the methodology that he's already testified to on direct

16 examination.

17          THE COURT:  That's proper cross examination.  If they

18 want to spend 25 minutes on methodology, they're permitted to

19 do it.  But I do believe that there is a problem with the

20 question the way it was asked.  Please rephrase the question.

21 BY MR. FINCH:

22 Q    Isn't it true, Dr. Florence, that you rely on the

23 company's historical experience in the tort system for making

24 an estimate of what its future liability would be in the tort

25 system because the historical experience is an empirical

CC-BLG001796

1  demonstration of what actually happened with respect to that

2  company?

3           MR. BERNICK:  It's the exact same question that he

4  asked two minutes ago and it's still defective.

5           MR. FINCH:  It's not the same question, Your Honor.

6           THE COURT:  Well, it changed to, isn't it true, so

7  it's not the exact same question but I think the purpose is the

8  same.  But I think that there are a lot of assumptions that I

9  haven't heard this witness testify to.  He is an expert but I

10 think you have to get him to agree with the assumption.  I

11 haven't heard him testify to all of the assumptions that you

12 have put into this question.

13 BY MR. FINCH:

14 Q    When you are -- these are the places where you have

15 testified as an expert on estimating asbestos liabilities, Dr.

16 Florence?

17 A    That's correct.

18 Q    In Babcock and Wilcox, you estimated the company's

19 liability for asbestos claims twice, correct?

20 A    I did.

21 Q    And in each case, you relied on the company's past history

22 as -- in terms of the percentage of claims paid and the value

23 of the claims that were paid in making your projections,

24 correct?

25 A    Correct.  We were asked to assume that, in both instances,

CC-BLG001797

1   that the company would have been in the tort system, would not

2   have been in bankruptcy and would be settling claims in the

3   tort system.

4   Q    Okay.  And other than that one assumption --

5   A    And we used --

6   Q    -- that the company would --

7            MR. BERNICK:  Could the witness please finish his

8   answer?

9            MR. FINCH:  Sure.

10  BY MR. FINCH:

11  A    We used the historic experience up until that time as a

12  reflection of that base that I was talking about earlier, that

13  base experience up to the time that we were asked to make the

14  forecast.

15  Q    And other than the one assumption that you were to assume

16  that the company would still be in the tort system, you were

17  not told any other assumptions to apply to estimate the

18  liability, correct?

19           MR. BERNICK:  In which case?

20           MR. FINCH:  Babcock.

21           MR. BERNICK:  Fraudulent conveyance or --

22           MR. FINCH:  Yes.

23           MR. BERNICK:  -- information?

24           MR. FINCH:  Both.

25           THE COURT:  Well, let's take them one at a time.

J&J COURT TRANSCRIBERS, INC.

1              MR. FINCH:  Okay.

2  BY MR. FINCH:

3  Q    Let's take the fraudulent conveyance case.

4                   (Pause)

5  A    I'm sorry, Mr. Finch.  I don't -- I can't recall whether

6  we were given additional assumptions in either one of those.

7  Q    In Armstrong -- you testified in the Armstrong

8  confirmation hearing about two years ago, correct?

9  A    I did.

10 Q    And there your estimate of the liability was based on the

11 company's past history of resolving cases in the tort system?

12 A    It was based on the assumption that the company would have

13 remained in the tort system and not filed for bankruptcy.

14             MR. FINCH:  One moment, Your Honor.

15                   (Pause)

16             MR. FINCH:  May I approach the witness, Your Honor?

17             THE COURT:  Yes.  Mr. Finch, may I ask the witness to

18 clarify something for me, please?  Dr. Florence, the question

19 you're being asked is whether you were making -- you were

20 testifying based on the assumption that the company's past

21 history of resolving claims in the tort system.  The question

22 you're answering is that you were told to assume the company

23 would remain in the tort system.  Are they the same thing?

24             THE WITNESS:  (No audible response).

25             THE COURT:  I just want to make sure that you're --

J&J COURT TRANSCRIBERS, INC.

1  that in answering this, that you're either -- that you're

2  saying yes.  I'm not sure if you're saying yes and then going

3  on or if you're saying no and going on.  So I just would like

4  to know whether the question and the answer are the same.

5            THE WITNESS:  Maybe I should hear the question again

6  to make sure I'm answering the right question.

7            THE COURT:  All right.  Thank you.  Would you repeat

8  that question for me, Mr. Finch?

