1  recess.   Thank you.

2                        (Recess)

3              THE COURT:  Please be seated.  Mr. Finch?

4              MR. FINCH:  Yes, Your Honor.

5              THE COURT:  Dr. Florence, ready?

6              THE WITNESS:  Yes.

7  Q    Dr. Florence, could you turn in your estimation report,

8  ACC Exhibit 462, to Page 15?

9  A    Yes.

10             MR. FINCH:  Can we just have the trial director?

11 Q    You've got a section here, Value of Mesothelioma Claims,

12 correct?

13 A    Yes.

14 Q    And the first -- the second paragraph under that section,

15 you say, "Because ARPC estimated pending claims, it met the

16 assumed evidentiary criteria.  ARPC first example to settle

17 mesothelioma claims in the closed claim sample, it met the same

18 criteria of the ones that provided the necessary information

19 based on the expert review of exposure information."  What's

20 that referring to?

21 A    The closed claim sample?

22 Q    Yes.  What's the closed claim sample?

23 A    It's a sample we drew of closed claims.

24 Q    And of that there were 350 mesothelioma claims that fell

25 into the closed claims sample?

CC-BLG001824

1  A    That's correct.

2  Q    Okay.  And you write -- what range -- what time period did

3  you use for the purposes of the values in your forecast?

4  A    I'm sorry, what time period?

5  Q    What time period for -- you came -- you used values from

6  some period of time to do your estimate, correct?

7  A    Correct.

8  Q    And what was the time period for the values that you used?

9  A    As I recall, it was closed claims sample coverage claims

10  that were filed and served between '98 and 2001, as I recall.

11  Q    Okay.  And then what is the reference to, "The range from

12  April 1999 to April 2001 was selected as being most recent and

13  therefore most reflective of future events"?  What does that

14  refer to?

15  A    We took those cases in that range for the value

16  calculation because they were most recent cases.

17  Q    Okay.  So, for the purposes of calculating the value that

18  you would use to apply to all pending and future "valid"

19  asbestos personal injury claims for mesothelioma, you used the

20  April 1999 to April 2001 time period to draw the sample from?

21  A    For the calculation of the values.

22  Q    Okay.  And why did you do that?

23  A    Because they were the most recent settlements.

24  Q    And why are the most recent settlements used?

25  A    They seem more applicable than old settlements for

CC-BLG001825

1  forecasting what will be paid tomorrow or --

2  Q    Sort of like if you're trying to budget how much you'll

3  pay for groceries next week, what you paid for groceries last

4  week is more relevant than what you might have paid for

5  groceries three years ago?

6  A    That's probably true, right.

7  Q    And is it true that with respect to the number of future

8  valid claims that you project you are assuming that the same

9  evidentiary and exposure criteria that you were asked to assume

10 for the present claims would continue forward forever into the

11 future, correct?

12 A    Right, that -- my task was to estimate pending and future

13 claims that would meet those criteria.  That's what I did.

14 Q    And so, the criteria that you assume that would apply the

15 exposure and medical criteria that you were asked to assume

16 would apply throughout the history -- throughout the entire

17 future claims forecast, correct?

18 A    Correct, the criteria would be the same.

19 Q    There's nothing in your criteria that takes into account

20 the identity of the plaintiff's lawyer, correct?

21 A    That's correct.

22 Q    There's nothing in your criteria that takes into account

23 the state in which the case is pending, correct?

24         MR. BERNICK:  I'm sorry.  These are criteria for

25 which claims get paid --

CC-BLG001826

1        MR. FINCH:  Yes, for which --

2        MR. BERNICK:  -- or the criteria for price?

3        MR. FINCH:  For which claims get paid.

4  A    That was not one of the criteria I was given, correct.

5  Q    The criteria you were asked to assume for which claims get

6  paid don't take into account any variations in state law, do

7  they?

8  A    I wasn't given criteria that included state variations, if

9  that's what you're saying, no.

10 Q    The criteria that you were asked to assume for purposes of

11 validity don't include any analysis of the impact of trial

12 dates?

13       MR. BERNICK:  Are you talking about a specific

14 analysis?

15       MR. FINCH:  At all.

16 Q    There's no criteria for when the plaintiff would get a

17 trial date in your analysis, correct?

18       MR. BERNICK:  Again, are you talking about which

19 claims get paid or the pricing?

20       MR. FINCH:  Which claims get paid.

21 A    I'm sorry, could I hear that again?

22 Q    The criteria you were asked to assume don't have any

23 criteria that at all analyzes or is related to whether or not

24 the claimant has a trial date?

25 A    That's correct.  The criteria did not include anything to

CC-BLG001827

1 do with trial dates.

2 Q    And the criteria don't have anything to do with the number

3 of fact witnesses that the plaintiff might call to testify in a

4 trial, do they?

5 A    It does not, no.

6 Q    And the criteria don't have anything to do with the

7 identity of the plaintiff's doctor with respect to mesothelioma

8 claims, correct?

9 A    Correct, there's no issue with doctor reliability or

10 reproducibility with regard to mesothelioma.

11 Q    And the criteria don't take into account the cost that

12 Grace might incur to defend the case, do they?

13 A    There are no criteria having to do with costs.

14 Q    Okay.  Now, in the closed claim file review, you drew the

15 sample of the 350 closed mesothelioma cases, right?

16 A    We drew a sample of -- yes, it was like 2800 and some odd

17 closed claims.  I -- let me get to -- the appendix, I think

18 describes it.  Yes, 2889 total claims.

19 Q    And of that there were 350 that were meso claims?

20 A    There were around 350 that were meso claims.

21 Q    Okay.  And as part of your backup materials, you produced

22 the list of the closed meso claims as well as the files, right?

23 A    Okay.

24 Q    And you asked Grace to give you all the information that

25 it had about each of those cases to go in those files to be

CC-BLG001828

1  reviewed by either the Celotex people or Exponent, correct?

2  A    We asked for the case file on those cases that were

3  sampled.

4  Q    In fact, you asked Grace to give you everything that it

5  had.  You didn't restrict it just to everything in your file.

6  Your request was to give you all the information that was

7  available on those cases, correct?

8  A    I believe that was the request, yes.

9           MR. FINCH:  Your Honor, may I approach the witness?

10          THE COURT:  Yes.

11 Q    Dr. Florence, do you recognize ACC-469 as your work papers

12 from which you derive the value of 155,000 for the six claims

13 that met the criteria?

14 A    These aren't my work papers but I assume they're the work

15 papers of the firm because there are six claims and they total

16 the 155,240.

17 Q    Okay.  And this has -- let's just make sure we understand

18 what the categories are.  Injury obviously means mesothelioma.

19 These are the six meso cases?

20 A    Yes, injury is meso.

21 Q    These are the six mesothelioma cases that --

22          MR. FINCH:  Can I have the ELMO, please?

23 Q    -- that Exponent identified as having satisfied the mixer

24 and installer criteria?

25 A    They are.

CC-BLG001829

1  Q    And then the value associated with those is called

2  disposition amount, correct?

3  A    On my copy, it's Disp I and F.  Is that what you're

4  saying?

5  Q    Yes, disp amount.  That's just like 197,000, that's

6  $197,000, right?

7  A    Oh, I'm sorry.

8  Q    Are you with me?

9  A    I am.

10  Q    Okay.  So, the disposition amount is the settlement amount

11  for that claim and the disp inflation is after you imply an

12  inflation factor?

13  A    That's correct.

14  Q    Okay.  So, if a case was settled in 2001, you wouldn't

15  apply an inflation factor.  If it was settled in 1999, you

16  would apply one, right?

17  A    That's correct.

18  Q    Okay.  So, for the disposition amount 197,000, the

19  inflation -- because that case was settled in 2000, the value

20  you're using for the purpose of your forecast is 201,000,

21  right?

22  A    Correct.

23  Q    Okay.

24  A    To bring it up to $2,001.

25  Q    And then you can see from the second and third pages of --

CC-BLG001830

1 and fourth and fifth pages of the exhibit all the ones that

2 Exponent found had insufficient information?

3 A    Yes.

4 Q    Okay.  And you can cross reference that back to the

5 database to find those people, correct?

6 A    Yes, the unique identifier doesn't seem to be on this

7 printout, but I assume there's a way to link them back.

8 Q    Okay.  Could you look at ACC-2062?

9         MR. FINCH:  And, John, could you also put up Florence

10 Report, Page 15, split the screen?  Your Honor, what I'm doing

11 here is I'm showing ACC-2062.

12 Q    ACC-2062 came out of your work papers, too, Dr. Florence,

13 and this has the Rust ID number for each of those closed

14 mesothelioma claims, do you see that?

15 A    Okay, yes.

16 Q    So, you got the same six that met the A or C exposure

17 number?  They were mixers or installers?

18                        (Pause)

19         MR. FINCH:  Your Honor, I'll deal with it.  I'm

20 sorry, I'm very parched.

21 Q    Dr. Florence, I think the question pending was the -- you

22 have the six people at the top where they could determine from

23 the exposure category that they were mixers or installers,

24 right?

25 A    I'm sorry, we're on 2062?

CC-BLG001831

1  Q    2062, second page.

2  A    Certainly it seems to be.  The category group is A/C.

3  Q    Okay.  And in your report you have six people that

4  Exponent found to be mixers or installers, right?

5  A    That's correct.

6  Q    And then in your report you say that there were 12 with

7  insufficient information, and we agreed at your deposition that

8  was actually a typo.  It should be 21, correct?

9  A    I think it was, yes.

10 Q    I think actually Mr. Bernick might have showed a slide.

11        MR. FINCH:  Could I have the ELMO again?

12 Q    Ignoring my handwriting, the six people that met the

13 criteria which -- and the criteria we're talking about is were

14 they a mixer or an installer, right?

15 A    Correct.

16 Q    And then there's 21 that didn't meet the criteria?

17 A    Correct.

18 Q    Okay.  And then there's 258 with insufficient information,

19 right?

20 A    Correct.

21 Q    Okay.  Now, one of the ones on this list with insufficient

22 information, I'd like you to go down to -- it's in the H's, the

23 number 408478.

24 A    I'm sorry, which list am I on?

25 Q    On 2062, ACC-2062.  Can I switch back to the -- sorry

CC-BLG001832

1  about the switching back and forth.

2  A     On Page 3?

3  Q     Yes, on Page 3, there's a reference to a guy named Donald

4  Halpain.

5  A     . I see it.

6  Q     Okay.  And so, that's one that Exponent coded as

7  insufficient information, right?

8  A     I believe so, yes.  I assume that --

9            MR. FINCH:  Your Honor, may I approach?

10 A     Yes, I'm assuming these are Exponent's codes, yes.

11 Q     Okay.  Well, certainly he was in the closed claim sample.

12 He didn't end up among the six A and Cs at the top, right?

13 A     Correct.

14 Q     Okay.

15           MR. FINCH:  Your Honor, may I approach the witness?

16           THE COURT:  Yes.

17           MR. FINCH:  Could you split the screen now, John,

18 between ACC-472 and ACC-2062?

19 Q     Dr. Florence, ACC-472 is the Halpain file.  You recall I

20 showed you this in your deposition?

21 A     Okay.

22 Q     Let's just tie it in.  You've got Halpain on ACC-2062,

23 which is your backup information that shows he was coded as an

24 insufficient information.  They couldn't tell whether he was a

25 mixer or installer, right?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001833

1  A    Correct.

2  Q    All right.  And his -- the number the Rust uses for him or

3  whoever put that number is 408478.  Are you with me, Dr.

4  Florence?

5  A    Hold on.  I am.

6  Q    Okay.  Now, ACC-472 has a reference to Donald Wayne

7  Halpain, 408478.

8        MR. FINCH:  That's this document, Your Honor, the

9  fatter document.

10        THE COURT:  I have it.

11        MR. FINCH:  You have it?

12  Q    And, Dr. Florence, you see on Page 256 of the Halpain

13  file, the middle paragraph?

14        MR. FINCH:  John, it's the about the fifth page back.

15  Yes.  In the middle paragraph, could you blow that -- could you

16  enlarge that, please?

17  Q    That indicates that Mr. Halpain's claim was paid $2

18  million?

19  A    It certainly seems to, yes.

20  Q    Okay.  Could you turn to the last page of the document?

21        THE COURT:  Well, pardon me.  I'm sorry, where are

22  you looking, Page 256?

23        MR. FINCH:  256, in the middle paragraph it says,

24  "Whereas Steven Halpain and Thomas Halpain individually..."

25  blah, blah, blah.  About ten lines down, it says, "Therefrom,

CC-BLG001834

1  under the statutes and laws of the State of Texas or any other

2  jurisdiction for a total consideration of two million and zero,

3  zero dollars and other good and valuable consideration."

4  Q    Do you see that, Dr. Florence?

5  A    I do.

6  Q    And this $2 million settlement was the largest settlement

7  in the closed claim sample, isn't that right?

8  A    I don't know, that --

9  Q    Well, could you look at ACC-469?  All right.  Well, let me

10  -- you don't know one way or the other whether it was the

11  biggest settlement in the sample, right?  But, you would agree

12  it's a $2 million settlement, right?

13  A    I agree that the release is for $2 million, yes.

14  Q    Okay.  Now, could you go back to ACC-472?  That's the

15  Halpain document.  That's the Halpain file that the -- and this

16  is the file that both Celotex Trust people and the Exponent

17  people would have looked at, right?

