1 recently as 1997, this -- the statement appear here that, "The

2 mechanisms by which asbestos causes fibrosis remain unclear.  A

3 number of studies in recent years probing the molecular and

4 cellular responses to asbestos by cells in vivo" -- that's in

5 the animals.  Right?

6 A    Right.

7 Q    " -- and in vitro" -- which means in those little lab

8 dishes.  Right?

9 A    Right.

10 Q    " -- featured generation of activated oxygen species on

11 the surface of the fibers..." and it goes on to talk about a

12 variety of different kinds of mechanisms that might be

13 involved, but there's nowhere in the paper that it says that

14 the fibrogenic reaction to asbestos -- the mechanism for that

15 is well-established.  Correct?

16 A    These are different levels.  What you're doing is you're

17 taking a scientific paper where it's very wise to be cautious

18 and to make sure that the reader knows that there's a lot more

19 to learn.  But I can tell you a lot about how the process is,

20 and there are many features that are well-established.  That's

21 all.

22 Q    Okay.  I'm not fighting that.  I'm just going to ask you

23 -- all my questions are going to ask you not what you would say

24 in a court of law but what you would say to your scientific

25 colleagues.  And my question to you just very openly now that

**J&J COURT TRANSCRIBERS, INC.**

1  you've testified exactly as I -- as you have is, isn't it true

2  that you have not and would not represent in a scientific

3  context -- in a scientific context that the mechanism by which

4  fibrogenesis takes place with respect to asbestos is

5  well-established?

6  A     That's a very good question, I give you that.  And what I

7  need to make clear is that it depends on the question that's

8  being asked.  If you're asking me do we know that fibroblast

9  makes scar tissue, and that macrophages make agents that cause

10  fibroblast to make scar tissue, I'd say that's

11  well-established, and I'll say that to anybody in any

12  scientific conference.  But when I write a scientific paper

13  like that, look at this paper you're talking about here.  This

14  is P-53 expression.  This is one of these tumor suppressor

15  proteins that we're learning about.  We don't know its role in

16  fibrogenesis, and that's not well-established, and that's why

17  that -- that's why you have to say that.  So I don't say

18  exactly the same things in papers that I say in the courtrooms

19  regarding what's known and what's not known as far as the

20  overall influence or the overall impact of what we know.  It --

21  there are separate questions that must be asked to get separate

22  answers.

23  Q     Is it true that you nowhere in your report in this case

24  make any kind of statement or any kind of indication to the

25  effect that the mechanisms which -- by which asbestos causes

CC-BLG002005

1  fibrosis remain unclear?  You can't find that language or

2  anything even remotely like it in your report, correct?

3  A    I'm sure you're right.

4  Q    Okay.  In fact, when you testify -- you testify in

5  literally hundreds of cases, correct?

6  A    Yes.

7  Q    And isn't it true that on direct examination in those

8  cases you never tell the Court and you never tell the jury that

9  the mechanisms by which asbestos leads to fibrosis remain

10 unclear.  You never make that statement, correct?

11 A    And it's because I'm not asked the questions at the level

12 where things are not yet well-established.  In other words,

13 what I'm telling you and what I've told this Court is

14 well-established.  We're at a level that's well-established,

15 but --

16 Q    Everything that you've told the Court -- everything that

17 you told the Court on direct examination, everything is

18 well-established, Dr. Brody?

19 A    Well, excuse me, at least in the fibrosis arena.  I

20 already told the Judge the things that I wish I could tell you

21 about the genes that are involved and the number of genes, and

22 there are many questions yet to be answered in this field.

23 Q    Oh, boy.  In fact, is it -- I'm just going to ask you the

24 same question again.  Is it your testimony that everything that

25 you've told the Court on direct examination, not just some

CC-BLG002006

1  things, everything that you told the Court on direct

2  examination is well-established?  Is that your testimony?

3         MR. BAILOR:  Objection.  Asked, answered, and

4  argumentative.

5         THE COURT:  It may be argumentative.  I'm not sure

6  it's been asked and answered.  It was asked, but I don't think

7  it was answered.  But, I think it's a question about which the

8  Court actually does need an answer, so I'm going to overrule

9  the objection.

10 Q    Is the question clear in your mind, Dr. Brody?

11 A    Yes.

12 Q    Are you representing to the Court that everything that you

13 told the Court on direct examination was well-established?

14 A    In the fibrogenesis sphere, I would say at the level we

15 were talking, yes.  In the carcinogenesis sphere, I would say

16 no, there are a number of questions yet to be asked --

17 answered.

18        THE COURT:  Wait, Mr. Bernick.  Pardon me just a

19 second.

20                     (Pause)

21        THE COURT:  I'm sorry, Mr. Bernick.  Go ahead.

22        MR. BERNICK:  Thank you very much, Your Honor.

23 Q    Let's talk a little bit about -- I get the benefit of

24 different answers.  I'm okay.  Let's talk about the mechanisms

25 for cancer.  I believe you told us that for cancer to develop

**J&J COURT TRANSCRIBERS, INC.**

1  as a result of asbestos, there must be some genetic impact, and

2  I use that "impact" word loosely.  That's probably not very

3  scientific but --

4  A    Genetic damage might be better.

5  Q    Damage.  That you also need to have as a result of that

6  genetic damage an error created.  Right?

7  A    That's right.

8  Q    And I believe you then were very careful and proper to

9  point out that the creation of an error is not enough, because

10  God bless our immune systems are such that they react to

11  genetically different cells by doing all kinds of things to

12  make them die?

13  A    Well, yes, and it's not just the immune system, but --

14  but, yes, all right.  We do a number of things to produce cells

15  that die.

16  Q    Okay.  So not only must the error be created, but the cell

17  must survive including surviving the defense systems.  Correct?

18  A    That's right.

19  Q    And not only must a cell survive, you were then very

20  careful to point out it must then also divide.  Right?

21  A    Correct.

22  Q    And when it divides, the error must continue.  Right?

23  A    It must be passed on, yes, that's right.

24  Q    And then you said that in order to generate cancer, I

25  believe your words were, there have to be a large number of

CC-BLG002008

1  errors.

2  A    Well, I don't know if I used large, but maybe.

3  Q    Well --

4  A    I mean, it could be --

5  Q    -- I don't want you to be -- do you remember giving a

6  deposition of this case on the 8th of October 2007, at Page 75

7  you were asked specifically at Line 18; "You have to have a

8  large number of these errors in the cells -- of errors in the

9  cells to cause it.  Correct?"  "Right."

10 A    Well, that's your words --

11         MR. BAILOR:  Yes.

12 A    -- large, not mine.

13         MR. BAILOR:  Could we have the complete answer,

14 please?

15         MR. BERNICK:  Well, sure, he can read -- you can read

16 as much --

17 Q    Dr. Brody, if you want to read the rest of the answer,

18 you're more than welcome to.  The point is that yes, the

19 questioner, which was not me, said "large", and you said,

20 "right."  Now, by right do you mean no it wasn't large, or

21 right, it was large?

22 A    What I mean is there's a better word than large.  That's

23 all, and you'd need a number that we don't know.  So that's why

24 I --

25 Q    That's not what you said at the time, correct, Dr. Brody?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002009

1  A    I didn't say large.  I was just being complacent.

2  Agreeable.  How about that?

3  Q    Agreeable and complacent?

4  A    Yes.

5       MR. BAILOR:  Your Honor, I object, and I'd like the

6  full answer read under the rule of completeness.  That's

7  mandated by the evidentiary rules.

8       MR. BERNICK:  I'll be happy to -- if counsel wants

9  it, I'll read it again.

10      "I think you used the phrase a significant error in

11 cells -- a significant error in the cells typically is not

12 enough to cause mesothelioma.  You have to have a large number

13 of errors in the cells to cause it.  Correct?"

14      And the answer is; "Right."  And then you go on to

15 say --

16 "A    That is why your question in a -- of a single day of

17 Trimolite in a series of exposures to chrysitolite makes that

18 Trimolite exposure more significant than if it's all the person

19 had.  That's why I say -- that's why I say that is the --

20 right, that's why I say if that's all the person had, that

21 wouldn't be sufficient to produce enough errors.  But, in the

22 scheme of things, like I say, that exposure to Trimolite is as

23 significant as any other day to any other fiber."  Is that your

24 complete answer?

25 A    Yeah, and I'm -- I don't really care to quibble about the

**J&J COURT TRANSCRIBERS, INC.**

Brody - Cross/Bernick                                    98

1  word large.  It's just that it's a -- it's just a bit

2  imprecise.  I mean we don't know how many there are.  So that's

3  fine.

4  Q    Okay.  And then not only must there be a large number of

5  errors, but something that you didn't quite mention.  The

6  errors have to be the right kind of errors.  Correct?

7  A    Well, I said for that person.  Sure.  I said that.

8  Q    Well, they have to be the right kind of errors to lead to

9  uncontrolled growth.  Right?

10 A    Right.  So the right kind would be errors in genes that

11 control cell growth sufficient for that person.  I believe

12 that's what I told the Court.

13 Q    Okay.  And you don't have any idea at this point exactly

14 what those errors are.  Correct?

15 A    No.  No.  I mean we can name some that we know that we can

16 expect to be damaged in a mesothelioma, but the sequence or the

17 combination I can't tell you.  Nobody can tell you.

18 Q    Well, you don't actually know of any particular error --

19 genetic error that is, in fact, the cause of mesothelioma.  Do

20 you?

21 A    That's right.  That is correct.

22 Q    And you also don't know how large the number of errors

23 must be.  Correct?

24 A    Right.  I mean, they're different for different people.

25 In other words, I can give you a list of genes that we expect

J&J COURT TRANSCRIBERS, INC.

CC-BLG002011

1 to be damaged in mesothelial cells, but the precise number and

2 the combination is different for different people.

3 Q    Well, no, let's be clear.  You can't tell me a single

4 genetic error that is a necessary condition for the induction

5 or for the creation of mesothelioma.  Can you?

6 A    That I'm 100 percent sure?  No.

7 Q    Okay.  In fact, you've never even published an idea of

8 what that genetic defect would be that is empirically based.

9 Correct?

10 A    I haven't.  A number of others have.

11 Q    Now, the error must be passed on.  We're not sure what

12 error it is, so it's kind of hard to say which one must be

13 passed on.  Divide; there has to be division.  Clearly, there

14 has to be division, otherwise, it doesn't continue on.  Right?

15 A    Right.

16 Q    So that's pretty easy to say, and that's pretty easy to

17 say.  The cell must survive.  How the cell survives; that is,

18 when the cell survives and does not survive, science doesn't

19 know the answer to that either.  Correct?

20 A    There are a set of genes that we know will make it more

21 likely that the cell survives, but it's the same issue.  That's

22 part of the number of questions that we have.

23 Q    And, of course, we don't know which error is created, and

24 the actual way -- exactly how the fiber causes genetic damage

25 you don't know.  Correct?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002012

Brody - Cross/Bernick                    100

1  A    Well, there are two ways that are now accepted, but, you

2  know, that's part of -- it's a theory.  It's a theory that's

3  undergoing extensive experimental observation.

4  Q    But it's not proven, correct?  We don't know exactly how

5  asbestos fiber caused genetic damage, correct?

6  A    We know that asbestos binds DNA, and we know that it

7  generates oxygen radicals.  Those are two -- well, I mean, you

8  know, you can't pooh pooh that, because we know that those are

9  very important -- we know that those are very important

10 mechanisms for producing cancers.  Now, can you watch that

11 happen in a given individual?  No, you don't get to do that.

12 So I just want us to be sure we're clear on what scientists

13 believe is happening through their experimental observation and

14 what we're absolutely able to prove in a given individual.

15 Q    You can see binding.  Right?

16 A    Yes.

17 Q    And you know from the chemistry that there's a production

18 of oxygen radicals.  Right?

19 A    And we know that oxygen radicals damage DNA.  Sure.

20 Q    But, in the case of asbestos you don't know which, if

21 either one, of those possible theories actually is true.

22 Correct?

23 A    In a given individual, that's right.

24 Q    Well, in any individual.  Correct?

25 A    Well, you can't -- you know, here's the point.  If you --

J&J COURT TRANSCRIBERS, INC.

CC-BLG002013

1  Q    I'm sorry.

2          MR. BAILOR:  Let -- could he let the witness complete

3  the answer?

4          MR. BERNICK:  I'd like to have --

5          THE COURT:  Pardon me.

6          MR. BERNICK:  I tried once, and I'm asking again.  I

7  mean actually, I've tried twice.  I'm asking for a third time

8  whether he can tell me that either one of these has actually

9  been proven, and then he gave me the answer, well, in any

10  individual, and I said, well, no, in anybody.  And I think that

11  I'm entitled to an answer to that question.

12          THE COURT:  Doctor, if you could, if it's possible to

13  answer yes or no, and if it's not possible to say I can't

14  answer yes or no, and then wait for a follow up question, that

15  would be helpful, please.

16          THE WITNESS:  Thank you.

17  A    I can't answer yes or no, and the reason I can't is,

18  because we know a lot about what asbestos fibers do as far as

19  binding DNA and generating oxygen radicals and damaging DNA.

20  So I don't believe it's fair to dismiss that likelihood as the

21  cause.  So if you say I know the cause, I'm telling you that I

22  can't go to an individual and say that's what happened in that

23  individual, but it's most likely that this is what occurred in

24  that person.

