1 scarcity of resources and funds.

2         That is his -- I must have asked him three different

3 times what is the objective test.  And the best thing that he

4 can do is go back and candidly say well, if I take a look at my

5 own career what is, you know, what kind of stands out?  And the

6 answer is well, I pushed the limits and I was a creative guy

7 and I tried to understand things.

8         So if that's the test and that's the measure is that

9 really a methodology at all?  Things that he did not review.

10 He did not review any of the claims files.  He has no -- none

11 of the claims files data.  He did not make any assessment to

12 the quantitative contribution of the factors important to the

13 settlement process with respect to any monetary portion that

14 Grace played.  That is, he talks about the settlement process,

15 but he has no analysis that actually takes that settlement

16 process and shows how it drives claim value.

17         And then what about his expertise?  The expertise

18 that he brings to bear.  And Mr. Snyder is a colorful guy and

19 he had very colorful testimony.  Why is his expertise different

20 from other asbestos lawyers?  You know, why is he any

21 different?  And the answer is, quote, I just have a lot more

22 moss on my back I think.  I've just been around a long time and

23 have seen a lot of things.

24         What about the facts and analysis underwriting his

25 report?  He says they're based upon 26 or 27 years of just

CC-BLG002094

1  doing it.  And again, what distinguished him?  Quote, I pushed

2  maybe the limits of the litigation a little bit more vigorously

3  and hopefully more creatively than some others.  That's his

4  expertise.  He's an in the trenches lawyer.  That means he's

5  going to come into this court and basically offer an opinion on

6  20, 30 years of Grace litigation as a, quote, expert.

7          What about the reliance materials and methodology

8  related to his opinions on motivation, because he's addressing

9  motivation?  I think it's etched on my face as well as my mind.

10 It has to do with my, you know, the size of my belt.  Which is

11 not inconsiderable, but he wears it well.  It is as a matter,

12 you know, what my blood pressure reading is at any given time.

13 And you almost get the sense that the guy is not just being

14 candid he's being dismissive.  If he doesn't want to come in,

15 if he can't come in and offer truly objectively driven

16 testimony, what he brings in its place is almost demeaning of

17 the idea of being an expert witness.

18         What is the standard of basis on which the quality of

19 Snyder's work can be judged?  He says, quote, I talk about

20 practical outcomes in the litigation.  I haven't tried to throw

21 any academic construct around any of this.  Well, that's

22 exactly the problem.  He may call it academic, but you need to

23 be able to testify as an expert, you need to have a construct.

24 That's the whole idea of having principles and reliable and

25 reproduceable methodology is that there has to be a constrict

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002095

1  so it's not construct so it's not simply a matter of your say-

2  so.

3          How does he talk about his own methodologies?  Well,

4  quote, one of my methodologies was simple economics.  What

5  incentivized people to do things?  Money, marketplace forces.

6  I guess that's a methodology.  Part of the method was, quote,

7  basic rules of economic supply and demand negotiation of price.

8  Well, those are easy to say.  They're undoubtedly true in a

9  very broad sense.  That doesn't constitute a methodology for

10  actually analyzing claims behavior on an objective and reliable

11  basis.

12          He then says, further I think it's, you know, basic

13  accounting and bookkeeping and a smattering of economics.

14  There's nothing you wouldn't get in the first two years of

15  undergraduate school.  That made me feel comfortable because I

16  like to think that I can do the same thing as Mr. Snyder based

17  upon my experience.  But I don't think it's appropriate to

18  bring some other person in who's like one of the other lawyers

19  in this court and have them occupy a special status as an

20  expert.  That's not what we're here for.  And he admits he's

21  neither an economist nor an accountant.

22          So we really have almost what would be an

23  entertaining piece in a legal magazine, maybe the American

24  Lawyer will get involved in this, that of all places where ipse

25  dixit should not come into place.  Our federal courts involved

CC-BLG002096

1  in sophisticated type cases as we have here.  And what do we

2  have?  We have an expert that gets up there in bold colors and

3  with bold bravado says hey, you know, I'm a heavy guy.  I'm a

4  guy who has been through this, and I got a lot of experience.

5  I'm going to tell it the way that it is.

6          That is not appropriate for expert testimony and it

7  actually shows to a certain extent disrespect for the rules

8  that have evolved over a long period of time now under <u>Daubert</u>

9  and are incorporated in Rule 702 and 703 of the Federal Rules

10 of Evidence.  So we would move for the exclusion of Mr. Snyder

11 as an expert witness based upon his own testimony in this

12 deposition.

13          MR. FINCH:  Your Honor, my partner Walter Slocombe

14 will argue this for the ACC.  Mr. Slocombe is a member of the

15 bar of the District of Columbia.

16          THE COURT:  All right.  Thank you.

17          MR. SLOCOMBE:  Good afternoon, Your Honor.

18          THE COURT:  Good afternoon.

19          MR. SLOCOMBE:  As Nate Finch just said, my name is

20 Walter Slocombe and I represent the ACC.

21          As you know, Your Honor, the position of the ACC and

22 the FCR is that the issue in this case is ultimately what Grace

23 would have had to pay if it had still been subject to suit

24 rather than been in bankruptcy.

25          THE COURT:  Yes.  But how does that have anything to

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002097

1  do with what Owens would have had to pay if it had still been

2  subject to suit and not in the bankruptcy?

3        MR. SLOCOMBE:  Mr. Snyder's testimony is not contrary

4  to what Mr. Bernick said primarily about what happened with

5  Owens Corning or Fiberglass -- <u>Fibreboard</u>.  Sorry.  It is about

6  how the system worked, how it worked for Grace with specific

7  reference to Grace's experience.  He didn't represent Grace,

8  but he knows a lot about what happened to Grace.  He also knows

9  a lot about what happened --

10       THE COURT:  How does he know what happened to Grace

11  other than how anybody knows what happened to Grace in terms of

12  reading about things in the newspaper and so forth if he didn't

13  represent Grace and didn't work for Grace?

14       MR. SLOCOMBE:  Let me address that, Your Honor.  He

15  talks in his report, and he will talk when he testifies about

16  how he knows what happened to Grace.  Some of it was Grace was

17  co-defendant.  Some of it were cases.  This is a man with a

18  quarter century experience in this very specialized field.

19       THE COURT:  It doesn't matter.  You're talking now

20  about his fact component.  I'm talking about his expert

21  component.  And if he knows what happened to Grace because

22  Grace was subject to a lawsuit and either settled out or

23  suffered an adverse verdict and he was an attorney and has fact

24  knowledge that's a different issue.  We're talking about his

25  expertise right now.

CC-BLG002098

1          MR. SLOCOMBE:  Of course his expertise involves

2     facts.   Indeed.   Part of Mr. Bernick's objection is it doesn't

3     involve facts.   He will explain how he knows these things about

4     Grace.   Mr. Bernick is free to cross examine him and if he

5     doesn't think that's appropriate basis he can do that.

6          THE COURT:   I'm trying to look at either the <u>Kumho</u>

7     <u>Tire</u> or the <u>Daubert</u> standards with respect to Mr. Snyder.   I

8     can't understand from looking at his report what type of

9     methodology whether you want to call it scientific, legal,

10    practical, based on one of their expertise.   What is the

11    methodology that he's using that can be put up on a screen that

12    another expert in his field -- because frankly I don't even

13    know what the field is in which he's claiming an expertise.

14    But whatever it is how's it going to be replicable and where is

15    it peer review?   Where is it studied?   What is it that the

16    expertise is supposed to do that's going to inform this Court

17    about something other than legal conclusions?   Because that's

18    what I can't pick up from this report.

19         MR. SLOCOMBE:   I understand.   The cases are clear

20    that experts can testify from practical knowledge.

21         THE COURT:   Absolutely.

22         MR. SLOCOMBE:   And practical knowledge is acquired by

23    experience and observation.   And it's not just about the things

24    you worked on directly, it's about the things you learned in

25    the course of acquiring that practical experience.   That's what

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002099

1  Mr. Snyder will testify to.  That's what been authored.  It is

2  in the cases clear that people, including lawyers, can testify

3  as to practices, customs, and standards in an industry.  That

4  even includes specialized areas of the law.  Lord knows

5  asbestos litigation is a specialized area of the law.  That's

6  the expertise he brings, that's the methodology he applies.

7          THE COURT:  But that's not what his report is about.

8  He's talking about people's motivations.  The fact that he

9  actually knows what drove settlements.  He's basically telling

10  me that as a psychologist without having interviewed anybody,

11  talked to anybody, produced a report, indicated that there is,

12  you know, a specific person that he interviewed that he can say

13  people either settled, litigated, went to trial, didn't because

14  of particular factors which by the way are also not identified.

15  So how is anybody going to replicate this information even

16  based on specialized knowledge?  I'm having a great deal of

17  difficulty understanding how what Mr. Snyder -- and I don't

18  challenge his 26 or 27 years of asbestos litigation practice.

19          MR. SLOCOMBE:  I understand.

20          THE COURT:  That's not the issue.  What the concern

21  is in order to have an expert testify it has to do something to

22  inform the Court as to a process on some issue that's going to

23  be helpful.  What's he going to give me that's helpful, because

24  I don't even understand the basis for what it is that he's

25  going to be testifying about.  Because he makes a lot of

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002100

1  pronouncements, but I don't understand the expertise upon which

2  those pronouncements are based.  If what he's going to say to

3  me is, I practiced law for 26 years and therefore I know people

4  settle cases, I'll accept that as a premise of judicial notice

5  without the need to produce a witness.

6         MR. SLOCOMBE:  We understand that.  Let's take one

7  example.  Grace has suggested in this case that there are a lot

8  of what they like to call scientific factors.  They're

9  liability filters.  But if only they got a chance to present

10 these in court and in a fair court they would have been able,

11 not just to win, but to get summary judgment or <u>Daubertize</u> all

12 the other experts.

13        One of the things which is most important about Mr.

14 Snyder's testimony is he will explain that these are not new

15 defenses, these are not new ideas, these are things which have

16 been tried.  Sometimes they work, but often they don't work.

17 And that's based on specific experience, specific observation

18 just like any other kind of a practical expert would bring into

19 court.

20        THE COURT:  I must have missed something.  I'm sorry.

21 I do not recall a witness for Grace, and I mean, I read these

22 reports months ago, so if I did, I apologize.  Please point it

23 out to me.  I do not recall an expert for Grace opining that if

24 Grace were still in the tort system they could have presented

25 what you're calling new defenses.  I don't think Grace used

**J&J COURT TRANSCRIBERS, INC.**

1 that term either, but new defenses in a court in a tort system

2 and obtained summary judgment.  I do not recall that statement

3 by a witness, I do not recall that conclusion, and I don't

4 recall that argument.  So where is it?  Because if that's the

5 basis for the testimony and that's not in Grace's paper I don't

6 see how that's going to form the basis for an expert opinion.

7 So point me to where Grace made that assertion first.

8          MR. SLOCOMBE:  Your Honor, has raised -- first of

9 all, it's been made repeatedly that they settled cases without

10 merit, that the world would be very different because now

11 they're under Federal Rules of Evidence rather than State Rules

12 of Evidence.  Those statements have been made by Mr. Bernick,

13 and Your Honor has actually pointed out a major problem with

14 their case.  The issue in this case is not whether they have

15 epidemiologists and doctors and industrial hygienists who will

16 testify on their side of the case.  Their position if -- it

17 seems to me the logic of Dr. Florence's analysis and Dr.

18 Anderson's, is that because of these things they will be able

19 to prevail in ways that they haven't been able to prevail in

20 the past and therefore they won't be able to settle.

21          THE COURT:  And therefore they --

22          MR. SLOCOMBE:  They won't need to settle because

23 they'll be able to win.  If you don't reach that conclusion the

24 logic doesn't link to how that affects their liability.  Their

25 liability would ultimately be decided in court.  It might be

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002102

1  decided in a variety of ways in court.  What Mr. Snyder will

2  show is that the attempt to protect themselves by these

3  arguments if they brought in the exact same technical

4  specialists they brought here -- not obviously Dr. Florence,

5  but the other people who are the underpinning for their

6  position -- they would be able to limit their liability.

7         It is an essential element of that, and I agree, they

8  put on very -- they've asserted it, but they put on very little

9  evidence to establish it.  And what we're going to show, in

10  part, not just through Mr. Snyder but through other witnesses,

11  is that that is not a realistic description of how any tort

12  system, any court, state or federal would receive that

13  evidence.  And that's an important part of his reports.

