**COMPREHENSIVE LOSS**

| (Dollars in millions) | 2001 | 2000 |
|---|---|---|
| Foreign currency translation....... | $ (164.8) | $ (140.2) |
| Minimum pension liability.......... | (136.0) | (11.6) |
| Securities available for sale...... | 0.1 | 0.3 |
| Accumulated other comprehensive loss | $ (300.7) | $ (151.5) |

---

## 9.  OTHER BALANCE SHEET ACCOUNTS

---

| (Dollars in millions) | 2001 | 2000 |
|---|---|---|
| NOTES AND ACCOUNTS RECEIVABLE, NET | | |
| Trade receivables, less allowance of $5.7 (2000 - $3.9)............. | $  276.4 | $  172.2 |
| Other receivables, less allowances of $1.9 (2000 - $0.5)............. | 25.7 | 25.0 |
| | $  302.1 | $  197.2 |
| INVENTORIES (1) | | |
| Raw materials ................... | $  39.2 | $  32.7 |
| In process ...................... | 27.6 | 22.4 |
| Finished products ............... | 108.1 | 96.4 |
| General merchandise .............. | 25.8 | 22.0 |
| Less:  Adjustment of certain inventories to a last-in/first-out (LIFO) basis .................. | (25.9) | (29.3) |
| | $  174.8 | $  144.2 |

(1) Inventories valued at LIFO cost comprised 50.7% of total inventories at December 31, 2001 and 50.1% at December 31, 2000.

## OTHER ASSETS

| | | |
|---|---|---|
| Deferred pension costs........... | $  326.1 | $  304.8 |
| Deferred charges ................. | 44.9 | 44.3 |
| Long-term receivables, less allowances of $0.6 (2000 - $0.8) | 2.8 | 2.4 |
| Investments in unconsolidated affiliates................... | 3.0 | 3.6 |
| Patents, licenses and other intangible assets, net ......... | 85.1 | 39.2 |
| | $  461.9 | $  394.3 |
| OTHER CURRENT LIABILITIES | | |
| Retained obligations of divested businesses ..................... | $   -- | $   67.2 |
| Accrued compensation .......... | 39.4 | 32.6 |
| Environmental remediation ........ | -- | 36.2 |
| Deferred compensation ............ | -- | 10.5 |
| Accrued interest ................. | 4.8 | 6.3 |
| Deferred tax liability ........... | 0.8 | 0.9 |
| Customer volume rebates ......... | 19.2 | 17.3 |
| Accrued commissions ............. | 6.1 | 4.3 |
| Accrued reorganization fees ...... | 6.4 | -- |
| Other accrued liabilities ........ | 51.2 | 80.3 |
| | $  127.9 | $  255.6 |
| OTHER LIABILITIES | | |
| Other postretirement benefits .... | $   -- | $  189.1 |
| Environmental remediation ........ | -- | 138.7 |
| Pension related ................. | 266.5 | 131.8 |
| Deferred compensation ............ | -- | 9.5 |
| Long-term self insurance reserve . | -- | 5.6 |
| Retained obligations of divested businesses ..................... | -- | 10.9 |
| Taxes payable, including interest | -- | 103.0 |
| Other accrued liabilities ........ | 8.7 | 27.0 |

CC-BLG002251

$    275.2    $   615.6
=================================================================

F-21

CC-BLG002252

## PROPERTIES AND EQUIPMENT

| (Dollars in millions) | 2001 | 2000 |
|---|---|---|
| Land | $ 17.7 | $ 16.3 |
| Buildings | 339.7 | 329.6 |
| Information technology and equipment | 104.4 | 67.5 |
| Machinery, equipment and other... | 1,113.5 | 1,076.5 |
| Projects under construction....... | 9.0 | 47.2 |
| Properties and equipment, gross... | 1,584.3 | 1,537.1 |
| Accumulated depreciation and amortization.................. | (995.3) | (935.4) |
| Properties and equipment, net..... | $ 589.0 | $ 601.7 |

Interest costs are incurred in connection with the financing of certain assets prior to placing them in service. Grace capitalized interest costs for continuing operations of $0.5 million in 2001, $1.0 million in 2000, and $0.8 million in 1999. Depreciation and lease amortization expense relating to properties and equipment amounted to $79.6 million in 2001, $84.6 million in 2000 and $86.6 million in 1999. Grace's rental expense for operating leases amounted to $19.8 million in 2001, $18.0 million in 2000 and $15.6 million in 1999. See Note 15 for information regarding contingent rentals.

At December 31, 2001, minimum future payments for operating leases were (dollars in millions):

## MINIMUM FUTURE PAYMENTS UNDER OPERATING LEASES

| | |
|---|---|
| 2002 | $ 7.8 |
| 2003 | 11.6 |
| 2004 | 14.5 |
| 2005 | 13.8 |
| 2006 | 5.0 |
| Thereafter | 9.6 |
| Total minimum lease payments | $ 62.3 |

The above minimum lease payments are net of anticipated sublease income of $39.5 million in 2002, $25.3 million in 2003, $16.4 million in 2004, $12.0 million in 2005 and $9.5 million in 2006.

## 11. LIFE INSURANCE

Grace is the beneficiary of life insurance policies on certain current and former employees with benefits in force of approximately $2,291.0 million and a net cash surrender value of $75.6 million at December 31, 2001. The policies were acquired to fund various employee benefit programs and other long-term liabilities and are structured to provide cash flow (primarily tax-free) over an extended number of years. The following table summarizes activity in these policies for 2001, 2000 and 1999:

## LIFE INSURANCE - ACTIVITY SUMMARY

| (Dollars in millions) | 2001 | 2000 | 1999 |
|---|---|---|---|
| Earnings on policy assets | $ 40.3 | $ 36.8 | $ 31.6 |
| Interest on policy loans. | (34.9) | (30.4) | (29.5) |
| Premiums................. | 2.5 | 2.5 | 2.4 |
| Proceeds from policy loans | (48.7) | -- | -- |
| Policy loan repayments... | 15.0 | 5.2 | 3.4 |
| Net investing activity... | (2.9) | 8.6 | (3.3) |
| Change in net cash value. | $ (28.7) | $ 22.7 | $ 4.6 |
| Gross cash value......... | $ 477.5 | $ 452.4 | $ 432.4 |

CC-BLG002253

| | | | | |
|---|---|---|---|---|
| Principal - policy loans. | | (377.6) | (325.8) | (331.0) |
| Accrued interest - policy loans .................. | | (24.3) | (22.3) | (19.8) |
| Net cash value.......... | $ | 75.6 | $ 104.3 | $ 81.6 |
| Insurance benefits in force | $ | 2,291.0 | $ 2,286.0 | $2,309.0 |
| Tax-free proceeds received | $ | 18.0 | $ 18.7 | $ 15.3 |

The Company's financial statements display income statement activity and balance sheet amounts on a net basis, reflecting the contractual interdependency of policy assets and liabilities.

F-22

CC-BLG002254

## COMPONENTS OF DEBT

| (Dollars in millions) | 2001 | 2000 |
|---|---|---|
| **DEBT PAYABLE WITHIN ONE YEAR** | | |
| Bank borrowings (6.9% weighted average interest rate at December 31, 2000) (1)................ | $ -- | $ 400.0 |
| 8.0% Notes Due 2004 (2)......... | -- | 5.7 |
| 7.75% Notes Due 2002 (2)........ | -- | 2.0 |
| Other short-term borrowings (3).. | 7.8 | 10.6 |
| | $ 7.8 | $ 418.3 |
| **DEBT PAYABLE AFTER ONE YEAR** | | |
| DIP facility (4)................. | $ -- | $ -- |
| DEBT SUBJECT TO COMPROMISE | | |
| Bank borrowings (1)............. | 500.0 | -- |
| Other borrowings (5)............ | 1.3 | -- |
| Accrued Interest (6)............ | 23.2 | -- |
| | $ 524.5 | $ -- |
| Full-year weighed average interest rates on total debt (7)........ | 5.8% | 7.1% |

(1) Under bank revolving credit agreements in effect at December 31, 2000, Grace could borrow up to $500.0 million at interest rates based upon the prevailing prime, federal funds and/or Eurodollar rates. Of that amount, $250.0 million was available under short-term facilities expiring in May 2001, and $250.0 million was available under a long-term facility expiring in May 2003. As a result of the Filing, Grace was in default under the bank revolving credit agreements, and accordingly, the balance has been reported as short-term debt as of December 31, 2000. The balance as of the Filing Date was reclassified to debt subject to compromise in the Consolidated Balance Sheet.

(2) During 1994, Grace sold $300.0 million of 8.0% Notes Due 2004 at an initial public offering price of 99.794% of par, to yield 8.0%; and during 1992, Grace sold at par $150.0 million of 7.75% Notes Due 2002. Interest on these notes was payable semiannually. As a result of the Filing, Grace was in default under the Notes. The 7.75% Notes were repaid on June 11, 2001 and the 8.0% Notes were repaid on August 15, 2001 by the unaffiliated guarantor of the Notes. Grace's liability to reimburse the unaffiliated guarantor with respect to these notes is included in "Liabilities subject to compromise" as of December 31, 2001.

(3) Represents borrowings under various lines of credit and other miscellaneous borrowings, primarily of non-U.S. subsidiaries. Under a maintenance capital promissory note in effect at December 31, 2001, with ART, an affiliate, Grace could borrow up to $5.0 million ($1.5 million outstanding at December 31, 2001) at interest rates equal to 125 basis points plus LIBOR.

(4) In 2001, the Debtors entered into a debtor-in-possession post-petition loan and security agreement with Bank of America, N.A. (the "DIP facility") in the aggregate amount of $250 million. The DIP facility has a term of two years, is secured by priority liens on substantially all assets of the Debtors, and bears interest based on LIBOR plus 2.00 to 2.25 percentage points. As of December 31, 2001, the Debtors had no outstanding borrowings under the DIP facility. However, $10.7 million of standby letters of credit were issued and outstanding under the facility as of December 31, 2001, which were issued mainly for trade-related matters such as performance bonds, as well as certain insurance and environmental matters. The outstanding amount of standby letters of credit issued under the DIP facility reduces the borrowing availability by a corresponding amount. Under the DIP facility, the Debtors are required to maintain $50 million of liquidity, a combination of cash, cash equivalents and the cash value of life insurance policies.

(5) Miscellaneous borrowings primarily consisting of U.S. mortgages.

(6) Grace is continuing to accrue interest expense on its pre-petition debt at the pre-petition contractual rate of LIBOR plus 100 basis points.

(7) Computation excludes interest expense and financing costs related to the Company's receivables securitization program which was terminated in May 2001.

Interest payments amounted to $9.5 million in 2001, $23.7 million in 2000 and $8.2 million in 1999.

## 13. FINANCIAL INSTRUMENTS

### DEBT AND INTEREST RATE SWAP AGREEMENTS

CC-BLG002255

Grace had no outstanding financial derivative instruments at December 31, 2001 and December 31, 2000.

## FAIR VALUE OF DEBT AND OTHER FINANCIAL INSTRUMENTS

At December 31, 2001, the fair value of Grace's debt payable within one year not subject to compromise approximated the recorded value of $7.8 million. Fair value is determined based on expected future cash flows (discounted at market interest rates), quotes from financial institutions and other appropriate valuation methodologies. At December 31, 2001, the recorded values of other financial instruments such as cash, short-term investments, trade receivables and payables and short-term debt approximated their fair values, based on the short-term maturities and floating rate characteristics of these instruments. The fair value of debt subject to compromise is undeterminable due to the Company's bankruptcy filing; the ultimate value of such debt will be determined by the outcome of the Chapter 11 proceedings.

## SALE OF ACCOUNTS RECEIVABLE

Prior to the Filing, Grace sold, on an ongoing basis, approximately a $100 million pool of its eligible trade accounts receivable to a multi-seller receivables company (the "conduit") through a wholly owned special purpose subsidiary (the "SPS"). Upon sale of the receivables, the SPS held a subordinated retained interest in the receivables. The estimated fair value of the subordinated interest, excluding allowance for doubtful accounts, was $33.2 million at December 31, 2000 and was included in "Other current assets" in the Consolidated Balance Sheet. Under the terms of the agreement, new receivables were added to the pool as collections reduced previously sold receivables. Grace serviced, administered and collected the receivables on behalf of the SPS and the conduit. The proceeds were used for the reduction of other short-term obligations and are reflected as operating cash flows in the Consolidated Statement of Cash Flows. Grace has recorded net losses of $1.2, $5.0 and $3.9 million in 2001, 2000 and 1999, respectively, from the corresponding sales to the conduit. As a result of the

F-23

CC-BLG002256

Filing, which constituted an event of default under the program, the amount outstanding under the program, approximating $65.3 million, was satisfied through the use of pre-petition trade receivables collected by the SPS during the period from the Filing Date to early May 2001. The program was terminated effective May 14, 2001.

## CREDIT RISK

Trade receivables potentially subject Grace to credit risk, given concentrations in the petroleum and construction industries. Grace's credit evaluation policies, relatively short collection terms and minimal credit losses mitigate credit risk exposures. Grace does not generally require collateral for its trade accounts receivable.

## 14. RESTRUCTURING COSTS AND ASSET IMPAIRMENTS

### RESTRUCTURING COSTS

In 2001, the restructuring reserves for employee termination costs were reduced to zero by cash payments of $1.6 million and the reversal of prior period restructuring reserves of $0.8 million. Restructuring reserves for plant/office closures were reduced by cash payments of $0.4 million; the remaining reserve of $0.7 million principally relates to long-term lease obligations in the United Kingdom.

During 2000, Grace recorded a net reduction of $3.9 million in previous restructuring charges to account for new sublease agreements that lowered previously reserved lease termination costs. This amount is reported in "Selling, general and administrative expenses" in the Consolidated Statement of Operations.

During 1999, Grace recorded a net restructuring charge of $2.6 million in continuing operations. In the first quarter of 1999, a restructuring charge of $4.3 million was recorded for additional severance costs directly related to the productivity effectiveness program implemented in the fourth quarter of 1998. The restructuring charge was offset by the reversal of $1.7 million of prior period restructuring charges primarily related to the execution of a sublease agreement which partially offset previously accrued lease termination costs. Such amounts are reported in "Selling, general and administrative expenses" in the Consolidated Statement of Operations.

The components of the restructuring charges recorded in 2001, 2000 and 1999, spending with respect to such charges and other activity during those years, and the remaining reserve balances included in "Other current liabilities" and "Other liabilities" at December 31, 2001 and 2000, were as follows:

| RESTRUCTURING CHARGES (Dollars in millions) | Employee Termination Costs | Plant/ Office Closures | Total |
|---|---|---|---|
| **1999** | | | |
| Restructuring reserve at December 31, 1998......... | $ 23.8 | $ 9.5 | $ 33.3 |
| Provisions recorded in continuing operations...... | 4.3 | -- | 4.3 |
| Reversal of prior period restructuring reserves..... | -- | (1.7) | (1.7) |
| Cash payments................ | (19.0) | (2.1) | (21.1) |
| Restructuring reserve at December 31, 1999......... | $ 9.1 | $ 5.7 | $ 14.8 |
| **2000** | | | |
| Reversal of prior period restructuring reserves..... | $ (1.1) | $ (2.8) | $ (3.9) |
| Cash payments................ | (5.6) | (1.8) | (7.4) |
| Restructuring reserve at December 31, 2000......... | $ 2.4 | $ 1.1 | $ 3.5 |
| **2001** | | | |
| Reversal of prior period restructuring reserves..... | $ (0.8) | $ -- | $ (0.8) |
| Cash payments................ | (1.6) | (0.4) | (2.0) |
| RESTRUCTURING RESERVE AT DECEMBER 31, 2001.......... | $ -- | $ 0.7 | $ 0.7 |

## 15. COMMITMENTS AND CONTINGENT LIABILITIES

CC-BLG002257

**ASBESTOS-RELATED LITIGATION - SEE NOTE 3**

**ENVIRONMENTAL REMEDIATION**

**General Matters and Discussion**

Grace is subject to loss contingencies resulting from extensive and evolving federal, state, local and foreign environmental laws and regulations relating to the generation, storage, handling, discharge and disposition of hazardous wastes and other materials. Grace accrues for anticipated costs associated with investigatory and remediation efforts where an assessment has indicated that a probable liability has been incurred and the amount of loss can be reasonably estimated. These accruals do not take into account any discounting for the time value of money. At December 31, 2001, Grace's liability for environmental investigatory and remediation costs related to continuing and discontinued operations totaled $153.1 million, as compared to $174.9 million at December 31, 2000. Grace made cash payments of $28.9 million in 2001, $47.2 million in 2000 and $25.0 million in 1999 to remediate environmentally

F-24

CC-BLG002258

impaired sites. These amounts have been charged against previously established reserves.

Grace's environmental liabilities are reassessed whenever circumstances become better defined or remediation efforts and their costs can be better estimated. These liabilities are evaluated based on currently available information, including the progress of remedial investigation at each site, the current status of discussions with regulatory authorities regarding the method and extent of remediation at each site, existing technology, prior experience in contaminated site remediation and the apportionment of costs among potentially responsible parties. Grace expects that the funding of environmental remediation activities will be affected by the Chapter 11 proceedings, but cannot predict at this time if such proceedings will have a favorable or adverse effect; any such effect could be material. Grace's environmental liabilities are included in "Liabilities subject to compromise" as of December 31, 2001.

