# W R GRACE & CO

# FORM 10-K
(Annual Report)

## Filed 03/13/03 for the Period Ending 12/31/02

| | |
|---|---|
| Address | 7500 GRACE DRIVE |
| | COLUMBIA, MD 21044 |
| Telephone | 410 531 4000 |
| CIK | 0001045309 |
| Symbol | GRA |
| SIC Code | 2800 - Chemicals & Allied Products |
| Industry | Chemical Manufacturing |
| Sector | Basic Materials |
| Fiscal Year | 12/31 |

http://www.edgar-online.com
© Copyright 2009, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

---

# FORM 10-K
### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
# THE SECURITIES AND EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2002 Commission file number 1-13953

# W. R. GRACE & CO.

Incorporated under the Laws of the I.R.S. Employer Identification No.
State of Delaware 65-0773649

**7500 GRACE DRIVE, COLUMBIA, MARYLAND 21044-4098**
410/531-4000

### SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

| TITLE OF EACH CLASS | NAME OF EACH EXCHANGE ON WHICH REGISTERED |
|---|---|
| Common Stock, $.01 par value | New York Stock Exchange, Inc. |
| Preferred Stock Purchase Rights | |

### SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:

None

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulations S-K is not contained herein and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [X]

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act). Yes [X] No [ ]

The aggregate market value of W. R. Grace & Co. voting and non-voting common equity held by non-affiliates as of June 30, 2002 (the last business day of the registrant's most recently completed second fiscal quarter) was $162,603,000.

At February 28, 2003, 65,542,679 shares of W. R. Grace & Co. Common Stock, $.01 par value, were outstanding.

### DOCUMENTS INCORPORATED BY REFERENCE

None.

CC-BLG002377

# TABLE OF CONTENTS

PART I...........................................................................................1
    Item 1.    Business................................................................1
                  Availability Of SEC Reports....................................1
                  Chapter 11 Filing.............................................1
                  Business Overview.............................................2
                  Products And Markets.........................................4
                  Intellectual Property; Research Activities...................9
                  Environmental, Health And Safety Matters.....................9
    Item 2.    Properties...............................................................10
    Item 3.    Legal Proceedings.......................................................10
    Item 4.    Submission of Matters to a Vote of Security Holders......................16

PART II..........................................................................................16
    Item 5.    Market for Registrant's Common Equity and Related Shareholder Matters....16
    Item 6.    Selected Financial Data.................................................18
    Item 7.    Management's Discussion and Analysis of Results of Operations and Financial Condition......18
    Item 7A.   Quantitative and Qualitative Disclosures About Market Risk..............18
    Item 8.    Financial Statements and Supplementary Data.............................18
    Item 9.    Changes in and Disagreements with Accountants on Accounting and
                  Financial Disclosure...................................................18

PART III.........................................................................................18
    Item 10.   Directors and Executive Officers of the Registrant.....................18
    Item 11.   Executive Compensation.................................................20
    Item 12.   Security Ownership of Certain Beneficial Owners and Management and Related Stockholder
                  Matters................................................................27
    Item 13.   Certain Relationships and Related Transactions.........................29
    Item 14    Controls and Procedures................................................29

PART IV..........................................................................................29
    Item 15.   Exhibits, Financial Statement Schedules, and Reports on Form 8-K........29

SIGNATURES.......................................................................................34

CERTIFICATIONS...................................................................................35

FINANCIAL SUPPLEMENT...........................................................................F-1

CC-BLG002378

## ITEM 1. BUSINESS

## AVAILABILITY OF SEC REPORTS

W. R. Grace & Co.(1) maintains an Internet website at www.grace.com Grace makes available (and made available throughout 2002), free of charge through its website, its annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to those reports, filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, as soon as reasonably practicable after such reports are electronically filed with, or furnished to, the SEC. These reports may be accessed through the website's investor information page.

## CHAPTER 11 FILING

On April 2, 2001, W. R. Grace & Co. and 61 of its United States subsidiaries and affiliates filed voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code ("Chapter 11") in the United States Bankruptcy Court for the District of Delaware. The cases were consolidated for the purpose of joint administration and were assigned case numbers 01-01139 through 01-01200. Grace's non-U.S. subsidiaries and certain of its U.S. subsidiaries were not included in the filing.

The filing was made in response to a sharply increasing number of asbestos-related bodily injury claims. Under Chapter 11, Grace is operating its businesses as debtor-in-possession under court protection from its creditors and claimants, while using the Chapter 11 process to develop and implement a plan for addressing the asbestos-related claims against it.

Prior to 2000, Grace was able to settle asbestos-related claims through direct negotiations. The filing of claims had stabilized, and annual cash flows were manageable and fairly predictable. In 2000, the litigation environment changed with an unexpected 81% increase in bodily injury claims, which Grace believes was due to a surge in unmeritorious claims. Trends in claims filing and settlement demands showed no signs of returning to historic levels and were exacerbated by the Chapter 11 filings of several co-defendants in asbestos bodily injury litigation. These trends greatly increased the risk that Grace would not be able to resolve its pending and future asbestos-related claims under the state court system.

Grace concluded that a federal court-supervised Chapter 11 filing provides the best forum available to achieve predictability and fairness in the claims resolution process. By filing under Chapter 11, Grace expects to be able both to obtain a comprehensive resolution of the claims against it and preserve the inherent value of its businesses.

As a consequence of the filing, pending litigation against Grace is generally stayed (subject to certain exceptions in the case of governmental authorities), and no party may take any action to realize its pre-petition claims except pursuant to order of the Bankruptcy Court. Since the filing, all motions necessary to conduct normal business activities have been approved by the Bankruptcy Court.

Grace intends to address all of its pending and future asbestos-related claims and all other pre-petition claims in a plan of reorganization. Such a plan of reorganization may include the establishment of a trust

---

(1) As used in this Report, the term "Grace" or the "Company" refers to W. R. Grace & Co., a Delaware corporation and, in certain cases, one or more of its subsidiaries and/or their respective predecessors.

CC-BLG002379

through which all pending and future asbestos-related claims would be channeled for resolution. However, it is currently impossible to predict with any degree of certainty the amount that would be required to be contributed to the trust, how the trust would be funded, how other pre-petition claims would be treated or what impact any reorganization plan may have on the shares of common stock of Grace. The interests of Grace's shareholders could be substantially diluted or cancelled under a plan of reorganization.

Grace's asbestos-related litigation and Chapter 11 filing are further discussed in Item 3 of this Report, and in Notes 1, 2 and 3 to Grace's Consolidated Financial Statements as of December 31, 2002 and December 31, 2001 and for each of the three years ended December 31, 2002 ("Consolidated Financial Statements") and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement to this Report.

## BUSINESS OVERVIEW

Grace, through its subsidiaries, is one of the world's leading specialty chemicals and materials companies. Grace entered the specialty chemicals industry in 1954, when it acquired both the Dewey and Almy Chemical Company and the Davison Chemical Company. Grace operates in the following two business segments:

o Davison Chemicals manufactures catalysts and silica-based products. Davison Chemicals' catalysts include (1) fluid cracking catalysts and additives used by petroleum refineries to convert distilled crude oil into transportation fuels and other petroleum-based products; (2) hydroprocessing catalysts that upgrade heavy oils and remove certain impurities; and (3) polyolefin catalysts and catalyst supports that are essential components in the manufacture of high density and linear low density polyethylene resins used in products such as plastic film, high-performance plastic pipe and plastic household containers. Davison Chemicals' silica gels, colloidal silicas, precipitated silicas, and zeolite adsorbents are used in a wide variety of industrial, consumer, biotechnology and pharmaceutical segments, such as ink jet paper, paints, toothpastes, precision investment casting, rubber compounds, insulated glass and separations/chromatography, as well as in edible oil refining and petrochemical processes. Davison Chemicals accounted for approximately 52% of Grace's 2002 sales.

o Performance Chemicals produces (1) specialty construction chemicals, including performance-enhancing concrete admixtures, cement additives and masonry products; (2) specialty building materials, including fireproofing and waterproofing materials and systems; and (3) sealants and coatings for packaging that protect food and beverages from bacteria and other contaminants, extend shelf life and preserve flavor. Performance Chemicals accounted for approximately 48% of Grace's 2002 sales.

Grace's principal executive offices are located at 7500 Grace Drive, Columbia, Maryland 21044, telephone 410/531-4000. As of year-end 2002, Grace had approximately 6,400 full-time employees worldwide in its continuing operations.

Information concerning the net sales, pretax operating income and total assets of Grace's continuing operations by business segment and information by geographic area for 2002, 2001 and 2000 is contained in Note 19 to the Consolidated Financial Statements in the Financial Supplement to this Report.

Strategic Objectives and Actions. Grace's strategy has been, and will continue to be, to seek to enhance enterprise value by profitably growing its specialty chemicals businesses globally and achieving high levels of financial performance. To achieve these objectives, Grace plans to (i) invest in research and development activities, with the goals of introducing new high-performance products and services and

2

CC-BLG002380

enhancing manufacturing processes; (ii) implement process and productivity improvements and cost-management initiatives (including the use of Six Sigma processes) such as rigorous controls on working capital and capital spending; and (iii) pursue selected acquisitions and alliances. These plans are designed to make Grace a high-performance company focused on the strengths of its global specialty chemicals businesses.

Projections and Other Forward-Looking Information. This Report contains, and other communications by Grace may contain, projections or other "forward-looking" information. Forward-looking information includes all statements regarding Grace's expected financial position, results of operations, cash flows, dividends, financing plans, business strategy, budgets, capital and other expenditures, competitive positions, growth opportunities for existing products, benefits from new technology, plans and objectives of management, and markets for stock. Like any other business, Grace is subject to risks and other uncertainties that could cause its actual results to differ materially from any projections or that could cause other forward-looking information to prove incorrect. Grace does not undertake any obligation to update any forward-looking information that may be contained in this Report.

Most significantly, Grace filed for protection under Chapter 11 on April 2, 2001 as a result of a sharply increasing number of asbestos bodily injury claims. See Item 3 of this Report, and Notes 1, 2 and 3 to Grace's Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement to this Report, for a more detailed discussion of risks related to Grace's asbestos liabilities.

In addition to general economic, business and market conditions, Grace is also subject to other risks and uncertainties, including the following:

o developments in and the outcome of the Chapter 11 proceedings, including but not limited to the determination of the allowed number and cost of resolution of pending and future asbestos-related claims and the time required to confirm and implement a plan of reorganization;

o the loss of senior management and other key employees as a result of the Chapter 11 proceedings;

o the loss of flexibility in operating its businesses and the higher costs of doing business under Chapter 11;

o greater than expected liabilities with respect to environmental remediation;

o an inability to obtain committed credit facilities or alternative sources of liquidity in amounts sufficient to fund operations, growth initiatives and non-core obligations;

o a decline in worldwide oil consumption or the development of new methods of oil refining;

o increases in prices of raw materials and energy costs;

o the consolidation of major customers, which could increase customer purchasing power, thereby putting pressure on operating profits;

o an inability to gain customer acceptance, or slower than anticipated acceptance, of new products or product enhancements;

o changes in environmental regulations or societal pressures that make Grace's business operations more costly or that change the types of products used, especially petroleum-based products;

o slower than anticipated economic advances in less developed countries;

o foreign currency devaluations in developing countries or other adverse changes in currency exchange rates (including, in particular, the U.S. dollar to Euro exchange rate);   .

o technological breakthroughs rendering a product, a class of products or a line of business obsolete;

o an inability to adapt to continuing technological improvements by competitors or customers; and

o the acquisition (through theft or other means) and use by others of Grace's proprietary formulas and other know-how (particularly in the sealants and coatings business).

3

CC-BLG002381

See Notes 1, 2, 3, 4, 5, 10, 13 and 14 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for additional information concerning risks and uncertainties.

## PRODUCTS AND MARKETS

Specialty Chemicals Industry Overview. Specialty chemicals, such as those produced by Grace, are high-value-added products used as catalysts, intermediates, components or additives in a wide variety of products and processes. They are produced in relatively small volumes and must satisfy well-defined performance requirements and specifications. Specialty chemicals are often critical components of the end products and catalysts for the processes in which they are used; consequently, they are tailored to meet customer needs, which generally results in a close relationship between the specialty chemicals producer and the customer. Rapid response to changing customer needs and reliability of product and supply are important competitive factors in specialty chemicals businesses.

Grace's management believes that in specialty chemicals businesses technological leadership (resulting from continuous innovation through research and development), combined with product differentiation and superior customer service, lead to higher operating margins. Grace believes that these factors reward it for the research and development and customer service costs associated with its strategy.

Davison Chemicals Business Segment (Catalysts and Silica-Based Products). Davison, founded in 1832, is composed of two primary product groups:
(i) catalysts and (ii) silica products and adsorbents. These product groups principally apply silica, alumina and zeolite technology in the design and manufacture of products to meet the varying specifications of such diverse customers as major oil refiners, plastics and chemical manufacturers, and consumer products and pharmaceutical/nutraceutical companies. Grace believes that Davison's technological expertise provides a competitive edge, allowing it to quickly design products and materials that meet changing customer specifications and to develop new products and materials that expand its existing technology.

Catalysts. Davison produces refinery catalysts, including (i) fluid cracking catalysts ("FCC") used by petroleum refiners to convert distilled crude oil into transportation fuels (such as gasoline and diesel fuels) and other petroleum-based products, and (ii) hydroprocessing catalysts that upgrade heavy oils and remove certain impurities (such as nitrogen, sulfur and heavy metals). Davison also develops and manufactures FCC additives used for octane enhancement and to reduce emissions of sulfur oxides, nitrogen oxides and carbon monoxide from the FCC unit. Davison has recently introduced new catalyst/additive technologies for sulfur reduction in gasoline. Oil refining is a highly specialized discipline, demanding that products be tailored to meet local variations in crude oil and the refinery's product mix. Davison works regularly with most of the approximately 360 refineries in the world, helping to find the most appropriate catalyst formulations for refiners' changing needs. To better serve its customers, Davison has designed a user-specific web site, e-Catalysts.com.

Davison's catalyst business has benefited from the increased use of FCC units to produce selected petrochemical feedstocks. It has also benefited from the passage of more stringent environmental regulations, which has increased demand for FCC additives and other products that reduce environmental emissions. Davison's business is affected by the capacity utilization of customers' processing units - as capacity utilization increases, the customer frequently uses a disproportionately greater amount of catalysts. Consolidation in the refining industry may affect Davison's catalyst sales and margins, as the purchasing power of its customers may increase, and the gain or loss of a customer may have a greater impact on Davison's sales.

4

CC-BLG002382

Davison operates its hydroprocessing catalyst business through Advanced Refining Technologies LLC ("ART"), a joint venture between Grace and Chevron Products Company that combined Chevron's fixed bed residuum catalyst business with Davison's ebullating bed residuum catalyst and distillate catalyst business. In 2002, ART acquired an exclusive license in most of the world for the hydroprocessing technology of Japan Energy Corporation and its subsidiary, Orient Catalyst Company, which expanded Davison's position in residuum and distillate hydroprocessing technologies. In response to increased demand for lower sulfur transportation fuels, ART has recently introduced new hydroprocessing catalyst technologies for sulfur reduction in gasoline and diesel fuels.

Grace believes that Davison is one of the world leaders in refinery catalysts and the largest supplier of FCCs in the world. Competition in the refinery catalyst business is based on technology, product performance, customer service and price. Davison's two principal global competitors in FCCs are Engelhard Corporation and Akzo Nobel. Davison has several competitors for FCC additives and hydroprocessing catalysts.

Davison is also a major producer of polyolefin catalysts and catalyst supports, essential components in the manufacture of high density and linear low density polyethylene resins that are in turn used in products such as plastic film, high-performance plastic pipe and plastic household containers. Davison catalysts and catalyst supports are used in manufacturing nearly half of all such resins produced worldwide. The polyolefin catalyst business is technology-intensive and focuses on providing products formulated to meet customer specifications. There are many manufacturers of polyolefin catalysts, and most compete on a worldwide basis. Competition has recently intensified because of evolving technologies, particularly the use of metallocene catalysts, which allow manufacturers to design polymers with exact performance characteristics. In January 2002, Davison acquired the polyolefin catalyst manufacturing assets of Borealis A/S, giving Davison access to new polyolefin catalyst and catalyst carrier technologies.

