Accounting Impact - The accompanying Consolidated Financial Statements have been prepared in accordance with Statement of Position 90-7 ("SOP 90-7") "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code," promulgated by the American Institute of Certified Public Accountants. SOP 90-7 requires that financial statements of debtors-in-possession be prepared on a going concern basis, which contemplates continuity of operations, realization of assets and liquidation of liabilities in the ordinary course of business. However, as a result of the Filing, the realization of certain Debtors' assets and the liquidation of certain Debtors' liabilities are subject to significant uncertainty. While operating as debtors-in-possession, the Debtors may sell or otherwise dispose of assets and liquidate or settle liabilities for amounts other than those reflected in the Consolidated Financial Statements. Further, a plan of reorganization could materially change the amounts and classifications reported in the Consolidated Financial Statements, which do not currently give effect to any adjustments to the carrying value or classification of assets or liabilities that might be necessary as a consequence of a plan of reorganization.

Pursuant to SOP 90-7, Grace's pre-petition liabilities that are subject to compromise are required to be reported separately on the balance sheet at an estimate of the amount that will ultimately be allowed by the Bankruptcy Court. As of December 31, 2002, such pre-petition liabilities include fixed obligations (such as debt and contractual commitments) as well as estimates of costs related to contingent liabilities (such as asbestos-related litigation, environmental remediation and other claims). The recorded amounts of such liabilities generally reflect accounting measurements as of the Filing Date, adjusted as warranted, for changes in facts and circumstances and/or rulings under Grace's Chapter 11 proceedings subsequent to the Filing. (See Note 2 to the Consolidated Financial Statements for detail of the liabilities subject to compromise as of December 31, 2002, and as of the Filing Date.) Obligations of Grace subsidiaries not covered by the Filing continue to be classified on the Consolidated Balance Sheet based upon maturity dates or the expected dates of payment. SOP 90-7 also requires separate reporting of certain expenses, realized gains and losses, and provisions for losses related to the Filing as reorganization items.

PRINCIPLES OF CONSOLIDATION: The Consolidated Financial Statements include the accounts of the Company and entities as to which the Company exercises control over operating and financial policies. Intercompany transactions and balances are eliminated in consolidation. Investments in affiliated companies as to which the Company does not exercise control over operating and financial policies are accounted for under the equity method, unless the Company's investment is determined to be temporary, in which case the investment is accounted for under the cost method.

RECLASSIFICATIONS: Certain amounts in prior years' Consolidated Financial Statements have been reclassified to conform to the 2002 presentation.

EFFECT OF NEW ACCOUNTING STANDARDS: In January 2003, the Financial Accounting Standards Board ("FASB") issued FASB Interpretation No. 46, "Consolidation of Variable Interest Entities" (FIN 46). Grace has elected to early adopt the provisions of FIN 46. The adoption of FIN 46 required Grace to consolidate Advanced Refining Technologies LLC. The impact of this consolidation was insignificant.

In December 2002, the FASB issued Statement of Financial Accounting Standards ("SFAS") No. 148, "Accounting for Stock-Based Compensation - Transition and Disclosure, an amendment of SFAS Statement No. 123." SFAS No. 148 amends SFAS No. 123 to provide alternative methods of transition for a voluntary change to the fair value based method of accounting for stock-based compensation. In addition, SFAS No. 148 amends the disclosure requirements of SFAS No. 123 to require prominent disclosures in both annual and interim financial statements about the method of accounting for stock-based employee compensation and the effect of the method used on reported results. Grace adopted the provisions of SFAS No. 148 in December 2002. The adoption had no material impact on the Consolidated Financial Statements.

In November 2002, the FASB issued FASB Interpretation No. 45, "Guarantor's Accounting and Disclosure Requirements of Guarantees, Including Indirect Guarantees of Indebtedness of Others" (FIN 45). The disclosure provisions of FIN 45 are effective for Grace's 2002 Consolidated Financial Statements. (See Note 14 for required disclosures.)

In July 2002, the FASB issued SFAS No. 146, "Accounting for Costs Associated with Exit or Disposal Activities." SFAS 146 addresses significant issues relating to the recognition, measurement, and reporting of costs associated with exit and disposal activities, including restructuring activities. SFAS No. 146 is effective for Grace in 2003 and is not expected

F-12

CC-BLG002426

to have a material impact on the Consolidated Financial Statements.

In June 2001, the FASB issued SFAS No. 141, "Business Combinations," and SFAS No. 142, "Goodwill and Other Intangible Assets." SFAS No. 141 supersedes Accounting Principles Board Opinion ("APB") No. 16, "Business Combinations." The provisions of SFAS No. 141: (1) require that the purchase method of accounting be used for all business combinations initiated after June 30, 2001, (2) provide specific criteria for the initial recognition and measurement of intangible assets apart from goodwill, and (3) require that unamortized negative goodwill be written off immediately as an extraordinary gain instead of being deferred and amortized. Grace adopted SFAS No. 141 in July 2001.

SFAS No. 142 supersedes APB 17, "Intangible Assets," and is effective for fiscal years beginning after December 15, 2001. SFAS No. 142 primarily addresses the accounting for goodwill and intangible assets subsequent to their initial recognition. The provisions of SFAS No. 142: (1) prohibit the amortization of goodwill and indefinite-lived intangible assets, (2) require that goodwill and indefinite-lived intangible assets be tested annually for impairment, (3) require that reporting units be identified for the purpose of assessing potential future impairments of goodwill, and (4) remove the 40 year limitation on the amortization period of intangible assets that have finite lives.

Grace adopted the provisions of SFAS No. 142 in the first quarter ended March 31, 2002. Grace has identified its reporting units as catalyst products ("Catalysts"), silica products ("Silicas"), specialty construction chemicals ("SCC"), specialty building materials ("SBM") and specialty sealants and coatings ("SSC") for purposes of measuring impairment under the provisions of SFAS No. 142. All amounts of goodwill, intangible assets, other assets, and liabilities have been appropriately classified and allocated to these reporting units. Amortization expense on goodwill for the year ended December 31, 2001 was insignificant. The adoption of SFAS No. 142 did not have a material impact on the Consolidated Financial Statements.

SFAS No. 142 requires that goodwill and certain intangible assets be tested annually for impairment. In connection with the adoption of SFAS No. 142 and as of November 30, 2002, Grace evaluated its goodwill and other intangible assets that have indefinite useful lives, with no impairment charge required.

In August 2001, the FASB issued SFAS No. 143, "Accounting for Asset Retirement Obligations." In October 2001, the FASB issued SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets." SFAS No. 143 requires the accrual of asset retirement obligations by increasing the initial carrying amount of the related long-lived asset, and systematically expensing the cost of such obligations over the asset's useful life. The standard is effective for Grace in 2003. Grace does not expect SFAS No. 143 to have a material effect on the Consolidated Financial Statements. SFAS No. 144 supersedes SFAS No. 121, "Accounting for the Impairment of Long-Lived Assets to Be Disposed Of," and expands the scope of discontinued operations. SFAS No. 144 was effective for Grace in 2002 and did not have a material impact on the Consolidated Financial Statements.

USE OF ESTIMATES: The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires that management make estimates and assumptions affecting the assets and liabilities reported at the date of the Consolidated Financial Statements, and the revenues and expenses reported for the periods presented. Actual amounts could differ from those estimates. Changes in estimates are recorded in the period identified. Grace's accounting measurements that are most affected by management's estimates of future events are:

o Contingent liabilities such as asbestos-related matters, environmental remediation, income taxes and retained obligations of divested businesses.

o Pension and post-retirement liabilities that depend on assumptions regarding discount rates and/or total returns on invested funds.

o Depreciation and amortization periods for long-lived assets, including property and equipment, intangible and other assets.

o Realization values of various assets such as trade receivables, inventories, insurance receivables, income taxes and goodwill.

The accuracy of these and other estimates may also be materially affected by the uncertainties arising under the Chapter 11 Cases.

CASH EQUIVALENTS: Cash equivalents consist of liquid instruments with maturities of three months or less when purchased. The recorded amounts approximate fair value.

SALE OF ACCOUNTS RECEIVABLE: Prior to the Filing, Grace entered into a program to sell certain of its trade

CC-BLG002427

accounts receivable and retained a subordinated interest and servicing rights. Net losses on the sale of receivables were based on the carrying value of the assets sold, allocated in proportion to their fair value. Retained interests were carried at fair value and were included in "Other current assets" in the Consolidated Balance Sheet. Grace generally estimated fair value based on the present value of expected future cash flows less management's best estimate of uncollectible accounts receivable. Grace maintained an allowance for doubtful accounts receivable based upon the expected collectibility of all trade receivables, including receivables sold. The allowance was reviewed regularly and adjusted for accounts deemed uncollectible by management. Expenses and losses associated with the program were recognized as a component of interest expense and related financing costs. As a result of the Filing, which constituted an event of default under the program, outstanding balances were satisfied through the use of pre-petition trade receivables collected during the period from the Filing Date to early May 2001. The program was terminated effective May 14, 2001.

INVENTORIES: Inventories are stated at the lower of cost or market. The methods used to determine cost include first-in/first-out and, for substantially all U.S. inventories, last-in/first-out. Market values for raw materials are based on current cost and, for other inventory classifications, net realizable value.

PROPERTIES AND EQUIPMENT: Properties and equipment are stated at cost. Depreciation of properties and equipment is generally computed using the straight-line method over the estimated useful life of the asset. Estimated useful lives range from 20 to 40 years for buildings, 3 to 7 years for information technology equipment, 3 to 10 years for machinery and equipment and 5 to 10 years for furniture and fixtures. Interest is capitalized in connection with major project expenditures. Fully depreciated assets are retained in properties and equipment and related accumulated depreciation accounts until they are removed from service. In the case of disposals, assets and related accumulated depreciation are removed from the accounts and the net amount, less any proceeds from disposal, is charged or credited to operations. Grace reviews long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be fully recoverable.

GOODWILL: Goodwill arises from certain purchase business combinations. With respect to business combinations completed prior to June 30, 2001, goodwill was amortized through December 31, 2001 using the straight-line method over appropriate periods not exceeding 40 years. Grace reviews its goodwill for impairment on an annual basis and whenever events or changes in circumstances indicate that the carrying amount may not be fully recoverable. The provisions of SFAS No. 141 were applied to goodwill and intangible assets acquired after June 30, 2001.

REVENUE RECOGNITION: Grace recognizes revenue when all of the following criteria are satisfied: risk of loss and title transfer to the customer; the price is fixed and determinable; and collectibility is reasonably assured. Certain customer arrangements include conditions for volume rebates. Grace accrues a rebate allowance and reduces recorded sales for anticipated selling price adjustments at the time of sale. Grace regularly reviews this rebate accrual based on actual and anticipated sales patterns.

RESEARCH AND DEVELOPMENT COSTS: Research and development costs are charged to expense as incurred.

INCOME TAXES: Grace recognizes deferred tax assets and liabilities with respect to the expected future tax consequences of events that have been recorded in the Consolidated Financial Statements and tax returns. If it is more likely than not that all or a portion of deferred tax assets will not be realized, a valuation allowance is provided against such deferred tax assets.

FOREIGN CURRENCY TRANSLATION: Assets and liabilities of foreign subsidiaries (other than those located in countries with highly inflationary economies) are translated into U.S. dollars at current exchange rates, while their revenues, costs and expenses are translated at average exchange rates during each reporting period. The resulting translation adjustments are included in the "Accumulated other comprehensive loss" section of the Consolidated Balance Sheet. The financial statements of subsidiaries located in countries with highly inflationary economies, if any, are remeasured as if the functional currency were the U.S. dollar; the remeasurement creates translation adjustments that are reflected in "Net income (loss)" in the Consolidated Statement of Operations.

FINANCIAL INSTRUMENTS: From time to time, Grace enters into interest rate swap agreements and foreign exchange forward and option contracts to manage exposure to fluctuations in interest and foreign currency exchange rates. Grace does not hold or issue derivative financial instruments for trading purposes. At December 31, 2002, Grace did not hold and had not issued any derivative financial instruments.

F-14

CC-BLG002428

## 2. CHAPTER 11 RELATED FINANCIAL INFORMATION

As a result of the Filing, Grace's Consolidated Balance Sheet separately identifies the liabilities that are "subject to compromise" as a result of the Chapter 11 proceedings. In Grace's case, "liabilities subject to compromise" represent pre-petition liabilities as determined under U.S. generally accepted accounting principles. Changes to the recorded amount of such liabilities will be based on developments in the Chapter 11 Cases and management's assessment of the claim amounts that will ultimately be allowed by the Bankruptcy Court. Changes to pre-petition liabilities subsequent to the Filing Date reflect: 1) cash payments under approved court orders; 2) the accrual of interest on pre-petition debt at the pre-petition contractual rate; 3) accruals for employee-related programs; and 4) changes in estimates related to pre-petition contingent liabilities and assets.

Components of liabilities subject to compromise are as follows:

| (Dollars in millions) | DECEMBER 31, 2002 | December 31, 2001 | Filing Date (Unaudited) |
|---|---|---|---|
| Debt, pre-petition plus accrued interest | $   538.8 | $   524.5 | $   511.5 |
| Asbestos-related liability | 973.2 | 996.3 | 1,002.8 |
| Income taxes | 227.8 | 216.6 | 210.1 |
| Environmental remediation | 201.1 | 153.1 | 164.8 |
| Postretirement benefits other than pensions | 147.2 | 169.1 | 185.4 |
| Special pension arrangements | 74.9 | 72.5 | 70.8 |
| Retained obligations of divested business | 55.3 | 80.5 | 75.5 |
| Accounts payable | 32.4 | 31.7 | 43.0 |
| Other accrued liabilities | 84.0 | 67.2 | 102.1 |
| | $ 2,334.7 | $2,311.5 | $ 2,366.0 |

Set forth below is a reconciliation of the changes in pre-filing date liability balances for the period from the Filing Date through December 31, 2002.

| (Dollars in millions) (Unaudited) | Cumulative Since Filing |
|---|---|
| Balance, Filing Date | $   2,366.0 |
| Cash disbursements and/or reclassifications under Bankruptcy Court orders: | |
| Freight and distribution order | (5.7) |
| Trade accounts payable order | (9.1) |
| Other court orders including employee wages and benefits, sales and use tax and customer programs | (145.1) |
| Expense/(income) items: | |
| Interest on pre-petition debt | 35.5 |
| Current period employment-related accruals | 14.7 |
| Change in estimate of environmental contingencies | 76.5 |
| Change in estimate of income tax contingencies | 20.5 |
| Balance sheet reclassifications | (18.6) |
| Balance, end of period | $   2,334.7 |

Additional liabilities subject to compromise may arise due to the rejection of executory contracts or unexpired leases, or as a result of the allowance of contingent or disputed claims.

The Debtors recorded Chapter 11 reorganization expenses for 2002 consisting of:

CC-BLG002429

| (Dollars in millions) | | 2002 | | 2001 |
|---|---|---|---|---|
| Legal and financial advisory fees................. | $ | 30.6 | $ | 16.6 |
| Interest income................................... | | (0.5) | | (0.9) |
| Chapter 11 reorganization expenses, net........... | $ | 30.1 | $ | 15.7 |

Pursuant to SOP 90-7, interest income earned on the Debtors' cash balances must be offset against reorganization expenses.

F-15

CC-BLG002430

Condensed financial information of the Debtors subsequent to the Filing Date is presented below:

```
========================================================
W. R. GRACE & CO. - CHAPTER 11 FILING    JANUARY 1,    APRIL 2,
ENTITIES                                  2002          2001
DEBTOR-IN-POSSESSION STATEMENT OF         TO            TO
OPERATIONS (UNAUDITED) DOLLARS IN         DECEMBER 31,  DECEMBER 31,
MILLIONS                                  2002          2001
========================================================
Net sales, including intercompany ........ $   985.2    $   768.7
Other income .............................      61.3         38.5
                                          ------------------------
                                             1,046.5        807.2
                                          ------------------------
Cost of goods, including intercompany,
  exclusive of depreciation and
  amortization shown separately below ....     632.1        480.0
Selling, general and administrative
  expenses ...............................     236.4        153.6
Research and development expenses .........     41.2         30.6
Depreciation and amortization .............     60.7         43.4
Interest expense and related financing
  costs ..................................      19.4         26.9
Provision for environmental remediation ...     70.7          5.8
                                          ------------------------
                                             1,060.5        740.3
                                          ------------------------
Income before Chapter 11 reorganization
  expenses, income taxes, and equity
  in net income of non-filing entities ...     (14.0)        66.9
Chapter 11 reorganization expenses, net ...     (30.1)       (12.7)
Provision for income taxes ................      (3.3)       (35.5)
Equity in net income of non-filing
  entities ...............................      69.5         45.2
                                          ------------------------
    NET INCOME ............................ $    22.1    $    63.9
========================================================
```

```
========================================================
W. R. GRACE & CO. - CHAPTER 11 FILING    JANUARY 1,    APRIL 2,
ENTITIES                                  2002          2001
DEBTOR-IN-POSSESSION STATEMENT OF         TO            TO
OPERATIONS (UNAUDITED) DOLLARS IN         DECEMBER 31,  DECEMBER 31,
MILLIONS                                  2002          2001
========================================================
OPERATING ACTIVITIES
Net income................................ $    22.1    $    63.9
Reconciliation to net cash provided by
  operating activities:
Non-cash items, net.......................      71.8         67.1
Increase in accounts receivable due to
  termination of securitization program ..      --          (98.4)
Decrease in subordinated interest of
  accounts receivable sold...............       --           33.1
Changes in other assets and liabilities,
  excluding the effect of businesses
  acquired/divested......................       18.2         --
                                          ------------------------
NET CASH PROVIDED BY OPERATING ACTIVITIES..     112.1         65.7

NET CASH USED FOR INVESTING ACTIVITIES.....     (66.0)       (20.0)

NET CASH USED FOR FINANCING ACTIVITIES.....     (27.3)       (16.3)
                                          ------------------------
NET INCREASE IN CASH AND CASH EQUIVALENTS..      18.8         29.4

Cash and cash equivalents, beginning of
  period..................................      38.0          8.6
                                          ------------------------
Cash and cash equivalents, end of period... $    56.8    $    38.0
========================================================
```

