that would be binding in future actions to recover further response costs.

In connection with its defense, Grace conducted its own investigation to determine whether the EPA's actions and cost claims were justified and reasonable. In December 2002, the District Court granted the United States' motion for partial summary judgment on a number of issues that limited Grace's ability to challenge the EPA's response actions. In January 2003, a trial was held on the remainder of the issues, which primarily involved the reasonableness and adequacy of documentation of the EPA's cost recovery claims through December 31, 2001. No decision has yet been issued. The EPA's Libby-related cost recovery claims through December 31, 2001 totaled approximately $57 million. Based on the testimony of EPA witnesses deposed in the lawsuit and other information, Grace believes that the EPA's total cost recovery claims could reach, and potentially exceed, $100 million. This lawsuit is not subject to the automatic stay provided under the Bankruptcy Code. Grace has accrued a liability of $63.0 million at December 31, 2002, with respect to this lawsuit and future cost recovery claims expected to be made by the EPA, which represents Grace's current estimate of probable liability and defense costs, pending the issuance of a decision of the trial court and the availability of additional information about the EPA's 2002 costs and projected future costs. Liabilities for recovery costs are included in "liabilities subject to compromise" and any payments would be subject to the outcome of the Chapter 11 proceedings.

Since January 2000, Grace has spent approximately $13.2 million for remediation of certain Libby area vermiculite processing sites and for health care of Libby area residents diagnosed with asbestos-related illness.

The EPA is also evaluating environmental risks at vermiculite processing sites throughout the U.S. that processed vermiculite from Libby, Montana, and has made claims against Grace to carry out or fund remediation activities. Grace is reviewing the EPA's actions and cost claims to determine whether they are justified and reasonable and, in several instances, has remediated or agreed to remediate certain sites. Costs associated with the above are included in "provision for environmental remediation" included in the Consolidated Statement of Operations.

## POSTRETIREMENT BENEFITS

Grace provides certain postretirement health care and life insurance benefits for retired employees, a large majority of which pertain to retirees of previously divested businesses. These plans are unfunded, and Grace pays the costs of benefits under these plans as they are incurred. Effective January 1, 2002, Grace's postretirement medical plan was amended to increase the contribution required to be paid by the retirees to a minimum of 40% of the calculated premium. During 2002, per capita costs under the retiree medical plans exceeded caps on the amount Grace is required to subsidize under the 1993 amendment to the plan. As a result, for 2003 and future years, retirees will bear 100% of any increase in premium costs.

## RETAINED OBLIGATIONS OF DIVESTED BUSINESSES

The principal retained obligations of divested businesses relate to contractual indemnification and to contingent liabilities not passed on to the new owner. At December 31, 2002, Grace had recorded $55.3 million, as compared with $80.5 million at December 31, 2001, to satisfy such obligations. The decrease primarily relates to a reclassification within "liabilities subject to compromise." Most of these matters are now subject to the automatic stay of the Bankruptcy Court and are expected to be resolved as part of Grace's Chapter 11 proceedings.

## TAX MATTERS

Grace has received the examination report from the Internal Revenue Service ("IRS") on tax periods 1993 through 1996 asserting, in the aggregate, approximately $114.0 million of proposed tax adjustments. The most significant contested issue addressed in such report concerns corporate-owned life insurance ("COLI") policies and is discussed below. Other proposed IRS tax adjustments include Grace's tax position regarding research and development credits, reporting of certain divestitures and other miscellaneous proposed adjustments. The tax audit for the 1993 through 1996 tax period is under the jurisdiction of IRS Appeals, where Grace has filed a protest. Grace's federal tax returns covering tax periods 1997 and forward are either under examination by the IRS or open for future examination. Grace believes that previously established reserves for tax matters will be sufficient to cover the expected net cost of probable tax return adjustments. Any cash payment would be subject to Grace's Chapter 11 proceedings.

In 1988 and 1990, Grace acquired COLI policies on the lives of certain of its employees as part of a strategy to fund the cost of postretirement employee health care benefits and other long-term liabilities. COLI premiums have been funded in part by loans issued against the cash surrender value of the COLI policies. The IRS is

CC-BLG002476

challenging deductions of interest on loans secured by COLI policies for years prior to 1999. In 2000, Grace paid $21.2 million of tax and interest related to this issue for tax years 1990 through 1992. Subsequent to 1992, Grace deducted approximately $163.2 million in interest attributable to COLI policy loans. Although Grace continues to believe that the deductions were legitimate, the IRS has successfully challenged interest deductions claimed by other corporations with respect to broad-based COLI policies in all of the three litigated cases to date. Therefore, Grace requested and was granted early referral to the IRS Office of Appeals for consideration of possible settlement alternatives of the COLI interest deduction issue.

On September 23, 2002, Grace filed a motion in its Chapter 11 bankruptcy proceeding requesting that the Bankruptcy Court authorize Grace to enter into a settlement agreement with the IRS with respect to Grace's COLI interest deductions. The tax years at issue are 1989 through 1998. Under the terms of the proposed settlement, the government would allow 20% of the aggregate amount of the COLI interest deductions and Grace would owe federal income tax and interest on the remaining 80%. Grace has accrued for the potential tax and interest liability related to the disallowance of all COLI interest deductions and continues to accrue interest as part of its quarterly income tax provision. On October 22, 2002, the Bankruptcy Court issued an order authorizing Grace to enter into settlement negotiations with the IRS consistent with the aforementioned terms and further ordered that any final agreement would be subject to Bankruptcy Court approval. Grace is currently in discussions with the IRS concerning the proposed settlement.

The IRS has assessed additional federal income tax withholding and Federal Insurance Contributions Act taxes plus interest and related penalties for calendar years 1993 through 1995 against a Grace subsidiary that formerly operated a temporary staffing business for nurses and other health care personnel. The assessments, aggregating $21.8 million, were made in connection with a meal and incidental expense per diem plan for traveling health care personnel, which was in effect through 1999. The IRS contends that certain per diem reimbursements should have been treated as wages subject to employment taxes and federal income tax withholding. Grace contends that its per diem and expense allowance plans were in accordance with statutory and regulatory requirements, as well as other published guidance from the IRS. Grace expects that the IRS will make additional assessments for the 1996 through 1999 periods. The matter is currently pending in the United States Court of Claims. Grace is currently in discussions with the Department of Justice concerning possible settlement options.

## LITIGATION RELATED TO FORMER PACKAGING AND MEDICAL CARE BUSINESSES

On November 29, 2002, Sealed Air Corporation ("Sealed Air") and Fresenius Medical Care AG ("Fresenius") each announced that they had reached agreements in principle with the Official Committee of Asbestos Personal Injury Claimants and the Official Committee of Asbestos Property Damage Claimants to settle asbestos and fraudulent conveyance claims related to the 1998 transaction involving Grace's former packaging business and Sealed Air, and the 1996 transaction involving Grace's former medical care business and Fresenius, respectively. Under the terms of the proposed Sealed Air settlement, Sealed Air would make a payment of $512.5 million (plus interest at 5.5% per annum commencing on December 21, 2002) and nine million shares of Sealed Air common stock, valued at $335.7 million as of December 31, 2002, as directed by the Bankruptcy Court upon confirmation of Grace's plan of reorganization. Under the terms of the proposed Fresenius settlement, as subsequently revised, Fresenius would contribute $115.0 million to the Grace estate, or as otherwise directed by the Bankruptcy Court, upon confirmation of a plan of reorganization. The Sealed Air and Fresenius settlements are subject to the approval of the Bankruptcy Court. Grace is unable to predict how these settlements may ultimately affect its plan of reorganization.

## LIQUIDITY AND CAPITAL RESOURCES

## CASH RESOURCES AND AVAILABLE CREDIT FACILITIES

At December 31, 2002, Grace had $365.4 million in cash and cash-like assets on hand ($283.0 million in cash and cash equivalents and $82.4 million in cash value of life insurance). In addition, Grace had access to committed credit facilities aggregating $248.4 million under the DIP facility, of which $226.2 million (net of letters of credit and holdback provisions) was available at December 31, 2002. The Debtors have filed a motion with the Bankruptcy Court seeking approval to extend the term of the DIP facility for an additional three years and to modify certain other provisions. Grace believes that these funds and credit facilities will be sufficient to finance its business strategy while in Chapter 11.

F-49

CC-BLG002477

**CASH FLOW**

Grace's net cash flow from core operations before investing was $303.6 million in 2002, compared with $228.6 million in 2001. Acquisition investments aggregated $28.5 million in 2002, compared with $84.4 million in 2001. Total Grace capital expenditures for 2002 and 2001 were $91.1 million and $62.9 million, respectively, substantially all of which was directed toward its business segments for capacity expansion and routine upgrades.

Grace expects to continue to invest excess cash flow and/or other available capital resources in its core business segments. These investments are likely to be in the form of added plant capacity, product line extensions and geographic market expansions. Such investments may be subject to Bankruptcy Court approval and Chapter 11 creditor committee review. Grace has taken steps to improve productivity and manage costs and, at this time, projects 2003 cash flow from core operations comparable to 2002.

The pre-tax cash outflow of noncore activities was $46.0 million in 2002, compared with an outflow of $84.1 million in 2001. The decreased cash outflow was primarily due to lower asbestos-related payments in 2002 resulting from the stay on payments for asbestos-related claims after the Filing Date. Expenditures for environmental remediation were lower in 2002, due partly to Grace's Chapter 11 proceedings and partly to the completion of remediation work on certain sites. Postretirement benefit payments were consistent with the prior year. Payments for retained obligations of divested businesses and other contingencies were lower in 2002 due to the stay of litigation and to the one-time nature of these matters.

Cash flows used for investing activities in 2002 were $110.7 million, compared with cash used of $131.4 million in 2001, and cash used of $94.0 million in 2000. Net cash outflows in 2002 were primarily impacted by businesses acquired of $28.5 million and capital expenditures of $91.1 million, $20.8 million of which was for capacity expansion projects. Net cash outflows in 2001 consisted of $84.4 million in businesses acquired and $62.9 million of capital expenditures.

Net cash (used for) provided by financing activities in 2002, 2001, and 2000 was ($9.2 million), $123.1 million and $239.9 million, respectively. In 2002, cash used in financing activities was primarily for loan repayments against life insurance policies. In 2001, borrowings under credit facilities of $93.5 million, net of repayments, were used to pay down Grace's receivables securitization program, which was terminated in May 2001, and to fund investments in acquired businesses, capital expenditures and noncore obligations. Net cash provided by financing activities in 2000 primarily related to borrowings under credit facilities of $311.3 million and the exercise of stock options of $5.8 million, offset by the repayment of $24.7 million of long-term debt, and the purchase of $47.3 million of treasury stock.

**LIFE INSURANCE**

Grace is the beneficiary of life insurance policies on certain current and former employees with a net cash surrender value of $82.4 million at December 31, 2002. This net cash surrender value is composed of $471.3 million in policy gross cash value offset by $388.9 million of policy loans. The policies were acquired to fund various employee benefit programs and other long-term liabilities and are structured to provide cash flows (primarily tax-free) over an extended period. Certain of these policies are of the type that has received recent judicial and legislative attention. Pending rulings and proposed reforms could adversely affect the availability of these policies as a funding source for Grace's noncore liabilities. Grace is evaluating whether to continue the policies that may be affected by these developments or to terminate them for their cash value.

**DEBT AND OTHER CONTRACTUAL OBLIGATIONS**

Total debt outstanding at December 31, 2002 was $542.2 million. As a result of the Filing, Grace is now in default on $501.0 million of such debt, which has been included in "liabilities subject to compromise" as of December 31, 2002. The automatic stay provided under the Bankruptcy Code prevents Grace's lenders from taking any action to collect the principal amounts as well as related accrued interest. However, Grace will continue to accrue and report interest on such debt during the Chapter 11 proceedings (unless further developments lead management to conclude that it is probable that such interest will not be paid).

In addition, Grace's accounts receivable securitization program was terminated effective May 14, 2001. As a result of the Filing, outstanding balances of approximately $65.3 million were satisfied under the terms of the program through the use of pre-petition trade receivables collected during the period from the Filing Date to early May 2001. During the period from the Filing Date to the termination of the program, Grace compensated for the lack of access to trade receivables collections by borrowing under the DIP facility.

F-50

CC-BLG002478

Financial assurances have been established for a variety of purposes, including insurance and environmental matters, asbestos settlements and appeals, trade-related commitments and other matters. At December 31, 2002, Grace had gross financial assurances outstanding of $237.7 million, comprised of $137.4 million of gross surety bonds issued by various insurance companies and $100.3 million of standby letters of credit issued by various banks. Of the standby letters of credit, $19.7 million act as collateral for surety bonds, thereby reducing Grace's overall obligations under its financial assurances to a net amount of $218.0 million. Of this net amount, approximately $6.5 million were issued on behalf of non-Debtor entities and $211.5 million were issued on behalf of the Debtors. Of the amounts issued by the Debtors, approximately $195.1 million were issued before the Filing Date, with the remaining $16.4 million being subsequent to the Filing, of which $13.7 million was issued under the DIP facility.

