otherwise resolve any such Indemnity Issue. It is expressly the intention of the parties to this Agreement to take, and the parties shall take, all actions necessary to establish Grace-Conn. as the sole agent for Tax purposes of each member of the Affiliated Group, as if Grace-Conn. were the common parent of the Affiliated Group, with respect to all combined, consolidated and unitary Tax Returns of the Affiliated Group for the Pre-Distribution Taxable Periods.

(d) The parties jointly shall represent the interests of (i) the Affiliated Group in any Proceeding relating to any Straddle Period and (ii) any Foreign Packco Subsidiary in any Proceeding relating to any taxable period that involves an Indemnity Issue. Neither party shall settle any dispute relating to any such period without the consent of the other party (which consent shall not be unreasonably withheld); provided, however, that if either party proposes a settlement and the other party does not consent thereto, the nonconsenting party shall assume control of the Proceeding (and bear all subsequently incurred costs, fees and expenses relating thereto) and the respective liabilities of the parties shall be determined pursuant to Section 6.7 based on the magnitude and likelihood of success of the issues involved in the Proceeding, the reasonableness of the settlement offer, the expense of continuing the Proceeding and other relevant factors. Any other disputes regarding the conduct or resolution of any such Proceeding shall be resolved pursuant to Section 6.7. All costs, fees and expenses paid to third parties in the course of such Proceeding shall be borne by the parties in the same ratio as the ratio in which, pursuant to the terms of this Agreement, the parties would share the responsibility for payment of the Taxes asserted by the taxing authority in its claim or assessment if such claim or assessment were sustained in its entirety; provided, however, that in the event that any party hereto retains its own advisors or experts in connection with any Proceeding, the costs and expenses thereof shall be borne solely by such party.

Section 4.3. Cooperation and Exchange of Information.

(a) Grace shall, and shall cause each appropriate member of the Packco Group to, prepare and submit to Grace-Conn., as soon as practicable, but in no event later than the date that is 30 days after a request from Grace-Conn. (i) all information as Grace-Conn. shall reasonably request to enable Grace-Conn. to file any Conn Prepared Return or prepare any Pre-Distribution Schedule (which information shall be provided in the form and of the quality in which comparable information was

-19-

CC-BLG002526

provided prior to the Distribution) and (ii) any Del Prepared Return (including any amended return) for any year within the carryback or carryforward period for an Overall Tax Benefit or Hypothetical Pre-Distribution Overall Tax Benefit that is for the account of Grace-Conn. or for any year with respect to which Grace is entitled to a payment under Section 3.2(a)(v). Grace-Conn. shall bear any out-of-pocket marginal expense paid by any member of the Packco Group in preparing and submitting such information in respect of a Pre-Distribution Schedule relating to a Pre-Distribution Taxable Period, and the parties shall share equally any such expenses in respect of a Pre-Distribution Schedule relating to a Straddle Period.

(b) Each party on behalf of itself and each member of its Group, agrees to provide the other party and the members of such party's Group with such cooperation and information as the second party or its Group members shall reasonably request in connection with the preparation or filing of any Tax Return, Pre-Distribution Schedule or claim for refund not inconsistent with this Agreement or in conducting any Proceeding in respect of Taxes. Such cooperation and information shall include, without limitation, (i) execution and delivery of a power of attorney by Grace or any other member of the Packco Group to Grace-Conn. or another member of the New Grace Group or designation of an officer of Grace-Conn. or another member of the New Grace Group as an officer of Grace or any other member of the Packco Group for the purpose of signing Tax Returns, cashing refund checks and conducting Proceedings if Grace-Conn. could not otherwise exercise its rights under this Agreement with respect to such Returns, refunds or Proceedings, (ii) promptly forwarding copies of appropriate notices and forms or other communications received from or sent to any taxing authority which relate to the Affiliated Group, the Packaging Business or the New Grace Business and (iii) providing copies of all relevant portions of Tax Returns, accompanying schedules, related workpapers, documents relating to rulings or other determinations by taxing authorities, including, without limitation, foreign taxing authorities, and records concerning the ownership and Tax basis of property, which either party may possess. Each party shall make, and shall cause the members of the Packco Group to make, their employees and facilities available on a mutually convenient basis to provide explanation of any documents or information provided hereunder.

(c) Grace and Grace-Conn. agree to retain all Tax Returns, related schedules and workpapers, and all material records and other documents as required under Section 6001 of

-20-

CC-BLG002527

the Code and the regulations promulgated thereunder relating thereto existing on the date hereof or created through the Distribution Date, until the expiration of the statute of limitations (including extensions) of the taxable years to which such Tax Returns and other documents relate and until the Final Determination of any payments which may be required in respect of such years under this Agreement. Grace-Conn. and Grace agree to advise each other promptly of any such Final Determination. Any information obtained under this Section shall be kept confidential, except as may be otherwise necessary in connection with the filing of Tax Returns or claims for refund or in conducting any audit or other proceeding.

(d) If (i) any member of the Packco Group fails to provide any information requested pursuant to Section 4.3(a) by the dates and in the manner specified in Section 4.3(a) hereof or (ii) with respect to information not requested pursuant to Section 4.3(a) hereof, any member of either Group fails to provide any information requested pursuant to this Section 4.3, within a reasonable period, then the requesting party shall have the right to engage a "Big Six" public accounting firm of its choice to gather such information. Each party agrees upon two business days' notice, in the case of a failure to provide information pursuant to Section 4.3 hereof to permit any such "Big Six" public accounting firm full access to all appropriate records or other information in the possession of any member of the party's Group during reasonable business hours, and promptly to reimburse or pay directly all costs and expenses in connection with the engagement of such public accountants.

(e) If any member of either Group supplies information pursuant to this Agreement and an officer of any member of the other Group signs a statement or other document under penalties of perjury in reliance upon the accuracy of such information and so requests, then a duly authorized officer of the member supplying such information shall certify, under penalties of perjury, the accuracy and completeness of the information so supplied. Grace agrees to indemnify and hold harmless each New Grace Indemnitee, and Grace-Conn. agrees to indemnify and hold harmless each Packco Indemnitee, from and against any cost, fine, penalty or other expense of any kind attributable to the gross negligence or willful misconduct of a member of the Packco Group, or New Grace Group, as the case may be, in supplying a member of the other Group with inaccurate or incomplete information.

-21-

CC-BLG002528

## ARTICLE V.

### CERTAIN POST-DISTRIBUTION TRANSACTIONS

Section 5.1 Sealed Air and Packco Group Covenants.

Unless, in the case of any of Sections 5.1(a) through (f) below, Grace has obtained a ruling letter from the IRS or an opinion of nationally recognized counsel to Grace, in either case, to the effect that, without material qualification, such act or omission will not adversely affect the federal income tax consequences of the Distribution to any of Grace, Grace-Conn. or the stockholders of Grace-Conn., as set forth in the Tax Opinions, and the substance of, and basis for, such conclusion in such ruling or opinion is reasonably satisfactory to Grace-Conn. in its good faith solely with regard to preserving the Tax-Free Status of the Distribution (the "Ruling/Opinion Exception"):

(a) No Sealed Air Party at any time nor any member of the Packco Group at any time after the Effective Time shall take any action, or fail or omit to take any action, that would cause any representation made in the Sealed Air Tax Matters Certificate or the Grace Tax Matters Certificate to be untrue in a manner that would have an adverse effect on the Tax-Free Status of the Distribution.

(b) Until the first day after the Restriction Period, the Packco Group shall continue the active conduct of the Packaging Business (the "Active Packco Business"). The Packco Group shall not liquidate, dispose of, or otherwise discontinue the conduct of any material portion of the Active Packco Busi-ness. The Packco Group shall continue the active conduct of the Packaging Business primarily through officers and employees of the Packco Group (and not through independent contractors).

(c) Until the first day after the Restriction Period, no Sealed Air Party nor any member of the Packco Group shall sell or otherwise issue to any Person, or redeem or otherwise acquire from any Person (other than any member of the Packco Group), any Equity Securities of Grace or any other member of the Packco Group; provided, however, that (i) purchases that, in the aggregate, meet the requirements of Section 4.05(1)(b) of Revenue Procedure 96-30 shall not constitute a redemption or acquisition of stock of Grace for purposes of this Section 5.1(c), (ii) if required by law, any member of the Packco Group may issue a de minimis number of Equity Securities of such member to any person in order to qualify such person to serve as

-22-

CC-BLG002529

an officer or director of such member and (iii) Grace may issue, as compensation for services or pursuant to the exercise of compensatory stock options, Equity Securities of Grace that do not exceed in the aggregate ten percent of the Equity Securities of Grace.

(d) Until the first day after the Restriction Period, no Sealed Air Party nor any member of the Packco Group shall (i) solicit any Person to make a tender offer for, or otherwise acquire or sell, the Equity Securities of Grace,
(ii) participate in or support any unsolicited tender offer for, or other acquisition, disposition or issuance of, the Equity Securities of Grace or (iii) approve or otherwise permit any proposed business combination or any transaction which, in the case of (i), (ii) or (iii), individually or in the aggregate, together with the transactions contemplated under the Distribution Agreement, the Merger Agreement, the Benefits Agreement and this Agreement, results in one or more Persons acquiring (other than in acquisitions not taken into account for purposes of Section 355(e)) directly or indirectly stock representing a 50 percent or greater interest (within the meaning of Section 355(e) of the Code) in Grace. In addition, no Sealed Air Party nor any member of the Packco Group shall at any time, whether before or subsequent to the expiration of the Restriction Period, engage in any action described in clauses (i), (ii) or (iii) of the preceding sentence if it is pursuant to an arrangement negotiated (in whole or in part) prior to the Distribution, even if at the time of the Distribution it is subject to various conditions, nor shall any such Party or member take any action, or fail or omit to take any action, that would cause
Section 355(d) or (e) to apply to the Distribution.

(e) Until the first day after the Restriction Period, no Sealed Air Party nor the members of the Packco Group shall sell, transfer, or otherwise dispose of or agree to dispose of assets (including, for such purpose, any shares of capital stock of a Subsidiary) that, in the aggregate, constitute more than 60% of the gross assets of Packco, nor shall they sell, transfer, or otherwise dispose of or agree to dispose of assets (including, for such purpose, any shares of capital stock of a Subsidiary) that, in the aggregate, constitute more than 60% of the consolidated gross assets of the Packco Group. The foregoing sentence shall not apply to sales, transfers, or dispositions of assets in the ordinary course of business. The percentages of gross assets or consolidated gross assets of Packco or the Packco Group, as the case may be, sold, transferred, or otherwise disposed of, shall be based on the

-23-

CC-BLG002530

fair market value of the gross assets of Packco and the Packco Group as of the Effective Time, and for this purpose, the values set forth in the Packaging Business Disclosure Letter Balance Sheet shall be conclusive.

