# W R GRACE & CO

# FORM 10-K
(Annual Report)

## Filed 03/05/04 for the Period Ending 12/31/03

| | |
|---|---|
| Address | 7500 GRACE DRIVE |
| | COLUMBIA, MD 21044 |
| Telephone | 410 531 4000 |
| CIK | 0001045309 |
| Symbol | GRA |
| SIC Code | 2800 - Chemicals & Allied Products |
| Industry | Chemical Manufacturing |
| Sector | Basic Materials |
| Fiscal Year | 12/31 |

http://www.edgar-online.com
© Copyright 2009, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

TRIAL EXHIBIT 21
CC-BLG002622-002850

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

## WASHINGTON, D.C. 20549

# FORM 10-K

### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF

# THE SECURITIES AND EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2003 Commission file number 1-13953

# W. R. GRACE & CO.

Incorporated under the Laws of the I.R.S. Employer Identification No.
State of Delaware 65-0773649

**7500 GRACE DRIVE, COLUMBIA, MARYLAND 21044-4098**
410/531-4000

### SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

```
                                          NAME OF EACH EXCHANGE ON
     TITLE OF EACH CLASS                    WHICH REGISTERED
     ------------------                    ----------------

Common Stock, $.01 par value        }
Preferred Stock Purchase Rights     }     New York Stock Exchange, Inc.
```

### SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:

None

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulations S-K is not contained herein and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ]

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act). Yes [X] No [ ]

The aggregate market value of W. R. Grace & Co. voting and non-voting common equity held by non-affiliates as of June 30, 2003 (the last business day of the registrant's most recently completed second fiscal quarter) was $239,410,239.

At February 20, 2004, 65,614,064 shares of W. R. Grace & Co. Common Stock, $.01 par value, were outstanding.

### DOCUMENTS INCORPORATED BY REFERENCE

None.

TABLE OF CONTENTS

PART I...................................................................1

    Item 1.  Business ......................................................1
                  AVAILABILITY OF SEC REPORTS...............................1
                  PROJECTIONS AND OTHER FORWARD-LOOKING INFORMATION.........1
                  CHAPTER 11 FILING.........................................2
                  BUSINESS OVERVIEW.........................................3
                  PRODUCTS AND MARKETS......................................4
                  INTELLECTUAL PROPERTY; RESEARCH ACTIVITIES................9
                  ENVIRONMENTAL, HEALTH AND SAFETY MATTERS..................9
    Item 2.  Properties....................................................10
    Item 3.  Legal Proceedings.............................................11
    Item 4.  Submission of Matters to a Vote of Security Holders...........18

PART II.................................................................18

    Item 5.  Market for Registrant's Common Equity and Related
          Shareholder Matters...........................................18
    Item 6.  Selected Financial Data.......................................19
    Item 7.  Management's Discussion and Analysis of Results of
          Operations and Financial Condition............................19
    Item 7A. Quantitative and Qualitative Disclosures About Market Risk......20
    Item 8.  Financial Statements and Supplementary Data....................20
    Item 9.  Changes in and Disagreements with Accountants on
          Accounting and Financial Disclosure...........................20
    Item 9A  Controls and Procedures.......................................20

PART III................................................................20

    Item 10. Directors and Executive Officers of the Registrant.............20
    Item 11. Executive Compensation........................................22
    Item 12. Security Ownership of Certain Beneficial Owners and
          Management and Related Stockholder Matters....................30
    Item 13. Certain Relationships and Related Transactions.................32
    Item 14  Principal Accounting Fees and Services........................32

PART IV.................................................................33

    Item 15. Exhibits, Financial Statement Schedules, and Reports on
          Form 8-K......................................................33

SIGNATURES..............................................................38

CC-BLG002624

PART I

## ITEM 1. BUSINESS

### AVAILABILITY OF SEC REPORTS

W. R. Grace & Co.(1) maintains an Internet website at www.grace.com. Grace makes available, free of charge through its website, its annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to those reports, filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, as soon as reasonably practicable after such reports are electronically filed with, or furnished to, the Securities and Exchange Commission ("SEC"). These reports may be accessed through the website's investor information page.

### PROJECTIONS AND OTHER FORWARD-LOOKING INFORMATION

This Report contains, and other communications by Grace may contain, projections or other "forward-looking" information. Forward-looking information includes all statements regarding Grace's expected financial position, results of operations, cash flows, dividends, financing plans, business strategy, budgets, capital and other expenditures, competitive positions, growth opportunities for existing products, benefits from new technology, plans and objectives of management, and markets for stock. Like any other business, Grace is subject to risks and other uncertainties that could cause its actual results to differ materially from any projections or that could cause other forward-looking information to prove incorrect. Grace does not undertake any obligation to update any forward-looking information that may be contained in this Report.

Most significantly, Grace filed for protection under Chapter 11 of the United States Bankruptcy Code ("Chapter 11") on April 2, 2001 as a result of a sharply increasing number of asbestos bodily injury claims. See the discussion below, in Item 3 of this Report, and Notes 1, 2 and 3 to Grace's Consolidated Financial Statements as of December 31, 2003 and December 31, 2002, and for each of the three years ended December 31, 2003, 2002 and 2001 ("Consolidated Financial Statements") and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement to this Report, for a more detailed discussion of risks related to Grace's asbestos liabilities.

In addition to general economic, business and market conditions, Grace is also subject to other risks and uncertainties, including the following:

o developments in and the outcome of the Chapter 11 proceedings, including but not limited to the determination of the cost of resolution of pending and future asbestos-related claims and the time required to confirm and implement a plan of reorganization;

o the loss of senior management and other key employees as a result of the Chapter 11 proceedings;

o the loss of flexibility in operating its businesses and the higher costs of doing business under Chapter 11;

o greater than expected liabilities with respect to environmental remediation (see Item 3);

o an inability to obtain committed credit facilities or alternative sources of liquidity in amounts sufficient to fund operations, growth initiatives and non-core obligations;

o a decline in worldwide oil consumption or the development of new methods of oil refining;

o increases in prices of raw materials and energy costs;

(1) As used in this Report, the term "Grace" or the "Company" refers to W. R. Grace & Co., a Delaware corporation and, in certain cases, one or more of its subsidiaries and/or their respective predecessors.

CC-BLG002625

o the consolidation of major customers, which could increase customer purchasing power, thereby putting pressure on operating profits;

o an inability to gain customer acceptance, or slower than anticipated acceptance, of new products or product enhancements;

o changes in environmental regulations or societal pressures that make Grace's business operations more costly or that change the types of products used by customers, especially petroleum-based products;

o slower than anticipated economic advances in less developed countries;

o foreign currency devaluations in developing countries or other adverse changes in currency exchange rates (including, in particular, the U.S. dollar to Euro exchange rate);

o technological breakthroughs rendering a product, a class of products or a line of business obsolete;

o an inability to adapt to continuing technological improvements by competitors or customers; and

o the acquisition (through theft or other means) and use by others of Grace's proprietary technology and other know-how.

See Notes 1, 2, 3, 4, 5, 10, 13 and 14 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for additional information concerning risks and uncertainties.

## CHAPTER 11 FILING

On April 2, 2001, W. R. Grace & Co. and 61 of its United States subsidiaries and affiliates filed voluntary petitions for reorganization under Chapter 11 in the United States Bankruptcy Court for the District of Delaware. The cases were consolidated for the purpose of joint administration and were assigned case numbers 01-01139 through 01-01200. Grace's non-U.S. subsidiaries and certain of its U.S. subsidiaries were not included in the filing.

The filing was made in response to a sharply increasing number of asbestos-related bodily injury claims. Under Chapter 11, Grace is operating its businesses as debtor-in-possession under court protection from its creditors and claimants, while using the Chapter 11 process to develop and implement a plan for addressing the asbestos-related claims against it.

Prior to 2000, Grace was able to settle asbestos-related claims through direct negotiations. The filing of claims had stabilized, and annual cash flows were manageable and fairly predictable. In 2000, the litigation environment changed with an unexpected 81% increase in bodily injury claims, which Grace believes was due to a surge in unmeritorious claims. Trends in claims filing and settlement demands showed no signs of returning to historic levels and were exacerbated by the Chapter 11 filings of several co-defendants in asbestos bodily injury litigation. These trends greatly increased the risk that Grace would not be able to resolve its pending and future asbestos-related claims under the state court system.

Grace concluded that a federal court-supervised Chapter 11 filing provides the best forum available to achieve predictability and fairness in the claims resolution process. By filing under Chapter 11, Grace expects to be able both to obtain a comprehensive resolution of the claims against it and to preserve the inherent value of its businesses.

As a consequence of the filing, pending litigation against Grace is generally stayed (subject to certain exceptions in the case of governmental authorities), and no party may take any action to realize its pre-petition claims except pursuant to an order of the Bankruptcy Court. Since the filing, all motions necessary to conduct normal business activities have been approved by the Bankruptcy Court.

Grace intends to address all of its pending and future asbestos-related claims and all other pre-petition

2

CC-BLG002626

claims in a plan of reorganization. Such a plan of reorganization may include the establishment of a trust through which all pending and future asbestos-related claims would be channeled for resolution. However, it is currently impossible to predict with any degree of certainty the amount that would be required to be contributed to the trust, how the trust would be funded, how other pre-petition claims would be treated or what impact any reorganization plan may have on the shares of common stock of Grace. The interests of Grace's shareholders could be substantially diluted or cancelled under a plan of reorganization. The value of Grace common stock following a plan of reorganization, and the extent of any recovery by non-asbestos-related creditors, will depend principally on the ultimate value assigned to Grace's asbestos-related claims, which will be addressed through the Bankruptcy Court proceedings.

Grace's asbestos-related litigation and Chapter 11 filing are discussed in more detail in Item 3 of this Report, and in Notes 1, 2 and 3 to the Consolidated Financial Statements, and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement to this Report.

## BUSINESS OVERVIEW

Grace, through its subsidiaries, is one of the world's leading specialty chemicals and materials companies. Grace entered the specialty chemicals industry in 1954, when it acquired both the Dewey and Almy Chemical Company and the Davison Chemical Company. Grace operates in the following two business segments:

o Davison Chemicals manufactures catalysts and silica-based products. Davison Chemicals' catalysts include (1) fluid cracking catalysts and additives used by petroleum refineries to convert distilled crude oil into transportation fuels and other petroleum-based products; (2) hydroprocessing catalysts that upgrade heavy oils and remove certain impurities; and (3) polyolefin catalysts and catalyst supports that are essential components in the manufacture of high density and linear low density polyethylene resins, and polypropylene resins, used in products such as plastic film, high-performance plastic pipe and plastic household containers. Davison Chemicals' silica gels, colloidal silicas, precipitated silicas, and zeolite adsorbents are used in a wide variety of industrial, consumer, biotechnology and pharmaceutical segments, such as ink jet paper, paints, toothpastes, precision investment casting, rubber compounds, insulated glass and separations/chromatography, as well as in edible oil refining and petrochemical processes. Davison Chemicals accounted for approximately 52% of Grace's 2003 sales.

o Performance Chemicals produces (1) specialty construction chemicals, including performance-enhancing concrete admixtures, cement additives and additives for masonry products; (2) specialty building materials, including fireproofing and waterproofing materials and systems; and (3) sealants and coatings for packaging that protect food and beverages from bacteria and other contaminants, extend shelf life and preserve flavor. Performance Chemicals accounted for approximately 48% of Grace's 2003 sales.

Grace's principal executive offices are located at 7500 Grace Drive, Columbia, Maryland 21044, telephone 410/531-4000. As of year-end 2003, Grace had approximately 6,300 full-time employees worldwide.

Information concerning the net sales, pretax operating income and total assets of Grace's continuing operations by business segment and information by geographic area for 2003, 2002 and 2001 is contained in Note 19 to the Consolidated Financial Statements in the Financial Supplement to this Report.

Strategic Objectives and Actions. Grace's strategy has been, and will continue to be, to enhance enterprise value by profitably growing its specialty chemicals businesses globally and achieving high levels of

3

CC-BLG002627

financial performance. To achieve these objectives, Grace plans to (i) invest in research and development activities, with the goals of introducing new high-performance products and services and enhancing manufacturing processes;
(ii) implement process and productivity improvements and cost-management initiatives (including the use of Six Sigma processes), such as rigorous controls on working capital and capital spending, and programs for procurement and materials management; and (iii) pursue selected acquisitions and alliances. These plans are designed to make Grace a high-performance company focused on the strengths of its global specialty chemicals businesses.

## PRODUCTS AND MARKETS

Specialty Chemicals Industry Overview. Specialty chemicals, such as those produced by Grace, are high-value-added products used as catalysts, intermediates, components or additives in a wide variety of products and processes. They are generally produced in relatively small volumes (compared to commodity chemicals) and must satisfy well-defined performance requirements and specifications. Specialty chemicals are often critical components of the end products and catalysts for the processes in which they are used; consequently, they are tailored to meet customer needs, which generally results in a close relationship between the specialty chemicals producer and the customer. Rapid response to changing customer needs and reliability of product and supply are important competitive factors in specialty chemicals businesses.

Grace's management believes that in specialty chemicals businesses technological leadership (resulting from continuous innovation through research and development), combined with product differentiation and superior customer service, deliver increased value to customers and lead to higher operating margins. Grace believes that these factors reward it for the research and development and customer service costs associated with its strategy.

Davison Chemicals Business Segment (Catalysts and Silica-Based Products). Davison, founded in 1832, is composed of two primary product groups: (i) catalysts and (ii) silica products and adsorbents. These product groups principally apply silica, alumina and zeolite technology in the design and manufacture of products to meet the varying specifications of such diverse customers as major oil refiners, plastics and chemical manufacturers, and consumer products and pharmaceutical/nutraceutical companies. Grace believes that Davison's technological expertise provides a competitive edge, allowing it to quickly design products and materials that meet changing customer specifications and to develop new products and materials that expand its existing technology.

Catalysts. Davison produces refinery catalysts, including (i) fluid cracking catalysts ("FCC") used by petroleum refiners to convert distilled crude oil into transportation fuels (such as gasoline and diesel fuels) and other petroleum-based products, and (ii) hydroprocessing catalysts that upgrade heavy oils and remove certain impurities (such as nitrogen, sulfur and heavy metals). Davison also develops and manufactures FCC additives used for octane enhancement and to reduce emissions of sulfur oxides, nitrogen oxides and carbon monoxide from the FCC unit. Davison has recently introduced new catalyst/additive technologies for sulfur reduction in gasoline and, as an alternative technology, membranes which, when employed in a pervaporation system, will remove sulfur from refinery streams. Oil refining is a highly specialized discipline, demanding that products be tailored to meet local variations in crude oil and the refinery's product mix. Davison works regularly with most of the approximately 360 refineries in the world, helping to find the most appropriate catalyst formulations for refiners' changing needs. To better serve its customers, Davison has designed a user-specific website, e-Catalysts.com.

Davison's catalyst business has benefited from the increased use of FCC units to produce selected petrochemical feedstocks. It has also benefited from the passage of more stringent environmental regulations, which has increased demand for FCC additives and other products that reduce environmental emissions.

4

CC-BLG002628

Davison's business is affected by the capacity utilization of customers' processing units - as capacity utilization increases, the customer frequently uses a disproportionately greater amount of catalysts. Consolidation in the refining industry may affect Davison's catalyst sales and margins, as the purchasing power of its customers may increase, and the gain or loss of a customer may have a greater impact on Davison's sales.

Davison operates its hydroprocessing catalyst business through Advanced Refining Technologies LLC ("ART"), a joint venture between Grace and Chevron Products Company that combines Chevron's fixed bed residuum catalyst business with Davison's ebullating bed residuum catalyst and distillate catalyst business. In 2002, ART acquired an exclusive license in most of the world for the hydroprocessing technology of Japan Energy Corporation and its subsidiary, Orient Catalyst Company, which expanded Davison's position in residuum and distillate hydroprocessing technologies. In response to increased demand for lower sulfur transportation fuels, ART has recently introduced new hydroprocessing catalyst technologies for sulfur reduction in gasoline and diesel fuels.

Grace believes that Davison is one of the world leaders in refinery catalysts and the largest supplier of FCCs in the world. Competition in the refinery catalyst business is based on technology, product performance, customer service and price. Davison's two principal global competitors in FCCs are Engelhard Corporation and Akzo Nobel. Davison has several regional competitors for FCC additives and hydroprocessing catalysts.

