admixtures. Sales in Asia Pacific increased from the effects of favorable foreign currency, as well as volume growth in construction chemicals.

CC-BLG002722

The increase in Performance Chemicals segment sales in 2002 versus 2001 was primarily driven by acquisitions in construction chemicals, which accounted for $20.0 million, or 2.4 percentage points, of the sales growth. Sales of construction chemicals increased despite reduced U.S. commercial construction activity, reflecting sales from the Pieri acquisition, an increase in construction activity outside North America, and the success of new product programs and sales initiatives. Sales of building materials, which are largely based in North America, were down due to softness in U.S. commercial construction and re-roofing activity. The increase in sales of sealants and coatings reflected continued positive results from growth programs in coatings and closure compounds, particularly in Europe.

F-42

CC-BLG002723

The decline in North America reflected the impact of weak U.S. commercial construction activity on sales of construction chemicals and building materials. In Europe, the increase in sales was primarily attributable to the Pieri acquisition and volume growth in all three product groups.

## Operating Income

Pre-tax operating income was higher in 2003 compared with 2002, reflecting favorable foreign currency translation, sales increases and successful productivity programs, partially offset by increases in raw material and energy costs. The second half of 2003 was significantly stronger than the first half, which was affected by soft construction activity and weather-delayed projects in the U.S. In the second half, U.S. construction weather improved, allowing for a catch-up in project activity, and there was some leveling of the decline in overall U.S. construction activity. Intensified focus on productivity programs and discretionary expense control also contributed to improved profitability in the second half.

The increase in pre-tax operating income in 2002 versus 2001 reflects the impact of acquisitions in construction chemicals and growth programs across all product groups, offset by the impact of weak U.S. commercial construction activity on sales of fire protection materials, a decrease in sales of roofing underlayments due to the effect of a mild U.S. 2001-02 winter on re-roofing activity and costs for facility rationalizations and restructuring in building materials and sealants and coatings.

## FINANCIAL POSITION

The following charts set forth the Davison Chemicals and Performance Chemicals total asset position and pre-tax return on average total assets for 2003 and 2002.

| DAVISON CHEMICALS (In millions) | 2003 | 2002 | $ Change (excluding currency translation) Fav (Unfav) | % Change (excluding currency translation) Fav (Unfav) |
|---|---|---|---|---|
| Receivables................................ | $ 146.3 | $ 137.6 | $ (2.7) | (2.0%) |
| Inventory.................................. | 133.6 | 111.0 | 13.0 | 11.7% |
| Other current assets...................... | 2.1 | 3.0 | (0.9) | (30.0%) |
| Total current assets...................... | 282.0 | 251.6 | 9.4 | 3.7% |
| Properties and equipment, net............. | 444.0 | 413.9 | 5.3 | 1.3% |
| Goodwill and other intangible assets...... | 65.8 | 64.2 | (5.0) | (7.8%) |
| Other assets.............................. | 5.3 | 4.4 | 0.4 | 9.1% |
| Total assets.............................. | $ 797.1 | $ 734.1 | $ 10.1 | 1.4% |
| Pre-tax return on average total assets.... | 15.4% | 17.5% | | (2.1) pts |

Davison Chemicals' total assets increased by $63.0 million compared with the prior year, of which $52.9 million was attributable to currency translation, reflecting the weaker U.S. dollar. The remainder of such increase was primarily due to increased inventories, offset by a decrease in receivables. The increase in inventory was primarily in North America and was due to a build-up for 2004 sales, increased inventory costs and acquisitions. The decline in receivables was caused by improved collections as well as changes in customer and product mix.

The pre-tax return on average total assets decreased by 2.1 percentage points, due to an 8.1% decline in pre-tax operating income.

CC-BLG002724

| PERFORMANCE CHEMICALS (In millions) | 2003 | 2002 | $ Change (excluding currency translation) Fav (Unfav) | % Change (excluding currency translation) Fav (Unfav) |
|---|---|---|---|---|
| Receivables.................................... | $ 196.2 | $ 172.8 | $ 8.0 | 4.6% |
| Inventory...................................... | 80.9 | 62.6 | 12.0 | 19.2% |
| Other current assets........................... | 5.9 | 5.2 | 0.5 | 9.6% |
| Total current assets........................... | 283.0 | 240.6 | 20.5 | 8.5% |
| Properties and equipment, net ................. | 203.2 | 193.4 | (2.4) | (1.2%) |
| Goodwill and other intangible ................. | 84.5 | 64.3 | 11.0 | 17.1% |
| Other assets................................... | 38.5 | 30.4 | 6.7 | 22.0% |
| Total assets................................... | $ 609.2 | $ 528.7 | $ 35.8 | 6.8% |
| Pre-tax return on average total assets.......... | 18.7% | 18.6% | | 0.1 pts |

F-43

CC-BLG002725

Performance Chemicals' total assets increased by $80.5 million compared with the prior year, of which $44.7 million was attributable to currency translation reflecting the weaker U.S dollar. The remainder of such increases was primarily due to receivables, inventory and goodwill and other intangible assets. The increase in receivables was caused primarily by a shift in the regional sales mix toward regions outside North America where, on average, the standard terms of sale are longer. The increase in inventory was due primarily to advance purchases of key raw materials to secure favorable pricing. The change in goodwill and other intangible assets was primarily due to acquisitions.

The pre-tax return on average total assets for 2003 was consistent with 2002.

## FINANCIAL CONDITION

## EFFECT OF CHAPTER 11

As described in Note 1 to the Consolidated Financial Statements, the Company and its principal U.S. operating subsidiary are debtors-in-possession under Chapter 11 of the Bankruptcy Code. Grace's non-U.S. subsidiaries, although not part of the Filing, are owned directly or indirectly by the Company's principal operating subsidiary or other filing entities. Consequently, it is likely that a Chapter 11 reorganization plan will involve the combined value of Grace's global businesses and its other assets to fund (with cash and/or securities) Grace's obligations as adjudicated through the bankruptcy process. Grace has analyzed its cash flow and the capital needs of its businesses, and believes that, while in Chapter 11, sufficient cash flow and credit facilities are available to support its business strategy.

The following sections address Grace's financial condition in more detail and describe the major contingencies that are being addressed as part of the Chapter 11 process. Grace's ability to present a plan of reorganization to the Bankruptcy Court depends largely on the timing of resolution of these contingencies.

## LIABILITIES AND CONTINGENCIES

Grace has a number of financial exposures originating from past businesses, products and events. These obligations arose from transactions and/or business practices that date back to when Grace was a much larger company, when it produced products or operated businesses that are no longer part of its revenue base, and when government regulations and scientific knowledge were much less advanced than today. The following table summarizes net noncore liabilities at December 31, 2003 and 2002:

DECEMBER 31, NET NONCORE LIABILITIES --------------------------------

| (In millions) | 2003 | 2002 |
|---|---|---|
| NET NONCORE LIABILITIES: | | |
| Asbestos-related liabilities................... | $ (992.3) | $ (973.2) |
| Asbestos-related insurance receivable......... | 269.4 | 282.6 |
| Asbestos-related liability, net.............. | (722.9) | (690.6) |
| Environmental remediation.................... | (332.4) | (201.1) |
| Postretirement benefits...................... | (134.3) | (147.2) |
| Retained obligations and other.............. | (57.0) | (55.3) |
| NET NONCORE LIABILITY...................... | $ (1,246.6) | $ (1,094.2) |

The resolution of most of these noncore recorded and contingent liabilities will be determined through the Chapter 11 proceedings. Grace cannot predict with any certainty how, and for what amounts, any of such estimates will be resolved. The amounts of these liabilities as ultimately determined through the Chapter 11 proceedings could be materially different from amounts recorded by Grace at December 31, 2003.

## ASBESTOS-RELATED MATTERS

Grace is a defendant in lawsuits relating to previously sold asbestos-containing products. In 2003, Grace had net receipts of $2.8 million for the defense and disposition of asbestos-related property damage and bodily injury litigation, including amounts received under settlements with insurance carriers, compared with net expenditures in 2002 of $2.3 million. At December 31, 2003, Grace's balance sheet reflects a gross asbestos-related liability of $992.3 million ($722.9 million net of insurance). This liability represents management's estimate, based on facts and circumstances existing prior to the Filing, of the undiscounted net cash outflows necessary to satisfy Grace's pending property damage claims for which sufficient information is available, and its pending and projected future bodily injury claims. In the fourth quarter of 2003, Grace recorded a $30.0 million pre-tax charge to its estimated liability for asbestos-related litigation to account for the estimated cost of resolving new asbestos-related property damage claims received through the Chapter 11 claims solicitation process. The pre-tax charge was based on an initial review, completed in the fourth quarter of 2003, of more than 4,000 new claims submitted

CC-BLG002726

prior to the March 31, 2003 claims bar date. Each claim is unique as to property, product in question, legal status of claimant, potential cost of remediation, and other factors. Such claims were reviewed in detail by Grace, categorized into claims with sufficient information to be evaluated or claims that require additional information and, where sufficient information existed, the cost of resolution was estimated. Grace's revised estimate of liability does not

F-44

CC-BLG002727

include any amounts for approximately 170 claims for which sufficient information was not available to evaluate potential liability. Any further changes to the recorded amount of such liability will be based on additional Chapter 11 developments and management's assessment of the claim amounts that will ultimately be allowed by the Bankruptcy Court.

Recently, federal legislation has been proposed to address asbestos bodily injury claims. In addition, several states have enacted or proposed legislation affecting asbestos bodily injury claims. At this time, Grace cannot predict what impact any such legislation would have on Grace's asbestos bodily injury liability, related insurance coverage, or its ultimate plan of reorganization.

The Consolidated Balance Sheet at December 31, 2003 includes total amounts due from insurance carriers of $269.4 million pursuant to settlement agreements with those insurance carriers. The recovery of amounts due from insurance carriers is dependent upon the timing, character and exposure periods of asbestos-related claims. Grace's Chapter 11 proceedings and proposed federal legislation could also affect the timing and amounts of Grace's recovery.

Grace intends to address all of its pending and future asbestos-related claims as part of a plan of reorganization under Chapter 11. Grace will seek to have the Bankruptcy Court establish a process to assess and appropriately quantify the numerous property damage and bodily injury claims against it. Measurement of Grace's asbestos-related liabilities will be materially affected by Bankruptcy Court rulings, the outcome of litigation and negotiations among interested parties.

## ENVIRONMENTAL MATTERS

Grace is subject to loss contingencies resulting from extensive and evolving federal, state, local and foreign environmental laws and regulations. Grace has expended substantial funds to comply with such laws and regulations and expects to continue to do so in the future. The following table sets forth Grace's expenditures in the past three years for (1) the operation and maintenance of environmental facilities and the disposal of wastes; (2) capital expenditures for environmental control facilities; and (3) site remediation.

| (In millions) | OPERATION OF FACILITIES AND WASTE | CAPITAL EXPENDITURES | SITE REMEDIATION |
|---|---|---|---|
| 2003 | $ 46.1 | $ 8.1 | $ 7.0 |
| 2002 | 38.0 | 5.6 | 13.7 |
| 2001 | 33.0 | 3.8 | 26.6 |

At December 31, 2003, Grace's recorded liability for environmental investigation and remediation costs totaled $332.4 million, as compared with $201.1 million at December 31, 2002. This liability covers both vermiculite and non-vermiculite related matters. The amount is based on funding and/or remediation agreements in place, together with Grace's best estimate of its cost for sites not subject to a formal remediation plan. The increase in the liability is primarily attributable to pre-tax charges relating to former vermiculite mining operations in Libby, Montana, as described below.

Grace's estimated liability for vermiculite-related remediation at December 31, 2003 and 2002 was $181.0 million and $62.7 million, respectively. Based on a previous ruling by the U.S. District Court of Montana, Grace is required to reimburse the EPA for all appropriate costs expended for clean-up activities in and around Libby, Montana, related to its former mining activities. As a result of such ruling, Grace recorded a pre-tax charge of $50.0 million in the third quarter of 2003. During the fourth quarter of 2003, Grace recorded a $70.0 million pre-tax charge based on additional information from the EPA and its evaluation of probable remediation costs at vermiculite processing sites. However, the EPA's cost estimates have changed regularly and increased substantially over the course of this clean-up. Consequently, Grace's estimate may change materially as more information becomes available. Grace's liability for this matter is included in "liabilities subject to compromise" as of December 31, 2003.

