| SUBSIDIARY NAME | STATE OF INCORPORATION |
|---|---|
| [X]  Grace Europe, Inc. | DE |
| [ ]  Grace Germany Holdings, Inc. | DE |
| [X]  Grace H-G Inc. | DE |
| [X]  Grace H-G II Inc. | DE |
| [X]  Grace Hotel Services Corporation | DE |
| [X]  Grace International Holdings, Inc. | DE |
| [ ]  Grace Latin America, Inc. | DE |
| [ ]  Grace Management Services, Inc. | DE |
| [X]  Grace Offshore Company | LA |
| [X]  Grace PAR Corporation | DE |
| [X]  Grace Petroleum Libya Incorporated | DE |
| [ ]  Grace Receivables Purchasing, Inc. | DE |
| [X]  Grace Tarpon Investors, Inc. | DE |
| [X]  Grace Ventures Corp. | DE |
| [X]  Grace Washington, Inc. | DE |
| [X]  W. R. Grace Capital Corporation | NY |
| [X]  W. R. Grace & Co.-Conn. | CT |
| [X]  W. R. Grace Land Corporation | NY |
| [X]  Gracoal, Inc. | DE |
| [X]  Gracoal II, Inc. | DE |
| [X]  Guanica-Caribe Land Development Corporation | DE |
| [X]  Hanover Square Corporation | DE |
| [X]  Homco International, Inc. | DE |
| [ ]  Ichiban Chemical Co., Inc. | DE |
| [X]  Kootenai Development Company | MT |
| [X]  L B Realty, Inc. | DE |
| [X]  Litigation Management, Inc. | DE |
| [X]  Monolith Enterprises, Incorporated | DC |
| [X]  Monroe Street, Inc. | DE |
| [X]  MRA Holdings Corp. | DE |
| [X]  MRA Intermedco, Inc. | DE |
| [X]  MRA Staffing Systems, Inc. | DE |
| [X]  Remedium Group, Inc. | DE |
| [ ]  Separations Group, The | CA |
| [X]  Southern Oil, Resin & Fiberglass, Inc. | FL |
| [X]  Water Street Corporation | DE |

2

CC-BLG002772

**NON-U.S. SUBSIDIARIES**

**COUNTRY/**
**SUBSIDIARY NAME**
**ARGENTINA**
W. R. Grace Argentina S.A.
WRG Argentina, S.A.
**AUSTRALIA**
Grace Australia Pty. Ltd.
**BELGIUM**
Grace N.V.
Grace Silica N.V.
**BRAZIL**
Grace Brasil Ltda.
Grace Davison Ltda.
PEADCO-Engenharia, Comercio Industria Ltda.
**CANADA**
GEC Divestment Corporation Ltd.
Grace Canada, Inc.
W. R. Grace Finance (NRO) Ltd.
**CHILE**
Grace Quimica Compania Limitada
**CHINA - PEOPLE'S REPUBLIC OF**
Grace China Ltd.
**COLOMBIA**
Grace Colombia S.A.
W. R. G. Colombia S.A.
**CUBA**
Envases Industriales y Comerciales, S.A.
Papelera Camagueyana, S.A.
**FRANCE**
Etablissements Pieri S.A.
Societe Civile Beau-Beton
W. R. Grace S.A.
**GERMANY**
Advanced Refining Technologies GmbH
Grace Bauprodukte GmbH
Grace Darex GmbH
Grace GP G.m.b.H.
Grace Holding G.m.b.H.
Grace Management GP G.m.b.H.
Grace Silica GmbH

3

CC-BLG002773

**COUNTRY/SUBSIDIARY NAME**
**GREECE**
**Grace Hellas E.P.E.**
**HONG KONG**
**W. R. Grace (Hong Kong) Limited**
**W. R. Grace Southeast Asia Holdings Limited**
**HUNGARY**
**Grace Ertekesito Kft.**
**INDIA**
**W. R. Grace & Co. (India) Private Limited**
**INDONESIA**
**PT. Grace Specialty Chemicals Indonesia**
**IRELAND**
**Amicon Ireland Limited**
**Grace Construction Products (Ireland) Limited**
**Trans-Meridian Insurance (Dublin) Ltd.**
**ITALY**
**W. R. Grace Italiana S.p.A.**
**JAPAN**
**Advanced Refining Technologies K.K.**
**Grace Chemicals K.K.**
**Grace Japan Kabushiki Kaisha**
**KOREA**
**Grace Korea Inc.**
**MALAYSIA**
**W. R. Grace (Malaysia) Sendiran Berhad**
**W. R. Grace Specialty Chemicals (Malaysia) Sdn. Bhd.**
**MEXICO**
**Grace Container, S. A. de C. V.**
**W. R. Grace Holdings, S. A. de C. V.**
**NETHERLANDS**
**Amicon B.V.**
**Denac Nederland B.V.**
**Storm van Bentem en Kluyver B.V.**
**W. R. Grace B.V.**
**NETHERLANDS ANTILLES**
**W. R. Grace N.V.**
**NEW ZEALAND**
**Grace (New Zealand) Limited**
**PHILIPPINES**
**W. R. Grace (Philippines), Inc.**
**POLAND**
Grace Sp. z o.o.
**RUSSIA**
**Darex CIS LLC**
**SINGAPORE**
**W. R. Grace (Singapore) Private Limited**
**SOUTH AFRICA**
**Grace Davison (Proprietary) Limited**
**W. R. Grace Africa (Pty.) Limited**

4

CC-BLG002774

**COUNTRY/**
**SUBSIDIARY NAME**
**SPAIN**
**Grace, S.A.**
**Pieri Especialidades, S.L.**
**SWEDEN**
**Grace AB**
**Grace Catalyst AB**
**Grace Sweden AB**
**SWITZERLAND**
**Pieri S.A.**
**TAIWAN**
**W. R. Grace Taiwan, Inc.**
**THAILAND**
**W. R. Grace (Thailand) Limited**
**UNITED KINGDOM**
**A.A. Consultancy & Cleaning Company Limited**
**Cormix Limited**
**Borndear 1 Limited**
**Borndear 2 Limited**
**Borndear 3 Limited**
**Darex UK Limited**
**Emerson & Cuming (Trading) Ltd.**
**Emerson & Cuming (UK) Ltd.**
**Grace Construction Products Limited**
**Pieri U.K. Limited**
**Servicised Ltd.**
**W. R. Grace Limited**
**VENEZUELA**
**Grace Venezuela, S.A.**
**Inversiones GSC, S.A.**

5

CC-BLG002775

EXHIBIT 24

## POWER OF ATTORNEY

The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and DAVID B. SIEGEL as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2003, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ John F. Akers
----------------------
John F. Akers

Dated: March 3, 2004

CC-BLG002776

EXHIBIT 24

## POWER OF ATTORNEY

The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and DAVID B. SIEGEL as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2003, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

```
                                    /s/ H. Furlong Baldwin
                                    -------------------------
                                       H. Furlong Baldwin
```

Dated:  March 3, 2004

CC-BLG002777

EXHIBIT 24

## POWER OF ATTORNEY

The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and DAVID B. SIEGEL as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2003, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

                                        /s/ Ronald C. Cambre
                                        --------------------------
                                           Ronald C. Cambre


            Dated: March 3, 2004

CC-BLG002778

EXHIBIT 24

## POWER OF ATTORNEY

The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and DAVID B. SIEGEL as her true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2003, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ Marye Anne Fox
----------------------
Marye Anne Fox

Dated: March 3, 2004

CC-BLG002779

EXHIBIT 24

## POWER OF ATTORNEY

The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and DAVID B. SIEGEL as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2003, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ John J. Murphy
---------------------------
   John J. Murphy

Dated: March 3, 2004

CC-BLG002780

EXHIBIT 24

## POWER OF ATTORNEY

The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and DAVID B. SIEGEL as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2003, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

```
                                    /s/ Thomas A. Vanderslice
                                    ------------------------------
                                       Thomas A. Vanderslice
```

```
         Dated: March 3, 2004
```

CC-BLG002781

**EXHIBIT 31.1**

## CERTIFICATION OF PERIODIC REPORT UNDER SECTION 302 OF
## THE SARBANES-OXLEY ACT OF 2002

I, Paul J. Norris, certify that:

1. I have reviewed this annual report on Form 10-K of W. R. Grace & Co.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 5, 2004

/s/ Paul J. Norris
------------------------
Paul J. Norris
Chairman and
Chief Executive Officer

CC-BLG002782

**EXHIBIT 31.2**

## CERTIFICATION OF PERIODIC REPORT UNDER SECTION 302 OF
## THE SARBANES-OXLEY ACT OF 2002

I, Robert M. Tarola, certify that:

1. I have reviewed this annual report on Form 10-K of W. R. Grace & Co.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions);

(a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

```
        Date: March 5, 2004


                                    /s/ Robert M. Tarola
                                    -------------------------
                                    Robert M. Tarola
                                    Senior Vice President and
                                    Chief Financial Officer
```

CC-BLG002783

**EXHIBIT 32**

## CERTIFICATION UNDER SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. Section 1350), the undersigned certifies that (1) this Annual Report of W. R. Grace & Co. (the "Company") on Form 10-K for the period ended December 31, 2003, as filed with the Securities and Exchange Commission on the date hereof (this "Report"), fully complies with the requirements of Sections 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, and (2) the information contained in this Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

```
/s/ Paul J. Norris
----------------------------
Chairman and Chief Executive Officer

/s/ Robert M. Tarola
----------------------------
Senior Vice President and Chief Financial Officer

Date: March 5, 2004                            .
```

A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

CC-BLG002784

# W R GRACE & CO

## FORM 10-K/A
(Amended Annual Report)

# Filed 08/09/04 for the Period Ending 12/31/03

| | |
|---|---|
| Address | 7500 GRACE DRIVE |
| | COLUMBIA, MD 21044 |
| Telephone | 410 531 4000 |
| CIK | 0001045309 |
| Symbol | GRA |
| SIC Code | 2800 - Chemicals & Allied Products |
| Industry | Chemical Manufacturing |
| Sector | Basic Materials |
| Fiscal Year | 12/31 |

http://www.edgar-online.com
© Copyright 2009, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

---

# FORM 10-K/A

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF**

# THE SECURITIES AND EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2003 Commission file number 1-13953

# W. R. GRACE & CO.

Incorporated under the Laws of the I.R.S. Employer Identification No.
State of Delaware 65-0773649

**7500 GRACE DRIVE, COLUMBIA, MARYLAND 21044-4098**
410/531-4000

**SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:**

| TITLE OF EACH CLASS | NAME OF EACH EXCHANGE ON WHICH REGISTERED |
|---|---|
| Common Stock, $.01 par value }<br>Preferred Stock Purchase Rights } | New York Stock Exchange, Inc. |

**SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:**

None

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulations S-K is not contained herein and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ]

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act). Yes [X] No [ ]

The aggregate market value of W. R. Grace & Co. voting and non-voting common equity held by non-affiliates as of June 30, 2003 (the last business day of the registrant's most recently completed second fiscal quarter) was $239,410,239.

At February 24, 2004, 65,614,064 shares of W. R. Grace & Co. Common Stock, $.01 par value, were outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

None.

CC-BLG002786

CC-BLG002787

**PORTIONS AMENDED**

The Registrant hereby amends Part II - Items 6, 8 and 9A and Part IV - Item 15 contained in its report on Form 10-K for the fiscal year ended December 31, 2003 for the restatement of the Registrant's consolidated financial statements as of December 31, 2003, and for the year ended December 31, 2003 to correct the Consolidated Balance Sheet as of December 31, 2003, and the Consolidated Statement of Shareholders' Equity (Deficit), the Consolidated Statement of Cash Flows, and the Consolidated Statement of Comprehensive Income (Loss) for the year ended December 31, 2003, for the U.S. dollar translation of a third party's interest in a small consolidated joint venture. Due to a currency conversion error, the third party interest was mistakenly calculated at $20.0 million instead of $200,000, a condition that was discovered as part of Grace's second quarter 2004 financial review. The effect of this non-cash correction to Grace's December 31, 2003 balance sheet was to increase shareholders' equity by $19.8 million and to decrease liabilities by the same amount. This condition had no effect on originally reported net loss, per share amounts, net sales, operating income or any other element of Grace's Consolidated Statement of Operations for the year ended December 31, 2003 or on any of the financial statements for the interim quarters in 2003.

CC-BLG002788

**TABLE OF CONTENTS**

PART II .......................................................................... 1

         Item 6.      Selected Financial Data .................................. 1

         Item 8.      Financial Statements and Supplementary Data ............. 1

         Item 9A.     Controls and Procedures ................................. 1

PART IV .......................................................................... 1

         Item 15.     Exhibits, Financial Statement Schedules, and Reports
                   on Form 8-K ............................................ 1

SIGNATURES ....................................................................... 3

FINANCIAL SUPPLEMENT ............................................................. F-1

CC-BLG002789

PART II

## ITEM 6. SELECTED FINANCIAL DATA

The information called for by this Item appears under the heading "Financial Summary" (page F-36 of the Financial Supplement) and in Notes 1, 2, 3, 4, 10, 13 and 14 to the Consolidated Financial Statements (pages F-10 through F-20, and F-23 through F-28 of the Financial Supplement), which is incorporated herein by reference.

## ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

See the Index to Consolidated Financial Statements and Financial Statement Schedule on page F-2 of the Financial Supplement, which is incorporated herein by reference.

## ITEM 9A. CONTROLS AND PROCEDURES

The information called for by this Item appears under the heading "Report on Internal Controls and Procedures" on page F-37 of the Financial Supplement, which is incorporated herein by reference.

### PART IV

## ITEM 15. EXHIBITS, FINANCIAL STATEMENT SCHEDULES, AND REPORTS ON FORM 8-K

Financial Statements and Schedules. See the Index to Consolidated Financial Statements and Financial Statement Schedule on page F-2 of the Financial Supplement.

Exhibits. The exhibits to this amended Report are listed below and are filed herewith.

Exhibit
no.

23 Consent of Independent Registered Public Accounting Firm

31.1 Certification of Periodic Report by Chief Executive Officer under Section 302 of the Sarbanes-Oxley Act of 2002

31.2 Certification of Periodic Report by Chief Financial Officer under Section 302 of the Sarbanes-Oxley Act of 2002

1

CC-BLG002790

Exhibit
no.

32 Certification of Periodic Report by Chief Executive Officer and Chief Financial Officer under Section 906 of the Sarbanes-Oxley Act of 2002

2

CC-BLG002791

# SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this amended Report to be signed on its behalf by the undersigned, thereto duly authorized.

**W. R. GRACE & CO.**

```
                              By: /s/ Paul J. Norris
                                  ------------------------
                                  Paul J. Norris
                                  (Chairman and
                                  Chief Executive Officer)

                              By: /s/ Robert M. Tarola
                                  ------------------------
                                  Robert M. Tarola
                                  (Senior Vice President and
                                  Chief Financial Officer)

        Dated: August 9, 2004
```

Pursuant to the requirements of the Securities Exchange Act of 1934, this Report has been signed below by the following persons on behalf of the registrant and in the capacities indicated on August 9, 2004.

```
        Signature                     Title
        ---------                     -----

        J. F. Akers*          }
        H. F. Baldwin*        }
        R. C. Cambre*         }
        M. A. Fox*            }       Directors
        J. J. Murphy*         }
        T. A. Vanderslice*    }

   /s/  Paul J. Norris                Chief Executive Officer and Director
   ---------------------------        (Principal Executive Officer)
        (Paul J. Norris)

   /s/ Robert M. Tarola              Senior Vice President and Chief Financial Officer
   ---------------------------        (Principal Financial Officer and Principal
        (Robert M. Tarola)           Accounting Officer)
```

* By signing his name hereto, Mark A. Shelnitz is signing this document on behalf of each of the persons indicated above pursuant to powers of attorney duly executed by such persons and filed with the Securities and Exchange Commission.

```
                              By: /s/ Mark A. Shelnitz
                                  ------------------------
                                  Mark A. Shelnitz
                                  (Attorney-in-Fact)
```

3

CC-BLG002792

FINANCIAL SUPPLEMENT

**W. R. GRACE & CO.**
**ANNUAL REPORT ON FORM 10-K/A**
**FOR THE YEAR ENDED DECEMBER 31, 2003**

F-1

CC-BLG002793

# FINANCIAL SUPPLEMENT
## TO
## ANNUAL REPORT ON FORM 10-K/A FOR THE YEAR ENDED DECEMBER 31, 2003

## W. R. GRACE & CO. AND SUBSIDIARIES

Index to Consolidated Financial Statements and Financial Statement Schedule

Management's Responsibility for Financial Reporting............................................. F-3
Report of Independent Registered Public Accounting Firm........................................ F-4
Report of Independent Registered Public Accounting Firm on Financial Statement Schedule........ F-5
Consent of Independent Registered Public Accounting Firm....................................... F-5
Consolidated Statements of Operations for the three years in the
     period ended December 31, 2003........................................................... F-6
Consolidated Statements of Cash Flows for the three years in the
     period ended December 31, 2003........................................................... F-7
Consolidated Balance Sheets at December 31, 2003 and 2002..................................... F-8
Consolidated Statements of Shareholders' Equity (Deficit) for the three
     years in the period ended December 31, 2003............................................. F-9
Consolidated Statements of Comprehensive Income (Loss) for the three
     years in the period ended December 31, 2003............................................. F-9
Notes to Consolidated Financial Statements.................................................... F-10 - F-35
Financial Summary............................................................................. F-36
Report on Internal Controls and Procedures ................................................... F-37

The financial data listed above appearing in this Financial Supplement are incorporated by reference herein. The Financial Statement Schedule should be read in conjunction with the Consolidated Financial Statements and Notes thereto. Financial statements of less than majority-owned persons and other persons accounted for by the equity method have been omitted as provided in Rule 3-09 of Securities and Exchange Commission Regulation S-X. Financial Statement Schedules not included have been omitted because they are not applicable or the required information is shown in the Consolidated Financial Statements or Notes thereto.

