# W R GRACE & CO

# FORM 10-K
### (Annual Report)

# Filed 03/07/05 for the Period Ending 12/31/04

| | |
|---|---|
| Address | 7500 GRACE DRIVE |
| | COLUMBIA, MD 21044 |
| Telephone | 410 531 4000 |
| CIK | 0001045309 |
| Symbol | GRA |
| SIC Code | 2800 - Chemicals & Allied Products |
| Industry | Chemical Manufacturing |
| Sector | Basic Materials |
| Fiscal Year | 12/31 |

http://www.edgar-online.com
© Copyright 2009, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

TRIAL EXHIBIT 22
CC-BLG002851-003113

CC-BLG002851

===============================================================

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

----------

FORM 10-K

ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(D) OF
THE SECURITIES AND EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2004        Commission file number 1-13953

W. R. GRACE & CO.

Incorporated under the Laws of the          I.R.S. Employer Identification No.
State of Delaware                                    65-0773649

7500 GRACE DRIVE, COLUMBIA, MARYLAND 21044-4098
410/531-4000

SECURITIES REGISTERED PURSUANT TO SECTION 12(B) OF THE ACT:

| TITLE OF EACH CLASS | NAME OF EACH EXCHANGE ON WHICH REGISTERED |
|---|---|
| Common Stock, $.01 par value | New York Stock Exchange, Inc. |
| Preferred Stock Purchase Rights | |

SECURITIES REGISTERED PURSUANT TO SECTION 12(G) OF THE ACT:

None

Indicate by check mark whether the registrant (1) has filed all reports required
to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during
the preceding 12 months and (2) has been subject to such filing requirements for
the past 90 days. Yes [X] No [_]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405
of Regulations S-K is not contained herein and will not be contained, to the
best of registrant's knowledge, in definitive proxy or information statements
incorporated by reference in Part III of this Form 10-K or any amendment to this
Form 10-K. [X]

Indicate by check mark whether the registrant is an accelerated filer (as
defined in Rule 12b-2 of the Exchange Act). Yes [X] No [_]

The aggregate market value of W. R. Grace & Co. voting and non-voting common
equity held by non-affiliates as of June 30, 2004 (the last business day of the
registrant's most recently completed second fiscal quarter) was $298,002,498.

At February 18, 2005, 66,663,392 shares of W. R. Grace & Co. Common Stock, $.01
par value, were outstanding.

DOCUMENTS INCORPORATED BY REFERENCE

None.

===============================================================

TABLE OF CONTENTS

PART I..................................................................1

    Item 1.   Business..............................................1
              AVAILABILITY OF REPORTS AND OTHER DOCUMENTS...........1
              PROJECTIONS AND OTHER FORWARD-LOOKING INFORMATION.....1
              CHAPTER 11 FILING.....................................2
              BUSINESS OVERVIEW.....................................3
              PRODUCTS AND MARKETS..................................4
              INTELLECTUAL PROPERTY; RESEARCH ACTIVITIES............9
              ENVIRONMENTAL, HEALTH AND SAFETY MATTERS.............10
    Item 2.   Properties...........................................10
    Item 3.   Legal Proceedings....................................11
    Item 4.   Submission of Matters to a Vote of Security Holders..22

PART II.................................................................22

    Item 5.   Market for Registrant's Common Equity and Related
              Shareholder Matters..................................22
    Item 6.   Selected Financial Data.............................23
    Item 7.   Management's Discussion and Analysis of Results of Operations
              and Financial Condition.............................24

CC-BLG002852

Item 7A.   Quantitative and Qualitative Disclosures About Market Risk...24
Item 8.    Financial Statements and Supplementary Data....................24
Item 9.    Changes in and Disagreements with Accountants on Accounting
           and Financial Disclosure....................................24
Item 9A    Controls and Procedures.......................................24
Item 9B    Other Information.............................................24


PART III...........................................................................24

Item 10.   Directors and Executive Officers of the Registrant.............24
Item 11.   Executive Compensation.......................................27
Item 12.   Security Ownership of Certain Beneficial Owners and
           Management and Related Stockholder Matters...................36
Item 13.   Certain Relationships and Related Transactions.................38
Item 14.   Principal Accounting Fees and Services.........................38


PART IV............................................................................39

Item 15.   Exhibits, Financial Statement Schedules, and Reports on
           Form 8-K....................................................39


SIGNATURES.........................................................................45

PART I


ITEM 1. BUSINESS

AVAILABILITY OF REPORTS AND OTHER DOCUMENTS

        W. R. Grace & Co.(1) maintains an Internet website at www.grace.com.
Grace makes available, free of charge through its website, its annual reports on
Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and
amendments to those reports, filed or furnished pursuant to Section 13(a) or
15(d) of the Securities Exchange Act of 1934, as amended, as soon as reasonably
practicable after such reports are electronically filed with, or furnished to,
the Securities and Exchange Commission ("SEC"). These reports may be accessed
through the website's investor information page.

        In addition, Grace makes available, through its website at
www.grace.com/corporategovernance, the charters for the Audit Committee, the
Compensation Committee, the Nominating and Governance Committee, and the
Corporate Responsibility Committee of its Board of Directors, and its corporate
governance guidelines. Printed copies of the charters and the governance
guidelines may be obtained free of charge by contacting Grace Shareholder
Services at 410-531-4167.

        On September 14, 2004, Grace's Chief Executive Officer submitted a
certification to the New York Stock Exchange that, as of such date, he was not
aware of any violation by Grace of the New York Stock Exchange corporate
governance listing standards.

PROJECTIONS AND OTHER FORWARD-LOOKING INFORMATION

        This Report contains, and other communications by Grace may contain,
projections or other "forward-looking" information. Forward-looking information
includes all statements regarding Grace's Chapter 11 proceeding (including the
proforma financial statements included in "Management's Discussion and Analysis
of Results of Operation and Financial Condition" included in the Financial
Supplement to this Report), expected financial position, results of operations,
cash flows, financing plans, business strategy, budgets, capital and other
expenditures, competitive positions, growth opportunities for existing products,
benefits from new technology, plans and objectives of management, and markets
for stock. Like any other business, Grace is subject to risks and other
uncertainties that could cause its actual results to differ materially from any
projections or that could cause other forward-looking information to prove
incorrect. Grace does not undertake any obligation to update any forward-looking
information that may be contained in this Report.

        Most significantly, Grace filed for protection under Chapter 11 of the
United States Bankruptcy Code ("Chapter 11") on April 2, 2001 as a result of a
sharply increasing number of asbestos personal injury claims. See the discussion
below, in Item 3 of this Report, and Notes 2 and 3 to Grace's Consolidated
Financial Statements as of December 31, 2004 and December 31, 2003 and for each
of the three years ended December 31, 2004, 2003 and 2002 ("Consolidated
Financial Statements") and "Management's Discussion and Analysis of Results of
Operations and Financial Condition" in the Financial Supplement to this Report,
for a more detailed discussion of risks related to Grace's asbestos liabilities.

        In addition to general economic, business and market conditions, Grace
is also subject to other risks and uncertainties, including the following:


----------
(1) As used in this Report, the term "Grace" or the "Company" refers to W. R.
Grace & Co., a Delaware corporation and, in certain cases, one or more of its
subsidiaries and/or their respective predecessors.

CC-BLG002853

o  developments in and the outcome of the Chapter 11 proceedings, including but not limited to the determination of the cost of resolution of pending and future asbestos-related claims and the time required to confirm and implement a plan of reorganization;

o  adverse effects arising out of the pending Montana criminal proceeding described in Item 3 of this Report;

o  the loss of senior management and other key employees as a result of the Chapter 11 proceedings;

o  the loss of flexibility in operating its businesses and the higher costs of doing business under Chapter 11;

o  greater than expected liabilities with respect to environmental remediation;

o  foreign currency devaluations in developing countries or other adverse changes in currency exchange rates (including, in particular, the U.S. dollar to Euro exchange rate);

o  increases in prices of raw materials and energy costs;

o  an inability to obtain committed credit facilities or alternative sources of liquidity in amounts sufficient to fund operations, growth initiatives and non-core obligations;

o  a decline in worldwide oil consumption or the development of new methods of oil refining;

o  the consolidation of major customers, which could increase customer purchasing power, thereby putting pressure on operating profits;

o  an inability to gain customer acceptance, or slower than anticipated acceptance, of new products or product enhancements;

o  changes in environmental regulations or societal pressures that make Grace's business operations more costly or that change the types of products used by customers, especially petroleum-based products;

o  slower than anticipated economic advances in less developed countries;

o  technological breakthroughs rendering a product, a class of products or a line of business obsolete;

o  an inability to adapt to continuing technological improvements or operating strategies by competitors or customers; and

o  the acquisition (through theft or other means) and use by others of Grace's proprietary technology and other know-how.

See Notes 1, 2, 3, 4, 5, 10, 13 and 14 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for additional information concerning risks and uncertainties.

CHAPTER 11 FILING

On April 2, 2001, W. R. Grace & Co. and 61 of its United States subsidiaries and affiliates filed voluntary petitions for reorganization under Chapter 11 in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The cases were consolidated for the purpose of joint administration and were assigned case numbers 01-01139 through 01-01200. Grace's non-U.S. subsidiaries and certain of its U.S. subsidiaries were not included in the filing.

The filing was made in response to a sharply increasing number of asbestos-related personal injury claims. Under Chapter 11, Grace is operating its businesses as debtor-in-possession under court protection from its creditors and claimants, while using the Chapter 11 process to develop and implement a plan for addressing the asbestos-related claims against it.

Prior to 2000, Grace was able to settle asbestos-related claims through direct negotiations. The filing of claims had stabilized, and annual cash flows were manageable and fairly predictable. In 2000, the litigation environment changed with an unexpected 81% increase in personal injury claims, which Grace believes was due to a surge in unmeritorious claims. Trends in claims filing and settlement demands showed no signs of returning to historic levels and were exacerbated by the Chapter 11 filings of several co-

2

defendants in asbestos personal injury litigation. These trends greatly increased the risk that Grace would not be able to resolve its pending and future asbestos-related claims under the state court system.

Grace concluded that a federal court-supervised Chapter 11 filing

CC-BLG002854

provides the best forum available to achieve predictability and fairness in the claims resolution process. By filing under Chapter 11, Grace expects to be able both to obtain a comprehensive resolution of the claims against it and to preserve the inherent value of its businesses.

As a consequence of the filing, pending litigation against Grace is generally stayed (subject to certain exceptions in the case of governmental authorities), and no party may take any action to realize its pre-petition claims except pursuant to an order of the Bankruptcy Court. Since the filing, all motions necessary to conduct normal business activities have been approved by the Bankruptcy Court.

Three creditors' committees, two representing asbestos claimants and the third representing other unsecured creditors, and a committee representing shareholders, have been appointed in the Chapter 11 proceeding. These committees, and a legal representative of future asbestos claimants, have the right to be heard on all matters that come before the Bankruptcy Court and are likely to play important roles in the Chapter 11 proceeding. Grace is required to bear certain costs and expenses of the committees and of the future asbestos claimants' representative, including those of their counsel and financial advisors.

Grace's Chapter 11 filing, proposed plan of reorganization, and asbestos-related litigation are further discussed in Item 3 of this Report, and in Notes 2 and 3 to the Consolidated Financial Statements, and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement to this Report.

BUSINESS OVERVIEW

Grace, through its subsidiaries, is one of the world's leading specialty chemicals and materials companies. Grace entered the specialty chemicals industry in 1954, when it acquired both the Dewey and Almy Chemical Company and the Davison Chemical Company. Grace operates in the following two business segments:

o   Davison Chemicals is operated through two product groups – refining technologies and specialty materials. The refining technologies group produces (1) fluid cracking catalysts and additives used by petroleum refineries to convert distilled crude oil into transportation fuels and other petroleum-based products, and (2) hydroprocessing catalysts that upgrade heavy oils and remove certain impurities. The specialty materials group produces (1) silica-based engineered materials used in a variety of industrial, consumer, biotechnology and pharmaceutical separations, such as ink jet paper, paints, toothpastes, precision investment casting, rubber compounds, and insulated glass, as well as in edible oil refining and petrochemical processes; (2) specialty catalysts, including polyolefin catalysts and catalyst supports that are essential components in the manufacture of polyethylene and polypropylene resins, and other chemical catalysts used in a variety of industrial and consumer applications; and (3) silica-based materials and chromatography columns and equipment for bioseparations, pharmaceutical and other life sciences applications. Davison Chemicals accounted for approximately 52.8% of Grace's 2004 sales.

o   Performance Chemicals is operated through two product groups – Grace construction products ("GCP") and Darex(R) sealants and coatings. GCP produces (1) specialty construction chemicals, including performance-enhancing concrete admixtures, cement additives and additives for masonry products; (2) specialty building materials, including fire protection and waterproofing materials and systems. Darex produces sealants and coatings for packaging that protect food and beverages from

3

bacteria and other contaminants, extend shelf life and preserve flavor. Performance Chemicals accounted for approximately 47.2% of Grace's 2004 sales.

Grace's principal executive offices are located at 7500 Grace Drive, Columbia, Maryland 21044, telephone 410/531-4000. As of year-end 2004, Grace had approximately 6,500 full-time employees worldwide.

Information concerning the net sales, pretax operating income and total assets of Grace's continuing operations by business segment and information by geographic area for 2004, 2003 and 2002 is contained in Note 19 to the Consolidated Financial Statements in the Financial Supplement to this Report.

Strategic Objectives and Actions. Grace's strategy has been, and will continue to be, to enhance enterprise value by profitably growing its specialty chemicals businesses globally and achieving high levels of financial performance. To achieve these objectives, Grace plans to (i) invest in research and development activities, with the goals of introducing new high-performance products and services and enhancing manufacturing processes; (ii) implement process and productivity improvements and cost-management initiatives (including the use of Six Sigma processes), such as rigorous controls on working capital and capital spending, and programs for supply chain management, which includes

CC-BLG002855

procurement and materials management; and (iii) pursue selected acquisitions and alliances. These plans are designed to make Grace a high-performance company focused on the strengths of its global specialty chemicals businesses.

PRODUCTS AND MARKETS

Specialty Chemicals Industry Overview. Specialty chemicals and materials, such as those produced by Grace, are high-value-added products used as catalysts, intermediates, components or additives in a wide variety of products and processes. They are generally produced in relatively small volumes (compared to commodity chemicals) and must satisfy well-defined performance requirements and specifications. Specialty chemicals are often critical components of end products, or catalysts for the production of materials used in end products; consequently, they are tailored to meet customer needs, which generally results in a close relationship between the specialty chemicals producer and the customer. Rapid response to changing customer needs and reliability of product and supply are important competitive factors in specialty chemicals businesses.

Grace's management believes that in specialty chemicals businesses technological leadership (resulting from continuous innovation through research and development), combined with product differentiation and superior customer service, deliver increased value to customers and lead to higher operating margins. Grace believes that these factors reward it for the research and development and customer service costs associated with its strategy.

Davison Chemicals Business Segment. Davison, founded in 1832, is composed of two primary product groups: (i) refining technologies, and (ii) specialty materials. These product groups, which reflect a 2004 realignment of Davison's product lines and reporting responsibilities, principally apply silica, alumina and zeolite technology in the design and manufacture of products to meet the varying specifications of such diverse customers as major oil refiners, plastics and chemical manufacturers, and consumer products and pharmaceutical companies. Grace believes that Davison's technological expertise provides a competitive edge, allowing it to quickly design products and materials that meet changing customer specifications and to develop new products and materials that expand its existing technology.

Refining Technologies. Davison produces refinery catalysts, including (i) fluid cracking catalysts ("FCC") used by petroleum refiners to convert distilled crude oil into transportation fuels (such as gasoline

4

and diesel fuels) and other petroleum-based products, and (ii) hydroprocessing catalysts that upgrade heavy oils and remove certain impurities (such as nitrogen, sulfur and heavy metals). Davison also develops and manufactures FCC additives used for octane enhancement and to reduce emissions of sulfur oxides, nitrogen oxides and carbon monoxide from the FCC unit. Davison has recently introduced new catalyst/additive technologies for sulfur reduction in gasoline and, as an alternative technology, membranes which, when employed in a pervaporation system, will remove sulfur from refinery streams.

Oil refining is a highly specialized discipline, demanding that products be tailored to meet local variations in crude oil and the refinery's product mix. Davison works regularly with most of the approximately 360 refineries in the world, helping to find the most appropriate catalyst formulations for refiners' changing needs. To better serve its customers, Davison has designed a user-specific website, e-Catalysts.com.

Davison's catalyst business has benefited from the increased use of FCC units to produce selected petrochemical feedstocks. It has also benefited from the passage of more stringent environmental regulations, which has increased demand for FCC additives and other products that reduce environmental emissions. Davison's business also is affected by the capacity utilization of customers' processing units - as capacity utilization increases, the customer frequently uses a disproportionately greater amount of catalysts.

Davison operates its hydroprocessing catalyst business through Advanced Refining Technologies LLC ("ART"), a joint venture between Grace and Chevron Products Company that combines Chevron's fixed bed residuum catalyst business with Davison's ebullating bed residuum catalyst and distillate catalyst business. In response to increased demand for lower sulfur transportation fuels, ART has recently introduced new hydroprocessing catalyst technologies for sulfur reduction in gasoline and diesel fuels.

Grace believes that Davison is one of the world leaders in refinery catalysts and the largest supplier of FCCs in the world. Competition in the refinery catalyst business is based on technology, product performance, customer service and price. Davison's two principal global competitors in FCCs are Engelhard Corporation and Albemarle Corporation. Davison has several regional competitors for FCC additives and hydroprocessing catalysts.

Specialty Materials. Davison's specialty materials business produces engineered materials, materials and equipment used for biotechnology and pharmaceutical separations, and specialty catalysts. These products, which share a common technological foundation based on silicas, are used in a wide variety of industrial, consumer, biotechnology and pharmaceutical applications.

CC-BLG002856

Davison's engineered materials included silica gels, colloidal silicas, precipitated silicas, and zeolites/adsorbents. Silicas have different physical properties, such as particle size, surface area, porosity, and surface chemistry, which give each type of silica unique characteristics that make it appropriate for specific applications. Davison has multiple competitors in each silicas/adsorbents segment in which it participates. Competition is based on product performance and quality, customer service, and price.

Silica gels are used in coatings as matting (gloss-reducing) agents, in digital media for ink adsorption, in plastics for anti-blocking, in pharmaceuticals as conditioning agents, in toothpastes as abrasives and whiteners, in foods to carry flavors and prevent caking, and in edible oil purification and beer stabilization. Davison's colloidal silicas are used primarily as binders in precision investment casting and refractory applications. They have also recently been introduced for use in ink jet printing of digital media, such as digital photographs. Precipitated silicas are used predominantly in the manufacture of tires and other industrial rubber goods such as belts, hoses and footwear. Zeolites, while not silica-based products, are based on related silica/alumina technology. Zeolite adsorbents are used between the two panes of insulating glass to

5

adsorb moisture and are also used in process applications to adsorb water and separate certain chemical components from mixtures.

The engineered materials business has a large, fragmented customer base, reflecting the diverse markets served by its products. To better serve these customers, the business uses a direct sales force as well as a distribution network, and has introduced web-based initiatives. Web-based offerings include technical service, literature access, customer feedback tools, and process design formulas to assist customers in determining their needs. More than half of Davison's engineered materials are sold in Europe.

Through acquisition and internal growth, Davison has recently focused on building a biotechnology and pharmaceutical separations business with its silica-based media and chromatography products, to take advantage of higher growth opportunities in drug discovery, purification and manufacturing processes. During 2003, Davison introduced several new products, including new higher-performing silica gel media for separations and, through two small acquisitions, high-performance chromatography columns and custom column packing services. On August 2, 2004, Davison acquired Alltech International Holdings, Inc., a global manufacturer and distributor of chromatography products used for drug discovery and production. Alltech had 2003 sales of approximately $47 million.

