|                              |          |           |           |           |           |
|------------------------------|----------|-----------|-----------|-----------|-----------|
| Net income (loss)            | $ --     | $ (55.2)  | $ --      | $ --      | $ (55.2)  |
| Stock plan activity          | (0.9)    | --        | 1.1       | --        | 0.2       |
| Other comprehensive income   | --       | --        | --        | 113.4     | 113.4     |
| BALANCE, DECEMBER 31, 2003   | $432.9   | $(170.9)  | $(135.9)  | $(289.9)  | $(163.8)  |
| Net income (loss)            | $ --     | $(402.3)  | $ --      | $ --      | $(402.3)  |
| Stock plan activity          | (5.6)    | --        | 10.0      | --        | 4.4       |
| Other comprehensive loss     | --       | --        | --        | (60.1)    | (60.1)    |
| BALANCE, DECEMBER 31, 2004   | $427.3   | $(573.2)  | $(125.9)  | $(350.0)  | $(621.8)  |

W. R. GRACE & CO. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME (LOSS)        YEAR ENDED DECEMBER 31,

| In millions | 2004 | 2003 | 2002 |
|---|---|---|---|
| NET INCOME (LOSS) | $(402.3) | $(55.2) | $ 22.1 |
| OTHER COMPREHENSIVE INCOME (LOSS): | | | |
| Foreign currency translation adjustments | 21.9 | 95.1 | 45.1 |
| Minimum pension liability adjustments, net of income taxes | (82.0) | 18.3 | (147.7) |
| Total other comprehensive income (loss) | (60.1) | 113.4 | (102.6) |
| COMPREHENSIVE INCOME (LOSS) | $(462.4) | $ 58.2 | $ (80.5) |

The Notes to Consolidated Financial Statements are an integral part of these statements.

F-9

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

---

1. BASIS OF PRESENTATION AND SUMMARY OF SIGNIFICANT ACCOUNTING AND FINANCIAL REPORTING POLICIES

---

W. R. Grace & Co., through its subsidiaries, is engaged in specialty chemicals and specialty materials businesses on a worldwide basis through two business segments: "Davison Chemicals," which includes two product groups - refining technologies and specialty materials; and "Performance Chemicals," which includes three product groups - specialty construction chemicals, building materials, and sealants and coatings.

W. R. Grace & Co. conducts substantially all of its business through a direct, wholly owned subsidiary, W. R. Grace & Co.-Conn. ("Grace-Conn."). Grace-Conn. owns substantially all of the assets, properties and rights of W. R. Grace & Co. on a consolidated basis, either directly or through subsidiaries.

As used in these notes, the term "Company" refers to W. R. Grace & Co. The term "Grace" refers to the Company and/or one or more of its subsidiaries and, in certain cases, their respective predecessors.

VOLUNTARY BANKRUPTCY FILING - In response to a sharply increasing number of asbestos-related personal injury claims, on April 2, 2001 (the "Filing Date"), W. R. Grace & Co. and 61 of its United States subsidiaries and affiliates, including Grace-Conn. (collectively, the "Debtors"), filed voluntary petitions for reorganization (the "Filing") under Chapter 11 of the United States Bankruptcy Code ("Chapter 11" or the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The cases were consolidated and are being jointly administered under case number 01-01139 (the "Chapter 11 Cases"). Grace's non-U.S. subsidiaries and certain of its U.S. subsidiaries were not included in the Filing.

During 2000 and the first quarter of 2001, Grace experienced several adverse developments in its asbestos-related litigation, including: a significant increase in personal injury claims, higher than expected costs to resolve personal injury and certain property damage claims, and class action lawsuits alleging damages from a former attic insulation product (Zonolite Attic Insulation or "ZAI"). After a thorough review of these developments, the Board

of Directors of Grace concluded on April 2, 2001 that a federal court-supervised Chapter 11 process provided the best forum available to achieve fairness in resolving these claims. Under Chapter 11, the Debtors have continued to operate their businesses as debtors-in-possession under court protection from creditors and claimants, while using the Chapter 11 process to develop and implement a plan for addressing the asbestos-related claims. Since the Filing, all motions necessary to conduct normal business activities have been approved by the Bankruptcy Court. (See Note 2 for Chapter 11 Related Information.)

PRINCIPLES OF CONSOLIDATION - The Consolidated Financial Statements include the accounts of Grace and entities as to which Grace exercises control over operating and financial policies. Intercompany transactions and balances are eliminated in consolidation. Investments in affiliated companies in which Grace can significantly influence operating and financial policies are accounted for under the equity method, unless Grace's investment is deemed to be temporary, in which case the investment is accounted for under the cost method.

RECLASSIFICATIONS - Certain amounts in prior years' Consolidated Financial Statements have been reclassified to conform to the 2004 presentation.

USE OF ESTIMATES - The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires that management make estimates and assumptions affecting the assets and liabilities reported at the date of the Consolidated Financial Statements, and the revenues and expenses reported for the periods presented. Actual amounts could differ from those estimates. Changes in estimates are recorded in the period identified. Grace's accounting measurements that are most affected by management's estimates of future events are:

o   Contingent liabilities such as asbestos-related matters (see Notes 2 and 3), environmental remediation (see Note 14), income taxes (see Note 14), and litigation related to retained obligations of divested businesses and discontinued operations.

o   Pension and postretirement liabilities that depend on assumptions regarding discount rates and/or total returns on invested funds (see Note 18).

o   Depreciation and amortization periods for long-lived assets, including property and equipment, intangible, and other assets.

o   Realization values of various assets such as net deferred tax assets (see Note 4), trade receivables, inventories, insurance receivables, income taxes, and goodwill.

F-10

The accuracy of these and other estimates may also be materially affected by the uncertainties arising under the Chapter 11 Cases.

CASH EQUIVALENTS - Cash equivalents consist of liquid instruments with maturities of three months or less when purchased. The recorded amounts approximate fair value.

INVENTORIES - Inventories are stated at the lower of cost or market. The methods used to determine cost include first-in/first-out and, for substantially all U.S. inventories, last-in/first-out. Market values for raw materials are based on current cost and, for other inventory classifications, net realizable value.

