non-paying insurance carriers. (Non-paying carriers are those that, although technically not insolvent, are not currently meeting their obligations to pay claims.) Grace has filed and continues to file claims in the insolvency proceedings of insolvent carriers. Grace is currently receiving distributions from some of these insolvent carriers and expects to receive distributions in the future. Settlement amounts are recorded as income when received.

Pursuant to settlements with primary-level and excess-level insurance carriers with respect to asbestos-related claims, Grace received payments totaling $18.7 million in 2004, $13.2 million in 2003, and $10.8 million in 2002.

Grace estimates that, assuming an ultimate payout of asbestos-related claims equal to the recorded liability of $1,700 million, it should be entitled to approximately $500 million, on a net present value basis, of insurance recovery.

| ESTIMATED INSURANCE RECOVERY ON ASBESTOS-RELATED LIABILITIES (In millions) | 2004 | 2003 |
|---|---|---|
| INSURANCE RECEIVABLE | | |
| Asbestos-related insurance receivable, beginning of year .... | $269.4 | $282.6 |
| Proceeds received under asbestos-related insurance settlements ........................................ | (7.6) | (13.2) |
| Insurance receivable adjustment ........................... | 238.2 | -- |
| Asbestos-related insurance receivable, end of year expected to be realized as claims are paid ..................................... | $500.0 | $269.4 |

4.   INCOME TAXES

The components of income (loss) from consolidated operations before income taxes and the related benefit from (provision for) income taxes for 2004, 2003, and 2002 are as follows:

| INCOME TAXES - CONSOLIDATED OPERATIONS (In millions) | 2004 | 2003 | 2002 |
|---|---|---|---|
| Income (loss) before income taxes: | | | |
| Domestic ..................................... | $(541.2) | $(175.7) | $(44.6) |
| Foreign ...................................... | 140.0 | 126.2 | 104.8 |
| Intercompany eliminations ..................... | (2.6) | (18.0) | (0.1) |
| | $(403.8) | $ (67.5) | $ 60.1 |
| Benefit from (provision for) income taxes: | | | |
| Federal - current ............................ | $ 32.1 | $  9.9 | $  8.1 |
| Federal - deferred ........................... | 14.8 | 34.5 | (11.0) |
| State and local - current .................... | (0.3) | 3.8 | (1.0) |
| Foreign - current ............................ | (25.1) | (34.3) | (27.6) |
| Foreign - deferred ........................... | (20.0) | (1.6) | (6.5) |
| | $  1.5 | $ 12.3 | $(38.0) |

F-21

At December 31, 2004 and 2003, the tax attributes giving rise to deferred tax assets and liabilities consisted of the following items:

| DEFERRED TAX ANALYSIS (In millions) | 2004 | 2003 |
|---|---|---|
| Liability for asbestos-related litigation................. | $ 595.0 | $ 347.3 |
| Net operating loss/credit carryforwards................... | 133.4 | 141.4 |
| Deferred state taxes...................................... | 140.5 | 126.1 |
| Liability for environmental remediation................... | 120.8 | 116.4 |
| Other postretirement benefits............................ | 41.6 | 47.0 |
| Deferred charges.......................................... | 37.7 | 42.9 |
| Reserves and allowances................................... | 36.0 | 28.8 |
| Research and development.................................. | 33.1 | 34.6 |
| Pension liabilities...................................... | 134.4 | 83.1 |
| Foreign loss/credit carryforwards......................... | 19.9 | 20.0 |
| Other..................................................... | 11.7 | 9.9 |

CC-BLG002906

| | | |
|---|---|---|
| Total deferred tax assets.............................. | ... | ... |
| Asbestos-related insurance receivable.................... | (180.5) | (100.6) |
| Pension assets........................................... | (32.8) | (14.2) |
| Properties and equipment................................. | (85.6) | (72.4) |
| Deferred foreign and other income........................ | (102.7) | -- |
| Other.................................................... | (56.4) | (60.8) |
| Total deferred tax liabilities........................... | (458.0) | (248.0) |
| Deferred state taxes..................................... | (140.5) | (126.1) |
| Net federal tax assets................................... | (69.4) | (23.7) |
| Foreign loss carryforwards............................... | (17.8) | (18.5) |
| Total valuation allowance ............................... | (227.7) | (168.3) |
| Net deferred tax assets.................................. | $ 618.4 | $ 581.2 |

The deferred tax valuation allowance of $227.7 million consists of: (i) $140.5 million of net deferred tax assets associated with state loss carryforwards and future tax deductions subject to limitations that are likely to restrict Grace's realized benefits, (ii) $17.8 million of tax assets relating to foreign loss and credit carryforwards that are likely to expire unutilized, and (iii) $69.4 million of net federal deferred tax assets relating to net operating losses, tax credit carryforwards and future tax deductions that exceeded Grace's analysis of the tax assets that could be realized under reasonable scenarios of future taxable income. The net increase in the valuation allowance during 2004 related primarily to the uncertainty as to Grace's ability to utilize all of the income tax benefits associated with the increase in deductible asbestos-related liability and interest expense under the Plan. Based upon anticipated future results, Grace has concluded that it is more likely than not that the balance of the net deferred tax assets, after consideration of the valuation allowance, will be realized. Because of the nature of the items that make up this balance, the realization period is likely to extend over a number of years and the outcome of the Chapter 11 cases could materially impact the amount and the realization period.

At December 31, 2004, there were $197.8 million of U.S. federal net operating loss carryforwards, representing deferred tax assets of $69.3 million, with expiration dates through 2022; $3.8 million of foreign tax credit carryforwards with expiration dates through 2006; $15.7 million of general business credit carryforwards with expiration dates through 2008; and $44.6 million of alternative minimum tax credit carryforwards with no expiration dates.

As part of Grace's evaluation and planning for the funding requirements of its plan of reorganization, Grace concluded in the fourth quarter of 2004 that the financing of the Plan will likely involve cash and financing from non-U.S. subsidiaries. Grace anticipates that approximately $500 million will be sourced in this manner. Approximately $267 million can be repatriated by way of intercompany debt repayments and the remaining $233 million by way of taxable dividends. Accordingly, in the fourth quarter of 2004, Grace recorded a tax liability of $82 million to recognize the expected taxable elements of financing its plan of reorganization. Grace has not provided for U.S. federal, state, local and foreign deferred income taxes on approximately $248 million of undistributed earnings of foreign subsidiaries that are expected to be retained indefinitely by such subsidiaries for reinvestment.

The difference between the benefit from (provision for) income taxes at the federal income tax rate of 35% and Grace's overall income tax provision is summarized as follows:

| INCOME TAX BENEFIT (PROVISION) ANALYSIS (In millions) | 2004 | 2003 | 2002 |
|---|---|---|---|
| Tax benefit (provision) at federal corporate rate................................. | $141.3 | $ 23.6 | $(21.0) |
| Change in provision resulting from: | | | |
| Nontaxable income/non-deductible expenses.............................. | 8.0 | (0.6) | (1.0) |
| State and local income taxes, net of federal income tax benefit............. | 13.0 | 10.9 | 11.7 |
| Federal and foreign taxes on foreign operations............................ | (93.6) | 3.8 | (16.3) |
| Change in valuation allowance on deferred tax assets................................... | (59.4) | (15.8) | 5.5 |
| Chapter 11 expenses (non-deductible)............................. | (6.0) | (4.3) | (10.5) |
| Tax and interest relating to tax deductibility of interest on life insurance policy loans (See Note 14).................................. | (1.8) | (5.3) | (6.4) |
| | ------ | ------ | ------ |

Income tax benefit from (provision for)

CC-BLG002907

=====================================================================================

On October 22, 2004, President Bush signed the American Jobs Creation Act of 2004 (the "Jobs Act") into law. While Grace and its advisors are currently analyzing the many revisions to the tax laws enacted by the Jobs Act, Grace has focused primarily at this time on the potential impacts of the domestic manufacturing deductions and the foreign repatriation incentives. With

F-22

respect to manufacturing, commencing in 2005, the Jobs Act phases in over a five-year period an annual manufacturing deduction of up to 9% on the lesser of a taxpayer's income from domestic manufacturing activities or taxable income. Given Grace's current U.S. net operating loss carryforward position, Grace will not be entitled to the special deduction. Therefore, Grace's 2004 effective tax rate does not reflect any benefit for the special deduction.

With respect to foreign repatriation incentives, the Jobs Act provides an 85% dividends received deduction with respect to certain dividends received from a U.S. corporation's foreign subsidiaries. The dividends must be used to fund certain permitted domestic activities, as specified in the Jobs Act. These domestic activities include the building or improvement of infrastructure, research and development, and the financial stabilization of the corporation. As Grace currently understands the repatriation provision, companies in a net operating loss carryforward position would not be eligible to utilize foreign tax credits to offset U.S. taxes on foreign dividends eligible for benefits under the Jobs Act. Such dividends would be subject to cash taxes equal to approximately 5.25% of the dividend distributions. Therefore, Grace does not expect to elect the application of the Jobs Act to foreign dividend distributions. Instead, if Grace is unable to utilize foreign tax credits to offset the U.S. tax on these dividends, it will likely opt to utilize NOLs to offset the full 35% U.S. income tax. Grace will continue to monitor IRS pronouncements with respect to the Jobs Act and will reconsider its current position if the law is either clarified or amended to permit use of its foreign tax credits to offset the U.S. tax on qualifying dividend income. Grace is closely tracking this new law and, if further guidance is provided by the government that would permit Grace to make use of the dividend received deduction, will consider repatriating certain of its foreign earnings in 2005. The dividend-received deduction is available to taxpayers for only a limited period of time, expiring after year-end 2005.

--------------------------------------------------------------------------------
5.   ACQUISITIONS AND JOINT VENTURES
--------------------------------------------------------------------------------

In 2004, Grace completed four business combinations for a total cash cost of $66.3 million as follows:

o    In July 2004, Grace, through its German subsidiary, acquired GROM ANALYTIK + HPLC GmbH, a leader in column packing technology and services designed for high performance small molecule separations.

o    In August 2004, Grace, through its subsidiary The Separations Group, acquired Alltech International Holdings, Inc., a global manufacturer and supplier of chromatography products.

o    In August 2004, Grace, through its Belgium subsidiary, acquired Pieri Benelux NV. Pieri Benelux had been the exclusive distributor of Grace's line of Pieri(R) products for architectural concrete in Benelux since the early 1980s.

o    In December 2004, Grace, through a non-Debtor subsidiary, acquired the TRI-PLEX 30 line of synthetic roofing underlayments from Flexia Corporation.

Goodwill recognized in those transactions amounted to $22.0 million, of which $17.5 million was assigned to Davison Chemicals and $4.5 million was assigned to Performance Chemicals.

In 2003, Grace completed three business combinations for a total cash cost of $26.9 million as follows:

o    In April 2003, Grace, through its subsidiary The Separations Group, acquired the business and assets of MODcol Corporation, a manufacturer of preparative chromatography columns and provider of custom column packaging services.

o    In July 2003, Grace, through its subsidiary The Separations Group, acquired the chromatography business of Argonaut Technologies, Inc., which had been marketed under the Jones Chromatography name.

o    In October 2003, Grace, through its German subsidiary, acquired certain assets of Tricosal Beton-Chemie GmbH & Co. KG, a leading supplier of specialty chemicals and materials to the European construction industry.

Goodwill recognized in those transactions amounted to $12.0 million, of which $1.3 million was assigned to Davison Chemicals and $10.7 million was assigned to

CC-BLG002908

Performance Chemicals. Case 01-01139-AMC   Doc 22961-14   Filed 08/25/09   Page 4 of 47

F-23

---

## 6.   OTHER (INCOME) EXPENSE

---

Components of other income are as follows:

OTHER (INCOME) EXPENSE

| (In millions) | 2004 | 2003 | 2002 |
|---|---|---|---|
| Investment income..................................... | $ (3.0) | $ (5.6) | $ (4.7) |
| Interest income...................................... | (3.1) | (4.3) | (3.9) |
| Net loss (income) on sale of investments and disposals of assets.............. | 0.8 | 1.5 | (1.9) |
| Tolling revenue...................................... | (0.8) | (1.0) | (3.1) |
| Currency translation-intercompany loan.............. | (29.3) | -- | -- |
| Value of currency hedges............................ | 39.5 | -- | -- |
| Other currency transaction effects ................. | 1.4 | 4.2 | 1.1 |
| Asbestos-related insurance........................... | (11.1) | -- | -- |
| Net gain from litigation settlement ................ | (51.2) | -- | -- |
| Other miscellaneous income........................... | (11.6) | (11.5) | (9.8) |
| Total other income.................................. | $(68.4) | $(16.7) | $(22.3) |

In March 2004, Grace began accounting for currency fluctuations on a Euro 293 million intercompany loan between Grace's subsidiaries in the United States and Germany as a component of operating results instead of as a component of other comprehensive income. The change was prompted by new tax laws in Germany and Grace's cash flow planning for its Chapter 11 reorganization, which indicated that it is no longer reasonable to consider this loan as part of the permanent capital structure in Germany. In May 2004, Grace entered into a series of foreign currency hedge agreements to mitigate future currency fluctuations on the remaining loan balance. These hedge agreements have varying rates on notional amounts that coincide with loan repayments due periodically through June 2005. In 2004, Euro 92 million of loan principal was repaid. For the year ended December 31, 2004, a $39.5 million hedge loss was recognized, offset by a $29.3 million foreign currency gain. These hedges are viewed as risk management instruments by Grace and are not used for trading or speculative purposes.

Also in 2004, Grace recorded a net gain of $51.2 million as a result of the settlement of litigation with Honeywell International, Inc. related to environmental contamination of a non-operating parcel of land.

---

## 7.   GOODWILL AND OTHER INTANGIBLE ASSETS

---

Grace adopted SFAS No. 142, "Goodwill and Other Intangible Assets" on January 1, 2002 and ceased the amortization of goodwill. The pro forma impact on pre-tax income and earnings per share was immaterial. For the purpose of measuring impairment under the provisions of SFAS No. 142, Grace has identified its reporting units as refining technologies and specialty materials (Davison Chemicals), and construction chemicals, building materials, and sealants and coatings (Performance Chemicals). Grace has evaluated its goodwill and other intangible assets that have indefinite useful lives annually since 2002, with no impairment charge required.

The carrying amount of goodwill attributable to each reporting unit and the changes in those balances during the year ended December 31, 2004 are as follows:

| (In millions) | Davison Chemicals | Performance Chemicals | Total Grace |
|---|---|---|---|
| Balance as of December 31, 2003............. | $20.8 | $64.4 | $ 85.2 |
| Goodwill acquired during the year............ | 17.5 | 4.5 | 22.0 |
| Foreign currency translation adjustment...... | 1.4 | 3.1 | 4.5 |
| BALANCE AS OF DECEMBER 31, 2004............. | $39.7 | $72.0 | $111.7 |

Grace's net book value of other intangible assets at December 31, 2004 and December 31, 2003 was $96.3 million and $65.1 million, respectively, detailed as follows:

CC-BLG002909

| (In millions) | AS OF DECEMBER 31, 2004 | |
|---|---|---|
| | GROSS CARRYING AMOUNT | ACCUMULATED AMORTIZATION |
| Technology | $ 43.0 | $ 9.6 |
| Patents | 0.4 | 0.3 |
| Customer lists | 48.6 | 8.6 |
| Other | 27.0 | 4.2 |
| Total | $119.0 | $22.7 |

| (In millions) | AS OF DECEMBER 31, 2003 | |
|---|---|---|
| | GROSS CARRYING AMOUNT | ACCUMULATED AMORTIZATION |
| Technology | $38.1 | $10.8 |
| Patents | 15.3 | 15.2 |
| Customer lists | 29.8 | 5.1 |
| Other | 15.7 | 2.7 |
| Total | $98.9 | $33.8 |

At December 31, 2004, estimated future annual amortization expenses for intangible assets are:

ESTIMATED AMORTIZATION EXPENSE
(In millions)

| | |
|---|---|
| 2005 | $9.5 |
| 2006 | 9.2 |
| 2007 | 8.5 |
| 2008 | 8.4 |
| 2009 | 8.2 |

F-24

## 8.  COMPREHENSIVE INCOME (LOSS)

The tables below present the pre-tax, tax, and after tax components of Grace's other comprehensive income (loss) for the years ended December 31, 2004, 2003 and 2002:

| YEAR ENDED DECEMBER 31, 2004 (In millions) | Pre-Tax Amount | Tax Benefit | After Tax Amount |
|---|---|---|---|
| Minimum pension liability adjustments | $(126.2) | $44.2 | $(82.0) |
| Foreign currency translation adjustments | 21.9 | -- | 21.9 |
| Other comprehensive income (loss) | $(104.3) | $44.2 | $(60.1) |

| YEAR ENDED DECEMBER 31, 2003 (In millions) | Pre-Tax Amount | Tax Expense | After Tax Amount |
|---|---|---|---|
| Minimum pension liability adjustments | $ 28.2 | $(9.9) | $ 18.3 |
| Foreign currency translation adjustments | 95.1 | -- | 95.1 |
| Other comprehensive income (loss) | $123.3 | $(9.9) | $113.4 |

| YEAR ENDED DECEMBER 31, 2002 (In millions) | Pre-Tax Amount | Tax Benefit | After Tax Amount |
|---|---|---|---|
| Minimum pension liability adjustments | $(227.2) | $79.5 | $(147.7) |

CC-BLG002910

Foreign currency translation adjustments ........    45.4       45.4

Other comprehensive income (loss) ...............    $(182.1)   $79.5   $(102.6)

| COMPOSITION OF ACCUMULATED OTHER COMPREHENSIVE LOSS (In millions) | 2004 | 2003 |
|---|---|---|
| Minimum pension liability ............................... | $(347.5) | $(265.4) |
| Foreign currency translation ............................ | (2.5) | (24.5) |
| Accumulated other comprehensive loss ..................... | $(350.0) | $(289.9) |

Grace is a global enterprise which operates in over 40 countries with local
currency generally deemed to be the functional currency for accounting purposes.
The foreign currency translation amount represents the adjustment necessary to
translate the balance sheets valued in local currencies to the U.S. dollar as of
the end of each year presented. The decline in foreign currency translation over
2003 and 2004 is due to the weakening of the U.S. dollar against most other
reporting currencies, and, in particular, the Euro.

The decline in equity market returns in 2000-2002, coupled with a decline in
interest rates from 2000-2004, created a shortfall between the accounting
measurement of Grace's obligations under certain of its qualified pension plans
for U.S. employees and the market value of dedicated pension assets. This
condition required Grace to record a minimum pension liability for these plans
equal to the funding shortfall and to offset related deferred costs against
shareholders' equity (deficit) at December 31, 2004 and 2003. Market returns in
2004 and 2003 were 9.8% and 22.5%, respectively, for Grace's qualified domestic
pension plan assets and contributions to under-funded domestic plans in 2004 and
2003 were $19.8 million and $48.5 million, respectively. However, these asset
gains and contributions were offset by higher liability measures from lower
discount rates (moving from 6.75% at December 31, 2002 to 5.5% at December 31,
2004) and an increase in assumed life spans of participants. (See Note 18.)

---

9.    OTHER BALANCE SHEET ACCOUNTS

---

| (In millions) | 2004 | 2003 |
|---|---|---|
| INVENTORIES (1) | | |
| Raw materials ............................................ | $ 62.4 | $ 53.5 |
| In process .............................................. | 36.1 | 35.8 |
| Finished products ....................................... | 166.7 | 134.0 |
| General merchandise ..................................... | 32.2 | 29.4 |
| Less: Adjustment of certain inventories to a last-in/first-out (LIFO) basis ..................... | (49.1) | (38.1) |
| | $248.3 | $214.6 |

(1)  Inventories valued at LIFO cost comprised 46.9% of total inventories at
     December 31, 2004 and 49.2% at December 31, 2003

| OTHER ASSETS | | |
|---|---|---|
| Deferred pension costs ................................... | $119.5 | $115.9 |
| Deferred charges ........................................ | 49.9 | 45.7 |
| Long-term receivables, less allowances of $0.8 (2003 - $0.7) ................................... | 8.3 | 9.2 |
| Patents, licenses and other intangible assets, net ......... | 96.3 | 65.1 |
| Pension-unamortized prior service cost .................... | 15.3 | 19.8 |
| Investments in unconsolidated affiliates and other ......... | 0.7 | 0.5 |
| | $290.0 | $256.2 |

| OTHER CURRENT LIABILITIES | | |
|---|---|---|
| Accrued compensation .................................... | $ 92.9 | $ 48.5 |
| Deferred tax liability .................................. | 1.2 | 1.5 |
| Customer volume rebates ................................. | 31.7 | 28.1 |
| Accrued commissions ..................................... | 11.0 | 9.8 |
| Accrued reorganization fees ............................. | 11.4 | 6.9 |
| Other accrued liabilities ............................... | 73.3 | 35.5 |
| | $221.5 | $130.3 |

---

10.  PROPERTIES AND EQUIPMENT

CC-BLG002911

| (In millions) | 2004 | 2003 |
|---|---|---|
| Land | $ 23.1 | $ 21.3 |
| Buildings | 438.8 | 416.1 |
| Information technology and equipment | 113.0 | 107.2 |
| Machinery, equipment and other | 1,368.1 | 1,304.0 |
| Projects under construction | 28.2 | 24.9 |
| Properties and equipment, gross | 1,971.2 | 1,873.5 |
| Accumulated depreciation and amortization | (1,325.9) | (1,216.9) |
| Properties and equipment, net | $ 645.3 | $ 656.6 |

Capitalized interest costs were insignificant for the periods presented.
Depreciation and lease amortization

F-25

expense relating to properties and equipment amounted to $101.8 million in 2004,
$96.2 million in 2003, and $89.8 million in 2002. Grace's rental expense for
operating leases amounted to $16.9 million in 2004, $15.4 million in 2003, and
$14.9 million in 2002. (See Note 14 for information regarding contingent
rentals.)

At December 31, 2004, minimum future non-cancelable payments for operating
leases were:

MINIMUM FUTURE PAYMENTS UNDER OPERATING LEASES
(In millions)

| | |
|---|---|
| 2005 | $17.2 |
| 2006 | 14.8 |
| 2007 | 9.5 |
| 2008 | 8.1 |
| 2009 | 7.4 |
| Thereafter | 6.2 |
| Total minimum lease payments | $63.2 |

The above minimum non-cancelable lease payments are net of anticipated sublease
income of $2.0 million in 2005, $1.9 million in 2006, $1.9 million in 2007, $1.5
million in 2008, and $1.3 million in 2009.

