7.2.2 FUNDING OF THE ASBESTOS TRUST

Effective on the Effective Date and conditioned upon the fulfillment of events enumerated in the Sealed Air Settlement Agreement, Cryovac, Inc. shall fund the Sealed Air

17

EXHIBIT 2.2

Payment into the Asbestos Trust in accordance with this Plan and the provisions of the Sealed Air Settlement Agreement. Effective on the thirty-first (31st) day after the Effective Date, the Parent shall transfer or cause the transfer of the Debtors' Payment into the Asbestos Trust in accordance with this Plan.

The Sealed Air Payment and that portion of the Debtors' Payment consisting of the Parent Common Stock, to the extent necessary, shall first fund the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund and the Asbestos Trust Expenses Fund. The remainder of the Sealed Air Payment, if any, and the Warrants included as part of the Debtors' Payment shall fund the Asbestos PI-AO Class Fund.

In addition, in the event that the proceeds of the sale of Parent Common Stock following exercise of all of the Warrants are insufficient to pay all Allowed Asbestos PI-AO Claims in full, the Reorganized Debtors shall pay the Asbestos Trust in full and in cash for the benefit of the Holders of such Claims, such payment to be made by the Reorganized Debtors on the first Business Day of the next calendar quarter after the date upon which the Asbestos PI-AO Claim becomes Allowed, unless the Claim becomes Allowed within fifteen (15) Business Days before the first Business Day of such next calendar quarter, in which case the payment date shall be the first Business Day of the next succeeding calendar quarter.

7.2.3 TRANSFER OF ASSETS INTO THE ASBESTOS TRUST

Upon the transfer of the Sealed Air Payment into the Asbestos Trust, and the transfer of the Debtors' Payment into the Asbestos Trust, each such transfer shall be vested in the Asbestos Trust, free and clear of all Claims, Equity Interests, Encumbrances and other interests of any Entity.

7.2.4 TRANSFER OF CLAIMS AND DEMANDS TO THE ASBESTOS TRUST

On the Effective Date, without any further action of any Entity, all liabilities, obligations, and responsibilities of any Asbestos Protected Party relating to all Asbestos Claims shall be channeled to and assumed by the Asbestos Trust whether or not (A) a proof of Claim based on such Claim was Filed or deemed Filed under Bankruptcy Code Section 501, (B) such Claim is or was Allowed under Bankruptcy Code Section 502, (C) such Claim was listed on the Schedules of a Debtor, or (D) the Holder of such Claim voted on or accepted this Plan. This paragraph is intended to further effect the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction, the Release Matters Injunction, and the Discharge described in Section 8.1 of this Plan. This paragraph is not intended to, and it shall not, serve as a waiver of any defense to any claim the Debtors, the Canadian Affiliates or the Asbestos Trust would otherwise have.

7.2.5 CREATION OF ASBESTOS TRUST SUB-ACCOUNTS

On the Effective Date, the Asbestos Trust shall contain the PD Account, the PI-AO Account, the PI-SE Account, the Trust Expenses Account, and such other accounts as may be provided for in and in accordance with the Asbestos Trust Agreement.

7.2.6 APPOINTMENT AND TERMINATION OF TRUSTEES

On or before the Confirmation Date, the Debtors shall nominate the initial three (3) Trustees of the Asbestos Trust. The Bankruptcy Court, after notice and opportunity for hearing,

18

EXHIBIT 2.2

shall be asked to appoint the three individuals named by the Debtors to serve as Trustees of the Asbestos Trust effective as of the Effective Date. Upon termination of the Asbestos Trust, the Trustees' employment shall be deemed terminated and the Trustees shall be released and discharged of and from all further authority, duties, responsibilities and obligations relating to or arising from or in connection with the Chapter 11 Cases.

7.2.7 CREATION AND TERMINATION OF THE TAC

Pursuant to the terms of the Asbestos Trust Agreement, the Debtors, the FCR, the Asbestos PI Committee and the Asbestos PD Committee, acting jointly, shall nominate the three (3) initial members of the TAC. On the Confirmation Date, effective as of the Effective Date, the Bankruptcy Court

CC-BLG002961

shall be asked to appoint the initial members of the TAC (and thereupon the TAC shall be formed) to serve as members of the TAC in accordance with the Asbestos Trust Agreement. Upon termination of the Asbestos Trust, the TAC shall be deemed dissolved and the TAC shall be released and discharged of and from all further authority, duties, responsibilities and obligations relating to or arising from or in connection with the Chapter 11 Cases.

### 7.2.8 COOPERATION AGREEMENT

On the Effective Date or as soon thereafter as is practicable, the Reorganized Debtors and the Asbestos Trust shall enter into a cooperation agreement pursuant to which: (a) the Reorganized Debtors shall provide to the Asbestos Trust the non-privileged books and records of the Debtors and the Reorganized Debtors that pertain directly to Asbestos Claims and (b) the Asbestos Trust shall provide to the Reorganized Debtors books and records of the Asbestos Trust that pertain to Asbestos Claims so as to fully enable the Reorganized Debtors to recover any amounts available under any Asbestos Insurance Policy as if the Reorganized Debtors were processing, litigating and/or paying all Asbestos Claims directly. Execution of the cooperation agreement, in a form acceptable to the Debtors, is a condition precedent to the Sealed Air Payment and the Debtors' Payment being delivered to the Asbestos Trust.

The Debtors shall File the draft of the cooperation agreement prior to the Effective Date and shall seek an order from the Court that the providing of books and records under such cooperation agreement shall not result in the destruction, impairment or waiver of any applicable privileges pertaining to such books and records.

### 7.2.9 INSTITUTION AND MAINTENANCE OF LEGAL AND OTHER PROCEEDINGS

As of the Effective Date, without any further action of any Entity, the Asbestos Trust shall be empowered to initiate, prosecute, defend, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the Asbestos Trust, provided that the Reorganized Debtors and the Canadian Affiliates, as applicable, shall have the sole right and authority to resolve Asbestos PI-AO Claims for which the Holder of such Asbestos PI-AO Claim elects the Litigation Option or the Canadian Litigation Option, as applicable.

### 7.3 PAYMENTS AND DISTRIBUTIONS UNDER THIS PLAN

### 7.3.1 ASBESTOS TRUST PAYMENTS AND PLAN DISTRIBUTIONS

Payments to Holders of Allowed Asbestos Claims shall be made by the Asbestos Trust in accordance with the Asbestos Trust Agreement, the respective TDPs, the CMO and the Canadian

19

EXHIBIT 2.2

Litigation Procedure, as applicable. All Distributions or payments required or permitted to be made under this Plan (other than to Professionals) shall be made by the Reorganized Debtors in accordance with the treatment specified for each such Holder as specified herein (unless otherwise ordered by the Bankruptcy Court). Distributions to be made on the GUC Distribution Date, the Initial Distribution Date or the Quarterly Distribution Date shall be deemed actually made on such distribution date if made either (i) on the GUC Distribution Date, the Initial Distribution Date or the Quarterly Distribution Date or (ii) as soon as practicable thereafter. Professionals shall be paid pursuant to the order of the Bankruptcy Court.

### 7.3.2 TIMING OF PLAN DISTRIBUTIONS

Whenever any Distribution to be made under this Plan shall be due on a day other than a Business Day, such Distribution shall instead be made, without the accrual of any additional interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due.

### 7.4 DELIVERY OF DISTRIBUTIONS AND UNDELIVERABLE OR UNCLAIMED DISTRIBUTIONS.

### 7.4.1 DELIVERY BY THE REORGANIZED DEBTORS OF DISTRIBUTIONS IN GENERAL

Payments by the Asbestos Trust to Holders of Allowed Asbestos Claims shall be made in accordance with the Asbestos Trust Agreement and the respective TDPs. All other Distributions to Holders of Allowed Claims shall be made at the address of the Holder of such Claim as set forth on the Schedules, unless superseded by a new address, or as set forth (i) in a proof of Claim Filed by a Holder of an Allowed Claim, (ii) in another writing notifying the Reorganized Debtors of a change of address prior to the date of Distribution, or (iii) in a request for payment of an Administrative Expense Claim, as the case may be.

### 7.4.2 UNDELIVERABLE DISTRIBUTIONS BY THE REORGANIZED DEBTORS

Any cash, assets, and other properties to be distributed by the Reorganized Debtors under this Plan to Holders of Claims, other than Asbestos

CC-BLG002962

Claims, that remain unclaimed (including by an Entity's failure to negotiate a check issued to such Entity) or otherwise not deliverable to the Entity entitled thereto before the later of (i) one year after Distribution or (ii) one-hundred twenty (120) calendar days after an order allowing such Entity's Claim becomes a Final Order, shall become vested in, and shall be transferred and delivered to, the Reorganized Debtors. In such event, such Entity's Claim shall no longer be deemed to be Allowed, and such Entity shall be deemed to have waived its rights to such payments or Distributions under this Plan pursuant to Bankruptcy Code Section 1143, shall have no further Claim in respect of such Distribution, and shall not participate in any further Distributions under this Plan with respect to such Claim.

### 7.5  PAYMENTS UNDER THIS PLAN

#### 7.5.1 MANNER OF PAYMENTS UNDER THIS PLAN

Unless the Entity receiving a Distribution or payment agrees otherwise, any such Distribution or payment in cash to be made by the Reorganized Debtors or the Asbestos Trust shall be made, at the election of the Reorganized Debtors or the Asbestos Trust, as applicable, by check drawn on a domestic bank or by wire transfer from a domestic bank.

20

EXHIBIT 2.2

#### 7.5.2 FRACTIONAL PAYMENTS UNDER THIS PLAN

Notwithstanding any other provision of this Plan, payments of fractions of dollars or of fractional shares shall not be made. Whenever, under this Plan, any payment of a fraction of a dollar or a fractional share of Parent Common Stock would otherwise be called for, the actual payment made shall reflect a rounding of such fraction to the nearest whole dollar or nearest whole share of Parent Common Stock, as applicable, (up or down), with half dollars or half shares being rounded up.

### 7.6  OCCURRENCE OF THE CONFIRMATION DATE

The following shall constitute conditions precedent to confirmation of this Plan:

#### 7.6.1 FINDINGS OF FACT AND/OR CONCLUSIONS OF LAW

The Court shall have made the following findings of fact and/or conclusions of law, among others, substantially to the effect as follows, in connection with the confirmation of this Plan, each of which shall be expressly set forth in the Confirmation Order:

(a) The Plan complies with all applicable sections of the Bankruptcy Code, including Bankruptcy Code Section 524(g);

(b) Claimants in Classes 6 through 8 shall be deemed to have voted for acceptance under the Plan in the requisite numbers and amounts required by Bankruptcy Code Sections 524(g), 1126 and 1129;

(c) As of the Petition Date, the Debtors have been named as defendants in personal injury, wrongful death, or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;

(d) On the Effective Date, the Asbestos Trust shall assume the liabilities of the Debtors and the Canadian Affiliates with respect to all Asbestos Claims;

(e) The Asbestos Trust is to be funded in part by securities of the Parent and by the obligations of the Reorganized Parent to make future payments;

(f) On the Effective Date, the Asbestos Trust would be entitled to own (if specific contingencies occur), the majority of the voting shares of the Reorganized Parent, by exercise of rights granted under the Plan;

(g) The Asbestos Trust is to use the Asbestos Trust Assets to pay Asbestos Claims;

(h) The Debtors and the Canadian Affiliates are likely to be subject to substantial Demands for payment arising out of the same or similar conduct or events that gave rise to the Asbestos Claims, which

21

CC-BLG002963

EXHIBIT 2.2

Demands are addressed by the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction and the Released Matters Injunction;

(i)  The actual amounts, numbers, and timing of Demands cannot be determined;

(j)  Pursuit of Demands outside the procedures prescribed by the Plan is likely to threaten the Plan's purpose to deal equitably with the Asbestos Claims and Demands;

(k)  The terms of the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction, and the Released Matters Injunction, including any provisions barring actions against third parties, are set out in the Plan in accordance with the requirements of Bankruptcy Rule 3016(c) and are adequately described in the Disclosure Statement;

(l)  Pursuant to Court orders or otherwise, the Asbestos Trust shall operate through mechanisms such as structured, periodic, or supplemental payments, matrices, or periodic review of estimates of the numbers and values of Asbestos Claims or Demands, or other comparable mechanisms that provide reasonable assurance that the Asbestos Trust shall value, and be in a position to pay, Asbestos Claims or Demands that involve similar claims in substantially the same manner;

(m)  The FCR shall have been appointed by the Court as part of the proceedings leading to the issuance of the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction, and the Released Matters Injunction for the purpose of, among other things, protecting the rights of Entities that might subsequently assert Demands of the kind that are addressed in the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction, and the Released Matters Injunction and transferred to the Asbestos Trust;

(n)  In light of the benefits provided, or to be provided, to the Asbestos Trust by, or on behalf of, each Asbestos Protected Party, the Asbestos Channeling Injunction is fair and equitable with respect to the Entities that might subsequently assert Demands against any Asbestos Protected Party;

(o)  The Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction and the Released Matters Injunction are to be implemented in connection with the Plan and the Plan Documents;

(p)  The Asbestos Channeling Injunction is essential to the Plan and the Debtors' reorganization efforts;

22

EXHIBIT 2.2

(q)  An identity of interests exists among the Debtors and the Asbestos Protected Parties such that a Claim asserted against any of the Asbestos Protected Parties gives rise to a Claim against the Debtors, including by the operation of the law of indemnity and/or contribution;

(r)  The Sealed Air Payment to the Asbestos Trust, together with the Debtors' Payment, and the Fresenius Payment constitute both (i) substantial assets of the Plan and the reorganization, and (ii) a fair, reasonable, and equitable settlement of all Asbestos Claims asserted against any Asbestos Protected Party;

(s)  As of the Effective Date, the Reorganized Debtors have the ability to pay and satisfy in the ordinary course of business all of their respective obligations and liabilities, including all Fresenius Indemnified Taxes and other liabilities under, the Fresenius Settlement Agreement and the Sealed Air Settlement Agreement;

(t)  Upon the transfer of the Sealed Air Common Stock to the Asbestos Trust, the Trustees shall represent and warrant and agree (on behalf of the Asbestos Trust) with Sealed Air, that the Asbestos Trust is acquiring the Sealed Air Common Stock for its own account for investment and not with a view toward distribution in a

CC-BLG002964

manner which would violate the Securities Act and the
Asbestos Trust and its transferees will comply with all
filing and other reporting obligations under all
applicable laws which shall be applicable to such
Asbestos Trust with respect to the Sealed Air Common
Stock.

(u) Upon confirmation and consummation of the Plan, each of
the Sealed Air Settlement Agreement, the Fresenius
Settlement Agreement and the Fresenius Settlement Order
shall be in full force and effect.

(v) The Court shall have found that the aggregate of the
Asbestos PI-SE Class Fund, the Asbestos PD Class Fund,
and the Asbestos Trust Expenses Fund is not greater
than one billion, four hundred eighty three million
($1,483,000,000).(2)

(w) The Court shall have found the Asbestos PI-AO Class
Fund is not greater than one hundred thirty million
($130,000,000).

----------
(2) This figure does not include Asbestos PD Claims that are fully secured by an
appeal bond in the case of Solow, et al. v W. R. Grace & Co.-Conn currently
pending in the New York Supreme Court, Appellate Division.

23

EXHIBIT 2.2

(x) The Court has entered an order finding that Class 6,
Class 7, and Class 8 are unimpaired.

(y) The Court has entered the Confirmation Order granting
the Asbestos Channeling Injunction, the Asbestos
Insurance Entity Injunction, and the Released Matters
Injunction to take effect as of the Effective Date.

(z) The terms of the Plan and the Confirmation Order do not
violate any obligation of the Debtors, the Canadian
Affiliates or any Asbestos Insurance Entity under any
Asbestos Insurance Policy or Asbestos Insurance
Settlement Agreement.

(aa) The terms of the Plan and the Confirmation Order do not
violate any obligation of the Debtors, the Canadian
Affiliates or any Asbestos Insurance Entity under any
consent-to-settlement, cooperation,
management-of-claims, or no-action provision of any
Asbestos Insurance Policy or Asbestos Insurance
Settlement Agreement.

(bb) The confirmation and/or recognition of the Plan does
not materially increase any Asbestos Insurance Entity's
risk of providing coverage for the asbestos-related
liabilities under the Asbestos Insurance Policies as
compared to the risk that was otherwise being borne by
the Asbestos Insurance Entity prior to the Effective
Date.

(cc) The duties and obligations of the Asbestos Insurance
Entities under the Asbestos Insurance Policies and
Asbestos Insurance Settlement Agreements are not
diminished, reduced or eliminated by (1) the discharge,
release, and extinguishment of the obligations and
liabilities of the Asbestos Protected Parties for and
in respect of all Asbestos Claims or (2) the assumption
by the Asbestos Trust of responsibility and liability
for all Asbestos Claims.

(dd) All Asbestos Claims shall be channeled to the Asbestos
Trust.

(ee) All Asbestos PI-SE Claims whose Holders elect the
Litigation Option or the Canadian Litigation Option, as
applicable, shall be litigated by, and at the expense
of, the Asbestos Trust in the name of the Asbestos
Trust.

(ff) All Allowed PI-SE Claims shall be paid by the Asbestos
Trust out of the Asbestos PI-SE Class Fund, which shall
be funded solely by the Sealed Air Payment and the
Parent Common Stock component of the Debtors' Payment,
if necessary.

(gg) All Allowed PI-AO Claims shall be paid initially by the
Asbestos Trust out of the Asbestos PI-AO Class Fund,
which shall be funded solely by the Warrants.

CC-BLG002965

EXHIBIT 2.2

(hh) All Asbestos PI-AO Claims whose Holders elect the Litigation Option or the Canadian Litigation Option, as applicable, shall be litigated by the Reorganized Debtors or the Canadian Affiliates, as applicable, in the name of the Asbestos Trust, initially at the expense of the Asbestos Trust out of the Asbestos PI-AO Class Fund.

(ii) After the exhaustion of the Asbestos PI-AO Class Fund in its entirety, all Allowed PI-AO Claims shall be paid in cash by the Asbestos Trust from funds to be paid to the Asbestos Trust by the Reorganized Debtors, such funds being in addition to the Debtors' Payment.

(jj) Although the litigation of Asbestos PI-AO Claims and Asbestos PI-SE Claims both are or will be in the name of the Asbestos Trust, the Asbestos Trust is the true party in interest in defending and/or objecting to Asbestos PI-SE Claims whereas, the Reorganized Debtors are the true parties in interest in defending and/or objecting to Asbestos PI-AO Claims.

(kk) There is no unity of economic interest between the Asbestos Trust in the context of the litigation of Asbestos PI-SE Claims and the Reorganized Debtors, acting nominally for the Asbestos Trust, in the context of the litigation of Asbestos PI-AO Claims.

(ll) Any findings of fact or conclusions of law arising out of the adjudication of any disputed Asbestos PI-SE Claims by the Asbestos Trust, and in which the Reorganized Debtors shall not appear as parties in interest and shall not participate directly, will not have collateral estoppel or any other preclusive effect on the Reorganized Debtors and/or the Asbestos Trust in the context of adjudication of any disputed Asbestos PI-AO Claim.

This Plan shall not be confirmed and the Confirmation Order shall not be entered until and unless each of the foregoing conditions to confirmation is either satisfied or waived by the Debtors and by Sealed Air and Fresenius with respect to the conditions set forth in paragraphs 7.6.1(r) and 7.6.1(s) above, and by Sealed Air with respect to the condition set forth in paragraph 7.6.1(t) above.

7.6.2 ORDERS OF THIS COURT

(a) The Confirmation Order shall be in form and substance acceptable to the Plan Proponents.

(b) The Confirmation Order shall be consistent with the requirements of the Sealed Air Settlement Agreement, the Fresenius Settlement Agreement and the Fresenius Settlement Order.

