Claims, Priority Tax Claims, Class 1 Claims, Class 2 Claims, Class 3 Claims, Class 4 Claims, Class 5 Claims, and Class 9 Claims. It also delineates the ways in which such objections may be resolved.

### 4.5.2 DISTRIBUTION ON ACCOUNT OF DISPUTED CLAIMS

Section 5.2 of the Plan provides for the timing and extent of Distributions for Disputed Claims which become Allowed.

### 4.5.3 RESOLUTION OF ASBESTOS CLAIMS

Section 5.3 of the Plan sets forth the way in which Asbestos Claims will be Allowed or Disallowed, and paid if Allowed. The Allowed Amount of Asbestos Claims (except for Canadian Claims that are filed by Claimants (i) with Asbestos PI Claims who elect the Canadian Litigation Option or (ii) with Asbestos PD Claims) shall be determined in accordance with the Bankruptcy Code, the Bankruptcy Rules, the applicable TDP, and the CMO. If any Asbestos

61

EXHIBIT 99.1

Claim becomes Allowed, it shall be satisfied from the Asbestos Trust in accordance with the Asbestos Trust Agreement and the applicable TDPs.

The Allowed Amount of Canadian Claims that are filed by Claimants (i) with Asbestos PI Claims who elect the Canadian Litigation Option or (ii) with Asbestos PD Claims shall be determined in accordance with the Canadian Litigation Procedure and the applicable TDP.

The Asbestos Trust shall have the sole right and authority to resolve all Asbestos PI-SE Claims and Asbestos PD Claims. All Asbestos PI-SE Claims whose Holders elect the Litigation Option or the Canadian Litigation Option, as applicable, shall be litigated by, and at the expense of, the Asbestos Trust in the name of the Asbestos Trust.

The Asbestos Trust shall also have the sole right and authority to resolve all Asbestos PI-AO Claims to the extent the Holder of an Asbestos PI-AO Claim elects the Registry Option or the Cash-Out Option.

If the Holder of an Asbestos PI-AO Claim elects the Litigation Option or the Canadian Litigation Option, as applicable, the Reorganized Debtors shall have the sole right and authority to resolve all such Asbestos PI-AO Claims. All Asbestos PI-AO Claims whose Holders elect the Litigation Option or the Canadian Litigation Option, as applicable, shall be litigated by the Reorganized Debtors or the Canadian Affiliates, as applicable, in the name of the Asbestos Trust, initially at the expense of the Asbestos Trust out of the Asbestos PI-AO Class Fund as it is the estate that remains liable for funding of Asbestos PI-AO Claims.

Any court proceeding related to the resolution of Canadian Claims shall be resolved by the Canadian Court in the context of the Canadian Proceedings.

The subsections of Section 5.3 of the Plan deal with:

o   Making of an Election by Asbestos PI Claimants;

o   Claims Materials for Asbestos PI Claimants;

o   Information Obtained by the Asbestos Trust or Reorganized Debtors Regarding Asbestos PI Claims; and

o   Withdrawal of Claims.

### 4.6 ACCEPTANCE OR REJECTION OF THE PLAN

Article 6 of the Plan discusses which Classes are impaired and which are not. Each Holder of a Claim or Equity Interest in an impaired Class is entitled to vote to accept or reject the Plan to the extent and in the manner provided in the Plan, the Confirmation Procedures Order and/or the Bankruptcy Code.

Classes 1, 2, 3, 4, 5, 6, 7, 8 and 11 of Claims and Equity Interests are unimpaired. Under Bankruptcy Code Section 1126(f), the Holders of Claims and Equity Interests in such Classes are conclusively presumed to have voted to accept the Plan.

62

EXHIBIT 99.1

Section 6.4.1 of the Plan deals with confirmation in the event an impaired Class rejects the Plan. Impaired Equity Interests and/or impaired Classes of Claims that fail to accept the Plan may be "crammed down" in accordance with Bankruptcy Code Section 1129(b). See also Section 7.2.1 of this

CC-BLG003061

Section 6.4.2 of the Plan provides that if the Plan fails to be accepted by the requisite number and amount of the Holders of Claims and Equity Interests required to satisfy Bankruptcy Code Sections 524(g) and 1129, then, notwithstanding any other provision of the Plan to the contrary, the Debtors reserve the right to amend the Plan.

### 4.7 IMPLEMENTATION OF THE PLAN

#### 4.7.1 CORPORATE GOVERNANCE OF THE PARENT AND THE OTHER DEBTORS

Section 7.1 of the Plan provides that the Certificates of Incorporation or Articles of Incorporation, as applicable, of each of the Debtors that is a corporation shall be amended as of the Effective Date. The form of the Certificate of Incorporation or Articles of Incorporation shall be filed as part of the Plan Supplement. The amended Certificates of Incorporation or Articles of Incorporation, as applicable, of the Debtors shall, among other things: (i) prohibit the issuance of nonvoting equity securities, (ii) as to any classes of securities possessing voting power, provide for an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in payment of such dividends, (iii) include, in the case of the Parent, restrictions on the transfer of the Parent Common Stock as necessary to protect the Reorganized Debtors' tax position, and (iv) effectuate any other provisions of the Plan.

Section 7.1 of the Plan also deals with amendments to the Parent's by-laws and the purchase of D&O and fiduciary liability tail coverage. The form of the Parent's by-laws shall be filed as part of the Plan Supplement.

#### 4.7.2 THE ASBESTOS TRUST

Section 7.2 of the Plan deals with the Asbestos Trust. It provides generally for the creation and funding of the Asbestos Trust; transfer of assets, Claims and Demands into the Asbestos Trust; appointment and termination of the Trustee and the TAC; and other administrative matters.

##### 4.7.2.1 CREATION OF THE ASBESTOS TRUST

Upon the entry of the Confirmation Order, effective as of the Effective Date, the Asbestos Trust shall be created as a "qualified settlement fund" in accordance with the Plan Documents.

The purpose of the Asbestos Trust shall be to, among other things: (i) assume the liabilities of the Debtors and the Canadian Affiliates with respect to all Asbestos Claims (whether now existing or arising at any time hereafter), (ii) process, liquidate, pay and satisfy all Asbestos Claims in accordance with the Plan, the Asbestos Trust Agreement, the respective

63

EXHIBIT 99.1

TDPs, the CMO, the Canadian Litigation Procedure and the Confirmation Order and in such a way that provides reasonable assurance that the Asbestos Trust will value and be in a position to pay, present and future Asbestos Claims and to otherwise comply with Bankruptcy Code Section 524(g)(2)(B)(i); (iii) preserve, hold, manage, and maximize the assets of the Asbestos Trust for use in paying and satisfying Allowed Asbestos Claims; and (iv) otherwise carry out the provisions of the Asbestos Trust Agreement and any other agreements into which the Trustees have entered or will enter in connection with the Plan.

##### 4.7.2.2 FUNDING OF THE ASBESTOS TRUST

Effective on the Effective Date and conditioned upon the fulfillment of events enumerated in the Sealed Air Settlement Agreement, Cryovac, Inc. shall fund the Sealed Air Payment into the Asbestos Trust in accordance with the Plan and the provisions of the Sealed Air Settlement Agreement. Effective on the thirty-first (31st) day after the Effective Date, the Parent shall transfer or cause the transfer of the Debtors' Payment into the Asbestos Trust in accordance with the Plan.

The Sealed Air Payment and that portion of the Debtors' Payment consisting of the Parent Common Stock, to the extent necessary, shall first fund the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund and the Asbestos Trust Expenses Fund. The remainder of the Sealed Air Payment, if any, and the Warrants included as part of the Debtors' Payment shall fund the Asbestos PI-AO Class Fund.

In addition, in the event that the proceeds of the sale of Parent Common Stock following exercise of all of the Warrants are insufficient to pay all Allowed Asbestos PI-AO Claims in full, the Reorganized Debtors shall pay the Asbestos Trust in full and in cash for the benefit of the Holders of such Claims, such payment to be made by the Reorganized Debtors on the first Business Day of the next calendar quarter after the date upon which the Asbestos PI-AO Claim becomes Allowed, unless the Claim becomes Allowed within fifteen (15) Business Days before the first Business Day of such next calendar quarter, in

CC-BLG003062

which case the payment date shall be the first business day of the next succeeding calendar quarter.

4.7.2.3 SECTIONS 7.2.3 THROUGH 7.2.9 OF THE PLAN

Sections 7.2.3 through 7.2.9 of the Plan deal with:

o    Transfer of assets into the Asbestos Trust;

o    Transfer of Claims and Demands to the Asbestos Trust;

o    Creation of Asbestos Trust sub-accounts;

o    Appointment and termination of Trustees;

o    Creation and termination of the TAC;

o    The cooperation agreement between the Reorganized Debtors and the Asbestos Trust;

64

EXHIBIT 99.1

o    Institution and maintenance of legal and other proceedings by the Asbestos Trust; and

o    The Reorganized Debtors' sole right and authority to resolve Asbestos PI-AO Claims for which the Holder of such Asbestos PI-AO Claim elects the Litigation Option or the Canadian Litigation Option, as applicable.

4.7.3 PAYMENTS AND DISTRIBUTIONS UNDER THE PLAN

Section 7.3 of the Plan sets forth the mechanics of Asbestos Trust payments and Plan Distributions. Among other things Section 7.3 provides that payments to Holders of Allowed Asbestos Claims shall be made by the Asbestos Trust in accordance with the Asbestos Trust Agreement, the respective TDPs, the CMO and the Canadian Litigation Procedure as applicable. All Distributions or payments required or permitted to be made under the Plan (other than to Professionals) shall be made by the Reorganized Debtors in accordance with the treatment specified for each such Holder as specified in the Plan (unless otherwise ordered by the Bankruptcy Court).

4.7.4 DELIVERY OF DISTRIBUTIONS AND UNDELIVERABLE OR UNCLAIMED DISTRIBUTIONS

Section 7.4 of the Plan provides that payments by the Asbestos Trust to Holders of Allowed Asbestos Claims shall be made in accordance with the Asbestos Trust Agreement and the respective TDPs, while other Distributions to Holders of Allowed Claims shall be made at the address of the Holder of such Claim as set forth on the Schedules, unless superseded by a new address, or as set forth in a further writing, including a filed proof of Claim. Section 7.4 of the Plan also provides for a mechanism to deal with undeliverable Distributions.

4.7.5 PAYMENTS UNDER THE PLAN

Section 7.5 of the Plan deals with the manner of payments under the Plan and provides a mechanism to deal with fractional payments.

4.7.6 OCCURRENCE OF THE CONFIRMATION DATE

Section 7.6 of the Plan sets forth conditions precedent to confirmation of the Plan. The Court must make all of the findings of fact and/or conclusions of law listed in Section 7.6.1 before confirmation of the Plan. Among other things, these findings of fact and/or conclusions of law relate to: (1) the Court having found that the aggregate of the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund is not greater than one billion, four hundred eighty three million dollars ($1,483,000,000), (2) the Court having found the Asbestos PI-AO Class Fund is not greater than one hundred thirty million dollars ($130,000,000), (3) compliance with all applicable subsections of Bankruptcy Code Section 524(g), (4) effectiveness of the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement, (5) a finding that the Reorganized Debtors have the ability to pay and satisfy in the ordinary course of business all of their respective obligations and liabilities as required by the Plan, the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement, (6) the unimpaired status of the classes of Asbestos Claims, (7) the effectiveness of the various

65

EXHIBIT 99.1

injunctions provided for in the Plan, (8) insurance matters, and (9) the lack of preclusive effect of certain asbestos-related litigation.

CC-BLG003063

Section 7.6.2 of the Plan requires certain orders - including the Confirmation Order, the CMO and an order approving the Sealed Air Settlement Agreement - all in form and substance acceptable to the Debtors be entered prior to or in conjunction with Plan confirmation. The Confirmation Order and the Sealed Air Settlement Agreement shall also be in a form and substance acceptable to the other Plan Proponents. In addition, the Court shall have entered the Estimation Order in form and substance acceptable to the Plan Proponents, including the following findings:

o   the Asbestos PI-SE Class Fund shall constitute the maximum amount that shall be required to be paid in order to pay in full all Allowed Asbestos PI-SE Claims;

o   the Asbestos PD Class Fund shall constitute the maximum amount that shall be required to be paid in order to pay in full all Allowed Asbestos PD Claims; and

o   the Asbestos Trust Expenses Fund shall constitute the maximum amount that shall be required to be paid in order to pay in full all expenses of the Asbestos Trust.

Assuming that other conditions precedent under the Plan are fulfilled, the Debtors would be willing to have the Plan confirmed if the Court finds that the aggregate of the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund is not greater than $1,483,000,000, and that the Asbestos PI-AO Class Fund is not greater than $130,000,000. However, such amounts do not represent the Debtors' estimate of their asbestos-related liabilities. In fact, through the use of the estimation process provided for under the Estimation Motion, the Debtors believe their actual asbestos-related liabilities may be significantly lower.

4.7.7 CONDITIONS TO OCCURRENCE OF THE EFFECTIVE DATE

Section 7.7 of the Plan sets forth conditions precedent to the Effective Date of the Plan, including entry of the Confirmation Order as specified, entry of the Recognition Order approving or recognizing the Confirmation Order, affirmation of the various injunctions specified in the Plan, filing of the necessary corporate documents, obtaining the necessary exit financing, and obtaining other various documents or agreements.

4.7.8 MANAGEMENT OF THE REORGANIZED DEBTORS

Section 7.8 of the Plan sets forth the post-confirmation governance of the Reorganized Debtors, including specifications relating to the Board of Directors of the Reorganized Parent.

4.7.9 CORPORATION ACTION

Section 7.9 of the Plan details corporate actions that must be taken in connection with the Plan.

66

EXHIBIT 99.1

4.7.10 EFFECTUATING DOCUMENTS AND FURTHER TRANSACTIONS

Section 7.10 of the Plan authorizes each of the officers of the Debtors and the Reorganized Debtors to execute, deliver, file, or record such agreements or documents and to take such actions as may be necessary or appropriate, for and on behalf of the Debtors and the Reorganized Debtors, to effectuate the Plan.

4.7.11 ALLOCATION OF PLAN DISTRIBUTIONS BETWEEN PRINCIPAL AND INTEREST

Section 7.11 of the Plan allocates Plan Distributions between principal and interest.

4.7.12 NO SUCCESSOR LIABILITY

Section 7.12 of the Plan provides the following: except as otherwise expressly provided in the Plan, the Debtors, the Reorganized Debtors, the Asbestos PI Committee, the Asbestos PD Committee, the FCR, and the Asbestos Protected Parties will not, pursuant to the Plan or otherwise, assume, agree to perform, pay, or indemnify creditors or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any of the Debtors' past or present Affiliates, as such liabilities or obligations may relate to or arise out of the operations of or assets of the Debtors or any of the Debtors' past or present Affiliates or any of their respective successors, whether arising prior to, or resulting from actions, events, or circumstances occurring or existing at any time prior to the Confirmation Date. Neither the Asbestos Protected Parties, the Reorganized Debtors, nor the Asbestos Trust is, or shall be, a successor to the Debtors or any of the Debtors' past or present Affiliates by reason of any theory of law or equity, and none shall have any successor or transferee liability of any kind or character, except that the Reorganized Debtors and the Asbestos Trust shall assume the obligations specified in the Plan and the Confirmation Order.

Except as otherwise expressly provided in the Plan, effective automatically on the Effective Date, the Asbestos Protected Parties and their respective Representatives shall be unconditionally, irrevocably and fully released from any and all Claims and causes of action, including Claims and causes of action arising under Chapter 5 of the Bankruptcy Code or similar Claims or causes of action arising under state or any other law, including, if applicable, claims in the nature of fraudulent transfer, successor liability, corporate veil piercing, or alter ego-type claims, as a consequence of transactions, events, or circumstances involving or affecting the Debtors or the Canadian Affiliates (or any of their predecessors) or any of their respective businesses or operations that occurred or existed prior to the Effective Date.

4.7.13 DEEMED CONSOLIDATION OF THE DEBTORS FOR PLAN PURPOSES ONLY

Section 7.13 of the Plan provides for the substantive consolidation of the Debtors as follows: subject to the occurrence of the Effective Date, the Debtors shall be deemed consolidated under the Plan for Plan purposes only. Each and every Claim Filed or to be Filed against any of the Debtors shall be deemed Filed against the deemed consolidated Debtors and shall be deemed one Claim against and obligation of the deemed consolidated Debtors.

Such deemed consolidation, however, shall not (other than for purposes related to funding Distributions under the Plan and as set forth above in Section 7.13 of the Plan) affect:

67

EXHIBIT 99.1

(i) the legal and organizational structure of the Debtors; (ii) any Encumbrances that are required to be maintained under the Plan (A) in connection with executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been or will be assumed, (B) pursuant to the Plan, or (C) in connection with any Exit Financing; (iii) the Sealed Air Settlement Agreement; and (iv) the Fresenius Settlement Agreement.

Notwithstanding anything contained in the Plan to the contrary, the deemed consolidation of the Debtors shall not have any effect on any of the Claims (other than Asbestos Claims) being reinstated and left unimpaired under the Plan, and the legal, equitable, and contractual rights to which the Holders of any such Claims (other than Asbestos Claims) are entitled shall be left unaltered by the Plan.

Such limited substantive consolidation will have no economic impact on recovery to Claimants as the Debtors are paying all Claims in full. Forgiveness of Intercompany Claims, therefore, would not result in an increased recovery to the Debtors' creditors.

4.8  INJUNCTIONS, RELEASES AND DISCHARGE

Section 7.12 and Article 8 of the Plan work together to shield the Debtors and certain other parties from any liability for any Claims dealt with under the Plan.

Several parties have raised objections to the releases provided by Section 8.7 and 8.4 Released Matters Injunction of the Plan, alleging that they go beyond the scope of permissible releases under applicable law. The Debtors disagree. The parties reserve their rights with respect to the release objections until the hearing on confirmation of the Plan.

Article 8 of the Plan provides the following:

4.8.1 DISCHARGE

4.8.1.1 DISCHARGE OF THE DEBTORS AND RELATED DISCHARGE INJUNCTION

The rights afforded in the Plan and the treatment of all Claims, Demands and Equity Interests in the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Claims, Demands and Equity Interests of any nature whatsoever, including any interest accrued thereon from and after the Petition Date, against the Debtors and the Debtors in Possession, or their assets, properties, or interests in property. Except as otherwise provided in the Plan, on the Effective Date, all Claims, Demands against, and Equity Interests in the Debtors and the Debtors in Possession shall be satisfied, discharged, and released in full. The Reorganized Debtors shall not be responsible for any obligations of the Debtors or the Debtors in Possession except those expressly assumed by the Reorganized Debtors pursuant to the Plan. All Entities shall be precluded and forever barred from asserting against the Debtors and the Reorganized Debtors, or their assets, properties, or interests in property any other or further Claims or Demands based upon any act or omission, transaction, or other activity, event, or occurrence of any kind or nature that occurred prior to the Effective Date, whether or not the facts of or legal bases therefor were known or existed prior to the Effective Date, except as expressly provided in the Plan.

