# W R GRACE & CO

# FORM 10-K
### (Annual Report)

## Filed 03/13/06 for the Period Ending 12/31/05

| | |
|---|---|
| Address | 7500 GRACE DRIVE |
| | COLUMBIA, MD 21044 |
| Telephone | 410 531 4000 |
| CIK | 0001045309 |
| Symbol | GRA |
| SIC Code | 2800 - Chemicals & Allied Products |
| Industry | Chemical Manufacturing |
| Sector | Basic Materials |
| Fiscal Year | 12/31 |

http://www.edgar-online.com
© Copyright 2009, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

TRIAL EXHIBIT 23
CC-BLG003114-003200

CC-BLG003114

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

## FORM 10-K

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES AND EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2005          Commission file number 1-13953

# W. R. GRACE & CO.

Incorporated under the Laws of the          I.R.S. Employer Identification No.
State of Delaware                                          65-0773649

7500 Grace Drive, Columbia, Maryland 21044-4098
410/531-4000
Securities registered pursuant to Section 12(b) of the Exchange Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $.01 par value | New York Stock Exchange, Inc. |
| Preferred Stock Purchase Rights | |

Securities registered pursuant to Section 12(g) of the Exchange Act:

None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

Yes ☐          No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Exchange Act.

Yes ☐          No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months and (2) has been subject to such filing requirements for the past 90 days.

Yes ☒          No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulations S-K is not contained herein and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐          Accelerated filer ☒          Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

Yes ☐          No ☒

The aggregate market value of W. R. Grace & Co. voting and non-voting common equity held by non-affiliates as of June 30, 2005 (the last business day of the registrant's most recently completed second fiscal quarter) based on the closing sale price of $7.79 as reported on the New York Stock Exchange was $433,873,772.*

At February 17, 2006, 67,051,200 shares of W. R. Grace & Co. Common Stock, $.01 par value, were outstanding

DOCUMENTS INCORPORATED BY REFERENCE

None.

*Excludes 11,219,148 shares of outstanding W. R. Grace & Co. ("Grace") Common Stock held by directors and executive officers and stockholders, whose beneficial ownership exceeds 10% of the outstanding shares of Grace Common Stock, as of June 30, 2005. Exclusion of shares held by any person should not be construed to indicate that such person possesses the power, direct or indirect, to direct or cause the direction of the management or policies of Grace, or that such person is controlled by or under common control with Grace.

## TABLE OF CONTENTS

| | | |
|---|---|---|
| PART I | | 1 |
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 12 |

| Item 1B. | Unresolved Staff Comments | 18 |
| Item 2. | Properties | 18 |
| Item 3. | Legal Proceedings | 19 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 28 |
| **PART II** | | 29 |
| Item 5. | Market for Registrant's Common Equity and Related Shareholder Matters | 29 |
| Item 6. | Selected Financial Data | 29 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 29 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 30 |
| Item 8. | Financial Statements and Supplementary Data | 30 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 30 |
| Item 9A. | Controls and Procedures | 30 |
| Item 9B. | Other Information | 30 |
| **PART III** | | 31 |
| Item 10. | Directors and Executive Officers of the Registrant | 31 |
| Item 11. | Executive Compensation | 33 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 42 |
| Item 13. | Certain Relationships and Related Transactions | 43 |
| Item 14. | Principal Accounting Fees and Services | 44 |
| **PART IV** | | 44 |
| Item 15. | Exhibits, Financial Statement Schedules, and Reports on Form 8-K | 44 |
| **SIGNATURES** | | 48 |

*Grace ®, the Grace ® logo and, except as otherwise indicated, the other trademarks in this Report are trademarks or registered trademarks of W. R. Grace & Co. — Conn. or its subsidiaries in the United States and other countries. OCR ® is a registered trademark of Chevron Intellectual Property, Inc. Six Sigma ® is a registered trademark of Motorola, Inc. Unless the context otherwise indicates, in this document the terms "Grace," "we," "us," "our" or "the company" mean W. R. Grace & Co. and/or its consolidated subsidiaries and affiliates.*

# PART I

## Item 1.  BUSINESS

### BUSINESS OVERVIEW

W. R. Grace and Co. is one of the world's leading specialty chemicals and materials companies. We entered the specialty chemicals industry in 1954, when we acquired both the Dewey and Almy Chemical Company and the Davison Chemical Company. During the 1980s and 1990s, we divested a substantial number of businesses that were not consistent with our business strategy and our operations now consist of two operating segments, Grace Davison and Grace Performance Chemicals. Grace is the successor to a company that originated in 1854 and originally became a public company in 1953.

Grace, along with 61 of its United States subsidiaries and affiliates, has filed voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code and, since 2001, has been subject to the jurisdiction of the United States Bankruptcy Court for the District of Delaware.

*Grace Davison* includes:

- catalysts and chemical additives used by petroleum refiners, including fluid catalytic cracking, or FCC, catalysts, that help to "crack" the hydrocarbon chain in distilled crude oil to produce transportation fuels, such as gasoline and diesel fuels, and other petroleum-based products, and FCC additives used to reduce sulfur in gasoline, maximize propylene production from refinery FCC units, and reduce emissions of sulfur oxides, nitrogen oxides and carbon monoxide from refinery FCC units

- hydroprocessing catalysts used by petroleum refiners in process reactors to upgrade heavy oils into lighter, more useful products by removing impurities such as nitrogen, sulfur and heavy metals, allowing less expensive feedstocks to be used in the petroleum refining process

- specialty catalysts, including polyolefin catalysts and catalyst supports that are essential components in the manufacture of polyethylene and polypropylene resins, and other chemical catalysts used in a variety of industrial, environmental and consumer applications

CC-BLG003116

silica-based and silica-alumina-based engineered materials used in:

- industrial markets, such as coatings, plastics and rubber, precision investment casting, refractory, insulating glass windows, desiccants, and gas and liquids purification

- consumer applications, such as food products, toothpaste, pharmaceutical and personal care products, and the processing of edible oils and beverages

- digital media coatings for ink jet papers

- silica-based materials and chromatography columns, instruments, consumables and accessories used in life and analytical sciences applications

Grace Davison accounted for approximately 53.3% of our 2005 sales.

*Grace Performance Chemicals, or GPC,* includes:

- Construction materials and systems, including concrete admixtures and fibers used to improve the durability and working properties of concrete, additives used in cement processing to improve energy efficiency and enhance the characteristics of finished cement, waterproofing materials used in commercial and residential construction and renovation to protect buildings from water penetration, and fireproofing materials used to protect buildings from structural failure in the event of fire

- Packaging technologies, primarily specialty sealants and coatings used in rigid food and beverage packages, including can and closure sealants used to seal and enhance the shelf life of can and bottle contents, and coatings for cans and closures that prevent metal corrosion, protect package contents from the influence of metal and ensure proper adhesion of sealing compounds

Grace Performance Chemicals accounted for approximately 46.7% of our 2005 sales.

Our principal executive offices are located at 7500 Grace Drive, Columbia, Maryland 21044, telephone (410) 531-4000. As of December 31, 2005, we had approximately 6,400 full-time employees worldwide.

1

Our strategy is to seek increased enterprise value by profitably growing our specialty chemicals and materials businesses in the global marketplace and achieving high levels of financial performance. To achieve these objectives, we plan to:

- invest in research and development activities, with the goals of introducing new high-performance, technically differentiated products and services and enhancing manufacturing processes

- expand sales and manufacturing into geographic areas that are growing, including China, India, Eastern Europe and the Middle East

- pursue selected acquisitions and alliances that complement our current product offerings or provide opportunities for faster penetration of desirable market or geographic segments

- continue our commitment to process and productivity improvements and cost-management (including Six Sigma ® processes), such as rigorous controls on working capital and capital spending, and programs for supply chain management, which include both procurement and materials management

As part of our effort to improve our processes, increase productivity and manage costs, commencing in 1999, we have implemented Six Sigma ® and other productivity improvement programs. Six Sigma ® is a structured, statistics-based process designed to improve our inventory management, customer delivery, plant utilization, administrative efficiency and, ultimately, cost structure. We seek to make Six Sigma ® a fundamental business process by training and engaging all of our employees.

## CHAPTER 11 FILING

On April 2, 2001, Grace, along with 61 of our United States subsidiaries and affiliates, filed voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. The cases are being jointly administered under case number 01-01139. Our non-U.S. subsidiaries and certain of our U.S. subsidiaries were not included in the bankruptcy filing.

*Background of Chapter 11*

A bankruptcy filing under Chapter 11 of the United States Bankruptcy Code is generally a voluntary action taken by a debtor to resolve financial problems such as major liabilities. Chapter 11 gives a debtor the chance to restructure its finances so that it may continue to operate, provide its employees with jobs and pay its creditors. Chapter 11 can be used by debtors that are faced with large numbers of product liability lawsuits in multiple jurisdictions as a practical way to address the potential liabilities under the supervision of one court. A Chapter 11 filing generally stops all lawsuits against a debtor and prevents creditors from taking action to enforce claims or collect any monies or property that might be owed at the time of filing.

Chapter 11 permits a debtor to define and resolve its liabilities under a court-supervised process generally referred to as a reorganization. Unlike a Chapter 7, or liquidation bankruptcy, which liquidates a business, Chapter 11 reorganization permits a debtor to continue its normal business operations. Existing management may continue to manage the debtor's operations during the reorganization as the debtor-in-possession. Under a Chapter 11 case, a debtor is able to do business with suppliers and customers in a routine manner. Certain other activities generally require specific approval of the bankruptcy court.

After a debtor files Chapter 11, one or more official committees that represent the interests of general unsecured creditors, other creditors and stockholders may be appointed. Normally these committees and their respective advisors, the fees and expenses of which are paid by the debtor, are actively involved in the reorganization to monitor the bankruptcy and protect the interests of their respective constituencies.

The Chapter 11 process generally ends when the bankruptcy court approves a plan of reorganization for the debtor. In cases similar to ours with complex asbestos liabilities, debtors have taken several years to complete the Chapter 11 process.

*Grace Chapter 11 Filing*

We voluntarily entered Chapter 11 to resolve comprehensively the tens of thousands of asbestos personal injury claims against us. These claims relate to past products and processes that involved asbestos, a mineral formerly used widely for many decades in building and other commercial products. Prior to 2000, we were able to resolve asbestos-related claims through direct negotiations and litigation, paying over $2 billion in claims and legal costs over a 20-year period. The rate at which new claims were filed had stabilized and annual cash flows with respect to those claims were manageable and fairly predictable. In 2000 and the first quarter of 2001, the litigation environment changed with an unexpected 81% increase in personal injury claims, which we believe was caused by a surge in unmeritorious claims. We also became a defendant in class

action lawsuits alleging damages from Zonolite Attic Insulation, or ZAI, a former attic insulation product. Trends in claims filing and settlement demands showed no sign of returning to historic levels and these unfavorable trends were exacerbated by the bankruptcy filings of several of our co-defendants in asbestos personal injury litigation. These trends greatly increased the risk that we would not be able to resolve our pending and future asbestos-related claims under the state court system. In most of the personal injury lawsuits, we are one of many defendants.

After a thorough review of these developments, our Board of Directors concluded that a federal court-supervised bankruptcy process provided the best forum available to achieve fairness in resolving these claims and, on April 2, 2001, we filed voluntary petitions for reorganization under Chapter 11.

We are currently operating as a debtor-in-possession under court protection from creditors and claimants. We believe that our bankruptcy filing will permit a comprehensive resolution of the claims against us while preserving the inherent value of our businesses. As a consequence of our bankruptcy filing, pending litigation against us is generally stayed (subject to certain exceptions in the case of governmental authorities), and no party may take any action to realize its pre-petition claims except pursuant to an order of the Bankruptcy Court. Since our bankruptcy filing, the Bankruptcy Court has approved all motions necessary for us to conduct normal business activities.

Three committees representing creditors, including two committees representing asbestos claimants and a third representing other unsecured creditors, and a committee representing shareholders, have been appointed in the bankruptcy cases. These committees, and a legal representative of future asbestos claimants, have the right to be heard on all matters that come before the Bankruptcy Court and are playing important roles in the bankruptcy cases. We are required to bear certain costs and expenses of the committees and of the future asbestos claimants' representative, including those of their counsel and financial advisors.

Please refer to Item 3, "Legal Proceedings" below and our Consolidated Financial Statements, related notes and "Managements' Discussion and Analysis of Financial Condition and Results of Operations" in the Financial Supplement for a description of our proposed plan of reorganization, proforma financial effects of the proposed plan, and the status of our current Chapter 11 proceedings.

## PRODUCTS AND MARKETS

### Specialty Chemicals Industry Overview

Specialty chemicals and materials are high value-added products used as catalysts, intermediates, components or additives in a wide variety of products and processes. They are generally produced in relatively small volumes (compared with commodity chemicals) and must satisfy well-defined performance requirements and specifications. Specialty chemicals and materials are often critical components of end products, or catalysts for the production of materials used in end products; consequently, they are tailored to meet customer needs, which generally results in a close relationship between the specialty chemicals producer and the customer.

We focus our business on the following, which we believe are important competitive factors in the specialty chemicals industry:

- value-added products and services, at competitive prices
- customer service, including rapid response to changing customer needs
- technological leadership (resulting from investment in research and development)
- reliability of product and supply

We believe that our focus on these competitive factors enables us to deliver increased value to customers and competitive operating margins notwithstanding the increased customer service and research and development costs that this focus entails.

### Grace Davison Operating Segment

Grace Davison, founded in 1832, principally applies silica, alumina, and zeolite technology in the design and manufacture of products to create significant value for our diverse customer base. Our customers include major oil refiners, plastics and chemical manufacturers, and consumer products and pharmaceutical companies. We believe that our technological expertise provides a competitive advantage, allowing us to quickly design products and materials that help our customers create value in their markets.

3

The following table sets forth Grace Davison sales of similar products as a percentage of Grace total revenue.

| (In millions) | 2005 Sales | 2005 % of Grace Revenue | 2004 Sales | 2004 % of Grace Revenue | 2003 Sales | 2003 % of Grace Revenue |
|---|---|---|---|---|---|---|
| Catalyst Products [1] | $ 975.5 | 38.0% | $ 829.0 | 36.7% | $ 734.9 | 37.1% |
| Materials [2] | 394.7 | 15.3% | 363.2 | 16.1% | 305.0 | 15.4% |
| Total Grace Davison Revenue | $ 1,370.2 | 53.3% | $ 1,192.2 | 52.8% | $ 1,039.9 | 52.5% |

[1] including FCC catalysts, hydroprocessing catalysts and specialty catalysts

[2] including engineered materials and discovery sciences

The following table sets forth Grace Davison sales by region as a percentage of Grace Davison total revenue.

| (In millions) | 2005 Sales | 2005 % of Grace Davison Revenue | 2004 Sales | 2004 % of Grace Davison Revenue | 2003 Sales | 2003 % of Grace Davison Revenue |
|---|---|---|---|---|---|---|
| North America | $ 508.9 | 37.1% | $ 453.9 | 38.1% | $ 395.2 | 38.0% |
| Europe | 561.4 | 41.0% | 498.1 | 41.8% | 418.3 | 40.2% |
| Asia Pacific | 239.1 | 17.5% | 194.1 | 16.3% | 177.7 | 17.1% |
| Latin America | 60.8 | 4.4% | 46.1 | 3.8% | 48.7 | 4.7% |
| Total Grace Davison Revenue | $ 1,370.2 | 100% | $ 1,192.2 | 100% | $ 1,039.9 | 100% |

### FCC Catalysts and Additives

We are a global leader in developing and manufacturing fluidic catalytic cracking, or FCC, catalysts and additives that enable petroleum refiners to increase profits by improving yields and product quality. Our products also enable refiners to reduce emissions

CC-BLG003118

from their FCC units and reduce sulfur content in gasoline and diesel fuel. Oil refining is a highly specialized discipline, and refinery catalysts must be tailored to meet local variations in crude oil and a refinery's product mix. We work regularly with customers to help them find the most appropriate catalyst formulations for their changing needs. Our business is affected by the extent to which our customers utilize the available capacity of their FCC units. In general, as capacity utilization increases, a refinery needs a disproportionately greater amount of catalyst.

Refinery feedstocks vary in quality from sweet to heavy crude oil. Sweet crude feedstocks are more expensive than heavy crude and have a greater proportion of high-value petroleum products and a lower proportion of resid, which is generally the lowest-value feedstock contained in crude oil. Although feedstocks with high resid content are less expensive than higher quality feedstocks, the processing of high resid feedstocks is more difficult due to their relatively high metals contamination and higher boiling points. Due to increased prices for petroleum products, refiners have increased their efforts to maximize the yield from resid feedstocks. We have designed our MIDAS ®, IMPACT ®, NEKTOR™, and NOMUS™ product portfolios to enable our customers to increase the efficiency and yield of resid refining.

Many U.S. petroleum refiners have entered into consent decrees with the U.S. Environmental Protection Agency under which the refiners have agreed to reduce emissions of nitrogen oxides and sulfur oxides. The European Union has also imposed requirements on refineries with respect to nitrogen oxides and sulfur oxides emissions. FCC units are generally the largest emitters of these pollutants in a refinery. Our catalysts are designed to assist refineries in meeting their obligations to reduce these pollutants. Our Super DESOX ® product delivers 35-50% reduction in sulfur oxides emissions from a commercial FCC unit. Our XNOx ® and DENOX ® products can generally achieve a reduction in nitrogen oxides emissions comparable to that obtained from the capital-intensive alternatives available to a refinery.

4

Economic growth in emerging countries has increased the demand for plastics. As a result, our refinery customers have sought increased profits in the petrochemical market by increasing the yield of propylene from their FCC units. Our zeolite-based technology, including our ProPlus, Olefins Max™ and OlefinsUltra™ products, is designed to maximize the propylene output of FCC units.

In recent years, many countries, including the U.S., European Union and China have imposed or increased the regulatory limitations on the sulfur content of gasoline and diesel fuel. We have developed a portfolio of products designed to assist refiners in meeting their gasoline sulfur reduction targets including our D-PriSM ® and GSR ®-5 additives and our SuRCA ®, SATURN ® and GSR ®-7 catalyst families.

Competition in the FCC catalyst and additives markets is based on technology, product performance, customer service and price. Our two principal global competitors are Engelhard Corporation and Albemarle Corporation. We have multiple regional competitors in the markets for FCC additives.

*Hydroprocessing Catalysts*

We sell hydroprocessing catalysts through Advanced Refining Technologies, LLC, or ART, our joint venture with Chevron Products Company. We established ART to combine our technology with that of Chevron and develop, market and sell hydroprocessing catalysts to customers in the petroleum refining industry worldwide.

As discussed above, the increase in prices for petroleum products has increased the value of refinery feedstocks that have high resid content. We are a leading supplier of hydroprocessing catalysts, including fixed-bed, on-stream catalyst replacement (OCR ®) and ebullating bed products, designed for processing these feedstocks.

We also offer a full line of catalysts used in processing ultra-low sulfur content gasoline and diesel fuel, including our SmART Catalyst System™ and ApART™ catalyst system, that are customized for individual refiners. These products are designed to help refiners meet their obligations to reduce sulfur content in their products.

In response to increased demand for hydroprocessing catalysts, we are in the process of expanding capacity at our Chicago, Illinois facility. We are also considering building a new facility to further increase our capacity to manufacture these catalysts.

Competition in the hydroprocessing catalyst industry is based on technology, product performance, customer service and price. Albemarle Corp. and Criterion Catalysts and Technologies are our leading competitors in hydroprocessing catalysts. We also have multiple regional competitors.

*Specialty Catalysts*

We are a leading provider of catalyst systems and catalyst supports to the polyolefins industry for a variety of polyethylene and polypropylene process technologies. These types of catalysts are used for the manufacture of polyethylene and polypropylene resins used in products such as plastic film, high-performance plastic pipe and household containers. We use a combination of proprietary catalyst and support technology and technology licensed from third parties to provide unique catalyst-based solutions to industry, and to provide a broad technology portfolio for enhancing collaboration opportunities with technology leaders.

Our single-site catalyst offerings utilize our proprietary manufacturing technology and know-how to integrate our single-site metallocene catalyst components with our supports to exact customer specifications. These catalysts are used by our customers to manufacture high value plastic resins for applications such as no-taste meat and cheese packaging, soft-feel artificial fabrics, and puncture-resistant shipping sacks. Close collaboration with our customers accelerates the product development cycle for new plastic resins. We also supply our Magnapore ® polymerization catalyst to produce high performance polyethylene in the slurry loop process for pipe and film applications. Polytrak™, our newest family of catalysts for the polypropylene market, is designed to achieve improved polymer performance, particularly for impact-resistant applications such as automobile bumpers.

Our Davicat ® customized products offer a wide range of chemical and physical properties based on our material science technology for supported catalysts and biotechnology applications such as nylon and artificial sweeteners. Our Raney ® products are used for the synthesis of organic compounds for the fibers, pharmaceuticals, plastics, perfumes, soaps, color couplers and petroleum industries. Our specialty catalysts products also include washcoat materials used in automotive catalytic converters to lower vehicle emissions by converting engine pollutants into non-toxic compounds.

The specialty catalyst industry is technology-intensive and suppliers must provide products formulated to meet customer specifications. There are many manufacturers of polyolefin and other specialty catalysts, and most sell their products worldwide.

5

*Engineered Materials*

Our engineered materials product group provides silica and silica-alumina based functional additives and process aids, such as silica gel, colloidal silica, zeolitic adsorbents, precipitated silica and silica-aluminas for a wide variety of applications including:

- industrial applications such as coatings, plastics and rubber, precision investment casting, refractory, insulating glass windows, desiccants, and gas and liquids purification

- consumer applications such as food products, toothpaste, pharmaceutical and personal care products and edible oils and beverage processing

- digital media applications such as additives and formulations for matte, semi-glossy and glossy ink receptive coatings on high

CC-BLG003119

performance ink jet papers, photo paper, and commercial wide-format print media

Our engineered materials products provide valuable additional attributes to the products of our customers, including matte surface appearance, anti-scratch resistance, improved shelf-life stability and higher purity (by removing contaminants and impurities). Our products are integrated into our customers' manufacturing processes and, when combined with our technical support, can increase the efficiency of such processes. By working closely with our customers, we help them to react quickly to the changing needs of their customers. Changing end-customer needs have included higher-resolution ink jet prints, improved scratch resistance of floor and furniture coatings, less abrasive toothpastes and technologies that are friendly to the environment such as water-borne coatings, green tires, bio-fuel processing and non-toxic anticorrosive pigments.

We market our engineered materials under the SYLOID ®, SYLOJET ®, TriSyl ®, DARACLAR ®, PERKASIL ®, LUDOX ®, PHONOSORB ®, and SYLOBEAD ® and other trademarks.

We have a global position in engineered materials, with greater than 50% of our engineered materials sales outside of the U.S. Our major competitors are INEOS, Degussa Corporation and UOP LLC who sell their products on a worldwide basis.

*Discovery Sciences*

Our discovery sciences product group includes a wide range of chromatography tools that enable scientists to separate mixtures of molecules into their various constituents. Chromatography is commonly used in a wide range of applications, including drug discovery and purification for the pharmaceutical and biotechnology industries, environmental analysis, forensics, petrochemical analysis, food, cosmetics and vitamins.

Our chromatography products include:

*   Vydac ®, Alltech ®, Jones Chromatography™, Flexit™, Grom™ and MODcol ® liquid and gas chromatography columns, detectors and other chromatography instruments including pumps, gas generators, auto samplers, flow meters, and gas chromatography instruments

*   Davisil ®, and Vydac ® silica used by drug companies for process scale chromatography

*   a wide range of chromatography consumables and accessories including solid phase extraction (SPE) cartridges, vials, syringes, standards, and thin layer chromatography (TLC) plates

We believe that our discovery sciences product group can benefit from growth opportunities in drug discovery, development and manufacturing processes.

Our product range includes chromatography consumables, analytical columns packed with our silica, and bulk silica that customers can pack in their own production columns. We have the ability to modify the base silica and surface chemistry for analytical, preparative and process scale customers allowing us to enhance our products for unique applications.

Our discovery sciences products compete on the basis of product quality, distinct technology and customer support. The market for these products is highly fragmented with a large number of companies that sell their products on a global and regional basis, although a number of companies, such as Waters Corporation and Agilent Technologies, have a sustained global position and a relatively large installed customer base. We have developed this product group over the past five years primarily through acquisitions of companies with substantial experience in this industry.

