Court shall conclude that the Funding Amount is not greater than $1,613 million. This amount, which should be sufficient to fund over $2 billion in pending and future claims, is based in part on Grace's evaluation of (1) existing but unresolved personal injury and property damage claims, (2) actuarially-based estimates of future personal injury claims, (3) the risk of loss from ZAI litigation, (4) proposed claim payments reflected in the Plan, and (5) the cost of the trust administration and litigation. This amount may not be consistent with what the Bankruptcy Court may conclude would be a sufficient Funding Amount.

The Bankruptcy Court has issued separate case management orders for estimating liability for pending and future personal injury claims and pending property damage claims, excluding ZAI claims. The case management orders originally contemplated that estimation hearings would take place in September 2006. However, in connection with the latest extensions of the Debtors' exclusive right to propose a plan or reorganization, the Bankruptcy Court has deferred the estimation process to provide the Debtors and the other stakeholders in the Chapter 11 proceeding with an opportunity to negotiate a resolution of all or a portion of the Debtors' asbestos-related liabilities. The Bankruptcy Court has appointed a mediator to facilitate such negotiations. As a result of this deferral, if negotiations are not successful and the Bankruptcy Court resumes the estimation process, the Debtors would not expect estimation hearings to take place until late 2006 or early 2007.

For personal injury claims, the Court has ordered that all claimants with claims pending as of the Filing Date must complete detailed questionnaires providing information on, among other things, their medical condition, including diagnostic support, exposure to Grace and non-Grace asbestos-containing products, employment history, and pending lawsuits against other companies. Such information will be analyzed by experts and presented to the Bankruptcy Court, including estimates of the number of personal injury claims expected to be filed in the future, as the basis for determining the Funding Amount in respect of all pending and future asbestos personal injury claims.

For property damage claims, the case management order provides that estimation will be preceded by litigation on certain common threshold issues affecting a substantial majority of claims. Such litigation will consist of determining the date by which building owners knew or should have known of the reported hazards of asbestos-containing materials in their buildings, which would provide the basis for a statute of limitations defense, and the evidentiary admissibility of certain asbestos testing methodologies. During the period preceding the estimation hearing, Grace will also seek the Bankruptcy Court to rule on Grace's specific objections to individual claims and groups of claims. Claims not resolved or expunged through the common issue litigation or the objection process would be the subject of an estimation hearing, which would provide the basis for a Bankruptcy Court determination of the Funding Amount in respect of all property damage claims.

The Funding Amount will be primarily a function of the number of allowed property damage and personal injury claims, and the amount payable per claim. Through the estimation process, Grace will seek to demonstrate that most claims should not be allowed because they fail to establish any material property damage, health impairment or significant occupational exposure to asbestos from Grace's operations or products. If the Bankruptcy Court agrees with Grace's position on the number of, and the amounts to be paid in respect of, allowed personal injury and property damage claims, then Grace believes that the Funding Amount could be less than $1,613 million. However, this outcome is highly uncertain and will depend on a number of Bankruptcy Court rulings favorable to Grace's position.

Conversely, the asbestos claimants committees and the future claimants representative continue to assert that Grace's asbestos-related liabilities are substantially higher than $1,613 million, and in fact are in excess of Grace's business value. If the Court accepts the position of the asbestos claimants committees, then any plan of reorganization likely would result in the loss of all or substantially all equity value by current shareholders. Therefore, due to the significant uncertainties of this process and asbestos litigation generally, Grace is not able to estimate a probable Funding Amount that would be accepted by the Bankruptcy Court.

However, as Grace is willing to proceed with confirmation of the Plan with a Funding Amount of up to $1,613 million (assuming that other conditions precedent to confirmation of the Plan are satisfied, including the availability of the payment from Cryovac directly to the asbestos trust under the settlement agreement described in Note 2), during the fourth quarter of 2004, Grace accrued and took a charge of $714.8 million to increase its recorded asbestos-related liability to reflect the maximum amount allowed as a condition precedent under the Plan. This amount, plus $87.0 million for pre-Chapter 11 contractual settlements and judgments, brings the total recorded asbestos-related liability as of December 31, 2005 to $1,700.0 million. Any differences between the Plan as filed and as approved for confirmation could fundamentally change the accounting measurement of Grace's asbestos-related liability and that change could be material.

*Insurance Rights* – Grace previously purchased insurance policies that provide coverage for years 1962 to 1985 with respect to asbestos-related lawsuits and claims. Since 1985, insurance coverage for asbestos-related liabilities has not been commercially available to Grace.

With one exception, coverage disputes regarding Grace's primary insurance policies have been settled, and the settlement amounts paid in full. Grace's excess coverage is for

F-21

loss above certain levels. The levels vary from policy to policy, creating "layers" of excess coverage, some of which are triggered before others. As of December 31, 2005, after subtracting previous reimbursements by insurers and allowing for discounts pursuant to certain settlement agreements, there remains approximately $960 million of excess coverage from more than 30 presently solvent insurers.

Grace has entered into settlement agreements with various excess insurance carriers. These settlements involve amounts paid and to be paid to Grace. The unpaid maximum aggregate amount available under these settlement agreements is approximately $477 million. With respect to asbestos-related personal injury claims, the settlement agreements generally require that the claims be spread over the claimant's exposure period and that each insurer pay a pro rata portion of each claim based on the amount of coverage provided during each year of the total exposure period.

Presently, Grace has no agreements in place with insurers with respect to approximately $483 million of excess coverage, which is at layers of coverage that have not yet been triggered, but certain layers would be triggered if the Plan were approved at the recorded asbestos-related liability of $1,700 million. Grace believes that any allowed ZAI claims also would be covered under the settlement agreements and unsettled policies discussed above to the extent they relate to installations of ZAI occurring after July 1, 1973.

Grace has approximately $329 million of excess coverage with insolvent or non-paying insurance carriers. (Non-paying carriers are those that, although technically not insolvent, are not currently meeting their obligations to pay claims.) Grace has filed and continues to file claims in the insolvency proceedings of insolvent carriers. Grace is currently receiving distributions from some of these insolvent carriers and expects to receive distributions in the future. Settlement amounts are recorded as income when received.

Grace estimates that, assuming an ultimate payout of asbestos-related claims equal to the recorded liability of $1,700 million, it should be entitled to approximately $500 million, on a net present value basis, of insurance recovery.

| Estimated Insurance Recovery on Asbestos-Related Liabilities<br>*(In millions)* | 2005 | 2004 |
|---|---|---|
| **Insurance Receivable** | | |
| Asbestos-related insurance receivable, beginning of year | $ 500.0 | $ 269.4 |
| Proceeds received under asbestos-related insurance settlements | — | (7.6) |
| Insurance receivable adjustment | — | 238.2 |
| Asbestos-related insurance receivable, end of year expected to be realized as claims are paid | $ 500.0 | $ 500.0 |

CC-BLG003157

4. Income Taxes

The components of income (loss) from consolidated operations before income taxes and the related benefit from (provision for) income taxes for 2005, 2004, and 2003 are as follows:

| Income Taxes – Consolidated Operations (In millions) | 2005 | 2004 | 2003 |
|---|---|---|---|
| Income (loss) before income taxes: | | | |
| Domestic | $ 10.5 | $ (549.3) | $ (174.0) |
| Foreign | 142.3 | 148.1 | 124.5 |
| Intercompany eliminations | (64.2) | (2.6) | (18.0) |
| | $ 88.6 | $ (403.8) | $ (67.5) |
| Benefit from (provision for) income taxes: | | | |
| Federal – current | $ 5.1 | $ 32.1 | $ 9.9 |
| Federal – deferred | 13.8 | 14.8 | 34.5 |
| State and local – current | (1.0) | (0.3) | 3.8 |
| Foreign – current | (47.5) | (25.1) | (34.3) |
| Foreign – deferred | 8.3 | (23.0) | (1.6) |
| | $ (21.3) | $ 1.5 | $ 12.3 |

At December 31, 2005 and 2004, the tax attributes giving rise to deferred tax assets and liabilities consisted of the following items:

F-22

| Deferred Tax Analysis (In millions) | 2005 | 2004 |
|---|---|---|
| Liability for asbestos-related litigation | $ 595.0 | $ 595.0 |
| Net operating loss/credit carryforwards | 106.9 | 100.9 |
| Deferred state taxes | 152.3 | 140.5 |
| Liability for environmental remediation | 119.7 | 120.8 |
| Other postretirement benefits | 35.5 | 41.6 |
| Deferred charges | 32.7 | 37.7 |
| Reserves and allowances | 37.3 | 36.0 |
| Research and development | 32.8 | 33.1 |
| Pension liabilities | 145.8 | 134.4 |
| Foreign loss/credit carryforwards | 31.8 | 34.8 |
| Accrued interest on pre-petition debt | 42.5 | 32.5 |
| Other | 6.7 | 11.7 |
| Total deferred tax assets | 1,339.0 | 1,319.0 |
| Asbestos-related insurance receivable | (180.5) | (180.5) |
| Pension assets | (32.8) | (32.8) |
| Properties and equipment | (69.3) | (85.6) |
| Deferred foreign and other income | (74.5) | (102.7) |
| Other | (60.5) | (56.4) |
| Total deferred tax liabilities | (417.6) | (458.0) |
| Deferred state taxes | (152.3) | (140.5) |
| Net federal tax assets | (70.7) | (69.4) |
| Foreign loss carryforwards | (22.3) | (32.7) |
| Total valuation allowance | (245.3) | (242.6) |
| Net deferred tax assets | $ 676.1 | $ 618.4 |

The deferred tax valuation allowance of $245.3 million consists of: (i) $152.3 million of net deferred tax assets associated with state loss carryforwards and future tax deductions subject to limitations that are likely to restrict benefits otherwise available to Grace, (ii) $22.3 million of tax assets relating to foreign loss and credit carryforwards that are likely to expire unutilized, and (iii) $70.7 million of net federal deferred tax assets relating to net operating losses, tax credit carryforwards and future tax deductions that exceeded Grace's analysis of the tax assets that could be realized under reasonable scenarios of future taxable income. Based upon anticipated future results, Grace has concluded that it is more likely than not that the balance of the net deferred tax assets, after consideration of the valuation allowance, will be realized. Because of the nature of the items that make up this balance, the realization period is likely to extend over a number of years and the outcome of the Chapter 11 cases could materially impact the amount and the realization period.

At December 31, 2005, there were $112.7 million of U.S. federal net operating loss carryforwards, representing deferred tax assets of $39.4 million, with expiration dates through 2022; $5.2 million of foreign tax credit carryforwards with expiration dates through 2010; $15.8 million of general business credit carryforwards with expiration dates through 2008; and $46.5 million of alternative minimum tax credit carryforwards with no expiration dates.

As part of Grace's evaluation and planning for the funding requirements of its plan of reorganization, Grace has concluded that the financing of the Plan will likely involve cash and financing from non-U.S. subsidiaries. Grace anticipates that approximately $500 million will be sourced in this manner. Approximately $255 million can be repatriated by way of intercompany debt repayments (including the German loan discussed in Note 6) and the remaining $233 million by way of taxable dividends. Accordingly, Grace has recorded in a prior year a deferred tax liability to recognize the expected taxable elements of financing its plan of reorganization. Grace has not provided for U.S. federal, state, local and foreign deferred income taxes on approximately $279 million of undistributed earnings of foreign subsidiaries that are expected to be retained indefinitely by such subsidiaries for reinvestment.

The difference between the benefit from (provision for) income taxes at the federal income tax rate of 35% and Grace's overall income tax provision is summarized as follows:

CC-BLG003158

| Income Tax Benefit (Provision) Analysis (In millions) | 2005 | 2004 | 2003 |
|---|---|---|---|
| Tax benefit (provision) at federal corporate rate | $ (31.0) | $ 141.3 | $ 23.6 |
| Change in provision resulting from: | | | |
| Nontaxable income/non-deductible expenses | (1.5) | — | (0.6) |
| State and local income taxes, net of federal income tax benefit | 11.1 | 13.0 | 10.9 |
| Federal and foreign taxes on foreign operations | (1.6) | (93.6) | 3.8 |
| Change in valuation allowance on deferred tax assets | (2.7) | (59.4) | (15.8) |
| Chapter 11 expenses (non-deductible) | (18.3) | (6.0) | (4.3) |
| Tax and interest relating to tax deductibility of interest on life insurance policy loans (See Note 14) | 1.2 | (1.8) | (5.3) |
| Adjustments to tax and interest contingencies | 13.5 | 8.0 | — |
| Income tax benefit from (provision for) continuing operations | $ (21.3) | $ 1.5 | $ 12.3 |

On October 22, 2004, President George W. Bush signed the American Jobs Creation Act of 2004 (the "Jobs Act") into law. The Jobs Act provides for, among other things, an 85% dividends received deduction with respect to certain dividends received from a U.S. corporation's foreign subsidiaries. The dividends must be used to fund certain permitted domestic activities, as specified in the Jobs Act. These domestic activities include the building or improvement of infrastructure, research and development, and the financial stabilization of the corporation. The IRS recently issued guidelines clarifying that companies such as Grace with net

F-23

operating loss carryforwards would be eligible to utilize foreign tax credits to offset U.S. taxes on certain foreign dividends. As a result of this clarification, Grace will elect to apply the provisions of the Jobs Act to the approximately $56.2 million in dividends that it received from its foreign subsidiaries during the 2005 tax period.

5.  Acquisitions and Joint Ventures

In 2005, Grace completed four business combinations for a total cash cost of $5.5 million as follows:

• In February 2005, Grace acquired certain assets of Midland Dexter Venezuela, S.A. ("Midevensa"). Midevensa supplies coatings and sealants for rigid packaging in the local and export markets of Latin America.

• In March 2005, Grace acquired certain assets relating to the concrete admixtures business of Perstorp Peramin AB ("Perstorp") located in Sweden. Perstorp supplies specialty chemicals and materials to the construction industry in Sweden and other Northern European countries.

• In November 2005, Grace acquired certain assets of Single-Site Catalysts, LLC, a supplier of organometallic catalysts, serving a variety of industries, including polyolefins and elastomers, with headquarters in Chester, Pennsylvania.

• In November 2005, Grace acquired Flexit Laboratories Pvt. Ltd., a manufacturer and supplier of chromatography products based in India.

Goodwill recognized in the 2005 transactions amounted to $1.5 million, of which $1.3 million was assigned to Grace Davison and $0.2 million was assigned to Grace Performance Chemicals.

In 2004, Grace completed four business combinations for a total cash cost of $66.3 million as follows:

• In July 2004, Grace acquired GROM ANALYTIK + HPLC GmbH, a leader in column packing technology and services designed for high performance small molecule separations.

• In August 2004, Grace acquired Alltech International Holdings, Inc., a global manufacturer and supplier of chromatography products.

• In August 2004, Grace acquired Pieri Benelux NV. Pieri Benelux had been the exclusive distributor of Grace's line of Pieri products for architectural concrete in Benelux since the early 1980s.

• In December 2004, Grace acquired the Triflex ® line of synthetic roofing underlayments from Flexia Corporation.

Goodwill recognized in the 2004 transactions amounted to $22.0 million, of which $17.5 million was assigned to Grace Davison and $4.5 million was assigned to Grace Performance Chemicals.

6.  Other (Income) Expense

Components of other (income) expense are as follows:

CC-BLG003159

**Other (Income) Expense**
*(In millions)*

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| Income from insurance settlements | $ (44.5) $ | (11.1) $ | — |
| COLI income, net | (3.5) | (3.0) | (5.6) |
| Interest income | (3.6) | (3.1) | (4.3) |
| Net (gain) loss on sales of investments and disposals of assets | 1.8 | 0.8 | 1.5 |
| Currency translation – intercompany loan | 35.9 | (29.3) | — |
| Value of currency contracts | (35.7) | 39.5 | — |
| Other currency transaction effects | (8.1) | 1.4 | 4.2 |
| Net gain from litigation settlement | — | (51.2) | — |
| Other miscellaneous income | (17.7) | (12.4) | (12.5) |
| Total other (income) expense | $ (67.4) $ | (68.4) $ | (16.7) |

Other (income) expense for the year ended December 31, 2005 includes $44.5 million paid by insurance carriers with respect to coverage for past environmental remediation costs and asbestos-related liability under liquidation arrangements or dispute settlements. Other miscellaneous income for the year ended December 31, 2005 includes the favorable impact from prepayment of a royalty obligation ($5.2 million) and an insurance recovery for business interruption losses incurred as a result of Hurricane Rita ($2.7 million).

In March 2004, Grace began accounting for currency fluctuations on a €293 million intercompany loan between Grace's subsidiaries in the United States and Germany as a component of operating results instead of as a component of other comprehensive income. The change was prompted by new tax laws in Germany and Grace's cash flow planning for its Chapter 11 reorganization, which indicated that it is no longer reasonable to consider this loan as part of the permanent capital structure in Germany. In May 2004, Grace entered into a series of foreign currency forward contracts to mitigate future currency fluctuations on the remaining loan balance. Contract amounts of €200.7 million were extended in June 2005 and have varying rates on notional amounts that coincide with loan repayments due periodically through December 2008. No loan repayments were made in 2005. For the year ended December 31, 2005, a $35.7 million contract gain was recognized, offset by a $35.9 million foreign currency loss. These forward contracts are viewed as risk management instruments by Grace and are not used for trading or speculative purposes.

F-24

In 2004, Grace recorded a net gain of $51.2 million as a result of the settlement of litigation with Honeywell International, Inc. related to environmental contamination of a non-operating parcel of land.

**7. Goodwill and Other Intangible Assets**

For the purpose of measuring impairment under the provisions of SFAS No. 142, Grace has identified its reporting units as refining technologies, hydroprocessing catalysts, engineered materials, specialty catalysts and discovery sciences (Grace Davison), and construction products and packaging technologies (Grace Performance Chemicals). Grace has evaluated its goodwill annually with no impairment charge required.

The carrying amount of goodwill attributable to each operating segment and the changes in those balances during the year ended December 31, 2005 are as follows:

| (In millions) | Grace Davison | Grace Performance Chemicals | Total Grace |
|---|---|---|---|
| Balance as of December 31, 2004 | $ 39.7 $ | 72.0 $ | 111.7 |
| Goodwill acquired during the year | 1.3 | 0.2 | 1.5 |
| Foreign currency translation / other adjustments | (4.7) | (4.6) | (9.3) |
| Balance as of December 31, 2005 | $ 36.3 $ | 67.6 $ | 103.9 |

Grace's net book value of other intangible assets at December 31, 2005 and December 31, 2004 was $87.6 million and $96.3 million, respectively, detailed as follows:

| | As of December 31, 2005 | |
|---|---|---|
| (In millions) | Gross Carrying Amount | Accumulated Amortization |
| Technology | $ 48.9 $ | 12.1 |
| Patents | 0.4 | 0.3 |
| Customer lists | 46.3 | 11.3 |
| Other | 21.4 | 5.7 |
| Total | $ 117.0 $ | 29.4 |

| | As of December 31, 2004 | |
|---|---|---|
| (In millions) | Gross Carrying Amount | Accumulated Amortization |
| Technology | $ 43.0 $ | 9.6 |

CC-BLG003160

| | | |
|---|---|---|
| Patents | 0.4 | 0.3 |
| Customer lists | 48.6 | 8.6 |
| Other | 27.0 | 4.2 |
| Total | $ 119.0 $ | 22.7 |

At December 31, 2005, estimated future annual amortization expenses for intangible assets are:

| Estimated Amortization Expense *(In millions)* | |
|---|---|
| 2006 | $ 9.6 |
| 2007 | 8.8 |
| 2008 | 8.8 |
| 2009 | 8.7 |
| 2010 | 8.3 |

8.  Comprehensive Income (Loss)

The tables below present the pre-tax, tax, and after tax components of Grace's other comprehensive income (loss) for the years ended December 31, 2005, 2004 and 2003:

| Year Ended December 31, 2005 *(In millions)* | Pre-Tax Amount | Tax Benefit | After Tax Amount |
|---|---|---|---|
| Minimum pension liability adjustments | $ (23.5) $ | 8.3 $ | (15.2) |
| Foreign currency translation adjustments | (28.7) | — | (28.7) |
| Other comprehensive income (loss) | $ (52.2) $ | 8.3 $ | (43.9) |

| Year Ended December 31, 2004 *(In millions)* | Pre-Tax Amount | Tax Benefit | After Tax Amount |
|---|---|---|---|
| Minimum pension liability adjustments | $ (126.2) $ | 44.2 $ | (82.0) |
| Foreign currency translation adjustments | 21.9 | — | 21.9 |
| Other comprehensive income (loss) | $ (104.3) $ | 44.2 $ | (60.1) |

| Year Ended December 31, 2003 *(In millions)* | Pre-Tax Amount | Tax Expense | After Tax Amount |
|---|---|---|---|
| Minimum pension liability adjustments | $ 28.2 $ | (9.9) $ | 18.3 |
| Foreign currency translation adjustments | 95.1 | — | 95.1 |
| Other comprehensive income (loss) | $ 123.3 $ | (9.9) $ | 113.4 |

F-25

| Composition of Accumulated Other Comprehensive Loss *(In millions)* | 2005 | 2004 |
|---|---|---|
| Minimum pension liability | $ (362.7) $ | (347.5) |
| Foreign currency translation | (31.2) | (2.5) |
| Accumulated other comprehensive loss | $ (393.9) $ | (350.0) |

Grace is a global enterprise which operates in over 40 countries with local currency generally deemed to be the functional currency for accounting purposes. The foreign currency translation amount represents the adjustment necessary to translate the balance sheets valued in local currencies to the U.S. dollar as of the end of each year presented.

The decline in equity market returns in 2000-2002, coupled with a decline in interest rates from 2000-2004, as well as updated assumptions for expected life-spans and the longevity of Grace's active work force, created a shortfall between the accounting measurement of Grace's obligations under certain of its qualified pension plans for U.S. employees and the market value of dedicated pension assets. This condition required Grace to record a minimum pension liability for these plans equal to the funding shortfall and to offset related deferred costs against shareholders' equity (deficit) at December 31, 2005 and 2004. Market returns in 2005 and 2004 were 6.36% and 9.8%, respectively, for Grace's qualified domestic pension plan assets and contributions to under-funded domestic plans in 2005 and 2004 were $24.1 million and $19.8 million, respectively. However, these asset gains and contributions were offset by higher liability measures from lower discount rates (moving from 6.25% at December 31, 2003 to 5.5% at December 31, 2004 and 2005) and an increase in assumed life spans of participants. (See Note 18.)

