# W R GRACE & CO

# FORM 10-K
### (Annual Report)

## Filed 03/02/07 for the Period Ending 12/31/06

| | |
|---|---|
| Address | 7500 GRACE DRIVE |
| | COLUMBIA, MD 21044 |
| Telephone | 410 531 4000 |
| CIK | 0001045309 |
| Symbol | GRA |
| SIC Code | 2800 - Chemicals & Allied Products |
| Industry | Chemical Manufacturing |
| Sector | Basic Materials |
| Fiscal Year | 12/31 |

http://www.edgar-online.com
© Copyright 2009, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

TRIAL EXHIBIT 24
CC-BLG003201-003435

CC-BLG003201

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

# FORM 10-K

### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
### THE SECURITIES EXCHANGE ACT OF 1934

**For the fiscal year ended December 31, 2006**

**Commission file number 1-13953**

# W. R. GRACE & CO.

Incorporated under the Laws of the
**State of Delaware**

I.R.S. Employer Identification No.
**65-0773649**

**7500 Grace Drive, Columbia, Maryland 21044-4098**
**410/531-4000**
Securities registered pursuant to Section 12(b) of the Exchange Act:

| Title of each class | Name of each exchange on which registered |
| --- | --- |
| Common Stock, $.01 par value | New York Stock Exchange, Inc. |
| Preferred Stock Purchase Rights | |

Securities registered pursuant to Section 12(g) of the Exchange Act:
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

Yes ☐          No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Exchange Act.

Yes ☐          No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months and (2) has been subject to such filing requirements for the past 90 days.

Yes ☒          No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulations S-K is not contained herein and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one)

Large accelerated filer ☐          Accelerated filer ☒          Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

Yes ☐          No ☒

The aggregate market value of W. R. Grace & Co. voting and non-voting common equity held by non-affiliates as of June 30, 2006 (the last business day of the registrant's most recently completed second fiscal quarter) based on the closing sale price of $11.70 as reported on the New

CC-BLG003202

York Stock Exchange was $667,355,329. *

At January 31, 2007, 69,206,435 shares of W. R. Grace & Co. Common Stock, $.01 par value, were outstanding.

DOCUMENTS INCORPORATED BY REFERENCE

None.

* *Excludes 11,219,148 shares of outstanding W. R. Grace & Co. ("Grace") Common Stock held by directors and executive officers and stockholders, whose beneficial ownership exceeds 10% of the outstanding shares of Grace Common Stock. Exclusion of shares held by any person should not be construed to indicate that such person possesses the power, direct or indirect, to direct or cause the direction of the management or policies of Grace, or that such person is controlled by or under common control with Grace.*

CC-BLG003203

Table of Contents

**PART I**   **3**

Item 1.   Business   3

Item 1A.   Risk Factors   22

Item 1B.   Unresolved Staff Comments   31

Item 2.   Properties   31

Item 3.   Legal Proceedings   32

Item 4.   Submission of Matters to a Vote of Security Holders   35

**PART II**   **36**

Item 5.   Market for Registrant's Common Equity and Related Shareholder Matters   36

Item 6.   Selected Financial Data   37

Item 7.   Management's Discussion and Analysis of Financial Condition and Results of Operations   37

Item 7A.   Quantitative and Qualitative Disclosures About Market Risk   37

Item 8.   Financial Statements and Supplementary Data   37

I tem 9.   Changes in and Disagreements with Accountants on Accounting and Financial Disclosure   38

Item 9A.   Controls and Procedures   38

Item 9B.   Other Information   38

**PART III**   **39**

Item 10.   Directors and Executive Officers of the Registrant   39

Item 11.   Executive Compensation   42

Item 12.   Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters   70

Item 13.   Certain Relationships and Related Transactions   72

Item 14.   Principal Accounting Fees and Services   74

**PART IV**   **75**

Item 15.   Exhibits, Financial Statement Schedules, and Reports on Form 8-K   75

**SIGNATURES**   **79**

*Grace ®, the Grace ® logo and, except as otherwise indicated, the other trademarks in this Report are trademarks or registered trademarks of W. R. Grace & Co.—Conn. or its subsidiaries in the United States and/or other countries. OCR ® is a registered trademark of Chevron Intellectual Property, Inc. As used herein, ® indicates that a trademark is registered in the United States and/or other countries. Unless the context otherwise indicates, in this document the terms "Grace," "we," "us," "our" or "the company" mean W. R. Grace & Co. and/or its consolidated subsidiaries and affiliates.*

PART I

## Item 1.   BUSINESS

## BUSINESS OVERVIEW

W. R. Grace and Co. is engaged in specialty chemicals and specialty materials businesses on a global basis through its two operating segments, Grace Davison and Grace Performance Chemicals. We entered the specialty chemicals industry in 1954, when we acquired both the Dewey and Almy Chemical Company and the Davison Chemical Company. During the 1980s and 1990s, we divested a substantial number of businesses that were not consistent with our business strategy. Grace is the successor to a company that originated in 1854 and originally became a public company in 1953.

Grace, along with 61 of its United States subsidiaries and affiliates, has filed voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code and, since 2001, has been subject to the jurisdiction of the United States Bankruptcy Court for the District of Delaware.

*Grace Davison* includes:

- catalysts and chemical additives used by petroleum refiners, including fluid catalytic cracking, or FCC, catalysts, that help to "crack" the hydrocarbon chain in distilled crude oil to produce transportation fuels, such as gasoline and diesel fuels, and other petroleum-based products, and FCC additives used to reduce sulfur in gasoline, maximize propylene production from refinery FCC units, and reduce emissions of sulfur oxides, nitrogen oxides and carbon monoxide from refinery FCC units

- hydroprocessing catalysts used by petroleum refiners in process reactors to upgrade heavy oils into lighter, more useful products by removing impurities such as nitrogen, sulfur and heavy metals, allowing less expensive feedstocks to be used in the petroleum refining process

- specialty catalysts, including polyolefin catalysts and catalyst supports that are essential components in the manufacture of polyethylene and polypropylene resins, and other chemical catalysts used in a variety of industrial, environmental and consumer applications

- silica-based and silica-alumina-based engineered materials used in:

  - industrial markets, such as coatings, plastics and rubber, precision investment casting, refractory, insulating glass windows, desiccants, and gas and liquids purification

  - consumer applications, such as food products, toothpaste, pharmaceutical and personal care products, and the processing of edible oils and beverages

  - digital media coatings for ink jet papers

- silica- and polymer-based materials and chromatography columns, instruments, consumables and accessories used in life and analytical sciences applications

Grace Davison accounted for approximately 53.1% of our 2006 sales.

3

CC-BLG003205

*Grace Performance Chemicals, or GPC,* includes:

- Specialty construction chemicals and materials, including concrete admixtures and fibers used to improve the durability and working properties of concrete, additives used in cement processing to improve energy efficiency, enhance the characteristics of finished cement and improve ease of use, building materials used in commercial and residential construction and renovation to protect buildings from water, vapor and air penetration, and fireproofing materials used to protect buildings in the event of fire

- Darex ® packaging products and technologies, primarily specialty sealants and coatings used in rigid food and beverage packages, including can and closure sealants used to seal and enhance the shelf life of can and bottle contents, and coatings for cans and closures that prevent metal corrosion, protect package contents from the influence of metal and ensure proper adhesion of sealing compounds

Grace Performance Chemicals accounted for approximately 46.9% of our 2006 sales.

Our principal executive offices are located at 7500 Grace Drive, Columbia, Maryland 21044, telephone (410) 531-4000. As of December 31, 2006, we had approximately 6,500 full-time employees worldwide.

Our strategy is to seek increased enterprise value by profitably growing our specialty chemicals and materials businesses in the global marketplace and achieving high levels of efficiency. To achieve these objectives, we plan to:

- invest in research and development activities, with the goals of introducing new high-performance, technically differentiated products and services while continuing to enhance manufacturing processes and operations

- expand sales and manufacturing into geographic areas that are growing, including China, India, Eastern Europe and the Middle East

- pursue selected acquisitions and alliances that complement our current product offerings or provide opportunities for faster penetration of desirable market or geographic segments

4

CC-BLG003206

- continue our commitment to process and productivity improvements and cost-management, such as rigorous controls on working capital and capital spending, integration of functional support services worldwide and programs for supply chain management, which include both procurement and materials management

## CHAPTER 11 FILING

On April 2, 2001, Grace, along with 61 of our United States subsidiaries and affiliates, filed voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. The cases are being jointly administered under case number 01-01139. Our non-U.S. subsidiaries and certain of our U.S. subsidiaries were not included in the bankruptcy filing.

### *Background of Chapter 11*

A bankruptcy filing under Chapter 11 of the United States Bankruptcy Code is generally a voluntary action taken by a debtor to resolve financial problems such as major liabilities. Chapter 11 gives a debtor the chance to restructure its finances so that it may continue to operate, provide its employees with jobs and pay its creditors. Chapter 11 can be used by debtors that are faced with large numbers of product liability lawsuits in multiple jurisdictions to provide a practical way to address the potential liabilities under the supervision of one court. A Chapter 11 filing generally stops all lawsuits against a debtor and prevents creditors from taking action to enforce claims or collect any monies or property that might be owed at the time of filing.

Chapter 11 permits a debtor to define and resolve its liabilities under a court-supervised process generally referred to as a reorganization. Unlike a Chapter 7, or liquidation bankruptcy, which results in the sale or distribution of all of the assets of a business, Chapter 11 reorganization permits a debtor to continue its normal business operations. Existing management may continue to manage the debtor's operations during the reorganization. As a debtor-in-possession, a debtor is able to do business with suppliers and customers in a routine manner. Certain other activities, including transactions outside the ordinary course of business, generally require specific approval of the bankruptcy court.

After a debtor files Chapter 11, one or more official committees that represent the interests of general unsecured creditors, other creditors and stockholders may be appointed. Normally these committees and their respective advisors are actively involved in the process to monitor the bankruptcy and protect the interests of their respective constituencies. The fees and expenses of these committees and advisors are paid by the debtor.

The Chapter 11 process generally ends when the bankruptcy court approves a plan of reorganization for the debtor. In cases similar to ours with complex asbestos liabilities, debtors have taken several years to complete the Chapter 11 process.

5

CC-BLG003207

We voluntarily entered Chapter 11 to resolve comprehensively the tens of thousands of asbestos personal injury claims against us. These claims relate to past products and processes that involved asbestos, a mineral formerly used widely for many decades in building and other commercial products. Prior to 2000, we were able to resolve asbestos-related claims through direct negotiations and litigation, paying over $2 billion in claims and legal costs over a 20-year period. In most of the personal injury lawsuits, we are one of many defendants. The rate at which new claims were filed had stabilized and annual cash flows with respect to those claims were manageable and fairly predictable. In 2000 and the first quarter of 2001, the litigation environment changed with an unexpected 81% increase in personal injury claims filed against us, which we believe was caused by a surge in unmeritorious claims. We also became a defendant in class action lawsuits alleging damages from Zonolite Attic Insulation, or ZAI, a former attic insulation product. Trends in claims filing and settlement demands showed no sign of returning to historic levels and these unfavorable trends were exacerbated by the bankruptcy filings of several of our co-defendants in asbestos personal injury litigation. These trends greatly increased the risk that we would not be able to resolve our pending and future asbestos-related claims under the state court system.

After a thorough review of these developments, our Board of Directors concluded that a federal court-supervised bankruptcy process provided the best forum available to achieve fairness in resolving these claims. On April 2, 2001, we, along with 61 United States subsidiaries and affiliates, filed voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. Since that time, we have been subject to the jurisdiction of the Bankruptcy Court.

We are currently operating as a debtor-in-possession under court protection from creditors and claimants. We believe that our bankruptcy filing will permit a comprehensive resolution of the claims against us while preserving the inherent value of our businesses. As a consequence of our bankruptcy filing, pending litigation against us is generally stayed (subject to certain exceptions in the case of governmental authorities), and no party may take any action to realize its pre-petition claims except pursuant to an order of the Bankruptcy Court. Since our bankruptcy filing, the Bankruptcy Court has approved all motions necessary for us to conduct normal business activities.

Four committees have been appointed in the bankruptcy cases, two representing asbestos claimants, a third representing other unsecured creditors and a fourth representing shareholders. These committees, and a legal representative of future asbestos claimants, have the right to be heard on all matters that come before the Bankruptcy Court and are playing important roles in the bankruptcy cases. We are required to bear certain costs of the committees and of the future asbestos claimants' representative, including those of their counsel and financial advisors.

6

CC-BLG003208

See disclosure in this Report in Item 3 (Legal Proceedings) and Item 7 (Managements' Discussion and Analysis of Financial Condition and Results of Operations) for a description of our proposed plan of reorganization, proforma financial effects of the proposed plan, and the status of our current Chapter 11 proceedings.

## PRODUCTS AND MARKETS

### *Specialty Chemicals and Specialty Materials Industry Overview*

Specialty chemicals and specialty materials are high-value-added products used as catalysts, intermediates, components, protectants or additives in a wide variety of products and applications. They are generally produced in relatively small volumes (compared with commodity chemicals) and must satisfy well-defined performance requirements and specifications. Specialty chemicals and specialty materials are often critical components of end products, or catalysts for the production of end products and components used in end products; consequently, they are tailored to meet customer needs, which generally results in a close relationship between the specialty chemicals or specialty materials producer and the customer.

We focus our business on the following, which we believe are important competitive factors in the specialty chemicals and specialty materials industry:

- value-added products and services, sold at competitive prices

- customer service, including rapid response to changing customer needs

- technological leadership (resulting from investment in research and development and technical customer service)

- reliability of product and supply

We believe that our focus on these competitive factors enables us to deliver increased value to customers and competitive operating margins notwithstanding the increased customer service and research and development costs that this focus entails.

### *Grace Davison Operating Segment*

Grace Davison, founded in 1832, principally applies silica, alumina, and zeolite technology in the design and manufacture of products to create significant value for our diverse customer base. Our customers include major oil refiners, plastics and chemical manufacturers, and consumer products and pharmaceutical companies. We believe that our technological expertise provides a competitive advantage, allowing us to quickly design products and materials that help our customers create value in their markets.

