Employees who become entitled to award payments under an LTIP are paid in two installments: one in March of the third year of the performance period (as partial payment based on the first two years of the performance period but limited to 50% of the LTIP target for those two years); and the other in March of the year following the performance period (as final payment based on the complete three-year performance period but offset by the prior partial payment).

Based on 2004-2006 operating performance, final payments under the 2004 LTIP are calculated based upon 170% of the target for each participant. Based on 2005-2006 operating performance, partial payments under the 2005 LTIP are calculated based upon 137% of the target for each participant but limited to 50% of the target amount for those two years.

In order to receive an LTIP award payment, employees generally must be actively employed by Grace through the payout date, which is in March following the second and third years of the LTIP performance period. An employee whose employment terminates prior to the payout date will forfeit any unpaid LTIP award payment if employment terminates for any of the following reasons:

- voluntary termination without the consent of the Compensation Committee;

- retirement under a Grace retirement plan prior to age 62 without the consent of the Compensation Committee; or

- termination for cause.

An employee whose employment terminates prior to the payout date will receive an LTIP award payment if employment terminates for any of the following reasons:

- retirement under a Grace retirement plan either at or after age 62;

- death or disability; or

- involuntary termination after a change in control of Grace (as defined in the LTIP).

See "Potential Payments Upon Termination or Change-In-Control—Contractual Termination Provisions" for a description of the circumstances under which LTIP payments, as described below, would be made to Mr. Festa in the event his employment with Grace is terminated.

If an employee whose employment terminates prior to the end of an LTIP performance period receives an LTIP award payment for that performance period, the amount of the LTIP award payment will be prorated for the period of

CC-BLG003260

the employee's service during the performance period.  Assuming the employment of the executive officers named in the Summary Compensation Table was terminated as of December 31, 2006 and the 2005 and 2006 LTIPs pay out at the target amounts, under any of the above-listed circumstances, the executive officers would be eligible for payments under their outstanding LTIPs as follows:  Mr. Festa—2004 LTIP—$938,900, 2005 LTIP—$1,126,666 and 2006 LTIP—$563,333, Mr. Tarola—2004 LTIP—$627,833, 2005 LTIP—$283,334 and 2006 LTIP—$116,667, Mr. Brown—2004 LTIP—$444,925, 2005 LTIP—$277,778 and 2006 LTIP—$133,334, Mr. Poling—2004 LTIP—$605,000, 2005 LTIP—$333,334 and 2006 LTIP—$133,334, and Mr. McGowan—2004 LTIP—$375,000, 2005 LTIP—$233,334 and 2006 LTIP—$83,334.  In the discretion of the Compensation Committee, an employee whose employment terminates for a reason that is not described above (i.e. involuntary termination not for cause or transfer to the buyer of a Grace business unit) prior to the payout date may receive an LTIP award payment.

*Stock Options Granted in 2006*

We granted no stock options or other equity awards to the executive officers named in the Summary Compensation Table during 2006.

CC-BLG003261

**Outstanding Equity Awards at Fiscal Year-End**

The following table provides information regarding outstanding stock options held by the executive officers named in the Summary Compensation Table as of December 31, 2006. All of these stock options were granted prior to 2002.

| Name | Option Awards | | | | |
|------|---------|---------|---------|---------|---------|
| | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options (#) | Option Exercise Price ($) | Option Expiration Date |
| A. E. Festa | -0- | -0- | -0- | N/A | N/A |
| R. M. Tarola | 100,000 | -0- | -0- | 16.1875 | 5/10/2009 |
| | 75,000 | -0- | -0- | 13.4688 | 5/9/2010 |
| | 27,900 | -0- | -0- | 2.4000 | 3/7/2011 |
| R. C. Brown | -0- | -0- | -0- | N/A | N/A |
| G. E. Poling | 10,789 | -0- | -0- | 12.0409 | 3/4/2007 |
| | 50,000 | -0- | -0- | 19.4688 | 3/31/2008 |
| | 35,000 | -0- | -0- | 13.4688 | 5/9/2010 |
| | 16,500 | -0- | -0- | 2.4000 | 3/7/2011 |
| W. B. McGowan | 17,531 | -0- | -0- | 12.0409 | 3/4/2007 |
| | 32,500 | -0- | -0- | 19.4688 | 3/31/2008 |
| | 33,600 | -0- | -0- | 20.1250 | 5/6/2008 |
| | 35,000 | -0- | -0- | 13.4688 | 5/9/2010 |
| | 12,300 | -0- | -0- | 2.4000 | 3/7/2011 |

60

CC-BLG003262

The following table provides information regarding benefits under our Retirement Plan for Salaried Employees, or Pension Plan, our Supplemental Executive Retirement Plan, or SERP, and any supplemental pension arrangements under employment agreements for the executive officers named in the Summary Compensation Table.

| Name | Plan Name | Number of Years Credited Service (years) | Present Value of Accumulated Benefit [1] ($) | Payments During Last Fiscal Year ($) |
|------|-----------|-----------------------------------------|---------------------------------------------|--------------------------------------|
| A. E. Festa | Pension Plan | 3.08 | 39,000 | -0- |
|  | SERP | 3.08 | 102,000 | -0- |
| R. M. Tarola | Pension Plan | 7.58 | 175,000 | -0- |
|  | SERP | 7.58 | 389,000 | -0- |
|  | Supplemental [2] | 7.58 | 578,000 | -0- |
| R. C. Brown | Pension Plan | 1.58 | 19,000 | -0- |
|  | SERP | 1.58 | 56,000 | -0- |
|  | Supplemental [3] | 1.58 | 79,000 | -0- |
| G. E. Poling | Pension Plan | 27.42 | 481,000 | -0- |
|  | SERP | 27.42 | 583,000 | -0- |
| W. B. McGowan | Pension Plan | 27.83 | 641,000 | -0- |
|  | SERP | 27.83 | 808,000 | -0- |

[1]   The amounts shown comprise the actuarial present value of the executive's accumulated benefit under the Pension Plan, SERP and, in the case of Messrs. Tarola and Brown, supplemental pension arrangements, as of December 31, 2006, assuming a 5.75% discount rate and retirement at age 62 with benefits payable on a straight life annuity basis and other assumptions used for financial reporting purposes under generally accepted accounting principles as described in footnote 18 to the Grace Consolidated Financial Statements set forth in Part I of this Report.  The Pension Plan, SERP and supplemental arrangements provide for a reduction in pension payments to employees that opt for early retirement ranging from a 17% reduction for retirement at age 55 to no reduction for retirement at age 62. Messrs. Tarola and McGowan are eligible for early retirement under the Pension Plan, SERP and, in the case of Mr. Tarola, his supplemental arrangements.

[2]   Under his employment agreement, Mr. Tarola is entitled to a supplemental pension benefit calculated by applying the benefit formula of the Pension Plan and SERP to additional years of credited service.  Mr. Tarola will be credited with one additional year of credited service (up to a maximum of 10 additional years of credited service) for each year of credited service under those plans that he actually earns during his period of employment with Grace.

[3]   Under his employment agreement, Mr. Brown is entitled to a supplemental pension benefit calculated by applying the benefit formula of the Pension Plan and SERP to additional years of credited service.  Mr. Brown will be credited with an additional year of credited service for each year he remains an employee for the first four years of his employment, and with six additional years of service as of his fifth anniversary of employment.

### *Retirement Plan for Salaried Employees*

Full-time salaried employees who are 21 or older and who have one or more years of service are eligible to participate in our Retirement Plan for Salaried

CC-BLG003263

Employees, or Pension Plan. Under this basic retirement plan, pension benefits are based upon (a) the employee's average annual compensation for the 60 consecutive months in which his or her compensation is highest during the last 180 months of continuous participation, and (b) the number of years of the employee's credited Grace service. The normal retirement age under the Pension Plan is 62, but participants may elect reduced payments upon early retirement beginning at age 55. For purposes of the Pension Plan, compensation generally includes base salary and AICP awards; however, for 2006, federal income tax law limits to $220,000 the annual compensation on which benefits under the Pension Plan may be based.

### Supplemental Executive Retirement Plan

We also have a Supplemental Executive Retirement Plan, or SERP, under which an employee will receive the full pension to which he or she would be entitled in the absence of the limitations described above and other limitations imposed under federal income tax law. In addition, the SERP recognizes deferred base salary, deferred annual incentive compensation awards and, in some cases, periods of employment during which an employee was ineligible to participate in the basic retirement plan. (Commencing in 2001, we no longer permit deferrals of base salary or incentive compensation.)

### Supplemental Pension Arrangements

**Robert M. Tarola.** Mr. Tarola had an employment agreement that expired on November 10, 2002. Mr. Tarola's supplemental pension benefit that is described in the table above is provided pursuant to the terms of this agreement that survived the expiration date. The supplemental pension benefit will be paid to Mr. Tarola from our general assets. The foregoing description of Mr. Tarola's supplemental pension arrangement does not purport to be complete and is qualified in its entirety by reference to the agreement, which has been filed with the SEC.

**Richard C. Brown.** In 2005, the Board of Directors approved the terms of a written agreement, dated April 22, 2005, providing for Mr. Brown's employment as a Vice President of Grace and President of Grace Performance Chemicals effective May 1, 2005. Mr. Brown's supplemental pension benefit that is described in the table above is provided pursuant to the terms of this agreement. If Mr. Brown is terminated other than for cause prior to the fifth anniversary of his employment with Grace, he will be entitled to a prorated portion of the supplemental pension benefit. The supplemental pension benefit will be paid to Mr. Brown from our general assets. The foregoing description of Mr. Brown's supplemental pension arrangement does not purport to be complete and is qualified in its entirety by reference to the agreement, which has been filed with the SEC.

CC-BLG003264

**Potential Payments Upon Termination or Change-In-Control**

The following table sets forth potential payments to executive officers named in the Summary Compensation Table in the event of the listed events calculated under the assumption that employment terminated on the last business day of 2006. The following table does not include payments pursuant to contracts, agreements, plans and arrangements that do not discriminate in scope, terms or operation, in favor of executive officers and that are available generally to all salaried employees. The value of payments to be made following termination of employment of the executive officers named in the Summary Compensation Table pursuant to the Grace SERP and supplemental pension benefits are described above under the caption "Pension Benefits" and payments that are required to be made following termination of employment under designated circumstances pursuant to the Grace LTIPs are described above under the caption "Grants of Plan-Based Awards—Long Term Incentive Programs (LTIPs)."

| | Involuntary Termination Without Cause (a) ($) | Involuntary Termination Without Cause Following Change-in-Control (c) (d) ($) | Death (e) ($) | Disability (f) ($) |
|---|---|---|---|---|
| A. E. Festa | 2,835,000(b) | 4,860,000(b) | 810,000(b) | 346,500(b) |
| R. M. Tarola | 860,000 | 2,296,200 | 430,000 | 122.000 |
| R. C. Brown | 585,000 | 2,047,500 | 390,000 | 143,000 |
| G. E. Poling | 780,000 | 2,047,500 | 390,000 | 78,000 |
| W. B. McGowan | 640,000 | 1,584,000 | 320,000 | 64,000 |

(a)  Consists of minimum severance payments pursuant to their respective employment agreements, in the case of Mr. Festa and Mr. Brown, or severance agreements in the case of the other executive officers.

(b)  If Mr. Festa's termination, death or disability, occurs within six months following emergence from Chapter 11, Mr. Festa is entitled to an additional payment of $1,750,000 and if his termination occurs after six months but within 18 months following emergence from Chapter 11, Mr. Festa is entitled to an additional payment of $1,000,000.

(c) ,  "Change-in-Control" is described below under "Change-In-Control Severance Agreements."

(d)  Consists of contractual payments pursuant to the executive officers' respective Change-In-Control Severance Agreements calculated under the assumption that no excise tax will apply.

(e)  Consists of the sum of payments under the Grace Executive Salary Protection Plan during the first year following death. During subsequent years after death until the specified termination year (reflecting the executive officer's age as of December 31, 2006), the sum of payments each year would be as follows: Mr. Festa—$405,000, 2016, Mr. Tarola—$215,000, 2015, Mr. Brown—$195,000, 2016, Mr. Poling—$195,000, 2016, and Mr. McGowan—$160,000, 2015.

63

CC-BLG003265

(f)    Consists of the sum of payments under the Grace Executive Salary Protection Plan during the first year following disability, assuming the executive officer remains disabled for at least 12 consecutive months. Amounts reflect the offset of expected payments under Grace's long-term and short-term disability programs that are based, in part, on the duration of the executive officer's employment. During subsequent years after disability, the sum of payments each year to Mr. Festa would be $126,000 until the earlier of the month he was no longer deemed disabled or until he attained age 65 in 2024. Due to the offset of expected payments under Grace's long-term and short-term disability programs, the other executive officers would not receive any additional payments under the Plan after the first year of disability.

## Contractual Termination Provisions

*Alfred E. Festa.*    In 2005, the Compensation Committee and the Bankruptcy Court approved the terms of an employment agreement, dated January 19, 2005, pursuant to which Mr. Festa assumed the position of Chief Executive Officer of Grace on June 1, 2005. The term of this agreement is four years, ending on May 31, 2009. Under the terms of this agreement, Mr. Festa would not be entitled to any unpaid award under the AICP or any LTIP if his employment with Grace terminates prior to the date that the award is paid to active Grace employees, except that Mr. Festa would be entitled to a pro-rated portion of such an unpaid award in the event that we terminate his employment without cause, he terminates his employment as a result of constructive discharge, or his employment terminates as a result of his death or disability before the applicable payment date. Assuming Mr. Festa's employment was terminated as of December 31, 2006 under any of the above-listed circumstances, Mr. Festa would be eligible to receive an AICP in the amount of his 2006 AICP payment as described above under "Summary Compensation Table" and LTIP payments as described above under the caption "Grants of Plan-Based Awards—Long Term Incentive Programs (LTIPs)." Also, under the terms of the agreement, if we terminate Mr. Festa's employment without cause, or he terminates his employment as a result of constructive discharge, prior to the expiration of the agreement, he would be entitled to a severance payment equal to two times a dollar amount equal to 175% of his annual base salary at the time of his termination. Mr. Festa's agreement also provides that he will be entitled to a Chapter 11 retention bonus of $1,750,000, payable in two installments. The first installment, in the amount of $750,000, will be paid 6 months after we emerge from Chapter 11 and the balance of $1 million will be paid 18 months after we emerge. If we do not emerge from Chapter 11 within 36 months after the filing of an initial plan of reorganization (i.e., by November 13, 2007), then Mr. Festa would be paid the retention bonus as follows: $750,000 would be paid 36 months after the plan of reorganization was filed (i.e., by November 13, 2007), and $1 million would be paid 48 months after the plan of reorganization was filed (i.e., November 13, 2008). Mr. Festa would not be entitled to any installment of the retention bonus if his employment is terminated prior to the date the installment is scheduled for payment, except in the case where his termination occurs after we emerge from Chapter 11 and is the result of (i) his resignation as a result of constructive discharge, (ii) termination by us not for cause, or (iii) his death or disability, in which case he would receive the emergence bonus in addition to any severance payments to which he is otherwise entitled. The foregoing description of Mr. Festa's employment agreement does not purport to be complete and is qualified in its entirety by reference to the agreement, which has been filed with the SEC.

64

CC-BLG003266

*Richard C. Brown.*   Mr. Brown's employment agreement provides that he is entitled to a severance payment equal to 1.5 times his annual base salary if he is involuntarily terminated by us under conditions that would entitle him to severance under the general severance pay plan for our salaried employees. The foregoing description of Mr. Brown's severance arrangement does not purport to be complete and is qualified in its entirety by reference to the agreement, which has been filed with the SEC.

*Other Termination Or Change-In-Control Provisions*

*Change-In-Control Severance Agreements.*   We have entered into severance agreements with all of our executive officers, which renew automatically unless the Board elects not to renew them. These agreements generally provide that in the event of the involuntary termination of the individual's employment without cause (including constructive termination caused by a material reduction in his or her authority or responsibility or by certain other circumstances) following a ''change in control,'' he or she will generally receive a severance payment equal to three times the sum of his or her annual base salary plus target annual incentive compensation, subject to reduction, pro rata in the case of an executive officer who is within 36 months of normal retirement age (65) or, under certain circumstances, to minimize the effect of certain excise taxes if applicable. For purposes of the severance agreements, ''change in control'' means the acquisition of 20% or more of the outstanding Grace Common Stock (but not if such acquisition is the result of the sale of Common Stock by Grace that has been approved by the Board), the failure of Board-nominated directors to constitute a majority of any class of the Board of Directors, the occurrence of a transaction in which the Grace shareholders immediately preceding such transaction do not own more than 50% of the combined voting power of the entity resulting from such transaction, or the liquidation or dissolution of Grace. As a result of Grace's Chapter 11 filing, the following events will not constitute a ''change in control'': (i) the acquisition of Grace Common Stock by a trust established for purposes of administering asbestos-related claims pursuant to a plan of reorganization, and (ii) a corporate transaction pursuant to Section 363 of the U.S. Bankruptcy Code or a plan of reorganization. This description of the severance agreements does not purport to be complete and is qualified in its entirety by reference to the form of such agreement, which has been filed with the SEC.

*Severance Agreements.*   We have entered into severance agreements with each of the executive officers, other than Mr. Festa and Mr. Brown, whose severance arrangements are covered by their respective employment agreements. Under the terms of these agreements, in the event of the involuntary termination of the executive officer's employment under

65

CC-BLG003267

circumstances that would qualify the executive officer for severance pay under the severance plan that generally covers our salaried employees, the executive officer would be entitled to severance pay equal to two times his or her annual base salary. With respect to any executive officer who has another agreement regarding the payment of severance upon termination of employment, if such executive officer becomes entitled to severance under both the terms of the severance agreement and the other agreement, then the executive officer would only receive severance pay under the severance agreement, unless the other agreement provides for a greater amount of severance pay (in which case, the executive officer would only receive severance pay under the other agreement). This description of the severance agreements does not purport to be complete and is qualified in its entirety by reference to the form of such agreement, which has been filed with the SEC.

