million at interest rates based upon the prevailing prime, federal funds and/or Eurodollar rates. Of that amount, $250 million was available under short-term facilities expiring in May 2001, and $250 million was available under a long-term facility expiring in May 2003. As a result of the Filing, Grace was in default under the bank revolving credit agreements, and accordingly, the balance as of the Filing Date was reclassified to debt subject to compromise in the Consolidated Balance Sheet.

(4) Miscellaneous borrowings primarily consisting of U.S. mortgages.
(5) In the fourth quarter of 2004, Grace accrued $69.5 million to increase its estimate of interest to which holders of the Debtor's pre-petition bank credit facilities and letters of credit would be entitled under the Plan to 6.09%. Grace continued to accrue interest at this rate throughout 2005.
(6) Beginning January 1, 2006, Grace agreed to pay interest on pre-petition bank debt at the prime rate, adjusted for periodic changes and compounded quarterly; such rate averaged 7.96% over 2006.

Interest payments on pre-petition obligations amounted to $3.1 million in 2006, $2.3 million in 2005, and $2.1 million in 2004.

13. **Financial Instruments and Risk**

*Debt and Interest Rate Swap Agreements* — Grace was not a party to any debt or interest rate swaps at December 31, 2006 and December 31, 2005.

*Commodity Risk* —Certain raw materials and energy are commodities subject to price fluctuation. Grace hedges against volatility in certain raw material and energy purchases, using financial instruments as appropriate. Grace also enters into long term supply agreements and/or forward commitments to secure materials at stable prices and in quantities fully expected to be used in production. During 2006 and 2005, Grace entered into forward contracts with natural gas suppliers in the U.S. to manage the cost of a portion of quantities required for use at certain U.S. plants. In 2006, Grace entered into option agreements with natural gas suppliers to hedge purchases of natural gas, and also entered into fixed-price swaps with a financial institution to hedge its purchases of natural gas from suppliers.

*Currency Risk* —Because Grace does business in over 40 countries, results are exposed to fluctuations in foreign exchange rates. Grace seeks to minimize exposure to these fluctuations by matching revenue streams in volatile currencies with expenditures in the same currencies, but it is not always possible to do so. From time to time Grace will use financial instruments such as foreign currency forward contracts, options, or combinations of the two to reduce the risk of certain specific transactions. However, Grace does not have a policy of hedging all exposures, because management does not believe that such a level of hedging would be cost-effective, particularly translation exposures that are not expected to affect cash flows in the near term. In 2004, Grace purchased forward contracts to minimize currency risk related to euro denominated intercompany loans due to a U.S. subsidiary of Grace. In 2005, Grace extended the remaining portion of these forward currency contracts.

In February 2006, Grace adopted a currency risk management program. Pursuant to this program, Grace has entered into derivative instruments such as foreign currency forward contracts and options to hedge its exposure to foreign currency fluctuations in various currencies.

*Fair Value of Debt and Other Financial Instruments* — At December 31, 2006, the fair value of Grace's debt payable within one year not subject to compromise approximated the recorded value of $3.3 million. Fair value is determined based on expected future cash flows (discounted at market interest rates), quotes from financial institutions and other appropriate valuation methodologies. At December 31, 2006, the recorded values of other financial instruments such as cash, short-term investments, trade receivables and payables and short-term debt approximated their fair values, based on the short-term maturities and floating rate characteristics of these instruments. At December 31, 2006, the carrying value of Grace's bank debt subject to compromise was $739.5 million. The estimated fair value of the bank debt is higher than the carrying value; however, because such debt is subject to compromise in Grace's Chapter 11 proceeding, neither carrying values or market values may reflect ultimate liquidation amounts.

*Credit Risk* — Trade receivables potentially subject Grace to credit risk. Concentrations of credit to customers in the petroleum and construction industries represent the greatest exposure. Grace's credit evaluation policies, relatively short collection terms and history of minimal credit losses mitigate credit risk exposures. Grace does not generally require collateral for its trade accounts receivable, but may require a bank letter

CC-BLG003316

of credit in certain instances, particularly when selling to customers in cash restricted countries.

