**Contents**

1. Basic principle.................................................................................................................... 9

2. Purchase offer, invoice copies.......................................................................................... 9

3. Acceptance.......................................................................................................................... 9

4. Assignment.......................................................................................................................... 10

5. Purchase price.................................................................................................................... 11

6. Purchase price retention................................................................................................... 11

7. Covenants............................................................................................................................ 12

8. Reimbursement of expenses, minimum fee...................................................................... 12

9. Warranty.............................................................................................................................. 12

10. Risk of a Customer's insolvency ("delcredere case").................................................... 13

11. Limit..................................................................................................................................... 14

12. CF's duty of notification, monthly accounts, approval by silence.................................. 14

13. Accounts receivable bookkeeping.................................................................................... 15

14. Reminder procedure, cash collection............................................................................... 16

15. Fiduciary relationship, Customer payments.................................................................... 16

16. Security................................................................................................................................ 17

17. Accessory obligations......................................................................................................... 17

18. Realisation of security........................................................................................................ 18

19. Enhancement of security.................................................................................................... 19

20. Rights of lien........................................................................................................................ 19

21. Fiduciary relationship in the case of non-assignable receivables................................. 20

22. Undisclosed assignment, information to Customers........................................................ 20

23. Obligation on form of contract.......................................................................................... 20

24. Obligations to provide information, right of examination.............................................. 21

*P remium L arge A ccounts F inancing: Contract*　　　　　　　　　　　　　　　*Page 7 of 25*

CC-BLG003381

25.    Assignability of claims against CF.................................................................................    22

26.    Unity of account, joint and several liability.....................................................................    23

27.    Commencement and end of the Contract.........................................................................    23

28.    Termination for good cause............................................................................................    24

29.    Other integral parts of this Contract...............................................................................    24

30.    Place of performance and place of jurisdiction...............................................................    24

31.    Applicable law................................................................................................................    24

32.    Severability.....................................................................................................................    24

*P*remium *L*arge *A*ccounts *F*inancing: Contract                                  *Page 8 of 25*

### *1.    Basic principle*

*CF* will purchase the receivables owed to the ***Premium Client*** by its Customers in accordance with this PLAF Contract. The ***Premium Client*** 's claims vis-à-vis *CF* and the resulting payments will not serve as security for credits granted to the ***Premium Client*** by third parties, but will be at the free disposal of the ***Premium Client*** , enabling it to fulfil its liabilities towards suppliers as a matter of priority using the advantages of immediate payment. The decision of *CF* to purchase the receivables depends essentially on the information provided by the ***Premium Client*** with regard to the receivables and Customers. The correctness and reliability of this information are therefore of decisive importance. This Contract establishes a good faith relationship which is intended for the long term.

### *2.    Purchase offer, invoice copies*

2.1    The ***Premium Client*** will offer to *CF* all present and future trade receivables from Customers. The offer will be made by submission of an open item list, a list of availability and a break-down by age at least twice per month.

2.2    The ***Premium Client*** will administer invoice and credit note copies as a trustee for *CF* and is obliged to pass corresponding copies to *CF* at its request. These copies must clearly state the Customer, the reason for the receivable, the amount of the receivable and the due date. The ***Premium Client*** may only offer receivables the original invoice copies of which have been received by the Customer and for which the consideration has been performed in full and without any defects.

### *3.    Acceptance*

3.1    The agreement on the purchase of the individual receivable will come into existence upon the acceptance declaration by *CF* . Acceptance will be declared by booking the receivable into the ***Premium Client*** 's receivables purchase account, without the ***Premium Client*** having to be notified of the booking.

3.2    *CF* undertakes to purchase each receivable in the invoice order as soon as the receivable complies with the following requirements:

   a.    The receivable is within the limit defined for the individual Customer and the maximum aggregate amount agreed for the ***Premium Client*** in total. To the extent these requirements are only met in part, *CF* undertakes to purchase that part of the receivable which falls within the limit and the maximum aggregate amount.

   b.    The Customer is not granted a longer payment period than the maximum payment period stipulated on Page 2 of this PLAF Contract.

   c.    The receivable exists, is free from any objections and defences ( *frei von Einwendungen und Einreden* ), is assignable and is not encumbered by any third-party rights.

*P remium L arge A ccounts F inancing: Contract*                                          *Page 9 of 25*

CC-BLG003383

    d.   The receivable is not owed by an affiliated company (*verbundenes Unternehmen*). Affiliated companies of the **Premium Client** are companies which hold a direct or indirect interest in the **Premium Client** or in which the **Premium Client** holds a direct or indirect interest or whose shareholders/partners are directly or indirectly identical to the partners of the **Premium Client** or whose authorised representatives are identical to at least some of the authorised representatives of the **Premium Client**.

    e.   The information on the invoices is provided to **CF** twice in the month after the invoice dates.

3.3    When calculating the extent to which the maximum aggregate amount has been utilised (Page 2, No. I a), all amounts paid for outstanding receivables from all of the **Premium Client**'s Customers must be taken into account.

3.4    **CF** is also entitled to purchase receivables which do not meet the requirements stipulated in Clause 3.2. **CF** will become obliged to purchase a receivable if a receivable which is initially not purchased meets the requirements stipulated in Clause 3.2 at a later time (carry-back procedure). If there is more than one such receivable, the purchase will be made in the order of invoice dates.

3.5    The purchase obligation of **CF** stipulated in Clause 3.2 and Clause 3.3 will lapse if **CF** has good reason to believe that the **Premium Client** has failed to fulfil its obligations towards suppliers with retention of title.

3.6    **CF** will book receivables it does not purchase after receipt of information on the receivable into a special account of the **Premium Client**. These receivables will remain on offer for purchase by **CF** at any time. The **Premium Client** may, however, set a time limit of 10 days in writing for **CF** to accept the offer to purchase such receivables; in this case, acceptance must be declared by notification that such receivables have been booked into the receivables account. If the fixed period expires without acceptance, the offer for sale will lapse.

3.7    At the commencement of the Contract, **CF** declares that it is prepared to purchase existing receivables insofar as these are not older than 90 days and do not fall due for payment later than within the time period stipulated on Page 2 of this PLAF Contract.

**4.   Assignment**

4.1    The **Premium Client** hereby assigns all existing and future trade receivables from its Customers to **CF** subject to the condition precedent that the relevant receivable is purchased by **CF**. **CF** hereby accepts this assignment. Upon acceptance of the offer for sale, **CF** therefore will concurrently become the owner of the purchased receivable. If only part of a receivable is purchased, only this part will be assigned.

CC-BLG003384

4.2     If *CF* initially does not purchase the receivable offered to it for purchase by the *Premium Client* (identification by booking into the special account), the *Premium Client* hereby assigns this receivable to *CF* as security for all of *CF*'s claims against the *Premium Client* arising from the business relationship with the *Premium Client*. *CF* hereby accepts this assignment. The *Premium Client* also assigns such claims to *CF* which arise between the offer dates stipulated in Clause 2.1.

4.3     All receivables which the *Premium Client* has assigned or will assign to suppliers in the context of an extended retention of title are excluded from the assignment under Clause 4.2 (partial waiver *in rem (dingliche Teilverzichtsklausel )*).  To the extent it has the authority to do so, the *Premium Client* authorises *CF* to collect these receivables in its own name and for a third-party account.

4.4     Should the extended retention of title of a receivable referred to in Clause 4.3 subsequently lapse, such receivable will be assigned under Clause 4.2.

Should *CF* subsequently purchase a receivable pursuant to Clause 3.4 or Clause 3.7, the assignment under Clause 4.2 or the collection authorisation under Clause 4.2 will lapse, and the receivable will be assigned under Clause 4.1.

## 5.    Purchase price

5.1     The purchase price to be paid by *CF* shall correspond to the amount of the purchased receivable, less bonuses and prompt payment discounts and less the ongoing fees set out on Page 2, No. III p).  The ongoing fees set out on Page 2, No. III p) will be calculated with respect to the part of the purchase price paid to the *Premium Client* for the period from the payment until the settlement of the receivable by the Customer or the occurrence of the delcredere event (Clause 10).

5.2     The purchase price, less the purchase price retention (cf. Clause 6), will be due immediately upon the purchase of the receivable.  The purchase price retention will be due for payment once the customer has paid the purchased receivable to *CF* in full and such payment has reached *CF* or the delcredere case has occurred (Clause 10).

## 6.    Purchase price retention

6.1     The purchase price retention set out on Page 2 will serve as security for *CF* in respect of any claims which *CF* may have against the *Premium Client*.  *CF* is also entitled to increase the purchase price retention above the agreed amount if and insofar as facts, according to *CF*'s reasonable judgment, justify the concern that

f.      the *Premium Client* will not meet its obligations to *CF*, in particular because a sustained deterioration of the *Premium Client*'s creditworthiness or of security provided by the *Premium Client* is to be presumed;

CC-BLG003385

g. The purchase price retention applicable up to that time is insufficient to cover the average legitimate reductions in the receivables, particularly those resulting from objections by the Customers or credit notes of the *Premium Client* .

