# W R GRACE & CO

# FORM 10-K
### (Annual Report)

## Filed 02/29/08 for the Period Ending 12/31/07

| | |
|---|---|
| Address | 7500 GRACE DRIVE |
| | COLUMBIA, MD 21044 |
| Telephone | 410 531 4000 |
| CIK | 0001045309 |
| Symbol | GRA |
| SIC Code | 2800 - Chemicals & Allied Products |
| Industry | Chemical Manufacturing |
| Sector | Basic Materials |
| Fiscal Year | 12/31 |

http://www.edgar-online.com
© Copyright 2009, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

TRIAL EXHIBIT 25
CC-BLG003436-003631

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

# FORM 10-K

### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
### THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2007                Commission file number 1-13953

# W. R. GRACE & CO.

Incorporated under the Laws of the                I.R.S. Employer Identification No.
State of Delaware                                                 65-0773649

**7500 Grace Drive, Columbia, Maryland 21044-4098**
**410/531-4000**
Securities registered pursuant to Section 12(b) of the Exchange Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $.01 par value | New York Stock Exchange, Inc. |
| Preferred Stock Purchase Rights | |

Securities registered pursuant to Section 12(g) of the Exchange Act:

None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

Yes ☐          No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Exchange Act.

Yes ☐          No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months and (2) has been subject to such filing requirements for the past 90 days.

Yes ☒          No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulations S-K is not contained herein and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☒                    Accelerated filer ☐
Non-accelerated filer ☐                       Smaller Reporting Company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

Yes ☐          No ☒

The aggregate market value of W. R. Grace & Co. voting and non-voting common equity held by non-affiliates as of June 29, 2007 (the last business day of the registrant's most recently completed second fiscal quarter) based on the closing sale price of $24.49 as reported on the New York Stock Exchange was $1,479,598,934*

At January 31, 2008, 71,635,601 shares of W. R. Grace & Co. Common Stock, $.01 par value, were outstanding.

### DOCUMENTS INCORPORATED BY REFERENCE

None.

CC-BLG003437

* Excludes 11,219,148 shares of outstanding W. R. Grace & Co. ("Grace") Common Stock held by directors and executive officers and stockholders, whose beneficial ownership exceeds 10% of the outstanding shares of Grace Common Stock. Exclusion of shares held by any person should not be construed to indicate that such person possesses the power, direct or indirect, to direct or cause the direction of the management or policies of Grace, or that such person is controlled by or under common control with Grace.

CC-BLG003438

# TABLE OF CONTENTS

**PART I**   1

Item 1.   Business   1

Item 1A.   Risk Factors   22

Item 1B.   Unresolved Staff Comments   31

Item 2.   Properties   31

Item 3.   Legal Proceedings   32

Item 4.   Submission of Matters to a Vote of Security Holders   36

**PART II**   37

Item 5.   Market for Registrant's Common Equity, Related Shareholder Matters and Issuer Purchases of Equity Securities   37

Item 6.   Selected Financial Data   38

Item 7.   Management's Discussion and Analysis of Financial Condition and Results of Operations   38

Item 7A.   Quantitative and Qualitative Disclosures About Market Risk   38

Item 8.   Financial Statements and Supplementary Data   38

Item 9.   Changes in and Disagreements with Accountants on Accounting and Financial Disclosure   39

Item 9A.   Controls and Procedures   39

Item 9B.   Other Information   39

**PART III**   40

Item 10.   Directors, Executive Officers and Corporate Governance   40

Item 11.   Executive Compensation   43

Item 12.   Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters   70

Item 13.   Certain Relationships, Related Transactions and Director Independence   72

Item 14.   Principal Accountant Fees and Services   74

**PART IV**   75

Item 15.   Exhibits and Financial Statement Schedules   75

**SIGNATURES**   79

*Grace ®, the Grace ® logo and, except as otherwise indicated, the other trademarks in this Report are trademarks or registered trademarks of W. R. Grace & Co. — Conn. or its subsidiaries in the United States and/or other countries. OCR ® is a registered trademark of Chevron Intellectual Property, LLC. As used herein, ® indicates that a trademark is registered in the United States and/or other countries. Unless the context otherwise indicates, in this document the terms "Grace," "we," "us," "our" or "the company" mean W. R. Grace & Co. and/or its consolidated subsidiaries and affiliates. Unless otherwise indicated, the contents of websites mentioned in this Report are not incorporated by reference or otherwise made a part of this Report.*

CC-BLG003439

PART I

## Item 1.   BUSINESS

### BUSINESS OVERVIEW

W. R. Grace and Co. is engaged in the production and sale of specialty chemicals and specialty materials on a global basis through its two operating segments, Grace Davison and Grace Construction Products.  We entered the specialty chemicals industry in 1954, when we acquired both the Dewey and Almy Chemical Company and the Davison Chemical Company.  During the 1980s and 1990s, we divested a substantial number of businesses that were not consistent with our business strategy. Grace is the successor to a company that originated in 1854 and originally became a public company in 1953.

Grace, along with 61 of its United States subsidiaries and affiliates, has filed voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code and, since 2001, has been subject to the jurisdiction of the United States Bankruptcy Court for the District of Delaware.

In the fourth quarter of 2007, we realigned our reportable operating segments to reflect the transfer of our packaging technologies product line to the Grace Davison operating segment.  Our previous Grace Performance Chemicals operating segment has been renamed "Grace Construction Products" as a result of the transfer.  All segment information contained herein has been retrospectively restated to reflect this realignment.

*Grace Davison* markets its products to a wide range of industrial customers, including those in the energy and refining industry, consumer, industrial and packaging industries, petro-/bio- chemical industry and the pharmaceutical and life sciences industry.  Grace Davison includes the following product groups:

- Refining Technologies, which includes:

    - fluid catalytic cracking, or FCC, catalysts, that help to "crack" the hydrocarbon chain in distilled crude oil to produce transportation fuels, such as gasoline and diesel fuels, and other petroleum-based products; and FCC additives used to reduce sulfur in gasoline, maximize propylene production from refinery FCC units, and reduce emissions of sulfur oxides, nitrogen oxides and carbon monoxide from refinery FCC units, and

    - hydroprocessing catalysts, marketed through our Advanced Refining Technologies, LLC joint venture with Chevron Products Company, in which Grace holds a 55% economic interest, that are used in process reactors to upgrade heavy oils into lighter, more useful products by removing impurities such as nitrogen, sulfur and heavy metals, allowing less expensive feedstocks to be used in the petroleum refining process;

1

CC-BLG003440

- Materials Technologies which includes:

    - silica-based and silica-alumina-based engineered materials used in:

        - industrial applications, such as rubber and tires, plastics, precision investment casting, refractory, insulating glass windows, and drying applications, fulfilling various functions such as reinforcement, high temperature binding and moisture scavenging,

        - consumer applications, as a free-flow, carrier or processing aid in food and personal care products; as a toothpaste abrasive; and for the processing and stabilization of edible oils and beverages, and

        - coatings and print media applications consisting of functional additives that: provide matting effects and corrosion protection for industrial coatings; enable enhanced media and paper quality in ink jet coatings; and act as a functional filler and retention aid in paper, and

    - sealants and coatings used in rigid food and beverage packaging, including can and closure sealants used to seal and enhance the shelf life of can and bottle contents, and coatings for cans and closures that prevent metal corrosion, protect package contents from the influence of metal and ensure proper adhesion of sealing compounds and technologies designed to reduce off-taste effects and extend the shelf-life of packaged products; and

- Specialty Technologies, which includes:

    - polyolefin catalysts and catalyst supports that are essential components in the manufacture of polyethylene and polypropylene resins, and other chemical catalysts used in a variety of industrial, environmental and consumer applications, and

    - silica-based materials and chromatography columns, instruments, consumables and accessories used in analytical chemistry applications and life sciences.

Grace Davison accounted for approximately 64% of our 2007 sales.

*Grace Construction Products, or GCP,* produces and sells specialty construction chemicals and materials, including:

- concrete admixtures and fibers used to improve the durability and working properties of concrete;

2

CC-BLG003441

- additives used in cement processing to improve energy efficiency, enhance the characteristics of finished cement and improve ease of use;

- building materials used in commercial and residential construction and renovation to protect buildings from water, vapor and air penetration; and

- fireproofing materials used to protect buildings in the event of fire.

Grace Construction Products accounted for approximately 36% of our 2007 sales.

Our principal executive offices are located at 7500 Grace Drive, Columbia, Maryland 21044, telephone (410) 531-4000. As of December 31, 2007, we had approximately 6,500 full-time employees worldwide.

Our strategy is to seek increased enterprise value by profitably growing our specialty chemicals and materials businesses in the global marketplace and achieving high levels of efficiency. To achieve these objectives, we plan to:

- invest in research and development activities, with the goals of introducing new high-performance, technically differentiated products and services while continuing to enhance manufacturing processes and operations;

- expand sales and manufacturing into geographic areas with emerging market economies, including China, India, Eastern Europe, Latin America, South America, Africa and the Middle East;

- pursue selected acquisitions and alliances that complement our current product offerings or provide opportunities for faster penetration of desirable market or geographic segments; and

- continue our commitment to process and productivity improvements and cost-management, such as rigorous controls on working capital and capital spending, integration of functional support services worldwide, and programs for supply chain management, which include both procurement and materials management.

## CHAPTER 11 FILING

On April 2, 2001, Grace, along with 61 of our United States subsidiaries and affiliates, filed voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. The cases are being jointly administered under case number 01-01139. Our non-U.S. subsidiaries and certain of our U.S. subsidiaries were not included in the bankruptcy filing.

CC-BLG003442

*Background of Chapter 11*

A bankruptcy filing under Chapter 11 of the United States Bankruptcy Code is generally a voluntary action taken by a debtor to resolve financial problems such as major liabilities. Chapter 11 gives a debtor the chance to restructure its finances so that it may continue to operate, provide its employees with jobs and pay its creditors. Chapter 11 can be used by debtors that are faced with large numbers of product liability lawsuits in multiple jurisdictions to provide a practical way to address the potential liabilities under the supervision of one court. A Chapter 11 filing generally stops all lawsuits against a debtor and prevents creditors from taking action to enforce claims or collect any monies or property that might be owed at the time of filing.

Chapter 11 permits a debtor to define and resolve its liabilities under a court-supervised process generally referred to as a reorganization. Unlike a Chapter 7, or liquidation bankruptcy, which results in the sale or distribution of all of the assets of a business, Chapter 11 reorganization permits a debtor to continue its normal business operations. Existing management may continue to manage the debtor's operations during the reorganization. As a debtor-in-possession, a debtor is able to do business with suppliers and customers in a routine manner. Certain other activities, including transactions outside the ordinary course of business, generally require specific approval of the bankruptcy court.

After a debtor files Chapter 11, one or more official committees that represent the interests of general unsecured creditors, other creditors and stockholders may be appointed. Normally these committees and their respective advisors are actively involved in the process to monitor the bankruptcy and protect the interests of their respective constituencies. The fees and expenses of these committees and advisors are paid by the debtor.

The Chapter 11 process generally ends when the bankruptcy court approves a plan of reorganization for the debtor. In cases similar to ours with complex asbestos liabilities, debtors have taken several years to complete the Chapter 11 process.

*Grace Chapter 11 Filing*

We voluntarily entered Chapter 11 to resolve comprehensively the nearly 130,000 asbestos personal injury and property damage claims against us, as well as any future demands which may be asserted. These claims and demands relate to past products and processes that involved asbestos, a mineral formerly used widely for many decades in building and other commercial products. Prior to 2000, we were able to resolve asbestos-related claims through direct negotiations and litigation, paying over $2 billion in claims and legal costs over a 20-year period. In most of the personal injury lawsuits, we are one of many defendants. In 2000 and the first quarter of 2001, the litigation environment changed with an unexpected 81% increase in personal injury claims filed against us, which we believe was caused by a surge in unmeritorious claims. We also became a defendant in class action lawsuits alleging damages from Zonolite Attic Insulation ®, or ZAI, a former attic insulation product. Trends in claims filing and

4

CC-BLG003443

settlement demands showed no sign of returning to historic levels and these unfavorable trends were exacerbated by the bankruptcy filings of several of our co-defendants in asbestos personal injury litigation. These trends greatly increased the risk that we would not be able to resolve our pending and future asbestos-related claims under the state court system.

After a thorough review of these developments, our Board of Directors concluded that a federal court-supervised bankruptcy process provided the best forum available to achieve fairness in resolving these claims and demands. On April 2, 2001, we, along with 61 United States subsidiaries and affiliates, filed voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. Since that time, we have been subject to the jurisdiction of the Bankruptcy Court.

We are currently operating as a debtor-in-possession under court protection from creditors and claimants. We believe that our bankruptcy filing will permit a comprehensive resolution of the claims against us while preserving the inherent value of our businesses. As a consequence of our bankruptcy filing, pending litigation against us is generally stayed (subject to certain exceptions in the case of governmental authorities), and no party may take any action to realize its pre-petition claims except pursuant to an order of the Bankruptcy Court. Since our bankruptcy filing, the Bankruptcy Court has approved all motions necessary for us to conduct normal business activities.

Four committees have been appointed in the bankruptcy cases, two representing asbestos claimants, a third representing other unsecured creditors and a fourth representing shareholders. These committees, and a legal representative of future asbestos claimants, have the right to be heard on all matters that come before the Bankruptcy Court and are playing important roles in the bankruptcy cases. We are required to bear certain costs of the committees and of the future asbestos claimants' representative, including those of their counsel and financial advisors.

See disclosure in this Report in Item 3 (Legal Proceedings) and Item 7 (Managements' Discussion and Analysis of Financial Condition and Results of Operations) for a description of our proposed plan of reorganization, proforma financial effects of our proposed plan, and the status of our current Chapter 11 proceedings.

## PRODUCTS AND MARKETS

### *Specialty Chemicals and Specialty Materials Industry Overview*

Specialty chemicals and specialty materials are high-value-added products used as catalysts, intermediates, components, protectants or additives in a wide variety of products and applications. They are generally produced in relatively small volumes (compared with commodity chemicals) and must satisfy well-defined performance requirements and specifications. Specialty chemicals and specialty materials are often critical components of end products, or catalysts for the production of end products and

5

CC-BLG003444

components used in end products; consequently, they are tailored to meet customer needs, which generally results in a close relationship between the producer and the customer.

We focus our business on the following, which we believe are important competitive factors in the specialty chemicals and specialty materials industry:

- value-added products and services, sold at competitive prices;

- customer service, including rapid response to changing customer needs;

- technological leadership (resulting from investment in research and development and technical customer service); and

- reliability of product and supply.

We believe that our focus on these competitive factors enables us to deliver increased value to customers and competitive operating margins notwithstanding the increased customer service and research and development costs that this focus entails.

### Grace Davison Operating Segment

Grace Davison principally applies silica, alumina, zeolite and rubber and lattice technology in the design and manufacture of products to create significant value for our diverse customer base. Our customers include major oil refiners, plastics and chemical manufacturers, users of product packaging, consumer product manufacturers and pharmaceutical companies. We believe that our technological expertise provides a competitive advantage, allowing us to quickly design products and materials that help our customers create value in their markets.

