(d)    The 2008 amount consists of the following payments that we expect to make in March 2009 pursuant to the 2006-2008 and 2007-2009 Long-Term Incentive Programs, or LTIPs, as follows:

| Name | Final Payment Payment 2006-2008 LTIP ($) | Initial Payment Payment 2007-2009 LTIP ($) | Total Payment ($) |
|---|---|---|---|
| A. E. Festa | 1,870,267 | 563,333 | 2,433,600 |
| H. La Force III | 180,000 | 62,500 | 242,500 |
| G. E. Poling | 664,000 | 216,667 | 880,667 |
| D. A. Bonham | 332,000 | 166,667 | 498,667 |
| M. A. Shelnitz | 332,000 | 108,333 | 440,333 |
| R. M. Tarola | 461,712 | 101,838 | 563,550 |

(e)    The 2008 amount consists of the aggregate change in the actuarial present value of the individual's accumulated benefit under the Grace Pension Plan, Grace Supplemental Executive Retirement Plan, and, in the case of Mr. Tarola, supplemental benefits pursuant to the terms of his employment agreement, from December 31, 2007 to December 31, 2008, assuming a 6.25% discount rate and retirement at age 62 with benefits payable on a straight life annuity basis and other assumptions used for financial reporting purposes under generally accepted accounting principles as described in this Report in Item 8 (Financial Statements and Supplementary Data) in the Financial Supplement under Note 20 (Pension Plans and Other Postretirement Benefits Plans) to the Consolidated Financial Statements. Mr. Tarola has elected early retirement under the Grace Pension Plan, Grace Supplemental Executive Retirement Plan and his supplemental arrangements. Mr. La Force is not a member of the Grace Pension Plan or the Grace Supplemental Executive Retirement Plan because he has not completed one year of credited service under the plans. The 2007 and 2008 amounts reflect changes from the method used in prior years to calculate pension values including our revised data collection procedures.

(f)    The 2008 amount consists of the following:

| Name | Personal Benefits ($)(1) | S&I Plan Matching Payments ($) | S&I Plan Replacement Payments ($) | Liability Insurance ($) | Life Insurance ($) | Severance and Vacation Payments ($)(2) | Total ($) |
|---|---|---|---|---|---|---|---|
| A. E. Festa | 25,608 | 13,800 | 123,960 | 1,200 | 2,397 | -0- | 166,965 |
| H. La Force III | -0- | 10,095 | 4,650 | 600 | 424 | -0- | 15,769 |
| G. E. Poling | -0- | 13,800 | 42,280 | 900 | 1,438 | -0- | 58,418 |
| D. A. Bonham | 848,673 | 13,800 | 30,000 | 900 | 310 | -0- | 893,683 |
| M. A. Shelnitz | -0- | 13,207 | 27,580 | 900 | 1,486 | -0- | 43,173 |
| R. M. Tarola | -0- | 13,800 | 34,800 | 900 | 3,782 | 91,076 | 144,358 |

(1)    Consists of our aggregate incremental cost of providing personal benefits if the aggregate amount of personal benefits provided to the individual equaled or exceeded $10,000. The following additional personal benefits exceeded the greater of $25,000 or 10% of the total amount of personal benefits for that individual and we are required to separately report them under SEC rules:

(A)    for Mr. Festa, personal use of Grace-provided aircraft; and

(B)    for Mr. Bonham:

(i)    certain benefits related to his overseas assignment in Belgium and his relocation to the U.S. including:

(a)    rental brokerage fees, U.S. housing maintenance, reimbursement of miscellaneous residential preparation and cleaning expenses and tax preparation fee,

(b)    estimated gross up for U.S. income taxes resulting from Grace expatriate benefits—$171,767, and

(c)    the following items paid in Euros and converted at exchange rates prevailing in the month such amounts were paid, foreign tax payments—$389,208, cost of living allowance—$37,056, local transportation expenses—$31,682, and overseas housing allowance—$51,114, and

(ii)    certain expenses and allowances related to his permanent relocation from Virginia to Massachusetts including:

(a)    reimbursement of residential closing costs and allowance for miscellaneous relocation expenses and related gross-up for U.S. income taxes,

(b)    cost of living allowance—$106,176, and

(c)    reimbursement for house hunting expenses—$27,181.

(2)    Includes contractual severance payments paid during 2008 in the amount of $74,000.

47

*CEO Employment Agreement*

Grace has entered into an employment agreement with Mr. Festa pursuant to which he serves as CEO of Grace. Under this employment agreement, Mr. Festa is entitled to an initial base annual salary of $760,000. His targeted award under the AICP for 2005 and each calendar year thereafter is 100% of his base salary earned during the applicable year (or greater, as determined by the Board). Under the agreement, Mr. Festa may also participate in the LTIPs. The agreement also provides for certain payments in the event that Mr. Festa's employment is involuntarily terminated. These severance payments are discussed below under "Potential Payments Upon Termination or Change-In-Control."

*CFO Employment Agreement*

Grace has entered into an employment agreement with Mr. La Force. Under the terms of this agreement, Mr. La Force received a "sign-on" bonus of $250,000, which he has agreed to re-pay if he terminates his employment with Grace before April 1, 2009. He is entitled to an initial base salary of $410,000 and to participate in the AICP. For the 2008 calendar year his targeted award is 75% of base salary earned in 2008. In addition, this agreement provides for targeted awards of $500,000 under each of the 2008-2010, 2007-2009 and 2006-2008 LTIPs, prorated, in each case, to reflect the actual time during the respective performance period that Mr. La Force was a Grace employee. Mr. La Force's actual award under the 2008-2010 LTIP is described below in the "Grants of Plan-Based Awards in 2008" table. The agreement also provides for certain payments in the event that Mr. La Force's employment is involuntarily terminated. These severance payments are discussed below under "Potential Payments Upon Termination or Change-In-Control."

*Former CFO Agreement*

Grace has entered into an agreement with Mr. Tarola pursuant to which he resigned his position as Chief Financial Officer and retired from Grace. Under the terms of this agreement, if the Grace Chapter 11 cases are resolved and Grace emerges from Chapter 11 bankruptcy on or before October 31, 2009 and the then current senior officers of Grace are awarded cash bonuses related to such resolution and emergence, the Chief Executive Officer shall consider recommending Mr. Tarola for such a bonus based on his evaluation regarding whether such a bonus is appropriate and his assessment of Mr. Tarola's contributions to such resolution and emergence. This agreement also includes provisions contained in his employment agreement regarding severance payments and enhanced pension payments that are discussed below under "Pension Benefits" and "Potential Payments Upon Termination or Change-In-Control."

48

CC-BLG003683

**Grants of Plan-Based Awards in 2008**

The following table provides information regarding grants under our Annual Incentive Compensation Program, or AICP, and Long Term Incentive Program, or LTIP, to the executive officers named in the Summary Compensation Table during 2008.

| Name | Plan | Option Grant Date | Estimated Future Payouts Under Non-Equity Incentive Plan Awards(a) | | | All Other Option Awards: Number of Securities Underlying Options (#) | Exercise or Base Price of Option Awards ($/Sh)(c) | Grant Date Fair Value of Option Awards ($)(d) |
|---|---|---|---|---|---|---|---|---|
| | | | Threshold ($)(b) | Target ($)(b) | Maximum ($)(b) | | | |
| A. E. Festa | 2008 AICP | n/a | 230,250 | 921,000 | 1,842,000 | n/a | n/a | n/a |
| | 2008-2010 LTIP (Cash) | n/a | -0- | 845,000 | 1,690,000 | n/a | n/a | n/a |
| | 2008-2010 LTIP (Option)(e) | 09/11/08 | n/a | n/a | n/a | 171,490 | 19.7100 | 1,019,508 |
| H. La Force III | 2008 AICP(f) | n/a | 57,656 | 230,625 | 461,250 | n/a | n/a | n/a |
| | 2008-2010 LTIP (Cash) | n/a | -0- | 250,000 | 500,000 | n/a | n/a | n/a |
| | 2008-2010 LTIP (Option)(e) | 09/11/08 | n/a | n/a | n/a | 70,190 | 19.7100 | 417,280 |
| | 2007-2009 LTIP(f) | n/a | -0- | 291,500 | 583,000 | n/a | n/a | n/a |
| | 2006-2008 LTIP(f) | n/a | -0- | 125,000 | 250,000 | n/a | n/a | n/a |
| G. E. Poling | 2008 AICP | n/a | 86,933 | 347,733 | 695,466 | n/a | n/a | n/a |
| | 2008-2010 LTIP (Cash) | n/a | -0- | 325,000 | 650,000 | n/a | n/a | n/a |
| | 2008-2010 LTIP (Option)(e) | 09/11/08 | n/a | n/a | n/a | 106,540 | 19.7100 | 633,380 |
| D. A. Bonham | 2008 AICP | n/a | 69,538 | 278,153 | 556,306 | n/a | n/a | n/a |
| | 2008-2010 LTIP (Cash) | n/a | -0- | 250,000 | 500,000 | n/a | n/a | n/a |
| | 2008-2010 LTIP (Option)(e) | 09/11/08 | n/a | n/a | n/a | 60,880 | 19.7100 | 361,932 |
| M. A. Shelnitz | 2008 AICP | n/a | 57,633 | 230,533 | 461,066 | n/a | n/a | n/a |
| | 2008-2010 LTIP (Cash) | n/a | -0- | 162,500 | 325,000 | n/a | n/a | n/a |
| | 2008-2010 LTIP (Option)(e) | 09/11/08 | n/a | n/a | n/a | 63,420 | 19.7100 | 377,032 |
| R. M. Tarola | 2008 AICP(g) | n/a | 21,645 | 86,580 | 173,160 | n/a | n/a | n/a |

(a)     Actual payments pursuant to the 2008 AICP, final payments pursuant to the 2006-2008 LTIP and initial payments pursuant to the 2007-2009 LTIP that we expect to pay in March 2009 have been determined and are reflected in the Summary Compensation Table.

(b)     For AICP, amounts are based upon base salary actually paid during 2008.

(c)     The exercise price was determined based on the average of the high and low trading prices of Grace Common Stock on the New York Stock Exchange on the grant date.

(d)     The grant date fair value is generally the amount that Grace would expense in its financial statements over the award's service period, but does not include a reduction for forfeitures.

(e)     Options are exercisable in 50% annual increments beginning on March 1, 2010.

(f)     Mr. La Force's AICP and LTIP amounts reflect proration for the portion of the relevant performance period that he was employed by Grace.

(g)     Mr. Tarola's AICP amount reflects proration for the portion of the AICP performance period that he served as Chief Financial Officer.

**Annual Incentive Compensation Program (AICP)**

Our Annual Incentive Compensation Program, or AICP, is a cash-based pay-for-performance incentive program. Awards under the AICP are allocated from the corporate incentive pool that is determined by the extent to which business performance objectives are achieved. In order to generate an incentive pool amount sufficient to pay all participants their target award, our pre-tax income from core operations, as adjusted, must be 8% higher than the prior year's pre-tax income from core operations. If our pre-tax income from core operations, as adjusted, is greater than or equal to 35% higher than the prior year's pre-tax income from core operations, the incentive pool is funded in an amount sufficient to pay all participants two times their target award. If our pre-tax income from core operations, as adjusted, is 80% of the prior year's pre-tax income from core

49

CC-BLG003684

operations, the incentive pool is funded in an amount sufficient to pay all participants 25% of their target award. Generally, no awards are earned if pre-tax income from core operations, as adjusted, is less than 80% of the prior year's pre-tax income from core operations. The Compensation Committee has discretion to establish or increase the size of the incentive pool even if performance measures are not achieved. Once the incentive pool is established, an executive officer's award payment is determined based on the individual's target award, performance and other factors determined by the Compensation Committee.

In order to receive an AICP award payment for a specific calendar year, employees generally must be actively employed by Grace through the payout date, which is typically in March of the following year. See "Potential Payments Upon Termination or Change-In-Control—Termination and Change-in-Control Arrangements" for a description of the circumstances under which AICP payments would be made upon termination of an executive's employment with Grace.

*Long-Term Incentive Program (LTIP)*

Our long-term incentive programs are multi-year, pay-for-performance incentive programs. Awards under our 2008-2010 LTIP consist of awards of a cash-based LTIP award with terms comparable to our 2006-2008 and 2007-2009 LTIPs and awards of stock options under our 2000 Stock Incentive Plan.

***Cash-Based LTIP.***    Cash-based awards under the LTIPs are payable based on the extent to which we achieve a specified compound annual growth in our pre-tax income from core operations as adjusted over the three-year performance period using results for the year prior to the first year of the performance period as the baseline. We generally refer to this growth objective as a CAGR. In order to earn the target award, our CAGR must be 6% and, to earn the maximum of two times the target award, our CAGR must be 25%. No awards are earned if the CAGR is zero or negative.

*LTIP Compound Annual Growth Rate (CAGR) as of December 31, 2008*

| LTIP | CAGR |
|---|---|
| 2006-2008 LTIP (full 3-year period) | 14.4% |
| 2007-2009 LTIP (partial 2-year period) | 17.2% |

Employees who become entitled to cash payments under an LTIP are paid in two installments: one in March of the third year of the performance period (as partial payment based on the first two years of the performance period but limited to 50% of the LTIP target for those two years); and the other in March of the year following the performance period (as final payment based on the complete three-year performance period but offset by the prior partial payment).

Based on 2006-2008 operating performance, final payments under the 2006 LTIP are calculated based upon 144% of the target for each participant. Based on 2007-2008 operating performance, partial payments under the 2007 LTIP are calculated based upon 159% of the target for each participant but limited to 50% of the target amount for those two years.

In order to receive a cash LTIP award payment, employees generally must be actively employed by Grace through the payout date, which is in March following the second and third years of the LTIP performance period. See "Potential Payments Upon Termination or Change-In-Control—Contractual Termination Provisions" for a description of the circumstances under which LTIP payments would be made upon termination of an executive's employment with Grace.

***Equity-Based LTIP.***    Stock options granted under the 2000 Stock Incentive Plan are exercisable in 50% annual increments beginning on March 1, 2010.

50

CC-BLG003685

## Outstanding Equity Awards at Fiscal Year-End

The following table provides information regarding outstanding stock options held by the executive officers named in the Summary Compensation Table as of December 31, 2008.

| | Option Awards | | | |
|---|---|---|---|---|
| Name | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Option Exercise Price ($) | Option Expiration Date |
| A. E. Festa | -0- | 171,490* | 19.7100 | 9/11/13 |
| H. La Force III | -0- | 70,190* | 19.7100 | 9/11/13 |
| G. E. Poling | -0- | 106,540* | 19.7100 | 9/11/13 |
| | 35,000 | -0- | | |
| | 16,500 | -0- | 13.4688 | 5/09/10 |
| | | | 2.4000 | 3/07/11 |
| D. A. Bonham | -0- | 60,880* | 19.7100 | 9/11/13 |
| M. A. Shelnitz | -0- | 63,420* | 19.7100 | 9/11/13 |
| | 22,000 | -0- | | |
| | 25,000 | -0- | 12.8125 | 3/03/09 |
| | 8,200 | -0- | 13.4688 | 5/09/10 |
| | | | 2.4000 | 3/07/11 |
| R. M. Tarola | 100,000 | -0- | 16.1875 | 5/10/09 |
| | 75,000 | -0- | | |
| | 27,900 | -0- | 13.4688 | 5/09/10 |
| | | | 2.4000 | 3/07/11 |

\*    Options are exercisable in 50% annual increments beginning on March 1, 2010.

## Option Exercises and Stock Vested

The following table provides information regarding the exercise of options held by the executive officers named in the Summary Compensation Table during 2008.

| | Option Awards | | Stock Awards | |
|---|---|---|---|---|
| Name | Number of Shares Acquired on Exercise (#) | Value Realized on Exercise ($) | Number of Shares Acquired on Vesting (#) | Value Realized on Vesting ($) |
| A. E. Festa | -0- | -0- | -0- | -0- |
| H. La Force III | -0- | -0- | -0- | -0- |
| G. E. Poling | 50,000* | 32,980 | -0- | -0- |
| D. A. Bonham | -0- | -0- | -0- | -0- |
| M. A. Shelnitz | 13,000* | 8,575 | -0- | -0- |
| R. M. Tarola | -0- | -0- | -0- | -0- |

\*    Exercised options had an expiration date of March 31, 2008.

