Notes to Consolidated Financial Statements (Continued)

**2. Chapter 11—Related Information (Continued)**

**W. R. Grace & Co.—Chapter 11 Filing Entities**
**Debtor-in-Possession Balance Sheets**

| | December 31, | |
|---|---|---|
| | 2008 | 2007 |
| | (In millions) | (Unaudited) |
| **ASSETS** | | |
| **Current Assets** | | |
| Cash and cash equivalents | $    218.1 | $    206.8 |
| Investment securities | 21.6 | 98.3 |
| Cash value of life insurance policies, net of policy loans | 67.2 | 77.1 |
| Trade accounts receivable, net | 115.0 | 108.3 |
| Receivables from non-filing entities, net | 69.9 | 103.2 |
| Inventories | 122.1 | 136.7 |
| Other current assets | 57.4 | 47.1 |
| **Total Current Assets** | 671.3 | 777.5 |
| Properties and equipment, net | 417.1 | 403.8 |
| Deferred income taxes | 834.4 | 725.6 |
| Asbestos-related insurance | 500.0 | 500.0 |
| Loans receivable from non-filing entities, net | 399.1 | 524.2 |
| Investment in non-filing entities | 492.0 | 400.8 |
| Overfunded defined benefit pension plans | 0.2 | 1.5 |
| Other assets | 97.8 | 81.6 |
| **Total Assets** | $3,411.9 | $3,415.0 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT)** | | |
| **Liabilities Not Subject to Compromise** | | |
| Current liabilities | $    239.5 | $    224.0 |
| Minority interests in consolidated entities | 64.2 | 64.5 |
| Underfunded defined benefit pension plans | 380.6 | 159.6 |
| Other liabilities | 41.6 | 39.0 |
| **Total Liabilities Not Subject to Compromise** | 725.9 | 487.1 |
| **Liabilities Subject to Compromise** | 3,112.9 | 3,277.5 |
| **Total Liabilities** | 3,838.8 | 3,764.6 |
| **Shareholders' Equity (Deficit)** | (426.9) | (349.6) |
| **Total Liabilities and Shareholders' Equity (Deficit)** | $3,411.9 | $3,415.0 |

    In addition to Grace's financial reporting obligations as prescribed by the SEC, the Debtors are also required, under the rules and regulations of the Bankruptcy Code, to periodically file certain statements and schedules and a monthly operating report with the Bankruptcy Court. This information is available to the public through the Bankruptcy Court. This information is prepared in a format that may not be comparable to information in Grace's quarterly and annual financial statements as filed with the SEC. The monthly operating reports are not audited, do not purport to represent the financial position or results of operations of Grace on a consolidated basis, and should not be relied on for such purposes.

CC-BLG003732

Notes to Consolidated Financial Statements (Continued)

**3. Asbestos-Related Litigation**

Grace is a defendant in property damage and personal injury lawsuits relating to previously sold asbestos-containing products. As of the Filing Date, Grace was a defendant in 65,656 asbestos-related lawsuits, 17 involving claims for property damage (one of which has since been dismissed), and the remainder involving 129,191 claims for personal injury. Due to the Filing, holders of asbestos-related claims are stayed from continuing to prosecute pending litigation and from commencing new lawsuits against the Debtors. The PI and PD Committees, representing the interests of asbestos personal injury and asbestos property damage claimants, respectively, and the PI FCR and PD FCR, representing the interests of future asbestos personal injury and property damage claimants, respectively, have been appointed in the Chapter 11 Cases. Grace's obligations with respect to present and future claims will be determined through the Chapter 11 process.

*Property Damage Litigation* —The plaintiffs in asbestos property damage lawsuits generally seek to have the defendants pay for the cost of removing, containing or repairing the asbestos-containing materials in the affected buildings. Various factors can affect the merit and value of PD Claims, including legal defenses, product identification, the amount and type of product involved, the age, type, size and use of the building, the legal status of the claimant, the jurisdictional history of prior cases, the court in which the case is pending, and the difficulty of asbestos abatement, if necessary.

Out of 380 asbestos property damage cases (which involved thousands of buildings) filed prior to the Filing Date, 140 were dismissed without payment of any damages or settlement amounts; judgments after trial were entered in favor of Grace in nine cases (excluding cases settled following appeals of judgments in favor of Grace); judgments after trial were entered in favor of the plaintiffs in eight cases (one of which is on appeal) for a total of $86.1 million; 207 property damage cases were settled for a total of $696.8 million; and 16 cases remain outstanding (including the one on appeal). Of the 16 remaining cases, eight relate to ZAI and eight relate to a number of former asbestos-containing products (two of which also are alleged to involve ZAI).

Approximately 4,300 additional PD claims were filed prior to the March 31, 2003 claims bar date established by the Bankruptcy Court. (The bar date did not apply to ZAI claims.) Such claims were reviewed in detail by Grace, categorized into claims with sufficient information to be evaluated or claims that require additional information and, where sufficient information existed, the estimated cost of resolution was considered as part of Grace's recorded asbestos-related liability. Approximately 200 claims did not contain sufficient information to permit an evaluation. Grace objected to virtually all PD claims on a number of different bases, including: no authorization to file a claim; the claim was previously settled or adjudicated; no or insufficient documentation; failure to identify a Grace product; the expiration of the applicable statute of limitations and/or statute of repose, and/or laches; and a defense that the product in place is not hazardous. As of December 31, 2008, following the reclassification, withdrawal or expungement of claims, approximately 465 PD Claims subject to the March 31, 2003 bar date remain outstanding. The Bankruptcy Court has approved settlement agreements covering approximately 375 of such claims for an aggregate allowed amount of $93 million.

Eight of the ZAI cases were filed as purported class action lawsuits in 2000 and 2001. In addition, 10 lawsuits were filed as purported class actions in 2004 and 2005 with respect to persons and homes in Canada. These cases seek damages and equitable relief, including the removal, replacement and/or disposal of all such insulation. The plaintiffs assert that this product is in millions

F-29

CC-BLG003733

Notes to Consolidated Financial Statements (Continued)

**3. Asbestos-Related Litigation (Continued)**

of homes and that the cost of removal could be several thousand dollars per home. As a result of the Filing, the eight U.S. cases have been stayed.

Based on Grace's investigation of the claims described in these lawsuits, and testing and analysis of this product by Grace and others, Grace believes that ZAI was and continues to be safe for its intended purpose and poses little or no threat to human health. The plaintiffs in the ZAI lawsuits (and the U.S. government in the Montana criminal proceeding described in Note 16) dispute Grace's position on the safety of ZAI. In October, 2004, the Bankruptcy Court held a hearing on motions filed by the parties to address a number of important legal and factual issues regarding the ZAI claims. In December, 2006, the Bankruptcy Court issued an opinion and order holding that, although ZAI is contaminated with asbestos and can release asbestos fibers when disturbed, there is no unreasonable risk of harm from ZAI. The ZAI claimants sought an interlocutory appeal of the opinion and order with the U.S. District Court for the District of Delaware, but that request was denied. In the event the Joint Plan is not confirmed, the ZAI claimants have reserved their right to appeal such opinion and order if and when it becomes a final order.

At the Debtors' request, in July 2008, the Bankruptcy Court established a bar date for U.S. ZAI PD Claims and approved a related notice program that required any person with a U.S. ZAI PD Claim to submit an individual proof of claim no later than October 31, 2008. Approximately 16,200 U.S. ZAI PD Claims were filed prior to the October 31, 2008 claims bar date and, as of December 31, 2008 an additional 1,755 U.S. ZAI PD Claims were filed. As described above, on October 17, 2008, the Ontario Superior Court of Justice, in the Grace Canada, Inc. proceeding pending under the Companies' Creditors Arrangement Act, approved the Minutes of Settlement that would settle all Canadian ZAI PD Claims on the terms of the Joint Plan. On October 20, 2008, the Bankruptcy Court established August 31, 2009 as the bar date for Canadian ZAI PD Claims.

As described above, on November 21, 2008, the Debtors, the Putative Class Counsel to the U.S. ZAI property damage claimants, the PD FCR, and the Equity Committee reached an agreement in principle designed to resolve all present and future U.S. ZAI PD Claims. The terms of the U.S. and Canadian ZAI agreements in principle have been incorporated into the terms of the Joint Plan and related documents. As described below, Grace's recorded asbestos related liability does not include the agreements in principle to settle the ZAI liability that is part of the Joint Plan. The asbestos related liability at December 31, 2008, which is based on the Prior Plan, assumes the risk of loss from ZAI litigation is not probable. If the Joint Plan or another plan of reorganization reflecting the agreements in principle is not confirmed or does not become effective and Grace's view as to risk of loss from ZAI litigation is not sustained, Grace believes the cost to resolve the U.S. ZAI litigation may be material.

***Personal Injury Litigation***—Asbestos personal injury claimants allege adverse health effects from exposure to asbestos-containing products formerly manufactured by Grace. Historically, Grace's cost to resolve such claims has been influenced by numerous variables, including the nature of the disease alleged, product identification, proof of exposure to a Grace product, negotiation factors, the solvency of other former producers of asbestos containing products, cross-claims by co-defendants, the rate at which new claims are filed, the jurisdiction in which the claims are filed, and the defense and disposition costs associated with these claims.

Cumulatively through the Filing Date, 16,354 asbestos personal injury lawsuits involving approximately 35,720 PI Claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved) and approximately 55,489

F-30

CC-BLG003734

Notes to Consolidated Financial Statements (Continued)

**3. Asbestos-Related Litigation (Continued)**

lawsuits involving approximately 163,698 PI Claims were disposed of (through settlements and judgments) for a total of $645.6 million. As of the Filing Date, 129,191 PI claims for personal injury were pending against Grace. Grace believes that a substantial number of additional PI Claims would have been received between the Filing Date and December 31, 2008 had such PI Claims not been stayed by the Bankruptcy Court.

The Bankruptcy Court has entered a case management order for estimating liability for pending and future PI Claims. A trial for estimating liability for PI Claims began in January 2008 but was suspended in April 2008 as a result of the PI Settlement.

*Asbestos-Related Liability* —The total recorded asbestos-related liability as of December 31, 2008 and 2007, including pre-Filing Date and post-Filing Date settlements, was $1,700 million and is included in "liabilities subject to compromise" in the accompanying Consolidated Balance Sheets. Grace adjusted its asbestos-related liability in the fourth quarter of 2004 based on the filing of the Prior Plan. The Prior Plan contained a condition precedent that the Bankruptcy Court determine that $1,613 million (this amount, plus $87 million of prepetition settlements and judgments, "the Funding Amount") was sufficient to pay, on a net present value basis, all PI Claims and PD Claims entitled to payment and related trust administration costs and expenses. Therefore, prior to the PI Settlement, the U.S. and Canadian ZAI agreements in principle and the filing of the Joint Plan, Grace was prepared to settle its asbestos-related claims at the Funding Amount as part of a consensual plan of reorganization and recorded its asbestos-related liability on that basis. The treatment of asbestos-related liabilities is significantly different under the Joint Plan than under the Prior Plan. Grace has not adjusted its accounting for asbestos-related liabilities to reflect the Joint Plan. At this time, Grace is unable to determine a reasonable estimate of the value of certain consideration payable to the PI Trust and the PD Trust under the Joint Plan. These values will ultimately be determined on the effective date of the Joint Plan. Grace expects to adjust its accounting for the Joint Plan when the consideration can be measured and material conditions to the Joint Plan are satisfied. Grace expects that such adjustments may be material to Grace's consolidated financial position and results of operations.

If the Joint Plan is not confirmed by the Bankruptcy Court, the Debtors would expect to resume the estimation trial, which was suspended in April 2008 due to the PI Settlement, to determine the amount of its asbestos-related liabilities. Through the estimation process and the continued adjudication of PD Claims, Grace would seek to demonstrate that most claims have no value because they fail to establish any significant property damage, health impairment or occupational exposure to asbestos from Grace's operations or products. If the Bankruptcy Court agreed with Grace's position on the number of, and the amounts to be paid in respect of, allowed PI Claims and PD Claims, then Grace believes that the Funding Amount could be lower than $1,700 million. However, this outcome would be highly uncertain and would depend on a number of Bankruptcy Court rulings favorable to Grace's position. Conversely, the PI and PD Committees and the PI FCR have asserted that Grace's asbestos-related liabilities are substantially higher than $1,700 million, and in fact are in excess of Grace's business value. If the Bankruptcy Court accepted the position of the PI and PD Committees and the PI FCR, then any plan of reorganization likely would result in the loss of all or substantially all equity value by current shareholders.

*Insurance Rights* —Grace holds insurance policies that provide coverage for 1962 to 1985 with respect to asbestos-related lawsuits and claims. For the most part, coverage for years 1962 through 1972 has been exhausted, leaving coverage for years 1973 through 1985 available for pending and future asbestos claims. Since 1985, insurance coverage for asbestos-related liabilities has not been commercially available to Grace. As discussed in Note 2, pursuant to the Joint Plan, insurance policies that provide coverage for asbestos-related claims and proceeds, including interest, received after the date of the PI Settlement, would be assigned to the PI Trust.

F-31

CC-BLG003735

Notes to Consolidated Financial Statements (Continued)

**3. Asbestos-Related Litigation (Continued)**

For each insurance year, Grace's coverage consists of both primary and excess coverage. Primary coverage for an insurance year generally reimburses Grace for the portion of paid claims allocated to that year starting at the first dollar paid (after any deductible) through the coverage limit. With one exception, coverage disputes regarding Grace's primary insurance policies have been settled, and the settlement amounts have been paid in full. Excess insurance generally reimburses Grace for claims paid above a specified policy threshold through the coverage limit. For each insurance year, Grace's insurance program includes multiple layers of excess coverage. A layer of excess coverage, which may include multiple insurers, is triggered once claim payments that can be assigned to that insurance year are paid up to the threshold of that layer.

Grace has entered into settlement agreements with various excess insurance carriers. These settlements involve amounts paid and to be paid to Grace. The unpaid maximum aggregate amount available under these settlement agreements is approximately $433 million. With respect to asbestos-related personal injury claims, the settlement agreements generally require that the claims be spread over the claimant's exposure period and that each insurer pay a pro rata portion of each claim based on the amount of coverage provided during each year of the total exposure period.

Presently, Grace has no agreements in place with insurers with respect to approximately $483 million of excess coverage. Such policies are at layers of coverage that have not yet been triggered, but certain layers would be triggered if the Prior Plan were approved at the recorded asbestos-related liability of $1,700 million. In estimating its ultimate insurance recovery, Grace has assumed that its unsettled excess coverage will be available on terms that are substantially similar to the existing settlement agreements described above. Grace believes that any allowed ZAI claims also would be covered under the policies discussed above to the extent they relate to installations of ZAI occurring after July 1, 1973.

In addition, Grace has approximately $253 million of excess coverage with insolvent or non-paying insurance carriers. Non-paying carriers are those that, although technically solvent, are not currently meeting their obligations to pay claims. Grace has filed and continues to file claims in the insolvency proceedings of these carriers. Grace periodically receives distributions from some of these insolvent carriers and expects to receive distributions in the future. Settlement amounts are recorded as income when received.

In November 2006, Grace entered into a settlement agreement with an underwriter of a portion of its excess insurance coverage. The insurer paid a settlement amount of $90 million directly to an escrow account for the benefit of the holders of claims for which Grace was provided coverage under the affected policies. The escrow account balance at December 31, 2008 and 2007 approximated $97.1 million and $94.8 million, respectively, including interest earned on the account. Funds will be distributed from this account directly to claimants at the direction of the escrow agent pursuant to the terms of a confirmed plan of reorganization or as otherwise ordered by the Bankruptcy Court. The settlement agreement provides that unless Grace confirms a plan of reorganization by December 31, 2008, at the option of the insurer, exercisable at any time prior to April 30, 2009, the escrow amount with interest must be returned to the insurer. Due to the open contingencies for the release of such amount, Grace has not recorded the amount in the escrow account or reduced its asbestos insurance receivable balance. Under the Joint Plan, the amount in the escrow account would be assigned to the PI Trust.

As of December 31, 2008, including the settlement discussed above and after subtracting previous reimbursements by insurers and allowing for discounts pursuant to certain settlement

F-32

CC-BLG003736

Notes to Consolidated Financial Statements (Continued)

3. Asbestos-Related Litigation (Continued)

agreements, there remains approximately $916 million of excess coverage from 53 presently solvent insurers. Grace estimates that eligible claims would have to exceed $4 billion to access total coverage. Grace further estimates that, assuming the resolution value of asbestos-related claims is equal to the recorded liability of $1,700 million (which should fund claim payments in excess of $2 billion), it should be entitled to approximately $500 million of insurance recovery, including the escrow described above. This amount was determined by estimating the aggregate and per year payout for claims over time and applying the expected insurance recovery factor to such claims. However, the ultimate amount of insurance recovered on such claims will depend on a number of factors that will only be determined at the time claims are paid including: the nature of the claim (PI Claim, PD Claim or ZAI PD Claim), the relevant exposure years, the timing of payment, the solvency of insurers and the legal status of policy rights. Accordingly, Grace's estimate of insurance recovery may differ materially from actual amounts received by Grace, or if the Joint Plan is confirmed and becomes effective, the PI Trust.

