Pricing actions, totaling approximately $150 million for the year, were implemented during 2008 in all product groups and in all regions in response to rising raw materials costs. However, the positive impact in 2008 of increased selling prices and foreign currency translation was partially offset by lower sales volumes in both operating segments.

Sales for both operating segments were favorably affected in 2007 by foreign currency translation and by higher selling prices in response to rising raw materials costs. Volumes were up overall in both operating segments, but sales of Grace Construction Products in North America were negatively affected by weakening demand in residential construction in the United States. Sales of Grace Davison were positively affected in 2007 by increased pricing on certain metals. Acquisitions contributed $13.1 million or 0.5 percentage points of the sales growth.

*Pre-tax Income from Core Operations*



**Grace**
**Operating Income and Margin**
**($ in millions)**

Operating profit increased year-over-year for the three-year period ended December 31, 2008. The increase in 2008 over 2007 was primarily due to selling price increases, estimated at $150 million, and productivity improvements, which offset the unfavorable impacts of raw materials cost inflation, estimated at $160 million. Cost containment actions implemented in the operating segments and the corporate functional areas mitigated the negative effect of lower volumes on 2008 operating profit.

The increase in operating profit in 2007 over 2006 was mainly due to increased sales volumes and selling price increases, partially offset by raw materials cost inflation.

Lower employment-related costs had a favorable impact on corporate costs in both 2008 and 2007.

Operating margin increased from 8.0% in 2006 to 9.5% in 2007 due primarily to higher sales volumes, improved pricing and improved productivity. Operating margin decreased to 9.0% in 2008 due primarily to lower sales volumes and increased raw materials and energy costs. Higher selling prices in 2008 largely offset the impact of these higher costs on operating income, but did not fully offset their impact on operating margin.

As a result of unprecedented volatility in raw materials costs in 2008, we are reviewing pricing in our contracts with customers and suppliers more frequently. Also, we have accelerated programs to

CC-BLG003782

identify alternate suppliers and to qualify substitute raw materials where doing so will help us further mitigate high raw materials costs.

As discussed further in the Operating Segment Overview, we have implemented cost reduction initiatives throughout our operations. We have reduced production and raw materials purchases, and continue to reduce inventory levels. In the first quarter of 2009, we announced restructuring actions to further reduce our operating costs. We expect to record charges related to these restructurings of approximately $20 million in the first quarter.

*Operating Segment Overview—Grace Davison*

Following is an overview of the financial performance of Grace Davison for the three years ended December 31, 2008, 2007, and 2006.

*Net Sales*



**Grace Davison Net Sales**
**($ in millions)**

Grace Davison operating segment sales are reported in the following product groups:

|  | 2008 | 2008 vs. 2007 | 2007 | 2007 vs. 2006 | 2006 |
|---|---|---|---|---|---|
|  | Sales | | Sales | | Sales |
|  | | | (in millions) | | |
| Refining Technologies | $1,099.1 | 13.2% | $ 971.1 | 13.0% | $ 859.1 |
| Materials Technologies | 694.8 | 4.7% | 663.5 | 11.9% | 592.8 |
| Specialty Technologies | 374.7 | 0.0% | 374.6 | 8.5% | 345.4 |
| **Total Grace Davison Revenue** | **$2,168.6** | **7.9%** | **$2,009.2** | **11.8%** | **$1,797.3** |

• *Refining Technologies*—sales were up 13.2% and 13.0% in 2008 and 2007, respectively.

The strong global economy over the three-year period resulted in increased demand for transportation fuels and strong volume growth in our FCC catalysts and additives. During 2006, 2007 and 2008, refinery FCC units ran at high capacity utilization rates, and new refining capacity came on line in the Middle East and Asia to meet increasing demand for transportation fuels and other refinery products. As the price of crude oil increased in this environment, refineries processed heavier, lower quality and less expensive feedstocks, which further increased demand for our catalysts and additives, especially our Midas® catalyst series. In addition, refiners' product mix shifted toward increased diesel production, which increased sales of our Midas® catalysts, as well as our hydroprocessing catalysts.

CC-BLG003783

Notwithstanding this shift in refiners' product mix, sales volumes of hydroprocessing catalysts were down in 2008 and 2007. Due to regulatory changes mandating lower sulfur content in diesel transportation fuel, 2006 was an exceptionally strong volume year for hydroprocessing catalysts.

The global economy slowed significantly in the fourth quarter of 2008. Sales volumes for our Refining Technologies products were down in the fourth quarter of 2008 compared to the prior year quarter.

Price increases contributed to sales growth over the three-year period. As the global economy grew in 2007 and through most of 2008, costs for the raw materials and energy used to produce our Refining Technologies products increased significantly, especially in the first two quarters of 2008. We raised our prices to offset these rising costs.

Foreign currency translation had a favorable effect on sales in both 2008 and 2007.

- *Materials Technologies* —sales were up 4.7% and 11.9% in 2008 and 2007, respectively.

Sales increased in 2007 over 2006 due to growth in existing markets and expansion in emerging regions. In the housing/building industry, sales of our molecular sieve products for dual pane windows in Europe increased. Sales of our silica gel in coatings were up as homeowners invested in home renovations and new furniture. In the industrial segment, our precipitated silica sales into the tire industry were strong. In the food and personal care segment grew, benefiting from population growth, especially in emerging regions, and increases in disposable income. Sales volumes for our Materials Technologies products declined in 2008, with the most pronounced decrease in the fourth quarter, when volumes were down more than 11% compared with the prior year quarter. Although consumer markets remained relatively stable, the automotive and building industries slowed significantly.

Increased selling prices, to offset higher raw materials and energy costs, had a favorable impact on sales. In addition, we changed the mix of our sales to emphasize higher value applications. We also introduced new products such as precipitated silicas for toothpaste and tire applications, and launched new packaging products in response to regulatory changes.

Foreign currency translation had a favorable effect on sales in both 2008 and 2007.

- *Specialty Technologies* —sales were flat for 2008 and up 8.5% in 2007.

Sales volume was up sequentially from 2006 through 2008 due to market growth, new product introductions, and geographic expansion. Continued strength in the polyolefin market caused sales growth for our catalysts and catalyst components for the production of resins used in high performance plastic pipes, plastic films and household containers. We introduced new products for polypropylene and specialty chemical synthesis and for processing renewable fuels. In the fourth quarter of 2008, global petrochemical prices and demand fell sharply as the global economy slowed. Polyethylene production decreased significantly in the fourth quarter of 2008, as customers reduced operating rates, and sales of our specialty technologies products decreased by over 6% compared to the prior year quarter.

Increased selling prices, in response to rising raw materials and energy costs, and favorable foreign currency translation, contributed to sales growth over the three-year period.

F-80

CC-BLG003784

*Operating Income and Margin*





Grace Davison
Operating Income and Margin
($ in millions)

Pre-tax operating income increased year-over-year for the three-year period primarily due to higher selling prices, productivity, and favorable foreign currency translation, offsetting higher raw materials and energy costs. Higher sales volume contributed to the increase in operating income in 2007 over 2006, but business slowed significantly in the fourth quarter of 2008, resulting in lower volumes in 2008.

Raw materials and energy costs increased rapidly at an accelerated rate in 2008. Price increases that we implemented in 2008 partially offset the higher raw materials and energy costs, but growth in 2008 operating income slowed considerably versus 2007, and operating margin declined.

During 2008, we focused our productivity efforts on four areas: quality, capacity, energy, and yield. By reducing manufacturing variability we produced a more consistent and reliable product. By shifting volume to our lowest cost manufacturing locations, we reduced our per unit costs and avoided certain capital investments. We reduced energy consumption by more than 5% in 2008 through better energy recycling and recovery, and decreased usage. Our waste reduction efforts enabled our manufacturing plants to use more of the product they produce, improving our cost position in raw materials, energy use and waste disposal.

Demand from our customers slowed sharply late in 2008. We implemented cost reduction initiatives and stopped or slowed production and raw materials purchases throughout our manufacturing operations. We reduced inventory levels in the fourth quarter of 2008, and expect to further reduce inventories in 2009. In the first quarter of 2009, we announced restructuring actions to further reduce operating costs.

Because we reduced production and inventory levels in the fourth quarter of 2008, manufacturing costs that were or would otherwise have been capitalized in inventories were charged to cost of goods sold, unfavorably affecting gross profit and gross profit percentage. We expect gross profit and gross profit percentage will continue to be unfavorably affected in 2009 as we continue to manage down production and inventory levels.

The cost of purchasing raw materials and energy peaked for Grace Davison in the fourth quarter of 2008. These high costs were capitalized in 2008 but will be included in cost of goods sold in

F-81

CC-BLG003785

2009. We expect a significant unfavorable affect on gross profit and gross profit percentage in the first quarter of 2009.

Although the costs of several of our raw materials declined in the fourth quarter of 2008, costs for certain raw materials, including caustic soda and some rare earths, remained high. Molybdenum is a key raw material in our hydroprocessing catalysts. Generally, we pass the cost of molybdenum through to our customers. However, during the fourth quarter of 2008, molybdenum prices decreased so rapidly and significantly that we were unable to fully pass through the actual amounts that we paid for molybdenum, primarily due to the timing of molybdenum purchases and finished product sales. These timing issues unfavorably affected our margins in the fourth quarter of 2008 and we expect this effect to continue in the first quarter of 2009.

### Operating Segment Overview—Grace Construction Products

Following is an overview of the financial performance of Grace Construction Products for the three years ended December 31, 2008, 2007, and 2006.

*Net Sales*



**Grace Construction Products Net Sales**
**($ in millions)**

$1,200 —
$1,100 —                          $1,106.0        $1,148.4
$1,000 —          $1,029.2
$900 —
$800 —
          2006              2007            2008

Grace Construction Products sales are reported by geographic regions as follows:

|  | 2008 | 2008 vs 2007 | 2007 | 2007 vs. 2006 | 2006 |
|---|---|---|---|---|---|
|  | Sales | | Sales (in millions) | | Sales |
| GCP Americas | $ 595.0 | 1.3% | $ 587.1 | (2.4)% | $ 601.4 |
| GCP Europe Africa* | 407.1 | 7.0% | 380.6 | 22.9% | 309.6 |
| GCP Asia Pacific | 146.3 | 5.8% | 138.3 | 17.0% | 118.2 |
| **Total GCP Revenue** | **$1,148.4** | **3.8%** | **$1,106.0** | **7.5%** | **$1,029.2** |

\*     Includes the Middle East and India.

F-82

CC-BLG003786

The following table presents Grace Construction Products sales of similar products by end-use market.

| | 2008 Sales | 2008 vs. 2007 | 2007 Sales (in millions) | 2007 vs. 2006 | 2006 Sales |
|---|---|---|---|---|---|
| Specialty Construction Chemicals* | $  741.3 | (0.4)% | $ 744.3 | 7.2% | $  694.0 |
| Specialty Building Materials** | 407.1 | 12.6% | 361.7 | 7.9% | 335.2 |
| **Total GCP Revenue** | **$1,148.4** | **3.8%** | **$1,106.0** | **7.5%** | **$1,029.2** |

\*      Includes concrete admixtures and cement additives.

\**     Includes vermiculite products.

    Although sales volume for Grace Construction Products increased in 2007 compared to 2006, it declined in 2008 compared to 2007. A sharp North American residential construction decline began in 2007 and continued through 2008. Residential construction in Western Europe, particularly Spain, Ireland and the UK, also declined during 2008. As credit market conditions worsened in the second half of 2008, commercial construction activity in North America declined with some projects continuing, but with many delayed and numerous new projects slowed or cancelled. Commercial construction starts in Europe also slowed in the fourth quarter of 2008. In 2008, commercial and infrastructure construction continued to grow in the Middle East, Asia Pacific, and Latin America, but at a reduced pace.

    Our specialty construction chemicals, which are used in the production of cement and concrete, are generally consumed in the early stages of a construction project, when the cement is produced and when the concrete is mixed. Our specialty building materials, such as waterproofing systems, air and vapor barriers, and fire protection materials, are generally applied at later stages of a construction project. Sales of specialty construction chemicals, which are the first to show the impact of declining construction activity, were down in 2008, but the decrease was partly offset by higher sales of specialty building materials. Although sales of both specialty construction chemicals and specialty building materials were negatively affected by market conditions in 2008, the decline was softened by the strong performance of new high value-added specialty products, particularly in specialty building materials, and by increased penetration of products used in repair and renovation.

    We implemented price increases in all major geographic regions and product groups to offset raw materials and energy cost inflation. These pricing actions, coupled with favorable translation effects from sales in foreign currencies, offset the impact of lower sales volumes and caused our GCP sales growth in 2008.

CC-BLG003787

*Operating Income and Margin*



Grace Construction Products
Operating Income and Margin
($ in millions)

Although pre-tax operating income increased over the three year period and in 2007 compared with 2006, it declined in 2008 compared to 2007. The effects of selling price increases, along with productivity and cost containment initiatives, more than offset raw materials cost increases over the three year period. Increased sales volumes in 2007 contributed to the growth in pre-tax operating income in 2007 over the prior year. Sales volumes were down in 2008, reflecting continued weakness in U.S. construction activity and a decline in European construction. The decrease in sales volume caused both operating income and operating margin to decline in 2008.

As demand from our customers slowed in 2008, we implemented cost reduction initiatives to improve our operating margins. We strengthened discretionary cost controls starting in the first quarter of 2008. We began reducing our workforce in the second quarter of 2008. We implemented a program to rationalize our production facilities, and we sold some redundant assets. In the fourth quarter, we significantly reduced production, purchases of raw materials, and inventories. In the first quarter of 2009, we announced restructuring actions to further reduce our operating costs.

*Corporate Overview*



Corporate Operating Expenses
($ in millions)

F-84

CC-BLG003788

Table of Contents

Corporate costs include corporate functional costs (such as finance, legal services, human resources, communications and information technology), and pension costs related to both corporate employees and to the amortization related to the effects of changes in assets and liabilities for all of our pension plans. Corporate costs have decreased in each of the last two years primarily due to lower pension costs resulting from our contributions to defined benefit pension plans, lower liability insurance premiums, and lower functional costs. Pension cost reductions were $8.3 million from 2006 to 2007 and $4.1 million from 2007 to 2008.

### Other Factors Affecting Core Operations

We normally attempt to fix raw materials costs through long-term supply contracts and targeted hedging programs. Arrangements and programs can span a few months to several years. Major raw materials include natural gas, certain metals, petroleum-based materials and certain industrial chemicals. The actual cost of these raw materials can differ significantly from spot prices at any point in time. Our reported gross profit for the periods presented has been favorably impacted by certain raw materials supply arrangements and unfavorably affected by others, relative to the then-current market price. We expect that new supply agreements and hedging arrangements will result in raw materials costs that can be significantly favorable or unfavorable compared with prior periods. We attempt to mitigate price volatility through hedging techniques such as layering our required supplies under fixed delivery contracts, entering into commodity option and swap contracts with suppliers and financial institutions, and by negotiating sales contracts that permit the partial pass-through of market price increases for volatile commodity items; however, gross profit margins are still likely to be affected when compared over time.

In the third quarter of 2008, we changed our method of accounting for the cost of our U.S inventories from the last-in/first-out method, or LIFO, to the first-in/first-out method, or FIFO. We made this change so we would have a consistent inventory costing method for both U.S. and non-U.S. inventories. We have retrospectively restated our financial statements for all periods presented to account for both U.S. and non-U.S. inventories using FIFO in compliance with Statement of Financial Accounting Standards (SFAS) 154. See Note 10 to the Consolidated Financial Statements for further discussion.

