Sealed Air Settlement Agreement) as required pursuant to this clause e. if each of the following four requirements has been previously satisfied (1) it has fully performed all of its obligations set forth in paragraph VI(f) of the Sealed Air Settlement Agreement or clause n. of this Annex I, (2) it has received a Contrary Opinion (as defined in the Sealed Air Settlement Agreement) with respect to such Defined Action (as defined in the Sealed Air Settlement Agreement) required or prohibited pursuant to paragraph VI (b) of the Sealed Air Settlement Agreement or clauses e., f. and g. of this Annex I, as the case may be, (3) it has provided a copy of such Contrary Opinion (as defined in the Sealed Air Settlement Agreement) to Sealed Air Corporation, and (4) within forty-five days of the receipt by Sealed Air Corporation of such Contrary Opinion (as defined in the Sealed Air Settlement Agreement), Sealed Air Corporation has not provided it with a Sealed Air Opinion (as defined in the Sealed Air Settlement Agreement),

f.  be prohibited from taking any Defined Action (as defined in the Sealed Air Settlement Agreement) prohibited from being taken pursuant to, or that is inconsistent with the provisions of, paragraphs II(c)(ix), (x), or (xi), or VI(g), of the Sealed Air Settlement Agreement and clauses o. and p. of this Annex I, *provided, however,* that it shall not be prohibited from taking a Defined Action (as defined in the Sealed Air Settlement Agreement) as required pursuant to this clause f. if each of the following four requirements has been previously satisfied (1) it has fully performed all of its obligations set forth in paragraph VI(f) of the Sealed Air Settlement Agreement or clause n. of this Annex I, (2) it has received a Contrary Opinion (as defined in the Sealed Air Settlement Agreement) with respect to such Defined Action (as defined in the Sealed Air Settlement Agreement) required or prohibited pursuant to paragraph VI(b) of the Sealed Air Settlement Agreement or clauses e., f. and g. of this Annex I, as the case may be, (3) it has provided a copy of such Contrary Opinion (as defined in the Sealed Air Settlement Agreement) to Sealed Air Corporation, and (4) within forty-five days of the receipt by Sealed Air Corporation of such Contrary Opinion (as defined in the Sealed Air Settlement Agreement), Sealed Air Corporation has not provided it with a Sealed Air Opinion (as defined in the Sealed Air Settlement Agreement),

g.  use its best efforts not to make any statement in a court document filed in the SA Debtors' Chapter 11 Cases or in any oral statement to the court in the SA Debtors' Chapter 11 Cases that is prohibited by, or inconsistent with the provisions of, paragraphs II(c)(ix), (x), or (xi), or VI(g), of the Sealed Air Settlement Agreement or clauses o. and p. of this Annex I, as the case may be, *provided, however,* that it shall not be required to take, or be prohibited from taking, as the case may be, a Defined Action (as defined in the Sealed Air Settlement Agreement) as required pursuant to this paragraph g. if each of the following four requirements has been previously satisfied (1) it has fully performed all of its obligations set forth in paragraph VI(f) of the Sealed Air Settlement or clause n. of this Annex I Agreement, as the case may be, (2) it has received a Contrary Opinion (as defined in the Sealed Air Settlement Agreement) required or prohibited pursuant to this sentence, (3) it has provided a copy of such Contrary Opinion (as defined in the Sealed Air Settlement Agreement) to Sealed Air Corporation, and (4) within forty-five days of the receipt by Sealed Air Corporation of such Contrary Opinion (as defined in the Sealed

2

CC-BLG003932

Air Settlement Agreement), Sealed Air Corporation has not provided it with a Sealed Air Opinion (as defined in the Sealed Air Settlement Agreement),

h.   promptly notify Cryovac, Inc. and Sealed Air Corporation upon receipt by any of them or any of their Affiliates of any notice of any pending or threatened audit or assessment, suit, litigation, proposed adjustment, deficiency, dispute, administrative or judicial proceeding or other similar Claim (as defined in the Sealed Air Settlement Agreement) involving any of them or any of their Affiliates from any Tax authority or any other Entity challenging (1) the qualification of the Asbestos PI Trust or the Asbestos PD Trust as a Qualified Settlement Fund (as defined in the Sealed Air Settlement Agreement), (2) the qualification of Cryovac, Inc. as a Transferor (as defined in the Sealed Air Settlement Agreement) to the Asbestos PI Trust or the Asbestos PD Trust, (3) the transfer by Cryovac, Inc. of the Cryovac Payment (reduced by the amount of the Asbestos PD Initial Payment) to the Asbestos PI Trust pursuant to Section 7.2.2 of the Plan or the Confirmation Order and the Asbestos PD Initial Payment to the Asbestos PD Trust pursuant to Section 7.3.2 of the Plan or the Confirmation Order as a direct payment by Cryovac, Inc. to the Asbestos PI Trust or the Asbestos PD Trust for Asbestos Claims that constitutes an ordinary and necessary expense of Cryovac, Inc. (for purposes of this Annex I, any such audit or assessment, suit, litigation, proposed adjustment, deficiency, dispute, administrative or judicial proceeding or other similar Claim (as defined in the Sealed Air Settlement Agreement), for purposes of this Annex I a "Tax Claim"),

i.   permit, and cause their respective Affiliates to permit, Cryovac, Inc. and Sealed Air Corporation to participate at their expense in the defense or prosecution of any Tax Claim (including to participate in all discussions with the Tax authorities regarding any Tax Claim and to be allowed to provide affirmative suggestions or comments with respect to any written submissions or communications to the Tax authorities regarding any Tax Claims, which comments and suggestions shall be incorporated into such written submissions or communications with the consent of the SA Debtors, such consent not to be unreasonably withheld),

j.   consult with Cryovac, Inc. and Sealed Air Corporation in connection with the defense or prosecution of any Tax Claim and provide such cooperation and information as Cryovac, Inc. and Sealed Air Corporation shall reasonably request with respect to any Tax Claim,

k.   agree to use its best efforts to attempt to sever any Tax Claim from other issues raised in any audit or assessment, suit, litigation, proposed adjustment, deficiency, dispute, administrative or judicial proceeding or other similar Claim (as defined in the Sealed Air Settlement Agreement) and shall instruct their, and their Affiliates', respective Chief Executive Officer, Chief Financial Officer, and Director of Taxes to deliver, and shall cause each of their Affiliates, to deliver to Cryovac, Inc. and Sealed Air Corporation:

   1.   promptly after the receipt of any document received from the IRS relating to a Tax Claim, a copy of such document;

   2.   any document delivered to the IRS with respect to a Tax Claim promptly after such document is delivered to the IRS, *provided, however*, that, if such document

3

CC-BLG003933

was prepared in response to a request by the IRS, then prior to the delivery of such document to the IRS, Cryovac, Inc. and Sealed Air Corporation shall be allowed to provide affirmative suggestions or comments with respect to any such document, as provided in paragraph VI(c)(ii) of the Sealed Air Settlement Agreement and clauses i. and j. of this Annex I;

    3.    at least five days prior to any meeting or conference (whether in person or by teleconference) scheduled with the IRS during which a Tax Claim may be discussed, with written notice of such scheduled meeting or conference, and an opportunity to attend the portions of such meeting or conference during which any Tax Claim is discussed; and

    4.    with cooperation and information reasonably requested by Cryovac, Inc. or Sealed Air Corporation in connection with any Tax Claim, including, at Cryovac, Inc.'s or Sealed Air Corporation's request, status updates with respect to all Tax Claims.

l.    be entitled to redact any document to be provided to Cryovac, Inc. or Sealed Air Corporation in furtherance of the obligations set forth in clause k. of this Annex I to exclude information not pertinent to the Tax Claim,

m.    settle or otherwise dispose of any Tax Claim unless otherwise required by a Final Determination (as defined in the Sealed Air Settlement Agreement),

n.    if any of the SA Debtors or the SA Non-Debtor Affiliates has determined that an issue (for the purposes of this Annex I such issue, a "Paragraph VI(f) Issue") may exist with respect to its taking, or the failure to take, a Defined Action (as defined in the Sealed Air Settlement Agreement) as required pursuant to paragraph II(c)(ix), (x), or (xi), or VI(b) or VI(g), of the Sealed Air Settlement Agreement or clauses c., f., g., o., and p., of this Annex I, as the case may be, then, prior to delivering a Contrary Opinion (as defined in the Sealed Air Settlement Agreement) to Sealed Air Corporation with respect to such Defined Action (as defined in the Sealed Air Settlement Agreement) in accordance with the provisos set forth in paragraph II(c)(ix), (x), or (xi), VI(b) or VI(g) of the Sealed Air Settlement Agreement, or clauses c., f., g., o., and p., of this Annex I, as the case may be, (1) provide to Sealed Air Corporation, as promptly as practicable, a written notice identifying such Defined Action (as defined in the Sealed Air Settlement Agreement) and describing in detail the Paragraph VI(f) Issue and (2) consult and act (and cause its advisors to, consult and act) in good faith to determine and resolve (i) if such issue relates to a Tax issue, whether, as a result of a Change in Circumstances, there is no "reasonable basis", as defined in IRC section 6662 (or successor provision thereof), for the taking of, or the failure to take, such Defined Action (as defined in the Sealed Air Settlement Agreement) by such Entity or (ii) if such issue relates to an accounting issue, whether, as a result of a Change in Circumstances, the taking, or the failure to take, such Defined Action (as defined in the Sealed Air Settlement Agreement) is inconsistent with generally accepted accounting principles. For purposes of this Annex I, "Change in Circumstances" shall mean (i) for U.S. federal income tax purposes, (x) any amendment to the IRC or the final or temporary regulations promulgated under the IRC, (y) a decision by any federal court, or (z) a Revenue Ruling, Notice, Revenue Procedure, or

CC-BLG003934

Announcement, which amendment is enacted, promulgated, issued, or announced, or which decision, Revenue Ruling, Notice, Revenue Procedure, or Announcement is issued or announced, in each case, after the Effective Date, and (ii) for financial accounting purposes, any amendment to or change in generally accepted accounting principles, which amendment is issued or announced or, which change occurs, in each case, after the Effective Date.

o.    unless otherwise required by a Final Determination (as defined in the Sealed Air Settlement Agreement), (1) file all Tax Returns required to be filed by such Entity, if any, consistent with the provisions of paragraph II(c)(ix) of the Sealed Air Settlement Agreement and take all other Defined Actions (as defined in the Sealed Air Settlement Agreement) that are reasonably requested by Sealed Air Corporation and consistent with the provisions of paragraph II(c)(ix) of the Sealed Air Settlement Agreement, and (2) be prohibited, from taking any Defined Action (as defined in the Sealed Air Settlement Agreement) that may result in the disqualification of the Asbestos PI Trust or the Asbestos PD Trust as a Qualified Settlement Fund (as such term is defined in the Sealed Air Settlement Agreement) or be inconsistent with Cryovac, Inc. being treated as a Transferor (as defined in the Sealed Air Settlement Agreement) of the Cryovac Payment (reduced by the amount of the Asbestos PD Initial Payment) directly to the Asbestos PI Trust pursuant to Section 7.2.2 of the Plan and the Confirmation Order and the Asbestos PD Initial Payment directly to the Asbestos PD Trust pursuant to Section 7.3.2 of the Plan and the Confirmation Order; *provided, however* , that it shall not be required to take, or be prohibited from taking, as the case may be, a Defined Action (as defined in the Sealed Air Settlement Agreement) as required pursuant to this clause o. if each of the following four requirements has been previously satisfied: (1) it has fully performed all of its obligations set forth in paragraph VI(f) of the Sealed Air Settlement Agreement and clause n. of this Annex I, as the case may be, (2) it has received a Contrary Opinion (as defined in the Sealed Air Settlement Agreement) with respect to such Defined Action (as defined in the Sealed Air Settlement Agreement) required or prohibited pursuant to this clause o., (3) it has provided a copy of such Contrary Opinion (as defined in the Sealed Air Settlement Agreement) to Sealed Air Corporation, and (4) within forty-five days of the receipt by Sealed Air Corporation of such Contrary Opinion (as defined in the Sealed Air Settlement Agreement), Sealed Air Corporation has not provided it with a Sealed Air Opinion (as defined in the Sealed Air Settlement Agreement),

p.    treat for all Tax purposes any and all payments by Cryovac, Inc. of the Cryovac Payment (reduced by the amount of the Asbestos PD Initial Payment) to the Asbestos PI Trust pursuant to Section 7.2.2 of the Plan and the Confirmation Order and the Asbestos PD Initial Payment to the Asbestos PD Trust pursuant to Section 7.3.2 of the Plan and the Confirmation Order as a direct payment by Cryovac, Inc. to the Asbestos PI Trust or the Asbestos PD Trust for Asbestos Claims that constitutes an ordinary and necessary expense of Cryovac, Inc., and, unless otherwise required by a Final Determination (as defined in the Sealed Air Settlement Agreement):