9            MR. FINCH:  Which one?

10           THE COURT:  Either one.  The question was, when he

11 testified in AWI at the confirmation hearing, he was told to

12 estimate liability based on the assumption of the company's

13 past history of resolving cases in the tort system.  Exactly

14 how you phrased it, I can't say, but the witness did not answer

15 using the same words you did.  I want to make sure that the

16 answer and the question are the same, if they are.

17           MR. FINCH:  Okay.

18 BY MR. FINCH:

19 Q    Dr. Florence, do you have the Armstrong report in front of

20 you?

21 A    I do.

22 Q    Okay.  And in that case, you estimated what Armstrong's

23 liability would be as of the bankruptcy petition date, correct?

24 A    Correct, if they remain in the tort system.

25 Q    If they remain in the tort system.  And with that

CC-BLG001800

Florence - Cross/Finch                              158

1 assumption, if they remain in the tort system, you estimated

2 their liability to be north of $4 billion, correct?

3 A    I did.

4 Q    Okay.  Is it correct that the way in which you estimated

5 Armstrong's liability for pending and future asbestos claims

6 was to estimate -- the future claims were valued using the

7 average settlement value incurred by Armstrong to resolve

8 claims in 1999 to 2000, on Page 2?

9           MR. BERNICK:  Your Honor, I -- if he's now being

10 asked what he was told to do, I really don't know what in the

11 world relevance that --

12           MR. FINCH:  Let me pick that up.

13 BY MR. FINCH:

14 Q    Dr. Florence, were you --

15           MR. BERNICK:  Excuse me.  Is the question withdrawn?

16           MR. FINCH:  The question is withdrawn.

17 BY MR. FINCH:

18 Q    Dr. Florence, other than the assumption that Armstrong did

19 not go into bankruptcy, were you told by your client how to go

20 about estimating the liability?

21 A    I may have been given assumptions about the case load.  In

22 other words, there were questions about -- that we may have had

23 about the historic filings and, as I mentioned before, patterns

24 we might have seen in the historic filings, trying to

25 understand that.  And if a client said this was a result of a

J&J COURT TRANSCRIBERS, INC.

CC-BLG001801

1  moratorium, this was a result of a settlement agreement, those

2  would be assumptions that we would have accepted going forward.

3  Q    But you don't know -- you don't recall being given any of

4  those assumptions by --

5  A    I don't remember in Armstrong's case.

6  Q    And, in Armstrong, you used the company's past history to

7  project the liability?

8  A    Correct.  I used their past historic experience, right, in

9  the tort system.

10 Q    And your client in that case was the future claimant's

11 representative, correct?

12 A    It was.  But I guess -- that's not what I'm being asked to

13 do here.  I'm being asked to estimate the claims that are

14 qualified under certain criteria so I guess that's where I'm

15 having trouble.  I --

16 Q    You don't have any empirical evidence that Grace ever

17 resolved a single asbestos claim using the criteria you've been

18 asked to assume here, correct?

19 A    I don't know what criteria Grace may have used

20 historically.  I think I testified to that earlier.

21 Q    In Armstrong though, you had empirical evidence as to the

22 outcome of the criteria that whatever criteria Armstrong

23 applied historically, correct?

24         THE COURT:  I'm sorry.  Would you -- for me, would

25 you repeat that?

CC-BLG001802

1           MR. FINCH:  Sure.

2  BY MR. FINCH:

3  Q    In Armstrong, you had -- Armstrong had a set of criteria

4  that it applied historically to resolve cases, right, Dr.

5  Florence?

6  A    I assume they did.

7  Q    Okay.  And you had empirical evidence of the outcome of

8  their application of those criteria, correct?

9  A    I had the -- I had historical experience or empirical data

10 on the outcome of their settlement or their tort system

11 experience, presumably using some criteria.  I don't know what

12 those criteria were or how they may have changed over time.

13 Q    And you estimated the liability -- when you estimated the

14 liability, you assumed that Armstrong would continue to apply

15 in the future the same criteria it applied historically,

16 correct?

17 A    By necessity, since we didn't know other than if there

18 were some pockets that we knew about, the assumptions that I

19 was saying about.