18  A    I'm sorry, what --

19  Q    Strike that.  Strike that.

20  A    I don't know that -- who looked at what here.

21  Q    ACC-472 is the Halpain file, right?

22  A    Okay.

23  Q    Okay.  Could you go to the last page?

24  A    All right.

25  Q    Now, under the criteria that Grace gave you, a

J&J COURT TRANSCRIBERS, INC.

CC-BLG001835

1  mesothelioma claim was treated as valid in the closed claim

2  sample if the claimant personally mixed or personally installed

3  a Grace's asbestos containing product?

4  A    That's correct.

5  Q    Okay.  The last page of the Halpain file shows the removal

6  of certain documents on ground of privilege.  Do you see that?

7  A    I see that, yes.

8  Q    And you talked to the company about the privilege

9  materials and about what they were?

10 A    We just asked about them.

11 Q    And what they told you was that virtually all of these in

12 talking to the company was that these were cover letters, not

13 that they were, you know, here as a case summary and deposition

14 report kind of thing?

15 A    That's correct.

16 Q    Would you agree with me the deposition of Mr. Halpain

17 would have been a type of document that would indicate whether

18 he mixed or installed a Grace asbestos product?

19 A    I don't know.

20 Q    You see this refers to a document dated the 30th of June

21 and it says, "Attaching status of case, 6/9/00 letter from Jay

22 Hughes from John Muir Day and deposition report."  Do you see

23 that?

24 A    I do.

25          MR. FINCH:  May I approach, Your Honor?

J&J COURT TRANSCRIBERS, INC.

CC-BLG001836

1          THE COURT:   (No verbal response).

2   Q    Dr. Florence, could you read the section, Product

3   Identification in the record?

4          THE COURT:   Where are you, please?

5          MR. FINCH:   I'm at page -- strike that, strike that,

6   strike that.   Page Boca 856 -- excuse me, Boca 854.

7   Q    Do you have that?

8          THE COURT:   On exhibit what?

9          MR. FINCH:   Exhibit ACC-34.

10  Q    Do you have it, Dr. Florence?

11  A    I do.

12  Q    It's talking about Mr. Halpain?

13  A    I do.

14  Q    It says on virtually all of these projects, his job

15  included mixing plaster and taking it to the plasterers.   The

16  only brand of plaster he recalled was Zonolite.   He described

17  going to the railroad station and uploading it by the truck

18  load.   Zonolite was by far the most common product mentioned by

19  Mr. Halpain.   That's what Mr. Halpain testified to according to

20  this?

21  A    According to this, yes.

22  Q    So, Halpain --

23         MR. FINCH:   Can I go to the ELMO, please?

24  Q    All of the values you used in your estimate are a function

25  of the six mesothelioma cases, right, a mathematical function?

CC-BLG001837

1 A    Correct.

2 Q    Okay.  So, if -- and it's just a matter of pure I don't

3 know if it's algebra or calculus, but if you were to say double

4 all the values used in your forecast, the total liability would

5 double, correct?

6 A    Yes, probably.

7 Q    Okay.

8 A    It's the same -- you're just going up 100 percent.

9 Q    Okay.

10          MR. FINCH:  Can we turn to the slide show?  And don't

11 worry, Your Honor, this time I actually marked these with some

12 separate documents.  So, if they come into evidence or for

13 demonstrative purposes, I won't have to scribble on them with a

14 blue marker.

15          THE COURT:  All right.

16 Q    Do you recognize that that's the table out of your

17 supplemental report showing the values you used in your

18 forecast for pending and future claims, Dr. Florence?

19 A    Yes.

20 Q    This is marked for Identification ACC-2099.1  Then the six

21 settlements used to calculate your mesothelioma average, the

22 mixers or installers, they averaged 155,240 a case, right?

23 A    They did.

24 Q    Okay.  And if you -- would you agree with me that if you

25 added in the Halpain case, which is the 404478 case, then you

CC-BLG001838

1  -- because he was a mixer, you get to -- the total amount of

2  money for those seven cases would be $2 million plus 155,240

3  times six, correct?

4  A    You mean arithmetically --

5  Q    Arithmetically.

6  A    -- is that correct, yes.

7  Q    And then you would have seven cases to divide from and you

8  would have a new mesothelioma average for the people that met

9  the mixer and installer criteria $418,000, correct?

10  A    If it was pure arithmetic it would be correct, yes.

11  Q    And if you carry that pure arithmetic through, the lung

12  cancer value you used in your forecast was about 30 percent of

13  the mesothelioma value, right, 30.7 percent?

14  A    I think those -- yes, the percentages are in the table.

15  Q    Okay.  And so, instead of the mesothelioma value for the

16  historically closed valid mixers and installers was $418,000

17  instead of the $155,000, then your new lung cancer value would

18  be $128,000, right?

19         MR. BERNICK:  This is the same exercise that we went

20  through in connection with the efforts to have recalculations

21  of the risk factors that were associated with Dr. Moolgavkar's

22  testimony I think and Dr. Anderson's testimony.  Mr. Finch can

23  go ahead and do the math but it doesn't mean anything unless

24  the witness signs onto the proposition these calculations are

25  appropriate.  All he's doing is he's adding another number into


                        J&J COURT TRANSCRIBERS, INC.

CC-BLG001839

1 the average, and this is -- we're now going to have a

2 demonstrative that simply is a function of Mr. Finch's math.

3 So, it seems to me --

4           THE COURT:  Well, this one is a little bit difference

5 because in this instance, there was a document that indicates

6 that in fact somebody was left out who could have been put in

7 based on the review of the claims.  Now, this witness didn't --

8 as I understand it didn't do that review of the claims.  He

9 simply accepted the evidence of somebody else's review of the

10 claims.  Nonetheless, there is now a document that indicates

11 that that claims review did not include something that with the

12 deposition shows that it could have been in.  And so, there is,

13 I think, a basis on the record for showing that these map

14 numbers could change.  And if the witness agrees with the

15 calculations, Mr. Finch is going to have to tie it up with

16 another witness to show that it's appropriate.  But,

17 nonetheless, as to the math calc, I think this is the

18 appropriate witness.

19           MR. BERNICK:  I think it's -- I would suggest, Your

20 Honor, that it is -- would be the other way around.  That is to

21 say, if he wants to have another witness do the calculation and

22 say, that's the calculation I would have done, then he can go

23 ahead and do that.  But, to do it in cross examination of this

24 witness where all it is that he's doing the math, and the

25 witness has not said that this is an appropriate calculation to

CC-BLG001840

1 | begin with is not appropriate through this witness.  And that
2 | is exactly the rule that came out of the Anderson process is
3 | that it doesn't make any difference if the math is correct.
4 | The question is whether -- the question that he could simply
5 | ask the witness is, what would you do with this one result?
6 | How would that affect the calculus?  And that is basically what
7 | you would expect of any of it.  How does this affect your
8 | analysis?  And Mr. Finch hasn't asked that question.  I don't
9 | know what the witness' answer will be candidly.  But, he hasn't
10 | asked that question and, therefore, there is no foundation for
11 | his now doing a calculation is that it bears upon the witness'
12 | testimony.
13 |         MR. FINCH:  Your Honor, there is a foundation for
14 | doing the calculation.  This is the value that he calculated
15 | using the assumptions that Grace gave him and using the values
16 | associated with those six historical settled cases.  I have, I
17 | think, demonstrated that this Mr. Halpain was someone who
18 | clearly should have been included by whoever reviewed the file.
19 | Grace for whatever reason pulled that document out of the file.
20 | And so, I think it's entirely appropriate to show the financial
21 | impact on his forecast switching that one case from
22 | insufficient information to valid information would be.  I
23 | could have Dr. Peterson do the calculation, but it's his
24 | forecast.  Dr. Peterson is not testifying as to his forecast.
25 | I think I'm entitled to demonstrate the financial impact of

CC-BLG001841

1  that one variable change.

2          MR. BERNICK:  Well, again, if --

3          THE COURT:  This witness has testified that he agrees

4  with the proposition that if the numbers change the math

5  changes.  I don't think frankly I need a witness to tell me

6  that.  I think I can assume -- I can take judicial notice that

7  if the numbers change and you do a math calculation with

8  different numbers, that the answer will change.  I think all of

9  us have gone through more than second grade and can probably

10 agree with that foundational premise.  So, I don't think I need

11 a witness for that purpose.  Nonetheless, this witness has so

12 testified.

13         Mr. Finch, I think you need to lay the foundation as

14 to whether or not this witness would do this calculation.  If

15 he would do this calculation based on the new evidence, then I

16 think you've laid the foundation.  The evidence in terms of the

17 fact that Mr. Halpain may have fit within that category is here

18 whether this witness accepts it or not.  I don't know whether

19 this witness will accept it or not.

20         MR. FINCH:  All right.

21 BY MR. FINCH:

22 Q    Dr. Florence, if they had -- if Exponent had come back to

23 you and instead of there being six cases that met the criteria,

24 the worksheet said seven cases that met the criteria, you would

25 have used what they gave you, right?

CC-BLG001842

1  A    No.

2         MR. BERNICK:  First of all, I'm going to object

3  because, Your Honor, this is actually --

4         MR. FINCH:  Withdrawn.  The question is withdrawn.

5  Your Honor, at this point, I would offer ACC-34, ACC-472 --

6         THE COURT:  Wait, we can only do them one at a time.

7  I know we're going to have objections.  Let's just do them one

8  at a time.  ACC-34 --

9         MR. FINCH:  Let me do the ones that there may not be

10 objections to.  ACC-469, which is Dr. Florence's work papers

11 that show the six mesothelioma settlement.

12        MR. BERNICK:  I have no objection as to that.

13        MR. FINCH:  ACC --

14        THE COURT:  Wait a minute, please.

15        MR. FINCH:  Sorry.

16        THE COURT:  It's admitted.

17        MR. FINCH:  ACC-2062, which shows the same group of

18 closed mesothelioma claims but this time with the Rust ID

19 number.

20        MR. BERNICK:  That's 2062?

21        MR. FINCH:  Correct.

22        MR. BERNICK:  Yes, that's okay, yes.

23        THE COURT:  Admitted.

24        MR. FINCH:  I would like to offer --

25        THE COURT:  I don't have 2062, by the way.

CC-BLG001843

1          MR. INSELBUCH:  I'll give it to you.

2          MR. FINCH:  I apologize, Your Honor.  I thought I had

3  it clipped to that.

4          THE COURT:  Oh, I'm sorry, maybe you do.  I

5  apologize, Mr. Inselbuch.  I do have it.  It was clipped and I

6  didn't see it.  I'm sorry.

7          MR. FINCH:  It was hiding, Your Honor.  I'm sorry for

8  not separating it.

9          THE COURT:  Okay, I have it.

10          MR. FINCH:  ACC-472, which is the --

11          THE COURT:  Halpain.

12          MR. FINCH:  -- Halpain file.

13          MR. BERNICK:  With respect to the Halpain file --

14          THE COURT:  You need to use the microphone, Mr.

15  Bernick.

16          MR. BERNICK:  Yes, I'm sorry.  With respect to the

17  Halpain file, if it's represented that this is, in fact, the

18  total PIQ file, I don't have a problem with that.

19          MR. FINCH:  It's the total settled claim file that

20  was provided to, as I understand it, to Celotex and Exponent

21  that came from Dr. Florence's backup.  There's a pretty big

22  hard drive of backup materials.  This is the that file.

23          MR. BERNICK:  I'm sorry, I don't understand.  This is

24  the totality of the file that was produced as the closed claims

25  file?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001844

1            MR. FINCH:  Yes.

2            MR. BERNICK:  If that's the representation, then I

3    don't have a problem with it.

4            THE COURT:  It's admitted.

5            MR. FINCH:  I'd like to offer Page 15 and only Page

6    15 of Dr. Florence's September 25th, 2007 expert report,

7    ACC-462.

8            MR. BERNICK:  I would object to that.  He can use it

9    for impeachment purposes, but it doesn't come in unless the

10   whole document come in.  And it's improper for -- to have it

11   come in isolation because the rest -- this is a calculation.

12   It's in the midst of a lot of text that talks about exactly how

13   he was proceeding.  So, if he wants the document, he should get

14   the whole document in.

15           MR. FINCH:  Your Honor, I think it is -- I'll

16   withdraw 462.

17           THE COURT:  All right.

18           MR. FINCH:  I want to offer ACC-FCR-34.

19           MR. BERNICK:  That we would object to at this time

20   unless there's a further foundation for what actually occurred

21   in connection with this letter.  This letter, Your Honor, is a

22   letter that was written in anticipation of a trial.  I believe

23   that the trial took place.  I believe that the trial resulted

24   in verdicts against Grace and then the case was settled.  I

25   believe so.  I'm not sure.  If that's true, then to take this

CC-BLG001845

1  document in isolation and argue about what its significance is

2  is really very misleading because we're talking about a verdict

3  result as opposed to a settlement result.  So, if Mr. Finch --

4  I mean, I hold this in abeyance. I intend to pursue this in my

5  examination anyhow and I'm prepared to establish a foundation

6  for this document.  Thus far, the witness -- Mr. Finch has not

7  established a foundation through this witness.