25  Q    Well, again, I want to get past an individual, because I

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002014

1  know that that's what you are generally testifying in the

2  context of an individual case.  This is not -- this case is not

3  about an individual.  It's about these diseases generally, and

4  I'm just going to ask you the question again.  Can you tell me

5  yes or no whether it has been proven that either one of the

6  theories that have been advanced and articulated by you for how

7  asbestos causes genetic damage -- that either one of those

8  theories has actually been proven with respect to human beings?

9  A    Not to the level that I -- that it probably will be at

10 some point in time.  That's the best that we have right now.

11 Q    And I'm not being dismissive.  I'm simply asking for the

12 state of what the evidence is.  In fact, isn't it true that as

13 recently as this year, researchers with respect to the asbestos

14 exposure in the causation of pleural mesothelioma have said in

15 clear language -- and this is Exhibit 762; "Although there is a

16 clear link between exposure to asbestos in mesothelioma, and

17 asbestos is known to be both clastogenic and cytotoxic to

18 mesothelial cells, the mechanisms of causation of MPM; that is,

19 malignant pleural mesothelioma, remain largely unknown."  Is

20 that an accurate statement of the status of science?

21 A    Yes, I think that's fine.

22 Q    Okay.  Now, I want to turn now from talking about

23 mechanisms to talking about something else.  We've talked about

24 mechanisms, and we've talked about the fact that mechanisms

25 with respect to cancer -- and that's what I -- all my questions

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002015

1  now are going to focus on, cancer.  We talked about mechanisms

2  and the fact that mechanisms are -- use data from animal

3  studies and lab studies, among other things, correct?

4  A    Yes.

5  Q    Okay.  And we know that there are other people who study

6  the actual what I'll call endpoints, which is kind of a

7  scientific term that deals with people who are sick.  There are

8  people in this area who focus on studying the clinical

9  presentations of people.  Correct?

10 A    Right.

11 Q    And that includes the discipline of epidemiology.  Right?

12 A    Yes.

13 Q    Now, epidemiologists can't see what's actually happening

14 inside of people, but they can observe whether they're sick or

15 not and make comparisons to see whether people who are exposed

16 to asbestos more often get sick with mesothelioma than people

17 who are not exposed to asbestos but are otherwise comparable

18 folks.  Right?

19 A    Right.

20 Q    Okay, and you are not an epidemiologist.  Correct?

21 A    That's right.

22 Q    And you do not hold yourself out to the scientific world

23 or the legal world as being a person who is expert in

24 epidemiology.  Correct?

25 A    Not at all.

CC-BLG002016

1  Q    Now when it comes to the relationship between mechanism

2  and epidemiology -- I want to ask you a few questions about

3  that -- is it true that there are a series of criteria that are

4  well-accepted in the fields of science, criteria for when can

5  you say that something causes something else?

6  A    So -- I'm sorry.  Ask the question again, please.

7  Q    In the field of science for people to say that something

8  causes something else, isn't it true that there are a series of

9  criteria that are often used to say, well, when do we know that

10 something causes something else?

11 A    Yes.

12 Q    And the Bradford-Hill criteria are very well-known

13 criteria in that respect.  Correct?

14 A    I agree.

15 Q    In fact, you yourself in the context of your testimony at

16 some trial -- I forget which one it was -- relatively recently

17 actually cited the Bradford-Hill criteria.  Correct?

18 A    Yes.

19 Q    Okay, and one of the Bradford-Hill criteria is biological

20 plausibility.  Correct?

21 A    Yes.

22 Q    And yet we know -- and this goes back to the days when the

23 Surgeon General first announced in the first report that

24 cigarettes caused disease.  At that time the mechanism by which

25 cigarettes caused cancer was not known.  Fair?

CC-BLG002017

1  A    I agree.

2  Q    Okay.  And yet the Surgeon General still concluded that

3  there was causation, because the statistical proofs -- the

4  epidemiology was very strong.  Correct?

5  A    Sure.

6  Q    Okay.  So now when we come to the relationship in terms of

7  your work on mechanism, between mechanism and epidemiology

8  isn't it true that to be able to say cause; that is, something

9  causes something else, that epi is required?

10  A    Yes.

11  Q    Isn't it also true that in order for your mechanisms or

12  possible mechanisms or statements about mechanisms to be

13  verified, they must meet the test of epidemiology.  Correct?

14  A    I agree.

15  Q    Okay.  Let's talk a little bit about some of the things

16  that you've said and other things that you suggested concerning

17  the effects of fibers in the human body.  And again I want to

18  focus very carefully on what it is that you said about how

19  asbestos fibers cause lung cancer and mesothelioma.  That's

20  where we're going.  That's what we're talking about.  Okay?

21  A    Yes.

22  Q    We're not talking about the fibrosis anymore.  We're just

23  talking about the lung cancers and the mesotheliomas.  Let's

24  see if we can agree on what we know about people, people who

25  have been exposed to any asbestos fibers.  And I'm going back

CC-BLG002018

1   to your statement here that when you talked about exposures

2   with respect to your experiments, your experiments are

3   experiments that are borne out.  Your work applies to any

4   asbestos fiber and any amount.  That's what you're looking for

5   in your mechanisms.  Correct?

6   A    Again, it depends on the questions you're asking, but as a

7   general principle, yes.

8   Q    That's the focus of your research.  Correct?  The research

9   that you yourself have conducted is research that works with --

10  at the level of cells and how cells interact, and that work

11  applies to any asbestos kind and any amount.  Correct?

12  A    Well, as I say, any asbestos fiber type I agree with.  Any

13  amount, I'm not sure that's true.  It depends on the question

14  you're asking.

15  Q    Oh, well, that's with respect to all of the direct

16  examination testimony that you gave this morning.  Was that

17  limited to some particular amount of asbestos fiber?

18  A    Well, you know, if all we're dealing with is background,

19  no.  If all we're dealing with is, you know, high-level

20  insulator-type exposures, no.  I mean -- so, yes, I mean it

21  cuts across a wide range, but I just don't like the broad

22  statements that include everything.  That's all.

23  Q    Well, I understand that, but in your direct examination

24  you made no limitation in your testimony based either on fiber

25  type or on amount.  Correct?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002019

1  A    No, I agree.

2  Q    Okay, and was it true that your own research, the research

3  that you actually conducted and displayed here in court this

4  morning, that is research that doesn't distinguish between

5  fiber type and it doesn't distinguish between fiber amount,

6  correct?

7  A    Well, again, I didn't distinguish it for the discussion

8  today, but there are specific questions that could be asked if

9  there are different amounts of exposures.

10 Q    I know.  I'm going to ask you a lot of them.

11 A    Okay.

12 Q    But in terms of the research that you presented here, that

13 was research that doesn't distinguish kind of fiber, or amount

14 of fiber, correct?

15 A    Well, I agree with you already on a kind of fiber.

16 Q    Right.

17 A    But I am taking some issue with the issue of amount,

18 because as I say, amount can have a lot of difference in the

19 rate of disease.  It can have a lot of different -- but I --

20 and I didn't talk about that today --

21 Q    Yes, I know --

22 A    It depends -- okay.  It depends on the question that I'm

23 asked.  So --

24 Q    Well, when you --

25 A    -- I was giving a general statement about what asbestos

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002020

1  does.

2  Q    Fair enough.  When you talked about the transportation of

3  fibers using macrophages in the lymphatic system, that's not

4  specific and not limited by either the type of asbestos or the

5  amount, correct?

6  A    Correct.

7  Q    When you talk about how fibers -- how fibers actually get

8  bound to chromosomal material, that's testimony and that's

9  research that's not focused on any particular fiber or amount

10 of fiber, correct?

11 A    Correct.

12 Q    And when you talk about the induction of errors; that is,

13 the mechanism by which errors are induced, that's not specific

14 to fiber type and it's not specific to amount, correct?

15 A    I agree.

16 Q    Oh.  Okay.  Now, when we get to the question of disease

17 that is not the mechanism but the end point in people, when we

18 get to this area, that's an area where type and amount make a

19 big difference, correct?

20 A    Sure.

21 Q    Okay.  Let's see if we can agree on how your research

22 intersects with -- you talked about endpoints this morning,

23 didn't you?  You talked about people getting sick with cancer,

24 both lung cancer and mesothelioma, correct?

25 A    Of course.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002021

1  Q    Let's talk a little bit more carefully about how your

2  testimony regarding mechanism intersects with real live people

3  and with whether they get sick or not for just a moment.  And I

4  think we're going to have a lot of agreement on this, at least

5  I hope, but that's what I'm aiming for, so maybe before the

6  lunch hour here we'll smile and agree.  First of all, with

7  respect to background, there is background asbestos, is there

8  not?

9  A    Yes.

10 Q    And background asbestos literally is fibers that are in

11 our environment, all around us, although more so probably when

12 you're in the city versus the country, correct?

13 A    Yes.

14 Q    Okay.  And isn't it true that the calculations of the

15 number of asbestos fibers that will be found in the lungs of

16 people who don't have an occupational or a derivative of

17 occupational exposure, the number of those fibers per gram of

18 tissue ranges up to about a million fibers per gram of lung

19 tissue?

20 A    That's on the high side, but yes.

21 Q    Well, that's the figure that was published by Dr. Churd

22 (phonetic), correct?

23 A    Correct.

24 Q    Okay.  And isn't it true that there are roughly 40 grams

25 of lung tissue for each person, correct?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002022

1  A     No.  It's way more than that.  It's -- there are 454 grams

2  in a pound, and we have about four pounds of lungs.

3  Q     Maybe I'm talking about the alveolar tissue, where the

4  material tends to concentrate.  I've seen -- you tell me if I'm

5  wrong --

6  A     I just did.

7  Q     You -- well, you're just going to correct me here -- I've

8  seen figures that say that they're upwards of 14 (sic) million

9  fibers for a human lung, or is it more than that?

10  A     Oh, it can be more than that.  I mean, it really depends

11  on how much tissue you're -- I mean, but that's not a lot of

12  fibers.  Remember, you can get a billion into a sugar cube, so

13  --

14  Q     Well, but this morning you were showing us how even one

15  little fiber can go ahead and create that binding, and, you

16  know, cleave the -- you know, the chromosomes, and basically

17  mess things up.

18  A     Sure.

19  Q     So, I now want to know, based upon the observation of

20  people, isn't it true that background asbestos in people's

21  lungs has been shown not to cause cancer.  You don't believe

22  that that causal relationship exists, correct?

23  A     Correct.

24  Q     Okay.  Now, let's go a little bit above the background to

25  the PEL, the occupational limit of .1 -- is it .1 fiber years?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002023

Brody - Cross/Bernick                    111

1  A    .1 fiber per c.c.

2  Q    Fiber per c.c.  So, you'd have to multiply that out to get

3  a total unburdened.  But that's the PEL.  Isn't it true that

4  the same thing applies; that is, that it's not shown to cause

5  disease?

6  A    Well, you'd have to ask an epidemiologist.  As far as I

7  know, that's not been shown to cause disease, but it's not been

8  shown to be safe, either.  So, I mean, it doesn't say that will

9  not cause disease.

10 Q    Well, didn't you ask this question and give this answer in

11 a trial that took place in April of '03 involving a case with

12 Lorillard, as you testified as follows.  "And there are no

13 studies that show that there is an increased risk of

14 mesothelioma at the .1 level.  That's true, is it not?"  And

15 your answer was; "To my knowledge that's true."  Was that your

16 testimony under oath at that time?

17 A    And I just said that.  I've just said exactly that.  There

18 are no studies that show that that level causes mesothelioma,

19 and there are also no studies that show that to be a safe level

20 guaranteeing it will not cause disease.

21 Q    Well, there are no guarantees in life.  I'm simply asking

22 whether there are no studies that show causation of disease at

23 that level?

24 A    I agree.

25 Q    Okay.  Now, let's talk about a couple more, and then we'll

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002024

1  almost be done.  Let's talk about fibers that are less than

2  five microns.  Is that the right --

3  A    That's fine.

4  Q    Okay.  Less than five microns long.  They'll still cause

5  all that binding, and it can cause fibrosis, correct?

6  A    Yes.

7  Q    But when it comes to the induction of cancer, isn't it

8  true that some of the most reputable scientists in the country

9  in this area have concluded that fibers less than five microns

10 have not been shown to cause disease?

11 A    Well, some have shown that, and said that, yes.  I

12 disagree.  I think that five micron fibers are less dangerous,

13 but I don't see how you can exonerate them.  So, if you put 5.1

14 microns that cause disease and 4.9 does not, I mean, you know,

15 that makes no sense.  So, in other words, longer fibers are

16 more dangerous.  I agree with that absolutely.  But you can't

17 exonerate fibers less than five microns.

18 Q    I'm not asking you about exoneration.  I'm not asking

19 whether something is guaranteed, lock solid to be safe.  That

20 has nothing to do with my question.  I asked you a very simple

21 question.  Isn't it true that some of the most reputable

22 scientists in the country have concluded science does not

23 demonstrate disease caused by fibers that are less than five

24 microns long?

25 A    A few people have said that.  Yes, sir.

CC-BLG002025

1  Q    A few people?  Isn't it true that reports prepared for the

2  ATSDR, which is one of the most prestigious organizations in

3  the country dealing with the effects of toxic materials on

4  people, has made that pronouncement?