14         He goes into considerable detail on how many of these

15  things have been tried in the past.  I'm not saying that

16  they're claiming they were new.  They are claiming that they

17  never had a fair opportunity to present them.  And that, I

18  think, is one of the central parts of Mr. Snyder's testimony.

19  Now, we've heard snip -- I'm sorry.

20         THE COURT:  But Mr. Snyder isn't opining anything

21  with respect to the facts as to what Grace did or didn't have

22  an opportunity to do in his expert analysis.  In his fact

23  analysis if he's going to say Grace was a co-defendant in, you

24  know, pick a number, 130 cases and they did have an opportunity

25  to present this defense and they didn't, they settled, okay.

**J&J COURT TRANSCRIBERS, INC.**

1  But that's a fact.

2        What you're telling me is that he is going to say

3  something like, in my representation of <u>Owens Corning</u> and

4  <u>Fibreboard</u>, I know that because we went to trial in X number of

5  cases, and these were the factors that we attempted to prove

6  and we lost, that if Grace were attempting to prove the same

7  things Grace would lose.  You can't make that assertion.  These

8  are jury trials.  Juries try cases and decide things in favor

9  of people and against people for all kinds of reasons.  They

10  may not like the color of your hair and decide against you if

11  they choose to.  I mean, you know, and I'm not being diminutive

12  of the jury trial system.  It's just the reality.  You don't

13  always know what the cause and effect in a jury trial is

14  anymore than you know the cause and effect in the settlement.

15  So what good is that type of testimony going to do?  Number

16  one.

17        Number two, the cases in the bankruptcy system that

18  look at this are very clear that I need a correlation between

19  the industry in order to make this type of evidence relevant.

20  How does Grace's industry correlate to Owens Corning's

21  industry?

22        MR. SLOCOMBE:  They're very similar types of cases.

23        THE COURT:  Well, I don't --

24        MR. SLOCOMBE:  I understand.

25        THE COURT:  -- know that I can agree with that.  Nor

**J&J COURT TRANSCRIBERS, INC.**

1   can I assume that the product, because Owens product, for the

2   large part as I recall correctly, was generally a dry blown

3   dust product and Grace's is not necessarily always dry blown

4   dust product.  The places in which they were used was not the

5   same.  The method of delivery was not the same.  The types of

6   employees involved was not the same.  So unless there is going

7   to be some assertion that the industries are the same I don't

8   see how this is going to work.

9          MR. SLOCOMBE:  They are both companies who made

10  products which were sold broadly through the construction

11  industry.

12         THE COURT:  Yes.

13         MR. SLOCOMBE:  It's certainly true they're different

14  products --

15         THE COURT:  Yes.

16         MR. SLOCOMBE:  -- and they are at least allegedly

17  different in their composition.  But the point is that he will

18  present -- under Daubert we're entitled to bring forward

19  experts including, I submit, practical experts with experience

20  in the relevant field in which there is an issue of how that

21  field operates.  Now, the issue is not whether their testimony

22  is obviously correct.  We think it is.  Undoubtedly the other

23  side will say it's not.

24         THE COURT:  No, it's the question of what have you

25  done to show that it's reliable and that it fits the facts of

CC-BLG002105

193

1 this case?  That's the issue.

2        MR. SLOCOMBE:  Under the cases reliability in a non-

3 technical, non-scientific area --

4        THE COURT:  But this is a technical area.  If it's

5 not I don't need the expertise.

6        MR. SLOCOMBE:  He's not going to be testifying to the

7 composition and to the -- all the cell biology or medical.

8        THE COURT:  No.  Technical in a legal area.  Legal

9 process area.

10        MR. SLOCOMBE:  It's technical in the sense that it's

11 a complicated area of the law and it's an area in which real

12 world experience is a very important element in understanding

13 the issues in this case.  He brings the real world experience.

14 And the cases are clear that the test under Daubert in any area

15 but obviously geared to -- the test of reliability under

16 Daubert is a flexible test depending on the area in which the

17 expert is offering to testify.

18        THE COURT:  Yes.

19        MR. SLOCOMBE:  Obviously.  And they are also clear

20 that the issue is good grounds for his opinion.

21        THE COURT:  Well, no, it's more than that.

22        MR. SLOCOMBE:  It's whether or not -- I have the

23 language here.  It's whether or not they apply -- in Kumho Tire

24 it's whether the expert employees in the courtroom the same

25 level of intellectual rigor that characterizes the practice of

**J&J COURT TRANSCRIBERS, INC.**

1  an expert in the relevant field.

2          THE COURT:  Right.

3          MR. SLOCOMBE:  And for a lawyer, an experienced

4  observer and participant in the tort system, he will bring that

5  kind of a perspective.  He will explain why he -- as I submit

6  he does in the reports, but obviously what counts is what he

7  says in court.  He will explain the basis for his opinions and

8  for his conclusions.  He will explain how they link up to

9  Grace's alleged differences from other defendants.  That's the

10 basis for his opinion, and that's the basis which makes it

11 reliable.  And that is indeed his methodology.

12         THE COURT:  That's not a methodology.  I mean, just

13 because he says I formed an opinion doesn't mean that he has a

14 methodology behind it.

15         MR. SLOCOMBE:  No.  Of course it doesn't.  But what

16 it does show is that he has a system which he has developed for

17 analyzing how players behave in the tort system.

18         THE COURT:  Well, that's what I'm looking for, and

19 that's what I don't see in the reports.  What is that system?

20         MR. SLOCOMBE:  We heard some snippets from his

21 deposition that Mr. Bernick read.

22         THE COURT:  Well, all I heard from -- all I got out

23 of what I heard from Mr. Bernick is that it's about the

24 suspender's approach.  And that does not a system make.

25         MR. SLOCOMBE:  I'm sorry.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  A belt and suspenders approach.  We all

2    have that.  I mean, gee, I know it when I see it.  That's not a

3    methodology.

4          MR. SLOCOMBE:  No.  But he talks even in his

5    deposition about some of the bases of his opinion and his

6    experience.  He says he's looked at hundreds of files and

7    talked to hundreds of plaintiff's lawyers over the years.  He's

8    obviously talked to lots of defendant's lawyers because he was

9    one.  He's read hundreds of plaintiff's depositions.  He's

10   spent endless hours with coordinating -- in coordinating judges

11   conferences.  He's negotiated for major defendants.  He served

12   on the board of the asbestos claims facility which managed the

13   defense for a large group of major defendants.

14          Now, that's not just experience that's a basis on

15   which to form judgments about how the system works.  And that's

16   what he will bring to the process and that's why his experience

17   and his expertise will be valuable to the Court.

18          THE COURT:  About what system?  I mean, about a

19   settlement system, about the court system in the state of

20   Texas?  About the court system in the state of Illinois?  About

21   the federal district court in a particular district?  I mean,

22   they're all -- about a jury system in Canada?  I mean, what

23   system?

24          MR. SLOCOMBE:  Sure.  There are important differences

25   from jurisdiction to jurisdiction.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002108

1          THE COURT:  Yes.

2          MR. SLOCOMBE:  There are important similarities as

3  well.

4          THE COURT:  Well, sometimes.  But his report doesn't

5  tell me what system, how he's analyzed it, what methodology

6  he's applied, how I make the translation between what he's

7  looked at and this case, how Grace was even involved, if it

8  was.  And if it wasn't where the parallel is between what he's

9  looked at and Grace.  That's the problem.  He's opining about

10  things that we as lawyers, all of us, can opine about.  Yes.

11  But he hasn't identified anything that brings a level of

12  expertise and a system that can be replicated by anybody else

13  given the same practical experience that this gentleman has

14  looking at the same level of cases and the same type of

15  information that would inform his opinion.  There is no

16  methodology described behind what he's doing whatsoever except

17  to say I've been involved in the system and therefore I'm

18  qualified to express an opinion.

19          MR. SLOCOMBE:  With respect, Your Honor, I think it's

20  more than just I've been involved.  It's that he has been a

21  major figure and a major player.  He has had an opportunity

22  which I don't think any of us in the room actually have had to

23  understand -- as lawyers to understand how the reality of this

24  process works.  He's also had the opportunity to observe how

25  the settlement process works, why defendants settle, why

CC-BLG002109

1  plaintiffs settle.

2          THE COURT:  Now, he's going to tell me why people

3  settle?

4          MR. SLOCOMBE:  He's going to tell you not what's in

5  their head except the fairly obvious proposition that

6  presumably the defendants want to minimize the cost to

7  themselves of proceeding with the -- of handling their asbestos

8  claims.  And he will explain --

9          THE COURT:  And on the other hand that the plaintiffs

10  want to eliminate the risk that they may lose and therefore

11  they're going to get more money out of the settlement than they

12  might have gotten had they gone to trial.

13          MR. SLOCOMBE:  But one of his important factual --

14  and I don't mean factual in the sense of an issue in this

15  particular case, but one of the important factual points he

16  brings to the process that I think nobody else does -- I mean

17  as far as I know nobody in this courtroom could bring -- is he

18  can recount and explain how some of these theories, what Mr.

19  Bernick calls his liability filters, have been attempted in the

20  past, why they have not -- why they sometimes work, but

21  economically they turn into a mistake for the people who try

22  it.  That's an important piece of information to have before

23  the Court as to how the system works in actual practice --

24          THE COURT:  Pardon me.  He's going to tell me, for

25  example, that before Owens went into the national settlement

CC-BLG002110

1  program it decided to litigate X number of cases and used a

2  particular litigation filter that Mr. Bernick has identified on

3  this record --

4          MR. SLOCOMBE:  No.  No, no.

5          THE COURT:  -- and that it failed.  And as a result

6  <u>Owens</u> before the juries that <u>Owens</u> was before was found liable

7  and had to pay X dollars and then somehow that that's going to

8  translate into the fact that if Grace with its products and

9  different plaintiffs in different jurisdictions had had the

10  same defense under different circumstances the verdicts would

11  have been the same?

12          MR. SLOCOMBE:  I don't think he's going to say the

13  verdicts would have been the same.  I think he is going to say

14  if you've seen other defendants, many of whom made these same

15  arguments about their products were unique and they were much

16  less dangerous than anybody else's, he's going to show from his

17  own experience and from the experience of others that aside

18  from instances in which Grace which did try some cases, aside

19  from cases in which Grace tried these defenses what happened to

20  other people.

21          Now, it's a fair inference if some defendants try a

22  defense and it doesn't work that it's going to be a problem --

23  it doesn't work all the time, and the issue is not whether it

24  works ever, it's whether it works all the time and makes a

25  fundamental difference in the total cost to resolving the

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002111

1  cases.  He's going to show that it is a fair inference from the

2  experience of other broadly similar defendants that where we're

3  trying to make an estimate of what would happen if Grace did

4  this in the future, which they're going to have to do if

5  they're -- if in this construct where they're not in bankruptcy

6  give the Court some basis for understanding what would likely

7  happen.

8          THE COURT:  The basis that this Court would like to

9  see is to what would likely happen is what happened to Grace.

10  If you want me to know what the likely outcome of Grace

11  litigating in the future is, tell me what the outcome was of

12  Grace litigating in the past with its own products, in its own

13  jurisdictions, and the juries that Grace would have dealt with

14  -- would it has had to contend with.

15          What happened to Owens, what happened to Federal

16  Mogul, what happened to any of the other asbestos defendants

17  has absolutely no bearing on what may have or did or would or

18  could happen to Grace.  That's one reason why every single case

19  comes up as a different case.  The products are different, the

20  claimants may not be different, sometimes they are.  It depends

21  on a lot of factors.  The industries are not the same, the

22  factors are not the same.  It is not a parallel to simply say

23  that because a particular defendant lost a particular defense

24  that all defendants for all time would lose or win.

25          MR. SLOCOMBE:  No, but --

**J&J COURT TRANSCRIBERS, INC.**

1        MR. BERNICK:  Your Honor, I note that they're now

2   significantly past their 20 minutes.

3        THE COURT:  They are, Mr. Bernick.  It's my fault.

4   I've been asking the questions.  I haven't given him --

5        MR. SLOCOMBE:  Your Honor, I'll be guided by you in

6   terms of how long you want to continue.