## Vermiculite Related Matters

In November 1999, the U.S. Environmental Protection Agency ("EPA") began an investigation into alleged excessive levels of asbestos-related disease related to Grace's former vermiculite mining activities in the Libby, Montana area. On March 30, 2001, the EPA filed a lawsuit in U.S. District Court for the District of Montana, Missoula Division (United States v. W. R. Grace & Company et al.) under the Comprehensive Environmental Response, Compensation and Liability Act for the recovery of costs allegedly incurred by the United States in response to the release or threatened release of asbestos in the Libby, Montana area relating to such former mining activities. These costs include cleaning and/or demolition of contaminated buildings, the evacuation and removal of contaminated soil, health screening of Libby residents and former mine workers, and investigation and monitoring costs. In this action, the United States is also seeking a declaration of Grace's liability that would be binding in future actions to recover further response costs. The EPA has reported that it has spent approximately $25.4 million in response costs in and around Libby through June 2001. Grace expects that the EPA may incur significant additional response costs, as Libby is expected to be added to EPA's National Priorities List of Superfund sites, but is unable to estimate the amount at this time. Grace intends to review the EPA's actions and cost claims to determine whether they are justified and reasonable. These lawsuits are not subject to the automatic stay provided under the U.S. Bankruptcy Code. However, recovery of any response costs would be subject to the Chapter 11 proceedings.

In February 2000, a purported class action lawsuit was filed in the U.S. District Court in Missoula, Montana against Grace on behalf of all owners of improved, private real property situated within 12 miles of Libby, Montana. The action alleges that the class members have suffered harm in the form of environmental contamination and loss of property rights resulting from Grace's former vermiculite mining and processing operations. The complaint seeks remediation, property damages and punitive damages. In October 2000, a purported class action lawsuit was filed in the U.S. District Court for Minnesota against Grace on behalf of all owners of real property situated near a former vermiculite processing plant in northeast Minneapolis. The action alleges that the class members have suffered harm in the form of environmental contamination and loss of property rights resulting from the former vermiculite processing operations. The complaint seeks remediation, property damages, and punitive damages. Grace has not completed its investigation of these claims, and, therefore, is not able to assess the extent of any possible liability related to these lawsuits. These cases have been stayed as a result of the Filing.

In 2001 and 2000, Grace recorded a pre-tax charge of $5.8 million and $10.4 million, respectively, for clean up costs at previously operating vermiculite mining and processing sites. The environmental risks related to vermiculite could result in material future charges to Grace's earnings, the amounts of which are not currently determinable.

## Insurance Matters

Grace is a party to three environmental insurance coverage actions involving one primary and one excess insurance carrier regarding the applicability of the carriers' policies to Grace's environmental remediation costs. The outcome of such litigation as well as the amounts of any recoveries that Grace may receive is presently uncertain. Accordingly, Grace has not recorded a receivable with respect to such insurance coverage.

## CONTINGENT RENTALS

Grace is the named tenant or guarantor with respect to leases entered into by previously divested businesses. These leases, some of which extend through the year 2017, have future minimum lease payments aggregating $105.0 million, and are fully offset by

F-25

CC-BLG002259

anticipated future minimum rental income from existing tenants and subtenants. In addition, Grace is liable for other expenses (primarily property taxes) relating to the above leases; these expenses are paid by tenants and subtenants. Certain of the rental income and other expenses are payable by tenants and subtenants that have filed for bankruptcy protection or are otherwise experiencing financial difficulties. Grace believes that the risk of significant loss from these lease obligations is remote. Grace is also evaluating whether to reject any of these leases as permitted by the Bankruptcy Code.

## TAX MATTERS

The Internal Revenue Service ("IRS") is challenging the deductions taken by a number of companies throughout the United States related to interest on policy loans under corporate owned life insurance ("COLI") policies for years prior to January 1, 1999. In 2000 Grace paid $21.2 million of tax and interest related to this issue for tax years 1990-1992. Subsequent to 1992, Grace deducted approximately $163.2 million in interest attributable to COLI policy loans. Grace filed a claim for refund of the amount paid to date and will contest any future IRS assessments on the grounds that these insurance policies and related loans had, and continue to have, a valid business purpose, that the COLI policies have economic substance and that interest deductions claimed were in compliance with tax laws in effect at the time.

The IRS also has assessed additional federal income tax withholding and Federal Insurance Contributions Act taxes plus interest and related penalties for calendar years 1993 through 1995 against CCHP, Inc. ("CCHP"), a Grace subsidiary that formerly operated a temporary staffing business for nurses and other healthcare personnel. The assessments, aggregating $21.8 million, were made in connection with a meal and incidental expense per diem plan for traveling healthcare personnel that was in effect through 1999. The IRS contends that certain per diem meals and incidental expenses and lodging benefits provided to traveling healthcare personnel to defray the expenses they incurred while traveling on business should have been treated as wages subject to employment taxes and federal income tax withholding. Grace contends that its for per diem and expense allowance plans were in accordance with statutory and regulatory requirements, as well as other published guidance from the IRS, per diem and expense allowance plans. Grace expects that the IRS will make additional assessments for the 1996 through 1999 periods as well. The matter is currently pending in the U.S. Court of Claims.

Grace has received notification from a foreign taxing authority assessing tax deficiencies plus interest relating to the purchase and sale of foreign bonds in 1989 and 1990. This assessment, totaling $10.5 million, is related to the Bekaert Group, which Grace sold in 1991 but as to which Grace retained liability for tax deficiencies attributable to tax periods prior to the sale. The matter is currently before the foreign tax authorities, but no decision has been rendered.

As a result of Grace's Chapter 11 filing, certain tax matters related to open tax years, including COLI interest deductions, could become the direct obligations of predecessor companies that now own Grace's former healthcare and packaging businesses. One or both of these companies could be directly liable to tax authorities for Grace's tax deficiencies. Pursuant to agreements relating to each transaction, Grace may be required to indemnify both parties for taxes relating to periods prior to the closing of such transactions. Any indemnification obligation that arises as a result of these matters would be a pre-petition liability subject to the Chapter 11 proceedings.

## FRAUDULENT TRANSFER CASES

The Company and one of its subsidiaries have been named in purported class action suits alleging that the 1996 reorganization involving a predecessor of Grace and Fresenius A.G. and the 1998 reorganization involving a predecessor of Grace and Sealed Air Corporation (the "1996 and 1998 transactions") were fraudulent transfers. The suits are alleged to have been brought on behalf of all individuals who then had lawsuits on file asserting personal injury or wrongful death claims against any of the defendants. The other defendants in the suits have all asserted claims against Grace for indemnification. Grace believes that the suits are without merit. These lawsuits have been stayed as a result of Grace's Chapter 11 filing. However, fraudulent transfer claims related to the 1996 and 1998 transactions are expected to be heard by the Bankruptcy Court during the fourth quarter of 2002.

## PURCHASE COMMITMENTS

From time to time, Grace engages in purchase commitments in its various business activities, all of which are expected to be fulfilled with no material

F-26

CC-BLG002260

adverse consequences to Grace's operations or financial condition.

## FINANCIAL ASSURANCES

At December 31, 2001, Grace had gross financial assurances issued and outstanding of $261.2 million, comprised of $149.2 million of gross surety bonds issued by various insurance companies and $112.0 million of standby letters of credit issued by various banks. Of the standby letters of credit, $29.4 million act as collateral for surety bonds, thereby reducing Grace's overall obligations under its financial assurances to a net amount of $231.8 million. These financial assurances were established for a variety of purposes, including insurance and environmental matters, asbestos settlements and appeals, trade- related commitments and other matters. Of the net amount of $231.8 million of financial assurances, approximately $10.1 million were issued by non-Debtor and $221.7 million were issued by the Debtors. Of the amounts issued by the Debtors, approximately $211.0 million were issued before the Filing Date, with the remaining $10.7 million being issued under the DIP facility subsequent to the Filing.

## ACCOUNTING FOR CONTINGENCIES

Although the outcome of each of the matters discussed above cannot be predicted with certainty, Grace has assessed its risk and has made accounting estimates as required under U.S. generally accepted accounting principles. As a result of the Filing, claims related to the items discussed above will be addressed as part of Grace's Chapter 11 proceedings. Accruals recorded for such contingencies have been included in "Liabilities subject to compromise" on the accompanying Consolidated Balance Sheet as of December 31, 2001. The amounts of these liabilities as ultimately determined through the Chapter 11 proceedings could be materially different from amounts recorded by Grace at December 31, 2001.

## 16. SHAREHOLDERS' EQUITY (DEFICIT)

Under its Certificate of Incorporation, the Company is authorized to issue 300,000,000 shares of common stock, $.01 par value. Of the common stock unissued at December 31, 2001, approximately 12,772,400 shares were reserved for issuance pursuant to stock options and other stock incentives. The Certificate of Incorporation also authorizes 53,000,000 shares of preferred stock, $.01 par value, none of which has been issued. 3,000,000 of such shares have been designated as Series A Junior Participating Preferred Stock and are reserved for issuance in connection with the Company's Preferred Stock Purchase Rights ("Rights"). A Right trades together with each outstanding share of common stock and entitles the holder to purchase one hundredth of a share of Series A Junior Participating Preferred Stock under certain circumstances and subject to certain conditions. The Rights are not and will not become exercisable unless and until certain events occur, and at no time will the Rights have any voting power.

The Company's Board of Directors previously approved programs to repurchase outstanding shares of common stock. During the year ended December 31, 2000, the Company acquired 4,815,400 shares of common stock for $47.3 million (at an average price per share of $9.82). During the year ended December 31, 1999, the Company acquired 6,956,200 shares of common stock for $94.4 million (at an average price per share of $13.57). In January 1999, Grace retired 5,476,800 shares of treasury stock with a cost basis of $88.4 million.

In November 2001, 56,911 shares of restricted stock were reclassified as treasury shares to reflect an election made by Paul J. Norris, Grace's Chairman, President and Chief Executive Officer, under a Bankruptcy Court approved employment agreement.

## 17. EARNINGS (LOSS) PER SHARE

The following table shows a reconciliation of the numerators and denominators used in calculating basic and diluted earnings (loss) per share from continuing operations.

## EARNINGS (LOSS) PER SHARE

| (Amounts in millions, except per share amounts) | 2001 | 2000 | 1999 |
|---|---|---|---|
| NUMERATORS | | | |
| Income (loss) from continuing operations | $ 78.6 | $ (89.7) | $ 130.2 |
| DENOMINATORS | | | |
| Weighted average common shares - basic calculation........ | 65.3 | 66.8 | 70.7 |

CC-BLG002261

|  | | | |
|---|---|---|---|
| Dilutive effect of employee stock options and restricted shares... | 0.1 | -- | 3.1 |
| Weighted average common shares - diluted calculation........ | 65.4 | 66.8 | 73.8 |
| BASIC EARNINGS (LOSS) PER SHARE.............. | $  1.20 | $ (1.34) | $  1.84 |
| DILUTED EARNINGS (LOSS) PER SHARE......... | $  1.20 | $ (1.34) | $  1.76 |

F-27

CC-BLG002262

As a result of the 2000 loss from continuing operations, approximately 800,000 of employee compensation-related shares, primarily issuable under stock options, were excluded from the diluted loss per share calculation in 2000 because their effect would be antidilutive. Additionally, stock options that could potentially dilute basic loss per share in the future (that were excluded from the computation of diluted loss per share because their exercise prices were greater than the average market price of the common shares) averaged approximately 14.2 million in 2001, 9.4 million in 2000 and 3.1 million in 1999.

## 18. STOCK INCENTIVE PLANS

Each stock option granted under the Company's stock incentive plans has an exercise price equal to the fair market value of the Company's common stock on the date of grant. Options become exercisable at the time or times determined by a committee of the Company's Board of Directors and may have terms of up to ten years and one month. The following table sets forth information relating to such options, as so adjusted, during 2001, 2000 and 1999:

```
================================================
STOCK OPTION ACTIVITY                    2001
================================================
                                       Average
                           Number      Exercise
                          of Shares     Price
                         -------------------------
Balance at beginning of year.....  14,005,209  $ 12.70
Options granted.................    1,339,846     2.53
Options exercised...............          --       --
Options terminated or cancelled..  (2,572,624)   11.46
                                   ------------
Balance at end of year...........  12,772,431    11.88
                                   ============
Exercisable at end of year.......   9,586,993  $ 12.64
================================================
                                                2000

Balance at beginning of year.....  12,530,287  $ 12.27
Options granted.................    2,555,000    13.32
Options exercised...............     (779,863)    7.52
Options terminated or cancelled..    (300,215)   13.62
                                   ------------
Balance at end of year...........  14,005,209    12.70
                                   ============
Exercisable at end of year.......   9,386,539  $ 11.96
================================================
                                                1999

Balance at beginning of year.....  14,289,870  $ 10.87
Options granted.................    2,332,290    13.21
Options exercised...............   (3,811,493)    7.30
Options terminated or cancelled..    (280,380)   16.21
                                   ------------
Balance at end of year...........  12,530,287    12.27
                                   ============
Exercisable at end of year.......   9,212,495  $  9.88
================================================
```

At December 31, 2001, 4,456,038 shares were available for additional grants. Currently outstanding options expire on various dates through November 2009.

Following is a summary of stock options outstanding at December 31, 2001:

## STOCK OPTIONS OUTSTANDING

| EXERCISE PRICE RANGE | Number Outstanding | Weighted-average Remaining Contractual Life | Weighted-average Exercise Price | Number Exercisable | Weighted-average Exercise Price |
|---|---|---|---|---|---|
| $2 - $8 | 3,281,071 | 5.88 | $ 4.64 | 2,176,270 | $ 5.76 |
| $8 - $13 | 4,335,469 | 6.30 | 11.82 | 3,800,298 | 11.68 |
| $13 - $18 | 2,841,326 | 8.63 | 14.14 | 1,304,860 | 14.82 |
| $18 - $21 | 2,314,565 | 7.01 | 19.47 | 2,305,565 | 19.47 |

CC-BLG002263

| | | | |
|---|---|---|---|
| 12,772,431 | 6.84 | $11.88 | 9,586,993 | $12.64 |

In 2000 and 1999, the Company granted a total of 25,000 and 45,000 shares, respectively, of the Company's Common Stock to certain executives, subject to various restrictions. No shares were granted in 2001. Such shares are subject to forfeiture if certain employment conditions are not met. For more information, see the Form of Restricted Share Award Agreements filed as an exhibit to the Company's Form 10-Q for the quarter ended March 31, 1998. At December 31, 2001, restrictions on all prior grants of restricted stock, net of forfeitures, totaled 55,000 shares; these restrictions lapse in 2002. The fair value of the restricted shares at the date of grant is amortized to expense ratably over the restriction period.

SFAS No. 123, "Accounting for Stock-Based Compensation," permits the Company to follow the measurement provisions of APB Opinion No. 25, "Accounting for Stock Issued to Employees," and not recognize compensation expense for its stock-based incentive plans. Had compensation cost for the Company's stock-based incentive compensation plans been determined based on the fair value at the grant dates of awards under those plans, consistent with the methodology prescribed by SFAS No. 123, the Company's net income (loss) and related earnings (loss) per share for 2001, 2000 and 1999 would have been reduced to the pro forma amounts indicated below:

**PRO FORMA EARNINGS
UNDER SFAS NO. 123**

| (Amounts in millions, except per share amounts) | 2001 | 2000 | 1999 |
|---|---|---|---|
| Net income (loss): | | | |
| As reported.......... | $ 78.6 | $ (89.7) | $ 135.9 |
| Pro forma (1)........ | 71.2 | (98.5) | 128.0 |
| Basic earnings (loss) per share: | | | |
| As reported.......... | $ 1.20 | $ (1.34) | $ 1.92 |
| Pro forma (1)........ | 1.09 | (1.47) | 1.81 |
| Diluted earnings (loss) per share: | | | |
| As reported.......... | $ 1.20 | $ (1.34) | $ 1.84 |
| Pro forma (1)........ | 1.09 | (1.47) | 1.73 |

(1) These pro forma amounts may not be indicative of future income (loss) and earnings (loss) per share.

F-28

CC-BLG002264

To determine compensation cost under SFAS No. 123, the fair value of each option is estimated on the date of grant using the Black-Scholes option pricing model, with the following historical weighted average assumptions applied to grants in 2001, 2000 and 1999:

| OPTION VALUE ASSUMPTIONS | 2001 | 2000 | 1999 |
|---|---|---|---|
| Dividend yield........ | --% | -- % | -- % |
| Expected volatility... | 61% | 59 % | 39 % |
| Risk-free interest rate | 5% | 7 % | 5 % |
| Expected life (in years) | 4 | 4 | 4 |

Based upon the above assumptions, the weighted average fair value of each option granted was $1.28 per share for 2001, $6.86 per share for 2000 and $5.05 per share for 1999.

## 19. PENSION PLANS AND OTHER POSTRETIREMENT BENEFITS PLANS

Grace maintains defined benefit pension plans covering employees of certain units who meet age and service requirements. Benefits are generally based on final average salary and years of service. Grace funds its U.S. pension plans in accordance with U.S. federal laws and regulations. Non-U.S. pension plans are funded under a variety of methods, as required under local laws and customs, and therefore cannot be summarized. Grace's accumulated other comprehensive loss, reflected as a reduction of shareholders equity (deficit), included additional minimum pension liabilities as of December 31, 2001 and 2000 of $209.3 million ($136.0 million, net of tax) and $17.9 million ($11.6 million, net of tax), respectively, for plans where the accumulated benefit obligation exceeded the fair market value of assets.

Grace provides certain other postretirement health care and life insurance benefits for retired employees of specified U.S. units. The retiree medical insurance plans provide various levels of benefits to employees (depending on their dates of hire) who retire from Grace after age 55 with at least 10 years of service. These plans are unfunded, and Grace pays the costs of benefits under these plans as they are incurred. Grace applies SFAS No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions," which requires that the future costs of postretirement health care and life insurance benefits be accrued over the employees' years of service.