Silicas and Adsorbents. Silica products and zeolite adsorbents produced by Davison are used in a wide variety of industrial, and consumer applications. Davison manufactures silica gels, colloidal silicas and precipitated silicas. These silicas have different physical properties, such as particle size, surface area, porosity, and surface chemistry, which give each type of silica unique characteristics that make it appropriate for specific applications. Davison has multiple competitors in each silicas/adsorbents segment in which it participates. Competition is based on product performance, customer service, and price.

Silica gels are used in coatings as matting agents (i.e., to reduce gloss), in plastics to improve handling, in pharmaceuticals as a formulating agent, in toothpastes as abrasives and whiteners, in foods to carry flavors and prevent caking, and in the purification of edible oils and beer stabilization. Davison is leveraging its materials science expertise, both internally and through acquisitions, to develop and introduce new silica materials and technologies, particularly for biotechnology separations applications. Davison recently has developed a new colloidal-based product and silica formulations for ink jet paper coatings to provide both glossy and matte functionality, expanding its portfolio of digital media solutions for ink jet papers, photos, and commercial wide-format printing. Davison has also introduced new products for other coatings (where silica is used to reduce gloss), such as for thin film applications, industrial wood coatings, and radiation-cured coatings. Davison intends to introduce new products for chromatography columns and separations media in 2003.

Colloidal silicas are used primarily as binders in precision investment casting and refractory applications. Precipitated silicas are used predominantly in the manufacture of tires and other industrial rubber goods such as belts, hoses and footwear. Zeolites, while not silica-based products, are based on silica/alumina technology. Zeolite adsorbents are used between the two panes of insulating glass to adsorb moisture and are also used in process applications to adsorb water and separate certain chemical components from mixtures.

5

CC-BLG002383

The silicas and adsorbents business has a large, fragmented customer base, reflecting the diverse markets served by its products. To better serve these customers, Davison has introduced web-based initiatives, including online ordering of packaged desiccants, process design formulas to assist customers in determining their needs, and literature access and customer feedback tools. Approximately half of Davison's silica and adsorbent sales are in Europe.

Davison Financial and Other Business Information. Davison's net sales were $945 million in 2002, $874 million in 2001, and $784 million in 2000; 41% of Davison's 2002 net sales were generated in North America, 38% in Europe, 16% in Asia Pacific, and 5% in Latin America. Sales of catalysts accounted for 37% of total net sales of Grace in 2002, 36% in 2001, and 35% in 2000. Sales of silica products and zeolite adsorbents accounted for 15% of Grace's total net sales in 2002 and 2001, and 14% in 2000.

At year-end 2002, Davison employed approximately 3,100 people worldwide in 16 facilities (10 in the U.S., two in Germany, and one each in Canada, Brazil, Sweden and Malaysia). Davison's principal U.S. manufacturing facilities are located in Baltimore, Maryland and Lake Charles, Louisiana. Its largest non-U.S. location is in Worms, Germany. Davison has a direct selling force and distributes most of its products directly to approximately 12,000 customers (500 for catalysts and more than 11,000 for silicas/adsorbents), the largest of which accounted for approximately 4% of Davison's 2002 sales.

Most raw materials used in the manufacture of Davison products are available from multiple sources. In some instances, Davison produces its own raw materials and intermediates. Natural gas and petroleum-based raw materials are two of the principal materials used in Davison's manufacturing process. World events and other economic factors can cause volatility in the price of these materials, which can impact Davison's operating margins. Seasonality does not have a significant overall effect on Davison's business. However, sales of FCC catalysts tend to be lower in the first quarter prior to the shift in production by refineries from home heating oil for the winter season to gasoline production for the summer season. Silica products and polyolefin catalysts are the product lines most sensitive to general downturns in economic activity.

Performance Chemicals Business Segment (Specialty Construction Chemicals, Specialty Building Materials, and Sealants and Coatings). Grace's Performance Chemicals segments include: (1) specialty construction chemicals and building materials, in which Grace is a leading supplier to the nonresidential (commercial and infrastructure) construction industry, and to a lesser extent, the residential construction and repair segment; and (2) a sealants and coatings product line operated under the Darex(R) name.

Construction Chemicals and Building Materials. Specialty construction chemicals (principally concrete admixtures, cement additives and masonry products) add strength, control corrosion and enhance the handling and application of concrete, improve the manufacturing efficiency and performance of cement, and improve the water resistance and other qualities of masonry wall and paving systems. Grace has introduced a number of new construction chemicals products and product enhancements in recent years. These include an admixture that reduces concrete shrinkage and helps prevent cracking; a product that enables contractors to obtain improved concrete set times in colder temperatures; an admixture that inhibits corrosion and prolongs the life of concrete structures; and an additive that improves cement processing efficiency and product quality. Grace seeks to continuously improve and adapt these products for different applications.

In 2001, Grace introduced new fiber reinforcements for concrete and a system for producing self-consolidating concrete (which improves the concrete's conformity to the shape of a structure). In 2002, Grace acquired the masonry admixtures business of Addiment Incorporated, which expanded Grace's position in the U.S. paver segment.

6

CC-BLG002384

Specialty building materials prevent structural water damage (for example, water- and ice-barrier products for residential use and waterproofing systems for commercial structures), and protect structural steel against collapse caused by fire. In North America, the specialty building materials product line also manufactures and distributes vermiculite products used in insulation and other applications. Recent product developments include liquid-applied waterproofing products and new roof underlayments that provide protection from ice and wind-driven rain; enhancements to spray-on fireproofing products that improve applicator productivity; and, through an acquisition in 2000, firestops. Firestops are caulk and sealant systems that retard the spread of heat, flame and smoke through walls, ceiling joints, and openings for wiring and piping.

In addition to new product introductions, product enhancements and acquisitions, Grace looks for growth opportunities in developing countries, where increases in construction activity and sophistication of construction practices can increase demand for Grace's construction chemicals and building materials products.

Construction chemicals and building materials are marketed under the Grace(R) name to abroad range of customers, including cement manufacturers, ready-mix and precast concrete producers, local contractors, specialty subcontractors and applicators, masonry block manufacturers, building materials distributors and other industrial manufacturers, as well as to architects and structural engineers. For some of these customer groups (such as contractors), cost and ease of application are key factors in making purchasing decisions; for others (such as architects and structural engineers), product performance and design versatility are the critical factors. In view of this diversity, and because the construction chemicals and building materials businesses require intensive sales and customer service efforts, Performance Chemicals maintains a separate sales and technical support team for each of its product groups. These sales and support teams sell products under global contracts, under U.S. or regional contracts, and on a job-by-job basis. Consequently, Grace competes globally with several large construction materials suppliers and regionally and locally with numerous smaller competitors. In recent years, the cement and concrete industry has experienced some consolidation, particularly in markets outside of the U.S. Competition is based largely on technical support and service, product performance, adaptability of the product and price.

The construction business is cyclical in response to economic conditions and construction demand. The construction business is also seasonal due to weather conditions. Grace seeks to increase profitability and minimize the impact of cyclical downturns in regional economies by introducing technically advanced higher-performance products, expanding geographically, and developing business opportunities in renovation construction markets. Although in recent years these strategies have been successful in minimizing the impact of cyclicality on Grace's construction business, a significant downturn in North American commercial construction activity adversely affected results of operations in 2002.

The raw materials used by the construction chemicals and building materials product lines can be obtained from multiple sources, including commodity chemical producers, petroleum companies and paper manufacturers. In most instances, there are at least two alternative suppliers for each of the principal raw materials used by these businesses.

Sealants and Coatings. The Darex(R) sealants and coatings business consists primarily of four product lines: can sealants and closure sealants for rigid containers, coatings for metal packaging, and specialty barrier coatings for flexible packaging. These products are used to assure the quality of packaging and to preserve container contents. Can sealants ensure a hermetic seal between the lid and the body of beverage, food, aerosol and other cans. Closure sealants are used to seal pry-off and twist-off metal crowns, as well as roll-on pilfer-proof and plastic closures for glass and plastic bottles and jars used in beverage and food applications. Coatings are used in the manufacture of cans and closures to protect the metal against corrosion, to protect the contents against the influences of metal, to ensure proper adhesion of sealing compounds to metal surfaces,

7

CC-BLG002385

and to provide base coats for inks and for decorative purposes. These products are principally sold to container manufacturers. Specialty barrier coatings are used to improve the gas and/or vapor barrier performance of various packaging materials. They are principally sold to manufacturers of oriented polypropylene films for food packaging.

Grace is seeking to expand its Darex(R) product offerings and improve sales growth by extending its technology to new markets, such as its oxygen-scavenging compounds (which absorb oxygen to increase shelf life) and high barrier materials that limit gas transmission into plastic packaging. Grace is also looking to improve sales of sealants and coatings through niche opportunities in metal packaging and continued growth in developing countries. However, sales growth has been impacted and will likely be impacted in the future by the trend toward increasing use of plastic packaging. Therefore, Grace has also been focusing on improving the profitability and cash flows of this business through productivity initiatives and a worldwide program to rationalize facilities.

Competition is based on providing high-quality customer service at customer sites, as well as on uniform product quality and reliability, the ability to offer environmentally-friendly products and price. In addition, because of the relative concentration of the canning and bottling market, maintaining relationships with leading container manufacturers, canners and bottlers, and assisting them as they reengineer processes are key elements for success.

Although raw materials used in the sealants and coatings business, including resins, rubber and latices, are generally available from multiple sources, many raw materials are purchased from single source suppliers. Some raw materials are also subject to pricing pressures from time to time, particularly certain specialty resins and commodity solvents, resins and plasticizers because of market demand or the volatility of oil prices. Also, currency devaluations in developing countries may adversely affect raw material costs and the prices the business may charge for its products. Performance Chemicals has been successful in establishing a supply chain organization focused on managing raw material costs and flow to alleviate some of these pressures. The impact of seasonality is not significant to the sealants and coatings business.

Performance Chemicals Financial and Other Business Information. Net sales of Grace's Performance Chemicals segment in 2002 totaled $872 million (57% in North America, 23% in Europe, 14% in Asia Pacific, and 6% in Latin America), versus $849 million in 2001 and $814 million in 2000. Sales of specialty construction chemicals accounted for 22% of Grace's total net sales in 2002, 21% in 2001 and 22% in 2000; sales of specialty building materials accounted for 13% of Grace's total net sales in 2002, and 14% in 2001 and 2000; and sales of Darex(R) products accounted for 13% of Grace's total net sales in 2002, 14% in 2001 and 15% in 2000.

At year-end 2002, Grace employed approximately 3,000 people at 64 Performance Chemicals production facilities (25 in North America, 19 in Asia Pacific, 14 in Europe, and 6 in Latin America) and approximately 70 sales offices worldwide. Most of Performance Chemicals' sales are direct sales to the customer. Performance Chemicals' capital expenditures tend to be relatively lower, and sales and marketing expenditures tend to be relatively higher, than those of Davison Chemicals.

See Note 19 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for further information regarding the Davison and Performance Chemicals business segments.

8

CC-BLG002386

**INTELLECTUAL PROPERTY; RESEARCH ACTIVITIES**

Grace's products, processes and manufacturing equipment are protected by numerous patents and patent applications. Grace also benefits from legally protectable know-how and other proprietary information relating to many of its products and processing technologies. As competition in the markets in which Grace does business is often based on technological superiority and innovation, with new products based on technological developments being introduced frequently, the ability to achieve technological innovations and to obtain patent or other intellectual property protection is important. There can be no assurance, however, that Grace's patents, patent applications or other intellectual property will provide sufficient proprietary protection. In addition, other companies may independently develop similar systems or processes that circumvent patents issued to Grace, or may acquire patent rights within the fields of Grace's businesses.

Grace's research and development programs are directed toward the development of new products and processes and the improvement of, and development of new uses for, existing products and processes. Research is conducted in all regions, with North America and Europe accounting for the most activity. Grace's research and development strategy is to develop technology platforms on which new products will be based, while also focusing on the improvement of existing products and/or the adaptation of existing products to customer needs.

Research and development expenses relating to continuing operations amounted to $52 million in 2002, $49 million in 2001, and $46 million in 2000. These amounts include expenses incurred in funding external research projects. The amount of research and development expenses relating to government- and customer-sponsored projects (rather than projects sponsored by Grace) was not material.

## ENVIRONMENTAL, HEALTH AND SAFETY MATTERS

Manufacturers of specialty chemicals products, including Grace, are subject to stringent regulations under numerous U.S. federal, state and local and foreign environmental, health and safety laws and regulations relating to the generation, storage, handling, discharge, disposition and stewardship of hazardous wastes and other materials. Grace has expended substantial funds to comply with such laws and regulations and expects to continue to do so in the future. The following table sets forth Grace's expenditures in the past three years, and its estimated expenditures in 2003 and 2004, for (i) the operation and maintenance of environmental facilities and the disposal of wastes with respect to continuing operations; (ii) capital expenditures for environmental control facilities relating to continuing operations; and (iii) site remediation:

|  | (i)<br>Operation of<br>Facilities and<br>Waste Disposal | (ii)<br>Capital<br>Expenditures | (iii)<br>Site<br>Remediation |
|---|---|---|---|
|  | (in $ millions) | | |
| 2000 | $26 | $4 | $42 |
| 2001 | 32 | 4 | 27 |
| 2002 | 37 | 6 | 14 |
| 2003 (est.) | 37 | 7 | 8 |
| 2004 (est.) | 38 | 10 | 22 |

The decline in site remediation costs for 2002, and the estimated decline for 2003 reflects reduced spending at non-owned sites due to Grace's Chapter 11 status. The $22 million in estimated site remediation

9

CC-BLG002387

expenditures in 2004 does not include possible additional spending or reimbursement of remediation costs related to Grace's former vermiculite mining and processing activities in the Libby, Montana area.

Grace continuously seeks to improve its environmental, health and safety performance. To the extent applicable, Grace extends the basic elements of the American Chemistry Council's Responsible Care(R) program to alL Grace locations worldwide, embracing specific performance objectives in the key areas of product stewardship, employee health and safety, community awareness and emergency response, distribution, process safety and pollution prevention. In addition, Grace is in the process of implementing the key elements of the new Responsible Care(R) Security Code for its operations and systems, including a review of existing company security (including cyber-security) vulnerability, the enhancement of security systems and countermeasures, and the protection of company assets.

For additional information, see Item 3 of this Report, and Note 14 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement to this Report.

## ITEM 2. PROPERTIES

Grace operates manufacturing and other types of plants and facilities (including office and other service facilities) throughout the world. Some of these plants and facilities are shared by more than one Grace business unit. Grace considers its major operating properties to be in good operating condition and suitable for their current use. Grace believes that, after taking planned expansion into account, the productive capacity of its plants and other facilities is generally adequate for current operations and foreseeable growth. See Note 19 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for information regarding Grace's capital expenditures.

Specific information regarding Grace's properties by business segment is set forth in Item 1 above.

## ITEM 3. LEGAL PROCEEDINGS

Asbestos Litigation. Grace is a defendant in property damage and bodily injury lawsuits relating to previously sold asbestos-containing products. In most of the bodily injury lawsuits, Grace is one of many defendants. As a result of the Chapter 11 filing, all asbestos-related litigation has been stayed and no party may commence any new proceedings against Grace. However, Grace expects that it will receive additional asbestos-related claims during the Chapter 11 process.

Grace was a defendant in 65,656 asbestos-related lawsuits on April 2, 2001, the date of Grace's Chapter 11 filing. Seventeen of such lawsuits involve claims for property damage, nine relating to Grace's former Zonolite attic insulation ("ZAI") product (one of which has since been dismissed) and eight relating to a number of former asbestos-containing products (two of which also involve ZAI). The remainder of such lawsuits involve 129,191 claims for bodily injury. As part of the Chapter 11 process, the Bankruptcy Court established a bar date of March 31, 2003 for submission of additional asbestos-related property damage claims. (The bar date does not apply to asbestos-related bodily injury claims or claims related to ZAI, which will be addressed separately by the court.) As new claims are filed, Grace will be cataloguing and assessing their validity.