F-16

CC-BLG002431

```
W. R. GRACE & CO. - CHAPTER 11 FILING
ENTITIES
DEBTOR-IN-POSSESSION BALANCE SHEET        DECEMBER 31,  DECEMBER 31,
(UNAUDITED) DOLLARS IN MILLIONS               2002          2001
================================================================
ASSETS
CURRENT ASSETS
Cash and cash equivalents ...........     $   56.8      $   38.0
Notes and accounts receivable, net ...        115.0        128.2
Receivables from non-filing entities,
    net ..............................         41.3          33.8
Inventories ..........................         70.5          89.5
Other current assets..................         53.0          78.6
                                          -------------------------
    TOTAL CURRENT ASSETS ..............        336.6         368.1

Properties and equipment, net........          389.7         384.9
Cash value of life insurance policies,
    net of policy loans...............          82.4          75.6
Deferred income taxes ................         567.0         502.6
Asbestos-related insurance expected to
    be realized after one year........         282.6         283.7
Loans receivable from non-filing
    entities, net ....................         444.4         388.0
Investment in non-filing entities ....         241.4         153.5
Other assets .........................          97.4         156.8
                                          -------------------------
    TOTAL ASSETS .....................    $2,441.5      $ 2,313.2
                                          =========================
```

## LIABILITIES AND SHAREHOLDERS' EQUITY

(DEFICIT)

## LIABILITIES NOT SUBJECT TO COMPROMISE

```
        Current liabilities .................   $   99.3    $   94.5
        Debt payable after one year .........       --          1.6
        Other liabilities ...................      229.6        47.3
                                               -------------------------
            TOTAL LIABILITIES NOT SUBJECT TO
            COMPROMISE......................        328.9        143.4

        LIABILITIES SUBJECT TO COMPROMISE ....    2,334.7      2,311.5
                                               -------------------------
            TOTAL LIABILITIES.................     2,663.6      2,454.9

            SHAREHOLDERS' EQUITY (DEFICIT) ....     (222.1)      (141.7)
                                               -------------------------
            TOTAL LIABILITIES AND SHAREHOLDERS'
            EQUITY (DEFICIT) ..............     $2,441.5    $ 2,313.2
                                               =========================
```

In addition to Grace's financial reporting obligations as prescribed by the U.S. Securities and Exchange Commission ("SEC"), the Debtors are also required, under the rules and regulations of the Bankruptcy Code, to periodically file certain statements and schedules and a monthly operating report with the Bankruptcy Court. This information is available to the public through the Bankruptcy Court. This information is prepared in a format that may not be comparable to information in Grace's quarterly and annual financial statements as filed with the SEC. The monthly operating reports are not audited, do not purport to represent the financial position or results of operations of Grace on a consolidated basis and should not be relied on for such purposes.

## 3. ASBESTOS-RELATED LITIGATION

Grace is a defendant in property damage and bodily injury lawsuits relating to previously sold asbestos-containing products. On April 2, 2001, Grace filed voluntary petitions for reorganization under Chapter 11 to use the court-supervised reorganization process to develop and implement a plan for addressing pending and future asbestos-related claims. (See Note 1 for further discussion.)

As of the Filing Date, Grace was a defendant in 65,656 asbestos-related lawsuits, 17 involving claims for property damage (one of which has since been dismissed), and the remainder involving 129,191 claims for bodily injury. Due to the Filing, holders of asbestos-related claims are stayed from continuing to prosecute pending litigation and from commencing new lawsuits against the Debtors. Additional asbestos-related claims are expected to be filed as part of the Chapter 11 claims process. Separate creditors' committees representing the interests of property

CC-BLG002432

damage and bodily injury claimants have been appointed in the Chapter 11 Cases. Grace's obligations with respect to present and future claims will be determined through proceedings in the Bankruptcy Court and negotiations with each of the official committees appointed in the Chapter 11 Cases, and a legal representative of future asbestos claimants, which are expected to provide the basis for a plan of reorganization.

## PROPERTY DAMAGE LITIGATION

The plaintiffs in asbestos property damage lawsuits generally seek to have the defendants absorb the cost of removing, containing or repairing the asbestos-containing materials in the affected buildings. Each property damage case is unique in that the age, type, size and use of the building, and the difficulty of asbestos abatement, if necessary, vary from structure to structure. Information regarding product identification, the amount of product in the building, the age, type, size and use of the building, the jurisdictional history of prior cases and the court in which the case is pending has provided meaningful guidance as to the range of potential costs. Grace has recorded an accrual for all outstanding property damage cases for which sufficient information is available to form a reasonable

F-17

CC-BLG002433

estimate of such exposure. (See "Asbestos-Related Liability" below.)

Through December 31, 2002, out of 380 asbestos property damage cases filed, 140 were dismissed without payment of any damages or settlement amounts; judgments were entered in favor of Grace in nine cases (excluding cases settled following appeals of judgments in favor of Grace); judgments were entered in favor of the plaintiffs in eight cases (one of which is on appeal) for a total of $86.1 million; 207 property damage cases were settled for a total of $696.8 million; and 16 cases remain outstanding (including the one on appeal). Of the 16 remaining cases, eight relate to ZAI and eight relate to a number of former asbestos-containing products (two of which also involve ZAI). Additional asbestos property damage claims (other than claims with respect to ZAI) are to be filed as part of the Chapter 11 claims process and are subject to the March 31, 2003 bar date established by the Bankruptcy Court.

The ZAI cases were filed as class action lawsuits in 2000 and 2001 on behalf of owners of homes containing ZAI. These cases seek damages and equitable relief, including the removal, replacement and/or disposal of all such insulation. The plaintiffs assert that this product is in millions of homes throughout the U.S. and that the cost of removal could be several thousand dollars per home. As a result of the Filing, these cases have been transferred to the U.S. Bankruptcy Court. While Grace has not completed its investigation of the claims described in these lawsuits, testing and analysis of this product by Grace and others supports Grace's belief that the product was and continues to be safe for its intended purpose and poses little or no threat to human health. At this time, Grace is not able to assess the extent of any possible liability related to this matter. In July 2002, the Bankruptcy Court approved special counsel to represent the ZAI claimants, at the Debtors' expense, in a proceeding to determine certain threshold scientific issues regarding ZAI. The court has set a litigation schedule that would result in pretrial hearings on these issues in the third quarter of 2003.

## BODILY INJURY LITIGATION

Asbestos bodily injury claims are generally similar to each other (differing primarily in the type of asbestos-related illness allegedly suffered by the plaintiff). However, Grace's estimated liability for such claims has been influenced by numerous variables, including the solvency of other former asbestos producers, cross-claims by co-defendants, the rate at which new claims are filed, the jurisdiction in which the claims are filed, and the defense and disposition costs associated with these claims. Grace's bodily injury liability reflects management's estimate, as of the Filing Date, of the number and ultimate cost of present and future bodily injury claims expected to be asserted against Grace given demographic assumptions of possible exposure to asbestos containing products previously manufactured by Grace.

Through the Filing Date, 16,354 asbestos bodily injury lawsuits involving approximately 35,720 claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved), and approximately 55,489 lawsuits involving approximately 163,698 claims were disposed of (through settlement and judgments) for a total of $645.6 million. (See "Asbestos-Related Liability" below.)

## ASBESTOS-RELATED LIABILITY

Asbestos-related litigation is stayed by the Chapter 11 Cases. Ongoing costs are generally limited to claims administration costs and to defense costs incurred in connection with litigation permitted by the Bankruptcy Court. Any other adjustments to the recorded liability is based on developments in the Chapter 11 Cases. For periods prior to and as of the Filing Date, Grace's estimated property damage and bodily injury liabilities were based on its experience with, and recent trends in, asbestos litigation. Its recorded liabilities covered indemnity and defense costs for pending property damage cases and for pending and projected future bodily injury claims. However, due to the Filing and the uncertainties of asbestos-related litigation, actual amounts could differ materially from the recorded liability. Since the Filing, Grace is aware that bodily injury claims have continued to be filed against co-defendant companies, and at higher than historical rates. Grace believes that had it not filed for Chapter 11 reorganization, it likely would have received thousands more claims than it had previously projected.

The total asbestos-related liability balances as of December 31, 2002 and 2001 were $973.2 million and $996.3 million, respectively. The decrease in the liability is primarily due to the payment of normal post-Filing administrative costs relating to claims management. The remaining decrease is due to the satisfaction of pre-petition settlements through draws on letters of credit securing such settlements. These draws were reclassified to "other accrued liabilities"

CC-BLG002434

in "liabilities subject to compromise" as payables to the issuing banks. The recorded asbestos-related liability is included in "liabilities subject to compromise."

## ASBESTOS INSURANCE

Grace previously purchased insurance policies with respect to its asbestos-related lawsuits and claims. Insurance coverage for asbestos-related liabilities has not been commercially available since 1985. Grace has settled with and has been paid by all of its primary insurance carriers with respect to both property damage and bodily injury cases and claims. Grace has also settled with its excess insurance carriers that wrote policies available for property damage cases; those settlements involve amounts paid and to be paid to Grace. Grace believes that certain of these settlements may cover ZAI claims as well as other property damage claims. In addition, Grace believes that additional coverage for ZAI claims may exist under excess insurance policies not subject to settlement agreements. Grace has settled with excess insurance carriers that wrote policies available for bodily injury claims in layers of insurance that Grace believes may be reached based on its current estimates.

The asbestos-related insurance asset represents amounts expected to be received from carriers under settlement agreements for defense and disposition costs to be paid by Grace. Estimated insurance reimbursements are based on the recorded amount of the asbestos-related liability and are only collectible as liabilities are satisfied. In the event that Grace's ultimate asbestos-related liability is determined to exceed recorded amounts, insurance exists to cover a portion of such incremental liability, but generally in a lower proportion than the currently recorded insurance receivable bears to the currently recorded liability.

Activity in the asbestos-related insurance receivable during 2002 and 2001 was as follows:

### ESTIMATED INSURANCE RECOVERY ON ASBESTOS-RELATED LIABILITIES

| (Dollars in millions) | 2002 | 2001 |
|---|---|---|
| INSURANCE RECEIVABLE | | |
| Asbestos-related insurance receivable, beginning of year | $ 293.4 | $ 369.3 |
| Proceeds received under asbestos-related insurance settlements | (10.8) | (75.9) |
| Asbestos-related insurance receivable, end of year | 282.6 | 293.4 |
| Expected to be realized within one year | -- | (9.7) |
| Expected to be realized after one year | $ 282.6 | $ 283.7 |

## 4. INCOME TAXES

The components of income (loss) from consolidated operations before income taxes and the related provision for income taxes for 2002, 2001, and 2000 are as follows:

| INCOME TAXES - CONSOLIDATED OPERATIONS (Dollars in millions) | 2002 | 2001 | 2000 |
|---|---|---|---|
| Income (loss) before income taxes: | | | |
| Domestic | $ (44.6) | $ 67.1 | $ (94.7) |
| Foreign | 104.7 | 75.2 | 75.0 |
| | $ 60.1 | $ 142.3 | $ (19.7) |
| (Provision) benefit for income taxes: | | | |
| Federal - current | $ 8.1 | $ (7.7) | $ (66.2) |
| Federal - deferred | (11.0) | (27.5) | 39.4 |
| State and local - current | (1.0) | (3.2) | (20.0) |
| Foreign - current | (27.6) | (22.2) | (21.8) |
| Foreign - deferred | (6.5) | (3.1) | (1.4) |
| | $ (38.0) | $ (63.7) | $ (70.0) |

At December 31, 2002 and 2001, the tax attributes in the Consolidated Balance Sheet giving rise to deferred tax assets and liabilities consisted

CC-BLG002435

**DEFERRED TAX ANALYSIS**

| (Dollars in millions) | 2002 | 2001 |
|---|---|---|
| Liability for asbestos-related litigation..... | $    340.6 | $    348.7 |
| Net operating loss/tax credit carryforwards............................. | 155.1 | 155.9 |
| Deferred state taxes......................... | 117.7 | 105.3 |
| Liability for environmental remediation....... | 70.4 | 53.6 |
| Other post-retirement benefits................ | 51.5 | 59.2 |
| Deferred charges............................. | 46.1 | 50.2 |
| Reserves and allowances...................... | 27.1 | 38.2 |
| Research and development..................... | 35.0 | 40.0 |
| Pension liabilities.......................... | 172.6 | 84.8 |
| Foreign loss/credit carryforwards............ | 14.8 | 23.3 |
| Other........................................ | 12.4 | 9.9 |
| Total deferred tax assets.................... | $  1,043.3 | $    969.1 |
| Asbestos-related insurance receivable........ | (103.6) | (106.9) |
| Pension assets............................... | (91.7) | (85.8) |
| Properties and equipment..................... | (71.7) | (56.3) |
| Other........................................ | (60.4) | (58.3) |
| Total deferred tax liabilities............... | (327.4) | (307.3) |
| Valuation allowance ......................... | (152.5) | (158.0) |
| Net deferred tax assets...................... | $    563.4 | $    503.8 |

The valuation allowance shown above arises from uncertainty as to the realization of certain deferred tax assets, primarily foreign tax credit carryforwards and state and local net operating loss carryforwards. Based upon anticipated future results, Grace has concluded that it is more likely than not that the balance of the net deferred tax assets, after consideration of the valuation allowance, will be realized. Because of the nature of the items that make up this balance, the realization period is likely to extend over a number of years.

F-19

CC-BLG002436

At December 31, 2002, there were $307.8 million of net operating loss carryforwards, representing deferred tax assets of $107.7 million, with expiration dates through 2022; $6.2 million of foreign tax credit carryforwards with expiration dates through 2006; $6.6 million of general business credit carryforwards with expiration dates through 2011; and $34.6 million of alternative minimum tax credit carryforwards with no expiration dates.

The differences between the (provision) benefit for income taxes at the federal income tax rate of 35% and Grace's overall income tax provision are summarized as follows:

**INCOME TAX (PROVISION) BENEFIT**
**ANALYSIS (Dollars in millions) 2002 2001 2000**

|  | 2002 | 2001 | 2000 |
|---|---|---|---|
| Tax (provision) benefit at federal corporate rate...................... | $ (21.0) | $ (49.8) | $ 6.9 |
| Change in provision resulting from: | | | |
| Nontaxable income/non-deductible expenses........................... | (1.0) | (1.6) | (1.6) |
| State and local income taxes, net of federal income tax benefit.......... | (0.7) | (1.7) | (1.8) |
| Federal and foreign taxes on foreign operations......................... | 1.6 | 1.3 | 1.5 |
| Chapter 11 reorganization expenses (non-deductible)................... | (10.5) | (5.5) | -- |
| Tax and interest relating to tax deductibility of interest on COLI policy loans (See note 14)......... | (6.4) | (6.4) | (75.0) |
| Income tax provision from continuing operations........................ | $ (38.0) | $ (63.7) | $ (70.0) |

Federal, state, local and foreign taxes have not been accrued on approximately $316.5 million of undistributed earnings of certain foreign subsidiaries, as such earnings are expected to be retained indefinitely by such subsidiaries for reinvestment. The distribution of these earnings would result in additional foreign withholding taxes of approximately $22.5 million and additional federal income taxes to the extent they are not offset by foreign tax credits. It is not practicable to estimate the total tax liability that would be incurred upon such a distribution.

## 5. ACQUISITIONS AND JOINT VENTURES

In 2002, Grace completed three business combinations for a total cash cost of $28.5 million as follows:

o In January 2002, Grace, through its Swedish subsidiary, acquired the catalyst manufacturing assets of Borealis A/S.

o In March 2002, Grace acquired the assets of Addiment, Incorporated, a leading supplier of specialty chemicals to the concrete paver and masonry industries in the U.S. and Canada.

o In August 2002, Advanced Refining Technologies LLC ("ART"), a joint venture between Grace and Chevron Products Company ("Chevron"), acquired an exclusive license for the hydroprocessing catalyst technology of Japan Energy Corporation and its subsidiary Orient Catalyst Company.

Goodwill recognized in those transactions amounted to $3.8 million, which was assigned to the Davison Chemicals and Performance Chemicals segments in the amounts of $0.9 million and $2.9 million, respectively.

In 2001, Grace completed three business combinations for a total cash cost of $84.4 million as follows:

o In March 2001, Grace acquired The Separations Group, a manufacturer of chromatography columns and separations media.

o In March 2001, Grace's German subsidiary acquired the precipitated silicas business of Akzo-PQ Silicas.

o In July 2001, Grace's French subsidiary acquired Pieri S.A., a leading supplier of specialty construction chemicals in Europe.

Goodwill recognized in those transactions amounted to $23.6 million, which was assigned to the Davison Chemicals and Performance Chemicals segments in the amounts of $10.8 million and $12.8 million, respectively.

CC-BLG002437

Pro forma results of operations have not been presented because the effects of these acquisitions were not material on either an individual or aggregate basis.

On March 1, 2001, Grace and Chevron formed ART to develop and market hydroprocessing catalysts globally. ART conducts business through two distribution companies and one operating company. ART has agreements with both Grace and Chevron under which each provides certain administrative and research and development services to ART. Although structured as a joint venture with shared governance, Grace is the primary manufacturer of ART products, Grace appoints the Chief Operating Officer and Grace is entitled to 55% of the economic benefits and assumes 55% of the

F-20

CC-BLG002438

economic risks. Accordingly, ART is consolidated for Grace's financial reporting purposes.