## CONTRACTUAL OBLIGATIONS NOT SUBJECT TO COMPROMISE

| (Dollars in millions) | Total | Less than 1 Year | 1-3 Years | Thereafter |
|---|---|---|---|---|
| Debt...................... | $ 3.4 | $ 3.4 | $ -- | $ -- |
| Operating leases.......... | 67.5 | 16.0 | 33.0 | 18.5 |
| TOTAL CONTRACTUAL CASH OBLIGATIONS.............. | $ 70.9 | $ 19.4 | $ 33.0 | $ 18.5 |

## PENSION BENEFITS

The decline in value of the U.S. and global equity markets, coupled with a decline in interest rates during 2002 and 2001, created a shortfall between accounting measurements of Grace's obligations under certain of its qualified pension plans for U.S. employees and the market value of dedicated pension assets. Grace's U.S. pension trust has been reduced by an overall negative return of 6.9% per annum over this three year period. The combination of negative returns on assets and lower interest rates required a balance sheet adjustment in shareholders' equity (deficit) of $147.7 million and $124.4 million at December 31, 2002 and 2001, respectively (net of tax), to recognize the pension shortfall and to fully reserve deferred pension losses. Grace has lowered its assumed return on plan assets for 2003 to 8.25%, down from 9.0% for 2002 and 2001. The new rate of return is comparable to the average long-term rate of return Grace has experienced since 1990. Furthermore, as a result of these conditions, certain of Grace's U.S. qualified pension plans are underfunded as defined by the Employee Retirement Income Security Act of 1984 (ERISA) and will require contributions from Grace over the next several years to close the shortfall between dedicated assets and measured pension obligations. The amount and timing of contributions could be affected by Grace's Chapter 11 proceedings. The total shortfall as of December 31, 2002 as defined under ERISA is $227.1 million.

## SHARE ACTIVITY

Key employees of Grace currently receive salaries, and are eligible to receive incentive bonuses and other long-term benefits, including stock options. In 2002, no options were issued as the uncertainties resulting from the Filing have diminished the value of the stock option program to current and prospective employees. In 2001, the Company granted a total of 1,339,846 options with an average exercise price of $2.53.

## INFLATION

The financial statements are presented on a historical cost basis and do not fully reflect the impact of prior years' inflation. While the U.S. inflation rate has been modest for several years, Grace operates in international economies with both inflation and currency risks. The ability to pass on inflation costs is an uncertainty due to general economic conditions and competitive situations. The cost of replacing Grace's property and equipment today is estimated to be greater than its historical cost. Accordingly, depreciation expense would be greater if the expense were stated on a current cost basis.

## ACCOUNTING PRONOUNCEMENTS

See Note 1 of Consolidated Financial Statements for a discussion of recent accounting pronouncements and their effect on Grace.

## FORWARD-LOOKING STATEMENTS

The forward-looking statements contained in this document are based on current expectations regarding important risk factors. Actual results

CC-BLG002479

may differ materially from those expressed. In addition to the uncertainties referred to in Management's Discussion and Analysis of Results of Operations and Financial Condition, other uncertainties include: the impact of worldwide economic conditions; pricing of both Grace's products and raw materials; customer outages and customer demand; factors resulting from fluctuations in interest rates and foreign currencies; the impact of competitive products and pricing; the continued success of Grace's process improvement initiatives; the impact

F-51

CC-BLG002480

of tax, legislation and other regulations in the jurisdictions in which the Company operates, and development in and the outcome of the Chapter 11 proceedings discussed above. Also, see "Introduction and Overview - Projections and Other Forward-Looking Information" in Item 1 of Grace's current Annual Report on Form 10-K.

F-52

CC-BLG002481

# W. R. GRACE & CO. AND SUBSIDIARIES
## VALUATION AND QUALIFYING ACCOUNTS AND RESERVES
### (Dollars in millions)

### FOR THE YEAR 2002

| Description | Balance at beginning of period | Additions/(deductions) | | Balance at end of period |
| | | Charged/ (credited) to costs and expenses | Other net (a) | |
|---|---|---|---|---|
| VALUATION AND QUALIFYING ACCOUNTS DEDUCTED FROM ASSETS: | | | | |
| Allowances for notes and accounts receivable............. | $ 7.6 | $ (2.2) | $ -- | $ 5.4 |
| Allowances for long-term receivables..................... | 0.6 | 0.2 | -- | 0.8 |
| Valuation allowance for deferred tax assets.............. | 158.0 | (5.5) | -- | 152.5 |
| RESERVES: | | | | |
| Reserves for retained obligations of divested businesses. | $ 80.5 | $ -- | $ (25.2) | $ 55.3 |

### FOR THE YEAR 2001

| Description | Balance at beginning of period | Additions/(deductions) | | Balance at end of period |
| | | Charged/ (credited) to costs and expenses | Other net (b) | |
|---|---|---|---|---|
| VALUATION AND QUALIFYING ACCOUNTS DEDUCTED FROM ASSETS: | | | | |
| Allowances for notes and accounts receivable............. | $ 4.4 | $ 3.2 | $ -- | $ 7.6 |
| Allowances for long-term receivables..................... | 0.8 | (0.2) | -- | 0.6 |
| Valuation allowance for deferred tax assets.............. | 179.1 | (21.1) | -- | 158.0 |
| RESERVES: | | | | |
| Reserves for retained obligations of divested businesses. | $ 78.1 | $ -- | $ 2.4 | $ 80.5 |

### FOR THE YEAR 2000

| Description | Balance at beginning of period | Additions/(deductions) | | Balance at end of period |
| | | Charged/ (credited) to costs and expenses | Other net (b) | |
|---|---|---|---|---|
| VALUATION AND QUALIFYING ACCOUNTS DEDUCTED FROM ASSETS: | | | | |
| Allowances for notes and accounts receivable............. | $ 4.1 | $ 0.3 | $ -- | $ 4.4 |
| Allowances for long-term receivables..................... | 0.8 | -- | -- | 0.8 |
| Valuation allowance for deferred tax assets.............. | 153.2 | 16.4 | 9.5 | 179.1 |
| RESERVES: | | | | |
| Reserves for retained obligations of divested businesses. | $ 99.1 | $ 6.2 | $ (27.2) | $ 78.1 |

(a) $25.2 million represents net spending offset by a reclass of an $18.0 million tax receivable relating to Grace's divested packaging business.

(b) Consists of additions and deductions applicable to businesses acquired, disposals of businesses, bad debt write-offs, foreign currency translation, reclassifications (including the deconsolidation of amounts relating to discontinued operations), cash payments for previously established reserves for divested businesses and miscellaneous other adjustments.

F-53

CC-BLG002482

EXHIBIT 12

## W. R. GRACE & CO. AND SUBSIDIARIES
### COMPUTATION OF RATIO OF EARNINGS TO FIXED CHARGES AND
### COMBINED FIXED CHARGES AND PREFERRED STOCK DIVIDENDS (a)
(Dollars in millions, except ratios)

(Unaudited)

| | Years Ended December 31, (b) | | | | |
|---|---|---|---|---|---|
| | 2002 (C) | 2001 | 2000 (d) | 1999 | 1998 (e) |
| Net income (loss) from continuing operations......... | $   22.1 | $   78.6 | $  (89.7) | $  130.2 | $ (194.7) |
| Add (deduct): Provision for (benefit from) income taxes........... | 38.0 | 63.7 | 70.0 | 73.2 | (28.5) |
| Minority interest in income (loss) of majority owned subsidiaries.................................... | (1.9) | (3.5) | -- | -- | -- |
| Equity in unremitted losses (earnings) of less than 50%-owned companies................................ | 1.7 | (4.0) | (0.5) | (0.2) | (1.2) |
| Interest expense and related financing costs, including amortization of capitalized interest....... | 22.3 | 39.5 | 30.6 | 18.8 | 37.5 |
| Estimated amount of rental expense deemed to represent the interest factor...................... | 5.0 | 4.7 | 4.7 | 5.2 | 5.2 |
| Income (loss) as adjusted........................... | $   87.2 | $  179.0 | $   15.1 | $  227.2 | $ (181.7) |
| Combined fixed charges and preferred stock dividends: Interest expense and related financing costs, including capitalized interest....................... | $   21.8 | $   37.6 | $   29.1 | $   17.0 | $   37.4 |
| Estimated amount of rental expense deemed to represent the interest factor...................... | 5.0 | 4.7 | 4.7 | 5.2 | 5.2 |
| Fixed charges...................................... | 26.8 | 42.3 | 33.8 | 22.2 | 42.6 |
| Combined fixed charges and preferred stock dividends. | $   26.8 | $   42.3 | $   33.8 | $   22.2 | $   42.6 |
| Ratio of earnings to fixed charges................. | 3.25 | 4.23 | (f) | 10.23 | (f) |
| Ratio of earnings to combined fixed charges and preferred stock dividends.......................... | 3.25 | 4.23 | (f) | 10.23 | (f) |

(a) Grace's preferred stocks were retired in 1996.

(b) Certain amounts have been restated to conform to the 2002 presentation.

(c) Amounts contain a provision for non-operating environmental remediation of $70.7 million.

(d) Includes a pre-tax provision of $208.0 million for asbestos-related liabilities net of insurance coverage. The provision for income taxes includes a $75.0 million charge for tax and interest relating to tax deductibility of interest on corporate-owned life insurance policy loans.

(e) Includes a pre-tax provision of $376.1 million for asbestos-related liabilities net of insurance coverage; $21.0 million relating to restructuring costs and asset impairments, offset by a pre-tax gain of $38.2 million for the receipt of insurance proceeds related to environmental matters, partially offset by a charge to reflect a change in the environmental remediation strategy for a particular site.

(f) As a result of the losses incurred for the years ended December 31, 2000 and 1998, Grace was unable to fully cover the indicated fixed charges.

F-54

CC-BLG002483

## W. R. GRACE & CO. AND SUBSIDIARIES
### REPORT ON INTERNAL CONTROLS AND PROCEDURES

**General Statement Of Responsibility.**

The management of Grace is responsible for the preparation, integrity and objectivity of the Consolidated Financial Statements and the other information included in this report. The financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America and accordingly include certain amounts that represent management's best estimates and judgments. Actual amounts could differ from those estimates. Management maintains internal control systems to assist it in fulfilling its responsibility for financial reporting. These systems include business, accounting and reporting policies and procedures, selection of personnel, segregation of duties and an internal audit function. For 2002, a Disclosure Committee was established to oversee Grace's public financial reporting process and key managers were required to confirm their compliance with Grace's policies and internal control systems. While no system can ensure elimination of all errors and irregularities, Grace's systems, which are reviewed and modified in response to changing conditions, have been designed to provide reasonable assurance that assets are safeguarded, policies and procedures are followed, transactions are properly executed and reported and appropriate disclosures are made. The concept of reasonable assurance is based on the recognition that there are limitations in all systems of internal control and that the costs of such systems should not exceed their benefits.

**Evaluation Of Disclosure Controls And Procedures.**

Within the 90 days prior to the date of this report, Grace carried out an evaluation of the effectiveness of the design and operation of its disclosure controls and procedures pursuant to Rule 13a-14 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Based upon that evaluation, Grace's Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures are effective in ensuring that information required to be disclosed in the Company's periodic filings under the Exchange Act is accumulated and communicated to such officers to allow timely decisions regarding required disclosures. There have been no significant changes in the Company's internal controls or in other factors that could significantly affect internal controls subsequent to the date the Company completed its evaluation.

F-55

CC-BLG002484

**EXHIBIT 10.1**

**EMPLOYEE BENEFITS ALLOCATION AGREEMENT**

This EMPLOYEE BENEFITS ALLOCATION AGREEMENT (this "Agreement"), dated as of March 30, 1998, by and among W. R. Grace & Co., a Delaware corporation ("Grace"), W. R. Grace & Co.-Conn., a Connecticut corporation and a wholly owned subsidiary of Grace ("Grace-Conn."), and General Specialty Chemicals, Inc. (to be renamed W. R. Grace & Co.), a Delaware corporation and a wholly owned subsidiary of Grace ("New Grace").

**RECITALS**

A. The Merger Agreement. Grace and Sealed Air Corporation, a Delaware corporation ("SAC"), have entered into an Agreement and Plan of Merger, dated as of August 14, 1997 (the "Merger Agreement"), pursuant to which, at the Effective Time (as defined therein), a wholly owned subsidiary of Grace will merge with and into SAC, with SAC being the surviving corporation (the "Merger"), and Grace being renamed Sealed Air Corporation.

B. The Distribution Agreement. The Distribution Agreement dated as of March 30, 1997, by and among Grace, Grace-Conn. and New Grace (the "Distribution Agreement") and the Other Agreements (as defined in the Distribution Agreement) set forth certain transactions that SAC has required as a condition to its willingness to consummate the Merger, and the purpose of the Distribution Agreement is to make possible the Merger by divesting Grace of the businesses and operations to be conducted by New Grace and its subsidiaries, including New Grace-Conn.

C. The Contribution. Prior to the Effective Time, and subject to the terms and conditions set forth in the Distribution Agreement, Grace intends to cause the transfer to a wholly owned subsidiary of Grace-Conn. ("Packco") of certain assets and liabilities of Grace and its subsidiaries predominantly related to the Packaging Business (the "Contribution"), as contemplated by the Distribution Agreement and the Other Agreements.