(f) Until the first day after the Restriction Period, neither Packco nor its Subsidiaries shall voluntarily dissolve or liquidate or engage in any merger, consolidation or other re-organization. The foregoing sentence shall not apply to transactions in which Grace or Packco acquires another corporation, limited liability company, limited partnership, general partnership or joint venture solely for cash or other consideration that is not Equity Securities. Reorganizations of Grace or Packco or their respective Subsidiaries with their Affiliates, and liquidations of Packco's Affiliates, are not subject to Section 5.1(b) or this Section 5.1(f) to the extent not inconsistent with the structure necessary for the Distribution to qualify for Tax-Free Status.

(g) Until the first day after the Restriction Period, Grace shall furnish Grace-Conn. with a copy of any ruling request that Sealed Air, Grace or any of their Affiliates may file with the IRS and any opinion received that relates to or otherwise reasonably could be expected to have an effect on the Tax-Free Status of the Distribution.

Section 5.2 New Grace Covenants.

Unless, in the case of any of Sections 5.2(a) through (e) below, Grace-Conn. has obtained a ruling letter from the IRS or an opinion of nationally recognized counsel to Grace-Conn., in either case, to the effect that, without material qualification, such act or omission will not adversely affect the federal income tax consequences of the Distribution to any of Grace, Grace-Conn. or the stockholders of Grace-Conn., as set forth in the Tax Opinions, and the substance of, and basis for, such conclusion in such ruling or opinion is reasonably satisfactory to Grace in its good faith solely with regard to preserving the Tax-Free Status of the Distribution:

(a) No member of the New Grace Group shall take any action, or fail or omit to take any action, that would cause any representation made in the Sealed Air Tax Matters Certificate or the Grace Tax Matters Certificate to be untrue in a manner that would have an adverse effect on the Tax-Free Status of the Distribution.

(b) Until the first day after the Restriction Period,

-24-

CC-BLG002531

the New Grace Group shall continue the active conduct of one of the Active New Grace Businesses. "Active New Grace Businesses" shall mean each of the Grace Davison business and the Grace Construction Business. The New Grace Group may dispose of, liquidate or discontinue the conduct of the Grace Davison business or the Grace Construction Products business if it actively continues the conduct of the other. The New Grace Group shall continue the active conduct of at least one of the Active New Grace Businesses primarily through officers and employees of the New Grace Group (and not through independent contractors).

(c) Until the first day after the Restriction Period, no member of the New Grace Group shall sell or otherwise issue to any Person, or redeem or otherwise acquire from any Person (other than any member of the New Grace Group), any Equity Securities of New Grace or any other member of the New Grace Group; provided, however, that (i) purchases that, in the aggregate, meet the requirements of Section 4.05(1)(b) of Revenue Procedure 96-30 shall not constitute a redemption or acquisition of stock of New Grace for purposes of this Section 5.2(c), (ii) if required by law, any member of the New Grace Group may issue a de minimis number of Equity Securities of such member to any person in order to qualify such person to serve as an officer or director of such member and (iii) New Grace may, pursuant to shareholder-approved equity compensation plans, issue, as compensation for services or pursuant to the exercise of compensatory stock options, Equity Securities of New Grace.

(d) Until the first day after the Restriction Period, no member of the New Grace Group shall (i) solicit any Person to make a tender offer for, or otherwise acquire or sell, the Equity Securities of New Grace, (ii) participate in or support any unsolicited tender offer for, or other acquisition, disposition or issuance of, the Equity Securities of New Grace or (iii) approve or otherwise permit any proposed business combination or any transaction which, in the case of (i), (ii) or (iii), individually or in the aggregate, together with the transactions contemplated under the Distribution Agreement, the Merger Agreement, the Benefits Agreement and this Agreement, results in one or more Persons acquiring (other than in acquisitions not taken into account for purposes of Section 355(e)) directly or indirectly stock representing a 50 percent or greater interest (within the meaning of Section 355(e) of the Code) in New Grace. In addition, no member of the New Grace Group shall at any time, whether before or subsequent to the expiration of the Restriction Period, engage in any action

-25-

CC-BLG002532

described in clauses (i), (ii) or (iii) of the preceding sentence if it is pursuant to an arrangement negotiated (in whole or in part) prior to the Distribution, even if at the time of the Distribution it is subject to various conditions, nor shall any such member take any action, or fail or omit to take any action, that would cause Section 355(d) or (e) of the Code to apply to the Distribution.

(e) Until the first day after the Restriction Period, no member of the New Grace Group shall sell, transfer, or otherwise dispose of or agree to dispose of assets (including, for such purpose, any shares of capital stock of a Subsidiary) that, in the aggregate, constitute more than 60% of the gross assets of New Grace, nor shall they sell, transfer, or otherwise dispose of or agree to dispose of assets (including, for such purpose, any shares of capital stock of a Subsidiary) that, in the aggregate, constitute more than 60% of the consolidated gross assets of the New Grace Group. The foregoing sentence shall not apply to sales, transfers, or dispositions of assets in the ordinary course of business or to a sale, transfer or disposition of any or all of the Discontinued Businesses and either of the Active New Grace Businesses; provided, however, that in the event of a sale, transfer or disposition of one of the Active New Grace Businesses, the retained Active New Grace Business shall be conducted by a member of the New Grace Group at substantially the same level as on the Distribution Date. The percentages of gross assets or consolidated gross assets of New Grace or the New Grace Group, as the case may be, sold, transferred, or otherwise disposed of, shall be based on the fair market value of the gross assets of New Grace and the New Grace Group as of the Effective Time, and for this purpose, the values set forth in the Registration Statements shall be conclusive.

(f) Until the first day after the Restriction Period, Grace-Conn. shall furnish Grace with a copy of any ruling request that Grace-Conn. or any of its Affiliates may file with the IRS and any opinion received that relates to or otherwise reasonably could be expected to have an effect on the Tax-Free Status of the Distribution.

Section 5.3. Responsibility for Taxes.

(a) Sealed Air and Grace agree to indemnify and hold the Grace-Conn. Indemnitees harmless from and against all Indemnifiable Losses resulting from
(x) any Action which causes the Distribution to fail to have Tax-Free Status or
(y) the Merger failing to qualify as a reorganization under Section 368

-26-

CC-BLG002533

of the Code. An "Action" shall mean any act or omission which fails to comply with any of the representations in the Sealed Air Tax Matters Certificate or the covenants in Section 5.1 and any act or omission which would fail to comply with any of the covenants in Section 5.1 but for compliance with the Ruling/Opinion Exception. An "Action" shall also include an action or omission which would be a breach of the covenant contained in the first sentence of Section 5.1(d), if such covenant were in effect until the day which is five years after the Effective Time instead of until the first day after the Restriction Period.

(b) Grace-Conn. agrees to indemnify and hold the Packco Indemnitees harmless from and against any Tax resulting from the failure of the Distribution to have Tax-Free Status, except where such failure is attributable to an Action.

(c) For purposes of Sections 5.1 and 5.2 hereof, when a tax opinion or ruling of one party (the "Transaction Party") is required to be reasonably satisfactory to the other party (the "Reviewing Party"), the Reviewing Party at the request of the Transaction Party shall designate nationally recognized counsel to review such opinion or ruling without revealing the substance of the underlying transaction to the Reviewing Party and the concurrence of such outside counsel to the sufficiency of such opinion or ruling shall constitute "reasonable satisfaction" to the Reviewing Party for purposes of this Agreement.

Section 5.4. Injunction. The parties hereto agree that the payment of monetary compensation would not be an adequate remedy for a breach of the obligations contained in Article V hereof, and each party consents to the issuance and entry of an injunction against the taking of any action by it or a member of its Group that would constitute such a breach; provided, however, that the foregoing shall be without prejudice to and shall not constitute a waiver of any other remedy either party may be entitled to at law or at equity hereunder.

Section 5.5. Distribution. For purposes of this Article V only, "Distribution" shall mean the contribution by Grace-Conn. of assets and liabilities to Packco, the distribution of cash by Packco to Grace-Conn., the distribution by Grace-Conn. of the stock of Packco to Grace, the contribution of cash and the stock of Grace-Conn. to New Grace, the loan from New Grace to Grace-Conn. and the distribution by Grace of the stock of New Grace to the shareholders of Grace, each as provided in the Distribution Agreement.

CC-BLG002534

# ARTICLE VI.

## MISCELLANEOUS

Section 6.1. Expenses. Unless otherwise expressly provided in this Agreement, the Distribution Agreement or the Merger Agreement, each party shall bear any and all expenses that arise from their respective obligations under this Agreement.

Section 6.2. Foreign Transfer Taxes. Adjusted Foreign Transfer Taxes shall be shared by the parties as provided in the Distribution Agreement. Audit adjustments and Final Determina-tions of such Taxes shall be governed by the Distribution Agree-ment. This Agreement governs responsibilities of the parties with respect to filing Tax Returns relating to Foreign Transfer Taxes, paying Foreign Transfer Taxes reflected on such Tax Returns to the applicable governmental authority and conducting Proceedings relating to Foreign Transfer Taxes. For purposes of determining indemnity and reimbursement obligations of the parties under this Agreement, Tax Items arising as a result of the Foreign Transfers (but not Tax Items arising from any actual distribution of Subsidiary Excess Cash) shall be disregarded, and the Pre-Distribution Schedules shall not reflect such Tax Items.

Section 6.3. Payments Paid or Received on Behalf of Indemnitees; Right to Designate Payee. Each of Grace-Conn. and Grace shall be entitled to designate an Affiliate of such party as payee with respect to any payment that would otherwise be made to Grace-Conn. or Grace, respectively, under this Agreement. Any payment received by Grace-Conn. or Grace, respectively, or its respective designees shall be received on behalf of the relevant Grace-Conn. Indemnitees or Packco Indemnitees.

Section 6.4. Foreign Exchange Rate. If any amount required to be paid hereunder is determined by reference to a Tax, Tax refund, Tax Benefit or Tax Detriment that is denominated in a currency other than United States dollars, such payment shall be made in United States dollars and the amount thereof shall be computed using the Foreign Exchange Rate for such currency determined as of the date that such Tax is paid, such Tax refund is received or such Tax Benefit or Tax Detriment reduces or increases the amount of Tax or Tax refund that would otherwise be paid or received.

-28-

CC-BLG002535

Section 6.5. Amendment. This Agreement may not be amended except by an agreement in writing, signed by the parties hereto. Anything in this Agreement or the Distribution Agreement to the contrary notwithstanding, in the event and to the extent that there shall be a conflict between the provisions of this Agreement and the Distribution Agreement, the provisions of this Agreement shall control.

Section 6.6. Notices. All notices and other communications hereunder shall be in writing and shall be delivered by hand including overnight business courier or mailed by registered or certified mail (return receipt requested) to the parties at the following addresses (or at such other addresses for a party as shall be specified by like notice) and shall be deemed given on the date on which such notice is received:

(a) To Grace-Conn. or any member of the New Grace Group:

W. R. Grace & Co.-Conn.

One Town Center Road
Boca Raton, Florida 33486-1010

Attention: Secretary
Fax: (561) 362-1635

with a copy to:

Wachtell, Lipton, Rosen & Katz 51 West 52nd Street
New York, New York 10019
Attention: Andrew R. Brownstein, Esq.