Davison is also a major producer of polyolefin catalysts and catalyst supports, essential components in the manufacture of high density and linear low density polyethylene resins, and polypropylene resins, that are in turn used in products such as plastic film, high-performance plastic pipe and plastic household containers. Davison catalysts and catalyst supports are used in manufacturing nearly half of all such supported polyethylene resins produced worldwide. The polyolefin catalyst business is technology-intensive and focuses on providing products formulated to meet customer specifications. There are many manufacturers of polyolefin catalysts, and most compete on a worldwide basis. Competition has recently intensified because of evolving technologies, particularly the use of metallocene catalysts, which allow manufacturers to design polymers with exact performance characteristics. In January 2002, Davison acquired the polyolefin catalyst manufacturing assets of Borealis A/S, giving Davison access to new polyolefin catalyst and catalyst carrier technologies. In addition, Davison produces other chemical catalysts for a wide variety of uses, including environmental control, petrochemical synthesis and pharmaceutical applications.

Silicas and Adsorbents. Silica products and zeolite adsorbents produced by Davison are used in a wide variety of industrial, consumer, biotechnology and pharmaceutical applications. Davison manufactures silica gels, colloidal silicas and precipitated silicas. These silicas have different physical properties, such as particle size, surface area, porosity, and surface chemistry, which give each type of silica unique characteristics that make it appropriate for specific applications. Davison has multiple competitors in each silicas/adsorbents segment in which it participates. Competition is based on product performance and quality, customer service, and price.

Silica gels are used in coatings as matting agents (i.e., to reduce gloss), in plastics to improve handling, in pharmaceuticals as a formulating agent, in toothpastes as abrasives and whiteners, in foods to carry flavors and prevent caking, and in the purification of edible oils and beer stabilization. Davison is leveraging its materials science expertise, both internally and through acquisitions, to develop and introduce new silica materials and technologies, particularly for the higher-growth segments of digital media, industrial coatings, and biotechnology separations applications. Davison recently has developed a new colloidal-based product as well as other silica formulations for ink jet paper coatings to provide both glossy and matte functionality, expanding its portfolio of digital media solutions for ink jet papers, photos, and commercial wide-format printing. Davison has also introduced new products for industrial coatings (where silica is used

5

CC-BLG002629

to reduce gloss), such as for thin film applications, industrial wood coatings, radiation-cured coatings, and anti-corrosion coatings.

Davison has recently focused on expanding its separations business to take advantage of higher growth opportunities in the drug discovery, purification and manufacturing processes. During 2003, Davison introduced several new products, including new higher-performing silica gel media for separations and, through two small acquisitions, high-performance chromatography columns and custom column packing services.

Davison's colloidal silicas are used primarily as binders in precision investment casting and refractory applications. They have also recently been introduced for use in ink jet printing of digital media, such as digital photographs. Precipitated silicas are used predominantly in the manufacture of tires and other industrial rubber goods such as belts, hoses and footwear. Zeolites, while not silica-based products, are based on related silica/alumina technology. Zeolite adsorbents are used between the two panes of insulating glass to adsorb moisture and are also used in process applications to adsorb water and separate certain chemical components from mixtures.

The silicas and adsorbents business has a large, fragmented customer base, reflecting the diverse markets served by its products. To better serve these customers, the business uses a direct sales force as well as a distribution network, and has introduced web-based initiatives. Web-based offerings include technical service, literature access, customer feedback tools, and process design formulas to assist customers in determining their needs. Approximately half of Davison's silica and adsorbent sales are in Europe.

Davison Financial and Other Business Information. Davison's net sales were $1,040 million in 2003, $939 million in 2002, and $868 million in 2001; 38% of Davison's 2003 net sales were generated in North America, 40% in Europe, 17% in Asia Pacific, and 5% in Latin America. Sales of catalysts accounted for 37% of total net sales of Grace in 2003 and 2002, and 36% in 2001. Sales of silica products and zeolite adsorbents accounted for 15% of Grace's total net sales in 2003 and 2002, and 14% in 2001.

At year-end 2003, Davison employed approximately 3,100 people worldwide in 16 facilities. Davison has a direct selling force and distributes most of its products directly to approximately 12,000 customers (500 for catalysts and more than 11,000 for silicas/adsorbents), the largest of which accounted for approximately 4% of Davison's 2003 sales.

Most raw materials used in the manufacture of Davison products are available from multiple sources. In some instances, Davison produces its own raw materials and intermediates. Natural gas and petroleum-based raw materials are two of the principal materials used in Davison's manufacturing process. World events and other economic factors have caused volatility in the price of these materials, which have impacted Davison's operating margins. Seasonality does not have a significant overall effect on Davison's business. However, sales of FCC catalysts tend to be lower in the first quarter prior to the shift in production by refineries from home heating oil for the winter season to gasoline production for the summer season. Silica products and polyolefin catalysts are the product lines most sensitive to general downturns in economic activity.

Performance Chemicals Business Segment (Specialty Construction Chemicals, Specialty Building Materials, and Sealants and Coatings). Grace's Performance Chemicals businesses include: (1) specialty construction chemicals and building materials, in which Grace is a leading supplier to the nonresidential (commercial and infrastructure) construction industry, and to a lesser extent, the residential construction and repair segment; and (2) a sealants and coatings product line operated under the Darex(R) brand.

6

CC-BLG002630

Construction Chemicals and Building Materials. Specialty construction chemicals (principally concrete admixtures, cement additives and additives for masonry products) improve durability and enhance the handling and application of concrete, improve the manufacturing efficiency and performance of cement, and improve the water resistance and other qualities of masonry wall and paving systems.

Grace has introduced a number of new construction chemicals products and product enhancements in recent years. These include: an additive that improves cement processing efficiency and product quality; new polymeric fiber reinforcements for concrete that can substitute for secondary metal reinforcements; an automated system to improve the reliability and accuracy of adding fibers to concrete production; an admixture system for producing self-consolidating concrete (which improves the concrete's conformity to the shape of a structure); and a liquid pigment admixture and dispensing system for concrete. Grace seeks to continuously improve and adapt these products for different applications.

Grace's strategy is also to extend its product portfolio and geographic reach through acquisitions. In 2003, Grace acquired the assets of Tricosal Beton-Chemie GmbH & Co. KG, which significantly expanded Grace's presence in Germany and Eastern Europe.

Specialty building materials prevent structural water damage (for example, water- and ice-barrier products for residential use and waterproofing systems for commercial structures), and protect structural steel against collapse caused by fire. In North America, the specialty building materials product line also manufactures and distributes vermiculite products used in insulation and other applications. Recent product developments include liquid-applied waterproofing products and new roof underlayments that provide protection from ice and wind-driven rain; enhancements to spray-on fireproofing products that improve applicator productivity; and, through an acquisition in 2000, firestops. Firestops are caulk and sealant systems that retard the spread of heat, flame and smoke through walls, ceiling joints, and openings for wiring and piping. The spray-on fire protection product line recently has been adversely affected by the adoption in the U.S. of new international building codes. These codes require less fire protection materials for structural steel used in commercial buildings.

In addition to new product introductions, product enhancements and acquisitions, Grace looks for growth opportunities in developing countries, where increases in construction activity and sophistication of construction practices can increase demand for Grace's higher-performance construction chemicals and building materials products.

Construction chemicals and building materials are marketed under the Grace(R) brand to a broad range of customers, including cement manufacturers, ready-mix and precast concrete producers, local contractors, specialty subcontractors and applicators, masonry block manufacturers, building materials distributors and other industrial manufacturers, as well as to architects and structural engineers. For some of these customer groups (such as contractors), cost and ease of application are key factors in making purchasing decisions; for others (such as architects and structural engineers), product performance and design versatility are the critical factors.

In view of this diversity, and because the construction chemicals and building materials businesses require intensive sales and customer service efforts, Performance Chemicals maintains a separate sales and technical support team for each of its product groups. These sales and support teams sell products under global contracts, under U.S. or regional contracts, and on a job-by-job basis. Consequently, Grace competes globally with several large construction materials suppliers and regionally and locally with numerous smaller competitors. In recent years, the cement and concrete industry has experienced some consolidation, particularly in markets outside of the U.S., thereby increasing the importance of servicing the global customers. Competition in these businesses is based largely on technical support and service, product performance, adaptability of the product and price.

7

CC-BLG002631

The construction business is cyclical in response to economic conditions and construction demand. The construction business is also seasonal and dependent on favorable weather conditions. Grace seeks to increase profitability and minimize the impact of cyclical downturns in regional economies by introducing technically advanced higher-performance products, expanding geographically, and developing business opportunities in renovation construction markets. Although in recent years these strategies have been successful in minimizing the impact of cyclicality on Grace's construction business, a significant downturn in North American commercial construction activity adversely affected results of operations in 2002 and the first half of 2003.

The raw materials used by the construction chemicals and building materials product lines can be obtained from multiple sources, including commodity chemical producers, petroleum companies and paper manufacturers. In most instances, there are at least two alternative suppliers for each of the principal raw materials used by these businesses. Recent higher petroleum-based raw material costs and other supply/demand disruptions have negatively impacted the operating margins of these product lines.

Sealants and Coatings. The Darex(R) sealants and coatings business consists primarily of four product lines: can sealants for rigid containers, sealants for metal and plastic bottle closures, coatings for metal packaging, and specialty barrier coatings for flexible packaging. These products are used to assure the quality of packaging and to preserve container contents. Can sealants ensure a hermetic seal between the lid and the body of beverage, food, aerosol and other cans. Closure sealants are used to seal pry-off and twist-off metal crowns, as well as roll-on pilfer-proof and plastic closures for glass and plastic bottles and jars used in beverage and food applications. Coatings are used in the manufacture of cans and closures to protect the metal against corrosion, to protect the contents against the influences of metal, to ensure proper adhesion of sealing compounds to metal surfaces, and to provide base coats for inks and for decorative purposes. These products are principally sold to container manufacturers. Specialty barrier coatings are used to improve the gas and/or vapor barrier performance of various packaging materials. They are principally sold to manufacturers of oriented polypropylene films for food packaging.

Grace is seeking to expand its Darex(R) product offerings and improve sales growth by extending its technology to new markets, such as its oxygen-scavenging compounds (which absorb oxygen to increase shelf life) and high barrier materials that limit gas transmission into plastic packaging. Grace is also looking to improve sales of closure sealants for plastic bottles, and can sealants and coatings through niche opportunities in metal packaging and continued growth in developing countries. However, sales growth has been impacted, and will likely continue to be impacted in the future, by the trend toward increasing use of plastic packaging. Grace will continue to focus on improving the profitability and cash flows of this business through worldwide productivity and strategic sourcing initiatives.

Competition is based on providing high-quality customer service at customer sites, as well as on uniform product quality and reliability, the ability to offer environmentally friendly products and price. In addition, because of the relative concentration of the canning and bottling market, maintaining relationships with leading container manufacturers, canners and bottlers, and assisting them as they re-engineer processes are key elements for success.

Although raw materials used in the sealants and coatings business, including resins, rubber and latices, are generally available from multiple sources, many raw materials are purchased from single source suppliers. Some raw materials are also subject to pricing pressures from time to time, particularly oil-based specialty and commodity materials such as resins and solvents. Also, currency devaluations versus the U.S. dollar and Euro in developing countries may adversely affect raw material costs and the prices the business may charge for its products. The business is focused on managing raw material costs and sourcing

8

CC-BLG002632

opportunities to alleviate some of these pressures. Since Darex is a global business, the impact of seasonality is not significant.

Performance Chemicals Financial and Other Business Information. Net sales of Grace's Performance Chemicals segment in 2003 totaled $940 million (52% in North America, 28% in Europe, 14% in Asia Pacific, and 6% in Latin America), versus $881 million in 2002 and $855 million in 2001. Sales of specialty construction chemicals accounted for 23% of Grace's total net sales in 2003, and 22% in 2002 and 2001; sales of specialty building materials accounted for 12% of Grace's total net sales in 2003, 13% in 2002, and 14% in 2001; and sales of Darex(R) products accounted for 13% of Grace's total net sales in 2003 and 2002, and 14% in 2001.

At year-end 2003, Grace employed approximately 3,000 people at 62 Performance Chemicals production facilities. Most of Performance Chemicals' sales are direct sales to the customer. Performance Chemicals' capital expenditures tend to be relatively lower, and sales and marketing expenditures tend to be relatively higher, than those of Davison Chemicals.

See Note 19 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for further information regarding the Davison and Performance Chemicals business segments.

## INTELLECTUAL PROPERTY; RESEARCH ACTIVITIES

Grace's products, processes and manufacturing equipment are protected by numerous patents and patent applications. Grace also benefits from legally protectable know-how and other proprietary information relating to many of its products and processing technologies. As competition in the markets in which Grace does business is often based on technological superiority and innovation, with new products based on technological developments being introduced frequently, the ability to achieve technological innovations and to obtain patent or other intellectual property protection is important. There can be no assurance, however, that Grace's patents, patent applications or other intellectual property will provide sufficient proprietary protection. In addition, other companies may independently develop similar systems or processes that circumvent patents issued to Grace, or may acquire patent rights within the fields of Grace's businesses.

Grace's research and development programs are directed toward the development of new products and processes and the improvement of, and development of new uses for, existing products and processes. Research is conducted in all regions, with North America and Europe accounting for the most activity. Grace's research and development strategy is to develop technology platforms on which new products will be based, while also focusing on the improvement of existing products and/or the adaptation of existing products to customer needs.

Research and development expenses relating to continuing operations amounted to $52 million in 2003 and 2002, and $50 million in 2001. These amounts include expenses incurred in funding external research projects. The amount of research and development expenses relating to government- and customer-sponsored projects (rather than projects sponsored by Grace) was not material.

## ENVIRONMENTAL, HEALTH AND SAFETY MATTERS

Manufacturers of specialty chemicals products, including Grace, are subject to stringent regulations under numerous U.S. federal, state and local and foreign environmental, health and safety laws and regulations relating to the generation, storage, handling, discharge, disposition and stewardship of hazardous wastes and other materials. Grace has expended substantial funds to comply with such laws and regulations

9

CC-BLG002633

and expects to continue to do so in the future. The following table sets forth Grace's expenditures in the past three years, and its estimated expenditures in 2004 and 2005, for (i) the operation and maintenance of environmental facilities and the disposal of wastes; (ii) capital expenditures for environmental control facilities; and (iii) site remediation:

|  | (i)<br>Operation of<br>Facilities and<br>Waste Disposal | (ii)<br>Capital<br>Expenditures | (iii)<br>Site<br>Remediation |
|---|---|---|---|
|  |  | (in $ millions) |  |
| 2001 | $33 | $4 | $27 |
| 2002 | 38 | 6 | 14 |
| 2003 | 46 | 8 | 7 |
| 2004 (est.) | 47 | 12 | 38 |
| 2005 (est.) | 48 | 15 | 7 |

The decline in site remediation costs since 2001 reflects reduced spending at non-owned sites due to Grace's Chapter 11 status. The $38 million in estimated site remediation expenditures in 2004 includes a potential $22 million payment to transfer liability with respect to a non-owned site to a third party; such payment is subject to the approval of the Bankruptcy Court. The $38 million does not include possible additional spending or reimbursement of remediation costs related to Grace's former vermiculite mining and processing activities.

Grace continuously seeks to improve its environmental, health and safety performance. To the extent applicable, Grace extends the basic elements of the American Chemistry Council's Responsible Care(R) program to all Grace locations worldwide, embracing specific performance objectives in the key areas of product stewardship, employee health and safety, community awareness and emergency response, distribution, process safety and pollution prevention. In addition, Grace has implemented key elements of the new Responsible Care(R) Security Code for its operations and systems. It has completed a review of existing company security (including cyber-security) vulnerability, and is in the process of taking actions to enhance security systems and protect company assets.

For additional information, see Item 3 of this Report, and Note 14 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement to this Report.

## ITEM 2. PROPERTIES

Grace operates manufacturing and other types of plants and facilities (including office and other service facilities) throughout the world. Some of these plants and facilities are shared by more than one Grace business unit. Grace owns all of its major manufacturing facilities. Substantially all of its U.S. properties are subject to security interests under Grace's debtor-in-possession borrowing facility. Grace considers its major operating properties to be in good operating condition and suitable for their current use. Grace believes that, after taking planned expansion into account, the productive capacity of its plants and other facilities is generally adequate for current operations and foreseeable growth. See Note 19 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for information regarding Grace's capital expenditures.

10

CC-BLG002634

Davison Chemicals operates out of 16 facilities in the following regions:

| Region | Number of Facilities |
| ------ | -------------------- |
| North America | 11 |
| Europe | 3 |
| Latin America | 1 |
| Asia Pacific | 1 |

Its largest facilities are located in Baltimore, Maryland; Lake Charles, Louisiana; and Worms, Germany.