At December 31, 2003 and 2002, Grace's estimated liability for remediation of sites not related to its former vermiculite mining and processing activities was $151.4 million and $138.4 million, respectively. This liability relates to Grace's current and former operations, including its share of liability for off-site disposal at facilities where it has been identified as a potentially responsible party. During the fourth quarter of 2003, Grace recorded a $20.0 million increase in its estimated environmental liability for non-vermiculite related sites as part of the Chapter 11 claims review process. Grace's revised estimated liability is based upon claims for which sufficient information was available. As Grace receives new information and continues its claims evaluation process, its estimated liability may change materially. Grace's liability for this matter is included in "liabilities subject to compromise" as of December 31, 2003.

See Note 14 to the Consolidated Financial Statements for a background description of Grace's Vermiculite and Non-Vermiculite Related Matters.

CC-BLG002728

**POSTRETIREMENT BENEFITS**

Grace provides certain health care and life insurance benefits for retired employees, a large majority of which pertain to retirees of previously divested businesses. These plans are unfunded, and Grace pays the costs of benefits under these plans as they are incurred. Effective January 1, 2002, Grace's postretirement medical plan was amended to increase the contribution required to be paid by the retirees to a minimum of 40% of the calculated premium. Also, during 2002, per capita costs under the retiree medical plans exceeded caps on the amount Grace is required to contribute under a 1993 amendment to the plan. As a result, for 2003 and future years, retirees will bear 100% of any increase in premium costs. Grace's share of benefits under this program was $12.6 million during 2003, compared with $21.5 million in 2002. Grace's recorded liability for postretirement benefits of $134.3 million at December 31, 2003 is stated at net present value discounted at 6.25%. The continuing payment of these benefits has been approved by the Bankruptcy Court; however, the program would still be subject to the terms of a Chapter 11 reorganization plan.

**TAX MATTERS**

The net deferred tax asset was $581.1 million and $563.4 million as of December 31, 2003 and 2002, respectively. Based upon anticipated future results, Grace has concluded that it is more likely than not that the balance of the net deferred tax assets (including the valuation allowance) will be realized. Because of the nature of the items that make up this balance, the realization period is likely to extend over a number of years and the outcome of the Chapter 11 process could materially impact the realization period.

See Note 14 to the Consolidated Financial Statements for a discussion of Grace's other tax-related contingencies.

**OTHER CONTINGENCIES**

See Note 14 to the Consolidated Financial Statements for a discussion of Grace's other contingent matters.

**LIQUIDITY AND CAPITAL RESOURCES**

**CASH RESOURCES AND AVAILABLE CREDIT FACILITIES**

At December 31, 2003, Grace had $400.0 million in cash and cash-like assets on hand ($309.2 million in cash and cash equivalents and $90.8 million in cash value of life insurance). In addition, Grace had access to committed credit facilities aggregating $250.0 million under the DIP facility, of which $215.9 million (net of borrowings, letters of credit, and holdback provisions) was available at December 31, 2003. The term of the DIP facility expires April 1, 2006. Grace believes that these funds and credit facilities will be sufficient to finance its business strategy while in Chapter 11.

**CASH FLOW**

| DECEMBER 31, CORE OPERATIONS (In millions) | 2003 | 2002 | 2001 |
|---|---|---|---|
| CASH FLOWS: | | | |
| Pre-tax operating income | $ 148.7 | $ 180.8 | $ 187.5 |
| Depreciation and amortization | 102.9 | 94.9 | 89.2 |
| PRE-TAX EARNINGS BEFORE DEPRECIATION AND AMORTIZATION | 251.6 | 275.7 | 276.7 |
| Working capital and other changes | (63.4) | 24.1 | (50.6) |
| CASH FLOW BEFORE INVESTING | 188.2 | 299.8 | 226.1 |
| Capital expenditures | (86.4) | (91.1) | (62.9) |
| Businesses acquired | (26.9) | (28.5) | (84.4) |
| NET CASH FLOW FROM CORE OPERATIONS | $ 74.9 | $ 180.2 | $ 78.8 |

Grace's net cash flow from core operations before investing decreased due to lower pre-tax operating income and increased investment in working capital and other items. The lower pre-tax operating income in 2003 resulted primarily from higher costs for pensions, certain raw materials, and natural gas. The increased investment in working capital and other items was due to a shift in regional sales mix outside North America where standard terms of sale are longer and advanced purchasing of key raw materials is often necessary. Capital expenditures were consistent year-over-year with a substantial portion of these expenditures directed toward the business segments for routine capital replacements and construction of new catalyst production capacity at the Lake Charles, Louisiana site.

Grace expects to continue to invest excess cash flow and/or other available capital resources in its core business base. These investments are

CC-BLG002729

likely to be in the form of added plant capacity, product line extensions and geographic market expansions, and/or acquisitions

F-46

CC-BLG002730

for similar strategic purposes. Investments that are outside the ordinary course of business may be subject to Bankruptcy Court approval and Chapter 11 creditor committee review.

DECEMBER 31, NONCORE ACTIVITIES -----------------------------

| (In millions) | 2003 | 2002 | 2001 |
|---|---|---|---|
| CASH FLOWS: | | | |
| Pre-tax (loss) income from noncore activities... | $(190.1) | $(74.5) | $  3.0 |
| Non-cash charges............................... | 189.2 | 81.1 | 6.4 |
| Cash spending for: | | | |
| Asbestos-related litigation, net of | | | |
| insurance recovery......................... | 2.8 | (2.3) | (30.8) |
| Environmental remediation..................... | (11.2) | (20.8) | (28.9) |
| Postretirement benefits....................... | (12.6) | (21.5) | (22.3) |
| Retained obligations and other................ | (1.3) | (4.5) | (9.1) |
| NET CASH OUTFLOW FOR NONCORE ACTIVITIES ........ | $ (23.2) | $(42.5) | $(81.7) |

Expenditures for environmental remediation were lower in 2003, due partly to Grace's Chapter 11 proceedings and partly to the completion of remediation work on certain sites. Postretirement benefit payments were also lower in 2003 due to changes in cost sharing under retiree medical plans. Payments for retained obligations of divested businesses and other contingencies were lower in 2003 due to the stay of litigation and to the one-time nature of these matters. These cash outflows were partially offset by asbestos-related cash inflows where insurance proceeds exceeded continuing administrative costs of claims administration.

See the "Consolidated Statements of Cash Flows" included in the Consolidated Financial Statements for investing and financing activities for the years ended December 31, 2003, 2002 and 2001.

## LIFE INSURANCE

Grace is the beneficiary of life insurance policies on certain current and former employees with a net cash surrender value of $90.8 million at December 31, 2003. This net cash surrender value is composed of $478.5 million in policy gross cash value offset by $387.7 million of policy loans. The policies were acquired to fund various employee benefit programs and other long-term liabilities and are structured to provide cash flows (primarily tax-free) over an extended period. Certain of these policies are of the type that has received recent judicial and legislative attention including proposals to tax benefit proceeds under certain circumstances. Pending rulings and proposed reforms could adversely affect the availability of these policies as a funding source for Grace's noncore liabilities. Grace is evaluating whether to continue the policies that may be affected by these developments or to terminate them for their cash value.

## PENSION BENEFITS UNDER U.S. QUALIFIED PLANS

The decline in value of the U.S. and global equity markets from 2000-2002, coupled with a decline in interest rates during 2001 and 2002, created a shortfall between accounting measurements of Grace's obligations under certain of its qualified pension plans and the market value of dedicated pension assets. A balance sheet adjustment of $147.7 million was recorded (net of tax) to reduce shareholders' equity (deficit) at December 31, 2002, to recognize the pension shortfall and to fully reserve deferred pension losses. Market returns in 2003 (22.5% for Grace's domestic pension plan assets) and contributions of $48.5 million to under-funded domestic plans served to lower, but were not sufficient to eliminate this shortfall. The increase in pension assets over 2003 resulted in a balance sheet adjustment of $18.3 million to increase shareholders' equity (deficit) at December 31, 2003. The market returns experienced in 2003 are not fully recognized in 2003 under the deferral method of accounting required under generally accepted accounting principles. These gains, along with other differences between assumed and actual returns, will be recognized into earnings over a period ranging from 12-24 years. Grace has lowered its assumed return on plan assets for 2004 to 8.0%, down from 8.25% for 2003 and 9.0% for 2002. The new rate of return is comparable to the average long-term rate of return Grace has experienced since 1990.

Under ERISA Grace will be required to make additional contributions to certain of its U.S. qualified pension plans in the future. The amount and timing of contributions could be affected by Grace's Chapter 11 proceedings.

F-47

CC-BLG002731

**DEBT AND OTHER CONTRACTUAL OBLIGATIONS**

## CONTRACTUAL OBLIGATIONS NOT SUBJECT TO COMPROMISE

| (In millions) | Total | Less than 1 Year | 1-3 Years | Thereafter |
|---|---|---|---|---|
| | | Payments due by Period | | |
| Operating commitments (1) | $ 14.2 | $ 13.8 | $ 0.4 | $ -- |
| Debt | 6.8 | 6.8 | -- | -- |
| Operating leases | 67.1 | 16.7 | 33.4 | 17.0 |
| Capital leases | 3.2 | 0.5 | 1.9 | 0.8 |
| Pension funding requirements per ERISA | 33.0 | 33.0 | -- | -- |
| TOTAL CONTRACTUAL CASH OBLIGATIONS | $124.3 | $ 70.8 | $ 35.7 | $ 17.8 |

(1) Amounts do not include open purchase commitments which are routine in nature and normally settle within 90 days.

Total debt outstanding at December 31, 2003 was $557.1 million, including $49.0 million of accrued interest on pre-petition debt. As a result of the Filing, Grace is now in default on $501.3 million of pre-petition debt, which, together with accrued interest thereon, has been included in "liabilities subject to compromise" as of December 31, 2003. The automatic stay provided under the Bankruptcy Code prevents Grace's lenders from taking any action to collect the principal amounts as well as related accrued interest. However, Grace will continue to accrue and report interest on such debt during the Chapter 11 proceedings unless further developments lead management to conclude that it is probable that such interest will be compromised.

See Note 14 to the Consolidated Financial Statements for a discussion of financial assurances.

## INFLATION

The financial statements are presented on a historical cost basis and do not fully reflect the impact of prior years' inflation. While the U.S. inflation rate has been modest for several years, Grace operates in international economies with both inflation and currency risks. The ability to pass on inflation costs is an uncertainty due to general economic conditions and competitive situations. The cost of replacing Grace's property and equipment today is estimated to be greater than its historical cost. Accordingly, depreciation expense would be greater if the expense were stated on a current cost basis.

## ACCOUNTING PRONOUNCEMENTS

See Note 1 of Consolidated Financial Statements for a discussion of recent accounting pronouncements and their effect on Grace.

## FORWARD-LOOKING STATEMENTS

The forward-looking statements contained in this document are based on current expectations regarding important risk factors. Actual results may differ materially from those expressed. In addition to the uncertainties referred to in Management's Discussion and Analysis of Results of Operations and Financial Condition, other uncertainties include: the impact of worldwide economic conditions; pricing of both Grace's products and raw materials; customer outages and customer demand; factors resulting from fluctuations in interest rates and foreign currencies; the impact of competitive products and pricing; the continued success of Grace's process improvement initiatives; the impact of tax, legislation and other regulations in the jurisdictions in which Grace operates; and developments in and the outcome of the Chapter 11 proceedings discussed above. Also, see "Introduction and Overview - Projections and Other Forward-Looking Information" in Item 1 of Grace's current Annual Report on Form 10-K.