CC-BLG002794

# MANAGEMENT'S RESPONSIBILITY FOR FINANCIAL REPORTING

Management is responsible for the preparation, integrity and objectivity of the Consolidated Financial Statements and the other financial information included in this report. Such financial information has been prepared in conformity with accounting principles generally accepted in the United States of America and accordingly includes certain amounts that represent management's best estimates and judgments. Actual amounts could differ from those estimates.

Management maintains internal controls to assist it in fulfilling its responsibility for financial reporting. These internal controls consist of the control environment, risk assessment, control activities, information and communication, and monitoring. A chartered Disclosure Committee oversees Grace's public financial reporting process and key managers are required to confirm their compliance with Grace's policies and internal controls. While no system of internal controls can ensure elimination of all errors and irregularities, Grace's internal controls, which are reviewed and modified in response to changing conditions, have been designed to provide reasonable assurance that assets are safeguarded, policies and procedures are followed, transactions are properly executed and reported, and appropriate disclosures are made. The concept of reasonable assurance is based on the recognition that there are limitations in all systems of internal control and that the costs of such systems should not exceed their benefits.

The Audit Committee of the Board of Directors, which is comprised solely of independent directors, meets regularly with Grace's senior financial management, internal auditors and independent auditors to review audit plans and results, as well as the actions taken by management in discharging its responsibilities for accounting, financial reporting and internal controls. The Audit Committee is responsible for the selection and compensation of the independent auditors. Grace's financial management, internal auditors and independent auditors have direct and confidential access to the Audit Committee at all times.

The independent auditors are engaged to conduct the audits of and report on the Consolidated Financial Statements in accordance with auditing standards generally accepted in the United States of America. These standards require an assessment of the systems of internal controls and tests of transactions to the extent considered necessary by the independent auditors for purposes of supporting their opinion as set forth in their report.

/s/ Paul J. Norris
Paul J. Norris
Chairman and
Chief Executive Officer
August 9, 2004

/s/ Robert M. Tarola
Robert M. Tarola
Senior Vice President and
Chief Financial Officer

F-3

CC-BLG002795

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

**TO THE SHAREHOLDERS AND BOARD OF DIRECTORS OF**
**W. R. GRACE & CO.**

In our opinion, the accompanying consolidated balance sheets and related consolidated statements of operations, of cash flows, of shareholders' equity (deficit) and of comprehensive income (loss) present fairly, in all material respects, the financial position of W.R. Grace & Co. and its subsidiaries at December 31, 2003 and 2002, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2003, in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the consolidated financial statements, on April 2, 2001, the Company and substantially all of its domestic subsidiaries voluntarily filed for protection under Chapter 11 of the United States Bankruptcy Code, which raises substantial doubt about the Company's ability to continue as a going concern in its present form. The accompanying consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

As discussed in Note 1A, the accompanying 2003 consolidated financial statements have been restated to correct the U.S. dollar translation of a third party's interest in a consolidated joint venture.

> /s/ PricewaterhouseCoopers LLP
> PricewaterhouseCoopers LLP
> Baltimore, Maryland
> January 27, 2004, except for Note 1A, as to which the date is August 9, 2004

F-4

CC-BLG002796

# REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM ON
## FINANCIAL STATEMENT SCHEDULE

**TO THE SHAREHOLDERS AND BOARD OF DIRECTORS OF W. R. GRACE & CO.**

Our audits of the consolidated financial statements referred to in our report dated January 27, 2004 (except for Note 1A, as to which the date is August 6, 2004), which was modified as to a matter raising substantial doubt about the Company's ability to continue as a going concern, appearing on page F-4 of this 2003 Annual Report on Form 10-K/A of W. R. Grace & Co. also included an audit of the Financial Statement Schedule listed on page F-2 in the Index to Consolidated Financial Statements and Financial Statement Schedule and Exhibit of this Form 10-K/A. In our opinion, this Financial Statement Schedule presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements.

```
/s/ PricewaterhouseCoopers LLP
PricewaterhouseCoopers LLP
Baltimore, Maryland
January 27, 2004, except for Note 1A, as to which the date is August 6, 2004
```

## CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We hereby consent to the incorporation by reference in the Registration Statements on Forms S-8 (Nos.333-37024, 333-49083, 333-49507, 333-49509, 333-49511, 333-49513, 333-49515, 333-49517, 333-49703 and 333-49705) of W.R. Grace & Co. of our report dated January 27, 2004 (except for Note 1A, as to which the date is August 6, 2004) appearing on page F-4 of this 2003 Annual Report on Form 10-K/A of W.R. Grace & Co. We also consent to the incorporation by reference of our report dated January 27, 2004 (except for Note 1A, as to which the date is August 6, 2004) relating to the Financial Statement Schedule, which appears above in this Form 10-K/A.

```
/s/ PricewaterhouseCoopers LLP
PricewaterhouseCoopers LLP
Baltimore, Maryland
August 6, 2004
```

F-5

CC-BLG002797

```
===============================================================================
W. R. GRACE & CO. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF OPERATIONS                    YEAR ENDED DECEMBER 31,
-------------------------------------------------------------------------------
In millions, except per share amounts
                                                  2003          2002          2001
                                               ----------    ----------    ----------
Net sales.....................................  $1,980.5      $1,819.7      $1,722.9
Other income..................................      16.7          22.5          30.8
                                               ----------    ----------    ----------
                                                 1,997.2       1,842.2       1,753.7

Cost of goods sold, exclusive of depreciation and amortization
     shown separately below...................   1,289.8       1,148.1       1,076.3
Selling, general and administrative expenses, exclusive of net
     pension expense (income) shown separately below.  365.6       345.1         343.6
Depreciation and amortization.................     102.9          94.9          89.2
Research and development expenses.............      52.0          51.5          49.5
Net pension expense (income)..................      52.7          19.5          (9.5)
Interest expense and related financing costs..      15.6          20.0          37.1
Provision for environmental remediation.......     142.5          70.7           5.8
Provision for asbestos-related litigation.....      30.0           --            --
                                               ----------    ----------    ----------
                                                 2,051.1       1,749.8       1,592.0
                                               ----------    ----------    ----------

(Loss) income before Chapter 11 expenses, income taxes, and
     minority interest.........................    (53.9)         92.4         161.7
Chapter 11 expenses, net......................     (14.8)        (30.1)        (15.7)
Benefit from (provision for) income taxes.....      12.3         (38.0)        (63.7)
Minority interest in consolidated entities....       1.2          (2.2)         (3.7)
                                               ----------    ----------    ----------
     NET (LOSS) INCOME.........................  $  (55.2)     $   22.1      $   78.6
                                               ==========    ==========    ==========

BASIC (LOSS) EARNINGS PER SHARE:
     Net (loss) income.........................  $  (0.84)     $   0.34      $   1.20

Weighted average number of basic shares.......      65.5          65.4          65.3

DILUTED (LOSS) EARNINGS PER SHARE:
     Net (loss) income.........................  $  (0.84)     $   0.34      $   1.20

Weighted average number of diluted shares.....      65.5          65.5          65.4
===============================================================================
```

The Notes to Consolidated Financial Statements are an integral part of these statements.

F-6

CC-BLG002798

W. R. GRACE & CO. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOWS                                                    YEAR ENDED DECEMBER 31,

| In millions | (RESTATED) 2003 | 2002 | 2001 |
|---|---|---|---|
| **OPERATING ACTIVITIES** | | | |
| (Loss) income before Chapter 11 expenses, income taxes, and minority interest | $(53.9) | $ 92.4 | $ 161.7 |
| Reconciliation to cash provided by operating activities: | | | |
| Depreciation and amortization | 102.9 | 94.9 | 89.2 |
| Interest accrued on pre-petition debt subject to compromise | 11.2 | 14.5 | 23.2 |
| Loss (gain) on sales of investments and disposals of assets | 1.5 | (1.9) | (9.7) |
| Provision for environmental remediation | 142.5 | 70.7 | 5.8 |
| Provision for asbestos-related litigation | 30.0 | -- | -- |
| Net income from life insurance policies | (5.6) | (4.7) | (5.4) |
| Changes in assets and liabilities, excluding effect of businesses acquired/divested and foreign currency translation: | | | |
| Working capital items | (42.3) | 22.2 | (63.5) |
| Contributions to defined benefit pension plans | (60.5) | (10.2) | (10.6) |
| Contributions to postretirement benefit plans | (12.6) | (21.5) | (22.3) |
| Expenditures for asbestos-related litigation | (10.4) | (13.1) | (109.6) |
| Proceeds from asbestos-related insurance | 13.2 | 10.8 | 78.8 |
| Expenditures for environmental remediation | (11.2) | (20.8) | (28.9) |
| Expenditures for retained obligations of discontinued operations | (1.3) | (4.5) | (9.1) |
| Increase in accounts receivable due to termination of securitization program | -- | -- | (65.3) |
| Pension expense and other non-cash items | 52.0 | 25.6 | 20.0 |
| NET CASH PROVIDED BY OPERATING ACTIVITIES BEFORE INCOME TAXES AND CHAPTER 11 EXPENSES | 155.5 | 254.4 | 54.3 |
| Chapter 11 expenses paid, net | (17.5) | (27.1) | (11.8) |
| Income taxes paid, net of refunds | (27.2) | (31.8) | (27.9) |
| NET CASH PROVIDED BY OPERATING ACTIVITIES | 110.8 | 195.5 | 14.6 |
| **INVESTING ACTIVITIES** | | | |
| Capital expenditures | (86.4) | (91.1) | (62.9) |
| Businesses acquired, net of cash acquired | (26.9) | (28.5) | (84.4) |
| Investment in life insurance policies | (11.6) | (16.4) | (17.6) |
| Proceeds from life insurance policies | 11.9 | 19.4 | 18.0 |
| Proceeds from sales of investments and disposals of assets | 3.9 | 5.9 | 15.5 |
| NET CASH USED FOR INVESTING ACTIVITIES | (109.1) | (110.7) | (131.4) |
| **FINANCING ACTIVITIES** | | | |
| Net change in loans secured by cash value of life insurance | (3.1) | (5.1) | 33.7 |
| Borrowings under credit facilities, net of repayments | 2.3 | (2.8) | 94.1 |
| Borrowings under debtor-in-possession facility, net of fees | 46.1 | 18.7 | 71.5 |
| Repayments of borrowings under debtor-in-possession facility | (50.0) | (20.0) | (75.0) |
| Purchase of common stock | -- | -- | (0.6) |
| NET CASH (USED FOR) PROVIDED BY FINANCING ACTIVITIES | (4.7) | (9.2) | 123.7 |
| Effect of currency exchange rate changes on cash and cash equivalents | 28.6 | 16.1 | (6.9) |
| INCREASE IN CASH AND CASH EQUIVALENTS | 25.6 | 91.7 | -- |
| Cash and cash equivalents, beginning of period | 283.6 | 191.9 | 191.9 |
| Cash and cash equivalents, end of period | $309.2 | $ 283.6 | $ 191.9 |

The Notes to Consolidated Financial Statements are an integral part of these statements.

F-7

CC-BLG002799

W. R. GRACE & CO. AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEETS                                       DECEMBER 31,

In millions, except par value and shares

|  | (RESTATED) 2003 | 2002 |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS** | | |
| Cash and cash equivalents | $ 309.2 | $ 283.6 |
| Accounts and other receivables, net | 347.5 | 316.6 |
| Inventories | 214.6 | 173.6 |
| Deferred income taxes | 29.8 | 20.6 |
| Other current assets | 27.8 | 35.9 |
| TOTAL CURRENT ASSETS | 928.9 | 830.3 |
| Properties and equipment, net of accumulated depreciation and amortization of $1,216.9 (2002 - $1,071.7) | 656.6 | 622.2 |
| Goodwill | 85.2 | 65.2 |
| Cash value of life insurance policies, net of policy loans | 90.8 | 82.4 |
| Deferred income taxes | 587.1 | 574.1 |
| Asbestos-related insurance expected to be realized after one year | 269.4 | 282.6 |
| Other assets | 256.2 | 234.9 |
| TOTAL ASSETS | $2,874.2 | $2,691.7 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT)** | | |
| **LIABILITIES NOT SUBJECT TO COMPROMISE** | | |
| **CURRENT LIABILITIES** | | |
| Debt payable within one year | $ 6.8 | $ 4.3 |
| Accounts payable | 101.8 | 100.3 |
| Income taxes payable | 16.6 | 11.4 |
| Other current liabilities | 129.2 | 131.3 |
| TOTAL CURRENT LIABILITIES | 254.4 | 247.3 |
| Deferred income taxes | 35.3 | 30.5 |
| Other liabilities | 296.0 | 301.4 |
| TOTAL LIABILITIES NOT SUBJECT TO COMPROMISE | 585.7 | 579.2 |
| LIABILITIES SUBJECT TO COMPROMISE - NOTE 2 | 2,452.3 | 2,334.7 |
| TOTAL LIABILITIES | 3,038.0 | 2,913.9 |
| COMMITMENTS AND CONTINGENCIES | | |
| **SHAREHOLDERS' EQUITY (DEFICIT)** | | |
| Common stock issued, par value $0.01; 300,000,000 shares authorized; outstanding: 2003 - 65,558,510 (2002 - 65,466,725) | 0.8 | 0.8 |
| Paid-in capital | 432.1 | 433.0 |
| Accumulated deficit | (170.9) | (115.7) |
| Treasury stock, at cost: shares: 2003 - 11,421,250; (2002 - 11,513,035) | (135.9) | (137.0) |
| Accumulated other comprehensive loss | (289.9) | (403.3) |
| TOTAL SHAREHOLDERS' EQUITY (DEFICIT) | (163.8) | (222.2) |
| TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT) | $2,874.2 | $2,691.7 |

The Notes to Consolidated Financial Statements are an integral part of these statements.

F-8

CC-BLG002800

W. R. GRACE & CO. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY (DEFICIT)

| In millions | Common Stock and Paid-in Capital | Retained Earnings (Accumulated Deficit) | Treasury Stock | Accumulated Other Comprehensive Loss | TOTAL SHAREHOLDERS' EQUITY (DEFICIT) |
|---|---|---|---|---|---|
| BALANCE, DECEMBER 31, 2000................. | $433.0 | $(216.4) | $(136.4) | $(151.5) | $ (71.3) |
| Net income................................ | -- | 78.6 | -- | -- | 78.6 |
| Purchase of common stock.................. | -- | -- | (0.6) | -- | (0.6) |
| Shares issued under stock plans............ | 0.8 | -- | -- | -- | 0.8 |
| Other comprehensive loss.................. | -- | -- | -- | (149.2) | (149.2) |
| BALANCE, DECEMBER 31, 2001................ | $433.8 | $(137.8) | $(137.0) | $(300.7) | $(141.7) |
| Net income................................ | $ -- | $ 22.1 | $ -- | $ -- | $ 22.1 |
| Other comprehensive loss.................. | -- | -- | -- | (102.6) | (102.6) |
| BALANCE, DECEMBER 31, 2002................ | $433.8 | $(115.7) | $(137.0) | $(403.3) | $(222.2) |
| Net loss.................................. | $ -- | $ (55.2) | $ -- | $ -- | $ (55.2) |
| Stock plan activity....................... | (0.9) | -- | 1.1 | -- | 0.2 |
| Other comprehensive income, as restated..... | -- | -- | -- | 113.4 | 113.4 |
| BALANCE, DECEMBER 31, 2003, AS RESTATED............................... | $432.9 | $(170.9) | $(135.9) | $(289.9) | $(163.8) |

W. R. GRACE & CO. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME (LOSS)                 YEAR ENDED DECEMBER 31,

| In millions | (RESTATED) 2003 | 2002 | 2001 |
|---|---|---|---|
| NET (LOSS) INCOME............................................. | $ (55.2) | $ 22.1 | $ 78.6 |
| OTHER COMPREHENSIVE INCOME (LOSS): | | | |
| Foreign currency translation adjustments...................... | 95.1 | 45.1 | (24.8) |
| Minimum pension liability adjustments, net of income taxes.... | 18.3 | (147.7) | (124.4) |
| Total other comprehensive income (loss)...................... | 113.4 | (102.6) | (149.2) |
| COMPREHENSIVE INCOME (LOSS)................................... | $ 58.2 | $(80.5) | $(70.6) |

The Notes to Consolidated Financial Statements are an integral part of these statements.

F-9

CC-BLG002801

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

---

1. BASIS OF PRESENTATION AND SUMMARY OF SIGNIFICANT ACCOUNTING AND FINANCIAL REPORTING POLICIES

---

W. R. Grace & Co., through its subsidiaries, is engaged in specialty chemicals and specialty materials businesses on a worldwide basis. These businesses consist of catalyst and silica products ("Davison Chemicals") and construction chemicals, building materials, and sealants and coatings ("Performance Chemicals").

W. R. Grace & Co. conducts substantially all of its business through a direct, wholly owned subsidiary, W. R. Grace & Co.-Conn. ("Grace-Conn."). Grace-Conn. owns substantially all of the assets, properties and rights of W. R. Grace & Co. on a consolidated basis, either directly or through subsidiaries.