The specialty catalyst business produces a range of supported catalysts based on Davison's core material science positions. Applications include ethylene and propylene polymerization, hydrogenation, and environmental and other chemical process applications. The largest portion of Davison's specialty catalysts business is the production of polyolefin catalysts. Polyolefin catalysts are used in the manufacture of nearly half the high density and linear low density polyethylene worldwide that is produced using supported catalysts. Polyethylene and polypropylene resins are used in products such as plastic film, high-performance plastic pipe and household containers. The polyolefin catalyst business is technology-intensive and focuses on providing products formulated to meet customer specifications. There are many manufacturers of polyolefin catalysts, and most compete on a worldwide basis. Competition continues to intensify because of evolving technologies, particularly the use of metallocene catalysts, which allow manufacturers to design polymers with exact performance characteristics. Davison uses a combination of its proprietary support technology and licensed technology from third parties to provide unique catalyst-based solutions to industry, and to provide a broad technology portfolio for enhancing collaboration opportunities with technology leaders.

Other Information. Davison's net sales were $1,192.2 million in 2004, $1,039.9 million in 2003, and $939.3 million in 2002; 38.0% of Davison's 2004 net sales were generated in North America, 41.8% in Europe, 16.3% in Asia Pacific, and 3.9% in Latin America. Sales of refining technologies products and services accounted for 29.2% of total net sales of Grace in 2004, 29.9% in 2003, and 30.0% in 2002. Sales of specialty materials products accounted for 23.6% of Grace's total net sales in 2004, 22.6% in 2003, and 21.6% in 2002.

At December 31 2004, Davison employed approximately 3,300 people worldwide in 20 facilities. Davison has a direct selling force and distributes most of its products directly to approximately 12,000 customers (500 for refining technologies and more than 11,000 for specialty materials), the largest of which accounted for approximately 4% of Davison's total sales.

Most raw materials used in the manufacture of Davison products are available from multiple sources. In some instances, Davison produces its own raw materials and intermediates. Natural gas is one of the principal materials used in Davison's manufacturing process. World events and other economic factors have caused volatility in the price of natural gas, which has impacted Davison's operating margins. Seasonality does not have a significant overall effect on Davison's business. However, sales of FCC catalysts tend to be lower in the first quarter prior to the shift in production by refineries from home heating oil for the winter

CC-BLG002857

6

season to gasoline production for the summer season. The specialty materials product group is most sensitive to general downturns in economic activity.

Performance Chemicals Business Segment. Grace's Performance Chemicals businesses include: (1) specialty construction chemicals and building materials, and (2) Darex(R) sealants and coatings.

Construction Chemicals and Building Materials. Grace is a leading supplier to the nonresidential (commercial and infrastructure) construction industry, and to a lesser extent, the residential construction and repair segment. Specialty construction chemicals (principally concrete admixtures, cement additives and additives for masonry products) improve the durability and aesthetics of finished concrete and enhance the handling and application of concrete, improve the manufacturing efficiency and performance of cement, and improve the water resistance and other qualities of masonry wall and paving systems.

Grace has introduced a number of new construction chemicals products and product enhancements in recent years. These include: an additive that reduces the level of chromium VI in cement; new polymeric fiber reinforcements for concrete that can substitute for secondary metal reinforcements; an admixture system for producing self-consolidating concrete (which reduces the labor cost of concrete placement and finishing); and a liquid pigment admixture and dispensing system for concrete. Grace seeks to improve and adapt these products continuously for different applications. Grace's strategy is also to extend its product portfolio and geographic reach through acquisitions. In 2003, Grace acquired the assets of Tricosal Beton-Chemie GmbH & Co. KG, which significantly expanded Grace's construction chemicals presence in Germany and Eastern Europe. In 2004, Grace acquired the assets of Pieri N.V., which established a foothold in the Benelux region.

Specialty building materials prevent structural water damage (for example, water- and ice-barrier products for residential use and waterproofing systems for commercial structures), and protect structural steel against collapse caused by fire. In North America, the specialty building materials product line also manufactures and distributes vermiculite products used in insulation and other applications. Recent product developments include improved window and door flashing products and deck protector tapes to inhibit deck corrosion. The spray-on fire protection product line recently has been adversely affected by the adoption in the U.S. of new international building codes, which require less fire protection material for structural steel used in commercial buildings. In November 2004, Grace acquired the synthetic roofing underlayments business of Flexia Corporation, expanding Grace's specialty residential products portfolio.

In addition to new product introductions, product enhancements and acquisitions, Grace looks for growth opportunities in developing countries, where increasing construction activity and sophistication of construction practices can increase demand for Grace's higher-performance construction chemicals and building materials products.

Construction chemicals and building materials are marketed under the Grace(R) brand to a broad range of customers, including cement manufacturers, ready-mix and precast concrete producers, local contractors, specialty subcontractors and applicators, masonry block manufacturers, building materials distributors and other industrial manufacturers, and architects and structural engineers. For some of these customer groups (such as contractors), cost and ease of application are key factors in making purchasing decisions; for others (such as architects and structural engineers), product performance and design versatility are the critical factors. In addition, some of Grace's waterproofing materials for residential use are available for sale in large home improvement stores.

In view of this diversity of customers and customer concerns, and because the construction chemicals and building materials businesses require intensive sales and customer service efforts, Grace maintains a separate sales and technical support team for construction chemicals, non-residential building materials and residential building materials. These sales and support teams sell products under global contracts, under U.S.

7

or regional contracts, and on a job-by-job basis. Consequently, GCP competes globally with several large construction materials suppliers and regionally and locally with numerous smaller competitors. In recent years, the cement and concrete industry has experienced some consolidation, thereby increasing the importance of servicing global customers. Competition in these businesses is based largely on technical support and service, product performance, brand and reputation, adaptability of the product and price.

The construction business is cyclical in response to economic conditions and construction demand. The construction business is also seasonal and dependent on favorable weather conditions. GCP seeks to increase

CC-BLG002858

profitability and minimize the impact of cyclical downturns in regional economies by introducing technically advanced higher-performance products, expanding geographically, and developing business opportunities in renovation construction markets. Although in recent years these strategies have been successful in minimizing the impact of cyclicality on Grace's construction business, a significant downturn in North American commercial construction activity adversely affected results of operations in 2002 and the first half of 2003. Operating results improved in 2004 as the decline in North American construction activity leveled off.

The raw materials used by the construction chemicals and building materials product lines can be obtained from multiple sources, including commodity chemical producers, petroleum companies and paper manufacturers. In most instances, there are at least two alternative suppliers for each of the principal raw materials used by these businesses. Recent higher petroleum-based raw material costs and other supply/demand disruptions have negatively impacted the operating margins of these product lines.

Darex(R) - Sealants and Coatings. The Darex sealants and coatings business consists primarily of four product lines: can sealants for rigid containers, sealants for metal and plastic bottle closures, coatings for metal packaging, and specialty barrier coatings for flexible packaging. These products are used to assure the quality of packaging and to preserve container contents. Can sealants ensure a hermetic seal between the lid and the body of beverage, food, aerosol and other cans. Closure sealants are used to seal pry-off and twist-off metal crowns, as well as roll-on pilfer-proof and plastic closures for glass and plastic bottles and jars used in beverage and food applications. Coatings are used in the manufacture of cans and closures to protect the metal against corrosion, to protect the contents against the influences of metal, to ensure proper adhesion of sealing compounds to metal surfaces, and to provide base coats for inks and for decorative purposes. These products are principally sold to container manufacturers. Specialty barrier coatings are used to improve the gas and/or vapor barrier performance of various packaging materials. They are principally sold to manufacturers of oriented polypropylene films for food packaging.

Grace is seeking to expand its Darex product offerings and improve sales growth by extending its technology to new markets, such as its oxygen-scavenging compounds (which absorb oxygen to increase shelf life) and high barrier materials that limit gas transmission into plastic packaging. Grace is also looking to improve sales of closure sealants for plastic bottles, and can sealants and coatings through niche opportunities in metal packaging and continued growth in developing countries. However, sales growth of can sealants has been impacted, and will likely continue to be impacted in the future, by the trend toward increasing use of plastic packaging. Grace will continue to focus on improving the profitability and cash flows of this business through worldwide productivity and strategic sourcing initiatives.

Competition is based on providing high-quality customer service at customer sites, as well as on uniform product quality and reliability, the ability to offer environmentally friendly products and price. In addition, because of the relative concentration of the canning and bottling market, maintaining relationships with leading container manufacturers, canners and bottlers, and assisting them as they re-engineer processes, are key elements for success.

8

Although raw materials used in the sealants and coatings business, including resins, rubber and lattices, are generally available from multiple sources, many raw materials are purchased from single source suppliers. The risk of using single source suppliers may be mitigated, in most cases, by identifying and qualifying alternative suppliers or, for unique materials, by using alternative formulations from other suppliers or by passing through price increases to customers. Some raw materials are also subject to pricing pressures from time to time, particularly petroleum-based specialty and commodity materials such as resins and solvents. Also, currency devaluations versus the U.S. dollar and Euro in developing countries may adversely affect raw material costs and the prices the business may charge for its products. The business is focused on managing raw material costs and sourcing opportunities to alleviate some of these pressures. Since Darex is a global business, the impact of seasonality is not significant.

Other Information. Net sales of Grace's Performance Chemicals segment in 2004 totaled $1067.7 million (49.2% in North America, 29.7% in Europe, 14.5% in Asia Pacific, and 6.6% in Latin America), versus $940.6 million in 2003 and $880.4 million in 2002. Sales of specialty construction chemicals accounted for 23.6% of Grace's total net sales in 2004, 22.6% in 2003 and 22.3% in 2002; sales of specialty building materials accounted for 11.3% of Grace's total net sales in 2004, 11.7% in 2003, and 12.6% in 2002; and sales of Darex(R) products accounted for 12.3% of Grace's total net sales in 2004, 13.2% in 2003 and 13.5% in 2002.

At year-end 2004, Grace employed approximately 3,000 people at 62 Performance Chemicals production facilities. Most of Performance Chemicals' sales are direct sales to the customer. Performance Chemicals' capital expenditures tend to be relatively lower, and sales and marketing expenditures tend to be relatively higher, than those of Davison Chemicals.

CC-BLG002859

See Note 19 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for further information regarding the Davison and Performance Chemicals business segments.

INTELLECTUAL PROPERTY; RESEARCH ACTIVITIES

Grace's products, processes and manufacturing equipment are protected by numerous patents and patent applications. Grace also benefits from legally protectable know-how and other proprietary information relating to many of its products and processing technologies. As competition in the markets in which Grace does business is often based on technological superiority and innovation, with new products based on technological developments being introduced frequently, the ability to achieve technological innovations and to obtain patent or other intellectual property protection is important. There can be no assurance, however, that Grace's patents, patent applications or other intellectual property will provide sufficient proprietary protection. In addition, other companies may independently develop similar systems or processes that circumvent patents issued to Grace, or may acquire patent rights within the fields of Grace's businesses.

Grace's research and development programs are directed toward the development of new products and processes and the improvement of, and development of new uses for, existing products and processes. Research is conducted in all regions, with North America and Europe accounting for the most activity. Grace's research and development strategy is to develop technology platforms on which new products will be based, while also focusing on the improvement of existing products and/or the adaptation of existing products to customer needs.

Research and development expenses relating to continuing operations amounted to $51 million in 2004, and $52 million in 2003 and 2002. These amounts include expenses incurred in funding external research projects. The amount of research and development expenses relating to government- and customer-sponsored projects (rather than projects sponsored by Grace) was not material.

9

ENVIRONMENTAL, HEALTH AND SAFETY MATTERS

Manufacturers of specialty chemicals products, including Grace, are subject to stringent regulations under numerous U.S. federal, state and local and foreign environmental, health and safety laws and regulations relating to the generation, storage, handling, discharge, disposition and stewardship of hazardous wastes and other materials. Grace has expended substantial funds to comply with such laws and regulations and expects to continue to do so in the future. The following table sets forth Grace's expenditures in the past three years, and its estimated expenditures in 2005 and 2006, for (i) the operation and maintenance of manufacturing facilities and the disposal of wastes; (ii) capital expenditures for environmental control facilities; and (iii) site remediation:

|  | (i) Operation of Facilities and Waste Disposal | (ii) Capital Expenditures | (iii) Site Remediation |
|---|---|---|---|
|  | (in $ millions) | | |
| 2002 | 38 | 6 | 14 |
| 2003 | 46 | 8 | 7 |
| 2004 | 47 | 7 | 9 |
| 2005 (est.) | 51 | 14 | 39 |
| 2006 (est.) | 52 | 12 | 14 |

The $39 million in estimated site remediation expenditures in 2005 includes a potential $22 million payment to transfer liability with respect to a non-owned site to a third party; such payment is subject to the approval of the Bankruptcy Court. The $39 million does not include possible additional spending or reimbursement of remediation costs related to Grace's former vermiculite mining and processing activities.

Grace continuously seeks to improve its environmental, health and safety performance. To the extent applicable, Grace extends the basic elements of the American Chemistry Council's Responsible Care(R) program to all Grace locations worldwide, embracing specific performance objectives in the key areas of product stewardship, employee health and safety, community awareness and emergency response, distribution, process safety and pollution prevention. In addition, Grace has implemented key elements of the new Responsible Care(R) Security Code for its operations and systems. It has completed a review of existing company security (including cyber-security) vulnerability, and has taken actions to enhance security systems and protect company assets.

For additional information, see Item 3 of this Report, and Note 14 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement to this Report.

CC-BLG002860

ITEM 2. PROPERTIES

        Grace operates manufacturing and other types of plants and facilities
(including office, warehouse, and other service facilities) throughout the
world. Some of these plants and facilities are shared by more than one Grace
business unit. Grace owns all of its major manufacturing facilities.
Substantially all of its U.S. properties are subject to security interests under
Grace's debtor-in-possession borrowing facility. Grace considers its major
operating properties to be in good operating condition and suitable for their
current use. Grace believes that, after taking planned expansion into account,
the productive capacity of its plants and

                                  10


other facilities is generally adequate for current operations and foreseeable
growth. See Note 19 to the Consolidated Financial Statements and "Management's
Discussion and Analysis of Results of Operations and Financial Condition" in the
Financial Supplement for information regarding Grace's capital expenditures.

        Davison Chemicals operates out of 24 facilities in the following
regions:

| Region        | Number of Facilities |
| ------------- | -------------------- |
| North America | 15                   |
| Europe        | 7                    |
| Latin America | 1                    |
| Asia Pacific  | 1                    |

Its largest facilities are located in Baltimore, Maryland; Lake Charles,
Louisiana; and Worms, Germany.

        Performance Chemicals operates out of 62 facilities in the following
regions:

| Region        | Number of Facilities |
| ------------- | -------------------- |
| North America | 26                   |
| Europe        | 12                   |
| Latin America | 6                    |
| Asia Pacific  | 18                   |

Its largest facilities are located in Cambridge, Massachusetts; Chicago,
Illinois; Slough, England; Epernon, France; and Singapore. Because of the nature
of its products, Performance Chemicals requires a greater number of facilities
to service its customers than Davison. Also, these facilities are generally
smaller and less capital intensive than Davison's facilities.


ITEM 3. LEGAL PROCEEDINGS

        1. Chapter 11 Proceedings. On November 13, 2004 Grace filed a plan of
reorganization, as well as several associated documents, including a disclosure
statement, with the Bankruptcy Court. On January 13, 2005, Grace filed an
amended plan of reorganization (the "Plan") and related documents to address
certain objections of creditors and other interested parties. The amended Plan
is supported by committees representing general unsecured creditors and equity
holders, but is not supported by committees representing asbestos personal
injury claimants and asbestos property damage claimants. The description of the
Plan herein does not purport to be complete and is qualified in its entirety by
reference to the Plan, disclosure statement, and glossary of terms furnished as
Exhibits 2.2, 99.1 and 99.2 to this Report, and the documents referred to
therein. Such other documents may be obtained through the Bankruptcy Court.

        Under the terms of the Plan, a trust would be established under
Section 524(g) of the Bankruptcy Code to which all pending and future
asbestos-related claims would be channeled for resolution. Grace has requested
that the Bankruptcy Court conduct an estimation hearing to determine the amount
that would need to be paid into the trust on the effective date of the Plan to
satisfy the estimated liability for each class of asbestos claimants and trust
administration costs and expenses over time. The Plan provides that Grace's
asbestos-related liabilities would be satisfied using cash and securities from
Grace and third parties.

        The Plan will become effective only after a vote of eligible creditors
and with the approval of the Bankruptcy Court and the U.S. District Court for
the District of Delaware. Votes on the Plan may not be solicited until the

CC-BLG002861

Bankruptcy Court approves the Disclosure Statement. Under the terms of the Plan, Grace

11

would satisfy claims under the Chapter 11 cases as follows:

Asbestos-Related Claims and Costs

A trust would be established under Section 524(g) of the Bankruptcy Code to which all pending and future asbestos-related claims would be channeled for resolution. The trust would utilize specified trust distribution procedures to satisfy the following allowed asbestos-related claims and costs:

o    Personal injury claims that meet specified exposure and medical criteria (Personal Injury-Symptomatic Eligible or "PI-SE" Claims) - in order to qualify for this class, claimants would have to prove that their health is impaired from meaningful exposure to asbestos-containing products formerly manufactured by Grace.

o    Personal injury claims that do not meet the exposure and medical criteria necessary to qualify as PI-SE Claims (Personal Injury-Asymptomatic and Other or "PI-AO" Claims) - this class would contain all asbestos-related personal injury claims against Grace that do not meet the specific requirements to be PI-SE Claims, but that do meet certain other specified exposure and medical criteria.

o    Property damage claims, including claims related to Grace's former Zonolite attic insulation ("ZAI" product ("PD Claims") - in order to qualify for this class, claimants would have to prove Grace liability for loss of property value or remediation costs related to asbestos-containing products formerly manufactured by Grace.

o    Trust administration costs and legal expenses.

The pending asbestos-related legal proceedings are described in "Asbestos Litigation" below. The claims arising from such proceedings would be subject to this classification process as part of the Plan.

Grace has requested that the Bankruptcy Court conduct an estimation hearing to determine the amounts that would need to be paid into the trust on the effective date of the Plan to satisfy the estimated liability for each class of asbestos claimants and trust administration costs and expenses over time. The amounts to fund PI-SE Claims, PD Claims and the expense of trust administration would be capped at the amount determined through the estimation hearing; therefore, after initial funding of the asbestos trust, Grace would have no further obligation for these claims and costs. Amounts required to fund PI-AO Claims would not be capped, so if the amount funded in respect thereof later proved to be inadequate, Grace would be responsible for contributing additional funds into the asbestos trust to satisfy PI-AO claims.

Asbestos personal injury claimants would have the option either to litigate their claims against the trust in federal court in Delaware or, if they meet specified eligibility criteria, accept a settlement amount based on the severity of their condition. Asbestos property damage claimants would be required to litigate their claims against the trust in federal court in Delaware. The Plan provides that, as a condition precedent to confirmation, the maximum estimated aggregate funding amount for all asbestos-related liabilities (PI-SE, PI-AO and PD including ZAI) and trust administration costs and expenses as determined by the Bankruptcy Court cannot exceed $1,613 million, which Grace believes would fund over $2 billion in claims, costs and expenses over time.