PROPERTIES AND EQUIPMENT - Properties and equipment are stated at cost. Depreciation of properties and equipment is generally computed using the straight-line method over the estimated useful life of the asset. Estimated useful lives range from 20 to 40 years for buildings, 3 to 7 years for information technology equipment, 3 to 10 years for machinery and equipment and 5 to 10 years for furniture and fixtures. Interest is capitalized in connection with major project expenditures. Fully depreciated assets are retained in properties and equipment and related accumulated depreciation accounts until they are removed from service. In the case of disposals, assets and related accumulated depreciation are removed from the accounts and the net amount, less any proceeds from disposal, is charged or credited to operations. Grace reviews long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be fully recoverable.

GOODWILL - Goodwill arises from certain purchase business combinations. Grace reviews its goodwill for impairment on an annual basis and whenever events or changes in circumstances indicate that the carrying amount may not be fully recoverable.

REVENUE RECOGNITION - Grace recognizes revenue when all of the following criteria are satisfied: risk of loss and title transfer to the customer; the price is fixed and determinable; and collectibility is reasonably assured. Certain customer arrangements include conditions for volume rebates. Grace accrues a rebate allowance and reduces recorded sales for anticipated selling price adjustments at the time of sale. Grace regularly reviews rebate accruals based on actual and anticipated sales patterns.

RESEARCH AND DEVELOPMENT COSTS - Research and development costs are charged to expense as incurred.

INCOME TAXES - Grace recognizes deferred tax assets and liabilities with respect

to the expected future tax consequences of events that have been recorded in the Consolidated Financial Statements and tax returns. If it is more likely than not that all or a portion of deferred tax assets will not be realized, a valuation allowance is provided against such deferred tax assets.

FOREIGN CURRENCY TRANSLATION - Assets and liabilities of foreign subsidiaries (other than those located in countries with highly inflationary economies) are translated into U.S. dollars at current exchange rates, while their revenues, costs and expenses are translated at average exchange rates during each reporting period. The resulting translation adjustments are included in the "accumulated other comprehensive loss" section of the Consolidated Balance Sheets. The financial statements of subsidiaries located in countries with highly inflationary economies, if any, are remeasured as if the functional currency were the U.S. dollar; the remeasurement creates translation adjustments that are reflected in "net income (loss)" in the Consolidated Statements of Operations.

FINANCIAL INSTRUMENTS - Grace periodically enters into interest rate swap agreements and foreign exchange forward and option contracts to manage exposure to fluctuations in interest and foreign currency exchange rates. Grace does not hold or issue derivative financial instruments for trading purposes. At December 31, 2004, Grace did not hold and had not issued any derivative financial instruments.

EFFECT OF NEW ACCOUNTING STANDARDS - In December 2004, the Financial Accounting Standards Board ("FASB") revised Statement of Financial Accounting Standards ("SFAS") No. 123, "Share-Based Payment," to require companies to measure and recognize in operations the cost of employee services received in exchange for an award of equity instruments based on the grant-date fair value. The provisions of this standard are effective as of the beginning of the first interim or annual reporting period that begins after June 15, 2005. Grace believes that this standard will not have a material impact on the Consolidated Financial Statements.

In November 2004, the FASB issued SFAS No. 151, "Inventory Costs - an Amendment of ARB No. 43, Chapter 4," to provide clarification that abnormal amounts of idle facility expense, freight, handling costs, and wasted material be recognized as current-period

F-11

charges. In addition, this standard requires that allocation of fixed production overheads to the costs of conversion be based on the normal capacity of the production facilities. The provisions of this standard are effective for inventory costs incurred during fiscal years beginning after June 15, 2005. Grace is currently evaluating the impact the standard will have on the Consolidated Financial Statements.

In December 2003, the FASB revised SFAS No. 132, "Employers' Disclosures about Pensions and Other Postretirement Benefits," to require additional disclosure about the assets, obligations, cash flows, and net periodic benefit cost of defined benefit plans and other postretirement plans. Grace adopted the provisions of SFAS No. 132 in December 2003. (See Note 18.)

STOCK INCENTIVE PLANS - SFAS No. 123 permits the Company to follow the measurement provisions of Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees," and not recognize compensation expense for its stock-based incentive plans. Had compensation cost for the Company's stock-based incentive compensation plans been determined based on the fair value at the grant dates of awards under those plans, consistent with the fair value methodology prescribed by SFAS No. 123, the Company's net income (loss) and related earnings (loss) per share for the years ended December 31, 2004, 2003 and 2002 would have been reduced to the pro forma amounts indicated below:

| PRO FORMA EARNINGS UNDER SFAS NO. 123 (In millions, except per share amounts) | YEAR ENDED DECEMBER 31, | | |
|---|---|---|---|
| | 2004 | 2003 | 2002 |
| Net income (loss), as reported.......................... | $(402.3) | $(55.2) | $22.1 |
| Deduct: | | | |
| Total stock-based employee compensation, net of tax effects............................................ | (0.1) | (1.4) | (4.2) |
| Pro forma net income (loss)(1)....................... | $(402.4) | $(56.6) | $17.9 |
| Basic earnings (loss) per share: | | | |
| As reported.......................................... | $ (6.11) | $(0.84) | $0.34 |
| Pro forma net income (loss) (1)...................... | (6.12) | (0.86) | 0.27 |
| Diluted earnings (loss) per share: | | | |
| As reported.......................................... | $ (6.11) | $(0.84) | $0.34 |
| Pro forma net income (loss)(1)....................... | (6.12) | (0.86) | 0.27 |

(1) These pro forma amounts may not be indicative of future income (loss) and earnings (loss) per share due to Grace's Chapter 11 Filing.

To determine compensation cost under SFAS No. 123, the fair value of each option is estimated on the date of grant using the Black-Scholes option pricing model. There were no option grants in the years ended 2004, 2003, and 2002.

---

2.  CHAPTER 11 RELATED INFORMATION

---

PLAN OF REORGANIZATION - On November 13, 2004 Grace filed a plan of reorganization, as well as several associated documents, including a disclosure statement, with the Bankruptcy Court. On January 13, 2005, Grace filed an amended plan of reorganization (the "Plan") and related documents to address certain objections of creditors and other interested parties. The amended Plan is supported by committees representing general unsecured creditors and equity holders, but is not supported by committees representing asbestos personal injury claimants and asbestos property damage claimants.