11.  LIFE INSURANCE

Grace is the beneficiary of life insurance policies on certain current and
former employees with a net cash surrender value of $96.0 million and $90.8
million at December 31, 2004 and 2003, respectively. The policies were acquired
to fund various employee benefit programs and other long-term liabilities and
are structured to provide cash flow (primarily tax-free) over an extended number
of years.

The following tables summarize activity in these policies for 2004, 2003 and
2002, and the components of net cash value at December 31, 2004 and 2003:

LIFE INSURANCE - ACTIVITY SUMMARY
(In millions)

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Earnings on policy assets | $32.4 | $38.7 | $39.4 |
| Interest on policy loans | (29.4) | (33.1) | (34.7) |
| Premiums | 2.4 | 2.4 | 2.4 |
| Policy loan repayments | 4.0 | 3.1 | 5.1 |
| Net investing activity | (4.2) | (2.7) | (5.4) |
| Change in net cash value | $ 5.2 | $ 8.4 | $ 6.8 |
| Tax-free proceeds received | $15.8 | $11.9 | $19.4 |

| | DECEMBER 31, |
|---|---|
| COMPONENTS OF NET CASH VALUE | |

| (In millions) | 2004 | 2003 |
|---|---|---|
| Gross cash value | $ 484.2 | $ 478.5 |
| Principal - policy loans | (368.2) | (365.3) |
| Accrued interest - policy loans | (20.0) | (22.4) |
| Net cash value | $ 96.0 | $ 90.8 |
| Insurance benefits in force | $2,191.3 | $2,213.1 |

Grace's financial statements display income statement activity and balance sheet amounts on a net basis, reflecting the contractual interdependency of policy assets and liabilities. See Note 14 for a discussion of a settlement agreement with the Internal Revenue Service ("IRS") with respect to tax contingencies regarding most of these life insurance policies.

In January 2005, Grace surrendered and terminated most of these life insurance policies and received approximately $16 million of net cash value from the termination. As a result of the termination, gross cash value of the policies was reduced by approximately $381 million and policy loans of approximately $365 million were satisfied. Grace's insurance benefits in force was reduced by approximately $2 billion to approximately $191 million. The tax consequences of such terminations are also discussed in Note 14.

---

## 12. DEBT

| COMPONENTS OF DEBT (In millions) | 2004 | 2003 |
|---|---|---|
| **DEBT PAYABLE WITHIN ONE YEAR** | | |
| Other short-term borrowings (1) | $ 12.4 | $ 6.8 |
| | $ 12.4 | $ 6.8 |
| **DEBT PAYABLE AFTER ONE YEAR** | | |
| DIP facility (2) | $ -- | $ -- |
| Other long-term borrowings | 1.1 | -- |
| | $ 1.1 | $ -- |
| **DEBT SUBJECT TO COMPROMISE** | | |
| Bank borrowings (3) | $500.0 | $500.0 |
| Other borrowings (4) | 15.0 | 16.2 |
| Accrued interest (5) | 130.8 | 49.0 |
| | $645.8 | $565.2 |
| Full-year weighted average interest rates on total debt | 6.0% | 2.1% |

(1) Represents borrowings under various lines of credit and other miscellaneous borrowings.

(2) In April 2001, the Debtors entered into a debtor-in-possession post-petition loan and security agreement with Bank of America, N.A. (the "DIP facility") in the aggregate amount of $250 million. The DIP facility is secured by priority liens on substantially all assets of the Debtors, and bears interest based on LIBOR plus 2.00 to 2.25 percentage points. The Debtors have extended the term of the DIP facility through April 1, 2006. As of December 31, 2004, the Debtors had no outstanding borrowings under the DIP facility. However, $27.5 million of standby letters of credit were issued and outstanding under the facility as of December 31, 2004, which were issued mainly for trade-related matters such as performance bonds, as well as certain insurance and environmental matters. The outstanding amount of standby letters of credit, as well as other holdback provisions, issued under the DIP facility, reduces the borrowing availability to $183.8 million. Under the DIP facility, the Debtors are required to maintain $50 million

F-26

of liquidity, in a combination of cash, cash equivalents and the cash value of life insurance policies.

(3) Under bank revolving credit agreements in effect prior to the Filing, Grace could borrow up to $500 million at interest rates based upon the prevailing

CC-BLG002913

prime, federal funds and/or Eurodollar rates. Of that amount, $250 million was available under short-term facilities expiring in May 2001, and $250 million was available under a long-term facility expiring in May 2003. As a result of the Filing, Grace was in default under the bank revolving credit agreements, and accordingly, the balance as of the Filing Date was reclassified to debt subject to compromise in the Consolidated Balance Sheet.

(4)  Miscellaneous borrowings primarily consisting of U.S. mortgages.

(5)  In the fourth quarter of 2004, Grace accrued $69.5 million to increase its estimate of interest to which holders of the Debtor's pre-petition bank credit facilities and letters of credit would be entitled under the Plan. (See Note 2.)

Interest payments amounted to $2.1 million in 2004, $4.2 million in 2003, and $1.1 million in 2002.

--------------------------------------------------------------------------------
13.  FINANCIAL INSTRUMENTS
--------------------------------------------------------------------------------

DEBT AND INTEREST RATE SWAP AGREEMENTS - Grace was not a party to any reportable derivative financial instruments at December 31, 2004 and December 31, 2003.

FAIR VALUE OF DEBT AND OTHER FINANCIAL INSTRUMENTS - At December 31, 2004, the fair value of Grace's debt payable within one year not subject to compromise approximated the recorded value of $12.4 million. Fair value is determined based on expected future cash flows (discounted at market interest rates), quotes from financial institutions and other appropriate valuation methodologies. At December 31, 2004, the recorded values of other financial instruments such as cash, short-term investments, trade receivables and payables and short-term debt approximated their fair values, based on the short-term maturities and floating rate characteristics of these instruments. The fair value of debt subject to compromise is at par value based on recent trading.

CREDIT RISK - Trade receivables potentially subject Grace to credit risk. Concentrations of credit to customers in the petroleum and construction industries represent the greatest exposure. Grace's credit evaluation policies, relatively short collection terms and history of minimal credit losses mitigate credit risk exposures. Grace does not generally require collateral for its trade accounts receivable.

--------------------------------------------------------------------------------
14.  COMMITMENTS AND CONTINGENT LIABILITIES
--------------------------------------------------------------------------------

ASBESTOS-RELATED LIABILITY - SEE NOTE 3

ENVIRONMENTAL REMEDIATION - Grace is subject to loss contingencies resulting from extensive and evolving federal, state, local and foreign environmental laws and regulations relating to the generation, storage, handling, discharge and disposition of hazardous wastes and other materials. Grace accrues for anticipated costs associated with investigative and remediation efforts where an assessment has indicated that a probable liability has been incurred and the cost can be reasonably estimated. These accruals do not take into account any discounting for the time value of money.

Grace's environmental liabilities are reassessed whenever circumstances become better defined or remediation efforts and their costs can be better estimated. These liabilities are evaluated based on currently available information, including the progress of remedial investigation at each site, the current status of discussions with regulatory authorities regarding the method and extent of remediation at each site, existing technology, prior experience in contaminated site remediation and the apportionment of costs among potentially responsible parties. Grace expects that the funding of environmental remediation activities will be affected by the Chapter 11 proceedings.

Grace's estimated environmental liabilities are included in "liabilities subject to compromise."

At December 31, 2004, Grace's estimated liability for environmental investigative and remediation costs totaled $345.0 million, as compared with $332.4 million at December 31, 2003. The amount is based on funding and/or remediation agreements in place and Grace's best estimate of its cost for sites not subject to a formal remediation plan.

For the years ended December 31, 2004 and 2003, Grace recorded pre-tax charges of $21.6 million and $142.5 million, respectively, for environmental matters. Approximately $20 million and $120 million of the pre-tax charges in 2004 and 2003, respectively, were in connection with a cost recovery lawsuit brought by the U.S. government relating to Grace's former vermiculite mining activities near Libby, Montana, and Grace's evaluation of probable remediation costs at vermiculite processing sites currently or formerly operated by Grace, as described below. The remainder of the pre-tax charges were primarily attributable to the ongoing review of bankruptcy claims.

CC-BLG002914

Net cash expenditures charged against previously established reserves for the years ended December 31, 2004, 2003 and 2002 were $9.0 million, $11.2 million, and $20.8 million, respectively. Spending for 5 sites represents approximately 85% of the total cash expenditures for the year ended December 31, 2004.

Vermiculite Related Matters

From the 1920's until 1992, Grace (beginning in 1963) and previous owners conducted vermiculite mining and related activities near Libby, Montana. The mined vermiculite contained varying amounts of asbestos as an impurity, almost all of which was removed during processing. Expanded vermiculite was used in products such as fireproofing, insulation and potting soil.

In November 1999, Region 8 of the Environmental Protection Agency ("EPA") began an investigation into alleged excessive levels of asbestos-related disease in the Libby population related to these former mining activities. This investigation led the EPA to undertake additional investigative activity and to carry out response actions in and around Libby. On March 30, 2001, the EPA filed a lawsuit in U.S. District Court for the District of Montana, Missoula Division (United States v. W. R. Grace & Company et al.) under the Comprehensive Environmental Response, Compensation and Liability Act for the recovery of costs allegedly incurred by the United States in response to the release or threatened release of asbestos in the Libby, Montana area relating to such former mining activities. These costs include cleaning and/or demolition of contaminated buildings, excavation and removal of contaminated soil, health screening of Libby residents and former mine workers, and investigation and monitoring costs. In this action, the EPA also sought a declaration of Grace's liability that would be binding in future actions to recover further response costs.

In December 2002, the District Court granted the United States' motion for partial summary judgment on a number of issues that limited Grace's ability to challenge the EPA's response actions. In January 2003, a trial was held on the remainder of the issues, which primarily involved the reasonableness and adequacy of documentation of the EPA's cost recovery claims through December 31, 2001. On August 28, 2003, the District Court issued a ruling in favor of the United States that requires Grace to reimburse the government for $54.5 million (plus interest) in costs expended through December 2001, and for all appropriate future costs to complete the clean-up. Grace appealed the court's ruling to the Ninth Circuit Court of Appeals, which heard oral argument on February 7, 2005. No decision has been issued on the appeal.

As a result of the District Court ruling and Grace's evaluation of estimated costs for remediation in and around Libby and at vermiculite processing sites currently or formerly operated by Grace, Grace's total estimated liability for vermiculite-related remediation at December 31, 2004 and 2003 was $204.2 million and $181.0 million, respectively. Grace's estimate of expected costs is based on public comments regarding the EPA's spending plans, discussions of spending forecasts with EPA representatives, analysis of other information made available from the EPA, and evaluation of probable remediation costs at vermiculite processing sites. However, the EPA's cost estimates have increased regularly and substantially over the course of this clean-up. Consequently, as the EPA's spending on these matters increases, Grace's liability for remediation will increase.

Non-Vermiculite Related Matters

At December 31, 2004 and 2003, Grace's estimated liability for remediation of sites not related to its former vermiculite mining and processing activities was $140.8 million and $151.4 million, respectively. This liability relates to Grace's current and former operations, including its share of liability for off-site disposal at facilities where it has been identified as a potentially responsible party. During the fourth quarter of 2004, Grace recorded a $1.6 million increase to its estimated environmental liability for non-vermiculite related sites in connection with the investigation of environmental conditions at a current operating plant. During the fourth quarter of 2003, Grace recorded a $20.0 million increase to such liability as a result of the Chapter 11 claims review process. Grace's revised estimated liability is based upon an evaluation of claims for which sufficient information was available. As Grace receives new information and continues its claims evaluation process, its estimated liability may change materially.

Insurance Matters

In December 2004, Grace settled two environmental insurance coverage actions previously pending in the U.S. District Court for the Southern District of New York. The terms of such settlements are subject to confidentiality restrictions. The result will be accounted for when approved by the Bankruptcy Court. Grace remains a party to one other coverage action involving one excess insurance carrier regarding the applicability of the carriers' policies to Grace's environmental remediation costs. The outcome of the remaining

litigation, as well as the amounts of any recoveries that Grace may receive, is presently uncertain.

CONTINGENT RENTALS - Grace is the named tenant or guarantor with respect to leases entered into by previously divested businesses. These leases, some of which extend through the year 2017, have future minimum lease payments

CC-BLG002915

aggregating $112.0 million, and are fully offset by anticipated future minimum rental income from existing tenants and subtenants. In addition, Grace is liable for other expenses (primarily property taxes) relating to the above leases; these expenses are paid by current tenants and subtenants. Certain of the rental income and other expenses are payable by tenants and subtenants that have filed for bankruptcy protection or are otherwise experiencing financial difficulty. Grace believes that any loss from these lease obligations would be immaterial. Grace has rejected certain of these leases as permitted by the Bankruptcy Code, the financial impacts of which are insignificant.

TAX MATTERS - On January 10, 2005, Grace received a corrected examination report from the Internal Revenue Service (the "IRS") for the 1993 - 1996 tax periods asserting, in the aggregate, approximately $90.9 million of proposed tax adjustments, plus accrued interest (the "Examination Report"). The most significant issue addressed in the Examination Report concerns corporate-owned life insurance ("COLI") policies. As discussed below, a settlement agreement relating to COLI was executed on January 20, 2005. The benefit of that settlement was not reflected in the Examination Report. Once reflected, Grace anticipates that the proposed tax adjustment will be reduced from approximately $90.9 million to $80.2 million plus accrued interest. Other proposed adjustments include disallowance of research and development ("R&D") credits, general business credits and miscellaneous deductions. Subject to Bankruptcy Court approval and IRS revision of the Examination Report to reflect the benefit of the COLI settlement, Grace is in agreement with the IRS with respect to all proposed tax adjustments in the Examination Report with the exception of approximately $7.0 million of proposed adjustments relating to R&D credits. On February 9, 2005 Grace filed a protest with IRS Appeals requesting (i) additional review of the R&D credit issue and (ii) issuance of a corrected Examination Report to reflect the COLI settlement. Grace also filed a motion with the Bankruptcy Court on February 14, 2005 requesting that the Court authorize Grace to (i) enter into a settlement agreement with the IRS with respect to all agreed issues for the 1993 - 1996 tax periods and (ii) pay the related federal taxes as well as certain state taxes for the 1990 - 1996 tax periods plus accrued interest. Grace estimates that the tax payment including interest will be approximately $122.5 million.

With respect to COLI, in 1988 and 1990, Grace acquired COLI policies and funded policy premiums in part using loans secured against policy cash surrender value. Grace claimed a total of approximately $258 million in deductions attributable to interest accrued on such loans through the 1998 tax year, after which such deductions were no longer permitted by law. The IRS disallowance of such interest deductions, beginning during the 1990-1992 federal tax audit, resulted in years of discussion until recently, when the issue was resolved in a tentative settlement approved by the Bankruptcy Court, as described below.

On October 13, 2004, the Bankruptcy Court entered an order authorizing Grace to enter into a settlement agreement with the IRS in connection with interest deductions claimed with respect to COLI and providing for the termination of the COLI policies. In accordance with that order, on January 20, 2005, Grace terminated the COLI policies and Grace, Fresenius Medical Care Holdings, Inc., Sealed Air Corporation and the IRS entered into a COLI Closing Agreement. Under the COLI Closing Agreement, the government allowed 20% of the aggregate amount of the COLI interest deductions and Grace owes federal income tax and interest with respect to the remaining 80% of the COLI interest deductions disallowed. Grace estimates that the federal tax liability resulting from the COLI settlement is approximately $53.5 million, $10.4 million of which was paid in connection with the 1990-1992 tax audit and $30.8 million of which will be paid in connection with the settlement of the 1993-1996 federal tax audit discussed above. The remaining approximately $12.3 million of additional tax liability will be satisfied in connection with the 1997 and 1998 federal tax audits, discussed below. The COLI Closing Agreement also provides that, with respect to the termination of the COLI policies, Grace will include 20% of the gain realized in taxable income, with the government exempting 80% of such gain from tax. As a result of the termination, Grace received approximately $16 million in cash proceeds and will record taxable income of approximately $60 million in 2005. It is anticipated that Grace will apply its net operating loss carryforwards to offset the taxable income generated from terminating the COLI policies, although alternative minimum taxes may apply.

Grace's federal tax returns covering 1997 and later tax periods are either under examination by the IRS or open for future examination. As a consequence of any finally

F-29

determined federal tax adjustments, Grace will be liable for additional state taxes plus interest accrued thereon.

The IRS has assessed additional federal income tax withholding and Federal Insurance Contributions Act taxes plus interest and related penalties for calendar years 1993 through 1999 against a Grace subsidiary that formerly operated a temporary staffing business for nurses and other health care personnel. The assessments, aggregating $61.9 million, were made in connection with a meal and incidental expense per diem plan for traveling health care personnel, which was in effect through 1999, the year in which Grace sold the business. (The statute of limitations has expired with respect to 1999.) The IRS contends that certain per diem reimbursements should have been treated as wages subject to employment taxes and federal income tax withholding. Grace contends that its per diem and expense allowance plans were in accordance with statutory

CC-BLG002916

and regulatory requirements, as well as other published guidance from the IRS. Grace has a right to indemnification from its former partner in the business for approximately 36% of any tax liability (including interest thereon) for the period from July 1996 through December 1998. The matter is currently pending in the United States Court of Claims. Grace has tentatively agreed with the Department of Justice and IRS on a settlement amount and certain other terms that would resolve the matter. The preliminary settlement is subject to the execution of written closing agreements with the IRS and a written settlement agreement with the Department of Justice, and to Bankruptcy Court approval.

Grace believes that the impact of probable tax return adjustments is adequately recognized as liabilities in its consolidated financial statements at December 31, 2004.

PURCHASE COMMITMENTS - From time to time, Grace engages in purchase commitments in its various business activities, all of which are expected to be fulfilled with no material adverse consequences to Grace's operations or financial position.

GUARANTEES AND INDEMNIFICATION OBLIGATIONS - Grace is a party to many contracts containing guarantees and indemnification obligations. These contracts primarily consist of:

o   Contracts providing for the sale of a former business unit or product line in which Grace has agreed to indemnify the buyer against liabilities arising prior to the closing of the transaction, including environmental liabilities. These liabilities are included in "liabilities subject to compromise" in the Consolidated Balance Sheets;

o   Guarantees of real property lease obligations of third parties, typically arising out of (a) leases entered into by former subsidiaries of Grace, or (b) the assignment or sublease of a lease by Grace to a third party. These obligations are included in "liabilities subject to compromise" in the Consolidated Balance Sheets;

o   Licenses of intellectual property by Grace to third parties in which Grace has agreed to indemnify the licensee against third party infringement claims;

o   Contracts entered into with third party consultants, independent contractors, and other service providers in which Grace has agreed to indemnify such parties against certain liabilities in connection with their performance. Based on historical experience and the likelihood that such parties will ever make a claim against Grace, such indemnification obligations are immaterial; and

o   Product warranties with respect to certain products sold to customers in the ordinary course of business. These warranties typically provide that product will conform to specifications. Grace generally does not establish a liability for product warranty based on a percentage of sales or other formula. Grace accrues a warranty liability on a transaction-specific basis depending on the individual facts and circumstances related to each sale. Both the liability and annual expense related to product warranties are immaterial to the Consolidated Financial Statements.

FINANCIAL ASSURANCES - Financial assurances have been established for a variety of purposes, including insurance and environmental matters, asbestos settlements and appeals, trade-related commitments and other matters. At December 31, 2004, Grace had gross financial assurances issued and outstanding of $253.2 million, comprised of $135.2 million of surety bonds issued by various insurance companies, and $118.0 million of standby letters of credit and other financial assurances issued by various banks.

MONTANA CRIMINAL PROCEEDING - On February 7, 2005, the United States Department of Justice announced the unsealing of a 10-count grand jury indictment against Grace and seven current or former senior level employees relating to Grace's former vermiculite mining and processing activities in Libby, Montana. The indictment accuses the defendants of (1) conspiracy to violate

F-30

environmental laws and obstruct federal agency proceedings; (2) violations of the federal Clean Air Act; (3) wire fraud in connection with the sale of allegedly contaminated properties; and (4) obstruction of justice.

Grace purchased the Libby mine in 1963 and operated it until 1990; vermiculite processing activities continued until 1992. The grand jury charges that the conspiracy took place from 1976 to 2002 and also charges that the alleged endangerment to the areas surrounding Libby continues to the present day. According to the U.S. Department of Justice, Grace could be subject to fines in an amount equal to twice the after-tax profit earned from its Libby operations or twice the alleged loss suffered by Libby victims, plus additional amounts for restitution to victims. The indictment alleges that such after tax profits were $140 million. Grace has categorically denied any criminal wrongdoing and intends to vigorously defend itself at trial.

Among the employees charged is Robert J. Bettacchi, a senior vice president of Grace and president of the Grace Performance Chemicals business unit. Mr. Bettacchi and two other current employees have been placed on administrative

CC-BLG002917

leave with pay so that they may dedicate sufficient time to their defense. The U.S. Bankruptcy Court previously granted Grace's request to advance legal and defense costs to the employees, subject to a reimbursement obligation if it is later determined that the employees did not meet the standards for indemnification set forth under the appropriate state corporate law.

Grace is unable to assess whether the indictment, or any conviction resulting therefrom, will have a material adverse effect on the results of operations or financial condition of Grace or affect Grace's bankruptcy proceedings. However, Grace expects legal fees for its current and former employees defense will be at least several million dollars.

ACCOUNTING FOR CONTINGENCIES - Although the outcome of each of the matters discussed above cannot be predicted with certainty, Grace has assessed its risk and has made accounting estimates as required under U.S. generally accepted accounting principles. As a result of the Filing, claims related to certain of the items discussed above will be addressed as part of Grace's Chapter 11 proceedings. Accruals recorded for such contingencies have been included in "liabilities subject to compromise" on the accompanying Consolidated Balance Sheets. The amounts of these liabilities as ultimately determined through the Chapter 11 proceedings could be materially different from amounts recorded at December 31, 2004.

--------------------------------------------------------------------------
15.  SHAREHOLDERS' EQUITY (DEFICIT)
--------------------------------------------------------------------------

Under its Certificate of Incorporation, the Company is authorized to issue 300,000,000 shares of common stock, $0.01 par value. Of the common stock unissued at December 31, 2004, approximately 7,691,580 shares were reserved for issuance pursuant to stock options and other stock incentives. The Company has not paid a dividend on its common stock since 1998. The Certificate of Incorporation also authorizes 53,000,000 shares of preferred stock, $0.01 par value, none of which has been issued. Of the total, 3,000,000 shares have been designated as Series A Junior Participating Preferred Stock and are reserved for issuance in connection with the Company's Preferred Stock Purchase Rights ("Rights"). A Right trades together with each outstanding share of common stock and entitles the holder to purchase one one-hundredth of a share of Series A Junior Participating Preferred Stock under certain circumstances and subject to certain conditions. The Rights are not and will not become exercisable unless and until certain events occur, and at no time will the Rights have any voting power.