EXHIBIT 2.2

(c) The Court shall have entered the CMO in form and substance acceptable to the Debtors.

(d) The Court shall have entered the Estimation Order in form and substance acceptable to the Plan Proponents, including the following findings:

(i) the Asbestos PI-SE Class Fund shall constitute the maximum amount that shall be required to be paid in order to pay in full all Allowed Asbestos PI-SE Claims;

(ii) the Asbestos PD Class Fund shall constitute the maximum amount that shall be required to be paid in order to pay in full all Allowed Asbestos PD Claims; and

(iii) the Asbestos Trust Expenses Fund shall constitute the maximum amount that shall be required to be paid in order to pay in full all expenses of the Asbestos Trust.

(e) The Court shall have entered an order in form and substance acceptable to the Plan Proponents approving the Sealed Air Settlement Agreement.

This Plan shall not be confirmed and the Confirmation Order shall not be entered until and unless each of the foregoing conditions to confirmation is either satisfied or waived by the Debtors, and by the Unsecured Creditors' Committee and the Equity Committee with respect to the conditions set forth in paragraphs 7.6.2(a), 7.6.2(d) and 7.6.2(e).

7.7   CONDITIONS TO OCCURRENCE OF THE EFFECTIVE DATE

The "effective date of the plan," as used in Bankruptcy Code Section 1129, shall not occur, and this Plan shall be of no force and effect, until the Effective Date. The occurrence of the Effective Date is subject to satisfaction of the following conditions precedent:

(a) Each of the Confirmation Order and the Recognition Order shall have been issued or affirmed by the District Court or the Canadian Court, as the case may be, and each shall have become a Final Order; provided that, at the option of the Plan Proponents, the Effective Date may occur at a point in time when the Confirmation Order is not a Final Order unless the effectiveness of the Confirmation Order has been stayed or vacated, in which case, at the option of the Plan Proponents, the Effective Date may be the first Business Day immediately following the expiration or other termination of any stay of effectiveness of the Confirmation Order.

(b) The District Court shall have entered or affirmed an order(s) entering the Asbestos Channeling Injunction which shall have been approved or recognized by the Canadian Court in the context of the Canadian Proceedings.

26

EXHIBIT 2.2

(c) The District Court shall have entered or affirmed an order(s) approving this Plan and all the Plan Documents and such order(s) shall have become Final Orders and which Final Orders shall have been approved or recognized by the Canadian Court in the context of the Canadian Proceedings.

(d) The Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction and the Released Matters Injunction shall be in full force and effect.

(e) The Plan Documents, including the Sealed Air Settlement Agreement, necessary or appropriate to implement this Plan shall have been (i) executed, in a form acceptable to the Plan Proponents, (ii) delivered by Sealed Air and, where applicable, (iii) filed with the appropriate governmental or supervisory authorities.

(f) The Certificate of Incorporation or Articles of Incorporation, as applicable, of each of the Debtors, as amended in accordance with this Plan, shall be in full force and effect.

(g) The Exit Financing, in an amount and on such terms satisfactory to the Debtors, shall be in full force and effect and available immediately upon the occurrence of the Effective Date and after all necessary parties have executed the documentation relating thereto.

(h) The Sealed Air Settlement Agreement shall have been duly approved by the board of directors of Sealed Air.

(i) The Court shall have entered a finding that the cooperation agreements entered into between the Reorganized Debtors and the Asbestos Trust do not result in the destruction, impairment, or waiver of any applicable privileges pertaining to the books and records subject thereto.

The Effective Date shall not occur unless and until each of the foregoing conditions is either satisfied or waived by the Debtors, by the Unsecured Creditors' Committee and the Equity Committee with respect to the conditions set forth in paragraphs 7.7(a), 7.7(b), 7.7(c), 7.7(d) and 7.7(e), and by Sealed Air with respect to the conditions set forth in paragraph 7.7(h). Notice of the occurrence of the Effective Date reflecting that the foregoing conditions have been satisfied or waived shall: (i) be signed by the Debtor and each Entity whose consent is required pursuant to this Plan, (ii) state the date of the Effective Date; and (iii) be Filed with the Bankruptcy Court by the

Debtors' counsel. No waiver shall be effective unless it complies with the requirements of this provision.

If the Effective Date does not occur by December 31, 2005, the Debtors reserve the right to seek dismissal of the Chapter 11 Cases. The other Plan Proponents reserve their right to take any action they believe appropriate regarding the Debtors' seeking of dismissal of the Chapter 11 Cases. In the event that the Effective Date does not occur, all parties shall be returned to the

27

EXHIBIT 2.2

position they would have held had the Confirmation Order not been entered. In such event, nothing contained herein or in any of the Plan Documents shall be deemed to constitute a waiver or release of any claims or defenses of, or an admission or statement against interest by, the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors.

### 7.8  MANAGEMENT OF THE REORGANIZED DEBTORS

On and after the Effective Date, the business and affairs of the Reorganized Debtors will be managed by their respective Boards of Directors or equivalent thereof. Upon the Effective Date, the Board of Directors of the Reorganized Parent shall be composed of at least five (5) directors. The Debtors shall specify the directors of the Reorganized Parent in the Plan Supplement. The directors of the Reorganized Parent appointed upon the Effective Date shall serve for two (2) years without replacement other than as a consequence of resignation, death or action of the Board of Directors. Thereafter, the directors may be replaced by stockholder action. In addition, as will be specified in the Plan Supplement, certain key members of current management are expected to continue with the Reorganized Debtors.

### 7.9  CORPORATE ACTION

On or prior to the Effective Date, the Boards of Directors of the respective Debtors that are corporations shall adopt an amendment to their respective Certificates of Incorporation or Articles of Incorporation, as applicable (the Certificate of Incorporation of the Parent to be substantially in the form included in the Plan Supplement) and the Parent shall adopt the By-Laws substantially in the form included in the Plan Supplement, and such corporate actions shall be authorized and approved in all respects, in each case without further action under applicable law, regulation, order, or rule, including any action by the stockholders of the Parent, the Debtors in Possession, or the Reorganized Debtors. On the Effective Date or as soon thereafter as is practicable, the Parent shall file with the Secretary of State of the State of Delaware, in accordance with the applicable Delaware statutes, rules, and regulations, such amendment to its Certificate of Incorporation and each of the other Debtors shall file their respective Certificates of Incorporation or Articles of Incorporation, as applicable with the Secretary of State, or equivalent official in their respective jurisdictions. On the Effective Date, the approval and effectiveness of matters provided under this Plan involving the corporate structure of the Reorganized Debtors or corporate action by the Reorganized Debtors shall be deemed to have occurred and to have been authorized, and shall be in effect from and after the Effective Date without requiring further action under applicable law, regulation, order, or rule, including any action by the stockholders or directors of the Debtors, the Debtors in Possession, or the Reorganized Debtors.

### 7.10  EFFECTUATING DOCUMENTS AND FURTHER TRANSACTIONS

Each of the officers of the Debtors and the Reorganized Debtors is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and to take such actions as may be necessary or appropriate, for and on behalf of the Debtors and the Reorganized Debtors, to effectuate and further evidence the terms and conditions of this Plan, the transactions contemplated by this Plan, and any securities issued pursuant to this Plan.

28

EXHIBIT 2.2

### 7.11  ALLOCATION OF PLAN DISTRIBUTIONS BETWEEN PRINCIPAL AND INTEREST

To the extent that any Allowed Claim entitled to a Distribution under this Plan consists of indebtedness and accrued but unpaid interest thereon, such Distribution shall, for federal income tax purposes, be allocated first to the principal amount of the Claim and then, to the extent the Distribution exceeds the principal amount of the Claim, to the accrued but unpaid interest.

### 7.12  NO SUCCESSOR LIABILITY

Except as otherwise expressly provided in this Plan, the Debtors, the

CC-BLG002968

Reorganized Debtors, the Asbestos PI Committee, the Asbestos PD Committee, the FCR, and the Asbestos Protected Parties will not, pursuant to this Plan or otherwise, assume, agree to perform, pay, or indemnify creditors or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any of the Debtors' past or present Affiliates, as such liabilities or obligations may relate to or arise out of the operation of or assets of the Debtors or any of the Debtors' past or present Affiliates or any of their respective successors, whether arising prior to, or resulting from actions, events, or circumstances occurring or existing at any time prior to the Confirmation Date. Neither the Asbestos Protected Parties, the Reorganized Debtors, nor the Asbestos Trust is, or shall be, a successor to the Debtors or any of the Debtors' past or present Affiliates by reason of any theory of law or equity, and none shall have any successor or transferee liability of any kind or character, except that the Reorganized Debtors and the Asbestos Trust shall assume the obligations specified in this Plan and the Confirmation Order.

Except as otherwise expressly provided in this Plan, effective automatically on the Effective Date, the Asbestos Protected Parties and their respective Representatives shall be unconditionally, irrevocably and fully released from any and all Claims and causes of action, including Claims and causes of action arising under Chapter 5 of the Bankruptcy Code or similar Claims or causes of action arising under state or any other law, including, if applicable, claims in the nature of fraudulent transfer, successor liability, corporate veil piercing, or alter ego-type claims, as a consequence of transactions, events, or circumstances involving or affecting the Debtors or the Canadian Affiliates (or any of their predecessors) or any of their respective businesses or operations that occurred or existed prior to the Effective Date.

7.13 DEEMED CONSOLIDATION OF THE DEBTORS FOR PLAN PURPOSES ONLY

Subject to the occurrence of the Effective Date, the Debtors shall be deemed consolidated under this Plan for Plan purposes only. Each and every Claim Filed or to be Filed against any of the Debtors shall be deemed Filed against the deemed consolidated Debtors and shall be deemed one Claim against and obligation of the deemed consolidated Debtors.

Such deemed consolidation, however, shall not (other than for purposes related to funding Distributions under this Plan and as set forth above in this Section 7.13) affect: (i) the legal and organizational structure of the Debtors; (ii) any Encumbrances that are required to be maintained under this Plan (A) in connection with executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been or will be assumed, (B) pursuant to this Plan, or (C) in connection with any Exit Financing; (iii) the Sealed Air Settlement Agreement; and (iv) the Fresenius Settlement Agreement.

Notwithstanding anything contained in this Plan to the contrary, the deemed consolidation of the Debtors shall not have any effect on any of the Claims (other than Asbestos

29

EXHIBIT 2.2

Claims) being reinstated and left unimpaired under this Plan, and the legal, equitable, and contractual rights to which the Holders of any such Claims (other than Asbestos Claims) are entitled shall be left unaltered by this Plan.

ARTICLE 8.
INJUNCTIONS, RELEASES & DISCHARGE

8.1  DISCHARGE

8.1.1 DISCHARGE OF THE DEBTORS AND RELATED DISCHARGE INJUNCTION

The rights afforded in this Plan and the treatment of all Claims, Demands and Equity Interests herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims, Demands and Equity Interests of any nature whatsoever, including any interest accrued thereon from and after the Petition Date, against the Debtors and the Debtors in Possession, or their assets, properties, or interests in property. Except as otherwise provided herein, on the Effective Date, all Claims, Demands against, and Equity Interests in the Debtors and the Debtors in Possession shall be satisfied, discharged, and released in full. The Reorganized Debtors shall not be responsible for any obligations of the Debtors or the Debtors in Possession except those expressly assumed by the Reorganized Debtors pursuant to this Plan. All Entities shall be precluded and forever barred from asserting against the Debtors and the Reorganized Debtors, or their assets, properties, or interests in property any other or further Claims or Demands based upon any act or omission, transaction, or other activity, event, or occurrence of any kind or nature that occurred prior to the Effective Date, whether or not the facts of or legal bases therefor were known or existed prior to the Effective Date, except as expressly provided in this Plan.

With respect to any debts discharged by operation of law under Bankruptcy Code Sections 524(a) and 1141, the discharge of the Debtors operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover, or offset any such debt as a personal liability of the Debtor, whether or not the discharge of such debt is waived; provided, however, that the obligations of the Reorganized Debtors

CC-BLG002969

under this Plan are not so discharged.

### 8.1.2 DISCHARGE OF LIABILITIES TO HOLDERS OF ASBESTOS CLAIMS

The transfer to, vesting in, and assumption by the Asbestos Trust of the Asbestos Trust Assets as contemplated by this Plan, among other things, shall (i) discharge the Debtors, the Reorganized Debtors and their Representatives for and in respect of all Asbestos Claims and (ii) discharge, release, and extinguish all obligations and liabilities of the Asbestos Protected Parties and Asbestos Insurance Entities for and in respect of all Asbestos Claims, subject to the reservations listed in Section 8.3.2 herein. On the Effective Date, the Asbestos Trust shall assume the liabilities of the Debtors with respect to all Asbestos Claims and shall pay the Allowed Asbestos Claims in accordance with the Asbestos Trust Agreement and the appropriate TDPs.

30

EXHIBIT 2.2

### 8.1.3 DISALLOWED CLAIMS AND DISALLOWED EQUITY INTERESTS

On and after the Effective Date, the Debtors, the Reorganized Debtors and their Representatives shall be fully and finally relieved of any liability or obligation on a Disallowed Claim or Disallowed Equity Interest, and any order creating a Disallowed Claim that is not a Final Order as of the Effective Date solely because of an Entity's right to move for reconsideration of such order pursuant to Bankruptcy Code Section 502 or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date.

### 8.1.4 NON-DISCHARGEABLE ERISA LIABILITY

The Parent is a controlled group member within the meaning of 29 U.S.C. Section 1301(a)(14) and may also be a contributing sponsor of one or more ongoing, defined benefit pension plans to which Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA") applies (the "Pension Plans"). The Debtors intend, and this Plan contemplates, that the Reorganized Debtors will continue to be the contributing sponsor of all the Pension Plans that it currently sponsors. Each of the Pension Plans is a defined benefit pension plan insured by the Pension Benefit Guaranty Corporation ("PBGC") under ERISA. The Pension Plans are subject to minimum funding requirements of ERISA and Section 412 of the IRC. The PBGC believes the Pension Plans to be underfunded on a termination basis. As of their April 2004 Form 4010 Filings with the PBGC, the Debtors Actuarial Information Certification indicates the total unfunded status of the Pension Plans was $394.2 million as of December 31, 2003. An underfunded pension plan can terminate only in either a distress termination or PBGC-initiated termination under Title IV of ERISA. Should the Pension Plans terminate, the PBGC may assert claims for the underfunding, for any unpaid minimum funding contributions owed the Pension Plan, and for any unpaid premiums owed the PBGC. The PBGC further asserts that portions of those claims would be entitled to priority status.

Nothing contained in this Plan, Confirmation Order, the Bankruptcy Code (including Bankruptcy Code Section 1141), or any other document Filed in the Chapter 11 Cases shall be construed to discharge, release or relieve the Debtors, or any other party, in any capacity, from any liability or responsibility to the PBGC with respect to the Pension Plans under any law, governmental policy, or regulatory provision. The PBGC shall not be enjoined or precluded from enforcing such liability or responsibility, as a result of any of the provisions of this Plan (including those provisions providing for exculpation, satisfaction, release and discharge of Claims), the Confirmation Order, the Bankruptcy Code (including Bankruptcy Code Section 1141), or any other document Filed in the Chapter 11 Cases. Notwithstanding the foregoing, neither the PBGC nor any other Entity shall assert any liability or responsibility with respect to the Pension Plans under any law, governmental policy or regulatory provisions against, and such liability or responsibility shall not attach to, the Asbestos Trust or any of the Asbestos Trust Assets.

### 8.2   THE ASBESTOS CHANNELING INJUNCTION

In order to supplement, where necessary, the injunctive effect of the discharge provided by Bankruptcy Code Sections 1141 and 524(a) and as described in this Article 8, and pursuant to the exercise of the equitable jurisdiction and power of the Court under Bankruptcy Code Sections 524(g) and 105(a), the Confirmation Order shall provide for issuance of the Asbestos Channeling Injunction to take effect as of the Effective Date. On and after the Effective Date, the sole recourse of the Holder of an Asbestos Claim on account of such Claim shall be to the Asbestos

31

EXHIBIT 2.2

Trust pursuant to the provisions of the Asbestos Channeling Injunction and the appropriate TDPs and such Holder shall have no right whatsoever at any time to assert its Asbestos Claim against the Debtors, the Canadian Affiliates, the Reorganized Debtors, any other Asbestos Protected Party, or any property or

CC-BLG002970

interest (including any distributions made pursuant to this Plan) in property of the Debtors, the Reorganized Debtors, or any other Asbestos Protected Party. Without limiting the foregoing, from and after the Effective Date, the Asbestos Channeling Injunction shall apply to all present and future Holders of Asbestos Claims, and all such Holders permanently and forever shall be stayed, restrained, and enjoined from taking any of the following actions for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Asbestos Claims other than from the Asbestos Trust in accordance with the Asbestos Channeling Injunction and pursuant to the Asbestos Trust Agreement and the appropriate TDPs, including:

      (a)   commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or affecting any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party;

      (b)   enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party;

      (c)   creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party;

      (d)   setting off, seeking reimbursement of, indemnification or contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party; and

      (e)   proceeding in any other manner with regard to any matter that is subject to resolution pursuant to the Asbestos Trust, except in conformity and compliance with the Asbestos Trust Agreement and the appropriate TDPs.

     Notwithstanding anything to the contrary above, this Asbestos Channeling Injunction shall not enjoin the rights of Entities to the treatment accorded them under Article 3 of this Plan, as applicable, including the rights of Entities with Asbestos Claims to assert such Asbestos Claims in accordance with the appropriate TDPs.

     Except as otherwise expressly provided in this Plan, the Sealed Air Settlement Agreement, or the Fresenius Settlement Agreement, nothing contained in this Plan shall constitute or be deemed a waiver of any claim, right, or cause of action that the Debtors, the

EXHIBIT 2.2

Canadian Affiliates, the Reorganized Debtors, or the Asbestos Trust may have against any Entity in connection with or arising out of or related to any Asbestos Claim.

   8.3  ASBESTOS INSURANCE ENTITY INJUNCTION

     Pursuant to the exercise of the equitable jurisdiction and power of the Court under Bankruptcy Code Section 105(a), the Confirmation Order shall provide for issuance of the Asbestos Insurance Entity Injunction to take effect as of the Effective Date.

      8.3.1  INJUNCTION

      (a)   All Entities that have held or asserted, that hold or assert, or that may in the future hold or assert any Claim, Demand, or cause of action, against any Asbestos Insurance Entity, based upon, relating to, arising out of, or in any way connected with any Claim, Demand, Asbestos Insurance Rights, Asbestos Insurance Policies, or Asbestos Insurance Settlement Agreements, whenever and wherever arisen or asserted (including all Claims in the nature of or sounding in tort, or under contract, warranty, or any other theory of law, equity, or admiralty) shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such Claim, Demand, or cause of action, including:

(i) commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or affecting any Asbestos Insurance Entity, or any property or interest in property of any Asbestos Insurance Entity;

(ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Asbestos Insurance Entity, or any property or interest in property of any Asbestos Insurance Entity;

(iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Asbestos Insurance Entity, or any property or interest in property of any Asbestos Insurance Entity;

(iv) setting off, seeking reimbursement of, indemnification or contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any Asbestos Insurance Entity, or any property or interest in property of any Asbestos Insurance Entity; and

(v) proceeding in any other manner with regard to any matter that is subject to resolution pursuant to the Asbestos Trust, except in conformity and compliance with the Asbestos Trust Agreement, the appropriate TDPs, and the appropriate Asbestos Insurance Settlement Agreements.