68

CC-BLG003065

EXHIBIT 99.1

With respect to any debts discharged by operation of law under Bankruptcy Code Sections 524(a) and 1141, the discharge of the Debtors operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover, or offset any such debt as a personal liability of the Debtor, whether or not the discharge of such debt is waived; provided, however, that the obligations of the Reorganized Debtors under the Plan are not so discharged.

### 4.8.1.2 DISCHARGE OF LIABILITIES TO HOLDERS OF ASBESTOS CLAIMS

The transfer to, vesting in, and assumption by the Asbestos Trust of the Asbestos Trust Assets as contemplated by the Plan, among other things, shall (i) discharge the Debtors, the Reorganized Debtors and their Representatives for and in respect of all Asbestos Claims and (ii) discharge, release, and extinguish all obligations and liabilities of the Asbestos Protected Parties and Asbestos Insurance Entities for and in respect of all Asbestos Claims, subject to the reservations listed in Section 8.3.2 in the Plan. On the Effective Date, the Asbestos Trust shall assume the liabilities of the Debtors with respect to all Asbestos Claims and shall pay the Allowed Asbestos Claims in accordance with the Asbestos Trust Agreement and the appropriate TDPs.

### 4.8.1.3 DISALLOWED CLAIMS AND DISALLOWED EQUITY INTERESTS

On and after the Effective Date, the Debtors, the Reorganized Debtors and their Representatives shall be fully and finally discharged of any liability or obligation on a Disallowed Claim or Disallowed Equity Interest, and any order creating a Disallowed Claim that is not a Final Order as of the Effective Date solely because of an Entity's right to move for reconsideration of such order pursuant to Bankruptcy Code Section 502 or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date.

### 4.8.1.4 NON-DISCHARGEABLE ERISA LIABILITY

The Parent is a controlled group member within the meaning of 29 U.S.C. Section 1301(a)(14) and may also be a contributing sponsor of one or more ongoing, defined benefit pension plans to which Title IV of ERISA applies (the "Pension Plans"). The Debtors intend, and the Plan contemplates, that the Reorganized Debtors will continue to be the contributing sponsor of all the Pension Plans that they currently sponsor. Each of the Pension Plans is a defined benefit pension plan insured by the Pension Benefit Guaranty Corporation ("PBGC") under ERISA. The Pension Plans are subject to minimum funding requirements of ERISA and Section 412 of the IRC. The PBGC believes the Pension Plans to be underfunded on a termination basis. As of their April 2004 Form 4010 Filings with the PBGC, the Debtors Actuarial Information Certification indicates the total unfunded status of the Pension Plans was $394.2 million as of December 31, 2003. An underfunded pension plan can terminate only in either a distress termination or PBGC-initiated termination under Title IV of ERISA. Should the Pension Plans terminate, the PBGC may assert claims for the underfunding, for any unpaid minimum funding contributions owed the Pension Plan, and for any unpaid premiums owed the PBGC. The PBGC further asserts that portions of those claims would be entitled to priority status.

Nothing contained in the Plan, Confirmation Order, the Bankruptcy Code (including Bankruptcy Code Section 1141), or any other document Filed in the Chapter 11 Cases shall be

EXHIBIT 99.1

construed to discharge, release or relieve the Debtors, or any other party, in any capacity, from any liability or responsibility to the PBGC with respect to the Pension Plans under any law, governmental policy, or regulatory provision. The PBGC shall not be enjoined or precluded from enforcing such liability or responsibility, as a result of any of the provisions of the Plan (including those provisions providing for exculpation, satisfaction, release and discharge of Claims), the Confirmation Order, the Bankruptcy Code (including Bankruptcy Code Section 1141), or any other document Filed in the Chapter 11 Cases. Notwithstanding the foregoing, neither the PBGC nor any other Entity shall assert any liability or responsibility with respect to the Pension Plans under any law, governmental policy or regulatory provisions against, and such liability or responsibility shall not attach to, the Asbestos Trust or any of the Asbestos Trust Assets.

### 4.8.2 THE ASBESTOS CHANNELING INJUNCTION

In order to supplement, where necessary, the injunctive effect of the discharge provided by Bankruptcy Code Sections 1141 and 524(a) and as described in Article 8 of the Plan, and pursuant to the exercise of the equitable jurisdiction and power of the Court under Bankruptcy Code Sections 524(g) and 105(a), the Confirmation Order shall provide for issuance of the Asbestos Channeling Injunction to take effect as of the Effective Date. On and after the Effective Date, the sole recourse of the Holder of an Asbestos Claim on account of such Claim shall be to the Asbestos Trust pursuant to the provisions of the

CC-BLG003066

Asbestos Channeling Injunction and the appropriate TDPs and such Holder shall have no right whatsoever at any time to assert its Asbestos Claim against the Debtors, the Canadian Affiliates, the Reorganized Debtors, any other Asbestos Protected Party, or any property or interest (including any Distributions made pursuant to the Plan) in property of the Debtors, the Reorganized Debtors, or any other Asbestos Protected Party. Without limiting the foregoing, from and after the Effective Date, the Asbestos Channeling Injunction shall apply to all present and future Holders of Asbestos Claims, and all such Holders permanently and forever shall be stayed, restrained, and enjoined from taking any of the following actions for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Asbestos Claims other than from the Asbestos Trust in accordance with the Asbestos Channeling Injunction and pursuant to the Asbestos Trust Agreement and the appropriate TDPs, including:

(a) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or affecting any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party;

(b) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party;

(c) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party;

70

EXHIBIT 99.1

(d) setting off, seeking reimbursement of, indemnification or contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party; and

(e) proceeding in any other manner with regard to any matter that is subject to resolution pursuant to the Asbestos Trust, except in conformity and compliance with the Asbestos Trust Agreement and the appropriate TDPs.

Notwithstanding anything to the contrary above, this Asbestos Channeling Injunction shall not enjoin the rights of Entities to the treatment accorded them under Article 3 of the Plan, as applicable, including the rights of Entities with Asbestos Claims to assert such Asbestos Claims in accordance with the appropriate TDPs.

Except as otherwise expressly provided in the Plan, the Sealed Air Settlement Agreement, or the Fresenius Settlement Agreement, nothing contained in the Plan shall constitute or be deemed a waiver of any claim, right, or cause of action that the Debtors, the Canadian Affiliates, the Reorganized Debtors, or the Asbestos Trust may have against any Entity in connection with or arising out of or related to any Asbestos Claim.

4.8.3 ASBESTOS INSURANCE ENTITY INJUNCTION

Pursuant to the exercise of the equitable jurisdiction and power of the Court under Bankruptcy Code Section 105(a), the Confirmation Order shall provide for issuance of the Asbestos Insurance Entity Injunction to take effect as of the Effective Date.

4.8.3.1 INJUNCTION

(a) All Entities that have held or asserted, that hold or assert, or that may in the future hold or assert any Claim, Demand, or cause of action, against any Asbestos Insurance Entity, based upon, relating to, arising out of, or in any way connected with any Claim, Demand, Asbestos Insurance Rights, Asbestos Insurance Policies, or Asbestos Insurance Settlement Agreements, whenever and wherever arisen or asserted (including all Claims in the nature of or sounding in tort, or under contract, warranty, or any other theory of law, equity, or admiralty) shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such Claim, Demand, or cause of action, including:

(i) commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or

CC-BLG003067

affecting any Asbestos Insurance Entity, or any property or
interest in property of any Asbestos Insurance Entity;

(ii) enforcing, levying, attaching (including any
prejudgment attachment), collecting, or otherwise recovering
by any means or in any manner, whether directly or
indirectly, any judgment, award, decree,

71

EXHIBIT 99.1

or other order against any Asbestos Insurance Entity, or any
property or interest in property of any Asbestos Insurance
Entity;

(iii) creating, perfecting, or otherwise enforcing in any
manner, directly or indirectly, any Encumbrance against any
Asbestos Insurance Entity, or any property or interest in
property of any Asbestos Insurance Entity;

(iv) setting off, seeking reimbursement of, indemnification
or contribution from, or subrogation against, or otherwise
recouping in any manner, directly or indirectly, any amount
against any liability owed to any Asbestos Insurance Entity,
or any property or interest in property of any Asbestos
Insurance Entity; and

(v) proceeding in any other manner with regard to any matter
that is subject to resolution pursuant to the Asbestos
Trust, except in conformity and compliance with the Asbestos
Trust Agreement, the appropriate TDPs, and the appropriate
Asbestos Insurance Settlement Agreements.

(b)   The Reorganized Debtors shall have the sole and exclusive
      authority at any time to terminate, reduce or limit the scope of,
      the Asbestos Insurance Entity Injunction as it may apply to any
      Asbestos Insurance Entity upon express written notice to that
      Asbestos Insurance Entity; and

(c)   The Asbestos Insurance Entity Injunction is not issued for the
      benefit of any Asbestos Insurance Entity, and no Asbestos
      Insurance Entity is or may become a third-party beneficiary of
      the Asbestos Insurance Entity Injunction.

          4.8.3.2  RESERVATIONS  FROM THE  ASBESTOS  INSURANCE  ENTITY
                   INJUNCTION

     Notwithstanding anything to the contrary above, the Asbestos Insurance
Entity Injunction shall not enjoin:

(a)   the rights of any Entity to the treatment accorded it under the
      Plan;

(b)   the rights of any of the Reorganized Debtors or the Non-Debtor
      Affiliates, as the case may be, to prosecute any cause of action
      or to assert any Claim, Demand, debt, obligation, or liability
      for payment against any Entity, including any Asbestos Insurance
      Entity, based on or arising from the Asbestos Insurance Rights
      for the Debtors', Reorganized Debtors' or the Non-Debtor
      Affiliates' benefit; and

(c)   the rights of any of the Reorganized Debtors or the Non-Debtor
      Affiliates, as the case may be, to receive any settlement, award,
      payment of cash or other property of any kind whatsoever from any
      Entity, including any Asbestos Insurance Entity, in satisfaction
      of any Asbestos Insurance Rights that any of the Debtors, the
      Reorganized Debtors or the Non-Debtor Affiliates, as the case may
      be, may have against any of the foregoing.

72

EXHIBIT 99.1

4.8.4 RELEASED MATTERS INJUNCTION

     Pursuant to the exercise of the equitable jurisdiction and power of
the Court under Bankruptcy Code Section 105(a), the Confirmation Order shall
provide for issuance of the Released Matters Injunction to take effect as of the
Effective Date.

          4.8.4.1 INJUNCTION

(a)   All Entities that have held or asserted, that hold or assert, or
      that may in the future hold or assert any Claim, Demand, or cause
      of action, against any Entity released under any provision of the

Plan, shall be enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery on account of such released matters, including:

      (i) commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or affecting any Entity released under any provision of the Plan, or any property or interest in property of any such released Entity;

      (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Entity released under any provision of the Plan, or any property or interest in property of any such released Entity;

      (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Entity released under any provision of the Plan, or any property or interest in property of any such released Entity; and

      (iv) setting off, seeking reimbursement of, indemnification or contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Entity released under any provision of the Plan, or any property or interest in property of any such released Entity.

    4.8.4.2 RESERVATIONS FROM THE RELEASED MATTERS INJUNCTION

Notwithstanding anything to the contrary above, the injunction provided in Section 8.4.1 of the Plan shall not enjoin:

(a)   the rights of any Entity to the treatment accorded it under the Plan;

(b)   the rights of any of the Reorganized Debtors or the Non-Debtor Affiliates, as the case may be, to prosecute any cause of action or to assert any Claim, Demand, debt, obligation, or liability for payment against any Entity, including any Asbestos Insurance Entity, based on or arising from the Asbestos Insurance

73

EXHIBIT 99.1

Rights for the Debtors', Reorganized Debtors' or the Non-Debtor Affiliates' benefit; and

(c)   the rights any of the Reorganized Debtors or the Non-Debtor Affiliates, as the case may be, to receive any settlement, award, payment of cash or other property of any kind whatsoever from any Entity, including any Asbestos Insurance Entity in satisfaction of any Asbestos Insurance Rights that any of the Reorganized Debtors or the Non-Debtor Affiliates, as the case may be, may have against any of the foregoing.

    4.8.5 INJUNCTIONS AND RELEASES RELATED TO THE SEALED AIR INDEMNIFIED PARTIES AND THE FRESENIUS INDEMNIFIED PARTIES

As required by the Sealed Air Settlement Agreement, the Fresenius Settlement Agreement and the Fresenius Settlement Order, the injunctions and releases outlined in the Plan herein, including the Asbestos Channeling Injunction and the Released Matters Injunction, and provided under Bankruptcy Code Sections 105(a) and 524(g), shall absolutely and unequivocally extend to and protect the Sealed Air Indemnified Parties and the Fresenius Indemnified Parties.

    4.8.6 TERM OF CERTAIN INJUNCTIONS AND AUTOMATIC STAY

      4.8.6.1 INJUNCTIONS AND/OR AUTOMATIC STAYS IN EXISTENCE IMMEDIATELY PRIOR TO CONFIRMATION

All of the injunctions and/or automatic stays provided for in or in connection with the Chapter 11 Cases, whether pursuant to Bankruptcy Code Sections 105, 362, or any other provision of the Bankruptcy Code or other applicable law, in existence immediately prior to the Confirmation Date shall remain in full force and effect until the injunctions set forth in the Plan become effective, and thereafter if so provided by the Plan, the Confirmation Order, or by their own terms. In addition, on and after the Confirmation Date, the Reorganized Debtors may seek such further orders as they may deem necessary or appropriate to preserve the status quo during the time between the Confirmation Date and the Effective Date.

CC-BLG003069

4.8.6.2 INJUNCTIONS PROVIDED FOR IN THE PLAN

Each of the injunctions provided for in the Plan shall become effective on the Effective Date and shall continue in effect at all times thereafter unless otherwise provided by the Plan. Notwithstanding anything to the contrary contained in the Plan, all actions in the nature of those to be enjoined by such injunctions shall be enjoined during the period between the Confirmation Date and the Effective Date.

4.8.7 ADDITIONAL RELEASES AND INDEMNIFICATION

4.8.7.1 REPRESENTATIVES OF THE DEBTORS

4.8.7.1.1 RELEASE OF REPRESENTATIVES OF THE DEBTORS

For good and valuable consideration, the receipt and sufficiency of which is acknowledged in the Plan, all Representatives of the Debtors and any of the Non-Debtor

74

EXHIBIT 99.1

Affiliates will be released, as of the Effective Date, from any and all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, that any Entity would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Entity, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date for Claims or liabilities resulting from their services as Representatives of the Debtors or any of the Non-Debtor Affiliates to the extent such Claims or liabilities relate to the business, operations, or management of any of the Debtors or the Non-Debtor Affiliates prior to the Effective Date or any of the matters referred to in Section 11.8 so long as, in each case such action, or failure to act, did not constitute willful misconduct. Any act or omission taken with the approval of the Bankruptcy Court will be conclusively deemed not to constitute willful misconduct. This section is not intended to preclude a governmental entity from enforcing its police and regulatory powers. These releases are conditioned on the released Representatives giving a mutual release, except that such Representatives are not releasing Claims with respect to commercial obligations of the Debtors and the Non-Debtor Affiliates, any Claims for indemnification in favor of the released Representatives, or Claims for wages, fees, benefits, commissions and salaries. Further, these releases are not intended to, and shall not, alter in any way the rights of the present and/or former officers and/or directors of the Parent, or of any of the other Debtors or Non-Debtor Affiliates, under the Parent's By-laws and/or Certificate of Incorporation, or any of the other Debtors' or Non-Debtor Affiliates' applicable by-laws and/or certificates of incorporation, whatever those rights, if any, may be.

4.8.7.1.2 INDEMNIFICATION OF REPRESENTATIVES OF THE DEBTORS AND NON-DEBTOR AFFILIATES

The Reorganized Debtors will defend, indemnify, and hold harmless to the fullest extent permitted by applicable law, all Representatives of the Debtors, and all Representatives of the Non-Debtor Affiliates, on and after the Effective Date for all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever that are purported to be released pursuant to Section 8.7.1(a) in the Plan.

4.8.7.2 RELEASE OF SEALED AIR INDEMNIFIED PARTIES

Upon receipt of the Sealed Air Payment (i) the Debtors, the Asbestos PD Committee and the Asbestos PI Committee shall execute and deliver the Release; (ii) the Government Plaintiff shall execute and deliver the Government Release; and (iii) the Asbestos PI Committee and the Asbestos PD Committee shall deliver the Fresenius Release, all as provided for and defined in the Sealed Air Settlement Agreement. In addition, each of the Non-Debtor Affiliates shall irrevocably release, acquit, and forever discharge the Sealed Air Indemnified Parties from any and all Asbestos Claims and any and all Claims, on the basis of, arising from, or attributable to (in whole or in part, directly or indirectly) the Fresenius Transaction, as that term is defined in the Sealed Air Settlement Agreement, that have accrued or been asserted or that hereafter might accrue or be asserted against the Sealed Air Indemnified Parties, and that each Non-Debtor Affiliate shall not institute, participate in, maintain, maintain a right to or assert against the Sealed Air Indemnified Parties, either directly or indirectly, on its own behalf, derivatively, or on behalf of any other person any and all Asbestos Claims, and any and all Claims on the basis of,

75

EXHIBIT 99.1

CC-BLG003070

arising from, or attributable to (in whole or in part, directly or indirectly) the Fresenius Transaction, as that term is defined in the Sealed Air Settlement Agreement.

The Debtors, the Reorganized Debtors and the Asbestos Trust shall defend, indemnify, and hold harmless each of the Sealed Air Indemnified Parties as provided in, and to the extent set forth in the Sealed Air Settlement Agreement, and the indemnification provisions set forth in the Sealed Air Settlement Agreement shall be binding on the Asbestos Trust with the same force and effect as if the Asbestos Trust was a party to the Sealed Air Settlement Agreement.

### 4.8.7.3 RELEASE OF FRESENIUS INDEMNIFIED PARTIES

Upon receipt of the Fresenius Payment, the Debtors, the Reorganized Debtors, the Asbestos PI Committee and the Asbestos PD Committee will fully, finally and forever release, relinquish and discharge each and every Fresenius Indemnified Party from any and all Grace-Related Claims, as that term is defined in the Fresenius Settlement Agreement, that the Debtors, the Reorganized Debtors, the Asbestos PI Committee or the Asbestos PD Committee have asserted or could have asserted in the Bankruptcy Court or any other forum against any of the Fresenius Indemnified Parties and the release that is attached as Appendix B to the Fresenius Settlement Agreement shall become effective. Upon receipt of the Fresenius Payment, in addition to the more limited duties of indemnification by the Debtors to the Fresenius Indemnified Parties under Article III of the Fresenius Settlement Agreement, the Debtors and the Reorganized Debtors shall indemnify, defend and hold harmless the Fresenius Indemnified Parties as provided in and to the extent set forth in the Fresenius Settlement Agreement.