*Manufacturing*

Our Grace Davison products are manufactured by a network of globally-coordinated plants that are positioned to service our customers regionally. Our integrated planning organization is responsible for the effective utilization of our manufacturing capabilities. Our discovery sciences product group also maintains specific "centers of excellence" for some product manufacturing.

6

*Marketing/Sales*

Our Grace Davison operating segment uses a global organization of technical professionals with extensive refining process, catalyst development, and catalyst application experience to market our refining technologies and ART product groups. These professionals work to tailor our technology to the needs of each specific customer. We generally negotiate prices for our FCC catalysts and ART hydroprocessing catalysts because our formulations are specific to the needs of each customer and each customer receives special attention and technical service. Due to the current demand for hydroprocessing catalysts, we generally sell ART products through long-term supply agreements with our geographically diverse customer base. These contracts usually have built-in price increase mechanisms.

We use a global sales force for our specialty catalysts product group that seeks to maintain close working relationships with our customers. These relationships enable us to cooperate with major polyolefin resin producers to develop catalyst technologies that complement their process developments. We have geographically distributed our sales and technical service professionals to make them responsive to the needs of our geographically diverse customers. We typically negotiate prices on an annual basis; however, we also operate under long-term contracts with built-in price increase mechanisms.

We use a combination of agents, distributors, and direct sales professionals for our engineered materials and discovery sciences product groups. These professionals are organized on a regional basis to meet the needs of the large and fragmented customer bases of these product groups.

Our marketing and research and development functions are organized at the operating segment level and operate globally. We also offer web-based support, including technical service, literature access, customer feedback tools, and process design formulas to assist our customers in determining their needs for our products. We also offer online ordering and order fulfillment for our discovery sciences products.

*Raw Materials*

The principal raw materials for Grace Davison products include caustic, alumina, rare earths, nickel, aluminum, cobalt carbonate, kaolin, molybdenum, sodium aluminate, and sodium silicate. Multiple suppliers are available for each of these materials. In some instances, we produce our own raw materials and intermediates. As in many chemical businesses, we consume significant quantities of natural gas in the production of Grace Davison products. World events and other economic factors have caused volatility in the price of natural gas. Increases in the cost of natural gas can negatively impact our operating margins.

Seasonality does not have a significant overall effect on our Grace Davison operating segment. However, sales of FCC catalysts tend to be lower in the first quarter prior to the shift in production by refineries from home heating oil for the winter season to gasoline production for the summer season.

*Grace Performance Chemicals Operating Segment*

Our GPC products include specialty construction chemicals and materials and Darex packaging technologies. We entered these businesses in 1954, with our acquisition of the Dewey and Almy Chemical Company.

The following table sets forth GPC sales of similar products as a percentage of Grace total revenue.

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| | % of Grace | % of Grace | % of Grace |

CC-BLG003120

| (In millions) | Sales | Revenue | | Sales | Revenue | | Sales | Revenue | |
|---|---|---|---|---|---|---|---|---|---|
| Construction Products | $ 906.4 | 35.30 | % $ | 788.6 | 34.9 | % $ | 679.1 | 34.3 | % |
| Darex Packaging Technologies | 292.9 | 11.4 | % | 279.1 | 12.3 | % | 261.5 | 13.2 | % |
| Total GPC Revenue | $ 1,199.3 | 46.7 | % $ | 1,067.7 | 47.2 | % $ | 940.6 | 47.5 | % |

The following table sets forth GPC sales by region as a percentage of GPC total revenue.

7

| | 2005 | | | | 2004 | | | | 2003 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (In millions) | Sales | % of GPC Revenue | | | Sales | % of GPC Revenue | | | Sales | % of GPC Revenue | |
| North America | $ 578.2 | 48.2 | % $ | | 525.1 | 49.2 | % $ | | 488.0 | 51.9 | % |
| Europe | 374.7 | 31.2 | % | | 317.6 | 29.7 | % | | 258.6 | 27.5 | % |
| Asia Pacific | 164.1 | 13.7 | % | | 155.1 | 14.5 | % | | 135.0 | 14.4 | % |
| Latin America | 82.3 | 6.9 | % | | 69.9 | 6.6 | % | | 59.0 | 6.2 | % |
| Total GPC Revenue | $ 1,199.3 | 100 | % $ | | 1,067.7 | 100 | % $ | | 940.6 | 100 | % |

## Specialty Construction Products

We are a supplier to the nonresidential (commercial and infrastructure) construction industry, and to a lesser extent, the residential construction and repair and restoration industries. The following table shows our principal specialty construction products:

| Products | Uses | Customers | Key Brands |
|---|---|---|---|
| Concrete admixtures | Concrete admixtures and polymeric fibers are used to reduce the production and in-place costs of concrete, and improve the life cycle cost of the structure. | Ready-mix and precast concrete producers | ADVA®, STRUX®, PolarSet®, Eclipse® |
| Additives for cement processing | Cement additives added to the grinding stage of the cement manufacturing process improve the energy efficiency of the plant and enhance the performance of the finished cement. Chromium reducing additives help meet environmental regulations. | Cement manufacturers | CBA®, Synchro®, HEA2®, TDA® |
| Products for architectural concrete | Products for architectural concrete include surface retarders, coatings, pigments and release agents used by concrete producers and contractors to enhance the surface appearance and aesthetics of concrete. | Precast concrete producers and architects | Pieri® |
| Admixtures for masonry concrete | Products for masonry concrete are used by block and paver producers for process efficiency and to improve the appearance, durability and water resistance of finished concrete masonry units (CMUs). | Masonry block manufacturers | Dry-Block®, Optec®, Quantec® |
| Specialty vermiculite products | Specialty vermiculite products are used in a wide range of applications making use of vermiculite's insulating properties and its ability to absorb nutrients, primarily in the horticultural, construction, and automotive industries. | Manufacturers of a variety of products, including potting soils, animal feeds, brakes, clutches and fire-rated products | MicroLite®, Versite™, FRSV® |

8

| Products | Uses | Customers | Key Brands |
|---|---|---|---|
| Structural waterproofing and air barrier systems | Structural waterproofing and air barrier systems prevent water and/or air infiltration in commercial structures. Products include self-adhered sheet and liquid membranes, joint sealing materials, drainage composites and waterstops. | Architects and structural engineers; specialty waterproofing and general contractors; specialty waterproofing distributors | Bituthene®, Procor®, Preprufe®, Perm-A-Barrier®, Adprufe® |
| Residential building materials | Specialty roofing membranes and flexible flashings for windows, doors, decks and detail areas. Products include fully-adhered roofing underlayments, synthetic underlayments and self-adhered flashing. | Roofing contractors, home builders and remodelers; specialty roofing distributors, lumberyards and home centers; homeowners; architects and specifiers | Grace Ice & Water Shield®, Grace Tri-Flex 30®, Grace Vycor® |
| Fire protection and firestop products | Fire protection products are spray-applied to the structural steel frame, encasing and insulating the steel and protecting the building from structural failure. Firestop products and systems compartmentalize and contain fire and smoke within a building. | Local contractors and specialty subcontractors and applicators; building materials distributors; industrial manufacturers; architects and structural engineers | Monokote®, FlameSafe® |

For some customer groups, such as producers and contractors, operational efficiency and total applied cost are key factors in making purchasing decisions, while for others, such as architects and engineers, product performance and design versatility are more important.

In view of this diversity of customers and customer concerns, and because construction chemicals and building materials require intensive sales and customer service efforts, we maintain a direct sales and technical support team for construction chemicals and building materials, with sales personnel based in more than 25 countries worldwide. This sales and support team sells products under global contracts, under U.S. or regional contracts, and on a job-by-job basis. We use distributors in some overseas markets and for most of our waterproofing products. We compete globally with several large construction materials suppliers and regionally and locally with numerous smaller competitors. In recent years, the cement and concrete industry has experienced some consolidation, thereby increasing the importance of servicing global customers. Our spray-on fire protection products recently have been adversely

CC-BLG003121

affected by the adoption in the U.S. of new international building codes, which require less fire protection material for structural steel used in commercial buildings.

Competition for our specialty construction products product group is based largely on product performance, technical support and service, brand and reputation, product adaptability, consistent quality and price.

We seek to improve our products, adapt them for new applications and add new products through our internal growth process, which focuses on close relationships with our customers and market-driven research and development. Our strategy is also to extend our product portfolio and geographic reach through acquisitions.

In addition to new product introductions, product enhancements and acquisitions, we look for growth opportunities in developing countries where increasing construction activity, improvement in building codes, and sophistication of construction practices can accelerate demand for our construction products.

The key raw materials used in our specialty construction products are obtained from a variety of suppliers, including commodity chemical producers, petroleum companies and paper manufacturers. The majority of our raw materials are olefins and organic chemicals; we also make significant purchases of inorganic materials such as gypsum, as well as specialty

9

materials including specialty films, papers, membranes and fibers. In most instances, these materials are available from multiple sources. World events and other economic factors have driven significant increases in key raw materials in 2005.

The construction business is cyclical in response to economic conditions and construction demand. The construction business is also seasonal and dependent on favorable weather conditions, with a decrease in construction activity during the winter months. We seek to increase profitability and minimize the impact of cyclical downturns in regional economies by introducing technically advanced high-performance products and expanding geographically. Although in recent years these strategies have been successful in minimizing the impact of cyclicality on our specialty construction products product group, a significant downturn in North American commercial construction activity adversely affected results of operations in 2002 and the first half of 2003. Operating results improved in 2004 and 2005 as the decline in North American commercial construction activity leveled off and reversed course.

*Darex Packaging Technologies*

Our Darex packaging products and technologies include:

- can sealants for rigid containers, which are principally sold to container manufacturers and ensure a hermetic seal between the lid and the body of beverage, food, aerosol and other cans

- sealants for metal and plastic bottle closures which are principally sold to container manufacturers and are used to seal pry-off and twist-off metal crowns, as well as roll-on pilfer-proof and plastic closures for glass and plastic bottles and jars used in beverage and food applications

- coatings for metal packaging which are principally sold to container manufacturers and are used in the manufacture of cans and closures to protect the metal against corrosion, protect the contents against the influences of metal, ensure proper adhesion of sealing compounds to metal surfaces, and provide base coats for inks and for decorative purposes

We seek to grow by developing new products to meet packager and brand owner needs and by focusing on specialty high-growth markets, such as plastic packaging, and growth geographies. Sales growth of can sealants has been impacted by the long-term shift from metal to plastic packaging. We will continue to focus on improving the profitability and cash flows of this product group through worldwide productivity and strategic sourcing initiatives.

During 2005, we sold our specialty polymers product line, which primarily manufactured specialty barrier coatings for flexible food packaging and contributed less than 2% of GPC's 2005 sales.

We believe that purchasing decisions in the rigid packaging segments we serve are generally based on product performance and reliability, as well as additional value added features to address the needs of brand owners. We have a direct selling force for our Darex products that is focused on consultative sales and technical support and distributes most of our Darex products directly to a large number of packaging producers worldwide.

Although raw materials used in our packaging technologies products, including resins, rubber and latices, are generally available from multiple sources, some raw materials are purchased from single source suppliers. We seek to mitigate the risk of using single source suppliers by identifying and qualifying alternative suppliers or, for unique materials, by using alternative formulations from other suppliers or by passing through price increases to customers. Some raw materials are also subject to pricing pressures from time to time, particularly petroleum-based specialty and commodity materials such as resins and solvents. We are focused on managing raw material costs and sourcing opportunities to alleviate some of these pressures. Since we manufacture a substantial portion of our packaging technologies products in developing countries using raw materials from suppliers in the U.S., Europe and other developed economies, currency revaluations versus the U.S. dollar and Euro in developing countries may adversely affect our raw material costs and the prices we may charge for our products.

Our packaging technologies product group is affected by seasonal and weather-related factors such as the consumption of beverages and the size and quality of food crops. These impacts are softened by the global nature of this product group.

## FINANCIAL INFORMATION ABOUT INDUSTRY SEGMENTS AND GEOGRAPHIC AREAS

Financial information about industry segments and geographic areas for 2005, 2004 and 2003 is contained in Note 19 to the Consolidated Financial Statements in the Financial Supplement to this Report. Risks attendant to our foreign operations are discussed below in "Risk Factors."

## INTELLECTUAL PROPERTY; RESEARCH ACTIVITIES

As competition in our industry is often based on technological superiority and innovation, our ability to maintain our margins and effectively compete with other suppliers depends on our ability to introduce new products based on innovative technology

10

and obtain patent or other intellectual property protection. Our research and development programs emphasize development of new products and processes, improvement of existing products and processes and application of existing products and processes to new industries and uses. We conduct research in all regions, with North America and Europe accounting for the most activity.

Numerous patents and patent applications protect our products, processes and manufacturing equipment. We also benefit from trade secrets, including know-how and other proprietary information relating to many of our products and processing technologies. There can be no assurance, however, that our patents, patent applications and precautions to protect trade secrets and know-how will provide sufficient protection for our intellectual property. In addition, other companies may independently develop systems or processes that circumvent our patents or acquire patent rights applicable to our business.

Research and development expenses relating to continuing operations amounted to $59 million in 2005, $51 million in 2004 and $52 million in 2003. These amounts include expenses incurred in funding external research projects. The amount of research and development expenses relating to government- and customer-sponsored projects (rather than projects that we sponsor) was not material during these periods.

## ENVIRONMENTAL, HEALTH AND SAFETY MATTERS

CC-BLG003122

We are subject, along with other manufacturers of specialty chemicals, to stringent regulations under numerous U.S. federal, state and local and foreign environmental, health and safety laws and regulations relating to the generation, storage, handling, discharge, disposition and stewardship of hazardous wastes and other materials. Environmental laws require that responsible parties fund remediation actions regardless of fault, legality of original disposal or ownership of a disposal site. We are involved in remediation actions to address hazardous wastes or other materials as required by foreign, federal and state laws. During the Chapter 11 proceeding, we generally are not participating in the funding of investigation and remediation at sites that we do not own. Our ultimate liability with respect to many of these sites will be determined as part of the Chapter 11 proceeding.

We have expended substantial funds to comply with environmental laws and regulations and expect to continue to do so in the future. The following table sets forth our expenditures in the past three years, and our estimated expenditures in 2006 and 2007, for (i) the operation and maintenance of manufacturing facilities and the disposal of wastes; (ii) capital expenditures for environmental control facilities; and (iii) site remediation.

| Year | Operation of Facilities and Waste Disposal (in $ millions) | Capital Expenditures (in $ millions) | Site Remediation (in $ millions) |
|------|------|------|------|
| 2003 | $46 | $ 8 | $ 7 |
| 2004 | $47 | $ 7 | $ 9 |
| 2005 | $51 | $ 9 | $28 |
| 2006 | $53 | $15 | $15* |
| 2007 | $55 | $15 | $11* |

* For 2006 and 2007, amounts are current estimates based on the assumption that we do not emerge from Chapter 11 and incur costs associated with sites that we do not own during the specified periods.

See Part I, Item 3 of this 10-K for additional information about our environmental remediation activities.

We continuously seek to improve our environmental, health and safety performance. To the extent applicable, we extend the basic elements of the American Chemistry Council's Responsible Care ® program to all our locations worldwide, embracing specific performance objectives in the key areas of management systems, product stewardship, employee health and safety, community awareness and emergency response, distribution, process safety and pollution prevention. In addition, we have implemented key elements of the new Responsible Care ® Security Code for our operations and systems. We have completed a review of our existing security (including cyber-security) vulnerability and have taken actions to enhance our security systems and protect our assets.

## EMPLOYEE RELATIONS

As of December 31, 2005, we employed approximately 6,400 persons, of whom approximately 3,200 were employed in the United States. Of our total employees, approximately 3,100 work in Grace Davison Business, approximately 2,500 work in

Grace Performance Chemicals facilities, and approximately 800 are dedicated to corporate activities and/or are shared through globally managed professional groups such as financial and legal services, human resources, information technology, supply chain and environmental health and safety.

Approximately 900 of our manufacturing employees in the United States are represented for collective bargaining purposes by a total of approximately 10 different local collective bargaining groups. We have operated without a labor work stoppage for more than 10 years.

We have works councils representing the majority of our European sites serving approximately 1,600 employees.

## AVAILABILITY OF REPORTS AND OTHER DOCUMENTS

We maintain an Internet website at www.grace.com . Our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to those reports, filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, are available, free of charge, on our website as soon as reasonably practicable after such reports are electronically filed with, or furnished to, the Securities and Exchange Commission. These reports may be accessed through our website's investor information page.

In addition, the charters for the Audit, Compensation, Nominating and Governance, and Corporate Responsibility Committees of our Board of Directors, our corporate governance guidelines and code of ethics are available, free of charge, on our website at www.grace.com/corporategovernance. Printed copies of the charters, governance guidelines and code of ethics may be obtained free of charge by contacting Grace Shareholder Services at 410-531-4167.

The information on our website is not, and shall not be deemed to be, a part of this report or incorporated into any other filings we make with the Securities and Exchange Commission.

On May 19, 2005, our Chief Executive Officer submitted a certification to the New York Stock Exchange that, as of such date, he was not aware of any violation by Grace of the New York Stock Exchange corporate governance listing standards. Our Chief Executive Officer and Chief Financial Officer have submitted certifications to the SEC pursuant to the Sarbanes Oxley Act of 2002 as exhibits to this Report.

## EXECUTIVE OFFICERS

See Part III, Item 10 of this Report for information about our Executive Officers.

## Item 1A.   RISK FACTORS

This document contains, and our other public communications may contain, projections or other "forward-looking" information, that is, information related to future, not past, events. Such information generally includes the words "believes," "plans," "intends," "targets," "will," "expects," "anticipates," or similar expressions. Forward-looking information includes all statements regarding our Chapter 11 proceeding (including the pro forma financial statements included in "Management's Discussion and Analysis of Financial Condition and Results of Operations"), expected financial position, results of operations, cash flows, financing plans, business strategy, budgets, capital and other expenditures, competitive positions, growth opportunities for existing products, benefits from new technology and cost reduction initiatives, plans and objectives of management, and markets for securities. For these statements, we claim the protection of the safe harbor for forward-looking statements contained in the Private Securities Litigation Reform Act of 1995. Like other businesses, we are subject to risks and uncertainties that could cause our actual results to differ materially from our projections or that could cause other forward-looking information to prove incorrect. Further, our reported results should not be considered as an indication of our future performance. Readers are cautioned not to place undue reliance on our projections and forward-looking information, which speak only as of the date thereof. We undertake no obligation to publicly release any revisions to the projections and forward-looking information contained in this document, or to update them to reflect events or circumstances occurring after the date of this document.

In addition to general economic, business and market conditions, we are subject to other risks and uncertainties, including, without limitation, the following:

## COMPANY RISKS

The outcome of our Chapter 11 cases could result in the substantial dilution or cancellation of Grace's currently outstanding

CC-BLG003123

common stock.

The outcome of our Chapter 11 cases depends primarily upon the resolution of our asbestos-related and other contingent liabilities. The Bankruptcy Court has agreed to a process for estimating our asbestos-related liabilities, which estimate would

12

form the basis for a plan of reorganization that would provide for the funding of a trust to which all pending and future asbestos-related claims would be channeled. If the allowed amount of asbestos-related liabilities, as determined through estimation or otherwise, and other liabilities exceeds assets available for funding, then we likely would issue additional shares of Grace common stock to satisfy such liabilities. The number of shares to be issued could substantially dilute the interests of current shareholders or result in a recapitalization of Grace that would cancel the shares of current shareholders and issue new shares to asbestos and other creditors. Because of this risk of substantial dilution or cancellation, the value of Grace common stock is highly speculative and any investment in Grace common stock poses a high degree of risk.

**If our proposed plan of reorganization is not confirmed, the ownership interests of holders of currently outstanding Grace common stock may become further diluted or worthless.**

Our proposed plan of reorganization provides that Grace common stock would remain outstanding at the effective date of the plan, but the interests of current holders of Grace common stock would be subject to substantial dilution by additional Grace securities that may be issued under the plan. The pro forma financial information included under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations – Proforma Financial Information" in the Financial Supplement reflects the accounting effects of the plan as if it had become effective on December 31, 2005, and as if it had been in effect for the year ended December 31, 2005 and, unless the plan is confirmed, may not provide useful information about our financial condition or results of operations.

The plan is subject to the fulfillment of numerous conditions, including a determination by the Bankruptcy Court that the maximum amount that we and other parties would be required to contribute to the trust for the benefit of asbestos claimants does not exceed $1,613 million, and that assets from settlement agreements with Sealed Air Corporation and Fresenius Medical Care will be available to fund our liabilities. The asbestos creditors have asserted that the plan is unconfirmable and have asked the Bankruptcy Court for authority to file one or more alternative plans. If the conditions precedent in our proposed plan are not fulfilled and the Bankruptcy Court confirms another plan, the other plan may provide for greater dilution of, or cancellation of, the interests of current holders of Grace common stock. In addition, if legislation under consideration by the U.S. Senate, providing for the resolution of asbestos personal injury claims through a government-administered trust to be funded by companies and insurers (including Grace) is passed into law, then a plan that contemplates the resolution of asbestos personal injury claims through this legislation could result in greater dilution of the interests of current holders of Grace common stock than Grace's proposed plan, because of the possible reduction or loss of the availability of assets to be contributed by Sealed Air and Fresenius, and the loss of asbestos-related insurance recoveries. Because of these possibilities, the value of Grace common stock is highly speculative and any investment in Grace common stock poses a high degree of risk.

**The bankruptcy process may disrupt our business.**

We have attempted to minimize the adverse effect of our Chapter 11 reorganization on our relationships with our employees, suppliers, customers and other parties. Nonetheless, as our reorganization becomes more protracted, our relationships with our customers, suppliers and employees may be adversely impacted and our operations could be materially and adversely affected. In addition, the continuation of our reorganization could negatively affect our ability to attract new employees and retain existing high performing employees.

**Chapter 11 limits the flexibility of our management team in running our business.**

While we operate our businesses as debtor-in-possession under supervision by the Bankruptcy Court, we are required to obtain the approval of the Bankruptcy Court prior to engaging in activities or transactions outside the ordinary course of business. For example, our strategic plan includes the acquisition of businesses in the specialty chemicals industry. Such acquisitions generally require Bankruptcy Court approval. Bankruptcy Court approval of non-ordinary course activities entails preparation and filing of appropriate motions with the Bankruptcy Court, negotiation with the various creditors' committees and other parties in interest and one or more hearings. The various creditors' committees and other parties in interest may be heard at any Bankruptcy Court hearing and may raise objections with respect to these motions. This process delays major decisions and limits our ability to respond quickly to opportunities and events in the marketplace. Furthermore, in the event the Bankruptcy Court does not approve a proposed activity or transaction, we would be prevented from engaging in activities and transactions that we believe are beneficial to Grace.

**We may not be able to collect all asbestos-related insurance payments that may be due to us.**

We have insurance coverage for a substantial portion of the asbestos-related claims against us. We estimate that, assuming an ultimate payout of asbestos-related claims equal to the $1,700 million of asbestos-related liabilities recorded on our

13

balance sheet, we should be entitled to approximately $500 million, on a net present value basis, of insurance recovery. Accordingly, our December 31, 2005 balance sheet includes a long-term asset for estimated asbestos-related insurance of $500 million. Although this amount pertains only to insurance carriers with which we have asbestos settlement agreements, and/or which are currently solvent, we cannot be sure that all these amounts will be collected. The timing and amount of future payments from our insurers depends on their continued solvency and the resolution of disputes regarding coverage under the insurance policies. Because of the significance of our future asbestos-related payments, the receipt of timely and complete payments from our insurers will be important to the success of our reorganization.

**Grace is currently under criminal indictment in connection with our former vermiculite mining and processing activities in Libby, Montana.**

Along with seven current or former senior level employees, Grace has been indicted in connection with our former vermiculite mining and processing activities in Libby, Montana. The indictment accuses Grace and the co-defendants of conspiracy to violate environmental laws and obstruct federal agency proceedings, violations of the federal Clean Air Act, and obstruction of justice. Trial is scheduled for September 2006. According to the U.S. Department of Justice, Grace could be subject to fines in an amount equal to twice the after-tax profit earned from our Libby operations or twice the alleged loss suffered by Libby victims, plus additional amounts for restitution to victims. The indictment alleges that our after-tax profits were $140 million. Grace has categorically denied any criminal wrongdoing and intends to vigorously defend itself at trial. We are unable to assess whether the indictment or any conviction will have a material adverse effect on our results of operations or financial condition or affect our bankruptcy proceedings. However, we expect legal fees for Grace's defense and that of our current and former employees could range from $7 million to $10 million per quarter through the trial date.