F-26

CC-BLG003161

9. Other Balance Sheet Accounts

| (In millions) | 2005 | 2004 |
|---|---|---|
| **Inventories** [1] | | |
| Raw materials | $ 69.4 | $ 62.4 |
| In process | 32.8 | 35.1 |
| Finished products | 217.7 | 166.7 |
| General merchandise | 33.2 | 32.2 |
| Less: Adjustment of certain inventories to a last-in/first-out (LIFO) basis | (65.8) | (49.1) |
| | $ 278.3 | $ 248.3 |

(1)  Inventories valued at LIFO cost comprised 52.2% of total inventories at December 31, 2005 and 46.9% at December 31, 2004.

| | 2005 | 2004 |
|---|---|---|
| **Other Assets** | | |
| Deferred pension costs | $ 108.8 | $ 119.5 |
| Deferred charges | 64.0 | 49.9 |
| Long-term receivables, less allowances of $0.7 (2004-$0.8) | 7.6 | 8.3 |
| Patents, licenses and other intangible assets, net | 87.6 | 96.3 |
| Pension-unamortized prior service cost | 12.7 | 15.3 |
| Investments in unconsolidated affiliates and other | 0.6 | 0.7 |
| | $ 281.3 | $ 290.0 |
| **Other Current Liabilities** | | |
| Accrued compensation | $ 70.4 | $ 92.9 |
| Deferred tax liability | 0.8 | 1.2 |
| Customer volume rebates | 35.4 | 31.7 |
| Accrued commissions | 11.1 | 11.0 |
| Accrued reorganization fees | 18.0 | 11.4 |
| Other accrued liabilities | 62.2 | 57.9 |
| | $ 197.9 | $ 206.1 |

Accrued compensation in the table above includes current amounts due in 2006 under the annual and long-term incentive programs. Other liabilities on the Consolidated Balance Sheet includes amounts expected to be paid under these programs in 2007 and beyond.

10.  Properties and Equipment

| (In millions) | 2005 | 2004 |
|---|---|---|
| Land | $ 21.2 | $ 23.1 |
| Buildings | 425.0 | 438.8 |
| Information technology and equipment | 116.6 | 113.0 |
| Machinery, equipment and other | 1,355.6 | 1,368.1 |
| Projects under construction | 35.6 | 28.2 |
| Properties and equipment, gross | 1,954.0 | 1,971.2 |
| Accumulated depreciation and amortization | (1,364.3) | (1,325.9) |
| Properties and equipment, net | $ 589.7 | $ 645.3 |

Capitalized interest costs were insignificant for the periods presented. Depreciation and lease amortization expense relating to properties and equipment amounted to $104.9 million in 2005, $101.8 million in 2004, and $96.2 million in 2003. Grace's rental expense for operating leases amounted to $18.7 million in 2005, $16.9 million in 2004, and $15.4 million in 2003. (See Note 14 for information regarding contingent rentals.)

At December 31, 2005, minimum future non-cancelable payments for operating leases were:

| Minimum Future Payments under Operating Leases (In millions) | |
|---|---|
| 2006 | $ 20.1 |
| 2007 | 17.3 |
| 2008 | 14.8 |

CC-BLG003162

| | | |
|---|---|---|
| 2009 | | 10.3 |
| 2010 | | 9.8 |
| Thereafter | | 16.2 |
| Total minimum lease payments | $ | 88.5 |

The above minimum non-cancelable lease payments are net of anticipated sublease income of $1.4 million in 2006, $0.8 million in 2007, $0.4 million in 2008, $0.2 million in 2009, and $0.1 million in 2010.

## 11. Life Insurance

Grace is the beneficiary of life insurance policies on certain current and former employees with a net cash surrender value of $84.8 million and $96.0 million at December 31, 2005 and 2004, respectively. The policies were acquired to fund various employee benefit programs and other long-term liabilities and are structured to provide cash flow (primarily tax-free) over an extended number of years.

The following tables summarize activity in these policies for 2005, 2004 and 2003, and the components of net cash value at December 31, 2005 and 2004:

| Life Insurance – Activity Summary (In millions) | 2005 | | 2004 | | 2003 | |
|---|---|---|---|---|---|---|
| Earnings on policy assets | $ | 6.3 | $ | 32.4 | $ | 38.7 |
| Interest on policy loans | | (2.8) | | (29.4) | | (33.1) |
| Premiums | | 1.7 | | 2.4 | | 2.4 |
| Policy loan repayments | | 0.6 | | 4.0 | | 3.1 |
| Proceeds from termination of life insurance policies | | (14.8) | | — | | — |
| Net investing activity | | (2.2) | | (4.2) | | (2.7) |
| Change in net cash value | $ | (11.2) | $ | 5.2 | $ | 8.4 |
| Tax-free proceeds received | $ | 2.2 | $ | 15.8 | $ | 11.9 |

F-27

| Components of Net Cash Value (In millions) | December 31, | | | |
|---|---|---|---|---|
| | 2005 | | 2004 | |
| Gross cash value | $ | 169.2 | $ | 484.2 |
| Principal – policy loans | | (83.7) | | (368.2) |
| Accrued interest – policy loans | | (0.7) | | (20.0) |
| Net cash value | $ | 84.8 | $ | 96.0 |
| Insurance benefits in force | $ | 196.3 | $ | 2,191.3 |

Grace's financial statements display income statement activity and balance sheet amounts on a net basis, reflecting the contractual interdependency of policy assets and liabilities.

In January 2005, Grace surrendered and terminated most of these life insurance policies and received approximately $14.8 million of net cash value from the termination. As a result of the termination, gross cash value of the policies was reduced by approximately $381 million and policy loans of approximately $365 million were satisfied. Grace's insurance benefits in force was reduced by approximately $2 billion. See Note 14 for a discussion of a settlement agreement with the Internal Revenue Service ("IRS") with respect to tax contingencies related to these life insurance policies and the tax consequences of terminating such policies.

## 12. Debt

| Components of Debt (In millions) | 2005 | | 2004 | |
|---|---|---|---|---|
| Debt payable within one year | | | | |
| Other short-term borrowings [1] | $ | 2.3 | $ | 12.4 |
| | $ | 2.3 | $ | 12.4 |
| | | | | |
| Debt payable after one year | | | | |
| DIP facility [2] | $ | — | $ | — |
| Other long-term borrowings | | 0.4 | | 1.1 |
| | $ | 0.4 | $ | 1.1 |
| | | | | |
| Debt Subject to Compromise | | | | |

CC-BLG003163

| | | |
|---|---|---|
| Bank borrowings [3] | $ 500.0 | $ 500.0 |
| Other borrowings [4] | 14.3 | 15.0 |
| Accrued interest [5] | 170.4 | 130.8 |
| | $ 684.7 | $ 645.8 |
| Full-year weighted average interest rates on total debt | 6.1% | 6.0% |

(1)  Represents borrowings under various lines of credit and other miscellaneous borrowings, primarily non-U.S. subsidiaries.

(2)  In April 2001, the Debtors entered into a debtor-in-possession post-petition loan and security agreement with Bank of America, N.A. (the "DIP facility") in the aggregate amount of $250 million. The DIP facility is secured by priority liens on substantially all assets of the Debtors, and bears interest based on LIBOR plus 2.00 to 2.25 percentage points. The Debtors have extended the term of the DIP facility through April 1, 2006. The facility is expected to be renewed under similar terms. As of December 31, 2005, the Debtors had no outstanding borrowings under the DIP facility. However, $30.2 million of standby letters of credit were issued and outstanding under the facility as of December 31, 2005, which were issued mainly for trade-related matters such as performance bonds, as well as certain insurance and environmental matters. The outstanding amount of standby letters of credit, as well as other holdback provisions issued under the DIP facility reduces the borrowing availability to $211.3 million. Under the DIP facility, the Debtors are required to maintain $50 million of liquidity, in a combination of cash, cash equivalents and the net cash value of life insurance policies.

(3)  Under bank revolving credit agreements in effect prior to the Filing, Grace could borrow up to $500 million at interest rates based upon the prevailing prime, federal funds under Eurodollar rates. Of that amount, $250 million was available under short-term facilities expiring in May 2001, and $250 million was available under a long-term facility expiring in May 2003. As a result of the Filing, Grace was in default under the bank revolving credit agreements, and accordingly, the balance as of the Filing Date was reclassified to debt subject to compromise in the Consolidated Balance Sheet.

(4)  Miscellaneous borrowings primarily consisting of U.S. mortgages.

(5)  In the fourth quarter of 2004, Grace accrued $69.5 million to increase its estimate of interest to which holders of the Debtor's pre-petition bank credit facilities and letters of credit would be entitled under the Plan. Grace continued to accrue interest at the increased rate throughout 2005.

Interest payments amounted to $2.3 million in 2005, $2.1 million in 2004, and $4.2 million in 2003.

13.  Financial Instruments and Risk

*Debt and Interest Rate Swap Agreements* – Grace was not a party to any debt or interest rate swaps at December 31, 2005 and December 31, 2004.

*Commodity Risk* – Certain raw materials and energy are commodities subject to price fluctuation. Grace's policy is to hedge against volatility in certain raw material and energy purchases using financial instruments as appropriate. Grace also executes long term supply agreements and/or forward commitments to secure materials at stable prices and in quantities fully expected to be used in production. During 2004 and 2005, the Company entered into forward contracts with natural gas suppliers in the U.S. to manage the cost of a portion of quantities required for use at certain U.S. plants.

*Currency Risk* – Because Grace does business in over 40 countries, results are exposed to fluctuations in foreign exchange rates. The Company seeks to minimize exposure to these fluctuations by matching revenue streams in volatile currencies with expenditures in the same currencies, but it is not always possible to do so. From time to time the Company will use financial instruments such as foreign currency forward contracts, options, or combinations of the two to reduce the risk of certain specific transactions. However, the Company does not have a policy of hedging all exposures, because management does not believe that such a level of hedging would be cost-effective, particularly translation exposures that are not expected to affect cash flows in the near term. In 2004 the Company purchased forward contracts to minimize

F-28

currency risk related to euro denominated intercompany loans due to a U.S. subsidiary of Grace. In 2005 the Company extended the remaining portion of these forward currency contracts (see Note 6 for further information).

*Fair Value of Debt and Other Financial Instruments* – At December 31, 2005, the fair value of Grace's debt payable within one year not subject to compromise approximated the recorded value of $2.3 million. Fair value is determined based on expected future cash flows (discounted at market interest rates), quotes from financial institutions and other appropriate valuation methodologies. At December 31, 2005, the recorded values of other financial instruments such as cash, short-term investments, trade receivables and payables and short-term debt approximated their fair values, based on the short-term maturities and floating rate characteristics of these instruments. Grace's bank debt subject to compromise is trading at approximately par value plus recorded accrued interest and, accordingly, is considered reflected at fair value.

*Credit Risk* – Trade receivables potentially subject Grace to credit risk. Concentrations of credit to customers in the petroleum and construction industries represent the greatest exposure. Grace's credit evaluation policies, relatively short collection terms and history of minimal credit losses mitigate credit risk exposures. Grace does not generally require collateral for its trade accounts receivable, but may require a bank letter of credit in certain instances, particularly when selling to customers in cash restricted countries.

14.  Commitments and Contingent Liabilities

*Asbestos-Related Liability* – See Note 3

*Environmental Remediation* – Grace is subject to loss contingencies resulting from extensive and evolving federal, state, local and foreign environmental laws and regulations relating to the generation, storage, handling, discharge and disposition of hazardous wastes and other materials. Grace accrues for anticipated costs associated with investigative and remediation efforts where an assessment has indicated that a probable liability has been incurred and the cost can be reasonably estimated. These accruals do not take into account any discounting for the time value of money.

Grace's environmental liabilities are reassessed whenever circumstances become better defined or remediation efforts and their costs can be better estimated. These liabilities are evaluated based on currently available information, including the progress of remedial investigation at each site, the current status of discussions with regulatory authorities regarding the method and extent of remediation

CC-BLG003164

at each site, existing technology, prior experience in contaminated site remediation and the apportionment of costs among potentially responsible parties. Grace expects that the funding of environmental remediation activities will be affected by the Chapter 11 proceedings.

At December 31, 2005, Grace's estimated liability for environmental investigative and remediation costs totaled $342.0 million, as compared with $345.0 million at December 31, 2004. The amount is based on funding and/or remediation agreements in place and Grace's best estimate of its cost for sites not subject to a formal remediation plan. Grace's estimated environmental liabilities are included in "liabilities subject to compromise."

For the years ended December 31, 2005 and 2004, Grace recorded pre-tax charges of $25.0 million and $21.6 million, respectively, for environmental matters. Of the pre-tax charges in 2005 and 2004, $22.3 million and $20.0 million, respectively, were in connection with a cost recovery lawsuit brought by the U.S. government relating to Grace's former vermiculite mining activities near Libby, Montana, and Grace's evaluation of probable remediation costs at vermiculite processing sites currently or formerly operated by Grace, as described below. The remainder of the pre-tax charges were primarily attributable to the ongoing review of recorded environmental liabilities.

Net cash expenditures charged against previously established reserves for the years ended December 31, 2005, 2004 and 2003 were $28.0 million, $9.0 million, and $11.2 million, respectively. The increase in spending for 2005 was primarily due to a $21.4 million payment made in settlement of remediation liability at a formerly owned site.

*Vermiculite Related Matters*

From 1963 until 1992, Grace conducted vermiculite mining and related activities near Libby, Montana. Previous owners had conducted similar activities at the Libby site since the 1920s. The mined vermiculite ore contained varying amounts of asbestos as an impurity, almost all of which was removed during processing. Expanded vermiculite was used in products such as fireproofing, insulation and potting soil.

EPA Lawsuit – In November 1999, Region 8 of the Environmental Protection Agency ("EPA") began an investigation into alleged excessive levels of asbestos-related disease in the Libby population related to these former mining activities. This investigation led the EPA to undertake additional investigative activity and to carry out response actions in and around Libby. On March 30, 2001, the EPA filed a lawsuit in U.S. District Court for the District of Montana, Missoula Division ( *United States v. W. R. Grace & Company et al.* ) under the Comprehensive Environmental Response, Compensation and Liability Act for the recovery of costs allegedly incurred by the United States in response to the release or threatened release of asbestos in the Libby, Montana area relating to such former mining activities. These costs include cleaning and/or demolition of contaminated buildings, excavation and removal of contaminated soil, health screening of Libby residents and former mine workers, and investigation and monitoring costs. In this action, the EPA

also sought a declaration of Grace's liability that would be binding in future actions to recover further response costs.

In December 2002, the District Court granted the United States' motion for partial summary judgment on a number of issues that limited Grace's ability to challenge the EPA's response actions. In January 2003, a trial was held on the remainder of the issues, which primarily involved the reasonableness and adequacy of documentation of the EPA's cost recovery claims through December 31, 2001. On August 28, 2003, the District Court issued a ruling in favor of the United States that requires Grace to reimburse the government for $54.5 million (plus interest) in costs expended through December 2001, and for all appropriate future costs to complete the clean-up. The Ninth Circuit Court of Appeals upheld the District Court's rulings. Grace intends to appeal this case to the U.S. Supreme Court.

Grace's total estimated liability for vermiculite-related remediation at December 31, 2005 and December 31, 2004 was $226.2 million and $204.2 million, respectively. The estimate does not include the cost to clean-up the Grace-owned mine site at Libby, which is not currently estimable. Grace's estimate of costs is based on public comments regarding the EPA's spending plans, discussions of spending forecasts with EPA representatives, analysis of other information made available from the EPA, and evaluation of probable remediation costs at vermiculite processing sites. However, the EPA's cost estimates have increased regularly and substantially over the course of this clean-up. Consequently, as the EPA's spending on these matters increases, Grace's liability for remediation will increase.

Montana Criminal Proceeding – On February 7, 2005, the United States Department of Justice announced the unsealing of a 10-count grand jury indictment against Grace and seven current or former senior level employees (*United States of America v. W. R. Grace & Co. et al*) relating to Grace's former vermiculite mining and processing activities in Libby, Montana. Two of the counts have since been dismissed. The indictment accuses the defendants of (1) conspiracy to violate environmental laws and obstruct federal agency proceedings; (2) violations of the federal Clean Air Act; and (3) obstruction of justice. The U.S. District Court for the District of Montana has entered a scheduling order setting a trial date of September 11, 2006.

Grace purchased the Libby mine in 1963 and operated it until 1990; vermiculite processing activities continued until 1992. The grand jury charges that the conspiracy took place from 1976 to 2002 and also charges that the alleged endangerment to the areas surrounding Libby continues to the present day. According to the U.S. Department of Justice, Grace could be subject to fines in an amount equal to twice the after-tax profit earned from its Libby operations or twice the alleged loss suffered by Libby victims, plus additional amounts for restitution to victims. The indictment alleges that such after tax profits were $140 million. Grace has categorically denied any criminal wrongdoing and intends to vigorously defend itself at trial.

The U.S. Bankruptcy Court previously granted Grace's request to advance legal and defense costs to the employees, subject to a reimbursement obligation if it is later determined that the employees did not meet the standards for indemnification set forth under the appropriate state corporate law. For the year ended December 31, 2005, total expense for Grace and the employees was $20.0 million, which is included in selling, general and administrative expenses.

Grace is unable to assess whether the indictment, or any conviction resulting therefrom, will have a material adverse effect on the results of operations or financial condition of Grace or affect Grace's bankruptcy proceedings. However, Grace expects legal fees for this matter could range from $7 million to $10 million per quarter through the trial date. Such costs will be expensed as incurred.

New Jersey Lawsuit – On June 1, 2005, the New Jersey Department of Environmental Protection ("DEP") filed a lawsuit against Grace and two former employees seeking civil penalties for alleged misrepresentations and false statements made in a Preliminary Assessment/Site Investigation Report and Negative Declarations submitted by Grace to the DEP in 1995 pursuant to the New Jersey Industrial Site Recovery Act. Grace submitted the Report, which was prepared by an independent environmental consultant, in connection with the closing of Grace's former plant in Hamilton Township, New Jersey. Grace is also aware that the State of New Jersey and U.S. Department of Justice each are conducting criminal investigations related to Grace's former operations of such plant.

Grace purchased the Hamilton plant assets in 1963 and ceased operations in 1994. During the operating period, Grace produced spray-on fire protection products and vermiculite-based products at this plant. The current property owners are conducting remediation activities as directed by the EPA. The property owners and the EPA have filed proofs of claim against Grace in the amount of approximately $4 million with respect to the Hamilton plant site.

Grace is unable at this time to assess the effect of this lawsuit or the pending criminal investigations on Grace's results of operations, cash flows, or liquidity, or on its bankruptcy proceeding.

*Non-Vermiculite Related Matters*

At December 31, 2005 and 2004, Grace's estimated liability for remediation of sites not related to its former vermiculite mining and processing activities was $115.8 million and $140.8 million, respectively. This liability relates to Grace's current and former operations, including its share of liability for off-site disposal at facilities where it has been identified as

a potentially responsible party. The decrease in the liability in 2005 was primarily due to a $21.4 million Bankruptcy Court approved

CC-BLG003165

payment made in settlement of remediation liability at a formerly owned site. During the fourth quarter of 2005, Grace recorded a net $2.7 million increase to its estimated environmental liability for non-vermiculite related sites as a result of settlement discussions with the EPA related to certain sites, and investigation of environmental conditions at a current operating plant. During the fourth quarter of 2004, Grace recorded a $1.6 million increase to its estimated environmental liability for non-vermiculite related sites in connection with the investigation of environmental conditions at a current operating plant. Grace's estimated liability is based upon an evaluation of claims for which sufficient information was available. As Grace receives new information and continues its claims evaluation process, its estimated liability may change materially.

*Contingent Rentals* – Grace is the named tenant or guarantor with respect to leases entered into by previously divested businesses. These leases, some of which extend through the year 2017, have future minimum lease payments aggregating $91.3 million, and are fully offset by anticipated future minimum rental income from existing tenants and subtenants. In addition, Grace is liable for other expenses (primarily property taxes) relating to the above leases; these expenses are paid by current tenants and subtenants. Certain of the rental income and other expenses are payable by tenants and subtenants that have filed for bankruptcy protection or are otherwise experiencing financial difficulties. Grace believes that any loss from these lease obligations would be immaterial. Grace has rejected certain of these leases as permitted by the Bankruptcy Code, the financial impacts of which are insignificant.

*Tax Matters* – On May 19, 2005, Grace received a revised examination report (the "1993-1996 Examination Report") from the Internal Revenue Service (the "IRS") for the 1993-1996 tax periods asserting, in the aggregate, approximately $77.3 million of proposed tax adjustments, plus accrued interest. The most significant issue addressed in the 1993-1996 Examination Report concerns corporate-owned life insurance ("COLI") policies, as discussed below. Grace reached an agreement with the IRS with respect to all proposed tax adjustments in the Examination Report with the exception of approximately $7.0 million of proposed adjustments relating to research and development credits. On April 14, 2005, Grace made a $90 million payment to the IRS with respect to federal taxes and accrued interest for the 1993-1996 tax periods, consistent with the revised Examination Report. On June 17, 2005, Grace filed its protest with respect to the R&D matter with the IRS Office of Appeals and on December 7, 2005 Grace received an acknowledgment from that office that the matter is under consideration at IRS Appeals.

With respect to COLI, in 1988 and 1990, Grace acquired COLI policies and funded policy premiums in part using loans secured against policy cash surrender value. Grace claimed a total of approximately $258 million in deductions attributable to interest accrued on such loans through the 1998 tax year, after which such deductions were no longer permitted by law. On January 20, 2005, Grace terminated the COLI policies and Grace, Fresenius, Sealed Air and the IRS entered into a COLI Closing Agreement. Under the COLI Closing Agreement, the government allowed 20% of the aggregate amount of the COLI interest deductions and Grace owed federal income tax and interest with respect to the remaining 80% of the COLI interest deductions disallowed. The federal tax liability resulting from the COLI settlement is approximately $57.5 million, $10.4 million of which was paid in 2000 in connection with the 1990-1992 tax audit, and $30.8 million of which was paid in the April 14, 2005 payment in connection with the 1993-1996 federal tax audit discussed above. The remaining approximately $16.3 million of additional tax liability will be satisfied in connection with the 1997 and 1998 federal tax audits, which are still under examination by the IRS. The COLI Closing Agreement also provides that, with respect to the termination of the COLI policies, Grace will include 20% of the gain realized in taxable income, with the government exempting 80% of such gain from tax. As a result of the termination, Grace received $14.8 million in cash proceeds and will report income for tax purposes of approximately $60 million in 2005. It is anticipated that Grace will apply its net operating loss carryforwards to offset the taxable income generated from terminating the COLI policies, although alternative minimum taxes may apply.

As a consequence of having finally determined federal tax adjustments for the 1990-1996 tax periods, Grace became liable for additional state taxes plus interest accrued thereon. Grace's estimate for state taxes and interest to be paid for these years is approximately $18.3 million, of which it has already paid approximately $6.3 million. The remainder is expected to be paid in accordance with Grace's bankruptcy proceedings.