7

CC-BLG003209

The following table sets forth Grace Davison sales of similar products based on end-use markets as a percentage of Grace total revenue.

| (In millions) | 2006 | | 2005 | | 2004 | |
|---|---|---|---|---|---|---|
| | Sales | % of Grace Revenue | Sales | % of Grace Revenue | Sales | % of Grace Revenue |
| Refining Industry [1] | $ 859.1 | 30.4% | $ 796.0 | 31.0% | $ 651.9 | 28.9% |
| Industrial Applications [2] | 641.5 | 22.7% | 574.2 | 22.3% | 540.3 | 23.9% |
| Total Grace Davison Revenue | $ 1,500.6 | 53.1% | $ 1,370.2 | 53.3% | $ 1,192.2 | 52.8% |

[1]    includes FCC catalysts and hydroprocessing catalysts

[2]    includes specialty catalysts, engineered materials, discovery sciences and other industrial technologies

The following table sets forth Grace Davison sales by region as a percentage of Grace Davison total revenue.

| (In millions) | 2006 | | 2005 | | 2004 | |
|---|---|---|---|---|---|---|
| | Sales | % of Grace Davison Revenue | Sales | % of Grace Davison Revenue | Sales | % of Grace Davison Revenue |
| North America | $ 536.9 | 35.8% | $ 508.9 | 37.1% | $ 453.9 | 38.1% |
| Europe | 643.8 | 42.9% | 561.4 | 41.0% | 498.1 | 41.8% |
| Asia Pacific | 261.9 | 17.4% | 239.1 | 17.5% | 194.1 | 16.3% |
| Latin America | 58.0 | 3.9% | 60.8 | 4.4% | 46.1 | 3.8% |
| Total Grace Davison Revenue | $ 1,500.6 | 100% | $ 1,370.2 | 100% | $ 1,192.2 | 100% |

*FCC Catalysts and Additives*

We are a global leader in developing and manufacturing fluidic catalytic cracking, or FCC, catalysts and additives that enable petroleum refiners to increase profits by improving product yields and quality. Our products also enable refiners to reduce emissions from their FCC units and reduce sulfur content in the gasoline and diesel fuel refiners produce.

Oil refining is a highly specialized discipline, and refinery catalysts must be tailored to meet local variations in crude oil and a refinery's product mix. We work regularly with customers to help them find the most appropriate catalyst formulations for their changing needs. We are dependent on the economics of the petroleum industry, specifically, the impacts of demand for transportation fuels and petrochemical products and crude oil supply which affect the extent to which our customers utilize the available capacity of their FCC units. In general, as capacity utilization increases, a refinery needs a disproportionately greater amount of catalyst.

8

CC-BLG003210

Refinery feedstocks vary in quality from sweet to heavy crude oil. Sweet crude feedstocks are more expensive than heavy crude and have a greater proportion of high-value petroleum products. They also have a lower proportion of residual oil, or "resid," which is generally the lowest-value feedstock contained in crude oil. Although feedstocks with high resid content are less expensive than higher quality feedstocks, the processing of high resid feedstocks is more difficult because of their relatively high metals, nitrogen and sulfur contamination and higher boiling points. Due to increased prices for crude oil, refiners have increased their efforts to maximize the yield from resid feedstocks. We have designed our MIDAS ®, IMPACT ®, NEKTOR™, and NOMUS™ product portfolios to enable our customers to increase the efficiency and yield of resid refining.

Many U.S. petroleum refiners have entered into consent decrees with the U.S. Environmental Protection Agency under which the refiners have agreed to reduce emissions of nitrogen oxides and sulfur oxides. The European Union has also imposed requirements on refineries with respect to nitrogen oxides and sulfur oxides emissions. FCC units are generally the largest emitters of these pollutants in a refinery. Our catalysts are designed to assist refineries in meeting their obligations to reduce these pollutants. Our Super DESOX ® product delivers 35-50% reduction in sulfur oxides emissions from a commercial FCC unit. Our XNOx ® and DENOX ® products can generally achieve a reduction in nitrogen oxides emissions comparable to that obtained from the capital-intensive alternatives available to a refinery.

Economic growth in emerging countries has increased the demand for plastics. As a result, our refinery customers have sought increased profits in the petrochemical market by increasing the yield of propylene from their FCC units. Our zeolite-based technology, including our ProPlus™, Olefins Max ® and OlefinsUltra ® products, is designed to maximize the propylene output of FCC units.

In recent years, many countries and regions, including the U.S., European Union and China have imposed or increased the regulatory limitations on the sulfur content of gasoline and diesel fuel. We have developed a portfolio of products designed to assist refiners in meeting their gasoline sulfur reduction targets including our D-PriSM ® and GSR ®-5 additives and our SuRCA ®, SATURN ® and GSR ®-7 catalyst families.

Competition in the FCC catalyst and additives markets is based on technology, product performance, customer service and price. Our two principal global competitors are BASF Corporation and Albemarle Corporation. We have multiple regional competitors in the markets for FCC additives.

*Hydroprocessing Catalysts*

We sell hydroprocessing catalysts through Advanced Refining Technologies, LLC, or ART, our joint venture with Chevron Products Company. We established ART to combine our technology with that of Chevron and to develop, market and sell hydroprocessing catalysts to customers in the petroleum refining industry worldwide.

CC-BLG003211

As discussed above, we are dependent on the economics of the petroleum industry. The increase in prices for crude oil has increased the value of refinery feedstocks that have high resid content. We are a leading supplier of hydroprocessing catalysts, including fixed-bed, on-stream catalyst replacement (OCR ®) and ebullating bed products, designed for processing these feedstocks.

We also offer a full line of catalysts used in processing ultra-low sulfur content gasoline and diesel fuel, including our SmART Catalyst System ® and ApART™ catalyst system, that are customized for individual refiners. These products are designed to help refiners meet their obligations to reduce sulfur content in their products.

Competition in the hydroprocessing catalyst industry is based on technology, product performance, customer service and price. Albemarle Corporation and Criterion Catalysts and Technologies are our leading global competitors in hydroprocessing catalysts.  We also have multiple regional competitors .

*Specialty Catalysts*

We are a leading provider of catalyst systems and catalyst supports to the polyolefins industry for a variety of polyethylene and polypropylene process technologies. These types of catalysts are used for the manufacture of polyethylene and polypropylene resins used in products such as plastic film, high-performance plastic pipe and household containers. We use a combination of proprietary catalyst and support technology, as well as technology licensed from third parties, to provide unique catalyst-based solutions to industry, and to provide a broad technology portfolio for enhancing collaboration opportunities with technology leaders.

Our single-site catalyst offerings utilize our proprietary manufacturing technology and know-how to integrate our single-site metallocene catalyst components with our supports to exact customer specifications. These catalysts are used by our customers to manufacture high value plastic resins for applications such as no-taste meat and cheese packaging, soft-feel artificial fabrics, and puncture-resistant shipping sacks. Close collaboration with our customers accelerates the product development cycle for new plastic resins.

We also supply our Magnapore ® polymerization catalyst to produce high performance polyethylene in the slurry loop process for pipe and film applications. Polytrak ®, our newest family of products for the polypropylene market, is designed to achieve improved polymer performance, particularly for impact-resistant applications such as automobile bumpers.

Our Davicat ® customized products offer a wide range of chemical and physical properties based on our material science technology for supported catalysts and biotechnology applications such as nylon and artificial sweeteners. Our Raney ® products are used for the synthesis of organic compounds for the fibers, pharmaceuticals, plastics, perfumes, soaps, color couplers and petroleum industries. Our specialty catalysts products also include washcoat materials used in automotive

10

CC-BLG003212

catalytic converters to lower vehicle emissions by converting engine pollutants into non-toxic compounds. We are in the process of exploring strategic alternatives for our washcoat materials business.

The specialty catalyst industry is technology-intensive and suppliers must provide products formulated to meet customer specifications. There are many manufacturers of polyolefin and other specialty catalysts, and most sell their products worldwide.

### Engineered Materials

Our engineered materials product group provides silica and silica-alumina based functional additives and process aids, such as silica gel, colloidal silica, zeolitic adsorbents, precipitated silica and silica-aluminas for a wide variety of applications including:

- industrial applications such as coatings, plastics and rubber, precision investment casting, refractory, insulating glass windows, desiccants, and gas and liquids purification

- consumer applications such as food products, toothpaste, pharmaceutical and personal care products and edible oils and beverage processing

- digital media applications such as additives and formulations for matte, semi-glossy and glossy ink receptive coatings on high performance ink jet papers, photo paper, and commercial wide-format print media

Our engineered materials products provide valuable additional attributes to the products of our customers, including matte surface appearance, anti-scratch resistance, improved shelf-life stability and higher purity (by removing contaminants and impurities). Our products are integrated into our customers' manufacturing processes and, when combined with our technical support, can increase the efficiency of such processes. By working closely with our customers, we help them to react quickly to the changing needs of their customers. Changing end-customer needs have included higher-resolution ink jet prints, improved scratch resistance of floor and furniture coatings, less abrasive toothpastes and technologies that are friendly to the environment such as water-borne coatings, green tires, bio-fuel processing and non-toxic anticorrosive pigments.

We market our engineered materials under the SYLOID ®, SYLOJET ®, TriSyl ®, DARACLAR ®, PERKASIL ®, LUDOX ®, PHONOSORB ®, and SYLOBEAD ® and other trademarks.

We have a global position in engineered materials, with greater than 50% of our engineered materials sales outside of the U.S. Our major competitors are INEOS, Degussa Corporation and UOP LLC who also sell their products on a worldwide basis.

11

CC-BLG003213

*Discovery Sciences*

Our discovery sciences product group includes a wide range of chromatography tools that enable scientists to separate mixtures of molecules into their various constituents. Chromatography is commonly used in a wide range of applications, including drug discovery and purification for the pharmaceutical and biotechnology industries, environmental analysis, forensics, petrochemical analysis, food, cosmetics, vitamins and biofuels.

Our product range includes chromatography consumables, analytical and preparative columns packed with our silica, and bulk silica that customers can pack in their own production columns. We can modify the base silica and surface chemistry for analytical, preparative and process scale customers, allowing us to enhance our products for unique applications. Our chromatography products include:

- Vydac ®, Alltech ®, Jones Chromatography™, Flexit™, Grom™ and MODcol ® liquid and gas chromatography columns, detectors and other chromatography instruments including pumps, gas generators, auto samplers, flow meters, and gas chromatography instruments

- Davisil ®, and Vydac ® silica used by drug companies for laboratory and process scale chromatography

- a wide range of chromatography consumables and accessories including solid phase extraction (SPE) cartridges, vials, syringes, standards, and thin layer chromatography (TLC) plates

Our discovery sciences products compete on the basis of product quality, distinct technology and customer support. The market for these products is highly fragmented with a large number of companies that sell their products on a global and regional basis, although a number of companies, such as Waters Corporation and Agilent Technologies, have a substantial global position and a relatively large installed customer base. We have developed this product group over the past few years, primarily through acquisitions of companies with substantial experience in this industry.

*Manufacturing*

Our Grace Davison products are manufactured by a network of globally-coordinated plants that are positioned to service our customers regionally. Our integrated planning organization is responsible for the effective utilization of our manufacturing capabilities. Our discovery sciences product group also maintains specific "centers of excellence" for some product manufacturing.

12

CC-BLG003214

*Marketing/Sales*

Our Grace Davison operating segment uses a global organization of technical professionals with extensive experience in refining processes, catalyst development, and catalyst applications to market our refining technologies and ART product groups. These professionals work to tailor our technology to the needs of each specific customer. We generally negotiate prices for our FCC catalysts and ART hydroprocessing catalysts because our formulations are specific to the needs of each customer and each customer receives special attention and technical service. Due to the current demand for hydroprocessing catalysts, we generally sell ART products through long-term supply agreements with our geographically diverse customer base.

We use a global sales force for our specialty catalysts product group that seeks to maintain close working relationships with our customers. These relationships enable us to cooperate with major polyolefin resin producers to develop catalyst technologies that complement their process developments. We have geographically distributed our sales and technical service professionals to make them responsive to the needs of our geographically diverse customers. We typically negotiate prices on an annual basis; however, we also operate under long-term contracts with built-in pricing mechanisms for certain customers.

We use a combination of agents, distributors, and direct sales professionals for our engineered materials and discovery sciences product groups. These professionals are organized on a regional basis to meet the needs of the large and fragmented customer bases of these product groups.

Our marketing and research and development functions are organized at the operating segment level and operate globally. We also offer web-based support, including technical service, literature access, customer feedback tools, and process design formulas to assist our customers in determining their needs for our products. We also offer online ordering and order fulfillment for our discovery sciences products.

Seasonality does not have a significant overall effect on our Grace Davison operating segment. However, sales of FCC catalysts tend to be lower in the first quarter prior to the shift in production by refineries from home heating oil for the winter season to gasoline production for the summer season. FCC catalysts and hydroprocessing catalysts are consumed at a relatively steady rate and are replaced regularly. Hydroprocessing catalysts are consumed over a period of years and are replaced in bulk in an irregular pattern. Since our customers periodically shut down their refining processes to replace hydroprocessing catalysts in bulk, our hydroprocessing catalyst sales to any customer can vary substantially over the course of a year based on that customer's catalyst replacement schedule.

*Raw Materials*

The principal raw materials for Grace Davison products include caustic, alumina, rare earths, nickel, aluminum, cobalt carbonate, kaolin, molybdenum, sodium aluminate, and sodium silicate. Multiple suppliers are generally available for each of these materials; however some of our raw materials are provided by single sources of supply. In some instances, we produce our own raw materials and intermediates. As in many chemical businesses, we consume significant quantities of natural gas in the production of Grace Davison products. World events and other economic factors have caused volatility in the price of natural gas. Increases in the cost of natural gas and other important raw materials can negatively impact our operating margins .

13

CC-BLG003215

*Grace Performance Chemicals Operating Segment*

Our GPC products include specialty construction chemicals and materials and Darex packaging products and technologies. We entered these businesses in 1954, with our acquisition of the Dewey and Almy Chemical Company.