***Executive Salary Protection Plan.*** All executive officers participate in the Executive Salary Protection Plan which provides that, in the event of a participant's disability or death prior to age 70, we will continue to pay all or a portion of base salary to the participant or a beneficiary for a period based on the participant's age at the time of disability or death. Payments under the plan may not exceed 100% of base salary for the first year and 60% thereafter in the case of disability (50% in the case of death). Any payment under the plan as a result of disability would be reduced by the amount of disability income received under Grace's long-term and short-term disability plans that are generally applicable to U.S. salaried employees. This description of the plan does not purport to be complete and is qualified in its entirety by reference to the text of the Executive Salary Protection Plan, as amended, which is filed with the SEC.

66

CC-BLG003268

**Director Compensation**

Under the compensation program for nonemployee directors in effect during 2006, each nonemployee director receives an annual retainer of $75,000 in cash, 50% of which is paid in January and 50% of which is paid December. In addition, directors receive $6,000 ($7,000 for directors holding a committee chair and $9,000 for the lead independent director) in cash for each meeting date in respect of the Board meeting and all committee meetings held on that date. We reimburse directors for expenses they incur in attending Board and committee meetings and other activities incidental to their service as directors. Our directors are entitled to participate in the Grace Foundation's Matching Grants Program. We also maintain business travel accident insurance coverage for our directors. Mr. Festa's compensation is described above in the Summary Compensation Table. Mr. Festa receives no additional compensation for serving as a member of the Board of Directors.

The following table sets forth amounts paid by Grace to our directors in connection with their services to Grace during 2006.

| Name | Fees Earned or Paid in Cash ($) [a] | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| John F. Akers | 117,000 | -0- | -0- | -0- | -0- | 3,000[b] | 120,000 |
| H. Furlong Baldwin | 111,000 | -0- | -0- | -0- | -0- | -0- | 111,000 |
| Ronald C. Cambre | 105,000 | -0- | -0- | -0- | -0- | 2,500[b] | 107,500 |
| Marye Anne Fox | 117,000 | -0- | -0- | -0- | -0- | 2,500[b] | 119,500 |
| John J. Murphy | 117,000 | -0- | -0- | -0- | -0- | 3,000[a] | 120,000 |
| Paul J. Norris | 111,000 | -0- | -0-[c] | 937,078[d] | -0- | 134,584[e] | 1,182,662 |
| Christopher J. Steffen | 18,500[f] | -0- | -0- | -0- | -0- | -0- | 18,500 |
| Mark E. Tomkins | 37,000[g] | -0- | -0- | -0- | -0- | -0- | 37,000 |
| Thomas A. Vanderslice | 129,000 | -0- | -0- | -0- | -0- | 3,000[b] | 132,000 |

[a] Except for Mr. Tomkins and Mr. Steffen, amount consists of annual retainer in the amount of $75,000, meeting fees in the amount of $36,000 for Messrs. Akers, Baldwin, Murphy, Norris and Vanderslice and

67

CC-BLG003269

Dr. Fox and $30,000 to Mr. Cambre, and additional payments to: Mr. Murphy for serving as Chair of the Audit Committee in the amount of $6,000; Mr. Akers for serving as Chair of the Compensation Committee in the amount of $6,000; Mr. Vanderslice for serving as Chair of the Nominating and Governance Committee and Lead Independent Director in the amount of $18,000; and Dr. Fox for serving as Chair of the Corporate Responsibility Committee in the amount of $6,000.

(b) Consists of charitable contributions paid to designated academic institutions at the request of the director pursuant to the Grace Foundation's Matching Grants Program. Grace also paid an aggregate of $180 in premiums for business travel accident insurance coverage for all directors during 2006.

(c) Mr. Norris served as Chief Executive Officer of Grace until his retirement on May 31, 2005. In his capacity as Chief Executive Officer, he was awarded options to purchase up to 1,165,026 shares of Grace Common Stock (439,026 of which are matched with stock appreciation rights as described below under the caption "Norris Stock Appreciation Rights") all of which are currently vested and exercisable.

(d) Amount consists of the final payment under the 2004-2006 Long-Term Incentive Program, or LTIP, and reflects proration of LTIP payment to reflect the actual time during the performance period that Mr. Norris was an employee.

(e) Consists of payments to Mr. Norris pursuant to his consulting agreement.

(f) Consists of annual retainer, prorated for the period Mr. Steffen served on the Board following his election on November 2, 2006, in the amount of $12,500 and meeting fees in the amount of $6,000.

(g) Consists of annual retainer, prorated for the period Mr. Tomkins served on the Board following his election on September 6, 2006, in the amount of $25,000 and meeting fees in the amount of $12,000.

## *Norris Stock Appreciation Rights*

Mr. Norris served as Chief Executive Officer of Grace until his retirement on May 31, 2005. Effective October 26, 1998, Mr. Norris and Grace entered into an employment agreement pursuant to which he agreed to serve as Chief Executive Officer. Pursuant to this agreement and upon his commencement of employment, Mr. Norris received a non-statutory stock option grant covering 439,026 shares of Grace Common Stock pursuant to the Grace 1998 Stock Incentive Plan. Mr. Norris' agreement provides that Grace will make a stock appreciation payment to Mr. Norris, at the time he elects to exercise any options under that stock option grant or at the time he elects to cancel the options, provided that the price of a share of Grace Common Stock is above $10.25 at the time. The required payment is equal to the product of the number of shares exercised (or cancelled), multiplied by the difference between (a) the purchase price per share ($16.75), or the price of a share of Grace Common Stock on the date of such exercise, if less than the purchase price per share, and (b) $10.25. As of February 1, 2007, the total amount of this option grant remains unexercised and uncancelled. Mr. Norris can exercise (or cancel) these options at any time until May 31, 2008 (3 years after his retirement as CEO), in accordance with the terms of the 1998 Stock Incentive Plan.

## *Norris Consulting Agreement*

The Compensation Committee and the Bankruptcy Court have approved a consulting agreement between Grace and Mr. Norris dated January 19, 2005, under which Mr. Norris monitors our Chapter 11 proceedings and provides consulting services and advice to our CEO, certain of our employees and the Board of Directors, regarding those proceedings and other matters. Under this agreement, Mr. Norris performs services as an independent contractor, and retains no authority to enter into

CC-BLG003270

agreements on our behalf and has no management or supervisory authority over our officers or employees. Under his agreement, Mr. Norris is entitled to a monthly retainer equal to $35,416.67 (i.e., $425,000 per year), provided that the retainer is subject to adjustment downward if Mr. Norris' services under the agreement are required for less than one-half of a regular 40-hour work week. Based on the amount of time Mr. Norris is currently devoting to his duties under the agreement, his monthly retainer has been adjusted to $10,625 ($127,500 per year). We anticipate that Mr. Norris will continue to provide services under the agreement until we emerge from Chapter 11. Mr. Norris' consulting agreement may be terminated by the Board of Directors or Mr. Norris at any time upon 30 days' written notice, without the obligation to make any post-termination payments, and in any event, the agreement will terminate 90 days after we emerge from Chapter 11. During the period of the agreement, Mr. Norris has access to office space and administrative services at our Columbia, Maryland headquarters. In addition, during this period and so long as he remains a director, Mr. Norris is eligible to receive the same compensation payable to our other non-employee directors. The foregoing description of Mr. Norris' consulting agreement does not purport to be complete and is qualified in its entirety by reference to the agreement which has been filed with the SEC.

**Compensation Committee Interlocks And Insider Participation**

During 2006, the Compensation Committee of the Board was comprised of Messrs. Akers (Chair), Baldwin, Cambre, Murphy, Vanderslice, Tomkins and Steffen and Dr. Fox. None of our executive officers serves or in the past has served as a member of the board of directors or compensation committee of any entity that has one or more of its executive officers serving on our Board of Directors or our Compensation Committee. None of these persons is our current or former officer or employee, nor did we have any reportable transactions with any of these persons.

69

CC-BLG003271

**Item 12.   SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

**SECURITY OWNERSHIP**

The following table sets forth the amount of Grace common stock beneficially owned, directly or indirectly, as of January 31, 2007 by:

- each person that we know is the beneficial owner of more than 5% of the outstanding shares of Grace common stock

- each current director

- each of the individuals named in the Summary Compensation Table set forth in Item 11 above

- all directors and all executive officers as a group

| Name and Address of Beneficial Owner [1] | Shares of Common Stock Beneficially Owned | Percent |
|---|---|---|
| Peninsula Partners, L.P. [2] <br> 404B East Main Street, 2nd Floor <br> Charlottesville, VA 22902 | 10,765,600 | 15.6% |
| Citadel Limited Partnership [3] <br> Citadel Investment Group, L.L.C. <br> Kenneth Griffin <br> 131 S. Dearborn Street <br> 32nd Floor Chicago, Illinois 60603 | 4,094,213 | 5.9% |
| J. F. Akers | 38,996 <br> 74,535 [6] <br> 15,196 [7] | |
| H. F. Baldwin | 21,918 | * |
| R. C. Cambre | 28,494 | * |
| A. E. Festa | -0- | -0- |
| M. A. Fox | 41,246 <br> 8,942 [7] | * |
| J. J. Murphy | 38,930 <br> 15,528 [6] <br> 18,629 [7] | * |
| P. J. Norris | 138,822 <br> 1,165,026 [6] | 1.9% |
| C. J. Steffen | -0- | -0- |

70

CC-BLG003272

| Name and Address of Beneficial Owner [1] | Shares of Common Stock Beneficially Owned | Percent |
|---|---|---|
| M. E. Tomkins | -0- | -0- |
| T. A. Vanderslice | 39,522<br>69,876 [6]<br>14,932 [7] | * |
| R. C. Brown | -0- | -0- |
| G. E. Poling | 112,289 [6] | * |
| R. M. Tarola | 15,000<br>202,900 [6] | * |
| W. B. McGowan | 10,000<br>130,931 [6] | * |
| Directors and executive officers as a group | 372,928<br>1,771,085 [6]<br>57,699 [7] | 3.1% |

| | |
|---|---|
| * | Indicates less than 1% |
| [6] | Shares covered by stock options exercisable on or within 60 days after January 31, 2007. |
| [7] | Shares owned by trusts and other entities as to which the person has the power to direct voting and/or investment. |
| [1] | The address of each of our directors and executive officers is c/o Secretary, W. R. Grace & Co., 7500 Grace Drive, Columbia, MD 21044. |
| [2] | The ownership information set forth is based in its entirety on material contained in a Form 4 report dated September 10, 2001 filed with the SEC. |
| [3] | The ownership information set forth above is based in its entirety on material contained in a Schedule 13G/A filed February 13, 2007 with the SEC. The number of shares beneficially owned includes shares owned by the following investment funds and managed accounts: Citadel Derivatives Group LLC and Citadel Equity Fund Ltd. All of such persons share voting and dispositive power. |

71

CC-BLG003273

**EQUITY COMPENSATION PLAN INFORMATION**

The following table sets forth information as of December 31, 2006 with respect to our compensation plans under which shares of Grace common stock are authorized for issuance upon the exercise of options, warrants or other rights. The only such compensation plans in effect are stock incentive plans providing for the issuance of stock options and restricted stock. Grace shareholders have approved all of these plans.

| Plan category | Number of securities to be issued upon exercise of outstanding options (a) | Weighted-average exercise price of outstanding options (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 4,596,881 | $ 14.18 | 4,763,957 |

## Item 13.   CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

### BOARD INDEPENDENCE

The Board has determined that all directors, other than Mr. Festa (who is also Chief Executive Officer) and Mr. Norris (who was Chief Executive Officer until June 1, 2005 and is currently a consultant to Grace) are independent under New York Stock Exchange rules because none of such directors has any direct or indirect material relationship with Grace or our affiliates, other than through his or her service as a director and as an owner of less than 1% of Grace common stock. This determination was based on a number of factors, principal among them were the following:

- none of these directors, nor any member of their immediate families is (or at any time during the last three years was) a Grace executive officer or employee and none of these directors is an employee, and no member of their immediate families is an executive officer of any other entity with whom we do any material amount of business;

- none of these directors or any member of their immediate families has, during the last three years, received any compensation from Grace (other than Board retainer and meeting fees); and

- none of these directors serve, or within the last three years served, as an executive officer, director, trustee or fiduciary of any charitable organization to which we made any material donation.

Only independent directors serve on our Audit, Nominating and Governance, Compensation and Corporate Responsibility Committees. Mr. Vanderslice has been appointed Lead Independent Director and, in this capacity, presides at executive sessions of independent directors. Interested parties may communicate with Mr. Vanderslice by writing him at the following address: Thomas A. Vanderslice—Lead Independent Director, c/o W. R. Grace & Co., 7500 Grace Drive, Columbia, Maryland 21044.

CC-BLG003274

**REVIEW, APPROVAL OR RATIFICATION OF TRANSACTIONS WITH RELATED PARTIES**

The Board recognizes that transactions involving related persons in which Grace is a participant can present conflicts of interest, or the appearance thereof, so the Board has adopted a written policy as part of the Grace Corporate Governance Principles (which are available on our website at www.grace.com/About/Leadership/Governance/) with respect to related person transactions. The policy applies to transactions involving related persons that are required to be disclosed pursuant to SEC regulations, which are generally transactions in which:

- Grace is a participant;

- the amount involved exceeds $120,000; and

- any related person, such as a Grace executive officer, director, director nominee, 5% stockholder or any of their respective family members, has a direct or indirect material interest.

Each such related person transaction shall be reviewed, determined to be in, or not inconsistent with, the best interests of Grace and its stockholders and approved or ratified by:

- the disinterested members of the Audit Committee, if the disinterested members of the Audit Committee constitute a majority of the members of the Audit Committee; or

- the disinterested members of the Board.

In the event a related person transaction is entered into without prior approval and, after review by the Audit Committee or the Board, as the case may be, the transaction is not ratified, we will make all reasonable efforts to cancel the transaction.

73

CC-BLG003275

**Item 14.   PRINCIPAL ACCOUNTING FEES AND SERVICES**

The Audit Committee of the Board of Directors selected PricewaterhouseCoopers LLP, or PwC, to continue to act as our principal independent accountants for 2006. The following table sets forth the fees that we incurred for the services of PwC for the fiscal years ended December 31, 2006 and 2005:

|  | 2006 | 2005 |
|---|---|---|
| Audit Fees | $4,484,600 | $4,136,600 |
| Audit-Related Fees | 239,200 | 265,600 |
| Tax Fees | 7,900 | 116,100 |
| All Other Fees | 26,300 | -0- |
| Total Fees | $4,758,000 | $4,518,300 |

Audit Services consisted of the audit of our Consolidated Financial Statements and our internal controls over financial reporting (as required under Section 404 of the Sarbanes-Oxley Act of 2002), the review of our consolidated quarterly financial statements and statutory audits of certain of Grace's non-U.S. subsidiaries and affiliates.

Audit-Related Services primarily consisted of (1) an audit of the financial statements of Advanced Refining Technologies, LLC (a joint venture with Chevron Products Company), (2) an audit of Grace's 401(k) plan, and (3) audits of subsidiary benefit plans as required.

Tax Services consisted of tax advice and compliance for non-U.S. subsidiaries, including preparation of tax returns, and advice relating to Grace's transfer pricing policies.

The Audit Committee has adopted a preapproval policy that requires the Audit Committee to specifically preapprove the annual engagement of the independent accountants for the audit of our Consolidated Financial Statements and internal controls. The policy also provides for general preapproval of certain audit-related, tax and other services provided by the independent accountants. Any other services must be specifically preapproved by the Audit Committee. However, the Chair of the Audit Committee has the authority to preapprove services requiring immediate engagement between scheduled meetings of the Audit Committee. The Chair must report any such preapproval decisions to the full Audit Committee at its next scheduled meeting. During 2006, no audit-related, tax, or other services were performed by PwC without specific or general approval as described above.

74

CC-BLG003276

PART IV

## Item 15.  EXHIBITS, FINANCIAL STATEMENT SCHEDULES, AND REPORTS ON FORM 8-K

Financial Statements and Schedules . See the Index to Consolidated Financial Statements and Financial Statement Schedule and Exhibit in the Financial Supplement.

Exhibits . The exhibits to this Report are listed below. Other than exhibits that are filed herewith, all exhibits listed below are incorporated by reference. Exhibits indicated by an asterisk (*) are the management contracts and compensatory plans, contracts or arrangements required to be filed as exhibits to this Report.