## 14. Commitments and Contingent Liabilities

*Asbestos-Related Liability* —See Note 3

*Environmental Remediation* — Grace is subject to loss contingencies resulting from extensive and evolving federal, state, local and foreign environmental laws and regulations relating to the generation, storage, handling, discharge and disposition of hazardous wastes and other materials. Grace accrues for anticipated costs associated with investigative and remediation efforts where an assessment has indicated that a probable liability has been incurred and the cost can be reasonably estimated. These accruals do not take into account any discounting for the time value of money.

Grace's environmental liabilities are reassessed whenever circumstances become better defined or remediation efforts and their costs can be better estimated. These liabilities are evaluated based on currently available information, including the progress of remedial investigation at each site, the current status of discussions with regulatory authorities regarding the method and extent of remediation at each site, existing technology, prior experience in contaminated site remediation and the apportionment of costs among potentially responsible parties. Grace expects that the funding of environmental remediation activities will be affected by the Chapter 11 proceedings.

At December 31, 2006, Grace's estimated liability for environmental investigative and remediation costs totaled $361.1 million, as compared with $342.0 million at December 31, 2005. The amount is based on funding and/or remediation agreements in place and Grace's best estimate of its cost for sites not subject to a formal remediation plan. Grace's estimated environmental liabilities are included in "liabilities subject to compromise" in the accompanying Consolidated Balance Sheets.

Grace recorded pre-tax charges of $30.0 million for environmental matters in 2006. Of the pre-tax charges, $28.0 million was in connection with a cost recovery claim brought by the U.S. Government and was based on additional information provided by the U.S. Department of Justice in support of spending by the U.S. Environmental Protection Agency ("EPA") during the 2002 through 2005 period, as described below. The remainder of the pre-tax charges were attributable to the ongoing review of recorded environmental liabilities.

Net cash expenditures charged against previously established reserves for the years ended December 31, 2006, 2005 and 2004 were $10.9 million, $28.0 million, and $9.0 million, respectively. Cash expenditures in 2005 included a settlement payment of $21.3 million related to a formerly owned site.

*Vermiculite Related Matters*

EPA Cost Recovery Claim —As a result of a 2002 district court ruling, Grace is required to reimburse the U.S. Government for $54.5 million (plus interest) in costs expended through December 2001, and for all appropriate future costs to complete asbestos-related remediation relating to Grace's former vermiculite mining and processing activities in the Libby, Montana area. These costs include cleaning and/or demolition of contaminated buildings, excavation and removal of contaminated soil, health screening of Libby residents and former mine workers, and investigation and monitoring costs.

Grace's total estimated liability for asbestos remediation related to its former vermiculite operations in Libby, including the cost of remediation at vermiculite processing sites outside of Libby, at December 31, 2006 and December 31, 2005 was $255.2 million and $226.2 million, respectively. The estimate of $255.2 million at December 31, 2006 includes $164.4 million for asserted reimbursable costs through 2005 (which includes the $54.5 million charge discussed above) that was recorded in the second quarter of 2006. The current estimate does not include the cost to remediate the Grace-owned mine site at Libby or other nearby properties that may require remediation, which costs are not currently estimable. Grace's estimate of costs is based on EPA spending data through December 31, 2005, public comments regarding the EPA's spending plans, discussions of spending forecasts with EPA representatives, analysis of other information made available from the EPA, and evaluation of probable remediation costs at vermiculite processing sites. However, the EPA's cost estimates have increased regularly and substantially over the course of this remediation. Consequently, as the EPA's spending on these matters increases, Grace's liability for remediation will increase. Grace has been

F-31

CC-BLG003317

informed that the EPA is attempting to estimate the future cost of this environmental remediation. This information may require Grace to increase its estimate of liability and the increase could be material.