## 7.  Covenants

7.1    The contracting parties have entered into this Contract on the basis of the documents provided by the *Premium Client* and the key financial figures contained therein.  It is agreed that in the event that the key figures should deteriorate, *CF* will be entitled to amend the contractual terms and conditions in compliance with the Covenant Agreement (Page 3 of the Contract).  Should the key figures develop positively, *CF* will examine the possibility to adjust the terms and conditions in favour of the *Premium Client* .  The details are governed by the Covenant Agreement (Page 3 of this Contract).

## 8.  Reimbursement of expenses, minimum fee

8.1    Insofar as a debit balance in the *Premium Client* 's settlement account occurs, e.g. as a result of credit notes or the receivable being disputed by the Customer after the purchase price has been paid, overdraft interest will be charged to the *Premium Client* as from the following banking day by way of a surcharge of 3.5% on the interest rate separately agreed on Page 2 of this PLAF Contract after the *Premium Client* has been notified by *CF* .

8.2    The costs of special audits shall be borne by the *Premium Client* .

8.3    The *Premium Client* shall bear all expenses incurred in connection with the proper creation, administration, release or realisation of security (in particular notary's fees, depositing charges and the costs of safeguarding collateral).

8.4    In order to calculate the payment obligations in respect of the minimum fee set out on Page 2, No. III r), all ongoing fees that have been paid in that contractual year in accordance with Page 2, No. III p) will be added at the end of the contractual year set out in Clause 27.1.  In the event that the total amount of ongoing fees set out on Page 2, No. III p) that have already been paid falls short of the amount of the minimum fee, the *Premium Client* shall pay to *CF* the difference between the amount of the minimum fee and the ongoing fees actually paid.

## 9.  Warranty

9.1    The *Premium Client* warrants the legal existence of the purchased receivable, in particular that the receivable, as shown in the invoice, exists, is due for payment, is free from objections and defences, is assignable and is not encumbered with any third-party rights, and that this will continue to apply until collection by *CF* .

CC-BLG003386

9.2    If claims under the warranty are enforced, the *Premium Client* shall place *CF* in the same position in which it would be if the Customer had paid the assigned receivable in full.

Any further rights under Sections 437 and 440 of the German Civil Code ( *Bürgerliches Gesetzbuch* ; **BGB** ) shall remain unaffected.

9.3    Should the Customer assert that it has no payment obligation towards *CF* in the event of disclosure under Clause 22.2, the latter will inform the *Premium Client* thereof by providing a special notification about objections or defences, by providing a notification of a special purchase price retention or by transferring the receivable to the special account. Should a Customer pay short a particular receivable, *CF* may, in the relationship with the *Premium Client* , interpret this to the effect that the Customer disputes its payment obligation to the extent of the amount which remains unpaid. Action in respect of disputed receivables or disputed parts of receivables may only be taken by Grace.

As long as the Customer disputes its payment obligation, *CF* may retain, as special purchase price retentions exceeding the general purchase price retention, any amounts which will fall due in future up to the amount of the purchase price already paid by *CF* in respect of the receivable.

The *Premium Client* may redeem such special purchase price retentions by providing suitable security, in particular bank guarantees. The special purchase price retention shall be paid out as soon as it has been established that the asserted objections or defences are unfounded.

The *Premium Client* is obliged to settle the dispute about the goods within 60 days by providing relevant documents or, alternatively, to purchase back the receivables.

9.4    If the Customer pays in a foreign currency and exchange rate differences occur as a result of the lapse of time between invoicing and payment, the *Premium Client* is obliged to compensate *CF* for these differences.

9.5    *CF* is entitled, but not obliged, to claim interest after the due date or default interest from the Customer. *CF* shall assign such claims against the Customer to the *Premium Client* if the latter so requests. If *CF* collects such claims prior to reassignment to the *Premium Client* , *CF* will set off such claims against claims held by *CF* against the *Premium Client* . Such claims will be asserted directly towards the Customer only in the event of disclosure of the purchase of receivables under Clause 22.2.

## 10.  Risk of a Customer's insolvency ("delcredere case")

10.1    The *Premium Client* assumes the risk that the Customer will not be able to pay the purchased receivable.

10.2    The Customer's insolvency will be presumed if the Customer fails to pay the invoice within 60 days of the due date.

CC-BLG003387

10.3    If insolvency (as defined in Clause 10.2) has occurred with respect to a receivable, *CF* will reassign the receivable to the *Premium Client*. The *Premium Client* is obliged to pay the purchase price back to the factor. The *Premium Client* is entitled to claim back receivables from CF even before that point in time in individual cases. It will reimburse *CF* immediately (*unmittelbar*) for the purchase price. The parties agree that the reassignment of the receivable will be effective upon the reimbursement of the purchase price.

10.4    If the Customer uses a cheque to pay a bill of exchange issued by the *Premium Client* which the Customer has accepted, the delcredere risk will lapse when the cheque is cashed. *CF* will thus not assume the risk of the Customer's insolvency for the *Premium Client*'s right of recourse against the Customer arising from the bill of exchange. It will not take the bill of exchange into its possession.

## 11.  *Limit*

11.1    Decisions on limits will be made by *CF* and will apply upon the notification of the decision to the *Premium Client*.

11.2    *CF* is at any time entitled to amend or cancel limits at its discretion after a due assessment of the circumstances (*nach pflichtgemäßem Ermessen*).

An amendment to limits will apply only to future receivables, but not to receivables for which the *Premium Client* has rendered, prior to receipt of notification of the amendment, the consideration by making deliveries to the Customer which it cannot recall.

Limit decisions and their amendments will be communicated by *CF* to the *Premium Client* without delay and/or retrieved by the *Premium Client*. The *Premium Client* will include these in the list of availability which it will send to *CF*.

11.3    When calculating the extent to which a limit has been used, all receivables from a Customer which have been purchased and are still unpaid will be added. Receivables for which payment is by bills of exchange which have been sent for discounting will be included in the calculation until and to the extent the bills of exchange have been paid.

## 12.  *CF's duty of notification, monthly accounts, approval by silence*

12.1    *CF* will send the *Premium Client* an overview of all account positions relating to the collaboration within 10 days of the end of each month (monthly accounts).

12.2    Any objections for reasons of inaccuracy or incompleteness of a monthly account must be notified by the *Premium Client* no later than within one month of its receipt; if the *Premium Client* raises its objections in writing, dispatch within the one-month period will be sufficient. Failure to notify objections within the time allowed will be deemed as approval and therefore equal to the conclusion of an agreement that the statements of account provided accurately reflect the mutual claims and legal relationships and are to be used as the basis for the continuation of the collaboration. *CF* will make particular reference to this consequence when issuing the monthly accounts.

CC-BLG003388

12.3   The *Premium Client* may also require a correction of the monthly accounts after the end of the time limit; in such a case, it must, however, prove that and to what extent the monthly accounts were incorrect.

12.4   Silence in respect of the monthly accounts as defined above will at the same time be deemed to be the final recognition of the interest, fees and other charges calculated for this month; particular reference will also be made to this fact when the monthly accounts are issued.

12.5   *CF* may reverse incorrect entries by making the corresponding adjusting entries by the time of the next monthly accounts. Should *CF* discover an incorrect entry only after the monthly accounts have been issued and after the end of the period set out in Clause 12.2, it will notify the *Premium Client* separately about the adjusting entry to be made.

Should the *Premium Client* raise justified objections to the adjusting entry, *CF* will reverse the adjusting entry and will separately lodge the claim resulting therefrom.

12.6   Should *CF* fail to settle a justified claim of the *Premium Client* based on an inaccurate entry without delay after becoming aware of such incorrect entry and after reviewing the entry without delay, *CF* is obliged to pay interest at a rate of 3.5% from the banking day following the date on which it becomes aware of the inaccurate entry and reviews such entry without delay.

### 13.   *Accounts receivable bookkeeping*

13.1   *CF* will not be in charge of accounts receivable bookkeeping itself; the bookkeeping of the accounts receivable, including the purchased receivables, will be undertaken by the *Premium Client* as a trustee for *CF* and with the care of a prudent businessman ( *Sorgfalt eines ordentlichen Kaufmannes* ). Information which the *Premium Client* must supply to CF as part of automated data interchange is listed in the "Process Description for PLAF Clients" (Schedule 3). The *Premium Client* will also be responsible for the reminder procedures relating to the receivables from Customers. The *Premium Client* is aware that, in doing so, it accepts an increased fiduciary and protective duty towards *CF* , which means that the *Premium Client* must execute the bookkeeping and reminder procedures in such a way that *CF* is under no circumstances in a worse position than it would be in if the named duties were performed by *CF* itself. This is a material contractual duty.

13.2   If agreed with the *Premium Client* , the collaboration will be based on electronic data interchange. In this case, the *Premium Client* undertakes to provide the corresponding data and to operate the defined interfaces.

*P remium L arge A ccounts F inancing: Contract*                                                            *Page 15 of 25*

CC-BLG003389

*14.   Reminder procedure, cash collection*

14.1    The *Premium Client* will execute the reminder procedures for the receivables from Customers on behalf of *CF* . The *Premium Client* undertakes to maintain the timing of reminders as described on Page 2 of this PLAF Contract.