The following table sets forth Grace Davison sales of similar products based on end-use markets as a percentage of Grace total revenue.

| (In millions) | 2007 | | 2006 | | 2005 | |
|---|---|---|---|---|---|---|
| | Sales | % of Grace Revenue | Sales | % of Grace Revenue | Sales | % of Grace Revenue |
| Refining Technologies | $ 971.1 | 31.2 % | $ 859.1 | 30.4 % | $ 796.0 | 31.0 % |
| Materials Technologies | 726.7 | 23.3 % | 654.4 | 23.2 % | 611.1 | 23.8 % |
| Specialty Technologies | 311.4 | 10.0 % | 283.8 | 10.0 % | 256.1 | 9.9 % |
| **Total Grace Davison Revenue** | $ 2,009.2 | 64.5 % | $ 1,797.3 | 63.6 % | $ 1,663.2 | 64.7 % |

6

CC-BLG003445

The following table sets forth Grace Davison sales by region as a percentage of Grace Davison total revenue.

| (In millions) | 2007 | | 2006 | | 2005 | |
|---|---|---|---|---|---|---|
| | Sales | % of Grace Davison Revenue | Sales | % of Grace Davison Revenue | Sales | % of Grace Davison Revenue |
| North America | $ 578.4 | 28.8% | $ 599.9 | 33.4% | $ 587.0 | 35.3% |
| Europe Africa* | 915.6 | 45.6% | 761.1 | 42.4% | 667.4 | 40.1% |
| Asia Pacific | 362.7 | 18.0% | 324.4 | 18.0% | 297.5 | 17.9% |
| Latin America | 152.5 | 7.6% | 111.9 | 6.2% | 111.3 | 6.7% |
| **Total Grace Davison Revenue** | $ 2,009.2 | 100% | $ 1,797.3 | 100% | $ 1,663.2 | 100% |

* Includes the Middle East.

### Refining Technologies

#### FCC Catalysts

We are a global leader in developing and manufacturing FCC catalysts and additives that enable petroleum refiners to increase profits by improving product yields and quality. Our FCC products also enable refiners to reduce emissions from their FCC units and reduce sulfur content in the gasoline that fuel refiners produce.

Oil refining is a highly specialized discipline, and FCC catalysts must be tailored to meet local variations in crude oil and a refinery's product mix. We work regularly with customers to help them find the most appropriate catalyst formulations for their changing needs. We are dependent on the economics of the petroleum industry, specifically, the impacts of demand for transportation fuels and petrochemical products and crude oil supply, which affect the extent to which our customers utilize the available capacity of their FCC units. In general, as a refinery utilizes more of its capacity, it needs a disproportionately greater amount of FCC catalyst.

Refinery feedstocks vary in quality from sweet to heavy crude oil. Sweet crude feedstocks are more expensive than heavy crude and yield a greater proportion of high-value petroleum products. They also yield a lower proportion of residual oil, or "resid," which is generally the lowest-value feedstock contained in crude oil. Although feedstocks with high resid content are less expensive than higher quality feedstocks, the processing of high resid feedstocks is more difficult because of their relatively high metals, nitrogen and sulfur contamination and higher boiling points. Due to increased prices for crude oil, refiners have increased their efforts to maximize the yield from resid feedstocks. We have designed our MIDAS ®, IMPACT ®, NEKTOR™, and NOMUS™ product portfolios to enable our customers to increase the efficiency and yield of resid refining.

Many U.S. petroleum refiners have entered into consent decrees with the U.S. Environmental Protection Agency under which the refiners have agreed to reduce emissions of nitrogen oxides and sulfur oxides. The European Union has also imposed

7

CC-BLG003446

requirements on refineries with respect to nitrogen oxides and sulfur oxides emissions. FCC units are generally the largest emitters of these pollutants in a refinery. Our additives are designed to assist refineries in meeting their obligations to reduce these pollutants. Our Super DESOX ® additive reduces sulfur oxides emissions from commercial FCC units. Our XNOx ® and DENOX ® additives are designed to achieve reductions in nitrogen oxides emissions comparable to those obtained from the capital-intensive alternatives available to a refinery.

Economic growth in emerging countries has increased the demand for plastics. As a result, our refinery customers have sought increased profits in the petrochemical market by increasing the yield of propylene from their FCC units. Our zeolite-based technology, including our Olefins-Max ® and OlefinsUltra ® products, is designed to maximize the propylene output of FCC units.

In recent years, many countries and regions, including the U.S., European Union and China have imposed or increased the regulatory limitations on the sulfur content of gasoline and diesel fuel. We have developed a portfolio of products designed to assist refiners in meeting their gasoline sulfur reduction targets including our D-PriSM ® and GSR ®-5 additives and our SuRCA ® and Neptune ™ catalyst families.

Competition in the FCC catalyst and additives markets is based on technology, product performance, customer service and price. Our principal FCC catalyst competitors are BASF and Albemarle, which, with Intercat, are also principal competitors in the FCC additives market. We also have multiple regional competitors in the markets for FCC catalysts and additives.

*Hydroprocessing Catalysts*

We market hydroprocessing catalysts through Advanced Refining Technologies, LLC, or ART, our joint venture with Chevron Products Company. We established ART to combine our technology with that of Chevron and to develop, market and sell hydroprocessing catalysts to customers in the petroleum refining industry worldwide.

As discussed above, we are dependent on the economics of the petroleum industry. The increase in prices for crude oil has increased the value of refinery feedstocks that have high resid content. We are a leading supplier of hydroprocessing catalysts, including fixed-bed, on-stream catalyst replacement (OCR ®) and ebullating bed products, designed for processing these feedstocks.

We also offer a full line of catalysts used in processing ultra-low sulfur content gasoline and diesel fuel, including our SmART Catalyst System ® and ApART™ catalyst system, that are customized for individual refiners. These products are designed to help refiners meet their obligations to reduce sulfur content in their products.

Competition in the hydroprocessing catalyst industry is based on technology, product performance, customer service and price. Albemarle and Criterion are our leading global competitors in hydroprocessing catalysts. We also have multiple regional competitors .

8

CC-BLG003447

*Materials Technologies*

We market silica-based and silica alumina-based functional additives and process aids, such as silica gel, colloidal silica, zeolitic adsorbents, precipitated silica and silica-aluminas, for a wide variety of uses, and formulations used in food and beverage packaging, such as closure sealants and can coatings and sealants, as follows:

| Application | Use | Key Brands |
|---|---|---|
| Industrial | Reinforcing agents for rubber and tires | PERKASIL ® |
| | Inorganic binders and surface smoothening aids for precision investment casting and refractory applications | LUDOX ® |
| | Adsorbents for dual pane windows and industrial applications, desiccant granules, beads, powders and bags and polyurethane moisture scavengers | PHONOSORB ®, PHONOSORB MTX ®, SYLOBEAD ®, SYLOSIV ® SAFETYSORB ® |
| | Chemical metal polishing aids and formulations for CMP/electronics applications | LUDOX ®, Poli Edge ® |
| Consumer | Toothpaste abrasives and thickening agents, free-flow agents, anticaking agents, tabletting aids, cosmetic additives and flavor carriers | SYLODENT ®, SYLOID FP ™, SYLOBLANC ®, ELFADENT ®, SYLOID ®, SYLOSIV ® |
| | Edible oil refining agents, beer stabilizers and clarification aids for beer, juices and other beverages | DARACLAR ®, TriSyl ® |
| Coatings & Print Media | Matting agents, anticorrosion pigments, $TiO_2$ extenders and moisture scavengers for paints and lacquers | SYLOID ®, SHIELDEX ®, SYLOSIV ®, SYLOWHITE ™ |
| | Additives and formulations for matte, semi-glossy and glossy ink receptive coatings on high performance ink jet papers, photo paper, and commercial wide-format print media | SYLOJET ®, DURAFILL ®, LUDOX ® |
| | Paper retention aids, functional fillers, paper frictionizers | DURAFILL ®, LUDOX ® |
| Packaging | Can sealants for rigid containers, that ensure a hermetic seal between the lid and the body of beverage, food, aerosol and other cans | DAREX ®, Sistiaga™ |
| | Sealants for metal and plastic bottle closures that are used on pry-off and twist-off metal crowns, as well as roll-on pilfer-proof and plastic closures to seal and enhance the shelf life of glass and plastic bottles and jars used in beverage and food applications | DAREX ®, DARAFORM ®, DARASEAL ®, DARABLEND ®, Sincera ®, Celox™ |
| | Coatings for metal packaging that are used in the manufacture of cans and closures to protect the metal against corrosion, protect the contents against the influences of metal, ensure proper adhesion of sealing compounds to metal surfaces, and provide base coats for inks and for decorative purposes | DAREX ®, Apperta ® |

Our products are integrated into our customers' manufacturing processes and, when combined with our technical support, can increase the efficiency of such processes. By working closely with our customers, we help them to react quickly to the changing

9

CC-BLG003448

needs of their customers. Changing end-customer needs have included higher-resolution ink jet prints, improved scratch resistance of floor and furniture coatings, less abrasive, high cleaning toothpastes and technologies that are friendly to the environment such as water-based coatings, green tires with less friction resistance, bio-fuel processing and non-toxic anticorrosive pigments.

We seek to grow our packaging products by continually developing and introducing new products to meet packager and brand owner needs and by focusing on high-growth markets, such as plastic packaging; growth geographies; and "active packaging" materials, such as oxygen scavenging sealants. Our development programs are aligned to the industry trends of flexible and lighter weight packaging, lower energy consumption, personal convenience, and highly individualized packaging. We also attempt to maintain expertise in regulatory awareness and compliance in order to anticipate and respond to new food grade packaging concerns and regulations.

Our Materials Technologies product group is global, with more than 50% of our sales outside of the U.S. Our major competitors include INEOS, Degussa, UOP, Altana, PPG, Akzo Nobel and Valspar who, in each case, also sell their products on a worldwide basis. Competition is generally based on product performance and reliability, as well as additional value added features to address the needs of our customers, end-users and brand owners.

### Specialty Technologies

#### Specialty Catalysts and Processing Technologies

We are a leading provider of catalyst systems and catalyst supports to the polyolefins industry for a variety of polyethylene and polypropylene process technologies. These types of catalysts are used for the manufacture of polyethylene and polypropylene resins used in products such as plastic film, high-performance plastic pipe and household containers. We use a combination of proprietary catalyst and support technology, as well as technology licensed from third parties, to provide unique catalyst-based solutions to industry, and to provide a broad technology portfolio for enhancing collaboration opportunities with technology leaders.

Our Magnapore ® polymerization catalyst is used to produce high performance polyethylene in the slurry loop process for pipe and film applications. Polytrak ®, our newest family of products for the polypropylene market, is designed to achieve improved polymer performance, particularly for impact-resistant applications such as automobile bumpers.

We also develop and market catalysts and adsorbents for enhanced biofuel production and chromatography-based analytical tools for biofuel quality control including our EnSieve ® desiccants for ethanol dehydration, EnPure ® adsorbents for biodiesel purification and EnSight ® analyzers for process monitoring and quality control.

10

CC-BLG003449

Our Davicat ® customized products offer a wide range of chemical and physical properties based on our material science technology for supported catalysts and biotechnology applications such as nylon and artificial sweeteners. Our Raney ® products are used for the synthesis of organic compounds for the fibers, pharmaceuticals, plastics, perfumes, soaps, color couplers and petroleum industries.

Our Sylobloc ® silica gel antiblock and processing aids for producers and processors of plastic film prevent layers of polymer film from sticking together and provide an improved surface structure which results in improved scratch-resistance.

Our Sylobead ® process adsorbents are used in petrochemical/natural gas processes for such applications as ethylene-cracked-gas-drying, natural gas drying and sulfur removal.

The specialty catalyst industry is technology-intensive and suppliers must provide products formulated to meet customer specifications. There are many manufacturers of polyolefin and other specialty catalysts, and most sell their products worldwide.

*Discovery Sciences*

We market an array of products for the life science, pharmaceutical, environmental, anesthesiology, biofuels, plastic and polymer, chemical, petrochemical, food and beverage, forensic, educational, neutraceutical and biotechnology industries including:

| Products | Key Brands |
|---|---|
| Liquid and gas chromatography columns, detectors and other chromatography instruments including pumps, gas generators, auto samplers, flow meters, and gas chromatography instruments | Vydac ®, Alltech ®, Jones Chromatography™, Flexit™, Grom™ and MODcol ® |
| Chromatography consumables and accessories including solid phase extraction (SPE) cartridges, vials, syringes, standards, and thin layer chromatography (TLC) plates | |
| Silica used by drug companies for pharmaceutical applications | Davisil ®, Vydac ® |
| $CO_2$ adsorbents for medial, marine, industrial and rescue applications | Sodasorb ® |

Our chromatography tools are used in a wide range of analytical chemistry applications, including drug discovery and purification for the pharmaceutical and biotechnology industries, environmental analysis, forensics, petrochemical analysis, food, cosmetics, vitamins and biofuels. We also market chromatography consumables, analytical and preparative columns packed with our silica, and bulk silica that customers can pack in their own production columns. We can modify the base silica and surface chemistry for analytical, preparative and process scale customers, allowing us to enhance our products for unique applications.

Our Discovery Sciences products compete on the basis of product quality, distinct technology and customer support. The market for these products is highly fragmented with a large number of companies that sell their products on a global and regional basis, although a number of companies, such as Waters Corporation and Agilent

CC-BLG003450

Technologies, have a substantial global position and a relatively large installed customer base. We have developed this product group over the past few years, primarily through acquisitions of companies with substantial experience in this industry.

### *Manufacturing*

Our Grace Davison products are manufactured by a network of globally-coordinated plants that are positioned to service our customers regionally. Our integrated planning organization is responsible for the effective utilization of our manufacturing capabilities. Our Discovery Sciences product line has its own integrated planning organization. Our packaging products are manufactured in both large facilities to permit economies of scale and a network of smaller operations that enable customization to local market conditions.

### *Marketing/Sales*

We use a global organization of technical professionals with extensive experience in refining processes, catalyst development, and catalyst applications to market our Refining Technologies catalysts and additives. These professionals work to tailor our technology to the needs of each specific customer. We generally negotiate prices for our refining catalysts because our formulations are specific to the needs of each customer and each customer receives special attention and technical service. Due to the current demand for hydroprocessing catalysts, we generally sell these products through long-term supply agreements with our geographically diverse customer base.

We use country-based direct sales forces that are dedicated to each product line and backed by application-specific technical customer service teams to market our Materials Technologies and Discovery Sciences products. Our sales force seeks to develop long-term relationships with our customers and focuses on consultative sales, technical support and key account growth programs. To ensure full geographic coverage, our direct sales organization is further supplemented, especially with respect to our Discovery Sciences products, by a network of agents and distributors.

We use a global direct sales force for our Specialty Catalysts and Processing Technologies products that seeks to maintain close working relationships with our customers. These relationships enable us to cooperate with major polyolefin resin producers to develop

12

CC-BLG003451

catalyst technologies that complement their process developments. We have geographically distributed our sales and technical service professionals to make them responsive to the needs of our geographically diverse customers. We typically negotiate prices on an annual basis; however, we also operate under long-term contracts with built-in pricing mechanisms for certain customers.

Our marketing and research and development functions operate globally. We offer web-based support, including technical service, literature access, customer feedback tools, and process design formulas to assist our customers in determining their needs for our products.

Seasonality does not have a significant overall effect on our Grace Davison operating segment. However, sales of FCC catalysts tend to be lower in the first quarter prior to the shift in production by refineries from home heating oil for the winter season to gasoline production for the summer season. FCC catalysts and ebullating-bed hydroprocessing catalysts are consumed at a relatively steady rate and are replaced regularly. Fixed-bed hydroprocessing catalysts are consumed over a period of years and are replaced in bulk in an irregular pattern. Since our customers periodically shut down their refining processes to replace fixed-bed hydroprocessing catalysts in bulk, our hydroprocessing catalyst sales to any customer can vary substantially over the course of a year and between years based on that customer's catalyst replacement schedule. Our packaging products are affected by seasonal and weather-related factors such as the consumption of beverages and the size and quality of food crops. These impacts are softened by the global nature of this product line.