## Pension Benefits

The following table provides information regarding benefits under our Retirement Plan for Salaried Employees, or Pension Plan, our Supplemental Executive Retirement Plan, or SERP, and

51

CC-BLG003686

any supplemental pension arrangements under employment agreements for the executive officers named in the Summary Compensation Table.

| Name | Plan Name | Number of Years Credited Service (years) | Present Value of Accumulated Benefit(a) ($) | Payments During Last Fiscal Year ($) |
|---|---|---|---|---|
| A. E. Festa | Pension Plan | 5.08 | 77,000 | -0- |
| | SERP | 5.08 | 578,000 | -0- |
| H. La Force III | Pension Plan(b) | .75 | -0- | -0- |
| | SERP(b) | .75 | -0- | -0- |
| G. E. Poling | Pension Plan | 29.42 | 568,000 | -0- |
| | SERP | 29.42 | 1,516,000 | -0- |
| D. A. Bonham | Pension Plan | 3.25 | 43,000 | -0- |
| | SERP | 3.25 | 79,000 | -0- |
| M. A. Shelnitz | Pension Plan | 25.17 | 412,000 | -0- |
| | SERP | 25.17 | 725,000 | -0- |
| R. M. Tarola | Pension Plan | 9.42 | 246,000 | 3,684 |
| | SERP | 9.42 | 830,000 | -0- |
| | Supplemental(c) | 9.42 | 1,076,000 | -0- |

(a)    Amounts comprise the actuarial present value of the executive officer's accumulated benefit under the Pension Plan, SERP and, in the case of Mr. Tarola, supplemental pension arrangements, as of December 31, 2008, assuming a 6.25% discount rate and retirement at age 62 with benefits payable on a straight life annuity basis and other assumptions used for financial reporting purposes under generally accepted accounting principles as described in this Report in Item 8 (Financial Statements and Supplementary Data) in the Financial Supplement under Note 20 (Pension Plans and Other Postretirement Benefits Plans) to the Consolidated Financial Statements. The Pension Plan, SERP and supplemental arrangements provide for a reduction in pension payments to employees that elect early retirement ranging from a 17% reduction for retirement at age 55 to no reduction for retirement at age 62. Effective upon his October 31, 2008 departure date, Mr. Tarola elected early retirement under the Pension Plan, SERP and his supplemental arrangements at age 58, accordingly his payments under these plans and arrangements are reduced by 7%. He also elected to have his benefits paid out in a 66 $2/3$ % joint and survivor benefit.

(b)    Mr. La Force will not be a member of the Grace Pension Plan or the Grace Supplemental Executive Retirement Plan until he completes one year of credited service.

(c)    Under his employment agreement, Mr. Tarola is entitled to a supplemental pension benefit calculated by applying the benefit formula of the Pension Plan and SERP to additional years of credited service. Mr. Tarola has been credited with one additional year of credited service for each year of credited service under those plans that he actually earned during his period of employment with Grace.

**Retirement Plan for Salaried Employees**

Full-time salaried employees who are 21 or older and who have one or more years of service are eligible to participate in our Retirement Plan for Salaried Employees, or Pension Plan. Under this basic retirement plan, pension benefits are based upon (a) the employee's average annual compensation for the 60 consecutive months in which his or her compensation is highest during the last 180 months of continuous participation, and (b) the number of years of the employee's credited Grace service. The normal retirement age under the Pension Plan is 62, but participants may elect reduced payments upon early retirement beginning at age 55. For purposes of the Pension Plan, compensation generally includes base salary and AICP awards; however, for 2008, federal income tax law limits to $230,000 the annual compensation on which benefits under the Pension Plan may be based.

CC-BLG003687

### Supplemental Executive Retirement Plan

We also have a Supplemental Executive Retirement Plan, or SERP, under which an employee will receive the full pension to which he or she would be entitled in the absence of the limitations described above and other limitations imposed under federal income tax law. In addition, the SERP recognizes deferred base salary, deferred annual incentive compensation awards and, in some cases, periods of employment during which an employee was ineligible to participate in the basic retirement plan. Commencing in 2001, we no longer permit deferrals of base salary or incentive compensation.

### Supplemental Pension Arrangement

Mr. Tarola had an employment agreement that expired on November 10, 2002. Mr. Tarola's supplemental pension benefit that is described in the table above is provided pursuant to the terms of this agreement that survived the expiration date. The supplemental pension benefit will be paid to Mr. Tarola from our general assets. The description of Mr. Tarola's supplemental pension arrangement in Item 11 of this Report does not purport to be complete and is qualified in its entirety by reference to the agreement, which has been filed with the SEC.

### Non-Qualified Deferred Compensation Plan

The following table summarizes the compensation deferred by the named executive officer pursuant to the provisions of Grace's incentive compensation program in 1998, under which certain employees were permitted to voluntarily defer receipt of shares of Grace common stock. Such deferred shares were contributed to a "rabbi trust" held for the benefit of the deferred compensation plan participants. Shares held in the plan are fully vested and may be distributed to the plan beneficiary upon retirement or termination of service with us. Since 1998, executives may no longer defer receipt of shares under the plan, although existing balances remain in place.

#### Fiscal Year 2008 Non-Qualified Deferred Compensation

| Name | Executive Contributions In Fiscal Year 2008 ($) | Registrant Contributions In Fiscal Year 2008 ($) | Aggregate Earnings In Fiscal Year 2008 ($) | Aggregate Withdrawals/ Distributions In Fiscal Year 2008 ($) | Aggregate Balance at Fiscal Year 2008 End ($) |
|---|---|---|---|---|---|
| M. A. Shelnitz | -0- | -0- | (190,396)(a) | -0- | 56,242(b) |

(a) Amount represents the decrease in value of 9,420.8496 shares of Grace common stock held in the plan based on the closing prices of Grace common stock on December 31, 2007 and December 31, 2008. Amounts reflected are not included in the "Summary Compensation Table" because the earnings are not "above-market."

(b) Amount represents the value of 9,420.8496 shares of Grace common stock held in the plan based on the closing price of Grace common stock on December 31, 2008.

### Potential Payments Upon Termination or Change-In-Control

The following table sets forth potential payments to executive officers named in the Summary Compensation Table in the event of the listed events calculated under the assumption that employment terminated on the last business day of 2008; provided however, that with respect to Mr. Tarola, amounts reflect actual and estimated payments that have been paid or that Grace expects to pay in respect of the termination of his employment with Grace on October 31, 2008. The

53

CC-BLG003688

following table does not include payments pursuant to contracts, agreements, plans and arrangements that do not discriminate in scope, terms or operation, in favor of executive officers and that are available generally to all salaried employees. The value of payments to be made following termination of employment pursuant to the Grace Retirement Plan, Grace SERP and Mr. Tarola's supplemental pension arrangements are described above under the caption "Pension Benefits." The value of payments to be made following termination of employment pursuant to Mr. Shelnitz's deferred shares arrangement are described above under the caption "Non-Qualified Deferred Compensation Plan."

| Name | Involuntary Termination Without Cause(a) ($) | Involuntary Termination Without Cause Following Change-in-Control(c)(d) ($) | Death (c)(e) ($) | Disability (c)(g) ($) |
|---|---|---|---|---|
| A. E. Festa | 3,276,000 | 8,894,600 | 4,872,194(f) | 4,348,994(f) |
| H. La Force III | 615,000 | 2,540,833 | 798,333 | 548,916 |
| G. E. Poling | 880,000 | 3,581,666 | 1,645,666 | 1,293,666 |
| D. A. Bonham | 562,500 | 2,717,416 | 1,123,666 | 879,916 |
| M. A. Shelnitz | 720,000 | 2,384,834 | 962,834 | 674,834 |
| R. M. Tarola | 1,717,218(b) | n/a | n/a | n/a |

(a)   Consists: (i) in the case of Mr. Tarola, of actual and estimated payments pursuant to his severance agreement or as otherwise approved by the Compensation Committee in respect of his actual departure from Grace on October 31, 2008; (ii) in the case of Mr. Festa, minimum severance payments pursuant to his employment agreement as described below under "—CEO Termination Provisions;" and (iii) minimum severance payments pursuant to severance agreements in the case of the other executive officers as described below under "—Termination and Change-in-Control Arrangements." Other than for Mr. Tarola, amount excludes AICP and/or LTIP payments executive officers may receive under certain circumstances in the discretion of the Compensation Committee as described below under "—Termination and Change-in-Control Arrangements."

(b)   Consists of: (i) severance payment of $74,000, 2008 AICP payment of $62,000, 2006-2008 LTIP final payment of $461,712 and 2007-2009 LTIP initial payment of $101,838 that have been separately reported in the Summary Compensation Table; and (ii) severance payment of $814,000 and estimated 2007-2009 LTIP final payment of $203,668 that are not reflected in the Summary Compensation Table and that Grace expects to pay under the terms of Mr. Tarola's severance agreement. AICP amount reflects pro ration for the portion of the AICP performance period that Mr. Tarola served as Chief Financial Officer and LTIP amounts reflect pro ration for the portion of the relevant LTIP performance periods that Mr. Tarola was employed by Grace. The estimated payment under the 2007-2009 LTIP is calculated as described below under "—Termination and Change-in-Control Arrangements—Long Term Incentive Program." All payments of LTIP and AICP to Mr. Tarola were approved by the Compensation Committee.

(c)   Includes actual LTIP payments (as included in the Summary Compensation Table) and estimated LTIP payments calculated as described below under "—Termination and Change-in-Control Arrangements—Long Term Incentive Program."

(d)   Includes contractual payments pursuant to each executive's respective Change-in-Control Severance Agreement calculated under the assumption that no excise tax will apply.

(e)   Includes the sum of payments under the Grace Executive Salary Protection Plan during the first year following death. During subsequent years after death until the specified termination year

54

(reflecting the executive officer's age as of December 31, 2008), the sum of payments each year would be as follows: Mr. Festa—$468,000, Mr. La Force—$205,000, Mr. Poling—$220,000, Mr. Bonham—$187,000 and Mr. Shelnitz—$180,000. For Mr. Festa, amount includes AICP payment pursuant to his employment agreement. For other executive officers, amount excludes AICP payments they may receive under certain circumstances in the discretion of the Compensation Committee as described below under "—Termination and Change-in-Control Arrangements."

(f)     Includes 2008 AICP payment calculated solely on the basis of Grace's 2008 financial performance.

(g)     Includes sum of payments under the Grace Executive Salary Protection Plan during the first year following disability, assuming the executive officer remains disabled for at least 12 consecutive months. Amounts reflect the offset of expected payments under Grace's long-term and short-term disability programs that are based, in part, on the duration of the executive officer's employment. During subsequent years after disability, the sum of payments each year to Mr. Festa would be $216,000 until the earlier of the month he was no longer deemed disabled or until he attained age 65 in 2024. Due to the offset of expected payments under Grace's long-term and short-term disability programs, Grace expects that the other executive officers would not receive any additional payments under the plan after the first year of disability. For Mr. Festa, amount includes AICP payment pursuant to his employment agreement. For other executive officers, amount excludes AICP payments they may receive under certain circumstances in the discretion of the Compensation Committee as described below under "—Termination and Change-in-Control Arrangements."

### Termination and Change-in-Control Arrangements

   *Change-in-Control Severance Agreements.*     We have entered into severance agreements with all of our executive officers, which renew automatically unless the Board elects not to renew them. These agreements generally provide that in the event of the involuntary termination of the individual's employment without cause (including constructive termination caused by a material reduction in his or her authority or responsibility or by certain other circumstances) following a "change in control," he or she will generally receive a severance payment equal to three times the sum of his or her annual base salary plus target annual incentive compensation, subject to reduction, pro rata in the case of an executive officer who is within 36 months of normal retirement age (65) or, under certain circumstances, to minimize the effect of certain excise taxes if applicable. For purposes of the severance agreements, "change in control" means the acquisition of 20% or more of the outstanding Grace Common Stock (but not if such acquisition is the result of the sale of Common Stock by Grace that has been approved by the Board), the failure of Board-nominated directors to constitute a majority of any class of the Board of Directors, the occurrence of a transaction in which the Grace shareholders immediately preceding such transaction do not own more than 50% of the combined voting power of the entity resulting from such transaction, or the liquidation or dissolution of Grace. As a result of Grace's Chapter 11 filing, the following events will not constitute a "change in control": (i) the acquisition of Grace Common Stock by a trust established for purposes of administering asbestos-related claims pursuant to a plan of reorganization; and (ii) a corporate transaction pursuant to Section 363 of the U.S. Bankruptcy Code or a plan of reorganization. The description of the severance agreements in Item 11 of this Report does not purport to be complete and is qualified in its entirety by reference to the form of such agreement, which has been filed with the SEC.

   *CEO Severance Arrangements.*     In 2005, the Compensation Committee and the Bankruptcy Court approved the terms of an employment agreement, dated January 19, 2005, pursuant to which Mr. Festa assumed the position of Chief Executive Officer of Grace on June 1, 2005. The term of

CC-BLG003690

this agreement is four years, ending on May 31, 2009. Under the terms of this agreement, Mr. Festa will not be entitled to any unpaid award under the AICP or any LTIP if his employment with Grace terminates prior to the date that the award is paid to active Grace employees, except that Mr. Festa would be entitled to a pro-rated portion of such an unpaid award in the event that we terminate his employment without cause or he terminates his employment as a result of constructive discharge after Grace emerges from Chapter 11, or his employment terminates as a result of his death or disability, in each case, before the applicable payment date. Assuming Mr. Festa's employment was terminated as of December 31, 2008 under any of the above listed circumstances, Mr. Festa would be eligible to receive an AICP payment calculated as described above under "Summary Compensation Table" and LTIP payments as described below under the caption "Termination and Change-in-Control Arrangements—Long Term Incentive Program." Also, under the terms of the agreement, if we terminate Mr. Festa's employment without cause, or he terminates his employment as a result of constructive discharge, prior to the expiration of the agreement, he would be entitled to a severance payment equal to two times a dollar amount equal to 175% of his annual base salary at the time of his termination. The description of Mr. Festa's employment agreement in Item 11 of this Report does not purport to be complete and is qualified in its entirety by reference to the agreement, which has been filed with the SEC.

**Other Executive Officer Severance Arrangements.**     We have entered into severance agreements that establish severance arrangements with Messrs. La Force (included in his employment agreement), Poling and Shelnitz. Mr. Bonham's severance arrangements were established by Compensation Committee approval. Under the terms of the severance arrangements applicable to these named executive officers, in the event of the involuntary termination of the executive officer's employment under circumstances that would qualify the executive officer for severance pay under the severance plan that generally covers our salaried employees, the executive officer would be entitled to severance pay equal to two times his or her annual base salary, in the case of Messrs. Poling and Shelnitz, or one and one-half times his annual base salary, in the case of Messrs. La Force and Bonham. Other than with respect to the amount of severance, the severance arrangements for these named executive officers are the same. The description of the severance arrangements in Item 11 of this Report does not purport to be complete and is qualified in its entirety by reference to Mr. La Force's employment agreement, the form of executive severance agreement and the Grace Severance Pay Plan for Salaried Employees, each of which has been filed with the SEC.

**Executive Salary Protection Plan.**     All executive officers participate in the Executive Salary Protection Plan which provides that, in the event of a participant's disability or death prior to age 70, we will continue to pay all or a portion of base salary to the participant or a beneficiary for a period based on the participant's age at the time of disability or death. Payments under the plan may not exceed 100% of base salary for the first year and 60% thereafter in the case of disability (50% in the case of death). Any payment under the plan as a result of disability would be reduced by the amount of disability income received under Grace's long-term and short-term disability plans that are generally applicable to U.S. salaried employees. The description of the plan in Item 11 of this Report does not purport to be complete and is qualified in its entirety by reference to the text of the Executive Salary Protection Plan, as amended, which is filed with the SEC.

**Annual Incentive Compensation Program.**     An employee whose employment terminates prior to an AICP payout date will generally not receive an AICP payment. However, in the discretion of the Compensation Committee, an employee whose employment terminates prior to the payout date may receive an AICP award payment if the employee has more than three months' service under the AICP and employment terminates for any of the following reasons: retirement under a Grace retirement plan; death; disability; divestment; or other termination of employment by Grace that is not for cause. If such an employee receives an AICP payment, the amount of the AICP payment will

56

CC-BLG003691

generally be prorated for the period of the employee's service during the year. See "—CEO Severance Arrangements" for a description of the circumstances under which AICP payments would be made to Mr. Festa in the event his employment with Grace is terminated. The description of the AICP in Item 11 of this Report does not purport to be complete and is qualified in its entirety by reference to the text of the AICP which is filed with the SEC.