4. Income Taxes

The components of income (loss) from consolidated operations before income taxes and the related benefit from (provision for) income taxes for 2008, 2007 and 2006 are as follows:

Income Taxes—Consolidated Operations

|  | 2008 | 2007 | 2006 |
|---|---|---|---|
|  | (In millions) | | |
| Income (loss) before income taxes: | | | |
| Domestic | $ 14.9 | $ 368.4 | $(111.6) |
| Foreign | 135.6 | 185.9 | 150.1 |
| Intercompany eliminations | (24.7) | (466.6) | (27.1) |
|  | $125.8 | $ 87.7 | $ 11.4 |
| Benefit from (provision for) income taxes: | | | |
| Federal—current | $ 4.9 | $ 29.0 | $ (8.5) |
| Federal—deferred | 7.8 | 29.8 | 47.1 |
| State and local—current | (1.3) | (1.3) | (1.4) |
| Foreign—current | (34.8) | (66.2) | (43.0) |
| Foreign—deferred | 19.1 | 9.8 | 3.0 |
|  | $ (4.3) | $ 1.1 | $ (2.8) |

The above table reflects the elimination in 2007 of approximately $440 million of domestic income resulting from repatriated earnings.

F-33

CC-BLG003737

**Notes to Consolidated Financial Statements (Continued)**

**4. Income Taxes (Continued)**

At December 31, 2008 and 2007, the tax attributes giving rise to deferred tax assets and liabilities consisted of the following items:

**Deferred Tax Analysis**

|  | 2008 | 2007 |
|---|---|---|
|  | (In millions) | |
| **Deferred tax assets:** | | |
| Liability for asbestos-related litigation | $ 595.0 | $ 595.0 |
| Net operating loss/credit carryforwards | 84.6 | 71.2 |
| Deferred state taxes | 130.2 | 121.0 |
| Liability for environmental remediation | 53.3 | 138.1 |
| Other postretirement benefits | 27.3 | 27.8 |
| Reserves and allowances | 50.1 | 40.8 |
| Research and development | 35.7 | 35.2 |
| Pension liabilities | 178.3 | 98.7 |
| Foreign loss/credit carryforwards | 37.7 | 36.6 |
| Accrued interest on pre-petition debt | 80.6 | 61.6 |
| Other | 11.6 | 9.5 |
| Total deferred tax assets | $1,284.4 | $1,235.5 |
| **Deferred tax liabilities:** | | |
| Asbestos-related insurance receivable | $ (180.5) | $ (180.5) |
| Deferred foreign and other income | (9.9) | (9.9) |
| Pension assets | (15.1) | (10.9) |
| Properties and equipment | (41.6) | (47.2) |
| Other | (22.9) | (100.0) |
| Total deferred tax liabilities | $ (270.0) | $ (348.5) |
| **Valuation allowance:** | | |
| Deferred state taxes | $ (130.2) | $ (121.0) |
| Net federal tax assets | — | — |
| Foreign loss carryforwards | (1.8) | (22.0) |
| Total valuation allowance | (132.0) | (143.0) |
| Net deferred tax assets | $ 882.4 | $ 744.0 |

The deferred tax asset valuation allowance of $132.0 million at December 31, 2008 consists of: (i) $130.2 million related to net deferred state tax assets associated with current loss carryforwards and future tax deductions that are not likely to provide a cash benefit, and (ii) $1.8 million related to foreign loss carryforwards that are not reasonably expected to be utilized in the future. The change in the valuation allowance from December 31, 2007 to 2008 primarily represents a reduction in the valuation allowance related to tax losses available in future years in our Brazilian subsidiary. Based upon anticipated future results, Grace has concluded that it is more likely than not that the balance of the net deferred tax assets, after consideration of the valuation allowance, will be realized. Because of the nature of the items that make up this balance, the realization period is likely to extend over a number of years and the outcome of the Chapter 11 Cases could materially impact the amount and the realization period.

F-34

CC-BLG003738

**Notes to Consolidated Financial Statements (Continued)**

**4. Income Taxes (Continued)**

The tax credit carryforwards at December 31, 2008 of $84.6 million consist of $65.0 million of foreign tax credit carryforwards with expiration dates through 2017; $0.6 million of general business credit carryforwards with expiration dates through 2025; and $18.9 million of alternative minimum tax credit ("AMTC") carryforwards with no expiration dates. However, the $18.9 million of AMTC carryforwards includes $15.8 million which will not be available if Grace is successful in resolving certain issues reflected as uncertain tax positions.

Grace has not yet recorded "windfall tax benefits" of $14.6 million associated with stock option compensation that remained unrealized at the end of 2008.

Grace utilized approximately $191 million of U.S. Federal net operating losses ("NOLs") during 2007 as a result of the repatriation of earnings from non-U.S. subsidiaries. Grace anticipates generating additional NOLs upon emergence from bankruptcy as contemplated in the Joint Plan. Because Grace did not pay a significant amount of U.S. taxes in prior years and/or has already received or applied for tax refunds from available NOL carryback years, it expects to carryforward most of its NOLs after emergence from bankruptcy. Under federal income tax law, a corporation is generally permitted to carryforward NOLs for a 20-year period for deduction against future taxable income. Grace's ability to utilize future tax deductions could be significantly limited if it were to undergo an ownership change during or as a result of the Chapter 11 proceeding. During the course of the bankruptcy proceeding, the Bankruptcy Court entered an order that places certain limitations on trading in Grace common stock or options convertible into Grace common stock. Pursuant to these limitations, Grace intends to object to any purchase of Grace common stock or options that would potentially contribute to an ownership change. In addition, under the Joint Plan, Grace's Board of Directors would be given the authority under certain circumstances, post emergence, to impose restrictions on certain stock transfers to further protect future tax deductions. However, Grace can provide no assurance that these limitations will prevent an ownership change or that its ability to utilize future tax deductions will not be significantly limited as a result of any change in control.

As part of Grace's evaluation and planning for the funding requirements of its plan of reorganization, Grace implemented a repatriation plan during 2007 resulting in payments of cash and promissory notes to the U.S. totaling $442.2 million from non-U.S. subsidiaries. Grace carries a deferred tax liability of $9.9 million related to the expected tax cost of future repatriations of earnings. Grace has not provided for U.S. federal, state and foreign deferred income taxes on approximately $770 million of undistributed earnings of foreign subsidiaries. Based upon Grace's current outlook and assumptions with respect to the amount of bankruptcy claims and foreign liquidity needs, Grace expects that these earnings will be retained indefinitely by such subsidiaries as they have been or will be reinvested locally. However, Grace will continue to monitor this position in light of the assumptions mentioned above.

F-35

CC-BLG003739

Notes to Consolidated Financial Statements (Continued)

**4. Income Taxes (Continued)**

The difference between the benefit from (provision for) income taxes at the federal income tax rate of 35% and Grace's overall income tax provision is summarized as follows:

Income Tax Benefit (Provision) Analysis

|  | 2008 | 2007 | 2006 |
|---|---|---|---|
|  | (In millions) | | |
| Tax provision at federal corporate rate | $(44.0) | $(30.8) | $ (3.9) |
| Change in provision resulting from: | | | |
| Nontaxable income/non-deductible expenses | (3.9) | (2.4) | (1.9) |
| State and local income taxes, net of federal income tax benefit | (0.7) | (0.7) | (6.1) |
| Federal and foreign taxes on foreign operations | 12.2 | 5.0 | (3.2) |
| Change in APB 23 reserve | — | 44.8 | (42.0) |
| Change in valuation allowance on deferred tax assets | 14.5 | — | 60.1 |
| Chapter 11 expenses (non-deductible) | (4.5) | (11.4) | (16.9) |
| Tax and interest relating to tax deductibility of interest on life insurance policy loans | (0.4) | (20.1) | 1.4 |
| Impact of rate changes on deferred tax balances | — | 3.4 | — |
| Net benefit recognized upon disposition of investment | 11.9 | — | — |
| Adjustments to tax and interest contingencies | 10.6 | 13.3 | 9.7 |
| Income tax benefit from (provision for) continuing operations | $ (4.3) | $ 1.1 | $ (2.8) |

In June 2006, the FASB issued Interpretation No. 48, "Accounting for Uncertainty in Income Taxes" ("FIN 48"), which Grace adopted effective January 1, 2007. Under FIN 48, Grace may recognize the tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained upon examination by the taxing authorities, based on the technical merits of the position. The tax benefits recognized in the financial statements from such a position should be measured based on the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement.

The effect of the implementation of FIN 48 was to reduce Grace's accumulated deficit as of January 1, 2007 by $2.2 million. This amount primarily reflected recognition of U.S. federal tax benefits relating to certain expenses incurred in defense of creditor claims and various alternative minimum tax benefits arising from prior year audits, offset by certain increases to reserves on foreign income and undistributed foreign earnings.

F-36

CC-BLG003740

**Notes to Consolidated Financial Statements (Continued)**

**4. Income Taxes (Continued)**

The amount of unrecognized tax benefits, reflected in the Balance Sheet, excluding interest and penalties, at December 31, 2008 was $134.6 million and at December 31, 2007 was $123.0 million. A rollforward of the unrecognized tax benefits, excluding interest and penalties, for the years ended December 31, 2008 and 2007 follows:

**Rollforward of Uncertain Tax Positions**

|  | Unrecognized Tax Benefits (In millions) |
|---|---|
| Balance as of January 1, 2007 | $ 154.9 |
| Additions for current year tax positions | 4.3 |
| Additions for prior year tax positions | 10.5 |
| Reductions for prior year tax positions | (11.2) |
| Settlements | (35.5) |
| Reductions for expirations of statute of limitations | — |
| Balance as of December 31, 2007 | $ 123.0 |
| Additions for current year tax positions | 2.9 |
| Additions for prior year tax positions | 18.6 |
| Reductions for prior year tax positions | (0.8) |
| Settlements | (2.7) |
| Reductions for expirations of statute of limitations | (6.4) |
| Balance as of December 31, 2008 | $ 134.6 |

Of the total amount of unrecognized benefits of $134.6 million, the amount that if recognized would affect the effective tax rate is equal to $118.8 million. This is due to the fact that $15.8 million of AMTC carryforwards recorded as deferred tax assets will not be available if Grace is successful in resolving certain issues.

Grace accrues potential interest and any associated penalties related to uncertain tax positions in "benefit from (provision for) income taxes" in the Consolidated Statements of Operations. The balances of Unrecognized Tax Benefits reflected above do not include accrued interest and penalties. The total amount of interest and penalties accrued on uncertain tax positions in the Balance Sheet as of December 31, 2008 was $78.4 million (53.4 million net of applicable tax benefits) and as of December 31, 2007 was $81.2 million ($54.9 million net of applicable tax benefits). The total amount of interest and penalties recognized in the Statement of Operations in 2008 was $11.4 million ($8.2 million net of applicable tax benefits) and in 2007 was $12.0 million ($9.6 million net of applicable tax benefits).

Grace files U.S. federal income tax returns as well as income tax returns in various states and foreign jurisdictions. In many cases, Grace's uncertain tax positions are related to tax years that

F-37

CC-BLG003741

**Notes to Consolidated Financial Statements (Continued)**

**4. Income Taxes (Continued)**

remain subject to examination by the relevant taxing authorities. The following table summarizes these open tax years by major jurisdiction:

| Tax Jurisdiction | Examination In Progress | Examination Not Yet Initiated |
|---|---|---|
| United States(1)(2) | 1994-2004 | 2005-2008 |
| Germany(1) | 2002-2005 | 2006-2008 |
| United Kingdom | None | 2001-2008 |
| Singapore | None | 2001-2008 |
| France | None | 2007-2008 |
| Canada | None | 2002-2008 |

(1)     Includes federal as well as state, provincial or local jurisdictions, as applicable.

(2)     In the U.S., the IRS is currently examining tax years 2002-2004. Tax years 1997-2001 have been examined and partially resolved and there are still pending issues in appeals or pending legal proceedings as described below.

Based upon the outcome of these examinations, or as a result of the expiration of statute of limitations for specific jurisdictions, Grace believes there may be a material change to Grace's aggregate recorded liabilities for uncertain tax positions in the next twelve months with respect to the following matters:

1.     With respect to the IRS examination of the 1997-2001 tax years, Grace has received revised examination reports from the IRS, which include the review of losses carried back to 1988-1989 (collectively, the "Examination Reports") asserting, in the aggregate, approximately $32.5 million of net additional tax plus accrued interest. The most significant issue addressed in the Examination Reports concerns the carryback of a specified liability loss from the 1998 tax period to the 1989 taxable year. The Tax Court has granted the parties' Joint Motions for Continuance and negotiations are ongoing.

2.     In 1998 Grace reorganized the structure of its ownership of certain non-U.S. subsidiaries. The principal purpose of the reorganization was to facilitate Grace's ability to efficiently deploy its financial resources outside of the U.S.. Grace claimed certain tax benefits as a result of the restructuring. Based on recent developments involving other tax payers, it is reasonably possible that the taxing authorities in certain jurisdictions could challenge the benefits claimed in relation to the subsequent operation of the subsidiaries. It is not reasonably possible to predict whether any taxing authority will assert any tax liability or to reasonably estimate the possible loss or range of loss with respect to such asserted tax liability. Grace would vigorously challenge any such assertion. If Grace were not to prevail in final, non-appealable determinations the impact could be material.

The following matters were settled during 2008 and the effects recorded on the liability for uncertain tax positions:

1.     On June 16, 2008, Grace filed a motion with the Bankruptcy Court seeking authorization to settle a federal income tax controversy relating to $7 million of research and experimentation expenditures ("R&E Settlement") claimed for the taxable years ending December 31, 1993 through December 31, 1996. The Bankruptcy Court entered an order

F-38

CC-BLG003742

Notes to Consolidated Financial Statements (Continued)

**4. Income Taxes (Continued)**

on July 21, 2008 approving the R&E Settlement, which resulted in a refund in the amount of approximately $6.3 million plus interest.

2.  On February 25, 2008, the U.S. Bankruptcy Court issued an order authorizing Grace to enter into a settlement agreement with the IRS under which Grace was allowed a capital loss of $32.2 million on the disposal of shares of an affiliated entity in lieu of the $128.6 million originally claimed on its 1999 tax return. The settlement resulted in the recognition of $11.3 million in tax benefits in December 2007. The settlement agreement was executed on March 12, 2008.

**5. Acquisitions and Divestments**

In August 2007, Grace sold its washcoat product line, which accounted for approximately $25.8 million of Grace Davison operating segment net sales in 2006.

In July 2007, Grace acquired certain assets of Grupo Sistiaga S.L., a supplier of coatings for aluminum containers located in Hernani, Spain. The acquired assets and liabilities and the results of operations of the acquired business are reflected in financial results of the Grace Davison operating segment.

In June 2007, Grace, through its Advanced Refining Technologies, LLC ("ART") joint venture with Chevron Products Company, completed the purchase of twelve million shares of the Kuwaiti Catalyst Company ("KCC"), which resulted in an approximate 18% ownership of the outstanding common stock of KCC. ART acquired the interest in KCC for the equivalent of $6.3 million, paid in cash, and has accounted for the investment under the equity method.

**6. Other (Income) Expense, net**

Components of other (income) expense, net are as follows:

**Other (Income) Expense, net**

|  | 2008 | 2007 | 2006 |
|---|---|---|---|
|  | (In millions) | | |
| Income from insurance settlements with insolvent insurance companies | $ (0.1) | $ (1.0) | $(12.5) |
| COLI income, net | (3.0) | (5.4) | (4.1) |
| Interest income | (3.8) | (7.6) | (7.0) |
| Net gain on sales of investments and disposals of assets | (14.1) | (1.9) | (0.6) |
| Currency translation—intercompany loans | 6.9 | (10.5) | (23.1) |
| Value of currency contracts | (10.7) | 8.2 | 21.5 |
| Other currency transaction effects | 5.1 | 2.8 | 3.3 |
| Other miscellaneous income | (12.3) | (17.7) | (11.8) |
| Total other (income) expense, net | $(32.0) | $(33.1) | $(34.3) |

**7. Fair Value Measurements**

Certain of Grace's assets and liabilities are reported at fair value. SFAS No. 157 defines fair value as the value that would be received at the measurement date in the principal or "most advantageous" market. Grace utilizes principal market data, whenever available, to value assets and

F-39

CC-BLG003743

**Notes to Consolidated Financial Statements (Continued)**

**7. Fair Value Measurements (Continued)**

liabilities at fair value that are required to be reported at fair value. SFAS No. 157 prescribes three valuation techniques that shall be used to measure fair value as follows:

1. Market Approach—uses prices or other relevant information generated by market transactions involving identical or comparable assets or liabilities.

2. Income Approach—uses valuation techniques to convert future amounts to a single present amount (discounted).

3. Cost Approach—the amount that currently would be required to replace the service capacity of an asset (i.e., current replacement cost).

One or a combination of the approaches above can be used to calculate fair value, whichever results in the most representative fair value.