We conduct certain business activities through joint ventures with unaffiliated third parties. Minority interest in consolidated entities decreased due to lower earnings of our joint ventures, particularly Advanced Refining Technologies, or ART, our largest joint venture. ART's year-over-year net income can change materially based on refill order patterns of customers and changes in the cost of commodity-based raw materials.

### Pre-tax Loss from Noncore Activities

Pre-tax loss from noncore activities reflects financial matters unrelated to our core operations. We expect this category of costs and income to be volatile as we address potentially material items through our Chapter 11 proceedings and the financial implications of our legal contingencies become apparent. Some noncore activities are shown as separate items on the Consolidated Statement of Operations. Those not separately listed are primarily included in selling, general and administrative expenses and in other (income) expense. The table below shows the components of noncore

CC-BLG003789

activities, and the captions in which each component is presented in the Consolidated Statements of Operations:

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| | (In millions) | | |
| Provision for environmental remediation—vermiculite | $ (5.0) | $(14.4) | $(29.4) |
| Provision for environmental remediation—other sites | (9.6) | (2.6) | (0.6) |
| **Total provision for environmental remediation** | $(14.6) | $(17.0) | $(30.0) |
| Insurance settlements—environmental and asbestos-related | 0.1 | 1.0 | 12.5 |
| COLI income, net | 3.0 | 5.4 | 4.1 |
| Translation effects—intercompany loans | (6.9) | 10.5 | 23.1 |
| Value of foreign currency forward contracts | 10.7 | (8.2) | (21.5) |
| Gain on sale of real estate | 5.3 | — | 3.9 |
| Other | 3.5 | 1.4 | — |
| **Total other income (expense), net** | $ 15.7 | $ 10.1 | $ 22.1 |
| Legal defense costs | (31.6) | (21.2) | (53.4) |
| D&O insurance cost—portion related to Chapter 11 | (3.8) | (6.0) | (6.1) |
| Asbestos administration | (8.2) | (14.9) | (11.6) |
| Postretirement benefit income—divested businesses | 0.4 | 1.9 | 3.5 |
| Stock appreciation rights | — | (1.9) | (2.9) |
| Other | (4.4) | (2.5) | (7.9) |
| **Total selling, general and administrative expenses** | $(47.6) | $(44.6) | $(78.4) |
| Net pension costs—divested businesses | (11.2) | (7.1) | (11.4) |
| **Total defined benefit pension expense** | $(11.2) | $ (7.1) | $(11.4) |
| **Total pre-tax loss from noncore activities** | $(57.7) | $(58.6) | $(97.7) |

In 2004, we purchased foreign currency forward contracts to minimize currency risk related to euro denominated intercompany loans due to one of our U.S. subsidiaries. In 2008, we repaid the intercompany loans and settled the foreign currency forward contracts. For the years ended December 31, 2008 and 2007, we recognized forward contract losses of $4.4 million and $10.6 million, respectively, offset by foreign currency gains on the intercompany loans of $8.0 million and $13.6 million, respectively.

In November 2007, we purchased additional foreign currency forward contracts to mitigate the effect of foreign currency risk with respect to new intercompany loans between our principal U.S. subsidiary and a German subsidiary. For the year ended December 31, 2008, the difference in the value of the loans and the fair value of the hedge contracts resulted in a net gain of $0.9 million. The change in value of the intercompany loans and the hedge contracts is recorded as a component of other (income) expense in the Consolidated Statements of Operations.

## Chapter 11 Expenses

Although we are unable to precisely measure the impact of the Chapter 11 proceedings on our overall financial performance, we incur significant added costs that are directly attributable to operating in Chapter 11. Net Chapter 11 expenses consist primarily of legal, financial and consulting fees that we, the three creditors' committees, the equity committee and the legal representatives of future asbestos claimants incur, reduced by interest income earned on cash and cash equivalents held by our entities subject to Chapter 11. We pay for the costs of all committees and the committees' advisors. These costs fluctuate with the activity in our Chapter 11 proceedings.

CC-BLG003790

An analysis of Chapter 11 costs follows:

| Chapter 11 Expenses, net | 2008 | 2007 | 2006 |
|---|---|---|---|
| | (In millions) | | |
| Costs related to: | | | |
| Grace as debtor-in-possession | $41.1 | $62.1 | $39.6 |
| General Unsecured Committee | 3.9 | 6.0 | 3.8 |
| Asbestos Property Damage Committee | 1.0 | 3.0 | 3.8 |
| Asbestos Personal Injury Committee | 7.9 | 10.8 | 5.7 |
| Future Asbestos Claims Representatives | 7.9 | 10.7 | 4.6 |
| Equity Committee | 1.8 | 2.5 | 0.4 |
| Total expenses | 63.6 | 95.1 | 57.9 |
| Interest (income) expense on filing entity cash/investment balances | 2.2 | (8.7) | (8.0) |
| Chapter 11 expenses, net | $65.8 | $86.4 | $49.9 |

The decrease in interest income earned on filing entity cash balances is due to a $6.0 million loss related to a decrease in the value of investment securities as well as lower interest rates and lower cash balances in 2008 compared to 2007. See "Cash Resources and Available Credit Facilities" below for further discussion of Grace's investment securities.

We incur numerous other indirect costs to manage the Chapter 11 proceedings such as: management time devoted to Chapter 11 matters; added cost of debt capital; added costs of general business insurance, including D&O liability insurance premiums; and lost business and acquisition opportunities due to the complexities and restrictions of operating under Chapter 11.

We present the net costs of our reorganization under Chapter 11 of the U.S. Bankruptcy Code as "Chapter 11 expenses, net of interest income," a separate caption in our Consolidated Statements of Operations. We do not include Chapter 11 expenses in the measures of income from core operations or loss from noncore operations.

### Interest Expense

Interest expense decreased in 2008 as compared to 2007 and 2006. The decrease in interest expense is attributable to reductions in the prime rate and reduced interest accruals for certain pre-petition obligations, partially offset by the effects of compounding interest on certain liabilities subject to compromise over the course of the Chapter 11 proceeding. Under our proposed joint plan of reorganization, each holder of an allowed general unsecured claim would be paid in full, plus post-petition interest. Post-petition interest shall accrue through the date of payment as follows:

- For the holders of pre-petition bank credit facilities, beginning January 1, 2006, we agreed to pay interest on pre-petition bank debt at the prime rate, adjusted for periodic changes, and compounded quarterly and we accrue post-petition interest accordingly. The effective rates on pre-petition bank debt for the twelve months ended December 31, 2008, 2007, and 2006 were 5.1%, 8.1%, and 8.0%, respectively. The general unsecured creditors that hold pre-petition bank credit facilities have asserted that they are entitled to post-petition interest at the default rate specified under the terms of the underlying credit agreements which, if paid, would be materially greater than that reflected above. We have asserted that such creditors are not entitled to interest at the default rate and have requested the bankruptcy court to determine the appropriate rate at which interest would be payable.

- For the holders of claims who, but for our Chapter 11 filing, would be entitled under a contract or otherwise to accrue or be paid interest on such claim in a non-default (or non-overdue payment) situation under applicable non-bankruptcy law, we accrue post-petition interest at

F-87

CC-BLG003791

the rate provided in the contract between the Grace entity and the claimant or such rate as may otherwise apply under applicable non-bankruptcy law.

- For all other holders of allowed general unsecured claims, we accrue post-petition interest at a rate of 4.19% per annum, compounded annually, unless otherwise negotiated during the claim settlement process.

The average effective interest rates on pre-petition obligations for 2008, 2007, and 2006 were 4.7%, 6.3% and 6.7%, respectively. Such interest will not be paid until our proposed joint plan of reorganization or another plan of reorganization is confirmed and becomes effective.

*Income Taxes*

Taxes on income for 2008, 2007 and 2006 were a provision of $4.3 million, a benefit of $1.1 million and a provision of $2.8 million, respectively, against pre-tax income after minority interest of $125.8 million in 2008, $87.7 million in 2007 and $11.4 million in 2006.

Our 2008 effective tax rate is lower than the 35% U.S. statutory rate primarily due to benefits of $14.5 million for valuation allowance adjustments, $12.2 million for lower tax rates in non-U.S. jurisdictions, a net $11.9 million recognized on disposition of investments, and $10.6 million for net adjustments to the liability for uncertain tax positions, partially offset by a provision for $4.5 million for nondeductible expenses related to Chapter 11.

Our 2007 effective tax rate is lower than the 35% U.S. statutory rate primarily due to benefits of $44.8 million for adjustments to our reserve for deferred tax expense related to undistributed foreign earnings in accordance with APB 23, $13.3 million for net adjustments to the liability for uncertain tax positions, and $5.0 million for lower tax rates in non-U.S. jurisdictions, partially offset by provisions for $20.1 million related to recording a deferred tax liability on life insurance investments and $11.4 million for nondeductible expenses related to Chapter 11.

Our 2006 effective tax rate is lower than the 35% U.S. statutory rate primarily due to benefits of $60.1 million for valuation allowance adjustments and $9.7 million for net adjustments to the liability for uncertain tax positions, partially offset by provisions for $42.0 million for adjustments to our reserve for deferred tax expense related to undistributed foreign earnings and $16.9 million for nondeductible expenses related to Chapter 11.

We have net deferred tax assets of $882.4 million, which, based upon our estimate of future anticipated results, will more likely than not be realized over time. A large proportion of this balance primarily relates to asbestos- and environmental-related liabilities that have not yet been paid and therefore are not yet time-limited. Deferred assets are reduced by deferred tax liabilities resulting primarily from deferred income, plant and equipment, and pension assets that may result in taxable amounts in future periods. We maintain valuation allowances for certain deferred tax assets that exceed our analysis of the amounts that we reasonably expect to realize in the future. Our recovery of these net tax assets could be materially affected by developments in our Chapter 11 proceeding.

See Note 4 to the Consolidated Financial Statements for additional information regarding income taxes, the liability for uncertain tax positions and changes in valuation allowances.

**Financial Condition, Liquidity and Capital Resources**

Following is an analysis of our financial condition, liquidity and capital resources for the three year period ended December 31, 2008. For additional information regarding our Chapter 11 cases, see Note 2 to the Consolidated Financial Statements. For additional information regarding our asbestos-related litigation, see Note 3 to the Consolidated Financial Statements. For additional information regarding environmental matters, see Note 16 to the Consolidated Financial Statements.

CC-BLG003792

*Funding Emergence from Chapter 11*

On September 19, 2008, we filed a joint plan of reorganization with the bankruptcy court and on December 18, 2008, February 3, 2009, and February 27, 2009, we amended this joint plan of reorganization. We refer herein to the amended joint plan of reorganization as amended on February 27, 2009 as the Joint Plan and it is described in Notes 1 and 2 to the Consolidated Financial Statements. The Joint Plan includes material conditions to its confirmation and effectiveness. One of these conditions is that we obtain exit financing in an amount and on terms satisfactory to us. We anticipate that we will need approximately $1.0 billion in new financing to fund the Joint Plan. The actual amount of new financing will generally depend on the amount of our available cash resources, including net cash flow from our operating and investing activities prior to emergence, and the resolution costs of our outstanding claims and contingent liabilities. Until the current crisis in the global credit markets more fully abates, additional traditional debt financing to fund current operations or for the payment of claims under a plan of reorganization may be unavailable to us on acceptable terms. If we are unable to obtain the necessary financing on acceptable terms, our emergence from Chapter 11 may be delayed.

*Cash Resources and Available Credit Facilities*

At December 31, 2008, we had available liquidity of $715.4 million, consisting of $460.1 million in cash and cash equivalents, $21.6 million in short-term investment securities, $67.2 million of net cash value of life insurance policies, approximately $100.9 million of available credit under our $165.0 million debtor-in-possession, or DIP, loan facility and approximately $65.6 million of available credit under various non-U.S. credit facilities.

Investment securities of $21.6 million and $98.3 million at December 31, 2008 and 2007, respectively, consist of direct or indirect investments in debt securities. Prior to the fourth quarter of 2007, our investment in the Columbia Strategic Cash Fund was classified in cash and cash equivalents as redemptions were available in cash. In December 2007, the fund began a liquidation that is expected to continue through 2009 and restricted redemptions to in-kind distributions of securities held by the fund. We have elected to remain in the fund and to value the fund based on the underlying securities as determined by the fund principals. We recorded a decrease in fair value of the fund of $6.0 million in the year ended December 31, 2008 due to unfavorable conditions in the credit markets. The loss is recorded as a reduction of interest income in the Consolidated Statements of Operations. This decrease in fair value was deemed to be other than temporary.

Net cash value of life insurance policies represents the cash value of premiums paid by us for life insurance policies in the names of current and former officers and senior employees. We expect to liquidate these policies to support financing of the Joint Plan.

Our $250 million debtor DIP facility expired on March 31, 2008. On April 1, 2008 we entered into an amended DIP facility with a syndicate of lenders that provides for up to $165 million of revolving loans and face amount of letters of credit. The amended DIP facility is secured by a priority lien on substantially all assets of our affiliates that were included in our Chapter 11 filing with the exclusion of the capital stock of non-U.S. subsidiaries, and bears interest based on the London Interbank Offered Rate (LIBOR). Our non-U.S. credit facilities are extended to various subsidiaries and used by them to issue bank guarantees supporting trade activity and to provide working capital during occasional cash shortfalls. Our largest non-U.S. credit facility is secured by third-party accounts receivable, with availability determined on the basis of eligible outstanding receivables. Most of our other credit facilities are unsecured and are offered subject to annual review and renewal.

F-89

CC-BLG003793

The following table summarizes our U.S. and non-U.S. credit facilities as of December 31, 2008:

| Credit Facilities | Maximum Borrowing Amount | Amount Available | Expiration Date |
|---|---|---|---|
| | | (in millions) | |
| **Country** | | | |
| U.S. | $ 165.0 | $ 100.9 | 04/01/10(1) |
| Germany | 71.3 | 56.6 | 12/31/09 |
| Germany | 17.1 | 2.9 | 09/30/09 |
| Other Countries | 11.1 | 6.1 | Various 2009 |
| **Total** | $ 264.5 | $ 166.5 | |

(1)    Expiration date is the earlier of April 1, 2010 or our emergence from Chapter 11.

We believe that these funds and credit facilities will be sufficient to finance our operations and support our business strategy while we are in Chapter 11. We intend to renew these facilities as they expire in 2009.

*Analysis of Cash Flows*

The following table summarizes our cash flows for the years ended December 31, 2008, 2007 and 2006:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2008** | **2007** | **2006** |
| | (in millions) | | |
| Net cash provided by operating activities | $ 1.6 | $ 88.2 | $ 152.7 |
| Net cash used for investing activities | (31.1) | (206.9) | (129.4) |
| Net cash provided by financing activities | 14.0 | 45.7 | 21.9 |
| Effect of currency exchange rate changes on cash and cash equivalents | (4.9) | 17.2 | 16.4 |
| Increase (decrease) in cash and cash equivalents | (20.4) | (55.8) | 61.6 |
| Cash and cash equivalents, beginning of period | 480.5 | 536.3 | 474.7 |
| Cash and cash equivalents, end of period | $460.1 | $ 480.5 | $ 536.3 |

Net cash provided by operating activities in 2008 was $1.6 million compared with $88.2 million in 2007. In response to lower customer demand during the fourth quarter of 2008, production at over 50 Grace plants worldwide was stopped or slowed and raw materials purchases were significantly reduced. As a result of these actions and our ongoing cash productivity initiatives, net working capital was reduced by $132 million during the fourth quarter. Net cash provided by operating activities in 2008 includes a payment of $252 million related to the settlement of certain environmental claims relating to our former vermiculite operations in Libby, Montana.