1.    for financial accounting or any other regulatory purpose, be prohibited from treating any payment by Cryovac, Inc. to the Asbestos PI Trust or the Asbestos PD Trust pursuant to the Plan or the Confirmation Order as a payment by

5

Cryovac, Inc. to any of the SA Debtors or SA Non-Debtor Affiliates, or as a payment by any SA Debtor or SA Non-Debtor Affiliate to any Entity (including to the Asbestos PI Trust or the Asbestos PD Trust) (or treating such payment as, or resulting in, an expense or deduction of any Debtor or Non-Debtor Affiliate),

2.    for Tax purposes, be prohibited from claiming that any payment by Cryovac, Inc. to the Asbestos PI Trust or the Asbestos PD Trust pursuant to the Plan or the Confirmation Order results in or gives rise (directly or indirectly) to the accrual or allowance of a deduction or expense, or income to, or any other transfer of any type to, any SA Debtor or SA Non-Debtor Affiliate,

3.    take all Defined Actions (as defined in the Sealed Air Settlement Agreement) that are reasonably requested by Sealed Air Corporation and consistent with the provisions of this clause p.,

4.    not take any position inconsistent with the foregoing on any Tax Return or with any Tax authority, and

5.    not make any statement in any public or regulatory filing or release or otherwise, or take any other Defined Action (as defined in the Sealed Air Settlement Agreement), that is inconsistent with the obligations of such Entity pursuant to this clause p.,

*provided, however* , that with respect to sub-clauses p.3 and p.5 above, it shall not be required to take, or be prohibited from taking, as the case may be, a Defined Action (as defined in the Sealed Air Settlement Agreement) as required pursuant to this clause p. if each of the following four requirements has been previously satisfied: (1) it has fully performed all of its obligations set forth in paragraph VI(f) of the Sealed Air Settlement Agreement and clause n. of this Annex 1, as the case may be, (2) it has received a Contrary Opinion (as defined in the Sealed Air Settlement Agreement) with respect to such Defined Action (as defined in the Sealed Air Settlement Agreement) required or prohibited pursuant to this clause p., (3) it has provided a copy of such Contrary Opinion (as defined in the Sealed Air Settlement Agreement) to Sealed Air Corporation, and (4) within forty-five days of the receipt by Sealed Air Corporation of such Contrary Opinion (as defined in the Sealed Air Settlement Agreement), Sealed Air Corporation has not provided it with a Sealed Air Opinion (as defined in the Sealed Air Settlement Agreement),

q.    be entitled to prepare and execute (but not file) a Protective Claim (as defined in the Sealed Air Settlement Agreement and, for purposes of this Annex I, with respect to each of the SA Debtors and the SA Non-Debtors Affiliates, a "Grace Protective Claim"), (which filing shall be effected only by Cryovac, Inc. pursuant to, and in accordance with, the provisions of the Settlement Agreement) for the taxable year of the SA Debtors in which the transfers by Cryovac, Inc. of the Cryovac Payment (reduced by the amount of the Asbestos PD Initial Payment) to the Asbestos PI Trust pursuant to Section 7.2.2 of the Plan or the Confirmation Order and the Asbestos PD Initial Payment to the Asbestos PD Trust pursuant to Section 7.3.2 of the Plan or the Confirmation Order (for purposes of

6

CC-BLG003936

this Annex I, the "Transfer") are made, or for any other prior (solely with respect to a carryback from the taxable year of the Transfer) or subsequent taxable year in which the Tax Benefits (as defined in the Sealed Air Settlement Agreement) realized as a result of such Transfer may be claimed by the SA Debtors (for purposes of this Annex I any such taxable year, a "Relevant Tax Year), and require Cryovac, Inc. to file such Grace Protective Claim with the IRS or other governmental authority for and on behalf of the SA Debtors; provided, however, that a Grace Protective Claim shall not be required to be filed by Cryovac, Inc. at any time prior to 15 days before the expiration (taking into account all extensions thereof) of the applicable statute of limitations for the SA Debtors to file an amended return ("SOL") for the Relevant Tax Year, and provided further that notwithstanding anything to the contrary set forth in paragraph VI(h) of the Sealed Air Settlement Agreement and clauses q., r., s., t. and u. of this Annex I, the Debtors may prepare and execute a Grace Protective Claim, and require Cryovac, Inc. to file such Grace protective Claim with the IRS or other governmental authority for a Relevant Tax Year, only if each of the following requirements has been previously satisfied:

    1.   the SA Debtors have granted each extension (and each further extension) to the applicable SOL for such Relevant Tax Year that has been requested by the IRS,

    2.   at the time of each such request by the IRS referred to in sub-clause p.1, above, to extend (or further extend) the applicable SOL for such Relevant Tax Year, the SA Debtors shall have used their best efforts to extend (and cause the IRS to agree to extend) such SOL for a period of two (2) years or longer;

    3.   in the event that the IRS has not requested the SA Debtors to extend (or further extend) the applicable SOL for such Relevant Tax Year prior to 180 days prior to the end of such SOL, the SA Debtors shall have used their best efforts to extend (and cause the IRS to agree to extend) such SOL for a period of two (2) years or longer;

    4.   the SA Debtors shall have provided to Cryovac, Inc. a written statement by their Chief Financial Officer that each of the requirements set forth immediately above in sub- clauses p.1, 2, and 3 has been satisfied in all respects; and

r.   at the request of Sealed Air Corporation, prepare and execute a Grace Protective Claim to be filed by Sealed Air Corporation pursuant to paragraph VI(h)(ii) of the Sealed Air Settlement Agreement and only such clause r.

s.   pay to Cryovac, Inc. in immediately available funds fifty (50) percent of the amount of any Tax Benefit (as defined in the Sealed Air Settlement Agreement) realized as a result of the Transfer no later than ten (10) days after such Tax Benefit (as defined in the Sealed Air Settlement Agreement) has been deemed to have been Actually Realized (as defined in and determined pursuant to the Sealed Air Settlement Agreement),

t.   if requested by Sealed Air Corporation, use their best efforts to extend (and cause the IRS to agree to extend) the applicable SOL for any Relevant Tax Year,

7

---

u.   include in Part II of Form 1120X (or applicable section of any similar state or local tax form) of any Grace Protective Claim the language set forth on Exhibit 7 of the Sealed Air Settlement Agreement and only such other language as may be mutually agreed to by the SA Debtors and Cryovac, Inc. (or Sealed Air Corporation),

v.   withdraw all Grace Protective Claims upon a Cryovac Final Determination (as defined in the Sealed Air Settlement Agreement) that the Transfer results in a Tax Benefit (as defined in the Sealed Air Settlement Agreement) to Cryovac, Inc. (or the affiliated group filing a consolidated Tax Return of which Sealed Air Corporation is the common parent), and provide a written statement to Cryovac, Inc. signed by the Chief Financial Officer of the SA Debtors stating that all Grace Protective Claims have been withdrawn,

w.   upon notice by Cryovac, Inc. as provided in paragraph VI(i) of the Sealed Air Settlement Agreement, as the case may be, or if otherwise requested in writing by Cryovac, Inc., use reasonable best efforts to pursue all Grace Protective Claims and keep Cryovac, Inc. fully informed of, and permit Cryovac, Inc. to participate in, all developments with respect to all such Grace Protective Claims in a manner consistent with the provisions set forth in paragraphs VI(c)(ii) through (vi) of the Sealed Air Settlement Agreement and clauses i., j., k., l., and m. of this Annex I, as the case may be,

x.   no later than ten (10) days after the SA Debtors shall have Actually Realized (as defined in the Sealed Air Settlement Agreement) a Tax Benefit (as defined in the Sealed Air Settlement Agreement) as a result of the Transfer, provide Cryovac, Inc. with a detailed statement (for the purposes of this Annex I, the "Tax Benefit Statement") specifying (1) the amount of the Tax Benefit (as defined in the Sealed Air Settlement Agreement) that was Actually Realized (as defined in the Sealed Air Settlement Agreement) by the SA Debtors and any information relevant to the computation thereof (including full access to any applicable Tax Return, non-proprietary work papers and other materials and information of the SA Debtors and their accountants), (2) the date that such Tax Benefit (as defined in the Sealed Air Settlement Agreement) was Actually Realized (as defined in the Sealed Air Settlement Agreement), (3) the amount of deduction, loss, credit or exclusion initially claimed by the SA Debtors as a result of the Transfer (for purposes of this Annex I, the "Initial Tax Benefit Item"), (4) the amount of the Initial Tax Benefit Item that is utilized by the SA Debtors to create such Tax Benefit (as defined in the Sealed Air Settlement Agreement) Actually Realized (as defined in the Sealed Air Settlement Agreement) (including as a result of all or a portion of the Initial Tax Benefit Item being carried back or forward), and (5) the amount of the Initial Tax Benefit Item not yet utilized by the SA Debtors (to create a Tax Benefit (as defined in the Sealed Air Settlement Agreement) Actually Realized (as defined in the Sealed Air Settlement Agreement)) that will be carried forward,

y.   no later than 30 days after the SA Debtors have filed their U.S. federal consolidated income Tax Return for each year beginning the year that includes the Tax Benefit Start Date (as defined in the Sealed Air Settlement Agreement), deliver to Cryovac, Inc. an annual statement (for purposes of this Annex I, the "CFO Annual Statement"), signed by their Chief Financial Officer under penalties of perjury, that sets forth (1) the amount of the Tax Benefits (as defined in the Sealed Air Settlement Agreement) Actually Realized

8

CC-BLG003937

(as defined in the Sealed Air Settlement Agreement), if any, by the SA Debtors as a result of the Transfer during the preceding taxable year (including, without limitation, as a result of an amended return for any taxable year, a loss or deduction being utilized for such preceding taxable year, a loss or credit carryback from such preceding taxable year, or a loss or credit carryforward to such preceding taxable year), (2) the date (or dates) such Tax Benefits were Actually Realized (as defined in the Sealed Air Settlement Agreement) during such taxable year, (3) the amount of the Initial Tax Benefit Item, (4) the amount of the Initial Tax Benefit Item that is utilized by the SA Debtors to create such Tax Benefit (as defined in the Sealed Air Settlement Agreement) Actually Realized (as defined in the Sealed Air Settlement Agreement), and (5) the amount of the Initial Tax Benefit Item not yet utilized by the SA Debtors (to create a Tax Benefit (as defined in the Sealed Air Settlement Agreement) Actually Realized (as defined in the Sealed Air Settlement Agreement)) that will be carried forward,

z.   provide Cryovac, Inc. with all information relevant to the computation of such Tax Benefits (as defined in the Sealed Air Settlement Agreement) Actually Realized (as defined in the Sealed Air Settlement Agreement) by the SA Debtors set forth in clause y.1 of this Annex 1 (including full access to any applicable Tax Return, the non-proprietary work papers, and other materials and information of the SA Debtors and their accountants),

aa.  within fifteen (15) days after the SA Debtors' receipt of a Tax Benefit Dispute Notice (as defined in the Sealed Air Settlement Agreement), unless the matters in the Tax Benefit Dispute Notice (as defined in the Sealed Air Settlement Agreement) have otherwise been resolved by mutual agreement of the parties, select, jointly with Cryovac, Inc., a nationally-recognized independent certified public accountant (for purposes of this Annex I, the "Tax Benefit Accountant"); *provided, however*, if the SA Debtors and Cryovac, Inc. are unable to agree upon the Tax Benefit Accountant within such fifteen (15) day period, then the SA Debtors and Cryovac, Inc. shall each select a nationally-recognized independent certified public accountant which shall then jointly choose the Tax Benefit Accountant within fifteen (15) days thereafter, and the terms of the engagement of such Tax Benefit Accountant shall require the Tax Benefit Accountant to comply with paragraph VI(j)(iv) of the Sealed Air Settlement Agreement,

bb.  pay to Cryovac, Inc. in immediately available funds no later than five (5) days after delivery of the Tax Benefit Report (as defined in the Sealed Air Settlement Agreement) to the SA Debtors and Cryovac, Inc. the sum of (x) the excess, if any, of fifty (50) percent of the amount of the Tax Benefit (as defined in the Sealed Air Settlement Agreement) Actually Realized (as defined in the Sealed Air Settlement Agreement) set forth in the Tax Benefit Report (as defined in the Sealed Air Settlement Agreement) over the amount previously paid, if any, by the SA Debtors to Cryovac, Inc. with respect thereto and (y) interest with respect to any such excess, as provided for in paragraph VI(k) of the Sealed Air Settlement Agreement,

cc.  if a loss, deduction, credit or exclusion that resulted in Tax Benefit that was Actually Realized (as defined in the Sealed Air Settlement Agreement) by the SA Debtors is later denied by a Taxing authority by (x) a decision, decree or other order by a court of

9

CC-BLG003938

competent jurisdiction, which has become final and unappealable or (y) any other means (including a closing agreement or accepted offer in compromise under section 7121 or 7122 of the Internal Revenue Code) if Cryovac, Inc. has consented to such other means, which consent shall not be unreasonably withheld or delayed, provide (1) a written statement, signed under penalties of perjury by the Chief Financial Officer of the SA Debtors, that states (i) the amount of such loss, deduction, credit or exclusion that was denied, (ii) the amount of the Tax Benefits (as defined in the Sealed Air Settlement Agreement) Actually Realized (as defined in the Sealed Air Settlement Agreement) that was initially determined and paid by the SA Debtors to Cryovac, Inc. for such taxable period, and (iii) the revised amount of the Tax Benefit (as defined in the Sealed Air Settlement Agreement) Actually Realized (as defined in the Sealed Air Settlement Agreement) for such taxable period taking into account the denial of such loss, deduction, credit or exclusion, and (2) provide to Cryovac, Inc. any information relevant to the computation of such initial and revised amount of the Tax Benefits (as defined in the Sealed Air Settlement Agreement) Actually Realized (as defined in the Sealed Air Settlement Agreement) by the SA Debtors (including full access to any applicable Tax Return, the non-proprietary work papers, and other materials and information of the SA Debtors and their accountants), and

dd.  perform all other actions required, and refrain from taking any other activities precluded, by the Sealed Air Settlement Agreement.