20          MR. BERNICK:  I have to object at this point.  There

21 is a clear lack of foundation with respect to Armstrong in

22 particular.  We've got the witness talking about a case where

23 he has just said he doesn't recall exactly what went into that

24 case and particularly, as Mr. Finch well knows, on the last

25 question, what he's now asked the witness to verify is an

CC-BLG001803

1  impossibility.  Again, Your Honor, I don't know --

2            THE COURT:  Okay.  That objection is simply overruled

3  because the witness basically has already answered the

4  question, saying that he was using the information that was

5  given to him and has no other information about criteria.

6  BY MR. FINCH:

7  Q    All right.  In your report at Page 1 in this case --

8            THE COURT:  This is Exhibit 462?

9            MR. FINCH:  Exhibit 462.

10  BY MR. FINCH:

11  Q    In May of 1997, ARPC was again asked to estimate the

12  volume, cost and timing of pending and future claims for

13  asbestos related injuries filed against Grace?  Do you see

14  that, Dr. Florence?

15  A    I do.

16  Q    And you write later, "As before, the estimate was based

17  solely on Grace's tort system experience"?

18  A    Yes.

19                        (Pause)

20            MR. FINCH:  Your Honor, may I approach the witness?

21            THE COURT:  Yes.

22                        (Pause)

23            MR. FINCH:  175, Dave.  May I approach the witness,

24  Your Honor?

25  BY MR. FINCH:

CC-BLG001804

Florence - Cross/Finch                          162

1  Q    Dr. Florence, I have put what has been marked ACC-109 in

2  front of you.

3              MR. BERNICK:  Do you have an extra copy of that made?

4              MR. FINCH:  We have an extra copy.

5  BY MR. FINCH:

6  Q    Dr. Florence, do you recognize ACC-109?  Beginning on the

7  second page is a report you prepared for Grace in May of 1997?

8              THE COURT:  This isn't in the binder.  This report --

9              MR. FINCH:  Oh.  May I have another copy, Dave?

10             THE COURT:  The AWI report wasn't either, if you're

11 marking it.  Thank you.

12             MR. FINCH:  We could also have the ACC --

13             THE COURT:  Thank you.

14 BY MR. FINCH:

15 Q    Dr. Florence, do you recognize ACC-109 as the report you

16 prepared for Grace in May of 1997?

17 A    This looks like a -- it looks like our report that was

18 prepared in '97.

19 Q    And you -- the scope of your engagement in 1997 was to

20 estimate Grace's liability for pending and future asbestos

21 claims?

22 A    I think so.  Let me just look at -- I didn't prepare this

23 report.  This was prepared by one of my associates.

24                           (Pause)

25 A    Yes.  This looks like a report of an estimate of pending


                J&J COURT TRANSCRIBERS, INC.

1 and open claims and a forecast of claims to be filed against

2 Grace.

3 Q    Okay.  Could you turn to the page that's marked 79-0534?

4 A    Yeah.

5         MR. BERNICK:  Your Honor, I would object to this.

6 Again, it's beyond -- it's precluded by the stipulation.  This

7 is an exhibit to the Beber (phonetic) deposition and also to

8 the Poser deposition.  It actually is a document produced from

9 Grace's files.  If it came to the attention of this witness, it

10 did so from Grace and therefore is picked up by the

11 stipulation.

12         MR. FINCH:  Your Honor, this -- Dr. Florence and his

13 partner -- let me lay a foundation.

14 BY MR. FINCH:

15 Q    Dr. Florence, Dan Rorke (phonetic) works for AR -- at the

16 time this report was written, you and Dr. Rorke both worked for

17 KPMG?

18 A    We did.  Right.

19 Q    And you were asked by W.R. Grace to prepare forecasts of

20 the volume and timing of future claims for asbestos related

21 injuries expected to be filed against Grace and the costs

22 associated with disposal of those claims?

23 A    KPMG?  Yes.

24 Q    Yes.  And you prepared this report?  It didn't come from

25 you -- to you from Grace in the first instance?  You prepared

CC-BLG001806

1  it and gave it to Grace, correct?

2  A    I didn't prepare this report but KPMG prepared the report.

3  Q    KPMG prepared the report and KPMG was authorized to do the

4  work on behalf of Grace, correct?

5  A    KPMG was retained by Grace to do the work.  Yes.

6  Q    And there was a letter that you prepared that went to

7  Wachtell Lipton that summarizes the results of this report,

8  correct?