8          MR. FINCH:  Your Honor, Grace has admitted the

9  document is authentic in it's -- in the stipulation process we

10 went to with respect to the exhibits.  This is clearly

11 admission of W.R. Grace.  They can't use a document as both a

12 shield -- they can't use a privilege as both a shield and a

13 sword.  They want to use --

14          MR. BERNICK:  Unless it's privileged.

15          MR. FINCH:  Excuse me, Mr. Bernick.  They want to use

16 this -- the attorney-client privilege as a basis for causing

17 the Exponent reviewers and the Court and Dr. Florence to assume

18 that there wasn't any evidence this person was a mixer when, in

19 fact, there is and there was.  And so, I would offer ACC-34.

20 And as to the statement whether the case was tried and then

21 settled, that's immaterial to the question of whether he was a

22 mixer or an installer.  And I'm not sure that it was correct.

23 In fact, I am fairly confident that this case wasn't tried.

24 And if I can lay my hands on -- okay.  But, in any event, we

25 offer the document, Your Honor.

CC-BLG001846

1          THE COURT:  I think the document --

2          MR. BERNICK:  I'm sorry, Your Honor, just so I can be

3    clear.  This is not established as an admission of Grace.  This

4    is a document written by counsel for Grace, and it's written by

5    counsel for Grace reflecting statements made out of court by

6    somebody who is not present before the Court.  Therefore, it's

7    hearsay.

8          THE COURT:  Well, actually the attachment isn't even

9    a statement written by Grace.  It's simply the cover letter is

10   a transmittal, as I understand it, of a letter by Grace's

11   counsel.  There is in the document attached to it an indication

12   that Mr. Halpain was an installer or worked with Grace

13   directly, worked with Grace's products.  Whether that

14   information is true, not true, so forth, I don't think at this

15   point in time has been tested.  Nonetheless, based on the

16   review process that Grace has testified -- has had its

17   witnesses testify to, it seems to me that this information

18   would have been sufficient had it been provided to someone for

19   someone to take a look to say that this person was a mixer at

20   least of Zonolite products.

21          It's pretty clearly listed that way in this document

22   and this would have been the type of information that a Grace

23   witness would have taken count of.  Under those circumstances,

24   it seems to me that for that limited purpose and only that

25   purpose, this document is admissible.  For settlement

CC-BLG001847

1 discussions and what led to the settlement, at this point in

2 time I don't have any information about that and I don't think

3 it's admissible for that purpose.  But, I think as to whether

4 or not there is evidence to indicate that Mr. Halpain would

5 have fit in the Category A or C, there is information in this

6 file that indicates that he would have fit into one of those

7 categories.  So, I'm going to admit it for that limited purpose

8 and that purpose only.  Let me make a note.

9          MR. FINCH:  Thank you, Your Honor.

10          MR. BERNICK:  Excuse me, Your Honor.  First, there's

11 a statement that's been made that the document itself was

12 withheld, and there's no record evidence that the document

13 itself was withheld.  The transmittal letters were what was

14 represented to be withheld.  Counsel has simply asserted that

15 because it does not appear in the closed claims file, it was

16 not produced and that is not necessarily so.  And Mr. Finch,

17 before he makes that kind of claim, ought to have some basis

18 for it.

19          Secondly, with respect to what this document says,

20 again it is a -- it is totally a hearsay document.  This is a

21 document where a lawyer purports to reflect the -- what may or

22 may not be the deposition testimony.  He has a deposition

23 taken.  If he said these things and it's properly summarized,

24 then so be it.  But, even if it were a deposition, it would

25 still be hearsay.  And there's ambiguity as to what it is

CC-BLG001848

1 that's being said.  All we know at this time is that it was not

2 included in the closed claim file review.

3        If the document is admitted for the purposes of

4 showing the fact that it was not included in the closed claims

5 file review, we would not have objection to it.  But, what

6 we're now doing is in the context of this cross examination

7 injecting into this record a document that has not undergone

8 any kind of review by any kind of expert to determine whether

9 it's accurate, whether it's germane to this analysis at all.

10 Mr. Finch is simply asserting based upon his argument that it

11 is.  We don't know that yet.

12        THE COURT:  I said he's going to have to subject it

13 to some further examination to determine whether, in fact, this

14 document does have that type of probative evidence.  But, he

15 has, I believe, substantiated from this witness the fact that

16 this witness has accepted the information provided by other

17 witnesses who have explained the closed claims review process.

18 This document seems to indicate that there is sufficient

19 evidence, at least of record, that indicates that, you know,

20 based on the process that has been explained to me on this

21 witness stand, would have led somebody to at least question

22 whether or not this person should have fit within Category A or

23 C.

24        MR. BERNICK:  I agree with that, but at this point in

25 time, we don't know whether they actually belonged in Category

CC-BLG001849

1 A or C either.

2          MR. FINCH:  Your Honor --

3          MR. BERNICK:  We just don't know because nobody has

4 done the review of the product.  Nobody has done any kind of

5 review to determine to what extent this is an actual exposure.

6          THE COURT:  I haven't heard from anybody that anybody

7 ever did any review of the closed claims files to see that any

8 of the settlements actually involved a real Grace product and

9 that Grace settled with respect only to real Grace products

10 after going back and actually checking to see that, in fact, it

11 was a real --

12          MR. BERNICK:  That is the criteria.  That is --

13          MR. FINCH:  Your Honor.

14          THE COURT:  I have not heard that.  If that's it,

15 produce a witness to tell me that because that is not my

16 assumption that somebody went back and checked to make sure

17 that a claimant actually worked with a Grace product.  I

18 understood the witness to say that if there was an assertion in

19 the file that somebody, in fact, worked with a Grace product

20 that that assertion was accepted in the closed claims file.

21          MR. BERNICK:  If it's the right kind of -- well, the

22 closed claims are a little bit different.  This is --

23          THE COURT:  That's what this is.

24          MR. BERNICK:  I understand that, but I think Your

25 Honor is recalling the testimony with respect to the PIQs.

CC-BLG001850

1          MR. FINCH:  Your Honor, may I --

2          MR. BERNICK:  In the PIQs if there was mention of a

3   Grace product, then that was enough to get you there.  I don't

4   know whether this Grace product is one of them, that it's a

5   product that contains asbestos or not.

6          THE COURT:  Zonolite Aggregate Plaster?

7          MR. BERNICK:  Well, but see it's plaster that's used

8   in the construction of schools and gas stations.  This is not

9   high temperature cement.

10          MR. FINCH:  Your Honor?

11          MR. BERNICK:  I don't know enough to be able to say,

12   but the inference that's being drawn here is that it's an A or

13   C exposure to Grace asbestos containing product.  Now, maybe it

14   is, but there's no foundation for that analysis.  So, Mr. Finch

15   has come in here with a document.  He's making a suggestion.

16   But, I don't believe that this document right now has

17   sufficient foundation to be accepted for purposes of the

18   proffer.  Now, if he can get that foundation through this

19   witness, he hasn't so far.

20          MR. FINCH:  Your Honor?

21          MR. BERNICK:  This is what foundation is all about.

22          MR. FINCH:  Your Honor, they -- the people who

23   reviewed the files for Exponent, there was -- if it said in the

24   file that they were a mixer or installer of a Grace asbestos

25   product, then they wouldn't look behind that and they would

CC-BLG001851

1   code it as such.

2           THE COURT:  That's what my understanding of the

3   testimony is.

4           MR. FINCH:  But, that's --

5           THE COURT:  If I'm incorrect, then I --

6           MR. BERNICK:  Your Honor --

7           MR. FINCH:  It's not a Grace asbestos --

8           THE COURT:  Pardon me.  Pardon me.

9           MR. BERNICK:  It has to be a Grace asbestos

10  containing product.

11          THE COURT:  Yes.  And my understanding was that if

12  something in the file indicated that a person worked for Grace

13  at a plant at which a Grace asbestos containing product was

14  used at the relevant time period and that indication was in the

15  file, that they accepted that.  Now, if you're telling me --

16  because I don't know the dates and the plants.  I'm sure you

17  do, Mr. Bernick.  So, if you're telling me that my

18  understanding of this particular document is incorrect and that

19  there is insufficient evidence in this file to show that this

20  gentleman worked at a Grace plant where there was an asbestos

21  containing product and, therefore, there is a question of fact

22  with respect to this document, then I will withhold this review

23  until there can be a connection made.

24          MR. BERNICK:  That's what I'm suggesting.  Actually,

25  what it is, Your Honor, it's not a Grace --

CC-BLG001852

1          MR. FINCH:  Your Honor, you have ruled.

2          MR. BERNICK:  Excuse me.

3          THE COURT:  Pardon me.  I have not, Mr. Finch.  Mr.

4   Bernick?

5          MR. BERNICK:  Yes, I -- it's not -- it says he's

6   working at the Bethlehem Steel Warehouse.  It's a shopping

7   center and a bunch of other things, chamber of commerce.  So,

8   these are basically construction projects.  And apparently he's

9   working for his stepfather as a general contractor.  And I

10  don't know whether the product that he refers to at this time

11  -- this is 48 to 54.  He says Zonolite Plaster.  I don't know

12  if that's Zonolite Plaster that contained asbestos or not.  I

13  just don't know.  And because of that I do believe it's

14  necessary to pin that down and determine whether under the

15  criteria -- the real question is under the criteria that were

16  being applied by Exponent this would have been counted as an A

17  or a C.

18         THE COURT:  All right.

19         MR. BERNICK:  If it would have been, then I can't

20  fight that.

21         THE COURT:  You may take a very limited either

22  interrogatory -- written interrogatory deposition or limited

23  deposition of someone from Exponent to connect up this

24  document.  I will not admit it until I have some connection of

25  this document.  I do not know as a matter of fact whether it

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001853

1  was or was not accepted and for what reason.

2          MR. FINCH:  Your Honor, the point is that Exponent

3  was not provided with this document.  The document --

4          THE COURT:  I don't know that either.  I mean, I do

5  have an indication that the last letter on this -- in the --

6  I've lost the document, I'm sorry -- ACC-472 indicates that

7  deposition documents were withheld.  That is clearly stated.

8  Mr. Bernick, as I understand it, is suggesting that because the

9  letter is here, that does not mean that the documents were

10 withheld.  So, gentlemen, I need to find out whether that is

11 the case.

12         MR. FINCH:  Your Honor, Dr. Florence --

13         MR. BERNICK:  I just don't --

14         THE COURT:  Mr. Bernick, it's his turn.

15         MR. BERNICK:  I'm sorry.

16         MR. FINCH:  Dr. Florence produced the actual files

17 that were sent to the Celotex Trust and to Exponent to review.

18 The entirety of the file was the ACC-472, the Halpain file --

19         THE COURT:  All right, without the deposition.

20         MR. FINCH:  -- without this document in it.  This

21 document says the -- "Grace made a product called Zonolite

22 Acoustical Plaster.  The only brand of plaster product Mr.

23 Halpain recalled was Zonolite.  He described going to the

24 railroad and uploading it by the truckload.  And on virtually

25 all of these projects, his job included mixing plaster and

CC-BLG001854

1  taking it to the plasterers." That is an admission of a

2  counsel of Grace, an 801(d)(2) admission. Grace's counsel was

3  hired to defend in the case. That's his statement of what this

4  guy was doing. And for purposes of the Exponent review,

5  whether he was a mixer was highly relevant. And the -- in fact

6  --

7          THE COURT: This is only a transmittal letter.

8          MR. FINCH: But, the --

9          THE COURT: I cannot see anything in this cover

10 letter that is an admission of fact. It is a transmittal that

11 says there's a settlement demand and what they're looking for

12 --

13         MR. FINCH: No, but --

14         THE COURT: -- or else they're going to go to trial.

15 There is no admission of fact in this cover letter.

16         MR. FINCH: Not in the cover letter. Look at what

17 the last page of the document says.

18         THE COURT: Which document?

19         MR. FINCH: The Halpain file, 472.

20         THE COURT: It says that they -- that "Re: The

21 status of the case and attaching copy of 6/9/00 letter to Jay

22 Hughes from John Muir," May or Day, I think it says, "and

23 deposition report."

24         MR. FINCH: Right. And the point is they didn't give

25 Exponent the deposition. The deposition is clearly not

CC-BLG001855

1  privileged.  The first -- .

2          THE COURT:  The deposition isn't what you're

3  offering.

4          MR. FINCH:  But, I'm offering --

5          THE COURT:  I don't have that either.

6          MR. FINCH:  I'm offering the June 9th, 2000 letter,

7  which is not a transmittal letter.  It's a summary of a

8  deposition.  It's a case summary.  It goes through -- the June

9  9th, 2000 letter is referred to twice in 472.  It's referred to

10 on the last page and the next to the last page.  It's a letter

11 to Grace's in-house counsel from Grace's outside counsel

12 reporting on what the plaintiff testified to in the deposition.

13         THE COURT:  Oh, I'm sorry.  Mr. Muir, you're saying,

14 is Grace's counsel.

15         MR. FINCH:  Yes.

16         THE COURT:  Not the counsel for the plaintiff.

17         MR. FINCH:  Correct.  He's Grace's counsel.

18         THE COURT:  Oh.

19         MR. FINCH:  It's an admission by Grace.  And what the

20 plaintiff testified to --

21 "Q   Do you recall any brand names of plaster that we used?"