5  A    Well, it's a report.  I don't know if it's a

6  pronouncement.

7  Q    Have you read the report?

8  A    I've seen it, and I'm sure it says that in there.  But

9  that's fine.  I just don't see how you can draw that

10  conclusion.

11  Q    Who wrote that report?

12  A    I'm not sure who wrote it.

13  Q    What?

14  A    I'm not sure who wrote it.

15  Q    Are you sure that you read it?

16  A    I have seen parts of it.

17  Q    Well, I didn't -- okay.  Did you read that part of the

18  report that bears directly on the question that I asked you?

19  A    I think so.

20  Q    You think so, or you're not sure, or you are sure?

21  A    You know, I read a lot of things.  I don't remember

22  precisely reading that.  It's been brought up to me a number of

23  times in the past.  I'm sure that it -- I wouldn't surprised

24  that it says that.

25  Q    It's been brought to you in the context of litigation?

J&J COURT TRANSCRIBERS, INC.

CC-BLG002026

1  A    Yes.

2  Q    Okay.  And even though it's been brought up in the context

3  of litigation where you've been confronted with this under

4  oath, you've never taken the time to go back and actually read

5  the document to see what it says, much less figure out whether

6  it's correct?

7           MR. BAILOR:  Objection.  Argumentative.

8  Q    Well, have you gone back since the issue was raised and

9  read the document to see what it actually said about fibers

10 less than five microns?

11 A    No.  And because somebody --

12 Q    Okay.

13 A    -- brings something up to me, I don't have to go running

14 back and read it.  I read what I --

15 Q    No --

16 A    -- think is important to me.

17 Q    Oh, sure.  And this was of no consequence?  The fact that

18 the ASTDR wrote a report that completely disagreed with you was

19 of no consequence?

20 A    So -- the fact that their --

21 Q    What about the EP -- I'm sorry.  I'll withdraw that.  What

22 about the EPA?  What does the EPA -- are you familiar with the

23 Berman and Crump report?

24 A    I've seen parts of that, as well.

25 Q    Have you read the Berman and Crump report, Dr. Brody?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Not from front to back.  It's the same discussion.  This

2  is a report that's out there.  It's been out there for years.

3  It's not EPA policy.  Those scientists believe that short

4  fibers don't cause disease, or at least some of them do, and I

5  say that that makes no sense.  You cannot exclude a population

6  of fibers that has been shown to bind membranes, bind DNA,

7  participate in disease.  I don't -- that's not been explained

8  to me by anyone how those fibers can be excluded.  Just because

9  they write a report doesn't make it true.

10 Q    But you don't even know what the basis for the report is

11 because you haven't read it, correct?

12 A    I've read some of it, but that's -- you know, I read the

13 science.  I read the papers.  There were papers by JMG Davis

14 that show that short fibers cause less disease than long

15 fibers.  I agree with that.  That's in the published scientific

16 --

17 Q    I didn't ask you about that.

18 A    Excuse me.

19 Q    I asked you about the EPA.

20        MR. BAILOR:  Objection.  Could we have the witness

21 complete his answer?

22        THE COURT:  I think you do need to give him an

23 opportunity to complete his answer, Mr. Bernick.

24        MR. BERNICK:  But then can we have, then, an answer

25 to my question, as well?

CC-BLG002028

1          THE COURT:  He did answer your question.  He said it

2    had -- he disagrees with the study that indicates that a fiber

3    less than five microns long cannot cause disease.  He has not

4    fully read the studies, but to the extent that he is aware of

5    them, he disagrees with them.  Is --

6          MR. BERNICK:  Yes, but then I asked him whether he

7    had read the support for the position in the document, and he

8    didn't answer that question.

9          THE COURT:  Okay.  I apologize.

10          MR. BERNICK:  He went on to talk about another study

11    that I didn't even ask him about.

12          THE COURT:  All right.  I apologize.  Could you

13    answer that question, please, doctor?

14   Q    So, the question to you is, Dr. Brody, did you actually

15    read the EPA study and the ATSDR study to find out what the

16    basis was for the position that was taken, which is that

17    science had not shown harm; that is, disease, below five

18    microns?

19   A    I haven't read specifically what they were after, but one

20    of the papers that they use is that Davis paper to -- that I

21    was telling you about.  There are a lot of papers that show

22    that --

23          MR. BERNICK:  Again, Your Honor, this is, again -- he

24    says no, but then, one of the papers that they talk about --

25    well, if he says no, then how would he know what papers they

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002029

1  even refer to?

2          THE WITNESS:  Well, I'm telling you about papers that

3  are important in this field.  You want to --

4          MR. BERNICK:  I didn't ask you about papers that were

5  important -- Your Honor, could you please instruct the witness

6  --

7          THE COURT:  All right.  Gentlemen, you --

8          UNIDENTIFIED ATTORNEY:  Objection.

9          THE COURT:  Gentlemen, you may not argue with each

10  other.  It's a question and answer, not a debate.

11          MR. BERNICK:  Right.

12          THE COURT:  Doctor, I think you've answered his

13  question.  If you have another question, put it to the witness,

14  but please do not argue with the witness.

15  Q   Isn't it true that when it comes to -- well, let me ask

16  you about another comparison.

17                          (Pause)

18  Q   We have -- let's do it this way.  This is the

19  concentration, and we're going to go up the scale.  So, we have

20  a certain concentration that's background, right?  We just

21  talked about that?

22  A   Yes.

23  Q   Then we have another concentration that's in excess of

24  background.  That's the PEL, right?

25  A   Yes.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002030

1  Q    Now, people have asked the question of, is there a

2  threshold; that is, an amount of exposure that is necessary for

3  there to be disease?

4            MR. BAILOR:  Objection, Your Honor.  This has gone

5  beyond the scope of direct.

6            MR. BERNICK:  Not at all.  The witness offered

7  specific opinions about how all these little different fibers

8  that he was talking about actually are responsible for the

9  causation of disease.

10            THE COURT:  He did opine that there are fibers that

11  will essentially split from the bundle of various intensities,

12  sizes, dimensions that will cause disease, so I think it is

13  within the scope.  You can proceed.

14            MR. BERNICK:  Yes.  And this will, I think, be fairly

15  brief, and then I'll be done except for an area that relates to

16  his involvement in the litigation.

17  Q    Now, the question of whether there is a threshold; that

18  is, an amount that's necessary for there to be causation of

19  lung cancer or meso from asbestos, that question has been asked

20  over the years, correct?

21  A    Yes.

22  Q    Okay.  And isn't it true that you don't know of what the

23  threshold is, you don't have an idea of what the threshold is,

24  correct?

25  A    I don't think anyone does.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002031

1 Q    Right.  So that today the question of what the threshold

2 is; that is, how much exposure there must be before you get

3 sick is still an unanswered question.  Fair?

4 A    Right, because it's different for different people.  Sure.

5 Q    Well, but it's -- there's no threshold that's actually

6 been specified for -- even for a group of people, correct?

7 A    I agree.

8 Q    Okay.  So, now, this additional amount above background,

9 the kind of additional contribution above background that's

10 necessary to cause disease, you've never calculated that, and

11 you don't know of anybody else who has calculated it, correct?

12 A    Right.

13 Q    And indeed, in terms of the epidemiology, even the

14 epidemiology doesn't tell you how much additional contribution

15 of asbestos is necessary to be causal, correct?

16 A    Right.  I mean, we know that there's dose response, but as

17 far as specific amounts, you can't say.

18 Q    Okay.  And is it also true that when it comes to the issue

19 of when you actually go back and take a look at the whole issue

20 of low dose causation, would you agree with me that the issue

21 of low dose causation is one where -- was one -- the long-term

22 effects of low chronic exposures or repeated peak above

23 background exposures to asbestos has not been defined in human

24 populations, would you agree with that?

25 A    Yes.  I would say that's right.

CC-BLG002032

1 Q    Okay.  And little is known about the effects of low

2 chronic exposures on mesothelioma prevalence.  Would you agree

3 with that?

4 A    Well, right.  I mean, that's generally true.  There

5 certainly are cases that show low dose exposures, but as a

6 general principle what you say is true.

7 Q    Right.  And case reports are, again, on the scale of the

8 quality of evidence.  Case reports don't rise to the level that

9 epidemiology does.  Fair?

10 A    I agree.

11 Q    Okay.  Now, the last area, and then I'll be done, and

12 maybe we can take a break for lunch.  The expert report that

13 you filed in this case is approximately five pages long?

14 A    I think so.

15 Q    And I don't think it has a single citation in it, does it?

16 A    I don't believe so.

17 Q    Is it true that that little five-page report is something

18 that you use in every case in which you appear and testify?

19 A    I call it a generic report.  Yes.

20 Q    Generic report.  That's fair.  And isn't it true that

21 therefore to prepare for any given case -- I mean, before you

22 came in here today you almost didn't really have to do any

23 preparation, correct?

24 A    This is my own work.  I know it, yes.

25 Q    Okay.  So, you can stand up there for an hour-and-a-half

**J&J COURT TRANSCRIBERS, INC.**

1 without a single question and go through those slides without a

2 single note, and you say exactly the same thing that you've

3 said twice a month in Court for the last 13 years, correct?

4 A    And I can stand up in front of a medical school class

5 without any notes either and tell them what I think they should

6 know.

7          MR. BERNICK:  Move to strike as not responsive.

8 Could I ask -- have the witness answer the question, please?

9          THE COURT:  All right.  It's stricken.  Would you

10 please answer the question, doctor?

11          THE WITNESS:  Sure.

12 Q    Is the answer to my question yes?

13 A    Yes.

14 Q    Okay.  In fact, you've been testifying, I think, for

15 approximately 13 years on a twice-a-month basis, correct?

16 A    Well, the last ten years, certainly.  Yes.

17 Q    Okay.  And have you ever told us, or disclosed to anybody

18 in the litigation context what percentage of your income today,

19 or the last, say, five years, what percentage of your income

20 comes from work that you do on litigation versus work that you

21 do as a faculty member?

22 A    Well, if it's asked, I tell them.

23 Q    So, what's the percentage?

24 A    It's about 50 percent, 60 percent.

25 Q    Okay.  Now, I think you testified on direct examination

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002034

1 that most of the time you testify for individual plaintiffs,

2 but from time to time you've testified for manufacturers, and I

3 think you mentioned Celotex, correct?

4 A    Right.

5 Q    But in fact, when you've testified for manufacturers,

6 that's been in the context of bankruptcy cases, right?

7 A    That's -- or insurance litigation, yes.

8 Q    Okay.  So, when it comes to actually testifying about the

9 causation of disease in any individual personal injury case, is

10 it true that in all of those instances you've testified for the

11 plaintiff?

12 A    Yes.

13         MR. BERNICK:  Your Honor, I think that I have no

14 further questions, and I will pass the witness.

15         THE COURT:  All right.  Mr. Bailor?

16         MR. HOROWITZ:  Your Honor --

17         THE COURT:  Oh, I'm sorry.

18         MR. HOROWITZ:  -- Greg Horowitz for the Equity

19 Committee.  We don't have any questions.  I just wanted -- a

20 reminder that in the future we may have a few questions.

21         THE COURT:  Yes, sir.  Thank you.  I apologize.

22         UNIDENTIFIED ATTORNEY:  The same for the unsecured

23 creditors.

24         THE COURT:  All right, sir.  Thank you.  Mr. Bailor?

25         MR. BAILOR:  Anybody else?

**J&J COURT TRANSCRIBERS, INC.**

Brody - Redirect                           123

REDIRECT EXAMINATION

1

2   BY MR. BAILOR:

3   Q    Dr. Brody --

4            THE CLERK:  Please state your name for the record.

5            MR. BAILOR:  Oh, I'm sorry.  Bernard Bailor for the

6   Asbestos Claimants' Committee.

7   Q    Can you explain to the Court the exact mechanism on the

8   molecular level that smoking causes cancer?

9   A    Well, I wish I could, Your Honor.  I mean, it --

10           MR. BERNICK:  Your Honor, I believe that this goes

11  beyond the scope of his expertise.  If he wants to offer

12  himself as an expert in that area I'd be happy to cross examine

13  him on that.

14           THE COURT:  I think the witness has said he'd be

15  happy if he could, but he can't.  So -- is that correct,

16  doctor?

17           THE WITNESS:  Well, it's the same -- it's the same

18  issue.  In other words, we know there are genetic errors --

19           MR. BERNICK:  Your Honor, he's now volunteering that

20  it's the same issue.  He is now stepping his toe in the water

21  of how we prove and deal with the causation of cancer from

22  cigarette smoke, and that is a new and different area, and I'm

23  happy if he goes into it, but I will cross examine him in that

24  area.

25           THE COURT:  Mr. Bailor, I understood where you were

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002036

1 going go to go with this.  I don't think it's where Mr. Bernick

2 intended that you go with this, but I got the point.  Do you

3 wish to pursue this area, or do you want to go down another

4 road?

5          MR. BAILOR:  Okay.  Let me withdraw the question.

6 Q    And, in fact, there are literally hundreds, if not

7 thousands of carcinogens; is that not true?

8 A    That's right.

9 Q    And, in fact, the exact mechanism that works on the

10 molecular level that causes cancer from any one of those

11 carcinogens is not yet known?