7        THE COURT:  I'll shut up and let you make your

8   argument.  I'll give you ten minutes to make your argument.

9        MR. SLOCOMBE:  Well, I think -- that's very kind of

10  you, but I think basically we've laid out the central points.

11  Let me just make a couple of other comments.  That he has

12  explained it in his reports and indeed in his deposition, the

13  basis on which he draws his conclusions with respect to the

14  issue Your Honor just raised.  Certainly it's true each

15  individual case is unique in some sense.  But there are also

16  similarities.

17        And one of the points that Mr. Snyder makes in his

18  report is that one of the facts about this huge deluge of

19  asbestos cases is it is in fact the case that as a result of

20  experience, lawyers on both sides and indeed the defendants

21  were able to understand that there were patterns.  And he will

22  present and explain what those patterns are.

23        Now, it may well be that there are important

24  differences.  He can explain whether those differences in his

25  view, in his experience are significant in the projecting of

**J&J COURT TRANSCRIBERS, INC.**

 1  what would happen to Grace in the system.

 2              THE COURT:  Patterns, I'm sorry, in what sense?

 3              MR. SLOCOMBE:  Patterns of how cases came out, why it

 4  was that participants in the system on both sides were able to

 5  make reasonable valuations of what these cases were worth, of

 6  what the risks both sides faced if they went to trial, and of

 7  what the incentives were either to go to trial in some cases or

 8  indeed to settle.  Just on a factual point he will also make

 9  the point that Grace was in some of the same cases which he had

10  direct experience, that there would be the same plaintiffs

11  making more or less the same arguments.  He's worked in

12  jurisdictions all over the country.  He hasn't obviously worked

13  in every jurisdiction, but he's worked in enough to have a

14  general sense of how the system operates across the country and

15  indeed of what the important jurisdictional differences are.

16              And that broadly there were patterns which were

17  important to understanding how the system worked.  Quite apart

18  from the merits of what he will show, this approach to

19  receiving expert witnesses is well established in the cases in

20  the areas of people like Mr. Snyder who are not technicians

21  either in the sense of being engineers or natural or even

22  social sciences.  I think that's the basis.

23              I appreciate the extra time.

24              THE COURT:  All right, thank you.

25              MR. SLOCOMBE:  Thank you.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  Your Honor, I just had a couple very

2     short comments because I know that we're trying to keep to a

3     time limit here.  And I want to focus on the reliability prong

4     of Daubert.  The reliability prong of Daubert articulated

5     obviously first in the Daubert case was also affirmed in the

6     Kumho Tire case.  There's no different standard in the so-

7     called non-technical areas.  Also affirmed in the Joiner case,

8     Joiner v General Electric.  And the fact that a given expertise

9     may arise from practical knowledge doesn't mean that it thereby

10    qualifies for Daubert on the basis of a looser principle.

11          Now, practical knowledge may be involved in

12    expertise, but for the expertise to be the appropriate subject

13    of testimony before the Court it still has to follow -- it has

14    to comply with the reliability prong.  And the essence of the

15    reliability prong is that there be a stateable methodology

16    that's consistently applied such that it can be judged --

17    replicated and judged and there be objective standards on the

18    basis of which the expert's testimony can be assessed so that

19    the testimony doesn't simply come down to the classical ipse

20    dixit.  Those are -- that's the bedrock of Daubert. And that

21    bedrock is pretty much completely ignored in the argument that

22    just got made, and that bedrock was openly flouted by Mr.

23    Snyder.

24          I tried to give Your Honor in very short form a

25    couple of the more colorful things, although again the color

CC-BLG002115

1  was all his not mine.  But I just want to read two very short

2  excerpts, because I asked these questions flat out.  I asked

3  the question, are there any objective standards on the basis of

4  which the quality of your work as an expert can be judged?  Not

5  even leading.  I just asked him flat out.  He says, you know, I

6  -- if you wanted to define what kinds of standards you're

7  talking about I might be able to answer that.  In other words,

8  I've got to give him the standards.

9          But you know, what I have is a resume of what I've

10  done, the things that I've accomplished, and some of the things

11  that I failed to accomplish in my practice, all which has

12  brought me up against a lot of the big issues in this

13  litigation.  And as I say in my report, you know, I talk about

14  the practical outcomes of litigation I haven't tried to throw

15  an academic construct around any of this.  Well, where was the

16  standard?  I said again, my question is, can you tell me a

17  single objective standard on the basis of which your work can

18  be judged?  And his answer now is give me the standard and I'll

19  tell you whether it applies.

20          So he just asks him flat out just to tell us what the

21  basics are and they're not there.  And that's when he starts

22  talking about, gees, well, you know, I negotiated, I was very

23  instrumental in the very first mandatory class global

24  settlement in the asbestos litigation.  And again, we don't

25  quarrel with the idea that he was a very dedicated and

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002116

1 resourceful defense lawyer, but that does not mean that he is

2 applying a methodology that is appropriate for him to testify.

3 His qualifications as a trial lawyer are not enough.  He has

4 got to have the methodology.

5        And this is what he had to say about Dr. Peterson who

6 he acknowledged that he really addressed the same issue as.  I

7 said Dr. Peterson, in describing and analyzing claiming and

8 resolution behavior works with data.  That is, how many claims

9 were filed, what they were resolved for, and how many are

10 projected to be filed in the future and what they'll be

11 resolved for.  And incidentally, this individual Mr. Snyder,

12 had not reviewed any of the claims files.

13        But I said, you're familiar with that.  Correct?  And

14 he says, I've seen his reports.  And the question that I've

15 been asked is, now when you say that you don't believe that Dr.

16 Peterson focuses on motivation.  Because Mr. Snyder says he's a

17 motivation guy.  And he then says, and this is Mr. Snyder

18 again, I think Dr. Peterson applies a methodology to try to

19 quantify the consequences of motivation.  I don't think Dr.

20 Peterson has ever settled an asbestos case.  I don't think he's

21 ever taken a client through bankruptcy.  I don't think he's

22 ever counseled a client, you know, try to put together an

23 understanding of the litigation to come up with a solution for

24 a client.

25        Question.  So you believe that your work is

**J&J COURT TRANSCRIBERS, INC.**

1  incremental to his in the sense that you are more familiar with

2  the motivations of the players.  His answer, I think I'm more

3  familiar with the well springs of the motivation and the kinds

4  of things that people respond to on sort of on the ground.  I

5  think his -- he and others like him like Dr. Florence, focus

6  more on the, you know, predicting outcomes at the time.

7       Question.  The facts that you're dealing with, the

8  motivations and the well springs of those motivations, are

9  those facts gathered pursuant to any methodology in your

10  report?  Answer.  Those facts are based upon -- I'm trying to

11  count now, give me a minute, 26, 27 years experience just doing

12  it.  And that just captures the essence of the thing.  I didn't

13  put words in his mouth.  I asked him the straight Daubert/Kumho

14  Tire questions straight up.  He can give any answer he wants,

15  and these are his own words.  And he disqualifies himself.

16       MR. SLOCOMBE:  Let me just, if I may, make one simple

17  point.  Much of our discussion with Your Honor and with Mr.

18  Bernick has been our assertions and your questions about what

19  he will and won't say.  There is authority in this circuit for

20  the proposition that before making a Daubert determination the

21  Court should have an opportunity to hear from the expert, not

22  from the lawyers describing what the expert is going to say.  I

23  think the best evidence of what Mr. Snyder's testimony will be

24  based on, the method he uses to formulate that will be what he

25  has to say.  And that, I think, is a factor which should be

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002118

1  dominant in making this decision.  That is, he will come,

2  present his information, Mr. Bernick will have an opportunity

3  to question his methodology, Your Honor, will have an

4  opportunity to see if his methodology passes the test of being

5  based on good grounds, and that will be the appropriate time to

6  make a decision.

7       THE COURT:  Well, I can, of course, have a Daubert

8  hearing to determine whether or not the Daubert standards are

9  satisfied.  And I'm just not even convinced with Mr. Snyder

10  that I need to go that far, frankly, because he does not have a

11  methodology and that seems to me to be very clear in his

12  report.  He has not articulated one, the deposition transcripts

13  don't articulate one, and how he's going to testify to one now

14  when he's had at least two opportunities to do that, one in his

15  report, and one in the depositions and he has not articulated

16  one, is beyond me.  I don't see how he's going to come up with

17  one now when he hasn't articulated one before.  So I simply

18  don't see how that is going to be the possibility.

19       I think the bottom line is this.  An expert witness

20  to be helpful to the -- an expert witness to be qualified at

21  all to offer an expert opinion has to do something that is

22  going to be of assistance to the Court.  And what I am still

23  missing is where this Court is going to be assisted in the

24  process.  He clearly is not going to be able to offer an

25  opinion as to what motivates people because he's not qualified

J&J COURT TRANSCRIBERS, INC.

1  to do that.  He's not a psychologist, he doesn't have the
2  training and he basically concedes that in his report.
3          To the extent that he wants to testify as to why
4  people settle cases he clearly cannot do that because he can't
5  testify as to why a person has an intent to do something else.
6  He's going to have to bring those people here to do it because
7  he's not an expert in why people particularly settle specific
8  cases.  That's outside the realm of the expertise and not
9  relevant in any event to the particular issue that's before
10  this Court.
11          In terms of what the tort system was doing back in
12  2001 when Grace filed the bankruptcy, if that is what I am to
13  judge -- if that's what the ACC's theory is, I should be
14  looking at what would have happened to Grace in 2001 if Grace
15  were still in the tort system and these claims should have been
16  litigated in the tort system.  If his report said, you know, in
17  the tort system at that time, Meso cases in the state of
18  Louisiana, if going to verdict were essentially in this range
19  and a number was coming in and settled were in this range and
20  therefore Grace had X number of claims filed in that state and
21  therefore applying some mathematical formula or litigation
22  factor discount I could expect that this would be the outcome,
23  I could understand that a lawyer could apply a litigation risk
24  discount and come up with that kind of a mathematical type of
25  principle or litigation risk principle.  But his report has

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002120

1  nothing to do with that.  I don't understand what it is that

2  his report is supposed to assist the Court in doing.

3        MR. SLOCOMBE:  It is supposed to assist the Court in

4  understanding how practical decisions are made and what the

5  experience of Grace and other companies with similar -- in

6  similarly situated cases how they managed those cases.  He's

7  not a psychologist.  He doesn't and he's not -- when he talks

8  about motivation I think it's clear he's talking about the

9  incentive to try to settle to dispose of the cases on the most

10  favorable economic terms.  He doesn't know the -- he doesn't

11  purport to know the inner workings of their mind.  And also if

12  I could just --

13        THE COURT:  But let me stop right there.  Because

14  that underlays another faulty premise in this report.  There's

15  nothing in the report that indicates to me that he has done any

16  type of analysis to see how companies were in similarly

17  situated circumstances to that of W.R. Grace.  And I can assure

18  you having now sat on, I'm not sure how many, 15, 20 asbestos

19  related conglomerates, I am not familiar with anyone whose

20  prelitigation circumstances would be similar to another.  So

21  I'm not sure where that circumstance comes up.  Their financial

22  reports were not the same.  Some are listed companies, some are

23  not.  Some had investment grade securities coming in and going

24  out of bankruptcy, others don't even come close.

25        How is this Court going to judge what was a similar

**J&J COURT TRANSCRIBERS, INC.**

1    circumstance within that company's picture to determine whether

2    the company is similarly situated so as to know whether the

3    decisions made by the board in handling particular asbestos

4    litigation or settlements is the same?  His report doesn't even

5    come close to addressing those factors. ·

6         MR. SLOCOMBE:  Your Honor, I think with respect that

7    it does say that in a sense the similarities outweigh the

8    differences.  And he will explain the respect in which that is

9    true.  It is certainly an issue whether Grace's experience in

10   the past is relevant to its experience in the future.  And it's

11   relevant whether other companies' experience is instructive as

12   to Grace's experience.  But that's what he's going to talk

13   about.

14        THE COURT:  But his report does not go into that, at

15   least as I recall, if it does show me.  He talks to a certain

16   extent about Owens and Fibreboard, as I recall.

17        MR. SLOCOMBE:  He talks about the ACF.

18        MR. BERNICK:  The ACF isn't even a company.

19        MR. SLOCOMBE:  The ACF was a consortium of companies.

20        THE COURT:  Well, it was a --

21        MR. SLOCOMBE:  And that exposed him to the experience

22   of individual companies in a wide -- a wide range of individual

23   companies.