An amendment to the structure of the retiree-paid premiums for postretirement medical benefits was approved by the Company's Board in November 2001. The amendment became effective January 1, 2002, and requires all retirees and beneficiaries covered by the postretirement medical plan to contribute a minimum of 40% of the calculated premium for that coverage.

The following summarizes the changes in benefit obligation and fair value of plan assets during the period:

F-29

CC-BLG002265

| CHANGE IN FINANCIAL STATUS OF RETIREMENT PLANS | PENSION | | | | | | OTHER POST-RETIREMENT PLANS | |
|---|---|---|---|---|---|---|---|---|
| | U.S. | | NON-U.S. | | TOTAL | | | |
| (Dollars in millions) | 2001 | 2000 | 2001 | 2000 | 2001 | 2000 | 2001 | 2000 |
| **CHANGE IN BENEFIT OBLIGATION** | | | | | | | | |
| Benefit obligation at beginning of year...... | $ 741.0 | $ 765.7 | $ 199.2 | $ 196.9 | $ 940.2 | $ 962.6 | $ 176.7 | $ 182.7 |
| Service cost.................................. | 7.9 | 6.3 | 3.8 | 3.8 | 11.7 | 10.1 | 0.7 | 0.6 |
| Interest cost................................. | 55.3 | 54.5 | 11.2 | 11.4 | 66.5 | 65.9 | 9.8 | 14.4 |
| Plan participants' contributions.............. | -- | -- | 0.4 | 0.5 | 0.4 | 0.5 | -- | -- |
| Amendments.................................... | -- | 2.4 | 1.6 | 0.1 | 1.6 | 2.5 | -- | (20.0) |
| Acquisitions/(divestitures).................... | -- | 8.3 | -- | -- | -- | 8.3 | -- | -- |
| Curtailments/settlements recognized gains..... | -- | -- | -- | -- | -- | -- | -- | -- |
| Actuarial (gain) loss......................... | 42.9 | (17.7) | 0.6 | 13.8 | 43.5 | (3.9) | (28.9) | 22.0 |
| Benefits paid................................. | (70.5) | (78.5) | (11.7) | (12.2) | (82.2) | (90.7) | (22.3) | (23.0) |
| Currency exchange translation adjustments..... | -- | -- | (9.0) | (15.1) | (9.0) | (15.1) | -- | -- |
| Benefit obligation at end of year............ | $ 776.6 | $ 741.0 | $ 196.1 | $ 199.2 | $ 972.7 | $ 940.2 | $ 136.0 | $ 176.7 |
| **CHANGE IN PLAN ASSETS** | | | | | | | | |
| Fair value of plan assets at beginning of year | $ 800.2 | $ 899.9 | $ 198.3 | $ 224.1 | $ 998.5 | $1,124.0 | $ -- | $ -- |
| Actual return on plan assets.................. | (47.0) | (28.6) | (15.2) | (1.6) | (62.2) | (30.2) | -- | -- |
| Employer contribution......................... | 6.8 | 7.4 | 3.8 | 4.0 | 10.6 | 11.4 | 22.3 | 23.0 |
| Acquisitions/Spinoff.......................... | -- | -- | -- | -- | -- | -- | -- | -- |
| Plan participants' contribution............... | -- | -- | 0.4 | 0.5 | 0.4 | 0.5 | -- | -- |
| Benefits paid................................. | (70.5) | (78.5) | (11.7) | (12.2) | (82.2) | (90.7) | (22.3) | (23.0) |
| Currency exchange translation adjustment...... | -- | -- | (8.3) | (16.5) | (8.3) | (16.5) | -- | -- |
| Fair value of plan assets at end of year...... | $ 689.5 | $ 800.2 | $ 167.3 | $ 198.3 | $ 856.8 | $ 998.5 | $ -- | $ -- |
| Funded status................................. | $ (87.1) | $ 59.2 | $ (28.8) | $ (0.9) | $(115.9) | $ 58.3 | $(136.0) | $(176.7) |
| Unrecognized transition (asset)/obligation.... | 0.7 | (9.3) | 0.8 | 0.9 | 1.5 | (8.4) | -- | -- |
| Unrecognized actuarial loss (gain)............ | 25.1 | 98.9 | 4.0 | 14.6 | 29.1 | 113.5 | 23.8 | 61.9 |
| Unrecognized prior service cost/(benefit)..... | 253.7 | 31.0 | 45.6 | 4.6 | 299.3 | 35.6 | (56.9) | (74.3) |
| Net amount recognized......................... | $ 192.4 | $ 179.8 | $ 21.6 | $ 19.2 | $ 214.0 | $ 199.0 | $(169.1) | $(189.1) |
| **AMOUNTS RECOGNIZED IN THE CONSOLIDATED BALANCE** | | | | | | | | |
| **SHEET CONSIST OF:** | | | | | | | | |
| Deferred pension costs........................ | $ 241.0 | $ 223.5 | $ 85.1 | $ 81.3 | $ 326.1 | $ 304.8 | $ -- | $ -- |
| Pension related liability................... | (276.0) | (68.3) | (65.1) | (63.5) | (341.1) | (131.8) | (169.1) | (189.1) |
| Intangible asset........................... | 19.0 | 6.9 | 0.7 | 1.2 | 19.7 | 8.1 | N/A | N/A |
| Accumulated other comprehensive loss........ | 208.4 | 17.7 | 0.9 | 0.2 | 209.3 | 17.9 | N/A | N/A |
| Net amount recognized......................... | $ 192.4 | $ 179.8 | $ 21.6 | $ 19.2 | $ 214.0 | $ 199.0 | $(169.1) | $ (189.1) |
| **WEIGHTED AVERAGE ASSUMPTIONS AS OF DECEMBER 31** | | | | | | | | |
| Discount rate................................. | 7.25% | 7.50% | 2.3-15.0% | 2.3-15.0% | N/M | N/M | 7.25% | 7.50% |
| Expected return on plan assets................ | 9.0 | 9.0 | 5.0-15.0 | 5.0-15.0 | N/M | N/M | N/M | N/M |
| Rate of compensation increase................. | 4.3 | 4.5 | 2.0-14.0 | 2.0-14.0 | N/M | N/M | N/M | N/M |

| COMPONENTS OF NET PERIODIC BENEFIT (INCOME) COST | 2001 | | | 2000 | | | 1999 | | |
|---|---|---|---|---|---|---|---|---|---|
| (Dollars in millions) | U.S. | NON-U.S. | OTHER | U.S. | Non-U.S. | Other | U.S. | Non-U.S. | Other |
| Service cost............................... | $ 7.9 | $ 3.8 | $ 0.7 | $ 6.3 | $ 3.8 | $ 0.6 | $ 7.3 | $ 5.2 | $ 0.8 |
| Interest cost.............................. | 55.3 | 11.2 | 9.8 | 54.5 | 11.4 | 14.4 | 57.7 | 11.8 | 12.8 |
| Expected return on plan assets............. | (69.1) | (15.9) | -- | (78.2) | (18.2) | -- | (76.0) | (17.1) | -- |
| Amortization of transition asset........... | (10.0) | -- | -- | (10.0) | (0.2) | -- | (11.5) | (0.2) | -- |
| Amortization of prior service cost (benefit)...... | 7.6 | 0.5 | (8.3) | 7.4 | 0.6 | (6.7) | 7.0 | 0.6 | (6.7) |
| Amortization of unrecognized actuarial loss....... | 2.4 | 0.2 | 0.1 | 0.8 | (0.4) | 2.4 | 3.9 | 0.3 | 2.7 |
| Net curtailment and settlement loss....... | -- | 0.2 | -- | -- | -- | -- | 11.0 | -- | -- |
| Net periodic benefit (income) cost................ | $ (5.9) | $ -- | 2.3 | $(19.2) | $ (3.0) | $ 10.7 | $ (0.6) | $ 0.8 | 9.6 |

| PENSION PLANS WHERE ACCUMULATED BENEFIT OBLIGATIONS EXCEED PLAN ASSETS (Dollars in millions) | U.S. | | NON-U.S. | | OTHER POST-RETIREMENT PLANS | |
|---|---|---|---|---|---|---|
| | 2001 | 2000 | 2001 | 2000 | 2001 | 2000 |
| Projected benefit obligation............. | $ 691.1 | $ 68.7 | $ 74.1 | $ 72.4 | N/A | N/A |
| Accumulated benefit obligation........... | 676.8 | 68.2 | 63.8 | 62.0 | $ 136.0 | $ 176.7 |
| Fair value of plan assets................ | 583.7 | -- | 0.9 | 0.6 | -- | -- |

N/M - Not meaningful
N/A - Not applicable

F-30

CC-BLG002266

For measurement purposes, rates of increase of 9.0% and 9.5% in the per capita cost of covered retiree health care benefits for pre-age 65 and post-age 65, respectively, were assumed for 2002. The rate is assumed to decrease gradually to 5.3% through 2007 and remain at that level thereafter. Assumed health care cost trend rates have a significant effect on the amounts reported for the postretirement medical plan. A one percentage-point increase (decrease) in assumed health care medical cost trend rates would increase (decrease) total service and interest cost components by $0.1 million and ($0.1) million, respectively, and increase (decrease) postretirement benefit obligations by $1.0 million and ($1.2) million, respectively.

---

## 20. BUSINESS SEGMENT INFORMATION

---

Grace is a global producer of specialty chemicals and specialty materials. It generates revenues from two business segments: Davison Chemicals and Performance Chemicals. Performance Chemicals was formed in 1999 by combining the previously separate business segments of Grace Construction Products and Darex Container Products. These businesses were consolidated under one management team to capitalize on infrastructure synergies from co-location of headquarters and production facilities around the world. Davison Chemicals produces a variety of catalysts and silica products. Performance Chemicals produces specialty construction chemicals, building materials and sealants and coatings. Intersegment sales, eliminated in consolidation, are not material. The table below presents information related to Grace's business segments for 2001, 2000 and 1999; in connection with the adoption of SFAS No. 131, "Disclosure about Segments of an Enterprise and Related Information," only those corporate expenses directly related to the segment are allocated for reporting purposes. All remaining corporate items are reported separately and labeled as such. Davison Chemicals pre-tax operating income includes Grace's equity income related to the unconsolidated operating company of ART (see Note 6).

---

### BUSINESS SEGMENT DATA

| (Dollars in millions) | 2001 | 2000 | 1999 |
|---|---|---|---|
| **NET SALES** | | | |
| Davison Chemicals..... | $ 874.1 | $ 783.9 | $ 751.1 |
| Performance Chemicals. | 849.1 | 813.5 | 799.8 |
| Total................. | $ 1,723.2 | $ 1,597.4 | $1,550.9 |
| **PRE-TAX OPERATING INCOME** | | | |
| Davison Chemicals..... | $ 128.7 | $ 131.6 | $ 124.3 |
| Performance Chemicals. | 101.1 | 95.5 | 105.8 |
| Total................. | $ 229.8 | $ 227.1 | $ 230.1 |
| **DEPRECIATION AND AMORTIZATION** | | | |
| Davison Chemicals..... | $ 58.4 | $ 57.2 | $ 59.2 |
| Performance Chemicals. | 29.5 | 29.3 | 28.8 |
| Total................. | $ 87.9 | $ 86.5 | $ 88.0 |
| **CAPITAL EXPENDITURES** | | | |
| Davison Chemicals..... | $ 39.3 | $ 33.7 | $ 48.0 |
| Performance Chemicals. | 22.8 | 28.3 | 30.7 |
| Total................. | $ 62.1 | $ 62.0 | $ 78.7 |
| **TOTAL ASSETS** | | | |
| Davison Chemicals..... | $ 713.0 | $ 632.3 | $ 590.3 |
| Performance Chemicals. | 497.7 | 479.1 | 478.3 |
| Total................. | $ 1,210.7 | $ 1,111.4 | $1,068.6 |

The table below presents information related to the geographic areas in which Grace operated in 2001, 2000 and 1999.

---

### GEOGRAPHIC AREA DATA

| (Dollars in millions) | 2001 | 2000 | 1999 |
|---|---|---|---|
| **NET SALES** | | | |
| United States........... | $ 835.1 | $ 825.6 | $ 783.5 |
| Canada and Puerto Rico... | 40.7 | 34.4 | 32.6 |

CC-BLG002267

|                          |            |            |            |
|--------------------------|-----------:|-----------:|-----------:|
| Europe.................. | 172.5      | 416.8      | 447.9      |
| Asia Pacific............ | 267.5      | 216.8      | 205.7      |
| Latin America........... | 107.0      | 103.8      | 81.8       |
| Total................... | $ 1,723.2  | $ 1,597.4  | $1,550.9   |

PROPERTIES AND EQUIPMENT, NET

|                          |            |            |            |
|--------------------------|-----------:|-----------:|-----------:|
| United States........... | $   386.7  | $   408.3  | $   399.0  |
| Canada and Puerto Rico...| 20.1       | 19.9       | 20.8       |
| Europe.................. | 118.0      | 101.1      | 118.1      |
| Asia Pacific............ | 49.1       | 54.7       | 61.9       |
| Latin America........... | 15.1       | 17.7       | 17.5       |
| Total................... | $   589.0  | $   601.7  | $   617.3  |

F-31

CC-BLG002268

Pre-tax operating income, depreciation and amortization, capital expenditures and total assets for Grace's business segments are reconciled below to amounts presented in the Consolidated Financial Statements.

## RECONCILIATION OF BUSINESS SEGMENT DATA TO FINANCIAL STATEMENTS

| (Dollars in millions) | 2001 | 2000 | 1999 |
|---|---|---|---|
| Pre-tax operating income - business segments....... | $ 229.8 | $ 227.1 | $ 230.1 |
| Gain on note receivable... | -- | -- | 18.5 |
| Gain on disposal of assets | 1.8 | 5.5 | 13.6 |
| Gain on sale of investments | 7.9 | 19.0 | 9.3 |
| Provision for environmental remediation............. | (5.8) | (10.4) | -- |
| Provisions for asbestos-related litigation, net of insurance coverage...... | -- | (208.0) | -- |
| Interest expense and related financing costs........ | (37.1) | (28.1) | (16.1) |
| Corporate operating costs. | (42.3) | (40.0) | (52.0) |
| Other, net............... | 3.7 | 15.2 | -- |
| Income (loss) from continuing operations before Chapter 11 reorganization expenses and income taxes....... | $ 158.0 | $ (19.7) | $ 203.4 |
| Depreciation and amortization - business segments............... | $ 87.9 | $ 86.5 | $ 88.0 |
| Depreciation and amortization - corporate | 1.1 | 1.3 | 1.2 |
| Total depreciation and amortization .......... | $ 89.0 | $ 87.8 | $ 89.2 |
| Capital expenditures - business segments....... | $ 62.1 | $ 62.0 | $ 78.7 |
| Capital expenditures - corporate............... | 0.8 | 2.8 | 3.8 |
| Total capital expenditures | $ 62.9 | $ 64.8 | $ 82.5 |
| Total assets - business segments............... | $1,210.7 | $1,111.4 | $ 1,068.6 |
| Total assets - corporate.. | 687.5 | 614.3 | 595.1 |
| Asbestos-related receivables | 293.4 | 372.0 | 371.4 |
| Deferred tax assets....... | 525.4 | 487.2 | 440.0 |
| Total assets............. | $ 2,717.0 | $2,584.9 | $ 2,475.1 |

F-32

CC-BLG002269

21. QUARTERLY SUMMARY AND STATISTICAL INFORMATION (UNAUDITED)

```
==================================================================================================
QUARTERLY SUMMARY AND STATISTICAL INFORMATION (Unaudited)
(Dollars in millions, except per share)
==================================================================================================
                                          March 31      June 30    September 30   December 31
                                       --------------------------------------------------------
2001
Net sales (1) .......................  $      395.7   $    450.3   $       448.1   $     429.1
Cost of goods sold (1) ..............         252.4        283.3           281.9         275.3
Income from continuing operations (2).         14.6         23.0            19.8          21.2
Net income ..........................          14.6         23.0            19.8          21.2

Net income per share: (3)
  Basic earnings per share:
    Continuing operations.............  $       0.22   $     0.35   $        0.30   $      0.32
    Net income.......................          0.22         0.35            0.30          0.32
  Diluted earnings per share:
    Continuing operations.............          0.22         0.35            0.30          0.32
    Net income.......................          0.22         0.35            0.30          0.32

Market price of common stock: (4)
    High.............................  $       4.38   $     2.35   $        1.87   $      1.72
    Low..............................          1.63         1.31            1.46          1.35
    Close............................          2.30         1.75            1.55          1.55
                                       --------------------------------------------------------
2000
Net sales (1) .......................  $      384.7   $    405.1   $       415.7   $     391.9
Cost of goods sold (1) ..............         231.8        239.8           252.4         249.9
Income (loss) from continuing operations.      24.2         34.6            34.1        (182.6)
Net income (loss)....................          24.2         34.6            34.1        (182.6)

Net income per share: (3)
  Basic earnings per share:
    Continuing operations.............  $       0.35   $     0.51   $        0.51   $     (2.80)
    Net income (loss)................          0.35         0.51            0.51         (2.80)
  Diluted earnings per share:
    Continuing operations.............          0.35         0.50            0.51         (2.80)
    Net income (loss)................          0.35         0.50            0.51         (2.80)

Market price of common stock: (4)
    High.............................  $      14.94   $    14.63   $       12.63   $      7.13
    Low..............................          9.50        11.38            6.56          1.31
    Close............................         12.88        12.13            6.88          3.19
==================================================================================================
```

(1) The net sales and cost of goods sold amounts presented above reflect a reclassification of freight costs and sales commissions (previously shown as a reduction of sales) to cost of sales and selling expenses, in accordance with Emerging Issues Task Force Consensus No. 00-10, "Accounting for Shipping and Handling Revenues and Costs."