The plaintiffs in property damage lawsuits generally seek to have the defendants pay the cost of removing, containing or repairing the asbestos-containing materials in the affected buildings. Through April 2, 2001, 140 asbestos property damage cases were dismissed without payment of any damages or settlement

10

CC-BLG002388

amounts; judgments were entered in favor of Grace in nine cases (excluding cases settled following appeals of judgments in favor of Grace); judgments were entered in favor of the plaintiffs in eight cases for a total of $86.1 million (one of which is on appeal); and 207 property damage cases were settled for a total of $696.8 million.

In February 2000 a purported class action lawsuit was filed in the U.S. District Court for the Eastern District of Massachusetts against the Company (Lindholm v. W. R. Grace & Co.) on behalf of all owners of homes containing ZAI, a product formerly sold by Grace that may contain trace amounts of asbestos. The action seeks damages and equitable relief, including the removal, replacement and/or disposal of all such insulation. After Lindholm was filed, nine additional purported class action ZAI lawsuits were initiated against Grace prior to the Chapter 11 filing. The nine lawsuits were filed in various state and federal courts asserting similar claims and seeking damages similar to those in Lindholm. One of the purported federal class actions has been consolidated with Lindholm. As a result of the Chapter 11 filing, all of these cases have been transferred to the U.S. Bankruptcy Court for the District of Delaware.

The plaintiffs in the ZAI lawsuits assert that this product is in millions of homes throughout the U.S. and that the cost of removal could be several thousand dollars per home. While Grace has not completed its investigation of the claims described in these lawsuits, testing and analysis of this product by Grace and others supports Grace's belief that the product was and continues to be safe for its intended purpose and poses little or no threat to human health. In July 2002, the Bankruptcy Court approved special counsel to represent the ZAI claimants, at Grace's expense, in a proceeding to determine certain threshold scientific issues regarding ZAI. The court has set a litigation schedule that would result in pretrial hearings on these issues in the third quarter of 2003. At this time, Grace is not able to assess the extent of any possible liability related to this matter.

Cumulatively through April 2, 2001, 16,354 bodily injury lawsuits involving 35,720 claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved), and 55,489 lawsuits involving 163,698 claims were disposed of for a total of $645.6 million.

Based on Grace's experience and analysis of trends in asbestos bodily injury litigation, Grace has endeavored to project the number and ultimate cost of all present and future bodily injury claims expected to be asserted, based on actuarial principles, and to measure probable and estimable liabilities under generally accepted accounting principles. Grace has accrued $973.2 million at December 31, 2002 as its estimate of the cost to resolve all asbestos-related bodily injury cases and claims pending as well as those expected to be filed in the future, and all pending property damage cases for which sufficient information is available to form a reasonable estimate of the cost of resolution. This estimate has been made based on historical facts and circumstances prior to April 2, 2001. Grace does not expect to adjust this estimate (other than for normal costs of continuing claims administration) unless developments in the Chapter 11 proceeding provide a reasonable basis for a revised estimate. Grace intends to use the Chapter 11 process to determine the validity and ultimate amount of its aggregate liability for asbestos-related claims. Due to the uncertainties of asbestos-related litigation, Grace's ultimate liability for asbestos-related litigation could differ materially from the recorded liability.

Grace previously purchased insurance policies under which Grace claims coverage for its asbestos-related lawsuits and claims. Grace has settled with and has been paid by all of its primary insurance carriers with respect to both property damage and bodily injury cases and claims. Grace has also settled with its excess insurance carriers that wrote policies available for property damage cases; those settlements involve amounts paid and to be paid to Grace. Grace believes that certain of these settlements may cover attic insulation claims as well as other property damage claims. In addition, Grace believes that additional coverage for attic insulation claims may exist under excess insurance policies not subject to settlement

11

CC-BLG002389

agreements. Grace has settled with excess insurance carriers that wrote policies available for bodily injury claims in layers of insurance that Grace believes may be reached based on its current estimates. Insurance coverage for asbestos-related liabilities has not been commercially available since 1985.

Pursuant to settlements with primary-level and excess-level insurance carriers with respect to asbestos-related claims, Grace received payments totaling $968.5 million prior to 2000, as well as payments totaling $85.6 million in 2000, $78.8 million in 2001, and $10.8 million in 2002. Under certain settlements, Grace expects to receive additional amounts from insurance carriers in the future and has recorded a receivable of $282.6 million to reflect the amounts expected to be recovered in the future, based on projected payments equal to the amount of the recorded asbestos-related liability.

During 2000, the number of bodily injury claims made against Grace increased significantly compared with 1999 and prior year claim levels, with a total of 48,786 bodily injury claims being received in 2000, versus 26,941 claims in 1999. This trend continued in the first quarter of 2001, when Grace received 16,411 bodily injury claims. Also, costs to resolve asbestos litigation were higher than expected for bodily injury and certain property damage claims. In addition, five significant codefendant companies in bodily injury litigation had petitioned for reorganization under Chapter 11. These developments and events caused an environment that increased the risk of more claims being filed against Grace than previously projected, with higher settlement demands and trial risks. These developments and events also raised substantial doubt whether Grace would be able to manage its asbestos liabilities over the long term under the existing state court system. As a result, following a thorough review of the strategic and operating issues associated with continuing to defend asbestos litigation through the court system versus voluntarily seeking a resolution of such litigation through reorganization under Chapter 11, Grace filed for protection under Chapter 11 on April 2, 2001.

Since its Chapter 11 filing, Grace is aware that asbestos bodily injury lawsuits have continued to be filed against co-defendant companies, and at higher than historical rates. As asbestos bodily injury claims are typically filed against numerous defendants, Grace believes that had it not filed for Chapter 11 reorganization, it likely would have received thousands more claims than it had previously projected.

See Item 1 of this Report and Notes 1, 2 and 3 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for additional information.

Environmental Proceedings. The following is a description of the material environmental proceedings in which Grace is involved:

Grace (together, in most cases, with many other companies) has been designated a "potentially responsible party" ("PRP") by the U.S. Environmental Protection Agency ("EPA") with respect to paying the costs of investigating and remediating pollution at various sites. At year-end 2002, proceedings were pending with respect to approximately 30 sites as to which Grace has been designated a PRP by the EPA. U.S. law provides that all PRPs for a site may be held jointly and severally liable for the costs of investigating and remediating the site. Grace is also conducting investigatory and remediation activities at sites under the jurisdiction of state and/or local authorities. During the Chapter 11 proceeding, Grace does not expect to participate (except in a limited number of special cases) in the joint funding of investigation and remediation, or other settlements, at non-owned sites where it is a PRP. Grace's ultimate liability with respect to such sites will be determined as part of its Chapter 11 proceeding.

From the 1920's until 1990, Grace and previous owners conducted vermiculite mining and related activities near Libby, Montana. The vermiculite ore that was mined contained varying amounts of asbestos as a contaminant, almost all of which was removed during processing. Expanded vermiculite from Libby

12

CC-BLG002390

was used in products such as fireproofing, insulation and potting soil. In November 1999, Region 8 of the EPA began an investigation into alleged excessive levels of asbestos-related disease in the Libby population related to these former mining activities. This investigation led the EPA to undertake additional investigative activity and to carry out response actions in and around Libby. On March 30, 2001, the EPA filed a lawsuit in U.S. District Court for the District of Montana, Missoula Division (United States v. W. R. Grace & Company, et al.) under the Comprehensive Environmental Response, Compensation and Liability Act for the recovery of costs allegedly incurred by the United States in response to the release or threatened release of asbestos in the Libby, Montana area relating to such former mining activities. These costs include cleaning and/or demolition of contaminated buildings, the excavation and removal of contaminated soil, health screening of Libby residents and former mine workers, and investigation and monitoring costs. In this action, the EPA also sought a declaration of Grace's liability that would be binding in future actions to recover further response costs.

In connection with its defense, Grace conducted its own investigation to determine whether the EPA's actions and cost claims were justified and reasonable. However, in December 2002, the District Court granted the United States' motion for partial summary judgment on a number of issues that limited Grace's ability to challenge the EPA's response actions. In January 2003, a trial was held on the remainder of the issues, which primarily involved the reasonableness and adequacy of documentation of the EPA's cost recovery claims through December 31, 2001. No decision has yet been issued. The EPA's Libby-related cost recovery claims through December 31, 2001 totaled approximately $57 million. Based on the testimony of EPA witnesses deposed in the lawsuit and other information, Grace believes that the EPA's total cost recovery claims could reach, and potentially exceed, $100 million. This lawsuit is not subject to the automatic stay provided under the Bankruptcy Code. Grace has accrued a liability of $63 million as of December 31, 2002 with respect to this lawsuit and future cost recovery claims expected to be made by the EPA, which represents Grace's current best estimate of probable liability and defense costs, pending the issuance of a decision by the trial court and the availability of additional information about the EPA's 2002 costs and projected future costs. Liabilities for recovery costs are subject to compromise, and any payments would be subject to the outcome of the Chapter 11 proceedings.

In February 2000, a purported class action lawsuit was filed in the U.S. District Court for Montana, Missoula Division (Tennison, et al. v. W. R. Grace & Co., et al.) against Grace on behalf of all owners of improved private real property situated within 12 miles of Libby, Montana. The action alleges that the class members have suffered harm in the form of environmental contamination and loss of property rights resulting from Grace's former vermiculite mining and processing operations. The complaint seeks remediation, property damages and punitive damages. While Grace has not completed its investigation of the claims, and, therefore, is not able to assess the extent of any possible liability related to this lawsuit, Grace has no reason to believe that its former activities caused damage to the environment or property. This case has been stayed as a result of Grace's Chapter 11 filing.

In October 2000, a purported class action lawsuit was filed in the U.S. District Court for Minnesota, 4th Division (Chase v. W. R. Grace & Co.-Conn.) alleging loss of property values of residents in the vicinity of a former Grace vermiculite expanding plant in Minneapolis. This case has also been stayed as a result of Grace's Chapter 11 filing. The EPA has remediated industrial property in the area, including the former vermiculite expanding plant, at a cost of $650,000. The EPA has also commenced and is continuing a program for removing suspected vermiculite processing by-products from the yards and driveways of houses near the plant. The EPA has reviewed approximately 1,640 residential properties and has targeted 260 for cleanup. Of the 260 properties, the EPA has taken action at 208, with the remaining 52 scheduled for removal actions in 2003. As of December 31, 2002, the EPA had spent $2.6 million on residential cleanup actions.

The EPA has compiled for investigation a list of 244 facilities that at one time used, stored, or processed concentrate that originated from Grace's former vermiculite mine at Libby, Montana. Included in

13

CC-BLG002391

this list are 50 vermiculite expansion plants currently or formerly operated by Grace. The EPA has listed 14 of these 50 sites as requiring additional action. Corrective actions or investigations have been conducted by Grace at six of these sites. The EPA has estimated that the cost of remediation for these 14 sites (exclusive of a Libby, Montana site) will be $6.6 million.

Grace is a party to additional proceedings involving U.S. federal, state and/or local government agencies and private parties regarding Grace's compliance with environmental laws and regulations. These proceedings are not expected to result in significant sanctions or in any material liability. However, Grace may incur material liability in connection with future actions of governmental agencies or private parties relating to past or future practices of Grace with respect to the generation, storage, handling, discharge, disposition or stewardship of hazardous wastes and other materials.

Grace is a party to three pending environmental insurance coverage actions. The first is styled Maryland Casualty Co. v. W. R. Grace & Co. (filed in 1988). This litigation, involving Grace's coverage claims against a primary-level carrier for environmental property damage, is currently the subject of an appeal in the U.S. Court of Appeals for the Second Circuit. The second case, entitled Uniguard v. W. R. Grace, was filed in 1997 in the U.S. District Court for the Southern District of New York. This declaratory judgment action seeks a determination concerning the liability of one excess carrier for bodily injury claims as a result of environmental contamination. This case has been stayed as a result of Grace's Chapter 11 filing. In June 2000, a separate lawsuit was filed in the U.S. District Court for the Southern District of New York against Grace by one of its former primary insurance carriers seeking coverage determinations regarding 45 claims (Continental Casualty Company v. W. R. Grace & Co. and W. R. Grace & Co.-Conn.). Most of these claims involve alleged environmental property damage at sites once owned and operated by Grace or at waste sites that allegedly received waste materials from plants operated by Grace, including Grace's claims for coverage regarding certain claims involving its former vermiculite mining operation in Libby, Montana. This case has been stayed as a result of Grace's Chapter 11 filing. The outcome of these cases, as well as the amounts of any recoveries that Grace may receive in connection therewith, is presently uncertain.

Grace's environmental liabilities are reassessed whenever circumstances become better defined or remediation efforts and their costs can be better estimated. These liabilities are evaluated quarterly, based on currently available information, including the progress of remedial investigation at each site, the current status of discussions with regulatory authorities regarding the method and extent of remediation at each site, existing technology, prior experience in contaminated site remediation and the apportionment of costs among potentially responsible parties. In addition, environmental liabilities related to Libby, Montana in excess of the current recorded liability could be material, though not currently estimable, if the proceedings described above are adversely determined. Grace does not have sufficient information to determine how the funding of environmental remediation activities will be affected by the Chapter 11 proceedings. For further information, see "Environmental, Health and Safety Matters" under Item 1 above and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement.

Litigation Related to Former Packaging and Medical Care Businesses. Grace has been named in a purported class action suit filed in September 2000 in California Superior Court for the County of San Francisco alleging that the 1996 reorganization involving a predecessor of Grace and Fresenius A.G. and the 1998 reorganization involving a predecessor of Grace and Sealed Air Corporation were fraudulent transfers (Abner, et al., v. W. R. Grace & Co., et al.). The suit is alleged to have been brought on behalf of all individuals who then had lawsuits on file asserting personal injury or wrongful death claims against any of the defendants. Since Abner, and prior to the Chapter 11 filing, two other similar class actions were filed. These lawsuits have been stayed as a result of Grace's Chapter 11 filing.

The Bankruptcy Court authorized the Official Committee of Asbestos Personal Injury Claimants and the Official Committee of Asbestos Property Damage Claimants to proceed with claims against Sealed Air

14

CC-BLG002392

Corporation that the 1998 transaction involving Grace's former packaging business and Sealed Air Corporation constituted a fraudulent conveyance. A trial had been scheduled to begin on December 9, 2002. On November 29, 2002, Sealed Air Corporation and Fresenius Medical Care AG each announced that they had reached agreements in principle with representatives of the asbestos creditors committees to resolve all of the current and future asbestos-related claims and the pending fraudulent transfer claims made against them and their respective affiliates. Under the terms of the proposed Sealed Air settlement, Sealed Air would make a payment of $512.5 million (plus interest at 5.5% per annum, commencing on December 21, 2002) and nine million shares of Sealed Air common stock, valued at $335.7 million as of December 31, 2002, as directed by Bankruptcy Court upon confirmation of Grace's plan of reorganization. Under the terms of the proposed Fresenius settlement, as subsequently revised, Fresenius would contribute $115 million to the Grace estate, or as otherwise directed by the Bankruptcy Court, upon confirmation of a plan of reorganization. Both settlements are subject to Bankruptcy Court approval. Upon the effectiveness of these settlements the Abner and all similar actions will be dismissed. Grace is unable to predict how these settlements may ultimately affect its plan of reorganization.

Tax Claims. Grace has received an Internal Revenue Service ("IRS") examination report for the 1993 through 1996 tax periods asserting in the aggregate approximately $114 million of proposed tax adjustments. The most significant contested issue addressed in such report concerns corporate-owned life insurance ("COLI") policies and is discussed in the next paragraph. Other proposed IRS tax adjustments relate to Grace's tax positions regarding research and development credits, reporting of certain divestitures and other miscellaneous proposed adjustments. The tax audit for the 1993 through 1996 tax period is currently under the jurisdiction of IRS Appeals, where Grace has filed a protest. Grace's federal tax returns covering tax periods 1997 and forward are either under examination by the IRS or open for future examination.