## 6. OTHER INCOME

Components of other income are as follows:

**OTHER INCOME**

| (Dollars in millions) | 2002 | 2001 | 2000 |
|---|---|---|---|
| Investment income........... | $ 4.7 | $ 5.4 | $ 6.4 |
| Interest income............. | 3.9 | 4.6 | 9.7 |
| Gain on sale of investments.. | 1.2 | 7.9 | 19.0 |
| Net gain on dispositions of assets................... | 0.7 | 1.8 | 5.5 |
| Tolling revenue............. | 3.1 | 3.1 | 1.2 |
| Equity in net income of affiliates............... | 0.7 | 0.4 | 0.6 |
| Other miscellaneous income .. | 8.9 | 8.0 | 7.1 |
| Total other income.......... | $ 23.2 | $ 31.2 | $ 49.5 |

## 7. GOODWILL AND OTHER INTANGIBLE ASSETS

Grace adopted SFAS No. 142, "Goodwill and Other Intangible Assets" on January 1, 2002 and ceased the amortization of goodwill. The pro forma impact on pre-tax income and earnings per share was immaterial. SFAS No. 142 requires that goodwill and indefinite life intangible assets be tested for impairment on an annual basis. For the purpose of measuring impairment under the provisions of SFAS No. 142, Grace has identified its reporting units as Catalysts and Silicas (Davison Chemicals) and SCC, SBM and SSC (Performance Chemicals). In connection with the adoption of SFAS No. 142 and as of November 30, 2002, Grace evaluated its goodwill and other intangible assets that have indefinite useful lives, with no impairment charge required.

At December 31, 2002 and December 31, 2001, Grace had goodwill balances of $65.2 million and $55.8 million, respectively. The carrying amount of goodwill attributable to each reporting unit and the changes in those balances during the year ended December 31, 2002 are as follows:

| (Dollars in millions) | Davison Chemicals | Performance Chemicals | Total Grace |
|---|---|---|---|
| Balance as of December 31, 2001 ... | $ 12.5 | $ 43.3 | $ 55.8 |
| Goodwill acquired during the year.. | 0.9 | 2.9 | 3.8 |
| Reclass of other intangible assets........................ | 1.7 | (1.2) | 0.5 |
| Foreign currency translation adjustment..................... | 1.9 | 3.2 | 5.1 |
| Balance as of December 31, 2002 ... | $ 17.0 | $ 48.2 | $ 65.2 |

Grace's book value of other intangible assets at December 31, 2002 and December 31, 2001 was $63.3 million and $57.5 million, respectively, including unamortizable intangible assets (primarily trademarks) of $6.9 million and $5.8 million, respectively. The composition of the remaining net amortizable intangible assets of $56.4 million and $51.7 million as of December 31, 2002 and December 31, 2001, respectively, was as follows:

| (Dollars in millions) | As of December 31, 2002 | |
|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization |
| Technology ................... | $ 34.6 | $ 4.6 |
| Patents...................... | 15.3 | 13.6 |
| Customer lists............... | 24.1 | ,3.3 |

CC-BLG002439

```
Other........................        5.0             1.1
                              -------------------------------------
Total.......................  $     79.0        $    22.6
                              =====================================
```

```
==============================================================
(Dollars in millions)                 As of December 31, 2001

                              Gross Carrying     Accumulated
                                  Amount         Amortization
                              -------------------------------------
Technology .................  $     29.9        $     1.7
Patents.....................        15.3             12.2
Customer lists..............        20.0              1.0
Other.......................         1.8              0.4
                              -------------------------------------
Total.......................  $     67.0        $    15.3
                              =====================================
```

At December 31, 2002, estimated future annual amortization expenses were (dollars in millions):

## ESTIMATED AMORTIZATION EXPENSE

```
2003..........................................  $    6.1
2004..........................................       4.9
2005..........................................       4.7
2006..........................................       4.6
2007..........................................       4.4
                                                ==============
```

## 8. COMPREHENSIVE LOSS

The tables below present the pre-tax, tax and after tax components of Grace's other comprehensive loss for the years ended December 31, 2002, 2001 and 2000:

```
================================================================
YEAR ENDED                                          AFTER
DECEMBER 31, 2002            Pre-Tax      Tax        TAX
(Dollars in millions)        Amount     Benefit     AMOUNT
----------------------------------------------------------------
Change in unrealized appreciation
    during the year.........  $  (0.1)  $   --    $   (0.1)
Minimum pension liability
    adjustments ............    (227.2)    79.5     (147.7)
Foreign currency translation
    adjustments.............      45.3      --        45.3
                              ----------------------------------
Other comprehensive loss....  $ (182.0) $  79.5   $  (102.5)
                              ==================================
```

F-21

CC-BLG002440

| YEAR ENDED DECEMBER 31, 2001 (Dollars in millions) | Pre-Tax Amount | Tax (Expense) Benefit | After Tax Amount |
|---|---|---|---|
| Change in unrealized appreciation during the year............... | $    (0.4) | $    0.2 | $    (0.2) |
| Minimum pension liability adjustments ................... | (191.4) | 67.0 | (124.4) |
| Foreign currency translation adjustments................... | (24.6) | -- | (24.6) |
| Other comprehensive loss.......... | $ (216.4) | $   67.2 | $ (149.2) |

| YEAR ENDED DECEMBER 31, 2000 (Dollars in millions) | Pre-Tax Amount | Tax (Expense) Benefit | After Tax Amount |
|---|---|---|---|
| Change in unrealized appreciation during the year............... | $   (27.0) | $    9.3 | $   (17.7) |
| Minimum pension liability adjustments ................... | (2.2) | (1.6) | (3.8) |
| Foreign currency translation adjustments................... | (34.1) | -- | (34.1) |
| Other comprehensive loss.......... | $  (63.3) | $    7.7 | $  (55.6) |

The decline in value of the U.S. and global equity markets, coupled with a decline in interest rates, during 2002 and 2001 created a shortfall between the accounting measurement of Grace's obligations under certain of its qualified pension plans for U.S. employees and the market value of dedicated pension assets. This condition required Grace to record a minimum pension liability for these plans equal to the funding shortfall and to offset related deferred costs against shareholders' equity (deficit) at December 31, 2002 and 2001. (See Note 18.)

## COMPOSITION OF ACCUMULATED OTHER COMPREHENSIVE LOSS

| (Dollars in millions) | 2002 | 2001 |
|---|---|---|
| Foreign currency translation.................... | $  (119.5) | $  (164.8) |
| Minimum pension liability...................... | (283.7) | (136.0) |
| Securities available for sale.................. | -- | 0.1 |
| Accumulated other comprehensive loss........... | $  (403.2) | $  (300.7) |

## 9. OTHER BALANCE SHEET ACCOUNTS

| (Dollars in millions) | 2002 | 2001 |
|---|---|---|
| ACCOUNTS AND OTHER RECEIVABLES, NET | | |
| Trade receivables, less allowance of $3.7 (2001 - $5.7)................................ | $   297.3 | $   276.4 |
| Other receivables, less allowances of $1.7 (2001 - $1.9)............................... | 14.0 | 25.7 |
| | $   311.3 | $   302.1 |
| INVENTORIES (1) | | |
| Raw materials ................................. | $    39.2 | $    39.2 |
| In process ................................... | 30.3 | 27.6 |
| Finished products ............................ | 109.6 | 113.3 |
| General merchandise .......................... | 26.8 | 25.8 |
| Less:  Adjustment of certain inventories to a last-in/first-out (LIFO) basis(2) .......... | (33.5) | (25.9) |
| | $   172.4 | $   180.0 |

(1) Inventories valued at LIFO cost comprised 48.5% of total inventories at December 31, 2002 and 51.9% at December 31, 2001

CC-BLG002441

(2) During 2002, a reduction in U.S. LIFO inventory levels resulted in product valued at costs pertaining to prior years being reflected in 2002 cost of sales. This so-called LIFO liquidation had the effect of increasing pre-tax income for the Davison segment and Grace by $0.5 million.

## OTHER ASSETS

|  |  |  |
|---|---:|---:|
| Deferred pension costs........................... | $ 104.2 | $ 143.3 |
| Deferred charges .............................. | 38.3 | 44.9 |
| Long-term receivables, less allowances of $0.8 (2001 - $0.6) .............................. | 2.0 | 2.8 |
| Investments in unconsolidated affiliates........ | 0.4 | 3.0 |
| Patents, licenses and other intangible assets, net .......................................... | 63.3 | 57.5 |
| Pension-unamortized prior service cost ........ | 26.4 | 19.7 |
| Other assets .................................. | 5.0 | 4.3 |
|  | $ 239.6 | $ 275.5 |

| OTHER CURRENT LIABILITIES |  |  |
|---|---:|---:|
| Accrued compensation .......................... | $ 40.0 | $ 39.4 |
| Accrued interest .............................. | 6.4 | 4.8 |
| Deferred tax liability ........................ | 0.8 | 0.8 |
| Customer volume rebates ....................... | 21.2 | 19.2 |
| Accrued commissions ........................... | 6.0 | 6.1 |
| Accrued reorganization fees ................... | 9.4 | 6.4 |
| Other accrued liabilities ..................... | 46.5 | 49.6 |
|  | $ 130.3 | $ 126.3 |

| OTHER LIABILITIES |  |  |
|---|---:|---:|
| Pension-underfunded plans ..................... | $ 295.1 | $ 85.8 |
| Other accrued liabilities ..................... | 6.2 | 8.7 |
|  | $ 301.3 | $ 94.5 |

F-22

CC-BLG002442

## 10. PROPERTIES AND EQUIPMENT

### PROPERTIES AND EQUIPMENT

| (Dollars in millions) | 2002 | 2001 |
|---|---|---|
| Land | $ 20.5 | $ 17.7 |
| Buildings | 367.2 | 335.1 |
| Information technology and equipment | 99.8 | 104.4 |
| Machinery, equipment and other | 1,137.0 | 1,076.0 |
| Projects under construction | 66.2 | 51.1 |
| Properties and equipment, gross | 1,690.7 | 1,584.3 |
| Accumulated depreciation and amortization | (1,069.9) | (995.3) |
| Properties and equipment, net | $ 620.8 | $ 589.0 |

Interest costs are capitalized for significant, extended construction projects. The amounts were insignificant for the periods presented. Depreciation and lease amortization expense relating to properties and equipment amounted to $89.6 million in 2002, $84.0 million in 2001 and $84.6 million in 2000. Grace's rental expense for operating leases amounted to $15.1 million in 2002, $14.2 million in 2001 and $14.2 million in 2000. (See Note 14 for information regarding contingent rentals.)

At December 31, 2002, minimum future payments for operating leases were (dollars in millions):

### MINIMUM FUTURE PAYMENTS UNDER OPERATING LEASES

| | |
|---|---|
| 2003 | $ 16.0 |
| 2004 | 13.5 |
| 2005 | 11.7 |
| 2006 | 7.8 |
| 2007 | 6.5 |
| Thereafter | 12.0 |
| Total minimum lease payments | $ 67.5 |

The above minimum lease payments are net of anticipated sublease income of $1.6 million in 2003, $1.5 million in 2004, $1.4 million in 2005, $1.4 million in 2006 and $1.3 million in 2007.

## 11. LIFE INSURANCE

Grace is the beneficiary of life insurance policies on certain current and former employees with a net cash surrender value of $82.4 million and $75.6 million at December 31, 2002 and 2001, respectively. The policies were acquired to fund various employee benefit programs and other long-term liabilities and are structured to provide cash flow (primarily tax-free) over an extended number of years. The following table summarizes activity in these policies for 2002, 2001 and 2000:

### LIFE INSURANCE - ACTIVITY SUMMARY

| (Dollars in millions) | 2002 | 2001 | 2000 |
|---|---|---|---|
| Earnings on policy assets | $ 39.4 | $ 40.3 | $ 36.8 |
| Interest on policy loans | (34.7) | (34.9) | (30.4) |
| Premiums | 2.4 | 2.5 | 2.5 |
| Proceeds from policy loans | -- | (48.7) | -- |
| Policy loan repayments | 5.1 | 15.0 | 5.2 |
| Net investing activity | (5.4) | (2.9) | 8.6 |
| Change in net cash value | $ 6.8 | $ (28.7) | $ 22.7 |
| Gross cash value | $ 471.3 | $ 477.5 | $ 452.4 |
| Principal - policy loans | (365.4) | (377.6) | (325.8) |
| Accrued interest - policy loans | (23.5) | (24.3) | (22.3) |

CC-BLG002443

| | | | | | |
|---|---|---|---|---|---|
| Net cash value................... | $ | 82.4 | $ | 75.6 | $ | 104.3 |
| Insurance benefits in force...... | $ 2,240.8 | $ 2,291.0 | $ 2,286.0 |
| Tax-free proceeds received....... | $ | 19.4 | $ | 18.0 | $ | 18.7 |

Grace's financial statements display income statement activity and balance sheet amounts on a net basis, reflecting the contractual interdependency of policy assets and liabilities.

## 12. DEBT

### COMPONENTS OF DEBT

| (Dollars in millions) | 2002 | 2001 |
|---|---|---|
| DEBT PAYABLE WITHIN ONE YEAR | | |
| Other short-term borrowings (1).............. | $   3.4 | $   6.3 |
| | $   3.4 | $   6.3 |
| DEBT PAYABLE AFTER ONE YEAR | | |
| DIP facility (2)........................... | $   -- | $   -- |
| DEBT SUBJECT TO COMPROMISE | | |
| Bank borrowings (3)........................ | $ 500.0 | $ 500.0 |
| Other borrowings (4)....................... | 1.0 | 1.3 |
| Accrued interest (5)....................... | 37.8 | 23.2 |
| | $ 538.8 | $ 524.5 |
| Full-year weighted average interest rates on total debt (6)........................... | 2.8% | 5.8% |

(1) Represents borrowings under various lines of credit and other miscellaneous borrowings, primarily of non-U.S. subsidiaries.

(2) In 2001, the Debtors entered into a debtor-in-possession post-petition loan and security agreement with Bank of America, N.A. (the "DIP facility") in the aggregate amount of $250 million. The DIP facility has a term of two years, is secured by priority liens on substantially all assets of the Debtors, and bears interest based on LIBOR plus 2.00 to 2.25 percentage points. As of December 31, 2002, the Debtors had no outstanding borrowings under the DIP facility. However, $13.7 million of standby letters of credit were issued and outstanding under the facility as of December 31, 2002, which were issued mainly for trade-related matters such as performance bonds, as well as certain insurance and environmental matters. The outstanding amount of standby letters of credit issued under the DIP facility reduces the borrowing availability by a corresponding amount. Under the DIP facility, the Debtors are required to maintain $50 million of liquidity, a combination of cash, cash equivalents and the cash value of life insurance policies. As of December 31, 2002, the cash value of life insurance policies exceeds the $50 million requirement.

(3) Under bank revolving credit agreements in effect prior to the Filing, Grace could borrow up to $500 million at interest rates based upon the prevailing prime, federal funds and/or Eurodollar rates. Of that amount, $250 million was available under short-term facilities expiring in May 2001, and $250 million was available under a long-term facility expiring in May 2003. As a result of the Filing,

F-23

CC-BLG002444

Grace was in default under the bank revolving credit agreements, and accordingly, the balance as of the Filing Date was reclassified to debt subject to compromise in the Consolidated Balance Sheet.

(4) Miscellaneous borrowings primarily consisting of U.S. mortgages.

(5) Grace is continuing to accrue interest expense on its pre-petition debt at the pre-petition contractual rate of LIBOR plus 100 basis points.

(6) Computation excludes interest expense and financing costs related to Grace's receivables securitization program, which was terminated in May 2001.

The Debtors have filed a motion with the Bankruptcy Court seeking approval to extend the term of the DIP facility for an additional three years and to modify certain other provisions.

Interest payments amounted to $1.1 million in 2002, $9.5 million in 2001 and $23.7 million in 2000.

## 13. FINANCIAL INSTRUMENTS

### DEBT AND INTEREST RATE SWAP AGREEMENTS

Grace was not a party to any financial derivative instruments at December 31, 2002 and December 31, 2001.

### FAIR VALUE OF DEBT AND OTHER FINANCIAL INSTRUMENTS

At December 31, 2002, the fair value of Grace's debt payable within one year not subject to compromise approximated the recorded value of $3.4 million. Fair value is determined based on expected future cash flows (discounted at market interest rates), quotes from financial institutions and other appropriate valuation methodologies. At December 31, 2002, the recorded values of other financial instruments such as cash, short-term investments, trade receivables and payables and short-term debt approximated their fair values, based on the short-term maturities and floating rate characteristics of these instruments. The fair value of debt subject to compromise is undeterminable; the ultimate value of such debt will be determined by the outcome of the Chapter 11 proceedings.

### SALE OF ACCOUNTS RECEIVABLE

Prior to the Filing, Grace sold, on an ongoing basis, approximately a $100 million pool of its eligible trade accounts receivable to a multi-seller receivables company (the "conduit") through a wholly owned special purpose subsidiary (the "SPS"). Upon sale of the receivables, the SPS held a subordinated retained interest in the receivables. Under the terms of the agreement, new receivables were added to the pool as collections reduced previously sold receivables. Grace serviced, administered and collected the receivables on behalf of the SPS and the conduit. The proceeds were used for the reduction of other short-term obligations and are reflected as operating cash flows in the Consolidated Statement of Cash Flows for the years ended December 31, 2001 and 2000. Grace has recorded net losses of $1.2 and $5.0 million in 2001 and 2000, respectively, from the corresponding sales to the conduit. As a result of the Filing, which constituted an event of default under the program, the amount outstanding under the program, approximately $65.3 million, was satisfied through the use of pre-petition trade receivables collected by the SPS during the period from the Filing Date to early May 2001. The program was terminated effective May 14, 2001.

### CREDIT RISK

Trade receivables potentially subject Grace to credit risk. Concentrations of credit to customers in the petroleum and construction industries represent the greatest exposure. Grace's credit evaluation policies, relatively short collection terms and history of minimal credit losses mitigate credit risk exposures. Grace does not generally require collateral for its trade accounts receivable.