D. The Distribution. Following the Contribution and prior to the Effective Time, subject to the conditions set forth in the Distribution Agreement, (i) the capital stock of Packco will be distributed to Grace, (ii) the capital stock of Grace-Conn. will be contributed to New Grace and (iii) all of the issued and outstanding shares of the common stock of New Grace (together with the New Grace Rights, "New Grace Common

CC-BLG002485

Stock") will be distributed (the "Distribution") to the holders as of the Record Date of the common stock of Grace, par value $.01 per share ("Grace Common Stock"), other than shares held in the treasury of Grace, on a pro rata basis.

E. This Agreement. This Agreement is one of the Other Agreements contemplated by the Distribution Agreement, and its purpose is to set forth the agreement of Grace, GraceConn. and New Grace with respect to certain matters relating to employees and employee benefit plans and compensation arrangements;

NOW, THEREFORE, in consideration of the premises, and of the representations, warranties, covenants and agreements set forth herein, the parties hereto hereby agree as follows:

# ARTICLE I

# DEFINITIONS

SECTION 1.01 GENERAL. Capitalized terms used but not defined herein shall have the meanings set forth in the Distribution Agreement or the Merger Agreement, as applicable. As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

Agreement: has the meaning assigned to it in the preamble hereof.

ABO: has the meaning assigned to it in Section 4.01(b).

AICP: the Annual Incentive Compensation Program of Grace.

Alternate Payee: an alternate payee under a domestic relations order which qualifies under Section 414(p) of the Code and Section 206(d) of ERISA and which creates or recognizes an alternate payee's right to, or assigns to an alternate payee, all or a portion of the benefits payable to a participant under any Plan, or an alternate recipient under a medical child support order which qualifies under Section 609(a) of ERISA and which creates or recognizes the existence of an alternate recipient's right to, or assigns to an alternate recipient the right to, receive benefits for which a participant or beneficiary is eligible under any Plan.

2

CC-BLG002486

ASA: has the meaning assigned to it in Section 4.01(b).

Benefit Plan: any Plan established, sponsored or maintained by any member of the Packco Group, any member of the New Grace Group, or any predecessor or affiliate of any of the foregoing, existing as of the Distribution Date or prior thereto, to which any member of the Packco Group or the New Grace Group contributes, has contributed, is required to contribute or has been required to contribute, on behalf of any employee of a member of the Packco Group or a member of the New Grace Group, or under which any employee of a member of the Packco Group or a member of the New Grace Group, former employee of a member of the Packco Group or a member of the New Grace Group, or any beneficiary or dependent thereof, is covered, is eligible for coverage or has benefits rights.

Change in Control Severance Agreements: the agreements listed on Schedule I hereto.

Change in Control Severance Plan: the Grace Change in Control Severance Program for U.S. Employees (April 3, 1996-April 3, 1998).

Current Performance Period: any three-year performance period under the Grace LTIP that begins before and ends after the Effective Time.

Current Plan Year: the plan year or fiscal year, to the extent applicable with respect to any Plan, during which the Distribution Date occurs.

Cypress 401(k) Plans: the Cypress Packaging, Inc. Union Employees 401(k) Pension Plan and the Cypress Packaging, Inc. 401(k) Retirement Plan.

Deferred Compensation Plan: the W. R. Grace & Co. Deferred Compensation Program.

Distribution Agreement: has the meaning assigned to it in the fourth paragraph hereof.

Employee: with respect to any entity, an individual who is considered, according to the payroll and other records of such entity, to be employed by such entity, regardless of whether such individual is, at the relevant time, actively at work or on leave of absence (including vacation, holiday, sick leave, family and medical leave, disability leave, military leave, jury duty, layoff with rights of recall, and any other leave of absence or similar interruption of active employment

3

CC-BLG002487

that is not considered, according to the policies or practices of such entity, to have resulted in a permanent termination of such individual's employment), but excluding any individual who is, as of the relevant time, on long-term disability leave.

Foreign Plan: has the meaning assigned to it in Section 6.01.

Grace: has the meaning assigned to it in the first paragraph hereof.

Grace Dependent Care Plan: the W. R. Grace & Co. Dependent Care Plan.

Grace LTIP: the Grace Long Term Incentive Program.

Grace Medical Expense Plan: the W. R. Grace & Co. Health Care Reimbursement Account Plan.

Grace Option: an option to purchase shares of Grace Common Stock granted pursuant to any Grace Stock Incentive Plan.

Grace Severance Pay Plan: the W. R. Grace & Co. Severance Pay Plan for Salaried Employees, as amended effective July 1, 1996.

Grace Stock Incentive Plans: the Grace 1996 Stock Incentive Plan, the Grace 1994 Stock Incentive Plan, the Grace 1989 Stock Incentive Plan, the Grace 1986 Stock Incentive Plan, and the Grace 1981 Stock Incentive Plan.

Hourly Non-Union Retirement Plan: the W. R. Grace & Co.-Conn. Retirement Plan for Non-Union Employees of Subsidiary Corporations.

Hourly SIP: the W. R. Grace & Co. Hourly Employee Savings and Investment Plan.

Insured Foreign Plan: a Foreign Plan that provides retirement or pension benefits and that is funded through individually allocated insurance contracts, each of which is identified as such in the Packaging Business Disclosure Letter to the Merger Agreement.

IRS: the Internal Revenue Service.

Local Actuary: has the meaning assigned to it in Section 6.01.

4

CC-BLG002488

LTIP Awards: has the meaning assigned to it in Section 3(a) hereof.

Newco Ratio: the amount obtained by dividing (i) the average of the arithmetic mean between the highest and lowest sales prices of a share of Grace Common Stock on the New York Stock Exchange Composite Tape on each of the five trading days immediately preceding the ex-dividend date for the Distribution, by
(ii) the average of the arithmetic mean between the highest and lowest sales prices of a share of Newco Common Stock on the New York Stock Exchange Composite Tape on each of the five trading days beginning on the ex-dividend date for the Distribution.

New Grace Benefit Plan: any Benefit Plan that is sponsored or maintained by a member of the New Grace Group as of the Distribution Date.

New Grace Employee: any Employee who is allocated to the New Grace Group pursuant to Section 2.01 of this Agreement and who is not hired by any member of the Packco Group pursuant to Section 6.11(b) of the Merger Agreement.

New Grace Participant: any individual who is a New Grace Employee or a beneficiary, dependent or Alternate Payee of such an individual.

New Grace Ratio: the amount obtained by dividing (i) the average of the arithmetic mean between the highest and lowest sales prices of a share of Grace Common Stock on the New York Stock Exchange Composite Tape on each of the five trading days immediately preceding the ex-dividend date for the Distribution by
(ii) the average of the arithmetic mean between the highest and lowest sales prices of a share of New Grace Common Stock on the New York Stock Exchange Composite Tape on each of the five trading days beginning on the ex-dividend date for the Distribution.

Noninsured Foreign Pension Plan: a Foreign Plan that is a defined benefit pension plan and is not an Insured Foreign Plan, each Noninsured Foreign Pension Plan being identified as such in the Packaging Business Disclosure Schedule to the Merger Agreement.

Packco Benefit Plan: any Benefit Plan that is sponsored or maintained by a member of the Packco Group following the Distribution Date.

Packco Employee: any Employee who is allocated to the Packco Group pursuant to Section 2.01 of this Agreement or who is hired by any member of the Packco Group pursuant to Section 6.11(b) of the Merger Agreement.

5

CC-BLG002489

Packco Health Plan: the Blue Cross Blue Shield Health Plan for Cryovac and Formpac Employees.

Packco Hourly Non-Union Retirement Plan: has the meaning assigned to it in Section 4.01(d).

Packco Medical and Dependent Care Expense Plan: the Health Care and Dependent Care Spending Account Plan for Cryovac and Formpac Employees.

Packco Participant: any individual who is a Packco Employee or a beneficiary, dependent or Alternate Payee of such an individual.

Packco Savings Plan: a Qualified Plan designated by Grace to receive a transfer of assets from the Hourly SIP and/or the Salaried SIP pursuant to
Section 4.02(b).

Pension Plan: any Benefit Plan that is an "employee pension benefit plan" (within the meaning of section 3(2) of ERISA), whether or not that Plan is a Qualified Plan.

Plan: any bonus, incentive compensation, deferred compensation, pension, profit sharing, retirement, stock purchase, stock option, stock ownership, stock appreciation rights, phantom stock, company car, fringe benefit, leave of absence, layoff, vacation, day or dependent care, legal services, cafeteria, life, health, medical, accident, disability, workman's compensation or other insurance, severance, separation or other employee benefit plan, practice, policy or other arrangement of any kind (including, but not limited to, any "employee benefit plan" (within the meaning of section 3(3) of ERISA)).

Qualified Plan: any Benefit Plan that is an "employee pension benefit plan" (within the meaning of section 3(2) of ERISA) and which is intended to qualify under section 401(a) of the Code.

Salaried Retirement Plan: the W. R. Grace & Co. Retirement Plan for Salaried Employees.

Salaried SIP: the W. R. Grace & Co. Salaried Employees Savings and Investment Plan.

Salary Protection Plan: the W.R. Grace & Co. Executive Salary Protection Plan.

Schurpack 401(k) Plan: the Schurpack Employees 401(k) Thrift Plan.

6

CC-BLG002490

SERP: the W. R. Grace & Co. Supplemental Executive Retirement Plan.

Split Dollar Program: the W. R. Grace & Co. Executive Split Dollar Life Insurance Program.

Terminated Grace Employee: any individual who is, as of the Distribution Date, a former Employee of any member of the New Grace Group or the Packco Group.

Terminated Grace Participant: a Terminated Grace Employee or a beneficiary, dependent or Alternate Payee of a Terminated Grace Employee.

Termination Benefits: has the meaning assigned to it in Section 2.02(a) hereof.

Union Retirement Plan: the Retirement Plan of W. R. Grace & Co.-Conn. Chemical Group (Cedar Rapids Plant).

U.S. Welfare Plan: a Welfare Plan other than a Welfare Plan that is maintained outside of the United States primarily for the benefit of individuals substantially all of whom are nonresident aliens with respect to the United States.

Welfare Plan: any Benefit Plan that is an "employee welfare benefit plan" (within the meaning of section 3(1) of ERISA).

## ARTICLE II

## TRANSFER OF EMPLOYEES; TERMINATION BENEFITS

SECTION 2.01 TRANSFER OF EMPLOYEES. (a) Grace and New Grace shall take all steps necessary or appropriate so that all of the Employees of Grace and its subsidiaries are allocated between the New Grace Group and the Packco Group in accordance with the principles set forth in the Section 2.01(b), and so that each individual who is so allocated to the Packco Group is, as of the Distribution Date, an Employee of a member of the Packco Group, and each other individual who is, as of the Distribution Date, an Employee of Grace or any of its Subsidiaries is an Employee of a member of the New Grace Group.

(b) In making the allocation provided for in Section 2.01, Grace and New Grace shall allocate each Employee who is exclusively employed in the Packaging Business to the Packco Group and each Employee who is exclusively employed in the New Grace Business to the New Grace Group. All other Employees

7

shall be allocated in a mutually agreeable manner that, to the extent possible, takes into account the Employees' expertise, experience and existing positions and duties and does not unreasonably disrupt either the Packaging Business or the New Grace Business and maximizes the ability of each of the Packco Group and the New Grace Group to manage and operate their respective businesses after the Distribution Date, taking into account the respective needs of such businesses as established by past practice.

SECTION 2.02 CHANGE OF CONTROL BENEFITS; TERMINATION BENEFITS. (a) No New Grace Employee and no Packco Employee shall be deemed, as a result of the steps called for by Section 2.01 or otherwise as a result of the consummation of the transactions contemplated by the Distribution Agreement and the Merger, to have become entitled to any benefits under any Ben- efit Plan, contract, agreement, statute, regulation or other arrangement that provides for the payment of severance pay, salary continuation, pay in lieu of notice, unused vacation pay, or similar benefits in connection with actual or constructive termination or alleged actual or constructive termination of employment (collectively, "Termination Benefits") . Without limiting the generality of the foregoing, none of the transactions contemplated by the Distribution Agreement and the Merger Agreement constitute a "change in control" for purposes of any Benefit Plan. Grace shall take all steps necessary and appropriate so that any Change in Control Severance Agreement between Grace and any Packco Employee terminates before the Distribution Date.

(b) All Liabilities (other than for Severance Costs as defined in Section 8.04 of the Distribution Agreement) relating to or arising out of claims made by or on behalf of New Grace Participants or Packco Participants for, or with respect to, Termination Benefits relating to the actual or constructive termination or alleged actual or constructive termination of employment of any New Grace Employee or Packco Employee with any member of the Packco Group or the New Grace Group, which claims arise as a result of the consummation of the transactions contemplated by the Distribution Agreement, shall be considered other Transaction Costs that are governed by clause (ii) of the first sentence of Section 8.04 of the Distribution Agreement.

(c) Except as specifically provided otherwise in Section 2.02(b) above and in Section 8.04 of the Distribution Agreement, effective as of the Distribution Date, the New Grace Group shall assume or retain, as appropriate, all Liabilities relating to or arising out of claims made by or on behalf of New Grace Participants for, or with respect to, Termination

8

CC-BLG002492

Benefits relating to the actual or constructive termination or alleged actual or constructive termination of employment of any New Grace Employee with any member of the Packco Group or the New Grace Group, whether before, on or after the Distribution Date. In addition, the New Grace Group shall assume or retain, as appropriate, all Liabilities (including with respect to Packco Employees) pursuant to the Change in Control Severance Plan and the Change in Control Severance Agreements.