Fax: (212) 403-2000

(b) To Grace or any member of the Packco Group:

care of Sealed Air
Park 80 East
Saddle Brook, New Jersey 07663 Attention: President
Fax: (201) 703-4152

with a copy to:

Davis Polk & Wardwell
450 Lexington Ave.

New York, New York 10017

Attention: Christopher Mayer, Esq. Fax: (212) 450-4800

-29-

CC-BLG002536

Section 6.7. Resolution of Disputes. Any disputes between the parties with respect to this Agreement regarding the practice and preparation of returns or the calculation of amounts shall be resolved by a "Big Six" public accounting firm whose determination shall be conclusive and binding on the parties. The fees and expenses of such firm shall be shared equally by Grace-Conn. and Grace, except as otherwise provided herein. Any other disputes shall be resolved by a "Big Six" public accounting firm or a law firm or by any other procedure that the parties may choose.

Section 6.8. Application to Present and Future Subsidiaries. This Agreement is being entered into by Grace-Conn. and Grace on behalf of themselves and each member of the New Grace Group and Packco Group, respectively. This Agreement shall constitute a direct obligation of each such member. Grace-Conn. and Grace hereby guarantee the performance of all actions, agreements and obligations provided for under this Agreement of each member of the New Grace Group and the Packco Group, respectively. Grace-Conn. and Grace shall, upon the written request of the other, cause any of their respective Group members formally to execute this Agreement. This Agreement shall be binding upon, and shall inure to the benefit of, the successors and assigns of any of the corporations bound hereby.

Section 6.9. Term. This Agreement shall commence on the date of execution indicated below and shall continue in effect until otherwise agreed to in writing by Grace-Conn. and Grace, or their successors.

Section 6.10. Titles and Headings. Titles and headings to Sections herein are inserted for the convenience of reference only and are not intended to be a part or to affect the meaning or interpretation of this Agreement.

Section 6.11. Legal Enforceability. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. Any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Without prejudice to any rights or remedies otherwise available to any party hereto, each party hereto acknowledges that damages would be an inadequate remedy for any breach of the provisions of this Agreement and agrees that the

-30-

CC-BLG002537

obligations of the parties hereunder shall be specifically enforceable.

Section 6.12. Governing Law. This Agreement shall be governed by the laws of the State of Delaware.

-31-

CC-BLG002538

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first above written.

**W. R. GRACE & CO.**

By: _____
          Name:
          Title:

**W. R. GRACE & CO.-CONN.**

By: _____
          Name:
          Title:

**SEALED AIR CORPORATION**

By: _____
          Name:
          Title:

-32-

CC-BLG002539

**Exhibit A**

Argentina

Australia

Belgium

Brazil

Canada

Chile

Colombia

Germany

Hong Kong

Italy

Japan

Mexico

Netherlands

New Zealand

Poland

Russia

South Africa

Spain

Sweden

United Kingdom

Venezuela

-33-

CC-BLG002540

EXHIBIT 10.4

## W. R. GRACE & CO.
### (FORMERLY NAMED GRACE SPECIALTY CHEMICALS, INC.)

### 1998 STOCK INCENTIVE PLAN

1. Purposes. The purposes of this Plan are (a) to enable Key Persons to have incentives related to Common Stock, (b) to encourage Key Persons to increase their interest in the growth and prosperity of the Company and to stimulate and sustain constructive and imaginative thinking by Key Persons, (c) to further the identity of interests of Key Persons with the interests of the Company's stockholders, and (d) to induce the service or continued service of Key Persons and to enable the Company to compete with other organizations offering similar or other incentives in obtaining and retaining the services of the most highly qualified individuals.

2. Definitions. When used in this Plan, the following terms shall have the meanings set forth in this section 2.

Board of Directors: The Board of Directors of the Company.

cessation of service (or words of similar import): When a person ceases to be an employee of the Company or a Subsidiary. For purposes of this definition, if an entity that was a Subsidiary ceases to be a Subsidiary, persons who immediately thereafter remain employees of that entity (and are not employees of the Company or an entity that is a Subsidiary) shall be deemed to have ceased service.

Change in Control: Shall be deemed to have occurred if (a) the Company determines that any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act), other than a trustee or other fiduciary holding securities under an employee benefit plan of the Company or a corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company, has become the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of 20% or more of the outstanding Common Stock of the Company (provided, however, that a Change in Control shall not be deemed to have occurred if such person has become the beneficial owner of 20% or more of the outstanding Common Stock as the result of a sale of Common Stock by the Company that has been approved by the Board of Directors); (b) individuals who are "Continuing Directors" (as defined below) cease to constitute a majority of any class of the Board of Directors; (c) there occurs a reorganization, merger, consolidation or other corporate transaction involving the Company (a "Corporate Transaction"), in each case, with respect to which the stockholders of the Company immediately prior to such Corporate Transaction do not, immediately after the Corporate Transaction, own 50% or more of the combined voting power of the corporation resulting from such Corporate Transaction; or (d) the stockholders of the Company approve a complete liquidation or dissolution of the Company. "Continuing

CC-BLG002541

EXHIBIT 10.4

Director" means any member of the Board of Directors who was such a member on the date on which this Plan was approved by the Board of Directors and any successor to such a Continuing Director who is approved as a nominee or elected to succeed a Continuing Director by a majority of Continuing Directors who are then members of the Board of Directors.

Change in Control Price: The higher of (a) the highest reported sales price, regular way, as reported in The Wall Street Journal or another newspaper of general circulation, of a share of Common Stock in any transaction reported on the New York Stock Exchange Composite Tape or other national exchange on which such shares are listed or on NASDAQ during the 60-day period prior to and including the date of a Change in Control or (b) if the Change in Control is the result of a tender or exchange offer or a Corporate Transaction, the highest price per share of Common Stock paid in such tender or exchange offer or Corporate Transaction; provided, however, that in the case of Incentive Stock Options, the Change in Control Price shall be in all cases the Fair Market Value of the Common Stock on the date such Incentive Stock Option is exercised. To the extent that the consideration paid in any Corporate Transaction or other transaction described above consists in whole or in part of securities or other noncash consideration, the value of such securities or other noncash consideration shall be determined in the sole discretion of the Board of Directors.

Code: The Internal Revenue Code of 1986, as amended.

Committee: The Compensation Committee of the Board of Directors of the Company or any other committee designated by the Board of Directors to administer stock incentive and stock option plans of the Company and the Subsidiaries generally or this Plan specifically.

Common Stock: The common stock of the Company, par value $.01 per share, or such other class of shares or other securities or property as may be applicable pursuant to the provisions of section 8.

Company: W. R. Grace & Co., a Delaware corporation formerly named Grace Specialty Chemicals, Inc.

Continuing Director: The meaning set forth in the definition of "Change in Control" above.

Corporate Transaction: The meaning set forth in the definition of "Change in Control" above.

Exchange Act: The Securities Exchange Act of 1934, as amended.

Exercise Period: The meaning set forth in section 14(b) of this Plan.

CC-BLG002542

EXHIBIT 10.4

Fair Market Value: (a) The mean between the high and low sales prices of a share of Common Stock in New York Stock Exchange composite transactions on the applicable date, as reported in The Wall Street Journal or another newspaper of general circulation, or, if no sales of shares of Common Stock were reported for such date, for the next preceding date for which such sales were so reported, or (b) the fair market value of a share of Common Stock determined in accordance with any other reasonable method approved by the Committee.

Incentive Stock Option: A stock option that states that it is an incentive stock option and that is intended to meet the requirements of Section 422 of the Code and the regulations thereunder applicable to incentive stock options, as in effect from time to time.

issuance (or words of similar import): The issuance of authorized but unissued Common Stock or the transfer of issued Common Stock held by the Company or a Subsidiary.

Key Person: An employee of the Company or a Subsidiary who, in the opinion of the Committee, has contributed or can contribute significantly to the growth and successful operations of the Company or one or more Subsidiaries. The grant of a Stock Incentive to an employee shall be deemed a determination by the Committee that such person is a Key Person.

Nonstatutory Stock Option: An Option that is not an Incentive Stock Option.

Option: An option granted under this Plan to purchase shares of Common Stock.

Option Agreement: An agreement setting forth the terms of an Option.

Plan: The 1998 Stock Incentive Plan of the Company herein set forth, as the same may from time to time be amended.

service: Service to the Company or a Subsidiary as an employee. "To serve" has a correlative meaning.

Spread: The meaning set forth in section 14(b) of this Plan.

Stock Award: An issuance of shares of Common Stock or an undertaking (other than an Option) to issue such shares in the future.

Stock Incentive: A stock incentive granted under this Plan in one of the forms provided for in section 3.

Subsidiary: A corporation (or other form of business association) of which shares (or other ownership interests) having 50% or more of the voting power regularly entitled to vote for directors (or equivalent management rights) are owned, directly or

CC-BLG002543

**EXHIBIT 10.4**

indirectly, by the Company, or any other entity designated as such by the Board of Directors; provided, however, that in the case of an Incentive Stock Option, the term "Subsidiary" shall mean a Subsidiary (as defined by the preceding clause) that is also a "subsidiary corporation" as defined in Section 424(f) of the Code and the regulations thereunder, as in effect from time to time.

3. Grants of Stock Incentives. (a) Subject to the provisions of this Plan, the Committee may at any time and from time to time grant Stock Incentives under this Plan to, and only to, Key Persons.

(b) The Committee may grant a Stock Incentive to be effective at a specified future date or upon the future occurrence of a specified event. For the purposes of this Plan, any such Stock Incentive shall be deemed granted on the date it becomes effective. An agreement or other commitment to grant a Stock Incentive that is to be effective in the future shall not be deemed the grant of a Stock Incentive until the date on which such Stock Incentive becomes effective.

(c) A Stock Incentive may be granted in the form of:

(i) a Stock Award, or

(ii) an Option, or

(iii) a combination of a Stock Award and an Option.

4. Stock Subject to this Plan. (a) Subject to the provisions of paragraph (c) of this section 4 and the provisions of section 8, the maximum number of shares of Common Stock that may be issued pursuant to Stock Incentives granted under this Plan shall not exceed Six Million (6,000,000).

(b) Authorized but unissued shares of Common Stock and issued shares of Common Stock held by the Company or a Subsidiary, whether acquired specifically for use under this Plan or otherwise, may be used for purposes of this Plan.

(c) If any shares of Common Stock subject to a Stock Incentive shall not be issued and shall cease to be issuable because of the termination, in whole or in part, of such Stock Incentive or for any other reason, or if any such shares shall, after issuance, be reacquired by the Company or a Subsidiary from the recipient of such Stock Incentive, or from the estate of such recipient, for any reason, such shares shall no longer be charged against the limitation provided for in paragraph (a) of this section 4 and may again be made subject to Stock Incentives.