Performance Chemicals operates out of 62 facilities in the following regions:

| Region | Number of Facilities |
| ------ | -------------------- |
| North America | 26 |
| Europe | 12 |
| Latin America | 6 |
| Asia Pacific | 18 |

Its largest facilities are located in Cambridge, Massachusetts; Chicago, Illinois; Slough, England; Epernon, France; and Singapore. Because of the nature of its products, Performance Chemicals requires a greater number of facilities to service its customers than Davison. Also, these facilities are generally smaller and less capital intensive than Davison's facilities.

## ITEM 3. LEGAL PROCEEDINGS

Asbestos Litigation. Grace is a defendant in property damage and bodily injury lawsuits relating to previously sold asbestos-containing products. In most of the bodily injury lawsuits, Grace is one of many defendants. As a result of the Chapter 11 filing, all asbestos-related litigation has been stayed and no party may commence any new proceedings against Grace.

Grace was a defendant in 65,656 asbestos-related lawsuits on April 2, 2001, the date of Grace's Chapter 11 filing. Seventeen of such lawsuits involve claims for property damage, nine relating to Grace's former Zonolite attic insulation ("ZAI") product (one of which has since been dismissed) and eight relating to a number of former asbestos-containing products (two of which also involve ZAI). The remainder of such lawsuits involve 129,191 claims for bodily injury.

The plaintiffs in property damage lawsuits generally seek to have the defendants pay the cost of removing, containing or repairing the asbestos-containing materials in the affected buildings. Cumulatively through April 2, 2001, 140 asbestos property damage cases were dismissed without payment of any damages or settlement amounts; judgments were entered in favor of Grace in nine cases (excluding cases settled following appeals of judgments in favor of Grace); judgments were entered in favor of the plaintiffs in eight cases for a total of $86.1 million (one of which is on appeal); and 207 property damage cases were settled for a total of $696.8 million.

In February 2000 a purported class action lawsuit was filed in the U.S. District Court for the Eastern District of Massachusetts against the Company (Lindholm v. W. R. Grace & Co.) on behalf of all owners of homes containing ZAI, a product formerly sold by Grace that may contain trace amounts of asbestos. The action seeks damages and equitable relief, including the removal, replacement and/or disposal of all such insulation. After Lindholm was filed, nine additional purported class action ZAI lawsuits were initiated

11

CC-BLG002635

against Grace prior to the Chapter 11 filing. The nine lawsuits were filed in various state and federal courts asserting similar claims and seeking damages similar to those in Lindholm. One of the purported federal class actions has been consolidated with Lindholm. As a result of the Chapter 11 filing, all of these cases have been transferred to the U.S. Bankruptcy Court for the District of Delaware.

The plaintiffs in the ZAI lawsuits assert that this product is in millions of homes throughout the U.S. and that the cost of removal could be several thousand dollars per home. Based on Grace's investigation of the claims described in these lawsuits, and testing and analysis of this product by Grace and others, Grace believes that the product was and continues to be safe for its intended purpose and poses little or no threat to human health. In July 2002, the Bankruptcy Court approved special counsel to represent the ZAI claimants, at Grace's expense, in a proceeding to determine certain threshold scientific issues regarding ZAI. The parties have completed discovery with respect to these threshold issues and have filed motions asking the Bankruptcy Court to resolve a number of important legal and factual issues regarding the ZAI claims. Grace expects the Bankruptcy Court to establish a schedule for determining the pending motions following the next status conference in May 2004. At this time, Grace is not able to assess the extent of any possible liability related to this matter.

As part of the Chapter 11 process, the Bankruptcy Court established a bar date of March 31, 2003 for submission of asbestos-related property damage claims. (The bar date did not apply to asbestos-related bodily injury claims or claims related to ZAI.) Approximately 4,000 additional property damage claims were filed prior to the bar date. Grace has analyzed the information provided by the claimants and has attempted to assess the validity and potential liability related to these claims. Approximately 170 claims failed to provide sufficient information to permit an evaluation. With respect to the remainder of such claims, based on its experience in valuing property damage claims, Grace estimates the cost to resolve such claims to be $30 million. This estimate is subject to change based on the receipt of additional information or other developments in the Chapter 11 proceeding.

Cumulatively through April 2, 2001, 16,354 bodily injury lawsuits involving 35,720 claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved), and 55,489 lawsuits involving 163,698 claims were disposed of for a total of $645.6 million.

Based on Grace's experience and analysis of trends in asbestos bodily injury litigation, Grace has endeavored to project the number and ultimate cost of all present and future bodily injury claims expected to be asserted, based on actuarial principles, and to measure probable and estimable liabilities under generally accepted accounting principles. Grace has accrued $992 million at December 31, 2003 as its estimate of the cost to resolve all asbestos-related bodily injury cases and claims pending as well as those expected to be filed in the future, and all pending property damage cases (including the additional claims filed prior to the bar date described above) for which sufficient information is available to form a reasonable estimate of the cost of resolution. This estimate has been made based on historical facts and circumstances prior to April 2, 2001. Grace does not expect to adjust this estimate (other than for normal costs of continuing claims administration) unless developments in the Chapter 11 proceeding provide a reasonable basis for a revised estimate. Grace intends to use the Chapter 11 process to determine the validity and ultimate amount of its aggregate liability for asbestos-related claims. Due to the uncertainties of asbestos-related litigation and the Chapter 11 process, Grace's ultimate liability could differ materially from the recorded liability.

Grace previously purchased insurance policies under which Grace claims coverage for its asbestos-related lawsuits and claims. Grace has settled with and has been paid by all of its primary insurance carriers with respect to both property damage and bodily injury cases and claims. Grace has also settled with its excess insurance carriers that wrote policies available for property damage cases; those settlements involve amounts paid and to be paid to Grace. Grace believes that certain of these settlements may cover attic

12

CC-BLG002636

insulation claims as well as other property damage claims. In addition, Grace believes that additional coverage for attic insulation claims may exist under excess insurance policies not subject to settlement agreements. Grace has settled with excess insurance carriers that wrote policies available for bodily injury claims in layers of insurance that Grace believes may be reached based on its current estimates. Insurance coverage for asbestos-related liabilities has not been commercially available since 1985.

Pursuant to settlements with primary-level and excess-level insurance carriers with respect to asbestos-related claims, Grace received payments totaling $1.054 billion prior to 2001, as well as payments totaling $78.8 million in 2001, $10.8 million in 2002, and $13.2 million in 2003. Under certain settlements, Grace expects to receive additional amounts from insurance carriers in the future and has recorded a receivable of $269.4 million to reflect the amounts expected to be recovered in the future, based on projected payments equal to the amount of the recorded asbestos-related liability.

During 2000, the number of bodily injury claims made against Grace increased significantly compared with 1999 and prior year claim levels, with a total of 48,786 bodily injury claims being received in 2000, versus 26,941 claims in 1999. This trend continued in the first quarter of 2001, when Grace received 16,411 bodily injury claims. Also, costs to resolve asbestos litigation were higher than expected for bodily injury and certain property damage claims. In addition, five significant codefendant companies in bodily injury litigation had petitioned for reorganization under Chapter 11. These developments and events caused an environment that increased the risk of more claims being filed against Grace than previously projected, with higher settlement demands and trial risks. These developments and events also raised substantial doubt whether Grace would be able to manage its asbestos liabilities over the long term under the existing state court system. As a result, following a thorough review of the strategic and operating issues associated with continuing to defend asbestos litigation through the court system versus voluntarily seeking a resolution of such litigation through reorganization under Chapter 11, Grace filed for protection under Chapter 11 on April 2, 2001.

Since its Chapter 11 filing, Grace is aware that asbestos bodily injury lawsuits have continued to be filed against co-defendant companies, and at higher than historical rates. As asbestos bodily injury claims are typically filed against numerous defendants, Grace believes that had it not filed for Chapter 11 reorganization, it likely would have received thousands more claims than it had previously projected.

See Item 1 of this Report and Notes 1, 2 and 3 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for additional information.

Environmental Proceedings. Libby, Montana and Vermiculite-Related Remediation From the 1920's until 1990, Grace and previous owners conducted vermiculite mining and related activities near Libby, Montana. The vermiculite ore that was mined contained varying amounts of asbestos as an impurity, almost all of which was removed during processing. Expanded vermiculite from Libby was used in products such as fireproofing, insulation and potting soil. In November 1999, Region 8 of the U.S. Environmental Protection Agency ("EPA") began an investigation into alleged excessive levels of asbestos-related disease in the Libby population related to these former mining activities. This investigation led the EPA to undertake additional investigative activity and to carry out response actions in and around Libby. On March 30, 2001, the EPA filed a lawsuit in U.S. District Court for the District of Montana, Missoula Division (United States v. W. R. Grace & Company et al.) under the Comprehensive Environmental Response, Compensation and Liability Act for the recovery of costs allegedly incurred by the United States in response to the release or threatened release of asbestos in the Libby, Montana area relating to such former mining activities. These costs include cleaning and/or demolition of alleged contaminated buildings, the excavation and removal of alleged contaminated soil, health screening of Libby residents and former mine workers, and investigation and

13

CC-BLG002637

monitoring costs. In this action, the EPA also sought a declaration of Grace's liability that would be binding in future actions to recover further response costs.

In connection with its defense, Grace conducted its own investigation to determine whether the EPA's actions and cost claims were justified and reasonable. However, in December 2002, the District Court granted the United States' motion for partial summary judgment on a number of issues that limited Grace's ability to challenge the EPA's response actions. In January 2003, a trial was held on the remainder of the issues, which primarily involved the reasonableness and adequacy of documentation of the EPA's cost recovery claims through December 31, 2001. On August 28, 2003, the District Court issued a ruling in favor of the United States that requires Grace to reimburse the government for $54.5 million in costs expended through December 2001, and for all appropriate future costs to complete the cleanup. Grace has appealed the court's ruling.

In October 2000, a purported class action lawsuit was filed in the U.S. District Court for Minnesota, 4th Division (Chase v. W. R. Grace & Co.-Conn.) alleging loss of property values of residents in the vicinity of a former Grace plant in Minneapolis, which processed vermiculite from the Libby mine. This case has been stayed as a result of Grace's Chapter 11 filing. The EPA has commenced and is continuing a program for removing suspected vermiculite processing by-products from the yards and driveways of houses near the former plant. The EPA has reviewed 1,648 residential properties and targeted 269 for cleanup. Of the 269 properties, the EPA has taken action at 252, and has not obtained access to the remaining 17. As of December 31, 2003, the EPA had spent $3.4 million on residential cleanup actions. While Grace has not completed its investigation of the claims in Chase, Grace has no reason to believe that it will incur material liability in addition to the amount of the EPA's remediation costs. The EPA also has remediated industrial property in the area, including the former vermiculite expanding plant, at a cost of $650,000. The EPA has submitted a claim for $7.9 million for the past and projected future costs (including indirect costs) of remediation of the residential and industrial properties at or around the former plant site.

The EPA also has compiled for investigation a list of 245 facilities that at one time used, stored, or processed concentrate that originated from the Libby vermiculite mine. Included in this list are 50 vermiculite expansion plants currently or formerly operated by Grace. The EPA has listed 17 of these 50 sites as requiring additional action. Grace has conducted corrective actions or investigations at six of these sites. The EPA has filed claims for 10 of these sites (exclusive of Libby, Montana) in the amount of $16 million. In addition, another governmental agency has commenced a separate investigation at 28 of the 245 facilities, 22 of which are currently or were formerly operated by Grace. Grace does not have sufficient information to determine whether this separate investigation is likely to result in any additional liability.

As a result of the ruling by the District Court in Montana, and Grace's evaluation of probable remediation costs at vermiculite processing sites, Grace estimates its total liability for vermiculite-related remediation at $181 million. Grace's estimate of expected costs is based on public comments regarding the EPA's spending plans, discussions of spending forecasts with EPA representatives, and analysis of other information made available from the EPA. However, the EPA's cost estimates have changed regularly and increased substantially over the course of its cleanup. Consequently, Grace's estimate may change materially as more information becomes available. Any such additional information could have a material effect on Grace's liability for this matter and on its Consolidated Financial Statements. Any payments to the EPA would be subject to the outcome of the Chapter 11 proceedings.

Libby Private Property Owners' Lawsuit. In February 2000, a purported class action lawsuit was filed in the U.S. District Court for Montana, Missoula Division (Tennison, et al. v. W. R. Grace & Co., et al.) against Grace on behalf of all owners of improved private real property situated within 12 miles of Libby, Montana. The action alleges that the class members have suffered harm in the form of environmental contamination and loss of property rights resulting from Grace's former vermiculite mining and processing

14

CC-BLG002638

operations. The complaint seeks remediation, property damages and punitive damages. This case has been stayed as a result of Grace's Chapter 11 filing. However, as described above, the EPA has been conducting remediation activities in and around Libby, which includes the remediation of private real property. While Grace has not completed its investigation of the claims in Tennison, Grace has no reason to believe that it will incur material liability in addition to the amount of the EPA's recoverable costs for cleanup activities around Libby.

Proceedings in which Grace is a Potentially Responsible Party. Grace (together, in most cases, with many other companies) has been designated a "potentially responsible party" ("PRP") by the EPA with respect to paying the costs of investigating and remediating pollution at various sites. At year-end 2003, proceedings were pending with respect to approximately 30 sites as to which Grace has been designated a PRP by the EPA. U.S. law provides that all PRPs for a site may be held jointly and severally liable for the costs of investigating and remediating the site. Grace is also conducting investigatory and remediation activities at sites under the jurisdiction of state and/or local authorities. During the Chapter 11 proceeding, Grace does not expect to participate (except in a limited number of special cases) in the joint funding of investigation and remediation at non-owned sites where it is a PRP. Grace's expected liability with respect to these sites is included in an aggregate $151 million liability for environmental remediation (excluding liability related to Grace's former vermiculite mining and processing activities as described above); however, Grace's ultimate liability with respect to many of such sites will be determined as part of its Chapter 11 proceeding.

Other Proceedings. Grace is also a party to additional proceedings involving U.S. federal, state and/or local government agencies and private parties regarding Grace's compliance with environmental laws and regulations. These proceedings are not expected to result in significant sanctions or in any material liability. However, Grace may incur material liability in connection with future actions of governmental agencies or private parties relating to past or future practices of Grace with respect to the generation, storage, handling, discharge, disposition or stewardship of hazardous wastes and other materials.

Determination of Other Environmental Liabilities. Based on its analysis of environmental-related claims submitted prior to the March 31, 2003 bar date and other available information, Grace increased its aggregate estimated liability for environmental remediation, other than remediation related to its former vermiculite mining and processing operations (discussed above), by $20 million in the fourth quarter of 2003 to an estimated aggregate liability of $151 million. These environmental liabilities are reassessed whenever circumstances become better defined or remediation efforts and their costs can be better estimated. These liabilities are evaluated quarterly, based on currently available information, including the progress of remedial investigation at each site, the current status of discussions with regulatory authorities regarding the method and extent of remediation at each site, existing technology, prior experience in contaminated site remediation and the apportionment of costs among potentially responsible parties. The estimated aggregate liability could change materially as additional information becomes available or circumstances change. Grace does not have sufficient information to determine how the funding of environmental remediation activities will be affected by the Chapter 11 proceedings.

Environmental Insurance Litigation. Grace is a party to three pending environmental insurance coverage actions. The first is styled Maryland Casualty Co. v. W. R. Grace & Co. (filed in 1988). This litigation involves Grace's coverage claims against a primary-level carrier, Continental Casualty Company, for environmental property damage. In 2001, Grace appealed certain rulings by the U.S. District Court for the Southern District of New York. In June 2003, the U.S. District Court of Appeals for the Second Circuit affirmed certain rulings dismissing Grace's claims for coverage of defense costs under certain policy years, but vacated the District Court's ruling dismissing coverage for defense costs under the last policy year at issue. The case was remanded to the District Court for further proceedings. A trial on the remaining issues has been scheduled for the fourth quarter of 2004. The second case, entitled Uniguard v. W. R. Grace, was filed in 1997 in the U.S. District Court for the Southern District of New York. This declaratory judgment

15

CC-BLG002639

action seeks a determination concerning the liability of one excess carrier for bodily injury claims as a result of environmental contamination. This case has been stayed as a result of Grace's Chapter 11 filing. In June 2000, a separate lawsuit was filed in the U.S. District Court for the Southern District of New York against Grace by one of its former primary insurance carriers seeking coverage determinations regarding 45 claims (Continental Casualty Company v. W. R. Grace & Co. and W. R. Grace & Co.-Conn.). Most of these claims involve alleged environmental property damage at sites once owned and operated by Grace or at waste sites that allegedly received waste materials from plants operated by Grace, including Grace's claims for coverage regarding certain claims involving its former vermiculite mining and processing operations. This case has been stayed as a result of Grace's Chapter 11 filing. The outcome of these cases, as well as the amounts of any recoveries that Grace may receive in connection therewith, is presently uncertain.