F-48

CC-BLG002732

W. R. GRACE & CO. AND SUBSIDIARIES
VALUATION AND QUALIFYING ACCOUNTS AND RESERVES
(In millions)

FOR THE YEAR 2003

| Description | Balance at beginning of period | Charged/ (credited) to costs and expenses | Other net (1) | Balance at end of period |
|---|---|---|---|---|
| VALUATION AND QUALIFYING ACCOUNTS DEDUCTED FROM ASSETS: | | | | |
| Allowances for notes and accounts receivable............. | $ 5.4 | $ 0.9 | $ -- | $ 6.3 |
| Allowances for long-term receivables.................... | 0.8 | (0.1) | -- | 0.7 |
| Valuation allowance for deferred tax assets............. | 152.5 | 15.8 | -- | 168.3 |
| RESERVES: | | | | |
| Reserves for retained obligations of divested businesses.. | $ 55.3 | $ -- | $ 1.7 | $ 57.0 |

FOR THE YEAR 2002

| Description | Balance at beginning of period | Charged/ (credited) to costs and expenses | Other net (2) | Balance at end of period |
|---|---|---|---|---|
| VALUATION AND QUALIFYING ACCOUNTS DEDUCTED FROM ASSETS: | | | | |
| Allowances for notes and accounts receivable............. | $ 7.6 | $ (2.2) | $ -- | $ 5.4 |
| Allowances for long-term receivables.................... | 0.6 | 0.2 | -- | 0.8 |
| Valuation allowance for deferred tax assets............. | 158.0 | (5.5) | -- | 152.5 |
| RESERVES: | | | | |
| Reserves for retained obligations of divested businesses.. | $ 80.5 | $ -- | $ (25.2) | $ 55.3 |

FOR THE YEAR 2001

| Description | Balance at beginning of period | Charged/ (credited) to costs and expenses | Other net (1) | Balance at end of period |
|---|---|---|---|---|
| VALUATION AND QUALIFYING ACCOUNTS DEDUCTED FROM ASSETS: | | | | |
| Allowances for notes and accounts receivable............. | $ 4.4 | $ 3.2 | $ -- | $ 7.6 |
| Allowances for long-term receivables.................... | 0.8 | (0.2) | -- | 0.6 |
| Valuation allowance for deferred tax assets............. | 179.1 | (21.1) | -- | 158.0 |
| RESERVES: | | | | |
| Reserves for retained obligations of divested businesses.. | $ 78.1 | $ -- | $ 2.4 | $ 80.5 |

(1) Various miscellaneous adjustments against reserves established for divested business.
(2) $25.2 million represents net spending offset by a reclass of an $18.0 million tax receivable relating to Grace's divested packaging business.

F-49

CC-BLG002733

EXHIBIT 12

W. R. GRACE & CO. AND SUBSIDIARIES
COMPUTATION OF RATIO OF EARNINGS TO FIXED CHARGES AND
COMBINED FIXED CHARGES AND PREFERRED STOCK DIVIDENDS (1)
(In millions, except ratios)
(Unaudited)

| | YEARS ENDED DECEMBER 31, (2) | | | | |
|---|---|---|---|---|---|
| | 2003 (3) | 2002 (4) | 2001 | 2000 (5) | 1999 |
| Net (loss) income from continuing operations | $ (55.2) | $ 22.1 | $ 78.6 | $ (89.7) | $ 130.2 |
| (Benefit from) provision for income taxes | (12.3) | 38.0 | 63.7 | 70.0 | 73.2 |
| Minority interest in income (loss) of majority owned subsidiaries | 1.2 | (2.2) | (3.7) | -- | -- |
| Equity in unremitted losses (earnings) of less than 50%-owned companies | 0.7 | 0.1 | -- | (0.5) | (0.2) |
| Interest expense and related financing costs, including amortization of capitalized interest | 17.5 | 22.3 | 39.5 | 30.6 | 18.8 |
| Estimated amount of rental expense deemed to represent the interest factor | 5.1 | 4.9 | 4.7 | 4.7 | 5.2 |
| (Loss) income as adjusted | $ (43.0) | $ 85.2 | $ 182.8 | $ 15.1 | $ 227.2 |
| Combined fixed charges and preferred stock dividends: Interest expense and related financing costs, including capitalized interest | $ 18.0 | $ 21.8 | $ 36.6 | $ 29.1 | $ 17.0 |
| Estimated amount of rental expense deemed to represent the interest factor | 5.1 | 5.0 | 4.7 | 4.7 | 5.2 |
| Fixed charges | 23.1 | 26.8 | 41.3 | 33.8 | 22.2 |
| Combined fixed charges and preferred stock dividends | $ 23.1 | $ 26.8 | $ 41.3 | $ 33.8 | $ 22.2 |
| Ratio of earnings to fixed charges | (6) | 3.18 | 4.43 | (6) | 10.23 |
| Ratio of earnings to combined fixed charges and preferred stock dividends | (6) | 3.18 | 4.43 | (6) | 10.23 |

(1) Grace's preferred stocks were retired in 1996.

(2) Certain amounts have been restated to conform to the 2003 presentation.

(3) Amounts include $172.5 million for pre-tax charges to adjust Grace's estimated liability for environmental remediation and asbestos-related property damage.

(4) Amounts contain a provision for non-operating environmental remediation of $70.7 million.

(5) Includes a pre-tax provision of $208.0 million for asbestos-related liabilities net of insurance coverage. The provision for income taxes includes a $75.0 million charge for tax and interest relating to tax deductibility of interest on corporate-owned life insurance policy loans.

(6) As a result of the losses incurred for the years ended December 31, 2003 and 2000, Grace was unable to fully cover the indicated fixed charges (a shortfall of $66.1 million and $18.7 million, respectively).

F-50

CC-BLG002734

**W. R. GRACE & CO. AND SUBSIDIARIES**
**REPORT ON INTERNAL CONTROLS AND PROCEDURES**

### General Statement Of Responsibility.

The management of Grace is responsible for the preparation, integrity and objectivity of the Consolidated Financial Statements and the other information included in this report. The financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America and accordingly include certain amounts that represent management's best estimates and judgments. Actual amounts could differ from those estimates. Management maintains internal controls to assist it in fulfilling its responsibility for financial reporting. These internal controls consist of the control environment, risk assessment, control activities, information and communication, and monitoring. A chartered Disclosure Committee oversees Grace's public financial reporting process and key managers are required to confirm their compliance with Grace's policies and internal controls. While no system of internal controls can ensure elimination of all errors and irregularities, Grace's internal controls, which are reviewed and modified in response to changing conditions, have been designed to provide reasonable assurance that assets are safeguarded, policies and procedures are followed, transactions are properly executed and reported, and appropriate disclosures are made. The concept of reasonable assurance is based on the recognition that there are limitations in all systems of internal control and that the costs of such systems should not exceed their benefits.

### Evaluation Of Disclosure Controls And Procedures.

As of December 31, 2003, Grace carried out an evaluation of the effectiveness of the design and operation of its disclosure controls and procedures pursuant to Rule 13a-15 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Based upon that evaluation, Grace's Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures are effective in ensuring that information required to be disclosed in the Company's periodic filings under the Exchange Act is accumulated and communicated to such officers to allow timely decisions regarding required disclosures. There was no significant change in the Company's internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

F-51

CC-BLG002735

EXHIBIT 10.6

## W. R. GRACE & CO.

### 1996 STOCK INCENTIVE PLAN

1. Purposes. The purposes of this Plan are (a) to enable Key Persons to have incentives related to Common Stock, (b) to encourage Key Persons to increase their interest in the growth and prosperity of the Company and to stimulate and sustain constructive and imaginative thinking by Key Persons, (c) to further the identity of interests of Key Persons with the interests of the Company's stockholders, and (d) to induce the service or continued service of Key Persons and to enable the Company to compete with other organizations offering similar or other incentives in obtaining and retaining the services of the most highly qualified individuals.

2. Definitions. When used in this Plan, the following terms shall have the meanings set forth in this section 2.

Board of Directors: The Board of Directors of the Company.

cessation of service (or words of similar import): When a person ceases to be an employee of the Company or a Subsidiary. For purposes of this definition, if an entity that was a Subsidiary ceases to be a Subsidiary, persons who immediately thereafter remain employees of that entity (and are not employees of the Company or an entity that is a Subsidiary) shall be deemed to have ceased service.

Change in Control: Shall be deemed to have occurred if (a) the Company determines that any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act), other than a trustee or other fiduciary holding securities under an employee benefit plan of the Company or a corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company, has become the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of 20% or more of the outstanding Common Stock of the Company;
(b) individuals who are "Continuing Directors" (as defined below) cease to constitute a majority of any class of the Board of Directors; (c) there occurs a reorganization, merger, consolidation or other corporate transaction involving the Company (a "Corporate Transaction"), in each case, with respect to which the stockholders of the Company immediately prior to such Corporate Transaction do not, immediately after the Corporate Transaction, own more than 60% of the combined voting power of the corporation resulting from such Corporate Transaction; or (d) the stockholders of the Company approve a complete liquidation or dissolution of the Company. Notwithstanding any other provision of this Plan, the distribution of all of the shares of Common Stock of the Company to the Shareholders of W. R. Grace & Co., a New York corporation, shall not be deemed a Change In Control.

CC-BLG002736

Change in Control Price: The higher of (a) the highest reported sales price, regular way, as reported in The Wall Street Journal or another newspaper of general circulation, of a share of Common Stock in any transaction reported on the New York Stock Exchange Composite Tape or other national exchange on which such shares are listed or on NASDAQ during the 60-day period prior to and including the date of a Change in Control or (b) if the Change in Control is the result of a tender or exchange offer or a Corporate Transaction, the highest price per share of Common Stock paid in such tender or exchange offer or Corporate Transaction; provided, however, that in the case of Incentive Stock Options, the Change in Control Price shall be in all cases the Fair Market Value of the Common Stock on the date such Incentive Stock Option is exercised. To the extent that the consideration paid in any Corporate Transaction or other transaction described above consists in whole or in part of securities or other noncash consideration, the value of such securities or other noncash consideration shall be determined in the sole discretion of the Board of Directors.

Code: The Internal Revenue Code of 1986, as amended.

Committee: The Compensation, Employee Benefits and Stock Incentive Committee of the Board of Directors of the Company or any other committee designated by the Board of Directors to administer stock incentive and stock option plans of the Company and the Subsidiaries generally or this Plan specifically.

Common Stock: The common stock of the Company, par value $.01 per share, or such other class of shares or other securities or property as may be applicable pursuant to the provisions of section 8.

Company: W. R. Grace & Co., a Delaware corporation.

Continuing Director: The meaning set forth in the definition of "Change in Control" above.

Corporate Transaction: The meaning set forth in the definition of "Change in Control" above.

Exchange Act: The Securities Exchange Act of 1934, as amended.

Exercise Period: The meaning set forth in section 14(b) of this Plan.

Fair Market Value: (a) The mean between the high and low sales prices of a share of Common Stock in New York Stock Exchange composite transactions on

CC-BLG002737

the applicable date, as reported in The Wall Street Journal or another newspaper of general circulation, or, if no sales of shares of Common Stock were reported for such date, for the next preceding date for which such sales were so reported, or (b) the fair market value of a share of Common Stock determined in accordance with any other reasonable method approved by the Committee.

Incentive Stock Option: A stock option that states that it is an incentive stock option and that is intended to meet the requirements of Section 422 of the Code and the regulations thereunder applicable to incentive stock options, as in effect from time to time.

issuance (or words of similar import): The issuance of authorized but unissued Common Stock or the transfer of issued Common Stock held by the Company or a Subsidiary.

Key Person: An employee of the Company or a Subsidiary who, in the opinion of the Committee, has contributed or can contribute significantly to the growth and successful operations of the Company or one or more Subsidiaries. The grant of a Stock Incentive to an employee shall be deemed a determination by the Committee that such person is a Key Person.

Nonstatutory Stock Option: An Option that is not an Incentive Stock Option.

Option: An option granted under this Plan to purchase shares of Common Stock.

Option Agreement: An agreement setting forth the terms of an Option.

Plan: The 1996 Stock Incentive Plan of the Company herein set forth, as the same may from time to time be amended.

service: Service to the Company or a Subsidiary as an employee. "To serve" has a correlative meaning.

Spread: The meaning set forth in section 14(b) of this Plan.

Stock Award: An issuance of shares of Common Stock or an undertaking (other than an Option) to issue such shares in the future.

Stock Incentive: A stock incentive granted under this Plan in one of the forms provided for in section 3.

Subsidiary: A corporation (or other form of business association) of which shares (or other ownership interests) having 50% or more of the voting power regularly entitled to vote for directors (or equivalent management rights) are owned, directly or indirectly, by the Company, or any other entity designated as such

3

CC-BLG002738

by the Board of Directors; provided, however, that in the case of an Incentive Stock Option, the term "Subsidiary" shall mean a Subsidiary (as defined by the preceding clause) that is also a "subsidiary corporation" as defined in Section 424(f) of the Code and the regulations thereunder, as in effect from time to time.

3. Grants of Stock Incentives. (a) Subject to the provisions of this Plan, the Committee may at any time and from time to time grant Stock Incentives under this Plan to, and only to, Key Persons.

(b) The Committee may grant a Stock Incentive to be effective at a specified future date or upon the future occurrence of a specified event. For the purposes of this Plan, any such Stock Incentive shall be deemed granted on the date it becomes effective. An agreement or other commitment to grant a Stock Incentive that is to be effective in the future shall not be deemed the grant of a Stock Incentive until the date on which such Stock Incentive becomes effective.

(c) A Stock Incentive may be granted in the form of:

(i) a Stock Award, or

(ii) an Option, or

(iii) a combination of a Stock Award and an Option.