As used in these notes, the term "Company" refers to W. R. Grace & Co. The term "Grace" refers to the Company and/or one or more of its subsidiaries and, in certain cases, their respective predecessors.

VOLUNTARY BANKRUPTCY FILING: In response to a sharply increasing number of asbestos-related bodily injury claims, on April 2, 2001 (the "Filing Date"), W. R. Grace & Co. and 61 of its United States subsidiaries and affiliates, including Grace-Conn. (collectively, the "Debtors"), filed voluntary petitions for reorganization (the "Filing") under Chapter 11 of the United States Bankruptcy Code ("Chapter 11" or the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The cases were consolidated and are being jointly administered under case number 01-01139 (the "Chapter 11 Cases"). Grace's non-U.S. subsidiaries and certain of its U.S. subsidiaries were not included in the Filing.

During 2000 and the first quarter of 2001, Grace experienced several adverse developments in its asbestos-related litigation, including: a significant increase in bodily injury claims, higher than expected costs to resolve bodily injury and certain property damage claims, and class action lawsuits alleging damages from a former attic insulation product. (These claims are discussed in more detail in Note 3 to the Consolidated Financial Statements.) After a thorough review of these developments, the Board of Directors of Grace concluded on April 2, 2001 that a federal court-supervised Chapter 11 process provided the best forum available to achieve predictability and fairness in the claims settlement process.

By filing under Chapter 11, Grace expects to be able to both obtain a comprehensive resolution of the claims against it and preserve the inherent value of its businesses. Under Chapter 11, the Debtors expect to continue to operate their businesses as debtors-in-possession under court protection from their creditors and claimants, while using the Chapter 11 process to develop and implement a plan for addressing the asbestos-related claims against them.

Consequence of Filing - As a consequence of the Filing, pending litigation against the Debtors for pre-petition matters is generally stayed (subject to certain exceptions in the case of governmental authorities), and no party may take action to realize its pre-petition claims except pursuant to an order of the Bankruptcy Court.

The Debtors intend to address all of their pending and future asbestos-related claims and all other pre-petition claims in a plan of reorganization. Such a plan of reorganization may include the establishment of a trust through which all pending and future asbestos-related claims would be channeled for resolution. However, it is currently impossible to predict with any degree of certainty the amount that would be required to be contributed to the trust, how the trust would be funded, how other pre-petition claims would be treated or what impact any reorganization plan may have on the shares of common stock of the Company. The interests of the Company's shareholders could be substantially diluted or cancelled under a plan of reorganization. The value of Grace common stock following a plan of reorganization, and the extent of any recovery by non-asbestos-related creditors, will depend principally on the ultimate value assigned to Grace's asbestos-related claims, which will be addressed through the Bankruptcy Court proceedings. The formulation and implementation of the plan of reorganization is expected to take a significant period of time.

Status of Chapter 11 Proceedings - Since the Filing, all motions necessary to conduct normal business activities have been approved by the Bankruptcy Court. In addition, the Debtors have received approval from the Bankruptcy Court to pay or otherwise honor certain of its pre-petition obligations in the ordinary course of business, including employee wages and benefits, customer programs, shipping charges, and a limited amount of claims of essential trade creditors.

As provided by the Bankruptcy Code, the Debtors had the exclusive right to propose a plan of reorganization for a 120-day period following the Filing Date. The Debtors have received extensions of their exclusivity period during which to file a plan of reorganization

F-10

CC-BLG002802

through February 1, 2004, and extensions of the Debtors' exclusive right to solicit acceptances of a reorganization plan through April 1, 2004. The Debtors have filed a motion with the Bankruptcy Court to further extend the exclusivity periods for an additional six months.

Three creditors' committees, two representing asbestos claimants and the third representing other unsecured creditors, and a committee representing shareholders have been appointed in the Chapter 11 Cases. These committees will have the right to be heard on all matters that come before the Bankruptcy Court and, together with a legal representative of future asbestos claimants (whom Grace expects to be appointed by the Bankruptcy Court in the future), are likely to play important roles in the Chapter 11 Cases. The Debtors are required to bear certain costs and expenses of the committees and of the future asbestos claimants representative, including those of their counsel and financial advisors.

The Debtors' Chapter 11 cases have been assigned to Judge Alfred M. Wolin, a senior federal judge who sits in Newark, New Jersey. Judge Wolin is presiding over asbestos bodily injury matters and the fraudulent conveyance litigation described below. He has assigned the Debtors' other bankruptcy matters to Judge Judith Fitzgerald, a U.S. bankruptcy judge from the Western District of Pennsylvania, sitting in Wilmington, Delaware.

Claims Filings - The Bankruptcy Court established a bar date of March 31, 2003 for claims of general unsecured creditors, asbestos-related property damage claims and medical monitoring claims related to asbestos. The bar date did not apply to asbestos-related bodily injury claims or claims related to Zonolite(R) attic insulation ("ZAI"), which will be dealt with separately.

Approximately 15,000 proofs of claim were filed by the bar date. Of these claims, approximately 10,000 were non-asbestos related, approximately 4,000 were for asbestos-related property damage, and approximately 1,000 were for medical monitoring. In addition, approximately 400 proofs of claim were filed after the bar date. The discussion below refers to claims filed before the bar date.

Approximately 7,000 of the 10,000 non-asbestos related claims involve claims by employees or former employees for future retirement benefits such as pension and retiree medical coverage. Grace views certain of these claims as contingent and does not plan to address them until a later date in the Chapter 11 proceeding. The other non-asbestos related claims include claims for payment for goods and services; taxes; product warranties; principal plus interest under pre-petition credit facilities; amounts due under leases; leases and other executory contracts rejected in the Bankruptcy Court; environmental remediation; indemnification or contribution from actual or potential co-defendants in asbestos-related and other litigation; pending non-asbestos-related litigation; and non-asbestos related personal injury.

The Debtors' preliminary analysis indicated that many claims are duplicates, represent the same claim filed against more than one of the Debtors, lack any supporting documentation, or provide insufficient supporting documentation. As of December 31, 2003, the Debtors had filed with the Bankruptcy Court approximately 1,100 objections with respect to such claims, most of which were non-substantive (duplicates, no supporting documentation, late filed claims, etc.). The Debtors expect to file a substantial number of additional objections, most of which will be substantive, as analysis and evaluation of the claims progresses. However, based on its initial claims analysis and other available information, Grace increased its aggregate estimated liability for environmental remediation and asbestos-related litigation as discussed in Notes 3 and 14. No other changes to Filing Date liabilities was deemed warranted at this time.

The medical monitoring claims were made by individuals who allege exposure to asbestos through Grace's products or operations. These claims, if sustained, would require Grace to fund ongoing health monitoring costs for qualified claimants. However, based on the number and expected cost of such claims, Grace does not believe such claims will have a material effect on its Consolidated Financial Statements. No specific liability has been established for these claims.

Grace believes that its recorded liabilities represent a reasonable estimate of the ultimate allowable amount for claims that are not in dispute or have been submitted with sufficient information to both evaluate their merit and estimate the cost of the claim. However, because of the uncertainties of the Chapter 11 and litigation process, the in-progress state of Grace's investigation of submitted claims, and the lack of documentation in support of many claims, such recorded liabilities may prove to be insufficient to satisfy all of such claims. As claims are resolved, or where better information becomes available and is evaluated, Grace will make adjustments to the liabilities recorded on its financial statements as appropriate. Any such adjustments could be material to its consolidated financial position and results of operations.

F-11

CC-BLG002803

Litigation Proceedings in Bankruptcy Court - In July 2002, the Bankruptcy Court approved special counsel to represent the ZAI claimants, at the Debtors' expense, in a proceeding to determine certain threshold scientific issues regarding ZAI. The Debtors' expect the Bankruptcy Court to establish a schedule for determining pending motions following a status conference in May 2004. (See Note 3 for background information.)

In September 2000, Grace was named in a purported class action lawsuit filed in California Superior Court for the County of San Francisco, alleging that the 1996 reorganization involving a predecessor of Grace and Fresenius Medical Care Holdings, Inc. ("Fresenius") and the 1998 reorganization involving a predecessor of Grace and Sealed Air Corporation ("Sealed Air") were fraudulent transfers. The Bankruptcy Court authorized the Official Committee of Asbestos Personal Injury Claimants and the Official Committee of Asbestos Property Damage Claimants to proceed with claims against Fresenius and Sealed Air on behalf of the Debtors' estates.

On November 29, 2002, Sealed Air and Fresenius each announced that they had reached agreements in principle with such Committees to settle asbestos and fraudulent conveyance claims related to such transactions. Under the terms of the Fresenius settlement, as subsequently revised and subject to certain conditions, Fresenius would contribute $115.0 million to the Debtors' estate as directed by the Bankruptcy Court upon confirmation of the Debtors' plan of reorganization. In July 2003, the Fresenius settlement was approved by the Bankruptcy Court. Under the terms of the proposed Sealed Air settlement, Sealed Air would make a payment of $512.5 million (plus interest at 5.5% per annum, commencing on December 21, 2002) and nine million shares of Sealed Air common stock (valued at $487.3 million as of December 31, 2003), as directed by the Bankruptcy Court upon confirmation of the Debtors' plan of reorganization. The Sealed Air settlement has not been agreed to by the Debtors and remains subject to the approval of the Bankruptcy Court and the fulfillment of specified conditions. The Debtors are unable to predict how these settlements may ultimately affect their plan of reorganization.

Impact on Debt Capital - All of the Debtors' pre-petition debt is in default due to the Filing. The accompanying Consolidated Balance Sheet as of December 31, 2003 reflects the classification of the Debtors' pre-petition debt within "liabilities subject to compromise."

The Debtors have entered into a debtor-in-possession post-petition loan and security agreement with Bank of America, N.A. (the "DIP facility") in the aggregate amount of $250 million. The term of the DIP facility expires on April 1, 2006.

Accounting Impact - The accompanying Consolidated Financial Statements have been prepared in accordance with Statement of Position 90-7 ("SOP 90-7"), "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code," promulgated by the American Institute of Certified Public Accountants. SOP 90-7 requires that financial statements of debtors-in-possession be prepared on a going concern basis, which contemplates continuity of operations, realization of assets and liquidation of liabilities in the ordinary course of business. However, as a result of the Filing, the realization of certain Debtors' assets and the liquidation of certain Debtors' liabilities are subject to significant uncertainty. While operating as debtors-in-possession, the Debtors may sell or otherwise dispose of assets and liquidate or settle liabilities for amounts other than those reflected in the Consolidated Financial Statements. Further, a plan of reorganization could materially change the amounts and classifications reported in the Consolidated Financial Statements, which do not currently give effect to any adjustments to the carrying value or classification of assets or liabilities that might be necessary as a consequence of a plan of reorganization.

Pursuant to SOP 90-7, Grace's pre-petition liabilities that are subject to compromise are required to be reported separately on the balance sheet at an estimate of the amount that will ultimately be allowed by the Bankruptcy Court. As of December 31, 2003, such pre-petition liabilities include fixed obligations (such as debt and contractual commitments), as well as estimates of costs related to contingent liabilities (such as asbestos-related litigation, environmental remediation, and other claims). The recorded amounts of such liabilities generally reflect accounting measurements as of the Filing Date, adjusted as warranted for changes in facts and circumstances, new information obtained in the claims review process, and/or rulings under Grace's Chapter 11 proceedings subsequent to the Filing. (See Note 2 to the Consolidated Financial Statements for detail of the liabilities subject to compromise.) Obligations of Grace subsidiaries not covered by the Filing continue to be classified on the Consolidated Balance Sheets based upon maturity dates or the expected dates of payment. SOP 90-7 also requires separate reporting of certain expenses, realized gains

F-12

CC-BLG002804

and losses, and provisions for losses related to the Filing as reorganization items.

PRINCIPLES OF CONSOLIDATION: The Consolidated Financial Statements include the accounts of Grace and entities as to which Grace exercises control over operating and financial policies. Intercompany transactions and balances are eliminated in consolidation. Investments in affiliated companies in which Grace can significantly influence operating and financial policies are accounted for under the equity method, unless Grace's investment is deemed to be temporary, in which case the investment is accounted for under the cost method.

RECLASSIFICATIONS: Certain amounts in prior years' Consolidated Financial Statements have been reclassified to conform to the 2003 presentation.

EFFECT OF NEW ACCOUNTING STANDARDS: In December 2003, the Financial Accounting Standards Board ("FASB") revised Statement of Financial Accounting Standards ("SFAS") No. 132, "Employers' Disclosures about Pensions and Other Postretirement Benefits," to require additional disclosure about the assets, obligations, cash flows, and net periodic benefit cost of defined benefit plans and other postretirement plans. Grace adopted the provisions of SFAS No. 132 in December 2003. (See Note 18.)

In January 2003, the FASB issued FASB Interpretation No. 46, "Consolidation of Variable Interest Entities" ("FIN 46"). Grace adopted the provisions of FIN 46 in 2002. The adoption of FIN 46 required Grace to consolidate Advanced Refining Technologies LLC, a joint venture between Grace and Chevron Products Company. The impact of this consolidation did not result in a material change to Grace's Consolidated Financial Statements.

In November 2002, the FASB issued FASB Interpretation No. 45, "Guarantor's Accounting and Disclosure Requirements of Guarantees, Including Indirect Guarantees of Indebtedness of Others" ("FIN 45"). Grace adopted FIN 45 in the first quarter of 2003. FIN 45 did not have a material effect on the Consolidated Financial Statements. (See Note 14.)

In July 2002, the FASB issued SFAS No. 146, "Accounting for Costs Associated with Exit or Disposal Activities." SFAS No. 146 addresses issues related to the recognition, measurement, and reporting of costs associated with exit and disposal activities, including restructuring activities. Grace adopted SFAS No. 146 in 2003. SFAS No. 146 did not have a material effect on the Consolidated Financial Statements.

STOCK INCENTIVE PLANS: SFAS No. 123 permits the Company to follow the measurement provisions of Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees," and not recognize compensation expense for its stock-based incentive plans. Had compensation cost for the Company's stock-based incentive compensation plans been determined based on the fair value at the grant dates of awards under those plans, consistent with the fair value methodology prescribed by SFAS No. 123, the Company's net (loss) income and related (loss) earnings per share for the years ended December 31, 2003, 2002 and 2001 would have been reduced to the pro forma amounts indicated below:

| PRO FORMA EARNINGS UNDER SFAS NO. 123 (In millions, except per share amounts) | YEAR ENDED DECEMBER 31, | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| Net (loss) income, as reported............. | $ (55.2) | $ 22.1 | $ 78.6 |
| Deduct: Total stock-based employee compensation expense determined under fair value based method for all awards, net of related tax effects... | (1.4) | (4.2) | (7.4) |
| Pro forma net (loss) income (1.).......... | $ (56.6) | $ 17.9 | $ 71.2 |
| Basic (loss) earnings per share: | | | |
| As reported............. | $ (0.84) | $ 0.34 | $ 1.20 |
| Pro forma net (loss) income (1)........... | (0.86) | 0.27 | 1.09 |
| Diluted (loss) earnings per share: | | | |
| As reported............. | $ (0.84) | $ 0.34 | $ 1.20 |
| Pro forma net (loss) income (1)........... | (0.86) | 0.27 | 1.09 |

(1) These pro forma amounts may not be indicative of future (loss) income and (loss) earnings per share due to Grace's Chapter 11 Filing.

CC-BLG002805

To determine compensation cost under SFAS No. 123, the fair value of each option is estimated on the date of grant using the Black-Scholes option pricing model, with the following historical weighted average assumptions applied to grants in 2001:

```
=======================================================================
OPTION VALUE ASSUMPTIONS                               2001
-----------------------------------------------------------------------
Dividend yield.......................................  -- %
Expected volatility..................................  61%
Risk-free interest rate..............................  5%
Expected life (in years)............................. 4
=======================================================================
```

Based upon the above assumptions, the weighted average fair value of each option granted was $1.28 per share for 2001. There were no option grants in 2003 and 2002.

F-13

CC-BLG002806

USE OF ESTIMATES: The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires that management make estimates and assumptions affecting the assets and liabilities reported at the date of the Consolidated Financial Statements, and the revenues and expenses reported for the periods presented. Actual amounts could differ from those estimates. Changes in estimates are recorded in the period identified. Grace's accounting measurements that are most affected by management's estimates of future events are:

o Contingent liabilities such as asbestos-related matters (see Note 3), environmental remediation (see Note 14), income taxes (see Note 14), and retained obligations of divested businesses.

o Pension and postretirement liabilities that depend on assumptions regarding discount rates and/or total returns on invested funds. (See Note 18.)

o Depreciation and amortization periods for long-lived assets, including property and equipment, intangible, and other assets.

o Realization values of various assets such as net deferred tax assets (see Note 4), trade receivables, inventories, insurance receivables, income taxes, and goodwill.

The accuracy of these and other estimates may also be materially affected by the uncertainties arising under the Chapter 11 Cases.

CASH EQUIVALENTS: Cash equivalents consist of liquid instruments with maturities of three months or less when purchased. The recorded amounts approximate fair value.

SALE OF ACCOUNTS RECEIVABLE: Prior to the Filing, Grace entered into a program to sell certain of its trade accounts receivable and retained a subordinated interest and servicing rights. Net losses on the sale of receivables were based on the carrying value of the assets sold, allocated in proportion to their fair value. Retained interests were carried at fair value and were included in "other current assets" in the Consolidated Balance Sheets. Grace generally estimated fair value based on the present value of expected future cash flows less management's best estimate of uncollectible accounts receivable. Grace maintained an allowance for doubtful accounts receivable based upon the expected collectibility of all trade receivables, including receivables sold. The allowance was reviewed regularly and adjusted for accounts deemed uncollectible by management. Expenses and losses associated with the program were recognized as a component of interest expense and related financing costs. As a result of the Filing, which constituted an event of default under the program, outstanding balances were satisfied through the use of pre-petition trade receivables collected during the period from the Filing Date to early May 2001. The program was terminated effective May 14, 2001.