The PI-SE Claims, the PD Claims and the related trust administration costs and expenses would be funded with (1) $512.5 million in cash (plus interest at 5.5% compounded annually from December 21, 2002) and nine million shares of common stock of Sealed Air Corporation pursuant to the terms of a settlement agreement resolving asbestos-related and fraudulent transfer claims against Sealed Air, and (2) Grace

12

common stock. The amount of Grace common stock required to satisfy these claims will depend on the liability measures approved by the Bankruptcy Court and the value of the Sealed Air settlement, which changes daily with the accrual of interest and the trading value of Sealed Air stock. The Sealed Air settlement agreement remains subject to Bankruptcy Court approval and the fulfillment of specified conditions.

The PI-AO Claims would be funded with warrants exercisable for that number of shares of Grace common stock which, when added to the shares issued directly to the trust on the effective date of the Plan, would represent 50.1% of Grace's voting securities. If the common stock issuable upon exercise of the warrants is insufficient to pay all PI-AO Claims (the liability for which is uncapped under the Plan), then Grace would pay any additional liabilities in cash.

CC-BLG002862

Other Creditors

The Plan provides that all allowed claims other than those covered under the asbestos trust would be paid 100% in cash (if such claims qualify as administrative or priority claims) Or 85% in cash and 15% in Grace common stock (if such claims qualify as general unsecured claims). Grace estimates that it would satisfy certain of such claims, including bank debt, environmental liabilities, non-qualified pension claims, trade payables, litigation, and tax liabilities, with interest where applicable. Grace would finance these payments with cash on hand, $115 million paid by Fresenius Medical Care Holdings, Inc. in settlement of asbestos and other Grace-related claims, $800 million in new Grace debt and Grace common stock. Grace would satisfy other non-asbestos related liabilities and claims (primarily certain environmental, tax, pension and retirement medical obligations) as they become due and payable over time. Proceeds from available product liability insurance applicable to asbestos-related claims would supplement operating cash flow to service new debt and liabilities not paid on the effective date of the Plan.

Effect on Grace Common Stock

The Plan provides that Grace common stock will remain outstanding at the effective date of the Plan, but that the interests of existing shareholders would be subject to dilution by additional shares of common stock issued under the Plan. In addition, in order to preserve significant tax benefits from net operating loss carryforwards ("NOLs"), which are subject to elimination or limitation in the event of a change in control (as defined by the Internal Revenue Code) of Grace, the Plan places restrictions on the purchase of Grace common stock. The restrictions would prohibit (without the consent of Grace), for a period of three years, a person or entity from acquiring more than 4.75% of the outstanding Grace common stock or, for those persons already holding more than 4.75%, prohibit them from increasing their holdings. The Bankruptcy Court has also approved the trading restrictions described above until the effective date of the Plan.

Grace intends to address all pending and future asbestos-related claims and all other pre-petition claims as outlined in the Plan. However, Grace may not be successful in obtaining approval of the Plan by the Bankruptcy Court and other interested parties. Instead, a materially different plan of reorganization may ultimately be approved and, under the ultimate plan of reorganization, the interests of the Company's shareholders could be substantially diluted or cancelled. The value of Grace common stock following a plan of reorganization, and the extent of any recovery by non-asbestos-related creditors, will depend principally on the allowed value of Grace's asbestos-related claims as determined by the Bankruptcy Court.

2. Asbestos Litigation. Grace is a defendant in property damage and personal injury lawsuits relating to previously sold asbestos-containing products. In most of the personal injury lawsuits, Grace is one of many defendants. As a result of the Chapter 11 filing, all asbestos-related litigation has been stayed and no party may commence any new proceedings against Grace. In general, the claims giving rise to these lawsuits would be dealt with in the Plan as explained above.

13

Grace was a defendant in 65,656 asbestos-related lawsuits on April 2, 2001, the date of Grace's Chapter 11 filing. Seventeen of these lawsuits involve claims for property damage, nine relating to Grace's former ZAI product (one of which has since been dismissed) and eight relating to a number of former asbestos-containing products (two of which also are alleged to involve ZAI). The remainder of these lawsuits involves 129,191 claims for personal injury.

The plaintiffs in property damage lawsuits generally seek to have the defendants pay the cost of removing, containing or repairing the asbestos-containing materials in the affected buildings. Cumulatively through April 2, 2001, Grace received 380 asbestos property damage cases (involving thousands of buildings), 140 of which were dismissed without payment of any damages or settlement amounts; judgments were entered in favor of Grace in nine cases (excluding cases settled following appeals of judgments in favor of Grace); judgments were entered in favor of the plaintiffs in eight cases for a total of $86.1 million (one of which is on appeal); and 207 property damage cases were settled for a total of $696.8 million.

As part of the Chapter 11 process, the Bankruptcy Court established a bar date of March 31, 2003 for submission of asbestos-related property damage claims. (The bar date did not apply to asbestos-related personal injury claims or claims related to ZAI.) Approximately 4,300 additional property damage claims were filed prior to the bar date. Grace has analyzed the information provided by the claimants and has attempted to assess the validity and potential liability related to these claims. Approximately 170 claims failed to provide sufficient information to permit an evaluation. With respect to the remainder of such claims, Grace intends to object to all or almost all of them on a number of different grounds. Such grounds may include: insufficient or lack of supporting documentation; lack of product identification; statute of limitations, statute of repose, and laches; lack of negligence; inapplicability of strict liability; lack of causation; and improper calculation of damages. Where sufficient information exists to analyze and estimate the liability related to such claims, the estimated cost of resolution has been factored into Grace's total recorded

CC-BLG002863

In February 2000 a purported class action lawsuit was filed in the U.S. District Court for the Eastern District of Massachusetts against the Company (Lindholm v. W. R. Grace & Co.) on behalf of all owners of homes containing ZAI, a product formerly sold by Grace that may contain trace amounts of asbestos. The action seeks damages and equitable relief, including the removal, replacement and/or disposal of all such insulation. After Lindholm was filed, nine additional purported class action ZAI lawsuits were initiated against Grace prior to the Chapter 11 filing. The nine lawsuits were filed in various state and federal courts asserting similar claims and seeking damages similar to those in Lindholm. One of the purported federal class actions has been consolidated with Lindholm. As a result of the Chapter 11 filing, all of these cases have been stayed and certain of them have been transferred to the U.S. Bankruptcy Court for the District of Delaware. In October 2004, two additional purported class action lawsuits were filed in Canada.

The plaintiffs in the ZAI lawsuits assert that this product is in millions of homes and that the cost of removal could be several thousand dollars per home. Based on Grace's investigation of the claims described in these lawsuits, and testing and analysis of this product by Grace and others, Grace believes that the product was and continues to be safe for its intended purpose and poses little or no threat to human health. The plaintiffs in the ZAI lawsuits (and the U.S. government in the Montana criminal proceeding described below) dispute Grace's position on the safety of ZAI. In July 2002, the Bankruptcy Court approved special counsel to represent the ZAI claimants, at Grace's expense, in a proceeding to determine certain threshold scientific issues regarding ZAI. On October 18, 2004, the Bankruptcy Court held a hearing on motions filed by the parties to address a number of important legal and factual issues regarding the ZAI claims, and has taken the motions under advisement. The Bankruptcy Court has indicated it may require further proceedings with respect to the matters addressed in the motions. At this time, Grace is not able to assess the extent of any possible liability related to this matter.

14

Asbestos personal injury claimants allege adverse health effects from exposure to asbestos-containing products formerly manufactured by Grace. Cumulatively through April 2, 2001, 16,354 personal injury lawsuits involving 35,720 claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved), and 55,489 lawsuits involving 163,698 claims were disposed of for a total of $645.6 million.

Prior to the Chapter 11 filing date, based on its experience and analysis of trends in asbestos personal injury litigation, Grace endeavored to project the number and ultimate cost of all present and future personal injury claims expected to be asserted, based on actuarial principles, and to measure probable and estimable liabilities under generally accepted accounting principles. After the Chapter 11 filing and prior to the filing of the Plan, Grace did not change its recorded asbestos-related personal injury liability because it did not believe that there was an appropriate basis to do so.

Under the Plan, Grace is requesting that the Bankruptcy Court determine the aggregate dollar amount, on a net present value basis (the "Funding Amount"), that must be funded on the effective date of the Plan into an asbestos trust (established under Section 524(g) of the Bankruptcy Code) to pay all allowed pending and future asbestos-related personal injury and property damage (including ZAI) claims and related trust administration costs and expenses on the later of the effective date of the Plan or when allowed. It is a condition to confirmation that the Bankruptcy Court shall conclude that the Funding Amount is not greater than $1,613 million. This amount, which should be sufficient to fund over $2 billion in pending and future claims, is based in part on Grace's evaluation of (1) existing but unresolved personal injury and property damage claims, (2) actuarially-based estimates of future personal injury claims, (3) the risk of loss from ZAI litigation, (4) proposed claim payments reflected in the Plan, and (5) the cost of trust administration and litigation. This amount may not be consistent with what the Bankruptcy Court may conclude would be a sufficient Funding Amount.

Grace has requested that the Bankruptcy Court implement a process for estimating the Funding Amount, which will be primarily a function of the number of allowed property damage (including ZAI) and personal injury claims, and the amount payable per claim. Using this process, which involves the use of detailed claim forms, questionnaires, and expert testimony, Grace will seek to demonstrate that the vast majority of claims should not be allowed because they fail to establish any material property damage, health impairment or significant occupational exposure to asbestos from Grace's operations or products. Grace also will seek Bankruptcy Court approval of Grace's proposed payouts for allowed personal injury claims, which will vary depending upon the type of claim and/or the claimant's medical condition. If the Bankruptcy Court agrees with Grace's position on the number of, and the amounts to be paid in respect of, allowed personal injury and property damage claims, then Grace believes that the Funding Amount could be less than $1,613 million. However, this outcome is highly uncertain and will depend on a number of Bankruptcy Court rulings favorable to Grace's position.

CC-BLG002864

Conversely, the asbestos claimants committees and the future claimants representative have objected to Grace's proposed estimation process and are likely to continue to assert that Grace's asbestos-related liabilities are substantially higher than $1,613 million, and in fact are in excess of Grace's business value. If the Court accepts the position of the asbestos claimants committees, then any plan of reorganization likely would result in the loss of all or substantially all equity value by current shareholders. Therefore, due to the significant uncertainties of this process and asbestos litigation generally, Grace is not able to estimate a probable Funding Amount that would be accepted by the Bankruptcy Court. However, as Grace is willing to proceed with confirmation of the Plan with a Funding Amount of up to $1,613 million (assuming that other conditions precedent to confirmation of the Plan are satisfied, including the availability of funds from Sealed Air Corporation under the settlement agreement described above), during the fourth quarter of 2004, Grace accrued and took a charge of $714.8 million to increase its recorded asbestos-related liability to reflect the $1,613 million maximum amount allowed as a condition precedent under the Plan. This amount, plus $87.0

15

million for pre-Chapter 11 contractual settlements and judgments, brings the total recorded asbestos-related liability as of December 31, 2004 to $1,700 million. Any differences between the Plan as filed and as approved for confirmation could fundamentally change the accounting measurement of Grace's asbestos-related liability and that change could be material.

Grace previously purchased insurance policies under which Grace claims coverage for its asbestos-related lawsuits and claims. Grace has settled with and has been paid by all but one of its primary insurance carriers with respect to both property damage and personal injury cases and claims. Grace has also settled with its excess insurance carriers that wrote policies available for property damage cases; those settlements involve amounts paid and to be paid to Grace. Grace believes that certain of these settlements may cover ZAI claims as well as other property damage claims. In addition, Grace believes that additional coverage for ZAI claims may exist under excess insurance policies not subject to settlement agreements. Grace has settled with excess insurance carriers that wrote policies available for personal injury claims in layers of insurance that Grace believes may be reached based on its current estimates. Insurance coverage for asbestos-related liabilities has not been commercially available since 1985.

Pursuant to settlements with primary-level and excess-level insurance carriers with respect to asbestos-related claims, Grace received payments totaling $10.8 million in 2002, $13.2 million in 2003, and $18.7 million in 2004. Grace estimates that, assuming an ultimate payout of asbestos-related claims equal to the recorded liability of $1,700 million, it should be entitled to approximately $500.0 million, on a net present value basis, of insurance recovery. Such recovery, however, would occur only as claims are paid by the asbestos trust, absent an alternative payment arrangement with Grace's insurers.

See Item 1 of this Report and Notes 2 and 3 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement for additional information.

3. Environmental Proceedings. a. Libby, Montana and Vermiculite-Related Proceedings. From the 1920's until 1992, Grace (beginning in 1963) and previous owners conducted vermiculite mining and related activities near Libby, Montana. The mined vermiculite ore contained varying amounts of asbestos as an impurity, almost all of which was removed during processing. Expanded vermiculite was used in products such as fireproofing, insulation and potting soil.

In November 1999, Region 8 of the U.S. Environmental Protection Agency ("EPA") began an investigation into alleged excessive levels of asbestos-related disease in the Libby population related to these former mining activities. This investigation led the EPA to undertake additional investigative activity and to carry out response actions in and around Libby. On March 30, 2001, the EPA filed a lawsuit in U.S. District Court for the District of Montana, Missoula Division (United States v. W. R. Grace & Company et al.) under the Comprehensive Environmental Response, Compensation and Liability Act for the recovery of costs allegedly incurred by the United States in response to the release or threatened release of asbestos in the Libby, Montana area relating to such former mining activities. These costs include cleaning and/or demolition of alleged contaminated buildings, excavation and removal of alleged contaminated soil, health screening of Libby residents and former mine workers, and investigation and monitoring costs. In this action, the EPA also sought a declaration of Grace's liability that would be binding in future actions to recover further response costs.

In connection with its defense, Grace conducted its own investigation to determine whether the EPA's actions and cost claims were justified and reasonable. However, in December 2002, the District Court granted the United States' motion for partial summary judgment on a number of issues that limited Grace's ability to challenge the EPA's response actions. In January 2003, a trial was held on the remainder of the issues, which primarily involved the reasonableness and adequacy of documentation of the EPA's cost

CC-BLG002865

recovery claims through December 31, 2001. On August 28, 2003, the District Court issued a ruling in favor of the United States that requires Grace to reimburse the government for $54.5 million (plus interest) in costs expended through December 2001, and for all appropriate future costs to complete the cleanup. Grace appealed the court's ruling to the Ninth Circuit Court of Appeals, which heard oral argument on February 7, 2005. No decision has been issued on the appeal.

In February 2000, a purported class action lawsuit was filed in the U.S. District Court for Montana, Missoula Division (Tennison, et al. v. W. R. Grace & Co., et al.) against Grace on behalf of all owners of improved private real property situated within 12 miles of Libby, Montana. The action alleges that the class members have suffered harm in the form of environmental contamination and loss of property rights resulting from Grace's former vermiculite mining and processing operations. The complaint seeks remediation, property damages, and punitive damages. This case has been stayed as a result of Grace's Chapter 11 filing. However, as described above, the EPA has been conducting remediation activities in and around Libby, which include the remediation of private real property. While Grace has not completed its investigation of the claims in Tennison, Grace has no reason to believe that it will incur material liability in addition to the amount of the EPA's recoverable costs for cleanup activities around Libby.

In October 2000, a purported class action lawsuit was filed in the U.S. District Court for the District of Minnesota, 4th Division (Chase v. W. R. Grace & Co.-Conn.) alleging loss of property values in the vicinity of a former Grace plant in Minneapolis, which processed vermiculite from the Libby mine. This case has been stayed as a result of Grace's Chapter 11 filing. The EPA has commenced and is continuing a program for removing suspected vermiculite processing by-products from the yards and driveways of houses near the former plant. The EPA has reviewed 1,648 residential properties and targeted 269 for cleanup. Of the 269 properties, the EPA has taken action at 252, and has not obtained access to the remaining 17. As of December 31, 2004, the EPA had spent approximately $3.4 million on these residential cleanup actions. While Grace has not completed its investigation of the claims in Chase, Grace has no reason to believe that it will incur material liability in addition to the amount of the EPA's remediation costs. The EPA also has remediated industrial property in the area, including the former vermiculite expanding plant, at a cost of $650,000. The EPA has submitted proofs of claims for $10.9 million for the past and projected future costs (including indirect costs) of remediation of the residential and industrial properties at or around the former plant site.

The EPA also has compiled for investigation a list of 245 facilities that at one time used, stored, or expanded vermiculite concentrate that originated from the Libby vermiculite mine. Included in this list are 50 vermiculite expansion plants currently or formerly operated by Grace. The EPA has listed 17 of these 50 sites as requiring additional action. Grace has conducted corrective actions or investigations at six of these sites. The EPA has filed proofs of claims for 10 of these sites (exclusive of Libby, Montana), and for three other sites never owned or operated by Grace. The amount claimed with respect to these 13 sites is $26 million. In addition, another governmental agency has commenced a separate investigation at 28 of the 245 facilities, 22 of which are currently or were formerly operated by Grace. Grace does not have sufficient information to determine whether this separate investigation is likely to result in any additional liability.

As a result of the ruling by the District Court in Montana in United States v. W. R. Grace & Company et al., and Grace's evaluation of probable remediation costs at vermiculite processing sites, Grace estimates its total liability for vermiculite-related remediation, including liability related to the matters described in the three preceding paragraphs at $204.2 million. Grace's estimate of expected costs is based on public comments regarding the EPA's spending plans, discussions of spending forecasts with EPA representatives, and analysis of other information made available from the EPA. However, the EPA's cost estimates have increased regularly and substantially over the course of its cleanup. Consequently, as the EPA's spending on these matters increases, Grace's liability for remediation will increase. Any payments to the EPA would be subject to the outcome of the Chapter 11 proceedings.

b. Non-Vermiculite-Related Environmental Proceedings. The EPA has designated Grace (together, in most cases, with many other companies) as a "potentially responsible party" ("PRP") with respect to paying the costs of investigating and remediating pollution at various sites. At year-end 2004, proceedings were pending with respect to approximately 30 sites as to which Grace has been designated a PRP by the EPA. U.S. law provides that all PRPs for a site may be held jointly and severally liable for the costs of investigating and remediating the site. Grace is also conducting investigatory and remediation activities at sites under the jurisdiction of state and/or local authorities. During the Chapter 11 proceeding, Grace has not been participating (except in a limited number of special cases) in the joint funding of investigation and remediation at non-owned sites where it is a PRP. Grace's expected liability with respect to these sites is included in an aggregate $140.8 million liability

for environmental remediation (excluding liability related to Grace's former vermiculite mining and processing activities as described above); however, Grace's ultimate liability with respect to many of such sites will be determined as part of its Chapter 11 proceeding.

Grace is a party to other legal proceedings and claims involving U.S. federal, state and/or local government agencies and private parties regarding Grace's responsibility for alleged noncompliance with environmental laws and regulations. These proceedings are not expected to result in significant sanctions or in any material liability. However, Grace may incur material liability in connection with future actions of governmental agencies or private parties relating to past or future practices of Grace with respect to the generation, storage, handling, discharge, disposition or stewardship of hazardous wastes and other materials.