Under the terms of the Plan, a trust would be established under Section 524(g) of the Bankruptcy Code to which all pending and future asbestos-related claims would be channeled for resolution. Grace has requested that the Bankruptcy Court conduct an estimation hearing to determine the amount that would need to be paid into the trust on the effective date of the Plan to satisfy the estimated liability for each class of asbestos claimants and trust administration costs and expenses over time. The Plan provides that Grace's asbestos-related liabilities would be satisfied using cash and securities from Grace and third parties.

The Plan will become effective only after a vote of eligible creditors and with the approval of the Bankruptcy Court and the U.S. District Court for the District of Delaware. Votes on the Plan may not be solicited until the Bankruptcy Court approves the disclosure statement. The Debtors have received extensions of their exclusive right to propose a plan of reorganization through May 24, 2005, and extensions of the Debtors' exclusive right to solicit acceptances of a plan of reorganization through July 24, 2005.

Under the terms of the Plan, Grace would satisfy claims under the Chapter 11 cases as follows:

Asbestos-Related Claims and Costs
---------------------------------
A trust would be established under Section 524(g) of the Bankruptcy Code to which all pending and future asbestos-related claims would be channeled for resolution. The trust would utilize specified trust distribution procedures to satisfy the following allowed asbestos-related claims and costs:

F-12

1.  Personal injury claims that meet specified exposure and medical criteria (Personal Injury-Symptomatic Eligible or "PI-SE" Claims) - In order to qualify for this class, claimants would have to prove that their health is impaired from meaningful exposure to asbestos-containing products formerly manufactured by Grace.

2.  Personal injury claims that do not meet the exposure and medical criteria necessary to qualify as PI-SE Claims (Personal Injury-Asymptomatic and Other or "PI-AO" Claims) - This class would contain all asbestos-related personal injury claims against Grace that do not meet the specific requirements to be PI-SE Claims but do meet certain other specified exposure and medical criteria.

3.  Property damage claims, including claims related to ZAI ("PD Claims") - In order to qualify for this class, claimants would have to prove Grace liability for loss of property value or remediation costs related to asbestos-containing products formerly manufactured by Grace.

4.  Trust administration costs and legal expenses.

The pending asbestos-related legal proceedings are described in "Asbestos-Related Litigation" (see Note 3). The claims arising from such proceedings would be subject to this classification process as part of the Plan.

Grace has requested that the Bankruptcy Court conduct estimation hearings to determine the amounts that would need to be paid into the trust on the effective date of the Plan to satisfy the estimated liability for each class of asbestos claimants and trust administration costs and expenses over time. The amounts to fund PI-SE Claims, PD Claims and the expense of trust administration would be capped at the amount determined through the estimation hearing, therefore, after initial funding of the asbestos trust; Grace would have no further obligation for these claims and costs. Amounts required to fund PI-AO Claims would not be capped, so if the amount funded in respect thereof later proved to be inadequate, Grace would be responsible for contributing additional funds into the asbestos trust to satisfy PI-AO Claims.

Asbestos personal injury claimants would have the option either to litigate their claims against the trust in federal court in Delaware or, if they meet specified eligibility criteria, accept a settlement amount based on the severity of their condition. Asbestos property damage claimants would be required to

litigate their claims against the trust in federal court in Delaware. The Plan provides that, as a condition precedent to confirmation, the maximum estimated aggregate funding amount for all asbestos-related liabilities (PI-SE, PI-AO and PD including ZAI) and trust administration costs and expenses as determined by the Bankruptcy Court cannot exceed $1,613 million, which Grace believes would fund over $2 billion in claims, costs and expenses over time.

The PI-SE Claims, the PD Claims and the related trust administration costs and expenses would be funded with (1) $512.5 million in cash (plus interest at 5.5% compounded annually from December 21, 2002) and nine million shares of common stock of Sealed Air Corporation ("Sealed Air") pursuant to the terms of a settlement agreement resolving asbestos-related and fraudulent transfer claims against Sealed Air, and (2) Grace common stock. The amount of Grace common stock required to satisfy these claims will depend on the liability measures approved by the Bankruptcy Court and the value of the Sealed Air settlement, which changes daily with the accrual of interest and the trading value of Sealed Air stock. The Sealed Air settlement agreement remains subject to Bankruptcy Court approval and the fulfillment of specified conditions.

The PI-AO Claims would be funded with warrants exercisable for that number of shares of Grace common stock which, when added to the shares issued directly to the trust on the effective date of the Plan, would represent 50.1% of Grace's voting securities. If the common stock issuable upon exercise of the warrants is insufficient to pay all PI-AO Claims (the liability for which is uncapped under the Plan), then Grace would pay any additional liabilities in cash.

Other Creditors
---------------
The Plan provides that all allowed claims other than those covered under the asbestos trust would be paid 100% in cash (if such claims qualify as administrative or priority claims) or 85% in cash and 15% in Grace common stock (if such claims qualify as general unsecured claims). Grace estimates that claims with a recorded value of approximately $1,215 million, including interest accrued through December 31, 2004, would be satisfied in this manner at the effective date of the Plan. Grace would finance these payments with cash on hand, cash from Fresenius Medical Care Holdings, Inc. ("Fresenius") paid in settlement of asbestos and other Grace-related claims, new Grace debt, and Grace common stock. Grace would satisfy other non-asbestos related liabilities and claims (primarily certain environmental, tax, pension and retirement medical obligations) as they become due and payable over time.

F-13

Proceeds from available product liability insurance applicable to asbestos-related claims would supplement operating cash flow to service new debt and liabilities not paid on the effective date of the Plan.

Effect on Grace Common Stock
----------------------------
The Plan provides that Grace common stock will remain outstanding at the effective date of the Plan, but that the interests of existing shareholders would be subject to dilution by additional shares of common stock issued under the Plan. In addition, in order to preserve significant tax benefits from net operating loss carryforwards ("NOLs"), which are subject to elimination or limitation in the event of a change in control (as defined by the Internal Revenue Code) of Grace, the Plan places restrictions on the purchase of Grace common stock. The restrictions would prohibit (without the consent of Grace), for a period of three years, a person or entity from acquiring more than 4.75% of the outstanding Grace common stock or, for those persons already holding more than 4.75%, prohibit them from increasing their holdings. The Bankruptcy Court has also approved the trading restrictions described above until the effective date of the Plan.