--------------------------------------------------------------------------
16.  EARNINGS (LOSS) PER SHARE
--------------------------------------------------------------------------

The following table shows a reconciliation of the numerators and denominators used in calculating basic and diluted earnings (loss) per share.

==========================================================================

| EARNINGS (LOSS) PER SHARE (In millions, except per share amounts) | 2004 | 2003 | 2002 |
|---|---|---|---|
| NUMERATORS | | | |
| Net income (loss) .............................. | $(402.3) | $(55.2) | $22.1 |
| DENOMINATORS | | | |
| Weighted average common shares - basic calculation ................... | 65.8 | 65.5 | 65.4 |
| Dilutive effect of employee stock options ................................ | -- | -- | 0.1 |
| Weighted average common shares - diluted calculation ................................ | 65.8 | 65.5 | 65.5 |
| BASIC EARNINGS (LOSS) PER SHARE ........................................ | $ (6.11) | $(0.84) | $0.34 |
| DILUTED EARNINGS (LOSS) PER SHARE ........................................ | $ (6.11) | $(0.84) | $0.34 |

==========================================================================

Stock options that could potentially dilute basic earnings (loss) per share (that were excluded from the computation of diluted earnings (loss) per share because their exercise prices were greater than the average market price of the common shares) averaged approximately 8.1 million in 2004, 9.4 million in 2003, and 11.5 million in 2002. As a result of the 2004 and 2003 net losses, approximately 300,000 and 100,000,

F-31

CC-BLG002918

respectively, of employee compensation-related shares issuable under stock options also were excluded from the diluted loss per share calculation because their effect would have been antidilutive.

---

## 17. STOCK INCENTIVE PLANS

Each stock option granted under the Company's stock incentive plans has an exercise price equal to the fair market value of the Company's common stock on the date of grant. Options become exercisable at the time or times determined by the Compensation Committee of the Company's Board of Directors and may have terms of up to ten years and one month.

The following table sets forth information relating to such options during 2004, 2003 and 2002:

| STOCK OPTION ACTIVITY | 2004 | |
|---|---|---|
| | Number of Shares | Average Exercise Price |
| Balance at beginning of year | 9,582,784 | $12.02 |
| Options exercised | (781,657) | 5.43 |
| Options terminated or cancelled | (1,109,547) | 10.41 |
| Balance at end of year | 7,691,580 | 12.92 |
| Exercisable at end of year | 7,691,580 | $12.92 |
| | **2003** | |
| Balance at beginning of year | 10,440,417 | $11.94 |
| Options exercised | (15,831) | 2.40 |
| Options terminated or cancelled | (841,802) | 11.24 |
| Balance at end of year | 9,582,784 | 12.02 |
| Exercisable at end of year | 9,227,438 | 12.39 |
| | **2002** | |
| Balance at beginning of year | 12,772,431 | $11.88 |
| Options granted | (1,266) | 2.40 |
| Options terminated or cancelled | (2,330,748) | 11.60 |
| Balance at end of year | 10,440,417 | 11.94 |
| Exercisable at end of year | 8,973,964 | $12.58 |

Currently outstanding options expire on various dates through September 2011. At December 31, 2004, 4,756,207 shares were available for additional stock option or restricted stock grants. The following is a summary of stock options outstanding at December 31, 2004:

| STOCK OPTIONS OUTSTANDING | | | | | |
|---|---|---|---|---|---|
| EXERCISE PRICE RANGE | Number Outstanding | Weighted-Average Remaining Contractual Life (Years) | Weighted-Average Exercise Price | Number Exercisable | Weighted-Average Exercise Price |
| $1 - $8 | 1,226,946 | 4.70 | $ 4.07 | 1,226,946 | $ 4.07 |
| $8 - $13 | 2,524,775 | 3.87 | 12.33 | 2,524,775 | 12.33 |
| $13 - $18 | 2,551,959 | 5.60 | 14.19 | 2,551,959 | 14.19 |
| $18 - $21 | 1,387,900 | 4.02 | 19.47 | 1,387,900 | 19.47 |
| | 7,691,580 | 4.60 | 12.92 | 7,691,580 | 12.92 |

---

## 18. PENSION PLANS AND OTHER POSTRETIREMENT BENEFITS PLANS

PENSION PLANS - Grace maintains defined benefit pension plans covering employees of certain units who meet age and service requirements. Benefits are generally based on final average salary and years of service. Grace funds its U.S. qualified domestic pension plans ("qualified domestic pension plans") in accordance with U.S. federal laws and regulations. Non-U.S. pension plans

CC-BLG002919

(*non-U.S. pension plans*) are funded under a variety of methods, as required under local laws and customs, and therefore cannot be summarized.

Grace also provides, through nonqualified plans, supplemental pension benefits in excess of qualified domestic pension plan limits imposed by federal tax law. These plans cover officers and higher-level employees and serve to increase the combined pension amount to the level that they otherwise would have received under the qualified domestic pension plans in the absence of such limits. The nonqualified plans are unfunded and Grace pays the costs of benefits as they are incurred.

At the December 31, 2004 measurement date for Grace's defined benefit pension plans (the "Plans"), the accumulated benefit obligation ("ABO") was approximately $1,367 million as measured under U.S. generally accepted accounting principles. At December 31, 2004, Grace's recorded pension liability for underfunded plans was $502.3 million ($424.9 million included in liabilities not subject to compromise and $77.4 million related to supplemental pension benefits for officers and higher-level employees, included in "liabilities subject to compromise"). The recorded ABO liability reflects 1) the shortfall between dedicated assets and the ABO of underfunded plans ($293.6 million); and 2) the ABO of pay-as-you-go plans ($208.7 million).

POST RETIREMENT BENEFITS OTHER THAN PENSIONS - Grace provides postretirement health care and life insurance benefits (referred to as other post-employment benefits or "OPEB") for retired employees of certain U.S. business units and certain divested units. The postretirement medical plan provides various levels of benefits to employees hired before 1991 and who retire from Grace after age 55 with at least 10 years of service. These plans are unfunded, and Grace pays a portion of the costs of benefits under these plans as they are incurred. Grace applies SFAS No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions," which requires that the future costs of

F-32

postretirement health care and life insurance benefits be accrued over the employees' years of service.

Retirees and beneficiaries covered by the postretirement medical plan are required to contribute a minimum of 40% of the calculated premium for that coverage. During 2002, per capita costs under the retiree medical plans exceeded caps on the amount Grace was required to contribute under a 1993 amendment to the plan. As a result, for 2003 and future years, retirees will bear 100% of any increase in premium costs. For this reason, assumed health care cost trend rates are not used in the determination of Grace's OPEB expense.

In December 2003, President Bush signed the Medicare Prescription Drug, Improvement and Modernization Act of 2003 (the "Act") into law. The Act introduces a prescription drug benefit under Medicare ("Medicare Part D") as well as a federal subsidy to companies that provide a benefit that is at least actuarially equivalent (as defined in the Act) to Medicare Part D. On January 21, 2005, the Center for Medicare and Medicaid Services released the final regulations implementing the Act. At this time, Grace is unable to determine if the prescription drug benefit under its postretirement health care plan is actuarially equivalent to the Medicare Part D benefit. Therefore, the financial statements do not reflect any amount associated with the federal subsidy.

ANALYSIS OF PLAN ACCOUNTING AND FUNDED STATUS - The following summarizes the changes in benefit obligations and fair value of retirement plan assets during 2004 and 2003 (Grace uses a December 31 measurement date for the majority of its plans):

F-33

| | | PENSION | | | | | OTHER POST-RETIREMENT PLANS | |
| | U.S. | | NON-U.S. | | TOTAL | | | |
| CHANGE IN FINANCIAL STATUS OF RETIREMENT PLANS (In millions) | 2004 | 2003 | 2004 | 2003 | 2004 | 2003 | 2004 | 2003 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| CHANGE IN PROJECTED BENEFIT OBLIGATION (PBO) | | | | | | | | |
| Benefit obligation at beginning of year........... | $ 918.1 | $ 870.2 | $ 293.9 | $ 233.7 | $1,212.0 | $1,103.9 | $ 127.0 | $ 123.8 |
| Service cost........................................ | 14.1 | 9.8 | 6.3 | 5.3 | 20.4 | 15.1 | 0.5 | 0.6 |
| Interest cost....................................... | 59.5 | 56.4 | 16.4 | 14.4 | 75.9 | 70.8 | 6.6 | 8.1 |
| Plan participants' contributions.................... | -- | -- | 0.8 | 0.9 | 0.8 | 0.9 | -- | -- |
| Amendments.......................................... | -- | -- | -- | -- | -- | -- | -- | -- |
| Acquisitions........................................ | -- | -- | -- | 0.2 | -- | 0.2 | -- | -- |
| Change in discount rates and other assumptions........ | 162.1 | 53.7 | 29.1 | 18.9 | 191.2 | 72.6 | (6.6) | 7.1 |
| Benefits paid....................................... | (74.2) | (72.0) | (14.4) | (13.6) | (88.6) | (85.6) | (12.5) | (12.6) |
| Currency exchange translation adjustments............ | -- | -- | 28.8 | 34.1 | 28.8 | 34.1 | -- | -- |

CC-BLG002920

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Benefit obligation at end of year | $1,079.0 | $ 918.1 | $ 360.9 | $ 293.9 | $1,440.1 | $1,212.0 | $ 115.0 | $ 127.0 |

**CHANGE IN PLAN ASSETS**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Fair value of plan assets at beginning of year | $ 658.1 | $ 557.2 | $ 193.2 | $ 159.2 | $ 851.3 | $ 716.4 | $ -- | $ -- |
| Actual return on plan assets | 57.6 | 120.0 | 18.9 | 20.8 | 76.5 | 140.8 | -- | -- |
| Employer contribution | 24.2 | 52.9 | 9.1 | 7.6 | 33.3 | 60.5 | 12.5 | 12.6 |
| Acquisitions | -- | -- | -- | 0.1 | -- | 0.1 | -- | -- |
| Plan participants' contribution | -- | -- | 0.8 | 0.9 | 0.8 | 0.9 | -- | -- |
| Benefits paid | (74.2) | (72.0) | (14.4) | (13.6) | (88.6) | (85.6) | (12.5) | (12.6) |
| Currency exchange translation adjustment | -- | -- | 18.1 | 18.2 | 18.1 | 18.2 | -- | -- |
| Fair value of plan assets at end of year | $ 665.7 | $ 658.1 | $ 225.7 | $ 193.2 | $ 891.4 | $ 851.3 | $ -- | $ -- |
| Funded status (PBO basis) | $(413.3) | $(260.0) | $(135.2) | $(100.7) | $(549.1) | $(360.7) | $(115.0) | $(127.0) |
| Unrecognized transition obligation | -- | -- | -- | 0.1 | -- | 0.1 | -- | -- |
| Unrecognized actuarial loss | 561.0 | 423.4 | 136.7 | 108.0 | 697.7 | 531.4 | 46.1 | 55.4 |
| Unrecognized prior service cost/(benefit) | 15.2 | 20.6 | 3.2 | 3.6 | 18.4 | 24.2 | (50.0) | (62.7) |
| Net amount recognized | $ 162.3 | $ 184.0 | $ 4.7 | $ 11.0 | $ 167.0 | $ 195.0 | $(118.9) | $(134.3) |

**AMOUNTS RECOGNIZED IN THE CONSOLIDATED BALANCE SHEET CONSIST OF:**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Prepaid pension costs | $ 2.9 | $ 6.3 | $ 116.6 | $ 109.6 | $ 119.5 | $ 115.9 | $ -- | $ -- |
| Pension obligation | (371.0) | (240.2) | (131.3) | (108.8) | (502.3) | (349.0) | (118.9) | (134.3) |
| Intangible asset | 15.3 | 19.8 | -- | -- | 15.3 | 19.8 | N/A | N/A |
| Accumulated other comprehensive loss | 515.1 | 398.1 | 19.4 | 10.2 | 534.5 | 408.3 | N/A | N/A |
| Net amount recognized | $ 162.3 | $ 184.0 | $ 4.7 | $ 11.0 | $ 167.0 | $ 195.0 | $(118.9) | $(134.3) |
| (Decrease) Increase in Minimum Liability Included in Other Comprehensive Income (Loss) | $ 116.9 | $ (37.8) | $ 9.2 | $ 9.6 | NM | NM | NM | NM |

**WEIGHTED AVERAGE ASSUMPTIONS USED TO DETERMINE BENEFIT OBLIGATIONS AS OF DECEMBER 31**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Discount rate | 5.50% | 6.25% | 5.11% | 5.52% | NM | NM | 5.50% | 6.25% |
| Rate of compensation increase | 4.25% | 4.25% | 3.51% | 3.50% | NM | NM | NM | NM |

**WEIGHTED AVERAGE ASSUMPTIONS USED TO DETERMINE NET PERIODIC BENEFIT COST FOR YEARS ENDED DECEMBER 31**

| | U.S 2005 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Discount rate | 5.50% | 6.25% | 6.75% | 5.52% | 5.86% | NM | NM | NM | 6.25% | 6.75% |
| Expected return on plan assets | 8.00% | 8.00% | 8.25% | 7.27% | 8.16% | NM | NM | NM | NM | NM |
| Rate of compensation increase | 4.25% | 4.25% | 4.25% | 3.50% | 3.84% | NM | NM | NM | NM | NM |

| COMPONENTS OF NET PERIODIC BENEFIT COST (INCOME) (In millions) | 2004 | | | 2003 | | | 2002 | | |
|---|---|---|---|---|---|---|---|---|---|
| | U.S. | NON-U.S. | OTHER | U.S. | Non-U.S. | Other | U.S. | Non-U.S. | Other |
| Service cost | $ 14.1 | $ 6.3 | $ 0.5 | $ 9.8 | $ 5.3 | $ 0.6 | $ 8.5 | $ 4.3 | $ 0.6 |
| Interest cost | 59.5 | 16.4 | 6.6 | 56.4 | 14.4 | 8.1 | 55.1 | 12.5 | 8.7 |
| Expected return on plan assets | (50.7) | (14.3) | -- | (44.5) | (13.3) | -- | (59.1) | (14.8) | -- |
| Amortization of transition obligation (asset) | -- | 0.1 | -- | -- | 0.5 | -- | -- | 0.7 | 0.4 |
| Amortization of prior service cost (benefit) | 5.4 | 0.7 | (12.7) | 5.5 | 0.6 | (12.7) | 5.2 | 0.6 | (12.7) |
| Amortization of unrecognized actuarial loss (gain) | 17.6 | 6.3 | 2.6 | 18.4 | 4.4 | 3.7 | 9.7 | 1.8 | 3.0 |
| Net curtailment and settlement loss | -- | 0.5 | -- | -- | 0.6 | -- | -- | 0.4 | -- |
| Net periodic benefit cost (income) | $ 45.9 | $ 16.0 | $ (3.0) | 45.6 | $ 12.5 | $ (0.3) | $ 20.1 | $ 5.2 | $ (0.4) |

NM - Not meaningful
N/A - Not applicable

| FUNDED STATUS OF U.S. PENSION PLANS (In millions) | FULLY-FUNDED QUALIFIED (1) U.S. PENSION PLANS | | | UNDERFUNDED QUALIFIED (1) U.S. PENSION PLANS | | | UNFUNDED (2) U.S. NONQUALIFIED PLANS | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2004 | 2003 | 2002 | 2004 | 2003 | 2002 | 2004 | 2003 | 2002 |
| Projected benefit obligation | $ 2.9 | $ 8.5 | $ 3.1 | $ 993.3 | $ 837.4 | $ 790.6 | $ 83.4 | $ 72.2 | $ 76.5 |
| Accumulated benefit obligation (ABO) | $ 2.9 | $ 8.4 | $ 3.1 | $ 954.9 | $ 818.3 | $ 767.0 | $ 77.4 | $ 69.5 | $ 74.9 |
| Fair value of plan assets | 4.4 | 10.5 | 6.0 | 661.3 | 647.6 | 551.2 | -- | -- | -- |

CC-BLG002921

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Funded status (ABO basis) ............. | $ 1.5 | $ 2.1 | $ 2.9 | $(293.6) | $(170.7) | $(215.8) | $(77.4) | $(69.5) | $(74.9) |
| Benefits paid ......................... | $(0.1) | $(1.0) | $(0.3) | $ 69.7) | $ 66.6) | $ 64.6) | $ 4.4) | $ 4.4) | $ 4.3) |
| Discount rate ......................... | 5.50% | 6.25% | 6.75% | 5.50% | 6.25% | 6.75% | 5.50% | 6.25% | 6.75% |

| | FULLY-FUNDED NON-U.S. (1) PENSION PLANS | | | UNDERFUNDED NON-U.S. (1) PENSION PLANS | | | UNFUNDED NON-U.S. (2) PENSION PLANS | | |
|---|---|---|---|---|---|---|---|---|---|
| FUNDED STATUS OF U.S. PENSION PLANS (In millions) | 2004 | 2003 | 2002 | 2004 | 2003 | 2002 | 2004 | 2003 | 2002 |
| Projected benefit obligation ...... | $211.6 | $172.9 | $138.1 | $17.4 | $14.3 | $11.0 | $ 131.9 | $ 106.7 | $ 84.6 |
| Accumulated benefit obligation .... | $196.2 | $159.7 | $128.8 | $14.7 | $12.5 | $ 8.6 | $ 123.0 | $ 101.6 | $ 73.5 |
| Fair value of plan assets ......... | 219.3 | 187.9 | 155.9 | 6.4 | 5.3 | 3.3 | -- | -- | -- |
| Funded status (ABO basis) ........ | $ 23.1 | $ 28.2 | $ 27.1 | $(8.3) | $(7.2) | $(5.3) | $(123.0) | $(101.6) | $(73.5) |
| Benefits paid ..................... | $ (8.9) | $ (8.5) | $ (7.2) | $(0.8) | $(0.7) | $(0.5) | $ (4.7) | $ (4.4) | $ (3.4) |
| Weighted average discount rate .... | 5.40% | 5.65% | 6.13% | 6.21% | 5.99% | 5.19% | 4.50% | 5.25% | 5.50% |

(1)  Plans intended to be advance-funded.

(2)  Plans intended to be pay-as-you-go.

| ESTIMATED EXPECTED FUTURE BENEFIT PAYMENTS REFLECTING FUTURE SERVICE FOR THE FISCAL YEAR(S) ENDING (In millions) | U.S. | NON-U.S. | OTHER POST-RETIREMENT PLANS | TOTAL |
|---|---|---|---|---|
| 2005 ............................................... | $ 74.7 | $ 16.8 | $ 9.8 | $101.3 |
| 2006 ............................................... | 67.6 | 17.0 | 9.4 | 94.0 |
| 2007 ............................................... | 67.9 | 17.7 | 9.0 | 94.6 |
| 2008 ............................................... | 68.5 | 18.6 | 8.7 | 95.8 |
| 2009 ............................................... | 69.6 | 19.1 | 8.4 | 97.1 |
| 2010 - 2014 ........................................ | $371.1 | $110.5 | $38.0 | $519.6 |

INVESTMENT GUIDELINES FOR ADVANCE-FUNDED PENSION PLANS - The target allocation of investment assets for 2005, the actual allocation at December 31, 2004 and 2003, and the expected long-term rate of return by asset category for Grace's domestic plans are as follows:

| | TARGET ALLOCATION | PERCENTAGE OF PLAN ASSETS DECEMBER 31, | | WEIGHTED-AVERAGE EXPECTED LONG-TERM RATE OF RETURN |
|---|---|---|---|---|
| ASSET CATEGORY | 2005 | 2004 | 2003 | 2004 |
| U.S. equity securities ............. | 45% | 45% | 45% | 4.46 |
| Non-U.S. equity securities ......... | 15% | 16% | 16% | 0.76 |
| Short-term debt securities ......... | 10% | 13% | 7% | 0.60 |
| Intermediate-term debt securities ... | 30% | 26% | 32% | 2.18 |
| Total ............................. | 100% | 100% | 100% | 8.00 |

The investment goal for the qualified domestic pension plans, subject to advance funding, is to earn a long-term rate of return consistent with the related cash flow profile of the underlying benefit obligation.

The qualified domestic pension plans have assets managed by six investment managers under investment guidelines summarized as follows:

o    For debt securities: single issuers are limited to 5% of the portfolio's

CC-BLG002922

market value (with the exception of U.S. government and agency securities), the average credit quality of the portfolio shall be at least A rated; no more than 15% of the market value of the portfolio shall be invested in non-dollar denominated bonds; and privately placed securities are limited to no more than 50% of the portfolio's market value.

o   For U.S. equity securities: the portfolio is entirely passively managed through investment in the Dow Jones Wilshire 5000 index.

o   For non-U.S. equity securities: no individual security shall represent more than 5% of the portfolio's market value at any time; investment in

F-35

U.S. common stock securities is prohibited (with the exception of American Depository Receipts) and emerging market securities may represent up to 30% of the total portfolio's market value. Currency futures and forward contracts may be held for the sole purpose of hedging existing currency risk in the portfolio.

For 2005, the expected long-term rate of return on assets for the qualified domestic pension plans is 8.0% (also 8.0% in 2004). Average annual returns over one, two, three, five, ten and fifteen-year periods were 9.80%, 16.02%, 6.45%, 1.69%, 8.37%, and 7.89%, respectively.

The allocation of investment assets at December 31, 2004 and 2003 for Grace's non-U.S. pension plans are as follows:

| | PERCENTAGE OF PLAN ASSETS DECEMBER 31, | |
| --- | --- | --- |
| ASSET CATEGORY | 2004 | 2003 |
| Equity securities | 48% | 49% |
| Debt securities | 49% | 48% |
| Other | 3% | 3% |
| Total | 100% | 100% |

Non-U.S. pension plans accounted for approximately 25% and 22% of total global pension assets at December 31, 2004 and 2003, respectively. Each of these plans, where applicable, follow local requirements and regulations. Some of the local requirements include the establishment of a local pension committee, a formal statement of investment policy and procedures, and routine valuations by plan actuaries.

The target allocation of investment assets for non-U.S. pension plans varies depending on the investment goals of the individual countries' plans. The plan assets of the United Kingdom pension plan represent approximately 84% and 85% of the total non-U.S. pension plan assets at December 31, 2004 and 2003, respectively. The target allocation of investment assets for 2005 for the United Kingdom pension plan is 50% equity securities and 50% debt securities. The plan assets of the Canadian pension plans represent approximately 6% and 5% of the total non-U.S. pension plan assets at December 31, 2004 and 2003, respectively. The target allocation of investment assets for 2005 for the Canadian pension plans is 55% equity securities and 45% debt securities. The plan assets of the other countries' plans represent approximately 10% in the aggregate (with no country representing more than 3% individually) of total non-U.S. pension plan assets at December 31, 2004 and 2003.