33

EXHIBIT 2.2

(b) The Reorganized Debtors shall have the sole and exclusive authority at any time to terminate, reduce or limit the scope of, the Asbestos Insurance Entity Injunction as it may apply to any Asbestos Insurance Entity upon express written notice to that Asbestos Insurance Entity; and

(c) The Asbestos Insurance Entity Injunction is not issued for the benefit of any Asbestos Insurance Entity, and no Asbestos Insurance Entity is or may become a third-party beneficiary of the Asbestos Insurance Entity Injunction.

8.3.2 RESERVATIONS FROM THE ASBESTOS INSURANCE ENTITY INJUNCTION

Notwithstanding anything to the contrary above, the Asbestos Insurance Entity Injunction shall not enjoin:

(a) the rights of any Entity to the treatment accorded it under this Plan;

(b) the rights of any of the Reorganized Debtors or the Non-Debtor Affiliates, as the case may be, to prosecute any cause of action or to assert any Claim, Demand, debt, obligation, or liability for payment against any Entity, including any Asbestos Insurance Entity, based on or arising from the Asbestos Insurance Rights for the Debtors', Reorganized Debtors' or the Non-Debtor Affiliates' benefit; and

(c) the rights of any of the Reorganized Debtors or the Non-Debtor Affiliates, as the case may be, to receive any settlement, award, payment of cash or other property of any kind whatsoever from any Entity, including any Asbestos Insurance Entity, in satisfaction of any Asbestos Insurance Rights that any of the Debtors, the Reorganized Debtors or the Non-Debtor Affiliates, as the case may be, may have against any of the foregoing.

8.4 RELEASED MATTERS INJUNCTION

Pursuant to the exercise of the equitable jurisdiction and power of the Court under Bankruptcy Code Section 105(a), the Confirmation Order shall provide for issuance of the Released Matters Injunction to take effect as of the Effective Date.

8.4.1 INJUNCTION

(a) All Entities that have held or asserted, that hold or assert, or that may in the future hold or assert any Claim, Demand, or cause of action, against any Entity released under any provision of this Plan, shall be enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery on

CC-BLG002972

account of such released matters, including:

34

EXHIBIT 2.2

(i) commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or affecting any Entity released under any provision of this Plan, or any property or interest in property of any such released Entity;

(ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Entity released under any provision of this Plan, or any property or interest in property of any such released Entity;

(iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Entity released under any provision of this Plan, or any property or interest in property of any such released Entity; and

(iv) setting off, seeking reimbursement of, indemnification or contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Entity released under any provision of this Plan, or any property or interest in property of any such released Entity.

8.4.2 RESERVATIONS FROM THE RELEASED MATTERS INJUNCTION

Notwithstanding anything to the contrary above, the injunction provided in Section 8.4.1 of this Plan shall not enjoin:

(a) the rights of any Entity to the treatment accorded it under this Plan;

(b) the rights of any of the Reorganized Debtors or the Non-Debtor Affiliates, as the case may be, to prosecute any cause of action or to assert any Claim, Demand, debt, obligation, or liability for payment against any Entity, including any Asbestos Insurance Entity, based on or arising from the Asbestos Insurance Rights for the Debtors', Reorganized Debtors' or the Non-Debtor Affiliates' benefit; and

(c) the rights any of the Reorganized Debtors or the Non-Debtor Affiliates, as the case may be, to receive any settlement, award, payment of cash or other property of any kind whatsoever from any Entity, including any Asbestos Insurance Entity in satisfaction of any Asbestos Insurance Rights that any of the Reorganized Debtors or the Non-Debtor Affiliates, as the case may be, may have against any of the foregoing.

8.5  INJUNCTIONS AND RELEASES RELATED TO THE SEALED AIR INDEMNIFIED PARTIES AND FRESENIUS INDEMNIFIED PARTIES

As required by the Sealed Air Settlement Agreement, the Fresenius Settlement Agreement, and the Fresenius Settlement Order, the injunctions and releases outlined in this Plan, including the Asbestos Channeling Injunction and the Released Matters Injunction and

35

EXHIBIT 2.2

provided under Bankruptcy Code Sections 105(a) and 524(g), shall absolutely and unequivocally extend to and protect the Sealed Air Indemnified Parties and the Fresenius Indemnified Parties.

8.6  TERM OF CERTAIN INJUNCTIONS AND AUTOMATIC STAY

8.6.1 INJUNCTIONS AND/OR AUTOMATIC STAYS IN EXISTENCE IMMEDIATELY PRIOR TO CONFIRMATION

All of the injunctions and/or automatic stays provided for in or in connection with the Chapter 11 Cases, whether pursuant to Bankruptcy Code Sections 105, 362, or any other provision of the Bankruptcy Code or other applicable law, in existence immediately prior to the Confirmation Date shall remain in full force and effect until the injunctions set forth in this Plan become effective, and thereafter if so provided by this Plan, the Confirmation Order, or by their own terms. In addition, on and after the Confirmation Date, the Reorganized Debtors may seek such further orders as they may deem necessary or appropriate to preserve the status quo during the time between the Confirmation Date and the Effective Date.

CC-BLG002973

8.6.2 INJUNCTIONS PROVIDED FOR IN THIS PLAN

Each of the injunctions provided for in this Plan shall become effective on the Effective Date and shall continue in effect at all times thereafter unless otherwise provided by this Plan. Notwithstanding anything to the contrary contained in this Plan, all actions in the nature of those to be enjoined by such injunctions shall be enjoined during the period between the Confirmation Date and the Effective Date.

8.7  ADDITIONAL RELEASES AND INDEMNIFICATION

8.7.1 REPRESENTATIVES OF THE DEBTORS

(A)  RELEASE OF REPRESENTATIVES OF THE DEBTORS

For good and valuable consideration, the receipt and sufficiency of which is acknowledged in this Plan, all Representatives of the Debtors and any of the Non-Debtor Affiliates will be released, as of the Effective Date, from any and all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, that any Entity would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Entity, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date for Claims or liabilities resulting from their services as Representatives of the Debtors or any of the Non-Debtor Affiliates to the extent such Claims or liabilities relate to the business, operations, or management of any of the Debtors or Non-Debtor Affiliates prior to the Effective Date or any of the matters referred to in Section 11.8 so long as, in each case such action, or failure to act, did not constitute willful misconduct; provided, however, that such releases shall not preclude a governmental entity from enforcing its police and regulatory powers. These releases are conditioned on the released Representatives giving a mutual release, except that such Representatives are not releasing Claims with respect to commercial obligations of the Debtors and the Non-Debtor Affiliates, any Claims for indemnification in favor of the released Representatives, or Claims for wages, fees, benefits,

36

EXHIBIT 2.2

commissions and expenses. Further, these releases are not intended to, and shall not, alter in any way the rights of the present and/or former officers and/or directors of the Parent, or of any of the other Debtors or Non-Debtor Affiliates, under the Parent's By-Laws and/or Certificate of Incorporation, or any of the other Debtors' or Non-Debtor Affiliates' applicable by-laws and/or certificates of incorporation, whatever those rights, if any, may be.

(B)  INDEMNIFICATION OF REPRESENTATIVES OF THE DEBTORS AND NON-DEBTOR AFFILIATES

The Reorganized Debtors will defend, indemnify, and hold harmless to the fullest extent permitted by applicable law, all Representatives of the Debtors, and all Representatives of the Non-Debtor Affiliates, on and after the Effective Date for all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever that are purported to be released pursuant to Section 8.7.1(a) herein.

8.7.2 RELEASE OF SEALED AIR INDEMNIFIED PARTIES

Upon receipt of the Sealed Air Payment (i) the Debtors, the Asbestos PD Committee and the Asbestos PI Committee shall execute and deliver the Release; (ii) the Government Plaintiff shall execute and deliver the Government Release; and (iii) the Asbestos PD Committee and the Asbestos PI Committee shall deliver the Fresenius Release, all as provided for and defined in the Sealed Air Settlement Agreement. In addition, each of the Non-Debtor Affiliates shall irrevocably release, acquit, and forever discharge the Sealed Air Indemnified Parties from any and all Asbestos Claims and any and all Claims, on the basis of, arising from, or attributable to (in whole or in part, directly or indirectly) the Fresenius Transaction, as that term is defined in the Sealed Air Settlement Agreement, that have accrued or been asserted or that hereafter might accrue or be asserted against the Sealed Air Indemnified Parties, and that each Non-Debtor Affiliate shall not institute, participate in, maintain, maintain a right to or assert against the Sealed Air Indemnified Parties, either directly or indirectly, on its own behalf, derivatively, or on behalf of any other person any and all Asbestos Claims, and any and all Claims on the basis of, arising from, or attributable to (in whole or in part, directly or indirectly) the Fresenius Transaction, as that term is defined in the Sealed Air Settlement Agreement.

The Debtors, the Reorganized Debtors and the Asbestos Trust shall defend, indemnify, and hold harmless each of the Sealed Air Indemnified Parties as provided in, and to the extent set forth in the Sealed Air Settlement Agreement, and the indemnification provisions set forth in the Sealed Air Settlement Agreement shall be binding on the Asbestos Trust with the same force and effect as if the Asbestos Trust was a party to the Sealed Air Settlement Agreement.

CC-BLG002974

### 8.7.3 RELEASE OF FRESENIUS INDEMNIFIED PARTIES

Upon receipt of the Fresenius Payment, the Debtors, the Reorganized Debtors, the Asbestos PI Committee and the Asbestos PD Committee will fully, finally and forever release, relinquish and discharge each and every Fresenius Indemnified Party from any and all Grace-Related Claims, as that term is defined in the Fresenius Settlement Agreement, that the Debtors, the Reorganized Debtors, the Asbestos PI Committee or the Asbestos PD Committee have asserted or could have asserted in the Bankruptcy Court or any other forum against any of the Fresenius Indemnified Parties and the release that is attached as Appendix B to the Fresenius Settlement Agreement shall become effective. Upon receipt of the Fresenius Payment, in

37

EXHIBIT 2.2

addition to the more limited duties of indemnification by the Debtors to the Fresenius Indemnified Parties under Article III of the Fresenius Settlement Agreement, the Debtors and the Reorganized Debtors shall indemnify, defend and hold harmless the Fresenius Indemnified Parties as provided in and to the extent set forth in the Fresenius Settlement Agreement.

### 8.7.4 SPECIFIC RELEASES BY HOLDERS OF CLAIMS OR EQUITY INTERESTS

Without limiting any other provisions of this Plan, each Holder of a Claim or Equity Interest who votes in favor of this Plan or receives or retains any property under this Plan shall be deemed to unconditionally have released the Asbestos Protected Parties, the Asbestos Insurance Entities, the Unsecured Creditors' Committee, the Asbestos PI Committee, the Asbestos PD Committee, the Equity Committee and the FCR, and each party's Representatives, as of the Effective Date from any and all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively), based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date in any way relating or pertaining to, the Debtors or the Reorganized Debtors, the Chapter 11 Cases, or the negotiation, formulation, and preparation of this Plan or any related agreements, instruments, or other documents, so long as, in each case, such action or failure to act does not constitute willful misconduct. Any act or omission taken with the approval of the Bankruptcy Court will be conclusively deemed not to constitute willful misconduct. This section is not intended to preclude a governmental entity from enforcing its police and regulatory powers.

### 8.7.5 APPROVAL OF SEALED AIR SETTLEMENT AGREEMENT

The Confirmation Order shall constitute an order approving, as a compromise and settlement pursuant to Bankruptcy Code Section 1123(b)(3)(A), the release of Sealed Air, the respective releases of each of the Reorganized Debtors and the Asbestos Trust contained in the Sealed Air Settlement Agreement, and the execution and delivery of the Sealed Air Settlement Agreement which contains the foregoing releases. The Confirmation Order shall also constitute an order assuming the 1998 Tax Sharing Agreement as defined in the Sealed Air Settlement Agreement.

### 8.7.6 EFFECT OF THE FRESENIUS SETTLEMENT AGREEMENT, THE FRESENIUS SETTLEMENT ORDER, AND THE SEALED AIR SETTLEMENT AGREEMENT.

Notwithstanding anything to the contrary in this Plan, any of the Plan Documents, or the Confirmation Order, nothing in this Plan, any of the Plan Documents or the Confirmation Order (including any other provisions that purports to be preemptory or supervening) shall in any way operate to, or have the effect of, impairing or limiting the legal, equitable or contractual rights or obligations of the Sealed Air Indemnified Parties, the Fresenius Indemnified Parties or the Debtors, the Reorganized Debtors and the Non-Debtor Affiliates, respectively, pursuant to the Sealed Air Settlement Agreement, the Fresenius Settlement Agreement or the Fresenius Settlement Order, as applicable, each of which is expressly made a part of this Plan and incorporated in this Plan by reference.

38

EXHIBIT 2.2

The Sealed Air Settlement Agreement, the Fresenius Settlement Agreement, and the Fresenius Settlement Order set forth certain preconditions to the making of the Sealed Air Payment and/or the Fresenius Payment and the Debtors intend by this Plan to fulfill each and every such precondition whether expressly or impliedly outlined in the Plan Documents.

ARTICLE 9.
EXECUTORY CONTRACTS, UNEXPIRED LEASES,
GUARANTIES, AND INDEMNITY AGREEMENTS

CC-BLG002975

9.1  ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Except for (i) executory contracts and unexpired leases that the Debtors reject prior to the Effective Date or designate (on a list to be included in the Plan Supplement) as being subject to rejection in connection with the Effective Date and (ii) agreements, to the extent executory, providing for indemnification of third parties for Asbestos Claims, all executory contracts and unexpired leases, including all Asbestos Insurance Policies and the 1998 Tax Sharing Agreement (as defined in the Sealed Air Settlement Agreement), not previously assumed by the Debtors pursuant to Bankruptcy Code Section 365 shall be deemed to have been assumed by the Reorganized Debtors on the Effective Date, and this Plan shall constitute a motion to assume such executory contracts and unexpired leases as of the Effective Date.

The Debtors reserve the right for 30 days after the Confirmation Date to modify the list of rejected contracts to be included in the Plan Supplement to add executory contracts or leases (but not the 1998 Tax Sharing Agreement) or remove executory contracts or leases, provided that the Debtors shall file a notice with the Bankruptcy Court and serve each affected party with such notice. Notwithstanding the foregoing, such affected parties shall not be entitled to any Administrative Expense Claim for any executory contracts or leases added to the list of rejected contracts and will only be entitled to a Claim for rejection damages.

Pursuant to the terms of the March 2003 Bar Date Order and Bankruptcy Rule 3002(c)(4), and except as otherwise ordered by the Bankruptcy Court, a proof of Claim for each Claim arising from the rejection of an executory contract or unexpired lease pursuant to this Plan or otherwise shall be Filed with the Bankruptcy Court within thirty (30) days of the later of: (i) the date of the entry of an order, prior to the Confirmation Date, approving such rejection, (ii) the Confirmation Date, or (iii) service of notice of rejection if such party is an affected party as described in the paragraph immediately above. Any Claims not Filed within such applicable time period shall be forever barred from assertion. All Allowed Claims for damages arising from the rejection of an executory contract or unexpired lease shall be included in Class 9 and shall be treated in accordance with Article 3 herein.

Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of such assumptions pursuant to Bankruptcy Code Section 365(a) and a finding by the Court that each such assumption is in the best interests of the Debtors, their estates, and all parties in interest in the Chapter 11 Cases.

With respect to each such executory contract or unexpired lease assumed by the Reorganized Debtors, unless otherwise determined by the Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, any defaults of the Debtors with respect to such assumed executory contracts or leases existing as of the Effective Date shall be cured in the ordinary course of the Reorganized Debtors' business promptly after any such

39

EXHIBIT 2.2

default becomes known to the Debtors and, if the cure amount is disputed, such cure amount shall be established pursuant to applicable law, and the assumed executory contracts or leases shall be binding upon and enforceable upon the parties thereto, subject to any rights and defenses existing thereunder. Subject to the occurrence of the Effective Date, upon payment of such cure amount, all defaults of the Debtors existing as of the Confirmation Date with respect to such executory contract or unexpired lease shall be deemed cured.

To the extent executory, all agreements providing for indemnification of third parties for Asbestos Claims shall be deemed rejected by operation of entry of the Confirmation Order unless expressly identified and assumed pursuant to an order of the Bankruptcy Court.

Executory Contracts and unexpired leases previously assumed by the Debtors during the case pursuant to Bankruptcy Code Section 365 shall be governed by and subject to the provisions of the order of the Court authorizing the assumption thereof.

9.2  LETTERS OF CREDIT, SURETY BONDS, GUARANTIES, AND CERTAIN
    INDEMNITY AGREEMENTS

Unless otherwise designated by the Debtors in the Plan Supplement, agreed to in writing by the affected parties, or modified by order of the Court, the Debtors' obligations under letters of credit, surety bonds, guaranties (which for purposes of this Section 9.2 include contingent liabilities arising in connection with assigned executory contracts and unexpired leases), or written indemnity agreements with respect to letters of credit, surety bonds or guaranties existing as of the Effective Date shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under this Plan. The Debtors' obligations under such letters of credit, surety bonds, guaranties, and indemnity agreements shall be deemed assumed pursuant to Bankruptcy Code Section 365(a), survive entry of the Confirmation Order and occurrence of the Effective Date, remain unaffected thereby (except as provided

in this Section 9.2), and not be discharged in accordance with Bankruptcy Code Section 1141.

The Debtors reserve the right for 30 days after the Confirmation Date to modify the list to be included in the Plan Supplement to add or remove letters of credit, surety bonds, guaranties, or indemnity agreements with respect to letters of credit, surety bonds or guaranties existing as of the Effective Date, provided that the Debtors shall file a notice with the Bankruptcy Court and serve each affected party with such notice.

Pursuant to the terms of the March 2003 Bar Date Order and Bankruptcy Rule 3002(c)(4), and except as otherwise ordered by the Bankruptcy Court, a proof of Claim for each Claim arising from the rejection of a: (i) letter of credit, (ii) surety bond, (iii) guaranty, or (iv) written indemnity agreement with respect to a letter of credit, surety bond or guaranty existing as of the Effective Date shall be Filed with the Bankruptcy Court within thirty (30) days of the later of: (A) the date of the entry of an order, prior to the Confirmation Date, approving such rejection, (B) the Confirmation Date, or (C) service of notice of rejection if such party is an affected party as described in the paragraph immediately above. Any Claims not Filed within such applicable time period shall be forever barred from assertion. All Allowed Claims for damages arising from the rejection of a letter of credit, surety bond, guaranty, or written indemnity agreement with respect to a letter of credit, surety bond or guaranty existing as of the Effective Date shall be included in Class 9 and shall be treated in accordance with Article 3 herein.

40

EXHIBIT 2.2

The Reorganized Debtors shall have the right to cure any defaults existing as of the Effective Date under any such letters of credit, surety bonds, guaranties, or written indemnity agreements with respect to letters of credit, surety bonds, or guaranties existing as of the Effective Date promptly after any such default becomes known to the Debtors or Reorganized Debtors and, if disputed, established pursuant to applicable law. All letters of credit, surety bonds, guaranties, or written indemnity agreements with respect to letters of credit, surety bonds or guaranties existing as of the Effective Date shall be deemed reinstated on the Effective Date notwithstanding any default therein by the Debtors, any delay in the cure thereof by the Debtors, or the Filing or existence of the Chapter 11 Cases, or any action taken in connection therewith, and shall be binding upon, and enforceable against, all parties thereto, subject to any rights and defenses existing thereunder. All undrawn or partially drawn letters of credit, including letters of credit outstanding under the Debtors' pre-petition credit facilities, will be replaced as soon as practicable with new or replacement letters of credit under a new facility.

Nothing in Article 9, however, shall (i) constitute a reinstatement, continuation or assumption of any warranty provision, guaranty or any other contractual or other obligation, Demand or Claim by the Reorganized Debtors to the extent that the Claim, Demand or obligation constitutes an Asbestos PD Claim, an Asbestos PI-SE Claim, or an Asbestos PI-AO Claim, or (ii) limit, restrict or otherwise impair the releases afforded to the Sealed Air Indemnified Parties and the Fresenius Indemnified Parties that are granted elsewhere in this Plan or Plan Documents.