### 4.8.7.4 SPECIFIC RELEASES BY HOLDERS OF CLAIMS OR EQUITY INTERESTS

Without limiting any other provisions of the Plan, each Holder of a Claim or Equity Interest who votes in favor of the Plan or receives or retains any property under the Plan shall be deemed to unconditionally have released the Asbestos Protected Parties, the Asbestos Insurance Entities, the Unsecured Creditors' Committee, the Asbestos PI Committee, the Asbestos PD Committee, the Equity Committee and the FCR, and each party's Representatives, as of the Effective Date from any and all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively), based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date in any way relating or pertaining to, the Debtors or the Reorganized Debtors, the Chapter 11 Cases, or the negotiation, formulation, and preparation of the Plan or any related agreements, instruments, or other documents, so long as, in each case, such action or failure to act does not constitute willful misconduct. Any act or omission taken with the approval of the Bankruptcy Court will be conclusively deemed not to constitute willful misconduct. This section is not intended to preclude a governmental entity from enforcing its police and regulatory powers.

### 4.8.7.5 APPROVAL OF SEALED AIR SETTLEMENT AGREEMENT

The Confirmation Order shall constitute an order approving, as a compromise and settlement pursuant to Bankruptcy Code Section 1123(b)(3)(A), the release of Sealed Air, the

76

EXHIBIT 99.1

respective releases of each of the Reorganized Debtors and the Asbestos Trust contained in the Sealed Air Settlement Agreement, and the execution and delivery of the Sealed Air Settlement Agreement which contains the foregoing releases. The Confirmation Order shall also constitute an order assuming the 1998 Tax Sharing Agreement as defined in the Sealed Air Settlement Agreement.

### 4.8.7.6 EFFECT OF THE FRESENIUS SETTLEMENT AGREEMENT, THE FRESENIUS SETTLEMENT ORDER, AND THE SEALED AIR SETTLEMENT AGREEMENT

Notwithstanding anything to the contrary in the Plan, any of the Plan Documents, or the Confirmation Order, nothing in the Plan, any of the Plan Documents or the Confirmation Order (including any other provisions that purports to be preemptory or supervening) shall in any way operate to, or have the effect of, impairing or limiting the legal, equitable or contractual rights or obligations of the Sealed Air Indemnified Parties, the Fresenius Indemnified Parties or the Debtors, the Reorganized Debtors and the Non-Debtor Affiliates, respectively, pursuant to the Sealed Air Settlement Agreement, the Fresenius Settlement Agreement or the Fresenius Settlement Order, as applicable, each of which is expressly made a part of the Plan and incorporated in the Plan by reference.

The Sealed Air Settlement Agreement, the Fresenius Settlement Agreement and the Fresenius Settlement Order set forth certain preconditions to the making of the Sealed Air Payment and/or the Fresenius Payment and the Debtors intend by the Plan to fulfill each and every such precondition whether

expressly or impliedly outlined herein. Those preconditions include but are not necessarily limited to the following:

- o  Releases by the Reorganized Debtors and the Non-Debtor Affiliates;

- o  Releases by the Holders of certain Claims, including but not limited to asbestos related Claims;

- o  Issuance of a permanent injunction under Bankruptcy Code Section 105(a) and a channeling injunction under Bankruptcy Code Section 524(g);

- o  Indemnification of the Fresenius Indemnified Parties and Sealed Air Indemnified Parties by the Reorganized Debtors and the Non-Debtor Affiliates;

- o  Dismissal of certain actions, including but not limited to the Fraudulent Conveyance Adversary Proceeding, as outlined in the Sealed Air Settlement Agreement, the Fresenius Settlement Agreement and the Fresenius Settlement Order; and

- o  A Confirmation Order containing a determination that, as of the Effective Date, the Reorganized Debtors have the ability to pay and satisfy in the ordinary course of business their respective obligations under the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement.

77

EXHIBIT 99.1

4.9  CONTRACTS

Article 9 of the Plan sets forth provisions dealing with executory contracts, unexpired leases, letters of credit, surety bonds, guaranties, and certain indemnity agreements.

4.10  RETENTION OF JURISDICTION

Article 10 of the Plan provides that the Bankruptcy Court will retain exclusive jurisdiction over any matter (i) arising under the Bankruptcy Code, (ii) arising in or related to the Chapter 11 Cases or the Plan, or (iii) that relates to the matters enumerated in Article 10 provided that the District Court shall retain jurisdiction for such matters to which the automatic reference to the Bankruptcy Court has been withdrawn and that the Canadian Court shall retain jurisdiction for matters related to the litigation of Canadian Claims and the hearing on the Recognition Order.

4.11  MISCELLANEOUS PROVISIONS

Article 11 of the Plan deals with a variety of miscellaneous matters including:

- o  authority of the Debtors

- o  payment of statutory fees

- o  provisions that must be included in the Plan according to the Fresenius Settlement Agreement and the Sealed Air Settlement Agreement

- o  dissolution of the Unsecured Creditors' Committee, the Asbestos PI Committee, the Asbestos PD Committee and the Equity Committee

- o  continued retention of the Future Claimants' Representative

- o  headings

- o  governing law

- o  filing of additional documents

- o  compliance with tax requirements

- o  further assurances

- o  further authorizations

The more significant sections of Article 11 of the Plan are:

Section 11.3.1 of the Plan - Maintenance of Causes of Action: Nothing in Section 11.3 of the Plan shall be deemed to be a transfer by the Debtors and the Reorganized Debtors of any Claims, causes of action, or defenses relating to assumed executory contracts or otherwise which are required by the Reorganized Debtors to conduct their businesses in the ordinary course subsequent to the Effective Date. Moreover, except as otherwise expressly contemplated by the Plan, the Sealed Air Settlement Agreement, the Fresenius Settlement Agreement or

CC-BLG003072

other Plan Documents, from and after the Effective Date, the Reorganized Debtors shall have and retain any and all rights to commence and pursue any and all Claims, causes of action, including the Retained Causes of Action, or defenses against any parties, including Claimants and Holders of

78

EXHIBIT 99.1

Equity Interests, whether such causes of action accrued before or after the Petition Date, including those Retained Causes of Action listed on Exhibit 11 in the Exhibit Book.

The Reorganized Debtors shall retain and may exclusively enforce any and all such Claims, rights or causes of action, including Retained Causes of Action, and commence, pursue and settle the causes of action in accordance with the Plan. The Reorganized Debtors shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such claims, rights, and causes of action, including Retained Causes of Action, without the consent or approval of any third party and without any further order of the Court.

Section 11.3.2 of the Plan - Preservation of Causes of Action: The Debtors are currently investigating whether to pursue potential causes of action against any Claimants or Entities. The investigation has not been completed to date, and, under the Plan, the Reorganized Debtors retain the right on behalf of the Debtors to commence and pursue any and all Retained Causes of Action. The potential causes of action currently being investigated by the Debtors, which may, but need not, be pursued by the Debtors before the Effective Date or by the Reorganized Debtors, after the Effective Date are described more fully in this Disclosure Statement. In addition, there may be numerous Unknown Causes of Action. The failure to list any such Unknown Causes of Action in the Plan, or on Exhibit 11 in the Exhibit Book, is not intended to limit the rights of the Reorganized Debtors to pursue any Unknown Cause of Action to the extent the facts underlying such Unknown Cause of Action become fully known to the Debtors.

Section 11.3.3 of the Plan - Preservation of All Causes of Action not Expressly Settled or Released: Unless a Claim or cause of action against a Claimant or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order, the Debtors expressly reserve such Claim or Retained Cause of Action (including any Unknown Causes of Action) for later adjudication by the Reorganized Debtors, as applicable. Therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Claims or Retained Causes of Action upon or after the Confirmation Date or Effective Date of the Plan based on this Disclosure Statement, the Plan or the Confirmation Order, except where such Claims and Retained Causes of Action have been released in the Plan or other Final Order. In addition, the Debtors, the Reorganized Debtors, and the successor entities under the Plan expressly reserve the right to pursue or adopt any Claim alleged in any lawsuit in which the Debtors are defendants or an interested party, against any Entity, including the plaintiffs or co-defendants in such lawsuits.

Any Entity to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that such obligation, transfer, or transaction may be reviewed by the Debtors or the Reorganized Debtors, and may, if appropriate, be the subject of an action after the Effective Date, whether or not (i) such Entity has filed a proof of Claim against the Debtors in the Chapter 11 Cases; (ii) such Claimant's proof of Claim has been objected to; (iii) such Claimant's Claim was included in the Debtors' Schedules; or (iv) such Claimant's scheduled Claim has been objected to by the Debtors or has

79

EXHIBIT 99.1

been identified by the Debtors as a Disputed Claim, a Contingent Claim, or an Unliquidated Claim.

Section 11.4 of the Plan - Third-Party Agreements: The Distributions to the various classes of Claims in the Plan will not affect the right of any Entity to levy, garnish, attach, or employ any other legal process with respect to such Distributions by reason of any claimed subordination rights or otherwise. All of such rights and any agreements relating thereto will remain in full force and effect.

Section 11.8 of the Plan - Exculpation: None of the Reorganized Debtors, the Debtors, the Non-Debtor Affiliates, the Sealed Air Indemnified Parties, the Fresenius Indemnified Parties, the Trustees of the Asbestos Trust, the Asbestos Trust Advisory Committee, the Asbestos PI Committee, the Asbestos PD Committee, the Unsecured Creditors' Committee, the Equity Committee, the FCR, or any of their respective Representatives are to have or incur any liability to

CC-BLG003073

any Entity for any pre- or post-Petition Date act or omission in connection with, related to, or arising out of the negotiation of the Plan or the settlement provided in the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement, the pursuit of confirmation of the Plan, the consummation of the Plan or the settlement provided in the Sealed Air Settlement Agreement or Fresenius Settlement Agreement, or the administration of the Plan or the property to be distributed under the Plan so long as, in each case such action, or failure to act, did not constitute willful misconduct. In all respects, they will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. Any act or omission taken with the approval of the Bankruptcy Court will be conclusively deemed not to constitute willful misconduct. This section is not intended to preclude a governmental entity from enforcing its police and regulatory powers.

Section 11.9 of the Plan - Title to Assets; Discharge of Liabilities: Upon the transfer of the Sealed Air Payment into the Asbestos Trust, and the transfer of the Debtors' Payment into the Asbestos Trust, each such transfer shall be vested in the Asbestos Trust free and clear of all Claims, Equity Interests, Encumbrances, and other interests of any Entity. Except as otherwise provided in the Plan and in accordance with Bankruptcy Code Section 1123(b)(3), on the Effective Date, title to all of the Debtors' assets and properties and interests in property, including the Retained Causes of Action, shall vest in the Reorganized Debtors free and clear of all Claims, Equity Interests, Encumbrances, and other interests, and the Confirmation Order shall be a judicial determination of discharge of the liabilities of the Debtors.

Section 11.10 of the Plan - Notices: Any notices, statements, requests, and demands required or permitted to be provided under the Plan, in order to be effective, must be: (i) in writing (including by facsimile transmission), and unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made (A) if personally delivered or if delivered by facsimile or courier service, when actually received by the Entity to whom notice is sent, (B) if deposited with the United States Postal Service (but only when actually received), at the close of business on the third business day following the day when placed in the mail, postage prepaid, certified or registered with return receipt requested, or (C) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid) (but only when actually received) and (ii) addressed to the appropriate Entity or Entities to whom such notice, statement, request or demand is directed (and, if required, its counsel), at the address of

80

EXHIBIT 99.1

such Entity or Entities set forth in the Plan (or at such other address as such Entity may designate from time to time by written notice to all other Entities listed below in accordance with Section 11.10 of the Plan).

Section 11.15 of the Plan - Exemption from Transfer Taxes: Pursuant to Bankruptcy Code Section 1146(c), the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan shall be exempt from all taxes as provided in Bankruptcy Code Section 1146(c).

5.   LIMITED SUBSTANTIVE CONSOLIDATION

On the Effective Date, each of the Debtors' estates will be substantively consolidated pursuant to Bankruptcy Code Section 105(a) for the limited purposes of allowance, treatment and Distribution under the Plan. As a result of the substantive consolidation, on the Effective Date, all property, rights and Claims of the Debtors will be deemed pooled for purposes of allowance, treatment and Distributions under the Plan.

As set forth in Section 7.13 of the Plan, the Plan does not contemplate the merger or dissolution of any Debtor which is currently operating or which currently owns operating assets or the transfer between Debtors or commingling of any assets of any Debtor. Such limited substantive consolidation will not affect (other than for Plan voting, treatment and/or Distribution purposes) (1) the legal and corporate structures of any Reorganized Debtor or (2) Equity Interests in Debtors other than the Parent.

As a result of substantive consolidation, a Holder of Claims against two or more of the Debtors arising from or relating to the same underlying debt that would otherwise constitute Allowed Claims against two or more Debtors, including Claims based on joint and several liability, contribution, indemnity, subrogation, reimbursement, surety, guaranty, co-maker and similar concepts, will have only one Allowed Claim on account of such Claims.

The Debtors believe that substantive consolidation is in the best interests of the Debtors' estates and will promote a more expeditious and streamlined distribution and recovery process for Claimants. In particular, substantive consolidation of the Debtors' estates will result in (1) the deemed consolidation of the assets and liabilities of the Debtors, (2) the deemed elimination of multiple and duplicative creditor Claims and joint and several liability Claims, and (3) the payment of Allowed Claims from a common pool of assets. Substantive consolidation will relieve the Debtors from having to

CC-BLG003074

litigate creditor Claims against multiple Debtors on the same liability, as only one Claim will be deemed allowed and payable from one common pool of assets. The Debtors estimate that there have been 1,032 duplicate proofs of Claim filed against the Debtors' estates.

Substantive consolidation is an equitable doctrine that permits the Court to merge the assets and liabilities of affiliated entities so that the combined assets and liabilities are treated as though held by one entity. It is well established that Bankruptcy Code Section 105(a), which provides, in pertinent part, that the "court may issue any order, process, or judgment that is necessary or

81

EXHIBIT 99.1

appropriate to carry out the provisions of this title," empowers a bankruptcy court to authorize substantive consolidation. The Bankruptcy Code also contemplates consolidation in aid of reorganization. See 11 U.S.C. Section 1123(a)(5).

The Debtors have reviewed in detail the factors relevant to substantive consolidation and believe that the facts in the Chapter 11 Cases warrant substantive consolidation. Substantive consolidation is appropriate because Grace-Conn. is the only Debtor that has substantial business, revenues and assets. The Debtors believe that the facts supporting substantive consolidation of the Debtors based on Debtors' corporate and management structure include, but are not limited to, the following: (i) the Parent is the ultimate parent and Grace-Conn. is the operating parent company for the other Debtors as well as for the Non-Debtor Affiliates, and Grace-Conn. directly or indirectly owns 100% of the Capital Stock of almost all of the Debtors; (ii) almost all of the directors and officers of the Debtors are directors, officers and/or employees of Grace-Conn.; (iii) under internal Grace guidelines, most major non-ordinary course transactions by the Debtors must be approved by the Parent's Board of Directors or members of senior management as well as by the other Debtors' Boards of Directors; (iv) the Debtors file consolidated federal tax returns, and joint or combined tax returns in a number of states; and (v) the Debtors and the Non-Debtor Affiliates prepare and file consolidated financial statements and SEC filings.

Substantive consolidation is also appropriate because Grace-Conn. manages the Debtors and Non-Debtor Affiliates, performs substantially all work related to the other Debtors and their assets, and pays substantially all their expenses. The Debtors believe that the facts supporting substantive consolidation of the Debtors based on Debtors' business operations include, but are not limited to, the following: (i) Grace-Conn. owns substantially all of the assets, conducts substantially all of the business, and realizes substantially all of the revenues and earnings of the Debtors; (ii) most of the Debtors are corporations whose assets were sold and whose operations were terminated before the Petition Date; (iii) some of the Debtors own real property and immaterial amounts of other property, but only a few Debtors conduct any business or have their own employees or bank accounts; (iv) substantially all the administrative work done with respect to the Debtors (for example, maintenance of property, sale of assets, payment of taxes and other governmental fees and charges, accounting and legal services) are provided by Grace-Conn. employees; and (v) with the exception of a few Debtors with cash on hand or revenue from business operations, leases, sales of property or intercompany loans, substantially all the expenses of the Debtors are paid by Grace-Conn.

Based upon the foregoing, the Debtors believe that the Parent and all of the other Debtors should be consolidated for Plan purposes.

6.    VOTING AND CONFIRMATION PROCEDURES

        6.1   VOTING PROCEDURES

        The voting procedures summarized in this Article 6 were established in the Confirmation Procedures Order. You should carefully read the Confirmation Procedures Order. It establishes, among other things: (1) the deadlines, procedures and instructions for voting to accept or reject the Plan, (2) the applicable standards for tabulating Ballots and Master Ballots, (3) the deadline

82

EXHIBIT 99.1

for filing objections to confirmation of the Plan, and (4) the date and time of the Confirmation Hearing.

The Confirmation Procedures Order should be referred to if you have any questions concerning the procedures described herein. If there are any inconsistencies or ambiguities between this Disclosure Statement and the Confirmation Procedures Order, the Confirmation Procedures Order will control.

CC-BLG003075

If one or more of your Claims and/or Equity Interests is in a voting Class, you have obtained, or the Debtors' Voting Agent has sent, you one or more Ballot(s) and/or Master Ballot(s) with return envelopes (WITHOUT POSTAGE ATTACHED) for voting to accept or reject the Plan. The Plan Proponents urge you to accept the Plan by completing, signing and returning the enclosed Ballot(s) in the return envelope(s) (WITH POSTAGE AFFIXED BY YOU) to the Voting Agent as follows:

IF BY HAND DELIVERY/COURIER:     IF BY U.S. MAIL:

Bankruptcy Management Corporation    Bankruptcy Management Corporation
1330 E. Franklin Avenue           P.O. Box 913
El Segundo, CA 90245              El Segundo, CA 90245-0913
Attn: Grace Voting Agent          Attn: Grace Voting Agent

    o    TO BE COUNTED, THE VOTING AGENT MUST RECEIVE YOUR COMPLETED BALLOT AND/OR MASTER BALLOT NO LATER THAN 4:00 P.M., EASTERN TIME, ON [_____], 2005 (THE "VOTING DEADLINE"). IF THE COURT EXTENDS OR WAIVES THE PERIOD DURING WHICH VOTES WILL BE ACCEPTED BY THE DEBTORS, THE TERM "VOTING DEADLINE" FOR SUCH SOLICITATION SHALL MEAN THE LAST TIME AND DATE TO WHICH SUCH SOLICITATION IS EXTENDED.

    o    ANY EXECUTED BALLOT OR COMBINATION OF BALLOTS REPRESENTING CLAIMS OR EQUITY INTERESTS IN THE SAME CLASS HELD BY THE SAME HOLDER THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR THAT INDICATES BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN SHALL NOT BE COUNTED.

    o    ANY BALLOT OR MASTER BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL NOT BE COUNTED.