**We are subject to environmental clean-up fines, penalties and damage claims that have been and continue to be costly.**

Grace is subject to lawsuits and regulatory actions, in connection with current and former operations, for breaches of environmental laws that seek clean-up or other remedies. For example, Grace has been found liable in federal court for $54.5 million (plus interest) in costs expended through December 2001 and for all appropriate future clean-up costs with respect to our former vermiculite mining and processing activities in Libby, Montana. The State of New Jersey is seeking civil penalties for alleged misrepresentations and false statements made in an official filing in connection with the closing of a former plant in New Jersey and we are aware that the State of New Jersey and U.S. Department of Justice each are conducting criminal investigations related to our former operations of that plant which included vermiculite processing and other activities. Grace is also subject to other lawsuits and investigations by public and private parties under various environmental laws in connection with our current and former operations in various states, including with respect to off-site disposal at facilities where Grace has been identified as a potentially responsible party under the

CC-BLG003124

Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, commonly referred to as CERCLA.

We have established accounting accruals for all environmental matters for which sufficient information is available. As we receive new information and continue our claims evaluation process, our estimated liability may change materially. We do not have sufficient information to accrue for all of Grace's environmental risks and we cannot be sure that our actual costs will be equal to or less than our current estimates and accruals. Furthermore, it is reasonably possible that costs associated with those environmental matters for which we have established accruals may exceed our current accruals by material amounts. Specifically, our estimate of expected costs in connection with the EPA activities with respect to our former vermiculite mining and processing activities is based on public comments regarding the EPA's spending plans, discussions of spending forecasts with EPA representatives, analysis of other information made available from the EPA, and evaluation of probable remediation costs at processing sites. As the EPA's spending on these matters increases, which we cannot anticipate with certainty, our potential liability for remediation will increase. Some or all of our liability in connection with alleged violations of environmental laws may not be discharged upon confirmation of our proposed plan of reorganization.

**Our capital resources are limited and we have limited access to additional financing.**

In addition to the cash requirements necessary to fund our ongoing operations, we currently are incurring, and anticipate that we will continue to incur significant, professional fees and other restructuring costs in connection with the Chapter 11 proceedings. We are currently funding our operations with cash flow from operations and a debtor-in-possession loan facility, which expires on April 1, 2006, in the aggregate amount of $250 million and with a borrowing availability as of December 31, 2005 of $211.3 million. We currently intend to request a two-year extension of this DIP facility. Based on our current

and anticipated level of operations, we believe that our cash flow from operations and financing available under the DIP facility are adequate to meet our current and anticipated cash requirements during the Chapter 11 proceedings. If such amounts are not sufficient to fund operations until a plan of reorganization is confirmed by the Bankruptcy Court, we may be required to reduce planned capital expenditures or seek additional financing. Further, our proposed plan of reorganization requires, and any plan of reorganization that is ultimately confirmed is likely to require, Grace to borrow funds for the payment of certain claims in cash. We can provide no assurance that additional financing for current operations or for payment of claims under a plan of reorganization will be available or, if available, offered on acceptable terms. As a result of the uncertainty surrounding our current circumstances, we cannot determine our long-term liquidity requirements or the adequacy of our capital resources until a plan of reorganization is confirmed by the Bankruptcy Court.

**We may be subject to claims of infringement of the intellectual property rights of others, which could hurt our business.**

From time to time, we face infringement claims from our competitors or others alleging that our processes or products infringe on their proprietary technologies. Any claims that our products or processes infringe the intellectual property rights of others, regardless of the merit or resolution of the claims, could cause us to incur significant costs in responding to, defending and resolving the claims, and may divert the efforts and attention of our management and technical personnel from our business. If we are found to be infringing on the proprietary technology of others, we may be liable for damages and we may be required to change our processes, redesign our products, pay others to use the technology or stop using the technology or producing the infringing product. Even if we ultimately prevail, the existence of the lawsuit could prompt our customers to switch to products that are not the subject of infringement suits.

**We have unfunded and underfunded pension plan liabilities of $533.9 million which will likely require Grace to use current and future operating cash flow to fund the shortfall. We have no assurance that Grace will generate sufficient cash flow to satisfy these obligations.**

We maintain U.S. and non-U.S. defined benefit pension plans covering employees who meet age and service requirements. Our net pension liability and cost is materially affected by the discount rate used to measure pension obligations, the longevity and actuarial profile of our workforce, the level of plan assets available to fund those obligations and the expected long-term rate of return on plan assets. Significant changes in investment performance or a change in the portfolio mix of invested assets can result in corresponding increases and decreases in the valuation of plan assets, particularly equity securities, or in a change in the expected rate of return on plan assets. A change in the discount rate would result in a significant increase or decrease in the valuation of pension obligations, affecting the reported funded status of our pension plans as well as the net periodic pension cost in the following years. Similarly, changes in the expected return on plan assets can result in significant changes in the net periodic pension cost in the following years. At the December 31, 2005 measurement date for our defined benefit pension plans, the accumulated benefit obligation, or ABO, was approximately $1,386 million, as measured under U.S. generally accepted accounting principles, and our recorded pension liability for underfunded plans was $533.9 million. This amount reflects the shortfall between dedicated assets and the ABO of underfunded plans of $321.4 million and the ABO of our pay-as-you-go plans of $212.5 million. The ABO was calculated using a weighted average discount rate of 5.5% per annum for the U.S. plans and 4.66% per annum for the non-U.S. plans, $321.4 million of which pertains to U.S. qualified plans that are required to be funded by law. If our U.S. qualified plans were terminated under the distress termination provisions of the Employee Retirement Income Security Act of 1974, as amended, or ERISA, the Pension Benefit Guaranty Corporation, or PBGC, would have claims against our assets for the amount necessary to satisfy the plans' unfunded benefit liabilities under the PBGC's actuarial assumptions, which amount may be greater than $321.4 million as of December 31, 2005.

**Our ability to use net operating loss carryovers to reduce future tax payments may be limited if there is a change in ownership of Grace or if Grace does not generate sufficient US taxable income.**

As of December 31, 2005, we had $112.7 million of net operating loss carryovers, or NOLs, available to reduce U.S. federal taxable income in future years. Our ability to utilize our NOLs may be limited by Section 382 of the Internal Revenue Code of 1986, as amended, if we undergo an ownership change as a result of subsequent changes in the ownership of stockholders owning Grace common stock. We would undergo an ownership change if, among other things, the stockholders, or group of stockholders, who own or have owned, directly or indirectly, 5% or more of the value of Grace common stock or are otherwise treated as 5% stockholders under Section 382 and the regulations promulgated thereunder increase their aggregate percentage ownership of Grace common stock by more than 50% over the lowest percentage of Grace common stock owned

by these stockholders at any time during the testing period, which is generally the three-year period preceding the potential ownership change. In the event of an ownership change, Section 382 may impose very strict limitations on NOL usage. In order to preserve the NOLs, the Bankruptcy Court has approved restrictions on the purchase of Grace common stock. The restrictions prohibit (without our consent), until the effective date of a plan of reorganization, a person or entity from acquiring more than 4.75% of the outstanding Grace common stock or, for those persons already holding more than 4.75%, prohibit them from increasing their holdings. In addition, our ability to utilize NOLs is dependant on our ability to generate sufficient future taxable income in the U.S. Currently, we have placed a valuation allowance of $48 million on all of our U.S. net deferred tax assets representing future tax deductions and NOL carryforwards, which reflects the view that it is more likely than not that such tax assets will not be realized.

**While Grace is in bankruptcy, we are not permitted to pay dividends on Grace common stock.**

We are not permitted to pay dividends on Grace common stock while we are in bankruptcy. Following emergence from bankruptcy, we may be subject to covenants in connection with our financing arrangements that limit or prevent us from paying dividends for the foreseeable future. Furthermore, it is likely that following our emergence from bankruptcy, our board of directors will decide to reinvest our operating cash flow in our business rather than paying dividends. Accordingly, for the foreseeable future, investors in Grace common stock, in all likelihood, will obtain an economic benefit from their shares only by selling them

**INDUSTRY RISKS**

CC-BLG003125

**Prices for raw materials and energy are volatile; we may not be able to pass through increases in costs and expenses for raw materials and energy which may hurt our profitability.**

We use significant amounts of natural gas in the manufacture of our Grace Davison products. We also use significant amounts of petroleum-based materials in our GPC products, including specialty and commodity materials such as resins and solvents. We purchase natural gas and petroleum-based products from third-parties. Prices of natural gas and petroleum products have increased dramatically in 2004 and 2005. To the extent this trend continues and we are unable to pass through these price increases to our customers, our operating profit and results of operations may decline.

A substantial portion of our raw materials are commodities whose prices fluctuate as market supply/demand fundamentals change. We attempt to manage exposures to price volatility of major commodities through:

- long-term supply contracts

- forward buying programs that layer in our expected requirements systematically over time

- limited use of contracts and financial instruments

Although we regularly assess our exposure to raw materials price volatility, we can not always predict the prospects of volatility and we can not always cover the risk in a cost effective manner.

We have a policy of maintaining, when available, multiple sources of supply for raw materials. However, some of our raw materials are provided by single sources of supply. We may not be able to obtain sufficient raw materials due to unforeseen developments that would cause an interruption in supply. Even if we have multiple sources of supply for raw materials, these sources may not make up for the loss of a major supplier.

**We spend large amounts of money for environmental compliance in connection with our current and former operations.**

As a manufacturer of specialty chemicals and materials, we are subject to stringent regulations under numerous U.S. federal, state, local and foreign environmental, health and safety laws and regulations relating to the generation, storage, handling, discharge, disposition and stewardship of hazardous wastes and other materials. We have expended substantial funds to comply with such laws and regulations. Legislative, regulatory and economic uncertainties make it difficult for us to project future spending for these purposes, and if there is an acceleration in new regulatory requirements, we may be required to expend substantial additional funds to remain in compliance.

16

**The international scope of our operations subjects us to the risks of doing business in foreign countries, which could adversely affect our business, financial condition and results of operations.**

We conduct a substantial portion of our business outside of the United States, with 63% of our 2005 sales to non-US customers. We currently have many production facilities, research and development facilities and administrative and sales offices located outside North America, including facilities and offices located in Europe, Latin America and Asia. We expect sales from international markets to continue to represent a significant portion of our revenue. Accordingly, our business is subject to risks related to the differing legal, political, social and regulatory requirements and economic conditions of many jurisdictions. Risks inherent in international operations include the following:

- agreements may be more difficult to enforce and receivables more difficult to collect

- foreign countries may impose additional withholding taxes or adopt other restrictions on foreign trade or investment, including currency exchange controls

- we may have difficulty transferring our profits or capital from foreign operations to the United States or other countries where such funds could be more profitably deployed

- foreign governments may nationalize private enterprises

- unexpected adverse changes in export duties, quotas and tariffs and difficulties in obtaining export licenses

- intellectual property rights may be more difficult to enforce

- our business and profitability in a particular country could be affected by political or economic repercussions on a domestic, country specific or global level from terrorist activities and the response to such activities

- we may be affected by unexpected adverse changes in foreign laws or regulatory requirements

In addition, certain of our operations are in high-risk regions of the world such as the Middle East, portions of Asia and Latin America. Unanticipated events, such as geopolitical changes, could adversely affect these operations. Our success as a global business will depend, in part, upon our ability to succeed in differing legal, regulatory, economic, social and political conditions by developing, implementing and maintaining policies and strategies that are effective in each location where we do business.

**We are exposed to currency exchange rate fluctuations that could impact our profitability.**

We are exposed to currency exchange rate risk through our non-U.S. operations. As we conduct a significant portion of our operations outside the United States, fluctuations in currencies of other countries, especially the Euro, may materially affect our operating results. For example, changes in currency exchange rates may affect the relative prices at which our competitors and we sell products in the same market and the cost of materials used in our operations. A substantial portion of our net sales and assets are denominated in currencies other than the U.S. dollar. During times of a strengthening U.S. dollar, at a constant level of business, our reported international sales, earnings, assets and liabilities will be reduced because the foreign currency will translate into fewer U.S. dollars. We estimate that the translation effects of changes in the value of other currencies against the U.S. dollar increased net sales by approximately 0.9% for the year ended December 31, 2005 and increased total assets by approximately 4.7% for the year ended December 31, 2005.

In addition to currency translation risks, we incur a currency transaction risk whenever one of our operating subsidiaries enters into either a purchase or a sales transaction using a currency different from the operating subsidiary's functional currency. Given the volatility of exchange rates, we may not be able to manage our currency transaction and/or translation risks effectively, or volatility in currency exchange rates may expose our financial condition or results of operations to a significant additional risk.

**The length and depth of product and industry business cycles in our markets, particularly in the construction and petroleum refining industries, may result in periods of reduced operating margins or operating losses.**

The construction products portion of our GPC operating segment and the refining products portions of our Grace Davison operating segment are sensitive to the cyclical nature of their respective industries. For example, a significant downturn in North American

CC-BLG003126

commercial construction activity adversely affected our results of operations in 2002 and the first half of 2003. Our hydroprocessing catalyst product group and other hydroprocessing catalyst suppliers have experienced alternating periods of inadequate capacity and excess capacity for their products. Periods of inadequate capacity, including some due to raw material shortages, have usually resulted in increased selling prices and operating margins. This has often been followed by periods of capacity additions, which have resulted in declining capacity utilization rates, selling prices and operating margins.

17

**Some of our employees are unionized, represented by workers' councils or employed subject to local laws that are less favorable to employers than the laws of the United States.**

As of December 31, 2005, we had approximately 6,400 employees worldwide. Approximately 28% of our 3,200 U.S. employees is unionized. In addition, a large number of our employees are employed in countries in which employment laws provide greater bargaining or other rights to employees than the laws of the United States. Such employment rights require us to work collaboratively with the legal representatives of the employees to effect any changes to labor arrangements. For example, most of our employees in Europe are represented by workers' councils that have co-determination rights on any changes in conditions of employment, including salaries and benefits and staff changes, and may impede efforts to restructure our workforce. Although we believe that we have a good working relationship with our employees, a strike, work stoppage or slowdown by our employees or significant dispute with our employees could result in a significant disruption of our operations or higher ongoing labor costs.

**We work with dangerous materials that can injure our employees, damage our facilities and disrupt our operations.**

Some of our operations involve the handling of hazardous materials that may pose the risk of fire, explosion, or the release of hazardous substances. Such events could result from terrorist attacks, natural disasters, or operational failures, and might cause injury or loss of life to our employees and others, environmental contamination, and property damage. These events might cause a temporary shutdown of an affected plant, or portion thereof, and the company could be subject to penalties or claims as a result. A disruption of our operations caused by these or other events could have a material adverse effect on our results of operations.

**We face substantial competition in our markets.**

The markets in which we compete are highly competitive and susceptible to technological change. Additionally, many of our customers have significant purchasing power and all have sophisticated knowledge about the costs and technological benefits of the products which they purchase. Accordingly, the market share for any of our products can vary significantly over time based on our comparative cost advantage and ability to develop leading edge technology.

Item 1B.  UNRESOLVED STAFF COMMENTS

None.

Item 2.  PROPERTIES

We operate manufacturing and other types of plants and facilities (including office, warehouse, and other service facilities) throughout the world. Some of these plants and facilities are shared by both of our operating segments. We own all of our major manufacturing facilities. Substantially all of our U.S. properties are subject to security interests under our debtor-in-possession borrowing facility. We consider our major operating properties to be in good operating condition and suitable for their current use. We believe that, after taking planned expansion into account, the productive capacity of our plants and other facilities is generally adequate for current operations and foreseeable growth.

Our Grace Davison operating segment operates out of 25 facilities in the following regions:

| Region | Number of Facilities |
|---|---|
| North America | 13 |
| Europe | 7 |
| Latin America | 1 |
| Asia Pacific | 4 |

Our largest Grace Davison facilities are located in Baltimore, Maryland; Lake Charles, Louisiana; and Worms, Germany. Our Grace Davison operating segment also operates sales offices and warehouses in various regions.

18

Our Grace Performance Chemicals operating segment operates out of 64 facilities in the following regions:

| Region | Number of Facilities |
|---|---|
| North America | 24 |
| Europe | 16 |
| Latin America | 6 |
| Asia Pacific | 18 |

Our largest GPC facilities are located in Cambridge, Massachusetts; Chicago, Illinois; Slough, England; Epernon, France; Atsugi, Japan; Singapore; and Hamburg, Germany. Because of the nature of our GPC products, GPC requires a greater number of facilities to service our customers than Grace Davison. Also, these facilities are generally smaller and less capital intensive than our Grace Davison facilities. For information on our net properties and equipment by region and country, see Note 19 to our Consolidated Financial Statements in the Financial Supplement to this Report.

Item 3.  LEGAL PROCEEDINGS

**CHAPTER 11 PROCEEDINGS**

Grace, along with 61 of its United States subsidiaries and affiliates, filed voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware on April 2, 2001 and, since that time, has been subject to the jurisdiction of the Bankruptcy Court. On November 13, 2004, Grace filed a plan of reorganization, as well as several associated documents, including a disclosure statement, with the Bankruptcy Court. On January 13, 2005, Grace filed an amended plan of reorganization and related documents to address certain objections of creditors and other interested parties. We refer to the amended plan of reorganization herein as the plan of reorganization. The plan of reorganization is supported by committees representing general unsecured creditors and equity holders, but is not supported by committees representing asbestos personal injury claimants and asbestos property damage claimants.

CC-BLG003127

Under the terms of the plan of reorganization, a trust would be established under Section 524(g) of the Bankruptcy Code to which all pending and future asbestos-related claims would be channeled for resolution. Grace has requested that the Bankruptcy Court conduct an estimation hearing to determine, among other things, the amount that would need to be paid into the trust on the effective date of the plan of reorganization to satisfy the estimated liability for all classes of asbestos claimants and trust administration costs and expenses over time. The plan of reorganization provides that Grace's asbestos-related liabilities would be satisfied using cash and securities from Grace and third parties.

The plan of reorganization will become effective only after a vote of eligible creditors and with the approval of the Bankruptcy Court and the U.S. District Court for the District of Delaware. Votes on the plan of reorganization may not be solicited until the Bankruptcy Court approves the disclosure statement. The Bankruptcy Court has indicated that it will not consider the approval of the disclosure statement until after completion of estimation hearings on the amount of Grace's asbestos-related liability. Grace has received extensions of its exclusive right to propose a plan of reorganization through April 17, 2006.

Under the terms of the plan of reorganization, claims would be satisfied under the Chapter 11 cases as follows:

*Asbestos-Related Claims and Costs*

A trust would be established under Section 524(g) of the Bankruptcy Code to which all pending and future asbestos-related claims would be channeled for resolution. The trust would utilize specified trust distribution procedures to satisfy the following allowed asbestos-related claims and costs:

- *Personal injury claims that meet specified exposure and medical criteria (Personal Injury-Symptomatic Eligible or ''PI-SE'' Claims)* – In order to qualify for this class, claimants would have to prove that their health is impaired from meaningful exposure to asbestos-containing products formerly manufactured by Grace.

- *Personal injury claims that do not meet the exposure and medical criteria necessary to qualify as PI-SE Claims (Personal Injury-Asymptomatic and Other or ''PI-AO'' Claims )* – This class would contain all asbestos-related personal injury claims against Grace that do not meet the specific requirements to be PI-SE Claims, but do meet certain other specified exposure and medical criteria.

19

- *Property damage claims, including claims related to ZAI (''PD Claims'')* – In order to qualify for this class, claimants would have to prove Grace liability for loss of property value or remediation costs related to products formerly manufactured by Grace that claimants allege contained asbestos.

- *Trust administration costs and legal expenses*

The pending asbestos-related legal proceedings are described in ''Asbestos Litigation'' below. The claims arising from such proceedings would be subject to this classification process as part of the plan of reorganization.

The Bankruptcy Court has entered case management orders for estimating liability for personal injury claims and property damage claims (excluding ZAI claims). The case management orders originally contemplated that estimation hearings would take place in September 2006. However, in connection with the latest extensions of Grace's exclusive right to propose a plan of reorganization, the Bankruptcy Court has deferred the estimation process to provide Grace and the other stakeholders in the Chapter 11 proceeding with an opportunity to negotiate a resolution of all or a portion of Grace's asbestos-related liabilities. The Bankruptcy Court has appointed a mediator to facilitate such negotiations. As a result of this deferral, if negotiations are not successful and the Bankruptcy Court resumes the estimation process, Grace does not expect estimation hearings would take place until late 2006 or early 2007.

The Bankruptcy Court is expected to use the estimated liability to determine the amounts to be paid into the trust on the effective date of the Plan  The amounts to fund PI-SE Claims, PD Claims and the expense of trust administration would be capped at the amount determined by the Bankruptcy Court. Amounts required to fund PI-AO Claims would not be capped, so if the amount funded in respect thereof later proved to be inadequate, Grace would be responsible for contributing additional funds into the asbestos trust to satisfy PI-AO Claims.

Asbestos personal injury claimants, including both PI-SE and PI-AO, would have the option either to litigate their claims against the trust in federal court in Delaware or, if they meet specified eligibility criteria, accept a settlement amount based on the severity of their condition. Asbestos property damage claimants would be required to litigate their claims against the trust in federal court in Delaware. The plan of reorganization provides that, as a condition precedent to confirmation, the maximum estimated aggregate funding amount for all asbestos-related liabilities (PI-SE, PI-AO and PD including ZAI) and trust administration costs and expenses as determined by the Bankruptcy Court cannot exceed $1,613 million, which Grace believes would fund over $2 billion in claims, costs and expenses over time.

The PI-SE Claims, the PD Claims and the related trust administration costs and expenses would be funded with (1) a payment of $512.5 million in cash (plus interest at 5.5% compounded annually from December 21, 2002) and nine million shares of common stock of Sealed Air Corporation (''Sealed Air'') to be made directly by Cryovac, Inc., a wholly owned subsidiary of Sealed Air, (''Cryovac'') to the asbestos trust pursuant to the terms of a settlement agreement resolving asbestos-related, successor liability and fraudulent transfer claims against Sealed Air and Cryovac and (2) Grace common stock. The amount of Grace common stock required to satisfy these claims will depend on the liability measures approved by the Bankruptcy Court and the value of the Sealed Air settlement, which changes daily with the accrual of interest and the trading value of Sealed Air common stock. The Sealed Air settlement agreement has been approved by the Bankruptcy Court, but remains subject to the fulfillment of specified conditions.

The PI-AO Claims would be funded with warrants exercisable for that number of shares of Grace common stock which, when added to the shares issued directly to the trust on the effective date of the plan of reorganization, would represent 50.1% of Grace's voting securities. If the common stock issuable upon exercise of the warrants is insufficient to pay all PI-AO Claims (the liability for which is uncapped under the plan of reorganization), then Grace would pay any additional liabilities in cash.

*Other Claims*

The plan of reorganization provides that all allowed administrative or priority claims would be paid 100% in cash and all general unsecured claims, other than those covered by the asbestos trust, would be paid 85% in cash and 15% in Grace common stock. Grace estimates that claims with a recorded value of approximately $1,154 million, including interest accrued through December 31, 2005, would be satisfied in this manner at the effective date of the plan of reorganization. Grace would finance these payments with cash on hand, cash from Fresenius Medical Care Holdings, Inc. paid in settlement of asbestos and other Grace-related claims, new Grace debt, and Grace common stock. Grace would satisfy other non-asbestos related liabilities and claims (primarily certain environmental, tax, pension and retirement medical obligations) as they become due and payable over time using cash flow from operations, insurance proceeds from policies and settlement agreements covering asbestos-related liabilities, and new credit facilities. Proceeds from available product liability insurance applicable to asbestos-related claims would supplement operating cash flow to service new debt and liabilities not paid on the effective date of the plan of reorganization.

20

*Effect on Grace Common Stock*

The plan of reorganization provides that Grace common stock will remain outstanding at the effective date of the plan of reorganization, but that the interests of existing shareholders would be subject to dilution by additional shares of common stock issued under the plan of reorganization. In addition, in order to preserve significant tax benefits from net operating loss carryforwards

("NOLs"), which are subject to elimination or limitation in the event of a change in control (certain thresholds of Grace Code, the plan of reorganization places restrictions on the purchase of Grace common stock. The restrictions would prohibit (without the consent of Grace), for a period of three years, a person or entity from acquiring more than 4.75% of the outstanding Grace common stock or, for those persons already holding more than 4.75%, prohibit them from increasing their holdings. The Bankruptcy Court has also approved the trading restrictions described above until the effective date of the plan of reorganization.