Grace's federal tax returns covering 1997 and later years are either under examination by the IRS or open for future examination. In connection with the years 1997 – 2001 that are currently under examination, Grace reached agreement with the IRS on a number of issues. After taking all issues into consideration, Grace reduced its recorded liabilities in 2005 by $13.5 million. Grace believes that the remaining recorded tax liability is adequate to cover the impact of probable tax return adjustments at December 31, 2005.

The IRS has assessed additional federal income tax withholding and Federal Insurance Contributions Act taxes plus interest and related penalties for calendar years 1993 through 1998 against a Grace subsidiary that formerly operated a temporary staffing business for nurses and other

health care personnel. The assessments, aggregating $61.9 million, were made in connection with a meal and incidental expense per diem plan for traveling health care personnel, which was in effect through 1999, the year in which Grace sold the business. (The statute of limitations has expired with respect to 1999.) The IRS contends that certain per diem reimbursements should have been treated as wages subject to employment taxes and federal income tax withholding. Grace contends that its per diem and expense allowance plans were in accordance with statutory and regulatory requirements, as well as other published guidance from the IRS. Grace has a right to indemnification from its former partner in the business for approximately 36% of any tax liability (including interest thereon) for the period from July 1996 through December 1998. The matter is currently pending in the United States Court of Claims. Grace has tentatively agreed with the Department of Justice and IRS on a settlement amount and certain other terms that would resolve the matter. The preliminary settlement is subject to the execution of written closing agreements with the IRS and a written settlement agreement with the Department of Justice, and to Bankruptcy Court approval.

*Purchase Commitments* – Grace engages in purchase commitments to minimize the volatility of major components of direct manufacturing costs including natural gas, certain metals, asphalt, amines and other materials. Such commitments are for quantities that Grace fully expects to use in its normal operations.

*Guarantees and Indemnification Obligations* – Grace is a party to many contracts containing guarantees and indemnification obligations. These contracts primarily consist of:

- Contracts providing for the sale of a former business unit or product line in which Grace has agreed to indemnify the buyer against liabilities arising prior to the closing of the transaction, including environmental liabilities. These liabilities are included in "liabilities subject to compromise" in the Consolidated Balance Sheets;

- Guarantees of real property lease obligations of third parties, typically arising out of (a) leases entered into by former subsidiaries of Grace, or (b) the assignment or sublease of a lease by Grace to a third party. These obligations are included in "liabilities subject to compromise" in the Consolidated Balance Sheets;

- Licenses of intellectual property by Grace to third parties in which Grace has agreed to indemnify the licensee against third party infringement claims;

- Contracts entered into with third party consultants, independent contractors, and other service providers in which Grace has agreed to indemnify such parties against certain liabilities in connection with their performance. Based on historical experience and the likelihood that such parties will ever make a claim against Grace, such indemnification obligations are immaterial; and

- Product warranties with respect to certain products sold to customers in the ordinary course of business. These warranties typically provide that product will conform to specifications. Grace generally does not establish a liability for product warranty based on a percentage of sales or other formula. Grace accrues a warranty liability on a transaction-specific basis depending on the individual facts and circumstances related to each sale. Both the liability and annual expense related to product warranties are immaterial to the Consolidated Financial Statements.

*Financial Assurances* – Financial assurances have been established for a variety of purposes, including insurance and environmental matters, asbestos settlements and appeals, trade-related commitments and other matters. At December 31, 2005, Grace had gross financial assurances issued and outstanding of $257.8 million, comprised of $135.1 million of surety bonds issued by various

insurance companies, and $122.7 million of standby letters of credit and other financial assurances issued by various banks.

*Accounting for Contingencies* – Although the outcome of each of the matters discussed above cannot be predicted with certainty, Grace has assessed its risk and has made accounting estimates as required under U.S. generally accepted accounting principles. As a result of the Filing, claims related to certain of the items discussed above will be addressed as part of Grace's Chapter 11 proceedings. Accruals recorded for such contingencies have been included in "liabilities subject to compromise" on the accompanying Consolidated Balance Sheets. The amounts of these liabilities as ultimately determined through the Chapter 11 proceedings could be materially different from amounts recorded at December 31, 2005.

15.  Shareholders' Equity (Deficit)

Under its Certificate of Incorporation, the Company is authorized to issue 300,000,000 shares of common stock, $0.01 par value. Of the common stock unissued at December 31, 2005, 7,093,646 shares were reserved for issuance pursuant to stock options and other stock incentives. The Company has not paid a dividend on its common stock since 1998. The Company is not permitted to pay dividends on its common stock while it is in bankruptcy. The Certificate of Incorporation also authorizes 53,000,000 shares of preferred stock, $0.01 par value, none of which has been issued. Of the total, 3,000,000 shares have been designated as Series A Junior Participating Preferred Stock and are

F-32

reserved for issuance in connection with the Company's Preferred Stock Purchase Rights ("Rights"). A Right trades together with each outstanding share of common stock and entitles the holder to purchase one one-hundredth of a share of Series A Junior Participating Preferred Stock under certain circumstances and subject to certain conditions. The Rights are not and will not become exercisable unless and until certain events occur, and at no time will the Rights have any voting power.

16.  Earnings (Loss) Per Share

The following table shows a reconciliation of the numerators and denominators used in calculating basic and diluted earnings (loss) per share.

| Earnings (Loss) Per Share (In millions, except per share amounts) | 2005 | 2004 | 2003 |
|---|---|---|---|
| **Numerators** | | | |
| Net income (loss) | $ 67.3 | $ (402.3) | $ (55.2) |
| **Denominators** | | | |
| Weighted average common shares – basic calculation | 66.8 | 65.8 | 65.5 |
| Dilutive effect of employee stock options | 0.5 | — | — |
| Weighted average common shares – diluted calculation | 67.3 | 65.8 | 65.5 |
| Basic earnings (loss) per share | $ 1.01 | $ (6.11) | $ (0.84) |
| Diluted earnings (loss) per share | $ 1.00 | $ (6.11) | $ (0.84) |

Stock options that could potentially dilute basic earnings (loss) per share (that were excluded from the computation of diluted earnings (loss) per share because their exercise prices were greater than the average market price of the common shares) averaged approximately 6.8 million in 2005, 8.1 million in 2004, and 9.4 million in 2003. As a result of the 2004 and 2003 net losses, approximately 300,000 and 100,000, respectively, of employee compensation-related shares issuable under stock options also were excluded from the diluted loss per share calculation because their effect would have been antidilutive.

17.  Stock Incentive Plans

Each stock option granted under the Company's stock incentive plans has an exercise price equal to the fair market value of the Company's common stock on the date of grant. Options become exercisable at the time or times determined by the Compensation Committee of the Company's Board of Directors and may have terms of up to ten years and one month.

The following table sets forth information relating to such options during 2005, 2004 and 2003:

| Stock Option Activity | 2005 | |
|---|---|---|
| | Number of Shares | Average Exercise Price |
| Balance at beginning of year | 7,691,580 | $  12.92 |

CC-BLG003167

| | | |
|---|---|---|
| Options exercised | (526,475) | 5.92 |
| Options terminated or cancelled | (71,459) | 14.19 |
| Balance at end of year | 7,093,646 | 13.42 |
| Exercisable at end of year | 7,093,646 $ | 13.42 |

| | 2004 | |
|---|---|---|
| Balance at beginning of year | 9,582,784 $ | 12.02 |
| Option exercised | (781,657) | 5.43 |
| Options terminated or cancelled | (1,109,547) | 10.41 |
| Balance at end of year | 7,691,580 | 12.92 |
| Exercisable at end of year | 7,691,580 $ | 12.92 |

| | 2003 | |
|---|---|---|
| Balance at beginning of year | 10,440,417 $ | 11.94 |
| Options exercised | (15,831) | 2.40 |
| Options terminated or cancelled | (841,802) | 11.24 |
| Balance at end of year | 9,582,784 | 12.02 |
| Exercisable at end of year | 9,227,438 $ | 12.39 |

Currently outstanding options expire on various dates through September 2011. At December 31, 2005, 4,768,707 shares were available for additional stock option or restricted stock grants. The following is a summary of stock options outstanding at December 31, 2005:

**Stock Options Outstanding**

| Exercise Price Range | Number Outstanding | Weighted-Average Remaining Contractual Life (Years) | Weighted-Average Exercise Price | Number Exercisable | Weighted-Average Exercise Price |
|---|---|---|---|---|---|
| $1-$8 | 695,813 | 6.00 | $ 2.66 | 695,813 | $ 2.66 |
| $8-$13 | 2,484,974 | 2.88 | 12.33 | 2,484,974 | 12.33 |
| $13-$18 | 2,547,959 | 4.60 | 14.19 | 2,547,959 | 14.19 |
| $18-$21 | 1,364,900 | 3.02 | 19.47 | 1,364,900 | 19.47 |
| | 7,093,646 | 3.83 | 13.42 | 7,093,646 | 13.42 |

F-33

**18.  Pension Plans and Other Postretirement Benefits Plans**

*Pension Plans* – Grace maintains defined benefit pension plans covering employees of certain units who meet age and service requirements. Benefits are generally based on final average salary and years of service. Grace funds its U.S. qualified pension plans ("U.S. qualified pension plans") in accordance with U.S. federal laws and regulations. Non-U.S. pension plans ("non-U.S. pension plans") are funded under a variety of methods, as required under local laws and customs.

Grace also provides, through nonqualified plans, supplemental pension benefits in excess of U.S. qualified pension plan limits imposed by federal tax law. These plans cover officers and higher-level employees and serve to increase the combined pension amount to the level that they otherwise would have received under the U.S. qualified pension plans in the absence of such limits. The nonqualified plans are unfunded and Grace pays the costs of benefits as they are incurred.

At the December 31, 2005 measurement date for Grace's defined benefit pension plans (the "Plans"), the accumulated benefit obligation ("ABO") was approximately $1,386 million as measured under U.S. generally accepted accounting principles. At December 31, 2005, Grace's recorded pension liability for underfunded plans was $533.9 million ($447.5 million included in liabilities not subject to compromise and $86.4 million related to supplemental pension benefits, included in "liabilities subject to compromise"). The recorded liability reflects 1) the shortfall between dedicated assets and the ABO of underfunded plans ($321.4 million); and 2) the ABO of pay-as-you-go plans ($212.5 million).

*Postretirement Benefits Other Than Pensions* – Grace provides postretirement health care and life insurance benefits (referred to as other post-employment benefits or "OPEB") for retired employees of certain U.S. business units and certain divested units. The postretirement medical plan provides various levels of benefits to employees hired before 1991 and who retire from Grace after age 55 with at least 10 years of service. These plans are unfunded and Grace pays a portion of the costs of benefits under these plans as they are incurred. Grace applies SFAS No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions," which requires that the future costs of postretirement health care and life insurance benefits be accrued over the employees' years of service.

Retirees and beneficiaries covered by the postretirement medical plan are required to contribute a minimum of 40% of the calculated premium for that coverage. During 2002, per capita costs under the retiree medical plans exceeded caps on the amount Grace was required to contribute under a 1993 amendment to the plan. As a result, for 2003 and future years, retirees will bear 100% of any increase in premium costs.

For 2005 measurement purposes, per capita costs, before retiree contributions, were assumed to initially increase at a rate of 10.5%. The rate is assumed to decrease gradually to 5.0% through 2010 and remain at that level thereafter. A one percentage point increase or decrease in assumed health care medical cost trend rates would have a negligible impact on Grace's postretirement benefit obligations.

In December 2003, President George W. Bush signed the Medicare Prescription Drug, Improvement and Modernization Act of 2003 (the "Act") into law. The Act introduces a prescription drug benefit under Medicare ("Medicare Part D") as well as a federal subsidy to companies that provide a benefit that is at least actuarially equivalent (as defined in the Act) to Medicare Part D. On January 21, 2005, the Center for Medicare and Medicaid Services released the final regulations implementing the Act. Grace has determined that the prescription drug benefit under its postretirement health care plan is actuarially equivalent to the Medicare Part D benefit. Therefore, the accumulated postretirement benefit obligation (APBO) was remeasured as of January 21, 2005 to reflect the amount associated with the federal subsidy. The APBO was reduced by approximately $14.6 million and the net periodic benefit cost for 2005 was reduced by approximately $1.9 million due to the effect of the federal subsidy.

CC-BLG003168

*Analysis of Plan Accounting and Funded Status* — The following table summarizes the changes in benefit obligations and fair value of retirement assets during 2005 and 2004 (Grace uses a December 31 measurement date for the majority of its plans):

F-34

| Change in Financial Status of Retirement Plans (in millions) | Pension | | | | | | Other Post-Retirement Plans | |
|---|---|---|---|---|---|---|---|---|
| | U.S. | | Non-U.S. | | Total | | | |
| | 2005 | 2004 | 2005 | 2004 | 2005 | 2004 | 2005 | 2004 |
| **Change in Projected Benefit Obligation (PBO)** | | | | | | | | |
| Benefit obligation at beginning of year | $ 1,079.6 | $ 918.1 | $ 360.9 | $ 203.9 | $ 1,440.5 | $ 1,212.0 | $ 115.0 | $ 127.0 |
| Service cost | 16.4 | 14.1 | 6.9 | 6.3 | 23.3 | 20.4 | 0.5 | 0.5 |
| Interest cost | 57.9 | 59.5 | 17.1 | 16.4 | 75.0 | 75.9 | 4.9 | 6.6 |
| Plan participants' contributions | — | — | 0.8 | 0.8 | 0.8 | 0.8 | | |
| Amendments | 2.9 | — | — | — | 2.9 | — | | |
| Curtailments/settlements recognized | (0.3) | — | 2.3 | — | 2.0 | — | | |
| Acquisitions | — | — | — | — | — | — | | |
| Change in discount rates and other assumptions | 29.1 | 162.1 | 30.3 | 29.1 | 59.4 | 191.2 | (19.9) | (6.6) |
| Benefits paid | (91.4) | (74.2) | (14.7) | (14.4) | (106.1) | (88.6) | (11.9) | (12.5) |
| Currency exchange translation adjustments | — | — | (39.3) | 23.8 | (39.3) | 23.8 | | |
| Benefit obligation at end of year | $ 1,094.2 | $ 1,079.6 | $ 364.3 | $ 360.9 | $ 1,458.5 | $ 1,440.5 | $ 88.6 | $ 115.0 |
| **Change in Plan Assets** | | | | | | | | |
| Fair value of plan assets at beginning of year | $ 665.7 | $ 658.1 | $ 225.7 | $ 193.2 | $ 891.4 | $ 851.3 | — | — |
| Actual return on plan assets | 36.2 | 57.6 | 34.1 | 18.9 | 70.3 | 76.5 | — | — |
| Employer contributions | 35.0 | 24.2 | 12.7 | 9.1 | 47.7 | 33.3 | 11.9 | 12.5 |
| Acquisitions | — | — | — | — | — | — | — | — |
| Plan participants' contributions | — | — | 0.8 | 0.8 | 0.8 | 0.8 | — | — |
| Benefits paid | (91.4) | (74.2) | (14.7) | (14.4) | (106.1) | (88.6) | (11.9) | (12.5) |
| Currency exchange translation adjustments | — | — | (21.5) | 18.1 | (21.5) | 18.1 | | |
| Fair value of plan assets at end of year | $ 645.5 | $ 665.7 | $ 237.1 | $ 225.7 | $ 882.6 | $ 891.4 | $ — | $ — |
| Funded status (PBO basis) | $ (448.7) | $ (413.9) | $ (127.2) | $ (135.2) | $ (575.9) | $ (549.1) | $ (88.6) | $ (115.0) |
| Unrecognized transition obligation | — | — | — | — | — | — | | |
| Unrecognized actuarial loss | 581.1 | 561.0 | 125.7 | 135.7 | 706.8 | 697.7 | 24.5 | 45.1 |
| Unrecognized prior service cost (benefit) | 12.6 | 15.2 | 2.2 | 3.2 | 14.8 | 18.4 | (37.2) | (50.0) |
| Net amount recognized | $ 145.0 | $ 162.3 | $ 0.7 | $ 4.7 | $ 145.7 | $ 167.0 | $ (101.3) | $ (119.9) |
| **Amounts recognized in the Consolidated Balance Sheet consist of:** | | | | | | | | |
| Deferred pension costs | $ 3.4 | $ 2.9 | $ 105.4 | $ 116.6 | $ 108.8 | $ 119.5 | $ — | $ — |
| Pension obligation | (407.8) | (371.0) | (126.1) | (131.3) | (533.9) | (502.3) | (101.3) | (119.9) |
| Intangible asset | 12.7 | 15.3 | — | — | 12.7 | 15.3 | N/A | N/A |
| Accumulated other comprehensive loss | 536.7 | 515.1 | 21.4 | 19.4 | 558.1 | 534.5 | N/A | N/A |
| Net amount recognized | $ 145.0 | $ 162.3 | $ 0.7 | $ 4.7 | $ 145.7 | $ 167.0 | $ (101.3) | $ (119.9) |
| Increase (Decrease) in Minimum Liability Included in Other Comprehensive Income (Loss) | $ 21.6 | $ 116.9 | $ 2.0 | $ 9.2 | NM | NM | NM | NM |
| **Weighted Average Assumptions Used to Determine Benefit Obligations as of December 31** | | | | | | | | |
| Discount rate | | 5.50% | 5.50% | 4.66% | 5.11% | NM | NM | 5.50% | 5.50% |
| Rate of compensation increase | | 4.25% | 4.25% | 3.42% | 3.51% | NM | NM | NM | NM |

| Weighted Average Assumptions Used to Determine Net Periodic Benefit Cost (Income) for Years Ended December 31 | U.S. 2006 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Discount rate | 5.50% | 5.50% | 6.25% | 5.11% | 5.52% | NM | NM | 5.50% | 6.25% |
| Expected return on plan assets | 8.00% | 8.00% | 8.00% | 7.21% | 7.27% | NM | NM | NM | NM |
| Rate of compensation increase | 4.25% | 4.25% | 4.25% | 3.51% | 3.50% | NM | NM | NM | NM |

NM — Not meaningful

N/A — Not applicable

F-35

| Components of Net Periodic Benefit Cost (Income) (in millions) | 2005 | | | 2004 | | | 2003 | | |
|---|---|---|---|---|---|---|---|---|---|
| | U.S. | Non-U.S. | Other | U.S. | Non-U.S. | Other | U.S. | Non-U.S. | Other |
| Service cost | $ 16.4 | $ 6.9 | $ 0.5 | $ 14.1 | $ 6.3 | $ 0.5 | $ 9.8 | $ 5.3 | $ 0.6 |
| Interest cost | 57.9 | 17.1 | 4.9 | 59.5 | 16.4 | 6.6 | 56.4 | 14.4 | 8.1 |
| Expected return on plan assets | (51.1) | (15.5) | — | (50.7) | (14.3) | — | (44.5) | (13.3) | — |
| Amortization of transition obligation | — | — | — | 0.1 | — | — | 0.5 | — | — |

CC-BLG003169

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amortization of prior service cost (benefit) | 8.1 | 0.7 | (12.7) | 5.4 | 0.7 | (12.7) | 5.5 | 0.6 | (12.7) |
| Amortization of unrecognized actuarial loss | 22.9 | 8.1 | 1.6 | 17.6 | 6.3 | 2.6 | 18.4 | 4.4 | 3.7 |
| Net curtailment and settlement loss | 1.1 | 2.3 | — | — | 0.5 | — | — | 0.6 | — |
| Net periodic benefit cost (income) | $ 52.3 | $ 19.6 | $ (5.7) | $ 45.9 | $ 16.0 | $ (3.0) | $ 45.6 | $ 12.5 | $ (0.3) |

| Funded Status of U.S. Pension Plans (In millions) | Fully-Funded U.S. [1] Qualified Pension Plans | | | Underfunded U.S. [1] Qualified Pension Plans | | | Unfunded U.S. [2] Nonqualified Pension Plans | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2005 | 2004 | 2003 | 2005 | 2004 | 2003 | 2005 | 2004 | 2003 |
| Projected benefit obligation | $ 3.2 | $ 2.9 | $ 8.5 | $ 999.4 | $ 993.3 | $ 837.4 | $ 91.6 | $ 83.4 | $ 72.2 |
| Accumulated benefit obligation (ABO) | $ 3.2 | $ 2.9 | $ 8.4 | $ 961.6 | $ 954.9 | $ 813.3 | $ 86.4 | $ 77.4 | $ 69.5 |
| Fair value of plan assets | 5.3 | 4.4 | 10.5 | 640.2 | 661.3 | 647.6 | | | |
| Funded status (ABO basis) | $ 2.1 | $ 1.5 | $ 2.1 | $ (321.4) | $ (293.6) | $ (170.7) | $ (86.4) | $ (77.4) | $ (69.5) |
| Benefits paid | $ (0.1) | $ (0.1) | $ (1.0) | $ (80.4) | $ (69.7) | $ (65.6) | $ (10.9) | $ (4.4) | $ (4.4) |
| Discount rate | 5.50% | 5.50% | 6.25% | 5.50% | 5.50% | 6.25% | 5.50% | 5.50% | 6.25% |

| Funded Status of Non-U.S. Pension Plans (In millions) | Fully-Funded Non-U.S. [1] Pension Plans | | | Underfunded Non-U.S. [1] Pension Plans | | | Unfunded Non-U.S. [2] Pension Plans | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2005 | 2004 | 2003 | 2005 | 2004 | 2003 | 2005 | 2004 | 2003 |
| Projected benefit obligation | $ 217.5 | $ 211.6 | $ 172.9 | $ 16.3 | $ 17.4 | $ 14.3 | $ 130.5 | $ 131.9 | $ 106.7 |
| Accumulated benefit obligation | $ 202.3 | $ 196.2 | $ 159.7 | $ 14.5 | $ 14.7 | $ 12.5 | $ 119.7 | $ 123.0 | $ 101.6 |
| Fair value of plan assets | 229.0 | 219.3 | 187.9 | 8.1 | 6.4 | 5.3 | | | |
| Funded status (ABO basis) | $ 26.7 | $ 23.1 | $ 28.2 | $ (6.4) | $ (8.3) | $ (7.2) | $ (119.7) | $ (123.0) | $ (101.6) |
| Benefits paid | $ (9.0) | $ (8.9) | $ (8.5) | $ (0.7) | $ (0.8) | $ (0.7) | $ (5.0) | $ (4.7) | $ (4.4) |
| Weighted average discount rate | 4.87% | 5.40% | 5.65% | 7.08% | 6.21% | 5.99% | 4.09% | 4.50% | 5.25% |

[1] Plans intended to be advance-funded.