The following table sets forth GPC sales of similar products based on end-use markets as a percentage of Grace total revenue.

| (In millions) | 2006 Sales | % of Grace Revenue | 2005 Sales | % of Grace Revenue | 2004 Sales | % of Grace Revenue |
|---|---|---|---|---|---|---|
| Construction Industry | $ 1008.1 | 35.7% | $ 886.9 | 34.5% | $ 769.3 | 34.0% |
| Food Packaging | 296.7 | 10.5% | 292.9 | 11.4% | 279.1 | 12.3% |
| Industrial Applications | 21.1 | 0.7% | 19.5 | 0.8% | 19.3 | 0.9% |
| **Total GPC Revenue** | **$ 1,325.9** | **46.9%** | **$ 1,199.3** | **46.7%** | **$ 1,067.7** | **47.2%** |

The following table sets forth GPC sales by region as a percentage of GPC total revenue.

| (In millions) | 2006 Sales | % of GPC Revenue | 2005 Sales | % of GPC Revenue | 2004 Sales | % of GPC Revenue |
|---|---|---|---|---|---|---|
| North America | $ 621.9 | 46.9% | $ 578.2 | 48.2% | $ 525.1 | 49.2% |
| Europe | 427.2 | 32.2% | 374.7 | 31.2% | 317.6 | 29.7% |
| Asia Pacific | 181.3 | 13.7% | 164.1 | 13.7% | 155.1 | 14.5% |
| Latin America | 95.5 | 7.2% | 82.3 | 6.9% | 69.9 | 6.6% |
| **Total GPC Revenue** | **$ 1,325.9** | **100%** | **$ 1,199.3** | **100%** | **$ 1,067.7** | **100%** |

14

CC-BLG003216

*Specialty Construction Chemicals and Materials*

We are a supplier to the nonresidential (commercial and infrastructure) construction industry, and to a lesser extent, the residential construction and repair and restoration industries. The following table shows our principal specialty construction chemicals and materials products:

| Products | Uses | Customers | Key Brands |
|---|---|---|---|
| Concrete admixtures | Concrete admixtures and polymeric fibers are used to reduce the production and in-place costs of concrete, and improve the life cycle cost of the structure. | Ready-mix and precast concrete producers, engineers and specifiers | ADVA ®, STRUX ®, PolarSet ®, Eclipse ® |
| Additives for cement processing | Cement additives added to the grinding stage of the cement manufacturing process improve the energy efficiency of the plant and enhance the performance of the finished cement. Chromium reducing additives help meet environmental regulations. | Cement manufacturers | CBA ®, Synchro ®, HEA2 ®, TDA ® |
| Products for architectural concrete | Products for architectural concrete include surface retarders, coatings, pigments and release agents used by concrete producers and contractors to enhance the surface appearance and aesthetics of concrete. | Precast concrete producers and architects | Pieri ® |
| Admixtures for masonry concrete | Products for masonry concrete are used by block and paver producers for process efficiency and to improve the appearance, durability and water resistance of finished concrete masonry units (CMUs). | Masonry block manufacturers | Dry-Block ®, Optec ®, Quantec ® |
| Specialty vermiculite products | Specialty vermiculite products are used in a wide range of applications making use of vermiculite's insulating properties and its ability to absorb nutrients, primarily in the horticultural, construction, and automotive industries. | Manufacturers of a variety of products, including potting soils, animal feeds, brakes, clutches and fire-rated products | MicroLite ®, Verxite ™, FRSV ™ |

15

CC-BLG003217

| Products | Uses | Customers | Key Brands |
|---|---|---|---|
| Structural waterproofing, vapor and air barrier systems | Structural waterproofing and air barrier systems prevent water, vapor and/or air infiltration in commercial structures. Products include self-adhered sheet and liquid membranes, joint sealing materials, drainage composites and waterstops. | Architects and structural engineers; specialty waterproofing and general contractors; specialty waterproofing distributors | Bituthene ®, Procor ®, Preprufe ®, Perm-A-Barrier ®, Adprufe ® |
| Residential building materials | Specialty roofing membranes and flexible flashings for windows, doors, decks and detail areas. Products include fully-adhered roofing underlayments, synthetic underlayments and self-adhered flashing. | Roofing contractors, home builders and remodelers; specialty roofing distributors, lumberyards and home centers; homeowners; architects and specifiers | Grace Ice & Water Shield ®, Grace Tri-Flex 30 ®, Grace Vycor ® |
| Fire protection and firestop products | Fire protection products are spray-applied to the structural steel frame, encasing and insulating the steel and protecting the building in the event of fire. Firestop products and systems compartmentalize and contain fire and smoke within a building. | Local contractors and specialty subcontractors and applicators; building materials distributors; industrial manufacturers; architects and structural engineers | Monokote ®, FlameSafe ® |

For some customer groups, such as producers and contractors, operational efficiency and total applied cost are key factors in making purchasing decisions, while for others, such as architects and engineers, product performance and design versatility are more important.

In view of this diversity of customers and customer concerns, and because construction chemicals and building materials require intensive sales and customer service efforts, we maintain a direct sales and technical support team for construction chemicals and building materials, with sales personnel based in more than 25 countries worldwide. This sales and support team sells products under global contracts, under U.S. or regional contracts, and on a job-by-job basis. We also use distributors in both domestic and overseas markets and for most of our waterproofing products. We compete globally with several large construction materials suppliers, and regionally and locally with numerous smaller competitors. In recent years, the cement and concrete industry has experienced some consolidation, thereby increasing the importance of servicing global customers.

Competition for our specialty construction chemicals and materials product group is based on product performance, technical support and service, and brand name recognition in the construction industry.

16

CC-BLG003218

We seek to improve our products, adapt them for new applications and add new products through our innovation growth processes which focus on understanding the needs of the customer, key performance indicators and marketing research and development. We also seek to extend our product portfolio and geographic reach through acquisitions.

In addition to new product introductions, product enhancements and acquisitions, we look for growth opportunities in developing countries where increasing construction activity, improvement in building codes, and sophistication of construction practices can accelerate demand for our construction products. We continue to expand our commercial and manufacturing capabilities in these geographic areas.

The key raw materials used in our specialty construction products are obtained from a variety of suppliers, including commodity chemical producers, petroleum companies and paper manufacturers. The majority of our raw materials are olefins and organic chemicals; we also make significant purchases of inorganic materials such as gypsum, as well as specialty materials including specialty films, papers, membranes and fibers. In most instances, these materials are available from multiple sources. Global supply and demand factors, and petroleum prices significantly impacted the price and availability of key raw materials in recent years.

The construction business is cyclical in response to economic conditions and construction demand. The construction business is also seasonal and dependent on favorable weather conditions, with a decrease in construction activity during the winter months. Demand for our specialty construction products is primarily impacted by global non-residential construction activity and U.S. residential construction activity. We seek to increase profitability and minimize the impact of cyclical downturns in regional economies by introducing technically advanced high-performance products and expanding geographically. Although in recent years these strategies have been successful in minimizing the impact of cyclicality on our specialty construction products product group, a significant downturn in North American commercial construction activity adversely affected results of operations in 2002 and the first half of 2003. Operating results improved in 2004 through 2006; however a decline in North American construction activity in late 2006 has had an impact on our residential building materials product line.

*Darex Packaging Products and Technologies*

Our Darex packaging products and technologies include:

- can sealants for rigid containers, which are principally sold to container manufacturers and ensure a hermetic seal between the lid and the body of beverage, food, aerosol and other cans

- sealants for metal and plastic bottle closures which are principally sold to container manufacturers and are used on pry-off and twist-off metal crowns, as well as roll-on pilfer-proof and plastic closures to seal and enhance the shelf life of glass and plastic bottles and jars used in beverage and food applications

17

CC-BLG003219

- coatings for metal packaging which are principally sold to container manufacturers and are used in the manufacture of cans and closures to protect the metal against corrosion, protect the contents against the influences of metal, ensure proper adhesion of sealing compounds to metal surfaces, and provide base coats for inks and for decorative purposes

We seek to grow the Darex product group by continually developing and introducing new products to meet packager and brand owner needs and by focusing on specialty high-growth markets, such as plastic packaging, and growth geographies. Sales growth of can sealants has been negatively impacted by the long-term shift from metal to plastic packaging for foods and beverages. This shift has caused a decline in can sealant usage over recent years, but provides opportunities for increased sales of closure sealants, coatings and other products for plastic packaging. We will continue to focus on improving the profitability and cash flows of this product group through worldwide productivity and strategic sourcing initiatives.

We believe that purchasing decisions in the rigid packaging segments we serve are generally based on product performance and reliability, as well as additional value added features to address the needs of brand owners. We have a direct selling force for our Darex products that is focused on consultative sales and technical support and distributes most of our Darex products directly to a large number of packaging producers worldwide.

Although raw materials used in our Darex products, including resins, rubber and lattices, are generally available from multiple sources, some raw materials are purchased from single source suppliers. We seek to mitigate the risk of using single source suppliers by identifying and qualifying alternative suppliers or, for unique materials, by using alternative formulations from other suppliers or by passing price increases on to customers. Some raw materials are also subject to pricing pressures, particularly petroleum-based specialty and commodity materials such as resins and solvents. Since we manufacture a substantial portion of our Darex products in developing countries using raw materials from suppliers in the U.S., Europe and other developed economies, currency revaluations versus the U.S. dollar and Euro in developing countries may adversely affect our raw material costs and the prices we may charge for our products.

Our Darex product group is affected by seasonal and weather-related factors such as the consumption of beverages and the size and quality of food crops. These impacts are softened by the global nature of this product group.

**FINANCIAL INFORMATION ABOUT INDUSTRY SEGMENTS AND GEOGRAPHIC AREAS**

Financial information about industry segments and geographic areas for 2006, 2005 and 2004 is contained in Note 19 to the Consolidated Financial Statements in the Financial Supplement to this Report. Risks attendant to our foreign operations are discussed below in "Risk Factors."

18

CC-BLG003220

**INTELLECTUAL PROPERTY; RESEARCH ACTIVITIES**

Competition in our industry is often based on technological superiority and innovation. Our ability to maintain our margins and effectively compete with other suppliers depends on our ability to introduce new products based on innovative technology, as well as our ability to obtain patent or other intellectual property protection. Our research and development programs emphasize development of new products and processes, improvement of existing products and processes and application of existing products and processes to new industries and uses. We conduct research in all regions, with North America and Europe accounting for the most activity.

Numerous patents and patent applications protect our products, processes and manufacturing equipment. We also benefit from trade secrets, including know-how and other proprietary information relating to many of our products and processing technologies. There can be no assurance, however, that our patents, patent applications and precautions to protect trade secrets and know-how will provide sufficient protection for our intellectual property. In addition, other companies may independently develop systems or processes that circumvent our patents or acquire patent rights applicable to our business.

Research and development expenses relating to continuing operations amounted to $64 million in 2006, $59 million in 2005 and $51 million in 2004. These amounts include expenses incurred in funding external research projects. The amount of research and development expenses relating to government- and customer-sponsored projects (rather than projects that we sponsor) was not material during these periods.

**ENVIRONMENTAL, HEALTH AND SAFETY MATTERS**

We are subject, along with other manufacturers of specialty chemicals, to stringent regulations under numerous U.S. federal, state and local and foreign environmental, health and safety laws and regulations relating to the generation, storage, handling, discharge, disposition and stewardship of hazardous wastes and other materials. Environmental laws require that responsible parties fund remediation actions regardless of fault, legality of original disposal or ownership of a disposal site. We are involved in remediation actions to address hazardous wastes or other materials as required by U.S. federal, state and local and foreign laws. During the Chapter 11 proceeding, we generally are not participating in the funding of investigation and remediation at sites that we do not own. Our ultimate liability with respect to many of these sites will be determined as part of the Chapter 11 proceeding.

19

CC-BLG003221

We have expended substantial funds to comply with environmental laws and regulations and expect to continue to do so in the future. The following table sets forth our expenditures in the past three years, and our estimated expenditures in 2007 and 2008, for (i) the operation and maintenance of manufacturing facilities and the disposal of wastes; (ii) capital expenditures for environmental control facilities; and (iii) site remediation:

| Year | Operation of Facilities and Waste Disposal (in $ millions) | Capital Expenditures (in $ millions) | Site Remediation (in $ millions) |
|------|----|----|----|
| 2004 | $ 47 | $  7 | $  9 |
| 2005 | $ 51 | $  9 | $ 28 |
| 2006 | $ 59 | $  8 | $ 11 |
| 2007 | $ 60 | $ 10 | $  9 |
| 2008 | $ 61 | $ 13 | $ 22 |

\*     For 2007 and 2008, amounts are current estimates based on the assumption that we do not emerge from Chapter 11 and incur costs associated with sites that we do not own during the specified periods.

See Part I, Item 3 of this 10-K for additional information about our environmental remediation activities.

We continuously seek to improve our environmental, health and safety performance. To the extent applicable, we extend the basic elements of the American Chemistry Council's Responsible Care ® program to all our locations worldwide, embracing specific performance objectives in the key areas of management systems, product stewardship, employee health and safety, community awareness and emergency response, distribution, process safety and pollution prevention. In addition, we have implemented key elements of the new Responsible Care ® Security Code for our operations and systems. We have completed a review of our existing security (including cyber-security) vulnerability and have taken actions to enhance our security systems and protect our assets.

## EMPLOYEE RELATIONS

As of December 31, 2006, we employed approximately 6,500 persons, of whom approximately 3,200 were employed in the United States. Of our total employees, approximately 3,100 work in Grace Davison facilities, approximately 2,600 work in Grace Performance Chemicals facilities, and approximately 800 are dedicated to corporate activities and/or are shared through globally managed professional groups such as financial and legal services, human resources, information technology, supply chain and environmental health and safety.

Approximately 900 of our manufacturing employees in the United States are represented for collective bargaining purposes by a total of approximately 10 different local collective bargaining groups. We have operated without a labor work stoppage for more than 10 years.

We have works councils representing the majority of our European sites serving approximately 1,600 employees.

20

CC-BLG003222

# RISK MANAGEMENT

‹ We have programs in place to address the following significant risks to Grace:

- *Disasters* —We have disaster recovery plans in effect at key sites, and we have built a certain amount of redundancy into our production plants where feasible. We also have a formalized risk management program, which includes several types and layers of insurance. We are advised by risk management professionals and brokers who are familiar with recent trends in the insurance markets worldwide. The level of insurance carried, and other related aspects such as deductibles, self-insurance levels, etc. are monitored by management and reviewed by the Board of Directors on a regular basis.

- *Environmental* —We are committed to the heath and safety of all employees and to protecting the environment from damage through the use or production of our products. Our Environmental Health and Safety (EH&S) organization is global in scope and is charged with assuring that we live up to our commitments in this area. The group performs EH&S audits of our facilities and regularly monitors local laws and regulations to ensure that we are in full compliance. Where appropriate, we use outside consultants and experts to augment our in-house staff. We continue to implement our EHS management system in our facilities worldwide. Our EHS management system is designed to enable us to apply "best practices" and "continual improvement" principles across our business.

- *Ethics and Fraud* —We insist that our employees maintain the highest standards of ethical behavior. We have preventative and investigatory programs in place to maintain these standards, as follows:

  - We have established online ethics training programs in several languages.

  - All U.S. employees and key employees outside the U.S. must sign an annual Ethics Statement in which they renew their commitment to operate ethically and according to the Grace code of conduct. They must also report any actual or potential conflicts of interest for evaluation by management, and remediation if necessary.

  - We have an anonymous telephone line to report fraudulent or unethical behavior to our Chief Ethics Officer. The direct line is available to all employees worldwide where local law allows such a facility. All allegations of fraud are reported to the Audit Committee.

  - Our Internal Audit Department is independent of management and reports functionally to the Chairman of the Audit Committee of the Board of Directors. The department conducts investigations in collaboration with the Chief Ethics Officer when alleged frauds have accounting, financial reporting or fiscal aspects.

  - We provide training to financial personnel in key positions covering topics such as the U.S. Foreign Corrupt Practices Act, the Sarbanes Oxley Act of 2002, and other laws and regulations relating to ethical or legal matters.

21

CC-BLG003223

**AVAILABILITY OF REPORTS AND OTHER DOCUMENTS**

We maintain an Internet website at www.grace.com . Our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to those reports, filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, are available, free of charge, on our website as soon as reasonably practicable after such reports are electronically filed with, or furnished to, the Securities and Exchange Commission. These reports may be accessed through our website's investor information page.

In addition, the charters for the Audit, Compensation, Nominating and Governance, and Corporate Responsibility Committees of our Board of Directors, our corporate governance guidelines and code of ethics are available, free of charge, on our website at www.grace.com/About/Leadership/Governance/.  Printed copies of the charters, governance guidelines and code of ethics may be obtained free of charge by contacting Grace Shareholder Services at 410-531-4167.