For purposes of describing these exhibits, "Old Grace" means W. R. Grace & Co., a Delaware corporation (subsequently renamed Sealed Air Corporation), a predecessor to the Company, and "Grace New York" means W. R. Grace & Co., a New York corporation (subsequently renamed Fresenius Medical Care Holdings, Inc.), a predecessor to Old Grace.

| EXHIBIT NO. | EXHIBIT | WHERE LOCATED |
|---|---|---|
| 2.1 | Form of Distribution Agreement, by and among Old Grace, W. R. Grace & Co.-Conn. and Grace Specialty Chemicals, Inc. (now named W. R. Grace & Co.) | Annex B to the Joint Proxy Statement/Prospectus dated February 13, 1998 of Old Grace and Sealed Air Corporation included in Form S-4 (filed 2/13/98) |
| 2.2 | Proposed Amended Joint Plan of Reorganization of W. R. Grace & Co. and its debtor subsidiaries dated January 13, 2005 | Exhibit 2.2 to Form 10-K (filed 3/7/05) |
| 3.1 | Restated Certificate of Incorporation of W. R. Grace & Co. | Exhibit 3.1 to Form 8-K (filed 4/8/98) |
| 3.2 | Amended and Restated By-laws of W. R. Grace & Co. | Exhibit 3.2 to Form 8-K (filed 4/29/05) |
| 4.1 | Rights Agreement dated as of March 31, 1998 between W. R. Grace & Co. and The Chase Manhattan Bank, as Rights Agent | Exhibit 4.1 to Form 8-K (filed 4/8/98) |
| 4.2 | Credit Agreement dated as of May 14, 1998, among W. R. Grace & Co.-Conn., W. R. Grace & Co., the several banks parties thereto; the co-agents signatories thereto; The Chase Manhattan Bank, as administrative agent for such banks; and Chase Securities Inc., as arranger | Exhibit 4.1 to Form 10-Q (filed 8/14/98) |
| 4.3 | 364-Day Credit Agreement, dated as of May 5, 1999, among W. R. Grace & Co.-Conn.; W. R. Grace & Co.; the several banks parties thereto; the co-agents signatories thereto; Bank of America National Trust and Savings Association, as documentation agent; The Chase Manhattan Bank, as administrative agent for such banks; and Chase Securities Inc., as book manager | Exhibit 4.1 to Form 10-Q (filed 8/3/99) |

75

CC-BLG003277

| 4.4 | First Amendment to 364-Day Credit Agreement dated as of May 5, 1999 among W. R. Grace & Co.-Conn.; W. R. Grace & Co.; the several banks parties thereto; Bank of America National Trust and Savings Association, as document agent; The Chase Manhattan Bank, as administrative agent for such banks; and Chase Securities, Inc., as bank manager | Exhibit 4 to Form 10-Q (filed 8/15/00) |
|------|------|------|
| 4.5 | Post-Petition Loan and Security Agreement dated as of April 1, 2001 among the financial institutions named therein, as Lenders, Bank of America, N.A. as Agent, and W. R. Grace & Co. and its subsidiaries named therein as Debtors and Debtors-in-Possession, as Borrowers | Exhibit 4 to Form 10-Q (filed 8/14/01) |
| 4.6 | Amendment No. 1 and Limited Waiver to Post-Petition Loan and Security Agreement | Exhibit 4 to Form 10-Q (filed May 13, 2003) |
| 4.7 | Amendment No. 2 and Limited Waiver to Post-Petition Loan and Security Agreement | Exhibit 4.1 to Form 10-Q (filed May 9, 2006) |
| 4.8 | Amendment No. 3 and Limited Waiver to Post-Petition Loan and Security Agreement | Exhibit 4.2 to Form 10-Q (filed May 9, 2006) |
| 4.9 | Amendment No. 4 and Limited Waiver to Post-Petition Loan and Security Agreement | Exhibit 4.3 to Form 10-Q (filed May 9, 2006) |
| 4.10 | Receivables Purchase agreement dated as of January 23, 2007 between Grace GmbH & Co. KG and Coface Finanz GmbH | Filed herewith |
| 10.1 | Form of Employee Benefits Allocation Agreement, by and among Old Grace, W. R. Grace & Co.-Conn. and Grace Specialty Chemicals, Inc. (now named W. R. Grace & Co.) | Exhibit 10.1 to Form 10-K (filed March 13, 2003) |
| 10.2 | Form of Tax Sharing Agreement, by and among Old Grace, W. R. Grace & Co.-Conn. and Grace Specialty Chemicals, Inc. (now named W. R. Grace & Co.) | Exhibit 10.2 to Form 10-K (filed 3/13/03) |
| 10.3 | W. R. Grace & Co. 2000 Stock Incentive Plan, as amended | Exhibit 10 to Form 10-Q (filed 8/15/00)* |
| 10.4 | W. R. Grace & Co. 1998 Stock Incentive Plan | Exhibit 10.4 to Form 10-K (filed 3/13/03)* |
| 10.5 | W. R. Grace & Co. 1998 Stock Plan for Nonemployee Directors | Exhibit 10.5 to Form 10-K (filed 3/13/03)* |
| 10.6 | W. R. Grace & Co. 1996 Stock Incentive Plan, as amended | Exhibit 10.6 to Form 10-K (filed 3/5/04)* |
| 10.7 | W. R. Grace & Co. Supplemental Executive Retirement Plan, as amended | Exhibit 10.7 to Form 10-K (filed 3/28/02)* |
| 10.8 | W. R. Grace & Co. Executive Salary Protection Plan, as amended | Exhibit 10.8 to Form 10-K (filed 3/28/02)* |

76

CC-BLG003278

| 10.9 | W. R. Grace & Co. 1994 Stock Incentive Plan, as amended | Exhibit 10.11 to Form 10-K (filed 3/28/02)* |
|---|---|---|
| 10.10 | Form of Stock Option Agreements | Exhibit 10.14 to Registration Statement on Form S-1 of Old Grace (filed 8/2/96)* |
| 10.11 | Form of Stock Option Agreements | Exhibit 10.5 to Form 10-Q (filed 5/15/98)* |
| 10.12 | Form of 2003-2005 Long-Term Incentive Program Award | Exhibit 10.29 to Form 10-K (filed 3/5/04)* |
| 10.13 | Form of 2004-2006 Long-Term Incentive Program Award | Exhibit 10.29 to Form 10-K (filed 3/7/05)* |
| 10.14 | Form of 2005-2007 Long-Term Incentive Program Award | Exhibit 10.1 to Form 8-K (filed 7/21/05)* |
| 10.15 | Form of 2006-2008 Long-Term Incentive Program Award | Exhibit 10.1 to Form 8-K (filed 11/06/06)* |
| 10.16 | Form of Executive Severance Agreement between Grace and certain officers | Exhibit 10.17 to Form 10-K (filed 3/13/03)* |
| 10.17 | Severance Pay Plan for Salaried Employees | Filed herewith |
| 10.18 | Employment Agreement, dated January 1, 2001, by and between Grace and Paul J. Norris | Exhibit 10.20 to Form 10-K (filed 4/16/01)* |
| 10.19 | Amendment dated November 6, 2002 to Employment Agreement between Grace and Paul J. Norris | Exhibit 10.19 to Form 10-K (filed 3/13/03)* |
| 10.20 | Employment Agreement dated May 11, 1999 between Grace and Robert M. Tarola | Exhibit 10.1 to Form 10-Q (filed 8/13/99)* |
| 10.21 | Letter Agreement dated May 7, 1999 between Paul J. Norris, on behalf of Grace, and William M. Corcoran | Exhibit 10.24 to Form 10-K (filed 4/16/01)* |
| 10.22 | Form of Indemnification Agreement between Grace and certain officers and directors | Exhibit 10.27 to Form 10-K (filed 4/16/01)* |
| 10.23 | Form of Severance Agreement | Exhibit 10.28 to Form 10-K (filed 3/5/04)* |
| 10.24 | Annual Incentive Compensation Program | Exhibit 10.26 to Form 10-K (filed 3/13/03)* |
| 10.25 | Letter Agreement dated January 19, 2005 between Paul J. Norris, on behalf of Grace, and Fred Festa | Exhibit 10.1 to Form 8-K (filed 4/29/05)* |
| 10.26 | Letter Agreement dated January 19, 2005 between Thomas A. Vanderslice, on behalf of Grace, and Paul J. Norris | Exhibit 10.2 to Form 8-K (filed 4/29/05)* |

77

CC-BLG003279

| | | |
|---|---|---|
| 10.27 | Letter Agreement dated April 22, 2005 between Fred Festa, on behalf of Grace, and Richard C. Brown | Exhibit 10.3 to Form 8-K (filed 4/29/05)* |
| 12 | Computation of Ratio of Earnings to Fixed Charges and Combined Fixed Charges and Preferred Stock Dividends | Filed herewith in Financial Supplement to Grace's 2006 Form 10-K |
| 21 | List of Subsidiaries of W. R. Grace & Co. | Filed herewith |
| 23 | Consent of Independent Accountants | Filed herewith in Financial Supplement to Grace's 2006 Form 10-K |
| 24 | Powers of Attorney | Filed herewith |
| 31(i).1 | Certification of Periodic Report by Chief Executive Officer under Section 302 of the Sarbanes-Oxley Act of 2002 | Filed herewith |
| 31(i).2 | Certification of Periodic Report by Chief Financial Officer under Section 302 of the Sarbanes-Oxley Act of 2002 | Filed herewith |
| 32 | Certification of Periodic Report by Chief Executive Officer and Chief Financial Officer under Section 906 of the Sarbanes-Oxley Act of 2002 | Filed herewith |
| 99.1 | Amended Disclosure Statement for proposed Amended Joint Plan of Reorganization of W. R. Grace & Co. and its debtor subsidiaries dated January 13, 2005 | Exhibit 99.1 to Form 10-K (filed 3/7/05) |
| 99.2 | Glossary of terms used in Plan of Reorganization documents | Exhibit 99.2 to Form 10-K (filed 3/7/05) |

78

CC-BLG003280

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this Report to be signed on its behalf by the undersigned, thereto duly authorized.

W. R. GRACE & CO.

By: /s/ Alfred E. Festa
    Alfred E. Festa
    (President and
    Chief Executive Officer)

By: /s/ Robert M. Tarola
    Robert M. Tarola
    (Senior Vice President and
    Chief Financial Officer)

Dated:   March 1, 2007

Pursuant to the requirements of the Securities Exchange Act of 1934, this Report has been signed below by the following persons on behalf of the registrant and in the capacities indicated on March 1, 2007.

| Signature | | Title |
|---|---|---|
| J. F. Akers* | } | |
| H. F. Baldwin* | } | |
| R. C. Cambre* | } | |
| M. A. Fox* | } | |
| J. J. Murphy* | } | Directors |
| P. J. Norris* | } | |
| C. J. Steffen* | } | |
| M. E. Tomkins* | } | |
| T. A. Vanderslice* | } | |

/s/ Alfred E. Festa                 Chief Executive Officer and Director
(Alfred E. Festa)                   (Principal Executive Officer)


/s/ Robert M. Tarola                Senior Vice President and
(Robert M. Tarola)                  Chief Financial Officer
                                    (Principal Financial Officer)
                                    (Principal Accounting Officer)

_____

*    By signing his name hereto, Mark A. Shelnitz is signing this document on behalf of each of the persons indicated above pursuant to powers of attorney duly executed by such persons and filed with the Securities and Exchange Commission.

By: /s/ Mark A. Shelnitz
    Mark A. Shelnitz
    (Attorney-in-Fact)

79

CC-BLG003281

Financial Supplement

# W. R. GRACE & CO.
## ANNUAL REPORT ON FORM 10-K
## FOR THE YEAR ENDED DECEMBER 31, 2006

F- 1

CC-BLG003282

# FINANCIAL SUPPLEMENT
to
**Annual Report on Form 10-K for the Year Ended December 31, 2006**

## W. R. GRACE & CO. AND SUBSIDIARIES

Index to Consolidated Financial Statements
and Financial Statement Schedule and Exhibit

| | |
|---|---|
| Management's Report on Financial Information and Internal Controls | F-3 |
| Report of Independent Registered Public Accounting Firm | F-4 |
| Consent of Independent Registered Public Accounting Firm | F-5 |
| Consolidated Statements of Operations for the three years in the period ended December 31, 2006 | F-6 |
| Consolidated Statements of Cash Flows for the three years in the period ended December 31, 2006 | F-7 |
| Consolidated Balance Sheets at December 31, 2006 and 2005 | F-8 |
| Consolidated Statements of Shareholders' Equity (Deficit) for the three years in the period ended December 31, 2006 | F-9 |
| Consolidated Statements of Comprehensive Income (Loss) for the three years in the period ended December 31, 2006 | F-9 |
| Notes to Consolidated Financial Statements | F-10 - F-47 |
| Financial Summary | F-48 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | F-49 - F-75 |

Financial Statement Schedule

| | |
|---|---|
| Schedule II - Valuation and Qualifying Accounts and Reserves | F-76 |

| | |
|---|---|
| Exhibit 12: Computation of Ratio of Earnings to Fixed Charges and Combined Fixed Charges and Preferred Stock Dividends | F-77 |

The financial data listed above appearing in this Financial Supplement are incorporated by reference herein. The Financial Statement Schedule should be read in conjunction with the Consolidated Financial Statements and Notes thereto. Financial statements of less than majority-owned persons and other persons accounted for by the equity method have been omitted as provided in Rule 3-09 of the United States Securities and Exchange Commission's (SEC) Regulation S-X. Financial Statement Schedules not included have been omitted because they are not applicable or the required information is shown in the Consolidated Financial Statements or Notes thereto.

F-2

CC-BLG003283

**Management's Report on Financial Information and Internal Controls**

*Responsibility For Financial Information* —We are responsible for the preparation, accuracy, integrity and objectivity of the Consolidated Financial Statements and the other financial information included in this report. Such information has been prepared in conformity with accounting principles generally accepted in the United States of America and accordingly, includes certain amounts that represent management's best estimates and judgments. Actual amounts could differ from those estimates.

*Responsibility for Internal Controls* —We are also responsible for establishing and maintaining adequate internal controls over financial reporting. These internal controls consist of policies and procedures that are designed to assess and monitor the effectiveness of the control environment including: risk identification, governance structure, delegations of authority, information flow, communications and control activities. A chartered Disclosure Committee oversees Grace's public financial reporting process and key managers are required to confirm their compliance with Grace's policies and internal controls quarterly. While no system of internal controls can ensure elimination of all errors and irregularities, Grace's internal controls, which are reviewed and modified in response to changing conditions, have been designed to provide reasonable assurance that assets are safeguarded, policies and procedures are followed, transactions are properly executed and reported, and appropriate disclosures are made. The concept of reasonable assurance is based on the recognition that there are limitations in all systems of internal control and that the costs of such systems should be balanced with their benefits. The Audit Committee of the Board of Directors, which is comprised solely of independent directors, meets regularly with Grace's senior financial management, internal auditors and independent registered public accounting firm to review audit plans and results, as well as the actions taken by management in discharging its responsibilities for accounting, financial reporting and internal controls. The Audit Committee is responsible for the selection and compensation of the independent registered public accounting firm. Grace's financial management, internal auditors and independent registered public accounting firm have direct and confidential access to the Audit Committee at all times.

*Report On Internal Control Over Financial Reporting* —We and our management have evaluated Grace's internal control over financial reporting as of December 31, 2006. This evaluation was based on criteria for effective internal control over financial reporting set forth in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, we and our management have concluded that Grace's internal control over financial reporting is effective as of December 31, 2006. Grace's independent registered public accounting firm that audited our financial statements included in Item 15 has also audited our assessment of the effectiveness of Grace's internal control over financial reporting as of December 31, 2006, as stated in their report, which appears on the following page.

*Report On Disclosure Controls And Procedures* —As of December 31, 2006, we carried out an evaluation of the effectiveness of the design and operation of Grace's disclosure controls and procedures pursuant to Rule 13a-15 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Based upon that evaluation, we concluded that Grace's disclosure controls and procedures are effective in ensuring that information required to be disclosed in Grace's periodic filings under the Exchange Act is accumulated and communicated to us to allow timely decisions regarding required disclosures, and such information is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms.

/s/ A. E. Festa                                           /s/ Robert M. Tarola
A. E. Festa                                               Robert M. Tarola
President and                                             Senior Vice President and
Chief Executive Officer                                   Chief Financial Officer

March 1, 2007

F- 3

*Report of Independent Registered Public Accounting Firm*

**To the Shareholders and Board of Directors of W. R. Grace & Co.:**

We have completed integrated audits of W. R. Grace & Co.'s consolidated financial statements and of its internal control over financial reporting as of December 31, 2006 in accordance with the standards of the Public Company Accounting Oversight Board (United States). Our opinions, based on our audits, are presented below.

<u>Consolidated financial statements and financial statement schedule</u>

In our opinion, the accompanying consolidated financial statements present fairly, in all material respects, the financial position of W. R. Grace & Co. and its subsidiaries (the "Company") at December 31, 2006 and 2005, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2006 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the accompanying financial statement schedule presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and financial statement schedule based on our audits. We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit of financial statements includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion .

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the consolidated financial statements, on April 2, 2001, the Company and substantially all of its domestic subsidiaries voluntarily filed for protection under Chapter 11 of the United States Bankruptcy Code, which raises substantial doubt about the Company's ability to continue as a going concern in its present form. Management's intentions with respect to this matter are described in Note 2. The accompanying consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

As discussed in Note 1 to the consolidated financial statements, the Company changed the manner in which it accounts for defined benefit pension and other postretirement plans effective December 31, 2006 to comply with a recently issued financial accounting standard.

<u>Internal control over financial reporting</u>

Also, in our opinion, management's assessment, included in the accompanying Management's Report on Internal Control over Financial Reporting, that the Company maintained effective internal control over financial reporting as of December 31, 2006 based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), is fairly stated, in all material respects, based on those criteria. Furthermore, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2006, based on criteria established in *Internal Control—Integrated Framework* issued by the COSO. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express opinions on management's assessment and on the effectiveness of the Company's internal control over financial reporting based on our audit. We conducted our audit of internal control over financial reporting in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. An audit of internal control over financial reporting includes obtaining an understanding of internal control over

F- 4

CC-BLG003285

financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we consider necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ PricewaterhouseCoopers LLP
PricewaterhouseCoopers LLP
McLean, Virginia
March 1, 2007

**Consent of Independent Registered Public Accounting Firm**

We hereby consent to the incorporation by reference in the Registration Statements on Form S-8 (Nos. 333-37024, 333-49083, 333-49507, 333-49509, 333-49511, 333-49513, 333-49515 and 333-49517) of W. R. Grace & Co. of our report dated March 1, 2007 relating to the financial statements, financial statement schedule, management's assessment of the effectiveness of internal control over financial reporting and the effectiveness of internal control over financial reporting which appears in this 2006 Annual Report on Form 10-K of W. R. Grace & Co.