Montana Criminal Proceeding —On February 7, 2005, the United States Department of Justice announced the unsealing of a grand jury indictment against Grace and seven current or former senior level employees *(United States of America v. W. R. Grace & Co. et al)* relating to Grace's former vermiculite mining and processing activities in Libby, Montana. The indictment accuses the defendants of (1) conspiracy to violate environmental laws and obstruct federal agency proceedings; (2) violations of the federal Clean Air Act; and (3) obstruction of justice.

Grace purchased the Libby mine in 1963 and operated it until 1990; vermiculite processing activities continued until 1992. The grand jury charges that the conspiracy took place from 1976 to 2002. According to the U.S. Department of Justice, Grace could be subject to fines in an amount equal to twice the after-tax profit earned from its Libby operations or twice the alleged loss suffered by victims, plus additional amounts for restitution to victims. The indictment alleges that such after-tax profits were $140 million. Grace has categorically denied any criminal wrongdoing and intends to vigorously defend itself at trial.

In March 2005, the U.S. District Court for the District of Montana entered a scheduling order setting a trial date of September 11, 2006. In July 2006, the District Court dismissed a portion of the conspiracy count of a superseding indictment alleging conspiracy to knowingly endanger residents of the Libby area and others in violation of the Clean Air Act. In August 2006, the District Court granted a motion by the defendants to exclude as evidence sample results that included minerals that do not constitute asbestos under the Clean Air Act. The Government has appealed these and other rulings to the Ninth Circuit Court of Appeals. As a result of the appeal, the trial has been delayed until September 2007 or later pending resolution of the appeals.

The U.S. Bankruptcy Court previously granted Grace's request to advance legal and defense costs to the employees, subject to a reimbursement obligation if it is later determined that the employees did not meet the standards for indemnification set forth under the appropriate state corporate law. For the years ended December 31, 2006 and 2005, total expense for Grace and the employees was $52.7 million and $20.0 million, respectively, which amounts are included in selling, general and administrative expenses in the accompanying Consolidated Statements of Operations.

Grace is unable to assess whether the indictment, or any conviction resulting therefrom, will have a material adverse effect on the results of operations or financial condition of Grace or affect Grace's bankruptcy proceedings. While the appeal is pending, Grace expects legal fees for this matter to be $3 million to $5 million per quarter. Grace intends to expense such costs as they are incurred.

New Jersey Lawsuit —On June 1, 2005, the New Jersey Department of Environmental Protection ("DEP") filed a lawsuit against Grace and two former employees in the Superior Court of New Jersey Law Division: Mercer County *(N.J. Dept. of Environmental Protection v. W.R. Grace & Co. et al.)* seeking civil penalties for alleged misrepresentations and false statements made in a Preliminary Assessment/Site Investigation Report and Negative Declarations submitted by Grace to the DEP in 1995 pursuant to the New Jersey Industrial Site Recovery Act. Grace submitted the report, which was prepared by an independent environmental consultant, in connection with the closing of Grace's former plant in Hamilton Township, New Jersey. Grace is also aware that the State of New Jersey and the U.S. Department of Justice each may be conducting criminal investigations related to Grace's former operations of the Hamilton plant.

Grace purchased the Hamilton plant assets in 1963 and ceased operations in 1994. During the operating period, Grace produced spray-on fire protection products and vermiculite-based products at this plant. The current property owners are conducting remediation activities as directed by the EPA. The property owners and the EPA have filed proofs of claim against Grace for this site and now seek approximately $3.4 million with respect to the Hamilton plant site.

Grace is unable at this time to assess the effect of this lawsuit or the pending criminal investigations on Grace's results of operations, cash flows, or liquidity, or on its bankruptcy proceeding.

F-32

CC-BLG003318

At December 31, 2006 and 2005, Grace's estimated liability for remediation of sites not related to its former vermiculite mining and processing activities was $105.9 million and $115.8 million, respectively. This liability relates to Grace's current and former operations, including its share of liability for off-site disposal at facilities where it has been identified as a potentially responsible party. Grace's estimated liability is based upon an evaluation of claims for which sufficient information was available. As Grace receives new information and continues its claims evaluation process, its estimated liability may change materially.