14.2    If no payment is received by the *Premium Client* after performance of the reminder procedure, it must return to *CF* the purchase price of the receivable after the expiry of the time period set out in Clause 10.2.

*15.   Fiduciary relationship, Customer payments*

15.1    If payments for assigned receivables are received by the *Premium Client* or in the *Premium Client* 's accounts kept with other banks, the *Premium Client* will accept these payments as a trustee for *CF* and shall immediately forward them to *CF* along with all original documents (credit transfer counterfoils, post bank credit notes, settlement notices, etc.).

The *Premium Client* hereby assigns its claims against its relevant bank arising from such credit balances to the extent paid by the Customer and irrevocably authorises *CF* to instruct the bank to transfer such claims to *CF* .

15.2    If the *Premium Client* receives such payments in another form (in particular in the form of bills of exchange, cheques or postal cheques), *CF* and the *Premium Client* hereby agree that title to such documents is transferred to *CF* as soon as they are acquired by the *Premium Client* . The *Premium Client* further assigns to *CF* in advance all of the rights arising from the documents. The transfer of cheques and bills of exchange which become the direct property of the *Premium Client* is substituted by the fact that *CF* and the *Premium Client* hereby conclude a safe-keeping agreement and the *Premium Client* , in the event that it does not acquire direct possession, assigns to *CF* its right to recover possession from third parties.

The *Premium Client* will endorse the documents — to the necessary extent — and will transfer them to *CF* without delay. Until the documents are transferred to *CF* , the *Premium Client* must take all measures necessary to preserve the rights arising from them. The *Premium Client* authorises *CF* to sign bills of exchange in its name as the drawer and to endorse bills of exchange and cheques in its name.

15.3    As long as the collaboration is performed in the settlement of balances procedure (see description, Schedule 3), *CF* waives the transfer of the payments and documents mentioned in Clauses 15.1 and 15.2.

15.4    If *CF* credits the value of cheques, debit notes and bills of exchange before they are settled, this will be subject to encashment. If such amounts have to be debited back, *CF* may request the *Premium Client* to place *CF* in the position in which it would be if the receivable which is the subject of the debit had not been paid at all. *CF* is authorised to make an adjusting booking irrespective of whether monthly accounts have in the meantime been issued.

CC-BLG003390

### 16. Security

16.1    As the delcredere risk ( *Debitorenrisiko* ) associated with the receivables will remain with the **Premium Client** , the **Premium Client** is willing to provide security to **CF** for the receivables only in respect of the requirements set out in Clauses 18 and 22 in accordance with the provisions set out below.  With the assignment of the receivable, the **Premium Client** assigns to **CF** all claims it acquires under its agreement with the Customer, in particular rights to the restitution of goods and services in the event of reversal of the agreement.

16.2    The **Premium Client** and **CF** hereby agree that the property title to which is reserved and the equitable lien with which the **Premium Client** has secured an assigned receivable will become the property or joint property of **CF** upon the assignment of the receivable to which the security relates — at the latest at the time at which the **Premium Client** acquires the ownership or joint ownership.

16.3    The **Premium Client** and **CF** also agree that all existing and future expectant rights which the **Premium Client** acquires to objects contained in the invoices underlying the assigned receivables will immediately pass to **CF** .

16.4    The **Premium Client** assigns forthwith to **CF** its future rights to recover possession from the Customer or another third party which is in direct possession of the property title to which is reserved or of the equitable lien.  To the extent such objects are in the direct possession of the **Premium Client** , the **Premium Client** will keep them as a trustee for **CF** free of charge and separately from other goods.

16.5    If the assigned receivable originates from a sale to a destination according to the buyer's instruction, the **Premium Client** hereby assigns to **CF** its claims towards the carrier and its right of stoppage in transit.

16.6    The **Premium Client** hereby assigns to **CF** all its potential insurance claims in respect of the assigned receivables and goods to which title has passed.  To the extent the assignment is contingent upon specific preconditions, the **Premium Client** undertakes to execute the assignment in the manner required.

16.7    To the extent ancillary rights are not transferred by operation of law, the **Premium Client** will transfer along with the receivable all rights which serve to secure and enforce the sold receivable.

### 17. Accessory obligations

17.1    If facts become known which give rise to doubts as to whether the Customer will properly perform an agreement underlying a receivable that has been assigned to **CF** , the **Premium Client** must repossess the goods if so directed by **CF** ; the costs of repossession of goods for which receivables have been purchased will be borne by **CF** ; costs relating to other goods will be borne by the **Premium Client** .

*P remium L arge A ccounts F inancing: Contract*                                          *Page 17 of 25*

CC-BLG003391

17.2    Goods which are once again in the possession of the *Premium Client* shall be kept by the *Premium Client* as a trustee for *CF* free of charge and separately from other goods, regardless of the reason for the repossession. The *Premium Client* shall inform *CF* of the repossession and obtain instructions from *CF* without delay. To the extent these goods are not already owned by *CF*, the *Premium Client* and *CF* agree that *CF* will become the owner as soon as the *Premium Client* reacquires the goods. The goods shall be marked as the property of *CF*. Clause 17.2 does not apply to returned goods the receivables for which have not been assigned to *CF*.

17.3    The *Premium Client* is obliged to support *CF* using its best efforts and free of charge in the enforcement and realisation of all security provided to it. *CF* may instruct the *Premium Client* to realise security itself in the best possible manner. In this case, the *Premium Client* will act as a trustee for *CF* and shall account comprehensively for the realisation and pass everything it receives thereby to *CF* without delay.

## 18.  Realisation of security

18.1    *CF* will realise security provided to it only if the *Premium Client* is late in making payments to *CF* of material amounts and a grace period of at least 2 weeks granted to the *Premium Client* by *CF* for the payment of the receivable, linked with a warning of realisation of security in the event of non-performance, has elapsed without a result. In addition, security for the receivables from the Customers will be released only after disclosure of the procedure within the meaning of Clause 22 of the PLAF Contract and after an unsuccessful attempt to collect the relevant receivables.

18.2    In the event of realisation, *CF* may choose between various items of security. In the realisation of security and when selecting the security to be realised, *CF* will take account of the legitimate interests of the *Premium Client* and a third-party security grantor which has created security for the *Premium Client*'s liabilities.

To realise the receivables assigned as security, *CF* will collect such receivables and set them off against the *Premium Client*'s liabilities towards *CF*.

18.3    Should the Customer fail to pay an assigned receivable on its due date, *CF* may, on the conditions set out in Clause 18.1, take possession of the security for the receivable, or store it at the premises of a third party, also if the security is in the possession of the *Premium Client*.

18.4    *CF* may also realise security by way of a sale in the open market at its discretion after a due assessment of the circumstances. *CF* will use the net proceeds from the realisation, after deduction of all costs accruing from the realisation and of a reasonable reimbursement for its own expenses, to cover the secured receivables. *CF* will surrender any unused surplus.

*Premium Large Accounts Financing: Contract*                                            **Page 18 of 25**

CC-BLG003392

## 19. Enhancement of security

19.1    *CF* may request security to be provided for all claims (including contingent claims) arising from overdrafts of the settlement account or in any other way.

19.2    *CF* may assert its claim for the provision or enhancement of security for as long as the realisable value of all security corresponds to the aggregate value of all claims arising from the business relationship (cover limit).

If the realisable value of all security not only temporarily exceeds the cover limit, *CF* shall, if so requested by the *Premium Client* , release security at its option up to the amount that is in excess of the cover limit; when selecting the security to be released, it will take into account the legitimate interests of the *Premium Client* and of a third-party security grantor that has provided security for the *Premium Client* 's liabilities.

19.3    If *CF* initially refrained in whole or in part from demanding the provision or enhancement of security when claims against the *Premium Client* arose under Clause 19.1, it may subsequently require that security be provided. However, the precondition for such action is the occurrence of knowledge of circumstances which justify an increased risk assessment relating to the claims against the *Premium Client* . This may in particular be the case if:

      a.    the economic situation of the *Premium Client* has deteriorated; or

      b.    the existing security has decreased in value.

19.4    *CF* will grant a reasonable period for the provision or enhancement of security. If *CF* intends to make use of its right of termination with immediate effect if the *Premium Client* does not meet its obligation to provide or enhance security in due time, it shall notify the *Premium Client* in advance.

## 20. Rights of lien

20.1    The *Premium Client* and *CF* agree that *CF* will acquire a right of lien over the securities and objects the possession of which has been acquired, or will be acquired, by *CF* in the course of ordinary business transactions between the parties, such as cheques.

*CF* will also acquire a right of lien over the claims to which the *Premium Client* is or will be entitled against *CF* as a result of the business relationship (such as credit balances).

20.2    The purpose of the right of lien is to secure all existing, future and contingent claims to which *CF* and all of its domestic and foreign branches are entitled towards the *Premium Client* as a result of the business relationship.

20.3    If money or goods come into the power of disposition of *CF* with the proviso that they may only be used for a specific purpose, *CF* 's right of lien will not extend to such money or goods.