*Raw Materials*

The principal raw materials for Grace Davison products include caustic, alumina, rare earths, nickel, aluminum, cobalt, kaolin, molybdenum, sodium aluminate, sodium silicate, resins, rubber and lattices (including certain food-grade raw materials). Multiple suppliers are generally available for each of these materials; however some of our raw materials are provided by single sources of supply. We seek to mitigate the risk of using single source suppliers by identifying and qualifying alternative suppliers or, for unique materials, by using alternative formulations from other suppliers or by passing price increases on to customers. In some instances, we produce our own raw materials and intermediates.

Some raw materials are also subject to pricing pressures, particularly metals and petroleum-based specialty and commodity materials such as resins and solvents. As in many chemical businesses, we consume significant quantities of natural gas in the production of Grace Davison products. World events and other economic factors have caused volatility in the price of natural gas. Increases in the cost of natural gas and other important raw materials can negatively impact our operating margins . Since we manufacture a substantial portion of our packaging products in developing countries using raw materials from suppliers in the U.S., Europe and other developed economies, currency revaluations versus the U.S. dollar and Euro in developing countries may adversely affect our raw material costs and the prices we may charge for our products.

13

CC-BLG003452

*Grace Construction Products Operating Segment*

Our GCP products include specialty construction chemicals and materials. We entered this business in 1954, with our acquisition of the Dewey and Almy Chemical Company.

The following table sets forth GCP sales of similar products based on end-use markets as a percentage of Grace total revenue.

| (In millions) | 2007 | | 2006 | | 2005 | |
|---|---|---|---|---|---|---|
| | Sales | % of Grace Revenue | Sales | % of Grace Revenue | Sales | % of Grace Revenue |
| Construction Chemicals* | $ 744.3 | 23.9% | $ 694.0 | 24.5% | $ 608.0 | 23.7% |
| Building Materials** | 361.7 | 11.6% | 335.2 | 11.9% | 298.3 | 11.6% |
| **Total GCP Revenue** | **$ 1,106.0** | **35.5%** | **$ 1,029.2** | **36.4%** | **$ 906.3** | **35.3%** |

\*       Includes Concrete and Cement products.
\*\*      Includes Fireproofing, Building Envelope and Vermiculite products.

The following table sets forth GCP sales by region as a percentage of GCP total revenue.

| (In millions) | 2007 | | 2006 | | 2005 | |
|---|---|---|---|---|---|---|
| | Sales | % of GCP Revenue | Sales | % of GCP Revenue | Sales | % of GCP Revenue |
| North America | $ 536.5 | 48.5% | $ 558.9 | 54.3% | $ 500.1 | 55.2% |
| Europe Africa* | 380.1 | 34.4% | 309.9 | 30.1% | 268.7 | 29.6% |
| Asia Pacific | 139.8 | 12.6% | 118.8 | 11.5% | 105.7 | 11.7% |
| Latin America | 49.6 | 4.5% | 41.6 | 4.1% | 31.8 | 3.5% |
| **Total GCP Revenue** | **$ 1,106.0** | **100%** | **$ 1,029.2** | **100%** | **$ 906.3** | **100%** |

\*       Includes the Middle East.

14

CC-BLG003453

We are a supplier to the nonresidential (commercial and infrastructure) construction industry, and to a lesser extent, the residential construction and repair and restoration industries. The following table shows our principal specialty construction chemicals and materials products:

| Products | Uses | Customers | Key Brands |
|---|---|---|---|
| Concrete admixtures | Concrete admixtures and polymeric fibers are used to reduce the production and in-place costs of concrete, and improve the life cycle cost of the structure. | Ready-mix and precast concrete producers, engineers and specifiers | ADVA ®, STRUX ®, PolarSet ®, Eclipse ® |
| Additives for cement processing | Cement additives added to the grinding stage of the cement manufacturing process improve the energy efficiency of the plant and enhance the performance of the finished cement. Chromium reducing additives to help cement manufacturers in Europe meet environmental regulations. | Cement manufacturers | CBA ®, Synchro ®, HEA2 ®, TDA ® |
| Products for architectural concrete | Products for architectural concrete include surface retarders, coatings, pigments and release agents used by concrete producers and contractors to enhance the surface appearance and aesthetics of concrete. | Precast concrete producers and architects | Pieri ® |
| Admixtures for masonry concrete | Products for masonry concrete are used by block and paver producers for process efficiency and to improve the appearance, durability and water resistance of finished concrete masonry units. | Masonry block manufacturers | Dry-Block ®, Optec ®, Quantec ® |
| Specialty vermiculite products | Specialty vermiculite products are used in a wide range of applications making use of vermiculite's insulating properties and its ability to absorb nutrients, primarily in the horticultural, construction, and automotive industries. | Manufacturers of a variety of products, including potting soils, animal feeds, brakes, clutches and fire-rated products | MicroLite ®, Verxite ™, FRSV ™ |
| Structural waterproofing, vapor and air barrier systems | Structural waterproofing and air barrier systems prevent water, vapor and/or air infiltration in commercial structures. Products include self-adhered sheet and liquid membranes, joint sealing materials, drainage composites and waterstops. | Architects and structural engineers; specialty waterproofing and general contractors; specialty waterproofing distributors | Bituthene ®, Procor ®, Preprufe ®, Perm-A-Barrier ®, Adprufe ® |
| Residential building materials | Specialty roofing membranes and flexible flashings for windows, doors, decks and detail areas. Products include fully-adhered roofing underlayments, synthetic underlayments and self-adhered flashing. | Roofing contractors, home builders and remodelers; specialty roofing distributors, lumberyards and home centers; homeowners; architects and specifiers | Ice & Water Shield ®, Tri-Flex 30 ®, Vycor ® |
| Fire protection and firestop products | Fire protection products are spray-applied to the structural steel frame, encasing and insulating the steel and protecting the building in the event of fire. Firestop products and systems compartmentalize and contain fire and smoke within a building. | Local contractors and specialty subcontractors and applicators; building materials distributors; industrial manufacturers; architects and structural engineers | Monokote ®, FlameSafe ® |

15

CC-BLG003454

Our GCP operating segment is organized into geographic regions and most product lines, with certain regional variations, are offered in each region. GCP manages its business under a geographic organizational structure that focuses on the following regions:

- *Americas* — including North, Central and South America;

- *Europe* — including Eastern and Western Europe, the Middle East, Africa and India; and

- *Asia* — including China, Japan, South Korea, South Asia (excluding India), Pacific Rim countries, Australia and New Zealand.

In view of this diversity of customers and customer concerns, and because construction chemicals and building materials require intensive sales and customer service efforts, we maintain a direct sales and technical support team with sales personnel based in more than 35 countries worldwide. This sales and support team sells products under global contracts, under U.S. or regional contracts, and on a job-by-job basis. We also use distributors in both domestic and overseas markets. We compete globally with several large construction materials suppliers, and regionally and locally with numerous smaller competitors. In recent years, the cement and concrete industry has experienced some consolidation, thereby increasing the importance of servicing global customers. For some customer groups, such as producers and contractors, operational efficiency and total applied cost are key factors in making purchasing decisions, while for others, such as architects and engineers, product performance and design versatility are more important.

Competition for our construction products is based on product performance, technical support and service, and brand name recognition in the construction industry. Our major global competitors are BASF and Sika.

We seek to improve our products, adapt them for new applications and add new products through our innovation growth processes that focus on understanding the needs of the customer, key performance indicators, and marketing research and development. We also seek to extend our product portfolio and geographic reach through acquisitions.

16

CC-BLG003455

In addition to new product introductions, product enhancements and acquisitions, we look for growth opportunities in developing countries where increasing construction activity, improvement in building codes, and sophistication of construction practices can accelerate demand for our construction products. We continue to expand our commercial and manufacturing capabilities in these geographic areas.

The key raw materials used in our specialty construction products are obtained from a variety of suppliers, including commodity chemical producers, petroleum companies and paper manufacturers. The majority of our raw materials are olefins and organic chemicals; we also make significant purchases of inorganic materials such as gypsum, as well as specialty materials including specialty films, papers, membranes and fibers. In most instances, these materials are available from multiple sources. Global supply and demand factors, currency revaluations against the U.S. dollar and petroleum prices significantly impacted the price and availability of key raw materials in recent years.

The construction business is cyclical in response to economic conditions and construction demand. The construction business is also seasonal and dependent on favorable weather conditions, with a decrease in construction activity during the winter months. Demand for our specialty construction products is primarily impacted by global non-residential construction activity and U.S. residential construction activity. We seek to increase profitability and minimize the impact of cyclical downturns in regional economies by introducing technically advanced high-performance products and expanding geographically. Although in recent years these strategies have been successful in reducing the impact of cyclicality in our markets, a decline in U.S. residential construction activity in late 2006 and 2007 has had a negative impact on our North American sales.

## FINANCIAL INFORMATION ABOUT INDUSTRY SEGMENTS AND GEOGRAPHIC AREAS

Disclosure of financial information about industry segments and geographic areas for 2007, 2006 and 2005 is provided in this Report in Item 8 (Financial Statements and Supplementary Data) in the Financial Supplement under Note 20 (Operating Segment Information) to the Consolidated Financial Statements which disclosure is incorporated herein by reference. Disclosure of risks attendant to our foreign operations is provided in this Report in Item 1A (Risk Factors).

CC-BLG003456

## INTELLECTUAL PROPERTY; RESEARCH ACTIVITIES

Competition in our industry is often based on technological superiority and innovation. Our ability to maintain our margins and effectively compete with other suppliers depends on our ability to introduce new products based on innovative technology, as well as our ability to obtain patent or other intellectual property protection. Our research and development programs emphasize development of new products and processes, improvement of existing products and processes and application of existing products and processes to new industries and uses. We conduct research in all regions, with North America and Europe accounting for the most activity.

Numerous patents and patent applications protect our products, processes and manufacturing equipment. We also benefit from trade secrets, including know-how and other proprietary information relating to many of our products and processing technologies. There can be no assurance, however, that our patents, patent applications and precautions to protect trade secrets and know-how will provide sufficient protection for our intellectual property. In addition, other companies may independently develop systems or processes that circumvent our patents or acquire patent rights applicable to our business.

Research and development expenses relating to continuing operations amounted to $80 million in 2007, $66 million in 2006 and $64 million in 2005. These amounts include depreciation and amortization expenses related to research and development and expenses incurred in funding external research projects. The amount of research and development expenses relating to government- and customer-sponsored projects (rather than projects that we sponsor) was not material during these periods.

## ENVIRONMENTAL, HEALTH AND SAFETY MATTERS

We are subject, along with other manufacturers of specialty chemicals, to stringent regulations under numerous U.S. federal, state and local and foreign environmental, health and safety laws and regulations relating to the generation, storage, handling, discharge, disposition and stewardship of hazardous wastes and other materials. Environmental laws require that certain responsible parties, as defined in the relevant statute, fund remediation actions regardless of legality of original disposal or ownership of a disposal site. We are involved in remediation actions to address hazardous wastes or other materials as required by U.S. federal, state and local and foreign laws. During the Chapter 11 proceeding, we generally are not participating in the funding of investigation and remediation at sites that we do not own. Our ultimate liability with respect to many of these sites will be determined as part of the Chapter 11 proceeding.

We have expended substantial funds to comply with environmental laws and regulations and expect to continue to do so in the future. The following table sets forth our expenditures in the past three years, and our estimated expenditures in 2008 and 2009, for (i) the operation and maintenance of manufacturing facilities and the disposal of wastes; (ii) capital expenditures for environmental control facilities; and (iii) site remediation:

18

CC-BLG003457

| Year | Operation of Facilities and Waste Disposal (in $ millions) | Capital Expenditures (in $ millions) | Site Remediation (in $ millions) |
|------|---|---|---|
| 2005 | $51 | $9 | $28 |
| 2006 | $59 | $8 | $11 |
| 2007 | $62 | $9 | $9 |
| 2008 | $63 | $8 | $8 |
| 2009 | $69 | $10 | $4 |

\*    For 2008 and 2009, amounts are current estimates of ongoing site remediation costs and exclude payments of claims in our Chapter 11 proceeding.

See Part I, Item 3 of this 10-K for additional information about our environmental remediation activities.

We continuously seek to improve our environmental, health and safety performance. To the extent applicable, we extend the basic elements of the American Chemistry Council's Responsible Care ® program to all our locations worldwide, embracing specific performance objectives in the key areas of management systems, product stewardship, employee health and safety, community awareness and emergency response, distribution, process safety and pollution prevention. In addition, we have implemented key elements of the new Responsible Care ® Security Code for our operations and systems. We have completed a review of our existing security (including cyber-security) vulnerability and have taken actions to enhance our security systems and protect our assets.

## EMPLOYEE RELATIONS

As of December 31, 2007, we employed approximately 6,500 persons, of whom approximately 3,050 were employed in the United States. Of our total employees, approximately 3,850 work in Grace Davison facilities, approximately 1,850 work in Grace Construction Products facilities, and approximately 800 are dedicated to corporate activities and/or are shared through globally managed professional groups such as financial and legal services, human resources, information technology, supply chain and environmental health and safety.

Approximately 900 of our manufacturing employees in the United States are represented for collective bargaining purposes by nine different local collective bargaining groups. We have operated without a labor work stoppage for more than 10 years.

We have works councils representing the majority of our European sites serving approximately 2,050 employees.

CC-BLG003458

**RISK MANAGEMENT**

We have programs in place to address the following significant risks to Grace

- *Disasters* — We have disaster recovery plans in effect at key sites, and we have built a certain amount of redundancy into our production plants where feasible. We also have a formalized risk management program, which includes several types and layers of insurance. We are advised by risk management professionals and brokers who are familiar with recent trends in the insurance markets worldwide. The level of insurance carried, and other related aspects such as deductibles, self-insurance levels, etc. are monitored by management on a regular basis.

- *Environmental* — We are committed to the heath and safety of all employees and to protecting the environment from damage through the use or production of our products. Our Environmental Health and Safety (EH&S) organization is global in scope and is charged with assuring that we live up to our commitments in this area. The group performs EH&S audits of our facilities and regularly monitors local laws and regulations. Where appropriate, we use outside consultants and experts to augment our in-house staff. We continue to implement our EHS management system in our facilities worldwide. Our EHS management system is designed to enable us to apply "best practices" and "continual improvement" principles across our business.

- *Ethics and Fraud* — We insist that our employees maintain the highest standards of ethical behavior. We have preventative and investigatory programs in place to maintain these standards, as follows:

  - We have established online ethics and compliance training programs in several languages.

  - All U.S. employees and key employees outside the U.S. must sign an annual ethics statement in which they renew their commitment to operate ethically and according to the Grace code of conduct. They must also report any actual or potential conflicts of interest for evaluation by management and, if necessary, remediation.

  - We have an anonymous telephone line to report fraudulent or unethical behavior to our Chief Ethics Officer. The direct line is available to all employees worldwide where local law allows such a facility. Any allegation of fraud is required to be reported to the Audit Committee.

  - Our Internal Audit Department is independent of management and reports functionally to the Chairman of the Audit Committee of the Board of Directors.

20

CC-BLG003459

The department conducts investigations in collaboration with the Chief Ethics Officer when alleged frauds have accounting, financial reporting or fiscal aspects.

- We provide training to financial personnel in key positions covering topics such as the U.S. Foreign Corrupt Practices Act, the Sarbanes Oxley Act of 2002, and other laws and regulations relating to ethical or legal matters.