*Long Term Incentive Program.*     An employee whose employment terminates prior to the payout date will forfeit any unpaid LTIP award payment if employment terminates for any of the following reasons:

- voluntary termination without the consent of the Compensation Committee;

- retirement under a Grace retirement plan prior to age 62 without the consent of the Compensation Committee; or

- termination for cause.

An employee whose employment terminates prior to the payout date will receive an LTIP award payment if employment terminates for any of the following reasons:

- retirement under a Grace retirement plan either at or after age 62;

- death or disability; or

- involuntary termination after a change in control of Grace ("change in control" means that a person beneficially owns 20% or more of the outstanding Grace common stock (but not if such ownership is the result of the sale of Grace common stock by Grace that has been approved by the Board or pursuant to a plan of reorganization that is confirmed and effective), the failure of Board-nominated directors to constitute a majority of any class of the Board of Directors, the occurrence of a corporate transaction (other than a corporate transaction pursuant to Section 363 of the U.S. Bankruptcy Code or a plan of reorganization that is confirmed and effective) in which the Grace shareholders immediately preceding such transaction do not own more than 50% of the combined voting power of the entity resulting from such transaction, or the liquidation or dissolution of Grace)

In the discretion of the Compensation Committee, an employee whose employment terminates for a reason that is not described above (i.e. involuntary termination not for cause or transfer to the buyer of a Grace business unit) prior to the payout date may receive an LTIP award payment.

See "—CEO Severance Arrangements" above for a description of the circumstances under which LTIP payments would be made to Mr. Festa in the event his employment with Grace is terminated. The description of the LTIPs in Item 11 of this Report does not purport to be complete and is qualified in its entirety by reference to the text of the LTIPs, which are filed with the SEC.

If an employee whose employment terminates prior to the end of an LTIP performance period receives an LTIP award payment for that performance period, the amount of the LTIP award payment will be prorated for the period of the employee's service during the performance period. Assuming the employment of the executive officers named in the Summary Compensation Table (other than Mr. Tarola) was terminated as of December 31, 2008 and the 2007 and 2008 LTIPs pay

CC-BLG003692

out at the target amounts, under any of the above-listed circumstances, the executive officers would be eligible for payments under their outstanding LTIPs as follows:

| Name | 2006-2008 LTIP ($) | 2007-2009 LTIP ($) | 2008-2010 LTIP ($) | Total ($) |
|---|---|---|---|---|
| A. E. Festa | 1,870,267 | 1,126,667 | 281,666 | 3,278,600 |
| H. La Force III | 180,000 | 125,000 | 83,333 | 388,333 |
| G. E. Poling | 664,000 | 433,333 | 108,333 | 1,205,666 |
| D. A. Bonham | 332,000 | 333,333 | 83,333 | 748,666 |
| M. A. Shelnitz | 332,000 | 216,667 | 54,167 | 602,834 |
| R. M. Tarola * | 461,712 | 305,500 | -0- | 767,212 |

\*    Amounts reflect pro ration for the portion of the relevant performance period that Mr. Tarola was employed by Grace prior to this departure on October 31, 2008.

*2000 Stock Incentive Plan.*    Any stock option held by an employee whose employment terminates prior to exercise will:

- terminate when employment terminates, if employment terminates voluntarily, without the consent of the Compensation Committee, or for cause;

- terminate three years after employment terminates, if employment terminates due to death, incapacity or retirement under a Grace retirement plan; or

- terminate three months (subject to extension by the Compensation Committee for up to three years) after employment terminates, if employment terminates for another reason; provided however, if the holder dies or becomes incapacitated during the three-month period (or such longer period as the Compensation Committee approves) the option shall terminate three years after employment termination.

In the event of a Change in Control, any stock options outstanding under the 2000 Stock Incentive Plan, that are not exercisable and vested, shall become fully exercisable and vested to the full extent of the original grant. For purposes of the 2000 Stock Incentive Plan, "change in control" means the acquisition of 20% or more of the outstanding Grace Common Stock (but not if such acquisition is the result of the sale of Grace common stock by Grace that has been approved by the Board), the failure of Board-nominated directors to constitute a majority of any class of the Board of Directors, the occurrence of a transaction in which the Grace shareholders immediately preceding such transaction do not own more than 50% of the combined voting power of the entity resulting from such transaction, or the liquidation or dissolution of Grace. The description of the 2000 Stock Incentive Plan in Item 11 of this Report does not purport to be complete and is qualified in its entirety by reference to the text of the 2000 Stock Incentive Plan, which is filed with the SEC.

### Director Compensation

Under the compensation program for nonemployee directors in effect during 2008, each nonemployee director received an annual retainer of $105,000 in cash, 50% of which was paid in January and 50% of which was paid in December. In addition, directors received $6,000 (plus $3,000 for the lead independent director and the Audit Committee chair and $2,000 for other committee chairs) in cash for each meeting date in respect of the Board meeting and all committee meetings held on that date. We reimburse directors for expenses they incur in attending Board and committee meetings and other activities incidental to their service as directors. Our directors, and all Grace employees, are entitled to participate in the Grace Foundation's Matching Grants Program. We also maintain business travel accident insurance coverage for our directors. Mr. Festa's compensation is described above in the Summary Compensation Table. Mr. Festa receives no additional compensation for serving as a member of the Board of Directors.

58

CC-BLG003693

The following table sets forth amounts paid by Grace to our nonemployee directors in connection with their services to Grace during 2008.

| Name | Fees Earned or Paid in Cash ($)(a) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($) | All Other Compensation ($)(b) | Total ($) |
|---|---|---|---|---|---|---|---|
| J. F. Akers | 153,000 | -0- | -0-(c) | -0- | -0- | 3,000(b) | 156,000 |
| H. F. Baldwin | 147,000 | -0- | -0- | -0- | -0- | -0- | 147,000 |
| R. C. Cambre | 147,000 | -0- | -0- | -0- | -0- | 3,000(b) | 150,000 |
| M. A. Fox | 161,000 | -0- | -0- | -0- | -0- | 3,000(b) | 164,000 |
| J. J. Murphy | 165,000 | -0- | -0-(c) | -0- | -0- | -0- | 165,000 |
| P. J. Norris | 147,000 | -0- | -0- | -0- | -0- | 81,125(d) | 228,125 |
| C. J. Steffen | 147,000 | -0- | -0- | -0- | -0- | -0- | 147,000 |
| M. E. Tomkins | 150,000 | -0- | -0- | -0- | -0- | -0- | 150,000 |
| T. A. Vanderslice | 182,000 | -0- | -0-(c) | -0- | -0- | -0- | 182,000 |

(a)     Amount consists of annual retainer in the amount of $105,000, meeting fees in the amount of $42,000 (other than Mr. Akers who received meeting fees of $36,000) and additional payments to: Mr. Akers for serving as Chair of the Compensation Committee in the amount of $12,000; Dr. Fox for serving as Chair of the Corporate Responsibility Committee in the amount of $14,000; Mr. Murphy for serving as Chair of the Audit Committee in the amount of $18,000; Mr. Tomkins for serving as Chair of the Audit Committee in the amount of $3,000; and Mr. Vanderslice for serving as Chair of the Nominating and Governance Committee and Lead Independent Director in the amount of $35,000.

(b)     Consists of charitable contributions paid to academic institutions at the request of the director pursuant to the Grace Foundation's Matching Grants Program. Grace also paid an aggregate of $350 in premiums for business travel accident insurance coverage for all directors during 2008.

(c)     The following directors hold options to purchase shares of Grace common stock all of which are currently vested and exercisable in the following amounts: Mr. Akers—74,535, Mr. Murphy—15,528 and Mr. Vanderslice—69,876.

(d)     Consists of payments to Mr. Norris pursuant to his consulting agreement.

**Norris Consulting Agreement**

The Compensation Committee and the Bankruptcy Court have approved a consulting agreement between Grace and Mr. Norris dated January 19, 2005, under which Mr. Norris monitors our Chapter 11 proceedings and provides consulting services and advice to our CEO, certain of our employees and the Board of Directors, regarding those proceedings and other matters. Under the agreement, Mr. Norris' current retainer under the agreement has been reduced to $4,000 per month. The description of Mr. Norris' consulting agreement in Item 11 of this Report does not purport to be complete and is qualified in its entirety by reference to the agreement that has been filed with the SEC.

**Compensation Committee Interlocks And Insider Participation**

During 2008, the Compensation Committee of the Board was comprised of Messrs. Akers (Chair), Baldwin, Cambre, Murphy, Vanderslice, Tomkins and Steffen and Dr. Fox. None of these persons is our current or former officer or employee, nor did we have any reportable transactions

CC-BLG003694

with any of these persons. None of our executive officers serves or in the past has served as a member of the board of directors or compensation committee of any entity that has one or more of its executive officers serving on our Board of Directors or our Compensation Committee.

**Item 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

**SECURITY OWNERSHIP**

The following table sets forth the amount of Grace common stock beneficially owned, directly or indirectly, as of January 31, 2009 by:

- each person that we know is the beneficial owner of more than 5% of the outstanding shares of Grace common stock

- each current director

- each of the individuals named in the Summary Compensation Table set forth in Item 11 above

- all directors and all executive officers as a group

|  | Shares of Common Stock | |
| --- | --- | --- |
| Name and Address of Beneficial Owner(1) | Beneficially Owned | Percent |
| FMR LLC(2)<br>Fidelity Management & Research Company<br>Edward C. Johnson 3d<br>82 Devonshire Street<br>Boston, Massachusetts 02109 | 10,801,627 | 15.0% |
| Peninsula Partners, L.P.(3)<br>404B East Main Street<br>2 nd Floor<br>Charlottesville, VA 22902 | 10,765,600 | 14.9% |
| J. F. Akers | 38,996<br>74,535 (O)<br>15,196 (T) | * |
| H. F. Baldwin | 21,918<br>15,000 (T) | * |
| R. C. Cambre | 28,494 | * |
| A. E. Festa | 100,000 | * |
| M. A. Fox | 55,346<br>8,942 (T) | * |
| J. J. Murphy | 38,930<br>15,528 (O)<br>18,629 (T) | * |
| P. J. Norris | 138,822 | * |
| C. J. Steffen | -0- | -0- |
| M. E. Tomkins | -0- | -0- |

CC-BLG003695

|                                                    | Shares of Common Stock |         |
|----------------------------------------------------|------------------------|---------|
| Name and Address of Beneficial Owner(1)            | Beneficially Owned     | Percent |
| T. A. Vanderslice                                  | 39,522                 | *       |
|                                                    | 69,876 (O)             |         |
|                                                    | 14,932 (T)             |         |
| D. A. Bonham                                       | -0-                    | -0-     |
| H. La Force III                                    | 50,000                 | *       |
| G. E. Poling                                       | 51,500 (O)             | *       |
|                                                    | 18,000 (T)             |         |
| M. A. Shelnitz                                     | 53,500                 | *       |
|                                                    | 55,200 (O)             |         |
|                                                    | 9,421 (T)              |         |
| Directors and executive officers as a group        | 565,528                | 1.3%    |
|                                                    | 266,639 (O)            |         |
|                                                    | 100,120 (T)            |         |

* Indicates less than 1%

(O) Shares covered by stock options exercisable on or within 60 days after January 31, 2009.

(T) Shares owned by trusts and other entities as to which the person has the power to direct voting and/or investment.

(1) The address of each of our directors and executive officers is c/o Secretary, W. R. Grace & Co., 7500 Grace Drive, Columbia, MD 21044.

(2) The ownership information set forth is based in its entirety on material contained in a Schedule 13G/A filed with the SEC jointly by FMR LLC ("FMR"), Fidelity Management & Research Company ("Fidelity") and Edward C. Johnson 3d ("Mr. Johnson") on February 17, 2009. FMR and Mr. Johnson have sole voting power with respect to 619,737 shares and sole dispositive power with respect to all 10,801,627 shares. Mr. Johnson is Chairman of FMR and members of Mr. Johnson's family may be deemed a controlling group with respect to FMR due to their ownership of FMR voting shares and their entry into a voting agreement with respect to such shares. Fidelity is a wholly-owned subsidiary of FMR. Mr. Johnson and FMR, through its control of Fidelity, each has sole dispositive power over 10,100,690 shares owned by various investment companies for which Fidelity serves as investment advisor. Pyramis Global Advisors Trust Company ("PGATC"), 53 State Street, Boston, Massachusetts, 02109, is a wholly-owned indirect subsidiary of FMR. Mr. Johnson and FMR, through its control of PGATC, each has sole dispositive power over 639,637 shares and sole voting power over 554,737 shares of Common Stock owned by institutional accounts managed by PGATC. Mr. Johnson is Chairman of FIL Limited ("FIL"), Pembroke Hall, 42 Crow Lane, Hamilton, Bermuda, and partnerships controlled predominantly by members of Mr. Johnson's family, or trusts for their benefit, own FIL shares representing approximately 47% of the total votes which may be cast by all holders of FIL voting stock. FMR and FIL disclaim that they are acting as a "group" for purposes of Section 13(d) under the Securities Exchange Act of 1934. FIL and various foreign-based subsidiaries provide investment advisory and management services to a number of non-U.S. investment companies and certain institutional investors. FIL is the beneficial owner of 61,300 shares.

(3) The ownership information set forth is based in its entirety on material contained in a Form 4 report dated September 10, 2001 filed with the SEC.

CC-BLG003696

## EQUITY COMPENSATION PLAN INFORMATION

The following table sets forth information as of December 31, 2008 with respect to our compensation plans under which shares of Grace common stock are authorized for issuance upon the exercise of options, warrants or other rights. The only such compensation plans in effect are stock incentive plans providing for the issuance of stock options and restricted stock.

| Plan category | Number of securities to be issued upon exercise of outstanding options | Weighted-average exercise price of outstanding options ($) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities to be issued upon exercise of outstanding options) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 3,193,646 | 16.33 | 2,804,657 |

## Item 13.    CERTAIN RELATIONSHIPS, RELATED TRANSACTIONS AND DIRECTOR INDEPENDENCE

### BOARD INDEPENDENCE

The Board has determined that all directors, other than Mr. Festa (who is also Chief Executive Officer) and Mr. Norris (who was Chief Executive Officer until June 1, 2005 and is currently a consultant to Grace) are independent under New York Stock Exchange rules because none of such directors has any direct or indirect material relationship with Grace or our affiliates, other than through his or her service as a director and as an owner of less than 1% of Grace common stock. In addition to the application of the New York Stock Exchange rules, this determination was based on a number of factors, principal among them were the following:

- none of these directors, nor any member of their immediate families is (or at any time during the last three years was) a Grace executive officer or employee and none of these directors is an employee, and no member of their immediate families is an executive officer of any other entity with whom we do any material amount of business;

- none of these directors or any member of their immediate families has, during the last three years, received more than $20,000 in direct compensation from Grace (other than director and committee fees); and

- none of these directors serve, or within the last three years served, as an executive officer, director, trustee or fiduciary of any charitable organization to which we made any material charitable donation.

Only independent directors serve on our Audit, Nominating and Governance, Compensation and Corporate Responsibility Committees. Mr. Vanderslice has been appointed Lead Independent Director and, in this capacity, presides at executive sessions of independent directors. Interested parties may communicate with Mr. Vanderslice by writing him at the following address: Thomas A. Vanderslice—Lead Independent Director, c/o W. R. Grace & Co., 7500 Grace Drive, Columbia, Maryland 21044.

### REVIEW, APPROVAL OR RATIFICATION OF TRANSACTIONS WITH RELATED PARTIES

The Board recognizes that transactions involving related persons in which Grace is a participant can present conflicts of interest, or the appearance thereof, so the Board has adopted a written policy as part of the Grace Corporate Governance Principles (which are available on our website at *www.grace.com/About/Leadership/Governance/*) with respect to related person transactions. The

CC-BLG003697

policy applies to transactions involving related persons that are required to be disclosed pursuant to SEC regulations, which are generally transactions in which:

- Grace is a participant;

- the amount involved exceeds $120,000; and

- any related person, such as a Grace executive officer, director, director nominee, 5% stockholder or any of their respective family members, has a direct or indirect material interest.

Each such related person transaction shall be reviewed, determined to be in, or not inconsistent with, the best interests of Grace and its stockholders and approved or ratified by:

- the disinterested members of the Audit Committee, if the disinterested members of the Audit Committee constitute a majority of the members of the Audit Committee; or

- the disinterested members of the Board.

In the event a related person transaction is entered into without prior approval and, after review by the Audit Committee or the Board, as the case may be, the transaction is not ratified, we will make all reasonable efforts to cancel the transaction.