In addition to the three valuation techniques, SFAS No. 157 prescribes a fair value hierarchy in order to increase consistency and comparability in fair value measurements and related disclosures. The fair value hierarchy prioritizes the inputs to valuation techniques used to measure fair value into three broad levels:

| | |
|---|---|
| *Level 1 Inputs* | — Quoted prices in active markets for identical assets or liabilities. A quoted price in an active market provides the most reliable evidence of fair value. |
| *Level 2 Inputs* | — Inputs other than quoted prices that are observable for the asset or liability, either directly or indirectly. |
| *Level 3 Inputs* | — Unobservable inputs for the asset or liability, which should reflect the reporting entity's own assumptions about the assumptions that market participants would use in pricing the asset or liability. |

Grace has identified the following financial assets and liabilities that are subject to the fair value analysis required by SFAS No. 157:

*Investment Securities*

Investment securities consist of direct or indirect investments in debt securities. Prior to the fourth quarter of 2007, Grace's investment in the Columbia Strategic Cash Portfolio Fund (the "Columbia Fund") was classified in cash and cash equivalents, as redemptions were available in cash. In December 2007, the Columbia Fund began an orderly liquidation that its principals expect will continue through 2009 and restricted redemptions to in-kind distribution of portfolio securities. In the year ended December 31, 2008, $70.7 million of Grace's account balance was distributed to Grace in cash. Grace has elected to maintain its investment in the Columbia Fund pending the orderly liquidation of the portfolio and to value its account based on the value of the underlying securities as determined by the fund principals. Grace has determined the value of the fund using a market approach, which consists of matrix pricing techniques based on widely available market data and comparables as provided by the fund principals. Grace's investment in the Columbia Fund was valued at $21.6 million and $98.3 million at December 31, 2008 and 2007, respectively.

Grace recorded a decrease in fair value of its Columbia Fund account of $6.0 million for the year ended December 31, 2008 due to unfavorable conditions in the credit markets. The decrease in fair value is recorded as an offset to interest income earned by Grace on its balance in the Columbia Fund which is netted against Chapter 11 expenses in the Consolidated Statements of Operations.

F-40

CC-BLG003744

Notes to Consolidated Financial Statements (Continued)

**7. Fair Value Measurements (Continued)**

This decrease in fair value was deemed to be other than temporary, and as such, was recorded in earnings.

*Derivatives*

From time to time, Grace enters into commodity derivatives such as forward contracts or option contracts directly with natural gas suppliers, and fixed-rate swaps with financial institutions to mitigate the risk of volatility of natural gas prices. Under fixed-rate swaps, Grace locks in a fixed rate with a financial institution for future natural gas purchases, purchases its natural gas from a supplier at the prevailing market rate, and then settles with the bank for any difference in the rates, thereby "swapping" a variable rate for a fixed rate. In 2007 and 2008, Grace utilized fixed-rate swaps to mitigate the risk of natural gas price volatility. The valuation of Grace's fixed-rate natural gas swaps was determined using a market approach, based on natural gas futures trading prices quoted on the New York Mercantile Exchange.

As part of its risk management program, Grace enters into foreign currency exchange rate forward and/or option contracts to mitigate the effects of exchange rate fluctuations. Grace also utilizes foreign currency forward exchange rate and/or option contracts from time to time to hedge the value of its net investment in certain foreign entities. The valuation of Grace's foreign currency exchange rate forward contracts was determined using both a market approach and an income approach. Inputs used to value foreign currency exchange rate forward contracts consist of: (1) spot rates, which are quoted by various financial institutions; (2) forward points, which are primarily affected by changes in interest rates on Euro and U.S. dollar deposits; and (3) discount rates used to present value future cash flows, which are based on the London Interbank Offered Rate (LIBOR) curve.

The following table presents the fair value hierarchy for non-financial assets and liabilities measured at fair value on a recurring basis as of December 31, 2008:

| Items Measured at Fair Value on a Recurring Basis | Total | Quoted Prices in Active Markets for Identical Assets or Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| | | | (In millions) | |
| **Assets** | | | | |
| Available-for-sale securities | $ 21.6 | $ — | $ 21.6 | $ — |
| Currency derivatives | 21.0 | — | 21.0 | — |
| **Total Assets** | $ 42.6 | $ — | $ 42.6 | $ — |
| **Liabilities** | | | | |
| Currency derivatives | $ 3.7 | $ — | $ 3.7 | $ — |
| Commodity derivatives | 10.8 | — | 10.8 | — |
| **Total Liabilities** | $ 14.5 | $ — | $ 14.5 | $ — |

F-41

CC-BLG003745

**Notes to Consolidated Financial Statements (Continued)**

**7. Fair Value Measurements (Continued)**

| Items Measured at Fair Value on a Recurring Basis | Total | Quoted Prices in Active Markets for Identical Assets or Liabilities (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| | | (in millions) | | |
| **Assets** | | | | |
| Available-for-sale securities | $ 98.3 | $     — | $  98.3 | $     — |
| Currency derivatives | 2.5 | | 2.5 | |
| **Total Assets** | $100.8 | $     — | $ 100.8 | $     — |
| **Liabilities** | | | | |
| Currency derivatives | $ 13.6 | $     — | $  13.6 | $     — |
| Commodity derivatives | 1.0 | | 1.0 | |
| **Total Liabilities** | $ 14.6 | $     — | $  14.6 | $     — |

Fair Value Measurements at December 31, 2007 Using

**8. Goodwill and Other Intangible Assets**

For the purpose of measuring impairment under the provisions of SFAS No. 142, Grace has identified its reporting units as the product groups at one level below its operating segments. Grace has evaluated its goodwill annually as of November 30 with no impairment charge required in any of the periods presented.

The carrying amount of goodwill attributable to each operating segment and the changes in those balances during the year ended December 31, 2008 are as follows:

| | Grace Davison | Grace Construction Products | Total Grace |
|---|---|---|---|
| | | (in millions) | |
| Balance as of December 31, 2007 | $ 55.7 | $   66.6 | $122.3 |
| Goodwill acquired during the year | 0.6 | — | 0.6 |
| Foreign currency translation | (1.9) | (3.9) | (5.8) |
| **Balance as of December 31, 2008** | $ 54.4 | $   62.7 | $117.1 |

Grace's net book value of other intangible assets at December 31, 2008 and December 31, 2007 was $72.5 million and $82.2 million, respectively, detailed as follows:

| | As of December 31, 2008 | |
|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization |
| | (in millions) | |
| Technology | $    44.5 | $    21.4 |
| Patents | 1.2 | 0.3 |
| Customer lists | 53.6 | 22.7 |
| Other | 29.1 | 11.5 |
| Total | $   128.4 | $    55.9 |

F-42

CC-BLG003746

**Notes to Consolidated Financial Statements (Continued)**

**8. Goodwill and Other Intangible Assets (Continued)**

| | As of December 31, 2007 | |
|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization |
| | (In millions) | |
| Technology | $ 45.3 | $ 19.3 |
| Patents | 1.2 | 0.2 |
| Customer lists | 56.1 | 21.6 |
| Other | 31.1 | 10.4 |
| Total | $ 133.7 | $ 51.5 |

At December 31, 2008, estimated future annual amortization expenses for intangible assets are:

**Estimated Amortization Expense**

| | (In millions) |
|---|---|
| 2009 | $ 10.5 |
| 2010 | 10.1 |
| 2011 | 9.9 |
| 2012 | 9.0 |
| 2013 | 8.4 |

**9. Comprehensive Income (Loss)**

The following tables present the pre-tax, tax, and after-tax components of Grace's other comprehensive income (loss) for the years ended December 31, 2008, 2007, and 2006:

| Year Ended December 31, 2008 | Pre-Tax Amount | Tax Benefit/ (Expense) | After-Tax Amount |
|---|---|---|---|
| | | (In millions) | |
| Defined benefit pension and other postretirement plans: | | | |
| Amortization of net prior service credit included in net periodic benefit cost | $ (6.3) | $ 2.2 | $ (4.1) |
| Amortization of net deferred actuarial loss included in net periodic benefit cost | 27.4 | (9.3) | 18.1 |
| Net deferred actuarial loss arising during period | (245.3) | 86.4 | (158.9) |
| Benefit plans, net | (224.2) | 79.3 | (144.9) |
| Foreign currency translation adjustments | (58.7) | — | (58.7) |
| Gain (loss) from hedging activities | (10.1) | 3.5 | (6.6) |
| Other comprehensive income (loss) | $(293.0) | $ 82.8 | $(210.2) |

F-43

CC-BLG003747

Notes to Consolidated Financial Statements (Continued)

**9. Comprehensive Income (Loss) (Continued)**

| Year Ended December 31, 2007 | Pre-Tax Amount | Tax Benefit/ (Expense) (In millions) | After-Tax Amount |
|---|---|---|---|
| Defined benefit pension and other postretirement plans: | | | |
| Amortization of net prior service credit included in net periodic benefit cost | $ (6.5) | $ 2.3 | $ (4.2) |
| Amortization of net deferred actuarial loss included in net periodic benefit cost | 28.4 | (9.7) | 18.7 |
| Net deferred actuarial loss arising during period | (29.1) | 9.9 | (19.2) |
| Benefit plans, net | (7.2) | 2.5 | (4.7) |
| Foreign currency translation adjustments | 43.7 | 0.9 | 44.6 |
| Gain (loss) from hedging activities | 0.9 | (0.1) | 0.8 |
| Other comprehensive income (loss) | $ 37.4 | $ 3.3 | $ 40.7 |

| Year Ended December 31, 2006 | Pre-Tax Amount | Tax Benefit/ (Expense) (In millions) | After-Tax Amount |
|---|---|---|---|
| Minimum pension liability adjustments | $107.5 | $ (37.6) | $ 69.9 |
| Foreign currency translation adjustments | 36.8 | — | 36.8 |
| Gain (loss) from hedging activities | (1.9) | 0.6 | (1.3) |
| Other comprehensive income (loss) | $142.4 | $ (37.0) | $ 105.4 |

| Components of Accumulated Other Comprehensive Income (Loss) | December 31, 2008 | December 31, 2007 (In millions) | December 31, 2006 |
|---|---|---|---|
| Defined benefit pension and other postretirement plans: | | | |
| Net prior service credit (net of tax) | $ 0.8 | $ 4.9 | $ 9.1 |
| Net deferred actuarial loss (net of tax) | (545.5) | (404.7) | (404.2) |
| Benefit plans, net | (544.7) | (399.8) | (395.1) |
| Foreign currency translation | (8.5) | 50.2 | 5.6 |
| Hedging activities, net of tax | (7.1) | (0.5) | (1.3) |
| Accumulated other comprehensive income (loss) | $ (560.3) | $ (350.1) | $ (390.8) |

Accumulated other comprehensive income (loss) related to the defined benefit pension and other postretirement plans at December 31, 2008 and 2007, respectively, represents the accumulation of net actuarial losses of $545.5 million and $404.7 million as well as net prior service credits of $0.8 million and $4.9 million. These amounts are net of tax and are amortized as a component of net periodic benefit cost. For the twelve months ended December 31, 2008 and 2007, the pre-tax benefit recognized related to prior service credits was $6.3 million and $6.5 million, respectively, and the pre-tax expense recognized for amortization of accumulated actuarial losses was $27.4 million and $28.4 million, respectively. In addition, $245.3 million and $29.1 million of pre-tax comprehensive loss was recognized for changes in funded status during the twelve months ended December 31, 2008 and 2007, respectively.

Grace is a global enterprise operating in over 40 countries with local currency generally deemed to be the functional currency for accounting purposes. The foreign currency translation amount represents the adjustments necessary to translate the balance sheets valued in local currencies to

F-44

CC-BLG003748

Notes to Consolidated Financial Statements (Continued)

**9. Comprehensive Income (Loss) (Continued)**

the U.S. dollar as of the end of each period presented, and to translate revenues and expenses at average exchange rates for each period presented.

See Note 7 for a discussion of hedging activities.

**10. Inventories**

Inventories are stated at the lower of cost or market, and cost is determined using FIFO. Inventories consisted of the following at December 31, 2008 and December 31, 2007:

|  | December 31, 2008 | December 31, 2007 |
|---|---|---|
|  | (in millions) | |
| Raw materials | $   63.6 | $   76.3 |
| In process | 42.1 | 44.7 |
| Finished products | 212.1 | 203.7 |
| General merchandise | 37.0 | 38.2 |
|  | $ 354.8 | $ 362.9 |

In the third quarter of 2008, Grace changed its method of accounting for U.S. inventories from LIFO to FIFO (see Note 1 for further discussion). The accounting change has resulted in retrospectively restated prior period consolidated statements of operations and balance sheet measures as follows:

| | Three Months Ended December 31, 2007 (Unaudited) | | | |
|---|---|---|---|---|
| | | As Originally | | |
| Consolidated Statement of Operations | As Restated | Reported | $ Change | % Change |
| | (in millions, except per share data) | | | |
| Cost of goods sold | $  563.2 | $  559.2 | $   4.0 | 0.7% |
| Income before income taxes and minority interest | 5.1 | 9.2 | (4.1) | (44.6)% |
| Benefit from (provision for) income taxes | 37.8 | 37.4 | 0.4 | 1.1% |
| Minority interest in consolidated entities | (5.7) | (8.3) | 2.6 | (31.3)% |
| Net income | $   37.2 | $   38.3 | $  (1.1) | (2.9)% |
| Diluted earnings per share | $   0.52 | $   0.53 | $ (0.01) | (1.9)% |

| | Year Ended December 31, 2007 | | | |
|---|---|---|---|---|
| | | As Originally | | |
| Consolidated Statement of Operations | As Restated | Reported | $ Change | % Change |
| | (in millions, except per share data) | | | |
| Cost of goods sold | $ 2,127.9 | $ 2,147.4 | $ (19.5) | (0.9)% |
| Income before income taxes and minority interest | 112.2 | 92.6 | 19.6 | 21.2% |
| Benefit from (provision for) income taxes | 1.1 | 5.8 | (4.7) | (81.0)% |
| Minority interest in consolidated entities | (24.5) | (18.1) | (6.4) | 35.4% |
| Net income | $   88.8 | $   80.3 | $   8.5 | 10.6% |
| Diluted earnings per share | $   1.24 | $   1.12 | $  0.12 | 10.7% |

In the above tables, the $0.1 million difference between the change in cost of goods sold and the change in income before income taxes and minority interest as originally reported and as

F-45

CC-BLG003749

**Notes to Consolidated Financial Statements (Continued)**

**10. Inventories (Continued)**

restated for the three months and year ended December 31, 2007 relates to rounding adjustments to other financial statement line items.

| Consolidated Statement of Operations | Year Ended December 31, 2006 | | | |
| | As Restated | As Originally Reported | $ Change | % Change |
| --- | --- | --- | --- | --- |
| | | (In millions, except per share data) | | |
| Cost of goods sold | $ 1,946.8 | $ 1,923.8 | $ 23.0 | 1.2% |
| Income before income taxes and minority interest | 37.8 | 60.8 | (23.0) | (37.8)% |
| Benefit from (provision for) income taxes | (2.8) | (8.1) | 5.3 | (65.4)% |
| Minority interests in consolidated entities | (26.4) | (34.4) | 8.0 | (23.3)% |
| Net income | $ 8.6 | $ 18.3 | $ (9.7) | (53.0)% |
| Diluted earnings per share | $ 0.13 | $ 0.27 | $ (0.14) | (51.9)% |

| Consolidated Balance Sheet | As of December 31, 2007 | | | |
| | As Restated | As Originally Reported | $ Change | % Change |
| --- | --- | --- | --- | --- |
| | | (In millions) | | |
| Inventories | $ 362.9 | $ 303.5 | $ 59.4 | 19.6% |
| Deferred income taxes | 747.5 | 767.5 | (20.0) | (2.6)% |
| Total assets | 3,908.4 | 3,869.0 | 39.4 | 1.0% |
| Minority interests in consolidated entities | 73.2 | 70.8 | 2.4 | 3.4% |
| Total liabilities | 4,258.0 | 4,255.6 | 2.4 | 0.1% |
| Accumulated deficit | (368.1) | (405.1) | 37.0 | 9.1% |
| Total shareholders' deficit | (349.6) | (386.6) | 37.0 | 9.6% |

The cumulative effect of the change from LIFO to FIFO was to reduce Grace's accumulated deficit by $37.0 million, $28.5 million and $38.2 million as of January 1, 2008; January 1, 2007; and January 1, 2006; respectively. If Grace had not elected to change the accounting method for U.S. inventories from LIFO to FIFO, net income for the three months and year ended December 31, 2008 would have been $53.5 million ($0.74 per diluted share) (unaudited) and $115.0 million ($1.59 per diluted share), respectively.

F-46

CC-BLG003750

**Notes to Consolidated Financial Statements (Continued)**

## 11. Other Balance Sheet Accounts

| | December 31, 2008 | December 31, 2007 |
|---|---|---|
| | (In millions) | |
| **Other Assets** | | |
| Deferred charges | $ 33.5 | $ 38.4 |
| Cash value of life insurance policies, net of policy loans | 4.2 | 3.9 |
| Long-term receivables, less allowances of $0.0 (2007—$0.0) | 0.9 | 1.3 |
| Patents, licenses and other intangible assets, net | 72.5 | 82.2 |
| Fair value of foreign exchange rate forward contracts | 21.0 | 2.5 |
| Investments in unconsolidated affiliates and other | 17.2 | 12.2 |
| | $ 149.3 | $ 140.5 |
| **Other Current Liabilities** | | |
| Accrued compensation | $ 88.1 | $ 97.2 |
| Customer volume rebates | 37.7 | 44.1 |
| Accrued commissions | 13.0 | 11.6 |
| Accrued reorganization expenses | 23.9 | 27.5 |
| Income tax payable | 15.9 | 30.4 |
| Deferred tax liability | 7.9 | 8.8 |
| Fair value of foreign exchange rate forward contracts | 3.7 | 13.6 |
| Other accrued liabilities | 101.3 | 91.9 |
| | $ 291.5 | $ 325.1 |

Accrued compensation in the table above includes salaries and wages as well as estimated current amounts due under the annual and long-term incentive programs.