Net cash used for investing activities in 2008 was $31.1 million, compared with $206.9 million in 2007. The decrease in net cash used in investing activities is primarily due to decreased investments in short-term debt securities. Capital expenditures in 2008 were $132.2 million, including over $50 million for strategic programs such as adding capacity for high-margin and high-growth products, adding capacity to produce high-cost raw materials internally and building new research and manufacturing capabilities in developing countries. Net cash provided by financing activities in 2008 was $14.0 million compared with $45.7 million in 2007. The decrease is primarily attributable to reduced proceeds from the exercise of stock options.

CC-BLG003794

Net cash provided by operating activities in 2007 was $88.2 million compared with $152.7 million in 2006. The lower net cash flow in 2007 was primarily due to higher Chapter 11-related costs and higher working capital, partially offset by higher pre-tax operating income. Net cash used for investing activities in 2007 was $206.9 million compared with $129.4 million in 2006. The increase in net cash used for investing activities is primarily due to increased investments in short-term debt securities. Capital expenditures in 2007 were $136.9 million, including over $40 million for strategic programs such as adding capacity for high-margin and high-growth products and building new research and manufacturing capabilities in developing countries. Net cash provided by financing activities in 2007 was $45.7 million, compared with $21.9 million in 2006, with the increase primarily attributable to increased proceeds from the exercise of stock options.

Net cash provided by operating activities includes significant payments related to our Chapter 11 proceedings. Net cash provided by operating activities before Chapter 11 expenses and settlements was $321.2 million, $190.6 million and $203.0 million for the years ended December 31, 2008, 2007 and 2006, respectively. These amounts exclude cash payments made for Chapter 11 expenses and to settle liabilities subject to compromise in our Chapter 11 proceedings.

*Operating free cash flow*

We use operating free cash flow as the cash flow measure in evaluating our operating results. For 2009, we expect to use operating free cash flow as a performance factor in determining certain incentive compensation. We define operating free cash flow to be pre-tax income from core operations before depreciation and amortization plus pension expense or minus the change in net working capital and specified other assets and liabilities of our core operations minus capital expenditures as set forth in the table below.

We provide this measure so you can distinguish the cash flows of our current business base from the cash flows of our past businesses, discontinued products, corporate legacies, and Chapter 11 proceedings, and to ensure that you understand the key data that we use to evaluate our results of operations. However, operating free cash flow does not purport to represent net cash flow provided by operating activities as defined under U.S. generally accepted accounting principles, and you should not consider it an alternative to such measure as an indicator of our performance. Operating free cash flow has material limitations as a cash flow measure because it excludes cash flows from our noncore activities, including, among other things, provisions for asbestos-related litigation and environmental remediation and legal defense costs, and costs related to our Chapter 11 proceedings, which have been material components of our cash flow. We compensate for the limitations of this measure by using it together with net cash flow provided by operating activities as defined under U.S. generally accepted accounting principles to present a complete analysis of our cash flows. You should evaluate operating free cash flow in conjunction with net cash flow provided by operating activities for a more complete analysis of our cash flow results.

F-91

CC-BLG003795

The following table summarizes operating free cash flow for the three years ended December 31, 2008:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2008 | 2007 | 2006 |
| | (In millions) | | |
| Pre-tax income from core operations before depreciation and amortization | $ 418.4 | $ 410.6 | $ 338.9 |
| Pension expense | 56.8 | 52.6 | 63.7 |
| Change in net working capital of core operations | 81.6 | (85.4) | (4.8) |
| Change in other assets and liabilities of core operations | (28.6) | 26.1 | 40.8 |
| Capital expenditures | (129.3) | (139.1) | (120.0) |
| Operating free cash flow | $ 398.9 | $ 264.8 | $ 318.6 |

Operating free cash flow increased $134.1 million from 2007 to 2008 due primarily to a reduction in net working capital of core operations. We are focused on increasing operating free cash flow to reduce our exit financing requirements.

The following table reconciles net cash provided by operating activities to operating free cash flow:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2008 | 2007 | 2006 |
| | (In millions) | | |
| Operating free cash flow (non-GAAP) | $ 398.9 | $ 264.8 | $ 318.6 |
| Cash paid to resolve contingencies subject to Chapter 11 | (252.0) | (10.3) | — |
| Chapter 11 expenses paid | (69.3) | (92.1) | (50.3) |
| Capital expenditures | 129.3 | 139.1 | 120.0 |
| Income taxes paid, net of refunds | (42.4) | (51.1) | (51.6) |
| Payments under defined benefit pension arrangements | (67.7) | (105.7) | (121.5) |
| Payments under postretirement benefit plans | (6.6) | (5.0) | (13.9) |
| Cash paid for environmental and divestment reserves | (6.0) | (10.5) | (14.5) |
| Noncore activities | (31.9) | (34.5) | (56.3) |
| Other, net | (50.7) | (6.5) | 22.2 |
| Net cash provided by operating activities (GAAP) | $ 1.6 | $ 88.2 | $ 152.7 |

## Debt and Other Contractual Obligations

Total debt outstanding at December 31, 2008 was $865.3 million, including $327.9 million of accrued interest on pre-petition debt. As a result of the Chapter 11 filing, we are now in default on $525.6 million of pre-petition debt, which, together with accrued interest thereon, has been included in "liabilities subject to compromise" as of December 31, 2008. The automatic stay provided under the U.S. Bankruptcy Code prevents our lenders from taking any action to collect the principal amounts as well as related accrued interest. However, we will continue to accrue and report interest on such debt during the Chapter 11 proceedings unless further developments lead our management to conclude that it is probable that such interest will be compromised.

CC-BLG003796

Set forth below are our contractual obligations as of December 31, 2008:

| Contractual Obligations | Total | Less than 1 Year | 1-3 Years | Thereafter | Upon Emergence from Chapter 11 | After Emergence from Chapter 11 |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| Operating commitments(1) | $ 90.4 | $ 72.4 | $ 18.0 | $ — | $ — | $ — |
| Debt | 11.8 | 11.2 | 0.6 | — | — | — |
| Capital leases | 0.8 | 0.2 | 0.6 | — | — | — |
| Operating leases | 64.9 | 21.5 | 32.5 | 10.9 | — | — |
| Liabilities subject to compromise(2): | | | | | | |
| Pre-petition bank debt plus accrued interest | 823.5 | — | — | — | 823.5 | — |
| Drawn letters of credit plus accrued interest | 30.0 | — | — | — | 30.0 | — |
| Asbestos-related contingencies(3) | 1,700.0 | — | — | — | 1,662.7 | 37.3 |
| Income tax contingencies | 121.0 | — | — | — | 26.2 | 94.8 |
| Environmental contingencies | 152.2 | — | — | — | 80.2 | 72.0 |
| Postretirement benefits | 179.2 | 9.5 | — | — | 17.0 | 152.7 |
| Other liabilities and accrued interest | 116.5 | — | — | — | 92.8 | 23.7 |
| Total liabilities subject to compromise | $3,122.4 | $ 9.5 | $ — | $ — | $ 2,732.4 | $ 380.5 |
| Pension funding requirements per ERISA(4) | 307.2 | 38.8 | 201.2 | 67.2 | — | — |
| Pension funding requirements for non-U.S. pension plans(5) | 66.4 | 12.2 | 39.7 | 14.5 | — | — |
| **Total Contractual Obligations** | $3,663.9 | $ 165.8 | $292.6 | $ 92.6 | $ 2,732.4 | $ 380.5 |

(1) Amounts do not include open purchase commitments, which are routine in nature and normally settle within 90 days or obligations to employees under annual or long-term incentive programs.

(2) See Note 2 to the Consolidated Financial Statements for a discussion of liabilities subject to compromise. Liabilities subject to compromise consist of estimated balances that may become due on the date of emergence from bankruptcy protection, which date is not certain at this time, or subsequent to emergence. Estimated amounts that may become due upon emergence have been presented in the "Upon Emergence from Chapter 11" column above and estimated amounts that may become due subsequent to emergence have been presented in the "After Emergence from Chapter 11" column, as we are not able to determine when these amounts will ultimately be settled. Amounts reflect the estimated claims payable pursuant to our plan of reorganization. It is possible that we could settle a portion of these claims at a date before emergence from Chapter 11 at the stated amounts or at amounts different from those recorded. In accordance with SFAS No. 158, we have presented $9.5 million of certain estimated pension and postretirement obligations subject to compromise as current obligations in the December 31, 2008 Consolidated Balance Sheet.

(3) Not all of these contingencies are contractual in nature and the amounts are not reflective of the Joint Plan of Reorganization.

(4) Based on the U.S. qualified pension plans' status as of December 31, 2008, funding requirements under ERISA have been estimated for the next five years. Amounts in subsequent years have not yet been determined.

F-93

CC-BLG003797

(5)    Based on the non-U.S. pension plans status as of December 31, 2008, funding requirements have been estimated for the next five years. Amounts have been translated at the applicable December 31, 2008 exchange rates. Amounts in subsequent years have not yet been determined.

See Note 16 to the Consolidated Financial Statements for a discussion of financial assurances.

**Employee Benefit Plans**

*Defined Contribution Retirement Plan*

We sponsor a defined contribution retirement plan for our employees in the United States. This plan is qualified under section 401(k) of the U.S. tax code. Currently, we contribute an amount equal to 100% of employee contributions, up to 6% of an individual employee's salary or wages. Our costs related to this benefit plan were $12.7 million, $12.4 million, and $14.0 million for the years ended December 31, 2008, 2007, and 2006, respectively.

*Defined Benefit Pension Plans*

We sponsor defined benefit pension plans for our employees in the U.S., Canada, the U.K., Australia, Germany, Italy, France, Spain, Netherlands, Japan, Philippines, South Korea, Taiwan, South Africa, Brazil and Mexico and fund government-sponsored programs in other countries where we operate. Certain of our defined benefit pension plans are advance-funded and others are pay-as-you-go. The advance-funded plans are administered by trustees who direct the management of plan assets and arrange to have obligations paid when due out of a trust. Our most significant advance-funded plans cover our salaried employees in the U.S. and U.K. and employees covered by collective bargaining agreements at certain of our U.S. facilities. Our U.S. advance-funded plans are qualified under the U.S. tax code.

During 2008, U.S. equity markets experienced broad-based and significant declines in value, as indicated by the Dow Jones Wilshire 5000 Index that declined 37% in 2008. Non-U.S. equity markets also declined sharply, as indicated by major indices such as the MSCI AC World Ex-US Free Index that declined approximately 45% in 2008. Our advance-funded plans experienced significant declines in fair value during the year. Our U.S. advance-funded plans, which collectively have the largest asset base of our advance-funded plans and a targeted asset allocation of 60% equities and 40% bonds, experienced an overall decline of 26% in 2008. Outside the U.S., our U.K. advance-funded plan is our largest advance-funded plan. Our U.K. advance-funded plan held approximately 90% bonds and cash and approximately 10% equities at year-end 2008 and experienced a modest gain of 1.7% in 2008.

We intend to satisfy obligations under our U.S. advance-funded plans and to comply with the requirements of the Employee Retirement Income Security Act of 1974, known generally as ERISA. In June 2008, we obtained bankruptcy court approval to fund minimum required payments of approximately $24 million for the period from July 2008 through January 2009. In that regard, we contributed approximately $11 million in September 2008, approximately $6 million in October 2008, and approximately $7 million in January 2009 to the trusts that hold assets of the U.S. advance-funded plans. While we intend to continue to fund all minimum required payments under the U.S. advance-funded plans, there can be no assurance that the bankruptcy court will continue to approve the funding needs of such plans. We expect to fund our U.S. advance-funded plans with approximately $39 million in 2009 based on funding requirements determined in mid-2008. We expect that our 2010 funding requirements for U.S. advance-funded plans will increase as a result of the 2008 market losses. We intend to elect a funding strategy permitted by ERISA that smoothes the increased funding requirement over a three-year period. Despite making this election, we expect our 2010 funding requirements for our U.S. advance-funded plans will increase to approximately

F-94

CC-BLG003798

$68 million. Final actual funding requirements for 2010 will be determined with our actuaries in early 2010. We do not expect our emergence from Chapter 11 to have a direct impact on our accounting for, or funding of, our U.S. advance-funded plans.

Contributions to non-U.S. pension plans are not subject to bankruptcy court approval and we intend to fund such plans based upon applicable legal requirements and actuarial and trustee recommendations. We contributed $13.5 million to these plans in 2008.

The following table presents the funded status of our fully-funded, underfunded, and unfunded pension plans:

| Funded Status of Pension Plans | Fully-Funded(1) Pension Plans | | | Underfunded(1) Pension Plans | | | Unfunded(2) Pension Plans | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2007 | 2006 | 2008 | 2007 | 2006 | 2008 | 2007 | 2006 |
| | | | | (In millions) | | | | | |
| Projected benefit obligation | $169.4 | $254.8 | $243.8 | $ 960.8 | $ 948.3 | $ 961.4 | $ 249.6 | $ 245.9 | $ 227.8 |
| Fair value of plan assets | 218.0 | 308.9 | 282.2 | 568.5 | 779.2 | 738.5 | — | — | — |
| Funded status (PBO basis) | $ 48.6 | $ 54.1 | $ 38.4 | $(392.3) | $(169.1) | $(222.9) | $(249.6) | $(245.9) | $(227.8) |
| Benefits paid | $ (10.7) | $ (11.5) | $ (10.4) | $ (61.5) | $ (85.3) | $ (88.0) | $ (12.4) | $ (11.5) | $ (10.4) |

(1)   Plans intended to be advance-funded.

(2)   Plans intended to be pay-as-you-go.

Changes to funded status as reported on our balance sheet is impacted by several factors with the most significant being contributions to the plans, changes in discount rates and actual return on assets. During 2008, we continued to make contributions to our advance-funded plans, both in the U.S. and in other countries. Discount rates were unchanged year over year in the U.S. and moved up an average of 43 basis points (0.43 percentage points) outside the U.S. The sharp decline in asset values noted above had a significant negative impact on the funded status of our advance-funded plans, particularly in the U.S. The overall impact of these and other actuarial changes was to reduce the funded status by a total of $232.4 million for all defined benefit pension plans.

Fully-funded plans include several advance-funded plans where the fair value of the plan assets exceeds the projected benefit obligation, or PBO. This group of plans was overfunded by $48.6 million as of December 31, 2008, and the overfunded status is reflected as "overfunded defined benefit pension plans" in the Consolidated Balance Sheet. Underfunded plans include a group of advance-funded plans that are underfunded on a PBO basis by a total of $392.3 million as of December 31, 2008. Additionally, we have several plans that are funded on a pay-as-you-go basis, and therefore, the entire PBO of $249.6 million at December 31, 2008 is unfunded. The combined balance of the underfunded and unfunded plans was $641.9 million as of December 31, 2008 and is presented as a liability on the Consolidated Balance Sheet as follows: $12.3 million in "other current liabilities;" $392.3 million included in "underfunded defined benefit pension plans;" $136.7 million included in "unfunded pay-as-you-go defined benefit pension plans;" and $100.6 million in "liabilities subject to compromise."

Beginning in 2007, on a quarterly basis, we analyze pension assets and pension liabilities along with the resulting funded status and update our estimate of these measures. Funded status is adjusted for contributions, benefit payments, actual return on assets, current discount rates and other identifiable and material actuarial changes.