CC-BLG003939

**Annex II**

Pursuant to Section 7.7(oo) of the Plan, and not by way of limitation of the Sealed Air Settlement Agreement, unless indicated otherwise:

a.          each of the Plaintiffs, the Asbestos PI Trust and the Asbestos PD Trust shall, unless otherwise required by a Final Determination, (1) file all Tax Returns required to be filed by it, if any, consistent with the provisions of this clause a. and shall take all other Defined Actions (as defined in the Sealed Air Settlement Agreement) that are reasonably requested by Sealed Air Corporation and consistent with the provisions of this clause a., and (2) be prohibited from taking any Defined Action (as defined in the Sealed Air Settlement Agreement) that may result in the disqualification of the Asbestos PI Trust or the Asbestos PD Trust as a Qualified Settlement Fund (as defined in the Sealed Air Settlement Agreement) or be inconsistent with Cryovac, Inc. being treated as a "transferor" (as defined under Treasury Regulations section 1.468B-1(d)) (for purposes of this Annex II the "Transferor") of the Cryovac Payment (reduced by the amount of the Asbestos PD Initial Payment) directly to the Asbestos PI Trust pursuant to Section 7.2.2 of the Plan and the Confirmation Order and the Asbestos PD Initial Payment directly to the Asbestos PD Trust pursuant to Section 7.3.2 of the Plan and the Confirmation Order , provided , however , that it shall not be required to take, or be prohibited from taking, as the case may be, a Defined Action (as defined in the Sealed Air Settlement Agreement) as required pursuant to this clause a. if each of the following four requirements has been previously satisfied (i) it has fully performed all of its obligations set forth in paragraph VI(f) of the Sealed Air Settlement Agreement, (ii) it has received a Contrary Opinion (as defined in the Sealed Air Settlement Agreement) with respect to such Defined Action (as defined in the Sealed Air Settlement Agreement) required or prohibited pursuant to this clause a., (iii) it has provided a copy of such Contrary Opinion (as defined in the Sealed Air Settlement Agreement) to Sealed Air Corporation, and (iv) within forty-five days of the receipt by Sealed Air Corporation of such Contrary Opinion (as defined in the Sealed Air Settlement Agreement), Sealed Air Corporation has not provided it with a Sealed Air Opinion (as defined in the Sealed Air Settlement Agreement),

b.          the Asbestos PI Trust and the Asbestos PD Trust shall, unless otherwise required by a Final Determination (as defined in the Sealed Air Settlement Agreement), treat for all Tax purposes any and all payments by Cryovac Inc. pursuant to Sections 7.2.2 and 7.2.3 of the Plan and the Confirmation Order, as a direct payment by Cryovac, Inc. to the Asbestos PI Trust or the Asbestos PD Trust, as applicable, for Asbestos Claims that constitutes an ordinary and necessary expense of Cryovac, Inc. and each of the Plaintiffs, the Asbestos PI Trust and the Asbestos PD Trust shall, unless otherwise required by a Final Determination (as defined in the Sealed Air Settlement Agreement): (1) be prohibited from taking any Defined Action (as defined in the Sealed Air Settlement Agreement) that is inconsistent with the foregoing provisions of this clause b., and (2) take all Defined Actions (as defined in the Sealed Air Settlement Agreement) that are

CC-BLG003940

reasonably requested by Sealed Air Corporation and consistent with the provisions of this clause b.; provided, however, that it shall not be required to take, or be prohibited from taking, as the case may be, a Defined Action (as defined in the Sealed Air Settlement Agreement) as required pursuant to sub-clauses (1) and (2) of this clause b. if each of the following four requirements has been previously satisfied (i) it has fully performed all of its obligations set forth in paragraph VI(f) of the Sealed Air Settlement Agreement, (ii) it has received a Contrary Opinion (as defined in the Sealed Air Settlement Agreement) with respect to such Defined Action (as defined in the Sealed Air Settlement Agreement) required or prohibited pursuant to this clause b., (iii) it has provided a copy of such Contrary Opinion (as defined in the Sealed Air Settlement Agreement) to Sealed Air Corporation, and (iv) within forty-five days of the receipt by Sealed Air Corporation of such Contrary Opinion (as defined in the Sealed Air Settlement Agreement), Sealed Air Corporation has not provided it with a Sealed Air Opinion (as defined in the Sealed Air Settlement Agreement),

c.    if it has determined that an issue (for the purposes of this Annex II such issue, a "Paragraph VI(f) Issue") may exist with respect to its taking, or the failure to take, a Defined Action (as defined in the Sealed Air Settlement Agreement) as required pursuant to paragraph II(c)(ix) or (x), of the Sealed Air Settlement Agreement or clauses a. and b., of this Annex II, as the case may be, then, prior to delivering a Contrary Opinion (as defined in the Sealed Air Settlement Agreement) to Sealed Air Corporation with respect to such Defined Action (as defined in the Sealed Air Settlement Agreement) in accordance with the provisos set forth in paragraph II (c)(ix) or (x) of the Sealed Air Settlement Agreement, or clauses a. and b., of this Annex II, as the case may be, each of the Plaintiffs, the Asbestos PI Trust and the Asbestos PD Trust, as the case may be, shall (1) provide to Sealed Air Corporation, as promptly as practicable, a written notice identifying such Defined Action (as defined in the Sealed Air Settlement Agreement) and describing in detail the Paragraph VI(f) Issue and (2) consult and act (and cause its advisors (including accountants and tax attorneys, as the case may be) to, consult and act) in good faith to determine and resolve (i) if such issue relates to a Tax issue, whether, as a result of a Change in Circumstances (as defined in the Sealed Air Settlement Agreement), there is no "reasonable basis", as defined in IRC section 6662 (or successor provision thereof), for the taking of, or the failure to take, such Defined Action (as defined in the Sealed Air Settlement Agreement) by such Entity or (ii) if such issue relates to an accounting issue, whether, as a result of a Change in Circumstances, the taking, or the failure to take, such Defined Action (as defined in the Sealed Air Settlement Agreement) is inconsistent with generally accepted accounting principles, and

d.    perform all other actions required, and refrain from taking any other activities precluded, by the Sealed Air Settlement Agreement.

CC-BLG003941

EXHIBIT 4.2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & Co., et al., | ) | Case No. 01-1139 (JFK) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | | Re: Docket Nos. 6681 and |
| | | 1/24/05 Agenda Item 3 |

**FINAL ORDER PURSUANT TO SECTIONS 105(a), 362(a)(3) AND 541 OF THE BANKRUPTCY
CODE (A) LIMITING CERTAIN TRANSFERS OF EQUITY SECURITIES OF THE DEBTORS
AND (B) APPROVING RELATED NOTICE
PROCEDURES**

Upon the emergency motion (the "Motion")(1) of the debtors and debtors in possession (the "Debtors") seeking entry of an order pursuant to Sections 105(a), 362 (a)(3) and 541 of the Bankruptcy Code (A) limiting certain transfers of equity securities of the Debtors and (B) approving related notice procedures; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that this proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2); and it appearing that venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that good and sufficient notice of the Motion having been given and that no other or further notice of the Motion need be provided; and after due deliberation and sufficient cause appearing therefor, the Court hereby orders as follows:

---

(1)      Unless otherwise defined herein, all capitalized terms used herein shall have the meanings set forth in the Debtors' Motion For Entry Of An Order Pursuant To Sections 105 (A), 362(A)(3) And 541 Of The Bankruptcy Code (A) Limiting Certain Transfers Of Equity Interests Of The Debtors And (B) Approving Related Notice Procedures.

CC-BLG003942

1.     The Motion is granted to the extent set forth in this Final Order (the "Order").  The interim orders entered by this Court on October 25, 2004 and November 17, 2004 on the same subject matter is hereby superseded by this Order, except as noted herein.

2.     Any purchase, sale or other transfer of equity securities of W.R. Grace & Co. ("Grace") in violation of the restrictions or the procedures set forth herein (including the notice requirements set forth in ¶¶ 3(c) or 3(d)) shall be null and void ab initio as an act in violation of this Order and shall confer no rights on the transferee.

3.     The following procedures and restrictions shall apply to trading in the equity securities of the Debtors:

(a)     Notice of Substantial Equityholder Status .  Any person or entity who currently or in the future Beneficially Owns (as defined in paragraph (b) below) at least 4.75% of the outstanding equity securities of Grace (a "Substantial Equityholder") shall file with the Court and serve upon the Debtors' counsel a notice of such status in the form attached hereto as Exhibit 1A on or before the date that is the later of: (A) February 7, 2005 or (B) ten (10) days after such person or entity becomes a Substantial Equityholder.

(b)     Beneficial Ownership .  "Beneficial Ownership" of "equity securities" shall be defined consistent with the applicable definitions found in Section 382 of the Internal Revenue Code (the "IRC") and the Treasury Regulations thereunder (including attribution rules).  In particular, Beneficial Ownership of equity securities shall include (but not be limited to):

(1)     direct and indirect ownership by a holder ( e.g., an individual shareholder of a holding company would be considered to "beneficially own" a proportionate share of all interests, as the case may be, owned or acquired by the holding company, its subsidiaries and/or affiliates);

(2)     ownership of a participation interest in a pass-through or grantor trust, with any such participant being considered to beneficially own a ratable share of all interests owned or acquired by such pass-through entity or such trust or its trustee;

(3)     ownership by a holder's family members;

2

    (4)      ownership by persons or entities acting in concert with a holder to make a coordinated acquisition;

    (5)      ownership of an interest that such holder has a right to acquire through the ownership of an option, a contingent purchase right, a warrant, convertible debt or equity, a put, a call, an equity security subject to risk of forfeiture, a contract to acquire an interest, or a similar interest (including those interests described in Treasury Regulation § 1.382-4(d)(9)), regardless of whether such interest or right to acquire is contingent or otherwise not currently exercisable (each such right or interest to acquire, an "Option"); and

    (6)      ownership by a trust qualified under Section 401(a) of the IRC.

For purposes of this Order, "equity securities" shall not include any instrument or obligation (other than an instrument or obligation that, pursuant to its terms, is convertible into stock of Grace) that when issued or incurred, as the case may be, constituted debt for all federal income tax purposes.

(c)     <u>Acquisition of Equity Securities</u>.  Prior to effecting any acquisition of Grace's equity securities (including the acquisition of Options to acquire Grace's equity securities) that would result in an increase in the amount of Grace's equity securities Beneficially Owned by a Substantial Equityholder or would result in a person or entity becoming a Substantial Equityholder (a "Proposed Equity Acquisition Transaction"), such person, entity or Substantial Equityholder (a "Proposed Equity Transferee") shall file with the Court and serve on the Debtors' counsel a Notice of Intent to Purchase, Acquire or Otherwise Accumulate an Equity Security (an "Equity Acquisition Notice"), in the form attached hereto as <u>Exhibit 1B</u>, specifically and in detail describing the intended transaction acquiring Grace's equity securities.

(d)     <u>Disposition of Equity Securities</u>.  Within two business days after effecting any disposition of Grace's equity securities (including the disposition of Options to acquire Grace's equity securities) that resulted in a decrease in the amount of Grace's equity securities Beneficially Owned by a Substantial Equityholder or that resulted in a person or entity ceasing to be a Substantial Equityholder (an "Equity Disposition Transaction"), such person, entity or Substantial Equityholder (an "Equity Transferor") shall file with the Court and serve on the Debtors' counsel a Notice of Disposition of an Equity Security (an "Equity Disposition Notice"), in the form attached hereto as <u>Exhibit 1C</u>, specifically and in detail describing the transaction disposing of Grace's equity securities.