9  A    I don't recall the letter but --

10        MR. FINCH:  John, can we show ACC-175, the last page?

11  Next to the last page.  Sorry.

12  BY MR. FINCH:

13  Q    Is that your signature on Page 25-1634, Dr. Florence?

14  A    It is.

15  Q    And could you turn to Page 24-1632?

16        MR. BERNICK:  I don't have this document.

17        MR. FINCH:  The only copy I have is with me.  I'm

18  just going to use this document on the screen.  Can you see it

19  on the screen?

20        MR. BERNICK:  No, not particularly but go ahead.

21  We'll see how far we get.

22        THE COURT:  No one can see it on the screen.

23        MR. FINCH:  Can you blow it up, John?  Make it

24  bigger?  The first one, estimating bodily injury liability.

25  Can you see that, Your Honor?

CC-BLG001807

1              THE COURT:  Yes.

2              MR. FINCH:  Okay.

3 BY MR. FINCH:

4 Q    You write in this -- do you know Mr. Wilensky (phonetic),

5 Dr. Florence?

6 A    I'm sorry.  Which Wilensky?  Is this the addressee to the

7 letter?

8 Q    Yes.

9 A    I met him.  Yes.

10 Q   He's a lawyer for -- he was a lawyer acting for W.R. Grace

11 in 1997, correct?

12 A   I met him.  Yes.

13 Q   Okay.  Now, what this -- what you write here is, "The

14 estimate of indemnity arising from BI claims is obtained by" --

15 and then you describe the steps that you follow, one, two,

16 three, four, correct?

17 A   Correct.

18 Q   Okay.

19 A   I see that.

20 Q   The -- now, computing indemnity for an injury category is

21 the product of three factors.  The sum of the number of pending

22 claims --

23            MR. BERNICK:  Objection.  I would object.  I would

24 object to this document being read.  I object to the witness

25 being confronted with this document.  I object to the witness

CC-BLG001808

1  being confronted with the document this is ancillary to.

2  Paragraph Romanette iii of the stipulation specifically

3  precludes any oral or written communication between an expert

4  witness, i.e., Dr. Florence, and the expert's witness

5  assistants or more than -- or one or more attorneys for the

6  party offering the testimony.  The attorneys in this case are

7  the Wachtell Lipton firm.  They are counsel for Grace.  The

8  underlying document is a document communicated between Mr.

9  Florence's firm and Grace and counsel for Grace.  All of them

10  are specifically picked up in the stipulation and they are

11  specifically barred.  And I will note that when it comes to Dr.

12  Peterson, I took his deposition.  It turns out he did earlier

13  analyses of Grace back in the 1990's and I didn't see those.

14  Why?  Because they were not relied upon in connection with this

15  case.

16         And I will further add we are now over an hour into

17  the examination, an hour and fifteen minutes of the

18  examination.  We were given a total estimate of two and a half

19  hours for the cross examination of this witness.  And all

20  that's happened so far is that Mr. Finch has wanted to pursue

21  his case through this witness.  He's got other people that can

22  pursue it.  It's not proper examination for this afternoon.

23         MR. FINCH:  Your Honor, the estimates of cross were

24  dependent upon lack of -- it was on the assumption there

25  wouldn't be a lot of time on speaking objections and colloquy

CC-BLG001809

1 with the Court.  This is not picked up by the expert

2 stipulation.  This document was produced to the United States

3 Government.  It's a no sense confidential and I'm establishing

4 that when Dr. Florence estimated Grace's liability in the past,

5 he used a methodology very similar to that used by Dr. Peterson

6 and Dr. Biggs.  And I believe that is highly relevant.  It's

7 not precluded by the stipulation.

8         THE COURT:  Wait.  This letter between an expert

9 witness and counsel was submitted to the Federal Government and

10 that's how it came into the ACC's possession?

11         MR. FINCH:  It came into the ACC -- it was produced

12 in discovery to the ACC.  It was turned over to the Federal

13 Government in response to a subpoena.  There is no

14 confidentiality whatsoever left with respect to this document.

15         MR. BERNICK:  Your Honor, what happened was, it was

16 turned over in connection with the Sealed Air litigation.  It

17 was turned over pursuant to a protective order.  The Federal

18 Government then subpoenaed documents from Grace, including

19 these documents, and they were turned over to the Federal

20 Government in connection with their subpoena and the ACC and

21 the FCR now take the position that that was a waiver.  Mr.