22         UNIDENTIFIED SPEAKER:  Microphone.

23 "A   We used Zonolite mostly."

24         UNIDENTIFIED SPEAKER:  Microphone.

25         MR. BERNICK:  Speak into the mike.

**J&J COURT TRANSCRIBERS, INC.**

1  "A    We used Zonolite mostly."

2              THE COURT:  What are you reading from?

3              MR. FINCH:  I'm reading from the deposition that --

4              THE COURT:  No, you can't do this, Mr. Finch.  It's

5  not in evidence.  You haven't proffered it.  I've got an

6  objection on the record.  You can't keep expanding what you're

7  doing.

8              MR. FINCH:  Okay.  The point, Your Honor, is that

9  Grace's counsel said this is what the guy was.  He was a mixer

10 of a Grace asbestos containing product.  That's an admission of

11 Grace and --

12             MR. BERNICK:  He didn't say that.

13             MR. FINCH:  -- we offer Exhibit 34.

14             MR. BERNICK:  He didn't say that.  Look, the fact of

15 the matter is -- and what's happening is everybody is

16 speculating.  And until we pin this down, that's all it's ever

17 going to be is speculation.  Yes, it is a letter from Grace's

18 counsel.  I acknowledge that.  Yes, it went to Grace.  I

19 acknowledge that as well.  The Halpain files appears to suggest

20 in the attachment that the covering letter, as well as the

21 attachment, were withheld, in which case I wonder where it is

22 that Mr. Finch got the attachment.  But, be that as it may,

23 it's clear that if all that is true, it wasn't reviewed by

24 Exponent, which is the issue that we're here to talk about.

25             So, then the question becomes, what is it that this

CC-BLG001857

1 document actually says?  Is the Zonolite Plaster the kind that

2 was used for the purpose that's described in the summary?  Was

3 that a Zonolite Plaster that contained asbestos or not?  I

4 don't know the answer to that question.  Assuming that it did,

5 what is the significance of this in terms of the actual

6 analysis that Dr. Florence did which will get us back to the

7 verdict, I'm afraid, Your Honor.  That still remains to be

8 determined.  But, for counsel to say it must come in on the

9 basis of his inference, that violates the rules relating to

10 foundation.  We can get the foundation.  If it's admissible,

11 Your Honor, it's admissible.  We'll deal with it.  We'll ask

12 Mr. Florence questions about the circumstances, and then we'll

13 go on.  It's not like the world has all of a sudden come to a

14 stop until Mr. Finch can convince Your Honor that his

15 interpretation of the document is correct.

16         THE COURT:  The only -- at this point, the only

17 relevance I can see to this document is the fact that it

18 appears to contain some information, whether it's relevant or

19 not, because I don't know if it contains information about a

20 Grace asbestos product under the debtor's theory of the case.

21 So, the relevance seems to be that the document was not

22 provided to Exponent in order to facilitate its review to see

23 whether or not this should have been included within the

24 designation of an A or C category.  But, the document itself,

25 based on what's before me now, is not something that I can

CC-BLG001858

1  adjudge.

2          The cover letter does say there are some documents

3  from the asbestos property damage litigation which supports his

4  claims.  But, it also says that the CCR has taken the lead and

5  there are other defendants in the case.  So, at this point,

6  from looking at the document, I have no idea what the specific

7  relevance is.  You need to connect this up.  I will withhold

8  the admission of this document subject to letting you connect

9  it up.

10          MR. BERNICK:  That's fine.  I think we'll be able to

11  establish some further significance of this with Dr. Florence

12  if Mr. Finch will simply ask him the question about whether

13  this factors into his analysis or whether he can say.  But,

14  we'll certainly be able to try to pin down whether this product

15  ID is a product ID that tells us it's an asbestos containing

16  product.  And if it is and it should have been included in the

17  review, you know, we'll then deal with the question of what

18  impact it would have had on the review.

19          MR. FINCH:  I rather suspect it was an asbestos

20  containing product or Grace wouldn't have paid $2 million to

21  resolve the claim.

22          MR. BERNICK:  All right, that is Mr. --

23          THE COURT:  That is or is not the case.  People

24  settle cases, especially when this one looks like it's a high

25  profile case.  The cover letter has all sorts of reasons why

CC-BLG001859

1  this may have been something that Grace wanted to settle.

2  Plaintiff is 63, he has twin minor sons, and so forth, et

3  cetera.  Mr. Finch, people settle cases for all kinds of

4  reasons that have nothing to do with liability, as we know.

5  That's one reason we had a 408 argument earlier today.

6  Nonetheless, it may be relevant.  You've got an opportunity to

7  substantiate the relevance.  You need to connect it up.

8          MR. FINCH:  Thank you, Your Honor.  I would also

9  offer at this time ACC-466.  That's Dr. Florence's report in

10  Armstrong.

11          MR. BERNICK:  The whole report?

12          MR. FINCH:  The whole report.

13          MR. BERNICK:  Yes, we would object to that.  That is

14  work that's been done in connection with another case.  And as

15  it has been done for -- in connection with work for another

16  case, it is precluded by the stipulation.  Furthermore, I don't

17  think he's established that it has any particular relevance.

18  So, we would object to the admission of that document.

19          THE COURT:  What is the relevance, Mr. Finch?

20          MR. FINCH:  The relevance shows that the methodology

21  that he used to estimate the cost of future asbestos claims is

22  the same methodology that is put forward by the ACC and the FCR

23  here.  It is relevant to impeach the methodology he is using in

24  this case, and it is also -- it demonstrates the unreliability

25  of what he's doing in this case.

CC-BLG001860

1          MR. BERNICK:  If they will stipulate, Your Honor,

2    that this represents the -- as Mr. Finch just said, if they

3    will stipulate that this document represents the methodology

4    that the ACC and FCR believes should be used in this case, we

5    will agree to the admission of the document for purposes of

6    that proffer.

7          MR. FINCH:  Come on.  This is ridiculous.

8          MR. BERNICK:  No, no, Your Honor.

9          MR. FINCH:  Well, that --

10         MR. BERNICK:  What is the --

11         THE COURT:  Let me rule.  I do not believe that the

12   document itself is admissible for that purpose.  It is evidence

13   -- or you use it for impeachment purposes.  Dr. Florence

14   testified with respect to the methodology he used.  That does

15   not make the document itself admissible evidence for that

16   purpose.  I am going to keep it as a demonstrative exhibit

17   simply so that when I am connecting all this up together at the

18   end of the case, I have it available simply to refresh

19   recollection as to what was going on.  But, it is not

20   substantive evidence that is relevant in this case, but it is

21   certainly corroborative of the fact that the witness has

22   explained the methodology that he used in the Armstrong case,

23   which is somewhat different from the methodology he has used

24   here.

25         MR. FINCH:  Radically different, Your Honor.

CC-BLG001861

1  Finally, I would offer ACC-175 and ACC --

2          THE COURT:  Pardon me.  Let me make a note, please,

3  before you get there.

4          MR. FINCH:  -- 171 and 109, the same --

5          MR. BERNICK:  What are those?

6          MR. FINCH:  -- the same objection applies to both.

7          MR. BERNICK:  What are those?

8                        (Pause)

9          MR. FINCH:  Are you ready, Your Honor?

10          THE COURT:  No, not yet.  Okay, now I am.  Please.

11          MR. FINCH:  I'm offering ACC-175 and 109 as

12  admissions of W.R. Grace under 801(d)(2).

13          MR. BERNICK:  What's 175?

14          MR. FINCH:  The letter from Dr. Florence to Mark

15  Wilensky.

16          MR. BERNICK:  We object to -- we object to 109.

17  Where's the letter?  Can I have the letter?  And we object to

18  the letter 175, as well, on the grounds they violate the

19  stipulation.  They're -- communications between Grace and the

20  expert and Grace's counsel regarding the Grace case.  They're

21  specifically foreclosed by the stipulation.  We are not

22  permitted to understand and be able to conduct discovery with

23  respect to Dr. Peterson's prior work on Grace, again pursuant

24  to the stipulation.  So, the stipulation holds and it shouldn't

25  be violated here.  And it doesn't make a difference if these

CC-BLG001862

1   documents are relevant.  Although we would question the

2   relevance of these documents, the stipulation should control.

3          MR. FINCH:  Your Honor, first of all, I didn't hear

4   any response to my assertion that these are -- well, strike

5   that.  We believe the stipulation doesn't apply to this.  Mr.

6   Mullady will address that point.

7          THE COURT:  Well, first of all, let's take them one

8   at a time because I have 109, but I don't have 175 in front of

9   me.  So, what is 175, because I can't seem to find it and I

10  thought I had them all.

11         MR. FINCH:  175 is -- may I approach, Your Honor?

12         THE COURT:  Yes, please.  I don't -- thank you.

13         MR. FINCH:  175 is a letter authored by Dr. Florence

14  in which he describes work he did for Grace in 1997 to estimate

15  the cost of currently pending and future bodily injury claims

16  related to Grace's production of insulating materials

17  containing asbestos, fireproofing and acoustical plaster.  And

18  it describes the methodology used in that and his estimate.  We

19  believe that this is an admission of a party opponent in the

20  sense that it's an 801(d)(2) admission in the same way that if

21  a bookkeeper were hired in a tax case to calculate a taxpayer's

22  income and the taxpayer -- the bookkeeper said the income is

23  $300,000, and then in a tax prosecution, the taxpayer has a

24  Form 1040 that says that his income is only $50,000, I'm

25  certain that the bookkeeper's documents would come in to

J&J COURT TRANSCRIBERS, INC.

CC-BLG001863

Florence - Cross/Finch                221

1  evidence as admissions of an agent of a party acting within the

2  scope of the agency.  That's Point Number 1.

3         Point Number 2, the stipulation was a discovery

4  stipulation.  It had nothing to do with cross examination at

5  trial.  It had nothing to do with material that was not related

6  to the expert's work in this case.  The intent of the

7  stipulation was to keep you from getting behind, notes back and

8  forth between Dr. Florence and his staff, or notes between

9  Kirkland & Ellis and Dr. Florence for the purpose of preparing

10 him to testify in this estimation case.  Not to put an absolute

11 bar as to any and all work that he has done in the past which

12 became publicly available.  The Sealed Air work became publicly

13 available in a variety of ways.  They didn't keep it just

14 within Grace, they gave it to Sealed Air.  They gave it to the

15 FCR's expert Eric Stout at the time.

16        So I don't think there's any confidentiality

17 associated with this.  It's not within the ambit of the expert

18 stipulation.

19        The exact same set of arguments would apply to

20 ACC-FCR-109.  Again, they're 801(d)(2) admissions.  They're not

21 within the scope of the expert's stipulation.  And they are not

22 confidential.  Both of these documents were provided to Sealed

23 Air.  They were provided to the FCR's expert Eric Stout at the

24 time of these transactions.  They were produced to the United

25 States government by my firm when the government served me with

J&J COURT TRANSCRIBERS, INC.

1  a subpoena, without any objection by Grace.  Grace has --

2          THE COURT:  Well, wait.  With respect to 109, this

3  witness indicated he had never seen it.  That it was prepared

4  by KPMG but not by him.  I don't see a foundation through this

5  witness for 109.  So let's stop with 109 right there.

6          With respect to 175, this witness did indicate that

7  this was a letter that he had written, but I still did never

8  hear from you and I asked you to lay the foundation for what it

9  was.  You said you would, then you went on to another line of

10 questioning.  You never went back to it.  I still don't know

11 what this document is or for what purpose it was created.

12          My concern -- the objection, I think, was that at the

13 time this document was created in connection with the Sealed

14 Air litigation and for that purpose and I don't know what it's

15 for.

16          MR. FINCH:  It was not created for the purposes of

17 the Sealed Air litigation, it was created for purposes of the

18 Sealed Air transaction, business planning purposes.

19          THE COURT:  Oh, a transaction.  Okay.

20          MR. FINCH:  It was for business planning purposes.

21 And we submit, Your Honor, there's no difference between

22 business planning purposes for purposes of deciding whether

23 you're solvent in order to transfer assets and business

24 planning purposes for purposes of determining the value of

25 money that goes into a trust.  Both of -- we believe the same

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001865

1  methodology should apply to both and it's apparent on the face

2  of the document what the document is for.  You don't need --

3  the only foundation I needed to lay was that he was working for

4  Grace at the time and that this is his letter which he

5  established.  Once he does that, I think it's an 801(d)(2)

6  admission.  That's the foundation.  The foundation is he made

7  the statement.  It's an 801(d)(2) admission.  It comes into

8  evidence pursuant to that.

9          MR. BERNICK:  Your Honor, is this really --

10          MR. FINCH:  It's not --

11          MR. BERNICK:  -- it's so many words and it doesn't

12  address the core issues.  Number one core issue is not

13  relevance.  Although there is a relevance problem, that is not

14  the basis in which the document should not come in.  It should

15  not come in because indeed it did relate to privileged matters

16  that were analyzed in connection with the <u>Sealed Air</u>

17  transaction.  Any transaction that's analyzed for purposes of

18  whether it creates an insolvency problem has to be informed by

19  estimates of liability.  Those estimates of liability, while

20  they are done for business purposes, are themselves still

21  confidential.  That issue has been litigated again and again

22  and again and again.  Otherwise, you'd have counsel's work

23  product displayed for the world just because that work product

24  was consulted in connection with establishing a reserve.