12          MR. BERNICK:  Objection.  There's a total lack of

13 foundation for that question without qualifying this man as an

14 expert with respect to all of those different carcinogens.

15          MR. BAILOR:  I disagree.  We spent a lot of time on

16 cross examination about the fact that there's no knowledge

17 about the mechanisms by which asbestos goes.  In fact, that is

18 true with respect for all cancers.

19          MR. BERNICK:  And again, if the witness were

20 qualified to address the issue and had addressed the issue,

21 that's fair game, but he has not been qualified on that at all.

22 Indeed, he has disavowed that expertise, and I did not raise

23 the question of what has been established or not established

24 with respect to any material other than asbestos.

25          THE COURT:  I think that's true.  I think you're

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002037

1  opening up a door.  If you want to pursue it, that's fine, but

2  we'll take a recess for lunch and let Mr. Bernick go at it.  So

3  --

4          MR. BAILOR:  Okay.  I'll withdraw the question.

5  Q    Doctor, have you written papers about cancer and the

6  carcinogen process?

7  A    Yes.

8  Q    Do you know how many, roughly?

9  A    I would say about a dozen, maybe ten papers or so.  I'd

10  have to go back and count.  But starting in the middle 80s,

11  with the work, the in vitro work, and then we produced lung

12  cancers, and just recently published a paper, it came out in

13  2007, on gene expression in mesothelial cells.

14  Q    And have you been invited as a guest at mesothelioma

15  conferences?

16  A    Yes.  I gave a talk at the International Mesothelioma

17  Conference last year in Chicago.

18  Q    You were shown on cross examination, a paper marked G --

19  Grace Exhibit 766 dealing with the p53 tumor suppressor

20  protein.  Does that tumor suppressor protein play a role in the

21  cancer suppression?

22          MR. BERNICK:  Which cancer suppression; tobacco or

23  asbestos?

24          MR. BAILOR:  Any cancer.

25          MR. BERNICK:  Well then, I object.

**J&J COURT TRANSCRIBERS, INC.**

Brody - Redirect                              126

1  Q    Does this paper deal with the suppression of cancer

2  tumors?

3  A    Yes.

4  Q    You mentioned that you -- I'm sorry -- I thought I heard

5  an objection.  You mentioned that you cannot tell what level of

6  exposure will cause a cancer in an individual.  Could you

7  explain to the Court why you cannot tell that?

8  A    Well, the reason is that it's so different for different

9  people.  In other words, their susceptibilities, genetic

10 susceptibilities control whether a person gets a cancer or not.

11 I mean -- and this p53 suppressor protein is a good example of

12 that.  In 50 percent of all mesotheliomas, that p53 gene is

13 mutated.  Now, that gene stops cells from dividing.  If that's

14 a gene that gets damaged, then those cells are going -- can go

15 on and form tumors.  Now, in some people they are more

16 susceptible to getting p53 injuries than others.  It's the same

17 in cigarette smoking and in asbestos exposures.

18        MR. BERNICK:  Objection to the -- strike the answer

19 with regard to cigarette smoking, otherwise I'll have to go

20 down the road.

21        THE COURT:  All right.  Cigarette smoking, at this

22 point in time, as far as I know, is not the issue that we're

23 facing, so fine, we'll strike it with respect to cigarette

24 smoking, although I believe that was illustrative.  Go ahead,

25 Mr. Bailor.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002039

1        MR. BAILOR:  Okay.

2   Q    Is it true, doctor, that evaluating whether or not a

3   cancer, an asbestos-induced -- a cancer was caused by asbestos

4   in an individual is going to require an in-depth evaluation of

5   the particular facts and circumstances related to that

6   individual?

7        MR. BERNICK:  Objection.  Lack of foundation.

8        THE COURT:  I'm sorry.  Would you restate it for me,

9   please?

10  Q    Is it true, doctor, that in determining whether or not

11  asbestos caused a particular cancer in an individual, that is

12  going to depend on an in-depth analysis of the facts and

13  circumstances related to that individual?

14       MR. BERNICK:  Objection.  Lack of foundation.  It's

15  also -- I won't make the leading objection -- there's no

16  foundation for that question.

17       THE COURT:  Well, I think there is a foundation based

18  on the witness' testimony.  Overruled.

19  A    Yes.  In other words, you'd need to go back and see what

20  that person was exposed to, and that would allow you to draw

21  conclusions about the cause of that person's disease.

22  Q    All right.  Now, how many cells must be impacted by

23  asbestos fiber, or be impacted -- strike that.  How many cells

24  would be impacted by a day of asbestos exposure in a particular

25  individual?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002040

1    MR. BERNICK:  Objection.  Complete lack of

2  foundation.

3    THE COURT:  That's sustained.

4  Q    Now, the asbestos fibers you have studied include

5  chrysotile?

6  A    Yes.

7  Q    All right.  Do you agree that chrysotile can cause

8  mesothelioma?

9  A    Yes.

10  Q    You mentioned earlier that there must be continuous impact

11  of the fibers on the cells for causing cancers and mesothelioma

12  --

13    MR. BERNICK:  Objection.  I believe that's what the

14  record reflects.  Lack of foundation.

15    MR. BAILOR:  I believe the testimony is in the

16  record.

17    THE COURT:  I don't think that's exactly what the

18  witness said, but he can explain it.

19  Q    That one fiber won't do it, but it will take an impact of

20  some number of fibers?

21    MR. BERNICK:  Well, I --

22    THE COURT:  That's a different question, Mr. Bailor.

23  Do you want to ask the witness which question you want him to

24  answer, please.  Restate the question.

25  Q    Okay.  Do you agree, doctor, that it takes a number of

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002041

1 fibers to induce mesothelioma in an individual?

2 A    Yes.  So, what happens is, every time there's an exposure

3 some proportion of the fibers reach the target site.  Now, a

4 single fiber can cause a genetic error, but it's -- it takes

5 multiple fibers to increase the likelihood of that event.

6 Q    All right.  And is it true that with respect to

7 mesothelioma that low doses can cause mesothelioma?

8        MR. BERNICK:  I'm going to object.  First of all,

9 it's leading, although I've not made that objection in an

10 effort to get things done.  Secondly, what exactly does counsel

11 mean by a low dose?  We've already had testimony in this area,

12 and I think that if we're going to have a question, there's got

13 to be some dose.

14 Q    Do you believe a dose level at the PEL level could cause

15 mesothelioma?

16        MR. BERNICK:  Objection.  Asked and answered.

17        THE COURT:  I think it was asked on cross exam, but

18 this is redirect.  If it's laying a foundation for a next

19 question we can go into it.  You can ask it.  Go ahead, doctor.

20 A    Well, the -- as I said, the PEL level has not been shown

21 to cause disease, but you couldn't rule it out.  It could.  I

22 mean, it's a level above background, and it could cause

23 disease, and --

24        MR. BERNICK:  Objection.  Move to strike as being

25 based on speculation.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002042

1      THE COURT:  Sustained.

2 Q    Have you reviewed case reports involving low dose

3 exposures causing mesothelioma?

4 A    I've seen case reports, yes.

5 Q    And can you recall what kinds of levels were described in

6 there as being low dose?

7 A    Well, these would be doses that would be -- like, for

8 example, take home exposures or environmental exposures?  I

9 can't give you a dose because I don't know, and I don't know

10 that the papers actually come up with a dose, but those would

11 be relative to an occupational setting, low dose.

12 Q    Okay.  Now, the Berman and Crump article was mentioned on

13 cross examination.  Do you know how many of the studies in the

14 Berman and Crump article that were relied upon by Berman and

15 Crump had actual exposure information?

16 A    I don't know.

17      MR. BAILOR:  Can I have a moment?

18                         (Pause)

19 Q    You mentioned on cross examination the Bradford-Hill

20 criteria.  Did you state that biological plausibility was one

21 of the Bradford-Hill criteria?

22 A    Well, we didn't get into that, but it certainly is.  I

23 mean, that's where my work and the work of other scientists

24 like myself enter into those criteria -- is it plausible to

25 think that -- or to state that asbestos doing what it does adds

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002043

Brody - Redirect                                    131

1  to the epidemiologic effect.  And -- sure.

2  Q    In your view is it biologically plausible for chrysotile

3  to cause mesothelioma?

4  A    Yes.

5  Q    In your view is it biologically plausible for fibers less

6  than five microns to cause mesothelioma?

7            MR. BERNICK:  Objection.  It is leading.

8            THE COURT:  Sustained.

9  Q    Do you have a view with whether or not fibers of less than

10  five microns can cause mesothelioma?

11  A    Yes, I do have an opinion.

12  Q    And would you please tell the Court what that view is?

13  A    Yes.  My opinion is that fibers less than five microns can

14  bind DNA, cause all of the changes that fibers cause, but

15  they're not as effective in doing so.  But if you have a lot of

16  them, and there are a number of small fibers around, they can

17  do whatever fibers do.  There's just no way to exclude them.

18  Q    Does that --

19            MR. BERNICK:  Move to strike the answer.  It has not

20  been responsive.  He didn't answer the question.

21            MR. BAILOR:  That was clearly responsive, Your Honor.

22            THE COURT:  It was responsive.  I believe the

23  question is going to be whether or not that is a view that

24  meets the criteria of the witness' expertise within his

25  scientific community, Mr. Bailor, and that is what I don't

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002044

Brody - Mullady                                        132

1  know.

2  Q    Is that view shared by others in your scientific

3  community?

4             MR. BERNICK:  Objection.  Lack of foundation.  I

5  mean, who are these folks?  You know --

6             MR. BAILOR:  Ah, come on, Your Honor.  This is

7  getting a little absurd.

8             THE COURT:  He has been qualified as an expert, and

9  to be qualified as an expert you have to have an expert

10  community, so if you will restate the question to define it

11  within the expert community, Mr. Bailor, I think we'll get past

12  it.

13  Q    Doctor, is that view shared by others in your expert

14  community of cellular and molecular biology?

15  A    Yes.  The majority of scientists who deal with fibers

16  consider all the fiber lengths to be biologically active, and

17  we agree that long fibers are more dangerous than short fibers,

18  but I would say very few people would be willing to exclude

19  short fibers.  It just doesn't make any sense.

20             MR. BAILOR:  No further questions, Your Honor.

21             THE COURT:  Mr. Mullady?

22             MR. BERNICK:  Yes, I -- oh.  Sorry.

23                        EXAMINATION

24  BY MR. MULLADY:

25  Q    Good morning, Dr. Brody.  I represent the representative

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002045

Brody - Mullady                    133

1  for future asbestos personal injury claimants.

2          THE CLERK:  Please state your name for the record.

3          MR. MULLADY:  Raymond Mullady for the FCR.

4  Q    Doctor --

5          MR. MULLADY:  Can I have the ELMO, please?

6  Q    On cross examination Mr. Bernick showed you this article

7  from -- this February 28, 2008 article entitled "Asbestos

8  Exposure Predicts Cell Cycle Control Gene Promoter Methylation

9  in Pleural Mesothelioma."  Do you recall that?

10         THE COURT:  Exhibit 762 for the record.

11         MR. MULLADY:  GX-762.  Correct, Your Honor.

12 Q    Do you recall that --

13 A    Yes --

14 Q    -- line of questions?

15 A    Yes.  I haven't seen that.  It looked like a fascinating

16 new piece of work.

17 Q    And I believe Mr. Bernick read you this sentence that I've

18 bracketed here.  "Although there is a clear link between

19 exposure to asbestos and mesothelioma, and asbestos is known to

20 be both clastogenic and cytotoxic to mesothelial cells, the

21 mechanisms of causation of MPM -- that's malignant pleural

22 mesothelioma -- remain largely unknown."  Do you recall him

23 reading that to you?

24 A    Yes.

25 Q    The next sentence reads, does it not, "However, there is a

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002046

1  rapidly emerging literature that describes inactivation of a

2  diverse array of tumor suppressor genes via promoter DNA CPG

3  methylation in MPM, malignant pleural mesothelioma, although

4  the ideology of these alterations remains unclear." Did I read

5  that correctly?

6  A    Yes.

7  Q    Sir, can you tell the Court what -- first of all, what

8  tumor suppressor genes are and their role in carcinogenesis?

9  A    Sure. A good example is this p53 gene that we wrote

10 about. In fact, it was the molecule of the year in 1993,

11 meaning that it's known to play a major role in biology. And

12 these are the kinds of genes in which these methylation defects

13 can occur. And that's what these people are writing about. In

14 other words, they are moving the field another step closer to

15 understanding how you can cause errors in a tumor suppressor

16 gene, which stops cells with errors from passing on those

17 errors.

18 Q    And, sir, what is meant by the authors here that asbestos

19 is known to be both clastogenic and cytotoxic?

20 A    Um-hmm.

21 Q    Can you deal with those one at a time. First,

22 clastogenic?

23 A    Sure. Clastogenic is what I showed the Court, actually.

24 Clastogenic means damage to DNA, and when that DNA is in a

25 chromosomal form. And so, you saw the DNA binding to the

J&J COURT TRANSCRIBERS, INC.

CC-BLG002047

1  fibers, and that's clastogenic damage.  Now, cytotoxic is a

2  general term meaning causes cell death.

3  Q    And these authors, as you can see here, have data that

4  suggest in their view a novel tumorogenic mechanism of action

5  of asbestos.  Did I read that correctly?