24        THE COURT:  Okay.  But that talked about a particular

25   aspect of the companies and why they decided to handle their

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002122

1  asbestos claims in a particular way before the NSP's and some

2  of the other programs came into being.  That has nothing to do

3  with whether the companies were situated in such a way that

4  they made a determination to handle their litigation strategies

5  the same way.

6          I'm sorry.  The more I hear about this, the less

7  likely I think that Mr. Snyder is qualified to express an

8  opinion on this topic.

9          MR. SLOCOMBE:  Well, we would --

10         THE COURT:  And his report clearly does not cover all

11 of the corporate factors that a company would go through to

12 make a determination on its own prepetition as to whether or

13 not it will handle a settlement strategy overall in a

14 particular way.

15         MR. SLOCOMBE:  Your Honor, we would like to move to

16 hold an evidentiary hearing with Mr. Snyder here which will

17 have an opportunity to -- not to present his testimony

18 obviously, but to have an opportunity for him, not me or not

19 Mr. Bernick to describe what it is that is his methodology and

20 to give you an opportunity -- to give Your Honor an opportunity

21 to ask the questions which are obviously very important ones.

22         MR. BERNICK:  Your Honor --

23         THE COURT:  That's fine.  I will permit that as part

24 of your time in trial.  Because I've already -- from what I can

25 see and this argument which has now taken an hour and a half,

J&J COURT TRANSCRIBERS, INC.

CC-BLG002123

1  and I've read the reports, and I've heard the argument and I've

2  read the briefs.  I cannot see how this is going to be of

3  assistance and I do not see how the gentleman has the

4  qualifications to express the opinion that you're asking that

5  he express, nor do I see how he meets the <u>Kumho Tire</u>, and I'll

6  limit it to <u>Kumho Tire</u> because I think you're asking for a

7  person experienced in the profession as opposed to someone who

8  would meet the scientific type of qualifications that <u>Daubert</u>

9  would qualify for.

10          MR. SLOCOMBE:  Exactly.

11          THE COURT:  I do not see that he fits within those

12  standards.  So I will permit you to bring him in as the first

13  person that you choose to call.  I think it should be limited

14  to one hour on direct and an hour on cross examination, because

15  if you can't do it in that time frame you're not going to get

16  it done.

17          MR. SLOCOMBE:  Could we do this at the beginning of

18  the time when he's scheduled to appear?

19          THE COURT:  No.  I want it done first.  Because I

20  need to make a determination, and to the extent that somebody's

21  going to decide whether or not they do need to prepare for

22  cross examination I think it should come in at that time.

23          MR. SLOCOMBE:  We'll obviously have to talk to him

24  about his availability and so on.

25          THE COURT:  Oh, I see, availability of the witness.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002124

1  I apologize.  I hadn't thought about that.  All right.  Yes,

2  you can do it as the first part of his testimony.  But he may

3  not be able to testify.

4        MR. SLOCOMBE:  We understand that.  We certainly do

5  understand that, Your Honor.

6        THE COURT:  All right.  And if I decide that he

7  cannot testify I'm going to strike it all.

8        MR. SLOCOMBE:  Of course.

9        MR. BERNICK:  Your Honor, I think you've decided what

10  you're going to do.  I would only stress that we took his

11  depositions specifically against the backdrop of an objection

12  to his appearance --

13        THE COURT:  Yes.

14        MR. BERNICK:  -- in order to create the record that

15  we have now created and set before the Court.  And usually,

16  yeah, you can have Daubert hearings, but they do take place on

17  a basis where it's not right in the middle of trial and we have

18  to get ready for his testimony and create yet another hole in

19  the schedule.  I would have thought that after all that Your

20  Honor has said that maybe the ACC would consider whether it is

21  worth the candle.

22        And I would have thought that maybe the best way to

23  assure that Mr. Snyder also believe it's worth the candle is in

24  fact to have them bring him in separately.  So that right now

25  there's no cost to them whatsoever of bringing Mr. Snyder in as

**J&J COURT TRANSCRIBERS, INC.**

1 part of the first part of his examination.   The only cost on

2 them -- the only cost is with respect to Court time and us.

3 And I just don't think that that's really fair.   Given all

4 that Your Honor has said why don't they listen and figure out

5 whether they really want to do all of this with Mr. Snyder's

6 time and with the Court's time and our time instead of

7 bargaining for what is essentially, you know, a position where

8 they got nothing to lose.

9         THE COURT:  All I am going to permit, I mean, you

10 folks can work out the schedule, Mr. Bernick.   I am sympathetic

11 to that.   I do not see a basis for his testimony for the

12 reasons I've expressed.  So I am sympathetic to that.   All I am

13 going to permit at the outset of his testimony if that's when

14 he's called is the Daubert hearing.   That's it.   First.   So

15 that's what you need to prepare for.   And to the extent that he

16 is permitted to testify it will not be right after I say he can

17 testify that you will call him.   There will at least be a day,

18 if not more.   You tell me how much time you need before he is

19 called to testify.

20         MR. BERNICK:  I appreciate that.   It won't take me

21 too long.

22         MR. FINCH:  Your Honor, we've also listed Mr. Snyder

23 as a fact witness.   So to the extent he has facts that are

24 relevant to our case would you suggest that we put them on

25 during the Daubert hearing?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002126

1    THE COURT:  No.  I think we need a separate Daubert

2  hearing which is just on Daubert.  That's what the purpose of

3  it is.  And then if you call him as a fact witness do it as

4  part of your case in chief after the Daubert hearing is over.

5    MR. BERNICK:  Thank you, Your Honor.

6    MR. SLOCOMBE:  Thank you, Judge.

7    THE COURT:  All right.  The argument with respect to

8  Mr. Krause.

9    MR. BERNICK:  Yes, Your Honor.  And I've got a series

10  of slides here that I hope will again organize things because

11  this is more factually complex.

12    You'll recall that Mr. Krause is one of the lead

13  trial lawyers involved in these cases.  He tends to specialize

14  in cases that are the higher value meso and lung cancer cases.

15    MR. FINCH:  Your Honor, I would just note for the

16  record that pressing all cases to verdict to how a settlement

17  value is paid by Grace in mesothelioma cases compared in size

18  to judgment returned in favor --

19    THE COURT:  You're reading something.  I don't know

20  what you're reading.

21    MR. FINCH:  On the scree he's got four columns there.

22  The second one we have withdrawn as a topic for any testimony

23  from Mr. Krause.

24    MR. BERNICK:  Well, that was not one of the topics

25  that was withdrawn by letter.  If you want to withdraw it now,

**J&J COURT TRANSCRIBERS, INC.**

1  that's fine.  What was withdrawn is what happened to verdict

2  values between 2001 and two thousand --

3        THE COURT:  Could we get through the argument?  You

4  folks interrupt each other.  I have no clue what you're talking

5  about.  Could we do it in some fashion that makes sense?  When

6  Mr. Bernick gets to a slide, could you inform me?  Because

7  otherwise you interrupt each other.  I lose my train of

8  thought.  You lose the sense of the argument and I don't know

9  what you're talking about.  So if we could just take it in some

10  orderly fashion, it would really be helpful.

11        MR. FINCH:  I'm sorry, Your Honor.  I saw the slide

12  and thought before Mr. Bernick proceeded that he would like to

13  know that we have withdrawn Mr. Krause as a witness for the

14  second topic there.  I thought I did it in my letter but I've

15  sent a lot of letters to Mr. Bernick and maybe this one missed

16  that point.  I apologize to the Court and I apologize to Mr.

17  Bernick.

18        THE COURT:  Okay.  Mr. Bernick, I think that was for

19  your edification.  If that's helpful to you, fine.  Please

20  proceed.

21        MR. BERNICK:  Yes, it is helpful and I certainly do

22  appreciate that.

23        These slides, incidentally, were all circulated I

24  think about three weeks ago in anticipation of the omnibus

25  hearing in March.  So I don't think that there is anything

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002128

1 that's particularly new here.  But what I tried to do is to

2 figure out an easy way to get at the range of different kinds

3 of facts that Mr. Krause apparently intends to testify about if

4 asked.  And the way that I did it is to try to organize his

5 testimony into four areas which I will now reduce to three.

6 And the three areas are Grace's pre-petition settlements as how

7 that was done.  The completeness of the PIQ responses because

8 you'll recall that the position taken by the ACC and the FCR is

9 that in some fashion the PIQ responses shouldn't be used or

10 have limited value because the information was not available at

11 the time that they were filled out.  And then what is the

12 appropriate legal standard?  That is what actually takes place

13 in trials and in litigation in state court when it comes to the

14 legal standard that's actually imposed.

15          So I use that as the rubric and then what I've done

16 now is to first of all tell you that as predicted because Mr.

17 Krause is a lawyer and has been called, not by his clients but

18 has been requested to appear by the ACC and the FCR, he does

19 not have the approval of his clients to testify about matters

20 that may be confidential or privileged just to them.

21          In the context of this deposition, at one point there

22 were no less than three different lawyers, both present in the

23 room and then on the phone, all of whom were speaking to the

24 issue of whether Mr. Krause would be permitted to testify in

25 response to my questions.  Initially it was Ms. Ramsey but Ms.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002129

1  Ramsey represented not Mr. Krause but his firm.  Ms. Ramsey did

2  not represent -- I'm sorry, his firm -- and did not represent

3  the Baron & Budd firm because Mr. Krause once was at Baron &

4  Budd and a lot of the questions, indeed his description of

5  testimony, includes his time while at Baron & Budd.

6           So we had Ms. Ramsey there in person, but Mr.

7  Esserman got on the phone.  Mr. Rich got on the phone from

8  Baron & Budd and there was an individual I never heard of

9  before who said that he was a business lawyer for Baron & Budd

10 and he got on the phone, too, all of whom were anxious to be

11 able to assert privileges and provide instruction to Mr. Krause

12 and what he could testify and not testify about.

13          There were a total as we counted 39 questions as to

14 which there was an instruction not to answer.  And there were

15 an additional four as to which the instruction was you can only

16 answer yes or no.

17          But the problems with privilege actually even

18 pre-dated the deposition and relate to our ability to get

19 access to those facts which are necessary to cross examine Mr.

20 Krause.  So what I've done is to take each one of these topics

21 and basically use the topics to frame the issue as to which

22 there will be cross examination and then ask are we getting

23 appropriate discovery with respect to that issue, or are we

24 being shut down because as predicted privilege assertions are

25 turning this process into Swiss cheese?

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002130

1      So, with respect to Grace's pre-petition settlements,

2 the ACC and the FCR take the position that these settlements

3 were freely negotiated.  Now, as you know, our view of the

4 matter is we have not placed that at issue.  This is their

5 case.  They want to place this at issue.  It doesn't respond to

6 any part of our case.  We're not seeking to say anything about

7 the settlements in terms of what really represented an

8 admission of liability or not.  We've made that clear.  We've

9 not created that issue.  Your Honor has now heard all of our

10 evidence.  We have not placed that at issue.

11      This is their position as part of their case.  They

12 want to bring in Mr. Krause to assert all kinds of things about

13 the settlements.  Now, of course, we believe that's barred by

14 Rule 408, but we know that we've argued that matter to Your

15 Honor and Your Honor is going to reserve decision on that till

16 later on in the case.

17      So they now want to talk about whether these

18 settlements that they are placing at issue were really freely

19 negotiated and the essence of what Mr. Krause is going to say

20 is oh, I had such a great working relationship with the Grace

21 people and they could walk away or they could stay, it just

22 depended upon them.