(2) Fourth quarter results include the effects of changes in estimates related to other postretirement plan benefits, which reduced expense by $6.0 million.

(3) Per share results for the four quarters may differ from full-year per share results, as a separate computation of the weighted average number of shares outstanding is made for each quarter presented.

(4) Principal market: New York Stock Exchange.

F-33

CC-BLG002270

```
============================================================================================
FINANCIAL SUMMARY (1) (Dollars in millions, except per share amounts)
============================================================================================
```

| | 2001 | 2000 | 1999 | 1998 | 1997 |
|---|---|---|---|---|---|
| **STATEMENT OF OPERATIONS** | | | | | |
| Net sales............................................... | $ 1,723.2 | $ 1,597.4 | $ 1,550.9 | $ 1,546.2 | $ 1,558.9 |
| Cost of goods sold...................................... | 1,092.9 | 973.9 | 929.3 | 961.7 | 969.0 |
| Depreciation and amortization........................... | 89.0 | 87.8 | 89.2 | 92.1 | 94.8 |
| Interest expense and related financing costs............ | 37.1 | 28.1 | 16.1 | 19.8 | 21.2 |
| Research and development expenses....................... | 44.1 | 45.7 | 42.4 | 47.4 | 42.4 |
| Income (loss) from continuing operations before Chapter 11 reorganization expenses and income taxes........ | 158.0 | (19.7) | 203.4 | (223.2) | 137.4 |
| Income (loss) from continuing operations................ | 78.6 | (89.7) | 130.2 | (194.7) | 85.9 |
| Income from discontinued operations (2)................. | -- | -- | 5.7 | 0.9 | 175.1 |
| Net income (loss)...................................... | 78.6 | (89.7) | 135.9 | (229.1) | 261.0 |
| **FINANCIAL POSITION** | | | | | |
| Current assets......................................... | $ 748.1 | $ 773.9 | $ 779.8 | $ 625.6 | $ 2,175.5 |
| Current liabilities.................................... | 249.1 | 1,092.9 | 769.4 | 669.8 | 1,357.7 |
| Properties and equipment, net.......................... | 589.0 | 601.7 | 617.3 | 661.4 | 663.3 |
| Total assets........................................... | 2,717.0 | 2,584.9 | 2,475.1 | 2,556.3 | 3,769.4 |
| Total debt not subject to compromise................... | 10.0 | 421.9 | 136.2 | 113.4 | 1,072.3 |
| Liabilities subject to compromise...................... | 2,313.6 | -- | -- | -- | -- |
| Shareholders' equity (deficit)......................... | (141.7) | (71.3) | 111.1 | 42.1 | 467.9 |
| **CASH FLOW** | | | | | |
| Operating activities................................... | $ 6.4 | $ (140.1) | $ 130.5 | $ (66.9) | $ 236.4 |
| Investing activities................................... | (133.3) | (97.6) | 89.4 | (114.0) | 370.1 |
| Financing activities................................... | 123.2 | 239.9 | (80.9) | 196.6 | (621.3) |
| Net cash flow.......................................... | (10.6) | (7.9) | 134.5 | 17.7 | (20.7) |
| **DATA PER COMMON SHARE (DILUTED)** | | | | | |
| Income (loss) from continuing operations............... | $ 1.20 | $ (1.34) | $ 1.76 | $ (2.61) | $ 1.13 |
| Net income (loss)...................................... | 1.20 | (1.34) | 1.84 | (3.07) | 3.45 |
| Dividends.............................................. | -- | -- | -- | -- | .56 |
| Average common diluted shares outstanding (thousands)..... | 65,400 | 66,800 | 73,800 | 74,600 | 75,700 |
| **OTHER STATISTICS** | | | | | |
| Dividends paid on common stock......................... | $ -- | $ -- | $ -- | $ -- | $ 41.2 |
| Capital expenditures................................... | 62.9 | 64.8 | 82.5 | 100.9 | 258.7 |
| Common stock price range (3)........................... | 1.31 - 4.38 | 14 15/16 - 1 5/16 | 21 - 11 13/16 | 21 11/16 - 10 7/8 | 18 1/16 - 9 7/8 |
| Common shareholders of record.......................... | 11,643 | 12,240 | 13,215 | 14,438 | 15,945 |
| Number of employees - continuing operations............. | 6,400 | 6,300 | 6,300 | 6,600 | 6,700 |

```
============================================================================================
```

(1) Certain prior-year amounts have been reclassified to conform to the 2001 presentation and to reflect a reclassification of freight costs and sales commissions (previously shown as a reduction of sales) to cost of sales and selling expenses in accordance with Emerging Issues Task Force Consensus No. 00-10, "Accounting for Shipping and Handling Revenues and Costs."

(2) See Note 4 to the Consolidated Financial Statements for additional information.

(3) On March 31, 1998, a predecessor of the Company ("Old Grace") completed a transaction in which its flexible packaging business ("Packaging Business") was combined with Sealed Air Corporation ("Sealed Air"). Old Grace effected this transaction by transferring its specialty chemicals businesses along with certain other businesses and assets to the Company (then named Grace Specialty Chemicals, Inc.), distributing the shares of the Company's common stock to Old Grace's shareholders on a one-for-one basis ("Spin-off") and merging a subsidiary of Old Grace with Sealed Air ("Merger"). Immediately following the Spin-off and Merger, the Company changed its name to "W. R. Grace & Co." and Old Grace changed its name to "Sealed Air Corporation" ("New Sealed Air"). As a result of the transaction, the Packaging Business was classified as a discontinued operation as of December 31, 1997. For further information, see Old Grace's Joint Proxy Statement/Prospectus dated February 13, 1998 and the Company's Information Statement dated February 13, 1998. Stock prices in 1997 and 1998 have been adjusted so that they are on a basis comparable to the stock prices following the disposition of the Packaging Business.

F-34

CC-BLG002271

MANAGEMENT'S DISCUSSION AND ANALYSIS OF RESULTS OF OPERATIONS AND FINANCIAL CONDITION

## DESCRIPTION OF BUSINESS

Grace is engaged in specialty chemicals and specialty materials businesses on a global basis. Its business segments are Davison Chemicals, which produces catalysts and silica products, and Performance Chemicals, which produces construction chemicals, building materials and sealants and coatings.

## VOLUNTARY BANKRUPTCY FILING

In response to a sharply increasing number of asbestos-related bodily injury claims, on April 2, 2001 (the "Filing Date"), W. R. Grace & Co. ("the Company") and 61 of its United States subsidiaries and affiliates, including W. R. Grace & Co.-Conn. (collectively, the "Debtors"), filed voluntary petitions for reorganization (the "Filing") under Chapter 11 of the United States Bankruptcy Code ("Chapter 11" or the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The cases were consolidated and are being jointly administered under case number 01-01139 (the "Chapter 11 Cases"). Grace's non-U.S. subsidiaries and certain of its U.S. subsidiaries were not included in the Filing.

During 2000 and the first quarter of 2001, Grace experienced several adverse developments in its asbestos-related litigation, including: a significant increase in bodily injury claims, higher than expected costs to resolve bodily injury and certain property damage claims, and class action lawsuits alleging damages from a former attic insulation product. (These claims are discussed in more detail in Note 3 to the Consolidated Financial Statements.) After a thorough review of these developments, the Board of Directors of Grace concluded on April 2, 2001 that a federal court-supervised Chapter 11 filing provides the best forum available to achieve predictability and fairness in the claims settlement process. By filing under Chapter 11, Grace expects to be able to both obtain a comprehensive resolution of the claims against it and preserve the inherent value of its businesses. Under Chapter 11, the Debtors expect to continue to operate their businesses as debtors-in-possession under court protection from their creditors and claimants, while using the Chapter 11 process to develop and implement a plan for addressing the asbestos-related claims against them.

Consequence of Filing - As a consequence of the Filing, pending litigation against the Debtors is generally stayed (subject to certain exceptions in the case of governmental authorities), and no party may take any action to realize its pre-petition claims except pursuant to an order of the Bankruptcy Court.

The Debtors intend to address all of their pending and future asbestos-related claims and all other pre-petition claims in a plan of reorganization. Such plan of reorganization will include the establishment of a trust, through which all pending and future asbestos-related claims would be channeled for resolution. However, it is currently impossible to predict with any degree of certainty the amount that would be required to be contributed to the trust, how the trust would be funded, how other pre-petition claims would be treated or what impact any reorganization plan may have on the shares of common stock of Grace. The interests of Debtors' equity security holders could be substantially diluted or cancelled under a plan of reorganization. The formulation and implementation of the plan of reorganization is expected to take a significant period of time.

Since the Filing, all motions necessary to conduct normal business activities have been approved by the Bankruptcy Court. In addition, the Debtors have received approval from the Bankruptcy Court to pay or otherwise honor certain of its pre-petition obligations in the ordinary course of business, including employee wages and benefits, customer programs, shipping charges and a limited amount of claims of essential trade creditors.

As provided by the Bankruptcy Code, the Debtors had the exclusive right to propose a plan of reorganization for a 120-day period following the Filing Date. The Debtors have received an extension of their exclusive period during which to file a plan of reorganization through August 1, 2002, and an extension of the Debtors' exclusive rights to solicit acceptances of a reorganization plan through October 1, 2002. No bar dates have yet been set for the filing of proofs of claims by claimants.

Three creditors' committees, two representing asbestos claimants and the third representing other unsecured creditors, and a committee representing shareholders have been appointed in the Chapter 11 Cases. These committees will have the right to be heard on all matters that come before the Bankruptcy Court, and, together with a legal representative of

CC-BLG002272

future asbestos claimants (who Grace expects to be appointed by the Bankruptcy Court in the near future), are likely to play important roles in the Chapter 11 Cases. The Debtors are required to bear certain of the committees' and the future asbestos claimants representative's costs and expenses, including those of their counsel and financial advisors.

All of the Debtor's pre-petition debt is now in default due to the Filing. The accompanying Consolidated Balance Sheet as of December 31, 2001 reflects the classification of the Debtors' pre-petition debt within "Liabilities subject to compromise."

The Debtors have entered into a debtor-in-possession post-petition loan and security agreement with Bank of America, N.A. (the "DIP facility") in the aggregate amount of $250 million. The DIP facility has a term expiring in April 2003 and bears interest under a formula based on the London Inter-Bank Offered Rate ("LIBOR") rate plus 2.00 to 2.25 percentage points depending on the level of loans outstanding.

In November 2001, the Debtors' Chapter 11 Cases, as well as the Chapter 11 Cases of four unrelated companies with asbestos-related claims, was assigned to Judge Alfred M. Wolin, a senior federal judge who sits in Newark, New Jersey. Judge Wolin will preside over the asbestos bodily injury matters affecting all five companies and, at his choosing, certain other asbestos-related lawsuits particular to Grace. Judge Judith Fitzgerald, a U.S. Bankruptcy judge from the Western District of Pennsylvania, sitting in Wilmington, Delaware, will preside over the Debtors' other bankruptcy matters.

Accounting Impact - The accompanying Consolidated Financial Statements have been prepared in accordance with Statement of Position 90-7 ("SOP 90-7") "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code," promulgated by the American Institute of Certified Public Accountants. SOP 90-7 requires that financial statements of debtors-in-possession be prepared on a going concern basis, which contemplates continuity of operations, realization of assets and liquidation of liabilities in the ordinary course of business. However, as a result of the Filing, the realization of certain of Debtors' assets and liquidation of certain of Debtors' liabilities are subject to significant uncertainty. While operating as debtors-in-possession, the Debtors may sell or otherwise dispose of assets and liquidate or settle liabilities for amounts other than those reflected in the Consolidated Financial Statements. Further, a plan of reorganization could materially change the amounts and classifications reported in the consolidated financial statements, which do not currently give effect to any adjustments to the carrying value or classification of assets or liabilities that might be necessary as a consequence of a plan of reorganization.

Pursuant to SOP 90-7, Grace's pre-petition liabilities that are subject to compromise are required to be reported separately on the balance sheet at an estimate of the amount that will ultimately be allowed by the Bankruptcy Court. As of December 31, 2001, such pre-petition liabilities include fixed obligations (such as debt and contractual commitments) as well as estimates of costs related to contingent liabilities (such as asbestos-related litigation and other claims). The recorded amounts of such liabilities generally reflect accounting measurements as of the Filing Date adjusted, as warranted, for changes in facts and circumstances and/or rulings under Grace's Chapter 11 proceedings subsequent to the Filing. (See Note 2 to the Consolidated Financial Statements for detail of the "Liabilities subject to compromise" as of December 31, 2001, and as of the Filing Date.) Obligations of Grace subsidiaries not covered by the Filing continue to be classified on the Consolidated Balance Sheet based upon maturity dates or the expected dates of payment. SOP 90-7 also requires separate reporting of certain expenses, realized gains and losses, and provisions for losses related to the Filing as reorganization items. During 2001, the Debtors recorded Chapter 11 reorganization expenses of $15.7 million. See Note 1 to the consolidated Financial Statements for further information concerning the Chapter 11 filing.

## CRITICAL ACCOUNTING ESTIMATES

The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires that management make estimates and assumptions affecting the assets and liabilities (including contingent assets and liabilities) reported at the date of the Consolidated Financial Statements and the revenues and expenses reported for the periods presented. Actual amounts could differ from those estimates. Grace's accounting measurements that are most affected by management's estimates of future events are:

o Contingent liabilities such as asbestos-related matters, environmental remediation, tax exposures and retained obligations of divested businesses.

F-36

CC-BLG002273

o Pension and postretirement liabilities that depend on assumptions regarding discount rates and total returns on invested funds.

o Depreciation and amortization periods for long-lived assets, including property and equipment, intangibles and goodwill.

o Realization values of various assets such as receivables, inventories, insurance and tax attributes.

The accuracy of these and other estimates may also be materially affected by the uncertainties arising under the Chapter 11 Cases.

## CONTINUING OPERATIONS

Set forth below is a chart that lists key operating statistics and percentage changes for the years ended December 31, 2001, 2000 and 1999. Immediately following the chart is an overview of the matters affecting the comparison of 2001 and 2000 as well as the comparison of 2000 and 1999. Each of these items should be referenced when reading management's discussion and analysis of the results of continuing operations. The chart below, as well as the financial information presented throughout this discussion, divides Grace's financial results between "core operations" and "noncore activities." Core operations comprise the financial results of Davison Chemicals, Performance Chemicals and the costs of corporate activities that directly or indirectly support business operations. In contrast, noncore activities comprise all other events and transactions not directly related to the generation of operating revenue or the support of core operations.

| ANALYSIS OF CONTINUING OPERATIONS (Dollars in millions) | 2001 | 2000 (a) | % Change Fav(Unfav) | 1999 (a) | % Change Fav(Unfav) |
|---|---|---|---|---|---|
| NET SALES: | | | | | |
| Davison Chemicals | $ 874.1 | $ 783.9 | 11.5% | $ 751.1 | 4.4% |
| Performance Chemicals | 849.1 | 813.5 | 4.4% | 799.8 | 1.7% |
| TOTAL GRACE SALES - CORE OPERATIONS | $ 1,723.2 | $ 1,597.4 | 7.9% | $ 1,550.9 | 3.0% |
| PRE-TAX OPERATING INCOME: | | | | | |
| Davison Chemicals | $ 128.7 | $ 131.6 | (2.2%) | $ 124.3 | 5.9% |
| Performance Chemicals | 101.1 | 95.5 | 5.9% | 105.8 | (9.7%) |
| Corporate operating costs | (42.3) | (40.0) | (5.8%) | (52.0) | 23.1% |
| PRE-TAX INCOME FROM CORE OPERATIONS | 187.5 | 187.1 | 0.2% | 178.1 | 5.0% |
| PRE-TAX INCOME (LOSS) FROM NONCORE ACTIVITIES | 3.0 | (188.4) | NM | 37.2 | NM |
| Interest expense | (37.1) | (28.1) | (32.0%) | (16.1) | (74.5%) |
| Interest income | 4.6 | 9.7 | (52.6%) | 4.2 | 131.0% |
| INCOME (LOSS) BEFORE CHAPTER 11 REORGANIZATION EXPENSE AND INCOME TAXES | 158.0 | (19.7) | NM | 203.4 | NM |
| Chapter 11 reorganization expenses, net | (15.7) | -- | NM | -- | NM |
| Provision for income taxes | (63.7) | (70.0) | 9.0% | (73.2) | NM |
| INCOME (LOSS) FROM CONTINUING OPERATIONS (b) | $ 78.6 | $ (89.7) | 187.6% | $ 130.2 | NM |
| KEY FINANCIAL MEASURES: | | | | | |
| Pre-tax income from core operations as a percentage of sales | 10.9% | 11.7% | (0.8)pts | 11.5% | 0.2pts |
| Pre-tax income from core operations before depreciation and amortization | $ 276.5 | $ 274.9 | 0.6% | $ 267.3 | 2.8% |
| As a percentage of sales | 16.0% | 17.2% | (1.2)pts | 17.2% | -- |
| NET SALES BY REGION: | | | | | |
| North America | $ 875.8 | $ 860.0 | 1.8% | $ 816.1 | 5.4% |
| Europe | 472.9 | 416.8 | 13.5% | 447.3 | (6.8%) |
| Asia Pacific | 267.5 | 216.8 | 23.4% | 205.7 | 5.4% |
| Latin America | 107.0 | 103.8 | 3.1% | 81.8 | 26.9% |
| TOTAL | $ 1,723.2 | $ 1,597.4 | 7.9% | $ 1,550.9 | 3.0% |

NM = Not meaningful       a = Net sales amounts presented
                               herein reflect a reclassification of freight
                               costs and sales commissions (previously
                               shown as a reduction of sales)

                          b = Also net income (loss) for 2001 and 2000.