In 1988 and 1990, Grace acquired COLI policies on the lives of certain of its employees as part of a strategy to fund the cost of post-retirement employee health care benefits and other long-term liabilities. COLI premiums have been funded in part by loans issued against the cash surrender value of the COLI policies. The IRS is challenging deductions of interest on loans secured by the COLI policies for years prior to January 1, 1999. In 2000, Grace paid $21.2 million of tax and interest related to this issue for tax years 1990 through 1992. Subsequent to 1992, Grace deducted approximately $163.2 million in interest attributable to COLI policy loans. Although Grace continues to believe that the deductions were legitimate, the IRS has successfully challenged interest deductions claimed by other corporations with respect to broad-based COLI policies in all of the three litigated cases to date. Therefore, Grace requested and was granted early referral to the IRS Office of Appeals for consideration of possible settlement alternatives of the COLI interest deduction issue.

On September 23, 2002, Grace filed a motion in its Chapter 11 proceeding requesting that the Bankruptcy Court authorize Grace to enter into a settlement agreement with the IRS with respect to Grace's COLI interest deductions. The tax years at issue are 1989 through 1998. Under the terms of the proposed settlement, the government would allow 20% of the aggregate amount of the COLI interest deductions and Grace would owe federal income tax and interest on the remaining 80%. On October 22, 2002, the Bankruptcy Court issued an order authorizing Grace to enter into settlement negotiations with the IRS consistent with the aforementioned terms and further ordered that any final agreement would be subject to Bankruptcy Court approval. Grace is currently in discussions with the IRS concerning the proposed settlement.

The IRS also has assessed additional federal income tax withholding and Federal Insurance Contributions Act taxes plus interest and related penalties for calendar years 1993 through 1995 against a Grace subsidiary that formerly operated a temporary staffing business for nurses and other healthcare personnel. The assessments, aggregating $21.8 million, were made in connection with a meal and incidental

15

CC-BLG002393

expense per diem plan for traveling healthcare personnel, which was in effect through 1999. The IRS contends that certain per diem reimbursements should have been treated as wages subject to employment taxes and federal income tax withholding. Grace contends that its per diem and expense allowance plans were in accordance with statutory and regulatory requirements, as well as other published guidance from the IRS. Grace expects that the IRS will make additional assessments for the 1996 through 1999 periods. The matter is pending in the United States Court of Claims. Grace is currently in discussions with the Department of Justice concerning possible settlement options.

For further information, see Note 14 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations under Financial Condition" in the Financial Supplement to this Report.

## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

This Item is inapplicable, as no matters were submitted to a vote of the Company's security holders during the fourth quarter of 2002.

## PART II

## ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED SHAREHOLDER MATTERS.

Except as provided below, the information called for by this Item appears in the Financial Supplement under the heading "Financial Summary" opposite the caption "Other Statistics - Common shareholders of record" (page F-35); under the heading "Quarterly Summary and Statistical Information - Unaudited" opposite the caption "Market price of common stock" (page F-34); and in Note 15 to the Consolidated Financial Statements (page F-29).

On March 31, 1998, the Company paid a dividend, in respect of each share of the Company's Common Stock, par value $.01 per share ("Common Stock"), of one Preferred Stock Purchase Right ("Right"). The Rights are not and will not become exercisable unless and until certain events occur (as described below). Until such events occur, the Rights will automatically trade with the Common Stock, and separate certificates for the Rights will not be distributed. The Rights will become exercisable on the earlier to occur of (a) 10 days after a person or group ("Acquiring Person") has acquired beneficial ownership of 20% or more of the then outstanding shares of Common Stock or (b) 10 business days (or such later date as may be fixed by the Company's Board of Directors) after an Acquiring Person commences (or announces the intention to commence) a tender offer or exchange offer that would result in such Acquiring Person becoming the beneficial owner or 20% or more of the then outstanding shares of Common Stock. Holders of Rights, as such, have no rights as shareholders of the Company; consequently, such holders have no rights to vote or receive dividends, among other things.

When the Rights become exercisable, each Right will initially entitle the holder to buy from the Company one hundredth of a share of the Company's Junior Participating Preferred Stock, par value $.01 per share ("Junior Preferred Stock"), for $100, subject to adjustment ("exercise price"). If a person or group becomes an Acquiring Person, each Right will entitle the holder to receive upon exercise, in lieu of shares of Junior Preferred Stock, that number of shares of Common Stock having a market value of two times the exercise price of the Right. If, at any time after a person or group becomes an Acquiring Person, the Company is acquired in a merger or other business combination or 50% or more of the Company's consolidated assets or earning power is sold, each Right not owned by an Acquiring Person will entitle the holder to buy a number of shares of common stock of the acquiring company having a market value equal to twice the exercise price.

16

CC-BLG002394

Shares of Junior Preferred Stock that may be purchased upon exercise of the Rights will not be redeemable. Each share of Junior Preferred Stock will be entitled to a minimum preferential quarterly dividend payment of $1.00 per share but will be entitled to an aggregate dividend equal to 100 times the dividend declared per share of Common Stock whenever such dividend is declared. In the event of liquidation, holders of Junior Preferred Stock will be entitled to a minimum preferential liquidation payment of $100 per share but will be entitled to an aggregate payment equal to 100 times the payment made per share of Common Stock. Each share of Junior Preferred Stock will have 100 votes, voting together with the Common Stock. Finally, in the event of any merger, consolidation or other transaction in which the Common Stock is exchanged, each share of Junior Preferred Stock will be entitled to receive an amount equal to 100 times the amount received per share of Common Stock. These rights are protected by customary antidilution provisions.

Because of the nature of the dividend, liquidation and voting rights of the Junior Preferred Stock, the value of the one-hundredth interest in a share of Junior Preferred Stock that may be purchased upon exercise of each Right should approximate the value of one share of Common Stock.

At any time after any person or group becomes an Acquiring Person, and prior to the acquisition by such Acquiring Person of 50% or more of the outstanding shares of Common Stock, the Company's Board of Directors may exchange the Rights (other than Rights owned by such person or group, which will become void after such person becomes an Acquiring Person) for Common Stock or Junior Preferred Stock, in whole or in part, at an exchange ratio of one share of Common Stock, or one hundredth of a share of Junior Preferred Stock (or of a share of another series of the Company's Preferred Stock having equivalent rights, preferences and privileges), per Right (subject to adjustment).

At any time prior to the acquisition by a person or group of beneficial ownership of 20% or more of the outstanding shares of Common Stock, the Company's Board of Directors may redeem the Rights in whole, but not in part, at a price of $.01 per Right.

The terms of the Rights may be amended by the Company's Board of Directors without the consent of the holders of the Rights, including an amendment to lower (a) the threshold at which a person becomes an Acquiring Person and (b) the percentage of Common Stock proposed to be acquired in a tender or exchange offer that would cause the Rights to become exercisable, to not less than the greater of (a) the sum of .001% plus the largest percentage of the Company's outstanding Common Stock then known to the Company to be beneficially owned by any person or group and (b) 10%, except that, from and after such time as any person or group becomes an Acquiring Person, no such amendment may adversely affect the interests of the holders of the Rights.

The Rights are currently scheduled to expire on March 31, 2008 (subject to extension or the earlier redemption or exchange of the Rights). As a result of Grace's Chapter 11 filing, the rights could be modified in a plan of reorganization.

The foregoing summary of the Rights does not purport to be complete and is qualified in its entirety by reference to the Rights Agreement, which was filed as an Exhibit 4.1 to the Company's Form 8-K filed on April 9, 1998.

17

CC-BLG002395

**ITEM 6. SELECTED FINANCIAL DATA**

The information called for by this Item appears under the heading "Financial Summary" (page F-35 of the Financial Supplement) and in Notes 1, 2, 3, 4, 10, 13 and 14 to the Consolidated Financial Statements (pages F-10 through F-20, and F-23 through F-28 of the Financial Supplement), which is incorporated herein by reference. In addition, Exhibit 12 to this Report (page F-53) of the Financial Supplement) contains the ratio of earnings to fixed charges and combined fixed charges and preferred stock dividends for Grace for the years 1998-2002.

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF RESULTS OF OPERATIONS AND FINANCIAL CONDITION**

The information called for by this Item appears on pages F-36 to F-52 of the Financial Supplement, which is incorporated herein by reference.

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

The information called for by this Item appears in Notes 12 and 13 to the Consolidated Financial Statements (pages F-23 and F-24 of the Financial Supplement), which is incorporated herein by reference.

**ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

See the Index to Consolidated Financial Statements and Financial Statement Schedule and Exhibit on page F-2 of the Financial Supplement, which is incorporated herein by reference.

**ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

This Item is inapplicable, as no such changes or disagreements have occurred.

**PART III**

**ITEM 10. DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT**

The Company's current directors and executive officers are listed below. The Company's Certificate of Incorporation provides for the division of the Board of Directors into three classes, each to serve for a three-year term or until their respective successors are elected. In view of the Chapter 11 filing, the directors are expected to continue to serve beyond the expiration of their respective current terms. Executive officers are elected to serve until the following annual meeting of the Company's Board of Directors or until their respective successors are elected.

| Name and Age | Office | First Elected |
|---|---|---|
| John F. Akers (68) | Class II Director | 05/09/97 |
| H. Furlong Baldwin (71) | Class I Director | 01/16/02 |
| Ronald C. Cambre (64) | Class III Director | 09/01/98 |

18

CC-BLG002396

| | | |
|---|---|---|
| Marye Anne Fox (55) | Class I Director | 05/10/96 |
| John J. Murphy (71) | Class II Director | 05/09/97 |
| Paul J. Norris (55) | Class III Director (Chairman)<br>President and Chief Executive Officer | 01/01/99<br>11/01/98 |
| Thomas A. Vanderslice (71) | Class I Director | 05/10/96 |
| Robert J. Bettacchi (60) | Senior Vice President | 04/01/97 |
| William M. Corcoran (53) | Vice President | 05/11/99 |
| W. Brian McGowan (53) | Senior Vice President | 12/06/90* |
| David B. Siegel (54) | Senior Vice President, General Counsel<br>and Chief Restructuring Officer | 09/01/98* |
| Robert M. Tarola (52) | Senior Vice President and<br>Chief Financial Officer | 05/11/99 |

* Designated an Executive Officer on July 9, 1998

Mr. Akers served as Chairman of the Board and Chief Executive Officer of International Business Machines Corporation from 1985 until his retirement in 1993. He is a director of Hallmark Cards, Inc., Lehman Brothers Holdings, Inc., The New York Times Company and PepsiCo, Inc.

Mr. Baldwin served as a director of Mercantile Bankshares Corporation from 1970 to 2003, and as Chairman of the Board from 1984 to 2003. From 1976 to 2001 he served as President and Chief Executive Officer. Mr. Baldwin is also a director of NASDAQ Stock Market, Inc., Platinum Underwriters Holdings, Ltd. and a member of the board of governors of NASD.

Mr. Cambre is retired Chairman of the Board and CEO of Newmont Mining Corporation. He joined Newmont as Vice Chairman and CEO in 1993 and retired as CEO in 2000 and as Chairman in 2001. He is also a director of Cleveland-Cliffs Inc., McDermott International, Inc. and Inco Limited.

Dr. Fox is Chancellor of North Carolina State University and Distinguished Professor of Chemistry at that institution. She is also a director of Boston Scientific Corporation, Red Hat, Inc. and Pre-Paid Legal Services, Inc.

Mr. Murphy served as Chairman of the Board of Dresser Industries, Inc., a supplier of products and technical services to the energy industry, until 1996. From 1997 to 2000, he was a Managing Director of SMG Management L.L.C., a privately owned investment group. Mr. Murphy is a director of CARBO Ceramics, Inc. and ShawCor Ltd.

Mr. Norris was Senior Vice President of AlliedSignal Incorporated and President of its specialty chemicals business from January 1997 until he joined Grace. He joined AlliedSignal in 1989 as President of its fluorine products/chemicals and catalysts businesses. Mr. Norris is a director of Borden Chemical, Inc. He also performs advisory services for Kolberg, Kravis Roberts & Co., the principal shareholder of Borden.

19

CC-BLG002397

Mr. Vanderslice served as Chairman and Chief Executive Officer of M/A-COM, Inc., a designer and manufacturer of radio frequency and microwave components, devices and subsystems for commercial and defense applications, from 1989 until his retirement in 1995. He is a director of ChevronTexaco Corporation.

Messrs. Bettacchi, McGowan and Siegel have been actively engaged in Grace's business for the past five years.

Mr. Corcoran previously served as Vice President of Business and Regulatory Affairs for AlliedSignal Incorporated's specialty chemicals business from 1997 until he joined Grace. For nine years prior to that, he served as Vice President of Public Affairs in AlliedSignal's engineered materials sector.

Mr. Tarola joined Grace from MedStar Health, Inc., where he had served as Senior Vice President and Chief Financial Officer from July 1998. He previously served in a similar capacity with Helix Health, Inc. for two years. From 1974 through 1996, Mr. Tarola was an employee and partner of Price Waterhouse LLP.

Section 16(a) Beneficial Ownership Reporting Compliance. Under Section 16 of the Securities Exchange Act of 1934, the Company's directors, certain of its officers, and beneficial owners of more than 10% of the outstanding Common Stock are required to file reports with the SEC and the New York Stock Exchange concerning their ownership of and transactions in Common Stock; such persons are also required to furnish the Company with copies of such reports. Based upon the reports and related information furnished to the Company, the Company believes that all such filing requirements were complied with in a timely manner during and with respect to 2002.

## ITEM 11. EXECUTIVE COMPENSATION

Summary Compensation Table. The following Summary Compensation Table contains information concerning the compensation of (a) Paul J. Norris, Chief Executive Officer; and (b) the other four most highly compensated executive officers of Grace who were serving as such at year-end 2002. Certain information has been omitted from the Summary Compensation Table because it is not applicable or because it is not required under the rules of the Securities and Exchange Commission ("SEC").

20

CC-BLG002398

| Name and Principal Position | Year | Salary | Bonus | Other Annual Compensation | No. of Shares Underlying Options Granted | LTIP Payouts (a) | All Other Compensation (b) |
|---|---|---|---|---|---|---|---|
| P. J. Norris | 2002 | $958,333 | $1,010,000 | --- | --- | --- | $ 587,808 |
| Chairman, President | 2001 | 887,500 | 936,250 | --- | 121,000 | --- | 1,457,298 |
| and Chief Executive Officer | 2000 | 812,500 | 526,800 | --- | 315,000 | --- | 90,766 |
| R. J. Bettacchi | 2002 | 358,000 | 265,000 | --- | --- | --- | 30,597 |
| Senior Vice President | 2001 | 345,340 | 275,000 | --- | 35,000 | --- | 366,346 |
|  | 2000 | 332,344 | 125,000 | --- | 85,000 | $102,670 | 42,171 |
| W. M. Corcoran | 2002 | 277,667 | 155,000 | --- | --- | --- | 33,643 |
| Vice President | 2001 | 267,333 | 150,000 | --- | 12,300 | --- | 283,428 |
|  | 2000 | 256,667 | 100,000 | --- | 40,000 | --- | 16,532 |
| D. B. Siegel | 2002 | 408,000 | 265,000 | --- | --- | --- | 244,448 |
| Senior Vice | 2001 | 370,000 | 240,000 | --- | 21,800 | --- | 627,915 |
| President and General Counsel | 2000 | 306,667 | 125,000 | --- | 60,000 | 75,832 | 22,205 |
| R. M. Tarola | 2002 | 388,000 | 250,000 | --- | --- | --- | 33,147 |
| Senior Vice | 2001 | 374,500 | 250,000 | --- | 27,900 | --- | 374,277 |
| President and Chief Financial Officer | 2000 | 359,000 | 155,000 | --- | 75,000 | --- | 12,322 |

(a) The amounts in this column represent payments made in 2000 under Grace's previous Long-Term Incentive Plan for the 1997-1999 Performance Period (to the extent not previously paid).