## 14. COMMITMENTS AND CONTINGENT LIABILITIES

### ASBESTOS-RELATED LITIGATION - SEE NOTE 3

### ENVIRONMENTAL REMEDIATION

#### General Matters and Discussion

Grace is subject to loss contingencies resulting from extensive and evolving federal, state, local and foreign environmental laws and regulations relating to the generation, storage, handling, discharge and disposition of hazardous wastes and other materials. Grace accrues for anticipated

CC-BLG002445

costs associated with investigative and remediation efforts where an assessment has indicated that a probable liability has been incurred and the cost can be reasonably estimated. These accruals do not take into account any discounting for the time value of money. At December 31, 2002, Grace's liability for environmental investigative and remediation costs related to continuing and discontinued operations totaled $201.1 million, as compared to $153.1 million at December 31, 2001. This estimate of environmental cost is based on funding and/or

F-24

CC-BLG002446

remediation agreements in place and Grace's best estimate of its cost for sites not subject to a formal remediation plan. The amounts of cash expenditures below have been charged against previously established reserves for the periods presented.

(Dollars in millions)

```
==================================================================
                                    2002       2001       2000
                                  --------   --------   --------
Continuing Operations.............  $   20.0   $   24.9   $   36.8
Discontinued Operations...........       0.8        4.0       10.4
                                  --------   --------   --------
Total.............................  $   20.8   $   28.9   $   47.2
==================================================================
```

Grace has continued to fund environmental remediation activities related to its owned sites while in Chapter 11. Charges against previously established reserves include $1.4 million for draws under letters of credit supporting environmental remediation activity. During 2002, the draws were reclassified to "other" liabilities subject to compromise as a payable to the issuing banks.

During 2002, Grace recorded pre-tax charges of $70.7 million for environmental matters. Approximately $68.0 million of these charges were in connection with a cost recovery lawsuit brought by the U.S. government relating to Grace's former vermiculite mining and processing activities near Libby, Montana. The environmental risks related to such activities could result in additional material future charges to Grace's earnings, the amounts of which are not currently determinable. (See discussion under "Vermiculite Related Matters" below.)

Grace's environmental liabilities are reassessed whenever circumstances become better defined or remediation efforts and their costs can be better estimated. These liabilities are evaluated based on currently available information, including the progress of remedial investigation at each site, the current status of discussions with regulatory authorities regarding the method and extent of remediation at each site, existing technology, prior experience in contaminated site remediation and the apportionment of costs among potentially responsible parties. Grace expects that the funding of environmental remediation activities will be affected by the Chapter 11 proceedings; any such effect could be material. Grace's environmental liabilities are included in "liabilities subject to compromise" as of December 31, 2002.

**Vermiculite Related Matters**

From the 1920's until 1990, Grace and previous owners conducted vermiculite mining and related activities near Libby, Montana. The vermiculite ore that was mined contained varying amounts of asbestos as a contaminant, almost all of which was removed during processing. Expanded vermiculite from Libby was used in products such as fireproofing, insulation and potting soil. In November 1999, Region 8 of the U.S. Environmental Protection Agency ("EPA") began an investigation into alleged excessive levels of asbestos-related disease in the Libby population related to these former mining activities. This investigation led the EPA to undertake additional investigative activity and to carry out response actions in and around Libby. On March 30, 2001, the EPA filed a lawsuit in U.S. District Court for the District of Montana, Missoula Division (United States v. W. R. Grace & Company et al.) under the Comprehensive Environmental Response, Compensation and Liability Act for the recovery of costs allegedly incurred by the United States in response to the release or threatened release of asbestos in the Libby, Montana area relating to such former mining activities. These costs include cleaning and/or demolition of contaminated buildings, the excavation and removal of contaminated soil, health screening of Libby residents and former mine workers, and investigation and monitoring costs. In this action, the EPA also sought a declaration of Grace's liability that would be binding in future actions to recover further response costs.

In connection with its defense, Grace conducted its own investigation to determine whether the EPA's actions and cost claims were justified and reasonable. However, in December 2002, the District Court granted the United States' motion for partial summary judgment on a number of issues that limited Grace's ability to challenge the EPA's response actions. In January 2003, a trial was held on the remainder of the issues, which primarily involved the reasonableness and adequacy of documentation of the EPA's cost recovery claims through December 31, 2001. No decision has yet been issued. The EPA's Libby-related cost recovery claims through December 31, 2001 totaled approximately $57 million. Based on the testimony of EPA witnesses deposed in the lawsuit and other information, Grace believes that the EPA's total cost recovery claims could reach, and potentially exceed, $100 million. This lawsuit is not subject to the automatic stay provided under the Bankruptcy Code. Grace has accrued a

F-25

CC-BLG002447

liability of $63 million at December 31, 2002 with respect to this lawsuit and future cost recovery claims expected to be made by the EPA, which represents Grace's current best estimate of probable liability and defense costs, pending the issuance of a decision of the trial court and the availability of additional information about the EPA's 2002 costs and projected future costs. Grace's liability for this matter is included in "liabilities subject to compromise" and any payments would be subject to the outcome of the Chapter 11 proceedings.

Since January 2000, Grace has spent approximately $13.2 million for remediation of certain Libby area vermiculite processing sites and for health care of Libby area residents diagnosed with asbestos-related illness.

The EPA is also evaluating environmental risks at vermiculite processing sites throughout the U.S. that processed vermiculite from Libby, Montana, and has made claims against Grace to carry out or fund remediation activities. Grace is reviewing the EPA's actions and cost claims to determine whether they are justified and reasonable and, in several instances, has remediated or agreed to remediate certain sites. Costs associated with the above are included in "provision for environmental remediation" included in the Consolidated Statement of Operations.

**Insurance Matters**

Grace is a party to three environmental insurance coverage actions involving one primary and one excess insurance carrier regarding the applicability of the carriers' policies to Grace's environmental remediation costs. The outcome of such litigation as well as the amounts of any recoveries that Grace may receive is presently uncertain. Accordingly, Grace has not recorded a receivable with respect to such insurance coverage.

**CONTINGENT RENTALS**

Grace is the named tenant or guarantor with respect to leases entered into by previously divested businesses. These leases, some of which extend through the year 2017, have future minimum lease payments aggregating $79.8 million, and are fully offset by anticipated future minimum rental income from existing tenants and subtenants. In addition, Grace is liable for other expenses (primarily property taxes) relating to the above leases; these expenses are paid by current tenants and subtenants. Certain of the rental income and other expenses are payable by tenants and subtenants that have filed for bankruptcy protection or are otherwise experiencing financial difficulties. Grace believes that any loss from these lease obligations would be immaterial. Grace has rejected certain of these leases as permitted by the Bankruptcy Code, the financial impacts of which are insignificant.

**TAX MATTERS**

Grace has received the examination report from the Internal Revenue Service ("IRS") on tax periods 1993 through 1996 asserting, in the aggregate, approximately $114.0 million of proposed tax adjustments. The most significant contested issue addressed in such report concerns corporate-owned life insurance ("COLI") policies and is discussed below. Other proposed IRS tax adjustments include Grace's tax position regarding research and development credits, reporting of certain divestitures and other miscellaneous proposed adjustments. The tax audit for the 1993 through 1996 tax period is under the jurisdiction of IRS Appeals, where Grace has filed a protest. Grace's federal tax returns covering periods 1997 and forward are either under examination by the IRS or open for future examination. Grace believes that previously established reserves for tax matters will be sufficient to cover the expected net cost of probable tax return adjustments. Any cash payment would be subject to Grace's Chapter 11 proceedings.

In 1988 and 1990, Grace acquired COLI policies on the lives of certain of its employees as part of a strategy to fund the cost of postretirement employee health care benefits and other long-term liabilities. COLI premiums have been funded in part by loans issued against the cash surrender value of the COLI policies. The IRS is challenging deductions of interest on loans secured by COLI policies for years prior to 1999. In 2000, Grace paid $21.2 million of tax and interest related to this issue for tax years 1990 through 1992. Subsequent to 1992, Grace deducted approximately $163.2 million in interest attributable to COLI policy loans. Although Grace continues to believe that the deductions were legitimate, the IRS has successfully challenged interest deductions claimed by other corporations with respect to broad-based COLI policies in all of the three litigated cases to date. Therefore, Grace requested and was granted early referral to the IRS Office of Appeals for consideration of possible settlement alternatives of the COLI interest deduction issue.

F-26

CC-BLG002448

On September 23, 2002, Grace filed a motion in its Chapter 11 bankruptcy proceeding requesting that the Bankruptcy Court authorize Grace to enter into a settlement agreement with the IRS with respect to Grace's COLI interest deductions. The tax years at issue are 1989 through 1998. Under the terms of the proposed settlement, the government would allow 20% of the aggregate amount of the COLI interest deductions and Grace would owe federal income tax and interest on the remaining 80%. Grace has accrued for the potential tax and interest liability related to the disallowance of all COLI interest deductions and continues to accrue interest as part of its quarterly income tax provision. On October 22, 2002, the Bankruptcy Court issued an order authorizing Grace to enter into settlement discussions with the IRS consistent with the aforementioned terms and further ordered that any final agreement would be subject to Bankruptcy Court approval. Grace is currently in negotiations with the IRS concerning the proposed settlement.

The IRS has assessed additional federal income tax withholding and Federal Insurance Contributions Act taxes plus interest and related penalties for calendar years 1993 through 1995 against a Grace subsidiary that formerly operated a temporary staffing business for nurses and other health care personnel. The assessments, aggregating $21.8 million, were made in connection with a meal and incidental expense per diem plan for traveling health care personnel, which was in effect through 1999. The IRS contends that certain per diem reimbursements should have been treated as wages subject to employment taxes and federal income tax withholding. Grace contends that its per diem and expense allowance plans were in accordance with statutory and regulatory requirements, as well as other published guidance from the IRS. Grace expects that the IRS will make additional assessments for the 1996 through 1999 periods. The matter is currently pending in the United States Court of Claims. Grace is currently in discussions with the Department of Justice concerning possible settlement options.

## LITIGATION RELATED TO FORMER PACKAGING AND MEDICAL CARE BUSINESSES

Grace has been named in a purported class action suit filed in September 2000 in California Superior Court for the County of San Francisco alleging that the 1996 reorganization involving a predecessor of Grace and Fresenius AG and the 1998 reorganization involving a predecessor of Grace and Sealed Air Corporation were fraudulent transfers. The Bankruptcy Court authorized the Official Committee of Asbestos Personal Injury Claimants and the Official Committee of Asbestos Property Damage Claimants to represent Grace in these lawsuits. On November 29, 2002, Sealed Air Corporation and Fresenius Medical Care AG each announced that they had reached agreements in principle with representatives of the asbestos creditors committees to resolve all of the current and future asbestos-related claims and the pending fraudulent transfer claims made against them and their respective affiliates. Under the terms of the proposed Sealed Air settlement, Sealed Air would make a payment of $512.5 million (plus interest at 5.5% per annum, commencing on December 21, 2002) and nine million shares of Sealed Air common stock, valued at $335.7 million as of December 31, 2002, as directed by the Bankruptcy Court upon confirmation of Grace's plan of reorganization. Under the terms of the proposed Fresenius settlement, as subsequently revised, Fresenius would contribute $115.0 million to the Grace estate, or as otherwise directed by the Bankruptcy Court, upon confirmation of a plan of reorganization. Both settlements are subject to Bankruptcy Court approval. Grace is unable to predict how these settlements may ultimately affect its plan of reorganization.

## PURCHASE COMMITMENTS

From time to time, Grace engages in purchase commitments in its various business activities, all of which are expected to be fulfilled with no material adverse consequences to Grace's operations or financial condition.

## GUARANTEES AND INDEMNIFICATION OBLIGATIONS

Grace is a party to many contracts containing guarantees and indemnification obligations. These contracts primarily consist of:

o Contracts providing for the sales of a former business unit or product line in which Grace has agreed to indemnify the buyer against liabilities arising prior to the closing of the transaction, including environmental liabilities. These liabilities are included in "liabilities subject to compromise" in the Consolidated Balance Sheet;

o Guarantees of real property lease obligations of third parties, typically arising out of (a) leases entered into by former subsidiaries of Grace, or

F-27

CC-BLG002449

(b) the assignment or sublease of a lease by Grace to a third party. These obligations are included in "liabilities subject to compromise" in the Consolidated Balance Sheet;

o Contracts entered into with third party consultants, independent contractors and other service providers in which Grace has agreed to indemnify such parties against certain liabilities in connection with their performance. Based on historical experience and the likelihood that such parties will ever make a claim against Grace, such indemnification obligations are immaterial;

o Product warranties with respect to certain products sold to customers in the ordinary course of business. These warranties typically provide that product will conform to specifications. Grace generally does not establish a liability for product warranty based on a percentage of sales or other formula. Grace accrues a warranty liability on a transaction-specific basis depending on the individual facts and circumstances related to each sale. Both the liability and annual expense related to product warranties are immaterial to the Consolidated Financial Statements.

## FINANCIAL ASSURANCES

Financial assurances have been established for a variety of purposes, including insurance and environmental matters, asbestos settlements and appeals, trade-related commitments and other matters. At December 31, 2002, Grace had gross financial assurances issued and outstanding of $237.7 million, comprised of $137.4 million of gross surety bonds issued by various insurance companies and $100.3 million of standby letters of credit issued by various banks. Of the standby letters of credit, $19.7 million act as collateral for surety bonds, thereby reducing Grace's overall obligations under its financial assurances to a net amount of $218.0 million. Of this net amount, approximately $6.5 million were issued on behalf of non-Debtor entities and $211.5 million were issued on behalf of the Debtors. Of the amounts issued by the Debtors, approximately $195.1 million were issued before the Filing Date, with the remaining $16.4 million being subsequent to the Filing, of which $13.7 million was issued under the DIP facility.

## ACCOUNTING FOR CONTINGENCIES

Although the outcome of each of the matters discussed above cannot be predicted with certainty, Grace has assessed its risk and has made accounting estimates as required under U.S. generally accepted accounting principles. As a result of the Filing, claims related to the items discussed above will be addressed as part of Grace's Chapter 11 proceedings. Accruals recorded for such contingencies have been included in "liabilities subject to compromise" on the accompanying Consolidated Balance Sheet as of December 31, 2002. The amounts of these liabilities as ultimately determined through the Chapter 11 proceedings could be materially different from amounts recorded by Grace at December 31, 2002.

## 15. SHAREHOLDERS' EQUITY (DEFICIT)

Under its Certificate of Incorporation, the Company is authorized to issue 300,000,000 shares of common stock, $.01 par value. Of the common stock unissued at December 31, 2002, approximately 10,440,400 shares were reserved for issuance pursuant to stock options and other stock incentives. The Company has not paid a dividend on its common stock since 1998. The Certificate of Incorporation also authorizes 53,000,000 shares of preferred stock, $.01 par value, none of which has been issued. 3,000,000 of such shares have been designated as Series A Junior Participating Preferred Stock and are reserved for issuance in connection with the Company's Preferred Stock Purchase Rights ("Rights"). A Right trades together with each outstanding share of common stock and entitles the holder to purchase one one-hundredth of a share of Series A Junior Participating Preferred Stock under certain circumstances and subject to certain conditions. The Rights are not and will not become exercisable unless and until certain events occur, and at no time will the Rights have any voting power.

The Company's Board of Directors previously approved programs to repurchase outstanding shares of common stock. During the year ended December 31, 2000, the Company acquired 4,815,400 shares of common stock for $47.3 million (at an average price per share of $9.82). No shares were repurchased under this program during 2002 and 2001.

In November 2001, 56,911 shares of restricted stock were reclassified as treasury shares to reflect an election made by Paul J. Norris, Grace's Chairman,

CC-BLG002450

President and Chief Executive Officer, under a Bankruptcy Court approved employment agreement.

## 16. EARNINGS (LOSS) PER SHARE

The following table shows a reconciliation of the numerators and denominators used in calculating basic and diluted earnings (loss) per share from continuing operations.

### EARNINGS (LOSS) PER SHARE

| (Amounts in millions, except per share amounts) | 2002 | 2001 | 2000 |
|---|---|---|---|
| NUMERATORS | | | |
| Net income (loss)........ | $ 22.1 | $ 78.6 | $ (89.7) |
| DENOMINATORS | | | |
| Weighted average common shares - basic calculation............. | 65.4 | 65.3 | 66.8 |
| Dilutive effect of employee stock options and restricted shares... | 0.1 | 0.1 | -- |
| Weighted average common shares - diluted calculation............. | 65.5 | 65.4 | 66.8 |
| BASIC EARNINGS (LOSS) PER SHARE.............. | $ 0.34 | $ 1.20 | $ (1.34) |
| DILUTED EARNINGS (LOSS) PER SHARE.............. | $ 0.34 | $ 1.20 | $ (1.34) |

Stock options that could potentially dilute basic earnings (loss) per share (that were excluded from the computation of diluted earnings (loss) per share because their exercise prices were greater than the average market price of the common shares) averaged approximately 11.9 million in 2002, 14.2 million in 2001 and 9.4 million in 2000. As a result of the 2000 net loss of $89.7 million, approximately 800,000 of employee compensation-related shares, primarily issuable under stock options, were excluded from the diluted loss per share calculation in 2000 because their effect would have been antidilutive.

## 17. STOCK INCENTIVE PLANS

Each stock option granted under the Company's stock incentive plans has an exercise price equal to the fair market value of the Company's common stock on the date of grant. Options become exercisable at the time or times determined by a committee of the Company's Board of Directors and may have terms of up to ten years and one month. The following table sets forth information relating to such options during 2002, 2001 and 2000:

| STOCK OPTION ACTIVITY | 2002 | |
|---|---|---|
| | Number of Shares | Average Exercise Price |
| Balance at beginning of year..... | 12,772,431 | $ 11.88 |
| Options granted................. | -- | -- |
| Options exercised............... | (1,266) | 2.40 |
| Options terminated or cancelled.. | (2,330,748) | 11.60 |
| Balance at end of year........... | 10,440,417 | 11.94 |
| Exercisable at end of year....... | 8,973,964 | $ 12.58 |
| | 2001 | |
| Balance at beginning of year..... | 14,005,209 | $ 12.70 |

CC-BLG002451

```
Options granted................    1,339,846    2.59
Options exercised...............       --        --
Options terminated or cancelled..  (2,572,624)  11.46
                                   ------------
Balance at end of year..........   12,772,431   11.88
                                   ============  =====
Exercisable at end of year.......   9,586,993  $ 12.64
                                   ============  =====
                                                 2000
                                   ------------------------
Balance at beginning of year.....  12,530,287  $ 12.27
Options granted.................    2,555,000   13.32
Options exercised...............     (779,863)   7.52
Options terminated or cancelled..    (300,215)  13.62
                                   ------------
Balance at end of year..........   14,005,209   12.70
                                   ============  =====
Exercisable at end of year.......   9,386,539  $ 11.96
                                   ============  =====
```

At December 31, 2002, 4,468,504 shares were available for additional grants. Currently outstanding options expire on various dates through November 2011.