(d) Except as specifically provided otherwise in Sections 2.02(b) and
(c) above and in Section 8.04 of the Distribution Agreement, effective as of the Distribution Date, the Packco Group shall assume or retain, as appropriate, all Liabilities relating to or arising out of claims made by or on behalf of Packco Participants for, or with respect to, Termination Benefits relating to the actual or constructive termination or alleged actual or constructive termination of employment of any Packco Employee with any member of the Packco Group or the New Grace Group, whether before (in the case of constructive termination), on or after the Distribution Date.

## ARTICLE III

## INCENTIVE PLANS

SECTION 3.01 GRACE LTIP. (a) The contingent awards for Current Performance Periods held by New Grace Participants and Packco Participants (such contingent awards, the "LTIP Awards") under the Grace LTIP shall be adjusted and paid in cash by New Grace in accordance with such methodology as New Grace determines in its sole discretion.

(b) Effective as of the Distribution Date, the New Grace Group shall assume or retain, as appropriate, all Liabilities relating to or arising out of awards payable under the Grace LTIP.

SECTION 3.02 GRACE OPTIONS. (a) New Grace shall assume and adopt, effective as of the Distribution Date, each of the Grace Stock Incentive Plans, with such changes as may be necessary to reflect the change in the issuer of awards thereunder and such other changes as New Grace shall, in its sole discretion, determine. As soon as practicable after and effective as of the Distribution Date, all Grace Options that are then outstanding shall be adjusted or replaced as set forth in this Section 3.02, or in such other manner as the parties hereto shall agree.

9

CC-BLG002493

(b) Each such Grace Option that is held by a New Grace Employee or a Terminated Grace Participant shall be replaced with an option (a "New Grace Option") to acquire a number of New Grace Common Shares that equals the number of shares subject to such Grace Option immediately before such replacement, times the New Grace Ratio (rounded up to the nearest whole share), with a per-share exercise price that equals the per-share exercise price of such Grace Option immediately before such replacement, divided by the New Grace Ratio (rounded up to the nearest one hundredth of a cent). Each New Grace Option shall otherwise have the same terms and conditions as the Grace Option it replaces, except that references to employment by or termination of employment with Grace and its affiliates shall be changed to references to employment by or termination of employment with New Grace and its affiliates. Effective as of the Distribution Date, New Grace shall assume all Liabilities relating to or arising under the New Grace Options or the Grace Stock Incentive Plans.

(c) Each such Grace Option that is held by a Packco Employee shall be adjusted so that the number of Newco Common Shares subject to such Grace Option equals the number of shares subject to such Grace Option immediately before such adjustment, times the Newco Ratio (rounded down to the nearest whole share), and the per-share exercise price equals the per-share exercise price of such Grace Option immediately before such adjustment, divided by the Newco Ratio (rounded up to the nearest whole cent) . Each Grace Option as so adjusted shall otherwise have the same terms and conditions as were in effect before such adjustment. Effective as of the Distribution Date, Grace shall retain all Liabilities relating to or arising under the Grace Options held by Packco Employees.

SECTION 3.03 ANNUAL INCENTIVE COMPENSATION PLAN. (a) New Grace shall pay, or cause to be paid by another member of the New Grace Group, all bonuses earned by Packco Employees and New Grace Employees for the 1997 calendar year under the AICP, in accordance with the terms of the AICP as interpreted by New Grace in its sole discretion. Effective as of the Distribution Date, the New Grace Group shall assume all Liabilities relating to or arising under the AICP.

(b) Packco Employees shall not be eligible to earn bonuses under the AICP for 1998 or any subsequent year. However, if the Distribution Date occurs later than March 31, 1998, then Grace and New Grace shall use reasonable best efforts to develop and implement an annual incentive program for Packco Employees, the cost of which will be shared between the New Grace Group and the Packco Group in a manner relating to

10

CC-BLG002494

the relative portions of the 1998 calendar year that precede and follow the Distribution Date.

# ARTICLE IV

## PENSION M~D SAVINGS PLANS

SECTION 4.01 RETIREMENT PLANS AND SUPPLEMENTAL RETIREMENT PLAN. (a) Grace, New Grace and Grace-Conn. shall take all steps necessary or appropriate so that, effective no later than the Distribution Date: (i) one or more members of the New Grace Group are the sole sponsors of the Salaried Retirement Plan, the SERP and the Hourly Non-Union Retirement Plan; and (ii) one or more members of the Packco Group are the sole sponsors of the Union Retirement Plan. Such steps shall include, without limitation, the appointment or reappointment by New Grace (by action after the Distribution Date to approve or ratify such appointment or reappointment) of all named fiduciaries, trustees, custodians, recordkeepers and other fiduciaries and service providers to the Salaried Retirement Plan, the SERP and the Hourly Non-Union Retirement Plan, and the appointment or reappointment by Grace of all named fiduciaries, trustees, custodians, recordkeepers and other fiduciaries and service providers to the Union Retirement Plan.

(b) Effective as of the Distribution Date, the Packco Employees shall cease accruing benefits under the Salaried Retirement Plan, the SERP and the Hourly Non-Union Retirement Plan. As promptly as practicable following the Distribution Date, and effective as of the Distribution Date, Grace intends to implement a program for Packco Employees who participated in the Salaried Retirement Plan before the Distribution Date designed to substantially make up for any anticipated material adverse impact on them resulting from the termination of such participation as of the Distribution Date. Such program will assume that each such Packco Participant works as an em- ployee until normal retirement (age 65) and that he or she will achieve a reasonable investment return on his or her account in the Sealed Air Corporation Profit Sharing Plan. Upon the implementation of such program by Grace, New Grace shall (i) cause the Salaried Retirement Plan to be amended so that, effective immediately before the Distribution Date: (A) the accrued benefit of each Packco Employee who is a participant therein is increased by crediting such Packco Employee with an additional year of service; (B) the accrued benefit of each such Packco Employee who is at least 40 years old as of the Distribution Date is also increased by an amount equal to the lesser of (x) 13 percent of the amount of such accrued benefit (after giving effect to the increase described in clause (A) of

11

CC-BLG002495

this sentence) or (y) the increase that results from crediting such Packco Employee with an additional four years of service, and (C) the accrued benefits of all such Packco Employees, as so increased, shall be fully vested as of the Distribution Date; or (ii) provide additional retirement benefits to such Packco Employees as a group having, in the aggregate, a value substantially equivalent to the increased benefits described in clause (i); provided, that the aggregate expense associated with the benefits described in clause (i) or (ii) (as applicable) shall be limited to the extent necessary so that the Accrued Benefit Obligation, calculated in accordance with FAS 87 ("ABO"), of such benefits does not exceed $15 million. Such ABO shall be determined by Actuarial Sciences Associates ("ASA") in accordance with the actuarial assumptions set forth in Schedule II hereto and in a manner consistent with past practice with respect to the Salaried Retirement Plan.

(c) Effective as of the Distribution Date, the New Grace Group shall assume or retain (as applicable) all Liabilities relating to or arising under the Salaried Retirement Plan and the SERP, including without limitation for benefits payable thereunder to Packco Participants. Effective as of the Distribution Date, the Packco Group shall assume or retain (as applicable) all Liabilities relating to or arising under the Union Retirement Plan.

(d) (i) Effective immediately after the Effective Time, Grace shall establish, cause to be established or designate a defined benefit pension plan (the "Packco Hourly NonUnion Retirement Plan") to provide benefits and assume liabilities and accept a transfer of assets from the Hourly Non-Union Retirement Plan, as provided for in this Section 4.01(d).

(ii) As soon as practicable after the Effective Time, following (A) the receipt by New Grace of a copy of a favorable determination letter or Grace's certification to New Grace, in a manner reasonably acceptable to New Grace, that the Packco Hourly Non-Union Retirement Plan is qualified under
Section 401(a) of the Code and the related trust is exempt from taxation under
Section 501(a) of the Code, and (B) the receipt by Grace of a copy of a favorable determination letter or New Grace's certification to Grace, in a manner reasonably acceptable to Grace, that the Hourly Non-Union Retirement Plan is qualified under Section 401(a) of the Code and the related trust is exempt from taxation under Section 501(a) of the Code, New Grace shall direct the trustee of the trust funding the Hourly Non-Union Retirement Plan to transfer to the trustee of the trust established to fund the Packco Hourly Non-Union Retirement Plan the amount described in Section 4.01(d) (iii) below. Such transfer shall be in cash unless otherwise agreed by

12

CC-BLG002496

Grace and New Grace. As of the date of such transfer, and effective immediately after the Effective Time, the Packco Group and the Packco Hourly Non-Union Retirement Plan shall assume all Liabilities for benefits payable to Packco Participants under the Hourly Non-Union Retirement Plan, and the New Grace Group and the Hourly Non-Union Retirement Plan shall retain no Liabilities for such benefits.

(iii) The amount transferred pursuant to this Section 4.01(d) shall be an amount equal to (A) less (B), as adjusted by (C); where (A) equals a portion of the assets of the Hourly Non-Union Retirement Plan having a fair market value equal to the ABO as of the Distribution Date attributable to Packco Participants; where (B) equals the aggregate payments made from the trust funding the Hourly Non-Union Retirement Plan in respect of Packco Participants from the Effective Time through the date the transfer occurs; and where (C) equals the amount of the net earnings or losses, as the case may be, from the Effective Time through the date the transfer occurs, on the average of the daily balances of the foregoing and based upon the actual rate of return earned by the Hourly Non-Union Retirement Plan during such period. All of the foregoing calculations shall be made by ASA in accordance with the assumptions set forth on Schedule III hereto. Grace shall be entitled to review and comment on such calculations as ASA is in the process of performing them. Notwithstanding the foregoing, however, in no event shall the amount so transferred be less than the amount necessary to comply with, nor more than the maximum amount permitted by, Section 414(l) of the Code and the regulations promulgated thereunder, as determined by ASA.

(iv) Grace, New Grace and Grace-Conn. shall, in connection with the transfer described in this Section 4.01(d), cooperate in making any and all appropriate filings required under the Code or ERISA, and the regulations thereunder and any applicable securities laws, and take all such action as may be necessary and appropriate to cause such transfers to take place as soon as practicable after the Effective Time. New Grace and Grace-Conn. agree, during the period ending with the date of the transfer of assets to the Packco Hourly Non-Union Retirement Plan, to cause distributions in respect of Packco Participants to be made in the ordinary course from the Hourly Non-Union Retirement Plan in accordance with applicable law and pursuant to plan provisions.

SECTION 4.02 Savings Plans. (a) Grace, New Grace and Grace-Conn. shall take all steps necessary or appropriate so that, effective no later than the Distribution Date: (i) one or more members of the New Grace Group are the sole sponsors of the Hourly SIP and the Salaried SIP; and (ii) one or

13

CC-BLG002497

more members of the Packco Group are the sole sponsors of the Cypress 401(k) Plans and the Schurpack 401(k) Plan. Effective as of the Distribution Date, the Packco Group shall assume all Liabilities relating to or arising under the Cypress 401(k) Plans and the Schurpack 401(k) Plan. Such steps shall include, without limitation, the appointment or reappointment by New Grace (by action after the Distribution Date to approve or ratify such appointment or reappointment) of all named fiduciaries, trustees, custodians, recordkeepers and other fiduciaries and service providers to the Hourly SIP and the Salaried SIP, and the appointment or reappointment by Grace of all named fi-- duciaries, trustees, custodians, recordkeepers and other fiduciaries and service providers to the Cypress 401(k) Plans and the Schurpack 401(k) Plan.

(b) Each of the transfers provided for in this Section 4.02(b) shall be implemented only if both Grace and New Grace so agree after the Distribution Date.

(i) Grace, New Grace and Grace-Conn. shall take all steps necessary or appropriate in order to transfer to a Packco Savings Plan and the related trust, as soon as practicable after the Effective Time, all account balances (including the pre-tax, after-tax and rollover account balances) under each of the Hourly SIP and the Salaried SIP of all Packco Participants. Such assets shall be transferred in kind, to the extent elected by New Grace with the consent of Grace (which consent shall not be unreasonably withheld), and otherwise shall be made in cash; provided, that in any event, unless the parties agree otherwise, any outstanding participant loans and FMC American Depositary Receipts shall be transferred in kind. It is the intention of Grace, New Grace and Grace-Conn. to carry out such transfer so as to preserve, to the extent practicable, the investment elections of participants as in effect immediately before the transfer, unless the parties agree otherwise.