(d) Of the total number of shares specified in paragraph (a) of this section 4 (subject to adjustment as specified therein), during the term of this Plan as defined in section 9, (i) no more than 15% may be subject to Options granted to any one Key

CC-BLG002544

EXHIBIT 10.4

Person and (ii) no more than 15% may be subject to Stock Incentives granted to any one Key Person.

5. Stock Awards. Except as otherwise provided in section 12, Stock Incentives in the form of Stock Awards shall be subject to the following provisions:

(a) For purposes of this Plan, all shares of Common Stock subject to a Stock Award shall be valued at not less than 100% of the Fair Market Value of such shares on the date such Stock Award is granted, regardless of whether or when such shares are issued pursuant to such Stock Award and whether or not such shares are subject to restrictions affecting their value.

(b) Shares of Common Stock subject to a Stock Award may be issued to a Key Person at the time the Stock Award is granted, or at any time subsequent thereto, or in installments from time to time. In the event that any such issuance shall not be made at the time the Stock Award is granted, the Stock Award may provide for the payment to such Key Person, either in cash or shares of Common Stock, of amounts not exceeding the dividends that would have been payable to such Key Person in respect of the number of shares of Common Stock subject to such Stock Award (as adjusted under section 8) if such shares had been issued to such Key Person at the time such Stock Award was granted. Any Stock Award may provide that the value of any shares of Common Stock subject to such Stock Award may be paid in cash, on each date on which shares would otherwise have been issued, in an amount equal to the Fair Market Value on such date of the shares that would otherwise have been issued.

(c) The material terms of each Stock Award shall be determined by the Committee. Each Stock Award shall be evidenced by a written instrument consistent with this Plan. It is intended that a Stock Award would be (i) made contingent upon the attainment of one or more specified performance objectives and/or (ii) subject to restrictions on the sale or other disposition of the Stock Award or the shares subject thereto for a period of three or more years; provided, however, that (x) a Stock Award may include restrictions and limitations in addition to those provided for herein and (y) of the total number of shares specified in paragraph (a) of section 4 (subject to adjustment as specified therein), up to 3% may be subject to Stock Awards not subject to clause (i) or clause (ii) of this sentence.

(d) A Stock Award shall be granted for such lawful consideration as may be provided for therein.

6. Options. Except as otherwise provided in section 12, Stock Incentives in the form of Options shall be subject to the following provisions:

(a) The purchase price per share of Common Stock shall be not less than 100% of the Fair Market Value of a share of Common Stock on the date the Option is granted. The purchase price and any withholding tax that may be due on the exercise of an Option may be paid in cash, or, if so provided in the Option Agreement, (i) in shares of Common Stock (including shares issued pursuant to the Option being exercised and

CC-BLG002545

shares issued pursuant to a Stock Award granted subject to restrictions as provided for in paragraph (c) of section 5), or (ii) in a combination of cash and such shares; provided, however, that no shares of Common Stock delivered in payment of the purchase price may be "immature shares," as determined in accordance with generally accepted accounting principles in effect at the time. Any shares of Common Stock delivered to the Company in payment of the purchase price or withholding tax shall be valued at their Fair Market Value on the date of exercise. No certificate for shares of Common Stock shall be issued upon the exercise of an Option until the purchase price for such shares has been paid in full.

(b) If so provided in the Option Agreement, the Company shall, upon the request of the holder of the Option and at any time and from time to time, cancel all or a portion of the Option then subject to exercise and either (i) pay the holder an amount of money equal to the excess, if any, of the Fair Market Value, at such time or times, of the shares subject to the portion of the Option so canceled over the purchase price for such shares, or (ii) issue shares of Common Stock to the holder with a Fair Market Value, at such time or times, equal to such excess, or (iii) pay such excess by a combination of money and shares.

(c) Each Option may be exercisable in full at the time of grant, or may become exercisable in one or more installments and at such time or times or upon the occurrence of such events, as may be specified in the Option Agreement, as determined by the Committee. Unless otherwise provided in the Option Agreement, an Option, to the extent it is or becomes exercisable, may be exercised at any time in whole or in part until the expiration or termination of such Option.

(d) Each Option shall be exercisable during the life of the holder only by him and, after his death, only by his estate or by a person who acquires the right to exercise the Option by will or the laws of descent and distribution. An Option, to the extent that it shall not have been exercised or canceled, shall terminate as follows after the holder ceases to serve: (i) if the holder shall voluntarily cease to serve without the consent of the Committee or shall have his service terminated for cause, the Option shall terminate immediately upon cessation of service; (ii) if the holder shall cease to serve by reason of death, incapacity or retirement under a retirement plan of the Company or a Subsidiary, the Option shall terminate three years after the date on which he ceased to serve; and (iii) except as provided in the next sentence, in all other cases the Option shall terminate three months after the date on which the holder ceased to serve unless the Committee shall approve a longer period (which approval may be given before or after cessation of service) not to exceed three years. If the holder shall die or become incapacitated during the three-month period (or such longer period as the Committee may approve) referred to in the preceding clause (iii), the Option shall terminate three years after the date on which he ceased to serve. A leave of absence for military or governmental service or other purposes shall not, if approved by the Committee (which approval may be given before or after the leave of absence commences), be deemed a cessation of service within the meaning of this paragraph (d). Notwithstanding the foregoing provisions of this paragraph (d) or any other provision of this Plan, no Option shall

CC-BLG002546

EXHIBIT 10.4

be exercisable after expiration of a period of ten years and one month from the date the Option is granted. Where a Nonstatutory Option is granted for a term of less than ten years and one month, the Committee may, at any time prior to the expiration of the Option, extend its term for a period ending not later than ten years and one month from the date the Option was granted. Such an extension shall not be deemed the grant of a new Option under this Plan.

(e) No Option nor any right thereunder may be assigned or transferred except by will or the laws of descent and distribution and except, in the case of a Nonstatutory Option, pursuant to a qualified domestic relations order (as defined in the Code), unless otherwise provided in the Option Agreement.

(f) An Option may, but need not, be an Incentive Stock Option. All shares of Common Stock that may be made subject to Stock Incentives under this Plan may be made subject to Incentive Stock Options; provided, however, that (i) no Incentive Stock Option may be granted more than ten years after the effective date of this Plan, as provided in section 9; and (ii) the aggregate Fair Market Value (determined as of the time an Incentive Stock Option is granted) of the shares subject to each installment becoming exercisable for the first time in any calendar year under Incentive Stock Options granted on or after January 1, 1987 (under all plans, including this Plan, of his employer corporation and its parent and subsidiary corporations) to the Key Person to whom such Incentive Stock Option is granted shall not exceed $100,000.

(g) The material terms of each Option shall be determined by the Committee. Each Option shall be evidenced by a written instrument consistent with this Plan, and shall specify whether the Option is an Incentive Stock Option or a Nonstatutory Option. An Option may include restrictions and limitations in addition to those provided for in this Plan.

(h) Options shall be granted for such lawful consideration as may be provided for in the Option Agreement.

7. Combination of Stock Awards and Options. Stock Incentives authorized by paragraph (c)(iii) of section 3 in the form of combinations of Stock Awards and Options shall be subject to the following provisions: (a) A Stock Incentive may be a combination of any form of Stock Award and any form of Option; provided, however, that the terms and conditions of such Stock Incentive pertaining to a Stock Award are consistent with section 5 and the terms and conditions of such Stock Incentive pertaining to an Option are consistent with section 6.

(b) Such combination Stock Incentive shall be subject to such other terms and conditions as may be specified therein, including without limitation a provision terminating in whole or in part a portion thereof upon the exercise in whole or in part of another portion thereof.

CC-BLG002547

EXHIBIT 10.4

(c) The material terms of each combination Stock Incentive shall be determined by the Committee. Each combination Stock Incentive shall be evidenced by a written instrument consistent with this Plan.

8. Adjustment Provisions. (a) In the event that any reclassification, split-up or consolidation of the Common Stock shall be effected, or the outstanding shares of Common Stock are, in connection with a merger or consolidation of the Company or a sale by the Company of all or a part of its assets, exchanged for a different number or class of shares of stock or other securities or property of the Company or for shares of the stock or other securities or property of any other corporation or person, or a record date for determination of holders of Common Stock entitled to receive a dividend payable in Common Stock shall occur, (i) the number, kind and class of shares or other securities or property that may be issued pursuant to Stock Incentives thereafter granted, (ii) the number, kind and class of shares or other securities or property that have not been issued under outstanding Stock Incentives, (iii) the purchase price to be paid per share or other unit under outstanding Stock Incentives, and (iv) the price to be paid per share or other unit by the Company or a Subsidiary for shares or other securities or property issued pursuant to Stock Incentives that are subject to a right of the Company or a Subsidiary to re-acquire such shares or other securities or property, shall in each case be equitably adjusted as determined by the Committee.

(b) In the event that there shall occur any spin-off or other distribution of assets of the Company to its shareholders (including without limitation an extraordinary dividend), (i) the number, kind and class of shares or other securities or property that may be issued pursuant to Stock Incentives thereafter granted, (ii) the number, kind and class of shares or other securities or property that have not been issued under outstanding Stock Incentives, (iii) the purchase price to be paid per share or other unit under outstanding Stock Incentives, and (iv) the price to be paid per share or other unit by the Company or a Subsidiary for shares or other securities or property issued pursuant to Stock Incentives that are subject to a right of the Company or a Subsidiary to re-acquire such shares or other securities or property, shall in each case be equitably adjusted as determined by the Committee.

9. Term. This Plan shall be deemed adopted and shall become effective on the date on which the Common Stock is distributed to the holders of the common stock of W. R. Grace & Co., a Delaware corporation subsequently renamed "Sealed Air Corporation." No Stock Incentives shall be granted under this Plan after the tenth anniversary of such date.

10. Administration. (a) This Plan shall be administered by the Committee, which shall have full authority to act in the matter of selection of Key Persons and in granting Stock Incentives to them and such other authority as is granted to the Committee by this Plan. Notwithstanding any other provision of this Plan, the Board of Directors may exercise any and all powers of the Committee with respect to this Plan, except to the extent that the possession or exercise of any power by the Board of

CC-BLG002548

EXHIBIT 10.4

Directors would cause any Stock Incentive to become subject to, or to lose an exemption from, Section 162(m) of the Code or Section 16(b) of the Exchange Act.

(b) The Committee may establish such rules and regulations, not inconsistent with the provisions of this Plan, as it deems necessary to determine eligibility to be granted Stock Incentives under this Plan and for the proper administration of this Plan, and may amend or revoke any rule or regulation so established. The Committee may make such determinations and interpretations under or in connection with this Plan as it deems necessary or advisable. All such rules, regulations, determinations and interpretations shall be binding and conclusive upon the Company, its Subsidiaries, its shareholders and its directors, officers and employees, and upon their respective legal representatives, beneficiaries, successors and assigns, and upon all other persons claiming under or through any of them.