For further information, see "Environmental, Health and Safety Matters" under Item 1 above, Note 14 to Grace's Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement.

Litigation Related to Former Packaging and Medical Care Businesses. In September 2000, Grace was named in a purported class action suit filed in California Superior Court for the County of San Francisco alleging that the 1996 reorganization involving a predecessor of Grace and Fresenius Medical Care Holdings, Inc. and the 1998 reorganization involving a predecessor of Grace and Sealed Air Corporation were fraudulent transfers (Abner, et al., v. W. R. Grace & Co., et al.). The suit is alleged to have been brought on behalf of all individuals who then had lawsuits on file asserting personal injury or wrongful death claims against any of the defendants. Since Abner, and prior to the Chapter 11 filing, two other similar class actions were filed. These lawsuits have been stayed as a result of Grace's Chapter 11 filing.

The Bankruptcy Court authorized the Official Committee of Asbestos Personal Injury Claimants and the Official Committee of Asbestos Property Damage Claimants to proceed with claims against Sealed Air and Fresenius on behalf of Grace's estate. On November 29, 2002, Sealed Air and Fresenius each announced that they had reached agreements in principle with such Committees to settle asbestos and fraudulent conveyance claims related to such transactions. Under the terms of the Fresenius settlement, as subsequently revised and subject to certain conditions, Fresenius would contribute $115.0 million to the Grace estate as directed by the Bankruptcy Court upon confirmation of Grace's plan of reorganization. In July 2003, the Fresenius settlement was approved by the Bankruptcy Court. Under the terms of the proposed Sealed Air settlement, Sealed Air would make a payment of $512.5 million (plus interest at 5.5% per annum, commencing on December 21, 2002) and nine million shares of Sealed Air common stock, valued at $487 million as of December 31, 2003, as directed by the Bankruptcy Court upon confirmation of Grace's plan of reorganization. The Sealed Air settlement has not been agreed to by Grace and remains subject to the approval of the Bankruptcy Court and the fulfillment of specified conditions. Upon the effectiveness of these settlements the Abner and all similar actions will be dismissed. Grace is unable to predict how these settlements may ultimately affect its plan of reorganization.

Tax Claims. Grace has received the examination report from the Internal Revenue Service (the "IRS") for tax periods 1993 through 1996 asserting, in the aggregate, approximately $114.0 million of proposed tax adjustments, including accrued interest. The most significant contested issue addressed in such report concerns corporate-owned life insurance ("COLI") policies and is discussed below. Other proposed IRS tax adjustments include Grace's tax position regarding research and development credits, the reporting of certain divestitures and other miscellaneous proposed adjustments. The tax audit for the 1993 through 1996 tax period was under the jurisdiction of the IRS Office of Appeals ("IRS Appeals"), where Grace filed a protest. IRS Appeals has returned the audit to the examination team for further review of the proposed adjustments as well as several affirmative tax claims raised by Grace. Grace's federal tax returns covering periods 1997 and forward are either under examination by the IRS or open for future examination. In addition, Grace will be required to report the additional taxable income (and the related accrued interest)

16

CC-BLG002640

resulting from IRS adjustments to state and local tax jurisdictions upon resolution of the Federal tax audit. Grace believes that the impact of probable tax return adjustments are adequately recognized as liabilities at December 31, 2003. Any cash payment would be subject to Grace's Chapter 11 proceedings.

In 1988 and 1990, Grace acquired COLI policies on the lives of certain of its employees as part of a strategy to fund the cost of postretirement employee health care benefits and other long-term liabilities. COLI premiums have been funded in part by loans issued against the cash surrender value of the COLI policies. The IRS is challenging deductions of interest on loans secured by COLI policies for years prior to 1999. In 2000, Grace paid $21.2 million of tax and interest related to this issue for tax years 1990 through 1992. Subsequent to 1992, Grace deducted approximately $163.2 million in interest attributable to COLI policy loans. Although Grace continues to believe that the deductions were legitimate, the IRS has successfully challenged interest deductions claimed by other corporations with respect to broad-based COLI policies in three out of four litigated cases. Given the level of IRS success in COLI cases, Grace requested and was granted early referral to the IRS Office of Appeals for consideration of possible settlement alternatives of the COLI interest deduction issue.

On September 23, 2002, Grace filed a motion in its Chapter 11 proceeding requesting that the Bankruptcy Court authorize Grace to enter into a settlement agreement with the IRS with respect to Grace's COLI interest deductions. The tax years at issue are 1989 through 1998. Under the terms of the proposed settlement, the government would allow 20% of the aggregate amount of the COLI interest deductions and Grace would owe federal income tax and interest on the remaining 80%. Grace has accrued for the potential tax and interest liability related to the disallowance of all COLI interest deductions and continues to accrue interest as part of its quarterly income tax provision. On October 22, 2002, the Bankruptcy Court issued an order authorizing Grace to enter into settlement discussions with the IRS consistent with the aforementioned terms and further ordered that any final agreement would be subject to Bankruptcy Court approval. Grace is currently in negotiations with the IRS concerning the proposed settlement, and the possible termination of the COLI policies.

The IRS has assessed additional federal income tax withholding and Federal Insurance Contributions Act taxes plus interest and related penalties for calendar years 1993 through 1995 against a Grace subsidiary that formerly operated a temporary staffing business for nurses and other health care personnel. The assessments, aggregating $21.8 million, were made in connection with a meal and incidental expense per diem plan for traveling health care personnel, which was in effect through 1999, the year in which Grace sold the business. The IRS contends that certain per diem reimbursements should have been treated as wages subject to employment taxes and federal income tax withholding. Grace contends that its per diem and expense allowance plans were in accordance with statutory and regulatory requirements, as well as other published guidance from the IRS. The IRS has issued additional assessments aggregating $40.1 million for the 1996 through 1998 tax periods. The statute of limitations has expired with respect to the 1999 tax year. Grace has a right to indemnification for approximately 36% of any tax liability (including interest thereon) for the period from July 1996 through December 1998 from its former partner in the business. The matter is currently pending in the United States Court of Claims. Grace is currently in discussions with the Department of Justice concerning possible settlement options.

Other Claims Received Prior to the Bar Date. The Bankruptcy Court established a bar date of March 31, 2003 for claims of general unsecured creditors, asbestos-related property damage claims and medical monitoring claims related to asbestos. The bar date did not apply to asbestos-related bodily injury claims or claims related to ZAI, which will be dealt with separately. Approximately 15,000 proofs of claim were filed by the bar date. Of these claims, approximately 10,000 were non-asbestos related, approximately 4,000 were for asbestos-related property damage (discussed above), and approximately 1,000 were for medical monitoring. In addition, approximately 400 proofs of claim have been filed after the bar date.

17

CC-BLG002641

The medical monitoring claims were made by individuals due to alleged exposure to asbestos through Grace's products or operations. These claims, if sustained, would require Grace to fund ongoing health monitoring costs for qualified claimants. Based on the number and expected value of such claims, Grace does not believe such claims will have a material effect on its Consolidated Financial Statements.

Approximately 7,000 of the 10,000 non-asbestos related claims involve claims by employees or former employees for future retirement benefits such as pension and retiree medical coverage. Grace views certain of these claims as contingent and does not plan to address them until a later date in the Chapter 11 proceeding. In addition to claims for environmental remediation or indemnification (discussed above), the remaining non-asbestos related claims include claims for payment for goods and services; taxes; product warranties; principal plus interest under pre-petition credit facilities; amounts due under leases; leases and other executory contracts rejected in the Bankruptcy Court; indemnification or contribution from actual or potential co-defendants in asbestos-related and other litigation; pending non-asbestos related litigation; and non-asbestos related personal injury.

Grace's initial analysis indicated that many claims are duplicates, represent the same claim filed against more than one of the debtors, lack any supporting documentation, or provide insufficient supporting documentation. As of December 31, 2003, Grace had filed with the Bankruptcy Court approximately 1,100 objections with respect to such claims, most of which were non-substantive (duplicates, no supporting documentation, late filed claims, etc.). As of December 31, 2003, orders had been entered expunging 890 claims, and 177 of the objections had been withdrawn on the basis of responses received from the claimants. Grace expects to file a substantial number of additional objections, most of which will be substantive, as analysis and evaluation of the claims progresses.

At this time, Grace believes that its recorded liabilities are sufficient to cover the remaining types of claims. However, because of the uncertainties of the Chapter 11 and litigation process, the in-progress state of Grace's investigation of submitted claims, and the lack of documentation submitted in support of many claims, the amounts required to satisfy all such claims may exceed such recorded liabilities. As claims are resolved, Grace will make adjustments to the liabilities recorded on its financial statements as appropriate. Any such adjustments could be material to its consolidated financial position and results of operations.

## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

This Item is inapplicable, as no matters were submitted to a vote of the Company's security holders during the fourth quarter of 2003.

### PART II

## ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED SHAREHOLDER MATTERS.

Except as provided below, the information called for by this Item appears in the Financial Supplement under the heading "Financial Summary" opposite the caption "Other Statistics - Common shareholders of record" (page F-35); under the heading "Quarterly Summary and Statistical Information - Unaudited" opposite the caption "Market price of common stock" (page F-34); and in Note 15 to the Consolidated Financial Statements (page F-27).

On March 31, 1998, the Company paid a dividend of one Preferred Stock Purchase Right ("Right") on each share of the Company's Common Stock. Subject to prior redemption by the Company for $.01 per Right, Rights will become exercisable on the earlier of (a) 10 days after a person or group ("Acquiring Person") has acquired beneficial ownership of 20% or more of the outstanding Common Stock or (b) 10

18

CC-BLG002642

business days (or a later date fixed by the Company's Board of Directors) after an Acquiring Person commences (or announces the intention to commence) a tender offer or exchange offer for beneficial ownership of 20% or more of the Common Stock. Until such events occur, the Rights will automatically trade with the Common Stock, and separate certificates for the Rights will not be distributed. The Rights do not have voting or dividend rights.

Generally, each Right not owned by an Acquiring Person (i) will initially entitle the holder to buy from the Company one hundredth of a share of the Company's Junior Participating Preferred Stock ("Junior Preferred Stock"), for $100, subject to adjustment ("exercise price"); (ii) will entitle such holder to receive upon exercise, in lieu of shares of Junior Preferred Stock, that number of shares of Common Stock having a market value of two times the exercise price of the Right; and (iii) may be exchanged by the Company for one share of Common Stock or one hundredth of a share of Junior Preferred Stock, subject to adjustment. Generally, if there is an Acquiring Person and the Company is acquired, each Right not owned by an Acquiring Person will entitle the holder to buy a number of shares of common stock of the acquiring company having a market value equal to twice the exercise price of the Right.

Each share of Junior Preferred Stock will be entitled to a minimum preferential quarterly dividend payment of $1.00 per share but will be entitled to an aggregate dividend equal to 100 times the dividend declared per share of Common Stock whenever such dividend is declared. In the event of liquidation, holders of Junior Preferred Stock will be entitled to a minimum preferential liquidation payment of $100 per share but will be entitled to an aggregate payment equal to 100 times the payment made per share of Common Stock. Each share of Junior Preferred Stock will have 100 votes, voting together with the Common Stock. Finally, in the event of any business combination, each share of Junior Preferred Stock will be entitled to receive an amount equal to 100 times the amount received per share of Common Stock. These rights are protected by customary antidilution provisions.

The terms of the Rights may be amended by the Company's Board of Directors without the consent of the holders of the Rights. The Rights are currently scheduled to expire on March 31, 2008. As a result of Grace's Chapter 11 filing, the rights could be modified in a plan of reorganization.

This summary of the Rights does not purport to be complete and is qualified in its entirety by reference to the Rights Agreement, which was filed as Exhibit 4.1 to the Company's Form 8-K filed on April 8, 1998.

## ITEM 6. SELECTED FINANCIAL DATA

The information called for by this Item appears under the heading "Financial Summary" (page F-35 of the Financial Supplement) and in Notes 1, 2, 3, 4, 10, 13 and 14 to the Consolidated Financial Statements (pages F-10 through F-20, and F-22 through F-27 of the Financial Supplement), which is incorporated herein by reference. In addition, Exhibit 12 to this Report (page F-50) of the Financial Supplement) contains the ratio of earnings to fixed charges and combined fixed charges and preferred stock dividends for Grace for the years 1999-2003.

## ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF RESULTS OF OPERATIONS AND FINANCIAL CONDITION

The information called for by this Item appears on pages F-36 to F-48 of the Financial Supplement, which is incorporated herein by reference.

CC-BLG002643

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

The information called for by this Item appears in Notes 12 and 13 to the Consolidated Financial Statements (pages F-23 and F-24 of the Financial Supplement), which is incorporated herein by reference.

## ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

See the Index to Consolidated Financial Statements and Financial Statement Schedule and Exhibit on page F-2 of the Financial Supplement, which is incorporated herein by reference.

## ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

This Item is inapplicable, as no such changes or disagreements have occurred.

## ITEM 9A. CONTROLS AND PROCEDURES

The information called for by this Item appears under the heading "Report on Internal Controls and Procedures" on page F-51 of the Financial Supplement, which is incorporated herein by reference.

## PART III

## ITEM 10. DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

The Company's current directors and executive officers are listed below. The Company's Certificate of Incorporation provides for the division of the Board of Directors into three classes, each to serve for a three-year term or until their respective successors are elected. In view of the Chapter 11 filing, the directors are expected to continue to serve beyond the expiration of their respective current terms. Executive officers are elected to serve until the next annual meeting of the Company's Board of Directors or until their respective successors are elected. Each of the directors, other than the Chief Executive Officer, meets the independence standards of the New York Stock Exchange.

| Name and Age | Office | First Elected |
|---|---|---|
| John F. Akers (69) | Class II Director | 05/09/97 |
| H. Furlong Baldwin (72) | Class I Director | 01/16/02 |
| Ronald C. Cambre (65) | Class III Director | 09/01/98 |
| Marye Anne Fox (56) | Class I Director | 05/10/96 |
| John J. Murphy (72) | Class II Director | 05/09/97 |
| Paul J. Norris (56) | Class III Director (Chairman)<br>Chief Executive Officer | 01/01/99<br>11/01/98 |

20

CC-BLG002644

| Name and Age | Office | First Elected |
| --- | --- | --- |
| Thomas A. Vanderslice (72) | Class I Director and Lead Director | 05/10/96 |
| Robert J. Bettacchi (61) | Senior Vice President | 04/01/97 |
| William M. Corcoran (54) | Vice President | 05/11/99 |
| Alfred E. Festa (44) | President and Chief Operating Officer | 11/17/03 |
| W. Brian McGowan (54) | Senior Vice President | 12/06/90* |
| David B. Siegel (54) | Senior Vice President, General Counsel and Chief Restructuring Officer | 09/01/98* |
| Robert M. Tarola (53) | Senior Vice President and Chief Financial Officer | 05/11/99 |

* Designated an Executive Officer on July 9, 1998

Mr. Akers served as Chairman of the Board and Chief Executive Officer of International Business Machines Corporation from 1985 until his retirement in 1993. He is also a director of Hallmark Cards, Inc., Lehman Brothers Holdings, Inc., The New York Times Company and PepsiCo, Inc.

Mr. Baldwin served as a director of Mercantile Bankshares Corporation from 1970 to 2003, and as Chairman of the Board from 1984 to 2003. From 1976 to 2001 he served as President and Chief Executive Officer. Mr. Baldwin is a Co-Chairman of NASDAQ Stock Market, Inc., and also a director of Platinum Underwriters Holdings, Ltd. and Allegheny Energy Inc.

Mr. Cambre is retired Chairman of the Board and CEO of Newmont Mining Corporation. He joined Newmont as Vice Chairman and CEO in 1993 and retired as CEO in 2000 and as Chairman in 2001. He is also a director of Cleveland-Cliffs Inc., McDermott International, Inc. and Inco Limited.

Dr. Fox is Chancellor of North Carolina State University and University Distinguished Professor of Chemistry at that institution. She is also a director of Boston Scientific Corporation, Red Hat, Inc. and Pharmaceutical Product Development, Inc.

Mr. Murphy served as Chairman of the Board of Dresser Industries, Inc., a supplier of products and technical services to the energy industry, until 1996. From 1997 to 2000, he was a Managing Director of SMG Management L.L.C., a privately owned investment group. Mr. Murphy is also a director of CARBO Ceramics, Inc. and ShawCor Ltd.