4. Stock Subject to this Plan. (a) Subject to the provisions of paragraph (c) of this section 4 and the provisions of section 8, the maximum number of shares of Common Stock that may be issued pursuant to Stock Incentives granted under this Plan shall not exceed seven million (7,000,000).

(b) Authorized but unissued shares of Common Stock and issued shares of Common Stock held by the Company or a Subsidiary, whether acquired specifically for use under this Plan or otherwise, may be used for purposes of this Plan.

(c) If any shares of Common Stock subject to a Stock Incentive shall not be issued and shall cease to be issuable because of the termination, in whole or in part, of such Stock Incentive or for any other reason, or if any such shares shall, after issuance, be reacquired by the Company or a Subsidiary from the recipient of such Stock Incentive, or from the estate of such recipient, for any reason, such shares shall no longer be charged against the limitation provided for in paragraph (a) of this section 4 and may again be made subject to Stock Incentives.

(d) Of the total number of shares specified in paragraph (a) of this section 4 (subject to adjustment as specified therein), during the term of this Plan as defined in section 9, (i) no more than 10% may be subject to Options granted to any one Key Person and (ii) no more than 15% may be subject to Stock

4

CC-BLG002739

Incentives granted to any one Key Person.

5. Stock Awards. Except as otherwise provided in section 12, Stock Incentives in the form of Stock Awards shall be subject to the following provisions:

(a) For purposes of this Plan, all shares of Common Stock subject to a Stock Award shall be valued at not less than 100% of the Fair Market Value of such shares on the date such Stock Award is granted, regardless of whether or when such shares are issued pursuant to such Stock Award and whether or not such shares are subject to restrictions affecting their value.

(b) Shares of Common Stock subject to a Stock Award may be issued to a Key Person at the time the Stock Award is granted, or at any time subsequent thereto, or in installments from time to time. In the event that any such issuance shall not be made at the time the Stock Award is granted, the Stock Award may provide for the payment to such Key Person, either in cash or shares of Common Stock, of amounts not exceeding the dividends that would have been payable to such Key Person in respect of the number of shares of Common Stock subject to such Stock Award (as adjusted under section 8) if such shares had been issued to such Key Person at the time such Stock Award was granted. Any Stock Award may provide that the value of any shares of Common Stock subject to such Stock Award may be paid in cash, on each date on which shares would otherwise have been issued, in an amount equal to the Fair Market Value on such date of the shares that would otherwise have been issued.

(c) The material terms of each Stock Award shall be determined by the Committee. Each Stock Award shall be evidenced by a written instrument consistent with this Plan. It is intended that a Stock Award would be (i) made contingent upon the attainment of one or more specified performance objectives and/or (ii) subject to restrictions on the sale or other disposition of the Stock Award or the shares subject thereto for a period of three or more years; provided, however, that (x) a Stock Award may include restrictions and limitations in addition to those provided for herein and (y) of the total number of shares specified in paragraph (a) of section 4 (subject to adjustment as specified therein), up to 3% may be subject to Stock Awards not subject to clause (i) or clause (ii) of this sentence.

(d) A Stock Award shall be granted for such lawful consideration as may be provided for therein.

6. Options. Except as otherwise provided in section 12, Stock Incentives in the form of Options shall be subject to the following provisions:

(a) The purchase price per share of Common Stock shall be not less than 100% of the Fair Market Value of a share of Common Stock on the date the Option is granted. The purchase price and any withholding tax that may be due on the exercise of an Option may be paid in cash, or, if so provided in the Option Agreement, (i) in shares of Common Stock (including shares issued

5

CC-BLG002740

pursuant to the Option being exercised and shares issued pursuant to a Stock Award granted subject to restrictions as provided for in paragraph (c) of section 5), or (ii) in a combination of cash and such shares; provided, however, that no shares of Common Stock delivered in payment of the purchase price may be "immature shares," as determined in accordance with generally accepted accounting principles in effect at the time. Any shares of Common Stock delivered to the Company in payment of the purchase price or withholding tax shall be valued at their Fair Market Value on the date of exercise. No certificate for shares of Common Stock shall be issued upon the exercise of an Option until the purchase price for such shares has been paid in full.

(b) If so provided in the Option Agreement, the Company shall, upon the request of the holder of the Option and at any time and from time to time, cancel all or a portion of the Option then subject to exercise and either (i) pay the holder an amount of money equal to the excess, if any, of the Fair Market Value, at such time or times, of the shares subject to the portion of the Option so canceled over the purchase price for such shares, or (ii) issue shares of Common Stock to the holder with a Fair Market Value, at such time or times, equal to such excess, or (iii) pay such excess by a combination of money and shares.

(c) Each Option may be exercisable in full at the time of grant, or may become exercisable in one or more installments and at such time or times or upon the occurrence of such events, as may be specified in the Option Agreement, as determined by the Committee. Unless otherwise provided in the Option Agreement, an Option, to the extent it is or becomes exercisable, may be exercised at any time in whole or in part until the expiration or termination of such Option.

(d) Each Option shall be exercisable during the life of the holder only by him and, after his death, only by his estate or by a person who acquires the right to exercise the Option by will or the laws of descent and distribution. An Option, to the extent that it shall not have been exercised or canceled, shall terminate as follows after the holder ceases to serve: (i) if the holder shall voluntarily cease to serve without the consent of the Committee or shall have his service terminated for cause, the Option shall terminate immediately upon cessation of service; (ii) if the holder shall cease to serve by reason of death, incapacity or retirement under a retirement plan of the Company or a Subsidiary, the Option shall terminate three years after the date on which he ceased to serve; and (iii) except as provided in the next sentence, in all other cases the Option shall terminate three months after the date on which the holder ceased to serve unless the Committee shall approve a longer period (which approval may be given before or after cessation of service) not to exceed three years. If the holder shall die or become incapacitated during the three-month period (or such longer period as the Committee may approve) referred to in the preceding clause (iii), the Option shall terminate three years after the date on which he ceased to serve. A leave of absence for military or governmental service or other purposes shall not, if approved by the Committee (which approval may be given before or after the leave of absence commences), be deemed a cessation of service within the meaning of

6

CC-BLG002741

this paragraph (d). Notwithstanding the foregoing provisions of this paragraph

(d) or any other provision of this Plan, no Option shall be exercisable after expiration of a period of ten years and one month from the date the Option is granted. Where a Nonstatutory Option is granted for a term of less than ten years and one month, the Committee may, at any time prior to the expiration of the Option, extend its term for a period ending not later than ten years and one month from the date the Option was granted. Such an extension shall not be deemed the grant of a new Option under this Plan.

(e) No Option nor any right thereunder may be assigned or transferred except by will or the laws of descent and distribution and except, in the case of a Nonstatutory Option, pursuant to a qualified domestic relations order (as defined in the Code), unless otherwise provided in the Option Agreement.

(f) An Option may, but need not, be an Incentive Stock Option. All shares of Common Stock that may be made subject to Stock Incentives under this Plan may be made subject to Incentive Stock Options; provided, however, that (i) no Incentive Stock Option may be granted more than ten years after the effective date of this Plan, as provided in section 9; and (ii) the aggregate Fair Market Value (determined as of the time an Incentive Stock Option is granted) of the shares subject to each installment becoming exercisable for the first time in any calendar year under Incentive Stock Options granted on or after January 1, 1987 (under all plans, including this Plan, of his employer corporation and its parent and subsidiary corporations) to the Key Person to whom such Incentive Stock Option is granted shall not exceed $100,000.

(g) The material terms of each Option shall be determined by the Committee. Each Option shall be evidenced by a written instrument consistent with this Plan, and shall specify whether the Option is an Incentive Stock Option or a Nonstatutory Option. An Option may include restrictions and limitations in addition to those provided for in this Plan.

(h) Options shall be granted for such lawful consideration as may be provided for in the Option.

7. Combination of Stock Awards and Options. Stock Incentives authorized by paragraph (c)(iii) of section 3 in the form of combinations of Stock Awards and Options shall be subject to the following provisions: (a) A Stock Incentive may be a combination of any form of Stock Award and any form of Option; provided, however, that the terms and conditions of such Stock Incentive pertaining to a Stock Award are consistent with section 5 and the terms and conditions of such Stock Incentive pertaining to an Option are consistent with section 6.

(b) Such combination Stock Incentive shall be subject to such other terms and conditions as may be specified therein, including without limitation

7

CC-BLG002742

a provision terminating in whole or in part a portion thereof upon the exercise in whole or in part of another portion thereof.

(c) The material terms of each combination Stock Incentive shall be determined by the Committee. Each combination Stock Incentive shall be evidenced by a written instrument consistent with this Plan.

8. Adjustment Provisions. (a) In the event that any reclassification, split-up or consolidation of the Common Stock shall be effected, or the outstanding shares of Common Stock are, in connection with a merger or consolidation of the Company or a sale by the Company of all or a part of its assets, exchanged for a different number or class of shares of stock or other securities or property of the Company or for shares of the stock or other securities or property of any other corporation or person, or a record date for determination of holders of Common Stock entitled to receive a dividend payable in Common Stock shall occur, (i) the number, kind and class of shares or other securities or property that may be issued pursuant to Stock Incentives thereafter granted, (ii) the number, kind and class of shares or other securities or property that have not been issued under outstanding Stock Incentives, (iii) the purchase price to be paid per share or other unit under outstanding Stock Incentives, and (iv) the price to be paid per share or other unit by the Company or a Subsidiary for shares or other securities or property issued pursuant to Stock Incentives that are subject to a right of the Company or a Subsidiary to re-acquire such shares or other securities or property, shall in each case be equitably adjusted as determined by the Committee.

(b) In the event that there shall occur any spin-off or other distribution of assets of the Company to its shareholders (including without limitation an extraordinary dividend), (i) the number, kind and class of shares or other securities or property that may be issued pursuant to Stock Incentives thereafter granted, (ii) the number, kind and class of shares or other securities or property that have not been issued under outstanding Stock Incentives, (iii) the purchase price to be paid per share or other unit under outstanding Stock Incentives, and (iv) the price to be paid per share or other unit by the Company or a Subsidiary for shares or other securities or property issued pursuant to Stock Incentives that are subject to a right of the Company or a Subsidiary to re-acquire such shares or other securities or property, shall in each case be equitably adjusted as determined by the Committee.

9. Term. This Plan shall be deemed adopted and shall become effective on the date as of which it is approved by W. R. Grace & Co., a New York corporation, as sole shareholder of the Company. No Stock Incentives shall be granted under this Plan after the tenth anniversary of such date.

10. Administration. (a) This Plan shall be administered by the Committee. No director shall be designated as or continue to be a member of the Committee unless he shall at the time of designation and at all times during service as a member of the Committee be an "outside director" within the

8

CC-BLG002743

meaning of Section 162(m) of the Code. The Committee shall have full authority to act in the matter of selection of Key Persons and in granting Stock Incentives to them and such other authority as is granted to the Committee by this Plan. Notwithstanding any other provision of this Plan, the Board of Directors may exercise any and all powers of the Committee with respect to this Plan, except to the extent that the possession or exercise of any power by the Board of Directors would cause any Stock Incentive to become subject to, or to lose an exemption from, Section 162(m) of the Code or Section 16(b) of the Exchange Act.

(b) The Committee may establish such rules and regulations, not inconsistent with the provisions of this Plan, as it deems necessary to determine eligibility to be granted Stock Incentives under this Plan and for the proper administration of this Plan, and may amend or revoke any rule or regulation so established. The Committee may make such determinations and interpretations under or in connection with this Plan as it deems necessary or advisable. All such rules, regulations, determinations and interpretations shall be binding and conclusive upon the Company, its Subsidiaries, its shareholders and its directors, officers and employees, and upon their respective legal representatives, beneficiaries, successors and assigns, and upon all other persons claiming under or through any of them.

(c) Members of the Board of Directors and members of the Committee acting under this Plan shall be fully protected in relying in good faith upon the advice of counsel and shall incur no liability in the performance of their duties, except as otherwise provided by applicable law.

11. General Provisions. (a) Nothing in this Plan or in any instrument executed pursuant hereto shall confer upon any person any right to continue in the service of the Company or a Subsidiary, or shall affect the right of the Company or of a Subsidiary to terminate the service of any person with or without cause.

(b) No shares of Common Stock shall be issued pursuant to a Stock Incentive unless and until all legal requirements applicable to the issuance of such shares have, in the opinion of counsel to the Company, been complied with. In connection with any such issuance, the person acquiring the shares shall, if requested by the Company, give assurances, satisfactory to counsel to the Company, in respect of such matters as the Company or a Subsidiary may deem desirable to assure compliance with all applicable legal requirements.