INVENTORIES: Inventories are stated at the lower of cost or market. The methods used to determine cost include first-in/first-out and, for substantially all U.S. inventories, last-in/first-out. Market values for raw materials are based on current cost and, for other inventory classifications, net realizable value.

PROPERTIES AND EQUIPMENT: Properties and equipment are stated at cost. Depreciation of properties and equipment is generally computed using the straight-line method over the estimated useful life of the asset. Estimated useful lives range from 20 to 40 years for buildings, 3 to 7 years for information technology equipment, 3 to 10 years for machinery and equipment and 5 to 10 years for furniture and fixtures. Interest is capitalized in connection with major project expenditures. Fully depreciated assets are retained in properties and equipment and related accumulated depreciation accounts until they are removed from service. In the case of disposals, assets and related accumulated depreciation are removed from the accounts and the net amount, less any proceeds from disposal, is charged or credited to operations. Grace reviews long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be fully recoverable.

GOODWILL: Goodwill arises from certain purchase business combinations. With respect to business combinations completed prior to June 30, 2001, goodwill was amortized through December 31, 2001 using the straight-line method over appropriate periods not exceeding 40 years. Grace reviews its goodwill for impairment on an annual basis and whenever events or changes in circumstances indicate that the carrying amount may not be fully recoverable. The provisions of SFAS No. 141 "Business Combinations" were applied to goodwill and intangible assets acquired after June 30, 2001.

REVENUE RECOGNITION: Grace recognizes revenue when all of the following criteria are satisfied: risk of loss and title transfer to the customer; the price is fixed and determinable; and collectibility is reasonably assured. Certain customer arrangements include conditions for volume rebates. Grace accrues a rebate allowance and reduces recorded sales for anticipated selling price adjustments at the time of sale. Grace regularly reviews rebate accruals based on actual and anticipated sales patterns.

CC-BLG002807

RESEARCH AND DEVELOPMENT COSTS: Research and development costs are charged to expense as incurred.

INCOME TAXES: Grace recognizes deferred tax assets and liabilities with respect to the expected future tax consequences of events that have been recorded in the Consolidated Financial Statements and tax returns. If it is more likely than not that all or a portion of deferred tax assets will not be realized, a valuation allowance is provided against such deferred tax assets.

FOREIGN CURRENCY TRANSLATION: Assets and liabilities of foreign subsidiaries (other than those located in countries with highly inflationary economies) are translated into U.S. dollars at current exchange rates, while their revenues, costs and expenses are translated at average exchange rates during each reporting period. The resulting translation adjustments are included in the "accumulated other comprehensive loss" section of the Consolidated Balance Sheets. The financial statements of subsidiaries located in countries with highly inflationary economies, if any, are remeasured as if the functional currency were the U.S. dollar; the remeasurement creates translation adjustments that are reflected in "net income (loss)" in the Consolidated Statements of Operations.

FINANCIAL INSTRUMENTS: From time to time, Grace enters into interest rate swap agreements and foreign exchange forward and option contracts to manage exposure to fluctuations in interest and foreign currency exchange rates. Grace does not hold or issue derivative financial instruments for trading purposes. At December 31, 2003, Grace did not hold and had not issued any derivative financial instruments.

---

1A. Restatement

---

The Company's financial statements as of December 31, 2003, have been restated to reflect a $19.8 million adjustment to correct the U.S. dollar translation of a third party's interest in a small consolidated joint venture. Due to a currency conversion error, the third party interest was mistakenly calculated at $20.0 million instead of $200,000, a condition that was discovered as part of Grace's second quarter 2004 financial review. The effect of this non-cash correction to Grace's December 31, 2003 balance sheet was to increase shareholders' equity by $19.8 million and to decrease liabilities by the same amount. The effect of the restatement on the accompanying financial statements is as follows:

W. R. GRACE & CO. AND DECEMBER 31, 2003
SUBSIDIARIES --------------------------------------------

| CONSOLIDATED BALANCE SHEET (In millions) | As Previously Reported | AS RESTATED |
|---|---|---|
| Other current liabilities..... | $ 145.6 | $ 129.2  (1) |
| Accumulated other comprehensive loss...................... | (309.7) | (289.9) |

(1) This balance includes an unrelated reclassification entry of $3.4 million to conform to the 2004 financial statement presentation.

W. R. GRACE & CO. AND SUBSIDIARIES
CONSOLIDATED STATEMENT OF CASH FLOWS
(In millions)

| | DECEMBER 31, 2003 | |
|---|---|---|
| | As Previously Reported | AS RESTATED |
| Working capital items........ | $(22.5) | $(42.3) |
| Changes in other accruals and non-cash items............ | 32.2 | 52.0 |

W. R. GRACE & CO. AND SUBSIDIARIES
CONSOLIDATED STATEMENT OF SHAREHOLDERS' EQUITY (DEFICIT)
(In millions)

| | DECEMBER 31, 2003 | |
|---|---|---|
| | As Previously Reported | AS RESTATED |
| Other comprehensive income.... | $ 93.6 | $ 113.4 |
| Accumulated other comprehensive loss........ | (309.7) | (289.9) |
| Balance, December 31, 2003.... | (183.6) | (163.8) |

W. R. GRACE & CO. AND SUBSIDIARIES
CONSOLIDATED STATEMENT OF COMPREHENSIVE INCOME (LOSS)
(In millions)

| | DECEMBER 31, 2003 | |
|---|---|---|
| | As Previously Reported | AS RESTATED |

CC-BLG002808

| | | |
|---|---|---|
| Foreign currency translation adjustments................ | $75.3 | $95.1 |
| Total other comprehensive income (loss).............. | 93.6 | 113.4 |
| Comprehensive income (loss)..................... | 38.4 | 58.2 |

===============================================================================

.

CC-BLG002809

The restatement has no effect on the Consolidated Statements of Operations for the years ended December 31, 2003, 2002 and 2001, the Consolidated Balance

F-15

CC-BLG002810

Sheet at December 31, 2002, or the Consolidated Statements of Cash Flows, of Shareholders' Equity (Deficit) and of Comprehensive Income (Loss) for the years ended December 31, 2002 and 2001. The restatement does not affect the financial position or results of operations of Grace's operating segments as previously reported.

## 2. CHAPTER 11 RELATED FINANCIAL INFORMATION

As a result of the Filing, Grace's Consolidated Balance Sheets separately identify the liabilities that are "subject to compromise" as a result of the Chapter 11 proceedings. In Grace's case, "liabilities subject to compromise" represent pre-petition liabilities as determined under U.S. generally accepted accounting principles. Changes to the recorded amount of such liabilities will be based on developments in the Chapter 11 Cases and management's assessment of the claim amounts that will ultimately be allowed by the Bankruptcy Court. Changes to pre-petition liabilities subsequent to the Filing Date reflect: 1) cash payments under approved court orders; 2) the accrual of interest on pre-petition debt at the pre-petition contractual rate; 3) accruals for employee-related programs; and 4) changes in estimates related to pre-petition contingent liabilities.

Condensed financial information and components of liabilities subject to compromise of the Debtors are presented below:

| W. R. GRACE & CO. - CHAPTER 11 FILING ENTITIES DEBTOR-IN-POSSESSION STATEMENTS OF OPERATION (In millions) (Unaudited) | JANUARY 1, 2003 TO DECEMBER 31, 2003 | January 1, 2002 to December 31, 2002 | April 2, 2001 to December 31, 2001 |
|---|---|---|---|
| Net sales, including intercompany............ | $1,031.9 | $ 979.4 | $ 763.0 |
| Other income.............. | 66.3 | 61.2 | 45.5 |
| | 1,098.2 | 1,040.6 | 808.5 |
| Cost of goods sold, including intercompany, exclusive of depreciation and amortization shown separately below........ | 714.8 | 626.6 | 474.5 |
| Selling, general and administrative expenses, exclusive of net pension expense (income) shown separately below........ | 217.8 | 214.0 | 154.1 |
| Research and development expenses................ | 38.0 | 41.4 | 30.6 |
| Depreciation and amortization .......... | 61.1 | 60.6 | 43.4 |
| Net pension expense (income)................ | 47.6 | 22.6 | (3.3) |
| Interest expense and related financing costs......... | 15.3 | 19.5 | 26.9 |
| Provision for environmental remediation............. | 142.5 | 70.7 | 5.8 |
| Provision for asbestos-related litigation............. | 30.0 | -- | -- |
| | 1,267.1 | 1,055.4 | 732.0 |
| (Loss) income before Chapter 11 expenses, income taxes, and equity in net income of non-filing entities..... | (168.9) | (14.8) | 76.5 |
| Chapter 11 expenses, net .. | (14.8) | (30.1) | (15.7) |
| Benefit from (provision for) income taxes........... | 45.4 | (3.3) | (34.3) |
| (Loss) income before equity in net income of non-filing entities................ | (138.3) | (48.2) | 26.5 |
| Equity in net income of non-filing entities .... | 83.1 | 70.3 | 37.4 |
| NET (LOSS) INCOME ........ | $ (55.2) | $ 22.1 | $ 63.9 |

CC-BLG002811

| (In millions) | DECEMBER 31, 2003 | December 31, 2002 | Filing Date (Unaudited) |
|---|---|---|---|
| Debt, pre-petition plus accrued interest........ | $ 552.7 | $ 538.8 | $ 511.5 |
| Asbestos-related liability. | 992.3 | 973.2 | 1,002.8 |
| Income taxes .............. | 217.9 | 227.8 | 210.1 |
| Environmental remediation.. | 332.4 | 201.1 | 164.8 |
| Postretirement benefits other than pension........... | 134.3 | 147.2 | 185.4 |
| Special pension arrangements | 69.5 | 74.9 | 70.8 |
| Retained obligations of divested businesses..... | 57.0 | 55.3 | 75.5 |
| Accounts payable.......... | 31.9 | 32.4 | 43.0 |
| Other accrued liabilities.. | 64.3 | 84.0 | 102.1 |
| TOTAL LIABILITIES SUBJECT TO COMPROMISE.............. | $2,452.3 | $2,334.7 | $2,366.0 |

F-16

CC-BLG002812

W. R. GRACE & CO. -

| CHAPTER 11 FILING ENTITIES DEBTOR-IN-POSSESSION CONDENSED STATEMENTS OF CASH FLOWS (In millions) (Unaudited) | JANUARY 1, 2003 TO DECEMBER 31, 2003 | January 1, 2002 to December 31, 2002 | April 2, 2001 to December 31, 2001 |
|---|---|---|---|
| OPERATING ACTIVITIES | | | |
| (Loss) income before Chapter 11 expenses, income taxes, and equity in net income of non-filing entities............ | $(168.9) | $ (14.8) | $ 76.5 |
| Reconciliation to net cash provided by (used for) operating activities: | | | |
| Non-cash items, net............ | 237.9 | 140.5 | 67.0 |
| Contributions to defined benefit pension plans ........ | (52.9) | (4.3) | (6.8) |
| Increase in accounts receivable due to termination of securitization program ...... | -- | -- | (98.4) |
| Decrease in subordinated interest of accounts receivable sold.............. | -- | -- | 33.1 |
| Changes in other assets and liabilities, excluding the effect of businesses acquired/divested........... | (14.1) | (36.1) | (15.3) |
| NET CASH PROVIDED BY OPERATING ACTIVITIES.................... | 2.0 | 85.3 | 56.1 |
| NET CASH PROVIDED BY (USED FOR) INVESTING ACTIVITIES.......... | 68.7 | (60.1) | (21.5) |
| NET CASH USED FOR FINANCING ACTIVITIES.................... | (7.0) | (6.4) | (5.2) |
| NET INCREASE IN CASH AND CASH EQUIVALENTS.............. | 63.7 | 18.8 | 29.4 |
| Cash and cash equivalents, beginning of period........... | 56.8 | 38.0 | 8.6 |
| Cash and cash equivalents, end of period................. | $ 120.5 | $ 56.8 | $ 38.0 |

Set forth below is a reconciliation of the changes in pre-filing date liability balances for the period from the Filing Date through December 31, 2003.

| (In millions) (Unaudited) | Cumulative Since Filing |
|---|---|
| Balance, Filing Date............................ | $2,366.0 |
| Cash disbursements and/or reclassifications under Bankruptcy Court orders: | |
| Freight and distribution order................ | (5.7) |
| Trade accounts payable order................. | (9.1) |
| Other court orders including employee wages and benefits, sales and use tax, and customer programs............................... | (186.2) |
| Expense/(income) items: | |
| Interest on pre-petition debt................. | 46.7 |
| Current period employee-related accruals...... | 10.4 |
| Change in estimate of asbestos-related property damage contingencies....................... | 30.0 |
| Change in estimate of environmental contingencies........................... | 219.0 |
| Change in estimate of income tax contingencies | 6.9 |
| Balance sheet reclassifications............... | (25.7) |
| Balance, end of period........................... | $2,452.3 |

CC-BLG002813

CC-BLG002814

```
W. R. GRACE & CO. -
     CHAPTER 11 FILING ENTITIES             DECEMBER 31,
     DEBTOR-IN-POSSESSION                 --------------------------------
     BALANCE SHEETS                       (RESTATED)
(In millions) (Unaudited)                  2003            2002
                                         ================================
ASSETS
CURRENT ASSETS
Cash and cash equivalents.................  $  120.5      $   56.8
Accounts and other receivables, net.......     105.6         114.7
Receivables from non-filing entities, net.      46.2          43.4
Inventories...............................      81.2          70.5
Other current assets......................      47.9          45.6
                                            -------------  ------------
TOTAL CURRENT ASSETS......................     401.4         331.0

Properties and equipment, net.............     383.9         389.7
Cash value of life insurance policies, net
   of policy loans........................      90.8          82.4
Deferred income taxes.....................     587.9         574.4
Asbestos-related insurance expected to be
   realized after one year...............     269.4         282.6
Loans receivable from non-filing
   entities, net..........................     448.0         444.4
Investment in non-filing entities.........     303.6         244.7
Other assets..............................      92.7          92.2
                                            -------------  ------------
TOTAL ASSETS..............................  $2,577.7      $2,441.4
                                            =============  ============
```

**LIABILITIES AND SHAREHOLDERS' EQUITY**

(DEFICIT)

**LIABILITIES NOT SUBJECT TO COMPROMISE**

```
     Current liabilities......................  $   98.0      $   99.3
     Other liabilities........................     191.2         229.6
                                              -------------  ------------
     TOTAL LIABILITIES NOT SUBJECT TO
          COMPROMISE ..........................
                                                   289.2         328.9

     LIABILITIES SUBJECT TO COMPROMISE........     2,452.3       2,334.7
                                              -------------  ------------
     TOTAL LIABILITIES........................     2,741.5       2,663.6

     SHAREHOLDERS' EQUITY (DEFICIT) ..........     (163.8)       (222.2)
                                              -------------  ------------
     TOTAL LIABILITIES AND SHAREHOLDERS'
          EQUITY (DEFICIT) ....................  $2,577.7      $2,441.4
                                              =============  ============
```

Additional liabilities subject to compromise may arise due to the rejection of executory contracts or unexpired leases, or as a result of the Bankruptcy Court's allowance of contingent or disputed claims.

The Debtors' Chapter 11 expenses for 2003, 2002, and 2001 consist of:

```
                                    ================================================
(In millions)                         2003          2002          2001
                                    ------------------------------------------------
Legal and financial advisory
   fees .....................       $  15.4       $  30.6       $  16.6
Interest income...............         (0.6)         (0.5)         (0.9)
                                    ------------  ------------  ------------
Chapter 11 expenses, net.......     $  14.8       $  30.1       $  15.7
                                    ================================================
```

Pursuant to SOP 90-7, interest income earned on the Debtors' cash balances must be offset against Chapter 11 expenses.

In addition to Grace's financial reporting obligations as prescribed by the U.S. Securities and Exchange Commission ("SEC"), the Debtors are also required, under the rules and regulations of the Bankruptcy Code, to periodically file certain statements and schedules and a monthly operating report with the Bankruptcy Court. This information is available to the public through the

CC-BLG002815

CC-BLG002816

Bankruptcy Court. This information is prepared in a format that may not be comparable to information in Grace's quarterly and annual financial statements as filed with the SEC. The monthly operating reports are not audited, do not purport to represent the financial position or results of operations of Grace on a consolidated basis, and should not be relied on for such purposes.

## 3. ASBESTOS-RELATED LITIGATION

Grace is a defendant in property damage and bodily injury lawsuits relating to previously sold asbestos-containing products. As of the Filing Date, Grace was a defendant in 65,656 asbestos-related lawsuits, 17 involving claims for property damage (one of which has since been dismissed), and the remainder involving 129,191 claims for bodily injury. Due to the Filing, holders of asbestos-related claims are stayed from continuing to prosecute pending litigation and from commencing new lawsuits against the Debtors. Additional asbestos-related claims will be subject to the Chapter 11 process established by the Bankruptcy Court. Separate creditors' committees representing the interests of property damage and bodily injury claimants have been appointed in the Chapter 11 Cases. Grace's obligations with respect to present and future claims will be determined through proceedings in the Bankruptcy Court and negotiations with each of the official committees appointed in the Chapter 11 Cases and a legal representative of future asbestos claimants, which negotiations are expected to provide the basis for a plan of reorganization.