Based on its analysis of environmental-related claims submitted prior to the March 31, 2003 bar date and other available information, Grace estimates that its aggregate liability for environmental remediation, other than remediation related to its former vermiculite mining and processing operations (discussed above), is $140.8 million as of December 31, 2004. These environmental liabilities are reassessed whenever circumstances become better defined or remediation efforts and their costs can be better estimated. These liabilities are evaluated quarterly, based on currently available information, including the progress of remedial investigation at each site, the current status of discussions with regulatory authorities regarding the method and extent of remediation at each site, existing technology, prior experience in contaminated site remediation and the apportionment of costs among potentially responsible parties. The estimated aggregate liability could change materially as additional information becomes available or circumstances change.

c. Environmental Insurance Litigation. In December 2004, Grace settled two environmental insurance coverage actions previously pending in the U.S. District Court for the Southern District of New York (Maryland Casualty Co. v. W. R. Grace & Co., and Continental Casualty Company v. W. R. Grace & Co. and W.R. Grace & Co. Conn.) with the remaining insurer in both cases. The terms of the settlement are subject to confidentiality restrictions. The Maryland Casualty action involved approximately 200 claims arising from environmental contamination of sites owned or formerly owned by Grace, and off-site, non-owned disposal sites. The Continental Casualty action involved approximately 45 claims of the same nature, including Grace's claims for coverage regarding certain claims involving former vermiculite mining operations in Libby, Montana. However, the Libby-related claims for coverage were excluded from the settlement. A third action (Unigard Security Ins. Co. v. W. R. Grace & Co.-Conn. and W. R. Grace & Co.) remains pending in the same court. In this suit, Unigard is seeking a declaration of no liability regarding potential personal injury claims against Grace arising from environmental contamination at four sites formerly owned by Grace. The Unigard policy at issue is a first-layer excess policy with limits of $10 million that was in effect from June 30, 1974 to June 30, 1975. No personal injury claims have been identified regarding the four sites. Additionally, in June 2003, the Second Circuit Court of Appeals, while interpreting coverage under the Continental Casualty Policy underlying the Unigard policy, held that Section 46 of the New York Insurance Law, which was in effect from 1971 to 1982, prohibited coverage for claims arising from gradual pollution.

18

For further information, see "Environmental, Health and Safety Matters" under Item 1 above, Note 14 to Grace's Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement.

4. Montana Criminal Proceeding. On February 7, 2005, the United States Department of Justice announced the unsealing of a 10-count grand jury indictment against Grace and seven current or former senior level employees relating to Grace's former vermiculite mining and processing activities in Libby, Montana. The indictment accuses the defendants of (1) conspiracy to violate environmental laws and obstruct federal agency proceedings; (2) violations of the federal Clean Air Act; (3) wire fraud in connection with the sale of allegedly contaminated properties; and (4) obstruction of justice.

Grace purchased the Libby mine in 1963 and operated it until 1990; vermiculite processing activities continued until 1992. The grand jury charges that the conspiracy took place from 1976 to 2002 and also charges that the alleged endangerment to the areas surrounding Libby continues to the present day. According to the U.S. Department of Justice, Grace could be subject to fines in an amount equal to twice the after-tax profit earned from its Libby operations or twice the alleged loss suffered by Libby victims, plus additional amounts for restitution to victims. The indictment alleges that such after tax profits were $140 million. Grace has categorically denied any criminal wrongdoing and intends to vigorously defend itself at trial.

Among the employees charged is Robert J. Bettacchi, a senior vice president of Grace and president of the Grace Performance Chemicals business unit. Mr. Bettacchi and two other current employees have been placed on administrative leave with pay so that they may dedicate sufficient time to their defense. The U.S. Bankruptcy Court previously granted Grace's request to advance legal and defense costs to the employees, subject to a reimbursement obligation if it is later determined that the employees did not meet the standards for

CC-BLG002867

indemnification set forth under the appropriate state corporate law.

Grace is unable to assess whether the indictment, or any conviction resulting therefrom, will have a material adverse effect on the results of operations or financial condition of Grace or affect Grace's bankruptcy proceedings.

5. Litigation Related to Former Packaging and Medical Care Businesses. In September 2000, Grace was named in a purported class action suit filed in California Superior Court for the County of San Francisco alleging that the 1996 reorganization involving a predecessor of Grace and Fresenius Medical Care Holdings, Inc. and the 1998 reorganization involving a predecessor of Grace and Sealed Air Corporation were fraudulent transfers (Abner, et al., v. W. R. Grace & Co., et al.). The suit is alleged to have been brought on behalf of all individuals who then had lawsuits on file asserting personal injury or wrongful death claims against any of the defendants. After Abner, and prior to the Chapter 11 filing, two other similar class actions were filed. These lawsuits have been stayed as a result of Grace's Chapter 11 filing.

The Bankruptcy Court authorized the Official Committee of Asbestos Personal Injury Claimants and the Official Committee of Asbestos Property Damage Claimants to proceed with claims against Sealed Air and Fresenius on behalf of Grace's bankruptcy estate. On November 29, 2002, Sealed Air and Fresenius each announced that they had reached agreements in principle with such Committees to settle asbestos and fraudulent transfer claims related to such transactions. Under the terms of the Fresenius settlement, as subsequently revised and subject to certain conditions, Fresenius would contribute $115.0 million to the Grace estate as directed by the Bankruptcy Court upon confirmation of Grace's plan of reorganization. In July 2003, the Fresenius settlement was approved by the Bankruptcy Court. Under the terms of the proposed Sealed Air settlement, Sealed Air would make a payment of $512.5 million (plus interest at 5.5% per annum, compounded annually, commencing on December 21, 2002) and nine million shares of Sealed Air common

19

stock, valued at $479.4 million as of December 31, 2004, as directed by the Bankruptcy Court upon confirmation of Grace's plan of reorganization. The Sealed Air settlement remains subject to the approval of the Bankruptcy Court and the fulfillment of specified conditions. Upon the effectiveness of these settlements Abner and all similar actions will be dismissed. These settlements are an integral part of Grace's Plan.

6. Tax Claims. On January 10, 2005, Grace received a corrected examination report from the Internal Revenue Service (the "IRS") for the 1993 - 1996 tax period asserting, in the aggregate, approximately $90.9 million of proposed tax adjustments, plus accrued interest (the "Examination Report"). The most significant issue addressed in the Examination Report concerns corporate-owned life insurance ("COLI") policies. As discussed below, a settlement agreement relating to COLI was executed on January 20, 2005. The benefit of that settlement was not reflected in the Examination Report. Once reflected, Grace anticipates that the proposed tax adjustment will be reduced from approximately $90.9 million to $80.2 million plus accrued interest. Other proposed adjustments in the Examination Report include disallowance of research and development ("R&D") credits, general business credits and miscellaneous deductions. Subject to Bankruptcy Court approval and IRS revision of the Examination Report to reflect the benefit of the COLI settlement, Grace is in agreement with the IRS with respect to all proposed tax adjustments in the Examination Report with the exception of approximately $7.0 million of proposed adjustments relating to R&D credits. On February 9, 2005, Grace filed a protest with IRS Appeals requesting (i) additional review of the R&D credit issue and (ii) issuance of a corrected Examination Report to reflect the COLI settlement. Grace also filed a motion with the Bankruptcy Court on February 14, 2005 requesting that the Court authorize Grace to: (i) enter into a settlement agreement with the IRS with respect to all agreed issues for the 1993 - 1996 tax periods and (ii) pay the related federal taxes as well as certain state taxes for the 1990 - 1996 tax periods plus accrued interest. Grace estimates that the tax payment including interest will be approximately $122.5 million.

With respect to COLI, in 1988 and 1990, Grace acquired COLI policies and funded policy premiums in part using loans secured against policy cash surrender value. Grace claimed a total of approximately $258 million in deductions attributable to interest accrued on such loans through the 1998 tax year, after which such deductions were no longer permitted by law. The IRS disallowance of such interest deductions, beginning during the 1990-1992 federal tax audit, resulted in years of discussion until recently, when the issue was resolved in a tentative settlement approved by the Bankruptcy Court, as described below.

On October 13, 2004, the Bankruptcy Court entered an order authorizing Grace to enter into a settlement agreement with the IRS in connection with interest deductions claimed with respect to COLI and providing for the termination of the COLI policies. In accordance with that order, on January 20, 2005, Grace terminated the COLI policies and Grace, Fresenius Medical Care Holdings, Inc., Sealed Air Corporation and the IRS entered into a COLI Closing Agreement. Under the COLI Closing Agreement, the government allowed 20% of the aggregate amount of the COLI interest deductions and Grace owes federal income tax and interest with respect to the remaining 80% of the COLI interest deductions disallowed. Grace estimates that the federal tax liability resulting from the COLI settlement is approximately $53.5 million, $10.4 million of which

CC-BLG002868

was paid in connection with the 1990-1992 tax audit and $50.8 million of which
will be paid in connection with the settlement of the 1993-1996 federal tax
audit discussed above. The remaining approximately $12.3 million of additional
tax liability will be satisfied in connection with the 1997 and 1998 federal tax
audits, discussed below. The COLI Closing Agreement also provides that, with
respect to the termination of the COLI policies, Grace will include 20% of the
gain realized in taxable income, with the government, exempting 80% of such gain
from tax. As a result of the termination, Grace received approximately $16
million in cash proceeds and will record taxable income of approximately $60
million in 2005. It is anticipated that Grace will apply its net operating loss
carryforwards to offset the taxable income generated from terminating the COLI
policies, although alternative minimum taxes may apply.

20

Grace's federal tax returns covering 1997 and later tax periods are
either under examination by the IRS or open for future examination. As a
consequence of any finally determined federal tax adjustments, Grace will be
liable for additional state taxes plus interest accrued thereon.

The IRS has assessed additional federal income tax withholding and
Federal Insurance Contributions Act (FICA) taxes plus interest and related
penalties for calendar years 1993 through 1998 against a Grace subsidiary that
formerly operated a temporary staffing business for nurses and other health care
personnel. The assessments, aggregating $61.9 million, were made in connection
with a meal and incidental expense per diem plan for traveling health care
personnel, which was in effect through 1999, the year in which Grace sold the
business. (The statute of limitations has expired with respect to 1999.) The IRS
contends that certain per diem reimbursements should have been treated as wages
subject to employment taxes and federal income tax withholding. Grace contends
that its per diem and expense allowance plans were in accordance with statutory
and regulatory requirements, as well as other published guidance from the IRS.
Grace has a right to indemnification from its former partner in the business for
approximately 36% of any tax liability (including interest thereon) for the
period from July 1996 through December 1998. The matter is currently pending in
the United States Court of Claims. Grace has tentatively agreed with the
Department of Justice and IRS on a settlement amount and certain other terms
that would resolve the matter. The preliminary settlement is subject to the
execution of written closing agreements with the IRS and a written settlement
agreement with the Department of Justice, and to Bankruptcy Court approval.

Grace believes that the impact of probable tax return adjustments is
adequately recognized as liabilities in its consolidated financial statements at
December 31, 2004.

7. ERISA lawsuits. In June 2004, a purported class action complaint
(Evans v. Akers et al.) was filed in U.S. District Court for the District of
Massachusetts against Grace's Board of Directors, certain current and former
Grace officers and employees, and others, relating to Grace's 401(k) Savings and
Investment Plan (the "S&I Plan"). The complaint alleges that the decline in the
price of Grace common stock from July 1999 through February 2004 resulted in
significant losses to S&I Plan participants. The complaint further alleges that
the defendants breached their fiduciary duties under the Employee Retirement
Income Security Act of 1974, as amended ("ERISA"), by failing to sell or take
other appropriate action with regard to Grace common stock held by the S&I Plan
during that period, and by failing to disclose to S&I Plan participants the risk
of investing in Grace common stock. The complaint seeks compensatory damages for
the S&I Plan from the defendants.

On October 26, 2004, a purported class-action complaint (Bunch et al.
v. W. R. Grace & Co. et al.) also related to the S&I Plan was filed in the U.S.
District Court for the Eastern District of Kentucky against Grace, the Grace
Investment and Benefits Committee, Grace's Board of Directors, certain current
and former Grace officers and employees, and others. The complaint alleges that
Grace and its investment advisors breached fiduciary duties under ERISA by
selling Grace common stock from the S&I Plan at a distressed price. The
complaint further alleges that Grace breached fiduciary duties under ERISA by
hiring State Street Bank and Trust Company, the investment manager for the S&I
Plan that was retained by Grace in December 2003, to rapidly liquidate all of
the employees' Grace common stock investment at an artificially low sales price.

The defendants in these cases have moved to transfer the Bunch action
to the U.S. District Court for the District of Massachusetts and will seek to
consolidate it with the Evans action. Grace likely would have an obligation to
indemnify the other defendants for any liability arising out of either of these
lawsuits. However, Grace believes that the allegations in both lawsuits are
without merit and that, in any event, any liability arising therefrom would be
covered by its fiduciary liability insurance.

21

8. Other Claims Received Prior to the Bar Date. The Bankruptcy Court
established a bar date of March 31, 2003 for claims of general unsecured
creditors, asbestos-related property damage claims and medical monitoring claims
related to asbestos. The bar date did not apply to asbestos-related personal

CC-BLG002869

injury claims or claims related to ZAI, which will be dealt with separately). Approximately 14,900 proofs of claim were filed by the bar date. Of these claims, approximately 9,400 were non-asbestos related, approximately 4,300 were for asbestos-related property damage (discussed above), and approximately 1,000 were for medical monitoring. In addition, approximately 500 proofs of claim were filed after the bar date.

The medical monitoring claims were made by individuals due to alleged exposure to asbestos through Grace's products or operations. These claims, if sustained, would require Grace to fund ongoing health monitoring costs for qualified claimants.

Approximately 7,000 of the 9,400 non-asbestos related claims involve claims by employees or former employees for future retirement benefits such as pension and retiree medical coverage. The Plan treats these claims as contingent and, after the effective date of the Plan, leaves these claimants' legal, equitable and contractual rights unaltered. In addition to claims for environmental remediation and indemnification (discussed above), the remaining non-asbestos related claims include claims for payment for goods and services; taxes; product warranties; principal and interest under pre-petition credit facilities; amounts due under leases and other contracts; leases and other executory contracts rejected in the Bankruptcy Court; indemnification or contribution to actual or potential co-defendants in asbestos-related and other litigation; pending non-asbestos related litigation; and non-asbestos related personal injury.

Grace's initial analysis indicated that many claims are duplicates, represent the same claim filed against more than one of the debtors, lack any supporting documentation, or provide insufficient supporting documentation. As of December 31, 2004, Grace had filed with the Bankruptcy Court objections to approximately 1,560 claims. Most of these objections were non-substantive (duplicates, no supporting documentation, late filed claims, etc.). Of such claims, 1,031 have been expunged, 31 have been withdrawn, and the remainder are being addressed through dispute resolution procedures approved by the Bankruptcy Court. Grace expects to file objections to additional claims, most of which will be substantive, as analysis and evaluation of the claims progresses.

At this time, Grace believes that its recorded liabilities for claims subject to the bar date represent a reasonable estimate of the ultimate allowable amount for such claims that are not in dispute or have been submitted with sufficient information to both evaluate merit and estimate the value of the claim. As claims are resolved, or where better information becomes available and is evaluated, Grace will make adjustments to the liabilities recorded on its financial statements as appropriate. Any such adjustments could be material to its consolidated financial position and results of operations.

ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

This Item is inapplicable, as no matters were submitted to a vote of the Company's security holders during the fourth quarter of 2004.

22

PART II

ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED SHAREHOLDER MATTERS.

Except as provided below, the information called for by this Item appears in the Financial Supplement under the heading "Financial Summary" opposite the caption "Other Statistics - Common shareholders of record" (page F-39); under the heading "Quarterly Summary and Statistical Information - Unaudited" opposite the caption "Market price of common stock" (page F-38); and in Note 15 to the Consolidated Financial Statements (page F-31).

On March 31, 1998, the Company paid a dividend of one Preferred Stock Purchase Right ("Right") on each share of the Company's Common Stock. Subject to prior redemption by the Company for $.01 per Right, Rights will become exercisable on the earlier of (a) 10 days after a person or group ("Acquiring Person") has acquired beneficial ownership of 20% or more of the outstanding Common Stock or (b) 10 business days (or a later date fixed by the Company's Board of Directors) after an Acquiring Person commences (or announces the intention to commence) a tender offer or exchange offer for beneficial ownership of 20% or more of the Common Stock. Until such events occur, the Rights will automatically trade with the Common Stock, and separate certificates for the Rights will not be distributed. The Rights do not have voting or dividend rights.

Generally, each Right not owned by an Acquiring Person (i) will initially entitle the holder to buy from the Company one hundredth of a share of the Company's Junior Participating Preferred Stock ("Junior Preferred Stock"), for $100, subject to adjustment ("exercise price"); (ii) will entitle such

holder to receive upon exercise, in lieu of shares of Junior Preferred Stock, that number of shares of Common Stock having a market value of two times the exercise price of the Right; and (iii) may be exchanged by the Company for one share of Common Stock or one hundredth of a share of Junior Preferred Stock, subject to adjustment. Generally, if there is an Acquiring Person and the Company is acquired, each Right not owned by an Acquiring Person will entitle the holder to buy a number of shares of common stock of the acquiring company having a market value equal to twice the exercise price of the Right.

Each share of Junior Preferred Stock will be entitled to a minimum preferential quarterly dividend payment of $1.00 per share but will be entitled to an aggregate dividend equal to 100 times the dividend declared per share of Common Stock whenever such dividend is declared. In the event of liquidation, holders of Junior Preferred Stock will be entitled to a minimum preferential liquidation payment of $100 per share but will be entitled to an aggregate payment equal to 100 times the payment made per share of Common Stock. Each share of Junior Preferred Stock will have 100 votes, voting together with the Common Stock. Finally, in the event of any business combination, each share of Junior Preferred Stock will be entitled to receive an amount equal to 100 times the amount received per share of Common Stock. These rights are protected by customary antidilution provisions.

The terms of the Rights may be amended by the Company's Board of Directors without the consent of the holders of the Rights. The Rights, which will remain outstanding under the proposed plan of reorganization, are currently scheduled to expire on March 31, 2008.

This summary of the Rights does not purport to be complete and is qualified in its entirety by reference to the Rights Agreement, which was filed as Exhibit 4.1 to the Company's Form 8-K filed on April 8, 1998.

23

ITEM 6. SELECTED FINANCIAL DATA

The information called for by this Item appears under the heading "Financial Summary" (page F-39 of the Financial Supplement) and in Notes 1, 2, 3, 4, 10, 13 and 14 to the Consolidated Financial Statements (pages F-10 through F-23, and F-25 through F-31 of the Financial Supplement), which is incorporated herein by reference. In addition, Exhibit 12 to this Report (page F-60) of the Financial Supplement) contains the ratio of earnings to fixed charges and combined fixed charges and preferred stock dividends for Grace for the years 2000-2004.

ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF RESULTS OF OPERATIONS AND FINANCIAL CONDITION

The information called for by this Item appears on pages F-40 to F-58 of the Financial Supplement, which is incorporated herein by reference.

ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

The information called for by this Item appears in Notes 12 and 13 to the Consolidated Financial Statements (pages F-26 and F-27 of the Financial Supplement), which is incorporated herein by reference.

ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

See the Index to Consolidated Financial Statements and Financial Statement Schedule and Exhibit on page F-2 of the Financial Supplement, which is incorporated herein by reference.

ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

This Item is inapplicable, as no such changes or disagreements have occurred.

ITEM 9A. CONTROLS AND PROCEDURES

The information called for by this Item appears under the heading "Management's Report on Financial Reporting and Internal Controls" on page F-3

CC-BLG002871

of the Financial Supplement, which is incorporated herein by reference.

ITEM 9B. OTHER INFORMATION

    None.