Grace intends to address all pending and future asbestos-related claims and all other pre-petition claims as outlined in the Plan. However, Grace may not be successful in obtaining approval of the Plan by the Bankruptcy Court and other interested parties. Instead, a materially different plan of reorganization may ultimately be approved and, under the ultimate plan of reorganization, the interests of the Company's shareholders could be substantially diluted or cancelled. The value of Grace common stock following a plan of reorganization, and the extent of any recovery by non-asbestos-related creditors, will depend principally on the allowed value of Grace's asbestos-related claims as determined by the Bankruptcy Court.

OFFICIAL PARTIES TO GRACE'S CHAPTER 11 PROCEEDINGS - Three creditors' committees, two representing asbestos claimants and the third representing other unsecured creditors, and a committee representing shareholders have been appointed in the Chapter 11 Cases. These committees, and a legal representative of future asbestos claimants, have the right to be heard on all matters that come before the Bankruptcy Court and are likely to play important roles in the Chapter 11 Cases. The Debtors are required to bear certain costs and expenses of the committees and of the future asbestos claimants' representative, including those of their counsel and financial advisors.

CLAIMS FILINGS - The Bankruptcy Court established a bar date of March 31, 2003 for claims of general unsecured creditors, asbestos-related property damage claims and medical monitoring claims related to asbestos. The bar date did not apply to asbestos-related personal injury claims or claims related to ZAI, which will be dealt with separately.

Approximately 14,900 proofs of claim were filed by the bar date. Of these claims, approximately 9,400 were non-asbestos related, approximately 4,300 were for asbestos-related property damage, and approximately 1,000 were for medical monitoring. The medical monitoring claims were made by individuals who allege exposure to asbestos through Grace's products or operations. These claims, if sustained, would require Grace to fund ongoing health monitoring costs for qualified claimants. In addition, approximately 500 proofs of claim were filed after the bar date.

Approximately 7,000 of the non-asbestos related claims involve claims by employees or former employees for future retirement benefits such as pension and retiree medical coverage. Grace views most of these claims as contingent and has proposed a plan of reorganization that would retain such benefits. The other non-asbestos related claims include claims for payment of goods and services, taxes, product warranties, principal and interest under pre-petition credit facilities, amounts due under leases and other contracts, leases and other executory contracts rejected in the Bankruptcy Court, environmental remediation, indemnification or contribution to actual or potential co-defendants in asbestos-related and other litigation, pending non-asbestos-related litigation, and non-asbestos-related personal injury.

The Debtors' have analyzed the claims as filed and have found that many are duplicates, represent the same claim filed against more than one of the Debtors, lack any supporting documentation, or provide insufficient supporting documentation. As of December 31, 2004, the Debtors had filed with the Bankruptcy Court objections to approximately 1,560 claims. Most of these objections were non-substantive (duplicates, no supporting documentation, late filed claims, etc.). Of such claims, 1,031 have been expunged, 31 have been withdrawn, and the remainder will be addressed through the claims objection process and the dispute resolution procedures approved by the Bankruptcy Court. The Debtors expect to file objections to a substantial number of additional claims.

Grace believes that its recorded liabilities for claims subject to the bar date represent a reasonable estimate

F-14

of the ultimate allowable amount for claims that are not in dispute or have been submitted with sufficient information to both evaluate merit and estimate the value of the claim. The asbestos-related claims are considered as part of Grace's overall asbestos liability and are being accounted for in accordance with the conditions precedent under the Plan, as described in "Accounting Impact" below. As claims are resolved, or where better information becomes available and is evaluated, Grace will make adjustments to the liabilities recorded on its financial statements as appropriate. Any such adjustments could be material to its consolidated financial position and results of operations.

LITIGATION PROCEEDINGS IN BANKRUPTCY COURT - In September 2000, Grace was named in a purported class action lawsuit filed in California Superior Court for the County of San Francisco, alleging that the 1996 reorganization involving a predecessor of Grace and Fresenius and the 1998 reorganization involving a predecessor of Grace and Sealed Air were fraudulent transfers. The Bankruptcy Court authorized the Official Committee of Asbestos Personal Injury Claimants and the Official Committee of Asbestos Property Damage Claimants to proceed with claims against Fresenius and Sealed Air on behalf of the Debtors' bankruptcy estate.

On November 29, 2002, Sealed Air and Fresenius each announced that they had reached agreements in principle with such Committees to settle asbestos and fraudulent transfer claims related to such transactions (the "litigation settlement agreements"). Under the terms of the Fresenius settlement, subject to certain conditions, Fresenius would contribute $115.0 million to the Debtors' estate as directed by the Bankruptcy Court upon confirmation of the Debtors' plan of reorganization, subject to the fulfillment of specified conditions. In July 2003, the Fresenius settlement was approved by the Bankruptcy Court. Under the terms of the proposed Sealed Air settlement, Sealed Air would make a payment of $512.5 million (plus interest at 5.5% compounded annually, commencing on December 21, 2002) and nine million shares of Sealed Air common stock (valued at $479.4 million as of December 31, 2004), as directed by the Bankruptcy Court upon confirmation of the Debtors' plan of reorganization. The Sealed Air settlement remains subject to the approval of the Bankruptcy Court and the fulfillment of specified conditions.

DEBT CAPITAL - All of the Debtors' pre-petition debt is in default due to the Filing. The accompanying Consolidated Balance Sheets reflect the classification of the Debtors' pre-petition debt within "liabilities subject to compromise."

The Debtors have entered into a debtor-in-possession post-petition loan and security agreement with Bank of America, N.A. (the "DIP facility") in the aggregate amount of $250 million. The term of the DIP facility expires on April 1, 2006.