PLAN CONTRIBUTIONS AND FUNDING - Subject to the approval of the Bankruptcy Court, Grace intends to contribute amounts equal to the greater of its annual pension expense or the minimum funding requirements of the Employee Retirement Income Security Act of 1974 ("ERISA"). If this funding approach is approved by the Bankruptcy Court, Grace would contribute approximately $43 million to its qualified domestic pension plans. Based on the Plan's status as of December 31, 2004, Grace's ERISA obligations for 2005, 2006, and 2007 would be approximately $17 million, $101 million, and $61 million, respectively. Grace expects to contribute approximately $9 million and $10 million to its non-U.S. pension plans and other post-retirement plans in 2005, respectively.

--------------------------------------------------------------------------
19.  BUSINESS SEGMENT INFORMATION
--------------------------------------------------------------------------

Grace is a global producer of specialty chemicals and specialty materials. It generates revenues from two business segments: Davison Chemicals, which consists of the refining technologies and specialty materials product groups; and Performance Chemicals, which consists of the specialty construction chemicals, building materials, and sealants and coatings product groups. Intersegment sales, eliminated in consolidation, are not material. The table below presents information related to Grace's business segments for 2004, 2003, and 2002. Only those corporate expenses directly related to the segment are allocated for reporting purposes. All remaining corporate items are reported separately and

CC-BLG002923

F-36

| BUSINESS SEGMENT DATA (In millions) | 2004 | 2003 | 2002 |
|---|---|---|---|
| **NET SALES** | | | |
| Davison Chemicals | $1,192.2 | $1,039.9 | $ 939.3 |
| Performance Chemicals | 1,067.7 | 940.6 | 880.4 |
| Total | $2,259.9 | $1,980.5 | $1,819.7 |
| **PRE-TAX OPERATING INCOME** | | | |
| Davison Chemicals | $ 148.2 | $ 118.9 | $ 129.4 |
| Performance Chemicals | 131.8 | 107.9 | 98.8 |
| Total | $ 280.0 | $ 226.8 | $ 228.2 |
| **DEPRECIATION AND AMORTIZATION** | | | |
| Davison Chemicals | $ 74.6 | $ 67.6 | $ 61.7 |
| Performance Chemicals | 32.0 | 33.1 | 32.0 |
| Total | $ 106.6 | $ 100.7 | $ 93.7 |
| **CAPITAL EXPENDITURES** | | | |
| Davison Chemicals | $ 43.4 | $ 68.1 | $ 59.5 |
| Performance Chemicals | 17.8 | 16.5 | 27.9 |
| Total | $ 61.2 | $ 84.6 | $ 87.4 |
| **TOTAL ASSETS** | | | |
| Davison Chemicals | $ 890.9 | $ 797.1 | $ 734.1 |
| Performance Chemicals | 674.5 | 609.2 | 528.7 |
| Total | $1,565.4 | $1,406.3 | $1,262.8 |

The table below presents information related to the geographic areas in which Grace operated in 2004, 2003 and 2002.

| GEOGRAPHIC AREA DATA (In millions) | 2004 | 2003 | 2002 |
|---|---|---|---|
| **NET SALES** | | | |
| United States | $ 873.2 | $ 804.3 | $ 827.1 |
| Canada and Puerto Rico | 105.8 | 78.9 | 56.1 |
| Total North America | 979.0 | 883.2 | 883.2 |
| Germany | 111.6 | 92.2 | 70.9 |
| Europe, other than Germany | 704.1 | 584.7 | 490.0 |
| Total Europe | 815.7 | 676.9 | 560.9 |
| Asia Pacific | 349.2 | 312.7 | 269.0 |
| Latin America | 116.0 | 107.7 | 106.6 |
| Total | $2,259.9 | $1,980.5 | $1,819.7 |
| **PROPERTIES AND EQUIPMENT, NET** | | | |
| United States | $ 364.6 | $ 386.4 | $ 392.0 |
| Canada and Puerto Rico | 19.0 | 19.4 | 18.5 |
| Total North America | 383.6 | 405.8 | 410.5 |
| Germany | 126.2 | 120.7 | 89.6 |
| Europe, other than Germany | 77.0 | 72.3 | 63.7 |
| Total Europe | 203.2 | 193.0 | 153.3 |
| Asia Pacific | 46.7 | 46.8 | 47.4 |
| Latin America | 11.8 | 11.0 | 11.0 |

CC-BLG002924

```
Total .......................................  $ 645.3   $ 656.6   $ 622.2
                                               ==================================
```

Pre-tax operating income, depreciation and amortization, capital expenditures
and total assets for Grace's business segments are reconciled below to amounts
presented in the Consolidated Financial Statements.

| RECONCILIATION OF BUSINESS SEGMENT DATA TO FINANCIAL STATEMENTS (In millions) | 2004 | 2003 | 2002 |
|---|---|---|---|
| Pre-tax operating income - business segments | $ 280.0 | $ 226.8 | $ 228.2 |
| Minority interest | 8.7 | (1.2) | 2.2 |
| Gain (loss) on sale of investments and disposal of assets | (0.8) | (1.5) | 1.9 |
| Provision for environmental remediation | (21.6) | (142.5) | (70.7) |
| Provision for asbestos-related litigation, net | (476.6) | (30.0) | -- |
| Net gain from litigation settlement | 51.2 | -- | -- |
| Interest expense and related financing costs | (111.1) | (15.6) | (20.0) |
| Corporate costs | (100.7) | (78.1) | (47.4) |
| Other, net | (6.2) | (11.8) | (1.8) |
| | -------- | -------- | -------- |
| Income (loss) from operations before Chapter 11 expenses, income taxes, and minority interest | $ (377.1) | $ (53.9) | $ 92.4 |
| Depreciation and amortization | | | |
| - business segments | $ 106.6 | $ 100.7 | $ 93.7 |
| - corporate | 2.2 | 2.2 | 1.2 |
| | -------- | -------- | -------- |
| Total depreciation and amortization | $ 108.8 | $ 102.9 | $ 94.9 |
| Capital Expenditures | | | |
| - business segments | $ 61.2 | $ 84.6 | $ 87.4 |
| - corporate | 1.7 | 1.8 | 3.7 |
| | -------- | -------- | -------- |
| Total capital expenditures | $ 62.9 | $ 86.4 | $ 91.1 |
| Total assets | | | |
| - business segments | $1,565.4 | $1,406.3 | $1,262.8 |
| - corporate | 789.8 | 581.6 | 551.6 |
| Asbestos-related receivables | 500.0 | 269.4 | 282.6 |
| Deferred tax assets | 683.7 | 618.0 | 594.7 |
| | -------- | -------- | -------- |
| Total assets | $3,538.9 | $2,875.3 | $2,691.7 |

Corporate costs include expenses of corporate headquarters functions incurred in
support of core operations, such as corporate financial and legal services,
human resources management, communications and regulatory affairs. This item
also includes certain pension and postretirement benefits, including the
amortization of deferred costs, that are considered a core operating expense but
not allocated to business segments.

F-37

---

20. QUARTERLY SUMMARY AND STATISTICAL INFORMATION (UNAUDITED)

---

QUARTERLY SUMMARY AND STATISTICAL INFORMATION (Unaudited)
(In millions, except per share)

| | March 31 | June 30 | September 30 | December 31(1) |
|---|---|---|---|---|

2004

CC-BLG002925

| | | | | |
|---|---|---|---|---|
| Net sales | $518.5 | $542.9 | $579.5 | $987.1 |
| Cost of goods sold | 331.7 | 357.6 | 361.3 | 380.9 |
| Net income (loss) | 15.8 | 21.3 | 48.0 | (487.4) |
| Net income (loss) per share: (2) | | | | |
| Basic earnings per share: | | | | |
| Net income (loss) | $ 0.24 | $ 0.32 | $ 0.73 | $ (7.36) |
| Diluted earnings per share: | | | | |
| Net income (loss) | 0.24 | 0.32 | 0.72 | (7.36) |
| Market price of common stock: (3) | | | | |
| High | $ 3.70 | $ 6.50 | $ 9.53 | $ 14.95 |
| Low | 2.55 | 2.51 | 5.26 | 9.34 |
| Close | 3.12 | 6.20 | 9.45 | 13.61 |
| **2003** | | | | |
| Net sales | $444.8 | $503.4 | $521.0 | $ 511.3 |
| Cost of goods sold | 296.7 | 329.7 | 336.5 | 326.9 |
| Net income (loss) | (2.3) | 6.5 | (9.9) | (49.5) |
| Net income (loss) per share: (2) | | | | |
| Basic earnings per share: | | | | |
| Net income (loss) | $(0.04) | $ 0.10 | $(0.15) | $ (0.75) |
| Diluted earnings per share: | | | | |
| Net income (loss) | (0.04) | 0.10 | (0.15) | (0.75) |
| Market price of common stock: (3) | | | | |
| High | $ 2.89 | $ 4.41 | $ 5.52 | $ 3.84 |
| Low | 1.48 | 1.65 | 2.57 | 2.34 |
| Close | 1.48 | 4.41 | 3.10 | 2.57 |

(1)  Fourth quarter 2004 net loss includes a $714.8 million pre-tax charge to adjust Grace's recorded asbestos-related liability to the maximum amount permitted as a condition precedent under Grace's proposed plan of reorganization (the "Plan"); a pre-tax credit for expected insurance recovery related to asbestos liabilities of $238.2 million; a $94.1 million pre-tax charge to increase the interest to which general unsecured creditors would be entitled under the Plan; a $151.7 million pre-tax credit for net income tax benefits related to the above items; and an $82 million tax liability on the expected taxable distributions from foreign subsidiaries to fund the Plan. Fourth quarter 2003 net loss includes $120.0 million for pre-tax charges to adjust Grace's estimated liability for environmental remediation and asbestos-related property damage.

(2)  Per share results for the four quarters may differ from full-year per share results, as a separate computation of the weighted average number of shares outstanding is made for each quarter presented.

(3)  Principal market: New York Stock Exchange.

F-38

FINANCIAL SUMMARY (1)
(In millions, except per share amounts)

| | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| **STATEMENT OF OPERATIONS** | | | | | |
| Net sales | $ 2,259.9 | $ 1,980.5 | $ 1,819.7 | $ 1,722.9 | $ 1,597.4 |
| Income (loss) from continuing operations before Chapter 11 expenses, income taxes, and minority interest (2) | (377.1) | (53.9) | 92.4 | 161.7 | (19.7) |
| Minority interest in consolidated entities | (8.7) | 1.2 | (2.2) | (3.7) | -- |
| Net income (loss) (2) | (402.3) | (55.2) | 22.1 | 78.6 | (89.7) |
| **FINANCIAL POSITION** | | | | | |
| Current assets | $ 1,228.5 | $ 930.0 | $ 830.3 | $ 741.3 | $ 773.9 |
| Current liabilities | 387.6 | 255.5 | 247.3 | 236.1 | 1,092.9 |
| Properties and equipment, net | 645.3 | 656.6 | 622.2 | 590.3 | 601.7 |
| Total assets | 3,538.9 | 2,875.3 | 2,691.7 | 2,521.1 | 2,584.9 |
| Total debt not subject to compromise | 13.5 | 6.8 | 4.3 | 6.9 | 421.9 |
| Liabilities subject to compromise | 3,207.7 | 2,452.3 | 2,334.7 | 2,311.5 | -- |
| Shareholders' equity (deficit) | (621.8) | (163.8) | (222.2) | (141.7) | (71.3) |
| **CASH FLOW** | | | | | |
| Operating activities | $ 313.0 | $ 110.8 | $ 195.5 | $ 14.6 | $ (143.7) |
| Investing activities | (125.6) | (109.1) | (110.7) | (131.4) | (94.0) |
| Financing activities | (0.7) | (4.7) | (9.2) | 123.7 | 239.9 |
| Net cash flow | 201.2 | 25.6 | 91.7 | -- | (7.9) |

CC-BLG002926

| DATA PER COMMON SHARE (DILUTED) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Net income (loss) (2) | $ | (6.11) | $ | (0.84) | $ | 0.34 | $ | 1.20 | $ | (1.34) |
| Average common diluted shares outstanding (thousands) | | 65,800 | | 65,500 | | 65,500 | | 65,400 | | 66,800 |

| OTHER STATISTICS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Capital expenditures | $ | 62.9 | $ | 86.4 | $ | 91.1 | $ | 62.9 | $ | 64.8 |
| Common stock price range | | $2.51-14.95 | | $1.48-5.52 | | $0.99-3.75 | | $1.31-4.38 | | $1.94-14.94 |
| Common shareholders of record | | 10,275 | | 10,734 | | 11,187 | | 11,643 | | 12,240 |
| Number of employees | | 6,500 | | 6,300 | | 6,400 | | 6,400 | | 6,300 |

(1)  Certain prior-year amounts have been reclassified to conform to the 2004
     presentation.

(2)  Amounts in 2004 reflect the following adjustments: a $714.8 million pre-tax
     charge to increase Grace's recorded asbestos-related liability to the
     maximum amount permitted as a condition precedent under Grace's Plan of
     Reorganization (the "Plan"); a pre-tax credit for expected insurance
     recovery related to asbestos liabilities of $238.2 million; a $94.1 million
     pre-tax charge to increase the interest to which general unsecured
     creditors would be entitled under the Plan; a $151.7 million pre-tax credit
     for net income tax benefits related to the above items; and an $82 million
     tax liability on the expected taxable distributions from foreign
     subsidiaries to fund the Plan. Amounts in 2003 contain a provision for
     environmental remediation of $142.5 million and a provision for
     asbestos-related claims of $30.0 million. Amounts in 2002 contain a
     provision for environmental remediation of $70.7 million. Amounts for 2000
     also contain a provision for asbestos litigation, net of expected insurance
     recovery, of $208.0 million.

                                    F-39


MANAGEMENT'S DISCUSSION AND ANALYSIS OF RESULTS OF OPERATIONS AND FINANCIAL
CONDITION

--------------------------------------------------------------------------------
DESCRIPTION OF CORE BUSINESSES
--------------------------------------------------------------------------------

W. R. Grace & Co. and its subsidiaries are engaged in specialty chemicals and
specialty materials businesses on a worldwide basis through two business
segments: Davison Chemicals, which includes two main product groups - refining
technologies and specialty materials; and Performance Chemicals, which includes
three main product groups - specialty construction chemicals, building materials
and sealants and coatings. During the second quarter of 2004, Grace realigned
its Davison Chemicals product groups into "refining technologies" (which
includes catalysts and other products and services used by petroleum refiners)
and "specialty materials" (which includes specialty catalysts, silica-based
engineered materials, and products used for separations and life sciences
applications). All sales information for the Davison Chemicals segment has been
restated to reflect this realignment.

The table below shows the Grace business segments and product groups as a
percentage of total Grace sales.

| PERCENTAGE OF TOTAL GRACE SALES | 2004 | 2003 | 2002 |
|---|---|---|---|
| Refining technologies | 29.2% | 29.9% | 30.0% |
| Specialty materials | 23.6% | 22.6% | 21.6% |
| DAVISON CHEMICALS | 52.8% | 52.5% | 51.6% |
| Construction chemicals | 23.6% | 22.6% | 22.3% |
| Building materials | 11.3% | 11.7% | 12.6% |
| Sealants and coatings | 12.3% | 13.2% | 13.5% |
| PERFORMANCE CHEMICALS | 47.2% | 47.5% | 48.4% |
| TOTAL | 100.0% | 100.0% | 100.0% |

REFINING TECHNOLOGIES includes: fluid cracking catalysts and additives used in
petroleum refineries to convert distilled crude oil into transportation fuels
and other petroleum-based products, and hydroprocessing catalysts used to
upgrade heavy oils and remove certain impurities. Key external factors for
refining technologies products are the economics of the refining industry,
specifically the impacts of demand for transportation fuels and petrochemical
products, and crude oil supply.

SPECIALTY MATERIALS includes: silica-based engineered materials, which are used
in a wide range of industrial and consumer applications such as paper, wood and
coil coatings, food processing, plastics, adsorbents, and personal care

CC-BLG002927

products; separations and life sciences materials and products which are used
for biotechnology and pharmaceutical separations; and specialty catalysts, which
are used in a variety of chemical processes and are essential components in the
manufacture of polyethylene and polypropylene resins used in products such as
plastic film, high-performance plastic pipe and other plastic parts. Sales of
these products are affected most by general economic conditions, and
specifically by the underlying growth rate of targeted end-use applications.

CONSTRUCTION CHEMICALS AND BUILDING MATERIALS are used primarily by the
non-residential and residential construction industries. Construction chemicals
improve strength and aesthetics of finished concrete, control corrosion, and
enhance the handling and application of concrete, and reduce the manufacturing
cost and improve the quality of cement. Performance for this product group is
affected by non-residential construction activity and, to a lesser extent,
residential construction activity, which tend to lag the general economy in both
decline and recovery. Building materials prevent water damage to structures and
protect structural steel against collapse due to fire. The performance of this
product group also is affected by non-residential construction activity and by
residential construction and renovation activity, with greater lags than
construction chemicals, reflecting longer lead times for large projects. Since
building materials is largely a North American product group, it is most notably
affected by the level of U.S. construction activity.

SEALANTS AND COATINGS are used to seal beverage and food cans, and glass and
plastic bottles, and to protect metal packaging from corrosion and the contents
from the influences of metal. Although this product group is affected by general
economic conditions, there is an ongoing shift in demand from metal and glass to
plastic packaging for foods and beverages. This shift is causing a decline in
can sealant usage, but provides opportunities to use closure sealants and other
products for plastic packaging.

Set forth on the next page is a chart that lists key operating statistics, and
dollar and percentage changes for the years ended December 31, 2004, 2003, and
2002. The chart should be referenced when reading management's discussion and
analysis of the results of operations and financial condition.

F-40

| ANALYSIS OF CONSOLIDATED OPERATIONS (In millions) | 2004 | 2003 | $ Change Fav (Unfav) | % Change Fav (Unfav) | 2002 | $ Change Fav (Unfav) | % Change Fav (Unfav) |
|---|---|---|---|---|---|---|---|
| NET SALES: | | | | | | | |
| Davison Chemicals | $1,192.2 | $1,039.9 | $ 152.3 | 14.6% | $ 939.3 | $ 100.6 | 10.7% |
| Performance Chemicals | 1,067.7 | 940.6 | 127.1 | 13.5% | 880.4 | 60.2 | 6.8% |
| TOTAL GRACE SALES - CORE OPERATIONS | $2,259.9 | $1,980.5 | $ 279.4 | 14.1% | $1,819.7 | $ 160.8 | 8.8% |
| PRE-TAX OPERATING INCOME: (1) | | | | | | | |
| Davison Chemicals (2) | $ 148.2 | $ 118.9 | $ 29.3 | 24.6% | $ 129.4 | $ (10.5) | (8.1%) |
| Performance Chemicals | 131.8 | 107.9 | 23.9 | 22.2% | 98.8 | 9.1 | 9.2% |
| Corporate costs: | | | | | | | |
| Support functions | (33.4) | (30.2) | (3.2) | (10.6%) | (31.1) | 0.9 | 2.9% |
| Pension and other | (67.3) | (47.9) | (19.4) | (40.5%) | (16.3) | (31.6) | (193.9%) |
| Total Corporate costs | (100.7) | (78.1) | (22.6) | (28.9%) | (47.4) | (30.7) | (64.8%) |
| PRE-TAX INCOME FROM CORE OPERATIONS | 179.3 | 148.7 | 30.6 | 20.6% | 180.8 | (32.1) | (17.8%) |
| PRE-TAX INCOME (LOSS) FROM NONCORE ACTIVITIES | (457.1) | (190.1) | (267.0) | (140.5%) | (74.5) | (115.6) | NM |
| Interest expense | (111.1) | (15.6) | (95.5) | NM | (20.0) | 4.4 | 22.0% |
| Interest income | 3.1 | 4.3 | (1.2) | (27.9%) | 3.9 | 0.4 | 10.3% |
| INCOME (LOSS) BEFORE CHAPTER 11 EXPENSES AND INCOME TAXES | (385.8) | (52.7) | (333.1) | NM | 90.2 | (142.9) | NM |
| Chapter 11 expenses, net | (18.0) | (14.8) | (3.2) | (21.6%) | (30.1) | 15.3 | 50.8% |
| Benefit from (provision for) income taxes | 1.5 | 12.3 | (10.8) | (87.8%) | (38.0) | 50.3 | NM |
| NET INCOME (LOSS) | $ (402.3) | $ (55.2) | $(347.1) | NM | $ 22.1 | $ (77.3) | NM |
| KEY FINANCIAL MEASURES: | | | | | | | |
| PRE-TAX INCOME FROM CORE OPERATIONS AS A PERCENTAGE OF SALES: | | | | | | | |
| Davison Chemicals | 12.4% | 11.4% | NM | 1.0 pts | 13.8% | NM | (2.4) pts |
| Performance Chemicals | 12.3% | 11.5% | NM | 0.8 pts | 11.2% | NM | 0.3 pts |
| Total Core Operations | 7.9% | 7.5% | NM | 0.4 pts | 9.9% | NM | (2.4) pts |
| PRE-TAX INCOME FROM CORE OPERATIONS BEFORE DEPRECIATION AND AMORTIZATION | $ 288.1 | $ 251.6 | $ 36.5 | 14.5% | $ 275.7 | $ (24.1) | (8.7%) |
| AS A PERCENTAGE OF SALES | 12.7% | 12.7% | NM | -- | 15.2% | NM | (2.5) pts |
| NET CONSOLIDATED SALES BY REGION: | | | | | | | |
| North America | $ 979.0 | $ 883.2 | $ 95.8 | 10.8% | $ 883.2 | $ -- | --% |

CC-BLG002928

| | | | | | | |
|---|---|---|---|---|---|---|
| Europe ........................ | | | | | 116.0 | 20.7% |
| Asia Pacific ................... | 349.2 | 312.7 | 36.5 | 11.7% | 269.0 | 43.7 | 16.2% |
| Latin America ................. | 116.0 | 107.7 | 8.3 | 7.7% | 106.6 | 1.1 | 1.0% |
| TOTAL ......................... | $2,259.9 | $1,980.5 | $ 279.4 | 14.1% | $1,819.7 | $ 160.8 | 8.8% |

NM = Not meaningful

(1)  Pre-tax operating income for all periods presented reflects a
     reallocation of the cost of earned pension benefits of active
     participants from corporate to the respective business segments.