9.3  COMPENSATION AND BENEFITS PROGRAM

Unless otherwise agreed to by the affected parties, or modified by order of the Court, all of the Debtors' obligations under employment and severance contracts and policies, and all compensation and benefit plans, policies, and programs shall be treated as though they are executory contracts that are deemed assumed under this Plan.

ARTICLE 10.
RETENTION OF JURISDICTION

Pursuant to Bankruptcy Code Sections 105(a) and 1142, and except as any matters outlined in this Section relate to the litigation of Canadian Claims or the hearing on the Recognition Order, the Bankruptcy Court shall retain and shall have exclusive jurisdiction over any matter (i) arising under the Bankruptcy Code, (ii) arising in or related to the Chapter 11 Cases or this Plan, or (iii) that relates to the following, provided that the District Court shall retain jurisdiction for such matters to which the automatic reference to the Bankruptcy Court has been withdrawn:

10.1  PLAN DOCUMENTS

To interpret, enforce, and administer the terms of the Plan Documents and all annexes and exhibits thereto);

10.2  EXECUTORY CONTRACTS AND UNEXPIRED LEASES

To hear and determine any and all motions or applications for the assumption and/or assignment or rejection of (i) executory contracts, (ii) unexpired leases, (iii) letters of credit, (iv) surety bonds, (v) guaranties (which for purposes of this Section 10.2 include contingent liabilities arising in connection with assigned executory contracts and unexpired leases), or (vi) written indemnity agreements with respect to letters of credit, surety bonds or

41

EXHIBIT 2.2

existing as of the Effective Date to which the Debtors are parties or with respect to which the Debtors may be liable that are: (A) pending on the Confirmation Date or (B) within the 30-day reservation period described in Sections 9.1 and 9.2 of this Plan, and to review and determine all Claims resulting from the expiration or termination of any executory contract or unexpired lease prior to the Confirmation Date;

The Debtors reserve the right for 30 days after the Confirmation Date to modify the list of rejected contracts to be included in the Plan Supplement to add or remove executory contracts, leases, letters of credit, surety bonds, guaranties, or written indemnity agreements with respect to letters of credit, surety bonds or guaranties existing as of the Effective Date, provided that the Debtors shall file a notice with the Bankruptcy Court and serve each affected party with such notice.

10.3 DISPUTED CLAIMS ALLOWANCE/DISALLOWANCE

To hear and determine any objections to: (i) the allowance of Claims, including any objections to the classification of any Claim; (ii) to allow or disallow any Disputed Claim in whole or in part; and (iii) to allow or disallow any disputed Asbestos Claim;

10.4 ENFORCEMENT/MODIFICATION OF THIS PLAN

(a) To issue such orders in aid of execution of this Plan to the extent authorized or contemplated by Bankruptcy Code Section 1142;

(b) To consider and approve any modifications of this Plan or Plan Documents, remedy any defect or omission, or reconcile any inconsistency in any order of the Court, including the Confirmation Order;

(c) To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with this Plan or any other Plan Documents or their interpretation, implementation, enforcement, or consummation;

(d) To hear and determine all objections to the termination of the Asbestos Trust;

(e) To determine such other matters that may be set forth in, or that may arise in connection with, this Plan, the Confirmation Order, the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction, the Released Matters Injunction, or the Asbestos Trust Agreement;

(f) To hear and determine any proceeding that involves the validity, application, construction, enforceability, or modification of the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction, or the Released Matters Injunction;

(g) To enter an order or final decree closing the Chapter 11 Cases;

42

EXHIBIT 2.2

(h) To hear and determine any other matters related hereto, including matters related to the implementation and enforcement of all orders entered by the Court in the Chapter 11 Cases;

(i) To enter such orders as are necessary to implement and enforce the injunctions described herein; and

(j) To enter orders authorizing immaterial modifications to this Plan which are necessary to comply with Section 468B of the IRC.

10.5 COMPENSATION OF PROFESSIONALS

To hear and determine all applications for allowance of compensation and reimbursement of expenses of Professionals under Bankruptcy Code Sections 327, 328, 329, 330, 331 and 363 and any other fees and expenses authorized to be paid or reimbursed under this Plan;

10.6 SETTLEMENTS

To the extent that Court approval is required, to consider and act on the compromise and settlement of any Claim or cause of action by or against the Debtors' or Reorganized Debtors' estates or the Asbestos Trust;

10.7 TAXES

To hear and determine matters concerning state, local, and federal taxes (including the amount of net operating loss carryforwards), fines, penalties, or additions to taxes for which the Debtors or Debtors in Possession may be liable, directly or indirectly, in accordance with Bankruptcy Code Sections 346, 505, and 1146.

10.8 SPECIFIC PURPOSES

To hear and determine such other matters and for such other purposes as may be provided in the Confirmation Order; and

10.9 INSURANCE MATTERS.

To hear and determine matters concerning the Asbestos Insurance Policies; provided that the Court shall have nonexclusive jurisdiction over such matters.

ARTICLE 11.
MISCELLANEOUS PROVISIONS

11.1 AUTHORITY OF THE DEBTORS

On the Confirmation Date, the Debtors shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary to enable them to implement effectively (i) the provisions of this Plan and (ii) the creation of the Asbestos Trust.

43

EXHIBIT 2.2

11.2 PAYMENT OF STATUTORY FEES

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Court at the hearing on confirmation of this Plan, shall be paid by the Debtors on or before the Effective Date.

11.3 RETAINED CAUSES OF ACTION

11.3.1 MAINTENANCE OF CAUSES OF ACTION

Nothing in this Section 11.3 of this Plan shall be deemed to be a transfer by the Debtors and the Reorganized Debtors of any Claims, causes of action, or defenses relating to assumed executory contracts or otherwise which are required by the Reorganized Debtors to conduct their businesses in the ordinary course subsequent to the Effective Date. Moreover, except as otherwise expressly contemplated by this Plan, the Sealed Air Settlement Agreement, the Fresenius Settlement Agreement or other Plan Documents, from and after the Effective Date, the Reorganized Debtors shall have and retain any and all rights to commence and pursue any and all Claims, causes of action, including the Retained Causes of Action, or defenses against any parties, including Claimants and Holders of Equity Interests, whether such causes of action accrued before or after the Petition Date, including those Retained Causes of Action listed on Exhibit 11 in the Exhibit Book.

The Reorganized Debtors shall retain and may exclusively enforce any and all such Claims, rights or causes of action, including Retained Causes of Action, and commence, pursue and settle the causes of action in accordance with this Plan. The Reorganized Debtors shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such claims, rights, and causes of action, including Retained Causes of Action, without the consent or approval of any third party and without any further order of the Court.

11.3.2 PRESERVATION OF CAUSES OF ACTION

The Debtors are currently investigating whether to pursue potential causes of action against any Claimants or Entities. The investigation has not been completed to date, and, under this Plan, the Reorganized Debtors retain the right on behalf of the Debtors to commence and pursue any and all Retained Causes of Action. The potential causes of action currently being investigated by the Debtors, which may, but need not, be pursued by the Debtors before the Effective Date or by the Reorganized Debtors, after the Effective Date are described more fully in the Disclosure Statement. In addition, there may be numerous Unknown Causes of Action. The failure to list any such Unknown Causes of Action herein, or on Exhibit 11 in the Exhibit Book, is not intended to limit the rights of the Reorganized Debtors to pursue any Unknown Cause of Action to the extent the facts underlying such Unknown Cause of Action become fully known to the Debtors.

CC-BLG002979

11.3.3 PRESERVATION OF ALL CAUSES OF ACTION NOT EXPRESSLY SETTLED OR RELEASED

Unless a Claim or cause of action against a Claimant or other Entity is expressly waived, relinquished, released, compromised or settled in this Plan or any Final Order, the Debtors expressly reserve such Claim or Retained Cause of Action (including any Unknown Causes of

44

EXHIBIT 2.2

Action) for later adjudication by the Reorganized Debtors, as applicable. Therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Claims or Retained Causes of Action upon or after the Confirmation Date or Effective Date of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except where such Claims or Retained Causes of Action have been released in this Plan or other Final Order. In addition, the Debtors, the Reorganized Debtors, and the successor entities under this Plan expressly reserve the right to pursue or adopt any Claim alleged in any lawsuit in which the Debtors are defendants or an interested party, against any Entity, including the plaintiffs or co-defendants in such lawsuits.

Any Entity to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that such obligation, transfer, or transaction may be reviewed by the Debtors or the Reorganized Debtors, and may, if appropriate, be the subject of an action after the Effective Date, whether or not (i) such Entity has filed a proof of Claim against the Debtors in the Chapter 11 Cases; (ii) such Claimant's proof of Claim has been objected to; (iii) such Claimant's Claim was included in the Debtors' Schedules; or (iv) such Claimant's scheduled Claim has been objected to by the Debtors or has been identified by the Debtors as a Disputed Claim, a Contingent Claim, or an Unliquidated Claim.

11.4 THIRD-PARTY AGREEMENTS

The Distributions to the various classes of Claims hereunder will not affect the right of any Entity to levy, garnish, attach, or employ any other legal process with respect to such Distributions by reason of any claimed subordination rights or otherwise. All of such rights and any agreements relating thereto will remain in full force and effect.

11.5 PURPOSE OF THE FRESENIUS PAYMENT AND CONSISTENCY OF TREATMENT

The Debtors acknowledge and agree, that the Fresenius Indemnified Parties have entered into the Fresenius Settlement Agreement for the purpose of settling and terminating any and all controversies relating to the assertion of Asbestos Claims, as well as other Grace-Related Claims, as that term is defined in the Fresenius Settlement Agreement, against the Fresenius Indemnified Parties. The Fresenius Payment is intended and shall be treated by the Settling Parties, as that term is defined in the Fresenius Settlement Agreement, as a payment by the Fresenius Indemnified Parties of an ordinary and necessary expense incurred by the Fresenius Indemnified Parties and as income of the Debtors and Reorganized Debtors in the same amount. Any indemnification payments made by Grace-Conn. to the Fresenius Indemnified Parties to the extent the indemnified obligation would have been an ordinary and necessary expense if incurred directly by Grace-Conn., shall be treated by the Settling Parties, as that term is defined in the Fresenius Settlement Agreement, as a payment by Grace-Conn. of an ordinary and necessary expense incurred by Grace-Conn. and, to the extent the indemnified obligation was itself deducted as an ordinary and necessary expense of the Fresenius Indemnified Parties as income of the Fresenius Indemnified Parties. None of the Settling Parties, as that term is defined in the

45

EXHIBIT 2.2

Fresenius Settlement Agreement, shall take a position inconsistent with the foregoing in any Tax Return, as that term is defined in the Fresenius Settlement Agreement, or with any tax authority.

11.6 PURPOSE OF THE SEALED AIR PAYMENT AND CONSISTENCY OF TREATMENT

The Debtors, the Reorganized Debtors and the Asbestos Trust shall treat for all tax purposes any and all payments by the Sealed Air Indemnified Parties directly to the Asbestos Trust as a direct payment by the Sealed Air Indemnified Parties to the Asbestos Trust for Asbestos Claims that constitutes an ordinary and necessary expense of the Sealed Air Indemnified Parties, and the Debtors, the Reorganized Debtors, the Asbestos PI Committee, the Asbestos PD Committee and the Asbestos Trust (i) shall be prohibited from taking any Defined

CC-BLG002980

Action, as that term is defined in the Sealed Air Settlement Agreement, that is inconsistent with the provisions of the Sealed Air Settlement Agreement and (ii) shall take all Defined Actions, as that term is defined in the Sealed Air Settlement Agreement, that are reasonably requested by Sealed Air and consistent with the provisions of the Sealed Air Settlement Agreement unless otherwise permitted under the Sealed Air Settlement Agreement and the procedures outlined therein. The Debtors, the Reorganized Debtors and the Asbestos Trust shall file all Tax Returns, as that term is defined in the Sealed Air Settlement Agreement, required to be filed by such person, if any, consistent with the provisions of the Sealed Air Settlement Agreement. Each of the Debtors shall use its best efforts to: (i) cause the Asbestos Trust to qualify, and to maintain its status, as a Qualified Settlement Fund, as that term is defined in the Sealed Air Settlement Agreement, and (ii) structure the transactions contemplated by the Sealed Air Settlement Agreement to achieve favorable tax treatment to the Sealed Air Indemnified Parties as set forth in the Sealed Air Settlement Agreement, provided that nothing in the Sealed Air Settlement Agreement shall in any way be construed as a representation, warranty, or covenant concerning the treatment for federal income tax purposes of any transfer by the Sealed Air Indemnified Parties pursuant to the Sealed Air Settlement Agreement.

The Debtors, the Reorganized Debtors and the Asbestos Trust shall promptly notify Sealed Air upon receipt by any such party of any notice of any pending or threatened audit or assessment, suit, litigation, proposed adjustment, deficiency, dispute, administrative or judicial proceeding or other similar claim involving the Asbestos Trust, any Debtor, Reorganized Debtor or Non-Debtor Affiliate from any tax authority or any other person challenging the qualification of the Asbestos Trust as a Qualified Settlement Fund, as that term is defined in the Sealed Air Settlement Agreement, or the Sealed Air Payment as a direct payment to the Asbestos Trust that constitutes an ordinary and necessary expense of the Sealed Air Indemnified Parties and the Sealed Air Indemnified Parties shall be entitled to participate in such matters as outlined in the Sealed Air Settlement Agreement.

The Debtors and the Reorganized Debtors acknowledge and agree that the Debtors will account in their books and records for the liabilities satisfied by the Sealed Air Payment and the transfer of the Sealed Air Payment to the Asbestos Trust consistent with provisions of the Sealed Air Settlement Agreement.

46

EXHIBIT 2.2

11.7 DISSOLUTION OF THE UNSECURED CREDITORS' COMMITTEE, THE ASBESTOS
PI COMMITTEE, THE ASBESTOS PD COMMITTEE AND THE EQUITY COMMITTEE;
CONTINUED RETENTION OF THE FUTURE CLAIMANTS' REPRESENTATIVE

On the Effective Date, the Asbestos PI Committee, the Asbestos PD Committee, and the Equity Committee shall thereupon be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to or arising from or in connection with the Chapter 11 Cases, and those committees shall be deemed dissolved.

The Unsecured Creditors' Committee shall be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to or arising from or in connection with the Chapter 11 Cases, and that committee shall be deemed dissolved on the first date on which the Reorganized Debtors shall have made distributions on account of Class 9 Claims in the aggregate amount of $881 million excluding post-petition interest (the "UCC Dissolution Date").

Notwithstanding the foregoing, if the Effective Date or the UCC Dissolution Date, as applicable, occurs prior to the entry of a Final Order with respect to final fee applications of Professionals retained by order of the Bankruptcy Court during the Chapter 11 Cases, the Unsecured Creditors' Committee, the Asbestos PI Committee, the Asbestos PD Committee, and the Equity Committee may, at their option, continue to serve until a Final Order is entered with respect to such proceedings.

The FCR shall continue to serve through the termination of the Asbestos Trust in order to perform the functions required by the Asbestos Trust Agreement. Upon termination of the Asbestos Trust, the FCR's employment shall be deemed terminated and the FCR shall be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to or arising from or in connection with the Chapter 11 Cases.

All reasonable and necessary post-Effective Date fees and expenses of the Professionals retained by the Unsecured Creditors' Committee shall be paid by the Reorganized Debtors. If any dispute regarding the payment of such fees and expenses arises, the parties shall attempt to resolve such dispute in good faith. If they fail to resolve such dispute, they shall submit the dispute to the Bankruptcy Court for resolution.

11.8 EXCULPATION

None of the Reorganized Debtors, the Debtors, the Non-Debtor Affiliates, the Sealed Air Indemnified Parties, the Fresenius Indemnified Parties, the Trustees of the Asbestos Trust, the Asbestos Trust Advisory Committee, the Asbestos PI Committee, the Asbestos PD Committee, the Unsecured

CC-BLG002981

Creditors' Committee, the Equity Committee, the FCR, or any of their respective
Representatives are to have or incur any liability to any Entity for any pre- or
post-Petition Date act or omission in connection with, related to, or arising
out of the negotiation of this Plan or the settlement provided in the Sealed Air
Settlement Agreement and the Fresenius Settlement Agreement, the pursuit of
confirmation of this Plan, the consummation of this Plan or the settlement
provided in the Sealed Air Settlement Agreement or Fresenius Settlement
Agreement, or the administration of this Plan or the property to be distributed
under this Plan so long as, in each case such action, or failure to act, did not
constitute willful misconduct. In all respects, they will be entitled to rely
upon the advice of counsel with respect to their duties and responsibilities
under this Plan. Any act or omission taken with the approval of the Bankruptcy
Court will be

47

EXHIBIT 2.2

conclusively deemed not to constitute willful misconduct. This section is not
intended to preclude a governmental entity from enforcing its police and
regulatory powers.

     11.9 TITLE TO ASSETS; DISCHARGE OF LIABILITIES

     Upon the transfer of the Sealed Air Payment into the Asbestos Trust,
and the transfer of the Debtors' Payment into the Asbestos Trust, each such
transfer shall be vested in the Asbestos Trust free and clear of all Claims,
Equity Interests, Encumbrances, and other interests of any Entity. Except as
otherwise provided in this Plan and in accordance with Bankruptcy Code Section
1123(b)(3), on the Effective Date, title to all of the Debtors' assets and
properties and interests in property, including the Retained Causes of Action,
shall vest in the Reorganized Debtors free and clear of all Claims, Equity
Interests, Encumbrances, and other interests, and the Confirmation Order shall
be a judicial determination of discharge of the liabilities of the Debtors.