Detailed voting instructions are printed on and/or accompany each Ballot and/or Master Ballot. Any unsigned Ballot or Master Ballot, or any Ballot or Master Ballot without an original signature, including any Ballot or Master Ballot received by facsimile or other electronic means, or any Ballot or Master Ballot with only a photocopy of a signature, will not be counted. Any Ballot or Master Ballot that is properly completed and timely received will not be counted if such Ballot or Master Ballot was sent in error to, or by, the voting party, because the voting party did

83

EXHIBIT 99.1

not have a Claim or Equity Interest that was entitled to be voted in the relevant voting Class as of the Voting Record Date.

Whenever a Holder of a Claim or Equity Interest casts more than one Ballot or Master Ballot voting the same Claim prior to the Voting Deadline, the last valid Ballot or Master Ballot physically received by the Voting Agent prior to the Voting Deadline will be deemed to reflect the voter's intent and thus will supersede and replace any prior cast Ballot(s) or Master Ballot(s) and any prior cast Ballot(s) or Master Ballot(s) will not be counted. The Debtors, without notice, subject to contrary order of the Court, may waive any defect in any Ballot or Master Ballot at any time, either before or after the close of voting. Such determinations will be disclosed in the voting report and any such determination by the Debtors will be subject to de novo review by the Court.

    6.2  CONFIRMATION PROCEDURES

        6.2.1 CONFIRMATION HEARING

Bankruptcy Code Section 1128(a) requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan. Bankruptcy Code Section 1128(b) provides that any party-in-interest may object to confirmation of the Plan.

The Bankruptcy Court has set the Confirmation Hearing for [____:____ ___. m.], Eastern Time on [_____, 2005], in the United States Bankruptcy Court, 824 Market Street, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned, from time to time, without notice, other than an announcement of an adjourned date at such hearing or an adjourned hearing, or by posting such continuance on the Bankruptcy Court's docket.

        6.2.2 OBJECTIONS TO CONFIRMATION OF THE PLAN

Any objections to confirmation of the Plan must be in writing (with proposed changes to the Plan being marked for changes, i.e., blacklined against the Plan), and must be filed with the Clerk of the Bankruptcy Court with a copy to the Bankruptcy Court's chambers, together with a proof of service thereof, and served on counsel for the Debtors and the Office of the United States Trustee ON OR BEFORE [_____] at 5:00 P.M., Eastern Time. Bankruptcy Rule 3020 governs the form of any such objection.

CC-BLG003076

EXHIBIT 99.1

COUNSEL ON WHOM OBJECTIONS MUST BE SERVED ARE:

COUNSEL FOR THE DEBTORS:
Kirkland & Ellis LLP
200 E. Randolph Drive
Chicago, Illinois 60601
Attn: Jonathan Friedland
    Ryan B. Bennett
and

COUNSEL FOR THE UNITED STATES TRUSTEE:
Office of the United States Trustee
844 N. King Street, Second Floor
Wilmington, Delaware 19801
Attn: Frank Perch

Kirkland & Ellis LLP
777 South Figueroa Street, 37th Floor
Los Angeles, California 90017
Attn: Bennett L. Spiegel
    Lori Sinanyan

COUNSEL FOR EQUITY COMMITTEE:
Kramer Levin Naftalis & Frankel LLP
919 Third Avenue
New York, NY 10022
Attn: Phillip Bentley
    Gary M. Becker

CO-COUNSEL FOR THE DEBTORS:
Pachulski, Stang, Ziehl, Young, Jones &
Weintraub P.C.
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (courier 19801)
Attn: Laura Davis Jones
    David W. Carickhoff, Jr.

COUNSEL FOR UNSECURED CREDITORS'
COMMITTEE:
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038-4982
Attn: Lewis Kruger
    Arlene Krieger
    Kenneth Pasquale

COUNSEL FOR ASBESTOS PD COMMITTEE:
Bilzin Sumberg Baena Price & Axelrod LLP
200 South Biscayne Blvd., Suite 2500
Miami, FL 33131-2336
Attn: Scott L. Baena
    Jay Sackalo

COUNSEL FOR ASBESTOS PI COMMITTEE:
Caplin & Drysdale, Chartered
One Thomas Circle NW, Suite 1100
Washington, D.C. 20005
Attn: Peter Van N. Lockwood

COUNSEL FOR FUTURE CLAIMANTS' REPRESENTATIVE:
Swidler, Berlin, Shereff, Friedman LLP
The Washington Harbour
3000 K Street, NW, Suite 300
Washington, DC 20007
Attn: Roger Frankel

    UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED UPON COUNSELS FOR
THE DEBTORS, THE UNSECURED CREDITORS' COMMITTEE AND THE EQUITY COMMITTEE AND
PROPERLY FILED WITH THE BANKRUPTCY COURT, IT WILL NOT BE CONSIDERED BY THE
BANKRUPTCY COURT.

85

EXHIBIT 99.1

    6.2.3 QUESTIONS ABOUT THE DISCLOSURE STATEMENT, PLAN, OR BALLOTS
        AND MASTER BALLOTS

    You may address any questions you have about this Disclosure
Statement, the Plan or your Ballot(s) to general bankruptcy counsel for the
Debtors:

        Jonathan P. Friedland
        Ryan B. Bennett
        Kirkland & Ellis LLP
        200 E. Randolph Drive
        Chicago, Illinois 60601
        Tel.: (312) 861-2000
        Fax: (312) 861-2200

7.  REQUIREMENTS FOR CONFIRMATION OF THE PLAN

    7.1  BANKRUPTCY CODE Section 1129 GENERALLY

    At the Confirmation Hearing, the Court will determine whether the
confirmation requirements of Bankruptcy Code Section 1129 have been satisfied.
If so, the Court will enter the Confirmation Order. The Debtors believe that the
Plan satisfies or will satisfy the applicable requirements for confirmation, as
follows:

    o   The Plan complies with the applicable provisions of the
        Bankruptcy Code. See 11 U.S.C. Section 1129(a)(1).

    o   The Debtors, as proponents of the Plan, have complied with the

applicable provisions of the Bankruptcy Code. See 11 U.S.C.
Section 1129(a)(2).

o    The Plan has been proposed in good faith and not by any means
     forbidden by law. See 11 U.S.C. Section 1129(a)(3).

o    Any payment made or promised by the Debtors, or by an Entity
     acquiring property under the Plan, for services or for costs and
     expenses in or in connection with the Chapter 11 Cases, or in
     connection with the Plan and incident to the Chapter 11 Cases,
     has been disclosed to the Court, and any such payment made before
     the confirmation of the Plan is reasonable, or if such payment is
     to be fixed after confirmation of the Plan, such payment is
     subject to the approval of the Court as reasonable. See 11 U.S.C.
     Section 1129(a)(4).

o    The Debtors have disclosed the identity and affiliations of any
     individual proposed to serve, after confirmation of the Plan, as
     a director, officer, or voting trustee of the Debtors, and the
     appointment to, or continuance in, such office of such
     individual, is consistent with the interests of Claimants and
     Equity Holders and with public policy, and the Debtors have
     disclosed the identity of any insider that will be employed or

86

EXHIBIT 99.1

retained by the Reorganized Debtors, and the nature of any
compensation for such insider. See 11 U.S.C. Section 1129(a)(5).

o    With respect to each Class of impaired Claims or Equity
     Interests, either each Holder of a Claim or Equity Interest of
     such Class has accepted the Plan, or will receive or retain under
     the Plan on account of such Claim or Equity Interest property of
     a value, as of the Effective Date of the Plan, that is not less
     than the amount that such Holder would so receive or retain if
     the Debtors were liquidated on such date under chapter 7 of the
     Bankruptcy Code; or if Bankruptcy Code Section 1111(b)(2) applies
     to the Claims of such Class, each Holder of a Claim will receive
     or retain under the Plan on account of such Claim property of a
     value, as of the Effective Date of the Plan, that is not less
     than the value of such Holder's interest in the Debtors' estates'
     interest in the property that secures such Claims. See 11 U.S.C.
     Section 1129(a)(7).

o    Each Class of Claims or Equity Interests that is entitled to vote
     on the Plan has either accepted the Plan or is not Impaired under
     the Plan, or the Plan can be confirmed without the approval of
     each voting Class pursuant to section 1129(b) of the Bankruptcy
     Code. (See Disclosure Statement Sections 7.7.1 & 7.2.1.) See 11
     U.S.C. Section 1129(a)(8).

o    Except to the extent that the Holder of a particular Claim has
     agreed to a different treatment of such Claim and subject to the
     Fresenius Settlement Agreement, the Plan provides that Allowed
     Administrative Expense Claims and Allowed Priority Claims will be
     paid in full on the Effective Date, or as reasonably practicable
     thereafter, and that Allowed Priority Tax Claims will receive, on
     account of such Allowed Claims, payment in full on the Effective
     Date or as reasonably practicable thereafter, or deferred cash
     payments plus interest, over a period not exceeding six years
     after the date of assessment of such Claim, of a value, as of the
     Effective Date, equal to the Allowed amount of such Claim. See 11
     U.S.C. Section 1129(a)(9).

o    At least one Class of impaired Claims has accepted the Plan,
     determined without including any acceptance of the Plan by any
     insider holding a Claim of such Class. See 11 U.S.C. Section
     1129(a)(10).

o    Confirmation of the Plan is not likely to be followed by the
     liquidation, or the need for further financial reorganization, of
     the Debtors or any successor to the Debtors under the Plan,
     unless such liquidation or reorganization is proposed in the
     Plan. See 11 U.S.C. Section 1129(a)(11).

o    The Plan must provide that the quarterly fees required under 28
     U.S.C. Section 1930 have been paid or that they will be paid on
     the Effective Date of the Plan. See 11 U.S.C. Section
     1129(a)(12).

o    The Plan must provide for the continuation after the Effective
     Date of payment of all retiree benefits (as that term is defined
     in Bankruptcy Code Section 1114) at the level established
     pursuant to Bankruptcy Code Section 1114(e)(1)(B) or Section
     1114(g), at any time

CC-BLG003078

EXHIBIT 99.1

prior to confirmation of the Plan, for the duration of the period the Debtor has obligated itself to provide such benefits. See 11 U.S.C. Section 1129(a)(13).

Bankruptcy Code Section 524(g) further provides that, in order for the Asbestos Channeling Injunction to be enforceable, the Plan must provide for a section 524(g) trust that will, among other things:

o   assume the liabilities of a debtor which at the time of entry of the order for relief has been named as a defendant in personal injury, wrongful death, or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products; see Bankruptcy Code Section 524(g)(2)(B)(i)(I)

o   be funded in whole or in part by the securities of one (1) or more debtors involved in the Plan and by the obligation of such debtor or debtors to make future payments, including dividends; see Bankruptcy Code Section 524(g)(2)(B)(i)(II)

o   own, or by the exercise of rights granted under the Plan would be entitled to own if specified contingencies occur, a majority of the voting shares of -

    o   each such debtor;

    o   the parent corporation of each such debtor; or

    o   a subsidiary of each such debtor that is also a debtor; see Bankruptcy Code Section 524(g)(2)(B)(i)(III) and

o   is to use its assets or income to pay Claims and Demands; see Bankruptcy Code Section 524(g)(2)(B)(i)(IV).

The Debtors believe that the Plan satisfies all of the statutory requirements of Bankruptcy Code Sections 1129 and 524(g).

7.2   VOTE REQUIRED FOR CLASS ACCEPTANCE

The Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by holders of two-thirds in dollar amount and more than one-half in number of the claims of that class which actually cast ballots for acceptance or rejection of the plan, i.e., acceptance takes place only if two-thirds in amount and a majority in number of the holders of claims in a given class actually voting cast their ballots in favor of acceptance. The Bankruptcy Code defines acceptance of a plan by a class of equity interest holders as acceptance by holders of two-thirds in amount of the interests of that class which actually cast ballots for acceptance or rejection of the plan.

Bankruptcy Code Section 524(g) further provides that any separate class or classes of the claimants whose claims are to be addressed by a section 524(g) trust must vote, by at least 75 percent of those voting, in favor of the plan.

88

EXHIBIT 99.1

If a plan is confirmed, then holders of Claims against, or equity interests in, the debtor, whether voting or non-voting and, if voting, whether accepting or rejecting the Plan, are bound by the terms of the plan, including any injunction(s) under Bankruptcy Code Sections 524(g) and/or 105(a).

7.2.1 CRAMDOWN

Generally, under the Bankruptcy Code, a plan of reorganization must be approved by each impaired class of creditors. The Court, however, may confirm a plan that has not been approved by each impaired class if at least one impaired class accepts the plan by the requisite vote and the Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to each class that is impaired and has not accepted the plan. This is often referred to as "cramming down" on a Class.

A plan of reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if each dissenting class is treated equally with other classes of equal rank. The phrase "fair and equitable" has different meanings depending on whether it is being used with respect to the treatment of secured Claims, unsecured Claims and equity interests.

As set forth in Bankruptcy Code Section 1129(b)(2), the condition that a plan of reorganization be fair and equitable with respect to a class includes the following requirements:

CC-BLG003079

(A)  With respect to a class of secured claims, the plan provides--

    (i) (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

    (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

    (ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

    (iii) for the realization by such holders of the indubitable equivalent of such claims.

(B)  With respect to a class of unsecured claims--

    (i) The plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

89

EXHIBIT 99.1

    (ii) The holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

(C)  With respect to a class of interests--

    (i) The plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or

    (ii) The holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

In the event one or more Classes of impaired Claims or Equity Interests rejects the Plan, the Debtors reserve the right to proceed with confirmation pursuant to Bankruptcy Code Section 1129(b), and the Court will determine, at the Confirmation Hearing, whether the Plan is fair and equitable and does not discriminate unfairly against any rejecting impaired Class of Claims or Equity Interests.

7.3  FEASIBILITY OF THE PLAN

To confirm the Plan, the Court must find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors. This requirement is imposed by Bankruptcy Code Section 1129(a)(11) and is referred to as the "feasibility" requirement. The Debtors believe that they will be able to timely perform all obligations described in the Plan and, therefore, that the Plan is feasible.

The Debtors filed their original Schedules and Statements of Financial Affairs on June 1, 2001 (the "SOFA"). The Debtors filed amendments and supplements to the SOFA on August 19, 2001, September 3, 2002 and February 11, 2003.

The Debtors have filed Monthly Operating Reports since the Petition Date and the Parent regularly files form 10-Ks, 10-Qs, and 8-Ks with the SEC which are available at www.grace.com or www.sec.gov. Summary Financial Information of Grace for the fiscal years ended December 31, 2001, December 31, 2002 and December 31, 2003 is included in the Exhibit Book as part of the Financial Information. This summary Financial Information reflects, on a consolidated basis, the activities of the Debtors and certain Non-Debtor Affiliates.

To demonstrate the feasibility of the Plan, the Debtors have prepared the proforma and prospective financial information for the Reorganized Debtors and the Non-Debtor Affiliates that is outlined in Exhibit 4 in the Exhibit Book, with such information presented on a consolidated basis for the fiscal years 2004, 2005 and 2006 taking into account the anticipated financial impact of the Plan. Claimants are advised to review these documents to fully understand the assets and liabilities of the Reorganized Debtors and the Non-Debtor Affiliates. The

CC-BLG003080

90

EXHIBIT 99.1

Reorganized Debtors and the Non-Debtor Affiliates have used their books and records, knowledge and experience, and opinions of accountants and counsel to provide the financial and other business-related information set forth in this Disclosure Statement.

As explained more fully in Article 5 herein, each of the Debtors' estates will be substantively consolidated pursuant to Bankruptcy Code Section 105(a) for the limited purposes of allowance, treatment and distributions under the Plan. As a result of the substantive consolidation, on the Effective Date, all property, rights and Claims of the Debtors will be deemed pooled for purposes of allowance, treatment and Distributions under the Plan.

The Financial Information has been prepared in conformity with U.S. generally accepted accounting principles ("GAAP") consistent with those currently utilized by Grace in the preparation of its consolidated financial statements except as otherwise noted. However, the proforma and prospective financial information has not been audited by registered independent public accountants.

The proforma and prospective financial information are based upon a variety of assumptions subject to significant business, economic and competitive uncertainties, contingencies and risks, many of which are beyond the control of the Debtors. Consequently, the proforma and prospective financial information should not be regarded as a representation or warranty by the Debtors or by any other Entity that the proforma or prospective financial information or measures will be realized. Such information should not be relied upon in making any investment decisions with respect to Parent Common Stock or otherwise. Actual results may vary materially from those presented and the variations may be adverse.

### 7.4  BEST INTERESTS TEST

Bankruptcy Code Section 1129(a)(7) requires that even if a plan is accepted by a class of creditors or equity interest holders, the Bankruptcy Court must nonetheless determine that the plan is in the "best interests" of any class of creditors or equity interest holders that are impaired by the plan. The "best interests" test requires that the Bankruptcy Court find either that (i) all members of an impaired class have accepted the plan or (ii) the plan will provide the holder of a Claim or Equity Interest in such class a distribution of a value, as of the effective date of the plan, that is at least equal to what such holder would receive in a hypothetical liquidation of the debtor under Chapter 7 of the Bankruptcy Code.

The Best Interests Analysis, which can be found in Exhibit 3 in the Exhibit Book, was prepared by the Debtors with the assistance of Blackstone and is based on numerous assumptions and estimates. The Best Interests Analysis shows that Holders of General Unsecured Claims would receive an estimated Distribution of 55% to 93% on their Claims under a Chapter 7 liquidation while such Holders would receive an estimated 100% Distribution under Chapter 11. The Unsecured Creditors' Committee, based on assumptions and estimates certain of which differ from those of the Debtors and their professionals, estimates that proceeds realized in a hypothetical Chapter 7 liquidation may be greater than those presented in the Best Interests Analysis, and in the high scenario, might result in net proceeds exceeding those necessary to pay a 100% Distribution to the Holders of Allowed General Unsecured Claims.

91

EXHIBIT 99.1

### 7.5  INFORMATION ABOUT CORPORATE GOVERNANCE, OFFICERS, AND DIRECTORS OF THE REORGANIZED DEBTORS, AND THE MANAGEMENT OF THE DEBTORS

#### 7.5.1 CORPORATE GOVERNANCE; LIMITATION OF DIRECTOR LIABILITY

The Certificate of Incorporation or Articles of Incorporation, as applicable, of each of the Debtors that is a corporation will be amended as of the Effective Date to among other things, (i) prohibit the issuance of nonvoting equity securities as required by Bankruptcy Code Section 1123(a)(6), and be subject to further amendment as permitted by applicable law, (ii) as to any classes of securities possessing voting power, provide for an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in payment of such dividends, (iii) include, in the case of the Parent, restrictions on the transfer of Parent Common Stock as necessary to protect the Reorganized Debtors' tax position, and (iv) effectuate any other provisions of the Plan. The amended Certificates of Incorporation or Articles of Incorporation, as applicable, will be filed with the Secretary of State or equivalent official in their respective jurisdictions of incorporation on or prior to the Effective Date and be in full

force and effect without any further amendment as of the Effective Date.