Grace intends to address all pending and future asbestos-related claims and all other pre-petition claims as outlined in the plan of reorganization. However, Grace may not be successful in obtaining approval of the plan of reorganization by the Bankruptcy Court and other interested parties. For example, the asbestos creditors committees and future asbestos claimants representative have challenged the confirmability of the plan of reorganization, arguing that the plan of reorganization impairs the rights of asbestos creditors and impermissibly denies them voting rights, and have asserted that Grace's asbestos-related liabilities exceed the fair value of Grace's assets. As a result of these challenges and other Bankruptcy Court rulings, a materially different plan of reorganization may ultimately be approved and, under the ultimate plan of reorganization, the interests of the Company's shareholders could be substantially diluted or cancelled. The value of Grace common stock following a plan of reorganization, and the extent of any recovery by non-asbestos-related creditors, will depend principally on the allowed value of Grace's asbestos-related claims as determined by the Bankruptcy Court.

## ASBESTOS LITIGATION

Grace is a defendant in property damage and personal injury lawsuits relating to previously sold asbestos-containing products. As of the date of the Chapter 11 filing, Grace was a defendant in 65,656 asbestos-related lawsuits, 17 involving claims for property damage (one of which has since been dismissed), and the remainder involving 129,191 claims for personal injury. Due to the Chapter 11 filing, holders of asbestos-related claims are stayed from continuing to prosecute pending litigation and from commencing new lawsuits against the Grace. Separate creditors' committees representing the interests of asbestos property damage and asbestos personal injury claimants, and a legal representative of future asbestos personal injury claimants, have been appointed in the Chapter 11 cases. Grace's obligations with respect to present and future claims will be determined through the Chapter 11 process.

### Asbestos Property Damage Litigation

The plaintiffs in asbestos property damage lawsuits generally seek to have the defendants pay for the cost of removing, containing or repairing the asbestos-containing materials in the affected buildings. Each property damage case is unique in that the age, type, size and use of the building, and the difficulty of asbestos abatement, if necessary, vary from structure to structure. Information regarding product identification, the amount of product in the building, the age, type, size and use of the building, the legal status of the claimant, the jurisdictional history of prior cases and the court in which the case is pending has provided meaningful guidance as to the range of potential costs.

Out of 380 asbestos property damage cases (which involved thousands of buildings) filed prior to the date of the Chapter 11 filing, 140 were dismissed without payment of any damages or settlement amounts; judgments were entered in favor of Grace in nine cases (excluding cases settled following appeals of judgments in favor of Grace); judgments were entered in favor of the plaintiffs in eight cases (one of which is on appeal) for a total of $86.1 million; 207 property damage cases were settled for a total of $696.8 million; and 16 cases remain outstanding (including the one on appeal). Of the 16 remaining cases, eight relate to ZAI and eight relate to a number of former asbestos-containing products (two of which also are alleged to involve ZAI).

Approximately 4,300 additional property damage claims were filed prior to the March 31, 2003 claims bar date established by the Bankruptcy Court. (The bar date did not apply to ZAI claims.) Such claims were reviewed in detail by Grace, categorized into claims with sufficient information to be evaluated or claims that require additional information and, where sufficient information existed, the estimated cost of resolution was considered as part of Grace's recorded asbestos-related liability. (Approximately 200 claims did not contain sufficient information to permit an evaluation.) Grace has objected to virtually all property damage claims on a number of different bases, including: no authorization to file a claim; the claim was previously

21

---

settled or adjudicated; no or insufficient documentation; failure to identify a Grace product; the expiration of the applicable statute of limitations and/or statute of repose, and/or laches; and a defense that the product in place is not hazardous. As of February 21, 2005, following the reclassification, withdrawal or expungement of claims, approximately 990 property damage claims remain outstanding.

Eight of the ZAI cases were filed as purported class action lawsuits in 2000 and 2001. In addition, eight lawsuits were filed as purported class actions in 2004 and 2005 with respect to persons and homes in Canada. These cases seek damages and equitable relief, including the removal, replacement and/or disposal of all such insulation. The plaintiffs assert that this product is in millions of homes and that the cost of removal could be several thousand dollars per home. As a result of the Chapter 11 filing, the eight U.S. cases have been transferred to the Bankruptcy Court. Based on Grace's investigation of the claims described in these lawsuits, and testing and analysis of this product by Grace and others, Grace believes that the product was and continues to be safe for its intended purpose and poses little or no threat to human health. The plaintiffs in the ZAI lawsuits (and the U.S. government in the Montana criminal proceeding described below) dispute Grace's position on the safety of ZAI. In July 2002, the Bankruptcy Court approved special counsel to represent, at Grace's expense, the ZAI claimants in a proceeding to determine certain threshold scientific issues regarding ZAI. On October 18, 2004, the Bankruptcy Court held a hearing on motions filed by the parties to address a number of important legal and factual issues regarding the ZAI claims, and has taken the motions under advisement. The Bankruptcy Court has indicated that it may require further proceedings with respect to the matters addressed in the motions and no decision has yet been rendered. Given the early stage of litigation, Grace's recorded asbestos-related liability at December 31, 2005 assumes the risk of loss from ZAI litigation is not probable. If Grace's view as to the risk of loss were not sustained, management believes the cost to resolve the matter would be material.

### Asbestos Personal Injury Litigation

Asbestos personal injury claimants allege adverse health effects from exposure to asbestos-containing products formerly manufactured by Grace. Claims are generally similar to each other, differing primarily in the type of asbestos-related illness allegedly suffered by the plaintiff. Grace's cost to resolve such claims has been influenced by numerous variables, including the solvency of other former producers of asbestos-containing products, cross-claims by co-defendants, the rate at which new claims are filed, the jurisdiction in which the claims are filed, and the defense and disposition costs associated with these claims.

Cumulatively through the date of the Chapter 11 filing, 16,354 asbestos personal injury lawsuits involving approximately 35,720 claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved) and approximately 55,489 lawsuits involving approximately 163,698 claims were disposed of (through settlements and judgments) for a total of $645.6 million. As of the date of the Chapter 11 filing, 129,191 claims for personal injury were pending against Grace. Grace believes that a substantial number of additional personal injury claims would have been received between the date of the Chapter 11 filing and December 31, 2005 had these claims not been stayed by the Bankruptcy Court.

Prior to the Chapter 11 filing date, based on its experience and analysis of trends in asbestos personal injury litigation, Grace endeavored to project the number and ultimate cost of all present and future personal injury claims expected to be asserted, based on actuarial principles, and to measure probable and estimable liabilities under generally accepted accounting principles. After the Chapter 11 filing and prior to the filing of the plan of reorganization, Grace did not change its recorded asbestos-related personal injury liability because it did not believe that there was an appropriate basis to do so.

### Treatment of Asbestos Litigation under Plan of Reorganization

Under the plan of reorganization, Grace is requesting that the Bankruptcy Court determine the aggregate dollar amount, on a net present value basis, that must be funded on the effective date of the plan of reorganization into an asbestos trust (established under Section 524(g) of the Bankruptcy Code) to pay all allowed pending and future asbestos-related personal injury and property damage claims (including ZAI) and related trust administration costs and expenses on the later of the effective date of the plan of reorganization or when allowed. We refer to this amount herein as the Funding Amount. It is a condition to confirmation of the plan of reorganization that the Bankruptcy Court shall conclude that the Funding Amount is not greater than $1,613 million. This amount, which should be sufficient to fund over $2 billion in pending and future claims, is based in part on Grace's evaluation of:

- existing but unresolved personal injury and property damage claims;

CC-BLG003207

- actuarially-based estimates of future personal injury claims;

- the risk of loss from ZAI litigation;

- proposed claim payments reflected in the plan of reorganization; and

- the cost of the trust administration and litigation.

This amount may not be consistent with what the Bankruptcy Court may conclude would be a sufficient Funding Amount.

The Bankruptcy Court has issued separate case management orders for estimating liability for pending and future personal injury claims and pending property damage claims, excluding ZAI claims. The case management orders originally contemplated that estimation hearings would take place in September 2006. However, in connection with the latest extensions of Grace's exclusivity right to propose a plan of reorganization, the Bankruptcy Court has deferred the estimation process to provide Grace and the other stakeholders in the Chapter 11 proceeding with an opportunity to negotiate a resolution of all or a portion of Grace's asbestos-related liabilities. The Bankruptcy Court has appointed a mediator to facilitate these negotiations. As a result of this deferral, if negotiations are not successful and the Bankruptcy Court resumes the estimation process, Grace does not expect estimation hearings would take place until late 2006 or early 2007.

For personal injury claims, the Bankruptcy Court has ordered that all claimants with claims pending as of the date of the Chapter 11 filing must complete detailed questionnaires providing information on, among other things, their medical condition, including diagnostic support, exposure to Grace and non-Grace asbestos-containing products, employment history, and pending lawsuits against other companies. Such information will be analyzed by experts and presented to the Bankruptcy Court, including estimates of the number of personal injury claims expected to be filed in the future, as the basis for determining the Funding Amount in respect of all pending and future asbestos personal injury claims.

For property damage claims, the case management order provides that estimation will be preceded by litigation on certain common threshold issues affecting a substantial majority of claims. Such litigation will consist of determining the date by which building owners knew or should have known of the reported hazards of asbestos-containing materials in their buildings, which would provide the basis for a statute of limitations defense, and the evidentiary admissibility of certain asbestos testing methodologies. During the period preceding the estimation hearing, Grace will also ask the Bankruptcy Court to rule on Grace's specific objections to individual claims and groups of claims. Claims not resolved or expunged through the common issue litigation or the objection process would be the subject of an estimation hearing, which would provide the basis for a Bankruptcy Court determination of the Funding Amount in respect of all property damage claims and may also provide for the allowability of the remaining property damage claims.

The Funding Amount will be primarily a function of the estimated number of allowed property damage and personal injury claims, and the amount payable per claim. Through the estimation process, Grace will seek to demonstrate that most claims should not be allowed because they fail to establish any material property damage, health impairment or significant occupational exposure to asbestos from Grace's operations or products. Therefore, due to the significant uncertainties of this process and asbestos litigation generally, Grace is not able to estimate a probable Funding Amount that would be accepted by the Bankruptcy Court.

Conversely, the asbestos claimants committees and the future claimants representative continue to assert that Grace's asbestos-related liabilities are substantially higher than $1,613 million, and in fact are in excess of Grace's business value. If the Bankruptcy Court accepts the position of the asbestos claimants committees, then any plan of reorganization likely would result in the loss of all or substantially all equity value by current Grace shareholders. Therefore, due to the significant uncertainties of this process and asbestos litigation generally, Grace is not able to estimate a probable Funding Amount that would be accepted by the Bankruptcy Court.

However, as Grace is willing to proceed with confirmation of the plan of reorganization with a Funding Amount of up to $1,613 million (assuming that other conditions precedent to confirmation of the plan of reorganization are satisfied, including the availability of the payment from Cryovac directly to the asbestos trust under the settlement agreement described below), during the fourth quarter of 2004, Grace accrued and took a charge of $714.8 million to increase its recorded asbestos-related liability to reflect the maximum amount allowed as a condition precedent under the plan of reorganization. This amount, plus $87.0 million for pre-Chapter 11 contractual settlements and judgments, brings the total recorded asbestos-related liability as of December 31, 2005 to $1,700.0 million. Any differences between the plan of reorganization as filed and as approved for confirmation could fundamentally change the accounting measurement of Grace's asbestos-related liability and that change could be material.

23

*Insurance Rights*

Grace previously purchased insurance policies under which Grace claims coverage for its asbestos-related lawsuits and claims. Grace has settled with and has been paid by all but one of its primary insurance carriers with respect to both property damage and personal injury cases and claims. Grace has also settled with its excess insurance carriers that wrote policies available for property damage cases; those settlements involve amounts paid and to be paid to Grace. Grace believes that certain of these settlements may cover ZAI claims as well as other property damage claims. In addition, Grace believes that additional coverage for ZAI claims may exist under excess insurance policies not subject to settlement agreements. Grace has settled with excess insurance carriers that wrote policies available for personal injury claims in layers of insurance that Grace believes may be reached based on its current estimates. Insurance coverage for asbestos-related liabilities has not been commercially available since 1985.

Grace estimates that, assuming an ultimate payout of asbestos-related claims equal to the recorded liability of $1,700 million, it should be entitled to approximately $500.0 million, on a net present value basis, of insurance recovery. Such recovery, however, would occur only as claims are paid by the asbestos trust, absent an alternative payment arrangement with Grace's insurers.

See Item 1 of this Report and Notes 2 and 3 to the Consolidated Financial Statements and ''Management's Discussion and Analysis of Results of Operations and Financial Condition'' in the Financial Supplement for additional information.

## ENVIRONMENTAL CIVIL PROCEEDINGS

*Libby, Montana and Vermiculite-Related Proceedings.*

From 1963 until 1992, Grace conducted vermiculite mining and related activities near Libby, Montana. Previous owners had conducted similar activities at the Libby site since the 1920s. The mined vermiculite ore contained varying amounts of asbestos as an impurity, almost all of which was removed during processing. Expanded vermiculite was used in products such as fireproofing, insulation and potting soil.

### *EPA Lawsuit*

In November 1999, Region 8 of the Environmental Protection Agency began an investigation into alleged excessive levels of asbestos-related disease in the Libby population related to these former mining activities. This investigation led the EPA to undertake additional investigative activity and to carry out response actions in and around Libby. On March 30, 2001, the EPA filed a lawsuit in U.S. District Court for the District of Montana, Missoula Division ( *United States v. W. R. Grace & Company et al* ) under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) for the recovery of costs allegedly incurred by the United States in response to the release or threatened release of asbestos in the Libby, Montana area relating to such former mining activities. These costs include cleaning and/or demolition of contaminated buildings, excavation and removal of contaminated soil,

CC-BLG003130

health screening of Libby residents and former mine workers, and investigation and monitoring costs. In this action, the EPA also sought a declaration of Grace's liability that would be binding in future actions to recover further response costs.

In December 2002, the District Court granted the United States' motion for partial summary judgment on a number of issues that limited Grace's ability to challenge the EPA's response actions. In January 2003, a trial was held on the remainder of the issues, which primarily involved the reasonableness and adequacy of documentation of the EPA's cost recovery claims through December 31, 2001. On August 28, 2003, the District Court issued a ruling in favor of the United States that requires us to reimburse the government for $54.5 million (plus interest) in costs expended through December 2001, and for all appropriate future costs to complete the clean-up. The Ninth Circuit Court of Appeals upheld the District Court's rulings. Grace intends to appeal this case to the U.S. Supreme Court.

In February 2000, a purported class action lawsuit was filed in the U.S. District Court for Montana, Missoula Division ( *Tennison, et al. v. W. R. Grace & Co., et al* .) against Grace on behalf of all owners of improved real property situated within 12 miles of Libby, Montana. The action alleges that the class members have suffered harm in the form of environmental contamination and loss of property rights resulting from Grace's former vermiculite mining and processing operations. The complaint seeks remediation, property damages, and punitive damages. This case has been stayed as a result of the Chapter 11 filing. However, as described above, the EPA has been conducting remediation activities in and around Libby, which include the remediation of private real property.

In October 2000, a purported class action lawsuit was filed in the U.S. District Court for the District of Minnesota, 4th Division ( *Chase v. W. R. Grace & Co.-Conn* .) alleging loss of property values in the vicinity of the former Grace plant in Minneapolis,

which processed vermiculite from the Libby mine. This case has been stayed as a result of the Chapter 11 filing. The EPA has commenced and is continuing a program for removing suspected vermiculite processing by-products from the yards and driveways of houses near the former plant. The EPA has reviewed 1,648 residential properties and targeted 269 for cleanup. Of the 269 properties, the EPA has taken action at 252, and has not obtained access to the remaining 17. As of December 31, 2005, the EPA had spent approximately $7.6 million on these residential cleanup actions. The EPA also has remediated industrial property in the area, including the former vermiculite expanding plant, at a cost of $1.0 million. The EPA has submitted proofs of claims for $12.4 million for the past and projected future costs (including indirect costs) of remediation of the residential and industrial properties at or around the former plant site.

The EPA also has compiled for investigation a list of 245 facilities that at one time used, stored, or expanded vermiculite concentrate that originated from the Libby vermiculite mine. Included in this list are 50 vermiculite expansion plants that Grace currently operates or formerly operated. The EPA has listed 17 of these 50 sites as requiring additional action. Grace has commenced corrective actions or investigations at six of these sites. The EPA has filed proofs of claims for 10 of these sites (exclusive of Libby, Montana), and for three other sites never owned or operated by Grace. The mount claimed with respect to these 13 sites is $26 million. In addition, another governmental agency has commenced a separate investigation at 28 of the 245 facilities, 22 of which Grace currently operates or formerly operated. Grace does not have sufficient information to determine whether this separate investigation is likely to result in any additional liability.

As a result of the ruling by the District Court in Montana in *United States v. W. R. Grace & Company et al* ., and Grace's evaluation of probable remediation costs in and around Libby and at vermiculite processing sites that Grace currently operates or formerly operated, Grace estimates its total liability for vermiculite-related remediation, including liability related to the matters described in the three preceding paragraphs at $226.2 million. The estimate does not include the cost to clean-up the Grace-owned mine site at Libby, which is not currently estimable but which may be material. Grace's estimate of expected costs is based on public comments regarding the EPA's spending plans, discussions of spending forecasts with EPA representatives, and analysis of other information made available from the EPA. As the EPA's spending on these matters increases, Grace's liability for remediation will increase. Any payments to the EPA would be subject to the outcome of the Chapter 11 proceedings.

*New Jersey Lawsuit*

On June 1, 2005, the New Jersey Department of Environmental Protection, or NJDEP filed a lawsuit against Grace and two former employees in the Superior Court of New Jersey Law Division: Mercer County ( *N. J. Dept. of Environmental Protection v. W. R. Grace & Co. et al* .) seeking civil penalties for alleged misrepresentations and false statements made in a Preliminary Assessment/Site Investigation Report and Negative Declarations submitted by Grace to the NJDEP in 1995 pursuant to the New Jersey Industrial Site Recovery Act. Grace submitted the report, which was prepared by an independent environmental consultant, in connection with the closing of Grace's former plant in Hamilton Township, New Jersey. Grace is also aware that the State of New Jersey and U.S. Department of Justice each are conducting criminal investigations related to Grace's former operations of the Hamilton plant.

Grace purchased the Hamilton plant assets in 1963 and ceased operations in 1994. During the operating period, Grace produced spray-on fire protection products and vermiculite-based products at this plant. The current property owners and the EPA have filed proofs of claim against Grace in the amount of approximately $4 million with respect to the Hamilton plant site.

Grace is unable at this time to assess the effect of this lawsuit or the pending criminal investigations on Grace's results of operations, cash flows, or liquidity, or on its bankruptcy proceeding.

*Non-Vermiculite-Related Environmental Proceedings*

The EPA has designated Grace (together, in most cases, with many other companies) as a potentially responsible party, or PRP, with respect to paying the costs of investigating and remediating pollution at various sites. As of December 31, 2005, proceedings were pending with respect to approximately 30 sites as to which Grace has been designated a PRP by the EPA. U.S. law provides that all PRPs for a site may be held jointly and severally liable for the costs of investigating and remediating the site. Grace is also conducting investigatory and remediation activities at sites under the jurisdiction of state and/or local authorities. During the Chapter 11 proceeding, Grace has not been participating (except in a limited number of special cases) in the joint funding of investigation and remediation at non-owned sites where Grace is a PRP.

Based on Grace's analysis of environmental-related claims submitted prior to the March 31, 2003 bar date and other available information, Grace estimates that its aggregate liability for environmental remediation, including liability with respect to

non-owned sites where Grace is a PRP, but excluding remediation related to its former vermiculite mining and processing operations (discussed above), is $115.8 million as of December 31, 2005; however, Grace's ultimate liability with respect to many of these sites will be determined as part of the Chapter 11 proceeding. These environmental liabilities are reassessed whenever circumstances become better defined or remediation efforts and their costs can be better estimated. Grace evaluates these liabilities quarterly, based on currently available information, including the progress of remedial investigation at each site, the current status of discussions with regulatory authorities regarding the method and extent of remediation at each site, existing technology, prior experience in contaminated site remediation and the apportionment of costs among PRPs. Grace believes that its estimated aggregate liability may change materially as additional information becomes available or circumstances change.

Grace is a party to other legal proceedings and claims involving U.S. federal, state and/or local government agencies and private parties regarding its responsibility for alleged noncompliance with environmental laws and regulations that are unrelated to its former vermiculite mining and processing activities. Although Grace cannot predict the outcome of these proceedings, Grace intends to vigorously defend itself. Grace may incur material liability in connection with future actions of governmental agencies or private parties relating to its past or future practices with respect to the generation, storage, handling, discharge, disposition or stewardship of hazardous wastes and other materials.

For further information, see "Environmental, Health and Safety Matters" under Item 1 above and Note 14 to the Consolidated Financial Statements and "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the Financial Supplement.

CC-BLG003131

MONTANA CRIMINAL PROCEEDING

On February 7, 2005, the United States Department of Justice announced the unsealing of a 10-count grand jury indictment against Grace and seven current and former senior level employees ( *United States of America v. W. R. Grace & Co. et al* ) relating to Grace's former vermiculite mining and processing activities in Libby, Montana. Two of the counts have since been dismissed. The indictment accuses the defendants of (1) conspiracy to violate environmental laws and obstruct federal agency proceedings; (2) violations of the federal Clean Air Act; and (3) obstruction of justice. The U.S. District Court for the District of Montana has entered a scheduling order setting a trial date of September 11, 2006.

Grace purchased the Libby mine in 1963 and operated it until 1990; vermiculite processing activities continued until 1992. The grand jury charges that the conspiracy took place from 1976 to 2002 and also charges that the alleged endangerment to the areas surrounding Libby continues to the present day. According to the U.S. Department of Justice, Grace could be subject to fines in an amount equal to twice the after-tax profit earned from its Libby operations or twice the alleged loss suffered by Libby victims, plus additional amounts for restitution to victims. The indictment alleges that such after tax profits were $140 million. Grace has categorically denied any criminal wrongdoing and intends to vigorously defend itself at trial.

The U.S. Bankruptcy Court previously granted Grace's request to advance legal and defense costs to the employees, subject to a reimbursement obligation if it is later determined that the employees did not meet the standards for indemnification set forth under the appropriate state corporate law. For the year ended December 31, 2005, total expense for Grace and the employees was $20.0 million. Among the former employees for whom Grace is advancing legal costs is Robert J. Bettacchi, a former Senior Vice President of Grace and President of GPC who was an executive officer until February 7, 2005. For the year ended December 31, 2005, Grace advanced approximately $1,243,800 for Mr. Bettacchi's defense in this proceeding.

Grace is unable to assess whether the indictment, or any conviction resulting therefrom, will have a material adverse effect on the results of operations or financial condition of Grace or affect Grace's bankruptcy proceedings. However, Grace expects legal fees for this matter could range from $7 million to $10 million per quarter through the trial date.

LITIGATION RELATED TO FORMER PACKAGING AND MEDICAL CARE BUSINESSES

In September 2000, Grace was named in a purported class action suit filed in California Superior Court for the County of San Francisco alleging that the 1996 reorganization involving a predecessor of Grace and Fresenius Medical Care Holdings, Inc. and the 1998 reorganization involving a predecessor of Grace and Sealed Air Corporation were fraudulent transfers ( *Abner, et al., v. W. R. Grace & Co., et al* ). The suit is alleged to have been brought on behalf of all individuals who then had lawsuits on file asserting personal injury or wrongful death claims against any of the defendants. After *Abner* , and prior to the Chapter 11 filing, two other similar class actions were filed. These lawsuits have been stayed as a result of Grace's Chapter 11 filing.