[2] Plans intended to be pay-as-you-go.

| Estimated Expected Future Benefit Payments Reflecting Future Service and Medicare Subsidy Receipts for the Fiscal Year(s) Ending (In millions) | Pension Plans | | Other Postretirement Plans | | |
|---|---|---|---|---|---|
| | U.S. Benefit Payments | Non-U.S. Benefit Payments | Benefit Payments | Medicare Subsidy Receipts | Total |
| 2006 | $ 81.5 | $ 14.7 | $ 9.7 | $ (3.7) | $ 102.2 |
| 2007 | 71.6 | 15.2 | 9.3 | (3.9) | 92.2 |
| 2008 | 72.1 | 16.4 | 9.0 | (4.1) | 93.4 |
| 2009 | 73.2 | 17.1 | 8.7 | (4.1) | 94.9 |
| 2010 | 74.5 | 18.3 | 8.5 | — | 101.3 |
| 2011-2015 | $ 395.7 | $ 102.2 | $ 38.9 | $ — | $ 536.8 |

*Discount Rate Assumption* – The assumed discount rate for pension plans reflects the market rates for high-quality corporate bonds currently available. The assumed discount rate is determined at the annual measurement date of December 31 and is subject to change each year based on changes in the overall market interest rates. For 2005 and 2004, the assumed discount rate for the U.S. qualified pension plans was selected by the Company, in consultation with its independent actuaries, based on a yield curve constructed from a portfolio of high quality bonds for which the timing and amount of cash outflows approximate the estimated payouts of the plan.

For 2003 and prior years, the assumed discount rate for the U.S. qualified pension plans was determined based on a comparison of historical spreads between the Company's selected discount rates and various benchmark interest rates (Moody's Corporate Aa Bond, 30-year Treasury Bond, PBGC Immediate Rate, etc.) over the past several years. The average of these spreads was then applied to the year-end benchmark interest rates.

As of December 31, 2005, the United Kingdom pension plan and German pension plans combined represented 87% of the benefit obligation of the non-U.S. pension plans. The assumed discount rates for these pension plans were selected by the Company, in consultation with its independent actuaries, based on yield curves constructed from a portfolio of Sterling and Euro denominated high quality bonds for which the timing and amount of cash outflows approximate the estimated payouts of the plans. The assumed discount rates for the remaining non-U.S. pension plans were determined based on the nature of the liabilities, local economic environments and available bond indices.

For 2004 and prior years, the Company, in consultation with its independent actuaries, set the assumed discount rates used for the non-U.S. pension plans based on the nature of the liabilities, local economic environments and available bond indices.

*Investment Guidelines for Advance-Funded Pension Plans* –The target allocation of investment assets for 2006, the actual allocation at December 31, 2005 and 2004, and the expected long-term rate of return by asset category for Grace's U.S. qualified pension plans are as follows:

| U.S. Qualified Pension Plans Asset Category | Target Allocation 2006 | Percentage of Plan Assets December 31, 2005 | 2004 | Weighted-Average Expected Long-Term Rate of Return 2005 |
|---|---|---|---|---|
| U.S. equity securities | 45% | 44% | 45% | 4.46 |
| Non-U.S. equity securities | 15% | 15% | 16% | 0.76 |
| Short-term debt securities | 10% | 14% | 13% | 0.60 |

CC-BLG003170

| | | | | |
|---|---|---|---|---|
| Intermediate-term debt securities | 30% | 27% | 26% | 2.18 |
| Total | 100% | 100% | 100% | 8.00 |

The investment goal for the U.S. qualified pension plans, subject to advance funding, is to earn a long-term rate of return consistent with the related cash flow profile of the underlying benefit obligation.

The U.S. qualified pension plans have assets managed by five investment managers under investment guidelines summarized as follows:

F-37

- For debt securities: single issuers are limited to 5% of the portfolio's market value (with the exception of U.S. government and agency securities); the average credit quality of the portfolio shall be at least A rated; no more than 20% of the market value of the portfolio shall be invested in non-dollar denominated bonds; and privately placed securities are limited to no more than 50% of the portfolio's market value.

- For U.S. equity securities: the portfolio is entirely passively managed through investment in the Dow Jones Wilshire 5000 index fund, which is invested primarily in equity securities with the objective of approximating as closely as possible the capitalization weighted total rate of return of the entire U.S. market for publicly traded securities.

- For non-U.S. equity securities: no individual security shall represent more than 5% of the portfolio's market value at any time; investment in U.S. common stock securities is prohibited (with the exception of American Depository Receipts) and emerging market securities may represent up to 30% of the total portfolio's market value. Currency futures and forward contracts may be held for the sole purpose of hedging existing currency risk in the portfolio.

For 2006, the expected long-term rate of return on assets for the U.S. qualified pension plans is 8.0% (also 8.0% in 2005). Average annual returns over one, two, three, five, ten and fifteen-year periods were 6.36%, 8.08%, 12.71%, 3.76%, 7.25%, and 8.16%, respectively. Negative returns across broad categories of U.S. equity securities in 2000, 2001 and 2002 caused lower returns in periods greater than three years.

Non-U.S. pension plans accounted for approximately 27% and 25% of total global pension assets at December 31, 2005 and 2004, respectively. Each of these plans, where applicable, follow local requirements and regulations. Some of the local requirements include the establishment of a local pension committee, a formal statement of investment policy and procedures, and routine valuations by plan actuaries.

The target allocation of investment assets for non-U.S. pension plans varies depending on the investment goals of the individual plans. The plan assets of the United Kingdom pension plan represent approximately 83% and 84% of the total non-U.S. pension plan assets at December 31, 2005 and 2004, respectively.

The target allocation of investment assets for 2006, the actual allocation at December 31, 2005 and 2004, and the expected long-term rate of return by asset category for Grace's United Kingdom pension plan are as follows:

| United Kingdom Pension Plans Asset Category | Target Allocation 2006 | Percentage of Plan Assets December 31, 2005 | Percentage of Plan Assets December 31, 2004 | Weighted-Average Expected Long-Term Rate of Return 2005 |
|---|---|---|---|---|
| U.K. equity securities | 30% | 30% | 30% | 2.55 |
| Non-U.K. equity securities | 20% | 21% | 21% | 2.00 |
| U.K. gilts | 20% | 20% | 20% | 0.90 |
| U.K. corporate bonds | 30% | 29% | 29% | 1.55 |
| Total | 100% | 100% | 100% | 7.00 |

The plan assets of the Canadian pension plans represent approximately 6% of the total non-U.S. pension plan assets at December 31, 2005 and 2004. The target allocation of investment assets for 2006, the actual allocation at December 31, 2005 and 2004, and the expected long-term rate of return by asset category for Grace's Canadian pension plans are as follows:

| Canadian Pension Plans Asset Category | Target Allocation 2006 | Percentage of Plan Assets December 31, 2005 | Percentage of Plan Assets December 31, 2004 | Weighted-Average Expected Long-Term Rate of Return 2005 |
|---|---|---|---|---|
| Equity securities | 55% | 59% | 58% | 5.50 |
| Bonds | 45% | 41% | 42% | 2.50 |
| Total | 100% | 100% | 100% | 8.00 |

The plan assets of the other country plans represent approximately 11% and 10% in the aggregate (with no country representing more than 3% individually) of total non-U.S. pension plan assets at December 31, 2005 and 2004, respectively.

F-38

*Plan Contributions and Funding* – Subject to the approval of the Bankruptcy Court, it is Grace's intention to satisfy its obligations under the Plans and to comply with all of the requirements of the Employee Retirement Income Security Act of 1974. On June 22, 2005, Grace obtained Bankruptcy Court approval to fund minimum required payments of approximately $46 million for the period from July 2005 through June 2006. In that regard, Grace contributed approximately $15 million in July 2005, approximately $9 million in October 2005 and approximately $9 million in January 2006, to the trusts that hold assets of the Plans. However, there can be no assurance that the Bankruptcy Court will continue to approve arrangements to satisfy the funding needs of the Plans. Based on the Plan's status as of December 31, 2005, Grace's ERISA obligations for 2006, 2007, and 2008 would be approximately $93 million, $61 million, and $41 million, respectively.

Contributions to non-U.S. pension plans are not subject to Bankruptcy Court approval and Grace intends to fund such plans based on actuarial and trustee recommendations. Grace expects to contribute approximately $13 million to its non-U.S. pension plans and $6 million to its other postretirement plans in 2006.

Grace plans to pay benefits as they become due under virtually all pay-as-you-go plans and to maintain compliance with federal

CC-BLG003171

funding laws for its U.S. qualified pension plans.

**19. Operating Segment Information**

Grace is a global producer of specialty chemicals and materials. It generates revenues from two operating segments: Grace Davison, which includes silica- and alumina-based catalysts and materials used in a wide range of industrial applications; and Grace Performance Chemicals, which includes specialty chemicals and materials used in commercial and residential construction and in rigid food and beverage packaging. Intersegment sales, eliminated in consolidation, are not material. The table below presents information related to Grace's operating segments for 2005, 2004, and 2003. Only those corporate expenses directly related to the segment are allocated for reporting purposes. All remaining corporate items are reported separately and labeled as such.

F-39

| Operating Segment Data (In millions) | | 2005 | | 2004 | | 2003 |
|---|---|---|---|---|---|---|
| Net Sales | | | | | | |
| Grace Davison | $ | 1,370.2 | $ | 1,192.2 | $ | 1,039.9 |
| Grace Performance Chemicals | | 1,199.3 | | 1,067.7 | | 940.6 |
| Total | $ | 2,569.5 | $ | 2,259.9 | $ | 1,980.5 |
| Pre-tax Operating Income | | | | | | |
| Grace Davison | $ | 157.1 | $ | 148.2 | $ | 118.9 |
| Grace Performance Chemicals | | 151.1 | | 131.8 | | 107.9 |
| Total | $ | 308.2 | $ | 280.0 | $ | 226.8 |
| Depreciation and Amortization | | | | | | |
| Grace Davison | $ | 76.0 | $ | 74.6 | $ | 67.6 |
| Grace Performance Chemicals | | 33.7 | | 32.0 | | 33.1 |
| Total | $ | 109.7 | $ | 106.6 | $ | 100.7 |
| Capital Expenditures | | | | | | |
| Grace Davison | $ | 48.8 | $ | 43.4 | $ | $58.1 |
| Grace Performance Chemicals | | 25.6 | | 17.8 | | 16.5 |
| Total | $ | 74.4 | $ | 61.2 | $ | 84.6 |
| Total Assets | | | | | | |
| Grace Davison | $ | 869.0 | $ | 890.9 | $ | $797.1 |
| Grace Performance Chemicals | | 665.6 | | 674.5 | | 609.2 |
| Total | $ | 1,534.6 | $ | 1,565.4 | $ | 1,406.3 |

F-40

The following table presents information related to the geographic areas in which Grace operated in 2005, 2004 and 2003.

| Geographic Area Data (In millions) | | 2005 | | 2004 | | 2003 |
|---|---|---|---|---|---|---|
| Net Sales | | | | | | |
| United States | $ | 945.4 | $ | 873.2 | $ | 804.3 |
| Canada and Puerto Rico | | 141.7 | | 105.8 | | 78.9 |
| Total North America | | 1,087.1 | | 979.0 | | 883.2 |
| Germany | | 121.0 | | 111.6 | | 92.2 |
| Europe, other than Germany | | 815.1 | | 704.1 | | 584.7 |
| Total Europe | | 936.1 | | 815.7 | | 676.9 |
| Asia Pacific | | 403.2 | | 349.2 | | 312.7 |
| Latin America | | 143.1 | | 116.0 | | 107.7 |
| Total | $ | 2,569.5 | $ | 2,259.9 | $ | 1,980.5 |
| Properties and Equipment, net | | | | | | |
| United States | $ | 348.2 | $ | 364.6 | $ | 386.4 |
| Canada and Puerto Rico | | 18.9 | | 19.0 | | 19.4 |
| Total North America | | 367.1 | | 383.6 | | 405.8 |
| Germany | | 104.6 | | 126.2 | | 120.7 |
| Europe, other than Germany | | 63.6 | | 77.0 | | 72.3 |
| Total Europe | | 168.2 | | 203.2 | | 193.0 |
| Asia Pacific | | 41.3 | | 46.7 | | 46.8 |
| Latin America | | 13.1 | | 11.8 | | 11.0 |
| Total | $ | 589.7 | $ | 645.3 | $ | 656.6 |
| Goodwill and Other Assets | | | | | | |
| United States | $ | 155.9 | $ | 147.2 | $ | 113.0 |
| Canada and Puerto Rico | | 18.9 | | 19.2 | | 4.1 |
| Total North America | | 174.8 | | 166.4 | | 117.1 |
| Germany | | 41.5 | | 50.6 | | 48.0 |
| Europe, other than Germany | | 139.3 | | 157.4 | | 146.6 |
| Total Europe | | 180.8 | | 208.0 | | 194.6 |
| Asia Pacific | | 13.3 | | 13.4 | | 13.6 |
| Latin America | | 16.3 | | 13.9 | | 16.1 |

CC-BLG003172

| Total | $ | 385.2 $ | | 401.7 $ | | 341.4 |
|-------|---|---------|--|---------|--|-------|

Cash value of life insurance policies, net of policy loans and asbestos-related insurance are held entirely in the U.S.

Pre-tax operating income, depreciation and amortization, capital expenditures and total assets for Grace's operating segments are reconciled below to amounts presented in the Consolidated Financial Statements.

F-41

| Reconciliation of Operating Segment Data to Financial Statements<br>(In millions) | | 2005 | | 2004 | | 2003 |
|---|---|---|---|---|---|---|
| Pre-tax operating income – operating segments | $ | 308.2 | $ | 280.0 | $ | 226.8 |
| Minority interest | | 21.1 | | 8.7 | | (1.2) |
| Gain (loss) on sale of investments and disposal of assets | | (1.8) | | (0.8) | | (1.5) |
| Provision for environmental remediation | | (25.0) | | (21.6) | | (142.5) |
| Provision for asbestos-related litigation, net | | — | | (476.6) | | (30.0) |
| Net gain from litigation settlement | | — | | 51.2 | | — |
| Interest expense and related financing costs | | (55.3) | | (111.1) | | (15.6) |
| Corporate costs | | (106.7) | | (100.7) | | (78.1) |
| Other, net | | 0.1 | | (6.2) | | (11.8) |
| Income (loss) from operations before Chapter 11 expenses, income taxes, and minority interest | $ | 140.6 | $ | (377.1) | $ | (53.9) |
| Depreciation and amortization<br>—operating segments | $ | 109.7 | $ | 106.6 | $ | 100.7 |
| —corporate | | 4.3 | | 2.2 | | 2.2 |
| Total depreciation and amortization | $ | 114.0 | $ | 108.8 | $ | 102.9 |
| Capital Expenditures<br>—operating segments | $ | 74.4 | $ | 61.2 | $ | 84.6 |
| —corporate | | 6.5 | | 1.7 | | 1.8 |
| Total capital expenditures | $ | 80.9 | $ | 62.9 | $ | 86.4 |
| Total assets<br>—operating segments | $ | 1,534.6 | $ | 1,565.4 | $ | 1,406.3 |
| —corporate | | 276.7 | | 279.4 | | 272.4 |
| Cash and equivalents | | 474.7 | | 510.4 | | 309.2 |
| Asbestos-related insurance | | 500.0 | | 500.0 | | 269.4 |
| Deferred tax assets | | 731.2 | | 683.7 | | 618.0 |
| Total assets | $ | 3,517.2 | $ | 3,538.9 | $ | 2,875.3 |

Minority interest primarily pertains to Advanced Refining Technologies LLC ("ART"), a joint venture between Grace and Chevron Products Company where Grace has a 55% economic interest.

Corporate costs include expenses of corporate headquarters functions incurred in support of core operations, such as corporate financial and legal services, human resources management, communications and regulatory affairs. This item also includes certain pension and postretirement benefits, including the amortization of deferred costs, that are considered a core operating expense but not allocated to operating segments.

F-42

## 20. Quarterly Summary and Statistical Information *(Unaudited)*

| Quarterly Summary and Statistical Information ( *Unaudited* )<br>(In millions, except per share) | | March 31 | | June 30 | | September 30 | | December 31 [1] |
|---|---|---|---|---|---|---|---|---|
| **2005** | | | | | | | | |
| Net sales | $ | 603.2 | $ | 676.5 | $ | 653.4 | $ | 636.4 |
| Cost of goods sold | | 392.7 | | 439.7 | | 426.0 | | 431.4 |
| Net income (loss) | | 3.1 | | 32.7 | | 32.1 | | (0.6) |
| Net income (loss) per share: [2] | | | | | | | | |
| Basic earnings (loss) per share: | | | | | | | | |
| Net income (loss) | $ | 0.05 | $ | 0.49 | $ | 0.48 | $ | (0.01) |
| Diluted earnings (loss) per share: | | | | | | | | |
| Net income (loss) | | 0.05 | | 0.49 | | 0.48 | | (0.01) |
| Market price of common stock: [3] | | | | | | | | |
| High | $ | 13.79 | $ | 11.59 | $ | 11.72 | $ | 10.47 |
| Low | | 8.49 | | 7.11 | | 7.32 | | 6.75 |
| Close | | 8.52 | | 7.79 | | 8.95 | | 9.40 |

CC-BLG003173

**2004**

| | | | | | |
|---|---|---|---|---|---|
| Net sales | $ | 518.5 $ | 572.4 $ | 579.9 $ | 589.1 |
| Cost of goods sold | | 331.2 | 357.2 | 361.3 | 381.8 |
| Net income (loss) | | 15.8 | 21.3 | 48.0 | (487.4) |
| Net income (loss) per share: (2) | | | | | |
| Basic earnings (loss) per share: | | | | | |
| Net income (loss) | $ | 0.24 $ | 0.32 $ | 0.73 $ | (7.36) |
| Diluted earnings (loss) per share: | | | | | |
| Net income (loss) | | 0.24 | 0.32 | 0.72 | (7.36) |
| Market price of common stock: (3) | | | | | |
| High | $ | 3.70 $ | 6.50 $ | 9.53 $ | 14.95 |
| Low | | 2.55 | 2.51 | 5.26 | 9.34 |
| Close | | 3.12 | 6.20 | 9.45 | 13.61 |

(1) *Fourth quarter 2005 net loss contains a provision for environmental remediation of $25.0 million. Fourth quarter 2004 net loss includes a $714.8 million pre-tax charge to adjust Grace's recorded asbestos-related liability to the maximum amount permitted as a condition precedent under Grace's proposed plan of reorganization (the "Plan"); a pre-tax credit for expected insurance recovery related to asbestos liabilities of $238.2 million; a $94.1 million pre-tax charge to increase the interest to which general unsecured creditors would be entitled under the Plan; a $151.7 million pre-tax credit for net income tax benefits related to the above items; and an $82.6 million tax liability on the expected taxable distributions from foreign subsidiaries to fund the Plan.*

(2) *Per share results for the four quarters may differ from full-year per share results, as a separate computation of the weighted average number of shares outstanding is made for each quarter presented.*

(3) *Principal market: New York Stock Exchange.*

F-43

**Financial Summary (1)**
(In millions, except per share amounts)

| | | 2005 | 2004 | 2003 | 2002 | 2001 |
|---|---|---|---|---|---|---|
| **Statement of Operations** | | | | | | |
| Net sales | $ | 2,569.5 $ | 2,259.9 $ | 1,980.5 $ | 1,819.7 $ | 1,722.9 |
| Income (loss) from continuing operations before Chapter 11 expenses, income taxes, and minority interest (2) | | 140.6 | (377.1) | (53.9) | 92.4 | 161.7 |
| Minority interest in consolidated entities | | (21.1) | (8.7) | 1.2 | (2.2) | (3.7) |
| Net income (loss) (2) | | 67.3 | (402.3) | (55.2) | 22.1 | 78.6 |
| **Financial Position** | | | | | | |
| Cash and cash equivalents | $ | 474.7 $ | 510.4 $ | 309.2 $ | 283.6 $ | 191.9 |
| Current assets | | 1,253.6 | 1,228.5 | 930.0 | 830.3 | 741.3 |
| Current liabilities | | 377.1 | 372.2 | 247.5 | 239.5 | 231.2 |
| Properties and equipment, net | | 589.7 | 645.3 | 656.6 | 622.2 | 590.3 |
| Total assets | | 3,517.2 | 3,538.9 | 2,875.3 | 2,691.7 | 2,521.1 |
| Total liabilities | | 4,112.5 | 4,160.7 | 3,039.1 | 2,913.9 | 2,662.8 |
| Liabilities subject to compromise (a subset of total liabilities) | | 3,155.1 | 3,207.7 | 2,452.3 | 2,334.7 | 2,311.5 |
| Shareholders' equity (deficit) | | (595.3) | (621.8) | (163.8) | (222.2) | (141.7) |
| **Cash Flow** | | | | | | |
| Operating activities | $ | 54.2 $ | 313.0 $ | 110.8 $ | 195.5 $ | 14.6 |
| Investing activities | | (64.8) | (125.6) | (109.1) | (110.7) | (131.4) |
| Financing activities | | (10.1) | (0.7) | (4.7) | (9.2) | 123.7 |
| Net cash flow | | (35.7) | 201.2 | 25.6 | 91.7 | — |
| **Data Per Common Share (Diluted)** | | | | | | |
| Net income (loss) (2) | $ | 1.00 $ | (6.11) $ | (0.84) $ | 0.34 $ | 1.20 |
| Average common diluted shares outstanding (thousands) | | 67,300 | 65,800 | 65,500 | 65,500 | 65,400 |
| **Other Statistics** | | | | | | |
| Capital expenditures | $ | 80.9 $ | 62.9 $ | 86.4 $ | 91.1 $ | 62.9 |
| Common stock price range | $ | 6.75-13.79 $ | 2.51-14.95 $ | 1.48-5.52 $ | 0.99-3.75 $ | 1.31-4.38 |
| Common shareholders of record | | 9,883 | 10,275 | 10,734 | 11,187 | 11,643 |
| Number of employees (approximately) | | 6,400 | 6,500 | 6,300 | 6,400 | 6,400 |

(1) *Certain prior-year amounts have been reclassified to conform to the 2005 presentation.*

(2) *Amounts in 2005 contain a provision for environmental remediation of $25.0 million. Amounts in 2004 reflect the following adjustments: a $714.8 million pre-tax charge to increase Grace's recorded asbestos-related liability to the maximum amount permitted as a condition precedent under Grace's Plan of Reorganization (the "Plan"); a pre-tax credit for expected insurance recovery related to asbestos liabilities of $238.2 million; a $94.1 million pre-tax charge to increase the interest to which general unsecured creditors would be entitled under the Plan; a $151.7 million pre-tax credit for net income tax benefits related to the above items; and an $82.6 million tax liability on the expected taxable distributions from foreign subsidiaries to fund the Plan. Amounts in 2003 contain a provision for environmental remediation of $142.5 million and a provision for asbestos-related claims of $30.0 million. Amounts in 2002 contain a provision for environmental remediation of $70.7 million.*

F-44

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

CC-BLG003174

Financial Summary for December 31, 2005

Following is a summary analysis of key financial measures of our performance for the year ended December 31, 2005 compared with the prior year.