The information on our website is not, and shall not be deemed to be, a part of this report or incorporated into any other filings we make with the Securities and Exchange Commission.

On April 7, 2006, our Chief Executive Officer submitted a certification to the New York Stock Exchange that, as of such date, he was not aware of any violation by Grace of the New York Stock Exchange corporate governance listing standards. Our Chief Executive Officer and Chief Financial Officer have submitted certifications to the SEC pursuant to the Sarbanes Oxley Act of 2002 as exhibits to this Report.

**EXECUTIVE OFFICERS**

See Part III, Item 10 of this Report for information about our Executive Officers.

**Item 1A.    RISK FACTORS**

This report and the Financial Supplement contain, and our other public communications may contain, projections or other "forward-looking" information, that is, information related to future, not past, events. Such information generally includes the words "believes," "plans," "intends," "targets," "will," "expects," "anticipates," or similar expressions. Forward-looking information includes all statements regarding our Chapter 11 proceeding (including the pro forma financial statements included in "Management's Discussion and Analysis of Financial Condition and Results of Operations"), expected financial position, results of operations, cash flows, financing plans, business strategy, budgets, capital and other expenditures, competitive positions, growth opportunities for

22

CC-BLG003224

existing products, benefits from new technology and cost reduction initiatives, plans and objectives of management, and markets for securities. For these statements, we claim the protection of the safe harbor for forward-looking statements contained in the Private Securities Litigation Reform Act of 1995. Like other businesses, we are subject to risks and uncertainties that could cause our actual results to differ materially from our projections or that could cause other forward-looking information to prove incorrect. Further, our reported results should not be considered as an indication of our future performance. Readers are cautioned not to place undue reliance on our projections and forward-looking information, which speak only as of the date thereof. We undertake no obligation to publicly release any revisions to the projections and forward-looking information contained in this document, or to update them to reflect events or circumstances occurring after the date of this document.

In addition to general economic, business and market conditions, we are subject to other risks and uncertainties, including, without limitation, the following:

## COMPANY RISKS

### *The outcome of our Chapter 11 cases could result in the substantial dilution or cancellation of Grace's currently outstanding common stock.*

The outcome of our Chapter 11 cases depends primarily upon the resolution of our asbestos-related and other contingent liabilities. The Bankruptcy Court has agreed to a process for estimating our asbestos-related liabilities, which estimate would form the basis for a plan of reorganization that would provide for the funding of a trust to which all pending and future asbestos-related claims would be channeled. If the allowed amount of asbestos-related liabilities, as determined through estimation or otherwise, and other liabilities exceeds assets available for funding, then we likely would issue additional shares of Grace common stock to satisfy such liabilities. The number of shares to be issued could substantially dilute the interests of current shareholders or result in a recapitalization of Grace that would cancel the shares of current shareholders and issue new shares to asbestos and other creditors. Because of this risk of substantial dilution or cancellation, the value of Grace common stock is highly speculative and any investment in Grace common stock poses a high degree of risk.

### *If our proposed plan of reorganization is not confirmed, the ownership interests of holders of currently outstanding Grace common stock may become further diluted or worthless.*

Our proposed plan of reorganization provides that Grace common stock would remain outstanding at the effective date of the plan, but the interests of current holders of Grace common stock would be subject to substantial dilution by additional Grace securities that may be issued under the plan. The pro forma financial information included under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations—Proforma Financial Information" in the Financial Supplement reflects the accounting effects of the plan as if it had become effective on December 31, 2006, and as if it had been in effect for the year ended December 31, 2006. If the plan is not confirmed or, if confirmed, if its provisions are materially different from those proposed, the proforma financial information will change.

23

CC-BLG003225

The plan is subject to the fulfillment of numerous conditions, including a determination by the Bankruptcy Court that the maximum amount that we and other parties would be required to contribute to the trust for the benefit of asbestos claimants does not exceed $1,613 million, and that assets from settlement agreements with Sealed Air Corporation and Fresenius Medical Care will be available to fund our liabilities. The asbestos creditors have asserted that the plan is unconfirmable and have asked the Bankruptcy Court for authority to file one or more alternative plans. If the conditions precedent in our proposed plan are not fulfilled and the Bankruptcy Court confirms another plan, the other plan may provide for greater dilution of, or cancellation of, the interests of current holders of Grace common stock.  Because of this possibility, the value of Grace common stock is highly speculative and any investment in Grace common stock poses a high degree of risk.

*The bankruptcy process may disrupt our business.*

We have attempted to minimize the adverse effect of our Chapter 11 reorganization on our relationships with our employees, suppliers, customers and other parties. Nonetheless, as our reorganization becomes more protracted, our relationships with our customers, suppliers and employees may be adversely impacted and our operations could be materially and adversely affected. In addition, the continuation of our reorganization could negatively affect our ability to attract new employees and retain existing high performing employees.

*Chapter 11 limits the flexibility of our management team in running our business.*

While we operate our businesses as debtor-in-possession under supervision by the Bankruptcy Court, we are required to obtain the approval of the Bankruptcy Court prior to engaging in activities or transactions outside the ordinary course of business. For example, our strategic plan includes the acquisition of businesses in the specialty chemicals industry. Such acquisitions generally require Bankruptcy Court approval. Bankruptcy Court approval of non-ordinary course activities entails preparation and filing of appropriate motions with the Bankruptcy Court, negotiation with the various creditors' committees and other parties in interest and one or more hearings. The various creditors' committees and other parties in interest may be heard at any Bankruptcy Court hearing and may raise objections with respect to these motions. This process delays major decisions and limits our ability to respond quickly to opportunities and events in the marketplace. Furthermore, in the event the Bankruptcy Court does not approve a proposed activity or transaction, we would be prevented from engaging in activities and transactions that we believe are beneficial to Grace.

24

CC-BLG003226

*We may not be able to collect all asbestos-related insurance payments that may be due to us.*

We have insurance coverage for a portion of the asbestos-related claims against us. We estimate that, assuming an ultimate payout of asbestos-related claims equal to the $1,700 million of asbestos-related liabilities recorded on our balance sheet, we should be entitled to approximately $500 million of insurance recovery. Accordingly, our December 31, 2006 balance sheet includes a long-term asset for estimated asbestos-related insurance of $500 million. Although this amount pertains only to insurance carriers with which we have asbestos settlement agreements, and/or which are currently solvent, we cannot be sure that all these amounts will be collected. The timing and amount of future payments from our insurers depends on their continued solvency and the resolution of disputes regarding coverage under the insurance policies as well as the nature and timing of actual claims paid. Because of the significance of our future asbestos-related payments, the receipt of timely and complete payments from our insurers will be important to the success of our reorganization.

*Grace is currently under criminal indictment in connection with our former vermiculite mining and processing activities in Libby, Montana.*

Along with seven current or former senior level employees, Grace has been indicted in connection with our former vermiculite mining and processing activities in Libby, Montana. The indictment accuses Grace and the co-defendants of conspiracy to violate environmental laws and obstruct federal agency proceedings, violations of the federal Clean Air Act, and obstruction of justice. Trial is scheduled for September 2007 but the case is stayed pending appeal by the U.S. to the Ninth Circuit Court of Appeals of certain pre-trial rulings in favor of the defendants. According to the U.S. Department of Justice, Grace could be subject to fines in an amount equal to twice the after-tax profit earned from our Libby operations or twice the alleged loss suffered by Libby victims, plus additional amounts for restitution to victims. The indictment alleges that our after-tax profits were $140 million. Grace has categorically denied any criminal wrongdoing and intends to vigorously defend itself at trial. We are unable to assess whether the indictment or any conviction will have a material adverse effect on our results of operations or financial condition or affect our bankruptcy proceedings. However, we expect that legal fees for Grace's defense and that of our current and former employees could range from $3 million to $5 million per quarter while the appeal is pending.

*We are subject to environmental clean-up fines, penalties and damage claims that have been and continue to be costly.*

Grace is subject to lawsuits and regulatory actions, in connection with current and former operations, for breaches of environmental laws that seek clean-up or other remedies. For example, a federal court has ruled that Grace is responsible for reimbursing the government for $54.5 million (plus interest) in costs expended through December 2001 and for all appropriate future clean-up costs with respect to our former vermiculite mining and processing activities in Libby, Montana. The State of New Jersey is seeking civil penalties for alleged misrepresentations and false statements made in

CC-BLG003227

an official filing in connection with the closing of a former plant in New Jersey, and we are aware that the State of New Jersey and U.S. Department of Justice each may be conducting criminal investigations related to our former operations of that plant which included vermiculite processing and other activities. Grace is also subject to other lawsuits and investigations by public and private parties under various environmental laws in connection with our current and former operations in various states, including with respect to off-site disposal at facilities where Grace has been identified as a potentially responsible party under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, commonly referred to as CERCLA.

We have established accounting accruals for all environmental matters for which sufficient information is available. As we receive new information, our estimated liability may change materially. We do not have sufficient information to accrue for all of Grace's environmental risks, and we cannot be sure that our actual costs will be equal to or less than our current estimates and accruals. Furthermore, it is reasonably possible that costs associated with those environmental matters for which we have established accruals may exceed our current accruals by material amounts. Specifically, our estimate of expected costs in connection with the EPA activities with respect to our former vermiculite mining and processing activities is based on documentation furnished by EPA related to past costs, public comments regarding the EPA's spending plans, discussions of spending forecasts with EPA representatives, analysis of other information made available from the EPA, and evaluation of probable remediation costs at processing sites. As the EPA's spending on these matters increases, which we cannot anticipate with certainty, our potential liability for remediation will increase. Some or all of our liability in connection with alleged violations of environmental laws may not be discharged upon confirmation of our proposed plan of reorganization.

*Our capital resources are limited and we have limited access to additional financing.*

In addition to the cash requirements necessary to fund our ongoing operations, we currently are incurring, and anticipate that we will continue to incur significant, professional fees and other restructuring costs in connection with the Chapter 11 proceedings. We are currently funding our operations with cash flow from operations and a debtor-in-possession (DIP) loan facility, which expires on April 1, 2008, in the aggregate amount of $250 million, and with a borrowing availability as of December 31, 2006 of $175.0 million. Based on our current and anticipated level of operations, we believe that our cash flow from operations and financing available under the DIP facility are adequate to meet our current and anticipated cash requirements during the Chapter 11 proceedings. If such amounts are not sufficient to fund operations until a plan of reorganization is confirmed by the Bankruptcy Court, we may be required to reduce planned capital expenditures or seek additional financing. Further, our proposed plan of reorganization requires, and any plan of reorganization that is ultimately confirmed is likely to require, Grace to borrow funds for the payment of certain claims in cash. We can provide no assurance that additional financing for current operations or for payment of claims under a plan of reorganization will be available or, if available, offered on acceptable terms. As a result of the uncertainty surrounding our current circumstances, we cannot determine our long-term liquidity requirements or the adequacy of our capital resources until a plan of reorganization is confirmed by the Bankruptcy Court.

26

CC-BLG003228

*We have unfunded and underfunded pension plan liabilities which will likely require us to use current and future operating cash flow to fund the shortfall. We have no assurance that we will generate sufficient cash flow to satisfy these obligations.*

We maintain U.S. and non-U.S. defined benefit pension plans covering employees who meet age and service requirements. Our net pension liability and cost is materially affected by the discount rate used to measure pension obligations, the longevity and actuarial profile of our workforce, the level of plan assets available to fund those obligations and the expected long-term rate of return on plan assets. Significant changes in investment performance or a change in the portfolio mix of invested assets can result in corresponding increases and decreases in the valuation of plan assets, particularly equity securities, or in a change in the expected rate of return on plan assets. A change in the discount rate would result in a significant increase or decrease in the valuation of pension obligations, affecting the reported funded status of our pension plans as well as the net periodic pension cost in the following years. Similarly, changes in the expected return on plan assets can result in significant changes in the net periodic pension cost in the following years.

*The international scope of our operations subjects us to the risks of doing business in foreign countries, which could adversely affect our business, financial condition and results of operations.*

We conduct a substantial portion of our business outside of the United States, with 63.5% of our 2006 sales to non-U.S. customers. We currently have many production facilities, research and development facilities and administrative and sales offices located outside North America, including facilities and offices located in Europe, Latin America and Asia. We expect sales from international markets to continue to represent a significant portion of our revenue. Accordingly, our business is subject to risks related to the differing legal, political, social and regulatory requirements and economic conditions of many jurisdictions. Risks inherent in international operations include the following:

- agreements may be more difficult to enforce and receivables more difficult to collect

- foreign countries may impose additional withholding taxes or adopt other restrictions on foreign trade or investment, including currency exchange controls

- we may have difficulty transferring our profits or capital from foreign operations to the United States or other countries where such funds could be more profitably deployed

- foreign governments may nationalize private enterprises

- we may experience unexpected adverse changes in export duties, quotas and tariffs and difficulties in obtaining export licenses

27

CC-BLG003229

- intellectual property rights may be more difficult to enforce

- our business and profitability in a particular country could be affected by political or economic repercussions on a domestic, country specific or global level from terrorist activities and the response to such activities

- we may be affected by unexpected adverse changes in foreign laws or regulatory requirements

In addition, certain of our operations are in high-risk regions of the world such as the Middle East, portions of Asia and Latin America. Unanticipated events, such as geopolitical changes, could adversely affect these operations. Our success as a global business will depend, in part, upon our ability to succeed in differing legal, regulatory, economic, social and political conditions by developing, implementing and maintaining policies and strategies that are effective in each location where we do business.

***We are exposed to currency exchange rate fluctuations that could impact our profitability.***

We are exposed to currency exchange rate risk through our non-U.S. operations. As we conduct a significant portion of our operations outside the United States, fluctuations in currencies of other countries, especially the Euro, may materially affect our operating results. For example, changes in currency exchange rates may affect the relative prices at which our competitors and we sell products in the same market and the cost of materials used in our operations. A substantial portion of our net sales and assets are denominated in currencies other than the U.S. dollar. During times of a strengthening U.S. dollar, at a constant level of business, our reported international sales, earnings, assets and liabilities will be reduced because the foreign currency will translate into fewer U.S. dollars

In addition to currency translation risks, we incur a currency transaction risk whenever one of our operating subsidiaries enters into either a purchase or a sales transaction using a currency different from the operating subsidiary's functional currency. Given the volatility of exchange rates, we may not be able to manage our currency transaction and/or translation risks effectively, or volatility in currency exchange rates may expose our financial condition or results of operations to a significant additional risk.

***We may be subject to claims of infringement of the intellectual property rights of others, which could hurt our business.***

From time to time, we face infringement claims from our competitors or others alleging that our processes or products infringe on their proprietary technologies. Any claims that our products or processes infringe the intellectual property rights of others, regardless of the merit or resolution of the claims, could cause us to incur significant costs in responding to, defending and resolving the claims, and may divert the efforts and attention of our management and technical personnel from our business. If we are found to be infringing on the proprietary technology of others, we may be liable for damages, and we may be required to change our processes, redesign our products, pay others to use the technology or stop using the technology or producing the infringing product. Even if we ultimately prevail, the existence of the lawsuit could prompt our customers to switch to products that are not the subject of infringement suits.