/s/ PricewaterhouseCoopers LLP
PricewaterhouseCoopers LLP
McLean, Virginia
March 1, 2007

F- 5

CC-BLG003286

Consolidated Financial Statements

**W. R. Grace & Co. and Subsidiaries**
**Consolidated Statements of Operations**
*(In millions, except per share amounts)*

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2006** | **2005** | **2004** |
| Net sales | **$ 2,826.5** | $ 2,569.5 | $ 2,259.9 |
| | | | |
| Cost of goods sold, exclusive of depreciation and amortization shown separately below | **1,845.0** | 1,689.8 | 1,431.5 |
| Selling, general and administrative expenses, exclusive of net pension expense and depreciation and amortization shown separately below | **560.9** | 474.2 | 436.3 |
| Depreciation and amortization | **113.5** | 120.9 | 115.3 |
| Research and development expenses | **63.8** | 59.2 | 51.1 |
| Net pension expense | **63.7** | 71.9 | 61.9 |
| Interest expense and related financing costs | **73.2** | 55.3 | 111.1 |
| Provision for environmental remediation | **30.0** | 25.0 | 21.6 |
| Provision for asbestos-related litigation, net of insurance | **—** | — | 476.6 |
| Chapter 11 expenses, net of interest income | **49.9** | 30.9 | 18.0 |
| Other (income) expense, net | **(34.3)** | (67.4) | (68.4) |
| | **2,765.7** | 2,459.8 | 2,655.0 |
| | | | |
| Income (loss) before income taxes and minority interest | **60.8** | 109.7 | (395.1) |
| Benefit from (provision for) income taxes | **(8.1)** | (21.3) | 1.5 |
| Minority interest in consolidated entities | **(34.4)** | (21.1) | (8.7) |
|    Net income (loss) | **$ 18.3** | $ 67.3 | $ (402.3) |
| | | | |
| **Basic earnings (loss) per share:** | | | |
|    Net income (loss) | **$ 0.27** | $ 1.01 | $ (6.11) |
|    Weighted average number of basic shares | **67.9** | 66.8 | 65.8 |
| | | | |
| **Diluted earnings (loss) per share:** | | | |
|    Net income (loss) | **$ 0.27** | $ 1.00 | $ (6.11) |
|    Weighted average number of diluted shares | **68.3** | 67.3 | 65.8 |

The Notes to Consolidated Financial Statements are an integral part of these statements.

F- 6

CC-BLG003287

**W. R. Grace & Co. and Subsidiaries**
**Consolidated Statements of Cash Flows**
*(In millions)*

| | Year Ended December 31, | | |
| --- | ---: | ---: | ---: |
| | **2006** | 2005 | 2004 |
| **OPERATING ACTIVITIES** | | | |
| Net income (loss) | **$ 18.3** | $ 67.3 | $ (402.3) |
| Reconciliation to net cash provided by (used for) operating activities: | | | |
| Chapter 11 expenses, net of interest income | **49.9** | 30.9 | 18.0 |
| (Benefit from) provision for income taxes | **8.1** | 21.3 | (1.5) |
| Minority interest in consolidated entities | **34.4** | 21.1 | 8.7 |
| Depreciation and amortization | **113.5** | 120.9 | 115.3 |
| Interest accrued on pre-petition liabilities subject to compromise | **71.3** | 50.6 | 106.4 |
| Net (gain) loss on sales of investments and disposals of assets | **(0.6)** | 0.7 | 0.8 |
| Net pension expense | **63.7** | 71.9 | 61.9 |
| Payments under defined benefit pension arrangements | **(121.5)** | (47.7) | (33.3) |
| Payments under postretirement benefit plans | **(13.9)** | (11.9) | (12.5) |
| Net gain from litigation settlement | **—** | — | (51.2) |
| Cash received from litigation settlement | **—** | — | 62.5 |
| Provision for asbestos-related litigation, net of insurance | **—** | — | 476.6 |
| Net income from life insurance policies | **(4.1)** | (3.5) | (3.0) |
| Provision for uncollectible receivables | **3.5** | 2.6 | 1.9 |
| Provision for environmental remediation | **30.0** | 25.0 | 21.6 |
| Expenditures for environmental remediation | **(10.9)** | (6.7) | (9.0) |
| Expenditures for retained obligations of divested businesses | **(3.6)** | (1.0) | (1.8) |
| Dividends paid to minority interests in consolidated entities | **(6.7)** | (0.4) | (0.2) |
| Changes in assets and liabilities, excluding effect of businesses acquired/divested and foreign currency translation: | | | |
| Working capital items (trade accounts receivable, inventories and accounts payable) | **6.1** | (46.3) | (15.8) |
| Other accruals and non-cash items | **17.1** | (31.0) | 35.8 |
| Income taxes paid, net of refunds | **(51.6)** | (45.7) | (37.7) |
| **Net cash provided by (used for) operating activities before Chapter 11 expenses and settlements** | **203.0** | 218.1 | 341.2 |
| Cash paid to resolve contingencies subject to Chapter 11 | **—** | (119.7) | — |
| Chapter 11 expenses paid | **(50.3)** | (31.1) | (15.8) |
| **Net cash provided by (used for) operating activities** | **152.7** | 67.3 | 325.4 |
| **INVESTING ACTIVITIES** | | | |
| Capital expenditures | **(119.2)** | (94.0) | (75.3) |
| Businesses acquired, net of cash acquired | **(19.6)** | (5.5) | (66.3) |
| Proceeds from termination of life insurance policies | **0.3** | 14.8 | — |
| Net investment in life insurance policies | **(0.5)** | 0.5 | 1.8 |
| Proceeds from sales of investments and disposals of assets | **9.6** | 1.8 | 1.8 |
| Proceeds from sale of business | **—** | 4.5 | — |
| **Net cash provided by (used for) investing activities** | **(129.4)** | (77.9) | (138.0) |
| **FINANCING ACTIVITIES** | | | |
| Net payment of loans secured by cash value of life insurance | **(0.1)** | (0.6) | (4.0) |
| Net (repayments) borrowings under credit arrangements | **0.3** | (10.4) | 1.2 |
| Fees paid under debtor-in-possession facility | **(2.4)** | (2.2) | (2.1) |
| Proceeds from exercise of stock options | **24.1** | 3.1 | 4.2 |
| **Net cash provided by (used for) financing activities** | **21.9** | (10.1) | (0.7) |
| Effect of currency exchange rate changes on cash and cash equivalents | **16.4** | (15.0) | 14.5 |
| **Increase (decrease) in cash and cash equivalents** | **61.6** | (35.7) | 201.2 |
| Cash and cash equivalents, beginning of period | **474.7** | 510.4 | 309.2 |
| Cash and cash equivalents, end of period | **$ 536.3** | $ 474.7 | $ 510.4 |

The Notes to Consolidated Financial Statements are an integral part of these statements.

F- 7

CC-BLG003288

**W. R. Grace & Co. and Subsidiaries**
**Consolidated Balance Sheets**
*(In millions, except par value and shares)*

| | December 31, | |
|---|---|---|
| | 2006 | 2005 |
| **ASSETS** | | |
| **Current Assets** | | |
| Cash and cash equivalents | $ 536.3 | $ 474.7 |
| Trade accounts receivable, less allowance of $6.6 (2005—$5.0) | 426.3 | 401.7 |
| Inventories | 284.6 | 278.3 |
| Deferred income taxes | 37.8 | 26.8 |
| Other current assets | 83.8 | 84.8 |
| **Total Current Assets** | 1,368.8 | 1,266.3 |
| | | |
| Properties and equipment, net of accumulated depreciation and amortization of $1,510.5 (2005—$1,420.2) | 664.5 | 632.9 |
| Goodwill | 116.5 | 103.9 |
| Cash value of life insurance policies, net of policy loans | 89.2 | 84.8 |
| Deferred income taxes | 728.5 | 679.1 |
| Asbestos-related insurance | 500.0 | 500.0 |
| Pension assets | 38.4 | 121.5 |
| Other assets | 131.5 | 150.1 |
| **Total Assets** | $ 3,637.4 | $ 3,538.6 |
| | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT)** | | |
| **Liabilities Not Subject to Compromise** | | |
| **Current Liabilities** | | |
| Debt payable within one year | $ 3.3 | $ 2.3 |
| Accounts payable | 172.7 | 166.8 |
| Other current liabilities | 272.6 | 221.2 |
| **Total Current Liabilities** | 448.6 | 390.3 |
| | | |
| Debt payable after one year | 0.2 | 0.4 |
| Deferred income taxes | 58.9 | 62.5 |
| Minority interest in consolidated entities | 65.0 | 36.4 |
| Pension liabilities | 349.6 | 447.5 |
| Other liabilities | 43.3 | 41.7 |
| **Total Liabilities Not Subject to Compromise** | 965.6 | 978.8 |
| | | |
| **Liabilities Subject to Compromise—Note 2** | 3,221.6 | 3,155.1 |
| **Total Liabilities** | 4,187.2 | 4,133.9 |
| | | |
| **Commitments and Contingencies** | | |
| | | |
| **Shareholders' Equity (Deficit)** | | |
| Common stock issued, par value $0.01; 300,000,000 shares authorized; outstanding: 2006—68,915,022 (2005—66,922,196) | 0.8 | 0.8 |
| Paid-in capital | 423.8 | 423.4 |
| Accumulated deficit | (487.6) | (505.9) |
| Treasury stock, at cost: shares: 2006—8,064,738 (2005—10,057,564) | (96.0) | (119.7) |
| Accumulated other comprehensive income (loss) | (390.8) | (393.9) |
| **Total Shareholders' Equity (Deficit)** | (549.8) | (595.3) |
| **Total Liabilities and Shareholders' Equity (Deficit)** | $ 3,637.4 | $ 3,538.6 |

The Notes to Consolidated Financial Statements are an integral part of these statements.

F- 8

CC-BLG003289

**W. R. Grace & Co. and Subsidiaries**
**Consolidated Statements of Shareholders' Equity (Deficit)**
*(In millions)*

| | Common Stock and Paid-in Capital | Accumulated Deficit | Treasury Stock | Accumulated Other Comprehensive Income (Loss) | Total Shareholders' Equity (Deficit) |
|---|---|---|---|---|---|
| **Balance, December 31, 2003** | $ 432.9 | $ (170.9) | $ (135.9) | $ (289.9) | $ (163.8) |
| Net income (loss) | — | (402.3) | — | — | (402.3) |
| Stock activity | (5.6) | — | 10.0 | — | 4.4 |
| Other comprehensive income (loss) | — | — | — | (60.1) | (60.1) |
| **Balance, December 31, 2004** | $ 427.3 | $ (573.2) | $ (125.9) | $ (350.0) | $ (621.8) |
| Net income (loss) | — | 67.3 | — | — | 67.3 |
| Stock plan activity | (3.1) | — | 6.2 | — | 3.1 |
| Other comprehensive income (loss) | — | — | — | (43.9) | (43.9) |
| **Balance, December 31, 2005** | $ 424.2 | $ (505.9) | $ (119.7) | $ (393.9) | $ (595.3) |
| Net income (loss) | — | 18.3 | — | — | 18.3 |
| Stock plan activity | 0.4 | — | 23.7 | — | 24.1 |
| Other comprehensive income (loss) | — | — | — | 105.4 | 105.4 |
| Adoption of FASB Statement No. 158 (Note 18) | — | — | — | (102.3) | (102.3) |
| **Balance, December 31, 2006** | $ 424.6 | $ (487.6) | $ (96.0) | $ (390.8) | $ (549.8) |

**W. R. Grace & Co. and Subsidiaries**
**Consolidated Statements of Comprehensive Income (Loss)**
*(In millions)*

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2006** | **2005** | **2004** |
| **Net income (loss)** | $ 18.3 | $ 67.3 | $ (402.3) |
| **Other comprehensive income (loss):** | | | |
| Foreign currency translation adjustments | 36.8 | (28.7) | 21.9 |
| Gain (loss) from hedging activities, net of income taxes | (1.3) | — | — |
| Minimum pension liability adjustments, net of income taxes | 69.9 | (15.2) | (82.0) |
| Total other comprehensive income (loss) | 105.4 | (43.9) | (60.1) |
| **Comprehensive income (loss)** | $ 123.7 | $ 23.4 | $ (462.4) |

The Notes to Consolidated Financial Statements are an integral part of these statements.

F- 9

CC-BLG003290

**1.    Basis of Presentation and Summary of Significant Accounting and Financial Reporting Policies**

W. R. Grace & Co., through its subsidiaries, is engaged in specialty chemicals and specialty materials businesses on a worldwide basis through two operating segments: "Grace Davison," which includes silica- and alumina-based catalysts and materials used in a wide range of industrial applications; and "Grace Performance Chemicals," which includes specialty chemicals and materials used in commercial and residential construction and in rigid food and beverage packaging.

W. R. Grace & Co. conducts substantially all of its business through a direct, wholly-owned subsidiary,
W. R. Grace & Co.-Conn. ("Grace-Conn."). Grace-Conn. owns substantially all of the assets, properties and rights of W. R. Grace & Co. on a consolidated basis, either directly or through subsidiaries.

As used in these notes, the term "Company" refers to W. R. Grace & Co. The term "Grace" refers to the Company and/or one or more of its subsidiaries and, in certain cases, their respective predecessors.

*Voluntary Bankruptcy Filing* —During 2000 and the first quarter of 2001, Grace experienced several adverse developments in its asbestos-related litigation, including: a significant increase in personal injury claims, higher than expected costs to resolve personal injury and certain property damage claims, and class action lawsuits alleging damages from Zonolite Attic Insulation ("ZAI") a former Grace attic insulation product.

After a thorough review of these developments, the Board of Directors concluded that a federal court-supervised bankruptcy process provided the best forum available to achieve fairness in resolving these claims and on April 2, 2001 (the "Filing Date"), Grace and 61 of its United States subsidiaries and affiliates, including Grace-Conn. (collectively, the "Debtors"), filed voluntary petitions for reorganization (the "Filing") under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The cases were consolidated and are being jointly administered under case number 01-01139 (the "Chapter 11 Cases"). Grace's non-U.S. subsidiaries and certain of its U.S. subsidiaries were not included in the Filing.

Under Chapter 11, the Debtors have continued to operate their businesses as debtors-in-possession under court protection from creditors and claimants, while using the Chapter 11 process to develop and implement a plan for addressing the asbestos-related claims. Since the Filing, all motions necessary to conduct normal business activities have been approved by the Bankruptcy Court. (See Note 2 for Chapter 11-Related Information.)

*Principles of Consolidation* —The Consolidated Financial Statements include the accounts of Grace and entities as to which Grace exercises control over operating and financial policies. Grace consolidates the activities of variable interest entities in circumstances where management determines that Grace is the primary beneficiary of the variable interest entity. Intercompany transactions and balances are eliminated in consolidation. Investments in affiliated companies in which Grace can significantly influence operating and financial policies are accounted for under the equity method, unless Grace's investment is deemed to be temporary, in which case the investment is accounted for under the cost method.

CC-BLG003291

*Minority Interest in Consolidated Entities* —Grace conducts certain of its business through joint ventures with unaffiliated third parties that require profit sharing.  For joint ventures in which Grace has a controlling financial interest, Grace consolidates the results of such joint ventures in the Consolidated Financial Statements.  Grace recognizes a liability for cumulative amounts due to the third parties based on the financial results of the joint ventures, and deducts the annual amount of profit sharing in the measurement of its consolidated net income (loss).

*Reclassifications* —Certain amounts in prior years' Consolidated Financial Statements have been reclassified to conform to the 2006 presentation.  Such reclassifications have not materially affected previously reported amounts in the Consolidated Financial Statements.

*Use of Estimates* —The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires that management make estimates and assumptions affecting the assets and liabilities reported at the date of the Consolidated Financial Statements, and the revenues and expenses reported for the periods presented. Actual amounts could differ from those estimates, and the differences could be material.  Changes in estimates are recorded in the period identified.  Grace's accounting measurements that are most affected by management's estimates of future events are:

- Contingent liabilities which depend on an assessment of the probability of loss and an estimate of ultimate resolution cost, such as asbestos-related matters (see Notes 2 and 3), environmental remediation (see Note 14), income taxes (see Note 14), and litigation (see Note 14);

- Pension and postretirement liabilities that depend on assumptions regarding participant life spans, future inflation, discount rates and total returns on invested funds (see Note 18); and

- Realization values of net deferred tax assets and insurance receivables, which depend on projections of future income and cash flows and assessments of insurance coverage and insurer solvency.

The accuracy of management's estimates may be materially affected by the uncertainties arising under Grace's Chapter 11 proceeding.

*Revenue Recognition* —Grace recognizes revenue when all of the following criteria are satisfied: risk of loss and title transfer to the customer; the price is fixed and determinable; and collectibility is reasonably assured. Certain customer arrangements include conditions for volume rebates. Grace accrues a rebate allowance and reduces recorded sales for anticipated selling price adjustments at the time of sale. Grace regularly reviews rebate accruals based on actual and anticipated sales patterns.

*Cash Equivalents* —Cash equivalents consist of liquid instruments and investments with maturities of three months or less when purchased. The recorded amounts approximate fair value.

*Inventories* —Inventories are stated at the lower of cost or market. The methods used to determine cost include first-in/first-out, or "FIFO" and, for substantially all U.S. inventories, last-in/first-out, or "LIFO." Market values for raw materials are based on current cost and, for other inventory classifications, net realizable value. Inventories are evaluated regularly for salability, and slow moving and/or obsolete items are adjusted to expected salable value. Inventory values include direct and certain indirect costs of materials and production. Abnormal costs of production are expensed as incurred.