*Tax Matters* —In 2005, Grace (with one exception) settled all proposed tax adjustments with the Internal Revenue Service (the "IRS") with respect to the 1993-1996 Federal income tax audit, and paid applicable taxes and interest of $90.0 million. The exception relates to $7.0 million of research and experimentation credits that the IRS is challenging; a settlement is currently under discussion with the IRS.

As a consequence of resolving federal tax adjustments for the 1993-1996 tax periods, Grace owes approximately $12 million in additional state taxes and accrued interest, which will be paid in accordance with Grace's bankruptcy proceedings.

In June 2006, Grace received revised examination reports from the IRS for the 1988-1989 and 1997-2001 tax periods (collectively, the "Examination Reports") asserting, in the aggregate, approximately $32.5 million of net additional tax plus accrued interest. The most significant issue addressed in the Examination Reports concerns the carryback of a specified liability loss from the 1998 tax period to the 1989 taxable year. Grace has filed a protest with the IRS Office of Appeals with respect to the carryback of the specified liability loss and certain other issues and anticipates receiving a tax assessment with respect to the specified liability loss issue, which Grace intends to contest. The remaining adjustments raised in the examination report were agreed to; however, since Grace was in a net operating loss position for all but one of the other tax periods covered in the 1997-2001 audit, the adjustments should not result in any cash tax liability but rather should reduce the amount of certain tax attributes claimed by Grace in those tax periods, such as losses and credits. Grace's federal tax returns for the 2002-2004 tax years are currently under examination by the IRS.

The IRS has assessed additional federal income tax withholding and Federal Insurance Contributions Act taxes plus interest and related penalties for calendar years 1993 through 1998 against a Grace subsidiary that formerly operated a temporary staffing business for nurses and other health care personnel. In August 2006, Grace agreed with the U.S. Department of Justice and the IRS on a settlement amount of $13.0 million and other terms that would resolve the matter. The settlement was approved by the Bankruptcy Court in October 2006. In January 2007, Grace paid the $13.0 million settlement amount and received an indemnification payment of approximately $2.7 million from its former partner in the business.

In September 2006, the German Ministry of Finance issued guidance that excludes Grace's German subsidiary from the application of a law that was effective in 2005 prohibiting interest deductions on certain intercompany loans.

Grace recorded a $12 million reduction in third quarter 2006 tax expense as a result of the resolution of the two foregoing issues.

As of December 31, 2006, Grace had $190.9 million in net operating loss ("NOL") carryforwards. Grace anticipates generating additional NOLs upon emergence from bankruptcy as contemplated in the Plan. Because Grace did not pay a significant amount of U.S. taxes in prior years and/or has already received tax refunds from available NOL carryback years, it expects to carryforward most of its NOLs. Under federal income tax law, a corporation is generally permitted to carryforward NOLs for a 20-year period for deduction against future taxable income. Grace's ability to deduct NOL carryforwards could be significantly limited if it were to undergo an ownership change during or as a result of the Chapter 11 proceeding. During the course of the bankruptcy proceeding, the Bankruptcy Court entered an order that places certain limitations on trading in Grace common stock or options convertible into Grace common stock. Pursuant to these limitations, Grace intends to object to any purchase of Grace common stock or options that would potentially contribute to an ownership change. However, Grace can provide no assurance that these limitations will prevent an ownership change or that its ability to utilize net operating loss carryforwards will not be significantly limited as a result of Grace's reorganization.

*Purchase Commitments* — Grace engages in purchase commitments to minimize the volatility of

CC-BLG003319

major components of direct manufacturing costs including natural gas, certain metals, asphalt, amines and other materials. Such commitments are for quantities that Grace fully expects to use in its normal operations.

*Guarantees and Indemnification Obligations* — Grace is a party to many contracts containing guarantees and indemnification obligations. These contracts primarily consist of:

- Contracts providing for the sale of a former business unit or product line in which Grace has agreed to indemnify the buyer against liabilities arising prior to the closing of the transaction, including environmental liabilities. These liabilities are included in "liabilities subject to compromise" in the accompanying Consolidated Balance Sheets.