CC-BLG003393

*21.   Fiduciary relationship in the case of non-assignable receivables*

21.1    The *Premium Client* will hold any receivables whose assignment is not valid as a trustee for *CF* . If the reason for the inability to assign the receivable lapses, the assignment will become effective, and *CF* will become the legal owner.

21.2    In the case of assignments which are valid under Section 354a HGB, the *Premium Client* is obliged not to conclude legal transactions in respect of the legitimate receivable without *CF* 's consent, and particularly to refrain from agreements on a set-off, retention, release and deferment, also to the extent that these are effective in the relationship with the creditor. The *Premium Client* will accept any incoming payments as a trustee for *CF* ; Clause 21.1 above will apply.

21.3    In addition, *CF* reserves the right to request the *Premium Client* to perform the reminder procedure directly vis-à-vis the Customer and with a frequency which is to be agreed with *CF* . *CF* is entitled to do so only in the event of disclosure under Clause 22.2.

*22.   Undisclosed assignment, information to Customers*

22.1    The sale and purchase of the receivables will be undisclosed. The contractual relationship and the assignment of the receivables will only be disclosed to the debtors of the *Premium Client* in compliance with the provisions of this Clause 22.

22.2    If the *Premium Client* (i) no longer meets the obligations to provide information on payments and lists of unpaid invoices and to undertake bookkeeping or if the amounts of the unpaid invoices materially deteriorate or the sustained deterioration of the economic situation is imminent and (ii) if the *Premium Client* is in default in payment in respect of receivables that are not only immaterial,

    a.    *CF* will be entitled and the *Premium Client* will be obliged, after a warning has been issued and a 5-day grace period has been set, to inform the Customer about the contractual relationship and the assignment of the receivables and security interests.

    b.    the *Premium Client* must include an unequivocal reference in its General Terms and Conditions used with its Customers (which must be agreed with *CF* ) to the collaboration with *CF* in respect of the PLAF process and the related assignment of receivables, ancillary rights and transfer of the rights to the goods delivered. This reference to the assignment of the invoiced receivables to *CF* shall also be included in the invoices in a clearly visible manner.

    c.    *CF* will be entitled to require the *Premium Client* to surrender the original invoices for the purpose of forwarding them to the Customer.

*23.   Obligation on form of contract*

23.1    The *Premium Client* has provided its General Terms and Conditions to *CF* for examination and has taken account of *CF* 's suggestions for additions and amendments. The *Premium Client* may amend its General Terms and

CC-BLG003394

Conditions only after informing *CF* thereof and, if the amendment is material for *CF* , after *CF* has consented to the amendment. By signing this Contract, *CF* agrees with the *Premium Client* 's General Terms and Conditions as applicable at that time.

23.2    The *Premium Client* will inform *CF* as soon as it makes any individual agreement with the Customer which is in breach of the above obligations.

23.3    The *Premium Client* will, without *CF* 's consent, refrain from making any agreements with its suppliers under which the assignment of receivables based on a purchase under the PLAF procedure is prohibited.

### 24.    *Obligations to provide information, right of examination*

24.1    The *Premium Client* is obliged to inform *CF* without delay of all material circumstances of which it becomes aware and which relate to the receivables from the Customers and could affect *CF* 's interests. The obligation to provide information extends in particular to the following:

   a)    objections and defences, rights of set-off, avoidance and retention. The *Premium Client* shall notify *CF* thereof through the fastest possible channel and shall issue a corresponding credit note without delay.

   b)    any contesting of the receivable by the Customer, even if the *Premium Client* does not consider such dispute to be justified. If the Customer comments in writing, the *Premium Client* shall provide *CF* with a copy through the fastest possible channel.

   c)    all material information available to the *Premium Client* regarding the Customers' creditworthiness, in particular information on any deterioration in the Customers' creditworthiness.

   d)    any measures to attach liens and other enforcement proceedings as well as all other enforcement of third-party rights in respect of receivables from Customers.

   e)    to submit to *CF* , if so requested, all documents in support of the receivables offered for purchase, such as delivery notes, agreements, order confirmations, etc.

24.2    The *Premium Client* is furthermore obliged to inform *CF* without delay of all material circumstances relating to its company and to pass on the following documents to *CF* :

   a)    Existing authorisations to third parties to collect cash may not be granted without the consent of *CF* ; authorisations already granted shall be revoked immediately;

   b)    all booking arrears of over two weeks; booking arrears shall not be longer than this;

   c)    any material deterioration in the *Premium Client* 's general financial and business positions; any material change under corporate law or in the legal representation of the *Premium Client* ; all facts which cause another company to become an affiliated company within the meaning of Clause 3.2.d).

---

*P remium L arge A ccounts F inancing: Contract*                                    *Page 21 of 25*

CC-BLG003395

24.3    If there is a legitimate interest, *CF* or any third party appointed by *CF* are at any time entitled to inspect the books, accounts and other documents and records of the *Premium Client* at the latter's premises.  Any documents requested in that context shall be presented to *CF* in full.  In order to conduct this audit, *CF* shall have unrestricted access to the *Premium Client* 's business premises at any time during normal business hours after consultations with the *Premium Client* .  If there is any dubiety on the existence of a receivable with respect to its grounds or amount, *CF* is entitled to conduct a special audit on the *Premium Client* 's premises.  The *Premium Client* will bear the ensuing costs up to the maximum amount set out on Page 2, No. III q), to the extent it is responsible for the dubiety.

24.4    The *Premium Client* releases *CF* and the companies affiliated with *CF* within the meaning of Clause 3.2.d) and, as far as information requests by *CF* are concerned, all commercial banks cooperating with it from banking secrecy and authorises *CF* to request from the commercial banks all information relating to the *Premium Client* .  In addition, *CF* may, with the *Premium Client* 's prior consent, request documents or information from the tax advisor, auditor or any other person in charge of bookkeeping or preparing the balance sheet for the *Premium Client* ; these persons are then released from their duty of confidentiality in respect of information provided to *CF* .

24.5    *CF* is entitled to forward any accounting data and information it has received or will receive from the *Premium Client* to affiliated companies of *CF* within the meaning of Clause 3.2.d).  These companies are Coface Holding AG, Coface Kreditversicherung AG, Coface Rating GmbH, Coface Debitorenmanagement GmbH, Coface S. A., Coface Nederland Services BV, Coface Danmark Services AS and Coface Sverige Services AB.  The data obtained in the context of the PLAF Contract will be used for internal examinations of the [ *Premium* ] *Client's* and the Customers' creditworthiness, the results of which may also be disclosed to clients of the Coface Group.

24.6    The *Premium Client* will use its best efforts to support *CF* in any disputes, whether in court or out of court, relating to a receivable or security interest.  The *Premium Client* is in particular obliged to inform *CF* comprehensively about the matter in dispute and to provide all documents and other evidence relevant to the matter.

24.7    In view of the agreed obligations to provide information and to give due consideration, the result of any legal action between the *Premium Client* and the Customer shall be deemed binding in the relationship between *CF* and the *Premium Client* even without third-party notice ( *Streitverkündung* ).

## 25.  *Assignability of claims against CF*

The *Premium Client* 's claims against *CF* may be assigned to third parties only with *CF* 's consent.  *CF* may withhold its consent for good cause; good cause shall be deemed to exist in particular if the intended assignment gives reason to presume that it is disadvantageous for the *Premium Client* 's suppliers.

*P remium L arge A ccounts F inancing: Contract*                                                    *Page 22 of 25*

CC-BLG003396

**26.  *Unity of account, joint and several liability***

26.1    All of the ***Premium Client***'s accounts kept with *CF* constitute a single account and may be offset against each other by *CF* to the legally permissible extent.  The ***Premium Client*** may perform set-offs against claims of *CF* only if the ***Premium Client***'s claims are undisputed or have been recognised by declaratory judgment ( *rechtskräftig festgestellt* ).

*CF* may, in its relationship with the ***Premium Client*** , first set off any payments received from a Customer after the limit fixed for the Customer has been cancelled against purchased receivables from the same Customer, regardless of the purpose stated by the Customer for these payments.  However, this is subject to the condition that no extended retention of title has been agreed in favour of a supplier of goods in respect of the purchased receivable against which the payment is to be set off.

26.2    The same shall apply to any claims of *CF* against the ***Premium Client*** under warranties set out in Clause 9 as well as to any credit notes issued by the ***Premium Client*** and any realisation proceeds.

26.3    All of *CF*'s claims against the ***Premium Client*** shall be due immediately.

**27.  *Commencement and end of the Contract***

27.1    The commencement and end of this Contract are set out on Page 2 of this Contract.

27.2    The Contract will be automatically extended unless any of the two contracting parties terminates the Contract by giving 2 months' written notice with effect as of the end of a quarter.  If the Contract is terminated by the ***Premium Client*** within the term of the Contract defined on Page 2 No. I. m., the ***Premium Client***  shall be required to pay the minimum fee agreed under Page 2 No. III. r. for the residual term of the Contract.  If the fees under Page 2 No. III. p. already paid at such time are lower than the minimum fee under Page 2 No. III. r., the ***Premium Client*** shall be required to pay the difference between the fees already paid and the minimum fee agreed under Page 2 No. III. r to *CF* .