## AVAILABILITY OF REPORTS AND OTHER DOCUMENTS

We maintain an Internet website at www.grace.com. Our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to those reports, filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, are available, free of charge, on our website as soon as reasonably practicable after such reports are electronically filed with, or furnished to, the Securities and Exchange Commission. These reports may be accessed through our website's investor information page.

In addition, the charters for the Audit, Compensation, Nominating and Governance, and Corporate Responsibility Committees of our Board of Directors, our corporate governance guidelines and code of ethics are available, free of charge, on our website at www.grace.com/About/Leadership/Governance/. Printed copies of the charters, governance guidelines and code of ethics may be obtained free of charge by contacting Grace Shareholder Services at 410-531-4167.

The information on our website is not, and shall not be deemed to be, a part of this report or incorporated into any other filings we make with the Securities and Exchange Commission.

On March 29, 2007, our Chief Executive Officer submitted a certification to the New York Stock Exchange that, as of such date, he was not aware of any violation by Grace of the New York Stock Exchange corporate governance listing standards. Our Chief Executive Officer and Chief Financial Officer have submitted certifications to the SEC pursuant to the Sarbanes Oxley Act of 2002 as exhibits to this Report.

## EXECUTIVE OFFICERS

See Part III, Item 10 of this Report for information about our Executive Officers.

21

<u>Item 1A.</u>    <u>RISK FACTORS</u>

This Report, including the Financial Supplement, contains, and our other public communications may contain, projections or other "forward-looking" information, that is, information related to future, not past, events. Such information generally includes the words "believes," "plans," "intends," "targets," "will," "expects," "anticipates," or similar expressions and includes all statements regarding our Chapter 11 proceeding (including the pro forma financial statements included in "Management's Discussion and Analysis of Financial Condition and Results of Operations"), expected financial position, results of operations, cash flows, financing plans, business strategy, budgets, capital and other expenditures, competitive positions, growth opportunities for existing products, benefits from new technology and cost reduction initiatives, plans and objectives of management and markets for securities. For these statements, we claim the protection of the safe harbor for forward-looking statements contained in the Private Securities Litigation Reform Act of 1995. Like other businesses, we are subject to risks and uncertainties that could cause our actual results to differ materially from our projections or that could cause other forward-looking information to prove incorrect. Factors that could cause actual events to materially differ from those contained in the forward-looking statements include those factors set forth below and elsewhere in this Annual Report on Form 10-K. Further, our reported results should not be considered as an indication of our future performance. Readers are cautioned not to place undue reliance on our projections and forward-looking information, which speak only as of the date thereof. We undertake no obligation to publicly release any revisions to the projections and forward-looking information contained in this document, or to update them to reflect events or circumstances occurring after the date of this document.

In addition to general economic, business and market conditions, we are subject to other risks and uncertainties, including, without limitation, the following:

### COMPANY RISKS

*The outcome of our Chapter 11 cases could result in the substantial dilution or cancellation of Grace's currently outstanding common stock.*

The outcome of our Chapter 11 cases depends primarily upon the resolution of our asbestos-related and other contingent liabilities. The Bankruptcy Court has agreed to a process for estimating our asbestos-related liabilities, which estimate would form the basis for a plan of reorganization that we expect would provide for the funding of a trust to which all pending and future asbestos-related claims would be channeled. If the amount of asbestos-related liabilities, as determined through estimation or otherwise, and other liabilities exceeds assets available for funding, then we likely would issue additional shares of Grace common stock to satisfy such liabilities. The number of shares to be issued could substantially dilute the interests of current shareholders or result in a recapitalization of Grace that would cancel the shares of current shareholders and issue new shares to asbestos and other creditors. Because of this risk of

22

CC-BLG003461

substantial dilution or cancellation, the value of Grace common stock is highly speculative and any investment in Grace common stock poses a high degree of risk.

***Our proposed plan of reorganization provides for substantial dilution of the ownership interests of holders of currently outstanding Grace common stock. An alternative plan that has been filed with the bankruptcy court provides for cancellation of these ownership interests with the result that outstanding Grace common stock would likely become worthless.***

Our proposed plan of reorganization provides that the interests of current holders of Grace common stock would be subject to substantial dilution by additional Grace securities that may be issued under the plan. The proforma financial information included under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations—Proforma Financial Information" reflects the accounting effects of our proposed plan as if it were in effect on the dates and for the periods set forth therein. If our plan is not confirmed or, if confirmed, if its provisions are materially different from those proposed, the proforma financial information will change. Our plan is subject to the fulfillment of numerous conditions, including a determination by the bankruptcy court that the maximum amount that we and other parties would be required to contribute to a trust for the benefit of asbestos personal injury and property damage claimants does not exceed $1,613 million, and that assets from settlement agreements with Cryovac, Inc. and Fresenius Medical Care Holdings, Inc. would be available to fund our liabilities.

On November 5, 2007, the committee representing asbestos personal injury claimants and the legal representative of future asbestos claimants filed an alternative plan of reorganization with the bankruptcy court that provides for the cancellation of the ownership interests of holders of currently outstanding Grace common stock . This plan is subject to the fulfillment of numerous conditions, including a determination by the bankruptcy court that the value of all pending and future asbestos-related personal injury claims is at least $4.0 billion, and assumes that assets from settlement agreements with Cryovac, Inc. and Fresenius Medical Care Holdings, Inc. would be available to fund our liabilities. No documents supporting this plan have been filed and the plan was not accompanied by a disclosure statement or other information that would permit a comprehensive anlysis of its financial implications. Proforma financial information is not available with respect to this plan.

Neither plan of reorganization may be ultimately approved by the bankruptcy court and other interested parties. No party currently has exclusive rights to propose a plan of reorganization and solicit votes thereon, so any party-in-interest can propose a competing plan of reorganization at any time. Further, the proponents of the filed plans of reorganization are free to amend their respective plans at any time. As a result, a plan of reorganization that is materially different from the two that have been filed may ultimately be approved and, under the ultimate plan of reorganization, the interests of the holders of Grace common stock may be substantially diluted or cancelled. As a result, the value of Grace common stock is highly speculative and any investment in Grace common stock poses a high degree of risk.

23

CC-BLG003462

*The bankruptcy process may disrupt our business.*

We have attempted to minimize the adverse effect of our Chapter 11 reorganization on our relationships with our employees, suppliers, customers and other parties. Nonetheless, as our reorganization becomes more protracted, our relationships with our customers, suppliers and employees may be adversely impacted and our operations could be materially and adversely affected. In addition, the continuation of our reorganization could negatively affect our ability to attract new employees and retain existing high performing employees.

*Chapter 11 limits the flexibility of our management team in running our business.*

While we operate our businesses as debtor-in-possession under supervision by the bankruptcy court, we are required to obtain the approval of the bankruptcy court prior to engaging in activities or transactions outside the ordinary course of business. For example, our strategic plan includes the acquisition of businesses in the specialty chemicals industry. Such acquisitions generally require bankruptcy court approval. Bankruptcy court approval of non-ordinary course activities entails preparation and filing of appropriate motions with the bankruptcy court, negotiation with the various creditors' committees and other parties in interest and one or more hearings. The various creditors' committees and other parties in interest may be heard at any bankruptcy court hearing and may raise objections with respect to these motions. This process delays major decisions and limits our ability to respond quickly to opportunities and events in the marketplace. Furthermore, in the event the bankruptcy court does not approve a proposed activity or transaction, we would be prevented from engaging in activities and transactions that we believe are beneficial to Grace.

*We may not be able to collect all asbestos-related insurance payments that may be due to us.*

We have insurance coverage for a portion of the asbestos-related claims against us. We estimate that, assuming an ultimate payout of asbestos-related claims equal to the $1,700 million of asbestos-related liabilities recorded on our balance sheet, we should be entitled to approximately $500 million of insurance recovery. Accordingly, our December 31, 2007 balance sheet includes a long-term asset for estimated asbestos-related insurance of $500 million. Although this amount pertains only to insurance carriers with which we have asbestos settlement agreements, and/or which are currently solvent, we cannot be sure that all these amounts will be collected. We have entered into a settlement agreement with an underwriter of a portion of our excess insurance coverage. The insurer funded an escrow account for the benefit of the holders of claims that currently holds approximately $94.8 million, including interest earned on the account. The settlement agreement provides that unless we confirm a plan of reorganization by December 31, 2008, at the option of the insurer, the escrow amount with interest must be returned to the insurer. The timing and amount of future payments from our insurers depends on their continued solvency and the resolution of disputes regarding coverage under the insurance policies as well as the nature and

24

CC-BLG003463

timing of actual claims paid. Because of the significance of our future asbestos-related payments, the receipt of timely and complete payments from our insurers will be important to the success of our reorganization.

***Grace is currently under criminal indictment in connection with our former vermiculite mining and processing activities in Libby, Montana.***

Along with seven former senior level employees (one of whom is now deceased), Grace has been indicted in connection with our former vermiculite mining and processing activities in Libby, Montana. The indictment accuses Grace and the co-defendants of conspiracy to violate environmental laws and obstruct federal agency proceedings, violations of the federal Clean Air Act, and obstruction of justice.

The case is currently stayed pending the resolution of an expected appeal by Grace to the U.S. Supreme Court of certain pre-trial rulings in favor of Grace that were reversed by the Ninth Circuit Court of Appeals.  According to the U.S. Department of Justice, Grace could be subject to fines in an amount equal to twice the after-tax profit earned from our Libby operations or twice the alleged loss suffered by Libby victims, plus additional amounts for restitution to victims. The indictment alleges that our after-tax profits were $140 million. Grace has categorically denied any criminal wrongdoing and intends to vigorously defend itself at trial. We are unable to assess whether the indictment or any conviction will have a material adverse effect on our results of operations or financial condition or affect our bankruptcy proceedings. However, we expect that legal fees for Grace's defense and that of our current and former employees could range from $3 million to $4 million per quarter while the appeal is pending.

***We are subject to environmental clean-up fines, penalties and damage claims that have been and continue to be costly.***

Grace is subject to lawsuits and regulatory actions, in connection with current and former operations, for breaches of environmental laws that seek clean-up or other remedies.  For example, a federal court has ruled that Grace is responsible for reimbursing the government for $54.5 million (plus interest) in costs expended through December 2001 and for all appropriate future clean-up costs with respect to our former vermiculite mining and processing activities in Libby, Montana. The State of New Jersey is seeking civil penalties for alleged misrepresentations and false statements made in an official filing in connection with the closing of a former plant in New Jersey. Grace is also subject to other lawsuits and investigations by public and private parties under various environmental laws in connection with our current and former operations in various states, including with respect to off-site disposal at facilities where Grace has been identified as a potentially responsible party under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, commonly referred to as CERCLA.

We have established accounting accruals for all environmental matters for which sufficient information is available. As we receive new information, our estimated liability may change materially. We do not have sufficient information to accrue for all of Grace's

25

CC-BLG003464

environmental risks, and we cannot be sure that our actual costs will be equal to or less than our current estimates and accruals. Furthermore, it is reasonably possible that costs associated with those environmental matters for which we have established accruals may exceed our current accruals by material amounts. Some or all of our liability in connection with alleged violations of environmental laws may not be discharged upon confirmation of our proposed plan of reorganization.

*Our capital resources are limited and we have limited access to additional financing.*

In addition to the cash requirements necessary to fund our ongoing operations, we currently are incurring, and anticipate that we will continue to incur significant, professional fees and other restructuring costs in connection with the Chapter 11 proceedings. We are currently funding our operations with cash flow from operations and a debtor-in-possession (DIP) loan facility, which expires on April 1, 2008, in the aggregate amount of $250 million, and with a borrowing availability as of December 31, 2007 of $178.5 million. We have requested a two-year extension of this DIP facility from the lenders and a hearing before the Bankruptcy Court with respect to the extension is scheduled for March 17, 2008. Based on our current and anticipated level of operations, we believe that our cash and short term investments and cash flow from operations are adequate to meet our current and anticipated cash requirements during the Chapter 11 proceedings. If such amounts are not sufficient to fund operations until a plan of reorganization is confirmed by the Bankruptcy Court, we may be required to reduce planned capital expenditures or seek additional financing. Further, our proposed plan of reorganization requires, and any plan of reorganization that is ultimately confirmed is likely to require, Grace to borrow funds for the payment of certain claims in cash. We can provide no assurance that additional financing for current operations or for payment of claims under a plan of reorganization will be available or, if available, offered on acceptable terms. As a result of the uncertainty surrounding our current circumstances, we cannot determine our long-term liquidity requirements or the adequacy of our capital resources until a plan of reorganization is confirmed by the Bankruptcy Court.

*We have unfunded and underfunded pension plan liabilities which will likely require us to use current and future operating cash flow to fund the shortfall. We have no assurance that we will generate sufficient cash flow to satisfy these obligations.*

We maintain U.S. and non-U.S. defined benefit pension plans covering employees who meet age and service requirements. Our net pension liability and cost is materially

26

CC-BLG003465

affected by the discount rate used to measure pension obligations, the longevity and actuarial profile of our workforce, the level of plan assets available to fund those obligations and the expected long-term rate of return on plan assets. Significant changes in investment performance or a change in the portfolio mix of invested assets can result in corresponding increases and decreases in the valuation of plan assets, particularly equity securities, or in a change in the expected rate of return on plan assets. A change in the discount rate would result in a significant increase or decrease in the valuation of pension obligations, affecting the reported funded status of our pension plans as well as the net periodic pension cost in the following years. Similarly, changes in the expected return on plan assets can result in significant changes in the net periodic pension cost in the following years.

***The international scope of our operations subjects us to the risks of doing business in foreign countries, which could adversely affect our business, financial condition and results of operations.***

We conduct a substantial portion of our business outside of the United States, with approximately 67% of our 2007 sales to non-U.S. customers. We currently have many production facilities, research and development facilities and administrative and sales offices located outside North America, including facilities and offices located in Europe, Latin America, Africa and Asia. We expect sales from international markets to continue to represent a significant portion of our revenue. Accordingly, our business is subject to risks related to the differing legal, political, social and regulatory requirements and economic conditions of many jurisdictions. Risks inherent in international operations include the following:

- agreements may be more difficult to enforce and receivables more difficult to collect;

- foreign countries may impose additional withholding taxes or adopt other restrictions on foreign trade or investment, including currency exchange controls;

- we may have difficulty transferring our profits or capital from foreign operations to the United States or other countries where such funds could be more profitably deployed;

- foreign governments may nationalize private enterprises;

- we may experience unexpected adverse changes in export duties, quotas and tariffs and difficulties in obtaining export licenses;

- intellectual property rights may be more difficult to enforce;

- our business and profitability in a particular country could be affected by political or economic repercussions on a domestic, country specific or global level from terrorist activities and the response to such activities; and

- we may be affected by unexpected adverse changes in foreign laws or regulatory requirements.

In addition, certain of our operations are in high-risk regions of the world such as the Middle East and portions of Asia, Africa and Latin America. Unanticipated events, such as geopolitical changes, could adversely affect these operations. Our success as a global business will depend, in part, upon our ability to succeed in differing legal,

27

CC-BLG003466

regulatory, economic, social and political conditions by developing, implementing and maintaining policies and strategies that are effective in each location where we do business.

***We are exposed to currency exchange rate fluctuations that could impact our profitability.***

We are exposed to currency exchange rate risk through our non-U.S. operations. As we conduct a significant portion of our operations outside the United States, fluctuations in currencies of other countries, especially the Euro, may materially affect our operating results. For example, changes in currency exchange rates may affect the relative prices at which we and our competitors sell products in the same market and the cost of materials used in our operations. A substantial portion of our net sales and assets are denominated in currencies other than the U.S. dollar. During times of a strengthening U.S. dollar, at a constant level of business, our reported international sales, earnings, assets and liabilities will be reduced because the foreign currency will translate into fewer U.S. dollars.