## Item 14.  PRINCIPAL ACCOUNTANT FEES AND SERVICES

The Audit Committee of the Board of Directors selected PricewaterhouseCoopers LLP, or PwC, to act as our principal independent accountants for 2008. The following table sets forth the fees that we incurred for the services of PwC for the fiscal years ended December 31, 2008 and 2007:

|  | 2008 | 2007 |
|---|---|---|
| Audit Fees | $4,161,200 | $4,666,400 |
| Audit-Related Fees | 261,400 | 244,400 |
| Tax Fees | 44,100 | 20,000 |
| Total Fees | $4,466,700 | $4,930,800 |

Audit Services consisted of the audit of our Consolidated Financial Statements and our internal controls over financial reporting (as required under Section 404 of the Sarbanes-Oxley Act of 2002), the review of our consolidated quarterly financial statements and statutory audits of certain of Grace's non-U.S. subsidiaries and affiliates.

Audit-Related Services primarily consisted of (1) an audit of the financial statements of Advanced Refining Technologies, LLC (a joint venture with Chevron Products Company), (2) an audit of Grace's 401(k) plan, and (3) audits of subsidiary benefit plans as required.

Tax Services consisted of tax advice and compliance for non-U.S. subsidiaries, including preparation of tax returns, and advice relating to Grace's transfer pricing policies.

The Audit Committee has adopted a preapproval policy that requires the Audit Committee to specifically preapprove the annual engagement of the independent accountants for the audit of our Consolidated Financial Statements and internal controls. The policy also provides for general preapproval of certain audit-related, tax and other services provided by the independent accountants. Any other services must be specifically preapproved by the Audit Committee. However, the Chair of the Audit Committee has the authority to preapprove services requiring immediate engagement between scheduled meetings of the Audit Committee. The Chair must report any such preapproval decisions to the full Audit Committee at its next scheduled meeting. During 2008, no audit-related, tax, or other services were performed by PwC without specific or general approval as described above

CC-BLG003698

**PART IV**

**Item 15.   EXHIBITS AND FINANCIAL STATEMENT SCHEDULES**

*Financial Statements and Schedules.*     The required information is set forth in the Financial Supplement under the heading "Index to Consolidated Financial Statements and Financial Statement Schedule and Exhibit" which is incorporated herein by reference.

*Exhibits.*     The exhibits to this Report are listed below. Other than exhibits that are filed herewith, all exhibits listed below are incorporated by reference. Exhibits indicated by an asterisk (*) are the management contracts and compensatory plans, contracts or arrangements required to be filed as exhibits to this Report.

For purposes of describing these exhibits, "Old Grace" means W. R. Grace & Co., a Delaware corporation (subsequently renamed Sealed Air Corporation), a predecessor to the Company, and "Grace New York" means W. R. Grace & Co., a New York corporation (subsequently renamed Fresenius Medical Care Holdings, Inc.), a predecessor to Old Grace.

| EXHIBIT NO. | EXHIBIT | WHERE LOCATED |
|---|---|---|
| 2.1 | Form of Distribution Agreement, by and among Old Grace, W. R. Grace & Co.-Conn. and Grace Specialty Chemicals, Inc. (now named W. R. Grace & Co.) | Annex B to the Joint Proxy Statement/Prospectus dated February 13, 1998 of Old Grace and Sealed Air Corporation included in Form S-4 (filed 2/13/98) |
| 2.2 | Proposed Joint Plan of Reorganization of W. R. Grace & Co. and its debtor subsidiaries dated February 27, 2009 | Filed herewith |
| 3.1 | Restated Certificate of Incorporation of W. R. Grace & Co. | Exhibit 3.1 to Form 8-K (filed 4/8/98) |
| 3.2 | Amended and Restated By-laws of W. R. Grace & Co. | Exhibit 3.1 to Form 8-K (filed 2/27/09) |
| 4.1 | Amended and Restated Rights Agreement dated as of March 25, 2008 between W. R. Grace & Co. and Mellon Investor Services LLC, as Rights Agent | Exhibit 4.1 to Form 10/A (filed 3/25/08) |
| 4.2 | Order of Delaware Bankruptcy Court limiting certain transfers of Grace equity securities | Filed herewith |
| 4.3 | Credit Agreement dated as of May 14, 1998, among W. R. Grace & Co.-Conn., W. R. Grace & Co., the several banks parties thereto; the co-agents signatories thereto; The Chase Manhattan Bank, as administrative agent for such banks; and Chase Securities Inc., as arranger | Exhibit 4.1 to Form 10-Q (filed 8/14/98) |

64

CC-BLG003699

EXHIBIT

| NO. | EXHIBIT | WHERE LOCATED |
|---|---|---|
| 4.4 | 364-Day Credit Agreement, dated as of May 5, 1999, among W. R. Grace & Co.-Conn.; W. R. Grace & Co.; the several banks parties thereto; the co-agents signatories thereto; Bank of America National Trust and Savings Association, as documentation agent; The Chase Manhattan Bank, as administrative agent for such banks; and Chase Securities Inc., as book manager | Exhibit 4.1 to Form 10-Q (filed 8/3/99) |
| 4.5 | First Amendment to 364-Day Credit Agreement dated as of May 5, 1999 among W. R. Grace & Co.-Conn.; W. R. Grace & Co.; the several banks parties thereto; Bank of America National Trust and Savings Association, as document agent; The Chase Manhattan Bank, as administrative agent for such banks; and Chase Securities, Inc., as bank manager | Exhibit 4 to Form 10-Q (filed 8/15/00) |
| 4.6 | Post-Petition Loan and Security Agreement dated as of April 1, 2001 among the financial institutions named therein, as Lenders, Bank of America, N.A. as Agent, and W. R. Grace & Co. and its subsidiaries named therein as Debtors and Debtors-in-Possession, as Borrowers | Exhibit 4 to Form 10-Q (filed 8/14/01) |
| 4.7 | Amendment No. 1 and Limited Waiver to Post-Petition Loan and Security Agreement | Exhibit 4 to Form 10-Q (filed May 13, 2003) |
| 4.8 | Amendment No. 2 and Limited Waiver to Post-Petition Loan and Security Agreement | Exhibit 4.1 to Form 10-Q (filed May 9, 2006) |
| 4.9 | Amendment No. 3 and Limited Waiver to Post-Petition Loan and Security Agreement | Exhibit 4.2 to Form 10-Q (filed May 9, 2006) |
| 4.10 | Amendment No. 4 and Limited Waiver to Post-Petition Loan and Security Agreement | Exhibit 4.3 to Form 10-Q (filed May 9, 2006) |
| 4.11 | Amendment No. 5 and Limited Waiver to Post-Petition Loan and Security Agreement | Exhibit 4.1 to Form 8-K (filed April 2, 2008) |
| 4.12 | Amendment No. 6 and Limited Waiver to Post-Petition Loan and Security Agreement | Exhibit 4.2 to Form 8-K (filed April 2, 2008) |
| 4.13 | Amendment No. 7 and Limited Waiver to Post-Petition Loan and Security Agreement | Filed herewith |
| 4.14 | Receivables Purchase agreement dated as of January 23, 2007 between Grace GmbH & Co. KG and Coface Finanz GmbH | Exhibit 4.10 to Form 10-K (filed 3/02/07) |
| 10.1 | Form of Employee Benefits Allocation Agreement, by and among Old Grace, W. R. Grace & Co.-Conn. and Grace Specialty Chemicals, Inc. (now named W. R. Grace & Co.) | Exhibit 10.1 to Form 10-K (filed March 13, 2003) |
| 10.2 | Form of Tax Sharing Agreement, by and among Old Grace, W. R. Grace & Co.-Conn. and Grace Specialty Chemicals, Inc. (now named W. R. Grace & Co.) | Exhibit 10.2 to Form 10-K (filed 3/13/03) |

65

CC-BLG003700

EXHIBIT

| NO. | EXHIBIT | WHERE LOCATED |
|---|---|---|
| 10.3 | W. R. Grace & Co. 2000 Stock Incentive Plan, as amended | Exhibit 10 to Form 10-Q (filed 8/14/00)* |
| 10.4 | W. R. Grace & Co. 1998 Stock Incentive Plan | Exhibit 10.4 to Form 10-K (filed 3/13/03)* |
| 10.5 | W. R. Grace & Co. 1998 Stock Plan for Nonemployee Directors | Exhibit 10.5 to Form 10-K (filed 3/13/03)* |
| 10.6 | W. R. Grace & Co. Supplemental Executive Retirement Plan, as amended | Exhibit 10.7 to Form 10-K (filed 3/28/02)* |
| 10.7 | W. R. Grace & Co. Executive Salary Protection Plan, as amended | Exhibit 10.8 to Form 10-K (filed 3/28/02)* |
| 10.8 | Form of Stock Option Agreements | Exhibit 10.5 to Form 10-Q (filed 5/15/98)* |
| 10.9 | Form of 2005-2007 Long-Term Incentive Program Cash Award | Exhibit 10.1 to Form 8-K (filed 7/21/05)* |
| 10.10 | Form of 2006-2008 Long-Term Incentive Program Cash Award | Exhibit 10.1 to Form 8-K (filed 11/06/06)* |
| 10.11 | Form of 2007-2009 Long-Term Incentive Program Cash Award | Exhibit 10.1 to Form 10-Q (filed 11/08/07)* |
| 10.12 | Form of 2008-2010 Long-Term Incentive Program Cash Award | Filed herewith |
| 10.13 | Form of Executive Severance Agreement between Grace and certain officers | Exhibit 10.17 to Form 10-K (filed 3/13/03)* |
| 10.14 | Severance Pay Plan for Salaried Employees | Exhibit 10.17 to Form 10-K (filed 3/02/07)* |
| 10.15 | Employment Agreement dated May 11, 1999 between Grace and Robert M. Tarola | Exhibit 10.1 to Form 10-Q (filed 8/13/99)* |
| 10.16 | Letter Agreement dated May 7, 1999 between Paul J. Norris, on behalf of Grace, and William M. Corcoran | Exhibit 10.24 to Form 10-K (filed 4/16/01)* |
| 10.17 | Form of Indemnification Agreement between Grace and certain officers and directors | Exhibit 10.27 to Form 10-K (filed 4/16/01)* |
| 10.18 | Form of Retention Agreement between Grace and certain officers (includes enhanced severance provision) | Exhibit 10.28 to Form 10-K (filed 4/16/01)* |
| 10.19 | Annual Incentive Compensation Program | Exhibit 10.26 to Form 10-K (filed 3/13/03)* |
| 10.20 | Letter Agreement dated January 19, 2005 between Paul J. Norris, on behalf of Grace, and Fred Festa | Exhibit 10.1 to Form 8-K (filed 4/29/05)* |
| 10.21 | Letter Agreement dated January 19, 2005 between Thomas A. Vanderslice, on behalf of Grace, and Paul J. Norris | Exhibit 10.2 to Form 8-K (filed 4/29/05)* |

66

CC-BLG003701

| EXHIBIT NO. | EXHIBIT | WHERE LOCATED |
|---|---|---|
| 10.22 | Letter Agreement dated February 28, 2008 between Fred Festa, on behalf of Grace, and Hudson La Force III (includes enhanced severance provision) | Exhibit 10.1 to Form 8-K (filed 3/07/08)* |
| 10.23 | Letter Agreement dated March 31, 2008 between Fred Festa, on behalf of Grace, and Robert M. Tarola | Exhibit 10.1 to Form 10-Q (filed 5/09/08)* |
| 10.24 | Settlement Agreement dated March 11, 2008 between Grace and the U.S. Government | Exhibit 10.1 to Form 8-K (filed 3/11/08) |
| 12 | Computation of Ratio of Earnings to Fixed Charges and Combined Fixed Charges and Preferred Stock Dividends | Filed herewith in this Report in Item 8 (Financial Statements and Supplementary Data) in the Financial Supplement |
| 21 | List of Subsidiaries of W. R. Grace & Co. | Filed herewith |
| 23 | Consent of Independent Accountants | Filed herewith in this Report in Item 8 (Financial Statements and Supplementary Data) in the Financial Supplement |
| 24 | Powers of Attorney | Filed herewith |
| 31(i).1 | Certification of Periodic Report by Chief Executive Officer under Section 302 of the Sarbanes-Oxley Act of 2002 | Filed herewith in this Report in Item 8 (Financial Statements and Supplementary Data) in the Financial Supplement |
| 31(i).2 | Certification of Periodic Report by Chief Financial Officer under Section 302 of the Sarbanes-Oxley Act of 2002 | Filed herewith in this Report in Item 8 (Financial Statements and Supplementary Data) in the Financial Supplement |
| 32 | Certification of Periodic Report by Chief Executive Officer and Chief Financial Officer under Section 906 of the Sarbanes-Oxley Act of 2002 | Filed herewith in this Report in Item 8 (Financial Statements and Supplementary Data) in the Financial Supplement |

67

CC-BLG003702

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this Report to be signed on its behalf by the undersigned, thereto duly authorized.

W. R. GRACE & CO.

By:    /s/ ALFRED E. FESTA

Alfred E. Festa
*(President, Chairman and
Chief Executive Officer)*

By:    /s/ HUDSON LA FORCE III

Hudson La Force III
*(Senior Vice President and
Chief Financial Officer)*

Dated: February 27, 2009

Pursuant to the requirements of the Securities Exchange Act of 1934, this Report has been signed below by the following persons on behalf of the registrant and in the capacities indicated on February 27, 2009.

| Signature | Title |
|---|---|
| J. F. Akers* | } |
| H. F. Baldwin* | } |
| R. C. Cambre* | } |
| M. A. Fox* | } |
| J. J. Murphy* | } Directors |
| P. J. Norris* | } |
| C. J. Steffen* | } |
| M. E. Tomkins* | } |
| T. A. Vanderslice* | } |

/s/ ALFRED E. FESTA        President, Chairman, Chief Executive Officer and Director
                           (Principal Executive Officer)
(Alfred E. Festa)

/s/ HUDSON LA FORCE III
                           Senior Vice President and Chief Financial Officer
                           (Principal Financial Officer and Principal Accounting Officer)
(Hudson La Force III)

*    By signing his name hereto, Mark A. Shelnitz is signing this document on behalf of each of the persons indicated above pursuant to powers of attorney duly executed by such persons and filed with the Securities and Exchange Commission.

By:    /s/ MARK A. SHELNITZ

Mark A. Shelnitz
*(Attorney-in-Fact)*

68

CC-BLG003703

Financial Supplement

# W. R. GRACE & CO.
### ANNUAL REPORT ON FORM 10-K
### FOR THE YEAR ENDED DECEMBER 31, 2008

CC-BLG003704

**FINANCIAL SUPPLEMENT**
to
**Annual Report on Form 10-K for the Year Ended December 31, 2008**

**W. R. GRACE & CO. AND SUBSIDIARIES**

Index to Consolidated Financial Statements
and Financial Statement Schedule and Exhibit

| | |
|---|---|
| Management's Report on Financial Information and Internal Controls | F-2 |
| Report of Independent Registered Public Accounting Firm | F-4 |
| Consent of Independent Registered Public Accounting Firm | F-5 |
| Consolidated Statements of Operations for the three years in the period ended December 31, 2008 | F-6 |
| Consolidated Statements of Cash Flows for the three years in the period ended December 31, 2008 | F-7 |
| Consolidated Balance Sheets at December 31, 2008 and 2007 | F-8 |
| Consolidated Statements of Shareholders' Equity (Deficit) for the three years in the period ended December 31, 2008 | F-9 |
| Consolidated Statements of Comprehensive Income (Loss) for the three years in the period ended December 31, 2008 | F-10 |
| Notes to Consolidated Financial Statements | F-11 |
| Selected Financial Data | F-71 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | F-72 |
| Financial Statement Schedule<br>  Schedule II—Valuation and Qualifying Accounts and Reserves | F-104 |
| Exhibit 12: Computation of Ratio of Earnings to Fixed Charges and Combined Fixed Charges and Preferred Stock Dividends | F-105 |

The financial data listed above appearing in this Financial Supplement are incorporated by reference herein. The Financial Statement Schedule should be read in conjunction with the Consolidated Financial Statements and Notes thereto. Financial statements of less than majority-owned persons and other persons accounted for by the equity method have been omitted as provided in Rule 3-09 of the United States Securities and Exchange Commission's (SEC) Regulation S-X. Financial Statement Schedules not included have been omitted because they are not applicable or the required information is shown in the Consolidated Financial Statements or Notes thereto.