## 12. Properties and Equipment

| | 2008 | 2007 |
|---|---|---|
| | (In millions) | |
| Land | $ 21.5 | $ 23.0 |
| Buildings | 460.8 | 460.7 |
| Information technology and equipment | 131.0 | 144.9 |
| Machinery, equipment and other | 1,577.9 | 1,571.0 |
| Projects under construction | 64.7 | 51.5 |
| Properties and equipment, gross | 2,255.9 | 2,251.1 |
| Accumulated depreciation and amortization | (1,545.3) | (1,545.0) |
| Properties and equipment, net | $ 710.6 | $ 706.1 |

Capitalized interest costs amounted to $0.3 million in 2008 and $2.0 million in 2007. Depreciation and lease amortization expense relating to properties and equipment amounted to $109.0 million in 2008, $104.4 million in 2007, and $104.2 million in 2006. Grace's rental expense for operating leases amounted to $23.8 million in 2008, $20.8 million in 2007, and $18.6 million in 2006.

F-47

CC-BLG003751

**Notes to Consolidated Financial Statements (Continued)**

**12. Properties and Equipment (Continued)**

At December 31, 2008, minimum future non-cancelable payments for operating leases were:

**Minimum Future Payments Under Operating Leases**

| | (In millions) |
|---|---|
| 2009 | $ 21.5 |
| 2010 | 16.0 |
| 2011 | 11.0 |
| 2012 | 5.5 |
| 2013 | 3.6 |
| Thereafter | 7.3 |
| Total minimum lease payments | $ 64.9 |

The above minimum non-cancelable lease payments are net of anticipated sublease income of $1.5 million in 2009, $0.7 million in 2010, $0.3 million in 2011, $0.2 million in 2012, and $0.2 million in 2013.

**13. Life Insurance**

Grace is the beneficiary of corporate-owned life insurance ("COLI") policies on certain current and former employees with net cash surrender values of $71.4 million and $81.0 million at December 31, 2008 and 2007, respectively. The following tables summarize activity in these policies for 2008, 2007 and 2006, and the components of net cash value at December 31, 2008 and 2007:

**Life Insurance—Activity Summary**

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| | (In millions) | | |
| Earnings on policy assets | $ 4.3 | $ 6.2 | $ 5.6 |
| Interest on policy loans | (1.3) | (0.9) | (1.5) |
| Premiums | 0.3 | 1.7 | 2.3 |
| Proceeds from policy loans | (56.0) | — | — |
| Policy loan repayments | 56.0 | 0.1 | 0.1 |
| Proceeds from termination of life insurance policies | (12.7) | (14.8) | (0.3) |
| Net investing activity | (0.2) | (0.5) | (1.8) |
| Change in net cash value | $ (9.6) | $ (8.2) | $ 4.4 |
| Tax-free proceeds received | $ 0.2 | $ 0.3 | $ 2.3 |

F-48

CC-BLG003752

**Notes to Consolidated Financial Statements (Continued)**

**13. Life Insurance (Continued)**

**Components of Net Cash Value**

|  | December 31, | |
|---|---|---|
|  | 2008 | 2007 |
|  | (In millions) | |
| Gross cash value | $ 77.5 | $ 85.8 |
| Principal—policy loans | (5.0) | (4.7) |
| Accrued interest—policy loans | (1.1) | (0.1) |
| Total net cash value | $ 71.4 | $ 81.0 |
| Less: current portion | (67.2) | (77.1) |
| Net cash value—long-term | $ 4.2 | $ 3.9 |
| Insurance benefits in force | $120.7 | $141.1 |

Grace's financial statements display income statement activity and balance sheet amounts on a net basis, reflecting the contractual interdependency of policy assets and liabilities.

In August and December 2008, Grace received proceeds of $40.0 million and $16.0 million, respectively, through a loan against the cash value of its life insurance policies. In December 2008, Grace made loan repayments of $56.0 million. In June and November 2008, Grace surrendered and terminated life insurance policies and received approximately $8.1 million and $4.6 million, respectively, of net cash value from the terminations. As a result of the terminations, gross cash value of the policies was reduced by approximately $12.7 million. Grace's insurance benefits in force was reduced by approximately $23.5 million.

**14. Debt**

**Components of Debt**

|  | 2008 | 2007 |
|---|---|---|
|  | (In millions) | |
| Debt payable within one year(1) | $ 11.2 | $ 4.7 |
| **Debt payable after one year** | | |
| DIP facility(2) | $ — | $ — |
| Other long-term borrowings | 0.6 | 0.3 |
|  | $ 0.6 | $ 0.3 |
| **Debt Subject to Compromise** | | |
| Bank borrowings(3) | $500.0 | $500.0 |
| Accrued interest on bank borrowings | 323.5 | 283.0 |
| Drawn letters of credit(4) | 25.6 | 23.6 |
| Accrued interest on drawn letters of credit | 4.4 | 3.3 |
|  | $853.5 | $809.9 |
| Full-year weighted average interest rates on total debt | 5.2% | 8.1% |

---

(1) Represents borrowings under various lines of credit and other miscellaneous borrowings, primarily by non-U.S. subsidiaries.

CC-BLG003753

Notes to Consolidated Financial Statements (Continued)

**14. Debt (Continued)**

(2)    The Debtors have entered into a debtor-in-possession post-petition loan and security agreement, or DIP facility, with a syndicate of lenders that, as amended effective April 1, 2008, provides for up to $165 million of revolving loans and face amount of letters of credit. The DIP facility is secured by a priority lien on substantially all assets of the Debtors with the exclusion of the capital stock of non-U.S. subsidiaries, and bears interest based on LIBOR. The term of the DIP facility ends on the earlier of April 1, 2010 or the Debtors' emergence from Chapter 11. The DIP facility permits the increase of commitments of existing lenders and/or commitments by new lenders up to an aggregate maximum of $250 million. As of December 31, 2008 and 2007, the Debtors had no outstanding borrowings under the DIP facility. However, $64.1 million and $56.3 million of standby letters of credit were issued and outstanding under the facility as of December 31, 2008 and 2007, respectively, which were issued mainly for trade-related matters such as performance bonds, as well as certain insurance and environmental matters. The outstanding amount of standby letters of credit, as well as other holdback provisions issued under the DIP facility reduces the borrowing availability to $100.9 million at December 31, 2008. Under the DIP facility, the Debtors are required to maintain $50 million of liquidity, in a combination of cash, cash equivalents and the net cash value of life insurance policies.

(3)    Under bank revolving credit agreements in effect prior to the Filing, Grace could borrow up to $500 million at interest rates based upon the prevailing prime, federal funds and/or Eurodollar rates. Of that amount, $250 million was available under short-term facilities expiring in May 2001, and $250 million was available under a long-term facility expiring in May 2003. As a result of the Filing, Grace was in default under the bank revolving credit agreements, and accordingly, the balance as of the Filing Date was reclassified to debt subject to compromise in the Consolidated Balance Sheet.

(4)    Amounts drawn on letters of credit pursuant to settled but unpaid claims.

**15. Financial Instruments and Risk**

    ***Debt and Interest Rate Swap Agreements*** —Grace was not a party to any debt or interest rate swaps at December 31, 2008 and December 31, 2007.

    ***Commodity Risk*** —Certain raw materials and energy sources are subject to price fluctuation. Grace hedges against volatility in certain raw material and energy purchases using financial instruments as appropriate. Grace also enters into long term supply agreements and/or forward commitments to secure materials at stable prices and in quantities fully expected to be used in production. During 2008 and 2007, Grace entered into fixed-price swaps with financial institutions, forward contracts with natural gas suppliers, and options agreements with natural gas suppliers to manage the cost of a portion of quantities required for use at certain production plants.

    ***Currency Risk*** —Because Grace does business in over 40 countries, results are exposed to fluctuations in foreign exchange rates. Grace seeks to minimize exposure to these fluctuations by matching revenue streams in volatile currencies with expenditures in the same currencies, but it is not always possible to do so. From time to time Grace will use financial instruments such as foreign currency forward contracts, options, or combinations of the two to reduce the risk of certain specific transactions. However, Grace does not have a policy of hedging all exposures, because management does not believe that such a level of hedging would be cost-effective, particularly translation exposures that are not expected to affect cash flows in the near term.

F-50

CC-BLG003754

Notes to Consolidated Financial Statements (Continued)

**15. Financial Instruments and Risk (Continued)**

In 2004, Grace purchased forward contracts to minimize currency risk related to euro denominated intercompany loans due to a U.S. subsidiary of Grace. In 2008, the intercompany loans were repaid and the forward foreign currency contracts were settled. In November 2007, Grace purchased additional forward foreign currency contracts to mitigate the effect of foreign currency translation with respect to new intercompany loans between its principal U.S. subsidiary and a German subsidiary.

*Fair Value of Debt and Other Financial Instruments* —At December 31, 2008, the fair value of Grace's debt payable within one year not subject to compromise approximated the recorded value of $11.2 million. Fair value is determined based on expected future cash flows (discounted at market interest rates), quotes from financial institutions and other appropriate valuation methodologies. At December 31, 2008, the recorded values of other financial instruments such as cash equivalents, short-term investments, trade receivables and payables and short-term debt approximated their fair values, based on the short-term maturities and floating rate characteristics of these instruments. At December 31, 2008, the carrying value of Grace's bank debt subject to compromise plus interest was $823.5 million. The estimated fair value of the bank debt is lower than the carrying value; however, because such debt is subject to compromise in Grace's Chapter 11 proceeding, neither carrying values nor market values may reflect ultimate liquidation value.

*Credit Risk* —Trade receivables potentially subject Grace to credit risk. Concentrations of credit to customers in the petroleum refining and construction industries represent the greatest exposure. Grace's credit evaluation policies, relatively short collection terms and history of minimal credit losses mitigate credit risk exposures. Grace does not generally require collateral for its trade accounts receivable, but may require a bank letter of credit in certain instances, particularly when selling to customers in cash restricted countries.

**16. Commitments and Contingent Liabilities**

*Asbestos-Related Liability* —See Note 3

*Environmental Remediation* —Grace is subject to loss contingencies resulting from extensive and evolving federal, state, local and foreign environmental laws and regulations relating to the generation, storage, handling, discharge and disposition of hazardous wastes and other materials. Grace accrues for anticipated costs associated with investigative and remediation efforts where an assessment has indicated that a probable liability has been incurred and the cost can be reasonably estimated. These accruals do not take into account any discounting for the time value of money.

Grace's environmental liabilities are reassessed whenever circumstances become better defined or remediation efforts and their costs can be better estimated. These liabilities are evaluated based on currently available information, including the progress of remedial investigation at each site, the current status of discussions with regulatory authorities regarding the method and extent of remediation at each site, existing technology, prior experience in contaminated site remediation and the apportionment of costs among potentially responsible parties. Grace expects that the funding of environmental remediation activities will be affected by the Chapter 11 proceedings.

At December 31, 2008, Grace's estimated liability for environmental investigative and remediation costs totaled $152.2 million, as compared with $394.7 million at December 31, 2007. The amount is based on funding and/or remediation agreements in place, including the Multi-Site Agreement described below, and Grace's best estimate of its cost for sites not subject to a formal

F-51

CC-BLG003755

Notes to Consolidated Financial Statements (Continued)

**16. Commitments and Contingent Liabilities (Continued)**

remediation plan. Grace's estimated environmental liabilities are included in "liabilities subject to compromise" in the accompanying Consolidated Balance Sheets.

Grace recorded pre-tax charges of $14.6 million and $17.0 million for environmental matters in 2008 and 2007, respectively. Of the pre-tax charges, $5.0 million and $14.4 million, respectively, were in connection with cost recovery obligations arising out of a lawsuit brought by the U.S. Government (see below). The remainder of the pre-tax charges were attributable to the ongoing review of environmental liabilities.

Net cash expenditures charged against previously established reserves for the years ended December 31, 2008, 2007, and 2006 were $256.9 million, $9.5 million, and $10.9 million, respectively. Cash expenditures in 2008 included a payment of $252 million related to the settlement of the cost recovery claim with respect to Libby, Montana.

*Multi-Site Settlement*

The U.S. Environmental Protection Agency ("EPA") has filed proofs of claim with respect to potential contamination at 38 sites, including vermiculite related claims and non-vermiculite related claims. In June 2008, Grace entered into a multi-site settlement agreement (the "Multi-Site Agreement") with the U.S. Government, on behalf of EPA and other federal agencies. Under the Multi-Site Agreement, Grace has agreed to pay approximately $44 million to the U.S. Government and other parties in settlement of 35 of these outstanding claims and the U.S. Government has agreed not to take action against Grace under the Comprehensive Environmental Response, Compensation, and Liability Act with respect to these sites. Grace intends to separately fund or carry out remediation at two of the remaining sites. With respect to the third remaining site, Libby, Montana, EPA's claims, excluding claims in respect of the Grace-owned Libby vermiculite mine, are resolved by the EPA Cost Recovery Agreement described below. Grace is working in cooperation with EPA to investigate the Libby vermiculite mine.

*Vermiculite Related Matters*

*EPA Cost Recovery Claim* —As a result of a 2002 U.S. District Court ruling, Grace is required to reimburse the U.S. Government for $54.5 million (plus interest) in costs expended through December 2001, and for all appropriate future costs to complete asbestos-related remediation relating to Grace's former vermiculite mining and processing activities in the Libby, Montana area. These costs include cleaning and/or demolition of contaminated buildings, excavation and removal of contaminated soil, health screening of Libby residents and former mine workers, and investigation and monitoring costs.

In June 2008, the Bankruptcy Court approved an agreement (the "EPA Cost Recovery Agreement"), between Grace and the U.S. Department of Justice to settle the EPA's cost recovery claims for all past and future remediation costs with respect to Grace's former Libby operations, except for those relating to the Grace-owned Libby vermiculite mine, for a payment by Grace of $250 million (which amount includes the $54.5 million referenced above). In addition, EPA has agreed to take no action against Grace with respect to the Libby Asbestos Superfund Site. During 2008, Grace paid $250 million plus accrued interest of approximately $2 million in satisfaction of its obligations under the EPA Cost Recovery Agreement.

F-52

CC-BLG003756

**Notes to Consolidated Financial Statements (Continued)**

**16. Commitments and Contingent Liabilities (Continued)**

Grace's total estimated liability for asbestos remediation related to its former vermiculite operations in Libby, including the cost of remediation at vermiculite processing sites outside of Libby, at December 31, 2008 and 2007 was $48.4 million and $296.9 million, respectively, excluding interest. The estimated obligation as of each date does not include the cost to remediate the Grace-owned Libby vermiculite mine, which is not currently estimable.

*Montana Criminal Proceeding* —In February, 2005, the United States Department of Justice announced the unsealing of a grand jury indictment against Grace and seven former senior level employees (one of whom is now deceased) *(United States of America v. W. R. Grace & Co. et al)* relating to Grace's former vermiculite mining and processing activities in Libby, Montana. The indictment accuses the defendants of (1) conspiracy to violate environmental laws and obstruct federal agency proceedings; (2) violations of the federal Clean Air Act; and (3) obstruction of justice.

Grace purchased the Libby mine in 1963 and operated it until 1990; vermiculite processing activities continued until 1992. The grand jury charges that the conspiracy took place from 1976 to 2002. According to the U.S. Department of Justice, Grace could be subject to fines in an amount equal to twice the after-tax profit earned from its Libby operations or twice the alleged loss suffered by victims, plus additional amounts for restitution to victims. The indictment alleges that such after-tax profits were $140 million. Grace has categorically denied any criminal wrongdoing and intends to vigorously defend itself at trial. The trial began February 19, 2009 and is expected to last three to four months. Pursuant to instructions issued by the U.S. District Court for the District of Montana, Grace is prohibited from making any public comments about the proceeding.

The U.S. Bankruptcy Court previously granted Grace's request to advance legal and defense costs to the employees involved in this case, subject to a reimbursement obligation if it is later determined that the employees did not meet the standards for indemnification set forth under the appropriate state corporate law. For the years ended December 31, 2008, 2007, and 2006, total expense for Grace and the employees was $29.7 million, $19.0 million, and $52.7 million, respectively, which amounts are included in selling, general and administrative expenses in the accompanying Consolidated Statements of Operations. Cumulative expenses to address this matter were $121.4 million through December 31, 2008.

Grace is unable to assess whether the indictment, or any conviction resulting therefrom, will have a material adverse effect on the results of operations or financial condition of Grace or affect Grace's bankruptcy proceedings. Grace expects legal fees for this matter to be in the range of $19 million to $21 million per quarter from January 2009 through the end of the trial. Grace intends to expense such costs as they are incurred.