At the December 31, 2008 measurement date for the U.S. advance-funded plans, the PBO was approximately $941 million as measured under U.S. generally accepted accounting principles. The PBO is measured as the present value (using a 6.25% discount rate as of December 31, 2008) of vested and non-vested benefits earned from employee service to date, based upon current services

F-95

CC-BLG003799

and estimated future pay increases for active employees. Of the participants in the advance-funded plans, approximately 82% are current retirees or employees of our former businesses, which skews the payout pattern to the nearer term. Assets available to fund the PBO at December 31, 2008 were approximately $561 million, or approximately $380 million less than the measured obligation.

The following tables present the components of defined benefit pension expense and cash contributions for the advance-funded and pay-as-you-go plans:

| Components of Defined Benefit Pension Expense | 2008 | 2007 | 2006 |
|---|---|---|---|
| | (in millions) | | |
| Annual pension benefits earned | $ 24.7 | $ 23.8 | $ 24.7 |
| Interest on opening liability—advance-funded plans | 70.8 | 66.7 | 65.2 |
| Expected return on plan assets | (80.8) | (80.0) | (71.3) |
| Net financing cost (benefit) of advance-funded plans | (10.0) | (13.3) | (6.1) |
| Interest on opening liability—pay-as-you-go plans | 14.1 | 12.2 | 10.8 |
| Net pension financing cost (benefit) | 4.1 | (1.1) | 4.7 |
| Amortization of: | | | |
| Plan changes related to prior service | 2.2 | 3.1 | 3.2 |
| Accumulated differences between actual and assumed performance(1) | 24.8 | 26.4 | 31.1 |
| Net curtailment and settlement loss | 1.0 | 0.4 | — |
| Net pension catch-up expense | 28.0 | 29.9 | 34.3 |
| **Total Defined Benefit Pension Expense** | $ 56.8 | $ 52.6 | $ 63.7 |

| Cash Contributions to Defined Benefit Pension Plans | 2008 | 2007 | 2006 |
|---|---|---|---|
| | (in millions) | | |
| U.S. advance-funded plans | $49.1 | $ 76.0 | $101.4 |
| U.S. pay-as-you-go plans | 5.1 | 5.1 | 5.2 |
| Non-U.S. advance-funded plans | 6.2 | 18.3 | 9.5 |
| Non-U.S. pay-as-you-go plans | 7.3 | 6.3 | 5.4 |
| **Total Cash Contributions** | $67.7 | $105.7 | $121.5 |

(1)    Primarily related to return on assets, termination, and mortality.

We expect pension expense to increase significantly in 2009 as a result of the higher amortization of differences between actual and assumed performance in 2008 and due to a lower expected return on assets caused by lower asset balances at January 1, 2009 compared to January 1, 2008. On a global basis we estimate that our 2009 pension expense will be approximately $89 million compared to $56.8 million in 2008. Final actual expense for 2009 will be determined with our actuaries later in 2009.

*Postretirement Benefits Other Than Pensions*

We provide certain health care and life insurance benefits for retired employees, a large majority of whom are retirees of divested businesses. These plans are unfunded, and we pay the costs of benefits under these plans as they are incurred. Our share of benefits under this program was $7.1 million in 2008, compared with $9.8 million in 2007. We received Medicare subsidy payments of $0.5 million and $4.8 million in 2008 and 2007, respectively. Our recorded liability for postretirement benefits of $73.2 million at December 31, 2008 is stated at net present value discounted at 6.25% (as discussed under Defined Benefit Pension Plans). Under our proposed Joint Plan, these benefits would continue.

CC-BLG003800

We expect pension expense to increase significantly in 2009 as a result of the higher amortization of differences between actual and assumed performance in 2008 and due to a lower expected return on assets caused by lower asset balances at January 1, 2009 compared to January 1, 2008. On a global basis we estimate that our 2009 pension expense will be approximately $89 million compared to $56.8 million in 2008. Final actual expense for 2009 will be determined with our actuaries later in 2009.

*Postretirement Benefits Other Than Pensions*

We provide certain health care and life insurance benefits for retired employees, a large majority of whom are retirees of divested businesses. These plans are unfunded, and we pay the costs of benefits under these plans as they are incurred. Our share of benefits under this program was $7.1 million in 2008, compared with $9.8 million in 2007. We received Medicare subsidy payments of $0.5 million and $4.8 million in 2008 and 2007, respectively. Our recorded liability for postretirement benefits of $73.2 million at December 31, 2008 is stated at net present value discounted at 6.25% (as discussed under Defined Benefit Pension Plans). Under our proposed Joint Plan, these benefits would continue.

*Noncore Liabilities*

We have a number of financial exposures originating from past businesses, products and events. These obligations arose from transactions and/or business practices that date to when Grace was a much larger company, when we produced products or operated businesses that are no longer part of our revenue base, when government regulation was less stringent and when scientific knowledge with respect to such businesses and products was much less advanced than today.

The following table summarizes our net noncore liabilities at December 31, 2008 and 2007:

| Net Noncore Liabilities | December 31, 2008 | December 31, 2007 |
|---|---|---|
| | (In millions) | |
| Asbestos-related liabilities | $ (1,700.0) | $ (1,700.0) |
| Asbestos-related insurance receivable | 500.0 | 500.0 |
| Asbestos-related liability, net | (1,200.0) | (1,200.0) |
| Environmental remediation | (152.2) | (394.7) |
| Postretirement benefits | (73.2) | (84.0) |
| Income taxes | (121.0) | (89.3) |
| Retained obligations and other | (35.1) | (36.2) |
| Net noncore liability | $ (1,581.5) | $ (1,804.2) |

The resolution of most of our noncore recorded and contingent liabilities will be determined through the Chapter 11 proceedings. We cannot predict with any certainty how, and for what amounts, these contingencies will be resolved. The amounts of these liabilities as ultimately determined through the Chapter 11 proceedings could be materially different from amounts we recorded at December 31, 2008. Our operating statements include periodic adjustments to account for changes in estimates of these liabilities and developments in our Chapter 11 proceeding. These liabilities and contingencies may result in continued volatility in net results in the future.

*Tax Matters*

After emergence from Chapter 11 under our proposed Joint Plan, or another plan of reorganization that is ultimately confirmed, we expect to have substantial future tax deductions. Upon emergence under the Joint Plan, we would expect future tax deductions in the aggregate of

F-97

CC-BLG003801

approximately $2 billion or more, primarily relating to asbestos, environmental and other payments made at emergence and thereafter. The extent to which we will be able to use these deductions after emergence will depend on Section 382 of the Internal Revenue Code, which generally imposes an annual limitation on a corporation's use of its deductions if a corporation undergoes an "ownership change." An ownership change is generally defined as a cumulative change of 50 percentage points or more in the ownership of certain stockholders owning 5% or more of the outstanding Grace common stock over a three year rolling period. If we were to have a change of ownership under Section 382 of the Code, approximately $2 billion of these future deductions could be severely restricted or even eliminated in whole or in part.

Accordingly, the proposed charter for the reorganized corporation under the Joint Plan provides that in the event there has been a 25 percentage point change of ownership in outstanding Grace stock after emergence, the Board of Directors will have the authority to impose restrictions on the transfer of Grace stock with respect to certain 5% shareholders. These transfer restrictions will generally not impose any limitations on a person or other entity that holds less than 5% of the outstanding Grace stock after emergence to either buy or sell Grace stock on the open market.

See Note 4 to the Consolidated Financial Statements and "Income Taxes" above for further discussion of our tax accounting and tax contingencies.

**Other Contingencies**

See Note 16 to the Consolidated Financial Statements for a discussion of our other contingent matters.

**Return on Invested Capital**

Grace Return on Invested Capital



We manage our operations with the objective of maximizing sales, earnings and cash flow over time. Doing so requires that we successfully balance our growth, profitability and working capital and other investments to support sustainable, long-term financial performance. We use return on invested capital as a performance measure in evaluating operating results, in making operating and investment decisions and in balancing the growth and profitability of our operations. Generally, we favor those businesses and investments that provide the highest return on invested capital.

We define return on invested capital to be pre-tax income from core operations divided by the sum of net working capital, properties and equipment and other assets and liabilities as shown in the table below. Return on invested capital does not purport to represent an income or cash flow measure as defined under U.S. generally accepted accounting principles, and you should not consider it an alternative to such measures as an indicator of our performance. We provide this measure so you can understand the key data that we use to evaluate our operations.

F-98

CC-BLG003802

The following table sets forth the return on invested capital of Grace as of December 31, 2008, 2007 and 2006:

| Grace (In millions) | 2008 | 2007 | 2006 |
|---|---|---|---|
| Pre-tax income from core operations | $ 299.7 | $ 297.2 | $ 225.4 |
| Invested capital: | | | |
| Trade accounts receivable | 462.6 | 500.6 | 426.3 |
| Inventories | 354.8 | 362.9 | 324.5 |
| Accounts payable | (230.4) | (191.3) | (172.7) |
| Net working capital | 587.0 | 672.2 | 578.1 |
| Other current assets | 86.1 | 80.8 | 81.4 |
| Other current liabilities | (291.5) | (325.1) | (272.6) |
| Properties and equipment, net | 710.6 | 706.1 | 664.5 |
| Goodwill and other intangible assets | 117.1 | 122.3 | 116.5 |
| Other assets | 145.1 | 136.6 | 131.5 |
| Total invested capital | $1,354.4 | $1,392.9 | $1,299.4 |
| Return on invested capital | 22.1% | 21.3% | 17.3% |

Return on invested capital has increased since 2006 as we have increased our pre-tax income from core operations and decreased the amount of capital invested in our core operations.

### Inflation

We operate in international economies with both inflation and currency risks. While the inflation rate in the U.S. and other developed economies has been modest and predictable for several years, it was neither in 2008. Commodity prices rose rapidly throughout the year, and peaked in the fourth quarter. Overall we experienced an inflation rate of 15% on raw materials and energy costs used to produce our products. Our ability to pass on inflation costs is affected by general economic conditions and competitive situations.

We estimate that the cost of replacing our property and equipment today is greater than its historical cost. Accordingly, our depreciation expense would be greater if the expense were stated on a current cost basis.

### Critical Accounting Estimates

The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires that we make estimates and assumptions affecting the assets and liabilities reported at the date of the Consolidated Financial Statements, and the revenues and expenses reported for the periods presented. We believe that our accounting estimates are appropriate and the related balances are reasonable; however, actual amounts could differ from the original estimates, requiring adjustments in future periods. Changes in estimates are recorded in the period in which the change is identified. Our accounting policies are described in Note 1 to the Consolidated Financial Statements. Critical accounting estimates are described in this section.

An accounting estimate is considered critical if the estimate requires management to make assumptions and judgments about matters that were highly uncertain at the time the estimate was made, if different estimates reasonably could have been used, or if changes in the estimate are reasonably likely to occur from period to period that could have a material impact on our financial condition or results of operations. As part of our quarterly disclosure controls and procedures,

CC-BLG003803

management has discussed the development, selection and disclosure of the critical accounting estimates with the Audit Committee of the Board of Directors. The accuracy of these and other estimates may be materially affected by the uncertainties arising under our Chapter 11 proceeding.

*Contingent Liabilities*

We have recorded a liability for the resolution of contingencies related to asbestos lawsuits, environmental remediation, income taxes and litigation. We record a liability if we have determined that a loss is probable, and we are able to reasonably estimate the amount of the loss or have another reasonable basis for recording a liability. We have determined that each of the contingencies discussed below involves an accounting judgment that is material to our Consolidated Financial Statements.

*Asbestos-Related Lawsuits*

We are a defendant in property damage and personal injury lawsuits relating to previously sold asbestos-containing products. See Note 3 to the Consolidated Financial Statements for a discussion of the background and status of the asbestos-related lawsuits, and how we are attempting to resolve them as part of our Chapter 11 proceeding. We have recorded a liability for our asbestos-related obligations as discussed below.

Our liability for asbestos-related matters has had a material impact on our financial condition and results of operations, and future changes in such liability, if required, will likely lead to material adjustments to the Consolidated Financial Statements. We expect the ultimate determination of the resolution cost of this obligation will have a material impact on our liquidity and capital resources.

On January 13, 2005, we filed an amended plan of reorganization with the bankruptcy court, the Prior Plan. As discussed in Notes 2 and 3 to the Consolidated Financial Statements, we adjusted our asbestos related liability in the fourth quarter of 2004 based on the filing of the Prior Plan and we have not adjusted our asbestos-related liability to reflect the filing of, or any amendment to, the Joint Plan.

Under the Prior Plan, it is a condition to confirmation that the bankruptcy court shall conclude that the amount necessary to fund all pending and future asbestos personal injury claims and property damage claims (and trust administration costs and expenses) is not greater than $1,613 million. This amount was based in part on our 2004 evaluation of (1) existing but unresolved personal injury and property damage claims, (2) actuarially-based estimates of future personal injury claims, (3) the risk of loss from the Zonolite® attic insulation litigation, (4) proposed claim payments reflected in the Prior Plan, and (5) the cost of the trust administration and litigation. This condition precedent is the basis for our currently recorded asbestos-related liability.

Our asbestos-related insurance receivable is directly dependent on the amount and nature of our asbestos-related liability. We estimate the amount of the receivable based on our analysis of coverage remaining under insurance policies for the 1962 to 1985 period, and the terms of settlement agreements in effect with certain insurers.

As described in Note 2 to the Consolidated Financial Statements, the Joint Plan contemplates that two asbestos trusts would be established under Section 524 (g) of the Bankruptcy Code. All asbestos related personal injury claims would be channeled for resolution to one asbestos trust and all asbestos-related property damage claims would be channeled to another asbestos trust. We expect to measure certain of the forms of consideration that we would use to fund the asbestos trusts under the Joint Plan as follows:

- Warrants—The warrants would be recorded in our Consolidated Financial Statements at fair value on the effective date of the Joint Plan as an increase in paid-in capital and a decrease

CC-BLG003804

in our asbestos related liability. The value of the warrants would be calculated using inputs such as risk-free borrowing rates, the market price of Grace common stock underlying the warrants and the expected volatility of Grace common stock prices.

- Deferred payments—We would record a liability for the present value of the future cash payments to be made from 2019 to 2033, and a decrease in our asbestos related liability. We would estimate this value using a discount rate that is impacted by many factors including: (i) interest rates at the effective date of the Joint Plan; (ii) our credit standing; (iii) restrictive covenants and terms of our other credit facilities; and (iv) assessment of the risk of a default, which would require us to issue shares of Grace common stock.

The treatment of asbestos-related liabilities is significantly different under the Joint Plan than under the Prior Plan. We have not adjusted our accounting for asbestos related liabilities to reflect the Joint Plan. At this time, we are unable to determine a reasonable estimate of the value of the warrants and deferred payments to be issued to the asbestos trusts under the Joint Plan. These values will ultimately be determined on the effective date of the Joint Plan. We expect to adjust our accounting for the Joint Plan when the consideration can be measured and material conditions to the Joint Plan are satisfied. We expect these adjustments may be material to our consolidated financial position and results of operations.

We provided proforma and prospective financial information for the Joint Plan in the exhibits to the Joint Plan in compliance with the requirements of the Bankruptcy Code. That proforma and prospective financial information is not included in or incorporated into this Report.

The fair value of the warrants for tax purposes would be treated as a deductible expense in the year of transfer. The deferred payments would be deductible at the time of each payment. Due to the payment of these and other deductible bankruptcy claims, we anticipate generating significant future tax deductions beginning in the year of emergence. See Note 4 to the Consolidated Financial Statements for a discussion of future tax deductions that we may generate in connection with emergence from Chapter 11.