(e)     <u>Objection Procedures</u>.  No later than the date that is ten (10) calendar days after the Debtors' actual receipt of an Equity Acquisition Notice (the

3

CC-BLG003944

"Objection Deadline"), the Debtors may file with the Court and serve on a Proposed Equity Transferee an objection (an "Objection") to any proposed transfer of Grace's equity securities described in an Equity Acquisition Notice on the grounds that such transfer poses a material risk of adversely affecting the Debtors' ability to utilize any of their net operating losses ("NOLs") as a result of an ownership change under Section 382 or Section 383 of the Internal Revenue Code.

    (1)    If the Debtors timely file an Objection by the Objection Deadline, the Proposed Equity Acquisition Transaction shall not be effective unless approved by an order of this Court, after notice and a hearing and such time as such order is not subject to appeal, stay, modification, or reconsideration.

    (2)    If the Debtors do not timely file an Objection by the Objection Deadline, or if the Debtors provide written notice to the Proposed Equity Transferee that they do not object to such transaction prior to the expiration of the 10-day notice period, then the Proposed Equity Acquisition Transaction may proceed only as specifically described in an Equity Acquisition Notice.

4.    Special Rules

(a)    <u>Agents, Brokers, Custodians, Nominees, Clearinghouses and Trustees</u> .  Sales, acquisitions or other transfers of equity securities of Grace by a person or entity acting as a broker, agent, custodian, nominee, prime broker, clearinghouse or trustee on behalf of another person or entity shall not be subject to this Order with respect to that particular sale, acquisition or other transfer; provided, however, that a trustee of a trust qualified under Section 401(a) of the IRC, and the customer or principal of such agent, broker, custodian, nominee, prime broker, clearinghouse or trustee, shall not be excluded from this Order by reason of this paragraph.

(b)    <u>Account Managers</u> .  Sales, acquisitions or other transfers of equity securities of Grace by a person or entity acting as a discretionary account manager or manager for one or more accounts, customers, regulated investment companies or mutual funds shall not be subject to this Order with respect to that particular sale, acquisition or other transfer; provided, however, that each of an account manager's individual customers, individual account holders, individual regulated investment companies or individual mutual funds shall not be excluded from this Order by reason of this paragraph (although such account manager shall not have any affirmative duty to inquire whether its customer or account holder shall be subject to this Order).

(c)    <u>Money Loans</u> .  A person or entity's use of equity securities of Grace as collateral for a money loan shall not cause such person or entity to be

CC-BLG003945

subject to this Order with respect to such money loan; provided, however, that any transfer of collateral pursuant to the collection of such money loan shall not be excluded from this Order solely by reason of this paragraph.

(d)      Riskless Principals.  Market trades in equity securities of Grace in which a person or entity acts as a "riskless principal" between customers by buying and selling the same aggregate amounts on the same trade date for effect on the same settlement date shall not be subject to this Order with respect to such trades; provided, however, that such trades shall not be excluded from this Order with respect to such customers solely by reason of this paragraph.

(e)      Day Trading.  "Day trading" market purchases and sales of equity securities of Grace by a person or entity that net to zero at the end of each day (and that settle on the same day) shall not be subject to this Order with respect to such purchases and sales.

(f)      Derivatives.  Trading by a person or entity in its capacity as a dealer in derivative contracts in respect of derivatives on equity securities of Grace shall not be subject to this Order with respect to such trades, so long as (i) those derivative contracts provide for cash settlement only and are in fact so cash settled and (ii) such person or entity undertakes to maintain its books of derivative contracts on such equity securities (including for this purpose cash short sales and cash long positions currently owned by such person or entity that are from time to time designated as appertaining to those derivative books) in approximately the same net long or short position as was the case on October 14, 2004; provided that nothing herein shall cause the actual acquisition or disposition of equity securities not to be subject to this Order, even if such actual acquisition or disposition is in connection with or related to a derivatives contract.  Nothing in this Order shall limit the scope of Sections 362, 546, 548, 555, 556, 559 and 560 of the Bankruptcy Code with respect to the financial and related contracts and agreements referenced therein.

(g)      Short Sales.  The borrowing of equity securities of Grace for the purpose of effecting short sales or for on-lending, whether for the borrower's own account or for a customer account, shall not be subject to this Order so long as such borrowing does not occur prior to the day when such equity securities are used to complete and settle the short sale or on-lending; provided that the initial lender of such shares or the purchaser of such shares shall not be excluded from this Order solely by reason of this paragraph.  The closing and settlement upon unwinding of such short sale by the short-seller shall also not be subject to this Order, so long as the equity securities of Grace used to close such short sale are acquired on the date such equity are returned to the lender.

CC-BLG003946

(h)     Waiver of Restrictions.  The Debtors shall be permitted to waive any restrictions, limitations or notice requirements imposed by this Order; provided, however, that any such waiver shall be filed with this Court.

5.     Other Notice Procedures

(a)     Service of Procedures Notice.  Following entry of this Order, the Debtors shall deliver a copy of (A) notification procedures applicable to Substantial Equityholders and (B) notification and hearing procedures for the transfer of equity securities (the "Notice of Notification Procedures") (a copy of which is attached hereto as Exhibit 2) to the entities listed below.  The Notice of Notification Procedures shall inform all recipients thereof how to obtain copies of these notice procedures and the relevant notices described herein.

(1)     the Office of the United States Trustee;

(2)     any official statutory committee appointed in these Chapter 11 Cases;

(3)     counsel for the Debtors' debtor-in-possession lenders; and

(4)     the transfer agents for all classes of equity securities of the Debtors.

(b)     The Debtors may, no more often than once every three months during the pendency of these Chapter 11 cases, deliver the Notice of Notification Procedures to any and all registered holders of equity securities of Grace.

(1)     Any such registered holder shall, in turn, deliver a copy of the Notice of Notification Procedures to any holder for whose account such registered holder holds such equity securities, and so on down the chain of ownership.

(2)     Any person or entity in its individual capacity (a "Prospective Seller"), and any broker or agent acting on behalf of a Prospective Seller, who contemplates selling 1% of Grace's equity securities to another person or entity (a "Prospective Purchaser") must provide a copy of the Notice of Notification Procedures to each Prospective Purchaser or any broker or agent acting on behalf of a Prospective Purchaser.

6.     The requirements set forth in this Order are in addition to the requirements of Federal Rule of Bankruptcy Procedure 3001(e) and applicable securities, corporate and other laws, and do not excuse compliance therewith.

6

CC-BLG003947

7.      This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

8.      Notwithstanding the possible applicability of Bankruptcy Rules 6004(g), 7062, or 9014, the terms, conditions and notification procedures of this Order shall be effective as of the date this Order is entered. The interim orders entered by this Court on October 25, 2004 and November 17, 2004 on the same subject matter shall continue to apply to any transaction occurring prior to the date this Order is entered.

9.      Nothing in this Order is intended to have any precedential effect in any other proceeding involving a Debtor or a Substantial Equityholder and shall not be used as either res judicata or collateral estoppel, or otherwise have precedential effect, in any such other proceeding.

10.     Except for those persons or entity that are required to provide notice pursuant to Paragraphs 3 of this Order, no person or entity shall be liable for any damages or losses resulting from or caused by a violation of this Order.

11.     This Order shall not apply after the effective date of the Debtors' plan of reorganization.

12.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

Dated: January 24, 2005

/s/ Judith K. Fitzgerald
The Honorable Judith K. Fitzgerald
United States Bankruptcy Judge

7

---

**Exhibit 1A**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

In re:                                          ) Chapter 11

W. R. GRACE & Co., et al.,                      ) Case No. 01-1139 (JFK)
                                                ) (Jointly Administered)
                 Debtors.

**NOTICE OF STATUS AS A SUBSTANTIAL EQUITYHOLDER(1)**

PLEASE TAKE NOTICE that [name of equityholder] is/has become a Substantial Equityholder with respect to the equity securities (the "Equity Securities") of W. R. Grace & Co., a debtor and debtor in possession in Case No. 01-1139, pending in the United States Bankruptcy Court for the District of Delaware (the "Court").

PLEASE TAKE FURTHER NOTICE that, as of [ date ], [ name of equityholder ] Beneficially Owns [ _____ ] shares of the Equity Securities of W. R. Grace & Co. The following table sets forth the date(s) on which [ name of equityholder ] acquired or otherwise became the Beneficial Owner of such Equity Securities:

| Number of Shares | Type of Equity Security | Date Acquired |
|---|---|---|
|  |  |  |

(Attach additional page if necessary)

PLEASE TAKE FURTHER NOTICE that the taxpayer identification number of [ name of equityholder ] is _____.

PLEASE TAKE FURTHER NOTICE that, under penalties of perjury, [ name of equityholder ] hereby declares that it has examined this Notice and accompanying attachments (if any), and, to the best of its knowledge and belief, this Notice and any attachments that purport to be part of this Notice are true, correct and complete.

PLEASE TAKE FURTHER NOTICE that, pursuant to the Final Order of this Court, entered on [January 26, 20005], Limiting Certain Transfers of Equity Securities of the Debtors and Approving Related Notice Procedures, this Notice is being (A) filed with the Court,

---

(1)     For purposes of this Notice, all capitalized terms not defined herein shall have the same meaning as is set forth in the Final Order of this Court, entered [January 26, 2005], Limiting Certain Transfers of Equity Securities of the Debtors and Approving Related Notice Procedures.

CC-BLG003948

and (B) served upon Kirkland & Ellis LLP, counsel to the Debtors, 200 E. Randolph Drive, Chicago, Illinois 60601, Attn.: Janet S. Baer, Esq.

Dated:
[city, state]

Respectfully submitted,

[Name of Acquirer/Seller] [Address]
[telephone and facsimile]

2

CC-BLG003949

Exhibit 1B

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| W. R. GRACE & Co., et al., | ) Case No. 01-1139 (JFK) |
| | ) (Jointly Administered) |
| Debtors. | |

## NOTICE OF INTENT TO PURCHASE, ACQUIRE
## OR OTHERWISE ACCUMULATE EQUITY SECURITIES

PLEASE TAKE NOTICE that [ name of prospective acquirer ] hereby provides notice of its intention to purchase, acquire or otherwise accumulate one or more shares of the equity securities (the "Equity Securities") of W. R. Grace & Co. or an Option with respect thereto (the "Proposed Transfer").

PLEASE TAKE FURTHER NOTICE that, if applicable, on [ prior date(s) ], [ name of prospective acquirer ] filed a Notice of Status as a Substantial Equityholder (1) with the United States Bankruptcy Court for the District of Delaware (the "Court") and served copies thereof on the Debtors' counsel.

PLEASE TAKE FURTHER NOTICE that [ name of prospective acquirer ] currently Beneficially Owns _____ shares of the Equity Securities (type of Equity Security) of W. R. Grace & Co.

PLEASE TAKE FURTHER NOTICE that, pursuant to the Proposed Transfer, [ name of prospective acquirer ] proposes to purchase, acquire or otherwise accumulate [ _____ ] shares of Equity Securities or an Option with respect to [ _____ ] shares of Equity Securities. If the Proposed Transfer is permitted to occur, [ name of prospective acquirer ] will Beneficially Own [ _____ ] shares of Equity Securities after the transfer.

PLEASE TAKE FURTHER NOTICE that the taxpayer identification number of [ name of prospective acquirer ] is _____.

---

(1)    For purposes of this Notice, all capitalized terms not defined herein shall have the same meaning as is set forth in the Final Order of this Court, entered [January 26, 2005], Limiting Certain Transfers of Equity Securities of the Debtors and Approving Related Notice Procedures.

PLEASE TAKE FURTHER NOTICE that, under penalties of perjury, [name of prospective acquirer ] hereby declares it has examined this Notice and accompanying attachments (if any), and, to the best of its knowledge and belief, this Notice and any attachments that purport to be part of this Notice are true, correct and complete.

PLEASE TAKE FURTHER NOTICE that, pursuant to the Final Order of this Court, entered on [January 26, 2005], Limiting Certain Transfers of Equity Securities of the Debtors and Approving Related Notice Procedures, this Notice is being (A) filed with the Court, and (B) served upon Kirkland & Ellis LLP, counsel to the Debtors, 200 E. Randolph Drive, Chicago, Illinois 60601, Attn.: Janet S. Baer, Esq.

PLEASE TAKE FURTHER NOTICE that the Debtors have ten (10) calendar days after receipt of this Notice to object to the Proposed Transfer described herein. If the Debtors file an objection, such Proposed Transfer will not be effective unless approved by an order of the Court not subject to appeal, modification, stay, or reconsideration. If the Debtors do not object within such ten (10) day period, then after expiration of such period the Proposed Transfer may proceed specifically as set forth in the Notice.