22 Finch specifically told me before he used such a document he

23 would alert us and that's why we don't have any copies --

24         MR. FINCH:  I would --

25         MR. BERNICK:  Excuse me -- we don't have copies of

CC-BLG001810

1 this document here this afternoon.  This is yet another

2 dimension of why it is foreclosed under the stipulation.  It is

3 a communication under Romanette iii between the witness, the

4 expert, and Grace through its counsel, that is not relied upon

5 in connection in connection with this.

6            MR. FINCH:  Your Honor, I would offer ACC-175 and

7 ACC-109.

8            THE COURT:  At this point, I have no foundation for

9 any of these documents.  I don't -- I mean, this witness

10 specifically has indicated that although he worked for KPMG

11 with respect to 109 -- I don't even know what 175 is yet.  I

12 don't think the witness has said anything about it except a

13 part of it, I think, includes a letter that he signed.  I

14 apologize if there's something more.  He did say he signed a

15 letter.

16            MR. FINCH:  Let me lay a foundation.

17 BY MR. FINCH:

18 Q    Dr. Florence, you did work in 1997 that resulted in an

19 estimate of Grace's asbestos liability, correct?

20            THE COURT:  For what purpose, Mr. Finch?

21            MR. FINCH:  For purposes of projecting the future

22 costs of asbestos claims in the tort system.

23 BY MR. FINCH:

24 Q    Correct?

25            MR. BERNICK:  Well, actually, the witness can testify

J&J COURT TRANSCRIBERS, INC.

1 he knows -- Mr. Finch well knows this was done specifically for

2 the Sealed Air transaction.  That's what it was done for.

3           THE COURT:  That, I think, is the problem.  I mean,

4 if one thing is clear in Babcock and Wilcox and some of the

5 other cases, the estimates of liability done for particular

6 purposes are not necessarily based on the same evidence or

7 subject to the same standards as estimates done for other

8 purposes.  Could we get to the purpose for which this one is

9 done?  If you want to ask this witness specifically what he's

10 done in the past to estimate liabilities, why don't you do it?

11 Why do we need to get into the documents that are not

12 themselves the evidence of this witness's testimony anyway and

13 avoid the problems with respect to the confidential nature of

14 these potential documents and the issues with respect to the

15 stipulation?  We don't need to be creating all these issues

16 when you can ask the witness a direct question.

17           MR. FINCH:  Your Honor, that's fine, but these

18 documents are, in my view, 801(d)2 admissions of W.R. Grace as

19 to a methodology for estimating the cost of future asbestos

20 claims.

21           THE COURT:  For purposes of filing something on,

22 what, a 10K with respect to the fraudulent conveyance

23 litigation?  For what purpose?

24           MR. FINCH:  For purposes of analyzing the total size

25 of their aggregate asbestos liability as a particular point in

CC-BLG001812

1  time.  It is our view of the case law that the amount that you

2  have to estimate is what the liability would be if the company

3  had not gone into bankruptcy.  That's the liability that's

4  channeled to the trust.

5                THE COURT:  That wasn't in 1997.

6                MR. FINCH:  The liability in 1997, though, the

7  methodology they followed in 1997, is relevant to the question

8  of whether the methodology they are asking you to accept now is

9  reliable or relevant.

10                THE COURT:  Ask him what methodology he used for that

11  purpose.

12                MR. FINCH:  Okay.

13                THE COURT:  Why do we need to get into issues with

14  respect to possible breaches of the stipulation and the

15  confidential nature of documents when you've got the witness on

16  the stand who apparently did some of the work?  Ask him what

17  methodology he used.

18  BY MR. FINCH:

19  Q    Dr. Florence, did you do some of the work with respect to

20  the 1997 estimate of Grace's liability?

21  A    I don't believe I did.  No.

22  Q    You oversaw the work, correct?

23  A    I probably reviewed the report before it went out.

24  Q    And that estimate of the liability was based solely on

25  Grace's experience in the tort system, correct, as you say in

CC-BLG001813

1 your report here, on Page 1?

2            THE COURT:  Which report?

3            MR. FINCH:  His report that he is -- for the

4 estimation.  462.

5            THE COURT:  Okay.

6 BY MR. FINCH:

7 A    I'm sorry.  I'm lost, guys.

8 Q    Page -- Exhibit 462.  You have that in your notebook.

9 Page 1.

10           THE COURT:  It's Tab No. 2, Dr. Florence.

11 BY MR. FINCH:

12 A    I do have 462.

13 Q    And ARPC estimated the total pending and future liability

14 of Grace as of May 1997 and, as before, the estimate was based

15 solely on Grace's tort system experience?  Do you agree with

16 that?