25          He then says well, that confidentiality or that

CC-BLG001866

1  privilege was breached when it was turned over in the <u>Sealed</u>
2  <u>Air</u> litigation.  It most certainly was not.  The <u>Sealed Air</u>
3  litigation was fraudulent conveyance litigation.  A protective
4  order was entered early on in that litigation to protect from
5  disclosure precisely these kinds of documents which would
6  otherwise be privileged.

7          He then says it was produced to the U.S. government
8  pursuant to subpoena.  Where I come from if you produce a
9  document in response to a subpoena, you are not waiving.  It is
10 something that is compelled by a process of the government.
11 All that goes to say that this remains a privileged
12 communication.

13         Then there is the stipulation.  And as much as Mr.
14 Finch may want to say that this is relevant and it's just so
15 important that we have it, et cetera, et cetera, it
16 specifically forecloses disclosure and discovery; "and
17 discovery of any oral or written communication between the
18 expert witness and counsel for the party unless it's relied
19 upon."  That's Romanette iii.  "Any oral or written
20 communication between an expert witness..." -- da, da, da, da
21 -- "or one or more attorneys for the party offering the
22 testimony of such witness."  That is attorney -- Wachtell
23 Lipton -- for the party offering testimony, that's W.R. Grace.
24 This is absolutely and completely foreclosed by the
25 stipulation.

CC-BLG001867

1          Now, I'd have to say, Your Honor, I say all of that,

2     this document does not make that much of a difference.  The

3     witness has already testified that he did estimates of

4     companies still in the tort system using tort system values

5     because that's what he was asked to assume.  All that this

6     document does is to establish the same fact.  However, I'm very

7     reluctant to waive our rights of privilege and to waive our

8     rights based upon the stipulation because the next thing that's

9     going to happen is that we'll have five more documents where

10    there's the insistence that it's highly relevant and highly

11    germane and these things don't matter.  You've got to stick by

12    the rules.  He elicited the testimony.  These documents add

13    nothing to the equation beyond what he's already testified to.

14    And we are now very late in the day and I'm now concerned about

15    finishing this witness today and it seems to me that we've just

16    got to get to the end of this process.

17          THE COURT:  With respect to finishing, we're going to

18    leave today at 5:15.  I have something that I must be at at six

19    o'clock and I have to be on my way out of this building at

20    5:15.  So we will be done today at 5:15.

21          Mr. Finch, I do not believe that this document has

22    been shown not to be anything other than privileged and

23    confidential.  I do not believe that producing the document

24    pursuant to a subpoena breaches the privilege of the entity

25    raising that privilege.  I don't know how it came into the

CC-BLG001868

1  possession of the ACC.  If it did so pursuant to the <u>Sealed Air</u>

2  litigation pursuant to a confidentiality stipulation or a

3  protective order issued by Judge Wolin in that litigation, then

4  it is not subject to being admitted in this proceeding for that

5  purpose.

6         So even though this witness has admitted that it is

7  his document, his testimony is clear as to how he has done

8  different types of analyses under different circumstances, it

9  would be cumulative and there is no need on this record to

10 create that type of an issue when his testimony is clear.

11        So I am sustaining the objection to the documents.

12        MR. FINCH:  Okay.  May I make one statement for the

13 record with respect to that?

14        THE COURT:  Yes.

15        MR. FINCH:  On September 22nd, 2006 Grace wrote me a

16 letter -- Barbara Harding -- in which she stated:  "After

17 comparing your chart of previously-produced documents" --

18 referring to the <u>Sealed Air</u> documents -- "with our chart of

19 potentially privileged documents, Grace has concluded that it

20 will no longer seek to assert privilege over the <u>Sealed Air</u>

21 documents in the chart you provided."  This document was on the

22 chart that he provided.

23        THE COURT:  Well, then --

24        MR. BERNICK:  If it was, then why didn't we go

25 through that to begin with and avoid this.

J&J COURT TRANSCRIBERS, INC.

CC-BLG001869

1            THE COURT:  I don't know.

2            MR. BERNICK:  And I told Mr. Finch specifically

3  before we started if it's already covered --

4            THE COURT:  You know, folks, I'm going to amend the

5  pretrial stipulation.  I want to know as to every exhibit

6  starting next week that you folks are offering in advance of

7  the day that the document is going to be offered for your case

8  in chief what the objections are going to be in writing along

9  with your witness narratives.  This is ridiculous.

10           MR. FINCH:  They have provided their objections, Your

11 Honor, and we provided ours.

12           THE COURT:  I have not seen these documents let alone

13 objections to these documents.  They are not included in the

14 binders.  They're handed up to the witness for the first time

15 in court.  I've not seen them.

16           MR. FINCH:  Your Honor, I'll pass the witness to Mr.

17 Mullady.

18           MR. BERNICK:  Can we have an estimate from Mr.

19 Mullady on how long his examination is going to take?

20           THE COURT:  I am back to this document, 175.  Has the

21 debtor waived the privilege?  If so --

22           MR. BERNICK:  We'll let Your Honor know tomorrow

23 morning.  I specifically asked Mr. Finch to go through this and

24 he decided rather to show the documents to the Court.  I will

25 let the Court know tomorrow morning.

CC-BLG001870

1          THE COURT:  All right.

2          MR. BERNICK:  And could we have an estimate from Mr.

3   Mullady on how long he'll be?  We're now two and a half hours

4   into their examination.  Their estimate was two and a half

5   hours.

6          MR. MULLADY:  Your Honor, I believe we're still well

7   within our two and a half hours given the extended colloquy.

8          THE COURT:  I don't know where we are.  Could we just

9   go, Mr. Mullady?  Thank you.

10          MR. MULLADY:  I will try to complete -- I will try to

11   do this in 25 minutes.  That which I had planned to do in 45, I

12   will try to do in 25.

13   CROSS EXAMINATION

14   BY MR. MULLADY:

15   Q    Good afternoon, Dr. Florence.

16   A    Good afternoon.

17   Q    Are we having any fun yet?

18   A    If I could grab five minutes, I'd have a lot more fun.

19          THE COURT:  All right, sir.  You have a five-minute

20   recess.  Thank you.

21                         (Recess)

22   Q    Good afternoon, Dr. Florence.

23   A    Good afternoon.

24   Q    Since I represent the FCR, I'd like to focus my questions

25   on future claims.

CC-BLG001871

Florence - Cross/Mullady                                    229

1  A.    Sure.

2  Q    I have on the screen here ACC-FCR Exhibit 462, your

3  supplemental report where I placed two tables side by side and

4  would ask you if you would confirm that your median forecast

5  for the estimated present value of future claims is $387

6  million in Table 5.5, correct?

7  A    The future claims it would meet the evidentiary criteria,

8  the present value, that's correct.

9  Q    Your estimate as shown in Table 6-3 of the estimated

10 present value of pending and future claims that met or will be

11 able to meet the evidentiary criteria is $468 million, correct?

12 A    That's correct.

13         THE COURT:  I'm sorry, I apologize.  What's Table 3?

14         MR. MULLADY:  Table 6-3 --

15         THE COURT:  Yes.

16         MR. MULLADY:  -- in ACC-FCR-462 is showing the

17 estimated present value of pending and future claims that met

18 the criteria in millions, 468.

19         THE COURT:  Okay.  Thank you.

20 Q    Now, would you agree with me, Dr. Florence, that 387 is

21 approximately 82.7 percent of 468?

22 A    True.  I assume you've done the math.

23 Q    I've done the math.

24 A    Yes.

25 Q    You'll accept my math.  So for purposes of -- you would

J&J COURT TRANSCRIBERS, INC.

CC-BLG001872

1  agree with me then that the percentage of the total estimate

2  that you've calculated for Grace of future claims is about 83

3  percent?

4  A    Right.   In terms of these medians, the median estimates

5  according to your calculations are 83 percent for futures,

6  right.

7           MR. MULLADY:   Okay.   Could we have ACC-FCR-3023,

8  please?

9  Q    We've had a lot of discussion about your assumptions.   I

10 don't want to go back through all those again.   But as I read

11 your report, I see certain assumptions that you made in

12 estimating future claims and I want to go through these one at

13 a time and see if you agree with them.

14           As I understand your analysis, you've assumed that

15 Grace's exposure and medical criteria are valid, correct?

16 A    I made no assumptions about the validity of any of the

17 criteria that were provided to me.

18 Q    Fair enough.   You didn't test these assumptions to

19 determine whether they were valid or not, is that correct?

20 A    The assumptions basically were that claims that didn't

21 meet these criteria wouldn't meet their burden of proof in the

22 court, and I'm not quite sure how I would test that.   And I

23 guess I -- other than asking the Court, there's no test for

24 those assumptions it seems to me.

25 Q    All right.   Well, would you agree with me then if we

CC-BLG001873

1 placed next to number one here that you did not test these

2 assumptions?

3          MR. BERNICK:  Actually, let's put his full testimony

4 which is no, that he didn't make that assumption.  Further, he

5 didn't believe that it was testable.  That's what he said.

6 Q    Did you hear my question, sir?

7          MR. BERNICK:  Object to the form of the question.

8 This is a pre-prepared slide.  If the witness doesn't testify

9 in accordance with the pre-prepared slide, we don't just go

10 back to the pre-prepared slide, we ought to have his testimony.

11          THE COURT:  Yes.  I think the form of the question

12 does not fairly track what the witness testified to, Mr.

13 Mullady.  Sustained.

14 Q    Dr. Florence, did you test the validity to suitability for

15 estimation purposes, if you will, of Grace's exposure and

16 medical criteria?

17          MR. BERNICK:  Object.  That was two different

18 questions; test versus the suitability.

19          THE COURT:  That's true.  Sustained.

20 Q    I'll rephrase the question.

21          Dr. Florence, did you attempt to validate in any way

22 whether Grace's exposure and medical criteria were appropriate

23 for the purposes of doing your estimation?

24 A    The criteria I was provided with were very clear so that

25 you should assume that these criteria will be necessary for

CC-BLG001874

1  claimants to satisfy their burden of proof and the Court.  And

2  so I don't know how I test that.  I mean there's no validity

3  test for that, it's an assumption.

4  Q    All right.  You would agree with me that you did nothing

5  to test that assumption, can we agree on that?

6  A    I could not test the assumption.  I'll agree with you on

7  that.

8  Q    That is fair.  Your second assumption, as I read your

9  report, is that future claimants will meet the criteria in the

10 same proportion as current claimants meet the criteria.  That's

11 part of your analysis, correct?

12 A    Yes.  Based on our comparison of the -- both the closed

13 claims and the open claims and the similarity in meeting the

14 criteria between those two, we assume that the proportion of

15 claims that would meet the criteria would be the same going

16 forward as it was today.

17 Q    Now, that is not something that you can test either,

18 correct?  That's just an assumption and it's not a testable

19 assumption, fair?

20 A    The future is the only verification for that, I guess.

21 Q    Okay.  So would you agree with me if we put on this chart

22 next to two that this is not a testable hypothesis?

23         MR. BERNICK:  Well, he actually said yes and then he

24 said it wasn't testable.

25         THE COURT:  Well, I think the first one also has to

CC-BLG001875

1    say not testable, Mr. Mullady, to be fair to what the witness

2    said.  He said he could not test, not that he did not test.

3              MR. MULLADY:  Okay.  The same thing, Your Honor.

4              Can we switch to the ELMO, please?

5    Q    I think where we are, Dr. Florence, is that we're in

6    agreement that assumptions one and two are not testable, is

7    that correct?

8    A    Correct.  That's not testable.

9    Q    I read assumption three from your materials -- well,

10   strike that.

11             You also assume in estimating future claims liability

12   of Grace that average settlement values for the six

13   mesothelioma claims -- from the closed claims set -- are

14   predictive of all future mesothelioma claim values.

15   A    Yes.  We used the average value for those six cases that

16   met the criteria, at least in the report and in my testimony

17   today, for purposes of valuing the future meso claims with the

18   exception that we also have in them an inflation factor that

19   would affect the value of the claims going forward in the

20   future.

21   Q    And the fourth assumption on my chart here, the Court can

22   use Grace's criteria other than tort system criteria.  That's

23   also something you're assuming for purposes of your analysis,

24   correct?

25   A    No.  I'm not presumptuously telling the Court that they

CC-BLG001876

1  can do anything.  All I'm saying is that I accepted these --

2  these criteria were given to me as assumptions and I was asked

3  to estimate how many claims will meet these criteria in the

4  present and in the future and what would the value of those

5  claims be.  And that's what I tried to do.  So --

6  Q    That's fair.  Let me go back to number three for a moment.

7  Have you done anything to test whether the average settlement

8  values for the six mesothelioma claims that you identified are,

9  in fact, or will be predictive of all future meso claim values?

10  A    Yeah.  Yes, I have.

11  Q    What did you do?

12  A    Well, I think is I tried to testify when we were going

13  through this, when we came to the issue of valuation of claims

14  that met the criteria going forward, we used the categorization

15  of the claims that were based on Exponent's review of the

16  closed claim sample and the claims fell into four categories.

17  Claims that were tested regardless of whether they passed or

18  failed the criteria -- and the average for that group of claims

19  was about $96,000.  Then there were a group of claims that

20  provided no information in order to be judged whether they met

21  the criteria -- I'm sorry, let me go to that section.