6  A    Yes.

7  Q    Sir, can you tell the Court what -- first of all, what

8  tumor suppressor genes are, and their role in carcinogenesis?

9  A    Sure.  A good example is this p53 gene that we wrote

10 about.  In fact, it was the molecule of the year in 1993,

11 meaning that it's known to play a major role in biology.  And

12 these are the kinds of genes in which these methylation defects

13 can occur.  And that's what these people are writing about.  In

14 other words, they are moving the field another step closer to

15 understanding how you can cause errors in a tumor suppressor

16 gene, which stops cells with errors from passing on those

17 errors.

18 Q    And, sir, what is meant by the authors here that asbestos

19 is known to be both clastogenic and cytotoxic?

20 A    Um-hmm.

21 Q    Can you deal with those one at a time.  First,

22 clastogenic?

23 A    Sure.  Clastogenic is what I showed the Court, actually.

24 Clastogenic means damage to DNA, and when that DNA is in a

25 chromosomal form.  And so, you saw the DNA binding to the

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002048

1 fibers, and that's clastogenic damage.  Now, cytotoxic is a

2 general term meaning causes cell death.

3 Q    And these authors, as you can see here, have data that

4 suggest in their view a novel tumorogenic mechanism of action

5 of asbestos.  Did I read that correctly?

6 A    Yes.

7 Q    Now, you have not read this paper, so I won't take you

8 further into it, but that's just to set the stage for a couple

9 of statements at the back of this paper that I do think bear on

10 your direct examination, but I'll ask you if you agree with

11 that or not?

12        MR. BERNICK:  Well, how can he agree with it if --

13 well -- go ahead.  Go ahead.

14        THE WITNESS:  Gee, thanks.

15        MR. BERNICK:  Do you want to -- it might be

16 appropriate to give the good doctor time to read the paper if

17 you're going to examine him on it.

18        MR. MULLADY:  Oh, I don't think he'll need to read

19 the whole paper to agree with this statement.

20 Q    Doctor, you tell me if you disagree.  On Page 13 of this

21 exhibit the authors write, "Asbestos exposure is associated

22 with chronic inflammation and the physical presence of asbestos

23 fibers at the interface of the mesothelial membrane and the

24 lung induces a dose dependent cycle of death and regrowth of

25 mesothelial cells in the area of fiber deposition."  Is that

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002049

1 statement consistent or inconsistent with your direct

2 examination this morning?

3 A    This is exactly what I showed the Court.

4 Q    And can you remind the Court where you demonstrated that

5 principle in your direct examination?

6 A    Right.  Well, the first point is physical presence of the

7 fibers at the interface of the mesothelial membrane.  So,

8 that's when I got the fibers out to the pleura by way of the

9 lymphatics.  And then -- if you put that back up?  I don't have

10 it in front of me, so --

11         MR. MULLADY:  I'm sorry.

12 A    And then the next point, induce a dose dependent cycle of

13 death and regrowth.  Right.  So, what happens is the cells that

14 are dying by way of programmed cell death that I told you about

15 through these after certain genes are damaged, and then

16 regrowth of the cells that remain alive.  I mean, cancer is the

17 most insipid form of natural selection.  You know, the cells

18 that are amenable to death die, and then those with errors that

19 can pass on those errors are the ones that do so, and those are

20 the ones that cause the tumors.

21 Q    Thank you, sir.  And finally, the authors here, on Page

22 14, state, as they did earlier, that "Additionally, asbestos

23 fibers are known to be clastogenic and lead to genotoxic

24 damage."  And we've already discussed that, correct?

25 A    Yes.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002050

1  Q    And they go on to say, "In tumors with higher asbestos

2  fiber burden may be induced to grow faster, possibly leading to

3  the preferential selection of clones with silenced cell cycle

4  control tumor suppressor genes."  Can you explain what they are

5  saying there in layman's terms?

6  A    Sure.  Okay.  So, we know clastogenic and genotoxic.

7  Those are the -- that's really the DNA damage that we talked

8  about.  Tumors with higher asbestos fiber burden, this is a

9  sort of dose response.  In other words, the more cells that you

10 have with these errors, the more likely you are to have one

11 that gets away.  And that's the final point leading to the

12 preferential selection of clones and silenced cells cycles.

13 So, these are the damage to specific genes that control the

14 cell cycle.  The more fibers that are there, the more likely

15 these events are to occur.

16             MR. MULLADY:  No further questions.  Thank you, sir.

17             THE WITNESS:  You're welcome.

18             THE COURT:  Mr. Bernick?

19                    RECROSS EXAMINATION

20 BY MR. BERNICK:

21 Q    Well, you know the gig here, Dr. Brody.  I get one more

22 little shot at you, and then we'll set you free here.  We had,

23 in the -- I believe that Mr. Bailor drew your attention to the

24 p53 study, which was Exhibit 766.  And that did talk about p53.

25 That's also the study where the lead author, and you joined in,

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002051

1  also made the statement that, "the mechanism by which asbestos

2  causes fibrosis remains unclear."  That was exactly the same

3  article --

4          MR. BAILOR:  Objection.  This has been asked and

5  answered.  This is recross.

6          MR. BERNICK:  No.  I'm providing the linkage that

7  counsel declined to provide, which is that this is -- this very

8  paper is the one that recited that the mechanisms were unclear

9  and then reiterated that at the end of the paper.

10          THE COURT:  All right.  It's recross.  It's on this

11  article.  Let's just get it done.

12  Q    The same article, right?

13  A    Yes.

14  Q    Okay.  And at the end of the summary section it says,

15  "Activation of p53 and the dual functions of PCNA as a DNA

16  receptor and repair protein suggest that DNA repair and

17  increased cell proliferation are two distinct responses to

18  asbestos fibers in the lung.  This paper doesn't purport to say

19  that it's been proven that the p53 gene actually is

20  responsible, and damage to it is responsible for tumor genesis,

21  does it?

22  A    Well, it doesn't say that here, but it's certainly been

23  shown in a number of other studies.

24  Q    Could you --

25          MR. BERNICK:  Your Honor, again --

**J&J COURT TRANSCRIBERS, INC.**

Brody - Recross/Bernick                    140

1        THE COURT:  Doctor, if you could just answer yes or

2   no, please?

3   A    Correct.  It doesn't say that.  We're appropriately

4   cautious.

5   Q    And then we got to this paper here, which is 762, and this

6   doesn't have anything to do -- counsel asked you questions

7   about p53, this paper, which is ten years later, doesn't even

8   mention p53, correct?

9   A    Well, it says tumor suppressor genes, and --

10  Q    I asked you whether --

11       MR. BAILOR:  Objection, Your Honor.  He hasn't read

12  the paper.

13       MR. MULLADY:  I join the objection.

14       THE COURT:  Well, he was asked about a great deal of

15  this paper.  If he hasn't read it he can certainly state that

16  fact.

17  Q    This doesn't mention anything -- doesn't say the letters

18  or numbers p53, does it?

19  A    I don't know.  I haven't looked in the references.  It

20  does say tumor suppressor protein, so I'd be surprised if they

21  don't reference p53.  But as I said, I haven't read it, so I

22  can't tell you.

23  Q    You haven't read this paper, either?

24  A    Well, what do you mean, either?

25  Q    Well, you haven't -- well, this -- I think the Court knows

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002053

1 what I mean by that.  I --

2            MR. BAILOR:  Objection.

3            THE COURT:  Sustained.

4            MR. BAILOR:  Move to strike.

5            THE COURT:  Sustained.  Stricken.  Please don't argue

6 with the witness.

7 Q    When counsel took you through the first sentence, and then

8 said, oh, but there's more, and then he took you through half

9 the last sentence on the first page, it says, "These data

10 suggest --"  It doesn't say prove, correct?

11 A    Just like I use suggest.  That's right.

12 Q    "A novel tumorogenic mechanism of action of asbestos."

13 And then he didn't read on.  "And may contribute to the

14 understanding of precisely how asbestos exposure influences the

15 ideology and clinical course of malignant mesothelioma."

16 That's what the rest of that sentence said, correct?

17 A    Sure.  That's where we are.

18 Q    And not only that, but then counsel read from Page 13,

19 that recited a lot of different facts, or a lot of different

20 pieces of information about mechanism, and he got to a part of

21 it, and then he left off a lot of different statements about

22 activities, and insults, and cytotoxicity, and -- what was the

23 other --

24            MR. BAILOR:  I'm going to object to form here.  Could

25 we just ask the question?

CC-BLG002054

1  Q    There were references -- clastogenic and cyto --

2        THE COURT:  That's sustained.

3  Q    Clastogenic --

4        MR. BAILOR:  There's an objection that's been

5  sustained, Mr. Bernick.

6        MR. BERNICK:  Fine.  I'll withdraw the question.

7  Q    Clastogenic and cytotoxic referred to effects on cells,

8  correct?

9  A    And DNA.

10 Q    And DNA.  And to say that something is cytotoxic does not

11 mean that it's necessarily carcinogenic, correct?

12 A    Right.  Separating those two.  Clastogenic deals with DNA,

13 and cytotoxic with the cell.  That's right.

14 Q    Okay.  And clastogenic doesn't necessarily mean it's

15 carcinogenic, correct?

16 A    That's true.

17 Q    Okay.  So, when you -- and when you said, in answer to a

18 prior question, what is your opinion concerning whether fibers

19 less than five microns cause or could cause mesothelioma, you

20 gave a long answer that ended in the words biologically active.

21 Do you remember that?

22 A    Yes.

23 Q    And the fact that a material is biologically active does

24 not necessarily mean that it's carcinogenic, correct?

25 A    True.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Okay.  In fact, biological activity is a very general term

2  that's designed to refer to the fact that a substance occasions

3  some kind of response by the human body, correct?

4  A    Right.

5  Q    Okay.  So, on the question, just so we're clear, are you

6  stating as an expert -- as an expert here in Court, that fibers

7  less than five microns have been proven to cause not biological

8  activity only, but proven to cause mesothelioma?

9  A    The same as any other fiber.  You can say the same thing.

10 You've been taunting me all day about what shows disease and

11 what doesn't.  Asbestos causes mesothelioma.  My opinion is

12 that you can't exclude a specific fiber length.  That's my

13 opinion.

14 Q    Okay.  I didn't ask --

15         THE COURT:  Is the answer, Doctor, no, it hasn't been

16 scientifically proven, but your opinion differs in that you

17 think it does, nonetheless?

18         THE WITNESS:  No, not exactly, Your Honor.  The point

19 is that asbestos has been shown to cause mesothelioma.  There

20 are some scientists who say that if asbestos is less than five

21 microns it doesn't cause it.  And that's -- I disagree with

22 that.  Asbestos causes it.

23 Q    But I think -- if I can rephrase, or re-put what I think

24 the Court was drawing as a distinction, which is what I maybe

25 inartfully asked you.  Would you agree that science has not

**J&J COURT TRANSCRIBERS, INC.**

1 proven, has not demonstrated that fibers less than five microns

2 in length actually do cause mesothelioma?  Would you agree with

3 that?

4 A    I agree with that, and that fibers less than five microns

5 can't be excluded either.  That's not been demonstrated either.

6 And it's asbestos, so -- you know, my feeling is it can't be

7 excluded.

8 Q    Now, you did make reference to the fact that, well, you

9 know, different people may react differently, that is, there

10 may be case reports of people who got sick because individuals

11 may react differently and have different responses to asbestos.

12 Do you recall that?

13 A    Well, they do.  Sure.

14 Q    Okay.  Well, in point of fact, it's not within the purview

15 of your expertise to examine individuals, correct?

16 A    Of course not.

17 Q    Okay.  It's not within the purview of your expertise to

18 testify based upon individual clinical experience, correct?

19 A    Right.

20 Q    Okay.  And, in fact, isn't it true that you have never

21 actually done an assessment based upon your expertise of what,

22 in fact, did cause mesothelioma in a given individual, correct?

23          MR. BAILOR:  Objection.  Beyond the scope.

24          MR. BERNICK:  This is exactly his line of

25 questioning.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002057

1          THE COURT:  I think this is within the scope.  You're

2    asking him particularly about causes, and I think this fits.

3    I've kind of lost track where we were, frankly, with what was

4    on redirect.  So, I apologize if it's outside the scope, but I

5    think it's a fair statement within his expertise, so I'm going

6    to let it go.

7    Q    So, the question, Dr. Brody, is, isn't it true that it

8    does not fall within the purview of your expertise to express

9    any opinion regarding what actually did or did not cause

10   mesothelioma in a given individual?

11   A    Well, I haven't done that in a clinical sense other than

12   review the pathology.  I mean, I've reviewed a number of

13   pathology slides of individuals, and working with the

14   pathologists making -- helping to make a diagnosis, but that's

15   not what I would do in litigation, and that's not what I would

16   do in a hospital setting.

17   Q    Okay.  And by the same token, you don't know whether there

18   is a -- you don't know whether different reactions by different

19   people, if there are different reactions by different people,

20   you don't know whether, in fact, they do have a basis in the

21   genetic make up of individuals, correct?

22   A    Well, nobody can predict susceptibility.  We know it's

23   there.  Just look at what happens when you line up 100 people

24   and expose them to the same thing.  Some of them get disease

25   and some of them do not.  And that's based on their genetics.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002058

1  But I, nor anyone else now, can go and predict just what the

2  basis of that susceptibility is.