23      Our position is very different.  Our position is that

24 the settlements now -- that the settlements are being placed at

25 issue.  We are going to talk about them and we're going to say

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002131

1  that they were driven by factors other than the merits and cost
2  Grace far more than its legal share.  We will show the Court
3  that there was a money machine here, and the reason these cases
4  were settled was not necessarily that either Grace wanted to
5  avoid trial, that was a principle concern in many cases, and
6  based on the jurisdictions that were selected and how the cases
7  were run. but from the plaintiffs' side, why do the plaintiffs
8  want to settle all these cases?  If the cases were so valuable
9  at trial, weren't they obliged to pursue all those cases to
10 trial?  And the answer is not that they thought that they were
11 going to lose, but that they thought that if they took the
12 cases to trial with all the defendants there, they would then
13 be limited in their total recovery to the amount of the
14 verdict, less insolvencies and subject to joint and several
15 liability.  Whereas if they picked people off one at a time,
16 there is no limit on the amount of money that they could
17 recover in settlement.
18         So a case that might be a $4 million meso case at
19 trial, now turns into an eight or $10 million meso case on the
20 basis of settlements.
21         So our position is not that our settlements were
22 driven by the merits or driven by cost, or for that matter that
23 their's were either, it was driven by a system, a system of
24 operation that had been developed over the years and was a
25 total money machine based upon the ability to name the same

CC-BLG002132

1  companies again and again and again.  They named -- Waters &

2  Krause named Grace in nine out of ten cases.  They had a 90

3  percent propensity as if Grace were the same as <u>Johns Manville</u>.

4  They named 20 to 40 other companies on a regular basis the same

5  way in nine out of ten cases -- maybe it was 15 -- in nine out

6  of ten cases.

7          So when you get this huge spike at the end of the

8  1990s, the huge spike of claims was not just Grace and wasn't

9  driven by Grace's share, several share of liability, it was

10 driven by the whole idea that the more people you can name, the

11 more people you can settle with, the more money that there is

12 to be made.

13         So we've got a real issue now about the marketplace

14 that they assert is there.  What really is the nature of that

15 marketplace?  What factors drove Grace's settlements?  What

16 factors drove the settlements -- not from Grace's point of view

17 alone, but from their point of view?  This is not a one-way

18 street.

19         Well, what happens?  We asked for documents.

20 Document request number one.  We asked the Court for permission

21 to make these requests and get responses by the depositions; we

22 did that.  Documents relating to the adoption of, or impact of,

23 or changes to the settlement criteria for settlements entered

24 into between claimants he represents and Grace.  That is how

25 are these criteria developed and what was the impact that they

CC-BLG002133

1  had for settlements?

2          And, of course, the answer is the documents are

3  independently privileged as attorney work product and the only

4  thing that they're going to be giving us are actual copies of

5  the settlement agreements.  Well, actual copies of the

6  settlement agreements don't give you the context in which the

7  settlements were reached.  It obviously doesn't tell us from

8  the claimants' side of the equation what was the negotiation.

9  This is a negotiated resolution, meeting of the minds.  They

10 say it was free.  We say no, it's not.  What were all of the

11 facts, not just the facts that they want to talk?  So we got

12 shut down on that.

13         Then what happened at the deposition?

14         THE COURT:  Wait, excuse me.  The work product

15 privilege isn't the client's privilege to assert, is it?

16         MR. BERNICK:  It is -- the work product privilege may

17 or may not be the client's to assert.  I think that there's

18 probably a legitimate interest that the client has in work

19 product that it has paid for.  I'm not going to get in between

20 on that.  All I know was that the instruction was given.  And,

21 remember, this is the same Waters & Krause that said we're not

22 going to subject ourselves to the jurisdiction of this Court on

23 these issues.  "If you want to compel production of these

24 documents," they said, "you've got to go down to Texas and

25 we'll talk about this in Dallas."  But this was the position

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002134

1 that was taken.

2          What about the testimony as to which the instructions

3 were being given?  All of these areas were foreclosed from

4 inquiry.  Re: internal documents, memoranda, or work product

5 relating to the value of individual cases and claims against

6 Grace, or the relative strength or weakness of the proof

7 against a given defendant and why plaintiffs would ask for more

8 or less against that defendant.  That is to say if they

9 believed that the settlements were all fair, appropriate and

10 merits driven, well, let's see it from their point of view.  No

11 questions permitted.

12          The amounts Grace and other defendants paid in

13 settlement were due to a series of factors.  He admits that.

14 But Krause allows discovery only as to the settlements

15 themselves, the aggregate and total numbers of settling

16 defendants.  They say -- they assert -- indeed Dr. Peterson

17 said -- "Grace only paid its several share."  That's what he

18 says in his report and that's what he says in his testimony,

19 and that's what they say here.  Fair is fair, freely negotiated

20 and you pay only your share.  Well, we don't think that that's

21 true at all.  We think that we are being asked to pay other

22 people's shares again and again and they were being asked to

23 pay our share again and again.  So we asked, tell us what the

24 several shares were.  What did we pay versus everybody else?

25 It was shut down.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002135

1          The existence of Baron & Budd material reflecting

2     from an internal perspective what the objectives and process

3     were for a settlement.  Just flat-out, open-ended question,

4     tell us your side of the equation now that you want us to tell

5     you our side of the equation.  That was shut down.

6          Documentation of how joint and several liability,

7     punitive damages and consolidation would impact the settlement

8     process.  Again, because we believe that they created this

9     system, it was designed to force us to pay for more than our

10    share.  We want to know the same thing from their side.

11         Decision-making process for which cases went to trial

12    and which were settled at Baron & Budd.  And that's the whole

13    question of again what actually determined trial status?  What

14    was the process?  That was shut down.

15         Reasons why Waters & Krause settled asbestos claims

16    against Grace.  They want that from us.  They've gotten our

17    privileged documents.  We want it from them.

18         Mr. Krause's own thought process resolving claims

19    against Grace from 1999 to 2001, we don't get to inquire on

20    that.  So Mr. Krause takes the stand.  He gives essentially

21    just the settlement agreements themselves.  And then he simply

22    says, "It is my general experience" -- and this is his

23    testimony -- "It is my general experience that Grace settled

24    for Grace.  That they had the opportunity to go to trial or

25    settle and these settlements were fairly negotiated and

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002136

1 represented the parties' respective views on the cheapest way

2 to resolve the litigation." He just says that and I can't

3 cross examine him on their side of the coin. It's a one-way

4 street.

5          Pressing all cases to verdict. They say that they

6 don't want to get into this, but I think the real reason that

7 they don't want to get into it actually is also germane to the

8 first question. I want to touch on it very, very briefly.

9          What happened in this deposition that was the most

10 telling thing is that it turns out that Mr. Krause, when he was

11 at Baron & Budd, was involved in a situation that was hugely

12 notorious. Hugely notorious. It made the national news. It

13 was a big event. And the big event was that somebody within

14 the Baron & Budd organization inadvertently produced what was

15 called a deposition preparation memo. And I can't tell you the

16 content of the memo because I was told in no uncertain terms

17 during the deposition that that was a privileged document even

18 though it's been published in newspapers around the country and

19 is in the hands of probably every asbestos defendant in the

20 country. And the people who chose to talk about the content of

21 the document or use it were the subject of efforts in Dallas to

22 have them disbarred and disciplined because it was a violation

23 of the ethical rules. And that position was asserted to me in

24 the deposition, so I'm not going to say one word about the

25 memo.

**J&J COURT TRANSCRIBERS, INC.**

1           What I am going to tell the Court is that during the
2    late 1997 time period, that memo came out.  There was
3    aggressive discovery that was conducted against the Baron &
4    Budd firm to find out -- I'm not going to get into that so we
5    don't have to close the courtroom -- there was an aggressive
6    effort to find out from Baron & Budd what evidence was tainted
7    as a result of the use of this document and to the extent that
8    it was used.  And there were lawyers, including lawyers from
9    Grace, who sought that discovery.  And, you know, all hell
10   broke loose.  There were subpoenas.  There were court
11   proceedings.  There were threats of disbarment.  It was a mess.
12   And in the middle of it was Baron & Budd and it also included
13   Mr. Krause.  And I'm not suggesting Mr. Krause did anything
14   inappropriate whatsoever.  I have no evidence of that at all.
15   But he was the guy who was doing business with W.R. Grace and
16   W.R. Grace's lawyers were out there trying to get this
17   discovery.  So what all of a sudden happens?  Da, da, da, da.
18   We got ten cases that are going to trial against W.R. Grace and
19   we're not going to settle them.  And it's absolutely totally
20   clear from Mr. Krause's deposition that that was precisely the
21   decision that was taken by Baron & Budd was as a retaliatory
22   move against W.R. Grace seeking this discovery.
23           Two sets of cases went to trial.  One set was won by
24   Grace, the other set was lost.  And when it came time to
25   settle, the set that was tried and lost by Grace, the

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002138

1  settlements were very substantial settlements.  And on top of

2  those settlements, just to make sure that Grace got the

3  message, there was a request that Grace no longer conduct any

4  kind of discovery into these matters and that it no longer use

5  the outside lawyer that had represented W.R. Grace in

6  connection with the effort to obtain this discovery.  And the

7  messenger for that determination and the person who negotiated

8  that settlement was Peter Krause.  Now, that is hugely fair

9  game on the proposition that this is all nice and fair and a

10  bunch of guys sitting around kind of doing business on the

11  basis of the merits, it gives life to the whole thing.

12          Needless to say, I was not permitted to get into any

13  of the facts that relate to this.  This is when all the Baron &

14  Budd people got on the telephone.

15          The third area -- and I'll try to wind this up -- PIQ

16  responds completeness.  And Your Honor well knows what the

17  issue is here.  They say the questionnaires were incomplete due

18  to the bankruptcy stay.  We couldn't fill them out.  We say

19  they were unimpaired by the bankruptcy process in filling out

20  those portions that are the most germane portions to the

21  estimate, i.e., what it was that the individual claimant

22  believes that he or she was exposed to.  The bankruptcy stay

23  doesn't limit the access of the lawyer to his or her own client

24  and it doesn't limit discovery with respect to medical records.

25  The only thing that it limits is discovery with respect to

CC-BLG002139

1  Grace, and even there during the entire pendency of the

2  bankruptcy, the document, the depository that Grace has

3  maintained in Cambridge for years and years and years remained

4  open.

5          So we have an issue now.  They've taken a potshot at

6  the PIQ and they now want to say, oh, well, they were

7  incomplete.  Our position is that they were totally free to

8  conduct whatever discovery they wanted relating to their own

9  client and what their own client did as well as what Grace

10 products were aware.  So we have the issue, what information

11 regarding exposure was available outside the bankruptcy and how

12 was it affected, if at all, by the bankruptcy?  Now, once again

13 we asked questions; documents referring or discussing any topic

14 contained in the Waters & Krause discovery responses.  These

15 were the discovery responses to our discovery request that

16 asked how you did it.

17         You remember what happened with that, Your Honor, is

18 that it was enormously contentious and we ultimately agreed to

19 walk away from getting any further answers to those discoveries

20 at their request.  They now want to have somebody come in and

21 testify to exactly the same subject matter that they didn't

22 want to give us evidence on before.  So, of course, we asked

23 well, tell us what you have relating to those discovery

24 responses.  That was turned down.  Tell us the manner in which

25 the attachments to the PIQ's were gathered and selected.  That

CC-BLG002140

1  was turned down.  And there are documents that relate to that

2  at Baron & Budd.  In fact, I think that there is a memo that

3  was given to Mr. Krause shortly before his deposition on that

4  subject and it wasn't revealed.

5         They say all these documents that you wanted were not

6  available.  They actually assert -- he says, "They were not

7  available to us until later in the tort litigation process."

8  That's what they've insisted.  So we've asked a simple

9  question, "Tell us when the following information became

10 'available' to you, i.e., what was your client exposed to, when

11 and where"?  So we say, "How during the prosecution of personal

12 injury cases you or any firm of which you were a member learned

13 of claimants' asbestos exposure against Grace or other

14 defendants, when such information became available and from

15 what sources such information was obtained?"  All privileged,

16 all shut down with the exception that they'll tell us the

17 exhibits that they've actually used in litigation.

18        All documents relating to interviews of or the

19 receipt of information from claimants.  Again, because we

20 believe that in the course of the intake interviews, they

21 interviewed their own clients and learned all the stuff about

22 where the product was and what the exposures were.  We've never

23 received the intake memos.  So we asked for that.  They say,

24 "No, you're not going to get that."

25        So here's all the testimony that was foreclosed.


**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002141

1  Documents at his firm that would tell Grace how the PIQ's were

2  filled out.  Now, he was foreclosed from saying anything more

3  than yes or no about whether he would have access to the

4  interviews with firm clients.  Same thing with respect to

5  whether witnesses were asked about product ID at the time of

6  the intake interview.  Internal documentation of the substance

7  to which the claimant was exposed and the sources.  We don't

8  get that.  How subsequent information relating to claimant

9  exposure was captured after the initial intake interview.  We

10 don't get that.  Intake procedure and deposition prep at Waters

11 & Krause and Baron & Budd.  No.  Contents of Baron & Budd data

12 base which we knew was filled out because that's what we

13 learned but we never got the data base.  No.  Content and

14 variation on Baron & Budd intake form, adequacy, et cetera, et

15 cetera, et cetera.