F-37

CC-BLG002274

**MATTERS AFFECTING COMPARISON - 2001 VS. 2000**

Several major factors affect the comparison of sales and pre-tax earnings from continuing operations between 2001 and 2000. The principal factors affecting core operations are sales and earnings from three acquisitions, the formation of a joint venture, a downturn in world economic activity beginning in late 2000 (exacerbated by the events of September 11, 2001), the continued contributions from Grace's productivity initiatives, the continued strength of the U.S. dollar compared to most foreign currencies, and increased energy costs. (Energy costs were high in the first half of 2001, declining during the second half, but overall were higher year-over-year.) The primary factors affecting pre-tax income from noncore activities were the sale of Grace's remaining interest in Cross Country Staffing, offset by accruals for legal and environmental matters. The effects of each of these factors are quantified throughout management's discussion and analysis.

**MATTERS AFFECTING COMPARISON - 2000 VS. 1999**

Several major factors affect the comparison of sales and pre-tax earnings from continuing operations between 2000 and 1999. The principal factors affecting core operations are sales and earnings from six acquisitions, contributions from Grace's productivity initiatives, a downturn in the U.S. economy in late 2000, increasing energy prices in the second half and to 1999, and a stronger U.S. dollar compared to most foreign currencies. The primary factors affecting pre-tax loss from noncore activities were: 1) the need to increase Grace's estimate of asbestos-related liability to account for adverse developments in claims activity in the latter part of 2000; and 2) new environmental risks related to Grace's former mining operations.

**NET SALES**

The following table identifies the year-over-year increase or decrease in sales attributable to changes in product volumes, product prices and/or mix, and the impact of foreign currency translation.

```
=========================================================
NET SALES                   2001 AS A PERCENTAGE
VARIANCE ANALYSIS       INCREASE (DECREASE) FROM 2000
=========================================================

                   VOLUME   PRICE/MIX  TRANSLATION   TOTAL
                   -------  ---------  -----------   -------
Davison Chemicals   9.1%      4.5%       (2.1%)      11.5%
Performance
   Chemicals .....  6.6%      0.5%       (2.7%)       4.4%
Net sales.......    7.8%      2.6%       (2.5%)       7.9%
-------------------------------------------------------
BY REGION:
   North America..  0.5%      1.6%       (0.3%)       1.8%
   Europe........  14.4%      2.9%       (3.8%)      13.5%
   Latin America.. (1.3%)     9.7%       (5.3%)       3.1%
   Asia Pacific... 28.5%      2.1%       (7.2%)      23.4%
=========================================================
```

**2000 AS A PERCENTAGE
INCREASE (DECREASE) FROM 1999**

```
Davison Chemicals   5.2%      4.4%       (5.2%)       4.4%
Performance
   Chemicals......  3.8%      0.4%       (2.5%)       1.7%
Net sales.......    4.5%      2.3%       (3.8%)       3.0%
-------------------------------------------------------
BY REGION:
   North America..  3.2%      2.2%         --         5.4%
   Europe........   3.1%      2.6%      (12.5%)      (6.8%)
   Latin America.. 26.8%      2.9%       (2.8%)      26.9%
   Asia Pacific...  3.6%      2.3%       (0.5%)       5.4%
-------------------------------------------------------
```

In 2001 and 2000, volume was the primary factor affecting the change in net sales, most of which is attributable to three acquired businesses in 2001 and six acquired businesses in 1999 and 2000. These acquired businesses added $71.9 million in sales in 2001 (4.5 percentage points of the year-over-year volume increase), and $49.6 million in 2000 (4.0 percentage points of the year-over-year volume increase). Increases in the price/mix profile in both years were offset by the negative impact of foreign currency translation.

In 2001 and 2000, each business segment experienced volume growth. The most significant volume increases in 2001 were experienced in catalyst products and silica products (9.3% and 8.4%, respectively) primarily attributable to new product penetration, acquisitions and the Advanced Refining Technologies ("ART") joint venture. In 2000, the silica products and construction chemicals groups experienced significant volume increases, primarily attributable to acquisitions of 6.3% and 6.2%, respectively.

In 2001, the most significant volume increases were experienced in Asia Pacific and Europe, attributable to acquisitions and the ART joint

venture. In 2000, the volume increases were greatest in Latin America, reflecting the acquisition of an admixtures business in Chile in late 1999. Reported net sales for Grace's international operations were negatively impacted from the translation of foreign currencies in relation to the U.S. dollar. Approximately 45% of Grace's reported net sales were generated by its international operations. The 2001 impact related to an approximate 5% devaluation in foreign currency exchange rates.

F-38

CC-BLG002276

Pre-tax income from core operations was $187.5 million for the year ended December 31, 2001, compared to $187.1 million for the year ended December 31, 2000, an increase of 0.2%. Pre-tax income from core operations in 2000 was $9.0 million or 5.0% higher than 1999.

Operating income of the Davison Chemicals segment for 2001 was $128.7 million, down 2.2% versus 2000. Davison's operating margin of 14.7% was down 2.1 points compared to the prior year. Operating income of the Performance Chemicals segment for 2001 was $101.1 million, up 5.9% from 2000, with an operating margin of 11.9%, up 0.2 points compared to the prior year. Operating income of the Davison Chemicals segment for 2000 was $131.6 million, up 5.9% from 1999. Davison's operating margin was 16.8% compared to 16.5% in 1999. Operating income of the Performance Chemicals segment for 2000 was $95.5 million, down 9.7% from 1999, with an operating margin of 11.7% in 2000 versus 13.2% in 1999.

Higher energy costs and the negative effects of currency translation served to dampen the year-over-year performances in both 2001 and 2000. In the first half of 2001 and the last half of 2000, the rise in natural gas prices (used by Davison Chemicals as part of its manufacturing process) and transportation fuel prices (impacting distribution costs for Performance Chemicals) had an adverse affect on profit margins. These energy sources are also a significant factor in the cost of many raw materials used by both business segments. Selling price increases did not keep pace with the rapid rise in these energy related costs.

Corporate operating costs primarily reflect corporate headquarters functions that support core operations. Corporate operating costs for the year ended December 31, 2001 totaled $42.3 million, compared to $40.0 million for the prior period, a 5.8% increase. Corporate operating costs were $52.0 million in 1999. The improvement in corporate operating costs since 1999 is primarily attributable to the relocation of Grace's headquarters from Florida to Maryland in 1999, which reduced occupancy costs and facilitated the consolidation of corporate support functions.

During 2001 and 2000, Grace continued to focus on productivity improvements. The results of its productivity initiatives are reflected in: 1) sales - through added plant capacity by improving production processes; 2) costs through efficiency gains and purchasing synergies; 3) working capital - by improving collection process and inventory management; and 4) capital avoidance - by maximizing asset utilization. Grace's goal is to offset annual base inflationary increases in personnel, purchased materials and process costs through productivity improvements. This goal was achieved in both 2001 and 2000.

## PRE-TAX INCOME (LOSS) FROM NONCORE ACTIVITIES

The net income from noncore activities totaled $3.0 million for 2001 compared to a net loss from noncore activities of $188.4 million for 2000. Income from noncore activities for 2001 includes $7.7 million from the sales of Grace's remaining cost-based investment in Cross Country Staffing, offset by accruals for legal and environmental matters primarily related to Grace's former mining operations. The loss for 2000 included the provision of $208.0 million for asbestos-related litigation, net of insurance, as well as accruals for legal and environmental matters related to Grace's former mining operations. These items were offset by a $19.0 million gain on the sale of marketable securities, and a $5.5 million gain on the sale of noncore assets.

## REORGANIZATION EXPENSES

Net reorganization expenses for the year ended December 31, 2001 of $15.7 million consist primarily of legal and consulting fees incurred by Grace and three creditors' committees related to the Chapter 11 Filing.

## INTEREST AND INCOME TAXES

Net interest expense for 2001 was $32.5 million, an increase of 76.6% from net interest expense of $18.4 million in 2000. This increase was attributable to the continued accrual of pre-petition contractual interest on debt subject to compromise as well as the interest expense on the DIP facility. Net interest expense increased 54.6% in 2000 over the 1999 amount of $11.9 million. Average debt levels were $205.0 million higher in 2001 compared to 2000; and $149.5 million higher in 2000 compared to 1999.

The Company's provision for income taxes at the federal corporate rate of 35% was $49.8 million for the year ended December 31, 2001. The primary difference between this amount and the overall provision for income taxes of $63.7 million is attributable to current period interest on tax contingencies and the non-deductibility of certain Chapter 11 reorganization expenses. In 2000, the Company's benefit from income taxes at the federal corporate rate was $6.9 million. The primary difference between this amount and the overall

CC-BLG002277

provision for income taxes of $70.0 million is attributable to an accrual for potential additional taxes and interest relating to the tax deductibility of interest on life insurance policy loans. In 1999, the Company's provision for income taxes at the federal corporate rate was $71.2 million. The primary difference between this amount and the provision for income taxes at the effective rate of $73.2 million were state and local income taxes.

## DAVISON CHEMICALS

| NET SALES | 2001 | 2000 | % Change Fav (Unfav) |
|---|---|---|---|
| Catalyst products ... | $ 624.8 | $ 562.7 | 11.0% |
| Silica products...... | 249.3 | 221.2 | 12.7% |
| TOTAL DAVISON CHEMICALS | $ 874.1 | $ 783.9 | 11.5% |

| | 2000 | 1999 | % Change Fav (Unfav) |
|---|---|---|---|
| Catalyst products ... | $ 562.7 | $ 538.2 | 4.6% |
| Silica products...... | 221.2 | 212.9 | 3.9% |
| TOTAL DAVISON CHEMICALS | $ 783.9 | $ 751.1 | 4.4% |

### Recent Acquisitions and Joint Ventures

On March 2, 2001, Grace acquired The Separations Group, a manufacturer of chromatography columns and separations media, with sales of approximately $6 million in 2001. On March 28, 2001, a German subsidiary of Grace acquired the precipitated silicas business of Akzo-PQ Silicas, with sales of approximately $21 million in 2001.

On March 1, 2001, Grace and Chevron Products Company ("Chevron") formed ART, a joint venture to develop and market hydroprocessing catalysts globally. ART conducts business through two distribution companies and one operating company. Grace has a majority ownership interest in and controls both distribution companies; therefore, for financial reporting purposes the assets, liabilities and results of operations of these entities are included in Grace's Consolidated Financial Statements. Grace does not exercise governance control over the operating company; therefore, the assets, liabilities and results of operations of this company are not consolidated in Grace's financial statements. The equity income or loss related to the operating company is reported in "Other Income" in Grace's Consolidated Statement of Operations. As of December 31, 2001, the operating company had no debt, and its liabilities included only working capital items. ART has agreements with both Grace and Chevron under which each provides certain administrative and research and development services to ART. Administrative costs of $1.5 million and research and development expenses of $5.8 million are reflected in the unconsolidated financial statements of ART.

On January 31, 2000 Grace acquired Crosfield Group's hydroprocessing catalysts business from Imperial Chemical Industries. This business had approximately $14 million of sales in 2000. On June 28, 2000, Grace acquired the Ludox colloidal silica business from the DuPont Company, which had sales of approximately $13 million in 2000.

### Sales

The Davison Chemicals segment is a leading global supplier of catalysts and silica products. Catalyst products represented approximately 36%, 35% and 34% of 2001, 2000 and 1999 total Grace sales, respectively. This segment includes fluid cracking catalysts ("FCC") and additives used in petroleum refineries to convert distilled crude oil into transportation fuels and other petroleum-based products, hydroprocessing catalysts which upgrade heavy oils and remove certain impurities, polyolefin catalysts, which are essential components in the manufacture of polyethylene used in products such as high-performance plastic pipe and other plastic parts, and chemical catalysts, which are used in a variety of chemical processes. Silica products, which represented 15% of 2001 total Grace sales (14% in 2000 and 1999), are used in a wide range of biotechnology, industrial and consumer applications such as seperations, coatings, food processing, plastics, adsorbents and personal care products.

Net sales of Davison Chemicals increased by 11.5% in 2001, despite the effect of the currency weakness in Europe, Asia Pacific and Latin America compared with the U.S. dollar, which adversely impacted 2001 sales by $16.6 million. Excluding the impact of currency translation, sales increased by 13.6%.

In 2001, catalyst products sales were $624.8 million, an increase of 11.0% over 2000. Excluding the ART joint venture and hydroprocessing catalysts, which are now part of the joint venture (as discussed above) catalyst products sales for the year 2001 were $531.9 million, or a 12.3% increase over 2000. Excluding ART/hydroprocessing and the negative impact of currency translation, 2001 sales were up 14.1%. This increase mainly reflected sales of new FCC's and additives for value-added refinery applications.

F-40

CC-BLG002278

Silica products sales in 2001 were up 12.7% to $249.3 million compared with 2000. Excluding The Separations Group, Akzo-PQ Silicas and the collodial silica acquisitions discussed above, silica products sales decreased 5.8% to $208.4 million. Excluding acquisitions and the negative impact of currency translation, 2001 sales decreased 2.5%, mainly reflecting recessionary pressures on end-use segments such as plastics and coatings, which are most affected by the general level of economic activity.

In 2000, catalyst products sales increased 4.6% compared to 1999, which was as a result of volume gains in Latin America, Asia Pacific and Europe partially offset by volume declines in North America. Silica products sales were up 3.9% in 2000 versus 1999, as volume gains in coatings and adsorbents were offset by unfavorable currency translation, mainly for Europe.

## Operating Earnings

Pre-tax operating income of $128.7 million reflected a 2.2% decrease compared with 2000. The decrease in operating income was primarily attributable to higher energy and raw material costs, offset by productivity initiatives.

Pre-tax operating income of $131.6 million in 2000 improved by 5.9% over $124.3 million in 1999. The improvement in operating income was primarily attributable to cost savings generated from productivity initiatives, which served to fully offset increased energy costs and the negative impact of foreign currency translation. Operating margins improved 0.3 percentage points to 16.8%.

## PERFORMANCE CHEMICALS

| NET SALES | 2001 | 2000 | % Change Fav(Unfav) |
|---|---|---|---|
| Construction chemicals | $ 365.1 | $ 348.7 | 4.7% |
| Building materials... | 239.9 | 228.0 | 5.2% |
| Sealants and coatings | 244.1 | 236.8 | 3.1% |
| TOTAL PERFORMANCE CHEMICALS.......... | $ 849.1 | $ 813.5 | 4.4% |

| | 2000 | 1999 | % Change Fav(Unfav) |
|---|---|---|---|
| Construction chemicals | $ 348.7 | $ 334.3 | 4.3% |
| Building materials... | 228.0 | 224.3 | 1.6% |
| Sealants and coatings | 236.8 | 241.2 | (1.8%) |
| TOTAL PERFORMANCE CHEMICALS.......... | $ 813.5 | $ 799.8 | 1.7% |

## Recent Acquisitions and Joint Ventures

On July 31, 2001, a French subsidiary of Grace acquired Pieri S.A., a leading supplier of specialty chemicals to the European construction industry. This business had sales of approximately $10 million for 2001.

On December 22, 1999, Grace acquired Sociedad Petreos S.A.'s "Polchem" concrete admixture and construction chemicals business from Cemento Polpaico S.A. Chile, an affiliate of Holderbank of Switzerland. For 2000, this business had sales of approximately $6 million. On March 24, 2000, Grace acquired International Protective Coatings Corp. ("IPC"), which contributed approximately $5 million in sales of fire protection products for the year 2000. On July 20, 2000, Grace acquired the Hampshire Polymers business from the Dow Chemical Company. This business had sales of approximately $12 million for 2000.

## Sales

The Performance Chemicals segment was formed in 1999 by combining the previously separate business segments of Grace Construction Products and Darex Container Products. These businesses were consolidated under one management team to capitalize on infrastructure synergies from co-location of headquarters and production facilities around the world. The major product groups of this business segment include specialty construction chemicals and specialty building materials used primarily by the nonresidential construction industry; and container sealants and coatings for food and beverage packaging, and other related products. Construction chemicals, which represented 21% of 2001 total Grace sales (22% in 2000 and 1999) add strength, control corrosion, and enhance the handling and application of concrete, and reduce the manufacturing cost and improve the quality of cement. Building materials, which represented 14% of 2001, 2000 and 1999 total Grace sales, prevent water damage to structures and protect structural steel against collapse due to fire. Sealants and coatings, which represented 14% of 2001 total Grace sales (15% in 2000 and 16% in 1999) seal beverage and food cans, and glass and plastic bottles, and protect metal packaging from corrosion and the contents from the influences of metal.

Net sales of Performance Chemicals products increased 4.4% in 2001 compared with 2000. The effect of currency weakness in Europe, Asia Pacific and Latin America compared with the U.S. dollar

CC-BLG002279

F-41

CC-BLG002280

adversely impacted sales by $20.3 million for 2001. Excluding the impact of currency translation, sales increased 7.0%.

In 2001, sales of construction chemicals were $365.1 million, an increase of 4.7% over 2000. Excluding the Pieri S.A. acquisition discussed above, 2001 sales for construction chemicals were $355.0 million, up 1.8%. Excluding Pieri and unfavorable currency translation, the year-over-year increase was 4.3%. This increase was achieved in all major regions and was driven by penetration of high-performance products for concrete and cement, especially in value added water reducers, grinding aids and quality improvers.

Sales of building materials increased 5.2% to $239.9 million in 2001 compared with 2000. Excluding the impact of the IPC acquisition, discussed above, and unfavorable currency translation, sales were up 5.8%. This growth was attributable to increased sales in North America, primarily roofing underlayments and specialty structural waterproofing.