(b) The amounts in this column for 2002 consist of the following:

(i) payments made to persons whose personal and/or Company contributions to Grace's Salaried Employees Savings and Investment Plan ("Savings Plan") would be subject to limitations under federal income tax law, as follows: Mr. Norris -- $74,658; Mr. Bettacchi -- $18,020; Mr. Corcoran -- $11,840; Mr. Siegel -- $19,500; and Mr. Tarola -- $21,570;

(ii) Company contributions to the Savings Plan, as follows: Mr. Norris -- $12,000; Mr. Bettacchi -- $12,000; Mr. Corcoran -- $12,000; Mr. Siegel -- $11,933; and Mr. Tarola -- $12,000;

(iii) the value of Company-provided personal liability insurance, as follows: Mr. Norris -- $1,150; Mr. Bettacchi -- $577; Mr. Corcoran -- $428; Mr. Siegel -- $577; and Mr. Tarola -- $577;

(iv) a $500,000 retention payment made to Mr. Norris under the terms of his employment agreement. See "Employment Agreements" for a description of Mr. Norris's employment agreement;

(v) for Mr. Corcoran, $9,375 of forgiveness of indebtedness income under the terms of a relocation loan, the balance of which has been reduced to zero; and

(vi) for Mr. Siegel, (A) $194,738 of expense reimbursements and payments made to Mr. Siegel under Grace's relocation program for employees relocating from Boca Raton, Florida to Columbia, Maryland, and (B) $17,700 of forgiveness of indebtedness income under the terms of a relocation loan, the balance of which was $57,300 as of December 31, 2002.

CC-BLG002399

Stock Options. Grace granted no stock options during 2002. No options were exercised by the named individuals during 2002, and none of the options held by them at year-end 2002 were "in the money" (i.e., the exercise price of all options held by the individuals was above the market value of the Common Stock at year-end 2002). The following table contains information concerning unexercised options held at December 31, 2002.

```
                                    No. of Shares Underlying Unexercised Options
                    Name              at 12/31/02 Exercisable/Unexercisable

        P. J. Norris ...........         979,359 / 185,667
        R. J. Bettacchi ........         605,596 /  51,668
        W. M. Corcoran .........          63,266 /  21,534
        D. B. Siegel ...........         345,461 /  34,534
        R. M. Tarola ...........         159,300 /  43,600
```

Long-Term Incentive Program. The Company's long-term incentive plans generally are designed to provide key employees with long-term incentives having a value at the 60th percentile of long-term incentives offered by specialty chemical companies of comparable size to Grace. In 2001, the Company's Board of Directors approved a Long-Term Incentive Plan for key employees ("2001 LTIP") for the 2001-2003 period. For each key employee, the targeted value of the 2001 LTIP award was split so that 50% of the value of the award was provided in the form of a stock option grant, and 50% was in the form of cash compensation, payable if the Company achieves certain pretax earnings targets over a three calendar year period.

In 2002, the Board and the Bankruptcy Court approved the 2002 LTIP for the 2002-2004 period (the "2002 LTP"). The 2002 LTIP operates in substantially the same manner as the 2001 LTIP, except that the targeted value of the 2002 LTIP award is payable 100% in cash, and the pretax earnings targets have been revised. If a key employee becomes entitled to cash compensation under the 2002 LTIP, then such compensation will generally be paid in two installments; one in early 2004 (which will be a partial payment based on performance for the first two years of the applicable three-year period), and the other installment will be paid to the employee in early 2005 (which will consider performance for the complete three-year period and will be offset by the amount of the prior installment). Generally, a key employee will forfeit his or her rights to receive an installment of cash compensation if, prior to the payment of the installment, the employee either voluntarily resigns from the Company or is terminated by the Company for cause. The following table sets forth threshold, targeted and maximum awards under the 2002 LTIP:

|  |  |  |  | Estimated Future Payouts Under Non-Stock Price-Based Plans | |
| Name | No. of Shares, Units Or Other Rights | Performance or Other Period Until Maturation or Payout | Threshold(a) | Target | Maximum |
| ---- | --------------- | ------------------------------ | ------------ | ------ | ------- |
| P. J. Norris | $1,452,000 | 2002-2004 | $0 or $ 24,248 | $1,452,000 | $2,904,000 |
| R. J. Bettacchi | 420,000 | 2002-2004 | $0 or $  7,014 | 420,000 | 840,000 |
| W. M. Corcoran | 150,000 | 2002-2004 | $0 or $  2,505 | 150,000 | 300,000 |
| D. B. Siegel | 335,000 | 2002-2004 | $0 or $  5,595 | 335,000 | 670,000 |
| R. M. Tarola | 335,000 | 2002-2004 | $0 or $  5,595 | 335,000 | 670,000 |

(a) No payment will be made unless the minimum targeted level of pretax earnings is achieved.

22

CC-BLG002400

Pension Arrangements. Full-time salaried employees who are 21 or older and who have one or more years of service are eligible to participate in the Retirement Plan for Salaried Employees. Under this basic retirement plan, pension benefits are based upon (a) the employee's average annual compensation for the 60 consecutive months in which his or her compensation is highest during the last 180 months of continuous participation, and (b) the number of years of the employee's credited service. For purposes of this basic retirement plan, compensation generally includes nondeferred base salary and annual incentive compensation (bonus) awards; however, for 2002, federal income tax law limited to $200,000 the annual compensation on which benefits under this plan may be based.

Grace also has a Supplemental Executive Retirement Plan under which a covered employee will receive the full pension to which he or she would be entitled in the absence of the limitations described above and other limitations imposed under federal income tax law. In addition, this supplemental plan recognizes deferred base salary, deferred annual incentive compensation awards and, in some cases, periods of employment during which an employee was ineligible to participate in the basic retirement plan. (Commencing in 2001, Grace no longer permits deferrals of base salary or incentive compensation.)

The following table shows the annual pensions payable under the basic and supplemental plans for different levels of compensation and years of credited service. The amounts shown have been computed on the assumption that the employee retired at age 65 on January 1, 2001, with benefits payable on a straight life annuity basis. Such amounts are subject to (but do not reflect) an offset of 1.25% of an estimate of the employee's primary Social Security benefit at retirement age for each year of credited service under the basic and supplemental plans.

| Highest Average Annual Compensation | Years of Credited Service | | | | | |
|---|---|---|---|---|---|---|
| | 10 Years | 15 Years | 20 Years | 25 Years | 30 Years | 35 Years |
| $100,000 | $15,000 | $22,500 | $30,000 | $37,500 | $45,000 | $52,500 |
| 200,000 | 30,000 | 45,000 | 60,000 | 75,000 | 90,000 | 105,000 |
| 300,000 | 45,000 | 67,500 | 90,000 | 112,500 | 135,000 | 157,500 |
| 400,000 | 60,000 | 90,000 | 120,000 | 150,000 | 180,000 | 210,000 |
| 500,000 | 75,000 | 112,500 | 150,000 | 187,500 | 225,000 | 262,500 |
| 600,000 | 90,000 | 135,000 | 180,000 | 225,000 | 270,000 | 315,000 |
| 700,000 | 105,000 | 157,500 | 210,000 | 262,500 | 315,000 | 367,500 |
| 800,000 | 120,000 | 180,000 | 240,000 | 300,000 | 360,000 | 420,000 |
| 900,000 | 135,000 | 202,500 | 270,000 | 337,500 | 405,000 | 472,500 |
| 1,000,000 | 150,000 | 225,000 | 300,000 | 375,000 | 450,000 | 525,000 |
| 1,100,000 | 165,000 | 247,500 | 330,000 | 412,500 | 495,000 | 577,500 |
| 1,200,000 | 180,000 | 270,000 | 360,000 | 450,000 | 540,000 | 630,000 |
| 1,300,000 | 195,000 | 292,500 | 390,000 | 487,500 | 585,000 | 682,500 |
| 1,400,000 | 210,000 | 315,000 | 420,000 | 525,000 | 630,000 | 735,000 |
| 1,500,000 | 225,000 | 337,500 | 450,000 | 562,500 | 675,000 | 787,500 |
| 1,600,000 | 240,000 | 360,000 | 480,000 | 600,000 | 720,000 | 840,000 |
| 1,700,000 | 255,000 | 382,500 | 510,000 | 637,500 | 765,000 | 892,500 |
| 1,800,000 | 270,000 | 405,000 | 540,000 | 675,000 | 810,000 | 945,000 |
| 1,900,000 | 285,000 | 427,500 | 570,000 | 712,500 | 855,000 | 997,500 |
| 2,000,000 | 300,000 | 450,000 | 600,000 | 750,000 | 900,000 | 1,050,000 |
| 2,100,000 | 315,000 | 472,500 | 630,000 | 787,500 | 945,000 | 1,102,500 |
| 2,200,000 | 330,000 | 495,000 | 660,000 | 825,000 | 990,000 | 1,155,000 |

23

CC-BLG002401

At December 31, 2002, Messrs. Norris, Bettacchi, Corcoran, Siegel and Tarola had 10.83, 31, 3.56, 25.75 and 3.56 years of credited service, respectively, under the basic and supplemental retirement plans. (Mr. Norris' years of credited service include his eligible service with Grace from 1975 to 1981.) For purposes of those plans, the 2002 compensation of such executive officers was as follows: Mr. Norris -- $1,894,583; Mr. Bettacchi -- $633,000; Mr. Corcoran -- $427,667; Mr. Siegel -- $648,000; and Mr. Tarola -- $638,000. Messrs. Norris, Corcoran and Tarola are entitled to additional pension benefits under their employment agreements (see "Employment Agreements").

Employment Agreements. Paul J. Norris. Effective January 1, 2003, Mr. Norris entered into a letter agreement with Grace (the "Letter Agreement"), whereby his employment agreement, dated October 26, 1998 (the "1998 Agreement"), was extended beyond its original termination date of December 31, 2002, and was amended as described herein. Under the Letter Agreement, Mr. Norris' employment with Grace will continue until terminated by Grace or Mr. Norris. Except as amended by the Letter Agreement, the provisions of the 1998 Agreement remain applicable to Mr. Norris during his post-2002 employment term with Grace.

Under the 1998 Agreement, during his post-2002 employment term, Mr. Norris will continue to be entitled to an annual base salary of not less than $875,000. In addition, he will continue to participate in Grace's annual incentive compensation program, under which his targeted award will be at least 75% of his annual base salary. (Mr. Norris' annual base salary as of January 1, 2003 is $1,000,000.)

Under the terms of the Letter Agreement, on December 31, 2003, Mr. Norris will receive a $1,235,000 retention bonus for services performed during 2003; and on December 31, 2004, Mr. Norris will receive an additional retention bonus of $1,235,000 for services performed during 2004. Mr. Norris will not receive a retention bonus, if prior to the payment date of a retention bonus, he is terminated by Grace for cause. In addition, Mr. Norris will not receive a retention bonus, if prior to the payment date, he resigns his employment with Grace, unless such resignation is on the basis of constructive discharge. If Mr. Norris' employment is terminated on the basis of constructive discharge (or as a result of his death or disability) during 2003 or 2004, then he (or his beneficiary, in the case of death) will be entitled to a payment of a pro-rated portion of the retention bonus for the calendar year of termination, based on the portion of such calendar year that he remained an employee of Grace.

Under the 1998 Agreement, during his post-2002 employment term with Grace, if Mr. Norris' employment is terminated by Grace without cause or by Mr. Norris on the basis of constructive discharge, then he will be entitled to receive a severance payment equal to two times the dollar amount that equals 175% of his annual base salary at the time of such termination. Such payment will be made in a lump sum immediately after Mr. Norris' date of termination.

Under the Letter Agreement, Mr. Norris is obligated to provide Grace with at least 180 days written prior notice of his intention to resign his employment with Grace in order to receive certain benefits and payments upon termination, which were originally specified under the 1998 Agreement. Specifically, if Mr. Norris provides such timely notice, he will receive the following benefits and payments upon termination: (1) an award under Grace's annual incentive compensation program for the calendar year of termination, which will be pro-rated based on the portion of such calendar year that he remained an employee of Grace, (2) a supplemental pension payment (described below), (3) principal residence relocation assistance (described below), and (4) a payment of the cash component of any award made to Mr. Norris under Grace's long-term incentive plans, which will be pro-rated based on the portion of the applicable 3-year performance period that he remained an employee of Grace. Under the Letter Agreement, Mr. Norris will also be entitled to these benefits and payments if his employment terminates for any reason except cause. If Mr. Norris' employment is terminated for cause, he will not be entitled to those benefits and payments.

24

CC-BLG002402

If Mr. Norris becomes entitled to a supplemental pension payment as referenced above, then in determining the benefits payable to Mr. Norris under Grace's basic and supplemental retirement plans, his years of service with Grace and his prior employer will be recognized as if those years were continuous service with Grace, with an offset for any retirement benefits payable from his prior employer's retirement plans. In addition, the "final average compensation" used to determine his retirement benefits payable under Grace's basic and supplemental retirement plans will only consider compensation earned by Mr. Norris from and after his commencement of his current term of employment with Grace on November 1, 1998. Such payment would be made in a lump sum immediately after Mr. Norris' date of termination.

Also, if Mr. Norris does not receive supplemental retirement benefits under any Grace plan (as a result of any reduction regarding such a plan pursuant to any Chapter 11 proceeding or otherwise), then such supplemental benefits will become payable to Mr. Norris under his employment agreement.

If Mr. Norris becomes entitled to the principal residence relocation assistance referenced above, Grace will provide him with relocation assistance to any location within the continental United States selected by Mr. Norris. Such relocation assistance would include certain cash payments and other relocation assistance, as well as compensation for any loss incurred on the sale of his Maryland home.

The 1998 Agreement also provides for Mr. Norris' participation in other benefits and compensation programs, including benefits and programs generally available to other senior executives of Grace.

The forgoing description of Mr. Norris' employment agreement does not purport to be complete and is qualified in its entirety by reference to the 1998 Agreement, which has been filed with the SEC as Exhibit 10.20 to Grace's 2000 Annual Report on Form 10-K, and by reference to the Letter Agreement, which has been filed with the SEC as Exhibit 10.19 to this Report.

William M. Corcoran. Mr. Corcoran had an employment agreement with Grace that expired on May 31, 2002. Under terms of the agreement that survived the expiration date, if Mr. Corcoran is terminated without cause, he will generally be entitled to a severance payment equal to 137% of his annual base salary at the time of termination. (However, along with other executive officers and certain key employees of Grace, Mr. Corcoran has entered into a retention agreement with Grace, described below, under which he may be entitled to enhanced severance pay in lieu of, but not in addition to, the severance pay provided under his employment agreement.) In addition, the benefits payable to Mr. Corcoran under Grace's basic and supplemental retirement plans will continue to be determined by adding additional years of credited service under those plans. Generally, for each year of credited service under those plans that he actually earns during his period of employment with Grace, he will receive credit for an additional one-half year of credited service (up to a maximum of 5 additional years of credited service), except that in no event will he receive less than 5 years of credited service, regardless of the date his employment with Grace actually terminates. The foregoing description of Mr. Corcoran's employment agreement does not purport to be complete and is qualified in its entirety by reference to such agreement, which has been filed with the SEC as Exhibit 10.24 to Grace's 2000 Annual Report on Form 10-K.

David B. Siegel. Under terms of a January 1, 2001 agreement, Mr. Siegel continues to be entitled to an enhanced severance payment equal to two times his annual base salary if his employment is involuntarily terminated without cause under circumstances that would qualify him for severance pay under Grace's severance plan that generally covers salaried employees. In addition, on January 1, 2002, under the terms of such agreement, Mr. Siegel relocated from Florida to Columbia, Maryland, and received the relocation benefits generally available to all Grace employees who relocated to Maryland in conjunction with the relocation of Grace's corporate headquarters. Grace has further agreed to provide Mr. Siegel with post-employment relocation assistance (on the terms of the relocation policy in effect for active employees) under certain conditions; this further agreement has not yet been finalized.