Following is a summary of stock options outstanding at December 31, 2002:

**STOCK OPTIONS OUTSTANDING**

| EXERCISE PRICE RANGE | Number Outstanding | Weighted-Average Remaining Contractual Life (Years) | Weighted-Average Exercise Price | Number Exercisable | Weighted-Average Exercise Price |
|---|---|---|---|---|---|
| $1 - $8 | 2,661,025 | 5.62 | $ 4.33 | 1,934,444 | $ 5.06 |
| $8 - $13 | 3,247,866 | 5.77 | 12.28 | 3,247,866 | 12.28 |
| $13 - $18 | 2,807,826 | 7.64 | 14.13 | 2,067,954 | 14.37 |
| $18 - $21 | 1,723,700 | 6.02 | 19.47 | 1,723,700 | 19.47 |
| | 10,440,417 | 6.27 | $ 11.94 | 8,973,964 | $ 12.58 |

In 2000, the Company granted a total of 25,000 shares of the Company's Common Stock to certain executives, subject to various restrictions. (No shares were granted in 2001 and 2002.) Such shares are subject to forfeiture if certain employment conditions are not met. At December 31, 2001, restrictions on all prior grants of restricted stock, net of forfeitures, totaled 55,000 shares; these restrictions lapsed in 2002. The quoted market value of the restricted shares at the date of grant is amortized to expense ratably over the restriction period.

SFAS No. 123, "Accounting for Stock-Based Compensation," permits the Company to follow the measurement provisions of APB Opinion No. 25, "Accounting for Stock Issued to Employees," and not recognize compensation expense for its stock-based

F-29

CC-BLG002452

incentive plans. Had compensation cost for the Company's stock-based incentive compensation plans been determined based on the fair value at the grant dates of awards under those plans, consistent with the methodology prescribed by SFAS No. 123, the Company's net income (loss) and related earnings
(loss) per share for 2002, 2001 and 2000 would have been reduced to the pro forma amounts indicated below:

**PRO FORMA EARNINGS
UNDER SFAS NO. 123**

| (Amounts in millions, except per share amounts) | 2002 | 2001 | 2000 |
|---|---|---|---|
| Net income (loss): | | | |
| As reported......................... | $ 22.1 | $ 78.6 | $ (89.7) |
| Pro forma (1)....................... | 17.9 | 71.2 | (98.5) |
| Basic earnings (loss) per share: | | | |
| As reported......................... | $ 0.34 | $ 1.20 | $ (1.34) |
| Pro forma (1)....................... | 0.27 | 1.09 | (1.47) |
| Diluted earnings (loss) per share: | | | |
| As reported......................... | $ 0.34 | $ 1.20 | $ (1.34) |
| Pro forma (1)....................... | 0.27 | 1.09 | (1.47) |

(1) These pro forma amounts may not be indicative of future income (loss) and earnings (loss) per share due to Grace's Chapter 11 Filing.

To determine compensation cost under SFAS No. 123, the fair value of each option is estimated on the date of grant using the Black-Scholes option pricing model, with the following historical weighted average assumptions applied to grants in 2001 and 2000:

| OPTION VALUE ASSUMPTIONS | 2001 | 2000 |
|---|---|---|
| Dividend yield............................. | -- % | -- % |
| Expected volatility......................... | 61 % | 59 % |
| Risk-free interest rate..................... | 5 % | 7 % |
| Expected life (in years).................... | 4 | 4 |

Based upon the above assumptions, the weighted average fair value of each option granted was $1.28 per share for 2001 and $6.86 per share for 2000.

## 18. PENSION PLANS AND OTHER POSTRETIREMENT BENEFITS PLANS

Grace maintains defined benefit pension plans covering employees of certain units who meet age and service requirements. Benefits are generally based on final average salary and years of service. Grace funds its U.S. pension plans in accordance with U.S. federal laws and regulations. Non-U.S. pension plans are funded under a variety of methods, as required under local laws and customs, and therefore cannot be summarized. Grace's accumulated other comprehensive loss, reflected as a reduction of shareholders' equity (deficit), included additional minimum pension liabilities as of December 31, 2002 and 2001 of $436.5 million ($283.7 million, net of tax) and $209.3 million ($136.0 million, net of tax), respectively, for plans where the accumulated benefit obligation exceeded the fair market value of assets. These amounts include offsets of related deferred pension costs.

Grace provides certain other postretirement health care and life insurance benefits for retired employees of certain U.S. business units and certain divested units. The postretirement medical plan provides various levels of benefits to employees (depending on their dates of hire) who retire from Grace after age 55 with at least 10 years of service. These plans are unfunded, and Grace pays the costs of benefits under these plans as they are incurred. Grace applies SFAS No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions," which requires that the future costs of postretirement health care and life insurance benefits be accrued over the employees' years of service.

An amendment to the structure of the retiree-paid premiums for postretirement medical benefits was approved by the Company's Board in November 2001. The amendment became effective January 1, 2002, and requires all retirees and beneficiaries covered by the postretirement medical plan to contribute a minimum of 40% of the calculated premium for that coverage.

The following summarizes the changes in benefit obligation and fair value of retirement plan assets during the period:

CC-BLG002453

| CHANGE IN FINANCIAL STATUS OF RETIREMENT PLANS | PENSION | | | | | | OTHER POST-RETIREMENT PLANS | |
|---|---|---|---|---|---|---|---|---|
| | U.S. | | NON-U.S. | | TOTAL | | | |
| (Dollars in millions) | 2002 | 2001 | 2002 | 2001 | 2002 | 2001 | 2002 | 2001 |
| CHANGE IN PROJECTED BENEFIT OBLIGATION | | | | | | | | |
| Projected benefit obligation at beginning of year | $ 776.6 | $ 741.0 | $ 196.1 | $ 199.2 | $ 972.7 | $ 940.2 | $ 136.0 | $ 176.7 |
| Service cost | 8.5 | 7.9 | 4.3 | 3.8 | 12.8 | 11.7 | 0.6 | 0.7 |
| Interest cost | 55.1 | 55.3 | 12.5 | 11.2 | 67.6 | 66.5 | 8.7 | 9.8 |
| Plan participants' contributions | -- | -- | 0.4 | 0.4 | 0.4 | 0.4 | -- | -- |
| Amendments | 5.6 | -- | 2.4 | 1.6 | 8.0 | 1.6 | (31.1) | -- |
| Actuarial loss (gain) | 93.6 | 42.9 | 2.8 | 0.6 | 96.4 | 43.5 | 31.1 | (28.9) |
| Benefits paid | (69.2) | (70.5) | (11.1) | (11.7) | (80.3) | (82.2) | (21.5) | (22.3) |
| Currency exchange translation adjustments | -- | -- | 26.3 | (9.0) | 26.3 | (9.0) | -- | -- |
| Projected benefit obligation at end of year | $ 870.2 | $ 776.6 | $ 233.7 | $ 196.1 | $1,103.9 | $ 972.7 | $ 123.8 | $ 136.0 |
| CHANGE IN PLAN ASSETS | | | | | | | | |
| Fair value of plan assets at beginning of year | $ 689.5 | $ 800.2 | $ 167.3 | $ 198.3 | $ 856.8 | $ 998.5 | $ -- | $ -- |
| Actual return on plan assets | (67.8) | (47.0) | (21.4) | (15.2) | (89.2) | (62.2) | -- | -- |
| Employer contribution | 4.3 | 6.8 | 5.9 | 3.8 | 10.2 | 10.6 | 21.5 | 22.3 |
| Acquisitions/spinoff | 0.4 | -- | 1.8 | -- | 2.2 | -- | -- | -- |
| Plan participants' contribution | -- | -- | 0.4 | 0.4 | 0.4 | 0.4 | -- | -- |
| Benefits paid | (69.2) | (70.5) | (11.1) | (11.7) | (80.3) | (82.2) | (21.5) | (22.3) |
| Currency exchange translation adjustment | -- | -- | 16.3 | (8.3) | 16.3 | (8.3) | -- | -- |
| Fair value of plan assets at end of year | $ 557.2 | $ 689.5 | $ 159.2 | $ 167.3 | $ 716.4 | $ 856.8 | $ -- | $ -- |
| Funded status | $(313.0) | $ (87.1) | $(74.5) | $ (28.8) | $(387.5) | $(115.9) | $(123.8) | $(136.0) |
| Unrecognized transition obligation (asset) | -- | 0.7 | 0.5 | 0.8 | 0.5 | 1.5 | -- | -- |
| Unrecognized actuarial loss (gain) | 463.6 | 253.7 | 90.6 | 45.6 | 554.2 | 299.3 | 51.9 | 23.8 |
| Unrecognized prior service cost (benefit) | 26.1 | 25.1 | 3.8 | 4.0 | 29.9 | 29.1 | (75.3) | (56.9) |
| Net amount recognized | $ 176.7 | $ 192.4 | $ 20.4 | $ 21.6 | $ 197.1 | $ 214.0 | $(147.2) | $(169.1) |
| AMOUNTS RECOGNIZED IN THE CONSOLIDATED BALANCE SHEET CONSIST OF: | | | | | | | | |
| Deferred pension costs | $ 5.3 | $ 58.2 | $ 98.9 | $ 85.1 | $ 104.2 | $ 143.3 | $ -- | $ -- |
| Pension related liability | (290.7) | (93.2) | (79.3) | (65.1) | (370.0) | (158.3) | (147.2) | (169.1) |
| Unamortized prior service cost | 26.2 | 19.0 | 0.2 | 0.7 | 26.4 | 19.7 | N/A | N/A |
| Accumulated other comprehensive loss | 435.9 | 208.4 | 0.6 | 0.9 | 436.5 | 209.3 | N/A | N/A |
| Net amount recognized | $ 176.7 | $ 192.4 | $ 20.4 | $ 21.6 | $ 197.1 | $ 214.0 | $(147.2) | $(169.1) |
| WEIGHTED AVERAGE ASSUMPTIONS AS OF DECEMBER 31 | | | | | | | | |
| Discount rate | 6.75% | 7.25% | 5.72% | 5.87% | N/M | N/M | 6.75% | 7.25% |
| Expected return on plan assets | 9.00% | 9.00% | 8.67% | 8.65% | N/M | N/M | N/M | N/M |
| Rate of compensation increase | 4.25% | 4.25% | 3.84% | 4.08% | N/M | N/M | N/M | N/M |

| COMPONENTS OF NET PERIODIC BENEFIT (INCOME) COST (Dollars in millions) | 2002 | | | 2001 | | | 2000 | | |
|---|---|---|---|---|---|---|---|---|---|
| | U.S. | NON-U.S. | OTHER | U.S. | NON-U.S. | OTHER | U.S. | NON-U.S. | OTHER |
| Service cost | $ 8.5 | $ 4.3 | $ 0.6 | $ 7.9 | $ 3.8 | $ 0.7 | $ 6.3 | $ 3.8 | $ 0.6 |
| Interest cost | 55.1 | 12.5 | 8.7 | 55.3 | 11.2 | 9.8 | 54.5 | 11.4 | 14.4 |
| Expected return on plan assets | (59.1) | (14.8) | -- | (69.1) | (15.9) | -- | (78.2) | (18.2) | -- |
| Amortization of transition asset | 0.7 | 0.4 | -- | (10.0) | -- | -- | (10.0) | (0.2) | -- |
| Amortization of prior service cost (benefit) | 5.2 | 0.6 | (12.7) | 7.6 | 0.5 | (8.3) | 7.4 | 0.6 | (6.7) |
| Amortization of unrecognized actuarial loss | 9.7 | 1.8 | 3.0 | 2.4 | 0.2 | 0.1 | 0.8 | (0.4) | 2.4 |
| Net curtailment and settlement loss | -- | -- | -- | -- | 0.2 | -- | -- | -- | -- |
| Net periodic benefit (income) cost | $ 20.1 | $ 4.8 | $ (0.4) | $ (5.9) | $ -- | | $ 2.3 | $ (19.2) | $ (3.0) | $10.7 |

| PENSION PLANS WHERE ACCUMULATED BENEFIT OBLIGATIONS EXCEED PLAN ASSETS (Dollars in millions) | U.S. | | NON-U.S. | | OTHER POST-RETIREMENT PLANS | |
|---|---|---|---|---|---|---|
| | 2002 | 2001 | 2002 | 2001 | 2002 | 2001 |
| Projected benefit obligation | $ 867.1 | $ 691.1 | $ 95.6 | $ 74.1 | N/A | N/A |
| Accumulated benefit obligation | 841.9 | 676.8 | 82.1 | 63.8 | $ 123.8 | $ 136.0 |
| Fair value of plan assets | 551.2 | 583.7 | 3.3 | 0.9 | -- | -- |

N/M - Not meaningful
N/A - Not applicable

CC-BLG002454

For 2002 measurement purposes, rates of increase of 9.0% and 9.5% in the per capita cost of covered retiree health care benefits for pre-age 65 and post-age 65, respectively, were assumed. The rate is assumed to decrease gradually to 5.3% through 2007 and remain at that level thereafter. A one percentage point increase (decrease) in assumed health care medical cost trend rates would have a negligible impact on Grace's postretirement benefit obligations.

## 19. BUSINESS SEGMENT INFORMATION

Grace is a global producer of specialty chemicals and specialty materials. It generates revenues from two business segments: Davison Chemicals and Performance Chemicals. Davison Chemicals produces a variety of catalysts and silica products. Performance Chemicals produces specialty construction chemicals, building materials and sealants and coatings. Intersegment sales, eliminated in consolidation, are not material. The table below presents information related to Grace's business segments for 2002, 2001 and 2000. Only those corporate expenses directly related to the segment are allocated for reporting purposes. All remaining corporate items are reported separately and labeled as such.

| BUSINESS SEGMENT DATA (Dollars in millions) | | 2002 | | 2001 | | 2000 |
|---|---|---|---|---|---|---|
| NET SALES (a) | | | | | | |
| Davison Chemicals.............. | $ | 945.2 | $ | 874.1 | $ | 783.9 |
| Performance Chemicals......... | | 872.0 | | 849.1 | | 813.5 |
| Total..................... | $ | 1,817.2 | $ | 1,723.2 | $ | 1,597.4 |
| PRE-TAX OPERATING INCOME | | | | | | |
| Davison Chemicals.............. | $ | 129.4 | $ | 123.8 | $ | 128.0 |
| Performance Chemicals......... | | 98.8 | | 96.7 | | 91.6 |
| Total..................... | $ | 228.2 | $ | 220.5 | $ | 219.6 |
| DEPRECIATION AND AMORTIZATION | | | | | | |
| Davison Chemicals.............. | $ | 61.7 | $ | 58.4 | $ | 57.2 |
| Performance Chemicals......... | | 31.8 | | 29.5 | | 29.3 |
| Total..................... | $ | 93.5 | $ | 87.9 | $ | 86.5 |
| CAPITAL EXPENDITURES | | | | | | |
| Davison Chemicals.............. | $ | 59.5 | $ | 39.3 | $ | 33.7 |
| Performance Chemicals......... | | 27.9 | | 22.8 | | 28.3 |
| Total..................... | $ | 87.4 | $ | 62.1 | $ | 62.0 |
| TOTAL ASSETS | | | | | | |
| Davison Chemicals.............. | $ | 751.1 | $ | 704.1 | $ | 639.2 |
| Performance Chemicals......... | | 530.9 | | 504.1 | | 486.7 |
| Total..................... | $ | 1,282.0 | $ | 1,208.2 | $ | 1,125.9 |

a= Net sales amounts presented herein for 2000 reflect a reclassification of freight costs and sales commissions (previously shown as a reduction of sales).

The table below presents information related to the geographic areas in which Grace operated in 2002, 2001 and 2000.

## GEOGRAPHIC AREA DATA

| (Dollars in millions) | | 2002 | | 2001 | | 2000 |
|---|---|---|---|---|---|---|
| NET SALES | | | | | | |
| United States................. | $ | 829.2 | $ | 835.1 | $ | 825.6 |
| Canada and Puerto Rico......... | | 56.2 | | 40.7 | | 34.4 |
| Europe......................... | | 551.9 | | 472.9 | | 416.8 |
| Asia Pacific.................. | | 272.8 | | 267.5 | | 216.8 |
| Latin America................. | | 107.1 | | 107.0 | | 103.8 |
| Total..................... | $ | 1,817.2 | $ | 1,723.2 | $ | 1,597.4 |

CC-BLG002455

PROPERTIES AND EQUIPMENT, NET

| | | | | | |
|---|---|---|---|---|---|
| United States.................. | $ | 392.0 | $ | 386.7 | $ | 408.3 |
| Canada and Puerto Rico......... | | 18.4 | | 20.1 | | 19.9 |
| Europe......................... | | 152.0 | | 118.0 | | 101.1 |
| Asia Pacific................... | | 47.4 | | 49.1 | | 54.7 |
| Latin America.................. | | 11.0 | | 15.1 | | 17.7 |
| Total......................... | $ | 620.8 | $ | 589.0 | $ | 601.7 |

F-32

CC-BLG002456

Pre-tax operating income, depreciation and amortization, capital expenditures and total assets for Grace's business segments are reconciled below to amounts presented in the Consolidated Financial Statements.