(ii) Grace, New Grace and Grace-Conn. shall cooperate in making all appropriate filings required under the Code or ERISA, and the regulations thereunder and any applicable securities laws, implementing all appropriate communications with participants, maintaining and transferring appropriate records, and taking all such other actions as may be necessary and appropriate to implement the provisions of this Section 4.02(b) and to cause the transfers of assets pursuant to this Section 4.02(b) to take place as soon as practicable after the Effective Time; provided, that each of such transfers shall take place only after (A) the receipt by New Grace of a favorable determination letter or Grace's certification, in a manner reasonably acceptable to New Grace, that the relevant

14

CC-BLG002498

Packco Savings Plan is qualified under Section 401(a) of the Code and the related trust is exempt from taxation under Section 501(a) of the Code, and (B) the receipt by Grace of a favorable determination letter or New Grace's certification, in a manner reasonably acceptable to Grace, that the Hourly SIP or the Salaried SIP, as applicable, is qualified under Section 401(a) of the Code and the related trust is exempt from taxation under Section 501(a) of the Code.

(c) If Grace and New Grace agree to implement the transfers provided for in Section 4.02(b), subject to the completion of such transfer and effective as of the Distribution Date, the members of the Packco Group and the SAC Savings Plan shall assume all Liabilities to or relating to Packco Participants relating to or arising under the Hourly SIP and the Salaried SIP. Effective as of the Distribution Date, the New Grace Group shall assume or retain (as applicable) all Liabilities relating to or arising under the Hourly SIP and the Salaried SIP, including without limitation for benefits payable thereunder to Packco Participants, that are not assumed by the Packco Group and the relevant Packco Savings Plan pursuant to the preceding sentence.

SECTION 4.03 QUALIFICATION OF PLANS. The New Grace Group shall be responsible for all Liabilities incurred by the Packco Group as a result of the failure of any of the Hourly Non-Union Retirement Plan, the Union Retirement Plan, the Hourly SIP, the Salaried SIP, the Cypress 401(k) Plans or the Schurpack 401(k) Plan to be qualified under Section 401(a) of the Code on or before the date assets are transferred from such Plan to a Packco Benefit Plan, or the date sponsorship of such Plan is assumed by any member of the Packco Group, as applicable. The Packco Group shall be responsible for all Liabilities incurred by the New Grace Group as a result of the failure of the Packco Hourly Non-Union Retirement Plan or any Packco Savings Plan to be qualified under Section 401(a) of the Code on or before the date assets are transferred to such Plan from a New Grace Benefit Plan. The parties hereto agree that to the extent any of them becomes aware that any such Plan fails or may fail to be so qualified, it shall notify the other parties and the parties shall cooperate and use best efforts to avoid such disqualification, including using the Internal Revenue Service's Voluntary Compliance Resolution program or similar programs, and taking any steps available pursuant to such program to avoid disqualification, as determined by the party who is made responsible under this Section 4.03 for the Liabilities that would result from such disqualification (and the Liabilities for which such party is responsible shall include all costs and expenses resulting from such steps, including

15

CC-BLG002499

fines, penalties, contributions, attorneys' fees and expenses and administrative expenses).

# ARTICLE V

## WELFARE AND OTHER BENEFITS

SECTION 5.01 BENEFITS FOR ACTIVE EMPLOYEES. (a) Grace, New Grace and Grace-Conn. shall take all steps necessary or appropriate so that, effective no later than the Distribution Date, one or more members of the Packco Group are the sole sponsors of the Packco Health Plan. Such steps shall include, without limitation, the appointment or reappointment by Grace of all named fiduciaries, trustees, custodians, recordkeepers and other fiduciaries and service providers to the Packco Health Plan, to the extent such appointments or reappointments are necessary.

(b) Effective as of the Distribution Date, the New Grace Group shall assume or retain (as applicable) all Liabilities relating to or arising out of claims for benefits under U.S. Welfare Plans by New Grace Participants and Terminated Grace Participants, whenever such claims are incurred, and (ii) by Packco Participants to the extent such claims are incurred before the Distribution Date and reported within 365 days thereafter. Effective as of the Distribution Date, the Packco Group shall assume or retain (as applicable) all Liabilities relating to or arising out of all other claims for benefits under U.S. Welfare Plans by Packco Participants, except as specifically provided in Section 5.02.

SECTION 5.02 RETIREE WELFARE BENEFITS. Effective as of the Distribution Date, the New Grace Group shall assume all Liabilities for providing post-retirement medical and life insurance benefits under U.S. Welfare Plans sponsored by Grace or any of its subsidiaries before the Distribution Date or any members of the New Grace Group on or after the Distribution Date, to: (i) Terminated Grace Participants; (ii) Packco Participants who would have been eligible to receive such benefits if they had retired at any time on or before the first anniversary of the Distribution Date (regardless of when they actually do retire); and (iii) any New Grace Participants who become eligible for such benefits after the Distribution Date pursuant to the Grace Severance Pay Plan as a result of a termination of employment as of the Distribution Date. Effective as of the Distribution Date, the Packco Group shall provide Packco Participants who retire after the Distribution Date for whom the New Grace has not assumed Liabilities for providing post-retirement medical and life insurance benefits pursuant to the

16

CC-BLG002500

preceding sentence with such benefits pursuant to one or more group insurance or group self-insured programs; provided, that the Packco Group may require such Packco Participants to bear the entire cost of such benefits, together with a reasonable fee for their allocable share of the Packco Group's costs of administering such programs.

SECTION 5.03 SEVERANCE. The Packco Group shall adopt, effective as of the Distribution Date, and shall maintain in effect without amendment adverse to participants, at least through the first anniversary of the Distribution Date, a severance plan providing Packco Employees with severance benefits as outlined in Exhibit A hereto.

SECTION 5.04 SPLIT DOLLAR PLAN; DEFERRED COMPENSATION PLAN; SALARY PROTECTION PLAN. Effective as of the Distribution Date, each Packco Employee who participates in the Split Dollar Plan, the Deferred Compensation Plan or the Salary Protection Plan shall be treated as a terminated participant under such Plan, and shall have the same options with respect to such Plan as are available to any other participant in such Plan upon termination of employment, in accordance with the terms of such Plan as in effect immediately before the Distribution Date. Effective as of the Distribution Date, the New Grace Group shall assume all Liabilities relating to or arising under the Split Dollar Plan, the Deferred Compensation Plan and the Salary Protection Plan.

SECTION 5.05 DEPENDENT CARE AND MEDICAL EXPENSE PLANS. (a) Grace, New Grace and Grace-Conn. shall take all steps necessary or appropriate so that, effective no later than the Distribution Date, one or more members of the New Grace Group are the sole sponsors of the Grace Dependent Care Plan and the Grace Medical Expense Plan, and the New Grace Group shall assume all Liabilities under such Plans. Such steps shall include, without limitation, the appointment or reappointment by New Grace (by action after the Distribution Date to approve or ratify such appointment or reappointment) of all named fiduciaries, trustees, custodians, recordkeepers and other fiduciaries and service providers to such Plans, to the extent such appointments or reappointments are necessary.

(b) Grace, New Grace and Grace-Conn. shall take all steps necessary or appropriate so that, effective no later than the Distribution Date, one or more members of the Packco Group are the sole sponsors of the Packco Medical and Dependent Care Expense Plan, and the Packco Group shall assume all Liabilities under such Plan. Such steps shall include, without limitation, the appointment or reappointment by Grace of all named fiduciaries, trustees, custodians, recordkeepers and other fiduciaries

17

CC-BLG002501

and service providers to such Plan, to the extent such appointments or reappointments are necessary. No employer contributions to such Plan shall be made or promised with respect to the 1998 plan year unless the parties otherwise agree.

## ARTICLE VI

## NON-U.S. PLANS

SECTION 6.01 NON-U.S. PLANS GENERALLY. As soon as practicable after the date of this Agreement, the parties hereto shall enter into one or more agreements or memoranda of understanding (collectively, the "Foreign Plans Agreement") regarding the treatment and allocation of Liabilities relating to or arising under Benefit Plans (the "Foreign Plans") for Employees located outside the United States, including without limitation expatriates, and to expatriate employees located in the United States. The Foreign Plans Agreement shall provide for the treatment of each Foreign Plan, which treatment may include (without limitation) (i) the retention or assumption of such Foreign Plan by the Packco Group, (ii) the retention or assumption of such Foreign Plan by the New Grace Group, or (iii) an allocation of the liabilities and assets (if any) of the Foreign Plan between a Plan (which may include the Foreign Plan) that is intended to be maintained by the New Grace Group and a Plan (which may include the Foreign Plan) that is intended to be maintained by the Packco Group, after the Distribution Date; provided, that the insurance contracts funding each Insured Foreign Pension Plan (and any assets related thereto) shall be divided between the appropriate Packco Benefit Plan and New Grace Benefit Plan by the insurer in accordance with applicable law, regulation and practice. Any transfers of assets or liabilities from a Noninsured Foreign Pension Plan shall be made on the basis of reasonable methods and assumptions determined by the local actuarial firm that is, as of the date of this Agreement, serving as the actuary for such Noninsured Foreign Pension Plan (or another actuarial firm if the parties hereto so agree) (the "Local Actuary"), in accordance with applicable legal and regulatory requirements, local practice and the past practice of Grace; provided, that each of Grace, Grace-Conn. and New Grace shall be entitled to review such methods and assumptions and object to them if they are unreasonable, and to review all calculations and determinations of the Local Actuary for accuracy. It is the intention of the parties hereto that the Packco Group will assume or retain Liabilities for Packco Employees under Foreign Plans and that to the extent permitted and practicable under legal and regulatory requirements and local practice, assets transferred from Noninsured Foreign Pension Plans pursuant to the Foreign

18

CC-BLG002502

Plans Agreement shall equal the Projected Benefit Obligation, calculated in accordance with FAS 87, for the liabilities assumed by Packco Benefit Plans pursuant to the Foreign Plans Agreement.

## ARTICLE VII

### GENERAL

SECTION 7.01 PRESERVATION OF RIGHTS TO AMEND OR TERMINATE PLANS AND TO TERMINATE OR CHANGE TERMS OF EMPLOYMENT. No provision of this Agreement shall be construed as a limitation on the rights of any member of the Packco Group or the New Grace Group to amend or terminate any Benefit Plan or other plan, program or arrangement relating to employees. No provision of this Agreement shall be construed to create a right in any employee or former employee or beneficiary or dependent of such employee or former employee under a Benefit Plan which such employee or former employee or beneficiary would not otherwise have under the terms of the Benefit Plan itself. Nothing contained in this Agreement shall confer upon any individual the right to remain an employee of any member of the Packco Group or the New Grace Group or restrain any member of the Packco Group or the New Grace Group from changing the terms and conditions of employment of any individual at any time following the Distribution Date, except as provided in Section 5.03 of this Agreement.

SECTION 7.02 OTHER LIABILITIES; GUARANTEE OF OBLIGATIONS. Effective as of the Distribution Date, the New Grace Group shall assume or retain (as applicable) all Liabilities relating to or arising out of claims for compensation and benefits made by or on behalf of any New Grace Participant, including salary, wages, bonuses, incentive compensation, severance benefits, separation pay, accrued sick, holiday, vacation, health, dental or retirement benefits, or other compensation under applicable law or otherwise, relating to or arising out of employment by Grace or any of its subsidiaries before the Distribution Date or employment by any member of the New Grace Group on or after the Distribution Date. Effective as of the Distribution Date, the Packco Group shall assume or retain (as applicable) responsibility for all Liabilities relating to or arising out of claims for compensation and benefits made by or on behalf of any Packco Participant, including salary, wages, bonuses, incentive compensation, severance benefits, separation pay, accrued sick, holiday, vacation, health, dental or retirement benefits, or other compensation under applicable law or otherwise, relating to or arising out of employment by Grace

19

CC-BLG002503

or any of its subsidiaries before the Distribution Date or employment by any member of the Packco Group on or after the Distribution Date. Notwithstanding the foregoing, this Section 7.02 shall not apply to any Liability that is specifically provided for elsewhere in this Agreement.

SECTION 7.03 ASSUMPTION OF PLANS; TERMINATION OF PARTICIPATION. Except as specifically provided otherwise in this Agreement, Grace, New Grace and Grace-Conn. shall take all steps necessary or appropriate so that, effective no later than the Distribution Date, one or more members of the New Grace Group are the sole sponsors of all Benefit Plans that are, as of the date of this Agreement, sponsored by Grace, and the New Grace Group shall assume or retain (as applicable) all Liabilities relating to or arising under such Benefit Plans. Such steps shall include, without limitation and where appropriate, the appointment or reappointment by New Grace (by action after the Distribution Date to approve or ratify such appointment or reappointment) of all named fiduciaries, trustees, custodians, recordkeepers and other fiduciaries and service providers to such Benefit Plans. Except as specifically provided otherwise in this Agreement or in the agreement provided for in Section 6.01 of this Agreement, the accrual of benefits by Packco Participants in any New Grace Benefit Plan shall cease not later than the Distribution Date.

SECTION 7.04 INFORMATION. The parties hereto shall, before the Distribution Date or as soon as practicable thereafter, provide each other with all information as may reasonably be requested and necessary to administer each Benefit Plan effectively in compliance with applicable law. Such information shall be provided in the form requested if, at the time of such request, it exists in such form or can readily be converted to such form. If a request would require a party providing information to incur any expenses in order to receive advice from any actuary, consultant or consulting firm, the information need not be provided unless the requesting party reimburses the party providing the information for all such expenses.