(c) Members of the Board of Directors and members of the Committee acting under this Plan shall be fully protected in relying in good faith upon the advice of counsel and shall incur no liability in the performance of their duties, except as otherwise provided by applicable law.

11. General Provisions. (a) Nothing in this Plan or in any instrument executed pursuant hereto shall confer upon any person any right to continue in the service of the Company or a Subsidiary, or shall affect the right of the Company or of a Subsidiary to terminate the service of any person with or without cause.

(b) No shares of Common Stock shall be issued pursuant to a Stock Incentive unless and until all legal requirements applicable to the issuance of such shares have, in the opinion of counsel to the Company, been complied with. In connection with any such issuance, the person acquiring the shares shall, if requested by the Company, give assurances, satisfactory to counsel to the Company, in respect of such matters as the Company or a Subsidiary may deem desirable to assure compliance with all applicable legal requirements.

(c) No person (individually or as a member of a group), and no beneficiary or other person claiming under or through him, shall have any right, title or interest in or to any shares of Common Stock allocated or reserved for the purposes of this Plan or subject to any Stock Incentive except as to such shares of Common Stock, if any, as shall have been issued to him.

(d) In the case of a grant of a Stock Incentive to a Key Person who is employed by a Subsidiary, such grant may provide for the issuance of the shares covered by the Stock Incentive to the Subsidiary, for such consideration as may be provided, upon the condition or understanding that the Subsidiary will transfer the shares to the Key Person in accordance with the terms of the Stock Incentive.

(e) In the event the laws of a country in which the Company or a Subsidiary has employees prescribe certain requirements for Stock Incentives to qualify for advantageous tax treatment under the laws of that country (including, without limitation,

CC-BLG002549

EXHIBIT 10.4

laws establishing options analogous to Incentive Stock Options), the Committee, may, for the benefit of such employees, amend, in whole or in part, this Plan and may include in such amendment additional provisions for the purposes of qualifying the amended plan and Stock Incentives granted thereunder under such laws; provided, however, that (i) the terms and conditions of a Stock Incentive granted under such amended plan may not be more favorable to the recipient than would be permitted if such Stock Incentive had been granted under this Plan as herein set forth, (ii) all shares allocated to or utilized for the purposes of such amended plan shall be subject to the limitations of section 4, and (iii) the provisions of the amended plan may restrict but may not extend or amplify the provisions of sections 9 and 13.

(f) The Company or a Subsidiary may make such provisions as either may deem appropriate for the withholding of any taxes that the Company or a Subsidiary determines is required to be withheld in connection with any Stock Incentive.

(g) Nothing in this Plan is intended to be a substitute for, or shall preclude or limit the establishment or continuation of, any other plan, practice or arrangement for the payment of compensation or benefits to directors, officers or employees generally, or to any class or group of such persons, that the Company or any Subsidiary now has or may hereafter put into effect, including, without limitation, any incentive compensation, retirement, pension, group insurance, stock purchase, stock bonus or stock option plan.

12. Acquisitions. If the Company or any Subsidiary should merge or consolidate with, or purchase stock or assets or otherwise acquire the whole or part of the business of, another entity, the Company, upon the approval of the Committee, (a) may assume, in whole or in part and with or without modifications or conditions, any stock incentives granted by the acquired entity to its directors, officers, employees or consultants in their capacities as such, or
(b) may grant new Stock Incentives in substitution therefor. Any such assumed or substitute Stock Incentives may contain terms and conditions inconsistent with the provisions of this Plan (including the limitations set forth in paragraph
(d) of section 4), including additional benefits for the recipient; provided, however, that if such assumed or substitute Stock Incentives are Incentive Stock Options, such terms and conditions are permitted under the plan of the acquired entity. For the purposes of any applicable plan provision involving time or a date, a substitute Stock Incentive shall be deemed granted as of the date of grant of the original stock incentive.

13. Amendments and Termination. (a) This Plan may be amended or terminated by the Board of Directors upon the recommendation of the Committee; provided, however, that, without the approval of the stockholders of the Company, no amendment shall be made which (i) causes this Plan to cease to comply with applicable law, (ii) permits any person who is not a Key Person to be granted a Stock Incentive (except as otherwise provided in section 12), (iii) amends the provisions of paragraph (d) of section 4, paragraph (a) of section 5 or paragraph (a) or paragraph (f) of section 6 to permit shares to be valued at, or to have a purchase price of,

CC-BLG002550

EXHIBIT 10.4

respectively, less than the percentage of Fair Market Value specified therein,
(iv) amends section 9 to extend the date set forth therein, or (v) amends this section 13.

(b) No amendment or termination of this Plan shall adversely affect any Stock Incentive theretofore granted, and no amendment of any Stock Incentive granted pursuant to this Plan shall adversely affect such Stock Incentive, without the consent of the holder thereof.

14. Change in Control Provisions. (a) Notwithstanding any other provision of this Plan to the contrary, in the event of a Change in Control:

(i) Any Options outstanding as of the date on which such Change in Control occurs, and which are not then exercisable and vested, shall become fully exercisable and vested to the full extent of the original grant; and

(ii) All restrictions and deferral limitations applicable to Stock Incentives shall lapse, and Stock Incentives shall become free of all restrictions and become fully vested and transferable to the full extent of the original grant.

(b) Notwithstanding any other provision of this Plan, during the 60-day period from and after a Change in Control (the "Exercise Period"), unless the Committee shall determine otherwise at the time of grant, the holder of an Option shall have the right, in lieu of the payment of the purchase price for the shares of Common Stock being purchased under the Option, by giving notice to the Company, to elect (within the Exercise Period) to surrender all or part of the Option to the Company and to receive cash, within 30 days after such notice, in an amount equal to the amount by which the Change in Control Price per share of Common Stock on the date of such election shall exceed the purchase price per share of Common Stock under the Option (the "Spread") multiplied by the number of shares of Common Stock subject to the Option as to which the right subject to this Section 14(b) shall have been exercised.

(c) Notwithstanding any other provision of this Plan, if any right granted pursuant to this Plan to receive cash in respect of a Stock Incentive would make a Change in Control transaction ineligible for pooling-of-interests accounting that, but for the nature of such grant, would otherwise be eligible for such accounting treatment, the Committee shall have the ability to substitute for such cash Common Stock with a Fair Market Value equal to the amount of such cash.

CC-BLG002551

EXHIBIT 10.5

## W. R. GRACE & CO.

(formerly named Grace Specialty Chemicals, Inc.)

## 1998 STOCK PLAN FOR NONEMPLOYEE DIRECTORS

1. Purposes. The purposes of this Plan are (a) to enable the Company to attract and retain the most highly qualified individuals to serve as Nonemployee Directors, (b) to link the compensation of Nonemployee Directors to the performance of the Common Stock, and (c) to unite the interests of Nonemployee Directors with those of the Company's shareholders.

2. Definitions. When used in this Plan, the following terms shall have the meanings set forth in this section 2.

Board of Directors: The Board of Directors of the Company.

Common Stock: The common stock of the Company, par value $.01 per share, or such other class of shares or other securities or property as may be applicable pursuant to the provisions of section 7.

Company: W. R. Grace & Co., a Delaware corporation formerly named Grace Specialty Chemicals, Inc.

Fair Market Value: (a) The mean between the high and low sales prices of a share of Common Stock in New York Stock Exchange composite transactions for the applicable date, as reported in The Wall Street Journal or another newspaper of general circulation, or, if no sales of shares of Common Stock were reported for such date, for the next preceding date for which such sales were so reported, or (b) the fair market value of a share of Common Stock determined in accordance with any other reasonable method.

Fee: A fee for attendance by a Nonemployee Director at a meeting of the Board of Directors or a committee thereof.

issuance (or words of similar import): (a) The issuance of authorized but unissued Common Stock, (b) the transfer of issued Common Stock held by the Company or a Subsidiary, or (c) the delivery of Common Stock purchased for use under this Plan by an agent independent of the Company.

Nonemployee Director: An individual who is (or was) a director of the Company and who is (or was) not employed by the Company or a Subsidiary while serving as a director of the Company.

CC-BLG002552

Plan: The 1998 Stock Plan for Nonemployee Directors herein set forth, as the same may from time to time be amended.

Retainer: An annual retainer for service as a Nonemployee Director or for service as the chair of a committee of the Board of Directors.

service: Service as a Nonemployee Director. "To serve" has a correlative meaning.

Service Period: A calendar year, or any other period designated by the Board of Directors, in respect of which a Nonemployee Director is to receive a Retainer and/or Fees.

Subsidiary: A corporation (or other form of business association) of which shares (or other ownership interests) having 50% or more of the voting power regularly entitled to vote for directors (or equivalent management rights) are owned, directly or indirectly, by the Company.

3. Eligibility and Participation. All Nonemployee Directors are eligible to participate in the Plan. Each Nonemployee Director will participate as described in section 5.

4. Stock Subject to this Plan.

(a) Subject to the provisions of paragraphs (b) and (c) of this section 4 and the provisions of section 7, the maximum number of shares of Common Stock that may be issued under this Plan shall be One Hundred Fifty Thousand (150,000) shares of Common Stock.

(b) Authorized but unissued shares of Common Stock and issued shares of Common Stock held by the Company or a Subsidiary, whether acquired specifically for use under this Plan or otherwise, may be used for purposes of this Plan. In addition, shares of outstanding Common Stock purchased by an agent independent of the Company may be used under this Plan, in which case such shares shall be deemed issued under this Plan for purposes of paragraph (a) of this section 4.

(c) If any shares of Common Stock issued pursuant to this Plan shall, after issuance, be reacquired by the Company or a Subsidiary from the recipient of such Common Stock, or from the estate of such recipient, for any reason, such shares shall no longer be charged against the limitation provided for in paragraph (a) of this section 4 and may be issued pursuant to this Plan.

5. Use of Common Stock Issued under this Plan. Shares of Common Stock may be issued under this Plan in respect of Fees and Retainers on such terms as may be fixed by the Board of Directors from time to time. All shares of Common Stock issued pursuant to this Plan shall be valued at not less than 100% of the Fair Market Value of

CC-BLG002553

such shares on the effective date of issuance of such shares, regardless of when such shares are actually issued.

6. Payment and Deferral of Retainers and Fees.

(a) Except as otherwise expressly set forth in this section 6, (i) a portion of any Retainer or Fee shall be payable in shares of Common Stock, with the balance being payable in cash, all in accordance with determinations made by the Board of Directors from time to time, and (ii) all payments shall be made as promptly as practicable following the conclusion of each Service Period.

(b) Subject to and in conformity with such procedures as may be approved by the Board of Directors from time to time, a Nonemployee Director may elect to receive in shares of Common Stock all or any portion of any Retainer or Fee that would otherwise be payable in cash.