Mr. Norris has been actively engaged in Grace's business for the past five years. He is also a director of Borden Chemical, Inc. In addition, he performs advisory services for Kolberg, Kravis Roberts & Co., the principal shareholder of Borden.

Mr. Vanderslice served as Chairman and Chief Executive Officer of M/A-COM, Inc., a designer and manufacturer of radio frequency and microwave components, devices and subsystems for commercial and defense applications, from 1989 until his retirement in 1995. He is also a director of ChevronTexaco Corporation. As lead director of Grace's Board, he presides at all executive sessions.

21

CC-BLG002645

Messrs. Bettacchi, McGowan and Siegel have been actively engaged in Grace's business for the past five years.

Mr. Corcoran previously served as Vice President of Business and Regulatory Affairs for AlliedSignal Incorporated's (now Honeywell International Inc.) specialty chemicals business from 1997 until he joined Grace.

Mr. Festa joined Grace from Morganthaler Private Equity Partners, a venture capital and buyout firm, where he was a partner. From 2000 to 2002, he was with ICG Commerce, Inc., a private company providing on-line procurement services, where he last served as President and Chief Executive Officer. For two years prior to that, he served as Vice President and General Manager of AlliedSignal's performance fibers business.

Mr. Tarola joined Grace from MedStar Health, Inc., where he had served as Senior Vice President and Chief Financial Officer from 1998 until May 1999. He previously served in a similar capacity with Helix Health, Inc. for two years. From 1974 until 1996, Mr. Tarola was an employee and partner of Price Waterhouse LLP.

Audit Committee. The Company has a standing Audit Committee established in accordance with SEC rules. The Committee members are John F. Akers, H. Furlong Baldwin, Ronald C. Cambre, Marye Anne Fox, John J. Murphy, and Thomas A. Vanderslice, each of whom meet the independence standards of the SEC and New York Stock Exchange. The Board of Directors of the Company has determined that all Committee members are audit committee financial experts as defined by SEC regulations.

Compliance with Section 16(a) of the Securities Exchange Act. Under Section 16 of the Securities Exchange Act of 1934, the Company's directors, certain of its officers, and beneficial owners of more than 10% of the outstanding Common Stock are required to file reports with the SEC and the New York Stock Exchange concerning their ownership of and transactions in Common Stock or other securities of the Company; such persons are also required to furnish the Company with copies of such reports. Based upon the reports and related information furnished to the Company, the Company believes that all such filing requirements were complied with in a timely manner during and with respect to 2003, except that Mr. Tarola filed a Form 4 Report on March 5, 2003 that was due on February 12, 2003. This transaction involved an inadvertent transfer of 50 shares of Grace common stock (having a value of $130.50) in connection with a rebalancing of Mr. Tarola's 401(k) savings plan portfolio.

Code of Ethics for Principal Officers. The Board of Directors of the Company and its Audit Committee have adopted revised Business Ethics and Conflicts of Interest policies, which apply to all of the Company's directors, officers, and employees, including the Company's principal officers. These policies are accessible through the Company's Internet website, www.grace.com under the "Corporate Governance" heading, and are available in hard copy upon request. The Company granted no waivers to these policies during 2003. Any amendments or waivers to these policies affecting any principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions for the Company will be promptly posted on the website.

## ITEM 11. EXECUTIVE COMPENSATION

Summary Compensation Table. The following Summary Compensation Table contains information concerning the compensation of (a) Paul J. Norris, Chief Executive Officer; and (b) the other four most highly compensated executive officers of Grace who were serving as such at year-end 2003. Certain information has been omitted from the Summary Compensation Table because it is not applicable or because it is not required under the rules of the SEC.

22

CC-BLG002646

| Name and Principal Position | Year | Salary | Bonus | Other Annual Compensation | Awards No. of Shares Underlying Options Granted | Payouts LTIP Payouts | All Other Compensation (a) |
|---|---|---|---|---|---|---|---|
| P. J. Norris | 2003 | $1,000,000 | $1,000,000 | --- | --- | --- | $1,349,800 |
| Chairman and Chief Executive | 2002 | 958,333 | 1,010,000 | --- | --- | --- | 587,808 |
| Officer | 2001 | 887,500 | 936,250 | --- | 121,000 | --- | 1,457,298 |
| R. J. Bettacchi | 2003 | 370,667 | 300,000 | --- | --- | --- | 279,663 |
| Senior Vice President | 2002 | 358,000 | 265,000 | --- | --- | --- | 30,597 |
| | 2001 | 345,340 | 275,000 | --- | 35,000 | --- | 366,346 |
| W. M. Corcoran | 2003 | 287,667 | 155,000 | --- | --- | --- | 213,143 |
| Vice President | 2002 | 277,667 | 155,000 | --- | --- | --- | 33,463 |
| | 2001 | 267,333 | 150,000 | --- | 12,300 | --- | 283,428 |
| D. B. Siegel | 2003 | 421,333 | 250,000 | --- | --- | --- | 338,497 |
| Senior Vice President and | 2002 | 408,000 | 265,000 | --- | --- | --- | 244,448 |
| General Counsel | 2001 | 370,000 | 240,000 | --- | 21,800 | --- | 627,915 |
| R. M. Tarola | 2003 | 398,667 | 245,000 | --- | ----- | --- | 298,163 |
| Senior Vice President and | 2002 | 388,000 | 250,000 | --- | ---- | --- | 33,147 |
| Chief Financial Officer | 2001 | 374,500 | 250,000 | --- | 27,900 | --- | 374,277 |

(a) The amounts in this column for 2003 consist of the following:

(i) retention payments made as follows: Mr. Norris -- $1,235,000; Mr. Bettacchi -- $240,933; Mr. Corcoran -- $186,983; Mr. Siegel -- $273,867; and Mr. Tarola -- $259,133; See "Retention Agreements" for a description of the retention arrangements entered into with the executive officers, and "Employment Agreements" for a description of Mr. Norris's retention arrangements;

(ii) payments made to persons whose personal and/or Company contributions to Grace's Salaried Employees Savings and Investment Plan ("Savings Plan") would be subject to limitations under federal income tax law, as follows: Mr. Norris -- $101,550; Mr. Bettacchi -- $25,980; Mr. Corcoran -- $13,660; Mr. Siegel -- $26,880; and Mr. Tarola -- $26,280;

(iii) Company contributions to the Savings Plan, as follows: Mr. Norris -- $12,000; Mr. Bettacchi -- $12,000; Mr. Corcoran -- $12,000; Mr. Siegel -- $12,000; and Mr. Tarola -- $12,000;

(iv) the value of Company-provided personal liability insurance, as follows: Mr. Norris -- $1,250; Mr. Bettacchi -- $750; Mr. Corcoran -- $500; Mr. Siegel -- $750; and Mr. Tarola -- $750; and

(v) for Mr. Siegel, $25,000 of forgiveness of indebtedness income under the terms of a relocation loan made in April 2002, the balance of which was $32,300 as of December 31, 2003.

Stock Options. Grace granted no stock options during 2003, and no previously granted options were exercised by the named individuals during 2003. The following table sets forth the value of unexercised "in-the-money" options held at December 31, 2003 (the difference between the aggregate purchase price of all such options held and the market value of the shares covered by such options at December 31, 2003).

23

CC-BLG002647

| Name | No. of Shares Underlying Unexercised Options at 12/31/03 Exercisable/Unexercisable | Value of Unexercised In-the-Money Options at 12/31/03 Exercisable/Unexercisable |
|------|---------------------------------------------------|---------------------------------------------------|
| P. J. Norris .......... | 1,124,692 / 40,334 | $18,553 / $9,277 |
| R. J. Bettacchi ........ | 533,938 / 11,667 | $5,367 / $2,683 |
| W. M. Corcoran ......... | 80,700 / 4,100 | $1,886 / $943 |
| D. B. Siegel .......... | 372,728 / 7,267 | $3,343 / $1,671 |
| R. M. Tarola .......... | 193,600 / 9,300 | $4,278 / $2,139 |

Long-Term Incentive Program. The Company's long-term incentive plans generally are designed to provide key employees with long-term incentives having a value at the 60th percentile of long-term incentives offered by specialty chemical companies of comparable size to Grace. In 2001, the Company's Board of Directors approved a Long-Term Incentive Plan for key employees ("2001 LTIP") for the 2001-2003 period. For each key employee, the targeted value of the 2001 LTIP award was split so that 50% of the value of the award was provided in the form of a stock option grant, and 50% was in the form of cash compensation, payable if the Company achieves certain pretax earnings targets over a three calendar year period. No payments will be made under the cash compensation portion of the 2001 LTIP.

In 2002, the Board and the Bankruptcy Court approved the 2002 LTIP for the 2002-2004 period. The 2002 LTIP operates in substantially the same manner as the 2001 LTIP, except that the targeted value of the 2002 LTIP award is payable 100% in cash, and the pretax earnings targets have been revised. If a key employee becomes entitled to cash compensation under the 2002 LTIP, then such compensation will generally be paid in two installments: one in the first quarter of 2004 (which will be a partial payment based on performance for the first two years of the applicable three-year period), and the other in the first quarter of 2005 (which will consider performance for the complete three-year period and will be offset by the amount of the prior installment). Generally, a key employee will forfeit his or her rights to receive an installment of cash compensation if, prior to the payment of the installment, the employee either voluntarily resigns from the Company or is terminated by the Company for cause.

In 2003, the Board and the Bankruptcy Court approved the 2003 LTIP for the 2003-2005 period. The 2003 LTIP operates in substantially the same manner as the 2002 LTIP, with revised pretax earnings targets. The following table sets forth threshold, targeted and maximum awards under the 2003 LTIP:

| Name | No. of Shares, Units Or Other Rights | Performance or Other Period Until Maturation or Payout | Estimated Future Payouts Under Non-Stock Price-Based Plans | | |
|------|---------------------------------------|--------------------------------------------------------|-----------------|-----------------|-----------------|
| | | | Threshold(a) | Target | Maximum |
| P. J. Norris | $1,452,000 | 2003-2005 | $0 or $24,248 | $1,452,000 | $2,904,000 |
| R. J. Bettacchi | 420,000 | 2003-2005 | $0 or $ 7,014 | 420,000 | 840,000 |
| W. M. Corcoran | 150,000 | 2003-2005 | $0 or $ 2,505 | 150,000 | 300,000 |
| D. B. Siegel | 335,000 | 2003-2005 | $0 or $ 5,595 | 335,000 | 670,000 |
| R. M. Tarola | 335,000 | 2003-2005 | $0 or $ 5,595 | 335,000 | 670,000 |

(a) No payment will be made unless the minimum targeted level of pretax earnings is achieved.

24

CC-BLG002648

Pension Arrangements. Full-time salaried employees who are 21 or older and who have one or more years of service are eligible to participate in the Retirement Plan for Salaried Employees. Under this basic retirement plan, pension benefits are based upon (a) the employee's average annual compensation for the 60 consecutive months in which his or her compensation is highest during the last 180 months of continuous participation, and (b) the number of years of the employee's credited service. For purposes of this basic retirement plan, compensation generally includes nondeferred base salary and annual incentive compensation (bonus) awards; however, for 2003, federal income tax law limited to $200,000 the annual compensation on which benefits under this plan may be based.

Grace also has a Supplemental Executive Retirement Plan under which a covered employee will receive the full pension to which he or she would be entitled in the absence of the limitations described above and other limitations imposed under federal income tax law. In addition, this supplemental plan recognizes deferred base salary, deferred annual incentive compensation awards and, in some cases, periods of employment during which an employee was ineligible to participate in the basic retirement plan. (Commencing in 2001, Grace no longer permits deferrals of base salary or incentive compensation.)

The following table shows the annual pensions payable under the basic and supplemental plans for different levels of compensation and years of credited service. The amounts shown have been computed on the assumption that the employee retired at age 65 on January 1, 2003, with benefits payable on a straight life annuity basis. Such amounts are subject to (but do not reflect) an offset of 1.25% of an estimate of the employee's primary Social Security benefit at retirement age for each year of credited service under the basic and supplemental plans.

| Highest Average Annual Compensation | Years of Credited Service | | | | | |
|---|---|---|---|---|---|---|
| | 10 Years | 15 Years | 20 Years | 25 Years | 30 Years | 35 Years |
| $100,000 | $15,000 | $22,500 | $30,000 | $37,500 | $45,000 | $52,500 |
| 200,000 | 30,000 | 45,000 | 60,000 | 75,000 | 90,000 | 105,000 |
| 300,000 | 45,000 | 67,500 | 90,000 | 112,500 | 135,000 | 157,500 |
| 400,000 | 60,000 | 90,000 | 120,000 | 150,000 | 180,000 | 210,000 |
| 500,000 | 75,000 | 112,500 | 150,000 | 187,500 | 225,000 | 262,500 |
| 600,000 | 90,000 | 135,000 | 180,000 | 225,000 | 270,000 | 315,000 |
| 700,000 | 105,000 | 157,500 | 210,000 | 262,500 | 315,000 | 367,500 |
| 800,000 | 120,000 | 180,000 | 240,000 | 300,000 | 360,000 | 420,000 |
| 900,000 | 135,000 | 202,500 | 270,000 | 337,500 | 405,000 | 472,500 |
| 1,000,000 | 150,000 | 225,000 | 300,000 | 375,000 | 450,000 | 525,000 |
| 1,100,000 | 165,000 | 247,500 | 330,000 | 412,500 | 495,000 | 577,500 |
| 1,200,000 | 180,000 | 270,000 | 360,000 | 450,000 | 540,000 | 630,000 |
| 1,300,000 | 195,000 | 292,500 | 390,000 | 487,500 | 585,000 | 682,500 |
| 1,400,000 | 210,000 | 315,000 | 420,000 | 525,000 | 630,000 | 735,000 |
| 1,500,000 | 225,000 | 337,500 | 450,000 | 562,500 | 675,000 | 787,500 |
| 1,600,000 | 240,000 | 360,000 | 480,000 | 600,000 | 720,000 | 840,000 |
| 1,700,000 | 255,000 | 382,500 | 510,000 | 637,500 | 765,000 | 892,500 |
| 1,800,000 | 270,000 | 405,000 | 540,000 | 675,000 | 810,000 | 945,000 |
| 1,900,000 | 285,000 | 427,500 | 570,000 | 712,500 | 855,000 | 997,500 |
| 2,000,000 | 300,000 | 450,000 | 600,000 | 750,000 | 900,000 | 1,050,000 |
| 2,100,000 | 315,000 | 472,500 | 630,000 | 787,500 | 945,000 | 1,102,500 |
| 2,200,000 | 330,000 | 495,000 | 660,000 | 825,000 | 990,000 | 1,155,000 |

25

CC-BLG002649

At December 31, 2003, Messrs. Norris, Bettacchi, Corcoran, Siegel and Tarola had 11.83, 32, 4.56, 26.75 and 4.56 years of credited service, respectively, under the basic and supplemental retirement plans. (Mr. Norris' years of credited service include his eligible service with Grace from 1975 to 1981.) For purposes of those plans, the 2003 compensation of such executive officers was as follows: Mr. Norris -- $2,010,000; Mr. Bettacchi -- $635,667; Mr. Corcoran -- $442,667; Mr. Siegel -- $686,333; and Mr. Tarola -- $648,667. Messrs. Norris, Corcoran and Tarola are entitled to additional pension benefits under their employment agreements (see "Employment Agreements").

Employment Agreements. Paul J. Norris. Effective January 1, 2003, Mr. Norris entered into a letter agreement with Grace (the "Letter Agreement"), whereby his employment agreement, dated October 26, 1998 (the "1998 Agreement"), was extended beyond its original termination date of December 31, 2002, and was amended as described herein. Under the Letter Agreement, Mr. Norris' employment with Grace will continue until terminated by Grace or Mr. Norris. Except as amended by the Letter Agreement, the provisions of the 1998 Agreement remain applicable to Mr. Norris during his post-2002 employment term with Grace.

Under the 1998 Agreement, during his post-2002 employment term, Mr. Norris will continue to be entitled to an annual base salary of not less than $875,000. In addition, he will continue to participate in Grace's annual incentive compensation program, under which his targeted award will be at least 75% of his annual base salary. (As of January 1, 2004, Mr. Norris' annual base salary is $1,000,000 and his targeted percentage for his annual incentive compensation award is 125%.)