(c) No person (individually or as a member of a group), and no beneficiary or other person claiming under or through him, shall have any right, title or interest in or to any shares of Common Stock allocated or reserved for the purposes of this Plan or subject to any Stock Incentive except as to such shares of Common Stock, if any, as shall have been issued to him.

(d) In the case of a grant of a Stock Incentive to a Key Person who is employed by a Subsidiary, such grant may provide for the issuance of the shares covered by the Stock Incentive to the Subsidiary, for such consideration as may be provided, upon the condition or understanding that the Subsidiary will transfer

9

the shares to the Key Person in accordance with the terms of the Stock Incentive.

(e) In the event the laws of a country in which the Company or a Subsidiary has employees prescribe certain requirements for Stock Incentives to qualify for advantageous tax treatment under the laws of that country (including, without limitation, laws establishing options analogous to Incentive Stock Options), the Committee, may, for the benefit of such employees, amend, in whole or in part, this Plan and may include in such amendment additional provisions for the purposes of qualifying the amended plan and Stock Incentives granted thereunder under such laws; provided, however, that (i) the terms and conditions of a Stock Incentive granted under such amended plan may not be more favorable to the recipient than would be permitted if such Stock Incentive had been granted under this Plan as herein set forth, (ii) all shares allocated to or utilized for the purposes of such amended plan shall be subject to the limitations of section 4, and (iii) the provisions of the amended plan may restrict but may not extend or amplify the provisions of sections 9 and 13.

(f) The Company or a Subsidiary may make such provisions as either may deem appropriate for the withholding of any taxes that the Company or a Subsidiary determines is required to be withheld in connection with any Stock Incentive.

(g) Nothing in this Plan is intended to be a substitute for, or shall preclude or limit the establishment or continuation of, any other plan, practice or arrangement for the payment of compensation or benefits to directors, officers or employees generally, or to any class or group of such persons, that the Company or any Subsidiary now has or may hereafter put into effect, including, without limitation, any incentive compensation, retirement, pension, group insurance, stock purchase, stock bonus or stock option plan.

12. Acquisitions. If the Company or any Subsidiary should merge or consolidate with, or purchase stock or assets or otherwise acquire the whole or part of the business of, another entity, the Company, upon the approval of the Committee, (a) may assume, in whole or in part and with or without modifications or conditions, any stock incentives granted by the acquired entity to its directors, officers, employees or consultants in their capacities as such, or
(b) may grant new Stock Incentives in substitution therefor. Any such assumed or substitute Stock Incentives may contain terms and conditions inconsistent with the provisions of this Plan (including the limitations set forth in paragraph
(d) of section 4), including additional benefits for the recipient; provided, however, that if such assumed or substitute Stock Incentives are Incentive Stock Options, such terms and conditions are permitted under the plan of the acquired entity. For the purposes of any applicable plan provision involving time or a date, a substitute Stock Incentive shall be deemed granted as of the date of grant of the original stock incentive.

10

CC-BLG002745

13. Amendments and Termination. (a) This Plan may be amended or terminated by the Board of Directors upon the recommendation of the Committee; provided, however, that, without the approval of the stockholders of the Company, no amendment shall be made which (i) causes this Plan to cease to comply with applicable law, (ii) permits any person who is not a Key Person to be granted a Stock Incentive (except as otherwise provided in section 12), (iii) amends the provisions of paragraph (d) of section 4, paragraph (a) of section 5 or paragraph (a) or paragraph (f) of section 6 to permit shares to be valued at, or to have a purchase price of, respectively, less than the percentage of Fair Market Value specified therein, (iv) amends section 9 to extend the date set forth therein, or (v) amends this section 13.

(b) No amendment or termination of this Plan shall adversely affect any Stock Incentive theretofore granted, and no amendment of any Stock Incentive granted pursuant to this Plan shall adversely affect such Stock Incentive, without the consent of the holder thereof.

14. Change in Control Provisions. (a) Notwithstanding any other provision of this Plan to the contrary, in the event of a Change in Control:

(i) Any Options outstanding as of the date on which such Change in Control occurs, and which are not then exercisable and vested, shall become fully exercisable and vested to the full extent of the original grant; and

(ii) All restrictions and deferral limitations applicable to Stock Incentives shall lapse, and Stock Incentives shall become free of all restrictions and become fully vested and transferable to the full extent of the original grant.

(b) Notwithstanding any other provision of this Plan, during the 60-day period from and after a Change in Control (the "Exercise Period"), unless the Committee shall determine otherwise at the time of grant, the holder of an Option shall have the right, in lieu of the payment of the purchase price for the shares of Common Stock being purchased under the Option, by giving notice to the Company, to elect (within the Exercise Period) to surrender all or part of the Option to the Company and to receive cash, within 30 days after such notice, in an amount equal to the amount by which the Change in Control Price per share of Common Stock on the date of such election shall exceed the purchase price per share of Common Stock under the Option (the "Spread") multiplied by the number of shares of Common Stock subject to the Option as to which the right subject to this Section 14(b) shall have been exercised.

(c) Notwithstanding any other provision of this Plan, if any right granted pursuant to this Plan to receive cash in respect of a Stock Incentive would make a Change in Control transaction ineligible for pooling-of-interests accounting that, but for the nature of such grant, would otherwise be eligible for such accounting treatment, the Committee shall have the ability to substitute for such cash Common Stock with a Fair Market Value equal to the amount of such cash.

11

CC-BLG002746

GRACE

**PAUL J. NORRIS**
Chairman, President & Chief Executive
Officer

W. R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044

(410) 531-4404
Fax: (410) 531-4414
email paul.j.norris@grace.com

November 17, 2003

Mr. Alfred E. Festa
14713 Goddingham Court
Midlothian, VA 23113

Dear Fred:

This letter agreement specifies the terms of your employment with W. R. Grace & Co. (the "Company") as President and Chief Operating Officer (collectively, the "COO"), which was approved by the Company's Board of Directors (the "Board") and Compensation Committee of the Board on November 6, 2003. In addition, this agreement was authorized by the U. S. Bankruptcy Court with jurisdiction over the Company's Chapter 11 cases on November 13, 2003.

Also, please note that I have agreed with the Board to relinquish the title of "President" of the Company, effective as of your first day of employment with the Company, which is today, November 17, 2003. I am extremely pleased that you will be joining the Company and believe you will make a valuable contribution to our future.

If you agree with the terms of this letter agreement, please sign where indicated below and return one fully executed copy to me. An additional copy of this letter is also enclosed for your records.

**RESPONSIBILITIES**

Your employment with the Company begins today, November 17, 2003. (As all other Company Headquarters employees, you will actually be employed by W. R. Grace & Co.-Conn., but will be an elected officer of both W. R. Grace & Co. and W. R. Grace & Co.-Conn.) Your title will be "President and Chief Operating Officer" of the Company, and you will report directly to me.

Your principal obligations, duties and responsibilities will be those generally inherent in the office and title of COO. In that regard, each of the Company's businesses will report directly to you, including Davison Catalysts, Davison Silicas and Grace Performance Chemicals. Your office will be located at the Company's Headquarters in Columbia, Maryland.

## TERM OF AGREEMENT

The term of your employment under this letter agreement will be for a period of three years, beginning on the date your employment with the Company commences, November 17, 2003, and ending on November 16, 2006 (such period is referred to in this agreement as your "Initial Employment Term").

If your employment as COO of the Company (or in any other position) continues after the Initial Employment Term, and no other contrary arrangements have been mutually agreed in writing between you and the Board, then the arrangements described in this agreement will be discontinued and you will be an employee of the Company "at will" subject to the same requirements as similarly situated employees of the Company at that time, except as provided under the following section entitled "Severance Pay Arrangement".

## COMPENSATION

1. Your initial annual base salary as COO will be $550,000.00. Thereafter, your base salary will be subject to periodic reviews on the same basis and at the same intervals as are applicable to other senior officers of the Company.

Your salary will cease to accrue immediately upon your termination of employment with the Company, even if your termination occurs during your Initial Employment Term and whether or not your termination is voluntary.

(Note, however, the provisions under "Severance Pay Arrangement.")

2. You will be eligible to participate in the Company's Annual Incentive Compensation Program. For 2003 and 2004, your targeted award under the Program will be 100% of your base salary earned during the applicable calendar year. For 2005 and thereafter, your targeted award will be 75% (or greater, as determined by the Board) of your annual base salary earned during the applicable calendar year. Any payments to you under the Program will be made at the same time and in the same manner as payments to other participants in the Program. Under the Program, awards for a calendar year are generally paid during March of the following calendar year. A Program participant is not entitled to payment of an award for a calendar year, if the participant is not an active employee of the Company on the date the award is actually paid. Awards under this Program are subject to Board approval and are contingent upon individual performance and financial results of the Company. In general, the amount of award paid to any participant may range from 0% to 200% of the participant's targeted award for the year, depending on individual performance and the extent to which the Company achieves (or surpasses) certain financial goals. These and the other provisions of the Program will apply to you in the same manner as applicable to other Program participants, except as specified below with regard to an award for 2003.

3. Notwithstanding the foregoing, the award payment you will receive under the Annual Incentive Compensation Program for 2003 will not be less than the result of the following calculation: your targeted award for that year (i.e., 100% of your annual base salary as of December 31, 2003), multiplied by a fraction where the numerator is the number of days during 2003 that you are an employee of the Company and the denominator is 365. However, as indicated above, you will only receive a payment

CC-BLG002748

under the Program for 2003 if you are an active employee of the Company on the date that the payments for that year are made to all participants in March 2004.

4. As described in this paragraph, you will be eligible for a targeted award under the Company's currently effective Long-Term Incentive Plans (the "LTIPs") for the following performance periods: 2002-2004 and 2003-2005. The amount of the targeted award applicable to you under each of those LTIPs shall be $687,000 (i.e., 125% of your starting annual base salary). However, any award payment to which you become entitled under any of the LTIPs shall be pro-rated to reflect the percentage of days during the applicable performance period that you were an active employee of the Company.

In all other respects, the terms of each of your LTIP awards shall be the same as the terms governing the awards of the other participants under the applicable LTIP.

You shall also be considered for awards under any other stock or cash based incentive programs maintained by the Company during your employment, at such times such awards are considered for other senior officers of the Company or at such other times the Board deems appropriate, at the sole discretion of the Board.

5. Consistent with your election as an officer of the Company, the Company will enter into an Executive Severance Agreement with you. In general, the terms of that agreement would provide for a severance payment of 3 times the sum of your annual base salary plus your targeted annual incentive compensation award, and certain other benefits, in the event your employment terminates under certain conditions following a change-in-control of the Company.

The form and provisions of your Executive Severance Agreement will be the same as applicable to other elected officers of the Company. A copy of the Agreement has previously been provided to you.

## SEVERANCE PAY ARRANGEMENT

If your employment is terminated by the Company without "Cause" (as defined below) or by you as a result of "Constructive Discharge" (as defined below), during your Initial Employment Term, you will be entitled to the severance payment described in the next sentence. The severance payment will be 1.5 times a dollar amount equal to 175% of your annual base salary at the time your employment is terminated. The severance payment may be made to you in installments, at the same time and in the same manner as salary continuation payments, over a period of 18 months beginning as of the date you are terminated. However, at your option, the entire severance payment may be paid to you in a single lump-sum as soon as practical after your termination (if approved by the Compensation Committee). In all other respects, your severance pay arrangement shall be governed by the terms of the W. R. Grace & Co. Severance Pay Plan for Salaried Employees.

You will also be entitled to the severance payment described in the prior paragraph if you decide to terminate your employment with the Company in the event that the Board does not offer you the position of Chief Executive Officer of the Company following my departure from the Company, and elects another individual as my successor to that position; provided that you comply with the notice requirements specified in the next sentence. In order to be

CC-BLG002749

entitled to the severance payment under these circumstances, you must comply with the following notification requirements: (1) you must deliver to the Chairman of the Compensation Committee of the Board (the "Comp Committee Chairman") written notice of your intention to terminate your employment (your "Termination Notice") no later than 30 days after the date the Company publicly announces that the Board has elected another individual as my successor as Chief Executive Officer and (2) your Termination Notice must specify your last date of employment with the Company, which must be no earlier than 30 days, and no later than 90 days, after the date your Termination Notice is delivered to the Comp Committee Chairman. Of course, if and when these circumstances arise, you and the Board may agree in writing to alternative arrangements regarding your employment status and the appropriate notice requirements.