### PROPERTY DAMAGE LITIGATION

The plaintiffs in asbestos property damage lawsuits generally seek to have the defendants absorb the cost of removing, containing or repairing the asbestos-containing materials in the affected buildings. Each property damage case is unique in that the age, type, size and use of the building, and the difficulty of asbestos abatement, if necessary, vary from structure to structure. Information regarding product identification, the amount of product in the building, the age, type, size and use of the building, the jurisdictional history of prior cases and the court in which the case is pending has provided meaningful guidance as to the range of potential costs. Grace has recorded a liability for all outstanding property damage cases for which sufficient information is available to form a reasonable estimate of the cost to resolve such litigation. (See "Asbestos-Related Liability" below.)

Out of 380 asbestos property damage cases filed prior to the Filing Date, 141 were dismissed without payment of any damages or settlement amounts; judgments were entered in favor of Grace in nine cases (excluding cases settled following appeals of judgments in favor of Grace); judgments were entered in favor of the plaintiffs in eight cases (one of which is on appeal) for a total of $86.1 million; 207 property damage cases were settled for a total of $696.8 million; and 16 cases remain outstanding (including the one on appeal). Of the 16 remaining cases, eight relate to ZAI and eight relate to a number of former asbestos-containing products (two of which also involve ZAI).

Approximately 4,000 additional property damage claims were filed prior to the March 31, 2003 claims bar date. Grace has analyzed the information provided by the claimants and has attempted to assess the validity and potential liability related to these claims. Approximately 170 claims contained insufficient information to permit an evaluation. (See "Asbestos-Related Liability" below for further discussion.)

The ZAI cases were filed as class action lawsuits in 2000 and 2001 on behalf of owners of homes containing ZAI. These cases seek damages and equitable relief, including the removal, replacement and/or disposal of all such insulation. The plaintiffs assert that this product is in millions of homes throughout the U.S. and that the cost of removal could be several thousand dollars per home. As a result of the Filing, these cases have been transferred to the U.S. Bankruptcy Court. Based on Grace's investigation of the claims described in these lawsuits, and testing and analysis of this product by Grace and others, Grace believes that the product was and continues to be safe for its intended purpose and poses little or no threat to human health. In July 2002, the Bankruptcy Court approved special counsel to represent the ZAI claimants, at the Debtors' expense, in a proceeding to determine certain threshold scientific issues regarding ZAI. The parties have completed discovery with respect to these threshold issues and have filed motions asking the Bankruptcy Court to resolve a number of important legal and factual issues regarding the ZAI claims. The Debtors expect the Bankruptcy Court to establish a schedule for determining the pending motions following the next status conference in May 2004. At this time, Grace is not able to assess the extent of any possible liability related to this matter.

### BODILY INJURY LITIGATION

Asbestos bodily injury claims are generally similar to each other (differing primarily in the type of asbestos-related illness allegedly suffered by the plaintiff). However, Grace's estimated liability for such claims has been influenced by numerous variables, including the

F-18

CC-BLG002817

solvency of other former producers of asbestos containing products, cross-claims by co-defendants, the rate at which new claims are filed, the jurisdiction in which the claims are filed, and the defense and disposition costs associated with these claims. Grace's bodily injury liability reflects management's estimate, as of the Filing Date (adjusted for post-Filing defense and claims administration costs), of the number and ultimate cost of present and future bodily injury claims expected to be asserted against Grace given demographic assumptions of possible exposure to asbestos containing products previously manufactured by Grace.

Cumulatively through the Filing Date, 16,354 asbestos bodily injury lawsuits involving approximately 35,720 claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved), and approximately 55,489 lawsuits involving approximately 163,698 claims were disposed of (through settlement and judgments) for a total of $645.6 million. (See "Asbestos-Related Liability" below.)

Approximately 1,000 claims for medical monitoring were filed against the Debtors prior to the bar date. These claims were made by individuals for medical monitoring, but not bodily injury, due to exposure to asbestos through Grace's products or operations. Based on the number and expected value of such claims, Grace does not believe such claims will have a material effect on the Consolidated Financial Statements.

## ASBESTOS-RELATED LIABILITY

Asbestos-related litigation is stayed by the Chapter 11 Cases. Ongoing costs are generally limited to claims administration costs and to defense costs incurred in connection with litigation permitted by the Bankruptcy Court. Other adjustments to the recorded liability will be based on developments in the Chapter 11 Cases including additional information or developments related to the new property damage claims submitted, and the assessment process.

For periods prior to and as of the Filing Date, Grace's estimated asbestos-related property damage and bodily injury liabilities were based on its experience with, and recent trends in, asbestos litigation. Its recorded liabilities covered indemnity and defense costs for pending property damage cases for which sufficient information was available, and for pending and projected future bodily injury claims. Since the Filing, Grace is aware that bodily injury claims have continued to be filed against co-defendant companies, and at higher than historical rates. Grace believes that had it not filed for Chapter 11 reorganization, it likely would have received thousands more claims than it had previously projected.

The total asbestos-related liability balances as of December 31, 2003 and 2002 were $992.3 million and $973.2 million, respectively. The increase in the liability during 2003 reflects a $30.0 million pre-tax charge taken in the fourth quarter for new asbestos-related property damage claims, net of defense and claims administration costs. The pre-tax charge was based on an initial review, completed in the fourth quarter of 2003, of more than 4,000 new claims submitted prior to the March 31, 2003 claims bar date. Each claim is unique as to property, product in question, legal status of claimant, potential cost of remediation, and other factors. Such claims were reviewed in detail by Grace, categorized into claims with sufficient information to be evaluated or claims that require additional information and, where sufficient information existed, the cost of resolution was estimated. (Grace's revised estimate of liability does not include any amounts for approximately 170 claims for which sufficient information was not available to evaluate potential liability.) However, due to the Filing and the uncertainties of asbestos-related litigation, the actual amount of Grace's asbestos-related liability could differ materially from the recorded liability. The recorded asbestos-related liability is included in "liabilities subject to compromise."

Recently, federal legislation has been proposed to address asbestos-related bodily injury litigation. In addition, several states have enacted or proposed legislation affecting asbestos-related bodily injury litigation. At this time, Grace cannot predict what impact any such legislation would have on Grace's asbestos-related bodily injury liability, or its ultimate plan of reorganization.

## ASBESTOS INSURANCE

Grace previously purchased insurance policies with respect to its asbestos-related lawsuits and claims. Insurance coverage for asbestos-related liabilities has not been commercially available since 1985. Grace has settled with and has been paid by all of its primary insurance carriers with respect to both property damage and bodily injury cases and claims. Grace has also settled with its excess insurance carriers that wrote policies available for property damage cases; those settlements involve amounts paid and to be paid to Grace. Grace believes that certain of these settlements may cover ZAI claims, as well as other property damage claims. In addition, Grace believes that additional coverage for ZAI claims may exist under excess

F-19

CC-BLG002818

insurance policies not subject to settlement agreements. Grace has settled with excess insurance carriers that wrote policies available for bodily injury claims in layers of insurance that Grace believes may be reached based on its current estimates.

The asbestos-related insurance asset represents amounts expected to be received from carriers under settlement agreements for defense and disposition costs to be paid by Grace. Estimated insurance reimbursements are based on the recorded amount of the asbestos-related liability and are only collectible as liabilities are satisfied. In the event that Grace's ultimate asbestos-related liability is determined to exceed recorded amounts, insurance exists to cover a portion of such incremental liability, but generally in a lower proportion than the currently recorded insurance receivable bears to the currently recorded liability.

## ESTIMATED INSURANCE RECOVERY ON ASBESTOS-RELATED LIABILITIES

| (In millions) | 2003 | 2002 |
|---|---|---|
| INSURANCE RECEIVABLE | | |
| Asbestos-related insurance receivable, beginning of year ................... | $282.6 | $293.4 |
| Proceeds received under asbestos-related insurance settlements ............... | (13.2) | (10.8) |
| Asbestos-related insurance receivable, end of year expected to be realized after one year ..................... | $269.4 | $282.6 |

## 4. INCOME TAXES

The components of (loss) income from consolidated operations before income taxes and the related benefit from (provision for) income taxes for 2003, 2002, and 2001 are as follows:

## INCOME TAXES - CONSOLIDATED OPERATIONS

| (In millions) | 2003 | 2002 | 2001 |
|---|---|---|---|
| (Loss) income before income taxes: | | | |
| Domestic................... | $(175.7) | $ (44.6) | $ 67.1 |
| Foreign................... | 126.2 | 104.8 | 75.7 |
| Intercompany eliminations.. | (18.0) | (0.1) | (0.5) |
| | $ (67.5) | $ 60.1 | $ 142.3 |
| Benefit from (provision for) income taxes: | | | |
| Federal - current......... | $ 9.9 | $ 8.1 | $ (7.7) |
| Federal - deferred......... | 34.5 | (11.0) | (27.5) |
| State and local - current.. | 3.8 | (1.0) | (3.2) |
| Foreign - current......... | (34.3) | (27.6) | (22.2) |
| Foreign - deferred......... | (1.6) | (6.5) | (3.1) |
| | $ 12.3 | $ (38.0) | $ (63.7) |

At December 31, 2003 and 2002, the tax attributes giving rise to deferred tax assets and liabilities consisted of the following items:

## DEFERRED TAX ANALYSIS

| (In millions) | 2003 | 2002 |
|---|---|---|
| Liability for asbestos-related litigation | $ 347.3 | $ 340.6 |
| Net operating loss/credit carryforwards.. | 141.4 | 155.1 |

CC-BLG002819

```
Deferred state taxes.....................   126.1        117.7
Liability for environmental remediation..   116.4         70.4
Other postretirement benefits............    47.0         51.5
Deferred charges.........................    42.9         46.1
Reserves and allowances..................    28.8         27.1
Research and development.................    34.6         35.0
Pension liabilities......................    83.1         94.6
Foreign loss/credit carryforwards........    20.0         14.8
Other....................................     9.8         12.4
-----------------------------------------------------------------------
Total deferred tax assets...............    997.4        965.3
-----------------------------------------------------------------------

Asbestos-related insurance receivable....  (100.6)      (103.6)
Pension assets...........................   (14.2)       (13.7)
Properties and equipment.................   (72.4)       (71.7)
Other....................................   (60.8)       (60.4)
-----------------------------------------------------------------------
Total deferred tax liabilities..........  (248.0)      (249.4)
-----------------------------------------------------------------------

Deferred state taxes.....................  (126.1)      (117.7)
Net operating loss/credit carryforwards..   (23.7)       (23.7)
Foreign loss carryforwards...............   (18.5)       (11.1)
-----------------------------------------------------------------------
Total valuation allowance ...............  (168.3)      (152.5)
-----------------------------------------------------------------------

Net deferred tax assets.................. $ 581.1      $ 563.4
=======================================================================
```

CC-BLG002820

The valuation allowance shown above arises from uncertainty as to the realization of certain deferred tax assets, primarily foreign tax credit carryforwards and foreign, state and local net operating loss carryforwards. Based upon anticipated future results, Grace has concluded that it is more likely than not that the balance of the net deferred tax assets, after consideration of the valuation allowance, will be realized. Because of the nature of the items that make up this balance, the realization period is likely to extend over a number of years and the outcome of the Chapter 11 process could materially impact the realization period.

At December 31, 2003, there were $213.7 million of U.S. federal net operating loss carryforwards, representing deferred tax assets of $74.8 million, with expiration dates through 2023; $6.2 million of foreign tax credit carryforwards with expiration dates through 2006; $15.8 million of general business credit carryforwards with expiration dates through 2008; and $44.6 million of alternative minimum tax credit carryforwards with no expiration dates.

The difference between the benefit from (provision for) income taxes at the federal income tax rate of 35% and Grace's overall income tax provision are summarized as follows:

F-20

**INCOME TAX BENEFIT (PROVISION)**
**ANALYSIS**

| (In millions) | 2003 | 2002 | 2001 |
|---|---|---|---|
| Tax benefit (provision) at federal corporate rate............. | $23.6 | $(21.0) | $(49.8) |
| Change in provision resulting from: | | | |
| Nontaxable income/non-deductible expenses................. | (0.6) | (1.0) | (1.6) |
| State and local income taxes, net of federal income tax benefit.................. | 2.5 | (0.7) | (1.7) |
| Federal and foreign taxes on foreign operations........ | (3.6) | 1.6 | 1.3 |
| Chapter 11 expenses (non-deductible).......... | (4.3) | (10.5) | (5.5) |
| Tax and interest relating to tax deductibility of interest on life insurance policy loans (See Note 14)............. | (5.3) | (6.4) | (6.4) |
| Income tax benefit from (provision for) continuing operations ................ | $12.3 | $(38.0) | $(63.7) |

Federal, state, local and foreign taxes have not been accrued on approximately $371.0 million of undistributed earnings of certain foreign subsidiaries, as such earnings are expected to be retained indefinitely by such subsidiaries for reinvestment. However, Chapter 11 and/or changes in the tax laws could affect this expectation in the future. The distribution of these earnings would result in additional foreign withholding taxes of approximately $17.3 million and additional federal income taxes to the extent they are not offset by foreign tax credits. It is not practicable to estimate the total tax liability that would be incurred upon such a distribution.

## 5. ACQUISITIONS AND JOINT VENTURES

In 2003, Grace completed three business combinations for a total cash cost of $26.9 million as follows:

o In April 2003, Grace, through its subsidiary The Separations Group, acquired the business and assets of MODcol Corporation, a manufacturer of preparative chromatography columns and provider of custom column packaging services.

o In July 2003, Grace acquired the chromatography business of Argonaut Technologies, Inc., which had been marketed under the Jones Chromatography name.

o In October 2003, Grace through its German subsidiary, acquired certain assets of Tricosal Beton - Chemie GmbH & Co. KG, a leading supplier of specialty chemicals and materials to the European construction industry.

Goodwill recognized in those transactions amounted to $12.0 million, of which $1.3 million was assigned to Davison Chemicals and $10.7 million was assigned to Performance Chemicals.

In 2002, Grace completed three business combinations for a total cash cost of $28.5 million as follows:

o In January 2002, Grace, through its Swedish subsidiary, acquired the catalyst manufacturing assets of Borealis A/S.

o In March 2002, Grace acquired the business and assets of Addiment, Incorporated, a leading supplier of specialty chemicals to the concrete paver and masonry industries in the U.S. and Canada.

o In August 2002, Advanced Refining Technologies LLC ("ART"), a joint venture between Grace and Chevron Products Company ("Chevron"), acquired an exclusive license for the hydroprocessing catalyst technology of Japan Energy Corporation and its subsidiary Orient Catalyst Company.

Goodwill recognized in those transactions amounted to $3.8 million, $0.9 million of which was assigned to Davison Chemicals and $2.9 million of which was assigned to Performance Chemicals.

CC-BLG002822

## 6. OTHER INCOME

Components of other income are as follows:

### OTHER INCOME

| (In millions) | 2003 | 2002 | 2001 |
|---|---|---|---|
| Investment income.............. | $  5.6 | $  4.7 | $  5.4 |
| Interest income................ | 4.3 | 3.9 | 4.6 |
| Gain on sale of investments... | -- | 1.2 | 7.9 |
| Net (loss) gain on dispositions of assets.................. | (1.5) | 0.7 | 1.8 |
| Tolling revenue................ | 1.0 | 3.1 | 3.1 |
| Foreign currency.............. | (4.4) | (1.1) | 0.9 |
| Other miscellaneous income ... | 11.7 | 10.0 | 7.1 |
| Total other income........... | $ 16.7 | $ 22.5 | $ 30.8 |

## 7. GOODWILL AND OTHER INTANGIBLE ASSETS

Grace adopted SFAS No. 142, "Goodwill and Other Intangible Assets" on January 1, 2002 and ceased the amortization of goodwill. The pro forma impact on pre-tax income and earnings per share was immaterial. SFAS No. 142 requires that goodwill and indefinite life intangible assets be tested for impairment on at least an annual basis. For the purpose of measuring impairment under the provisions of SFAS No. 142, Grace has identified its reporting units as catalyst products and

F-21

CC-BLG002823

silica products (Davison Chemicals), and construction chemicals, building materials, and sealants and coatings (Performance Chemicals). In connection with the adoption of SFAS No. 142 and as of November 30, 2003, Grace evaluated its goodwill and other intangible assets that have indefinite useful lives, with no impairment charge required.