                    PART III


ITEM 10. DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

    The Company's current directors and executive officers are listed
below. The Company's Certificate of Incorporation provides for the division of
the Board of Directors into three classes, each to serve for a three-year term
or until their respective successors are elected. In view of the Chapter 11
filing, the directors are continuing to serve beyond the expiration of their
respective terms. Executive officers are elected to serve

                    24


until the next annual meeting of the Company's Board of Directors or until their
respective successors are elected.


| Name and Age | Office | First Elected |
| --- | --- | --- |
| John F. Akers (70) | Class II Director | 05/09/97 |
| H. Furlong Baldwin (73) | Class I Director | 01/16/02 |
| Ronald C. Cambre (66) | Class III Director | 09/01/98 |
| Alfred E. Festa (45) | Class II Director<br>President and Chief Operating Officer | 09/08/04<br>11/17/03 |
| Marye Anne Fox (57) | Class I Director | 05/10/96 |
| John J. Murphy (73) | Class II Director | 05/09/97 |
| Paul J. Norris (57) | Class III Director (Chairman)<br>Chief Executive Officer | 01/01/99<br>11/01/98 |
| Thomas A. Vanderslice (73) | Class I Director and Lead Independent Director | 05/10/96 |
| Robert J. Bettacchi (62)* | Senior Vice President | 04/01/97 |
| William M. Corcoran (55) | Vice President | 05/11/99 |
| W. Brian McGowan (55) | Senior Vice President | 12/06/90** |
| David B. Siegel (55) | Senior Vice President, General Counsel and Chief Restructuring Officer | 09/01/98** |
| Robert M. Tarola (54) | Senior Vice President and Chief Financial Officer | 05/11/99 |


*    On administrative leave

**   Designated an Executive Officer on July 9, 1998

    Mr. Akers served as Chairman of the Board and Chief Executive Officer
of International Business Machines Corporation from 1985 until his retirement in
1993. He is also a director of Hallmark Cards, Inc., Lehman Brothers Holdings,
Inc., The New York Times Company and PepsiCo, Inc.

    Mr. Baldwin served as a director of Mercantile Bankshares Corporation
from 1970 to 2003, and as Chairman of the Board from 1984 to 2003. From 1976 to
2001 he served as President and Chief Executive Officer. Mr. Baldwin is Chairman
of NASDAQ Stock Market, Inc., and also a director of Platinum Underwriters
Holdings, Ltd. and Allegheny Energy Inc.

                    25

CC-BLG002872

Mr. Cambre is retired Chairman of the Board and CEO of Newmont Mining Corporation. He joined Newmont as Vice Chairman and CEO in 1993 and retired as CEO in 2000 and as Chairman in 2001. He is also a director of Cleveland-Cliffs Inc., McDermott International, Inc. and Inco Limited.

Mr. Festa joined Grace from Morganthaler Private Equity Partners, a venture capital and buyout firm, where he was a partner. From 2000 to 2002, he was with ICG Commerce, Inc., a private company providing on-line procurement services, where he last served as President and Chief Executive Officer. For two years prior to that, he served as Vice President and General Manager of AlliedSignal's performance fibers business.

Dr. Fox is Chancellor of the University of California San Diego and is a Professor of Chemistry at that institution. She is also a director of Boston Scientific Corporation, Red Hat, Inc. and Pharmaceutical Product Development, Inc.

Mr. Murphy served as Chairman of the Board of Dresser Industries, Inc., a supplier of products and technical services to the energy industry, until 1996. From 1997 to 2000, he was a Managing Director of SMG Management L.L.C., a privately owned investment group. Mr. Murphy is also a director of CARBO Ceramics, Inc. and ShawCor Ltd.

Mr. Norris has been actively engaged in Grace's business for the past five years. He was a director of Borden Chemical, Inc. until August 2004. He continues to perform advisory services for Kolberg Kravis Roberts & Co., which previously was the principal shareholder of Borden.

Mr. Vanderslice served as Chairman and Chief Executive Officer of M/A-COM, Inc., a designer and manufacturer of radio frequency and microwave components, devices and subsystems for commercial and defense applications, from 1989 until his retirement in 1995. He is currently a private investor. As Lead Independent Director of Grace's Board, he presides at all executive sessions.

Messrs. Bettacchi, Corcoran, McGowan, Siegel and Tarola have been actively engaged in Grace's business for the past five years. Mr. Tarola is also a director of mutual funds sponsored by Legg Mason, Inc. Mr. Bettacchi has been named the subject of a pending criminal proceeding relating to Grace's former vermiculite mining and processing activities in Libby, Montana, and has been placed on administrative leave. See "Montana Criminal Proceeding" in Item 3 of this Report for further information.

Board Independence. The Board has determined that all directors, other than Mr. Norris (who is also Chief Executive Officer) and Mr. Festa (who is also President and Chief Operating Officer) are independent under New York Stock Exchange rules because none of such directors has any direct or indirect material relationship with the Company or its affiliates, other than through his or her service as a director and as an owner of less than 1% of the Company's Common Stock. This determination was based on a number of factors, principal among them was that (1) none of such directors, or any member of their immediate families is (or at any time during the last three years was) an executive officer or employee of the Company, or an executive officer of any other entity with whom the Company does business; (2) none of such directors or any member of their immediate families has, during the last three years, received any compensation from the Company (other than Board retainer and meeting fees); and (3) none of such directors serve, or within the last three years served, as an executive officer, director, trustee or fiduciary of any charitable organization to which the Company made any material donation. Mr. Vanderslice has been appointed Lead Independent Director and, in such capacity, he presides at executive sessions of non-management directors. Interested parties may communicate with Mr. Vanderslice by writing him at the following address: Thomas A. Vanderslice - Lead Independent Director, c/o W. R. Grace & Co., 7500 Grace Drive, Columbia, Maryland 21044.

26

Audit Committee. The Company has a standing Audit Committee established in accordance with SEC rules. The Committee members are John F. Akers, H. Furlong Baldwin, Ronald C. Cambre, Marye Anne Fox, John J. Murphy, and Thomas A. Vanderslice, each of who meet the independence standards of the SEC and New York Stock Exchange. The Board of Directors of the Company has determined that all Committee members are audit committee financial experts as defined by SEC regulations.

Compliance with Section 16(a) of the Securities Exchange Act. Under Section 16 of the Securities Exchange Act of 1934, the Company's directors, certain of its officers, and beneficial owners of more than 10% of the outstanding Common Stock are required to file reports with the SEC and the New York Stock Exchange concerning their ownership of and transactions in Common Stock or other securities of the Company; such persons are also required to furnish the Company with copies of such reports. Based upon the reports and related information furnished to the Company, the Company believes that all such filing requirements were complied with in a timely manner during and with respect to 2004.

Code of Ethics for Principal Officers. The Board of Directors of the Company and its Audit Committee have adopted revised Business Ethics and Conflicts of Interest policies, which apply to all of the Company's directors, officers, and employees, including the Company's principal officers. These policies are accessible through the Company's Internet website, www.grace.com/corporategovernance, and are available in hard copy, free of

CC-BLG002873

charge, by contacting Grace Shareholder Services at 410-531-4167. The Company
granted no waivers to these policies during 2004. Any amendments or waivers to
these policies affecting any principal executive officer, principal financial
officer, principal accounting officer or controller, or persons performing
similar functions for the Company will be promptly posted on the website.


ITEM 11. EXECUTIVE COMPENSATION

         Summary Compensation Table. The following Summary Compensation Table
contains information concerning the compensation of (a) Paul J. Norris, Chief
Executive Officer; and (b) the other four most highly compensated executive
officers of Grace who were serving as such at year-end 2004. Certain
compensation information omitted from the Summary Compensation Table because it
is not applicable or because it is not required under the rules of the SEC is
discussed elsewhere in this Item 11.

| Name and Principal Position | Year | Annual Compensation | | | Long-Term Compensation | |
| | | Salary | Bonus | Other Annual Compensation | LTIP Payouts (a) | All Other Compensation (b) |
| --- | --- | --- | --- | --- | --- | --- |
| P. J. Norris | 2004 | $1,000,000 | $2,500,000 | -- | $246,840 | $1,354,750 |
| Chairman and Chief | 2003 | 1,000,000 | 1,000,000 | -- | -- | 1,349,800 |
| Executive Officer | 2002 | 958,333 | 1,010,000 | -- | -- | 589,493 |
| R. J. Bettacchi | 2004 | 381,667 | 610,000 | -- | 71,400 | 287,680 |
| Senior Vice President | 2003 | 370,667 | 300,000 | -- | -- | 281,008 |
| | 2002 | 358,000 | 265,000 | -- | -- | 31,444 |
| A. E. Festa | 2004 | 558,333 | 1,116,000 | -- | 8,170 | 57,850 |
| President and Chief | 2003 | 68,750 | 100,000 | -- | -- | 2,078 |
| Operating Officer (c) | 2002 | -- | -- | -- | -- | -- |
| D. B. Siegel | 2004 | 426,000 | 639,000 | -- | 56,950 | 343,490 |
| Senior Vice President and | 2003 | 421,333 | 250,000 | -- | -- | 338,497 |
| General Counsel | 2002 | 408,000 | 265,000 | -- | -- | 244,448 |
| R. M. Tarola | 2004 | 402,000 | 627,000 | -- | 56,950 | 300,578 |
| Senior Vice President and | 2003 | 398,667 | 245,000 | -- | -- | 298,413 |
| Chief Financial Officer | 2002 | 388,000 | 250,000 | -- | -- | 33,377 |

                              27

(a)  Partial payment under 2002-2004 Long-Term Incentive Program ("LTIP").
     In March 2005, a final payment is expected to be made under the
     2002-2004 LTIP in the following amounts: Mr. Norris -- $1,176,120; Mr.
     Bettacchi -- $340,200; Mr. Festa -- $247,669; Mr. Siegel -- $271,350;
     and Mr. Tarola -- $271,350. In addition, in March 2005, a partial
     payment is expected to be made under the 2003-2005 LTIP in the
     following amounts: Mr. Norris -- $484,000; Mr. Bettacchi -- $140,000;
     Mr. Festa -- $129,385; Mr. Siegel -- $111,667; and Mr. Tarola --
     $111,667.

(b)  The amounts in this column for 2004 consist of the following:

     (i)   retention payments made as follows: Mr. Norris -- $1,235,000; Mr.
           Bettacchi -- $248,083; Mr. Festa -- $0; Mr. Siegel -- $276,900;
           and Mr. Tarola -- $261,300. (See "Retention Agreements" for a
           description of the retention arrangements entered into with the
           executive officers, and "Employment and Consulting Agreements"
           for a description of Mr. Norris' retention arrangements);

     (ii)  payments made to persons whose personal and/or Company
           contributions to Grace's Salaried Employees Savings and
           Investment Plan ("Savings Plan") would be subject to limitations
           under federal income tax law, as follows: Mr. Norris -- $108,600;
           Mr. Bettacchi -- $26,140; Mr. Festa -- $0; Mr. Siegel -- $29,180;
           and Mr. Tarola -- $26,920;

     (iii) Company contributions to the Savings Plan, as follows: Mr.
           Norris -- $9,800; Mr. Bettacchi -- $11,362.50; Mr. Festa --
           $7,375; Mr. Siegel -- $11,235; and Mr. Tarola -- $11,295;

     (iv)  the value of Company-provided personal liability insurance, as
           follows: Mr. Norris -- $1,350; Mr. Bettacchi -- $810; Mr. Festa
           -- $1,080; Mr. Siegel -- $810; and Mr. Tarola -- $810;

     (v)   the value of Company-provided term life insurance, as follows:
           Mr. Norris -- $0; Mr. Bettacchi -- $1,284; Mr. Festa -- $1,395;

CC-BLG002874

(vi)  for Mr. Siegel, $25,000 of forgiveness of indebtedness income
      under the terms of a relocation loan made in April 2002, the
      balance of which was $7,300 as of December 31, 2004; and

(vii) for Mr. Festa, $48,000 for a housing allowance pending the
      relocation of his primary residence to the Columbia, Maryland
      area.

(c)  Mr. Festa joined Grace in November 2003.

        Stock Options. Grace granted no stock options during 2004, and no
previously granted options were exercised by the named individuals during 2004.
The following table sets forth the value of unexercised "in-the-money" options
held at December 31, 2004 (the difference between the aggregate purchase price
of all such options held and the market value of the shares covered by such
options at December 31, 2004).

| Name | No. of Shares Underlying Unexercised Options at 12/31/04 Exercisable/Unexercisable | Value of Unexercised In-the-Money Options at 12/31/04 Exercisable/Unexercisable |
|------|-----------------------------------------------------------------------------------|--------------------------------------------------------------------------------|
| P. J. Norris ...... | 1,165,026/0 | $ 3,223,793*/$0 |
| R. J. Bettacchi ... | 433,946/0 | $ 1,382,020 /$0 |
| A. E. Festa ....... | 0/0 | $        0 /$0 |
| D. B. Siegel ...... | 377,163/0 | $ 1,047,533 /$0 |
| R. M. Tarola ...... | 202,900/0 | $   333,639 /$0 |

*   See description of Mr. Norris' employment agreement below for discussion of
    stock appreciation rights component of 439,026 options

                                    28

        Long-Term Incentive Program. The Company's long-term incentive plans
generally are designed to provide key employees with long-term incentives having
a value at the 60th percentile of long-term incentives offered by specialty
chemical companies of comparable size to Grace. In 2002, the Board of Directors
and the Bankruptcy Court approved a Long-Term Incentive Plan ("LTIP") for key
employees for the 2002-2004 performance period ("2002 LTIP"). Awards under the
2002 LTIP are payable 100% in cash, based on the extent to which the Company
achieves certain pretax earnings targets over the three year performance period.
Employees who become entitled to award payments under the 2002 LTIP will
generally be paid in two installments: one in the first quarter of 2004 (as
partial payment based on performance for the first two years of the three-year
performance period), and the other in the first quarter of 2005 (which will
consider performance for the complete three-year performance period and will be
offset by the amount of the prior installment). The partial payout of the 2002
LTIP was made in March 2004 (see the Compensation Table for payouts to the named
executive officers), and the remainder of such payout will be made in March
2005. Generally, a key employee forfeits his or her rights to receive an
installment of an award if, prior to the payment of the installment, the
employee either voluntarily resigns from the Company or is terminated by the
Company for cause.

        In 2003, the Board and the Bankruptcy Court approved the 2003 LTIP for
the 2003-2005 performance period, and in 2004, the Board and the Bankruptcy
Court approved the 2004 LTIP for the 2004-2006 performance period. The 2003 and
2004 LTIPs operate in substantially the same manner as the 2002 LTIP, with
revised pretax earnings targets. The following table sets forth threshold,
targeted and maximum awards under the 2004 LTIP.

| Name | No. of Shares, Units Or Other Rights | Performance or Other Period Until Maturation or Payout | Estimated Future Payouts Under Non-Stock Price-Based Plans | | |
|------|--------------------------------------|---------------------------------------------------------|-----------------------------------------------------------|---|---|
| | | | Threshold(a) | Target | Maximum |
| P. J. Norris | $1,452,000 | 2004-2006 | $0 or $24,248 | $1,452,000 | $2,904,000 |
| A. E. Festa | 687,000 | 2004-2006 | $0 or $11,452 | 687,000 | 1,374,000 |
| R. J. Bettacchi | 420,000 | 2004-2006 | $0 or $ 7,014 | 420,000 | 840,000 |
| D. B. Siegel | 335,000 | 2004-2006 | $0 or $ 5,595 | 335,000 | 670,000 |
| R. M. Tarola | 335,000 | 2004-2006 | $0 or $ 5,595 | 335,000 | 670,000 |

(a)  No payment will be made unless the minimum targeted level of pretax
     earnings is achieved.

        Pension Arrangements. Full-time salaried employees who are 21 or older

CC-BLG002875

and who have one or more years of service are eligible to participate in the Retirement Plan for Salaried Employees. Under this basic retirement plan, pension benefits are based upon (a) the employee's average annual compensation for the 60 consecutive months in which his or her compensation is highest during the last 180 months of continuous participation, and (b) the number of years of the employee's credited service. For purposes of this basic retirement plan, compensation generally includes nondeferred base salary and annual incentive compensation (bonus) awards; however, for 2004, federal income tax law limited to $205,000 the annual compensation on which benefits under this plan may be based.

Grace also has a Supplemental Executive Retirement Plan under which a covered employee will receive the full pension to which he or she would be entitled in the absence of the limitations described above and other limitations imposed under federal income tax law. In addition, this supplemental plan recognizes deferred base salary, deferred annual incentive compensation awards and, in some cases, periods of employment during which an employee was ineligible to participate in the basic retirement plan. (Commencing in 2001, Grace no longer permits deferrals of base salary or incentive compensation.)

29

The following table shows the annual pensions payable under the basic and supplemental plans for different levels of compensation and years of credited service. The amounts shown have been computed on the assumption that the employee retired at age 65 on January 1, 2004, with benefits payable on a straight life annuity basis. Such amounts are subject to (but do not reflect) an offset of 1.25% of an estimate of the employee's primary Social Security benefit at retirement age for each year of credited service under the basic and supplemental plans.

| Highest Average Annual Compensation | Years of Credited Service | | | | | |
|---|---|---|---|---|---|---|
| | 10 Years | 15 Years | 20 Years | 25 Years | 30 Years | 35 Years |
| 200,000 | 30,000 | 45,000 | 60,000 | 75,000 | 90,000 | 105,000 |
| 300,000 | 45,000 | 67,500 | 90,000 | 112,500 | 135,000 | 157,500 |
| 400,000 | 60,000 | 90,000 | 120,000 | 150,000 | 180,000 | 210,000 |
| 500,000 | 75,000 | 112,500 | 150,000 | 187,500 | 225,000 | 262,500 |
| 600,000 | 90,000 | 135,000 | 180,000 | 225,000 | 270,000 | 315,000 |
| 700,000 | 105,000 | 157,500 | 210,000 | 262,500 | 315,000 | 367,500 |
| 800,000 | 120,000 | 180,000 | 240,000 | 300,000 | 360,000 | 420,000 |
| 900,000 | 135,000 | 202,500 | 270,000 | 337,500 | 405,000 | 472,500 |
| 1,000,000 | 150,000 | 225,000 | 300,000 | 375,000 | 450,000 | 525,000 |
| 1,200,000 | 180,000 | 270,000 | 360,000 | 450,000 | 540,000 | 630,000 |
| 1,400,000 | 210,000 | 315,000 | 420,000 | 525,000 | 630,000 | 735,000 |
| 1,600,000 | 240,000 | 360,000 | 480,000 | 600,000 | 720,000 | 840,000 |
| 1,800,000 | 270,000 | 405,000 | 540,000 | 675,000 | 810,000 | 945,000 |
| 2,000,000 | 300,000 | 450,000 | 600,000 | 750,000 | 900,000 | 1,050,000 |
| 2,200,000 | 330,000 | 495,000 | 660,000 | 825,000 | 990,000 | 1,155,000 |
| 2,400,000 | 360,000 | 540,000 | 720,000 | 900,000 | 1,080,000 | 1,260,000 |

At December 31, 2004, Messrs. Norris, Festa, Bettacchi, Siegel and Tarola had 12.83, 1.12, 33.0, 27.75 and 5.56 years of credited service, respectively, under the basic and supplemental retirement plans. (Mr. Norris' years of credited service include his eligible service from 1975 to 1981.) For purposes of those plans, the 2004 compensation of such executive officers was as follows: Mr. Norris -- $2,000,000; Mr. Festa -- $658,333; Mr. Bettacchi -- $681,667; Mr. Siegel -- $676,000; and Mr. Tarola -- $647,000. Messrs. Norris and Tarola are entitled to additional pension benefits under their employment agreements (see "Employment and Consulting Agreements").

Employment and Consulting Agreements. Paul J. Norris. On November 17, 2004, Mr. Norris announced his intention to retire as CEO of Grace effective May 31, 2005. (Mr. Norris will remain chairman of the Board of Grace.) Mr. Norris and the Board of Directors have agreed, subject to Bankruptcy Court approval, that upon his retirement, he will commence providing consulting services to the new CEO and others at Grace with respect to Grace's Chapter 11 proceeding and other matters, in accordance with a consulting agreement dated January 19, 2005, which is described below. Until his retirement, both Mr. Norris and the Board of Directors expect him to continue as CEO of Grace, in accordance with the terms of his current employment agreement with Grace.