ACCOUNTING IMPACT - The accompanying Consolidated Financial Statements have been prepared in accordance with Statement of Position 90-7 ("SOP 90-7"), "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code," promulgated by the American Institute of Certified Public Accountants. SOP 90-7 requires that financial statements of debtors-in-possession be prepared on a going

CC-BLG002899

concern basis, which contemplates continuity of operations, realization of assets and liquidation of liabilities in the ordinary course of business. However, as a result of the Filing, the realization of certain of the Debtors' assets and the liquidation of certain of the Debtors' liabilities are subject to significant uncertainty. While operating as debtors-in-possession, the Debtors may sell or otherwise dispose of assets and liquidate or settle liabilities for amounts other than those reflected in the Consolidated Financial Statements. Further, the ultimate plan of reorganization could materially change the amounts and classifications reported in the Consolidated Financial Statements.

Pursuant to SOP 90-7, Grace's pre-petition liabilities that are subject to compromise are required to be reported separately on the balance sheet at an estimate of the amount that will ultimately be allowed by the Bankruptcy Court. As of December 31, 2004, such pre-petition liabilities include fixed obligations (such as debt and contractual commitments), as well as estimates of costs related to contingent liabilities (such as asbestos-related litigation, environmental remediation, and other claims). Obligations of Grace subsidiaries not covered by the Filing continue to be classified on the Consolidated Balance Sheets based upon maturity dates or the expected dates of payment. SOP 90-7 also requires separate reporting of certain expenses, realized gains and losses, and provisions for losses related to the Filing as reorganization items.

Grace's Consolidated Financial Statements as of and for the year ended December 31, 2004 reflect the following adjustments:

o   An accrual and charge of $714.8 million to increase Grace's recorded asbestos-related liability to that which is reflected as the maximum amount allowed under the conditions precedent to the Plan - Under the Plan, Grace is requesting that the Bankruptcy Court determine the aggregate dollar

F-15

amount, on a net present value basis, that must be funded (the "Funding Amount") into an asbestos trust (established under Section 524(g) of the Bankruptcy Code) to pay all allowed pending and future asbestos-related personal injury and property damage claims and related trust administration costs and expenses on the effective date of the Plan. It is a condition to confirmation that the Bankruptcy Court shall conclude that the Funding Amount is not greater than $1,613 million (excluding pre-petition asbestos-related contractual settlements and judgements of $87 million - treated as general unsecured claims), which would result in total asbestos-related liability of $1,700 million. This amount may not be consistent with what the Bankruptcy Court may conclude would be a sufficient Funding Amount.

o   An asset and credit of $238.2 million to increase Grace's estimate of insurance proceeds to which it would be entitled to an aggregate of $500.0 million - Under Grace's available insurance coverage, the payment of asbestos-related claims and costs will entitle Grace to partial insurance recovery. The amounts will vary with the type of expenditure and the relevant time period of the covered loss. Grace estimates that, at an ultimate payout of asbestos-related claims of $1,700 million, it would be entitled to approximately $500 million, on a net present value basis, of insurance recovery.

o   An accrual and charge of $94.1 million to increase Grace's estimate of interest to which general unsecured creditors would be entitled under the Plan - The Plan states that each holder of an allowed general unsecured claim shall be paid in full, plus post-petition interest, such payment to be 85% in cash and 15% in Grace stock. Post-petition interest shall accrue through the date of payment and shall be (i) for the holders of the Debtors' pre-petition bank credit facilities, at a rate of 6.09% per annum, compounded quarterly, (ii) for the holders of claims who, but for the Filing of the Chapter 11 Cases, would be entitled under a contract or otherwise to accrue or be paid interest on such claim in a non-default (or non-overdue payment) situation under applicable non-bankruptcy law, the rate provided in the contract between a Debtor(s) and the claimant or such rate as may otherwise apply under applicable non-bankruptcy law, or (iii) for all other holders of allowed general unsecured claims, at a rate of 4.19% per annum, compounded annually.

o   An asset and credit of $151.7 million for net income tax benefits related to the items described above - The net pre-tax effect of the above items on Grace's 2004 Consolidated Statement of Operations was a $570.7 million charge to reflect the net pre-tax liability aspects of the Plan. The deferred tax benefit on this net liability is $199.7 million at a statutory rate of 35%. Of this amount, $48.0 million exceeds Grace's analysis of the tax assets that may be more likely than not realized under reasonable scenarios of future taxable income (exclusive of the tax effects under the litigation settlements with Sealed Air and Fresenius). Accordingly, Grace has recorded a deferred tax valuation allowance of $48.0 million.

Grace has not recorded any assets available to fund asbestos-related and other liabilities under the litigation settlements with Sealed Air and Fresenius, as such agreements are subject to conditions which, although expected to be met, have not been satisfied and approved by the Bankruptcy Court. The value available under these litigation settlement agreements as measured at December 31, 2004, was $1,165.7 million comprised of $115.0 million in cash from Fresenius and $1,050.7 million in cash and stock from Sealed Air.

Grace's Consolidated Balance Sheets separately identify the liabilities that are "subject to compromise" as a result of the Chapter 11 proceedings. In Grace's case, "liabilities subject to compromise" represent pre-petition liabilities as determined under U.S. generally accepted accounting principles. Changes to the recorded amount of such liabilities will be based on developments in the Chapter 11 Cases and management's assessment of the claim amounts that will ultimately be allowed by the Bankruptcy Court. Changes to pre-petition liabilities subsequent to the Filing Date reflect: 1) cash payments under approved court orders; 2) the terms of Grace's proposed plan of reorganization, as discussed above, including the accrual of interest on pre-petition debt and the adjustment to Grace's recorded asbestos-related liability; 3) accruals for employee-related programs; and 4) changes in estimates related to other pre-petition contingent liabilities.

F-16

Components of liabilities subject to compromise are as follows:

| (In millions) | DECEMBER 31, 2004 | December 31, 2003 | Filing Date (Unaudited) |
|---|---|---|---|
| Debt, pre-petition plus accrued interest | $ 645.8 | $ 565.2 | $ 511.5 |
| Asbestos-related liability | 1,700.0 | 992.3 | 1,002.8 |
| Income taxes | 210.4 | 247.9 | 240.1 |
| Environmental remediation | 345.0 | 332.4 | 164.8 |
| Postretirement benefits other than pension | 118.9 | 134.3 | 185.4 |
| Unfunded special pension arrangements | 77.4 | 69.5 | 70.8 |
| Retained obligations of divested businesses | 25.1 | 27.0 | 45.5 |
| Accounts payable | 31.3 | 31.9 | 43.0 |
| Other accrued liabilities | 53.8 | 51.8 | 102.1 |
| TOTAL LIABILITIES SUBJECT TO COMPROMISE | $3,207.7 | $2,452.3 | $2,366.0 |

Note that the unfunded special pension arrangements reflected above exclude non-U.S. plans and qualified U.S. plans that became underfunded subsequent to the Filing. Contributions to qualified U.S. plans are subject to Bankruptcy Court approval.