(2)  Davison Chemicals pre-tax operating income includes minority interest
     related to the Advanced Refining Technologies joint venture.

The above chart, as well as the financial information presented throughout this
discussion, divides Grace's financial results between "core operations" and
"noncore activities." Core operations comprise the financial results of Davison
Chemicals, Performance Chemicals, and the costs of corporate activities that
directly or indirectly support business operations. In contrast, noncore
activities comprise all other events and transactions not directly related to
the generation of operating revenue or the support of core operations and
generally relate to Grace's former operations and products.

Neither pre-tax income from core operations nor pre-tax income from core
operations before depreciation and amortization purport to represent income or
cash flow as defined under generally accepted accounting principles, and should
not be considered an alternative to such measures as an indicator of Grace's
performance. These measures are provided to distinguish operating results of
Grace's current business base from results and related assets and liabilities of
past businesses, discontinued products, and corporate legacies.

                              F-41

--------------------------------------------------------------------------------
GRACE OVERVIEW
--------------------------------------------------------------------------------

CRITICAL ACCOUNTING ESTIMATES - The preparation of financial statements in
conformity with U.S. generally accepted accounting principles requires that
management make estimates and assumptions affecting the assets and liabilities
reported at the date of the Consolidated Financial Statements, and the revenues
and expenses reported for the periods presented. Actual amounts could differ
from those estimates. Changes in estimates are recorded in the period
identified. Grace's accounting measurements that are most affected by
management's estimates of future events are:

o   Contingent liabilities such as asbestos-related matters (see Notes 2 and 3
    to the Consolidated Financial Statements), environmental remediation (see
    Note 14 to the Consolidated Financial Statements), income taxes (see Note
    14 to the Consolidated Financial Statements), and litigation related to
    retained obligations of divested businesses and discontinued operations.

o   Pension and postretirement liabilities that depend on assumptions regarding
    discount rates and/or total returns on invested funds. (See Note 18 to the
    Consolidated Financial Statements.)

o   Depreciation and amortization periods for long-lived assets, including
    property and equipment, intangible, and other assets.

o   Realization values of various assets such as net deferred tax assets (see
    Note 4 to the Consolidated Financial Statements), trade receivables,
    inventories, insurance receivables, and goodwill.

The accuracy of these and other estimates may also be materially affected by the
uncertainties arising under Grace's Chapter 11 proceeding.

SUMMARY FINANCIAL ANALYSIS - The following is a summary analysis of various
measures of Grace's performance over the past three years:

o   Grace's net income (loss) has been determined primarily by: (1) the
    performance of Grace's businesses, which employ a growth and productivity
    strategy to maximize business performance, and (2) the impact of legal
    contingencies and other non-core liabilities, primarily asbestos-related
    litigation and environmental remediation.

o   Sales have grown at rates in excess of the general U.S. and global economy
    as a result of (1) Grace's focus on high-growth end-use markets and
    geographies, (2) synergistic acquisitions that capitalize on established
    sales channels or market presence, (3) strong underlying base business
    demand, particularly in 2004, and (4) favorable currency translation from a
    weakening U.S. dollar.

o   Pre-tax income from core operations for 2004 for Grace overall was about
    even with 2002, after a dip in operating profitability in 2003. The dip in
    2003 was primarily attributable to higher pension expenses to account for

CC-BLG002929

the negative returns from equity markets in 2000-2002, and manufacturing
difficulties at Grace's largest U.S. plant. The higher pension expenses
continued in 2004, while manufacturing difficulties were resolved.

o   Pre-tax operating income for the Davison Chemicals segment fluctuated,
    primarily as a result of manufacturing difficulties in 2003, which
    contributed to the lower operating income for Grace overall. Also, the
    Davison Chemicals segment is regularly challenged by increasing costs of
    natural gas and certain other commodity-based raw materials.

o   Pre-tax operating income for the Performance Chemicals segment increased
    steadily as a result of both growth and cost containment initiatives.
    Product mix shifted to non-U.S. markets as a result of (1) targeted
    acquisitions, particularly in Europe, and (2) the leveraging of existing
    products through new and existing sales channels.

Grace is attempting to resolve noncore liabilities and contingencies through a
voluntary bankruptcy proceeding. The noncore liabilities include
asbestos-related litigation, environmental remediation, tax disputes and
business litigation. Grace's operating statements include periodic adjustments
to account for changes in estimates of such liabilities and developments in its
Chapter 11 proceeding, which have resulted in significant fluctuations in net
income over the three-year period. These liabilities and contingencies may
result in continued volatility in net income in the future.

                          F-42


NET SALES - The following table identifies the year-over-year increase or
decrease in sales attributable to changes in product volume, product price
and/or mix, and the impact of foreign currency translation.

| NET SALES VARIANCE ANALYSIS | 2004 AS A PERCENTAGE INCREASE (DECREASE) FROM 2003 | | | |
|---|---|---|---|---|
| | VOLUME | PRICE/MIX | CURRENCY TRANSLATION | TOTAL |
| Davison Chemicals... | 4.8% | 6.0% | 3.8% | 14.6% |
| Performance Chemicals ........ | 10.7% | (1.0%) | 3.8% | 13.5% |
| Net sales........... | 7.6% | 2.7% | 3.8% | 14.1% |
| BY REGION: | | | | |
| North America.... | 6.9% | 3.6% | 0.3% | 10.8% |
| Europe........... | 8.9% | 2.2% | 9.4% | 20.5% |
| Latin America.... | 7.1% | 0.4% | 0.2% | 7.7% |
| Asia Pacific..... | 7.0% | 2.0% | 2.7% | 11.7% |

| | 2003 AS A PERCENTAGE INCREASE (DECREASE) FROM 2002 | | | |
|---|---|---|---|---|
| Davison Chemicals... | 1.7% | 2.8% | 6.2% | 10.7% |
| Performance Chemicals......... | 2.4% | 0.1% | 4.3% | 6.8% |
| Net sales........... | 2.0% | 1.5% | 5.3% | 8.8% |
| BY REGION: | | | | |
| North America.... | (2.1%) | 1.7% | 0.4% | --% |
| Europe........... | 5.7% | (1.4%) | 16.4% | 20.7% |
| Latin America.... | (1.0%) | 9.6% | (7.6%) | 1.0% |
| Asia Pacific..... | 14.4% | (1.4%) | 3.2% | 16.2% |

Grace's sales for the year ended December 31, 2004 were favorably impacted by
higher volume (including acquisitions), product mix, price increases, and
favorable currency translation from a weaker U.S. dollar. Foreign currency
translation contributed $75.1 million or 3.8 percentage points of the sales
growth, mainly due to the strengthening of the Euro against the U.S. dollar.
Acquisitions contributed $45.0 million or 2.3 percentage points of the sales
growth.

Grace's 2003 sales were favorably impacted by currency translation, improved
volume, product mix and revenue from acquisitions in specialty materials and
construction chemicals. Acquisitions contributed $27.1 million or 1.5 percentage
points of the sales volume growth. The impact from foreign currency translation
occurred primarily from European sales, reflecting the strengthening of the Euro
against the U.S. dollar.

Reported net sales from Grace's non-U.S. operations were positively impacted by
foreign currency translation in 2004 and 2003. For countries in which Grace
operates, weighted average foreign currency exchange rates appreciated, relative
to the U.S. dollar, by approximately 5.7% and 8.9%, in 2004 and 2003,

CC-BLG002930

respectively.

PRE-TAX INCOME FROM CORE OPERATIONS - Pre-tax operating income increased in 2004 primarily as a result of strong sales growth across all product lines, productivity gains and correction of prior-year difficulties in manufacturing processes in the Davison Chemicals segment, which more than offset higher costs for pensions, certain raw materials, and energy.

The decline in 2003 operating profit and margins was principally caused by higher costs for pensions, natural gas, and certain raw materials. Manufacturing difficulties at Davison Chemicals' largest U.S. production site and a change in regional and product sales mix from North America to other regions, particularly in the first half of 2003, also contributed to the decrease.

Corporate costs include corporate functional costs (such as financial and legal services, human resources, communications and information technology), the cost of corporate governance (including directors and officers ("D&O") liability insurance) and pension costs related to both corporate employees and to the effects of changes in assets and liabilities for all Grace pension plans. Corporate costs for the year ended December 31, 2004 increased over 2003 primarily due to performance-based compensation and added professional fees in preparation for the review and audit of accounting controls under the Sarbanes-Oxley Act of 2002.

The increase in corporate costs from 2003 to 2002 was primarily due to: (1) added costs for pension benefits to account for the negative equity market returns in 2000-2002 that have impacted the funded status of defined benefit pension plans; and (2) higher D&O liability insurance premiums.

During the 2002-2004 period, Grace continued to focus on productivity improvements to partially offset adverse market and cost factors. The results of its productivity initiatives are reflected in: (1) sales - through added plant capacity resulting from improved production processes; (2) costs - through efficiency gains and purchasing synergies; and (3) capital avoidance - by maximizing asset utilization.

Grace values its U.S. inventories under the last-in/first-out method ("LIFO"), and its non-U.S. inventories under the first-in/first-out ("FIFO") method. LIFO was selected in 1974 for U.S. financial reporting and tax purposes because it generally results in a better matching of current revenue with current costs. Grace cannot elect LIFO for its non-U.S. inventories due to statutory restrictions. However, if Grace valued its U.S. inventories using the FIFO method, consistent with non-U.S. subsidiaries, pre-tax income from core operations would have been approximately 6.0%, 4.0%, and 3.0% higher for each of the years ended December 31, 2004, 2003, and 2002, respectively.

F-43

PRE-TAX INCOME (LOSS) FROM NONCORE ACTIVITIES - Pre-tax income (loss) from noncore activities reflects items not directly related to Grace's core operating units. This category of costs and income is expected to be volatile as potentially material items are addressed through Grace's Chapter 11 proceedings and/or as the financial implications of Grace's legal contingencies become better understood.

| (In millions) | 2004 | 2003 | 2002 |
|---|---|---|---|
| Environmental provision - vermiculite | $ (20.0) | $(122.5) | $(68.0) |
| Environmental provision - all other sites | (1.6) | (20.0) | (2.7) |
| Provision for asbestos-related litigation, net | (476.6) | (30.0) | -- |
| Asbestos administration and insurance recovery, net | 10.4 | -- | -- |
| COLI income, net | 3.0 | 5.6 | 4.7 |
| D&O insurance cost | (6.8) | (6.8) | (3.4) |
| Pension and postretirement benefit costs | (9.6) | (9.0) | (6.2) |
| Translation effects - intercompany loan | 29.3 | -- | -- |
| Value of currency hedges | (39.5) | -- | -- |
| Foreign currency transaction effects | (1.4) | (4.2) | (1.1) |
| Net gain from litigation settlement | 51.2 | -- | -- |
| Other | 4.5 | (3.2) | 2.2 |
| | $(457.1) | $(190.1) | $(74.5) |

The unique items recorded for the year ended December 31, 2004 were: (1) the foreign currency effect of an intercompany loan as described below, (2) a pre-tax charge of $20 million for a change in Grace's estimate of the costs necessary to address environmental remediation obligations in Libby, Montana, (3) the net gain from the settlement of litigation described below, and (4) a pre-tax charge of $714.8 million ($476.6 million net of estimated insurance proceeds) to increase Grace's recorded asbestos-related liability. (See Note 2 to the Consolidated Financial Statements for more information.)

In March 2004, Grace began accounting for currency fluctuations on a Euro 293 million intercompany loan between Grace's subsidiaries in the United States and

CC-BLG002931

Germany as a component of operating results instead of a component of other comprehensive income. The change was prompted by new tax laws in Germany and Grace's cash flow planning for its Chapter 11 reorganization, which indicated that it is no longer reasonable to consider this loan as part of the permanent capital structure in Germany. In May 2004, Grace entered into a series of foreign currency hedge agreements to mitigate future currency fluctuations on the remaining loan balance. These hedge agreements have varying rates that coincide with loan repayments due periodically through June 2005. In 2004, Euro 92 million of loan principal was repaid. For the year ended December 31, 2004, a $39.5 million hedge loss was recognized, offset by a $29.3 million foreign currency gain, and was reported in other (income) expense. These hedges are considered derivative instruments that are viewed as risk management tools by Grace and are not used for trading or speculative purposes.

In September 2004, Grace entered into an agreement with Honeywell International, Inc. settling litigation relating to environmental contamination of a non-operating parcel of Grace-owned land. Under the terms of the agreement, Grace received $62.5 million and recognized a net gain of $51.2 million.

The 2003 pre-tax loss from noncore activities was attributable primarily to pre-tax charges to adjust Grace's estimated liabilities for pre-Chapter 11 contingencies. Grace increased its estimated liability for environmental clean-up related to previously operated vermiculite mining and processing sites by $122.5 million to a total of $181.0 million at December 31, 2003. Grace also recorded a $20.0 million increase in its estimated liability for non-vermiculite related environmental risks identified and measured as part of the Chapter 11 claims review process. In addition, Grace recorded a $30.0 million increase in its estimated liability for asbestos-related litigation to account for the estimated cost of resolving new asbestos-related property damage claims received through the Chapter 11 claims solicitation process.

Expense from noncore activities for 2002 included $70.7 million for Grace's defense and other probable costs to resolve pending environmental litigation, primarily relating to former vermiculite mining operations in Libby, Montana.

CHAPTER 11 EXPENSES - Although it is difficult to measure precisely how Chapter 11 has impacted Grace's overall financial performance, there are certain added costs that are directly attributable to operating under the Bankruptcy Code. Net Chapter 11 expenses consist primarily of legal, financial and consulting fees incurred by Grace and the official committees/representatives in Grace's bankruptcy proceeding. The increase in Chapter 11 expenses in 2004 compared with 2003 was due to the requirement to file a proposed plan of reorganization. The decrease of Chapter 11 expenses in 2003 from 2002 is related to reduced advisory activity. Grace believes that Chapter 11 expenses will range between $2 million and $7 million per quarter for the foreseeable future. In addition, for 2004, 2003 and 2002, Grace's pre-tax income from core operations included expenses of $12.3 million, $9.0 million, and $7.4 million, respectively, for Chapter 11-related compensation charges.

F-44

There are numerous other indirect costs to manage Grace's Chapter 11 proceedings such as: management time devoted to Chapter 11 matters; added cost of debt capital; added costs of general business insurance, including D&O liability insurance premiums; and lost business and acquisition opportunities due to the complexities of operating under Chapter 11.

INTEREST EXPENSE - In the fourth quarter of 2004, Grace accrued $94.1 million of interest, which increases Grace's estimate of interest to which general unsecured creditors would be entitled under the Plan to $155.3 million as of December 31, 2004. The Plan states that each holder of an allowed general unsecured claim shall be paid in full, plus post-petition interest. Post-petition interest shall accrue through the date of payment and shall be (i) for the holders of the Debtors' pre-petition bank credit facilities, at a rate of 6.09% per annum, compounded quarterly, (ii) for the holders of claims who, but for the Filing of the Chapter 11 Cases would be entitled under a contract or otherwise to accrue or be paid interest on such claim in a non-default (or non-overdue payment) situation under applicable non-bankruptcy law, the rate provided in the contract between a Debtor(s) and the claimant or such rate as may otherwise apply under applicable non-bankruptcy law, or (iii) for all other holders of allowed general unsecured claims, at a rate of 4.19% per annum, compounded annually. Under the Plan, such interest, which is payable 85% in cash and 15% in Grace common stock, will not be paid until the Plan is confirmed and funded.

The decrease in net interest expense in 2003 compared with 2002 was primarily attributable to a lower contractual interest rate on pre-petition debt subject to compromise. The payment of interest accrued on pre-petition debt is subject to the outcome of Grace's Chapter 11 proceedings.

INCOME TAXES - Grace's benefit from (provision for) income taxes at the federal corporate rate of 35% for the years ended December 31, 2004, 2003 and 2002 was $141.3 million, $23.6 million, and $(21.0) million, respectively. Grace's recorded tax benefit of $1.5 million for 2004 reflects a reduction from the statutory tax benefit for (1) an accrual of tax on undistributed earnings of non-U.S. subsidiaries, and (2) a net increase in the valuation allowance on the realization of overall net tax assets. In 2003 and 2002, the primary differences between the income tax liability at the federal corporate rate of 35% and the recorded income tax liability were the current period interest on tax

CC-BLG002932

contingencies and the non-deductibility of certain Chapter 11 expenses.

As part of Grace's evaluation and planning for the funding requirements of the Plan, Grace concluded in the fourth quarter of 2004 that the financing of the Plan will likely involve cash and financing from non-U.S. subsidiaries. Grace anticipates that approximately $500 million will be sourced in this manner. Approximately $267 million can be repatriated by way of intercompany debt repayments and the remaining $233 million by way of taxable dividends. Accordingly, in the fourth quarter of 2004, Grace recorded a tax liability of $82 million to recognize the expected taxable elements of financing its plan of reorganization. Grace has not provided for U.S. federal, state, local and foreign deferred income taxes on approximately $248 million of undistributed earnings of foreign subsidiaries that are expected to be retained indefinitely by such subsidiaries for reinvestment.

Also in the fourth quarter of 2004, Grace recorded an increase in deductible asbestos-related liability and interest expenses under the Plan. Such net deductions exceeded Grace's analysis of the federal tax assets that can be realized under reasonable scenarios of future taxable income by approximately $48 million (exclusive of the tax effects under the litigation settlements with Sealed Air and Fresenius). Such analysis included scenarios of future taxable income under various operating income growth rates, tax planning options, and asset sales. Although several scenarios supported full recovery of recorded tax assets, other ones indicated that a partial impairment may exist. Accordingly, Grace's 2004 tax provision reflects an addition to its federal deferred tax valuation allowance of $48.0 million to recognize the added impairment risk.

In addition, because of the additional fourth quarter deductions for asbestos and interest, Grace increased its valuation allowance for deferred state tax assets by $14.4 million and reduced its valuation allowance by $3.0 million relating primarily to foreign tax credit carryforwards that expired unused.

This additional valuation allowance brings Grace's total valuation allowance to $227.7 million on net tax assets of $846.1 million. The total valuation allowance covers (1) state tax deductions with a tax value of approximately $140.5 million, which are not expected to be realized in reduced taxes due to income projections and timing limitations, (2) foreign loss carryforwards with a tax value of $17.8 million, which are not expected to be usable during the relevant carryforward periods, and (3) net federal deferred tax assets, including currently available net operating loss carryforwards, with a tax value of $69.4 million, which do not meet Grace's test for realization. The net recorded deferred tax asset of $618.4 million is considered to be realizable over time. A large proportion of such balance (primarily associated with asbestos- and environmental- related liabilities) is not yet

F-45

time-limited as it pertains to liabilities not yet funded. The recovery of such net tax assets could be materially affected by developments in Grace's Chapter 11 proceeding.

On October 22, 2004, President Bush signed the American Jobs Creation Act of 2004 (the "Jobs Act") into law. While Grace and its advisors are currently analyzing the many revisions to the tax laws enacted by the Jobs Act, Grace has focused primarily at this time on the potential impacts of the domestic manufacturing deductions and the foreign repatriation incentives. With respect to manufacturing, commencing in 2005, the Jobs Act phases in over a five-year period an annual manufacturing deduction of up to 9% on the lesser of a taxpayer's income from domestic manufacturing activities or taxable income. Given Grace's current U.S. net operating loss carryforward position, Grace will not be entitled to the special deduction. Therefore, Grace's 2004 effective tax rate does not reflect any benefit for the special deduction.

With respect to foreign repatriation incentives, the Jobs Act provides an 85% dividends received deduction with respect to certain dividends received from a U.S. corporation's foreign subsidiaries. The dividends must be used to fund certain permitted domestic activities, as specified in the Jobs Act. These domestic activities include the building or improvement of infrastructure, research and development, and the financial stabilization of the corporation. As Grace currently understands the repatriation provision, companies in a net operating loss carryforward position would not be eligible to utilize foreign tax credits to offset U.S. taxes on foreign dividends eligible for benefits under the Jobs Act. Such dividends would be subject to cash taxes equal to approximately 5.25% of the dividend distributions. Therefore, Grace does not expect to elect the application of the Jobs Act to foreign dividend distributions. Instead, if Grace is unable to utilize foreign tax credits to offset the U.S. tax on these dividends, it will likely opt to utilize NOLs to offset the full 35% U.S. income tax. Grace will continue to monitor IRS pronouncements with respect to the Jobs Act and will reconsider its current position if the law is either clarified or amended to permit use of its foreign tax credits to offset the U.S. tax on qualifying dividend income. Grace is closely tracking this new law and, pending further guidance from the government on a number of technical provisions in the law, will consider repatriating certain of its foreign earnings in 2005. The dividend-received deduction is available to taxpayers for only a limited period of time, expiring after year-end 2005.

CC-BLG002933

BUSINESS SEGMENT OVERVIEW
--------------------------------------------------------------------------------

DAVISON CHEMICALS

================================================================================

| NET SALES BY PRODUCT LINE (In millions) | 2004 | 2003 | 2002 |
|---|---|---|---|
| Refining technologies ......................... | $ 660.1 | $ 591.5 | $546.7 |
| Specialty materials ........................... | 532.1 | 448.4 | 392.6 |
| TOTAL DAVISON CHEMICALS ....................... | $1,192.2 | $1,039.9 | $939.3 |

================================================================================

| PERCENTAGE CHANGE IN NET SALES BY PRODUCT LINE | 2004 vs. 2003 | 2003 vs. 2002 | 2002 vs. 2001 |
|---|---|---|---|
| Refining technologies ......................... | 11.6% | 8.2% | 8.5% |
| Specialty materials ........................... | 18.7% | 14.2% | 7.7% |
| TOTAL DAVISON CHEMICALS ....................... | 14.6% | 10.7% | 8.2% |

================================================================================

| NET SALES BY REGION (In millions) | 2004 | 2003 | 2002 |
|---|---|---|---|
| North America ................................. | $ 453.9 | $ 395.2 | $388.1 |
| Europe ........................................ | 498.1 | 418.3 | 354.2 |
| Asia Pacific .................................. | 194.1 | 177.7 | 146.7 |
| Latin America ................................. | 46.1 | 48.7 | 50.3 |
| TOTAL DAVISON CHEMICALS ....................... | $1,192.2 | $1,039.9 | $939.3 |

================================================================================

| PERCENTAGE CHANGE IN NET SALES BY REGION | 2004 vs. 2003 | 2003 vs. 2002 | 2002 vs. 2001 |
|---|---|---|---|
| North America ................................. | 14.9% | 1.8% | 7.1% |
| Europe ........................................ | 19.1% | 18.1% | 16.6% |
| Asia Pacific .................................. | 9.2% | 21.1% | (2.1%) |
| Latin America ................................. | (5.3%) | (3.2%) | (3.8%) |
| TOTAL DAVISON CHEMICALS ....................... | 14.6% | 10.7% | 8.2% |

================================================================================

Recent Acquisitions

See Note 5 to the Consolidated Financial Statements for a description of
acquisitions completed in 2004 and 2003.