     11.10 NOTICES

     Any notices, statements, requests, and demands required or permitted
to be provided under this Plan, in order to be effective, must be: (i) in
writing (including by facsimile transmission), and unless otherwise expressly
provided herein, shall be deemed to have been duly given or made (A) if
personally delivered or if delivered by facsimile or courier service, when
actually received by the Entity to whom notice is sent, (B) if deposited with
the United States Postal Service (but only when actually received), at the close
of business on the third business day following the day when placed in the mail,
postage prepaid, certified or registered with return receipt requested, or (C)
one (1) Business Day after being sent to the recipient by reputable overnight
courier service (charges prepaid) (but only when actually received) and (ii)
addressed to the appropriate Entity or Entities to whom such notice, statement,
request or demand is directed (and, if required, its counsel), at the address of
such Entity or Entities set forth below (or at such other address as such Entity
may designate from time to time by written notice to all other Entities listed
below in accordance with this Section 11.10):

```
-------------------------------------------------------------------
IF TO THE DEBTORS:                    W. R. Grace & Co.
                                      7500 Grace Drive
                                      Columbia, MD 21044
                                      Attn: Secretary
                                      Telephone: (410) 531-4000
                                      Facsimile: (410) 531-4545
-------------------------------------------------------------------
```

48

EXHIBIT 2.2

```
-------------------------------------------------------------------
WITH A COPY TO:                       Kirkland & Ellis LLP
                                      777 South Figueroa Street,
                                      37th Floor
                                      Los Angeles, CA 90017
                                      Attn: Bennett L. Spiegel /
                                      Lori Sinanyan
                                      Telephone: (213) 680-8400
                                      Facsimile: (213) 680-8500

                                      and

                                      Kirkland & Ellis LLP
                                      200 East Randolph Drive
```

Chicago, IL 60601
Attn: Jonathan Friedland /
Ryan Bennett
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

and

Pachulski, Stang, Ziehl, Young,
Jones & Weintraub P.C.
919 North Market Street,
16th Floor
P.O. Box 8705
Attn: Laura Davis Jones /
David W. Carickhoff, Jr.
Wilmington, Delaware 19899-8705
(Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

---

| IF TO GRACE CANADA INC.: | Grace Canada Inc.<br>627 Lyons Lane, Suite 308<br>Oakville, Ontario L6J 5Z7<br>Canada<br>Attn: Pierre Le Bourdais<br>Telephone: (905) 845-2728<br>Facsimile: * |
|---|---|
| WITH A COPY TO: | Ogilvy Renault<br>Royal Bank Plaza, South Tower<br>200 Bay Street, Suite 3800<br>Toronto, Ontario M5J 2Z4<br>Canada<br>Attn: Derrick Tay<br>Telephone: (416) 216-4832<br>Facsimile: (416) 216-3930 |
| IF TO THE ASBESTOS PI COMMITTEE: | Caplin & Drysdale, Chartered<br>One Thomas Circle NW, Suite 1100<br>Washington D.C. 20005<br>Attn: Peter Van N. Lockwood<br>Telephone: (202) 862-5000<br>Facsimile: (202) 429-3301 |
| IF TO THE ASBESTOS PD COMMITTEE: | Bilzin Sumberg Baena Price &<br>Axelrod LLP<br>200 South Biscayne Blvd.,<br>Suite 2500<br>Miami, FL 33131-2336<br>Attn: Scott L. Baena / Jay Sackalo<br>/ Minda A. Mora<br>Telephone: (305) 374-7580<br>Facsimile: (305) 374-7593 |

49


EXHIBIT 2.2

---

| IF TO THE FUTURE CLAIMANTS' REPRESENTATIVE: | David T. Austern<br>8260 Willow Oaks Corp. Drive<br>P.O. Box 10415<br>Fairfax, VA 22031<br>Telephone: (703) 204-9300<br>Facsimile: (703) 205-6249 |
|---|---|
| WITH A COPY TO: | Swidler, Berlin, Shereff,<br>Friedman LLP<br>The Washington Harbour<br>3000 K Street, NW, Suite 300<br>Washington, DC 20007<br>Attn: Roger Frankel<br>Telephone: (202) 424-7500<br>Facsimile: (202) 424-7643 |
| IF TO THE UNSECURED CREDITORS' COMMITTEE: | Stroock & Stroock & Lavan LLP<br>180 Maiden Lane<br>New York, NY 10038-4982<br>Attn: Lewis Kruger /<br>Arlene Krieger / Kenneth Pasquale<br>Telephone: (212) 806-5400<br>Facsimile: (212) 806-6006 |
| IF TO SEALED AIR: | Sealed Air Corporation<br>Park 80 East |

CC-BLG002983

```
                              Saddlebrook, NJ 07663
                              Attn: Mary A. Coventry
                              Telephone: (201) 791-7600
                              Facsimile: (201) 703-4205
----------------------------------------------------------------
WITH A COPY TO:               Skadden, Arps, Slate, Meagher &
                              Flom LLP
                              Four Times Square
                              New York, NY 10036
                              Attn: Jan Baker / Shmuel Vasser
                              Telephone: (212) 735-3000
                              Facsimile: (212) 735-2000
----------------------------------------------------------------
IF TO FRESENIUS:              Fresenius Medical Care North
                              America
                              Corporate Headquarters
                              Corporate Law Department
                              95 Hayden Avenue
                              Lexington, MA 02420-9192
                              Attn: General Counsel
                              Telephone: (781) 402-9000
                              Facsimile: (781) 402-9700
----------------------------------------------------------------
WITH A COPY TO:               McDermott, Will & Emery
                              227 W. Monroe, Suite 4400
                              Chicago, IL 60606
                              Attn: David S. Rosenbloom
                              Telephone: (312) 372-2000
                              Facsimile: (312) 984-7700
----------------------------------------------------------------
IF TO THE EQUITY COMMITTEE:   Kramer Levin Naftalis &
                              Frankel LLP
                              919 Third Avenue
                              New York, NY 10022
                              Attn: Phillip Bentley /
                              Gary M. Becker
                              Telephone: (212) 715-9100
                              Facsimile: (212) 715-8000
----------------------------------------------------------------
```

50

EXHIBIT 2.2

11.11 HEADINGS

The headings used in this Plan are inserted for convenience only and
neither constitute a portion of this Plan nor in any manner affect the
construction of the provisions of this Plan.

11.12 GOVERNING LAW

Unless a rule of law or procedure is supplied by federal law
(including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of
Delaware, without giving effect to any conflicts of law principles thereof that
would result in the application of the laws of any other jurisdiction, shall
govern the construction of this Plan and any agreements, documents, and
instruments executed in connection with this Plan, except as otherwise expressly
provided in such instruments, agreements, or documents.

11.13 FILING OF ADDITIONAL DOCUMENTS

On or before the Effective Date, the Debtors, the Asbestos PI
Committee, the Asbestos PD Committee, the Equity Committee, the Unsecured
Creditors' Committee, and the FCR shall File with the Court such agreements and
other documents as may be necessary or appropriate to effectuate and further
evidence the terms and conditions of this Plan.

11.14 COMPLIANCE WITH TAX REQUIREMENTS

In connection with this Plan, the Debtors, the Reorganized Debtors,
and the Asbestos Trust will comply with all applicable withholding and reporting
requirements imposed by federal, state, and local taxing authorities, and all
Distributions hereunder or under any Plan Document shall be subject to such
withholding and reporting requirements, if any. Notwithstanding any other
provision of this Plan, each Entity receiving a Distribution pursuant to this
Plan, or any other Plan Document, will have sole and exclusive responsibility
for the satisfaction and payment of any tax obligations imposed by any
Governmental Unit, including income tax and other obligations, on account of
that Distribution.

11.15 EXEMPTION FROM TRANSFER TAXES

Pursuant to Bankruptcy Code Section 1146(c), the issuance, transfer,
or exchange of notes or equity securities under this Plan, the creation of any
mortgage, deed of trust, or other security interest, the making or assignment of
any lease or sublease, or the making or delivery of any deed or other instrument
of transfer under, in furtherance of, or in connection with this Plan shall be

CC-BLG002984

exempt from all taxes as provided in Bankruptcy Code Section 1146(c).

## 11.16 FURTHER ASSURANCES

The Plan Proponents, the Reorganized Debtors, the Non-Debtor Affiliates, the Asbestos Indemnified Parties, the Asbestos Insurance Entities, the Asbestos Trust, and all Holders of Claims receiving Distributions under this Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other action consistent with the terms of this Plan as may be necessary to effectuate the provisions and intent of this Plan, with each such Entity to bear its own costs incurred in connection therewith.

51

EXHIBIT 2.2

## 11.17 FURTHER AUTHORIZATIONS

The Debtors, and, after the Effective Date, the Reorganized Debtors or the Asbestos Trust, if and to the extent necessary, may seek such orders, judgments, injunctions, and rulings that any of them deem necessary to carry out further the intentions and purposes of, and to give full effect to the provisions of, this Plan, with each such Entity to bear its own costs in connection therewith.

Respectfully submitted,

W. R. GRACE & CO., ET AL.
(on behalf of the Debtors and Debtors
In Possession)

By:
    --------------------------------------------
Name: David B. Siegel
Title: Senior Vice President, General Counsel &
        Chief Restructuring Officer

OFFICIAL COMMITTEE OF UNSECURED CREDITORS

By:
    --------------------------------------------
Name: Thomas F. Maher
Title: Chairman

OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS

By:
    --------------------------------------------
Name: R. Ted Weschler
Title: Chairman

52

EXHIBIT 2.2

TABLE OF CONTENTS

ARTICLE 1.    DEFINITIONS, CONSTRUCTION OF TERMS, EXHIBITS AND
              ANCILLARY DOCUMENTS...........................................1
    1.1       Defined Terms..................................................1
    1.2       Other Terms/Interpretation.....................................1
    1.3       The Plan Documents.............................................2
    1.4       Ancillary Documents............................................3

ARTICLE 2.    PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSES AND
              PRIORITY TAX CLAIMS............................................3
    2.1       Unclassified Claims............................................3
    2.2       Payment of Allowed Administrative Expense Claims...............3
    2.3       Priority Tax Claims............................................4

ARTICLE 3.    CLASSIFICATION AND TREATMENT OF CLAIMS AND
              EQUITY INTERESTS...............................................4
    3.1       Summary........................................................4
              3.1.1   Class 1. Priority Claims...............................5
              3.1.2   Class 2. Secured Claims................................5
              3.1.3   Class 3. Unsecured Pass-Through Employee
                              Related Claims.................................6
              3.1.4   Class 4. Workers' Compensation Claims..................6
              3.1.5   Class 5. Intercompany Claims...........................6
              3.1.6   Class 6. Asbestos PI-SE Claims.........................7
              3.1.7   Class 7. Asbestos PI-AO Claims.........................8
              3.1.8   Class 8. Asbestos PD Claims............................9

CC-BLG002985

3.1.9    Class 9. General Unsecured Claims............................10
3.1.10   Class 10. Equity Interests in the Parent.............11
3.1.11   Class 11. Equity Interests in the Debtors other
         than the Parent................................11
3.2      Effect of Asbestos PI Claimant Electing Various Options......11
         3.2.1    Cash-Out Option.......................................11
         3.2.2    Litigation Option and Canadian Litigation Option......12
         3.2.3    Registry Option.......................................12

ARTICLE 4.    MODIFICATION OR WITHDRAWAL OF THIS PLAN................12
4.1      Modification of this Plan; Amendment of Plan Documents.......12
         4.1.1    Modification of this Plan.............................12
         4.1.2    Amendment of Plan Documents..........................12
4.2      Withdrawal of this Plan.....................................13
         4.2.1    Right to Withdraw this Plan..........................13
         4.2.2    Effect of Withdrawal.................................13

ARTICLE 5.    PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS AND
              ASBESTOS CLAIMS GENERALLY...................................13
5.1      Objections to Claims (other than Asbestos Claims);
         Prosecution of Disputed Claims...............................13
5.2      Distribution on Account of Disputed Claims...................13

i

EXHIBIT 2.2

5.3      Resolution of Asbestos Claims...............................14
         5.3.1    Making of an Election by Asbestos PI Claimants.......14
         5.3.2    Claims Materials for Asbestos PI Claimants..........14
         5.3.3    Information Obtained by the Asbestos Trust or
                  Reorganized Debtors Regarding Asbestos PI Claims.....15
         5.3.4    Withdrawal of Claims.................................15

ARTICLE 6.    ACCEPTANCE OR REJECTION OF THIS PLAN.........................15
6.1      Impaired Classes to Vote....................................15
6.2      Acceptance by Impaired Classes of Claims....................15
6.3      Presumed Acceptance of this Plan............................16
6.4      Nonconsensual Confirmation..................................16
         6.4.1    Cramdown.............................................16
         6.4.2    General Reservation of Rights........................16

ARTICLE 7.    IMPLEMENTATION OF THIS PLAN..................................16
7.1      Corporate Governance of the Parent and the Other Debtors......16
         7.1.1    Amendment of Certificates of Incorporation or
                  Articles of Incorporation of the Debtors.............16
         7.1.2    Amendment of By-Laws of the Parent...................17
         7.1.3    D&O and Fiduciary Liability Tail Coverage
                  Policies.............................................17
7.2      The Asbestos Trust..........................................17
         7.2.1    Creation of the Asbestos Trust......................17
         7.2.2    Funding of the Asbestos Trust.......................17
         7.2.3    Transfer of Assets into the Asbestos Trust..........18
         7.2.4    Transfer of Claims and Demands to the Asbestos
                  Trust................................................18
         7.2.5    Creation of Asbestos Trust Sub-Accounts.............18
         7.2.6    Appointment and Termination of Trustees.............18
         7.2.7    Creation and Termination of the TAC.................19
         7.2.8    Cooperation Agreement...............................19
         7.2.9    Institution and Maintenance of Legal and other
                  Proceedings.........................................19
7.3      Payments and Distributions Under this Plan..................19
         7.3.1    Asbestos Trust Payments and Plan Distributions......19
         7.3.2    Timing of Plan Distributions........................20
7.4      Delivery of Distributions and Undeliverable or Unclaimed
         Distributions...............................................20
         7.4.1    Delivery by the Reorganized Debtors of
                  Distributions in General............................20
         7.4.2    Undeliverable Distributions by the Reorganized
                  Debtors.............................................20
7.5      Payments under this Plan....................................20
         7.5.1    Manner of Payments under this Plan..................20
         7.5.2    Fractional Payments under this Plan.................21
7.6      Occurrence of the Confirmation Date.........................21
         7.6.1    Findings of Fact and/or Conclusions of Law..........21
         7.6.2    Orders of this Court................................25
7.7      Conditions to Occurrence of the Effective Date..............26
7.8      Management of the Reorganized Debtors.......................28
7.9      Corporate Action............................................28
7.10     Effectuating Documents and Further Transactions.............28

ii

EXHIBIT 2.2

7.11     Allocation of Plan Distributions Between Principal and

Interest.............................................................29
7.12    No Successor Liability.......................................29
7.13    Deemed Consolidation of the Debtors for Plan Purposes Only...29

ARTICLE 8.    INJUNCTIONS, RELEASES & DISCHARGE.........................30
8.1     Discharge....................................................30
        8.1.1    Discharge of the Debtors and Related Discharge
                 Injunction..........................................30
        8.1.2    Discharge of Liabilities to Holders of Asbestos
                 Claims..............................................30
        8.1.3    Disallowed Claims and Disallowed Equity Interests...31
        8.1.4    Non-Dischargeable ERISA Liability...................31
8.2     The Asbestos Channeling Injunction...........................31
8.3     Asbestos Insurance Entity Injunction.........................33
        8.3.1    Injunction..........................................33
        8.3.2    Reservations from the Asbestos Insurance Entity
                 Injunction..........................................34
8.4     Released Matters Injunction..................................34
        8.4.1    Injunction..........................................34
        8.4.2    Reservations from the Released Matters Injunction...35
8.5     Injunctions and Releases Related to the Sealed Air
        Indemnified Parties and Fresenius Indemnified Parties........35
8.6     Term of Certain Injunctions and Automatic Stay...............36
        8.6.1    Injunctions and/or Automatic Stays in Existence
                 Immediately prior to Confirmation...................36
        8.6.2    Injunctions Provided for in this Plan...............36
8.7     Additional Releases and Indemnification......................36
        8.7.1    Representatives of the Debtors......................36
        8.7.2    Release of Sealed Air Indemnified Parties...........37
        8.7.3    Release of Fresenius Indemnified Parties............37
        8.7.4    Specific Releases by Holders of Claims or Equity
                 Interests...........................................38
        8.7.5    Approval of Sealed Air Settlement Agreement.........38
        8.7.6    Effect of the Fresenius Settlement Agreement, the
                 Fresenius Settlement Order, and the Sealed Air
                 Settlement Agreement................................38

ARTICLE 9.    EXECUTORY CONTRACTS, UNEXPIRED LEASES, GUARANTIES, AND
              INDEMNITY AGREEMENTS....................................39
9.1     Assumption of Executory Contracts and Unexpired Leases.......39
9.2     Letters of Credit, Surety Bonds, Guaranties, and Certain
        Indemnity Agreements.........................................40
9.3     Compensation and Benefits Program............................41

ARTICLE 10.   RETENTION OF JURISDICTION..............................41
10.1    Plan Documents...............................................41
10.2    Executory Contracts and Unexpired Leases.....................41
10.3    Disputed Claims Allowance/Disallowance.......................42
10.4    Enforcement/Modification of this Plan........................42
10.5    Compensation of Professionals................................43
10.6    Settlements..................................................43
10.7    Taxes........................................................43

iii

EXHIBIT 2.2

10.8    Specific Purposes............................................43
10.9    Insurance Matters............................................43

ARTICLE 11.   MISCELLANEOUS PROVISIONS...............................43
11.1    Authority of the Debtors.....................................43
11.2    Payment of Statutory Fees....................................44
11.3    Retained Causes of Action....................................44
        11.3.1   Maintenance of Causes of Action.....................44
        11.3.2   Preservation of Causes of Action....................44
        11.3.3   Preservation of All Causes of Action not
        Expressly Settled or Released................................44
11.4    Third-Party Agreements.......................................45
11.5    Purpose of the Fresenius Payment and Consistency of
        Treatment....................................................45
11.6    Purpose of the Sealed Air Payment and Consistency of
        Treatment....................................................46
11.7    Dissolution of the Unsecured Creditors' Committee, the
        Asbestos PI Committee, the Asbestos PD Committee and the
        Equity Committee; Continued Retention of the Future
        Claimants' Representative....................................47
11.8    Exculpation..................................................47
11.9    Title to Assets; Discharge of Liabilities....................48
11.10   Notices......................................................48
11.11   Headings.....................................................51
11.12   Governing Law................................................51
11.13   Filing of Additional Documents...............................51
11.14   Compliance with Tax Requirements.............................51
11.15   Exemption from Transfer Taxes................................51
11.16   Further Assurances...........................................51
11.17   Further Authorizations.......................................52

CC-BLG002987

EXHIBIT 10.14

2004-2006 LONG-TERM CASH AWARD

Granted to:                [Firstname] [Lastname]
Effective Date of Grant:   May 6, 2004
Targeted Award:            $[Target]
Performance Period:        January 1, 2004 - December 31, 2006

Under the long-term incentive program of W.R. Grace & Co (the "Company"), the Compensation Committee (the "Committee") of the Board of Directors of the Company has granted you a Long-Term Cash Award under which you may earn a cash payout in an amount equal to (or, in certain circumstances, greater or less than) the Targeted Award set forth above, over the Performance Period.

You will earn this Targeted Award if the performance objectives described in Annex B for the Performance Period are met. If the performance objectives are only partially achieved or are over-achieved, the amount you actually earn under this Award will be decreased (or eliminated) or increased as set forth in Annex B.

The award will be calculated and paid to you, net of the applicable taxes.

The consequences of a change in or termination of your employment status during the Performance Period are described in the attached Administrative Practices (Annex C).

In all matters regarding the administration of the Long-Term Cash Award, the Committee has full and sole jurisdiction, subject to the provisions of Annex C.

Long-Term Cash Awards are being granted only to a limited number of key employees of the Company and its subsidiaries. This Award should, consequently, be treated confidentially.

W.R. Grace & Co.

By: /s/ Paul Norris
-------------------------------------
Paul Norris
Chairman & CEO

Acceptance of the foregoing is
acknowledged this _____ day of
_____, 2004.

-------------------------------------
(Signature of Participant)

-------------------------------------
(Please print full name)

EXHIBIT 10.14

Annex B

CALCULATION OF 2004-2006 LTIP

Your 2004-2006 LTIP award payout will be based on the 3-year compound annual growth rate (CAGR) in total Grace core earnings before interest and taxes (core EBIT). Payouts are contingent upon achievement of target CAGR for the 3-year performance period. The target CAGR is 6%, using 2003 results as the base year.

The core earnings before interest and taxes (core EBIT) in 2003 was $148.7 million. The chart below details six scenarios at different assumed growth rates. The target growth is highlighted.

| | | PERFORMANCE PERIOD GROWTH TARGETS | | | TOTAL GROWTH | LTIP | CUMULATIVE REPORTED |
| ASSUMED GROWTH | BASE PERIOD | 2004 | 2005 | 2006 | 04-06 (1) | POOL | EARNINGS (2) |
| RATES | 2003 | | | | | | |
| 1.50% | 148.7 | 150.9 | 153.2 | 155.5 | 459.6 | 2.9 | 456.7 |
| 3.00% | 148.7 | 153.2 | 157.8 | 162.5 | 473.5 | 5.9 | 467.6 |

CC-BLG002988

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 6.00% | 148.7 | 157.4 | 167.4 | 177.1 | 487.4 | 11.8 | 487.4 |
| 10.00% | 148.7 | 163.6 | 179.9 | 197.9 | 541.4 | 14.3 | 529.6 |
| 15.00% | 148.7 | 171.0 | 196.7 | 226.2 | 593.9 | 17.3 | 582.1 |
| 25.00% | 148.7 | 185.9 | 232.3 | 290.4 | 708.6 | 23.6 | 696.8 |

------------------------------------------------------------------------

(1) All results include full recognition/accrual of Annual Incentive
Compensation Program and, for achievement levels above 6% (i.e., 10%, 15%, and
25%), all totals include accruals for Long-Term Incentive Program Payments

(2) Cumulative Reported Earnings represent the 3 year core EBIT earnings
required at the respective assumed growth rates. Up to the first $11.8 million
(target CAGR 6%) is deducted from reported results. Payouts over target ($11.8
million) must be accrued as part of reported earnings.