The restrictions on stock transfers in order to protect the Reorganized Debtors' tax position will include a three (3) year prohibition, waivable by the Parent's Board of Directors, on (i) any Entity other than the Asbestos Trust acquiring after the Effective Date an amount of shares of the Parent Common Stock that would cause such Entity to become a Holder of 4.75% or more of the Parent Common Stock, and (ii) any Entity that as of the Effective Date holds 4.75% or more of the Parent Common Stock from increasing its ownership of Parent Common Stock. In addition, any Parent Common Stock held by the Asbestos Trust will not be transferable for a period of at least three (3) years after the Effective Date. Other restrictions will apply with respect to the Warrants held by the Asbestos Trust, including a prohibition on the Asbestos Trust exercising an amount of Warrants greater than 50% of its total Warrants for a period of at least three (3) years after the Effective Date.

### 7.5.2 MANAGEMENT COMPENSATION AND INCENTIVE PROGRAM

Pursuant to Bankruptcy Code Section 1129(a)(5), the Debtors will disclose, prior to the Confirmation Hearing, the identity of any individuals proposed to serve, after confirmation of the Plan, as a director or officer of the Reorganized Debtors and, if that person is an insider, the nature of any compensation for such insider. The Debtors recently announced that Paul J. Norris will step down as Chief Executive Officer effective May 31, 2005, but will remain on the Board of Directors as non-executive chairman. A.E. Festa, currently the Debtors' President and Chief Operating Officer, will succeed Norris as Chief Executive Officer.

Currently, the total compensation package that the Debtors' directors, officers and key employees receive includes base salary, annual bonus opportunities, long-term cash incentives and other benefits. Certain officers and employees are also beneficiaries of a key employee retention program.

92

EXHIBIT 99.1

It is anticipated that the total compensation for the Debtors' directors, officers and key employees after confirmation of the Plan will continue to include base salary, annual bonus and long term stock and cash incentives and other benefits in accordance with the ordinary business policies of the Debtors.

The Debtors anticipate that the value of long term incentive awards issued after the Effective Date will be consistent with the Debtors' past practices. The Debtors expect that such awards, which have been payable 100% in cash during the Chapter 11 Cases, will be payable, at least partially, in restricted stock or stock options of the Reorganized Parent, in accordance with a Management Stock Incentive Plan, the key terms of which are presently being finalized but will be disclosed prior to solicitation of votes on the Plan. Such compensation is included in the projections and accordingly incorporated into the fully diluted reorganized equity value as further described in Section 2.8 of this Disclosure Statement.

### 7.5.3 TAIL COVERAGE POLICIES FOR OFFICERS AND DIRECTORS

Pursuant to the Section 7.1.3 of the Plan, the Reorganized Debtors will obtain sufficient tail coverage for a maximum period of six years under both directors' and officers' insurance policies and fiduciary liability policies, which will cover the Debtors, as well as the Debtors' current and former officers, directors, and employees. The Debtors have determined that this insurance is necessary to protect the releases provided in the Plan. Further, pursuant to Section 8.7.1 of the Plan, the Reorganized Debtors have an obligation to indemnify these parties for certain payments covered by the tail insurance. Therefore, without such insurance, if the Debtors' current and/or former directors, officers and/or employees were sued after the Effective Date, the Reorganized Debtors could be required to satisfy such indemnification claims.

## 8.   IMPORTANT CONSIDERATIONS AND RISK FACTORS

### 8.1   GENERAL

The following provides a summary of various important considerations and risk factors associated with the Plan. However, it is not exhaustive. In considering whether to vote for or against the Plan, Holders of Claims or Equity Interests should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced in this Disclosure Statement.

### 8.2   CERTAIN BANKRUPTCY AND MASS TORT LAW CONSIDERATIONS

#### 8.2.1   PARTIES IN INTEREST MAY OBJECT TO THE DEBTORS' CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

Bankruptcy Code Section 1122 provides that a plan of reorganization may place a class or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of Claims

CC-BLG003082

and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created eleven classes of Claims and Equity Interests, each encompassing Claims or Equity Interests that are substantially similar to the other Claims or Equity Interests in each such class. For example, Class 1 comprises all Claims accorded priority

93

EXHIBIT 99.1

in right to payment under Bankruptcy Code Section 507(a) other than Priority Tax Claims or Administrative Claims. There can be no assurance, however, that the Bankruptcy Court will reach the same conclusion.

### 8.2.2 A DELAY IN PLAN CONFIRMATION MAY DISRUPT GRACE'S OPERATIONS AND HAVE POTENTIAL ADVERSE EFFECTS OF PROLONGED CONFIRMATION PROCESS

A prolonged confirmation process could adversely affect the Debtors' relationships with their customers, suppliers, and employees, which, in turn, could adversely affect the Debtors' competitive position, financial condition, and results of operations. Such developments could, in turn, adversely affect the price of the Parent Common Stock, and hence the value to Holders of Equity Interests and the value of assets available to satisfy Holders of Allowed Claims.

### 8.2.3 THE DEBTORS MAY NOT BE ABLE TO SECURE CONFIRMATION OR CONSUMMATION OF THE PLAN

There can be no assurance that the Plan will be accepted by the required number of Claimants who hold a sufficient amount of Claims and Equity Interests. Although the Debtors believe that the Plan will satisfy all requirements necessary for Confirmation, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes. There is no assurance that the Court will approve the Plan as satisfying the requirements of Bankruptcy Code Section 1129. Notwithstanding Court approval, it is possible that the Plan may not be consummated because of other external factors that may adversely affect the implementation of the Plan.

### 8.2.4 THERE IS A RISK OF POST-CONFIRMATION DEFAULT

At the Confirmation Hearing, the Court will be required to make a judicial determination that the Plan is feasible, but that determination does not serve as any guarantee that there will not be any post-confirmation defaults. The Debtors believe that the cash flow generated from operations and insurance proceeds will be sufficient to meet Reorganized Grace's operating requirements, its obligations under the Exit Financing, and other post-confirmation obligations under the Plan. Reorganized Grace's projected operating cash flow is set forth in the Debtors' prospective financial information that is included as Exhibit 4 in the Exhibit Book.

### 8.2.5 THE DEBTORS MAY OBJECT TO THE AMOUNT OR CLASSIFICATION OF A CLAIM

Except as otherwise provided in the Plan and the Final DIP Order (Docket No. 194), the Debtors reserve the right to object to the amount or classification of any Claim or Equity Interest deemed Allowed under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim or Equity Interest where such Claim or Equity Interest is subject to an objection. Any Holder of a Claim may not receive its specified share of the estimated distributions described in this Disclosure Statement.

### 8.2.6 THE POTENTIAL IMPACT OF PENDING ASBESTOS LEGISLATION IS UNCERTAIN

Legislation currently is pending before the United States Congress that, if enacted, could affect the rights and obligations of companies with asbestos liabilities. The exact terms of the

94

EXHIBIT 99.1

legislation are still the subject of negotiation, however, and it is uncertain how, if at all, such legislation would impact the Debtors, Holders of Claims, Holders of Equity Interests, or any other parties that may be affected by the Chapter 11 Cases.

### 8.2.7 EXEMPTION FROM REGISTRATION REQUIREMENTS OF APPLICABLE FEDERAL SECURITIES LAWS MAY NOT BE AVAILABLE

There are several securities law considerations that parties should bear in mind. These are discussed at length in Article 11 of this Disclosure Statement.

CC-BLG003083

8.3  FACTORS AFFECTING THE DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS
     AFTER THE EFFECTIVE DATE

### 8.3.1 THE DEBTORS DISCLAIM ACCURACY OF FINANCIAL INFORMATION PROVIDED

Although the Debtors have used their reasonable best efforts to ensure the accuracy of the financial information provided in this Disclosure Statement, some of the financial information contained in this Disclosure Statement has not been audited and is based upon an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement. While the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the information contained herein and attached hereto is without inaccuracies.

The Unsecured Creditors' Committee and the Equity Committee, and their respective legal and financial advisors, have not taken any independent action to verify the accuracy or completeness of the financial or other information included in this Disclosure Statement, including any financial projections, and expressly disclaim any representation or warranty, express or implied, concerning the accuracy or completeness thereof.

### 8.3.2 VARIANCE FROM THE PROFORMA AND PROSPECTIVE FINANCIAL INFORMATION

The Debtors' management currently believes that (i) the proforma financial information included as Exhibit 4 in the Exhibit Book is a reasonable presentation of the accounting effects of the Plan, as if the Plan were in effect at the end of, and for, the periods presented; and (ii) the prospective financial information included in the Exhibit Book is a reasonable estimate of the collective future of the Reorganized Debtors and the Non-Debtor Affiliates. Unanticipated events and circumstances occurring subsequent to the preparation of the Reorganized Debtors' and the Non-Debtor Affiliates' collective proforma and prospective financial information may affect the actual accounting effects of the Plan and/or the actual financial results of Reorganized Grace. Although the Debtors' management believes that the accounting effects of the Plan reflected in Reorganized Grace's proforma financial information, and the performance reflected in Reorganized Grace's prospective financial information, are reasonable and attainable, some or all of the estimates may differ from actual results, and the actual proforma effects, and/or the actual future financial results, may be materially worse than the estimated effects and results.

In particular, the proforma and prospective financial information included in the Exhibit Book are each based upon numerous assumptions regarding (1) the confirmation and consummation of the Plan in accordance with its terms, (2) the anticipated future performance of

EXHIBIT 99.1

Reorganized Grace, (3) the tax consequences of the Plan, (4) general business and economic conditions, (5) certain other matters, many of which are beyond the control of the Debtors. There is no assurance that such assumptions will prove to be valid. The effect of any variance from the proforma and prospective financial information may be material and adverse.

### 8.3.3 RISK THAT AMOUNTS OF ALLOWED CLAIMS WILL EXCEED THE DEBTORS' PROJECTIONS

The Allowed Amount of Administrative Expense Claims, Priority Tax Claims, and Claims in Class 1, Class 2, Class 3, Class 4, Class 5, and Class 9 could be more than projected, which, in turn, would impair the value of Parent Common Stock.

### 8.3.4 RISK REGARDING THE SOLVENT INSURANCE CARRIERS

Grace's ultimate recovery of insurance proceeds may be effected by the financial status of the remaining solvent insurance carriers and the number, nature and amount of individual Allowed Asbestos Claims.

8.4  FACTORS AFFECTING THE PARENT COMMON STOCK

The Parent Common Stock is traded on the New York Stock Exchange (Ticker: GRA). Pursuant to the provisions of the Plan, that common stock will not be cancelled and will remain outstanding (although Equity Interests will be impaired by the issuance of additional shares and Warrants, and will thus be entitled to vote on the Plan).

The estimate of the range of the reorganized equity value set forth in Section 2.8 (Estimated Value of the Reorganized Debtors and Non-Debtor Affiliates) of this Disclosure Statement or elsewhere in the Plan Documents does not purport to be an estimate reflective of the pre- or post-reorganization trading value of the Parent Common Stock. The estimate reflective of the range of the fully diluted reorganized equity value per share ascribed herein, or elsewhere in the Plan Documents, may or may not correlate with the actual trading price (if any) of Parent Common Stock on the New York Stock Exchange. It

CC-BLG003084

represents hypothetical reorganized values based on numerous assumptions. The estimated values set forth herein do not necessarily reflect values that could be attainable in public or private markets, and do not consider market trading characteristics, trading limitations possibly imposed on the Parent Common Stock, or perceptions in public or private markets about the Reorganized Debtors and/or Non-Debtor Affiliates that may affect the trading price of Parent Common Stock.

Holders' interests in the Parent Common Stock are subject to dilution by, among other things, additional shares of Parent Common Stock issued under the Plan and possible exercise of the Warrants issued under the Plan, and may be further impacted by future payments by Reorganized Grace.

### 8.4.1 THE REORGANIZED DEBTORS MAY NOT BE ABLE TO ACHIEVE PROJECTED FINANCIAL RESULTS

The Reorganized Debtors may not be able to meet their projected financial results or achieve the revenue or cash flow that they have assumed in projecting future business prospects. If the Reorganized Debtors do not achieve these projected revenue or cash flow levels, they may

EXHIBIT 99.1

lack sufficient liquidity to continue operating as planned after the Effective Date. The Debtors' financial projections represent management's view based on current known facts and hypothetical assumptions about the Reorganized Debtors' future operations. However, the Projections set forth herein do not guarantee the Reorganized Debtors' future financial performance.

### 8.4.2 THE REORGANIZED DEBTORS MAY NOT BE ABLE TO MEET POST-REORGANIZATION DEBT OBLIGATIONS AND FINANCE ALL OPERATING EXPENSES, WORKING CAPITAL NEEDS AND CAPITAL EXPENDITURES

To the extent the Reorganized Debtors are unable to meet their projected financial results or achieve projected revenues and cash flows, the Reorganized Debtors may be unable to service their debt obligations as they come due or to meet the Reorganized Debtors' operational needs. Such a failure may preclude the Reorganized Debtors from developing or enhancing their products, taking advantage of future opportunities, growing their business or responding to competitive pressures.

### 8.4.3 CERTAIN TAX IMPLICATIONS OF THE DEBTORS' BANKRUPTCY AND REORGANIZATION MAY INCREASE THE TAX LIABILITY OF THE REORGANIZED DEBTORS

Holders of Claims should carefully review Article 10 (Federal Income Tax Consequences of the Plan) to determine how the tax implications of the Plan and these Chapter 11 Cases may adversely affect the Reorganized Debtors.

Holders of Claims should also be aware that if, as described in Section 2.5.2 (Fraudulent Transfer Litigation), the IRS successfully asserts that the Sealed Air Payment gives rise to taxable income to the Debtors without any offsetting deductions, the NOLs available to the Reorganized Debtors would be substantially reduced. Any such reduction in NOLs could adversely impact the Reorganized Debtors' cash flow and thus, the value of the Parent Common Stock.

### 8.5 FACTORS ASSOCIATED WITH THE BUSINESS

There are many business factors that create risks for the Debtors' current business operations, as well as Reorganized Grace's future operations. These risks include the following:

- o   loss of senior management and other key employees;

- o   greater than expected liabilities for environmental remediation;

- o   a decline in worldwide oil consumption or the development of new methods of oil refining;

- o   increases in the price of raw materials and energy costs;

- o   consolidation of major customers, which could increase customer purchasing power, thereby putting pressure on operating profits;

EXHIBIT 99.1

- o   inability to gain customer acceptance, or slower than anticipated acceptance, of new products or product enhancements;

o   changes in environmental regulations or societal pressures
    that make Grace's business operations more costly or that
    change the types of products used by customers, especially
    petroleum-based products;

o   slower than anticipated economic advances in less developed
    countries;

o   foreign currency devaluations in developing countries or
    other adverse changes in currency exchange rates (in
    particular, the U.S. dollar to Euro exchange rate);

o   technological breakthroughs rendering a product, a class of
    products, or a line of business obsolete;

o   inability to adapt to continuing technological improvements
    or operating strategies by competitors or customers;

o   inability to adapt to other improvements made by direct or
    indirect competitors;

o   acquisition (through theft or other unlawful means) or use
    by others of Grace's proprietary technology and other
    know-how; and

o   an adverse change in relations with employees and/or labor
    unions.

### 8.5.1 REORGANIZED GRACE MAY NOT OBTAIN POST-CONFIRMATION FINANCING

The Plan envisions that Reorganized Grace will obtain Exit Financing.
There is no guarantee that Reorganized Grace will be able to obtain such Exit
Financing, or obtain it on the terms contemplated by the proforma and
prospective financial information.

### 8.6   FACTORS AFFECTING THE ASBESTOS TRUST

#### 8.6.1 RISK THAT THE ASBESTOS TRUST WILL NOT BE ABLE TO PAY ALL ALLOWED CLAIMS

Even if the Plan is confirmed and consummated, Claimants and Holders
of Equity Interests should be aware of certain risks associated with
confirmation and the ability of the Debtors to perform under the Plan. The Plan
provides that the Asbestos Trust will pay all Allowed Asbestos Claims. The Plan
further provides that the Asbestos Trust will be funded by: (1) $512.5 million
in cash, plus interest thereon from December 21, 2002 until the Effective Date,
at a rate of 5.5% per annum compounded annually, paid by Cryovac Inc., (2) 9
million shares of Sealed Air Common Stock (subject to antidilution adjustments
outlined in the Sealed Air Settlement Agreement), (3) Parent Common Stock in an
amount to be determined, and (4) Warrants exercisable for additional Parent
Common Stock, which, together with the Parent Common Stock being issued under
the Plan, could represent up to an aggregate of 50.1% of the voting shares of
the Parent. There is no guarantee that the value of Sealed Air Common Stock or
Parent Common Stock will not decline such that the Asbestos Trust will not be
able to pay all

98

EXHIBIT 99.1

Allowed Asbestos Claims, as provided in the Plan. Finally, the amount of Allowed
Asbestos Claims could be significantly more than estimated by the Court.

#### 8.6.2 RISK OF APPOINTING DIFFERENT TRUSTEES FOR THE ASBESTOS TRUST

At the Confirmation Hearing, the Debtors will request that the Court
appoint certain individuals to be designated prior to the Confirmation Hearing
as the three initial Trustees of the Asbestos Trust. However, the Court may
reject one or more of the proposed Trustees. If the Court rejects the nomination
of a Trustee, another person would need to be designated, which may delay the
Effective Date of the Plan. The selection of different Trustees also could
impact administration of the Asbestos Trust.

### 8.7   RISK THAT THE INFORMATION IN THIS DISCLOSURE STATEMENT MAY BE INACCURATE

The statements contained in this Disclosure Statement are made by the
Debtors as of the date hereof, unless otherwise specified herein, and the
delivery of this Disclosure Statement after that date does not imply that there
has not been a change since that date in the information set forth herein. The
Debtors may subsequently update the information in this Disclosure Statement,
but they have no duty to update this Disclosure Statement unless ordered to do
so by the Court. Further, the proforma and prospective financial information
contained herein, unless otherwise expressly indicated, is unaudited. Finally,
neither the SEC nor any other governmental authority has passed upon the
accuracy or adequacy of this Disclosure Statement, the Plan, or any Exhibits in

CC-BLG003086

This financial information contains certain statements that are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. These statements are subject to a number of assumptions, risks and uncertainties, many of which are beyond the control of the Debtors, including the implementation of the Plan, existing and future governmental regulations, the continuing availability of sufficient borrowing capacity or other financing to fund operations, currency exchange rate fluctuations, natural disasters, terrorist actions or acts of war, operating efficiencies, labor relations, actions of governmental bodies and other market and competitive conditions. Holders of Claims and/or Equity Interests are cautioned that the forward-looking statements speak as of the date made and are not guarantees of future performance. Actual results or developments may differ materially from the expectations expressed or implied in the forward-looking statements and the Debtors undertake no obligation to update any such statements.