The Bankruptcy Court authorized the Official Committee of Asbestos Personal Injury Claimants and the Official Committee of Asbestos Property Damage Claimants to proceed with claims against Sealed Air and Fresenius on behalf of Grace's

26

bankruptcy estate. On November 29, 2002, Sealed Air and Fresenius each announced that they had reached agreements in principle with these Committees to settle asbestos, successor liability and fraudulent transfer claims related to such transactions. Under the terms of the Fresenius settlement, as subsequently revised and subject to certain conditions, Fresenius would contribute $115.0 million to the Grace estate as directed by the Bankruptcy Court upon confirmation of Grace's plan of reorganization. In July 2003, the Fresenius settlement was approved by the Bankruptcy Court. Under the terms of the proposed Sealed Air settlement, subject to the fulfillment of certain conditions, Cryovac Inc., a subsidiary of Sealed Air, would make a payment of $512.5 million (plus interest at 5.5% per annum, compounded annually, commencing on December 21, 2002) and nine million shares of Sealed Air common stock, valued at $1,108.3 million as of December 31, 2005, as directed by the Bankruptcy Court upon confirmation of Grace's plan of reorganization. In June 2005, the Sealed Air settlement was approved by the Bankruptcy Court. Upon the effectiveness of these settlements *Abner* and all similar actions will be dismissed. These settlements are an integral part of the plan of reorganization.

TAX CLAIMS

The IRS has assessed additional federal income tax withholding and Federal Insurance Contributions Act taxes plus interest and related penalties for calendar years 1993 through 1998 against a Grace subsidiary that formerly operated a temporary staffing business for nurses and other health care personnel. The assessments, aggregating $61.9 million, were made in connection with a meal and incidental expense per diem plan for traveling health care personnel, which was in effect through 1999, the year in which Grace sold the business. (The statute of limitations has expired with respect to 1999.) The IRS contends that certain per diem reimbursements should have been treated as wages subject to employment taxes and federal income tax withholding. Grace contends that its per diem and expense allowance plans were in accordance with statutory and regulatory requirements, as well as other published guidance from the IRS. Grace has a right to indemnification from its former partner in the business for approximately 36% of any tax liability (including interest thereon) for the period from July 1996 through December 1998. The matter is currently pending in the United States Court of Claims. Grace has tentatively agreed with the Department of Justice and IRS on a settlement amount and certain other terms that would resolve the matter. The preliminary settlement is subject to the execution of written closing agreements with the IRS and a written settlement agreement with the Department of Justice, and to Bankruptcy Court approval.

ERISA LAWSUITS

In June 2004, a purported class action complaint ( *Evans v. Akers et al* .) was filed in U.S. District Court for the District of Massachusetts against the Board of Directors, certain of current and former Grace officers and employees, and others, relating to the Grace 401(k) Savings and Investment Plan. The complaint alleges that the decline in the price of Grace common stock from July 1999 through February 2004 resulted in significant losses to S&I Plan participants. The complaint further alleges that the defendants breached their fiduciary duties under the Employee Retirement Income Security Act of 1974, as amended, or ERISA, by failing to sell or take other appropriate action with regard to Grace common stock held by the S&I Plan during that period, and by failing to disclose to S&I Plan participants the risk of investing in Grace common stock. The complaint seeks compensatory damages for the S&I Plan from the defendants.

On October 26, 2004, a purported class action complaint ( *Bunch et al. v. W. R. Grace & Co. et al* .) also related to the S&I Plan was filed in the U.S. District Court for the Eastern District of Kentucky against Grace, the Investment and Benefits Committee, the Board of Directors, certain current and former Grace officers and employees, and others. The complaint alleges that Grace and its investment advisors breached fiduciary duties under ERISA by selling Grace common stock from the S&I Plan at a distressed price. The complaint further alleges that Grace breached fiduciary duties under ERISA by hiring State Street Bank and Trust Company, the investment manager for the S&I Plan that Grace retained in December 2003, to rapidly liquidate all of the employees' Grace common stock investment at an artificially low sales price.

On July 21, 2005, the U.S. District Court for the Eastern District of Kentucky granted the defendants' motion to transfer the *Bunch* action to the U.S. District Court for the District of Massachusetts. On August 23, 2005, the Massachusetts District Court consolidated into one case both the *Bunch* action and the *Evans* action. Grace expects that it would have an obligation to indemnify the other defendants for any liability arising out of the consolidated lawsuit. Although Grace cannot predict the outcome, Grace intends to vigorously defend this consolidated lawsuit. Grace has $50 million of employers' fiduciary liability insurance coverage that Grace believes would be available to pay liabilities arising out of this consolidated lawsuit. Since all Grace employees who had interests in the S&I Plan during the relevant periods are members of the purported class and Messrs. Bettacchi, Corcoran, McGowan, Norris, Poling, Shelnitz and Tarola had interests in the S&I Plan during these periods, they have interests in this litigation that may be adverse to Grace.

27

OTHER CLAIMS RECEIVED PRIOR TO THE BAR DATE

CC-BLG003132

The Bankruptcy Court established a bar date of March 31, 2003 for claims of general unsecured creditors, asbestos-related property damage claims and medical monitoring claims related to asbestos. The bar date did not apply to asbestos-related personal injury claims or claims related to ZAI, which will be dealt with separately.

Approximately 14,900 proofs of claim were filed by the bar date. Of these claims, approximately 9,400 were non-asbestos related, approximately 4,300 were for asbestos-related property damage (discussed above), and approximately 1,000 were for medical monitoring. The medical monitoring claims were made by individuals who allege exposure to asbestos through Grace's products or operations. These claims, if sustained, would require Grace to fund ongoing health monitoring costs for qualified claimants. In addition, approximately 765 proofs of claim were filed after the bar date.

Approximately 7,000 of the non-asbestos related claims involve claims by employees or former employees for future retirement benefits such as pension and retiree medical coverage. Grace views most of these claims as contingent and has proposed a plan of reorganization that would retain such benefits. The other non-asbestos related claims include claims for payment of goods and services, taxes, product warranties, principal and interest under pre-petition credit facilities, amounts due under leases and other contracts, leases and other executory contracts rejected in the Bankruptcy Court, environmental remediation, indemnification or contribution to actual or potential co-defendants in asbestos-related and other litigation, pending non-asbestos-related litigation, and non-asbestos-related personal injury.

Grace has analyzed the claims as filed and has found that many are duplicates, represent the same claim filed against more than one of the debtors in the Chapter 11 proceeding, lack any supporting documentation, or provide insufficient supporting documentation. As of December 31, 2005, Grace had filed objections to approximately 5,400 claims (approximately 100 of which were subsequently withdrawn), approximately 3,950 of which were asbestos property damage claims. Of the 5,300 claims, approximately 2,100 have been expunged, approximately 200 have been resolved, approximately 1,800 have been withdrawn by claimants, and the remaining approximately 1,200 will be addressed through the claims objection process and the dispute resolution procedures approved by the Bankruptcy Court.

Grace believes that its recorded liabilities for claims subject to the bar date represent a reasonable estimate of the ultimate allowable amount for claims that are not in dispute or have been submitted with sufficient information to both evaluate the merit and estimate the value of the claim. As claims are resolved, or where better information becomes available and is evaluated, Grace will make adjustments to the liabilities recorded on its financial statements as appropriate. Any such adjustments could be material to its consolidated financial position and results of operations.

## Item 4.   SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

This Item is inapplicable, as no matters were submitted to a vote of our security holders during the fourth quarter of 2005.

28

## PART II

## Item 5.   MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED SHAREHOLDER MATTERS.

Except as provided below, the information called for by this Item appears in the Financial Supplement under the heading "Financial Summary" opposite the caption "Other Statistics – Common shareholders of record" (page F-44); under the heading "Quarterly Summary and Statistical Information – Unaudited" opposite the caption "Market price of common stock" (page F-43); and in Note 15 to the Consolidated Financial Statements (pages F-32 through F-33).

On March 31, 1998, we paid a dividend of one Preferred Stock Purchase Right on each share of Grace common stock. Subject to our prior redemption for $.01 per right, rights will become exercisable on the earlier of:

- 10 days after an acquiring person, comprised of an individual or group, has acquired beneficial ownership of 20% or more of the outstanding Grace common stock or

- 10 business days (or a later date fixed by the Board of Directors) after an acquiring person commences (or announces the intention to commence) a tender offer or exchange offer for beneficial ownership of 20% or more of the outstanding Grace common stock.

Until these events occur, the rights will automatically trade with the Grace common stock, and separate certificates for the rights will not be distributed. The rights do not have voting or dividend rights.

Generally, each right not owned by an acquiring person:

- will initially entitle the holder to buy from Grace one hundredth of a share of the Grace Junior Participating Preferred Stock, at an exercise price of $100, subject to adjustment;

- will entitle such holder to receive upon exercise, in lieu of shares of Grace junior preferred stock, that number of shares of Grace common stock having a market value of two times the exercise price of the right; and

- may be exchanged by Grace for one share of Grace common stock or one hundredth of a share of Grace junior preferred stock, subject to adjustment.

Generally, if there is an acquiring person and we are acquired, each right not owned by an acquiring person will entitle the holder to buy a number of shares of common stock of the acquiring company having a market value equal to twice the exercise price of the right.

Each share of Grace junior preferred stock will be entitled to a minimum preferential quarterly dividend payment of $1.00 per share but will be entitled to an aggregate dividend equal to 100 times the dividend declared per share of Grace common stock whenever such dividend is declared. In the event of liquidation, holders of Grace junior preferred stock will be entitled to a minimum preferential liquidation payment of $100 per share but will be entitled to an aggregate payment equal to 100 times the payment made per share of Grace common stock. Each share of Grace junior preferred stock will have 100 votes, voting together with the Grace common stock. Finally, in the event of any business combination, each share of Grace junior preferred stock will be entitled to receive an amount equal to 100 times the amount received per share of Grace common stock. These rights are protected by customary antidilution provisions.

The terms of the rights may be amended by the Board of Directors without the consent of the holders of the rights. The rights, which will remain outstanding under the proposed plan of reorganization, are currently scheduled to expire on March 31, 2008.

This summary of the rights does not purport to be complete and is qualified in its entirety by reference to the Rights Agreement, which was filed as Exhibit 4.1 to the Grace Form 8-K filed on April 8, 1998.

## Item 6.   SELECTED FINANCIAL DATA

The information called for by this Item appears under the heading "Financial Summary" (page F-44 of the Financial Supplement) and in Notes 1, 2, 3, 4, 10, 13 and 14 to the Consolidated Financial Statements (pages F-10 through F-24, and F-27 through F-32 of the Financial Supplement), which is incorporated herein by reference. In addition, Exhibit 12 to this Report (page F-66 of the Financial Supplement) contains the ratio of earnings to fixed charges and combined fixed charges and preferred stock dividends for Grace for the years 2001-2005 .

## Item 7.   MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The information called for by this Item appears on pages F-45 through F-63 of the Financial Supplement, which is incorporated herein by reference.

CC-BLG003133

Item 7A.    QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

The information called for by this Item appears in Notes 12 and 13 to the Consolidated Financial Statements (pages F-28 through F-29 of the Financial Supplement) and under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations – Risk Management" (pages F-62 through F-63 of the Financial Supplement) which is incorporated herein by reference.

Item 8.    FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

See the Index to Consolidated Financial Statements and Financial Statement Schedule and Exhibit on page F-2 of the Financial Supplement, which is incorporated herein by reference.

Item 9.    CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND
            FINANCIAL DISCLOSURE

None.

Item 9A.    CONTROLS AND PROCEDURES

The information called for by this Item appears under the heading "Management's Report on Financial Information and Internal Controls" on page F-3 of the Financial Supplement, which is incorporated herein by reference. In addition, there was no change in Grace's internal control over financial reporting during the quarter ended December 31, 2005 that has materially affected, or is reasonably likely to materially affect, Grace's internal control over financial reporting.

Item 9B.    OTHER INFORMATION

None.

30

---

PART III

Item 10.    DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

Our current directors and executive officers are listed below. Our Certificate of Incorporation provides for the division of the Board of Directors into three classes, each to serve for a three-year term or until their respective successors are elected. In view of the Chapter 11 filing, the directors are continuing to serve beyond the expiration of their respective terms. Executive officers are elected to serve until the next annual meeting of the Board of Directors or until their respective successors are elected.

| Name and Age | Office | First Elected |
|---|---|---|
| John F. Akers (71) | Class II Director | 5/09/97 |
| H. Furlong Baldwin (74) | Class I Director | 1/16/02 |
| Ronald C. Cambre (67) | Class III Director | 9/01/98 |
| Alfred E. Festa (46) | Class II Director | 9/08/04 |
|  | President and Chief Executive Officer | 6/01/05* |
| Marye Anne Fox (58) | Class I Director | 5/10/96 |
| John J. Murphy (74) | Class II Director | 5/09/97 |
| Paul J. Norris (58) | Class III Director (Chairman) | 1/01/99 |
| Thomas A. Vanderslice (74) | Class I Director and Lead Independent Director | 5/10/96 |
| Richard C. Brown (46) | Vice President | 5/01/05 |
| Gregory E. Poling (50) | Vice President | 3/03/05* |
| William M. Corcoran (56) | Vice President | 6/01/99 |
| W. Brian McGowan (56) | Senior Vice President | 7/09/98* |
| Robert M. Tarola (55) | Senior Vice President and Chief Financial Officer | 5/11/99 |
| Mark A. Shelnitz (47) | Vice President, General Counsel and Secretary | 4/27/05* |

*  Mr. Festa was elected President and Chief Executive Officer on January 19, 2005 to be effective June 1, 2005. Messrs. Poling, McGowan and Shelnitz joined Grace on July 18, 1977, February 5, 1979 and October 3, 1983, respectively.

*Mr. Akers* served as Chairman of the Board and Chief Executive Officer of International Business Machines Corporation from 1985 until his retirement in 1993. He is also a director of Lehman Brothers Holdings, Inc., The New York Times Company and PepsiCo, Inc.

*Mr. Baldwin* served as a director of Mercantile Bankshares Corporation from 1970 to 2003, and as Chairman of the Board from 1984 to 2003. From 1976 to 2001 he served as President and Chief Executive Officer. Mr. Baldwin is Chairman of NASDAQ Stock Market, Inc., and also a director of Platinum Underwriters Holdings, Ltd. and Allegheny Energy Inc.

*Mr. Cambre* is retired Chairman of the Board and CEO of Newmont Mining Corporation. He joined Newmont as Vice Chairman and CEO in 1993 and retired as CEO in 2000 and as Chairman in 2001. He is also a director of Cleveland-Cliffs Inc., McDermott International, Inc. and Inco Limited.

*Mr. Festa* joined Grace in 2003 and served as President and Chief Operating Officer until he became Chief Executive Officer in June 2005. Prior to joining Grace, Mr. Festa was a partner of Morganthaler Private Equity Partners, a venture capital and buyout firm from 2002 to 2003. From 2000 to 2002, he was with ICG Commerce, Inc., a private company providing on-line procurement services, where he last served as President and Chief Executive Officer. For two years prior to that, he served as Vice President and General Manager of AlliedSignal's performance fibers business.

*Dr. Fox* has been Chancellor of the University of California-San Diego and a Professor of Chemistry at that institution since 2004. She was Chancellor of North Carolina State University from 1998 to 2004. She is also a director of Boston Scientific Corporation, Red Hat, Inc. and Pharmaceutical Product Development, Inc.

*Mr. Murphy* served as Chairman of the Board of Dresser Industries, Inc., a supplier of products and technical services to the energy industry, until 1996. From 1997 to 2000, he was a Managing Director of SMG Management L.L.C., a privately owned investment group. Mr. Murphy is also a director of CARBO Ceramics, Inc. and ShawCor Ltd.

*Mr. Norris* was actively engaged in Grace's business for the past six years until his retirement as Chief Executive Officer in 2005. He was a director of Borden Chemical, Inc. until August 2004 and is currently a director of FMC Corporation and the

31

CC-BLG003134

Sealy Mattress Corp. He continues to perform advisory services for Kohlberg Kravis Roberts & Co., currently the principal shareholder of the Sealy Mattress Corp, and formerly the principal shareholder of Borden.

*Mr. Vanderslice* served as Chairman and Chief Executive Officer of M/A-COM, Inc., a designer and manufacturer of radio frequency and microwave components, devices and subsystems for commercial and defense applications, from 1989 until 1995. He is currently a private investor. As Lead Independent Director of Grace's Board, he presides at all executive sessions.

*Messrs. Corcoran, McGowan, Poling, Shelnitz and Tarola* have been actively engaged in Grace's business for the past five years. Mr. Tarola is a director of 23 registered mutual funds sponsored by Legg Mason, Inc.

*Mr. Brown* was an executive in the plastics and specialty materials businesses of General Electric Co. in various positions of increasing responsibility for 19 years before joining Grace in May 2005.

## BOARD INDEPENDENCE

The Board has determined that all directors, other than Mr. Festa (who is also Chief Executive Officer) and Mr. Norris (who was Chief Executive Officer until June 1, 2005) are independent under New York Stock Exchange rules because none of such directors has any direct or indirect material relationship with Grace or our affiliates, other than through his or her service as a director and as an owner of less than 1% of Grace common stock. This determination was based on a number of factors, principal among them were the following:

- none of these directors, nor any member of their immediate families is (or at any time during the last three years was) a Grace executive officer or employee, or an executive officer of any other entity with whom we do business;

- none of these directors or any member of their immediate families has, during the last three years, received any compensation from Grace (other than Board retainer and meeting fees); and

- none of these directors serve, or within the last three years served, as an executive officer, director, trustee or fiduciary of any charitable organization to which we made any material donation.

Mr. Vanderslice has been appointed Lead Independent Director and, in this capacity, presides at executive sessions of non-management independent directors. Interested parties may communicate with Mr. Vanderslice by writing him at the following address: Thomas A. Vanderslice – Lead Independent Director, c/o W. R. Grace & Co., 7500 Grace Drive, Columbia, Maryland 21044.

## AUDIT COMMITTEE

We have a standing Audit Commitee established in accordance with SEC rules. The Committee members are John F. Akers, H. Furlong Baldwin, Ronald C. Cambre, Marye Anne Fox, John J. Murphy, and Thomas A. Vanderslice, each of whom meet the independence standards of the SEC and New York Stock Exchange. Mr. Murphy serves as Chair of the Committee. The Board of Directors has determined that all Committee members are audit committee financial experts as defined by SEC regulations.

## OTHER COMMITTEES

We have standing Nominating and Governance, Compensation and Corporate Responsibility Committees. The members of each of these committees are John F. Akers, H. Furlong Baldwin, Ronald C. Cambre, Marye Anne Fox, John J. Murphy, and Thomas A. Vanderslice, each of whom meet the independence standards of the New York Stock Exchange. Mr. Vanderslice serves as Chair of the Nominating and Governance Committee, Mr. Akers serves as Chair of the Compensation Committee and Dr. Fox serves as Chair of the Corporate Responsibility Committee.

## SECTION 16(A) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

Under Section 16 of the Securities Exchange Act of 1934, as amended, our directors, certain of our officers, and beneficial owners of more than 10% of the outstanding Grace common stock are required to file reports with the SEC and the New York Stock Exchange concerning their ownership of and transactions in Grace common stock or other Grace securities; these persons are also required to furnish us with copies of these reports. Based upon the reports and related information furnished to us, with the exception of Mr. Shelnitz, who failed to disclose one holding on one Form 3 that was otherwise timely filed, we believe that all such filing requirements were complied with in a timely manner during and with respect to 2005.

## CODE OF ETHICS FOR PRINCIPAL OFFICERS

The Board of Directors and the Audit Committee have adopted Business Ethics and Conflicts of Interest policies, which apply to all of our directors, officers, and employees, including our principal officers. These policies are accessible through our Internet website, www.grace.com/corporategovernance, and are available in hard copy, free of charge, by contacting Grace Shareholder Services at 410-531-4167. We granted no waivers to these policies during 2005. We intend to promptly post on our website any amendments or waivers to these policies affecting any principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions.

## Item 11.   EXECUTIVE COMPENSATION

### SUMMARY COMPENSATION TABLE

The following table sets forth the compensation we paid for services rendered during each of the fiscal years ended December 31, 2005, 2004 and 2003 to Alfred E. Festa, our President and Chief Executive Officer and four most highly compensated executive officers who were executive officers as of December 31, 2005, determined by reference to total salary and bonus earned by such individuals for the 2005 fiscal year, Paul J. Norris, our Chief Executive Officer until June 2005 and Robert J. Bettacchi, a former employee who served as an executive officer until February 2005. Other compensation and benefits including stock option values and exercises, retirement benefits and benefits under employment agreements are set forth below.

| Name and Principal Position | Fiscal Year | Annual Compensation | | Other Annual Compensation (b) | Long-Term Compensation | | All Other Compensation (d) |
| | | Salary | Bonus (a) | | LTIP Payouts (c) | |  |
| --- | --- | --- | --- | --- | --- | --- | --- |
| A. E. Festa | 2005 | $ 714,167 . | $ 900,000 | $ 226,858 | $ 377,054 | $ | 42,734 |
| President and Chief | 2004 | 558,333 | 1,116,000 | 61,393 | 8,170 | | 9,850 |
| Executive Officer* | 2003 | 68,750 | 100,000 | -- | -- | | 2,078 |
| R. M. Tarola | 2005 | 408,167 | 375,000 | -- | 383,017 | | 42,523 |
| Senior Vice President | 2004 | 402,000 | 627,000 | -- | 56,950 | | 300,578 |
| and Chief Financial Officer | 2003 | 398,667 | 245,000 | -- | -- | | 298,240 |
| R. C. Brown | 2005 | 250,000 | 700,000 | -- | -- | | 950 |
| Vice President* | 2004 | -- | -- | -- | -- | | -- |

CC-BLG003135

| | Year | Salary | Bonus | Other Annual Compensation | LTIP Payouts | All Other Compensation |
|---|---|---|---|---|---|---|
| | 2003 | – | – | | | |
| G. E. Poling | 2005 | 347,910 | 350,000 | – | 257,250 | 27,515 |
| Vice President | 2004 | 280,000 | 392,000 | – | 38,250 | 207,489 |
| | 2003 | 256,667 | 150,000 | – | | 188,379 |
| W. M. Corcoran | 2005 | 207,833 | 230,000 | – | 171,500 | 29,665 |
| Vice President | 2004 | 251,000 | 378,000 | – | 25,500 | 225,320 |
| | 2003 | 287,667 | 155,000 | – | | 221,625 |
| P. J. Norris | 2005 | 416,667 | 609,375 | 62,434 | 1,660,120 | 321,811 |
| Former Chief Executive | 2004 | 1,000,000 | 2,500,000 | 62,295 | 246,840 | 1,354,750 |
| Officer* | 2003 | 1,000,000 | 1,000,000 | | | 1,349,700 |
| R. J. Bettacchi | 2005 | 385,000 | 308,000 | – | 480,200 | 43,321 |
| Former Senior Vice | 2004 | 381,667 | 610,000 | – | 71,400 | 287,680 |
| President* | 2003 | 370,667 | 300,000 | – | | 280,835 |

\* Mr. Norris served as Chief Executive Officer until his retirement on May 31, 2005. Mr. Festa, then President and Chief Operating Officer, was elected Chief Executive Officer effective June 1, 2005. Mr. Norris remains non-executive Chairman of the Board of Directors. Mr. Brown joined Grace on May 1, 2005. Mr. Bettacchi was placed on administrative leave and was no longer an executive officer as of February 7, 2005 and retired on January 31, 2006.

(a) For 2005, other than for Mr. Brown, amount consists of bonus earned under the Annual Incentive Compensation Plan, or AICP, during 2005, that we expect to pay in March 2006. For Mr. Brown, amount includes amount earned under the AICP that we expect to pay in March 2006 and a signing bonus of $350,000 paid in 2005.

(b) This column includes our aggregate incremental cost of providing personal benefits if the aggregate amount of personal benefits provided to the individual equals or exceeds the lesser of $50,000 or 10% of the total of salary and bonus for the individual for the year. The following personal benefits represent at least 25% of the total amount of Other Annual Compensation for the indicated individual for the indicated year and we are required to separately report them under SEC rules:

    (i) for Mr. Festa, for 2005, $156,996 for expenses in connection with his purchase of a home in the Columbia, Maryland area and, for 2004, $48,000 as a housing allowance pending his relocation; and

    (ii) for Mr. Norris, for personal use of Grace-provided aircraft $55,420 in 2005 and $44,694 in 2004.

(c) For 2005, amount consists of the final payment under the 2002-2004 Long-Term Incentive Program, or LTIP, and a partial payment under the 2003-2005 LTIP.