- Net income for each period has been primarily affected by: 1) the results of our businesses – which is categorized as "core operations"; and 2) the impact of legal contingencies and other nonoperating liabilities -- which is categorized as "noncore activities".

- Net income for the year ended December 31, 2005 was $67.3 million, compared with a net loss in 2004 of $402.3 million. Net income for 2005 included interest accruals of $50.6 million ($32.9 million after tax) on prepetition liabilities and a $25.0 million ($16.3 million after tax) charge for environmental remediation. It also included income from insurance carriers of $44.5 million ($28.9 million after tax) for losses related to pre-chapter 11 asbestos and environmental claims. The net loss in 2004 included a $476.6 million pre-tax charge ($309.8 million after tax) to adjust our liability for asbestos-related litigation, net of insurance, as reflected in our proposed plan of reorganization, and a $94.1 million pre-tax charge ($61.2 million after tax) to adjust interest accruals on pre-petition obligations to the rates reflected in the plan.

- Sales increased 13.7% for the year ended December 31, 2005 primarily as a result of higher sales volume in all geographic regions, improved product mix and selling price increases in response to cost inflation.

- Pre-tax income from core operations increased 12.4% for the year ended December 31, 2005, due to higher sales, favorable currency exchange rates, and acquisitions. Pretax income was negatively impacted by raw material and utility inflation that was partially offset by increased selling prices and productivity.

- Pre-tax operating income of our Grace Performance Chemicals operating segment increased 14.6% for the year ended December 31, 2005 reflecting higher sales volume, and positive results from productivity and cost containment initiatives, partially offset by raw material cost inflation

- Pre-tax operating income of our Grace Davison operating segment increased 6.0% for the year ended December 31, 2005 reflecting higher sales from both volume and mix factors, improved productivity over 2004 and selling price increases that partially offset higher raw material and natural gas costs.

- Operating cash flow was $54.2 million and $313.0 million for the years ended December 31, 2005 and 2004, respectively. The 2005 cash flow reflects an increase in working capital in response to higher sales as well as bankruptcy court-approved payments aggregating $119.7 million to resolve U.S. federal tax return audits and an environmental contingency at a formerly owned site.

We are attempting to resolve noncore liabilities and contingencies through our Chapter 11 proceeding. Our noncore liabilities include asbestos-related litigation, environmental remediation, tax disputes and business litigation. Our operating statements include periodic adjustments to account for changes in estimates of such liabilities and developments in our Chapter 11 proceeding. These liabilities and contingencies may result in continued volatility in net income in the future.

*Effect of Hurricanes Katrina and Rita*

On August 29, 2005, Hurricane Katrina made landfall in Louisiana, Mississippi and Alabama, causing widespread wind and water damage. Katrina caused shutdowns of several refineries in the affected area, including a number of customers that regularly use our Grace Davison fluid catalytic cracking, or FCC, catalysts, and also disrupted other business operations and construction activity. The shutdowns and disruptions negatively affected our sales, and the damage to infrastructure in the affected area increased sales and distribution costs of our FCC catalyst products business for the remainder of 2005. We did not incur property damage losses as a result of Hurricane Katrina  Business interruption impacts from Hurricane Katrina were below our insurance deductible.

On September 25, 2005, Hurricane Rita made landfall in Louisiana and Texas, also causing widespread wind and water damage and further disrupting refinery and other business operations and construction activity. Our Grace Davison production facility for refining catalysts in Lake Charles, Louisiana is located in an area that was particularly hard-hit by Rita. Our Lake Charles facility was shut down for two weeks but returned to full production before the end of October. We were able to supply our customers during the shutdown, but incurred increased production and distribution costs by supplying products from our other catalyst plants. We also incurred additional expenses to support our displaced workers in Lake Charles during the storm's aftermath. Our energy and raw material costs were driven higher as a result of both hurricanes.

We incurred property damage losses at our Lake Charles facility and business interruption costs throughout North America as a result of Hurricane Rita. Property damage and

F-45

cleanup at our Lake Charles facility was less than the deductible of our insurance policy. Business interruption impacts from Hurricane Rita were approximately $7.1 million for which we reached agreement for approximately $2.7 million from our insurance carrier after deductibles, which is included in other (income) expense.

Description of Core Business

We are engaged in specialty chemicals and specialty materials businesses on a worldwide basis through our two operating segments:

*Grace Davison* includes:

- catalysts and chemical additives used by petroleum refiners, including fluid catalytic cracking, or FCC, catalysts, that help to "crack" the hydrocarbon chain in distilled crude oil to produce transportation fuels, such as gasoline and diesel fuels, and other petroleum-based products, and FCC additives used to reduce sulfur in gasoline, maximize propylene production from refinery FCC units, and reduce emissions of sulfur oxides, nitrogen oxides and carbon monoxide from refinery FCC units

CC-BLG003175

hydroprocessing catalysts used by petroleum refiners in process reactors to upgrade heavy oils into lighter, more useful products by removing impurities such as nitrogen, sulfur and heavy metals, allowing less expensive feedstocks to be used in the petroleum refining process

- specialty catalysts, including polyolefin catalysts and catalyst supports that are essential components in the manufacture of polyethylene and polypropylene resins, and other chemical catalysts used in a variety of industrial, environmental and consumer applications

- silica-based and silica-alumina-based engineered materials used in:

    - industrial markets, such as coatings, plastics and rubber, precision investment casting, refractory, insulating glass windows, desiccants, and gas and liquids purification

    - consumer applications, such as food products, toothpaste, pharmaceutical and personal care products, and the processing of edible oils and beverages

    - digital media coatings on ink jet papers

- silica-based materials and chromatography columns, instruments, consumables and accessories used in life and analytical sciences applications

We conduct our hydroprocessing catalyst business through Advanced Refining Technologies, LLC, or ART, our joint venture with Chevron Products Company. We report 100% of the revenues of our ART joint venture, but only receive 55% of the income after the minority interest.

Key external factors for our FCC catalysts and hydroprocessing catalysts are the economics of the petroleum refining industry, specifically the impacts of demand for transportation fuels and petrochemical products, and crude oil supply.

Sales of our other three Grace Davison product groups are affected by general economic conditions including the underlying growth rate of targeted end-use applications.

*Grace Performance Chemicals, or GPC,* includes:

- Construction materials and systems, including concrete admixtures and fibers used to improve the durability and working properties of concrete, additives used in cement processing to improve energy efficiency and enhance the characteristics of finished cement, waterproofing materials used in commercial and residential construction and renovation to protect buildings from water penetration, and fireproofing materials used to protect buildings from structural failure in the event of fire

- Packaging technologies, primarily specialty sealants and coatings used in rigid food and beverage packages, including can and closure sealants used to seal and enhance the shelf life of can and bottle contents, and coatings for cans and closures that prevent metal corrosion, protect package contents from the influence of metal and ensure proper adhesion of sealing compounds

Construction products sales are affected by non-residential construction activity and, to a lesser extent, residential construction activity, which both tend to lag the general economy in both decline and recovery. Waterproofing products sales are also significantly affected by residential renovation activity. A significant portion of our sales of construction products are in the U.S., so it is most dependent on the level of U.S. construction activity.

Our packaging technologies sales are affected by general economic conditions globally as well as an ongoing shift in demand from metal and glass to plastic packaging for foods and beverages. This shift is causing a decline in can sealant usage, but provides opportunities for closure sealants and other products for plastic packaging.

*Global scope* – We operate our business on a global scale with more than 60% of our revenue and 40% of our operating property outside the United States. Our business is conducted in more than 40 countries and in more than 20 currencies. Our operating segments are managed on a global basis, serving global markets, with currency fluctuations in relation to the U.S. dollar affecting reported earnings, net assets and cash flows.

F-46

The table below shows the sales of our operating segments as a percentage of our total sales.

| Percentage of Total Grace Sales | 2005 | 2004 | 2003 |
|---|---|---|---|
| Grace Davison | 53.3% | 52.8% | 52.5% |
| Grace Performance Chemicals | 46.7% | 47.2% | 47.5% |
| Total | 100.0% | 100.0% | 100.0% |
| Grace U.S. | 36.8% | 38.6% | 40.6% |
| Grace non-U.S. | 63.2% | 61.4% | 59.4% |
| Total | 100.0% | 100.0% | 100.0% |

**Voluntary Bankruptcy Filing**

In response to a sharply increasing number of asbestos-related personal injury claims, on April 2, 2001, Grace and 61 of our United States subsidiaries and affiliates, including W. R. Grace & Co. – Conn., filed voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. Our non-U.S. subsidiaries and certain of our U.S. subsidiaries were not included in the Chapter 11 filing.

Under Chapter 11, we have continued to operate as debtors-in-possession under court protection from creditors and claimants, while using the Chapter 11 process to develop and implement a plan for addressing the asbestos-related claims. Since the Chapter 11 filing, all motions necessary to conduct normal business activities have been approved by the bankruptcy court.

On January 13, 2005, we filed an amended plan of reorganization and related documents with the bankruptcy court. The plan of

CC-BLG003176

reorganization is supported by committees representing general unsecured creditors and equity holders, but is not supported by committees representing asbestos personal injury claimants and asbestos property damage claimants. Under the terms of the plan of reorganization, a trust would be established to which all pending and future asbestos-related claims would be channeled for resolution. The plan of reorganization can become effective only after a vote of eligible creditors and with the approval of the bankruptcy court and the U.S. District Court for the District of Delaware. See "Plan of Reorganization" below for more information.

Critical Accounting Estimates

The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires that we make estimates and assumptions affecting the assets and liabilities reported at the date of the Consolidated Financial Statements, and the revenues and expenses reported for the periods presented. Actual amounts could differ from those estimates. Changes in estimates are recorded in the period identified. Accounting measurements that are most affected by our estimates of future events are:

* Contingent liabilities such as asbestos-related matters (see Notes 2 and 3 to the Consolidated Financial Statements), environmental remediation (see Note 14 to the Consolidated Financial Statements), income taxes (see Note 14 to the Consolidated Financial Statements), and litigation (see Note 14 to the Consolidated Financial Statements).

* Pension and postretirement liabilities that depend on assumptions regarding discount rates and/or total returns on invested funds. (See Note 18 to the Consolidated Financial Statements.)

* Liabilities for employee incentive compensation and customer rebates.

* Depreciation and amortization periods for long-lived assets, including property and equipment, intangible, and other assets.

* Realization values of various assets such as net deferred tax assets, trade receivables, inventories, insurance receivables, properties and equipment, and goodwill.

The accuracy of these and other estimates may also be materially affected by the uncertainties arising under our Chapter 11 proceeding.

Summary Financial Information and Metrics

Set forth on the next page is a chart that lists our key operating statistics, and dollar and percentage changes for the years ended December 31, 2005, 2004, and 2003. You should reference this chart when reading management's discussion and analysis of financial condition and the results of operations.

F-47

| Analysis of Continuing Operations (in millions) | 2005 | 2004 | $ Change Fav (Unfav) | % Change Fav (Unfav) | 2003 | $ Change Fav (Unfav) | % Change Fav (Unfav) |
|---|---|---|---|---|---|---|---|
| Net Sales: | | | | | | | |
| Grace Davison | $ 1,370.2 | $ 1,192.2 | $ 178.0 | 14.9% | $ 1,039.9 | $ 152.3 | 14.6% |
| Grace Performance Chemicals | 1,199.3 | 1,067.7 | 131.6 | 12.3% | 940.6 | 127.1 | 13.5% |
| Total Grace net sales | $ 2,569.5 | $ 2,259.9 | $ 309.6 | 13.7% | $ 1,980.5 | $ 279.4 | 14.1% |
| Pre-tax operating income: | | | | | | | |
| Grace Davison [1] | $ 157.1 | $ 148.2 | $ 8.9 | 6.0% | $ 118.9 | $ 29.3 | 24.6% |
| Grace Performance Chemicals | 151.1 | 131.8 | 19.3 | 14.6% | 107.9 | 23.9 | 22.2% |
| Corporate costs: | | | | | | | |
| Support functions | (41.4) | (33.4) | (8.0) | (24.0%) | (30.2) | (3.2) | (10.6%) |
| Pension, performance-related compensation, and other | (65.3) | (67.3) | 2.0 | 3.0% | (47.9) | (19.4) | (40.5%) |
| Total Corporate costs | (106.7) | (100.7) | (6.0) | (6.0%) | (78.1) | (22.6) | (28.9%) |
| Pre-tax income from core operations | 201.5 | 179.3 | 22.2 | 12.4% | 148.7 | 30.6 | 20.6% |
| Pre-tax income (loss) from noncore activities | (30.3) | (457.1) | 426.8 | 93.4% | (190.1) | (267.0) | (140.5%) |
| Interest expense | (55.3) | (111.1) | 55.8 | 50.2% | (15.6) | (95.5) | NM |
| Interest income | 3.6 | 3.1 | 0.5 | 16.1% | 4.3 | (1.2) | (27.9%) |
| Income (loss) before Chapter 11 expenses and income taxes | 119.5 | (385.8) | 505.3 | 131.0% | (52.7) | (333.1) | NM |
| Chapter 11 expenses, net | (30.9) | (18.0) | (12.9) | (71.7%) | (14.8) | (3.2) | (21.6%) |
| Benefit from (provision for) income taxes | (21.3) | 1.5 | (22.8) | NM | 12.3 | (10.8) | (87.8%) |
| Net income (loss) | $ 67.3 | $ (402.3) | $ 469.6 | 116.7% | $ (55.2) | $ (347.1) | NM |
| Key Financial Measures: | | | | | | | |
| Pre-tax income from core operations as a percentage of sales: | | | | | | | |
| Grace Davison | 11.5% | 12.4% | NM | (0.9) pts | 11.4% | NM | 1.0 pts |
| Grace Performance Chemicals | 12.6% | 12.3% | NM | 0.3 pts | 11.5% | NM | 0.8 pts |
| Total Core Operations | 7.8% | 7.9% | NM | (0.1) pts | 7.5% | NM | 0.4 pts |
| Total Core Operations adjusted for profit sharing of joint ventures [2] | 8.7% | 8.3% | NM | 0.4 pts | 7.4% | NM | 0.9 pts |

CC-BLG003177

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Pre-tax income from core operations before depreciation and amortization | $ 315.5 | $ 288.1 | $ 27.4 | 9.5% | $ 251.6 | $ 36.5 | 14.5% |
| As a percentage of sales | 12.3% | 12.7% | NM | (0.4) pts | 12.7% | NM | — |
| Depreciation and amortization | 114.0 | 108.8 | 5.2 | 4.8% | 102.9 | 5.9 | 5.7% |
| Gross profit percentage (sales less cost of goods sold as a percent of sales) (3) : | | | | | | | |
| Grace Davison | 28.8% | 30.7% | NM | (1.9) pts | 27.8% | NM | 2.9 pts |
| Grace Performance Chemicals | 34.0% | 35.5% | NM | (1.5) pts | 35.5% | NM | — |
| Total Grace | 31.0% | 33.0% | NM | (2.0) pts | 31.2% | NM | 1.8 pts |
| **Net Consolidated Sales by Region:** | | | | | | | |
| North America | $ 1,087.1 | $ 979.0 | $ 108.1 | 11.0% | $ 883.2 | $ 95.8 | 10.8% |
| Europe | 936.1 | 815.7 | 120.4 | 14.8% | 676.9 | 138.8 | 20.5% |
| Asia Pacific | 403.2 | 349.2 | 54.0 | 15.5% | 312.7 | 36.5 | 11.7% |
| Latin America | 143.1 | 116.0 | 27.1 | 23.4% | 107.7 | 8.3 | 7.7% |
| Total | $ 2,569.5 | $ 2,259.9 | $ 309.6 | 13.7% | $ 1,980.5 | $ 279.4 | 14.1% |

NM = No: meaningful

(1) Grace Davison pre-tax operating income includes minority interest related to the Advanced Refining Technologies joint venture.

(2) Reflects the add-back of minority interests in consolidated subsidiaries.

(3) Includes depreciation and amortization related to manufacturing of products.

F-48

The above chart, as well as the financial information presented throughout this discussion, divides our financial results between "core operations" and "noncore activities." Core operations comprise the financial results of Grace Davison, Grace Performance Chemicals, and the costs of corporate activities that directly or indirectly support our business operations. In contrast, noncore activities comprise all other events and transactions not directly related to the generation of operating revenue or the support of our core operations and generally relate to our former operations and products. See "Pretax Income (Loss) from Noncore Activities" for more information about noncore activities. We use pre-tax income from core operations as a factor in determining certain incentive compensation and as a key factor in our decision-making process.

Neither pre-tax income from core operations nor pre-tax income from core operations before depreciation and amortization purport to represent income or cash flow as defined under generally accepted accounting principles, and you should not consider them an alternative to such measures as an indicator of our performance. We provide these measures so you can distinguish the operating results of our current business base from the results and related assets and liabilities of our past businesses, discontinued products, and corporate legacies including the effect of our Chapter 11 proceedings.

**Grace Overview**

The following is an overview of our financial performance for the years ended December 31, 2005, 2004 and 2003.

*Net Sales* – The following table identifies the year-over-year increase or decrease in sales attributable to changes in product volume, product price and/or mix, and the impact of foreign currency translation.

| Net Sales Variance Analysis | 2005 as a Percentage Increase (Decrease) from 2004 | | | |
|---|---|---|---|---|
| | Volume | Price/Mix | Currency Translation | Total |
| Grace Davison | 3.9% | 10.3% | 0.7% | 14.9% |
| Grace Performance Chemicals | 8.0% | 3.1% | 1.2% | 12.3% |
| Net sales | 5.8% | 7.0% | 0.9% | 13.7% |
| **By Region:** | | | | |
| North America | 3.0% | 7.8% | 0.2% | 11.0% |
| Europe | 8.0% | 5.6% | 1.2% | 14.8% |
| Asia Pacific | 5.8% | 8.4% | 1.3% | 15.5% |
| Latin America | 14.3% | 5.7% | 3.4% | 23.4% |

| | 2004 as a Percentage Increase (Decrease) from 2003 | | | |
|---|---|---|---|---|
| Grace Davison | 4.8% | 6.0% | 3.8% | 14.6% |
| Grace Performance Chemicals | 10.7% | (1.0%) | 3.8% | 13.5% |
| Net sales | 7.6% | 2.7% | 3.8% | 14.1% |
| **By Region:** | | | | |
| North America | 6.9% | 3.6% | 0.3% | 10.8% |
| Europe | 8.9% | 2.2% | 9.4% | 20.5% |
| Asia Pacific | 7.0% | 2.0% | 2.7% | 11.7% |
| Latin America | 7.1% | 0.4% | 0.2% | 7.7% |

Sales for 2005 were favorably impacted by higher volume (including acquisitions), product mix, price increases, and favorable currency translation from a weaker U.S. dollar. Acquisitions contributed $42.5 million or 1.9 percentage points of the sales growth.

CC-BLG003178

Sales for 2004 were favorably impacted by improved volume and product mix, favorable currency translation, and revenue from acquisitions. Acquisitions contributed $45.0 million or 2.3 percentage points of the sales growth. The impact from foreign currency translation is primarily reflected in European sales from the strengthening of the Euro against the U.S. dollar.

Sales from non-U.S. operations were positively impacted by foreign currency translation in 2005 and 2004. For countries in which we operate, weighted average foreign currency exchange rates appreciated, relative to the U.S. dollar, by approximately 1.3% and 5.7%, in 2005 and 2004, respectively.



Grace Net Sales
($ in millions)

*Pre-tax Income from Core Operations* – Operating profit for 2005 improved over 2004 due to higher sales volume, including acquisitions, and positive results from productivity and cost containment initiatives, partially offset by raw material cost inflation and the negative effects of the hurricanes in the Gulf of Mexico.

F-49

Corporate costs include corporate functional costs (such as financial and legal services, human resources, communications and information technology), the cost of corporate governance (including directors and officers liability insurance, a portion of which is allocated to noncore activities) and pension costs related to both corporate employees and to the effects of changes in assets and liabilities for all of our pension plans. Corporate costs for the year ended December 31, 2005 increased over the prior year primarily due to higher pension expense, resulting from updated assumptions for expected life-spans, the longevity of our active work force, and amortization of deferred costs related to capital market returns in recent years, and costs to support global supply chain and corporate communications initiatives.

During the 2003-2005 period, we continued to focus on productivity improvements to offset general inflation. The results of these productivity initiatives are reflected in: (1) sales – through added plant capacity resulting from improved production processes; (2) lower costs – through efficiency gains and purchasing synergies; (3) capital expenditure avoidance – by maximizing asset utilization, and (4) lower working capital requirements.

We value our U.S. inventories under the last-in/first- out method, or LIFO, and our non-U.S. inventories under the first-in/first-out, or FIFO, method. LIFO was selected in 1974 for U.S. financial reporting and tax purposes because it generally results in a better matching of current revenue with current costs during periods of inflation. We have not elected LIFO for our non-U.S. inventories due to statutory restrictions. However, if we valued our U.S. inventories using the FIFO method, consistent with our non-U.S. subsidiaries, our pre-tax income from core operations would have been approximately 8.0%, 6.0%, and 4.0% higher for each of the years ended December 31, 2005, 2004, and 2003, respectively.