28

CC-BLG003230

*Our ability to use net operating loss carryovers to reduce future tax payments may be limited if there is a change in ownership of Grace or if Grace does not generate sufficient U.S. taxable income.*

As of December 31, 2006, we had $190.9 million of net operating loss carryovers, or NOLs, available to reduce U.S. federal taxable income in future years. Our ability to utilize our NOLs may be limited by Section 382 of the Internal Revenue Code of 1986, as amended, if we undergo an ownership change as a result of future changes in the ownership of outstanding Grace common stock. In addition, our ability to utilize NOLs is dependant on our ability to generate sufficient future taxable income in the U.S.

*While Grace is in bankruptcy, we are not permitted to pay dividends on Grace common stock.*

We are not permitted to pay dividends on Grace common stock while we are in bankruptcy. Following emergence from bankruptcy, we may be subject to covenants in connection with our financing arrangements that limit or prevent us from paying dividends for the foreseeable future. Furthermore, it is likely that following our emergence from bankruptcy, our board of directors will decide to reinvest our operating cash flow in our business rather than paying dividends. Accordingly, for the foreseeable future, investors in Grace common stock, in all likelihood, will obtain an economic benefit from their shares only by selling them.

**INDUSTRY RISKS**

*Prices for raw materials and energy are volatile; we may not be able to pass through increases in costs and expenses for raw materials and energy which may hurt our profitability.*

We use significant amounts of natural gas in the manufacture of our Grace Davison products. We also use significant amounts of petroleum-based materials in our GPC products, including specialty and commodity materials such as resins and solvents. We purchase natural gas and petroleum-based products from third-parties. Prices of natural gas and petroleum products have increased dramatically in recent years.  To the extent this trend continues and we are unable to pass through these price increases to our customers, our operating profit and results of operations may decline.

*A substantial portion of our raw materials are commodities whose prices fluctuate as market supply/demand fundamentals change.*

We attempt to manage exposures to price volatility of major commodities through:

- long-term supply contracts

- forward buying programs that layer in our expected requirements systematically over time

- limited use of contracts and financial instruments

29

CC-BLG003231

Although we regularly assess our exposure to raw materials price volatility, we cannot always predict the prospects of volatility and we cannot always cover the risk in a cost effective manner.

We have a policy of maintaining, when available, multiple sources of supply for raw materials. However, some of our raw materials are provided by single sources of supply. We may not be able to obtain sufficient raw materials due to unforeseen developments that would cause an interruption in supply. Even if we have multiple sources of supply for raw materials, these sources may not make up for the loss of a major supplier.

***We spend large amounts of money for environmental compliance in connection with our current and former operations.***

As a manufacturer of specialty chemicals and materials, we are subject to stringent regulations under numerous U.S. federal, state, local and foreign environmental, health and safety laws and regulations relating to the generation, storage, handling, discharge, disposition and stewardship of hazardous wastes and other materials. We have expended substantial funds to comply with such laws and regulations. Legislative, regulatory and economic uncertainties make it difficult for us to project future spending for these purposes, and if there is an acceleration in new regulatory requirements, we may be required to expend substantial additional funds to remain in compliance.

***The length and depth of product and industry business cycles in our markets, particularly in the construction and petroleum refining industries, may result in periods of reduced sales, operating margins and operating losses.***

The construction products portion of our GPC operating segment and the refining products portions of our Grace Davison operating segment are sensitive to the cyclical nature of their respective industries. Our hydroprocessing catalyst product group and other hydroprocessing catalyst suppliers have experienced alternating periods of inadequate capacity and excess capacity for their products. Periods of inadequate capacity, including some due to raw material shortages, have usually resulted in increased selling prices and operating margins. This has often been followed by periods of capacity additions, which have resulted in declining capacity utilization rates, selling prices and operating margins.

30

CC-BLG003232

*Some of our employees are unionized, represented by workers' councils or employed subject to local laws that are less favorable to employers than the laws of the United States.*

As of December 31, 2006, we had approximately 6,500 employees worldwide. Approximately 28% of our 3,200 U.S. employees is unionized. In addition, a large number of our employees are employed in countries in which employment laws provide greater bargaining or other rights to employees than the laws of the United States. Such employment rights require us to work collaboratively with the legal representatives of the employees to effect any changes to labor arrangements. For example, most of our employees in Europe are represented by workers' councils that have co-determination rights on any changes in conditions of employment, including salaries and benefits and staff changes, and may impede efforts to restructure our workforce. Although we believe that we have a good working relationship with our employees, a strike, work stoppage or slowdown by our employees or significant dispute with our employees could result in a significant disruption of our operations or higher ongoing labor costs.

*We work with dangerous materials that can injure our employees, damage our facilities and disrupt our operations.*

Some of our operations involve the handling of hazardous materials that may pose the risk of fire, explosion, or the release of hazardous substances. Such events could result from terrorist attacks, natural disasters, or operational failures, and might cause injury or loss of life to our employees and others, environmental contamination, and property damage. These events might cause a temporary shutdown of an affected plant, or portion thereof, and we could be subject to penalties or claims as a result. A disruption of our operations caused by these or other events could have a material adverse effect on our results of operations.

## Item 1B.   UNRESOLVED STAFF COMMENTS

None.

## Item 2.   PROPERTIES

We operate manufacturing and other types of plants and facilities (including office, warehouse, and other service facilities) throughout the world. Some of these plants and facilities are shared by both of our operating segments. We own all of our major manufacturing facilities. Substantially all of our U.S. properties are subject to security interests under our debtor-in-possession borrowing facility. We consider our major operating properties to be in good operating condition and suitable for their current use. We believe that, after taking planned expansion into account, the productive capacity of our plants and other facilities is generally adequate for current operations and foreseeable growth.

Our Grace Davison operating segment operates out of 26 facilities in the following regions:

| Region | Number of Facilities |
|---|---|
| North America | 14 |
| Europe | 7 |
| Latin America | 1 |
| Asia Pacific | 4 |

31

CC-BLG003233

Our largest Grace Davison facilities are located in Baltimore, Maryland; Lake Charles, Louisiana; and Worms, Germany. Our Grace Davison operating segment also operates sales offices and warehouses in various regions.

Our Grace Performance Chemicals operating segment operates out of 64 facilities in the following regions:

| Region | Number of Facilities |
|---|---|
| North America | 24 |
| Europe | 17 |
| Latin America | 4 |
| Asia Pacific | 19 |

Our largest GPC facilities are located in Cambridge, Massachusetts; Chicago, Illinois; Slough, England; Epernon, France; Atsugi, Japan; Singapore; and Hamburg, Germany. Because of the nature of our GPC products, GPC requires a greater number of facilities to service our customers than Grace Davison. Also, these facilities are generally smaller and less capital intensive than our Grace Davison facilities. For information on our net properties and equipment by region and country, see Note 19 to our Consolidated Financial Statements in the Financial Supplement to this Report.

**Item 3.**    **LEGAL PROCEEDINGS**

**CHAPTER 11 PROCEEDINGS**

Disclosure provided in this Report in Item 1 (Business) under the caption "Chapter 11 Filing" and in Note 1 (Bases of Presentation and Summary of Significant Accounting and Financial Reporting Policies) under the caption "Voluntary Bankruptcy Filing," and Note 2 (Chapter 11—Related Information) to the Consolidated Financial Statements in the Financial Supplement is incorporated herein by reference.

**ASBESTOS LITIGATION**

Disclosure provided in this Report in Item 8 (Financial Statements and Supplementary Data) under Note 3 (Asbestos-Related Litigation) to the Consolidated Financial Statements in the Financial Supplement is incorporated herein by reference.

**ENVIRONMENTAL INVESTIGATIONS, CLAIMS AND CIVIL PROCEEDINGS**

Disclosure provided in this Report in Item 8 (Financial Statements and Supplementary Data) under Note 14 (Commitments and Contingent Liabilities) under the caption "Environmental Remediation" to the Consolidated Financial Statements in the Financial Supplement is incorporated herein by reference.

CC-BLG003234

The EPA also has compiled for investigation a list of 245 facilities that at one time used, stored, or expanded vermiculite concentrate that originated from the Libby vermiculite mine. Included in this list are 50 vermiculite expansion plants that Grace currently operates or formerly operated. The EPA has listed 17 of these 50 sites as requiring additional action. Grace has conducted corrective actions or investigations at six of these sites. The EPA filed proofs of claims for 9 of these sites (not including Minneapolis, MN and Libby, MT), and for three other sites never owned or operated by Grace.

In addition, another governmental agency commenced a separate investigation at 28 of the 245 facilities, 23 of which Grace currently operates or formerly operated. During 2006, health screenings for current and former Grace employees and their household contacts commenced at two of these locations at a cost of approximately $2 million (including indirect costs). Grace's December 31, 2006 environmental reserve included this amount. Grace does not have sufficient information to determine whether this separate investigation is likely to result in any additional liability.

In February 2000, a purported class action lawsuit was filed in the U.S. District Court for Montana, Missoula Division ( *Tennison, et al. v. W. R. Grace & Co., et al* .) against Grace on behalf of all owners of improved private real property situated within 12 miles of Libby, Montana. The action alleges that the class members have suffered harm in the form of environmental contamination and loss of property rights resulting from Grace's former vermiculite mining and processing operations. The complaint seeks remediation, property damages, and punitive damages. This case has been stayed as a result of the Chapter 11 filing.  However, as described in this Report in Item 8 (Financial Statements and Supplementary Data) under Note 14 (Commitments and Contingent Liabilities) under the caption "Vermiculite Related Matters—Cost Recovery Claim", the EPA has been conducting remediation activities in and around Libby, which include the remediation of private real property.

In October 2000, a purported class action lawsuit was filed in the U.S. District Court for the District of Minnesota, 4 th Division ( *Chase v. W. R. Grace & Co.-Conn* .) alleging loss of property values in the vicinity of the former Grace plant in Minneapolis, Minnesota that processed vermiculite from the Libby mine. This case has been stayed as a result of the Chapter 11 filing. The EPA has commenced and is continuing a program for removing suspected vermiculite processing by-products from the yards and driveways of properties near the former plant. The EPA has reviewed 1,648 residential properties and targeted 269 for cleanup. Of the 269 properties, the EPA took action at 252, and could not obtain access to the remaining 17.

The EPA has designated Grace (together, in most cases, with many other companies) as a potentially responsible party, or PRP, with respect to paying the costs of investigating and remediating pollution at various sites. As of December 31, 2006, proceedings were pending with respect to approximately 20 sites as to which Grace has been designated a PRP by the EPA. U.S. law provides that all PRPs for a site may be held jointly and severally liable for the costs of investigating and remediating the site. Grace is also conducting investigatory and remediation activities at sites under the jurisdiction of state and/or local authorities. During the Chapter 11 proceeding, Grace has not been participating (except in a limited number of special cases) in the joint funding of investigation and remediation at non-owned sites where Grace is a PRP.

CC-BLG003235

For further information, see the disclosure provided in this Report in Item 1 (Business) under the caption "Environmental, Health and Safety Matters."

## MONTANA CRIMINAL PROCEEDING

Disclosure provided in this Report in Item 8 (Financial Statements and Supplementary Data) under Note 14 (Commitments and Contingent Liabilities) under the caption "Vermiculite Related Matters—Montana Criminal Proceeding" to the Consolidated Financial Statements in the Financial Supplement is incorporated herein by reference.

## LITIGATION RELATED TO FORMER PACKAGING AND MEDICAL CARE BUSINESSES

Disclosure provided in this Report in Item 8 (Financial Statements and Supplementary Data) under Note 2 (Chapter 11—Related Information) under the caption "Litigation Proceedings in Bankruptcy Court" to the Consolidated Financial Statements in the Financial Supplement is incorporated herein by reference.

## TAX CLAIMS

Disclosure provided in this Report in Item 8 (Financial Statements and Supplementary Data) under Note 14 (Commitments and Contingent Liabilities) under the caption "Tax Matters" to the Consolidated Financial Statements in the Financial Supplement is incorporated herein by reference.

## ERISA LAWSUITS

In June 2004, a purported class action complaint ( *Evans v. Akers et al.* ) was filed in U.S. District Court for the District of Massachusetts against the Board of Directors, certain current and former Grace officers and employees, and others, relating to the Grace 401(k) Savings and Investment Plan. The complaint alleges that the decline in the price of Grace common stock from July 1999 through February 2004 resulted in significant losses to S&I Plan participants. The complaint further alleges that the defendants breached their fiduciary duties under the Employee Retirement Income Security Act of 1974, as amended, or ERISA, by failing to sell or take other appropriate action with regard to Grace common stock held by the S&I Plan during that period, and by failing to disclose to S&I Plan participants the risk of investing in Grace common stock. The complaint seeks compensatory damages for the S&I Plan from the defendants.

On October 26, 2004, a purported class action complaint ( *Bunch et al. v. W. R. Grace & Co. et al.* ) also related to the S&I Plan was filed in the U.S. District Court for the Eastern District of Kentucky against Grace, the Investment and Benefits Committee, the Board of Directors, certain current and former Grace officers and employees, and others. The

34

CC-BLG003236

complaint alleges that Grace and its investment advisors breached fiduciary duties under ERISA by selling Grace common stock from the S&I Plan at a distressed price. The complaint further alleges that Grace breached fiduciary duties under ERISA by hiring State Street Bank and Trust Company, the investment manager for the S&I Plan that Grace retained in December 2003, to rapidly liquidate all of the employees' Grace common stock investment at an artificially low sales price.

On July 21, 2005, the U.S. District Court for the Eastern District of Kentucky granted the defendants' motion to transfer the *Bunch* action to the U.S. District Court for the District of Massachusetts. On August 23, 2005, the Massachusetts District Court consolidated into one case both the *Bunch* action and the *Evans* action. Grace expects that it would have an obligation to indemnify the other defendants for any liability arising out of the consolidated lawsuit.

On December 6, 2006, the Massachusetts District Court, in considering the *Evans* plaintiffs' motion for class certification, denied that motion and dismissed the *Evans* plaintiffs' claims, on grounds that those plaintiffs lacked standing to bring suit. The *Evans* plaintiffs have appealed these decisions to the U.S. Court of Appeals for the First Circuit.

On January 16, 2007, the *Bunch* plaintiffs filed an amended complaint in the Massachusetts District Court alleging self-dealing by State Street and various theories purportedly supporting allegations of breaches of fiduciary duty by Grace and other defendants. On February 2, 2007, Grace and State Street each filed motions with the District Court to dismiss the amended complaint against Grace and State Street, respectively. The District Court held a hearing to consider these motions to dismiss on February 27th.