*Properties and Equipment* —Properties and equipment are stated at cost.  Depreciation of properties and equipment is generally computed using the straight-line method over the estimated useful life of the asset.  Estimated useful lives range from 20 to 40 years for buildings, 3 to 7 years for information technology equipment, 3 to 10 years for machinery and equipment and 5 to 10 years for furniture and fixtures.  Interest is capitalized in connection with major project expenditures. Fully depreciated assets are retained in properties and equipment and related accumulated depreciation accounts until they are removed from service.  In the case of disposals, assets and related accumulated depreciation are removed from the accounts and the net amount, less any proceeds from disposal, is charged or

F- 11

CC-BLG003292

credited to operations. Obligations for costs associated with asset retirements, such as requirements to restore a site to its original condition, are accrued at net present value and amortized along with the related asset. Grace reviews long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be fully recoverable.

*Goodwill* —Goodwill arises from certain purchase business combinations. Grace reviews its goodwill for impairment on an annual basis and whenever events or changes in circumstances indicate that the carrying amount may not be fully recoverable. Recoverability is assessed at the reporting unit level most directly associated with the business combination that generated the goodwill.

*Income Taxes* —Grace recognizes deferred tax assets and liabilities with respect to the expected future tax consequences of events that have been recorded in the Consolidated Financial Statements and tax returns. If it is more likely than not that all or a portion of deferred tax assets will not be realized, a valuation allowance is provided against such deferred tax assets. The assessment of realization of deferred tax assets is performed annually under scenarios of future taxable income and tax planning alternatives that are considered reasonable in the circumstances.

*Foreign Currency Translation* —Assets and liabilities of foreign subsidiaries (other than those located in countries with highly inflationary economies) are translated into U.S. dollars at current exchange rates, while revenues, costs and expenses are translated at average exchange rates during each reporting period. The resulting translation adjustments are included in the "accumulated other comprehensive income (loss)" caption of the Consolidated Balance Sheets. The financial statements of subsidiaries located in countries with highly inflationary economies, if any, are remeasured as if the functional currency were the U.S. dollar; the remeasurement creates translation adjustments that are reflected in "net income (loss)" in the Consolidated Statements of Operations.

*Financial Instruments* —Grace periodically enters into commodity forward, swap and/or option contracts, interest rate swap agreements and foreign exchange forward and/or option contracts to manage exposure to fluctuations in commodity prices and interest and foreign currency exchange rates. Grace does not hold or issue derivative financial instruments for trading purposes. Derivative instruments are recorded in the Consolidated Balance Sheets as either assets or liabilities at their fair value. For derivative instruments designated as fair value hedges, changes in the fair value of the derivative instruments closely offset changes in the fair values of the hedged items in other income (expense) in the Consolidated Statements of Operations. For derivative instruments designated as cash flow hedges, the effective portion of any hedge is reported as accumulated other comprehensive income (loss) in the Consolidated Balance Sheets until it is cleared to earnings during the same period in which the hedged item affects earnings. The ineffective portion of all hedges, and changes in the fair values of derivative instruments that are not designated as hedges, are recorded in current period earnings. Cash flows from derivative instruments are reported in the same category as the cash flows from the items being hedged.

*Effect of New Accounting Standards* —In September 2006, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards ("SFAS") No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans." SFAS No. 158 requires an employer to recognize the funded status of defined benefit pension plans and other postretirement benefit plans as an asset or liability in its statement of financial position, and requires recognition in other comprehensive income of gains or losses and prior service costs or credits arising during the period but which are not included as components of net periodic benefit cost. Grace adopted the provisions of SFAS No. 158 as of December 31, 2006. The incremental effect of applying this Statement on individual line items in the Consolidated Balance Sheet as of December 31, 2006 is shown below. Adoption of SFAS No. 158 did not impact Grace's 2006 consolidated results of operations, and it is not expected to materially impact consolidated results of operations in future periods.

F- 12

CC-BLG003293

| Incremental Effect of Applying SFAS No. 158 on Individual Line Items in the Consolidated Balance Sheet (In millions) | December 31, 2006 | | |
|---|---|---|---|
| | Before Application of SFAS No. 158 | Adjustments | After Application of SFAS No. 158 |
| Deferred income taxes | $ 674.7 | $ 53.8 | $ 728.5 |
| Pension assets | 126.2 | (87.8) | 38.4 |
| Other assets | 141.6 | (10.1) | 131.5 |
| Total assets | 3,681.5 | (44.1) | 3,637.4 |
| Other current liabilities | 257.7 | 14.9 | 272.6 |
| Pension liabilities | 296.7 | 52.9 | 349.6 |
| Liabilities subject to compromise | 3,231.2 | (9.6) | 3,221.6 |
| Total liabilities | 4,129.0 | 58.2 | 4,187.2 |
| Accumulated other comprehensive income (loss) | (288.5) | (102.3) | (390.8) |
| Total Shareholders' Equity (Deficit) | (447.5) | (102.3) | (549.8) |

In September 2006, the FASB Emerging Issues Task Force ("EITF") promulgated Issue No. 06-4, "Accounting for Deferred Compensation and Postretirement Benefit Aspects of Endorsement Split-Dollar Life Insurance Arrangements." This Issue specifies that if a company provides a benefit to an employee under an endorsement split-dollar life insurance arrangement that extends to postretirement periods, it would have to recognize a liability and related compensation costs. Grace will adopt EITF 06-4 effective in the first quarter of 2008, and has not yet assessed the estimated impact to its Consolidated Financial Statements.

In September 2006, the EITF promulgated Issue No. 06-5, "Accounting for Purchases of Life Insurance—Determining the Amount That Could Be Realized in Accordance with FASB Technical Bulletin No. 85-4, *Accounting for Purchases of Life Insurance.*" Companies can choose to purchase life insurance policies to fund the cost of employee benefits or to protect against the loss of key persons, and receive tax-free death benefits. These policies are commonly referred to as corporate-owned life insurance (COLI). This Issue clarifies whether the policyholder should consider additional amounts from the policy other than the cash surrender value in determining the amount that could be realized under the insurance contract, or whether a policyholder should consider the contractual ability to surrender all individual life policies at the same time in determining the amount that could be realized under the insurance contract. Grace will adopt EITF 06-5 effective in the first quarter of 2007; it is not expected to materially impact the Consolidated Financial Statements.

In September 2006, the FASB issued SFAS No. 157, "Fair Value Measurements." SFAS No. 157 defines fair value, establishes a framework for measuring fair value, and expands disclosures about fair value measurements. Grace will adopt SFAS No. 157 effective in the first quarter of 2008, and has not yet assessed the estimated impact to its Consolidated Financial Statements.

In September 2006, the SEC Staff released Staff Accounting Bulletin ("SAB") 108. SAB 108 expresses the SEC Staff's views regarding the process of quantifying financial statement misstatements. Grace has applied the guidance in SAB 108 effective for the fourth quarter ended December 31, 2006.

In June 2006, the FASB issued Interpretation No. 48, "Accounting for Uncertainty in Income Taxes" ("FIN 48"), which prescribes a recognition threshold and measurement attribute for tax positions taken or expected to be taken in tax returns. FIN 48 also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, disclosure, and transition. Grace will adopt FIN 48 effective in the first quarter of 2007. At this stage, Grace does not believe the adoption of FIN 48 will have a material effect on its financial condition or results of operations. However, the FASB has indicated that it expects to issue additional FIN 48 implementation guidance regarding the ultimate settlement of a tax audit, which may impact the timing of certain liability adjustments. Accordingly, such guidance may impact the amount Grace would record upon adoption of this statement. Grace continues to evaluate the effects of adopting this standard.

## 2.    Chapter 11-Related Information

***Official Parties to Grace's Chapter 11 Proceedings*** —Three creditors' committees, two representing asbestos claimants and the third representing other unsecured creditors, and a committee representing shareholders, have been appointed in the Chapter 11 Cases. These committees, and a legal representative of future asbestos claimants, have the right to be heard on all matters that come before the Bankruptcy Court and have important roles in the Chapter 11 Cases. The Debtors are required to bear certain costs and expenses of the committees and of the representative of future asbestos claimants, including those of their counsel and financial advisors.

***Plan of Reorganization*** —On November 13, 2004 Grace filed a plan of reorganization, as well as several associated documents, including a disclosure statement, with the Bankruptcy Court. On January 13, 2005, Grace filed an amended plan

F- 13

CC-BLG003294

of reorganization (the "Plan") and related documents to address certain objections of creditors and other interested parties. The Plan is supported by committees representing general unsecured creditors and equity holders, but is not supported by committees representing asbestos personal injury claimants and asbestos property damage claimants or the representative of future asbestos claimants.

Under the terms of the Plan, a trust would be established under Section 524(g) of the Bankruptcy Code to which all pending and future asbestos-related claims would be channeled for resolution. Grace has requested that the Bankruptcy Court conduct an estimation hearing to, among other things, determine the amount that would need to be paid into the trust on the effective date of the Plan to satisfy the estimated liability for all classes of asbestos claimants and trust administration costs and expenses over time. The Plan provides that Grace's asbestos-related liabilities would be satisfied using cash and securities from Grace and third parties.

The Plan will become effective only after a vote of eligible creditors and with the approval of the Bankruptcy Court and the U.S. District Court for the District of Delaware. Votes on the Plan may not be solicited until the Bankruptcy Court approves the disclosure statement. The Bankruptcy Court has currently deferred consideration of the disclosure statement and Plan until after completion of estimation hearings on the amount of Grace's asbestos-related liability. The Debtors have received extensions of their exclusive right to propose a plan of reorganization and solicit acceptances of that plan through July 23, 2007. The committees representing asbestos claimants and the future claimants' representative have appealed the extension of exclusivity to the Third Circuit Court of Appeals.

Under the terms of the Plan, claims would be satisfied under the Chapter 11 Cases as follows:

<u>Asbestos-Related Claims and Costs</u>

Under the Plan, a trust would be established under Section 524(g) of the Bankruptcy Code to which all pending and future asbestos-related claims would be channeled for resolution. The trust would utilize specified trust distribution procedures to satisfy the following allowed asbestos-related claims and costs:

*Personal injury claims that meet specified exposure and medical criteria (Personal Injury-Symptomatic Eligible or "PI-SE" Claims)*— In order to qualify for this class, claimants would have to prove that their health is impaired from meaningful exposure to asbestos-containing products formerly manufactured by Grace.

*Personal injury claims that do not meet the exposure and medical criteria necessary to qualify as PI-SE Claims (Personal Injury-Asymptomatic and Other or "PI-AO" Claims)*— This class would contain all asbestos-related personal injury claims against Grace that do not meet the specific requirements to be PI-SE Claims, but do meet certain other specified exposure and medical criteria.

*Property damage claims, including claims related to ZAI ("PD Claims")* —In order to qualify for this class, claimants would have to prove Grace liability for loss of property value or remediation costs related to products formerly manufactured by Grace that claimants allege contained asbestos.

*Trust administration costs and legal expenses*

The pending asbestos-related legal proceedings are described in "Asbestos-Related Litigation" (see Note 3). The claims arising from such proceedings would be subject to this classification process as part of the Plan.

The Bankruptcy Court has entered separate case management orders for estimating liability for pending and future personal injury claims and adjudicating pending property damage claims, excluding ZAI claims. Trial dates for estimating liability for personal injury claims are currently scheduled to begin in September 2007. Hearings for the adjudication of various issues regarding property damage claims are currently scheduled to take place during the second quarter of 2007. The Debtors expect that the estimated liability for all asbestos-related claims may provide the basis for determining the amount to be paid into a trust on the effective date of a plan of reorganization.

Under the Plan, asbestos personal injury claimants, including both PI-SE and PI-AO claims, would have the option either to litigate their claims against the trust in federal court in Delaware or, if they meet specified eligibility criteria, accept a settlement amount based on the severity of their condition. Under the plan, asbestos property damage claimants would be required to litigate their claims against the trust in federal court in

F- 14

CC-BLG003295

Delaware. The Plan provides that, as a condition precedent to confirmation, the maximum estimated aggregate funding amount for all asbestos-related liabilities (PI-SE, PI-AO and PD including ZAI) and trust administration costs and expenses as determined by the Bankruptcy Court cannot exceed $1,613 million, which Grace believes would fund over $2 billion in claims, costs and expenses over time.

The PI-SE Claims, the PD Claims and the related trust administration costs and expenses would be funded with (1) a payment of $512.5 million in cash (plus interest at 5.5% compounded annually from December 21, 2002) and nine million shares of common stock of Sealed Air Corporation ("Sealed Air") to be made directly by Cryovac, Inc., a wholly owned subsidiary of Sealed Air ("Cryovac"), to the asbestos trust pursuant to the terms of a settlement agreement resolving asbestos-related, successor liability and fraudulent transfer claims against Sealed Air and Cryovac and (2) Grace common stock. The number of shares of Grace common stock required to satisfy these claims will depend on the price of Grace common stock on the effective date of the Plan, liability measures approved by the Bankruptcy Court, and the value of the Sealed Air settlement, which changes daily with the accrual of interest and the trading value of Sealed Air common stock. The Sealed Air settlement agreement has been approved by the Bankruptcy Court, but remains subject to the fulfillment of specified conditions.

The PI-AO Claims would be funded with warrants exercisable for that number of shares of Grace common stock which, when added to the shares issued directly to the trust on the effective date of the Plan, would represent 50.1% of Grace's voting securities. If the common stock issuable upon exercise of the warrants is insufficient to pay all PI-AO Claims (the liability for which is uncapped under the Plan), then Grace would pay any additional liabilities in cash.

Under the Plan, the amounts to fund PI-SE Claims, PD Claims and the expense of trust administration would be capped at the amount determined by the Bankruptcy Court. Amounts required to fund PI-AO Claims would not be capped, so if the amount funded in respect thereof later proved to be inadequate, Grace would be responsible for contributing additional funds into the asbestos trust to satisfy PI-AO Claims. Because of the number and nature of the uncertainties involved, Grace is unable to determine the extent to which, if any, the liability under the Plan for PI-AO claims may exceed the amount funded into the trust in respect thereof.

<u>Other Claims</u>

The Plan provides that all allowed administrative or priority claims would be paid 100% in cash and all general unsecured claims, other than those covered by the asbestos trust, would be paid 85% in cash and 15% in Grace common stock. Grace estimates that claims with a recorded value of approximately $1,241 million, including interest accrued through December 31, 2006, would be satisfied in this manner at the effective date of the Plan. Grace would finance these payments with cash on hand, cash from Fresenius Medical Care Holdings, Inc. ("Fresenius") paid in settlement of asbestos and other Grace-related claims, new Grace debt, and Grace common stock.  Grace would satisfy other non-asbestos related liabilities and claims (primarily certain environmental, tax, pension and retirement medical obligations) as they become due and payable over time using cash flow from operations, insurance proceeds from policies and settlement agreements covering asbestos-related liabilities, and new credit facilities. Proceeds from available product liability insurance applicable to asbestos-related claims would supplement operating cash flow to service new debt and liabilities not paid on the effective date of the Plan.

<u>Effect on Grace Common Stock</u>

The Plan provides that Grace common stock will remain outstanding at the effective date of the Plan, but that the interests of existing shareholders would be subject to dilution by additional shares of common stock issued under the Plan. In addition, in order to preserve significant tax benefits from net operating loss carryforwards ("NOLs") and certain future deductions, which are subject to elimination or limitation in the event of a change in control (as defined by the Internal Revenue Code) of Grace, the Plan places restrictions on the purchase of Grace common stock. The restrictions would prohibit (without the consent of Grace), for a period of three years after the effective date of the Plan, a person or entity from acquiring more than 4.75% of the outstanding Grace common stock or, for those persons already holding more than 4.75%, prohibit them from increasing or decreasing their holdings. The Bankruptcy Court has also approved the trading restrictions described above, excluding the restriction on sales, until the effective date of the Plan.

CC-BLG003296

Grace intends to address all pending and future asbestos-related claims and all other pre-petition claims as outlined in the Plan. However, the Plan may not be ultimately approved by the Bankruptcy Court and other interested parties. For example, the asbestos creditors committees and representative of future asbestos claimants have challenged the confirmability of the Plan, arguing that the Plan impairs the rights of asbestos creditors and impermissibly denies them voting rights, and have asserted that Grace's asbestos-related liabilities exceed the fair value of Grace's assets. As a result of these challenges and other Bankruptcy Court rulings, a materially different plan of reorganization may ultimately be approved and, under the ultimate plan of reorganization, the interests of the Company's shareholders could be substantially diluted or cancelled. The value of Grace common stock following a plan of reorganization, and the extent of any recovery by non-asbestos-related creditors, will depend principally on the amount of Grace's asbestos-related liability under a confirmed plan of reorganization.

*Claims Filings* —The Bankruptcy Court established a bar date of March 31, 2003 for claims of general unsecured creditors, asbestos-related property damage claims (other than ZAI claims) and medical monitoring claims related to asbestos. The bar date did not apply to asbestos-related personal injury claims or claims related to ZAI.

Approximately 14,900 proofs of claim were filed by the March 31, 2003 bar date. Of these claims, approximately 9,400 were non-asbestos related, approximately 4,300 were for asbestos-related property damage, and approximately 1,000 were for medical monitoring. The medical monitoring claims were made by individuals who allege exposure to asbestos through Grace's products or operations. These claims, if sustained, would require Grace to fund ongoing health monitoring costs for qualified claimants. In addition, approximately 800 proofs of claim were filed after the bar date.