- Guarantees of real property lease obligations of third parties, typically arising out of (a) leases entered into by former subsidiaries of Grace, or (b) the assignment or sublease of a lease by Grace to a third party. These obligations are included in "liabilities subject to compromise" in the accompanying Consolidated Balance Sheets.

- Licenses of intellectual property by Grace to third parties in which Grace has agreed to indemnify the licensee against third party infringement claims.

- Contracts entered into with third party consultants, independent contractors, and other service providers in which Grace has agreed to indemnify such parties against certain liabilities in connection with their performance. Based on historical experience and the likelihood that such parties will make a claim against Grace, Grace believes that such indemnification obligations are immaterial.

- Product warranties with respect to certain products sold to customers in the ordinary course of business. These warranties typically provide that product will conform to specifications. Grace generally does not establish a liability for product warranty based on a percentage of sales or other formula. Grace accrues a warranty liability on a transaction-specific basis depending on the individual facts and circumstances related to each sale. Both the liability and annual expense related to product warranties are immaterial to the Consolidated Financial Statements.

*Financial Assurances* — Financial assurances have been established for a variety of purposes, including insurance and environmental matters, asbestos settlements and appeals, trade-related commitments and other matters. At December 31, 2006, Grace had gross financial assurances issued and outstanding of $287.4 million, comprised of $142.5 million of surety bonds issued by various insurance companies, and $144.9 million of standby letters of credit and other financial assurances issued by various banks. As discussed in Note 12, $55.4 million of these financial assurances have been issued under the DIP facility.

In connection with a 1994 divestment, Grace obtained a letter of credit in the maximum amount of $25.0 million to secure scheduled payments on bonds issued to fund the transaction. Amounts drawn under this letter of credit aggregated $3.3 million through December 31, 2006. The last of the bonds matures in November 2016. Because the primary source of bond payment funds is revenue from contracts under which timing and amounts of sales are variable, it is not possible to predict future draws.

*Accounting for Contingencies* — Although the outcome of each of the matters discussed above cannot be predicted with certainty, Grace has assessed its risk and has made accounting estimates as required under U.S. generally accepted accounting principles. As a result of the Filing, claims related to certain of the items discussed above will be addressed as part of Grace's Chapter 11 proceedings. Accruals recorded for such contingencies have been included in "liabilities subject to compromise" in the accompanying Consolidated Balance Sheets. The amounts of these liabilities as ultimately determined through the Chapter 11 proceedings could be materially different from amounts recorded at December 31, 2006.

15. **Shareholders' Equity (Deficit)**

Under its Certificate of Incorporation, the Company is authorized to issue 300,000,000 shares of common stock, $0.01 par value. Of the common stock unissued at December 31, 2006, 4,596,881 shares were reserved for issuance pursuant to stock options and other stock incentives. The

CC-BLG003320

Company has not paid a dividend on its common stock since 1998. The Company is not permitted to pay dividends on its common stock while it is in Chapter 11. The Certificate of Incorporation also authorizes 53,000,000 shares of preferred stock, $0.01 par value, none of which has been issued. Of the total, 3,000,000 shares have been designated as Series A Junior Participating Preferred Stock and are reserved for issuance in connection with the Company's Preferred Stock Purchase Rights ("Rights"). A Right trades together with each outstanding share of common stock and entitles the holder to purchase one one-hundredth of a share of Series A Junior Participating Preferred Stock under certain circumstances and subject to certain conditions. The Rights are not and will not become exercisable unless and until certain events occur, and at no time will the Rights have any voting power.