27.3    Upon the end of the Contract, all unaccepted purchase offers will lapse.  Any pending transactions will be settled in accordance with this PLAF Contract.

In the event of termination of the Contract, *CF* is entitled to require the ***Premium Client*** to reduce the exposure (utilisation of the maximum aggregate amount).

In this case, *CF* will demand from the [ *Premium* ] *Client* in writing to reduce the exposure within a specified period.  Should the ***Premium Client*** fail to reduce the exposure within such period, *CF* is entitled to require the provision or enhancement of security under Clause 19.  The underlying receivables will remain purchased and assigned to *CF* .

---

*P remium L arge A ccounts F inancing: Contract*                                    *Page 23 of 25*

**28.  Termination for good cause**

28.1    The PLAF Contract may be terminated in writing and with immediate effect for good cause.  Good cause shall be deemed to exist in particular if the other contracting party breaches a material contractual obligation on a continued basis or if its assets materially deteriorate such that the performance of its contractual duties is jeopardised.  Good cause shall also be deemed to exist if the **Premium Client** does not meet its payment obligations to suppliers, in particular if it does not honour cheques and bills of exchange that are due for payment.

28.2    Should the **Premium Client** 's bookkeeping no longer comply with the contractual requirements, **CF** will notify the **Premium Client** thereof and require it to rectify the situation within a specified period.  If the **Premium Client** fails to comply with this requirement within such period, **CF** shall have a right of extraordinary termination of this Contract.

28.3    In the event of termination under Clause 28.1, Clause 27.3 shall apply *mutatis mutandis* .

**29.  Other integral parts of this Contract**

Schedules 1-3 to this Contract are integral parts of this Contract.

**30.  Place of performance and place of jurisdiction**

To the legally permissible extent, the place of performance and place of jurisdiction for all disputes arising from this Contract shall be Mainz.

**31.  Applicable law**

The application of German law to this Contract and to all disputes arising from the performance of this PLAF Contract is agreed.

**32.  Severability**

Should any of the provisions of this Contract or its Schedules be or become invalid in whole or in part, this shall not affect the validity of the remaining provisions.  This shall apply in particular where the invalidity affects only individual receivables or parts thereof.  The invalid provision shall be replaced by a provision which is legally valid and comes as close as possible to the intended economic purpose of the invalid provision.  Should any transactions *in rem* ( *dingliche Geschäfte* ) (assignment of claims and expectancies, transfers of ownership) be ineffective, the contracting parties, to the legally permissible extent, shall be obliged to treat such transactions in the internal relationship as if they were effective.  In addition, they are obliged to conclude the transaction

CC-BLG003398

*in rem* without delay, taking into the account any requirements left out of account before.

| | |
|---|---|
| Coface Finanz GmbH<br>Isaac-Fulda-Allee 5<br>55124 Mainz | GRACE GmbH & Co. KG<br>In der Hollerhecke 1<br>67547 Worms |

Mainz, [date]                           Worms, [date]

*P remium L arge A ccounts F inancing: Contract*                 *Page 25 of 25*

CC-BLG003399

**W. R. GRACE & CO.
SEVERANCE PAY PLAN FOR
SALARIED EMPLOYEES**

Effective, as amended, April 1, 2005

CC-BLG003400

## W. R. GRACE & CO. SEVERANCE PAY PLAN
### FOR SALARIED EMPLOYEES

### SECTION 1

OVERVIEW

### PREAMBLE

This Plan was originally adopted on January 1, 1994. Effective July 1, 1996, the Plan was amended and restated to reflect that the severance payable hereunder equals 1-1/2 weeks pay for each year of service, and to cease the requirement that "Downsizing Events" must be declared in order to apply the Plan. Effective February 1, 1999, the Plan was further amended and restated to reflect that no Covered Employee is entitled to severance pay under this Plan, if he or she ceases employment from the Company as a result of the 1999 Grace Productivity Effectiveness Program, whether or not such cessation is a result of the Employee's election to not relocate with his or her position with the Company. Effective April 1, 2005, the Plan was further amended and restated to reflect that no Covered Employee is entitled to severance pay under this Plan, unless he or she signs and does not revoke an agreement acceptable to the Company under which he or she releases the Company, as well as its directors, officers, and employees (and other related parties), from any liability related to his or her employment with or termination from the Company.

1.1     Purpose

The purpose of this Plan is to provide guidelines with respect to severance pay to certain salaried employees of the Core Businesses (as hereinafter defined) of W. R. Grace & Co., including its affiliates and subsidiaries, (hereinafter the "Company") whom the Company permanently terminates from its employment because of job elimination or reorganization. This Plan shall not apply to any employee of the Health Care Businesses (as hereinafter defined) or any non-core business of the Company.

2

CC-BLG003401

1.2    Revocation Of Prior Severance Policies And Plans:

Effective as of July 1, 1996, the Company rescinds, revokes, and discontinues any other policies, plans or practices regarding severance pay with respect to employees of the Core Businesses, and no severance or similar payments shall be made by the Company to an employee of any Core Business except as provided under the terms of this Plan or another applicable written severance pay plan of the Company with an effective date subsequent to the effective date of this Plan.  The immediately preceding sentence notwithstanding, the Company may also make severance or similar payments to employees of Core Businesses pursuant to an arrangement not governed by this Plan, if the requirements of subsection (a), (b) or (c) of this Section 1.2 are satisfied.

(a)    The Company may make severance or similar payments pursuant to, and in consideration of, a properly executed written agreement that releases the Company from all claims and potential claims of an employee; provided that the terms of the severance pay arrangement are described in that agreement; and provided further that the agreement is not part of an "employment termination program" (within the meaning of the Age Discrimination In Employment Act) offered to a group of employees (any such program shall not be implemented without the approval of the Benefits Committee).

3

CC-BLG003402

(b)    The Company may make severance or similar payments pursuant to a written employment agreement that specifies the terms of a severance pay arrangement with respect to an employee.

(c)    The Company may make severance payments under the Grace Cost Management Program to individuals who were identified for termination under that Program prior to its expiration on June 30, 1996 (even if such termination occurs after that date).

The Plan shall not be interpreted as requiring severance or similar payments in the circumstances describe in this Section 1.2.

A Covered Employee shall not receive severance pay under this Plan if the Plan Administrator determines that the Covered Employee is entitled to severance or similar payments pursuant to subsection (a), (b) or (c) of this Section 1.2.

<u>SECTION 2</u>

<u>DEFINITIONS</u>

The following words and phrases as used herein shall be defined as follows unless a different definition is plainly required by context.

2.1    <u>Base Salary</u> :

The regular earnings paid by the Company.  Base Salary does not include (a) overtime, commission, incentive, special, premium or bonus compensation or (b) any amount attributable to Company sponsored employee benefit plans, whether or not such compensation or amount is taxable as income.

4

CC-BLG003403

2.2    <u>Benefits Committee</u> :

The Investment and Benefits Committee of W. R. Grace & Co.

2.3    <u>Continuous Employment</u> :

The period of employment with the Company commencing on the Covered Employee's (a) first day of employment with the Company or (b) adjusted commencement of service date (as defined and administered by the Covered Employee's business unit), whichever is later.

2.4    <u>Covered Employee</u> :

A regular, full-time salaried employee of the Company employed in the United States and who is directly employed in one of the Core Businesses; and excluding any temporary or part-time employee, any employee of the "Health Care Businesses" of the Company, and any employee covered by a collective bargaining agreement. "Health Care Businesses" mean National Medical Care, Inc. and its direct and indirect subsidiaries.

2.5    <u>Core Businesses</u> :

The following product lines of the Company: Construction Products, Davison Products, Packaging (including Container) and Emissions Control. In addition, Grace Headquarters, Corporate Technical Group, the Research Division (including Washington Research Center and Lexington Research Laboratory), and Lexington Service Center Operations shall be considered Core Businesses solely for purposes of this Plan.

5

CC-BLG003404

2.6     Effective Date :

This Plan was originally effective as of January 1, 1994.

2.8     ERISA :

The Employee Retirement Income Security Act of 1974, as now in effect or as hereafter amended.

2.9     Last Scheduled Employment Date:

A Covered Employee's final scheduled date of work with the Company which is established by the Company.

2.10    Layoff :

The discontinuance of active employment with the Company which is initiated by the Company and which is expected by the Company to be less than one year.

2.11    Medical Or Life Plan :

Each Company-sponsored employee welfare benefit plan (as defined by ERISA section 3(1)) that provides medical or life insurance coverage to active employees.

2.12    Plan :

The W. R. Grace & Co. Severance Pay Plan for Salaried Employees, as set forth herein.

2.13    Plan Administrator :

The W. R. Grace & Co. Corporate Human Resources Division Vice President or his or her designee.

2.14    Plan Sponsor :

W. R. Grace & Co.

6

CC-BLG003405

2.15   Product Line/Business Unit Executive :

A Company officer who has been designated by the Chief Executive Officer of the Company as the head of a major product line or business unit of the Company.

2.16   Week's Pay :

A Covered Employee's annual Base Salary in effect on his Last Scheduled Employment date, divided by 52.