In addition to currency translation risks, we incur a currency transaction risk whenever one of our operating subsidiaries enters into either a purchase or a sales transaction using a currency different from the operating subsidiary's functional currency. Given the volatility of exchange rates, we may not be able to manage our currency transaction and/or translation risks effectively, or volatility in currency exchange rates may expose our financial condition or results of operations to a significant additional risk.

***Our ability to use future net operating loss carryovers to reduce future tax payments may be limited if there is a change in ownership of Grace or if Grace does not generate sufficient U.S. taxable income.***

Our ability to utilize future net operating loss carryovers may be limited by Section 382 of the Internal Revenue Code of 1986, as amended, if we undergo an ownership change as a result of future changes in the ownership of outstanding Grace common stock. In addition, our ability to utilize NOLs is dependant on our ability to generate sufficient future taxable income in the U.S.

***We may be subject to claims of infringement of the intellectual property rights of others, which could hurt our business.***

From time to time, we face infringement claims from our competitors or others alleging that our processes or products infringe on their proprietary technologies. Any claims that our products or processes infringe the intellectual property rights of others, regardless of the merit or resolution of the claims, could cause us to incur significant costs in responding to, defending and resolving the claims, and may divert the efforts and attention of our management and technical personnel from our business. If we are found to be infringing on the proprietary technology of others, we may be liable for damages, and we may be required to change our processes, redesign our products, pay others to use the technology or stop using the technology or producing the

28

CC-BLG003467

infringing product. Even if we ultimately prevail, the existence of the lawsuit could prompt our customers to switch to products that are not the subject of infringement suits.

***While Grace is in bankruptcy, we are not permitted to pay dividends on Grace common stock.***

We are not permitted to pay dividends on Grace common stock while we are in bankruptcy. Following emergence from bankruptcy, we may be subject to covenants in connection with our financing arrangements that limit or prevent us from paying dividends for the foreseeable future. Furthermore, it is likely that following our emergence from bankruptcy, our board of directors will decide to reinvest our operating cash flow in our business rather than paying dividends. Accordingly, for the foreseeable future, investors in Grace common stock, in all likelihood, will obtain an economic benefit from their shares only by selling them.

## INDUSTRY RISKS

***Prices for raw materials and energy are volatile; we may not be able to pass through increases in costs and expenses for raw materials and energy which may hurt our profitability.***

We use metals, significant amounts of natural gas and petroleum-based materials, including both specialty and commodity materials such as resins and solvents, in the manufacture of our products. We purchase metals, natural gas and petroleum-based products from third-parties and prices have increased dramatically in recent years. To the extent this trend continues and we are unable to pass through these price increases to our customers, our operating profit and results of operations may decline.

***A substantial portion of our raw materials are commodities whose prices fluctuate as market supply/demand fundamentals change.***

We attempt to manage exposure to price volatility of major commodities through:

- long-term supply contracts;

- contracts with customers that permit adjustments for changes in prices of commodity-based materials and energy;

- forward buying programs that layer in our expected requirements systematically over time; and

- limited use of contracts and financial instruments.

Although we regularly assess our exposure to raw material price volatility, we cannot always predict the prospects of volatility and we cannot always cover the risk in a cost effective manner.

We have a policy of maintaining, when available, multiple sources of supply for raw materials. However, some of our raw materials are provided by single sources of

29

CC-BLG003468

supply. We may not be able to obtain sufficient raw materials due to unforeseen developments that would cause an interruption in supply. Even if we have multiple sources of supply for raw materials, these sources may not make up for the loss of a major supplier.

***We spend large amounts of money for environmental compliance in connection with our current and former operations.***

As a manufacturer of specialty chemicals and materials, we are subject to stringent regulations under numerous U.S. federal, state, local and foreign environmental, health and safety laws and regulations relating to the generation, storage, handling, discharge, disposition and stewardship of hazardous wastes and other materials. We have expended substantial funds to comply with such laws and regulations. Legislative, regulatory and economic uncertainties make it difficult for us to project future spending for these purposes, and if there is an acceleration in new regulatory requirements, we may be required to expend substantial additional funds to remain in compliance.

***The length and depth of product and industry business cycles in our markets, particularly in the construction and petroleum refining industries, may result in periods of reduced sales, operating margins and operating losses.***

Our GCP operating segment and the refining products portion of our Grace Davison operating segment are sensitive to the cyclical nature of their respective industries. Our hydroprocessing catalyst product line and other hydroprocessing catalyst suppliers have experienced alternating periods of inadequate capacity and excess capacity for their products. Periods of inadequate capacity, including some due to raw material shortages, have usually resulted in increased selling prices and operating margins. This has often been followed by periods of capacity additions, which have resulted in declining capacity utilization rates, selling prices and operating margins.

***Some of our employees are unionized, represented by workers' councils or employed subject to local laws that are less favorable to employers than the laws of the United States.***

As of December 31, 2007, we had approximately 6,500 employees worldwide. Approximately 29% of our 3,150 U.S. employees is unionized. In addition, a large number of our employees are employed in countries in which employment laws provide greater bargaining or other rights to employees than the laws of the United States. Such employment rights require us to work collaboratively with the legal representatives of the employees to effect any changes to labor arrangements. For example, most of our employees in Europe are represented by workers' councils that have co-determination rights on any changes in conditions of employment, including salaries and benefits and staff changes, and may impede efforts to restructure our workforce. Although we believe that we have a good working relationship with our employees, a strike, work stoppage or slowdown by our employees or significant dispute with our employees could result in a significant disruption of our operations or higher ongoing labor costs.

30

CC-BLG003469

*We work with dangerous materials that can injure our employees, damage our facilities and disrupt our operations.*

Some of our operations involve the handling of hazardous materials that may pose the risk of fire, explosion, or the release of hazardous substances. Such events could result from terrorist attacks, natural disasters, or operational failures, and might cause injury or loss of life to our employees and others, environmental contamination, and property damage. These events might cause a temporary shutdown of an affected plant, or portion thereof, and we could be subject to penalties or claims as a result. A disruption of our operations caused by these or other events could have a material adverse effect on our results of operations.

### Item 1B.    UNRESOLVED STAFF COMMENTS

None.

### Item 2.    PROPERTIES

We operate manufacturing and other types of plants and facilities (including office, warehouse, and other service facilities) throughout the world. Some of these plants and facilities are shared by both of our operating segments. We own all of our major manufacturing facilities. Substantially all of our U.S. properties are subject to security interests under our debtor-in-possession borrowing facility. We consider our major operating properties to be in good operating condition and suitable for their current use. We believe that, after taking planned expansion into account, the productive capacity of our plants and other facilities is generally adequate for current operations and foreseeable growth.

Our Grace Davison operating segment operates out of 40 facilities in the following regions:

| Region | Number of Facilities |
|---|---|
| North America | 15 |
| Europe | 12 |
| Latin America | 2 |
| Asia Pacific | 11 |

Our largest Grace Davison facilities are located in Baltimore, Maryland; Lake Charles, Louisiana; and Worms, Germany. Our Grace Davison operating segment also operates sales offices and warehouses in various regions.

31

CC-BLG003470

Our Grace Construction Products operating segment operates out of 55 facilities in the following regions:

| Region | Number of Facilities |
|---|---|
| North America | 23 |
| Europe | 13 |
| Latin America | 3 |
| Asia Pacific | 16 |

Our largest GCP facilities are located in Cambridge, Massachusetts; Chicago, Illinois; and Slough, England. Because of the nature of our GCP products, GCP requires a greater number of facilities to service our customers than Grace Davison. Also, these facilities are generally smaller and less capital intensive than our Grace Davison facilities. For information on our net properties and equipment by region and country, see disclosure set forth in Item 8 (Financial Statements and Supplementary Data) in the Financial Supplement under Note 20 (Operating Segment Information) to our Consolidated Financial Statements which disclosure is incorporated herein by reference.

## Item 3.   LEGAL PROCEEDINGS

### CHAPTER 11 PROCEEDINGS

Disclosure provided in this Report in Item 1 (Business) under the caption "Chapter 11 Filing" and in Item 8 (Financial Statements and Supplementary Data) in the Financial Supplement under Note 1 (Basis of Presentation and Summary of Significant Accounting and Financial Reporting Policies), under the caption "Voluntary Bankruptcy Filing," and Note 2 (Chapter 11–Related Information) to the Consolidated Financial Statements is incorporated herein by reference.

### ASBESTOS LITIGATION

Disclosure provided in this Report in Item 8 (Financial Statements and Supplementary Data) in the Financial Supplement under Note 2 (Chapter 11–Related Information) and Note 3 (Asbestos-Related Litigation) to the Consolidated Financial Statements is incorporated herein by reference.

### ENVIRONMENTAL INVESTIGATIONS, CLAIMS AND CIVIL PROCEEDINGS

Disclosure provided in this Report in Item 1 (Business) under the caption "Environmental, Health and Safety Matters" and Item 8 (Financial Statements and Supplementary Data) in the Financial Supplement under Note 15 (Commitments and Contingent Liabilities), under the caption "Environmental Remediation," to the Consolidated Financial Statements is incorporated herein by reference.

32

CC-BLG003471

The EPA also has compiled for investigation a list of 245 facilities that at one time used, stored, or expanded vermiculite concentrate that originated from the Libby vermiculite mine. Included in this list are 50 vermiculite expansion plants that Grace currently operates or formerly operated. The EPA has listed 17 of these 50 sites as requiring additional action. Grace has conducted corrective actions or investigations at six of these sites. The EPA filed proofs of claims for 9 of these sites (not including Minneapolis, MN and Libby, MT), and for three other sites never owned or operated by Grace.

In addition, another governmental agency commenced a separate investigation at 28 of the 245 facilities, 23 of which Grace currently operates or formerly operated. During 2006 and 2007, health screenings for current and former Grace employees and their household contacts commenced at four of these locations at a cost of approximately $3.4 million (including indirect costs). Grace's December 31, 2007 recorded environmental liability included this amount. Grace does not have sufficient information to determine whether this separate investigation is likely to result in any additional liability.

In February 2000, a purported class action lawsuit was filed in the U.S. District Court for Montana, Missoula Division ( *Tennison, et al. v. W. R. Grace & Co., et al* .) against Grace on behalf of all owners of improved private real property situated within 12 miles of Libby, Montana. The action alleges that the class members have suffered harm in the form of environmental contamination and loss of property rights resulting from Grace's former vermiculite mining and processing operations. The complaint seeks remediation, property damages, and punitive damages. This case has been stayed as a result of the Chapter 11 filing. However, as described in this Report in Item 8 (Financial Statements and Supplementary Data) under Note 15 (Commitments and Contingent Liabilities) under the caption "Vermiculite Related Matters—EPA Cost Recovery Claim", the EPA has been conducting remediation activities in and around Libby, which include the remediation of private real property.

In October 2000, a purported class action lawsuit was filed in the U.S. District Court for the District of Minnesota, 4th Division ( *Chase v. W. R. Grace & Co.-Conn* .) alleging loss of property values in the vicinity of the former Grace plant in Minneapolis, Minnesota that processed vermiculite from the Libby mine. This case has been stayed as a result of the Chapter 11 filing.

The EPA has completed a program for removing suspected vermiculite processing by-products from the former Minneapolis vermiculite expansion plant, from the yards and driveways of properties near the former plant, and from a municipal park. The Multi-Site Settlement Agreement, discussed below, includes all work completed by EPA in the Minneapolis area involving these properties.

The EPA has designated Grace (together, in most cases, with many other companies) as a potentially responsible party, or PRP, with respect to paying the costs of investigating and remediating pollution at various sites. As of December 31, 2007, proceedings were pending with respect to approximately 20 sites as to which Grace has

33

CC-BLG003472

been designated a PRP by the EPA. U.S. law provides that all PRPs for a site may be held jointly and severally liable for the costs of investigating and remediating the site. Grace is also conducting investigatory and remediation activities at sites under the jurisdiction of state and/or local authorities. During the Chapter 11 proceeding, Grace has not been participating (except in a limited number of special cases) in the joint funding of investigation and remediation at non-owned sites where Grace is a PRP.

During the last quarter of 2007, Grace filed a motion with the Bankruptcy Court for approval of a Multi-Site Settlement Agreement that Grace has executed with the U.S. Government, on behalf of EPA and other federal agencies, with respect to 38 sites. Under this agreement, Grace would pay approximately $44 million to the U.S. Government and other parties in settlement of 35 of these sites. In return, the U.S. Government would agree not to take action against Grace under the Comprehensive Environmental Response, Compensation, and Liability Act with respect to such sites. Grace intends to separately fund or carry out remediation at the three remaining sites, including remediation relating to Grace's former vermiculite mining site in Libby, Montana .

## MONTANA CRIMINAL PROCEEDING

Disclosure provided in this Report in Item 8 (Financial Statements and Supplementary Data) in the Financial Supplement under Note 15 (Commitments and Contingent Liabilities), under the caption "Vermiculite Related Matters—Montana Criminal Proceeding," to the Consolidated Financial Statements is incorporated herein by reference.

## LITIGATION RELATED TO FORMER PACKAGING AND MEDICAL CARE BUSINESSES

Disclosure provided in this Report in Item 8 (Financial Statements and Supplementary Data) in the Financial Supplement under Note 2 (Chapter 11—Related Information), under the caption "Litigation Proceedings in Bankruptcy Court," to the Consolidated Financial Statements is incorporated herein by reference.

## TAX CLAIMS

Disclosure provided in this Report in Item 8 (Financial Statements and Supplementary Data) in the Financial Supplement under Note 4 (Income Taxes) to the Consolidated Financial Statements is incorporated herein by reference.

## ERISA LAWSUITS

In June 2004, a purported class action complaint ( *Evans v. Akers et al.* ) was filed in U.S. District Court for the District of Massachusetts against the Board of Directors, certain current and former Grace officers and employees, and others, relating to the Grace 401(k) Savings and Investment Plan, also known as the S&I Plan. The *Evans* complaint alleges that the decline in the price of Grace common stock from July 1999

34

CC-BLG003473

through February 2004 resulted in significant losses to S&I Plan participants. The *Evans* complaint further alleges that the defendants breached their fiduciary duties under the Employee Retirement Income Security Act of 1974, as amended, or ERISA, by failing to sell or take other appropriate action with regard to Grace common stock held by the S&I Plan during that period, and by failing to disclose to S&I Plan participants the risk of investing in Grace common stock. The *Evans* complaint seeks compensatory damages for the S&I Plan from the defendants.

In October 2004, a purported class action complaint ( *Bunch et al. v. W. R. Grace & Co. et al.* ), also related to the S&I Plan, was filed in the U.S. District Court for the Eastern District of Kentucky against Grace, the Grace Investment and Benefits Committee, the Board of Directors, certain current and former Grace officers and employees, and others. The complaint alleges that Grace and its investment advisors breached fiduciary duties under ERISA by selling Grace common stock from the S&I Plan at a distressed price. The complaint further alleges that Grace breached fiduciary duties under ERISA by hiring State Street Bank and Trust Company, the investment manager for the S&I Plan that Grace retained in December 2003, to rapidly liquidate all of the employees' Grace common stock investment at an artificially low sales price.

In 2005, the Kentucky District Court transferred the *Bunch* action to the Massachusetts District Court and that court consolidated into one case both the *Bunch* action and the *Evans* action.