CC-BLG003705

## Management's Report on Financial Information and Internal Controls

**Responsibility For Financial Information** —We are responsible for the preparation, accuracy, integrity and objectivity of the Consolidated Financial Statements and the other financial information included in this report. Such information has been prepared in conformity with accounting principles generally accepted in the United States of America and accordingly, includes certain amounts that represent management's best estimates and judgments. Actual amounts could differ from those estimates.

**Responsibility for Internal Controls** —We are also responsible for establishing and maintaining adequate internal controls over financial reporting. These internal controls consist of policies and procedures that are designed to assess and monitor the effectiveness of the control environment including: risk identification, governance structure, delegations of authority, information flow, communications and control activities. A chartered Disclosure Committee oversees Grace's public financial reporting process and key managers are required to confirm their compliance with Grace's policies and internal controls quarterly. While no system of internal controls can ensure elimination of all errors and irregularities, Grace's internal controls, which are reviewed and modified in response to changing conditions, have been designed to provide reasonable assurance that assets are safeguarded, policies and procedures are followed, transactions are properly executed and reported, and appropriate disclosures are made. The concept of reasonable assurance is based on the recognition that there are limitations in all systems of internal control and that the costs of such systems should be balanced with their benefits. The Audit Committee of the Board of Directors, which is comprised solely of independent directors, meets regularly with Grace's senior financial management, internal auditors and independent registered public accounting firm to review audit plans and results, as well as the actions taken by management in discharging its responsibilities for accounting, financial reporting and internal controls. The Audit Committee is responsible for the selection and compensation of the independent registered public accounting firm. Grace's financial management, internal auditors and independent registered public accounting firm have direct and confidential access to the Audit Committee at all times.

**Report On Internal Control Over Financial Reporting** —We and our management have evaluated Grace's internal control over financial reporting as of December 31, 2008. This evaluation was based on criteria for effective internal control over financial reporting set forth in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, we and our management have concluded that Grace's internal control over financial reporting is effective as of December 31, 2008. Grace's independent registered public accounting firm that audited our financial statements included in Item 15 has also audited the effectiveness of Grace's internal control over financial reporting as of December 31, 2008, as stated in their report, which appears on the following page.

F-2

CC-BLG003706

**Report On Disclosure Controls And Procedures**— As of December 31, 2008, we carried out an evaluation of the effectiveness of the design and operation of Grace's disclosure controls and procedures pursuant to Rule 13a-15 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Based upon that evaluation, we concluded that Grace's disclosure controls and procedures are effective in ensuring that information required to be disclosed in Grace's periodic filings under the Exchange Act is accumulated and communicated to us to allow timely decisions regarding required disclosures, and such information is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms.

/s/ A. E. Festa

A. E. Festa
*President and*
*Chief Executive Officer*

/s/ Hudson La Force III

Hudson La Force III
*Senior Vice President and*
*Chief Financial Officer*

February 27, 2009

F-3

CC-BLG003707

**Report of Independent Registered Public Accounting Firm**

To the Shareholders and Board of Directors of W. R. Grace & Co.:

In our opinion, the accompanying consolidated financial statements present fairly, in all material respects, the financial position of W. R. Grace & Co. and its subsidiaries (the "Company") at December 31, 2008 and December 31, 2007, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2008 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedule listed in the accompanying index presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2008 based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for these financial statements and financial statement schedule, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying management's Report On Internal Control Over Financial Reporting. Our responsibility is to express opinions on these financial statements, on the financial statement schedule, and on the Company's internal control over financial reporting based on our integrated audits. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the consolidated financial statements, on April 2, 2001, the Company and substantially all of its domestic subsidiaries voluntarily filed for protection under Chapter 11 of the United States Bankruptcy Code, which raises substantial doubt about the Company's ability to continue as a going concern in its present form. Management's intentions with respect to this matter are described in Note 2. The accompanying consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

As discussed in Note 10 to the accompanying consolidated financial statements, the Company changed its method of accounting for the cost of its U.S Inventories from the Last-In-First-Out (LIFO) inventory valuation method for U.S. inventories to the First-In-First-Out (FIFO) inventory valuation method. As discussed in Note 4 to the consolidated financial statements, the Company changed the manner in which it accounts for income tax uncertainties effective January 1, 2007 to comply with a recently issued financial accounting standard. Also as discussed in Note 20 to the consolidated financial statements, the Company changed the manner in which it accounts for defined benefit pension and other postretirement plans effective December 31, 2006 to comply with a recently issued financial accounting standard.

F-4

CC-BLG003708

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ PricewaterhouseCoopers LLP
PricewaterhouseCoopers LLP
McLean, Virginia
February 27, 2009

EXHIBIT 23

### Consent of Independent Registered Public Accounting Firm

We hereby consent to the incorporation by reference in the Registration Statements on Form S-8 (Nos. 333-37024, 333-49083 and 333-49515) of W. R. Grace & Co. of our report dated February 27, 2009 relating to the financial statements, financial statement schedule and the effectiveness of internal control over financial reporting, which appears in this Form 10-K.

/s/ PricewaterhouseCoopers LLP
PricewaterhouseCoopers LLP
McLean, Virginia
February 27, 2009

F-5

CC-BLG003709

**Consolidated Financial Statements**

**W. R. Grace & Co. and Subsidiaries**

**Consolidated Statements of Operations**

**(In millions, except per share amounts)**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2008** | **2007** | **2006** |
| Net sales | **$3,317.0** | $3,115.2 | $2,826.5 |
| Cost of goods sold | **2,338.7** | 2,127.9 | 1,946.8 |
| Selling, general and administrative expenses | **595.0** | 600.6 | 593.8 |
| Research and development expenses | **82.7** | 79.5 | 65.6 |
| Defined benefit pension expense | **56.8** | 52.6 | 63.7 |
| Interest expense and related financing costs | **54.2** | 72.1 | 73.2 |
| Provision for environmental remediation | **14.6** | 17.0 | 30.0 |
| Chapter 11 expenses, net of interest income | **65.8** | 86.4 | 49.9 |
| Other (income) expense, net | **(32.0)** | (33.1) | (34.3) |
| | **3,175.8** | 3,003.0 | 2,788.7 |
| Income before income taxes and minority interest | **141.2** | 112.2 | 37.8 |
| Benefit from (provision for) income taxes | **(4.3)** | 1.1 | (2.8) |
| Minority interests in consolidated entities | **(15.4)** | (24.5) | (26.4) |
| **Net income** | **$ 121.5** | $ 88.8 | $ 8.6 |
| **Basic earnings per share:** | | | |
| Net income | **$ 1.69** | $ 1.27 | $ 0.13 |
| Weighted average number of basic shares | **72.0** | 70.1 | 67.9 |
| **Diluted earnings per share:** | | | |
| Net income | **$ 1.68** | $ 1.24 | $ 0.13 |
| Weighted average number of diluted shares | **72.5** | 71.6 | 68.3 |

The Notes to Consolidated Financial Statements are an integral part of these statements.

F-6

CC-BLG003710

W. R. Grace & Co. and Subsidiaries

Consolidated Statements of Cash Flows

(In millions)

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2008 | 2007 | 2006 |
| **OPERATING ACTIVITIES** | | | |
| Net income | $ 121.5 | $ 88.8 | $ 8.6 |
| Reconciliation to net cash provided by operating activities: | | | |
| Depreciation and amortization | 118.7 | 113.4 | 113.5 |
| Chapter 11 expenses, net of interest income | 65.8 | 86.4 | 49.9 |
| (Benefit from) provision for income taxes | 4.3 | (1.1) | 2.8 |
| Income taxes paid, net of refunds | (42.4) | (61.1) | (51.6) |
| Minority interests in consolidated entities | 15.4 | 24.5 | 26.4 |
| Dividends paid to minority interests in consolidated entities | (13.4) | (12.0) | (6.7) |
| Interest accrued on pre-petition liabilities subject to compromise | 49.4 | 70.9 | 71.3 |
| Net (gain) loss on sales of investments and disposals of assets | (14.1) | (1.9) | (0.6) |
| Defined benefit pension expense | 56.8 | 52.6 | 63.7 |
| Payments under defined benefit pension arrangements | (67.7) | (105.7) | (121.5) |
| Payments under postretirement benefit plans | (6.6) | (5.0) | (13.9) |
| Net income from life insurance policies | (3.0) | (5.4) | (4.1) |
| Provision for (recovery of) uncollectible receivables | 2.2 | (0.4) | 3.5 |
| Provision for environmental remediation | 14.6 | 17.0 | 30.0 |
| Expenditures for environmental remediation | (4.9) | (9.5) | (10.9) |
| Expenditures for retained obligations of divested businesses | (1.1) | (1.0) | (3.6) |
| Changes in assets and liabilities, excluding effect of businesses acquired/divested and foreign currency translation: | | | |
| Working capital items (trade accounts receivable, inventories and accounts payable) | 56.2 | (67.1) | 29.1 |
| Other accruals and non-cash items | (28.8) | (2.8) | 17.1 |
| Net cash provided by operating activities before Chapter 11 expenses and settlements | 322.9 | 190.6 | 203.0 |
| Cash paid to resolve contingencies subject to Chapter 11 | (252.0) | (10.3) | — |
| Chapter 11 expenses paid | (69.3) | (92.1) | (50.3) |
| Net cash provided by operating activities | 1.6 | 88.2 | 152.7 |
| **INVESTING ACTIVITIES** | | | |
| Capital expenditures | (132.2) | (136.9) | (119.2) |
| Investments in short term debt securities | — | (124.7) | |
| Proceeds from sales of investment securities | 70.7 | — | |
| Purchases of equity investment | (4.0) | (6.3) | — |
| Businesses acquired, net of cash acquired | — | (5.5) | (19.6) |
| Proceeds from sale of business/product line | — | 21.8 | — |
| Proceeds from termination of life insurance policies | 12.7 | 14.8 | 0.3 |
| Net investment in life insurance policies | (0.1) | (1.2) | (0.5) |
| Proceeds from sales of investments and disposals of assets | 21.8 | 31.1 | 9.6 |
| Net cash used for investing activities | (31.1) | (206.9) | (129.4) |
| **FINANCING ACTIVITIES** | | | |
| Net payment of loans secured by cash value of life insurance policies | — | (0.1) | (0.1) |
| Net (repayments) borrowings under credit arrangements | 6.7 | 8.3 | 0.3 |
| Fees paid under debtor-in-possession credit facility | (2.3) | (2.6) | (2.4) |
| Proceeds from exercise of stock options | 9.6 | 40.1 | 24.1 |
| Net cash provided by financing activities | 14.0 | 45.7 | 21.9 |
| Effect of currency exchange rate changes on cash and cash equivalents | (4.9) | 17.2 | 16.4 |
| Increase (decrease) in cash and cash equivalents | (20.4) | (55.8) | 61.6 |
| Cash and cash equivalents, beginning of period | 480.5 | 536.3 | 474.7 |
| Cash and cash equivalents, end of period | $ 460.1 | $ 480.5 | $ 536.3 |

The Notes to Consolidated Financial Statements are an integral part of these statements.

F-7

CC-BLG003711

**W. R. Grace & Co. and Subsidiaries**

**Consolidated Balance Sheets**

**(In millions, except par value and shares)**

| | December 31, 2008 | December 31, 2007 |
|---|---|---|
| **ASSETS** | | |
| **Current Assets** | | |
| Cash and cash equivalents | $ 460.1 | $ 480.5 |
| Investment securities | 21.6 | 98.3 |
| Cash value of life insurance policies, net of policy loans | 67.2 | 77.1 |
| Trade accounts receivable, less allowance of $5.0 (2007—$5.2) | 462.6 | 500.6 |
| Inventories | 354.8 | 362.9 |
| Deferred income taxes | 45.8 | 37.7 |
| Other current assets | 86.1 | 80.8 |
| **Total Current Assets** | 1,498.2 | 1,637.9 |
| Properties and equipment, net of accumulated depreciation and amortization of $1,545.3 (2007—$1,545.0) | 710.6 | 706.1 |
| Goodwill | 117.1 | 122.3 |
| Deferred income taxes | 851.7 | 747.5 |
| Asbestos-related insurance | 500.0 | 500.0 |
| Overfunded defined benefit pension plans | 48.6 | 54.1 |
| Other assets | 149.3 | 140.5 |
| **Total Assets** | $ 3,875.5 | $ 3,908.4 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT)** | | |
| **Liabilities Not Subject to Compromise** | | |
| **Current Liabilities** | | |
| Debt payable within one year | $ 11.2 | $ 4.7 |
| Accounts payable | 230.4 | 191.3 |
| Other current liabilities | 291.5 | 325.1 |
| **Total Current Liabilities** | 533.1 | 521.1 |
| Debt payable after one year | 0.6 | 0.3 |
| Deferred income taxes | 7.1 | 32.7 |
| Minority interests in consolidated entities | 73.1 | 73.2 |
| Underfunded defined benefit pension plans | 392.3 | 169.1 |
| Unfunded pay-as-you-go defined benefit pension plans | 136.7 | 137.9 |
| Other liabilities | 46.6 | 46.2 |
| **Total Liabilities Not Subject to Compromise** | 1,189.5 | 980.5 |
| **Liabilities Subject to Compromise—Note 2** | | |
| Pre-petition bank debt plus accrued interest | 823.5 | 783.0 |
| Drawn letters of credit plus accrued interest | 30.0 | 26.9 |
| Income tax contingencies | 121.0 | 89.3 |
| Asbestos-related contingencies | 1,700.0 | 1,700.0 |
| Environmental contingencies | 152.2 | 394.7 |
| Postretirement benefits | 169.7 | 172.7 |
| Other liabilities and accrued interest | 116.5 | 110.9 |
| **Total Liabilities Subject to Compromise** | 3,112.9 | 3,277.5 |
| **Total Liabilities** | 4,302.4 | 4,258.0 |
| **Commitments and Contingencies** | | |
| **Shareholders' Equity (Deficit)** | | |
| Common stock issued, par value $0.01; 300,000,000 shares authorized; outstanding: 2008—72,157,518 (2007—71,627,901) | 0.8 | 0.8 |
| Paid-in capital | 436.6 | 431.5 |
| Accumulated deficit | (246.6) | (368.1) |
| Treasury stock, at cost: shares: 2008—4,822,242; (2007—5,351,859) | (57.4) | (63.7) |
| Accumulated other comprehensive income (loss) | (560.3) | (350.1) |
| **Total Shareholders' Equity (Deficit)** | (426.9) | (349.6) |
| **Total Liabilities and Shareholders' Equity (Deficit)** | $ 3,875.5 | $ 3,908.4 |

The Notes to Consolidated Financial Statements are an integral part of these statements.

F-8

CC-BLG003712

**W. R. Grace & Co. and Subsidiaries**

**Consolidated Statements of Shareholders' Equity (Deficit)**

**(In millions)**

| | Common Stock and Paid-in Capital | Accumulated Deficit | Treasury Stock | Accumulated Other Comprehensive Income (Loss) | Total Shareholders' Equity (Deficit) |
|---|---|---|---|---|---|
| Balance, December 31, 2005 | $ 424.2 | $ (467.7) | $(119.7) | $ (393.9) | $ (557.1) |
| Net income | — | 8.6 | — | — | 8.6 |
| Stock plan activity | 0.4 | — | 23.7 | — | 24.1 |
| Other comprehensive income (loss) | — | — | — | 105.4 | 105.4 |
| Adoption of FASB Statement No. 158 (Note 20) | — | — | — | (102.3) | (102.3) |
| Balance, December 31, 2006 | $ 424.6 | $ (459.1) | $ (96.0) | $ (390.8) | $ (521.3) |
| Cumulative effect of adoption of FASB Interpretation No. 48 | — | 2.2 | — | — | 2.2 |
| Balance, January 1, 2007 | $ 424.6 | $ (456.9) | $ (96.0) | $ (390.8) | $ (519.1) |
| Net income | — | 88.8 | — | — | 88.8 |
| Stock plan activity | 7.7 | — | 32.3 | — | 40.0 |
| Other comprehensive income (loss) | — | — | — | 40.7 | 40.7 |
| Balance, December 31, 2007 | $ 432.3 | $ (368.1) | $ (63.7) | $ (350.1) | $ (349.6) |
| Net income | — | 121.5 | — | — | 121.5 |
| Stock plan activity | 5.1 | — | 6.3 | — | 11.4 |
| Other comprehensive income (loss) | — | — | — | (210.2) | (210.2) |
| Balance, December 31, 2008 | $ 437.4 | $ (246.6) | $ (57.4) | $ (560.3) | $ (426.9) |

The Notes to Consolidated Financial Statements are an integral part of these statements.