*New Jersey Claims* —In 2005, the New Jersey Department of Environmental Protection ("NJDEP") filed a lawsuit against Grace and two former employees, which was removed at Grace's request to the U.S. District Court for the District of New Jersey *(N.J. Dept. of Environmental Protection v. W.R. Grace & Co. et al.),* seeking civil penalties for alleged misrepresentations and false statements made in a Preliminary Assessment/Site Investigation Report and Negative Declarations submitted by Grace to the NJDEP in 1995 pursuant to the New Jersey Industrial Site Recovery Act. Grace submitted the report, which was prepared by an independent environmental consultant, in connection with the closing of Grace's former vermiculite expansion plant in Hamilton Township, New Jersey. In 2005, the Bankruptcy Court stayed this lawsuit. In April 2008, the Bankruptcy Court issued an opinion stating that the action filed by New Jersey was in violation of the automatic stay and enjoined further pursuit of all claims in the lawsuit and New Jersey appealed this

F-53

**Notes to Consolidated Financial Statements (Continued)**

**16. Commitments and Contingent Liabilities (Continued)**

order to the U.S. Court of Appeals for the Third Circuit. In December 2008, the New Jersey District Court ordered this lawsuit stayed and administratively terminated. To the extent this lawsuit proceeds against the two former Grace employees, Grace may have an indemnification obligation.

In April 2007, New Jersey filed a motion for leave to file a late proof of claim in the amount of $31 million with respect to substantially the same claims set forth in the lawsuit described in the preceding paragraph. In August 2007, the Bankruptcy Court denied this motion and the Delaware District Court affirmed this ruling on appeal in March 2008. In April 2008, New Jersey appealed this ruling to the Third Circuit.

*Non-Vermiculite Related Matters*                                                                                                      ,

At December 31, 2008 and 2007, Grace's estimated liability for remediation of sites not related to its former vermiculite mining and processing activities was $103.8 million and $97.8 million, respectively. This liability relates to Grace's current and former operations, including its share of liability for off-site disposal at facilities where it has been identified as a potentially responsible party. Grace's estimated liability is based upon an evaluation of claims for which sufficient information was available and the liabilities settled pursuant to the multi-site settlement agreement described above. As Grace receives new information and continues its claims evaluation process, its estimated liability may change materially.

**Purchase Commitments** —Grace engages in purchase commitments to minimize the volatility of major components of direct manufacturing costs including natural gas, certain metals, asphalt, amines and other materials. Such commitments are for quantities that Grace fully expects to use in its normal operations.

**Guarantees and Indemnification Obligations** —Grace is a party to many contracts containing guarantees and indemnification obligations. These contracts primarily consist of:

- Contracts providing for the sale of a former business unit or product line in which Grace has agreed to indemnify the buyer against liabilities arising prior to the closing of the transaction, including environmental liabilities. These liabilities are included in "liabilities subject to compromise" in the accompanying Consolidated Balance Sheets.

- Guarantees of real property lease obligations of third parties, typically arising out of (a) leases entered into by former subsidiaries of Grace, or (b) the assignment or sublease of a lease by Grace to a third party. These obligations are included in "liabilities subject to compromise" in the accompanying Consolidated Balance Sheets.

- Licenses of intellectual property by Grace to third parties in which Grace has agreed to indemnify the licensee against third party infringement claims.

- Contracts entered into with third party consultants, independent contractors, and other service providers in which Grace has agreed to indemnify such parties against certain liabilities. Based on historical experience and the likelihood that such parties will make a claim against Grace, Grace believes that such indemnification obligations are immaterial.

- Contracts entered into with customers in which Grace has agreed to indemnify such parties against damages caused by our personnel or our products or resulting from our violation of applicable laws.

F-54

CC-BLG003758

Notes to Consolidated Financial Statements (Continued)

**16. Commitments and Contingent Liabilities (Continued)**

• Product warranties with respect to certain products sold to customers in the ordinary course of business. These warranties typically provide that product will conform to specifications. Grace generally does not establish a liability for product warranty based on a percentage of sales or other formula. Grace accrues a warranty liability on a transaction-specific basis depending on the individual facts and circumstances related to each sale. Both the liability and annual expense related to product warranties are immaterial to the Consolidated Financial Statements.

*Financial Assurances* —Financial assurances have been established for a variety of purposes, including insurance and environmental matters, asbestos settlements and appeals, trade-related commitments and other matters. At December 31, 2008, Grace had gross financial assurances issued and outstanding of $271.5 million, comprised of $141.7 million of surety bonds issued by various insurance companies, and $129.8 million of standby letters of credit and other financial assurances issued by various banks. As discussed in Note 14, $64.1 million of these financial assurances have been issued under the DIP facility.

In connection with a 1994 divestment, Grace obtained a letter of credit in the maximum amount of $25.0 million to secure scheduled payments on bonds issued to fund the transaction. This letter of credit was terminated as of December 31, 2008 due to the sale of Grace's interest in the investment.

*Accounting for Contingencies* —Although the outcome of each of the matters discussed above cannot be predicted with certainty, Grace has assessed its risk and has made accounting estimates as required under U.S. generally accepted accounting principles. As a result of the Filing, claims related to certain of the items discussed above will be addressed as part of Grace's Chapter 11 proceedings. Accruals recorded for such contingencies have been included in "liabilities subject to compromise" in the accompanying Consolidated Balance Sheets. The amounts of these liabilities as ultimately determined through the Chapter 11 proceedings could be materially different from amounts recorded at December 31, 2008.

**17. Shareholders' Equity (Deficit)**

Under its Certificate of Incorporation, the Company is authorized to issue 300,000,000 shares of common stock, $0.01 par value. Of the common stock unissued at December 31, 2008, 3,193,646 shares were reserved for issuance pursuant to stock options and other stock incentives. As of December 31, 2008 and 2007, 529,617 and 2,712,879 stock options were exercised for aggregate proceeds of $9.6 million and $40.1 million, respectively.

CC-BLG003759

**Notes to Consolidated Financial Statements (Continued)**

**18. Earnings Per Share**

The following table shows a reconciliation of the numerators and denominators used in calculating basic and diluted earnings per share.

| Earnings Per Share | 2008 | 2007 | 2006 |
|---|---|---|---|
| | (In millions, except per share amounts) | | |
| **Numerators** | | | |
| Net income | $ 121.5 | $ 88.8 | $ 8.6 |
| **Denominators** | | | |
| Weighted average common shares—basic calculation | 72.0 | 70.1 | 67.9 |
| Dilutive effect of employee stock options | 0.5 | 1.5 | 0.4 |
| Weighted average common shares—diluted calculation | 72.5 | 71.6 | 68.3 |
| **Basic earnings per share** | $ 1.69 | $ 1.27 | $ 0.13 |
| **Diluted earnings per share** | $ 1.68 | $ 1.24 | $ 0.13 |

Stock options that could potentially dilute basic earnings per share (that were excluded from the computation of diluted earnings per share because their exercise prices were greater than the average market price of the common shares) averaged approximately 0.2 million in 2008. The average market price of Grace's common stock exceeded the exercise price of all outstanding stock options as of December 31, 2007. Therefore, there were no antidilutive options outstanding for 2007. Stock options that could potentially dilute basic earnings per share (that were excluded from the computation of diluted earnings per share because their exercise prices were greater than the average market price of the common shares) averaged approximately 5.3 million in 2006.

**19. Stock Incentive Plans**

Each stock option granted under the Company's stock incentive plans has an exercise price equal to the fair market value of the Company's common stock on the date of grant. Options become exercisable at the time or times determined by the Compensation Committee of the Company's Board of Directors and may have terms of up to ten years and one month.

The following table sets forth information relating to such options during 2008, 2007, and 2006:

| Stock Option Activity | Number Of Shares | Average Exercise Price |
|---|---|---|
| Balance at January 1, 2006 | 7,093,646 | $ 13.42 |
| Options exercised | (1,992,626) | 12.10 |
| Options terminated or cancelled | (503,939) | 11.73 |
| Balance at December 31, 2006 | 4,596,881 | $ 14.18 |
| Options exercised | (2,712,879) | 14.79 |
| Options terminated or cancelled | (15,039) | 10.70 |
| Balance at December 31, 2007 | 1,868,963 | $ 13.33 |
| Options exercised | (529,617) | 18.20 |
| Options terminated or cancelled | (134,600) | 17.20 |
| Options granted | 1,988,900 | 19.71 |
| **Balance at December 31, 2008** | **3,193,646** | **$ 16.33** |

F-56

CC-BLG003760

Notes to Consolidated Financial Statements (Continued)

**19. Stock Incentive Plans (Continued)**

Currently outstanding options expire on various dates through September 2013. At December 31, 2008, 2,804,657 shares were available for additional stock option or restricted stock grants. The following is a summary of stock options outstanding and exercisable at December 31, 2008:

**Stock Options Outstanding and Exercisable**

| Exercise Price Range | Number Outstanding and Exercisable | Weighted-Average Remaining Contractual Life (Years) | Weighted-Average Exercise Price |
|---|---|---|---|
| $ 1 - $ 8 | 330,906 | 3.00 | $ 2.80 |
| $ 8 - $13 | 208,590 | 1.00 | 12.81 |
| $13 - $18 | 665,250 | 1.80 | 14.08 |
| $19.71(1) | 1,988,900 | 2.00 | 19.71 |
| | 3,193,646 | 2.00 | 16.33 |

(1)    These options were granted on September 11, 2008 and are not exercisable as of December 31, 2008.

**Options Granted—2008**

On September 11, 2008, W.R. Grace granted approximately 2 million nonstatutory stock options (under the W. R. Grace & Co. 2000 Stock Incentive Plan ("the Plan")). These grants are a component of the 2008-2010 long term incentive plan. These are the first of such options granted since 2001 and since the adoption of SFAS 123R.

For the year ended December 31, 2008, we recognized non-cash stock-based compensation expense of approximately $1.6 million, which is included in selling, general and administrative expense. We value options using the Black-Scholes option-pricing model which was developed for use in estimating the fair value of traded options. The risk-free rate is based on the U.S. Treasury yield curve published as of the grant date, with maturities approximating the expected term of the options. The expected term of the options was estimated using the simplified method as allowed by Staff Accounting Bulletin No. 110, whereby the average between the vesting period and contractual term is utilized. We believe this is an appropriate method because of the lack of historical option activity, as we believe our actual stock volatility in the last several years may not be representative of expected future volatility. Since we have been in bankruptcy, the expected volatility was estimated using both actual stock volatility and the volatility of an industry peer group. The following summarizes the assumptions used for estimating the fair value of stock options granted during 2008.

| | December 31, 2008 |
|---|---|
| Expected Volatility | 32.5% - 34.8% |
| Weighted Average Expected Volatility | 33.7% |
| Expected Term | 3.23 years - 3.73 years |
| Risk-Free Rate | 2.63% |
| Dividend Yield | 0% |

F-57

CC-BLG003761

**Notes to Consolidated Financial Statements (Continued)**

**20. Pension Plans and Other Postretirement Benefits Plans**

In September 2006, the FASB issued SFAS No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans." SFAS No. 158 requires an employer to recognize the funded status of defined benefit pension plans and other postretirement benefit plans as an asset or liability in its statement of financial position, and requires recognition in other comprehensive income of gains or losses and prior service costs or credits arising during the period but which are not included as components of net periodic benefit cost. Grace adopted the provisions of SFAS No. 158 as of December 31, 2006.

*Pension Plans* —Grace maintains defined benefit pension plans covering employees of certain units who meet age and service requirements. Benefits are generally based on final average salary and years of service. Grace funds its U.S. qualified pension plans ("U.S. qualified pension plans") in accordance with U.S. federal laws and regulations. Non-U.S. pension plans ("non-U.S. pension plans") are funded under a variety of methods, as required under local laws and customs.

Grace also provides, through nonqualified plans, supplemental pension benefits in excess of U.S. qualified pension plan limits imposed by federal tax law. These plans cover officers and higher-level employees and serve to increase the combined pension amount to the level that they otherwise would have received under the U.S. qualified pension plans in the absence of such limits. The nonqualified plans are unfunded and Grace pays the costs of benefits as they are incurred.

At the December 31, 2008 measurement date for Grace's defined benefit pension plans, the projected benefit obligation ("PBO") was approximately $1,380 million as measured under U.S. generally accepted accounting principles compared with $1,449 million as of December 31, 2007. The PBO basis reflects the present value (using a 6.25% discount rate for U.S. plans and a 6.24% weighted average discount rate for non-U.S. plans as of December 31, 2008) of vested and non-vested benefits earned from employee service to date, based upon current services and estimated future pay increases for active employees.

Beginning in 2007, on a quarterly basis, Grace analyzes pension assets and pension liabilities along with the resulting funded status and updates its estimate of these measures. Funded status is adjusted for contributions, benefit payments, actual return on assets, current discount rates and other identifiable and material actuarial changes.

At December 31, 2008, Grace's recorded pension liability for underfunded and unfunded plans was $641.9 million ($392.3 million included in "underfunded defined benefit pension plans", $136.7 million included in "unfunded pay-as-you-go defined benefit pension plans", $12.3 million included in "other current liabilities", and $100.6 million related to noncurrent supplemental pension benefits, included in "liabilities subject to compromise"). The recorded liability reflects 1) the shortfall between dedicated assets and the PBO of underfunded plans ($392.3 million); and 2) the PBO of unfunded pay-as-you-go plans ($249.6 million).

*Postretirement Benefits Other Than Pensions* —Grace provides postretirement health care and life insurance benefits for retired employees of certain U.S. business units and certain divested units. The postretirement medical plan provides various levels of benefits to employees hired before 1991 who retire from Grace after age 55 with at least 10 years of service. These plans are unfunded and Grace pays a portion of the costs of benefits under these plans as they are incurred. Grace applies SFAS No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions," which requires that the future costs of postretirement health care and life insurance benefits be accrued over the employees' years of service.

F-58

CC-BLG003762

**Notes to Consolidated Financial Statements (Continued)**

**20. Pension Plans and Other Postretirement Benefits Plans (Continued)**

Retirees and beneficiaries covered by the postretirement medical plan are required to contribute a minimum of 40% of the calculated premium for that coverage. During 2002, per capita costs under the retiree medical plans exceeded caps on the amount Grace was required to contribute under a 1993 amendment to the plan. As a result, for 2003 and future years, retirees will bear 100% of any increase in premium costs.

For 2008 measurement purposes, per capita costs, before retiree contributions, were assumed to initially increase at a rate of 8.5%. The rate is assumed to decrease gradually to 5% through 2014 and remain at that level thereafter. A one percentage point increase or decrease in assumed health care medical cost trend rates would not materially change Grace's postretirement benefit obligations (impact of less than $1 million) and would have a negligible impact on the aggregate of the service and interest cost components of net periodic benefit cost.

F-59

CC-BLG003763

**Notes to Consolidated Financial Statements (Continued)**

## 20. Pension Plans and Other Postretirement Benefits Plans (Continued)

*Analysis of Plan Accounting and Funded Status* —The following table summarizes the changes in benefit obligations and fair values of retirement plan assets during 2008 and 2007:

| Change in Financial Status of Retirement Plans | Defined Benefit Pension Plans | | | | | | Other Post-Retirement Plans | |
|---|---|---|---|---|---|---|---|---|
| | U.S. | | Non-U.S. | | Total | | | |
| | 2008 | 2007 | 2008 | 2007 | 2008 | 2007 | 2008 | 2007 |
| | | | | (in millions) | | | | |
| **Change in Projected Benefit Obligation (PBO)** | | | | | | | | |
| Benefit obligation at beginning of year | $1,032.6 | $1,044.1 | $ 416.4 | $ 388.9 | $1,449.0 | $1,433.0 | $ 84.0 | $ 72.7 |
| Service cost | 16.3 | 15.7 | 8.4 | 8.1 | 24.7 | 23.8 | 0.3 | 0.3 |
| Interest cost | 62.1 | 58.0 | 22.8 | 20.9 | 84.9 | 78.9 | 4.9 | 4.6 |
| Plan participants' contributions | — | — | 0.7 | 0.8 | 0.7 | 0.8 | — | — |
| Curtailments/settlements recognized | — | — | (2.6) | (0.1) | (2.6) | (0.1) | — | — |
| Actuarial (gain) loss | 0.2 | 2.7 | (29.1) | (5.3) | (28.9) | (2.6) | (9.4) | 11.4 |
| Medicare subsidy receipts | — | — | — | — | — | — | 0.5 | 4.8 |
| Benefits paid | (64.3) | (87.9) | (20.3) | (20.4) | (84.6) | (108.3) | (7.1) | (9.8) |
| Currency exchange translation adjustments | — | — | (63.4) | 23.5 | (63.4) | 23.5 | — | — |
| Benefit obligation at end of year | $1,046.9 | $1,032.6 | $ 332.9 | $ 416.4 | $1,379.8 | $1,449.0 | $ 73.2 | $ 84.0 |
| **Change in Plan Assets** | | | | | | | | |
| Fair value of plan assets at beginning of year | $ 773.7 | $ 737.2 | $ 314.4 | $ 283.5 | $1,088.1 | $1,020.7 | $ — | $ — |
| Actual return on plan assets | (203.1) | 43.3 | (3.1) | 15.4 | (206.2) | 58.7 | — | — |
| Employer contributions | 54.2 | 81.1 | 13.5 | 24.9 | 67.7 | 105.7 | 6.6 | 5.0 |
| Plan participants' contributions | — | — | 0.7 | 0.8 | 0.7 | 0.8 | — | — |
| Settlements recognized | — | — | (2.6) | — | (2.6) | — | — | — |
| Medicare subsidy receipts | — | — | — | — | — | — | 0.5 | 4.8 |
| Benefits paid | (64.3) | (87.9) | (20.3) | (20.4) | (84.6) | (108.3) | (7.1) | (9.8) |
| Currency exchange translation adjustments | — | — | (76.6) | 10.5 | (76.6) | 10.5 | — | — |
| Fair value of plan assets at end of year | $ 560.5 | $ 773.7 | $ 226.0 | $ 314.4 | $ 786.5 | $1,088.1 | $ — | $ — |
| Funded status at end of year (PBO basis) | $ (486.4) | $ (258.9) | $(106.9) | $(102.0) | $ (593.3) | $ (360.9) | $(73.2) | $(84.0) |
| **Amounts recognized in the Consolidated Balance Sheet consist of:** | | | | | | | | |
| Noncurrent assets | $ 0.2 | $ 1.5 | $ 48.4 | $ 52.6 | $ 48.6 | $ 54.1 | $ — | $ — |
| Current liabilities | (5.4) | (5.3) | (6.9) | (7.2) | (12.3) | (12.5) | (4.1) | (6.8) |
| Noncurrent liabilities | (481.2) | (255.1) | (148.4) | (147.4) | (629.6) | (402.5) | (69.1) | (77.2) |
| Net amount recognized | $ (486.4) | $ (258.9) | $(106.9) | $(102.0) | $ (593.3) | $ (360.9) | $(73.2) | $(84.0) |
| **Amounts recognized in Accumulated Other Comprehensive (Income) Loss consist of:** | | | | | | | | |
| Accumulated actuarial loss | $ 743.0 | $ 497.6 | $ 80.7 | $ 97.0 | $ 823.7 | $ 594.6 | $ 15.8 | $ 27.0 |
| Prior service cost (credit) | 6.5 | 8.0 | 0.3 | 1.0 | 6.8 | 9.0 | (8.1) | (16.7) |
| Net amount recognized | $ 749.5 | $ 505.6 | $ 81.0 | $ 98.0 | $ 830.5 | $ 603.6 | $ 7.7 | $ 10.3 |
| **Weighted Average Assumptions Used to Determine Benefit Obligations as of December 31** | | | | | | | | |
| Discount rate | 6.25% | 6.25% | 6.24% | 5.81% | NM | NM | 6.25% | 6.25% |
| Rate of compensation increase | 4.50% | 4.50% | 3.53% | 3.55% | NM | NM | NM | NM |
| **Weighted Average Assumptions Used to Determine Net Periodic Benefit Cost (Income) for Years Ended December 31** | | | | | | | | |
| Discount rate | 6.25% | 5.75% | 5.81% | 5.31% | NM | NM | 6.25% | 5.75% |
| Expected return on plan assets | 8.00% | 8.00% | 6.43% | 7.19% | NM | NM | NM | NM |
| Rate of compensation increase | 4.50% | 4.25% | 3.55% | 3.42% | NM | NM | NM | NM |

NM—Not meaningful

CC-BLG003764

**Notes to Consolidated Financial Statements (Continued)**

**20. Pension Plans and Other Postretirement Benefits Plans (Continued)**

| Components of Net Periodic Benefit Cost (Income) and Other Amounts Recognized In Other Comprehensive (Income) Loss | 2008 | | | 2007 | | | 2006 | | |
|---|---|---|---|---|---|---|---|---|---|
| | U.S. | Non-U.S. | Other | U.S. | Non-U.S. | Other | U.S. | Non-U.S. | Other |
| | | | | (in millions) | | | | | |
| **Net Periodic Benefit Cost (Income)** | | | | | | | | | |
| Service cost | $ 16.3 | $ 8.4 | $ 0.3 | $ 15.7 | $ 8.1 | $ 0.3 | $ 16.3 | $ 8.4 | $ 0.4 |
| Interest cost | 62.1 | 22.8 | 4.9 | 58.0 | 20.9 | 4.5 | 58.2 | 17.6 | 4.0 |
| Expected return on plan assets | (62.0) | (18.8) | — | (58.4) | (21.6) | — | (53.2) | (18.1) | — |
| Amortization of prior service cost (credit) | 1.5 | 0.7 | (8.5) | 2.4 | 0.7 | (10.0) | 2.5 | 0.7 | (10.5) |
| Amortization of net deferred actuarial loss | 19.9 | 4.9 | 1.7 | 21.1 | 5.3 | 1.9 | 23.0 | 8.1 | 0.4 |
| Net curtailment and settlement loss | — | 1.0 | — | 0.4 | — | — | — | — | — |
| Net periodic benefit cost (income) | $ 37.8 | $ 19.0 | $ (1.6) | $ 39.2 | $ 13.4 | $ (3.3) | $ 46.8 | $ 16.9 | $ (5.7) |
| **Other Changes in Plan Assets and Benefit Obligations Recognized in Other Comprehensive (Income) Loss** | | | | | | | | | |
| Net deferred actuarial (gain) loss | $265.3 | $(10.6) | $ (9.4) | $ 17.8 | $ — | $ 11.3 | N/A | N/A | N/A |
| Amortization of prior service cost (credit) | (1.5) | (0.7) | 8.5 | (2.8) | (0.7) | 10.0 | N/A | N/A | N/A |
| Amortization of net deferred actuarial loss | (19.9) | (5.8) | (1.7) | (21.1) | (5.4) | (1.9) | N/A | N/A | N/A |
| Total recognized in other comprehensive (income) loss | 243.9 | (17.1) | (2.6) | (6.1) | (6.1) | 19.4 | N/A | N/A | N/A |
| Total recognized in net periodic benefit cost (income) and other comprehensive (income) loss | $281.7 | $ 1.9 | $ (4.2) | $ 33.1 | $ 7.3 | $ 16.1 | N/A | N/A | N/A |

The estimated net deferred actuarial loss and prior service cost for the defined benefit pension plans that will be amortized from accumulated other comprehensive income into net periodic benefit cost (income) over the next fiscal year are $39.7 million and $1.4 million, respectively. The estimated net deferred actuarial loss and prior service credit for the other postretirement plans that will be amortized from accumulated other comprehensive income into net periodic benefit cost (income) over the next fiscal year are $1.1 million and $(4.1) million, respectively.

F-61

CC-BLG003765

**Notes to Consolidated Financial Statements (Continued)**

**20. Pension Plans and Other Postretirement Benefits Plans (Continued)**

| Funded Status of U.S. Pension Plans | Fully-Funded U.S.(1) Qualified Pension Plans | | | Underfunded U.S.(1) Qualified Pension Plans | | | Unfunded Pay-As-You-Go(2) U.S. Nonqualified Plans | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2007 | 2006 | 2008 | 2007 | 2006 | 2008 | 2007 | 2006 |
| | | | | | (In millions) | | | | |
| Projected benefit obligation | $ 0.3 | $ 6.8 | $ 7.4 | $ 940.6 | $ 925.0 | $ 941.1 | $ 106.0 | $ 100.8 | $ 95.6 |
| Fair value of plan assets | 0.5 | 8.3 | 10.1 | 560.0 | 765.4 | 727.1 | — | — | — |
| Funded status (PBO basis) | $ 0.2 | $ 1.5 | $ 2.7 | $(380.6) | $(159.6) | $(214.0) | $(106.0) | $(100.8) | $(95.6) |
| Benefits paid | $ — | $ (0.3) | $ (0.3) | $ (59.2) | $ (82.5) | $ (87.2) | $ (5.1) | $ (5.1) | $ (5.1) |
| Discount rate | 6.25% | 6.25% | 5.75% | 6.25% | 6.25% | 5.75% | 6.25% | 6.25% | 5.75% |

| Funded Status of Non-U.S. Pension Plans | Fully-Funded Non-U.S.(1) Pension Plans | | | Underfunded Non-U.S.(1) Pension Plans | | | Unfunded Pay-As-You-Go(2) Non-U.S. Pension Plans | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2007 | 2006 | 2008 | 2007 | 2006 | 2008 | 2007 | 2006 |
| | | | | | (In millions) | | | | |
| Projected benefit obligation | $169.1 | $248.0 | $236.4 | $ 20.2 | $23.3 | $20.3 | $ 143.6 | $ 145.1 | $ 132.2 |
| Fair value of plan assets | 217.5 | 300.6 | 272.1 | 8.5 | 13.8 | 11.4 | — | — | — |
| Funded status (PBO basis) | $ 48.4 | $ 52.6 | $ 35.7 | $(11.7) | $ (9.5) | $ (8.9) | $(143.6) | $(145.1) | $(132.2) |
| Benefits paid | $(10.7) | $(11.2) | $(10.1) | $ (2.3) | $ (2.8) | $ (0.8) | $ (7.3) | $ (6.4) | $ (5.3) |
| Weighted average discount rate | 6.58% | 5.77% | 5.30% | 6.92% | 8.16% | 7.46% | 5.74% | 5.49% | 4.99% |

(1)   Plans intended to be advance-funded.

(2)   Plans intended to be pay-as-you-go.

The accumulated benefit obligation for all defined benefit pension plans was approximately $1,311 million and $1,379 million as of December 31, 2008 and 2007, respectively.

| Pension Plans with Underfunded or Unfunded Accumulated Benefit Obligation | U.S. | | Non-U.S. | | Total | |
|---|---|---|---|---|---|---|
| | 2008 | 2007 | 2008 | 2007 | 2008 | 2007 |
| | | | (In millions) | | | |
| Projected benefit obligation | $1,046.6 | $1,025.8 | $159.8 | $163.8 | $1,206.4 | $1,189.6 |
| Accumulated benefit obligation | 1,008.5 | 992.6 | 143.8 | 147.6 | 1,152.3 | 1,140.2 |
| Fair value of plan assets | $ 560.0 | $ 765.4 | $ 4.8 | $ 9.4 | $ 564.8 | $ 774.8 |

F-62

CC-BLG003766

**Notes to Consolidated Financial Statements (Continued)**

**20. Pension Plans and Other Postretirement Benefits Plans (Continued)**

| Estimated Expected Future Benefit Payments Reflecting Future Service and Medicare Subsidy Receipts for the Fiscal Year(s) Ending | Pension Plans | | Other Postretirement Plans | | |
|---|---|---|---|---|---|
| | U.S.(3) | Non-U.S. (4) | | Medicare | Total Payments |
| | Benefit Payments | Benefit Payments | Benefit Payments | Subsidy Receipts | Net of Subsidy |
| | | | (in millions) | | |
| 2006 (actual) | $ 92.6 | $ 16.2 | $ 13.9 | $ — | $ 122.7 |
| 2007 (actual) | 87.9 | 20.4 | 9.8 | (4.8) | 113.3 |
| 2008 (actual) | 64.3 | 20.3 | 7.1 | (0.5) | 91.2 |
| 2009 | 66.2(5) | 17.0 | 7.9 | (3.8) | 87.3 |
| 2010 | 72.3 | 18.0 | 7.8 | (0.7) | 97.4 |
| 2011 | 73.2 | 18.3 | 7.7 | (0.1) | 99.1 |
| 2012 | 77.8 | 19.5 | 7.5 | (0.1) | 104.7 |
| 2013 | 79.1 | 20.9 | 7.3 | (0.1) | 107.2 |
| 2014—2018 | $ 415.7 | $ 116.4 | $ 33.2 | $ (0.2) | $ 565.1 |

(3)   Effective January 1, 2008 lump sum distributions from certain U.S. qualified pension plans were restricted based on the provisions of the Pension Protection Act of 2006 (the "Act"). During the period the plan is less than 100% funded after that date, the Act prohibits the distribution of lump sums to retiring participants while the Company remains under Chapter 11 of the U.S. Bankruptcy Code. The plan will be permitted to resume distributing lump sums to retiring participants under the Act at the date (1) the plan becomes 100% funded or (2) the Company is no longer in Chapter 11 and the plan is at least 80% funded, whichever is earlier.

(4)   Non-U.S. estimated benefit payments for 2009 and future periods have been translated at the applicable December 31, 2008 exchange rates.

(5)   Excludes $19 million of estimated future benefit payments from nonqualified plans that are restricted by the Bankruptcy Court.

**Discount Rate Assumption** —The assumed discount rate for pension plans reflects the market rates for high-quality corporate bonds currently available and is subject to change based on changes in the overall market interest rates. For the U.S. qualified pension plans, the assumed discount rate of 6.25% as of December 31, 2008 was selected by Grace, in consultation with its independent actuaries, based on a yield curve constructed from a portfolio of high quality bonds for which the timing and amount of cash outflows approximate the estimated payouts of the plan.

As of December 31, 2008 and 2007, the United Kingdom pension plan and German pension plans combined represented approximately 85% and 86%, respectively, of the benefit obligation of the non-U.S. pension plans. The assumed discount rates as of December 31, 2008 for the United Kingdom (6.50%) and Germany (5.75%) were selected by Grace, in consultation with its independent actuaries, based on yield curves constructed from a portfolio of Sterling and Euro denominated high quality bonds for which the timing and amount of cash outflows approximate the estimated payouts of the plans. The assumed discount rates for the remaining non-U.S. pension plans were determined based on the nature of the liabilities, local economic environments and available bond indices.

CC-BLG003767

Notes to Consolidated Financial Statements (Continued)

20. Pension Plans and Other Postretirement Benefits Plans (Continued)

*Investment Guidelines for Advance-Funded Pension Plans* —The target allocation of investment assets for 2009, the actual allocation at December 31, 2008 and 2007, and the expected long-term rate of return by asset category for Grace's U.S. qualified pension plans are as follows:

| | | Percentage of Plan Assets | | Weighted-Average Expected Long-Term Rate of Return |
| | Target Allocation | December 31, | | |
| U.S. Qualified Pension Plans Asset Category | 2009 | 2008 | 2007 | 2008 |
|---|---|---|---|---|
| U.S. equity securities | 45% | 43% | 45% | 4.46 |
| Non-U.S. equity securities | 15% | 15% | 16% | 0.76 |
| Short-term debt securities | 10% | 13% | 11% | 0.60 |
| Intermediate-term debt securities | 30% | 29% | 28% | 2.18 |
| Total | 100% | 100% | 100% | 8.00 |

The investment goal for the U.S. qualified pension plans, subject to advance funding, is to earn a long-term rate of return consistent with the related cash flow profile of the underlying benefit obligation.

The U.S. qualified pension plans have assets managed by five investment managers under investment guidelines summarized as follows:

- For debt securities: single issuers are limited to 5% of the portfolio's market value (with the exception of U.S. government and agency securities); the average credit quality of the portfolio shall be at least A rated; no more than 20% of the market value of the portfolio shall be invested in non-dollar denominated bonds; and privately placed securities are limited to no more than 50% of the portfolio's market value.

- For U.S. equity securities: the portfolio is entirely passively managed through investment in the Dow Jones Wilshire 5000 index fund, which is invested primarily in equity securities with the objective of approximating as closely as possible the capitalization weighted total rate of return of the entire U.S. market for publicly traded securities.

- For non-U.S. equity securities: no individual security shall represent more than 5% of the portfolio's market value at any time; investment in U.S. common stock securities is prohibited (with the exception of American Depository Receipts) and emerging market securities may represent up to 30% of the total portfolio's market value. Currency futures and forward contracts may be held for the sole purpose of hedging existing currency risk in the portfolio.

For 2008, the expected long-term rate of return on assets for the U.S. qualified pension plans was 8%. Average annual returns over one, two, three, five, ten and fifteen-year periods were (25.9%), (11.2%), (4.0%), 0.7%, 2.0%, and 4.9%, respectively. Significant negative returns across broad asset class categories in 2008 caused negative returns in periods less than three years.

The expected return on plan assets for the U.S. qualified pension plans is a conservative rate based on a comparison to historical actual returns and benchmark data. Grace looks at the trailing 20-year and 25-year returns on the plan portfolio under the current target equity to fixed income allocation of 60%/40% to determine a weighted-average rate of return based on historical data.

F-64

CC-BLG003768

**Notes to Consolidated Financial Statements (Continued)**

**20. Pension Plans and Other Postretirement Benefits Plans (Continued)**

These results are then compared with historical returns of balanced fund indices, as provided by our independent actuaries.

The balanced fund indices are composites of the S&P 500 and the Barclays Capital Gov't/Credit indices. Grace then evaluates the estimated rates and selects a rate that it believes to be reasonable and conservative, and submits that rate for review by our independent actuaries for reasonableness.

Non-U.S. pension plans accounted for approximately 29% of total global pension assets at December 31, 2008 and 2007. Each of these plans, where applicable, follows local requirements and regulations. Some of the local requirements include the establishment of a local pension committee, a formal statement of investment policy and procedures, and routine valuations by plan actuaries.

The target allocation of investment assets for non-U.S. pension plans varies depending on the investment goals of the individual plans. The plan assets of the United Kingdom pension plan represent approximately 83% and 82% of the total non-U.S. pension plan assets at December 31, 2008 and 2007, respectively. In determining the expected rate of return for the UK plan, the trustees' strategic investment policy has been considered together with long-term historical returns and investment community forecasts for each asset class. The expected return by sector has been combined with the actual asset allocation to determine the 2008 expected long-term return assumption of 6%.