*Environmental Remediation*

We are obligated under applicable law to remediate certain properties related to our business or former businesses. At some sites we finance all or a portion of remediation conducted by third parties (generally state or Federal authorities) and at others, we perform the required remediation ourselves. Our environmental remediation obligation has a significant impact on our Consolidated Financial Statements. See Note 16 to the Consolidated Financial Statements for a discussion of our environmental remediation liabilities.

At sites where third parties conduct remediation, we estimate our obligations from information available from regulatory authorities including actual costs incurred, expected future costs and time to completion.

At sites where we conduct remediation, we work with regulatory authorities to define compliance requirements and then estimate the cost required to meet those requirements. We base our estimates on our historical knowledge and engineering assessments specific to conditions at each site and we update our estimates as necessary.

Our estimates can fluctuate significantly due to the extended duration of some remediation projects. The accuracy of our estimates is dependent on the validity of assumptions regarding such matters as labor rates, indirect costs and capital costs (such as building materials), which are difficult to forecast over extended periods. We cannot estimate the impact on our Consolidated Financial Statements of using other reasonably possible assumptions because we primarily rely on the assumptions and estimates of the applicable regulatory authorities. Future changes in estimates, if

F-101

CC-BLG003805

required, will more than likely lead to material adjustments to our Consolidated Financial Statements, and we expect the ultimate resolution of these obligations to have a material impact on our liquidity and capital resources.

*Litigation*

We are subject to legal proceedings and claims arising out of the normal course of business. We are currently a party to various legal proceedings, both civil and criminal in nature, in which we have been named as a defendant. See Note 16 to the Consolidated Financial Statements for a discussion of our significant legal proceedings.

To estimate the cost to resolve our legal obligations, we review the facts of each matter to determine the merits of the case and the corresponding probability of a loss. If we determine that a loss is probable, we determine if there is sufficient information to make a reasonable estimate of the loss amount. Our estimates regarding the outcome of our legal proceedings and claims involve substantial uncertainties that could cause our actual losses to differ materially from our estimates. In estimating the likely outcome of a legal proceeding, we consider the nature of the specific claim (or unasserted claim), our experience with similar claims, the jurisdiction in which the proceeding is filed, court rulings, the status of any settlement negotiations, the likelihood of resolution through settlement or alternative dispute resolution, the proceeding's current status and other relevant information and events. We adjust our recorded liability for litigation contingencies as necessary to reflect our current evaluation of these and other factors.

*Pension and Other Postretirement Benefits Expenses and Liabilities*

We sponsor defined benefit pension plans for our employees in the United States, Canada, the United Kingdom, Australia, Germany, Italy, France, Spain, Netherlands, Japan, Philippines, South Korea, Taiwan, South Africa, Brazil and Mexico and fund government sponsored programs in other countries where we operate. See Note 20 to the Consolidated Financial Statements for a detailed discussion of our pension plans and other postretirement benefit plans.

In order to estimate our pension and other postretirement benefits expenses and liabilities, we evaluate the range of possible assumptions to be used in the calculation of pension and other postretirement benefits expenses and liabilities. We select the assumptions that we believe to be most indicative of factors such as participant demographics, past experiences and market indices, and provide the assumptions to independent actuaries. These assumptions are updated annually and primarily include factors such as discount rates, health care cost trend rates, expected return on plan assets, mortality rates, retirement rates, and rate of compensation increase. The independent actuaries review our assumptions for reasonableness, and use the assumptions to calculate our estimated liability and future pension expense. We review the actuarial reports for reasonableness and adjust our expenses, assets and liabilities to reflect the amounts calculated in the actuarial reports.

On a quarterly basis, we analyze the rollforward of pension assets and pension liabilities along with the resulting funded status to assure that the Consolidated Balance Sheet reflects an updated estimate of these measures each period. Funded status is adjusted for actual contributions, benefit payments, return on assets and other identifiable and material actuarial changes. Discount rates are also evaluated for reasonableness each period.

*Income Taxes*

We are a global enterprise with operations in more than 40 countries. This global reach results in a complexity of tax regulations, which require assessments of applicable tax law and judgments in estimating our ultimate income tax liability. See Note 4 to the Consolidated Financial Statements for

CC-BLG003806

a detailed discussion of our estimates used in accounting for income taxes and income tax contingencies.

We recognize the tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained upon examination by the taxing authorities, based on the technical merits of the position. We measure tax benefits in our financial statements from such a position as the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement. Unrecognized tax benefits are tax benefits claimed in our tax returns that do not meet these recognition and measurement standards.

We record a liability for income tax contingencies when it is more likely than not that a tax position we have taken will not be sustained upon audit. We evaluate such likelihood based on relevant facts and tax law. We adjust our recorded liability for income tax matters due to changes in circumstances or new uncertainties, such as amendments to existing tax law. Our ultimate tax liability depends upon many factors, including negotiations with taxing authorities in the jurisdictions in which we operate, outcomes of tax litigation, and resolution of disputes arising from federal, state, and international tax audits. Due to the varying tax laws in each jurisdiction senior management, with the assistance of local tax advisors as necessary, assesses individual matters in each jurisdiction on a case-by-case basis. We research and evaluate our income tax positions, including why we believe they are compliant with income tax regulations, and these positions are documented internally.

Deferred income taxes result from the differences between the financial and tax basis of our assets and liabilities and are adjusted for changes in tax rates and tax laws when changes are enacted. If it is more likely than not that all or a portion of deferred tax assets will not be realized, a valuation allowance is provided against such deferred tax assets. Significant judgment is required in evaluating the need for and magnitude of appropriate valuation allowances against deferred tax assets. The assessment of realization of deferred tax assets is performed annually under scenarios of future taxable income and tax planning alternatives that are considered reasonable in the circumstances.

### Recent Accounting Pronouncements

See Note 1 of Consolidated Financial Statements for a discussion of recent accounting pronouncements and their effect on us.

F-103

CC-BLG003807

**W. R. GRACE & CO. AND SUBSIDIARIES**
**SCHEDULE II—VALUATION AND QUALIFYING ACCOUNTS AND RESERVES**
*(In millions)*

### For the Year Ended December 31, 2008

| Description | | Balance at beginning of period | | Charged/ (credited) to costs and expenses | | Deductions | | Other net(3) | | Balance at end of period |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | *Additions/(deductions)* | | | | | | |
| Valuation and qualifying accounts deducted from assets: | | | | | | | | | | |
| Allowances for notes and accounts receivable | $ | 6.9 | $ | 2.2 | $ | (2.6) | $ | 0.2 | $ | 6.7 |
| Allowances for long-term receivables | | — | | — | | — | | — | | — |
| Valuation allowance for deferred tax assets | | 143.0 | | (11.0) | | — | | — | | 132.0 |
| Reserves: | | | | | | | | | | |
| Reserves for asbestos-related litigation | | 1,700.0 | | — | | — | | — | | 1,700.0 |
| Reserves for environmental remediation | | 394.7 | | 14.6 | | (256.9) | | (0.2) | | 152.2 |
| Reserves for retained obligations of divested businesses | $ | 36.2 | $ | — | $ | (1.1) | $ | — | $ | 35.1 |

### For the Year Ended December 31, 2007

| Description | | Balance at beginning of period | | Charged/ (credited) to costs and expenses | | Deductions | | Other net(3) | | Balance at end of period |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | *Additions/(deductions)* | | | | | | |
| Valuation and qualifying accounts deducted from assets: | | | | | | | | | | |
| Allowances for notes and accounts receivable | $ | 8.3 | $ | (0.4) | $ | (0.7) | $ | (0.3) | $ | 6.9 |
| Allowances for long-term receivables | | 0.5 | | (0.5) | | — | | — | | — |
| Valuation allowance for deferred tax assets | | 185.2 | | (42.2) | | — | | — | | 143.0 |
| Reserves: | | | | | | | | | | |
| Reserves for asbestos-related litigation | | 1,700.0 | | — | | — | | — | | 1,700.0 |
| Reserves for environmental remediation | | 361.1 | | 17.0 | | (9.5) | | 26.1(1) | | 394.7 |
| Reserves for retained obligations of divested businesses | $ | 23.3 | $ | — | $ | (1.0) | $ | 13.9(2) | $ | 36.2 |

### For the Year Ended December 31, 2006

| Description | | Balance at beginning of period | | Charged/ (credited) to costs and expenses | | Deductions | | Other net(3) | | Balance at end of period |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | *Additions/(deductions)* | | | | | | |
| Valuation and qualifying accounts deducted from assets: | | | | | | | | | | |
| Allowances for notes and accounts receivable | $ | 6.7 | $ | 3.5 | $ | (1.7) | $ | (0.2) | $ | 8.3 |
| Allowances for long-term receivables | | 0.7 | | (0.2) | | — | | — | | 0.5 |
| Valuation allowance for deferred tax assets | | 245.3 | | (60.1) | | — | | — | | 185.2 |
| Reserves: | | | | | | | | | | |
| Reserves for asbestos-related litigation | | 1,700.0 | | — | | — | | — | | 1,700.0 |
| Reserves for environmental remediation | | 342.0 | | 30.0 | | (10.9) | | — | | 361.1 |
| Reserves for retained obligations of divested businesses | $ | 23.4 | $ | 4.0 | $ | (3.6) | $ | (0.5) | $ | 23.3 |

(1) Reclassification of accrued interest on payments related to Libby, Montana EPA settlement

(2) Primarily represents a reclassification from tax reserves

(3) Various miscellaneous adjustments against reserves and effects of foreign currency translation

F-104

CC-BLG003808

EXHIBIT 12

**W.R. GRACE & CO. AND SUBSIDIARIES**
COMPUTATION OF RATIO OF EARNINGS TO FIXED CHARGES AND
COMBINED FIXED CHARGES AND PREFERRED STOCK DIVIDENDS(1)
*(In millions, except ratios)*
*(Unaudited)*

| | Year Ended December 31,(2) | | | | |
|---|---|---|---|---|---|
| | 2008(3) | 2007(3) | 2006(3) | 2005(3) | 2004(3) |
| Net income (loss) from continuing operations | $ 121.5 | $ 88.8 | $ 8.6 | $ 76.0 | $(395.7) |
| Provision for (benefit from) income taxes | 4.3 | (1.1) | 2.8 | 26.0 | 2.0 |
| Minority interest in income (loss) of majority owned subsidiaries | 15.2 | 24.1 | 24.8 | 21.7 | 9.4 |
| Equity in unremitted losses (earnings) of less than 50%-owned companies | 0.6 | — | — | — | — |
| Interest expense and related financing costs, including amortization of capitalized interest | 54.9 | 73.0 | 74.1 | 56.6 | 112.6 |
| Estimated amount of rental expense deemed to represent the interest factor | 7.9 | 6.9 | 6.2 | 6.2 | 5.6 |
| Income (loss) as adjusted | $ 204.4 | $191.7 | $116.5 | $186.5 | $(266.1) |
| | | | | | |
| Combined fixed charges and preferred stock dividends: | | | | | |
| Interest expense and related financing costs, including capitalized interest | $ 70.4 | $ 88.5 | $101.6 | $ 54.9 | $ 100.7 |
| Estimated amount of rental expense deemed to represent the interest factor | 7.9 | 6.9 | 6.2 | 6.2 | 5.6 |
| Fixed charges | 78.3 | 95.4 | 107.8 | 61.1 | 106.3 |
| Combined fixed charges and preferred stock dividends | $ 78.3 | $ 95.4 | $107.8 | $ 61.1 | $ 106.3 |
| Ratio of earnings to fixed charges | 2.61 | 2.01 | 1.08 | 3.05 | (5) |
| Ratio of earnings to combined fixed charges and preferred stock dividends | 2.61 | 2.01 | 1.08 | 3.05 | (5) |

(1)   Grace preferred stocks were retired in 1996.

(2)   Certain amounts have been restated to conform to the 2008 presentation.

(3)   Amounts in 2008, 2007, 2006, and 2005 contain provisions for environmental remediation of $14.6, $17.0 million, $30.0 million, and $25.0 million, respectively.

(4)   Amounts reflect the following adjustments: a $476.6 million accrual to increase our recorded asbestos-related liability, net of expected insurance recovery of $238.2 million; a $94.1 million accrual to increase our estimate of interest to which general unsecured creditors would be entitled; and a $151.7 million credit for net income tax benefits related to the items described above.

(5)   As a result of the losses incurred for the year ended December 31, 2004, we were unable to fully cover the indicated fixed charges (a shortfall of $372.4 million).

F-105

CC-BLG003809

EXHIBIT 31(I).1

## CERTIFICATION OF PERIODIC REPORT UNDER SECTION 302 OF
## THE SARBANES-OXLEY ACT OF 2002

I, A. E. Festa, certify that:

1.  I have reviewed this annual report on Form 10-K of W. R. Grace & Co.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 27, 2009

/s/ A. E. FESTA

A. E. Festa
*President and Chief Executive Officer*

F-106

CC-BLG003810

EXHIBIT 31(i).2

**CERTIFICATION OF PERIODIC REPORT UNDER SECTION 302 OF
THE SARBANES-OXLEY ACT OF 2002**

I, Hudson La Force III, certify that:

1.    I have reviewed this annual report on Form 10-K of W. R. Grace & Co.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)    designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)    evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)    disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 27, 2009

/s/ HUDSON LA FORCE III

Hudson La Force III
*Senior Vice President and*
*Chief Financial Officer*

F-107

CC-BLG003811

EXHIBIT 32

**CERTIFICATION UNDER SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. Section 1350), the undersigned certifies that (1) this Annual Report of W. R. Grace & Co. (the "Company") on Form 10-K for the period ended December 31, 2008, as filed with the Securities and Exchange Commission on the date hereof (this "Report"), fully complies with the requirements of Sections 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, and (2) the information contained in this Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ ALFRED E. FESTA

*President and Chief Executive Officer*

/s/ HUDSON LA FORCE III

*Senior Vice President and Chief Financial Officer*

Date: February 27, 2009

A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

F-108

CC-BLG003812

EXHIBIT 2.2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., *et al.* | ) | Case No. 01-1139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |

**FIRST AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE OF W. R. GRACE & CO., ET AL., THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS, THE ASBESTOS PI FUTURE CLAIMANTS' REPRESENTATIVE, AND THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS DATED FEBRUARY 27, 2009**

CC-BLG003813

David M. Bernick, P.C.
Theodore L. Freedman
Deanna D. Boll
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022
Telephone: (212) 446-4800

Laura Davis Jones (#2436)
James E. O'Neill (#4042)
Timothy Cairns (#4228)
PACHULSKI STANG ZIEHL & JONES LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100

*Counsel for the Debtors and Debtors in Possession*

Roger Frankel
Richard H. Wyron
Debra L. Felder
ORRICK, HERRINGTON & SUTCLIFFE LLP
Columbia Center
1152 15th Street, NW
Washington, DC 20005-1706
Telephone: (202) 339-8400

John C. Phillips, Jr. (#110)
PHILLIPS, GOLDMAN & SPENCE, P.A.
1200 North Broom Street
Wilmington, DE 19806
Telephone: (302) 655-4200

*Counsel for David T. Austern,*
*Asbestos PI Future Claimants' Representative*

Elihu Inselbuch
CAPLIN & DRYSDALE, CHARTERED
375 Park Avenue, 35th Floor
New York, NY 10152-3500
Telephone: (212) 319-7125