The undersigned prospective acquirer understands that any further transactions that may result in [ name of prospective acquirer ] purchasing, acquiring or otherwise accumulating additional shares of Equity Securities (or an Option with respect thereto) will each require an additional notice filed with the Court to be served in the same manner as this Notice.

Dated:
[city, state]

Respectfully submitted,

[Name of Acquirer/Seller] [Address]
[telephone and facsimile]

2

CC-BLG003951

Exhibit 1C

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| W. R. GRACE & Co., et al., | ) Case No. 01-1139 (JFK) |
| | ) (Jointly Administered) |
| Debtors. | ) |

### NOTICE OF DISPOSITION OF EQUITY SECURITIES

PLEASE TAKE NOTICE that [ name of seller ] hereby provides notice of its disposition of one or more shares of the equity securities (the "Equity Securities") of W. R. Grace & Co. or an Option with respect thereto (the "Transfer").

PLEASE TAKE FURTHER NOTICE that, if applicable, on [ prior date(s) ], [ name of seller ] filed a Notice of Status as a Substantial Equityholder(1) with the United States Bankruptcy Court for the District of Delaware (the "Court") and served copies thereof on the Debtors' counsel.

PLEASE TAKE FURTHER NOTICE that [name of seller] Beneficially Owned, immediately prior to the Transfer described in this Notice, _____shares of Equity Securities of W. R. Grace & Co.

PLEASE TAKE FURTHER NOTICE that, pursuant to the Transfer, [name of seller] disposed of _____shares of Equity Securities or an Option with respect to _____shares of Equity Securities. Following the Transfer, [ name of seller ] Beneficially Owns _____shares of Equity Securities.

PLEASE TAKE FURTHER NOTICE that, under penalties of perjury, [ name of seller ] hereby declares that it has examined this Notice and accompanying attachments (if any), and, to the best of its knowledge and belief, this Notice and any attachments that purport to be part of this Notice are true, correct and complete.

PLEASE TAKE FURTHER NOTICE that, pursuant to the Final Order of this Court, entered on [January 26, 2005], Limiting Certain Transfers of Equity Securities of the Debtors and Approving Related Notice Procedures, this Notice is being (A) filed with the Court, and (B) served upon Kirkland & Ellis LLP, counsel to the Debtors, 200 E. Randolph Drive, Chicago, Illinois 60601, Attn.: Janet S. Baer, Esq.

---

(1)   For purposes of this Notice, all capitalized terms not defined herein shall have the same meaning as is set forth in the Final Order of this Court, entered (January 26, 2005], Limiting Certain Transfers of Equity Securities of the Debtors and Approving Related Notice Procedures.

CC-BLG003952

[ Name of seller ] understands that any further transactions that may result in [ name of seller ] selling, trading or otherwise transferring shares of Equity Securities (or an Option with respect thereto) may each require an additional notice filed with the Court to be served in the same manner as this Notice.

Dated:
[city, state]

Respectfully submitted,

[Name of Acquirer/Seller] [Address]
[telephone and facsimile]

2

CC-BLG003953

Exhibit 2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| W. R. GRACE & Co., et al., | ) Case No. 01-1139 (JFK) |
| | ) (Jointly Administered) |
| Debtors. | ) |

NOTICE OF (A) NOTIFICATION PROCEDURES APPLICABLE TO
SUBSTANTIAL HOLDERS OF EQUITY SECURITIES
AND (B) NOTIFICATION AND HEARING PROCEDURES FOR
TRADING IN EQUITY SECURITIES

TO ALL PERSONS OR ENTITIES WITH EQUITY INTERESTS IN W. R. GRACE & CO.:

PLEASE TAKE NOTICE that on April 2, 2001 (the "Petition Date"), W.R. Grace & Co., together with certain of its subsidiaries and affiliates (collectively, the "Debtors"), commenced cases under Chapter 11 of Title 11 of the United States Code as amended from time to time (the "Bankruptcy Code").

PLEASE TAKE FURTHER NOTICE that on [January 26, 2005], the United States Bankruptcy Court for the District of Delaware (the "Court") entered a final order (the "Order") imposing certain transfer restrictions on equity securities of W. R. Grace & Co. and approving the procedures set forth in the Order (the "Notice Procedures") to preserve the Debtor's net operating losses ("NOLs").

**The Order applies to any person or entity who currently or in the future beneficially owns (as defined in the Order) at least 4.75% of the outstanding equity securities of W.R. Grace & Co. Any sale or other transfer of equity securities in W. R. Grace & Co. in violation of the Order or the Notice Procedures shall be null and void *ab initio* and shall confer no rights on the transferee.**

PLEASE TAKE FURTHER NOTICE that, pursuant to the Order, the Notice Procedures shall apply to holding, acquiring and disposing, and any other transfers of EQUITY SECURITIES IN W. R. GRACE & CO.

PLEASE TAKE FURTHER NOTICE that any person or entity may obtain a copy of the Order, the Notice Procedures and the forms of each of the required notices described therein by:

1. Contacting the Clerk's Office for the United States Bankruptcy Court for the District of Delaware at 824 Market Street, 3rd Floor, Wilmington, Delaware 19801, 302-252-2900,

CC-BLG003954

Monday through Friday during the hours of 8:00 a.m. to 4:00 p.m., excluding Federal Holidays.

      2. Contacting Kirkland & Ellis LLP, counsel to the Debtors, 200 E. Randolph Drive, Chicago, Illinois 60601, Attn.: Samuel Blatnick, Esq., 312-861-2359, sblatnick@kirkland.com.

      PLEASE TAKE FURTHER NOTICE that the requirements set forth in this Notice are in addition to the requirements of Rule 3001(e) of the Federal Rules of Bankruptcy Procedure and applicable securities, corporate and other laws, and do not excuse compliance therewith.

Dated: [city]
      January   , 2005

                    **W. R. GRACE & CO., et al.**

                    By: _____

                    Counsel for the Debtors and Debtors in Possession

CC-BLG003955

EXHIBIT 4.13

AMENDMENT NO. 7 TO
POST-PETITION LOAN AND SECURITY AGREEMENT

This AMENDMENT NO. 7 TO POST-PETITION LOAN AND SECURITY AGREEMENT (this "Amendment") is dated as of June 19, 2008, among the Lenders, BANK OF AMERICA, N.A., as agent for the Lenders (the "Agent"), W. R. GRACE & CO. (the "Company") and the Subsidiaries of W. R. Grace & Co. parties hereto (collectively, the "Borrowers").

WHEREAS, the parties hereto are parties to a Post-Petition Loan and Security Agreement dated as of April 1, 2001 (as previously amended, the "Loan Agreement"); and

WHEREAS, the parties hereto desire to amend the Loan Agreement as herein set forth.

NOW, THEREFORE, for and in consideration of the mutual covenants set forth herein and in the Loan Agreement, and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.    Amendments. Subject to the satisfaction of each of the conditions to effectiveness set forth in Section 3 hereof, the Loan Agreement is hereby amended as follows:

(a)    Section 7.13 of the Loan Agreement is hereby amended to read in its entirety as follows:

"7.13 Debt. No Borrower shall incur or maintain any Debt (or apply to the Bankruptcy Court for authority to do so), other than: (a) the Obligations; (b) Debt existing on the Closing Date and described on Schedule 6.7; (c) Capital Leases of Equipment and purchase money secured Debt incurred following the Closing Date to purchase Equipment provided that (i) Liens securing the same attach only to the Equipment acquired by the incurrence of such Debt, and (ii) the aggregate amount of such Debt (including Capital Leases) outstanding does not exceed $25,000,000 at any time; (d) Permitted Intercompany Debt; (e) Debt consisting of Guaranties which are permitted by Section 7.12; (f) Debt arising pursuant to Hedging Agreements entered into in the ordinary course of business and not for speculative purposes); (g) Debt of any entity existing at the time such entity is acquired by a Borrower or any Other Subsidiary provided that such Debt shall not have been incurred in contemplation of such acquisition and no Borrower shall guaranty or otherwise assume such Debt; (h) Debt owing by W. R. Grace & Co.-Conn. to ART incurred in a manner consistent with the joint venture arrangements relating to ART which are in existence on the Closing Date, (i) Debt (1) incurred after the Petition Date, but prior to the time at which the initial Revolving Loans are made hereunder, (2) owing to one or more Other Subsidiaries, and (3) which is repaid with the proceeds of the initial Loans hereunder, (j) Debt incurred (i) while no Default or Event of Default has occurred and is continuing, (ii) while the Obligations exceed $50,000,000 and (iii) owing to one or more Other Subsidiaries, (k) Debt in an aggregate amount not to exceed $100,000,000, as

CC-BLG003956

long as such Debt is secured by any or all COLI and not secured by any assets other than COLI, and (l) other unsecured Debt not exceeding $25,000,000 in aggregate principal amount at any time outstanding.  The aggregate amount of lease payments under synthetic leases entered into by the Borrowers following the Petition Date shall not exceed $15,000,000.

(b)    The definition of "Permitted Lien" is hereby amended by relettering clause (n)  thereof to be clause (o) thereof, and inserting a new clause (n) , immediately prior to the relettered clause (o) , which new clause (n)  shall read in its entirety as follows:

"(n) Liens on COLI to the extent such Liens solely secure Debt permitted by Section 7.13(k)  (and such related obligations).

(c)    The definition of "Restricted Investment" is hereby amended by amending clause (k)  thereof to read in its entirety as follows:

"(k) Investments, made while no Default or Event of Default has occurred and is continuing, not otherwise permitted hereunder by any Borrower in any Other Subsidiary, provided that (A) (i) immediately prior to and immediately after giving effect to such Investments, Availability equals or is greater than $82,500,000 or (ii) such Investments are funded from cash received from Other Subsidiaries (excluding cash received (x) in payment of trade payables, royalties or similar payments or interest or (y) as or from proceeds of loans) and (B) after giving effect to such Investments, the aggregate then outstanding amount of all such Investments made pursuant to this clause (k) subsequent to the Amendment No. 1 Closing Date shall not exceed  $60,000,000 in the aggregate on a net annual cash flow basis cumulatively (it being agreed that only $22,500,000 of this amount may be invested through transactions which do not require and have not received approval of the Bankruptcy Court);"

2.    <u>Representations and Warranties of Borrower</u> .  Each Borrower represents and warrants that:

(a)    The execution, delivery and performance by each Borrower of this Amendment has been duly authorized by all necessary corporate action required on its part and this Amendment is a legal, valid and binding obligation of each Borrower enforceable against each Borrower in accordance with its terms except as the enforcement thereof may be subject to (i) the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and (ii) general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(b)    Each of the representations and warranties contained in the Loan Agreement and the Loan Documents is true and correct in all material respects on and as of the date hereof as if made on the date hereof (except to the extent stated to relate to a specific earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date).

CC-BLG003957

       (c)      Upon the effectiveness of this Amendment, no Event of Default shall have occurred and be continuing

3.    <u>Conditions</u> .  This Amendment shall be effective upon execution by each party hereto.

4.    <u>Reference to and Effect Upon the Loan Agreement</u> .

       (a)      Except as specifically amended above, the Loan Agreement and the other Loan Documents shall remain in full force and effect and are hereby ratified and confirmed.

       (b)      Upon the effectiveness of this Amendment, each reference in the Loan Agreement to "this Agreement", "hereunder", "hereof", "herein" or words of similar import shall mean and be a reference to the Loan Agreement as amended hereby.

5.    <u>Defined Terms</u> .  Except as otherwise defined herein, all defined terms herein shall have the meanings ascribed thereto in the Loan Agreement.

6.    <u>Governing Law</u> .  THIS AMENDMENT SHALL BE INTERPRETED AND THE RIGHTS AND LIABILITIES OF THE PARTIES HERETO DETERMINED IN ACCORDANCE WITH THE INTERNAL LAWS (PROVIDED THAT PERFECTION ISSUES WITH RESPECT TO ARTICLE 9 OF THE UCC MAY GIVE EFFECT TO APPLICABLE CHOICE OR CONFLICT OF LAW RULES SET FORTH IN ARTICLE 9 OF THE UCC) OF THE STATE OF NEW YORK TO THE EXTENT NOT PREEMPTED BY FEDERAL BANKRUPTCY LAWS; PROVIDED THAT THE AGENT AND THE LENDERS SHALL RETAIN ALL RIGHTS ARISING UNDER FEDERAL LAW.

7.    <u>Headings</u> .  Section headings in this amendment are included herein for convenience of reference only and shall not constitute a part of this Amendment for any other purposes.

8.    <u>Severability</u> .  If any provision of this Amendment shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Amendment.

9.    <u>Acceptance of Signatures</u> .  The parties agree that this Amendment will be considered signed when the signature of a party is delivered by facsimile or electronic mail transmission.  Such facsimile or electronic mail signature shall be treated in all respects as having the same effect as an original signature.