17 A    Correct.  The firm did that.

18 Q    And in December 2000, ARPC was also asked by Grace to

19 estimate the number of future asbestos personal injury claims

20 and -- is that correct?

21 A    The last paragraph there?

22 Q    Yes.

23 A    Correct.

24 Q    And based on Grace's claims data as of December 2000, you

25 estimated there would be approximately 320,000 asbestos

CC-BLG001814

1  personal injury claims filed against Grace from 2001 to 2039,

2  correct?

3  A    That's correct.

4  Q    And, again, as with all of ARPC's pre-petition estimates

5  on behalf of Grace, the estimate was based solely on Grace's

6  tort system experience, correct?

7  A    Correct.

8  Q    And you prepared -- strike that.  The Delaware Claims

9  Facility is an entity that you are familiar with, correct?

10 A    Correct.

11 Q    For purposes of your first report in this case, you had

12 the Delaware Claims Facility review a sample of questionnaires,

13 correct?

14 A    Grace contracted with the Delaware Claims Processing

15 Facility which was, at the time, the Celotex trust.

16 Q    Okay.  Is it correct that your firm selected the sample of

17 the closed claims that the Delaware Claims Facility would

18 review?

19 A    That's correct.

20 Q    And as part of your back-up materials in this case, you

21 identified the list of the closed claims that they reviewed,

22 that you asked them to pull?

23 A    I assume we did.  I assume that's the list.  I mean, I

24 don't -- I wasn't aware of what was sent in on the --

25 Q    You created a sample and then you produced, as part of

CC-BLG001815

1  your back-up material, the list of the closed claim sample as

2  well as pictures of all of the files that the Delaware Claims

3  Facility reviewed, correct?

4  A    Okay.  I mean, I didn't produce that so I -- someone in my

5  office did.

6  Q    You don't doubt that someone in your office produced that?

7  A    No, I don't.

8  Q    The review of the questionnaires with respect to the --

9  first of all, the Celotex trust is an entity that's in the

10 business of reviewing asbestos claims submitted to trusts,

11 correct?

12 A    Correct.

13 Q    And as part of that, they review medical and exposure

14 information for purposes of claim settlement, correct?

15 A    Correct.  We're talking about Celotex or the --

16 Q    Celotex.  Celotex.

17 A    Yeah.

18 Q    And they have familiarity with reviewing medical and

19 exposure information for purposes of seeing if they meet the

20 criteria to be applied, correct?

21 A    Well, they have familiarity with reviewing medical records

22 and legal documents for purposes of collecting that type of

23 information.

24 Q    You don't know one way or another whether Exponent is in

25 the business of reviewing asbestos exposure and medical

CC-BLG001816

1  documents for purposes of deciding whether to pay or deny

2  asbestos personal injury claims?

3  A    I don't.

4  Q    You never relied on Exponent for purposes of reviewing

5  asbestos personal injury claims information prior to this case,

6  correct?

7  A    That's correct.

8                           (Pause)

9  Q    Would you turn to your report in this case, 462 at Page

10 15?  Do you have that, Dr. Florence?

11 A    I do.

12 Q    This is your counts of the -- or your estimates of the

13 number of pending claims against Grace as of the petition date,

14 at the top line?

15 A    This is the number of pending claims that had proofs of

16 claim filed.

17 Q    And for lung cancer claims, there were 5510 lung cancer

18 claims that filed a proof of claim form that you could match

19 back to the historical database, is that correct?

20 A    There are 5510 pending claimants that we could find a POC

21 for.

22 Q    Okay.  And of that 5510 using the criteria that you were

23 asked to apply here, only 59 lung cancer claimants have valid

24 claims, is that correct?

25            MR. BERNICK:  I'm sorry, could I have that question

CC-BLG001817

1 read back?  I -- Nate, can you just restate it?

2 Q    Of the 5510 lung cancer claims that were pending on the

3 bankruptcy petition date that you could find had filed a proof

4 of claim form, using the criteria that Grace asked you to apply

5 here, only 59 of them have valid claims?

6 A    Fifty-nine of them would meet those criteria.

7 Q    Fifty-nine of them would meet that criteria.  That's about

8 one percent?

9 A    Yes.

10 Q    And with respect to the mesothelioma only about 20 percent

11 of them, 19 percent of them would be valid, is that right, for

12 pending mesothelioma?