22  Q    Doctor, for the sake of expediency, if you're just

23  repeating what you said on direct, I don't really need that to

24  be repeated.

25  A    Well, I just want to make sure I was clear.

CC-BLG001877

1 Q    I think you were.

2 A    Because you've asked me about these six and we did test

3 these six and the test was to test whether these six, the value

4 for these six, were statistically different from the overall

5 value of the case, which was $96,000.  And I want to emphasize

6 this because there's been a lot of discussion over the last

7 hour about just this kind of thing.

8        What the statistical test said is that you could

9 expect this kind of difference, not due to the criteria, but

10 due to the fact that you're using six cases.  And so, you know,

11 from a pure statistical standpoint, a statistician would look

12 at this answer and say the appropriate value to apply to cases

13 that meet the criteria is $96,000.  Okay.  So what I did is I

14 looked at the categories by which the criteria were met.  They

15 seem to be going in the -- trending in the right direction

16 logically, and when I looked at the six cases there were no

17 outlier cases in that group of cases.  They were representative

18 of the other cases.

19 Q    I understand.

20 A    So we chose to use the 155.  But the 155 is not something

21 that should be carved in stone in the sense of this is the

22 answer and the only answer.  Probably the most appropriate

23 answer is what the average value of these cases was; the

24 average value of the 258.

25 Q    Yes.  And you found, as we see in GG-2232 on the ELMO,

J&J COURT TRANSCRIBERS, INC.

CC-BLG001878

1  that there was no statistically significant difference and that

2  the strength of exposure was not a driver of values, correct?

3  And that's what you said on direct.

4  A    That's correct.

5  Q    But, Dr. Florence, you wouldn't expect to see a

6  statistically significant relationship between historical

7  settlements where the exposure criteria were met as opposed to

8  not met because Grace didn't require claimants to satisfy the

9  A and C exposure to be paid before bankruptcy, did they?

10 A    These are only claims that meet A and C.

11 Q    I understand that.

12 A    So I'm only looking at those claims.

13 Q    But those claims, sir, you would agree, were not settled

14 on those criteria, were they?

15 A    I don't know what criteria were used to settle the claims.

16 Q    Well, you don't have any information -- I didn't hear you

17 testify on direct that you knew that Grace paid those

18 settlements and paid those settlement amounts because the

19 plaintiff had adduced evidence that he was a mixer and

20 installer of Grace products.  I didn't hear you say that.

21 A    That's right.  I said I don't know anything about what

22 criteria they used in settling their claims.

23 Q    What was Grace's -- when you applied your criteria, as I

24 understand it, only 6 percent -- about 6 percent of

25 mesothelioma claims using Method 1 qualify for payment

CC-BLG001879

1  according to your analysis, is that correct?

2  A    Well, I think that's about right.

3  Q    And you're aware, sir, that prior to bankruptcy Grace was

4  historically closing with payments some 60 to 70 percent of its

5  mesothelioma claims.  Are you aware of that?

6         MR. BERNICK:  Objection.  Relevance.  He's testified

7  repeatedly that he didn't do a reconciliation of pre-imposed

8  bankruptcy practices.  So now we've got a question of the

9  witness that I can't only imagine is designed to adduce through

10 this witness what they're going to talk about through their own

11 witnesses if it's a true fact.

12        THE COURT:  Well, regardless of what they're going to

13 do, this question is only very simple.  Is he aware of a

14 particular fact?  He's testified that he's worked for Grace for

15 over ten years.  He may or may not be aware of the fact.  It's

16 a simple yes or no.  Overruled.

17 A    I'm sorry.  Could I hear the question again?

18 Q    Sure.  Dr. Florence, are you aware of what percentage of

19 cases -- claims -- Grace was closing with payment -- meso

20 claims -- prior to filing for bankruptcy in April of 2001?

21 A    Not off the top of my head, no.

22 Q    You know it's more than 50 percent of the claims, don't

23 you, sir?

24 A    Not off the top of my head.

25 Q    From your prior work?

CC-BLG001880

1  A     Not off the top of my head.

2  Q     All right.

3  A     I don't carry -- I can't carry that around with me, I'm

4  sorry.

5  Q     Let me ask you to assume hypothetically that Grace was

6  closing with payment 60 to 70 percent of mesothelioma claims

7  before petition for bankruptcy.  With that hypothetical in

8  place, do you think that if plaintiffs' attorneys had known

9  that Grace was only settling 6 percent of mesothelioma claims

10  at that time and they had clients with A/C type exposure, are

11  you telling this Court that those plaintiffs' attorneys would

12  have accepted an average settlement of $155,000?

13         MR. BERNICK:  Objection.  This is, a), it's totally

14  argumentative.  B) --

15         THE COURT:  Sustained.

16  Q  You would agree, Doctor, that this $155,000 represents no

17  more and no less than the amount of money that the plaintiffs'

18  attorneys in these six cases accepted for their settlements on

19  average with Grace, correct?

20         MR. BERNICK:  Objection.  a), it's argumentative.

21  B), there's no foundation for it.

22         THE COURT:  I'm sorry, Mr. Mullady, I didn't get the

23  beginning of the question.

24  Q     All you know, Dr. Florence, is that these cases -- these

25  mesothelioma cases were settled for $155,000 on average, these

CC-BLG001881

1  six.  That's all you know.

2  A    And I know they meet the criteria that were given to me

3  and that's why I'm looking at the six.

4  Q    Okay.  Let me go back to your total estimate for a moment

5  and just ask you about 2340.  It's the pendings and futures NPV

6  slide where you show your forecast and then you say it's an

7  NPV.  My question, sir, is NPV as of what date?

8  A    I'm sorry, I need to go to my report.

9        I think it's the 2001 date, but hold on.

10                    (Pause)

11        Yeah, that's in 2001 dollars.

12  Q    April 2, 2001, was that the date you were using -- or it's

13  just 2001 dollars?

14  A    Just 2001 dollars.

15  Q    Thank you.  Now, Dr. Florence, am I correct in

16  understanding that your estimate of the number of future

17  claims, the number of future claims, depends on the base number

18  of present claims?

19  A    Correct.  To some degree it's a function of the number of

20  claims that meet the criteria today or -- right.

21  Q    Correct.

22  A    Present -- I'm sorry, present -- it depends on the number

23  of historically pending and resolved claims as of the

24  bankruptcy date.

25  Q    Would you agree that increasing or decreasing the number

CC-BLG001882

1  of valid pending claims, i.e., claims that meet the criteria,

2  by a certain percentage will affect the number of valid, i.e.,

3  claims meeting the criteria, future claims by roughly the same

4  percentage?

5  A    I hate to be stupid about this, but there's a lot of

6  moving parts here and so I'm not sure it's a pure linear

7  relationship.

8  Q    Let's take a look at something on your report that sheds

9  some light on this.  This is ACC-FCR-3022.  Okay.  This is a

10 demonstrative we've prepared that shows side-by-side Tables

11 4-5 and Table 5-3 from your supplemental report, ACC-FCR-462.

12 Table 4-5 shows your calculated number of pending claims that

13 met the exposure criteria using your two methods, correct?

14 A    Correct.

15 Q    One method is based on claims providing exposure data and

16 the other method is based on claims providing exposure data and

17 assuming the same proportion for those not providing exposure

18 data, correct?

19 A    Correct.

20 Q    Now, Table 5-3 shows your estimated number of future

21 claims that will be able to meet the criteria under those same

22 two methods, right?

23 A    That's correct.

24 Q    Now, looking at mesothelioma only, the 156 pending claims

25 that met the criteria yields 196 -- excuse me -- pending claims

CC-BLG001883

1 yields 196 future claims that will meet the criteria under your

2 first method, is that correct?

3 A    No, that's --

4        MR. BERNICK:  Objection to the form of the question.

5        Go ahead.

6 A    -- 1,196 futures.

7 Q    I misspoke.  I meant 1196.

8 A    Right.

9 Q    Okay.  And under your second method -- and that's about a

10 seven to one ratio?  I did the math.

11        MR. BERNICK:  Your Honor, I don't know how or who

12 prepared this document, but he had the witness assume that it's

13 an apples and apples comparison and the type and the title of

14 the tables shows that it's not an apples and apples comparison.

15 I don't know if counsel noticed this.  The first one deals with

16 just exposure.  The second one deals both with medical and

17 exposure.  So it's not an apples and apples comparison.

18        MR. MULLADY:  Well, that may be the case and, Your

19 Honor, to expedite this where I'm going is that the

20 percentages, there's about a seven to one ratio in both the

21 present and the future for mesothelioma claims and it seemed

22 like a very odd coincidence to us unless there is a straight

23 mathematical relationship here.  And that's all I'm trying to

24 establish.

25        MR. BERNICK:  Well, but the predicate for the

J&J COURT TRANSCRIBERS, INC.

CC-BLG001884

1  question is wrong and there's probably a reason why.  It

2  doesn't make a difference for mesothelioma but will with

3  respect to the balance.  But the predicate for the question,

4  you're showing the witness and saying it's the same and it's

5  not.  One is exposure and the other is medical and exposure.

6  Q    Dr. Florence, is there any medical criteria for

7  mesothelioma in your analysis?

8           MR. BERNICK:  It's true with respect -- go ahead.

9  A    Not with respect to meso.

10  Q    Okay.

11  A    Other than -- but for the other --

12           MR. BERNICK:  For the others --

13  A    -- table -- the other --

14  Q    Okay.  Well, let's just keep this on mesothelioma then.  I

15  know my predicate question was broader than that.  But for

16  purposes of mesothelioma will you agree that there is -- that

17  the mathematics follow through such that by increasing or

18  decreasing the number of valid pending meso claims by a certain

19  percentage, that will affect the number of valid future meso

20  claims by roughly the same percentage.

21  A    No.  I mean unless I -- unless I just accept your

22  calculation.

23  Q    What would you need to do to verify the proposition that

24  I've stated?

25  A    What you're saying is the ratio of 156 to 1196 is the same

CC-BLG001885

1  as the ratio of 463 to --

2  Q    3499.

3  A    -- 3439 -- 3499?

4  Q    Yes.

5  A    And so if that ratio was the same -- you're asking me if

6  that ratio is the same?

7  Q    If that ratio is the same, does that mean that if we

8  increase the number of present meso claims that meet the

9  criteria by any percentage, that that same percentage change is

10 going to be seen in future mesothelioma claims in terms of

11 those that are valid?

12 A    Okay.  I mean to expedite things there would be an

13 increase.  I don't know that it's a linear increase.  I won't

14 argue with you about there being an increase.

15 Q    Very well.  You said a few minutes ago in response to one

16 of my other questions that -- you mentioned burden of proof and

17 I think that comes from your report where you said on Page 6 at

18 the bottom of Section 4 of your report -- I'll try to pull it

19 up for you but I'm going to go ahead just because we're pressed

20 for time -- "Grace asked ARPC to assume that only the claimants

21 whose claims met specific criteria will be able to sustain

22 their burden of proof that the claims against Grace are valid

23 and therefore compensable."  Is that what you wrote?

24 A    I did.

25 Q    Okay.  And I asked you at deposition, burden of proof,

CC-BLG001886

1  where?  Do you remember what you said?

2  A    I said I assumed the Court.  I mean this is Grace's

3  language.  I mean I tried to be as accurate as possible as to

4  what they asked me to do.  So.

5  Q    And that is exactly what you said in deposition, you

6  assumed burden of proof in the Court.  And then I asked you --

7  well, I'll ask you again, what is your understanding of -- let

8  me skip to this question.  You are not opining, as I read your

9  report, that had Grace remained in the tort system only those

10  claimants who met the criteria would be able to sustain their

11  burden of proof in court against Grace, correct?

12  A    Correct.  I said nothing about Grace remaining in the tort

13  system.

14  Q    And there are no trust criteria in place in the W.R. Grace

15  Chapter 11 bankruptcy yet, correct?

16  A    I don't know whether there are or not.

17  Q    I'll represent to you that there are not.

18  A    Okay.

19  Q    With that representation, you couldn't have been saying in

20  your report -- and I don't hear you saying now -- that only the

21  claimants whose claims meet Grace's criteria will have a

22  compensable claim against the future trust here, correct?

23         MR. BERNICK:  Objection.  It calls for a legal

24  conclusion.

25         THE COURT:  I think it does call for a legal

CC-BLG001887

1 conclusion.

2          MR. MULLADY:  I just want to know if this is an

3 opinion the witness is offering.

4 Q    You're not offering that opinion as I hear your testimony.

5 A    I certainly don't want to offer a legal opinion, no.

6 Q    Thank you.  I want to ask you about the calibration

7 periods that you used to estimate the number of claims, number

8 of future claims.

9          MR. MULLADY:  Can we have ACC-FCR-462 again, Table

10 5-3?

11 Q    This is the same table I think we were looking at a few

12 minutes ago.  It shows the estimated number of future claims

13 that will be able to meet the evidentiary criteria.  It

14 represents your median forecast of the number of future claims

15 which you based on 32 individual forecasts, right?

16 A    Correct.

17 Q    And those 32 forecasts were the product of two methods for

18 calculating the number of claims that would meet the criteria

19 as we discussed, correct?  Right?