3  Q    Well, but in point of fact, to say that it's genetic

4  susceptibility that creates a risk factor for disease is

5  something that requires scientific proof.  You can't just

6  assume that that's the case just because a smaller number of

7  people get sick, correct?

8  A    Well, genetic susceptibility is an established concept.

9  We're not going to argue about that, I'm sure.

10 Q    Well, the question is whether it has been established that

11 there is genetic susceptibility to mesothelioma.  I've never

12 heard of a paper that expresses the scientific view that

13 genetic susceptibility has been proven for mesothelioma.

14 A    Oh.  Well, you've missed the boat, then.

15 Q    Okay.

16 A    Let me tell you about that.  All right?  If I may?

17 There's --

18 Q    No, I'm going to ask you --

19        MR. BAILOR:  Objection.  Let him complete his answer.

20        THE COURT:  No.  You may ask about this if we get

21 into it, because this is on recross, and frankly, this is

22 outside the scope of the redirect.

23        MR. BERNICK:  I'll withdraw the question.  That's all

24 I have, Your Honor.

25        THE COURT:  Mr. Bailor, do you want to follow this

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002059

147

1  line?

2          MR. BAILOR:  I don't think so, Your Honor.  I think

3  we can excuse the witness.

4          THE COURT:  Mr. Mullady?

5          MR. MULLADY:  Nothing further from the FCR.  Thank

6  you.

7          THE COURT:  All right.  Doctor, thank you.  You're

8  excused.

9          THE WITNESS:  Thanks.

10          THE COURT:  All right.  We will be in recess until

11  1:30.  Make it 1:40 so that you can have time to get back up.

12  Thank you.

13                          (Recess)

14          THE CLERK:  The Court will come to order.

15          THE COURT:  Be seated.

16                          (Pause)

17          THE COURT:  Mr. Bernick?

18          MR. BERNICK:  Yes, Your Honor.  Your Honor, I think

19  we have three matters of business to take up this afternoon.

20  First is the proffer of the remaining evidence in Grace's case.

21  Second is a discussion of the scheduling going forward.

22  Actually, I think we have agreed to switch that to last.  So,

23  the second order of business would be the motions that have

24  been filed with respect to Messrs. Krause and Snyder.  Peter

25  Krause, as you know, is a -- one of the principal claimant's

CC-BLG002060

1  lawyers in the case, and he was deposed.  Mr. Snyder, actually

2  a former player on the right side of the courtroom, on the

3  defense side.  But he recently -- or actually a few years ago

4  went off and became a testimonial expert for claimants in the

5  asbestos litigation, and he's been proffered as an expert

6  witness, and we have a motion with respect to him, and both of

7  those will be able to review the deposition testimony that was

8  taken in connection with their testimony over the last several

9  weeks.  And then finally is scheduling.

10        So, I think that the least controversial matter is

11 the proffer of the remaining evidence in our case, and we have

12 a series of things to proffer.  We've discussed this among

13 counsel, and I believe that we have agreement that there aren't

14 objections to these.  They comprise summaries of depositions,

15 and then some of the documents that were used in connection

16 with the depositions.  The summaries are depositions that

17 already have been offered into Evidence, and then others that

18 have not been offered into Evidence.  All of the summaries have

19 citations to the underlying testimony, so if Your Honor wishes

20 to consider any additional testimony that's referred to, that's

21 obviously available to the Court.

22        With respect to the depositions that have -- or, the

23 testimony that has not yet been proffered to the Court, we

24 understand that the ACC and the FCR have reserved their right

25 to offer in counter-designations to any of the matters that are

J&J COURT TRANSCRIBERS, INC.

1 set forth in the summaries as part of their case as a pre-

2 condition of their being prepared to proceed with the summaries

3 here this afternoon.

4         So, with that said -- and I guess there's one other

5 item of clarification.  Some of the summaries are of prior

6 testimony that relate to the assertion of a Fifth Amendment

7 privilege -- Fifth Amendment right with respect to the witness

8 subsequently, that is to say we have a series of doctor

9 witnesses who have taken the Fifth and their summaries both

10 comprise their assertion of the Fifth, and additionally other

11 testimony that they've given on prior occasions that we would

12 then tender to the Court in order to support our request that

13 the inference be drawn by the Court from the fact that the

14 Fifth Amendment right has been asserted, that the testimony

15 that they would otherwise have offered would be the same as

16 what had been offered before.  We want to be clear that the

17 evidence is being proffered by Grace.  Obviously Grace is

18 adverse to the ACC and the FCR, but we're not seeking to have

19 an inference drawn that in some fashion the ACC or the FCR were

20 instrumental or operative in connection with the assertion of

21 privilege.  It's not an inference that is adverse to the ACC

22 and the FCR.  It's an inference that's adverse to the witness,

23 so that the assertion of the Fifth Amendment does not have the

24 affect of foreclosing testimony that would otherwise be

25 forthcoming in the case.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002062

1        And with that clarification, I think I'll just go

2   through the summaries and offer each one.  Do you want to have

3   the doors closed?  Is that --

4        THE COURT:  Is there a problem?

5        AUDIO OPERATOR:  Maybe the inside doors, if you don't

6   want to hear the noise we can shut the outside --

7                    (Pause)

8        UNIDENTIFIED ATTORNEY:  Highest and best use.

9        MR. BERNICK:  There's a very important discussion

10  that's going on outside on the bench.  So, with all of that

11  said, and in case any of it's unclear I know it will be

12  clarified before we're done here, the first offer we would make

13  is Exhibit 2161, which is a summary with respect to the

14  testimony of Dr. Ray Harron.  The video -- or, the deposition

15  was played on January 24 of 2008 in --

16       MR. FINCH:  David, do you have an extra set of the

17  summaries in Court so I can follow along?

18       UNIDENTIFIED ATTORNEY:  Nate, I've got it.

19       THE COURT:  I did not bring the set back.  Are these

20  the same as the set you gave me earlier?  Because if so, I'll

21  just go get them.

22       MR. BERNICK:  Well, here's the Court copy.

23       UNIDENTIFIED ATTORNEY:  We're fine.  But thank you.

24       MR. BERNICK:  For Court.

25       THE COURT:  Okay.


                    J&J COURT TRANSCRIBERS, INC.

CC-BLG002063

1          UNIDENTIFIED ATTORNEY:   Now we have two.

2          THE COURT:   Thank you.

3          MR. BERNICK:   That was designed to be plain enough so

4    that I wouldn't forget it, but it didn't work.   So, the first

5    offer would be Exhibit 2161, which, as I indicated, is the

6    summary with respect to the deposition of Ray Harron played on

7    January 24 of '08.   We would offer that.

8          THE COURT:   Any objection?

9          MR. FINCH:   No, Your Honor.

10          UNIDENTIFIED ATTORNEY:   No, Your Honor.

11          THE COURT:   The next one is the summary for Andrew

12    Harron, and that is Exhibit 2162.   That was not previously

13    played, but we would offer the summary.

14          THE COURT:   Any objection?

15          MR. FINCH:   No, Your Honor.

16          MR. MULLADY:   None.

17          THE COURT:   It's admitted.

18          MR. BERNICK:   The same with respect to James Ballard,

19    2163, summary played on January 24 of '08.   That is the

20    deposition played at that time.   We would offer 2163.

21          MR. FINCH:   No objection.

22          MR. MULLADY:   No objection.

23          MR. BERNICK:   Dominic Gaziano, G-a-z-i-a-n-o,

24    deposition played January 24, summary is 2164.   We would offer

25    it.

**J&J COURT TRANSCRIBERS, INC.**

152

1          MR. FINCH:  No objection.

2          MR. MULLADY:  No objection.

3          THE COURT:  It's admitted.  2162 is admitted, as

4  well.  I don't know if I -- oh, wait.  Excuse me one second.

5  I'm sorry.  Ballard is 2163, correct?

6          MR. BERNICK:  That's correct.

7          THE COURT:  All right.  That's admitted.  I don't

8  think I said so.

9          MR. BERNICK:  Gaziano is 2164.  We would also offer

10 the summary of Oaks, 2165.

11         THE COURT:  Any objection?

12         MR. FINCH:  No objection.

13         MR. MULLADY:  No objection.

14         THE COURT:  One second.  It's admitted.

15         MR. BERNICK:  Lucas, 2166, which was -- the

16 deposition was played on January 24 of '08.  We would offer

17 that.

18         MR. FINCH:  No objection.

19         MR. MULLADY:  No objection.

20         THE COURT:  It's admitted.

21         MR. BERNICK:  Schonfeld, 2168, we offer that.

22         MR. FINCH:  No objection.

23         MR. MULLADY:  No objection.

24         THE COURT:  Admitted.

25         MR. BERNICK:  Dr. Richard Levine, which was read on

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002065

1  January 24 of '08.  We would offer the summary, which is 2172.

2            MR. FINCH:  No objection.

3            MR. MULLADY:  No objection.

4            THE COURT:  Admitted.

5            MR. BERNICK:  Dr. Philip Lucas, deposition played

6  January 24 of '08.  We offer the summary 2173.

7            THE COURT:  Is that -- that's different from 2166?

8            UNIDENTIFIED SPEAKER:  Yes.

9            MR. BERNICK:  Yes, it is.

10           THE COURT:  All right.  I'm sorry.  This is 2173?

11           MR. BERNICK:  Yes.

12           THE COURT:  All right.  Any objection?

13           MR. FINCH:  No objection, Your Honor.

14           MR. MULLADY:  No objection.

15           THE COURT:  Admitted.

16           MR. BERNICK:  Then we have 2174, which is Oaks,

17 again, another Oaks, 2174.  We offer that.

18           MR. FINCH:  Another -- you mean --

19           MR. BERNICK:  It's different --

20           MR. FINCH:  It's the same guy, different --

21           MR. BERNICK:  Yes.

22           MR. FINCH:  -- stuff?  No objection, Your Honor.

23           MR. MULLADY:  No objection.

24           THE COURT:  Admitted.

25           MR. BERNICK:  Segarra.  The summary is 2176.  We

CC-BLG002066

154

1  offer that.

2          MR. FINCH:  No objection.

3          MR. MULLADY:  No objection.

4          THE COURT:  Admitted.

5          MR. BERNICK:  Another Segarra, another summary, 2178.

6  We offer that.

7          MR. FINCH:  No objection.

8          MR. MULLADY:  No objection.

9          THE COURT:  Admitted.

10          MR. BERNICK:  The next one is a summary for

11  deposition of Charles Foster, played on January 24 of '08.

12  That's 2181.  We would offer that.

13          MR. FINCH:  No objection.

14          MR. MULLADY:  No objection.

15          THE COURT:  Give me a second here, please.  It was

16  played when?  I'm sorry.

17          MR. BERNICK:  January 24, '08.

18          THE COURT:  Okay.  It's admitted.

19          MR. BERNICK:  The next one is Heath Mason, deposition

20  played January 24 of '08.  The summary is 2183.  We would offer

21  that.

22          MR. FINCH:  No objection.

23          MR. MULLADY:  No objection.

24          THE COURT:  Admitted.

25          MR. BERNICK:  Additionally, we would offer the

**J&J COURT TRANSCRIBERS, INC.**

1  following exhibits which have been reviewed with counsel and we

2  believe to be without objection, and I'm just going to read

3  them in slowly as a sequence, Your Honor.  They are GX-135,

4  139, 140, 142, 146, 147, 148, 150, 151, 261 through 265, 269

5  through 271, 322, 323 and 479.  We would offer all of those

6  exhibits, plus 143.  Okay.  We would offer that, as well.

7          MR. FINCH:  No objection.

8          THE COURT:  Are they in a binder somewhere?

9          MR. MULLADY:  No objection.

10         UNIDENTIFIED SPEAKER:  We kept them together with the

11 dep designations that we were going to offer, but we can put

12 them in a binder for you, Your Honor.

13         MR. BERNICK:  And let's just do that so we could

14 label it, Your Honor, as exhibits in connection with the dep

15 summaries.

16         THE COURT:  All right.  They're admitted.

17         MR. BERNICK:  And with that, and subject to the

18 reservation that Your Honor -- we were considering whether

19 there needed to be reservations, and in that respect thought

20 back on objections that had been raised with respect to Your

21 Honor, and whether any of them, if granted, might be cured by

22 our calling a witness.  And we think that there may be one or

23 two.  For the most part Your Honor has allowed evidence in

24 subject to deciding the objections later on, so we have made

25 the record.  But there are a couple areas where that's not so,

CC-BLG002068

1  so I want to make sure that I reserve our right to put in

2  additional evidence in the event that Your Honor has determined

3  that for some reason we didn't create an appropriate foundation

4  and we need to create that foundation.  Subject to that caveat,

5  we would rest our case-in-chief for the estimation.

6           THE COURT:  Okay.  I think it would be better if the

7  witnesses are available to put that foundation in so that I've

8  got the whole record and can get through this process.  What I

9  don't want to do is find out that some objection is going to be

10  sustained, you think there's a cure, and I have to reopen this

11  case four months or five months from now.