16         I mean we can go on and on and on.  All of these

17 different things that are sources of information that would say

18 when was the information available when they assert that it

19 wasn't available to them in connection with this case.  We

20 don't get any of it.  We just have to rely upon his say-so.

21         Notwithstanding that, I would have to say we did get

22 general testimony that on the bottom line conclusion, without

23 the ability to cross examine on anything else, it was actually

24 very revealing.  The sources of information that were

25 identified by Mr. Krause on the question of claimant exposure

CC-BLG002142

1  were first of all the claimant herself or himself, and so I

2  asked, "Well, did the stay prevent you from talking with your

3  own clients"?  His answer is, "My understanding is the stay

4  does not prevent me from communicating with my clients, that's

5  correct."

6          "People who work with the clients, why does the stay

7  prevent them from talking with people who work with the

8  clients?"  Answer is, "That ability, no.  I think I'd be able

9  to do that if it were required."  The fact of the matter is

10  they just decided not to do it.

11          Grace documents, Grace historical records of

12  litigation files, "Why can't they get that?"  Answer is, "I

13  would say correct.  I don't have the evidence of that because I

14  haven't attempted in the course of this."  That is he hadn't

15  even attempted to go to the depository to look to see what was

16  in the depository.

17          Third-party records.  He hasn't looked into the

18  question of whether he could initiate discovery in some

19  proceeding.  "It's probably fair.  I haven't researched the

20  issue."

21          Impact of the bankruptcy on the ability to gather

22  exposure evidence.  This was the bottom line.  It was,

23  "You don't have any personal knowledge.  You don't have any

24  evidence that you can point to that says that the bankruptcy

25  stay in the Grace case has actually limited your ability to

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002143

1 obtain access to exposure information with regard to Grace

2 products." And there's an objection. Answer, "With respect to

3 the bankruptcy, I'm not a bankruptcy practitioner. I haven't

4 researched or attempted that, so I don't know the answer

5 there."

6       So, to the extent that Mr. Krause had personal

7 knowledge, he had no personal knowledge. Of all the things

8 that they've insisted again and again and again and again and

9 again about how they couldn't fill out the PIQ's and the PIQ's

10 can't be used because they were shut down by the bankruptcy,

11 that's poppycock. And out of his own mouth he admitted that

12 from his own personal point of view it's poppycock.

13       That when we want to get the documents from their

14 files that confirm that when the statement is made that it

15 wasn't available, it's false. We are just totally and

16 completely shut down.

17       So, it was our position, Your Honor, that Mr. Krause

18 we don't believe has appropriate testimony to offer, but if

19 he's going to testify he should be subject to cross examination

20 like any other witness. And the privilege, however well taken

21 or poorly taken that privilege might be, the privilege cannot

22 be invoked by a third party or protected by the ACC and the FCR

23 at the expense of our cross examination. It is not our

24 decision to bring this individual, it is theirs and they can't

25 simultaneously say, oh, well, he's here for the ACC-FCR, he's

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002144

1  not here for the clients so he doesn't have to testify to what

2  the clients want, but he can testify to what we want and Grace

3  just has to live with it.  That's just not right.

4          Now, I know Your Honor has said that when an

5  individual shows up and takes the stand at trial, you know,

6  you're going to have the ability to ask them to do or tell them

7  to do what needs to be done.  But I asked the question, Why do

8  we have to go through this?  They're either going to produce

9  -- Mr. Krause, if he's sitting here, can't violate an

10 attorney/client privilege by saying, okay, I'm going to comply

11 with Your Honor's order.  He can't do that.  He doesn't have

12 his client here.  He can't do that.

13         So, we're going to have this very ugly kind of scene

14 where the witness is going to say something.  We're going to

15 seek to cross examine.  He'll say I can't answer, and then

16 we're going to have a huge argument about what it is that we're

17 going to do with his testimony.  Why should we go through with

18 that?  If they want to produce him, he's going to have to

19 testify about the matters that are implicated by his testimony.

20 Give us the documents.  We'll cross examine him.  If he's not

21 going to give us the documents, we shouldn't have to go through

22 the Court's time and effort here to go through this process of

23 trying to hash out who it is that's getting what and who is

24 entitled to what.

25         THE COURT:  Mr. Krause, as I understand it,

CC-BLG002145

1  represents and represented people with mesothelioma and lung

2  cancers who at the time that Grace filed bankruptcy, at least,

3  the 2001 period, were probably in many instances an extremis.

4  Is it not the case that at this point in time a search of his

5  files would probably reveal that as to many -- or I don't know

6  about many -- but at least some of the clients about which he

7  might be offering testimony at this point in time, they

8  probably have died?

9          MR. BERNICK:  Yes.  Most of them have passed away.

10  And, in fact, what we have from Mr. Krause is that he

11  essentially gave us the files as those files were produced to

12  the other side during the litigation.  And to the extent that

13  the files therefore contained interrogatory answers, the

14  interrogatory answers were updated and have the information

15  that they have and those have been provided to us.

16          So as we sit here today, with respect to probably all

17  of the people that we're talking about in the case of his firm,

18  we have the litigation file in whatever condition it was, and

19  we have as of the time that it was completed.  And then

20  presumably they used that to fill out the questionnaire.  And

21  we would say, of course, is that there's nothing that prevented

22  them from filling out the questionnaire.  The bankruptcy stay

23  didn't stop it.

24          At the same time, there are documents that we know

25  are in their files that would reflect what information is

CC-BLG002146

1  available to the firm.  They take the position that the firm

2  didn't have the information necessary to fill out the PIQ.

3  They say it was not available to us.  Well, available to them

4  is available in whatever shape or form.  So, particularly with

5  respect to people who are deceased, they got whatever

6  information they got at the time of intake or interviews and we

7  should know what that is because if we had the intake or

8  interview form, we can see whether it contains a statement

9  regarding asbestos exposure to Grace or not.  That's what

10  they've refused to give us.

11          THE COURT:  But what I'm getting at is where is the

12  attorney/client privilege or work product privilege to the

13  extent that it is still asserted by a client who is deceased

14  applicable?

15          MR. BERNICK:  I don't know, Your Honor, and I'm sure

16  that we could look into that, but we would have to to be able

17  to pick up with that, we would have to go down and litigate

18  before whatever Court has jurisdiction over Mr. Krause's

19  client.  I don't know that this Court has jurisdiction -- this

20  Court has jurisdiction over Mr. Krause's clients to the extent

21  that they are claimants.

22          THE COURT:  Right.

23          MR. BERNICK:  But I don't know whether if they are

24  not claimants -- I guess if they're claimants and they filed

25  the claims, yeah, the individuals would have to be subject to

CC-BLG002147

235

1 the Court's jurisdiction as well.  That wouldn't be true of

2 many of the claims, that is claims -- you're focused on that

3 last issue.  I'm focused also on the tort history before --

4          THE COURT:  So am I.

5          MR. BERNICK:  -- the pending claims.

6          THE COURT:  To the extent that Waters --

7          MR. BERNICK:  The closed claims.

8          THE COURT:  Yes.  To the extent that Waters & Krause

9 is saying I can't produce a file because it's subject to an

10 attorney/client privilege, but there is no client, how is there

11 an attorney/client privilege?

12          MR. BERNICK:  I don't know.  All I know is that with

13 respect to the closed claims, I then go back to the issue about

14 whether this Court has jurisdiction, in which case if we wanted

15 to get closure on that issue, we would have to go back to

16 whoever their client, now deceased, is part of a closed claim,

17 subject to jurisdiction.

18          MR. FINCH:  Your Honor, the privilege survives the

19 death of the client and becomes the property of the estate.

20          THE COURT:  Well, then you've got a problem because

21 to the extent that Mr. Krause cannot be subject to cross

22 examination as to the issues that are going to be relevant to

23 get behind his testimony, Mr. Krause is not going to be able to

24 testify.  So I indicated --

25          MR. FINCH:  Your Honor, I --

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002148

1          THE COURT:  -- this early.  It was an issue that we

2     addressed many, many months ago, and it hasn't changed.

3          MR. FINCH:  Your Honor, but none of the testimony

4     that we would elicit from Mr. Krause would be based on

5     privilege or confidential information.  When I was a child --

6          THE COURT:  But it's cross examination, Mr. Finch.

7     Credibility and the ability of a witness to perceive particular

8     events and the ability to assess his judgment in determining

9     whether the settlement history that he is explaining is or

10    isn't accurate and credible, may very well depend on that, and

11    that is proper cross examination.

12         MR. FINCH:  Your Honor, we are not asking Mr. Krause

13    to explain the settlement history.  When I was a child there

14    was a radio show I used to listen to all the time called The

15    Rest of the Story with Paul Harvey, and you haven't heard the

16    rest of the story as to what Mr. Krause will testify to and how

17    this will work.  This is a slide Mr. Bernick put on the board.

18         THE COURT:  Which, by they way, I'll need copies at

19    some point so I can refer to what this is about.

20         Go ahead, Mr. Finch.

21         MR. FINCH:  The theme of my argument is the rest of

22    the story.  Mr. Bernick says Grace's position that settlements

23    were driven by factors other than the merits and cost Grace far

24    more than its legal share.  There's been absolutely no evidence

25    in the record.  He's rested his case.  There's no evidence in

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002149

1 | the record at all as to what factors drove Grace settlements.

2 |       THE COURT:  Right.  That's what he said.  That it's

3 | not an issue in the debtor's case --

4 |       MR. FINCH:  Right.

5 |       THE COURT:  -- but you're going to make it an issue

6 | by putting on a witness who's going to say that they were

7 | freely negotiated.

8 |       MR. FINCH:  Right.  But Mr. Krause is not going to

9 | testify as to what was going through the minds of the party.

10 | He will testify to the criteria that Grace told him that his

11 | clients had to meet before they got paid money.  You heard Dr.

12 | Florence testify yesterday that when he is forecasting future

13 | tort system costs one of the things he takes into consideration

14 | is the criteria that a defendant uses to resolve cases, either

15 | explicitly if he has settlement agreements, or if he doesn't --

16 | if it's a black box as he put it, he can see the outcome of

17 | that.  And what Grace has posited to you in its direct case is

18 | a set of criteria for paying money.  We would only have to pay

19 | money if certain criteria were met.  That a meso victim was a

20 | mixer or installer, for example.  We are entitled to respond to

21 | that by showing the criteria that, in fact, in the real world

22 | they actually applied very different criteria.  We're not

23 | getting into with Mr. Krause the reasons why Grace did things,

24 | or the reasons why Mr. Krause did things, it's certainly not a

25 | waiver of his client's privilege nor is it proper subject for

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002150

1  cross examination.  If I were to ask him questions like did you

2  ever start trials in cases where Grace is a remaining defendant

3  at trial?  How many times?  What type of evidence would you put

4  on the exhibit list or offer into evidence in trials in which

5  Grace is a defendant?  What evidence did you introduce in

6  trials about exposure issues?  Were you permitted in trials to

7  put on expert testimony on causation and exposure?  Describe

8  that evidence.

9         THE COURT:  But if Grace asks for him to produce

10 those documents, he's going to have to produce them.

11        MR. FINCH:  He's certainly did produce those

12 documents.

13        THE COURT:  Okay.  And that's what he -- pardon me.

14 That's what he said that he would produce because that's

15 information that he produced pursuant to the litigation

16 already.

17        MR. FINCH:  He produced over a hundred boxes of

18 documents --

19        THE COURT:  All right.

20        MR. FINCH:  -- to Grace just in response to the

21 document request two weeks ago.  He produced all of the

22 settlement agreements he had between Grace and he produced all

23 of the exhibits he ever used in trials against Grace.  He

24 produced all the depositions of his clients who had

25 mesothelioma and lung cancer cases from the time he joined the

**J&J COURT TRANSCRIBERS, INC.**

1 firm until Grace went into bankruptcy.  He said I've got a

2 hundred boxes of documents down here in Texas that are

3 combinations of depositions, discovery responses, all the stuff

4 we think you already have but we'll reproduce it.  You can come

5 down and look.  And Mr. Bernick said, "We do not wish to

6 receive those materials from Mr. Krause."  That is the material

7 that he needs to effectively cross examine Mr. Krause.  It is

8 not a waiver of the attorney/client privilege if -- under Mr.