Sales of sealants and coatings increased 3.1% to $244.1 million in 2001. Excluding the Hampshire Polymers acquisition, discussed above, and unfavorable currency translation, sales were up 0.2%, primarily from volume gains in closure sealants and coatings.

In 2000, Performance Chemicals sales increased 1.7% compared to 1999, as sales increases in construction chemicals and building materials were partially offset by a sales decrease in sealants and coatings. Sales of construction chemicals were up 4.3% in 2000, driven by penetration of high-performance products. Sales of building materials were up 1.6% in 2000, reflecting new product sales in fire protection and volume gains in roofing underlayments. Sealants and coatings sales decreased 1.8% in 2000 versus 1999. Unfavorable foreign exchange more than offset volume gains in can sealants and coatings.

**Operating Earnings**

Pre-tax operating income increased 5.9% from $95.5 million in 2000 to $101.1 million in 2001. This increase was attributable to higher sales and savings generated from productivity programs, more than offsetting higher energy and raw material costs.

Pre-tax operating income of $95.5 million in 2000 was down 9.7% compared to pre-tax operating income of $105.8 million in 1999. This decrease in pre-tax operating income was caused by increased transportation costs in construction chemicals and higher petroleum-based raw materials costs in both building materials and container products, offset by productivity gains.

## DISCONTINUED OPERATIONS

### CROSS COUNTRY STAFFING

In July 1999, Grace completed the sale of substantially all of its interest in Cross Country Staffing ("CCS"), a provider of temporary nursing and other healthcare services, for total cash proceeds of $184.6 million. The Company's investment in CCS had been accounted for under the equity method. The sale resulted in a net pre-tax gain of $76.3 million ($32.1 million after tax), including the cost of the Company's purchase of interests held by third parties in CCS and the amount payable under CCS's phantom equity plan prior to closing under the sale transaction. The gain and operations of CCS prior to the sale are included in "Income from discontinued operations, net of tax" in the Consolidated Statement of Operations. Certain contingent liabilities, primarily related to tax matters of CCS, have been retained by the Company and are included in "Liabilities subject to compromise" in the Consolidated Balance Sheet. In February 2001, Grace sold its remaining interest in CCS, recognizing a $7.7 million gain which is included in "Other income" on the Consolidated Statement of Operations.

### RETAINED OBLIGATIONS

Under certain divestiture agreements, Grace has retained contingent obligations that could require Grace in the future to accrue for estimated costs of defense or loss under generally accepted accounting principles.

These obligations primarily consist of: (1) future lease payments and other retained contractual commitments, (2) net asset settlements, (3) indemnities and other guarantees, and (4) contingent risks under pending or possible litigation.

Grace's recorded liability for such matters was $80.5 million at December 31, 2001. Grace's Chapter 11 proceedings could impact the amount and timing of resolution of these retained obligations. Grace is unable to predict whether or to what extent the ultimate resolution of these matters will differ from recorded amounts.

F-42

CC-BLG002281

**FINANCIAL CONDITION**

The charts below are intended to enhance understanding of Grace's overall financial position by separately displaying assets, liabilities and cash flows related to core operations from those related to noncore activities. The Company's management structure and activities are tailored to the separate focus and accountability of core operations and noncore activities.

## CORE OPERATIONS

The Company had a net asset position supporting its core operations of $1,299.6 million at December 31, 2001, compared to $1,053.6 million at December 31, 2000 (including the cumulative translation account reflected in Shareholders' Equity (Deficit) of $164.8 million for 2001 and $140.2 million for 2000). After-tax return on capital invested in core operations decreased by 2.4 percentage points in 2001, due to a combination of higher investment and only a small improvement in earnings. Net cash flows from core operations decreased primarily due to investment in new businesses.

## CORE OPERATIONS

| (Dollars in millions) | 2001 | 2000 |
|---|---|---|
| BOOK VALUE OF INVESTED CAPITAL | | |
| Receivables ................... | $ 296.3 | $ 187.4 |
| Inventory ..................... | 174.8 | 144.2 |
| Properties and equipment, net ... | 582.9 | 596.2 |
| Intangible assets and other...... | 616.8 | 455.7 |
| ASSETS SUPPORTING CORE OPERATIONS | 1,670.8 | 1,383.5 |
| Accounts payable and accruals.... | (371.2) | (329.9) |
| CAPITAL INVESTED IN CORE OPERATIONS | $ 1,299.6 | $ 1,053.6 |
| After-tax return on average invested capital................. | 9.6% | 12.0% |
| CASH FLOWS: | | |
| Pre-tax operating income ........ | $ 187.5 | $ 187.1 |
| Depreciation and amortization ... | 89.0 | 87.8 |
| PRE-TAX EARNINGS BEFORE DEPRECIATION AND AMORTIZATION .. | 276.5 | 274.9 |
| Working capital and other changes | (60.3) | (63.0) |
| CASH FLOW BEFORE INVESTING....... | 216.2 | 211.9 |
| Capital expenditures ............ | (62.9) | (64.8) |
| Businesses acquired ............ | (86.3) | (52.6) |
| NET CASH FLOW FROM CORE OPERATIONS | $ 67.0 | $ 94.5 |

## NONCORE ACTIVITIES

The Company has a number of financial exposures originating from past businesses, products and events. These obligations arose from transactions and/or business practices that date back to when Grace was a much larger company, when it produced products or operated businesses that are no longer part of its revenue base, and when government regulations and scientific knowledge were much less advanced than today. The table below summarizes the net noncore liability at December 31, 2001 and 2000 and the net cash flow from noncore activities for the years then ended:

## NONCORE ACTIVITIES

| (Dollars in millions) | 2001 | 2000 |
|---|---|---|
| NONCORE LIABILITIES: | | |
| Asbestos-related liabilities.. | $ (996.3) | $ (1,105.9) |
| Asbestos-related insurance receivable.................. | 293.4 | 372.0 |

CC-BLG002282

| | | | |
|---|---|---|---|
| Asbestos-related liability, net ..................... | | (702.9) | (733.9) |
| Environmental remediation..... | | (153.1) | (174.9) |
| Postretirement benefits....... | | (169.1) | (189.1) |
| Retained obligations and other | | (80.6) | (78.1) |
| | | ------------------------- | |
| NET NONCORE LIABILITY......... | $ | (1,105.7) | $ (1,176.0) |
| | | ========================= | |
| CASH FLOWS: | | | |
| Pre-tax income (loss) from noncore activities.......... | $ | 3.0 | $ (188.4) |
| Provision for asbestos-related litigation, net of insurance recovery.......... | | -- | 208.0 |
| Other changes................. | | 0.5 | (10.7) |
| Cash spending for: | | | |
| Asbestos-related litigation, net of insurance recovery........ | | (30.8) | (196.2) |
| Environmental remediation... | | (28.9) | (47.2) |
| Postretirement benefits..... | | (22.3) | (23.0) |
| Retained obligations and other..................... | | (9.1) | (24.5) |
| | | ------------------------- | |
| NET CASH FLOW FROM NONCORE ACTIVITIES ............... | $ | (87.6) | $ (282.0) |
| | | ========================= | |

As described under "Voluntary Bankruptcy Filing," the resolution of most of these noncore recorded and contingent liabilities will be determined through the Chapter 11 proceedings. Grace cannot predict with any certainty how, and for what amounts, any of such estimates will be resolved. The amounts of these liabilities as ultimately determined through the Chapter 11 proceedings could be materially different from amounts recorded by Grace at December 31, 2001.

**ASBESTOS-RELATED MATTERS**

Grace is a defendant in lawsuits relating to previously sold asbestos-containing products. In 2001, Grace paid $30.8 million for the defense and disposition of asbestos-related property damage and bodily injury litigation, net of amounts received under settlements with insurance carriers, compared to net expenditures in 2000 of $196.2 million. At December 31, 2001, Grace's balance sheet reflects a gross liability of $996.3 million, ($702.9 million net of insurance). This liability represents management's estimate of the undiscounted net cash outflows in satisfaction of

F-43

CC-BLG002283

Grace's current and expected asbestos-related claims, based on facts and circumstances existing prior to the Filing. Changes to the recorded amount of such liability will be based on Chapter 11 developments and management's assessment of the claim amounts that will ultimately be allowed by the Bankruptcy Court.

In the fourth quarter of 2000, Grace recorded a charge of $208.0 million (net of expected insurance recovery) to account for several adverse developments in its asbestos-related litigation, including: a significant increase in bodily injury claims; higher than expected costs to resolve certain property damage and bodily injury claims; and defense costs related to new class-action lawsuits alleging damages from a former attic insulation product not previously subject to property damage litigation. In addition, during 2000, five co-defendant companies in asbestos bodily injury litigation petitioned for bankruptcy court protection. These developments contributed to the risk that Grace would be subject to more claims than previously projected, with higher settlement demands. See Notes 1 and 3 to the Consolidated Financial Statements for further information concerning asbestos-related lawsuits and claims.

The Consolidated Balance Sheet at December 31, 2001 includes total amounts due from insurance carriers of $293.4 million pursuant to settlement agreements with insurance carriers. The recovery of amounts due from insurance carriers is dependent upon the timing, character and exposure periods of asbestos-related claims. Grace's Chapter 11 bankruptcy proceedings could also affect recovery timing and amounts.

Grace intends to address all of its pending and future asbestos-related claims as part of a plan of reorganization under Chapter 11. Grace will seek to have the Bankruptcy Court establish a process to assess and appropriately quantify the numerous property damage and bodily injury claims against it. Measurement of Grace's asbestos-related liabilities will be materially affected by Bankruptcy Court rulings, the outcome of litigation and negotiations among interested parties.

## ENVIRONMENTAL MATTERS

Grace is subject to loss contingencies resulting from extensive and evolving federal, state, local and foreign environmental laws and regulations. Expenses of continuing operations related to the operation and maintenance of environmental facilities and the disposal of hazardous and nonhazardous wastes totaled $31.7 million in 2001, $26.4 million in 2000 and $31.1 million in 1999. Such costs are estimated to be between $32.0 and $37.0 million in each of 2002 and 2003. In addition, capital expenditures for continuing operations relating to environmental protection totaled $3.8 million in 2001, $4.0 million in 2000 and $5.7 million in 1999. Capital expenditures to comply with environmental initiatives in future years are estimated to be between $5.0 and $7.0 million in each of 2002 and 2003. Grace also has incurred costs to remediate environmentally impaired sites. These costs were $28.9 million in 2001, $47.2 million in 2000 and $25.0 million in 1999. These amounts have been charged against previously established reserves. At December 31, 2001, Grace's liability for environmental investigatory and remediation costs related to continuing and discontinued operations totaled $153.1 million, as compared to $174.9 million at December 31, 2000. Future pre-tax cash outlays for remediation costs are expected to average between $25.0 and $40.0 million over the next few years.

In addition, Grace is facing environmental lawsuits related to previously operated vermiculite mining and processing sites that could result in a material future charge to Grace's earnings, the amount of which is not currently determinable. The EPA reported that it had expended approximately $25.4 million in response costs in and around Libby, Montana (the site of a former Grace vermiculite mine) through June 2001. Grace expects that the EPA may incur significant additional response costs, as Libby is expected to be added to the EPA's National Priorities List of Superfund sites. The EPA is also evaluating environmental risks at several vermiculite processing sites throughout the U.S. which processed vermiculite from Libby, Montana, and has made claims against Grace to fund clean-up activities. Grace intends to review the EPA's actions and cost claims to determine whether they are justified and reasonable. These lawsuits are not subject to the automatic stay provided under Section 362 of the U.S. Bankruptcy Code.

## PENSION BENEFITS

The decline in value of the U.S. and global equity markets, coupled with a decline in interest rates, primarily in the second half of 2001, created a shortfall between the accounting measurement of Grace's U.S. salaried qualified pension obligations and the market value of dedicated pension assets. This condition required a balance sheet adjustment in shareholders' equity (deficit) at December 31, 2001 of $124.4 million, and will increase Grace's pension

F-44

CC-BLG002284

expense by approximately $16 million in 2002. No funding is required in 2002, and no additional pension charge with respect to such obligations was required in 2001.

## POSTRETIREMENT BENEFITS

Grace provides certain postretirement health care and life insurance benefits for retired employees, a large majority of which pertain to retirees of previously divested businesses. These plans are unfunded, and Grace pays the costs of benefits under these plans as they are incurred. Effective January 1, 2002, Grace's postretirement medical plan was amended to increase the contribution required to be paid by the retirees to a minimum of 40% of the calculated premium.

## RETAINED OBLIGATIONS OF DIVESTED BUSINESSES

The principal retained obligations of divested businesses relate to contractual indemnification and to contingent liabilities not passed on to the new owner. At December 31, 2001, Grace had recorded $80.5 million to satisfy such obligations. Prior to Grace's Chapter 11 filing, $43.5 million of this total was expected to be paid over periods ranging from 2 to 10 years. The remainder represents estimates of probable cost to satisfy specific contingencies that were expected to be resolved over the next few years. However, most of these matters are now subject to the automatic stay of the Bankruptcy Court and will be resolved as part of Grace's Chapter 11 proceedings.

## TAX MATTERS

The Internal Revenue Service ("IRS") is challenging the deductions taken by a number of companies throughout the United States related to interest on policy loans under corporate owned life insurance ("COLI") policies for years prior to January 1, 1999. In 2000 Grace paid $21.2 million of tax and interest related to this issue for tax years 1990-1992. Subsequent to 1992, Grace deducted approximately $163.2 million in interest attributable to COLI policy loans. Grace filed a claim for refund of the amount paid to date and will contest any future IRS assessments on the grounds that these insurance policies and related loans had, and continue to have, a valid business purpose, that the COLI policies have economic substance and that interest deductions claimed were in compliance with tax laws in effect at the time.

During the first quarter of 2001, a U.S. District Court ruling, American Electric Power, Inc. vs. United States, denied interest deductions of a taxpayer in a similar situation. American Electric Power, Inc. is currently appealing this ruling. However, in light of the ruling, Grace recorded an additional accrual in 2000 for tax exposure and related interest, and continues to accrue interest on estimated amounts that may be due. There are two additional COLI cases decided against the taxpayer currently on appeal. The taxpayer in Winn-Dixie Stores, Inc. v. Commisioner of Internal Revenue has petitioned for a rehearing in the United States Court of Appeals and is seeking appeal in the United States Supreme Court. CM Holdings, Inc. v. Internal Revenue Service is currently on appeal to the United States Court of Appeals. Finally, Dow Chemical Company has filed an action to recover income taxes and interest paid in connection with its COLI policies, and that case is currently pending in the United States District Court. Grace is monitoring these cases and will continue to reassess its legal posture as the cases evolve.

The IRS also has assessed additional federal income tax withholding and Federal Insurance Contributions Act taxes plus interest and related penalties for calendar years 1993 through 1995 against CCHP, Inc. ("CCHP"), a Grace subsidiary that formerly operated a temporary staffing business for nurses and other healthcare personnel. The assessments, aggregating $21.8 million, were made in connection with a meal and incidental expense per diem plan for traveling healthcare personnel that was in effect through 1999. The IRS contends that certain per diem meals and incidental expenses and lodging benefits provided to traveling healthcare personnel to defray the expenses they incurred while traveling on business should have been treated as wages subject to employment taxes and federal income tax withholding. Grace contends that its per diem and expense allowance plans were in accordance with statutory and regulatory requirements, as well as other published guidance from the IRS, per diem and expense allowance plans. Grace expects that the IRS will make additional assessments for the 1996 through 1999 periods as well. The matter is currently pending in the U.S. Court of Claims.

Grace has received notification from a foreign taxing authority assessing tax deficiencies plus interest relating to the purchase and sale of foreign bonds in 1989 and 1990. This assessment, totaling $10.5 million, is related to the Bekaert Group, which Grace sold in 1991 but as to which Grace retained liability for tax deficiencies attributable to tax periods prior to the sale. The matter is currently before the foreign tax authorities, but no decision has been rendered.

F-45

CC-BLG002285

As a result of Grace's Chapter 11 filing, certain tax matters related to open tax years, including COLI interest deductions, could become the direct obligations of predecessor companies that now own Grace's former healthcare and packaging businesses. One or both of these companies could be directly liable to tax authorities for Grace's tax deficiencies. Pursuant to agreements relating to each transaction, Grace may be required to indemnify both parties for taxes relating to periods prior to the closing of such transactions. Any indemnification obligation that arises as a result of these matters would be a pre-petition liability subject to the Chapter 11 proceedings.

## LIQUIDITY AND CAPITAL RESOURCES

### CASH FLOW

Grace's net cash flow from core operations before investing was $216.2 million in 2001 compared to $211.9 million in 2000. Acquisition investments aggregated $86.3 million in 2001 compared to $49.0 million in 2000. Total Grace capital expenditures for 2001 and 2000 were $62.9 million and $64.8 million, respectively, substantially all of which was directed toward its business segments and of a routine nature. In 1999, Grace made capital expenditures of $82.5 million. Grace's cash flow from core operations in 2002 is expected to be relatively stable and consistent with recent years. Grace expects to continue to invest excess cash flow and/or other available capital resources in its core business base. These investments are likely to be in the form of added plant capacity, product line extensions and geographic market expansions. Such investments may be subject to Bankruptcy Court approval and Chapter 11 creditor committee review. Grace projects that 2002 will be another challenging year with the first half continuing to be affected by the weak global economy, improving somewhat in the second half. Grace has taken steps to improve productivity and manage costs and, at this time, projects 2002 cash flow from core operations comparable to 2001.