25

CC-BLG002403

Robert M. Tarola. Mr. Tarola had an employment agreement that expired on November 10, 2002. Under terms of the agreement that survived the expiration date, if Mr. Tarola is terminated without cause, he will generally be entitled to a severance payment equal to 145% of his annual base salary at the time of termination. (However, along with the other executive officers and certain key employees of Grace, Mr. Tarola has entered into a retention agreement with Grace, described below, under which he may be entitled to enhanced severance pay in lieu of, but not in addition to, the severance pay provided under his employment agreement.) In addition, the benefits payable to Mr. Tarola under Grace's basic and supplemental retirement plans will continue to be determined by adding additional years of credited service under those plans. Generally, for each year of credited service under those plans that he actually earns during his period of employment with Grace, he will receive credit for one additional year of credited service (up to a maximum of 10 additional years of credited service), except that in no event will he receive less than 5 years of credited service, regardless of the date his employment with Grace actually terminates. The foregoing description of Mr. Tarola's employment agreement does not purport to be complete and is qualified in its entirety by reference to such agreement, which has been filed with the SEC as Exhibit 10.1 to Grace's Quarterly Report on Form 10-Q for the quarter ended June 30, 1999.

Change-in-Control Severance Agreements. In addition to the severance provisions described under "Retention Agreements" below, Grace has severance agreements with all of its executive officers, which renew automatically unless the Board of Directors of the Company elects not to renew them. These agreements generally provide that in the event of the involuntary termination of the individual's employment without cause (including constructive termination caused by a material reduction in his or her authority or responsibility or by certain other circumstances) following a "change in control" of Grace, he or she will generally receive a severance payment equal to three times the sum of his or her annual base salary plus target annual incentive compensation (bonus), subject to pro rata reduction in the case of an officer who is within 36 months of normal retirement age (65). For purposes of the severance agreements, "change in control" means the acquisition of 20% or more of the Common Stock (but not if such acquisition is the result of the sale of Common Stock by Grace that has been approved by the Board), the failure of Board-nominated directors to constitute a majority of any class of the Board of Directors, the occurrence of a transaction in which the shareholders of Grace immediately preceding such transaction do not own more than 50% of the combined voting power of the company resulting from such transaction, or the liquidation or dissolution of Grace. This description of the severance agreements does not purport to be complete and is qualified in its entirety by reference to the form of such agreement, which has been filed with the SEC as Exhibit 10.17 to this Report. As a result of Grace's Chapter 11 filing, the following events will not constitute a "change in control": (i) the acquisition by a trust of Common Stock, established for purposes of administering asbestos-related claims pursuant to a plan of reorganization, and (ii) a corporate transaction pursuant to Section 363 of the U.S. Bankruptcy Code or a plan of reorganization.

Retention Agreements. Effective January 1, 2001, Grace entered into retention agreements with each of the executive officers other than Messrs. Norris and Siegel, whose retention arrangements were covered by their respective employment agreements. These agreements were approved by the Compensation Committee in recognition of the adverse effect that the market performance of the Common Stock has had and is expected to continue to have on Grace's ability to attract and retain key employees. Under the terms of these agreements, each such executive officer received a payment in January 2001 equal to his annual base salary, subject to remaining employed with Grace through December 31, 2002. The retention payments are not considered compensation for purposes of any Grace benefit or compensation plans or programs. In addition to the retention payment, the retention agreements provide that in the event of the involuntary termination of such officer's employment under circumstances that would qualify such officer for severance pay under Grace's severance plan that generally covers salaried employees, then the officer would be entitled to severance pay equal to two times his or her annual base salary. With respect to any such officer who has any other agreement with Grace regarding the payment of severance upon termination of employment, if such

26

CC-BLG002404

officer becomes entitled to severance under both the terms of the retention agreement and such other agreement, then the officer would only receive severance pay under the retention agreement, unless the other agreement provides for a greater amount of severance pay (in which case, the officer would only receive severance pay under such other agreement).

Grace has implemented a new retention program for 2003 and 2004 under which each executive officer (except Mr. Norris, whose retention arrangement for those years is covered by his employment agreement) would be entitled to receive a payment equal to a designated percentage of his base salary if the officer remains employed with Grace for the entire year. For 2003, the percentage is 65% of base salary. The payment of the retention bonus will be made to each eligible executive officer at the end of the calendar year to which the payment relates. These retention payments are not considered compensation for purposes of any Grace benefit or compensation plans or programs.

Executive Salary Protection Plan. All executive officers participate in the Executive Salary Protection Plan ("ESPP"), which provides that, in the event of a participant's disability or death prior to age 70, Grace will continue to pay all or a portion of base salary to the participant or a beneficiary for a period based on the participant's age at the time of disability or death. Payments under the ESPP may not exceed 100% of base salary for the first year and 60% thereafter in the case of disability (50% in the case of death). This description of the ESPP does not purport to be complete and is qualified in its entirety by reference to the text of the ESPP, as amended, which is filed as Exhibit 10.8 to Grace's 2001 Annual Report on Form 10-K.

Effect of Chapter 11 Filing. The U.S. Bankruptcy Court has approved the employment agreements and the continuation of the executive compensation and benefit agreements and programs described above. The continuation of these agreements and programs, and the establishment of new programs may be affected by the Chapter 11 proceedings.

Directors' Compensation. Under the compensation program for nonemployee directors in effect for 2002, each nonemployee director received an annual retainer of $50,000, 50% of which was paid in cash and 50% of which was paid in the form of Common Stock. In addition, directors received $4,000 ($5,000 for directors holding a committee chair) in cash for each meeting date in respect of the Board meeting and all committee meetings held on such date. The same compensation program will be effective during 2003. Grace reimburses nonemployee directors for expenses they incur in attending Board and committee meetings. Grace also maintains business travel accident insurance coverage for them.

Compensation Committee Interlocks and Insider Participation. During 2002, the Compensation Committee of the Board was comprised of Messrs. Akers
(Chair), Baldwin, Cambre, Murphy and Vanderslice, and Dr. Fox. None of such persons is a current or former officer or employee of Grace or any of its subsidiaries, nor did any of such persons have any reportable transactions with Grace or any of its subsidiaries.

## ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

Security Ownership. The following table sets forth the Common Stock beneficially owned, directly or indirectly, as of January 31, 2003 by (1) each person known to Grace to be the beneficial owner of more than 5% of the outstanding shares of Common Stock, and (2) each current director, each of the executive officers named in the Summary Compensation Table set forth in Item 11 above, and such directors and all executive officers as a group.

CC-BLG002405

| Beneficial Owner | Shares of Common Stock Beneficially Owned | | Percent |
|---|---|---|---|
| Peninsula Partners, L.P. (1)........................ 404B East Main Street, 2nd Floor Charlottesville, VA 22902 | 10,765,600 | | 16.43% |
| J. F. Akers ...................................... | 29,737 74,535 15,196 | (O) (T) | * |
| H. F. Baldwin ................................... | 12,659 | | * |
| R. J. Bettacchi ................................. | 617,264 24,675 | (O) (T) | * |
| R. C. Cambre .................................... | 54,876 | | * |
| W. M. Corcoran .................................. | 10,000 67,367 1,265 | (O) (T) | * |
| M. A. Fox ....................................... | 31,987 8,942 | (T) | * |
| J. J. Murphy .................................... | 29,671 15,528 18,629 | (O) (T) | * |
| P. J. Norris ................................... | 138,822 1,458,719 1,071 | (O) (T) | 2.39% |
| D. B. Siegel ................................... | 15,100 352,187 20,832 | (O) (T) | * |
| R. M. Tarola ................................... | 15,000 168,600 50 | (O) (T) | * |
| T. A. Vanderslice ............................... | 30,263 69,876 14,932 | (O) (T) | * |
| Directors and executive officers as a group ........ | 378,115 3,134,589 122,010 | (O) (T) | 5.29% |

* Indicates less than 1%

(O) Shares covered by stock options exercisable on or within 60 days after January 31, 2003.

(T) Shares owned by trusts and other entities as to which the person has the power to direct voting and/or investment.

(1) The ownership information set forth is based in its entirety on material contained in a Form 4 report dated September 10, 2001 filed with the SEC.

28

CC-BLG002406

Equity Compensation Plan Information. The following table sets forth information as of December 31, 2002 with respect to Grace's compensation plans under which shares of Common Stock are authorized for issuance upon the exercise of options, warrants or other rights. The only such compensation plans in effect are stock incentive plans providing for the issuance of stock options. All such plans have been approved by Grace's shareholders.

| Plan category | Number of securities to be issued upon exercise of outstanding options (a) | Weighted-average exercise price of outstanding options (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 10,199,610 | $11.90 | 4,468,504 |

## ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

Commercial Transactions. During 2002, no director, executive officer (or any member of any of their respective immediate families) or, to the Company's knowledge, any holder of more than 5% of the Common Stock, had a direct or indirect material interest in any transaction (or any proposed transaction) to which the Company was (or will become) a party.

Loans to Officers. In April 2002, the Company made a $75,000 interest-free loan to Mr. Siegel under the terms of Grace's relocation policy covering employees relocating from Boca Raton, Florida to Columbia, Maryland. The loan is forgiven over a three year period so long as Mr. Siegel remains with the Company. The balance of such loan as of December 31, 2002 was $57,300.

Legal Proceedings; Indemnification. During 2002 there were no legal proceedings pending in which any current officers or directors of the Company were parties adverse to, or had a material interest adverse to, the Company.

## ITEM 14. CONTROLS AND PROCEDURES

The information called for by this Item appears under the heading "Controls and Procedures" on page F-55 of the Financial Supplement, which is incorporated herein by reference.

PART IV

## ITEM 15. EXHIBITS, FINANCIAL STATEMENT SCHEDULES, AND REPORTS ON FORM 8-K

Financial Statements and Schedules. See the Index to Consolidated Financial Statements and Financial Statement Schedule and Exhibit on page F-2 of the Financial Supplement.

CC-BLG002407

Reports on Form 8-K. The Company did not file any Reports on Form 8-K during the fourth quarter of 2002.

Exhibits. The exhibits to this Report are listed below. Other than exhibits that are filed herewith, all exhibits listed below are incorporated by reference. Exhibits indicated by an asterisk (*) are the management contracts and compensatory plans, contracts or arrangements required to be filed as exhibits to this Report.

For purposes of describing these exhibits, "Old Grace" means W. R. Grace & Co., a Delaware corporation (subsequently renamed Sealed Air Corporation), a predecessor to the Company, and "Grace New York" means W. R. Grace & Co., a New York corporation (subsequently renamed Fresenius Medical Care Holdings, Inc.), a predecessor to Old Grace.

| EXHIBIT NO. | EXHIBIT | WHERE LOCATED |
|---|---|---|
| 2.1 | Form of Distribution Agreement, by and among Old Grace, W. R. Grace & Co.-Conn. and Grace Specialty Chemicals, Inc. (now named W. R. Grace & Co.) | Annex B to the Joint Proxy Statement/Prospectus dated February 13, 1998 of Old Grace and Sealed Air Corporation included in Form S-4 (filed 2/13/98) |
| 3.1 | Restated Certificate of Incorporation of W. R. Grace & Co. | Exhibit 3.1 to Form 8-K (filed 4/9/98) |
| 3.2 | Amended and Restated By-laws of W. R. Grace & Co. | Exhibit 3.2 to Form 10-K (filed 3/28/02) |
| 4.1 | Rights Agreement dated as of March 31, 1998 between W. R. Grace & Co. and The Chase Manhattan Bank, as Rights Agent | Exhibit 4.1 to Form 8-K (filed 4/8/98) |
| 4.2 | Credit Agreement dated as of May 14, 1998, among W. R. Grace & Co.-Conn., W. R. Grace & Co., the several banks parties thereto; the co-agents signatories thereto; The Chase Manhattan Bank, as administrative agent for such banks; and Chase Securities Inc., as arranger | Exhibit 4.1 to Form 10-Q (filed 8/14/98) |
| 4.3 | 364-Day Credit Agreement, dated as of May 5, 1999, among W. R. Grace & Co.-Conn.; W. R. Grace & Co.; the several banks parties thereto; the co-agents signatories thereto; Bank of America National Trust and Savings Association, as documentation agent; The Chase Manhattan Bank, as administrative agent for such banks; and Chase Securities Inc., as book manager | Exhibit 4.1 to Form 10-Q (filed 8/3/99) |
| 4.4 | First Amendment to 364-Day Credit Agreement dated as of May 5, 1999 among W. R. Grace & Co.-Conn.; W. R. Grace & Co.; the several banks | Exhibit 4 to Form 10-Q (filed 8/15/00) |

30

CC-BLG002408

parties thereto; Bank of America National Trust and
Savings Association, as document agent; The Chase
Manhattan Bank, as administrative agent for such banks;
and Chase Securities, Inc., as bank manager

| | | |
|---|---|---|
| 4.5 | Post-Petition Loan and Security Agreement dated as of April 1, 2001 among the financial institutions named therein, as Lenders, Bank of America, N.A. as Agent, and W. R. Grace & Co. and its subsidiaries named therein as Debtors and Debtors-in-Possession, as Borrowers | Exhibit 4 to Form 10-Q (filed 8/14/01) |
| 10.1 | Form of Employee Benefits Allocation Agreement, by and among Old Grace, W. R. Grace & Co.-Conn. and Grace Specialty Chemicals, Inc. (now named W. R. Grace & Co.) | Filed herewith |
| 10.2 | Form of Tax Sharing Agreement, by and among Old Grace, W. R. Grace & Co.-Conn. and Grace Specialty Chemicals, Inc. (now named W. R. Grace & Co.) | Filed herewith |
| 10.3 | W. R. Grace & Co. 2000 Stock Incentive Plan, as amended | Exhibit 10 to Form 10-Q (filed 8/15/00) * |
| 10.4 | W. R. Grace & Co. 1998 Stock Incentive Plan | Filed herewith* |
| 10.5 | W. R. Grace & Co. 1998 Stock Plan for Nonemployee Directors | Filed herewith* |
| 10.6 | W. R. Grace & Co. 1996 Stock Incentive Plan, as amended | Exhibit 10.4 to Form 10-Q (filed 5/15/98) * |
| 10.7 | W. R. Grace & Co. Supplemental Executive Retirement Plan, as amended | Exhibit 10.7 to Form 10-K (filed 3/28/02) * |
| 10.8 | W. R. Grace & Co. Executive Salary Protection Plan, as amended | Exhibit 10.8 to Form 10-K (filed 3/28/02) * |
| 10.9 | W. R. Grace & Co. 1986 Stock Incentive Plan, as amended | Exhibit 10.9 to Form 10-K (filed 3/28/02) * |
| 10.10 | W. R. Grace & Co. 1989 Stock Incentive Plan, as amended | Exhibit 10.10 to Form 10-K (filed 3/28/02) * |
| 10.11 | W. R. Grace & Co. 1994 Stock Incentive Plan, as amended | Exhibit 10.11 to Form 10-K (filed 3/28/02) * |

31

CC-BLG002409

| 10.12 | Forms of Stock Option Agreements | Exhibit 10.15 to Form 10-K (filed 3/29/99)* |
|-------|----------------------------------|---------------------------------------------|
| 10.13 | Form of Stock Option Agreements | Exhibit 10.14 to Registration Statement on Form S-1 of Old Grace (filed 8/2/96)* |
| 10.14 | Form of Stock Option Agreements | Exhibit 10.5 to Form 10-Q (filed 5/15/98)* |
| 10.15 | Form of 2001-2003 Long Term Incentive Program Award | Exhibit 10.23 to Form 10-K (filed 4/16/01)* |
| 10.16 | Form of 2002-2004 Long-Term Incentive Program Award | Filed herewith* |
| 10.17 | Form of Executive Severance Agreement between W. R. Grace & Co. and officers | Filed herewith* |
| 10.18 | Employment Agreement, dated January 1, 2001, by and between W. R. Grace & Co. and Paul J. Norris | Exhibit 10.20 to Form 10-K (filed 4/16/01)* |
| 10.19 | Amendment dated November 6, 2002 to Employment Agreement between W. R. Grace & Co. and Paul J. Norris | Filed herewith* |
| 10.20 | Employment Agreement dated May 11, 1999 between W. R. Grace & Co.-Conn. and Robert M. Tarola | Exhibit 10.1 to Form 10-Q (filed 8/13/99)* |
| 10.21 | Letter Agreement dated January 30, 2001 between Paul J. Norris, on behalf of W. R. Grace & Co., and David B. Siegel | Exhibit 10.22 to Form 10-K (filed 4/16/01)* |
| 10.22 | Letter Agreement dated May 7, 1999 between Paul J. Norris, on behalf of W. R. Grace & Co., and William M. Corcoran | Exhibit 10.24 to Form 10-K (filed 4/16/01)* |
| 10.23 | Form of Indemnification Agreement between W. R. Grace & Co. and certain Officers and Directors | Exhibit 10.27 to Form 10-K (filed 4/16/01)* |
| 10.24 | Form of Retention Agreement for 2001-2002 | Exhibit 10.28 to Form 10-K (filed 4/16/01)* |
| 10.25 | Form of Retention Agreement for 2003-2004 | Filed herewith* |
| 10.26 | Annual Incentive Compensation Program | Filed herewith* |

32

CC-BLG002410

| | | |
|---|---|---|
| 12 | Computation of Ratio of Earnings to Fixed Charges and Combined Fixed Charges and Preferred Stock Dividends | Filed herewith in Financial Supplement to Grace's 2002 Form 10-K |
| 21 | List of Subsidiaries of W. R. Grace & Co. | Filed herewith |
| 23 | Consent of Independent Accountants | Filed herewith in Financial Supplement to Grace's 2002 Form 10-K |
| 24 | Powers of Attorney | Filed herewith |
| 99.1 | Certification of Periodic Report by Chief Executive Officer under Section 906 of the Sarbanes-Oxley Act of 2002 | Filed herewith |
| 99.2 | Certification of Periodic Report by Chief Financial Officer under Section 906 of the Sarbanes-Oxley Act of 2002 | Filed herewith |

33

CC-BLG002411

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this Report to be signed on its behalf by the undersigned, thereto duly authorized.