## RECONCILIATION OF BUSINESS SEGMENT
## DATA TO FINANCIAL STATEMENTS

| (Dollars in millions) | 2002 | 2001 | 2000 |
|---|---|---|---|
| Pre-tax operating income - business segments | $ 228.2 | $ 220.5 | $ 219.6 |
| Add back: | | | |
| Minority Interest | 1.9 | 3.5 | -- |
| | $ 230.1 | $ 224.0 | $ 219.6 |
| Gain on disposal of assets | 0.7 | 1.8 | 5.5 |
| Gain on sale of investments | 1.2 | 7.9 | 19.0 |
| Provision for environmental remediation | (70.7) | (5.8) | (10.4) |
| Provisions for asbestos-related litigation, net of insurance coverage | -- | -- | (208.0) |
| Interest expense and related financing costs | (20.0) | (37.1) | (28.1) |
| Corporate operating costs | (47.4) | (33.0) | (32.5) |
| Other, net | (1.8) | 3.7 | 15.2 |
| Income (loss) from operations before Chapter 11 expenses, income taxes, and minority interest | $ 92.1 | $ 161.5 | $ (19.7) |
| Depreciation and amortization - business segments | $ 93.5 | $ 87.9 | $ 86.5 |
| Depreciation and amortization - corporate | 1.1 | 1.1 | 1.3 |
| Total depreciation and amortization | $ 94.6 | $ 89.0 | $ 87.8 |
| Capital expenditures - business segments | $ 87.4 | $ 62.1 | $ 62.0 |
| Capital expenditures - corporate | 3.7 | 0.8 | 2.8 |
| Total capital expenditures | $ 91.1 | $ 62.9 | $ 64.8 |
| Total assets - business segments | $ 1,282.0 | $ 1,208.2 | $1,125.9 |
| Total assets - corporate | 528.4 | 491.4 | 599.8 |
| Asbestos-related receivables | 282.6 | 293.4 | 372.0 |
| Deferred tax assets | 594.7 | 525.4 | 487.2 |
| Total assets | $ 2,687.7 | $ 2,518.4 | $2,584.9 |

F-33

CC-BLG002457

20. QUARTERLY SUMMARY AND STATISTICAL INFORMATION (UNAUDITED)

QUARTERLY SUMMARY AND STATISTICAL INFORMATION (Unaudited)
(Dollars in millions, except per share)

|  | March 31 | June 30 | September 30 | December 31(1) |
|---|---|---|---|---|
| **2002** | | | | |
| Net sales ..................... | $ 413.5 | $ 471.6 | $ 478.7 | $ 453.4 |
| Cost of goods sold (2) .......... | 260.8 | 294.6 | 299.4 | 294.1 |
| Net income (loss) .............. | 12.4 | 21.2 | 14.0 | (25.5) |
| Net income per share: (3) | | | | |
| Basic earnings per share: | | | | |
| Net income .................. | $ 0.19 | $ 0.32 | $ 0.21 | $ (0.39) |
| Diluted earnings per share: | | | | |
| Net income .................. | 0.19 | 0.32 | 0.21 | (0.39) |
| Market price of common stock: (4) | | | | |
| High ........................ | $ 2.47 | $ 3.75 | $ 3.05 | $ 2.50 |
| Low ......................... | 1.56 | 2.13 | 1.46 | 0.99 |
| Close ....................... | 2.20 | 3.00 | 1.60 | 1.96 |
| **2001** | | | | |
| Net sales ..................... | $ 395.7 | $ 450.3 | $ 448.1 | $ 429.1 |
| Cost of goods sold (2) .......... | 252.2 | 279.0 | 275.2 | 273.0 |
| Net income ................... | 14.6 | 23.0 | 19.8 | 21.2 |
| Net income per share: (3) | | | | |
| Basic earnings per share: | | | | |
| Net income .................. | $ 0.22 | $ 0.35 | $ 0.30 | $ 0.32 |
| Diluted earnings per share: | | | | |
| Net income .................. | 0.22 | 0.35 | 0.30 | 0.32 |
| Market price of common stock: (4) | | | | |
| High ........................ | ·$ 4.38 | $ 2.35 | $ 1.87 | $ 1.72 |
| Low ......................... | 1.63 | 1.31 | 1.46 | 1.35 |
| Close ....................... | 2.30 | 1.75 | 1.55 | 1.55 |

(1) Fourth quarter 2002 net income includes a $51.0 million pre-tax charge to adjust Grace's estimate of defense and other probable costs to resolve cost recovery claims by the EPA for cleanup of vermiculite in and around Libby, Montana.

(2) 2002 and 2001 quarterly results are retroactively restated to reflect the full consolidation of Advanced Refining Technologies, LLC, previously reported as an equity method joint venture. This restatement had no effect on reported sales or net income.

(3) Per share results for the four quarters may differ from full-year per share results, as a separate computation of the weighted average number of shares outstanding is made for each quarter presented.

(4) Principal market: New York Stock Exchange.

F-34

CC-BLG002458

FINANCIAL SUMMARY (1) (Dollars in millions, except per share amounts)

| | 2002 | 2001 | 2000 | 1999 | 1998 |
|---|---|---|---|---|---|
| **STATEMENT OF OPERATIONS** | | | | | |
| Net sales | $ 1,817.2 | $ 1,723.2 | $ 1,597.4 | $ 1,550.9 | $ 1,546.2 |
| Income (loss) from continuing operations before Chapter 11 expenses, income taxes, and minority interest (2) | 92.1 | 161.5 | (19.7) | 203.4 | (223.2) |
| Income (loss) from continuing operations (2) | 22.1 | 78.6 | (89.7) | 130.2 | (194.7) |
| Income from discontinued operations (2) | -- | -- | -- | 5.7 | 0.9 |
| Minority interest in consolidated entities | (1.9) | (3.5) | -- | -- | -- |
| Net income (loss) | 22.1 | 78.6 | (89.7) | 135.9 | (229.1) |
| **FINANCIAL POSITION** | | | | | |
| Current assets (3) | $ 830.4 | $ 735.9 | $ 773.9 | $ 779.8 | $ 625.6 |
| Current liabilities (3) | 243.3 | 233.3 | 1,092.9 | 769.4 | 669.8 |
| Properties and equipment, net | 620.8 | 589.0 | 601.7 | 617.3 | 661.4 |
| Total assets (3) | 2,687.7 | 2,518.4 | 2,584.9 | 2,475.1 | 2,556.3 |
| Total debt not subject to compromise (3) | 3.4 | 6.3 | 421.9 | 136.2 | 113.4 |
| Liabilities subject to compromise | 2,334.7 | 2,311.5 | -- | -- | -- |
| Shareholders' equity (deficit) | (222.1) | (141.7) | (71.3) | 111.1 | 42.1 |
| **CASH FLOW** | | | | | |
| Operating activities (3) | $ 195.4 | $ 14.7 | $ (143.7) | $ 130.5 | $ (66.9) |
| Investing activities | (110.7) | (131.4) | (94.0) | 89.4 | (114.0) |
| Financing activities (3) | (9.2) | 123.1 | 239.9 | (80.9) | 196.6 |
| Net cash flow (3) | 91.6 | (0.5) | (7.9) | 134.5 | 17.7 |
| **DATA PER COMMON SHARE (DILUTED)** | | | | | |
| Income (loss) from continuing operations (2) | $ 0.34 | $ 1.20 | $ (1.34) | $ 1.76 | $ (2.61) |
| Net income (loss) | 0.34 | 1.20 | (1.34) | 1.84 | (3.07) |
| Average common diluted shares outstanding (thousands) | 65,500 | 65,400 | 66,800 | 73,800 | 74,600 |
| **OTHER STATISTICS** | | | | | |
| Capital expenditures | $ 91.1 | $ 62.9 | $ 64.8 | $ 82.5 | $ 100.9 |
| Common stock price range (4) | $0.99-3.75 | $1.31-4.38 | $14 15/16-1 15/16 | $21-11 13/16 | $21 11/16-10 |
| Common shareholders of record | 11,187 | 11,643 | 12,240 | 13,215 | 14,438 |
| Number of employees - continuing operations | 6,400 | 6,400 | 6,300 | 6,300 | 6,600 |

(1) Certain prior-year amounts have been reclassified to conform to the 2002 presentation and to reflect a reclassification of freight costs and sales commissions (previously shown as a reduction of sales) to cost of sales and selling expenses in accordance with Emerging Issues Task Force Consensus No. 00-10, "Accounting for Shipping and Handling Revenues and Costs" adopted in 2000.

(2) Amounts contain a provision for environmental remediation of $70.7 million for 2002. Amounts for 2000 and 1998 also contain a provision for asbestos litigation, net of expected insurance recovery, of $208.0 million and $376.1 million, respectively.

(3) 2001 results are retroactively restated to reflect the full consolidation of Advanced Refining Technologies, LLC, previously reported as an equity method joint venture. This restatement had no effect on reported sales or net income.

(4) On March 31, 1998, a predecessor of the Company ("Old Grace") completed a transaction in which its flexible packaging business ("Packaging Business") was combined with Sealed Air Corporation ("Sealed Air"). Old Grace effected this transaction by transferring its specialty chemicals businesses along with certain other businesses and assets to the Company (then named Grace Specialty Chemicals, Inc.), distributing the shares of the Company's common stock to Old Grace's shareholders on a one-for-one basis ("Spin-off") and merging a subsidiary of Old Grace with Sealed Air ("Merger"). Immediately following the Spin-off and Merger, the Company changed its name to "W. R. Grace & Co." and Old Grace changed its name to "Sealed Air Corporation" ("New Sealed Air"). For further information, see Old Grace's Joint Proxy Statement/Prospectus dated February 13, 1998 and the Company's Information Statement dated February 13, 1998. Stock prices in 1998 have been adjusted so that they are on a basis comparable to the stock prices following the disposition of the Packaging Business.

F-35

CC-BLG002459

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF RESULTS OF OPERATIONS AND FINANCIAL CONDITION**

## DESCRIPTION OF BUSINESS

W. R. Grace & Co. and its subsidiaries are engaged in specialty chemicals and specialty materials businesses on a global basis. Its business segments are Davison Chemicals, which produces catalysts and silica products, and Performance Chemicals, which produces construction chemicals, building materials and sealants and coatings.

As used herein, the term "Company" refers to W. R. Grace & Co. The term "Grace" refers to the Company and/or one or more of its subsidiaries and, in certain cases, their respective predecessors.

## VOLUNTARY BANKRUPTCY FILING

In response to a sharply increasing number of asbestos-related bodily injury claims, on April 2, 2001 (the "Filing Date"), the Company and 61 of its United States subsidiaries and affiliates, including W. R. Grace & Co.-Conn. (collectively, the "Debtors"), filed voluntary petitions for reorganization (the "Filing") under Chapter 11 of the United States Bankruptcy Code ("Chapter 11" or the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The cases were consolidated and are being jointly administered under case number 01-01139 (the "Chapter 11 Cases"). Grace's non-U.S. subsidiaries and certain of its U.S. subsidiaries were not included in the Filing.

During 2000 and the first quarter of 2001, Grace experienced several adverse developments in its asbestos-related litigation, including: a significant increase in bodily injury claims, higher than expected costs to resolve bodily injury and certain property damage claims, and class action lawsuits alleging damages from a former attic insulation product. (These claims are discussed in more detail in Note 3 to the Consolidated Financial Statements.) After a thorough review of these developments, the Board of Directors of Grace concluded on April 2, 2001 that a federal court-supervised Chapter 11 filing provided the best forum available to achieve predictability and fairness in the claims settlement process.

By filing under Chapter 11, Grace expects to be able to both obtain a comprehensive resolution of the claims against it and preserve the inherent value of its businesses. Under Chapter 11, the Debtors expect to continue to operate their businesses as debtors-in-possession under court protection from their creditors and claimants, while using the Chapter 11 process to develop and implement a plan for addressing the asbestos-related claims against them.

Consequence of Filing - As a consequence of the Filing, pending litigation against the Debtors for pre-petition matters is generally stayed (subject to certain exceptions in the case of governmental authorities), and no party may take action to realize its pre-petition claims except pursuant to an order of the Bankruptcy Court.

The Debtors intend to address all of their pending and future asbestos-related claims and all other pre-petition claims in a plan of reorganization. Such a plan of reorganization may include the establishment of a trust, through which all pending and future asbestos-related claims would be channeled for resolution. However, it is currently impossible to predict with any degree of certainty the amount that would be required to be contributed to the trust, how the trust would be funded, how other pre-petition claims would be treated or what impact any reorganization plan may have on the shares of common stock of the Company. The interests of the Company's shareholders could be substantially diluted or cancelled under a plan of reorganization. The formulation and implementation of the plan of reorganization is expected to take a significant period of time.

Status of Chapter 11 Proceedings - Since the Filing, all motions necessary to conduct normal business activities have been approved by the Bankruptcy Court. In addition, the Debtors have received approval from the Bankruptcy Court to pay or otherwise honor certain of its pre-petition obligations in the ordinary course of business, including employee wages and benefits, customer programs, shipping charges and a limited amount of claims of essential trade creditors.

As provided by the Bankruptcy Code, the Debtors had the exclusive right to propose a plan of reorganization for a 120-day period following the Filing Date. The Debtors have received an extension of their exclusivity period during which to file a plan of reorganization through August 1, 2003, and an extension of the Debtors' exclusive rights to solicit acceptances of a reorganization plan through October 1, 2003.

Three creditors' committees, two representing asbestos claimants and the third representing other unsecured creditors, and a committee representing shareholders have been appointed in the Chapter 11 Cases. These

CC-BLG002460

committees will have the right to be heard on all matters that come before the Bankruptcy Court, and, together with a legal representative of future asbestos claimants (whom Grace expects to be appointed by the Bankruptcy Court in the future), are likely to play important roles in the Chapter 11 Cases. The Debtors are required to bear certain of the committees' and the future asbestos claimants representative's costs and expenses, including those of their counsel and financial advisors.

The Debtors' Chapter 11 cases have been assigned to Judge Alfred M. Wolin, a senior federal judge who sits in Newark, New Jersey. Judge Wolin is presiding over asbestos bodily injury matters and the fraudulent conveyance litigation described below. He has assigned the Debtors' other bankruptcy matters to Judge Judith Fitzgerald, a U.S. Bankruptcy judge from the Western District of Pennsylvania, sitting in Wilmington, Delaware.

At a hearing on April 22, 2002 the Bankruptcy Court entered an order establishing a bar date of March 31, 2003 for claims of general unsecured creditors, asbestos property damage claims and medical monitoring claims related to asbestos. The bar date does not apply to asbestos-related bodily injury claims or claims related to Zonolite(R) attic insulation ("ZAI"), which will be addressed separately. Grace has distributed notices and run media announcements of the bar date under a program approved by the Bankruptcy Court. Rust Consulting, the court-approved claims handling agent for the Chapter 11 Cases, is maintaining a register of all claims filed. As claims are filed, Grace will be cataloguing and assessing their validity. At this time, it is not possible to estimate the value of the claims that will ultimately be allowed by the Bankruptcy Court, due to the uncertainties of the Chapter 11 process, the in-progress state of Grace's investigation of submitted claims and the lack of documentation submitted in support of many claims.

In July 2002, the Bankruptcy Court approved special counsel to represent the ZAI claimants, at the Debtors' expense, in a proceeding to determine certain threshold scientific issues regarding ZAI. The court has set a litigation schedule that would result in pretrial hearings on these issues in the third quarter of 2003.

On November 29, 2002 Sealed Air Corporation ("Sealed Air") and Fresenius Medical Care AG ("Fresenius") each announced that they had reached agreements in principle with the Official Committee of Asbestos Personal Injury Claimants and the Official Committee of Asbestos Property Damage Claimants to settle asbestos and fraudulent conveyance claims related to the 1998 transaction involving Grace's former packaging business and Sealed Air, and the 1996 transaction involving Grace's former medical care business and Fresenius, respectively. Under the terms of the proposed Sealed Air settlement, Sealed Air would make a payment of $512.5 million (plus interest at 5.5% per annum commencing on December 21, 2002) and nine million shares of Sealed Air common stock, valued at $335.7 million as of December 31, 2002, as directed by the Bankruptcy Court upon confirmation of Grace's plan of reorganization. Under the terms of the proposed Fresenius settlement, as subsequently revised, Fresenius would contribute $115.0 million to the Grace estate, or as otherwise directed by the Bankruptcy Court, upon confirmation of a plan of reorganization. The Sealed Air and Fresenius settlements are subject to the approval of the Bankruptcy Court. Grace is unable to predict how these settlements may ultimately affect its plan of reorganization.

Impact on Debt Capital - All of the Debtors' pre-petition debt is in default due to the Filing. The accompanying Consolidated Balance Sheet as of December 31, 2002 reflects the classification of the Debtors' pre-petition debt within "liabilities subject to compromise."

The Debtors have entered into a debtor-in-possession post-petition loan and security agreement with Bank of America, N.A. (the "DIP facility") in the aggregate amount of $250 million. The DIP facility has a term expiring on April 1, 2003 and bears interest under a formula based on the London Inter-Bank Offered Rate ("LIBOR") plus 2.00 to 2.25 percentage points depending on the level of loans outstanding. The Debtors have filed a motion with the Bankruptcy Court seeking approval to extend the term of the DIP facility for an additional three years and to modify certain other provisions.

Accounting Impact - The accompanying Consolidated Financial Statements have been prepared in accordance with Statement of Position 90-7 ("SOP 90-7") "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code," promulgated by the American Institute of Certified Public Accountants. SOP 90-7 requires that financial statements of debtors-in-possession be prepared on a going concern basis, which contemplates continuity of operations, realization of assets and liquidation of liabilities in the ordinary course of business. However, as a result of the Filing, the realization of certain Debtors' assets and the liquidation of certain Debtors' liabilities are subject to significant uncertainty. While operating as debtors-in-possession, the Debtors may sell or otherwise dispose of assets and liquidate or settle liabilities for amounts other than those reflected in the Consolidated Financial Statements. Further, a plan of reorganization could

F-37

CC-BLG002461

materially change the amounts and classifications reported in the Consolidated Financial Statements, which do not currently give effect to any adjustments to the carrying value or classification of assets or liabilities that might be necessary as a consequence of a plan of reorganization.