SECTION 7.05 COMPLETE AGREEMENT; COORDINATION WITH TAX SHARING AGREEMENT. (a) This Agreement, the Exhibits and Schedules hereto and the agreements and other documents referred to herein, shall constitute the entire agreement between the parties hereto with respect to the subject matter hereof (other than the Distribution Agreement, the Merger Agreement and the schedules and exhibits thereto) and shall supersede all previous negotiations, commitments and writings with respect to such subject matter.

20

CC-BLG002504

(b) This Agreement, and not the Tax Sharing Agreement, constitutes the sole agreement of the parties regarding responsibility for any excise taxes, penalties or similar levies that may be imposed by any taxing authority on, or with respect to, any Benefit Plan, except as otherwise specifically provided in the Tax Sharing Agreement with respect to payroll taxes.

SECTION 7.06 GOVERNING LAW. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware (other than the laws regarding choice of laws and conflict of laws that would apply the substantive laws of any other jurisdiction) as to all matters, including matters of validity, construction, effect, performance and remedies, except to the extent preempted by federal law.

SECTION 7.07 NOTICES. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given as provided in the Distribution Agreement.

SECTION 7.06 SUCCESSORS AND ASSIGNS; NO THIRD-PARTY BENEFICIARIES. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted assigns, but neither this Agreement nor any of the rights, interests and obligations hereunder shall be assigned by any party hereto without the prior written consent of the other party (which consent shall not be unreasonably withheld). Without limiting the generality of the foregoing, it is expressly acknowledged that at the Effective Time, the Certificate of Incorporation of Grace will be amended (the "Newco Amendment") to change the name of Grace to "Sealed Air Corporation" and that references herein to "Grace" include, from and after the Effective Time, such corporation (which is also referred to in the Merger Agreement as Newco). Accordingly, to the extent this Agreement calls for the agreement of "Grace" or of "the parties" from and after the Effec- tive Time, the agreement of Newco (as defined in the Merger Agreement) will be required. This Agreement is solely for the benefit of the parties hereto and their Subsidiaries and is not intended to confer, nor shall it confer, upon any other Persons (including New Grace Participants and Packco Participants) any rights or remedies hereunder.

SECTION 7.09 AMENDMENT AND MODIFICATION. This Agreement may be amended, modified or supplemented only by a written agreement signed by all of the parties hereto.

21

CC-BLG002505

SECTION 7.10 COUNTERPARTS. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

SECTION 7.11 INTERPRETATION. The Article and Section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties hereto and shall not in any way affect the meaning or interpretation of this Agreement.

SECTION 7.12 INDEMNITY PROCEDURES. The provisions of Article IV of the Distribution Agreement shall apply with respect to Liabilities allocated under this Agreement.

SECTION 7.13 SEVERABILITY. If any provision of this Agreement or the application thereof to any person or circumstance is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions hereof, or the application of such provision to persons or circumstances other than those as to which it has been held invalid or unenforceable, shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party.

SECTION 7.14 REFERENCES; CONSTRUCTION. References to any "Article," "Exhibit," "Schedule" or "Section," without more, are to Articles, Exhibits, Schedules and Sections to or of this Agreement. Unless otherwise expressly stated, clauses beginning with the term "including" set forth examples only and in no way limit the generality of the matters thus exemplified.

SECTION 7.15 SAC REASONABLE CONSENT. The parties hereto agree that any actions to be taken by Grace, Grace-Conn. or New Grace to implement the terms of this Agreement that are not specifically required herein that relate to Packco or the Packaging Business, and any actions that are to be taken pursuant to this Agreement only by agreement of the parties, must be reasonably satisfactory to SAC.

22

CC-BLG002506

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**W. R. GRACE & CO.**

By: _____

Name: Larry Ellberger Title: Senior Vice President

**W. R. GRACE & CO.-CONN.**

By: _____

Name: Robert B. Lamm Title: Vice President

**GRACE SPECIALTY CHEMICALS, INC.**

By: _____

Name: W.B. McGowan Title: Senior Vice President

23

CC-BLG002507

EXHIBIT 10.2

## TAX SHARING AGREEMENT

This TAX SHARING AGREEMENT (this "Agreement"), dated as of March 30, 1998, by and among W. R. Grace & Co., a Delaware corporation ("Grace"), W. R. Grace & Co.-Conn., a Connecticut corporation and a wholly owned subsidiary of Grace ("Grace-Conn."), and Sealed Air Corporation, a Delaware corporation ("Sealed Air").

## RECITALS

WHEREAS, Grace, Packco Acquisition Corp., a Delaware corporation and a wholly owned subsidiary of Grace, and Sealed Air have entered into an Agreement and Plan of Merger (the "Merger Agreement");

WHEREAS, Grace, Grace-Conn. and Grace Specialty Chemicals, Inc., a Delaware corporation and a wholly owned subsidiary of Grace ("New Grace"), have entered into the Distribution Agreement;

AND WHEREAS, Grace, on behalf of itself and the Packco Group, and Grace-Conn., on behalf of itself and the New Grace Group, wish to provide for the allocation between the Packco Group and the New Grace Group of all responsibilities, liabilities and benefits relating to or affecting Taxes (as hereinafter defined) paid or payable by either of them for all taxable periods, whether beginning before, on or after the Distribution Date (as hereinafter defined) and to provide for certain other matters.

NOW, THEREFORE, in consideration of the premises, and of the representations, warranties, covenants and agreements set forth herein, the parties hereto hereby agree as follows:

## ARTICLE I.

## DEFINITIONS

Capitalized terms used but not otherwise defined herein shall have the respective meanings assigned to them in the Distribution Agreement or the Merger Agreement. As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and the plural forms of the terms defined):

CC-BLG002508

"Action": as defined in Section 5.3(a).

"Active New Grace Businesses": as defined in Section 5.2(b).

"Active Packo Business": as defined in Section 5.1(b).

"Adjusted Item": as defined in Section 3.2(a)(v).

"Adjusted Party" means the party for the account of which is an Adjusted Item.

"Affiliated Group" means the affiliated group of which Grace is the common parent or any predecessor or successor thereto.

"Agreed Date": as defined in Section 2.2(b).

"Code" means the Internal Revenue Code of 1986, as amended, and shall include corresponding provisions of any subsequently enacted federal tax laws.

"Conn Prepared Returns": as defined in Section 2.2(a).

"Conn Prior Payments": as defined in Section 3.2(c)(iii).

"Consistency/Basis Disagreement": as defined in Section 2.2(b).

"Corresponding Item": as defined in Section 3.2(a)(v).

"Corresponding Party" means the party for the account of which is a Corresponding Item.

"Del Prepared Returns": as defined in Section 2.2(a).

"Discontinued Businesses": shall mean (x) the can sealing and coating portion of the New Grace Business which portion is described in the proviso to the definition of the Packaging Business and (y) certain other businesses currently accounted for as discontinued operations.

"Distribution Date" means the date on which the Distribution occurs. For purposes of this Agreement, the

-2-

CC-BLG002509

Distribution shall be deemed effective as of the close of business on the Distribution Date.

"Equity Securities" means any stock or other equity securities treated as stock for tax purposes, or options, warrants, rights, convertible debt, or any other instrument or security that affords any Person the right, whether conditional or otherwise, to acquire stock.

"Final Determination" means the final resolution of liability for any Tax for a taxable period (i) by a duly executed IRS Form 870 or 870-AD (or any successor forms thereto), on the date such Form is effective, or by a comparable form under the laws of other jurisdictions; except that a Form 870 or 870-AD or comparable form that reserves (whether by its terms or by operation of law) the right of the taxpayer to file a claim for refund and/or the right of the taxing authority to assert a further deficiency shall not constitute a Final Determination with respect to the right so reserved; (ii) by a decision, judgment, decree, or other order by a court of competent jurisdiction, which has become final and unappealable; (iii) by a closing agreement or accepted offer in compromise under Section 7121 or 7122 of the Code, or comparable agreements under the laws of other jurisdictions; (iv) by any allowance of a refund or credit in respect of an overpayment of Tax, but only after the expiration of all periods during which such refund may be recovered (including by way of offset) by the jurisdiction imposing Tax; or (v) by any other final disposition, including by reason of the expiration of the applicable statute of limitations or by mutual agreement of the parties.

"Foreign Cap" shall mean $3 million.

"Foreign Packco Subsidiary" means a Packco Subsidiary organized in a foreign jurisdiction.

"Foreign Packco Tax Item" means a Tax Item of a Foreign Packco Subsidiary arising in the Pre-Distribution Period attributable to the Packaging Business conducted by such Subsidiary other than any Tax Item of a Foreign Packco Subsidiary arising as a result of a Foreign Transfer.

"Foreign New Grace Subsidiary" means a New Grace Subsidiary organized in a foreign jurisdiction.

"Forwarding Party": as defined in Section 4.1.

-3-

CC-BLG002510

"Forwarding Responsibilities": as defined in Section 4.1.

"Hypothetical Pre-Distribution Tax": as defined in Section 2.2(d).

"Hypothetical Pre-Distribution Overall Tax Benefit": as defined in Section 2.2(d).

"Indemnified Amount": as defined in Section 4.1.

"Indemnitee": as defined in Section 4.2(a).

"Indemnitor": as defined in Section 4.2(a).

"Indemnity Issue": as defined in Section 4.2(a).

"Interest": as defined under "Taxes" below.

"IRS" means the Internal Revenue Service.

"New Grace Tax Item" means a Tax Item arising in the Pre-Distribution Period attributable to (i) New Grace, Grace- Conn., Packco, any Foreign New Grace Subsidiary, any member of the Affiliated Group which was a member prior to the Distribution Date or any member of the affiliated group for United States federal income tax purposes of which W. R. Grace & Co., a New York corporation, was the common parent or (ii) the New Grace Business conducted by any Foreign Packco Subsidiary.

"Overall Tax Benefit" shall mean, for any taxable period, the net operating loss, unused credits (taking into account foreign tax credits when realized regardless of the period for which the associated earnings and profits were earned) and any other aggregate net unused Tax Benefit not used to reduce Taxes for the period.

"Packco Prior Payments": as defined in Section 3.2(c)(iii).

"Packaging Tax Item" means a Tax Item attributable to Sealed Air, any member of the Packco Group or otherwise relating to the Packaging Business or the Packaging Assets that is not a New Grace Tax Item or a Foreign Packco Tax Item.

"Payee": as defined in Section 3.2(c).

"Payor": as defined in Section 3.2(c).

-4-

CC-BLG002511

"Post-Distribution Period" means the Post-Distribution Taxable Periods and the portion of any Straddle Period beginning on the date after the Distribution Date.

"Post-Distribution Taxable Period" means any taxable period beginning after the Distribution Date.

"Pre-Distribution Period" means the Pre-Distribution Taxable Periods and the portion of any Straddle Period ending on the Distribution Date.

"Pre-Distribution Schedules": as defined in Section 2.2(b).

"Pre-Distribution Taxable Period" means any taxable period ending on or before the Distribution Date

"Proceeding" shall mean any audit or other examination, judicial or administrative proceeding relating to liability for or refunds or adjustments with respect to Taxes.

"Recipient Group": as defined in Section 4.1.

"Restriction Period" means the period beginning on the date hereof and ending on the two-year anniversary of the Effective Time.

"Reviewing Party": as defined in Section 5.3(c).

"Ruling/Opinion Exception": as defined in Section 5.1.

"Sealed Air Parties" means Sealed Air and each of its past, present or future Affiliates, other than any member of the Packco Group.

"Straddle Period" means a taxable period that includes, but does not end on, the Distribution Date.

"Substantial Authority": as defined in Section 2.1.

"Tax Benefit" means any item of loss, deduction, credit or any other Tax Item which decreases Taxes paid or payable.

"Tax Deficiency" means an assessment of Taxes, as a result of a Final Determination.

-5-

CC-BLG002512

"Tax Detriment" means any item of income, gain, recapture of credit or any other Tax Item which increases Taxes paid or payable.

"Tax-Free Status" means the qualification of the Distribution (i) as a transaction described in Section 355(a)(1) of the Code, (ii) as a transaction in which the stock distributed thereby is qualified property for purposes of Section 355(c)(2) of the Code and (iii) as a transaction in which each of Grace, Grace-Conn., Packco, New Grace and each member of the New Grace Group recognizes no income or gain.

"Tax Item" means any item of income, gain, loss, deduction, credit, recapture of credit or any other item which increases or decreases Taxes paid or payable, including an adjustment under Code Section 481 resulting from a change in accounting method.

"Tax Opinions" shall mean the tax opinions referred to in Section 7.1(e) of the Merger Agreement.

"Tax Refund" means a refund of Taxes as the result of a Final Determination.

"Tax Return" means any return, filing, questionnaire, information return or other document required to be filed, including requests for extensions of time, filings made with estimated tax payments, claims for refund and amended returns that may be filed, for any period with any taxing authority (whether domestic or foreign) in connection with any Tax or Taxes (whether or not a payment is required to be made with respect to such filing).

"Taxes" means all forms of taxation, whenever created or imposed, and whether of the United States or elsewhere, and whether imposed by a local, municipal, governmental, state, foreign, federation or other body, and, without limiting the generality of the foregoing, shall include income, sales, use, ad valorem, gross receipts, trade, license, value added, franchise, transfer, recording, withholding, payroll, employment, excise, occupation, unemployment insurance, social security, business license, business organization, stamp, environmental, premium and property taxes, together with any related interest, penalties and additions to any such tax, or additional amounts imposed by any taxing authority (domestic or foreign) (such interest, penalties, additions and additional amounts, "Interest").