(c) Not later than the day immediately preceding the first day of any Service Period, a Nonemployee Director may elect to defer all or any portion of the Common Stock or the cash payable in respect of any Retainer or Fee, as the case may be, for the next following Service Period. Such election shall be made in writing and, once made, shall be irrevocable.

(d) (i) Any portion of a Retainer or Fee payable in cash and as to which a deferral election is made shall be payable to the Nonemployee Director or his or her heirs or beneficiaries in a lump sum or in installments (as specified by the Nonemployee Director in accordance with arrangements approved by the Board of Directors) following a date specified by the Nonemployee Director, which date shall in no event be earlier than such Nonemployee Director's termination from service. An interest equivalent on any amount so deferred shall be computed at such rate or rates as may be fixed by the Board of Directors from time to time.

(ii) Any portion of a Retainer or Fee payable in Common Stock and as to which a deferral election is made shall be payable to the Nonemployee Director or his or her heirs or beneficiaries in a lump sum or in installments (as specified by the Nonemployee Director in accordance with arrangements approved by the Board of Directors) following a date specified by the Nonemployee Director, which date shall in no event be earlier than such Nonemployee Director's termination from service. The Common Stock shall be held in a trust established by the Company. Dividends paid on such Common Stock will be reinvested in Common Stock. The Nonemployee Director shall have the right to vote the Common Stock held in such trust, if, as and to the extent specified in the trust.

(e) The terms of this Plan are intended to insure that the electing Nonemployee Director is not subject to income tax on any cash or Common Stock (including any cash or Common Stock that has been deferred) until such amounts are paid to the Nonemployee Director.

CC-BLG002554

7. Adjustment Provisions.

(a) In the event that any reclassification, split up or consolidation of the Common Stock shall be effected, or the outstanding shares of Common Stock are, in connection with a merger or consolidation of the Company or a sale by the Company of all or a part of its assets, exchanged for a different number or class of shares of stock or other securities or property of the Company or for shares of the stock or other securities or property of any other corporation or person, or a record date for determination of holders of Common Stock entitled to receive a dividend payable in Common Stock shall occur, the number, class and kind of shares that have not been issued pursuant to this Plan shall be equitably adjusted.

(b) In the event that any spin off or other distribution of assets of the Company to its shareholders (including without limitation an extraordinary dividend) shall occur, the number, class and kind of shares that have not been issued pursuant to this Plan shall be equitably adjusted.

8. Term. This Plan shall be deemed adopted and shall become effective on the date on which the Common Stock is distributed to the holders of common stock of W. R. Grace & Co., a Delaware corporation subsequently renamed "Sealed Air Corporation." No Common Stock shall be issued under this Plan after the tenth anniversary of such date.

9. General Provisions.

(a) Nothing in this Plan or in any instrument executed pursuant hereto shall confer upon any person any right to continue to serve as a Nonemployee Director or to receive Retainers or Fees.

(b) No shares of Common Stock shall be issued pursuant to this Plan unless and until all legal requirements applicable to the issuance of such shares have, in the opinion of counsel to the Company, been complied with. In connection with any such issuance, the person or entity acquiring the shares shall, if requested by the Company, give assurances, satisfactory to counsel to the Company, in respect of such matters as the Company or a Subsidiary may deem desirable to assure compliance with all applicable legal requirements.

(c) No person, individually or as a member of a group, and no beneficiary or other person claiming under or through him or her, shall have any right, title or interest in or to any shares of Common Stock allocated or reserved for the purposes of this Plan except as to such shares of Common Stock, if any, as shall have been issued to him or her. No rights to receive shares of Common Stock under this Plan shall be subject in any manner to alienation, sale, transfer, assignment, pledge, encumbrance or charge, except by will or the laws of descent and distribution. The only rights that may exist under this Plan shall be limited to those of an unsecured creditor of the Company.

CC-BLG002555

(d) Nothing in this Plan is intended to be a substitute for, or shall preclude or limit the establishment or continuation of, any other plan, practice or arrangement for the payment of compensation or benefits to Nonemployee Directors that the Company now has or may hereafter put into effect.

10. Amendments and Termination.

(a) This Plan may be terminated, suspended or amended at any time by the Board of Directors upon the recommendation of its Compensation Committee; provided, however, that no amendment shall become effective without the approval of the shareholders of the Company to the extent shareholder approval is required by applicable law.

(b) No termination, suspension or amendment of this Plan shall adversely affect any shares theretofore issued pursuant to this Plan.

CC-BLG002556

GRACE MEMO Human Resources Columbia, Maryland

| | | |
|---|---|---|
| Date: | July 2002 | |
| To: | Participants in the 2002 Long-Term Incentive Program | |
| From: | M. N. Piergrossi | |
| cc: | J. P. Forgach | S. K. Krawczel |
| | M. T. Johnson | W. B. McGowan |

I am pleased to inform you that you have been selected to participate in Grace's 2002-2004 Long-Term Incentive Program. The 2002 Long-Term Incentive Program provides for 100% of the value of your award to be paid in cash.

## LTIP CASH PAYOUT

Your 2002 LTIP payout will be based on the average annual growth rate (AAGR) in total Grace core EBIT achieved during the 3-year performance period (i.e. 2002-2004). The target AAGR is 6%, using 2001 results as the base. The payout will vary with actual results as described in Annex B attached to your award.

Under U.S. federal income tax law, the value of the cash payments, when received, will constitute ordinary income and will trigger income tax withholding obligations at that time. If you are subject to taxes in a country other than the United States, the tax consequences of the receipt of cash will be determined under the laws of such country.

## ENCLOSURES

o Two copies of your 2002 LTIP Award
o Sample Calculation of the 2002-2004 LTIP (which constitutes part of Annex B)
o Administrative Practices - Long-Term Cash Award Program (which constitutes Annex C)

## REQUIRED ACTIONS

Please promptly sign and return one copy of the cash award to Marihelen Johnson in the Columbia office.

## ADDITIONAL QUESTIONS

If you have any questions on this program, please feel free to call me at (410) 531-4183 or Sonya Krawczel at (410) 531-4479.

**THIS DOCUMENT CONSTITUTES PART OF A
PROSPECTUS COVERING SECURITIES THAT
HAVE BEEN REGISTERED UNDER THE
SECURITIES ACT OF 1933.**

CC-BLG002557

-2-

## ANNEX B

## CALCULATION OF 2002-2004 LTIP

Name of Participant: _____

Targeted Award: _____

Your 2002-2004 LTIP award payout will be based on the 3-year average annual growth rate (AAGR) in total Grace core earnings before interest and taxes (core EBIT). Payouts are contingent upon achievement of target AAGR for the 3-year performance period. The target AAGR is 6%, using 2001 results as the base year.

The core earnings before interest and taxes (core EBIT) in 2001 was $187.5 million. The chart below details five scenarios at different assumed growth rates. The target growth is highlighted.

| ASSUMED GROWTH RATES | BASE PERIOD 2001 | PERFORMANCE PERIOD 2002 | 2003 | 2004 | TOTAL GROWTH 02-04 (1) | LTIP POOL | CUMULATIVE REPORTED EARNINGS (2) |
|---|---|---|---|---|---|---|---|
| 1.50% | 187.5 | 190.3 | 193.2 | 196.1 | 579.5 | 2.9 | 576.6 |
| 3.00% | 187.5 | 193.1 | 198.9 | 204.9 | 596.9 | 5.9 | 591.0 |
| 6.00% | 187.5 | 198.8 | 210.7 | 223.3 | 632.7 | 11.8 | 620.9 |
| 10.00% | 187.5 | 206.3 | 226.9 | 249.6 | 682.7 | 14.3 | 670.9 |
| 15.00% | 187.5 | 215.6 | 248.0 | 285.2 | 748.8 | 17.3 | 737.0 |
| 25.00% | 187.5 | 234.4 | 293.0 | 366.2 | 893.6 | 23.6 | 881.8 |

(1) All results include full recognition/accrual of Annual Incentive Compensation Program and, for achievement levels above 6% (i.e., 10%, 15%, and 25%), all totals include accruals for Long-Term Incentive Program Payments

(2) Up to the first $11.8 million (target AAGR 6%) is deducted from reported results. Payouts over target ($11.8 million) must be accrued as part of reported earnings. As a result, actual growth rate is slightly lower than assumed growth rate.

CC-BLG002558

The Long-Term Cash Award payout will vary with actual results as shown in the chart below:

| AAGR LEVEL ACHIEVED | PAYOUT (ROUNDED TO THE NEAREST WHOLE PERCENTAGE) |
| --- | --- |
| 25% | 200% |
| 15% | 147% |
| 10% | 121% |
| 6% | 100% |
| 3% | 50% |
| 1.5% | 25% |

For the 2002-2004 LTIP, cash payments will be made in two installments - 50% of what is earned based on current performance at the end of 2003, but no more than 50% of target, will be paid in March 2004, and the balance will be paid in March 2005.

**Example:**

A sample calculation of the Long-Term Cash Award Earned is provided below. Assume that your Targeted Award is $20,400.

| AAGR LEVEL ACHIEVED | PAYOUT IN MARCH 2004 | PAYOUT IN MARCH 2005 | TOTAL PAYOUT |
| --- | --- | --- | --- |
| 25% | $6,800 | $34,000 | $40,800 |
| 15% | $6,800 | $23,188 | $29,988 |
| 10% | $6,800 | $17,885 | $24,685 |
| 6% | $6,800 | $13,600 | $20,400 |
| 3% | $3,400 | $6,800 | $10,200 |

CC-BLG002559

# ANNEX C

## W. R. GRACE & CO.

### ADMINISTRATIVE PRACTICES - LONG-TERM CASH AWARD PROGRAM
#### 2002-2004 Performance Period

## DEFINITIONS

"Award Payment": An Interim Long-Term Cash Award Payment or Remaining Long-Term Award Payment, as applicable.

**"BOARD OF DIRECTORS": THE BOARD OF DIRECTORS OF THE COMPANY**

"Committee": The Compensation Committee of the Board of Directors.

"Company": W. R. Grace & Co., a Delaware Corporation and/or, if applicable in the context, one or more of its Subsidiaries.

"Incomplete Long-Term Cash Awards": A Long-Term Cash Award for which the Performance Period has not been completed as of the date referenced.

"Interim Long-Term Cash Award Payment": As defined on page 4, provided that such payment will not exceed 50% of the Participant's Targeted Award for the first two years, regardless of Company performance at the time of payment.

"Key Employee": An officer or other senior, full-time employee of the Company, who, in the opinion of the Company, can contribute significantly to the growth and successful operations of the Company.

"Long-Term Cash Award Program": An undertaking by the Company to financially reward a Key Employee at the end of a Performance Period, which undertaking is contingent upon or measured by the attainment over the Performance Period of specified performance objectives determined (on a consolidated or unconsolidated basis) by changes in the 3-year average annual growth rate (AAGR) in Total Grace's core earnings before interest and taxes (core EBIT).