Under the terms of the Letter Agreement, on December 31, 2003, Mr. Norris received a $1,235,000 retention bonus for services performed during 2003. Mr. Norris is eligible to receive, on December 31, 2004, an additional retention bonus of $1,235,000 for services performed during 2004. Pursuant to a separate agreement, Mr. Norris has agreed that 50% of such amount will be paid on December 31, 2004, and the remaining 50% will be subject to the achievement of specified earnings targets for 2004 and, to the extent achieved, will be paid in the first quarter of 2005. Mr. Norris will not receive a 2004 retention bonus if, prior to December 31, 2004, he is terminated by Grace for cause. In addition, Mr. Norris will not receive a 2004 retention bonus, if prior to December 31, 2004, he resigns his employment with Grace, unless such resignation is on the basis of constructive discharge. If Mr. Norris' employment is terminated on the basis of constructive discharge (or as a result of his death or disability) during 2004, then he (or his beneficiary, in the case of death) will be entitled to a payment of a pro-rated portion of the actual retention bonus otherwise payable for such year, based on the portion of such year that he remained an employee of Grace.

Under the 1998 Agreement, during his post-2002 employment term with Grace, if Mr. Norris' employment is terminated by Grace without cause or by Mr. Norris on the basis of constructive discharge, then he will be entitled to receive a severance payment equal to two times the dollar amount that equals 175% of his annual base salary at the time of such termination. Such payment will be made in a lump sum immediately after Mr. Norris' date of termination.

Under the Letter Agreement, Mr. Norris is obligated to provide Grace with at least 180 days written prior notice of his intention to resign his employment with Grace in order to receive certain benefits and payments upon termination, which were originally specified under the 1998 Agreement. Specifically, if Mr. Norris provides such timely notice, he will receive the following benefits and payments upon termination: (1) an award under Grace's annual incentive compensation program for the calendar year of termination, which will be pro-rated based on the portion of such calendar year that he remained an employee of Grace, (2) a supplemental pension payment (described below), (3) principal residence relocation assistance (described below), and (4) a payment of the cash component of any award made to Mr. Norris under Grace's long-term incentive plans, which will be pro-rated based on the portion of the applicable 3-year performance period that he remained an employee of Grace. Under the Letter Agreement, Mr. Norris will also be entitled to these

26

CC-BLG002650

benefits and payments if his employment is terminated by Grace for any reason except cause. If Mr. Norris' employment is terminated for cause, he will not be entitled to those benefits and payments.

If Mr. Norris becomes entitled to a supplemental pension payment as referenced above, then in determining the benefits payable to Mr. Norris under Grace's basic and supplemental retirement plans, his years of service with Grace and his prior employer will be recognized as if those years were continuous service with Grace, with an offset for any retirement benefits payable from his prior employer's retirement plans. Such payment would be made in a lump sum immediately after Mr. Norris' date of termination.

Also, if Mr. Norris does not receive supplemental retirement benefits under any Grace plan (as a result of any reduction regarding such a plan pursuant to any Chapter 11 proceeding or otherwise), then such supplemental benefits will become payable to Mr. Norris under his employment agreement.

If Mr. Norris becomes entitled to the principal residence relocation assistance referenced above, Grace will provide him with relocation assistance to any location within the continental United States selected by Mr. Norris. Such relocation assistance would include certain cash payments and other relocation assistance, as well as compensation for any loss incurred on the sale of his Maryland home.

The 1998 Agreement also provides for Mr. Norris' participation in other benefits and compensation programs, including benefits and programs generally available to other senior executives of Grace.

The forgoing description of Mr. Norris' employment agreement does not purport to be complete and is qualified in its entirety by reference to the 1998 Agreement, which has been filed with the SEC as Exhibit 10.20 to Grace's 2000 Annual Report on Form 10-K, and by reference to the Letter Agreement, which has been filed with the SEC as Exhibit 10.19 to Grace's 2002 Annual Report on Form 10-K.

William M. Corcoran. Mr. Corcoran had an employment agreement with Grace that expired on May 31, 2002. Under terms of the agreement that survived the expiration date, if Mr. Corcoran is terminated without cause, he will generally be entitled to a severance payment equal to 137% of his annual base salary at the time of termination. (However, along with other executive officers and certain key employees of Grace, Mr. Corcoran entered into a retention agreement with Grace, described below, under which he may be entitled to enhanced severance pay in lieu of, but not in addition to, the severance pay provided under his employment agreement.) In addition, the benefits payable to Mr. Corcoran under Grace's basic and supplemental retirement plans will continue to be determined by adding additional years of credited service under those plans. Generally, for each year of credited service under those plans that he actually earns during his period of employment with Grace, he will receive credit for an additional one-half year of credited service (up to a maximum of 5 additional years of credited service), except that in no event will he receive less than 5 years of credited service, regardless of the date his employment with Grace actually terminates. The foregoing description of Mr. Corcoran's employment agreement does not purport to be complete and is qualified in its entirety by reference to such agreement, which has been filed with the SEC as Exhibit 10.24 to Grace's 2000 Annual Report on Form 10-K.

Alfred E. Festa. Mr. Festa has a three year employment agreement with Grace dated November 17, 2003, his first day of employment with Grace. Under the agreement, Mr. Festa is entitled to an initial annual base salary of $550,000. He is also entitled to participate in the Company's Annual Incentive Compensation Program. Under the agreement, for 2003 he was entitled to 100% of base salary for the portion of 2003 during which he was actually employed by the Company. For 2004 his targeted award will be 100% of his annual base salary earned during such year;. For 2005 and thereafter, his targeted award will be 75% (or greater, if determined by the Company's Board) of his annual base salary earned during the applicable year.

27

CC-BLG002651

Under the agreement, Mr. Festa will also participate in the Company's currently effective LTIPs for the 2002-2004 and 2003-2005 performance periods. His targeted award under each of the LTIPs is $687,000. However, any award to which he becomes entitled under either of the LTIPs will be pro-rated to reflect the percentage of days that he was an active employee of the Company during the applicable performance period.

Also, under terms of the agreement, if Mr. Festa's employment is terminated by the Company without cause, or by him as a result of constructive discharge, prior to the expiration of his employment agreement, he will be entitled to a severance payment equal to 1.5 times 175% of his annual base salary at the time of his termination. Mr. Festa would also be entitled to such a severance payment if he terminates his employment with the Company in the event that he is not offered the position of Chief Executive Officer upon the departure of Mr. Norris. In addition, the agreement provides that Mr. Festa is eligible to participate in other compensation and benefit plans and programs that are provided to the other senior officers of the Company. The foregoing description of Mr. Festa's employment agreement does not purport to be complete and is qualified in its entirety by reference to such agreement, which has been filed with the SEC as Exhibit 10.27 to this Report Form.

David B. Siegel. Under terms of a January 1, 2001 agreement, Mr. Siegel continues to be entitled to an enhanced severance payment equal to two times his annual base salary if his employment is involuntarily terminated without cause under circumstances that would qualify him for severance pay under Grace's severance plan that generally covers salaried employees. In addition, on January 1, 2002, under the terms of such agreement, Mr. Siegel relocated from Florida to Columbia, Maryland, and received the relocation benefits generally available to all Grace employees who relocated to Maryland in conjunction with the relocation of Grace's corporate headquarters. Grace has further agreed to provide Mr. Siegel with post-employment relocation assistance (on the terms of the relocation policy in effect for active employees) under certain conditions; this further agreement has not yet been finalized.

Robert M. Tarola. Mr. Tarola had an employment agreement that expired on November 10, 2002. Under terms of the agreement that survived the expiration date, if Mr. Tarola is terminated without cause, he will generally be entitled to a severance payment equal to 145% of his annual base salary at the time of termination. (However, along with the other executive officers and certain key employees of Grace, Mr. Tarola has entered into a retention agreement with Grace, described below, under which he may be entitled to enhanced severance pay in lieu of, but not in addition to, the severance pay provided under his employment agreement.) In addition, the benefits payable to Mr. Tarola under Grace's basic and supplemental retirement plans will continue to be determined by adding additional years of credited service under those plans. Generally, for each year of credited service under those plans that he actually earns during his period of employment with Grace, he will receive credit for one additional year of credited service (up to a maximum of 10 additional years of credited service), except that in no event will he receive less than 5 years of credited service, regardless of the date his employment with Grace actually terminates. The foregoing description of Mr. Tarola's employment agreement does not purport to be complete and is qualified in its entirety by reference to such agreement, which has been filed with the SEC as Exhibit 10.1 to Grace's Quarterly Report on Form 10-Q for the quarter ended June 30, 1999.

Change-in-Control Severance Agreements. In addition to the severance provisions described under "Retention Agreements" below, Grace has severance agreements with all of its executive officers, which renew automatically unless the Board of Directors of the Company elects not to renew them. These agreements generally provide that in the event of the involuntary termination of the individual's employment without cause (including constructive termination caused by a material reduction in his or her authority or responsibility or by certain other circumstances) following a "change in control" of Grace, he or she will generally receive a severance payment equal to three times the sum of his or her annual base salary plus target annual incentive compensation (bonus), subject to pro rata reduction in the case of an officer who is within 36 months of normal retirement age (65). For purposes of the severance agreements, "change in control" means

28

CC-BLG002652

the acquisition of 20% or more of the Common Stock (but not if such acquisition is the result of the sale of Common Stock by Grace that has been approved by the Board), the failure of Board-nominated directors to constitute a majority of any class of the Board of Directors, the occurrence of a transaction in which the shareholders of Grace immediately preceding such transaction do not own more than 50% of the combined voting power of the company resulting from such transaction, or the liquidation or dissolution of Grace. This description of the severance agreements does not purport to be complete and is qualified in its entirety by reference to the form of such agreement, which has been filed with the SEC as Exhibit 10.17 to Grace's 2002 Annual Report on Form 10-K. As a result of Grace's Chapter 11 filing, the following events will not constitute a "change in control": (i) the acquisition by a trust of Common Stock, established for purposes of administering asbestos-related claims pursuant to a plan of reorganization, and (ii) a corporate transaction pursuant to Section 363 of the U.S. Bankruptcy Code or a plan of reorganization.

Retention Agreements. Effective January 1, 2001, Grace entered into retention agreements with each of the executive officers other than Messrs. Norris and Siegel (and Mr. Festa, who did not join Grace until November 2003), whose retention arrangements were covered by their respective employment agreements. These agreements were approved by the Compensation Committee in recognition of the adverse effect that the market performance of the Common Stock has had and is expected to continue to have on Grace's ability to attract and retain key employees. Under the terms of these agreements, each such executive officer received a payment in January 2001 equal to his annual base salary, subject to remaining employed with Grace through December 31, 2002. The retention payments are not considered compensation for purposes of any Grace benefit or compensation plans or programs. In addition to the retention payment, the retention agreements provide that in the event of the involuntary termination of such officer's employment under circumstances that would qualify such officer for severance pay under Grace's severance plan that generally covers salaried employees, then the officer would be entitled to severance pay equal to two times his or her annual base salary. With respect to any such officer who has any other agreement with Grace regarding the payment of severance upon termination of employment, if such officer becomes entitled to severance under both the terms of the retention agreement and such other agreement, then the officer would only receive severance pay under the retention agreement, unless the other agreement provides for a greater amount of severance pay (in which case, the officer would only receive severance pay under such other agreement).

Grace has implemented a new retention program for 2003 and 2004 under which each executive officer (except for Mr. Norris, whose retention arrangement is covered by separate agreements, and Mr. Festa) would be entitled to receive a payment equal to 65% of his base salary if the officer remains employed with Grace for the entire year. The payment of the 2003 retention bonus was made to each eligible executive officer at the end of 2003. For 2004, 50% of the retention bonus is contingent upon the achievement of specified earnings targets for such year. Therefore, 50% of such retention bonus will be paid to each eligible executive at the end of 2004, and the remaining bonus, if any, will be paid during the first quarter of 2005. These retention payments are not considered compensation for purposes of any Grace benefit or compensation plans or programs.

Executive Salary Protection Plan. All executive officers participate in the Executive Salary Protection Plan ("ESPP"), which provides that, in the event of a participant's disability or death prior to age 70, Grace will continue to pay all or a portion of base salary to the participant or a beneficiary for a period based on the participant's age at the time of disability or death. Payments under the ESPP may not exceed 100% of base salary for the first year and 60% thereafter in the case of disability (50% in the case of death). This description of the ESPP does not purport to be complete and is qualified in its entirety by reference to the text of the ESPP, as amended, which is filed as Exhibit 10.8 to Grace's 2001 Annual Report on Form 10-K.

Effect of Chapter 11 Filing. The U.S. Bankruptcy Court has approved the employment agreements and the continuation of the executive compensation and benefit agreements and programs described above.

29

CC-BLG002653

The continuation of these agreements and programs, and the establishment of new programs may be affected by the Chapter 11 proceedings.

Directors' Compensation. Under the compensation program for nonemployee directors in effect for 2003, each nonemployee director received an annual retainer of $50,000, 50% of which was paid in cash and 50% of which was paid in the form of Common Stock. In addition, directors received $4,000 ($5,000 for directors holding a committee chair) in cash for each meeting date in respect of the Board meeting and all committee meetings held on such date. The same compensation program will be effective during 2004. Grace reimburses nonemployee directors for expenses they incur in attending Board and committee meetings. Grace also maintains business travel accident insurance coverage for them.

Compensation Committee Interlocks and Insider Participation. During 2003, the Compensation Committee of the Board was comprised of Messrs. Akers (Chair), Baldwin, Cambre, Murphy and Vanderslice, and Dr. Fox. None of such persons is a current or former officer or employee of Grace or any of its subsidiaries, nor did any of such persons have any reportable transactions with Grace or any of its subsidiaries.

## ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

Security Ownership. The following table sets forth the Common Stock beneficially owned, directly or indirectly, as of January 31, 2004 by (1) each person known to Grace to be the beneficial owner of more than 5% of the outstanding shares of Common Stock, and (2) each current director, each of the executive officers named in the Summary Compensation Table set forth in Item 11 above, and such directors and all executive officers as a group.

| Beneficial Owner | Shares of Common Stock Beneficially Owned | | Percent |
|---|---|---|---|
| Peninsula Partners, L.P. (1)................... 404B East Main Street, 2nd Floor Charlottesville, VA 22902 | 10,765,600 | | 16.41% |
| J. F. Akers .................................. | 38,996 74,535 15,196 | (O) (T) | * |
| H. F. Baldwin ................................ | 21,918 | | * |
| R. J. Bettacchi ............................... | 545,605 24,675 | (O) (T) | * |
| R. C. Cambre ................................. | 64,135 | | * |
| W. M. Corcoran .............................. | 10,000 84,800 1,265 | (O) (T) | * |
| M. A. Fox ..................................... | 41,246 8,942 | (T) | * |

30

CC-BLG002654

|                          | Shares of Common Stock<br>Beneficially Owned |     | Percent |
|--------------------------|---------------------------------------------|-----|---------|
| Beneficial Owner         |                                             |     |         |
| J. J. Murphy ............................. | 38,930                     |     | *       |
|                          | 15,528                                      | (O) |         |
|                          | 18,629                                      | (T) |         |
|                          |                                             |     |         |
| P. J. Norris ............................. | 138,822                    |     | 1.95%   |
|                          | 1,165,026                                   | (O) |         |
|                          | 1,071                                       | (T) |         |
|                          |                                             |     |         |
| D. B. Siegel ............................. | 15,100                     |     | *       |
|                          | 379,995                                     | (O) |         |
|                          | 20,832                                      | (T) |         |
|                          |                                             |     |         |
| R. M. Tarola  ............................. | 15,000                    |     | *       |
|                          | 202,900                                     | (O) |         |
|                          |                                             |     |         |
| T. A. Vanderslice ......................... | 39,522                    |     | *       |
|                          | 69,876                                      | (O) |         |
|                          | 14,932                                      | (T) |         |
|                          |                                             |     |         |
| Directors and executive officers as a group ... | 433,669              |     | 4.52%   |
|                          | 2,864,545                                   | (O) |         |
|                          | 121,960                                     | (T) |         |

| * | Indicates less than 1% |
|---|------------------------|
| (O) | Shares covered by stock options exercisable on or within 60 days after January 31, 2004. |
| (T) | Shares owned by trusts and other entities as to which the person has the power to direct voting and/or investment. |
| (1) | The ownership information set forth is based in its entirety on material contained in a Form 4 report dated September 10, 2001 filed with the SEC. |

Equity Compensation Plan Information. The following table sets forth

information as of December 31, 2003 with respect to Grace's compensation plans under which shares of Common Stock are authorized for issuance upon the exercise of options, warrants or other rights. The only such compensation plans in effect are stock incentive plans providing for the issuance of stock options. All such plans have been approved by Grace's shareholders.

| Plan category | Number of securities to<br>be issued upon exercise<br>of outstanding options<br>(a) | Weighted-average<br>exercise of<br>outstanding options<br>(b) | Number of securities remaining available<br>for future issuance under equity<br>compensation plans (excluding securities<br>reflected in column (a))<br>(c) |
|---------------|---|---|---|
| Equity compensation plans approved by security holders | 9,582,789 | $12.02 | 4,474,004 |

CC-BLG002655

**ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS**

Commercial Transactions. During 2003, no director, executive officer (or any member of any of their respective immediate families) or, to the Company's knowledge, any holder of more than 5% of the Common Stock, had a direct or indirect material interest in any transaction (or any proposed transaction) to which the Company was (or will become) a party.