You will not, in any event, however, be entitled to the severance payment described above if, at the time your employment terminates, your employment terminates as the result of your death, or you are entitled to payments under your Executive Severance Agreement described above, or to disability income payments under the Grace "LTD Plan" and/or "ESP Plan" described below.

Also, if you receive a severance payment under this letter agreement, you will not be entitled to any other severance pay from the Company.

## DEFINITION OF CAUSE

"Cause", for purposes of this letter agreement, means:

(i) Commission by you of a criminal act (i.e., any act which, if successfully prosecuted by the appropriate authorities would constitute a crime under State or Federal law) or of willful misconduct (including but not limited to violating written policies of the Company), which has had or will have a direct material adverse effect upon the business affairs, reputation, properties, operations or results of operations or financial condition of Company,

(ii) Refusal or failure of you to comply with the mandates of the CEO or the Board (unless any such mandates by the CEO or the Board constitute Constructive Discharge, and you have determined to terminate your employment as a result thereof), or failure by you to substantially perform your duties as COO, other than such failure resulting from your total or partial incapacity due to physical or mental illness, which refusal or failure has not been cured within 30 days after notice has been given to you, or

(iii) Material breach of any of the terms of this agreement by you, which breach has not been cured within 30 days after notice has been given to you.

## DEFINITION OF CONSTRUCTIVE DISCHARGE

"Constructive Discharge," for purposes of this letter agreement, means the occurrence of any of the following without your prior written consent:

(i) any demotion from the position of COO of the Company (provided that this provision shall not apply if you are appointed or elected to one or more other positions within the Company that are in addition to your position as COO, at the same time that you retain the COO position);

CC-BLG002750

(ii) the relocation of your principle office to a location more than 35 miles away from the current site of the Company's Headquarters in Columbia, Maryland;

(iii) any material diminution in your level of authority from that of COO or any assignment to you of any duties that are not consistent with the position of COO; other than authority or duties that (i) may be appropriate to another position with the Company that you hold in addition to the position of COO, (ii) are assigned to you as a result of your election as CEO, (iii) result from any requirement or request from the CEO or the Board that is reasonably related to your position as COO (or any other position you may hold with the Company at the time you retain your position as COO), or (iv) results from an inadvertent failure or oversight of the CEO or Board that is remedied within 30 days after your written notice thereof has been received by the "Comp Committee Chairman" (as defined above);

(iv) the Company imposes upon you compensation arrangements that do not comply with this letter agreement; or

(v) any material breach of this letter agreement by the Company.

Notwithstanding the forgoing:

o any termination of employment by you will not be deemed to be a termination as a result of Constructive Discharge, unless (i) you provide to the Comp Committee Chairman written notice of your decision to terminate your employment that sets forth in reasonable detail the specific conduct or occurrence that you deem constitutes Constructive Discharge and the specific provision of this letter agreement upon which you rely and (ii) the Company does not cure such conduct or occurrence within 30 days after such notice has been received by the Chairman;

o your right to terminate your employment on the basis of Constructive Discharge shall be deemed waived by you if you do not provide such notice to the Comp Committee Chairman within 60 days after you become aware of all material facts regarding the conduct or occurrence that your deem constitutes Constructive Discharge.

## OTHER BENEFIT PROGRAMS

As a senior officer of the Company, you will also be eligible to participate in the following benefit plans and programs (subject to the continuation and the actual provisions of the plans and programs, as amended from time to time):

o The W. R. Grace & Co. Retirement Plan for Salaried Employees ("Grace Salaried Retirement Plan")
o The W. R. Grace & Co. Supplemental Executive Retirement Plan
o The W. R. Grace & Co. Salaried Employee Savings & Investment Plan
o The W. R. Grace & Co. Savings & Investment Plan Replacement Payment Program
o The W. R. Grace & Co. Long-Term Disability Income Plan ("LTD Plan")
o Executive Salary Protection Plan ("ESP Plan")
o The W. R. Grace & Co. Voluntary Group Accident Insurance Plan
o The W. R. Grace & Co. Business Travel Accident Insurance Plan
o The W. R. Grace & Co. Group Term Life Insurance Program
o Personal Excess Liability Insurance

CC-BLG002751

o The W. R. Grace & Co. Group Medical Plan
o The W. R. Grace & Co. Dental Plan
o Retiree Medical Coverage

In addition, during your employment with the Company, you shall also be entitled to participate in all other employee/executive perquisite, pension and welfare benefit plans and programs made available to the Company's senior level executives or to its employees generally, as such plans or programs may be in effect, and amended, from time to time.

## INDEMNIFICATION

The Company shall to the extent permitted by applicable law, indemnify you and hold you harmless from and against any and all losses and liabilities you may incur as a result of your performance of your duties hereunder in accordance with the provisions of this letter agreement (except those liabilities that result from any behavior by you that is enumerated in the "Cause" definition of this agreement). In addition, the Company shall indemnify and hold you harmless against any and all losses and liabilities that you may incur, directly or indirectly, as a result of any third party claims brought against you (other than by any taxing authority) with respect to the Company's performance of (or failure to perform) any commitment made to you under this agreement. The Company shall obtain, if reasonably available, such policy or policies of insurance as it reasonably may deem appropriate to effect this indemnification.

## DISPUTE RESOLUTION

Any dispute, controversy or claim arising out of or relating to this letter agreement, or a breach thereof, shall be settled by arbitration in accordance with the laws of the State of Maryland, without respect to the conflict of laws rules thereof, and the arbitration shall be conducted in Maryland or such other location as the Company and you may mutually agree in accordance with the Commercial Arbitration Rules of the American Arbitration Association, as such rules are in effect in New York, NY on the date of the delivery of a demand for arbitration, which shall be effectuated by the demanding party providing notice to the other party in accordance with the provisions below under the heading "Notices". The parties expressly acknowledge that they are waiving their rights to seek remedies in court, including without limitation the right (if any) to a jury trial.

There shall be three arbitrators, one to be chosen by each party at will within 10 business days from the date of delivery of demand for arbitration and the third arbitrator to be selected by the two arbitrators chosen. If the two arbitrators are unable to select a third arbitrator within 10 business days after the last of the two arbitrators is chosen by the parties, the third arbitrator shall be designated, on application by either party, by the American Arbitration Association.

The decision of a majority of the arbitrators shall be final and binding on the parties and their respective heirs, executors, administrators, personal representatives, successors and assigns. Judgment upon any award of the arbitrators may be entered in any court of competent jurisdiction, or application may be made to any such court for the judicial acceptance of the award and for an order of enforcement.

CC-BLG002752

## RELOCATION

As specified above, your office will be located in Columbia, Maryland, which will require you to relocate to the Columbia area. Therefore, you will be entitled to receive principal residence relocation assistance under the Company's relocation policy applicable to the relocation of active employees. A copy of that policy has previously been provided to you.

## FINANCIAL COUNSELING PROGRAM

As an officer of the Company, you will be eligible to participate in the Company's Financial Counseling Program. This Program provides you with financial and estate planning and income tax preparation assistance. The Company will pay up to $4,000 per calendar year for reasonable, supportable expenses, except that the maximum amount for the first year of your participation will be $9,000.

## COMPANY CAR

The Company will arrange for you to lease, at the Company's expense, an automobile for use on Company business and for your personal use. The terms of the coverage will be the same as those provided for other officers of the Company, including a purchase price cap of $50,000.

## EXECUTIVE PHYSICAL PROGRAM

As an officer of the Company, you will be eligible to receive a Company-paid annual executive physical examination.

## NOTICES

Except as otherwise provided herein, you and the Company agree that any notices and other communications permitted or required under this letter agreement shall be in writing and shall be given by hand delivery to the other party or sent by registered or certified mail, return receipt requested, postage prepaid, or by nationally recognized overnight courier service, addressed as follows:

If to you:

Alfred E. Festa
W. R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044

If to the Company:

W. R. Grace & Co.
Attention: General Counsel
7500 Grace Drive
Columbia, MD 21044

or to such other addresses as either party furnishes to the other in writing in accordance with this notice provision. Notices and communications shall be effective when actually received by the addressee.

## NO MITIGATION; NO SET OFF

In the event of any termination of employment hereunder, you shall be under no obligation to seek other employment and there shall be no offset against any amounts due to you under this letter agreement on account of any remuneration attributable to any subsequent employment you may obtain. The amounts payable hereunder shall not be subject to setoff, counterclaim, recoupment, defense or other right which the Company may have against you.

## SUCCESSORS

Except as otherwise provided herein, this letter agreement is personal to you, and without the prior written consent of the Company shall not be assignable by you other than by will or the laws of descent and distribution. This agreement shall inure to the benefit of and be enforceable by your legal representatives. This agreement shall inure to the benefit of and be binding upon the Company and its successors and assigns. Except as provided herein, this agreement shall not be assignable by the Company without your prior written consent. The Company shall require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to assume expressly and agree to perform this agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place. "Company" means the Company as hereinbefore defined and any successor to its business and/or assets as aforesaid that assumes and agrees to perform this agreement by operation of law or otherwise.

## SURVIVORSHIP

The respective rights and obligations of the parties hereunder shall survive any termination of your employment to the extent necessary to effect those rights and obligations.

## VACATION

As an officer of the Company, you shall be entitled to four weeks paid vacation per full calendar year of employment with the Company.

## LEGAL FEES

The Company will also reimburse you for reasonable legal expenses, not to exceed $10,000, which you incur with respect to reviewing this letter agreement.

## CONFIDENTIALITY AND NON-COMPETE AGREEMENTS

In order to commence employment with the Company, you will be required to sign the Company's standard employment agreement (the "Standard Agreement"), which includes agreements regarding the confidentiality of Company information and non-competition, and similar provisions.

CC-BLG002754

You and the Company agree that, to the extent that the terms the Standard Agreement differ from the terms of this letter agreement, then the terms of this letter agreement (and not the Standard Agreement) shall control your employment relationship with the Company, and that the provisions of item 5 of the Standard Agreement are not applicable to the terms of this letter agreement, in that the Standard Agreement does not supercede any terms of this letter agreement. A copy of the Standard Agreement that you will be required to sign has previously been provided to you.

## MISCELLANEOUS

You and the Company acknowledge this letter agreement, and the other written agreements referred to herein, contain the entire understanding of the parties concerning the subject matter hereof. You and the Company acknowledge that this agreement supersedes any prior agreement between you and the Company concerning the subject matter hereof. Except as expressly otherwise provided herein, this agreement shall not adversely affect your right to participate in, or receive any benefit under, any incentive, severance or other benefit plan or program in which you may from time to time participate.

If any provision of this agreement is held invalid or unenforceable in whole or in part, such provision, to the extent it is invalid or unenforceable, shall be revised to the extent necessary to make the provision, or part hereof, valid and enforceable, consistent with the intentions of the parties hereto. Any provision of this agreement that is held invalid or unenforceable, in whole or in part, shall not affect the validity and enforceability of the other provision of this agreement, which shall remain if full force and effect.

This letter agreement may be amended, superseded or canceled only by a written instrument specifically stating that it amends, supersedes or cancels this agreement, executed by you and the Company.

If you have any questions regarding any expectations of your new position, please call me.

If you have any questions regarding the compensation and Company benefit plans and programs, please feel free to call W. Brian McGowan, Senior Vice President, Administration, at (410) 531-4191.

CC-BLG002755

Alfred E. Festa November 17, 2003 Page 10

Fred, we are very excited about your joining the Grace organization and look forward to a productive and mutually rewarding relationship.

Sincerely,

/s/ Paul J. Norris

Paul J. Norris
Chairman, President & Chief Executive Officer W. R. Grace & Co.

**Attachment**

cc: W. B. McGowan

**AGREED AND ACCEPTED:**

/s/ Alfred E. Festa

-------------------------------
Alfred E. Festa

11/17/2003
-------------------------------
Date

CC-BLG002756

Exhibit 10.28

Paul J. Norris
Chairman & Chief Executive Officer

**GRACE**

W. R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044

Voice: (410) 531-4406
Fax: (410) 531-4414
email: paul.j.norris@grace.com

January 21, 2004

To:

**PERSONAL AND CONFIDENTIAL**

Dear

In order to continue Grace's successful operating performance in the Chapter 11 environment, it is important to retain key employees by providing compensation programs that are valued and compete with our industry peers. To that end, Grace has proposed, and the Court has approved, a special retention program for certain key employees. At this time, we do not have Court approval to extend this program beyond 2004.

I am pleased to inform you that you will participate in this retention program. The total target amount of your retention payment will be [Recommendation] of your salary throughout 2004. These supplemental payments are subject to the provisions specified in the attachment to this letter.