At December 31, 2003 and December 31, 2002, Grace had goodwill balances of $85.2 million and $65.2 million, respectively. The carrying amount of goodwill attributable to each reporting unit and the changes in those balances during the year ended December 31, 2003 are as follows:

| (In millions) | Davison Chemicals | Performance Chemicals | Total Grace |
|---|---|---|---|
| Balance as of December 31, 2002 .................. | $17.0 | $48.2 | $65.2 |
| Goodwill acquired during the year.............. | 1.3 | 10.7 | 12.0 |
| Foreign currency translation adjustment.............. | 2.5 | 5.5 | 8.0 |
| BALANCE AS OF DECEMBER 31, 2003 .................. | $20.8 | $64.4 | $85.2 |

Grace's book value of other intangible assets at December 31, 2003 and December 31, 2002 was $65.1 million and $63.3 million, respectively, including unamortizable intangible assets (primarily trademarks) of $6.9 million in 2002. The composition of the remaining net amortizable intangible assets of $65.1 million and $56.4 million as of December 31, 2003 and December 31, 2002, respectively, was as follows:

| (In millions) | AS OF DECEMBER 31, 2003 | |
|---|---|---|
| | GROSS CARRYING AMOUNT | ACCUMULATED AMORTIZATION |
| Technology ............... | $38.1 | $10.8 |
| Patents................... | 15.3 | 15.2 |
| Customer lists............ | 29.8 | 5.8 |
| Other..................... | 15.7 | 2.0 |
| Total..................... | $98.9 | $33.8 |

| (In millions) | As of December 31, 2002 | |
|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization |
| Technology ............... | $34.6 | $ 4.6 |
| Patents................... | 15.3 | 13.6 |
| Customer lists............ | 24.1 | 3.3 |
| Other..................... | 5.0 | 1.1 |
| Total..................... | $79.0 | $22.6 |

At December 31, 2003, estimated future annual amortization expenses were:

**ESTIMATED AMORTIZATION EXPENSE**
(In millions)

| | |
|---|---|
| 2004.................................................. | $6.0 |
| 2005.................................................. | 5.9 |
| 2006.................................................. | 5.7 |
| 2007.................................................. | 5.1 |
| 2008.................................................. | 5.0 |

8. COMPREHENSIVE INCOME (LOSS)

CC-BLG002824

The tables below present the pre-tax, tax, and after tax components of Grace's other comprehensive income (loss) for the years ended December 31, 2003, 2002 and 2001:

| YEAR ENDED DECEMBER 31, 2003 (RESTATED) (In millions) | Pre-Tax Amount | Tax Expense | AFTER TAX AMOUNT |
|---|---|---|---|
| Minimum pension liability adjustments............... | $ 28.2 | $ (9.9) | $ 18.3 |
| Foreign currency translation adjustments............... | 95.1 | -- | 95.1 |
| Other comprehensive income.... | $123.3 | $ (9.9) | $113.4 |

CC-BLG002825

| YEAR ENDED<br>DECEMBER 31, 2002<br>(In millions) | Pre-Tax<br>Amount | Tax<br>Benefit | After<br>Tax<br>Amount |
|---|---|---|---|
| Minimum pension liability<br>adjustments............... | $(227.2) | $ 79.5 | $(147.7) |
| Foreign currency translation<br>adjustments............... | 45.1 | -- | 45.1 |
| Other comprehensive loss...... | $(182.1) | $ 79.5 | $(102.6) |

| YEAR ENDED<br>DECEMBER 31, 2001<br>(In millions) | Pre-Tax<br>Amount | Tax<br>Benefit | After<br>Tax<br>Amount |
|---|---|---|---|
| Minimum pension liability<br>adjustments............... | $(191.4) | $ 67.0 | $(124.4) |
| Foreign currency translation<br>adjustments............... | (24.8) | -- | (24.8) |
| Other comprehensive loss...... | $(216.2) | $ 67.0 | $(149.2) |

| COMPOSITION OF ACCUMULATED OTHER<br>COMPREHENSIVE LOSS<br>(In millions) | (RESTATED)<br>2003 | 2002 |
|---|---|---|
| Minimum pension liability............... | $(265.4) | $(283.7) |
| Foreign currency translation ............ | (24.5) | (119.6) |
| Accumulated other comprehensive loss..... | $(289.9) | $(403.3) |

Grace is a global enterprise which operates in over 40 countries with local currency generally deemed to be the functional currency for accounting purposes. The foreign currency translation amount represents the adjustment necessary to translate the balance sheets valued in local currencies to the U.S. dollar as of the end of each year presented. The decline in foreign currency translation over 2003 is due to the weakening of the U.S. dollar against most other reporting currencies.

F-22

CC-BLG002826

The decline in equity market returns in 2000-2002, coupled with a decline in interest rates, created a shortfall between the accounting measurement of Grace's obligations under certain of its qualified pension plans for U.S. employees and the market value of dedicated pension assets. This condition required Grace to record a minimum pension liability for these plans equal to the funding shortfall and to offset related deferred costs against shareholders' equity (deficit) at December 31, 2003 and 2002. Market returns in 2003 (22.5% for Grace's domestic pension plan assets) and contributions of $48.5 million to under-funded domestic plans were not sufficient to eliminate the minimum pension liability. (See Note 18.)

## 9. OTHER BALANCE SHEET ACCOUNTS

|  | (RESTATED) | |
|---|---|---|
| (In millions) | 2003 | 2002 |
| **ACCOUNTS AND OTHER RECEIVABLES, NET** | | |
| Trade receivables, less allowance of $4.6 (2002 - $3.7) | $ 331.5 | $ 302.8 |
| Other receivables, less allowances of $1.7 (2002 - $1.7) | 16.0 | 13.8 |
| | $ 347.5 | $ 316.6 |
| **INVENTORIES (1)** | | |
| Raw materials | $ 53.5 | $ 39.2 |
| In process | 35.8 | 30.3 |
| Finished products | 134.0 | 110.8 |
| General merchandise | 29.4 | 26.8 |
| Less: Adjustment of certain inventories to a last-in/first-out (LIFO) basis (2) | (38.1) | (33.5) |
| | $ 214.6 | $ 173.6 |

(1) Inventories valued at LIFO cost comprised 49.2% of total inventories at December 31, 2003 and 48.4% at December 31, 2002

(2) During 2002, a reduction in U.S. LIFO inventory levels resulted in product valued at costs pertaining to prior years being reflected in 2002 cost of sales. This so-called LIFO liquidation had the effect of increasing pre-tax income for the Davison segment and Grace by $0.5 million.

## OTHER ASSETS

| | | |
|---|---|---|
| Deferred pension costs | $ 115.9 | $ 104.2 |
| Deferred charges | 45.7 | 38.7 |
| Long-term receivables, less allowances of $0.7 (2002 - $0.8) | 9.2 | 2.0 |
| Patents, licenses and other intangible assets, net | 65.1 | 63.3 |
| Pension-unamortized prior service cost | 19.8 | 26.4 |
| Investments in unconsolidated affiliates and other | 0.5 | 0.3 |
| | $ 256.2 | $ 234.9 |
| **OTHER CURRENT LIABILITIES** | | |
| Accrued compensation | $ 44.8 | $ 40.0 |
| Deferred tax liability | 0.5 | 0.8 |
| Customer volume rebates | 28.1 | 21.2 |
| Accrued commissions | 9.8 | 6.0 |
| Accrued reorganization fees | 6.9 | 9.4 |
| Other accrued liabilities | 39.1 | 53.9 |
| | $ 129.2 | $ 131.3 |
| **OTHER LIABILITIES** | | |
| Pension-underfunded plans | $ 278.5 | $ 295.1 |
| Other accrued liabilities | 17.5 | 6.3 |
| | $ 296.0 | $ 301.4 |

## 10. PROPERTIES AND EQUIPMENT

| (In millions) | 2003 | 2002 |
|---|---|---|
| Land................................... | $    21.3 | $    20.5 |
| Buildings.............................. | 416.1 | 367.2 |
| Information technology and equipment.... | 107.2 | 99.8 |
| Machinery, equipment and other.......... | 1,304.0 | 1,140.2 |
| Projects under construction............. | 24.9 | 66.2 |
| Properties and equipment, gross......... | 1,873.5 | 1,693.9 |
| Accumulated depreciation and amortization .......................... | (1,216.9) | (1,071.7) |
| Properties and equipment, net.......... | $   656.6 | $   622.2 |

CC-BLG002828

Interest costs are capitalized for significant, extended construction projects. Capitalized interest cost was insignificant for the periods presented. Depreciation and lease amortization expense relating to properties and equipment amounted to $96.2 million in 2003, $89.8 million in 2002, and $84.2 million in 2001. Grace's rental expense for operating leases amounted to $15.4 million in 2003, $14.9 million in 2002, and $14.2 million in 2001. (See Note 14 for information regarding contingent rentals.)

At December 31, 2003, minimum future non-cancelable payments for operating leases were:

**MINIMUM FUTURE PAYMENTS UNDER OPERATING LEASES**
(In millions)

| | |
|---|---|
| 2004 | $16.7 |
| 2005 | 13.5 |
| 2006 | 12.6 |
| 2007 | 7.3 |
| 2008 | 6.3 |
| Thereafter | 10.7 |
| Total minimum lease payments | $67.1 |

The above minimum non-cancelable lease payments are net of anticipated sublease income of $1.6 million in 2004, $1.5 million in 2005, $1.4 million in 2006, $1.4 million in 2007, and $0.9 million in 2008.

## 11. LIFE INSURANCE

Grace is the beneficiary of life insurance policies on certain current and former employees with a net cash surrender value of $90.8 million and $82.4 million at December 31, 2003 and 2002, respectively. The policies were acquired to fund various employee benefit programs and other long-term liabilities and are structured to provide cash flow (primarily tax-free) over an extended number of years.

F-23

CC-BLG002829

The following table summarizes activity in these policies for 2003, 2002 and 2001:

## LIFE INSURANCE - ACTIVITY SUMMARY

| (In millions) | 2003 | 2002 | 2001 |
|---|---|---|---|
| Earnings on policy assets.... | $ 38.7 | $ 39.4 | $ 40.3 |
| Interest on policy loans..... | (33.1) | (34.7) | (34.9) |
| Premiums.................... | 2.4 | 2.4 | 2.5 |
| Proceeds from policy loans... | -- | -- | (48.7) |
| Policy loan repayments....... | 3.1 | 5.1 | 15.0 |
| Net investing activity....... | (2.7) | (5.4) | (2.9) |
| Change in net cash value..... | $ 8.4 | $ 6.8 | $ (28.7) |
| Gross cash value............ | $ 478.5 | $ 471.3 | $ 477.5 |
| Principal - policy loans..... | (365.3) | (365.4) | (377.6) |
| Accrued interest - policy loans ................... | (22.4) | (23.5) | (24.3) |
| Net cash value.............. | $ 90.8 | $ 82.4 | $ 75.6 |
| Insurance benefits in force................... | $2,213.1 | $2,240.8 | $2,291.0 |
| Tax-free proceeds received... | $ 11.9 | $ 19.4 | $ 18.0 |

Grace's financial statements display income statement activity and balance sheet amounts on a net basis, reflecting the contractual interdependency of policy assets and liabilities. See Note 14 for tax contingencies regarding certain of these life insurance policies.

## 12. DEBT

### COMPONENTS OF DEBT

| (In millions) | 2003 | 2002 |
|---|---|---|
| DEBT PAYABLE WITHIN ONE YEAR | | |
| Other short-term borrowings (1)........ | $ 6.8 | $ 4.3 |
| | $ 6.8 | $ 4.3 |
| DEBT PAYABLE AFTER ONE YEAR | | |
| DIP facility (2)...................... | $ -- | $ -- |
| DEBT SUBJECT TO COMPROMISE | | |
| Bank borrowings (3).................... | $500.0 | $500.0 |
| Other borrowings (4)................... | 3.7 | 1.0 |
| Accrued interest (5).................. | 49.0 | 37.8 |
| | $552.7 | $538.8 |
| Full-year weighted average interest rates on total debt .................... | 2.1% | 2.8% |

(1) Represents borrowings under various lines of credit and other miscellaneous borrowings.

(2) In April 2001, the Debtors entered into a debtor-in-possession post-petition loan and security agreement with Bank of America, N.A. (the "DIP facility") in the aggregate amount of $250 million. The DIP facility is secured by priority liens on substantially all assets of the Debtors, and bears interest based on LIBOR plus 2.00 to 2.25 percentage points. The Debtors have extended the term of the DIP facility through April 1, 2006. As of December 31, 2003, the Debtors had no outstanding borrowings under the DIP facility. However, $25.6 million of standby letters of credit were issued and outstanding under the facility as of December 31, 2003, which were issued mainly for trade-related matters such as performance bonds, as well as certain insurance and environmental matters. The outstanding amount of standby letters of credit issued under the DIP facility reduces the borrowing availability by a corresponding amount. Under the DIP facility, the Debtors are required to maintain $50 million of liquidity, a combination of cash, cash equivalents and the cash value of life insurance policies. As of December 31, 2003, the cash value of life insurance policies exceeded the $50 million requirement.

CC-BLG002830

(3) Under bank revolving credit agreements in effect prior to the Filing, Grace could borrow up to $500 million at interest rates based upon the prevailing prime, federal funds and/or Eurodollar rates. Of that amount, $250 million was available under short-term facilities expiring in May 2001, and $250 million was available under a long-term facility expiring in May 2003. As a result of the Filing, Grace was in default under the bank revolving credit agreements, and accordingly, the balance as of the Filing Date was reclassified to debt subject to compromise in the Consolidated Balance Sheet.

(4) Miscellaneous borrowings primarily consisting of U.S. mortgages and leases.

(5) Grace is continuing to accrue interest expense on its pre-petition debt at the pre-petition contractual rate of LIBOR plus 100 basis points.

Interest payments amounted to $4.2 million in 2003, $1.1 million in 2002, and $9.5 million in 2001.

## 13. FINANCIAL INSTRUMENTS

### DEBT AND INTEREST RATE SWAP AGREEMENTS

Grace was not a party to any derivative financial instruments at December 31, 2003 and December 31, 2002.

### FAIR VALUE OF DEBT AND OTHER FINANCIAL INSTRUMENTS

At December 31, 2003, the fair value of Grace's debt payable within one year not subject to compromise approximated the recorded value of $6.8 million. Fair value is determined based on expected future cash flows (discounted at market interest rates), quotes from financial institutions and other appropriate valuation methodologies. At December 31, 2003, the recorded values of other financial instruments such as cash, short-term investments, trade receivables and payables and short-term debt approximated their fair values, based on the short-term maturities and floating rate characteristics of these instruments. The fair value of debt subject to compromise is undeterminable; the ultimate value of such debt will be determined by the outcome of the Chapter 11 proceedings.

### SALE OF ACCOUNTS RECEIVABLE

Prior to the Filing, Grace sold, on an ongoing basis, approximately a $100 million pool of its eligible trade accounts receivable to a multi-seller receivables company (the "conduit") through a wholly owned special purpose subsidiary (the "SPS"). Upon sale of the receivables, the SPS held a subordinated retained interest in the receivables. Under the terms of the agreement, new receivables were added to the pool as collections reduced previously sold receivables. Grace serviced, administered and collected the receivables on behalf of the SPS and the conduit. The proceeds were used for the reduction of other short-term obligations and are reflected as operating cash flows in the Consolidated Statement of Cash Flows for the year ended December 31, 2001. Grace recorded a net loss of

F-24

CC-BLG002831

$1.2 million in 2001 from the corresponding sales to the conduit. As a result of the Filing, which constituted an event of default under the program, the amount outstanding under the program, approximately $65.3 million, was satisfied through the use of pre-petition trade receivables collected by the SPS during the period from the Filing Date to early May 2001. The program was terminated effective May 14, 2001.

**CREDIT RISK**

Trade receivables potentially subject Grace to credit risk. Concentrations of credit to customers in the petroleum and construction industries represent the greatest exposure. Grace's credit evaluation policies, relatively short collection terms and history of minimal credit losses mitigate credit risk exposures. Grace does not generally require collateral for its trade accounts receivable.

---

**14. COMMITMENTS AND CONTINGENT LIABILITIES**

---

**ASBESTOS-RELATED LITIGATION - SEE NOTE 3**

**ENVIRONMENTAL REMEDIATION**

**General Matters and Discussion**

Grace is subject to loss contingencies resulting from extensive and evolving federal, state, local and foreign environmental laws and regulations relating to the generation, storage, handling, discharge and disposition of hazardous wastes and other materials. Grace accrues for anticipated costs associated with investigative and remediation efforts where an assessment has indicated that a probable liability has been incurred and the cost can be reasonably estimated. These accruals do not take into account any discounting for the time value of money.

Grace's environmental liabilities are reassessed whenever circumstances become better defined or remediation efforts and their costs can be better estimated. These liabilities are evaluated based on currently available information, including the progress of remedial investigation at each site, the current status of discussions with regulatory authorities regarding the method and extent of remediation at each site, existing technology, prior experience in contaminated site remediation and the apportionment of costs among potentially responsible parties. Grace expects that the funding of environmental remediation activities will be affected by the Chapter 11 proceedings; any such effect could be material. Grace's environmental liabilities are included in "liabilities subject to compromise" as of December 31, 2003.

At December 31, 2003, Grace's estimated liability for environmental investigative and remediation costs totaled $332.4 million, as compared with $201.1 million at December 31, 2002. This liability covers both vermiculite and non-vermiculite related matters. The amount is based on funding and/or remediation agreements in place and Grace's best estimate of its cost for sites not subject to a formal remediation plan.

For the years ended December 31, 2003 and 2002, Grace recorded pre-tax charges of $142.5 million and $70.7 million, respectively, for environmental matters. Approximately $180.0 million of the pre-tax charges for these two years were in connection with a cost recovery lawsuit brought by the U.S. government relating to Grace's former vermiculite mining near Libby, Montana, and Grace's evaluation of probable remediation costs at vermiculite processing sites currently or formerly operated by Grace, as described below. The remainder of the pre-tax charges were primarily attributable to the ongoing review of bankruptcy claims.

Cash expenditures charged against previously established reserves for the years ended December 31, 2003, 2002 and 2001 were $11.2 million, $20.8 million and $28.9 million, respectively.