Effective January 1, 2003, Mr. Norris entered into a letter agreement with Grace (the "Letter Agreement"), whereby his employment agreement, dated January 1, 2001 (the "2001 Agreement"), was extended beyond its original termination date of December 31, 2002, and was amended as described herein. (The 2001 Agreement superceded Mr. Norris' original employment agreement with Grace, dated October 26,

30

CC-BLG002876

1998.) Except as amended by the Letter Agreement, the provisions of the 2001 Agreement remain applicable to Mr. Norris during his entire post-2002 employment term with Grace.

During his post-2002 employment term, Mr. Norris will continue to be entitled under the 2001 Agreement to an annual base salary of not less than $875,000. In addition, he will continue to participate in Grace's annual incentive compensation program, under which his targeted award will be at least 75% of his annual base salary. Since January 1, 2003, Mr. Norris' annual base salary has been $1,000,000, and his targeted percentage for his annual incentive compensation award has been 125%.

Under the terms of the Letter Agreement, on December 31, 2003, Mr. Norris received a $1,235,000 retention bonus for services performed during 2003; and, on December 31, 2004, he was entitled to receive an additional retention bonus of $1,235,000 for services performed during 2004. Pursuant to a separate agreement, 50% of the 2004 retention bonus was paid on December 31, 2004, and the remaining 50% was made subject to the achievement of specified earnings targets for 2004 and, as a result of the achievement of those targets, will be paid in the first quarter of 2005.

Also, under Mr. Norris' original employment agreement with Grace, dated October 26, 1998, he received upon his commencement of employment on November 1, 1998 a non-statutory stock option grant covering 439,026 shares of Common Stock pursuant to Grace's 1998 Stock Incentive Plan. Both his original employment agreement and the 2001 Agreement provide that Grace will make a stock appreciation payment to Mr. Norris, at the time he elects to exercise any options under that stock option grant or at the time he elects to cancel such options, provided that the price of a share of Common Stock is above $10.25 at the time. The payment will be equal to the product of the number of shares exercised (or cancelled), multiplied by the difference between (a) the purchase price per share ($16.75), or the price of a share of Common Stock on the date of such exercise, if less than the purchase price per share, and (b) $10.25. As of February 1, 2005, the total amount of the option grant covering 439,026 shares remains unexercised and uncancelled. Mr. Norris will have the right to exercise (or cancel) these options at any time up to 3 years after he retires as CEO, in accordance with the terms of the 1998 Stock Incentive Plan.

Under the Letter Agreement, Mr. Norris was obligated to provide Grace with at least 180 days written prior notice of his intention to resign his employment with Grace in order to receive certain benefits and payments upon termination, which were originally specified under the 1998 Agreement. Since Mr. Norris has satisfied this notice requirement, he is entitled to receive the following benefits and payments upon his retirement as CEO:

(1) A lump sum payment in the total amount of approximately $6,030,000, comprised of the following components: approximately $3,120,000 as a supplemental pension payment calculated (as described below) in accordance with the terms of his 2001 Agreement; and approximately $2,910,000 as the lump sum payment of his accrued benefits under Grace's supplemental executive retirement plan. (Mr. Norris is also entitled to a lump sum payment of approximately $308,000 under the Grace's basic retirement plan.) The supplemental pension payment is determined by (a) calculating the benefits payable to Mr. Norris under Grace's basic and supplemental retirement plans, based upon his years of service with Grace plus his service with his prior employer as if those years of service were with Grace, (b) offsetting the amount of those benefits by the retirement benefits payable from his prior employer's retirement plans and by the benefits to which he is otherwise entitled under Grace's basic and supplemental executive retirement plans, and then (c) discounting the remaining amount of these benefits to derive a present value (using assumptions applicable to lump sum calculations under Grace's basic retirement plan) payable as of his retirement date. In addition, his 2001 Agreement provides that Grace pay Mr. Norris his accrued benefits under Grace's supplemental retirement plan as a lump sum upon retirement. (The terms of that plan generally provide that all benefits thereunder must be paid as monthly annuity benefits.)

31

(2) An award under Grace's annual incentive compensation program for 2005, payable in March 2006 and pro-rated based on the portion of 2005 that Mr. Norris remains an employee of Grace. Based on a target annual incentive award of 125% of base salary and a May 31, 2005 retirement date, his pro-rated target award would be $520,833 and his actual award could range from $0 to $1,041,667, depending upon the extent to which the Company's earnings targets are achieved.

(3) An award under both the 2003 LTIP and the 2004 LTIP, pro-rated based on the portion of the applicable LTIP performance period during which Mr. Norris remained an employee of Grace. While it is not possible to specify the amount of these awards because they are based upon the extent to which Grace achieves certain earnings targets during the applicable performance periods, which are ongoing, such award under the 2003 LTIP could range up to $2,339,462, with a pro-rated target of $1,169,731 (less any partial payment made in March 2004), and under the 2004 LTIP Mr. Norris' award could range up to $1,371,268 with a pro-rated target of $685,634, depending on the extent to which those targets are achieved during the applicable performance period, provided and assuming Mr. Norris' retirement date remains May 31, 2005.

(4) Mr. Norris is also entitled to post-employment residential

CC-BLG002877

relocation assistance, to any location within the continental United States selected by Mr. Norris. Such relocation would include a lump sum cash payment equal to two months of his base salary, grossed up to account for applicable income taxes ("Relocation Cash Payment"), reimbursement of household moving expenses and other expenses under Grace's relocation policy applicable to current employees ("Moving Expenses") and compensation for any loss on the sale of Mr. Norris' Maryland residence ("Residential Loss Payment"). In order to receive this relocation assistance, Mr. Norris must move his residence no later than 2 years after he ceases to be a member of Grace's Board of Directors. If Mr. Norris becomes entitled to relocation assistance, it is estimated that the total cost to Grace of that assistance will be approximately $440,000, comprised of a Relocation Cash Payment of approximately $280,000 (including base payment plus income tax gross up), Moving Expenses of approximately $150,000, and no Residential Loss Payment.

The 2001 Agreement also provides for Mr. Norris' participation in other benefits and compensation programs generally available to other senior executives of Grace, including the fringe benefits specified below under the heading "Executive Fringe Benefits".

As stated above, Mr. Norris has entered into a consulting agreement dated January 19, 2005 with Grace, under which he will continue to monitor Grace's Chapter 11 proceedings and provide consulting services and advice to the new Grace CEO, certain employees of Grace and the Board of Directors, regarding those proceedings and other matters (the "Norris Consulting Agreement"), after he retires as CEO. The Norris Consulting Agreement is subject to Bankruptcy Court approval. Under the Norris Consulting Agreement, Mr. Norris would perform services as an independent contractor, and would retain no authority to enter into agreements on behalf of Grace and would have no management or supervisory authority over Grace officers or employees. Under the Norris Consulting Agreement, Mr. Norris would initially be paid a monthly retainer equal to $35,416.67 (i.e., $425,000 per year), provided that the retainer would be subject to adjustment downward if Mr. Norris dedicates significantly less than one-half of a regular 40 hour work week to perform his duties under the Norris Consulting Agreement. It is anticipated that Mr. Norris will continue to provide services under the Norris Consulting Agreement until Grace emerges from Chapter 11 protection, provided that the Agreement may be terminated by the Grace Board or Mr. Norris at any time upon 30 days' written notice, without the obligation to make any post-termination payments, and in any event will terminate 90 days after Grace emerges from Chapter 11. During the period of the Norris Consulting Agreement, Mr. Norris will have access to office space and administrative services at Grace's Columbia headquarters. In addition, during this period and so long as he remains a director, Mr. Norris would be eligible to receive the same compensation payable to other non-employee directors of the Company.

32

The foregoing description of Mr. Norris' employment agreement and consulting agreement does not purport to be complete and is qualified in its entirety by reference to the 1998 Agreement, which has been filed with the SEC as Exhibit 10.20 to Grace's 2000 Annual Report on Form 10-K, by reference to the Letter Agreement, which has been filed with the SEC as Exhibit 10.19 to Grace's 2002 Annual Report on Form 10-K and by reference to the Norris Consulting Agreement, which is filed as Exhibit 10.28 to this Report.

Alfred E. Festa. Mr. Festa and the Grace Board have agreed that Mr. Festa would assume the position of CEO of Grace on June 1, 2005 (upon the retirement of Mr. Norris), in accordance with the terms of a written agreement, dated January 19, 2005 (the "Festa CEO Agreement"), which is described more fully below. Until Mr. Festa assumes the CEO position, both he and the Board expect him to continue in the capacity of Chief Operating Officer and President of Grace, pursuant to his employment agreement dated November 17, 2003 (the "Festa COO Agreement").

The Festa COO Agreement is a three year employment agreement with Grace, under which, Mr. Festa is entitled to an initial annual base salary of $550,000. He is also entitled to participate in Grace's Annual Incentive Compensation Program (the "AICP"). For 2004, he was entitled to a targeted award of 100% of his annual base salary earned during such year.

Under the Festa COO Agreement, Mr. Festa also participates in Grace's currently effective LTIPs for the 2002-2004 and 2003-2005 performance periods. His targeted award under each of those LTIPs is $687,000. However, any award to which he becomes entitled under either of the LTIPs will be pro-rated to reflect the percentage of days that he was an active employee of the Company during the applicable performance period.

Also, under terms of the Festa COO Agreement, if Mr. Festa's employment is terminated by the Company without cause, or by him as a result of constructive discharge, prior to the expiration of his employment agreement, he will be entitled to a severance payment equal to 1.5 times 175% of his annual base salary at the time of his termination.

Under the Festa CEO Agreement, which is subject to Bankruptcy approval, Mr. Festa will assume the position of CEO of Grace on June 1, 2005, and thereupon the Festa COO Agreement shall become void.

The term of the Festa CEO Agreement is for four years, ending on May 31, 2009. Under the Festa CEO Agreement, Mr. Festa is entitled to an initial

CC-BLG002878

base annual salary of $780,000. His targeted award under the AICP for 2005 and each calendar year thereafter is 100% of his base salary earned during the applicable year (or greater, as determined by the Board). Under the Festa CEO Agreement, he will also continue to participate in the Grace LTIPs. Under a proposed 2005 LTIP (which would cover the 2005-2007 performance period), Mr. Festa's targeted award would be $1,690,000 (or an equivalent value comprised of stock options or other equity and/or cash, as provided under the terms of the LTIP).

Mr. Festa would not be entitled to any unpaid award under the AICP or any LTIP if his employment with Grace terminates prior to the date that the award is paid to active Grace employees, except that Mr. Festa would be entitled to a pro-rated portion of such an unpaid award in the event that his termination was by Grace without cause, by him as a result of constructive discharge, or as a result of his death or disability before the applicable payment date.

Also, under the terms of the Festa CEO Agreement, if his employment is terminated by Grace without cause, or by him as a result of constructive discharge, prior to the expiration of the Agreement, he would be entitled to a severance payment equal to 2 times a dollar amount equal to 175% of his annual base salary at the time of his termination.

33

The Festa CEO Agreement also provides that Mr. Festa will be entitled to a Chapter 11 emergence bonus of $1,750,000, payable in two installments. The first installment will be in the amount of $750,000 and be paid 6 months after Grace emerges from Chapter 11, and the remaining balance of $1,000,000 will be paid 18 months after such emergence. However, if Grace does not emerge from Chapter 11 within 36 months after the filing of an initial plan of reorganization (i.e., by November 13, 2007), then Mr. Festa would be paid the emergence bonus as follows: $750,000 would be paid 36 months after such plan was filed, and $1,000,000 would be paid 48 months after such plan was filed. Mr. Festa would not be entitled to any installment of the emergence bonus if his employment with Grace is terminated prior to the date the installment is scheduled for payment, except in the case where his termination occurs after Grace emerges from Chapter 11 and is the result of (i) his resignation as a result of constructive discharge, (ii) termination by Grace not for cause, or (iii) his death or disability.

In addition, Mr. Festa will generally be eligible to participate in other compensation and benefit plans and programs that are provided to other senior executives of Grace, including the fringe benefits specified below under the heading "Executive Fringe Benefits".

The foregoing descriptions of the Festa COO Agreement do not purport to be complete and are qualified in their entirety by reference to the Festa COO Agreement, which has been filed with the SEC as Exhibit 10.27 to Grace's 2003 Annual Report on Form 10-K, and by reference to the Festa CEO Agreement which is filed as Exhibit 10.27 to this Report.

William M. Corcoran. Mr. Corcoran had an employment agreement with Grace that expired on May 31, 2002. Under terms of the agreement that survived the expiration date, if Mr. Corcoran is terminated without cause, he will generally be entitled to a severance payment equal to 137% of his annual base salary at the time of termination. (However, along with other executive officers and certain key employees of Grace, Mr. Corcoran has entered into a retention agreement with Grace, described below, under which he may be entitled to enhanced severance pay in lieu of, but not in addition to, the severance pay provided under his employment agreement.) In addition, the benefits payable to Mr. Corcoran under Grace's basic and supplemental retirement plans will continue to be determined by adding additional years of credited service under those plans. Generally, for each year of credited service under those plans that he actually earns during his period of employment with Grace, he will receive credit for an additional one-half year of credited service (up to a maximum of 5 additional years of credited service). The foregoing description of Mr. Corcoran's employment agreement does not purport to be complete and is qualified in its entirety by reference to such agreement, which has been filed with the SEC as Exhibit 10.24 to Grace's 2000 Annual Report on Form 10-K.

David B. Siegel. Under terms of a January 1, 2001 agreement, Mr. Siegel continues to be entitled to an enhanced severance payment equal to two times his annual base salary if his employment is involuntarily terminated without cause under circumstances that would qualify him for severance pay under Grace's severance plan that generally covers salaried employees.

Robert M. Tarola. Mr. Tarola had an employment agreement that expired on November 10, 2002. Under terms of the agreement that survived the expiration date, if Mr. Tarola is terminated without cause, he will generally be entitled to a severance payment equal to 145% of his annual base salary at the time of termination. (However, along with the other executive officers and certain key employees of Grace, Mr. Tarola has entered into a retention agreement with Grace, described below, under which he may be entitled to enhanced severance pay in lieu of, but not in addition to, the severance pay provided under his employment agreement.) In addition, the benefits payable to Mr. Tarola under Grace's basic and supplemental retirement plans will continue to be determined by adding additional years of credited service under those plans. Generally, for each year of credited service under those plans that he actually earns during his period of employment with Grace, he will receive credit for one additional

CC-BLG002879

year of credited service (up to a maximum

34

of 10 additional years of credited service). The foregoing description of Mr. Tarola's employment agreement does not purport to be complete and is qualified in its entirety by reference to such agreement, which has been filed with the SEC as Exhibit 10.1 to Grace's Quarterly Report on Form 10-Q for the quarter ended June 30, 1999.

Executive Fringe Benefits. Grace's executive officers are also entitled to certain fringe benefits not otherwise generally available to other employees of Grace. These benefits include an executive physical, personal financial counseling and tax preparation, and a Company-provided car. The aggregate value of these benefits for 2004 ranged from $7,000 to $20,000 per person. In addition, Messrs. Norris and Festa have access to a corporate aircraft under an agreement between the Company and NetJets Sales, Inc., which provides for approximately 100 flight hours per year. Other executive officers and key employees also are permitted to travel on such aircraft on occasion. The total cost to Grace for such service in 2004 was approximately $640,000. During 2004, Mr. Norris and Mr. Corcoran made use of such aircraft for non-business purposes; the value of such personal use as determined by IRS regulations was $11,920, and $2,551, respectively.

Change-in-Control Severance Agreements. In addition to the severance provisions described under "Retention Agreements" below, Grace has severance agreements with all of its executive officers, which renew automatically unless the Board of Directors of the Company elects not to renew them. These agreements generally provide that in the event of the involuntary termination of the individual's employment without cause (including constructive termination caused by a material reduction in his or her authority or responsibility or by certain other circumstances) following a "change in control" of Grace, he or she will generally receive a severance payment equal to three times the sum of his or her annual base salary plus target annual incentive compensation (bonus), subject to pro rata reduction in the case of an officer who is within 36 months of normal retirement age (65). For purposes of the severance agreements, "change in control" means the acquisition of 20% or more of the Common Stock (but not if such acquisition is the result of the sale of Common Stock by Grace that has been approved by the Board), the failure of Board-nominated directors to constitute a majority of any class of the Board of Directors, the occurrence of a transaction in which the shareholders of Grace immediately preceding such transaction do not own more than 50% of the combined voting power of the company resulting from such transaction, or the liquidation or dissolution of Grace.

This description of the severance agreements does not purport to be complete and is qualified in its entirety by reference to the form of such agreement, which has been filed with the SEC as Exhibit 10.17 to Grace's 2002 Annual Report on Form 10-K. As a result of Grace's Chapter 11 filing, the following events will not constitute a "change in control": (i) the acquisition by a trust of Common Stock, established for purposes of administering asbestos-related claims pursuant to a plan of reorganization, and (ii) a corporate transaction pursuant to Section 363 of the U.S. Bankruptcy Code or a plan of reorganization.

Retention Agreements. Effective January 1, 2001, Grace entered into retention agreements with each of the executive officers other than Messrs. Norris and Siegel (and Mr. Festa, who did not join Grace until November 2003), whose retention arrangements were covered by their respective employment agreements. These agreements were approved by the Compensation Committee in recognition of the adverse effect that the market performance of the Common Stock has had and is expected to continue to have on Grace's ability to attract and retain key employees. Under the terms of these agreements, each such executive officer received a payment in January 2001 equal to his annual base salary, subject to remaining employed with Grace through December 31, 2002. In addition to the retention payment, the retention agreements provide that in the event of the involuntary termination of such officer's employment under circumstances that would qualify such officer for severance pay under Grace's severance plan that generally covers salaried employees, then the officer would be entitled to severance pay equal to two times his or her annual base salary. With respect to any such officer who has any other agreement with Grace regarding the payment of severance upon termination of employment, if such officer becomes entitled to severance under both the terms of the retention

35

agreement and such other agreement, then the officer would only receive severance pay under the retention agreement, unless the other agreement provides for a greater amount of severance pay (in which case, the officer would only receive severance pay under such other agreement).

Grace implemented a new retention program for 2003 and 2004 under which each executive officer (except for Mr. Norris, whose retention arrangement is covered by separate agreements, and Mr. Festa) would be entitled to receive a payment equal to 65% of his base salary if the officer remains employed with Grace for the entire year. The 2003 retention payment was made to each eligible

CC-BLG002880

executive officer at the end of 2003. For 2004, 50% of the retention payment was
contingent upon the achievement of specified earnings targets for such year.
Therefore, 50% of such retention payment was paid to each eligible executive at
the end of 2004 and, since such earnings targets were achieved, the remaining
payment will be paid during the first quarter of 2005. These retention payments
are not considered compensation for purposes of any Grace benefit or
compensation plans or programs.

        Executive Salary Protection Plan. All executive officers participate
in the Executive Salary Protection Plan ("ESPP"), which provides that, in the
event of a participant's disability or death prior to age 70, Grace will
continue to pay all or a portion of base salary to the participant or a
beneficiary for a period based on the participant's age at the time of
disability or death. Payments under the ESPP may not exceed 100% of base salary
for the first year and 60% thereafter in the case of disability (50% in the case
of death). This description of the ESPP does not purport to be complete and is
qualified in its entirety by reference to the text of the ESPP, as amended,
which is filed as Exhibit 10.8 to Grace's 2001 Annual Report on Form 10-K.

        Effect of Chapter 11 Filing. The U.S. Bankruptcy Court has approved
the employment agreements and the continuation of the executive compensation and
benefit agreements and programs described above except that the Norris
Consulting Agreement and the Festa CEO Agreement have been submitted to the
Bankruptcy Court and remain subject to its approval. The continuation of these
agreements and programs, and the establishment of new programs may be affected
by the Chapter 11 proceedings.