CHANGE IN LIABILITIES SUBJECT TO COMPROMISE

Set forth below is a reconciliation of the changes in pre-filing date liability balances for the period from the Filing Date through December 31, 2004.

| (In millions) (Unaudited) | Cumulative Since Filing |
|---|---|
| Balance, Filing Date | $2,366.0 |
| Cash disbursements and/or reclassifications under Bankruptcy Court orders: | |
| Freight and distribution order | (5.7) |
| Trade accounts payable order | (9.1) |
| Other court orders including employee wages and benefits, sales and use tax, and customer programs | (250.9) |
| Expense/(income) items: | |
| Interest on pre-petition liabilities | 153.1 |
| Employee-related accruals | 19.9 |
| Change in asbestos-related contingencies | 744.8 |
| Change in estimate of environmental contingencies | 240.6 |
| Change in estimate of income tax contingencies | (25.3) |
| Balance sheet reclassifications | (25.7) |
| Balance, end of period | $3,207.7 |

Additional liabilities subject to compromise may arise due to the rejection of executory contracts or unexpired leases, or as a result of the Bankruptcy Court's allowance of contingent or disputed claims.

CHAPTER 11 EXPENSES

| (In millions) | 2004 | 2003 | 2002 |
|---|---|---|---|

```
Legal and financial advisory fees .....................  $20.3   $15.4   $30.6
Interest income .......................................   (2.3)   (0.6)   (0.5)
                                                         -----   -----   -----
Chapter 11 expenses, net ..............................  $18.0   $14.8   $30.1
                                                         =====   =====   =====
```

Pursuant to SOP 90-7, interest income earned on the Debtors' cash balances must be offset against Chapter 11 expenses.

CONDENSED FINANCIAL INFORMATION OF THE DEBTORS

```
==============================================================================
W. R. GRACE & CO. -
    CHAPTER 11 FILING ENTITIES
    DEBTOR-IN-POSSESSION                             YEAR ENDED DECEMBER 31,
    STATEMENTS OF OPERATION                         --------------------------
(In millions) (Unaudited)                            2004      2003     2002
==============================================================================
Net sales, including intercompany ...............  $1,165.4  $1,031.9  $979.4
                                                   --------  --------  ------
Cost of goods sold, including intercompany,
    exclusive of depreciation and
    amortization shown separately below .........     768.7     714.8   626.6
Selling, general and administrative expenses,
    exclusive of net pension expense shown
    separately below ............................     262.6     218.2   214.0
Research and development expenses ...............      34.6      38.0    41.4
Depreciation and amortization ...................      57.4      61.1    60.6
Net pension expense .............................      45.9      45.6    20.1
Interest expense and related financing costs ....     110.7      15.3    19.5
Other (income) expense ..........................     (74.0)    (66.3)  (61.2)
Provision for environmental remediation .........      21.6     142.5    70.7
Provision for asbestos-related litigation,
    net of insurance ............................     476.6      30.0     --
                                                   --------  --------  ------
                                                    1,704.1   1,199.2   991.7
                                                   --------  --------  ------
Income (loss) before Chapter 11
    expenses, income taxes, and equity in net
    income of non-filing entities ...............    (538.7)   (167.3)  (12.3)
Chapter 11 expenses, net ........................     (18.0)    (14.8)  (30.1)
Benefit from (provision for) income taxes .......      44.8      45.4    (3.3)
                                                   --------  --------  ------
Income (loss) before equity in net income of
    non-filing entities .........................    (511.9)   (136.7)  (45.7)
Equity in net income of non-filing entities .....     109.6      81.5    67.8
                                                   --------  --------  ------
NET INCOME (LOSS) ...............................  $ (402.3) $  (55.2) $ 22.1
                                                   ========  ========  ======
```

F-17

```
==============================================================================
W. R. GRACE & CO. -
    CHAPTER 11 FILING ENTITIES
    DEBTOR-IN-POSSESSION
    CONDENSED STATEMENTS OF                          YEAR ENDED DECEMBER 31,
    CASH FLOWS                                      --------------------------
(In millions) (Unaudited)                            2004      2003     2002
==============================================================================
OPERATING ACTIVITIES
Income (loss) before Chapter 11 expenses,
    income taxes, and equity in net income of
    non-filing entities .........................  $(538.7)  $(168.9)  $(14.8)
Reconciliation to net cash provided by (used for)
    operating activities:
    Non-cash items, net .........................    663.2     237.9   140.5
    Contributions to defined benefit pension
        plans ...................................    (24.2)    (52.9)   (4.3)
    Changes in other assets and liabilities,
        excluding the effect of businesses
        acquired/divested .......................     87.0     (14.1)  (36.1)
                                                   -------   -------   -----
NET CASH PROVIDED BY OPERATING ACTIVITIES .......    187.3       2.0    85.3

NET CASH PROVIDED BY (USED FOR)
    INVESTING ACTIVITIES ........................     38.3      68.7   (60.1)

NET CASH USED FOR FINANCING ACTIVITIES ..........     (6.1)     (7.0)   (6.4)
```

```
NET INCREASE IN CASH AND CASH EQUIVALENTS ........    219.5      63.7     18.8
Cash and cash equivalents, beginning of period ...    120.5      56.8     38.0
                                                    -------    -------   ------
Cash and cash equivalents, end of period .........  $ 340.0   $ 120.5   $ 56.8
                                                    =======   =======   ======
```