Sales

Sales of the Davison Chemicals segment are affected mainly by global demand for
transportation fuels, petrochemical products, and general industrial and
consumer goods. The factors affecting demand were generally weak in 2002 and the
first half of 2003, with a change to relatively strong demand growth starting in
the second half of 2003 and throughout 2004. As a result, Davison Chemicals
sales growth accelerated in 2003 and 2004. Sales from four completed
acquisitions and favorable currency translation also contributed to increases in
sales over this three-year period. Sales of products to the refining industry
were in line with the

demand pattern over this three-year period, with 2004 sales reflecting the high
utilization rates of petroleum refiners worldwide. Greater use of
higher-performance products, such as hydroprocessing catalysts for the treatment
of lower grade feedstocks and additives that improve emissions, also favorably
impacted Davison Chemicals' sales. Sales from acquisitions accounted for $22.6
million, or 2.2 percentage points of the sales growth in 2004 and $20.9 million,
or 2.2 percentage points of 2003 sales growth. Sales increases also reflected
favorable foreign currency translation (3.8 percentage points in 2004 and 6.2
percentage points in 2003). Sales increases of specialty materials products
reflected higher volumes of polyolefin catalysts and silica products used in
coatings, separations, and consumer applications, and favorable foreign currency
translation. Stronger economic activity in the United States and Europe were the
primary market factors driving the increase.

Sales in North America, Europe and Asia Pacific were up over this three-year
period due to increased volume and favorable foreign currency translation. In
North America, increased sales were primarily attributable to volume growth in
both refining technologies and specialty materials, as well as favorable product
mix factors, reflecting stronger economic activity in the United States.
European sales were higher due to the effects of favorable currency translation
and growth in refining technologies and specialty materials products. Sales in

CC-BLG002934

Asia Pacific were up primarily from volume growth in specialty materials and favorable product mix factors in refining technologies, as well as the effects of favorable currency translation. Sales in Latin America decreased due to a decline in demand, primarily within refining technologies, offset by favorable currency translation.

Operating Income

Pre-tax operating income for the Davison Chemicals segment was up from 2003, primarily from higher sales in North America and Europe, as well as foreign currency translation effects on Euro-based sales. The operating margin increase over the prior-year period was attributable to favorable product mix and positive results from productivity initiatives, partially offset by higher raw material and energy costs.

The decline in pre-tax operating income in 2003 compared with 2002 reflected a sluggish U.S. economy and higher energy, raw materials, and other manufacturing costs. Manufacturing costs were higher in the first half of 2003 due to maintenance and production problems at Grace's largest U.S. manufacturing facility. Second half comparisons improved as the U.S. economy strengthened, and manufacturing costs and operating expenses were reduced.

PERFORMANCE CHEMICALS

| NET SALES BY PRODUCT LINE (In millions) | 2004 | 2003 | 2002 |
|---|---|---|---|
| Construction chemicals | $ 533.0 | $448.1 | $405.4 |
| Building materials | 255.6 | 231.0 | 230.2 |
| Sealants and coatings | 279.1 | 261.5 | 244.8 |
| TOTAL PERFORMANCE CHEMICALS | $1,067.7 | $940.6 | $880.4 |

| PERCENTAGE CHANGE IN NET SALES BY PRODUCT LINE | 2004 VS. 2003 | 2003 VS. 2002 | 2002 VS. 2001 |
|---|---|---|---|
| Construction chemicals | 18.9% | 10.5% | 8.5% |
| Building materials | 10.6% | 0.3% | (3.7%) |
| Sealants and coatings | 6.7% | 6.8% | 1.2% |
| TOTAL PERFORMANCE CHEMICALS | 13.5% | 6.8% | 3.0% |

| NET SALES BY REGION (In millions) | 2004 | 2003 | 2002 |
|---|---|---|---|
| North America | $ 525.1 | $488.0 | $495.1 |
| Europe | 317.6 | 258.6 | 206.7 |
| Asia Pacific | 155.1 | 135.0 | 122.3 |
| Latin America | 69.9 | 59.0 | 56.3 |
| TOTAL PERFORMANCE CHEMICALS | $1,067.7 | $940.6 | $880.4 |

| PERCENTAGE CHANGE IN NET SALES BY REGION | 2004 VS. 2003 | 2003 VS. 2002 | 2002 VS. 2001 |
|---|---|---|---|
| North America | 7.6% | (1.4%) | (2.5%) |
| Europe | 22.8% | 25.1% | 17.7% |
| Asia Pacific | 14.9% | 10.4% | 4.7% |
| Latin America | 18.5% | 4.8% | 3.3% |
| TOTAL PERFORMANCE CHEMICALS | 13.5% | 6.8% | 3.0% |

Recent Acquisition

See Note 5 to the Consolidated Financial Statements for a description of acquisitions completed in 2004 and 2003.

Sales

The increases in sales for the Performance Chemicals segment in 2004 compared with 2003, and in 2003 compared with 2002, were primarily attributable to volume increases from successful growth programs, favorable foreign currency translation and acquisitions. In 2003, these factors were partially offset by declines in U.S. construction activity and the effect of new building codes on sales of fire protection products. In 2004, U.S. construction activity was basically level with 2003, and fireproofing code changes did not have a material impact on the comparison. Foreign currency translation accounted for 3.8 percentage points and 4.3 percentage

CC-BLG002935

points of the 2004 and 2003 sales growth, respectively. Sales from acquisitions accounted for $22.4 million, or 2.3 percentage points, of the sales growth in 2004 and $6.2 million, or 0.7 percentage points, of 2003 sales growth.

The sales increase in construction chemicals in 2004 compared with 2003 primarily reflected successful customer and new product programs and the acquisitions of Tricosal Beton-Chemie (October 2003) and Pieri NV (August 2004), as well as favorable foreign currency translation. The increase in 2003 compared with 2002 also reflected growth programs, the Tricosal Beton-Chemie acquisition and favorable foreign currency translation, partially offset by declines in U.S. construction activity.

The building materials sales increase in 2004 versus 2003 was primarily due to strong sales of specialty waterproofing products and favorable foreign currency translation. The flat sales performance from 2002 to 2003 reflected the above factors, offset by declines in U.S. construction activity and the negative impact of new building codes that permit less fire protection materials for structural steel used in commercial buildings.

The increases in sales for sealants and coatings in 2004 compared with 2003 and in 2003 compared with 2002 reflected favorable foreign currency translation as well as growth initiatives in specialty coatings and closure compounds.

The North America sales increase from 2003 to 2004 reflected successful growth programs in construction chemicals and specialty waterproofing; the decline from 2002 to 2003 reflected these favorable factors, more than offset by declines in U.S. construction activity and building code changes affecting sales of fire protection products. The increases in Europe in 2004 versus 2003 and in 2003 versus 2002 mainly reflected favorable foreign currency translation and the acquisitions of Tricosal Beton-Chemie and Pieri NV, as well as volume growth in construction chemicals from key customer and new product programs. Asia Pacific increases in both periods reflected volume increases in all product groups as well as favorable foreign currency translation. Increases in Latin America in both periods were attributable to volume increases in construction chemicals and sealants and coatings.

Operating Income

Increases in operating income for the Performance Chemicals segment in 2004 compared with 2003 and in 2003 compared with 2002 were driven by sales increases, successful productivity and cost containment programs, and favorable foreign exchange translation, partially offset by raw material and energy cost increases.

OPERATING RETURNS ON ASSETS EMPLOYED - The following charts set forth the Davison Chemicals and Performance Chemicals total asset position and pre-tax return on average total assets for 2004, 2003, and 2002. It should be noted that the manufacture of Davison Chemicals products generally require significantly higher capital costs than the manufacture of Performance Chemical products.

| DAVISON CHEMICALS (In millions) | 2004 | 2003 | 2002 |
|---|---|---|---|
| Trade receivables | $172.0 | $144.2 | $136.8 |
| Inventory | 151.8 | 133.6 | 111.0 |
| Other current assets | 4.9 | 4.2 | 3.8 |
| Total current assets | 328.7 | 282.0 | 251.6 |
| Properties and equipment, Net | 437.6 | 444.0 | 413.9 |
| Goodwill and other intangible assets | 105.7 | 65.8 | 64.2 |
| Other assets | 18.9 | 5.3 | 4.4 |
| Total assets | $890.9 | $797.1 | $734.1 |
| Pre-tax return on average total assets | 17.8% | 15.4% | 17.5% |

Davison Chemicals' total assets increased by $93.7 million compared with the prior year, of which $35.2 million was attributable to currency translation, reflecting the weaker U.S. dollar. The remainder of such increase was primarily due to the Alltech and Grom acquisitions, completed during the third quarter, and increased accounts receivable and inventory. The increase in accounts receivable was primarily due to year-over-year sales growth. Inventory quantities were higher to meet increased demand. Properties and equipment decreased due to depreciation expense and lower capital expenditures as compared with the prior year period, when a major plant expansion was completed. The pre-tax return on average total assets increased by 2.4 percentage points, due to a 24.6% increase in pre-tax operating income.

CC-BLG002936

PERFORMANCE CHEMICALS
(In millions)

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Trade receivables ................................ | $219.1 | $186.8 | $164.3 |
| Inventory ........................................ | 96.5 | 80.9 | 62.6 |
| Other current assets ............................. | 14.5 | 15.3 | 13.7 |
| Total current assets ............................. | 330.1 | 283.0 | 240.6 |
| Properties and equipment, net .................... | 198.3 | 203.2 | 193.4 |
| Goodwill and other intangible assets ............. | 102.2 | 84.5 | 64.3 |
| Other assets ..................................... | 43.9 | 38.5 | 30.4 |
| Total assets ..................................... | $674.5 | $609.2 | $528.7 |
| Pre-tax return on average total assets ........... | 20.7% | 18.8% | 18.6% |

Performance Chemicals' total assets increased by $65.3 million compared with the prior year, of which $28.0 million was attributable to currency translation reflecting the weaker U.S dollar. The remainder of such increase was due to a fourth quarter acquisition as well as higher receivables and inventory, offset by a decline in properties and equipment. The increase in receivables was due to overall sales growth and inventory was higher to meet increased demand. The decline in properties and equipment was due to depreciation expense exceeding capital expenditures during the year. The pre-tax return on average total assets increased by 1.9 percentage points, due to a 22.2% increase in pre-tax operating income.

---

VOLUNTARY BANKRUPTCY FILING
--------------------------------------------------------------------------

As described under "Voluntary Bankruptcy Filing" in Notes 1 and 2 to the Consolidated Financial Statements, the Company and its principal U.S. operating subsidiary are debtors-in-possession under Chapter 11 of the Bankruptcy Code. Grace's non-U.S. subsidiaries, although not part of the Filing, are owned directly or indirectly by the Company's principal operating subsidiary or other filing entities. Consequently, it is likely that a Chapter 11 reorganization plan will involve the combined value of Grace's global businesses and its other assets to fund (with cash and/or securities) Grace's obligations as adjudicated through the bankruptcy process. Grace has analyzed its cash flow and capital needs to continue to fund its businesses and believes that, while in Chapter 11, sufficient cash flow and credit facilities are available to support its business strategy.

Grace has a number of financial exposures originating from past businesses, products and events. These obligations arose from transactions and/or business practices that date back to when Grace was a much larger company, when it produced products or operated businesses that are no longer part of its revenue base, and when government regulations and scientific knowledge were much less advanced than today.

The following table summarizes net noncore liabilities at December 31, 2004 and 2003:

NET NONCORE LIABILITIES

| | DECEMBER 31, | |
|---|---|---|
| (In millions) | 2004 | 2003 |
| Asbestos-related liabilities ......................... | $(1,700.0) | $ (992.3) |
| Asbestos-related insurance receivable ............................... | 500.0 | 269.4 |
| Asbestos-related liability, net ...................... | (1,200.0) | (722.9) |
| Environmental remediation ............................ | (345.0) | (332.4) |
| Postretirement benefits ............................. | (118.9) | (134.3) |
| Retained obligations and other ...................... | (25.1) | (27.0) |
| Income taxes ........................................ | (210.4) | (247.9) |
| NET NONCORE LIABILITY ................................ | $(1,899.4) | $(1,464.5) |

The resolution of most of these noncore recorded and contingent liabilities will be determined through the Chapter 11 proceedings. Grace cannot predict with any certainty how, and for what amounts, any of these contingencies will be resolved. The amounts of these liabilities as ultimately determined through the Chapter 11 proceedings could be materially different from amounts recorded by Grace at December 31, 2004.

PLAN OF REORGANIZATION - On November 13, 2004 Grace filed a plan of reorganization, as well as several associated documents, including a disclosure statement, with the Bankruptcy Court. On January 13, 2005, Grace filed an amended plan of reorganization (the "Plan") and related documents to address certain objections of creditors and other interested parties. The amended Plan is supported by committees representing general unsecured creditors and equity holders, but is not supported by committees representing asbestos personal injury claimants and asbestos property damage claimants.

CC-BLG002937

Under the terms of the Plan, a trust would be established under Section 524(g) of the Bankruptcy Code to which all pending and future asbestos-related claims would be channeled for resolution. Grace has requested that the Bankruptcy Court conduct an estimation hearing to determine the amount that would need to be paid into the trust on the effective date of the Plan to satisfy the estimated liability for each class of asbestos claimants and trust administration costs and expenses over time. The Plan provides that Grace's asbestos-related liabilities would be satisfied using cash and securities from Grace and third parties.

The Plan will become effective only after a vote of eligible creditors and with the approval of the Bankruptcy Court and the U.S. District Court for the District of Delaware. Votes on the Plan may not be solicited until the Bankruptcy Court approves the

F-49

disclosure statement. The Debtors have received extensions of their exclusive right to propose a plan of reorganization through May 24, 2005, and extensions of the Debtors' exclusive right to solicit acceptances of a plan of reorganization through July 24, 2005.

Under the terms of the Plan, Grace would satisfy claims under the Chapter 11 cases as follows:

Asbestos-Related Claims and Costs
----------------------------------

A trust would be established under Section 524(g) of the Bankruptcy Code to which all pending and future asbestos-related claims would be channeled for resolution. The trust would utilize specified trust distribution procedures to satisfy the following allowed asbestos-related claims and costs:

1.  Personal injury claims that meet specified exposure and medical criteria (Personal Injury-Symptomatic Eligible or "PI-SE" Claims) - In order to qualify for this class, claimants would have to prove that their health is impaired from meaningful exposure to asbestos-containing products formerly manufactured by Grace.

2.  Personal injury claims that do not meet the exposure and medical criteria necessary to qualify as PI-SE Claims (Personal Injury-Asymptomatic and Other or "PI-AO" Claims) - This class would contain all other asbestos-related personal injury claims against Grace that are not PI-SE Claims but meet specified exposure and medical criteria.

3.  Property damage claims, including claims related to ZAI ("PD Claims") - In order to qualify for this class, claimants would have to prove Grace liability for loss of property value or remediation costs related to asbestos-containing products formerly manufactured by Grace.

4.  Trust administration costs and legal expenses.

The pending asbestos-related legal proceedings are described in "Asbestos-Related Litigation" (see Note 3). The claims arising from such proceedings would be subject to this classification process as part of the Plan.

Grace has requested that the Bankruptcy Court conduct asbestos claim estimation hearings to determine the amounts that would need to be paid into the trust on the effective date of the Plan to satisfy the estimated liability for each class of asbestos claimants and trust administration costs and expenses over time. The amounts to fund PI-SE Claims, PD Claims and expense of trust administration would be capped at the amount determined through the estimation hearing. Amounts required to fund PI-AO Claims would not be capped.

Asbestos personal injury claimants would have the option either to litigate their claims against the trust in federal court in Delaware or, if they meet specified eligibility criteria, accept a settlement amount based on the severity of their condition. Asbestos property damage claimants would be required to litigate their claims against the trust in federal court in Delaware. The Plan provides that, as a condition precedent to confirmation, the maximum aggregate payment for all asbestos-related liabilities (PI-SE, PI-AO and PD including ZAI) and trust administrative costs and expenses cannot exceed $1,613 million, which Grace believes would fund over $2 billion in claims, costs and expenses over time.

The PI-SE Claims, the PD Claims and the related trust administration costs and expenses would be funded with (1) $512.5 million in cash (plus interest at 5.5% compounded annually from December 21, 2002) and nine million shares of common stock of Sealed Air Corporation ("Sealed Air") pursuant to the terms of a settlement agreement resolving asbestos-related and fraudulent transfer claims against Sealed Air, and (2) Grace common stock. The amount of Grace common stock required to satisfy these claims will vary depending on the liability measures approved by the Bankruptcy Court and the value of the Sealed Air settlement, which varies daily with the accrual of interest and the trading value of Sealed Air stock. The Sealed Air settlement agreement remains subject to Bankruptcy Court approval and the fulfillment of specified conditions.

The PI-AO Claims would be funded with warrants exercisable for that number of shares of Grace common stock which, when added to the shares issued directly to

CC-BLG002938

the trust on the effective date of the Plan, would represent 50.1% of Grace's voting securities. If the common stock issuable upon exercise of the warrants is insufficient to pay all PI-AO Claims (the liability for which is uncapped under the Plan), then Grace would pay any additional liabilities in cash.

Other Creditors
---------------

The Plan provides that all allowed claims other than those covered under the asbestos trust would be paid 100% in cash (if such claims qualify as administrative or priority claims) or 85% in cash and 15% in Grace common stock (if such claims qualify as general unsecured claims). Grace estimates that approximately $1,215 million of claims, including interest accrued through December 31, 2004, would be satisfied in this manner at the effective date of the Plan. Grace would finance these payments with cash on hand, cash from Fresenius Medical Care Holdings, Inc. ("Fresenius") paid

F-50

in settlement of asbestos and other Grace-related claims, new Grace debt, and Grace common stock. Grace would satisfy other non-asbestos related liabilities and claims (primarily environmental, tax, pension and retirement medical obligations) as they become due and payable over time. Proceeds from available product liability insurance applicable to asbestos claims would supplement operating cash flow to service new debt and liabilities not paid on the effective date of the Plan.

Effect on Grace Common Stock
----------------------------

The Plan provides that Grace common stock will remain outstanding at the effective date of the Plan, but that the interests of existing shareholders would be subject to dilution for additional shares of common stock issued under the Plan. In addition, in order to preserve significant tax benefits from net operating loss carryforwards ("NOLs"), which are subject to elimination or limitation in the event of a change in control (as defined by the Internal Revenue Code) of Grace, the Plan places restrictions on the purchase of Grace common stock. The restrictions would prohibit, for a period of three years, a person or entity from acquiring more than 4.75% of the outstanding Grace common stock or, for those persons already holding more than 4.75%, prohibit them from increasing their holdings. The Bankruptcy Court has also approved the trading restrictions described above until the effective date of the Plan.

RISKS OF THE PLAN - Grace intends to address all pending and future asbestos-related claims and all other pre-petition claims as outlined in the Plan. However, Grace may not be successful in obtaining approval of the Plan by the Bankruptcy Court. Instead, a materially different plan of reorganization may ultimately be approved and, under the ultimate plan of reorganization, the interests of the Company's shareholders could be substantially diluted or cancelled. The value of Grace common stock following a plan of reorganization, and the extent of any recovery by non-asbestos-related creditors, will depend principally on the allowed value of Grace's asbestos-related claims as determined by the Bankruptcy Court.

Grace's proposed plan of reorganization assumes several fundamental conditions including:

1.   Grace's asbestos-related liabilities can be resolved at a net present value cost of no more than $1,700 million (including $87 million for pre-petiton asbestos-related contractual settlements and judgments), including all property damage claims (including ZAI) and all pending and future personal injury claims; and

2.   Assets from litigation settlement agreements with Sealed Air and Fresenius will be available to fund the liability under the Plan.

There can be no guarantee that these two fundamental conditions can be met. The measure of Grace's asbestos-related liabilities could be settled by the Bankruptcy Court (in conformity with Grace's Plan or otherwise), by a negotiation with interested parties, and/or by legislation (currently being considered by the U.S. Congress) for the personal injury component of this contingency. Any resolution, other than that reflected in the Plan, could have a material adverse effect on the percentage of Grace common stock to be retained by current shareholders of Grace beyond that reflected in the proforma financial information presented below. Also, a resolution of personal injury claims based on federal legislation that would provide for payments to be made by companies and their insurers to a government-administered trust may not satisfy the conditions precedent under the litigation settlement agreements with Sealed Air and Fresenius and, therefore, may reduce or eliminate the availability of these assets to fund a plan of reorganization. Grace will adjust its financial statements and the proforma effects of its Plan as facts and circumstances warrant.

PROFORMA FINANCIAL INFORMATION - The proforma financial information of Grace presented below reflects the accounting effects of the Plan (1) as if it were put in effect on the date of Grace's most recent consolidated balance sheet - December 31, 2004, and (2) as if it were in effect for the year ended December 31, 2004. Such proforma financial statements show how Grace's assets, liabilities, equity and income would be affected by the Plan as follows:

A.   Borrowings Under New Debt Agreements and Contingencies

CC-BLG002939

The Plan reflects the assumed establishment of a new $1,000 million debt facility to fund settled claims payable at the effective date of the Plan (approximately $800 million) and to provide working capital (approximately $200 million) for continuing operations. Proforma expenses reflect an assumed 7% interest rate on outstanding borrowings. No such facility currently exists but, in Grace's view based on discussions with prospective lenders, one can be established before the effective date of the Plan. In addition, the proforma financial information reflects $150.0 million in contingencies to pay professional and bank fees, other non-operating liabilities and their related tax effects that will not become liabilities until the effective date of the Plan.

F-51

B.   Fresenius and Sealed Air Settlements

The Plan reflects the value, in the form of cash and securities, expected to be realized under each litigation settlement agreement as follows: $115.0 million of cash from Fresenius Medical Care; and, $1,050.7 million of estimated value from Sealed Air Corporation (calculated as of December 31, 2004) in the form of $512.5 million of cash plus accrued interest at 5.5% from December 21, 2002 compounded annually (approximately $58.8 million), and nine million shares of Sealed Air common stock valued at $53.27 per share (approximately $479.4 million). Tax accounts have been adjusted to reflect the satisfaction of Grace's recorded liabilities by way of these third-party agreements. The Fresenius settlement amount will be payable to Grace and will be accounted for as income. The Sealed Air settlement assets will be paid directly to the asbestos trust by Sealed Air and will be accounted for as satisfaction of a portion of Grace's recorded asbestos-related liability. In addition, the valuation allowance related to Grace's federal deferred tax assets will not be required as a result of taxable amounts from these settlements and has therefore been reversed. The Sealed Air settlement remains subject to Bankruptcy Court approval, and both the Sealed Air and Fresenius settlements are subject to the fulfillment of specified conditions.