                                        EXHIBIT 10.14


The Long-Term Cash Award payout will vary with actual results as shown in the
chart below:

| | PAYOUT |
|---|---|
| CAGR LEVEL ACHIEVED | (ROUNDED TO THE NEAREST WHOLE PERCENTAGE) |
| 25% | 200% |
| 15% | 147% |
| 10% | 121% |
| 6% | 100% |
| 3% | 50% |
| 3%< | Prorated |

For the 2004-2006 LTIP, cash payments will be made in two installments - 50% of
what is earned based on current performance at the end of 2005, but no more than
50% of target for the first two years, will be paid in March 2006, and the
balance will be paid in March 2007.


Example:

A sample calculation of the Long-Term Cash Award Earned is provided below.
Assume that your Targeted Award is $20,400. $13,600 would be earned after Year 2
assuming a 6% growth per year. Therefore the payment in March 2006 would be
$6,800, 50% of what is earned.

| CAGR LEVEL ACHIEVED | PAYOUT IN MARCH 2006 | PAYOUT IN MARCH 2007 | TOTAL PAYOUT |
|---|---|---|---|
| 25% | $6,800 | $34,000 | $40,800 |
| 15% | $6,800 | $23,188 | $29,988 |
| 10% | $6,800 | $17,885 | $24,685 |
| 6% | $6,800 | $13,600 | $20,400 |
| 3% | $3,400 | $ 6,800 | $10,200 |


                                        EXHIBIT 10.14
                                            Annex C

                              W. R. GRACE & CO.
              Administrative Practices - Long-Term Cash Award Program
                          2004-2006 Performance Period


Definitions

"Award Payment": An Interim Long-Term Cash Award Payment or Remaining Long-Term
Award Payment, as applicable.

"Board of Directors": The Board of Directors of the Company

"Committee": The Compensation Committee of the Board of Directors.

CC-BLG002989

"Company": W. R. Grace & Co., a Delaware Corporation and/or, if applicable in the context, one or more of its Subsidiaries.

"Incomplete Long-Term Cash Awards": A Long-Term Cash Award for which the Performance Period has not been completed as of the date referenced.

"Interim Long-Term Cash Award Payment": As defined on page 4, provided that such payment will not exceed 50% of the Participant's Targeted Award for the first two years, regardless of Company performance at the time of payment.

"Key Employee": An officer or other senior, full-time employee of the Company, who, in the opinion of the Company, can contribute significantly to the growth and successful operations of the Company.

"Long-Term Cash Award Program": An undertaking by the Company to financially reward a Key Employee at the end of a Performance Period, which undertaking is contingent upon or measured by the attainment over the Performance Period of specified performance objectives determined (on a consolidated or unconsolidated basis) by changes in the 3-year compound annual growth rate (CAGR) in Total Grace's core earnings before interest and taxes (core EBIT).

"Long-Term Cash Award": A cash award, to be paid in the future, which is granted to Key Employees under the Company's long-term incentive program.

"Long-Term Cash Award Earned": The amount of cash earned by a Participant pursuant to the terms of a Long-Term Cash Award.

"Participant": A Key Employee who is, or who is proposed to be, a recipient of a Long-Term Cash Award.

"Performance Period": Except as provided herein, a period of three calendar years over which a Long-Term Cash Award may be earned, as approved by the Committee. The first Performance Period under this Plan will commence effective January 1, 2004 and

(1)

EXHIBIT 10.14
Annex C

will end on December 31, 2006. Performance Periods with respect to different Long-Term Cash Awards to the same individual may overlap.

"Total Grace Core EBIT": The core earnings before interest and taxes (core EBIT)" of the Company as reported on (and calculated in accordance with) the statement of W. R. Grace & Co. Continuing Operations- Segment Basis.

"Remaining Long-Term Cash Award Payment": As defined on Page 4, the second installment of the Long-Term Cash Award that may be paid after the end of the Performance Period, based on Company performance for the entire Performance Period.

"Subsidiary": A corporation, partnership, limited liability company or other form of business association of which shares of common stock or other ownership interests (i) having more than 50% of the voting power regularly entitled to vote for directors (or equivalent management rights) or (ii) regularly entitled to receive more than 50% of the dividends (or their equivalents) paid on the common stock (or other ownership interests), are owned, directly or indirectly, by the Company.

"Targeted Award": The amount of cash award specified in writing for a Participant as his or her "Targeted Award" for a Performance Period and which is subject to and covered by the terms and conditions of a Long-Term Cash Award. This amount may be different from the Long-Term Cash Award Earned by an individual.

Plan Administration

The Plan shall be administered by the Committee, provided that no member of the Committee shall be eligible to receive a Long-Term Cash Award while serving on the Committee.

The Committee shall approve (i) the performance measurements and objectives for each Long-Term Cash Award and (ii) the Performance Period over which a Long-Term Cash Award is to be earned.

The Committee shall approve (i) the Key Employees who are to be granted Long-Term Cash Awards and (ii) the Targeted Award subject to each Long-Term Cash Award.

Long-Term Cash Awards

The Committee may, at any time or from time to time, grant Long-Term Cash Awards to Key Employees.

Each Long-Term Cash Award shall be evidenced by a written instrument containing such terms and conditions as the Committee shall approve, provided the instrument is consistent with these practices.

CC-BLG002990

No Long-Term Cash Award, nor any payment or right thereunder, shall be subject in any manner to alienation, sale, transfer, assignment, pledge, encumbrance or charge, except

(2)

EXHIBIT 10.14
Annex C

by will or the laws of descent and distribution, or by the terms of a Participant's Designation of Beneficiary, if any, on file with the Company.

In the case of a Key Employee who becomes a Participant after the beginning of a Performance Period, the Committee may ratably reduce the amount of the Targeted Award covered by such Employee's Long-Term Cash Award or otherwise appropriately adjust the terms of the Long-Term Cash Award to reflect the fact that the Key Employee is to be a Participant for only part of the Performance Period.

It is the intention of the Committee that Long-Term Cash Awards be related to the results of the core operations affected by the management actions taken by the Participants. Subject to the administrative practices that apply to termination or change in employment status and to the amendment or discontinuance of Long-Term Cash Awards, the performance objectives applicable to Long-Term Cash Awards will remain unchanged during the Performance Period except as follows:

o   In the event of the divestment of a Business prior to completion of the Performance Period, both the performance objectives and results pertaining to that Business shall be eliminated for the full year in which the divestment occurs and for any subsequent years.

o   In general, acquisitions will be included in the performance results.

Termination or Change in Employment Status

A Participant shall forfeit all rights to any Award Payment, if, prior to the date of payment of such Award Payment, the Participant (1) resigns without the consent of the Committee, (2) retires under a retirement plan of the Company or Subsidiary before age 62 without the consent of the Committee, or (3) is terminated for cause.

If a Participant retires under a retirement plan of the Company or Subsidiary at or after age 62, or ceases employment as a result of death or disability, or ceases employment as a result of an involuntary termination after a Change in Control of the Company (as defined herein), during a Performance Period, then his rights in any Incomplete Long-Term Cash Award related to that Performance Period shall thereupon vest, and he shall be entitled to receive any Award Payment of any Long-Term Cash Award Earned he would otherwise have received (at the time he would have otherwise received the Award Payment), except that the amount of any Long-Term Cash Award Earned shall be reduced ratably in proportion to the portion of the Performance Period during which the Participant was not an employee. If a Participant ceases employment with the Company for any of the reasons specified in this paragraph, after the completion of any Performance Period (but before the payment of the Remaining Long-Term Cash Award Payment related to the completed Performance Period), then his rights to any Long-Term Cash Award Earned and to such Award Payment related to the completed Performance Period shall thereupon vest, and he shall be entitled to receive such Award Payment at the time he would have otherwise received the Payment.

If a Participant ceases employment with the Company for any reason other than those indicated in the previous two paragraphs (including by reason of involuntary termination

(3)

EXHIBIT 10.14
Annex C

not for cause, except as provided above with respect to involuntary termination after a Change in Control of the Company, or transfer of employment to a buyer of any business unit of the Company), then his rights in any Incomplete Long-Term Cash Award, and any Award Payment that is unpaid as of the date the Participant ceases such employment, shall be determined by the Committee (or the designee of the Committee, which may include the Chief Executive Officer of the Company) as soon as practicable after the Participant ceases such employment. All such determinations shall be final and binding on all parties.

Except as modified by the provisions of the second and third paragraphs of this section, payments due to Participants pursuant to the applicable preceding paragraphs, above, shall be calculated and made in accordance with the provisions described under the section entitled "Calculation of Long-Term Cash Awards Earned: Form of Payment".

A leave of absence, if approved by the Committee, shall not be deemed a termination or change of employment status for the purposes of this section,

but, unless the Committee otherwise directs, any Long-Term Cash Award Earned that a Participant would otherwise have received under a Long-Term Cash Award Program shall be reduced ratably in proportion to the portion of the Performance Period during which the Participant was on such leave of absence.

Any consent, approval or direction which the Committee may give under this section in respect of an event or transaction may be given before or after the event or transaction.

Calculation of Long-Term Cash Awards Earned: Form of Payment

Long-Term Cash Awards Earned will be paid to a Participant in two installments (1) the first installment shall be paid in March of the third and final year of the Performance Period and shall be equal to 50% of what is earned based on the Company's performance for the first two calendar years of the applicable Performance Period, but no more than 50% of the Participant's Targeted Award for the first two years (the "Interim Long-Term Cash Award Payment"), and (2) the balance, if any, of the Long-Term Cash Award Earned will be paid in March after the end of the third and final year of the Performance Period (the "Remaining Long-Term Cash Award Payment").

The Committee shall determine the extent to which the performance objectives of a Long-Term Cash Award have been achieved during the Performance Period and the amount of any Long-Term Cash Awards Earned (and the amount of any Award Payment). All calculations in this regard shall be made in accordance with the generally accepted accounting principles customarily applied by the Company and shall be submitted to the Committee for its review and approval. The determination of the Committee shall be final and binding.

(4)

EXHIBIT 10.14
Annex C

General

Nothing in this document nor in any instrument executed pursuant hereto shall confer upon a Participant any right to continue in the employ of the Company or a Subsidiary, or shall affect the right of the Company or a Subsidiary to terminate his or her employment with or without cause.

The Company or a Subsidiary may make such provisions as it may deem appropriate for the withholding or any taxes that the Company or a Subsidiary determines it is required to withhold in connection with any Long-Term Cash Award Earned.

Nothing in a Long-Term Cash Award is intended to be a substitute for, or shall preclude or limit the establishment or continuation of, any other plan, practice, or arrangement for the payment of compensation or benefits to employees generally, or to any class or group of employees, which the Company or a Subsidiary now has or may hereafter lawfully put into effect, including, without limitation, any retirement, pension, group insurance, annual bonus, stock purchase, stock bonus or stock option plan; provided, however, that no amounts awarded or paid pursuant to any Long-Term Cash Award shall be included or counted as compensation for the purposes of any employee benefit plan of the Company or a Subsidiary where contributions to the plan, or the benefits received from the plan, are measured or determined in whole or in part, by the amount of the employee's compensation.

The grant of a Long-Term Cash Award to an employee of a Subsidiary shall be contingent on the approval of the Long-Term Cash Award by the Subsidiary and the Subsidiary's agreement that (i) the Company may administer such Award on its behalf and (ii) the Subsidiary will make, or reimburse the Company for, the payments called for by the Long-Term Cash Award. The provisions of this paragraph and the obligations of the Subsidiary so undertaken may be waived, in whole or in the part, from time to time by the Company.

Amendments and Discontinuance

In the event acquisitions, divestments, substantial changes in tax or other laws or in accounting principles or practices, natural disasters or other extraordinary events render fulfillment of the performance objectives of a Long-Term Cash Award impossible or impracticable, or result in the achievement of the performance objectives without appreciable effort by the Participant, the Committee may, but shall not be obligated to, amend any such Long-Term Cash Award in any appropriate manner so that the Participant may earn Long-Term Cash Awards comparable to those that might have been earned if the extraordinary event had not occurred.

The Chief Executive Officer of the Company may approve such technical changes and clarifications to the Long-Term Cash Award Program as necessary, provided such changes or clarifications do not vary substantially from the terms and conditions outlined in this description.

(5)

EXHIBIT 10.14

CC-BLG002992

In the event a Change in Control of the Company (as defined herein) shall occur or the Board of Directors has reason to believe that a Change of Control may occur, the Committee may, with respect to any one or more Long-Term Cash Awards, (i) reduce the length of a Performance Period to not less than one year, (ii) make ratable adjustments to performance objectives and Targeted Awards, (iii) change the methods of measuring the performance objectives, (iv) accelerate the payment of any Long-Term Cash Awards Earned or any Award Payment, and (v) take other action deemed by it to be appropriate and in the best interests of the Company under the circumstances. For the purposes of this paragraph:

(A)   "Change in Control of the Company" means and shall be deemed to have occurred if (a) the Company determines that any "person" (as such term is used in Section 13(d) and 14 (d) of the Securities Exchange Act of 1934), other than a trustee or other fiduciary holding securities under an employee benefit plan of the Company or a corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company, has become the "beneficial owner" (as defined in Rule 13d-3 under such Act), directly or indirectly, of 20% or more of the outstanding common stock of the Company (provided, however, that a Change in Control shall not be deemed to have occurred if such person has become the beneficial owner of 20% or more of the outstanding Common Stock as the results of a sale of Common Stock by the Company that has been approved by the Board of Directors); or pursuant to a plan of reorganization which has been confirmed by the U.S. District Court or Bankruptcy Court having jurisdiction of the Company's Chapter 11 case, Case No. 01-01139 (JJF), pursuant to an order of such Court which is final and nonappealable, and becomes effective); (ii) individuals who are Continuing Directors cease to constitute a majority of any class of directors of the Board; (iii) there occurs a reorganization, merger, consolidation or other corporate transaction involving the Company (a "Corporate Transaction"), in each case, with respect to which the stockholders of the Company immediately prior to such Corporate Transaction do not, immediately after the Corporate Transaction, own 50% or more of the combined voting power of the corporation resulting from such Corporate Transaction, provided that this clause (iii) shall not apply to a Corporate Transaction which is pursuant to section 363 of the Bankruptcy Code, or is pursuant to a plan of reorganization which has been confirmed by the U.S. District Court or Bankruptcy Court having jurisdiction of the Company's chapter 11 case, Case No. 01-01139 (JJF), pursuant to an order of such Court which is final and nonappealable, and becomes effective; or (iv) the shareholders of the Company approve a complete liquidation or dissolution of the Company.

(B)   "Continuing Director" means any member of the Board of Directors who was such a member on the date on which this Program was approved by the Board of Directors, and any successor to a Continuing Director who is approved as a nominee or elected to succeed to a Continuing Director by a majority of Continuing Directors who are then members of the Board of Directors.

The granting of Long-Term Cash Awards may be amended or discontinued by the Committee at any time.

(6)

EXHIBIT 10.14
Annex C

No amendment or discontinuance of Long-Term Cash Awards shall, without a Participant's consent, adversely affect his rights in any Long-Term Cash Awards theretofore granted to him, except that, if the Committee so directs, all Incomplete Long-Term Cash Awards may be terminated prospectively with the same effect as a termination of employment under the second paragraph of the section entitled "Termination or Change in Employment Status".

(7)

CC-BLG002993

EXHIBIT 10.27

PAUL J. NORRIS
Chairman & Chief Executive Officer

W. R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044

(410) 531-4404
Fax: (410) 531-4414
email paul.j.norris@grace.com

[GRACE LOGO]

January 19, 2005

Mr. Alfred E. Festa
14713 Goddingham Court
Midlothian, VA 23113

Dear Fred:

The Board of Directors has approved this letter agreement which specifies the terms of your continued employment with W. R. Grace & Co. (the "Company"). You will assume the position of Chief Executive Officer of the Company, effective June 1, 2005, in conjunction with my retirement from the Company effective the day before that date (i.e., effective May 31, 2005). Thus, as of June 1, 2005, you will be Chief Executive Officer and President of the Company (collectively, the "CEO").

Also, as discussed, I will continue as Chairman of the Board of Directors of the Company (the "Board") after my retirement, and, as agreed with the Board, will provide consulting services related to the Company's Chapter 11 cases and other matters.

As you know, the provisions of this letter agreement were previously approved by the Board and the Compensation Committee of the Board. In addition, this letter agreement will be submitted to the U. S. Bankruptcy Court with jurisdiction over the Company's Chapter 11 cases.

Fred, I am extremely pleased that you have agreed to assume the position of CEO, and we are confident that you will continue to make valuable contributions to the success of the Company in your new position.

If you agree with the terms of this letter agreement, please sign where indicated below and return one fully executed copy to me. An additional copy of this letter is also enclosed for your records.

RESPONSIBILITIES

You will assume the position as CEO of the Company on June 1, 2005. (As all other Company Headquarters employees, you will continue to be employed by W. R. Grace & Co.-Conn., but will be CEO of both W. R. Grace & Co. and W. R. Grace & Co.-Conn.) As of that date, your title will be "Chief Executive Officer and President" of the Company, and you will report directly to the Board.

---

Alfred E. Festa                January 19, 2005                Page 2
--------------------------------------------------------------------------

Your principal obligations, duties and responsibilities will be those generally inherent in the office and title of CEO. Your office will continue to be located at the Company's Headquarters in Columbia, Maryland.

EFFECTIVE DATE AND STATUS OF PRIOR AGREEMENT

Subject to Bankruptcy Court approval, this letter agreement shall be effective as of June 1, 2005. Any other provision of this agreement notwithstanding, should you cease to be an employee of the Company for any reason before that date, you shall not become the CEO of the Company, and the provisions of this letter agreement shall become void as of the date that your employment with the Company ceases, which means that neither you nor the Company (nor any other party) shall have any rights or obligations under this agreement, in that case.

As of the date you assume the position of CEO, your prior agreement with the Company, dated November 17, 2003, shall become void, which means that neither you nor the Company (nor any other party) will retain any rights or obligations thereunder, as of that date. The rights and obligations related to your employment with the Company as CEO on and after that date shall be governed by the terms of this letter agreement (including any written amendments to this agreement).

TERM OF AGREEMENT

The term of your employment as CEO under this letter agreement will be for a period of four years, beginning on the date you assume that position, June 1, 2005, and ending on May 31, 2009 (such period is referred to in this agreement

CC-BLG002994

as your "Initial CEO Employment Term".

If your employment as CEO of the Company (or in any other position) continues after the Initial CEO Employment Term, and no other contrary arrangements have been mutually agreed in writing between you and the Board, then the arrangements described in this agreement will be discontinued and you will be an employee of the Company "at will" subject to the same requirements as similarly situated employees of the Company at that time, except as provided under the following section entitled "Severance Pay Arrangement".

COMPENSATION

1.  Your initial annual base salary as CEO will be $760,000.00. Thereafter, your base salary will be subject to periodic reviews on the same basis and at the same intervals as are applicable to other senior officers of the Company.