9.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Plan Proponents believe that the Plan affords the Holders of Claims and Equity Interests the potential for the greatest realization on their Claims and Equity Interests and, therefore, is in the best interest of such Holders. If the Plan is not confirmed, however, the theoretical alternatives include (1) continuation of the pending Chapter 11 Cases, (2) alternative plans of reorganization, or (3) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

99

EXHIBIT 99.1

9.1  CONTINUATION OF THE CHAPTER 11 CASES

If the Debtors remain in Chapter 11 and the Plan, as currently proposed, is not confirmed within the time period projected, the Debtors could continue to operate their businesses and manage their properties as Debtors in Possession. However, the value of assets and cash flow could be affected by the expenses of operating under Chapter 11 of the Bankruptcy Code for a further extended period of time. Such delay may significantly reduce the recoveries received by Claimants and Equity Interest Holders under any future plan of reorganization.

9.2  ALTERNATIVE PLANS OF REORGANIZATION

If the Plan is not confirmed, it is possible that any other party in interest in the Chapter 11 Cases could attempt to formulate and propose a different plan or plans on such terms as they may desire. Such alternative plan would still have to meet the requirements of confirmation. The Debtors believe that the Plan proposed by the Debtors provides the best potential return to both the Debtors' Claimants and Equity Interest Holders.

9.3  CHAPTER 7 LIQUIDATION

Bankruptcy Code Section 1129(a)(7) requires that even if a plan is accepted by a class of creditors or equity interest holders, the Bankruptcy Court must nonetheless determine that the plan is in the "best interests" of any class of creditors or equity interest holders that are impaired by the plan. The "best interests" test requires that Bankruptcy Court find either that (i) all members of an impaired class have accepted the plan or (ii) the plan will provide the holder of a Claim or Equity Interest in such class a distribution of a value, as of the effective date of the plan, that is at least equal to what such holder would receive in a hypothetical liquidation of the debtor under Chapter 7 of the Bankruptcy Code.

In a hypothetical liquidation of the Debtors under Chapter 7, a trustee would be elected or appointed to liquidate the assets of the Debtors and the Non-Debtor Affiliates. This "liquidation value" would consist primarily of the proceeds from a sale of the assets of the Debtors and Non-Debtor Affiliates. The amount of the liquidation value available would be distributed first to secured Claimants, to the extent of the value of their collateral. Thereafter, any remaining funds would be distributed in accordance with the priorities of the Bankruptcy Code. The estimate of liquidation value available to Claimants and Equity Interest Holders would be further reduced by (i) the costs and expenses incurred as a result of the Chapter 7 liquidation, and (ii) Administrative Expense Claims and Priority Claims incurred in the Chapter 11 Cases allowed in the Chapter 7 case.

The Best Interests Analysis requires estimates of the net proceeds that may be generated as a result of a hypothetical Chapter 7 liquidation. Any such liquidation would necessarily take place in the future under circumstances that cannot be predicted; the amount of such proceeds is therefore highly speculative and could be significantly impacted as a result of the uncertainty that exists as to whether a Chapter 7 trustee could sell the assets free and clear of any Claims that could be asserted against the Debtors. The amount of proceeds available from the liquidation of other assets is an estimate that assumes conditions that may not be present at the time of the Chapter 7 liquidation.

EXHIBIT 99.1

The Debtors' liquidation analysis is included as a component of the "Best Interests Analysis," attached as Exhibit 3 in the Exhibit Book, was prepared by the Debtors with the assistance of Blackstone. Reference is made to the Best Interests Analysis for estimates of liquidation value, costs and expenses and claims amounts, for a description of the procedures followed, the factors considered, and the assumptions made in preparing the analysis. In preparing the Best Interests Analysis, the Debtors have projected a range for the Amount of Allowed Claims based on a review of their Schedules and Filed proofs of claim. No order or finding has been entered estimating or fixing the amount of Claims. The actual amount of Claims against the estate could vary significantly from the Debtors' estimates. For all of the foregoing reasons, the actual net proceeds available to Holders of Allowed General Unsecured Claims and Holders of Equity Interests in the Parent could vary materially from the amounts in the Best Interests Analysis. The Best Interests Analysis can be found in Exhibit 3 in the Exhibit Book and shows that Holders of General Unsecured Claims would receive an estimated Distribution of 55% - 93% on their Claims under a Chapter 7 liquidation while such Holders would receive an estimated 100% Distribution under Chapter 11. The Unsecured Creditors' Committee, based on assumptions and estimates certain of which differ from those of the Debtors and their professionals, estimates that proceeds realized in a hypothetical Chapter 7 liquidation may be greater than those presented in the Best Interests Analysis, and in the high scenario, might result in net proceeds exceeding those necessary to pay a 100% Distribution to the Holders of Allowed General Unsecured Claims.

The Plan Proponents believe that Plan complies with the best interests test, as Creditors and Holders of Equity Interests in the Parent are expected to receive under the Plan a distribution that is at least as much as they would receive in a hypothetical liquidation under Chapter 7 of the Bankruptcy Code.

10.  FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain federal income tax consequences of the Plan to the Debtors, the Reorganized Debtors, the Asbestos Trust, the Holders of Claims and the Holders of Equity Interests based upon the IRC, judicial authorities and current administrative rulings and practices now in effect, all of which are subject to change at any time by legislative, judicial or administrative action. Any such change could be retroactively applied in a manner that could adversely affect the Debtors, the Reorganized Debtors, the Asbestos Trust, Holders of Claims and Holders of Equity Interests. In particular, some of the consequences discussed herein are based on United States Department of Treasury regulations or IRS notices that have been proposed but not finalized, which regulations are particularly susceptible to change at any time.

The tax consequences of certain aspects of the Plan are uncertain due to the lack of applicable legal authority and may be subject to administrative or judicial interpretations that differ from the discussion below. The Debtors have not requested a tax ruling from the IRS. However, there can be no assurance that the treatment set forth in the following discussion will be accepted by the IRS. Further, the federal income tax consequences to the Debtors, the Reorganized Debtors, the Asbestos Trust, and Holders of Claims and/or Equity Interests may be affected by matters not discussed below. For example, the following discussion does not address state, local or foreign tax considerations that may be applicable; further, it does not address the

101

EXHIBIT 99.1

tax consequences of the Plan to certain types of Holders of Claims or Equity Interests, creditors and stockholders (including foreign persons, financial institutions, life insurance companies, tax-exempt organizations and taxpayers who may be subject to the alternative minimum tax) who may be subject to special rules not addressed herein.

The discussion set forth below is included for general information only. The Debtors and their counsel and financial advisors are not making any representations regarding the particular tax consequences of confirmation and consummation of the Plan, nor are they rendering any form of legal or tax advice on such tax consequences. The tax laws applicable to corporations in bankruptcy are extremely complex, and the following summary is not exhaustive. Holders of Claims and/or Equity Interests are strongly urged to consult their tax advisors regarding tax consequences of the Plan, including U.S. federal, state and local, and foreign tax consequences.

Except where essential to the context, references to the "Debtors" in Article 10 herein refer to both the Debtors and the Reorganized Debtors, collectively.

10.1 FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS

CC-BLG003088

10.1.1 GENERAL DISCUSSION

In general, the Debtors do not expect to incur any substantial tax liability as a result of implementation of the Plan, and do not expect to realize any significant amount of cancellation of indebtedness income. Upon consummation of the Plan, the Debtors expect to have an NOL available to offset future taxable income. The amount of that NOL is uncertain at this point, but is currently estimated to be approximately $348 million as of December 31, 2003. As discussed in Section 10.1.2 below, this NOL should be increased by the tax deductions received by the Debtors upon consummation of the Plan, which deductions should be based on the value of the consideration transferred by the Debtors in satisfaction of their tort, environmental and other liabilities. The actual amount of the NOL available to the Debtors after consummation of the Plan will depend on the value of those deductions, as well as the outcome of certain unresolved past tax liabilities and the mechanism by which the Debtors finance their bankruptcy emergence. As discussed in Section 2.5.3.2 of this Disclosure Statement, approximately one-third of the NOLs are currently subject to challenge by the IRS. The utilization of those NOLs may also be subject to certain annual limitations, as discussed in more detail below.

In order to ensure that the Debtors' NOL will continue to be available following emergence from bankruptcy, certain restrictions will be placed upon transfers of Parent Common Stock. In particular, without the consent of the Parent for a period of three years after emergence from bankruptcy, any Entity (other than the Asbestos Trust) who currently owns or controls more than 4.75% of the Parent Common Stock will be prohibited from increasing its ownership percentage, and any Entities (other than the Asbestos Trust) who do not own any Parent Common Stock or own or control less than 4.75% of the Parent Common Stock, will be prohibited from increasing their ownership percentage of the Parent Common Stock to an amount equal to or greater than 4.75%. Further, the Asbestos Trust will be prohibited from selling the Parent Common Stock contributed to the Asbestos Trust for a period of three years after the Effective Date.

102

EXHIBIT 99.1

Certain restrictions will also be imposed on the exercise of the Warrants that the Debtors will contribute to the Asbestos Trust. The amount of Warrants that the Asbestos Trust will be able to exercise, for a period of three years after emergence, will be limited to approximately 1/2 of the Asbestos Trust's total Warrants. In addition, the Debtors will have the right, as necessary to protect the utilization of their NOLs, to purchase Warrants from the Asbestos Trust for their fair market value, in lieu of permitting the exercise of such Warrants.

In connection with obtaining adequate capital to fund its operations upon emergence from bankruptcy, the Debtors may be required to take capital as a dividend from certain of its foreign subsidiaries. The receipt of these dividends would be taxable to the Debtors for U.S. income tax purposes, and could therefore have an adverse impact on the Debtors' tax planning. In addition, the Debtors or their Non-Debtor Affiliates may be forced to pledge some or all of their foreign assets as security in order to obtain Exit Financing, which may be treated as a deemed dividend for U.S. income tax purposes. Either of these actions could result in the Debtors being forced to realize a significant charge to earnings.

10.1.2 DEDUCTION OF AMOUNTS TRANSFERRED TO SATISFY ASBESTOS CLAIMS

The tax treatment of transfers of property by the Debtors to the Asbestos Trust will vary depending on the characterization of such transfers, e.g., as a "grantor trust" as defined by Section 671 et seq. of the IRC, or as a "qualified settlement fund" ("QSF") as defined by Treasury Regulation Section 1.468B-1 et seq. The Debtors currently expect that the Asbestos Trust will be treated as a QSF for federal income tax purposes, meaning that the Debtors should be entitled to an immediate deduction for the fair market value of any property contributed by the Debtors to the Asbestos Trust.

Any transfer of Parent Common Stock by the Debtors to the Asbestos Trust should be deductible by the Debtors in an amount equal to the fair market value of such stock. No gain or loss should be recognized by the Debtors with respect to this stock. The transfer of cash, if any, to the Asbestos Trust should be deductible by the Debtors in an amount equal to the amount of such cash.

The IRS has not provided any specific guidance as to whether the transfer of Warrants to the Asbestos Trust will constitute the transfer of property that gives rise to an immediate deduction. The Debtors expect to take the position that the transfer of Warrants to the Asbestos Trust does not constitute the transfer of property, and that only the exercise of the Warrants will constitute a deductible transfer. If so, the Debtors will be entitled to a deduction equal to the fair market value of the Parent Common Stock upon exercise, less the exercise price of such Warrants. The IRS may, however, later disagree with that conclusion and take the position that the transfer of the Warrants themselves constitutes the transfer of property. In that case, the Debtors' tax deduction would be accelerated and the amount of such deduction may

CC-BLG003089

be materially different.

### 10.1.3 CANCELLATION OF DEBT INCOME

Under the IRC, a taxpayer generally recognizes gross income to the extent that indebtedness of the taxpayer is cancelled for less than the amount owed by the taxpayer, subject to certain judicial or statutory exceptions. The most significant of these exceptions with respect

103

EXHIBIT 99.1

to the Debtors is that taxpayers who are operating under the jurisdiction of a federal bankruptcy court are not required to recognize such income. In that case, however, the taxpayer must reduce its tax attributes, such as its NOLs, general business credits, capital loss carryforwards, and tax basis in assets, by the amount of the cancellation of indebtedness income ("CODI") avoided.

The Debtors do not expect to realize any significant CODI upon consummation of the Plan, since the Debtors expect that Claimants entitled to Distributions under the Plan will receive an amount of consideration that should equal the total amount of their Claims (including accrued but unpaid interest). In order to ensure that Claimants receive full consideration for their Claims, the value of the Parent Common Stock transferred to the Claimants will be determined based on the average of the closing prices of such stock on the trading days during the 30 days beginning on the Effective Date.

### 10.1.4 NET OPERATING LOSSES

As a result of existing NOLs and additional deductions that will be generated by the resolution of tort, environmental and other claims upon emergence from bankruptcy, the Debtors expect to have an NOL after emerging from bankruptcy. The amount of the NOL may be reduced somewhat by any CODI realized upon emerging from bankruptcy, although as stated above the Debtors do not expect that there will be CODI realized upon emergence.

The extent to which the Debtors will be able to utilize their NOL after emerging from bankruptcy will depend on Section 382 of the IRC, which generally imposes an annual limitation on a corporation's use of its NOLs (and may limit a corporation's use of certain built-in losses if such built-in losses are recognized within a five-year period following an "ownership change," as defined below) if a corporation undergoes an ownership change. This discussion describes the limitation determined under Section 382 of the IRC in the case of an ownership change as the "Section 382 Limitation." The annual Section 382 Limitation on the use of pre-change losses (the NOLs and built-in losses recognized within the five year post-ownership change period) in any "post-change year" is generally equal to the product of the fair market value of the loss corporation's outstanding stock immediately before the ownership change multiplied by the long-term tax-exempt rate in effect for the month in which the ownership change occurs. The long-term tax-exempt rate is published monthly by the IRS and is intended to reflect current interest rates on long-term tax-exempt debt obligations. It is presently approximately 4.5%. Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. As discussed below, however, a special exception from these rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

In general, an ownership change occurs when the percentage of the corporation's stock owned by certain "5 percent shareholders" increases by more than 50 percentage points in the aggregate over the lowest percentage owned by them at any time during the applicable "testing period" (generally, the shorter of (a) the 36-month period preceding the testing date or (b) the period of time since the most recent ownership change of the corporation). Although the Debtors will be giving Parent Common Stock under the Plan to certain of its Claimants, the Debtors are not certain whether the amount of such Parent Common Stock will be sufficient to constitute an ownership change under Section 382 of the IRC. Consequently, the Debtors do not know

104

EXHIBIT 99.1

whether their ability to utilize their NOL following emergence from bankruptcy will be subject to the Section 382 Limitation.

The uncertainty regarding whether an ownership change will occur is increased by the presence of the Warrants in the Asbestos Trust. As the Asbestos Trust exercises Warrants over the three-year period following emergence from bankruptcy, it is possible that the combination of such exercises, coupled with certain other transactions that occurred prior to emergence from bankruptcy or that may occur after bankruptcy emergence, could give rise to an ownership change within the meaning of Section 382 of the IRC. However, the existence of such ownership change may not give rise to any limitation on the Debtors' ability to use their NOLs. In particular, Section 382(l)(5) of the IRC provides a special rule applicable in the case of a bankruptcy reorganization (the

CC-BLG003090

"Section 382(1)(5) Exception," i a corporation qualifies for the Section 382(1)(5) Exception, the annual Section 382 Limitation will not apply to the corporation's NOL on account of an ownership change occurring as a result of the bankruptcy reorganization. The Section 382(1)(5) Exception does, however, require that the corporation's NOL and credit carryovers be computed without taking into account the aggregate amount of all interest deductions in respect of debt exchanged for the corporation's stock during the three prior taxable years and the portion of the current taxable year ending on the date of the ownership change.

A corporation will qualify under the Section 382(1)(5) Exception if the corporation's pre-bankruptcy shareholders and holders of certain debt ("Qualifying Debt") own at least 50% of the stock of the corporation after the bankruptcy reorganization, and the corporation does not "elect out" of the Section 382(1)(5) Exception. Qualifying Debt is a claim which (i) was held by the same creditor for at least 18 months prior to the bankruptcy filing or (ii) arose in the ordinary course of a corporation's trade or business and has been owned, at all times, by the same creditor. Indebtedness will be treated as arising in the ordinary course of a corporation's trade or business if such indebtedness is incurred by the corporation in connection with the normal, usual or customary conduct of the corporation's business. While not free from doubt, the Debtors expect that Asbestos Claims will qualify as Qualifying Debt, and that the stock acquired by the Asbestos Trust upon exercise of the Warrants will be treated as stock acquired in exchange for Qualifying Debt within the meaning of the Section 382(1)(5) Exception. In addition, any debt held by a creditor who receives an amount of stock representing less than 5.0% of the equity interests in the Debtors upon emerging from bankruptcy will also be treated as Qualifying Debt, unless such creditor actively participated in formulating the Debtors' bankruptcy plan and in doing so made it clear to the Debtors that its debt was not Qualified Debt.

If an ownership change occurs and the Debtors do not qualify for the Section 382(1)(5) Exception, the Debtors would then be subject to an annual Section 382 Limitation. Under Section 382(1)(6) of the IRC, if a corporation is otherwise not eligible for the Section 382(1)(5) Exception (or if it elects out of Section 382(1)(5)), then the annual Section 382 Limitation is calculated by taking into account the increase in equity value resulting from the issuance of equity upon emergence in exchange for debt claims.

The Debtors expect at this point that, if an ownership change occurs, it would be likely that the Debtors would qualify for a Section 382(1)(5) Exception. However, Section 382 of the IRC provides that if a company that utilizes the Section 382(1)(5) Exception undergoes another

105

EXHIBIT 99.1

ownership change within two years, that company's NOL is reduced to zero. For that reason, the Parent Common Stock, upon emergence, will be subject to certain transfer restrictions in order to ensure that another ownership change does not occur after emergence. Those restrictions were discussed above under Section 10.1.1 (General Discussion). The general effect of these restrictions is to ensure that no Entity acquires an amount of Parent Common Stock after emerging from bankruptcy that would cause such Entity to hold more than 4.75% of the Parent's equity value, without the consent of the Parent's Board of Directors, and to ensure that no stockholder who owns more than 4.75% of the Parent's equity value after emergence buys additional Parent Common Stock. The amount of Warrants that the Asbestos Trust will be able to exercise within the three years after emergence will also be limited to an amount equal to approximately 50% of the Asbestos Trust's total Warrants.

These transfer restrictions will generally not impose any limitations on a Claimant or other Entity that holds less than 4.75% of the Parent Common Stock after emergence to either buy or sell stock on the open market, so long as such purchase or sale does not cause the Claimant or other Entity to then hold more than 4.75% of the Parent Common Stock.

10.2 FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND THE ASBESTOS TRUST

10.2.1 HOLDERS OF ASBESTOS CLAIMS

To the extent that payments from the Asbestos Trust to Claimants constitute damages received by such Claimants on account of personal injuries, such payments should not constitute gross income to such Claimants, except to the extent that such payments are attributable to medical expense deductions allowed under Section 213 of the IRC for a prior taxable year.

To the extent that payments from the Asbestos Trust to Claimants constitute compensatory damages for destruction or damage to property, and such payments do not exceed the Claimant's tax basis in its property, such payments should not be included in taxable income. Instead, such payments would be treated as a return of capital to such Claimant, reducing the Holder's tax basis in the property. Any amounts received in excess of the Claimant's tax basis should be treated as gain from the disposition of the property, and would therefore give rise to capital gain assuming that the Claimant held such property as a capital asset.