(d) For 2005, amount consists of the following:

    (i) payments made to persons whose personal and/or Grace contributions to the Savings and Investment Plan, or Savings Plan, would be subject to limitations under federal income tax law, as follows: Mr. Festa – $27,200, Mr. Tarola – $26,520, Mr. Brown $-0-, Mr. Poling – $13,500, Mr. Corcoran – $14,460, Mr. Norris – $107,700, and Mr. Bettacchi – $28,600;

    (ii) our contributions to the Savings Plan, as follows: Mr. Festa – $12,600; Mr. Tarola – $12,600, Mr. Brown – $-0-; Mr. Poling – $12,600; Mr. Corcoran – $12,600; Mr. Norris – $12,600; and Mr. Bettacchi – $12,600;

    (iii) the value of Grace-provided personal liability insurance, as follows: Mr. Festa – $1,120; Mr. Tarola – $840; Mr. Brown – $373; Mr. Poling – $560; Mr. Corcoran – $560; Mr. Norris – $817; and Mr. Bettacchi – $840;

    (iv) the value of Grace-provided life insurance, as follows: Mr. Festa – $1,814; Mr. Tarola – $2,563; Mr. Brown – $577; Mr. Poling – $855; Mr. Corcoran – $2,045; Mr. Norris – $-0-; and Mr. Bettacchi – $1,281; and

    (v) payments in the aggregate amount of $200,694 to Mr. Norris under his consulting agreement.

## ANNUAL INCENTIVE COMPENSATION PLAN

Our Annual Incentive Compensation Plan, or AICP, is a cash-based pay-for-performance incentive program, and its purpose is to motivate and reward executive officers, and other upper- and middle-level management employees, for their contributions to our performance by making a significant portion of their annual cash compensation variable and dependent upon our annual financial performance. The amount of an individual incentive award under the AICP is based upon:

- the individual's annual incentive target amount

- our pretax operating income, after certain adjustments

- the individual's personal performance

The Compensation Committee sets the annual incentive target amount for executive officers. The targets for the executive officers (other than Mr. Festa whose annual incentive compensation awards are governed by his employment agreement) range from 65% to 78% of base salary and actual awards may range from $-0- to an amount equal to twice the target amount. In order to generate an amount sufficient to pay all participants their target award for 2006 (allowing for individual differentiation as described above), our pretax operating income, after certain adjustments, must be 8% higher than the prior year's pretax operating income. No awards are earned for any year if adjusted pretax operating income is less then 80% of the prior year's adjusted pretax operating income.

## STOCK OPTIONS GRANTED IN 2005

We granted no stock options during 2005.

CC-BLG003136

AGGREGATED OPTION EXERCISES IN 2005 AND DECEMBER 31, 2005 OPTION VALUE

| Name | Shares acquired on exercise (#) | Value realized ($) | No. of Shares Underlying Unexercised Options at 12/31/05 (#) Exercisable/Unexercisable | Value of Unexercised In-the-Money Options at 12/31/05 ($) Exercisable/Unexercisable |
|---|---|---|---|---|
| A. E. Festa | -0- | -0- | -0-/-0- | -0-/-0- |
| R. M. Tarola | -0- | -0- | 202,900/-0- | $194,184/-0- |
| R. C. Brown | -0- | -0- | -0-/-0- | -0-/-0- |
| G. E. Poling | 7,076 | $29,563 | 126,948/-0- | $114,840/-0- |
| W. M. Corcoran | -0- | -0- | 84,800/-0- | $ 85,600/-0- |
| P. J. Norris* | -0- | -0- | 1,165,026/-0- | $842,160/-0- |
| R. J. Bettacchi | 111,659 | $420,181 | 312,287/-0- | $243,600/-0- |

\* See description of Mr. Norris' employment agreement below for discussion of stock appreciation rights component of 439,026 options

## LONG-TERM INCENTIVE PROGRAM

Our long-term incentive programs, or LTIPs, generally are designed to provide key employees with incentives for sustained performance over a multi-year period. In 2005, the Board of Directors and the Bankruptcy Court approved the 2005 LTIP for key employees for the 2005-2007 performance period. Awards under the 2005 LTIP are payable 100% in cash, based on the extent to which we achieve certain pretax earnings targets over the three-year performance period. Employees who become entitled to award payments under the 2005 LTIP will generally be paid in two installments: one in the first quarter of 2007 (as partial payment based on performance for the first two years of the three-year performance period), and the other in the first quarter of 2008 (which will consider performance for the complete three-year performance period and will be offset by the amount of the prior installment). Generally, a key employee forfeits his or her right to receive an installment of an award if, prior to the payment of the installment, the employee ceases employment with us prior to age 62.

The following table sets forth threshold, targeted and maximum awards granted under the LTIPs during 2005:

| Name | Units or Other Rights | Performance or Other Period Until Maturation or Payout | Estimated Future Payouts Under Non-Stock Price-Based Plans | | |
|---|---|---|---|---|---|
| | | | Threshold | Target | Maximum |
| A. E. Festa | $1,690,000 | 2005-2007 | $-0- | $1,690,000 | $3,380,000 |
| R. M. Tarola | 350,000 | 2005-2007 | -0- | 350,000 | 700,000 |
| R. C. Brown | 355,600* | 2005-2007 | -0- | 355,600 | 711,200 |
| | 222,000* | 2004-2006 | -0- | 222,000 | 444,000 |
| | 89,000* | 2003-2005 | -0- | 89,000 | 178,000 |
| G. E. Poling | 400,000 | 2005-2007 | -0- | 400,000 | 800,000 |
| W. M. Corcoran | 250,000 | 2005-2007 | -0- | 250,000 | 500,000 |
| P. J. Norris | — | — | — | — | — |
| R. J. Bettacchi | — | — | — | — | — |

\* Reflects proration of LTIP award to reflect the actual time during the applicable performance period that Mr. Brown was an employee

## PENSION ARRANGEMENTS

Full-time salaried employees who are 21 or older and who have one or more years of service are eligible to participate in our Retirement Plan for Salaried Employees. Under this basic retirement plan, pension benefits are based upon (a) the employee's average annual compensation for the 60 consecutive months in which his or her compensation is highest during the last 180 months of continuous participation, and (b) the number of years of the employee's credited service. For purposes of this basic retirement plan, compensation generally includes nondeferred base salary and AICP awards; however, for 2005, federal income tax law limited to $210,000 the annual compensation on which benefits under this plan may be based.

35

We also have a Supplemental Executive Retirement Plan under which a covered employee will receive the full pension to which he or she would be entitled in the absence of the limitations described above and other limitations imposed under federal income tax law. In addition, this supplemental plan recognizes deferred base salary, deferred annual incentive compensation awards and, in some cases, periods of employment during which an employee was ineligible to participate in the basic retirement plan. (Commencing in 2001, we no longer permit deferrals of base salary or incentive compensation.)

The following table shows the annual pensions payable under the basic and supplemental plans for different levels of compensation and years of credited service. The amounts shown have been computed on the assumption that the employee retired at age 65 on January 1, 2006, with benefits payable on a straight life annuity basis. Such amounts are subject to (but do not reflect) an offset of 1.25% of an estimate of the employee's primary Social Security benefit at retirement age for each year of credited service under the basic and supplemental plans. The basic and supplemental plans provide for decreased pension payments to employees that opt for early retirement ranging from 83% for retirement at age 55 to 100% for retirement at age 62.

| Highest Average Annual Compensation | Years of Credited Service | | | | | |
|---|---|---|---|---|---|---|
| | 10 Years | 15 Years | 20 Years | 25 Years | 30 Years | 35 Years |
| $200,000 | 30,000 | 45,000 | 60,000 | 75,000 | 90,000 | 105,000 |
| 300,000 | 45,000 | 67,500 | 90,000 | 112,500 | 135,000 | 157,500 |
| 400,000 | 60,000 | 90,000 | 120,000 | 150,000 | 180,000 | 210,000 |
| 500,000 | 75,000 | 112,500 | 150,000 | 187,500 | 225,000 | 262,500 |
| 600,000 | 90,000 | 135,000 | 180,000 | 225,000 | 270,000 | 315,000 |
| 700,000 | 105,000 | 157,500 | 210,000 | 262,500 | 315,000 | 367,500 |
| 800,000 | 120,000 | 180,000 | 240,000 | 300,000 | 360,000 | 420,000 |
| 900,000 | 135,000 | 202,500 | 270,000 | 337,500 | 405,000 | 472,500 |

CC-BLG003137

| 1,000,000 | 150,000 | 225,000 | 300,000 | 375,000 | 450,000 | 525,000 |
| 1,200,000 | 180,000 | 270,000 | 360,000 | 450,000 | 540,000 | 630,000 |
| 1,400,000 | 210,000 | 315,000 | 420,000 | 525,000 | 630,000 | 735,000 |
| 1,600,000 | 240,000 | 360,000 | 480,000 | 600,000 | 720,000 | 840,000 |
| 1,800,000 | 270,000 | 405,000 | 540,000 | 675,000 | 810,000 | 945,000 |
| 2,000,000 | 300,000 | 450,000 | 600,000 | 750,000 | 900,000 | 1,050,000 |
| 2,200,000 | 330,000 | 495,000 | 660,000 | 825,000 | 990,000 | 1,155,000 |
| 2,400,000 | 360,000 | 540,000 | 720,000 | 900,000 | 1,080,000 | 1,260,000 |

The table below sets forth the 2005 qualifying compensation and the amount of credited service under our basic and supplemental retirement plans as of December 31, 2005, for the following individuals:

36

| Name | 2005 Qualifying Compensation | Years of Service as of December 31, 2005 |
| --- | --- | --- |
| A. E. Festa | $830,168 | 2.0833 years |
| R. M. Tarola (a) | 1,035,167 | 6.5845 years |
| R. C. Brown (a) | 250,000 | 0.6667 years |
| G. E. Poling | 740,333 | 25.4155 years |
| W. M. Corcoran (a) | 675,833 | 6.5833 years |
| P. J. Norris (a) (b) | 2,916,667 | 13.2500 years |
| R. J. Bettacchi | 995,000 | 34.0000 years |

(a)  Messrs. Norris, Tarola, Brown and Corcoran are entitled to additional pension benefits under their respective employment agreements.

(b)  Mr. Norris' years of credited service include his eligible service with Grace from 1975 to 1981.

## EMPLOYMENT AND CONSULTING AGREEMENTS

*Alfred E. Festa .* In 2005, The Compensation Committee and the Bankruptcy Court approved the terms of a written agreement, dated January 19, 2005, the Festa CEO Agreement, pursuant to which Mr. Festa assumed the position of Chief Executive Officer of Grace on June 1, 2005. The term of the Festa CEO Agreement is for four years, ending on May 31, 2009. Under the Festa CEO Agreement, Mr. Festa is entitled to an initial base annual salary of $760,000. His targeted award under the AICP for 2005 and each calendar year thereafter is 100% of his base salary earned during the applicable year (or greater, as determined by the Board). Under the Festa CEO Agreement, he may also participate in the Grace LTIPs and under the 2005 LTIP (which covers the 2005-2007 performance period), Mr. Festa's targeted award is $1,690,000. Mr. Festa would not be entitled to any unpaid award under the AICP or any LTIP if his employment with Grace terminates prior to the date that the award is paid to active Grace employees, except that Mr. Festa would be entitled to a pro-rated portion of such an unpaid award in the event that we terminate his employment without cause, he terminates his employment as a result of constructive discharge, or his employment terminates as a result of his death or disability before the applicable payment date. Also, under the terms of the Festa CEO Agreement, if we terminate Mr. Festa's employment without cause, or he terminates his employment as a result of constructive discharge, prior to the expiration of the Agreement, he would be entitled to a severance payment equal to 2 times a dollar amount equal to 175% of his annual base salary at the time of his termination.

The Festa CEO Agreement also provides that Mr. Festa will be entitled to a Chapter 11 retention bonus of $1,750,000, payable in two installments. The first installment will be in the amount of $750,000 and be paid 6 months after we emerge from Chapter 11, and the remaining balance of $1,000,000 will be paid 18 months after we emerge. However, if we do not emerge from Chapter 11 within 36 months after the filing of an initial plan of reorganization (i.e., by November 13, 2007), then Mr. Festa would be paid the retention bonus as follows: $750,000 would be paid 36 months after the plan of reorganization was filed, and $1,000,000 would be paid 48 months after plan of reorganization was filed. Mr. Festa would not be entitled to any installment of the emergence bonus if his employment is terminated prior to the date the installment is scheduled for payment, except in the case where his termination occurs after we emerge from Chapter 11 and is the result of (i) his resignation as a result of constructive discharge, (ii) termination by us not for cause, or (iii) his death or disability. In addition, Mr. Festa will generally be eligible to participate in other compensation and benefit plans and programs that are provided to our other senior executives, including the fringe benefits specified below under the heading ''Executive Fringe Benefits''.

Prior to June 1, 2005, Mr. Festa served as Chief Operating Officer pursuant to an employment agreement dated November 17, 2003, the Festa COO Agreement. Under the Festa COO Agreement, Mr. Festa was entitled to an initial annual base salary of $550,000. Under the Festa COO Agreement, Mr. Festa also participated in the LTIP for the 2003-2005 performance period under which his targeted award was $687,000, pro-rated to reflect the percentage of days that he was an active employee during the performance period. The Festa COO Agreement became void on June 1, 2005, when Mr. Festa became CEO. The foregoing description of the Festa CEO Agreement does not purport to be complete and is qualified in its entirety by reference to the Festa CEO Agreement, which has been filed with the SEC.

*Robert M. Tarola.*    Mr. Tarola had an employment agreement that expired on November 10, 2002. Under terms of the agreement that survived the expiration date, if Mr. Tarola is terminated without cause, he will generally be entitled to a severance payment equal to 145% of his annual base salary at the time of termination. (However, along with the other

37

executive officers and certain key employees, Mr. Tarola has entered into a retention agreement, described below, under which he may be entitled to enhanced severance pay in lieu of, but not in addition to, the severance pay provided under his employment agreement.) In addition, the benefits payable to Mr. Tarola under the basic and supplemental retirement plans will continue to be determined by adding additional years of credited service under those plans. Generally, for each year of credited service under those plans that he actually earns during his period of employment, he will receive credit for one additional year of credited service (up to a maximum of 10 additional years of credited service). The foregoing description of Mr. Tarola's employment agreement does not purport to be complete and is qualified in its entirety by reference to the agreement, which has been filed with the SEC.

*Richard C. Brown.*    In 2005, the Board of Directors approved the terms of a written agreement, dated April 22, 2005, providing for Mr. Brown's employment as a Vice President of Grace and President of Grace Performance Chemicals effective May 1, 2005. Under the terms of the Brown Agreement, Mr. Brown received a ''sign-on'' bonus of $350,000 (which he must re-pay if he terminates his employment with Grace anytime before May 1, 2006) and is entitled to an initial base annual salary of $375,000. He is also entitled to participate in the AICP and, for the 2005 calendar year, he is guaranteed a minimum AICP payout of $285,000. In addition, Mr. Brown received targeted awards under the Grace LTIPs (subject to pro ration to reflect the actual time during the applicable performance period that Mr. Brown was an employee) as follows: $400,000 (prorated to $355,600) for the 2005-2007 performance

CC-BLG003138

period, $400,000 (prorated to $222,000) for the 2004-2006 performance period and $400,000 (prorated to $89,000) for the 2003-2005 performance period. The Brown Agreement also provides that Mr. Brown is entitled to a severance payment equal to 1.5 times his annual base salary if he is involuntarily terminated by us under conditions that would entitle him to severance under the general severance pay plan for our salaried employees. Mr. Brown is also entitled to a supplemental pension benefit (in addition to any pension benefit that may otherwise accrue under the Salaried Retirement Plan and Supplemental Retirement Plan), which will be calculated by applying the benefit formula of the retirement plans to additional years of credited service, as follows: Mr. Brown will be credited with an additional year of credited service for each year he remains an employee for the first four years of his employment, and with six additional years of service as of his fifth anniversary of employment (provided he is still employed by Grace as of that anniversary), for a maximum total of 10 additional years of credited service. If Mr. Brown is terminated for cause prior to the fifth anniversary, he will be entitled to a prorated portion of the supplemental pension benefit. The supplemental pension benefit will be paid to Mr. Brown from our general assets. The foregoing description of Mr. Brown's employment agreement does not purport to be complete and is qualified in its entirety by reference to the agreement, which has been filed with the SEC.

*William M. Corcoran.*  Mr. Corcoran had an employment agreement that expired on May 31, 2002. Under terms of the agreement that survived the expiration date, if Mr. Corcoran is terminated without cause, he will generally be entitled to a severance payment equal to 137% of his annual base salary at the time of termination. (However, along with other executive officers and certain key employees, Mr. Corcoran has entered into a retention agreement, described below, under which he may be entitled to enhanced severance pay in lieu of, but not in addition to, the severance pay provided under his employment agreement.) In addition, the benefits payable to Mr. Corcoran under the basic and supplemental retirement plans will continue to be determined by adding additional years of credited service under those plans. Generally, for each year of credited service under those plans that he actually earns during his period of employment, he will receive credit for an additional one-half year of credited service (up to a maximum of 5 additional years of credited service). The foregoing description of Mr. Corcoran's employment agreement does not purport to be complete and is qualified in its entirety by reference to the agreement, which has been filed with the SEC.

*Paul J. Norris .* Mr. Norris retired as CEO effective May 31, 2005 but remains non-executive Chairman of the Board. The Compensation Committee and the Bankruptcy Court have approved an arrangement with Mr. Norris under which he provides consulting services to our CEO and other executives with respect to our Chapter 11 proceeding and other matters, in accordance with a consulting agreement dated January 19, 2005, which is described below.

Effective January 1, 2003, Mr. Norris entered into a letter agreement, whereby his employment agreement, dated January 1, 2001, was extended beyond its original termination date of December 31, 2002, and was amended as described herein. The 2001 Agreement superceded Mr. Norris' original employment agreement, dated October 26, 1998. Except as amended by the Letter Agreement, the provisions of the 2001 Agreement remained applicable to Mr. Norris during his entire post-2002 employment term.

During his post-2002 employment term, Mr. Norris was entitled under the 2001 Agreement to an annual base salary of not less than $875,000 and he continued to participate in the AICP, under which his targeted award was required to be at least 75% of his annual base salary. Since January 1, 2003, while he remained CEO, Mr. Norris' annual base salary was $1,000,000, and his targeted percentage for his AICP award was 125%.

---

Under the terms of the Letter Agreement, Mr. Norris received a $1,235,000 retention bonus for services performed during 2004. Pursuant to a separate agreement, 50% of the 2004 retention bonus was made subject to the achievement of specified earnings targets for 2004 and, as a result of the achievement of those targets, was paid in the first quarter of 2005.

Also, under the 1998 Agreement, he received upon his commencement of employment on November 1, 1998 a non-statutory stock option grant covering 439,026 shares of Grace Common Stock pursuant to the 1998 Stock Incentive Plan. Both the 1998 Agreement and the 2001 Agreement provide that we will make a stock appreciation payment to Mr. Norris, at the time he elects to exercise any options under that stock option grant or at the time he elects to cancel the options, provided that the price of a share of Grace Common Stock is above $10.25 at the time. The payment will be equal to the product of the number of shares exercised (or cancelled), multiplied by the difference between (a) the purchase price per share ($16.75), or the price of a share of Grace Common Stock on the date of such exercise, if less than the purchase price per share, and (b) $10.25. As of February 1, 2006, the total amount of the option grant covering 439,026 shares remains unexercised and uncancelled. Mr. Norris will have the right to exercise (or cancel) these options at any time until May 31, 2008 (3 years after his retirement as CEO), in accordance with the terms of the 1998 Stock Incentive Plan.

Under the Letter Agreement, Mr. Norris was obligated to provide at least 180 days written prior notice of his intention to resign his employment in order to receive certain benefits and payments upon termination, which were originally specified under the 1998 Agreement. Since Mr. Norris satisfied this notice requirement, he received the following benefits and payments upon his retirement as CEO:

- A lump sum payment in the total amount of $6,396,645, comprised of the following components: $2,966,189 as a supplemental pension payment calculated (as described below) in accordance with the terms of his 2001 Agreement; and $3,137,093 as the lump sum payment of his accrued benefits under the supplemental executive retirement plan. (Mr. Norris was also paid a lump sum payment of $293,363 under the basic retirement plan.) The supplemental pension payment was determined by (a) calculating the benefits payable to Mr. Norris under the basic and supplemental retirement plans, based upon his years of service plus his service with his prior employer as if those years of service were with us, (b) offsetting the amount of those benefits by the retirement benefits payable from his prior employer's retirement plans and by the benefits to which he is otherwise entitled under the basic and supplemental executive retirement plans, and then (c) discounting the remaining amount of those benefits to derive a present value (using assumptions applicable to lump sum calculations under the basic retirement plan) payable as of his retirement date. In addition, his 2001 Agreement provided that we will pay Mr. Norris his accrued benefits under the supplemental retirement plan as a lump sum upon retirement. (The terms of that plan generally provide that all benefits thereunder must be paid as monthly annuity benefits.)

- A 2005 AICP award, payable in March 2006 and pro-rated based on the portion of 2005 that Mr. Norris remained an employee. Based on a target annual incentive award of 125% of base salary, his May 31, 2005 retirement date and Grace's achievement of its earnings targets, Mr. Norris is entitled to $609,375.

- An award under both the 2003 LTIP and the 2004 LTIP, pro-rated based on the portion of the applicable LTIP performance period during which Mr. Norris remained an employee of Grace. In March 2006, we expect to make payments to Mr. Norris in the amount of $896,207 as a final payment under the 2003 LTIP and $228,556 as a partial payment under the 2004 LTIP. Mr. Norris is entitled to the final payment under the 2004 LTIP in March 2007.

- Mr. Norris is also entitled to post-employment residential relocation assistance, to any location within the continental United States selected by Mr. Norris. This relocation assistance would include a lump sum cash payment equal to two months of his base salary, grossed up to account for applicable income taxes, reimbursement of household moving expenses and other expenses under our relocation policy applicable to current employees and compensation for any loss on the sale of Mr. Norris' Maryland residence. In order to receive this relocation assistance, Mr. Norris must move his residence no later than 2 years after he ceases to be a member of our Board of Directors. If Mr. Norris becomes entitled to relocation assistance, we estimate that the total cost would be approximately $440,000, comprised of a cash payment of approximately $280,000 (including base payment plus income tax gross up), moving expenses of approximately $150,000, and no residence sale loss payment.

The 2001 Agreement also provided for Mr. Norris' participation in other benefits and compensation programs generally available to other Grace senior executives while he remained employed by Grace, including the fringe benefits specified below under the heading "Executive Fringe Benefits".

*Norris Consulting Agreement  −*  Mr. Norris has entered into a consulting agreement dated January 19, 2005, under which he continues to monitor our Chapter 11 proceedings and provides consulting services and advice to our CEO, certain of our

CC-BLG003139

employees and the Board of Directors, regarding those proceedings and other matters. Under the Norris Consulting Agreement, Mr. Norris performs services as an independent contractor, and retains no authority to enter into agreements on our behalf and has no management or supervisory authority over our officers or employees. Under the Norris Consulting Agreement, Mr. Norris was initially paid a monthly retainer equal to $35,416.67 (i.e., $425,000 per year), provided that the retainer is subject to adjustment downward if Mr. Norris dedicates significantly less than one-half of a regular 40 hour work week to perform his duties under the Norris Consulting Agreement. Based on the amount of time Mr. Norris is currently devoting to his duties under the Norris Consulting Agreement, his monthly retainer has been adjusted to $10,625 ($127,500 per year). We anticipate that Mr. Norris will continue to provide services under the Norris Consulting Agreement until we emerge from Chapter 11 protection, provided that the Norris Consulting Agreement may be terminated by the Board of Directors or Mr. Norris at any time upon 30 days' written notice, without the obligation to make any post-termination payments, and in any event will terminate 90 days after we emerge from Chapter 11. During the period of the Norris Consulting Agreement, Mr. Norris will have access to office space and administrative services at our Columbia headquarters. In addition, during this period and so long as he remains a director, Mr. Norris will be eligible to receive the same compensation payable to our other non-employee directors. During 2005, we paid Mr. Norris $200,694 pursuant to the Norris Consulting Agreement.

The foregoing descriptions of Mr. Norris' employment agreements and consulting agreement do not purport to be complete and are qualified in their entirety by reference to the 1998 Agreement, the Letter Agreement and the Norris Consulting Agreement which have been filed with the SEC.

## EXECUTIVE FRINGE BENEFITS

During 2005, our executive officers were entitled to certain fringe benefits not otherwise generally available to our other employees. These benefits include personal financial counseling and tax preparation and a company car. In addition, Mr. Festa has access to a corporate aircraft under an agreement between Grace and NetJets Sales, Inc., which provides for approximately 100 flight hours per year. Other executive officers and key employees also are permitted to travel on such aircraft on occasion for business purposes. As of January 1, 2006, we will no longer provide a company car to our executive officers as a fringe benefit.