Grace
Operating Income and Margin
($ in millions)

Operating Income   —◆— Operating Margin

*Pre-tax Income (Loss) from Noncore Activities* – Pre-tax income (loss) from noncore activities reflects financial matters unrelated to our core operating units. This category of costs and income is expected to be volatile as potentially material items are addressed through our Chapter 11 proceedings and/or as the financial implications of our legal contingencies become apparent. Some noncore activities are shown as separate items on the Consolidated Statement of Operations. Those not separately listed are primarily included in selling, general and administrative expenses and in other (income) expense. The following table shows the components of noncore activities:

| (in millions) | 2005 | 2004 | 2003 |
|---|---|---|---|
| Provision for environmental remediation – vermiculite | $ (22.3) | $ (20.0) | $ (122.5) |
| Provision for environmental remediation – other sites | (2.7) | (1.6) | (20.0) |
| Insurance settlements – environmental and asbestos-related | 44.5 | 11.1 | — |
| Provision for asbestos-related litigation, net | — | (476.6) | (30.6) |
| Asbestos administration, net | (0.9) | (0.7) | — |
| COLI income, net | 3.5 | 3.0 | 5.6 |
| D&O insurance cost – portion related to Chapter 11 | (5.7) | (6.8) | (6.8) |
| Pension and postretirement benefit costs – divested businesses | (9.5) | (9.6) | (9.6) |
| Translation effects – intercompany loan | (35.9) | 29.3 | — |
| Value of currency contracts | 25.7 | (19.5) | — |
| Foreign currency transaction effects | 0.1 | (1.4) | (4.2) |
| Net gain from litigation settlement | — | 51.2 | — |
| Legal defense costs | (22.0) | — | — |
| Other | (6.1) | 4.5 | (3.2) |
| | $ (30.3) | $ (457.1) | $ (190.1) |

Changes to pre-tax income (loss) from noncore activities were attributable primarily to: (1) the foreign currency effect of an intercompany loan as described below, (2) $44.5 million paid by insurance carriers with respect to coverage for past environmental remediation costs and asbestos-related liability under liquidation arrangements or dispute settlements, (3) legal defense costs of $22.0 million related to the Montana and New Jersey legal proceedings (see Note 14 to the Consolidated Financial Statements for more information), (4) a pre-tax charge of $714.8 million ($476.6 million net of estimated insurance proceeds) in 2004 to increase our

CC-BLG003179

recorded asbestos-related liability (see Note 3 to the Consolidated Financial Statements for more information), and (5) a net gain of $51.2 million in 2004 from the settlement of

F-50

litigation under an agreement with Honeywell International, Inc. related to environmental contamination of a non-operating parcel of land.

In March 2004, we began accounting for currency fluctuations on a €293 million intercompany loan between our subsidiaries in the United States and Germany as a component of operating results instead of as a component of other comprehensive income. This change was prompted by our analysis of new tax laws in Germany and our cash flow planning in connection with our Chapter 11 reorganization, which together indicated that we should no longer consider this loan as part of our permanent capital structure in Germany. In May 2004, we entered into a series of foreign currency forward contracts to mitigate future currency fluctuations on the remaining loan balance. Contract amounts of €200.7 million were extended in June 2005 and have varying rates that coincide with loan repayments due periodically through December 2008. No loan repayments were made in 2005. For the year ended December 31, 2005, a $35.7 million contract gain was recognized, offset by a $35.9 million foreign currency loss, and was reported in other (income) expense. These forward contracts are derivative instruments that we use as risk management tools. We do not use them for trading or speculative purposes.

The 2003 pre-tax loss from noncore activities was attributable primarily to pre-tax charges to adjust our estimated liabilities for pre-Chapter 11 contingencies. We increased our estimated liability for environmental clean-up related to previously operated vermiculite mining and processing sites by $122.5 million to a total of $181.0 million at December 31, 2003. We also recorded a $20.0 million increase in our estimated liability for non-vermiculite related environmental risks identified and measured as part of the Chapter 11 claims review process. In addition, we recorded a $30.0 million increase in our estimated liability for asbestos-related litigation to account for the estimated cost of resolving new asbestos-related property damage claims received through the Chapter 11 claims solicitation process.

*Chapter 11 Expenses* – Although we are unable to measure precisely the impact of the Chapter 11 proceedings on our overall financial performance, we incur certain added costs that are directly attributable to operating in Chapter 11. Net Chapter 11 expenses consist primarily of legal, financial and consulting fees that we, and the three creditors' committees, incur. They fluctuate with the activity in our Chapter 11 proceedings.

Our pre-tax income from core operations included expenses for Chapter 11-related compensation charges of $17.5 million, $28.9 million, and $15.4 million for the years ended December 31, 2005, 2004, and 2003, respectively. Poor Grace common stock price performance in the period leading up to and after the Chapter 11 filing diminished the value of our stock option program as an incentive compensation tool for current and prospective employees, which caused us to change our long-term incentive compensation from an equity-based to a cash-based program.

We incur numerous other indirect costs to manage the Chapter 11 proceedings such as: management time devoted to Chapter 11 matters; added cost of debt capital; added costs of general business insurance, including D&O liability insurance premiums; and lost business and acquisition opportunities due to the complexities and restrictions of operating under Chapter 11.

*Interest Expense* – In 2004, net interest expense was $108.0 million which reflected in part the retroactive application of the higher interest rate provided for in the plan of reorganization. As a result of this additional charge in 2004, interest expense was lower in 2005. The plan of reorganization states that each holder of an allowed general unsecured claim shall be paid in full, plus post-petition interest. Post-petition interest shall accrue through the date of payment as follows:

- for the holders of pre-petition bank credit facilities, at a rate of 6.09% per annum, compounded quarterly through December 31, 2005 (effective for periods after January 1, 2006 we have agreed to pay interest on prepetition bank debt at the prime rate reset and compounded quarterly. That rate is 7.25% for the first quarter of 2006);

- for the holders of claims who, but for the Chapter 11 filing, would be entitled under a contract or otherwise to accrue or be paid interest on such claim in a non-default (or non-overdue payment) situation under applicable non-bankruptcy law, the rate provided in the contract between the Grace entity and the claimant or such rate as may otherwise apply under applicable non-bankruptcy law; or

- for all other holders of allowed general unsecured claims, at a rate of 4.19% per annum, compounded annually.

Such interest, which under the plan of reorganization is payable 85% in cash and 15% in Grace common stock, will not be paid until the plan of reorganization is confirmed and funded.

*Income Taxes* – Income tax benefit (provision) at the federal corporate rate of 35% for the years 2005, 2004 and 2003 was $(21.3) million, $141.3 million, and $23.6 million, respectively. Our recorded tax provision of $(21.3) million for 2005 reflects a reduction from the statutory tax benefit for (1) a favorable reassessment of certain tax contingencies, and (2) a release of the valuation allowance in a non-U.S. subsidiary prompted by a favorable law change. In 2004, the primary differences between the income tax benefit at the federal corporate rate of 35% and the recorded income tax benefit were due to an accrual of tax on undistributed earnings of non-U.S. subsidiaries and a net increase in the valuation allowance on the realization of U.S.

F-51

net deferred tax assets. In 2003, the primary differences between the income tax benefit at the federal corporate rate of 35% and the recorded income tax benefit were the current period interest on tax contingencies and the non-deductibility of certain Chapter 11 expenses.

As part of our evaluation and planning for the funding requirements of the plan of reorganization, we have concluded that the financing of the plan of reorganization will likely involve cash and financing from non-U.S. subsidiaries. We anticipate that approximately $500 million will be sourced in this manner. Approximately $255 million can be repatriated by way of intercompany debt repayments and the remaining $233 million by way of taxable dividends. Accordingly, in 2004, we recorded a deferred tax liability of $82 million to recognize the expected taxable elements of financing our plan of reorganization. We have not provided for U.S. federal, state, local and foreign deferred income taxes on approximately $279 million of undistributed earnings of foreign subsidiaries that are expected to be retained indefinitely by such subsidiaries for reinvestment.

We also have significant deferred tax assets primarily associated with asbestos- and environmental-related liabilities that would reduce taxable income in future periods as such liabilities are funded, and net operating loss and tax credit carryforwards. In addition, we have deferred tax liabilities resulting primarily from deferred income, plant and equipment, and pension assets that may result in taxable amounts in future periods. Valuation allowances have been established and are maintained for the federal deferred tax assets based upon our analysis of the tax assets that can be realized under reasonable scenarios of future taxable income under various operating income growth rates, tax planning options, and asset sales. Although several scenarios supported full recovery of recorded tax assets, other scenarios indicated that a partial impairment may exist. Therefore, we continue to maintain a valuation allowance on our net U.S. deferred tax assets.

Because of our current and future state tax profile and more restrictive laws governing the utilization of tax loss carryforwards, we increased our valuation allowance for deferred state tax assets by $11.8 million in 2005. In addition we reversed $10.4 million of valuation allowances relating primarily to a non-U.S. subsidiary due to a change in law and income projections that made it more likely than not that prior loss carryforwards would be utilized before expiring. We increased our valuation allowance by $1.3 million for federal tax credit carryforwards.

The net additional valuation allowance brings our total valuation allowance to $245.3 million on net tax assets of $921.4 million. The total valuation allowance covers (1) state tax deductions with a tax value of approximately $152.3 million, which we do not expect to

realize in reduced taxes due to timing limitations, (2) foreign loss and credit carryforwards with a tax value of $22.3 million, which we do not expect to be able to use during the relevant carryforward periods, and (3) net federal deferred tax assets, including currently available net operating loss carryforwards, with a tax value of $70.7 million, which do not meet our test for realization. We expect to realize the remaining net recorded deferred tax asset of $676.1 million over time. A large proportion of such balance (primarily associated with asbestos- and environmental- related liabilities) is not yet time-limited as it pertains to liabilities not yet funded. Our recovery of such net tax assets could be materially affected by developments in our Chapter 11 proceeding.

On October 22, 2004, President George W. Bush signed the American Jobs Creation Act of 2004, or Jobs Act, into law. The Jobs Act provides for, among other things, an 85% dividends received deduction with respect to certain dividends received from a U.S. corporation's foreign subsidiaries. The dividends must be used to fund certain permitted domestic activities, as specified in the Jobs Act. These domestic activities include the building or improvement of infrastructure, research and development, and the financial stabilization of the company. The IRS recently issued guidelines clarifying that companies such as Grace with net operating loss carryforwards would be eligible to utilize foreign tax credits to offset U.S. taxes on certain foreign dividends. As a result of this clarification, we intend to elect to apply the provisions of the Jobs Act to the approximately $56.2 million in dividends that we received from our foreign subsidiaries during the 2005 tax period.

**Operating Segment Overview**

The following is an overview of financial measures of the performance of our operating segments for the three years ended December 31, 2005.

*Grace Davison*

| Net Sales by Region (in millions) | 2005 | 2004 | 2003 |
|---|---|---|---|
| North America | $ 508.9 | $ 453.9 | $ 395.2 |
| Europe | 561.4 | 498.1 | 418.3 |
| Asia Pacific | 239.1 | 194.1 | 177.7 |
| Latin America | 60.8 | 46.1 | 48.7 |
| Total Grace Davison | $ 1,370.2 | $ 1,192.2 | $ 1,039.9 |

F-52

| Percentage Change in Net Sales by Region | 2005 vs. 2004 | 2004 vs. 2003 | 2003 vs. 2002 |
|---|---|---|---|
| North America | 12.1% | 14.9% | 1.8% |
| Europe | 12.7% | 19.1% | 18.1% |
| Asia Pacific | 23.2% | 9.2% | 21.1% |
| Latin America | 31.9% | (5.3%) | (3.2%) |
| Total Grace Davison | 14.9% | 14.6% | 10.7% |

*Recent Acquisitions*

See Note 5 to the Consolidated Financial Statements for a description of acquisitions completed in 2005 and 2004.

*Sales*

The key factors contributing to the Grace Davison sales increase over the three-year period were:

- increased demand for catalysts used by petroleum refiners, particularly FCC catalysts used to help produce clean fuels and hydroprocessing catalysts that upgrade low-quality, heavy crude oil

- growth in specialty catalysts used in the manufacture of polyethylene and polypropylene, driven by strength in the U.S. economy

- pass-through of higher costs for commodity metals and surcharges to partially offset natural gas inflation

Sales increases were partially offset by reduced demand for silica-based products used in industrial applications, especially in Europe, and lost volume due to the impact of the hurricanes in the Gulf of Mexico on our customers in 2005.

Sales from acquisitions accounted for $28.7 million, or 2.4 percentage points of the sales growth in 2005, almost all of which was attributable to our acquisition of Alltech International Holdings, Inc. completed in August 2004, and $22.6 million or 2.2 percentage points of 2004 sales growth from other acquisitions of businesses in the life sciences product lines. Sales increases related to favorable currency translation were 0.7% and 3.8% in 2005 and 2004, respectively.

Sales growth over the three-year period was strong in all regions except Latin America. Sales in Asia Pacific were up due to strong demand in all product groups resulting from economic activity in China. In North America, increased sales were primarily attributable to volume growth, as well as favorable product price/mix, reflecting stronger economic activity in the United States. European sales were higher due to higher demand for refining catalysts, which more than offset the effects of lower economic activity in parts of that region. In Latin America, the strong sales growth in 2005 more than offset the lower sales growth in 2004, driven primarily by demand in refining technologies.

**Grace Davison Net Sales**
**($ in millions)**

CC-BLG003181



## Operating Income and Margin

Grace Davison 2005 pretax operating income reflects higher sales in all regions and major product lines and from acquisitions; partially offset by the negative effects of the hurricanes in the Gulf of Mexico, higher raw material and energy costs and incremental costs associated with integrating business functions and processes. We report 100% of sales for the Advanced Refining Technologies LLC joint venture, but only account for 55% of the income in our measure of operating performance.

Pre-tax operating income for the Davison Chemicals segment was up in 2004 compared with 2003, primarily from higher sales in North America and Europe, as well as foreign currency translation effects on Euro-based sales. The operating margin increase over the prior-year period was attributable to favorable product mix and positive results from productivity initiatives, partially offset by higher raw material and energy costs



### Grace Davison
### Operating Income and Margin
### ($ in millions)



F-53

## Grace Performance Chemicals

| Net Sales by Region (In millions) | 2005 | 2004 | 2003 |
|---|---|---|---|
| North America | $ 578.2 | $ 525.1 | $ 488.0 |
| Europe | 374.7 | 317.6 | 258.6 |
| Asia Pacific | 164.1 | 155.1 | 135.0 |
| Latin America | 82.3 | 69.9 | 59.0 |
| Total Grace Performance Chemicals | $ 1,199.3 | $ 1,067.7 | $ 940.6 |

| Percentage Change in Net Sales by Region | 2005 vs. 2004 | 2004 vs. 2003 | 2003 vs. 2002 |
|---|---|---|---|
| North America | 10.1% | 7.6% | (1.4%) |
| Europe | 18.0% | 22.8% | 25.1% |
| Asia Pacific | 5.8% | 14.9% | 10.4% |
| Latin America | 17.7% | 18.5% | 4.8% |
| Total Grace Performance Chemicals | 12.3% | 13.5% | 6.8% |

## Recent Acquisitions

See Note 5 to the Consolidated Financial Statements for a description of acquisitions completed in 2005 and 2004.

## Sales

The key factors contributing to the increase in sales from our Grace Performance Chemicals operating segment over the three-year period were:

* volume growth in products directed at high-growth industry, geographic and customer segments

* continued steady construction activity in the United States

* higher selling prices in response to increases in raw material costs

Sales growth was strong in all regions over the three-year period. Sales increases in North America reflected higher U.S. construction activity, growth programs in construction products and the Triflex acquisition, completed in the fourth quarter of 2004. In Europe, higher sales were primarily due to favorable foreign currency translation and growth programs in construction products. Sales in Asia Pacific increased as a result of broad-based volume growth and the effects of favorable foreign currency translation. Sales in Latin America were favorably impacted by currency translation and volume increases in construction chemicals and sealants and coatings.

### Grace Performance Chemicals Net Sales
### ($ in millions)

CC-BLG003182



*Operating Income and Margin*

Grace Performance Chemicals 2005 operating income increased compared with 2004, reflecting higher sales volume, and positive results from productivity and cost containment initiatives, partially offset by raw material cost inflation.

Increases in operating income for 2004 compared with 2003 were driven by sales increases, successful productivity and cost containment programs, and favorable foreign exchange translation, partially offset by raw material and energy cost increases.



**Grace Performance Chemicals
Operating Income and Margin
($ in millions)**

**Operating Returns on Assets Employed** – The following charts set forth the Grace Davison and Grace Performance Chemicals total asset position and pre-tax return on average total assets for 2005, 2004, and 2003. You should note that we devote significantly higher capital to the manufacture of Grace Davison products than to the manufacture of Grace Performance Chemicals products. Conversely, nonmanufacturing costs, particularly selling expenses, are significantly

higher for Grace Performance Chemicals than for Grace Davison.

| Grace Davison (in millions) | 2005 | 2004 | 2003 |
|---|---|---|---|
| Trade receivables | $ 178.2 | $ 172.0 | $ 144.2 |
| Inventory | 177.6 | 151.8 | 133.6 |
| Other current assets | 24.3 | 4.9 | 4.2 |
| Total current assets | 380.1 | 328.7 | 282.0 |
| Properties and equipment, net | 390.7 | 437.6 | 444.0 |
| Goodwill and other intangible assets | 98.2 | 105.7 | 65.8 |
| Other assets | — | 18.9 | 5.3 |
| Total assets | $ 869.0 | $ 890.9 | $ 797.1 |
| Pre-tax return on average total assets | 17.9% | 17.8% | 15.4% |

Grace Davison's total assets decreased by $21.9 million in 2005 compared with the prior year. The decrease was due to depreciation and amortization expense and from $45.5 million in lower foreign currency translation reflecting a stronger U.S. dollar period over period. Increased trade receivables and inventory, caused by increased sales and higher raw material costs, partially offset the decrease.

| Grace Performance Chemicals (in millions) | 2005 | 2004 | 2003 |
|---|---|---|---|
| Trade receivables | $ 222.7 | $ 219.1 | $ 186.8 |
| Inventory | 100.7 | 96.5 | 80.9 |
| Other current assets | 15.7 | 14.5 | 15.3 |
| Total current assets | 339.1 | 330.1 | 283.0 |
| Properties and equipment, net | 183.2 | 198.3 | 203.2 |
| Goodwill and other intangible assets | 93.5 | 102.2 | 84.5 |
| Other assets | 49.8 | 43.9 | 38.5 |
| Total assets | $ 665.6 | $ 674.5 | $ 609.2 |
| Pre-tax return on average total assets | 22.4% | 20.7% | 18.8% |

Grace Performance Chemicals' total assets decreased by $8.9 million in 2005 compared with the prior year. The decrease was due to depreciation and amortization expense and from $33.5 million in lower foreign currency translation reflecting a stronger U.S. dollar period over period. The increase in trade receivables and inventory, due to overall sales growth, partially offset the decrease.

**Noncore Liabilities**

We have a number of financial exposures originating from past businesses, products and events. These obligations arose from transactions and/or business practices that date to when Grace was a much larger company, when we produced products or operated

CC-BLG003183

businesses that are no longer part of our revenue base, and when government regulation was less stringent and scientific knowledge with respect to such businesses and products was much less advanced than today.

The following table summarizes our net noncore liabilities at December 31, 2005 and December 31, 2004:

| Net Noncore Liabilities<br>In millions | December 31,<br>2005 | | December 31,<br>2004 | |
|---|---|---|---|---|
| Asbestos-related liabilities | $ | (1,700.0) | $ | (1,700.0) |
| Asbestos-related insurance receivable | | 500.0 | | 500.0 |
| Asbestos-related liability, net | | (1,200.0) | | (1,200.0) |
| Environmental remediation | | (342.0) | | (345.0) |
| Postretirement benefits | | (101.2) | | (118.9) |
| Income taxes | | (134.5) | | (210.4) |
| Retained obligations and other | | (25.4) | | (25.1) |
| Net noncore liability | $ | (1,803.2) | $ | (1,899.4) |

The resolution of most of these noncore recorded and contingent liabilities will be determined through the Chapter 11 proceedings. We cannot predict with any certainty how, and for what amounts, any of these contingencies will be resolved. The amounts of these liabilities as ultimately determined through the Chapter 11 proceedings could be materially different from amounts we recorded at December 31, 2005.

**Plan of Reorganization**

As described under ''Voluntary Bankruptcy Filing'' in Notes 1 and 2 to the Consolidated Financial Statements, Grace and our principal U.S. operating subsidiary are debtors-in-possession under Chapter 11 of the bankruptcy code. Our non-U.S. subsidiaries, although not part of the Chapter 11 filing, are owned directly or indirectly by our principal operating subsidiary or other filing entities. Consequently, we expect that any Chapter 11 plan of reorganization, including our proposed plan of reorganization, will involve the combined value of our global businesses and other assets to fund (with cash and/or securities) our obligations as adjudicated through the bankruptcy process. We have analyzed our cash flow and capital needs to continue to fund our businesses and believe that, while in Chapter 11, sufficient cash flow and credit facilities are available to support our business strategy.

On January 13, 2005, we filed a plan of reorganization and related documents that amended our original plan of reorganization and disclosure statement filed on November 13, 2004 to address certain objections of creditors and other interested

parties. The plan of reorganization is supported by committees representing general unsecured creditors and equity holders, but is not supported by committees representing asbestos personal injury claimants and asbestos property damage claimants. See Note 2 to the Consolidated Financial Statements for more information on the plan of reorganization.

*Risks of the plan of reorganization* – We intend to address all pending and future asbestos-related claims and all other pre-petition claims as outlined in the plan of reorganization. However, we may not be successful in obtaining approval of the plan of reorganization by the Bankruptcy Court. Instead, a materially different plan of reorganization may ultimately be approved and, under the ultimate plan of reorganization, the interests of Grace shareholders could be substantially diluted or cancelled. The value of Grace common stock following a plan of reorganization, and the extent of any recovery by non-asbestos-related creditors, will depend principally on the allowed value of our asbestos-related claims as determined by the Bankruptcy Court.

Our proposed plan of reorganization assumes several fundamental conditions including that:

* our asbestos-related liabilities can be resolved at a net present value cost of no more than $1,700 million (including $87 million for pre-petition asbestos-related contractual settlements and judgments), including all property damage claims (including claims related to our former Zonolite Attic Insulation, or ZAI, product) and all pending and future personal injury claims

* the benefit of assets from litigation settlement agreements with Sealed Air Corporation and its subsidiary, Cryovac, Inc., and Fresenius Medical Care Holdings, Inc. will be available to satisfy liabilities under the plan of reorganization

There can be no guarantee that these two fundamental conditions can be met. The measure of our asbestos-related liabilities could be settled by the bankruptcy court (in conformity with the plan of reorganization or otherwise), by a negotiation with interested parties, and/or by legislation (currently being considered by the U.S. Congress) for the personal injury component of this contingency.

In May 2005, the U.S. Senate Judiciary Committee reported the Specter-Leahy Fairness in Asbestos Injury Resolution Act of 2005, or FAIR, to the U.S. Senate. The FAIR bill is intended to create a fair and efficient system to resolve claims of victims for personal injury caused by asbestos exposure. FAIR, as reported, provides for the creation of a government-administered trust, to be funded by payments from insurers and defendant companies. It also includes medical criteria against which monetary values have been assigned so that people with an asbestos-related condition will receive compensation under a no-fault system.

Under the current version of FAIR, our required payments to the fund would be approximately $30.4 million payable annually over a period of up to 30 years.

Whether FAIR, as reported or as it may be amended, is enacted into law is highly uncertain. Legislation to provide a resolution for asbestos personal injury litigation has been considered many times before and in no instance has legislation passed both houses of Congress. A resolution of personal injury claims based on FAIR may not satisfy the conditions precedent under the litigation settlement agreements with Sealed Air and Fresenius and, therefore, may reduce or eliminate the availability of those assets to fund a plan of reorganization.