Grace has $50 million of employers' fiduciary liability insurance coverage that Grace believes would be available to pay liabilities arising out of this consolidated lawsuit. Since all Grace employees who had interests in the S&I Plan during the relevant periods are members of the purported class and Messrs. Corcoran, McGowan, Norris, Poling, Shelnitz and Tarola had interests in the S&I Plan during these periods, they have interests in this litigation that may be adverse to Grace.

## OTHER CLAIMS RECEIVED PRIOR TO THE CHAPTER 11 BAR DATE

Disclosure provided in this Report in Item 8 (Financial Statements and Supplementary Data) under Note 2 (Chapter 11-Related Information) under the caption "Claims Filings" to the Consolidated Financial Statements in the Financial Supplement is incorporated herein by reference.

## Item 4.   SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

This Item is inapplicable, as no matters were submitted to a vote of our security holders during the fourth quarter of 2006.

CC-BLG003237

**PART II**

<u>Item 5.</u>    **MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED SHAREHOLDER MATTERS.**

Except as provided below, the information called for by this Item appears in the Financial Supplement under the heading "Financial Summary" opposite the caption "Other Statistics—Common shareholders of record"; under the heading "Quarterly Summary and Statistical Information—Unaudited" opposite the caption "Market price of common stock"; and in Note 15 to the Consolidated Financial Statements in the Financial Supplement.

On March 31, 1998, we paid a dividend of one Preferred Stock Purchase Right on each share of Grace common stock. Subject to our prior redemption for $.01 per right, rights will become exercisable on the earlier of:

- 10 days after an acquiring person, comprised of an individual or group, has acquired beneficial ownership of 20% or more of the outstanding Grace common stock or

- 10 business days (or a later date fixed by the Board of Directors) after an acquiring person commences (or announces the intention to commence) a tender offer or exchange offer for beneficial ownership of 20% or more of the outstanding Grace common stock.

Until these events occur, the rights will automatically trade with the Grace common stock, and separate certificates for the rights will not be distributed. The rights do not have voting or dividend rights.

Generally, each right not owned by an acquiring person:

- will initially entitle the holder to buy from Grace one hundredth of a share of the Grace Junior Participating Preferred Stock, at an exercise price of $100, subject to adjustment;

- will entitle such holder to receive upon exercise, in lieu of shares of Grace junior preferred stock, that number of shares of Grace common stock having a market value of two times the exercise price of the right; and

- may be exchanged by Grace for one share of Grace common stock or one hundredth of a share of Grace junior preferred stock, subject to adjustment.

Generally, if there is an acquiring person and we are acquired, each right not owned by an acquiring person will entitle the holder to buy a number of shares of common stock of the acquiring company having a market value equal to twice the exercise price of the right.

36

CC-BLG003238

Each share of Grace junior preferred stock will be entitled to a minimum preferential quarterly dividend payment of $1.00 per share but will be entitled to an aggregate dividend equal to 100 times the dividend declared per share of Grace common stock whenever such dividend is declared. In the event of liquidation, holders of Grace junior preferred stock will be entitled to a minimum preferential liquidation payment of $100 per share but will be entitled to an aggregate payment equal to 100 times the payment made per share of Grace common stock. Each share of Grace junior preferred stock will have 100 votes, voting together with the Grace common stock. Finally, in the event of any business combination, each share of Grace junior preferred stock will be entitled to receive an amount equal to 100 times the amount received per share of Grace common stock. These rights are protected by customary antidilution provisions.

The terms of the rights may be amended by the Board of Directors without the consent of the holders of the rights. The rights, which will remain outstanding under the proposed plan of reorganization, are currently scheduled to expire on March 31, 2008.

This summary of the rights does not purport to be complete and is qualified in its entirety by reference to the Rights Agreement, which was filed as Exhibit 4.1 to the Grace Form 8-K filed on April 8, 1998.

## Item 6.    SELECTED FINANCIAL DATA

The information called for by this Item appears under the heading "Financial Summary" of the Financial Supplement and in Notes 1, 2, 3, 4, 10, 13 and 14 to the Consolidated Financial Statements, which is incorporated herein by reference. In addition, Exhibit 12 to this Report contains the ratio of earnings to fixed charges and combined fixed charges and preferred stock dividends for Grace for the years 2002-2006 .

## Item 7.    MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The information called for by this Item appears in the Financial Supplement, which is incorporated herein by reference.

## Item 7A.    QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

The information called for by this Item appears in "Management's Discussion and Analysis of Financial Condition and Results of Operations" which is incorporated herein by reference.

## Item 8.    FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

See the Index to Consolidated Financial Statements and Financial Statement Schedule and Exhibit in the Financial Supplement, which is incorporated herein by reference.

37

CC-BLG003239

**Item 9.**  **CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None.

**Item 9A.**  **CONTROLS AND PROCEDURES**

The information called for by this Item appears under the heading "Management's Report on Financial Information and Internal Controls" in the Financial Supplement, which is incorporated herein by reference. In addition, there was no change in Grace's internal control over financial reporting during the quarter ended December 31, 2006 that has materially affected, or is reasonably likely to materially affect, Grace's internal control over financial reporting.

**Item 9B.**  **OTHER INFORMATION**

None.

38

CC-BLG003240

PART III

## Item 10.   DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

Our current directors and executive officers are listed below. Our Certificate of Incorporation provides for the division of the Board of Directors into three classes, each to serve for a three-year term or until their respective successors are elected. In view of the Chapter 11 filing, the directors are continuing to serve beyond the expiration of their respective terms. Executive officers are elected to serve until the next annual meeting of the Board of Directors or until their respective successors are elected.

| Name and Age | Office | First Elected |
|---|---|---|
| John F. Akers (72) | Class II Director | 5/09/97 |
| H. Furlong Baldwin (75) | Class I Director | 1/16/02 |
| Ronald C. Cambre (68) | Class III Director | 9/01/98 |
| Alfred E. Festa (47) | Class II Director | 9/08/04 |
| | President and Chief Executive Officer | 6/01/05* |
| Marye Anne Fox (59) | Class I Director | 5/10/96 |
| John J. Murphy (75) | Class II Director | 5/09/97 |
| Paul J. Norris (59) | Class III Director and Chairman of the Board | 1/01/99 |
| Christopher J. Steffen (65) | Class I Director | 11/01/06 |
| Mark E. Tomkins (51) | Class III Director | 9/06/06 |
| Thomas A. Vanderslice (75) | Class I Director and Lead Independent Director | 5/10/96 |
| Richard C. Brown (47) | Vice President | 5/01/05 |
| Gregory E. Poling (51) | Vice President | 3/03/05* |
| William M. Corcoran (57) | Vice President | 6/01/99 |
| W. Brian McGowan (57) | Senior Vice President | 7/09/98* |
| Robert M. Tarola (56) | Senior Vice President and Chief Financial Officer | 5/11/99 |
| Mark A. Shelnitz (48) | Vice President, General Counsel and Secretary | 4/27/05* |

\*    Mr. Festa was elected President and Chief Executive Officer on January 19, 2005 to be effective June 1, 2005. Messrs. Poling, McGowan and Shelnitz joined Grace on July 18, 1977, February 5, 1979 and October 3, 1983, respectively.

*Mr. Akers* served as Chairman of the Board and Chief Executive Officer of International Business Machines Corporation from 1985 until his retirement in 1993. He is also a director of Lehman Brothers Holdings, Inc. and PepsiCo, Inc.

39

CC-BLG003241

*Mr. Baldwin* served as a director of Mercantile Bankshares Corporation from 1970 to 2003, as Chairman of the Board from 1984 to 2003 and as President and Chief Executive Officer From 1976 to 2001. Mr. Baldwin is Chairman of NASDAQ Stock Market, Inc., and is a director of Platinum Underwriters Holdings, Ltd. and Allegheny Energy Inc.

*Mr. Cambre* is retired Chairman of the Board and CEO of Newmont Mining Corporation. He joined Newmont as Vice Chairman and CEO in 1993 and retired as CEO in 2000 and as Chairman in 2001. He is also a director of Cleveland-Cliffs Inc. and McDermott International, Inc.

*Mr. Festa* joined Grace in 2003 and served as President and Chief Operating Officer until he became Chief Executive Officer in June 2005. Prior to joining Grace, Mr. Festa was a partner of Morganthaler Private Equity Partners, a venture capital and buyout firm from 2002 to 2003. From 2000 to 2002, he was with ICG Commerce, Inc., a private company providing on-line procurement services, where he last served as President and Chief Executive Officer. For two years prior to that, he served as Vice President and General Manager of AlliedSignal's performance fibers business.

*Dr. Fox* has been Chancellor of the University of California San Diego and Distinguished Professor of Chemistry at that institution since 2004. She was Chancellor of North Carolina State University from 1998 to 2004. She is also a director of Boston Scientific Corporation, Red Hat, Inc. and Pharmaceutical Product Development, Inc.

*Mr. Murphy* served as Chairman of the Board of Dresser Industries, Inc., a supplier of products and technical services to the energy industry, until 1996. From 1997 to 2000, he was a Managing Director of SMG Management L.L.C., a privately owned investment group. Mr. Murphy is also a director of CARBO Ceramics, Coastal Energy and Flexitallic, Inc., a privately owned manufacturing company.

*Mr. Norris* was actively engaged in Grace's business from 1998 until his retirement as Chief Executive Officer in 2005. He is also a director of FMC Corporation and Sealy Corp. He performs advisory services for Kohlberg Kravis Roberts & Co., currently the majority shareholder of Sealy Corp.

*Mr. Steffen* most recently served as Vice Chairman of Citicorp and its principal subsidiary, Citibank N.A. Since his retirement in 1996, he has been a consultant to a number of companies and public accounting firms and served on committees advising the Financial Account Standards Board. Mr. Steffen is also a director of Accelrys, Inc., ViaSystems, Inc. and several private companies in which he has an ownership stake.

CC-BLG003242

*Mr. Tomkins* served as Senior Vice President and Chief Financial Officer of Innovene, a petrochemical and oil refining company that is now part of the INEOS Group, from 2005 until January 2006. He served as CFO of Vulcan Materials Company from 2001 to 2005. Mr. Tomkins is a member of the Board of Directors of Coffeyville Resources, a privately-held oil refining company.

*Mr. Vanderslice* served as Chairman and Chief Executive Officer of M/A-COM, Inc., a designer and manufacturer of radio frequency and microwave components, devices and subsystems for commercial and defense applications, from 1989 until 1995. He is currently a private investor. As Lead Independent Director, Mr. Vanderslice presides at all executive sessions of the Board.

*Messrs. Corcoran, McGowan, Poling, Shelnitz and Tarola* have been actively engaged in Grace's business for the past five years. Mr. Tarola is a director of 21 registered mutual funds sponsored by Legg Mason, Inc. Mr. Poling is a director of Foamex International, Inc.

*Mr. Brown* was an executive in the plastics and specialty materials businesses of General Electric Co. in various positions of increasing responsibility for 19 years before joining Grace in 2005.

## Audit Committee

We have a standing Audit Committee established in accordance with the provisions of the Securities Exchange Act of 1934, as amended. The Committee members are John F. Akers, H. Furlong Baldwin, Ronald C. Cambre, Marye Anne Fox, John J. Murphy, Christopher J. Steffen, Mark E. Tomkins and Thomas A. Vanderslice, each of whom meets the independence standards of the SEC and New York Stock Exchange. Mr. Murphy serves as Chair of the Audit Committee. The Board of Directors has determined that all Audit Committee members are audit committee financial experts as defined by SEC regulations. A complete description of the responsibilities of the Audit Committee is set forth in the Grace Audit Committee Charter which is available on the Internet at www.grace.com/About/Leadership/Governance/.

## Other Committees

We have standing Nominating and Governance, Compensation and Corporate Responsibility Committees. The members of each of these committees are John F. Akers, H. Furlong Baldwin, Ronald C. Cambre, Marye Anne Fox, John J. Murphy, Christopher J. Steffen, Mark E. Tomkins and Thomas A. Vanderslice, each of whom meets the independence standards of the New York Stock Exchange. Mr. Vanderslice serves as Chair of the Nominating and Governance Committee, Mr. Akers serves as Chair of the Compensation Committee and Dr. Fox serves as Chair of the Corporate Responsibility Committee. A complete description of the responsibilities of the various Board committees is set forth in the respective committee charters which are available on the Internet at www.grace.com/About/Leadership/Governance/.

41

CC-BLG003243

**Section 16(a) Beneficial Ownership Reporting Compliance**

Under Section 16 of the Securities Exchange Act of 1934, as amended, our directors, certain of our officers, and beneficial owners of more than 10% of the outstanding Grace common stock are required to file reports with the SEC and the New York Stock Exchange concerning their ownership of and transactions in Grace common stock or other Grace securities; these persons are also required to furnish us with copies of these reports. Based upon the reports and related information furnished to us, we believe that all such filing requirements were complied with in a timely manner during and with respect to 2006.

**Code of Ethics for Principal Officers**

The Board of Directors and the Audit Committee have adopted Business Ethics and Conflicts of Interest policies, which apply to all of our directors, officers, and employees, including our principal officers. These policies are accessible through our Internet website, www.grace.com/About/Leadership/Governance/, and are available in hard copy, free of charge, by contacting Grace Shareholder Services at 410-531-4167. We granted no waivers to these policies during 2006. We intend to promptly post on our website any amendments or waivers to these policies affecting any principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions.

**Item 11.   Executive Compensation**

**Compensation Discussion and Analysis**

*Overview*

The Board of Directors has designated seven Grace officers (including the executive officers named in the Summary Compensation Table) as "executive officers." The executive officers include the Chief Executive Officer (CEO), Chief Financial Officer, vice presidents in charge of operating segments and principal functions and other officers who have policy-making authority for Grace. The Board of Directors has delegated authority for administering the compensation program for executive officers and other members of senior management to the Compensation Committee. The Board has appointed all of the independent members of the Board to serve as members of the Compensation Committee. Because Mr. Tomkins and Mr. Steffen joined the Compensation Committee late in 2006, they had only limited participation in its deliberations regarding 2006 compensation.

CC-BLG003244

The Compensation Committee reviews and approves all executive officers' compensation, including:

- base salary;

- annual incentive compensation;

- long-term incentive compensation;

- employment agreements;

- severance arrangements;

- change-in-control agreements; and

- any special or supplemental benefits.

The Compensation Committee reviews and approves corporate goals and objectives used in determining the compensation of the CEO, evaluates the CEO's performance in light of those goals and objectives and has sole authority to determine the CEO's compensation based on this evaluation subject to the terms of the CEO's employment agreement. In determining the long-term incentive component of the CEO's compensation, the Committee considers the value of similar incentive awards to CEOs at comparable companies and the awards given to the CEO in past years. The CEO proposes compensation levels for all other executive officers for approval by the Compensation Committee. The Compensation Committee also approves the annual and long-term incentive programs.