Approximately 7,000 of the non-asbestos related claims involve claims by employees or former employees for future retirement benefits such as pension and retiree medical coverage. Grace views most of these claims as contingent and has proposed a plan of reorganization that would retain such benefits. The other non-asbestos related claims include claims for payment of goods and services, taxes, product warranties, principal and interest under pre-petition credit facilities, amounts due under leases and other contracts, leases and other executory contracts rejected in the Bankruptcy Court, environmental remediation, indemnification or contribution to actual or potential co-defendants in asbestos-related and other litigation, pending non-asbestos-related litigation, and non-asbestos-related personal injury.

The Debtors have analyzed the claims filed pursuant to the March 31, 2003 bar date and have found that many are duplicates, represent the same claim filed against more than one of the Debtors, lack any supporting documentation, or provide insufficient supporting documentation. As of December 31, 2006, the Debtors had filed objections to approximately 5,600 claims (approximately 100 of which were subsequently withdrawn by the claimant), approximately 3,950 of which were asbestos property damage claims. Of the 5,500 remaining claims objections, approximately 1,050 asbestos property damage claims have been expunged, approximately 1,300 non-asbestos claims have been expunged, approximately 300 non-asbestos claims have been resolved, approximately 2,125 asbestos property damage claims have been withdrawn by claimants, approximately 50 non-asbestos claims have been withdrawn by claimants, and the remaining approximately 625 will be addressed pursuant to the procedures set forth in the asbestos property damage case management order approved by the Bankruptcy Court. An additional approximately 1,100 non-asbestos claims will be addressed through the claims objection process and the dispute resolution procedures approved by the Bankruptcy Court.

Grace believes that its recorded liabilities for claims subject to the March 31, 2003 bar date represent a reasonable estimate of the ultimate allowable amount for claims that are not in dispute or have been submitted with sufficient information to both evaluate the merit and estimate the value of the claim. The asbestos-related claims are considered as part of Grace's overall asbestos liability and are being accounted for in accordance with the conditions precedent under the Plan, as described in "Accounting Impact" below. Grace will adjust its recorded asbestos-related liability, as necessary, to reflect rulings by the Bankruptcy Court. Any such adjustments could be material to its consolidated financial position and results of operations.

F- 16

CC-BLG003297

*Litigation Proceedings in Bankruptcy Court* —In September 2000, Grace was named in a purported class action lawsuit filed in California Superior Court for the County of San Francisco, alleging that the 1996 reorganization involving a predecessor of Grace and Fresenius AG and the 1998 reorganization involving a predecessor of Grace and Sealed Air were fraudulent transfers *(Abner, et al., v. W.R. Grace & Co., et al.)* . The Bankruptcy Court authorized the Official Committee of Asbestos Personal Injury Claimants and the Official Committee of Asbestos Property Damage Claimants to proceed with claims against Fresenius and Sealed Air and Cryovac on behalf of the Debtors' bankruptcy estate.

On November 29, 2002, Sealed Air (and Cryovac) and Fresenius each announced that they had reached agreements in principle with such Committees to settle asbestos, successor liability and fraudulent transfer claims related to such transactions (the "litigation settlement agreements"). Under the terms of the Fresenius settlement, subject to the fulfillment of certain conditions, Fresenius would pay $115.0 million to the Debtors' estate as directed by the Bankruptcy Court upon confirmation of the Debtors' plan of reorganization. In July 2003, the Fresenius settlement was approved by the Bankruptcy Court. Under the terms of the Sealed Air settlement, subject to the fulfillment of certain conditions, Cryovac would make a payment of $512.5 million (plus interest at 5.5% compounded annually, commencing on December 21, 2002) and nine million shares of Sealed Air common stock (collectively valued at $1,220.2 million as of December 31, 2006), as directed by the Bankruptcy Court upon confirmation of the Debtors' plan of reorganization. In June 2005, the Sealed Air settlement was approved by the Bankruptcy Court.

*Debt Capital* —All of the Debtors' pre-petition debt is in default due to the Filing. The accompanying Consolidated Balance Sheets reflect the classification of the Debtors' pre-petition debt within "liabilities subject to compromise."

The Debtors have entered into a debtor-in-possession post-petition loan and security agreement with Bank of America, N.A. (the "DIP facility") in the aggregate amount of $250 million.  The term of the DIP facility expires on April 1, 2008.

*Accounting Impact* —The accompanying Consolidated Financial Statements have been prepared in accordance with Statement of Position 90-7 ("SOP 90-7"), "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code," promulgated by the American Institute of Certified Public Accountants. SOP 90-7 requires that financial statements of debtors-in-possession be prepared on a going concern basis, which contemplates continuity of operations, realization of assets and liquidation of liabilities in the ordinary course of business.  However, as a result of the Filing, the realization of certain of the Debtors' assets and the liquidation of certain of the Debtors' liabilities are subject to significant uncertainty. While operating as debtors-in-possession, the Debtors may sell or otherwise dispose of assets and liquidate or settle liabilities for amounts other than those reflected in the Consolidated Financial Statements. Further, the ultimate plan of reorganization could materially change the amounts and classifications reported in the Consolidated Financial Statements.

Pursuant to SOP 90-7, Grace's pre-petition and future liabilities that are subject to compromise are required to be reported separately on the balance sheet at an estimate of the amount that will ultimately be allowed by the Bankruptcy Court. As of December 31, 2006, such pre-petition liabilities include fixed obligations (such as debt and contractual commitments), as well as estimates of costs related to contingent liabilities (such as asbestos-related litigation, environmental remediation, and other claims). Obligations of Grace subsidiaries not covered by the Filing continue to be classified on the Consolidated Balance Sheets based upon maturity dates or the expected dates of payment. SOP 90-7 also requires separate reporting of certain expenses, realized gains and losses, and provisions for losses related to the Filing as reorganization items. Grace presents reorganization items as "Chapter 11 expenses, net of interest income," a separate caption in its Consolidated Statements of Operations.

Grace has not recorded the benefit of any assets that may be available to fund asbestos-related and other liabilities under the litigation settlements with Sealed Air and Fresenius, as such agreements are subject to conditions which, although expected to be met, have not been satisfied and confirmed by the Bankruptcy Court. The value available under these litigation settlement agreements as measured at December 31, 2006, was $1,335.2 million comprised of $115.0 million in cash from Fresenius and $1,220.2 million in cash and stock from Cryovac. Payments under the Sealed Air settlement will be made directly to the asbestos trust by Cryovac, and will be accounted for as a satisfaction of a portion of Grace's recorded asbestos-related liability and a credit to shareholders' equity.

F- 17

CC-BLG003298

Grace's Consolidated Balance Sheets separately identify the liabilities that are "subject to compromise" as a result of the Chapter 11 proceedings. In Grace's case, "liabilities subject to compromise" represent both pre-petition and future liabilities as determined under U.S. generally accepted accounting principles. The bases for the asbestos-related liability component of "liabilities subject to compromise" are described in Note 3. Changes to the recorded amount of such liabilities will be based on developments in the Chapter 11 Cases and management's assessment of the claim amounts that will ultimately be allowed by the Bankruptcy Court. Changes to pre-petition liabilities subsequent to the Filing Date reflect: 1) cash payments under approved court orders; 2) the terms of Grace's proposed plan of reorganization, as discussed above, including the accrual of interest on pre-petition debt and other fixed obligations; 3) accruals for employee-related programs; and 4) changes in estimates related to other pre-petition contingent liabilities.

Components of liabilities subject to compromise are as follows:

| (In millions) | December 31, 2006 | December 31, 2005 | Filing Date (Unaudited) |
|---|---|---|---|
| Debt, pre-petition plus accrued interest | $ 739.5 | $ 684.7 | $ 511.5 |
| Asbestos-related liability | 1,700.0 | 1,700.0 | 1,002.8 |
| Income taxes | 141.2 | 136.5 | 242.1 |
| Environmental remediation | 361.1 | 342.0 | 164.8 |
| Postretirement benefits other than pension | 72.7 | 101.3 | 185.4 |
| Unfunded special pension arrangements | 95.6 | 86.4 | 70.8 |
| Retained obligations of divested businesses | 18.0 | 18.1 | 43.5 |
| Accounts payable | 31.7 | 31.5 | 43.0 |
| Other accrued liabilities | 71.2 | 54.6 | 102.1 |
| Reclassification to current liabilities [1] | (9.4) | — | — |
| **Total Liabilities Subject to Compromise [1]** | $ 3,221.6 | $ 3,155.1 | $ 2,366.0 |

[1] As of December 31, 2006, $9.4 million of certain pension and postretirement benefit obligations subject to compromise have been presented in other current liabilities in the Consolidated Balance Sheet in accordance with SFAS No. 158.

Note that the unfunded special pension arrangements reflected above exclude non-U.S. plans and U.S. qualified plans that became underfunded subsequent to the Filing. Contributions to U.S. qualified plans are subject to Bankruptcy Court approval.

### Change in Liabilities Subject to Compromise

The following table is a reconciliation of the changes in pre-filing date liability balances for the period from the Filing Date through December 31, 2006.

| (In millions) (Unaudited) | Cumulative Since Filing |
|---|---|
| Balance, Filing Date April 2, 2001 | $ 2,366.0 |
| Cash disbursements and/or reclassifications under Bankruptcy Court orders: | |
| Freight and distribution order | (5.7) |
| Trade accounts payable order | (9.1) |
| Resolution of contingencies subject to Chapter 11 | (119.7) |
| Other court orders including employee wages and benefits, sales and use tax, and customer programs | (329.5) |
| Expense/(income) items: | |
| Interest on pre-petition liabilities | 274.9 |
| Employee-related accruals | 34.0 |
| Provision for asbestos-related contingencies | 744.8 |
| Provision for environmental contingencies | 295.6 |
| Provision for income tax contingencies | 5.4 |
| Balance sheet reclassifications | (35.1) |
| Balance, end of period | $ 3,221.6 |

Additional liabilities subject to compromise may arise due to the rejection of executory contracts or unexpired leases, or as a result of the Bankruptcy Court's allowance of contingent or disputed claims.

Beginning January 1, 2006, Grace agreed to pay interest on pre-petition bank debt at the prime rate, adjusted for periodic changes, and compounded quarterly. The effective rate for 2006 was 7.96%. From the Filing Date through December 31, 2005, Grace accrued interest on pre-petition bank debt at a negotiated fixed annual rate of 6.09%, compounded quarterly.

### Chapter 11 expenses

| (In millions) | 2006 | 2005 | 2004 |
|---|---|---|---|
| Legal and financial advisory fees | $57.9 | $38.4 | $20.3 |
| Interest income | (8.0) | (7.5) | (2.3) |
| Chapter 11 expenses, net | $49.9 | $30.9 | $18.0 |

CC-BLG003299

Pursuant to SOP 90-7, interest income earned on the Debtors' cash balances must be offset against Chapter 11 expenses.

F- 18

CC-BLG003300

*Condensed financial information of the Debtors*

## W. R. Grace & Co.—Chapter 11 Filing Entities
**Debtor-in-Possession Statements of Operation**

| *(In millions) (Unaudited)* | 2006 | 2005 | 2004 |
|---|---|---|---|
| Net sales, including intercompany | $ 1,425.0 | $ 1,267.2 | $ 1,165.4 |
| Cost of goods sold, including intercompany, exclusive of depreciation and amortization shown separately below | 1,037.4 | 896.0 | 768.7 |
| Selling, general and administrative expenses, exclusive of net pension expense shown separately below | 336.9 | 276.1 | 258.6 |
| Research and development expenses | 40.8 | 38.4 | 34.6 |
| Depreciation and amortization | 58.6 | 65.2 | 61.4 |
| Net pension expense | 46.3 | 51.9 | 45.9 |
| Interest expense and related financing costs | 72.7 | 54.7 | 110.7 |
| Other (income) expense, net | (89.6) | (107.3) | (74.0) |
| Provision for environmental remediation | 30.0 | 25.0 | 21.6 |
| Provision for asbestos-related litigation, net of insurance | — | — | 476.6 |
| Chapter 11 expenses, net of interest income | 49.8 | 30.7 | 18.0 |
| | 1,582.9 | 1,330.7 | 1,722.1 |
| Income (loss) before income taxes and equity in net income of non-filing entities | (157.9) | (63.5) | (556.7) |
| Benefit from (provision for) income taxes | 33.0 | 15.0 | 44.8 |
| Income (loss) before equity in net income of non-filing entities | (124.9) | (48.5) | (511.9) |
| Equity in net income of non-filing entities | 143.2 | 115.8 | 109.6 |
| **Net income (loss)** | $ 18.3 | $ 67.3 | $ (402.3) |

Year Ended December 31,

## W. R. Grace & Co.—Chapter 11 Filing Entities Debtor-in-Possession
**Condensed Statements of Cash Flows**

| *(In millions) (Unaudited)* | 2006 | 2005 | 2004 |
|---|---|---|---|
| **Operating Activities** | | | |
| Income (loss) before net Chapter 11 expenses, income taxes, and equity in net income of non-filing entities | $ (108.1) | $ (32.8) | $ (538.7) |
| Reconciliation to net cash provided by (used for) operating activities: | | | |
| Non-cash items, net | 159.5 | 135.8 | 667.2 |
| Contributions to defined benefit pension plans | (106.6) | (35.0) | (24.2) |
| Cash paid to resolve contingencies subject to Chapter 11 | — | (119.7) | — |
| Changes in other assets and liabilities, excluding the effect of businesses acquired/divested | (19.0) | (63.6) | 88.7 |
| **Net cash provided by (used for) operating activities** | (74.2) | (115.3) | 193.0 |
| **Net cash provided by (used for) investing activities** | 17.1 | 44.2 | 28.4 |
| **Net cash provided by (used for) financing activities** | 21.7 | 0.3 | (1.9) |
| **Net increase (decrease) in cash and cash equivalents** | (35.4) | (70.8) | 219.5 |
| Cash and cash equivalents, beginning of period | 269.2 | 340.0 | 120.5 |
| Cash and cash equivalents, end of period | $ 233.8 | $ 269.2 | $ 340.0 |

Year Ended December 31,

F- 19

CC-BLG003301

**W. R. Grace & Co.—Chapter 11 Filing Entities**
**Debtor-in-Possession Balance Sheets**
*(In millions) (Unaudited)*

| | December 31, | |
|---|---|---|
| | **2006** | **2005** |
| **ASSETS** | | |
| **Current Assets** | | |
| Cash and cash equivalents | $ 233.8 | $ 269.2 |
| Trade accounts receivable, net | 117.9 | 108.0 |
| Receivables from non-filing entities, net | 53.2 | 62.3 |
| Inventories | 72.9 | 86.8 |
| Other current assets | 60.9 | 52.0 |
| **Total Current Assets** | 538.7 | 578.3 |
| | | |
| Properties and equipment, net | 394.5 | 378.9 |
| Cash value of life insurance policies, net of policy loans | 89.2 | 84.8 |
| Deferred income taxes | 687.1 | 702.5 |
| Asbestos-related insurance | 500.0 | 500.0 |
| Loans receivable from non-filing entities, net | 237.7 | 306.9 |
| Investment in non-filing entities | 660.3 | 527.9 |
| Other assets | 90.8 | 79.3 |
| **Total Assets** | $ 3,198.3 | $ 3,158.6 |
| | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT)** | | |
| **Liabilities Not Subject to Compromise** | | |
| Current liabilities | $ 212.0 | $ 187.3 |
| Minority interest in consolidated entities | 58.4 | 32.6 |
| Other liabilities | 256.1 | 378.9 |
| **Total Liabilities Not Subject to Compromise** | 526.5 | 598.8 |
| **Liabilities Subject to Compromise** | 3,221.6 | 3,155.1 |
| **Total Liabilities** | 3,748.1 | 3,753.9 |
| **Shareholders' Equity (Deficit)** | (549.8) | (595.3) |
| **Total Liabilities and Shareholders' Equity (Deficit)** | $ 3,198.3 | $ 3,158.6 |

In addition to Grace's financial reporting obligations as prescribed by the SEC, the Debtors are also required, under the rules and regulations of the Bankruptcy Code, to periodically file certain statements and schedules and a monthly operating report with the Bankruptcy Court. This information is available to the public through the Bankruptcy Court. This information is prepared in a format that may not be comparable to information in Grace's quarterly and annual financial statements as filed with the SEC. The monthly operating reports are not audited, do not purport to represent the financial position or results of operations of Grace on a consolidated basis, and should not be relied on for such purposes.

### 3. Asbestos-Related Litigation

Grace is a defendant in property damage and personal injury lawsuits relating to previously sold asbestos-containing products. As of the Filing Date, Grace was a defendant in 65,656 asbestos-related lawsuits, 17 involving claims for property damage (one of which has since been dismissed), and the remainder involving 129,191 claims for personal injury. Due to the Filing, holders of asbestos-related claims are stayed from continuing to prosecute pending litigation and from commencing new lawsuits against the Debtors. Separate creditors' committees representing the interests of property damage and personal injury claimants, and a legal representative of future personal injury claimants, have been appointed in the Chapter 11 Cases. Grace's obligations with respect to present and future claims will be determined through the Chapter 11 process.

*Property Damage Litigation* —The plaintiffs in asbestos property damage lawsuits generally seek to have the defendants pay for the cost of removing, containing or repairing the asbestos-containing materials in the affected buildings. Various factors can affect the merit and value of property damage claims, including legal defenses, product identification, the amount and type of product involved, the age, type, size and use of the building, the legal status of the claimant, the jurisdictional history of prior cases, the court in which the case is pending, and the difficulty of asbestos abatement, if necessary.

CC-BLG003302

Out of 380 asbestos property damage cases (which involved thousands of buildings) filed prior to the Filing Date, 140 were dismissed without payment of any damages or settlement amounts; judgments after trial were entered in favor of Grace in nine cases (excluding cases settled following appeals of judgments in favor of Grace); judgments after trial were entered in favor of the plaintiffs in eight cases (one of which is on appeal) for a total of $86.1 million; 207 property damage cases were settled for a total of $696.8 million; and 16 cases remain outstanding (including the one on appeal). Of the 16 remaining cases, eight relate to ZAI and eight relate to a number of former asbestos-containing products (two of which also are alleged to involve ZAI).