## 16. Earnings (Loss) Per Share

The following table shows a reconciliation of the numerators and denominators used in calculating basic and diluted earnings (loss) per share.

| **Earnings (Loss) Per Share**<br>*(In millions, except per share amounts)* | 2006 | 2005 | 2004 |
|---|---|---|---|
| **Numerators** | | | |
| Net income (loss) | $ 18.3 | $ 67.3 | $ (402.3) |
| **Denominators** | | | |
| Weighted average common shares—basic calculation | 67.9 | 66.8 | 65.8 |
| Dilutive effect of employee stock options | 0.4 | 0.5 | — |
| Weighted average common shares—diluted calculation | 68.3 | 67.3 | 65.8 |
| **Basic earnings (loss) per share** | $ 0.27 | $ 1.01 | $ (6.11) |
| **Diluted earnings (loss) per share** | $ 0.27 | $ 1.00 | $ (6.11) |

Stock options that could potentially dilute basic earnings (loss) per share (that were excluded from the computation of diluted earnings (loss) per share because their exercise prices were greater than the average market price of the common shares) averaged approximately 5.3 million in 2006, 6.8 million in 2005, and 8.1 million in 2004.

As a result of the 2004 net loss, approximately 300,000 of employee compensation-related shares issuable under stock options also were excluded from the diluted loss per share calculation because their effect would have been antidilutive.

## 17. Stock Incentive Plans

Each stock option granted under the Company's stock incentive plans has an exercise price equal to the fair market value of the Company's common stock on the date of grant. Options become

exercisable at the time or times determined by the Compensation Committee of the Company's Board of Directors and may have terms of up to ten years and one month.

The following table sets forth information relating to such options during 2006, 2005 and 2004:

**Stock Option Activity**

|  | 2006 | |
|---|---:|---:|
|  | Number of Shares | Average Exercise Price |
| Balance at beginning of year | 7,093,646 | $ 13.42 |
| Options exercised | (1,992,826) | 12.10 |
| Options terminated or cancelled | (503,939) | 11.73 |
| Balance at end of year | 4,596,881 | 14.18 |
| Exercisable at end of year | 4,596,881 | $ 14.18 |
|  | **2005** | |
| Balance at beginning of year | 7,691,580 | $ 12.92 |
| Options exercised | (526,475) | 5.92 |
| Options terminated or cancelled | (71,459) | 14.19 |
| Balance at end of year | 7,093,646 | 13.42 |
| Exercisable at end of year | 7,093,646 | $ 13.42 |
|  | **2004** | |
| Balance at beginning of year | 9,582,784 | $ 12.02 |
| Options exercised | (781,657) | 5.43 |
| Options terminated or cancelled | (1,109,547) | 10.41 |
| Balance at end of year | 7,691,580 | 12.92 |
| Exercisable at end of year | 7,691,580 | $ 12.92 |

Currently outstanding options expire on various dates through September 2011. At December 31, 2006, 4,763,957 shares were available for additional stock option or restricted stock grants. The following is a summary of stock options outstanding at December 31, 2006:

**Stock Options Outstanding**

| Exercise Price Range | Number Outstanding and Exercisable | Weighted-Average Remaining Contractual Life (Years) | Weighted-Average Exercise Price |
|---|---:|---:|---:|
| $1 - $8 | 556,963 | 5.00 | $ 2.72 |
| $8 - $13 | 862,142 | 2.73 | 12.71 |
| $13 - $18 | 1,831,176 | 3.45 | 14.48 |
| $18 - $21 | 1,346,600 | 2.02 | 19.47 |
|  | 4,596,881 | 3.08 | 14.18 |

**18. Pension Plans and Other Postretirement Benefits Plans**

*Pension Plans* —Grace maintains defined benefit pension plans covering employees of certain units who meet age and service requirements. Benefits are generally based on final average salary and years of service. Grace funds its U.S. qualified pension plans ("U.S. qualified pension plans") in accordance with U.S. federal laws and regulations. Non-U.S. pension plans ("non-U.S. pension plans") are funded under a variety of methods, as required under local laws and customs.

Grace also provides, through nonqualified plans, supplemental pension benefits in excess of U.S. qualified pension plan limits imposed by federal tax law. These plans cover officers and higher-level employees and serve to increase the combined pension amount to the level that they otherwise would have received under the U.S. qualified pension plans in the absence of such limits. The nonqualified plans are unfunded and Grace pays the costs of benefits as they are incurred.