2.17   Year of Service :

During a Covered Employee's period of Continuous Employment, each twelve consecutive month period that commences on (a) the first date of the Covered Employee's employment with the Company or adjusted commencement of service date (as defined and administered by the Covered Employee's business unit), whichever is later, and (b) the anniversary of that date.

SECTION 3

ELIGIBILITY

3.1      A Covered Employee shall qualify to receive severance pay up to an amount set forth in Section 3.3 if (a) the Plan Administrator determines that the Covered Employee was terminated by the Company and at the time of termination of employment the employee was employed directly in one of the Core Businesses, (b) the Covered Employee signs and does not revoke an agreement acceptable to the Company under which he or

7

CC-BLG003406

she releases the Company and its directors, officers, and employees (and other related parties) from any liability related to his or her employment with or termination from the Company and (c) no provision of Section 3.2 is applicable with respect to the employee.

3.2     The provisions of Section 3.1 notwithstanding, a Covered Employee shall not qualify to receive severance pay if the Plan Administrator determines that any of the following circumstances are applicable with respect to the employee:

(a)     The Covered Employee is on Layoff or leave of absence (paid or unpaid);

(b)     The Covered Employee terminated his or her employment with the Company for any reason, including resignation or retirement, prior to the employee's Last Scheduled Employment Date:

(c)     The Covered Employee is terminated by the Company as a result of the Company's sale or transfer of all or a portion of the stock or assets of a business of the Company to another person or entity, whether or not the Covered Employee becomes an employee of, or is offered employment with, such other person or entity;

(d)     The Covered Employee is terminated by the Company before, or on, the employee's Last Scheduled Employment Date for (i) misconduct with respect of the employee's obligations to the Company, (ii) "cause" (as defined herein), (iii) violation of any agreement between the employee and the Company, (iv) failure to

8

CC-BLG003407

follow policies, rules or procedures of the Company or of the employee's business unit or (v) similar reasons. "Cause" means the willful refusal by the employee to substantially carry out his or her assigned duties and responsibilities, or the employee engaging in actions that are injurious to the Company (monetarily or otherwise). (No provision of this Plan shall be deemed to, or interpreted to, in any way limit the Company's authority or discretion to terminate an employee for any reason.)

(e)     The Covered Employee refuses to accept an offer to transfer to another position at the Company for a Base Salary that is not less than the employee's Base Salary effective as of the employee's Last Scheduled Employment Date, where the principal work location of the position is within a reasonable commuting distance of the Covered Employee's residence.

(f)     The Covered Employee (i) fails to follow policies, rules or procedures of the Company or of the employee's business unit or (ii) fails to adhere to any agreement between the employee and the Company, through the Covered Employee's Last Scheduled Employment Date.

(g)     The Covered Employee (i) is entitled to receive long term disability ("LTD") payments under any plan or program sponsored by the Company that provides LTD payments to eligible employees, as of the employee's Last Scheduled Employment date or (ii) becomes

9

CC-BLG003408

eligible to receive such LTD payments as a result of a disability that commences prior to or on the employee's Last Scheduled Employment Date. Any such Covered Employee shall be entitled to LTD payments, in accordance with the terms of such plan or program.

(h)     The Covered Employee is covered by any other severance plan of the Company.

(i)     The Covered Employee does not sign or revokes an agreement acceptable to the Company under which he or she releases the Company and its directors, officers, and employees (and other related parties) from any liability related to his or her employment with or termination from the Company.

3.3     <u>Amount of Severance Pay</u> :

If a Covered Employee qualifies for severance pay under this Plan, the amount of severance to which he shall be entitled shall not exceed 1-1/2 Weeks Pay for each Year of Service (subject to a minimum of 4 Weeks Pay and a maximum of 52 Weeks Pay).

3.4     <u>Time and Form of Payment</u> :

Severance pay shall be paid in regular payroll installments where each such installment is equal to the Covered Employee's periodic Base Salary payment, until the total severance for which the Covered Employee qualifies is paid (with the uneven balance, if any, added to the final installment), commencing as soon as

10

CC-BLG003409

practicable following the employee's Last Scheduled Employment Date; provided that, at the option of the Company (upon the request of the Covered Employee or otherwise) (a) severance pay may be paid in a lump sum payment as soon as practicable following the employee's Last Scheduled Employment Date, and (b) the unpaid balance of severance pay that is being paid in regular payroll installments may be paid in a lump sum payment at any time during the installment payment period.  Notwithstanding the foregoing, as soon as practicable after the Covered Employee commences full-time employment as an employee of an employer, the total remaining severance pay to which the Covered Employee is entitled shall be paid in a lump sum payment.

3.5        <u>Deductions From Severance Pay</u> :

The Company shall deduct from severance payments (a) any federal, state or local withholding or other taxes or charges which it is required to deduct under applicable laws, (b) any amounts that the Covered Employee owes the Company and (c) any required employee contributions with respect to the continuation of benefits regarding the employee pursuant to Section 9.

3.6        <u>Denial Or Discontinuance of Severance/Similar Payments</u> :

Any other provision of the Plan to the contrary notwithstanding, the Plan Administrator may deny or discontinue severance or similar pay to a Covered Employee if the Plan Administrator determines

11

CC-BLG003410

that the Covered Employee has engaged in "inappropriate conduct" (as defined herein) before or after the Covered Employee's Last Scheduled Employment Date. "Inappropriate conduct" means any action that (a) violates any policy, rule or procedure of the Company or the employee's business unit, (b) violates any agreement between the employee and Company, or (c) is otherwise detrimental to the Company.

3.7    <u>Reemployment by the Company</u>:

In the event that an individual who received severance pay under any severance pay plan or policy of the Company becomes reemployed by the Company thereafter, he shall not receive credit under any severance pay plan or policy of the Company (including this Plan) for the years of service for which Severance Pay had previously been paid to the employee.

3.8    <u>Death of Covered Employee</u>:

If a Covered Employee dies prior to the employee's Last Scheduled Employment Date, severance shall not be paid pursuant to this Plan, with respect to the deceased employee. If a Covered Employee dies on or after the employee's Last Scheduled Employment Date, the unpaid amount of severance to which the employee was entitled shall be paid in a lump sum payment to his or her spouse or, if the employee is not married on the date of death, to the employee's estate.

12

CC-BLG003411

SECTION 4

INTEGRATION WITH NOTICE REQUIREMENTS

To the extent that the Company is required to make a payment to a Covered Employee pursuant to a federal, state or local plant closing law (including, but not limited to, the Federal Workers Adjustment and Retraining Notification Act) (a "Plant Closing Payment"), any severance pay that might be payable to the employee under this Plan shall be reduced by an amount equal to the Plant Closing Payment; provided that any payments made pursuant to an applicable state or local unemployment compensation law shall not be regarded as paid pursuant to a plant closing law.

SECTION 5

ADMINISTRATION AND INTERPRETATION OF PLAN

The Plan Administrator shall have general responsibility for the administration and interpretation of the Plan. The Plan Administrator shall have full discretionary authority to determine if an individual qualifies for severance pay and the amount, if any, of severance pay payable under the Plan, and to otherwise interpret and construe the Plan. The interpretations and determinations of the Plan Administrator shall be binding and conclusive unless they are determined by a court of law to be arbitrary and capricious.

13

CC-BLG003412

SECTION 6

## SOURCE OF BENEFITS

This Plan is unfunded and shall not be secured by any specific asset, account, or fund of the Company. To the extent that any person acquires a right to receive payments from the Company hereunder, such right shall be no greater than the right of an unsecured general creditor of the Company.

SECTION 7

## CLAIMS AND APPEALS

7.1    A Covered Employee or former employee who believes that an event has occurred which qualifies the employee for a benefit under this Plan, but who has not been advised of such benefit or believes that the calculation of the benefit is in error, shall file a claim with the Plan Administrator. The claim must be filed within 30 days of the date on which the employee had been advised of his or her Last Scheduled Employment Date with the Company or, if later, within 30 days of the date that the employee has learned the amount of his or her benefit under this Plan or that the employee will not receive such a benefit. The claim must be in a writing, signed and dated by the employee, which includes an explanation of the claim specifying the Section or Sections of this Plan upon which the claim is based. A decision on the claim shall be made by the Plan Administrator within 30 days of receipt of the claim, unless special circumstances require an extension, in which case a decision shall be reached as soon

14

CC-BLG003413

as possible but in no event more than 60 days after receipt of the claim. Notice of the decision shall be given to the employee in writing and sent by first class mail to the employee's last known address, and shall set forth the reasons for the decision.

7.2     If any claim is denied in whole or in part, the claimant may appeal to the Plan Administrator in writing within 60 days of the date notice of denial is received by the claimant. Such appeal may include any additional information and statements which the claimant feels support the claimant's position. A decision on the appeal shall be made by the Plan Administrator within 30 days of receipt of the appeal, unless special circumstances require an extension, in which case a decision shall be reached as soon as possible but in no event more than 60 days after receipt of the appeal. Notice of the decision on the appeal shall be given to the claimant in writing and sent by first class mail to the claimant's last known address, and shall set forth the reasons for the decision.