In December 2006, the Massachusetts District Court dismissed the *Evans* claims, on grounds that the *Evans* plaintiffs lacked standing to bring suit. The *Evans* plaintiffs' petitioned the U.S. Court of Appeals for the First Circuit to reverse the District Court's dismissal of their claims and on February 7, 2008, the First Circuit heard oral argument regarding their appeal.

On January 30, 2008, the court ruled in favor of the defendants on the *Bunch* action, holding that State Street and Grace did not breach their fiduciary duties under ERISA. On February 13, 2008, the *Bunch* plaintiffs appealed the Massachusetts District Court's decision to the First Circuit. That appeal is pending.

On February 6, 2008, a purported class action complaint ( *Siamis v Akers et al.* ) was filed in the Massachusetts District Court by the plaintiff's counsel in the *Evans* action but with a different plaintiff. The *Siamis* complaint asserts the same claims previously asserted in the *Evans* complaint.

Grace expects that it would have an obligation to indemnify the other defendants for any liability resulting from this litigation. Grace has $50 million of employers' fiduciary liability insurance coverage that Grace believes would be available to pay liabilities arising out of these lawsuits. Since all Grace employees who had interests in the S&I Plan during the relevant periods are members of the purported class and Messrs. Corcoran, McGowan, Norris, Poling, Shelnitz and Tarola had interests in the S&I Plan during these periods, they have interests in this litigation that may be adverse to Grace.

35

CC-BLG003474

**OTHER CLAIMS RECEIVED PRIOR TO THE CHAPTER 11 BAR DATE**

Disclosure provided in this Report in Item 8 (Financial Statements and Supplementary Data) in the Financial Supplement under Note 2 (Chapter 11–Related Information) under the caption "Claims Filings" to the Consolidated Financial Statements is incorporated herein by reference.

Item 4.    <u>SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS</u>

This Item is inapplicable, as no matters were submitted to a vote of our security holders during the fourth quarter of 2007.

36

CC-BLG003475

**Item 5.    MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED SHAREHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

Except as provided below, the disclosure required by this Item appears in the Financial Supplement, under the heading "Selected Financial Data" opposite the caption "Other Statistics — Common shareholders of record," and in this Report in Item 8 (Financial Statements and Supplementary Data) in the Financial Supplement in Note 16 (Shareholders' Equtiy (Deficit)) and Note 22 (Quarterly Summary and Statistical Information (Unaudited)), opposite the caption "Market price of common stock," to the Consolidated Financial Statements and is incorporated herein by reference.

On March 31, 1998, we paid a dividend of one Preferred Stock Purchase Right on each share of Grace common stock. Subject to our prior redemption for $.01 per right, rights will become exercisable on the earlier of:

- 10 days after an acquiring person, comprised of an individual or group, has acquired beneficial ownership of 20% or more of the outstanding Grace common stock or

- 10 business days (or a later date fixed by the Board of Directors) after an acquiring person commences (or announces the intention to commence) a tender offer or exchange offer for beneficial ownership of 20% or more of the outstanding Grace common stock.

Until these events occur, the rights will automatically trade with the Grace common stock, and separate certificates for the rights will not be distributed. The rights do not have voting or dividend rights.

Generally, each right not owned by an acquiring person:

- will initially entitle the holder to buy from Grace one hundredth of a share of the Grace Junior Participating Preferred Stock, at an exercise price of $100, subject to adjustment;

- will entitle such holder to receive upon exercise, in lieu of shares of Grace junior preferred stock, that number of shares of Grace common stock having a market value of two times the exercise price of the right; and

- may be exchanged by Grace for one share of Grace common stock or one hundredth of a share of Grace junior preferred stock, subject to adjustment.

Generally, if there is an acquiring person and we are acquired, each right not owned by an acquiring person will entitle the holder to buy a number of shares of common stock of the acquiring company having a market value equal to twice the exercise price of the right.

Each share of Grace junior preferred stock will be entitled to a minimum preferential quarterly dividend payment of $1.00 per share but will be entitled to an aggregate

CC-BLG003476

dividend equal to 100 times the dividend declared per share of Grace common stock whenever such dividend is declared. In the event of liquidation, holders of Grace junior preferred stock will be entitled to a minimum preferential liquidation payment of $100 per share but will be entitled to an aggregate payment equal to 100 times the payment made per share of Grace common stock. Each share of Grace junior preferred stock will have 100 votes, voting together with the Grace common stock. Finally, in the event of any business combination, each share of Grace junior preferred stock will be entitled to receive an amount equal to 100 times the amount received per share of Grace common stock. These rights are protected by customary antidilution provisions.

The terms of the rights may be amended by the Board of Directors without the consent of the holders of the rights. The rights, which will remain outstanding under the proposed plan of reorganization, are currently scheduled to expire on March 31, 2008. Prior to expiration of the rights, Grace intends to amend the terms of the rights to extend the expiration date of the rights to March 31, 2018.

This summary of the rights does not purport to be complete and is qualified in its entirety by reference to the Rights Agreement, which has been filed with the SEC.

## Item 6.    SELECTED FINANCIAL DATA

The disclosure required by this Item appears in the Financial Supplement under the heading "Selected Financial Data" which disclosure is incorporated herein by reference.

## Item 7.    MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The disclosure required by this Item appears in the Financial Supplement under the heading "Management's Discussion and Analysis of Financial Condition and Results of Operations" which disclosure is incorporated herein by reference.

## Item 7A.    QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

The disclosure required by this Item appears in the Financial Supplement under the heading "Management's Discussion and Analysis of Financial Condition and Results of Operations—Market Risk" which disclosure is incorporated herein by reference.

## Item 8.    FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

The disclosure required by this Item appears in the Financial Supplement which disclosure is incorporated herein by reference.

38

CC-BLG003477

**Item 9.    CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None.

**Item 9A.    CONTROLS AND PROCEDURES**

Except as provided below, the disclosure required by this Item appears in the Financial Supplement under the heading "Management's Report on Financial Information and Internal Controls" which disclosure is incorporated herein by reference.

There was no change in Grace's internal control over financial reporting during the quarter ended December 31, 2007 that has materially affected, or is reasonably likely to materially affect, Grace's internal control over financial reporting.

**Item 9B.    OTHER INFORMATION**

None.

39

CC-BLG003478

PART III

<u>Item 10.</u>    **DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE**

Our current directors and executive officers are listed below. Our Certificate of Incorporation provides for the division of the Board of Directors into three classes, each to serve for a three-year term or until their respective successors are elected.  In view of the Chapter 11 filing, the directors are continuing to serve beyond the expiration of their respective terms. Executive officers are elected to serve until the next annual meeting of the Board of Directors or until their respective successors are elected.

| Name and Age | Office | First Elected |
|---|---|---|
| John F. Akers (73) | Class II Director | 5/09/97 |
| H. Furlong Baldwin (76) | Class I Director | 1/16/02 |
| Ronald C. Cambre (69) | Class III Director | 9/01/98 |
| Alfred E. Festa (48) | Class II Director | 9/08/04 |
| | Chairman of the Board | 1/1/08 |
| | President and Chief Executive Officer | 6/01/05 |
| Marye Anne Fox (60) | Class I Director | 5/10/96 |
| John J. Murphy (76) | Class II Director | 5/09/97 |
| Paul J. Norris (60) | Class III Director | 1/01/99 |
| Christopher J. Steffen (66) | Class I Director | 11/01/06 |
| Mark E. Tomkins (52) | Class III Director | 9/06/06 |
| Thomas A. Vanderslice (76) | Class I Director and Lead Independent Director | 5/10/96 |
| D. Andrew Bonham (47) | Vice President & President, Grace Construction Products | 9/11/07 |
| William M. Corcoran (58) | Vice President, Public and Regulatory Affairs | 6/01/99 |
| W. Brian McGowan (58) | Senior Vice President, Administration | 7/09/98 |
| Gregory E. Poling (52) | Vice President & President, Grace Davison | 3/03/05 |
| Mark A. Shelnitz (49) | Vice President, General Counsel & Secretary | 4/27/05 |
| Robert M. Tarola (57) | Senior Vice President & Chief Financial Officer | 5/11/99 |

*Mr. Akers* served as Chairman of the Board and Chief Executive Officer of International Business Machines Corporation from 1985 until his retirement in 1993. He is also a director of Lehman Brothers Holdings, Inc.

40

CC-BLG003479

**Mr. Baldwin** served as a director of Mercantile Bankshares Corporation from 1970 to 2003, as Chairman of the Board from 1984 to 2003 and as President and Chief Executive Officer from 1976 to 2001. Mr. Baldwin is Chairman of NASDAQ Stock Market, Inc., and is a director of Platinum Underwriters Holdings, Ltd. and Allegheny Energy Inc.

**Mr. Cambre** is retired Chairman of the Board and CEO of Newmont Mining Corporation. He joined Newmont as Vice Chairman and CEO in 1993 and retired as CEO in 2000 and as Chairman in 2001. He is also a director of Cleveland-Cliffs Inc. and McDermott International, Inc.

**Mr. Festa** joined Grace in 2003 and served as President and Chief Operating Officer until he became Chief Executive Officer in 2005 and Chairman in January 2008. Prior to joining Grace, Mr. Festa was a partner of Morganthaler Private Equity Partners, a venture capital and buyout firm from 2002 to 2003. From 2000 to 2002, he was with ICG Commerce, Inc., a private company providing on-line procurement services, where he last served as President and Chief Executive Officer. For two years prior to that, he served as Vice President and General Manager of AlliedSignal's performance fibers business.

**Dr. Fox** has been Chancellor of the University of California San Diego and Distinguished Professor of Chemistry at that institution since 2004. She was Chancellor of North Carolina State University from 1998 to 2004. She is also a director of Boston Scientific Corporation and Red Hat, Inc.

**Mr. Murphy** served as Chairman of the Board of Dresser Industries, Inc., a supplier of products and technical services to the energy industry, until 1996. From 1997 to 2000, he was a Managing Director of SMG Management L.L.C., a privately owned investment group. Mr. Murphy is also a director of Coastal Energy Company.

**Mr. Norris** was actively engaged in Grace's business from 1998 until his retirement as Chief Executive Officer in 2005. Since his retirement, Mr. Norris has provided consulting services to Grace. He is also a director of FMC Corporation and Sealy Corp. He performs advisory services for Kohlberg Kravis Roberts & Co., currently the majority shareholder of Sealy Corp.

**Mr. Steffen** most recently served as Vice Chairman of Citicorp and its principal subsidiary, Citibank N.A. Since his retirement in 1996, he has been a consultant to a number of companies and public accounting firms and served on committees advising the Financial Accounting Standards Board. Mr. Steffen is also a director of Accelrys, Inc., ViaSystems, Inc. and several private companies in which he has an ownership stake.

**Mr. Tomkins** is currently serving as interim CFO for Renewable Chemicals Corporation, a privately held manufacturer of bio intermediates for replacement of petroleum products in certain chemical compounds. He served as Senior Vice President and Chief Financial Officer of Innovene, a petrochemical and oil refining

41

CC-BLG003480

company that is now part of the INEOS Group, from 2005 until January 2006. He served as CFO of Vulcan Materials Company from 2001 to 2005. Mr. Tomkins is a member of the Board of Directors of CVR Energy, Inc., a publicly held oil refining company.

*Mr. Vanderslice* served as Chairman and Chief Executive Officer of M/A-COM, Inc., a designer and manufacturer of radio frequency and microwave components, devices and subsystems for commercial and defense applications, from 1989 until 1995. He is currently a private investor. As Lead Independent Director, Mr. Vanderslice presides at all executive sessions of the Board.

*Messrs. Corcoran, McGowan, Poling, Shelnitz and Tarola* have been actively engaged in Grace's business for the past five years. Mr. Tarola is a director of 14 registered mutual funds sponsored by Legg Mason, Inc. Mr. Poling is a director of Foamex International, Inc.

*Mr. Bonham* joined Grace in 2005 as vice president and general manager of Grace Construction Products' European operations. Prior to joining Grace, he was president and general manager, from 2004 to 2005, and vice president and general manager, from 2002 to 2004, of Invensys Controls Americas. Before joining Invensys Controls, he held positions of increasing responsibility at General Electric and Honeywell.

**Audit Committee**

We have a standing Audit Committee established in accordance with the provisions of the Securities Exchange Act of 1934, as amended. The Committee members are John F. Akers, H. Furlong Baldwin, Ronald C. Cambre, Marye Anne Fox, John J. Murphy, Christopher J. Steffen, Mark E. Tomkins and Thomas A. Vanderslice, each of whom meets the independence standards of the SEC and New York Stock Exchange. Mr. Murphy serves as Chair of the Audit Committee. The Board of Directors has determined that all Audit Committee members are audit committee financial experts as defined by SEC regulations. A complete description of the responsibilities of the Audit Committee is set forth in the Grace Audit Committee Charter which is available on the Internet at www.grace.com/About/Leadership/Governance/.

**Other Committees**

We have standing Nominating and Governance, Compensation and Corporate Responsibility Committees. The members of each of these committees are John F. Akers, H. Furlong Baldwin, Ronald C. Cambre, Marye Anne Fox, John J. Murphy, Christopher J. Steffen, Mark E. Tomkins and Thomas A. Vanderslice, each of whom meets the independence standards of the New York Stock Exchange. Mr. Vanderslice serves as Chair of the Nominating and Governance Committee, Mr. Akers serves as Chair of the Compensation Committee and Dr. Fox serves as Chair of the Corporate Responsibility Committee. A complete description of the responsibilities of the Board committees is set forth in their respective committee charters which are available on the Internet at www.grace.com/About/Leadership/Governance/.

42

CC-BLG003481

**Section 16(a) Beneficial Ownership Reporting Compliance**

Under Section 16 of the Securities Exchange Act of 1934, as amended, our directors, certain of our officers, and beneficial owners of more than 10% of the outstanding Grace common stock are required to file reports with the SEC concerning their ownership of and transactions in Grace common stock or other Grace securities; these persons are also required to furnish us with copies of these reports. Based upon the reports and related information furnished to us, we believe that all such filing requirements were complied with in a timely manner during and with respect to 2007.

**Code of Ethics for Principal Officers**

The Board of Directors and the Audit Committee have adopted Business Ethics and Conflicts of Interest policies, which apply to all of our directors, officers, and employees, including our principal officers. These policies are accessible through our Internet website, www.grace.com/About/Leadership/Governance/, and are available in hard copy, free of charge, by contacting Grace Shareholder Services at 410-531-4167. We granted no waivers to these policies during 2007. We intend to promptly post on our website any amendments or waivers to these policies affecting any principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions.

**Item 11.    EXECUTIVE COMPENSATION**

**Compensation Discussion and Analysis**

*Overview*

The Board of Directors has designated seven Grace officers (including the executive officers named in the Summary Compensation Table) as "executive officers." The executive officers include the Chief Executive Officer (CEO), Chief Financial Officer and vice presidents who are in charge of operating segments or principal functions or who have policy-making authority for Grace. The Board of Directors has delegated authority for administering the compensation program for executive officers and other members of senior management to the Compensation Committee. The Board has appointed all of the independent members of the Board to serve as members of the Compensation Committee.

A complete description of the responsibilities of the Compensation Committee is set forth in the Grace Compensation Committee Charter which is available on the Internet at www.grace.com/About/Leadership/Governance/. The Compensation Committee and the Board review and revise the charter as necessary. In this Compensation Discussion and Analysis, unless the context otherwise requires, the terms "we", "our" and "the committee" refer to the Compensation Committee.

CC-BLG003482

We, the committee, are responsible for reviewing and approving all executive officers' compensation, including:

- base salary;

- annual incentive compensation;

- long-term incentive compensation;

- employment agreements;

- severance arrangements;

- change-in-control agreements; and

- any special or supplemental benefits.