F-9

CC-BLG003713

**W. R. Grace & Co. and Subsidiaries**

**Consolidated Statements of Comprehensive Income (Loss)**

**(In millions)**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2008 | 2007 | 2006 |
| **Net income** | $ 121.5 | $ 88.8 | $   8.6 |
| **Other comprehensive income (loss):** | | | |
| Foreign currency translation adjustments | (58.7) | 44.6 | 36.8 |
| Gain (loss) from hedging activities, net of income taxes | (6.6) | 0.8 | (1.3) |
| Minimum pension liability adjustments, net of income taxes | — | — | 69.9 |
| Defined benefit pension and other postretirement plans, net of income taxes | (144.9) | (4.7) | — |
| Total other comprehensive income (loss) | (210.2) | 40.7 | 105.4 |
| **Comprehensive income (loss)** | $ (88.7) | $129.5 | $114.0 |

The Notes to Consolidated Financial Statements are an integral part of these statements.

F-10

CC-BLG003714

## Notes to Consolidated Financial Statements

**1. Basis of Presentation and Summary of Significant Accounting and Financial Reporting Policies**

W. R. Grace & Co., through its subsidiaries, is engaged in specialty chemicals and specialty materials businesses on a worldwide basis through two operating segments: Grace Davison, which includes specialty catalysts and materials used in a wide range of energy, refining, consumer, industrial, packaging and life sciences applications; and Grace Construction Products, which includes specialty chemicals and materials used in commercial, infrastructure and residential construction.

W. R. Grace & Co. conducts substantially all of its business through a direct, wholly-owned subsidiary, W. R. Grace & Co.-Conn. ("Grace-Conn."). Grace-Conn. owns substantially all of the assets, properties and rights of W. R. Grace & Co. on a consolidated basis, either directly or through subsidiaries.

As used in these notes, the term "Company" refers to W. R. Grace & Co. The term "Grace" refers to the Company and/or one or more of its subsidiaries and, in certain cases, their respective predecessors.

*Voluntary Bankruptcy Filing* —During 2000 and the first quarter of 2001, Grace experienced several adverse developments in its asbestos-related litigation, including: a significant increase in personal injury claims, higher than expected costs to resolve personal injury and certain property damage claims, and class action lawsuits alleging damages from Zonolite Attic Insulation ("ZAI"), a former Grace attic insulation product.

After a thorough review of these developments, Grace's Board of Directors concluded that a federal court-supervised bankruptcy process provided the best forum available to achieve fairness in resolving these claims and on April 2, 2001 (the "Filing Date"), Grace and 61 of its United States subsidiaries and affiliates, including Grace-Conn. (collectively, the "Debtors"), filed voluntary petitions for reorganization (the "Filing") under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The cases were consolidated and are being jointly administered under case number 01-01139 (the "Chapter 11 Cases"). Grace's non-U.S. subsidiaries and certain of its U.S. subsidiaries were not included in the Filing.

Under Chapter 11, the Debtors have continued to operate their businesses as debtors-in-possession under court protection from creditors and claimants, while using the Chapter 11 process to develop and implement a plan for addressing the asbestos-related claims. Since the Filing, all motions necessary to conduct normal business activities have been approved by the Bankruptcy Court. (See Note 2 for Chapter 11—Related Information.)

*Principles of Consolidation* —The Consolidated Financial Statements include the accounts of Grace and entities as to which Grace exercises control over operating and financial policies. Grace consolidates the activities of variable interest entities in circumstances where management determines that Grace is the primary beneficiary of the variable interest entity. Intercompany transactions and balances are eliminated in consolidation. Investments in affiliated companies in which Grace can significantly influence operating and financial policies are accounted for under the equity method, unless Grace's investment is deemed to be temporary, in which case the investment is accounted for under the cost method.

*Operating Segments* —Grace reports financial results of each of its operating segments that engage in business activities that generate revenues and expenses, and whose operating results are

CC-BLG003715

**Notes to Consolidated Financial Statements (Continued)**

**1. Basis of Presentation and Summary of Significant Accounting and Financial Reporting Policies (Continued)**

regularly reviewed by Grace's Chief Executive Officer. Grace reports two operating segments: Grace Davison, which includes specialty catalysts and materials used in a wide range of energy, refining, consumer, industrial, packaging and life sciences applications; and Grace Construction Products, which includes specialty chemicals and materials used in commercial, infrastructure and residential construction.

*Minority Interests in Consolidated Entities* —Grace conducts certain of its business through joint ventures with unaffiliated third parties that require profit sharing. For joint ventures in which Grace has a controlling financial interest, Grace consolidates the results of such joint ventures in the Consolidated Financial Statements. Grace recognizes a liability for cumulative amounts due to the third parties based on the financial results of the joint ventures, and deducts the annual amount of profit sharing in the measurement of its consolidated net income.

*Change in Accounting Principle* —In the third quarter of 2008, Grace changed its method of accounting for the cost of its U.S inventories from the last-in/first-out method, or LIFO, to the first-in/first-out method, or FIFO. Grace decided to make this change in order to achieve a consistent inventory costing method for both U.S. and non-U.S. inventories. Grace has retrospectively restated prior periods' financial statements for all periods presented herein to account for all inventories using FIFO in compliance with SFAS 154. See Note 10 for further discussion.

*Reclassifications* —Certain amounts in prior years' Consolidated Financial Statements have been reclassified to conform to the 2008 presentation. Such reclassifications have not materially affected previously reported amounts in the Consolidated Financial Statements.

*Use of Estimates* —The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amount of assets and liabilities and disclosure of contingent assets and liabilities at the date of the Consolidated Financial Statements, and the reported amounts of revenues and expenses for the periods presented. Actual amounts could differ from those estimates, and the differences could be material. Changes in estimates are recorded in the period identified. Grace's accounting measurements that are most affected by management's estimates of future events are:

- Contingent liabilities, which depend on an assessment of the probability of loss and an estimate of ultimate resolution cost, such as asbestos-related matters (see Notes 2 and 3), environmental remediation (see Note 16), income taxes (see Note 4), and litigation (see Note 16);

- Pension and postretirement liabilities that depend on assumptions regarding participant life spans, future inflation, discount rates and total returns on invested funds (see Note 20); and

- Realization values of net deferred tax assets and insurance receivables, which depend on projections of future income and cash flows and assessments of insurance coverage and insurer solvency.

The accuracy of management's estimates may be materially affected by the uncertainties arising under Grace's Chapter 11 proceeding.

*Revenue Recognition* —Grace recognizes revenue when all of the following criteria are satisfied: risk of loss and title transfer to the customer; the price is fixed and determinable; and

F-12

CC-BLG003716

Notes to Consolidated Financial Statements (Continued)

**1. Basis of Presentation and Summary of Significant Accounting and Financial Reporting Policies (Continued)**

collectability is reasonably assured. Certain customer arrangements include conditions for volume rebates. Grace accrues a rebate allowance and reduces recorded sales for anticipated selling price adjustments at the time of sale. Grace regularly reviews rebate accruals based on actual and anticipated sales patterns.

*Cash Equivalents* —Cash equivalents consist of liquid instruments and investments with maturities of three months or less when purchased. The recorded amounts approximate fair value.

*Investment Securities* —Investment securities consist of direct and indirect investments in debt securities and are classified as available-for-sale securities. These investments are reported at fair value as determined by independent pricing sources and/or professional market participants, with temporary unrealized gains and losses included in other comprehensive income. Losses that are deemed to be other than temporary are considered impairments and are recorded in earnings. Grace reflects these securities as current assets as they are actively in the process of being liquidated.

*Inventories* —Inventories are stated at the lower of cost or market. The method used to determine cost is first-in/first-out, or "FIFO." Market values for raw materials are based on current cost and, for other inventory classifications, net realizable value. Inventories are evaluated regularly for salability, and slow moving and/or obsolete items are adjusted to expected salable value. Inventory values include direct and certain indirect costs of materials and production. Abnormal costs of production are expensed as incurred.

*Properties and Equipment* —Properties and equipment are stated at cost. Depreciation of properties and equipment is generally computed using the straight-line method over the estimated useful life of the asset. Estimated useful lives range from 20 to 40 years for buildings, 3 to 7 years for information technology equipment, 3 to 10 years for machinery and equipment and 5 to 10 years for furniture and fixtures. Interest is capitalized in connection with major project expenditures. Fully depreciated assets are retained in properties and equipment and related accumulated depreciation accounts until they are removed from service. In the case of disposals, assets and related accumulated depreciation are removed from the accounts and the net amount, less any proceeds from disposal, is charged or credited to operations. Obligations for costs associated with asset retirements, such as requirements to restore a site to its original condition, are accrued at net present value and amortized along with the related asset. Grace reviews long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be fully recoverable.

*Goodwill* —Goodwill arises from certain purchase business combinations. Grace reviews its goodwill for impairment on an annual basis and whenever events or changes in circumstances indicate that the carrying amount may not be fully recoverable. Recoverability is assessed at the reporting unit level most directly associated with the business combination that generated the goodwill.

*Income Taxes* —Deferred tax assets and liabilities are recognized with respect to the expected future tax consequences of events that have been recorded in the Consolidated Financial Statements and tax returns. If it is more likely than not that all or a portion of deferred tax assets will not be realized, a valuation allowance is provided against such deferred tax assets. The assessment

F-13

CC-BLG003717

Notes to Consolidated Financial Statements (Continued)

**1. Basis of Presentation and Summary of Significant Accounting and Financial Reporting Policies (Continued)**

of realization of deferred tax assets is performed annually under scenarios of future taxable income and tax planning alternatives that are considered reasonable in the circumstances.

Tax benefits from an uncertain tax position are recognized only if it is more likely than not that the tax position will be sustained upon examination by the taxing authorities, based on the technical merits of the position. Tax benefits recognized in the financial statements from such a position are measured based on the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement.

*Foreign Currency Translation* —Assets and liabilities of foreign subsidiaries (other than those located in countries with highly inflationary economies) are translated into U.S. dollars at current exchange rates, while revenues, costs and expenses are translated at average exchange rates during each reporting period. The resulting translation adjustments are included in the "accumulated other comprehensive income (loss)" caption of the Consolidated Balance Sheets. The financial statements of subsidiaries located in countries with highly inflationary economies, if any, are remeasured as if the functional currency were the U.S. dollar; the remeasurement creates translation adjustments that are reflected in "net income" in the Consolidated Statements of Operations.

*Financial Instruments* —Grace periodically enters into commodity forward, swap and/or option contracts, and foreign exchange forward and/or option contracts to manage exposure to fluctuations in commodity prices and foreign currency exchange rates. Grace does not hold or issue derivative financial instruments for trading purposes. Derivative instruments are recorded in the Consolidated Balance Sheets as either assets or liabilities at their fair value. For derivative instruments designated as fair value hedges, changes in the fair values of the derivative instruments closely offset changes in the fair values of the hedged items in other income (expense) in the Consolidated Statements of Operations. For derivative instruments designated as cash flow hedges, if the derivative instruments qualify for hedge accounting pursuant to FAS 133, "Accounting for Derivative Instruments and Hedging Activities", the effective portion of any hedge is reported as accumulated other comprehensive income (loss) in the Consolidated Balance Sheets until it is cleared to earnings during the same period in which the hedged item affects earnings. The ineffective portion of all hedges, and changes in the fair values of derivative instruments that are not designated as hedges, are recorded in current period earnings. Cash flows from derivative instruments are reported in the same category as the cash flows from the items being hedged.

*Effect of New Accounting Standards* —In December 2008, the Financial Accounting Standards Board ("FASB") issued FASB Staff Position ("FSP") No. FAS 140-4 and FIN 46 (R)-8 "Disclosures by Public Entities (Enterprises) about Transfers of Financial Assets and Interests in Variable Interest Entities." The disclosures required by this FSP are intended to provide greater transparency to financial statement users about a transferor's continuing involvement with transferred financial assets and an enterprise's involvement with variable interest entities and qualifying Special Purpose Entities ("SPEs"). This FSP is effective for the first reporting period ending after December 15, 2008. Grace adopted these disclosure requirements in 2008.

In December 2008, the FASB issued FSP No. FAS 132(R)-1 "Disclosures about Postretirement Benefit Plan Assets." This FSP amends FASB Statement No. 132 (revised 2003), Employers' Disclosures about Pensions and Other Postretirement Benefits, to provide guidance on an employer's disclosures about plan assets of a defined benefit pension or other postretirement plan.

CC-BLG003718

**Notes to Consolidated Financial Statements (Continued)**

**1. Basis of Presentation and Summary of Significant Accounting and Financial Reporting Policies (Continued)**

This FSP shall be effective for fiscal years ending after December 15, 2009. Grace will adopt these disclosure requirements in 2009.

In May 2008, FASB issued Statement of Financial Accounting Standards ("SFAS") No. 162, "The Hierarchy of Generally Accepted Accounting Principles." SFAS No. 162 identifies the sources of accounting principles and the framework for selecting the principles to be used in the preparation of financial statements of nongovernmental entities that are presented in conformity with generally accepted accounting principles. This statement is effective 60 days following the SEC's approval of the Public Company Accounting Oversight Board amendments to Auditing Interpretations ("AU") section 411, *The Meaning of Present Fairly in Conformity With Generally Accepted Accounting Principles* . Grace will adopt this standard when effective.

In April 2008, the FASB issued FSP No. FAS 142-3, "Determination of the Useful Life of Intangible Assets." FSP 142-3 will improve the consistency between the useful life of a recognized intangible asset under Statement 142 and the period of expected cash flows used to measure the fair value of the asset under FASB Statement No. 141 (revised 2007), *Business Combinations* , and other U.S. generally accepted accounting principles. This FSP is effective for financial statements issued for fiscal years beginning after December 15, 2008, and interim periods within those fiscal years. Grace will adopt this standard in 2009.

In March 2008, the FASB issued SFAS No. 161, "Disclosures about Derivative Instruments and Hedging Activities—an amendment of FASB Statement No. 133." SFAS No. 161 expands the current disclosure framework by requiring entities to provide qualitative disclosures about the objectives and strategies for using derivatives, quantitative data about the fair value of and gains and losses on derivative contracts, and details of credit-risk-related contingent features in their hedged positions. SFAS No. 161 is effective for fiscal years beginning after November 15, 2008. Grace will adopt these disclosure requirements in 2009.

In December 2007, the FASB issued SFAS No. 141(R), "Business Combinations," SFAS No. 141(R) will require the acquirer in a business combination to recognize the assets acquired, the liabilities assumed, and any noncontrolling interest in the acquiree at the acquisition date, measured at their fair values as of that date, with acquisition-related costs recognized separately from the acquisition. SFAS No. 141(R) applies prospectively to business combinations occurring on or after the beginning of the first annual reporting period beginning on or after December 15, 2008. Grace will adopt this standard in 2009.

In December 2007, the FASB issued SFAS No. 160, "Noncontrolling Interests in Consolidated Financial Statements." SFAS No. 160 establishes new accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary. SFAS No. 160 is effective for fiscal years beginning on or after December 15, 2008. Grace will adopt this standard in 2009.

In September 2006, the FASB issued SFAS No. 157, "Fair Value Measurements." SFAS No. 157 defines fair value, establishes a framework for measuring fair value, and expands disclosures about fair value measurements. In February 2008, the FASB issued FSP 157-1, "Application of FASB Statement No. 157 to FASB Statement No. 13 and Other Accounting Pronouncements That Address Fair Value Measurements for Purposes of Lease Classification or Measurement under Statement 13", and FSP 157-2, "Effective Date of FASB Statement No. 157".

F-15

CC-BLG003719

Notes to Consolidated Financial Statements (Continued)

**1. Basis of Presentation and Summary of Significant Accounting and Financial Reporting Policies (Continued)**

FSP 157-1 amends SFAS No. 157 to remove certain leasing transactions from its scope. FSP 157-2 delays the effective date of SFAS No. 157 for all non-financial assets and non-financial liabilities, except for items that are recognized or disclosed at fair value in the financial statements on a recurring basis (at least annually), until fiscal years beginning after November 15, 2008. In October 2008, the FASB issued FSP No. FAS 157-3 "Determining the Fair Value of a Financial Asset When the Market for That Asset Is Not Active." This FSP clarifies the application of SFAS No. 157 and illustrates key considerations in determining the fair value of a financial asset when the market for that financial asset is not active. This FSP is effective upon issuance, including prior periods for which financial statements have not been issued. Grace adopted SFAS No. 157 and the related FSPs in the first quarter of 2008, and the adoption for Grace's financial assets and liabilities did not have a material impact on its Consolidated Financial Statements. Grace does not believe the adoption of SFAS No. 157 for its non-financial assets and liabilities, effective January 1, 2009, will have a material impact on its Consolidated Financial Statements. See Note 7 for further discussion of SFAS No. 157.