The target allocation of investment assets for 2009, the actual allocation at December 31, 2008 and 2007, and the expected long-term rate of return by asset category for Grace's United Kingdom pension plan are as follows:

| United Kingdom Pension Plans Asset Category | Target Allocation 2009 | Percentage of Plan Assets December 31, 2008 | 2007 | Weighted-Average Expected Long-Term Rate of Return 2008 |
|---|---|---|---|---|
| Equity securities | 8% | 8% | 17% | 1.49 |
| U.K. gilts | 19% | 19% | 20% | 0.86 |
| U.K. corporate bonds | 63% | 63% | 63% | 3.65 |
| Cash/other | 10% | 10% | 0% | 0.00 |
| Total | 100% | 100% | 100% | 6.00 |

The plan assets of the Canadian pension plans represent approximately 6% and 7% of the total non-U.S. pension plan assets at December 31, 2008 and 2007, respectively. The target allocation of

F-65

CC-BLG003769

**Notes to Consolidated Financial Statements (Continued)**

**20. Pension Plans and Other Postretirement Benefits Plans (Continued)**

investment assets for 2009, the actual allocation at December 31, 2008 and 2007, and the expected long-term rate of return by asset category for Grace's Canadian pension plans are as follows:

| Canadian Pension Plans Asset Category | Target Allocation 2009 | Percentage of Plan Assets December 31, 2008 | Percentage of Plan Assets December 31, 2007 | Weighted-Average Expected Long-Term Rate of Return 2008 |
|---|---|---|---|---|
| Equity securities | 55% | 55% | 53% | 5.20 |
| Bonds | 45% | 45% | 47% | 2.80 |
| Total | 100% | 100% | 100% | 8.00 |

The plan assets of the other country plans represent approximately 11% in the aggregate (with no country representing more than 3% individually) of total non-U.S. pension plan assets at December 31, 2008 and 2007.

*Plan Contributions and Funding* —Subject to any required approval of the Bankruptcy Court, Grace intends to satisfy its funding obligations under the U.S. qualified pension plans and to comply with all of the requirements of the Employee Retirement Income Security Act of 1974 ("ERISA"). For ERISA purposes, funded status is calculated on a different basis than under U.S. generally accepted accounting principles. On June 18, 2008, Grace obtained Bankruptcy Court approval to fund minimum required payments of approximately $24 million for the period from July 2008 through January 2009. In that regard, Grace contributed approximately $11 million in September 2008, approximately $6 million in October 2008, and approximately $7 million in January 2009 to the trusts that hold assets of the U.S. qualified pension plans. While Grace intends to continue to fund all minimum required payments under the U.S. qualified pension plans, there can be no assurance that the Bankruptcy Court will continue to approve these payments. Based on the U.S. qualified pension plans' status as of December 31, 2008, Grace's ERISA funding obligations for 2009 would be approximately $39 million.

Contributions to non-U.S. pension plans are not subject to Bankruptcy Court approval and Grace intends to fund such plans based on applicable legal requirements and actuarial and trustee recommendations. Grace expects to contribute approximately $12 million to its non-U.S. pension plans and approximately $8 million (excluding any Medicare subsidy receipts) to its other postretirement plans in 2009.

Grace plans to pay benefits as they become due under virtually all pay-as-you-go plans and to maintain compliance with federal funding laws for its U.S. qualified pension plans.

**21. Operating Segment Information**

Grace is a global producer of specialty chemicals and materials. It generates revenues from two operating segments: Grace Davison, which includes specialty catalysts and specialty materials used in a wide range of refining, consumer industrial, packaging and life sciences applications; and Grace Construction Products, which includes specialty construction chemicals and specialty building materials used in commercial, infrastructure, and residential construction. Intersegment sales, eliminated in consolidation, are not material.

CC-BLG003770

**Notes to Consolidated Financial Statements (Continued)**

**21. Operating Segment Information (Continued)**

The table below presents information related to Grace's operating segments for the years ended December 31, 2008, 2007, and 2006. Only those corporate expenses directly related to the operating segments are allocated for reporting purposes. All remaining corporate items are reported separately and labeled as such.

**Operating Segment Data**

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| | (In millions) | | |
| **Net Sales** | | | |
| Grace Davison | $2,168.6 | $2,009.2 | $1,797.3 |
| Grace Construction Products | 1,148.4 | 1,106.0 | 1,029.2 |
| Total | $3,317.0 | $3,115.2 | $2,826.5 |
| **Pre-tax Operating Income** | | | |
| Grace Davison | $ 255.7 | $ 251.2 | $ 194.2 |
| Grace Construction Products | 140.9 | 149.3 | 138.6 |
| Corporate | (96.9) | (103.3) | (107.4) |
| Total | $ 299.7 | $ 297.2 | $ 225.4 |
| **Depreciation and Amortization** | | | |
| Grace Davison | $ 81.0 | $ 79.6 | $ 81.7 |
| Grace Construction Products | 35.7 | 31.6 | 30.6 |
| Corporate | 2.0 | 2.2 | 1.2 |
| Total | $ 118.7 | $ 113.4 | $ 113.5 |
| **Capital Expenditures** | | | |
| Grace Davison | $ 88.8 | $ 87.0 | $ 69.6 |
| Grace Construction Products | 35.8 | 38.2 | 40.0 |
| Corporate | 7.6 | 11.7 | 9.6 |
| Total | $ 132.2 | $ 136.9 | $ 119.2 |
| **Total Assets** | | | |
| Grace Davison | $1,208.9 | $1,232.8 | $1,102.7 |
| Grace Construction Products | 543.6 | 573.8 | 531.1 |
| Corporate | 2,123.0 | 2,101.8 | 2,028.1 |
| Total | $3,875.5 | $3,908.4 | $3,661.9 |

Corporate costs include expenses of corporate headquarters functions incurred in support of core operations, such as corporate finance, legal services, human resources management, communications and regulatory affairs. Corporate costs also include certain pension and postretirement benefits, including the amortization of deferred costs that are considered a core operating expense but not allocated to operating segments. Corporate assets include cash and cash equivalents, investment securities, cash value of life insurance policies, net of policy loans, deferred income taxes and asbestos insurance receivable.

F-67

CC-BLG003771

**Notes to Consolidated Financial Statements (Continued)**

**21. Operating Segment Information (Continued)**

The following table presents information related to the geographic areas in which Grace operated in 2008, 2007 and 2006. Sales are attributed to geographic areas based on customer location.

**Geographic Area Data**

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| | | (In millions) | |
| **Net Sales** | | | |
| United States | $1,078.2 | $1,020.7 | $1,032.3 |
| Canada and Puerto Rico | 101.5 | 94.2 | 126.5 |
| Total North America | 1,179.7 | 1,114.9 | 1,158.8 |
| Europe Africa | 1,320.1 | 1,295.7 | 1,071.0 |
| Asia Pacific | 582.9 | 502.5 | 443.2 |
| Latin America | 234.3 | 202.1 | 153.5 |
| Total | $3,317.0 | $3,115.2 | $2,826.5 |
| **Properties and Equipment, net** | | | |
| United States | $ 420.8 | $ 408.8 | $ 400.2 |
| Canada and Puerto Rico | 16.4 | 20.8 | 18.7 |
| Total North America | 437.2 | 429.6 | 418.9 |
| Europe Africa | 213.3 | 212.8 | 186.7 |
| Asia Pacific | 46.4 | 47.0 | 44.1 |
| Latin America | 13.7 | 16.7 | 14.8 |
| Total | $ 710.6 | $ 706.1 | $ 664.5 |
| **Goodwill and Other Assets** | | | |
| United States | $ 140.3 | $ 126.1 | $ 133.2 |
| Canada and Puerto Rico | 8.9 | 8.7 | 10.3 |
| Total North America | 149.2 | 134.8 | 143.5 |
| Europe Africa | 132.7 | 141.8 | 117.3 |
| Asia Pacific | 14.2 | 17.5 | 10.2 |
| Latin America | 14.8 | 18.9 | 15.4 |
| Total | $ 310.9 | $ 313.0 | $ 286.4 |

Cash value of life insurance policies, net of policy loans and asbestos-related insurance are held entirely in the U.S.

The pre-tax operating income for Grace's operating segments for the years ended December 31, 2008, 2007 and 2006 is reconciled below to income before income taxes and minority interest presented in the accompanying Consolidated Statements of Operations.

F-68

CC-BLG003772

**Notes to Consolidated Financial Statements (Continued)**

**21. Operating Segment Information (Continued)**

**Reconciliation of Operating Segment Data to Financial Statements**

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| | | (In millions) | |
| Pre-tax operating income—core operations | $299.7 | $297.2 | $225.4 |
| Minority interests in consolidated entities | 15.4 | 24.5 | 26.4 |
| Chapter 11 expenses, net of interest income | (65.8) | (86.4) | (49.9) |
| Net gain (loss) on sales of investments and disposals of assets | 14.1 | 1.9 | 0.6 |
| Provision for environmental remediation | (14.6) | (17.0) | (30.0) |
| Interest expense and related financing costs | (54.2) | (72.1) | (73.2) |
| Other, net | (53.4) | (35.9) | (61.5) |
| Income before income taxes and minority interest | $141.2 | $112.2 | $ 37.8 |

**22. Minority Interests in Consolidated Entities**

Within both Grace Davison and Grace Construction Products, Grace conducts certain business activities in various countries through joint ventures with unaffiliated third parties, the financial results of which are included in Grace's consolidated financial statements. Minority interest primarily pertains to Grace's ART joint venture with Chevron Products Company for the development and sale of hydroprocessing catalysts to the petroleum refining industry. Grace has a 55% economic interest in this joint venture. The following table presents summary financial statistics for Grace's combined businesses subject to profit sharing:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2008 | 2007 | 2006 |
| | | (In millions) | |
| Sales | $460.5 | $434.7 | $397.9 |
| Income before taxes | 36.7 | 55.9 | 61.4 |
| Net income | 34.2 | 48.7 | 66.4 |
| Minority interests in net income | 15.4 | 24.5 | 26.4 |
| Cash | 78.1 | 57.0 | 65.5 |
| Other current assets | 153.3 | 162.4 | 127.9 |
| Total assets | 252.8 | 236.6 | 206.7 |
| Total liabilities | 84.1 | 74.5 | 66.9 |
| Shareholders' equity | 168.7 | 162.1 | 139.8 |
| Minority interests in shareholders' equity | 73.1 | 73.2 | 61.0 |

F-69

CC-BLG003773

Notes to Consolidated Financial Statements (Continued)

**23. Quarterly Summary and Statistical Information (Unaudited)**

Quarterly Summary and Statistical Information *(Unaudited)*

| | March 31 | June 30 | September 30 | December 31 |
|---|---|---|---|---|
| | | (In millions, except per share) | | |
| **2008 (3)** | | | | |
| Net sales | $ 759.2 | $900.0 | $ 889.4 | $ 768.4 |
| Cost of goods sold | 519.8 | 624.0 | 633.4 | 561.5 |
| Net income | 17.7 | 32.1 | 28.3 | 43.4 |
| **Net income per share: (1)** | | | | |
| **Basic earnings per share:** | | | | |
| Net income | $ 0.24 | $ 0.45 | $ 0.39 | $ 0.60 |
| **Diluted earnings per share:** | | | | |
| Net income | 0.24 | 0.44 | 0.39 | 0.60 |
| **Market price of common stock: (2)** | | | | |
| High | $ 25.10 | $27.79 | $ 26.75 | $ 14.33 |
| Low | 16.50 | 23.44 | 13.75 | 3.01 |
| Close | 22.82 | 23.49 | 15.12 | 5.97 |

| | March 31 | June 30 | September 30 | December 31 |
|---|---|---|---|---|
| **2007 (4)** | | | | |
| Net sales | $ 715.6 | $812.8 | $ 783.1 | $ 803.7 |
| Cost of goods sold | 486.5 | 545.6 | 532.6 | 563.2 |
| Net income | 9.5 | 23.0 | 19.1 | 37.2 |
| **Net income per share: (1)** | | | | |
| **Basic earnings per share:** | | | | |
| Net income | $ 0.14 | $ 0.33 | $ 0.27 | $ 0.53 |
| **Diluted earnings per share:** | | | | |
| Net income | 0.13 | 0.32 | 0.27 | 0.52 |
| **Market price of common stock: (2)** | | | | |
| High | $ 26.83 | $29.92 | $ 27.08 | $ 30.65 |
| Low | 19.82 | 24.46 | 18.86 | 22.99 |
| Close | 26.42 | 24.49 | 26.86 | 26.18 |

(1)    Per share results for the four quarters may differ from full-year per share results, as a separate computation of the weighted average number of shares outstanding is made for each quarter presented.

(2)    Principal market: New York Stock Exchange.

(3)    In 2008 Grace changed its method of accounting for inventories from LIFO to FIFO. The effects of this change are as follows:

At June 30, 2008 and March 31, 2008, cost of goods sold changed by $(11.3) million and $(7.4) million, respectively. Net income changed by $7.1 million and $4.1 million, respectively. Diluted earnings per share changed by $0.10 and $0.05, respectively. Data as of December 31, 2008 and September 30, 2008 are originally reported under FIFO.

(4)    In 2008 Grace changed its method of accounting for inventories from LIFO to FIFO. The effects of this change are as follows:

At December 31, 2007; September 30, 2007; June 30, 2007; and March 31, 2007; cost of goods sold changed by $4.0 million, $(5.0) million, $(7.3) million and $(11.2) million, respectively. Net income changed by $(1.1) million, $2.4 million, $2.5 million and $4.7 million, respectively. Diluted earnings per share changed by $(0.01), $0.04, $0.03 and $0.06, respectively.

CC-BLG003774

**23. Quarterly Summary and Statistical Information (Unaudited) (Continued)**

SELECTED FINANCIAL DATA(1)

| | 2008 | 2007 | 2006(4) | 2005(4) | 2004(4) |
|---|---|---|---|---|---|
| | | | (In millions, except per share amounts) | | |
| **Statement of Operations** | | | | | |
| Net sales | $ 3,317.0 | $ 3,115.2 | $ 2,826.5 | $ 2,569.5 | $ 2,259.9 |
| Income (loss) from continuing operations before income taxes and minority interest(2) | 141.2 | 112.2 | 37.8 | 125.1 | (383.7) |
| Minority interests in consolidated entities | (15.4) | (24.5) | (26.4) | (23.1) | (10.0) |
| Net income (loss)(2) | 121.5 | 88.8 | 8.6 | 76.0 | (395.7) |
| **Financial Position** | | | | | |
| Cash and cash equivalents | $ 460.1 | $ 480.5 | $ 536.3 | $ 474.7 | $ 510.4 |
| Properties and equipment, net | 710.6 | 706.1 | 664.5 | 632.9 | 683.6 |
| Total assets | 3,875.5 | 3,908.4 | 3,662.0 | 3,580.8 | 3,584.3 |
| Total liabilities | 4,302.4 | 4,258.0 | 4,183.3 | 4,137.9 | 4,176.9 |
| Liabilities subject to compromise (a subset of total liabilities) | 3,112.9 | 3,277.5 | 3,221.6 | 3,155.1 | 3,207.7 |
| Shareholders' equity (deficit) | (426.9) | (349.6) | (521.3) | (557.1) | (592.6) |
| **Cash Flow** | | | | | |
| Operating activities | $ (0.1)(3) | $ 88.2 | $ 152.7 | $ 67.3 | $ 325.4 |
| Investing activities | (31.1) | (206.9) | (129.4) | (77.9) | (138.0) |
| Financing activities | 15.7 | 45.7 | 21.9 | (10.1) | (0.7) |
| Net cash flow | (20.4) | (55.8) | 61.6 | (35.7) | 201.2 |
| **Data Per Common Share (Diluted)** | | | | | |
| Net income (loss)(2) | $ 1.68 | $ 1.24 | $ 0.13 | $ 1.13 | $ (6.01) |
| Average common diluted shares outstanding (millions) | 72.5 | 71.6 | 68.3 | 67.3 | 65.8 |
| **Other Statistics** | | | | | |
| Capital expenditures | $ 132.2 | $ 136.9 | $ 119.2 | $ 94.0 | $ 75.3 |
| Common stock price range | $3.01-27.79 | $18.86-30.65 | $8.12-20.35 | $6.75-13.79 | $2.51-14.95 |
| Common shareholders of record | 8,801 | 9,153 | 9,522 | 9,883 | 10,275 |
| Number of employees (approximately) | 6,300 | 6,500 | 6,500 | 6,400 | 6,500 |

(1)  Certain prior-year amounts have been reclassified to conform to the 2008 presentation.

(2)  Amounts in 2008, 2007, 2006, and 2005 contain provisions for environmental remediation of $14.6, $17.0 million, $30.0 million, and $25.0 million, respectively. Amounts in 2004 reflect the following adjustments: a $714.8 million pre-tax charge to increase Grace's recorded asbestos-related liability to the maximum amount permitted as a condition precedent under Grace's November 2004 plan of reorganization (the "Prior Plan"); a pre-tax credit for expected insurance recovery related to asbestos liabilities of $238.2 million; a $94.1 million pre-tax charge to increase the interest to which general unsecured creditors would be entitled under the Prior Plan; a $151.7 million pre-tax credit for net income tax benefits related to the above items; and an $82.0 million tax liability on the expected taxable distributions from foreign subsidiaries to fund the Prior Plan.

(3)  The amount for 2008 reflects a payment of $252 million related to the settlement of the cost recovery claim with respect to Libby, Montana.