Peter Van N. Lockwood
Ronald Reinsel
Jeffrey Liesemer
CAPLIN & DRYSDALE, CHARTERED
One Thomas Circle, NW
Washington, DC 20005
Telephone: (202) 862-5000

Marla R. Eskin (#2989)
Mark T. Hurford (#3299)
CAMPBELL & LEVINE, LLC
800 King Street, Suite 300
Wilmington, DE 19801
Telephone: (302) 426-1900

*Counsel for the Official Committee of*
*Asbestos Personal Injury Claimants*

Philip Bentley
Douglas Mannal
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100

Teresa K.D. Currier (#3080)
BUCHANAN INGERSOLL & ROONEY PC
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE 19801
Telephone: (302) 552-4200

*Counsel for the Official Committee of Equity Security Holders*

ii

CC-BLG003814

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| ARTICLE 1 DEFINITIONS, CONSTRUCTION OF TERMS, EXHIBITS AND ANCILLARY DOCUMENTS | | 2 |
| 1.1 | DEFINED TERMS | 2 |
| 1.2 | OTHER TERMS/INTERPRETATION | 40 |
| 1.3 | THE PLAN DOCUMENTS | 41 |
| 1.4 | ANCILLARY DOCUMENTS | 41 |
| ARTICLE 2 PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS | | 41 |
| 2.1 | UNCLASSIFIED CLAIMS | 41 |
| | 2.1.1 PAYMENT OF ALLOWED ADMINISTRATIVE EXPENSE CLAIMS | 41 |
| | 2.1.2 PRIORITY TAX CLAIMS | 44 |
| ARTICLE 3 CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS | | 44 |
| 3.1 | SUMMARY | 44 |
| | 3.1.1 Class 1. Priority Claims | 45 |
| | 3.1.2 Class 2. Secured Claims | 45 |
| | 3.1.3 Class 3. Employee Benefit Claims | 46 |
| | 3.1.4 Class 4. Workers' Compensation Claims | 46 |
| | 3.1.5 Class 5. Intercompany Claims | 47 |
| | 3.1.6 Class 6. Asbestos PI Claims | 47 |
| | 3.1.7 Class 7. Asbestos PD Claims | 48 |
| | 3.1.8 Class 8. CDN ZAI PD Claims | 50 |
| | 3.1.9 Class 9. General Unsecured Claims | 50 |
| | 3.1.10 Class 10. Equity Interests in the Parent | 55 |
| | 3.1.11 Class 11. Equity Interests in the Debtors other than the Parent | 55 |
| ARTICLE 4 MODIFICATION OR WITHDRAWAL OF THIS PLAN | | 55 |
| 4.1 | MODIFICATION OF THE PLAN; AMENDMENT OF PLAN DOCUMENTS | 55 |
| | 4.1.1 Modification of the Plan | 55 |
| | 4.1.2 Post-Effective Date Amendment of Other Plan Documents | 56 |
| 4.2 | WITHDRAWAL OF THIS PLAN | 56 |

i

TABLE OF CONTENTS
(continued)

| | | | Page |
|---|---|---|---|
| 4.2.1 | Right to Withdraw this Plan | | 56 |
| 4.2.2 | Effect of Withdrawal | | 56 |
| ARTICLE 5 PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS AND ASBESTOS CLAIMS GENERALLY | | | 56 |
| 5.1 | OBJECTION TO CLAIMS (OTHER THAN ASBESTOS PI CLAIMS, ASBESTOS PD CLAIMS, AND CDN ZAI PD CLAIMS); PROSECUTION OF DISPUTED CLAIMS | | 57 |
| 5.2 | RESOLUTION OF ASBESTOS PI CLAIMS | | 57 |
| 5.3 | RESOLUTION OF ASBESTOS PD CLAIMS | | 57 |
| 5.4 | RESOLUTION OF CDN ZAI PD CLAIMS | | 58 |
| ARTICLE 6 ACCEPTANCE OR REJECTION OF THIS PLAN | | | 58 |
| 6.1 | IMPAIRED CLASSES TO VOTE | | 58 |
| 6.2 | ACCEPTANCE BY IMPAIRED CLASSES OF CLAIMS | | 58 |
| 6.3 | PRESUMED ACCEPTANCE OF THIS PLAN | | 58 |
| 6.4 | ACCEPTANCE PURSUANT TO SECTION 524(G) OF THE BANKRUPTCY CODE. | | 58 |
| 6.5 | NONCONSENSUAL CONFIRMATION | | 58 |
| 6.5.1 | Cram Down | | 58 |
| 6.5.2 | General Reservation of Rights | | 59 |
| ARTICLE 7 IMPLEMENTATION OF THIS PLAN | | | 59 |
| 7.1 | CORPORATE GOVERNANCE | | 59 |
| 7.1.1 | Amendment of Certificates of Incorporation of the Debtors | | 59 |
| 7.1.2 | Amendment of By-Laws of the Parent | | 60 |
| 7.1.3 | Precedence of Share Issuance Obligations | | 60 |
| 7.1.4 | Warrants | | 60 |
| 7.2 | THE ASBESTOS PI TRUST | | 61 |
| 7.2.1 | Creation of the Asbestos PI Trust | | 61 |
| 7.2.2 | Funding of the Asbestos PI Trust | | 62 |
| 7.2.3 | Transfer of Claims and Demands to the Asbestos PI Trust | | 63 |
| 7.2.4 | Assignment and Enforcement of Asbestos PI Trust Causes of Action | | 63 |
| 7.2.5 | Appointment and Termination of Asbestos PI Trustees | | 64 |

ii

CC-BLG003816

TABLE OF CONTENTS
(continued)

|  |  |  | Page |
|---|---|---|---|
| | 7.2.6 | Creation and Termination of the Asbestos PI TAC | 64 |
| | 7.2.7 | Cooperation Agreement | 64 |
| | 7.2.8 | Institution and Maintenance of Legal and other Proceedings | 64 |
| 7.3 | | THE ASBESTOS PD TRUST | 64 |
| | 7.3.1 | Creation of the Asbestos PD Trust | 64 |
| | 7.3.2 | Funding of the Asbestos PD Trust | 65 |
| | 7.3.3 | Transfer of Claims and Demands to the Asbestos PD Trust | 66 |
| | 7.3.4 | Assignment and Enforcement of Asbestos PD Trust Causes of Action | 66 |
| | 7.3.5 | Appointment and Termination of Asbestos PD Trustees | 67 |
| | 7.3.6 | Creation and Termination of the Zonolite Attic Insulation TAC | 67 |
| 7.4 | | PAYMENTS AND DISTRIBUTIONS UNDER THIS PLAN | 67 |
| | 7.4.1 | Asbestos PI Trust Payments, Asbestos PD Trust Payments and Plan Distributions | 67 |
| | 7.4.2 | Timing of Plan Distributions | 68 |
| | 7.5 | DELIVERY OF DISTRIBUTIONS AND UNDELIVERABLE OR UNCLAIMED DISTRIBUTIONS | 68 |
| | 7.5.1 | Delivery by the Reorganized Debtors of Distributions in General | 68 |
| | 7.5.2 | Undeliverable Distributions by the Reorganized Debtors | 68 |
| 7.6 | | PAYMENTS UNDER THIS PLAN | 69 |
| | 7.6.1 | Manner of Cash Payments under this Plan | 69 |
| | 7.6.2 | Fractional Payments under this Plan | 69 |
| 7.7 | | CONDITIONS TO OCCURRENCE OF THE CONFIRMATION DATE | 69 |
| 7.8 | | CONDITIONS TO OCCURRENCE OF THE EFFECTIVE DATE | 81 |
| 7.9 | | MANAGEMENT OF THE REORGANIZED DEBTORS | 85 |
| 7.10 | | CORPORATE ACTION | 85 |
| 7.11 | | EFFECTUATING DOCUMENTS AND FURTHER TRANSACTIONS | 85 |
| 7.12 | | ALLOCATION OF PLAN DISTRIBUTIONS BETWEEN PRINCIPAL AND INTEREST | 85 |
| 7.13 | | NO SUCCESSOR LIABILITY | 86 |

iii

TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|
| 7.14 | DEEMED CONSOLIDATION OF THE DEBTORS FOR PLAN PURPOSES ONLY | 86 |
| 7.15 | INSURANCE NEUTRALITY | 87 |
| ARTICLE 8 INJUNCTIONS, RELEASES & DISCHARGE | | 88 |
| 8.1 | DISCHARGE | 88 |
| | 8.1.1   Discharge of the Debtors and Related Discharge Injunction | 89 |
| | 8.1.2   Discharge of Liabilities to Holders of Asbestos PI Claims | 89 |
| | 8.1.3   Discharge of Liabilities to Holders of Asbestos PD Claims | 89 |
| | 8.1.4   Discharge of Liabilities to Holders of CDN ZAI PD Claims | 89 |
| | 8.1.5   Disallowed Claims and Disallowed Equity Interests | 89 |
| | 8.1.6   Non-Dischargeable ERISA Liability | 90 |
| 8.2 | THE ASBESTOS PI CHANNELING INJUNCTION | 90 |
| | 8.2.1   Asbestos PI Channeling Injunction | 90 |
| | 8.2.2   Reservations from Asbestos PI Channeling Injunction | 91 |
| 8.3 | THE ASBESTOS PD CHANNELING INJUNCTION | 93 |
| | 8.3.1   Asbestos PD Channeling Injunction | 93 |
| | 8.3.2   Reservations from Asbestos PD Channeling Injunction | 94 |
| 8.4 | ASBESTOS INSURANCE ENTITY INJUNCTION | 96 |
| | 8.4.1   Asbestos Insurance Entity Injunction | 96 |
| 8.5 | SUCCESSOR CLAIMS INJUNCTION | 97 |
| | 8.5.1   Injunction | 98 |
| 8.6 | INJUNCTIONS AND RELEASES RELATED TO THE SEALED AIR INDEMNIFIED PARTIES AND FRESENIUS INDEMNIFIED PARTIES | 98 |
| 8.7 | TERM OF CERTAIN INJUNCTIONS AND AUTOMATIC STAY | 99 |
| | 8.7.1   Injunctions and/or Automatic Stays in Existence Immediately prior to Confirmation | 99 |
| | 8.7.2   Injunctions Provided for in this Plan | 99 |
| 8.8 | ADDITIONAL RELEASES AND INDEMNIFICATION | 99 |
| | 8.8.1   Release of Sealed Air Indemnified Parties | 99 |
| | 8.8.2   Reservation of Rights With Respect to Cryovac Transaction Contractual Obligations | 100 |

iv

CC-BLG003818

TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|
| 8.8.3 | Release of Fresenius Indemnified Parties | 101 |
| 8.8.4 | Assumption of 1998 Tax Sharing Agreement and Section 4.04 of the TSIA | 101 |
| 8.8.5 | Effect of the Fresenius Settlement Agreement, the Fresenius Settlement Order, and the Sealed Air Settlement Agreement | 102 |
| 8.8.6 | Release of Avoidance Actions | 102 |
| 8.8.7 | Specific Releases by Holders of Claims or Equity Interests | 102 |
| 8.8.8 | Release by Debtors and Estate Parties | 103 |
| 8.8.9 | Indemnification of Representatives of the Debtors and Non-Debtor Affiliates | 103 |
| 8.8.10 | Indemnification of Reorganized Debtors and Their Representatives by the Asbestos PI Trust | 103 |
| 8.8.11 | Indemnification of the Reorganized Debtors and Their Representatives by the Asbestos PD Trust | 104 |
| ARTICLE 9 EXECUTORY CONTRACTS, UNEXPIRED LEASES, LETTERS OF CREDIT, SURETY BONDS, COMPENSATION, INDEMNITY AND BENEFIT PROGRAMS | | 105 |
| 9.1 | ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 105 |
| 9.1.1 | Assumption Generally. | 105 |
| 9.1.2 | Assumption Procedures. | 105 |
| 9.1.3 | Rejection of Certain Executory Contracts and Unexpired Leases. | 107 |
| 9.2 | LETTERS OF CREDIT AND SURETY BONDS | 108 |
| 9.3 | COMPENSATION, INDEMNITY AND BENEFIT PROGRAM | 108 |
| 9.3.1 | Employee Benefits. | 108 |
| 9.3.2 | Retiree Benefits. | 109 |
| 9.3.3 | Workers' Compensation Benefits. | 109 |
| ARTICLE 10 RETENTION OF JURISDICTION | | 109 |
| 10.1 | PLAN DOCUMENTS | 109 |
| 10.2 | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 109 |
| 10.3 | DISPUTED CLAIMS ALLOWANCE/DISALLOWANCE | 110 |

v

CC-BLG003819

TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|
| 10.4 | ENFORCEMENT/MODIFICATION OF THIS PLAN AND THE RELEASES, INJUNCTIONS AND DISCHARGE PROVIDED UNDER THE PLAN | 110 |
| 10.5 | COMPENSATION OF PROFESSIONALS | 111 |
| 10.6 | SETTLEMENTS | 111 |
| 10.7 | TAXES | 111 |
| 10.8 | SPECIFIC PURPOSES | 111 |
| 10.9 | INSURANCE MATTERS | 111 |
| ARTICLE 11 MISCELLANEOUS PROVISIONS | | 112 |
| 11.1 | AUTHORITY OF THE DEBTORS | 112 |
| 11.2 | AUTHORITY OF THE REORGANIZED DEBTORS TO GRANT NEW STOCK INCENTIVE PLAN AND IMPOSE STOCK TRADING RESTRICTIONS | 112 |
| 11.3 | PAYMENT OF STATUTORY FEES | 112 |
| 11.4 | RETAINED CAUSES OF ACTION | 112 |
| | 11.4.1   Maintenance of Causes of Action | 113 |
| | 11.4.2   Preservation of All Causes of Action not Expressly Settled or Released | 114 |
| 11.5 | THIRD-PARTY AGREEMENTS | 114 |
| 11.6 | REQUIREMENTS OF THE FRESENIUS SETTLEMENT AGREEMENT | 114 |
| 11.7 | REQUIREMENTS OF THE SEALED AIR SETTLEMENT AGREEMENT | 114 |
| 11.8 | DISSOLUTION OF THE UNSECURED CREDITORS' COMMITTEE, THE ASBESTOS PI COMMITTEE, THE ASBESTOS PD COMMITTEE AND THE EQUITY COMMITTEE; CONTINUED RETENTION OF THE ASBESTOS PI FUTURE CLAIMANTS' REPRESENTATIVE AND THE ASBESTOS PD FUTURE CLAIMANTS' REPRESENTATIVE | 114 |
| 11.9 | EXCULPATION | 115 |
| 11.10 | TITLE TO ASSETS; DISCHARGE OF LIABILITIES | 116 |
| 11.11 | ENTIRE AGREEMENT | 116 |
| 11.12 | NOTICES | 116 |
| 11.13 | HEADINGS | 120 |

CC-BLG003820

TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|
| 11.14 | GOVERNING LAW | 120 |
| 11.15 | FILING OF ADDITIONAL DOCUMENTS | 120 |
| 11.16 | COMPLIANCE WITH TAX REQUIREMENTS | 120 |
| 11.17 | EXEMPTION FROM TRANSFER TAXES | 120 |
| 11.18 | FURTHER ASSURANCES | 120 |
| 11.19 | FURTHER AUTHORIZATIONS | 121 |

vii

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., *et al.* | ) | Case No. 01-1139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |

**FIRST AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE OF W. R. GRACE & CO., ET AL, THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS, THE ASBESTOS PI FUTURE CLAIMANTS' REPRESENTATIVE, AND THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS DATED FEBRUARY 27, 2009**

THIS PLAN(1) PROVIDES, AMONG OTHER THINGS, FOR THE ISSUANCE OF INJUNCTIONS THAT (A) RESULT IN THE CHANNELING OF ALL ASBESTOS PERSONAL INJURY CLAIMS, ASBESTOS PROPERTY DAMAGE CLAIMS, AND CDN ZAI PD CLAIMS (INCLUDING ALL RELATED SUCCESSOR CLAIMS) AGAINST W. R. GRACE & CO. AND THE ASBESTOS PROTECTED PARTIES (AS DEFINED HEREIN) INTO TRUSTS AND/OR A CLAIMS FUND AND (B) ENJOIN ALL SUCCESSOR CLAIMS BASED ON OR ARISING FROM, IN WHOLE OR IN PART, DIRECTLY OR INDIRECTLY, THE CRYOVAC TRANSACTION OR FRESENIUS TRANSACTION AGAINST W. R. GRACE & CO. AND THE ASBESTOS PROTECTED PARTIES (AS DEFINED HEREIN), EACH AS MORE FULLY DESCRIBED HEREIN.