10.    <u>Counterparts</u> .  This Amendment may be executed in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument.

CC-BLG003958

IN WITNESS WHEREOF, this Amendment has been duly executed as of the date first written above.

BANK OF AMERICA, N.A.,
as Agent and Lender

By:    /s/ Edmundo Kahn
Name:  Edmundo Kahn
Title:   Vice President

**BORROWERS:**

W. R. Grace & Co.
A-1 Bit & Tool Co., Inc.
Alewife Boston Ltd.
Alewife Land Corporation
Amicon, Inc.
CB Biomedical, Inc.
CCHP, Inc.
Coalgrace, Inc.
Coalgrace II, Inc.
Creative Food 'N Fun Company
Darex Puerto Rico, Inc.
Del Taco Restaurants, Inc.
Ecarg, Inc.
Five Alewife Boston Ltd.
G C Limited Partners I, Inc.
G C Management, Inc.
GEC Management Corporation
GN Holdings, Inc.
GPC Thomasville Corp.
Gloucester New Communities Company, Inc.
Grace A-B Inc.
Grace A-B II Inc.
Grace Chemical Company of Cuba
Grace Culinary Systems, Inc.
Grace Drilling Company
Grace Energy Corporation
Grace Environmental, Inc.
Grace Europe, Inc.
Grace H-G Inc.
Grace H-G II Inc.

[Signature Page to Amendment No. 7 to
Post-Petition Loan and Security Agreement]

Grace Hotel Services Corporation
Grace International Holdings, Inc.
Grace Offshore Company
Grace PAR Corporation
Grace Petroleum Libya Incorporated
Grace Tarpon Investors, Inc.
Grace Ventures Corp.
Grace Washington, Inc.
W. R. Grace Capital Corporation
W. R. Grace & Co.-Conn.
W. R. Grace Land Corporation
Gracoal, Inc.
Gracoal II, Inc.
Guanica-Caribe Land Development Corporation
Hanover Square Corporation
Homco International, Inc.
Kootenai Development Company
L B Realty, Inc.
Litigation Management, Inc.
Monolith Enterprises, Incorporated
Monroe Street, Inc.
MRA Holdings Corp.
MRA Intermedco, Inc.
MRA Staffing Systems, Inc.
Remedium Group, Inc.
Southern Oil, Resin & Fiberglass, Inc.
Water Street Corporation, each as a Debtor and a Debtor-in-Possession


By:    /s/ Hudson La Force III
Its Duly Authorized Signatory


[Signature Page to Amendment No. 7 to
Post-Petition Loan and Security Agreement]

CC Partners, as a Debtor and Debtor-in-Possession

By:    MRA Staffing Systems, Inc., a General Partner

By:  /s/ Hudson La Force III _____

Its:  _____

By:    CCHP, Inc., a General Partner

By:  /s/ Hudson La Force III _____

Its:  _____

Axial Basin Ranch Company, as a Debtor and Debtor-in-Possession

By:    Grace A-B II, Inc., a General Partner

By:  /s/ Hudson La Force III _____

Its:  _____

By:    Grace A-B, Inc., a General Partner

By:  /s/ Hudson La Force III _____

Its:  _____

Hayden-Gulch West Coal Company, as a Debtor and Debtor-in-Possession

By:    Grace H-G, Inc., a General Partner

By:  /s/ Hudson La Force III _____

Its:  _____

[Signature Page to Amendment No. 7 to
Post-Petition Loan and Security Agreement]

By:   Grace H-G II, Inc., a General Partner

     By:   /s/ Hudson La Force III _____

     Its:  _____

H-G Coal Company, as a Debtor and Debtor-in-Possession

By:   Coalgrace, Inc., a General Partner

     By:   /s/ Hudson La Force III _____

     Its:  _____

By:   Coalgrace II, Inc., a General Partner

     By:   /s/ Hudson La Force III _____

     Its:  _____

Dewey and Almy, LLC, as a Debtor and Debtor-in-Possession

By:   W. R. Grace & Co.-Conn., its sole member

     By:   /s/ Hudson La Force III _____

     Its:  _____

[Signature Page to Amendment No. 7 to
Post-Petition Loan and Security Agreement]

CC-BLG003962

THE CIT GROUP/BUSINESS CREDIT, INC

By:      /s/ Matthew DeFranco
Title:   Vice President
Address:    11 West 42 nd Street
            New York, New York 10036
            Attention: Matthew DeFranco
            Facsimile: (212) 461-7715

[Signature Page to Amendment No. 7 to
Post-Petition Loan and Security Agreement]

CC-BLG003963

PNC BANK, NATIONAL ASSOCIATION

By: _____
Title:    Vice President
Address:    70 East 55 th Street
            14 th Floor
            New York, New York 10022
            Attention: John D. Trott
            Facsimile: (212) 303-0060

[Signature Page to Amendment No. 7 to
Post-Petition Loan and Security Agreement]

CC-BLG003964

EXHIBIT 10.12

**2008-2010 Long-Term Cash Award**

Granted to:                                         «First» «Last»
Effective Date of Grant:                            September 2008
Targeted Cash Award:                               $
Performance Period:                                January 1, 2008 – December 31, 2010

Under the long-term incentive program of W.R. Grace & Co (the "Company"), the Compensation Committee (the "Committee") of the Board of Directors of the Company has granted you a Long-Term Cash Award under which you may earn a cash payout in an amount equal to (or, in certain circumstances, greater or less than) the Targeted Cash Award set forth above, over the Performance Period.

You will earn this Targeted Cash Award if the performance objectives described in Annex B for the Performance Period are met. If the performance objectives are only partially achieved or are over-achieved, the amount you actually earn under this Award will be decreased (or eliminated) or increased as set forth in Annex B .

The award will be calculated and paid to you, net of the applicable taxes.

The consequences of a change in or termination of your employment status during the Performance Period are described in the attached Administrative Practices (Annex C).

In all matters regarding the administration of the Long-Term Incentive Award, the Committee has full and sole jurisdiction, subject to the provisions of Annex C.

Long-Term Incentive Awards are being granted only to a limited number of key employees of the Company and its subsidiaries. This Award should, consequently, be treated confidentially.

W.R. Grace & Co.

By:

Alfred Festa
Chairman, President and CEO

Acceptance of the foregoing is acknowledged this
day of                         , 2008.

_____
(Signature of Participant)

_____
(Please print full name)

CC-BLG003965

Calculation of 2008-2010 LTIP- Cash Award

Your 2008-2010 Long Term Cash award payout will be based on the 3-year compound annual growth rate (CAGR) in total Grace core earnings before interest and taxes (core EBIT). Payouts are contingent upon achievement of target CAGR for the 3-year performance period. The target CAGR is **6%**, using 2007 results as the base year.

The core earnings before interest and taxes (core EBIT) in 2007 were $297.1 million (reflecting adjustment for Grace's recent change in accounting for U.S. inventories from LIFO to FIFO). The chart below details six scenarios at different assumed growth rates. The target growth is highlighted.

| Assumed Growth Rates | Base Period 2007 | Performance Period Growth Targets | | | Total Growth 08-10 |
|---|---|---|---|---|---|
| | | 2008 | 2009 | 2010 | |
| 1.50% | 297.1 | 301.6 | 306.1 | 310.7 | 918.4 |
| 3.00% | 297.1 | 306.0 | 315.2 | 324.6 | 945.8 |
| 6.00% | 297.1 | 314.9 | 333.8 | 353.9 | 1002.6 |
| 10.00% | 297.1 | 326.8 | 359.5 | 395.4 | 1081.7 |
| 15.00% | 297.1 | 341.7 | 392.9 | 451.9 | 1186.5 |
| 25.00% | 297.1 | 371.4 | 464.2 | 580.3 | 1415.9 |

Actual results for each year of the performance period are adjusted for the change in pension expense and LITP expense as compared to the base period.

The Long-Term Cash Award payout will vary with actual results as shown in the chart below:

| CAGR Level Achieved | Payout (rounded to the nearest whole percentage) |
|---|---|
| 25% | 200% |
| 15% | 147% |
| 10% | 121% |
| 6% | 100% |
| 3% | 50% |
| 3%< | Prorated |

CC-BLG003966

For the 2008-2010 LTIP, cash payments will be made in two installments – 50% of what is earned based on performance for 2008 and 2009, but no more than 50% of your target for the first two years, will be paid in March 2010, and the balance will be paid in March 2011.

Example:

A sample calculation of the Long-Term Cash Award Earned is provided below. Assume that your Targeted Award is $20,400. $13,600 would be earned after Year 2 assuming a 6% growth per year. Therefore the payment in March 2010 would be $6,800, 50% of what is earned.

| CAGR Level Achieved | Payout In March 2010 | | Payout In March 2011 | | Total Payout | |
|---|---|---|---|---|---|---|
| 25% | $ | 6,800 | $ | 34,000 | $ | 40,800 |
| 15% | $ | 6,800 | $ | 23,188 | $ | 29,988 |
| 10% | $ | 6,800 | $ | 17,885 | $ | 24,685 |
| 6% | $ | 6,800 | $ | 13,600 | $ | 20,400 |
| 3% | $ | 3,400 | $ | 6,800 | $ | 10,200 |

CC-BLG003967

Annex C

W. R. GRACE & CO.
Administrative Practices – Long-Term Cash Award Program
2008-2010 Performance Period

Definitions

"Award Payment": An Interim Long-Term Cash Award Payment or Remaining Long-Term Award Payment, as applicable.

"Board of Directors": The Board of Directors of the Company

"Committee": The Compensation Committee of the Board of Directors.

"Company": W. R. Grace & Co., a Delaware Corporation and/or, if applicable in the context, one or more of its Subsidiaries.

"Incomplete Long-Term Cash Awards": A Long-Term Cash Award for which the Performance Period has not been completed as of the date referenced.

"Interim Long-Term Cash Award Payment": As defined on page 4, provided that such payment will not exceed 50% of the Participant's Targeted Award for the first two years, regardless of Company performance at the time of payment.

"Key Employee": An officer or other senior, full-time employee of the Company, who, in the opinion of the Company, can contribute significantly to the growth and successful operations of the Company.

"Long-Term Cash Award Program": An undertaking by the Company to financially reward a Key Employee at the end of a Performance Period, which undertaking is contingent upon or measured by the attainment over the Performance Period of specified performance objectives determined (on a consolidated or unconsolidated basis) by changes in the 3-year compound annual growth rate (CAGR) in Total Grace's core earnings before interest and taxes (core EBIT).

"Long-Term Cash Award": A cash award, to be paid in the future, which is granted to Key Employees under the Company's long-term incentive program.

"Long-Term Cash Award Earned": The amount of cash earned by a Participant pursuant to the terms of a Long-Term Cash Award.

"Participant": A Key Employee who is, or who is proposed to be, a recipient of a Long-Term Cash Award.

"Performance Period": Except as provided herein, a period of three calendar years over which a Long-Term Cash Award may be earned, as approved by the Committee. The first Performance Period under this Plan will commence effective January 1, 2008 and will end on December 31, 2010. Performance Periods with respect to different Long-Term Cash Awards to the same individual may overlap.

1

CC-BLG003968

"Total Grace Core EBIT": The core earnings before interest and taxes (core EBIT)" of the Company as reported on (and calculated in accordance with) the statement of W. R. Grace & Co. Continuing Operations- Segment Basis.

"Remaining Long-Term Cash Award Payment": As defined on Page 4, the second installment of the Long-Term Cash Award that may be paid after the end of the Performance Period, based on Company performance for the entire Performance Period.

"Subsidiary": A corporation, partnership, limited liability company or other form of business association of which shares of common stock or other ownership interests (i) having more than 50% of the voting power regularly entitled to vote for directors (or equivalent management rights) or (ii) regularly entitled to receive more than 50% of the dividends (or their equivalents) paid on the common stock (or other ownership interests), are owned, directly or indirectly, by the Company.

"Targeted Cash Award": The amount of cash award specified in writing for a Participant as his or her "Targeted Cash Award" for a Performance Period and which is subject to and covered by the terms and conditions of a Long-Term Cash Award. This amount may be different from the Long-Term Cash Award Earned by an individual.

**Plan Administration**

The Plan shall be administered by the Committee, provided that no member of the Committee shall be eligible to receive a Long-Term Cash Award while serving on the Committee.

The Committee shall approve (i) the performance measurements and objectives for each Long-Term Cash Award and (ii) the Performance Period over which a Long-Term Cash Award is to be earned.

The Committee shall approve (i) the Grace Leadership Team members who are to be granted Long-Term Cash Awards and (ii) the Targeted Award subject to each Long-Term Cash Award. The Committee (or the designee of the Committee, which may include the Chief Executive Officer of the Company) shall approve awards for all other Key Employees.