13 A    Something like that, yes.  It's 463 of 2426.

14          MR. FINCH:  Can I have the ELMO?

15          UNIDENTIFIED SPEAKER:  Yes.

16 Q    This is a chart that Mr. Bernick showed you, GG2315.  Do

17 you see that chart, Dr. Florence?

18 A    I do.

19 Q    Now, you've got a box here, not filed as of 4/01.  What

20 does that refer to?

21 A    Those were proofs of claim that were filed or were

22 submitted that did not have a pending claim.  They had not been

23 filed with Grace prior to 4/01.

24 Q    They were not filed in the sense you couldn't match them

25 back to the historical database, correct?

CC-BLG001818

1  A    Well, some we know were not filed in the sense that they

2  had dates -- filing dates that were subsequent to 4/01.

3  Q    What do you mean by filing dates?

4  A    There were dates indicated that the case was filed after

5  4/01.

6  Q    Well, nobody could file a case against Grace after 4/01,

7  correct?

8  A    I agree.

9  Q    But, they -- are you talking about dates that indicated

10 they had filed the case against other people after 4/01 or

11 dates that were --

12 A    There were dates that indicate they had filed against

13 Grace after 4/01.

14 Q    So, there were some number of people that -- couldn't that

15 be an artifact of the database, meaning that people could have

16 filed a lawsuit against Grace prior to April of 2001 and it

17 wasn't entered in the database until some months later.

18 A    I think we retained a filing date.  We also had diagnosis

19 dates that were subsequent to 4/01.  So, it seemed strange that

20 a case could be diagnosed after the -- and filed before but

21 diagnosed after the 4/01 date.

22 Q    Well, the diagnosis date was a diagnosis date that was in

23 the questionnaires, correct?

24 A    No, there would be -- we would have to have some other

25 data other than the POC to determine the diagnosis date,

CC-BLG001819

1    correct.

2    Q    And you don't know whether the diagnosis date that the

3    claimants were using for the questionnaire was just the most

4    recent diagnosis date or the first diagnosis date, do you?

5              MR. BERNICK:  Objection to this line of questioning.

6    The question is presumably whether the case -- the complaint

7    was filed as of the date of the Grace filing.  What does that

8    have to do with diagnosis dates or what's filed on the

9    questionnaire?

10   Q    Dr. Florence, how many people filed non-settle proof of

11   claim forms that indicated that they had a claim against W.R.

12   Grace that you didn't consider for purposes of your analysis

13   because they fell into this box, not filed as of 4/01?

14             MR. BERNICK:  Objection to the form of the question,

15   didn't consider.

16             THE COURT:  Do you want to clarify didn't consider?

17   Q    Didn't include as part of your base of pending claims.

18   A    There were a number of claims for which -- we tried to

19   match the pending cases against the POCs.  There were a number

20   of claims that we could not match a pending case to a POC.  Of

21   those POCs, there were a number of POCs that were cases that

22   were POCs for settled claims, liquidated claims, claims filed

23   after the bankruptcy date, and claims we had never seen before

24   anywhere, so claims that didn't seem to have any relation to

25   Grace's historic experience.

CC-BLG001820

1 Q    Is it correct that over 100,000 people filed a proof of

2 claim form for a pending unsettled personal injury claim?

3          MR. BERNICK:  Objection to the form of the question.

4 Pending in what sense?

5 Q    Over 100,000 people filed a proof of claim form alleging

6 that they had a claim against Grace that wasn't settled prior

7 to petition date, correct?

8          THE COURT:  I'm sorry, I thought the evidence was

9 that there were approximately 84,000 or 87.  Are you suggesting

10 there were more?

11          MR. BERNICK:  Yes.

12          THE COURT:  Okay, I'm sorry.  I apologize.

13 A    You're saying how many proofs of claim were filed?

14 Q    For asbestos personal injury claims.

15 A    It seems to me there were somewhere around 130,000 filed

16 or something like that.

17 Q    Okay.  And of that number how many were settled?

18 A    I don't remember the exact number but the majority of them

19 were pending.

20 Q    So, over 100,000 proof of claim forms were filed for

21 pending unsettled --

22 A    No, no, no, I said the majority of them were pending.  Of

23 the proof of claim forms that were filed, the majority of them

24 were pending.  The next largest category I believe were settled

25 or liquidated claims.  And then the next largest category as

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001821