20 A    Correct.

21 Q    Two alternative meso and lung cancer forecast methods,

22 Nicholson and Peto.

23 A    Correct.

24 Q    Four calibration periods which --

25 A    Correct.

CC-BLG001888

1  Q    -- you talked about on direct.  And two methods for

2  estimating the other cancers and non-malignancies and those

3  methods were ratio and regression, correct?

4  A    Correct.

5  Q    All right.  Now, the calibration period, that is selected

6  to be the historical period that is expected to be most

7  reflective of future events, correct?

8  A    Correct.

9  Q    The four calibration periods you used were 1996 to 2000,

10 '98 to '00, '98 -- excuse me -- 1996 to 2000, 1998 to 2000,

11 1999 to 2000 and there was one other and I have a typo.  Do you

12 remember what it was?

13 A    I think it's six through -- it's right above it.  '96 to

14 2000; '97, '98, to 2000; '99 to 2000.  There's four periods.

15 Q    All right.  Thank you.  And you showed us an exhibit --

16      MR. BERNICK:  Your Honor, at this point it is way

17 late and this witness is going to be having to come back and

18 it's not his fault, it's the fault of a very, very poor

19 estimate about cross examination time and I'm going to get

20 squeezed on my redirect as a result of it.  This is really --

21 we have relied on these estimates from the get-go and every

22 single time -- because there are two examiners -- every single

23 time they grossly exceed their estimate.  Every time.  There

24 hasn't been one done on time.

25      MR. MULLADY:  Your Honor, I'm going as quickly as I

CC-BLG001889

1  can.

2           THE COURT:  How much longer do you have, Mr. Mullady?

3           MR. MULLADY:  Can I have five more minutes to finish

4  up with this witness?

5           THE COURT:  Yes.

6           MR. MULLADY:  Can I have ACC-FCR-3024, please?

7  Q    And you said, by the way, on direct, Dr. Florence, that

8  you want to use the most recent history and that's the best

9  indicator for future trends, correct?

10 A    Correct.

11 Q    All right.  Now, I'm showing you this exhibit.  This is a

12 file from ARPC's reliance materials for your report.

13          MR. MULLADY:  For the record, Your Honor, this is

14 from the hard drive of the reliance materials accompanying the

15 September report from a directory named Discovery for

16 Supplemental Report\Forecast and the file name is

17 Forecast_Scenarios_Combined.XLS.  I believe, Dr. Florence, it's

18 essentially the same type of data you presented in a slide this

19 morning showing that when you use your different methods your

20 calibration periods yield a future claims prediction.  Your

21 slide showed it reduced to net present value.  This one is just

22 straight from your reliance material and just shows the number

23 -- the nominal number, okay?

24          Would you agree with me that these figures here as we

25 go from the 1996 to 2000 calibration period up to the 1999 to

CC-BLG001890

1  2000 calibration period they increase in each and every -- with

2  each and every different calibration period that's applied and

3  they do so for both the Peto and Nicholson forecast?

4  A    Yes, they seem to.

5  Q    And in each of these methods we see here that the future

6  claims increase as you move to more recent years in the

7  calibration period, right?

8  A    Yes.

9  Q    So these data show that the propensity to sue Grace was

10  increasing over this five-year period, 1996 to 2000, right?

11  A    No.  It has nothing to do with the propensity to sue I

12  don't think.

13  Q    It doesn't?

14  A    No.

15  Q    Well, doesn't it show that more claims are being filed as

16  we get closer to 2000?

17  A    What this shows is I'm estimating claims that meet the

18  criteria.  And what this says is if I use the current claims

19  that meet the criteria and I use those as a base, and I make

20  forecasts based on three -- I'm sorry -- four calibration

21  periods, '96, '97, '98 and '99, and I get different forecasts

22  for the number of people that will bring a claim -- prosecute a

23  claim -- and meet those criteria.  I'm not sure that I've said

24  anything about propensity to sue or anything like that.  That

25  really doesn't come into my calculations.

CC-BLG001891

1  Q    You're trying to find the best indicator of future trends,

2  that's how you're selecting your calibration period, correct?

3          MR. BERNICK:  Objection to the form of the question.

4  A    I'm trying to do two things when I sought the calibration

5  period.  I'm trying to select that period that gives me as much

6  data as I can get and I believe is reflective of -- most likely

7  to be reflective of the future.  What we routinely do in

8  selecting calibration periods is select them over a five-year

9  period unless there is something in that five-year period that

10 would cause us to, for example, in the fifth year, in this

11 instance 1996, unless there was something there that looked

12 like it was out of place with the trend.  When I look at the

13 actual claim filings that qualify historically to be used in

14 this -- as the calibration period, they are very stable over

15 this period.  The filings may not be stable, but the claims

16 that meet the criteria are very stable over that period.

17 Q    The filings may not be stable and you would agree, Doctor,

18 that none of these calibration periods include the year 2001,

19 correct?

20 A    There isn't a year 2001.  There were three months of

21 filings right before the bankruptcy.

22 Q    None of these calibration periods include the three months

23 in 2001 before the bankruptcy, do they?

24 A    Absolutely not.  We would never include it.

25 Q    And didn't Grace receive over 500 mesothelioma claims in

CC-BLG001892

1  the first quarter of 2001?

2  A    I don't know what Grace received in the first quarter.

3  Q    In Section 4.4.1 of your report in a discussion on a

4  different subject I see that you used a calibration period that

5  did include -- let's go to that, please.

6         MR. MULLADY:  And this is my last question, Your

7  Honor.

8  Q    4.4.1 of ACC-FCR-462.  This relates to the analysis you

9  made when calculating settlement averages to value pending meso

10 claims.  And I think you say here that -- this is in the

11 section, "Value of mesothelioma claims," you write -- "to value

12 the estimated pending mesothelioma claims ARPC analyzed Grace's

13 historical settlement data."  And then we drop down here.

14 "You're looking at a range from April 1999 to April 2001 was

15 selected as being the most recent and therefore the most

16 reflective of future events without over-weighting any single

17 time period."  Did I read that correctly?

18 A    Correct.

19 Q    So you considered April data in the first three months of

20 April 2001 when looking for values from mesothelioma claims for

21 purposes of your valuation part of your analysis, but you

22 didn't include the first three months of 2001 for your

23 calibration period for calculating the number of future claims,

24 is that correct?

25 A    That's correct because to not include 2001 for the

CC-BLG001893

1  calculation of the averages would throw us into a situation

2  where we have so few cases the averages weren't calculable.

3            MR. MULLADY:  I pass the witness.

4            MR. BERNICK:  The reason I'm searching for boxes is I

5  can't quite see because my glasses are not prescription.  I

6  apologize, but if I could look at this quickly for a moment.

7                    REDIRECT EXAMINATION

8  BY MR. BERNICK:

9  Q    Dr. Florence --

10            MR. BERNICK:  T.J., could we show, please --

11  actually, I'll just do the whole thing on the ELMO.  So if you

12  do the ELMO we'll be all set.

13  Q    -- counsel just asked you --

14                    (Pause)

15  Q    -- counsel just asked you some questions about the

16  calibration period and I'm showing you 2336 and let me just ask

17  you, in the period of time was there anything special that was

18  done in determining what kinds of calibration periods to look

19  for with respect to the Grace case?  That is did you do some

20  kind of Grace-specific approach to selecting various

21  calibration periods?

22  A    No.  No, we did nothing unusual in Grace.  What we

23  normally do is we look at the period starting from the most

24  recent period, which in Grace's case was the end of 2000, and

25  look back.  What we try to do is get as much information as we

CC-BLG001894

1  can, as much data as we can into a calibration period because

2  it makes the forecast -- more comfort in the forecast.  We try

3  to get as much data as we can until -- if you go back so far

4  there's a point at which it looks like that year is somehow

5  unrepresentative of the years going forward.  In other words,

6  it's a different look in terms of filings, or in terms of

7  claims qualified in this instance.  And that's where we will

8  usually cut off our calibration periods.

9  Q    What if you're talking about a year that's the most recent

10 year?  What if it turned out that given the calibration period

11 1999 to 2000, it was just way high?  Does that mean it's

12 discarded?

13 A    No.

14 Q    What do you do if it's high more recently as opposed to

15 way back when?

16 A    We'll just make sure that in case that's an anomalous

17 year, we'll try to make the calibration period long enough so

18 that if it is anomalous it's being averaged out over a longer

19 period of time.

20 Q    Now, when you finally select that -- when you do the

21 calibrations, do you select one calibration period as being the

22 calibration period that's going to drive all of your

23 calculations?

24 A    No.  No, we're saying we think these four periods seem

25 reasonable calibration periods but one period is no better than

CC-BLG001895

1  another.

2  Q    And when you now have all the different calibration

3  periods and all the different model runs, do you take the

4  highest, the lowest, the median?  How do you then stack up all

5  these different runs that are done based upon different

6  calibration periods?

7  A    Well, it's hard to show 32 estimates in the report or on a

8  slide.  So what we normally do is pick the mid-point of those

9  estimates when we're presenting.

10 Q    Okay.

11 A    But the estimates themselves are available in our report.

12 Q    Mr. Finch asked you a bunch of questions essentially

13 focused on the question of whether the -- for purposes of doing

14 an estimate of future tort system costs, whether there was

15 empirical data for some of the assumptions here versus what he

16 was suggesting was the absence of empirical data for the

17 assumptions that were being made in this particular case.  Do

18 you recall those questions?

19 A    Generally, yes.

20 Q    Okay.  Well, when it comes to a settlement practice that's

21 used for estimating future tort system costs and you talk with

22 the client, I believe you told us that sometimes the client

23 will tell you, well, we have this kind of settlement package,

24 or that kind of settlement package.  Do you know whether that

25 settlement package actually is going to continue to be in place

CC-BLG001896

1  over any period of time?

2  A    Usually we'll try to find out if this is a standing

3  settlement agreement or if the moratorium, for example, I think

4  is another example I mentioned, is somehow time limited, we'll

5  try to determine that period of time.

6  Q    But there's no time -- if the client simply says this is

7  how we are settling cases and going to continue to settle

8  cases, is there any way to prove that up empirically?

9  A    Not that I know of.

10  Q    What about the fundamental fact that as you go forward in

11  time -- I think you've told us that on the basis of the

12  settlement practices and the historical claims, you developed a

13  ratio that's then used for your model.  Do you recall that?

14  A    A ratio or an exposed population --

15  Q    An exposed population.

16  A    -- depending on the method.

17  Q    The assumption that that's going to continue for the life

18  of the model, is there any way that that is provable

19  empirically?

20  A    Only time will tell.

21  Q    Are there situations in which the client actually in

22  asking you to focus on a cost of future tort system claims, the

23  clients actually ask you to make assumptions that you know are

24  counter-factual?

25  A    Well, we -- let me think.

CC-BLG001897

1  Q    From time to time.

2  A    Pardon me?

3  Q    From time to time does the client actually ask you to make

4  some assumptions that are not necessarily factual?

5  A    Well, not that we're able to determine.

6  Q    Okay.  Let's talk about the Armstrong case.  You were

7  shown ACC-FCR Exhibit 466 which is an estimate that was done

8  for the Armstrong case.  And do you remember being asked about

9  the Armstrong projection?

10  A    I do.

11  Q    And do you remember that in the Armstrong, Armstrong was a

12  member of the CCR, the Center for Claims Resolution, during the

13  period of its tort claim history?

14  A    Correct.

15  Q    Now, did a time come when CCR was disbanded?

16  A    That's correct.

17  Q    Roughly in about 2001?

18  A    I don't remember the exact date.

19  Q    Well, when it came to Armstrong, was there any way that

20  the CCR -- did they ask you to assume that the CCR historical

21  values should be used for the future, or how was that handled

22  in Armstrong, do you remember?

23  A    In the estimate of --

24  Q    Futures.

25  A    -- futures?  I think the only data that we had were the

CC-BLG001898

1  historic data from the CCR.  So.

2  Q    And in the historic data you knew -- well, you knew that

3  it couldn't be actually the same as the future so you had to

4  make some assumptions.

5  A    Right.

6  Q    In the Babcock and Wilcox case, wasn't it the case that

7  everybody assumed that historical values should be used for the

8  future?

9  A    I believe so, yes.

10 Q    Was the same thing true in Armstrong?  Was there anybody

11 in the Armstrong case who was proposing something other than

12 the traditional approach?

13 A    No, I don't believe so.

14 Q    What about Owens Corning?

15 A    I wasn't in the Owens Corning case.

16        MR. FINCH:  Objection.  Lack of foundation.

17 Q    You were asked questions about what the future will bring.

18        MR. BERNICK:  Do we have the futures little thing

19 that he had?  Could you find the futures chart?

20 Q    You were asked some questions about the use of pathology.

21 Do you recall that?

22 A    Yes.

23 Q    And that you said that you used the 8.6 percent passage

24 rate that was determined by the Dr. Henry study for those

25 people who said that they were relying on X-rays and submitted

CC-BLG001899

Florence - Redirect/Bernick                    257

1  existing ILO's.  Do you recall that?

2  A    That's correct.

3             MR. FINCH:  Objection.  Leading.

4             MR. BERNICK:  It's foundational.  I want to get to

5  the point --

6             THE COURT:  Overruled.

7             MR. BERNICK:  -- of what we're doing here.

8  Q    And then it was brought out by Mr. Finch that there were

9  people who didn't rely upon X-rays but relied upon pathology

10 and you said well, they were included in the category where we

11 also applied the 8.6.