12           MR. BERNICK:  I don't think that -- I understand

13  that, but I think that Your Honor has ruled on -- there are

14  objections that Your Honor ruled on with regard to foundation,

15  whether somebody could rely upon something.  And Your Honor let

16  the testimony in, but then said you may decide later on that

17  you want to hear more.  And we -- if you do decide that, we

18  will make those people available.  But right now we don't see

19  that Your Honor has told us to or that we need to.

20           THE COURT:  I see.

21           MR. BERNICK:  So, there's no point in our extending

22  the case on the basis of the possibility that Your Honor may

23  reconsider down the road.  But I do think that -- and it may

24  well be this just turns out to be a non-issue, but before the

25  -- all of the evidence closes, you know, we'll be sure to raise

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002069

1  the issue again to see if there's somebody else that Your Honor

2  would need to hear from.

3          THE COURT:  All right.

4          MR. FINCH:  Your Honor, we object to resting with a

5  reservation of rights.  A Court always has the power to reopen

6  a case at a party's request, but it's our position that if the

7  debtor rests, the debtor rests.  The debtor made the choice as

8  to what witnesses it would present and what testimony it would

9  elicit from them.  And it's our position that he cannot rest

10  the case subject to a reservation to recall a witness if, later

11  on, he wishes he had.  So, while he may make the motion at the

12  proper time, but I don't think there's any -- any authority for

13  resting subject to a reservation of rights.

14          MR. BERNICK:  Well, that's not -- it really has

15  nothing to do with what I've just said.  We're not choosing

16  about who we're going to call or not call.  The Court has said

17  that you may wish to hear from additional witnesses, and in

18  that circumstance we will be providing those witnesses.  And if

19  that's something that the Court feels is not necessary, we

20  won't.  It's not at our election.  It's at the Court's

21  election.  I just want to make sure that we haven't waived.

22          MR. FINCH:  Your Honor, we object to resting with a

23  reservation of rights.  They either rest, or they don't rest.

24          THE COURT:  I think the issue is this.  If I have

25  stated that I thought that a foundation had been satisfied, but

CC-BLG002070

1  then determined, in looking at the record, that it had not, but

2  the problem is that I admitted the evidence and then conclude

3  later that I shouldn't have had, the problem is that I will

4  have created error on the record because somebody relied on a

5  document that I have now said I thought there was a foundation

6  for, but there wasn't.  And how do you handle it?  That's the

7  issue.  I think, Mr. Bernick is trying to get to, it's going to

8  apply to all of you.  I hope not to have to reverse those kinds

9  of decisions, but if I do have to reverse that kind of a

10 decision, I think that as to all of you the issue would be do I

11 give you an opportunity to lay the foundation if another

12 witness has relied on it, and I think in good conscience I'd

13 have to say yes.  I'd give whoever the party is the opportunity

14 to lay the appropriate foundation in some fashion if that

15 happens and we get there.

16        MR. FINCH:  Your Honor, that's true, and that's up to

17 the Court.  But it's up to the Court to decide at the proper

18 time --

19        THE COURT:  Right.

20        MR. FINCH:  -- not now.  You cannot rest with a

21 reservation of rights.  I've never heard of that.

22        THE COURT:  Well -- and I agree.  You don't rest with

23 a reservation of rights, but that's what I understand the issue

24 to be.  I think it's a fairness issue on behalf of the Court,

25 since I have told you all that I'm making rulings as we go

CC-BLG002071

1 along to control the process of the trial, but that I'm going

2 to consider all the evidence at the end.  And I think that's

3 the problem that you all face in the context of this, and I

4 certainly don't intend to step on anybody's evidentiary rights

5 as we go through this process, so -- okay.

6          MR. BERNICK:  So, I think with that, the next order

7 of business is -- well, do you want to deal with the scheduling

8 now and just get it --

9          MR. FINCH:  No, no.  Has the debtor rested?

10          MR. BERNICK:  I just told you exactly what I did.  If

11 there's something else that you'd like to take up, feel free to

12 make another request of the Court, but --

13          MR. FINCH:  Your Honor, if the debtor has rested, the

14 ACC and the FCR would make a motion pursuant to Rule 52(c) for

15 partial judgment as -- a judgment on partial finding as a

16 matter of law.  It's our position that in an estimation for

17 purposes of 524(g) under the Bankruptcy Code, that the thing to

18 be estimated is the cost that the debtor would incur going

19 forward if it had either passed the asbestos claims through

20 unscathed and unimpaired, or if it had stayed in the tort

21 system.  That is what the -- we believe the controlling case

22 law requires one to estimate.  And as was very clear from Dr.

23 Florence's testimony yesterday, there's not a shred of evidence

24 in the record as to what the debtor's expected liability for

25 pending and future asbestos claims would be in the tort system

**J&J COURT TRANSCRIBERS, INC.**

1  had it either not gone into bankruptcy or had it passed the

2  claims through.  So, we request a partial judgment on --

3  judgment as a matter of law and partial findings pursuant to

4  Rule 52(c).

5          MR. BERNICK:  I don't believe that Rule 52(c) even

6  has application in connection with an estimation proceeding.

7  Your Honor is going to issue a decision on that matter.  I

8  don't even know it takes the form of a judgment.  I don't know

9  who the parties to the judgment would be.  So -- but in any

10  event, we disagree with the legal position that's been asserted

11  by the ACC and the FCR for all the same reasons that were set

12  forth in the trial briefs.  And I understand that they may

13  choose to make their record, but I don't think that there's

14  anything further that would be required of the Court at this

15  time.

16          MR. MULLADY:  And for the record, Your Honor, the FCR

17  joins the motion made by the ACC.

18          MR. BERNICK:  So, with respect to scheduling --

19          THE COURT:  Wait --

20          MR. FINCH:  Excuse me.  Could we have a ruling on our

21  motion?

22          THE COURT:  Yes.

23          MR. FINCH:  I know you've ruled, Mr. Bernick.

24                      (Laughter)

25          THE COURT:  The motion is denied.  As I had indicated

**J&J COURT TRANSCRIBERS, INC.**

1  earlier, I am going to consider all of the evidence at the end

2  of the case.  I think that the cases, to date, have looked at

3  an uncontested, in the sense of the issue that you've raised,

4  proceeding.  I have gone back and tried to look at every

5  estimation case that involves a mass tort.  I cannot find one

6  that looks at the issues in the fashion that the debtor has

7  crafted them exactly.  There is a changing landscape out there

8  with respect to what mass tort litigation may be as of a time

9  in the past, I think as of the time post-petition for this

10 debtor, but nonetheless, as of a time in the past, and that

11 past is obviously not the present.  And that will, I think,

12 apply going forward into the future, and that will definitely

13 affect, I believe, the estimation for future claims.  The cases

14 say that although you'd make the estimation for present claims

15 obviously as they're pending in the tort system as of the time,

16 and the cases do, at this point in time, focus on what the

17 debtor's liabilities would have been in the tort system.  They

18 also recognize that as to future claims you have to take

19 account of what that changing landscape would be.  And as a

20 result, I think there are some changes to what past cases have

21 looked at because there is a recognized and acknowledged change

22 in what that landscape has been.  And as a result, I am not

23 satisfied that what has gone on in all cases in the past is

24 what the world should be, or is.  Not just should be, but, in

25 fact, is at this time.  So, I'm overruling that motion.  I'm

**J&J COURT TRANSCRIBERS, INC.**

1 going to hear all the evidence, and then I'm going to figure it

2 all out at the end.

3          MR. FINCH:  May I make one statement for the record,

4 Your Honor?

5          THE COURT:  Yes.

6          MR. FINCH:  The debtors also did not put on any

7 evidence of what, if any, changes there have been in tort law

8 or tort procedures since the bankruptcy petition date, and I

9 would ask the Court to revisit its review of the Owens Corning

10 decision, where the issue was squarely addressed what is it to

11 be estimated, the liability of the debtor in the tort system,

12 or the liability of the debtor assuming claims qualification

13 procedures that may be very different from the tort system that

14 could be adopted by a trust.  That issue was the number one

15 issue addressed and decided by Judge Fullam in the Owens

16 Corning case, and he squarely held that the thing to be

17 estimated is what is the future cost to resolve pending and

18 future claims in the tort system, not under some kind of

19 alternative hypothetical regime using very different criteria

20 than what the debtor had applied historically.

21          MR. BERNICK:  You know, Your Honor, we can go through

22 this.  We have briefs that run to a hundred pages.  That is,

23 a), a misreading of that case, b), that case never raised and

24 never considered the structure of the Bankruptcy Code and what

25 the Bankruptcy Code requires before a claim either a present or

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002075

1  a future claim can be paid at all.  It may be that they teed up

2  these issues, that is the ACC and FCR teed up these issues in

3  connection with other cases where the parties took different

4  positions, but they're not this case.  In this case the Court

5  has been totally clear that Your Honor, is going to decide

6  these matters as they are presented to the Court and based upon

7  the law and the facts.

8          And to have an argument about what Judge Fullam

9  decided when these matters were not placed before the Court is

10  really kind of an irrelevance.  And in fact it presumes that

11  the Court is not an independent Court here and won't consider

12  this case based upon the law and the record that's presented

13  here.  And so to keep on arguing as we constantly hear now,

14  well, what's happened in other cases doesn't really advance the

15  cause.  It certainly doesn't advance the cause of getting this

16  case complete.

17          If we're going to have a full argument, as we did in

18  opening statement in connection with the law and what the facts

19  are, I'm more than happy to do that.  But to have this

20  continuing dialogue where at every point in order to, quote,

21  make their record, they got to get up and say oh, well, you

22  know, gee, the cases have been decided the other way around, I

23  just don't really think is a very productive use of our time

24  with all due respect to the fact that we're now at the resting

25  of our case.


**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002076

1          THE COURT:  Well, stare decisis principles have in

2    fact governed the principles of jurisprudence in this country

3    for a very long time, Mr. Bernick.  So I'm not necessarily

4    prepared to set them all aside.  But nonetheless, I do think

5    that this case has taken off on a tangent of its own and I am

6    going to hear all of the evidence and decide it at the end.  So

7    the motion is denied.

8          MR. FINCH:  Thank you, Your Honor.

9          MR. BERNICK:  Thank you, Your Honor.  Now, with

10   respect to the trial time we have a major, major issue.  What

11   we have done, and what I'm putting up on the monitor here is

12   we've tried to figure out based upon -- both sides have

13   exchanged not only lists, but estimates of the time that it

14   will take to complete testimony.  And Your Honor underscored, I

15   think, at our request at the conclusion of proceedings last

16   week that we should get a list -- a real list of the witnesses

17   that they're actually going to call.

18          And so we've now been given that list.  There are a

19   couple of people who have been taken off.  But basically what

20   we have here is the current list together with the time

21   estimates that have been provided, some of them with respect to

22   some witnesses.  All we have are their designations, for

23   example, of our people's depositions and we haven't really had

24   the opportunity to see how much we're going to have to

25   designate in response.  So it's not a perfect situation.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002077

1         But the bottom line really is quite clear which is

2    that based upon their list and the estimates of time we won't

3    even get through their case in chief, to say nothing of our

4    rebuttal or any surrebuttal they might have within all of the

5    trial days that have been allotted.  It's just not going to

6    happen.  And we had a very extended discussion at the behest of

7    the ACC and the FCR before this trial began, the thrust of

8    which was how can we be sure that this case is going to be

9    completed on time?  Complete with injunctions and warnings that

10   counsel for the ACC were not going to be available beyond a

11   certain point in June.  And I think our position was that we

12   could make it happen, we can get this case done, we don't have

13   to have a formal clock, but we can get the case done.

14        It now appears that perhaps our position was ill-

15   advised.  Because what's happened is that we're done with our

16   case in chief within a period of less than seven days and we

17   now have upwards of 11 perhaps 12 or 13 days that they've

18   reserved for the presentation of their evidence.  This is

19   simply not workable.  And either they don't intend to finish

20   within the trial days that are allotted, or they're not telling

21   us what their real list is and how long these people are

22   actually going to take.  Either way we shouldn't have to be

23   wrestling with the burden of either problem.

24        We should have a schedule from them that calls it the

25   way that it is.  Either they're going to be done much sooner

**J&J COURT TRANSCRIBERS, INC.**

1 and they're not going to call these witnesses, all of them or

2 they're not going to take as long as they've said, which I'm

3 skeptical of given the time estimates that they've given for

4 cross, or we're going to need more trial time, in which case

5 they ought to make themselves available for that trial time.

6         Now, my client's vast overwhelming preference is that

7 we stick within the trial schedule.  I'm sure that that's the

8 Court's preference as well.  But I can't -- I don't think it is

9 correct, fair, appropriate that we have to prepare for all of

10 these witnesses when they're not going to be called or prepare

11 for long deposition designations when they're not going to be

12 used and deal with the uncertainty of what this trial schedule

13 is going to be like.  It's got to stop.

14         And what I would ask the Court request of the ACC and

15 the FCR is they go back to their drawing boards between now and

16 next Monday and come up with a real list of witnesses and a

17 real schedule so that we can get this case back on track.

18 Because right now it's not even close.  And the debtor has not

19 worked this way.  We gave them a definite list.  No more, no

20 less, we finished on schedule.

21         THE COURT:  Well, I ordered a definite list to be

22 given to you last Friday.