9 Bernick's theory, anytime a client who is represented by a

10 lawyer takes the stand and testifies, he thereby waives the

11 attorney/client privilege and the work product as to everything

12 he discussed with his lawyer and that just can't possibly be

13 the case because lawyers walk into court and do things all the

14 time in open court.  I make arguments on behalf of my client to

15 Your Honor.  I introduce evidence in trials.  I elicit

16 testimony from witnesses.  That can't possibly be a waiver of

17 the asbestos claimants' committee's attorney/client privilege

18 or work product doctrine.  It's just not.  There's absolutely

19 no case that stands for that proposition.

20      And so basically there's no difference between me

21 putting Mr. Krause on the stand and eliciting the type of

22 questions I just read you about what he did in trials where

23 Grace is a defendant and then the follow-up question is, "Were

24 there ever situations where Grace offered to pay your client

25 money before the case got to judgment?"  "Yes, there were."

CC-BLG002152

1  "Could you describe for me what Grace said to you?  That what

2  criteria you had to meet before it would pay you money."  That

3  goes directly to the criteria point on here.

4       What Grace told Mr. Krause and what the objective

5  criteria were, doesn't invade anybody's privilege.  Doesn't

6  require privileged information to cross examine.  It is no

7  different than if Mr. Inselbuch put me on the stand and said,

8  Mr. Finch, could you describe how to try a securities fraud

9  case?  What kind of evidence do you put in the record?  What

10 type of documents do you use?  Have you ever had discussions

11 about settling a securities fraud case with, you know, X, Y, Z

12 defendant?  Or probably in the past ten years more likely an

13 asbestos estimation case, I think I have some experience in how

14 to try one of those.  But by no means if I describe what I do

15 in open court, or what I told the other side and what the other

16 side told me, that neither waives a privilege, implicates a

17 privilege, or implicates the work product doctrine.  I mean

18 lawyers go to seminars all the time and talk about how they try

19 cases, particular types of cases.  How you try an intellectual

20 property case.  How you try -- how they tried a toxic tort

21 case.  Mr. Bernick gives speeches on how to try toxic tort

22 cases.  That doesn't -- I'm sure his clients would not believe

23 that that waives the privilege as to all of his work product in

24 those cases.

25       So to ask Mr. Krause about the documents he puts in

CC-BLG002153

1  evidence and the materials does not waive the privilege or

2  implicate any privilege.

3          I think with respect to the whole questionnaire

4  issue, Mr. Bernick is either misunderstanding or

5  mis-describing our position.  We are not putting on Mr. Krause

6  to have him offer excuses about why the questionnaire wasn't

7  complete.  The questionnaires are complete to the best of his

8  ability.  And even Mr. Bernick recognized that the

9  questionnaires were not going to be the full evidence available

10  on a claim.  In a hearing -- I'm putting this -- quoting this

11  from our brief because I don't have the transcript of the

12  hearing here, if I do, you know, Mr. Walker could probably find

13  it but I don't want to take the time to do it -- in a hearing

14  in August of 2006 Mr. Bernick described what the questionnaire

15  evidence would be and how it would be used by the experts and

16  what he says is, "As of this point in time, there will be

17  claims that were very mature.  Lots of information.  There will

18  be claims that even were settled.  There will be a lot of

19  claims that were immature.  That's just the way that is and the

20  estimation will have to deal with each of those claims

21  differently.  You don't take all the claims that were pending

22  as of April 1, 2001 and then attempt to make them all the same

23  by saying we're now going to give everybody the opportunity to

24  come forward and try to conduct a discovery that maybe they

25  would have liked to conduct to find out whether their claim was

J&J COURT TRANSCRIBERS, INC.

CC-BLG002154

1  good, bad, or indifferent.  All you have is a snapshot and you

2  take it as it is.  All the questionnaires did was ask people

3  what evidence they had to support their claims and it

4  deliberately froze them there."

5          And so what Mr. Krause is going to do is answer

6  questions like were there instances in which your client in a

7  mesothelioma or lung cancer case was no longer alive at the

8  time you received the PIQ?  Does the PIQ ask you to provide

9  your expert witness reports on causation and exposure that you

10 would use in a trial involving Grace?  Does the PIQ ask you to

11 identify the fact witnesses that you would call in a trial

12 involving Grace?  Does the PIQ ask you to identify every

13 exhibit you would offer into evidence and you had historically

14 offered into evidence in a trial involving Grace?  Does it ask

15 you to even to try to predict what evidence you might use in a

16 case involving a particular person?  I submit, a) that doesn't

17 invade the privilege for him to say the questionnaire didn't

18 ask me that.  And, b) to the extent he's testifying about what

19 trials he had with Grace prior to the time it went into

20 bankruptcy, what he did in those trials certainly doesn't

21 implicate any privileged or work product communications.

22          Finally, on the last piece of the rest of the story,

23 and, Mr. Bernick, you may want to clear the courtroom for this

24 one since you opened the door with this slide.

25          MR. BERNICK:  Well, I don't have to clear the court

**J&J COURT TRANSCRIBERS, INC.**

1  that's -- I don't know what you're -- I don't know why we would

2  have to clear the court.

3          MR. FINCH:  Okay, I'm fine with not clearing the

4  court.  This is a slide where Mr. Bernick quotes a memo to

5  Mendes & Mount.  This is a letter from -- I happen to know

6  because Mr. Bernick sent to me the letter that backed up this

7  slide.  He kindly sent that to me and other people in advance.

8          THE COURT:  This is not a slide Mr. Bernick showed.

9          MR. FINCH:  Yes, it was.

10          THE COURT:  I did not --

11          MR. BERNICK:  I did show the slide.  I described

12  generically without getting into that letter.  I agree with Mr.

13  Finch that I technically opened the door.  It sounds to me like

14  Mr. Finch really wants to go through the door.

15          THE COURT:  I'm sorry.  If this slide was shown, I

16  don't have either a recollection of it or a note.  So I must

17  have been looking at Mr. Bernick --

18          MR. BERNICK:  Well, then I'll withdraw it.

19          MR. FINCH:  It was -- do you withdraw all the

20  commentary about the Baron & Budd --

21          MR. BERNICK:  No, I'm not going to -- this is --

22          THE COURT:  He did talk about Baron & Budd but I did

23  not see the slide.

24          MR. FINCH:  Yes.  And referenced this slide.

25          MR. BERNICK:  No, I did not.


                    J&J COURT TRANSCRIBERS, INC.

CC-BLG002156

1        MR. FINCH:  He had this slide.  It was shown in open

2   court.

3        MR. BERNICK:  I'm not going to argue with him, Your

4   Honor.  When he's done I'll respond to it.

5        MR. FINCH:  It was shown in open court.  It's quoting

6   from a letter from Mr. Hughes to Mendes & Mount which is

7   counsel to Lloyds of London which is now Equitas and --

8        THE COURT:  Okay.  I apologize but I have not seen

9   this slide.

10       MR. BERNICK:  I did not read from that letter, and,

11  Mr. Finch, if you read from the letter it is your own decision

12  and I can't take responsibility for the consequences of what

13  you're doing.

14       THE COURT:  I did not have copies of the slides, Mr.

15  Finch, and this slide, as I recall, was not shown.  Just so

16  it's clear.  So if you want to read from it --

17       MR. FINCH:  Your Honor, this slide was shown but --

18       THE COURT:  Okay.  I should have had them marked; I

19  did not.

20       UNIDENTIFIED SPEAKER:  I think he handed up the

21  slide.

22       MR. FINCH:  I think he handed up the slide, Your

23  Honor.

24       THE COURT:  He has handed up copies.  I have not seen

25  them.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002157

1          MR. FINCH:  But he handed --

2          MR. BERNICK:  I don't think I handed up the copies

3   yet either.

4          THE COURT:  I do not have copies of the slides

5   either.  So I don't have copies and I have not seen this slide.

6   So if it was shown, I apologize but I have not seen this slide.

7          MR. FINCH:  With respect to the Baron & Budd

8   memorandum, the fact is that Baron & Budd has never been

9   sanctioned for that.  There was an internal investigation.

10  There have been lawsuits about this which have been dismissed.

11  Mr. Krause's testimony is very clear that nothing was ever

12  demonstrated that memo was used in any way to prepare any

13  witness that had testified in any trial that he was involved in

14  and the fact is that Grace settled those cases, the Baron &

15  Budd cases, on terms that were very favorable compared to their

16  historical settlements in Texas.

17          So, whatever the implication Mr. Bernick wants you to

18  draw about the settlements were driven by factors other than

19  the merits, there's been no evidence in the record as to that.

20  The ACC and FCR case will put on the evidence that Grace's

21  settlement history is a settlement history.  Whatever factors

22  drove that, or whatever the factors drove -- we believe that

23  that's the best source of data for projecting the future cost.

24  If on his response case he wants to put on testimony to open

25  the door to the reasons why -- you know, if Grace wants to put

J&J COURT TRANSCRIBERS, INC.

CC-BLG002158

1 Mr. Hughes up there and say I think these cases were all crap

2 and I settled them because the tort system was broken, they

3 didn't put a shred of that evidence on in their direct case and

4 they're done with their direct case.  And I don't think they

5 can attack the settlement history anymore based on the record

6 as it currently exists.  There is absolutely not a shred of

7 evidence as to the bona fides or lack of bona fides that the

8 settlement -- Dr. Florence certainly treated those 258 closed

9 mesothelioma claims as valid settlements.  He didn't make any

10 dispersions of them.  And so as the state of the record is

11 right now, there's absolutely no evidence as to Grace's

12 position.  It's just void.  And Mr. Krause is not going to

13 testify about what was in people's head when they settled the

14 cases.  He's going to testify about this is what Grace told me.

15 This is what I told it.  That is basic non-opinion fact

16 testimony from someone who was personally involved in the

17 situation.  And the reason the criteria are relevant is, I

18 believe, as you can see it was discussed by Dr. Florence, and

19 you'll hear more about it from Ms. Biggs and Dr. Peterson.

20         And so with that, I think, you know, Mr. Krause's

21 testimony is clearly relevant.  It's clearly admissible.  There

22 will be no privilege implications for his testimony.  If after

23 the end of my direct examination you believe that there were --

24 and I'll be very careful to frame my questions in a way that

25 don't draw privilege objections and I don't think the scope of

CC-BLG002159

1  any cross would -- any kind of conceivably relevant cross

2  within the scope of my direct would implicate privilege

3  matters.   It just is not proper cross examination if a client

4  or a lawyer takes the stand and testifies as to facts as to

5  what they did in open court or if say a merger case a lawyer

6  who was involved in a deal testifies about what the parties

7  were talking about on the deal points, that certainly doesn't

8  waive the privilege as between him and his client and it's not

9  fair cross examination to get behind the statements back and

10 forth.

11         So with that, Your Honor, I think it's proper

12 testimony.   I think the motion in limine is not well founded

13 and I will reserve whatever time I have remaining.

14         MR. MULLADY:   The FCR joins the comments.   No

15 additional argument by us.

16         THE COURT:   All right.   Mr. Bernick.

17         MR. BERNICK:   Very briefly, Your Honor.

18         This is very interesting to listen to all the

19 protestations and what we're going to do and how I've never

20 heard of this before and blink away the reality of what we have

21 here which is relatively simple.

22         You can't proffer a witness to testify to a subject

23 matter and then say well, I'm going to frame my questions in a

24 way such that I don't open the door to privilege even though

25 that I know that what your position is with respect to the same

CC-BLG002160

248

1  subject matter will inevitably open that door.