The pre-tax cash outflow of noncore activities was $80.0 million in 2001 compared to an outflow of $270.1 million in 2000. The decreased cash outflow was primarily due to lower asbestos-related payments in 2001 as compared to 2000, resulting from the stay on payments for asbestos-related claims after the Filing Date. Expenditures for environmental remediation were lower in 2001 due partly to Grace's Chapter 11 proceedings and partly to the completion of remediation work on certain sites. Postretirement benefit payments, which are allowed to be paid under Grace's Chapter 11 proceedings, were consistent with the prior year. The payments for retained obligations of divested businesses and other contingencies were lower in 2001 due to the stay of litigation and to the one-time nature of these matters.

Cash flows used for investing activities in 2001 were $133.3 million, compared to cash used of $97.6 million in 2000, and cash provided of $89.4 million in 1999. Net cash outflows in 2001 were primarily impacted by businesses acquired in 2001 of $84.4 million and by capital expenditures as discussed below. Net cash outflows of 2000 consisted of $49.0 million in businesses acquired, capital expenditures and net investment in life insurance policies of $11.1 million. In 1999, the sale of Cross Country Staffing generated net cash of $184.6 million. Proceeds from disposals of assets in 2001 were also lower than 2000, with $7.6 million in 2001, $11.9 million in 2000 and $40.6 million in 1999. Included in the 1999 amount was the sale of the corporate aircraft for $20.4 million and the sale of certain real properties for a total of $17.1 million.

Net cash provided by financing activities in 2001 was $123.2 million as compared to $239.9 million provided in 2000. This principally represents borrowings under credit facilities of $93.6 million, net of repayments, to fund investments in acquired businesses, capital expenditures and noncore obligations. In 2000, $47.3 million used to purchase 4.8 million of the Company's shares as part of share repurchase programs, was partially offset by proceeds from the exercise of stock options of $5.8 million. Net cash used for financing activities of $80.9 million in 1999 primarily related to the purchase of treasury stock ($95.3 million) and the net financing activity of discontinued operations ($27.5 million), offset by borrowings under credit facilities, net of payments and the exercise of stock options, $18.7 and $26.6 million respectively.

### LIFE INSURANCE

Grace is the beneficiary of life insurance policies on certain current and former employees with benefits in force of approximately $2,291.0 million and a net cash surrender value of $75.6 million at December 31, 2001. This net cash surrender value is comprised of $477.5 million in policy gross cash value offset by $401.9 million of policy loans. The policies were acquired to fund various employee benefit programs and other

F-46

CC-BLG002286

long-term liabilities and are structured to provide cash flows (primarily tax-free) over an extended period. The Company intends to use policy cash flows, which are actuarially projected to range from $15 million to $45 million annually over the policy terms, to fund (partially or fully) noncore liabilities and to earmark gross policy cash value as a source of funding for noncore obligations.

## DEBT AND OTHER CONTRACTUAL OBLIGATIONS

Total debt outstanding at December 31, 2001 was $532.3 million. As a result of the Filing, Grace is now in default on $501.3 million of such debt, which has been included in "Liabilities subject to compromise" as of December 31, 2001. The automatic stay provided under the Bankruptcy Code prevents the Company's lenders from taking any action to collect the principal amounts as well as related accrued interest. However, Grace will continue to accrue and report interest on such debt during the Chapter 11 proceedings (unless further developments lead management to conclude that it is probable that such interest will be compromised).

In addition, Grace's accounts receivable securitization program was terminated effective May 14, 2001. As a result of the Filing, outstanding balances of approximately $65.3 million were satisfied under the terms of the program through the use of pre-petition trade receivables collected during the period from the Filing Date to early May 2001. During the period from the Filing Date to the termination of the program, Grace compensated for the lack of access to trade receivables collections by borrowing under the DIP facility.

At December 31, 2001, Grace had gross financial assurances outstanding of $261.2 million, comprised of $149.2 million of gross surety bonds issued by various insurance companies and $112.0 million of standby letters of credit issued by various banks. Of the standby letters of credit, $29.4 million act as collateral for surety bonds, thereby reducing Grace's overall obligations under its financial assurances to a net amount of $231.8 million. These financial assurances were established for a variety of purposes, including insurance and environmental matters, asbestos settlements and appeals, trade-related commitments and other matters. Of the net amount of $231.8 million of financial assurances, approximately $10.1 million were issued by non-Debtor and $221.7 million were issued by the Debtors. Of the amounts issued by the Debtors, approximately $211.0 million were issued before the Filing Date, with the remaining $10.7 million being issued under the DIP facility subsequent to the Filing.

## CONTRACTUAL OBLIGATIONS NOT SUBJECT TO COMPROMISE

| (Dollars in millions) | Payments due by Period | | | |
|---|---|---|---|---|
| | Total | Less than 1 Year | 1-3 Years | Thereafter |
| Debt................. | $ 7.8 | $ 7.8 | $ -- | $ -- |
| Operating leases.... | 62.3 | 7.8 | 26.1 | 28.4 |
| TOTAL CONTRACTUAL CASH OBLIGATIONS........ | $ 70.1 | $ 15.6 | $ 26.1 | $ 28.4 |

## SOURCES OF LIQUIDITY

To meet its liquidity needs in 2002 and 2003, Grace entered into a debtor-in-possession loan facility (see "DIP facility" under Note 12 to Grace's Consolidated Financial Statements) in the aggregate amount of $250 million, under which Grace had no borrowings as of December 31, 2001. In addition, Grace had cash and cash equivalents of $181.3 million and cash value of life insurance (net) of $75.6 million at December 31, 2001. Management believes that Grace's core operating cash flow together with the DIP facility and the existing liquid assets will be sufficient to meet the operating needs of Grace over the next year.

## SHARE ACTIVITY

Grace employees currently receive salaries, incentive bonuses, other benefits, and stock options. Each stock option granted under the Company's stock incentive plan has an exercise price equal to the fair market value of the Company's common stock on the date of grant. In 2001, the Company granted a total of 1,339,846 options with an average exercise price of $2.53.

Poor stock price performance in the period leading up to and after the Filing have diminished the value of the option program to current and prospective employees, which caused Grace to change its long-term incentive compensation program into more of a cash-based program. Grace has also sought to address employee retention issues by providing added compensation to certain employees and increasing Grace's contribution to its savings and investment plan. For 2001, Grace's pre-tax income from core operations includes an expense of $10.0 million for the Chapter 11 related compensation charges.

In May 2000, the Company's Board of Directors approved a program to repurchase up to 12,000,000 of the Company's outstanding shares in the open market. Through December 31, 2000, the Company had acquired 1,753,600 shares of common stock for $12.2 million under this program (an average price per share of $6.98).

CC-BLG002287

CC-BLG002288

The financial statements are presented on a historical cost basis and do not fully reflect the impact of prior years' inflation. While the U.S. inflation rate has been modest for several years, the Company operates in international economies with both inflation and currency risks. The ability to pass on inflation costs is an uncertainty due to general economic conditions and competitive situations. The cost of replacing Grace's property and equipment today is estimated to be greater than its historical cost. Accordingly, depreciation expense would be greater if the expense were stated on a current cost basis.

## THE EURO

As of January 1, 2001 twelve of the fifteen countries of the European Union had adopted one common currency, known as the Euro. Grace has operations in ten of the Euro countries and has complied with the legislation applicable to its introduction. The Euro conversion has not had and is not expected to have a material adverse impact on Grace's financial condition or results of operations.

## ACCOUNTING PRONOUNCEMENTS

In June 2001, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards ("SFAS"), No. 141 "Business Combinations," and SFAS No. 142, "Goodwill and Other Intangible Assets." SFAS No. 141 supersedes Accounting Principles Board Opinion ("APB") No. 16, "Business Combinations." The provisions of SFAS No. 141: (1) require that the purchase method of accounting be used for all business combinations initiated after June 30, 2001, (2) provide specific criteria for the initial recognition and measurement of intangible assets apart from goodwill, and (3) require that unamortized negative goodwill be written off immediately as an extraordinary gain instead of being deferred and amortized. Grace adopted SFAS No. 141 in July 2001.

SFAS No. 142 supersedes APB 17, "Intangible Assets," and is effective for fiscal years beginning after December 15, 2001. SFAS No. 142 primarily addresses the accounting for goodwill and intangible assets subsequent to their initial recognition. The provisions of SFAS No. 142: (1) prohibit the amortization of goodwill and indefinite-lived intangible assets, (2) require that goodwill and indefinite-lived intangible assets be tested annually for impairment, (3) require that reporting units be identified for the purpose of assessing potential future impairments of goodwill, and (4) remove the 40 year limitation on the amortization period of intangible assets that have finite lives.

Grace will adopt the provisions of SFAS No. 142 in its first quarter ending March 31, 2002. Grace has identified its reporting units as catalyst products, silica products, specialty construction chemicals, specialty building materials and specialty sealants and coatings for purposes of measuring impairment under the provisions of SFAS No. 142. All amounts of goodwill, intangible assets, other assets, and liabilities have been appropriately classified and allocated to these reporting units. Amortization expense on goodwill for the year ended December 31, 2001 was $0.5 million. In connection with the adoption of SFAS No. 142, Grace is in the process of evaluating the useful lives of its existing intangible assets and anticipates that any changes in the useful lives will not have a material impact on the results of its operations.

SFAS No. 142 requires that goodwill and certain intangible assets be tested annually for impairment. An impairment test must be performed at the beginning of the period of adoption. Grace expects that its goodwill and other intangible assets will not be impaired.

In August 2001, the FASB issued SFAS No. 143, "Accounting for Assets Retirement Obligations," and SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets." SFAS No. 143 requires the accrual of asset retirement obligations by increasing the initial carrying amount of the related long-lived asset, and systematically expensing such costs over the asset's useful life. The standard is effective for fiscal years beginning after June 15, 2002. SFAS No. 144 supersedes SFAS No. 121, "Accounting for the Impairment of Long-Lived Assets to Be Disposed Of," and expands the scope of discontinued operations. SFAS No. 144 is effective for financial statements issued for fiscal years beginning after December 15, 2001. Grace does not expect SFAS No. 143 or 144 to have material effect on its financial statements.

Grace adopted SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities" (as amended) for 2001. SFAS No. 133 requires, among

CC-BLG002289

other things, that all derivative instruments be recognized at fair value as assets or liabilities in the consolidated balance sheet with changes in fair value recognized currently in earnings unless specific hedge accounting criteria are met. At December 31, 2001, the Company did not hold or issue any derivative financial instruments.

## FORWARD-LOOKING STATEMENTS

The forward-looking statements contained in this document are based on current expectations regarding important risk factors. Actual results may differ materially from those expressed. In addition to the uncertainties referred to in Management's Discussion and Analysis of Results of Operations and Financial Condition, other uncertainties include the impact of worldwide economic conditions; pricing of both the Company's products and raw materials; customer outages and customer demand; factors resulting from fluctuations in interest rates and foreign currencies; the impact of competitive products and pricing; the continued success of Grace's process improvement initiatives; the impact of tax and legislation and other regulations in the jurisdictions in which the Company operates; and development in and the outcome of the Chapter 11 proceedings discussed above. Also, see "Introduction and Overview - Projections and Other Forward-Looking Information" in Item 1 of Grace's current Annual Report on Form 10-K.

F-49

CC-BLG002290

**W. R. GRACE & CO. AND SUBSIDIARIES**

**VALUATION AND QUALIFYING ACCOUNTS AND RESERVES**

(Dollars in millions)

**FOR THE YEAR 2001**

| | | Additions/(deductions) | | |
| Description | Balance at beginning of period | Charged/ (credited) to costs and expenses | Other net * | Balance at end of period |
| --- | --- | --- | --- | --- |
| VALUATION AND QUALIFYING ACCOUNTS DEDUCTED FROM ASSETS: | | | | |
| Allowances for notes and accounts receivable.......... | $ 4.4 | $ 3.2 | $ -- | $ 7.6 |
| Allowances for long-term receivables.................. | 0.8 | (0.2) | -- | 0.6 |
| Valuation allowance for deferred tax assets........... | 179.1 | (21.1) | -- | 158.0 |
| RESERVES: | | | | |
| Reserves for divested businesses...................... | $ 78.1 | $ -- | $ 2.4 | $ 80.5 |

**FOR THE YEAR 2000**

| | | Additions/(deductions) | | |
| Description | Balance at beginning of period | Charged/ (credited) to costs and expenses | Other net * | Balance at end of period |
| --- | --- | --- | --- | --- |
| VALUATION AND QUALIFYING ACCOUNTS DEDUCTED FROM ASSETS: | | | | |
| Allowances for notes and accounts receivable.......... | $ 4.1 | $ 0.3 | $ -- | $ 4.4 |
| Allowances for long-term receivables.................. | 0.8 | -- | -- | 0.8 |
| Valuation allowance for deferred tax assets........... | 153.2 | 16.4 | 9.5 | 179.1 |
| RESERVES: | | | | |
| Reserves for divested businesses...................... | $ 99.1 | $ 6.2 | $ (27.2) | $ 78.1 |

**FOR THE YEAR 1999**

| | | Additions/(deductions) | | |
| Description | Balance at beginning of period | Charged/ (credited) to costs and expenses | Other net * | Balance at end of period |
| --- | --- | --- | --- | --- |
| VALUATION AND QUALIFYING ACCOUNTS DEDUCTED FROM ASSETS: | | | | |
| Allowances for notes and accounts receivable.......... | $ 5.5 | $ (1.4) | $ -- | $ 4.1 |
| Allowances for long-term receivables.................. | 17.1 | (16.3) | -- | 0.8 |
| Valuation allowance for deferred tax assets........... | 154.7 | (1.5) | -- | 153.2 |
| RESERVES: | | | | |
| Reserves for divested businesses...................... | $ 76.4 | $ 59.8 | $ (37.1) | $ 99.1 |

\* Consists of additions and deductions applicable to businesses acquired, disposals of businesses, bad debt write-offs, foreign currency translation, reclassifications (including the deconsolidation of amounts relating to discontinued operations), cash payments for previously established reserves for divested businesses and miscellaneous other adjustments.

F-50

CC-BLG002291

EXHIBIT 12

## W. R. GRACE & CO. AND SUBSIDIARIES

### COMPUTATION OF RATIO OF EARNINGS TO FIXED CHARGES AND COMBINED FIXED CHARGES AND PREFERRED STOCK DIVIDENDS (a)

(Dollars in millions, except ratios)

(Unaudited)

| | Years Ended December 31, (b) | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2001 | 2000 (c) | 1999 | 1998 (d) | 1997 (e) |
| Net income (loss) from continuing operations........ | $ 78.6 | $ (89.7) | $ 130.2 | $ (194.7) | $ 85.9 |
| Add (deduct): | | | | | |
| Provision for (benefit from) income taxes............ | 63.7 | 70.0 | 73.2 | (28.5) | 51.5 |
| Minority interest in income (loss) of majority owned subsidiaries............................................. | 0.6 | -- | -- | -- | -- |
| Equity in unremitted losses (earnings) of less than 50%-owned companies................................ | (4.0) | (0.5) | (0.2) | (1.2) | (1.0) |
| Interest expense and related financing costs, including amortization of capitalized interest............ | 39.5 | 30.6 | 18.8 | 37.5 | 89.6 |
| Estimated amount of rental expense deemed to represent the interest factor................................ | 2.9 | 2.9 | 5.2 | 5.2 | 6.9 |
| Income (loss) as adjusted........................... | $ 181.3 | $ 13.3 | $ 227.2 | $ (181.7) | $ 232.9 |
| Combined fixed charges and preferred stock dividends: | | | | | |
| Interest expense and related financing costs, including capitalized interest................................. | $ 37.6 | $ 29.1 | $ 17.0 | $ 37.4 | $ 94.4 |
| Estimated amount of rental expense deemed to represent the interest factor................................ | 2.9 | 2.9 | 5.2 | 5.2 | 6.9 |
| Fixed charges........................................ | 40.5 | 32.0 | 22.2 | 42.6 | 101.3 |
| Preferred stock dividend requirements (a)........... | -- | -- | -- | -- | -- |
| Combined fixed charges and preferred stock dividends. | $ 40.5 | $ 32.0 | $ 22.2 | $ 42.6 | $ 101.3 |
| Ratio of earnings to fixed charges.................. | 4.48 | (f) | 10.23 | (f) | 2.30 |
| Ratio of earnings to combined fixed charges and preferred stock dividends.......................... | 4.48 | (f) | 10.23 | (f) | 2.30 |

(a) Grace's preferred stocks were retired in 1996.

(b) Certain amounts have been restated to conform to the 2001 presentation.

(c) Includes a pre-tax provision of $208.0 million for asbestos-related liabilities and insurance coverage. The provision for income taxes includes a $75.0 million charge for tax and interest relating to tax deductibility of interest on corporate-owned life insurance policy loans.

(d) Includes a pre-tax provision of $376.1 for asbestos-related liabilities and insurance coverage; $21.0 relating to restructuring costs and asset impairments, offset by a pre-tax gain of $38.2 for the receipt of insurance proceeds related to environmental matters, partially offset by a charge to reflect a change in the environmental remediation strategy for a particular site.

(e) Includes a pre-tax gain of $103.1 on sales of businesses, offset by a pre-tax provision of $47.8 for restructuring costs and asset impairments.

(f) As a result of the losses incurred for the years ended December 31, 2000 and 1998, Grace was unable to fully cover the indicated fixed charges.

CC-BLG002292

EXHIBIT 3.2

Adopted on January 16, 2002

AMENDED AND RESTATED

BY-LAWS
OF
W. R. GRACE & CO.

INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE

## ARTICLE I
## OFFICES AND RECORDS

Section 1.1. Delaware Office. The principal office of the Corporation in the State of Delaware shall be located in Wilmington, Delaware, and the name and address of its registered agent is The Prentice-Hall Corporation System, Inc., 1013 Centre Road, Wilmington, Delaware.