**W. R. GRACE & CO.**

```
                              By: /s/ Paul J. Norris
                                  -------------------
                                  Paul J. Norris
                                  (Chairman, President and
                                  Chief Executive Officer)

                              By: /s/ Robert M. Tarola
                                  -------------------
                                  Robert M. Tarola
                                  (Senior Vice President and
                                  Chief Financial Officer)
```

        Dated: March 13, 2003

Pursuant to the requirements of the Securities Exchange Act of 1934, this Report has been signed below by the following persons on behalf of the registrant and in the capacities indicated on March 13, 2003.

```
        Signature                     Title

        J. F. Akers*           }
        H. F. Baldwin*         }
        R. C. Cambre*          }
        M. A. Fox*             }      Directors
        J. J. Murphy*          }
        T. A. Vanderslice*     }


     /s/ Paul J. Norris               President and Director
     --------------------------       (Principal Executive Officer)
         Paul J. Norris


     /s/ Robert M. Tarola             Senior Vice President and Chief
     --------------------------       Financial Officer (Principal Financial
         (Robert M. Tarola)           Officer and Principal Accounting
                                      Officer)


     --------------------------
```

* By signing his name hereto, Mark A. Shelnitz is signing this document on behalf of each of the persons indicated above pursuant to powers of attorney duly executed by such persons and filed with the Securities and Exchange Commission.

```
                        By: /s/ Mark A. Shelnitz
                            --------------------
                            Mark A. Shelnitz
                            (Attorney-in-Fact)
```

34

CC-BLG002412

# CERTIFICATION

I, Paul J. Norris, certify that:

1. I have reviewed this annual report on Form 10-K of W. R. Grace & Co.;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and have:

a) designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

b) evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

c) presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officers and I have indicated in this annual report whether there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Date:  March 13, 2003

/s/ Paul J. Norris
----------------------
Paul J. Norris
Chairman, President and
Chief Executive Officer

35

CC-BLG002413

CERTIFICATION

I, Robert M. Tarola, certify that:

1. I have reviewed this annual report on Form 10-K of W. R. Grace & Co.;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and have:

a) designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

b) evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

c) presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officers and I have indicated in this annual report whether there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

```
          Date:  March 13, 2003


                                    /s/ Robert M. Tarola
                                    --------------------
                                    Robert M. Tarola
                                    Senior Vice President and
                                    Chief Financial Officer
```

36

CC-BLG002414

FINANCIAL SUPPLEMENT

**W. R. GRACE & CO.**
**ANNUAL REPORT ON FORM 10-K**
**FOR THE YEAR ENDED DECEMBER 31, 2002**

F-1

CC-BLG002415

FINANCIAL SUPPLEMENT
TO
**ANNUAL REPORT ON FORM 10-K FOR THE YEAR ENDED DECEMBER 31, 2002**

## W. R. GRACE & CO. AND SUBSIDIARIES

Index to Consolidated Financial Statements and Financial Statement Schedule and Exhibit

```
Management's Responsibility for Financial Reporting...............................  F-3
Report of Independent Accountants................................................  F-4
Report of Independent Accountants on Financial Statement Schedule................  F-5
Consent of Independent Accountants...............................................  F-5
Consolidated Statement of Operations for the three years in the
     period ended December 31, 2002..............................................  F-6
Consolidated Statement of Cash Flows for the three years in the
     period ended December 31, 2002..............................................  F-7
Consolidated Balance Sheet at December 31, 2002 and 2001.........................  F-8
Consolidated Statement of Shareholders' Equity (Deficit) for the three
     years in the period ended December 31, 2002.................................  F-9
Consolidated Statement of Comprehensive (Loss) Income for the three
     years in the period ended December 31, 2002.................................  F-9
Notes to Consolidated Financial Statements.......................................  F-10 - F-34
Financial Summary................................................................  F-35
Management's Discussion and Analysis of Results of Operations
     and Financial Condition.....................................................  F-36 - F-52

Financial Statement Schedule
     Schedule II  - Valuation and Qualifying Accounts and Reserves...............  F-53

Exhibit 12:  Computation of Ratio of Earnings to Fixed Charges and
     Combined Fixed Charges and Preferred Stock Dividends........................  F-54


Report on Internal Controls and Procedures ......................................  F-55
```

The financial data listed above appearing in this Financial Supplement are incorporated by reference herein. The Financial Statement Schedule should be read in conjunction with the Consolidated Financial Statements and Notes thereto. Financial statements of less than majority-owned persons and other persons accounted for by the equity method have been omitted as provided in Rule 3-09 of Securities and Exchange Commission Regulation S-X. Financial Statement Schedules not included have been omitted because they are not applicable or the required information is shown in the Consolidated Financial Statements or Notes thereto.

F-2

CC-BLG002416

analysis

# MANAGEMENT'S RESPONSIBILITY FOR FINANCIAL REPORTING

Management is responsible for the preparation, integrity and objectivity of the Consolidated Financial Statements and the other financial information included in this report. Such financial information has been prepared in conformity with accounting principles generally accepted in the United States of America and accordingly includes certain amounts that represent management's best estimates and judgments. Actual amounts could differ from those estimates.

Management maintains internal control systems to assist it in fulfilling its responsibility for financial reporting. These systems include business, accounting and reporting policies and procedures, selection of personnel, segregation of duties and an internal audit function. For 2002, a Disclosure Committee was established to oversee Grace's public financial reporting process; and executives and certain managers were required to confirm their compliance with Grace's policies and internal control systems. While no system can ensure elimination of all errors and irregularities, Grace's systems, which are reviewed and modified in response to changing conditions, have been designed to provide reasonable assurance that assets are safeguarded, policies and procedures are followed and transactions are properly executed and reported and appropriate disclosures are made. The concept of reasonable assurance is based on the recognition that there are limitations in all systems of internal control and that the costs of such systems should not exceed their benefits.

The Audit Committee of the Board of Directors, which is comprised solely of independent directors, meets regularly with Grace's senior financial management, internal auditors and independent accountants to review audit plans and results, as well as the actions taken by management in discharging its responsibilities for accounting, financial reporting and internal control systems. The Audit Committee reports its findings to the Board of Directors. The Audit Committee is responsible for the selection of the independent accountants. Grace's financial management, internal auditors and independent accountants have direct and confidential access to the Audit Committee at all times.

The independent accountants are engaged to conduct the audits of and report on the Consolidated Financial Statements in accordance with auditing standards generally accepted in the United States of America. These standards require an assessment of the systems of internal controls and tests of transactions to the extent considered necessary by the independent accountants for purposes of supporting their opinion as set forth in their report.

/s / Paul J. Norris
Paul J. Norris
Chairman, President and
Chief Executive Officer

March 13, 2003

/s/ Robert M. Tarola
Robert M. Tarola
Senior Vice President and
Chief Financial Officer

F-3

CC-BLG002417

**REPORT OF INDEPENDENT ACCOUNTANTS**

**TO THE SHAREHOLDERS AND BOARD OF DIRECTORS OF**
**W. R. GRACE & CO.**

In our opinion, the accompanying consolidated balance sheet and the related consolidated statements of operations, of cash flows, of shareholders' equity (deficit) and of comprehensive loss, present fairly, in all material respects, the financial position of W. R. Grace & Co. and its subsidiaries at December 31, 2002 and 2001, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2002, in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the consolidated financial statements, on April 2, 2001, the Company and substantially all of its domestic subsidiaries voluntarily filed for protection under Chapter 11 of the United States Bankruptcy Code, which raises substantial doubt about the Company's ability to continue as a going concern in its present form. Management's intentions with respect to this matter are also described in Note 1. The accompanying consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

/s/ PricewaterhouseCoopers LLP
PricewaterhouseCoopers LLP
Baltimore, Maryland
January 29, 2003

F-4

CC-BLG002418

# REPORT OF INDEPENDENT ACCOUNTANTS ON FINANCIAL STATEMENT SCHEDULE

**TO THE SHAREHOLDERS AND BOARD OF DIRECTORS OF W. R. GRACE & CO.**

Our audits of the consolidated financial statements referred to in our report dated January 29, 2003, which was modified as to a matter raising substantial doubt about the Company's ability to continue as a going concern, appearing on page F-4 of this 2002 Annual Report on Form 10-K of W. R. Grace & Co. also included an audit of the Financial Statement Schedule listed on page F-2 in the Index to Consolidated Financial Statements and Financial Statement Schedule and Exhibit of this Form 10-K. In our opinion, this Financial Statement Schedule presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements.

```
/s/ PricewaterhouseCoopers LLP
PricewaterhouseCoopers LLP
Baltimore, Maryland
January 29, 2003
```

## CONSENT OF INDEPENDENT ACCOUNTANTS

We hereby consent to the incorporation by reference in the Registration Statements on Form S-8 (Nos. 333-37024, 333-49083, 333-49507, 333-49509, 333-49511, 333-49513, 333-49515, 333-49703 and 333-49705) of W. R. Grace & Co. of our report dated January 29, 2003 appearing on page F-4 of this 2002 Annual Report on Form 10-K of W. R. Grace & Co. We also consent to the incorporation by reference of our report dated January 29, 2003 relating to the Financial Statement Schedule, which appears above in this Form 10-K.

```
/s/ PricewaterhouseCoopers LLP
PricewaterhouseCoopers LLP
Baltimore, Maryland
March 13, 2003
```

F-5

CC-BLG002419

**CONSOLIDATED FINANCIAL STATEMENTS**

```
================================================================================
W. R. GRACE & CO. AND SUBSIDIARIES
CONSOLIDATED STATEMENT OF OPERATIONS                    YEAR ENDED DECEMBER 31,
--------------------------------------------------------------------------------
```

| Amounts in millions, except per share amounts | 2002 | 2001 | 2000 |
|---|---|---|---|
| Net sales | $ 1,817.2 | $ 1,723.2 | $ 1,597.4 |
| Other income | 23.2 | 31.2 | 49.5 |
| | 1,840.4 | 1,754.4 | 1,646.9 |
| | | | |
| Cost of goods sold, exclusive of depreciation and amortization shown separately below | 1,148.9 | 1,079.4 | 973.9 |
| Selling, general and administrative expenses | 362.4 | 332.2 | 312.7 |
| Research and development expenses | 51.7 | 49.4 | 45.7 |
| Depreciation and amortization | 94.6 | 89.0 | 87.8 |
| Interest expense and related financing costs | 20.0 | 37.1 | 28.1 |
| Provision for environmental remediation | 70.7 | 5.8 | 10.4 |
| Provision for asbestos-related litigation, net of insurance | -- | -- | 208.0 |
| | 1,748.3 | 1,592.9 | 1,666.6 |
| | | | |
| Income (loss) before Chapter 11 expenses, income taxes, and minority interest | 92.1 | 161.5 | (19.7) |
| Chapter 11 reorganization expenses, net | (30.1) | (15.7) | -- |
| Provision for income taxes | (38.0) | (63.7) | (70.0) |
| Minority interest in consolidated entities | (1.9) | (3.5) | -- |
| NET INCOME (LOSS) | $ 22.1 | $ 78.6 | $ (89.7) |
| | | | |
| BASIC EARNINGS (LOSS) PER SHARE: | | | |
| Net income (loss) | $ 0.34 | $ 1.20 | $ (1.34) |
| Weighted average number of basic shares | 65.4 | 65.3 | 66.8 |
| DILUTED EARNINGS (LOSS) PER SHARE: | | | |
| Net income (loss) | $ 0.34 | $ 1.20 | $ (1.34) |
| Weighted average number of diluted shares | 65.5 | 65.4 | 66.8 |

The Notes to Consolidated Financial Statements are an integral part of these statements.

F-6

CC-BLG002420

W. R. GRACE & CO. AND SUBSIDIARIES
CONSOLIDATED STATEMENT OF CASH FLOWS

YEAR ENDED DECEMBER 31,

| Dollars in millions | 2002 | 2001 | 2000 |
|---|---|---|---|
| OPERATING ACTIVITIES | | | |
| Income (loss) before Chapter 11 expenses, income taxes, and minority interest | $ 92.1 | $ 161.5 | $ (19.7) |
| Reconciliation to cash provided by operating activities: | | | |
| Depreciation and amortization | 94.6 | 89.0 | 87.8 |
| Interest accrued on pre-petition debt subject to compromise | 14.5 | 23.2 | -- |
| Gain on sales of investments | (1.2) | (7.9) | (19.0) |
| Gain on disposals of assets | (0.7) | (1.8) | (5.5) |
| Provision for environmental remediation | 70.7 | 5.8 | 10.4 |
| Provision for asbestos-related litigation, net of insurance | -- | -- | 208.0 |
| Income from life insurance policies, net | (4.7) | (5.4) | (6.4) |
| Changes in assets and liabilities, excluding effect of businesses acquired/divested and foreign currency translation: | | | |
| Decrease (increase) in working capital items | 23.1 | (60.9) | (28.7) |
| Increase in accounts receivable due to termination of securitization program | -- | (65.3) | -- |
| Expenditures for asbestos-related litigation | (13.1) | (109.6) | (281.8) |
| Proceeds from asbestos-related insurance | 10.8 | 78.8 | 95.6 |
| Expenditures for environmental remediation | (20.0) | (24.9) | (36.8) |
| Expenditures for postretirement benefits | (21.5) | (22.3) | (23.0) |
| Net expenditures for retained obligations of discontinued operations | (5.3) | (13.1) | (34.9) |
| Changes in accruals and other non-cash items | 15.0 | 7.3 | (51.4) |
| NET CASH PROVIDED BY (USED FOR) OPERATING ACTIVITIES BEFORE INCOME TAXES AND CHAPTER 11 REORGANIZATION EXPENSES | 254.3 | 54.4 | (115.4) |
| Chapter 11 reorganization expenses paid, net | (27.1) | (11.8) | -- |
| Income taxes paid, net of refunds | (31.8) | (27.9) | (28.3) |
| NET CASH PROVIDED BY (USED FOR) OPERATING ACTIVITIES | 195.4 | 14.7 | (143.7) |
| | | | |
| INVESTING ACTIVITIES | | | |
| Capital expenditures | (91.1) | (62.9) | (64.8) |
| Businesses acquired in purchase transactions, net of cash acquired | (28.5) | (84.4) | (49.0) |
| Investments in life insurance policies | (16.4) | (17.6) | (29.8) |
| Proceeds from life insurance policies | 19.4 | 18.0 | 18.7 |
| Proceeds from sales of investments | 0.9 | 7.9 | 19.0 |
| Proceeds from disposals of assets | 5.0 | 7.6 | 11.9 |
| NET CASH USED FOR INVESTING ACTIVITIES | (110.7) | (131.4) | (94.0) |
| | | | |
| FINANCING ACTIVITIES | | | |
| Proceeds from loans secured by cash value of life insurance, net of repayments | (5.1) | 33.7 | (5.2) |
| Borrowings under credit facilities, net of repayments | (3.1) | 93.5 | 311.3 |
| Borrowings under debtor-in-possession facility, net of fees | 19.0 | 71.5 | -- |
| Repayments of term debt | -- | -- | (24.7) |
| Repayments of borrowings under debtor-in-possession facility | (20.0) | (75.0) | -- |
| Exercise of stock options | -- | -- | 5.8 |
| Purchase of treasury stock | -- | (0.6) | (47.3) |
| NET CASH (USED FOR) PROVIDED BY FINANCING ACTIVITIES | (9.2) | 123.1 | 239.9 |
| Effect of currency exchange rate changes on cash and cash equivalents | 16.1 | (6.9) | (10.1) |
| INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | 91.6 | (0.5) | (7.9) |
| CASH AND CASH EQUIVALENTS, BEGINNING OF PERIOD | 191.4 | 191.9 | 199.8 |
| CASH AND CASH EQUIVALENTS, END OF PERIOD | $ 283.0 | $ 191.4 | $ 191.9 |

The Notes to Consolidated Financial Statements are an integral part of these statements.