Pursuant to SOP 90-7, Grace's pre-petition liabilities that are subject to compromise are required to be reported separately on the balance sheet at an estimate of the amount that will ultimately be allowed by the Bankruptcy Court. As of December 31, 2002, such pre-petition liabilities include fixed obligations (such as debt and contractual commitments) as well as estimates of costs related to contingent liabilities (such as asbestos-related litigation, environmental remediation and other claims). The recorded amounts of such liabilities generally reflect accounting measurements as of the Filing Date, adjusted as warranted for changes in facts and circumstances and/or rulings under Grace's Chapter 11 proceedings subsequent to the Filing. (See Note 2 to the Consolidated Financial Statements for detail of the liabilities subject to compromise as of December 31, 2002, and as of the Filing Date.) Obligations of Grace subsidiaries not covered by the Filing continue to be classified on the Consolidated Balance Sheet based upon maturity dates or the expected dates of payment. SOP 90-7 also requires separate reporting of certain expenses, realized gains and losses, and provisions for losses related to the Filing as reorganization items.

## CRITICAL ACCOUNTING ESTIMATES

The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires that management make estimates and assumptions affecting the assets and liabilities reported at the date of the Consolidated Financial Statements, and the revenues and expenses reported for the periods presented. Actual amounts could differ from those estimates. Changes in estimates are recorded in the period identified. Grace's accounting measurements that are most affected by management's estimates of future events are:

o Contingent liabilities such as asbestos-related matters, environmental remediation, income taxes and retained obligations of divested businesses.

o Pension and postretirement liabilities that depend on assumptions regarding discount rates and/or total returns on invested funds.

o Depreciation and amortization periods for long-lived assets, including property and equipment, intangible and other assets.

o Realization values of various assets such as trade receivables, inventories, insurance receivables, income taxes, and goodwill.

The accuracy of these and other estimates may also be materially affected by the uncertainties arising under the Chapter 11 Cases.

## CONSOLIDATED OPERATIONS

Set forth below is a chart that lists key operating statistics and percentage changes for the years ended December 31, 2002, 2001 and 2000. Immediately following the chart is an overview of the matters affecting the comparison of 2002 and 2001 as well as the comparison of 2001 and 2000. Each of these items should be referenced when reading management's discussion and analysis of the results of operations and financial condition. The chart below, as well as the financial information presented throughout this discussion, divides Grace's financial results between "core operations" and "noncore activities." Core operations comprise the financial results of Davison Chemicals, Performance Chemicals and the costs of corporate activities that directly or indirectly support business operations. In contrast, noncore activities comprise all other events and transactions not directly related to the generation of operating revenue or the support of core operations.

Neither pre-tax income from core operations nor pre-tax income from core operations before depreciation and amortization purport to represent income or cash flow as defined under generally accepted accounting principles, and should not be considered an alternative to such measures as an indicator of Grace's performance.

F-38

CC-BLG002462

| ANALYSIS OF CONSOLIDATED OPERATIONS (Dollars in millions) | 2002 | 2001 (a) | % Change Fav(Unfav) | 2000 (a) | % Change Fav(Unfav) |
|---|---|---|---|---|---|
| NET SALES: | | | | | |
| Davison Chemicals.................................... | $   945.2 | $   874.1 | 8.1% | $   783.9 | 11.5% |
| Performance Chemicals................................ | 872.0 | 849.1 | 2.7% | 813.5 | 4.4% |
| TOTAL GRACE SALES - CORE OPERATIONS.................... | $ 1,817.2 | $ 1,723.2 | 5.5% | $ 1,597.4 | 7.9% |
| PRE-TAX OPERATING INCOME (b): | | | | | |
| Davison Chemicals (c)................................ | $   129.4 | $   123.8 | 4.5% | $   128.0 | (3.3%) |
| Performance Chemicals................................ | 98.8 | 96.7 | 2.2% | 91.6 | 5.6% |
| Corporate operating costs............................ | (47.4) | (33.0) | (43.6%) | (32.5) | (1.5%) |
| PRE-TAX INCOME FROM CORE OPERATIONS (d)................ | 180.8 | 187.5 | (3.6%) | 187.1 | 0.2% |
| PRE-TAX INCOME (LOSS) FROM NONCORE ACTIVITIES.......... | (74.5) | 3.0 | NM | (188.4) | NM |
| Interest expense....................................... | (20.0) | (37.1) | 46.1% | (28.1) | (32.0%) |
| Interest income....................................... | 3.9 | 4.6 | (15.2%) | 9.7 | (52.6%) |
| INCOME (LOSS) BEFORE CHAPTER 11 REORGANIZATION EXPENSE AND INCOME TAXES.................................. | 90.2 | 158.0 | (42.9%) | (19.7) | NM |
| Chapter 11 reorganization expenses, net............... | (30.1) | (15.7) | (91.7%) | -- | NM |
| Provision for income taxes............................ | (38.0) | (63.7) | 40.3% | (70.0) | 9.0% |
| NET INCOME (LOSS).................................... | $    22.1 | $    78.6 | (71.9%) | $   (89.7) | 187.6% |
| KEY FINANCIAL MEASURES: | | | | | |
| PRE-TAX INCOME FROM CORE OPERATIONS AS A PERCENTAGE OF SALES: | | | | | |
| Davison Chemicals................................ | 13.7% | 14.2% | (0.5)pts | 16.3% | (2.1)pts |
| Performance Chemicals............................ | 11.3% | 11.4% | (0.1)pts | 11.3% | 0.1 pts |
| Consolidated..................................... | 9.9% | 10.9% | (1.0)pts | 11.7% | (0.8)pts |
| Pre-tax income from core operations before depreciation and amortization (d)................... | $   275.4 | $   276.5 | (0.4%) | $   274.9 | 0.6% |
| As a percentage of sales............................ | 15.2% | 16.0% | (0.8)pts | 17.2% | (1.2)pts |
| NET SALES BY REGION: | | | | | |
| North America......................................... | $   885.4 | $   875.8 | 1.1% | $   860.0 | 1.8% |
| Europe................................................ | 551.9 | 472.9 | 16.7% | 416.8 | 13.5% |
| Asia Pacific.......................................... | 272.8 | 267.5 | 2.0% | 216.8 | 23.4% |
| Latin America......................................... | 107.1 | 107.0 | 0.1% | 103.8 | 3.1% |
| TOTAL................................................. | $ 1,817.2 | $ 1,723.2 | 5.5% | $ 1,597.4 | 7.9% |

NM = Not meaningful

a = Net sales amounts presented herein reflect a reclassification of freight costs and sales commissions (previously shown as a reduction of sales).

b = Pre-tax operating income for all periods presented reflects a reallocation of the cost of annual accrued pension benefits of active participants from corporate to the respective business segments.

c = Davison Chemicals pre-tax operating income includes minority interest related to the Advanced Refining Technologies joint venture.

d = Neither pre-tax income from core operations nor pre-tax income from core operations before depreciation and amortization purport to represent income or cash flow as defined under generally accepted accounting principles, and should not be considered an alternative to such measures as an indicator of Grace's performance.

F-39

CC-BLG002463

**COSTS OF DOING BUSINESS IN CHAPTER 11**

Although it is difficult to measure precisely how Chapter 11 has impacted Grace's overall financial performance, there are certain added costs that are directly attributable to operating under the Bankruptcy Code. Net reorganization expenses of $30.1 million in 2002 and $15.7 million in 2001 consist primarily of legal, financial and consulting fees incurred by Grace and three creditors' committees. In addition, for 2002 and 2001, Grace's pre-tax income from core operations included expenses of $7.8 million and $10.0 million, respectively, for Chapter 11-related compensation charges. Poor stock price performance in the period leading up to and after the Filing diminished the value of Grace's stock option program to current and prospective employees, which caused Grace to change its long-term incentive compensation program into a cash-based program. Grace has also sought to address employee retention issues by providing added compensation to certain employees and increasing Grace's contribution to its savings and investment plan.

There are numerous other indirect costs to manage Grace's Chapter 11 proceedings such as: management time devoted to Chapter 11 matters; added cost of debt capital; added costs of general business insurance, including directors and officers liability insurance; and lost business or acquisition opportunities due to complexities of operating under Chapter 11.

**MATTERS AFFECTING COMPARISON - 2002 VS. 2001**

The principal factors affecting changes in pre-tax income from core operations from 2001 to 2002 were: sales and income from three acquisitions completed in 2002 for a total cash cost of $28.5 million; the full-year impact of 2001 acquisitions; productivity gains; higher costs for pensions, medical benefits and insurance; the negative effects of the cost of facility rationalizations; and continued weakness in the global economy and in U.S. commercial construction activity. The primary factors affecting changes in pre-tax income from noncore activities included accruals for legal and environmental matters and higher pension costs, offset by income from life insurance policies. The effects of each of these factors are quantified throughout management's discussion and analysis.

**MATTERS AFFECTING COMPARISON - 2001 VS. 2000**

The principal factors affecting changes in pre-tax income from core operations from 2000 to 2001 were: sales and income from three acquisitions for a total cash cost of $84.4 million; the formation of a joint venture; a downturn in world economic activity beginning in late 2000 (exacerbated by the events of September 11, 2001); productivity gains; strengthening of the U.S. dollar compared to most foreign currencies; and increased energy costs. The primary factors affecting changes in pre-tax income from noncore activities were the sale of Grace's remaining interest in Cross Country Staffing in 2001 and accruals for legal and environmental matters. The effects of each of these factors are quantified throughout management's discussion and analysis.

**NET SALES**

The following table identifies the year-over-year increase or decrease in sales attributable to changes in product volumes, product prices and/or mix, and the impact of foreign currency translation.

| NET SALES VARIANCE ANALYSIS | 2002 AS A PERCENTAGE INCREASE (DECREASE) FROM 2001 | | | |
|---|---|---|---|---|
| | VOLUME | PRICE/MIX | TRANSLATION | TOTAL |
| Davison Chemicals...... | 6.3% | 0.7% | 1.1% | 8.1% |
| Performance Chemicals.. | 3.8% | (0.1%) | (1.0%) | 2.7% |
| Net sales............. | 5.1% | 0.3% | 0.1% | 5.5% |
| BY REGION: | | | | |
| North America........ | 1.6% | (0.5%) | -- | 1.1% |
| Europe............... | 13.1% | 0.1% | 3.7% | 16.7% |
| Latin America........ | 2.7% | 13.2% | (15.9%) | 0.1% |
| Asia Pacific......... | 3.0% | (1.2%) | 0.2% | 2.0% |

**2001 AS A PERCENTAGE
INCREASE (DECREASE) FROM 2000**

| | | | | |
|---|---|---|---|---|
| Davison Chemicals...... | 9.1% | 4.5% | (2.1%) | 11.5% |
| Performance Chemicals.. | 6.6% | 0.5% | (2.7%) | 4.4% |
| Net sales............. | 7.8% | 2.6% | (2.5%) | 7.9% |
| BY REGION: | | | | |
| North America........ | 0.5% | 1.6% | (0.3%) | 1.8% |
| Europe............... | 14.4% | 2.9% | (3.8%) | 13.5% |
| Latin America........ | (1.3%) | 9.7% | (5.3%) | 3.1% |
| Asia Pacific......... | 28.5% | 2.1% | (7.2%) | 23.4% |

Grace's 2002 net sales increased 5.5% to $1,817.2 million, compared with $1,723.2 million in 2001. Sales were favorably impacted by strong demand for refining catalysts, and by revenue from synergistic acquisitions in catalyst products, silica products and construction chemicals. Acquisitions contributed $45.0 million or 2.6 percentage points of the sales growth. The impact from foreign currency translation occurred primarily in Europe, where sales reported in U.S. dollars were positively affected by 3.7%, partially offset by Latin

F-40

CC-BLG002465

America, where sales reported in U.S. dollars were adversely affected by 15.9%.

In 2002 and 2001, both business segments experienced volume growth. Catalyst volumes were strong due to increased refining catalyst demand. Silica products sales reflect the addition of two acquisitions during the first quarter of 2001 and volume increases in coatings. Construction chemical volume growth in Europe was driven by the acquisition of Pieri S.A. in July 2001.

In 2002, the most significant volume increases were experienced in Europe, primarily attributable to the Borealis A/S and Pieri S.A. acquisitions. In 2001, the most significant volume increases were experienced in Asia Pacific and Europe, attributable to acquisitions and the Advanced Refining Technologies LLC joint venture ("ART"). Reported net sales from Grace's non-U.S. operations were relatively free from impact of foreign currency translation in 2002, but were negatively impacted in 2001. Approximately 48% and 45% of Grace's reported net sales were generated by its non-U.S. operations in 2002 and 2001, respectively. For countries in which Grace operates, weighted average foreign currency exchange rates appreciated approximately 0.3% in 2002, and depreciated approximately 5.0% in 2001.

## PRE-TAX INCOME FROM CORE OPERATIONS

Pre-tax income from core operations was $180.8 million for the year ended December 31, 2002, compared with $187.5 million for the year ended December 31, 2001, a decrease of 3.6%.

Grace values its U.S. inventories under the last-in/first-out method ("LIFO"), and its non-U.S. inventories under the first-in/first-out ("FIFO") method. LIFO was selected in 1974 for U.S. book and tax purposes because it generally results in a better match of current revenue with current costs. Grace cannot elect LIFO for its non-U.S. inventories due to statutory restrictions. However, if Grace valued its U.S. inventories using the FIFO method, consistent with non-U.S. subsidiaries, pre-tax income from core operations would have been $186.4 million for the year ended December 31, 2002, compared with $184.1 million for the year ended December 31, 2001, an increase of 1.2%. If Grace valued its U.S. inventories using the FIFO method, pre-tax income from core operations would have been $184.1 million for the year ended December 31, 2001, compared with $189.2 million for the year ended December 31, 2000, a decrease of 2.7%.

Operating income in 2002 was adversely affected by: continued weakness in the global economy and in U.S. commercial construction activity; lower than normal plant utilization; product mix; higher expenses to support growth initiatives; and higher costs for pensions, medical benefits, insurance and other operating costs. Higher sales and lower energy costs favorably affected operating income in 2002.

Higher energy costs and the negative effects of currency translation were the most significant factors adversely affecting operating income in 2001 and 2000. In the first half of 2001 and the last half of 2000, the rise in natural gas prices (used by Davison Chemicals as part of its manufacturing process) and transportation fuel prices (impacting distribution costs for Performance Chemicals) had an adverse affect on profit margins. These energy sources are also a significant factor in the cost of many raw materials used by both business segments. Selling price increases did not keep pace with the rapid rise in these energy related costs.

Corporate operating costs for the years ended December 31, 2002, 2001 and 2000 were $47.4 million, $33.0 million and $32.5 million, respectively. The increase from 2001 to 2002 is primarily attributable to higher pension and general insurance costs, offset by a year-over-year improvement in support function costs. The increase in pension costs was attributable to negative returns on pension plan assets, due to poor equity market performance. Grace also experienced a significant increase in costs of medical, general, and directors and officers liability insurance, due to market factors.

During 2002 and 2001, Grace continued to focus on productivity improvements. The results of its productivity initiatives are reflected in: 1) sales - through added plant capacity by improving production processes; 2) costs - through efficiency gains and purchasing synergies; 3) working capital - by improving collection processes and inventory management; and 4) capital avoidance - by maximizing asset utilization.

## PRE-TAX INCOME (LOSS) FROM NONCORE ACTIVITIES

The pre-tax loss from noncore activities totaled $74.5 million for 2002, compared with pre-tax income from noncore activities of $3.0 million for 2001. The expense from noncore activities for 2002 included $70.7 million for Grace's defense and other probable costs to resolve pending environmental litigation (primarily in Libby, Montana).

Income from noncore activities for 2001 included $7.7 million from the sale of Grace's remaining cost-based

CC-BLG002466

investment in Cross Country Staffing, offset by accruals for legal and environmental matters primarily related to Grace's former vermiculite mining operations in Libby, Montana.

The pre-tax loss for 2000 included a provision of $208.0 million for asbestos-related litigation, net of insurance, as well as accruals for legal and environmental matters related to Grace's former vermiculite mining operations. These items were offset by a $19.0 million gain on the sale of marketable securities, and a $5.5 million gain on the sale of noncore assets.

## CHAPTER 11 EXPENSES

Net reorganization expenses for the year ended December 31, 2002 were $30.1 million compared with $15.7 million for the prior year, and consisted primarily of legal, financial and consulting fees incurred by Grace and three creditors' committees related to the Filing. The increase in net reorganization expenses in 2002 compared with 2001 is due to a full year of costs and more activity in the Chapter 11 Cases. Grace believes that reorganization expenses will continue between $6 and $8 million per quarter for the foreseeable future.

## INTEREST

Net interest expense for 2002 was $16.1 million, a decrease of 50.5% from net interest expense of $32.5 million in 2001. This decrease was attributable to a lower contractual interest rate on pre-petition debt subject to compromise, as well as lower interest expense on the DIP facility due to reduced borrowings in 2002 as compared with 2001. Net interest expense increased 76.6% in 2001 over the 2000 amount of $18.4 million. This increase was attributable to higher average debt levels in 2001 versus 2000 and the continued accrual of contractual interest on pre-petition debt subject to compromise, as well as interest expense on the DIP facility. Average debt levels were $508.6 million in 2002; $538.6 million in 2001; and $277.3 million in 2000. Interest accrued on pre-petition debt is subject to Grace's Chapter 11 proceedings. Weighted average interest rates in each year were 2.8%, 5.8% and 7.1%, respectively.

## INCOME TAXES

Grace's provisions for income taxes at the federal corporate rate of 35% were $21.0 million and $49.8 million for the years ended December 31, 2002 and 2001, respectively. The primary differences between these amounts and the overall provisions for income taxes of $38.0 million for 2002 and $63.7 million for 2001 were attributable to current period interest on tax contingencies and the non-deductibility of certain Chapter 11 reorganization expenses. In 2000, Grace's benefit from income taxes at the federal corporate rate was $6.9 million. The primary difference between this amount and the overall provision for income taxes of $70.0 million was attributable to an accrual for probable additional taxes and interest relating to the tax deductibility of interest on corporate owned life insurance policy loans.