-6-

CC-BLG002513

## ARTICLE II.

## FILING OF TAX RETURNS

Section 2.1. Manner of Filing. All Tax Returns filed after the Distribution Date and the Pre-Distribution Schedules shall be prepared on a basis which is consistent with the consummation of the transactions as set forth in the Distribution Agreement, the Grace Tax Matters Certificate, the Sealed Air Tax Matters Certificate, the Tax Opinions and any opinions, rulings, agreements or written advice relating to Foreign Transfers (in the absence of a controlling change in law or circumstances) and shall be filed on a timely basis (including extensions) by the party responsible for such filing under this Agreement. In the absence of a controlling change in law or circumstances, all such Tax Returns and Pre-Distribution Schedules shall also be prepared on a basis which is consistent with the treatment of each of the Foreign Transfers in the jurisdictions listed on Exhibit A hereto as a reorganization, pursuant to a plan of reorganization, within the meaning of Section 368(a)(1)(D) of the Code. The Pre-Distribution Schedules and all Tax Returns in respect of a Pre-Distribution Taxable Period or portion, ending on the Distribution Date of any Straddle Period, that include any member of the New Grace Group or the Packco Group shall be prepared on the basis of substantial authority or on a reasonable basis with (if applicable) appropriate disclosure (each, "Substantial Authority"); provided, however, that such Schedules and Returns shall be prepared on a basis consistent with the elections (other than elections relating to carrybacks and carryforwards described in Section 3.3(a)), accounting methods, conventions and principles of taxation used for the most recent taxable periods of members of the New Grace Group for which Tax Returns involving similar Tax Items have been filed, to the extent that a failure to do so would result in a Tax Detriment, or a reduction in a Tax Benefit, to a member of the Packco Group, as long as such consistent position has Substantial Authority. All Tax Returns in respect of a Post-Distribution Taxable Period or portion, beginning after the Distribution Date, of any Straddle Period, shall be prepared with Substantial Authority; provided, however, that such Returns shall be prepared on a basis consistent with the elections (other than elections relating to carrybacks and carryforwards described in Section 3.3(a)), accounting methods, conventions and principles of taxation used for the most recent taxable periods of members of the New Grace Group for which Tax Returns involving similar Tax Items have

-7-

CC-BLG002514

been filed, to the extent that a failure to do so would result in a Tax Detriment, or a reduction in a Tax Benefit, to a member of the other Group, as long as such consistent position has Substantial Authority. In the event of a conflict with respect to a Straddle Period between the requirements of the immediately preceding sentence and the second preceding sentence, the second preceding sentence shall prevail. Subject to the provisions of this Agreement, all decisions relating to the preparation of Tax Returns shall be made in the sole discretion of the party responsible under this Agreement for such preparation. Grace shall provide Grace-Conn. with copies of all Tax Returns filed after the Distribution Date that relate to any member of the New Grace Group. Grace-Conn. shall provide Grace with a copy of any portion of a Tax Return necessary to confirm Grace-Conn.'s entitlement to payment hereunder in respect of a carryback or refund.

Section 2.2. Pre-Distribution and Straddle Period Tax Returns.

(a) Grace shall prepare and file, or cause to be prepared and filed, any Tax Returns required to be filed by a member or members of the New Grace Group or the Packco Group for any Pre-Distribution Taxable Period and any Straddle Period; provided, however, that Grace-Conn. shall prepare and file, or cause to be prepared and filed, any Tax Returns relating solely to a member or members of the New Grace Group or their respective assets or businesses (such Tax Returns to be prepared and filed, or caused to be prepared and filed, by Grace, the "Del Prepared Returns", and by Grace-Conn., the "Conn Prepared Returns", respectively).

(b) With respect to any Del Prepared Return that has not been filed as of the Distribution Date and relates to a Pre-Distribution Taxable Period or a Straddle Period, Grace-Conn. shall, 25 calendar days before the due date (including extensions) for such Return, provide Grace with a schedule (collectively, the "Pre-Distribution Schedules") detailing the computation of
(i) in the case of a Pre-Distribution Taxable Period, the Tax and/or Overall Tax Benefit and (ii) in the case of a Straddle Period, the Hypothetical Pre-Distribution Tax and/or Hypothetical Pre-Distribution Overall Tax Benefit, in either case, attributable to the member or members of the New Grace Group or the Packco Group included in such Return. Any Pre-Distribution Schedule relating to a Pre-Distribution Taxable Period shall be delivered to Grace in the form of a completed, but unexecuted Tax Return. If Grace so requests, Grace-Conn. shall discuss with Grace the preparation of, and allow Grace

-8-

CC-BLG002515

periodically to review major issues with respect to, any Pre-Distribution Schedule. In the event that Grace disagrees with any Tax Item reflected (or anticipated to be reflected) on a Pre-Distribution Schedule and demonstrates (by means of a written explanation in sufficient detail to permit such conclusion to be verified) its conclusion that Grace-Conn. has failed to comply with the requirements of the third sentence of Section 2.1 hereof (a "Consistency/Basis Disagreement"), Grace-Conn. shall explain its calculation of such Tax Item within 14 days of receipt of Grace's written explanation. The parties shall attempt in good faith mutually to resolve any Consistency/Basis Disagreements prior to the due date for filing the relevant Tax Return. Notwithstanding any other provision of this Agreement, with respect to estimated Tax payments to a foreign governmental authority for the first quarter of 1998 that are due before the parties have agreed on the amount in connection therewith for which Grace-Conn. is responsible hereunder, (I) Grace shall estimate in good faith and in accordance with past practice and make such estimated Tax payment, (II) Grace shall promptly provide such estimate to Grace-Conn., (III) Grace-Conn. shall deliver to Grace the applicable Pre-Distribution Schedule reasonably promptly after the Distribution Date (provided that Grace and its Affiliates reasonably and promptly cooperate with Grace-Conn. in the preparation thereof), (IV) Grace-Conn. shall not be required to make any payment in respect of such estimated Taxes to Grace until five days after the date that the parties agree on such Pre-Distribution Schedule (the "Agreed Date") (and such payment shall not exceed the amount of such estimated Tax paid, shall otherwise be determined based on the Pre-Distribution Schedule as distinguished from the estimated Tax paid, and shall be made in immediately available funds), and (IV) such payment shall bear interest from the time that payment is due to the applicable governmental authority until the earlier of the date that payment is made by Grace-Conn. and five days after the Agreed Date at the rate of interest charged for Eurodollar or LIBOR loans under Grace-Conn.'s principal senior bank debt agreement. If such payment by Grace-Conn. is not made by the fifth day after the Agreed Date, then such payment shall bear interest from the fifth day after the Agreed Date until the date that payment is made by Grace-Conn. at the rate that is two percent in excess of the rate set forth in clause (IV) of the preceding sentence.

(c) Whether or not any Consistency/Basis Disagreements or any other disagreements relating to a Tax Item on a Pre-Distribution Schedule have been resolved by the

-9-

CC-BLG002516

applicable due date, Grace shall (i) prepare the Del Prepared Returns on the basis of, and in a manner consistent with, the Pre-Distribution Schedules, (ii) provide Grace-Conn. with a copy of each Del Prepared Return 14 calendar days before such Return is filed and reflect any comments thereon provided in good faith by Grace-Conn. and (iii) provide Grace-Conn. with a copy of each Del Prepared Return two business days after such Return is filed. In the event that any Consistency/Basis Disagreements relating to a Pre-Distribution Schedule have not been resolved prior to the filing of the relevant Tax Return, such disagreements shall be promptly resolved pursuant to Section 6.7 hereof.

(d) The "Hypothetical Pre-Distribution Tax" shall mean the Tax that would have been due for the taxable period ending on the Distribution Date if the Distribution Date were the last day of the taxable period. The "Hypothetical Pre-Distribution Overall Tax Benefit" shall mean the Overall Tax Benefit that would have arisen in the taxable period ending on the Distribution Date if the Distribution Date were the last day of the taxable period. Such Tax or Overall Tax Benefit shall be computed by determining items of income, expense, deduction, loss and credit on a "closing of the books" basis, reflecting tax accounting principles as of the close of business on the Distribution Date.

Section 2.3. Post-Distribution Tax Returns. Any Tax Return for a Post-Distribution Taxable Period shall be the responsibility of the New Grace Group if such Tax Return relates solely to a member or members of the New Grace Group or their respective assets or businesses, and shall be the responsibility of the Packco Group if such Tax Return relates solely to a member or members of the Packco Group or Sealed Air or their respective assets or businesses.

**ARTICLE III.**

**PAYMENT OF TAXES**

Section 3.1. Allocation of Tax Liabilities With Respect to Unfiled Returns.

(a) All Taxes shall be paid by the party responsible under this Agreement for filing the Tax Return pursuant to which such Taxes are due; provided, however, that

(i) in the case of Taxes due with respect to Del Prepared Returns for Pre-Distribution Taxable Periods or

-10-

CC-BLG002517

Straddle Periods, Grace-Conn. shall pay Grace the amount, if any, of the Tax or Hypothetical Pre-Distribution Tax, as the case may be, if any, reflected in the Pre-Distribution Schedule relating to such Tax Return attributable to the member or members of the New Grace Group or the Packco Group included in such Return (and in the case of the Business Tax and Real Estate Tax due to France or a political subdivision thereof (and other Taxes due to any jurisdiction based on analogous principles), with respect to Post-Distribution Periods in 1998, Grace-Conn. shall pay Grace the amount of any Tax liability attributable to the New Grace Business). Such payment shall be made, at Grace-Conn.'s discretion, either in immediately available funds on the morning of the relevant date when payment is due to the governmental authority in respect of such Tax Return or, if not in immediately available funds, two business days prior to such due date. Grace shall forward any such payment that it receives from Grace-Conn. to the appropriate taxing authority.

(ii) in the case of Del Prepared Returns for any taxable period, on the relevant date on which payment is due (or a refund is received) in respect of such Tax Return, Grace shall pay Grace-Conn. the amount, if any, of the actual reduction in Taxes, or the actual increase in the Tax refund, that would have been payable or receivable with respect to such Tax Return but for any Overall Tax Benefit (or Hypothetical Pre-Distribution Overall Tax Benefit) that is for the account of Grace-Conn. under Section 3.2(a)(iii), below. In the case of a payment by Grace in respect of a reduction in Taxes, such payment shall be made in immediately available funds on the morning of the relevant due date or, if not in immediately available funds, two business days prior to the due date.

(iii) the parties intend that, in implementing this Section 3.1(a), payment and reimbursement between the parties shall reflect the principles of Section 3.2(a).

(b) Notwithstanding anything to the contrary, any Tax Item resulting from any act or omission not in the ordinary course of business (other than transactions contemplated by this Agreement, the Distribution Agreement, the Merger Agreement or the Benefits Agreement) on the part of any member of the Packco Group or any of the Sealed Air Parties occurring on the Distribution Date after the Effective Time shall be deemed to arise in a taxable period which begins after the Distribution Date.

-11-

CC-BLG002518

Section 3.2. Indemnities; Redetermined Tax Liabilities. Except as otherwise provided in Article V:

(a) Indemnities.

(i) Grace-Conn. shall be responsible for (w) any Tax for a Pre-Distribution Taxable Period (and any Hypothetical Pre-Distribution Tax for a Straddle Period) of Grace, Grace-Conn., Packco, any Foreign New Grace Subsidiary, any current or former member of the Affiliated Group which was a member prior to the Distribution Date or any current or former member of the affiliated group for United States federal income tax purposes of which W. R. Grace & Co., a New York corporation, was the common parent, (x) any Tax for a Pre-Distribution Taxable Period (and any Hypothetical Pre-Distribution Tax for a Straddle Period) of a Foreign Packco Subsidiary attributable to the Packaging Business reflected on a Tax Return filed by such Subsidiary on or before the Distribution Date or on a Pre-Distribution Schedule, (y) any Tax of any member of the New Grace Group or a Foreign Packco Subsidiary, in either case, to the extent attributable to the New Grace Business and (z) 75% (or if the Packco Group has borne an amount of Tax in respect of adjustments to Foreign Packco Tax Items (and fees and expenses in Proceedings relating to such adjustments) that exceeds the Foreign Cap, then 100%) of any increase in Tax of a member of the Packco Group attributable to an adjustment to a Foreign Packco Tax Item.

(ii) Grace shall be responsible for any Taxes (x) of any member of the Packco Group or otherwise relating to the Packaging Business or the Packaging Assets (except to the extent that Grace-Conn. is responsible for such Taxes pursuant to clause (i) above) and (y) of any of the Sealed Air Parties, whether arising before, on or after the Distribution Date.