"Long-Term Cash Award": A cash award, to be paid in the future, which is granted to Key Employees under the Company's long-term incentive program.

"Long-Term Cash Award Earned": The amount of cash earned by a Participant pursuant to the terms of a Long-Term Cash Award.

"Participant": A Key Employee who is, or who is proposed to be, a recipient of a Long-Term Cash Award.

"Performance Period": Except as provided herein, a period of three calendar years over which a Long-Term Cash Award may be earned, as approved by the Committee. The first Performance Period under this Plan will commence effective January 1, 2002 and will end on December 31, 2004. Performance Periods with respect to different Long-Term Cash Awards to the same individual may overlap.

CC-BLG002560

"Total Grace Core EBIT": The core earnings before interest and taxes (core EBIT)" of the Company as reported on (and calculated in accordance with) the statement of W. R. Grace & Co. Continuing Operations- Segment Basis.

"Remaining Long-Term Cash Award Payment": As defined on Page 4, the second installment of the Long-Term Cash Award that may be paid after the end of the Performance Period, based on Company performance for the entire Performance Period.

"Subsidiary": A corporation, partnership, limited liability company or other form of business association of which shares of common stock or other ownership interests (i) having more than 50% of the voting power regularly entitled to vote for directors (or equivalent management rights) or (ii) regularly entitled to receive more than 50% of the dividends (or their equivalents) paid on the common stock (or other ownership interests), are owned, directly or indirectly, by the Company.

"Targeted Award": The amount of cash award specified in writing for a Participant as his or her "Targeted Award" for a Performance Period and which is subject to and covered by the terms and conditions of a Long-Term Cash Award. This amount may be different from the Long-Term Cash Award Earned by an individual.

## PLAN ADMINISTRATION

The Plan shall be administered by the Committee, provided that no member of the Committee shall be eligible to receive a Long-Term Cash Award while serving on the Committee.

The Committee shall approve (i) the performance measurements and objectives for each Long-Term Cash Award and (ii) the Performance Period over which a Long-Term Cash Award is to be earned.

The Committee shall approve (i) the Key Employees who are to be granted Long-Term Cash Awards and (ii) the Targeted Award subject to each Long-Term Cash Award.

## LONG-TERM CASH AWARDS

The Committee may, at any time or from time to time, grant Long-Term Cash Awards to Key Employees.

Each Long-Term Cash Award shall be evidenced by a written instrument containing such terms and conditions as the Committee shall approve, provided the instrument is consistent with these practices.

No Long-Term Cash Award, nor any payment or right thereunder, shall be subject in any manner to alienation, sale, transfer, assignment, pledge, encumbrance or charge, except by will or the laws of descent and distribution, or by the terms of a Participant's Designation of Beneficiary, if any, on file with the Company.

CC-BLG002561

-6-

In the case of a Key Employee who becomes a Participant after the beginning of a Performance Period, the Committee may ratably reduce the amount of the Targeted Award covered by such Employee's Long-Term Cash Award or otherwise appropriately adjust the terms of the Long-Term Cash Award to reflect the fact that the Key Employee is to be a Participant for only part of the Performance Period.

It is the intention of the Committee that Long-Term Cash Awards be related to the results of the core operations affected by the management actions taken by the Participants. Subject to the administrative practices that apply to termination or change in employment status and to the amendment or discontinuance of Long-Term Cash Awards, the performance objectives applicable to Long-Term Cash Awards will remain unchanged during the Performance Period except as follows:

o In the event of the divestment of a Business prior to completion of the Performance Period, both the performance objectives and results pertaining to that Business shall be eliminated for the full year in which the divestment occurs and for any subsequent years.

o In general, acquisitions will be included in the performance results.

## TERMINATION OR CHANGE IN EMPLOYMENT STATUS

A Participant shall forfeit all rights to any Award Payment, if, prior to the date of payment of such Award Payment, the Participant (1) resigns without the consent of the Committee, (2) retires under a retirement plan of the Company or Subsidiary before age 62 without the consent of the Committee, or (3) is terminated for cause.

If a Participant retires under a retirement plan of the Company or Subsidiary at or after age 62, or ceases employment as a result of death or disability, or ceases employment as a result of an involuntary termination after a Change in Control of the Company (as defined herein), during a Performance Period, then his rights in any Incomplete Long-Term Cash Award related to that Performance Period shall thereupon vest, and he shall be entitled to receive any Award Payment of any Long-Term Cash Award Earned he would otherwise have received (at the time he would have otherwise received the Award Payment), except that the amount of any Long-Term Cash Award Earned shall be reduced ratably in proportion to the portion of the Performance Period during which the Participant was not an employee. If a Participant ceases employment with the Company for any of the reasons specified in this paragraph, after the completion of any Performance Period (but before the payment of the Remaining Long-Term Cash Award Payment related to the completed Performance Period), then his rights to any Long-Term Cash Award Earned and to such Award Payment related to the completed Performance Period shall thereupon vest, and he shall be entitled to receive such Award Payment at the time he would have otherwise received the Payment.

If a Participant ceases employment with the Company for any reason other than those indicated in the previous two paragraphs (including by reason of involuntary termination not for cause, except as provided above with respect to involuntary termination after a Change in Control of the Company, or transfer of employment to a buyer of any business unit of the Company), then his rights in any Incomplete Long-Term Cash Award, and any Award Payment that is unpaid as of the date the Participant ceases

CC-BLG002562

such employment, shall be determined by the Committee (or the designee of the Committee, which may include the Chief Executive Officer of the Company) as soon as practicable after the Participant ceases such employment. All such determinations shall be final and binding on all parties.

Except as modified by the provisions of the second and third paragraphs of this section, payments due to Participants pursuant to the applicable preceding paragraphs, above, shall be calculated and made in accordance with the provisions described under the section entitled "Calculation of Long-Term Cash Awards Earned: Form of Payment".

A leave of absence, if approved by the Committee, shall not be deemed a termination or change of employment status for the purposes of this section, but, unless the Committee otherwise directs, any Long-Term Cash Award Earned that a Participant would otherwise have received under a Long-Term Cash Award Program shall be reduced ratably in proportion to the portion of the Performance Period during which the Participant was on such leave of absence.

Any consent, approval or direction which the Committee may give under this section in respect of an event or transaction may be given before or after the event or transaction.

## CALCULATION OF LONG-TERM CASH AWARDS EARNED: FORM OF PAYMENT

Long-Term Cash Awards Earned will be paid to a Participant in two installments
(1) the first installment shall be paid in March of the third and final year of the Performance Period and shall be equal to 50% of what is earned based on the Company's performance for the first two calendar years of the applicable Performance Period, but no more than 50% of the Participant's Targeted Award (the "Interim Long-Term Cash Award Payment"), and (2) the balance, if any, of the Long-Term Cash Award Earned will be paid in March after the end of the third and final year of the Performance Period (the "Remaining Long-Term Cash Award Payment").

The Committee shall determine the extent to which the performance objectives of a Long-Term Cash Award have been achieved during the Performance Period and the amount of any Long-Term Cash Awards Earned (and the amount of any Award Payment). All calculations in this regard shall be made in accordance with the generally accepted accounting principles customarily applied by the Company and shall be submitted to the Committee for its review and approval. The determination of the Committee shall be final and binding.

CC-BLG002563

-8-

## GENERAL

Nothing in this document nor in any instrument executed pursuant hereto shall confer upon a Participant any right to continue in the employ of the Company or a Subsidiary, or shall affect the right of the Company or a Subsidiary to terminate his or her employment with or without cause.

The Company or a Subsidiary may make such provisions as it may deem appropriate for the withholding or any taxes that the Company or a Subsidiary determines it is required to withhold in connection with any Long-Term Cash Award Earned.

Nothing in a Long-Term Cash Award is intended to be a substitute for, or shall preclude or limit the establishment or continuation of, any other plan, practice, or arrangement for the payment of compensation or benefits to employees generally, or to any class or group of employees, which the Company or a Subsidiary now has or may hereafter lawfully put into effect, including, without limitation, any retirement, pension, group insurance, annual bonus, stock purchase, stock bonus or stock option plan; provided, however, that no amounts awarded or paid pursuant to any Long-Term Cash Award shall be included or counted as compensation for the purposes of any employee benefit plan of the Company or a Subsidiary where contributions to the plan, or the benefits received from the plan, are measured or determined in whole or in part, by the amount of the employee's compensation.

The grant of a Long-Term Cash Award to an employee of a Subsidiary shall be contingent on the approval of the Long-Term Cash Award by the Subsidiary and the Subsidiary's agreement that (i) the Company may administer such Award on its behalf and (ii) the Subsidiary will make, or reimburse the Company for, the payments called for by the Long-Term Cash Award. The provisions of this paragraph and the obligations of the Subsidiary so undertaken may be waived, in whole or in the part, from time to time by the Company.

## AMENDMENTS AND DISCONTINUANCE

In the event acquisitions, divestments, substantial changes in tax or other laws or in accounting principles or practices, natural disasters or other extraordinary events render fulfillment of the performance objectives of a Long-Term Cash Award impossible or impracticable, or result in the achievement of the performance objectives without appreciable effort by the Participant, the Committee may, but shall not be obligated to, amend any such Long-Term Cash Award in any appropriate manner so that the Participant may earn Long-Term Cash Awards comparable to those that might have been earned if the extraordinary event had not occurred.

The Chief Executive Officer of the Company may approve such technical changes and clarifications to the Long-Term Cash Award Program as necessary, provided such changes or clarifications do not vary substantially from the terms and conditions outlined in this description.

CC-BLG002564

In the event a Change in Control of the Company (as defined herein) shall occur or the Board of Directors has reason to believe that a Change of Control may occur, the Committee may, with respect to any one or more Long-Term Cash Awards,
(i) reduce the length of a Performance Period to not less than one year, (ii) make ratable adjustments to performance objectives and Targeted Awards, (iii) change the methods of measuring the performance objectives, (iv) accelerate the payment of any Long-Term Cash Awards Earned or any Award Payment, and (v) take other action deemed by it to be appropriate and in the best interests of the Company under the circumstances. For the purposes of this paragraph:

(A) "Change in Control of the Company" means and shall be deemed to have occurred if (a) the Company determines that any "person" (as such term is used in Section 13(d) and 14 (d) of the Securities Exchange Act of 1934), other than a trustee or other fiduciary holding securities under an employee benefit plan of the Company or a corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company, has become the "beneficial owner" (as defined in Rule 13d-3 under such Act), directly or indirectly, of 20% or more of the outstanding common stock of the Company (provided, however, that a Change in Control shall not be deemed to have occurred if such person has become the beneficial owner of 20% or more of the outstanding Common Stock as the results of a sale of Common Stock by the Company that has been approved by the Board of Directors); or pursuant to a plan of reorganization which has been confirmed by the U.S. District Court or Bankruptcy Court having jurisdiction of the Company's Chapter 11 case, Case No. 01-01139 (JJF), pursuant to an order of such Court which is final and nonappealable, and becomes effective); (ii) individuals who are Continuing Directors cease to constitute a majority of any class of directors of the Board; (iii) there occurs a reorganization, merger, consolidation or other corporate transaction involving the Company (a "Corporate Transaction"), in each case, with respect to which the stockholders of the Company immediately prior to such Corporate Transaction do not, immediately after the Corporate Transaction, own 50% or more of the combined voting power of the corporation resulting from such Corporate Transaction, provided that this clause (iii) shall not apply to a Corporate Transaction which is pursuant to section 363 of the Bankruptcy Code, or is pursuant to a plan of reorganization which has been confirmed by the U.S. District Court or Bankruptcy Court having jurisdiction of the Company's chapter 11 case, Case No. 01-01139 (JJF), pursuant to an order of such Court which is final and nonappealable, and becomes effective, or (iv) the shareholders of the Company approve a complete liquidation or dissolution of the Company.