Legal Proceedings; Indemnification. During 2003 there were no legal proceedings pending in which any current officers or directors of the Company were parties adverse to, or had a material interest adverse to, the Company.

**ITEM 14. PRINCIPAL ACCOUNTING FEES AND SERVICES**

The Audit Committee of the Board of Directors of Grace selected PricewaterhouseCoopers LLP ("PwC") to continue to act as Grace's principal independent accountants for 2003. The following table sets forth the fees incurred by Grace for the services of PwC for the years ended December 31, 2003 and 2002:

|                    | 2003        | 2002        |
|--------------------|-------------|-------------|
| Audit Fees         | $1,763,000  | $1,587,000  |
| Audit-Related Fees | 210,500     | 198,000     |
| Tax Fees           | 133,000     | 160,000     |
| All Other Fees     | -           | 988,000     |
| Total Fees         | $2,106,500  | $2,933,000  |

Audit Services consisted of the audit of Grace's consolidated financial statements, the review of its consolidated quarterly financial statements and statutory audits of certain of Grace's non-U.S. subsidiaries and affiliates.

Audit-Related Services consisted of financial statement audits of Grace's U.S. employee benefit plans and the audit of the financial statements of Advanced Refining Technologies, LLC (a joint venture with Chevron Products Company).

Tax Services consisted of tax advice and compliance for non-U.S. subsidiaries, including preparation of tax returns.

All Other Services consisted of expert services related to environmental litigation.

The Audit Committee has adopted a preapproval policy that requires the Audit Committee to specifically preapprove the annual engagement of the independent accountants for the audit of Grace's consolidated financial statements. The policy also provides for general preapproval of certain audit-related, tax and other services, up to a specified dollar amount for each year. Services in excess of such dollar amounts and any other services must be specifically preapproved by the Audit Committee. However, the chair of the Audit Committee has the authority to preapprove services requiring immediate engagement between scheduled meetings of the Audit Committee. The chair must report any such preapproval decisions to the full Audit Committee at its next scheduled meeting. During 2003, no audit-related, tax, or other services were performed by PwC without specific or general approval as described above.

32

CC-BLG002656

PART IV

## ITEM 15. EXHIBITS, FINANCIAL STATEMENT SCHEDULES, AND REPORTS ON FORM 8-K

Financial Statements and Schedules. See the Index to Consolidated Financial Statements and Financial Statement Schedule and Exhibit on page F-2 of the Financial Supplement.

Reports on Form 8-K. The following reports on Form 8-K were filed during the fourth quarter of 2003: October 24, 2003 - Press release announcing Grace's financial results for the third quarter of 2003.

Exhibits. The exhibits to this Report are listed below. Other than exhibits that are filed herewith, all exhibits listed below are incorporated by reference. Exhibits indicated by an asterisk (*) are the management contracts and compensatory plans, contracts or arrangements required to be filed as exhibits to this Report.

For purposes of describing these exhibits, "Old Grace" means W. R. Grace & Co., a Delaware corporation (subsequently renamed Sealed Air Corporation), a predecessor to the Company, and "Grace New York" means W. R. Grace & Co., a New York corporation (subsequently renamed Fresenius Medical Care Holdings, Inc.), a predecessor to Old Grace.

| EXHIBIT NO. | EXHIBIT | WHERE LOCATED |
|---|---|---|
| 2.1 | Form of Distribution Agreement, by and among Old Grace, W. R. Grace & Co.-Conn. and Grace Specialty Chemicals, Inc. (now named W. R. Grace & Co.) | Annex B to the Joint Proxy Statement/Prospectus dated February 13, 1998 of Old Grace and Sealed Air Corporation included in Form S-4 (filed 2/13/98) |
| 3.1 | Restated Certificate of Incorporation of W. R. Grace & Co. | Exhibit 3.1 to Form 8-K (filed 4/8/98; SEC File No. 001-13953) |
| 3.2 | Amended and Restated By-laws of W. R. Grace & Co. | Exhibit 3.2 to Form 10-K (filed 3/28/02) |
| 4.1 | Rights Agreement dated as of March 31, 1998 between W. R. Grace & Co. and The Chase Manhattan Bank, as Rights Agent | Exhibit 4.1 to Form 8-K (filed 4/8/98; SEC File No. 001-13953) |
| 4.2 | Credit Agreement dated as of May 14, 1998, among W. R. Grace & Co.-Conn., W. R. Grace & Co., the several banks parties thereto; the co-agents signatories thereto; The Chase Manhattan Bank, as administrative agent for such banks; and Chase Securities Inc., as arranger | Exhibit 4.1 to Form 10-Q (filed 8/14/98; SEC File No. 001-13953) |

33

CC-BLG002657

| EXHIBIT NO. | EXHIBIT | WHERE LOCATED |
| --- | --- | --- |
| 4.3 | 364-Day Credit Agreement, dated as of May 5, 1999, among W. R. Grace & Co.-Conn.; W. R. Grace & Co.; the several banks parties thereto; the co-agents signatories thereto; Bank of America National Trust and Savings Association, as documentation agent; The Chase Manhattan Bank, as administrative agent for such banks; and Chase Securities Inc., as book manager | Exhibit 4.1 to Form 10-Q (filed 8/3/99) |
| 4.4 | First Amendment to 364-Day Credit Agreement dated as of May 5, 1999 among W. R. Grace & Co.-Conn.; W. R. Grace & Co.; the several banks parties thereto; Bank of America National Trust and Savings Association, as document agent; The Chase Manhattan Bank, as administrative agent for such banks; and Chase Securities, Inc., as bank manager | Exhibit 4 to Form 10-Q (filed 8/15/00) |
| 4.5 | Post-Petition Loan and Security Agreement dated as of April 1, 2001 among the financial institutions named therein, as Lenders, Bank of America, N.A. as Agent, and W. R. Grace & Co. and its subsidiaries named therein as Debtors and Debtors-in-Possession, as Borrowers | Exhibit 4 to Form 10-Q (filed 8/14/01) |
| 4.6 | Amendment No. 1 and Limited Waiver to Post-Petition Loan and Security Agreement | Exhibit 4 to Form 10-Q (filed May 13, 2003) |
| 10.1 | Form of Employee Benefits Allocation Agreement, by and among Old Grace, W. R. Grace & Co.-Conn. and Grace Specialty Chemicals, Inc. (now named W. R. Grace & Co.) | Exhibit 10.1 to Form 10-K (filed March 13, 2003) |
| 10.2 | Form of Tax Sharing Agreement, by and among Old Grace, W. R. Grace & Co.-Conn. and Grace Specialty Chemicals, Inc. (now named W. R. Grace & Co.) | Exhibit 10.2 to Form 10-K (filed March 13, 2003) |
| 10.3 | W. R. Grace & Co. 2000 Stock Incentive Plan, as amended | Exhibit 10 to Form 10-Q (filed 8/15/00)* |
| 10.4 | W. R. Grace & Co. 1998 Stock Incentive Plan | Exhibit 10.4 to Form 10-K (filed March 13, 2003)* |
| 10.5 | W. R. Grace & Co. 1998 Stock Plan for Nonemployee Directors | Exhibit 10.5 to Form 10-K (filed March 13, 2003)* |

34

CC-BLG002658

| EXHIBIT NO. | EXHIBIT | WHERE LOCATED |
|---|---|---|
| 10.6 | W. R. Grace & Co. 1996 Stock Incentive Plan, as amended | Filed herewith* |
| 10.7 | W. R. Grace & Co. Supplemental Executive Retirement Plan, as amended | Exhibit 10.7 to Form 10-K (filed 3/28/02)* |
| 10.8 | W. R. Grace & Co. Executive Salary Protection Plan, as amended | Exhibit 10.8 to Form 10-K (filed 3/28/02)* |
| 10.9 | W. R. Grace & Co. 1986 Stock Incentive Plan, as amended | Exhibit 10.9 to Form 10-K (filed 3/28/02)* |
| 10.10 | W. R. Grace & Co. 1989 Stock Incentive Plan, as amended | Exhibit 10.10 to Form 10-K (filed 3/28/02)* |
| 10.11 | W. R. Grace & Co. 1994 Stock Incentive Plan, as amended | Exhibit 10.11 to Form 10-K (filed 3/28/02)* |
| 10.12 | Forms of Stock Option Agreements | Exhibit 10.15 to Form 10-K (filed 3/29/99)* |
| 10.13 | Form of Stock Option Agreements | Exhibit 10.14 to Registration Statement on Form S-1 of Old Grace (filed 8/2/96)* |
| 10.14 | Form of Stock Option Agreements | Exhibit 10.5 to Form 10-Q (filed 5/15/98; SEC File No. 001-13953)* |
| 10.15 | Form of 2001-2003 Long Term Incentive Program Award | Exhibit 10.23 to Form 10-K (filed 4/16/01)* |
| 10.16 | Form of 2002-2004 Long-Term Incentive Program Award | Exhibit 10.16 to Form 10-K (filed March 13, 2003)* |
| 10.17 | Form of Executive Severance Agreement between W. R. Grace & Co. and officers | Exhibit 10.17 to Form 10-K (filed March 13, 2003)* |
| 10.18 | Employment Agreement, dated January 1, 2001, by and between W. R. Grace & Co. and Paul J. Norris | Exhibit 10.20 to Form 10-K (filed 4/16/01)* |
| 10.19 | Amendment dated November 6, 2002 to Employment Agreement between W. R. Grace & Co. and Paul J. Norris | Exhibit 10.19 to Form 10-K (filed March 13, 2003)* |
| 10.20 | Employment Agreement dated May 11, 1999 between W. R. Grace & Co.-Conn. and Robert M. Tarola | Exhibit 10.1 to Form 10-Q (filed 8/13/99)* |

35

CC-BLG002659

| EXHIBIT NO. | EXHIBIT | WHERE LOCATED |
|---|---|---|
| 10.21 | Letter Agreement dated January 30, 2001 between Paul J. Norris, on behalf of W. R. Grace & Co., and David B. Siegel | Exhibit 10.22 to Form 10-K (filed 4/16/01)* |
| 10.22 | Letter Agreement dated May 7, 1999 between Paul J. Norris, on behalf of W. R. Grace & Co., and William M. Corcoran | Exhibit 10.24 to Form 10-K (filed 4/16/01)* |
| 10.23 | Form of Indemnification Agreement between W. R. Grace & Co. and certain Officers and Directors | Exhibit 10.27 to Form 10-K (filed 4/16/01)* |
| 10.24 | Form of Retention Agreement for 2001-2002 | Exhibit 10.28 to Form 10-K (filed 4/16/01)* |
| 10.25 | Form of Retention Agreement for 2003 | Exhibit 10.25 to Form 10-K (filed March 13, 2003)* |
| 10.26 | Annual Incentive Compensation Program | Exhibit 10.26 to Form 10-K (filed March 13, 2003)* |
| 10.27 | Letter Agreement dated November 17, 2003 between Paul J. Norris, on behalf of W. R. Grace & Co., and Fred Festa | Filed herewith* |
| 10.28 | Form of Retention Agreement for 2004 | Filed herewith* |
| 10.29 | Form of 2003-2005 Long-Term Incentive Program Award | Filed herewith* |
| 12 | Computation of Ratio of Earnings to Fixed Charges and Combined Fixed Charges and Preferred Stock Dividends | Filed herewith in Financial Supplement to Grace's 2003 Form 10-K |
| 21 | List of Subsidiaries of W. R. Grace & Co. | Filed herewith |
| 23 | Consent of Independent Accountants | Filed herewith in Financial Supplement to Grace's 2003 Form 10-K |
| 24 | Powers of Attorney | Filed herewith |
| 31.1 | Certification of Periodic Report by Chief Executive Officer under Section 302 of the Sarbanes-Oxley Act of 2002 | Filed herewith |

36

CC-BLG002660

| EXHIBIT NO. | EXHIBIT | WHERE LOCATED |
| --- | ------- | ------------- |
| 31.2 | Certification of Periodic Report by Chief Financial Officer under Section 302 of the Sarbanes-Oxley Act of 2002 | Filed herewith |
| 32 | Certification of Periodic Report by Chief Executive Officer and Chief Financial Officer under Section 906 of the Sarbanes-Oxley Act of 2002 | Filed herewith |

37

CC-BLG002661

SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this Report to be signed on its behalf by the undersigned, thereto duly authorized.

**W. R. GRACE & CO.**

```
                                    By: /s/ Paul J. Norris
                                        --------------------------
                                        Paul J. Norris
                                        (Chairman and
                                        Chief Executive Officer)


                                    By: /s/ Robert M. Tarola
                                        --------------------------
                                        Robert M. Tarola
                                        (Senior Vice President and
                                        Chief Financial Officer)


        Dated: March 5, 2004
```

Pursuant to the requirements of the Securities Exchange Act of 1934, this Report has been signed below by the following persons on behalf of the registrant and in the capacities indicated on March 5, 2004.

```
        Signature                          Title
        ---------                          -----

        J. F. Akers*              )
        H. F. Baldwin*            )
        R. C. Cambre*             )
        M. A. Fox*                )          Directors
        J. J. Murphy*             )
        T. A. Vanderslice*        )


        /s/ Paul J. Norris                   Chief Executive Officer and Director
        ------------------------------       (Principal Executive Officer)
            (Paul J. Norris)


        /s/ Robert M. Tarola                 Senior Vice President and Chief
        ------------------------------       Financial Officer (Principal
            (Robert M. Tarola)               Financial Officer and Principal
                                             Accounting Officer)
```

---

* By signing his name hereto, Mark A. Shelnitz is signing this document on behalf of each of the persons indicated above pursuant to powers of attorney duly executed by such persons and filed with the Securities and Exchange Commission.

```
                    By: /s/ Mark A. Shelnitz
                        ------------------------------
                        Mark A. Shelnitz
                        (Attorney-in-Fact)
```

38

CC-BLG002662

FINANCIAL SUPPLEMENT

**W. R. GRACE & CO.**
**ANNUAL REPORT ON FORM 10-K**
**FOR THE YEAR ENDED DECEMBER 31, 2003**

CC-BLG002663

# FINANCIAL SUPPLEMENT
## TO
## ANNUAL REPORT ON FORM 10-K FOR THE YEAR
## ENDED DECEMBER 31, 2003

### W. R. GRACE & CO. AND SUBSIDIARIES

Index to Consolidated Financial Statements and Financial Statement Schedule and Exhibit

```
Management's Responsibility for Financial Reporting...............  F-3
Report of Independent Auditors...................................  F-4
Report of Independent Auditors on Financial Statement Schedule.....  F-5
Consent of Independent Accountants...............................  F-5
Consolidated Statements of Operations for the three years in the
    period ended December 31, 2003................................  F-6
Consolidated Statements of Cash Flows for the three years in the
    period ended December 31, 2003................................  F-7
Consolidated Balance Sheets at December 31, 2003 and 2002.........  F-8
Consolidated Statements of Shareholders' Equity (Deficit) for
    the three years in the period ended December 31, 2003.........  F-9
Consolidated Statements of Comprehensive (Loss) Income for
    the three years in the period ended December 31, 2003.........  F-9
Notes to Consolidated Financial Statements.......................  F-10 - F-34
Financial Summary................................................  F-35
Management's Discussion and Analysis of Results of Operations
    and Financial Condition.......................................  F-36 - F-48

Financial Statement Schedule
    Schedule II - Valuation and Qualifying Accounts and Reserves....  F-49

Exhibit 12:  Computation of Ratio of Earnings to Fixed Charges
    and Combined Fixed Charges and Preferred Stock Dividends........  F-50


Report on Internal Controls and Procedures ......................  F-51
```

The financial data listed above appearing in this Financial Supplement are incorporated by reference herein. The Financial Statement Schedule should be read in conjunction with the Consolidated Financial Statements and Notes thereto. Financial statements of less than majority-owned persons and other persons accounted for by the equity method have been omitted as provided in Rule 3-09 of Securities and Exchange Commission Regulation S-X. Financial Statement Schedules not included have been omitted because they are not applicable or the required information is shown in the Consolidated Financial Statements or Notes thereto.