In order to build better alignment with financial objectives, fifty-percent of the payment is at risk and will be based on Grace's 2004 core EBIT performance against 2003, the same as the Annual Incentive Compensation Plan. This portion will be paid in March 2005. The other fifty-percent is guaranteed and will be paid on December 26, 2004.

I realize that cash is not the only reason why an employee should stay with an organization. At Grace, you should expect to continue to receive opportunities to experience personal growth, to upgrade your skills, and to engage in challenging, satisfying work.

Your loyal, dedicated service to Grace is appreciated. Thanks.

Sincerely,

**Paul J. Norris**

CC-BLG002757

# SPECIAL RETENTION PROGRAM
## FOR SELECTED KEY EMPLOYEES

### COMMENCING JANUARY 1, 2004

As specified in the letter from Mr. Norris that accompanies this attachment, selected individuals, including you, will receive supplemental retention payments, in accordance with a special retention program approved by the Grace Board and the bankruptcy court (the "Program"). Fifty percent of the supplemental payment is at-risk, based on Grace's 2004 Core EBIT performance versus 2003, and fifty percent is guaranteed. This memo specifies some of the provisions applicable to Program participants.

### CALCULATION OF PAYMENT-AT-RISK
Fifty percent of the 2004 retention payment is at-risk and will be paid based on Grace's Core EBIT performance as shown on the chart below.

| % of Target Payment-at-Risk Paid | Grace 2004 Core EBIT Performance against Target |
|---|---|
| 25% | 80% of 2003 EBIT |
| 75% | 100% of 2003 EBIT |
| 100% | 110% of 2003 EBIT |

The payment-at-risk will be paid in March 2005 and will be calculated based on a percentage of the participant's base earnings (base salary payments before income tax withholding and other deductions during the period January 1, 2004 to December 31, 2004), and based on Grace's Core EBIT Performance in 2004 against Target. In order to receive the payment, the participant must remain a full-time employee of Grace through December 31, 2004. Termination of employment prior to December 31, 2004, whether voluntary or involuntary, will result in no payment under this program.

### CALCULATION OF GUARANTEED PAYMENT

For the 2004 calendar year, each Program participant will receive a supplemental cash payment on December 31, 2004 - provided that the participant remains a full-time employee of Grace through that date.

The guaranteed cash payment will be calculated based on a percentage of the participant's base earnings (base salary payments before income tax withholding and other deductions) during the relevant period. The guaranteed cash payment for December 31 will be equal to fifty percent of the total retention payment amount based on base earnings during the period January 1, 2004 to December 31, 2004 (this payment will be made on December 26).

CC-BLG002758

**TAX AND BENEFIT TREATMENT OF ALL RETENTION PAYMENTS**

The supplemental payment will, of course, be considered ordinary taxable income; and, therefore, applicable income and other tax withholding will apply to the payment.

The supplemental payment will not be considered for purposes of any Grace benefit plan or program. For example, no portion of the payment will be contributed to Grace's Savings & Investment Plan, nor will the payment be used to determine final average compensation under the Grace Salaried Retirement Plan or the Grace Supplemental Executive Retirement Plan (in this regard, the payments will be considered non-pensionable "special pay"). Also, the payment will not be used to calculate the amount of disability income or life insurance that a participant or beneficiary may become entitled to under any Grace benefit plan.

The Program payment will not be considered for purposes of any Grace compensation plan or program. For example, the payment will not be considered in determining a participant's annual incentive compensation award. Any applicable regular or promotional base salary increase will be calculated without regard to the payment, which means, for instance, that the payment will not be treated as an offset to any regular or promotional base salary increase.

The terms of a Program participant's employment with Grace are not affected by the Program (except for the guaranteed supplemental payment that a participant will receive and the supplemental payment-at-risk under the Program for the 2004 calendar year, while continuing full time employment with Grace). This means, for instance, that the participant's employment with Grace remains "at will" before, during and after the implementation of the Program.

**EXAMPLE**

Your supplemental retention payment target is 55%. Your salary as of January 1, 2004 is $200,000 and you received a merit increase of $6,000 in May 2004. Grace achieves its EBIT goal of 10% growth. Your total supplemental retention payment under the 2004 program equals $112,200.

On December 26, you would receive a supplement retention payment of $56,100 ($204,000 X 27.5%).

In March 2005, you would receive a supplement retention payment of $56,100 ($204,000 X 27.5% X 100%).

CC-BLG002759

**Exhibit 10.29**

### 2003-2005 LONG-TERM CASH AWARD

Granted to: Name
Effective Date of Grant: Date
Targeted Award: $XX,XXX
Performance Period: January 1, 2003 - December 31, 2005

Under the long-term incentive program of W.R. Grace & Co (the "Company"), the Compensation Committee (the "Committee") of the Board of Directors of the Company has granted you a Long-Term Cash Award under which you may earn a cash payout in an amount equal to (or, in certain circumstances, greater or less than) the Targeted Award set forth above, over the Performance Period.

This Targeted Award will be earned by you if the performance objectives described in Annex B for the Performance Period are met. If the performance objectives are only partially achieved or are over-achieved, the amount you actually earn under this Award will be decreased (or eliminated) or increased as set forth in Annex B. The award will be calculated and paid to you, net of the applicable taxes.

The consequences of a change in or termination of your employment status during the Performance Period are described in the attached Administrative Practices (Annex C).

In all matters regarding the administration of the Long-Term Cash Award, the Committee has full and sole jurisdiction, subject to the provisions of Annex C.

Long-Term Cash Awards are being granted only to a limited number of key employees of the Company and its subsidiaries. This Award should, consequently, be treated confidentially.

**W.R. Grace & Co**

By:
Paul Norris
Chairman, CEO, President

Acceptance of the foregoing is acknowledged
this _____ day of _____, 2003.

(Signature of Participant)

(Please print full name)

Annex B

## CALCULATION OF 2003-2005 LTIP

Your 2003-2005 LTIP award payout will be based on the 3-year compound annual growth rate (CAGR) in total Grace core earnings before interest and taxes (core EBIT). Payouts are contingent upon achievement of target CAGR for the 3-year performance period. The target CAGR is 6%, using 2002 results as the base year.

The core earnings before interest and taxes (core EBIT) in 2002 was $180.8 million. The chart below details six scenarios at different assumed growth rates. The target growth is highlighted.

```
        -------------------------------------------------------------------------
                                  PERFORMANCE PERIOD
        ASSUMED      BASE                                     TOTAL     LTIP      CUMULATIVE
        GROWTH       PERIOD    2003      2004      2005       GROWTH    POOL      REPORTED
        RATES        2002                                     03-05(1)            EARNINGS(2)
        -------------------------------------------------------------------------
        1.50%        180.8     183.5     186.3     189.1      558.9     2.9       556.0
        3.00%        180.8     186.2     191.8     197.6      575.6     5.9       569.7
        6.00%        180.8     191.6     203.1     215.3      610.0     11.8      598.2
        10.00%       180.8     198.9     218.8     240.6      658.3     14.3      646.5
        15.00%       180.8     207.9     239.1     275.0      722.0     17.3      710.2
        25.00%       180.8     226.0     282.5     353.1      861.6     23.6      849.8
        -------------------------------------------------------------------------
```

(1) All results include full recognition/accrual of Annual Incentive Compensation Program and, for achievement levels above 6% (i.e., 10%, 15%, and 25%), all totals include accruals for Long-Term Incentive Program Payments

(2) Cumulative Reported Earnings represent the 3 year core EBIT earnings required at the respective assumed growth rates. Up to the first $11.8 million (target CAGR 6%) is deducted from reported results. Payouts over target ($11.8 million) must be accrued as part of reported earnings.

CC-BLG002761

The Long-Term Cash Award payout will vary with actual results as shown in the chart below:

| CAGR LEVEL ACHIEVED | PAYOUT (ROUNDED TO THE NEAREST WHOLE PERCENTAGE) |
|---|---|
| 25% | 200% |
| 15% | 147% |
| 10% | 121% |
| 6% | 100% |
| 3% | 50% |
| 1.5% | 25% |

For the 2003-2005 LTIP, cash payments will be made in two installments - 50% of what is earned based on current performance at the end of 2004, but no more than 50% of target, will be paid in March 2005, and the balance will be paid in March 2006.

**Example:**

A sample calculation of the Long-Term Cash Award Earned is provided below. Assume that your Targeted Award is $20,400. $13,600 would be earned after Year 2 assuming 6% growth per year. Therefore the payment in March 2005 would be $6,800, 50% of what is earned.

| CAGR LEVEL ACHIEVED | PAYOUT IN MARCH 2005 | PAYOUT IN MARCH 2006 | TOTAL PAYOUT |
|---|---|---|---|
| 25% | $6,800 | $34,000 | $40,800 |
| 15% | $6,800 | $23,188 | $29,988 |
| 10% | $6,800 | $17,885 | $24,685 |
| 6% | $6,800 | $13,600 | $20,400 |
| 3% | $3,400 | $6,800 | $10,200 |

CC-BLG002762

## W. R. GRACE & CO.
### Administrative Practices - Long-Term Cash Award Program
### 2003-2005 Performance Period

### Definitions

"Award Payment": An Interim Long-Term Cash Award Payment or Remaining Long-Term Award Payment, as applicable.

"Board of Directors": The Board of Directors of the Company

"Committee": The Compensation Committee of the Board of Directors.

"Company": W. R. Grace & Co., a Delaware Corporation and/or, if applicable in the context, one or more of its Subsidiaries.

"Incomplete Long-Term Cash Awards": A Long-Term Cash Award for which the Performance Period has not been completed as of the date referenced.

"Interim Long-Term Cash Award Payment": As defined on page 4, provided that such payment will not exceed 50% of the Participant's Targeted Award for the first two years, regardless of Company performance at the time of payment.

"Key Employee": An officer or other senior, full-time employee of the Company, who, in the opinion of the Company, can contribute significantly to the growth and successful operations of the Company.

"Long-Term Cash Award Program": An undertaking by the Company to financially reward a Key Employee at the end of a Performance Period, which undertaking is contingent upon or measured by the attainment over the Performance Period of specified performance objectives determined (on a consolidated or unconsolidated basis) by changes in the 3-year average annual growth rate (AAGR) in Total Grace's core earnings before interest and taxes (core EBIT).

"Long-Term Cash Award": A cash award, to be paid in the future, which is granted to Key Employees under the Company's long-term incentive program.

"Long-Term Cash Award Earned": The amount of cash earned by a Participant pursuant to the terms of a Long-Term Cash Award.

"Participant": A Key Employee who is, or who is proposed to be, a recipient of a Long-Term Cash Award.

"Performance Period": Except as provided herein, a period of three calendar years over which a Long-Term Cash Award may be earned, as approved by the Committee. The first Performance Period under this Plan will commence effective January 1, 2003 and

(1)

CC-BLG002763

will end on December 31, 2005. Performance Periods with respect to different Long-Term Cash Awards to the same individual may overlap.

"Total Grace Core EBIT": The core earnings before interest and taxes (core EBIT)" of the Company as reported on (and calculated in accordance with) the statement of W. R. Grace & Co. Continuing Operations- Segment Basis.

"Remaining Long-Term Cash Award Payment": As defined on Page 4, the second installment of the Long-Term Cash Award that may be paid after the end of the Performance Period, based on Company performance for the entire Performance Period.

"Subsidiary": A corporation, partnership, limited liability company or other form of business association of which shares of common stock or other ownership interests (i) having more than 50% of the voting power regularly entitled to vote for directors (or equivalent management rights) or (ii) regularly entitled to receive more than 50% of the dividends (or their equivalents) paid on the common stock (or other ownership interests), are owned, directly or indirectly, by the Company.

"Targeted Award": The amount of cash award specified in writing for a Participant as his or her "Targeted Award" for a Performance Period and which is subject to and covered by the terms and conditions of a Long-Term Cash Award. This amount may be different from the Long-Term Cash Award Earned by an individual.

## Plan Administration

The Plan shall be administered by the Committee, provided that no member of the Committee shall be eligible to receive a Long-Term Cash Award while serving on the Committee.

The Committee shall approve (i) the performance measurements and objectives for each Long-Term Cash Award and (ii) the Performance Period over which a Long-Term Cash Award is to be earned.

The Committee shall approve (i) the Key Employees who are to be granted Long-Term Cash Awards and (ii) the Targeted Award subject to each Long-Term Cash Award.

## Long-Term Cash Awards

The Committee may, at any time or from time to time, grant Long-Term Cash Awards to Key Employees.

Each Long-Term Cash Award shall be evidenced by a written instrument containing such terms and conditions as the Committee shall approve, provided the instrument is consistent with these practices.