**Vermiculite Related Matters**

From the 1920's until 1990, Grace and previous owners conducted vermiculite mining and related activities near Libby, Montana. The vermiculite ore that was mined contained varying amounts of asbestos as a contaminant, almost all of which was removed during processing. Expanded vermiculite from Libby was used in products such as fireproofing, insulation and potting soil. In November 1999, Region 8 of the Environmental Protection Agency ("EPA") began an investigation into alleged excessive levels of asbestos-related disease in the Libby population related to these former mining activities. This investigation led the EPA to undertake additional investigative activity and to carry out response actions in and around Libby. On March 30, 2001, the EPA filed a lawsuit in U.S. District Court for the District of Montana, Missoula Division (United States v. W. R. Grace & Company et al.) under the Comprehensive Environmental Response, Compensation and Liability Act for the recovery of costs allegedly incurred by the United States in response to the release or threatened release of asbestos in the Libby, Montana area relating to such former mining activities. These

F-25

CC-BLG002832

costs include cleaning and/or demolition of contaminated buildings, the excavation and removal of contaminated soil, health screening of Libby residents and former mine workers, and investigation and monitoring costs. In this action, the EPA also sought a declaration of Grace's liability that would be binding in future actions to recover further response costs.

In connection with its defense, Grace conducted its own investigation to determine whether the EPA's actions and cost claims were justified and reasonable. However, in December 2002, the District Court granted the United States' motion for partial summary judgment on a number of issues that limited Grace's ability to challenge the EPA's response actions. In January 2003, a trial was held on the remainder of the issues, which primarily involved the reasonableness and adequacy of documentation of the EPA's cost recovery claims through December 31, 2001. On August 28, 2003, the District Court issued a ruling in favor of the United States that requires Grace to reimburse the government for $54.5 million in costs expended through December 2001, and for all appropriate future costs to complete the clean-up. Grace has appealed the court's ruling.

As a result of such ruling, Grace recorded a pre-tax charge of $50.0 million in the third quarter of 2003. During the fourth quarter of 2003, Grace recorded a $70.0 million pre-tax charge for estimated remediation costs in and around Libby, Montana, and at vermiculite processing sites currently or formerly operated by Grace. Grace's estimated liability for vermiculite-related matters at December 31, 2003 and 2002 was $181.0 million and $62.7 million, respectively. Grace's estimate of expected costs is based on public comments regarding the EPA's spending plans, discussions of spending forecasts with EPA representatives, analysis of other information made available from the EPA, and evaluation of probable remediation costs at vermiculite processing sites. However, the EPA's cost estimates have changed regularly and increased substantially over the course of this clean-up. Consequently, Grace's estimate may change materially as more information becomes available. Grace's liability for this matter is included in "liabilities subject to compromise" as of December 31, 2003.

**Non-Vermiculite Related Matters**

At December 31, 2003 and 2002, Grace's estimated liability for remediation of sites not related to its former vermiculite mining and processing activities was $151.4 million and $138.4 million, respectively. This liability relates to Grace's current and former operations, including its share of liability for off-site disposal at facilities where it has been identified as a potentially responsible party. During the fourth quarter of 2003, Grace recorded a $20.0 million increase in its estimated environmental liability for non-vermiculite related sites as part of the Chapter 11 claims review process. Grace's revised estimated liability is based upon claims for which sufficient information was available. As Grace receives new information and continues its claims evaluation process, its estimated liability may change materially. Grace's liability for this matter is included in "liabilities subject to compromise" as of December 31, 2003.

**Insurance Matters**

Grace is a party to three environmental insurance coverage actions involving one primary and one excess insurance carrier regarding the applicability of the carriers' policies to Grace's environmental remediation costs. The outcome of such litigation, as well as the amounts of any recoveries that Grace may receive, is presently uncertain. Accordingly, Grace has not recorded a receivable with respect to such insurance coverage.

## CONTINGENT RENTALS

Grace is the named tenant or guarantor with respect to leases entered into by previously divested businesses. These leases, some of which extend through the year 2017, have future minimum lease payments aggregating $123.8 million, and are fully offset by anticipated future minimum rental income from existing tenants and subtenants. In addition, Grace is liable for other expenses (primarily property taxes) relating to the above leases; these expenses are paid by current tenants and subtenants. Certain of the rental income and other expenses are payable by tenants and subtenants that have filed for bankruptcy protection or are otherwise experiencing financial difficulties. Grace believes that any loss from these lease obligations would be immaterial. Grace has rejected certain of these leases as permitted by the Bankruptcy Code, the financial impacts of which are insignificant.

## TAX MATTERS

Grace has received the examination report from the Internal Revenue Service (the "IRS") for tax periods 1993 through 1996 asserting, in the aggregate, approximately $114.0 million of proposed tax adjustments, including accrued interest. The most significant contested issue addressed in such report concerns corporate-owned life insurance ("COLI") policies and is discussed below. Other proposed IRS tax

CC-BLG002833

adjustments include Grace's tax position regarding research and development credits, the reporting of certain divestitures and other miscellaneous proposed adjustments. The tax audit for the 1993 through 1996 tax period was under the jurisdiction of the IRS Office of Appeals, where Grace filed a protest. The IRS Office of Appeals has returned the audit to the examination team for further review of the proposed adjustments as well as several affirmative tax claims raised by Grace. Grace's federal tax returns covering periods 1997 and forward are either under examination by the IRS or open for future examination. In addition, Grace will be required to report the additional taxable income (and the related accrued interest) resulting from IRS adjustments to state and local tax jurisdictions upon resolution of the Federal tax audits. Grace believes that the impact of probable tax return adjustments are adequately recognized as liabilities at December 31, 2003. Any cash payment as a result of such adjustment would be subject to Grace's Chapter 11 proceedings.

In 1988 and 1990, Grace acquired COLI policies on the lives of certain of its employees as part of a strategy to fund the cost of postretirement employee health care benefits and other long-term liabilities. COLI premiums have been funded in part by loans issued against the cash surrender value of the COLI policies. The IRS is challenging deductions of interest on loans secured by COLI policies for years prior to 1999. In 2000, Grace paid $21.2 million of tax and interest related to this issue for tax years 1990 through 1992. Subsequent to 1992, Grace deducted approximately $163.2 million in interest attributable to COLI policy loans. Although Grace continues to believe that the deductions were legitimate, the IRS has successfully challenged interest deductions claimed by other corporations with respect to broad-based COLI policies in three out of four litigated cases. Given the level of IRS success in COLI cases, Grace requested and was granted early referral to the IRS Office of Appeals for consideration of possible settlement alternatives of the COLI interest deduction issue.

On September 23, 2002, Grace filed a motion in its Chapter 11 proceeding requesting that the Bankruptcy Court authorize Grace to enter into a settlement agreement with the IRS with respect to Grace's COLI interest deductions. The tax years at issue are 1989 through 1998. Under the terms of the proposed settlement, the government would allow 20% of the aggregate amount of the COLI interest deductions and Grace would owe federal income tax and interest on the remaining 80%. Grace has accrued for the potential tax and interest liability related to the disallowance of all COLI interest deductions and continues to accrue interest as part of its quarterly income tax provision. On October 22, 2002, the Bankruptcy Court issued an order authorizing Grace to enter into settlement discussions with the IRS consistent with the aforementioned terms and further ordered that any final agreement would be subject to Bankruptcy Court approval. Grace is currently in negotiations with the IRS concerning the proposed settlement, and the possible termination of the COLI policies.

The IRS has assessed additional federal income tax withholding and Federal Insurance Contributions Act taxes plus interest and related penalties for calendar years 1993 through 1995 against a Grace subsidiary that formerly operated a temporary staffing business for nurses and other health care personnel. The assessments, aggregating $21.8 million, were made in connection with a meal and incidental expense per diem plan for traveling health care personnel, which was in effect through 1999, the year in which Grace sold the business. The IRS contends that certain per diem reimbursements should have been treated as wages subject to employment taxes and federal income tax withholding. Grace contends that its per diem and expense allowance plans were in accordance with statutory and regulatory requirements, as well as other published guidance from the IRS. The IRS has issued additional assessments aggregating $40.1 million for the 1996 through 1998 tax periods. The statute of limitations has expired with respect to the 1999 tax year. Grace has a right to indemnification for approximately 36% of any tax liability (including interest thereon) for the period from July, 1996 through December, 1998 from its former partner in the business. The matter is currently pending in the United States Court of Claims. Grace is currently in discussions with the Department of Justice concerning possible settlement options. Grace does not expect the resolution of this matter to have significant adverse impact on its Consolidated Financial Statements.

## PURCHASE COMMITMENTS

From time to time, Grace engages in purchase commitments in its various business activities, all of which are expected to be fulfilled with no material adverse consequences to Grace's operations or financial position.

## GUARANTEES AND INDEMNIFICATION OBLIGATIONS

Grace is a party to many contracts containing guarantees and indemnification obligations. These contracts primarily consist of:

F-27

CC-BLG002834

o Contracts providing for the sale of a former business unit or product line in which Grace has agreed to indemnify the buyer against liabilities arising prior to the closing of the transaction, including environmental liabilities. These liabilities are included in "liabilities subject to compromise" in the Consolidated Balance Sheets;

o Guarantees of real property lease obligations of third parties, typically arising out of (a) leases entered into by former subsidiaries of Grace, or (b) the assignment or sublease of a lease by Grace to a third party. These obligations are included in "liabilities subject to compromise" in the Consolidated Balance Sheets;

o Licenses of intellectual property by Grace to third parties in which Grace has agreed to indemnify the licensee against third party infringement claims;

o Contracts entered into with third party consultants, independent contractors, and other service providers in which Grace has agreed to indemnify such parties against certain liabilities in connection with their performance. Based on historical experience and the likelihood that such parties will ever make a claim against Grace, such indemnification obligations are immaterial; and

o Product warranties with respect to certain products sold to customers in the ordinary course of business. These warranties typically provide that product will conform to specifications. Grace generally does not establish a liability for product warranty based on a percentage of sales or other formula. Grace accrues a warranty liability on a transaction-specific basis depending on the individual facts and circumstances related to each sale. Both the liability and annual expense related to product warranties are immaterial to the Consolidated Financial Statements.

## FINANCIAL ASSURANCES

Financial assurances have been established for a variety of purposes, including insurance and environmental matters, asbestos settlements and appeals, trade-related commitments and other matters. At December 31, 2003, Grace had gross financial assurances issued and outstanding of $249.2 million, comprised of $136.8 million of surety bonds issued by various insurance companies, and $112.4 million of standby letters of credit and other financial assurances issued by various banks. Of the standby letters of credit, $19.0 million act as collateral for surety bonds, thereby reducing Grace's overall obligations under its financial assurances to a net amount of $230.2 million. Of this net amount of financial assurances, approximately $8.8 million were issued by non-Debtor entities and $221.4 million were issued by the Debtors. Of the amounts issued by the Debtors, approximately $191.3 million were issued before the Filing Date, with the remaining $30.1 million being issued subsequent to the Filing, of which $25.6 million was issued under the DIP facility.

## ACCOUNTING FOR CONTINGENCIES

Although the outcome of each of the matters discussed above cannot be predicted with certainty, Grace has assessed its risk and has made accounting estimates as required under U.S. generally accepted accounting principles. As a result of the Filing, claims related to certain of the items discussed above will be addressed as part of Grace's Chapter 11 proceedings. Accruals recorded for such contingencies have been included in "liabilities subject to compromise" on the accompanying Consolidated Balance Sheets. The amounts of these liabilities as ultimately determined through the Chapter 11 proceedings could be materially different from amounts recorded by Grace at December 31, 2003.

## 15. SHAREHOLDERS' EQUITY (DEFICIT)

Under its Certificate of Incorporation, the Company is authorized to issue 300,000,000 shares of common stock, $0.01 par value. Of the common stock unissued at December 31, 2003, approximately 9,582,784 shares were reserved for issuance pursuant to stock options and other stock incentives. The Company has not paid a dividend on its common stock since 1998. The Certificate of Incorporation also authorizes 53,000,000 shares of preferred stock, $0.01 par value, none of which has been issued. Of the total, 3,000,000 shares have been designated as Series A Junior Participating Preferred Stock and are reserved for issuance in connection with the Company's Preferred Stock Purchase Rights ("Rights"). A Right trades together with each outstanding share of common stock and entitles the holder to purchase one one-hundredth of a share of Series A Junior Participating Preferred Stock under certain circumstances and subject to certain conditions. The Rights are not and will not become exercisable unless and until certain events occur, and at no time will the Rights have any voting power.

In November 2001, 56,911 shares of restricted stock were reclassified as treasury shares to reflect an election made by Paul J. Norris, Grace's Chairman and Chief Executive Officer, under a Bankruptcy Court approved employment agreement.

F-28

CC-BLG002835

## 16. (LOSS) EARNINGS PER SHARE

The following table shows a reconciliation of the numerators and denominators used in calculating basic and diluted (loss) earnings per share.

(LOSS) EARNINGS PER SHARE

| (In millions, except per share amounts) | 2003 | 2002 | 2001 |
|---|---|---|---|
| **NUMERATORS** | | | |
| Net (loss) income............. | $ (55.2) | $ 22.1 | $ 78.6 |
| **DENOMINATORS** | | | |
| Weighted average common shares - basic calculation ............... | 65.5 | 65.4 | 65.3 |
| Dilutive effect of employee stock options and restricted shares....... | -- | 0.1 | 0.1 |
| Weighted average common shares - diluted calculation................ | 65.5 | 65.5 | 65.4 |
| BASIC (LOSS) EARNINGS PER SHARE..................... | $(0.84) | $ 0.34 | $ 1.20 |
| DILUTED (LOSS) EARNINGS PER SHARE..................... | $(0.84) | $ 0.34 | $ 1.20 |

Stock options that could potentially dilute basic (loss) earnings per share (that were excluded from the computation of diluted (loss) earnings per share because their exercise prices were greater than the average market price of the common shares) averaged approximately 9.4 million in 2003, 11.5 million in 2002, and 14.2 million in 2001. As a result of the 2003 net loss of $55.2 million, approximately 100,000 of employee compensation-related shares issuable under stock options were excluded from the diluted loss per share calculation in 2003 because their effect would have been antidilutive.

## 17. STOCK INCENTIVE PLANS

Each stock option granted under the Company's stock incentive plans has an exercise price equal to the fair market value of the Company's common stock on the date of grant. Options become exercisable at the time or times determined by the Compensation Committee of the Company's Board of Directors and may have terms of up to ten years and one month.

The following table sets forth information relating to such options during 2003, 2002 and 2001:

| STOCK OPTION ACTIVITY | 2003 | |
|---|---|---|
| | Number of Shares | Average Exercise Price |
| Balance at beginning of year.......... | 10,440,417 | $11.94 |
| Options exercised..................... | (15,831) | 2.40 |
| Options terminated or cancelled........ | (841,802) | 11.24 |
| Balance at end of year................. | 9,582,784 | 12.02 |
| Exercisable at end of year............. | 9,227,438 | $12.39 |
| | 2002 | |
| Balance at beginning of year.......... | 12,772,431 | $11.88 |
| Options exercised..................... | (1,266) | 2.40 |
| Options terminated or cancelled........ | (2,330,748) | 11.60 |
| Balance at end of year................. | 10,440,417 | 11.94 |

CC-BLG002836

Exercisable at end of year............    8,973,964      $12.58
=================================================================

|                                        | 2001        |         |
|----------------------------------------|-------------|---------|
| Balance at beginning of year...........| 14,005,209  | $12.70  |
| Options granted........................| 1,339,846   | 2.53    |
| Options terminated or cancelled........| (2,572,624) | 11.46   |
| Balance at end of year.................| 12,772,431  | 11.88   |

=================================================================
Exercisable at end of year............    9,586,993      $12.64
=================================================================

CC-BLG002837

Currently outstanding options expire on various dates through November 2011. At December 31, 2003, 4,474,004 shares were available for additional stock option or restricted stock grants.

Following is a summary of stock options outstanding at December 31, 2003:

## STOCK OPTIONS OUTSTANDING

| EXERCISE PRICE RANGE | Number Outstanding | Weighted-Average Remaining Contractual Life (Years) | Weighted-Average Exercise Price | Number Exercisable | Weighted-Average Exercise Price |
|---|---|---|---|---|---|
| $1  - $8 | 2,300,702 | 5.23 | $ 4.17 | 1,945,356 | $ 4.49 |
| $8  - $13 | 2,974,756 | 4.81 | 12.30 | 2,974,756 | 12.30 |
| $13 - $18 | 2,791,126 | 7.44 | 14.14 | 2,791,126 | 14.14 |
| $18 - $21 | 1,516,200 | 6.02 | 19.47 | 1,516,200 | 19.47 |
| | 9,582,784 | 5.87 | 12.02 | 9,227,438 | 12.39 |

At December 31, 2001, restrictions on all prior grants of restricted stock, net of forfeitures, totaled 55,000 shares; these restrictions lapsed in 2002. The quoted market value of the restricted shares at the date of grant was amortized to expense ratably over the restriction period.

## 18. PENSION PLANS AND OTHER POSTRETIREMENT BENEFITS PLANS

Grace maintains defined benefit pension plans covering employees of certain units who meet age and service requirements. Benefits are generally based on final average salary and years of service. Grace funds its U.S. pension plans ("domestic plans") in accordance with U.S. federal laws and regulations. Non-U.S. pension plans ("foreign plans") are funded under a variety of

F-29

CC-BLG002838

methods, as required under local laws and customs, and therefore cannot be summarized.

Grace provides certain other postretirement health care and life insurance benefits for retired employees of certain U.S. business units and certain divested units. The postretirement medical plan provides various levels of benefits to employees (depending on their dates of hire) who retire from Grace after age 55 with at least 10 years of service. These plans are unfunded, and Grace pays the costs of benefits under these plans as they are incurred. Grace applies SFAS No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions," which requires that the future costs of postretirement health care and life insurance benefits be accrued over the employees' years of service.