        Directors' Compensation. Under the compensation program for
nonemployee directors in effect for 2004, each nonemployee director received an
annual retainer of $50,000 in cash, 50% of which was paid in January 2004 and
50% of which was paid in January 2005. Previously, the annual retainer was paid
50% in cash and 50% in Common Stock. In addition, directors received $4,000
($5,000 for directors holding a committee chair) in cash for each meeting date
in respect of the Board meeting and all committee meetings held on such date.
The same compensation program will be effective during 2005. Grace reimburses
nonemployee directors for expenses they incur in attending Board and committee
meetings. Grace also maintains business travel accident insurance coverage for
them.

        Compensation Committee Interlocks and Insider Participation. During
2004, the Compensation Committee of the Board was comprised of Messrs. Akers
(Chair), Baldwin, Cambre, Murphy and Vanderslice, and Dr. Fox. None of such
persons is a current or former officer or employee of Grace or any of its
subsidiaries, nor did any of such persons have any reportable transactions with
Grace or any of its subsidiaries.


                                      36




ITEM 12.  SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND
          RELATED STOCKHOLDER MATTERS

        Security Ownership. The following table sets forth the Common Stock
beneficially owned, directly or indirectly, as of January 31, 2005 by (1) each
person known to Grace to be the beneficial owner of more than 5% of the
outstanding shares of Common Stock, and (2) each current director, each of the
executive officers named in the Summary Compensation Table set forth in Item 11
above, and such directors and all executive officers as a group.


| Beneficial Owner | Shares of Common Stock Beneficially Owned | Percent |
| --- | --- | --- |
| Peninsula Partners, L.P. (1)................<br>404B East Main Street, 2nd Floor<br>Charlottesville, VA 22902 | 10,765,600 | 16.22% |
| Citadel Limited Partnership (2)..............<br>Citadel Investment Group, LLC<br>Kenneth Griffin<br>131 S. Dearborn Street<br>32nd Floor<br>Chicago, Illinois 60603 | 3,908,520 | 5.89% |
| Philip Hempleman. (3)........................<br>262 Harbor Drive..<br>Stamford, Connecticut 06902 | 3,460,000 | 5.21% |
| J. F. Akers.................................. | 38,996<br>74,535(O)<br>15,196(T) | * |
| H. F. Baldwin............................... | 21,918 | * |

| | | |
|---|---|---|
| R. J. Bettacchi................................. | 33,946(O) 25,050(T) | |
| R. C. Cambre................................... | 28,494 | * |
| A. E. Festa................................... | 0 | |
| M. A. Fox...................................... | 41,246 8,942(T) | * |
| J. J. Murphy................................... | 38,930 15,528(O) 18,629(T) | * |
| P. J. Norris.................................. | 138,822 1,165,026(O) | 1.93% |
| D. B. Siegel.................................. | 15,100 377,163(O) | * |

37

| | | |
|---|---|---|
| R. M. Tarola.................................. | 15,000 202,900(O) | * |
| T. A. Vanderslice............................. | 39,522 69,876(O) 14,932(T) | * |
| Directors and executive officers as a group... | 398,028 2,728,823(O) 82,749(T) | 4.65% |

\*     Indicates less than 1%

(O)   Shares covered by stock options exercisable on or within 60 days after January 31, 2005.

(T)   Shares owned by trusts and other entities as to which the person has the power to direct voting and/or investment.

(1)   The ownership information set forth is based in its entirety on material contained in a Form 4 report dated September 10, 2001 filed with the SEC.

(2)   The ownership information set forth above is based in its entirety on material contained in a Form 13G dated February 18, 2005 filed with the SEC. The number of shares beneficially owned includes shares owned by the following investment funds and managed accounts: Citadel Wellington LLC; Citadel Kensington Global Strategies Fund Ltd.; Citadel Equity Fund Ltd.; Citadel Credit Trading Ltd.; and Citadel Credit Products Ltd. All of such persons share voting and dispositive power.

(3)   The ownership information set forth above is based in its entirety on material contained in a Form 13G dated February 11, 2005 filed with the SEC. The number of shares beneficially owned includes 2,995,000 shares owned by investment funds and managed accounts which share voting and dispositive power with their investment advisor Ardsley Advisory Partners, of which Mr. Hempleman is Managing Director, and 465,000 shares owned solely by Mr. Hempleman.

     Equity Compensation Plan Information. The following table sets forth information as of December 31, 2004 with respect to Grace's compensation plans under which shares of Common Stock are authorized for issuance upon the exercise of options, warrants or other rights. The only such compensation plans in effect are stock incentive plans providing for the issuance of stock options. All such plans have been approved by Grace's shareholders.

| Plan category | Number of securities to be issued upon exercise of outstanding options (a) | Weighted-average exercise price of outstanding options (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 7,685,295 | $12.92 | 4,756,207 |

CC-BLG002882

ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

     Commercial Transactions. During 2004, no director, executive officer (or any member of any of their respective immediate families) or, to the Company's knowledge, any holder of more than 5% of the Common

38

Stock, had a direct or indirect material interest in any transaction (or any proposed transaction) to which the Company was (or will become) a party.

     Legal Proceedings; Indemnification. During 2004 there were no legal proceedings pending in which any current officers or directors of the Company were parties adverse to, or had a material interest adverse to, the Company. However, see "Montana Criminal Proceeding" in Item 3 of this Report.

ITEM 14. PRINCIPAL ACCOUNTING FEES AND SERVICES

     The Audit Committee of the Board of Directors of Grace selected PricewaterhouseCoopers LLP ("PwC") to continue to act as Grace's principal independent accountants for 2004. The following table sets forth the fees incurred by Grace for the services of PwC for the years ended December 31, 2004 and 2003:

| | 2004 | 2003 |
|---|---|---|
| Audit Fees | $4,322,100 | $1,763,000 |
| Audit-Related Fees | 491,900 | 210,500 |
| Tax Fees | 122,000 | 133,000 |
| All Other Fees | -- | -- |
| Total Fees | $4,936,000 | $2,106,500 |

     Audit Services consisted of the audit of Grace's consolidated financial statements and its internal controls (as required under Section 404 of the Sarbanes-Oxley Act of 2002), the review of its consolidated quarterly financial statements and statutory audits of certain of Grace's non-U.S. subsidiaries and affiliates.

     Audit-Related Services primarily consisted of (1) an audit of the financial statements of Alltech International Holdings, Inc. in connection with an acquisition of Alltech by a subsidiary of Grace in August 2004, (2) an audit of the financial statements of Advanced Refining Technologies, LLC (a joint venture with Chevron Products Company), (3) an audit of Grace's 401(k) plan, and (4) an audit of a Canadian benefit plan.

     Tax Services consisted of tax advice and compliance for non-U.S. subsidiaries, including preparation of tax returns, and advice relating to Grace's transfer pricing policies.

     The Audit Committee has adopted a preapproval policy that requires the Audit Committee to specifically preapprove the annual engagement of the independent accountants for the audit of Grace's consolidated financial statements and internal controls. The policy also provides for general preapproval of certain audit-related, tax and other services, up to a specified dollar amount for each year. Services in excess of such dollar amounts and any other services must be specifically preapproved by the Audit Committee. However, the chair of the Audit Committee has the authority to preapprove services requiring immediate engagement between scheduled meetings of the Audit Committee. The chair must report any such preapproval decisions to the full Audit Committee at its next scheduled meeting. During 2004, no audit-related, tax, or other services were performed by PwC without specific or general approval as described above.

39

PART IV

ITEM 15. EXHIBITS, FINANCIAL STATEMENT SCHEDULES, AND REPORTS ON FORM 8-K

CC-BLG002883

Financial Statements and Schedules. See the Index to Consolidated Financial Statements and Financial Statement Schedule and Exhibit on page F-2 of the Financial Supplement.

Reports on Form 8-K. The following reports on Form 8-K were filed during the fourth quarter of 2004:

o    October 22, 2004 - Press release announcing Grace's financial results for the third quarter of 2004.

o    October 26, 2004 - Grace filed a motion with the Delaware Bankruptcy Court seeking an order to impose notice requirements and potential restrictions on the acquisition of Grace common stock.

o    November 1, 2004 - Grace received a letter stating that the company and certain current and former employees were the targets of a federal grand jury investigation relating to the company's former operations in Libby, Montana.

o    November 16, 2004 - Grace filed its proposed plan of reorganization and related documents with the Delaware Bankruptcy Court.

o    November 22, 2004 - Grace announced that Paul J. Norris has elected to retire as Chief Executive Officer, effective May 31, 2005, but will remain Chairman; and that Alfred E. Festa will succeed Mr. Norris as Chief Executive Officer.

o    November 26, 2004 - updated disclosure on Montana federal grand jury investigation.

o    December 10, 2004 - certain officers of Grace established trading plans in accordance with Rule 10b5-1 of the Securities Exchange Act of 1934 with respect to stock options expiring on March 1, 2005.

Exhibits. The exhibits to this Report are listed below. Other than exhibits that are filed herewith, all exhibits listed below are incorporated by reference. Exhibits indicated by an asterisk (*) are the management contracts and compensatory plans, contracts or arrangements required to be filed as exhibits to this Report.

For purposes of describing these exhibits, "Old Grace" means W. R. Grace & Co., a Delaware corporation (subsequently renamed Sealed Air Corporation), a predecessor to the Company, and "Grace New York" means W. R. Grace & Co., a New York corporation (subsequently renamed Fresenius Medical Care Holdings, Inc.), a predecessor to Old Grace.

| EXHIBIT NO. | EXHIBIT | WHERE LOCATED |
|---|---|---|
| 2.1 | Form of Distribution Agreement, by and among Old Grace, W. R. Grace & Co.-Conn. and Grace Specialty Chemicals, Inc. (now named W. R. Grace & Co.) | Annex B to the Joint Proxy Statement/Prospectus dated February 13, 1998 of Old Grace and Sealed Air Corporation included in Form S-4 (filed 2/13/98) |
| 2.2 | Proposed Amended Joint Plan of Reorganization of W. R. Grace & Co. and its debtor subsidiaries dated January 13, 2005 | Filed herewith |

| EXHIBIT NO. | EXHIBIT | WHERE LOCATED |
|---|---|---|
| 3.1 | Restated Certificate of Incorporation of W. R. Grace & Co. | Exhibit 3.1 to Form 8-K (filed 4/8/98; SEC File No. 001-13953) |
| 3.2 | Amended and Restated By-laws of W. R. Grace & Co. | Exhibit 3.2 to Form 10-K (filed 3/28/02) |
| 4.1 | Rights Agreement dated as of March 31, 1998 between W. R. Grace & Co. and The Chase Manhattan Bank, as Rights Agent | Exhibit 4.1 to Form 8-K (filed 4/8/98; SEC File No. 001-13953) |
| 4.2 | Credit Agreement dated as of May 14, 1998, among W. R. Grace & Co.-Conn., W. R. Grace & Co., the several banks parties thereto; the co-agents signatories thereto; The | Exhibit 4.1 to Form 10-Q (filed 8/14/98; SEC File No. 001-13953 |

CC-BLG002884

Chase Manhattan Bank, as
administrative agent for such
banks; and Chase Securities Inc.,

| | | |
|---|---|---|
| 4.3 | 364-Day Credit Agreement, dated as of May 5, 1999, among W. R. Grace & Co.-Conn.; W. R. Grace & Co.; the several banks parties thereto; the co-agents signatories thereto; Bank of America National Trust and Savings Association, as documentation agent; The Chase Manhattan Bank, as administrative agent for such banks; and Chase Securities Inc., as book manager | Exhibit 4.1 to Form 10-Q (filed 8/3/99) |
| 4.4 | First Amendment to 364-Day Credit Agreement dated as of May 5, 1999 among W. R. Grace & Co.-Conn.; W. R. Grace & Co.; the several banks parties thereto; Bank of America National Trust and Savings Association, as document agent; The Chase Manhattan Bank, as administrative agent for such banks; and Chase Securities, Inc., as bank manager | Exhibit 4 to Form 10-Q (filed 8/15/00) |
| 4.5 | Post-Petition Loan and Security Agreement dated as of April 1, 2001 among the financial institutions named therein, as Lenders, Bank of America, N.A. as Agent, and W. R. Grace & Co. and its subsidiaries named therein as Debtors and Debtors-in-Possession, as Borrowers | Exhibit 4 to Form 10-Q (filed 8/14/01) |
| 4.6 | Amendment No. 1 and Limited Waiver to Post-Petition Loan and Security Agreement | Exhibit 4 to Form 10-Q (filed May 13, 2003) |

41

| EXHIBIT NO. | EXHIBIT | WHERE LOCATED |
|---|---|---|
| 10.1 | Form of Employee Benefits Allocation Agreement, by and among Old Grace, W. R. Grace & Co.-Conn. and Grace Specialty Chemicals, Inc. (now named W. R. Grace & Co.) | Exhibit 10.1 to Form 10-K (filed March 13, 2003) |
| 10.2 | Form of Tax Sharing Agreement, by and among Old Grace, W. R. Grace & Co.-Conn. and Grace Specialty Chemicals, Inc. (now named W. R. Grace & Co.) | Exhibit 10.2 to Form 10-K (filed 3/13/03) |
| 10.3 | W. R. Grace & Co. 2000 Stock Incentive Plan, as amended | Exhibit 10 to Form 10-Q (filed 8/15/00)* |
| 10.4 | W. R. Grace & Co. 1998 Stock Incentive Plan | Exhibit 10.4 to Form 10-K (filed 3/13/03)* |
| 10.5 | W. R. Grace & Co. 1998 Stock Plan for Nonemployee Directors | Exhibit 10.5 to Form 10-K (filed 3/13/03)* |
| 10.6 | W. R. Grace & Co. 1996 Stock Incentive Plan, as amended | Exhibit 10.6 to Form 10-K (filed 3/5/04)* |
| 10.7 | W. R. Grace & Co. Supplemental Executive Retirement Plan, as amended | Exhibit 10.7 to Form 10-K (filed 3/28/02)* |
| 10.8 | W. R. Grace & Co. Executive Salary Protection Plan, as amended | Exhibit 10.8 to Form 10-K (filed 3/28/02)* |
| 10.9 | W. R. Grace & Co. 1994 Stock Incentive Plan, as amended | Exhibit 10.11 to Form 10-K (filed 3/28/02)* |
| 10.10 | Form of Stock Option Agreements | Exhibit 10.14 to Registration Statement on Form S-1 of Old Grace (filed 8/2/96)* |
| 10.11 | Form of Stock Option Agreements | Exhibit 10.5 to Form 10-Q (filed 5/15/98; SEC File No. 001-13953)* |

CC-BLG002885

| 10.12 | Form of 2002-2004 Long-Term Incentive Program Award | Exhibit 10.26 to Form 10-K (filed 3/13/2003)* |
| 10.13 | Form of 2003-2005 Long-Term Incentive Program Award | Exhibit 10.29 to Form 10-K (filed 3/5/04)* |
| 10.14 | Form of 2004-2006 Long-Term Incentive Program Award | Filed herewith* |

42

| EXHIBIT NO. | EXHIBIT | WHERE LOCATED |
| ------- | ------- | ------- |
| 10.15 | Form of Executive Severance Agreement between Grace and certain officers | Exhibit 10.17 to Form 10-K (filed 3/13/03)* |
| 10.16 | Employment Agreement, dated January 1, 2001, by and between Grace and Paul J. Norris | Exhibit 10.20 to Form 10-K (filed 4/16/01)* |
| 10.17 | Amendment dated November 6, 2002 to Employment Agreement between Grace and Paul J. Norris | Exhibit 10.19 to Form 10-K (filed 3/13/03)* |
| 10.18 | Employment Agreement dated May 11, 1999 between Grace and Robert M. Tarola | Exhibit 10.1 to Form 10-Q (filed 8/13/99)* |
| 10.19 | Letter Agreement dated January 30, 2001 between Paul J. Norris, on behalf of Grace, and David B. Siegel | Exhibit 10.22 to Form 10-K (filed 4/16/01)* |
| 10.20 | Letter Agreement dated May 7, 1999 between Paul J. Norris, on behalf of Grace, and William M. Corcoran | Exhibit 10.24 to Form 10-K (filed 4/16/01)* |
| 10.21 | Form of Indemnification Agreement between Grace and certain officers and directors | Exhibit 10.27 to Form 10-K (filed 4/16/01)* |
| 10.22 | Form of Retention Agreement for 2001-2002 | Exhibit 10.28 to Form 10-K (filed 4/16/01)* |
| 10.23 | Form of Retention Agreement for 2003 | Exhibit 10.25 to Form 10-K (filed 3/13/03)* |
| 10.24 | Form of Retention Agreement for 2004 | Exhibit 10.28 to Form 10-K (filed 4/5/04)* |
| 10.25 | Annual Incentive Compensation Program | Exhibit 10.26 to Form 10-K (filed 3/13/03)* |
| 10.26 | Letter Agreement dated November 17, 2003 between Paul J. Norris, on behalf of W. R. Grace & Co., and Fred Festa | Exhibit 10.27 to Form 10-K (filed 3/5/04)* |
| 10.27 | Proposed Letter Agreement dated January 19, 2005 between Paul J. Norris, on behalf of Grace, and Fred Festa (pending Bankruptcy Court approval) | Filed herewith* |

43

| EXHIBIT NO. | EXHIBIT | WHERE LOCATED |
| ------- | ------- | ------- |
| 10.28 | Proposed Letter Agreement dated January 19, 2005 between Thomas A. Vanderslice, on behalf of Grace, and Paul J. Norris (pending Bankruptcy Court approval) | Filed herewith* |
| 12 | Computation of Ratio of Earnings to Fixed Charges and Combined Fixed Charges and Preferred Stock Dividends | Filed herewith in Financial Supplement to Grace's 2004 Form 10-K |

CC-BLG002886

| 21 | List of Subsidiaries of W. R. Grace & Co. | Filed herewith |
| 23 | Consent of Independent Accountants | Filed herewith in Financial Supplement to Grace's 2004 Form 10-K |
| 24 | Powers of Attorney | Filed herewith |
| 31.1 | Certification of Periodic Report by Chief Executive Officer under Section 302 of the Sarbanes-Oxley Act of 2002 | Filed herewith |
| 31.2 | Certification of Periodic Report by Chief Financial Officer under Section 302 of the Sarbanes-Oxley Act of 2002 | Filed herewith |
| 32 | Certification of Periodic Report by Chief Executive Officer and Chief Financial Officer under Section 906 of the Sarbanes-Oxley Act of 2002 | Filed herewith |
| 99.1 | Amended Disclosure Statement for proposed Amended Joint Plan of Reorganization of W. R. Grace & Co. and its debtor subsidiaries dated January 13, 2005 | Filed herewith |
| 99.2 | Glossary of terms used in Plan of Reorganization documents | Filed herewith |

44

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this Report to be signed on its behalf by the undersigned, thereto duly authorized.

W. R. GRACE & CO.

By: /s/ Paul J. Norris
------------------------------------
Paul J. Norris
(Chairman and
Chief Executive Officer)

By: /s/ Robert M. Tarola
------------------------------------
Robert M. Tarola
(Senior Vice President and
Chief Financial Officer)

Dated: March 4, 2005

Pursuant to the requirements of the Securities Exchange Act of 1934, this Report has been signed below by the following persons on behalf of the registrant and in the capacities indicated on March 4, 2005.

| Signature | Title |
| --------- | ----- |
| J. F. Akers* | ) |
| H. F. Baldwin* | ) |
| R. C. Cambre* | ) |
| A. E. Festa* | ) |
| M. A. Fox* | )  Directors |
| J. J. Murphy* | ) |
| T. A. Vanderslice* | ) |

/s/ Paul J. Norris                    Chief Executive Officer and Director
--------------------------             (Principal Executive Officer)
(Paul J. Norris)

/s/ Robert M. Tarola                  Senior Vice President and
--------------------------            Chief Financial Officer
(Robert M. Tarola)                    (Principal Financial Officer and
                                      Principal Accounting Officer)

CC-BLG002887

\*    By signing his name hereto, Mark A. Shelnitz is signing this document on
     behalf of each of the persons indicated above pursuant to powers of
     attorney duly executed by such persons and filed with the Securities and
     Exchange Commission.