| W. R. GRACE & CO. - CHAPTER 11 FILING ENTITIES DEBTOR-IN-POSSESSION BALANCE SHEETS (In millions) (Unaudited) | DECEMBER 31, 2004 | DECEMBER 31, 2003 |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS** | | |
| Cash and cash equivalents | $ 340.0 | $ 120.5 |
| Trade accounts receivable, net | 111.6 | 99.6 |
| Receivables from non-filing entities, net | 37.8 | 46.2 |
| Inventories | 76.9 | 81.2 |
| Other current assets | 38.1 | 53.9 |
| TOTAL CURRENT ASSETS | 604.4 | 401.4 |
| Properties and equipment, net | 359.9 | 383.9 |
| Cash value of life insurance policies, net of policy loans | 96.0 | 90.8 |
| Deferred income taxes | 666.2 | 587.9 |
| Asbestos-related insurance | 500.0 | 269.4 |
| Loans receivable from non-filing entities, net | 358.6 | 448.0 |
| Investment in non-filing entities | 468.4 | 303.6 |
| Other assets | 101.7 | 92.7 |
| TOTAL ASSETS | $3,155.2 | $2,577.7 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT)** | | |
| **LIABILITIES NOT SUBJECT TO COMPROMISE** | | |
| Current liabilities | $ 187.5 | $ 98.0 |
| Other liabilities | 381.8 | 191.2 |
| TOTAL LIABILITIES NOT SUBJECT TO COMPROMISE | 569.3 | 289.2 |
| LIABILITIES SUBJECT TO COMPROMISE | 3,207.7 | 2,452.3 |
| TOTAL LIABILITIES | 3,777.0 | 2,741.5 |
| SHAREHOLDERS' EQUITY (DEFICIT) | (621.8) | (163.8) |
| TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT) | $3,155.2 | $2,577.7 |

In addition to Grace's financial reporting obligations as prescribed by the U.S. Securities and Exchange Commission ("SEC"), the Debtors are also required, under the rules and regulations of the Bankruptcy Code, to periodically file certain statements and schedules and a monthly operating report with the Bankruptcy Court. This information is available to the public through the Bankruptcy Court. This information is prepared in a format that may not be comparable to information in Grace's quarterly and annual financial statements as filed with the SEC. The monthly operating reports are not audited, do not purport to represent the financial position or results of operations of Grace on a consolidated basis, and should not be relied on for such purposes.

---

### 3.  ASBESTOS-RELATED LITIGATION

---

Grace is a defendant in property damage and personal injury lawsuits relating to previously sold asbestos-containing products. As of the Filing Date, Grace was a defendant in 65,656 asbestos-related lawsuits, 17 involving claims for property damage (one of which has since been dismissed), and the remainder involving 129,191 claims for personal injury. Due to the Filing, holders of asbestos-related claims are stayed from continuing to prosecute pending litigation and from commencing new lawsuits against the Debtors. Separate creditors' committees representing the interests of property damage and personal injury claimants, and a legal representative of future personal injury claimants, have been appointed in the Chapter 11 Cases. Grace's obligations with respect to present and future claims will be determined through the Chapter 11 process.

PROPERTY DAMAGE LITIGATION - The plaintiffs in asbestos property damage lawsuits generally seek to have the defendants pay for the cost of removing, containing or repairing the asbestos-containing materials in the affected buildings. Each property damage case is unique in that the age, type, size and use of the building, and the difficulty of asbestos abatement, if necessary, vary from structure to structure. Information regarding product identification, the amount

of product in the building, the age, type, size and use of the building, the legal status of the claimant, the jurisdictional history of prior cases and the court in which the case is pending has provided meaningful guidance as to the range of potential costs.

Out of 380 asbestos property damage cases (which involved thousands of buildings) filed prior to the Filing Date, 140 were dismissed without payment of any damages or settlement amounts; judgments were entered in favor of Grace in nine cases (excluding cases settled following appeals of judgments in favor of Grace); judgments were entered in favor of the plaintiffs in eight cases (one of which is on appeal) for a total of $86.1 million; 207 property damage cases were settled for a total of $696.8 million; and 16 cases remain outstanding (including the one on appeal). Of the 16 remaining cases, eight relate to ZAI and eight relate to a number of former asbestos-containing products (two of which also are alleged to involve ZAI).

Approximately 4,300 additional property damage claims were filed prior to the March 31, 2003 claims bar date established by the Bankruptcy Court. (The bar date did not apply to ZAI claims.) Such claims were reviewed in detail by Grace, categorized into claims with sufficient information to be evaluated or claims that require additional information and, where sufficient information existed, the estimated cost of resolution was considered as part of Grace's recorded asbestos-related liability. (Approximately 170 claims failed to provide sufficient information to permit an evaluation.)

Eight of the ZAI cases were filed as purported class action lawsuits in 2000 and 2001. In addition, two purported class action lawsuits were filed in October 2004 with respect to homes in Canada. These cases seek damages and equitable relief, including the removal, replacement and/or disposal of all such insulation. The plaintiffs assert that this product is in millions of homes and that the cost of removal could be several thousand dollars per home. As a result of the Filing, the eight U.S. cases have been transferred to the Bankruptcy Court. Based on Grace's investigation of the claims described in these lawsuits, and testing and analysis of this product by Grace and others, Grace believes that the product was and continues to be safe for its intended purpose and poses little or no threat to human health. The plaintiffs in the ZAI lawsuits (and the U.S. government in the Montana Criminal Proceeding described in Note 14) dispute Grace's position on the safety of ZAI. In July 2002, the Bankruptcy Court approved special counsel to represent, at the Debtors' expense, the ZAI claimants in a proceeding to determine certain threshold scientific issues regarding ZAI. On October 18, 2004, the Bankruptcy Court held a hearing on motions filed by the parties to address a number of important legal and factual issues regarding the ZAI claims, and has taken the motions under advisement. The Bankruptcy Court has indicated that it may require further proceedings with respect to the matters addressed in the motions. Given the very early stage of litigation, Grace's recorded asbestos-related liability at December 31, 2004 assumes the risk of loss from ZAI litigation is not probable.

PERSONAL INJURY LITIGATION - Asbestos personal injury claimants allege adverse health effects from exposure to asbestos-containing products formerly manufactured by Grace. Claims are generally similar to each other, differing primarily in the type of asbestos-related illness allegedly suffered by the plaintiff. Claimants allege adverse health effects from exposure to asbestos-containing products formerly manufactured by Grace. Grace's cost to resolve such claims has been influenced by numerous variables, including the solvency of other former producers of asbestos containing products, cross-claims by co-defendants, the rate at which new claims are filed, the jurisdiction in which the claims are filed, and the defense and disposition costs associated with these claims.