C.   Payment of Pre-Petition Liabilities

The Plan reflects the transfer of funds and securities to settle estimated obligations payable under the Plan at the effective date. Tax accounts are adjusted to reflect the change in nature of Grace's tax assets from predominately temporary differences to predominately time-limited tax net operating losses. Non-asbestos pass-through liabilities are assumed to be paid in cash when due.

D.   Proforma Consolidated Statement of Operations

The proforma income adjustments reflect the elimination from Grace's 2004 Consolidated Statements of Operations of: (1) charges and expenses directly related to Chapter 11, (2) the accounting for estimates and provisions directly related to the Plan, (3) the $51.2 million net gain from environmental litigation relating to a non-operating parcel of property and the $11.1 million received from insolvent insurance carriers related to asbestos claims recorded in 2004, and (4) the addition of interest and new common shares related to the assumed financing of the Plan. For purposes of proforma earnings per share and proforma share capital, the trading value of Grace's common stock at December 31, 2004, of $13.61 per share, was used for calculating issued and outstanding shares. At this per share valuation, it is assumed that 47.5 million shares will be issued at the effective date of the Plan to fund asbestos and general unsecured claims, 9.6 million shares would be issuable upon exercise of warrants to satisfy Grace's estimate of PI-AO claims, and 5.7 million shares would be issued upon exercise of in-the-money stock options. Such trading value is presented solely for purposes of presenting a proforma Consolidated Statement of Operations and may not be indicative of the actual trading value of Grace common stock following the effective date of the Plan. Should Grace's distributable value per share at the effective date of the Plan be below approximately $9.50 per share, Grace would be required to revalue its balance sheet for a change in control.

E.   Non-asbestos Contingencies

The accompanying proforma financial information assumes all non-asbestos related contingencies (including environmental, tax and civil and criminal litigation) are settled for recorded amounts as of December 31, 2004. Certain liabilities are assumed to be paid at the effective date based on Grace's estimate of amounts that will be determinable and payable. The remainder, which would also be subject to the approved plan of reorganization, is assumed to be paid subsequent to the adequate date as amounts are either not due until a later date or will be determined through post-effective-date litigation. The ultimate value of such claims may change materially as Grace's Chapter 11 and other legal proceedings further define Grace's non-asbestos related obligations.

F-52

CC-BLG002940

W. R. GRACE & CO AND SUBSIDIARIES

PROFORMA CONDENSED CONSOLIDATED BALANCE SHEET

In millions

| | DECEMBER 31, 2004 AS REPORTED | BORROWINGS UNDER NEW DEBT AGREEMENTS AND CONTINGENCIES | SEALED AIR/ FRESENIUS SETTLEMENTS | PAYMENT OF REMAINING PRE-PETITION LIABILITIES | DECEMBER 31, 2004 PROFORMA |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **CURRENT ASSETS** | | | | | |
| Cash and cash equivalents...................................... | $ 510.4 | $800.0 | $ 115.0 | $(1,100.0) | $ 325.4 |
| Other current assets........................................... | 718.1 | -- | -- | -- | 718.1 |
| TOTAL CURRENT ASSETS...................................... | 1,228.5 | 800.0 | 115.0 | (1,100.0) | 1,043.5 |
| Non-current operating assets................................... | 1,047.0 | -- | -- | -- | 1,047.0 |
| Cash value of life insurance................................... | 96.0 | -- | -- | -- | 96.0 |
| Deferred income taxes: | | | | | |
| Net operating loss carryforwards........................... | 133.4 | -- | (40.3) | 200.8 | 293.9 |
| Temporary differences, net of valuation allowance .......... | 534.0 | 52.5 | (319.8) | (188.3) | 78.4 |
| Asbestos-related insurance..................................... | 500.0 | -- | -- | -- | 500.0 |
| TOTAL ASSETS........................................... | $ 3,538.9 | $852.5 | $ (245.1) | $(1,087.5) | $3,058.8 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT)** | | | | | |
| Total Current Liabilities...................................... | $ 387.6 | $ -- | $ -- | $ 12.5 | $ 400.1 |
| Long-term debt................................................. | 1.1 | 800.0 | -- | -- | 801.1 |
| Other noncurrent liabilities................................... | 564.3 | -- | -- | -- | 564.3 |
| TOTAL LIABILITIES NOT SUBJECT TO COMPROMISE................... | 953.0 | 800.0 | -- | 12.5 | 1,765.5 |
| Bank debt/letters of credit/capital leases.................... | 645.8 | -- | -- | (643.1) | 2.7 |
| Liability for asbestos-related litigation and claims........... | 1,700.0 | -- | (1,050.7) | (519.3) | 130.0 |
| Liability for environmental remediation....................... | 345.0 | -- | -- | (231.3) | 113.7 |
| Liability for postretirement health and special pensions....... | 196.3 | -- | -- | (8.6) | 187.7 |
| Liability for accounts payable and litigation................. | 110.2 | -- | -- | (70.5) | 39.7 |
| Liability for tax claims and contingencies.................... | 210.4 | -- | -- | (168.0) | 42.4 |
| Other nonoperating liabilities, including Plan contingencies... | -- | 150.0 | -- | (105.7) | 44.3 |
| LIABILITIES SUBJECT TO COMPROMISE............................. | 3,207.7 | 150.0 | (1,050.7) | (1,746.5) | 560.5 |
| TOTAL LIABILITIES............................................. | 4,160.7 | 950.0 | (1,050.7) | (1,734.0) | 2,326.0 |
| **SHAREHOLDER'S EQUITY (DEFICIT)** | | | | | |
| Share capital................................................. | 427.3 | -- | -- | 646.5 | 1,073.8 |
| Retained earnings and other equity items...................... | (1,049.1) | (97.5) | 805.6 | -- | (341.0) |
| TOTAL SHAREHOLDERS' EQUITY (DEFICIT) ......................... | (621.8) | (97.5) | 805.6 | 646.5 | 732.8 |
| TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT) .......... | $ 3,538.9 | $852.5 | $ (245.1) | $(1,087.5) | $3,058.8 |

W.R. GRACE & CO. AND SUBSIDIARIES
PROFORMA CONSOLIDATED STATEMENTS OF OPERATIONS

In millions, except per share amounts

| | YEAR ENDED DECEMBER 31, 2004 | | |
|---|---|---|---|
| | AS REPORTED | PROFORMA ADJUSTMENTS | PROFORMA |
| NET SALES.............................................. | $2,259.9 | $ -- | $2,259.9 |
| Cost of goods sold, exclusive of depreciation and amortization shown separately below................................... | 1,431.5 | -- | 1,431.5 |
| Selling, general and administrative expenses, exclusive of net pension expense shown separately below.................... | 442.8 | -- | 442.8 |
| Depreciation and amortization................................ | 108.8 | -- | 108.8 |
| Research and development expenses............................ | 51.1 | -- | 51.1 |
| Net pension expense.......................................... | 61.9 | -- | 61.9 |
| Interest expense and related financing costs................. | 111.1 | (51.8) | 59.3 |
| Provision for environmental remediation...................... | 21.6 | (21.6) | -- |
| Provision for asbestos-related litigation.................... | 476.6 | (476.6) | -- |
| Other (income) expense....................................... | (68.4) | 62.3 | (6.1) |
| TOTAL COSTS AND EXPENSES..................................... | 2,637.0 | (487.7) | 2,149.3 |

CC-BLG002941

```
INCOME (LOSS) BEFORE CHAPTER 11 EXPENSES, INCOME TAXES AND
   MINORITY INTEREST.......................................  (377.1)   487.7    110.6
Chapter 11 expenses, net.....................................  (18.0)    18.0     --
Benefit from (provision for) income taxes....................    1.5    (37.2)   (35.7)
Minority interest in consolidated entities...................   (8.7)     --      (8.7)
                                                              --------  -------  --------
NET INCOME (LOSS)............................................ $ (402.3) $ 468.5  $  66.2
                                                              ========  =======  ========

BASIC EARNINGS (LOSS) PER COMMON SHARE....................... $  (6.11)          $  0.56
Weighted average number of basic shares......................   65.8    53.2     119.0
DILUTED EARNINGS (LOSS) PER COMMON SHARE..................... $  (6.11)          $  0.52
Weighted average number of diluted shares....................   65.8    62.8     128.6
                                                              ========  =======  ========
```

F-53

------------------------------------------------------------------------------
FINANCIAL CONDITION
------------------------------------------------------------------------------

ASBESTOS-RELATED LITIGATION - See Note 3 to the Consolidated Financial
Statements.

ENVIRONMENTAL MATTERS - Grace is subject to loss contingencies resulting from
extensive and evolving federal, state, local and foreign environmental laws and
regulations. Grace has expended substantial funds to comply with such laws and
regulations and expects to continue to do so in the future. The following table
sets forth Grace's expenditures in the past three years for (1) the operation
and maintenance of environmental facilities and the disposal of wastes; (2)
capital expenditures for environmental control facilities; and (3) site
remediation.

==============================================================================

| (In millions) | OPERATION OF FACILITIES AND WASTE | CAPITAL EXPENDITURES | SITE REMEDIATION |
|---|---|---|---|
| 2004 ................................... | $47.4 | $6.6 | $ 8.9 |
| 2003 ................................... | 46.1 | 8.1 | 7.0 |
| 2002 ................................... | 38.0 | 5.6 | 13.7 |

==============================================================================

At December 31, 2004, Grace's recorded liability for environmental investigation
and remediation costs totaled $345.0 million, as compared with $332.4 million at
December 31, 2003. This liability covers both vermiculite and non-vermiculite
related matters. The amount is based on funding and/or remediation agreements in
place, together with Grace's best estimate of its cost for sites not subject to
a formal remediation plan. The increase in the liability is primarily
attributable to pre-tax charges relating to former vermiculite mining operations
in Libby, Montana, as described below.

Grace's estimated liability for vermiculite-related remediation at December 31,
2004 and 2003 was $204.2 million and $181.0 million, respectively. Based on a
previous ruling by the U.S. District Court of Montana, Grace is required to
reimburse the EPA for all appropriate costs expended for clean-up activities in
and around Libby, Montana, related to its former mining activities. (This ruling
has been appealed by Grace to the Ninth Circuit Court of Appeals. Oral arguments
were heard on February 7, 2005, but no decision has been issued.) As a result of
such ruling, Grace recorded a pre-tax charge of $20.0 million and $120.0 million
in 2004 and 2003, respectively, to increase its estimated liability for
vermiculite-related environmental costs to reflect Grace's current understanding
of the timeframe and related costs necessary to remediate properties in and
around Libby, Montana. The EPA's cost estimates increased regularly and
substantially over the course of this clean-up. Consequently, Grace's estimate
may change materially as more information becomes available. Grace's liability
for this matter is included in "liabilities subject to compromise" as of
December 31, 2004.

At December 31, 2004 and 2003, Grace's estimated liability for remediation of
sites not related to its former vermiculite mining and processing activities was
$140.8 million and $151.4 million, respectively. This liability relates to
Grace's current and former operations, including its share of liability for
off-site disposal at facilities where it has been identified as a potentially
responsible party. During the fourth quarter of 2004, Grace recorded a $1.6
million increase to its estimated environmental liability for non-vermiculite
related sites in connection with the investigation of environmental conditions
at a current operating plant. During the fourth quarter of 2003, Grace recorded
a $20.0 million increase in its estimated environmental liability for
non-vermiculite related sites as part of the Chapter 11 claims review process.
Grace's revised estimated liability was based upon an evaluation of those claims
for which sufficient information was available. As Grace receives new

CC-BLG002942

information and continues its claims evaluation process, its estimated liability may change materially. Grace's liability for this matter is included in "liabilities subject to compromise" as of December 31, 2004.

See Note 14 to the Consolidated Financial Statements for a background description of Grace's Vermiculite and Non-Vermiculite Related Matters.

MONTANA CRIMINAL PROCEEDING - On February 7, 2005, the United States Department of Justice announced the unsealing of a 10-count grand jury indictment against Grace and seven current or former senior level employees relating to Grace's former vermiculite mining and processing activities in Libby, Montana. The indictment accuses the defendants of (1) conspiracy to violate environmental laws and obstruct federal agency proceedings; (2) violations of the federal Clean Air Act; (3) wire fraud in connection with the sale of allegedly contaminated properties; and (4) obstruction of justice.

Grace purchased the Libby mine in 1963 and operated it until 1990; vermiculite processing activities continued until 1992. The grand jury charges that the conspiracy took place from 1976 to 2002 and also charges that the alleged endangerment to the areas surrounding Libby continues to the present day. According to the U.S. Department of Justice, Grace could be subject to fines in an amount equal to twice the after-tax profit earned from its Libby operations or twice the alleged loss suffered by Libby victims, plus additional amounts for restitution to victims. The indictment alleges that such after tax

F-54

profits were $140 million. Grace has categorically denied any criminal wrongdoing and intends to vigorously defend itself at trial.

Among the employees charged is Robert J. Bettacchi, a senior vice president of Grace and president of the Grace Performance Chemicals business unit. Mr. Bettacchi and two other current employees have been placed on administrative leave with pay so that they may dedicate sufficient time to their defense. The U.S. Bankruptcy Court previously granted Grace's request to advance legal and defense costs to the employees, subject to a reimbursement obligation if it is later determined that the employees did not meet the standards for indemnification set forth under the appropriate state corporate law.

Grace is unable to assess whether the indictment, or any conviction resulting therefrom, will have a material adverse effect on the results of operations or financial condition of Grace or affect Grace's bankruptcy proceedings. However, Grace expects legal fees for its current and former employees defense will be at least several million dollars.

DEFINED BENEFIT PENSION PLANS - Grace sponsors defined benefit pension plans for its employees in the United States, Canada and the United Kingdom, and funds government sponsored programs in other countries where it operates. Certain of the Grace sponsored plans are advance-funded and others are pay-as-you-go. The advance-funded plans are administered by trustees who direct the management of plan assets and arrange to have obligations paid when due out of a trust. The most significant advance-funded plans cover Grace's salaried employees in the U.S. and employees covered by collective bargaining agreements at certain of its U.S. facilities.

At the December 31, 2004 measurement date for the U.S. advance-funded defined benefit pension plans (the "Plans"), the accumulated benefit obligation ("ABO") was approximately $958 million as measured under U.S. generally accepted accounting principles. The ABO is measured as the present value (using a 5.5% discount rate as of December 31, 2004) of vested and non-vested benefits earned from employee service to date, based upon current salary levels. Such discount rate is based on a high quality bond portfolio designed to meet the payout pattern of the Plans. Of the participants in the Plans, approximately 80% are current retirees or employees of former Grace businesses, making the payout pattern skewed to the nearer term. Assets available to fund the ABO at December 31, 2004 were approximately $666 million, or approximately $292 million less than the measured obligation.

In September 2004, Grace contributed approximately $20 million to the trusts that hold assets of the Plans as permitted by the Bankruptcy Court. This contribution followed a $48.5 million contribution in 2003, also permitted by the Bankruptcy Court. Although it is Grace's intention to satisfy its obligations under the Plans and to comply with all of the requirements of the Employee Retirement Income Security Act of 1974, additional contributions to the Plans' trusts will continue to require Bankruptcy Court approval. There can be no assurance that the Bankruptcy Court will continue to approve arrangements to satisfy the funding needs of the Plans. Grace funded $9.1 million for non-U.S. plans in 2004 and $7.6 million in 2003. Such contributions are not subject to Bankruptcy Court approval and Grace intends to fund such plans based on actuarial and trustee recommendations.

See Note 18 to the Consolidated Financial Statements for the components of net periodic benefit cost for the years ended December 31, 2004, 2003 and 2002. Total pension expense for 2004 was approximately $62 million, and benefit payments to retirees were approximately $89 million for all pension programs in 2004. At December 31, 2004, Grace's recorded pension liability for underfunded plans was $502.3 million ($424.9 million included in liabilities not subject to compromise and $77.4 million related to supplemental pension benefits for officers and higher-level employees, included in "liabilities subject to

CC-BLG002943

compromise") which includes the following components: (1) shortfall between dedicated assets and ABO of underfunded plans ($293.6 million); and (2) ABO of pay-as-you-go plans ($208.7 million).

POSTRETIREMENT BENEFITS OTHER THAN PENSIONS - Grace provides certain health care and life insurance benefits for retired employees, a large majority of which pertain to retirees of previously divested businesses. These plans are unfunded, and Grace pays the costs of benefits under these plans as they are incurred. Grace's share of benefits under this program was $12.5 million during 2004, compared with $12.6 million in 2003. Grace's recorded liability for postretirement benefits of $118.9 million at December 31, 2004 is stated at net present value discounted at 5.5% (as discussed under Defined Benefit Pension Plans). The continuing payment of these benefits has been approved by the Bankruptcy Court. Grace's Plan provides for the continuation of these benefits.

In December 2003, President Bush signed the Medicare Prescription Drug, Improvement and Modernization Act of 2003 (the "Act") into law. The Act introduces a prescription drug benefit under Medicare ("Medicare Part D") as well as a federal subsidy to companies that

provide a benefit that is at least actuarially equivalent (as defined in the Act) to Medicare Part D. On January 21, 2005, the Center for Medicare and Medicaid Services released the final regulations implementing the Act. At this time, Grace is unable to determine if its prescription drug benefit under its postretirement health care plan is actuarially equivalent to the Medicare Part D benefit. Therefore, the financial statements do not reflect any amount associated with the federal subsidy.

TAX MATTERS - As of December 31, 2004, Grace had recorded reserves for tax contingencies of $210.4 million. Such reserves are to cover the risk of government assertions for added taxes and interest thereon related to open tax years. Grace settled tax issues relating to COLI interest deductions in January 2005 and expects to settle a number of other pending tax issues in 2005, including adjustments related to the IRS audit of its 1993 to 1996 tax returns. These settlements would result in payments between of approximately $120 to $150 million in 2005, subject to Bankruptcy Court approval. See Notes 4 and 14 to the Consolidated Financial Statements and page F-45 of Management's Discussion and Analysis of Results of Operations and Financial Condition for further discussion of Grace's tax accounting and tax contingencies.

OTHER CONTINGENCIES - See Note 14 to the Consolidated Financial Statements for a discussion of Grace's other contingent matters.

--------------------------------------------------------------------------------

LIQUIDITY AND CAPITAL RESOURCES
--------------------------------------------------------------------------------

CASH RESOURCES AND AVAILABLE CREDIT FACILITIES - At December 31, 2004, Grace had $606.4 million in cash and cash-like assets on hand ($510.4 million in cash and cash equivalents and $96.0 million in cash value of life insurance). In addition, Grace had access to committed credit facilities aggregating $250.0 million under the DIP facility, of which $183.8 million (net of letters of credit and holdback provisions) was available at December 31, 2004. The term of the DIP facility expires April 1, 2006. Grace believes that these funds and credit facilities will be sufficient to finance its business strategy while in Chapter 11.

CASH FLOW FROM CORE OPERATIONS - Grace's 2004 net cash flow from core operations before investing increased due to higher pre-tax operating income and decreased investment in working capital and other items.

| CORE OPERATIONS | DECEMBER 31, | | |
| --- | --- | --- | --- |
| (In millions) | 2004 | 2003 | 2002 |
| CASH FLOWS: | | | |
| Pre-tax operating income ........................... | $179.3 | $148.7 | $180.8 |
| Depreciation and amortization ...................... | 108.8 | 102.9 | 94.9 |
| | ------ | ------ | ------ |
| PRE-TAX EARNINGS BEFORE DEPRECIATION | | | |
|   AND AMORTIZATION ................................. | 288.1 | 251.6 | 275.7 |
| Working capital and other changes ................. | 27.7 | (63.4) | 24.1 |
| | ------ | ------ | ------ |
| CASH FLOW BEFORE INVESTING ......................... | 315.8 | 188.2 | 299.8 |
| Capital expenditures .............................. | (62.9) | (86.4) | (91.1) |
| Businesses acquired ............................... | (66.3) | (26.9) | (28.5) |
| | ------ | ------ | ------ |
| NET CASH FLOW FROM CORE OPERATIONS ................. | $186.6 | $ 74.9 | $180.2 |

CC-BLG002944

Capital expenditures were lower in 2004, as compared with 2003, while cash invested in business acquisitions was higher than in 2003. Capital expenditures in 2004 principally represented spending for routine equipment replacements. A substantial portion of the expenditures during the first half of 2003 were directed toward the construction of new refining catalyst production capacity at Davison Chemicals' Lake Charles, Louisiana site. The lower pre-tax operating income in 2003 resulted primarily from higher costs for pensions, certain raw materials and natural gas, and manufacturing difficulties at Grace's largest U.S. production site. The increased investment in working capital and other items was due to a shift in regional sales mix outside North America where standard terms of sale are longer and advanced purchasing of key raw materials is often necessary.

Grace expects to continue to invest excess cash flow and other available capital resources in its core business base. These investments are likely to be in the form of added plant capacity, product line extensions and geographic market expansions, and/or acquisitions in existing product lines. Investments that are outside the ordinary course of business may be subject to Bankruptcy Court approval and Chapter 11 creditor committee review.

CASH FLOW FROM NONCORE ACTIVITIES - The cash flow from Grace's noncore activities can be volatile. Expenditures are generally governed by Bankruptcy Court rulings and receipts are generally nonrecurring. Much of the noncore spending in the past three years has been under Chapter 11 first-day motions that allow Grace to fund postretirement benefits and required environmental remediation on Grace-owned sites. Cash inflows have been from asbestos-related insurance recovery on pre-Chapter 11 liability payments, and unusual events such as the litigation settlement in 2004 related to a nonoperating property.