    Your salary will cease to accrue immediately upon your termination of employment with the Company, even if your termination occurs during your Initial CEO Employment Term and whether or not your termination is voluntary. (Note, however, the provisions under "Severance Pay Arrangement.")

2.  As CEO, you will, of course, continue to be eligible to participate in the Company's Annual Incentive Compensation Program. For 2005, your targeted award under the Program will be 100% of your base salary earned during the applicable calendar year. For 2006 and thereafter, your targeted award will continue to be 100% (or greater, as determined by the Board) of your annual base salary earned during the applicable calendar year. Any payments to you under the Program will be made at the same

---

Alfred E. Festa                January 19, 2005                    Page 3
--------------------------------------------------------------------------------

time and in the same manner as payments to other participants in the Program. Under the Program, awards for a calendar year are generally paid during March of the following calendar year Awards under this Program are subject to Board approval and are contingent upon individual performance and financial results of the Company. In general, the amount of award paid to any participant may range from 0% to 200% of the participant's targeted award for the year, depending on individual performance and the extent to which the Company achieves (or surpasses) certain financial goals. Also, a Program participant is not entitled to payment of an award for a calendar year, if the participant is not an active employee of the Company on the date the award is actually paid. These and the other provisions of the Program will apply to you in the same manner as applicable to other Program participants; except as specified in the next sentence. Notwithstanding the prior provisions of this paragraph, if your employment is terminated by the Company without "Cause" (as defined below) or by you as a result of "Constructive Discharge" (as defined below) after the Company emerges from Chapter 11 but during your Initial CEO Employment Term, or as a result of your death or because you become entitled to disability income payments under the "Grace LTD Plan" and/or the "ESP Plan" (mentioned below) at any time during your Initial CEO Employment Term, then you (or your beneficiary, if applicable) will be entitled to a pro-rated award under the Program for the calendar year of your last day of employment with the Company. In that event, your pro-rated award for that calendar year will be calculated as follows: the amount you would have otherwise been awarded under the Program for that calendar year (but for your termination), calculated based solely on the applicable financial results of the Company for that calendar year, multiplied by the fraction whereby the numerator is the number of days that you were an active employee of the Company during that calendar year and the denominator is 365. The actual payment under the Program for that calendar year shall be made to you at the same time and in the same manner as payments are made to other Program participants (who were not terminated prior to the payment date) for that calendar year.

3.  You also will be eligible for a targeted award under the Company's Long-Term Incentive Plan (the "LTIP") for the 2005 - 2007 performance period in the amount of $1,690,000; or an equivalent value comprised of stock options or other equity and/or cash targets, as provided under the terms of that LTIP. The terms of your award under that LTIP, and your awards under all other LTIPs, shall be the same as the terms governing the awards of the other participants under the applicable LTIP, including the requirement of active employment with the Company on the date an LTIP payment is made to the LTIP participants, in order to be entitled to such a payment; except as specified in the next sentence. Notwithstanding the prior provisions of this paragraph, if your employment is terminated by the Company without "Cause" (as defined below) or by you as a result of "Constructive Discharge" (as defined below) after the Company emerges from Chapter 11 but during your Initial CEO Employment Term, or as a result of your death or because you become entitled to disability income payments under the "Grace LTD Plan" and/or the "ESP Plan" (mentioned below) at any time during your Initial CEO Employment Term, then you will be entitled to a pro-rated award under each LTIP in which you participated prior to your termination. In that event, your pro-rated award under each such LTIP will be calculated as follows: the amount you would have otherwise been entitled to under the LTIP (but for your termination), multiplied by the fraction whereby the numerator is the number of days that you were an active

Alfred E. Festa               January 19, 2005                    Page 4
--------------------------------------------------------------------------

the LTIP and the denominator is the total number of days of during such
performance period. Each payment under each such LTIP shall be made to you
at the same time and in the same manner as payments are made to other LTIP
participants who were not terminated prior to the payment date.

4.   The Executive Severance Agreement you entered into with the Company upon
     your initial election as an officer will remain in effect during your term
     as CEO, subject to the actual terms of that agreement (including the
     Board's right to terminate that agreement in accordance with the procedures
     described therein). In general, the terms of that agreement would provide
     for a severance payment of 3 times the sum of your annual base salary plus
     your targeted annual incentive compensation award, and certain other
     benefits, in the event your employment terminates under certain conditions
     following a change-in-control of the Company.

SEVERANCE PAY ARRANGEMENT

If your employment is terminated by the Company without "Cause" (as defined
below) or by you as a result of "Constructive Discharge" (as defined below),
during your Initial CEO Employment Term, you will be entitled to the severance
payment described in the next sentence. The severance payment will be 2 times a
dollar amount equal to 175% of your annual base salary at the time your
employment is terminated. The severance payment may be made to you in
installments, at the same time and in the same manner as salary continuation
payments, over a period of 24 months beginning as of the date you are
terminated. However, at your option, the entire severance payment may be paid to
you in a single lump-sum as soon as practical after your termination (if
approved by the Compensation Committee). In all other respects, your severance
pay arrangement shall be governed by the terms of the W. R. Grace & Co.
Severance Pay Plan for Salaried Employees. Notwithstanding the foregoing, any
election to receive such payments, as well as the timing of those payments, must
comply with the American Jobs Creation Act of 2004 (and all other applicable
law).

You will not, in any event, however, be entitled to the severance payment
described above if, at the time your employment terminates, your employment
terminates as the result of your death, or you are entitled to payments under
your Executive Severance Agreement described above, or to disability income
payments under the Grace "LTD Plan" and/or "ESP Plan" mentioned below.

Also, if you receive a severance payment under this letter agreement, you will
not be entitled to any other severance pay from the Company.

DEFINITION OF CAUSE

"Cause", for purposes of this letter agreement, means:

(i)   Commission by you of a criminal act (i.e., any act which, if successfully
      prosecuted by the appropriate authorities would constitute a crime under
      State or Federal law) or of willful misconduct (including but not limited
      to violating written policies of the Company), either of which has had or
      will have a direct material adverse effect upon the business affairs,
      reputation, properties, operations or results of operations or financial
      condition of Company,

Alfred E. Festa               January 19, 2005                    Page 5
--------------------------------------------------------------------------

(ii)   Refusal or failure of you to comply with the mandates of the Board (unless
       any such mandates by the Board constitute Constructive Discharge, and you
       have determined to terminate your employment as a result thereof), or
       failure by you to substantially perform your duties as CEO, other than such
       failure resulting from your total or partial incapacity due to physical or
       mental illness, which refusal or failure has not been cured within 30 days
       after notice has been given to you, or

(iii)  Material breach of any of the terms of this agreement by you, which breach
       has not been cured within 30 days after notice has been given to you.

DEFINITION OF CONSTRUCTIVE DISCHARGE

"Constructive Discharge," for purposes of this letter agreement, means the
occurrence of any of the following without your prior written consent:

(i)   any demotion from the position as CEO of the Company (provided that this
      provision shall not apply if you agree that any other individual should be
      elected as President and/or Chief Operating Officer of the Company);

(ii)  the relocation of your principle office to a location more than 35 miles
      away from the current site of the Company's Headquarters in Columbia,
      Maryland, without your prior consent;

CC-BLG002996

(iii) any material diminution in your level of authority from that of CEO or any
assignment to you of any duties that are not consistent with the position
of CEO; other than authority or duties that (a) may be appropriate to
another position with the Company that you hold in addition to the position
of CEO, (b) result from any requirement or request from the Board that is
reasonably related to your position as CEO (or any other position you may
hold with the Company at the time you retain your position as CEO), or (c)
results from an inadvertent failure or oversight of the Board that is
remedied within 30 days after your written notice thereof has been received
by the Chairman of the Compensation Committee of the Company's Board of
Directors;

(iv) the Company imposes upon you compensation arrangements that do not comply
with this letter agreement; or

(v) any material breach of this letter agreement by the Company.

Notwithstanding the foregoing:

o    any termination of employment by you will not be deemed to be a termination
as a result of Constructive Discharge, unless (i) you provide to the
Chairman of the Compensation Committee written notice of your decision to
terminate your employment that sets forth in reasonable detail the specific
conduct or occurrence that you deem constitutes Constructive Discharge and
the specific provision of this letter agreement upon which you rely and
(ii) the Company does not cure such conduct or occurrence within 30 days
after such notice has been received by the Chairman of the Compensation
Committee;

Alfred E. Festa            January 19, 2005                    Page 6
-------------------------------------------------------------------------------

o    your right to terminate your employment on the basis of Constructive
Discharge shall be deemed waived by you if you do not provide such notice
to the Chairman of the Compensation Committee within 60 days after you
become aware of all material facts regarding the conduct or occurrence that
you deem constitutes Constructive Discharge.

CHAPTER 11 EMERGENCE BONUS

You will be paid a "Chapter 11 emergence bonus," as specified by this paragraph
(your "Emergence Bonus"). The total amount of your Emergence Bonus will be
$1,750,000 -- $750,000 of that amount will be paid 6 months after the Company
emerges from Chapter 11, and the remaining $1,000,000 will be paid to you 18
months after such emergence; or, if the Company does not emerge from Chapter 11
within 36 months of it (or another party) filing an initial plan of
reorganization with the Bankruptcy Court, you will instead be paid your
Emergence Bonus as follows: $750,000 will be paid 36 months after the filing of
an initial plan of reorganization with the Court, and $1,000,000 will be paid 48
months after such filing (even if the Company emerges from Chapter 11 after such
36 month, but before such 48 month, period).

Notwithstanding the foregoing, you shall not be entitled to any payment
described in the immediate prior paragraph, if you are not employed by the
Company as of the date the payment is scheduled to be made as described above;
except as specified in the next sentence. Notwithstanding the prior provisions
of this paragraph, if your employment is terminated by the Company without
"Cause" (as defined above) or by you as a result of "Constructive Discharge" (as
defined above) or as a result of your death (or because you become entitled to
disability income payments under the "Grace LTD Plan" and/or the "ESP Plan"
mentioned below), and such event occurs after the Company emerges from Chapter
11 but before you actually receive all payments of your Emergence Bonus, then
you (or your beneficiary, if applicable)will be paid the total remaining, unpaid
amount of your Emergence Bonus no later than 30 days after your last date of
employment with the Company.

OTHER BENEFIT PROGRAMS

As a senior officer of the Company, you will also continue to be eligible to
participate in the following benefit plans and programs (subject to the
continuation and the actual provisions of the plans and programs, as amended
from time to time):

o    The W. R. Grace & Co. Retirement Plan for Salaried Employees ("Grace
Salaried Retirement Plan")

o    The W. R. Grace & Co. Supplemental Executive Retirement Plan

o    The W. R. Grace & Co. Salaried Employee Savings & Investment Plan

o    The W. R. Grace & Co. Savings & Investment Plan Replacement Payment Program

o    The W. R. Grace & Co. Long-Term Disability Income Plan ("LTD Plan")

o    Executive Salary Protection Plan ("ESP Plan")

o    The W. R. Grace & Co. Voluntary Group Accident Insurance Plan

CC-BLG002997

o   The W. R. Grace & Co. Business Travel Accident Insurance Plan

o   The W. R. Grace & Co. Group Term Life Insurance Program

o   Personal Excess Liability Insurance

o   The W. R. Grace & Co. Group Medical Plan

o   The W. R. Grace & Co. Dental Plan


Alfred E. Festa            January 19, 2005              Page 7
--------------------------------------------------------------------

o   Retiree Medical Coverage

In addition, during your employment with the Company, you shall also be entitled
to participate in all other employee/executive perquisites, pension and welfare
benefit plans and programs made available to the Company's senior level
executives or to its employees generally, as such plans or programs may be in
effect, and amended, from time to time.

INDEMNIFICATION

The Company shall, to the extent permitted by applicable law, indemnify you and
hold you harmless from and against any and all losses and liabilities you may
incur as a result of your performance of your duties as a director, officer or
employee of the Company. In addition, the Company shall indemnify and hold you
harmless against any and all losses and liabilities that you may incur, directly
or indirectly, as a result of any third party claims brought against you (other
than by any taxing authority) with respect to the Company's performance of (or
failure to perform) any commitment made to you under this agreement. The Company
shall obtain such policy or policies of insurance as it reasonably may deem
appropriate to effect this indemnification; provided, however, that in no event
shall the Company modify its insurance coverage with respect to you in a manner
that renders such coverage less favorable to you than that in force as of the
date of this letter agreement.

DISPUTE RESOLUTION

Any dispute, controversy or claim arising out of or relating to this letter
agreement, or a breach thereof, shall be settled by arbitration in accordance
with the National Rules for the Resolution of Employment Disputes of the
American Arbitration Association as such rules are in effect on the date of the
delivery of a demand for arbitration (the "National Resolution Rules"), which
shall be effectuated by the demanding party providing notice to the other party
in accordance with the provisions below under the heading "Notices". The parties
expressly acknowledge that they are waiving their rights to seek remedies in
court, including without limitation the right (if any) to a jury trial.

There shall be one arbitrator, to be selected under the National Resolution
Rules.

The decision of the arbitrator shall be final and binding on the parties and
their respective heirs, executors, administrators, personal representatives,
successors and assigns. Judgment upon any award of the arbitrator may be entered
in any court of competent jurisdiction, or application may be made to any such
court for the judicial acceptance of the award and for an order of enforcement.

AIR TRAVEL

In addition to the usual Company policies regarding air travel by senior
officers on Company business, the Company will provide you with travel by
chartered aircraft or with travel on an aircraft fractionally owned by the
Company, at times requested by you, including for reasonable personal travel
that will be included as taxable income to you.

RELOCATION

As specified above, your office as CEO will be located in Columbia, Maryland,
and you will relocate to the Columbia area in conjunction with assuming that
position (unless otherwise


Alfred E. Festa            January 19, 2005              Page 8
--------------------------------------------------------------------

agreed by the Board). Therefore, you will be entitled to receive principal
residence relocation assistance under the Company's relocation policy applicable
to the relocation of active employees. A copy of that policy has previously been
provided to you.

NOTICES

Except as otherwise provided herein, you and the Company agree that any notices
and other communications permitted or required under this letter agreement shall
be in writing and shall be given by hand delivery to the other party or sent by
registered or certified mail, return receipt requested, postage prepaid, or by

CC-BLG002998

nationally recognized overnight courier service, addressed as follows:

If to you:

Alfred E. Festa
W. R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044

If to the Company:

W. R. Grace & Co.
Attention: General Counsel
7500 Grace Drive
Columbia, MD 21044

or to such other addresses as either party furnishes to the other in writing in accordance with this notice provision. Notices and communications shall be effective when actually received by the addressee.

NO MITIGATION; NO SET OFF

In the event of any termination of employment hereunder, you shall be under no obligation to seek other employment and there shall be no offset against any amounts due to you under this letter agreement on account of any remuneration attributable to any subsequent employment you may obtain. The amounts payable hereunder shall not be subject to setoff, counterclaim, recoupment, defense or other right which the Company may have against you.

SUCCESSORS

Except as otherwise provided herein, this letter agreement is personal to you, and without the prior written consent of the Company shall not be assignable by you other than by will or the laws of descent and distribution. This agreement shall inure to the benefit of and be enforceable by your legal representatives. This agreement shall inure to the benefit of and be binding upon the Company and its successors and assigns. Except as provided herein, this agreement shall not be assignable by the Company without your prior written consent. The Company shall require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the

---

Alfred E. Festa                    January 19, 2005                    Page 9
-----------------------------------------------------------------------------

Company to assume expressly and agree to perform this agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place. "Company" means the Company as hereinbefore defined and any successor to its business and/or assets as aforesaid that assumes and agrees to perform this agreement by operation of law or otherwise.

SURVIVORSHIP

The respective rights and obligations of the parties hereunder shall survive any termination of your employment to the extent necessary to effect those rights and obligations.

VACATION

As an officer of the Company, you shall be entitled to four weeks paid vacation per full calendar year of employment with the Company.

CONFIDENTIALITY AND NON-COMPETE AGREEMENTS

Fred, of course, the Company's standard employment agreement (the "Standard Agreement"), which includes agreements regarding the confidentiality of Company information and non-competition, and similar provisions, which you signed in order to commence employment with the Company shall remain in full force and effect; except you and the Company agree that, to the extent that the terms the Standard Agreement differ from the terms of this letter agreement, the terms of this letter agreement (and not the Standard Agreement) shall control your employment relationship with the Company, and that the provisions of item 5 of the Standard Agreement are not applicable to the terms of this letter agreement, in that the Standard Agreement does not supercede any terms of this letter agreement. A copy of the Standard Agreement that you signed has previously been provided to you.

MISCELLANEOUS

You and the Company acknowledge this letter agreement, and the other written agreements referred to herein, contain the entire understanding of the parties concerning the subject matter hereof. You and the Company acknowledge that this agreement supersedes any prior agreement between you and the Company concerning the subject matter hereof. Except as expressly otherwise provided herein, this agreement shall not adversely affect your right to participate in, or receive any benefit under, any incentive, severance or other benefit plan or program in which you may from time to time participate.

CC-BLG002999

If any provision of this agreement is held invalid or unenforceable in whole or in part, such provision, to the extent it is invalid or unenforceable, shall be revised to the extent necessary to make the provision, or part hereof, valid and enforceable, consistent with the intentions of the parties hereto. Any provision of this agreement that is held invalid or unenforceable, in whole or in part, shall not affect the validity and enforceability of the other provision of this agreement, which shall remain in full force and effect.

This letter agreement may be amended, superseded or canceled only by a written instrument specifically stating that it amends, supersedes or cancels this agreement, executed by you and the Company.

Alfred E. Festa              January 19, 2005                    Page 10
--------------------------------------------------------------------

If you have any questions regarding any expectations of your new position, please call me.

If you have any questions regarding the compensation and Company benefit plans and programs, please feel free to call W. Brian McGowan, Senior Vice President, Administration, at (410) 531-4191.

Fred, again, we are very excited about your election as CEO and look forward to continuing our productive and rewarding relationship.

Sincerely,

Paul J. Norris
Chairman & Chief Executive Officer
W. R. Grace & Co.

Attachment

cc: W. B. McGowan

AGREED AND ACCEPTED:


---------------------------------------
Alfred E. Festa

---------------------------------------
Date

CC-BLG003000

EXHIBIT 10.28

Thomas A. Vanderslice,
Lead Independent Director
W. R. Grace & Co. Board of Directors

W. R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044-4098

January 19, 2005

Mr. Paul Norris
W. R. Grace & Co.
7500 Grace Drive
Columbia, Maryland 21044

Dear Paul:

As discussed, after you retire as CEO of W. R. Grace & Co. ("Grace"),
you have agreed to continue to monitor Grace's efforts to reorganize under
Chapter 11 of the U.S. Bankruptcy Code (the "Chapter 11 Process"), and to
provide consulting and advisory services to Grace's new CEO, Fred Festa, other
Grace officers and employees, and the Board, regarding that Process. You have
also agreed to assist Grace in the legislative process and to provide such other
limited transition consulting and advisory services as may be requested by
Grace, all in accordance with the terms specified in this letter agreement. If
you agree with the terms of this letter agreement, please sign where indicated
below and return a signed copy to W. Brian McGowan.

With respect to the Chapter 11 Process, you will be responsible for
independently determining whether you need to attend certain meetings or Court
hearings to fulfill your obligations under this letter agreement. Also, of
course, you may receive specific assignments (e.g., to attend certain meetings
or Court hearings or to render advice on specific aspects of the Chapter 11
Process) from Mr. Festa or the Board with regard to the Chapter 11 Process.

You will determine where, when and how you perform your monitoring
duties and consulting services hereunder (except for attending meetings
scheduled for the convenience of all parties and certain Court hearings, and the
requirement that you satisfy any deadlines imposed regarding the completion of
specific services hereunder).