CC-BLG003091

The Debtors expect that the Asbestos Trust will be a QSF for federal income tax purposes. As a QSF, the Asbestos Trust will be subject to a separate entity level tax on its income at the maximum rate applicable to trusts and estates. In determining the taxable income of the Asbestos Trust, (a) any amounts contributed to the Asbestos Trust will not be treated as taxable income, (b) any sale, exchange or distribution of property by the Asbestos Trust will result in the recognition of gain or loss in an amount equal to the difference between the fair market value of the property on the date of the sale, exchange or distribution and the adjusted tax basis of such property, (c) interest income and dividend income will be treated as taxable income, and (d) administrative costs (including state and local taxes) will be deductible. In general, the adjusted tax basis of property received by the Asbestos Trust will be its fair market value at the time of receipt. As discussed above, the Debtors believe that the transfer of

106

EXHIBIT 99.1

Warrants to the Asbestos Trust will not be treated as a transfer of property until such time as the Warrants are exercised. For that reason, the Debtors believe that the Asbestos Trust will not recognize any income or gain upon exercise of the Warrants. This result is not free from doubt, however, and it is possible that the IRS would take the position that the exercise of such Warrants should be treated as taxable income or gain to the Asbestos Trust.

### 10.2.3 CONSEQUENCES TO HOLDERS OF GENERAL UNSECURED CLAIMS

Pursuant to the Plan, each Holder of a General Unsecured Claim will receive, in full satisfaction and discharge of its Allowed Claim, a combination of cash and Parent Common Stock. The federal income tax consequences of the Plan to a Holder of a General Unsecured Claim depend, in part, on whether such Claim constitutes a "security" for federal income tax purposes.

Whether an instrument constitutes a "security" is determined based on all the facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a current basis or accrued.

In general, the Debtors believe that the General Unsecured Claims do not qualify as "securities" for federal income tax purposes. If a debt instrument constituting a surrendered Allowed General Unsecured Claim is not treated as a security, the Holder of such a Claim should be treated as exchanging its Allowed General Unsecured Claim for Parent Common Stock and cash in a fully taxable exchange. The Holder of an Allowed General Unsecured Claim who is subject to fully taxable exchange treatment should recognize gain or loss equal to the difference between (i) the fair market value of the Parent Common Stock as of the Effective Date plus the cash received that is not allocable to accrued interest, and (ii) the Holder's basis in the debt instrument constituting the surrendered Allowed General Unsecured Claim. Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the debt constituting the surrendered Allowed General Unsecured Claim were held for more than one year. To the extent that a portion of the Parent Common Stock or cash received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income. See Section 10.2.3.1 (Accrued Interest). A Holder's tax basis in the Parent Common Stock received should equal the fair market value of the Parent Common Stock as of the date received. A Holder's holding period for the Parent Common Stock should begin on the day following the Effective Date.

### 10.2.3.1 ACCRUED INTEREST

To the extent that any amount received by a Holder of a surrendered Allowed Claim under the Plan is attributable to accrued interest that was not previously included in the Holder's

107

EXHIBIT 99.1

gross income, such amount should be taxable to the Holder as interest income. Conversely, a Holder of a surrendered Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the Holder's gross income but

CC-BLG003092

was not paid in full by Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed Claim is unclear. Pursuant to the Plan, all Distributions in respect of any Allowed Claim will be allocated first to the principal amount of such Claim, to the extent otherwise permitted and as determined for federal income tax purposes, and thereafter to the remaining portion of such Claim, if any. However, there can be no assurance that the IRS will respect this allocation.

### 10.2.3.2 MARKET DISCOUNT

Under the "market discount" provisions of Sections 1276 through 1278 of the IRC, some or all of the gain realized by a Holder of a debt instrument constituting an Allowed Claim who exchanges the debt instrument for other property on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (ii) in the case of a debt instrument issued with an original-issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the taxable disposition of surrendered debts (determined as described above) that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

### 10.2.4 CONSEQUENCES TO HOLDERS OF EQUITY INTERESTS

Pursuant to the Plan, each Holder of an Allowed Equity Interest in the Debtors will retain their Allowed Equity Interest, subject to dilution on account of, among other things, Parent Common Stock issued (i) under the Management Stock Incentive Plan, (ii) to other Holders of Allowed Claims, or (iii) to the Asbestos Trust upon exercise of Warrants. Holders of Allowed Equity Interests will therefore recognize neither gain nor loss with respect to the reorganization. Such Holders will retain their existing tax basis and holding period in their Allowed Equity Interests.

108

EXHIBIT 99.1

### 10.3 BACKUP WITHHOLDING

Debtors will withhold any amounts required by law to be withheld from payments of interest and dividends and will comply with all applicable reporting requirements of the IRC.

## 11. SECURITIES IMPLICATIONS OF THE PLAN

### 11.1 THE ISSUANCE OF SECURITIES PURSUANT TO THE PLAN

The Debtors will be relying on an exemption from registration under the Securities Act and applicable provisions of applicable state securities or "blue sky" laws with respect to the issuance of shares of the Parent Common Stock pursuant to the Plan.

The Debtors intend to rely upon the exemption from the registration requirements of the Securities Act (and of equivalent state securities or "blue sky" laws) provided by Bankruptcy Code Section 1145(a)(1). Generally, Bankruptcy Code Section 1145(a)(1) exempts the offer and sale of securities pursuant to a plan of reorganization from the registration requirements of the Securities Act and equivalent state securities and "blue sky" laws if the following conditions are satisfied (1) the securities are issued by a debtor (or its affiliate or successor) or plan sponsor under a plan of reorganization, (2) the recipients of the securities hold a claim against, and interest in, or a claim for an administrative expense against, the debtor, and (3) the securities are issued entirely in exchange for the recipient's claim against or interest in the debtor, or are issued "principally" in such exchange and "partly" for cash or property. The Debtors believe that the exchange of the Parent Common Stock for Claims satisfies such requirements.

The Parent Common Stock issued to Holders of Claims pursuant to the Plan may be resold by such Entities without restriction unless, as more fully described below, any such Holder is deemed to be an "underwriter" with respect to such securities, as defined in Bankruptcy Code Section 1145(b)(1). Generally, Bankruptcy Code Section 1145(b)(1) defines an "underwriter" as any party who (1) purchases a claim against, or equity interest in, the debtor in a bankruptcy case, with a view towards the distribution of any security to be received in

CC-BLG003093

exchange for such claim or equity interest, (2) offers to sell securities issued under a bankruptcy plan on behalf of the holders of such securities, (3) offers to buy securities issued under a bankruptcy plan from parties receiving such securities, if the offer to buy is made with a view towards distribution of such securities, or (4) is an "issuer," as such term is defined in Section 2(11) of the Securities Act.

The reference contained in Bankruptcy Code Section 1145(b)(1)(D) to Section 2(11) of the Securities Act would include as "underwriters" all parties who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. "Control" (as such term is defined in Rule 405 of Regulation C under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a party, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor (or its affiliate or successor) under a plan of reorganization may be deemed to "control" such debtor (and therefore be an underwriter for purposes of Bankruptcy Code Section 1145), particularly if such management position is coupled with the ownership of a significant percentage of the

109

EXHIBIT 99.1

debtor's (or affiliate's or successor's) voting securities. In addition, the legislative history of Bankruptcy Code Section 1145 suggests that a creditor with at least 10% of the securities of a debtor could be deemed a "control" person.

Holders may, under certain circumstances, be able to sell their securities pursuant to the safe harbor resale provisions of Rule 144 under the Securities Act. Generally, Rule 144 provides that if certain conditions are met (e.g. one-year holding period with respect to "restricted securities," volume limitations, manner of sale, availability of current information about the issuer, etc.), specified persons who (1) resell "restricted securities" or (2) resell securities which are not restricted but who are "affiliates" of the issuer of the securities sought to be resold, will not be deemed to be "underwriters" as defined in Section 2(11) of the Securities Act. Under paragraph (k) of Rule 144, the aforementioned conditions to resale will no longer apply to restricted securities sold for the account of a Holder who is not an affiliate of the Debtors at the time of such resale and who has not been such during the three-month period next preceding such resale, so long as a period of at least two years has elapsed since the later of (1) the Effective Date and (2) the date on which such holder acquired his or its securities from an affiliate of the Debtors. The SEC has taken the position in no-action letters that the holding period requirement set forth in Rule 144(d) is not applicable to holders of securities issued pursuant to Bankruptcy Code Section 1145.

Under Bankruptcy Code Section 1145(a)(4), stockbrokers are required to deliver a copy of this Disclosure Statement (and supplements hereto, if any, if ordered by the Court) at or before the time of delivery of securities issued under the Plan to their customers for the first 40 days after the Effective Date. This requirement specifically applies to trading and other aftermarket transactions in such securities.

The foregoing summary discussion is general in nature and has been included in this Disclosure Statement solely for information purposes. The Plan Proponents do not make any representations concerning, and do not provide an opinion or advice with respect to, the securities law and bankruptcy law matter described above. The Plan Proponents encourage each Entity who is to receive Parent Common Stock pursuant to the Plan to consider carefully and consult with their own legal advisor(s) with respect to such (and any related) matters in view of the uncertainty concerning the availability of exemptions from the registration requirements of the Securities Act and equivalent state securities and "blue sky" laws to a recipient of Parent Common Stock, who may be deemed to be an "underwriter" (within the meaning of Bankruptcy Code Section 1145(B)(1) and/or an "affiliate of" or a person who exercised "control" over Grace under applicable federal and state securities laws.

12.  CONCLUSION AND RECOMMENDATION

Your vote on the Plan is important. The Plan Proponents strongly recommend that you vote in favor of the Plan.

The Plan Proponents believe that confirmation and implementation of the Plan is preferable to any of the alternatives described herein because the Plan will provide the greatest recoveries to Holders of Claims and Equity Interests. Nonacceptance of the Plan may result in protracted delays, uncertainty, substantial additional administrative costs, a chapter 7 liquidation,

110

EXHIBIT 99.1

CC-BLG003094

or the confirmation of another less favorable Chapter 11 plan. These
alternatives may not provide for distribution or retention of as much value to
Holders of Allowed Claims and/or Equity Interests as does the Plan. Further, the
Plan Proponents believe that the Plan, as a whole, is in the best interests of
all of their Claimants and Holders of Equity Interests. THEREFORE, THE PLAN
PROPONENTS RECOMMEND THAT ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ENTITLED TO
VOTE ON THE PLAN SUPPORT CONFIRMATION OF THE PLAN AND VOTE TO ACCEPT THE PLAN.


111


EXHIBIT 99.1

Dated: January 13, 2005


Respectfully submitted,

W. R. GRACE & CO., ET AL.
(on behalf of the Debtors and Debtors In
Possession)


By:
    ------------------------------------
Name: David B. Siegel
Title: Senior Vice President,
       General Counsel &
       Chief Restructuring Officer


112

CC-BLG003095

EXHIBIT 99.2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                          )  CHAPTER 11
                                )
W. R. GRACE & CO., ET AL.(1)    )  CASE NO. 01-1139 (JKF)
                                )
            DEBTORS.    )  (JOINTLY ADMINISTERED)

GLOSSARY OF TERMS USED IN PLAN DOCUMENTS

Terms defined herein apply to the Plan, the Disclosure Statement and all other
Plan Documents except where specifically provided for otherwise.

----------
(1)  The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a
     Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool
     Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB
     Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace,
     Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico,
     Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy
     Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I,
     Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc.
     (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN
     Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company,
     Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba,
     Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy
     Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc.,
     Grace H-G II Inc., Grace Hotel Services Corporation, Grace International
     Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace
     Offshore Company, Grace PAR Corporation, Grace Petroleum Libya
     Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace
     Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land
     Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land
     Development Corporation, Hanover Square Corporation, Homco International,
     Inc., Kootenai Development Company, L B Realty, Inc., Litigation
     Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos
     Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc.,
     MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco,
     Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British
     Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental
     Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.),
     Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial
     Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing),
     Hayden-Gulch West Coal Company, H-G Coal Company.

1

EXHIBIT 99.2

1    "ADDITIONAL INDEMNITIES" shall have the meaning ascribed to it in Section
     3.5 of the Asbestos Trust Agreement.

2.   "ADMINISTRATIVE EXPENSE CLAIM" shall mean: (i) any Claim constituting a
     cost or expense of administration in the Chapter 11 Cases, on or after the
     Petition Date but prior to the Effective Date, under Bankruptcy Code
     Sections 503(b), 507(a)(1), 507(b) or 1114(e)(2), including: (a) any actual
     and necessary costs and expenses of preserving the estates of the Debtors,
     (b) any actual and necessary costs and expenses of operating the businesses
     of the Debtors, (c) any indebtedness or obligation incurred or assumed by
     the Debtors (including any executory contracts of the Debtors assumed
     pursuant to Bankruptcy Code Section 365 by order of the Bankruptcy Court or
     the Plan) in connection with the conduct of their businesses or for the
     acquisition or lease of property or the rendition of services, and (d) any
     allowed compensation or reimbursement of expenses awarded or allowed under
     Bankruptcy Code Sections 330(a), 331 or 503, and (ii) any fees or charges
     assessed against the estates of the Debtors under 28 U.S.C. Section 1930.

3.   "AFFILIATE" shall mean as to any specified Entity: (i) any other Entity
     that, directly or indirectly through one or more intermediaries or
     otherwise, controls, is controlled by, or is under common control with, the
     specified Entity, and (ii) any Entity that is an "affiliate" (within the
     meaning of Bankruptcy Code Section 101(2)) of the specified Entity. As used
     in clause (i) of this definition, "control" shall mean the possession,
     directly or indirectly, of the power to direct or cause the direction of
     the management or policies of an Entity (whether through ownership of
     Capital Stock of that Entity, by contract, or otherwise).

4.   "ALLOWED" shall mean:

     (a)  With respect to Asbestos Claims, except for Canadian Claims made by
          Asbestos PD Claimants or made by Asbestos Claimants who elect the

CC-BLG003096

Canadian Litigation Option, in such amount as is determined pursuant to the procedures set forth in the respective TDPs or the CMO, as applicable.

(b) With respect to Canadian Claims made by Asbestos PD Claimants or made by Asbestos Claimants who elect the Canadian Litigation Option, in such amount as is determined pursuant to the Canadian Litigation Procedure.

(c) With respect to any Claim other than an Administrative Expense Claim or Asbestos Claim, as to which a proof of Claim was Filed within the applicable period of limitation fixed in accordance with Bankruptcy Rule 3003(c)(3) by the Court, (i) as to which no objection to the allowance thereof has been interposed within the applicable period of limitations fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order of the Bankruptcy Court, or (ii) as to which an objection to the allowance thereof has been interposed within such time as is set by the Bankruptcy Court pursuant to the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order of the Bankruptcy Court, such Claim to the extent that such objection has been (A) overruled in whole or in part by a Final Order of the Bankruptcy Court, or (B) resolved by agreement of the relevant parties, or (C) resolved via settlement, mediation, litigation, or otherwise pursuant to the terms of any alternative dispute resolution program that is implemented in the Chapter 11 Cases.

(d) With respect to any Claim other than an Administrative Expense Claim or Asbestos Claim, as to which no proof of Claim was Filed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order of the Bankruptcy Court, such Claim to the extent that it has been listed by the Debtors in their Schedules as liquidated in amount and not disputed or contingent and not otherwise subject to an objection Filed within such time as is set by the Bankruptcy Court pursuant to the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order of the Bankruptcy Court;

(e) With respect to any Equity Interest in Parent, any Equity Interest registered in the stock register maintained by or on behalf of the Debtors as of the Voting Record Date; and

2

EXHIBIT 99.2

(f) With respect to any Claim that is asserted to constitute an Administrative Expense Claim:

(i) that represents a Claim of a Professional to the extent it is allowed in whole or in part by a Final Order of the Bankruptcy Court; or

(ii) other than with respect to a Claim of a Professional, (X) a Claim to the extent that the Debtors or the Reorganized Debtors determine it to constitute an Administrative Expense Claim, or (Y) a Claim to the extent it is allowed in whole or in part by a Final Order of the Bankruptcy Court and only to the extent that such allowed portion is deemed, pursuant to a Final Order of the Bankruptcy Court, to constitute a cost or expense of administration under Bankruptcy Code Sections 503 or 1114.

5. "ALLOWED AMOUNT" shall mean the lesser of: (i) the dollar amount of an Allowed Claim; or (ii) the Estimated Amount of a Claim, but only to the extent that the Court has expressly estimated such Claim for purposes of distribution.

6. "ARTICLES OF INCORPORATION" shall mean Certificate of Incorporation.

7. "ASBESTOS CHANNELING INJUNCTION" shall mean the order(s) entered or affirmed by the District Court, in accordance with and pursuant to Bankruptcy Code Sections 524(g), 105(a) and 1141 or otherwise, permanently and forever staying, restraining, and enjoining any Entity from taking any action against any Asbestos Protected Party (except as may be specifically provided in such order(s)) for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Asbestos Claims, all of which shall be channeled to the Asbestos Trust for resolution as set forth in the appropriate TDPs (other than actions brought to enforce any right or obligation under the Plan or any agreement or instrument between the Debtors or the Reorganized Debtors, on the one hand, and the Asbestos Trust, on the other hand, entered into pursuant to the Plan). The Asbestos Channeling Injunction is further described in Section 8.2 of the Plan.

8. "ASBESTOS CLAIMS" shall mean all Asbestos PI Claims and Asbestos PD Claims.

9. "ASBESTOS INSURANCE ACTION" shall mean any claim, cause of action, or right of any Debtor or Reorganized Debtor, as the case may be, against any Asbestos Insurance Entity, arising from or related to: (i) any such Asbestos Insurance Entity's failure to provide coverage, pay or agree to pay a Claim under an Asbestos Insurance Policy; (ii) the refusal of any

CC-BLG003097

such Asbestos Insurance Entity to compromise or settle any Asbestos Claim under or pursuant to any Asbestos Insurance Policy; or (iii) the interpretation or enforcement of the terms of any Asbestos Insurance Policy with respect to any Asbestos Claim.

10. "ASBESTOS INSURANCE ENTITY" shall mean any Entity (other than the Debtors and the Non-Debtor Affiliates), including any insurance company, broker, or guaranty association, that has issued, or that has actual or potential liability, duties or obligations with respect to, any Asbestos Insurance Policy.

11. "ASBESTOS INSURANCE ENTITY INJUNCTION" shall mean the injunction described in Section 8.3 of the Plan.

12. "ASBESTOS INSURANCE POLICY" shall mean any insurance policy, whether known or unknown, including the policies listed on the schedule attached as Exhibit 10 in the Exhibit Book, that actually or potentially provides insurance coverage for any Asbestos Claim; provided that an Asbestos Insurance Policy shall not include any rights or obligations under any insurance policy to which any of the Debtors are a party insofar as the insurance policy relates to Workers' Compensation Claims.