## CHANGE-IN-CONTROL SEVERANCE AGREEMENTS

In addition to the severance provisions described under "Retention Agreements" below, we have severance agreements with all of our executive officers, which renew automatically unless the Board of Directors elects not to renew them. These agreements generally provide that in the event of the involuntary termination of the individual's employment without cause (including constructive termination caused by a material reduction in his or her authority or responsibility or by certain other circumstances) following a "change in control," he or she will generally receive a severance payment equal to three times the sum of his or her annual base salary plus target annual incentive compensation (bonus), subject to pro rata reduction in the case of an executive officer who is within 36 months of normal retirement age (65). For purposes of the severance agreements, "change in control" means the acquisition of 20% or more of the outstanding Grace Common Stock (but not if such acquisition is the result of the sale of Common Stock by Grace that has been approved by the Board), the failure of Board-nominated directors to constitute a majority of any class of the Board of Directors, the occurrence of a transaction in which the Grace shareholders immediately preceding such transaction do not own more than 50% of the combined voting power of the entity resulting from such transaction, or the liquidation or dissolution of Grace.

This description of the severance agreements does not purport to be complete and is qualified in its entirety by reference to the form of such agreement, which has been filed with the SEC. As a result of Grace's Chapter 11 filing, the following events will not constitute a "change in control": (i) the acquisition of Grace Common Stock by a trust established for purposes of administering asbestos-related claims pursuant to a plan of reorganization, and (ii) a corporate transaction pursuant to Section 363 of the U.S. Bankruptcy Code or a plan of reorganization.

## RETENTION AGREEMENTS

We have entered into retention agreements with each of the executive officers, other than Mr. Festa and Mr. Brown, whose retention arrangements are covered by their respective employment agreements. These agreements were approved by the Compensation Committee in recognition of the adverse effect that the market performance of the Grace Common Stock has had and is expected to continue to have on our ability to attract and retain key employees. Under the terms of these agreements, in the event of the involuntary termination of the executive officer's employment under circumstances that would qualify the executive officer for severance pay under the severance plan that generally covers our salaried employees, the

40

---

executive officer would be entitled to severance pay equal to two times his or her annual base salary. With respect to any executive officer who has another agreement regarding the payment of severance upon termination of employment, if such executive officer becomes entitled to severance under both the terms of the retention agreement and the other agreement, then the executive officer would only receive severance pay under the retention agreement, unless the other agreement provides for a greater amount of severance pay (in which case, the executive officer would only receive severance pay under the other agreement).

## EXECUTIVE SALARY PROTECTION PLAN

All executive officers participate in the Executive Salary Protection Plan which provides that, in the event of a participant's disability or death prior to age 70, we will continue to pay all or a portion of base salary to the participant or a beneficiary for a period based on the participant's age at the time of disability or death. Payments under the plan may not exceed 100% of base salary for the first year and 60% thereafter in the case of disability (50% in the case of death). This description of the plan does not purport to be complete and is qualified in its entirety by reference to the text of the Executive Salary Protection Plan, as amended, which is filed with the SEC.

## DIRECTORS' COMPENSATION

Under the compensation program for nonemployee directors in effect until June 29, 2005, each nonemployee director received an annual retainer of $50,000 in cash, 50% of which was paid in January and 50% of which was paid in December. In addition, directors received $4,000 ($5,000 for directors holding a committee chair) in cash for each meeting date in respect of the Board meeting and all committee meetings held on that date.

Under the compensation program for nonemployee directors in effect following June 29, 2005, each nonemployee director receives an annual retainer of $75,000 in cash, 50% of which is paid in January and 50% of which is paid December. In addition, directors receive $6,000 ($7,000 for directors holding a committee chair and $9,000 for the lead independent director) in cash for each meeting date in respect of the Board meeting and all committee meetings held on that date. We expect this compensation program to remain in effect during 2006.

We reimburse nonemployee directors for expenses they incur in attending Board and committee meetings. We also maintain business travel accident insurance coverage for our directors.

## COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION

During 2005, the Compensation Committee of the Board was comprised of Messrs. Akers (Chair), Baldwin, Cambre, Murphy and Vanderslice, and Dr. Fox. None of our executive officers serves or in the past has served as a member of the board of directors or compensation committee of any entity that has one or more of its executive officers serving on our Board of Directors or our Compensation Committee None of these persons is our current or former officer or employee, nor did we have any reportable transactions with any of these persons.

41

CC-BLG003140

Item 12.   SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

SECURITY OWNERSHIP

The following table sets forth the amount of Grace common stock beneficially owned, directly or indirectly, as of January 31, 2006 by:

- each person that we know is the beneficial owner of more than 5% of the outstanding shares of Grace common stock

- each current director

- each of the individuals named in the Summary Compensation Table set forth in Item 11 above

- all directors and all executive officers as a group

| Name and Address of Beneficial Owner (1) | Shares of Common Stock Beneficially Owned | | Percent |
|---|---|---|---|
| Peninsula Partners, L.P. (2) | 10,765,600 | | 16.1% |
| 404B East Main Street, 2 nd Floor | | | |
| Charlottesville, VA 22902 | | | |
| | | | |
| Citadel Limited Partnership (3) | 4,060,868 | | 6.1% |
| Citadel Investment Group, L.L.C. | | | |
| Kenneth Griffin | | | |
| 131 S. Dearborn Street | | | |
| 32 nd Floor | | | |
| Chicago, Illinois 60603 | | | |
| | | | |
| Max Holmes (4) | 1,000,000 | | 5.5% |
| Plainfield Asset Management LLC | 2,854,300 | (O) | |
| 55 Railroad Avenue, | | | |
| Third Floor, Greenwich, CT 06830 | | | |
| J. F. Akers | 38,996 | | * |
| | 74,535 | (O) | |
| | 15,196 | (T) | |
| H. F. Baldwin | 21,918 | | * |
| R. C. Cambre | 28,494 | | * |
| A. E. Festa | -0- | | -0- |
| M. A. Fox | 41,246 | | * |
| | 8,942 | (T) | |
| J. J. Murphy | 38,930 | | * |
| | 13,958 | (O) | |
| | 18,629 | (T) | |
| P. J. Norris | 138,822 | | 1.5% |
| | 1,165,026 | (O) | |
| T. A. Vanderslice | 39,522 | | * |
| | 69,876 | (O) | |
| | 14,932 | (T) | |
| R. C. Brown | -0- | | -0- |
| W. M. Corcoran | 10,000 | | * |
| | 84,800 | (O) | |
| G. E. Poling | 126,948 | (O) | * |
| R. M. Tarola | 15,000 | | * |
| | 202,900 | (O) | |
| R. J. Bettacchi | 322,287 | (O) | * |
| | 25,050 | (T) | |
| Directors and executive officers as a group | 386,428 | | 3.3% |
| | 1,786,728 | (O) | |
| | 67,120 | (T) | |

\* Indicates less than 1%

(O) Shares covered by stock options exercisable on or within 60 days after January 31, 2006.

(T) Shares owned by trusts and other entities as to which the person has the power to direct voting and/or investment.

(1) The address of each of our directors and executive officers is c/o Secretary, W. R. Grace & Co., 7500 Grace Drive, Columbia, MD 21044.

(2) The ownership information set forth is based in its entirety on material contained in a Form 4 report dated September 10, 2001 filed with the SEC.

(3) The ownership information set forth above is based in its entirety on material contained in a Schedule 13G/A dated February 13, 2006 filed with the SEC. The number of shares beneficially owned includes shares owned by the following investment funds and managed accounts: Citadel Wellington LLC; Citadel Kensington Global Strategies Fund Ltd.; and Citadel Equity Fund Ltd. All of such persons share voting and dispositive power.

(4)

CC-BLG003141

The ownership information set forth below is based in its entirety on material contained in a Schedule 13G dated February 14, 2006 filed with the SEC. The number of shares beneficially owned includes shares owned by Plainfield Special Situation Master Fund Limited, a private investment vehicle. Certain of these securities were acquired without compliance with the Bankruptcy Court order limiting purchase, acquisition or accumulation of Grace Common Stock. Plainfield Asset Management LLC has represented that it has not at any time owned shares of Grace Common Stock in an amount greater than 4.75% of the outstanding Grace Common Stock, as calculated in accordance with the Internal Revenue Code. In addition, Plainfield Asset Management LLC has agreed: (i) to sell shares of Grace Common Stock or options to purchase Grace Common Stock or allow options to expire, in an amount sufficient to reduce its total ownership of Grace Common Stock and options to an amount equal to or less than 4.75% of the total outstanding Grace Common Stock calculated in accordance with the Internal Revenue Code; and (ii) not to acquire Grace Common Stock or exercise options at any time while the Bankruptcy Court order is in effect that would cause it to hold more than 4.75% of the total outstanding shares of Grace Common Stock, as calculated in accordance with the Internal Revenue Code, except as permitted by the Bankruptcy Court order.

## EQUITY COMPENSATION PLAN INFORMATION

The following table sets forth information as of December 31, 2005 with respect to our compensation plans under which shares of Grace common stock are authorized for issuance upon the exercise of options, warrants or other rights. The only such compensation plans in effect are stock incentive plans providing for the issuance of stock options. Grace shareholders have approved all of these plans.

| Plan category | Number of securities to be issued upon exercise of outstanding options (a) | Weighted-average exercise price of outstanding options (b). | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 7,093,646 | $13.42 | 4,768,707 |

## Item 13.   CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

This item discusses certain direct and indirect relationships and transactions involving Grace and any director or executive officer.

*Siegel Consulting Agreement*  – On June 27, 2005, the Bankruptcy Court approved a consulting agreement dated April 27, 2005 between Grace and Mr. Siegel, who retired as Senior Vice President, General Counsel and Chief Restructuring Officer of Grace on April 26, 2005. Under the Siegel Consulting Agreement, Mr. Siegel provides consulting services to Grace on pending litigation and Chapter 11 reorganization matters. Under the Siegel Consulting Agreement, Mr. Siegel is paid $37,500 per month (i.e., $450,000 per year) based on working 900 hours per year. In the event he works more than 900 hours in a year, he would be paid $500 for each additional hour. During the period of the Siegel Consulting Agreement, Mr. Siegel also retains the use of his Grace-provided car and has access to a computer, business telephone and administrative support. Grace or Mr. Siegel may terminate the Siegel Consulting Agreement at any time upon 60 days' written notice. During 2005, we paid Mr. Siegel $300,000 pursuant to the Siegel Consulting Agreement.

*Bettacchi Indemnification* – In connection with the Montana Criminal Proceeding, we are advancing legal and defense costs to Robert J. Bettacchi, a former Grace Senior Vice President and President of GPC who was an executive officer until

43

February 7, 2005, subject to a reimbursement obligation if it is later determined that he did not meet the standards for indemnification set forth under the appropriate state corporate law. For the year ended December 31, 2005, we advanced approximately $1,243,800 for Mr. Bettacchi's defense in this proceeding.

## Item 14.   PRINCIPAL ACCOUNTING FEES AND SERVICES

The Audit Committee of the Board of Directors selected PricewaterhouseCoopers LLP, or PwC, to continue to act as our principal independent accountants for 2005. The following table sets forth the fees that we incurred for the services of PwC for the fiscal years ended December 31, 2005 and 2004:

| | 2005 | 2004 |
|---|---|---|
| Audit Fees | $ 4,136,600 | $ 4,322,100 |
| Audit-Related Fees | 265,600 | 491,900 |
| Tax Fees | 116,100 | 122,000 |
| All Other Fees | — | — |
| Total Fees | $ 4,518,300 | $ 4,936,000 |

Audit Services consisted of the audit of our consolidated financial statements and our internal controls over financial reporting (as required under Section 404 of the Sarbanes-Oxley Act of 2002), the review of our consolidated quarterly financial statements and statutory audits of certain of Grace's non-U.S. subsidiaries and affiliates.

Audit-Related Services primarily consisted of (1) an audit of the financial statements of Advanced Refining Technologies, LLC (a joint venture with Chevron Products Company), (2) an audit of Grace's 401(k) plan, and (3) audits of subsidiary benefit plans as required.

Tax Services consisted of tax advice and compliance for non-U.S. subsidiaries, including preparation of tax returns, and advice relating to Grace's transfer pricing policies.

The Audit Committee has adopted a preapproval policy that requires the Audit Committee to specifically preapprove the annual engagement of the independent accountants for the audit of our consolidated financial statements and internal controls. The policy also provides for general preapproval of certain audit-related, tax and other services provided by the independent accountants. Any other services must be specifically preapproved by the Audit Committee. However, the Chair of the Audit Committee has the authority to preapprove services requiring immediate engagement between scheduled meetings of the Audit Committee. The Chair must report any such preapproval decisions to the full Audit Committee at its next scheduled meeting. During 2005, no audit-related, tax, or other services were performed by PwC without specific or general approval as described above.

## PART IV

## Item 15.   EXHIBITS, FINANCIAL STATEMENT SCHEDULES, AND REPORTS ON FORM 8-K

*Financial Statements and Schedules* . See the Index to Consolidated Financial Statements and Financial Statement Schedule and Exhibit on page F-2 of the Financial Supplement.

*Exhibits* . The exhibits to this Report are listed below. Other than exhibits that are filed herewith, all exhibits listed below are incorporated by reference. Exhibits indicated by an asterisk (*) are the management contracts and compensatory plans, contracts or arrangements required to be filed as exhibits to this Report.

For purposes of describing these exhibits, "Old Grace" means W. R. Grace & Co., a Delaware corporation (subsequently renamed Sealed Air Corporation), a predecessor to the Company, and "Grace New York" means W. R. Grace & Co., a New York corporation (subsequently renamed Fresenius Medical Care Holdings, Inc.), a predecessor to Old Grace.

CC-BLG003142

| EXHIBIT NO. | EXHIBIT | WHERE LOCATED |
|---|---|---|
| 2.1 | Form of Distribution Agreement, by and among Old Grace, W. R. Grace & Co.-Conn. and Grace Specialty Chemicals, Inc. (now named W. R. Grace & Co.) | Annex B to the Joint Proxy Statement/Prospectus dated February 13, 1998 of Old Grace and Sealed Air Corporation included in Form S-4 (filed 2/13/98) |
| 2.2 | Proposed Amended Joint Plan of Reorganization of W. R. Grace & Co. and its debtor subsidiaries dated January 13, 2005 | Exhibit 2.2 to Form 10-K (filed 3/7/05) |
| 3.1 | Restated Certificate of Incorporation of W. R. Grace & Co. | Exhibit 3.1 to Form 8-K (filed 4/8/98) |
| 3.2 | Amended and Restated By-laws of W. R. Grace & Co | Exhibit 3.2 to Form 8-K (filed 4/29/05) |
| 4.1 | Rights Agreement dated as of March 31, 1998 between W. R. Grace & Co. and The Chase Manhattan Bank, as Rights Agent | Exhibit 4.1 to Form 8-K (filed 4/8/98) |
| 4.2 | Credit Agreement dated as of May 14, 1998, among W. R. Grace & Co.-Conn., W. R. Grace & Co., the several banks parties thereto; the co-agents signatories thereto; The Chase Manhattan Bank, as administrative agent for such banks; and Chase Securities Inc., as arranger | Exhibit 4.1 to Form 10-Q (filed 8/14/98) |
| 4.3 | 364-Day Credit Agreement, dated as of May 5, 1999, among W. R. Grace & Co.-Conn.; W. R. Grace & Co.; the several banks parties thereto; the co-agents signatories thereto; Bank of America National Trust and Savings Association, as documentation agent; The Chase Manhattan Bank, as administrative agent for such banks; and Chase Securities Inc., as book manager | Exhibit 4.1 to Form 10-Q (filed 8/3/99) |
| 4.4 | First Amendment to 364-Day Credit Agreement dated as of May 5, 1999 among W. R. Grace & Co.-Conn.; W. R. Grace & Co.; the several banks parties thereto; Bank of America National Trust and Savings Association, as document agent; The Chase Manhattan Bank, as administrative agent for such banks; and Chase Securities, Inc., as bank manager | Exhibit 4 to Form 10-Q (filed 8/15/00) |
| 4.5 | Post-Petition Loan and Security Agreement dated as of April 1, 2001 among the financial institutions named therein, as Lenders, Bank of America, N.A. as Agent, and W. R. Grace & Co. and its subsidiaries named therein as Debtors and Debtors-in-Possession, as Borrowers | Exhibit 4 to Form 10-Q (filed 8/14/01) |
| 4.6 | Amendment No. 1 and Limited Waiver to Post-Petition Loan and Security Agreement | Exhibit 4 to Form 10-Q (filed May 13, 2003) |
| 10.1 | Form of Employee Benefits Allocation Agreement, by and among Old Grace, W. R. Grace & Co.-Conn. and Grace Specialty Chemicals, Inc. (now named W. R. Grace & Co.) | Exhibit 10.1 to Form 10-K (filed March 13, 2003) |
| 10.2 | Form of Tax Sharing Agreement, by and among Old Grace, W. R. Grace & Co.-Conn. and Grace Specialty Chemicals, Inc. (now named W. R. Grace & Co.) | Exhibit 10.2 to Form 10-K (filed 3/13/03) |
| 10.3 | W. R. Grace & Co. 2000 Stock Incentive Plan, as amended | Exhibit 10 to Form 10-Q (filed 8/15/00)* |
| 10.4 | W. R. Grace & Co. 1998 Stock Incentive Plan | Exhibit 10.4 to Form 10-K (filed 3/13/03)* |

45

| EXHIBIT NO. | EXHIBIT | WHERE LOCATED |
|---|---|---|
| 10.5 | W. R. Grace & Co. 1998 Stock Plan for Nonemployee Directors | Exhibit 10.5 to Form 10-K (filed 3/13/03)* |
| 10.6 | W. R. Grace & Co. 1996 Stock Incentive Plan, as amended | Exhibit 10.6 to Form 10-K (filed 3/5/04)* |
| 10.7 | W. R. Grace & Co. Supplemental Executive Retirement Plan, as amended | Exhibit 10.7 to Form 10-K (filed 3/28/02)* |
| 10.8 | W. R. Grace & Co. Executive Salary Protection Plan, as amended | Exhibit 10.8 to Form 10-K (filed 3/28/02)* |
| 10.9 | W. R. Grace & Co. 1994 Stock Incentive Plan, as amended | Exhibit 10.11 to Form 10-K (filed 3/28/02)* |
| 10.10 | Form of Stock Option Agreements | Exhibit 10.14 to Registration Statement on Form S-1 of Old Grace (filed 8/2/96)* |
| 10.11 | Form of Stock Option Agreements | Exhibit 10.5 to Form 10-Q (filed 5/15/98)* |
| 10.12 | Form of 2002-2004 Long-Term Incentive Program Award | Exhibit 10.16 to Form 10-K (filed 3/13/2003)* |
| 10.13 | Form of 2003-2005 Long-Term Incentive Program Award | Exhibit 10.29 to Form 10-K (filed 3/5/04)* |
| 10.14 | Form of 2004-2006 Long-Term Incentive Program Award | Exhibit 10.29 to Form 10-K (filed 3/7/05)* |
| 10.15 | Form of 2005-2007 Long-Term Incentive Program Award | Exhibit 10.1 to Form 8-K (filed 7/21/05)* |
| 10.16 | Form of Executive Severance Agreement between Grace and certain officers | Exhibit 10.17 to Form 10-K (filed 3/13/03)* |
| 10.17 | Employment Agreement, dated January 1, 2001, by and between Grace and Paul J. Norris | Exhibit 10.20 to Form 10-K (filed 4/16/01)* |
| 10.18 | Amendment dated November 6, 2002 to Employment Agreement between Grace and Paul J. Norris | Exhibit 10.19 to Form 10-K (filed 3/13/03)* |
| 10.19 | Employment Agreement dated May 11, 1999 between Grace and Robert M. Tarola | Exhibit 10.1 to Form 10-Q (filed 8/13/99)* |
| 10.20 | Letter Agreement dated January 30, 2001 between Paul J. Norris, on behalf of Grace, and David B. Siegel | Exhibit 10.22 to Form 10-K (filed 4/16/01)* |
| 10.21 | Letter Agreement dated May 7, 1999 between Paul J. Norris, on behalf of Grace, and William M. Corcoran | Exhibit 10.24 to Form 10-K (filed 4/16/01)* |

CC-BLG003143

| | | |
|---|---|---|
| 10.22 | Form of Indemnification Agreement between Grace and certain officers and directors | Exhibit 10.27 to Form 10-K (filed 4/16/01)* |
| 10.23 | Form of Retention Agreement for 2001-2002 | Exhibit 10.28 to Form 10-K (filed 4/16/01)* |
| 10.24 | Form of Retention Agreement for 2003 | Exhibit 10.25 to Form 10-K (filed 3/13/03)* |
| 10.25 | Form of Retention Agreement for 2004 | Exhibit 10.28 to Form 10-K (filed 3/5/04)* |
| 10.26 | Annual Incentive Compensation Program | Exhibit 10.26 to Form 10-K (filed 3/13/03)* |
| 10.27 | Letter Agreement dated January 19, 2005 between Paul J. Norris, on behalf of Grace, and Fred Festa | Exhibit 10.1 to Form 8-K (filed 4/29/05)* |
| 10.28 | Letter Agreement dated January 19, 2005 between Thomas A. Vanderslice, on behalf of Grace, and Paul J. Norris | Exhibit 10.2 to Form 8-K (filed 4/29/05)* |
| 10.29 | Letter Agreement dated April 22, 2005 between Fred Festa, on behalf of Grace, and Richard C. Brown | Exhibit 10.3 to Form 8-K (filed 4/29/05)* |
| 12 | Computation of Ratio of Earnings to Fixed Charges and Combined Fixed Charges and Preferred Stock Dividends | Filed herewith in Financial Supplement to Grace's 2005 Form 10-K |
| 21 | List of Subsidiaries of W. R. Grace & Co. | Filed herewith |

46

| EXHIBIT NO. | EXHIBIT | WHERE LOCATED |
|---|---|---|
| 23 | Consent of Independent Accountants | Filed herewith in Financial Supplement to Grace's 2005 Form 10-K |
| 24 | Powers of Attorney | Filed herewith |
| 31(i).1 | Certification of Periodic Report by Chief Executive Officer under Section 302 of the Sarbanes-Oxley Act of 2002 | Filed herewith |
| 31(i).2 | Certification of Periodic Report by Chief Financial Officer under Section 302 of the Sarbanes-Oxley Act of 2002 | Filed herewith |
| 32 | Certification of Periodic Report by Chief Executive Officer and Chief Financial Officer under Section 906 of the Sarbanes-Oxley Act of 2002 | Filed herewith |
| 99.1 | Amended Disclosure Statement for proposed Amended Joint Plan of Reorganization of W. R. Grace & Co. and its debtor subsidiaries dated January 13, 2005 | Exhibit 99.1 to Form 10-K (filed 3/7/05) |
| 99.2 | Glossary of terms used in Plan of Reorganization documents | Exhibit 99.2 to Form 10-K (filed 3/7/05) |

47

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this Report to be signed on its behalf by the undersigned, thereto duly authorized.

W. R. GRACE & CO.

By: /s/ Alfred E. Festa
   Alfred E. Festa
   (President and
   Chief Executive Officer)

By: /s/ Robert M. Tarola
   Robert M. Tarola
   (Senior Vice President and
   Chief Financial Officer)

Dated:   March 10, 2006

Pursuant to the requirements of the Securities Exchange Act of 1934, this Report has been signed below by the following persons on behalf of the registrant and in the capacities indicated on March 10, 2006.

| Signature | | Title |
|---|---|---|
| J. F. Akers* | } | |
| H. F. Baldwin* | } | |
| R. C. Cambre* | } | |
| M. A. Fox* | } | Directors |
| J. J. Murphy* | } | |
| P. J. Norris* | } | |
| T. A. Vanderslice* | } | |

/s/ Alfred E. Festa          Chief Executive Officer and Director
(Alfred E. Festa)            Principal Executive Officer

CC-BLG003144

/s/ Robert M. Tarola     Senior Vice President and Chief
(Robert M. Tarola)        Financial Officer
                     (Principal Financial Officer)
                     (Principal Accounting Officer)

\*    By signing his name hereto, Mark A. Shelnitz is signing this document on behalf of each of the persons
indicated above pursuant to powers of attorney duly executed by such persons and filed with the Securities and
Exchange Commission.