Any resolution, other than that reflected in the plan of reorganization, could have a material adverse effect on the percentage of Grace common stock to be retained by current Grace shareholders beyond that reflected in the proforma financial information presented below. We will adjust our financial statements and the proforma effects of the plan of reorganization as facts and circumstances warrant.

*Proforma Financial Information* – The unaudited proforma financial information presented below reflects the accounting effects of our proposed plan of reorganization (1) as if it were put into effect on the date of our most recent consolidated balance sheet – December 31, 2005, and (2) as if it were in effect for the year ended December 31, 2005. The proforma financial information included herein, may not be consistent with the plan of reorganization documents filed on January 13, 2005 due to subsequent changes in operations and accounting estimates. Such proforma financial statements reflect how our assets, liabilities, equity and income would be affected by the plan of reorganization as follows:

CC-BLG003184

A. Borrowings Under New Debt Agreements and Contingencies

The plan of reorganization reflects the assumed establishment of a new $1,000 million debt facility to fund settled claims payable at the effective date of the plan of reorganization (approximately $800 million) and to provide working capital (approximately $200 million) for continuing operations Proforma expenses reflect an assumed 7% interest rate on outstanding borrowings. No such facility currently exists but, we expect, based on our discussions with prospective lenders, that we can obtain a facility before the effective date of the plan of reorganization. In addition, the proforma financial information reflects $150.0 million in contingencies to pay professional and bank fees, other non-operating liabilities and their related tax effects that will not become liabilities until the effective date of the plan of reorganization.

B. Fresenius and Sealed Air Settlements

The plan of reorganization reflects the value, in the form of cash and securities, expected to be realized under litigation

settlement agreements as follows: $115.0 million of cash from Fresenius; and, $1,108.3 million of estimated value from Cryovac, Inc., a subsidiary of Sealed Air (calculated as of December 31, 2005) in the form of $512.5 million of cash plus accrued interest at 5.5% from December 21, 2002 compounded annually (approximately $90.3 million), and nine million shares of Sealed Air common stock valued at $56.17 per share (approximately $505.5 million). Tax accounts have been adjusted to reflect the satisfaction of our recorded liabilities by way of these third-party agreements. The Fresenius settlement amount will be payable directly to Grace and will be accounted for as income. Payments under the Sealed Air settlement will be paid directly to the asbestos trust by Cryovac and will be accounted for as satisfaction of a portion of our recorded asbestos-related liability and a credit to shareholder's equity. In addition, the valuation allowance related to our federal deferred tax assets will not be required as a result of these settlements and has therefore been reversed. Both the Sealed Air and Fresenius settlements are subject to the fulfillment of specified conditions.

C. Payment of Pre-Petition Liabilities

The plan of reorganization reflects the transfer of funds and securities to settle estimated obligations payable under the plan of reorganization at the effective date. We have adjusted tax accounts to reflect the change in nature of our tax assets from predominantly temporary differences to predominantly time-limited tax net operating losses. We have assumed non-asbestos pass-through liabilities will be paid in cash when due.

D. Proforma Consolidated Statement of Operations and Capital Structure

The proforma income adjustments reflect the elimination from our 2005 Consolidated Statements of Operations of:

- charges and expenses directly related to Chapter 11

- other expenses and income related to matters expected to be resolved before emerging from Chapter 11

- the accounting for estimates and provisions directly related to the plan of reorganization

- the addition of interest and new shares of Grace common stock related to the assumed financing of the plan of reorganization

For purposes of proforma earnings per share and proforma share capital, we used the trading price of $9.40 per share as of December 31, 2005 for calculating issued and outstanding shares. At this per share valuation, we assume that 56.8 million shares will be issued at the effective date of the plan of reorganization to fund asbestos and general unsecured claims, 13.8 million shares would be issuable upon exercise of warrants to satisfy our estimate of PI-AO claims, and 0.7 million shares would be issued upon exercise of in-the-money stock options. We present the trading value solely to show a proforma Consolidated Statement of Operations and this trading value may not be indicative of the actual trading value of Grace common stock following the effective date of the plan of reorganization. If our distributable value per share at the effective date of the plan of reorganization is below approximately $7.85 per share, we would be required to revalue our balance sheet for a change in control. (The trading value of Grace common stock over the twelve-month period ended December 31, 2005 was between $6.75 and $13.79 per share.) These proforma financial statements reflect no change in assets or income related to this potential accounting outcome.

E. Non-asbestos Contingencies

The accompanying proforma financial information assumes all non-asbestos related contingencies (including environmental, tax and civil and criminal litigation) are settled for recorded amounts as of December 31, 2005. Certain liabilities are assumed to be paid at the effective date based on our estimate of amounts that will be determinable and payable. The remainder, which would also be subject to the plan of reorganization, if approved, is assumed to be paid subsequent to the effective date as amounts are either not due until a later date or will be determined through post-effective-date litigation. The ultimate value of such claims may change materially as Chapter 11 and other legal proceedings further define our non-asbestos related obligations.

| W. R. Grace & Co and Subsidiaries Proforma Condensed Consolidated Balance Sheet *(In millions)* | December 31, 2005 As Reported | Proforma Adjustments | | | December 31, 2005 Proforma |
|---|---|---|---|---|---|
| | | Borrowings Under New Debt Agreements and Contingencies | Sealed Air/ Fresenius Settlements | Payment of Remaining Pre-Petition Liabilities | |
| **ASSETS** | | | | | |
| **Current Assets** | | | | | |
| Cash and cash equivalents | $    474.7 | $    800.0 | $    115.0 | $    (994.5) | $    395.2 |
| Other current assets | 778.9 | — | — | — | 778.9 |
| Total Current Assets | 1,253.6 | 800.0 | 115.0 | (994.5) | 1,174.1 |
| Non-current operating assets | 974.9 | — | — | — | 974.9 |
| Cash value of life insurance | 84.8 | — | — | — | 84.8 |
| Deferred income taxes: | | | | | |
| Net operating loss carryforwards | 39.4 | — | (40.3) | 105.1 | 104.2 |
| Temporary differences, net of valuation allowance | 664.5 | 26.3 | (339.9) | (105.1) | 245.8 |

CC-BLG003185

| | As Reported | | | Proforma |
|---|---|---|---|---|
| Asbestos-related insurance | 500.0 | | — | 500.0 |
| Total Assets | $ 3,517.2 | $ 826.3 | $ (265.2) | $ (994.5) | $ 3,083.8 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT)** | | | | |
| Total current liabilities | $ 377.1 | $ — | $ — | $ — | $ 377.1 |
| Long-term debt | 0.4 | 800.0 | | | 800.4 |
| Other noncurrent liabilities | 579.9 | | | — | 579.9 |
| Total Liabilities Not Subject to Compromise | 957.4 | 800.0 | | — | 1,757.4 |
| Bank debt/letters of credit/capital leases | 684.7 | — | | (682.9) | 1.8 |
| Liability for asbestos-related litigation and claims | 1,700.0 | — | (1,108.3) | (461.7) | 130.0 |
| Liability for environmental remediation | 342.0 | — | — | (229.5) | 112.5 |
| Liability for postretirement health and special pensions | 187.7 | — | — | (11.0) | 176.7 |
| Liability for accounts payable and litigation | 106.2 | — | — | (81.5) | 24.7 |
| Liability for tax claims and contingencies | 134.5 | — | — | (12.0) | 122.5 |
| Other nonoperating liabilities, including plan of reorganization contingencies | — | 150.0 | — | (50.0) | 100.0 |
| Liabilities Subject to Compromise | 3,155.1 | 150.0 | (1,108.3) | (1,528.6) | 668.2 |
| Total Liabilities | 4,112.5 | 950.0 | (1,108.3) | (1,528.6) | 2,425.6 |
| **Shareholder's Equity (Deficit)** | | | | |
| Share capital | 424.2 | — | — | 534.1 | 958.3 |
| Retained earnings and other equity items | (1,019.5) | (123.7) | 843.1 | — | (300.1) |
| Total Shareholders' Equity (Deficit) | (595.3) | (123.7) | 843.1 | 534.1 | 658.2 |
| Total Liabilities and Shareholders' Equity (Deficit) | $ 3,517.2 | $ 826.3 | $ (265.2) | $ (994.5) | $ 3,083.8 |

Note    Proforma amounts in liabilities subject to compromise will be reclased to liabilities not subject to compromise after the proposed plan is in effect.

F-58

| W.R. Grace & Co. and Subsidiaries Proforma Consolidated Statement of Operations (In millions, except per share amounts) | Year Ended December 31, 2005 | | |
|---|---|---|---|
| | As Reported | Proforma Adjustments | Proforma |
| Net Sales | $ 2,569.5 | $ — | $ 2,569.5 |
| Cost of goods sold, exclusive of depreciation and amortization shown separately below | 1,689.8 | — | 1,689.8 |
| Selling, general and administrative expenses, exclusive of net pension expense shown separately below | 481.1 | (39.4) | 441.7 |
| Depreciation and amortization | 114.0 | — | 114.0 |
| Research and development expenses | 59.2 | — | 59.2 |
| Net pension expense | 71.9 | — | 71.9 |
| Interest expense and related financing costs | 55.3 | 1.6 | 56.9 |
| Provision for environmental remediation | 25.0 | (25.0) | — |
| Provision for asbestos-related litigation, net of insurance | — | — | — |
| Other (income) expense | (67.4) | 44.5 | (22.9) |
| Total costs and expenses | 2,428.9 | (18.3) | 2,410.6 |
| Income (loss) before Chapter 11 expenses, income taxes and minority interest | 140.6 | 18.3 | 158.9 |
| Chapter 11 expenses, net | (30.9) | 30.9 | — |
| Benefit from (provision for) income taxes | (21.3) | (26.9) | (48.2) |
| Minority interest in consolidated entities | (21.1) | — | (21.1) |
| Net income (loss) | $ 67.3 | $ 22.3 | $ 89.6 |
| Basic earnings (loss) per common share | $ 1.01 | $ | $ 0.72 |
| Weighted average number of basic shares | 66.8 | 57.5 | 124.3 |
| Diluted earnings (loss) per common share | $ 1.00 | $ | $ 0.65 |
| Weighted average number of diluted shares | 67.3 | 71.3 | 138.6 |

F-59

**Financial Condition**

*Asbestos-Related Litigation* – See Note 3 to the Consolidated Financial Statements.

*Environmental Matters* – See Note 14 to the Consolidated Financial Statements.

*Defined Benefit Pension Plans* – We sponsor defined benefit pension plans for our employees in the United States, Canada, the United Kingdom, Australia, Germany, Italy, France, Spain, Denmark, Japan, Philippines, South Korea, Taiwan, South Africa, Brazil and Mexico and fund government sponsored programs in other countries where we operate. Certain of our sponsored plans are advance-funded and others are pay-as-you-go. The advance-funded plans are administered by trustees who direct the management of plan assets and arrange to have obligations paid when due out of a trust. The most significant advance-funded plans cover our salaried employees in the U.S. and U.K. and employees covered by collective bargaining agreements at certain of our U.S. facilities.

At the December 31, 2005 measurement date for the U.S. advance-funded defined benefit pension plans, the accumulated benefit obligation, or ABO, was approximately $965 million as measured under U.S. generally accepted accounting principles. The ABO is measured as the present value (using a 5.5% discount rate as of December 31, 2005) of vested and non-vested benefits earned from employee service to date, based upon current salary levels. Such discount rate is based on a high quality bond portfolio designed to meet the payout pattern of the pension plans. Of the participants in the pension plans, approximately 80% are current retirees or

CC-BLG003186

employees of our former businesses, making the payout pattern skewed to the nearer term. Assets available to fund the ABO at December 31, 2005 were approximately $645 million, or approximately $320 million less than the measured obligation.

It is our intention to satisfy our obligations under the pension plans and to comply with all of the requirements of the Employee Retirement Income Security Act of 1974. On June 22, 2005 we obtained bankruptcy court approval to fund minimum required payments of approximately $46 million for the period July 2005 through June 2006. In that regard, we contributed approximately $15 million in July 2005, approximately $9 million in October 2005 and approximately $9 million in January 2006, to the trusts that hold assets of the pension plans. Contributions to non-U.S. plans are not subject to bankruptcy court approval and we intend to fund such plans based on actuarial and trustee recommendations; $12.7 million was funded during the year ended December 31, 2005.

See Note 18 to the Consolidated Financial Statements for the components of net periodic benefit cost for the years ended December 31, 2005, 2004 and 2003. Total pension expense for 2005 was approximately $72 million, and benefit payments to retirees aggregated approximately $106 million for all pension programs in 2005. At December 31, 2005, our recorded pension liability for U.S. and non-U.S. underfunded plans was $533.9 million ($447.5 million included in liabilities not subject to compromise and $86.4 million related to supplemental pension benefits, included in "liabilities subject to compromise") which includes the following components: (1) shortfall between dedicated assets and ABO of underfunded plans ($321.4 million); and (2) ABO of pay-as-you-go plans ($212.5 million).

*Postretirement Benefits Other Than Pensions* – We provide certain health care and life insurance benefits for retired employees, a large majority of whom are retirees of divested businesses. These plans are unfunded, and we pay the costs of benefits under these plans as they are incurred. Our share of benefits under this program was $11.9 million during 2005, compared with $12.5 million in 2004. Our recorded liability for postretirement health care plan at December 31, 2005 is stated at net present value discounted at 5.5% (as discussed under Defined Benefit Pension Plans). Our proposed plan of reorganization provides for the continuation of these benefits.

In December 2003, President George W. Bush signed the Medicare Prescription Drug, Improvement and Modernization Act of 2003 into law. This act introduces a prescription drug benefit under Medicare, Medicare Part D, as well as a federal subsidy to companies that provide a benefit that is at least actuarially equivalent (as defined in the act) to Medicare Part D. On January 21, 2005, the Center for Medicare and Medicaid Services released the final regulations implementing the act. We have determined that the prescription drug benefit under our postretirement health care plan is actuarially equivalent to the Medicare Part D benefit. Therefore, the accumulated postretirement benefit obligation, or APBO, was remeasured as of January 21, 2005 to reflect the amount associated with the federal subsidy. The APBO was reduced by approximately $14.6 million and the net periodic benefit cost for 2005 was reduced by approximately $1.9 million due to the effect of the federal subsidy.

*Tax Matters* – See Notes 4 and 14 to the Consolidated Financial Statements and "Income Taxes" above for further discussion of our tax accounting and tax contingencies.

*Other Contingencies* – See Note 14 to the Consolidated Financial Statements for a discussion of our other contingent matters.

F-60

## Liquidity and Capital Resources

*Cash Resources and Available Credit Facilities* – At December 31, 2005, we had $559.5 million in cash and cash-like assets ($474.7 million in cash and cash equivalents and $84.8 million in net cash value of life insurance). In addition, we had access to committed credit facilities in the U.S., Germany and France. In the U.S., under the $250.0 million DIP facility, $211.3 million was available at December 31, 2005 net of letters of credit and holdback provisions. The term of the DIP facility expires April 1, 2006. We expect to renew the facility for an additional two-year period. In Germany, under a €10.0 million line of credit, we had access to €3.5 million at December 31, 2005 net of bankers guarantees and other holdbacks. The term of the facility expired January 16, 2006 and is expected to be renewed for an additional one-year period. In France, under a €3.9 million line of credit, we had access to €0.6 million at December 31, 2005 net of bankers guarantees. The term of the facility expires May 31, 2006 and is expected to be renewed for an additional one-year period. We believe that these funds and credit facilities will be sufficient to finance our business strategy while in Chapter 11.

*Cash Flow From Core Operations* – Our 2005 net cash flow from core operations before investing decreased due to increased investment in working capital.

| Core Operations | December 31, | | |
|---|---|---|---|
| (In millions) | 2005 | 2004 | 2003 |
| Cash flows: | | | |
| Pre-tax operating income | $ 201.5 | $ 179.3 | $ 148.7 |
| Depreciation and amortization | 114.0 | 108.8 | 102.9 |
| Pre-tax earnings before depreciation and amortization | 315.5 | 288.1 | 251.6 |
| Working capital and other changes | (75.0) | 27.7 | (63.4) |
| Cash flow before investing | 240.5 | 315.8 | 188.2 |
| Capital expenditures | (80.9) | (62.5) | (86.4) |
| Businesses acquired | (5.5) | (66.7) | (26.9) |
| Net cash flow from core operations | $ 154.1 | $ 186.6 | $ 74.9 |

The increased investment in working capital was primarily due to payments of approximately $70 million for prior year performance incentives and customer volume rebates. Additional investment in working capital was due to a shift in regional sales mix outside North America where standard terms of sale are longer and advanced purchasing of key raw materials is often necessary.

We expect to continue to invest excess cash flow and/or other available capital resources in our core business base. These investments are likely to be in the form of additional plant capacity, product line extensions and geographic market expansions, and/or acquisitions in existing product lines. Investments that are outside the ordinary course of business may be subject to bankruptcy court approval and review by the Chapter 11 creditor committees.

*Cash Flow From Noncore Activities* – The cash flow from our noncore activities can be volatile. Expenditures are generally governed by bankruptcy court rulings and receipts are generally nonrecurring. Much of the noncore spending in the past three years has been under Chapter 11 first-day motions that allow us to fund postretirement benefits and required environmental remediation on Grace-owned sites. Cash inflows have been from asbestos-related insurance recovery on pre-Chapter 11 liability payments, and unusual events. In April 2005, we made a $90 million payment to the U.S. Internal Revenue Service to fund taxes and interest on settled amounts as approved by the bankruptcy court.

CC-BLG003187

| Noncore Activities (In millions) | December 31, | | |
|---|---|---|---|
| | 2005 | 2004 | 2003 |
| **Cash flows:** | | | |
| Pre-tax income (loss) from noncore activities | $ (30.3) | $ (457.1) | $ (190.1) |
| Net gain litigation from settlement | — | (51.2) | — |
| Provision for asbestos-related litigation, net | — | 476.6 | 30.0 |
| Other non-cash charges | 50.1 | 100.5 | 158.1 |
| Cash spending for: | | | |
| Noncore contingencies: | | | |
| Tax settlement | (50.0) | — | — |
| Environmental settlement | (29.7) | — | — |
| Environmental remediation | (6.7) | (9.0) | (11.2) |
| Postretirement benefits | (11.9) | (12.5) | (12.6) |
| Retained obligations and other | (1.0) | (1.8) | (1.3) |
| **Net cash flow from noncore activities** | $ (119.5) | $ 45.5 | $ (27.1) |

Net cash flow from core operations and net cash flow from noncore activities do not represent income or cash flow as defined under generally accepted accounting principles, and you should not consider them to be an alternative to such

measures as an indicator of our performance. We provide these measures to permit you to distinguish operating results of our current business base from results and related assets and liabilities of past businesses, discontinued products, and corporate legacies and the effect of our Chapter 11 proceedings.

See the "Consolidated Statements of Cash Flows" included in the Consolidated Financial Statements for investing and financing activities for the years ended December 31, 2005, 2004 and 2003.

*Debt and Other Contractual Obligations* — Total debt outstanding at December 31, 2005 was $687.4 million, including $170.4 million of accrued interest on pre-petition debt. As a result of the Chapter 11 filing, we are now in default on $514.3 million of pre-petition debt, which, together with accrued interest thereon, has been included in "liabilities subject to compromise" as of December 31, 2005. The automatic stay provided under the bankruptcy code prevents our lenders from taking any action to collect the principal amounts as well as related accrued interest. However, we will continue to accrue and report interest on such debt during the Chapter 11 proceedings unless further developments lead management to conclude that it is probable that such interest will be compromised.

Set forth below are contractual obligations not subject to compromise.

**Contractual Obligations Not Subject to Compromise**

| (In millions) | Payments due by Period | | | |
|---|---|---|---|---|
| | Total | Less than 1 Year | 1-3 Years | Thereafter |
| Operating commitments [1] | $ 45.7 | $ 43.9 | $ 1.8 | $ — |
| Debt | 2.7 | 2.3 | 0.4 | — |
| Operating leases | 88.5 | 20.1 | 42.4 | 26.0 |
| Capital leases | 2.0 | 0.6 | 1.4 | — |
| Pension funding requirements per ERISA | 195.0 | 93.4 | 101.6 | [2] |
| **Total Contractual Cash Obligations** | $ 333.9 | $ 160.3 | $ 147.6 | $ 26.0 |

*(1) Amounts do not include open purchase commitments which are routine in nature and normally settle within 90 days or obligations to employees under annual or long-term incentive programs.*

*(2) Amount has not yet been determined.*

See Note 14 to the Consolidated Financial Statements for a discussion of financial assurances.

**Inflation**

The financial statements are presented on a historical cost basis and do not fully reflect the impact of prior years' inflation. While the U.S. inflation rate has been modest for several years, we operate in international economies with both inflation and currency risks. The ability to pass on inflation costs is an uncertainty due to general economic conditions and competitive situations. The cost of replacing our property and equipment today is estimated to be greater than its historical cost. Accordingly, depreciation expense would be greater if the expense were stated on a current cost basis.

**Accounting Policies**

See Note 1 of Consolidated Financial Statements for a discussion of recent accounting pronouncements and their effect on us.

**Risk Management**

The nature of our business requires us to deal with risks of several types. We seek to manage these risk factors so that the Company is exposed to an acceptable level of risk. We have established an Enterprise Risk Management function under our Chief Risk and Compliance Officer, the purpose of which is to provide assurance that management is addressing all risks facing the Company in a comprehensive and conservative way. The following are examples of how we are addressing certain categories of risks:

- *Commodities* – Our Supply Chain organization is responsible for procuring our raw material needs. Some of our raw materials are commodities subject to price fluctuation. Natural gas is a prime example. It is a key energy source for our Grace Davison production facilities, the price of which has fluctuated widely over the past two years. Our policy is to hedge against volatility in raw material prices, using hedge contracts and other financial instruments as necessary and appropriate. We also execute long term supply agreements and/or forward commitments to secure materials at stable prices and in quantities fully expected to be used in production. The result of our approach in 2005 was favorable with respect to certain metals used in catalyst products where we were able to secure supply at below market prices, but was unfavorable with respect to natural gas as we

CC-BLG003188

were subject to market changes for most of the year.

F-62

---

- *Currencies* – Because we do business in over 40 countries, our financial results are exposed to fluctuations in foreign exchange rates. We seek to minimize our exposure to these fluctuations by matching revenue streams in volatile currencies with expenditures in the same currencies, but it is not always possible to do so. From time to time we will use financial instruments such as foreign currency forward contracts, options, or combinations of the two to reduce the risk of certain specific transactions. However, we do not have a policy of hedging all exposures, because we do not believe that such a level of hedging would be cost-effective, particularly translation exposures that are not expected to affect cash flows in the near term. Executing our approach for 2005 allowed us to avoid currency risk of most funds available for repatriation from foreign subsidiaries. See "Pre-tax Income (Loss) from Noncore Activities" above for more information regarding our foreign currency forward contracts.