The Grace human resources department and legal services group provide advice and legal and administrative assistance to the Compensation Committee in performing its functions. The Compensation Committee also has authority to retain advisors from outside of Grace. During 2006, the Compensation Committee used the services of Watson Wyatt Worldwide, a human resources consulting firm, for competitive data and advice regarding executive compensation. We expect that Watson Wyatt will continue to work with the Compensation Committee during 2007. Watson Wyatt also provides consulting services to Grace in connection with its employee benefit plans. A complete description of the responsibilities of the Compensation Committee is set forth in the Grace Compensation Committee Charter which is available on the Internet at www.grace.com/About/Leadership/Governance/. The Compensation Committee and the Board review and revise the charter as necessary.

In this Compensation Discussion and Analysis, unless the context otherwise requires, the terms "we," "our" and "the Committee" refer to the Compensation Committee.

### *Executive Compensation Philosophy and Objectives*

The key objective of the Grace executive compensation program is to enable Grace to compete effectively with other firms in attracting, motivating and retaining the executives that Grace needs to ensure its future growth and business success. We intend the incentive compensation portion of the program

43

CC-BLG003245

to align closely the financial interests of Grace executives with those of Grace's stakeholders (including creditors, security holders and others with an interest in the Chapter 11 proceedings). Because senior executives have a substantial ability to influence business success, we believe that the portion of compensation that is at risk based on corporate performance should increase as the level of responsibility of the executive increases. We also expect the executive compensation programs to be consistent with a culture of ethical conduct, personal integrity and compliance with Grace policies and applicable law.

The program is designed to reward executives for the achievement of corporate goals and objectives, taking into account both individual performance and contributions to the success of the overall management team. The individual performance evaluation is based on our assessment of an executive officer's leadership, technical skill, management and operational performance, and potential to contribute to Grace's future success. We require executives to set an example for employees and other Grace business associates in emphasizing the Grace Core Values in their daily business conduct. The Grace Core Values consist of a commitment to people and teamwork, customers and performance, integrity and ethics, agility and speed and innovation and creativity, and are the foundation of the Grace corporate culture.

Once we have completed an evaluation of an executive's overall performance, we review the executive's existing compensation and compensation potentially payable to the executive. An executive's outstanding equity-based awards are not considered in setting future compensation. We then consult with Watson Wyatt for an assessment of the competitiveness of Grace executive officer compensation relative to certain benchmark companies in the chemicals, materials and specialty chemicals industry, that we deem our peer group and relative to certain broad industry data. We selected the benchmark companies as our peer group based upon our judgment regarding the likelihood that they would compete with us for executive talent and the availability of public information regarding their compensation practices. We periodically review the composition of the peer group to ensure that it remains relevant. For 2006, the peer group consisted of:

| | |
|---|---|
| Albemarle | Fuller (H.B.) |
| Cabot | Hercules |
| Dow Chemical | International Flavors & Fragrances |
| Du Pont | PPG Industries |
| Eastman Chemical | Rohm & Haas |
| Eco Lab | Sigma-Aldrich |

The broad industry data that we generally review is included in studies produced by Mercer, Towers Perrin, Hewitt and Watson Wyatt for any given compensation year.

44

CC-BLG003246

We intend that the annual compensation paid to Grace executives (consisting of salary plus annual incentive compensation) approximate the 50th percentile, and that long-term incentive compensation approximate the 60th percentile, of the practices of the peer group companies and broad industry data when performance objectives are achieved. In applying these targets, we did not base our decision on a mathematical analysis of the available data, rather, we used our judgment after considering all available information. If performance objectives are exceeded, we believe that incentive compensation should be above these levels, and when performance objectives are not achieved, incentive compensation should be below these levels. The bias toward incentive compensation reflected in these percentages is in keeping with our intention to align executive and stakeholder interests.

As a result of Grace's Chapter 11 status, we believe that Grace common stock and stock options are speculative securities that are not suitable for executive compensation. Accordingly, Grace incentive compensation programs are currently 100% cash-based, although equity incentives awarded prior to 2002 remain outstanding. We have requested that the Corporate Secretary inform the Committee if an executive officer wishes to enter into any transaction involving Grace equity securities. Following Grace's emergence from Chapter 11, we will consider including equity incentives in the executive compensation program.

We believe that income before interest and taxes is generally the best indicator of the performance of the Grace business for incentive compensation purposes. Income before interest and taxes includes the factors that the executive team generally has the ability to affect and excludes the cost of capital and tax rates that we believe are generally unrelated to business performance or management control. However, this income measure is significantly affected by other factors that Grace executives are generally unable to influence such as the substantial costs of the Chapter 11 proceedings, legacy liabilities, income from insurance settlements and pension income and expense. As a result, our performance metric for incentive compensation purposes is pre-tax income from core operations (calculated as described in "Management's Discussion and Analysis of Financial Condition and Results of Operations—Summary Financial Information and Metrics" in the financial supplement) adjusted to eliminate the effect of certain unusual or one-time events, the change in pension and Long Term Incentive Program, or LTIP, expense from year to year and, for the LTIP, major acquisitions or divestments as the performance metric. We generally refer to this performance metric as pre-tax income from core operations as adjusted. Grace core operations are comprised of the financial results of Grace Davison, Grace Performance Chemicals, and the costs of corporate activities that directly or indirectly support their business operations. Excluded from pre-tax income from core operations and pre-tax income from core operations as adjusted are all other events and transactions not directly related to the generation of operating revenue or the support of our core operations.

45

CC-BLG003247

To ensure comparability with other companies, as well as consistency and uniformity within Grace, all management positions, have been assigned to compensation bands with salary ranges based upon broad industry data. Individual salaries for executive officers are set within the salary ranges based on the median annual base salaries paid to individuals who hold comparable positions at the peer group companies, broad industry data, individual performance and the amount budgeted for salary increases. Although these factors apply to Mr. Festa and Mr. Brown, their base salaries are also subject to the terms of their respective employment agreements which are discussed below in this Compensation Discussion and Analysis and under the Summary Compensation Table, Potential Payments Upon Termination or Change-In-Control Table and, for Mr. Brown, Pension Benefits Table.

Grace executives are generally eligible for salary review at intervals of not less than 12 months from the date of the last increase. Salary increases for executive officers are based on the amount budgeted for salary increases for all Grace salaried personnel, individual performance, salary levels of peers and subordinates within Grace and salaries paid to executives in comparable positions in the peer group companies.

For 2006, Grace established a guideline for salary increases applicable to all Grace U.S. salaried employees of 3.6%. Grace determined the amount of the guideline based on a review of projected wage increases in the U.S. chemical industry and certain additional data applicable to the geographic regions in which Grace has its major operations. Base salary increases for the Grace executive officers listed below in the Summary Compensation Table, referred to herein as named executive officers, were generally in line with those of other salaried employees, ranging from 2.4% to 6.6%.

### Annual Incentive Compensation

The Annual Incentive Compensation Plan, or AICP, is a cash-based pay-for-performance incentive program. Its purpose is to motivate and reward executive officers, and other upper- and middle-level employees, for their contributions to Grace performance and align their financial interests with those of Grace stakeholders by making a significant portion of their annual compensation variable and dependent upon Grace's annual financial performance. The amount of an individual incentive award payment under the AICP is based upon:

- the individual's annual incentive target amount;

- the change in Grace pre-tax earnings from core operations as adjusted; and

- the individual's personal performance

46

CC-BLG003248

The AICP targets for the named executive officers (other than Mr. Festa) for 2006 range from 65% to 78% of base salary and actual awards may range from $-0- to an amount equal to twice the target amount, based on business and individual performance. As with base salary, each compensation band includes an AICP target range based on broad industry data. The AICP targets for executive officers are generally set within the target range based on the median annual bonus paid to individuals who hold comparable positions at the peer group companies. Although these factors also apply to Mr. Festa, his AICP target is also subject to the terms of his employment agreement, which requires a minimum AICP target of 100% of base salary. For 2006, Mr. Festa's AICP target is 100% of base salary.

For 2006, the target performance objective was an 8% increase, and the maximum compensable performance objective was a 35% increase, in pre-tax earnings from core operations as adjusted over pre-tax earnings from core operations for 2005. Generally, no awards are earned for any year if pre-tax earnings from core operations as adjusted is less than 80% of the prior year's pre-tax earnings from core operations; provided however, that we have discretion to establish or increase the size of the incentive pool even if performance measures are not achieved. We generally based these performance objectives on the historical performance of our peer group companies. We usually grant AICP awards during the first quarter for the current compensation year.

Based on 2006 operating performance, the aggregate AICP incentive pool was established at 137.4% of the aggregate of all AICP targets. With the exception of Messrs. Festa, Brown and Poling, AICP award payments for the named executive officers were generally in line with the incentive pool applicable to other AICP participants. The 2006 AICP award payments to Mr. Festa (approximately 158% of target award) and Messrs. Brown and Poling (each approximately 159% of their respective target awards) were based, in each case, upon the executive officer's individual contribution to the performance of Grace for the year in the judgment of the Committee.

*Long-Term Incentive Compensation*

The LTIPs, are cash-based incentive programs. Their purpose is to motivate and reward approximately 270 upper-level Grace employees, including the executive officers, for their contributions to Grace performance over a multi-year period and align their financial interests with those of Grace stakeholders by making a significant portion of their total compensation variable and dependent upon Grace's sustained financial performance. The top four compensation bands include an LTIP target range based on the 60th percentile of long-term compensation paid to individuals who hold comparable positions at the peer group companies and broad industry data. Due to our Chapter 11 status, we view the cash-based LTIP as a substitute for the equity incentive programs that other public companies generally make available to their senior executives.

47

The Bankruptcy Court has approved the LTIPs for each of the 2004-2006, 2005-2007 and 2006-2008 performance periods. Awards under these LTIPs are payable 100% in cash, based on the extent to which Grace achieves certain performance targets. These LTIP payouts are based on the compound annual growth in our pre-tax income from core operations as adjusted over the performance period using results for the year prior to the first year of the performance period as the baseline. We generally refer to this growth objective as a CAGR. For these LTIPs, the CAGR objective is 6% and the maximum compensable CAGR objective is 25%. The LTIP award payouts may range from $-0- to an amount equal to twice the target amount, based on Grace's operating performance. No award payouts are earned under these LTIPs if the CAGR for the performance period is zero or negative. We generally based these performance objectives on the historical performance of our peer group companies. The LTIP target is lower than the AICP target because the LTIPs are designed to incentivize sustained growth over a long-term period which generally is more difficult to achieve than annual performance targets.

During 2006, we reviewed the LTIP awards for our named executive officers, other than Mr. Festa, and determined that the outstanding LTIP awards for previous years were significantly below the 50th percentile of the practices of the peer group companies and broad industry data. In order to more closely align the long-term compensation of the named executive officers with the long-term compensation of similar executives at the peer group companies and broad industry data, we made additional awards to the named executive officers, other than Mr. Festa, under the 2004 and 2005 LTIPs, pro rated, in the case of Mr. Brown, for the period that he was employed by Grace.

We believe that the LTIP awards encourage executive retention because the right to any pending payment under an LTIP is generally subject to forfeiture if the executive ceases employment with us prior to age 62. We generally grant LTIP awards during the first year for the performance period.

*Pension Plan/Supplemental Executive Retirement Plan*

As described below under "Pension Benefits," payments under Grace's tax-qualified pension plan are calculated, using annual compensation, including base salary and AICP awards, and years of credited Grace service. We believe that retirement compensation that increases with increases in years of service and annual compensation is an effective recruiting and retention tool for our employees, including our executive officers. For 2006, federal income tax law limits to $220,000 the annual compensation on which benefits under the tax-qualified pension plan may be based. As a result, we have implemented a Supplemental Executive Retirement Plan, generally referred to as a SERP, that currently applies to approximately 70 upper-level employees, including the executive officers, whose annual compensation exceeds that amount, under

48

CC-BLG003250

which each such employee will receive the full pension to which that employee would be entitled in the absence of the limitations described above and other limitations imposed under federal income tax law.  The SERP is unfunded and is not qualified for tax purposes.

*Savings and Investment Plan/Replacement Payment Program*

We generally offer a tax-qualified 401(k)-type Savings and Investment Plan, or S&I Plan, to employees under which they may save a portion of their annual compensation in investment accounts on a pre- or post- tax basis.  Grace currently matches 100% of employee savings under the plan up to six percent of the employee's base salary and annual incentive compensation.  We believe that a 401(k)-type plan with a substantial company match that increases (in dollar amount, not percentage of compensation) with the level of participation in the plan and increases in the employee's annual compensation is an effective recruiting and retention tool for our employees, including our executive officers.  Grace currently matches employee contributions to S&I Plan accounts dollar for dollar up to 6% of annual compensation for any employee.  For 2006, federal income tax law limits the total contributions, that can be made to an employee's 401(k) plan account to $44,000 and qualifying annual compensation for 401(k) plan purposes to $220,000.  As a result, we have implemented an S&I Plan Replacement Payment Program that currently applies to approximately 70 of our employees, including our executive officers, whose annual compensation exceeds $220,000 under which each such employee will receive the full Grace matching payments to which that employee would be entitled in the absence of the limitations described above and other limitations imposed under federal income tax law.

*Executive Personal Benefits*

We believe that executives generally should not be treated differently than the general employee population when it comes to personal benefits and therefore, we have limited executive personal benefits.  During 2006, these personal benefits for the named executive officers were generally limited to financial counseling and tax preparation services for which Grace paid a maximum of $10,000 for Mr. Festa and $4,000 for the other named executive officers.  Mr. Festa has access to corporate aircraft at Grace expense for reasonable personal travel.  In order to facilitate his transition to Grace, Mr. Brown was paid a housing allowance through August 2006.  Because Mr. Brown maintains his primary residence some distance from Grace operations, he is reimbursed for his commuting expenses.  These personal benefits are included in the executive officers' taxable income in accordance with applicable income tax regulations.

49

CC-BLG003251

*Change-In-Control Severance Agreements*

As described below under "Change-In-Control Severance Agreements," Grace has entered into change-in-control severance agreements with each of the named executive officers. Payments under these agreements are triggered by the involuntary termination of the executive officer's employment without cause (including constructive termination caused by a material reduction in his or her authority or responsibility or by certain other circumstances) following a "change in control." We recognize that, as is the case with many publicly-held corporations, the possibility of a change in control may exist and that such possibility, and the uncertainty and questions which it may raise among management, may result in the departure or distraction of management personnel to the detriment of Grace and its stakeholders. The change-in-control severance agreements are designed to reinforce and encourage the continued attention and dedication of the executive officers to their assigned duties without distraction in the face of potentially disturbing circumstances arising from the possibility of a change in control of Grace. Certain terms of these agreements are described below under the Potential Payments Upon Termination or Change-In-Control Table.

*Severance Agreements*

As described below under "Severance Agreements," we have entered into severance agreements with each of the named executive officers, other than Mr. Festa and Mr. Brown, whose severance arrangements are included in their respective employment agreements. Payments under these agreements are triggered by involuntary termination of employment under most circumstances. The Grace severance agreements are designed to encourage and reinforce the continued attention and dedication of our executive officers to their assigned duties without undue concern regarding their job security. Certain terms of these agreements are described below under the Potential Payments Upon Termination or Change-In-Control Table.