Approximately 4,300 additional property damage claims were filed prior to the March 31, 2003 claims bar date established by the Bankruptcy Court. (The bar date did not apply to ZAI claims.) Such claims were reviewed in detail by Grace, categorized into claims with sufficient information to be evaluated or claims that require additional information and, where sufficient information existed, the estimated cost of resolution was considered as part of Grace's recorded asbestos-related liability. (Approximately 200 claims did not contain sufficient information to permit an evaluation.) Grace has objected to virtually all property damage claims on a number of different bases, including: no authorization to file a claim; the claim was previously settled or adjudicated; no or insufficient documentation; failure to identify a Grace product; the expiration of the applicable statute of limitations and/or statute of repose, and/or laches; and a defense that the product in place is not hazardous. As of January 31, 2007, following the reclassification, withdrawal or expungement of claims, approximately 625 property damage claims remain outstanding.

Eight of the ZAI cases were filed as purported class action lawsuits in 2000 and 2001. In addition, ten lawsuits were filed as purported class actions in 2004 and 2005 with respect to persons and homes in Canada. These cases seek damages and equitable relief, including the removal, replacement and/or disposal of all such insulation. The plaintiffs assert that this product is in millions of homes and that the cost of removal could be several thousand dollars per home. As a result of the Filing, the eight U.S. cases have been stayed.

Based on Grace's investigation of the claims described in these lawsuits, and testing and analysis of this product by Grace and others, Grace believes that the product was and continues to be safe for its intended purpose and poses little or no threat to human health. The plaintiffs in the ZAI lawsuits (and the U.S. government in the Montana criminal proceeding described in Note 14) dispute Grace's position on the safety of ZAI. On October 18, 2004, the Bankruptcy Court held a hearing on motions filed by the parties to address a number of important legal and factual issues regarding the ZAI claims. On December 14, 2006, the Bankruptcy Court issued an opinion and order holding that, although Grace ZAI is contaminated with asbestos and can release asbestos fibers when disturbed, there is no unreasonable risk of harm from ZAI. The ZAI claimants intend to appeal such opinion and order. The Bankruptcy Court has scheduled a conference in April 2007 to consider whether any of the claimant's theories of liability still need to be addressed and what claims, if any, may still remain. Grace's recorded asbestos-related liability at December 31, 2006 assumes the risk of loss from ZAI litigation is not probable. If Grace's view as to risk of loss is not sustained, management believes the cost to resolve the matter would be material.

*Personal Injury Litigation* —Asbestos personal injury claimants allege adverse health effects from exposure to asbestos-containing products formerly manufactured by Grace. Historically, Grace's cost to resolve such claims has been influenced by numerous variables, including the nature of the disease alleged, product identification, negotiation factors, the solvency of other former producers of asbestos containing products, cross-claims by co-defendants, the rate at which new claims are filed, the jurisdiction in which the claims are filed, and the defense and disposition costs associated with these claims.

Cumulatively through the Filing Date, 16,354 asbestos personal injury lawsuits involving approximately 35,720 claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Grace

CC-BLG003303

products were not involved) and approximately 55,489 lawsuits involving approximately 163,698 claims were disposed of (through settlements and judgments) for a total of $645.6 million. As of the Filing Date, 129,191 claims for personal injury were pending against Grace. Grace believes that a substantial number of additional personal injury claims would have been received between the Filing Date and December 31, 2006 had such claims not been stayed by the Bankruptcy Court.

*Asbestos-Related Liability* —The total recorded asbestos-related liability as of December 31, 2006 and 2005 was $1,700.0 million and is included in "liabilities subject to compromise" in the accompanying Consolidated Balance Sheets. Grace adjusted its asbestos-related liability in the fourth quarter of 2004 based on its proposed plan of reorganization as discussed in Note 2. The amount recorded at December 31, 2006 and 2005 includes the $1,613 million maximum amount reflected as a condition precedent to the Plan and $87 million related to pre-Chapter 11 contractual settlements and judgments included in general unsecured claims.

Under the Plan, Grace is requesting that the Bankruptcy Court determine the aggregate dollar amount, on a net present value basis, that must be funded on the effective date of the Plan into an asbestos trust (established under Section 524(g) of the Bankruptcy Code) to pay all asbestos-related personal injury and property damage claims (including ZAI) entitled to payment under the Plan and related trust administration costs and expenses on the later of the effective date of the Plan or when allowed (the "Funding Amount"). It is a condition to confirmation of the Plan that the Bankruptcy Court shall conclude that the Funding Amount is not greater than $1,613 million. This amount, which should be sufficient to fund over $2 billion in pending and future claims, was based in part on Grace's 2004 evaluation of (1) existing but unresolved personal injury and property damage claims, (2) actuarially-based estimates of future personal injury claims, (3) the risk of loss from ZAI litigation, (4) proposed claim payments reflected in the Plan, and (5) the cost of the trust administration and litigation. Based upon these and other factors, Grace was prepared to settle its asbestos-related claims at this amount as part of a consensual plan of reorganization. As part of the estimation and litigation process, the amounts proposed to or adopted by the Bankruptcy Court may be materially different than this amount.

The Bankruptcy Court has entered separate case management orders for estimating liability for pending and future personal injury claims and adjudicating pending property damage claims, excluding ZAI claims. Trial dates for estimating liability for personal injury claims are currently scheduled to begin in September 2007. Hearings for the adjudication of various issues regarding property damage claims are currently scheduled to take place during the second quarter of 2007. The Debtors expect that the estimated liability will provide the basis for determining the Funding Amount to be paid into the trust on the effective date of the Plan.

For personal injury claims, the Bankruptcy Court has ordered that all claimants with claims pending as of the Filing Date (other than settled but unpaid claims) must complete detailed questionnaires providing information on, among other things, their medical condition, including diagnostic support, exposure to Grace and non-Grace asbestos-containing products, employment history, and pending lawsuits against other companies. The Bankruptcy Court required questionnaires to be completed on or before July 12, 2006 and supplemental questionnaires to be completed on or before January 12, 2007.

The Bankruptcy Court has also established procedures and deadlines for filing proofs of claims for asbestos personal injury claims pending as of the Filing Date. Claimants asserting claims subject to enforceable written settlement agreements dated prior to the Filing Date, which have not been fully paid or satisfied, were required to file proofs of claim by October 16, 2006. Claimants asserting claims that are not subject to such settlement agreements were required to file proofs of claim by November 15, 2006.

F- 22

CC-BLG003304

Grace is cataloguing, analyzing and reconciling the information furnished with the proofs of claim and questionnaires. Grace expects that the estimation process for personal injury claims will include the compilation of data from the questionnaires, review and analysis of such data by experts, the preparation of expert reports, including estimates of the number of personal injury claims expected to be filed in the future, and depositions of witnesses and other pretrial discovery proceedings. Grace expects the process to conclude with the estimation hearing that is currently scheduled to begin in September 2007. Grace expects to adjust its recorded asbestos-related liability as necessary to reflect rulings made by the Bankruptcy Court following the estimation trial after consideration of all evidence presented by Grace, the official committees and the representative of future asbestos claimants; such adjustments may be material.

For property damage claims, the case management order provides that estimation will be preceded by litigation on certain common threshold issues affecting a substantial majority of claims. Such litigation will consist of determining, among other things, (1) whether asbestos-containing products formerly manufactured by Grace are hazardous in place, and (2) compliance with the applicable statute of limitations. Grace will also ask the Bankruptcy Court to rule on Grace's specific objections to individual claims and groups of claims.

The Funding Amount will primarily be a function of the number of property damage and personal injury claims entitled to be paid under the Plan, and the amount payable per claim. Through the estimation process, Grace will seek to demonstrate that most claims have no value because they fail to establish any material property damage, health impairment or significant occupational exposure to asbestos from Grace's operations or products. If the Bankruptcy Court agrees with Grace's position on the number of, and the amounts to be paid in respect of, allowed personal injury and property damage claims, then Grace believes that the Funding Amount could be less than $1,613 million. However, this outcome is highly uncertain and will depend on a number of Bankruptcy Court rulings favorable to Grace's position.

Conversely, the asbestos claimants committees and the representative of future asbestos claimants continue to assert that Grace's asbestos-related liabilities are substantially higher than $1,613 million, and in fact are in excess of Grace's business value. If the Court accepts the position of the asbestos claimants committees, then any plan of reorganization likely would result in the loss of all or substantially all equity value by current shareholders. Therefore, due to the significant uncertainties of this process and asbestos litigation generally, Grace is not able to estimate a probable Funding Amount that would be accepted by the Bankruptcy Court.

However, as Grace is willing to proceed with confirmation of the Plan with a Funding Amount of up to $1,613 million (assuming that other conditions precedent to confirmation of the Plan are satisfied, including the availability of the payment from Cryovac directly to the asbestos trust under the settlement agreement described in Note 2), during the fourth quarter of 2004, Grace accrued a charge of $714.8 million to increase its recorded asbestos-related liability to reflect the maximum amount allowed as a condition precedent under the Plan. This amount, plus $87.0 million for pre-Chapter 11 contractual settlements and judgments, brings the total recorded asbestos-related liability as of December 31, 2006 and 2005 to $1,700 million. Any differences between the Plan as filed and as approved for confirmation could fundamentally change the accounting measurement of Grace's asbestos-related liability and that change could be material.

*Insurance Rights* —Grace previously purchased insurance policies that provided coverage for years 1962 to 1985 with respect to asbestos-related lawsuits and claims. For the most part, coverage for years 1962 through 1972 has been exhausted, leaving coverage for years 1973 through 1985 available for pending and future asbestos claims. Since 1985, insurance coverage for asbestos-related liabilities has not been commercially available to Grace.

With one exception, coverage disputes regarding Grace's primary insurance policies have been settled, and the settlement amounts paid in full. Grace's excess coverage is for loss above certain levels. The levels vary from policy to policy, creating "layers" of excess coverage, some of which are triggered before others.

Grace has entered into settlement agreements with various excess insurance carriers. These settlements involve amounts paid and to be paid to Grace. The unpaid maximum aggregate amount for settled insurers available under these settlement

CC-BLG003305

agreements is approximately $487 million. With respect to asbestos-related personal injury claims, the settlement agreements generally require that the claims be spread over the claimant's exposure period and that each insurer pay a pro rata portion of each claim based on the amount of coverage provided during each year of the total exposure period.

Presently, Grace has no agreements in place with insurers with respect to approximately $430 million of excess coverage, which is at layers of coverage that have not yet been triggered, but certain layers would be triggered if the Plan were approved at the recorded asbestos-related liability of $1,700 million. Grace believes that any allowed ZAI claims also would be covered under the settlement agreements and unsettled policies discussed above to the extent they relate to installations of ZAI occurring after July 1, 1973.

In addition, Grace has approximately $253 million of excess coverage with insolvent or non-paying insurance carriers. Non-paying carriers are those that, although technically solvent, are not currently meeting their obligations to pay claims. Grace has filed and continues to file claims in the insolvency proceedings of insolvent carriers. Grace is currently receiving distributions from some of these insolvent carriers and expects to receive distributions in the future. Settlement amounts are recorded as income when received.

In November 2006, Grace entered into a settlement agreement with an underwriter of a portion of its excess insurance coverage. The insurer paid a settlement amount of $90 million directly to an escrow account for the benefit of the holders of claims for which Grace was provided coverage under the affected policies. Funds will be distributed from this account directly to claimants at the direction of the escrow agent pursuant to the terms of a confirmed plan of reorganization or as otherwise ordered by the Bankruptcy Court. Grace will record the amount in the escrow account as an asset and reduce its asbestos insurance receivable balance when all contingencies for the release of such amount are satisfied.

As of December 31, 2006, including the settlement discussed above and after subtracting previous reimbursements by insurers and allowing for discounts pursuant to certain settlement agreements, there remains approximately $917 million of excess coverage from 55 presently solvent insurers. Grace estimates that, assuming the resolution value of asbestos-related claims equal to the recorded liability of $1,700 million (which should fund claim payments in excess of $2 billion), it should be entitled to approximately $500 million of insurance recovery. This amount was determined by estimating the aggregate and per year payout for claims over time and applying the expected insurance recovery factor to such claims. However, the ultimate amount of insurance recovered on such claims will depend on a number of factors that can only be determined at the time claims are paid including: the nature of the claim (PI, PD or ZAI), the relevant exposure years, the timing of payment, the solvency of insurers and the legal status of policy rights. Accordingly, Grace's recorded estimate of insurance recovery may differ from actual amounts received.

## 4.   Income Taxes

The components of income (loss) from consolidated operations before income taxes and the related benefit from (provision for) income taxes for 2006, 2005, and 2004 are as follows:

**Income Taxes—Consolidated Operations**
*(In millions)*

|  | 2006 | 2005 | 2004 |
|---|---|---|---|
| Income (loss) before income taxes: |  |  |  |
| Domestic | $ (96.6) | $  10.5 | $ (549.3) |
| Foreign | 150.1 | 142.3 | 148.1 |
| Intercompany eliminations | (27.1) | (64.2) | (2.6) |
|  | $  26.4 | $  88.6 | $ (403.8) |
| Benefit from (provision for) income taxes: |  |  |  |
| Federal—current | $  (8.5) | $   5.1 | $   32.1 |
| Federal—deferred | 41.8 | 13.8 | 14.8 |
| State and local—current | (1.4) | (1.0) | (0.3) |
| Foreign—current | (43.0) | (47.5) | (25.1) |
| Foreign—deferred | 3.0 | 8.3 | (20.0) |
|  | $  (8.1) | $  (21.3) | $   1.5 |

At December 31, 2006 and 2005, the tax attributes giving rise to deferred tax assets and liabilities consisted of the following items:

F- 24

CC-BLG003306

**Deferred Tax Analysis**
*(In millions)*

| | 2006 | 2005 |
|---|---|---|
| **Deferred tax assets:** | | |
| Liability for asbestos-related litigation | $ 595.0 | $ 595.0 |
| Net operating loss/credit carryforwards | 133.8 | 106.9 |
| Deferred state taxes | 146.9 | 152.3 |
| Liability for environmental remediation | 126.4 | 119.6 |
| Other postretirement benefits | 29.7 | 35.5 |
| Reserves and allowances | 38.6 | 37.3 |
| Research and development | 33.3 | 32.8 |
| Pension liabilities | 152.5 | 145.8 |
| Foreign loss/credit carryforwards | 24.8 | 31.8 |
| Accrued interest on pre-petition debt | 56.8 | 42.5 |
| Other | 5.4 | 6.0 |
| Total deferred tax assets | 1,343.2 | 1,305.5 |
| **Deferred tax liabilities:** | | |
| Asbestos-related insurance receivable | (180.5) | (180.5) |
| Deferred foreign and other income | (111.6) | (74.5) |
| Pension assets | (41.0) | (32.8) |
| Properties and equipment | (60.5) | (69.3) |
| Other | (63.7) | (60.5) |
| Total deferred tax liabilities | (457.3) | (417.6) |
| **Valuation allowance:** | | |
| Deferred state taxes | (146.9) | (152.3) |
| Net federal tax assets | (21.7) | (70.7) |
| Foreign loss carryforwards | (16.6) | (22.3) |
| Total valuation allowance | (185.2) | (245.3) |
| Net deferred tax assets | $ 700.7 | $ 642.6 |

The deferred tax asset valuation allowance of $185.2 million at December 31, 2006 consists of: (i) $146.9 million related to net deferred state tax assets associated with current state carryforwards and future tax deductions, (ii) $16.6 million related to foreign loss carryforwards that are likely to expire unutilized, and (iii) $21.7 million related to foreign tax credit, general business credit and alternative minimum tax credit carryforwards that exceed Grace's analysis of the amounts reasonably expected to be realized in the future. The change in the valuation allowance from December 31, 2005 to 2006 primarily represents a $48.0 million reduction in the allowance related to future U.S. Federal income tax deductions as a result of Grace's current forecasts of future U.S. taxable income. Based upon anticipated future results, Grace has concluded that it is more likely than not that the balance of the net deferred tax assets, after consideration of the valuation allowance, will be realized. Because of the nature of the items that make up this balance, the realization period is likely to extend over a number of years and the outcome of the Chapter 11 Cases could materially impact the amount and the realization period.

At December 31, 2006, there were $190.9 million of U.S. federal net operating loss carryforwards, representing deferred tax assets of $66.8 million, with expiration dates through 2026; $4.2 million of foreign tax credit carryforwards with expiration dates through 2015; $16.3 million of general business credit carryforwards with expiration dates through 2025; and $46.5 million of alternative minimum tax credit carryforwards with no expiration dates.

As part of Grace's evaluation and planning for the funding requirements of its plan of reorganization, Grace has concluded that the financing of the Plan will likely involve cash and financing from non-U.S. subsidiaries. Grace anticipates that approximately $680 million will be sourced in this manner. Approximately $190 million can be repatriated by way of intercompany debt repayments and the remaining $490 million by way of taxable dividends and return of capital. Accordingly, Grace recorded a deferred tax liability to recognize the expected taxable elements of financing its plan of reorganization, $42 million of which was accrued in 2006. Grace has not provided for U.S. federal, state, local and foreign deferred income taxes on approximately $220 million of undistributed earnings of foreign subsidiaries that are expected to be retained indefinitely by such subsidiaries for reinvestment.