At the December 31, 2006 measurement date for Grace's defined benefit pension plans (the "Plans"), the projected benefit obligation ("PBO") was approximately $1,433 million as measured under U.S. generally accepted accounting principles. At December 31, 2006, Grace's recorded pension liability for underfunded and unfunded plans was $450.7 million ($355.1 million included in liabilities not subject to compromise and $95.6 million related to supplemental pension benefits, included in "liabilities subject to compromise"). The recorded liability reflects 1) the shortfall between dedicated assets and the PBO of underfunded plans ($222.9 million); and 2) the PBO of unfunded pay-as-you-go plans ($227.8 million).

*Postretirement Benefits Other Than Pensions* —Grace provides postretirement health care and life insurance benefits for retired employees of certain U.S. business units and certain divested units. The postretirement medical plan provides various levels of benefits to employees hired before 1991 who retire from Grace after age 55 with at least 10 years of service. These plans are unfunded and Grace pays a portion of the costs of benefits under these plans as they are incurred. Grace applies SFAS No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions," which requires that the future costs of postretirement health care and life insurance benefits be accrued over the

employees' years of service.

Retirees and beneficiaries covered by the postretirement medical plan are required to contribute a minimum of 40% of the calculated

F-36

CC-BLG003323

premium for that coverage. During 2002, per capita costs under the retiree medical plans exceeded caps on the amount Grace was required to contribute under a 1993 amendment to the plan. As a result, for 2003 and future years, retirees will bear 100% of any increase in premium costs.

For 2006 measurement purposes, per capita costs, before retiree contributions, were assumed to initially increase at a rate of 8.5%. The rate is assumed to decrease gradually to 5.0% through 2010 and remain at that level thereafter. A one percentage point increase or decrease in assumed health care medical cost trend rates would have a negligible impact on Grace's postretirement benefit obligations.

*Analysis of Plan Accounting and Funded Status*— The following table summarizes the changes in benefit obligations and fair values of retirement plan assets during 2006 and 2005:

F-37

CC-BLG003324

| Change in Financial Status of Retirement Plans *(In millions)* | Defined Benefit Pension Plans | | | | | | Other Post-Retirement Plans | |
|---|---|---|---|---|---|---|---|---|
| | U.S. | | Non-U.S. | | Total | | | |
| | 2006 | 2005 | 2006 | 2005 | 2006 | 2005 | 2006 | 2005 |
| **Change in Projected Benefit Obligation (PBO)** | | | | | | | | |
| Benefit obligation at beginning of year | $ 1,094.2 | $ 1,079.6 | $ 364.3 | $ 360.9 | $ 1,458.5 | $ 1,440.5 | $ 88.6 | $ 115.0 |
| Service cost | 16.3 | 16.4 | 8.4 | 6.9 | 24.7 | 23.3 | 0.4 | 0.5 |
| Interest cost | 58.2 | 57.9 | 17.8 | 17.1 | 76.0 | 75.0 | 4.0 | 4.9 |
| Plan participants' contributions | — | — | 0.7 | 0.8 | 0.7 | 0.8 | — | — |
| Amendments | 0.6 | 2.9 | — | — | 0.6 | 2.9 | — | — |
| Curtailments/settlements recognized | — | (0.3) | — | 2.3 | — | 2.0 | — | — |
| Change in discount rates and other assumptions | (32.6) | 29.1 | (24.9) | 30.3 | (57.5) | 59.4 | (6.4) | (19.9) |
| Benefits paid | (92.6) | (91.4) | (16.2) | (14.7) | (108.8) | (106.1) | (13.9) | (11.9) |
| Currency exchange translation adjustments | — | — | 38.8 | (39.3) | 38.8 | (39.3) | — | — |
| Benefit obligation at end of year | $ 1,044.1 | $ 1,094.2 | $ 388.9 | $ 364.3 | $ 1,433.0 | $ 1,458.5 | $ 72.7 | $ 88.6 |
| **Change in Plan Assets** | | | | | | | | |
| Fair value of plan assets at beginning of year | $ 645.5 | $ 665.7 | $ 237.1 | $ 225.7 | $ 882.6 | $ 891.4 | $ — | $ — |
| Actual return on plan assets | 77.7 | 36.2 | 20.4 | 34.1 | 98.1 | 70.3 | — | — |
| Employer contributions | 106.6 | 35.0 | 14.9 | 12.7 | 121.5 | 47.7 | 13.9 | 11.9 |
| Plan participants' contributions | — | — | 0.7 | 0.8 | 0.7 | 0.8 | — | — |
| Benefits paid | (92.6) | (91.4) | (16.2) | (14.7) | (108.8) | (106.1) | (13.9) | (11.9) |
| Currency exchange translation adjustments | — | — | 26.6 | (21.5) | 26.6 | (21.5) | — | — |
| Fair value of plan assets at end of year | $ 737.2 | $ 645.5 | $ 283.5 | $ 237.1 | $ 1,020.7 | $ 882.6 | $ — | $ — |
| Funded status at end of year (PBO basis) | $ (306.9) | $ (448.7) | $ (105.4) | $ (127.2) | $ (412.3) | $ (575.9) | $ (72.7) | $ (88.6) |
| Unrecognized net loss | N/A | 581.1 | N/A | 125.7 | N/A | 706.8 | N/A | 24.5 |
| Unrecognized prior service cost (credit) | N/A | 12.6 | N/A | 2.2 | N/A | 14.8 | N/A | (37.2) |
| Net amount recognized | N/A | $ 145.0 | N/A | $ 0.7 | N/A | $ 145.7 | N/A | $ (101.3) |
| **Amounts recognized in the Consolidated Balance Sheet consist of:** | | | | | | | | |
| Noncurrent assets | $ 2.7 | $ 16.1 | $ 35.7 | $ 105.4 | $ 38.4 | $ 121.5 | $ — | $ — |
| Current liabilities | (4.7) | — | (5.5) | — | (10.2) | — | (4.7) | — |
| Noncurrent liabilities | (304.9) | (407.8) | (135.6) | (126.1) | (440.5) | (533.9) | (68.0) | (101.3) |
| Accumulated other comprehensive loss | — | 536.7 | — | 21.4 | — | 558.1 | N/A | N/A |
| Net amount recognized | $ (306.9) | $ 145.0 | $ (105.4) | $ 0.7 | $ (412.3) | $ 145.7 | $ (72.7) | $ (101.3) |
| **Amounts recognized in Accumulated Other Comprehensive Income (Loss) consist of:** | | | | | | | | |
| Net loss | $ 500.9 | N/A | $ 102.4 | N/A | $ 603.3 | N/A | $ 17.6 | N/A |
| Prior service cost (credit) | 10.8 | N/A | 1.7 | N/A | 12.5 | N/A | (26.7) | N/A |
| Net amount recognized | $ 511.7 | N/A | $ 104.1 | N/A | $ 615.8 | N/A | $ (9.1) | N/A |
| **Weighted Average Assumptions Used to Determine Benefit Obligations as of December 31** | | | | | | | | |
| Discount rate | 5.75% | 5.50% | 5.31% | 4.66% | NM | NM | 5.75% | 5.50% |
| Rate of compensation increase | 4.25% | 4.25% | 3.42% | 3.42% | NM | NM | NM | NM |

| **Weighted Average Assumptions Used to Determine Net Periodic Benefit Cost (Income) for Years Ended December 31** | U.S. 2007 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Discount rate | 5.75% | 5.50% | 5.50% | 4.66% | 5.11% | NM | NM | 5.50% | 5.50% |
| Expected return on plan assets | 8.00% | 8.00% | 8.00% | 7.21% | 7.21% | NM | NM | NM | NM |
| Rate of compensation increase | 4.25% | 4.25% | 4.25% | 3.42% | 3.51% | NM | NM | NM | NM |