SECTION 8

AMENDMENT AND TERMINATION

By action of the Board of Directors of the Company or the Benefits Committee or its designee, the Company may (a) amend or revise the Plan in any respect and at any time or (b) terminate the Plan at any time.

15

CC-BLG003414

The benefits provided under this Plan are not vested benefits and, therefore, eligibility for such benefits may be changed at any time by amendment or termination of the Plan.

SECTION 9

BENEFITS

9.1      If a Covered Employee receives severance pay under this Plan in regular payroll installments, the Covered Employee shall continue to participate in each Medical Or Life Plan, under which the employee is covered on the employee's Last Scheduled Employment Date, until the end of the calendar month in which the period that severance is paid to the employee expires; such participation shall be under the same terms and conditions as would be applicable had the employee continued to be an active employee of the employee's business unit for that period.

This Plan Section 9.1 shall not limit the Company's ability to amend or terminate any Medical Or Life Plan with respect to active employees, and such amendment or termination shall also apply to each Covered Employee receiving severance who is covered by such plan.

9.2      Under no circumstances shall (a) severance pay be considered compensation for purposes of any Company-sponsored defined benefit or defined contribution employee pension benefit plan (as defined by ERISA section 3(2)(A)) or (b) the period during which the Covered Employee receives severance be considered, or counted as, service or credited service under any such plan; except as required by applicable law or applicable regulation or by the terms of such plan.

16

CC-BLG003415

9.3     For purposes of eligibility to elect coverage under a retiree medical or life insurance plan (a "Retiree Medical Plan"), sponsored by the Company, which is otherwise applicable to a Covered Employee who is eligible to receive severance under this Plan:  (i) the employee shall be credited with a period of service which is equal to the period for which he or she could have received installment severance payments under the Plan (whether or not he or she actually receives installment payments) and (ii) the employee's age at separation of service with the Company shall be deemed to be his or her age on the date that the last installment severance payment would have been made to the employee.  With regard to a Covered Employee who would not be eligible to elect coverage under a Retiree Medical Plan but for the immediately preceding sentence, the employee shall be eligible to elect to commence participation under such Plan as of, or after, the date he or she receives his or her last severance payment under the Plan (even if that payment is a lump sum payment).  Notwithstanding the foregoing, if the provisions of a Retiree Medical Plan conflict with the provisions of this Section 9.3, the provisions of the Retiree Medical Plan shall control.

9.4     Except as provided by Section 3.2(g), each Covered Employee's participation in any plan or program of the company that provides LTD payments to eligible employees shall cease as of the employee's Last Scheduled Employment Date, and no such plan shall provide LTD payments to the Covered Employee with respect to disabilities occurring after that date.

17

CC-BLG003416

SECTION 10

## MISCELLANEOUS

10.1    The Company reserves the right to determine whether any employee or group of employees qualifies for severance pay. The Company also reserves the right, whether in an individual case or more generally, not to pay severance or to pay a lesser amount than is set forth in this Plan.

10.2    Any other provision of this Plan to the contrary notwithstanding, a Covered Employee's business unit Product Line/Business Unit Executive may recommend, or the Plan Administrator may approve, that the Covered Employee receive severance pay that is less than the amount of severance calculated in accordance with Section 3 of this Plan; and, in such a case, the Covered Employee shall be entitled only to that lesser amount of severance pay.

10.3    The fact that a former employee has failed to qualify for a benefit under this Plan shall not rescind or otherwise affect in any manner the employee's termination of employment from the Company, and such failure to qualify for a benefit shall not establish any right (a) to a continuation or a reinstatement of employment with the Company or (b) to receive any payment from the Company in lieu of such benefit.

18

CC-BLG003417

10.4    If an employee or former employee is eligible for benefits under this Plan, together with other cash termination benefits (other than benefits provided by a qualified retirement plan) ("Total Benefits"), equal to or exceeding the equivalent of twice the employee's "annual compensation" (as herein defined) during the year immediately preceding the employee's Last Scheduled Employment Date, the Plan Administrator shall reduce the benefits payable under this Plan so that Total Benefits do not exceed that amount. "Annual compensation" means the amount set forth in section 2510.3-2(b)(2)(i) of the Department of Labor regulations issued under ERISA.

10.5    All payments made to each Covered Employee under this Plan shall be completed no later than 24 months after the termination of the employee's service with the Company.

10.6    Any other provision of this Plan or any provision of any other severance or similar plan or policy of the Company notwithstanding: (a) a Covered Employee that qualifies for benefits under this Plan shall not qualify, or be eligible, for severance pay or similar benefits under any other plan or policy of the Company, including any severance plan covering employees of the Health Care Businesses; and (b) a Covered Employee shall not receive benefits under more than one severance or similar plan or program of the Company.

10.7    Notwithstanding any other provision of this Plan, no Covered Employee shall be eligible for benefits under this Plan as a result of ceasing employment under the Company's 1999 Productivity Effectiveness Program, whether or not such cessation is a result of his or her election to not physically relocate with his or her position under the Program, or as a result of any other circumstance related to the Program.

19

CC-BLG003418

EXHIBIT 21

✓    **W. R. GRACE & CO.**, a Delaware corporation
**U.S. SUBSIDIARIES**

12/31/2006

✓    Chapter 11 Filing — April 2, 2001

| | SUBSIDIARY NAME | CO. # | STATE OF INCORPORATION |
|---|---|---|---|
| ✓ | A-1 Bit & Tool Co., Inc. | 458 | DE |
| | *Advanced Refining Technologies LLC | 268 | DE |
| | | (f/k/a 930) | |
| ✓ | Alewife Boston Ltd. | 070 | MA |
| ✓ | Alewife Land Corporation | 069 | MA |
| | Alltech Associates, Inc. | 259 | IL |
| ✓ | Amicon, Inc. | 174 | DE |
| | AP Chem Incorporated | 436 | MD |
| ✓ | CB Biomedical, Inc. | 125 | DE |
| ✓ | CCHP, Inc. | 074 | DE |
| ✓ | Coalgrace, Inc. | 824 | DE |
| ✓ | Coalgrace II, Inc. | 835 | DE |
| | Construction Products Dubai, Inc. | 121 | DE |
| ✓ | Creative Food 'N Fun Company | 587 | DE |
| ✓ | Darex Puerto Rico, Inc. | 798 | DE |
| ✓ | Del Taco Restaurants, Inc. | 557 | DE |
| ✓ | Dewey and Almy, LLC | 406 | DE |
| ✓ | Ecarg, Inc. | 519 | NJ |
| ✓ | Five Alewife Boston Ltd. | 071 | MA |
| ✓ | G C Limited Partners I, Inc. | 465 | DE |
| ✓ | G C Management, Inc. | 539 | DE |
| ✓ | GEC Management Corporation | 689 | DE |
| ✓ | GN Holdings, Inc. | 073 | DE |
| ✓ | GPC Thomasville Corp. | 637 | DE |
| ✓ | Gloucester New Communities Company, Inc. | 572 | NJ |
| ✓ | Grace A-B Inc. | 625 | DE |
| ✓ | Grace A-B II Inc. | 827 | DE |
| | Grace Asia Pacific, Inc. | 107 | DE |
| | Grace Chemicals, Inc. | 710 | DE |
| ✓ | Grace Chemical Company of Cuba | 305 | IL |
| | Grace Collections, Inc. | 316 | DE |
| ✓ | Grace Culinary Systems, Inc. | 479 | MD |
| ✓ | Grace Drilling Company | 877 | DE |

*    Ownership of Advanced Refining Technologies LLC is 55% W. R. Grace & Co.-Conn. (#001) and 45% Chevron USA, Inc.; certain enumerated actions of the Executive Committee require unanimous consent.

| | SUBSIDIARY NAME | CO. # | STATE OF INCORPORATION |
|---|---|---|---|
| ✓ | Grace Energy Corporation | 681 | DE |
| ✓ | Grace Environmental, Inc. | 198 | DE |
| ✓ | Grace Europe, Inc. | 407 | DE |
| | Grace Germany Holdings, Inc. | | DE |
| ✓ | Grace H-G Inc. | 506 | DE |
| ✓ | Grace H-G II Inc. | 828 | DE |
| ✓ | Grace Hotel Services Corporation | 480 | DE |
| ✓ | Grace International Holdings, Inc. | 543 | DE |
| | Grace Latin America, Inc. | 263 | DE |
| | Grace Management Services, Inc. | 485 | DE |
| ✓ | Grace Offshore Company | 822 | LA |
| ✓ | Grace PAR Corporation | 621 | DE |
| ✓ | Grace Petroleum Libya Incorporated | 880 | DE |
| | Grace Receivables Purchasing, Inc. | 041 | DE |
| ✓ | Grace Tarpon Investors, Inc. | 462 | DE |
| ✓ | Grace Ventures Corp. | 664 | DE |
| ✓ | Grace Washington, Inc. | 197 | DE |
| ✓ | W. R. Grace Capital Corporation | 563 | NY |
| ✓ | W. R. Grace & Co.-Conn. | 001 | CT |
| ✓ | W. R. Grace Land Corporation | 523 | NY |
| ✓ | Gracoal, Inc. | 856 | DE |
| ✓ | Gracoal II, Inc. | 848 | DE |
| ✓ | Guanica-Caribe Land Development Corporation | 376 | DE |
| ✓ | Hanover Square Corporation | 516 | DE |
| ✓ | Homco International, Inc. | 631 | DE |
| | Ichiban Chemical Co., Inc. | 028 | DE |
| ✓ | Kootenai Development Company | 079 | MT |
| ✓ | L B Realty, Inc. | 495 | DE |
| ✓ | Litigation Management, Inc. | 317 | DE |
| ✓ | Monolith Enterprises, Incorporated | 477 | DC |
| ✓ | Monroe Street, Inc. | 481 | DE |
| ✓ | MRA Holdings Corp. | 075 | DE |
| ✓ | MRA Intermedco, Inc. | 076 | DE |
| ✓ | MRA Staffing Systems, Inc. | 077 | DE |
| | NZ Alltech, Inc. | | IL |
| ✓ | Remedium Group, Inc. | 063 | DE |
| ✓ | Southern Oil, Resin & Fiberglass, Inc. | 318 | FL |
| ✓ | Water Street Corporation | 548 | DE |