We also review and approve all corporate goals and objectives used in determining the compensation of each executive officer. We evaluate each executive officer's performance in light of those goals and objectives and we approve each executive officer's compensation based on this evaluation. In determining the long-term incentive component of an executive officer's compensation, we consider the value of similar incentive awards to executive officers with similar titles at comparable companies and the awards given to the executive officer in previous years. We also approve the annual and long-term incentive programs applicable to other salaried personnel in which the executive officers participate.

We receive advice and legal and administrative assistance from the Grace human resources department and legal services group in meeting our responsibilities. We also have authority to retain advisors from outside of Grace. During 2007, we used the services of Watson Wyatt Worldwide, a human resources consulting firm, and we expect to continue working with Watson Wyatt during 2008. We instructed Watson Wyatt to compile competitive compensation data and, based upon such data, to recommend ranges of annual and long-term compensation that are consistent with our compensation philosophy and objectives as discussed below. We also asked Watson Wyatt to provide suggestions and alternatives regarding the form of various elements of executive compensation. We expect Watson Wyatt and Grace executive officers, including the CEO, General Counsel and Senior Vice President of Administration, and their respective subordinates, to meet, exchange information and otherwise cooperate in the performance of their respective duties outside committee meetings. Watson Wyatt also provides consulting services to Grace in connection with its employee benefit plans.

### *Executive Compensation Philosophy and Objectives*

#### *General*

The key objective of the Grace executive compensation program is to enable Grace to compete effectively with other firms in attracting, motivating and retaining the executives that Grace needs to ensure its future growth and business success. We intend the incentive compensation portion of the program to align closely the financial interests of Grace executives with those of Grace's stakeholders (including creditors, security holders and others with an interest in the Chapter 11 proceedings). Because senior

44

CC-BLG003483

executives have a substantial ability to influence business success, we believe that the portion of compensation that is at-risk based on corporate performance should increase as the level of responsibility of the executive increases. We also expect the executive compensation programs to be consistent with a culture of ethical conduct, personal integrity and compliance with Grace policies and applicable law. We require executives to set an example for employees and other Grace business associates in emphasizing the Grace Core Values in their daily business conduct. The Grace Core Values consist of a commitment to teamwork, performance, integrity, speed and innovation, and are the foundation of the Grace corporate culture.

The program is designed to reward executives for the achievement of corporate goals and objectives, taking into account both individual performance and contributions to the success of the overall management team. The individual performance evaluation is based on our assessment of an executive officer's leadership, technical skill, management and operational performance, and potential to contribute to Grace's future success. In evaluating executive officers other than the CEO, we receive substantial input from the CEO. The CEO proposes compensation levels for the other executive officers and, although not a member of the committee, attends our meetings and participates in our deliberations regarding compensation levels for the other executive officers, but is excused from deliberations regarding his own compensation and executive sessions. Although we have not received such a request, at the request of the CEO, we would very likely hold a special meeting of the committee.

Once we have completed an evaluation of an executive's overall performance, we review the executive's existing compensation and compensation potentially payable to the executive. An executive's outstanding equity-based awards are not considered in setting future compensation. We then consult with Watson Wyatt for an assessment of the competitiveness of Grace executive officer compensation relative to certain benchmark companies in the chemicals, materials and specialty chemicals industry, that we deem our peer group and relative to certain broad industry data. We selected the benchmark companies as our peer group based upon our judgment regarding the likelihood that they would compete with us for executive talent and the availability of public information regarding their compensation practices. We periodically review the composition of the peer group to ensure that it remains relevant. For 2007, the peer group consisted of:

| | |
|---|---|
| Albemarle | Hercules |
| Cabot | International Flavors & Fragrances |
| Eastman Chemical | PPG Industries |
| EcoLab | Rohm & Haas |
| Fuller (H.B.) | Sigma-Aldrich |

The broad industry data that we generally review is included in studies produced by Mercer, Towers Perrin, Hewitt and Watson Wyatt for any given compensation year. The chemicals and non-durable goods sections of such surveys were used, in each case, appropriately scoped to reflect Grace's revenues. This data is used as a secondary reference for executive officer compensation, largely as a check on the peer group levels, as well as to determine if there are any identifiable non-industry trends in compensation.

45

CC-BLG003484

We intend that the annual compensation paid to Grace executives (consisting of salary plus annual incentive compensation) fall within a range that approximates the 50th percentile, and that long-term incentive compensation fall within a range that approximates the 60th percentile, of the practices of the peer group companies and broad industry data when performance objectives are achieved. We selected these percentile targets because they are generally consistent with the historical practices of the peer group. In applying these targets, we do not base our decision on a mathematical analysis of the available data; rather, we use our judgment after considering all available information. If performance objectives are exceeded, we believe that incentive compensation should be above these levels, and when performance objectives are not achieved, incentive compensation should be below these levels. The bias toward incentive compensation reflected in these percentages is in keeping with our intention to align executive and stakeholder interests.

Since Grace's Chapter 11 filing, we have not included Grace common stock and stock options in the executive compensation program. Accordingly, Grace incentive compensation programs are currently 100% cash-based, although equity incentives awarded prior to 2002 remain outstanding. We have requested that the Corporate Secretary inform the committee if an executive officer wishes to enter into any transaction involving Grace equity securities. Following Grace's emergence from Chapter 11, we will consider including equity incentives in the executive compensation program.

We believe that income before interest and taxes is generally the best indicator of the performance of the Grace business for incentive compensation purposes. Income before interest and taxes includes the factors that the executive team generally has the ability to affect and excludes the cost of capital and tax rates that we believe are generally unrelated to business performance or management control. However, this income measure is significantly affected by other factors that Grace executives are generally unable to influence such as the substantial costs of the Chapter 11 proceedings, legacy liabilities, income from insurance settlements and pension income and expense. As a result, our performance metric for incentive compensation purposes is pre-tax income from core operations (calculated as described in "Management's Discussion and Analysis of Financial Condition and Results of Operations—Summary Financial Information and Metrics" in the financial supplement) adjusted to eliminate the effect of: certain unusual or one-time events; changes in pension expense (related to core operations) and Long Term Incentive Program, or LTIP, expense from year to year; and, for the LTIP, the effect of major acquisitions or divestments. We generally refer to this performance metric as pre-tax income from core operations as adjusted. Grace core operations are comprised of the financial results of Grace Davison, Grace Construction Products, and the costs of corporate activities that directly or indirectly support their business operations. Excluded from pre-tax income from core operations and pre-tax income from core operations as adjusted are all other events and transactions not directly related to the generation of operating revenue or the support of our core operations.

46

CC-BLG003485

*Chief Executive Officer*

Our process for determining the compensation of the CEO is similar to the process we apply to other executive officers. We review and approve corporate goals and objectives used in determining the compensation of the CEO. We evaluate the CEO's performance in light of those goals and objectives and have sole authority to determine the CEO's compensation based on this evaluation subject to the terms of his employment agreement, that are discussed below in this Compensation Discussion and Analysis and under the Summary Compensation Table and Potential Payments Upon Termination or Change-In-Control Table. The CEO plays no part in our deliberations or approval of his compensation.

We believe the CEO's compensation should be substantially higher than the compensation of other executive officers because the CEO is uniquely positioned to influence all aspects of Grace's operations and performance and the resulting return to our stakeholders. In addition, we believe there exists a robust competition for effective CEO talent among companies the size of Grace and, in this environment, a competitive compensation package is essential for retention. Our view is consistent with the practices of the peer group companies and the broad industry data that we have reviewed.

*Base Salary*

To ensure comparability with other companies, as well as consistency and uniformity within Grace, all management positions have been assigned to salary ranges based upon broad industry data. Individual salaries and salary increases for executive officers are set within the salary ranges based on the median annual base salaries paid to individuals who hold comparable positions at the peer group companies, salary levels of peers and subordinates within Grace, individual performance and the amount budgeted for salary increases. Although these factors apply to Mr. Festa his base salary is also subject to the terms of his employment agreement. Grace executives are generally eligible for annual salary reviews.

For 2007, Grace established a guideline for base salary merit increases applicable to all Grace U.S. salaried employees of 3.7%. Grace determined the amount of the guideline based on a review of projected wage increases in the U.S. chemical industry and certain additional data applicable to the geographic regions in which Grace has its major operations. Base salary merit increases for the Grace executive officers listed below in the Summary Compensation Table, referred to herein as named executive officers, other than Mr. Festa, were generally in line with those of other salaried employees, ranging from 3.3% to 8.7%. We increased Mr. Festa's base salary by 11.1% to reflect our view of his individual contribution to the performance of Grace during 2006 and 2007.

*Annual Incentive Compensation*

The Annual Incentive Compensation Program, or AICP, is a cash-based pay-for-performance incentive program. Its purpose is to motivate and reward executive officers, and other upper- and middle-level employees, for their contributions to Grace

47

CC-BLG003486

performance and align their financial interests with those of Grace stakeholders by making a significant portion of their annual compensation variable and dependent upon Grace's annual financial performance. The amount of an individual incentive award payment under the AICP is based upon:

- the individual's annual incentive target amount;

- the change in Grace pre-tax earnings from core operations as adjusted; and

- the individual's personal performance.

The AICP targets for the named executive officers (other than Mr. Festa) for 2007 range from 65% to 80% of base salary and actual awards may range from $-0- to an amount equal to twice the target amount , based on business and individual performance . The AICP targets for executive officers are generally set within the target range based on the median annual bonus paid to individuals who hold comparable positions at the peer group companies. Although these factors also apply to Mr. Festa, his AICP target is also subject to the terms of his employment agreement, which requires a minimum AICP target of 100% of base salary. For 2007, Mr. Festa's AICP target is 100% of base salary.

For 2007, the target performance objective was an 8% increase, and the maximum compensable performance objective was a 35% increase, in pre-tax earnings from core operations as adjusted over pre-tax earnings from core operations for 2006. The target performance objective reflects our collective view of good performance by Grace based upon Grace's historical performance and the long-term historical performance of the peer group. Generally, no awards are earned for any year if pre-tax earnings from core operations as adjusted is less than 80% of the prior year's pre-tax earnings from core operations; provided however, that we have discretion to establish or increase the size of the incentive pool even if performance measures are not achieved. We usually make AICP awards during the first quarter for the current compensation year.

Based on 2007 operating performance, the aggregate AICP incentive pool was established at 127.0% of the targeted awards. Mr. Festa's 2007 AICP award payment (159% of his target award) reflects his individual contribution to the performance of Grace for the year in the judgment of the committee. Mr. Tarola's 2007 AICP award payment was generally in line with the incentive pool. Mr. Poling's 2007 AICP award payment (155% of his target award) reflects the increased responsibility he assumed during the year with the transfer of the Darex product line to Grace Davison as well as his individual contribution to the performance of Grace for the year in the judgment of the committee. Mr. Bonham's 2007 AICP award payment (176% of his target award) reflects the increased responsibility he assumed as a result of his promotion to President, Grace Construction Products as well as his individual contribution to the performance of Grace for the year in the judgment of the committee. Mr. Shelnitz's 2007 AICP award payment (153% of his target award) reflects the committee's view of his individual performance within the context of Grace's challenging legal environment.

### Long-Term Incentive Compensation

The LTIPs are cash-based incentive programs. Their purpose is to motivate and reward approximately 225 upper-level Grace employees, including the executive officers, for their contributions to Grace performance over a multi-year period and align their financial interests with those of Grace stakeholders by making a significant portion of their total compensation variable and dependent upon Grace's sustained financial performance. The LTIP target opportunities for these employees are based on the 60 th percentile of long-term compensation opportunities of individuals who hold comparable positions at the peer group companies (in the case of the executive officers) and broad industry data for other participants. Due to our Chapter 11

CC-BLG003487

status, w e view the cash-based LTIP as a substitute for the equity incentive programs that other public companies generally make available to their senior executives.

The Bankruptcy Court has approved the LTIPs for each of the 2005-2007, 2006-2008 and 2007-2009 performance periods. Awards under these LTIPs are payable 100% in cash, based on the extent to which Grace achieves certain performance targets. These LTIP payouts are based on the compound annual growth in our pre-tax income from core operations as adjusted over the performance period using results for the year prior to the first year of the performance period as the baseline. We generally refer to this growth objective as a CAGR. For these LTIPs, the CAGR objective is 6% and the maximum compensable CAGR objective is 25%. The CAGR objective reflects our collective view of good performance by Grace based upon Grace's historical performance and the long-term historical performance of the peer group. The LTIP target is lower than the AICP target because the LTIPs are designed to incentivize sustained growth over a long-term period, which we believe is generally more difficult to achieve than annual performance targets. The LTIP award payouts m ay range from $-0- to an amount equal to twice the target amount , based on Grace's operating performance. No award payouts are earned under these LTIPs if the CAGR for the performance period is zero or negative .

During 2007, we reviewed the LTIP awards for our named executive officers, other than Mr. Festa, and determined that the outstanding LTIP awards for previous years were significantly below the 60th percentile of the practices of the peer group companies and broad industry data. In order to more closely align the long-term compensation of the named executive officers with the long-term compensation of similar executives at the peer group companies and broad industry data, we made additional awards to the named executive officers, other than Mr. Festa, under the 2005 and 2006 LTIPs.

We believe that the LTIP awards encourage executive retention because the right to any pending payment under an LTIP is generally subject to forfeiture if the executive ceases employment with us prior to age 62. We generally grant LTIP awards during the first year of the performance period.

*Pension Plan/Supplemental Executive Retirement Plan*

As described below under "Pension Benefits," payments under Grace's tax-qualified pension plan are calculated using annual compensation, including base salary and AICP awards, and years of credited Grace service. We believe that retirement compensation that increases with increases in years of service and annual compensation is an effective recruiting and retention tool for our employees, including our executive officers. For 2007, federal income tax law limits to $225,000 the annual compensation on which benefits under the tax-qualified pension plan may be based. As a result, we have implemented a Supplemental Executive Retirement Plan, generally referred to as a SERP, that currently applies to approximately 70 upper-level employees, including the executive officers, whose annual compensation exceeds that amount, under which each such employee will receive the full pension to which that employee would be entitled in the absence of the limitations described above and other limitations imposed under federal income tax law. The SERP is unfunded and is not qualified for tax purposes.

49

CC-BLG003488

*Savings and Investment Plan/Replacement Payment Program*

We generally offer a tax-qualified 401(k)-type Savings and Investment Plan, or S&I Plan, to employees under which they may save a portion of their annual compensation in investment accounts on a pre- or post- tax basis. Grace currently matches 100% of employee savings under the plan up to six percent of the employee's base salary and annual incentive compensation. We believe that a 401(k)-type plan with a substantial company match that increases (in dollar amount, not percentage of compensation) with the level of participation in the plan and increases in the employee's annual compensation is an effective recruiting and retention tool for our employees, including our executive officers. For 2007, federal income tax law limits the total contributions, which include an employee's contribution plus the employer's matching contributions, that can be made to an employee's 401(k) plan account to $45,000 and qualifying annual compensation for 401(k) plan purposes to $225,000. As a result, we have implemented an S&I Plan Replacement Payment Program that currently applies to approximately 75 of our employees, including our executive officers, whose annual compensation exceeds $225,000 under which each such employee will receive the full Grace matching payments to which that employee would be entitled in the absence of the limitations described above and other limitations imposed under federal income tax law.