**2. Chapter 11—Related Information**

   *Official Parties to Grace's Chapter 11 Cases*   Three creditors' committees, two representing asbestos claimants, the Official Committee of Asbestos Personal Injury Claimants (the "PI Committee") and the Official Committee of Asbestos Property Damage Claimants (the "PD Committee"), and the third representing other unsecured creditors, and the Official Committee of Equity Security Holders (the "Equity Committee"), have been appointed in the Chapter 11 Cases. These committees, a legal representative of future asbestos personal injury claimants (the "PI FCR") and a legal representative of future asbestos property damage claimants (the "PD FCR"), have the right to be heard on all matters that come before the Bankruptcy Court and have important roles in the Chapter 11 Cases. The Debtors are required to bear certain costs and expenses of the committees and the representatives of future asbestos claimants, including those of their counsel and financial advisors.

   As discussed below, the Debtors, the Equity Committee, the PI Committee and the PI FCR have filed a joint plan of reorganization and thereafter, an amended joint plan of reorganization, with the Bankruptcy Court that is designed to address all pending and future asbestos-related claims and all other pre-petition claims as outlined therein. The committee representing general unsecured creditors, the PD Committee and the PD FCR are not co-proponents of this plan.

   *Plans of Reorganization*   On November 13, 2004, Grace filed a proposed plan of reorganization, as well as several associated documents, including a disclosure statement, trust distribution procedures, exhibits and other supporting documents, with the Bankruptcy Court. On January 13, 2005, Grace filed an amended plan of reorganization (the "Prior Plan") and related documents to address certain objections of creditors and other interested parties. At the time it was filed, the Prior Plan was supported by the committee representing general unsecured creditors and the Equity Committee, but was not supported by the PI Committee, the PD Committee or the PI FCR. At the time of filing of the Prior Plan, the PD FCR had not been appointed.

   On July 26, 2007, the Bankruptcy Court terminated Grace's exclusive rights to propose a plan of reorganization and solicit votes thereon. As a result of the termination of these rights, any party-in-interest may propose a competing plan of reorganization. On November 5, 2007, the PI

F-16

CC-BLG003720

Notes to Consolidated Financial Statements (Continued)

**2. Chapter 11—Related Information (Continued)**

Committee and the PI FCR filed a proposed plan of reorganization (the "PI Plan") with the Bankruptcy Court.

On April 6, 2008, the Debtors reached an agreement in principle with the PI Committee, the PI FCR, and the Equity Committee designed to resolve all present and future asbestos-related personal injury claims (the "PI Settlement").

Prior to the PI Settlement, the Bankruptcy Court entered a case management order for estimating liability for pending and future asbestos personal injury claims. A trial for estimating liability for such claims began in January 2008 but was suspended in April 2008 as a result of the PI Settlement.

As contemplated by the PI Settlement, on September 19, 2008, the Debtors, supported by the Equity Committee, the PI Committee and the PI FCR, as co-proponents, filed a joint plan of reorganization with the Bankruptcy Court to reflect the terms of the PI Settlement.

On October 17, 2008, the Ontario Superior Court of Justice, in the Grace Canada, Inc. proceeding pending under the Companies' Creditors Arrangement Act, approved an agreement (the "Minutes of Settlement"), entered into by the Company, Grace Canada and legal representatives of Canadian ZAI property damage claimants on September 2, 2008, that would settle all Canadian ZAI property damage claims and demands. Under the Minutes of Settlement, all Canadian ZAI property damage claims and demands would be paid through a separate Canadian ZAI property damage claims fund funded with CDN$6.5 million. The Minutes of Settlement are subject to the confirmation and effectiveness of the Joint Plan.

On November 21, 2008, the Debtors reached an agreement in principle (the "ZAI PD Term Sheet") with the Putative Class Counsel to the U.S. ZAI claimants, the PD FCR, and the Equity Committee designed to resolve all present and future U.S. ZAI property damage claims and demands.

As contemplated by the PI Settlement and the ZAI PD Term Sheet, the Debtors, supported by the Equity Committee, the PI Committee and the PI FCR, as co-proponents, amended the joint plan of reorganization and several associated documents, including a disclosure statement, trust distribution procedures, exhibits and other supporting documents on December 18, 2008, February 3, 2009 and February 27, 2009 through filings with the Bankruptcy Court. The joint plan of reorganization (as amended through February 27, 2009, the "Joint Plan") is designed to address all pending and future asbestos-related claims and all other pre-petition claims as outlined therein. The Joint Plan supersedes the Prior Plan and the PI Plan. The committee representing general unsecured creditors, the PD Committee and the PD FCR are not co-proponents of the Joint Plan.

Any plan of reorganization, including the Joint Plan and any plan of reorganization that may be filed in the future by a party-in-interest, will become effective only after a vote of eligible creditors and with the approval of the Bankruptcy Court and the U.S. District Court for the District of Delaware. Votes on a plan of reorganization may not be solicited until the Bankruptcy Court approves a related disclosure statement.

Under the Joint Plan, two asbestos trusts would be established under Section 524(g) of the Bankruptcy Code. All asbestos-related personal injury claims would be channeled for resolution to one asbestos trust (the "PI Trust") and all asbestos-related property damage claims, including U.S

F-17

CC-BLG003721

Notes to Consolidated Financial Statements (Continued)

**2. Chapter 11—Related Information (Continued)**

and Canadian ZAI property damage claims, would be channeled to a separate asbestos trust (the "PD Trust").

The Joint Plan assumes that Cryovac, Inc. ("Cryovac"), a wholly-owned subsidiary of Sealed Air Corporation ("Sealed Air"), will fund the PI Trust and the PD Trust with an aggregate of: (i) $512.5 million in cash (plus interest at 5.5% compounded annually from December 21, 2002); and (ii) 18 million shares (reflecting a two-for-one stock split) of common stock of Sealed Air, pursuant to the terms of a settlement agreement resolving asbestos-related, successor liability and fraudulent transfer claims against Sealed Air and Cryovac, as further described below (the "Sealed Air Settlement"). The value of the Sealed Air Settlement changes daily with the accrual of interest and the trading value of Sealed Air common stock. The Joint Plan also assumes that Fresenius AG ("Fresenius") will fund the PI Trust and the PD Trust with an aggregate of $115.0 million pursuant to the terms of a settlement agreement resolving asbestos-related, successor liability and fraudulent transfer claims against Fresenius, as further described below (the "Fresenius Settlement"). The Sealed Air Settlement and the Fresenius Settlement have been approved by the Bankruptcy Court, but remain subject to the fulfillment of specified conditions.

The Joint Plan is designed to address all pending and future asbestos-related claims and demands and all other pre-petition claims as outlined respectively therein. However, it is possible that the Joint Plan will not be confirmed by the Bankruptcy Court, or become effective if it is confirmed. If the Joint Plan is not confirmed by the Bankruptcy Court or the U.S. District Court for the District of Delaware or does not become effective, the Debtors would expect to resume the estimation trial, which was suspended in April 2008 due to the PI Settlement, to determine the amount of its asbestos-related liabilities. Under those circumstances, a different plan of reorganization may ultimately be confirmed and become effective. Under that effective plan of reorganization, the interests of holders of Company common stock could be substantially diluted or cancelled. The value of Company common stock following the effective date of any plan of reorganization and the extent of any recovery by non-asbestos-related creditors would depend principally on the amount of Debtors' asbestos-related liability under such effective plan of reorganization.

*Joint Plan of Reorganization*    Under the terms of the Joint Plan, claims under the Chapter 11 Cases would be satisfied as follows:

*Asbestos-Related Personal Injury Claims*

All pending and future asbestos-related personal injury claims and demands ("PI Claims") would be channeled to the PI Trust for resolution. The PI Trust would utilize specified trust distribution procedures to satisfy allowed PI Claims.

The PI Trust would be funded with:

- $250 million in cash plus interest thereon from January 1, 2009 to the effective date of the Joint Plan to be paid by Grace;

- Cash in the amount of the PD Initial Payment (as described below) and the ZAI Initial Payment (as described below) to be paid by Grace;

- A warrant to acquire 10 million shares of Company common stock at an exercise price of $17.00 per share, expiring one year from the effective date of the Joint Plan;

F-18

CC-BLG003722

**Notes to Consolidated Financial Statements (Continued)**

## 2. Chapter 11—Related Information (Continued)

- Rights to all proceeds under all of the Debtors' insurance policies that are available for payment of PI Claims;

- Cash in the amount of $512.5 million plus interest thereon from December 21, 2002 to the effective date of the Joint Plan at a rate of 5.5% per annum reduced by the amount of Cryovac's contribution to the PD Initial Payment (as described below) and 18 million shares of Sealed Air common stock to be paid by Cryovac pursuant to the Sealed Air Settlement;

- Cash in the amount of $115 million to be paid by Fresenius pursuant to the Fresenius Settlement reduced by the amount of Fresenius' contribution to the PD Initial Payment (as described below); and

- Deferred payments by Grace-Conn. of $110 million per year for five years beginning in 2019, and $100 million per year for 10 years beginning in 2024, that would be subordinate to any bank debt or bonds outstanding, guaranteed by the Company and secured by the Company's obligation to issue 50.1% of its outstanding common stock (measured as of the effective date of the Joint Plan) to the PI Trust in the event of default.

*Asbestos-Related Property Damage Claims*

All pending and future asbestos-related property damage claims and demands ("PD Claims") would be channeled to the PD Trust for resolution. The PD Trust would contribute CDN$6.5 million to a separate Canadian ZAI PD Claims fund through which Canadian ZAI PD Claims would be resolved. The PD Trust would generally resolve U.S. ZAI PD Claims that qualify for payment by paying 55% of the claimed amount, but in no event would the PD Trust pay more than 55% of $7,500 (as adjusted for the increase in inflation each year after the fifth anniversary of the effective date of the Joint Plan). The PD Trust would satisfy other allowed PD Claims pursuant to specified trust distribution procedures with cash payments in the allowed settlement amount. Unresolved PD Claims would be litigated before the Bankruptcy Court pursuant to procedures to be approved by the Bankruptcy Court and, to the extent such claims were determined to be allowed claims, would be paid in cash by the PD Trust in the amount determined by the Bankruptcy Court.

The PD Trust would contain two accounts, the PD account and the ZAI PD account. U.S. ZAI PD Claims would be paid from the ZAI PD account and other PD Claims would be paid from the PD account. The separate Canadian ZAI PD Claims would be paid by a separate fund established in Canada. Each account would have a separate trustee and the assets of the accounts would not be commingled. The two accounts would be funded as follows:

The PD account would be funded with:

- Approximately $112 million in cash plus cash in the amount of the estimated first six months of PD Trust expenses, to be paid by Cryovac and Fresenius (the "PD Initial Payment"), and CDN$6.5 million in cash to be paid by Grace pursuant to the Minutes of Settlement.

- A Grace obligation (the "PD Obligation") providing for a payment to the PD Trust every six months in the amount of the non ZAI PD Claims allowed during the preceding six months plus interest and, except for the first six months, the amount of PD Trust expenses for the preceding six months. The aggregate amount to be paid under the PD Obligation would not be capped.

F-19

CC-BLG003723

**Notes to Consolidated Financial Statements (Continued)**

**2. Chapter 11—Related Information (Continued)**

The ZAI account would be funded as follows (the "ZAI Assets"):

- $30 million in cash plus, if the effective date of the Joint Plan occurs after March 31, 2009, interest from April 1, 2009 to the effective date, to be paid by Cryovac and Fresenius (the "ZAI Initial Payment").

- $30 million in cash on the third anniversary of the effective date of the Joint Plan.

- A Grace obligation providing for the payment of up to 10 contingent deferred payments of $8 million per year during the 20-year period beginning on the fifth anniversary of the effective date of the Joint Plan, with each such payment due only if the ZAI Assets fall below $10 million during the preceding year.

All payments to the PD Trust that were not to be paid on the effective date of the Joint Plan would be secured by the Company's obligation to issue 50.1% of its outstanding common stock (measured as of the effective date of the Joint Plan) to the PD Trust in the event of default. Grace would have the right to conduct annual audits of the books, records and claim processing procedures of the PD Trust.

*Other Claims*

All allowed administrative claims would be paid in cash and all allowed priority claims would be paid in cash with interest. Secured claims would be paid in cash with interest or by reinstatement. Allowed general unsecured claims would be paid in cash, including any post-petition interest as follows: (i) for holders of pre-petition bank credit facilities, post-petition interest at the rate of 6.09% from the Filing Date through December 31, 2005 and thereafter at floating prime, in each case compounded quarterly; and (ii) for all other unsecured claims that are not subject to a settlement agreement providing otherwise, interest at 4.19% from the Filing Date, compounded annually, or if pursuant to an existing contract, interest at the non-default contract rate. The general unsecured creditors that hold pre-petition bank credit facilities have asserted that they are entitled to post-petition interest at the default rate specified under the terms of the underlying credit agreements which, if paid, would be materially greater than that reflected above. Grace has asserted that such creditors are not entitled to interest at the default rate and has requested the Bankruptcy Court to determine the appropriate rate at which interest would be payable. Unsecured employee-related claims such as pension, retirement medical obligations and workers compensation claims, would be reinstated.

*Effect on Company Common Stock*

The Joint Plan assumes that Company common stock will remain outstanding at the effective date of the Joint Plan, but that the interests of existing shareholders would be subject to dilution by additional shares of Company common stock issued under the warrant or in the event of default in respect of the deferred payment obligations to the PI Trust or the PD Trust under the Company's security obligation. In order to preserve significant tax benefits which are subject to elimination or limitation in the event of a change in control (as defined by the Internal Revenue Code) of Grace, the Joint Plan provides that under certain circumstances, the Board of Directors would have the authority to impose restrictions on the transfer of Grace stock with respect to certain 5% shareholders. These restrictions will generally not limit the ability of a person that holds less than 5% of Grace stock after emergence to either buy or sell stock on the open market. In addition, the

F-20

CC-BLG003724

**Notes to Consolidated Financial Statements (Continued)**

**2. Chapter 11—Related Information (Continued)**

Bankruptcy Court has approved trading restrictions on Grace common stock until the effective date of a plan of reorganization. These restrictions prohibit (without the consent of Grace) a person from acquiring more than 4.75% of the outstanding Grace common stock or, for any person already holding more than 4.75%, from increasing such person's holdings. This summary of the stock transfer restrictions does not purport to be complete and is qualified in its entirety by reference to the order of the Bankruptcy Court, which has been filed with the SEC.

*Claims Filings* —The Bankruptcy Court established a bar date of March 31, 2003 for claims of general unsecured creditors, PD Claims (other than ZAI PD Claims) and medical monitoring claims related to asbestos. The bar date did not apply to PI Claims or claims related to ZAI PD Claims.

Approximately 14,900 proofs of claim were filed by the March 31, 2003 bar date. Of these claims, approximately 9,400 were non-asbestos related, approximately 4,300 were PD Claims, and approximately 1,000 were for medical monitoring. The medical monitoring claims were made by individuals who allege exposure to asbestos through Grace's products or operations. Under the Joint Plan, these claims would be channeled to the PI Trust for resolution. In addition, approximately 800 proofs of claim were filed after the bar date.

Approximately 7,000 of the non-asbestos related claims involve claims by employees or former employees for future retirement benefits such as pension and retiree medical coverage. Grace views most of these claims as contingent and has proposed to retain such benefits under the Joint Plan. The remaining non-asbestos claims include claims for payment of goods and services, taxes, product warranties, principal and interest under pre-petition credit facilities, amounts due under leases and other contracts, leases and other executory contracts rejected in the Chapter 11 Cases, environmental remediation, pending non-asbestos- related litigation, and non-asbestos-related personal injury. Claims for indemnification or contribution to actual or potential codefendants in asbestos-related and other litigation were also filed.