(4)  In 2008, Grace changed its method of accounting for inventories from LIFO to FIFO. The effects of this change are as follows:

In 2004, loss from continuing operations, minority interest and net loss changed by $11.4 million, $(1.3) million, and $6.6 million, respectively. Total assets, total liabilities and shareholder's deficit changed by $31.2 million, $2.0 million and $29.2 million, respectively. Net loss per common share changed by $0.10.

In 2005, income from continuing operations, minority interest and net income changed by $15.4 million, $(2.0) million, and $8.7 million, respectively. Total assets, total liabilities and shareholder's deficit changed by $42.2 million, $4.0 million and $38.2 million, respectively. Net loss per common share changed by $0.13.

In 2006, total assets, total liabilities and shareholder's deficit changed by $24.6 million, $(3.9) million and $28.5 million, respectively.

Reference Note 10 for the impact to the 2006 statement of operations and data per common share, and for the impact to 2007.

CC-BLG003775

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION
## AND RESULTS OF OPERATIONS

**Results of Operations**

*Financial Summary for December 31, 2008*

Following is a summary of our financial performance for the year ended December 31, 2008 compared with the prior year.

*Grace*

- Sales for the year ended December 31, 2008 were $3,317.0 million compared with $3,115.2 million for the prior year, a 6.5% increase (3.5% increase before the effects of currency translation). The increase was attributable to higher selling prices in response to rising raw materials costs and favorable currency translation.

- Net income for 2008 was $121.5 million compared with net income in 2007 of $88.8 million. The current year and prior year periods were negatively affected by Chapter 11 expenses, litigation and other matters not related to core operations.

- Pre-tax income from core operations was $299.7 million for the year ended December 31, 2008, up 0.8% from the prior year. Price increases totaled approximately $150 million in the year ended December 31, 2008, increasing sales approximately 4.8% when compared with the prior year. Inflation on raw materials (excluding metals) and energy costs totaled approximately $160 million in the year ended December 31, 2008, increasing costs approximately 15% when compared with the prior year.

*Operating Segments*

- Sales of the Grace Davison operating segment for the year ended December 31, 2008 were $2,168.6 million, up 7.9% over the prior year. Full year pre-tax operating income was $255.7 million, a 1.8% increase over the prior year, with operating margins at 11.8%, compared with 12.5% for the prior year. Full year operating margins declined primarily due to raw materials and energy cost inflation.

- Sales of the Grace Construction Products operating segment for the year ended December 31, 2008 were $1,148.4 million, up 3.8% over the prior year. Full-year pre-tax operating income was $140.9 million compared with $149.3 million for the prior year, a 5.6% decrease, reflecting weakness in the U.S. and European construction markets and raw materials cost inflation. Operating margin of 12.3% for the year ended December 31, 2008 was down 1.2 percentage points compared with the prior year.

- Corporate costs related to core operations were $96.9 million for the year ended December 31, 2008, compared with $103.3 million in 2007, a decrease of 6.2%, primarily due to lower employment-related costs.

*Cash Flow and Liquidity*

- Net cash provided by operating activities for the full year ended December 31, 2008 was $1.6 million, compared with $88.2 million for the prior year. In response to lower customer demand during the fourth quarter of 2008, production at over 50 Grace plants worldwide was stopped or slowed and raw materials purchases were significantly reduced. As a result of these actions and ongoing cash productivity initiatives, net working capital was reduced by $132 million during the fourth quarter. Net cash provided by operating activities in 2008

F-72

CC-BLG003776

includes a payment of $252 million related to the previously announced settlement of certain environmental claims relating to our former vermiculite operations in Libby, Montana.

- At December 31, 2008, Grace had available liquidity of approximately $715.4 million, consisting of $460.1 million in cash and cash equivalents, $21.6 million in short-term investment securities, $67.2 million in net cash value of life insurance policies, approximately $65.6 million of available credit under various non-U.S. credit facilities and approximately $100.9 million of available credit under its $165.0 million debtor-in-possession ("DIP") facility.

### First Quarter Outlook

For the first quarter of 2009, we expect pre-tax income from core operations to be negative. We expect first quarter results to be unfavorably affected by three factors as follows:

- Grace Construction Products sales volumes are typically lowest in the first quarter of each year due to seasonal factors.

- We expect our costs of goods sold in the first quarter to reflect the high raw materials and energy costs that we experienced in the fourth quarter of 2008. Further, we intend to further reduce our production volumes and inventory levels in the first quarter and, as a result, we will experience less favorable fixed cost absorption resulting in a lower gross profit percentage.

- We expect to incur restructuring charges of approximately $20 million in the first quarter from previously announced cost reduction actions.

We expect cash flow to be positive for the first quarter. We expect improvements in net working capital, including the reduction in inventories referenced above, and reductions in capital expenditures. In addition, we expect pre-tax income from core operations to include significant non-cash costs in the first quarter, including in cost of goods sold as discussed above and in pension expense.

### Summary Description of Core Business

We are engaged in specialty chemicals and specialty materials businesses on a worldwide basis through two operating segments. Our Grace Davison operating segment accounts for approximately 65% of our total sales. Grace Construction Products accounts for approximately 35% of total sales.

*Grace Davison* includes specialty catalysts and materials used in a wide range of industrial applications that we manage through the following product groups:

- *Refining Technologies* includes fluid catalytic cracking, or FCC, and hydroprocessing catalysts and chemical additives used by petroleum refineries;

- *Materials Technologies* includes engineered materials, coatings and sealants used in numerous industrial, consumer and packaging applications; and

- *Specialty Technologies* includes highly specialized catalysts and materials used in unique or proprietary applications and markets.

Key external factors for our Refining Technologies product group are the economics of the petroleum refining industry, specifically the impacts of demand for transportation fuels and petrochemical products, and crude oil supply. FCC catalysts and some hydroprocessing catalysts are consumed at a relatively steady rate and replaced regularly, while other hydroprocessing catalysts are consumed over a period of years and replaced in an irregular pattern. Sales of our Materials Technologies and Specialty Technologies product groups are affected by global economic conditions, including the underlying growth rate of targeted end-use applications.

CC-BLG003777

*Grace Construction Products* includes specialty construction chemicals and specialty building materials used in commercial, infrastructure and residential construction that we manage by geographic region as follows:

- *GCP Americas* includes products sold to customers in North, Central and South America;

- *GCP Europe* includes products sold to customers in Eastern and Western Europe, the Middle East, Africa and India; and

- *GCP Asia* includes products sold to customers in Asia (excluding India), Australia and New Zealand.

Construction Products sales are heavily influenced by global non-residential construction activity and U.S. residential construction activity.

For a description of our core business, see Item 1 (Business) of this Report.

*Global scope*

We operate our business on a global scale with approximately 68% of our sales and over 50% of our operating properties outside the United States. We conduct business in over 40 countries and in more than 20 currencies. We manage our operating segments on a global basis, to serve global markets. Currency fluctuations in relation to the U.S. dollar affect our reported earnings, net assets and cash flows.

**Summary Financial Information and Metrics**

Set forth below are our key operating statistics with dollar and percentage changes for the years ended December 31, 2008, 2007 and 2006. Please refer to this Analysis of Continuing Operations when reading Management's Discussion and Analysis of Financial Condition and Results of Operations.

In the Analysis of Continuing Operations, as well as in the financial information presented throughout Management's Discussion and Analysis of Financial Condition and Results of Operations, we present our financial results in the same manner as results are reviewed internally. We review our results of operations by operating segment and separate "core operations" from "noncore activities." Core operations include the financial results of Grace Davison, Grace Construction Products, and the costs of corporate activities that directly or indirectly support our business operations. In contrast, noncore activities include all other events and transactions not directly related to the generation of operating revenue or the support of our core operations and generally relate to our former operations and products. See "Pre-tax Income (Loss) from Noncore Activities" for more information about noncore activities. We use pre-tax income from core operations as the profitability factor in all significant business decisions and as a performance factor in determining certain incentive compensation.

Pre-tax income from core operations, pre-tax loss from noncore activities, pre-tax income from core operations as a percentage of sales, and pre-tax income from core operations before depreciation and amortization do not purport to represent income or cash flow measures as defined under U.S. generally accepted accounting principles, and you should not consider them an alternative to such measures as an indicator of our performance. We provide these measures so you can distinguish the operating results of our current business base from the income and expenses of our past businesses, discontinued products, and corporate legacies, and the effect of our Chapter 11 proceedings, and to ensure that you understand the key data that management uses to evaluate our results of operations.

CC-BLG003778

Pre-tax income from core operations has material limitations as an operating performance measure because it excludes income and expenses that comprise our noncore activities, which include, among other things, provisions for asbestos-related litigation and environmental remediation, income from insurance settlements, and legal costs, which have been material components of our net income. Pre-tax income from core operations before depreciation and amortization also has material limitations as an operating performance measure since it excludes the impact of depreciation and amortization expense. Our business is substantially dependent on the successful deployment of our capital assets; therefore, depreciation and amortization expense is a necessary element of our costs and ability to generate revenue. We compensate for the limitations of these measurements by using these indicators together with net income as measured under U.S. generally accepted accounting principles to present a complete analysis of our results of operations. You should evaluate pre-tax income from core operations and pre-tax income from core operations

CC-BLG003779

before depreciation and amortization in conjunction with net income for a more complete analysis of our financial results.

| Analysis of Continuing Operations | 2008 | 2007 | $ Change Fav (Unfav) | % Change Fav (Unfav) (in millions) | 2006 | $ Change Fav (Unfav) | % Change Fav (Unfav) |
|---|---|---|---|---|---|---|---|
| **Net sales:** | | | | | | | |
| Grace Davison | $2,168.6 | $2,009.2 | $ 159.4 | 7.9% | $1,797.3 | $ 211.9 | 11.8% |
| Refining Technologies | 1,099.1 | 971.1 | 128.0 | 13.2% | 859.1 | 112.0 | 13.0% |
| Materials Technologies | 694.8 | 663.5 | 31.3 | 4.7% | 592.8 | 70.7 | 11.9% |
| Specialty Technologies | 374.7 | 374.6 | 0.1 | 0.0% | 345.4 | 29.2 | 8.5% |
| Grace Construction Products | 1,148.4 | 1,106.0 | 42.4 | 3.8% | 1,029.2 | 76.8 | 7.5% |
| Americas | 595.0 | 587.1 | 7.9 | 1.3% | 601.4 | (14.3) | (2.4)% |
| Europe | 407.1 | 380.6 | 26.5 | 7.0% | 309.6 | 71.0 | 22.9% |
| Asia | 146.3 | 138.3 | 8.0 | 5.8% | 118.2 | 20.1 | 17.0% |
| **Total Grace net sales** | $3,317.0 | $3,115.2 | $ 201.8 | 6.5% | $2,826.5 | $ 288.7 | 10.2% |
| **Pre-tax operating income:** | | | | | | | |
| Grace Davison(1) | $ 255.7 | $ 251.2 | $ 4.5 | 1.8% | $ 194.2 | $ 57.0 | 29.4% |
| Grace Construction Products(2) | 140.9 | 149.3 | (8.4) | (5.6)% | 138.6 | 10.7 | 7.7% |
| Corporate costs: | | | | | | | |
| Support functions | (47.8) | (46.8) | (1.0) | (2.1)% | (46.3) | (0.5) | (1.1)% |
| Pension, performance-related compensation, and other | (49.1) | (56.5) | 7.4 | 13.1% | (61.1) | 4.6 | 7.5% |
| Total Corporate costs | (96.9) | (103.3) | 6.4 | 6.2% | (107.4) | 4.1 | 3.8% |
| Pre-tax income from core operations | 299.7 | 297.2 | 2.5 | 0.8% | 225.4 | 71.8 | 31.9% |
| Pre-tax income (loss) from noncore activities | (57.7) | (58.6) | 0.9 | 1.5% | (97.7) | 39.1 | 40.0% |
| Interest expense | (54.2) | (72.1) | 17.9 | 24.8% | (73.2) | 1.1 | 1.5% |
| Interest income | 3.3 | 7.6 | (3.8) | (50.0)% | 6.8 | 0.8 | 11.8% |
| Income before Chapter 11 expenses and income taxes | 191.6 | 174.1 | 17.5 | 10.1% | 61.3 | 112.8 | 184.0% |
| Chapter 11 expenses, net of interest income | (65.8) | (86.4) | 20.6 | 23.8% | (49.9) | (36.5) | (73.1)% |
| Benefit from (provision for) income taxes | (4.3) | 1.1 | (5.4) | NM | (2.8) | 3.9 | 139.3% |
| **Net Income** | $ 121.5 | $ 88.8 | $ 32.7 | 36.8% | $ 8.6 | $ 80.2 | NM |
| **Key Financial Measures:** | | | | | | | |
| Pre-tax income from core operations as a percentage of sales: | | | | | | | |
| Grace Davison | 11.8% | 12.5% | NM | (0.7)pts | 10.8% | NM | 1.7pts |
| Grace Construction Products | 12.3% | 13.5% | NM | (1.2)pts | 13.5% | NM | 0.0pts |
| Total Core Operations | 9.0% | 9.5% | NM | (0.5)pts | 8.0% | NM | 1.5pts |
| Total Core Operations adjusted for profit sharing of joint ventures(3) | 9.5% | 10.3% | NM | (0.8)pts | 8.9% | NM | 1.4pts |
| Pre-tax income from core operations before depreciation and amortization | $ 418.4 | $ 410.6 | $ 7.8 | 1.9% | $ 338.9 | $ 71.7 | 21.2% |
| As a percentage of sales | 12.6% | 13.2% | NM | (0.6)pts | 12.0% | NM | 1.2pts |
| Depreciation and amortization | $ 118.7 | $ 113.4 | $ (5.3) | (4.7)% | $ 113.5 | $ 0.1 | 0.1% |
| Gross profit percentage (sales less cost of goods sold as a percent of sales)(4) : | | | | | | | |
| Grace Davison | 27.2% | 29.3% | NM | (2.1)pts | 28.5% | NM | 0.8pts |
| Grace Construction Products | 34.5% | 36.5% | NM | (2.0)pts | 36.2% | NM | 0.3pts |
| Total Grace | 29.5% | 31.7% | NM | (2.2)pts | 31.1% | NM | 0.6pts |
| Net Consolidated Sales by Region: | | | | | | | |
| North America | $1,179.7 | $1,114.9 | $ 64.8 | 5.8% | $1,158.8 | $ (43.9) | (3.8)% |
| Europe Africa | 1,320.1 | 1,295.7 | 24.4 | 1.9% | 1,071.0 | 224.7 | 21.0% |
| Asia Pacific | 582.9 | 502.5 | 80.4 | 16.0% | 443.2 | 59.3 | 13.4% |
| Latin America | 234.3 | 202.1 | 32.2 | 15.9% | 153.5 | 48.6 | 31.7% |
| Total | $3,317.0 | $3,115.2 | $ 201.8 | 6.5% | $2,826.5 | $ 288.7 | 10.2% |

NM = Not meaningful

(1) Grace Davison pre-tax operating income includes minority interest expense related to the Advanced Refining Technologies joint venture.

(2) Grace Construction Products pre-tax operating income includes minority interest expense related to consolidated joint ventures.

(3) Reflects the add-back of minority interest expense.

(4) Includes depreciation and amortization related to manufacturing of products.

F-76

CC-BLG003780

*Grace Overview*

Following is an overview of our financial performance for the years ended December 31, 2008, 2007 and 2006.

*Net Sales*



The following table identifies the year-over-year increase or decrease in sales attributable to changes in product volume, product price and/or mix, metals volumes and prices, and the impact of foreign currency translation.

| Net Sales Variance Analysis | 2008 as a Percentage Increase (Decrease) from 2007 | | | | |
|---|---|---|---|---|---|
| | Volume | Price/Mix | Currency Translation | Metals | Total |
| Grace Davison | (0.6)% | 5.4% | 3.3% | (0.2)% | 7.9% |
| Grace Construction Products | (1.8)% | 3.4% | 2.2% | N/A | 3.8% |
| Net sales | (1.0)% | 4.6% | 3.0% | (0.1)% | 6.5% |
| **By Region:** | | | | | |
| North America | (1.9)% | 6.6% | 0.2% | 0.9% | 5.8% |
| Europe Africa | (4.4)% | 2.6% | 5.9% | (2.2)% | 1.9% |
| Asia Pacific | 6.9% | 4.3% | 1.5% | 3.3% | 16.0% |
| Latin America | 5.9% | 7.8% | 3.2% | (1.0)% | 15.9% |

| Net Sales Variance Analysis | 2007 as a Percentage Increase (Decrease) from 2006 | | | | |
|---|---|---|---|---|---|
| | Volume | Price/Mix | Currency Translation | Metals | Total |
| Grace Davison | 2.8% | 3.2% | 3.7% | 2.1% | 11.8% |
| Grace Construction Products | 0.8% | 2.8% | 3.9% | N/A | 7.5% |
| Net sales | 2.1% | 3.0% | 3.8% | 1.3% | 10.2% |
| **By Region:** | | | | | |
| North America | (6.0)% | 2.3% | 0.2% | (0.3)% | (3.8)% |
| Europe Africa | 7.1% | 3.7% | 8.1% | 2.1% | 21.0% |
| Asia Pacific | 3.9% | 2.8% | 2.9% | 3.8% | 13.4% |
| Latin America | 23.1% | 4.2% | 3.2% | 1.2% | 31.7% |

F-77

CC-BLG003781