This Plan constitutes a settlement of all Claims and Demands against the Debtors on, and subject to, the terms described herein and the other Plan Documents. Nothing in the Plan Documents constitutes an admission by the Debtors as to the existence, merits, or amount of the Debtors' actual present or future liability on account of any Claim or Demand except to the extent that such liability is specifically provided for in the Plan or the other Plan Documents in accordance with the Confirmation Order effective as of the Effective Date.

This Plan is not an offer with respect to any securities or a solicitation of acceptances of this Plan; any such offer or solicitation will only be made in compliance with applicable law, including applicable provisions of securities laws and the Bankruptcy Code. This Plan has not been filed with or reviewed by the Securities and Exchange Commission or any securities regulatory authority of any state under the Securities Act of 1933, as amended, or under any state securities or "blue sky" laws. This Plan has not been approved or disapproved by any court or

---

(1)    Unless otherwise indicated, capitalized terms shall have the meanings ascribed to them in Article 1 of this Plan.

CC-BLG003821

the Securities and Exchange Commission. Any representation to the contrary is a criminal offense.

The Debtors, the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders hereby jointly propose the following Plan of Reorganization pursuant to the provisions of chapter 11 of title 11 of the United States Code for W. R. Grace & Co. and the other Debtors in these Chapter 11 Cases. Reference is made to the Disclosure Statement distributed contemporaneously herewith for, among other things, a discussion of the history, businesses, properties, and results of operations of the Debtors, and risks associated with this Plan.

### ARTICLE 1
### DEFINITIONS, CONSTRUCTION OF TERMS, EXHIBITS
### AND ANCILLARY DOCUMENTS

1.1    **DEFINED TERMS**

### Definitions

Terms defined in this Section 1 apply to the Plan, the Disclosure Statement and the other Plan Documents (unless specifically provided otherwise in any such Plan Document).

1.      "**1998 Tax Sharing Agreement**" means the Tax Sharing Agreement by and among Old Grace Delaware, Grace-Conn., and Old Sealed Air Corporation, dated as of March 30, 1998.

2.      "**Administrative Expense Claim**" shall mean: (i) any Claim constituting a cost or expense of administration in the Chapter 11 Cases, on or after the Petition Date but prior to the Effective Date, under Bankruptcy Code §§ 503(b), 507(a)(1), 507(b) or 1114(e)(2), including: (a) any actual and necessary costs and expenses of preserving the estates of the Debtors, (b) any actual and necessary costs and expenses of operating the businesses of the Debtors, (c) any indebtedness or obligation incurred or assumed by the Debtors (including any executory contracts of the Debtors assumed pursuant to Bankruptcy Code § 365 by order of the Bankruptcy Court or the Plan) in connection with the conduct of their businesses or for the acquisition or lease of property or the rendition of services, and (d) any allowed compensation or reimbursement of expenses awarded or allowed under Bankruptcy Code §§ 330(a), 331 or 503, and (ii) any fees or charges assessed against the estates of the Debtors under 28 U.S.C. § 1930.

3.      "**Affiliate**" shall mean as to any specified Entity: (i) any other Entity that, directly or indirectly through one or more intermediaries or otherwise, controls, is controlled by, or is under common control with, the specified Entity, and (ii) any Entity that is an "affiliate" (within the meaning of Bankruptcy Code § 101(2)) of the specified Entity. As used in clause (i) of this definition, "control" shall include the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of an Entity (whether through ownership of Capital Stock of that Entity, by contract, or otherwise).

2

CC-BLG003822

4.    "Allowed" shall mean:

(a)    With respect to Asbestos PD Claims in Class 7A, such Asbestos PD Claim in such amount as is set forth (i) in any PD Settlement Agreement and subject to the terms set forth in the Asbestos PD Trust Agreement, or (ii) after the Effective Date, as set forth in any stipulation, order, judgment, decree, or agreement approved by a Final Order of the Bankruptcy Court or such other United States District Court as is authorized to determine the liability of the Asbestos PD Trust on account of such Asbestos PD Claims as set forth in the Class 7A CMO;

(b)    With respect to any Plan Claim other than an Administrative Expense Claim or an Asbestos Claim, as to which a proof of claim was Filed within the applicable period of limitation fixed in accordance with Bankruptcy Rule 3003(c)(3) by the Court, (i) as to which no objection to the allowance thereof has been interposed within the applicable period of limitations fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order of the Bankruptcy Court, (ii) as to which an objection to the allowance thereof has been interposed within such time as is set by the Bankruptcy Court pursuant to the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order of the Bankruptcy Court, such Plan Claim to the extent that such objection has been (A) overruled in whole or in part by a Final Order of the Bankruptcy Court, (B) resolved by agreement of the Debtors and the Claimant which is approved by a Final Order of the Bankruptcy Court, (C) resolved by agreement of the Reorganized Debtors and the Claimant pursuant to Section 5.1 of the Plan, or (D) determined by Final Order in the Chapter 11 Cases, or (iii) as to which such Claim is listed on an Undisputed Claims Exhibit indicating allowance thereof, which has been Filed pursuant to Section 5.1 of the Plan;

(c)    With respect to any Plan Claim other than an Administrative Expense Claim or Asbestos Claim, as to which no proof of claim was Filed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order of the Bankruptcy Court, such Plan Claim to the extent that it has been listed by the Debtors in their Schedules as liquidated in amount and not disputed or contingent and not otherwise subject to an objection Filed within such time as is set by the Bankruptcy Court pursuant to the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order of the Bankruptcy Court;

(d)    With respect to any Equity Interest in Parent, any Equity Interest registered in the stock register maintained by or on behalf of the Debtors as of the Confirmation Date; and

(e)    With respect to any Administrative Expense Claim:

3

CC-BLG003823

(i)      that represents a Claim of a Professional, such a Claim to the extent it is allowed in whole or in part by a Final Order of the Bankruptcy Court; or

(ii)     other than with respect to a Claim of a Professional, (X) a Claim to the extent that the Debtors or the Reorganized Debtors determine it to constitute an Administrative Expense Claim, or (Y) a Claim to the extent it is allowed in whole or in part by a Final Order of the Bankruptcy Court and only to the extent that such allowed portion is deemed, pursuant to a Final Order of the Bankruptcy Court, to constitute a cost or expense of administration under Bankruptcy Code §§ 503 or 1114.

5.        **"Allowed Amount"** shall mean the dollar amount of an Allowed Plan Claim (other than an Asbestos PI Claim).

6.        **"Asbestos Claims"** shall mean any and all Asbestos PI Claims (including Indirect PI Trust Claims, CDN ZAI PI Claims, and Asbestos Medical Monitoring Claims), CDN ZAI PD Claims, Workers' Compensation Claims that are SA Asbestos Personal Injury Claims, Asbestos PD Claims (including US ZAI PD Claims and Indirect PD Trust Claims), SA Asbestos Personal Injury Claims, and SA Asbestos Property Damage Claims, and any and all Demands related thereto.

7.        **"Asbestos In-Place Insurance Coverage"** means any insurance coverage issued to any Insurance Contributor to the extent available to be utilized for the payment or reimbursement of liability, indemnity, or defense costs arising from or related to Asbestos PI Claims or Asbestos PI Trust Expenses under any Asbestos Insurance Policy or Asbestos Insurance Settlement Agreement; *provided, however* , that the term "Asbestos In-Place Insurance Coverage" shall not include any Asbestos Insurance Reimbursement Agreement.

8.        **"Asbestos Insurance Action"** shall mean any claim, cause of action, or right of any Insurance Contributor, under the laws of any jurisdiction, against any Asbestos Insurance Entity, arising from or based on: (i) any such Asbestos Insurance Entity's failure to provide coverage for, or failure to pay or agree to pay, any claim under any Asbestos Insurance Policy, Asbestos In-Place Insurance Coverage, Asbestos Insurance Reimbursement Agreement, or Asbestos Insurance Settlement Agreement; (ii) the refusal of any such Asbestos Insurance Entity to compromise or settle any claim under or pursuant to any Asbestos Insurance Policy, Asbestos In-Place Insurance Coverage, Asbestos Insurance Reimbursement Agreement, or Asbestos Insurance Settlement Agreement; (iii) the interpretation or enforcement of the terms of any Asbestos Insurance Policy, Asbestos In-Place Insurance Coverage, Asbestos Insurance Reimbursement Agreement, or Asbestos Insurance Settlement Agreement; or (iv) any conduct of any Asbestos Insurance Entity constituting "bad faith" or other wrongful conduct under applicable law with respect to any Asbestos Insurance Policy, Asbestos In-Place Insurance Coverage, Asbestos Insurance Reimbursement Agreement, or Asbestos Insurance Settlement Agreement.

4

CC-BLG003824

9.    **"Asbestos Insurance Reimbursement Agreement"** means any agreement entered into prior to the Petition Date between the Debtors or Non-Debtor Affiliates, or any of them or their predecessors, on the one hand, and any Asbestos Insurance Entity, on the other hand, pursuant to which the Asbestos Insurance Entity agreed to reimburse the Debtors or the Non-Debtor Affiliates, or any of them or their predecessors, for certain liability, indemnity, or defense costs arising from or related to asbestos-related claims, including Asbestos PI Claims. The known Asbestos Insurance Reimbursement Agreements are listed on Schedule 3 to the Asbestos Insurance Transfer Agreement.

10.   **"Asbestos Insurance Entity"** shall mean any Entity, including any insurance company, broker, or guaranty association, that has issued, or that has or had actual or potential liability, duties or obligations under or with respect to, any Asbestos Insurance Policy.

11.   **"Asbestos Insurance Entity Injunction"** shall mean the injunction described in Section 8.4 of the Plan.

12.   **"Asbestos Insurance Policy"** shall mean any insurance policy under which any Insurance Contributor has or had insurance coverage with a policy period incepting prior to June 30, 1985, whether known or unknown, that actually or potentially provides insurance coverage for any Asbestos Claim, including the policies listed on schedule 1 attached to Exhibit 6 in the Exhibit Book; *provided* that an Asbestos Insurance Policy shall not include any rights or obligations under any insurance policy or settlement agreement to which any of the Debtors are a party to the extent, but only to the extent, that such rights or obligations pertain solely to coverage for Workers' Compensation Claims.

13.   **"Asbestos Insurance Rights"** shall mean any and all rights, titles, privileges, interests, claims, demands or entitlements of the Insurance Contributors to any proceeds, payments, escrowed funds, initial or supplemental dividends, scheme payments, supplemental scheme payments, causes of action, and choses in action of any Insurance Contributor with respect to any Asbestos Insurance Policy, Asbestos Insurance Settlement Agreement, Asbestos In-Place Insurance Coverage, or Asbestos Insurance Reimbursement Agreement, including all Asbestos Insurance Actions, whether now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, including:

    (a)    any and all rights of any Insurance Contributor to pursue or receive payments or proceeds under any Asbestos Insurance Policy, whether for liability, defense, or otherwise;

    (b)    any and all rights of any Insurance Contributor to pursue or receive payments made or proceeds received on or after April 6, 2008, pursuant to any Asbestos Insurance Settlement Agreement or Asbestos In-Place Insurance Coverage, together with all interest earned thereon;

5

CC-BLG003825

(c)    any and all proceeds of the settlement with Lloyd's Underwriters, together with all interest earned thereon;

(d)    any and all proceeds of all settlements with Asbestos Insurance Entities under Asbestos In-Place Insurance Coverage or installment payment agreements, to the extent payment of the proceeds occurred on or after April 6, 2008;

(e)    any and all rights of any Insurance Contributor to pursue or receive payments from any insolvent Asbestos Insurance Entity, whether in receivership, liquidation, rehabilitation, run-off, or scheme of arrangement, or any other form of proceeding, or from any insolvent insurer's estate, and the proceeds of all payments received by any Insurance Contributor from any such insolvent Asbestos Insurance Entity or such insolvent insurer's estate on or after April 6, 2008, together with all interest earned on such proceeds;

(f)    any and all rights of any Insurance Contributor to pursue or receive payments with respect to Asbestos PI Claims from any insurance guaranty association; and

(g)    any and all rights of any Insurance Contributor to pursue or receive payments pursuant to an exception to a workers' compensation exclusion in any Asbestos Insurance Policy;

provided that, other than the rights identified in Section 1.1.12(g) above, Asbestos Insurance Rights shall not include any rights or obligations under any insurance policy, settlement agreement, or coverage-in-place agreement to which any Insurance Contributor is a party to the extent, but only to the extent, that such rights or obligations pertain solely to coverage for Workers' Compensation Claims; and provided, further, that, for the avoidance of doubt, Asbestos Insurance Rights shall not include any rights, titles, privileges, interests, claims, demands, or entitlements of the Insurance Contributors against any of the Sealed Air Indemnified Parties or the Fresenius Indemnified Parties.

14.    **"Asbestos Insurance Settlement Agreement"** shall mean any settlement agreement between or among any of the Debtors, the Reorganized Debtors, the Non-Debtor Affiliates, or any of them or their predecessors, and any Asbestos Insurance Entity involving any Asbestos Insurance Policy, provided, however, that the term "Asbestos Insurance Settlement Agreement" shall not include any Asbestos Insurance Reimbursement Agreement, and further provided that the parties to an Asbestos Insurance Reimbursement may agree to modify such agreement to become an Asbestos Insurance Settlement Agreement.

15.    **"Asbestos Insurance Transfer Agreement"** shall mean the Asbestos Insurance Transfer Agreement substantially in the form included as Exhibit 6 in the Exhibit Book.

16.    **"Asbestos Insurer Coverage Defenses"** shall mean all rights and defenses at law or in equity that any Asbestos Insurance Entity may have under any Asbestos Insurance Policy, Asbestos Insurance Settlement Agreement, Asbestos In-Place Insurance Coverage, or applicable law to a claim seeking insurance coverage. Asbestos Insurer

CC-BLG003826

Coverage Defenses include any defense based on the terms of the Plan or the Plan Documents or the manner in which the Plan or Plan Documents were negotiated; but Asbestos Insurer Coverage Defenses do not include any defense that (i) the Plan or any of the Plan Documents do not comply with the Bankruptcy Code, or (ii) the transfer of Asbestos Insurance Rights pursuant to the Asbestos Insurance Transfer Agreement is prohibited by any Asbestos Insurance Policy, any Asbestos Insurance Settlement Agreement, any Asbestos In-Place Insurance Coverage or applicable non-bankruptcy law.