**Long-Term Cash Awards**

The Committee may, at any time or from time to time, grant Long-Term Cash Awards to Key Employees.

Each Long-Term Cash Award shall be evidenced by a written instrument containing such terms and conditions as the Committee shall approve, provided the instrument is consistent with these practices.

CC-BLG003969

No Long-Term Cash Award, nor any payment or right thereunder, shall be subject in any manner to alienation, sale, transfer, assignment, pledge, encumbrance or charge, except by will or the laws of descent and distribution, or by the terms of a Participant's Designation of Beneficiary, if any, on file with the Company.

In the case of a Key Employee who becomes a Participant after the beginning of a Performance Period, the Committee may ratably reduce the amount of the Targeted Award covered by such Employee's Long-Term Cash Award or otherwise appropriately adjust the terms of the Long-Term Cash Award to reflect the fact that the Key Employee is to be a Participant for only part of the Performance Period.

It is the intention of the Committee that Long-Term Cash Awards be related to the results of the core operations affected by the management actions taken by the Participants. Subject to the administrative practices that apply to termination or change in employment status and to the amendment or discontinuance of Long-Term Cash Awards, the performance objectives applicable to Long-Term Cash Awards will remain unchanged during the Performance Period except as follows:

In general, acquisitions and divestments will be included in the performance results.

**Termination or Change in Employment Status**

A Participant shall forfeit all rights to any Award Payment, if, prior to the date of payment of such Award Payment, the Participant (1) resigns without the consent of the Committee, (2) retires under a retirement plan of the Company or Subsidiary before age 62 without the consent of the Committee, or (3) is terminated for cause.

If a Participant retires under a retirement plan of the Company or Subsidiary at or after age 62, or ceases employment as a result of death or disability, or ceases employment as a result of an involuntary termination after a Change in Control of the Company (as defined herein), during a Performance Period, then his rights in any Incomplete Long-Term Cash Award related to that Performance Period shall thereupon vest, and he shall be entitled to receive any Award Payment of any Long-Term Cash Award Earned he would otherwise have received (at the time he would have otherwise received the Award Payment), except that the amount of any Long-Term Cash Award Earned shall be reduced ratably in proportion to the portion of the Performance Period during which the Participant was not an employee. If a Participant ceases employment with the Company for any of the reasons specified in this paragraph, after the completion of any Performance Period (but before the payment of the Remaining Long-Term Cash Award Payment related to the completed Performance Period), then his rights to any Long-Term Cash Award Earned and to such Award Payment related to the completed Performance Period shall thereupon vest, and he shall be entitled to receive such Award Payment at the time he would have otherwise received the Payment.

If a Participant ceases employment with the Company for any reason other than those indicated in the previous two paragraphs (including by reason of involuntary termination not for cause, except as provided above with respect to involuntary termination after a

3

CC-BLG003970

Change in Control of the Company, or transfer of employment to a buyer of any business unit of the Company), then his rights in any Incomplete Long-Term Cash Award, and any Award Payment that is unpaid as of the date the Participant ceases such employment, shall be forfeited, unless the Committee (or the designee of the Committee, which may include the Chief Executive Officer of the Company) determines to make an exception.    All such determinations, if any, shall be final and binding on all parties.

Except as modified by the provisions of the second and third paragraphs of this section, payments due to Participants pursuant to the applicable preceding paragraphs, above, shall be calculated and made in accordance with the provisions described under the section entitled "Calculation of Long-Term Cash Awards Earned: Form of Payment".

A leave of absence, if approved by the Committee, shall not be deemed a termination or change of employment status for the purposes of this section, but, unless the Committee otherwise directs, any Long-Term Cash Award Earned that a Participant would otherwise have received under a Long-Term Cash Award Program shall be reduced ratably in proportion to the portion of the Performance Period during which the Participant was on such leave of absence.

Any consent, approval or direction which the Committee may give under this section in respect of an event or transaction may be given before or after the event or transaction.

**Calculation of Long-Term Cash Awards Earned: Form of Payment**

Long-Term Cash Awards Earned will be paid to a Participant in two installments (1) the first installment shall be paid in March (and no later than March 13 th) of the third and final year of the Performance Period and shall be equal to 50% of what is earned based on the Company's performance for the first two calendar years of the applicable Performance Period, but no more than 50% of the Participant's Targeted Award for the first two years (the "Interim Long-Term Cash Award Payment"), and (2) the balance, if any, of the Long-Term Cash Award Earned will be paid in March (and no later than March 13 th) after the end of the third and final year of the Performance Period (the "Remaining Long-Term Cash Award Payment").

The Committee shall determine the extent to which the performance objectives of a Long-Term Cash Award have been achieved during the Performance Period and the amount of any Long-Term Cash Awards Earned (and the amount of any Award Payment).    All calculations in this regard shall be made in accordance with the generally accepted accounting principles customarily applied by the Company and shall be submitted to the Committee for its review and approval.    The determination of the Committee shall be final and binding. Payments under this Program are intended to be exempt from Section 409A of the Internal Revenue Code; and the provisions of these "Administrative Practices" shall be interpreted and administered in that manner.

4

CC-BLG003971

**Treatment of Large Corporate Acquisitions and Divestments**

Notwithstanding any other provision of the Plan to the contrary, the Total Grace Core EBIT for the Performance Period shall be adjusted to account for any business acquisition that occurs during the Performance Period, which has a purchase price to the Company of more than $50 million (a "Significant Acquisition), as follows:

(a)  with respect to the calendar year during the Performance Period in which the Significant Acquisition closes, the Total Grace Core EBIT will be decreased by the result of the following formula — the EBIT of the Significant Acquisition (the "Base SA EBIT") for the full calendar year prior to the calendar year that the Significant Acquisition closes (the "Pre-Acquisition Calendar Year"), which shall be calculated by the Company in the same manner as the Company calculated the Total Grace Core EBIT, multiplied by (the number of full months remaining in the calendar year that the Significant Acquisition closed divided by 12);

(b)  with respect to the first subsequent full calendar year (if any) during the Performance Period after the Significant Acquisition closes, the Total Grace Core EBIT shall be further decreased by the following formula — the Base SA EBIT for the Pre-Acquisition Calendar Year multiplied by 1.06; and with respect to the second subsequent calendar year (if any) during the Performance Period after the Significant Acquisition closes, the Total Grace Core EBIT shall be further decreased by the following formula — the Base SA EBIT for the Pre-Acquisition Calendar Year multiplied by 1.06, the result of which is further multiplied by 1.06.

Also, notwithstanding any other provision of the Plan to the contrary, in the event that the Company divests any of its businesses, which results in total proceeds to the Debtors of more than $50 million (a "Significant Divestiture") during the Performance Period, the Total Grace Core EBIT for the Performance Period shall be increased to account for the Significant Divestiture using the approach that is the converse of the approach specified above with respect to Significant Acquisitions; so that the effect of a Significant Divestiture upon the Total Grace Core EBIT shall be neutralized in the same manner as the effect of a Significant Acquisition described above; and any realized gains or losses that result from the Significant Divestiture shall not be included in the Total Grace Core EBIT.

**General**

Nothing in this document nor in any instrument executed pursuant hereto shall confer upon a Participant any right to continue in the employ of the Company or a Subsidiary, or shall affect the right of the Company or a Subsidiary to terminate his or her employment with or without cause.

CC-BLG003972

The Company or a Subsidiary may make such provisions as it may deem appropriate for the withholding or any taxes that the Company or a Subsidiary determines it is required to withhold in connection with any Long-Term Cash Award Earned.

Nothing in a Long-Term Cash Award is intended to be a substitute for, or shall preclude or limit the establishment or continuation of, any other plan, practice, or arrangement for the payment of compensation or benefits to employees generally, or to any class or group of employees, which the Company or a Subsidiary now has or may hereafter lawfully put into effect, including, without limitation, any retirement, pension, group insurance, annual bonus, stock purchase, stock bonus or stock option plan; provided, however, that no amounts awarded or paid pursuant to any Long-Term Cash Award shall be included or counted as compensation for the purposes of any employee benefit plan of the Company or a Subsidiary where contributions to the plan, or the benefits received from the plan, are measured or determined in whole or in part, by the amount of the employee's compensation.

The grant of a Long-Term Cash Award to an employee of a Subsidiary shall be contingent on the approval of the Long-Term Cash Award by the Subsidiary and the Subsidiary's agreement that (i) the Company may administer such Award on its behalf and (ii) the Subsidiary will make, or reimburse the Company for, the payments called for by the Long-Term Cash Award. The provisions of this paragraph and the obligations of the Subsidiary so undertaken may be waived, in whole or in the part, from time to time by the Company.

**Amendments and Discontinuance**

In the event acquisitions, divestments, substantial changes in tax or other laws or in accounting principles or practices, natural disasters or other extraordinary events render fulfillment of the performance objectives of a Long-Term Cash Award impossible or impracticable, or result in the achievement of the performance objectives without appreciable effort by the Participant, the Committee may, but shall not be obligated to, amend any such Long-Term Cash Award in any appropriate manner so that the Participant may earn Long-Term Cash Awards comparable to those that might have been earned if the extraordinary event had not occurred.

The Chief Executive Officer of the Company may approve such technical changes and clarifications to the Long-Term Cash Award Program as necessary, provided such changes or clarifications do not vary substantially from the terms and conditions outlined in this description.

Payments under this Program are intended to be exempt from Section 409A of the Internal Revenue Code; and the provisions of these "Administrative Practices" shall be interpreted and administered in that manner.

In the event a Change in Control of the Company (as defined herein) shall occur or the Board of Directors has reason to believe that a Change of Control may occur, the Committee may, with respect to any one or more Long-Term Cash Awards, (i) reduce the

6

length of a Performance Period to not less than one year, (ii) make ratable adjustments to performance objectives and Targeted Awards, (iii) change the methods of measuring the performance objectives, (iv) accelerate the payment of any Long-Term Cash Awards Earned or any Award Payment, and (v) take other action deemed by it to be appropriate and in the best interests of the Company under the circumstances. For the purposes of this paragraph:

(A)  "Change in Control of the Company" means and shall be deemed to have occurred if (a) the Company determines that any "person" (as such term is used in Section 13(d) and 14 (d) of the Securities Exchange Act of 1934), other than a trustee or other fiduciary holding securities under an employee benefit plan of the Company or a corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company, has become the "beneficial owner" (as defined in Rule 13d-3 under such Act), directly or indirectly, of 20% or more of the outstanding common stock of the Company (provided, however, that a Change in Control shall not be deemed to have occurred if such person has become the beneficial owner of 20% or more of the outstanding Common Stock as the results of a sale of Common Stock by the Company that has been approved by the Board of Directors); or pursuant to a plan of reorganization which has been confirmed by the U.S. District Court or Bankruptcy Court having jurisdiction of the Company's Chapter 11 case, Case No. 01-01139 (JJF), pursuant to an order of such Court which is final and nonappealable, and becomes effective; (ii) individuals who are Continuing Directors cease to constitute a majority of any class of directors of the Board; (iii) there occurs a reorganization, merger, consolidation or other corporate transaction involving the Company (a "Corporate Transaction"), in each case, with respect to which the stockholders of the Company immediately prior to such Corporate Transaction do not, immediately after the Corporate Transaction, own 50% or more of the combined voting power of the corporation resulting from such Corporate Transaction, provided that this clause (iii) shall not apply to a Corporate Transaction which is pursuant to section 363 of the Bankruptcy Code, or is pursuant to a plan of reorganization which has been confirmed by the U.S. District Court or Bankruptcy Court having jurisdiction of the Company's chapter 11 case, Case No. 01-01139 (JJF), pursuant to an order of such Court which is final and nonappealable, and becomes effective, or (iv) the shareholders of the Company approve a complete liquidation or dissolution of the Company.

(B)  "Continuing Director" means any member of the Board of Directors who was such a member on the date on which this Program was approved by the Board of Directors, and any successor to a Continuing Director who is approved as a nominee or elected to succeed to a Continuing Director by a majority of Continuing Directors who are then members of the Board of Directors.

The granting of Long-Term Cash Awards may be amended or discontinued by the Committee at any time.

No amendment or discontinuance of Long-Term Cash Awards shall, without a Participant's consent, adversely affect his rights in any Long-Term Cash Awards theretofore granted to him, except that, if the Committee so directs, all Incomplete

7

CC-BLG003974

Long-Term Cash Awards may be terminated prospectively with the same effect as a termination of employment under the second paragraph of the section entitled "Termination or Change in Employment Status".