12 A    Correct.

13 Q    Just to give the Court some sense of magnitude and

14 perspective.  What was the -- do you recall what the total

15 number of lung cancer claims was that occupied that category of

16 saying that they had other evidence?  Do you remember roughly

17 what it was?

18            MR. FINCH:  Objection.  Not in his report.

19 A    I just don't remember off the top of my head.

20 Q    Do you remember the total number of claims as to which

21 pathology was even supplied?

22 A    I think that was a fairly small number.

23 Q    Roughly about --

24            MR. FINCH:  Objection.  This wasn't in his report,

25 Your Honor.

J&J COURT TRANSCRIBERS, INC.

CC-BLG001900

1      MR. BERNICK:  They got backup data left, right and

2 center.  It was absolutely in the backup data.

3      THE COURT:  I'm going to overrule this just so we can

4 get through it.  I'm really not sure at this point what

5 difference it's going to make.  But go ahead.

6      MR. BERNICK:  It would make a difference, Your Honor,

7 because they suggested that pathology was a big deal, that

8 people had path slides.  But 8.6 percent was applied to that

9 whole category and if the category was as we believe it was

10 2000, then about 8.6 percent would be about 200 and that's the

11 number of pathology samples that were submitted.

12 Q    Do you recall whether about 200 people had lung cancer

13 and --

14      MR. FINCH:  Objection.

15      THE COURT:  Sustained.

16 Q    Do you have any recollection as to the numbers?

17 A    It was, as I said before, it was fairly low.  Probably

18 less than 200.

19      MR. FINCH:  Just to pick a number.

20 Q    Well, now you opened the door and you opened the door in

21 the area where all the information has been provided.  I'd like

22 to talk for a moment about the proof of claim form.  And with

23 respect to the proof of claims, you were shown 2315, do you

24 recall that?

25 A    I do.

CC-BLG001901

1  Q    Okay.  Now, you were asked questions, I believe, about the

2  category of proofs of claim where a POC was filed but it didn't

3  match, it didn't match to the data base and therefore it fell

4  into this top category.  Do you remember that?

5  A    I do.

6  Q    Now, counsel for the futures claimants representative

7  submitted some interrogatory answers that were answered by

8  Grace during -- in his cross examination notebook and it

9  reflected that approximately -- that the total number of POC's

10 that did not match was about 13,000.  Is that roughly

11 consistent with your recollection?

12 A    That's about right, yes.

13 Q    And it also goes onto say that there are really just a

14 handful of firms who populate this 14,000 discrepancy -- not a

15 discrepancy, but people who submitted proofs of claim and there

16 wasn't an entry in the data base and it turns out that Kelley

17 and Ferraro had 51 percent of the total.  They had 7,500 POC's,

18 51 percent; 3,700 post-dated.  Then 738, another one.  Five law

19 firms did 76.9.  Based upon the fact as recited there that

20 there were a very small number of firms that had these huge

21 volumes of POC's, is there any significance to you that there

22 are a number of claims, there was a POC but it did not, in

23 fact, match the data base?

24 A    No.  We did -- it was a six-month effort to match POC's to

25 pending claims and that's two people working with computers and

CC-BLG001902

1  by hand to match every last claim.

2  Q    I want to ask you a couple questions about slide 3023 and

3  then we'll go to the last questions that I have which relate to

4  our calculation of meso settlement value.   Mr. Mullady

5  suggested to you that in your analysis, the future claimants

6  will meet the criteria -- you assumed that they'll meet the

7  criteria in the same proportion as currents meet the criteria.

8  Do you see that?

9  A    I do.

10  Q    Is it any different if you're analyzing not according to

11  the Grace procedures but if you're analyzing in the tort system

12  context, that is, what will the future bring, would you have

13  any different approach from the approach that you've used here

14  with respect to whether the proportion that you have in the

15  present carries forward to the future?

16  A    Well, the principle -- I mean certainly the approach would

17  be different -- I mean I've got different data and different

18  criteria here.

19  Q    Different data.

20  A    But the principle is of most, virtually all of these

21  forecasts is that the past, and most likely the recent past,

22  is a predictor of what will happen in the future.   And without

23  some indication of a trend in the recent past or something that

24  would call a question into the forecast, you're basically

25  assuming that history will repeat itself.   So those ratios

CC-BLG001903

1  should be the same and there's no different for a tort system

2  forecast or for this forecast.

3  Q    Now, the third one Mr. Mullady asked about, was average

4  settlement values for six meso claims are predictive of all

5  future meso claims and that plus the now famous Halpain file,

6  bring me to my last line of questioning.

7          Mr. Mullady's characterization was that you've

8  assumed that the average settlement values for six meso claims

9  are predictive of all future meso claim values.  Going back to

10 your chart which is 2330, were you saying in this chart that

11 these three claims, these six claims, were actually predictive

12 of what the numbers would be in the future?  Actually

13 predictive.

14 A    No.  We were setting a value to those claims that were

15 qualified.

16 Q    Okay.  And if you actually -- I believe what you said was

17 that if you wanted to take the data that you had for this group

18 of claims as a whole, you could, but then you'd have actually a

19 lower number.

20         MR. FINCH:  Objection.  Leading.

21 Q    Well, just let me ask you whether we're on the same page

22 because I'm going to tee up the Halpain case.

23 A    Yes.

24 Q    Okay.  Now, is there --

25         MR. MULLADY:  Is that --

CC-BLG001904

Florence - Redirect/Bernick                                    262

1          THE COURT:  It is leading but he's testified to this,

2   Mr. Mullady, so it's also cumulative.  I think we're just

3   setting the stage for where we're going.  So I'm going to

4   accept it as cumulative.

5          MR. BERNICK:  Okay.

6   Q   Now, with respect to the Halpain case, in the Halpain case

7   -- if I can find this, clipped back over here.  We know from

8   the claim -- closed claims file you have your six meso claims

9   here that comprise the set.  You've got a series of claims that

10  vary in value and we know that in Halpain it is at least said

11  that Halpain settled for approximately $2 million.  If I can

12  find a pen.  We have Halpain now blows off the top at $2

13  million.  And I want you to assume, as reflected in the Halpain

14  file, that Halpain settlement documents were actually signed as

15  recently -- between March 5 of 2001, according to ACC-FCR-469,

16  page ending in 237, and they're actually signed by Grace as

17  recently as March 10 of 2001 which is less than three weeks

18  before Grace declared Chapter 11, that Grace facing a trial

19  decided to settle this case and go into Chapter 11 without

20  having a case that was either going to verdict immediately or

21  was actually pending.  But those --

22          MR. FINCH:  Objection.  Lack of foundation.

23          MR. BERNICK:  No, I'm going to ask him to assume that

24  is absolutely the case.  That indeed when these papers were

25  inked, Grace's board was meeting to consider the details of a

J&J COURT TRANSCRIBERS, INC.

CC-BLG001905

1 Chapter 11 case and under those circumstances they decided to

2 settle and they settled for $2 million.

3 Q    I want you to assume that.  I now want to go back to these

4 six cases which created your 155 and the analysis that you had

5 done saying we'll use the 155 even though the rest of the data

6 would take us to a lower average.  And I'm now going to give

7 you the opportunity that none of these counsel gave you and I

8 don't know what your answer is because we haven't talked about

9 this.  What, if any, impact would that Halpain settlement on

10 the eve of Grace's Chapter 11 at that value have on the

11 assessment that you reached about the appropriate number to use

12 for purposes of your estimate going forward?

13          MR. MULLADY:  Objection to the form of the question.

14 Incomplete hypothetical.  Lacks foundation.  Misleading.

15          THE COURT:  Well, okay.  I think it doesn't --

16          MR. MULLADY:  Argumentative.

17          THE COURT:  Well, it's not argumentative, it's a

18 hypothetical.  I don't know about the lack of foundation,

19 however.  This witness has been asked to assume that his

20 calculations would change if the $2 million were added to this

21 criteria which is what Mr. Finch was asking him to do but Mr.

22 Finch had made the calculation not this witness.  So, I think

23 it's -- I don't think there's a lack of foundation.  I think

24 the foundation is substantiated.  What was the rest?

25          MR. BERNICK:  Well, to be clear.  The foundation that

CC-BLG001906

1 I'm giving the witness in the hypothetical comes right from the

2 file that they just put into evidence.  The dates are there;

3 March 5, 2001, March 10.  The date of Grace's Chapter 11 is

4 April 5 of 2001 which is less than three weeks later.  And I'll

5 represent to the Court that Grace was actively planning the

6 bankruptcy, indeed had announced such publicly at the time.  So

7 my hypothetical doesn't lack foundation.  What I'm asking the

8 witness to do though, to be clear, is to say now that he has

9 this data point, what does he do with the data point?  What

10 does he do with it?  How does it figure into the analysis?

11          THE COURT:  The objection is overruled.  I believe

12 this is the same information that Mr. Finch was getting to with

13 the sole exception that Mr. Finch was preparing the

14 calculations rather than the witness.  Now the witness is being

15 asked what effect that would have, if any, on his calculations.

16          MR. BERNICK:  That's correct.

17          THE COURT:  You can answer, Doctor.

18 A    Well, one thing that -- one effect it would not have would

19 be the addition of a $2 million claim to six claims in the

20 calculation of a different average.

21 Q    And why is that?

22 A    As I said when we were trying to determine what was a

23 reasonable value to assign to these claims, and looking at

24 claims that had the information -- that didn't have the

25 information and that met the criteria, we were left with six

CC-BLG001907

1  claims.  What we saw in our tests is that -- well, it was

2  really an equivalence between 155 and 96, as strange as that

3  sounds for non-statisticians, it was the same number.  We

4  couldn't distinguish.  In other words, claims that met the

5  criteria could just as well have been worth $96,000 as 155.

6  If this result had been presented to me that the six was seven,

7  and one of those seven was a $2 million claim, to accept a

8  sample of seven with an extreme outlier like $2 million in it

9  and then to call that seven cases representative of the

10  historic settlements that meet this criteria, seems crazy.  I

11  mean it's clearly a statistical outlier.  It clearly -- it's

12  probably four or five standard deviations from the mean of

13  settlement values.  So on the statistical basis alone I

14  wouldn't use it.

15         Secondly, I've been doing kind of the modeling of

16  settlement values with a lot of defendants.  What are the

17  factors that drive settlement values?  And in all of those

18  models that we've -- statistical models that we've done,

19  criteria like this seldom show up as being the factors that

20  drive the settlement value.  So the exposure criteria, people

21  that meet stronger exposure criteria and people that meet

22  stronger medical criteria, not that they don't have an effect,

23  but they are not the main drivers of settlement value.  So I

24  would have been surprised also just from a personal basis to

25  see this value be as high as 55 or much higher than 55.  So

CC-BLG001908

1  there's no way that -- if I was forced to judge with a $2

2  million case in seven cases, I'd say then I would pick the

3  overall average as the best indicant of what the cases are

4  worth going forward.

5          MR. BERNICK:  Okay.  Thank you very much, Dr.

6  Florence.  I have nothing further at this time.

7          MR. FINCH:  Two minutes recross?

8          THE COURT:  Yes, sir.

9          MR. FINCH:  ELMO, please.

10                  RECROSS EXAMINATION

11 BY MR. FINCH:

12 Q    Dr. Florence, you would agree that the $9,000 mesothelioma

13 settlement in this population of six is an outlier, too, right?

14 A    No, it's not.  We looked to see if it was a statistical

15 outlier and the $9,900 settlement is not a statistical outlier.

16 Q    It's ten times lower than Grace's average mesothelioma

17 settlement.

18 A    But in the settlement values for -- in the meso settlement

19 values it is not an outlier.

20 Q    It's ten times smaller than Grace's average meso

21 settlement value, correct?  It's one-tenth the size of the

22 typical mesothelioma settlement value.

23 A    I don't know the typical mesothelioma settlement value.

24 Q    You testified -- I thought you testified on direct that of

25 the entire population of closed claims you looked at, the

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG001909

1  average settlement value was 96,000.

2  A    That's right.  That's right.

3  Q    And so 9,800 is about 10 percent of that, right?

4  A    And it is not -- it's not mediations from the mean

5  settlement value for Grace.

6  Q    But it's one-tenth --

7  A    It still falls well within the distribution of settlement

8  values for Grace.

9  Q    Isn't it true that for all settlement values it's a skewed

10 distribution?

11 A    Sure.

12 Q    There's a lot of --

13 A    There's a lot more at the top end than -- a longer tail on

14 the top end than the bottom.

15 Q    And there's a lot of big settlement averages but there's a

16 small number of them but it skews the distribution, right?

17 A    The distribution is skewed of settlement values, correct.

18 Q    Now, you were asked a question about the CCR -- about the

19 Armstrong testimony and the CCR.  The assumption whether it was

20 counter-factual to assume that the CCR would continue to exist.

21 Do you recall that question by Mr. Bernick?

22 A    I think.  Counter-factual to assume that the CCR would

23 exist?

24 Q    Yes.  That was -- in the Armstrong case the CCR stopped

25 existing at a particular time and you used Armstrong's

CC-BLG001910