23         MR. BERNICK:  What?

24         THE COURT:  I ordered them to give you a definite

25 list last Friday.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002079

1          MR. BERNICK:  This is it.

2          UNIDENTIFIED ATTORNEY:  No.

3          MR. FINCH:  No, that's not what we gave him, Your

4    Honor.

5          MR. BERNICK:  Well, this is -- well, I believe this

6    is absolutely the best and most current information that we

7    have.

8          MR. FINCH:  No.  We certainly didn't have Mr. Longo's

9    testimony on June 3rd and 4th.  Let me back up, Your Honor.

10         MR. BERNICK:  No, no.  You have Longo -- we put the

11   dates in driven by the time estimates.  These are not the dates

12   that you all had because you didn't consider the time period

13   that had been allotted for the examination of any of these

14   people.  You artificially had everybody crammed in to a shorter

15   period of time.  It's not going to happen because the time

16   estimates and the scope of testimony that you all have proposed

17   is completely out of sync with the calendar.  That's the

18   problem

19         THE COURT:  All right.  Let me start from the

20   beginning.  Is this the accurate list of witnesses that you

21   expect to call?

22         MR. FINCH:  We -- yes, Your Honor, but we never

23   intended to read the deposition testimony in open court of Mr.

24   Hughes or Mr. Beber or anyone else.  We had intended to proceed

25   by summaries and in handing out the depositions for the Court

**J&J COURT TRANSCRIBERS, INC.**

1  for the record so the debtor can object or do whatever it wants

2  to with that.  But we were going to proceed with respect to

3  those depositions the way they just proceeded this afternoon

4  with respect to some of the doctors who testified by

5  deposition.  So that's not going to take any -- we shouldn't

6  take any courtroom time.  Secondly, I think --

7            UNIDENTIFIED ATTORNEY:  Two days.  That takes care of

8  two days.

9            MR. FINCH:  That takes care of two days on this.  I

10  think that --

11            MR. BERNICK:  So now we're to June 3rd.

12            UNIDENTIFIED ATTORNEY:  Can we finish?

13            MR. FINCH:  May I please continue, Your Honor?  We

14  had our first witness Dr. Brody.  I had not anticipated that we

15  would finish in time with him today to bring Dr. Welch in, so

16  that's my fault that Dr. Welch is not here this afternoon.  But

17  our next two witnesses are Dr. Roggli who's available on the

18  7th only, and Dr. Welch who's available on the 7th and 8th.  So

19  we would have Dr. Roggli's direct examination and cross

20  examination on the 7th and Dr. Welch's direct examination.  And

21  I don't know whether we would finish the cross on the 7th or

22  not.

23            On the 8th there would be the testimony from an

24  industrial hygienist Steven Hays.  And then as to the next two

25  witnesses are Marshal Shapo and Steven Snyder.  And it is --

**J&J COURT TRANSCRIBERS, INC.**

1 that is the order in which we will present them, although the

2 one caveat to that is Mr. Snyder is available on the 9th and

3 the 14th only and not on the 15th.  And so we very well may

4 decide that Mr. Shapo may be a rebuttal witness or a

5 surrebuttal witness rather than a direct case witness.  And so

6 I would anticipate that we would get to Mr. Krause on the 14th.

7        I don't think we need to call Mr. Radecki at all.

8 Mr. Radecki is being proffered for solely for purposes of the

9 discount rate and the inflation factor for one of our -- the

10 discount rate for two of our experts and inflation factor for

11 one.  I don't think there's going to be any big dispute.  This

12 case is not going to turn on which discount rate a witness use.

13 I would hope that we could work out a stipulation on the

14 discount rate with the debtor.

15        And it was my intention or my thought that on the

16 15th of April we would put Dr. Peterson on.  His testimony, I

17 assume, would take a day like Dr. Florence's.  The 16th of

18 April would be Ms. Biggs.  And then on the 5th of May we would

19 finish our case with Mr. Longo and Mr. Myer and Mr. Stallard.

20        MR. BERNICK:  All in one day?

21        MR. FINCH:  Well, perhaps it would spill over to the

22 6th, but I think we would basically be done by the 6th of May.

23        MR. BERNICK:  Well, first of all, that's not the

24 list.  That's now an amended list.  I'm very happy to have it

25 amended.  But what I would ask the Court to do is to have them

CC-BLG002082

1 put that down in writing so we can see where it ends up and

2 we're still going to have a problem with time.  There is a

3 rebuttal case.  And the rebuttal case is not an insignificant

4 case.  And that's not just our doing, it's their doing as well.

5 So all I ask Your Honor is that they come up with a schedule

6 that's a real world schedule.  It's very helpful to know that

7 Mr. Shapo will be a rebuttal witness if he's called, that Mr.

8 Radecki doesn't need to testify.

9             MR. MULLADY:  Well, just to clarify, that decision

10 hasn't been made yet about Professor Shapo.  He's an FCR

11 witness.  The present intention is that he will be here

12 testifying April 9th.  I think what Mr. Finch said accurately

13 is that it's possible that he will be pulled and submitted as a

14 surreply witness.

15             THE COURT:  Yes.  That's what he said.

16             MR. MULLADY:  Okay.  Thank you.

17             MR. BERNICK:  That is precisely the problem.  They're

18 still trying to figure out what they want to do, and they're

19 doing it at our expense.  We gave them committed lists and we

20 met with them, and we met them, and that saved them a ton of

21 work in the process.  We chopped off all kinds of witnesses.

22 We need the same treatment and response, and we would ask that

23 revised list be submitted by Friday that shows that we are in

24 fact going to finish this case by the 4th.  And if we're not

25 going to finish the case by the 4th, then we need to take up

CC-BLG002083

1  next Monday what's going to happen with the balance of the

2  case.  We can't have the case continue to spill along at the

3  convenience of, or subject to the schedules of counsel.

4           THE COURT:  By the 4th of June?

5           MR. BERNICK:  No.  Yes.  That was the plan.  By the

6  4th of June.

7           THE COURT:  Okay.  I'm sorry.  I just lost whether

8  you were talking about the ACC/FCR case they said May 6th or

9  whether you were talking the entire case.  I just wasn't --

10          MR. BERNICK:  The entire case --

11          THE COURT:  Okay.

12          MR. BERNICK:  -- is supposed to be done by the 4th of

13  June.

14          THE COURT:  All right.  I think the concept of

15  getting a final list is what I had ordered earlier.  So, yes --

16          MR. FINCH:  And we gave them that list, Your Honor.

17  We gave them that list.  We filed it on March the -- last

18  Friday.  Whatever day that was.

19          MR. BERNICK:  So for -- three days we now see that

20  it's already changed.

21          MR. FINCH:  No.  The only thing that has changed is

22  we told you -- it wasn't a change, we told you that we didn't

23  intend to read the Hughes and Beber material to the Court.  And

24  the only change is the possibility solely based on --

25          THE COURT:  All right.  Folks, you know this really

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002084

1  is not a discussion you ought to have to have here in court.

2  This is really a discussion that you folks ought to be having

3  on your own.  I honestly don't know what it is that I'm going

4  to add to this except that it seems to me that if they're

5  telling you they're going to be done by May 6th they should be

6  done by May 6th.  And yes, you should get a final witness list

7  and an order so that you can adequately prepare cross

8  examination.

9          MR. BERNICK:  Yes.  Unless we have -- unfortunately,

10  unless we have these discussions before the Court it just

11  doesn't get done.

12          THE COURT:  Well, I'm ordering it to get done.  I

13  mean, you folks talk to each other about everything else.  Why

14  don't you talk to each other about schedules?

15          MR. FINCH:  We filed a list that -- the order of

16  witnesses is what he put up there.  The time estimates and the

17  time that he showed up there is very different from our

18  conception of the list.

19          THE COURT:  All right.  Then get together about the

20  time estimates.  Because, you know, folks, you've been doing

21  this a long time.  You ought to know by now.  Dr. Peterson has

22  testified in how many asbestos estimation cases?  At least a

23  half a dozen.  You ought to know by now how long your case is

24  going to take with him.

25          MR. FINCH:  We do.

**J&J COURT TRANSCRIBERS, INC.**

1        THE COURT:  Well then talk to each other about it so

2   that it shouldn't be an issue.  Both for direct and cross you

3   ought to know how long the cases are going to take for these

4   doctors.  And if it's going to be a one day/one doctor deal

5   then say that and we'll know.

6        MR. HOROWITZ:  Your Honor, Greg Horowitz for the

7   equity committee.  Since you mentioned the getting together on

8   time estimates I want to make one thing clear.  Nobody has

9   talked to the equity committee about any estimates of time that

10  we would have for cross.  We do intend to cross some of these

11  witnesses.  Notwithstanding what Mr. Bernick put up that is not

12  a complete list of the time estimates as far as we're

13  concerned.  And we've never seen any of these estimates.  We

14  have not been involved in any of these discussions we think we

15  should be.

16       THE COURT:  Fine.  I'm ordering all counsel for all

17  parties, that includes the creditors' committee, to get

18  together as soon as today's hearing is adjourned.  You are not

19  free to leave this courtroom until you have come together on a

20  schedule of all witnesses, how long it will take to do the

21  direct and cross.  If you miss your planes, so be it.

22  Hopefully that will be a time period which will be meaningful

23  to you so that you can get out of town on time.  Okay.  Next,

24  Mr. Bernick.

25       MR. BERNICK:  Yes.  We have motions that are pending

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002086

1  with respect to Messrs. Krause and Snyder.  And I've got some

2  summaries to show the Court in order to facilitate the

3  consideration of what as predicted turns out to be a rather

4  twisted set of tales and issues.

5          MR. FINCH:  Your Honor, may we ask that the motions

6  be limited to 20 minutes per side per motion in limine?

7          MR. BERNICK:  I'd be happy to do that except the last

8  time that happened we followed the limit and they went 15

9  minutes over because they had more people who wanted to talk.

10 That is a request that I'm happy to accommodate if it actually

11 applies to both sides.

12         MR. FINCH:  It will.

13         THE COURT:  Okay.

14         MR. FINCH:  And I had requested of Mr. Bernick as a

15 personal courtesy that we do Snyder first.

16         MR. BERNICK:  Okay.  We'll take up Mr. Snyder first.

17         THE COURT:  I'm sorry.  What's the request?  You want

18 to do 20 minutes per side per witness?

19         MR. BERNICK:  Correct.

20         THE COURT:  So 20 on Snyder --

21         MR. FINCH:  And then 20 on Krause.

22         MR. BERNICK:  I have to say, Your Honor, I'm not

23 going to take 40 minutes to talk about both of these people.

24 So I'm happy to do it any way the Court pleases.

25         THE COURT:  It doesn't matter to me, Mr. Bernick.

**J&J COURT TRANSCRIBERS, INC.**

1 | That's fine.

2 |        MR. BERNICK:  Okay.  Your Honor, with respect to Mr.

3 | Snyder, there's a question of how to put an awful lot into a

4 | relatively small package.  But essentially Mr. Snyder is former

5 | defense counsel for <u>Fibreboard</u> and then for a period of time

6 | the <u>Owens Corning Corporation</u>.  He was a very active lawyer

7 | defending those clients for many, many years in litigation all

8 | over the United States.  At a point, Owens Corning decided to

9 | enter into what they called the National Settlement Program.

10 | That included <u>Fibreboard</u>.  And at that point the litigation

11 | business for those two entities wound down considerably.  That

12 | was also the period of time when the Supreme Court was being

13 | asked to consider global class action settlements with respect

14 | to those companies.

15 |        Ultimately Owens Corning never really emerged from

16 | the process of being involved in the National Settlement

17 | Program.  When the Supreme Court overturned those decisions

18 | that underpinned the settlements, Owens Corning was essentially

19 | left with trying to keep on maintaining the National Settlement

20 | Program.  It didn't work and Owens Corning went into

21 | bankruptcy.  As kind of a transition Mr. Snyder, really coming

22 | out of the loss of a major asbestos case called <u>Kozey</u> in

23 | Mississippi in the late 1990's, decided to take on

24 | representation of Owens Corning against the tobacco industry.

25 | The proceeds from that settlement being proceeds that would go

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002088

1  to people probably of whom some of them were also asbestos

2  claimants.  But be that as it may his career took a major

3  change.  And from that point going forward into the 2000's Mr.

4  Snyder has acted in a variety of capacities both as expert

5  witness and as counsel in various capacities for people who

6  represent or who are the interests of personal injury

7  claimants.

8          For the Court's information, Mr. Snyder is counsel

9  for Flintkote in connection with the Flintkote litigation out

10  in California.  So in one of his roles he has taken on the task

11  of being an expert witness in this case for either the ACC or

12  the FCR.  I think it's for the ACC.  And he has offered a very,

13  very extensive report as an expert, but then also as a fact

14  witness.  And in that expert report he essentially goes through

15  chapter and verse in a tremendous level of detail of the ins

16  and outs of how Owens Corning and Fibreboard defended their

17  cases.  And he has a whole bunch of observations about what

18  worked and what did not work, and basically the bottom line is

19  that nothing worked.  And they had to pay to get rid of their

20  liability and they did pay to get rid of their liability.  And

21  to try to defend the cases on any other kind of basis would

22  have been fruitless and non-economic.  And he then brings to

23  bear all of that wisdom and accumulated learning to say that

24  well, the same thing would have happened to Grace.

25          If Grace had stayed in the tort system that they also

**J&J COURT TRANSCRIBERS, INC.**