2          So what we have is the ACC and the FCR purportedly

3  serving the interests or representing the interests of

4  claimants.   The claimants then assert through their counsel

5  privileges that constrain the scope of cross examination.   I've

6  never heard of that before.   It is an unusual situation.   You

7  generally don't have lawyers take the stand and testify about

8  anything.   You don't even have them take the stand to talk

9  about what they did in litigation with rare exceptions.   And

10  you certainly don't have them take the stand and talk about

11  settlements.   That's very unusual.   If you put somebody on the

12  stand to talk about settlements, the subject matter of the

13  settlements is fair game and you can't control the cross

14  examination by saying well, I didn't actually ask him that

15  question in that particular way.   So Mr. Finch says, Well, as

16  the description, in fact, indicates, Mr. Krause, what did Grace

17  tell you the exposure criteria were?   And the description says

18  just that.   What did Grace tell you the settlement criteria

19  would be?   And Mr. Krause will say, Well, I said X, Y and Z.

20  And the argument will be it's all admissions.   They're all

21  statements by Grace so it all comes in and why does that

22  implicate any privilege of Mr. Krause because after all what

23  Grace told him.

24          But the issue really is were the settlement criteria

25  set by Grace or not?   Mr. Krause may say yes, they were.   They

**J&J COURT TRANSCRIBERS, INC.**

1  told me this.  His files may show exactly the opposite.  Now,

2  they had access to all of our files because we agreed to make

3  our settlement files available in order to avoid litigating the

4  408 issue during the discovery phase, relying then upon this

5  trial to flush out the question of whether it would be

6  admissible.  So they got all of our files and they really

7  wanted our files and they moved to compel our files in the

8  worse possible way and they got them.

9        So now they want to have a witness take the stand up

10  here, talk about what our files have said as produced in

11  discovery, provide his characterization of one side of the

12  conversation using their files, but now when it comes to the

13  truth that we may seek to explore on cross examination, the

14  answer is we can't get it.  And it doesn't even pass the --

15  that makes a mockery of the idea of having a level playing

16  field.

17        So the idea that they can control this problem by

18  walking through the grimp and mire of privilege and taking the

19  rights steps so that they don't "open the door" when they know

20  that we can't cross examine because we don't have access to the

21  information because we asked for it and it's not been produced,

22  is illusory.

23        You know, when it comes to the documents that were

24  asked for, we asked specifically for those documents.  We took

25  literally the description that they offered and we said give us

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002162

1  the documents and they said no.  Another area was with respect

2  to Mr. Krause is we asked for, with respect to the negotiation

3  process, we asked for what the sides considered during the

4  negotiations.  That is what was really the to and fro.  And

5  interestingly Mr. Finch says again, Well, we don't really need

6  necessarily to get into that, we'll just say did Grace enter

7  into the settlement?  Yes.  And that will be up to Grace to say

8  why.  And that's certainly true.

9         Now, the argument was made that somehow Grace has

10  closed its case and not put in its evidence and somehow there's

11  a -- this is ridiculous.  We have not depended for our

12  estimation on any aspect of the actual settlement process

13  itself.  They are now getting into it.  We have a very robust

14  response to it.  But it's their deal.  And the best example of

15  how this works out is the example that unfortunately involves

16  Mr. Krause where they put us to trial, notwithstanding the

17  interests of their own client in settling it.  They decided for

18  their own firm reasons to put us against the wall at the trial

19  and nothing could be clearer.  And what do they want?  Well,

20  Mr. Finch says, Oh, this was all very nice and innocent.  You

21  know, there was an internal investigation.  Did we ever get to

22  see the internal investigation?  He says it's there.  I asked

23  Mr. Krause that question.  Shut down.  Couldn't be answered.

24         There was never any sanctions of Baron & Budd.  Well,

25  why weren't there sanctions of Baron & Budd?  Because of all

CC-BLG002163

1 the steps that were taken down in Dallas court that put people

2 in very, very substantial concern of what was going to happen

3 to them, I asked Mr. Krause questions about that. That was

4 shut down.

5          He says, The settlement was really very remarkably

6 favorable to Grace. What do they have to complain about?

7 After they got taken to trial and the verdicts came in, oh, it

8 was not a big deal. They got a great favorable settlement.

9 Well, that's easy for Mr. Finch to say but that isn't a subject

10 of discovery in cross examination. Was the settlement a

11 favorable settlement? Grace says, No, it wasn't a favorable

12 settlement. Well, they know that, but what does Mr. Krause's

13 own files say? Does their witness believe it was a favorable

14 settlement or not? Well, I can't conduct inquiry into that

15 because the witness is hiding behind -- or the witness is

16 invoking a privilege that the ACC and the FCR are hiding

17 behind.

18          So this is just -- it's gamesmanship. It's not going

19 to work. We know it's not going to work. It's going to be

20 agonizing. You take the discussion today, it's going to be

21 multiplied at ten different times.

22          We have the PIQ's. The PIQ's. Well, we got all the

23 PIQ's and Mr. Bernick said, Well, yeah, some of these cases

24 were immature. Yes, they were immature in the sense that we

25 didn't have expert reports and they were not on the eve of

CC-BLG002164

1  trial, many of them.  But what Mr. Finch fails to appreciate

2  and what we have made clear during our case is that when we

3  actually put the PIQ's to work and we took the information from

4  them, we only worked with certain information, i.e., that

5  information that should have been in the possession of the

6  claimant or the law firm day one when the case was filed, which

7  is what did they say their job was and what product did they

8  say their exposure was?  That's what we did in order precisely

9  to avoid any issue about whether the claim was mature.

10         They've now come back and said -- and Mr. Krause's

11  description, Well, the information was not available to us.

12  That information was not available to us.  So we then conducted

13  the discovery.  We said tell us when it became available to

14  you.  You say it wasn't, we believe it was.  We can't get the

15  answer to that question.

16         So in each and every case there is plainly -- we

17  served the discovery.  It's right on point.  It focused on

18  their own description.  We got shut down.  In any ordinary case

19  if this matter were at issue, this Court would resolve the

20  privilege issues.  It would resolve them as a pre-condition of

21  their being any kind of testimony so that the Court could

22  determine before the testimony occurred what would be fair and

23  appropriate cross examination.

24         The way it stands now, that's going to be impossible

25  because they've asserted the privilege with respect to matters

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002165

1  as to which the clients aren't even present before the Court.

2          So, yeah, this is unusual but the unusual nature of

3  it is a fact of their creation.

4          Last point is that Mr. Finch says, Well, you know,

5  the litigation files were all made available.  Yeah, after the

6  close of discovery and on the eve of the deposition of Mr.

7  Krause we made a request and made the request, it was a

8  fairly broad request, relating to his potential testimony as a

9  fact witness.  They didn't give us virtually anything that we

10 asked for, but they then saw this as an opportunity to somehow

11 open the door anew -- this is literally weeks ago long after

12 the discovery cutoff has occurred by dumping on us a hundred

13 boxes of documents literally days before the deposition.  And,

14 yeah, I said, you know what? I can't possibly begin to do a

15 thing with those litigation files.  This is an effort to back

16 into this case long after everything has been done.  A

17 so-called new record of what these cases were really like.  As

18 a practical matter, that was a gesture that was -- as most of

19 the arguments that have been made here this afternoon -- it was

20 a strategic gesture.  All that we want is a fair opportunity to

21 conduct cross examination.  All that we're getting are

22 privileged assertions and gamesmanship that we can't possibly

23 get resolved in a sensible fashion in the middle of trial.

24         MR. FINCH:  Brief response, Your Honor.  With respect

25 to his -- Mr. Bernick's assertion that it was late in the day

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002166

254

1  when the hundred boxes of documents were delivered.  The fact

2  is we've listed Peter Krause as a witness for over two years.

3  They could have put a subpoena on Peter Krause three days after

4  we listed him as a witness -- or ten days.  They didn't wait --

5  they waited until October of 2007 to even bother to put a

6  document subpoena on Mr. Krause.  Then after Mr. Krause quite

7  properly objected to it because the subpoena was a blunderbuss

8  and asked questions that clearly invaded any kind of privilege

9  or work product that is protections his client may have, they

10  didn't even -- they didn't attempt to enforce the subpoena in

11  any way, shape, or form.  They didn't even bother to meet and

12  confer with Ms. Ramsey about the scope of the requests.

13          So then we negotiate a procedure where Mr. Krause

14  would be served with a "document request" which is not

15  available against a non-party.  He complied with the document

16  request to the best of his ability by producing what he could,

17  which was a huge volume of material, and now Mr. Bernick

18  complains that it was late in the day that it landed on his

19  doorsteps.  I suggest to you that the fault is all of Mr.

20  Bernick's.

21          Now, Mr. Bernick also said, "Oh, this settlement --

22  this Baron & Budd settlement was a terrible deal for Grace."

23  Let me read to you what they said at the time.

24          MR. BERNICK:  This is a document that still has a

25  privilege status and it's not to be displayed in open court.

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002167

255

1   Yeah, I don't even know what makes you say that.

2          MR. FINCH:  Your Honor, let me --

3          MR. BERNICK:  I didn't read any -- this is an

4   outrageous --

5          MR. FINCH:  Mr. Bernick --

6          MR. BERNICK:  This is an outrageous procedure for

7   counsel to --

8          MR. FINCH:  Mr. --

9          MR. BERNICK:  -- make such free use --

10         MR. FINCH:  Mr. Bernick --

11         THE COURT:  Gentlemen, you know what?  It really

12  doesn't matter.  It's outside the scope, I think, of the

13  argument that's being made here anyway, isn't it?

14         MR. FINCH:  He just made the assertion that the

15  settlement was a bad deal for Grace.

16         THE COURT:  No.  What he said was that in the event

17  that Grace decides to make that position known at trial that it

18  is a bad deal.  That they can't cross examine Mr. Krause on

19  that view because they can't get his documents to find out

20  whether in Mr. Krause's file there would be support for that

21  contention.  That's what he said.

22         MR. FINCH:  But the point is we are not putting on

23  Mr. Krause to testify about whether Grace thought the deal was

24  a good deal, or a bad deal, or any kind of deal.  We're putting

25  on Mr. Krause to testify about what the objective criteria were

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002168

1  and what the deal was.

2      THE COURT:  But the problem that he's raising is

3  this.  Let's say you say to -- I don't know the specific

4  questions -- hypothetically.  You're going to say to Mr.

5  Krause, what criteria did you get from Grace before you could

6  present a client for settlement of a meso case and he's going

7  to say Grace wanted the meso clients to meet the following four

8  criteria; A, B, C, D.  End of story.  That's it.  That's all

9  you ask him.  On cross examination Mr. Bernick is going to say,

10  who came up with the criteria?  And he's going to say, Grace

11  did.  Mr. Bernick is going to say I want to see your file

12  because Grace's point of view is you came up with the criteria

13  13 years ago in a particular case, or claim, or whatever, and

14  Grace has only been using them ever since.  So I want to see

15  your files back 13 years ago to support that view.  And he

16  can't get them because there will be an assertion that those

17  files are protected by the attorney/client privilege.

18      MR. FINCH:  He can certainly get all of the --

19  everything that Waters & Krause told Grace about what those

20  criteria should be.  He's produced that.  This is the back and

21  forth settlement correspondence.  Our position is that a

22  settlement agreement is a contract and there is a course of

23  dealing between the parties and you don't look behind the

24  course of dealing to figure out what the contract is worth or

25  what it means.  It just --

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002169

1          THE COURT:  Well, then I don't need to know what the

2    criteria were that he was presented with.

3          MR. FINCH:  We need to know what the criteria were to

4    show that Grace's criteria historically differ from the

5    criteria that they're asking you to assume would be operative

6    in the future going forward forever from all time.

7          THE COURT:  Then if Grace wants to attack that by

8    saying going forward these are going to be the criteria that

9    Grace is coming up with because Grace was using somebody else's

10   criteria even though you assert that they were Grace's

11   criteria, I mean that's going to be, isn't it, a defense?

12         MR. FINCH:  Your Honor, the criteria is the criteria.

13   However they came to be.  The settlement history is the

14   settlement history.  We believe we are entitled to show through

15   competent fact witness testimony and otherwise that Grace's

16   historical criteria differ from the criteria that it is asking

17   you to assume will exist from now until the end of time as part

18   of its estimation case.  We are not attacking the settlement

19   history.  It is Grace that said they would attack the

20   settlement history, but they haven't.  And so if they want to

21   open the door in their case by doing that, they can do so.  But

22   we are not opening a door to anybody's privileged

23   communications and it is simply not the case that -- if I

24   represented Mr. Inselbuch and he got hit by a bus and we

25   settled the case and there somehow became a dispute over

**J&J COURT TRANSCRIBERS, INC.**

CC-BLG002170