Section 1.2. Other Offices. The Corporation may have such other offices, either within or without the State of Delaware, as the Board of Directors may designate or as the business of the Corporation may from time to time require.

Section 1.3. Books and Records. The books and records of the Corporation may be kept outside the State of Delaware at such place or places as may from time to time be designated by the Board of Directors.

## ARTICLE II
## STOCKHOLDERS

Section 2.1. Annual Meeting. The annual meeting of the stockholders of the Corporation shall be held annually (a) on the tenth day of May, or (b) if such day be a Saturday, Sunday or a holiday at the place where the meeting is to be held, on the last business day preceding or on the first business day after such tenth day of May, as may be fixed by the Board of Directors, or (c) on such other date as may be fixed by the Board of Directors.

Section 2.2. Special Meeting. Subject to the rights of the holders of any series of stock having a preference over the Common Stock of the Corporation as to dividends or upon liquidation ("Preferred Stock") with respect to such series of Preferred Stock, special meetings of the stockholders may be called only by the Chairman, by the President or by the Board of Directors pursuant to a resolution adopted by a majority of the total number of directors which the Corporation would have if there were no vacancies (the "Whole Board").

Section 2.3. Place of Meeting. The Chairman, the President or the Board of Directors, as the case may be, may designate the place of meeting for any annual meeting or for any special meeting of the stockholders called by the Chairman, the President or the Board of Directors. If no designation is so made, the place of meeting shall be the principal office of the Corporation.

Section 2.4. Notice of Meeting. Written or printed notice, stating the place, date and time of the meeting and the purpose or purposes for which the meeting is called, shall be delivered by the Corporation not less than ten (10) days nor more than sixty (60) days before the date of the meeting, either personally or by mail, to each stockholder of record entitled to vote at such meeting. If mailed, such notice shall be deemed to be delivered when deposited in the U.S. mail with postage thereon prepaid, addressed to the stockholder at his address as it appears on the stock transfer books of the Corporation. Such further notice shall be given as may be required by law. Only such business shall be conducted at a special meeting of stockholders as shall have been brought before the meeting pursuant to the Corporation's notice of meeting. Meetings may be held without notice if all stockholders entitled to vote are present, or if notice is waived by those not present in accordance with Section 6.4 of these By-laws. Any previously scheduled meeting of the stockholders may be postponed, and (unless the Certificate of Incorporation otherwise provides) any special meeting of the stockholders may be cancelled, by resolution of the Board of Directors upon public notice given prior to the date previously scheduled for such meeting of stockholders.

Section 2.5. Quorum and Adjournment. Except as otherwise provided by law or by the Certificate of Incorporation, the holders of a majority of the outstanding shares of the Corporation entitled to vote generally in the election of directors (the "Voting Stock"), represented in person or by proxy, shall constitute a quorum at a meeting of stockholders, except that when specified business is to be voted on by a class or series of stock voting as a class, the holders of a majority of the voting power of the shares of such class or series shall constitute a quorum of such class or series for the transaction of such business. The chairman of the meeting or a majority of the shares so represented may adjourn the meeting from time to time, whether or not there is a quorum. No notice of the time and place of adjourned meetings need be given except as required by law. The stockholders present at a duly called meeting at which a quorum is present may continue to transact business until adjournment, notwithstanding the withdrawal of enough stockholders to leave less than a quorum.

Section 2.6. Proxies. At all meetings of stockholders, a stockholder may vote by proxy executed in writing (or in any other manner permitted by law) by the stockholder, or by his duly authorized attorney-in-fact.

Section 2.7. Notice of Stockholder Business and Nominations.

-2-

CC-BLG002294

(A) Annual Meetings of Stockholders. (1) Nominations of persons for election to the Board of Directors of the Corporation and the proposal of business to be considered by the stockholders may be made at an annual meeting of stockholders (a) pursuant to the Corporation's notice of meeting, (b) by or at the direction of the Board of Directors or (c) by any stockholder of the Corporation who was a stockholder of record at the time of giving of the notice provided for in this Section 2.7, who is entitled to vote at the meeting and who complies with the notice procedures set forth in this Section 2.7.

(2) For nominations or other business to be properly brought before an annual meeting by a stockholder pursuant to clause (c) of paragraph (A)(1) of this Section 2.7, the stockholder must have given timely notice thereof in writing to the Secretary of the Corporation, and such other business must otherwise be a proper matter for stockholder action. To be timely, a stockholder's notice shall be delivered to the Secretary at the principal executive offices of the Corporation not later than the close of business on the 60th day nor earlier than the close of business on the 90th day prior to the first anniversary of the preceding year's annual meeting; provided, however, that in the event that the date of the annual meeting is more than 30 days before or more than 60 days after such anniversary date, notice by the stockholder to be timely must be so delivered not earlier than the close of business on the 90th day prior to such annual meeting and not later than the close of business on the later of the 60th day prior to such annual meeting or the 10th day following the day on which public announcement of the date of such meeting is first made by the Corporation. In no event shall the public announcement of an adjournment of an annual meeting commence a new time period for the giving of a stockholder's notice as described above. Such stockholder's notice shall set forth (a) as to each person whom the stockholder proposes to nominate for election or re-election as a director all information relating to such person that is required to be disclosed in solicitations of proxies for election of directors in an election contest, or is otherwise required, in each case pursuant to Regulation 14A under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Rule 14a-11 thereunder (including such person's written consent to being named in the proxy statement as a nominee and to serving as a director if elected); (b) as to any other business that the stockholder proposes to bring before the meeting, a brief description of the business desired to be brought before the meeting, the reasons for conducting such business at the meeting and any material interest in such business of such stockholder and the beneficial owner, if any, on whose behalf the proposal is made; and (c) as to the stockholder giving the notice and the beneficial owner, if any, on whose behalf the nomination or proposal is made (i) the name and address of such stockholder, as they appear on the Corporation's books, and of such beneficial owner and (ii) the class and number of shares of the Corporation which are owned beneficially and of record by such stockholder and such beneficial owner.

(3) Notwithstanding anything in the second sentence of paragraph (A)(2) of this Section 2.7 to the contrary, in the event that the number of directors to be elected to the Board of Directors of the Corporation is increased and there is no public announcement by the Corporation naming all of the nominees for election as director or specifying the size of the increased Board of Directors at least 70 days prior to the first anniversary of the

-3-

CC-BLG002295

preceding year's annual meeting, a stockholder's notice required by this Section 2.7 shall also be considered timely, but only with respect to nominees for any new positions created by such increase, if it shall be delivered to the Secretary at the principal executive offices of the Corporation not later than the close of business on the 10th day following the day on which such public announcement is first made by the Corporation.

(B) Special Meetings of Stockholders. Only such business shall be conducted at a special meeting of stockholders as shall have been brought before the meeting pursuant to the Corporation's notice of meeting. Nominations of persons for election to the Board of Directors may be made at a special meeting of stockholders at which directors are to be elected pursuant to the Corporation's notice of meeting (a) by or at the direction of the Board of Directors or (b) provided that the Board of Directors has determined that directors shall be elected at such meeting, by any stockholder of the Corporation who is a stockholder of record at the time of giving of notice provided for in this Section 2.7, who shall be entitled to vote at the meeting and who complies with the notice procedures set forth in this Section 2.7. In the event the Corporation calls a special meeting of stockholders for the purpose of electing one or more directors to the Board of Directors, any such stockholder may nominate a person or persons (as the case may be), for election to such position(s) as specified in the Corporation's notice of meeting, if the stockholder's notice required by paragraph (A)(2) of this Section 2.7 shall be delivered to the Secretary at the principal executive offices of the Corporation not earlier than the close of business on the 90th day prior to such special meeting and not later than the close of business on the later of the 60th day prior to such special meeting or the 10th day following the day on which public announcement is first made of the date of the special meeting and of the nominees proposed by the Board of Directors to be elected at such meeting. In no event shall the public announcement of an adjournment of a special meeting commence a new time period for the giving of a stockholder's notice as described above.

(C) General. (1) Only such persons who are nominated in accordance with the procedures set forth in this Section 2.7 shall be eligible to serve as directors and only such business shall be conducted at a meeting of stockholders as shall have been brought before the meeting in accordance with the procedures set forth in this Section 2.7. Except as otherwise provided by law, the Certificate of Incorporation or these By-laws, the chairman of the meeting shall have the power and duty to determine whether a nomination or any business proposed to be brought before the meeting was made or proposed, as the case may be, in accordance with the procedures set forth in this Section 2.7 and, if any proposed nomination or business is not in compliance with this Section 2.7, to declare that such defective proposal or nomination shall be disregarded.

(2) For purposes of this Section 2.7, "public announcement" shall mean disclosure in a press release reported by the Dow Jones News Service, Associated Press or a comparable national news service or in a document publicly filed by the Corporation with the Securities and Exchange Commission pursuant to Section 13, 14 or 15(d) of the Exchange Act.

-4-

CC-BLG002296

(3) Notwithstanding the foregoing provisions of this Section 2.7, a stockholder shall also comply with all applicable requirements of the Exchange Act and the rules and regulations thereunder with respect to the matters set forth in this by-law. Nothing in this Section 2.7 shall be deemed to affect any rights (i) of stockholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 under the Exchange Act or

(ii) of the holders of any series of Preferred Stock to elect directors under specified circumstances.

Section 2.8. Procedure for Election of Directors; Required Vote. Election of directors at all meetings of the stockholders at which directors are to be elected shall be by ballot, and, subject to the rights of the holders of any series of Preferred Stock to elect directors under specified circumstances, a plurality of the votes cast thereat shall elect directors. Except as otherwise provided by law, the Certificate of Incorporation, or these By-laws, in all matters other than the election of directors, the affirmative vote of a majority of the shares present in person or represented by proxy at the meeting and entitled to vote on the matter shall be the act of the stockholders.

Section 2.9. Inspectors of Elections; Opening and Closing the Polls. The Board of Directors by resolution shall appoint one or more inspectors, which inspector or inspectors may include individuals who serve the Corporation in other capacities, including, without limitation, as officers, employees, agents or representatives, to act at meetings of stockholders and make written reports thereof. One or more persons may be designated as alternate inspectors to replace any inspector who fails to act. If no inspector or alternate has been appointed to act or is able to act at a meeting of stockholders, the chairman of the meeting shall appoint one or more inspectors to act at the meeting. Each inspector, before discharging his or her duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability. The inspectors shall have the duties prescribed by law.

The chairman of the meeting shall fix and announce at the meeting the date and time of the opening and the closing of the polls for each matter upon which the stockholders will vote at a meeting.

## ARTICLE III
## BOARD OF DIRECTORS

Section 3.1. General Powers. The business and affairs of the Corporation shall be managed under the direction of the Board of Directors. In addition to the powers and authorities by these By-laws expressly conferred upon them, the Board of Directors may exercise all such powers of the Corporation and do all such lawful acts and things as are not by statute or by the Certificate of Incorporation or by these By-laws required to be exercised or done by the stockholders.

-5-

CC-BLG002297

Section 3.2. Number, Tenure and Qualifications. Subject to the rights of the holders of any series of Preferred Stock to elect directors under specified circumstances, the number of directors shall be fixed from time to time exclusively pursuant to a resolution adopted by a majority of the Whole Board. The directors, other than those who may be elected by the holders of any series of Preferred Stock under specified circumstances, shall be divided, with respect to the time for which they severally hold office, into three classes, as nearly equal in number as is reasonably possible, designated Class I, Class II and Class III, with the initial term of office of the Class I directors to expire at the 1999 annual meeting of stockholders, the initial term of office of the Class II directors to expire at the 2000 annual meeting of stockholders and the initial term of office of the Class III directors to expire at the 2001 annual meeting of stockholders, with each director to hold office until his or her successor shall have been duly elected and qualified. At each annual meeting of stockholders, commencing with the 1999 annual meeting, directors elected to succeed those directors whose terms then expire shall be elected for a term of office to expire at the third succeeding annual meeting of stockholders after their election, with each director to hold office until his or her successor shall have been duly elected and qualified.

Section 3.3. Regular Meetings. A regular meeting of the Board of Directors shall be held without other notice than this Section 3.3 immediately after, and at the same place as, the Annual Meeting of Stockholders. The Board of Directors may fix the time and place for the holding of additional regular meetings without notice.

Section 3.4. Special Meetings. Special meetings of the Board of Directors shall be called at the request of the Chairman, the President or a majority of the directors then in office. The person or persons authorized to call special meetings of the Board of Directors may fix the place and time of such meetings.

Section 3.5. Notice. Notice of any special meeting or notice of a change in the time or place of any regular meeting of the Board of Directors shall be given to each director at his or her business or residence in writing by hand delivery, first-class or overnight mail or courier service, telegram or facsimile transmission, or orally by telephone. If mailed by first-class mail, such notice shall be deemed adequately delivered when deposited in the U.S. mails so addressed, with postage thereon prepaid, at least five (5) days before such meeting. If by telegram, overnight mail or courier service, such notice shall be deemed adequately delivered when the telegram is delivered to the telegraph company or the notice is delivered to the overnight mail or courier service company at least twenty-four (24) hours before such meeting. If by facsimile transmission, such notice shall be deemed adequately delivered when the notice is transmitted at least twelve (12) hours before such meeting. If by telephone, the notice shall be communicated to the director or his or her representative or answering machine. If by telephone or by hand delivery, the notice shall be given at least twenty-four (24) hours prior to the time set for the meeting. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board of Directors need be specified in the notice of such meeting, except for amendments to these By-laws, as provided under Section 8.1. A meeting may be held at any time

-6-

CC-BLG002298

without notice if all the directors are present or if those not present waive notice of the meeting in accordance with Section 6.4 of these By-laws.

Section 3.6. Action by Consent of Board of Directors. Any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting if all members of the Board of Directors or committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Board of Directors or committee.

Section 3.7. Conference Telephone Meetings. Members of the Board of Directors, or any committee thereof, may participate in a meeting of the Board of Directors or such committee by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at such meeting.

Section 3.8. Quorum. Subject to Section 3.9, a number of directors equal to at least a majority of the Whole Board shall constitute a quorum for the transaction of business. If at any meeting of the Board of Directors there shall be less than a quorum present, a majority of the directors present may adjourn the meeting from time to time without further notice. The act of the majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors. The directors present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough directors to leave less than a quorum.

Section 3.9. Vacancies. Subject to applicable law and the rights of the holders of any series of Preferred Stock with respect to such series of Preferred Stock, and unless the Board of Directors otherwise determines, vacancies resulting from death, resignation, retirement, disqualification, removal from office or other cause, and newly created directorships resulting from any increase in the authorized number of directors, may be filled only by the affirmative vote of a majority of the remaining directors, though less than a quorum of the Board of Directors, and directors so chosen shall hold office for a term expiring at the annual meeting of stockholders at which the term of office of the class to which they have been elected expires and until such director's successor shall have been duly elected and qualified. No decrease in the number of authorized directors constituting the Whole Board shall shorten the term of any incumbent director.

Section 3.10. Committees. The Board of Directors may establish one or more committees. Each Committee shall consist of two or more directors of the Corporation designated by the Board of Directors. The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. Any such committee may to the extent permitted by law exercise such powers and shall have such responsibilities as shall be specified in the designating resolution. In the absence or disqualification of any member of such committee or committees, the member or members thereof present at any meeting and not disqualified from voting, whether or not constituting a quorum, may

-7-

CC-BLG002299

unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member. Each committee shall keep written minutes of its proceedings and shall report such proceedings to the Board of Directors when requested.

A majority of any committee may determine its action and fix the time and place of its meetings, unless the Board of Directors shall otherwise provide. Notice of such meetings shall be given to each member of the committee in the manner provided for in Section 3.5 of these By-laws. The Board of Directors shall have the power at any time to fill vacancies in, to change the membership of, or to dissolve any such committee. Nothing herein shall be deemed to prevent the Board of Directors from appointing one or more committees consisting in whole or in part of persons who are not directors of the Corporation; provided, however, that no such committee shall have or may exercise any authority of the Board of Directors.

The term of office of a committee member shall be as provided in the resolution of the Board designating him or her but shall not exceed his or her term as a director. If prior to the end of his term, a committee member should cease to be a director, he or she shall cease to be a committee member. Any member of a committee may resign at any time by giving written notice to the Board of Directors, the Chairman, the President or the Secretary. Such resignation shall take effect as provided in Section 6.6 of these By-laws in the case of resignations by directors. Any member of a committee may be removed from such committee, either with or without cause, at any time, by resolution adopted by a majority of the whole Board. Any vacancy in a committee shall be filled by the Board of Directors in the manner prescribed by these By-laws for the original designation of the members of such committee.

Section 3.11. Committee on Officers' Compensation. Pursuant to Section 3.10 of these By-laws, the Board of Directors shall designate a committee to evaluate the performance of, and to recommend the appropriate level of compensation for, officers of the Corporation. Such committee shall have access to an advisor not otherwise serving the Corporation. Each member of such committee shall be an "independent director," as that term is defined in the following sentence. For purposes of this Section 3.11, an "independent director" shall mean a person who (a) has not been employed by the Corporation within the past five years; (b) is not, and is not affiliated with, a firm that is an advisor or consultant to the Corporation; (c) is not affiliated with any customer or supplier of the Corporation whose purchases from and/or sales to the Corporation exceed 3% of the sales and revenues of such customer or supplier for its most recently completed fiscal year; (d) has no personal services contract with the Corporation; (e) is not affiliated with a tax-exempt entity, not otherwise affiliated with the Corporation, that receives contributions from the Corporation that exceed 3% of such entity's gross contributions for its most recently completed fiscal year; and (f) is not a member of the "immediate family" (as defined in Item 404(a) of Securities and Exchange Commission Regulation S-K) of any person described in clauses (a) through (e).

-8-

CC-BLG002300