F-7

```
=================================================================================
W. R. GRACE & CO. AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEET                                      DECEMBER 31,
---------------------------------------------------------------------------------
Amounts in millions, except par value and shares             2002        2001
                                                          ----------  ----------
ASSETS
CURRENT ASSETS
Cash and cash equivalents ..............................  $   283.0  $   191.4
Accounts and other receivables, net ....................      311.3      302.1
Inventories ............................................      172.4      180.0
Deferred income taxes ..................................       28.0       22.5
Asbestos-related insurance expected to be realized within one year .......      --         9.7
Other current assets ...................................       35.7       30.2
                                                          ----------  ----------
        TOTAL CURRENT ASSETS ...........................      830.4      735.9

Properties and equipment, net of accumulated depreciation and
        amortization of $1,069.8 (2001 - $995.3) .......      620.8      589.0
Goodwill ...............................................       65.2       55.8
Cash value of life insurance policies, net of policy loans ...............       82.4       75.6
Deferred income taxes ..................................      566.7      502.9
Asbestos-related insurance expected to be realized after one year ........      282.6      283.7
Other assets ...........................................      239.6      275.5
                                                          ----------  ----------
        TOTAL ASSETS ...................................  $ 2,687.7  $ 2,518.4
                                                          ==========  ==========

LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT)
LIABILITIES NOT SUBJECT TO COMPROMISE
CURRENT LIABILITIES
Debt payable within one year ...........................  $     3.4  $     6.3
Accounts payable .......................................       98.2       86.3
Income taxes payable ...................................       11.4       14.4
Other current liabilities ..............................      130.3      126.3
                                                          ----------  ----------
        TOTAL CURRENT LIABILITIES ......................      243.3      233.3

Deferred income taxes ..................................       30.5       20.8
Other liabilities ......................................      301.3       94.5
                                                          ----------  ----------
        TOTAL LIABILITIES NOT SUBJECT TO COMPROMISE ....      575.1      348.6
                                                          ----------  ----------
LIABILITIES SUBJECT TO COMPROMISE - NOTE 2 .............    2,334.7    2,311.5
                                                          ----------  ----------
        TOTAL LIABILITIES ..............................    2,909.8    2,660.1
                                                          ----------  ----------
COMMITMENTS AND CONTINGENCIES

SHAREHOLDERS' EQUITY (DEFICIT)
Common stock issued, par value $.01; 300,000,000 shares authorized;
        outstanding: 2002 - 65,466,725 (2001 - 65,399,600) ...............        0.8        0.8
Paid-in capital ........................................      433.0      433.0
Retained earnings (accumulated deficit) ................     (115.7)    (137.8)
Treasury stock, at cost: shares: 2002 - 11,513,035; (2001 - 11,500,800) ..     (137.0)    (137.0)
Accumulated other comprehensive loss ...................     (403.2)    (300.7)
                                                          ----------  ----------
        TOTAL SHAREHOLDERS' EQUITY (DEFICIT) ...........     (222.1)    (141.7)
                                                          ----------  ----------
        TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT) ...............  $ 2,687.7  $ 2,518.4
=================================================================================
```

The Notes to Consolidated Financial Statements are an integral part of these statements.

F-8

CC-BLG002422

W. R. GRACE & CO. AND SUBSIDIARIES
CONSOLIDATED STATEMENT OF SHAREHOLDERS' EQUITY (DEFICIT)

| Dollars in millions | Common Stock and Paid-in Capital | Retained Earnings (Accumulated Deficit) | Deferred Compensation Trust | Treasury Stock | Accumulated Other Comprehensive Loss | TOTAL SHAREHOLDERS' EQUITY (DEFICIT) |
|---|---|---|---|---|---|---|
| BALANCE, DECEMBER 31, 1999....... | $    423.4 | $   (126.7) | $    (0.6) | $   (89.1) | $    (95.9) | $   111.1 |
| Net loss ....................... | -- | (89.7) | -- | -- | -- | (89.7) |
| Purchase of common stock ........ | -- | -- | -- | (47.3) | -- | (47.3) |
| Shares issued under stock plans.. | 9.4 | -- | -- | -- | -- | 9.4 |
| Rabbi trust activity............ | 0.2 | -- | (0.8) | -- | -- | (0.6) |
| Rabbi trust obligations.......... | -- | -- | 1.4 | -- | -- | 1.4 |
| Other comprehensive loss ........ | -- | -- | -- | -- | (55.6) | (55.6) |
| BALANCE, DECEMBER 31, 2000....... | $    433.0 | $   (216.4) | $      -- | $  (136.4) | $   (151.5) | $   (71.3) |
| Net income ..................... | $      -- | $    78.6 | $      -- | $     -- | $      -- | $    78.6 |
| Purchase of common stock........ | -- | -- | -- | (0.6) | -- | (0.6) |
| Shares issued under stock plans.. | 0.8 | -- | -- | -- | -- | 0.8 |
| Other comprehensive loss ........ | -- | -- | -- | -- | (149.2) | (149.2) |
| BALANCE, DECEMBER 31, 2001....... | $    433.8 | $   (137.8) | $      -- | $  (137.0) | $   (300.7) | $  (141.7) |
| Net income ..................... | $      -- | $    22.1 | $      -- | $     -- | $      -- | $    22.1 |
| Other comprehensive loss........ | -- | -- | -- | -- | (102.5) | (102.5) |
| BALANCE, DECEMBER 31, 2002....... | $    433.8 | $   (115.7) | $      -- | $  (137.0) | $   (403.2) | $  (222.1) |

W. R. GRACE & CO. AND SUBSIDIARIES
CONSOLIDATED STATEMENT OF COMPREHENSIVE LOSS                           YEAR ENDED DECEMBER 31,

| Dollars in millions | 2002 | 2001 | 2000 |
|---|---|---|---|
| NET INCOME (LOSS)................................................ | $   22.1 | $   78.6 | $  (89.7) |
| OTHER COMPREHENSIVE LOSS: | | | |
| Foreign currency translation adjustments............................ | 45.3 | (24.6) | (34.1) |
| Net unrealized losses on investments, net of income taxes............ | (0.1) | (0.2) | (17.7) |
| Minimum pension liability adjustments, net of income taxes........... | (147.7) | (124.4) | (3.8) |
| Total other comprehensive loss........................................ | (102.5) | (149.2) | (55.6) |
| COMPREHENSIVE LOSS.................................................... | $  (80.4) | $  (70.6) | $ (145.3) |

The Notes to Consolidated Financial Statements are an integral part of these statements.

F-9

CC-BLG002423

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
(Dollars in millions unless otherwise stated)

## 1. BASIS OF PRESENTATION AND SUMMARY OF SIGNIFICANT ACCOUNTING AND FINANCIAL REPORTING POLICIES

W. R. Grace & Co., through its subsidiaries, is engaged in specialty chemicals and specialty materials businesses on a worldwide basis. These businesses consist of catalysts and silica products ("Davison Chemicals") and construction chemicals, building materials and sealants and coatings ("Performance Chemicals").

W. R. Grace & Co. conducts substantially all of its business through a direct, wholly owned subsidiary, W. R. Grace & Co.-Conn. ("Grace-Conn."). Grace-Conn. owns substantially all of the assets, properties and rights of W. R. Grace & Co., either directly or through subsidiaries.

As used in these notes, the term "Company" refers to W. R. Grace & Co. The term "Grace" refers to the Company and/or one or more of its subsidiaries and, in certain cases, their respective predecessors.

VOLUNTARY BANKRUPTCY FILING: In response to a sharply increasing number of asbestos-related bodily injury claims, on April 2, 2001 (the "Filing Date"), W. R. Grace & Co. and 61 of its United States subsidiaries and affiliates, including Grace-Conn. (collectively, the "Debtors"), filed voluntary petitions for reorganization (the "Filing") under Chapter 11 of the United States Bankruptcy Code ("Chapter 11" or the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The cases were consolidated and are being jointly administered under case number 01-01139 (the "Chapter 11 Cases"). Grace's non-U.S. subsidiaries and certain of its U.S. subsidiaries were not included in the Filing.

During 2000 and the first quarter of 2001, Grace experienced several adverse developments in its asbestos-related litigation, including: a significant increase in bodily injury claims, higher than expected costs to resolve bodily injury and certain property damage claims, and class action lawsuits alleging damages from a former attic insulation product. (These claims are discussed in more detail in Note 3 to the Consolidated Financial Statements.) After a thorough review of these developments, the Board of Directors of Grace concluded on April 2, 2001 that a federal court-supervised Chapter 11 filing provided the best forum available to achieve predictability and fairness in the claims settlement process.

By filing under Chapter 11, Grace expects to be able to both obtain a comprehensive resolution of the claims against it and preserve the inherent value of its businesses. Under Chapter 11, the Debtors expect to continue to operate their businesses as debtors-in-possession under court protection from their creditors and claimants, while using the Chapter 11 process to develop and implement a plan for addressing the asbestos-related claims against them.

Consequence of Filing - As a consequence of the Filing, pending litigation against the Debtors for pre-petition matters is generally stayed (subject to certain exceptions in the case of governmental authorities), and no party may take action to realize its pre-petition claims except pursuant to an order of the Bankruptcy Court.

The Debtors intend to address all of their pending and future asbestos-related claims and all other pre-petition claims in a plan of reorganization. Such a plan of reorganization may include the establishment of a trust through which all pending and future asbestos-related claims would be channeled for resolution. However, it is currently impossible to predict with any degree of certainty the amount that would be required to be contributed to the trust, how the trust would be funded, how other pre-petition claims would be treated or what impact any reorganization plan may have on the shares of common stock of the Company. The interests of the Company's shareholders could be substantially diluted or cancelled under a plan of reorganization. The formulation and implementation of the plan of reorganization is expected to take a significant period of time.

Status of Chapter 11 Proceedings - Since the Filing, all motions necessary to conduct normal business activities have been approved by the Bankruptcy Court. In addition, the Debtors have received approval from the Bankruptcy Court to pay or otherwise honor certain of its pre-petition obligations in the ordinary course of business, including employee wages and benefits, customer programs, shipping charges and a limited amount of claims of essential trade creditors.

As provided by the Bankruptcy Code, the Debtors had the exclusive right to propose a plan of reorganization for a 120-day period following the Filing Date. The

CC-BLG002424

Debtors have received an extension of their exclusivity period during which to file a plan of reorganization through August 1, 2003, and an extension of the Debtors' exclusive rights to solicit acceptances of a reorganization plan through October 1, 2003.

Three creditors' committees, two representing asbestos claimants and the third representing other unsecured creditors, and a committee representing shareholders have been appointed in the Chapter 11 Cases. These committees will have the right to be heard on all matters that come before the Bankruptcy Court and, together with a legal representative of future asbestos claimants (whom Grace expects to be appointed by the Bankruptcy Court in the future), are likely to play important roles in the Chapter 11 Cases. The Debtors are required to bear certain of the committees' and the future asbestos claimants representative's costs and expenses, including those of their counsel and financial advisors.

The Debtors' Chapter 11 cases have been assigned to Judge Alfred M. Wolin, a senior federal judge who sits in Newark, New Jersey. Judge Wolin is presiding over asbestos bodily injury matters and the fraudulent conveyance litigation described below. He has assigned the Debtors' other bankruptcy matters to Judge Judith Fitzgerald, a U.S. bankruptcy judge from the Western District of Pennsylvania, sitting in Wilmington, Delaware.

At a hearing on April 22, 2002, the Bankruptcy Court entered an order establishing a bar date of March 31, 2003 for claims of general unsecured creditors, asbestos property damage claims and medical monitoring claims related to asbestos. The bar date does not apply to asbestos-related bodily injury claims or claims related to Zonolite(R) attic insulation ("ZAI"), which will be addressed separately. Grace has distributed notices and run media announcements of the bar date under a program approved by the Bankruptcy Court. Rust Consulting, the court-approved claims handling agent for the Chapter 11 Cases, is maintaining a register of all claims filed. Grace is cataloguing claims as filed and assessing their validity. At this time, it is not possible to estimate the value of all claims that will ultimately be allowed by the Bankruptcy Court, due to the uncertainties of the Chapter 11 process, the in-progress state of Grace's investigation of submitted claims, and the lack of documentation submitted in support of many claims.

In July 2002, the Bankruptcy Court approved special counsel to represent the ZAI claimants, at the Debtors' expense, in a proceeding to determine certain threshold scientific issues regarding ZAI. The court has set a litigation schedule that would result in pretrial hearings on these issues in the third quarter of 2003.

On November 29, 2002, Sealed Air Corporation ("Sealed Air") and Fresenius Medical Care AG ("Fresenius") each announced that they had reached agreements in principle with the Official Committee of Asbestos Personal Injury Claimants and the Official Committee of Asbestos Property Damage Claimants to settle asbestos and fraudulent conveyance claims related to the 1998 transaction involving Grace's former packaging business and Sealed Air, and the 1996 transaction involving Grace's former medical care business and Fresenius, respectively. Under the terms of the proposed Sealed Air settlement, Sealed Air would make a payment of $512.5 million (plus interest at 5.5% per annum commencing on December 21, 2002) and nine million shares of Sealed Air common stock, valued at $335.7 million as of December 31, 2002, as directed by the Bankruptcy Court upon confirmation of Grace's plan of reorganization. Under the terms of the proposed Fresenius settlement, as subsequently revised, Fresenius would contribute $115.0 million to the Grace estate, or as otherwise directed by the Bankruptcy Court, upon confirmation of a plan of reorganization. The Sealed Air and Fresenius settlements are subject to the approval of the Bankruptcy Court. Grace is unable to predict how these settlements may ultimately affect its plan of reorganization.

Impact on Debt Capital - All of the Debtors' pre-petition debt is in default due to the Filing. The accompanying Consolidated Balance Sheet as of December 31, 2002 reflects the classification of the Debtors' pre-petition debt within "liabilities subject to compromise."

The Debtors have entered into a debtor-in-possession post-petition loan and security agreement with Bank of America, N. A. (the "DIP facility") in the aggregate amount of $250 million. The DIP facility has a term expiring on April 1, 2003 and bears interest under a formula based on the London Inter-Bank Offered Rate ("LIBOR") plus 2.00 to 2.25 percentage points depending on the level of loans outstanding. The Debtors have filed a motion with the Bankruptcy Court seeking approval to extend the term of the DIP facility for an additional three years and to modify certain other provisions.

F-11

CC-BLG002425