## DAVISON CHEMICALS

| NET SALES | | 2002 | | 2001 | % Change Fav(Unfav) |
|---|---|---|---|---|---|
| Catalyst products .......... | $ | 680.6 | $ | 624.8 | 8.9% |
| Silica products............. | | 264.6 | | 249.3 | 6.1% |
| TOTAL DAVISON CHEMICALS..... | $ | 945.2 | $ | 874.1 | 8.1% |
| | | 2001 | | 2000 | % Change Fav(Unfav) |
| Catalyst products .......... | $ | 624.8 | $ | 562.7 | 11.0% |
| Silica products............. | | 249.3 | | 221.2 | 12.7% |
| TOTAL DAVISON CHEMICALS..... | $ | 874.1 | $ | 783.9 | 11.5% |

### Recent Acquisitions and Joint Ventures

In August 2002, ART, Grace's joint venture with Chevron Products Company ("Chevron"), acquired an exclusive license for the hydroprocessing catalyst technology of Japan Energy Corporation and its subsidiary Orient Catalyst Company. The joint venture will market and distribute catalysts based on this technology worldwide.

In January 2002, Grace, through its Swedish subsidiary, acquired the catalyst manufacturing assets of Borealis A/S. This acquisition has been integrated into Grace's global polyolefin catalysts business.

In March 2001, Grace acquired The Separations Group, a manufacturer of chromatography columns and separations media. In March 2001, a German subsidiary of Grace acquired the precipitated silicas business of Akzo-PQ Silicas.

In March 2001, Grace and Chevron formed ART, to develop and market hydroprocessing catalysts globally. ART conducts business through

CC-BLG002467

two distribution companies and one operating company. ART has agreements with both Grace and Chevron under which each provides certain administrative and research and development services to ART.

F-42

CC-BLG002468

Catalyst products represented approximately 37%, 36% and 35% of 2002, 2001 and 2000 total Grace sales, respectively. This product group includes: fluid cracking catalysts and additives ("FCC") used in petroleum refineries to convert distilled crude oil into transportation fuels and other petroleum-based products; hydroprocessing catalysts, which upgrade heavy oils and remove certain impurities; polyolefin catalysts, which are essential components in the manufacture of polyethylene used in products such as high-performance plastic pipe and other plastic parts; and chemical catalysts, which are used in a variety of chemical processes. Silica products represented approximately 15%, 15% and 14% of 2002, 2001 and 2000 total Grace sales, respectively. Silica products are used in a wide range of industrial and consumer applications such as coatings, food processing, plastics, adsorbents, personal care products and separations.

Sales for the Davison Chemicals segment in 2002 were $945.2 million, an 8.1% increase over 2001. Acquisitions accounted for $25.0 million or 2.9 percentage points of the sales growth. Sales of catalyst products were up 8.9%. This increase primarily reflected added revenue from acquisitions and joint ventures that complemented polyolefin and hydroprocessing catalyst product offerings and an increase in FCC volumes. Sales of silica products were up 6.1% for the period, primarily from growth programs in coating applications and added volume in Latin America, Europe and Asia Pacific.

Sales in 2002 were up 5.9% in North America and 16.8% in Europe. In Latin America, sales were down 3.4%, and Asia Pacific sales were about even with 2001. In North America, the increase was primarily attributable to favorable order patterns of hydroprocessing catalysts, offset by a decrease in chemical catalysts. In Europe, the increase was driven by refining catalysts and silica coating applications, along with the Borealis A/S acquisition in polyolefin catalysts completed in the first quarter of 2002. The decrease in Latin America was primarily due to a reduction in sales of hydroprocessing catalysts offset by an increase in sales of silica materials.

Sales for the Davison Chemicals segment in 2001 were $874.1 million, an 11.5% increase over 2000. Acquisitions accounted for $40.9 million or 5.2 percentage points of the sales growth. Sales of catalyst products in 2001 were up 11.0% as compared with 2000. Excluding the negative impact of currency translation, 2001 sales were up 14.1%. This increase mainly reflected sales of new FCCs for value-added refinery applications. Silica product sales in 2001 were up 12.7% as compared with 2000. Excluding acquisitions and the negative impact of currency translation, 2001 sales decreased 2.5%, mainly reflecting weakness in demand for end-use segments such as plastics and coatings, which were most affected by the general economic downturn.

2001 sales in North America were down 4.6% compared with 2000. Sales were up 17.2% in Europe, 5.2% in Latin America, and 67.3% in Asia Pacific in 2001 as compared with 2000, despite the effect of currency weakness in those regions compared with the U.S. dollar, which adversely impacted 2001 sales by $16.6 million. Excluding the impact of currency translation, total Davison sales increased by 13.6%.

## Operating Income

Pre-tax operating income of $129.4 million in 2002 was 4.5% higher than 2001. Added income from good year-over-year sales growth was partially offset by higher expenses to support growth initiatives and increases in employee benefits (including pension), insurance and other operating costs.

Pre-tax operating income of $123.8 million in 2001 was down 3.3% from $128.0 million in 2000. The decline in operating income was primarily attributable to higher energy and raw materials costs, partially offset by productivity initiatives.

## PERFORMANCE CHEMICALS

| NET SALES | | 2002 | | 2001 | % Change Fav(Unfav) |
|---|---|---|---|---|---|
| Construction chemicals........ | $ | 393.9 | $ | 365.1 | 7.9% |
| Building materials........... | | 230.8 | | 239.9 | (3.8%) |
| Sealants and coatings........ | | 247.3 | | 244.1 | 1.3% |
| TOTAL PERFORMANCE CHEMICALS... | $ | 872.0 | $ | 849.1 | 2.7% |

| | | 2001 | | 2000 | % Change Fav(Unfav) |
|---|---|---|---|---|---|
| Construction chemicals........ | $ | 365.1 | $ | 348.7 | 4.7% |
| Building materials........... | | 239.9 | | 228.0 | 5.2% |
| Sealants and coatings........ | | 244.1 | | 236.8 | 3.1% |
| TOTAL PERFORMANCE CHEMICALS... | $ | 849.1 | $ | 813.5 | 4.4% |

F-43

CC-BLG002469

**Recent Acquisitions and Joint Ventures**

In March 2002, Grace acquired the assets of Addiment, Incorporated, a leading supplier of specialty chemicals to the concrete paver and masonry industries in the U.S. and Canada, which has been integrated into the construction chemicals product line.

In July 2001, a French subsidiary of Grace acquired Pieri S.A., a leading supplier of specialty chemicals to the European construction industry.

**Sales**

The major product groups of this business segment include: specialty construction chemicals and specialty building materials used primarily by the nonresidential construction industry, and container sealants and coatings for food and beverage packaging. Construction chemicals, which represented 22% of 2002 total Grace sales (21% in 2001 and 22% in 2000) add strength, control corrosion, and enhance the handling and application of concrete, and reduce the manufacturing cost and improve the quality of cement. Building materials, which represented 13% of 2002, 14% of 2001 and 14% of 2000 total Grace sales, prevent water damage to structures and protect structural steel against collapse due to fire. Sealants and coatings, which represented 13% of 2002 total Grace sales (14% in 2001 and 15% in 2000) are used to seal beverage and food cans, and glass and plastic bottles, and to protect metal packaging from corrosion and the contents from the influences of metal.

Sales for the Performance Chemicals segment in 2002 were $872.0 million, a 2.7% increase over 2001. Acquisitions accounted for $20.0 million, or 2.4 percentage points of the sales growth, all related to construction chemicals. Sales of construction chemicals were up 7.9%, despite reduced commercial construction activity in North America. Sales were strong in all other geographic regions, reflecting additional sales from the Pieri S.A. acquisition, some pickup in construction activity and the success of new product programs and sales initiatives in key economics worldwide. Sales of building materials products were down 3.8%, reflecting softness in North American construction and re-roofing activity. This business is largely based in the United States and is most affected by changes in U.S. commercial construction activity. Sales of sealants and coatings were up 1.3%, reflecting continued good results from growth programs in coatings and closure compounds, particularly in North America and Europe.

2002 sales in North America were down 2.5% compared with 2001. 2002 sales were up in Europe by 16.9%, in Asia Pacific by 4.6% and in Latin America by 3.3%. Declining sales in North America occurred primarily in construction chemicals and building materials, reflecting softness in North American commercial construction activity. Sealants and coatings sales were up slightly compared with the prior year. In Europe, the increase in sales was primarily attributable to the Pieri S.A. acquisition and volume growth in all three product lines. Sales in Asia Pacific reflected an increase in construction chemicals, with offsetting declines in building materials and sealants and coatings. Sales in Latin America reflected an overall increase in sales of construction chemicals, with slight decreases in sales of building materials and sealants and coatings.

In 2001, sales of construction chemicals were $365.1 million, an increase of 4.7% over 2000. The Pieri S.A. acquisition accounted for 2.9 percentage points of the increase. Sales increased in all major regions and were driven by penetration of high-performance products for concrete and cement, especially in value added water reducers, grinding aids and quality improvers. Sales of building materials were $239.9 million in 2001, a 5.2% increase over 2000. Excluding the impact of acquisitions and unfavorable currency translation, sales were up 5.8%. This growth was attributable to increased sales in North America, primarily roofing underlayments and specialty structural waterproofing. Sales of sealants and coatings were $244.1 million in 2001, a 3.1% increase over 2000. Excluding acquisitions and unfavorable currency translation, sales were up 0.2%, primarily from volume gains in closure sealants and coatings.

2001 sales were down 7.6% in Asia Pacific as compared with 2000. 2001 sales were up 7.0% in North America, 7.2% in Europe and 1.1% in Latin America as compared with 2000. The effect of currency weakness in Europe, Asia Pacific and Latin America compared with the U.S. dollar adversely impacted sales by $20.3 million for 2001. Excluding the impact of currency translation, total Performance Chemicals sales increased 7.0%.

**Operating Income**

Pre-tax operating income increased 2.2% from $96.7 million in 2001 to $98.8 million in 2002. The cost of facility rationalizations during 2002, primarily in the sealants and coatings product line, partially offset the profit improvement from added sales and productivity. Pre-tax operating income of $96.7 million in 2001 was up 5.6% compared with pre-tax operating income of $91.6 million in 2000. This increase was attributable to

F-44

CC-BLG002470

higher sales and savings generated from productivity programs, which more than offset higher petroleum-based raw material costs.

## CORPORATE OPERATING COSTS

Corporate operating costs include expenses incurred by corporate headquarters' functions in support of core operations. It includes the cost of corporate functions such as legal, finance, human resources and information technology, as well as other costs not directly attributable to business segments. Corporate operating costs for the year ended December 31, 2002 were $47.4 million, up from $33.0 million in 2001. This increase was primarily attributable to an increase in pension costs and directors and officers liability insurance ("D&O"), offset by lower support function expenses. Pension costs rose $17.6 million in 2002, reflecting the accounting effects of negative returns on pension assets from 2000 to 2002. The loss in value of pension assets will cause 2003 pension expense to increase by approximately $25.0 million. D&O costs increased $1.1 million, or 24.5% in 2002, reflecting the current tight insurance market for this coverage. Due to the continued difficulty in the D&O market, 2003 premiums for D&O are anticipated to increase by $5.4 million. Corporate operating costs for the year ended December 31, 2001 totaled $33.0 million, compared with $32.5 million for the prior year period, a 1.5% increase.

## FINANCIAL POSITION AND CASH FLOWS

The following chart sets forth Grace's net asset position supporting its core operations and its net cash flows from core operations.

| Core Operations (Dollars in millions) | DECEMBER 2002 | December 2001 |
|---|---|---|
| Book value of invested capital | | |
| Receivables............................... | $ 308.4 | $ 296.3 |
| Inventory.................................. | 172.4 | 180.0 |
| Properties and equipment, net............ | 614.6 | 582.9 |
| Intangible assets and other.............. | 609.7 | 585.0 |
| Assets supporting core operations........ | 1,705.1 | 1,644.2 |
| Accounts payable and accruals............ | (311.0) | (294.5) |
| Capital invested in core operations...... | $ 1,394.1 | $ 1,349.7 |
| After-tax return on average invested capital (trailing twelve months)............ | 8.3% | 9.4% |

| | DECEMBER 31, | |
|---|---|---|
| Cash flows: | 2002 | 2001 |
| Pre-tax operating income................. | $ 180.8 | $ 187.5 |
| Depreciation and amortization............ | 94.6 | 89.0 |
| Pre-tax earnings before depreciation and amortization ............................ | 275.4 | 276.5 |
| Working capital and other changes........ | 28.1 | (47.9) |
| Cash flow before investing............... | 303.5 | 228.6 |
| Capital expenditures..................... | (91.1) | (62.9) |
| Businesses acquired...................... | (28.5) | (84.4) |
| Net cash flow from core operations....... | $ 183.9 | $ 81.3 |

Grace had a net asset position supporting its core operations of $1,394.1 million at December 31, 2002, compared with $1,349.7 million at December 31, 2001 (including the cumulative translation account reflected in Shareholders' Equity (Deficit) of $119.5 million for 2002 and $164.8 million for 2001). The increase in invested capital supporting core operations was primarily due to:

a) An increase in receivables of $12.1 million, which was attributable to currency translation, primarily of European and Asian receivables, reflecting the weaker dollar.

b) An overall decrease in inventory of $7.6 million consisting of: a $15.4 million decrease based on a reduction in the number of days on hand as compared with the prior year, offset by an increase of $7.8 million attributable to currency translation, primarily of European and Asian inventories reflecting the weaker dollar.

c) An increase in property, equipment and intangibles due to currency translation and capital invested in property and acquisitions.

The after tax return on capital invested in core operations decreased by 1.1 percentage points in 2002, due to a 3.6% decline in pre-tax operating income compared to a higher investment base. Net cash flows from core operations increased due to the easing of working capital pressures that began prior to the Filing, and a reduction in cash invested in business acquisitions,

CC-BLG002471

.

.

.

CC-BLG002472

partially offset by an increase in capital spending, primarily for expansion projects coming on line in 2003.

## FINANCIAL CONDITION

### EFFECT OF CHAPTER 11

As described under "Voluntary Bankruptcy Filing", the Company and its principal U.S. operating subsidiary are debtors-in-possession under Chapter 11 of the Bankruptcy Code. Grace's non-U.S. subsidiaries, although not part of the Filing, are owned directly or indirectly by the Company's principal operating subsidiary or other filing entities. Consequently, it is likely that a Chapter 11 reorganization plan will involve the combined value of Grace's global businesses and its other assets to fund (with cash and/or securities) Grace's obligations as adjudicated through the bankruptcy process. Grace has analyzed its cash flow and capital needs to continue to fund its businesses and believes that, while in Chapter 11, sufficient cash flow and credit facilities are available to support its business strategy.

The following sections address Grace's financial condition in more detail and describe the major contingencies that are being addressed as part of the Chapter 11 process. Grace's ability to present a plan of reorganization to the Bankruptcy Court depends largely on the timing of resolution of these contingencies.

### LIABILITIES AND CONTINGENCIES

Grace has a number of financial exposures originating from past businesses, products and events. These obligations arose from transactions and/or business practices that date back to when Grace was a much larger company, when it produced products or operated businesses that are no longer part of its revenue base, and when government regulations and scientific knowledge were much less advanced than today. The table below summarizes the net noncore liability at December 31, 2002 and 2001 and the net cash flow from noncore activities for the years then ended:

### NONCORE ACTIVITIES

| (Dollars in millions) | | 2002 | | 2001 |
|---|---|---|---|---|
| NONCORE LIABILITIES: | | | | |
| Asbestos-related liabilities............. | $ | (973.2) | $ | (996.3) |
| Asbestos-related insurance receivable.... | | 262.6 | | 293.4 |
| Asbestos-related liability, net ......... | | (690.6) | | (702.9) |
| Environmental remediation............... | | (201.1) | | (153.1) |
| Postretirement benefits.................. | | (147.2) | | (169.1) |
| Retained obligations and other.......... | | (55.3) | | (80.6) |
| NET NONCORE LIABILITY.................... | $ | (1,094.2) | $ | (1,105.7) |
| CASH FLOWS: | | | | |
| Pre-tax (loss) income from noncore activities.......................... | $ | (74.5) | $ | 3.0 |
| Non-cash charges........................ | | 77.6 | | 4.0 |
| Cash spending for: | | | | |
| Asbestos-related litigation, net of insurance recovery................... | | (2.3) | | (30.8) |
| Environmental remediation.............. | | (20.8) | | (28.9) |
| Postretirement benefits................ | | (21.5) | | (22.3) |
| Retained obligations and other........ | | (4.5) | | (9.1) |
| NET CASH FLOW FROM NONCORE ACTIVITIES ... | $ | (46.0) | $ | (84.1) |

As described under "Voluntary Bankruptcy Filing," the resolution of most of these noncore recorded and contingent liabilities will be determined through the Chapter 11 proceedings. Grace cannot predict with any certainty how, and for what amounts, any of such estimates will be resolved. The amounts of these liabilities as ultimately determined through the Chapter 11 proceedings could be materially different from amounts recorded by Grace at December 31, 2002.

### ASBESTOS-RELATED MATTERS

Grace is a defendant in lawsuits relating to previously sold asbestos-containing products. In 2002, Grace paid $2.3 million for the defense and disposition of asbestos-related property damage and bodily injury litigation, net of amounts received under settlements with insurance carriers, compared with net expenditures in 2001 of $30.8 million. At December 31, 2002, Grace's balance sheet reflects a gross liability of $973.2

CC-BLG002473

million, ($690.6 million net of insurance). This liability represents management's estimate of the undiscounted future net cash outflows in satisfaction of Grace's current and expected asbestos-related claims, based on facts and circumstances existing prior to the Filing. Changes to the recorded amount of such liability will be based on Chapter 11 developments and Grace's assessment of the claim amounts that will ultimately be allowed by the Bankruptcy Court. Grace's ultimate liability for asbestos-related litigation could differ materially from the recorded liability.

F-46

CC-BLG002474