(iii) Any Overall Tax Benefit (or Hypothetical Pre-Distribution Overall Tax Benefit) shall be for the account of Grace-Conn. to the extent that such Overall Tax Benefit (or Hypothetical Pre-Distribution Overall Tax Benefit) is attributable to (w) Grace, Grace-Conn., Packco, any Foreign New Grace Subsidiary, any current or former member of the Affiliated Group which was a member prior to the Distribution Date or any current or former member of the affiliated group for United States federal income tax purposes of which W. R. Grace & Co., a New York corporation, was the common parent, in each case, for the Pre-Distribution Period, (x) the Packaging Business of a Foreign Packco Subsidiary for the Pre-Distribution

-12-

CC-BLG002519

Period reflected on a Tax Return filed by such Subsidiary on or before the Distribution Date or on a Pre-Distribution Schedule (other than the Foreign NOLs), (y) a Pre-Distribution Period of any member of the New Grace Group or a Foreign Packco Subsidiary, in either case, to the extent attributable to the New Grace Business (other than the Foreign NOLs) or (z) any adjustment to a Foreign Packco Tax Item.

(iv) For purposes of determining the amount for which Grace or Grace-Conn. is responsible for paying the other party, or entitled to receive from the other party, in the event of any adjustment, including a Final Determination, of a Tax Item of a Foreign Packaging Subsidiary (other than a Tax Item that arises as a result of a Foreign Transfer), Tax Items that are clearly attributable to the Packaging Business or the New Grace Business, respectively, shall be allocated to such Business and Tax Items that are not so attributable shall be allocated in the proportion that the earnings from operations of such Business operated by such Subsidiary bears to the total earnings from operations of such Subsidiary, as reflected in audited financial statements for the most recent, as of the end of such taxable period, full-year accounting period. Tax Items so allocated shall be treated for all purposes of this Agreement as attributable to the Business to which they are allocated.

(v) Timing Adjustments. In the event of any adjustment, including a Final Determination, of a Tax Item (the "Adjusted Item") which results in a Tax Benefit or Tax Detriment for the account of one party and a corresponding Tax Detriment or Tax Benefit (the "Corresponding Item") for the account of the other party, then (I) if the Corresponding Item is a Tax Benefit, the Corresponding Party shall pay the Adjusted Party and (II) if the Corresponding Item is a Tax Detriment, the Adjusted Party shall pay the Corresponding Party, in either case, for each taxable period in which a member of the Group of the party entitled to payment under this Section 3.2(a)(v) actually realizes the Tax Benefit, in the case of (I), or the Tax Detriment, in the case of (II), by reason of the adjustment, an amount equal to such realized Tax Benefit, in the case of (I), or realized Tax Detriment, in the case of (II), including interest
(computed at a 5% annual rate) from the original due date (without extensions) for filing of the Return for such taxable period through the date of payment under this Section 3.2(a)(v).

(b) Final Determinations. In the case of any Final Determination regarding a Tax Return, any Tax Deficiency shall be paid to the appropriate taxing authority by, and any Tax

-13-

CC-BLG002520

Refund received from the appropriate taxing authority shall be paid to, the party which filed such Return; provided, however, that whether or not there is a Tax Deficiency or Tax Refund and whether or not a payment is required to or from the appropriate taxing authority, Grace shall make payments to, or receive payments from, Grace-Conn. based upon the following principles:

(i) Grace-Conn. shall make a payment to Grace in an amount equal to (x) any increase in the Tax of any of the Sealed Air Parties or any member of the Packco Group resulting from any adjustment to a New Grace Tax Item and (y) 75% (or, if the Packco Group has borne an amount of Tax in respect of adjustments to Foreign Packco Tax Items (and fees and expenses in Proceedings relating to such adjustments) that exceeds the Foreign Cap, then 100%) of any increase in the Tax of any of the Sealed Air Parties or any member of the Packco Group resulting from any adjustment to a Foreign Packco Tax Item, in either case (x) or (y), together with any Interest relating thereto that is or has been imposed by the relevant taxing authority (or would have been imposed but for an offsetting Packaging Tax Item).

(ii) Grace shall pay to Grace-Conn. an amount equal to (x) any decrease in the Tax of any of the Sealed Air Parties or any member of the Packco Group resulting from any adjustment to a New Grace Tax Item and (y) any decrease in the Tax of any of the Sealed Air Parties or any member of the Packco Group resulting from any adjustment to a Foreign Packco Tax Item, in either case (x) or (y), together with any Interest relating thereto that is or has been paid by the relevant taxing authority (or would have been paid but for an offsetting Packaging Tax Item).

(iii) The parties intend that, in implementing this Section 3.2(b), payment and reimbursement between the parties shall reflect the principles of Section 3.2(a).

(iv) Payments otherwise required to be made under this Section 3.2(b) with respect to a single Final Determination shall be netted and offset against each other so that either Grace shall make a payment to Grace-Conn. or Grace-Conn. shall make a payment to Grace, but not both.

-14-

CC-BLG002521

(c) Calculation and Payment of Amounts.

(i) All calculations and determinations required to be made pursuant to this Article III shall initially be made by the party obligated to make such payment (the "Payor") in its good faith. If the party entitled to receive a payment (the "Payee") so requests, the Payor shall present its calculations and determinations to the Payee in writing. The Payee shall be deemed to consent to such calculations and determinations unless the Payee notifies the Payor in writing within 30 days of receiving such calculations and determinations. If the Payee disagrees with the Payor's calculations and determinations, the parties shall attempt in good faith mutually to resolve the disagreement. In the event that they cannot so resolve the disagreement, it shall be resolved promptly pursuant to Section 6.7 hereof.

(ii) For all tax purposes, the parties hereto agree to treat, and to cause their respective affiliates to treat, (x) any payment required to be paid to a member of the other Group by this Agreement as an adjustment to the portion of the New Grace Capital Contribution that is contributed from Grace to New Grace and (ii) any payment of interest or Taxes (other than U.S. Federal income taxes) by or to a taxing authority as taxable or deductible, as the case may be, to the party entitled under this Agreement to retain such payment or required under this Agreement to make such payment, in either case except as otherwise mandated by the law or a Final Determination. In the event of such a Final Determination, the payment in question shall be adjusted to place the parties in the same after-tax position that they would have enjoyed absent such Final Determination. Any payment required by this Agreement that is not made on or before the date required hereunder shall bear interest, from and after such date through the date of payment, at the rate that is two percent in excess of the rate of interest charged for Eurodollar or LIBOR loans under the principal senior bank debt agreement of the party required to make such payment.

(iii) Payment of any amount required to be made pursuant to this Article III as a result of a Final Determination shall become due and payable after such Final Determination has been made within ten business days of the receipt of written notice from the party entitled to receive such payment to the party required to make such payment. Any amounts required to be paid in respect of Taxes or Overall Tax Benefits pursuant to this Article III shall be adjusted to avoid duplication of payments and to take into account the sum of any

-15-

CC-BLG002522

payments previously made by any member of the Packco Group on or prior to the Distribution Date or by Grace-Conn. or any other member of the New Grace Group at any time in respect of such Taxes or Overall Tax Benefits (the "Conn Prior Payments") and the sum of any payments previously made by any member of the Packco Group after the Distribution Date in respect of such Taxes or Overall Tax Benefits (the "Packco Prior Payments"). Appropriate payments will be made between the parties in the event that the Conn Prior Payments or the Packco Prior Payments, respectively, exceed the amounts for which Grace-Conn. or Packco, respectively, is responsible under the principles of Section 3.2 (a).

(d) Other Tax Liabilities and Refunds. Any Tax or Tax refund that is not otherwise covered by Section 3.1 or 3.2(b) shall be allocated, and payment shall be made by Grace-Conn. or Grace, using the principles of Sections 3.2(a); provided, however, that any Tax refund (whether or not governed by Section 3.1 or 3.2(b)) arising as a result of an adjustment of a Foreign Packco Tax Item shall be allocated in the same manner and to the same extent as Taxes and expenses in respect of adjustments of Foreign Packco Tax Items have been borne (it being agreed and understood that to the extent that the Foreign Cap has been exceeded, such refund shall be entirely for the benefit of Grace-Conn. and to the extent that refunds are shared 75% by Grace-Conn. and 25% by Grace the Foreign Cap shall be increased by the amount refunded to Grace). Any Tax refund received by one party that is for the account of the other party shall be paid to such other party promptly upon receipt thereof. Any Tax paid by one party that is the responsibility of the other party shall be reimbursed promptly by the other party.

Section 3.3. Carrybacks and Refund Claims. (a) Any Tax refund resulting from the carryback by any member of the New Grace Group of any Tax Item arising after the Distribution Date to a Pre-Distribution Taxable Period or a Straddle Period shall be for the account of Grace-Conn., and Grace shall promptly pay over to Grace-Conn. any such Tax refund that it receives. In the event that a member of the New Grace Group, on the one hand, and a member of the Packco Group or a Sealed Air Party, on the other hand, are each entitled to carryback a Tax Item to a Pre-Distribution Taxable Period or a Straddle Period, the respective Tax Items shall be utilized under the rules of applicable law (which shall be, in the case of carrybacks to such periods of the Affiliated Group and carrybacks under foreign or State law with respect to which there is no applicable rule regarding the priority of such utilization, the rules contained in Treasury

-16-

CC-BLG002523

Regulation (section)1.1502-21T). Any election affecting the carryback or carryforward of any Tax Item of any member of the New Grace Group, or a payment to or by such member under this Agreement in respect of a carryback or carryforward, including the elections under Section 172(b)(3) of the Code and Treasury Regulation (section)1.1502-21T(b)(3) and 1.172-13(c) with respect to the taxable years of the Affiliated Group that begin on each of January 1, 1997, and January 1, 1998, shall not be made without the consent of Grace-Conn. and shall be made if Grace-Conn. so requests.

(b) Grace-Conn. shall be permitted to file, and Grace shall fully cooperate with Grace-Conn. in connection with, any refund claim. To the extent that such a refund claim (other than a claim arising from a carryback) does not result in a Tax refund (or would not result in a refund if a claim were filed) as the result of an offsetting Packaging Tax Item (including a Packaging Tax Item carried back to a Pre-Distribution Taxable Period or a Straddle Period), Grace shall remit to Grace-Conn. the amount of any decrease in Tax that results or would have resulted from such refund claim.

Section 3.4. Liability for Taxes with Respect to Post-Distribution Periods. Unless otherwise specifically provided in this Agreement or the Distribution Agreement, the New Grace Group shall pay all Taxes and shall be entitled to receive and retain all refunds of Taxes with respect to periods beginning after the Distribution Date which are attributable to the New Grace Business. Unless otherwise provided in this Agreement, the Packco Group shall pay all Taxes and shall be entitled to receive and retain all refunds of Taxes with respect to periods beginning after the Distribution Date which are attributable to the Packaging Business.

## ARTICLE IV.

## INDEMNITY, COOPERATION AND EXCHANGE OF INFORMATION

Section 4.1. Breach. Grace-Conn. shall be liable for and shall indemnify, defend and hold harmless the Packco Indemnitees from and against, and Grace shall be liable for and shall indemnify, defend and hold harmless the New Grace Indemnitees from and against, any payment required to be made as a result of the breach by a member of the New Grace Group or the Packco Group, respectively, of any obligation under this Agreement. If any member of the Packco Group or the New Grace Group, fails to comply in any respect whatsoever with any of its responsibilities under this Agreement relating to promptly

-17-

CC-BLG002524

forwarding to any member of the other Group (the "Recipient Group") any communications with and refunds received from any taxing authority ("Forwarding Responsibilities"), then Grace or Grace-Conn., as the case may be, (the "Forwarding Party") shall be liable for and shall indemnify and hold the New Grace Indemnitees or the Packco Indemnitees, as the case may be, harmless from and against any costs or expenses (including, without limitation, Taxes and reasonably incurred lawyers' and accountants' fees) ("Indemnified Amount") incurred by or imposed upon any member of the Recipient Group arising out of, in connection with or relating to such communication; provided, however, that the liability of the Forwarding Party with respect to any one such failure shall be equal to that portion of the Indemnified Amount that a member of the Recipient Group demonstrates is caused (directly or indirectly) by such failure.

Section 4.2. Contests. (a) Whenever a party hereto (the "Indemnitee") becomes aware of the existence of an issue that could increase the liability for any Tax, or decrease the amount of any refund, of the other party hereto or any member of its Group or require a payment hereunder (an "Indemnity Issue"), the Indemnitee shall in good faith promptly give notice to such other party (the "Indemnitor") of such Indemnity Issue. The failure of any Indemnitee to give such notice shall not relieve any Indemnitor of its obligations under this Agreement, except to the extent that such Indemnitor or its affiliate is actually materially prejudiced by such failure to give notice.

(b) The Indemnitor and its representatives, at the Indemnitor's expense, shall be entitled to participate (i) in all conferences, meetings or proceedings with any taxing authority, the subject matter of which is or includes an Indemnity Issue in respect of a Pre-Distribution Period and (ii) in all appearances before any court, the subject matter of which is or includes an Indemnity Issue in respect of a Pre-Distribution Period.

(c) Except as provided in Section 4.2(d), Grace-Conn. shall have the right to decide as between the parties hereto how any Indemnity Issue for a Pre-Distribution Taxable Period is to be dealt with and finally resolved with the appropriate taxing authority and shall control all Proceedings relating thereto. Grace agrees to cooperate with Grace-Conn. in the settlement of any such Indemnity Issue; provided, however, that Grace-Conn. shall act in good faith in the conduct of such Proceedings and shall keep Grace reasonably informed of any developments which can reasonably be expected to affect adversely Grace. Such cooperation shall include permitting Grace-Conn. to litigate or

-18-

CC-BLG002525