(B) "Continuing Director" means any member of the Board of Directors who was such a member on the date on which this Program was approved by the Board of Directors, and any successor to a Continuing Director who is approved as a nominee or elected to succeed to a Continuing Director by a majority of Continuing Directors who are then members of the Board of Directors.

The granting of Long-Term Cash Awards may be amended or discontinued by the Committee at any time.

CC-BLG002565

-10-

No amendment or discontinuance of Long-Term Cash Awards shall, without a Participant's consent, adversely affect his rights in any Long-Term Cash Awards theretofore granted to him, except that, if the Committee so directs, all Incomplete Long-Term Cash Awards may be terminated prospectively with the same effect as a termination of employment under the second paragraph of the section entitled "Termination or Change in Employment Status".

CC-BLG002566

Exhibit 10.17

**CONFIDENTIAL**

_____, 20__

**Dear:**

W. R. Grace & Co., a Delaware corporation (the "Company"), considers it essential to the best interests of its stockholders to foster the continuous employment of key management personnel. In this connection, the Board of Directors of the Company (the "Board") recognizes that, as is the case with many publicly held corporations, the possibility of a change in control may exist and that such possibility, and the uncertainty and questions which it may raise among management, may result in the departure or distraction of management personnel to the detriment of the Company, its subsidiaries and other business units, and its stockholders.

Accordingly, the Board has determined that appropriate steps should be taken to reinforce and encourage the continued attention and dedication of members of the Company's management, including yourself, to their assigned duties without distraction in the face of potentially disturbing circumstances arising from the

CC-BLG002567

possibility of a change in control of the Company, although no such change is now contemplated.

In order to induce you to remain in the employ of Grace (as hereafter defined), the Company agrees that you shall receive the severance benefits set forth in this letter agreement ("Agreement") in the event your employment with Grace is terminated subsequent to a Change in Control of the Company (as hereinafter defined) under the circumstances provided in this Agreement.

1. Definitions. When used in this Agreement as capitalized terms, the following defined terms shall have the meanings set forth or specified in this Section.

(a) "Board" shall have the meaning specified in the first paragraph of this Agreement.

(b) "Change in Control of the Company" means and shall be deemed to have occurred if (i) the Company determines that any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act), other than a trustee or other fiduciary holding securities under an employee benefit plan of the Company or a corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company, has become the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of 20% or more of the outstanding common stock of the Company (provided, however, that a Change in Control of the

CC-BLG002568

Exhibit 10.17

Company shall not be deemed to have occurred if such person has become the beneficial owner of 20% or more of the outstanding common stock of the Company as the result of a sale of common stock by the Company that has been approved by the Board of Directors or pursuant to a plan of reorganization which has been confirmed by the U.S. District Court or Bankruptcy Court having jurisdiction of the Company's Chapter 11 case, Case No. 01-01139 (JJF), pursuant to an order of such Court which is final and nonappealable, and becomes effective); (ii) individuals who are Continuing Directors cease to constitute a majority of any class of directors of the Board; (iii) there occurs a reorganization, merger, consolidation or other corporate transaction involving the Company (a "Corporate Transaction"), in each case, with respect to which the stockholders of the Company immediately prior to such Corporate Transaction do not, immediately after the Corporate Transaction, own 50% or more of the combined voting power of the corporation resulting from such Corporate Transaction, provided that this clause (iii) shall not apply to a Corporate Transaction which is pursuant to section 363 of the Bankruptcy Code, or is pursuant to a plan of reorganization which has been confirmed by the U.S. District Court or Bankruptcy Court having jurisdiction of the Company's chapter 11 case, Case No. 01-01139 (JJF), pursuant to an order of such Court which is final and nonappealable, and becomes effective; or (iv) the

-3-

CC-BLG002569

Exhibit 10.17

shareholders of the Company approve a complete liquidation or dissolution of the Company.

(c) "Code" means the Internal Revenue Code of 1986, as amended and in effect at the time of a Change in Control of the Company.

(d) "Company" means W. R. Grace & Co., a Delaware corporation, and any successor as provided in Section 6(a).

(e) "Continuing Director" means any member of the Board who was such a member on the date hereof and any successor to such a Continuing Director who is approved as a nominee or elected to succeed a Continuing Director by a majority of Continuing Directors who are then members of the Board.

(f) "Corporate Transaction" shall have the meaning specified in Section 1(b).

(g) "Date of Termination" shall have the meaning specified in
Section 3(e).

(h) "Disability" shall have the meaning specified in Section 3(a).

(i) "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(j) "Excise Tax" means the excise tax imposed by Section 4999 of the Code and/or any interest or penalties with respect to such excise tax.

-4-

CC-BLG002570

Exhibit 10.17

(k) "Grace" means the Company and/or one or more of its subsidiaries.

(l) "Good Reason" shall have the meaning specified in Section 3(c).

(m) "Notice of Termination" means a written notice which shall indicate the specific termination provision in this Agreement relied upon and shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of your employment under the provision so indicated.

(n) "Other Payments" means payments and/or the value of benefits to which you are entitled (other than the Severance Payment) pursuant to any agreement (including this Agreement) that constitute "parachute payments" (as defined in Section 280G of the Code and the regulations thereunder).

(o) "Retirement" shall have the meaning specified in Section 4(a).

(p) "Retirement Plans" means retirement plans of Grace; "Retirement Arrangements" means Retirement Plans and agreements of Grace relating to retirement benefits, and "Insurance Plans" means Grace's basic life and health insurance plans, the survivor benefit under any Grace deferred compensation program, and the Executive Salary Protection Plan.

-5-

CC-BLG002571

Exhibit 10.17

(q) "Severance Payment" means a single, lump sum payment, in accordance with Section 4(c)(ii).

(r) "Tax Advisor" means a tax advisor that, in the reasonable judgment of the Company, is familiar with and experienced in the tasks required of the "tax advisor" hereunder, and is selected by the Company to perform those tasks. The Company shall pay all of the fees and expenses of the Tax Advisor.

2. Term of Agreement. This Agreement shall become effective on November 1, 1998 and shall continue in effect through December 31, 1998; provided, however, that commencing on each January 1 thereafter, the term of this Agreement shall automatically be extended for one additional year unless, not later than September 30 of the preceding year, the Company shall have given notice that it does not wish to extend this Agreement or you shall have given such notice to the Company; provided, further, if a Change in Control of the Company shall have occurred during the original or any extended term of this Agreement, this Agreement shall continue in effect for a period of 24 months beyond the month in which such Change in Control of the Company occurred. This Agreement shall terminate upon your ceasing to be an officer of the Company unless prior thereto a Change in Control of the Company shall have occurred.

-6-

CC-BLG002572

Exhibit 10.17

3. Termination Following Change in Control. No benefits shall be payable hereunder unless there shall have been a Change in Control of the Company during the term of this Agreement. If any of the events described in Section 1(b) constituting a Change in Control of the Company shall have occurred, you shall be entitled to the benefits provided in Section 4 upon the subsequent termination of your employment during the term of this Agreement unless such termination is (i) because of your death, Disability or Retirement, (ii) by the Company for Cause, or (iii) by you other than for Good Reason, as specified below.

(a) Disability. If, as a result of your incapacity due to physical or mental illness, you shall have been absent from the full-time performance of your duties with Grace for six consecutive months, and within 30 days after written notice of termination is given you shall not have returned to the full-time performance of your duties, your employment may be terminated for "Disability".

(b) Cause. The Company shall be entitled to terminate your employment for Cause. For the purposes of this Agreement, "Cause" means (i) the willful and continued failure by you to substantially perform your duties with Grace (other than any such failure resulting from your incapacity due to physical or mental illness or any such actual or anticipated failure after the issuance of a Notice of Termination by you for Good Reason) after a

-7-

CC-BLG002573

Exhibit 10.17

written demand for substantial performance is delivered to you as authorized by the Board, which demand specifically identifies the manner in which the Board believes that you have not substantially performed your duties, or (ii) the willful engaging by you in conduct which is demonstrably and materially injurious to Grace, monetarily or otherwise. For purposes of this Subsection, no act, or failure to act, on your part shall be deemed "willful" unless done, or omitted to be done, by you not in good faith and without reasonable belief that your action or omission was in the best interest of Grace. Any act or omission based upon authority given pursuant to authorization of the Board or upon the advice of counsel for Grace shall be conclusively presumed to be done or omitted by you in good faith and in the best interest of Grace. Notwithstanding the foregoing, your employment shall not be deemed to have been terminated for Cause unless and until there shall have been delivered to you a copy of a resolution duly adopted by the affirmative vote of not less than three-quarters of the entire membership of the Board at a meeting of the Board, held after reasonable notice to you and an opportunity for you, together with your counsel, to be heard before the Board, finding that in the good faith opinion of the Board you were guilty of conduct set forth above in clause (i) or (ii) of the second sentence of this Subsection and specifying the particulars thereof in detail.

-8-

CC-BLG002574

Exhibit 10.17

(c) Good Reason. You shall be entitled to terminate your employment for "Good Reason". For purposes of this Agreement, "Good Reason" means the occurrence after a Change in Control of the Company of any of the following circumstances, without your express written consent, unless such circumstances (other than that specified in paragraph (iii)) are fully corrected prior to the Date of Termination specified in the Notice of Termination given by you in respect thereof:

(i) The assignment to you of any duties inconsistent with your status as an officer of the Company and an executive of Grace or a substantial adverse alteration in the nature or status of your responsibilities from those in effect immediately prior to the Change in Control of the Company.

(ii) A reduction in your annual base salary as in effect on the date hereof or as the same may be increased from time to time, or Grace's failure to increase your annual base salary substantially in accordance with increases given to other officers of the Company.

(iii) Grace's requiring you to be based anywhere other than the metropolitan area in which your office is located immediately prior to the Change in Control of the Company, except for required travel on Grace's business to an extent

-9-

CC-BLG002575