CC-BLG002664

# MANAGEMENT'S RESPONSIBILITY FOR FINANCIAL REPORTING

Management is responsible for the preparation, integrity and objectivity of the Consolidated Financial Statements and the other financial information included in this report. Such financial information has been prepared in conformity with accounting principles generally accepted in the United States of America and accordingly includes certain amounts that represent management's best estimates and judgments. Actual amounts could differ from those estimates.

Management maintains internal controls to assist it in fulfilling its responsibility for financial reporting. These internal controls consist of the control environment, risk assessment, control activities, information and communication, and monitoring. A chartered Disclosure Committee oversees Grace's public financial reporting process and key managers are required to confirm their compliance with Grace's policies and internal controls. While no system of internal controls can ensure elimination of all errors and irregularities, Grace's internal controls, which are reviewed and modified in response to changing conditions, have been designed to provide reasonable assurance that assets are safeguarded, policies and procedures are followed, transactions are properly executed and reported, and appropriate disclosures are made. The concept of reasonable assurance is based on the recognition that there are limitations in all systems of internal control and that the costs of such systems should not exceed their benefits.

The Audit Committee of the Board of Directors, which is comprised solely of independent directors, meets regularly with Grace's senior financial management, internal auditors and independent auditors to review audit plans and results, as well as the actions taken by management in discharging its responsibilities for accounting, financial reporting and internal controls. The Audit Committee is responsible for the selection and compensation of the independent auditors. Grace's financial management, internal auditors and independent auditors have direct and confidential access to the Audit Committee at all times.

The independent auditors are engaged to conduct the audits of and report on the Consolidated Financial Statements in accordance with auditing standards generally accepted in the United States of America. These standards require an assessment of the systems of internal controls and tests of transactions to the extent considered necessary by the independent auditors for purposes of supporting their opinion as set forth in their report.

/s/ Paul J. Norris
Paul J. Norris
Chairman and
Chief Executive Officer

/s/ Robert M. Tarola
Robert M. Tarola
Senior Vice President and
Chief Financial Officer

March 5, 2004

F-3

CC-BLG002665

**REPORT OF INDEPENDENT AUDITORS**

**TO THE SHAREHOLDERS AND BOARD OF DIRECTORS OF**
**W. R. GRACE & CO.**

In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of operations, of cash flows, of shareholders' equity (deficit) and of comprehensive income (loss), present fairly, in all material respects, the financial position of W. R. Grace & Co. and its subsidiaries at December 31, 2003 and 2002, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2003, in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the consolidated financial statements, on April 2, 2001, the Company and substantially all of its domestic subsidiaries voluntarily filed for protection under Chapter 11 of the United States Bankruptcy Code, which raises substantial doubt about the Company's ability to continue as a going concern in its present form. Management's intentions with respect to this matter are also described in Note 1. The accompanying consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

/s/ PricewaterhouseCoopers LLP
PricewaterhouseCoopers LLP
Baltimore, Maryland
January 27, 2004

F-4

CC-BLG002666

# REPORT OF INDEPENDENT AUDITORS ON FINANCIAL STATEMENT SCHEDULE

**TO THE SHAREHOLDERS AND BOARD OF
DIRECTORS OF W. R. GRACE & CO.**

Our audits of the consolidated financial statements referred to in our report dated January 27, 2004, which was modified as to a matter raising substantial doubt about the Company's ability to continue as a going concern, appearing on page F-4 of this 2003 Annual Report on Form 10-K of W. R. Grace & Co. also included an audit of the Financial Statement Schedule listed on page F-2 in the Index to Consolidated Financial Statements and Financial Statement Schedule and Exhibit of this Form 10-K. In our opinion, this Financial Statement Schedule presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements.

```
/s/ PricewaterhouseCoopers LLP
PricewaterhouseCoopers LLP
Baltimore, Maryland
January 27, 2004
```

## CONSENT OF INDEPENDENT ACCOUNTANTS

We hereby consent to the incorporation by reference in the Registration Statements on Form S-8 (Nos. 333-37024, 333-49083, 333-49507, 333-49509, 333-49511, 333-49513, 333-49515, 333-49703 and 333-49705) of W. R. Grace & Co. of our report dated January 27, 2004 appearing on page F-4 of this 2003 Annual Report on Form 10-K of W. R. Grace & Co. We also consent to the incorporation by reference of our report dated January 27, 2004 relating to the Financial Statement Schedule, which appears above in this Form 10-K.

```
/s/ PricewaterhouseCoopers LLP
PricewaterhouseCoopers LLP
Baltimore, Maryland
March 5, 2004
```

F-5

CC-BLG002667

**CONSOLIDATED FINANCIAL STATEMENTS**

```
===================================================================================
W. R. GRACE & CO. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF OPERATIONS              YEAR ENDED DECEMBER 31,
-----------------------------------------------------------------------------------
In millions, except per share amounts
                                                 2003       2002       2001
                                               --------------------------------
Net sales........................................ $ 1,980.5  $ 1,819.7  $ 1,722.9
Other income.....................................    16.7       22.5       30.8
                                               --------------------------------
                                                 1,997.2    1,842.2    1,753.7

Cost of goods sold, exclusive of depreciation and
  amortization shown separately below............ 1,289.8    1,148.1    1,076.3
Selling, general and administrative expenses,
  exclusive of net pension expense (income)
    shown separately below.......................   365.6      345.1      343.6
Depreciation and amortization....................   102.9       94.9       89.2
Research and development expenses................    52.0       51.5       49.5
Net pension expense (income).....................    52.7       19.5       (9.5)
Interest expense and related financing costs.....    15.6       20.0       37.1
Provision for environmental remediation..........   142.5       70.7        5.8
Provision for asbestos-related litigation.........    30.0       --          --
                                               --------------------------------
                                                 2,051.1    1,749.8    1,592.0
                                               --------------------------------

(Loss) income before Chapter 11 expenses, income
  taxes, and minority interest...................   (53.9)      92.4      161.7
Chapter 11 expenses, net.........................   (14.8)     (30.1)     (15.7)
Benefit from (provision for) income taxes.........    12.3     (38.0)     (63.7)
Minority interest in consolidated entities........     1.2      (2.2)      (3.7)
                                               --------------------------------
    NET (LOSS) INCOME............................ $  (55.2)  $   22.1  $    78.6
===================================================================================

BASIC (LOSS) EARNINGS PER SHARE:
    Net (loss) income............................ $  (0.84)  $   0.34  $    1.20

Weighted average number of basic shares..........    65.5       65.4       65.3

DILUTED (LOSS) EARNINGS PER SHARE:
    Net (loss) income............................ $  (0.84)  $   0.34  $    1.20

Weighted average number of diluted shares.........    65.5       65.5       65.4

===================================================================================
```

The Notes to Consolidated Financial Statements are an integral part of these statements.

F-6

CC-BLG002668

W. R. GRACE & CO. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOWS                    YEAR ENDED DECEMBER 31,

In millions

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| OPERATING ACTIVITIES |  |  |  |
| (Loss) income before Chapter 11 expenses, income taxes, and minority interest........................ | $ (53.9) | $ 92.4 | $ 161.7 |
| Reconciliation to cash provided by operating activities: |  |  |  |
| Depreciation and amortization...................... | 102.9 | 94.9 | 89.2 |
| Interest accrued on pre-petition debt subject to compromise....................................... | 11.2 | 14.5 | 23.2 |
| Loss (gain) on sales of investments and disposals of assets........................................ | 1.5 | (1.9) | (9.7) |
| Provision for environmental remediation............ | 142.5 | 70.7 | 5.8 |
| Provision for asbestos-related litigation.......... | 30.0 | -- | -- |
| Net income from life insurance policies............ | (5.6) | (4.7) | (5.4) |
| Changes in assets and liabilities, excluding effect of businesses acquired/divested and foreign currency translation: |  |  |  |
| Working capital items.......................... | (22.5) | 22.2 | (63.5) |
| Contributions to defined benefit pension plans.. | (60.5) | (10.2) | (10.6) |
| Contributions to postretirement benefit plans... | (12.6) | (21.5) | (22.3) |
| Expenditures for asbestos-related litigation.... | (10.4) | (13.1) | (109.6) |
| Proceeds from asbestos-related insurance........ | 13.2 | 10.8 | 78.8 |
| Expenditures for environmental remediation...... | (11.2) | (20.8) | (28.9) |
| Expenditures for retained obligations of discontinued operations....................... | (1.3) | (4.5) | (9.1) |
| Increase in accounts receivable due to termination of securitization program......... | -- | -- | (65.3) |
| Changes in other accruals and non-cash items.... | 32.2 | 25.6 | 20.0 |
| NET CASH PROVIDED BY OPERATING ACTIVITIES BEFORE INCOME TAXES AND CHAPTER 11 EXPENSES............. | 155.5 | 254.4 | 54.3 |
| Chapter 11 expenses paid, net...................... | (17.5) | (27.1) | (11.8) |
| Income taxes paid, net of refunds.................. | (27.2) | (31.8) | (27.9) |
| NET CASH PROVIDED BY OPERATING ACTIVITIES.......... | 110.8 | 195.5 | 14.6 |
| INVESTING ACTIVITIES |  |  |  |
| Capital expenditures............................... | (86.4) | (91.1) | (62.9) |
| Businesses acquired, net of cash acquired.......... | (26.9) | (28.5) | (84.4) |
| Investment in life insurance policies.............. | (11.6) | (16.4) | (17.6) |
| Proceeds from life insurance policies.............. | 11.9 | 19.4 | 18.0 |
| Proceeds from sales of investments and disposals of assets........................................ | 3.9 | 5.9 | 15.5 |
| NET CASH USED FOR INVESTING ACTIVITIES............. | (109.1) | (110.7) | (131.4) |
| FINANCING ACTIVITIES |  |  |  |
| Net change in loans secured by cash value of life insurance....................................... | (3.1) | (5.1) | 33.7 |
| Borrowings under credit facilities, net of repayments. | 2.3 | (2.8) | 94.1 |
| Borrowings under debtor-in-possession facility, net of fees........................................... | 46.1 | 18.7 | 71.5 |
| Repayments of borrowings under debtor-in-possession facility....................................... | (50.0) | (20.0) | (75.0) |
| Purchase of common stock........................... | -- | -- | (0.6) |
| NET CASH (USED FOR) PROVIDED BY FINANCING ACTIVITIES...................................... | (4.7) | (9.2) | 123.7 |
| Effect of currency exchange rate changes on cash and cash equivalents................................ | 28.6 | 16.1 | (6.9) |
| INCREASE IN CASH AND CASH EQUIVALENTS.............. | 25.6 | 91.7 | -- |
| Cash and cash equivalents, beginning of period........ | 283.6 | 191.9 | 191.9 |
| Cash and cash equivalents, end of period.............. | $ 309.2 | $ 283.6 | $ 191.9 |

The Notes to Consolidated Financial Statements are an integral part of these statements.

F-7

CC-BLG002669

W. R. GRACE & CO. AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEETS

| | DECEMBER 31, | |
|---|---|---|
| In millions, except par value and shares | 2003 | 2002 |

**ASSETS**
**CURRENT ASSETS**

| | 2003 | 2002 |
|---|---|---|
| Cash and cash equivalents................................... | $ 309.2 | $ 283.6 |
| Accounts and other receivables, net........................ | 347.5 | 316.6 |
| Inventories................................................ | 214.6 | 173.6 |
| Deferred income taxes...................................... | 29.8 | 20.6 |
| Other current assets....................................... | 27.8 | 35.9 |
| TOTAL CURRENT ASSETS................................. | 928.9 | 830.3 |
| Properties and equipment, net of accumulated depreciation and amortization of $1,216.9 (2002 - $1,071.7).......... | 656.6 | 622.2 |
| Goodwill................................................... | 85.2 | 65.2 |
| Cash value of life insurance policies, net of policy loans. | 90.8 | 82.4 |
| Deferred income taxes...................................... | 587.1 | 574.1 |
| Asbestos-related insurance expected to be realized after one year................................................. | 269.4 | 282.6 |
| Other assets............................................... | 256.2 | 234.9 |
| TOTAL ASSETS......................................... | $ 2,874.2 | $2,691.7 |

**LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT)**
**LIABILITIES NOT SUBJECT TO COMPROMISE**
**CURRENT LIABILITIES**

| | 2003 | 2002 |
|---|---|---|
| Debt payable within one year............................... | $ 6.8 | $ 4.3 |
| Accounts payable........................................... | 101.8 | 100.3 |
| Income taxes payable....................................... | 16.6 | 11.4 |
| Other current liabilities.................................. | 145.6 | 131.3 |
| TOTAL CURRENT LIABILITIES............................. | 270.8 | 247.3 |
| Deferred income taxes...................................... | 35.3 | 30.5 |
| Other liabilities.......................................... | 286.4 | 301.4 |
| TOTAL LIABILITIES NOT SUBJECT TO COMPROMISE............ | 592.5 | 579.2 |
| LIABILITIES SUBJECT TO COMPROMISE - NOTE 2................. | 2,465.3 | 2,334.7 |
| TOTAL LIABILITIES..................................... | 3,057.8 | 2,913.9 |

**COMMITMENTS AND CONTINGENCIES**

**SHAREHOLDERS' EQUITY (DEFICIT)**

| | 2003 | 2002 |
|---|---|---|
| Common stock issued, par value $0.01; 300,000,000 shares authorized; outstanding: 2003 - 65,558,510 (2002 - 65,466,725)............................................... | 0.8 | 0.8 |
| Paid-in capital............................................ | 432.1 | 433.0 |
| Accumulated deficit........................................ | (170.9) | (115.7) |
| Treasury stock, at cost: shares: 2003 - 11,421,250; (2002 - 11,513,035)............................................... | (135.9) | (137.0) |
| Accumulated other comprehensive loss....................... | (309.7) | (403.3) |
| TOTAL SHAREHOLDERS' EQUITY (DEFICIT)................... | (183.6) | (222.2) |
| TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT).... | $ 2,874.2 | $2,691.7 |

The Notes to Consolidated Financial Statements are an integral part of these statements.

F-8

CC-BLG002670

W. R. GRACE & CO. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY (DEFICIT)

| In millions | Common Stock and Paid-in Capital | Retained Earnings (Accumulated Deficit) | Treasury Stock | Accumulated Other Comprehensive Loss | TOTAL SHAREHOLDERS' EQUITY (DEFICIT) |
|---|---|---|---|---|---|
| BALANCE, DECEMBER 31, 2000 | $ 433.0 | $ (216.4) | $ (136.4) | $ (151.5) | $ (71.3) |
| Net income................ | -- | 78.6 | -- | -- | 78.6 |
| Purchase of common stock . | -- | -- | (0.6) | -- | (0.6) |
| Shares issued under stock plans.................. | 0.8 | -- | -- | -- | 0.8 |
| Other comprehensive loss.. | -- | -- | -- | (149.2) | (149.2) |
| BALANCE, DECEMBER 31, 2001 | $ 433.8 | $ (137.8) | $ (137.0) | $ (300.7) | $ (141.7) |
| Net income............... | $ -- | $ 22.1 | $ -- | $ -- | $ 22.1 |
| Other comprehensive loss.. | -- | -- | -- | (102.6) | (102.6) |
| BALANCE, DECEMBER 31, 2002 | $ 433.8 | $ (115.7) | $ (137.0) | $ (403.3) | $ (222.2) |
| Net loss................. | $ -- | $ (55.2) | $ -- | $ -- | $ (55.2) |
| Stock plan activity....... | (0.9) | -- | 1.1 | -- | 0.2 |
| Other comprehensive income | -- | -- | -- | 93.6 | 93.6 |
| BALANCE, DECEMBER 31, 2003 | $ 432.9 | $ (170.9) | $ (135.9) | $ (309.7) | $ (183.6) |

W. R. GRACE & CO. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME (LOSS)

| In millions | YEAR ENDED DECEMBER 31, | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| NET (LOSS) INCOME................................ | $(55.2) | $ 22.1 | $ 78.6 |
| OTHER COMPREHENSIVE INCOME (LOSS): | | | |
| Foreign currency translation adjustments....... | 75.3 | 45.1 | (24.8) |
| Minimum pension liability adjustments, net of income taxes................................ | 18.3 | (147.7) | (124.4) |
| Total other comprehensive income (loss)........ | 93.6 | (102.6) | (149.2) |
| COMPREHENSIVE INCOME (LOSS)..................... | $38.4 | $ (80.5) | $ (70.6) |

The Notes to Consolidated Financial Statements are an integral part of these statements.

F-9

CC-BLG002671