No Long-Term Cash Award, nor any payment or right thereunder, shall be subject in any manner to alienation, sale, transfer, assignment, pledge, encumbrance or charge, except

(2)

CC-BLG002764

by will or the laws of descent and distribution, or by the terms of a Participant's Designation of Beneficiary, if any, on file with the Company.

In the case of a Key Employee who becomes a Participant after the beginning of a Performance Period, the Committee may ratably reduce the amount of the Targeted Award covered by such Employee's Long-Term Cash Award or otherwise appropriately adjust the terms of the Long-Term Cash Award to reflect the fact that the Key Employee is to be a Participant for only part of the Performance Period.

It is the intention of the Committee that Long-Term Cash Awards be related to the results of the core operations affected by the management actions taken by the Participants. Subject to the administrative practices that apply to termination or change in employment status and to the amendment or discontinuance of Long-Term Cash Awards, the performance objectives applicable to Long-Term Cash Awards will remain unchanged during the Performance Period except as follows:

o In the event of the divestment of a Business prior to completion of the Performance Period, both the performance objectives and results pertaining to that Business shall be eliminated for the full year in which the divestment occurs and for any subsequent years.

o In general, acquisitions will be included in the performance results.

<u>Termination or Change in Employment Status</u>

A Participant shall forfeit all rights to any Award Payment, if, prior to the date of payment of such Award Payment, the Participant (1) resigns without the consent of the Committee, (2) retires under a retirement plan of the Company or Subsidiary before age 62 without the consent of the Committee, or (3) is terminated for cause.

If a Participant retires under a retirement plan of the Company or Subsidiary at or after age 62, or ceases employment as a result of death or disability, or ceases employment as a result of an involuntary termination after a Change in Control of the Company (as defined herein), during a Performance Period, then his rights in any Incomplete Long-Term Cash Award related to that Performance Period shall thereupon vest, and he shall be entitled to receive any Award Payment of any Long-Term Cash Award Earned he would otherwise have received (at the time he would have otherwise received the Award Payment), except that the amount of any Long-Term Cash Award Earned shall be reduced ratably in proportion to the portion of the Performance Period during which the Participant was not an employee. If a Participant ceases employment with the Company for any of the reasons specified in this paragraph, after the completion of any Performance Period (but before the payment of the Remaining Long-Term Cash Award Payment related to the completed Performance Period), then his rights to any Long-Term Cash Award Earned and to such Award Payment related to the completed Performance Period shall thereupon vest, and he shall be entitled to receive such Award Payment at the time he would have otherwise received the Payment.

If a Participant ceases employment with the Company for any reason other than those indicated in the previous two paragraphs (including by reason of involuntary termination

(3)

Annex C

not for cause, except as provided above with respect to involuntary termination after a Change in Control of the Company, or transfer of employment to a buyer of any business unit of the Company), then his rights in any Incomplete Long-Term Cash Award, and any Award Payment that is unpaid as of the date the Participant ceases such employment, shall be determined by the Committee (or the designee of the Committee, which may include the Chief Executive Officer of the Company) as soon as practicable after the Participant ceases such employment. All such determinations shall be final and binding on all parties.

Except as modified by the provisions of the second and third paragraphs of this section, payments due to Participants pursuant to the applicable preceding paragraphs, above, shall be calculated and made in accordance with the provisions described under the section entitled "Calculation of Long-Term Cash Awards Earned: Form of Payment".

A leave of absence, if approved by the Committee, shall not be deemed a termination or change of employment status for the purposes of this section, but, unless the Committee otherwise directs, any Long-Term Cash Award Earned that a Participant would otherwise have received under a Long-Term Cash Award Program shall be reduced ratably in proportion to the portion of the Performance Period during which the Participant was on such leave of absence.

Any consent, approval or direction which the Committee may give under this section in respect of an event or transaction may be given before or after the event or transaction.

Calculation of Long-Term Cash Awards Earned: Form of Payment

Long-Term Cash Awards Earned will be paid to a Participant in two installments
(1) the first installment shall be paid in March of the third and final year of the Performance Period and shall be equal to 50% of what is earned based on the Company's performance for the first two calendar years of the applicable Performance Period, but no more than 50% of the Participant's Targeted Award (the "Interim Long-Term Cash Award Payment"), and (2) the balance, if any, of the Long-Term Cash Award Earned will be paid in March after the end of the third and final year of the Performance Period (the "Remaining Long-Term Cash Award Payment").

The Committee shall determine the extent to which the performance objectives of a Long-Term Cash Award have been achieved during the Performance Period and the amount of any Long-Term Cash Awards Earned (and the amount of any Award Payment). All calculations in this regard shall be made in accordance with the generally accepted accounting principles customarily applied by the Company and shall be submitted to the Committee for its review and approval. The determination of the Committee shall be final and binding.

(4)

CC-BLG002766

## General

Nothing in this document nor in any instrument executed pursuant hereto shall confer upon a Participant any right to continue in the employ of the Company or a Subsidiary, or shall affect the right of the Company or a Subsidiary to terminate his or her employment with or without cause.

The Company or a Subsidiary may make such provisions as it may deem appropriate for the withholding or any taxes that the Company or a Subsidiary determines it is required to withhold in connection with any Long-Term Cash Award Earned.

Nothing in a Long-Term Cash Award is intended to be a substitute for, or shall preclude or limit the establishment or continuation of, any other plan, practice, or arrangement for the payment of compensation or benefits to employees generally, or to any class or group of employees, which the Company or a Subsidiary now has or may hereafter lawfully put into effect, including, without limitation, any retirement, pension, group insurance, annual bonus, stock purchase, stock bonus or stock option plan; provided, however, that no amounts awarded or paid pursuant to any Long-Term Cash Award shall be included or counted as compensation for the purposes of any employee benefit plan of the Company or a Subsidiary where contributions to the plan, or the benefits received from the plan, are measured or determined in whole or in part, by the amount of the employee's compensation.

The grant of a Long-Term Cash Award to an employee of a Subsidiary shall be contingent on the approval of the Long-Term Cash Award by the Subsidiary and the Subsidiary's agreement that (i) the Company may administer such Award on its behalf and (ii) the Subsidiary will make, or reimburse the Company for, the payments called for by the Long-Term Cash Award. The provisions of this paragraph and the obligations of the Subsidiary so undertaken may be waived, in whole or in the part, from time to time by the Company.

## Amendments and Discontinuance

In the event acquisitions, divestments, substantial changes in tax or other laws or in accounting principles or practices, natural disasters or other extraordinary events render fulfillment of the performance objectives of a Long-Term Cash Award impossible or impracticable, or result in the achievement of the performance objectives without appreciable effort by the Participant, the Committee may, but shall not be obligated to, amend any such Long-Term Cash Award in any appropriate manner so that the Participant may earn Long-Term Cash Awards comparable to those that might have been earned if the extraordinary event had not occurred.

The Chief Executive Officer of the Company may approve such technical changes and clarifications to the Long-Term Cash Award Program as necessary, provided such changes or clarifications do not vary substantially from the terms and conditions outlined in this description.

(5)

CC-BLG002767

In the event a Change in Control of the Company (as defined herein) shall occur or the Board of Directors has reason to believe that a Change of Control may occur, the Committee may, with respect to any one or more Long-Term Cash Awards, (i) reduce the length of a Performance Period to not less than one year, (ii) make ratable adjustments to performance objectives and Targeted Awards, (iii) change the methods of measuring the performance objectives, (iv) accelerate the payment of any Long-Term Cash Awards Earned or any Award Payment, and (v) take other action deemed by it to be appropriate and in the best interests of the Company under the circumstances. For the purposes of this paragraph:

(A) "Change in Control of the Company" means and shall be deemed to have occurred if (a) the Company determines that any "person" (as such term is used in Section 13(d) and 14 (d) of the Securities Exchange Act of 1934), other than a trustee or other fiduciary holding securities under an employee benefit plan of the Company or a corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company, has become the "beneficial owner" (as defined in Rule 13d-3 under such Act), directly or indirectly, of 20% or more of the outstanding common stock of the Company (provided, however, that a Change in Control shall not be deemed to have occurred if such person has become the beneficial owner of 20% or more of the outstanding Common Stock as the results of a sale of Common Stock by the Company that has been approved by the Board of Directors); or pursuant to a plan of reorganization which has been confirmed by the U.S. District Court or Bankruptcy Court having jurisdiction of the Company's Chapter 11 case, Case No. 01-01139 (JJF), pursuant to an order of such Court which is final and nonappealable, and becomes effective); (ii) individuals who are Continuing Directors cease to constitute a majority of any class of directors of the Board; (iii) there occurs a reorganization, merger, consolidation or other corporate transaction involving the Company (a "Corporate Transaction"), in each case, with respect to which the stockholders of the Company immediately prior to such Corporate Transaction do not, immediately after the Corporate Transaction, own 50% or more of the combined voting power of the corporation resulting from such Corporate Transaction, provided that this clause (iii) shall not apply to a Corporate Transaction which is pursuant to section 363 of the Bankruptcy Code, or is pursuant to a plan of reorganization which has been confirmed by the U.S. District Court or Bankruptcy Court having jurisdiction of the Company's chapter 11 case, Case No. 01-01139 (JJF), pursuant to an order of such Court which is final and nonappealable, and becomes effective, or (iv) the shareholders of the Company approve a complete liquidation or dissolution of the Company.

(B) "Continuing Director" means any member of the Board of Directors who was such a member on the date on which this Program was approved by the Board of Directors, and any successor to a Continuing Director who is approved as a nominee or elected to succeed to a Continuing Director by a majority of Continuing Directors who are then members of the Board of Directors.

The granting of Long-Term Cash Awards may be amended or discontinued by the Committee at any time.

(6)

CC-BLG002768

**Annex C**

No amendment or discontinuance of Long-Term Cash Awards shall, without a Participant's consent, adversely affect his rights in any Long-Term Cash Awards theretofore granted to him, except that, if the Committee so directs, all Incomplete Long-Term Cash Awards may be terminated prospectively with the same effect as a termination of employment under the second paragraph of the section entitled "Termination or Change in Employment Status".

(7)

CC-BLG002769

Exhibit 21

**[X] W. R. GRACE & CO., A DELAWARE CORPORATION**
**U.S. SUBSIDIARIES**

12/31/2003

[X]  Chapter 11 Filing - April 2, 2001

| SUBSIDIARY NAME | STATE OF INCORPORATION |
|---|---|
| [X]   A-1 Bit & Tool Co., Inc. | DE |
| * Advanced Refining Technologies LLC | DE |
| [X]   Alewife Boston Ltd. | MA |
| [X]   Alewife Land Corporation | MA |
| [X]   Amicon, Inc. | DE |
| [ ]   AP Chem Incorporated | MD |
| [X]   CB Biomedical, Inc. | DE |
| [X]   CCHP, Inc. | DE |
| [X]   Coalgrace, Inc. | DE |
| [X]   Coalgrace II, Inc. | DE |
| [ ]   Construction Products Dubai, Inc. | DE |
| [X]   Creative Food 'N Fun Company | DE |
| [X]   Darex Puerto Rico, Inc. | DE |
| [X]   Del Taco Restaurants, Inc. | DE |
| [X]   Dewey and Almy, LLC | DE |
| [X]   Ecarg, Inc. | NJ |
| [X]   Five Alewife Boston Ltd. | MA |
| [X]   G C Limited Partners I, Inc. | DE |
| [X]   G C Management, Inc. | DE |
| [X]   GEC Management Corporation | DE |
| [X]   GN Holdings, Inc. | DE |
| [X]   GPC Thomasville Corp. | DE |
| [X]   Gloucester New Communities Company, Inc. | NJ |
| [X]   Grace A-B Inc. | DE |
| [X]   Grace A-B II Inc. | DE |
| [ ]   Grace Asia Pacific, Inc. | DE |
| [ ]   Grace Chemicals, Inc. | DE |
| [X]   Grace Chemical Company of Cuba | IL |
| [ ]   Grace Collections, Inc. | DE |
| [X]   Grace Culinary Systems, Inc. | MD |
| [X]   Grace Drilling Company | DE |
| [X]   Grace Energy Corporation | DE |
| [X]   Grace Environmental, Inc. | DE |

CC-BLG002770

-- -- -- -- -- -- -- -- -- --

\* Ownership of Advanced Refining Technologies LLC is 55% W. R. Grace & Co.-Conn. (#001) and 45% Chevron USA, Inc.; certain enumerated actions of the Executive Committee require unanimous consent.

1

CC-BLG002771