An amendment to the structure of the retiree-paid premiums for postretirement medical benefits was approved by the Company's Board in November 2001. The amendment became effective January 1, 2002, and requires all retirees and beneficiaries covered by the postretirement medical plan to contribute a minimum of 40% of the calculated premium for that coverage. Also, during 2002, per capita costs under the retiree medical plans exceeded caps on the amount Grace was required to contribute under a 1993 amendment to the plan. As a result, for 2003 and future years, retirees will bear 100% of any increase in premium costs.

At December 31, 2003 and 2002 the accounting measure of the accumulated benefit obligation for certain of the domestic and foreign plans exceeded the fair value of dedicated plan assets. As a result, Grace's accumulated other comprehensive loss, reflected as a reduction of shareholders' equity (deficit), includes the recognition of a minimum pension liability as of December 31, 2003 and 2002 of $408.3 million ($265.4 million, net of tax) and $436.5 million ($283.7 million, net of tax), respectively. These amounts include offsets of related deferred pension costs.

The following summarizes the changes in benefit obligations and fair value of retirement plan assets during 2003 and 2002 (Grace uses a December 31 measurement date for the majority of its plans):

F-30

CC-BLG002839

| CHANGE IN FINANCIAL STATUS OF RETIREMENT PLANS | PENSION | | | | | | OTHER POST-RETIREMENT PLANS | |
|---|---|---|---|---|---|---|---|---|
| | U.S. | | NON-U.S. | | TOTAL | | | |
| (In millions) | 2003 | 2002 | 2003 | 2002 | 2003 | 2002 | 2003 | 2002 |
| **CHANGE IN PROJECTED BENEFIT OBLIGATION** | | | | | | | | |
| Benefit obligation at beginning of year | $ 870.2 | $ 776.6 | $ 233.7 | $ 196.1 | $1,103.9 | $ 972.7 | $ 123.8 | $ 136.0 |
| Service cost | 9.8 | 8.5 | 5.3 | 4.3 | 15.1 | 12.8 | 0.6 | 0.6 |
| Interest cost | 56.4 | 55.1 | 14.4 | 12.5 | 70.8 | 67.6 | 8.1 | 8.7 |
| Plan participants' contributions | -- | -- | 0.9 | 0.4 | 0.9 | 0.4 | -- | -- |
| Amendments | -- | 5.6 | -- | 2.4 | -- | 8.0 | -- | (31.1) |
| Acquisitions | -- | -- | 0.2 | -- | 0.2 | -- | -- | -- |
| Change in discount rates and other assumptions | 53.7 | 93.6 | 18.9 | 2.8 | 72.6 | 96.4 | 7.1 | 31.1 |
| Benefits paid | (72.0) | (69.2) | (13.6) | (11.1) | (85.6) | (80.3) | (12.6) | (21.5) |
| Currency exchange translation adjustments | -- | -- | 34.1 | 26.3 | 34.1 | 26.3 | -- | -- |
| Benefit obligation at end of year | $ 918.1 | $ 870.2 | $ 293.9 | $ 233.7 | $1,212.0 | $1,103.9 | $ 127.0 | $ 123.8 |
| **CHANGE IN PLAN ASSETS** | | | | | | | | |
| Fair value of plan assets at beginning of year | $ 557.2 | $ 689.5 | $ 159.2 | $ 167.3 | $ 716.4 | $ 856.8 | $ -- | $ -- |
| Actual return on plan assets | 120.0 | (67.8) | 20.8 | (21.4) | 140.8 | (89.2) | -- | -- |
| Employer contribution | 52.9 | 4.3 | 7.6 | 5.9 | 60.5 | 10.2 | 12.6 | 21.5 |
| Acquisitions | -- | 0.4 | 0.1 | 1.8 | 0.1 | 2.2 | -- | -- |
| Plan participants' contribution | -- | -- | 0.9 | 0.4 | 0.9 | 0.4 | -- | -- |
| Benefits paid | (72.0) | (69.2) | (13.6) | (11.1) | (85.6) | (80.3) | (12.6) | (21.5) |
| Currency exchange translation adjustment | -- | -- | 18.2 | 16.3 | 18.2 | 16.3 | -- | -- |
| Fair value of plan assets at end of year | $ 658.1 | $ 557.2 | $ 193.2 | $ 159.2 | $ 851.3 | $ 716.4 | $ -- | $ -- |
| Funded status | $(260.0) | $(313.0) | $(100.7) | $ (74.5) | $(360.7) | $(387.5) | $(127.0) | $(123.8) |
| Unrecognized transition obligation | -- | -- | 0.1 | 0.5 | 0.1 | 0.5 | -- | -- |
| Unrecognized actuarial loss | 423.4 | 463.6 | 108.0 | 90.6 | 531.4 | 554.2 | 55.4 | 51.9 |
| Unrecognized prior service cost/(benefit) | 20.6 | 26.1 | 3.6 | 3.8 | 24.2 | 29.9 | (62.7) | (75.3) |
| Net amount recognized | $ 184.0 | $ 176.7 | $ 11.0 | $ 20.4 | $ 195.0 | $ 197.1 | $(134.3) | $(147.2) |
| **AMOUNTS RECOGNIZED IN THE CONSOLIDATED BALANCE SHEET CONSIST OF:** | | | | | | | | |
| Prepaid pension costs | $ 6.3 | $ 5.3 | $ 105.6 | $ 98.9 | $ 115.9 | $ 104.2 | $ -- | $ -- |
| Pension obligation | (240.2) | (290.7) | (108.8) | (79.3) | (349.0) | (370.0) | (134.3) | (147.2) |
| Intangible asset | 19.8 | 26.2 | -- | 0.2 | 19.8 | 26.4 | N/A | N/A |
| Accumulated other comprehensive loss | 398.1 | 435.9 | 10.2 | 0.6 | 408.3 | 436.5 | N/A | N/A |
| Net amount recognized | $ 184.0 | $ 176.7 | $ 11.0 | $ 20.4 | $ 195.0 | $ 197.1 | $(134.3) | $(147.2) |
| (Decrease) Increase in Minimum Liability Included in Other Comprehensive Income (Loss) | $ (37.8) | $ 227.5 | $ 9.6 | $ (0.3) | NM | NM | NM | NM |
| **WEIGHTED AVERAGE ASSUMPTIONS USED TO DETERMINE BENEFIT OBLIGATIONS AS OF DECEMBER 31** | | | | | | | | |
| Discount rate | 6.25% | 6.75% | 5.32% | 5.72% | NM | NM | 6.25% | 6.75% |
| Rate of compensation increase | 4.25% | 4.25% | 3.50% | 3.84% | NM | NM | NM | NM |

WEIGHTED AVERAGE ASSUMPTIONS USED TO DETERMINE NET PERIODIC BENEFIT COST FOR YEARS ENDED DECEMBER 31

| | U.S. 2004 | U.S. 2003 | U.S. 2002 | NON-U.S. 2003 | NON-U.S. 2002 | TOTAL 2003 | TOTAL 2002 | OTHER 2003 | OTHER 2002 |
|---|---|---|---|---|---|---|---|---|---|
| Discount rate | 6.25% | 6.75% | 7.25% | 5.72% | 5.87% | NM | NM | 6.75% | 7.25% |
| Expected return on plan assets | 8.00% | 8.25% | 9.00% | 8.16% | 8.67% | NM | NM | NM | NM |
| Rate of compensation increase | 4.25% | 4.25% | 4.25% | 3.84% | 4.08% | NM | NM | NM | NM |

| COMPONENTS OF NET PERIODIC BENEFIT COST (INCOME) | 2003 | | | 2002 | | | 2001 | | |
|---|---|---|---|---|---|---|---|---|---|
| (Dollars in millions) | U.S. | NON-U.S. | OTHER | U.S. | Non-U.S. | Other | U.S. | Non-U.S. | Other |
| Service cost | $ 9.8 | $ 5.3 | $ 0.6 | $ 8.5 | $ 4.3 | $ 0.6 | $ 7.9 | $ 3.8 | $ 0.7 |
| Interest cost | 56.4 | 14.4 | 8.1 | 55.1 | 12.5 | 8.7 | 55.3 | 11.2 | 9.8 |
| Expected return on plan assets | (44.5) | (13.3) | -- | (59.1) | (14.8) | -- | (69.1) | (15.9) | -- |
| Amortization of transition obligation (asset) | -- | 0.5 | -- | 0.7 | 0.4 | -- | (10.0) | -- | -- |
| Amortization of prior service cost (benefit) | 5.5 | 0.6 | (12.7) | 5.2 | 0.6 | (12.7) | 7.6 | 0.5 | (8.3) |
| Amortization of unrecognized actuarial loss | 18.4 | 4.4 | 3.7 | 9.7 | 1.8 | 3.0 | 2.4 | 0.2 | 0.1 |
| Net curtailment and settlement loss | -- | 0.6 | -- | -- | -- | -- | -- | 0.2 | -- |
| Net periodic benefit cost (income) | $ 45.6 | $ 12.5 | $ (0.3) | $ 20.1 | $ 4.8 | $ (0.4) | $ (5.9) | $ -- | $ 2.3 |

NM - Not meaningful
N/A - Not applicable

F-31

CC-BLG002840

| PENSION PLANS WHERE ACCUMULATED BENEFIT OBLIGATIONS EXCEED PLAN ASSETS | U.S. | | NON-U.S. | | OTHER POST-RETIREMENT PLANS | |
|---|---|---|---|---|---|---|
| (In millions) | 2003 | 2002 | 2003 | 2002 | 2003 | 2002 |
| Projected benefit obligation............................. | $909.6 | $867.1 | $121.0 | $ 95.6 | N/A | N/A |
| Accumulated benefit obligation (1).................... | 887.8 | 841.9 | 111.3 | 82.1 | $127.0 | $123.8 |
| Fair value of plan assets................................. | 647.6 | 551.2 | 5.3 | 3.3 | -- | -- |

N/A - Not applicable

(1) The accumulated benefit obligation for all domestic plans was $896.2 million and $845.0 million at December 31, 2003 and 2002, respectively.

The target allocation of investment assets for 2004, the actual allocation at December 31, 2003 and 2002, and the expected long-term rate of return by asset category for Grace's domestic plans are as follows:

| ASSET CATEGORY | TARGET ALLOCATION | PERCENTAGE OF PLAN ASSETS DECEMBER 31, | | WEIGHTED-AVERAGE EXPECTED LONG-TERM RATE OF RETURN |
|---|---|---|---|---|
| | 2004 | 2003 | 2002 | 2003 |
| U.S. stock......................................................... | 45% | 45% | 42% | 4.01% |
| Non-U.S. stock.................................................. | 15% | 16% | 20% | 2.39% |
| Short-term fixed income..................................... | 10% | 7% | --% | --% |
| Intermediate-term fixed income........................... | 30% | 32% | 38% | 1.85% |
| Total.................................................................. | 100% | 100% | 100% | 8.25% |

The investment goal for the domestic plans is to earn a long-term rate of return consistent with the long-term funding requirements of the underlying benefit obligation and cash flow profile. Plan amendments, assumptions and demographics are considered in determining the necessary level of returns.

The domestic pension plans have assets managed by six investment managers. Some of the general restrictions on their investments are summarized as follows:

o For fixed income securities: single issuers are limited to 5% of the portfolio's market value (with the exception of U.S. government and agency securities); the average credit quality of the portfolio shall be at least A rated; no more than 15% of the market value of the portfolio shall be invested in non-dollar denominated bonds; and privately placed securities are limited to no more than 50% of the portfolio's market value.

o For U.S. equity securities; the portfolio is entirely passively managed through investment in the Wilshire 5000 index.

o For non-U.S. equity securities; no individual security shall represent more than 5% of the portfolio's market value at any time, investment in U.S. common stock securities is prohibited (with the exception of American Depository Receipts) and emerging market securities may represent up to 30% of the total portfolio's market value. Currency futures and forward contracts may be held for the sole purpose of hedging existing currency risk in the portfolio.

For 2004, the expected long-term rate of return on assets for domestic plans is 8.0% (8.25% in 2003). Average annual returns over one, three, five, ten and fifteen year periods were 22.57%, 0.98%, 3.28%, 7.12%, and 8.50%, respectively. The change in the expected rate is due to the reallocation of targeted equity from 65% stocks/35% bonds to 60% stocks/40% bonds in December 2003. Grace reallocated the assets due to the volatility in the equity markets and to maintain an investment portfolio more in line with the profile of the domestic plan participants, a significant portion of whom are drawing current benefits.

Non-U.S. pension plans accounted for approximately 22% of total global pension assets at December 31, 2003 and 2002, respectively. Each of these plans, where applicable, abide by local requirements and regulations. Some of the local requirements include the establishment of a local pension committee, a formal statement of investment policy and procedures, and routine plan valuations by hired plan actuaries.

Subject to the approval of the Bankruptcy Court, Grace expects to contribute approximately $40.0 million to its domestic qualified defined benefit pension plans and approximately $12.0 million to its other postretirement plans in 2004. Of the approximately $40.0 million expected to be contributed to the domestic pension plans during 2004, approximately $33.0 million is estimated to be needed to satisfy minimum funding requirements under the Employee Retirement Income Security Act of 1984.

CC-BLG002841

Grace intends to contribute the additional $7.0 million to help fund the shortfall between the accounting measurement of Grace's U.S. qualified pension obligations and the market value of dedicated pension assets. The entire contribution to fund the other postretirement benefit plans is discretionary, as the plans are not subject to any minimum regulatory funding requirements.

For 2003 measurement purposes, the per capita cost of covered retiree health care benefits for pre-age 65 and post-age 65, respectively, were assumed to increase at rates of 8.25% and 8.65%, respectively. The rate is assumed to decrease gradually to 5.3% through 2007 and remain at that level thereafter. A one percentage point increase or decrease in assumed health care medical cost trend rates would have a negligible impact on Grace's postretirement benefit obligations.

## 19. BUSINESS SEGMENT INFORMATION

Grace is a global producer of specialty chemicals and specialty materials. It generates revenues from two business segments: Davison Chemicals and Performance Chemicals. Davison Chemicals produces a variety of catalyst and silica products. Performance Chemicals produces specialty construction chemicals, building materials and sealants and coatings. Intersegment sales, eliminated in consolidation, are not material. The table below presents information related to Grace's business segments for 2003, 2002, and 2001. Only those corporate expenses directly related to the segment are allocated for reporting purposes. All remaining corporate items are reported separately and labeled as such.

**BUSINESS SEGMENT DATA**

| (In millions) | 2003 | 2002 | 2001 |
|---|---|---|---|
| NET SALES | | | |
| Davison Chemicals......... | $1,039.9 | $ 939.3 | $ 868.3 |
| Performance Chemicals..... | 940.6 | 880.4 | 854.6 |
| Total.................... | $1,980.5 | $1,819.7 | $1,722.9 |
| | | | |
| PRE-TAX OPERATING INCOME | | | |
| Davison Chemicals......... | $ 118.9 | $ 129.4 | $ 123.8 |
| Performance Chemicals..... | 107.9 | 98.8 | 96.7 |
| Total.................... | $ 226.8 | $ 228.2 | $ 220.5 |
| | | | |
| DEPRECIATION AND AMORTIZATION | | | |
| Davison Chemicals......... | $ 67.6 | $ 61.7 | $ 58.5 |
| Performance Chemicals..... | 33.1 | 32.0 | 29.6 |
| Total.................... | $ 100.7 | $ 93.7 | $ 88.1 |
| | | | |
| CAPITAL EXPENDITURES | | | |
| Davison Chemicals......... | $ 68.1 | $ 59.5 | $ 39.3 |
| Performance Chemicals..... | 16.5 | 27.9 | 22.8 |
| Total.................... | $ 84.6 | $ 87.4 | $ 62.1 |
| | | | |
| TOTAL ASSETS | | | |
| Davison Chemicals......... | $ 797.1 | $ 734.1 | $ 687.2 |
| Performance Chemicals..... | 609.2 | 528.7 | 498.8 |
| Total.................... | $1,406.3 | $1,262.8 | $1,186.0 |

CC-BLG002842

The table below presents information related to the geographic areas in which Grace operated in 2003, 2002 and 2001.

**GEOGRAPHIC AREA DATA**

| (In millions) | 2003 | 2002 | 2001 |
|---|---|---|---|
| NET SALES | | | |
| United States............. | $   804.3 | $   827.1 | $   829.7 |
| Canada and Puerto Rico..... | 78.9 | 56.1 | 40.3 |
| Germany................... | 92.2 | 70.9 | 61.8 |
| Europe, other than | | | |
| Germany................... | 584.7 | 490.0 | 417.6 |
| Asia Pacific.............. | 312.7 | 269.0 | 266.7 |
| Latin America............. | 107.7 | 106.6 | 106.8 |
| Total..................... | $1,980.5 | $1,819.7 | $1,722.9 |
| PROPERTIES AND EQUIPMENT, NET | | | |
| United States............. | $   386.4 | $   392.0 | $   386.7 |
| Canada and Puerto Rico..... | 19.4 | 18.5 | 20.1 |
| Germany................... | 120.7 | 89.6 | 77.7 |
| Europe, other than | | | |
| Germany................... | 72.3 | 63.7 | 41.6 |
| Asia Pacific.............. | 46.8 | 47.4 | 49.1 |
| Latin America............. | 11.0 | 11.0 | 15.1 |
| Total..................... | $   656.6 | $   622.2 | $   590.3 |

F-33

CC-BLG002843