                              By: /s/ Mark A. Shelnitz
                                  ------------------------------------
                                  Mark A. Shelnitz
                                  (Attorney-in-Fact)


                              45



                         FINANCIAL SUPPLEMENT

                          W. R. GRACE & CO.
                       ANNUAL REPORT ON FORM 10-K
                     FOR THE YEAR ENDED DECEMBER 31, 2004


                              F-1



                         FINANCIAL SUPPLEMENT

                                TO

          ANNUAL REPORT ON FORM 10-K FOR THE YEAR ENDED DECEMBER 31, 2004

                    W. R. GRACE & CO. AND SUBSIDIARIES

                   Index to Consolidated Financial Statements
                   and Financial Statement Schedule and Exhibit

Management's Report on Financial Reporting and Internal Controls.......   F-3
Report of Independent Registered Public Accounting Firm...............   F-4
Report of Independent Registered Public Accounting Firm on Financial
   Statement Schedule.................................................   F-5
Consent of Independent Registered Public Accounting Firm..............   F-5
Consolidated Statements of Operations for the three years in the
   period ended December 31, 2004.....................................   F-6
Consolidated Statements of Cash Flows for the three years in the
   period ended December 31, 2004.....................................   F-7
Consolidated Balance Sheets at December 31, 2004 and 2003.............   F-8
Consolidated Statements of Shareholders' Equity (Deficit) for the
   three years in the period ended December 31, 2004..................   F-9
Consolidated Statements of Comprehensive Income (Loss) for the three
   years in the period ended December 31, 2004........................   F-9
Notes to Consolidated Financial Statements............................   F-10 - F-38
Financial Summary.....................................................   F-39
Management's Discussion and Analysis of Results of Operations and
   Financial Condition................................................   F-40 - F-58

Financial Statement Schedule
   Schedule II - Valuation and Qualifying Accounts and Reserves.......   F-59

Exhibit 12: Computation of Ratio of Earnings to Fixed Charges and
   Combined Fixed Charges and Preferred Stock Dividends...............   F-60

The financial data listed above appearing in this Financial Supplement are
incorporated by reference herein. The Financial Statement Schedule should be
read in conjunction with the Consolidated Financial Statements and Notes
thereto. Financial statements of less than majority-owned persons and other
persons accounted for by the equity method have been omitted as provided in Rule
3-09 of Securities and Exchange Commission Regulation S-X. Financial Statement
Schedules not included have been omitted because they are not applicable or the
required information is shown in the Consolidated Financial Statements or Notes
thereto.


                              F-2



MANAGEMENT'S REPORT ON FINANCIAL REPORTING AND INTERNAL CONTROLS

RESPONSIBILITY FOR FINANCIAL INFORMATION - We are responsible for the
preparation, integrity and objectivity of the Consolidated Financial Statements
and the other financial information included in this report. Such financial
information has been prepared in conformity with accounting principles generally
accepted in the United States of America and accordingly includes certain
amounts that represent management's best estimates and judgments. Actual amounts
could differ from those estimates. We are also responsible for establishing and

CC-BLG002888

maintaining adequate internal controls over financial reporting. These internal control consist of policies and procedures that are designed to assess and monitor the effectiveness of the control environment including: risk identification, governance structure, delegations of authority, information flow, communications and control activities. A chartered Disclosure Committee oversees Grace's public financial reporting process and key managers are required to confirm their compliance with Grace's policies and internal controls quarterly. While no system of internal controls can ensure elimination of all errors and irregularities, Grace's internal controls, which are reviewed and modified in response to changing conditions, have been designed to provide reasonable assurance that assets are safeguarded, policies and procedures are followed, transactions are properly executed and reported, and appropriate disclosures are made. The concept of reasonable assurance is based on the recognition that there are limitations in all systems of internal control and that the costs of such systems should be balanced with their benefits. The Audit Committee of the Board of Directors, which is comprised solely of independent directors, meets regularly with Grace's senior financial management, internal auditors and independent auditors to review audit plans and results, as well as the actions taken by management in discharging its responsibilities for accounting, financial reporting and internal controls. The Audit Committee is responsible for the selection and compensation of the independent auditors. Grace's financial management, internal auditors and independent auditors have direct and confidential access to the Audit Committee at all times.

REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING - As stated above, we are responsible for establishing and maintaining effective internal control over financial reporting. We have evaluated Grace's internal control over financial reporting as of December 31, 2004. This evaluation was based on criteria for effective internal control over financial reporting set forth in standards promulgated by the Public Company Accounting Oversight Board and in the Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, we have concluded that Grace's internal control over financial reporting is adequate as of December 31, 2004. Grace's independent registered public accounting firm that audited our financial statements included in Item 15 has also audited our assessment of Grace's internal control over financial reporting as of December 31, 2004, as stated in their report, which appears on the following page.

REPORT ON DISCLOSURE CONTROLS AND PROCEDURES - As of December 31, 2004, we carried out an evaluation of the effectiveness of the design and operation of Grace's disclosure controls and procedures pursuant to Rule 13a-15 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Based upon that evaluation, we concluded that Grace's disclosure controls and procedures are effective in ensuring that information required to be disclosed in Grace's periodic filings under the Exchange Act is accumulated and communicated to us to allow timely decisions regarding required disclosures. There was no significant change in Grace's internal control over financial reporting during the quarter ended December 31, 2004 that has materially affected, or is reasonably likely to materially affect, Grace's internal control over financial reporting.


/s/ Paul J. Norris                        /s/ Robert M. Tarola
--------------------------------          --------------------------------
Paul J. Norris                            Robert M. Tarola
Chairman and                              Senior Vice President and
Chief Executive Officer                   Chief Financial Officer

March 4, 2005


                                   F-3




REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

TO THE SHAREHOLDERS AND BOARD OF DIRECTORS OF
W. R. GRACE & CO.:

We have completed an integrated audit of W. R. Grace & Co. 2004 consolidated financial statements and of its internal control over financial reporting as of December 31, 2004 and audits of its 2003 and 2002 consolidated financial statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Our opinions, based on our audits, are presented below.

Consolidated financial statements

In our opinion, the accompanying consolidated balance sheets and related consolidated statements of operations, of cash flows, of shareholders' equity (deficit) and of comprehensive income (loss) present fairly, in all material respects, the financial position of W. R. Grace & Co. and its subsidiaries at December 31, 2004 and 2003, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2004 in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board

(United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit of financial statements includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the consolidated financial statements, on April 2, 2001, the Company and substantially all of its domestic subsidiaries voluntarily filed for protection under Chapter 11 of the United States Bankruptcy Code, which raises substantial doubt about the Company's ability to continue as a going concern in its present form. Management's intentions with respect to this matter are described in Note 2. The accompanying consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

Internal control over financial reporting

Also, in our opinion, management's assessment, included in Management's Report on Internal Control over Financial Reporting appearing on the preceding page, that the Company maintained effective internal control over financial reporting as of December 31, 2004 based on criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), is fairly stated, in all material respects, based on those criteria. Furthermore, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2004, based on criteria established in Internal Control - Integrated Framework issued by the COSO. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express opinions on management's assessment and on the effectiveness of the Company's internal control over financial reporting based on our audit. We conducted our audit of internal control over financial reporting in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. An audit of internal control over financial reporting includes obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we consider necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

F-4

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ PricewaterhouseCoopers LLP
-----------------------------------
PricewaterhouseCoopers LLP
McLean, Virginia
March 4, 2005

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM ON FINANCIAL STATEMENT SCHEDULE

TO THE SHAREHOLDERS AND BOARD OF DIRECTORS OF W. R. GRACE & CO.

Our audits of the consolidated financial statements, of management's assessment of the effectiveness of internal control over financial reporting and of the effectiveness of internal control over financial reporting referred to in our report dated March 4, 2005, which was modified as to a matter raising substantial doubt about the Company's ability to continue as a going concern, appearing on page F-4 of this 2004 Annual Report on Form 10-K of W. R. Grace & Co., also included an audit of the Financial Statement Schedule listed on page F-2 in the Index to Consolidated Financial Statements and Financial Statement

CC-BLG002890

Schedule and Exhibit of this Form 10-K. In our opinion, this Financial Statement Schedule presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements.

/s/ PricewaterhouseCoopers LLP
----------------------------------------
PricewaterhouseCoopers LLP
McLean, Virginia
March 4, 2005


CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We hereby consent to the incorporation by reference in the Registration Statements on Form S-8 (Nos. 333-37024, 333-49083, 333-49507, 333-49509, 333-49511, 333-49513, 333-49515, 333-49517, 333-49703 and 333-49705) of W. R. Grace & Co. of our report dated March 4, 2005 relating to the financial statements, management's assessment of the effectiveness of internal control over financial reporting appearing on page F-4 of this 2004 Annual Report on Form 10-K of W. R. Grace & Co. We also consent to the incorporation by reference of our report dated March 4, 2005 relating to the Financial Statement Schedule, which appears in this Form 10-K.

/s/ PricewaterhouseCoopers LLP
----------------------------------------
PricewaterhouseCoopers LLP
McLean, Virginia
March 4, 2005


F-5


CONSOLIDATED FINANCIAL STATEMENTS

========================================================================================

| W. R. GRACE & CO. AND SUBSIDIARIES CONSOLIDATED STATEMENTS OF OPERATIONS | YEAR ENDED DECEMBER 31, | | |
|---|---|---|---|
| In millions, except per share amounts | 2004 | 2003 | 2002 |
| Net sales | $2,259.9 | $1,980.5 | $1,819.7 |
| Cost of goods sold, exclusive of depreciation and amortization shown separately below | 1,431.5 | 1,287.8 | 1,146.4 |
| Selling, general and administrative expenses, exclusive of net pension expense shown separately below | 442.8 | 362.2 | 340.8 |
| Depreciation and amortization | 108.8 | 102.9 | 94.9 |
| Research and development expenses | 51.1 | 52.0 | 51.5 |
| Net pension expense | 61.9 | 58.1 | 25.3 |
| Interest expense and related financing costs | 111.1 | 15.6 | 20.0 |
| Provision for environmental remediation | 21.6 | 142.5 | 70.7 |
| Provision for asbestos-related litigation, net of insurance | 476.6 | 30.0 | -- |
| Other (income) expense | (68.4) | (16.7) | (22.3) |
| | 2,637.0 | 2,034.4 | 1,727.3 |
| Income (loss) before Chapter 11 expenses, income taxes, and minority interest | (377.1) | (53.9) | 92.4 |
| Chapter 11 expenses, net | (18.0) | (14.8) | (30.1) |
| Benefit from (provision for) income taxes | 1.5 | 12.3 | (38.0) |
| Minority interest in consolidated entities | (8.7) | 1.2 | (2.2) |
| NET INCOME (LOSS) | $ (402.3) | $ (55.2) | $ 22.1 |
| BASIC EARNINGS (LOSS) PER SHARE: | | | |
| Net income (loss) | $ (6.11) | $ (0.84) | $ 0.34 |
| Weighted average number of basic shares | 65.8 | 65.5 | 65.4 |
| DILUTED EARNINGS (LOSS) PER SHARE: | | | |
| Net income (loss) | $ (6.11) | $ (0.84) | $ 0.34 |
| Weighted average number of diluted shares | 65.8 | 65.5 | 65.5 |

The Notes to Consolidated Financial Statements are an integral

part of these statements.

F-6

W. R. GRACE & CO. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOWS

| | | YEAR ENDED DECEMBER 31, | |
| In millions | 2004 | 2003 | 2002 |
|---|---|---|---|
| **OPERATING ACTIVITIES** | | | |
| Income (loss) before Chapter 11 expenses, income taxes, and minority interest | $(377.1) | $ (53.9) | $ 92.4 |
| Reconciliation to cash provided by operating activities: | | | |
| Depreciation and amortization | 108.8 | 102.9 | 94.9 |
| Interest accrued on pre-petition liabilities subject to compromise | 106.4 | 11.2 | 14.5 |
| Loss (gain) on sales of investments and disposals of assets | 0.8 | 1.5 | (1.9) |
| Net pension expense | 61.9 | 58.1 | 25.3 |
| Payments to fund defined benefit pension arrangements | (33.3) | (60.5) | (10.2) |
| Net gain from litigation settlement | (51.2) | -- | -- |
| Cash received from litigation settlement | 62.5 | -- | -- |
| Provision for environmental remediation | 21.6 | 142.5 | 70.7 |
| Provision for asbestos-related litigation, net of insurance | 476.6 | 30.0 | -- |
| Net income from life insurance policies | (3.0) | (5.6) | (4.7) |
| Bad debt expense | 1.9 | 0.8 | 1.1 |
| Payments under postretirement benefit plans | (12.5) | (12.6) | (21.5) |
| Expenditures for asbestos-related litigation | (8.1) | (10.4) | (13.1) |
| Proceeds from asbestos-related insurance | 18.7 | 13.2 | 10.8 |
| Expenditures for environmental remediation | (9.0) | (11.2) | (20.8) |
| Expenditures for retained obligations of divested businesses | (1.8) | (1.3) | (4.5) |
| Changes in assets and liabilities, excluding effect of businesses acquired/divested and foreign currency translation: | | | |
| Working capital items | 27.3 | (42.3) | 22.2 |
| Other accruals and non-cash items | (26.3) | (6.9) | (0.8) |
| NET CASH PROVIDED BY OPERATING ACTIVITIES BEFORE INCOME TAXES AND CHAPTER 11 EXPENSES | 364.2 | 155.5 | 254.4 |
| Chapter 11 expenses paid, net | (13.5) | (17.5) | (27.1) |
| Income taxes paid, net of refunds | (37.7) | (27.2) | (31.8) |
| NET CASH PROVIDED BY OPERATING ACTIVITIES | 313.0 | 110.8 | 195.5 |
| **INVESTING ACTIVITIES** | | | |
| Capital expenditures | (62.9) | (86.4) | (91.1) |
| Businesses acquired, net of cash acquired | (66.3) | (26.9) | (28.5) |
| Investment in life insurance policies | (14.0) | (11.6) | (16.4) |
| Proceeds from life insurance policies | 15.8 | 11.9 | 19.4 |
| Proceeds from sales of investments and disposals of assets | 1.8 | 3.9 | 5.9 |
| NET CASH USED FOR INVESTING ACTIVITIES | (125.6) | (109.1) | (110.7) |
| **FINANCING ACTIVITIES** | | | |
| Net change in loans secured by cash value of life insurance | (4.0) | (3.1) | (5.1) |
| Borrowings under credit facilities, net of repayments | 1.2 | 2.3 | (2.8) |
| Borrowings under debtor-in-possession facility, net of fees | (2.1) | 46.1 | 18.7 |
| Repayments of borrowings under debtor-in-possession facility | -- | (50.0) | (20.0) |
| Exercise of stock options | 4.2 | -- | -- |
| NET CASH USED FOR FINANCING ACTIVITIES | (0.7) | (4.7) | (9.2) |
| Effect of currency exchange rate changes on cash and cash equivalents | 14.5 | 28.6 | 16.1 |
| INCREASE IN CASH AND CASH EQUIVALENTS | 201.2 | 25.6 | 91.7 |
| Cash and cash equivalents, beginning of period | 309.2 | 283.6 | 191.9 |
| Cash and cash equivalents, end of period | $ 510.4 | $ 309.2 | $ 283.6 |

The Notes to Consolidated Financial Statements are an integral part of these
statements.

F-7

W. R. GRACE & CO. AND SUBSIDIARIES

CC-BLG002892

CONSOLIDATED BALANCE SHEETS

--------------------------------------------------------------------------------

| In millions, except par value and shares | 2004 | 2003 |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS** | | |
| Cash and cash equivalents | $ 510.4 | $ 309.2 |
| Trade accounts receivable, less allowance of $5.8 (2003 - $4.6) | 390.9 | 331.5 |
| Inventories | 248.3 | 214.6 |
| Deferred income taxes | 16.3 | 30.9 |
| Other current assets | 62.6 | 43.8 |
| **TOTAL CURRENT ASSETS** | 1,228.5 | 930.0 |
| Properties and equipment, net of accumulated depreciation and amortization of $1,325.9 (2003 - $1,216.9) | 645.3 | 656.6 |
| Goodwill | 111.7 | 85.2 |
| Cash value of life insurance policies, net of policy loans | 96.0 | 90.8 |
| Deferred income taxes | 667.4 | 587.1 |
| Asbestos-related insurance | 500.0 | 269.4 |
| Other assets | 290.0 | 256.2 |
| **TOTAL ASSETS** | $3,538.9 | $2,875.3 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT)** | | |
| **LIABILITIES NOT SUBJECT TO COMPROMISE** | | |
| **CURRENT LIABILITIES** | | |
| Debt payable within one year | $ 12.4 | $ 6.8 |
| Accounts payable | 146.0 | 101.8 |
| Income taxes payable | 7.7 | 16.6 |
| Other current liabilities | 221.5 | 130.3 |
| **TOTAL CURRENT LIABILITIES** | 387.6 | 255.5 |
| Debt payable after one year | 1.1 | -- |
| Deferred income taxes | 64.1 | 35.3 |
| Unfunded defined benefit pension liability | 424.9 | 279.5 |
| Other liabilities | 75.3 | 16.5 |
| **TOTAL LIABILITIES NOT SUBJECT TO COMPROMISE** | 953.0 | 586.8 |
| **LIABILITIES SUBJECT TO COMPROMISE - NOTE 2** | 3,207.7 | 2,452.3 |
| **TOTAL LIABILITIES** | 4,160.7 | 3,039.1 |
| **COMMITMENTS AND CONTINGENCIES** | | |
| **SHAREHOLDERS' EQUITY (DEFICIT)** | | |
| Common stock issued, par value $0.01; 300,000,000 shares authorized; outstanding: 2004 - 66,395,721 (2003 - 65,558,510) | 0.8 | 0.8 |
| Paid-in capital | 426.5 | 432.1 |
| Accumulated deficit | (573.2) | (170.9) |
| Treasury stock, at cost: shares: 2004 - 10,584,039; (2003 - 11,421,250) | (125.9) | (135.9) |
| Accumulated other comprehensive loss | (350.0) | (289.9) |
| **TOTAL SHAREHOLDERS' EQUITY (DEFICIT)** | (621.8) | (163.8) |
| **TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT)** | $3,538.9 | $2,875.3 |

The Notes to Consolidated Financial Statements are an integral part of these
statements.

F-8

--------------------------------------------------------------------------------

W. R. GRACE & CO. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY (DEFICIT)

--------------------------------------------------------------------------------

| In millions | Common Stock and Paid-in Capital | Accumulated Deficit | Treasury Stock | Accumulated Other Comprehensive Loss | TOTAL SHAREHOLDERS' EQUITY (DEFICIT) |
|---|---|---|---|---|---|
| BALANCE, DECEMBER 31, 2001... | $433.8 | $(137.8) | $(137.0) | $(300.7) | $(141.7) |
| Net income (loss)............ | -- | 22.1 | -- | -- | 22.1 |
| Other comprehensive loss..... | -- | -- | -- | (102.6) | (102.6) |
| BALANCE, DECEMBER 31, 2002... | $433.8 | $(115.7) | $(137.0) | $(403.3) | $(222.2) |

CC-BLG002893