Cumulatively through the Filing Date, 16,354 asbestos personal injury lawsuits involving approximately 35,720 claims were dismissed without payment of any

F-19

damages or settlement amounts (primarily on the basis that Grace products were not involved) and approximately 55,489 lawsuits involving approximately 163,698 claims were disposed of (through settlements and judgments) for a total of $645.6 million. As of the Filing Date, 129,191 claims for personal injury were pending against Grace. Grace believes that a substantial number of additional personal injury claims would have been received between the Filing Date and December 31, 2004 had such claims not been stayed by the Bankruptcy Court.

ASBESTOS-RELATED LIABILITY - The total asbestos-related liability balances as of December 31, 2004 and December 31, 2003 were $1,700 million and $992.3 million, respectively, and are included in "liabilities subject to compromise." Grace adjusted its asbestos-related liability in the fourth quarter of 2004 based on its proposed plan of reorganization as discussed in Note 2. The amount recorded at December 31, 2004 includes the $1,613 million maximum amount reflected as a condition precedent to the Plan and $87 million related to pre-Chapter 11 contracts and court rulings included in the general unsecured claims.

Under the Plan, Grace is requesting that the Bankruptcy Court determine the aggregate dollar amount, on a net present value basis (the "Funding Amount"), that must be funded on the effective date of the Plan into an asbestos trust (established under Section 524(g) of the Bankruptcy Code) to pay all allowed pending and future asbestos-related personal injury and property damage claims (including ZAI) and related trust administration costs and expenses on the later of the effective date of the Plan or when allowed. It is a condition to

CC-BLG002904

confirmation of the Plan that the Bankruptcy Court shall conclude that the Funding Amount is not greater than $1,613 million. This amount, which should be sufficient to fund over $2 billion in pending and future claims, is based in part on Grace's evaluation of (1) existing but unresolved personal injury and property damage claims, (2) actuarially-based estimates of future personal injury claims, (3) the risk of loss from ZAI litigation, (4) proposed claim payments reflected in the Plan, and (5) the cost of the trust administration and litigation. This amount may not be consistent with what the Bankruptcy Court may conclude would be a sufficient Funding Amount.

Grace has requested that the Bankruptcy Court implement a process for estimating the Funding Amount, which will be primarily a function of the number of allowed property damage (including ZAI) and personal injury claims, and the amount payable per claim. Using this process, which involves the use of detailed claim forms, questionnaires, and expert testimony, Grace will seek to demonstrate that the vast majority of claims should not be allowed because they fail to establish any material property damage, health impairment or significant occupational exposure to asbestos from Grace's operations or products. Grace also will seek Bankruptcy Court approval of Grace's proposed payouts for allowed personal injury claims, which will vary depending upon the type of claim and/or the claimant's medical condition. If the Bankruptcy Court agrees with Grace's position on the number of, and the amounts to be paid in respect of, allowed personal injury and property damage claims, then Grace believes that the Funding Amount could be less than $1,613 million. However, this outcome is highly uncertain and will depend on a number of Bankruptcy Court rulings favorable to Grace's position.

Conversely, the asbestos claimants committees and the future claimants representative have objected to Grace's proposed estimation process and are likely to continue to assert that Grace's asbestos-related liabilities are substantially higher than $1,613 million, and in fact are in excess of Grace's business value. If the Court accepts the position of the asbestos claimants committees, then any plan of reorganization likely would result in the loss of all or substantially all equity value by current shareholders. Therefore, due to the significant uncertainties of this process and asbestos litigation generally, Grace is not able to estimate a probable Funding Amount that would be accepted by the Bankruptcy Court.

However, as Grace is willing to proceed with confirmation of the Plan with a Funding Amount of up to $1,613 million (assuming that other conditions precedent to confirmation of the Plan are satisfied, including the availability of funds from Sealed Air under the settlement agreement described in Note 2), during the fourth quarter of 2004, Grace accrued and took a charge of $714.8 million to increase its recorded asbestos-related liability to reflect the maximum amount allowed as a condition precedent under the Plan. This amount, plus $87.0 million for pre-Chapter 11 contractual settlements and judgments, brings the total recorded asbestos-related liability as of December 31, 2004 to $1,700 million. Any differences between the Plan as filed and as approved for confirmation could fundamentally change the accounting measurement of Grace's asbestos-related liability and that change could be material.

INSURANCE RIGHTS - Grace previously purchased insurance policies that provide coverage for the 1962 - 1985 period with respect to asbestos-related lawsuits

F-20

and claims. Since 1985, insurance coverage for asbestos-related liabilities has not been commercially available to Grace.

Grace's primary insurance coverage is in the amount of $1 million per occurrence with annual aggregate product-liability limits ranging from $1 to $2 million. With one exception, coverage disputes regarding primary insurance policies have been settled, and the settlement amounts paid in full.

Grace's excess coverage is for loss above certain levels. The levels vary from policy to policy, creating "layers" of excess coverage, some of which are triggered before others. As of December 31, 2004, after subtracting previous reimbursements by insurers and allowing for discounts pursuant to certain settlement agreements, there remains approximately $978 million of excess coverage from more than 30 presently solvent insurers.

Grace has entered into settlement agreements with various excess insurance carriers. These settlements involve amounts paid and to be paid to Grace. The unpaid maximum aggregate amount available under these settlement agreements is approximately $495 million. With respect to asbestos-related personal injury claims, the settlement agreements generally require that the claims be spread over the claimant's exposure period and that each insurer pay a pro rata portion of each claim based on the amount of coverage provided during each year of the total exposure period.

Presently, Grace has no agreements in place with insurers with respect to approximately $483 million of excess coverage, which is at layers of coverage that have not yet been triggered, but certain layers would be triggered if the Plan were approved at the recorded asbestos-related liability of $1,700 million. Grace believes that the ZAI claims also are covered under the settlement agreements and unsettled policies discussed above to the extent they relate to installations of ZAI occurring after July 1, 1973.

Grace has approximately $355 million of excess coverage with insolvent or