F-56

| NONCORE ACTIVITIES | DECEMBER 31, | | |
|---|---|---|---|
| (In millions) | 2004 | 2003 | 2002 |
| CASH FLOWS: | | | |
| Pre-tax income (loss) from noncore activities .... | $(457.1) | $(190.1) | $(74.5) |
| Net gain from litigation settlement .............. | (51.2) | -- | -- |
| Provision for asbestos-related litigation ........ | 476.6 | 30.0 | -- |
| Other non-cash charges ........................... | 89.8 | 155.3 | 81.1 |
| Cash spending for: | | | |
| Asbestos-related litigation, net of | | | |
| insurance recovery ........................... | 10.7 | 2.8 | (2.3) |
| Environmental remediation ..................... | (9.0) | (11.2) | (20.8) |
| Postretirement benefits ....................... | (12.5) | (12.6) | (21.5) |
| Retained obligations and other ................ | (1.8) | (1.3) | (4.5) |
| NET CASH OUTFLOW FOR NONCORE ACTIVITIES .......... | $ 45.5 | $ (27.1) | $(42.5) |

Expenditures for environmental remediation were lower in 2004 and 2003, due partly to Grace's Chapter 11 proceedings and partly to the completion of remediation work on certain sites. Postretirement benefit payments were also lower in both 2004 and 2003 due to changes in cost sharing under retiree medical plans. Spending in 2004 and 2003 for retained obligations was down as compared with 2002, primarily due to the stay of litigation, with 2004 payments slightly higher than 2003 due to one-time expenses incurred. These cash outflows were partially offset by asbestos-related cash inflows where insurance proceeds in reimbursement from pre-Chapter 11 asbestos payments exceeded the costs of claims administration.

See the "Consolidated Statements of Cash Flows" included in the Consolidated Financial Statements for investing and financing activities for the years ended December 31, 2004, 2003 and 2002.

DEBT AND OTHER CONTRACTUAL OBLIGATIONS - Total debt outstanding at December 31, 2004 was $659.3 million, including $130.8 million of accrued interest on pre-petition debt. As a result of the Filing, Grace is now in default on $515.0 million of pre-petition debt, which, together with accrued interest thereon, has been included in "liabilities subject to compromise" as of December 31, 2004. The automatic stay provided under the Bankruptcy Code prevents Grace's lenders from taking any action to collect the principal amounts as well as related accrued interest. However, Grace will continue to accrue and report interest on such debt during the Chapter 11 proceedings unless further developments lead management to conclude that it is probable that such interest will be compromised.
Set forth below are contractual obligations not subject to compromise.

| CONTRACTUAL OBLIGATIONS NOT SUBJECT TO COMPROMISE | |
|---|---|
| | Payments due by Period |

CC-BLG002945

| (In millions) | Total | Less than 1 Year | 1-3 Years | Thereafter |
|---|---|---|---|---|
| Operating commitments (1) ............... | $ 5.8 | $ 4.3 | $ 1.5 | $ -- |
| Debt ................................... | 13.5 | 12.4 | 1.1 | -- |
| Operating leases ....................... | 63.2 | 17.2 | 32.4 | 13.6 |
| Capital leases ......................... | 2.7 | 0.7 | 1.8 | 0.2 |
| Pension funding requirements per ERISA ... | 179.6 | 16.9 | 162.7 | -- |
| TOTAL CONTRACTUAL CASH OBLIGATIONS ....... | $264.8 | $51.5 | $199.5 | $13.8 |

(1)  Amounts do not include open purchase commitments which are routine in
     nature and normally settle within 90 days.

See Note 14 to the Consolidated Financial Statements for a discussion of
financial assurances.

## INFLATION

The financial statements are presented on a historical cost basis and do not
fully reflect the impact of prior years' inflation. While the U.S. inflation
rate has been modest for several years, Grace operates in international
economies with both inflation and currency risks. The ability to pass on
inflation costs is an uncertainty due to general economic conditions and
competitive situations. The cost of replacing Grace's property and equipment
today is estimated to be greater than its historical cost. Accordingly,
depreciation expense would be greater if the expense were stated on a current
cost basis.

## ACCOUNTING POLICIES

See Note 1 of Consolidated Financial Statements for a discussion of recent
accounting pronouncements and their effect on Grace.

## FORWARD-LOOKING STATEMENTS

The forward-looking statements contained in this document are based on current
expectations regarding important risk factors. Actual results may differ
materially from those expressed. In addition to the uncertainties referred to in
the Notes to the Consolidated Financial Statements and in Management's
Discussion and Analysis of Results of Operations and Financial Condition, other
uncertainties include: the impact of worldwide economic conditions; pricing of
both Grace's products and raw materials; customer outages and

customer demand; factors resulting from fluctuations in foreign currencies; the
impact of competitive products and pricing; the continued success of Grace's
process improvement initiatives; the impact of tax, legislation and other
regulations in the jurisdictions in which Grace operates; and developments in
and the outcome of the Chapter 11 proceedings discussed above. Also, see
"Introduction and Overview - Projections and Other Forward-Looking Information"
in Item 1 of Grace's current Annual Report on Form 10-K for additional risk
factors.

W. R. GRACE & CO. AND SUBSIDIARIES
VALUATION AND QUALIFYING ACCOUNTS AND RESERVES
(In millions)

FOR THE YEAR 2004

| Description | Balance at beginning of period | Additions/(deductions) Charged/ (credited) to costs and expenses | Other net | Balance at end of period |
|---|---|---|---|---|
| VALUATION AND QUALIFYING ACCOUNTS DEDUCTED FROM ASSETS: | | | | |
| Allowances for notes and accounts receivable.............. | $ 6.3 | $ 1.2 | $ -- | $ 7.5 |

CC-BLG002946

```
  Allowances for long-term receivables.................      0.7       0.1         --      0.8
  Valuation allowance for deferred tax assets................    168.3      59.4         --    227.7
RESERVES:
  Reserves for retained obligations of divested businesses...   $ 57.0    $  --     $(1.9)  $ 55.1
```

FOR THE YEAR 2003

| | | Additions/(deductions) | | |
| | Balance at beginning of period | Charged/(credited) to costs and expenses | Other net (1) | Balance at end of period |
| Description | | | | |
|---|---|---|---|---|
| VALUATION AND QUALIFYING ACCOUNTS DEDUCTED FROM ASSETS: | | | | |
| Allowances for notes and accounts receivable.............. | $ 5.4 | $ 0.9 | $ -- | $ 6.3 |
| Allowances for long-term receivables..................... | 0.8 | (0.1) | -- | 0.7 |
| Valuation allowance for deferred tax assets................ | 152.5 | 15.8 | -- | 168.3 |
| RESERVES: | | | | |
| Reserves for retained obligations of divested businesses... | $ 55.3 | $ -- | $1.7 | $ 57.0 |

FOR THE YEAR 2002

| | | Additions/(deductions) | | |
| | Balance at beginning of period | Charged/(credited) to costs and expenses | Other net (2) | Balance at end of period |
| Description | | | | |
|---|---|---|---|---|
| VALUATION AND QUALIFYING ACCOUNTS DEDUCTED FROM ASSETS: | | | | |
| Allowances for notes and accounts receivable.............. | $ 7.6 | $(2.2) | $ -- | $ 5.4 |
| Allowances for long-term receivables..................... | 0.6 | 0.2 | -- | 0.8 |
| Valuation allowance for deferred tax assets................ | 158.0 | (5.5) | -- | 152.5 |
| RESERVES: | | | | |
| Reserves for retained obligations of divested businesses... | $ 80.5 | $ -- | $(25.2) | $ 55.3 |

(1) Various miscellaneous adjustments against reserves established for divested
    business.

(2) $25.2 million represents net spending offset by a reclass of an $18.0
    million tax receivable relating to Grace's divested packaging business.

F-59

W. R. GRACE & CO. AND SUBSIDIARIES
COMPUTATION OF RATIO OF EARNINGS TO FIXED CHARGES AND
COMBINED FIXED CHARGES AND PREFERRED STOCK DIVIDENDS (1)
(In millions, except ratios)
(Unaudited)

| | YEARS ENDED DECEMBER 31, (2) | | | | |
| | 2004(3) | 2003(4) | 2002(5) | 2001 | 2000(6) |
|---|---|---|---|---|---|
| Net income (loss) from continuing operations ................ | $(402.3) | $(55.2) | $22.1 | $ 78.6 | $(89.7) |
| Provision for (benefit from) income taxes .................. | (1.5) | (12.3) | 38.0 | 63.7 | 70.0 |
| Minority interest in income (loss) of majority owned subsidiaries ........................................... | (8.7) | 1.2 | (2.2) | (3.7) | -- |
| Equity in unremitted losses (earnings) of less than 50%-owned | | | | | |

CC-BLG002947

| | | | | | |
|---|---|---|---|---|---|
| companies ..................... | | | | | (2)(5) |
| Interest expense and related financing costs, including amortization of capitalized interest ..................... | 112.6 | 17.5 | 22.3 | 39.5 | 30.6 |
| Estimated amount of rental expense deemed to represent the interest factor .................................... | 5.6 | 5.1 | 4.9 | 4.7 | 4.7 |
| Income (loss) as adjusted ................................ | $(294.3) | $(43.4) | $85.2 | $182.8 | $ 15.1 |
| Combined fixed charges and preferred stock dividends: Interest expense and related financing costs, including capitalized interest .................................. | $ 100.7 | $ 18.0 | $21.8 | $ 36.6 | $ 29.1 |
| Estimated amount of rental expense deemed to represent the interest factor .................................... | 5.6 | 5.1 | 5.0 | 4.7 | 4.7 |
| Fixed charges ........................................... | 106.3 | 23.1 | 26.8 | 41.3 | 33.8 |
| Combined fixed charges and preferred stock dividends ........ | $ 106.3 | $ 23.1 | $26.8 | $ 41.3 | $ 33.8 |
| Ratio of earnings to fixed charges ......................... | (7) | (7) | 3.18 | 4.43 | (7) |
| Ratio of earnings to combined fixed charges and preferred stock dividends ............................... | (7) | (7) | 3.18 | 4.43 | (7) |

(1) Grace's preferred stocks were retired in 1996.

(2) Certain amounts have been restated to conform to the 2004 presentation.

(3) Amounts reflect the following adjustments: a $476.6 million accrual to increase Grace's recorded asbestos-related liability, net of expected insurance recovery of $238.2 million; a $94.1 million accrual to increase Grace's estimate of interest to which general unsecured creditors would be entitled; and a $151.7 million credit for net income tax benefits related to the items described above.

(4) Amounts include $172.5 million for pre-tax charges to adjust Grace's estimated liability for environmental remediation and asbestos-related property damage.

(5) Amounts contain a provision for non-operating environmental remediation of $70.7 million.

(6) Includes a pre-tax provision of $208.0 million for asbestos-related liabilities, net of insurance coverage. The provision for income taxes includes a $75.0 million charge for tax and interest relating to tax deductibility of interest on corporate-owned life insurance policy loans.

(7) As a result of the losses incurred for the years ended December 31, 2004, 2003, and 2000, Grace was unable to fully cover the indicated fixed charges (a shortfall of $400.6 million, $66.5 million and $18.7 million, respectively).

F-60

CC-BLG002948

EXHIBIT 2.2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                              )    Chapter 11
                                    )
W. R. GRACE & CO., et al.,(1)       )    Case No. 01-1139 (JKF)
                                    )    (Jointly Administered)
                    Debtors.        )

AMENDED JOINT PLAN OF REORGANIZATION

THIS PLAN PROVIDES, AMONG OTHER THINGS, FOR THE ISSUANCE OF INJUNCTIONS UNDER
BANKRUPTCY CODE SECTIONS 105 AND 524(g) THAT RESULT IN THE CHANNELING OF ALL
ASBESTOS-RELATED LIABILITIES OF W. R. GRACE & CO. AND THE ASBESTOS PROTECTED
PARTIES (AS DEFINED HEREIN) INTO A TRUST AS MORE FULLY DESCRIBED HEREIN.

KIRKLAND & ELLIS LLP            PACHULSKI, STANG, ZIEHL, YOUNG, JONES
David M. Bernick, P.C.          & WEINTRAUB P.C.
Janet S. Baer                   Laura Davis Jones (Bar No. 2436)
Jonathan P. Friedland           David W. Carickhoff, Jr. (Bar No. 3715)
Samuel L. Blatnick              919 North Market Street, 16th Floor
200 East Randolph Drive         P.O. Box 8705
Chicago, Illinois 60601         Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (312) 861-2000       Telephone: (302) 652-4100

and

Bennett L. Spiegel
Lori Sinanyan
777 South Figueroa Street

Los Angeles, California 90017
Telephone: (213) 680-8400

            - Co-Counsel for the Debtors and Debtors in Possession -

                    Dated: January 13, 2005

----------
(1) Debtors are defined in the Glossary.


EXHIBIT 2.2

        W. R. Grace & Co. and the above-captioned debtors and debtors in
possession (collectively, "Grace" or the "Debtors"), the Official Committee of
Unsecured Creditors, and the Official Committee of Equity Security Holders
(collectively, the "Plan Proponents") hereby propose the following Plan of
Reorganization pursuant to the provisions of chapter 11 of title 11 of the
United States Code. Reference is made to the Disclosure Statement (as defined
herein) distributed contemporaneously herewith for, among other things, a
discussion of the history, businesses, properties, results of operations,
projections for future operations of the Debtors, and risks associated with this
Plan.

                            ARTICLE 1.
            DEFINITIONS, CONSTRUCTION OF TERMS, EXHIBITS
                    AND ANCILLARY DOCUMENTS

        1.1  DEFINED TERMS

        All capitalized terms used herein shall have the respective meanings
specified herein or in the Glossary for this Plan listed as Exhibit 2 in the
Exhibit Book, unless the context otherwise requires.

        1.2  OTHER TERMS/INTERPRETATION

            (a)  Wherever from the context it appears appropriate, each
                 term stated in either the singular or the plural shall
                 include the singular and the plural, and pronouns
                 stated in the masculine, feminine, or neuter gender
                 shall include the other genders.

            (b)  When used in this Plan, the term "Claim" shall be
                 broadly construed to include all manner and type of
                 Claim, whenever and wherever such Claim may arise, and
                 shall include Asbestos PI-SE Claims, Asbestos PI-AO
                 Claims, and Asbestos PD Claims.

            (c)  Any reference in this Plan to a contract, instrument,
                 release, indenture or other agreement or document being
                 in a particular form or on particular terms and

conditions shall mean that such document shall be substantially in such form or substantially on such terms and conditions.

(d)   Any reference in this Plan to an existing document or exhibit in the Exhibit Book Filed or to be Filed shall mean the document or exhibit as it may have been or may be amended, modified or supplemented.

(e)   Any reference to an Entity as a Holder of a Claim shall include that Entity's successors, assigns and affiliates.

(f)   The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained in this Plan.

1

EXHIBIT 2.2

(g)   The word "including" (and, with correlative meaning, the forms of the word "include") shall mean including, without limiting the generality of any description preceding that word; and the words "shall" and "will" are used interchangeably and have the same meaning.

(h)   Unless otherwise indicated herein, all references to dollars are to United States dollars.

(i)   An initially capitalized term used herein that is not defined herein shall have the meaning ascribed to such term, if any, in the Bankruptcy Code, unless the context shall otherwise require.

(j)   The descriptive headings contained in this Plan are included for convenience of reference only and are not intended to be a part of and shall not affect in any way the meaning or interpretation of this Plan.

(k)   All references in this Plan to sections, articles, and exhibits are references to sections, articles and exhibits of or to this Plan unless otherwise specified.

(l)   Unless otherwise expressly provided herein, in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

(m)   The rules of construction set forth in Bankruptcy Code Section 102 shall apply.

1.3  THE PLAN DOCUMENTS

The Plan Documents, once Filed, shall also be available for review:

(a)   in the office of the clerk of the Bankruptcy Court during normal hours of operation of the Bankruptcy Court;

(b)   on Business Days from 9:00 a.m. through 5:00 p.m. (Eastern Time) at the following address:

Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C.
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
Telephone: (302) 652-4100
Attn: David W. Carickhoff, Jr.

2

EXHIBIT 2.2

(c)   by download from the following website:
www.bmccorp.net/wrgrace

Holders of Claims and Equity Interests may also obtain a copy of the Plan Documents following their Filing with the Clerk of the Court by contacting counsel for the Debtors by a written request sent to the above address.

1.4  ANCILLARY DOCUMENTS

Each of the Plan Documents is an integral part of this Plan and is

hereby incorporated by reference and made a part of this Plan.

ARTICLE 2.
PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

2.1  UNCLASSIFIED CLAIMS

In accordance with Bankruptcy Code Section 1123(a)(1), Administrative Expense Claims and Priority Tax Claims are not classified and are excluded from the Classes set forth in Article 3 of this Plan.

2.2  PAYMENT OF ALLOWED ADMINISTRATIVE EXPENSE CLAIMS

Subject to the provisions of Bankruptcy Code Sections 330(a), 331, and 503, each Holder of an Allowed Administrative Expense Claim shall be paid the Allowed Amount of its Administrative Expense Claim either (i) in full, in cash, by the Reorganized Debtors, on the Effective Date or as soon as practicable thereafter, or (ii) upon such other less favorable terms as may be mutually agreed upon between the Holder of an Allowed Administrative Expense Claim and the Reorganized Debtors or otherwise established pursuant to an order of the Bankruptcy Court; provided that (A) Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors in Possession on or after the Petition Date or assumed by the Debtors in Possession pursuant to this Plan or an order of the Bankruptcy Court shall be paid by the Reorganized Debtors in accordance with the terms and conditions of the particular transactions and any agreements relating thereto or any order of the Bankruptcy Court and (B) Allowed Administrative Expense Claims of Professionals shall be paid pursuant to order of the Bankruptcy Court.

All final applications for compensation of Professionals for services rendered and for reimbursement of expenses incurred on or before the Confirmation Date, and any other request for compensation by any Entity for making a substantial contribution (as described in Bankruptcy Code Section 503(b)(3)(D)) in the Chapter 11 Cases (except only for Claims under 28 U.S.C. Section 1930 and for fees incurred by the Clerk's Office), shall be Filed no later than ninety (90) days after the Effective Date. Any Professional or Entity with a Claim for payment of such an Administrative Expense Claim that does not File an application for payment of such Claim or expenses by the deadline set forth herein shall be forever barred from asserting such Claim and shall receive no Distribution under this Plan or otherwise on account of such Claim.

3

EXHIBIT 2.2

2.3  PRIORITY TAX CLAIMS

Each Holder of an Allowed Priority Tax Claim shall be paid the Allowed Amount of its Priority Tax Claim, at the option of the Reorganized Debtors, either (i) in full, in cash, by the Reorganized Debtors, on the Effective Date or as soon as practicable thereafter, or (ii) upon such other less favorable terms as may be mutually agreed upon between the Holder of an Allowed Priority Tax Claim and the Reorganized Debtors, or (iii) in equal quarterly cash payments on the Initial Distribution Date and, thereafter, on each Quarterly Tax Distribution Date in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at 3.5% per annum, over a period not exceeding six (6) years after the date of assessment of such Allowed Priority Tax Claim, or upon such other terms determined by the Bankruptcy Court, which will provide the Holder of such Allowed Priority Tax Claim deferred cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim; provided, however, that each Holder of a Claim which by operation of the Fresenius Settlement Agreement is an obligation for Indemnified Taxes promptly shall be paid in full in cash as such Fresenius Indemnified Taxes become due and payable.

ARTICLE 3.
CLASSIFICATION AND TREATMENT
OF CLAIMS AND EQUITY INTERESTS

3.1  SUMMARY

Claims and Equity Interests are classified for all purposes, including voting, confirmation, and Distribution pursuant to this Plan and pursuant to Bankruptcy Code Sections 1122 and 1123(a)(1), as follows:

| CLASSIFICATION | IMPAIRMENT AND VOTING |
|---|---|
| Class 1   Priority Claims | Unimpaired -- deemed to have voted to accept the Plan; no separate vote being solicited. |
| Class 2   Secured Claims | Unimpaired -- deemed to have voted to accept the Plan; no separate vote being solicited. |
| Class 3   Unsecured Pass-Through Employee Related Claims | Unimpaired -- deemed to have voted to accept the Plan; |

CC-BLG002951

| | | no separate vote being solicited. |
|---|---|---|
| Class 4 | Workers' Compensation Claims | Unimpaired -- deemed to have voted to accept the Plan; no separate vote being solicited. |
| Class 5 | Intercompany Claims | Unimpaired -- deemed to have voted to accept the Plan; no separate vote being solicited. |
| Class 6 | Asbestos PI-SE Claims | Unimpaired -- deemed to have voted to accept the Plan; no separate vote being solicited. |
| Class 7 | Asbestos PI-AO Claims | Unimpaired -- deemed to have voted to accept the Plan; no separate vote being solicited. |
| Class 8 | Asbestos PD Claims | Unimpaired -- deemed to have voted to accept the Plan; no separate vote being solicited. |
| Class 9 | General Unsecured Claims | Impaired -- vote being solicited. |
| Class 10 | Equity Interests in the Parent | Impaired -- vote being solicited. |

4

EXHIBIT 2.2

| CLASSIFICATION | | IMPAIRMENT AND VOTING |
|---|---|---|
| Class 11 | Equity Interests in Debtors Other than the Parent | Unimpaired -- deemed to have voted to accept the Plan; no separate vote being solicited. |

### 3.1.1 CLASS 1. PRIORITY CLAIMS

(a)  Classification

Class 1 consists of all Priority Claims against the Debtors.

(b)  Treatment

Each Holder of an Allowed Priority Claim shall be paid the Allowed Amount of its Allowed Priority Claim either (i) in full, in cash, on the later of (A) the Effective Date or as soon as practicable thereafter or (B) the date such Priority Claim becomes an Allowed Priority Claim, or as soon as practicable thereafter, or (ii) upon such other less favorable terms as may be mutually agreed upon between the Holder of an Allowed Priority Claim and the Reorganized Debtors.

(c)  Impairment and Voting

Class 1 is unimpaired. The Holders of the Allowed Priority Claims in Class 1 are deemed to have voted to accept this Plan and, accordingly, their separate vote will not be solicited.

### 3.1.2 CLASS 2. SECURED CLAIMS

(a)  Classification

Class 2 consists of all Secured Claims against the Debtors.

(b)  Treatment

Each Holder of an Allowed Secured Claim shall be paid the Allowed Amount of its Allowed Secured Claim at the option of the Reorganized Debtors, either (i) in full, in cash, on the later of (A) the Effective Date or as soon as practicable thereafter or (B) the date such Secured Claim becomes an Allowed Secured Claim, or as soon as practicable thereafter; (ii) upon such other less favorable terms as may be mutually agreed upon between the Holder of an Allowed Secured Claim and the Reorganized Debtors; (iii) by the surrender to the Holder or Holders of any Allowed Secured Claim of the property securing such Claim; or (iv) notwithstanding any contractual provision or applicable law that entitles the Holder of a Secured Claim to demand or receive payment thereof prior to the stated maturity from and after the occurrence of a default, by reinstatement in accordance with Bankruptcy Code Section 1124(2)(A)-(D).

(c)  Impairment and Voting

Class 2 is unimpaired. The Holders of the Allowed Secured Claims in Class 2 are deemed to have voted to accept this Plan and, accordingly, their

CC-BLG002952