You will provide services hereunder as an independent contractor, with
no authority to bind the Company to any agreement or arrangement. As a
consultant hereunder, you will work closely with Grace's Chief Restructuring
Officer and other

Mr. Paul Norris
January 19, 2005
Page 2

persons performing roles related to the consulting services provided hereunder;
but you will not supervise any Grace employee and no Grace employee will report
to you. Also, except as specifically requested by Grace, you will not be
required to provide services related to Grace's ongoing businesses or other
Grace matters..

In consideration for your services pursuant to this agreement, you
will be paid a monthly retainer (your "Consulting Retainer"). Initially, your
Consulting Retainer will be $35,416.67 per month (i.e., $425,000 annually),
subject to adjustment as provided in the next paragraph. (You will, of course,
also receive the usual director fees paid to the Company's Board members, to the
extent you are entitled to such fees as a member of the Board.)

At this time, it is anticipated that you may be required to dedicate
an amount of time that is equal to approximately 1/2 of a regular 40 hour per
week work schedule ("1/2 Time") to your duties under this agreement. You also
agree, however, that your Consulting Retainer will be adjusted downward to the
extent that the time that you are required to dedicate to providing services
hereunder is, or later becomes, substantially less than 1/2 Time.

Your Consulting Retainer will be paid to you as an independent
contractor, and you will be responsible for all tax reporting and payments
generally associated with payments to independent contractors in accordance with
the Federal Self-Employment Contributions Act and other applicable laws. Also,
you will not receive any employee benefits or other employee or officer
prerequisites from Grace in conjunction with your services hereunder or as a
result of your receipt of your Consulting Retainer.

While you are a consultant hereunder, Grace will provide you with
office space in its Columbia Maryland headquarters (along with secretarial and
business telephone services, as well as other office work assistance, which
would generally be helpful to you in performing your duties as a consultant).
You will not, however, be required to perform your consulting services from that
office space, and there will be no specified standard hours that you will need
to be present at the Columbia headquarters or any other location.

If you are required to travel away from home and the Columbia headquarters in order to attend meetings or otherwise perform any duties pursuant to this agreement, Grace will of course reimburse you for reasonable business expenses related to such travel.

The term of this agreement will commence the first business day after you retire from Grace (unless you and the Board agree to a later date); and it is anticipated that you will continue to provide consulting services hereunder only for a temporary period,.

Mr. Paul Norris
January 19, 2005
Page 3

However, you may voluntarily cease providing such services at any time, upon at least 30 days written notice to the Chairman of the Compensation Committee of the Board. In addition, the Board may terminate this consulting arrangement at any time, upon 30 days written notice to you. Your Consulting Retainer shall cease to accrue immediately upon your ceasing to provide services hereunder, regardless of the reason for such cessation.

The Board understands that at the same time you are providing services hereunder, you will most likely also be providing consulting or other services to other business organizations. Nothing in this agreement shall prevent you from performing consulting or other services for other businesses at any time during or after the term of this letter agreement.

Notwithstanding the forgoing or any other provision of this letter agreement, however, you agree that, without the prior written consent of Mr. Festa or the Board, you shall not at any time (during the term of this letter agreement or thereafter) disclose, or use for your own benefit or purposes, or for the benefit or purposes of any other person or business organization, any information or data belonging to, or relating to, the affairs of Grace (or its affiliates or subsidiaries), including (but not limited to) information related to the Chapter 11 Process, which you receive pursuant to your performance of duties and services under this letter agreement ("Confidential Information"). (Information that is in, or hereafter enters, the public domain through no fault of yours is not, however, to be considered Confidential Information under this letter agreement.) Finally, this provision regarding Confidential Information shall not supercede, but shall be in addition to, any other confidentiality agreement or understanding between you and Grace (or any of its affiliates or subsidiaries) as a result of your status as a former employee of any such entity or otherwise.

Grace will, to the maximum extent permitted by applicable law, indemnify you and hold you harmless from and against any and all losses and liabilities you may incur as a result of your monitoring the Chapter 11 Process and your performing consulting and advisory services, under this letter agreement. Such indemnification shall be in addition to any indemnification granted to or available to you as a director or former employee or executive of Grace.

Finally, in order to resolve any dispute that may arise with respect to the obligations, duties and responsibilities of the parties under this letter agreement, you and the Board agree to adopt the terms of your prior employment agreement with Grace, dated January 1, 2001 (and amended November 6, 2002), under the heading "Governing Law and Dispute Resolution".

Mr. Paul Norris
January 19, 2005
Page 4

Paul, please let me again thank you on behalf of the Board for agreeing to assist Fred and the Board in their efforts to manage Grace's Chapter 11 Process and assisting with transition issues after you retire from Grace.

Sincerely,

Thomas A. Vanderslice

AGREED:

----------------------------------------
PAUL NORRIS

----------------------------------------
Date:

CC-BLG003002

EXHIBIT 21

[X] W. R. GRACE & CO., A DELAWARE CORPORATION
U.S. SUBSIDIARIES

12/31/2004

[X] Chapter 11 Filing - April 2, 2001

---

| | SUBSIDIARY NAME | CO. # | STATE OF INCORPORATION |
|---|---|---|---|
| [X] | A-1 Bit & Tool Co., Inc. | 458 | DE |
| | * Advanced Refining Technologies LLC | 930 | DE |
| [X] | Alewife Boston Ltd. | 070 | MA |
| [X] | Alewife Land Corporation | 069 | MA |
| | Alltech Associates, Inc. | | IL |
| [X] | Amicon, Inc. | 174 | DE |
| | AP Chem Incorporated | 436 | MD |
| [X] | CB Biomedical, Inc. | 125 | DE |
| [X] | CCHP, Inc. | 074 | DE |
| [X] | Coalgrace, Inc. | 824 | DE |
| [X] | Coalgrace II, Inc. | 835 | DE |
| | Construction Products Dubai, Inc. | 121 | DE |
| [X] | Creative Food 'N Fun Company | 587 | DE |
| [X] | Darex Puerto Rico, Inc. | 798 | DE |
| [X] | Del Taco Restaurants, Inc. | 557 | DE |
| [X] | Dewey and Almy, LLC | 406 | DE |
| [X] | Ecarg, Inc. | 519 | NJ |
| [X] | Five Alewife Boston Ltd. | 071 | MA |
| [X] | G C Limited Partners I, Inc. | 465 | DE |
| [X] | G C Management, Inc. | 539 | DE |
| [X] | GEC Management Corporation | 689 | DE |
| [X] | GN Holdings, Inc. | 073 | DE |
| [X] | GPC Thomasville Corp. | 637 | DE |
| [X] | Gloucester New Communities Company, Inc. | 572 | NJ |
| [X] | Grace A-B Inc. | 625 | DE |
| [X] | Grace A-B II Inc. | 827 | DE |
| | Grace Asia Pacific, Inc. | 107 | DE |
| | Grace Chemicals, Inc. | 710 | DE |
| [X] | Grace Chemical Company of Cuba | 305 | IL |
| | Grace Collections, Inc. | 316 | DE |
| [X] | Grace Culinary Systems, Inc. | 479 | MD |
| [X] | Grace Drilling Company | 877 | DE |
| [X] | Grace Energy Corporation | 681 | DE |

----------

*    Ownership of Advanced Refining Technologies LLC is 55% W. R. Grace &
     Co.-Conn. (#001) and 45% Chevron USA, Inc.; certain enumerated actions of
     the Executive Committee require unanimous consent.

1

EXHIBIT 21

---

| | SUBSIDIARY NAME | CO. # | STATE OF INCORPORATION |
|---|---|---|---|
| [X] | Grace Environmental, Inc. | 198 | DE |
| [X] | Grace Europe, Inc. | 407 | DE |
| | Grace Germany Holdings, Inc. | | DE |
| [X] | Grace H-G Inc. | 506 | DE |
| [X] | Grace H-G II Inc. | 828 | DE |
| [X] | Grace Hotel Services Corporation | 480 | DE |
| [X] | Grace International Holdings, Inc. | 543 | DE |
| | Grace Latin America, Inc. | 263 | DE |
| | Grace Management Services, Inc. | 485 | DE |
| [X] | Grace Offshore Company | 822 | LA |
| [X] | Grace PAR Corporation | 621 | DE |
| [X] | Grace Petroleum Libya Incorporated | 880 | DE |
| | Grace Receivables Purchasing, Inc. | 041 | DE |
| [X] | Grace Tarpon Investors, Inc. | 462 | DE |
| [X] | Grace Ventures Corp. | 664 | DE |
| [X] | Grace Washington, Inc. | 197 | DE |
| [X] | W. R. Grace Capital Corporation | 563 | NY |
| [X] | W. R. Grace & Co.-Conn. | 001 | CT |
| [X] | W. R. Grace Land Corporation | 523 | NY |
| [X] | Gracoal, Inc. | 856 | DE |
| [X] | Gracoal II, Inc. | 848 | DE |
| [X] | Guanica-Caribe Land Development Corporation | 376 | DE |

CC-BLG003003

| | | | |
|---|---|---|---|
| [X] | Hanover Square Corporation | 516 | DE |
| [X] | Homco International, Inc. | 631 | DE |
| | Ichiban Chemical Co., Inc. | 028 | DE |
| [X] | Kootenai Development Company | 779 | MT |
| | | (f/k/a | |
| | | 079) | |
| [X] | L B Realty, Inc. | 495 | DE |
| [X] | Litigation Management, Inc. | 317 | DE |
| [X] | Monolith Enterprises, Incorporated | 477 | DC |
| [X] | Monroe Street, Inc. | 481 | DE |
| [X] | MRA Holdings Corp. | 075 | DE |
| [X] | MRA Intermedco, Inc. | 076 | DE |
| [X] | MRA Staffing Systems, Inc. | 077 | DE |
| | NZ Alltech, Inc. | | IL |
| [X] | Remedium Group, Inc. | 063 | DE |
| [X] | Southern Oil, Resin & Fiberglass, Inc. | 318 | FL |
| [X] | Water Street Corporation | 548 | DE |

2

EXHIBIT 21

NON-U.S. SUBSIDIARIES

COUNTRY/
SUBSIDIARY NAME
--------------------------------------------------------------------------------
ARGENTINA
--------------------------------------------------------------------------------
W. R. Grace Argentina S.A.
WRG Argentina, S.A.
--------------------------------------------------------------------------------
AUSTRALIA
--------------------------------------------------------------------------------
Alltech Associates (Australia) Pty. Ltd.
Grace Australia Pty. Ltd.
--------------------------------------------------------------------------------
BELGIUM
--------------------------------------------------------------------------------
Grace Construction Products N.V.
Grace N.V.
Grace Silica N.V.
Inverco Benelux N.V.
--------------------------------------------------------------------------------
BRAZIL
--------------------------------------------------------------------------------
Grace Brasil Ltda.
Grace Davison Ltda.
--------------------------------------------------------------------------------
CANADA
--------------------------------------------------------------------------------
GEC Divestment Corporation Ltd.
Grace Canada, Inc.
W. R. Grace Finance (NRO) Ltd.
--------------------------------------------------------------------------------
CHILE
--------------------------------------------------------------------------------
Grace Quimica Compania Limitada
--------------------------------------------------------------------------------
CHINA - PEOPLE'S REPUBLIC OF
--------------------------------------------------------------------------------
Grace China Ltd.
--------------------------------------------------------------------------------
COLOMBIA
--------------------------------------------------------------------------------
Grace Colombia S.A.
W. R. G. Colombia S.A.
--------------------------------------------------------------------------------
CUBA
--------------------------------------------------------------------------------
Envases Industriales y Comerciales, S.A.
Papelera Camagueyana, S.A.
--------------------------------------------------------------------------------
FRANCE
--------------------------------------------------------------------------------
Alltech France S.A.R.L.
Etablissements Pieri S.A.
Societe Civile Beau-Beton
W. R. Grace S.A.
--------------------------------------------------------------------------------
GERMANY
--------------------------------------------------------------------------------
Advanced Refining Technologies GmbH
Alltech G.m.b.H.
Grace Bauprodukte GmbH
Grace Darex GmbH
Grace GP G.m.b.H.
--------------------------------------------------------------------------------

CC-BLG003004

GERMANY (CONTINUED)
--------------------------------------------------------------
Grace Holding G.m.b.H.
Grace Management GP G.m.b.H.
Grace Silica GmbH
Grom Chromatography GmbH
--------------------------------------------------------------


3


EXHIBIT 21

COUNTRY/
SUBSIDIARY NAME
--------------------------------------------------------------
GREECE
--------------------------------------------------------------
Grace Hellas E.P.E.
--------------------------------------------------------------
HONG KONG
--------------------------------------------------------------
Alltech Applied Science Labs (HK) Limited
Alltech Scientific (China) Limited
W. R. Grace (Hong Kong) Limited
W. R. Grace Southeast Asia Holdings Limited
--------------------------------------------------------------
HUNGARY
--------------------------------------------------------------
Grace Ertekesito Kft.
--------------------------------------------------------------
INDIA
--------------------------------------------------------------
W. R. Grace & Co. (India) Private Limited
--------------------------------------------------------------
INDONESIA
--------------------------------------------------------------
PT. Grace Specialty Chemicals Indonesia
--------------------------------------------------------------
IRELAND
--------------------------------------------------------------
Amicon Ireland Limited
Grace Construction Products (Ireland) Limited
Trans-Meridian Insurance (Dublin) Ltd.
--------------------------------------------------------------
ITALY
--------------------------------------------------------------
Alltech Italia S.R.L.
W. R. Grace Italiana S.p.A.
--------------------------------------------------------------
JAPAN
--------------------------------------------------------------
Advanced Refining Technologies K.K.
Grace Chemicals K.K.
Grace Japan Kabushiki Kaisha
--------------------------------------------------------------
KOREA
--------------------------------------------------------------
Grace Korea Inc.
--------------------------------------------------------------
MALAYSIA
--------------------------------------------------------------
W. R. Grace (Malaysia) Sendiran Berhad
W. R. Grace Specialty Chemicals (Malaysia) Sdn. Bhd.
--------------------------------------------------------------
MEXICO
--------------------------------------------------------------
Grace Container, S. A. de C. V.
W. R. Grace Holdings, S. A. de C. V.
--------------------------------------------------------------
NETHERLANDS
--------------------------------------------------------------
Alltech Applied Science B.V.
Amicon B.V.
Denac Nederland B.V.
Storm van Bentem en Kluyver B.V.
W. R. Grace B.V.
--------------------------------------------------------------
NETHERLANDS ANTILLES
--------------------------------------------------------------
W. R. Grace N.V.
--------------------------------------------------------------
NEW ZEALAND
--------------------------------------------------------------
Grace (New Zealand) Limited
--------------------------------------------------------------
PHILIPPINES
--------------------------------------------------------------
W. R. Grace (Philippines), Inc.
--------------------------------------------------------------

CC-BLG003005

POLAND
--------------------------------------------------------------------------
Grace Sp. z o.o.
--------------------------------------------------------------------------
RUSSIA
--------------------------------------------------------------------------
Darex CIS LLC
--------------------------------------------------------------------------
SINGAPORE
--------------------------------------------------------------------------

4

EXHIBIT 21

COUNTRY/
SUBSIDIARY NAME
--------------------------------------------------------------------------
W. R. Grace (Singapore) Private Limited
--------------------------------------------------------------------------
SOUTH AFRICA
--------------------------------------------------------------------------
Grace Davison (Proprietary) Limited
W. R. Grace Africa (Pty.) Limited
--------------------------------------------------------------------------
SPAIN
--------------------------------------------------------------------------
Grace, S.A.
Pieri Especialidades, S.L.
--------------------------------------------------------------------------
SWEDEN
--------------------------------------------------------------------------
Grace AB
Grace Catalyst AB
Grace Sweden AB
--------------------------------------------------------------------------
SWITZERLAND
--------------------------------------------------------------------------
Pieri S.A.
--------------------------------------------------------------------------
TAIWAN
--------------------------------------------------------------------------
W. R. Grace Taiwan, Inc.
--------------------------------------------------------------------------
THAILAND
--------------------------------------------------------------------------
W. R. Grace (Thailand) Limited
--------------------------------------------------------------------------
UNITED KINGDOM
--------------------------------------------------------------------------
A.A. Consultancy & Cleaning Company Limited
Alltech Associates Applied Science Limited
Cormix Limited
Borndear 1 Limited
Borndear 2 Limited
Borndear 3 Limited
Darex UK Limited
Emerson & Cuming (Trading) Ltd.
Emerson & Cuming (UK) Ltd.
Exemere Limited
Grace Construction Products Limited
Pieri U.K. Limited
Servicised Ltd.
W. R. Grace Limited
--------------------------------------------------------------------------
VENEZUELA
--------------------------------------------------------------------------
Grace Venezuela, S.A.
Inversiones GSC, S.A.
--------------------------------------------------------------------------

5

CC-BLG003006

EXHIBIT 24

POWER OF ATTORNEY

The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and DAVID B. SIEGEL as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2004, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ John F. Akers
--------------------------
John F. Akers

Dated: March 3, 2005

EXHIBIT 24

POWER OF ATTORNEY

The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and DAVID B. SIEGEL as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2004, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ H. Furlong Baldwin
--------------------------
H. Furlong Baldwin

Dated: March 3, 2005

EXHIBIT 24

POWER OF ATTORNEY

The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and DAVID B. SIEGEL as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2004, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ Ronald C. Cambre
--------------------------
Ronald C. Cambre

Dated: March 3, 2005

EXHIBIT 24

POWER OF ATTORNEY

The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and DAVID B. SIEGEL as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2004, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ Alfred E. Festa
--------------------------
Alfred E. Festa

Dated: March 3, 2005

EXHIBIT 24

POWER OF ATTORNEY

The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and DAVID B. SIEGEL as her true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2004, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full

CC-BLG003007

power to act without the other.

/s/ Marye Anne Fox
--------------------------
Marye Anne Fox

Dated: March 3, 2005

EXHIBIT 24

POWER OF ATTORNEY

The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and DAVID B. SIEGEL as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2004, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ John J. Murphy
--------------------------
John J. Murphy

Dated: March 3, 2005

EXHIBIT 24

POWER OF ATTORNEY

The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and DAVID B. SIEGEL as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2004, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ Thomas A. Vanderslice
--------------------------
Thomas A. Vanderslice

Dated: March 3, 2005

CC-BLG003008

EXHIBIT 31.1

CERTIFICATION OF PERIODIC REPORT UNDER SECTION 302 OF
THE SARBANES-OXLEY ACT OF 2002

I, Paul J. Norris, certify that:

1. I have reviewed this annual report on Form 10-K of W. R. Grace & Co.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

    Date: March 4, 2005

                                    /s/ Paul J. Norris
                                    ------------------------------
                                    Paul J. Norris
                                    Chairman and
                                    Chief Executive Officer

CC-BLG003009

EXHIBIT 31.2

CERTIFICATION OF PERIODIC REPORT UNDER SECTION 302 OF
THE SARBANES-OXLEY ACT OF 2002

I, Robert M. Tarola, certify that:

1.  I have reviewed this annual report on Form 10-K of W. R. Grace & Co.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 4, 2005

                          /s/ Robert M. Tarola
                          ------------------------------
                          Robert M. Tarola
                          Senior Vice President and
                          Chief Financial Officer

CC-BLG003010

EXHIBIT 32

CERTIFICATION UNDER SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. Section 1350), the undersigned certifies that (1) this Annual Report of W. R. Grace & Co. (the "Company") on Form 10-K for the period ended December 31, 2004, as filed with the Securities and Exchange Commission on the date hereof (this "Report"), fully complies with the requirements of Sections 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, and (2) the information contained in this Report fairly presents, in all material respects, the financial condition and results of operations of the Company.


/s/ Paul J. Norris
-------------------------------------
Chairman and Chief Executive Officer

/s/ Robert M. Tarola
-------------------------------------
Senior Vice President and
Chief Financial Officer

Date: March 4, 2005


A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

CC-BLG003011