13. "ASBESTOS INSURANCE RIGHTS" shall mean any and all rights, titles, privileges, interests, claims, demands or entitlements to any proceeds, payments, initial or supplemental dividends, scheme payments, supplemental scheme payments, causes of action, and choses in action related to any of the Asbestos Insurance Policies and/or the Asbestos Insurance Settlement Agreements, whether now existing or hereafter arising, accrued

3

EXHIBIT 99.2

or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, including:

(a) any and all rights to pursue or receive payments with respect to Asbestos Claims under any Asbestos Insurance Policy or any Asbestos Insurance Settlement Agreement, whether for liability, defense, or otherwise;

(b) any and all rights to pursue or receive payments related to any Asbestos Insurance Policy and/or any Asbestos Insurance Settlement Agreement that was entered into by any domestic or foreign insolvent insurance company, whether in receivership, liquidation, rehabilitation, run-off, scheme of arrangement, or any other form of proceeding; and

(c) any and all rights to pursue or receive payments related to any Asbestos Insurance Policy and/or any Asbestos Insurance Settlement Agreement from any insurance guaranty association of a Governmental Unit in connection with any insurance guaranty association statute of any Governmental Unit;

provided that Asbestos Insurance Rights shall not include any rights or obligations under any insurance policy or settlement agreement to which any of the Debtors are a party insofar as the insurance policy or settlement agreement relates to Workers' Compensation Claims.

14. "ASBESTOS INSURANCE SETTLEMENT AGREEMENT" shall mean any settlement agreement between or among any of the Debtors, the Reorganized Debtors, the Non-Debtor Affiliates, or any of them or their predecessors, and a Resolved Asbestos Insurance Company or a Settled Asbestos Insurance Company relating to any Asbestos Claim or any Asbestos Insurance Action.

15. "ASBESTOS MEDICAL MONITORING CLAIM" shall mean: (i) a Claim, Demand, or remedy, including all related claims, debts, obligations, or liabilities for compensatory (including general, special, and consequential damages) and punitive damages, (ii) a cross-claim, contribution claim, subrogation claim, reimbursement claim or indemnity claim, or (iii) any debt, liability, or obligation of one or more of the Debtors or any other Asbestos Protected Party (whether or not such Claim, Demand, remedy, debt, liability, or obligation is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; whether or not the facts of or legal bases therefor are known or unknown; and whether in the nature of or sounding in tort, or under contract, warranty, guarantee, contribution, joint and several liability, subrogation, reimbursement or indemnity, or any other theory of law, equity, or admiralty), for, relating to, or arising out of, resulting from, or attributable to, directly or indirectly:

(a) personal injuries or damages by or on behalf of those who have not, as of the Petition Date, suffered any personal injury but who are alleging that:

(i) the Debtors (or any of their respective past or present Affiliates, any of the predecessors of any of the Debtors or any of their respective past or present Affiliates, or any other Entity for whose products or operations any of the Debtors

allegedly has liability or is otherwise liable) wrongfully caused
them to be significantly exposed to hazardous asbestos fibers,

(ii) this exposure significantly increased the Claimant's risk of
contracting a serious latent disease,

(iii) medical monitoring could reasonably be expected to result in
early detection of the onset and mitigation of the severity of
such disease, and

(iv) because of this exposure it is necessary for the Claimant to be
examined by a physician or receive medical testing more often
that he or she otherwise would.

4

EXHIBIT 99.2

Asbestos Medical Monitoring Claims are included within the Class of
Asbestos PI-AO Claims.

16.   "ASBESTOS PD CLAIM" shall mean: (i) a Claim, Demand, or remedy, including
all related claims, debts, obligations, or liabilities for compensatory
(including general, special, and consequential damages) and punitive
damages, (ii) a cross-claim, contribution claim, subrogation claim,
reimbursement claim or indemnity claim, or (iii) any debt, liability, or
obligation of one or more of the Debtors or any other Asbestos Protected
Party, including the Canadian Affiliates (whether or not such Claim,
Demand, remedy, debt, liability, or obligation is reduced to judgment,
liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed,
undisputed, legal, equitable, secured, or unsecured; whether or not the
facts of or legal bases therefor are known or unknown; and whether in the
nature of or sounding in tort, or under contract, warranty, guarantee,
contribution, joint and several liability, subrogation, reimbursement or
indemnity, or any other theory of law, equity, or admiralty):

(a)   arising directly from acts or omissions of one or more of the Debtors
(or any of their respective past or present Affiliates, any of the
predecessors of any of the Debtors or any of their respective past or
present Affiliates, or any other Entity for whose products or
operations any of the Debtors allegedly has liability or is otherwise
liable); and

(b)   for, relating to, or arising out of, resulting from, or attributable
to, directly or indirectly, the cost of removal, abatement, diminution
of property value, environmental damage, or economic loss caused or
allegedly caused:

(i)   by asbestos in products or materials manufactured, sold,
supplied, produced, specified, selected, distributed or in any
way marketed by one or more of the Debtors (or any of their
respective past or present Affiliates, any of the predecessors of
any of the Debtors or any of their respective past or present
Affiliates, or any other Entity for whose products or operations
any of the Debtors allegedly has liability or is otherwise
liable); or

(ii)  from vermiculite mined, milled, or processed by the Debtors (or
any of their respective past or present Affiliates, any of the
predecessors of any of the Debtors or any of their respective
past or present Affiliates, or any other Entity for whose
products or operations any of the Debtors allegedly has liability
or is otherwise liable).

Notwithstanding anything to the contrary, Previously Settled/Adjudicated
Asbestos Claims and claims of governmental and private entities under the
Comprehensive Environmental Response Compensation and Liabilities Act, 42
USC Section 9601 et seq., or analogous state laws for liability related to
the release of a hazardous substance into the environment are not included
within the Class of Asbestos PD Claims. ZAI Claims are included within the
Class of Asbestos PD Claims.

17.   "ASBESTOS PD CLAIMANT" shall mean the Holder of an Asbestos PD Claim.

18.   "ASBESTOS PD CLASS FUND" shall mean the aggregate dollar amount, as
determined by the Court in the Estimation Order, that must be funded into
the Asbestos Trust (on or within thirty-one (31) days of the Effective
Date) so as to enable all Allowed Claims in the Class of Asbestos PD Claims
to be paid in full by the Asbestos Trust as, or as soon as practicable
after, they become Allowed Claims.

19.   "ASBESTOS PD COMMITTEE" shall mean the Official Committee of Asbestos
Property Damage Claimants appointed in the Chapter 11 Cases.

20.   "ASBESTOS PERSONAL INJURY CLAIM" shall mean an Asbestos PI Claim.

21.   "ASBESTOS PERSONAL INJURY-ASYMPTOMATIC / OTHER CLAIM" shall mean an
Asbestos PI-AO Claim.

CC-BLG003099

22.    "ASBESTOS PERSONAL INJURY-SYMPTOMATIC / ELIGIBLE CLAIM" shall mean an
Asbestos PI-SE Claim.

5

EXHIBIT 99.2

23.    "ASBESTOS PI CLAIM" shall mean: (i) a Claim, Demand, or remedy, including
all related claims, debts, obligations, or liabilities for compensatory
(including general, special, and consequential damages) and punitive
damages, (ii) a cross-claim, contribution claim, subrogation claim,
reimbursement claim or indemnity claim, or (iii) any debt, liability, or
obligation of one or more of the Debtors or any other Asbestos Protected
Party, including the Canadian Affiliates (whether or not such Claim,
Demand, remedy, debt, liability, or obligation is reduced to judgment,
liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed,
undisputed, legal, equitable, secured, or unsecured; whether or not the
facts of or legal bases therefor are known or unknown; and whether in the
nature of or sounding in tort, or under contract, warranty, guarantee,
contribution, joint and several liability, subrogation, reimbursement or
indemnity, or any other theory of law, equity, or admiralty), for, relating
to, or arising out of, resulting from, or attributable to, directly or
indirectly:

   (a)    death, wrongful death, personal or bodily injury (whether physical,
          emotional, or otherwise), sickness, disease, loss of consortium,
          survivorship, medical monitoring, or other personal injuries or other
          damages caused, or allegedly caused, and arising or allegedly arising,
          from acts or omissions of one or more of the Debtors (or any of their
          respective past or present Affiliates, any of the predecessors of any
          of the Debtors or any of their respective past or present Affiliates,
          or any other Entity for whose products or operations any of the
          Debtors allegedly has liability or is otherwise liable); and

   (b)    exposure to:

          (i)    any products or materials containing asbestos that were
                 manufactured, sold, supplied, produced, specified, selected,
                 distributed or in any way marketed by one or more of the Debtors
                 (or any of their respective past or present Affiliates, or any of
                 the predecessors of any of the Debtors or any of their respective
                 past or present Affiliates, or any other Entity for whose
                 products or operations any of the Debtors allegedly has liability
                 or is otherwise liable); or

          (ii)   vermiculite mined, milled or processed by the Debtors (or any of
                 their respective past or present Affiliates, any of the
                 predecessors of any of the Debtors or any of their respective
                 past or present Affiliates, or any other Entity for whose
                 products or operations any of the Debtors allegedly has liability
                 or is otherwise liable).

   Notwithstanding anything to the contrary, neither Workers' Compensation
   Claims nor Previously Settled/Adjudicated Asbestos Claims are included
   within the Class of Asbestos PI Claims.

24.    "ASBESTOS PI CLAIMANT" shall mean the Holder of an Asbestos PI Claim.

25.    "ASBESTOS PI COMMITTEE" shall mean the Official Committee of Asbestos
Personal Injury Claimants appointed in the Chapter 11 Cases.

26.    "ASBESTOS PI PRE-PETITION LITIGATION BAR DATE" shall mean the date that the
Court establishes, by the Estimation Procedures Order or other order of the
Court, as the last day for Filing Asbestos PI Pre-petition Litigation
Claims.

27.    "ASBESTOS PI PRE-PETITION LITIGATION CLAIM" shall mean any Asbestos PI
Claim that is based upon either (i) a Pre-petition Lawsuit for which no
judgment or enforceable settlement was reached before the Petition Date, or
(ii) to the extent that a final judgment was rendered or an enforceable
settlement was reached, and the settlement or judgment, as applicable,
places any obligation(s) upon any Debtor(s) or any of the Canadian
Affiliates, such Debtor(s) or Canadian Affiliates have not satisfied its
obligations pursuant to the judgment or settlement.

28.    "ASBESTOS PI PROOF OF CLAIM FORM" shall mean the proof of claim form, as it
may be modified from time to time, that each Holder of an Asbestos PI Claim
must file, either pursuant to the terms of the Debtors'

6

EXHIBIT 99.2

proposed Estimation Procedures Order or pursuant to the Plan and the
applicable TDP, in order to receive a distribution in these Chapter 11
Cases.

CC-BLG003100

29.  "ASBESTOS PI QUESTIONNAIRE" shall mean the questionnaire, as it may be modified from time to time, that each Holder of an Asbestos PI Claim must complete and submit, either pursuant to the terms of the Debtors' proposed Estimation Procedures Order or pursuant to the Plan and the applicable TDP, in order to receive a distribution in these Chapter 11 Cases.

30.  "ASBESTOS PI-AO CASH-OUT CLAIM" shall mean an Asbestos PI-AO Claim that is eligible for the Cash-Out Option under the Plan and the Holder of which has elected such Cash-Out Option.

31.  "ASBESTOS PI-AO CLAIM" OR "ASBESTOS PERSONAL INJURY-ASYMPTOMATIC / OTHER CLAIM" shall mean any Asbestos PI Claim that is not an Asbestos PI-SE Claim and is not a Previously Settled/Adjudicated Asbestos Claim.

32.  "ASBESTOS PI-AO CLAIMANT" shall mean the Holder of an Asbestos PI-AO Claim.

33.  "ASBESTOS PI-AO CLASS FUND" shall mean the aggregate dollar amount, as determined by the Court in the Estimation Order, that must be funded into the Asbestos Trust (on or within thirty-one (31) days of the Effective Date) so as to enable all Allowed Claims in the Class of Asbestos PI-AO Claims to be paid in full by the Asbestos Trust as, or as soon as practicable after, they become Allowed Claims.

34.  "ASBESTOS PI-SE CASH-OUT CLAIM" shall mean an Asbestos PI-SE Claim that is eligible for the Cash-Out Option under the Plan and the Holder of which has elected such Cash-Out Option.

35.  "ASBESTOS PI-SE CLAIM" OR "ASBESTOS PERSONAL INJURY-SYMPTOMATIC ELIGIBLE CLAIM" shall mean an Asbestos PI Claim that is not a Previously Settled/Adjudicated Asbestos Claim, and whose Holder meets the Asbestos PI-SE Eligibility Requirements.

36.  "ASBESTOS PI-SE CLAIMANT" shall mean the Holder of an Asbestos PI-SE Claim.

37.  "ASBESTOS PI-SE CLASS FUND" shall mean the aggregate dollar amount, as determined by the Court in the Estimation Order, that must be funded into the Asbestos Trust (on or within thirty-one (31) days of the Effective Date) so as to enable all Allowed Claims in the Class of Asbestos PI-SE Claims to be paid in full by the Asbestos Trust as, or as soon as practicable after, they become Allowed Claims.

38.  "ASBESTOS PI-SE ELIGIBILITY REQUIREMENTS" shall mean the Medical/Exposure Criteria for any of Disease Levels I, II, III, IV, V or VI under the PI-SE TDP.

39.  "ASBESTOS PROPERTY DAMAGE CLAIM" shall mean an Asbestos PD Claim.

40.  "ASBESTOS PROTECTED PARTY" shall mean any of the following parties:

(a)  the Debtors;

(b)  the Reorganized Debtors;

(c)  the Non-Debtor Affiliates;

(d)  predecessors of the Debtors and the Non-Debtor Affiliates;

(e)  the Resolved Asbestos Insurance Companies;

(f)  the Sealed Air Indemnified Parties;

7

EXHIBIT 99.2

(g)  the Fresenius Indemnified Parties;

(h)  any Entity that, pursuant to the Plan or otherwise on or after the Effective Date, becomes a direct or indirect transferee of, or successor to, any of the Debtors, the Reorganized Debtors, the Non-Debtor Affiliates, the Sealed Air Indemnified Parties, or the Fresenius Indemnified Parties, or any of their respective assets (but only to the extent that any liability is asserted to exist as a result of its becoming such a transferee or successor);

(i)  any Entity that, pursuant to the Plan or otherwise on or after the Effective Date, makes a loan to any of the Reorganized Debtors, the Non-Debtor Affiliates, the Asbestos Trust, or to a successor to, or transferee of any of the respective assets of, the Debtors, the Reorganized Debtors, the Non-Debtor Affiliates, or the Asbestos Trust (but only to the extent that any liability is asserted to exist as a result of its becoming such a lender or to the extent any Encumbrance of assets made in connection with such a loan is sought to be invalidated, upset or impaired in whole or in part as a result of its being such a lender);

(j)  each of the respective present and future Affiliates of each of the Debtors, the Reorganized Debtors, the Non-Debtor Affiliates, the

CC-BLG003101

Sealed Air Indemnified Parties, the Fresenius Indemnified Parties, and the Resolved Asbestos Insurance Companies (but only to the extent that any liability is asserted to exist as a result of its becoming such an Affiliate); or

(k)   each of the respective Representatives of each of the Debtors, the Reorganized Debtors, the Non-Debtor Affiliates, the Sealed Air Indemnified Parties, the Fresenius Indemnified Parties, and the Resolved Asbestos Insurance Companies.

41.   "ASBESTOS-RELATED LUNG CANCER 1" shall mean a Claim that meets the Medical/Exposure Criteria for Disease Level V under the PI-SE TDP.

42.   "ASBESTOS-RELATED LUNG CANCER 2" shall mean a Claim that meets the Medical/Exposure Criteria for Disease Level IV under the PI-SE TDP.

43.   "ASBESTOS-RELATED OTHER CANCER" shall mean a Claim that meets the Medical/Exposure Criteria for Disease Level III under the PI-SE TDP.

44.   "ASBESTOS TRUST" shall mean the WRG Asbestos Trust, a Delaware statutory trust, established in accordance with the Asbestos Trust Agreement, created upon entry of the Confirmation Order and effective on the Effective Date.

45.   "ASBESTOS TRUST ACCOUNTS" shall have the meaning ascribed to it in Section 4.1 of the Asbestos Trust Agreement.

46.   "ASBESTOS TRUST AGGREGATE FUND" shall mean the sum of the Asbestos PI-SE Class Fund, the Asbestos PI-AO Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund.

47.   "ASBESTOS TRUST AGREEMENT" shall mean the agreement, effective as of the Effective Date, substantially in the form of Exhibit 5 in the Exhibit Book, to be entered into by and among the Debtors, [the Canadian Affiliates,] the Future Claimants' Representative, the TAC and the Trustees in connection with the formation of the Asbestos Trust.

48.   "ASBESTOS TRUST ASSETS" shall mean the Debtors' Payment and the Sealed Air Payment, and any proceeds thereof.

49.   "ASBESTOS TRUST EXPENSES" are all costs, tax obligations arising out of the assets comprising the Asbestos Trust Expenses Fund, and expenses of or imposed on the Asbestos Trust, including: (i) compensation of the Trustees, the FCR, the TAC and each of their professionals; (ii) insurance premiums; (iii) legal,

8

EXHIBIT 99.2

accounting and other Professional fees and expenses; (iv) overhead; and (v) disbursements and expenses relating to the implementation of the TDPs, but excluding (A) payments to the Holders of Asbestos Claims on account of such Claims and (B) the cost of litigating any Asbestos PI-AO Claims whose Holders elect the Litigation Option.

50.   "ASBESTOS TRUST EXPENSES FUND" shall mean the aggregate dollar amount, as determined by the Court in the Estimation Order, that must be funded into the Asbestos Trust (on or within thirty-one (31) days of the Effective Date) so as to enable the Asbestos Trust Expenses to be paid in full as, or as soon as practicable after, they become due.

51.   "ASBESTOSIS" shall mean a Claim that meets the Medical/Exposure Criteria for Disease Level I under the PI-SE TDP.

52.   "BALLOT" shall mean the form or forms distributed to certain Holders of Claims and Equity Interests by which such parties may indicate acceptance or rejection of the Plan.

53.   "BANKRUPTCY CODE" shall mean title 11 of the United States Code, as set forth in Sections 101 et seq., and applicable portions of titles 18 and 28 of the United States Code.

54.   "BANKRUPTCY COURT" shall mean the United States Bankruptcy Court for the District of Delaware.

55.   "BANKRUPTCY RULES" shall mean the Federal Rules of Bankruptcy Procedure, as amended, as applicable to the Chapter 11 Cases, including the Local Rules of the Bankruptcy Court.

56.   "BLACKSTONE" shall mean The Blackstone Group L.P., the financial advisors to the Debtors.

57.   "BOARD OF DIRECTORS" shall mean the Board of Directors of any of the Debtors, or any of the Reorganized Debtors, as the case may be, as it may exist from time to time.

58.   "BUSINESS DAY" shall mean any day other than a Saturday, Sunday or legal holiday (as defined in Bankruptcy Rule 9006(a)) in the United States of America.

CC-BLG003102