By:   /s/ Mark A. Shelnitz
Mark A. Shelnitz
(Attorney-In-Fact)

48

---

# Financial Supplement

## W. R. GRACE & CO.

**ANNUAL REPORT ON FORM 10-K
FOR THE YEAR ENDED DECEMBER 31, 2005**

F-1

---

FINANCIAL SUPPLEMENT
to
Annual Report on Form 10-K for the Year Ended December 31, 2005

**W. R. GRACE & CO. AND SUBSIDIARIES**

Index to Consolidated Financial Statements
and Financial Statement Schedule and Exhibit

| | |
|---|---|
| Management's Report on Financial Information and Internal Controls | F-3 |
| Report of Independent Registered Public Accounting Firm | F-4 |
| Report of Independent Registered Public Accounting Firm on Financial Statement Schedule | F-5 |
| Consent of Independent Registered Public Accounting Firm | F-5 |
| Consolidated Statements of Operations for the three years in the period ended December 31, 2005 | F-6 |
| Consolidated Statements of Cash Flows for the three years in the period ended December 31, 2005 | F-7 |
| Consolidated Balance Sheets at December 31, 2005 and 2004 | F-8 |
| Consolidated Statements of Shareholders' Equity (Deficit) for the three years in the period ended December 31, 2005 | F-9 |
| Consolidated Statements of Comprehensive Income (Loss) for the three years in the period ended December 31, 2005 | F-9 |
| Notes to Consolidated Financial Statements | F-10 - F-43 |
| Financial Summary | F-44 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | F-45 - F-63 |
| Financial Statement Schedule<br>Schedule II -- Valuation and Qualifying Accounts and Reserves | F-64 |
| Exhibit 12: Computation of Ratio of Earnings to Fixed Charges and Combined Fixed Charges and Preferred Stock Dividends | F-66 |

The financial data listed above appearing in this Financial Supplement are incorporated by reference herein. The

CC-BLG003145

Financial Statement Schedule should be read in conjunction with the Consolidated Financial Statements and Notes thereto. Financial statements of less than majority-owned persons and other persons accounted for by the equity method have been omitted as provided in Rule 3-09 of Securities and Exchange Commission Regulation S-X. Financial Statement Schedules not included have been omitted because they are not applicable or the required information is shown in the Consolidated Financial Statements or Notes thereto.

F-2 .

## Management's Report on Financial Information and Internal Controls

*Responsibility For Financial Information* – We are responsible for the preparation, integrity and objectivity of the Consolidated Financial Statements and the other financial information included in this report. Such information has been prepared in conformity with accounting principles generally accepted in the United States of America and accordingly includes certain amounts that represent management's best estimates and judgments. Actual amounts could differ from these estimates. We are also responsible for establishing and maintaining adequate internal control over financial reporting. These internal controls consist of policies and procedures that are designed to assess and monitor the effectiveness of the control environment including: risk identification, governance structure, delegations of authority, information flow, communications and control activities. A chartered Disclosure Committee oversees Grace's public financial reporting process and key managers are required to confirm their compliance with Grace's policies and internal controls quarterly. While no system of internal controls can ensure elimination of all errors and irregularities, Grace's internal controls, which are reviewed and modified in response to changing conditions, have been designed to provide reasonable assurance that assets are safeguarded, policies and procedures are followed, transactions are properly executed and reported, and appropriate disclosures are made. The concept of reasonable assurance is based on the recognition that there are limitations in all systems of internal control and that the costs of such systems should be balanced with their benefits. The Audit Committee of the Board of Directors, which is comprised solely of independent directors, meets regularly with Grace's senior financial management, internal auditors and independent registered public accounting firm to review audit plans and results, as well as the actions taken by management in discharging its responsibilities for accounting, financial reporting and internal controls. The Audit Committee is responsible for the selection and compensation of the independent registered public accounting firm. Grace's financial management, internal auditors and independent registered public accounting firm have direct and confidential access to the Audit Committee at all times.

*Report On Internal Control Over Financial Reporting* – We and our management are responsible for establishing and maintaining adequate internal control over financial reporting. We together have evaluated Grace's internal control over financial reporting as of December 31, 2005. This evaluation was based on criteria for effective internal control over financial reporting set forth in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, we and our management have concluded that Grace's internal control over financial reporting is effective as of December 31, 2005. Grace's independent registered public accounting firm that audited our financial statements included in Item 15 has also audited our assessment of the effectiveness of internal control over financial reporting as of December 31, 2005, as stated in their report, which appears on the following page.

*Report On Disclosure Controls And Procedures* – As of December 31, 2005, we carried out an evaluation of the effectiveness of the design and operation of Grace's disclosure controls and procedures pursuant to Rule 13a-15 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Based upon that evaluation, we concluded that Grace's disclosure controls and procedures are effective in ensuring that information required to be disclosed in Grace's periodic filings under the Exchange Act is accumulated and communicated to us to allow timely decisions regarding required disclosures, and such information is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms.

/s/ A. E. Festa                    /s/ Robert M. Tarola
A. E. Festa                        Robert M. Tarola
President and                      Senior Vice President and
Chief Executive Officer            Chief Financial Officer

March 10, 2006

F-3

## Report of Independent Registered Public Accounting Firm

To the Shareholders and Board of Directors of
W. R. Grace & Co.:

We have completed integrated audits of W. R. Grace & Co.'s 2005 and 2004 consolidated financial statements and of its internal control over financial reporting as of December 31, 2005 and an audit of its 2003 consolidated financial statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Our opinions, based on our audits, are presented below.

### Consolidated financial statements

In our opinion, the accompanying consolidated financial statements present fairly, in all material respects, the financial position of W. R. Grace & Co. and its subsidiaries (the "Company") at December 31, 2005 and 2004, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2005 in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit of financial statements includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the consolidated financial statements, on April 2, 2001, the Company and substantially all of its domestic subsidiaries voluntarily filed for protection under Chapter 11 of the United States Bankruptcy Code, which raises substantial doubt about the Company's ability to continue as a going concern in its present form. Management's intentions with respect to this matter are described in Note 2. The accompanying consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

### Internal control over financial reporting

Also, in our opinion, management's assessment, included in the accompanying Management's Report on Internal Control over Financial Reporting, that the Company maintained effective internal control over financial reporting as of December 31, 2005 based on criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), is fairly stated, in all material respects, based on those criteria. Furthermore, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2005, based on criteria established in *Internal Control – Integrated Framework* issued by the COSO. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express opinions on management's assessment and on the effectiveness of the Company's

CC-BLG003146

internal control over financial reporting based on our audit. We conducted our audit of internal control over financial reporting in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. An audit of internal control over financial reporting includes obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we consider necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

F-4

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ PricewaterhouseCoopers LLP
PricewaterhouseCoopers LLP
McLean, Virginia
March 10, 2006

*Report of Independent Registered Public Accounting Firm on Financial Statement Schedule*

To the Shareholders and Board of Directors of W. R. Grace & Co.

Our audits of the consolidated financial statements, of management's assessment of the effectiveness of internal control over financial reporting and of the effectiveness of internal control over financial reporting referred to in our report dated March 10, 2006, which was modified as to a matter raising substantial doubt about the Company's ability to continue as a going concern, appearing on page F-4 of the 2005 Annual Report on Form 10-K of W. R. Grace & Co., also included an audit of the Financial Statement Schedule listed on page F-2 in the Index to Consolidated Financial Statements and Financial Statement Schedule and Exhibit of this Form 10-K. In our opinion, this Financial Statement Schedule presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements.

/s/ PricewaterhouseCoopers LLP
PricewaterhouseCoopers LLP
McLean, Virginia
March 10, 2006

*Consent of Independent Registered Public Accounting Firm*

We hereby consent to the incorporation by reference in the Registration Statements on Form S-8 (Nos. 333-37024, 333-49083, 333-49507, 333-49509, 333-49511, 333-49513, 333-49515 and 333-49517) of W. R. Grace & Co. of our report dated March 10, 2006 relating to the financial statements, management's assessment of the effectiveness of internal control over financial reporting appearing on page F-4 of this 2005 Annual Report on Form 10-K of W. R. Grace & Co. We also consent to the incorporation by reference of our report dated March 10, 2006 relating to the Financial Statement Schedule, which appears in this Form 10-K.

/s/ PricewaterhouseCoopers LLP
PricewaterhouseCoopers LLP
McLean, Virginia
March 10, 2006

F-5

**Consolidated Financial Statements**

| W. R. Grace & Co. and Subsidiaries Consolidated Statements of Operations *In millions, except per share amounts* | Year Ended December 31, | | |
|---|---|---|---|
| | 2005 | 2004 | 2003 |
| Net sales | $ 2,569.5 | $ 2,259.9 | $ 1,980.5 |
| Cost of goods sold, exclusive of depreciation and amortization shown separately below | 1,689.8 | 1,431.5 | 1,287.8 |
| Selling, general and administrative expenses, exclusive of net pension expense shown separately below | 481.1 | 442.8 | 362.2 |
| Depreciation and amortization | 114.0 | 108.8 | 102.9 |
| Research and development expenses | 59.2 | 51.1 | 52.0 |
| Net pension expense | 71.9 | 61.9 | 58.1 |
| Interest expense and related financing costs | 55.3 | 111.1 | 15.6 |
| Provision for environmental remediation | 25.0 | 21.6 | 142.5 |
| Provision for asbestos-related litigation, net of insurance | — | 476.6 | 30.0 |
| Other (income) expense | (67.4) | (68.4) | (16.7) |
| | 2,428.9 | 2,637.0 | 2,034.4 |
| Income (loss) before Chapter 11 expenses, income taxes, and minority interest | 140.6 | (377.1) | (53.9) |
| Chapter 11 expenses, net | (30.9) | (18.0) | (14.8) |
| Benefit from (provision for) income taxes | (21.3) | 1.5 | 12.3 |
| Minority interest in consolidated entities | (21.1) | (8.7) | 1.2 |
| Net income (loss) | $ 67.3 | $ (402.3) | $ (55.2) |
| Basic earnings (loss) per share: | | | |
| Net income (loss) | $ 1.01 | $ (6.11) | $ (0.84) |
| Weighted average number of basic shares | 66.8 | 65.8 | 65.5 |
| Diluted earnings (loss) per share: | | | |

CC-BLG003147

| | | 2005 | | 2004 | | 2003 |
|---|---|---|---|---|---|---|
| Net income (loss) | $ | 1.00 | $ | (6.11) | $ | (0.84) |
| Weighted average number of diluted shares | | 67.3 | | 65.8 | | 65.5 |

The Notes to Consolidated Financial Statements are an integral part of these statements.

F-6

| W. R. Grace & Co. and Subsidiaries Consolidated Statements of Cash Flows | | Year Ended December 31, | | |
|---|---|---|---|---|
| In millions | | 2005 | 2004 | 2003 |
| OPERATING ACTIVITIES | | | | |
| Income (loss) before Chapter 11 expenses, income taxes, and minority interest | $ | 140.6 $ | (377.1) $ | (53.9) |
| Reconciliation to net cash provided by (used for) operating activities: | | | | |
| Depreciation and amortization | | 114.0 | 108.8 | 102.9 |
| Interest accrued on pre-petition liabilities subject to compromise | | 50.6 | 106.4 | 11.2 |
| Net (gain) loss on sales of investments and disposals of assets | | 0.7 | 0.8 | 1.5 |
| Loss on sale of business | | 1.1 | — | — |
| Net pension expense | | 71.9 | 61.9 | 58.1 |
| Payments to fund defined benefit pension arrangements | | (47.7) | (33.3) | (60.5) |
| Net gain from litigation settlement | | — | (51.2) | — |
| Cash received from litigation settlement | | — | 62.5 | — |
| Provision for environmental remediation | | 25.0 | 21.6 | 142.5 |
| Provision for asbestos-related litigation, net of insurance | | — | 476.6 | 30.0 |
| Net income from life insurance policies | | (3.5) | (3.0) | (5.6) |
| Provision for uncollectible receivables | | 2.6 | 1.9 | 0.8 |
| Payments under postretirement benefit plans | | (11.9) | (12.5) | (12.6) |
| Expenditures for environmental remediation | | (6.7) | (9.0) | (11.2) |
| Expenditures for retained obligations of divested businesses | | (1.0) | (1.8) | (1.3) |
| Changes in assets and liabilities, excluding effect of businesses acquired/divested and foreign currency translation: | | | | |
| Working capital items | | (46.3) | (15.8) | (27.2) |
| Other accruals and non-cash items | | (45.5) | 27.4 | (19.2) |
| Net cash provided by (used for) operating activities before income taxes, Chapter 11 expenses and settlement of noncore contingencies | | 243.9 | 364.2 | 155.5 |
| Cash paid to settle noncore contingencies | | (119.7) | — | — |
| Chapter 11 expenses paid | | (24.3) | (13.5) | (17.5) |
| Income taxes paid, net of refunds | | (45.7) | (37.7) | (27.2) |
| Net cash provided by (used for) operating activities | | 54.2 | 313.0 | 110.8 |
| INVESTING ACTIVITIES | | | | |
| Capital expenditures | | (80.9) | (62.9) | (85.4) |
| Businesses acquired, net of cash acquired | | (5.5) | (66.3) | (26.9) |
| Proceeds from termination of life insurance policies | | 14.8 | — | — |
| Net investment in life insurance policies | | (1.7) | (14.0) | (11.6) |
| Proceeds from life insurance policies | | 2.2 | 15.8 | 11.9 |
| Proceeds from sales of investments and disposals of assets | | 1.8 | 1.8 | 3.9 |
| Proceeds from sale of business | | 4.5 | — | — |
| Net cash provided by (used for) investing activities | | (64.8) | (125.6) | (109.1) |
| FINANCING ACTIVITIES | | | | |
| Net payment of loans secured by cash value of life insurance | | (0.6) | (4.0) | (3.1) |
| Net (repayments) borrowings under credit arrangements | | (10.4) | 1.2 | 2.3 |
| Borrowings under debtor-in-possession facility, net of fees | | (2.2) | (2.1) | 46.1 |
| Repayments of borrowings under debtor-in-possession facility | | — | — | (50.0) |
| Proceeds from exercise of stock options | | 3.1 | 4.2 | — |
| Net cash provided by (used for) financing activities | | (10.1) | (0.7) | (4.7) |
| Effect of currency exchange rate changes on cash and cash equivalents | | (15.0) | 14.5 | 28.6 |
| Increase (decrease) in cash and cash equivalents | | (35.7) | 201.2 | 25.6 |
| Cash and cash equivalents, beginning of period | | 510.4 | 309.2 | 283.6 |
| Cash and cash equivalents, end of period | $ | 474.7 $ | 510.4 $ | 309.2 |

The Notes to Consolidated Financial Statements are an integral part of these statements.

F-7

| W. R. Grace & Co. and Subsidiaries Consolidated Balance Sheets | | December 31, | |
|---|---|---|---|
| In millions, except par value and shares | | 2005 | 2004 |
| ASSETS | | | |
| Current Assets | | | |
| Cash and cash equivalents | $ | 474.7 $ | 510.4 |
| Trade accounts receivable, less allowance of $5.0 (2004 – $5.8) | | 401.7 | 350.9 |

CC-BLG003148

| | | |
|---|---:|---:|
| Inventories | 278.3 | 248.3 |
| Deferred income taxes | 27.3 | 16.3 |
| Other current assets | 71.6 | 62.6 |
|    Total Current Assets | 1,253.6 | 1,228.5 |
| Properties and equipment, net of accumulated depreciation and amortization of $1,364.3 (2004 – $1,325.9) | 589.7 | 645.3 |
| Goodwill | 103.9 | 111.7 |
| Cash value of life insurance policies, net of policy loans | 84.8 | 96.0 |
| Deferred income taxes | 703.9 | 667.4 |
| Asbestos-related insurance | 500.0 | 500.0 |
| Other assets | 281.3 | 290.0 |
|    Total Assets | $ 3,517.2 | $ 3,538.9 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT)** | | |
| **Liabilities Not Subject to Compromise** | | |
| **Current Liabilities** | | |
| Debt payable within one year | $ 2.3 | $ 12.4 |
| Accounts payable | 166.8 | 146.0 |
| Income taxes payable | 10.1 | 7.7 |
| Other current liabilities | 197.9 | 206.1 |
|    Total Current Liabilities | 377.1 | 372.2 |
| Debt payable after one year | 0.4 | 1.1 |
| Deferred income taxes | 54.3 | 64.1 |
| Minority interest in consolidated affiliates | 36.4 | 15.4 |
| Unfunded defined benefit pension liability | 447.5 | 424.9 |
| Other liabilities | 41.7 | 75.3 |
|    Total Liabilities Not Subject to Compromise | 957.4 | 953.0 |
| **Liabilities Subject to Compromise – Note 2** | 3,155.1 | 3,207.7 |
|    Total Liabilities | 4,112.5 | 4,160.7 |
| **Commitments and Contingencies** | | |
| **Shareholders' Equity (Deficit)** | | |
| Common stock issued, par value $0.01; 300,000,000 shares authorized; outstanding: 2005 – 66,922,196 (2004 – 66,395,721) | 0.8 | 0.8 |
| Paid-in capital | 423.4 | 426.5 |
| Accumulated deficit | (505.9) | (573.2) |
| Treasury stock, at cost: shares: 2005 – 10,057,564 (2004 – 10,584,039) | (119.7) | (125.9) |
| Accumulated other comprehensive income (loss) | (393.9) | (350.0) |
|    Total Shareholders' Equity (Deficit) | (595.3) | (621.8) |
|    Total Liabilities and Shareholders' Equity (Deficit) | $ 3,517.2 | $ 3,538.9 |

The Notes to Consolidated Financial Statements are an integral part of these statements.

F-8

**W. R. Grace & Co. and Subsidiaries**
**Consolidated Statements of Shareholders' Equity (Deficit)**

| In millions | Common Stock and Paid-in Capital | Accumulated Deficit | Treasury Stock | Accumulated Other Comprehensive Income (Loss) | Total Shareholders' Equity (Deficit) |
|---|---:|---:|---:|---:|---:|
| **Balance, December 31, 2002** | $ 433.8 | $ (115.7) | $ (137.0) | $ (403.3) | $ (222.2) |
| Net income (loss) | — | (55.2) | — | — | (55.2) |
| Stock plan activity | (0.9) | — | 1.1 | — | 0.2 |
| Other comprehensive income (loss) | — | — | — | 113.4 | 113.4 |
| **Balance, December 31, 2003** | $ 432.9 | $ (170.9) | $ (135.9) | $ (289.9) | $ (163.8) |
| Net income (loss) | — | (402.3) | — | — | (402.3) |
| Stock plan activity | (5.6) | — | 10.0 | — | 4.4 |
| Other comprehensive income (loss) | — | — | — | (60.1) | (60.1) |
| **Balance, December 31, 2004** | $ 427.3 | $ (573.2) | $ (125.9) | $ (350.0) | $ (621.8) |
| Net income (loss) | — | 67.3 | — | — | 67.3 |
| Stock plan activity | (3.1) | — | 6.2 | — | 3.1 |
| Other comprehensive income (loss) | — | — | — | (43.9) | (43.9) |
| **Balance, December 31, 2005** | $ 424.2 | $ (505.9) | $ (119.7) | $ (393.9) | $ (595.3) |

**W. R. Grace & Co. and Subsidiaries**
**Consolidated Statements of Comprehensive Income (Loss)**

| In millions | Year Ended December 31, | | |
|---|---:|---:|---:|
| | 2005 | 2004 | 2003 |
| Net income (loss) | $ 67.3 | $ (402.3) | $ (55.2) |
| **Other comprehensive income (loss):** | | | |
| Foreign currency translation adjustments | (28.7) | 21.9 | 95.1 |
| Minimum pension liability adjustments, net of income taxes | (15.2) | (82.0) | 18.3 |
| Total other comprehensive income (loss) | (43.9) | (60.1) | 113.4 |
| Comprehensive income (loss) | $ 23.4 | $ (462.4) | $ 58.2 |

CC-BLG003149

The Notes to Consolidated Financial Statements are an integral part of these statements.

F-9

Notes to Consolidated Financial Statements

**1.    Basis of Presentation and Summary of Significant Accounting and Financial Reporting Policies**

W. R. Grace & Co., through its subsidiaries, is engaged in specialty chemicals and specialty materials businesses on a worldwide basis through two operating segments: "Grace Davison," which includes silica- and alumina-based catalysts and materials used in a wide range of industrial applications; and "Grace Performance Chemicals," which includes specialty chemicals and materials used in commercial and residential construction and in rigid food and beverage packaging.

W. R. Grace & Co. conducts substantially all of its business through a direct, wholly-owned subsidiary, W. R. Grace & Co.-Conn. ("Grace-Conn."). Grace-Conn. owns substantially all of the assets, properties and rights of W. R. Grace & Co. on a consolidated basis, either directly or through subsidiaries.

As used in these notes, the term "Company" refers to W. R. Grace & Co. The term "Grace" refers to the Company and/or one or more of its subsidiaries and, in certain cases, their respective predecessors.

*Voluntary Bankruptcy Filing* – During 2000 and the first quarter of 2001, Grace experienced several adverse developments in its asbestos-related litigation, including: a significant increase in personal injury claims, higher than expected costs to resolve personal injury and certain property damage claims, and class action lawsuits alleging damages from Zonolite Attic Insulation ("ZAI") a former Grace attic insulation product.

After a thorough review of these developments, the Board of Directors concluded that a federal court-supervised bankruptcy process provided the best forum available to achieve fairness in resolving these claims and on April 2, 2001 (the "Filing Date"), Grace and 61 of its United States subsidiaries and affiliates, including Grace-Conn. (collectively, the "Debtors"), filed voluntary petitions for reorganization (the "Filing") under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The cases were consolidated and are being jointly administered under case number 01-01139 (the "Chapter 11 Cases"). Grace's non-U.S. subsidiaries and certain of its U.S. subsidiaries were not included in the Filing.

Under Chapter 11, the Debtors have continued to operate their businesses as debtors-in-possession under court protection from creditors and claimants, while using the Chapter 11 process to develop and implement a plan for addressing the asbestos-related claims. Since the Filing, all motions necessary to conduct normal business activities have been approved by the Bankruptcy Court. (See Note 2 for Chapter 11 Related Information.)

*Principles of Consolidation* – The Consolidated Financial Statements include the accounts of Grace and entities as to which Grace exercises control over operating and financial policies. Intercompany transactions and balances are eliminated in consolidation. Investments in affiliated companies in which Grace can significantly influence operating and financial policies are accounted for under the equity method, unless Grace's investment is deemed to be temporary, in which case the investment is accounted for under the cost method.

*Reclassifications* – Certain amounts in prior years' Consolidated Financial Statements have been reclassified to conform to the 2005 presentation.

*Use of Estimates* – The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires that management make estimates and assumptions affecting the assets and liabilities reported at the date of the Consolidated Financial Statements, and the revenues and expenses reported for the periods presented. Actual amounts could differ from those estimates. Changes in estimates are recorded in the period identified. Grace's accounting measurements that are most affected by management's estimates of future events are:

- Contingent liabilities such as asbestos-related matters (see Notes 2 and 3), environmental remediation (see Note 14), income taxes (see Note 14), and litigation (see Note 14).

- Pension and postretirement liabilities that depend on assumptions regarding discount rates and total returns on invested funds (see Note 18).

- Liabilities for employee incentive compensation and customer rebates.

- Depreciation and amortization periods for long-lived assets, including property and equipment, intangible, and other assets.

- Realization values of various assets such as net deferred tax assets (see Note 4), trade receivables, inventories, insurance receivables, properties and equipment, and goodwill.

The accuracy of these and other estimates may also be materially affected by the uncertainties arising under Grace's Chapter 11 proceeding.

*Revenue Recognition* – Grace recognizes revenue when all of the following criteria are satisfied: risk of loss and title transfer to the customer; the price is fixed and determinable; and collectibility is reasonably assured. Certain customer arrangements include conditions for volume rebates. Grace accrues a rebate allowance and reduces recorded sales for

F-10

anticipated selling price adjustments at the time of sale. Grace regularly reviews rebate accruals based on actual and anticipated sales patterns.

*Cash Equivalents* – Cash equivalents consist of liquid instruments and investments with maturities of three months or less when purchased. The recorded amounts approximate fair value.

*Inventories* – Inventories are stated at the lower of cost or market. The methods used to determine cost include first-in/first-out and,

CC-BLG003150