- *Disasters* – We have disaster recovery plans in effect at key sites, and we have built a certain amount of redundancy into our production plants where feasible. We also have a formalized risk management program, which includes several types and layers of insurance. We are advised by risk management professionals and brokers who are familiar with recent trends in the insurance markets worldwide. The level of insurance carried, and other related aspects such as deductibles, self-insurance levels, etc. are monitored regularly by management and reviewed by the Board of Directors on a regular basis. See "Effect of Hurricanes Katrina and Rita" above for more information.

- *Environmental* – We are committed to the heath and safety of all employees and to protecting the environment from damage through the use or production of our products. Our Environmental Health and Safety (EH&S) organization is global in scope and is charged with assuring that Grace lives up to its commitments in this area. The group performs EH&S audits of Grace facilities and regularly monitors local laws and regulation to assure that we are in full compliance. Where appropriate, outside consultants and experts are utilized to augment our in-house staff. We are in the process of finalizing an improved EH&S Management System, which will enable us to apply 'best practices' principles across the company.

- *Ethics and Fraud* – We insist that our employees maintain the highest standards of ethical behavior. We have preventative and investigatory programs in place to maintain these standards, as follows:

  - We have established online ethics training programs in five languages and we require all employees to take a certain number of courses annually.

  - All U.S. employees and key employees outside the U.S. must sign an annual Ethics Statement in which they renew their commitment to operate ethically and according to the Company's code of conduct. They must also report any actual or potential conflicts of interest for evaluation by management, and remediation if necessary.

  - We have an anonymous telephone line to report fraudulent or unethical behavior to the Company's Chief Ethics Officer. The direct line is available to all employees worldwide where local law allows such a facility. All allegations of fraud are reported to the Audit Committee.

  - Our Internal Audit Department is independent of management and reports functionally to the Chairman of the Audit Committee of the Board of Directors. The department conducts investigations in collaboration with the Chief Ethics Officer when alleged frauds have accounting, financial reporting or fiscal aspects.

  - We provide training to financial personnel in key positions covering topics such as the U.S. Foreign Corrupt Practices Act, the Sarbanes Oxley Act of 2002, and other laws and regulations relating to ethical or legal matters.

F-63

---

**W. R. GRACE & CO. AND SUBSIDIARIES**
**VALUATION AND QUALIFYING ACCOUNTS AND RESERVES**
*(In millions)*

**For the Year 2005**

| | | Additions/(deductions) | | | |
| Description | Balance at beginning of period | Charged/ (credited) to costs and expenses | Cash received/ (paid) | Other net [1] | Balance at end of period |
|---|---|---|---|---|---|
| **Valuation and qualifying accounts deducted from assets:** | | | | | |
| Allowances for notes and accounts receivable | $    7.5 | $    (0.8) | $    — | $    — | $    6.7 |
| Allowances for long-term receivables | 0.8 | (0.1) | — | — | 0.7 |
| Allowances for inventory obsolescence | 9.1 | (2.4) | — | — | 6.7 |
| Valuation allowance for deferred tax assets | 242.6 | 2.7 | — | — | 245.3 |
| **Reserves:** | | | | | |
| Reserves for asbestos-related litigation | 1,700.0 | — | — | — | 1,700.0 |
| Reserves for environmental remediation | 345.0 | 25.0 | (6.7) | (21.3) | 342.0 |
| Reserves for retained obligations of divested businesses | $    25.1 | $    5.0 | $    (4.7) | $    — | 25.4 |

---

**For the Year 2004**

| | Additions/(deductions) |
| | Charged/ |

CC-BLG003189

| Description | Balance at beginning of period | (credited) to costs and expenses | Cash received/ (paid) | Other net [1] | Balance at end of period |
|---|---|---|---|---|---|
| **Valuation and qualifying accounts deducted from assets:** | | | | | |
| Allowances for notes and accounts receivable | $ 6.3 | $ 1.2 | $ — | $ — | $ 7.5 |
| Allowances for long-term receivables | 0.7 | 0.1 | — | — | 0.8 |
| Allowances for inventory obsolescence | 4.0 | 2.0 | — | 3.1 | 9.1 |
| Valuation allowance for deferred tax assets | 168.3 | 74.3 | — | — | 242.6 |
| **Reserves:** | | | | | |
| Reserves for asbestos-related litigation | 992.3 | 714.8 | 10.6 | (17.7) | 1,700.0 |
| Reserves for environmental remediation | 332.4 | 21.6 | (9.0) | — | 345.0 |
| Reserves for retained obligations of divested businesses | $ 27.0 | $ — | $ (1.8) | $ (0.1) | $ 25.1 |

F-64

### For the Year 2003

| | | Additions/(deductions) | | | |
|---|---|---|---|---|---|
| Description | Balance at beginning of period | Charged/ (credited) to costs and expenses | Cash received/ (paid) | Other net [1] | Balance at end of period |
| **Valuation and qualifying accounts deducted from assets:** | | | | | |
| Allowances for notes and accounts receivable | $ 5.4 | $ 0.9 | $ — | $ — | $ 6.3 |
| Allowances for long-term receivables | 0.8 | (0.1) | — | — | 0.7 |
| Allowances for inventory obsolescence | 3.6 | 0.4 | — | — | 4.0 |
| Valuation allowance for deferred tax assets | 152.5 | 15.8 | — | — | 168.3 |
| **Reserves:** | | | | | |
| Reserves for asbestos-related litigation | 973.2 | 30.0 | 2.8 | (13.7) | 992.3 |
| Reserves for environmental remediation | 201.0 | 142.5 | (11.2) | 0.1 | 332.4 |
| Reserves for retained obligations of divested businesses | $ 25.3 | $ — | $ (1.3) | $ 3.0 | $ 27.0 |

(1) Various miscellaneous adjustments against reserves.

F-65

Exhibit 12

### W. R. GRACE & CO. AND SUBSIDIARIES

COMPUTATION OF RATIO OF EARNINGS TO FIXED CHARGES AND
COMBINED FIXED CHARGES AND PREFERRED STOCK DIVIDENDS [1]
(In millions, except ratios)
(Unaudited)

| | Years Ended December 31, [2] | | | | |
|---|---|---|---|---|---|
| | 2005 [3] | 2004 [4] | 2003 [3] | 2002 [2] | 2001 |
| Net income (loss) from continuing operations | $ 67.3 | $ (402.3) | $ (55.2) | $ 22.1 | $ 78.6 |
| Provision (benefit) from income taxes | 21.3 | (1.5) | (12.3) | 38.0 | 63.7 |
| Minority interest in income (loss) of majority owned subsidiaries | 19.7 | 8.1 | (1.5) | 2.0 | 0.1 |
| Equity in unremitted losses (earnings) of less than 50%-owned companies | — | — | 0.3 | 0.1 | — |
| Interest expense and related financing costs, including amortization of capitalized interest | 56.6 | 112.6 | 17.5 | 22.3 | 39.5 |
| Estimated amount of rental expense deemed to represent the interest factor | 6.2 | 5.6 | 5.1 | 4.9 | 4.7 |
| Income (loss) as adjusted | $ 171.1 | $ (277.5) | $ (46.1) | $ 89.4 | $ 186.6 |
| **Combined fixed charges and preferred stock dividends:** | | | | | |
| Interest expense and related financing costs, including capitalized interest | $ 54.9 | $ 100.7 | $ 18.0 | $ 21.8 | $ 36.6 |
| Estimated amount of rental expense deemed to represent the interest factor | 6.2 | 5.6 | 5.1 | 5.0 | 4.7 |
| Fixed charges | 61.1 | 106.3 | 23.1 | 26.8 | 41.3 |
| Combined fixed charges and preferred stock dividends | $ 61.1 | $ 106.3 | $ 23.1 | $ 26.8 | $ 41.3 |
| Ratio of earnings to fixed charges | 2.80 | (7) | (7) | 3.34 | 4.52 |
| Ratio of earnings to combined fixed charges and preferred stock dividends | 2.80 | (7) | (7) | 3.34 | 4.52 |

(1) Grace preferred stocks were retired in 1996.

(2) Certain amounts have been restated to conform to the 2005 presentation.

CC-BLG003190

(3)  Amounts in 2005 contain a provision for environmental remediation of $15.0 million.

(4)  Amounts reflect the following adjustments: a $476.6 million accrual to increase our recorded asbestos-related liability, net of expected insurance recovery of $238.2 million; a $94.1 million accrual to increase our estimate of interest to which general unsecured creditors would be entitled; and a $151.7 million credit for net income tax benefits related to the items described above.

(5)  Amounts include $172.5 million for pre-tax charges to adjust our estimated liability for environmental remediation and asbestos-related property damage.

(6)  Amounts contain a provision for non-operating environmental remediation of $70.7 million.

(7)  As a result of the losses incurred for the years ended December 31, 2004 and 2003, we were unable to fully cover the indicated fixed charges (a shortfall of $383.8 million and $59.2 million, respectively)

F-66

CC-BLG003191

W. R. GRACE & CO., a Delaware corporation
U.S. SUBSIDIARIES

12/31/2005

X    Chapter 11 Filing — April 2, 2001

| | SUBSIDIARY NAME | CO. # | STATE OF INCORPORATION |
|---|---|---|---|
| X | A-1 Bit & Tool Co., Inc. | 458 | DE |
| | * Advanced Refining Technologies LLC | 930 | DE |
| X | Alewife Boston Ltd. | 070 | MA |
| X | Alewife Land Corporation | 069 | MA |
| | Alltech Associates, Inc. | | IL |
| X | Amicon, Inc. | 174 | DE |
| | AP Chem Incorporated | 436 | MD |
| X | CB Biomedical, Inc. | 125 | DE |
| X | CCHP, Inc. | 074 | DE |
| X | Coalgrace, Inc. | 824 | DE |
| X | Coalgrace II, Inc. | 835 | DE |
| | Construction Products Dubai, Inc. | 121 | DE |
| X | Creative Food 'N Fun Company | 587 | DE |
| X | Darex Puerto Rico, Inc. | 798 | DE |
| X | Del Taco Restaurants, Inc. | 557 | DE |
| X | Dewey and Almy, LLC | 406 | DE |
| X | Ecarg, Inc. | 519 | NJ |
| X | Five Alewife Boston Ltd. | 071 | MA |
| X | G C Limited Partners I, Inc. | 465 | DE |
| X | G C Management, Inc. | 539 | DE |
| X | GEC Management Corporation | 689 | DE |
| X | GN Holdings, Inc. | 073 | DE |
| X | GPC Thomasville Corp. | 637 | DE |
| X | Gloucester New Communities Company, Inc. | 572 | NJ |
| X | Grace A-B Inc. | 625 | DE |
| X | Grace A-B II Inc. | 827 | DE |
| X | Grace Asia Pacific, Inc. | 107 | DE |
| | Grace Chemicals, Inc. | 710 | DE |
| X | Grace Chemical Company of Cuba | 305 | IL |
| | Grace Collections, Inc. | 316 | DE |
| X | Grace Culinary Systems, Inc. | 479 | MD |
| X | Grace Drilling Company | 877 | DE |
| X | Grace Energy Corporation | 681 | DE |

*  Ownership of Advanced Refining Technologies LLC is 55% W. R. Grace & Co.-Conn. (#001) and 45% Chevron USA, Inc.; certain enumerated actions of the Executive Committee require unanimous consent.

1

| | SUBSIDIARY NAME | CO. # | STATE OF INCORPORATION |
|---|---|---|---|
| X | Grace Environmental, Inc. | 198 | DE |
| X | Grace Europe, Inc. | 407 | DE |
| | Grace Germany Holdings, Inc. | | DE |
| X | Grace H-G Inc. | 506 | DE |
| X | Grace H-G II Inc. | 828 | DE |
| X | Grace Hotel Services Corporation | 480 | DE |
| X | Grace International Holdings, Inc. | 543 | DE |
| | Grace Latin America, Inc. | 263 | DE |
| | Grace Management Services, Inc. | 485 | DE |

CC-BLG003192

| | | | |
|---|---|---|---|
| X | Grace Offshore Company | 822 | LA |
| X | Grace PAR Corporation | 621 | DE |
| X | Grace Petroleum Libya Incorporated | 880 | DE |
| | Grace Receivables Purchasing, Inc. | 041 | DE |
| X | Grace Tarpon Investors, Inc. | 462 | DE |
| X | Grace Ventures Corp. | 664 | DE |
| X | Grace Washington, Inc. | 197 | DE |
| X | W. R. Grace Capital Corporation | 563 | NY |
| X | W. R. Grace & Co.-Conn. | 001 | CT |
| X | W. R. Grace Land Corporation | 523 | NY |
| X | Gracoal, Inc. | 856 | DE |
| X | Gracoal II, Inc. | 848 | DE |
| X | Guanica-Caribe Land Development Corporation | 376 | DE |
| X | Hanover Square Corporation | 516 | DE |
| X | Homco International, Inc. | 631 | DE |
| | Ichiban Chemical Co., Inc. | 028 | DE |
| X | Kootenai Development Company | 779 (f/k/a 079) | MT |
| X | L B Realty, Inc. | 495 | DE |
| X | Litigation Management, Inc. | 317 | DE |
| X | Monolith Enterprises, Incorporated | 477 | DC |
| X | Monroe Street, Inc. | 481 | DE |
| X | MRA Holdings Corp. | 075 | DE |
| X | MRA Intermedco, Inc. | 076 | DE |
| X | MRA Staffing Systems, Inc. | 077 | DE |
| | NZ Alltech, Inc. | | IL |
| X | Remedium Group, Inc. | 063 | DE |
| X | Southern Oil, Resin & Fiberglass, Inc. | 318 | FL |
| X | Water Street Corporation | 548 | DE |

2

---

## NON-U.S. SUBSIDIARIES

**COUNTRY/
SUBSIDIARY NAME**

**ARGENTINA**
W. R. Grace Argentina S.A.
WRG Argentina, S.A.
**AUSTRALIA**
Alltech Associates (Australia) Pty. Ltd.
Grace Australia Pty. Ltd.
**BELGIUM**
Grace Construction Products N.V.
Grace N.V.
Grace Silica N.V.
Inverco Benelux N.V.
**BRAZIL**
Grace Brasil Ltda.
Grace Davison Ltda.
**CANADA**
GEC Divestment Corporation Ltd.
Grace Canada, Inc.
W. R. Grace Finance (NRO) Ltd.
**CHILE**
Grace Quimica Compania Limitada
**CHINA — PEOPLE'S REPUBLIC OF**

CC-BLG003193

Grace China Ltd.

**COLOMBIA**

Grace Colombia S.A.

W. R. G. Colombia S.A.

**CUBA**

Envases Industriales y Comerciales, S.A.

Papelera Camagueyana, S.A.

**FRANCE**

Alltech France S.A.R.L.

Etablissments Pieri S.A.

Société Civile Beau-Béton

W. R. Grace S.A.

**GERMANY**

Advanced Refining Technologies GmbH

Alltech Grom GmbH

Grace Bauprodukte GmbH

Grace Darex GmbH

Grace GP G.m.b.H.

**GERMANY (Continued)**

Grace Holding G.m.b.H.

Grace Management GP G.m.b.H.

Grace Silica GmbH

3

---

COUNTRY/
SUBSIDIARY NAME

**GREECE**

Grace Hellas E.P.E.

**HONG KONG**

Alltech Applied Science Labs (HK) Limited

Alltech Scientific (China) Limited

W. R. Grace (Hong Kong) Limited

W. R. Grace Southeast Asia Holdings Limited

**HUNGARY**

Grace Értékesito Kft.

**INDIA**

Flexit Laboratories Private Ltd.

W. R. Grace & Co. (India) Private Limited

**INDONESIA**

PT. Grace Specialty Chemicals Indonesia

**IRELAND**

Amicon Ireland Limited

Grace Construction Products (Ireland) Limited

Trans-Meridian Insurance (Dublin) Ltd.

**ITALY**

Alltech Italia S.R.L.

W. R. Grace Italiana S.p.A.

**JAPAN**

Advanced Refining Technologies K.K.

Grace Chemicals K.K.

Grace Japan Kabushiki Kaisha

**KOREA**

Grace Korea Inc.

**MALAYSIA**

W. R. Grace (Malaysia) Sendiran Berhad

W. R. Grace Specialty Chemicals (Malaysia) Sdn Bhd.

**MEXICO**

Grace Container, S. A. de C. V.

W. R. Grace Holdings, S. A. de C. V.

**NETHERLANDS**

CC-BLG003194

Alltech Applied Science B.V.

Amicon B.V.

Denne Nederland B.V.

Storm van Bentem en Kluyver B.V.

W. R. Grace B.V.

**NETHERLANDS ANTILLES**

W. R. Grace N.V.

**NEW ZEALAND**

Grace (New Zealand) Limited

4

---

**COUNTRY/
SUBSIDIARY NAME**

**PHILIPPINES**

W. R. Grace (Philippines), Inc.

**POLAND**

Grace Sp. z o.o.

**RUSSIA**

Darex CIS LLC

**SINGAPORE**

W. R. Grace (Singapore) Private Limited

**SOUTH AFRICA**

Grace Davison (Proprietary) Limited

W. R. Grace Africa (Pty.) Limited

**SPAIN**

Grace, S.A.

Pieri Especialidades, S.L.

**SWEDEN**

Grace AB

Grace Catalyst AB

Grace Sweden AB

**SWITZERLAND**

Pieri S.A.

**TAIWAN**

W. R. Grace Taiwan, Inc.

**THAILAND**

W. R. Grace (Thailand) Limited

**UNITED KINGDOM**

A.A. Consultancy & Cleaning Company Limited

Alltech Associates Applied Science Limited

Cormix Limited

Borndear 1 Limited

Borndear 2 Limited

Borndear 3 Limited

Darex UK Limited

Emerson & Cuming (Trading) Ltd.

Emerson & Cuming (UK) Ltd.

Exemere Limited

Grace Construction Products Limited

Pieri U.K. Limited

Servicised Ltd.

W. R. Grace Limited

**VENEZUELA**

Grace Venezuela, S.A.

Inversiones GSC, S.A.

5

CC-BLG003195

EXHIBIT 24

#### POWER OF ATTORNEY

The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and MICHAEL W. CONRON as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2005, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ John F. Akers

John F. Akers

Dated:   February 23, 2006

---

EXHIBIT 24

#### POWER OF ATTORNEY

The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and MICHAEL W. CONRON as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2005, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ H. Furlong Baldwin

H. Furlong Baldwin

Dated:   February 23, 2006

---

EXHIBIT 24

#### POWER OF ATTORNEY

The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and MICHAEL W. CONRON as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2005, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ Ronald C. Cambre



Ronald C. Cambre

Dated:   February 23, 2006

---

EXHIBIT 24

#### POWER OF ATTORNEY

The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and MICHAEL W. CONRON as her true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2005, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ Marye Anne Fox

Marye Anne Fox

Dated:   February 23, 2006

---

EXHIBIT 24

#### POWER OF ATTORNEY

The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and MICHAEL W. CONRON as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2005, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

CC-BLG003196

/s/ John J. Murphy

<!-- redacted -->

John J. Murphy

Dated.   February 23, 2006

---

EXHIBIT 24

POWER OF ATTORNEY

The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and MICHAEL W. CONRON as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2005, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ Paul J. Norris

<!-- redacted -->

Paul J. Norris

Dated:   February 23, 2006

---

EXHIBIT 24

POWER OF ATTORNEY

The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and MICHAEL W. CONRON as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2005, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ Thomas A. Vanderslice

<!-- redacted -->

Thomas A. Vanderslice

Dated:   February 23, 2006

CC-BLG003197

EXHIBIT 31(i).1

CERTIFICATION OF PERIODIC REPORT UNDER SECTION 302 OF
THE SARBANES-OXLEY ACT OF 2002

I, A. E. Festa, certify that:

1.  I have reviewed this annual report on Form 10-K of W. R. Grace & Co.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 10, 2006

/s/ A. E. Festa
A. E. Festa
President and Chief Executive Officer

CC-BLG003198

EXHIBIT 31(i).2

CERTIFICATION OF PERIODIC REPORT UNDER SECTION 302 OF
THE SARBANES-OXLEY ACT OF 2002

I, Robert M. Tarola, certify that:

1.  I have reviewed this annual report on Form 10-K of W. R. Grace & Co.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to
    state a material fact necessary to make the statements made, in light of the circumstances under which
    such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this
    report, fairly present in all material respects the financial condition, results of operations and cash
    flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining
    disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and
    internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))
    for the registrant and have:

    (a)  designed such disclosure controls and procedures, or caused such disclosure controls and
         procedures to be designed under our supervision, to ensure that material information relating to
         the registrant, including its consolidated subsidiaries, is made known to us by others within those
         entities, particularly during the period in which this report is being prepared;

    (b)  designed such internal control over financial reporting, or caused such internal control over
         financial reporting to be designed under our supervision, to provide reasonable assurance
         regarding the reliability of financial reporting and the preparation of financial statements for
         external purposes in accordance with generally accepted accounting principles;

    (c)  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in
         this report our conclusions about the effectiveness of the disclosure controls and procedures, as
         of the end of the period covered by this report based on such evaluation; and

    (d)  disclosed in this report any change in the registrant's internal control over financial reporting that
         occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in
         the case of an annual report) that has materially affected, or is reasonably likely to materially
         affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of
    internal control over financial reporting, to the registrant's auditors and the audit committee of the
    registrant's board of directors (or persons performing the equivalent functions):

    (a)  all significant deficiencies and material weaknesses in the design or operation of internal control
         over financial reporting which are reasonably likely to adversely affect the registrant's ability to
         record, process, summarize and report financial information; and

    (b)  any fraud, whether or not material, that involves management or other employees who have a
         significant role in the registrant's internal control over financial reporting.

Date: March 10, 2006

                              /s/ Robert M. Tarola
                              Robert M. Tarola
                              Senior Vice President and
                              Chief Financial Officer

CC-BLG003199

EXHIBIT 32

CERTIFICATION UNDER SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. Section 1350), the undersigned certifies that (1) this Annual Report of W. R. Grace & Co. (the "Company") on Form 10-K for the period ended December 31, 2005, as filed with the Securities and Exchange Commission on the date hereof (this "Report"), fully complies with the requirements of Sections 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, and (2) the information contained in this Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ A. E. Festa

President and Chief Executive Officer

/s/ Robert M. Tarola

Senior Vice President and Chief Financial Officer

Date: March 10, 2006

A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

CC-BLG003200