*Executive Salary Protection Plan*

As described below under "Executive Salary Protection Plan," our Executive Salary Protection Plan provides payments to our named executive officers, or their respective beneficiaries, in the event of their disability or death prior to age 70 while employed by Grace. The plan is designed to encourage the continued attention and dedication of our executive officers to their assigned duties without undue concern regarding their ability to earn a living and support their families in the event of death or disability. Certain terms of this plan are described below under the Potential Payments Upon Termination or Change-In-Control Table.

50

CC-BLG003252

*Employment Agreements*

Grace has entered into an employment agreement with Mr. Festa pursuant to which he serves as CEO of Grace. Certain terms of this employment agreement are described below under the Summary Compensation Table and Potential Payments Upon Termination or Change-In-Control Table. This agreement was approved by the Bankruptcy Court and was designed to encourage Mr. Festa to accept his appointment as CEO of Grace, remain with Grace and work diligently in pursuit of corporate objectives. Mr. Festa's employment agreement includes a minimum salary and AICP target that were negotiated with Mr. Festa and are based on his business experience, his past performance as Chief Operating Officer of Grace and a competitive analysis of the base salary and annual bonus paid to individuals who hold comparable positions at the peer group companies. The agreement also provides for retention payments that are designed to encourage Mr. Festa to make a long-term commitment to Grace through the uncertainty of the Chapter 11 process in lieu of other opportunities that may be available to him and severance payments that are designed to encourage and reinforce Mr. Festa's continued attention and dedication to his assigned duties without undue concern regarding his job security.

Grace has also entered into employment agreements with Messrs. Tarola and Brown. Certain terms of these employment agreements are described below under the Summary Compensation Table, Pension Benefits Table and, for Mr. Brown, Potential Payments Upon Termination or Change-In-Control Table. These agreements include currently effective provisions regarding severance payments and enhanced pension ' payments. In addition to these provisions, the currently effective provisions of Mr. Brown's agreement include a minimum salary and the right to participate in the AICP. In each case, these agreements were negotiated on an arms-length basis prior to the time the executive joined Grace. The payments required by these agreements were designed to encourage the executives to join and remain with Grace in lieu of other employment opportunities available to them.

*Deductibility of Executive Compensation*

Under the Omnibus Budget Reconciliation Act of 1993, provisions were added to the Internal Revenue Code of 1986, as amended, under Section 162(m) that limit the tax deduction for compensation expense in excess of $1 million paid to executive officers unless such compensation is "performance-based" and satisfies certain other conditions. We believe that compensation payable to executive officers should generally meet the conditions required for full deductibility under Section 162(m). Tax deductibility is one criterion we consider when establishing compensation programs. The AICP and LTIPs are structured with the intention that the compensation payable thereunder, with the exception of any discretionary AICP payments or other non-performance-based payments, will qualify as deductible "performance-based" compensation. While we believe

51

CC-BLG003253

that it is important to preserve the ability to structure compensation programs to meet a variety of corporate objectives even if the compensation is not deductible, due to our focus on performance-based compensation plans, we expect that the vast majority of compensation paid to the named executive officers will be tax deductible.

**Compensation Committee Report**

We, the undersigned members of the Compensation Committee of the Board of Directors of Grace, have reviewed Grace's Compensation Discussion and Analysis for 2006 and have discussed it with Grace management. Based on our review and this discussion, we recommend to the Board that the Compensation Discussion and Analysis be included in Grace's Annual Report on Form 10-K.

> COMPENSATION COMMITTEE
> John F. Akers, Chair
> H. Furlong Baldwin
> Ronald C. Cambre
> Marye Anne Fox
> John J. Murphy
> Christopher J. Steffen
> Mark E. Tomkins
> Thomas A. Vanderslice

52

CC-BLG003254

**Summary Compensation Table**

The following table sets forth the compensation we paid for services rendered during the fiscal year ended December 31, 2006 to Fred Festa, our President and Chief Executive Officer, Robert Tarola, our Senior Vice President and Chief Financial Officer and each of our other three most highly compensated executive officers who were executive officers as of December 31, 2006, determined by reference to total compensation (reduced by the amount set forth in the table below under the caption "Change in Pension Value and Nonqualified Deferred Compensation Earnings") earned by such individuals for the 2006 fiscal year.

| Name and Principal Position | Year | Salary ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | | Change in Pension Value and Nonqualified Deferred Compensation Earnings [i] ($) | All Other Compensation [j] ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | AICP | LTIP [a] | | | |
| **A. E. Festa** President & Chief Executive Officer | 2006 | 789,167 | -0- | -0- | 1,250,000 | 1,502,233 | 56,000 | 244,525 | 3,841,925 |
| **R. M. Tarola** Senior Vice President & Chief Financial Officer | 2006 | 426,667 | -0- | -0- | 460,000 | 769,500 | 295,000 | 101,284 | 2,052,451 |
| **R. C. Brown** Vice President | 2006 | 385,000 | -0- | -0- | 460,000 | 583,814 | 154,000 | 107,408 | 1,690,222 |
| **G. E. Poling** Vice President | 2006 | 385,000 | -0- | -0- | 460,000 | 771,667 | 158,000 | 77,407 | 1,852,074 |
| **W. B. McGowan** Senior Vice President | 2006 | 316,667 | -0- | -0- | 290,000 | 491,667 | 209,000 | 61,330 | 1,368,664 |

53

CC-BLG003255

(a)   Amount consists of:  the final payment earned under the 2004-2006 Long-Term Incentive Program, or LTIP, as follows:  Mr. Festa—$938,900, Mr. Tarola—$627,833, Mr. Brown—$444,925, Mr. Poling—$605,000, and Mr. McGowan—$375,000; and the partial payment earned under the 2005-2007 LTIP as follows:  Mr. Festa—$563,333, Mr. Tarola—$141,667, Mr. Brown—$138,889, Mr. Poling—$166,667, and Mr. McGowan—$116,667, that we expect, in each case, to pay in March 2007.

(b)   Amount consists of the aggregate change in the actuarial present value of the individual's accumulated benefit under the Grace Pension Plan, the Grace Supplemental Executive Retirement Plan and, in the case of Messrs. Tarola and Brown, supplemental benefits pursuant to the terms of their respective employment agreements, from December 31, 2005 to December 31, 2006 assuming a 5.75% discount rate and retirement at age 62 with benefits payable on a straight life annuity basis and other assumptions used for financial reporting purposes under generally accepted accounting principles as described in footnote 18 to the Grace Consolidated Financial Statements set forth in Part I of this Report.

(c)   Amount consists of the following:

   (i)    our aggregate incremental cost of providing personal benefits if the aggregate amount of personal benefits provided to the individual equals or exceeds $10,000.  Except as specified below, our executive officers' personal benefits are limited to financial counseling and tax preparation services.  The following additional personal benefits exceed the greater of $25,000 or 10% of the total amount of personal benefits for that individual and we are required to separately report them under SEC rules:  for Mr. Festa, $37,885 for personal use of Grace-provided aircraft; and for Mr. Brown $32,000 for housing allowance and $33,511 for commuting expenses.

   (ii)   our contributions to the Savings and Investment Plan, or S&I Plan, as follows:  Mr. Festa—$13,200, Mr. Tarola—$13,200, Mr. Brown—$13,200, Mr. Poling—$13,200, and Mr. McGowan—$13,200;

   (iii)  payments made during 2006 in respect of 2005 compensation and payments made in 2006 in respect of 2006 compensation pursuant to the S&I Plan Replacement Payment Program to persons whose personal and/or Grace contributions to the S&I Plan would be subject to limitations under federal income tax law, as follows:  Mr. Festa for 2005—$97,210, for 2006—$88,150, Mr. Tarola for 2005—$49,510 for 2006—$34,900, Mr. Brown for 2005—$0, for 2006—$27,150, Mr. Poling for 2005—$31,795, for 2006—$30,900, and Mr. McGowan for 2005—$27,630, for 2006—$19,600 (before 2006, Grace made payments pursuant to the S&I Plan Replacement Payment Program during the year following the year in which such payments were earned; Grace now makes payments under the program during the year in which such payments are earned);

   (iv)   the value of Grace-provided personal liability insurance, as follows:  Mr. Festa—$1,200, Mr. Tarola—$900, Mr. Brown—$600, Mr. Poling—$600, and Mr. McGowan—$900; and

   (v)    the value of Grace-provided life insurance, as follows:  Mr. Festa—$2,030, Mr. Tarola—$2,774, Mr. Brown—$947, Mr. Poling—$912, and Mr. McGowan—$0.

***CEO Employment Agreement***

Grace has entered into an employment agreement with Mr. Festa pursuant to which he serves as CEO of Grace.  Under this employment agreement, Mr. Festa is entitled to an initial base annual salary of $760,000.  His targeted award

CC-BLG003256

under the AICP for 2005 and each calendar year thereafter is 100% of his base salary earned during the applicable year (or greater, as determined by the Board).  Under the Agreement, Mr. Festa may also participate in the LTIPs and, under the 2005 LTIP (which covers the 2005-2007 performance period), Mr. Festa's targeted award is $1,690,000.  Mr. Festa's agreement also provides for retention payments, which will generally be triggered by Mr. Festa remaining employed by Grace through a specified period, and certain payments in the event that Mr. Festa's employment is involuntarily terminated.  These retention and severance payments are discussed below under the Potential Payments Upon Termination or Change-In-Control Table.

*Other Executive Employment Agreements*

Grace has also entered into employment agreements with Messrs. Tarola and Brown.  These agreements include currently effective provisions regarding severance payments and enhanced pension payments.  In addition to these provisions, under the currently effective provisions of his agreement, Mr. Brown is entitled to an initial base annual salary of $375,000 and he is entitled to participate in the AICP.  In addition, Mr. Brown received targeted awards under the Grace LTIPs (subject to proration to reflect the actual time during the applicable performance period that Mr. Brown was an employee of Grace) as follows: $400,000 (prorated to $355,600) for the 2005-2007 performance period and $400,000 (prorated to $222,000) for the 2004-2006 performance period.   Other terms of these agreements are discussed below under the Pension Benefits Table and, for Mr. Brown, Potential Payments Upon Termination or Change-In-Control Table.

55

CC-BLG003257

**Grants of Plan-Based Awards in 2006**

The following table provides information regarding grants under our Annual Incentive Compensation Program, or AICP, and Long Term Incentive Program, or LTIP, to the executive officers named in the Summary Compensation Table during 2006.

| Name | Plan | Estimated Future Payouts Under Non-Equity Incentive Plan Awards [1] | | |
|---|---|---|---|---|
| | | Threshold ($) | Target ($) [2] | Maximum ($) [2] |
| A. E. Festa | 2006 AICP | 197,292 | 789,167 | 1,578,334 |
| | 2006-2008 LTIP | -0- | 1,690,000 | 3,380,000 |
| R. M. Tarola | 2006 AICP | 83,200 | 332,800 | 665,600 |
| | 2004-2006 LTIP | -0- | 100,000 | 200,000 |
| | 2005-2007 LTIP | -0- | 75,000 | 150,000 |
| | 2006-2008 LTIP | -0- | 350,000 | 700,000 |
| R. C. Brown | 2006 AICP | 72,188 | 288,750 | 577,500 |
| | 2004-2006 LTIP | -0- | 83,250[3] | 166,500 |
| | 2005-2007 LTIP | -0- | 88,889[3] | 177,778 |
| | 2006-2008 LTIP | -0- | 400,000 | 800,000 |
| G. E. Poling | 2006 AICP | 72,188 | 288,750 | 577,500 |
| | 2004-2006 LTIP | -0- | 175,000 | 350,000 |
| | 2005-2007 LTIP | -0- | 100,000 | 200,000 |
| | 2006-2008 LTIP | -0- | 400,000 | 800,000 |
| W. B. McGowan | 2006 AICP | 51,459 | 205,834 | 411,668 |
| | 2004-2006 LTIP | -0- | 100,000 | 200,000 |
| | 2005-2007 LTIP | -0- | 100,000 | 200,000 |
| | 2006-2008 LTIP | -0- | 250,000 | 500,000 |

[1]  Actual payments pursuant to the 2006 AICP, final payments pursuant to the 2004-2006 LTIP and partial payments pursuant to the 2005-2007 LTIP that we expect to pay in March 2007 have been determined and are reflected in the Summary Compensation Table.
[2]  For AICP, amounts are based upon base salary actually paid during 2006.
[3]  Reflects proration of LTIP award to reflect the actual time during the applicable performance period that Mr. Brown was an employee.

***Annual Incentive Compensation Program (AICP)***

Our Annual Incentive Compensation Program, or AICP, is a cash-based pay-for-performance incentive program. Awards under the AICP are allocated from the corporate incentive pool which is determined by the extent to which business performance objectives are achieved. In order to generate an incentive pool amount sufficient to pay all participants their target award, our pre-tax income from core operations as adjusted must be 8% higher than the prior year's pre-tax income from core operations. If our pre-tax income from core operations as

56

CC-BLG003258

adjusted is greater than or equal to 35% higher than the prior year's pre-tax income from core operations, the incentive pool is funded in an amount sufficient to pay all participants two times their target award. Generally, no awards are earned if pre-tax income from core operations as adjusted is less then 80% of the prior year's pre-tax income from core operations; provided however, that the Compensation Committee has discretion to establish or increase the size of the incentive pool even if performance measures are not achieved. Once the incentive pool is established, an individual's award is determined based on the individual's target award and performance and other factors determined by the Compensation Committee.

In order to receive an AICP award payment for a specific calendar year, employees generally must be actively employed by Grace through the payout date, which is typically in March of the following year. In the discretion of the Compensation Committee, an employee whose employment terminates prior to the payout date may receive an AICP award payment if the employee has more than three months' service under the AICP and employment terminates for any of the following reasons: retirement under a Grace retirement plan; death; disability; divestment; or other termination of employment by Grace that is not for cause. If an employee whose employment terminates prior to the end of the year receives an AICP award payment, the amount of the AICP award payment will generally be prorated for the period of the employee's service during the year. See "Potential Payments Upon Termination or Change-In-Control—Contractual Termination Provisions" for a description of the circumstances under which AICP payments would be made to Mr. Festa in the event his employment with Grace is terminated.

### Long-Term Incentive Program (LTIP)

Our long-term incentive programs are multi-year, cash-based, pay-for-performance incentive programs. Awards under the LTIPs are payable 100% in cash, based on the extent to which we achieve a specified compound annual growth in our pre-tax income from core operations as adjusted over the three-year performance period using results for the year prior to the first year of the performance period as the baseline. We generally refer to this growth objective as a CAGR. In order to earn the target award, our CAGR must be 6% and, to earn the maximum of two times the target award, our CAGR must be 25%. No awards are earned if our CAGR is zero or negative.

LTIP Compound Annual Growth Rate (CAGR) as of December 31, 2006

| LTIP | CAGR |
|---|---|
| 2004-2006 LTIP (full 3-year period) | 19% |
| 2005-2007 LTIP (partial 2-year period) | 13% |

57

CC-BLG003259