The difference between the benefit from (provision for) income taxes at the federal income tax rate of 35% and Grace's overall income tax provision is summarized as follows:

**Income Tax Benefit (Provision) Analysis**
*(In millions)*

| | 2006 | 2005 | 2004 |
|---|---|---|---|
| Tax benefit (provision) at federal corporate rate | $ (9.2) | $ (31.0) | $ 141.3 |
| Change in provision resulting from: | | | |
| Nontaxable income/non-deductible expenses | (1.9) | (1.5) | — |
| State and local income taxes, net of federal income tax benefit | (6.1) | 11.1 | 13.0 |
| Federal and foreign taxes on foreign operations | (45.2) | (1.6) | (93.6) |
| Change in valuation allowance on deferred tax assets | 60.1 | (2.7) | (59.4) |
| Chapter 11 expenses (non-deductible) | (16.9) | (10.3) | (6.0) |

CC-BLG003307

| | | | |
|---|---|---|---|
| Tax and interest relating to tax deductibility of interest on life insurance policy loans (See Note 14) | 1.4 | 1.2 | (1.8) |
| Adjustments to tax and interest contingencies | 9.7 | 13.5 | 8.0 |
| Income tax benefit from (provision for) continuing operations | $  (8.1) | $ (21.3) | $  1.5 |

CC-BLG003308

**5.   Acquisitions and Joint Ventures**

In June 2006, Grace acquired the custom catalyst manufacturing assets of Basell, USA, as well as Basell's components business for cash consideration of $19.6 million. The manufacturing assets and the results of operations of the acquired business have been included as part of the Grace Davison operating segment since the date of acquisition. Grace recorded $9.7 million of goodwill as a result of this transaction.

In 2005, Grace completed four business combinations for a total cash cost of $5.5 million as follows:

- In February 2005, Grace acquired certain assets of Midland Dexter Venezuela, S.A., a supplier of coatings and sealants for rigid packaging to the local and export markets of Latin America.

- In March 2005, Grace acquired certain assets relating to the concrete admixtures business of Perstorp Peramin AB ("Perstorp"), a supplier of specialty chemicals and materials to the construction industry in Sweden and other Northern European countries.

- In November 2005, Grace acquired certain assets of Single-Site Catalysts, LLC, a supplier of organometallic catalysts, serving a variety of industries, including polyolefins and elastomers, with headquarters in Chester, Pennsylvania.

- In November 2005, Grace acquired Flexit Laboratories Pvt. Ltd., a supplier of chromatography products based in India.

Goodwill recognized in the 2005 transactions amounted to $1.5 million, of which $1.3 million was assigned to Grace Davison and $0.2 million was assigned to Grace Performance Chemicals.

**6.   Other (Income) Expense, net**

Components of other (income) expense, net are as follows:

| Other (Income) Expense, net<br>*(In millions)* | 2006 | 2005 | 2004 |
|---|---|---|---|
| Income from insurance settlements | $(12.5) | $(44.5) | $(11.1) |
| COLI income, net | (4.1) | (3.5) | (3.0) |
| Interest income | (7.0) | (3.6) | (3.1) |
| Net (gain) loss on sales of investments and disposals of assets | (0.6) | 0.7 | 0.8 |
| Currency translation—intercompany loan | (23.1) | 35.9 | (29.3) |
| Value of currency contracts | 21.5 | (35.7) | 39.5 |
| Other currency transaction effects | 3.3 | (0.1) | 1.4 |
| Net gain from litigation settlement | — | — | (51.2) |
| Other miscellaneous income | (11.8) | (16.6) | (12.4) |
| Total other (income) expense, net | $(34.3) | $(67.4) | $(68.4) |

Income from insurance settlements represents amounts paid by insurance carriers with respect to coverage for past environmental remediation costs and asbestos-related liability under liquidation arrangements or dispute settlements. The increased other miscellaneous income for the year ended December 31, 2005 as compared to the other periods presented represents the favorable impact from prepayment of a royalty obligation ($5.2 million) and an insurance recovery for business interruption losses incurred as a result of Hurricane Rita ($2.7 million).

In 2004, Grace recorded a net gain of $51.2 million as a result of the settlement of litigation with Honeywell International, Inc. related to environmental contamination of a non-operating parcel of land.

**7.   Goodwill and Other Intangible Assets**

For the purpose of measuring impairment under the provisions of SFAS No. 142, Grace has identified its reporting units as the product groups at one level below its operating segments. Grace has evaluated goodwill annually as of November 30 with no impairment charge required in any of the periods presented.

CC-BLG003309

The carrying amount of goodwill attributable to each operating segment and the changes in those balances during the year ended December 31, 2006 are as follows:

| (In millions) | Grace Davison | Grace Performance Chemicals | Total Grace |
|---|---|---|---|
| Balance as of December 31, 2005 | $ 36.3 | $ 67.6 | $ 103.9 |
| Goodwill acquired during the year | 9.7 | — | 9.7 |
| Foreign currency translation / other adjustments | 1.9 | 1.0 | 2.9 |
| Balance as of December 31, 2006 | $ 47.9 | $ 68.6 | $ 116.5 |

Grace's net book value of other intangible assets at December 31, 2006 and December 31, 2005 was $84.9 million and $87.6 million, respectively, detailed as follows:

| | As of December 31, 2006 | |
|---|---|---|
| (In millions) | Gross Carrying Amount | Accumulated Amortization |
| Technology | $ 43.6 | $ 15.7 |
| Patents | 1.6 | 0.6 |
| Customer lists | 52.3 | 16.3 |
| Other | 28.0 | 8.0 |
| Total | $ 125.5 | $ 40.6 |

| | As of December 31, 2005 | |
|---|---|---|
| (In millions) | Gross Carrying Amount | Accumulated Amortization |
| Technology | $ 48.9 | $ 12.1 |
| Patents | 0.4 | 0.3 |
| Customer lists | 46.3 | 11.3 |
| Other | 21.4 | 5.7 |
| Total | $ 117.0 | $ 29.4 |

At December 31, 2006, estimated future annual amortization expenses for intangible assets are:

**Estimated Amortization Expense**
*(In millions)*

| | |
|---|---|
| 2007 | $9.6 |
| 2008 | 9.5 |
| 2009 | 9.4 |
| 2010 | 9.0 |
| 2011 | 9.0 |

8.  **Comprehensive Income (Loss)**

The tables below present the pre-tax, tax and after tax components of Grace's other comprehensive income (loss) for the years ended December 31, 2006, 2005 and 2004:

| Year Ended December 31, 2006 (In millions) | Pre-Tax Amount | Tax Benefit / (Expense) | After Tax Amount |
|---|---|---|---|
| Minimum pension liability adjustments | $ 107.5 | $ (37.6) | $ 69.9 |
| Gain (loss) from hedging activities | (1.9) | 0.6 | (1.3) |
| Foreign currency translation adjustments | 36.8 | — | 36.8 |
| Other comprehensive income (loss) | $ 142.4 | $ (37.0) | $ 105.4 |

| Year Ended December 31, 2005 (In millions) | Pre-Tax Amount | Tax Benefit | After Tax Amount |
|---|---|---|---|
| Minimum pension liability adjustments | $ (23.5) | $ 8.3 | $ (15.2) |
| Foreign currency translation adjustments | (28.7) | — | (28.7) |
| Other comprehensive income (loss) | $ (52.2) | $ 8.3 | $ (43.9) |

| Year Ended December 31, 2004 (In millions) | Pre-Tax Amount | Tax Benefit | After Tax Amount |
|---|---|---|---|
| Minimum pension liability adjustments | $ (126.2) | $ 44.2 | $ (82.0) |
| Foreign currency translation adjustments | 21.9 | — | 21.9 |
| Other comprehensive income (loss) | $ (104.3) | $ 44.2 | $ (60.1) |

CC-BLG003310

F- 27

CC-BLG003311

| Components of Accumulated Other<br>Comprehensive Income (Loss), Net of Tax<br>( In millions) | Foreign currency<br>translation<br>adjustment | Gain (loss)<br>from hedging<br>activities | Pension<br>accounting | Total<br>accumulated<br>other<br>comprehensive<br>loss |
|---|---|---|---|---|
| Balance as of December 31, 2004 | $ (2.5) | $ — | $ (347.5) | $ (350.0) |
| Current-period change | (28.7) | | (15.2) | (43.9) |
| Balance as of December 31, 2005 | (31.2) | — | (362.7) | (393.9) |
| Current-period change | 36.8 | (1.3) | 69.9 | 105.4 |
| Adoption of SFAS 158 (See Note 18) | — | | (102.3) | (102.3) |
| **Balance as of December 31, 2006** | $ 5.6 | $ (1.3) | $ (395.1) | $ (390.8) |

From time to time, Grace enters into commodity derivatives such as forward contracts or option contracts directly with natural gas suppliers, and fixed-rate swaps with financial institutions to mitigate the risk of volatility of natural gas prices in the United States. Under fixed-rate swaps, Grace locks in a fixed rate with a financial institution for future natural gas purchases, purchases its natural gas from a supplier at the prevailing market rate, and settles with the bank for any difference in the rates, thereby "swapping" a variable rate for a fixed rate. In 2006, Grace purchased forward contracts, swaps and options for a portion of its expected natural gas requirements. Grace's forward contracts for natural gas qualify for the normal purchases and normal sales exception from SFAS No. 133, as they do not contain net settlement provisions, and result in physical delivery of natural gas from suppliers. Therefore, the fair values of these contracts are not recorded in the Consolidated Balance Sheets. The outstanding swaps and options are treated as effective cash flow hedges for accounting purposes and revalued at the end of each quarter, with corresponding adjustments to other comprehensive income (loss).

Grace is a global enterprise, which operates in over 40 countries with local currency generally deemed to be the functional currency for accounting purposes. The foreign currency translation amount represents the adjustments necessary to translate the balance sheets valued in local currencies to the U.S. dollar as of the end of each period presented, and to translate revenues and expenses at average exchange rates for each period presented. As part of its risk management program, Grace enters into foreign currency exchange rate forward and/or option contracts to mitigate the effects of exchange rate fluctuations. The outstanding foreign currency forward contracts and options were treated as effective cash flow hedges for accounting purposes and revalued at the end of each quarter, with corresponding adjustments to other comprehensive income (loss).

## 9. Other Balance Sheet Accounts

| (In millions) | 2006 | 2005 |
|---|---|---|
| **Inventories** [1] | | |
| Raw materials | $ 59.6 | $ 67.3 |
| In process | 41.4 | 32.8 |
| Finished products | 189.8 | 210.8 |
| General merchandise | 35.6 | 33.2 |
| Less: Adjustment of certain inventories to a LIFO basis [2] | (41.8) | (65.8) |
| | $284.6 | $278.3 |

---

[1] Inventories valued at LIFO cost comprised 48.2% of total inventories at December 31, 2006 and 52.3% at December 31, 2005.
[2] During 2006, a reduction in U.S. LIFO inventory levels resulted in costs pertaining to prior years being reflected in cost of sales for the 2006 year. This had the effect of increasing pre-tax income by $0.9 million compared with current cost.

| **Other Assets** | | |
|---|---|---|
| Deferred charges | $ 38.1 | $ 54.3 |
| Long-term receivables, less allowances of $0.5 (2005—$0.7) | 7.9 | 7.6 |
| Patents, licenses and other intangible assets, net | 84.9 | 87.6 |
| Investments in unconsolidated affiliates and other | 0.6 | 0.6 |
| | $131.5 | $150.1 |
| **Other Current Liabilities** | | |
| Accrued compensation | $ 90.4 | $ 72.2 |
| Customer volume rebates | 41.8 | 35.4 |
| Accrued commissions | 13.5 | 11.1 |
| Accrued reorganization fees | 24.9 | 18.0 |
| Income tax payable | 13.9 | 23.3 |
| Deferred tax liability | 6.7 | 0.8 |
| Other accrued liabilities | 81.4 | 60.4 |
| | $272.6 | $221.2 |
| **Other Liabilities** | | |
| Long-term self insurance reserve | $ 8.0 | $ 8.0 |
| Retained obligations of divested businesses | 5.3 | 5.3 |
| Long-term incentive compensation | 12.2 | 13.5 |
| Other accrued liabilities | 17.8 | 14.9 |
| | $ 43.3 | $ 41.7 |

CC-BLG003312

Accrued compensation in the table above includes salaries and wages as well as estimated current amounts due under the annual and long-term incentive programs.

## 10.    Properties and Equipment

| *(In millions)* | 2006 | 2005 |
|---|---|---|
| Land | $   22.4 | $   21.2 |
| Buildings | 440.4 | 425.0 |
| Information technology and equipment | 125.8 | 116.6 |
| Machinery, equipment and other | 1,513.8 | 1,454.7 |
| Projects under construction | 72.6 | 35.6 |
| Properties and equipment, gross | 2,175.0 | 2,053.1 |
| Accumulated depreciation and amortization | (1,510.5) | (1,420.2) |
| Properties and equipment, net | $  664.5 | $  632.9 |

Capitalized interest costs amounted to $1.2 million in 2006.  Capitalized interest costs were insignificant for 2005. Depreciation and lease amortization expense relating to properties and equipment amounted to $104.2 million in 2006, $111.9 million in 2005, and $108.2 million in 2004. Grace's rental expense for operating leases amounted to $18.6 million in 2006, $18.7 million in 2005, and $16.9 million in 2004.

F- 28

CC-BLG003313

At December 31, 2006, minimum future non-cancelable payments for operating leases were:

**Minimum Future Payments under Operating Leases**
*(In millions)*

| | |
|---|---|
| 2007 | $ 21.3 |
| 2008 | 16.8 |
| 2009 | 11.4 |
| 2010 | 8.6 |
| 2011 | 4.0 |
| Thereafter | 7.7 |
| Total minimum lease payments | $ 69.8 |

The above minimum non-cancelable lease payments are net of anticipated sublease income of $2.4 million in 2007, $2.0 million in 2008, $1.7 million in 2009, $0.9 million in 2010, and $0.6 million in 2011.

### 11.    Life Insurance

Grace is the beneficiary of corporate-owned life insurance ("COLI") policies on certain current and former employees with net cash surrender values of $89.2 million and $84.8 million at December 31, 2006 and 2005, respectively. The policies were acquired to fund various employee benefit programs and other long-term liabilities and are structured to provide cash flow (primarily tax-free) over an extended number of years.

The following tables summarize activity in these policies for 2006, 2005 and 2004, and the components of net cash value at December 31, 2006 and 2005:

**Life Insurance—Activity Summary**
*(In millions)*

| | 2006 | 2005 | 2004 |
|---|---|---|---|
| Earnings on policy assets | $ 5.6 | $ 6.3 | $ 32.4 |
| Interest on policy loans | (1.5) | (2.8) | (29.4) |
| Premiums | 2.3 | 1.7 | 2.4 |
| Policy loan repayments | 0.1 | 0.6 | 4.0 |
| Proceeds from termination of life insurance policies | (0.3) | (14.8) | — |
| Net investing activity | (1.8) | (2.2) | (4.2) |
| Change in net cash value | $ 4.4 | $ (11.2) | $ 5.2 |
| Tax-free proceeds received | $ 2.3 | $ 2.2 | $ 15.8 |

**Components of Net Cash Value**
*(In millions)*

| | December 31, | |
|---|---|---|
| | 2006 | 2005 |
| Gross cash value | $ 114.7 | $ 109.2 |
| Principal—policy loans | (25.0) | (23.7) |
| Accrued interest—policy loans | (0.5) | (0.7) |
| Net cash value | $ 89.2 | $ 84.8 |
| Insurance benefits in force | $ 197.9 | $ 196.3 |

Grace's financial statements display income statement activity and balance sheet amounts on a net basis, reflecting the contractual interdependency of policy assets and liabilities.

In January 2005, Grace surrendered and terminated most of these life insurance policies and received approximately $14.8 million of net cash value from the termination. As a result of the termination, gross cash value of the policies was reduced by approximately $381 million and policy loans of approximately $365 million were satisfied. Grace's insurance benefits in force was reduced by approximately $2 billion.

### 12.    Debt

**Components of Debt**
*(In millions)*

| | 2006 | 2005 |
|---|---|---|
| **Debt payable within one year** | | |
| Other short-term borrowings [(1)] | $ 3.3 | $ 2.3 |
| **Debt payable after one year** | | |
| DIP facility [(2)] | $ — | $ — |
| Other long-term borrowings | 0.2 | 0.4 |
| | $ 0.2 | $ 0.4 |
| **Debt Subject to Compromise** | | |
| Bank borrowings [(3)] | $ 500.0 | $ 500.0 |
| Other borrowings [(4)] | 13.8 | 14.3 |
| Accrued interest [(5)(6)] | 225.7 | 170.4 |
| | $ 739.5 | $ 684.7 |
| Full-year weighted average interest rates on total debt | 7.9% | 6.1% |

[(1)] Represents borrowings under various lines of credit and other miscellaneous borrowings, primarily by non-U.S. subsidiaries.
[(2)] In April 2001, the Debtors entered into a debtor-in-possession post-petition loan and security agreement with Bank of America, N.A. (the "DIP facility") in the aggregate amount of $250 million. The DIP facility is secured by priority liens on substantially all assets of the Debtors, and bears interest based on LIBOR plus 2.00 to 2.25 percentage

CC-BLG003314

points. The Debtors have extended the term of the DIP facility through April 1, 2008. As of December 31, 2006 and 2005, the Debtors had no outstanding borrowings under the DIP facility. However, $55.4 million and $30.2 million of standby letters of credit were issued and outstanding under the facility as of December 31, 2006 and 2005, respectively, which were issued mainly for trade-related matters such as performance bonds, as well as certain insurance and environmental matters. The outstanding amount of standby letters of credit, as well as other holdback provisions issued under the DIP facility reduces the borrowing availability to $175.0 million. Under the DIP facility, the Debtors are required to maintain $50 million of liquidity, in a combination of cash, cash equivalents and the net cash value of life insurance policies.

(3)    Under bank revolving credit agreements in effect prior to the Filing, Grace could borrow up to $500

F-29

CC-BLG003315