2

CC-BLG003420

**NON-U.S. SUBSIDIARIES**

**COUNTRY/SUBSIDIARY NAME**

**ARGENTINA**
W. R. Grace Argentina S.A.
WRG Argentina, S.A.
**AUSTRALIA**
Alltech Associates (Australia) Pty. Ltd.
Grace Australia Pty. Ltd.
**BELGIUM**
Grace Construction Products N.V.
Grace N.V.
Grace Silica N.V.
Inverco Benelux N.V.
**BRAZIL**
Grace Brasil Ltda.
Grace Davison Ltda.
**CANADA**
GEC Divestment Corporation Ltd.
Grace Canada, Inc.
W. R. Grace Finance (NRO) Ltd.
**CHILE**
Grace Quimica Compania Limitada
**CHINA - PEOPLE'S REPUBLIC OF**
Grace China Ltd.
Grace Trading (Shanghai) Co., Ltd.
**COLOMBIA**
Grace Colombia S.A.
W. R. G. Colombia S.A.
**CUBA**
Envases Industriales y Comerciales, S.A.
Papelera Camagueyana, S.A.
**FRANCE**
Alltech France S.A.R.L.
Grace Produits de Construction SAS
Société Civile Beau-Béton
W. R. Grace S.A.
**GERMANY**
Advanced Refining Technologies GmbH
Alltech Grom GmbH
Grace Bauprodukte GmbH
Grace Darex GmbH
Grace GP G.m.b.H.
Grace Holding G.m.b.H.
Grace Management GP G.m.b.H.
Grace Silica GmbH

3

CC-BLG003421

COUNTRY/SUBSIDIARY NAME

**GREECE**
Grace Hellas E.P.E.
**HONG KONG**
Alltech Applied Science Labs (HK) Limited
Alltech Scientific (China) Limited
W. R. Grace (Hong Kong) Limited
W. R. Grace Southeast Asia Holdings Limited
**HUNGARY**
Grace Értékesito Kft.
**INDIA**
Flexit Laboratories Private Ltd.
W. R. Grace & Co. (India) Private Limited
**INDONESIA**
PT. Grace Specialty Chemicals Indonesia
**IRELAND**
Amicon Ireland Limited
Grace Construction Products (Ireland) Limited
Trans-Meridian Insurance (Dublin) Ltd.
**ITALY**
Alltech Italia S.R.L.
W. R. Grace Italiana S.p.A.
**JAPAN**
Advanced Refining Technologies K.K.
Grace Chemicals K.K.
Grace Japan Kabushiki Kaisha
**KOREA**
Grace Korea Inc.
**MALAYSIA**
W. R. Grace (Malaysia) Sendiran Berhad
W. R. Grace Specialty Chemicals (Malaysia) Sdn. Bhd.
**MEXICO**
Grace Container, S. A. de C. V.
W. R. Grace Holdings, S. A. de C. V.
**NETHERLANDS**
Alltech Applied Science B.V.
Amicon B.V.
Denac Nederland B.V.
LC Service B.V.
Storm van Bentem en Kluyver B.V.
W. R. Grace B.V.
**NETHERLANDS ANTILLES**
W. R. Grace N.V.
**NEW ZEALAND**
Grace (New Zealand) Limited
**PHILIPPINES**
W. R. Grace (Philippines), Inc.
**POLAND**
Grace Sp. z o.o.

4

CC-BLG003422

**COUNTRY/SUBSIDIARY NAME**

**RUSSIA**
Darex CIS LLC
**SINGAPORE**
W. R. Grace (Singapore) Private Limited
**SOUTH AFRICA**
Grace Davison (Proprietary) Limited
W. R. Grace Africa (Proprietary) Limited
**SPAIN**
Grace, S.A.
Pieri Especialidades, S.L.
**SWEDEN**
Grace AB
Grace Catalyst AB
Grace Sweden AB
**SWITZERLAND**
Pieri S.A.
**TAIWAN**
W. R. Grace Taiwan, Inc.
**THAILAND**
W. R. Grace (Thailand) Limited
**UNITED KINGDOM**
A.A. Consultancy & Cleaning Company Limited
Alltech Associates Applied Science Limited
Cormix Limited
Borndear 1 Limited
Borndear 2 Limited
Borndear 3 Limited
Darex UK Limited
Emerson & Cuming (Trading) Ltd.
Emerson & Cuming (UK) Ltd.
Exemere Limited
Grace Construction Products Limited
Pieri U.K. Limited
Servicised Ltd.
W. R. Grace Limited
**VENEZUELA**
Grace Venezuela, S.A.
Inversiones GSC, S.A.

5

CC-BLG003423

EXHIBIT 24

## POWER OF ATTORNEY

     The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and MICHAEL W. CONRON as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2006, and all amendments thereto, to be filed with the Securities and Exchange Commission.  Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ John F. Akers
_____
John F. Akers

Dated:  February 28, 2007

CC-BLG003424

## POWER OF ATTORNEY

The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and MICHAEL W. CONRON as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2006, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ H. Furlong Baldwin
H. Furlong Baldwin

Dated:  February 28, 2007

CC-BLG003425

## POWER OF ATTORNEY

    The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and MICHAEL W. CONRON as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2006, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ Ronald C. Cambre
Ronald C. Cambre

Dated:  February 28, 2007

CC-BLG003426

## POWER OF ATTORNEY

    The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and MICHAEL W. CONRON as her true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2006, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ Marye Anne Fox
Marye Anne Fox

Dated:  February 28, 2007

CC-BLG003427

## POWER OF ATTORNEY

The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and MICHAEL W. CONRON as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2006, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ John J. Murphy
John J. Murphy

Dated:  February 28, 2007

CC-BLG003428

### POWER OF ATTORNEY

The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and MICHAEL W. CONRON as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2006, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ Paul J. Norris
Paul J. Norris

Dated:  February 28, 2007

CC-BLG003429

## POWER OF ATTORNEY

The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and MICHAEL W. CONRON as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2006, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ Christopher J. Steffen
Christopher J. Steffen

Dated: February 28, 2007

CC-BLG003430

## POWER OF ATTORNEY

The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and MICHAEL W. CONRON as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2006, and all amendments thereto, to be filed with the Securities and Exchange Commission.  Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ Mark E. Tomkins
Mark E. Tomkins

Dated:  February 28, 2007

CC-BLG003431

## POWER OF ATTORNEY

The undersigned hereby appoints ROBERT M. TAROLA, MARK A. SHELNITZ, and MICHAEL W. CONRON as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2006, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ Thomas A. Vanderslice
Thomas A. Vanderslice

Dated: February 28, 2007

CC-BLG003432

EXHIBIT 31(i).1

CERTIFICATION OF PERIODIC REPORT UNDER SECTION 302 OF
THE SARBANES-OXLEY ACT OF 2002

I, A. E. Festa, certify that:

1.  I have reviewed this annual report on Form 10-K of W. R. Grace & Co.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 1, 2007

/s/ A. E. Festa
A. E. Festa
President and Chief Executive Officer

CC-BLG003433

CERTIFICATION OF PERIODIC REPORT UNDER SECTION 302 OF
THE SARBANES-OXLEY ACT OF 2002

I, Robert M. Tarola, certify that:

1.   I have reviewed this annual report on Form 10-K of W. R. Grace & Co.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a)   designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)   designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)   evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)   disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a)   all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 1, 2007

                                          /s/ Robert M. Tarola
                                          Robert M. Tarola
                                          Senior Vice President and
                                          Chief Financial Officer

CC-BLG003434

CERTIFICATION UNDER SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. Section 1350), the undersigned certifies that (1) this Annual Report of W. R. Grace & Co. (the "Company") on Form 10-K for the period ended December 31, 2006, as filed with the Securities and Exchange Commission on the date hereof (this "Report"), fully complies with the requirements of Sections 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, and (2) the information contained in this Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ A. E. Festa
President and Chief Executive Officer


/s/ Robert M. Tarola
Senior Vice President and Chief Financial Officer


Date: March 1, 2007

A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

CC-BLG003435