*Executive Personal Benefits*

We believe that executives generally should not be treated differently than the general employee population when it comes to personal benefits and therefore, we have limited executive personal benefits. During 2007, these personal benefits for the named executive officers were generally limited to financial counseling and tax preparation services limited to no more than $10,000 for Mr. Festa and $4,000 for the other named executive officers. We eliminated this personal benefit during 2007, Mr. Festa has access to corporate aircraft at Grace expense for reasonable personal travel. Due to his overseas assignment in Belgium, Mr. Bonham receives certain expatriate benefits that are generally available to Grace executives that are U.S. citizens stationed abroad. We intend that these benefits compensate Grace's expatriate executives for the additional economic costs they face as a result of their foreign service including housing costs, higher cost of living, family leave in the U.S., local transportation expenses, children's tuition, foreign income taxes and increases in U.S. taxes caused by such benefits.

*Change-In-Control Severance Agreements*

As described below under "Change-In-Control Severance Agreements," Grace has entered into change-in-control severance agreements with each of the named executive officers. The provisions in these agreements are based on competitive practice and are designed to ensure that the executive officers' interests remain aligned with the interests of the Grace stakeholders if a potential change in control occurs. Payments under these agreements are triggered by the involuntary termination of the executive officer's employment without cause (including constructive termination

50

CC-BLG003489

caused by a material reduction in his or her authority or responsibility or by certain other circumstances) following a "change in control." A change in control situation often undermines an executive officer's job security, and it is to Grace's and its stakeholders' benefit to encourage the Grace executive officers to seek out beneficial transactions and to remain employed through the closing of any transaction, even though their future employment at Grace may be uncertain. The change-in-control severance agreements are designed to reinforce and encourage the continued attention and dedication of the executive officers to their assigned duties without distraction in the face of potentially adverse circumstances arising from the possibility of a change in control of Grace. Certain terms of these agreements are described below under the Potential Payments Upon Termination or Change-In-Control Table.

### Severance Arrangements

As described below under "Severance Arrangements," we have entered into severance agreements with each of the named executive officers, other than Mr. Festa, whose severance arrangements are included in his employment agreement, and Mr. Bonham, whose severance arrangements were established by committee approval. Payments under these arrangements are triggered by involuntary termination of employment under most circumstances. The Grace severance arrangements are designed to encourage and reinforce the continued attention and dedication of our executive officers to their assigned duties without undue concern regarding their job security. Certain terms of these agreements are described below under the Potential Payments Upon Termination or Change-In-Control Table.

### Executive Salary Protection Plan

As described below under "Executive Salary Protection Plan," our Executive Salary Protection Plan provides payments to our named executive officers, or their respective beneficiaries, in the event of their disability or death prior to age 70 while employed by Grace. The plan is designed to encourage the continued attention and dedication of our executive officers to their assigned duties without undue concern regarding their ability to earn a living and support their families in the event of death or disability. Certain terms of this plan are described below under the Potential Payments Upon Termination or Change-In-Control Table.

### Employment Agreements

Grace has entered into an employment agreement with Mr. Festa pursuant to which he serves as CEO of Grace. Certain terms of this employment agreement are described below under the Summary Compensation Table and Potential Payments Upon Termination or Change-In-Control Table. This agreement was approved by the Bankruptcy Court and was designed to encourage Mr. Festa to accept his appointment as CEO of Grace, remain with Grace and work diligently in pursuit of corporate objectives. Mr. Festa's employment agreement includes a minimum salary and AICP target that were negotiated with Mr. Festa and are based on his business experience, his past performance as Chief Operating Officer of Grace and a competitive analysis of

51

CC-BLG003490

the base salary and annual bonus paid to CEOs at the peer group companies. The agreement also provides for retention payments that are designed to encourage Mr. Festa to make a long-term commitment to Grace through the uncertainty of the Chapter 11 process in lieu of other opportunities that may be available to him, and severance payments that are designed to encourage and reinforce Mr. Festa's continued attention and dedication to his assigned duties without undue concern regarding his job security.

Grace has also entered into an employment agreement with Mr. Tarola. Certain terms of this employment agreement are described below under the Summary Compensation Table and Pension Benefits Table. This agreement includes currently effective provisions regarding severance payments and enhanced pension payments. This agreement was negotiated on an arms-length basis prior to the time Mr. Tarola joined Grace. The payments required by this agreement were designed to encourage Mr. Tarola to join and remain with Grace in lieu of other employment opportunities available to him.

### Deductibility of Executive Compensation

Under the Omnibus Budget Reconciliation Act of 1993, provisions were added to the Internal Revenue Code of 1986, as amended, under Section 162(m) that limit the tax deduction for compensation expense in excess of $1 million paid to executive officers unless such compensation is "performance-based" and satisfies certain other conditions. We believe that compensation payable to executive officers should generally meet the conditions required for full deductibility under Section 162(m). Tax deductibility is one criterion we consider when establishing compensation programs. The AICP and LTIPs are structured with the intention that the compensation payable thereunder, with the exception of any discretionary AICP payments or other non-performance-based payments, will qualify as deductible "performance-based" compensation. While we believe that it is important to preserve the ability to structure compensation programs to meet a variety of corporate objectives even if the compensation is not deductible, due to our focus on performance-based compensation plans, we expect that the vast majority of compensation paid to the named executive officers will be tax deductible.

### Compensation Committee Report

We, the undersigned members of the Compensation Committee of the Board of Directors of Grace, have reviewed Grace's Compensation Discussion and Analysis for 2007 and have discussed it with Grace management. Based on our review and this discussion, we recommend to the Board that the Compensation Discussion and Analysis be included in Grace's Annual Report on Form 10-K.

COMPENSATION COMMITTEE

John F. Akers, Chair
H. Furlong Baldwin
Ronald C. Cambre
Marye Anne Fox
John J. Murphy
Christopher J. Steffen
Mark E. Tomkins
Thomas A. Vanderslice

CC-BLG003491

**Summary Compensation Table**

The following table sets forth the compensation we paid for services rendered during the fiscal year ended December 31, 2007 to our Chief Executive Officer, our Chief Financial Officer and each of our other three most highly compensated executive officers who were executive officers as of December 31, 2007, determined by reference to total compensation (reduced by the amount set forth in the table below under the caption "Change in Pension Value and Nonqualified Deferred Compensation Earnings") earned by such individuals for the 2007 fiscal year.

| Name and Principal Position | Year | Salary ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) AICP | Non-Equity Incentive Plan Compensation ($) LTIP [a] | Change in Pension Value and Nonqualified Deferred Compensation Earnings [b] ($) | All Other Compensation [c] ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| **A. E. Festa** | 2007 | 862,500 | -0- | -0- | 1,375,000 | 2,399,800 | 326,000 | 916,470 | 5,879,770 |
| President & Chief Executive Officer | 2006 | 789,167 | -0- | -0- | 1,250,000 | 1,502,233 | 56,000 | 244,525 | 3,841,925 |
| **R. M. Tarola** | 2007 | 439,333 | -0- | -0- | 440,000 | 611,833 | 682,000 | 58,594 | 2,231,760 |
| Senior Vice President & Chief Financial Officer | 2006 | 426,667 | -0- | -0- | 460,000 | 769,500 | 295,000 | 101,284 | 2,052,451 |
| **G. E. Poling** | 2007 | 412,667 | -0- | -0- | 500,000 | 743,333 | 560,000 | 53,342 | 2,269,342 |
| Vice President | 2006 | 385,000 | -0- | -0- | 460,000 | 771,667 | 158,000 | 77,407 | 1,852,074 |
| **D. A. Bonham** | 2007 | 311,667 | -0- | -0- | 360,000 | 301,765 | 33,000 | 488,537 | 1,494,969 |
| Vice President | | | | | | | | | |
| **M. A. Shelnitz** | 2007 | 336,000 | -0- | -0- | 335,000 | 453,167 | 237,000 | 39,957 | 1,401,124 |
| Vice President, Secretary and General Counsel | | | | | | | | | |

53

CC-BLG003492

(a)    2007 amount consists of the following payments that we expect to make in March 2008 pursuant to the 2005-2007 and 2006-2008 Long-Term Incentive Programs, or LTIPs, as follows:

| Name | Final Payment 2005-2007 LTIP | Initial Payment 2006-2008 LTIP $ | Total $ |
|------|------|------|------|
| A. E. Festa | 1,836,467 | 563,333 | 2,399,800 |
| R. M. Tarola | 461,833 | 150,000 | 611,833 |
| G. E. Poling | 543,333 | 200,000 | 743,333 |
| D. A. Bonham | 201,765 | 100,000 | 301,765 |
| M. A. Shelnitz | 353,167 | 100,000 | 453,167 |

(b)    2007 amount consists of the aggregate change in the actuarial present value of the individual's accumulated benefit under the Grace Pension Plan, the Grace Supplemental Executive Retirement Plan and, in the case of Mr. Tarola supplemental benefits pursuant to the terms of his employment agreement, from December 31, 2006 to December 31, 2007 assuming a 6.25% discount rate and retirement at age 62 with benefits payable on a straight life annuity basis and other assumptions used for financial reporting purposes under generally accepted accounting principles as described in this Report in Item 8 (Financial Statements and Supplementary Data) in the Financial Supplement under Note 19 (Pension Plans and Other Postretirement Benefits Plans) to the Consolidated Financial Statements. The 2007 amount reflects changes from the method used in prior years to calculate pension values including our revised data collection procedures.

(c)    2007 amount consists of the following:

(i)    retention payment of $750,000 pursuant to Mr. Festa's employment agreement;

(ii)    our aggregate incremental cost of providing personal benefits if the aggregate amount of personal benefits provided to the individual equals or exceeds $10,000. Except as specified below, these personal benefits are limited to financial counseling and tax preparation services. The following additional personal benefits exceed the greater of $25,000 or 10% of the total amount of personal benefits for that individual and we are required to separately report them under SEC rules:

(A)    for Mr. Festa, $33,873 for personal use of Grace-provided aircraft, and

(B)    for Mr. Bonham, certain expatriate benefits related to his overseas assignment in Belgium that are generally available to Grace executives that are U.S. citizens stationed abroad including, bank fees, U.S. housing maintenance, local transportation expenses, estimated gross up for U.S. income taxes resulting from Grace expatriate benefits—$172,400, travel allowance related to family leave in the U.S.—$27,851, and the following items paid in Euros and converted at exchange rates prevailing at the time such amounts were paid: foreign tax payments—$28,349, cost of living allowance—$61,976, overseas housing allowance—$95,667, and children's tuition reimbursement—$37,106;

(iii)    our contributions to the Savings and Investment Plan, or S&I Plan, as follows: Mr. Festa—$13,500, Mr. Tarola—$13,500, Mr. Poling—$12,525, Mr. Bonham—$13,500 and Mr. Shelnitz—$13,500;

(iv)    payments pursuant to the S&I Plan Replacement Payment Program to persons whose personal and/or Grace contributions to the S&I Plan would be subject to limitations under federal income tax law, as follows: Mr. Festa—$113,250, Mr. Tarola—$40,460, Mr. Poling—$38,860, Mr. Bonham—$23,500 and Mr. Shelnitz—$25,260;

(v)    the value of Grace-provided personal liability insurance, as follows: Mr. Festa—$1,200, Mr. Tarola—$900, Mr. Poling—$600, Mr. Bonham—$200 and Mr. Shelnitz—$600; and

CC-BLG003493

(vi)   the value of Grace-provided life insurance, as follows:  Mr. Festa—$2,097, Mr. Tarola—$3,734,  Mr. Poling—$1,357, Mr. Bonham—$224 and Mr. Shelnitz—$597.

### CEO Employment Agreement

Grace has entered into an employment agreement with Mr. Festa pursuant to which he serves as CEO of Grace.  Under this employment agreement, Mr. Festa is entitled to an initial base annual salary of $760,000. His targeted award under the AICP for 2005 and each calendar year thereafter is 100% of his base salary earned during the applicable year (or greater, as determined by the Board).  Under the Agreement, Mr. Festa may also participate in the LTIPs.  Mr. Festa's agreement also provides for retention payments, which will generally be triggered by Mr. Festa remaining employed by Grace through a specified period, and certain payments in the event that Mr. Festa's employment is involuntarily terminated.  These retention and severance payments are discussed below under the Potential Payments Upon Termination or Change-In-Control Table.

### CFO Employment Agreement

Grace has also entered into an employment agreement with Mr. Tarola.  This agreement includes currently effective provisions regarding severance payments and enhanced pension payments.  Other terms of this agreement are discussed below under the Pension Benefits Table.

CC-BLG003494

**Grants of Plan-Based Awards in 2007**

The following table provides information regarding grants under our Annual Incentive Compensation Program, or AICP, and Long Term Incentive Program, or LTIP, to the executive officers named in the Summary Compensation Table during 2007.

| Name | Plan | Estimated Future Payouts Under Non-Equity Incentive Plan Awards [1] | | |
|---|---|---|---|---|
| | | Threshold ($) | Target ($) [2] | Maximum ($) [2] |
| A. E. Festa | 2007 AICP | 215,625 | 862,500 | 1,725,000 |
| | 2007-2009 LTIP | -0- | 1,690,000 | 3,380,000 |
| | 2006-2008 LTIP (3) | -0- | -0- | -0- |
| R. M. Tarola | 2007 AICP | 85,670 | 342,680 | 685,359 |
| | 2007-2009 LTIP | -0- | 500,000 | 1,000,000 |
| | 2006-2008 LTIP (3) | -0- | 100,000 | 200,000 |
| G. E. Poling | 2007 AICP | 80,467 | 321,866 | 643,732 |
| | 2007-2009 LTIP | -0- | 650,000 | 1,300,000 |
| | 2006-2008 LTIP (3) | -0- | 200,000 | 400,000 |
| D. A. Bonham | 2007 AICP | 51,250 | 205,000 | 410,000 |
| | 2007-2009 LTIP | -0- | 500,000 | 1,000,000 |
| | 2006-2008 LTIP (3) | -0- | 185,000 | 370,000 |
| M. A. Shelnitz | 2007 AICP | 54,600 | 218,400 | 436,800 |
| | 2007-2009 LTIP | -0- | 325,000 | 650,000 |
| | 2006-2008 LTIP (3) | -0- | 50,000 | 100,000 |

(1)   Actual payments pursuant to the 2007 AICP, final payments pursuant to the 2005-2007 LTIP and initial payments pursuant to the 2006-2008 LTIP that we expect to pay in March 2008 have been determined and are reflected in the Summary Compensation Table.

(2)   For AICP, amounts are based upon base salary actually paid during 2007.

(3)   Including these grants, the following executive officers hold aggregate outstanding awards under the 2006-2008 Long Term Incentive Program with target payouts and maximun payouts as follows: Mr. Festa—$1,690,000 and $3,380,000; Mr. Tarola—$450,000 and $900,000; Mr. Poling—$600,000 and $1,200,000; Mr. Bonham—$300,000 and $600,000; and Mr. Shelnitz—$300,000 and $600,000. The initial payments pursuant to these awards, that we expect to pay in March 2008, have been determined and are reflected above in the Summary Compensation Table

*Annual Incentive Compensation Program (AICP)*

Our Annual Incentive Compensation Program, or AICP, is a cash-based pay-for-performance incentive program. Awards under the AICP are allocated from the corporate incentive pool that is determined by the extent to which business performance objectives are achieved. In order to generate an incentive pool amount sufficient to pay all participants their target award, our pre-tax income from core operations as adjusted must be 8% higher than the prior year's pre-tax income from core operations. If our pre-tax income from core operations as adjusted is greater than or equal to 35% higher than the prior year's pre-tax income from core operations, the incentive pool is funded in an amount sufficient to pay all participants two times their target award. If our pre-tax income from

56

CC-BLG003495