The Debtors analyzed the claims filed pursuant to the March 31, 2003 bar date and found that many are duplicates, represent the same claim filed against more than one of the Debtors, lack any supporting documentation, or provide insufficient supporting documentation. As of December 31, 2008, of the approximately 4,300 non-ZAI PD Claims filed, approximately 360 claims have been resolved, approximately 3,850 claims have been expunged, reclassified by the Debtors or withdrawn by claimants, leaving approximately 90 claims to be addressed through the property damage case management order approved by the Bankruptcy Court and/or the Joint Plan or another plan of reorganization. As of December 31, 2008, of the approximately 3,270 non-asbestos claims filed, approximately 1,890 have been expunged or withdrawn by claimants, approximately 1,155 have been resolved, and an additional approximately 225 claims are to be addressed through the claim objection process and the dispute resolution procedures approved by the Bankruptcy Court.

Additionally, by order dated June 17, 2008, the Bankruptcy Court established October 31, 2008 as the bar date for ZAI PD Claims related to property located in the U.S. As of December 31, 2008, approximately 17,955 US ZAI PD Claims have been filed. In addition, on October 21, 2008, the Bankruptcy Court entered an order establishing August 31, 2009 as the bar date for ZAI PD Claims related to property located in Canada. The Joint Plan provides for the channeling of US ZAI PD Claims and Canadian ZAI PD Claims to the Asbestos PD Trust created under the Joint Plan, and the subsequent transfer of Canadian ZAI PD Claims to a Canadian fund. No bar date has been set for personal injury claims related to ZAI. The Joint Plan provides that ZAI PI Claims would be channeled to the Asbestos PI Trust created under the Joint Plan.

F-21

CC-BLG003725

Notes to Consolidated Financial Statements (Continued)

2. Chapter 11—Related Information (Continued)

Grace is continuing to analyze and review unresolved claims in relation to the Joint Plan. Grace believes that its recorded liabilities for claims subject to the March 31, 2003 bar date represent a reasonable estimate of the ultimate allowable amount for claims that are not in dispute or have been submitted with sufficient information to both evaluate the merit and estimate the value of the claim. The PD Claims are considered as part of Grace's overall asbestos liability and are being accounted for in accordance with the conditions precedent under the Prior Plan, as described in Note 3.

*Litigation Proceedings in Bankruptcy Court* —In September 2000, Grace was named in a purported class action lawsuit filed in California Superior Court for the County of San Francisco, alleging that the 1996 reorganization involving a predecessor of Grace and Fresenius and the 1998 reorganization involving a predecessor of Grace and Sealed Air were fraudulent transfers *(Abner, et al., v. W.R. Grace & Co., et al.)* . The Bankruptcy Court authorized the PI and PD Committees to proceed with claims against Fresenius and Sealed Air and Cryovac on behalf of the Debtors' bankruptcy estate.

On November 29, 2002, Sealed Air (and Cryovac) and Fresenius each announced that they had reached agreements in principle with the PI and PD Committees to settle asbestos, successor liability and fraudulent transfer claims related to such transactions. Under the terms of the Fresenius Settlement, subject to the fulfillment of certain conditions, Fresenius would pay $115.0 million to the Debtors' estate as directed by the Bankruptcy Court upon confirmation of the Debtors' plan of reorganization. In July 2003, the Fresenius Settlement was approved by the Bankruptcy Court. Under the terms of the Sealed Air Settlement, subject to the fulfillment of certain conditions, Cryovac would make a payment of $512.5 million (plus interest at 5.5% compounded annually, commencing on December 21, 2002) and nine million shares (now 18 million shares to reflect a two-for-one stock split) of Sealed Air common stock (collectively valued at $976.8 million as of December 31, 2008), as directed by the Bankruptcy Court upon confirmation of a plan of reorganization. In June 2005, the Sealed Air Settlement was approved by the Bankruptcy Court.

*Debt Capital* —All of the Debtors' pre-petition debt is in default due to the Filing. The accompanying Consolidated Balance Sheets reflect the classification of the Debtors' pre-petition debt within "liabilities subject to compromise."

The Debtors have entered into a debtor-in-possession post-petition loan and security agreement, or DIP facility, with a syndicate of lenders that, as amended effective April 1, 2008, provides for up to $165 million of revolving loans and face amount of letters of credit. The DIP facility is secured by a priority lien on substantially all assets of the Debtors with the exclusion of the capital stock of non-U.S. subsidiaries, and bears interest based on LIBOR. The term of the DIP facility ends on the earlier of April 1, 2010 or the Debtors' emergence from Chapter 11.

*Accounting Impact* —The accompanying Consolidated Financial Statements have been prepared in accordance with Statement of Position 90-7 ("SOP 90-7"), "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code," promulgated by the American Institute of Certified Public Accountants. SOP 90-7 requires that financial statements of debtors-in-possession be prepared on a going concern basis, which contemplates continuity of operations, realization of assets and liquidation of liabilities in the ordinary course of business. However, as a result of the Filing, the realization of certain of the Debtors' assets and the liquidation of certain of the Debtors' liabilities are subject to significant uncertainty. While operating as debtors-in-possession, the Debtors may sell or otherwise dispose of assets and liquidate or settle liabilities for amounts other than those reflected in the Consolidated Financial Statements. Further, the ultimate plan of reorganization could materially change the amounts and classifications reported in the Consolidated Financial Statements.

F-22

CC-BLG003726

**Notes to Consolidated Financial Statements (Continued)**

**2. Chapter 11—Related Information (Continued)**

Pursuant to SOP 90-7, Grace's pre-petition and future liabilities that are subject to compromise are required to be reported separately on the balance sheet at an estimate of the amount that will ultimately be allowed by the Bankruptcy Court. As of December 31, 2008, such pre-petition liabilities include fixed obligations (such as debt and contractual commitments), as well as estimates of costs related to contingent liabilities (such as asbestos-related litigation, environmental remediation, and other claims). Obligations of Grace subsidiaries not covered by the Filing continue to be classified on the Consolidated Balance Sheets based upon maturity dates or the expected dates of payment. SOP 90-7 also requires separate reporting of certain expenses, realized gains and losses, and provisions for losses related to the Filing as reorganization items. Grace presents reorganization items as "Chapter 11 expenses, net of interest income," a separate caption in its Consolidated Statements of Operations.

As discussed in Note 3, Grace has not adjusted its accounting for asbestos-related liabilities to reflect the Joint Plan.

Grace has not recorded the benefit of any assets that may be available to fund asbestos-related and other liabilities under the Fresenius Settlement and the Sealed Air Settlement, as such agreements are subject to conditions, which, although expected to be met, have not been satisfied and confirmed by the Bankruptcy Court and, under the Joint Plan, these assets would be transferred to the PI Trust and the PD Trust. The value available under the Fresenius Settlement and the Sealed Air Settlement as measured at December 31, 2008, was $1,091.8 million comprised of $115.0 million in cash from Fresenius and $976.8 million in cash and stock from Cryovac under the Joint Plan. Payments under the Sealed Air Settlement will be made directly to the PI Trust and the PD Trust by Cryovac.

Grace's Consolidated Balance Sheets separately identify the liabilities that are "subject to compromise" as a result of the Chapter 11 proceedings. In Grace's case, "liabilities subject to compromise" represent both pre-petition and future liabilities as determined under U.S. generally accepted accounting principles. Changes to pre-petition liabilities subsequent to the Filing Date reflect: (1) cash payments under approved court orders; (2) the terms of the Prior Plan, as discussed above and in Note 3, including the accrual of interest on pre-petition debt and other fixed obligations; (3) accruals for employee-related programs; and (4) changes in estimates related to other pre-petition contingent liabilities. The accounting for the asbestos-related liability component of "liabilities subject to compromise" is described in Note 3.

F-23

CC-BLG003727

**Notes to Consolidated Financial Statements (Continued)**

**2. Chapter 11—Related Information (Continued)**

Components of liabilities subject to compromise are as follows:

| | December 31, 2008 | December 31, 2007 | Filing Date (Unaudited) |
|---|---|---|---|
| | (in millions) | | |
| Pre-petition bank debt plus accrued interest | $ 823.5 | $ 783.0 | $ 511.5 |
| Drawn letters of credit plus accrued interest | 30.0 | 26.9 | — |
| Asbestos-related contingencies | 1,700.0 | 1,700.0 | 1,002.8 |
| Income taxes(1) | 121.0 | 89.3 | 242.1 |
| Environmental contingencies | 152.2 | 394.7 | 164.8 |
| Postretirement benefits other than pension | 73.2 | 84.0 | 185.4 |
| Unfunded special pension arrangements | 106.0 | 100.8 | 70.8 |
| Retained obligations of divested businesses | 29.8 | 30.9 | 43.5 |
| Accounts payable | 31.2 | 31.7 | 43.0 |
| Other accrued liabilities | 55.5 | 48.3 | 102.1 |
| Reclassification to current liabilities(2) | (9.5) | (12.1) | — |
| **Total Liabilities Subject to Compromise** | **$ 3,112.9** | **$ 3,277.5** | **$ 2,366.0** |

(1)   Amounts as of December 31, 2008 and 2007 are net of expected refunds of $0.8 million and $76.4 million, respectively.

(2)   As of December 31, 2008 and 2007, approximately $9.5 million and $12.1 million, respectively, of certain pension and postretirement benefit obligations subject to compromise have been presented in other current liabilities in the Consolidated Balance Sheets in accordance with SFAS No. 158.

Note that the unfunded special pension arrangements reflected above exclude non-U.S. pension plans and qualified U.S. pension plans that became underfunded subsequent to the Filing. Contributions to qualified U.S. pension plans are subject to Bankruptcy Court approval.

CC-BLG003728

Notes to Consolidated Financial Statements (Continued)

2. Chapter 11—Related Information (Continued)

*Change in Liabilities Subject to Compromise*

The following table is a reconciliation of the changes in pre-filing date liability balances for the period from the Filing Date through December 31, 2008.

|  | Cumulative Since Filing (In millions) (Unaudited) |
|---|---|
| Balance, Filing Date April 2, 2001 | $ 2,366.0 |
| Cash disbursements and/or reclassifications under Bankruptcy Court orders: | |
| Payment of environmental settlement liability—including Libby (see Note 16) | (252.0) |
| Freight and distribution order | (5.7) |
| Trade accounts payable order | (9.1) |
| Resolution of contingencies subject to Chapter 11 | (130.0) |
| Other court orders including employee wages and benefits, sales and use tax, and customer programs | (353.4) |
| Expense/(income) items: | |
| Interest on pre-petition liabilities | 396.8 |
| Employee-related accruals | 66.8 |
| Provision for asbestos-related contingencies | 744.8 |
| Provision for environmental contingencies | 327.2 |
| Provision for income tax contingencies | (3.3) |
| Balance sheet reclassifications | (35.2) |
| Balance, end of period | $ 3,112.9 |

Additional liabilities subject to compromise may arise due to the rejection of executory contracts or unexpired leases, or as a result of the Bankruptcy Court's allowance of contingent or disputed claims.

For the holders of pre-petition bank credit facilities, beginning January 1, 2006, Grace agreed to pay interest on pre-petition bank debt at the prime rate, adjusted for periodic changes, and compounded quarterly. The effective rates for the twelve months ended December 31, 2008 and 2007 were 5.09% and 8.05%, respectively. From the Filing Date through December 31, 2005, Grace accrued interest on pre-petition bank debt at a negotiated fixed annual rate of 6.09%, compounded quarterly. The general unsecured creditors that hold pre-petition bank credit facilities have asserted that they are entitled to post-petition interest at the default rate specified under the terms of the underlying credit agreements which, if paid, would be materially greater than that reflected above. Grace has asserted that such creditors are not entitled to interest at the default rate and has requested the Bankruptcy Court to determine the appropriate rate at which interest would be payable.

For the holders of claims who, but for the Chapter 11 filing, would be entitled under a contract or otherwise to accrue or be paid interest on such claim in a non-default (or non-overdue payment) situation under applicable non-bankruptcy law, Grace accrues interest at the rate provided in the contract between the Grace entity and the claimant or such rate as may otherwise apply under applicable non-bankruptcy law.

F-25

CC-BLG003729

Notes to Consolidated Financial Statements (Continued)

**2. Chapter 11—Related Information (Continued)**

For all other holders of allowed general unsecured claims, Grace accrues interest at a rate of 4.19% per annum, compounded annually, unless otherwise negotiated during the claim settlement process.

*Chapter 11 Expenses*

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| | (In millions) | | |
| Legal and financial advisory fees | $63.6 | $95.1 | $57.9 |
| Interest (income) expense | 2.2 | (8.7) | (8.0) |
| Chapter 11 expenses, net | $65.8 | $86.4 | $49.9 |

Pursuant to SOP 90-7, interest income earned on the Debtors' cash balances must be offset against Chapter 11 expenses. During 2008, interest income was reduced by a $6.0 million charge related to the change in fair value of investment securities held by the Debtors.

*Condensed financial information of the Debtors*

**W. R. Grace & Co.—Chapter 11 Filing Entities**
**Debtor-in-Possession Statements of Operations**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2008 | 2007 | 2006 |
| | (In millions) (Unaudited) | | |
| Net sales, including intercompany | $1,559.6 | $1,497.9 | $1,425.0 |
| Cost of goods sold, including intercompany, exclusive of depreciation and amortization shown separately below | 1,145.0 | 1,058.2 | 1,041.9 |
| Selling, general and administrative expenses, exclusive of defined benefit pension expense shown separately below | 298.1 | 314.0 | 340.2 |
| Research and development expenses | 43.3 | 43.9 | 38.3 |
| Depreciation and amortization | 57.1 | 55.5 | 58.6 |
| Defined benefit pension expense | 37.4 | 38.8 | 46.3 |
| Interest expense and related financing costs | 53.3 | 71.1 | 72.7 |
| Other (income) expense, net | (109.3) | (72.8) | (83.4) |
| Provision for environmental remediation | 14.6 | 17.0 | 30.0 |
| Chapter 11 expenses, net of interest income | 65.8 | 86.6 | 49.8 |
| | 1,605.3 | 1,612.3 | 1,594.4 |
| Loss before income taxes and equity in net income of non-filing entities | (45.7) | (114.4) | (169.4) |
| Benefit from income taxes | 11.4 | 57.2 | 38.3 |
| Loss before equity in net income of non-filing entities | (34.3) | (57.2) | (131.1) |
| Equity in net income of non-filing entities | 155.8 | 146.0 | 139.7 |
| Net income | $ 121.5 | $ 88.8 | $ 8.6 |

F-26

CC-BLG003730

Notes to Consolidated Financial Statements (Continued)

2. Chapter 11—Related Information (Continued)

W. R. Grace & Co.—Chapter 11 Filing Entities
Debtor-in-Possession Condensed Statements of Cash Flows

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2008 | 2007 | 2006 |
| | (In millions) (Unaudited) | | |
| **Operating Activities** | | | |
| Net income | $ 121.5 | $ 88.8 | $ 8.6 |
| Reconciliation to net cash used for operating activities: | | | |
| Chapter 11 expenses, net of interest income | 65.8 | 86.6 | 49.8 |
| Benefit from income taxes | (11.4) | (57.2) | (38.3) |
| Equity in net income of non-filing entities | (155.8) | (146.0) | (139.7) |
| Depreciation and amortization | 57.1 | 55.5 | 58.6 |
| Interest on pre-petition liabilities subject to compromise | 49.4 | 70.9 | 71.3 |
| Provision for environmental remediation | 14.6 | 17.0 | 30.0 |
| Other non-cash items, net | (17.1) | (7.3) | (0.4) |
| Contributions to defined benefit pension plans | (54.2) | (81.1) | (106.6) |
| Cash paid to resolve contingencies subject to Chapter 11 | (252.0) | (10.3) | — |
| Chapter 11 expenses paid | (69.3) | (92.1) | (50.3) |
| Changes in other assets and liabilities, excluding the effect of businesses acquired/divested | 141.2 | (3.7) | 42.8 |
| **Net cash used for operating activities** | (110.2) | (78.9) | (74.2) |
| **Investing Activities** | | | |
| Capital expenditures | (74.3) | (86.3) | (81.4) |
| Loan repayments and other | 188.5 | 100.8 | 98.5 |
| **Net cash provided by investing activities** | 114.2 | 14.5 | 17.1 |
| **Net cash provided by financing activities** | 7.3 | 37.4 | 21.7 |
| **Net increase (decrease) in cash and cash equivalents** | 11.3 | (27.0) | (35.4) |
| Cash and cash equivalents, beginning of period | 206.8 | 233.8 | 269.2 |
| Cash and cash equivalents, end of period | $ 218.1 | $ 206.8 | $ 233.8 |

F-27

CC-BLG003731