17.   **"Asbestos Medical Monitoring Claim"** shall mean: a Claim, Canadian Claim, SA Claim, Grace-Related Claim, or Demand against, or present or future debt, liability, or obligation of, any of the Debtors or the Asbestos Protected Parties, including (x) all related claims, debts, obligations, liabilities or remedies for compensatory (including general, special, and consequential damages) and punitive damages, and (y) all cross-claims, contribution claims, subrogation claims, reimbursement claims or indemnity claims (whether or not such Claim, Canadian Claim, SA Claim, Grace-Related Claim, Demand, remedy, debt, liability, or obligation is reduced to judgment, liquidated, unliquidated, fixed, settled, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; whether or not the facts of or legal bases therefor are known or unknown; and whether in the nature of or sounding in tort, or under contract, warranty, guarantee, contribution, joint and several liability, subrogation, reimbursement or indemnity, or any other theory of law, equity, or admiralty), in each case for, based on, or arising out of, resulting from, or attributable to, directly or indirectly, personal injuries or damages by or on behalf of those who have not, as of the Petition Date, suffered any personal injury but who are alleging that:

(i)     the Debtors (or (x) any of their respective predecessors, successors, or assigns, or any current or former Affiliate of any of the foregoing (including any of the Non-Debtor Affiliates), but only to the extent that any liability is asserted to exist as a result of it being such a predecessor, successor, assign, or current or former Affiliate, or (y) any other Entity for whose products or operations any of the Debtors allegedly has liability or is otherwise liable) wrongfully caused them to be significantly exposed to hazardous asbestos fibers,

(ii)    this exposure significantly increased the Claimant's risk of contracting a serious latent disease,

(iii)   medical monitoring could reasonably be expected to result in early detection of the onset and mitigation of the severity of such disease, and

(iv)    because of this exposure it is necessary for the Claimant to be examined by a physician or receive medical testing more often that he or she otherwise would.

Asbestos Medical Monitoring Claims are included within Asbestos PI Claims.

7

18.   **"Asbestos PD Claim"** shall mean:

(i)     a Claim, Canadian Claim, Indirect PD Trust Claim, SA Claim, Grace-Related Claim, or Demand, if any, against, or present or future debt, liability, or obligation of, any of the Debtors or the Asbestos Protected Parties, including (x) all related claims, debts, obligations, liabilities, and remedies for compensatory (including general, special, and consequential damages) and punitive damages, and (y) all cross-claims, contribution claims, subrogation claims, reimbursement claims, and indemnity claims (whether or not such Claim, Canadian Claim, Indirect PD Trust Claim, SA Claim, Grace-Related Claim, Demand, if any, remedy, debt, liability, or obligation is reduced to judgment, liquidated, unliquidated, fixed, settled, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; whether or not the facts of or legal bases therefor are known or unknown; and whether in the nature of or sounding in tort, or under contract, warranty, guarantee, contribution, joint and several liability, subrogation, reimbursement or indemnity, or any other theory of law, equity, or admiralty):

(a)     arising from acts or omissions of one or more of the Debtors (or any of their respective predecessors, successors, or assigns, or any current or former Affiliate of any of the foregoing (including any of the Non-Debtor Affiliates), or any other Entity for whose products or operations any of the Debtors allegedly has liability or is otherwise liable); and

(b)     for, based on, or arising out of, resulting from, or attributable to, directly or indirectly, the cost of removal, abatement, operations and maintenance activities and programs, diminution of property value, environmental damage, economic loss, or property damage (including the cost of inspecting, maintaining, encapsulating, abating, repairing, decontaminating, removing, or disposing of asbestos or asbestos containing materials or products in buildings or other structures, or other property) caused or allegedly caused by, based on, arising out of, or attributable to, directly or indirectly, in whole or in part:

(1)     the installation in, presence in, or removal of asbestos or asbestos-containing materials or products mined, processed, consumed, used, stored, manufactured, designed, sold, assembled, distributed, supplied, produced, specified, selected, disposed of, installed by, or in any way marketed by, or on behalf of, one or more of the Debtors (or (x) any of their respective predecessors, successors, or assigns, or any current or former Affiliate of any of the foregoing (including any of the Non-Debtor Affiliates), but only to the extent that any liability is asserted to exist as a result of it being such a predecessor, successor, assign, or current or former Affiliate, or (y) any other Entity for whose products or operations any of the Debtors allegedly has liability or is otherwise liable); or

8

CC-BLG003827

(2)  asbestos-containing vermiculite mined, milled, or processed by the Debtors (or (x) any of their respective predecessors, successors, or assigns, or any current or former Affiliate of any of the foregoing (including any of the Non-Debtor Affiliates), but only to the extent that any liability is asserted to exist as a result of it being such a predecessor, successor, assign, or current or former Affiliate, or (y) any other Entity for whose products or operations any of the Debtors allegedly has liability or is otherwise liable);

(ii)  any and all SA Asbestos Property Damage Claims (other than CDN ZAI PD Claims) and related Demands, if any, against any of the Debtors, the Sealed Air Indemnified Parties, or the Fresenius Indemnified Parties; and

(iii)  any and all US ZAI PD Claims against any of the Debtors or the Asbestos Protected Parties.

Notwithstanding the foregoing or anything else to the contrary, "Asbestos PD Claim" as defined herein does not include CDN ZAI PD Claims.  For the avoidance of doubt, and notwithstanding the foregoing or anything else to the contrary, nothing in the Plan is intended or shall be interpreted, to exclude CDN ZAI PD Claims from, or to otherwise change, the definition of "Asbestos Property Damage Claims" as that term is defined in the Sealed Air Settlement Agreement.

19.  " **Asbestos PD Claimant**" shall mean the Holder of an Asbestos PD Claim.

20.  "**Asbestos PD Committee**" shall mean the Official Committee of Asbestos Property Damage Claimants appointed in the Chapter 11 Cases.

21.  " **Asbestos PD Channeling Injunction**" shall mean the order(s) entered or affirmed by the District Court, in accordance with and pursuant to Bankruptcy Code § 524(g), permanently and forever staying, restraining, and enjoining any Entity from taking any action against any Asbestos Protected Party (except as may be specifically provided in such order(s)) for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to (i) any Asbestos PD Claims in Class 7A, all of which shall be channeled to the Asbestos PD Trust for resolution as set forth in the Class 7A Case Management Order (other than actions brought to enforce any right or obligation under the Plan or any agreement or instrument between the Debtors or the Reorganized Debtors, on the one hand, and the Asbestos PD Trust, on the other hand, entered into pursuant to the Plan); including, (A) Unresolved Asbestos PD Claims, and (B) Asbestos PD Claims that were Allowed by PD Settlement Agreements that became final prior to the Effective Date, for which the Asbestos PD Trust shall pay such claims as provided in such PD Settlement Agreements from the proceeds of the Class 7A Initial Payment, (ii) any US ZAI PD Claims in Class 7B, all of which shall be channeled to the Asbestos PD Trust for resolution as set forth in the ZAI TDP, and (iii) any CDN ZAI PD Claims, the provision for payment of which shall be made to the Asbestos PD Trust to be

9

CC-BLG003828

disbursed to the CDN ZAI PD Claims Fund.  The Asbestos PD Channeling Injunction is further described in Section 8.3 of the Plan.

22.    **"Asbestos PD FCR"** shall mean the Asbestos PD Future Claimants' Representative.

23.    **"Asbestos PD Future Claimants' Representative"** shall mean Alexander M. Sanders, Jr. (or any Court-appointed successor), appointed as the legal representative for future asbestos-related property damage (including property damage related to ZAI) Claimants in the Chapter 11 Cases for the purpose of protecting the interests of persons that may subsequently assert Demands, if any, channeled to the Asbestos PD Trust.

24.    **"Asbestos PD Initial Payment"** shall mean collectively, the Class 7A Initial Payment and the Class 7B Initial Payment.

25.    **"Asbestos PD Trust"** shall mean the WRG Asbestos Property Damage Settlement Trust, a Delaware statutory trust, established pursuant to section 524(g) of the Bankruptcy Code and in accordance with the Asbestos PD Trust Agreement.

26.    **"Asbestos PD Trustees"** shall mean the Entities confirmed by the Court to serve as trustees of the Asbestos PD Trust pursuant to (a) the terms of the Plan, (b) the Confirmation Order, and (c) the Asbestos PD Trust Agreement, or who subsequently may be appointed pursuant to the terms of the Asbestos PD Trust Agreement.

27.    **"Asbestos PD Trust Agreement"** shall mean the WRG Asbestos PD Trust Agreement, effective as of the Effective Date, substantially in the form included as Exhibit 3 in the Exhibit Book, to be entered into by and among the Debtors, the Asbestos PD Future Claimants' Representative, and the Asbestos PD Trustees in connection with the formation of the Asbestos PD Trust.

28.    **"Asbestos PD Trust Assets"** shall mean the payments pursuant to (a) the Class 7A Asbestos PD Deferred Payment Agreement and all rights of the Asbestos PD Trust under the Class 7A Asbestos PD Deferred Payment Agreement; (b) the Class 7B Asbestos PD Deferred Payment Agreement and all rights of the Asbestos PD Trust under the Class 7B Asbestos PD Deferred Payment Agreement; (c) the Share Issuance Agreement and all rights of the Asbestos PD Trust pursuant to the Share Issuance Agreement; (d) the Asbestos PI/PD Inter-Creditor Agreement and all rights of the Asbestos PD Trust pursuant to the Asbestos PI/PD Inter-Creditor Agreement; (e) the Asbestos PD Initial Payment; (f) the Grace PD Guarantee Agreement for Class 7A and all rights of the Asbestos PD Trust under the Grace PD Guarantee Agreement for Class 7A; (g) the Grace PD Guarantee Agreement for Class 7B and all rights of the Asbestos PD Trust under the Grace PD Guarantee Agreement for Class 7B; and (h) the Asbestos PD Trust Causes of Action.

29.    **"Asbestos PD Trust Causes of Action"** shall mean any and all of the actions, claims, rights, defenses, counterclaims, suits and causes of action of the Debtors and the other Asbestos Protected Parties, whether known or unknown, in law, at equity or otherwise,

10

CC-BLG003829

whenever and wherever arising under the laws of any jurisdiction attributable to: (a) all defenses to any Asbestos PD Claim other than Asbestos PD Claims that have been Allowed by PD Settlement Agreements, (b) with respect to any Asbestos PD Claims, all rights of setoff, recoupment, contribution, reimbursement, subrogation or indemnity (as those terms are defined by the non-bankruptcy law of any relevant jurisdiction) and any other indirect claim of any kind whatsoever, whenever and wherever arising or asserted, and (c) any other claims or rights with respect to Asbestos PD Claims that any of the Debtors and the other Asbestos Protected Parties would have had under applicable law if the Chapter 11 Cases had not occurred and the holder of such Asbestos PD Claim had asserted it by initiating civil litigation against any such Debtor and the other Asbestos Protected Parties.  Notwithstanding the foregoing, Asbestos PD Trust Assets and Asbestos PD Trust Causes of Action shall not include any claim, cause of action, or right of the Debtors or any of them, under the laws of any jurisdiction, against any party (including the Sealed Air Indemnified Parties and the Fresenius Indemnified Parties) for reimbursement, indemnity, contribution, breach of contract or otherwise arising from or based on any payments made by the Debtors on account of Asbestos PD Claims prior to the Effective Date.  In addition, for the avoidance of doubt, Asbestos PD Trust Causes of Action do not include any rights of the Debtors, the Reorganized Debtors, or the other Asbestos Protected Parties arising under the Asbestos PD Channeling Injunction or any of the other injunctions, releases, or the discharge entered into in connection with the Plan and the Confirmation Order.

30.     **"Asbestos PD Trust Expenses"** means any liabilities, costs, taxes, or expenses of, or imposed upon, or in respect of, the Asbestos PD Trust or, on and after the Effective Date, the Asbestos PD Trust Assets (except for payments to holders of Asbestos PD Claims on account of such Asbestos PD Claims).

31.     **"Asbestos Personal Injury Claim"** shall mean an Asbestos PI Claim.

32.     **" Asbestos PI Channeling Injunction"** shall mean the order(s) entered or affirmed by the District Court, in accordance with and pursuant to Bankruptcy Code § 524(g), permanently and forever staying, restraining, and enjoining any Entity from taking any action against any Asbestos Protected Party (except as may be specifically provided in such order(s)) for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Asbestos PI Claims, all of which shall be channeled to the Asbestos PI Trust for resolution as set forth in the Asbestos PI TDP (other than actions brought to enforce any right or obligation under the Plan or any agreement or instrument between the Debtors or the Reorganized Debtors, on the one hand, and the Asbestos PI Trust, on the other hand, entered into pursuant to the Plan).  The Asbestos PI Channeling Injunction is further described in Section 8.2 of the Plan.

33.     **"Asbestos PI Claim"** shall mean:

   (i)     a Claim, Canadian Claim, Indirect PI Trust Claim, SA Claim, Grace-Related Claim, or Demand against, or any present or future, debt, liability, or obligation of, any of the Debtors or the Asbestos Protected Parties, including (x) all related

11

CC-BLG003830

claims, debts, obligations, liabilities, and remedies for compensatory (including general, special, and consequential damages) and punitive damages, and (y) all cross-claims, contribution claims, subrogation claims, reimbursement claims, and indemnity claims (whether or not such Claim, Canadian Claim, Indirect PI Trust Claim, SA Claim, Grace-Related Claim, Demand, remedy, debt, liability, or obligation is reduced to judgment, liquidated, unliquidated, fixed, settled, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; whether or not the facts of or legal bases therefor are known or unknown; and whether in the nature of or sounding in tort, or under contract, warranty, guarantee, contribution, joint and several liability, subrogation, reimbursement or indemnity, or any other theory of law, equity, or admiralty), in each case for, based on, or arising out of, resulting from, or attributable to, directly or indirectly:

(a)     death, wrongful death, personal or bodily injury (whether physical, emotional, or otherwise), sickness, disease, loss of consortium, survivorship, medical monitoring, or other personal injuries (whether physical, emotional, or otherwise) or other damages (including medical, legal, and other expenses, caused, or allegedly caused, based on, and arising or allegedly arising, from or attributable to, directly or indirectly, in whole or in part, acts or omissions of one or more of the Debtors (or any of their respective predecessors, successors, or assigns, or any current or former Affiliate of any of the foregoing (including any of the Non-Debtor Affiliates), or any other Entity for whose products or operations any of the Debtors allegedly has liability or is otherwise liable); and

(b)     the presence of or exposure at any time to:

   (1)     asbestos or any products or materials containing asbestos that were mined, processed, consumed, used, stored, manufactured, designed, sold, assembled, supplied, produced, specified, selected, distributed, disposed of, installed by, or in any way marketed by, or on behalf of, one or more of the Debtors (or (x) any of their respective predecessors, successors, or assigns, or any current or former Affiliate of any of the foregoing (including any of the Non-Debtor Affiliates), but only to the extent that any liability is asserted to exist as a result of it being such a predecessor, successor, assign, or current or former Affiliate, or (y) any other Entity for whose products or operations any of the Debtors allegedly has liability or is otherwise liable); or

   (2)     asbestos-containing vermiculite mined, milled or processed by the Debtors (or (x) any of their respective predecessors, successors, or assigns, or any current or former Affiliate of any of the foregoing (including any of the Non-Debtor Affiliates), but only to the extent that any liability is asserted to exist as a result of it being such a predecessor, successor, assign or current or former

12

CC-BLG003831