8

CC-BLG003975

EXHIBIT 21

☒    **W. R. GRACE & CO., a Delaware corporation**
**U.S. SUBSIDIARIES**

12/31/2008

☒    Chapter 11 Filing — April 2, 2001

| SUBSIDIARY NAME | CO. # | STATE OF INCORPORATION |
|---|---|---|
| ☒   A-1 Bit & Tool Co., Inc. | 458 | DE |
| * Advanced Refining Technologies LLC | 268 (f/k/a 930) | DE |
| ☒   Alewife Boston Ltd. | 070 | MA |
| ☒   Alewife Land Corporation | 069 | MA |
| Alltech Associates, Inc. | 259 | IL |
| ☒   Amicon, Inc. | 174 | DE |
| AP Chem Incorporated | 436 | MD |
| ☒   CB Biomedical, Inc. | 125 | DE |
| ☒   CCHP, Inc. | 074 | DE |
| ☒   Coalgrace, Inc. | 824 | DE |
| ☒   Coalgrace II, Inc. | 835 | DE |
| Construction Products Dubai, Inc. | 121 | DE |
| ☒   Creative Food 'N Fun Company | 587 | DE |
| ☒   Darex Puerto Rico, Inc. | 798 | DE |
| ☒   Del Taco Restaurants, Inc. | 557 | DE |
| ☒   Dewey and Almy, LLC | 406 | DE |
| ☒   Ecarg, Inc. | 519 | NJ |
| ☒   Five Alewife Boston Ltd. | 071 | MA |
| ☒   G C Limited Partners I, Inc. | 465 | DE |
| ☒   G C Management, Inc. | 539 | DE |
| ☒   GEC Management Corporation | 689 | DE |
| ☒   GN Holdings, Inc. | 073 | DE |
| ☒   GPC Thomasville Corp. | 637 | DE |
| ☒   Gloucester New Communities Company, Inc. | 572 | NJ |
| ☒   Grace A-B Inc. | 625 | DE |
| ☒   Grace A-B II Inc. | 827 | DE |
| Grace Asia Pacific, Inc. | 107 | DE |
| Grace Chemicals, Inc. | 710 | DE |
| ☒   Grace Chemical Company of Cuba | 305 | IL |
| Grace Collections, Inc. | 316 | DE |
| ☒   Grace Culinary Systems, Inc. | 479 | MD |
| ☒   Grace Drilling Company | 877 | DE |

* Ownership of Advanced Refining Technologies LLC is 55% W. R. Grace & Co.-Conn. (#001) and 45% Chevron USA, Inc.; certain enumerated actions of the Executive Committee require unanimous consent.

1

CC-BLG003976

| | SUBSIDIARY NAME | CO. # | STATE OF INCORPORATION |
|---|---|---|---|
| ☒ | Grace Energy Corporation | 681 | DE |
| ☒ | Grace Environmental, Inc. | 198 | DE |
| ☒ | Grace Europe, Inc. | 407 | DE |
| | Grace Germany Holdings, Inc. | | DE |
| ☒ | Grace H-G Inc. | 506 | DE |
| ☒ | Grace H-G II Inc. | 828 | DE |
| ☒ | Grace Hotel Services Corporation | 480 | DE |
| ☒ | Grace International Holdings, Inc. | 543 | DE |
| | Grace Latin America, Inc. | 263 | DE |
| | Grace Management Services, Inc. | 485 | DE |
| ☒ | Grace Offshore Company | 822 | LA |
| ☒ | Grace PAR Corporation | 621 | DE |
| ☒ | Grace Petroleum Libya Incorporated | 880 | DE |
| | Grace Receivables Purchasing, Inc. | 041 | DE |
| ☒ | Grace Tarpon Investors, Inc. | 462 | DE |
| ☒ | Grace Ventures Corp. | 664 | DE |
| ☒ | Grace Washington, Inc. | 197 | DE |
| ☒ | W. R. Grace Capital Corporation | 563 | NY |
| ☒ | W. R. Grace & Co.-Conn. | 001 | CT |
| ☒ | W. R. Grace Land Corporation | 523 | NY |
| ☒ | Gracoal, Inc. | 856 | DE |
| ☒ | Gracoal II, Inc. | 848 | DE |
| ☒ | Guanica-Caribe Land Development Corporation | 376 | DE |
| ☒ | Hanover Square Corporation | 516 | DE |
| ☒ | Homco International, Inc. | 631 | DE |
| | Ichiban Chemical Co., Inc. | 028 | DE |
| ☒ | Kootenai Development Company | 079 | MT |
| ☒ | L B Realty, Inc. | 495 | DE |
| ☒ | Litigation Management, Inc. | 317 | DE |
| ☒ | Monolith Enterprises, Incorporated | 477 | DC |
| ☒ | Monroe Street, Inc. | 481 | DE |
| ☒ | MRA Holdings Corp. | 075 | DE |
| ☒ | MRA Intermedco, Inc. | 076 | DE |
| ☒ | MRA Staffing Systems, Inc. | 077 | DE |
| | NZ Alltech, Inc. | | IL |
| ☒ | Remedium Group, Inc. | 063 | DE |
| ☒ | Southern Oil, Resin & Fiberglass, Inc. | 318 | FL |
| ☒ | Water Street Corporation | 548 | DE |

2

CC-BLG003977

<u>NON-U.S. SUBSIDIARIES</u>

COUNTRY/
SUBSIDIARY NAME
_____

**ARGENTINA**
W. R. Grace Argentina S.A.
WRG Argentina, S.A.
**AUSTRALIA**
Alltech Associates (Australia) Pty. Ltd.
Grace Australia Pty. Ltd.
**BELGIUM**
Grace Construction Products N.V.
Grace S.A. (f/k/a Grace N.V.)
Grace Silica N.V.
Inverco Benelux N.V.
**BRAZIL**
Grace Brasil Ltda.
Grace Davison Ltda.
**CANADA**
GEC Divestment Corporation Ltd.
Grace Canada, Inc.
W. R. Grace Finance (NRO) Ltd.
**CHILE**
Grace Quimica Compania Limitada
**CHINA - PEOPLE'S REPUBLIC OF**
Grace China Ltd.
Grace Trading (Shanghai) Co., Ltd.
**COLOMBIA**
Grace Colombia S.A.
W. R. G. Colombia S.A.
**CUBA**
Envases Industriales y Comerciales, S.A.
Papelera Camagueyana, S.A.
**FRANCE**
Alltech France S.A.R.L.
Grace Produits de Construction SAS
Société Civile Beau-Béton
W. R. Grace S.A.
**GERMANY \***
Advanced Refining Technologies GmbH
Alltech Grom GmbH
Grace Bauprodukte GmbH
Grace Darex GmbH

_____

\*    Grace GmbH, formerly the main operating entity in Germany, was restructured into two partnerships:

      1.     Grace GmbH & Co. KG (#252), and
      2.     Grace Manufacturing GmbH & Co. KG (#253),

    both of which are listed in the "Partnerships" section.

3

CC-BLG003978

**COUNTRY/**
**SUBSIDIARY NAME**

**GERMANY (Continued)**
Grace Energy GmbH (f/k/a Grace Holding GmbH)
Grace Europe Holding GmbH
Grace GP GmbH
Grace Management GP GmbH
Grace Silica GmbH
**GREECE**
Grace Hellas E.P.E.
**HONG KONG**
Alltech Applied Science Labs (HK) Limited
Alltech Scientific (China) Limited
W. R. Grace (Hong Kong) Limited
W. R. Grace Southeast Asia Holdings Limited
**HUNGARY**
Grace Értékesito Kft.
**INDIA**
Grace Davison Chemicals India Pvt. Ltd.
*(f/k/a Flexit Laboratories Private Ltd.)*
W. R. Grace & Co. (India) Private Limited
**INDONESIA**
PT. Grace Specialty Chemicals Indonesia
**IRELAND**
Amicon Ireland Limited
Grace Construction Products (Ireland) Limited
Trans-Meridian Insurance (Dublin) Ltd.
**ITALY**
Alltech Italia S.R.L.
W. R. Grace Italiana S.p.A.
**JAPAN**
Advanced Refining Technologies K.K.
Grace Chemicals K.K.
Grace Japan Kabushiki Kaisha
**KOREA**
Grace Korea Inc.
**MALAYSIA**
W. R. Grace (Malaysia) Sendiran Berhad
W. R. Grace Specialty Chemicals (Malaysia) Sdn. Bhd.
**MEXICO**
Grace Container, S. A. de C. V.
W. R. Grace Holdings, S. A. de C. V.
**NETHERLANDS**
Alltech Applied Science B.V.
Amicon B.V.
Denac Nederland B.V.
LC Service B.V.
Storm van Bentem en Kluyver B.V.
W. R. Grace B.V.
**NETHERLANDS ANTILLES**
W. R. Grace N.V.

4

CC-BLG003979

**COUNTRY/**
**SUBSIDIARY NAME**

**NEW ZEALAND**
Grace (New Zealand) Limited
**PHILIPPINES**
W. R. Grace (Philippines), Inc.
**POLAND**
Grace Sp. z o.o.
**RUSSIA**
Darex CIS LLC
**SINGAPORE**
W. R. Grace (Singapore) Private Limited
**SOUTH AFRICA**
Grace Davison (Proprietary) Limited
W. R. Grace Africa (Proprietary) Limited
**SPAIN**
Grace, S.A.
Pieri Especialidades, S.L.
**SWEDEN**
Grace AB
Grace Catalyst AB
Grace Sweden AB
**SWITZERLAND**
Grace Construction Products S.A.
*(f/k/a Pieri S.A.)*
**TAIWAN**
W. R. Grace Taiwan, Inc.
**THAILAND**
W. R. Grace (Thailand) Limited
**UNITED KINGDOM**
A.A. Consultancy & Cleaning Company Limited
Alltech Associates Applied Science Limited
Cormix Limited
Borndear 1 Limited
Borndear 2 Limited
Borndear 3 Limited
Darex UK Limited
Emerson & Cuming (Trading) Ltd.
Emerson & Cuming (UK) Ltd.
Exemere Limited
Grace Construction Products Limited
Pieri U.K. Limited
Servicised Ltd.
W. R. Grace Limited
**VENEZUELA**
Grace Venezuela, S.A.
Inversiones GSC, S.A.
**VIETNAM**
W. R. Grace Vietnam Company Limited

5

CC-BLG003980

EXHIBIT 24

POWER OF ATTORNEY

The undersigned hereby appoints HUDSON LA FORCE III, MARK A. SHELNITZ, and MICHAEL W. CONRON as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2008, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ John F. Akers
John F. Akers

Dated: February 25, 2009

CC-BLG003981

## POWER OF ATTORNEY

The undersigned hereby appoints HUDSON LA FORCE III, MARK A. SHELNITZ, and MICHAEL W. CONRON as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2008, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ H. Furlong Baldwin
H. Furlong Baldwin

Dated: February 25, 2009

CC-BLG003982

POWER OF ATTORNEY

The undersigned hereby appoints HUDSON LA FORCE III, MARK A. SHELNITZ, and MICHAEL W. CONRON as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2008, and all amendments thereto, to be filed with the Securities and Exchange Commission.  Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ Ronald C. Cambre
Ronald C. Cambre

Dated:  February 25, 2009

POWER OF ATTORNEY

The undersigned hereby appoints HUDSON LA FORCE III, MARK A. SHELNITZ, and MICHAEL W. CONRON as her true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2008, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ Marye Anne Fox
Marye Anne Fox

Dated:  February 25, 2009

POWER OF ATTORNEY

The undersigned hereby appoints HUDSON LA FORCE III, MARK A. SHELNITZ, and MICHAEL W. CONRON as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2008, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ John J. Murphy
John J. Murphy

Dated: February 25, 2009

POWER OF ATTORNEY

The undersigned hereby appoints HUDSON LA FORCE III, MARK A. SHELNITZ, and MICHAEL W. CONRON as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2008, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ Paul J. Norris
Paul J. Norris

Dated: February 25, 2009

CC-BLG003986

POWER OF ATTORNEY

The undersigned hereby appoints HUDSON LA FORCE III, MARK A. SHELNITZ, and MICHAEL W. CONRON as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2008, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ Christopher J. Steffen
Christopher J. Steffen

Dated:  February 25, 2009

CC-BLG003987

POWER OF ATTORNEY

The undersigned hereby appoints HUDSON LA FORCE III, MARK A. SHELNITZ, and MICHAEL W. CONRON as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2008, and all amendments thereto, to be filed with the Securities and Exchange Commission. Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ Mark E. Tomkins
Mark E. Tomkins

Dated: February 25, 2009

POWER OF ATTORNEY

The undersigned hereby appoints HUDSON LA FORCE III, MARK A. SHELNITZ, and MICHAEL W. CONRON as his true and lawful attorneys-in-fact for the purpose of signing the Annual Report on Form 10-K of W. R. GRACE & CO. for the year ended December 31, 2008, and all amendments thereto, to be filed with the Securities and Exchange Commission.  Each of such attorneys-in-fact is appointed with full power to act without the other.

/s/ Thomas A. Vanderslice
_____
Thomas A. Vanderslice

Dated:  February 25, 2009

CC-BLG003989