petition contingencies. Of this amount, approximately $10 million is expected to be satisfied as Allowed General Unsecured Claims at the Effective Date, approximately $30 million is expected to be satisfied as Priority Tax Claims under the Plan (see Section 2.6.3.2 of this Disclosure Statement), and approximately $3 million is expected to be satisfied as Administrative Expense Claims. The remainder will be re-instated and satisfied in accordance with their terms, including approximately $5 million expected to be treated as Class 3 Claims, $24 million expected to be treated as Administrative Expense Claims, $13 million expected to be General Unsecured Claims, and $17 million of non-core reserves.

### 2.7    Assets and other Rights

#### 2.7.1    Excess Real Property

The Debtors own a number of parcels of excess real property, most of which were used in previously divested operations, are not useful for the Debtors' current operations, and are not readily marketable. Some of the excess property is not marketable because it is undergoing environmental remediation, which is often an expensive and lengthy process. Although Grace is actively engaged in selling properties that are considered marketable, the net value of the Debtors' excess real property does not appear material.

#### 2.7.2    Insurance Rights

##### 2.7.2.1 Overview

Grace previously purchased insurance policies that provide coverage for the 1962 – 1985 period with respect to asbestos-related lawsuits and Claims. Since 1985, however, insurance coverage for asbestos-related liabilities has not been commercially available to Grace. Insurance policies that were purchased by Grace prior to 1962 were determined by the courts to be inapplicable because they were purchased prior to the year in which Grace acquired the Zonolite Company, through which Grace began producing asbestos containing products. However, as part of the Zonolite acquisition, Grace obtained all rights under the insurance policies purchased by Zonolite.

##### 2.7.2.2 Primary Insurance Coverage

Grace's primary insurance coverage for 1962 – 1985 is in the amount of $1 million per occurrence with annual aggregate product-liability limits ranging from $1 to $2 million. With one exception, coverage disputes regarding the Grace and Zonolite primary policies have been settled, and the settlement amounts paid in full. The only unsettled primary coverage is that of Continental Casualty Company ("CNA") for 1973 – 1985. In a pending declaratory judgment action in U.S. District Court for the Southern District of New York, Grace asserts that this coverage is still available to pay asbestos-related Claims that are not based on product liability, such as Claims made by certain Libby residents. This action is currently stayed due to the filing of the Chapter 11 Cases.

##### 2.7.2.3 Excess Insurance Coverage

Grace's excess coverage is for levels of loss above certain levels. The levels vary from policy to policy, creating "layers" of excess coverage, some of which are triggered before others.

91100-001\DOCS_DE:104617.1

CC-BLG004092

As of May 31, 2004, after subtracting previous reimbursements by insurers and allowing for discounts pursuant to certain settlement agreements, there remains $978 million of excess coverage from more than 30 presently solvent insurers.

Grace has entered into settlement agreements with various excess insurance carriers. These settlements involve amounts paid and to be paid to Grace. One such settlement agreement provides for reimbursement of a specified percentage of each dollar spent by Grace or the Non-Debtor Affiliates to settle or defend asbestos-related Claims. It is the Debtors' position that, under this agreement, a group of carriers has agreed to reimburse Grace for 20% of each dollar spent to settle or defend personal injury or property damage Claims, up to a remaining maximum reimbursement of approximately $78 million. The other settlement agreements would be available to pay asbestos-related personal injury Claims. The remaining maximum aggregate amount available under these other settlement agreements is approximately $417 million. With respect to asbestos-related personal injury Claims, the settlement agreements generally require that the Claims be spread over the Claimant's exposure period and that each insurer pay a pro rata portion of each Claim based on the amount of coverage provided during each year of the total exposure period. Nothing in Section 2.7.2.3 of this Disclosure Statement is intended to affect or vary the above-reference settled agreements.

Presently, Grace has no agreements in place with insurers with respect to approximately $483 million of excess coverage, which is at layers of coverage that have not yet been triggered by the value of claims submitted by Grace.

Grace believes that the ZAI Claims also are covered under the settlement agreements and unsettled policies discussed above to the extent they relate to installations of ZAI occurring after July 1, 1973.

Grace has approximately $355 million of excess coverage with insolvent or non-paying insurance carriers. (Non-paying carriers are those that, although technically not insolvent, are not currently meeting their obligations to pay claims.) Grace has filed and continues to file claims in the insolvency proceedings of insolvent carriers. Grace is currently receiving distributions from some of these insolvent carriers and expects to receive distributions in the future.

### 2.7.2.4 Estimated Insurance Recoveries

Grace's total reimbursement percentage for asbestos-related personal injury Claims will vary based on the total amount of asbestos-related liability. Grace estimates that it would receive $500 million from settled and solvent unsettled insurance carriers if the Asbestos Trust Aggregate Fund is determined by the Court to be the maximum permitted under the Plan. (Coverage for property damage Claims is available only under the settlement agreement referred to above that has a maximum remaining reimbursement of approximately $78 million and, therefore, any amounts paid in respect of such property damage Claims would reduce the amount payable for personal injury Claims.) Generally, the reimbursement percentage decreases at higher levels of liability. At $1 billion and $2 billion of estimated personal injury liability, the reimbursement percentages would be approximately 34% and 28%, respectively. The

31

CC-BLG004093

prospective financial information assumes that there will be no recoveries from insolvent carriers.

Grace's ultimate recovery of insurance proceeds may be affected by the financial status of the remaining solvent insurance carriers and the number, nature and amount of individual Allowed Asbestos Claims.

### 2.7.3 Debtors' Retained Causes of Action

#### 2.7.3.1 Preservation of Causes of Action

The Debtors are currently investigating whether to pursue potential causes of action against any Claimants or Entities. The investigation has not been completed. Under the Plan, the Reorganized Debtors are retaining the Debtors' rights to commence and pursue any and all Retained Causes of Action. The Debtors may pursue them before the Effective Date. Otherwise, the Reorganized Debtors may pursue them after the Effective Date. The potential causes of action include the following:

- All actual actions or potential actions, whether legal, equitable or statutory in nature, for, or in any way involving, the collection of accounts receivable or general ledger items that are due and owing to the Debtors, including trade receivables, rent and other lease and sublease charges, franchise and/or license fees, payments due under equipment leases and licenses, or other miscellaneous charges;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, against customers, including those customers listed in Exhibit 11 in the Exhibit Book, for accounts receivable, improper setoff, overpayment, or any other claim arising out of the customer relationship;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, against vendors, including those vendors listed on Exhibit 11 in the Exhibit Book, for overpayment, improper setoff, warranty, indemnity, or any other claim arising out of the vendor relationship;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, against Entities, including vendors with respect to pre-petition violations of applicable federal or state securities laws;

- All actual actions or potential breach of contract actions against any customers, vendors or Entities who violated the automatic stay after the Petition Date, including those customers or vendors listed on Exhibit 11 in the Exhibit Book;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, against landlords, lessees, sublessees, or assignees arising from various leases, subleases and assignment agreements relating thereto, including actions for unpaid rent, overcharges relating to taxes, common area maintenance and other similar charges, including those claims identified on Exhibit 11 in the Exhibit Book;

32

CC-BLG004094

- All actual actions or potential actions, whether legal, equitable or statutory in nature, against the Debtors' current or former insurance carriers to recover unpaid reimbursements and claims, overpayment of premiums and fees, claims for breach of contract, indemnity obligations or coverage or similar causes of action, including those insurers listed on Exhibit 11 in the Exhibit Book;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, against purchasers of assets from the Debtors relating to breach of the purchase agreement or unpaid compensation thereunder, including those purchasers listed on Exhibit 11 in the Exhibit Book;

- Any and all rights to payment against any taxing authority or other potentially liable party, including parties other than the government for reimbursement of taxes and tax payments, listed on Exhibit 11 in the Exhibit Book for any tax refunds, credits, overpayments or offsets that may be due and owing to the Debtors for taxes that the Debtors may have paid to any such taxing authority;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, relating to deposits or other amounts owed by any creditor, lessor utility, supplier, vendor, landlord, sub-lessee, assignee or other Entity;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, relating to environmental and product liability matters;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, arising out of, or relating to, the Debtors' intellectual property rights;

- Any litigation or lawsuit initiated by any of the Debtors that is currently pending, whether in the Bankruptcy Court, before the American Arbitration Association, or any other court or tribunal or initiated against the Debtors after the Petition Date for which the Debtors may have counterclaims or other rights, including those actions listed on Exhibit 11 in the Exhibit Book;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, against any of the Debtors' former Professionals, except the Asbestos Protected Parties, for breach of fiduciary duty, breach of contract, negligence or professional misconduct or malpractice, or other tortuous conduct, including those former Professionals listed on Exhibit 11 in the Exhibit Book;

- All actual or potential contract and tort actions that may exist or may subsequently arise; and

- All actual actions or potential actions whether legal, equitable or statutory in nature, arising out of, or in connection with the Debtors' business or operations, except actions against the Asbestos Protected Parties to the extent they are released by the Plan.

33

CC-BLG004095

The above categories of Retained Causes of Action will not be limited in any way by reference to the Exhibits nor are the categories intended to be mutually exclusive.

In addition, it is possible that there are numerous Unknown Causes of Action. The failure to list any such Unknown Causes of Action above, or in Exhibit 11 in the Exhibit Book, is not intended to limit the rights of the Reorganized Debtors to pursue any of these actions to the extent the facts underlying such Unknown Causes of Action become known to the Debtors.

### 2.7.3.2 Maintenance of Causes of Action

Except as otherwise provided in the Plan, the Reorganized Debtors are retaining all of the Debtors' rights, to commence and pursue, as appropriate, in any court or other tribunal including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases, any and all causes of action, whether such causes of action accrued before or after the Petition Date, including those Retained Causes of Action listed in Exhibit 11 in the Exhibit Book.

Except as otherwise provided in the Plan, in accordance with Bankruptcy Code § 1123(b)(3), any Claims, rights, and causes of action, including the Retained Causes of Action, that the respective Debtors may hold against any Entity will vest in the Reorganized Debtors, and the Reorganized Debtors will retain and may exclusively enforce any and all such Claims, rights or causes of action, including Retained Causes of Action, and commence, pursue and settle the causes of action in accordance with the Plan. The Reorganized Debtors will have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such Claims, rights, and causes of action, including Retained Causes of Action, without the consent or approval of any third party and without any further order of the Court.

### 2.7.3.3 Avoidance Actions

The Debtors do not possess any causes of action for "Avoidance Actions" (actions or proceedings under Bankruptcy Code §§ 544, 545, 547, 548 or 553). Pursuant to Bankruptcy Code § 546(a), a debtor has two years after entry of the order for relief to bring Avoidance Actions. The Debtors' order for relief was entered on April 2, 2001; thus the deadline to bring Avoidance Actions was April 2, 2003. The Debtors analyzed potential Avoidance Actions and concluded that none should be commenced. The Debtors then provided their analysis to counsel for the Equity Committee and the various creditors' committees so that they could also determine whether there were any Avoidance Actions. No Avoidance Actions were brought by any party prior to the deadline. The Unsecured Creditors' Committee filed a motion seeking to extend the time within which the Avoidance Actions could be commenced but the Bankruptcy Court denied the motion.

### 2.7.3.4 Preservation of All Causes of Action not Expressly Settled or Released

Unless a Claim or Retained Cause of Action against a Claimant or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order, the Debtors expressly reserve such Claim or Retained Cause of Action (including any Unknown Causes of Action) for later adjudication by the Reorganized Debtors. Therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim

34

CC-BLG004096

preclusion, waiver, estoppel (judicial, equitable, or other) or laches will apply to such Claims or Retained Causes of Action upon or after the Confirmation Date or Effective Date of the Plan based on this Disclosure Statement, the Plan or the Confirmation Order, except where such Claims or Retained Causes of Action have been expressly released in the Plan or other Final Order. In addition, the Debtors, the Reorganized Debtors, and their successors expressly reserve the right to pursue or adopt any Claim alleged in any lawsuit in which the Debtors are defendants or an interested party, against any Entity, including the plaintiffs or co-defendants in such lawsuits.

Any Entity that has incurred an obligation to the Debtors (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that such obligation, transfer, or transaction may be reviewed by the Debtors or the Reorganized Debtors, and may, if appropriate, be the subject of an action after the Effective Date, whether or not (1) such Entity has filed a proof of Claim against the Debtors in the Chapter 11 Cases, (2) such Claimant's proof of Claim has been objected to, (3) such Claimant's Claim was included in the Debtors' Schedules, or (4) such Claimant's scheduled Claim has been objected to by the Debtors or has been identified by the Debtors as a Disputed Claim, a Contingent Claim, or an Unliquidated Claim.

### 2.8    Estimated Value of the Reorganized Debtors and Non-Debtor Affiliates

The Debtors have been advised by Blackstone with respect to the reorganization value of the Reorganized Debtors and Non-Debtor Affiliates. For purposes of this analysis, the Effective Date is assumed to be December 31, 2004. The reorganized enterprise value is calculated as the value of core operations ("Core Business Value") plus the value of the assumed insurance receivable (based on the assumed asbestos liabilities[12]), plus the present value of the projected use of tax assets and the proceeds from the assumed exercise of in-the-money stock options. To determine the equity value for the Reorganized Debtors and Non-Debtor Affiliates, estimates for net debt and non-core liabilities proforma for the implementation of the Plan are subtracted from the reorganized enterprise value. Further adjustments are made for share dilution to calculate fully diluted reorganized equity value per share. The Asbestos PD Committee has indicated it reserves its right to contest the Core Business Value calculated by the Debtors and to present its own valuation with respect to the Core Business Value.

#### 2.8.1    Core Business Value of the Reorganized Debtors and Non-Debtor Affiliates

Two valuation methodologies were used to determine Core Business Value:  (i) an analysis of public market value as a multiple of various operating statistics for selected similar public companies and (ii) an analysis of transaction value as a multiple of various operating statistics for selected similar public merger and acquisition transactions. Both methodologies

---

[12] For purposes of this analysis, asbestos liabilities are assumed to equal the sum of (i) the maximum aggregate amounts that would satisfy the conditions precedent in Section 7.6.1(v) and (w) of the Plan; plus (ii) an estimate of Previously Settled/Adjudicated Asbestos Claims.

CC-BLG004097

rely upon the Financial Information prepared by management attached as Exhibit 4 in the Exhibit Book.

Based on these two methodologies, the estimated Core Business Value at the Effective Date is approximately $2.2 billion to $2.6 billion, with $2.4 billion as the midpoint estimate. A third methodology was considered: a calculation of the present value of the free cash flows under the prospective financial information, including assumptions for a terminal value; however, that methodology was not used because it was concluded that the resultant reorganized value would not be meaningful based on the prospective period of two years.

### 2.8.1.1 Comparable Public Company Analysis

The comparable public company analysis ("Comparable Public Company Analysis") estimates value based on a comparison of financial statistics of the Reorganized Debtors and Non-Debtor Affiliates with the financial statistics of similar public companies using common variables such as revenues and earnings before interest, taxes, depreciation and amortization ("EBITDA").

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the Reorganized Debtors and Non-Debtor Affiliates. Criteria for selecting comparable companies include, among other relevant characteristics, similar lines of business, business risks, target market segments, growth prospects, maturity of businesses, market presence, size, and scale of operations. The selection of truly comparable companies is often difficult and subject to interpretation.

The Comparable Public Company Analysis includes companies similar to the Reorganized Debtors and Non-Debtor Affiliates' two business segments: Davison and Performance Chemicals.

The publicly traded companies deemed generally comparable to Davison Chemicals, in some or all of the aforementioned factors are Albermarle Corp., Engelhard Corp., Great Lakes Chemical Corp., Johnson Matthey plc, and Lubrizol Corp.

The publicly traded companies deemed generally comparable to Performance Chemicals, in some or all of the aforementioned factors, are Crown Holdings, Inc., ElkCorp, Ferro Corp., H.B. Fuller Corp., Lafarge North America Inc., RPM International Inc., Silgan Holdings Inc., Texas Industries, Inc., Valspar Corp. and Vulcan Materials Co.

The Comparable Public Company Analysis determines the multiple of each comparable company's current enterprise value divided by (i) its calendar year 2004 estimated revenue and EBITDA and (ii) its calendar year 2005 estimated EBITDA. The calendar year 2004 estimated revenue and EBITDA, as well as the calendar year 2005 estimated EBITDA, for comparable companies are based on projections by equity research analysts of third-party financial institutions.

The calendar year 2004 enterprise value to revenue, and enterprise value to EBITDA multiples for comparable companies are in the ranges of 0.8x – 1.1x and 7.5x – 9.0x, respectively. Applied to the Reorganized Debtors and Non-Debtor Affiliates' 2004 estimated

91100-001\DOCS_DE:104617.1

CC-BLG004098

revenue of $2.236 billion and EBITDA of $298 million, respectively, these multiples indicate a Core Business Value in a range of $2.2 billion to $2.7 billion. The calendar year 2005 enterprise value to EBITDA multiple for comparable companies ranges from 6.5x – 8.0x. Applied to the Reorganized Debtors and Non-Debtor Affiliates' estimated 2005 EBITDA of $314 million, these multiples indicate a Core Business Value in a range of $2.0 billion to $2.5 billion.

### 2.8.1.2 The Precedent Transaction Analysis

The precedent transaction analysis ("Precedent Transaction Analysis") estimates value by examining selected public merger and acquisition transactions. An analysis of a company's disclosed transaction value as a multiple of various operating statistics provides valuation multiples for companies in similar lines of business. Multiples for selected precedent transactions were calculated based on the purchase price (including any debt assumed) paid. These multiples were then applied to the key operating statistics of the Reorganized Debtors and Non-Debtor Affiliates to determine the reorganized value to a potential buyer.

Valuation conclusions cannot be based solely upon quantitative results. The reasons for, and circumstances surrounding, each acquisition transaction are specific to such acquisition, and there are inherent differences between the businesses, operations and prospects of each. Qualitative judgments must be made concerning the differences among the characteristics of these reorganizations and transactions and other factors and issues, which could affect the target's value. Therefore, each of the multiples based on precedent transactions was evaluated and judgments were made as to their relative significance in determining reorganized value.

Multiples of various financial results to the transaction values of these companies were calculated and analyzed. Emphasis was placed on multiples based upon revenue and EBITDA. On the basis of enterprise value as a multiple of revenues, the precedent transactions indicated an approximate range of 1.1x – 1.3x. On the basis of enterprise value as a multiple of EBITDA, the precedent transactions indicated an average of 7.5x – 9.5x. As discussed above, the determination of these multiple ranges accounts for a variety of factors, both quantitative and qualitative. In addition, due to the fact that the results of a Precedent Transaction Analysis often reflect a control premium, or are impacted by a competitive dynamic due to multiple bidders, the valuation multiples indicate aspects of value not necessarily present in a reorganization. Applied to the Reorganized Debtors and Non-Debtor Affiliates' 2004 estimated revenue of $2.236 billion and EBITDA of $298 million, these multiples indicate a Core Business Value in a range of $2.2 billion to $2.8 billion.

### 2.8.2    Calculation of Fully Diluted Reorganized Equity Value

The Core Business Value is adjusted by the following amounts to determine the fully diluted reorganized equity value of the Reorganized Debtors and Non-Debtor Affiliates: (i) assumed insurance receivable, (ii) the present value of the projected use of tax assets, (iii) non-core liabilities, (iv) net debt, (v) proceeds from the exercise of assumed in-the-money options, and (vi) share dilution as set forth in the summary in Section 2.8.2.6.

37

CC-BLG004099

### 2.8.2.1 Insurance

According to management's estimate, the assumed insurance receivable has a book value of $500 million based on the assumed asbestos liabilities.[13]  There exists significant variability around the ultimate amount and timing of receipt of this amount.

### 2.8.2.2 Tax Assets

Tax assets result from prior losses, foreign taxes paid, and deductions as a result of the implementation of the Plan.  The future use of tax assets is quantified based on projected annual tax savings.  The present value of the projected use of tax assets over a nine year period is calculated at a discount range of approximately 13% to 23%, which represents levered cost of equity.  Estimated cost of equity was derived using the capital asset pricing model, which assumes that the required equity return is a function of the risk-free cost of capital and the correlation of a publicly traded stock's performance to the return of the overall market.  The analysis assumes a risk-free rate of 4.2% based on the November 8, 2004 yield of the ten-year U.S. Treasury Note.  Levered beta of 1.19 for the Reorganized Debtors and Non-Debtor Affiliates is based on (i) an average un-levered beta of 0.72 for the companies identified in Section 2.8.1.1 herein (the Comparable Public Company Analysis) and (ii) an assumed debt/equity ratio of approximately 50% as of the Effective Date.

The present value of the projected use of tax assets is calculated in the approximate range of $75 million to $120 million with a midpoint estimate of $98 million.  There exists significant variability around the ultimate value of this asset and the tax asset remaining at the end of the measurement period because it depends on, among other things, proforma capital structure and limitations on the use of tax assets that could result from activities outside of the control of the Reorganized Debtors and Non-Debtor Affiliates.

### 2.8.2.3 Non-Core Liabilities

The projected book value of non-core liabilities, estimated as of December 31, 2004, is approximately $487 million.  This amount consists of the following obligations: $190 million of post-retirement, pension benefits (not including the qualified pension plan) and other employee liabilities, $107 million of unliquidated environmental Claims, $50 million of Priority Tax Claims paid over time (unless there are obligations for Fresenius Indemnified Taxes in which case they will be paid promptly in full in cash as they become due and payable) and other tax contingencies, $37 million of other non-core accrued liabilities, $3 million of capital leases, and $100 million for other unliquidated Claims.  The value of these non-core liabilities could be higher or lower, depending on, among other things, the resolution of Claims, the timing of certain payments, and the use of contingency.

---

[13]  For purposes of this analysis, asbestos liabilities are assumed to equal the sum of (i) the maximum aggregate amounts that would satisfy the conditions precedent in Section 7.6.1(v) and (w) of the Plan; plus (ii) an estimate of Previously Settled/Adjudicated Asbestos Claims.

38

CC-BLG004100

#### 2.8.2.4 Net Debt

The estimated net debt, as of December 31, 2004, is based on management's projections of $800 million of debt and $300 million of cash. Projected cash includes proceeds from the assumed exercise of in-the-money options. Net debt could ultimately be higher or lower than this estimate, depending on actual cash funding requirements for the Plan and free cash flow generation before emergence. As presented in the Financial Information in Exhibit 4 in the Exhibit Book, cash is projected to decline to $250 million in 2005, which is approximately the minimum level of operating cash required by the Reorganized Debtors and the Non-Debtor Affiliates.

#### 2.8.2.5 Proceeds of Options

The Reorganized Debtors and Non-Debtor Affiliates have employee and management options outstanding representing 8.2 million shares at a wide range of strike prices. Based on the assumed fully diluted reorganization equity value per share, options that would be in-the-money are assumed to be exercised. The proceeds from the assumed exercise of in-the-money options are added to fully diluted equity value and the shares issued are included in the calculation of the fully diluted price per share. The proceeds from the assumed exercise of in-the-money options are $66 million (6.3 million shares), $75 million (6.8 million shares) and $102 million (8.2 million shares), respectively, based on the low, medium and high value range of fully diluted reorganization equity value per share.

#### 2.8.2.6 Summary

Based on the above assumptions, the calculated fully diluted reorganized equity value is a range of $1.779 billion to $2.260 billion at the assumed Effective Date.

To calculate the fully diluted reorganized equity value per share, fully diluted shares must be calculated by adding: (1) basic shares of Parent Common Stock outstanding, (2) the shares of Parent Common Stock underlying the in-the-money options, as more fully described above; (3) the shares of Parent Common Stock to be issued in respect of Class 9, equal to 15% of the Allowed Class 9 Claims, which amount is assumed to represent approximately $149 million; (4) the shares of Parent Common Stock expected to be issued to the Asbestos Trust, which amount is assumed to represent approximately $498 million based on the maximum aggregate amount that would satisfy the conditions precedent in Section 7.16(v) of the Plan; and (5) the shares of Parent Common Stock underlying the Warrants which are issued to the Asbestos Trust to fund assumed Class 7 liability of $130 million based on the maximum aggregate amount that would satisfy the conditions precedent in Section 7.6.1(w) of the Plan. Based on the foregoing assumptions, the range of fully diluted shares varies with the range of calculated equity values and is 127.8 million shares at the low end of the reorganized equity value range and 112.7 million shares at the high end of such range (a higher equity value implies that fewer shares would be required to fund items (3), (4) and (5) above), with a midpoint estimate of 118.2 million shares. The calculated fully diluted reorganized equity value per share is in the approximate range of $13.92 to $20.06, with a midpoint estimate of $17.01.

The Reorganized Debtors and Non-Debtor Affiliates' fully diluted reorganized equity value could be materially lower if the Asbestos PI-AO Claims liability exceeds the $130 million

39

CC-BLG004101

(plus expenses) assumed as the maximum estimated liability that would satisfy the Asbestos PI-AO Claims. If all Warrants were immediately exercised by the Asbestos Trust, fully diluted reorganized equity value per share would be in the approximate range of $10.76 to $13.89, with a midpoint estimate of $12.37. However, the theoretical dilution to equity value is not limited to the Warrants exercisable by the Asbestos Trust, but also could be impacted by future payments by Reorganized Grace.

The estimates of reorganized value do not purport to be appraisals, liquidation values or estimates of the actual market value that may be realized if assets are sold. The estimates of reorganized value, fully diluted reorganized equity value, and fully diluted reorganized equity value per share represent hypothetical values developed solely for purposes of the Plan and should not be relied upon in making investment decisions to purchase or sell Parent Common Stock at any time, now or in the future.

The estimates of reorganized value, fully diluted reorganized equity value, and fully diluted reorganized equity value per share are highly dependent upon achieving the future financial results set forth in the proforma and prospective financial information as well as the realization of certain other assumptions which are not guaranteed, in particular, assumptions regarding the value of all Asbestos Claims and estimates presented herein regarding insurance, tax and cash assets as well as net debt and other liabilities. Because such estimates are inherently subject to uncertainties, neither the Debtors, the Reorganized Debtors and Non-Debtor Affiliates, Blackstone, nor any other person assumes responsibility for their accuracy.

The Parent Common Stock of Grace is traded on the New York Stock Exchange (TICKER: GRA). The estimates of the range of fully diluted reorganized equity value do not purport to be an estimate of the pre- or post-reorganization trading value of the Parent Common Stock and the estimate of the fully diluted reorganized equity value per share may not correlate with actual trading prices on the New York Stock Exchange. The estimated values set forth herein represent estimated reorganized values and estimated fully diluted reorganized equity values and do not necessarily reflect values that could be attainable in public or private markets. The values set forth herein do not consider market trading characteristics, trading limitations possibly imposed on the Parent Common Stock or perceptions in public or private markets about the Reorganized Debtors and Non-Debtor Affiliates or the value of the Parent Common Stock. The trading value of the Parent Common Stock, if any, may be materially different from the estimates set forth in this Estimated Value of the Reorganized Debtors and Non-Debtor Affiliates.

91100-001\DOCS_DE:104617.1

CC-BLG004102

The table set forth below illustrates the number of shares to be distributed to, or retained by, each class of Creditors or Holders of Equity Interests pursuant to the Plan at the low, mid and high value of reorganized equity.

**The actual number of shares to be distributed will be based on the price of the Parent Common Stock measured in accordance with the provisions of the Plan.**

*(in millions)*

|  | Low | Mid | High |
|---|---|---|---|
| Fully Diluted Reorganized Equity Value (1) | $ 1,779 | $ 2,011 | $ 2,260 |

Distribution of Shares

|  | | | |
|---|---|---|---|
| Shares issued to Class 6 and Class 8 (2) | 35.8 | 29.3 | 24.8 |
| Shares underlying Warrants issued to Class 7 | 9.3 | 7.6 | 6.5 (4) |
| Shares issued to Class 9 (3) | 10.7 | 8.7 | 7.4 |
| Shares held by Holders of Equity Interests | 65.8 | 65.8 | 65.8 |
| Shares pursuant to management options (1) | 6.3 | 6.8 | 8.2 |
| Shares outstanding post-emergence | 127.8 | 118.2 | 112.7 |

In addition to the Warrants set forth in the table above, Warrants shall be issued to Class 7 in an amount such that, upon the payment of the Sealed Air Payment and the Debtors' Payment into the Asbestos Trust, the Parent Common Stock and Warrants (if exercised) that make up the Debtors' Payment would constitute a majority of the issued and outstanding voting shares of the Reorganized Parent. The numbers of Warrants that may be exercised is dependent on the difference, if any, between the Asbestos PI-AO Class Fund and the amount of Class 7 Allowed Claims.

Additional Shares if all Additional Warrants were Exercised

|  | | | |
|---|---|---|---|
| Shares underlying Class 7 additional Warrants | 37.6 | 44.4 | 50.1 |
| Shares outstanding post-emergence | 165.4 | 162.6 | 162.7 |

Notes:

(1) Assumes the exercise of existing in-the-money management options.

(2) Based on amount requested in the Estimation Motion filed on November 13, 2004. As a condition precedent to confirmation of the Plan, the Court shall have found that the aggregate of the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund and the Asbestos Trust Expenses Fund is not greater than $1.483 billion and that the Asbestos PI-AO Class Fund is not greater than $130.0 million.

(3) Assumes the estimated amount of Allowed Claims for Class 9 is $1,175 million, including unliquidated liabilities, estimated at approximately $185 million, that would be Class 9 Claims if and when Allowed.

(4) In connection with $130 million Asbestos PI-AO Class Fund

## 3.    THE CHAPTER 11 FILINGS AND RELATED CANADIAN PROCEEDINGS

### 3.1    Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Chapter 11 authorizes a debtor to reorganize its business for its benefit and its stakeholders' benefit, whether those stakeholders are its creditors or equity interest holders. In addition to

91100-001\DOCS_DE:104617.1

CC-BLG004103

permitting a debtor to rehabilitate itself, chapter 11 also requires that any distributions to stakeholders ensure equality of treatment for similarly situated creditors and similarly situated equity interest holders.

Commencing a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The principal objective of a chapter 11 case is to consummate a plan of reorganization. A plan of reorganization sets forth the means for satisfying claims against and equity interests in a debtor. Confirmation of a plan of reorganization by a bankruptcy court binds a debtor, any issuer of securities thereunder, any person acquiring property under the plan and any creditor or equity interest holder of that debtor to the terms of the plan. Subject to certain limited exceptions, the confirmation order discharges a debtor from any debt that arose prior to the date of confirmation of the plan, and substitutes therefor the obligations specified in the confirmed plan.

### 3.2    Significant Events During the Course of the Chapter 11 Cases

Many pleadings have been filed with the Bankruptcy Court and District Court during the course of the Chapter 11 Cases, and many hearings have been conducted in connection with those pleadings.[14] In order to obtain a comprehensive listing of the pleadings and events that have been filed in the Chapter 11 Cases, the docket for each case should be consulted. The relevant pleadings referenced below may be obtained and reviewed from the Bankruptcy Court or District Court, as applicable. The following is a general description of the more significant pleadings that have been filed during the Chapter 11 Cases:

#### 3.2.1    First Day Motions

##### 3.2.1.1 Retention and Employment of Professionals By the Debtors

The Bankruptcy Court approved the Debtors' request to retain certain professionals to represent them and assist them in connection with the Chapter 11 Cases on May 3, 2001. These professionals include: (a) Kirkland & Ellis LLP and Pachulski, Stang, Ziehl, Young, Jones & Weintraub, P.C. as bankruptcy counsel (Docket Nos. 180 and 181, respectively), (b) The Blackstone Group L.P. ("Blackstone") as Financial Advisors (Docket No. 182), (c) Kekst & Company Incorporated as public relations consultant (Docket No. 183), (d) R.R. Donnelley & Sons Company as the notice agent (Docket No. 15), and (e) Wachtell, Lipton, Rosen & Katz as special corporate counsel (Docket No. 184). The Debtors were also authorized to retain and employ and compensate certain Professionals utilized in the ordinary course of the Debtors' businesses (Docket No. 197).

---

[14] All docket numbers refer to Case No. 01-1139 unless otherwise stated.

91100-001\DOCS_DE:104617.1

CC-BLG004104

### 3.2.1.2 Financing and Critical Trade Motions

The Debtors filed their "Emergency Motion for Interim and Final Orders under 11 U.S.C. §§ 105, 362, 363 and 364 Approving Post-Petition Financing and Related Relief and Setting Final Hearing Pursuant to Bankruptcy Rule 4001(c)" (the "Financing Motion") (Docket No. 26) on the Petition Date whereby the Debtors sought authority to enter into a post-petition credit agreement.  The Court granted the emergency relief and subsequently, on May 3, 2001, granted final relief in connection with the Financing Motion (Docket No. 194).  Pursuant to the loan agreements, the Debtors have available up to $250,000,000 in post-petition financing.  The Court extended the Debtors' post-petition credit facility on May 14, 2003 until the earlier of (1) April 1, 2006 or (2) the Debtors' emergence from bankruptcy (Docket No. 3512).

The Debtors also were granted authority to pay in the ordinary course of business the pre-petition claims of essential trade creditors up to the sum of $4.5 million (Docket No. 195).

### 3.2.1.3 Operational Motions

The Debtors were granted authority to (1) pay certain pre-petition obligations, including certain sales, use and franchise taxes, as well as charges relating to shipping and most employee benefits and (2) maintain their existing bank accounts, business forms, cash management systems, and intercompany agreements (Docket Nos. 18 and 21 respectively).  Additionally, the Debtors sought, and the Court granted, authority to honor certain pre-petition obligations to customers and otherwise continue in the ordinary course of business certain customer programs and practices (Docket No. 19).

### 3.2.2 Motions to Assume Pre-Petition Executory Contracts and Leases

On April 3, 2001, the Debtors moved the Court (Docket No. 20) for authority to assume the existing employment contracts with the following key employees:  (1) Paul J. Norris (Chairman, President and Chief Executive Officer), (2) David B. Siegel (Senior Vice President and General Counsel), (3) Robert M. Tarola (Senior Vice President and Chief Financial Officer), (4) William M. Corcoran (Vice President, Public and Regulatory Affairs), (5) Wayne T. Smith (Vice President and General Manager of Grace Performance Chemicals), (6) Ann E. MacDonald (Sales and Marketing Manager), and (7) Johnny P. Forehand, Jr. (Vice President, Operations). The Court granted the Debtors' motion on June 22, 2001 (Docket No. 560).

The Debtors have also periodically sought and received authority from the Court to assume and/or assign certain leases.

### 3.2.3 Appointment of Official Committees of Creditors, the Official Equity Committee and the Future Claims Representative

### 3.2.3.1 Official Committees of Creditors

### 3.2.3.1.1 Unsecured Creditors' Committee

The Unsecured Creditors' Committee was formed on April 13, 2001 when the United States Trustee issued and filed an amended notice of appointment of the official committee of unsecured creditors (Docket No. 94).  Subsequently, the Unsecured Creditors' Committee sought

43

CC-BLG004105

and received Bankruptcy Court approval to employ (a) Stroock & Stroock & Lavan LLP, as counsel (Docket Nos. 177 and 340), (b) Duane, Morris & Heckscher LLP, as local counsel (Docket Nos. 288 and 550), (c) FTI Pelicano Manzo, as financial advisors (Docket Nos. 287 and 549), and (d) Capstone Corporate Recovery, LLC to replace FTI Pelicano Manzo as financial advisors (Docket No. 5758) except with respect to tax related services.

### 3.2.3.1.2  Asbestos PI Committee

The Asbestos PI Committee was formed on April 13, 2001 when the United States Trustee issued and filed a notice of appointment of an official committee of asbestos personal injury claimants (Docket No. 95). Subsequently, the Asbestos PI Committee sought and received Bankruptcy Court approval to employ (a) Legal Analysis Systems, Inc., as consultants (Docket No. 206), (b) Caplin & Drysdale, Chartered, as counsel (Docket No. 208), (c) L. Tersigni Consulting, P.C., as financial advisors (Docket No. 209), (d) Ashby & Geddes, P.A., as local counsel for the period from April 12, 2001 through June 15, 2001 (Docket No. 697), and (e) Campbell & Levine, LLC, as local counsel beginning June 16, 2001 (Docket No. 698).

### 3.2.3.1.3  Asbestos PD Committee

The Asbestos PD Committee was formed on May 11, 2001 when the United States Trustee issued and filed an amended notice of appointment of an official committee of asbestos property damage claimants (Docket No. 252). Subsequently, the Asbestos PD Committee sought and received Bankruptcy Court approval to employ: (a) Bilzin Sumburg Dunn Baena Price & Axelrod LLP, as counsel (Docket Nos. 298 and 551), (b) Ferry & Joseph, P.A., as local counsel (Docket Nos. 299 and 553), (c) Conway, Del Genio, Gries & Co., as financial advisor and investment banker (Docket No. 1027), and (d) Hamilton, Rabinovitz & Aschuler, Inc. (Docket Nos. 1568 and 1735) and W.D. Hilton, Jr. (Docket Nos. 1567 and 1736), as consultants.

### 3.2.3.2 Official Equity Committee

The Equity Committee was formed on June 18, 2001 when the United States Trustee issued and filed a notice of appointment of the official committee of equity security holders (Docket No. 532). The Equity Committee sought and received Bankruptcy Court approval to employ: (a) Kramer Levin Naftalis & Frankel LLP, as counsel (Docket Nos. 787 and 985), (b) Klett Rooney Lieber & Schorling, P.C., as co-counsel (Docket Nos. 1059 and 1275).

### 3.2.3.3 Representative for Future Asbestos Claimants

The Debtors filed an application for appointment of a legal representative for the future Asbestos Claimants on April 19, 2004 (Docket No. 5460). The Court entered an order appointing David T. Austern as the Future Claimants' Representative (Docket No. 5645). Federal Insurance Company, Royal Indemnity Company, and the Asbestos PD Committee appealed the Court's order appointing Mr. Austern. The Asbestos PD Committee subsequently withdrew its appeal. The insurance companies' appeals are pending before the District Court.

CC-BLG004106

### 3.2.4    Section 341(a) Meeting of Creditors

On May 18, 2001, the United States Trustee's office conducted the meeting of creditors required by Bankruptcy Code § 341(a). Representatives of the Debtors, as well as the Debtors' counsel, appeared at the Section 341(a) meeting and responded to inquiries from the U.S. Trustee and creditors.

### 3.2.5    Selected Adversary Proceedings

#### 3.2.5.1 Stay of Asbestos-Related Litigation Against Various Affiliates

Contemporaneously with the filings of their Chapter 11 petitions, the Debtors filed the adversary proceeding entitled W. R. Grace & Co., et al. v. Margaret Chakarian, et al. and John Does 1-1000, Case No. A-01-771. A temporary restraining order was initially entered on April 2, 2001 and on May 3, 2001, the Court issued a preliminary injunction. On January 22, 2002, the Court entered an "Order Granting Modified Preliminary Injunction" (Case No. A-01-771, Docket No. 87) which, among other things, enjoined the commencement or continuation of certain actions against non-debtor third-parties, including actions: (1) that arise from alleged exposure to asbestos, indirectly or directly, allegedly caused by the Debtors, against (a) Fresenius, (b) Sealed Air, (c) Merrill Lynch, (d) Credit Suisse First Boston, (e) certain of the Debtors' insurance carriers, (f) Affiliates of the Debtors that are not filing entities for purposes of the Chapter 11 Cases, or (g) present and former officers, directors and employees of the Debtors; (2) for which there may be coverage under certain of the Debtors' insurance policies; (3) brought against certain of the Debtors' insurance carriers, which allege coverage for asbestos-related liabilities; or (4) against current and former officers, directors or employees of the Debtors that arise out of such officer's, director's or employee's employment or relationship with the Debtors.

On February 4, 2002, certain Claimants filed a motion to clarify the scope of the preliminary injunction or to modify the preliminary injunction (Case No. A-01-771, Docket No. 86). Specifically, the Claimants sought entry of an order stating that, to the extent their asserted causes of action against Maryland Casualty Company ("MCC"), one of the Debtors' insurers, were based upon MCC's own, independent tortious conduct, the preliminary injunction did not stay such litigation. The Bankruptcy Court denied the motion for clarification (Case No. A-01-771, Docket No. 96). The Claimants appealed the Bankruptcy Court's decision to the District Court, and, on July 16, 2003, the District Court vacated the Bankruptcy Court's order. MCC appealed the District Court's decision, and, on October 28, 2004, the Third Circuit vacated the District Court's order and affirmed the Bankruptcy Court's decision that the modified preliminary injunction stayed the litigation with respect to MCC. As a result, the Claimant's lawsuits against MCC are presently stayed pursuant to the Debtors' modified preliminary injunction.

#### 3.2.5.2 Enjoining Bond Payments by National Union

The Debtors filed the adversary proceeding entitled W. R. Grace & Co.-Conn. v. National Union Fire Insurance Company of Pittsburgh, P.A., et al., Case No. 02-01657 (Bankr. D. Del.), on January 18, 2002, which sought to enjoin National Union, the issuer of surety bonds to Grace, from making any payment under the bonds in connection with two settlement protocols relating to certain asbestos personal injury litigation. On May 13, 2002, the Court approved an interim

45

CC-BLG004107

settlement agreement, under which: (1) payment under one of the bonds was permanently enjoined, (2) a single payment of $9,729,720.00 was authorized under the second bond, (3) and a letter of credit draw by National Union in that same amount, under a letter of credit obtained by the Debtors to secure the bonds, was authorized. The Court retained jurisdiction concerning the remainder of this dispute. National Union then paid $9,729,720.00, and it drew that same amount from the Debtors' letter of credit.

On December 22, 2002, National Union filed a motion for summary judgment and a corresponding brief in support of the motion, which sought a declaratory judgment that the remaining Claims asserted by the Claimants were not owed by National Union to the Claimants. Specifically, National Union requested a determination that no further sums are due to the Claimants on account of the "Aggregate Submission Provisions" of the settlement protocols. In the alternative to summary judgment, National Union sought an order deferring determination of amounts due under its surety bonds until the outcome of procedures for defining "asbestos personal injury" had been established for the Chapter 11 Cases.

The Claimants opposed the National Union Summary Judgment Motion, and responded on September 10, 2003 by filing their own motion for summary judgment and a related brief in support (Case No. 02-01657, Docket No. 39).

The Court heard the summary judgment motions on March 26, 2004. The Court denied National Union's summary judgment motion. However, the Court held that, pursuant to Bankruptcy Code § 362, the Debtors have the right to review all Claims (1) that were submitted pursuant to either settlement protocol during the 60-day period prior to April 2, 2001 or (2) on, or after, April 2, 2001, to determine whether any of those Claims lack adequate qualifying materials, as required in the applicable settlement protocol. Similarly, the Court granted National Union the right to review all Claims that were submitted at any time prior to April 2, 2001 (1) for which payment has not already been made, and (2) for which the Debtors failed previously to formally object pursuant to the provisions of the applicable settlement protocol. A formal order has yet to be entered.

### 3.2.6   Extension of Exclusivity Period and Termination of Exclusivity Period

The Court has entered several orders extending the Debtors' exclusive periods to file and solicit acceptances of a Chapter 11 plan. By order of the Court entered on June 16, 2004 (Docket No. 5820), the Court had granted the Debtors (i) an exclusive period to file a reorganization plan (or plans) through November 24, 2004 and (ii) an exclusive solicitation period through and including January 24, 2005. However, the Court had ordered that the Debtors file their plan and disclosure statement no later than October 14, 2004. The Debtors were prepared to file such plan and disclosure statement on October 14, 2004, but at the request of the FCR, the Asbestos PI Committee and the Asbestos PD Committee, sought a further extension to permit all parties to negotiate a consensual plan. Elliot International, L.P. (a significant Holder of Parent Common Stock) objected. On October 25, 2004 (Docket No. 6734), the Court extended the Debtors' time to file a reorganization plan through November 15, 2004. A hearing currently is scheduled for January 24, 2005.

91100-001\DOCS_DE:104617.1

CC-BLG004108

### 3.2.7  Motions to Lift the Automatic Stay

Throughout the Chapter 11 Cases, various parties have filed motions to lift the Debtors' automatic stay.  The Debtors have successfully opposed efforts to modify the stay where the respective Claims would be payable out of assets that would otherwise be available for the payment of Claims.  In certain situations, the Debtors have consented to modifications of the stay to (1) establish the amount of certain Claims, or (2) where the Claimants sought to proceed only against the Debtors' insurance, and, in the Debtors' estimation, any potential recovery from such insurance would not affect the amount of insurance available to pay other Claimants.

### 3.2.8  Certain Post-Petition Litigation Matters

#### 3.2.8.1 Litigation Related to Grace's Savings and Investment Plan

In June 2004, a purported class action complaint was filed in U.S. District Court for the District of Massachusetts against the Parent's Board of Directors, certain current and former Grace officers and employees, and others, relating to Grace's 401(k) Savings and Investment Plan (the "S&I Plan").  The complaint alleges that the decline in the price of Parent Common Stock from July 1999 through February 2004 resulted in significant losses to S&I Plan participants.  The complaint further alleges that the defendants breached their fiduciary duties under the Employee Retirement Income Security Act of 1974, as amended, ("ERISA") by failing to sell or take other appropriate action with regard to Parent Common Stock held by the S&I Plan during that period, and failed to disclose to S&I Plan participants the risk of investing in Parent Common Stock.  The complaint seeks compensatory damages for the S&I Plan from the defendants.  The Bankruptcy Court stayed this action with respect to all defendants through and including December 31, 2004.

On October 26, 2004, a purported class-action complaint was filed in the U.S. District Court for the Eastern District of Kentucky, on behalf of present and former participants in the S&I Plan, against W. R. Grace & Co., the W. R. Grace Investment and Benefits Committee, the Parent's Board of Directors, certain current and former Grace officers and employees, and others.  The complaint alleges that Grace and its investment advisors breached fiduciary duties under ERISA by selling Parent Common Stock from the S&I Plan at a "distressed price."  The complaint further alleges that Grace breached fiduciary duties under ERISA by hiring State Street Bank and Trust Company, the investment manager for the S&I Plan that was retained by the Debtors in December 2003 (pursuant to a Court order authorizing such retention), to "rapidly liquidate" all of the employees' Parent Common Stock investment at an "artificially low" sales price.  This case was stayed by agreement of the parties through and including December 31, 2004.  The Defendants currently have until January 31, 2005 to answer or otherwise plead.

Pursuant to Grace's Certificate of Incorporation and By-Laws, Grace is required to indemnify its directors, officers and employees for any liability arising out of either of these lawsuits.  Grace also has certain contractual indemnity obligations that may be triggered.  However, Grace believes that the allegations in both lawsuits are without merit and that any liability arising therefrom would in any event be covered by its fiduciary liability insurance.

Pursuant to Section 8.7 of the Plan, the Debtors propose to (1) provide their current and former directors, officers, and employees who are defendants in the above-referenced S&I Plan

47

CC-BLG004109

lawsuits, with a full and complete release of all liability associated with any such litigation, and (2) to indemnify such defendants for any costs and/or expenses associated with any such litigation. However, to the extent that plaintiffs in the lawsuits have valid Claims against the Debtors, their pre-petition Claims will be treated as Class 9 General Unsecured Claims and their post-petition Claims will be treated as Administrative Expense Claims under the Plan.

The named Plaintiff in the Massachusetts lawsuit outlined above has raised an objection to the releases provided by Section 8.7 of the Plan, alleging that they go beyond the scope of permissible releases under applicable law. The Debtors disagree. The parties reserve their rights with respect to the release objections until the hearing on confirmation of the Plan.

### 3.2.8.2 The Scotts Company Litigation

On September 2, 2004, the Scotts Company ("Scotts"), a former Grace vermiculite customer, filed an adversary proceeding in the Bankruptcy Court seeking declaratory relief with respect to its entitlement under the Grace liability insurance policies. Scotts alleges that it is currently defending 76 asbestos-related bodily injury cases (involving approximately 4,192 plaintiffs) that were filed against Scotts after the Petition Date. Grace presently does not have the information necessary to assess the potential impact these allegations may have on its potential insurance recoveries.

### 3.2.8.3 Montana Grand Jury Investigation

On October 29, 2004, Grace received a letter from the U.S. Attorney for the District of Montana informing the company that it has been named as a target of a federal grand jury investigation involving possible obstruction of federal agency proceedings, violations of federal environmental laws, and conspiring with others to violate federal environmental laws. This investigation relates to Grace's former vermiculite mining and processing activities in Libby, Montana. By designating Grace as a "target" of the investigation, the U.S. Attorney is asserting that it has substantial evidence linking the company to the commission of a crime. Grace understands that the investigation is at an advanced stage and that it may be indicted during the first half of 2005, unless a resolution of this matter can be reached with the U.S. Attorney within such timeframe.

Several current and former senior level employees associated with Grace's construction products business also have been named as targets of the investigation. On November 15, 2004, the Bankruptcy Court granted Grace's request to advance legal and defense costs to the employees, subject to a reimbursement obligation if it is later determined that the employees did not meet the standards for indemnification set forth under state corporate law (Docket Nos. 6829 and 7143).

Grace is unable to assess whether the investigation, an indictment resulting therefrom, or any resolution thereof or conviction resulting therefrom, will have a material adverse effect on the results of operations or financial condition of Grace or affect Grace's bankruptcy proceedings.

48

CC-BLG004110

### 3.2.9    Motion for Entry of Case Management Order

The Debtors filed their motion seeking entry of a case management order, establishment of bar date, approval of proofs of Claim forms, and approval of notice program (the "Original CMO Motion") on June 27, 2001 (Docket No. 586). The Original CMO Motion outlined the Debtors' proposal for resolution of all of the various key issues facing the Debtors, including issues relating to Asbestos PI Claims. The matter was fully briefed and set to be tried before District Judge Farnan on November 21, 2001 when the Court of Appeals for the Third Circuit reassigned the Chapter 11 Cases, along with the asbestos bankruptcy cases of four other debtors pending in Delaware, to the Honorable Judge Alfred M. Wolin.

Judge Wolin (1) retained the asbestos personal injury issues and the fraudulent transfer lawsuit (described in detail in Section 2.5.2 in this Disclosure Statement) and (2) referred all other matters to the Bankruptcy Court. Judge Wolin first addressed the fraudulent transfer lawsuit. After extensive briefing and negotiations, the matter was resolved in principle by the parties in November of 2002 and will potentially result in the recovery of approximately $1 billion for the Debtors' estates.

Judge Wolin did not immediately address the Debtors' potential liability for asbestos personal injury. Instead, he had the parties re-brief these issues and put the matter on hold pending resolution of the fraudulent transfer lawsuit. On June 21, 2002, the Debtors filed a supplemental brief regarding procedures for the litigation of the common personal injury liability issues (Docket No. 2275). This supplemental brief provided a detailed summary of the Debtors' proposal concerning (1) the level of impairment that should be necessary for a party to assert an asbestos personal injury claim against the Debtors' estates and (2) procedures for implementing, and the need for the implementation of, a bar date covering asbestos personal injury claims. The District Court never considered the matter. In lieu of the procedures outlined in the Original CMO Motion, the Plan Documents establish a process for parties to file Asbestos PI Claims against the Debtors' estates.

On November 24, 2004, the Debtors filed a motion with the District Court requesting that it refer jurisdiction over the Debtors' amended motion for entry of a CMO (Docket No. 7036). The District Court has ordered that all objections and responses to the Debtors' motion be filed by January 5, 2005, the Debtors' Reply to any objection or response be filed by January 12, 2005 and a hearing on the Referral Motion be held on January 18, 2005 (Docket No. 7326).

### 3.2.10    Debtors' Bar Date for Asbestos PD Claims (Excluding ZAI Claims), Non-Asbestos Claims, and Asbestos Medical Monitoring Claims

By an order dated April 22, 2002, the Court established the March 2003 Bar Date as the last date for Filing proofs of Claim for all pre-petition Claims relating to (1) Asbestos PD Claims (excluding ZAI Claims), (2) non-Asbestos Claims (including all governmental Claims), and (3) Asbestos Medical Monitoring Claims (Docket No. 1963). A bar date was not set for Asbestos PI Claims and ZAI Claims.

Pursuant to the March 2003 Bar Date, approximately 15,438 proofs of Claim were filed against the Debtors' estates. The Debtors believe that many of the proofs of Claim are

49

CC-BLG004111

illegitimate, duplicative, or otherwise grossly overstated in amount. The Debtors currently are pursuing a series of omnibus Claims objections to deal with many of these proofs of Claim.

### 3.2.11  The ADR Program

On June 12, 2004, the Debtors filed a Motion for the entry of an order establishing an alternative dispute resolution ("ADR") program to liquidate certain pre-petition Claims that were submitted pursuant to the order setting the March 2003 Bar Date. On November 9, 2004, the Court entered an order approving the Debtors' ADR program, as amended to address concerns raised by the Court and other parties. The ADR program establishes procedures for resolving certain contested non-asbestos Claims through negotiation and then, if necessary, through mediation.

### 3.2.12  The Judge Wolin Mandamus and Recusal Proceedings

Certain creditors of Owens Corning Corporation moved to have Judge Wolin recused from any further participation in the Owens Corning bankruptcy cases that were pending before him in the District Court on October 10, 2003. Shortly thereafter, certain creditors of the Debtors filed a similar motion. The Third Circuit issued an order that stayed all matters before Judge Wolin in each of the five asbestos cases before him, including matters pertaining to the Debtors' Chapter 11 Cases, on October 30, 2003. The cases before Judge Wolin remained stayed, pending resolution of the Wolin recusal matters. The Third Circuit issued a Writ of Mandamus on May 17, 2004 which (1) ordered Judge Wolin to recuse himself from the five asbestos cases before him, including the Debtors' Chapter 11 Cases, and (2) lifted the stay of all matters before Judge Wolin. The Honorable Ronald E. Buckwalter was assigned all matters in the Chapter 11 Cases that were previously pending before Judge Wolin on May 27, 2004 (Docket No. 5652).

### 3.2.13  Negotiations with the Various Committees and the FCR

At various times during the course of the Chapter 11 Cases, the Debtors have met with the FCR and representatives of the Asbestos PI Committee, the Asbestos PD Committee, the Equity Committee and the Unsecured Creditors' Committee and presented alternatives to the Plan in an effort to achieve a consensual plan of reorganization. As a result of such meetings, in December 2004, the Equity Committee and the Unsecured Creditors' Committee agreed to become Plan Proponents. However, the Debtors were unable to obtain the remaining constituencies' agreement to the Debtors' Plan.

### 3.2.14  Motion to Protect Tax Benefits

In order to limit the trading of its shares to prevent a change in control of the Parent for tax purposes, Grace filed a motion seeking an order to require notice and waiting periods on transfers of Parent Common Stock to give Grace time to review the purchases for tax purposes. The order imposes notice requirements and potential restrictions on stock acquisitions by those persons or entities that (i) currently own 4.75% or more of Parent Common Stock or (ii) seek to acquire 4.75% or more of Parent Common Stock. A change in control of the Parent would severely limit Grace's ability to use its net operating losses to offset taxes on future income. Under the order, Grace has the right to object in Bankruptcy Court to those persons or entities

50

CC-BLG004112

acquiring Parent Common Stock if the acquisition poses a material risk of adversely affecting Grace's ability to use its net operating losses. The request was granted on an interim basis on October 23, 2004 and a hearing on final approval is scheduled for January 24, 2005.

### 3.3    The Canadian Proceedings

#### 3.3.1    General Information

Although Grace's Canadian operating subsidiary Grace Canada, Inc. ("Grace Canada") is not a Debtor, Grace believed that Grace Canada could potentially become subject to asbestos-related Claims. Accordingly, the Debtors sought and obtained ancillary relief in Canada with respect to Grace Canada.

On April 4, 2001, the Canadian Court granted Grace Canada an order (the "Canadian Order"), pursuant to Section 18.6 of the Canadian Companies' Creditors Arrangement Act, which, among other things (1) recognized the Chapter 11 Cases in Canada, (2) prohibited the commencement of any asbestos related suits against Grace Canada, and (3) appointed Pierre Le Bourdais as Grace Canada's Information Officer. The Information Officer is responsible for submitting certain interim information reports concerning the Chapter 11 Cases and Grace Canada to the Canadian Court.

#### 3.3.2    Notice of the Canadian Proceedings

In accordance with the terms of the Canadian Order, Grace Canada published notice of the Canadian proceedings in newspapers of national circulation in Canada on each of April 11, 2001 and April 12, 2001. These notices (1) advised Entities of the Chapter 11 Cases and the Canadian proceedings, (2) stated that Grace Canada could seek further relief from the Canadian Court to ensure fair and equal access for Canadians with Asbestos Claims against Grace Canada, and (3) instructed any Entity who wished to be made a party to the Canadian proceedings to contact counsel to Grace Canada. To date, the only party who has requested to be added this service list is counsel involved in the fraudulent transfer litigation.

#### 3.3.3    Quarterly Reports

In accordance with the terms of the Canadian Order, the Information Officer has filed thirteen (13) quarterly reports with the Canadian Court. These reports have provided the Canadian Court with a description of matters affecting Grace Canada, as well as provided a summary of all material events taking place in the Chapter 11 Cases. Through these reports, the Information Officer has kept the Canadian Court informed as to the Debtors' reorganization process.

#### 3.3.4    Court Orders in the Canadian Proceedings

Since the date of the Canadian Order, Grace Canada has appeared before the Canadian Court on numerous occasions and has received approval or recognition of a number of Orders granted in the United States in connection with the Chapter 11 Cases. The following represents a summary of material matters approved by the Canadian Court:

91100-001\DOCS_DE:104617.1

CC-BLG004113

### 3.3.4.1 Orders Extending the Stay of Proceedings in Canada

The stay of proceedings granted in the Canadian Order was originally set to expire on October 1, 2001. The Canadian Court has extended this deadline. The current stay of proceedings will expire on April 1, 2005, unless extended prior to that date.

### 3.3.4.2 Recognition of the Debtors' March 2003 Bar Date Order

On December 5, 2002, in order to give effect to the March 2003 Bar Date Order, the Canadian Court ordered that the order setting the March 2003 Bar Date be recognized and implemented in Canada in accordance with its terms.

### 3.3.4.3 The Corporate Reorganization Order

On April 14, 2004, Grace Canada applied for, and the Canadian Court granted, an Order (the "Canadian Reorganization Order") approving a corporate reorganization involving Grace Canada and certain of the Debtors. The proposed reorganization contemplated, *inter alia,* that Grace Canada would acquire, for valuable consideration, shares or debt in a number of the Debtors' Latin American subsidiaries. The Canadian Reorganization Order was to be effective subject to the filing of a certificate of the directors of Grace Canada that they were satisfied that Grace Canada was receiving true value on a reasonable and realistic basis in respect of the assets being acquired. Grace Canada has now received the results of the appraisals for the property to be acquired and is in the process of reviewing and considering the results. The certificate of the directors of Grace Canada has not yet been filed and, accordingly, the Canadian Reorganization Order is not yet effective.

### 3.3.5    Post-Petition Canadian Lawsuits

On October 25, 2004, Raven Thundersky and Rebecca Bruce filed a complaint with the Queens' Bench for Winnipeg Centre against certain of the Debtors, certain of the Debtors' former Canadian subsidiaries, the Attorney General of Canada, and others. The complaint is styled as a purported class-action and seeks recovery for alleged injuries suffered by any Canadian resident as a result of Grace's marketing, selling, processing, manufacturing, distributing and/or delivering asbestos or asbestos-containing products in Canada.

On October 29, 2004, a Motion for Authorization to Institute a Class Action and to Obtain the Status of Representative was filed by the Association des Consummateurs Pour la Qualité Dans La Construction and Jean-Charles Dextras in the Superior Court for the Province of Quebec, District of Montreal. The motion seeks authorization to institute a class-action lawsuit against Grace Canada, Inc. and the Attorney General of Canada on behalf of (1) every person who is the owner of a building insulated with vermiculite that was marketed under the brand name Zonolite Attic Insulation and (2) every person (or their heirs and successors, if applicable) who lives or has lived in a building insulated with Zonolite Attic Insulation and who has suffered, is suffering or will suffer from asbestosis, mesothelioma, or cancer of the lung.

91100-001\DOCS_DE:104617.1

CC-BLG004114

### 3.3.6   Canadian Claims

Upon confirmation, Canadian Claims shall be transferred to the Asbestos Trust along with all Asbestos Claims.  Any Allowed Canadian Claims will be paid by the Asbestos Trust.

## 4.   SUMMARY OF THE PLAN[15]

### 4.1   Overview of the Chapter 11 Plan

THE DISCUSSION OF THE PLAN SET FORTH BELOW IS MORE DETAILED THAN THE EXECUTIVE SUMMARY CONTAINED IN ARTICLE 1 OF THIS DISCLOSURE STATEMENT, BUT IT IS NOT A COMPLETE RECITATION OF THE TERMS OF THE PLAN.  MOREOVER, CERTAIN KEY ASPECTS OF THE PLAN ARE HIGHLIGHTED IN THE EXECUTIVE SUMMARY BUT ARE NOT REPEATED IN THIS SECTION.

THE DEBTORS HAVE ATTEMPTED TO SUMMARIZE IN THIS DISCLOSURE STATEMENT, THE KEY PROVISIONS OF THE PLAN, BUT SUCH A SUMMARY IS BY ITS VERY NATURE HIGHLY SUBJECTIVE AND PRONE TO DISPUTE.  THEREFORE, THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN AND THE EXHIBITS IN THE EXHIBIT BOOK, THE TERMS OF WHICH ARE CONTROLLING.

A TRUE AND CORRECT COPY OF THE PLAN IS ATTACHED AS EXHIBIT 1 IN THE EXHIBIT BOOK.  HOLDERS OF CLAIMS OR EQUITY INTERESTS AND OTHER INTERESTED PARTIES ARE URGED TO READ THE PLAN AND THE EXHIBITS THERETO IN THEIR ENTIRETY SO THAT THEY MAY MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.

### 4.2   PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

Article 2 of the Plan deals with unclassified Claims.  In accordance with Bankruptcy Code § 1123(a)(1), Administrative Expense Claims and Priority Tax Claims are not classified and are excluded from the Classes set forth in Article 3 of the Plan.  These Claims are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code or upon such other less favorable terms as may be mutually agreed upon between the Holder of such unclassified Claim and the Reorganized Debtors or otherwise established pursuant to an order of the Bankruptcy Court; provided, however, that each Holder of a Claim which by operation of the Fresenius Settlement Agreement is an obligation for Indemnified Taxes promptly shall be paid in full in cash as such Fresenius Indemnified Taxes become due and payable.

---

[15] The section number references in this Article 4 match up one-to-one with the section numbers of the Plan.  For example, Section 4.3.1 of this Disclosure Statement correlates to Section 3.1 of the Plan; Section 4.5.1 of this Disclosure Statement correlates to Section 5.1 of the Plan.

CC-BLG004115

The Debtors estimate the total of all Allowed Administrative Expense Claims on the Effective Date to be approximately $138 million. This amount consists of approximately $76 million expected to be paid on the Effective Date or as soon as practicable thereafter (including $15 million of environmental Claims, $3 million of accrued fees for letters of credit, $8 million of post-petition special pension arrangements, and $50 million of other administrative expenses, including professional fees, exit financing costs and unknown contingencies), and approximately $62 million expected to be paid after the Effective Date (including $35 million of environmental Claims and $27 million of other contracts). The Debtors estimate the total of all Allowed Priority Tax Claims on the Effective Date to be approximately $232 million. Of this amount, approximately $182 million is expected to be paid on or before the Effective Date in settlement of assessed or asserted income tax claims and approximately $50 million is expected to be paid over time in accordance with the Plan.[16]

The remainder of Article 2 of the Plan delineates in detail the treatment of these unclassified Claims, including treatment of liabilities incurred in the ordinary course of business, fee applications by Professionals and payment of interest to Holders of Priority Tax Claims paid out over time, subject to the requirements of the Fresenius Settlement Agreement.

### 4.3    CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

Article 3 of the Plan deals with classification and treatment of Claims and Equity Interest.

#### 4.3.1    Summary

Claims and Equity Interests are classified for all purposes, including voting, confirmation, and Distribution pursuant to the Plan and pursuant to Bankruptcy Code §§ 1122 and 1123(a)(1), as follows:

##### 4.3.1.1 Class 1.        Priority Claims

Class 1 consists of all Priority Claims against the Debtors. Each Holder of an Allowed Priority Claim shall be paid the Allowed Amount of its Allowed Priority Claim either (i) in full, in cash, on the later of (A) the Effective Date or as soon as practicable thereafter or (B) the date such Priority Claim becomes an Allowed Priority Claim, or as soon as practicable thereafter, or (ii) upon such other less favorable terms as may be mutually agreed upon between the Holder of an Allowed Priority Claim and the Reorganized Debtors. The Debtors estimate that there are no Allowed Priority Claims as of the Effective Date. Class 1 is unimpaired. The Holders of the Allowed Priority Claims in Class 1 are deemed to have voted to accept the Plan and, accordingly, their separate vote will not be solicited.

---

[16] Each of these figures in this Section 4.2 is consistent with the Debtors' books and records and includes the Debtors' estimates for certain Claims that are disputed, which Claims may ultimately be determined to be significantly higher or lower.

CC-BLG004116

### 4.3.1.2 Class 2.    Secured Claims

Class 2 consists of all Secured Claims against the Debtors. Each Holder of an Allowed Secured Claim shall be paid the Allowed Amount of its Allowed Secured Claim at the option of the Reorganized Debtors, either (i) in full, in cash, on the later of (A) the Effective Date or as soon as practicable thereafter or (B) the date such Secured Claim becomes an Allowed Secured Claim, or as soon as practicable thereafter; (ii) upon such other less favorable terms as may be mutually agreed upon between the Holder of an Allowed Secured Claim and the Reorganized Debtors; (iii) by the surrender to the Holder or Holders of any Allowed Secured Claim of the property securing such Claim; or (iv) notwithstanding any contractual provision or applicable law that entitles the Holder of a Secured Claim to demand or receive payment thereof prior to the stated maturity from and after the occurrence of a default, by reinstatement in accordance with Bankruptcy Code § 1124(2)(A)-(D). Although certain Claimants have asserted Secured Claims against the Debtors, including an approximately $3.7 million Claim alleged by the Town of Acton, Massachusetts, the Debtors estimate the total of all Allowed Secured Claims on the Effective Date to be approximately $90,000 plus interest at the applicable rate, if any. To the extent an asserted Secured Claim is Allowed as a Secured Claim, it will be treated as a Secured Claim under the Plan. The Holders of the Allowed Secured Claims in Class 2 are deemed to have voted to accept the Plan and, accordingly, their separate vote will not be solicited.

### 4.3.1.3 Class 3.    Unsecured Pass-Through Employee Related Claims

Class 3 consists of all Unsecured Pass-Through Employee Related Claims. The Plan leaves unaltered the legal, equitable, and contractual rights to which each such Claim entitles the Holder of such Claim. The Debtors estimate the total of all Allowed Unsecured Pass-Through Employee Related Claims on the Effective Date to be approximately $190 million.[17] This amount includes approximately $123 million of post-retirement benefits other than pensions classified pursuant to Section 2.6.3.3, approximately $63 million of unfunded special pension arrangements classified pursuant to Section 2.6.3.4, and approximately $5 million of deferred compensation classified pursuant to Section 2.6.3.6.

All other Allowed Unsecured Pass-Through Employee Related Claims have already been paid pursuant to first day orders of this Court or will be paid in the ordinary course as they become due. Class 3 is unimpaired. The Holders of the Unsecured Pass-Through Employee Related Claims in Class 3 are deemed to have voted to accept the Plan and, accordingly, their separate vote will not be solicited.

### 4.3.1.4 Class 4.    Workers' Compensation Claims

Class 4 consists of all Workers' Compensation Claims against the Debtors. The Plan leaves unaltered the legal, equitable, and contractual rights to which each such Claim entitles the Holder of such Claim. All Allowed Workers' Compensation Claims have been paid pursuant to

---

[17] This figure is consistent with the Debtors' books and records and includes the Debtors' estimates for certain Claims that are disputed, which Claims may ultimately be determined to be significantly higher or lower.

CC-BLG004117

first day orders or will be paid in the ordinary course as they become due. Class 4 is unimpaired. The Holders of the Workers' Compensation Claims in Class 4 are deemed to have voted to accept the Plan and, accordingly, their separate vote will not be solicited.

### 4.3.1.5 Class 5. Intercompany Claims

Class 5 consists of all Intercompany Claims. The Plan leaves unaltered the legal, equitable, and contractual rights to which each such Claim entitles the Holder of such Claim. For proforma cash flow purposes, all Intercompany Claims will have no impact upon the Plan as all payments under the Plan are based upon the Debtors and Non-Debtor Affiliates as consolidated. Class 5 is unimpaired. The Holders of Intercompany Claims in Class 5 are deemed to have voted to accept the Plan and, accordingly, their separate vote will not be solicited.

### 4.3.1.6 Class 6. Asbestos PI-SE Claims

Class 6 consists of all Asbestos PI-SE Claims against the Debtors and the Canadian Affiliates.

All Allowed Class 6 Claims shall be paid in full. All Allowed Class 6 Claims shall be processed and paid in accordance with the terms, provisions, and procedures of the Asbestos Trust Agreement and the PI-SE TDP. All Allowed Class 6 Claims shall be paid by the Asbestos Trust out of the Asbestos PI-SE Class Fund, which shall be funded solely by the Sealed Air Payment and the Parent Common Stock component of the Debtors' Payment, if necessary. In accordance with the terms of the Asbestos Trust Agreement and the PI-SE TDP, each Holder of an Asbestos PI-SE Claim that is not a Canadian Claim shall complete an Asbestos PI Questionnaire or Claims Materials, as applicable, and have the option to elect: (A) the Litigation Option or (B) the Cash-Out Option; provided, however, that a Holder of a Third Party Indemnification/Contribution Claim that is not a Canadian Claim shall be conclusively presumed to have elected the Litigation Option. In accordance with the terms of the Asbestos Trust Agreement and the PI-SE TDP, each Holder of an Asbestos PI-SE Claim that is a Canadian Claim shall complete an Asbestos PI Questionnaire or Claims Materials, as applicable, and have the option to elect: (A) the Canadian Litigation Option or (B) the Cash-Out Option; provided, however, that a Holder of a Third Party Indemnification/Contribution Claim that is a Canadian Claim shall be conclusively presumed to have elected the Canadian Litigation Option. Failure to complete and return an Asbestos PI Questionnaire or Claims Materials, as applicable, by the applicable deadline shall result in an automatic election of the Litigation Option or the Canadian Litigation Option, as applicable. Notwithstanding the foregoing, nothing shall prevent the Holder of an Asbestos PI-SE Claim that has not yet been Allowed from agreeing with the Entity against whom the Claim is asserted (or after the Effective Date, with the Asbestos Trust) for such Claim to be liquidated and paid in an amount lower than if the Claim were to be Allowed in the amount asserted. Claimants may assert their Claims on the Asbestos PI Proof of Claim Form included with the Claims Materials.

The sole recourse of the Holder of an Asbestos PI-SE Claim on account of such Claim shall be to the PI-SE Account of the Asbestos Trust pursuant to the provisions of the Asbestos Channeling Injunction, the Asbestos Trust Agreement, and the PI-SE TDP.

56

CC-BLG004118

The Bankruptcy Court, pursuant to the Estimation Motion, shall determine the amount of the Asbestos PI-SE Claims. As a condition precedent to confirmation of the Plan, the Court shall have found that the aggregate of the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund is not greater than $1,483 billion.

Class 6 is unimpaired. The Holders of the Allowed Asbestos PI-SE Claims in Class 6 are deemed to have voted to accept the Plan and, accordingly, their separate vote will not be solicited.

### 4.3.1.7 Class 7.          Asbestos PI-AO Claims

Class 7 consists of all Asbestos PI-AO Claims against the Debtors and the Canadian Affiliates.

All Allowed Class 7 Claims shall be paid in full. All Allowed Class 7 Claims shall be processed and paid in accordance with the terms, provisions, and procedures of the Asbestos Trust Agreement and the PI-AO TDP. All Allowed Class 7 Claims shall be paid initially by the Asbestos Trust out of the Asbestos PI-AO Class Fund which shall be funded by the Sealed Air Payment (to the extent any funds remain after first funding the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund and the Asbestos Trust Expenses Fund) and the Warrants. After the exhaustion of the Asbestos PI-AO Class Fund in its entirety, all Allowed PI-AO Claims shall be paid in cash by the Asbestos Trust from funds to be paid to the Asbestos Trust by the Reorganized Debtors, such funds being in addition to the Debtors' Payment. In accordance with the terms of the Asbestos Trust Agreement and the PI-AO TDP, each Holder of an Asbestos PI-AO Claim that is not a Canadian Claim shall complete an Asbestos PI Questionnaire or Claims Materials, as applicable, and have the option to elect: (A) the Litigation Option, (B) the Registry Option, or (C) the Cash-Out Option; provided, however, that a Holder of a Third Party Indemnification/Contribution Claim that is not a Canadian Claim shall be conclusively presumed to have elected the Litigation Option. In accordance with the terms of the Asbestos Trust Agreement and the PI-AO TDP, each Holder of an Asbestos PI-AO Claim that is a Canadian Claim shall complete an Asbestos PI Questionnaire or Claims Materials, as applicable, and have the option to elect: (A) the Canadian Litigation Option, (B) the Registry Option, or (C) the Cash-Out Option; provided, however, that a Holder of a Third Party Indemnification/ Contribution Claim that is a Canadian Claim shall be conclusively presumed to have elected the Canadian Litigation Option. Failure to complete and return an Asbestos PI Questionnaire or Claims Materials, as applicable, by the applicable deadline shall result in an automatic election of the Litigation Option or the Canadian Litigation Option, as applicable. Notwithstanding the foregoing, nothing shall prevent the Holder of an Asbestos PI-AO Claim that has not yet been Allowed from agreeing with the Reorganized Debtors for such Claim to be liquidated and paid in an amount lower than if the Claim were to be Allowed in the amount asserted. Claimants may assert their Claims on the Asbestos PI Proof of Claim Form included with the Claims Materials.

The sole recourse of the Holder of an Asbestos PI-AO Claim on account of such Claim shall be to the PI-AO Account of the Asbestos Trust pursuant to the provisions of the Asbestos Channeling Injunction, the Asbestos Trust Agreement, and the PI-AO TDP.

91100-001\DOCS_DE:104617.1

CC-BLG004119

The Bankruptcy Court, pursuant to the Estimation Motion, shall determine the amount of the Asbestos PI-AO Claims.  As a condition precedent to confirmation of the Plan, the Court shall have found that the Asbestos PI-AO Class Fund is not greater than $130 million.

Class 7 is unimpaired.  The Holders of the Allowed Asbestos PI-AO Claims in Class 7 are deemed to have voted to accept the Plan and, accordingly, their separate vote will not be solicited.

### 4.3.1.8 Class 8.        Asbestos PD Claims

Class 8 consists of all Asbestos PD Claims against the Debtors and the Canadian Affiliates.

All Allowed Class 8 Claims shall be paid in full.  All Allowed Class 8 Claims shall be processed and paid out of the Asbestos PD Class Fund (funded solely by the Sealed Air Payment and the Parent Common Stock component of the Debtors' Payment, if necessary) in accordance with the terms, provisions, and procedures of the Asbestos Trust Agreement and the PD TDP. Notwithstanding the foregoing, nothing shall prevent the Holder of an Asbestos PD Claim that has not yet been Allowed from agreeing with the Entity against whom the Claim is asserted (or after the Effective Date, with the Asbestos Trust) for such Claim to be liquidated and paid in an amount lower than if the Claim were to be Allowed in the amount asserted.

The sole recourse of the Holder of an Asbestos PD Claim on account of such Claim shall be to the PD Account of the Asbestos Trust pursuant to the provisions of the Asbestos Channeling Injunction, the Asbestos Trust Agreement, and the PD TDP.

The Bankruptcy Court, pursuant to the Estimation Motion, shall determine the amount of the Asbestos PD Claims.  As a condition precedent to confirmation of the Plan, the Court shall have found that the aggregate of the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund is not greater than $1.483 billion.

Class 8 is unimpaired.  The Holders of the Asbestos PD Claims in Class 8 are deemed to have voted to accept the Plan and, accordingly, their separate vote will not be solicited.

### 4.3.1.9 Class 9.        General Unsecured Claims

Class 9 consists of all General Unsecured Claims against the Debtors.

Each Holder of an Allowed General Unsecured Claim shall be paid the Allowed Amount of its General Unsecured Claim on the GUC Distribution Date.  Such payment shall be either (i) in full, plus post-petition interest, such payment to be 85% in cash and 15% in Parent Common Stock, such Parent Common Stock being subject to, among other things, the transactions described in Section 7.2.2 of the Plan, and the Management Stock Incentive Plan, or (ii) upon such other less favorable terms as may be mutually agreed upon between the Holder of an Allowed General Unsecured Claim and the Reorganized Debtors.  Notwithstanding the foregoing, each Holder of a Claim which by operation of the Fresenius Settlement Agreement is an obligation for Indemnified Taxes promptly shall be paid in full in cash as such Fresenius Indemnified Taxes become due and payable.

58

CC-BLG004120

Post-petition interest shall accrue from the Petition Date through the date of payment and shall be (i) for the Holders of Claims under the Debtors' pre-petition bank credit facilities, at a rate of 6.09% per annum, compounded quarterly, (ii) for the Holders of Claims who, but for the Filing of the Chapter 11 Cases would be entitled under a contract or otherwise to accrue or be paid interest on such Claim in a non-default (or non-overdue payment) situation under applicable non-bankruptcy law, the rate provided in the contract between a Debtor(s) and the Claimant or such rate as may otherwise apply under applicable non-bankruptcy law, or (iii) for all other Holders of Class 9 Claims, at a rate of 4.19% per annum (the federal judgment rate as of the Petition Date), compounded annually.[18]

The Parent Common Stock paid to the Holders of Allowed General Unsecured Claims in accordance with Section 3.1.9(b) of the Plan shall be valued at the average of the closing prices on The New York Stock Exchange for the trading days within the thirty (30) calendar days immediately preceding the GUC Distribution Date. The trading price on the GUC Distribution Date could be higher or lower than such average. The Parent Common Stock may be subject to material price volatility and may trade up or down after the GUC Distribution Date.

The Debtors estimate the total of all Allowed General Unsecured Claims to be approximately $1,175 million as of September 30, 2004.[19] This amount consists of $500 million of principal and approximately $121 million of accrued interest under the Debtors' pre-petition bank credit facilities, approximately $223 million of environmental Claims, approximately $14 million of amounts drawn under drawn letters of credit (including accrued interest), $36 million of accounts payable including accrued interest, $87 million of asbestos Claims subject to pre-petition judgments or agreements (including accrued interest), $10 million of insurance and other Claims, and $198 million of other unliquidated liabilities (including $72 million of unliquidated environmental), which are conservatively estimated to be Class 9 Claims when and if Allowed. These unliquidated liabilities are not projected to be Allowed General Unsecured Claims at the Effective Date.

---

[18] In consideration for the treatment provided to Class 9 Claims, the Unsecured Creditors' Committee has agreed to be a Plan Proponent of the Debtors' Amended Joint Plan filed on or about January 13, 2005 as the same may be amended from time to time with the consent of the Unsecured Creditors' Committee (the "Plan"). The Unsecured Creditors' Committee and the Debtors have agreed that the Unsecured Creditors' Committee has the right to withdraw as a Plan Proponent on the occurrence of any of the following circumstances: (i) failure of the Court to approve the Disclosure Statement incorporating the Plan no later than November 30, 2005; (ii) determination by the Court that the Plan is not confirmable and the failure to file an amended Plan within 60 days; (iii) determination by the Court that the Debtors are insolvent; (iv) termination of the Debtors' exclusive period; (v) withdrawal of the Plan by the Plan Proponents and the failure of the Plan Proponents to file a new Plan within 60 days; or (vi) failure of the Plan to become effective on or before January 1, 2007. This agreement does not commit any member of the Unsecured Creditors' Committee or any creditor to vote for the Plan. The parties intend to memorialize their agreement in a plan support agreement. In consideration for the treatment provided to Class 9 Claims, certain substantial Claimants have also agreed to support the Plan.

[19] This figure is consistent with the Debtors' books and records and includes the Debtors' estimates for certain Claims that are disputed, which Claims may ultimately be determined to be significantly higher or lower.

CC-BLG004121

Class 9 is impaired as Class 9 Claimants are to received 15% of the Allowed Amount of their Claims in the form of stock, the value of which may be volatile and cannot be guaranteed. The Debtors are soliciting the votes of Holders of the General Unsecured Claims in Class 9 to accept or reject the Plan in the manner and to the extent provided in the Confirmation Procedures Order.

### 4.3.1.10      Class 10.      Equity Interests in the Parent

Class 10 consists of Equity Interests in the Parent. On the Effective Date, Holders of Class 10 Equity Interests in the Parent shall retain such interests; provided that such Equity Interests shall: (i) be subject, among other things, to the transactions described in Section 7.2.2 of the Plan, and the Management Stock Incentive Plan and (ii) be restricted as described in Section 7.1.1 of the Plan. Class 10 is impaired. The Debtors are soliciting the votes of Holders of the Allowed Equity Interests in the Parent in Class 10 to accept or reject the Plan in the manner and to the extent provided in the Confirmation Procedures Order.

### 4.3.1.11      Class 11.      Equity Interests in the Debtors other than the Parent

Class 11 consists of Equity Interests in the Debtors other than the Parent. The Plan leaves unaltered the legal, equitable, and contractual rights to which each such Equity Interest entitles the Holder of such Equity Interest. Class 11 is unimpaired. The Holders of the Equity Interests in the Debtors other than the Parent in Class 11 are deemed to have voted to accept the Plan and, accordingly, their separate vote will not be solicited.[20]

### 4.3.2    Effect of Asbestos PI Claimant Electing Various Options

#### 4.3.2.1 Cash-Out Option

If an Asbestos PI Claimant elects the Cash-Out Option, (i) his election is irrevocable, (ii) his Claim will be treated under the terms of the PI-SE TDP or PI-AO TDP, as applicable, and (iii) he shall be precluded, pursuant to the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction and the Released Matters Injunction, from seeking any further recovery against an Asbestos Protected Party, any Asbestos Insurance Entity or any Entity released under any provision of the Plan on account of such Claim.

#### 4.3.2.2 Litigation Option and Canadian Litigation Option

If an Asbestos PI Claimant elects, or is deemed to elect, the Litigation Option or the Canadian Litigation Option as applicable, (i) his Claim will be litigated against the Asbestos Trust and (ii) he shall be precluded, pursuant to the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction and the Released Matters Injunction, from seeking any

---

[20] The Equity Committee and the Debtors have agreed that the Equity Committee has the right to withdraw as a Plan Proponent if the Plan does not become effective on or before January 1, 2007.

60

CC-BLG004122

further recovery against an Asbestos Protected Party, any Asbestos Insurance Entity or any Entity released under any provision of the Plan on account of such Claim.

### 4.3.2.3 Registry Option

If an Asbestos PI-AO Claimant chooses the Registry Option, he shall (i) register his name on the Registry, (ii) be precluded, pursuant to the Asbestos Channeling Injunction, the Asbestos Insurance Entity Injunction and the Released Matters Injunction, from seeking any further recovery against an Asbestos Protected Party, any Asbestos Insurance Entity or any Entity released under any provision of the Plan, (iii) have the statute of limitations be deemed to be tolled to the extent that such Claimant becomes an Asbestos PI-SE Claimant and (iv) be entitled to seek further recovery, in accordance with the provisions of the Plan, against the Asbestos Trust if such Holder becomes an Asbestos PI-SE Claimant.

### 4.4    MODIFICATION OR WITHDRAWAL OF THE PLAN

Article 4 of the Plan sets forth the Debtors' right to modify, amend or withdraw the Plan, and/or the Plan Documents and the effect of any such withdrawal.

### 4.5    PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS AND ASBESTOS CLAIMS GENERALLY

#### 4.5.1    Objections to Claims (other than Asbestos Claims); Prosecution of Disputed Claims

Section 5.1 of the Plan sets forth the right of the Debtors or Reorganized Debtors, as applicable, the United States Trustee and any other party-in-interest to object to the allowance of any Administrative Expense Claims, Priority Tax Claims, Class 1 Claims, Class 2 Claims, Class 3 Claims, Class 4 Claims, Class 5 Claims, and Class 9 Claims. It also delineates the ways in which such objections may be resolved.

#### 4.5.2    Distribution on Account of Disputed Claims

Section 5.2 of the Plan provides for the timing and extent of Distributions for Disputed Claims which become Allowed.

#### 4.5.3    Resolution of Asbestos Claims

Section 5.3 of the Plan sets forth the way in which Asbestos Claims will be Allowed or Disallowed, and paid if Allowed. The Allowed Amount of Asbestos Claims (except for Canadian Claims that are filed by Claimants (i) with Asbestos PI Claims who elect the Canadian Litigation Option or (ii) with Asbestos PD Claims) shall be determined in accordance with the Bankruptcy Code, the Bankruptcy Rules, the applicable TDP, and the CMO. If any Asbestos Claim becomes Allowed, it shall be satisfied from the Asbestos Trust in accordance with the Asbestos Trust Agreement and the applicable TDPs.

The Allowed Amount of Canadian Claims that are filed by Claimants (i) with Asbestos PI Claims who elect the Canadian Litigation Option or (ii) with Asbestos PD Claims shall be determined in accordance with the Canadian Litigation Procedure and the applicable TDP.

91100-001\DOCS_DE:104617.1

CC-BLG004123

The Asbestos Trust shall have the sole right and authority to resolve all Asbestos PI-SE Claims and Asbestos PD Claims.  All Asbestos PI-SE Claims whose Holders elect the Litigation Option or the Canadian Litigation Option, as applicable, shall be litigated by, and at the expense of, the Asbestos Trust in the name of the Asbestos Trust.

The Asbestos Trust shall also have the sole right and authority to resolve all Asbestos PI-AO Claims to the extent the Holder of an Asbestos PI-AO Claim elects the Registry Option or the Cash-Out Option.

If the Holder of an Asbestos PI-AO Claim elects the Litigation Option or the Canadian Litigation Option, as applicable, the Reorganized Debtors shall have the sole right and authority to resolve all such Asbestos PI-AO Claims.  All Asbestos PI-AO Claims whose Holders elect the Litigation Option or the Canadian Litigation Option, as applicable, shall be litigated by the Reorganized Debtors or the Canadian Affiliates, as applicable, in the name of the Asbestos Trust, initially at the expense of the Asbestos Trust out of the Asbestos PI-AO Class Fund as it is the estate that remains liable for funding of Asbestos PI-AO Claims.

Any court proceeding related to the resolution of Canadian Claims shall be resolved by the Canadian Court in the context of the Canadian Proceedings.

The subsections of Section 5.3 of the Plan deal with:

- Making of an Election by Asbestos PI Claimants;

- Claims Materials for Asbestos PI Claimants;

- Information Obtained by the Asbestos Trust or Reorganized Debtors Regarding Asbestos PI Claims; and

- Withdrawal of Claims.

## 4.6    ACCEPTANCE OR REJECTION OF THE PLAN

Article 6 of the Plan discusses which Classes are impaired and which are not.  Each Holder of a Claim or Equity Interest in an impaired Class is entitled to vote to accept or reject the Plan to the extent and in the manner provided in the Plan, the Confirmation Procedures Order and/or the Bankruptcy Code.

Classes 1, 2, 3, 4, 5, 6, 7, 8 and 11 of Claims and Equity Interests are unimpaired.  Under Bankruptcy Code § 1126(f), the Holders of Claims and Equity Interests in such Classes are conclusively presumed to have voted to accept the Plan.

Section 6.4.1 of the Plan deals with confirmation in the event an impaired Class rejects the Plan.  Impaired Equity Interests and/or impaired Classes of Claims that fail to accept the Plan may be "crammed down" in accordance with Bankruptcy Code § 1129(b).  See also Section 7.2.1 of this Disclosure Statement for further discussion.

Section 6.4.2 of the Plan provides that if the Plan fails to be accepted by the requisite number and amount of the Holders of Claims and Equity Interests required to satisfy Bankruptcy

91100-001\DOCS_DE:104617.1

CC-BLG004124

Code §§ 524(g) and 1129, then, notwithstanding any other provision of the Plan to the contrary, the Debtors reserve the right to amend the Plan.

## 4.7    IMPLEMENTATION OF THE PLAN

### 4.7.1    Corporate Governance of the Parent and the Other Debtors

Section 7.1 of the Plan provides that the Certificates of Incorporation or Articles of Incorporation, as applicable, of each of the Debtors that is a corporation shall be amended as of the Effective Date. The form of the Certificate of Incorporation or Articles of Incorporation shall be filed as part of the Plan Supplement. The amended Certificates of Incorporation or Articles of Incorporation, as applicable, of the Debtors shall, among other things: (i) prohibit the issuance of nonvoting equity securities, (ii) as to any classes of securities possessing voting power, provide for an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in payment of such dividends, (iii) include, in the case of the Parent, restrictions on the transfer of the Parent Common Stock as necessary to protect the Reorganized Debtors' tax position, and (iv) effectuate any other provisions of the Plan.

Section 7.1 of the Plan also deals with amendments to the Parent's by-laws and the purchase of D&O and fiduciary liability tail coverage. The form of the Parent's by-laws shall be filed as part of the Plan Supplement.

### 4.7.2    The Asbestos Trust

Section 7.2 of the Plan deals with the Asbestos Trust. It provides generally for the creation and funding of the Asbestos Trust; transfer of assets, Claims and Demands into the Asbestos Trust; appointment and termination of the Trustee and the TAC; and other administrative matters.

#### 4.7.2.1 Creation of the Asbestos Trust

Upon the entry of the Confirmation Order, effective as of the Effective Date, the Asbestos Trust shall be created as a "qualified settlement fund" in accordance with the Plan Documents.

The purpose of the Asbestos Trust shall be to, among other things: (i) assume the liabilities of the Debtors and the Canadian Affiliates with respect to all Asbestos Claims (whether now existing or arising at any time hereafter), (ii) process, liquidate, pay and satisfy all Asbestos Claims in accordance with the Plan, the Asbestos Trust Agreement, the respective TDPs, the CMO, the Canadian Litigation Procedure and the Confirmation Order and in such a way that provides reasonable assurance that the Asbestos Trust will value and be in a position to pay, present and future Asbestos Claims and to otherwise comply with Bankruptcy Code § 524(g)(2)(B)(i); (iii) preserve, hold, manage, and maximize the assets of the Asbestos Trust for use in paying and satisfying Allowed Asbestos Claims; and (iv) otherwise carry out the provisions of the Asbestos Trust Agreement and any other agreements into which the Trustees have entered or will enter in connection with the Plan.

CC-BLG004125

### 4.7.2.2 Funding of the Asbestos Trust

Effective on the Effective Date and conditioned upon the fulfillment of events enumerated in the Sealed Air Settlement Agreement, Cryovac, Inc. shall fund the Sealed Air Payment into the Asbestos Trust in accordance with the Plan and the provisions of the Sealed Air Settlement Agreement. Effective on the thirty-first (31st) day after the Effective Date, the Parent shall transfer or cause the transfer of the Debtors' Payment into the Asbestos Trust in accordance with the Plan.

The Sealed Air Payment and that portion of the Debtors' Payment consisting of the Parent Common Stock, to the extent necessary, shall first fund the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund and the Asbestos Trust Expenses Fund. The remainder of the Sealed Air Payment, if any, and the Warrants included as part of the Debtors' Payment shall fund the Asbestos PI-AO Class Fund.

In addition, in the event that the proceeds of the sale of Parent Common Stock following exercise of all of the Warrants are insufficient to pay all Allowed Asbestos PI-AO Claims in full, the Reorganized Debtors shall pay the Asbestos Trust in full and in cash for the benefit of the Holders of such Claims, such payment to be made by the Reorganized Debtors on the first Business Day of the next calendar quarter after the date upon which the Asbestos PI-AO Claim becomes Allowed, unless the Claim becomes Allowed within fifteen (15) Business Days before the first Business Day of such next calendar quarter, in which case the payment date shall be the first Business Day of the next succeeding calendar quarter.

### 4.7.2.3 Sections 7.2.3 through 7.2.9 of the Plan

Sections 7.2.3 through 7.2.9 of the Plan deal with:

- Transfer of assets into the Asbestos Trust;

- Transfer of Claims and Demands to the Asbestos Trust;

- Creation of Asbestos Trust sub-accounts;

- Appointment and termination of Trustees;

- Creation and termination of the TAC;

- The cooperation agreement between the Reorganized Debtors and the Asbestos Trust;

- Institution and maintenance of legal and other proceedings by the Asbestos Trust; and

- The Reorganized Debtors' sole right and authority to resolve Asbestos PI-AO Claims for which the Holder of such Asbestos PI-AO Claim elects the Litigation Option or the Canadian Litigation Option, as applicable.

91100-001\DOCS_DE:104617.1

CC-BLG004126

### 4.7.3   Payments and Distributions Under the Plan

Section 7.3 of the Plan sets forth the mechanics of Asbestos Trust payments and Plan Distributions.  Among other things Section 7.3 provides that payments to Holders of Allowed Asbestos Claims shall be made by the Asbestos Trust in accordance with the Asbestos Trust Agreement, the respective TDPs, the CMO and the Canadian Litigation Procedure as applicable. All Distributions or payments required or permitted to be made under the Plan (other than to Professionals) shall be made by the Reorganized Debtors in accordance with the treatment specified for each such Holder as specified in the Plan (unless otherwise ordered by the Bankruptcy Court).

### 4.7.4   Delivery of Distributions and Undeliverable or Unclaimed Distributions

Section 7.4 of the Plan provides that payments by the Asbestos Trust to Holders of Allowed Asbestos Claims shall be made in accordance with the Asbestos Trust Agreement and the respective TDPs, while other Distributions to Holders of Allowed Claims shall be made at the address of the Holder of such Claim as set forth on the Schedules, unless superseded by a new address, or as set forth in a further writing, including a filed proof of Claim.  Section 7.4 of the Plan also provides for a mechanism to deal with undeliverable Distributions.

### 4.7.5   Payments under the Plan

Section 7.5 of the Plan deals with the manner of payments under the Plan and provides a mechanism to deal with fractional payments.

### 4.7.6   Occurrence of the Confirmation Date

Section 7.6 of the Plan sets forth conditions precedent to confirmation of the Plan.  The Court must make all of the findings of fact and/or conclusions of law listed in Section 7.6.1 before confirmation of the Plan.  Among other things, these findings of fact and/or conclusions of law relate to: (1) the Court having found that the aggregate of the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund is not greater than one billion, four hundred eighty three million dollars ($1,483,000,000), (2) the Court having found the Asbestos PI-AO Class Fund is not greater than one hundred thirty million dollars ($130,000,000), (3) compliance with all applicable subsections of Bankruptcy Code § 524(g), (4) effectiveness of the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement, (5) a finding that the Reorganized Debtors have the ability to pay and satisfy in the ordinary course of business all of their respective obligations and liabilities as required by the Plan, the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement, (6) the unimpaired status of the classes of Asbestos Claims, (7) the effectiveness of the various injunctions provided for in the Plan, (8)  insurance matters, and (9) the lack of preclusive effect of certain asbestos-related litigation.

Section 7.6.2 of the Plan requires certain orders - including the Confirmation Order, the CMO and an order approving the Sealed Air Settlement Agreement - all in form and substance acceptable to the Debtors be entered prior to or in conjunction with Plan confirmation.  The Confirmation Order and the Sealed Air Settlement Agreement shall also be in a form and

91100-001\DOCS_DE:104617.1

CC-BLG004127

substance acceptable to the other Plan Proponents. In addition, the Court shall have entered the Estimation Order in form and substance acceptable to the Plan Proponents, including the following findings:

- the Asbestos PI-SE Class Fund shall constitute the maximum amount that shall be required to be paid in order to pay in full all Allowed Asbestos PI-SE Claims;

- the Asbestos PD Class Fund shall constitute the maximum amount that shall be required to be paid in order to pay in full all Allowed Asbestos PD Claims; and

- the Asbestos Trust Expenses Fund shall constitute the maximum amount that shall be required to be paid in order to pay in full all expenses of the Asbestos Trust.

Assuming that other conditions precedent under the Plan are fulfilled, the Debtors would be willing to have the Plan confirmed if the Court finds that the aggregate of the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund, and the Asbestos Trust Expenses Fund is not greater than $1,483,000,000, and that the Asbestos PI-AO Class Fund is not greater than $130,000,000. However, such amounts do not represent the Debtors' estimate of their asbestos-related liabilities. In fact, through the use of the estimation process provided for under the Estimation Motion, the Debtors believe their actual asbestos-related liabilities may be significantly lower.

### 4.7.7    Conditions to Occurrence of the Effective Date

Section 7.7 of the Plan sets forth conditions precedent to the Effective Date of the Plan, including entry of the Confirmation Order as specified, entry of the Recognition Order approving or recognizing the Confirmation Order, affirmation of the various injunctions specified in the Plan, filing of the necessary corporate documents, obtaining the necessary exit financing, and obtaining other various documents or agreements.

### 4.7.8    Management of the Reorganized Debtors

Section 7.8 of the Plan sets forth the post-confirmation governance of the Reorganized Debtors, including specifications relating to the Board of Directors of the Reorganized Parent.

### 4.7.9    Corporation Action

Section 7.9 of the Plan details corporate actions that must be taken in connection with the Plan.

### 4.7.10    Effectuating Documents and Further Transactions

Section 7.10 of the Plan authorizes each of the officers of the Debtors and the Reorganized Debtors to execute, deliver, file, or record such agreements or documents and to take such actions as may be necessary or appropriate, for and on behalf of the Debtors and the Reorganized Debtors, to effectuate the Plan.

66

CC-BLG004128

### 4.7.11  Allocation of Plan Distributions Between Principal and Interest

Section 7.11 of the Plan allocates Plan Distributions between principal and interest.

### 4.7.12  No Successor Liability

Section 7.12 of the Plan provides the following: except as otherwise expressly provided in the Plan, the Debtors, the Reorganized Debtors, the Asbestos PI Committee, the Asbestos PD Committee, the FCR, and the Asbestos Protected Parties will not, pursuant to the Plan or otherwise, assume, agree to perform, pay, or indemnify creditors or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any of the Debtors' past or present Affiliates, as such liabilities or obligations may relate to or arise out of the operations of or assets of the Debtors or any of the Debtors' past or present Affiliates or any of their respective successors, whether arising prior to, or resulting from actions, events, or circumstances occurring or existing at any time prior to the Confirmation Date.  Neither the Asbestos Protected Parties, the Reorganized Debtors, nor the Asbestos Trust is, or shall be, a successor to the Debtors or any of the Debtors' past or present Affiliates by reason of any theory of law or equity, and none shall have any successor or transferee liability of any kind or character, except that the Reorganized Debtors and the Asbestos Trust shall assume the obligations specified in the Plan and the Confirmation Order.

Except as otherwise expressly provided in the Plan, effective automatically on the Effective Date, the Asbestos Protected Parties and their respective Representatives shall be unconditionally, irrevocably and fully released from any and all Claims and causes of action, including Claims and causes of action arising under Chapter 5 of the Bankruptcy Code or similar Claims or causes of action arising under state or any other law, including, if applicable, claims in the nature of fraudulent transfer, successor liability, corporate veil piercing, or alter ego-type claims, as a consequence of transactions, events, or circumstances involving or affecting the Debtors or the Canadian Affiliates (or any of their predecessors) or any of their respective businesses or operations that occurred or existed prior to the Effective Date.

### 4.7.13  Deemed Consolidation of the Debtors for Plan Purposes Only

Section 7.13 of the Plan provides for the substantive consolidation of the Debtors as follows: subject to the occurrence of the Effective Date, the Debtors shall be deemed consolidated under the Plan for Plan purposes only.  Each and every Claim Filed or to be Filed against any of the Debtors shall be deemed Filed against the deemed consolidated Debtors and shall be deemed one Claim against and obligation of the deemed consolidated Debtors.

Such deemed consolidation, however, shall not (other than for purposes related to funding Distributions under the Plan and as set forth above in Section 7.13 of the Plan) affect: (i) the legal and organizational structure of the Debtors; (ii) any Encumbrances that are required to be maintained under the Plan (A) in connection with executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been or will be assumed, (B) pursuant to the Plan, or (C) in connection with any Exit Financing; (iii) the Sealed Air Settlement Agreement; and (iv) the Fresenius Settlement Agreement.

91100-001\DOCS_DE:104617.1

CC-BLG004129

Notwithstanding anything contained in the Plan to the contrary, the deemed consolidation of the Debtors shall not have any effect on any of the Claims (other than Asbestos Claims) being reinstated and left unimpaired under the Plan, and the legal, equitable, and contractual rights to which the Holders of any such Claims (other than Asbestos Claims) are entitled shall be left unaltered by the Plan.

Such limited substantive consolidation will have no economic impact on recovery to Claimants as the Debtors are paying all Claims in full. Forgiveness of Intercompany Claims, therefore, would not result in an increased recovery to the Debtors' creditors.

### 4.8    Injunctions, Releases and Discharge

Section 7.12 and Article 8 of the Plan work together to shield the Debtors and certain other parties from any liability for any Claims dealt with under the Plan.

Several parties have raised objections to the releases provided by Section 8.7 and 8.4 Released Matters Injunction of the Plan, alleging that they go beyond the scope of permissible releases under applicable law. The Debtors disagree. The parties reserve their rights with respect to the release objections until the hearing on confirmation of the Plan.

Article 8 of the Plan provides the following:

#### 4.8.1    Discharge

##### 4.8.1.1 Discharge of the Debtors and Related Discharge Injunction

The rights afforded in the Plan and the treatment of all Claims, Demands and Equity Interests in the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Claims, Demands and Equity Interests of any nature whatsoever, including any interest accrued thereon from and after the Petition Date, against the Debtors and the Debtors in Possession, or their assets, properties, or interests in property. Except as otherwise provided in the Plan, on the Effective Date, all Claims, Demands against, and Equity Interests in the Debtors and the Debtors in Possession shall be satisfied, discharged, and released in full. The Reorganized Debtors shall not be responsible for any obligations of the Debtors or the Debtors in Possession except those expressly assumed by the Reorganized Debtors pursuant to the Plan. All Entities shall be precluded and forever barred from asserting against the Debtors and the Reorganized Debtors, or their assets, properties, or interests in property any other or further Claims or Demands based upon any act or omission, transaction, or other activity, event, or occurrence of any kind or nature that occurred prior to the Effective Date, whether or not the facts of or legal bases therefor were known or existed prior to the Effective Date, except as expressly provided in the Plan.

With respect to any debts discharged by operation of law under Bankruptcy Code §§ 524(a) and 1141, the discharge of the Debtors operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover, or offset any such debt as a personal liability of the Debtor, whether or not the discharge of such debt is waived; provided, however, that the obligations of the Reorganized Debtors under the Plan are not so discharged.

91100-001\DOCS_DE:104617.1

CC-BLG004130

### 4.8.1.2 Discharge of Liabilities to Holders of Asbestos Claims

The transfer to, vesting in, and assumption by the Asbestos Trust of the Asbestos Trust Assets as contemplated by the Plan, among other things, shall (i) discharge the Debtors, the Reorganized Debtors and their Representatives for and in respect of all Asbestos Claims and (ii) discharge, release, and extinguish all obligations and liabilities of the Asbestos Protected Parties and Asbestos Insurance Entities for and in respect of all Asbestos Claims, subject to the reservations listed in Section 8.3.2 in the Plan. On the Effective Date, the Asbestos Trust shall assume the liabilities of the Debtors with respect to all Asbestos Claims and shall pay the Allowed Asbestos Claims in accordance with the Asbestos Trust Agreement and the appropriate TDPs.

### 4.8.1.3 Disallowed Claims and Disallowed Equity Interests

On and after the Effective Date, the Debtors, the Reorganized Debtors and their Representatives shall be fully and finally discharged of any liability or obligation on a Disallowed Claim or Disallowed Equity Interest, and any order creating a Disallowed Claim that is not a Final Order as of the Effective Date solely because of an Entity's right to move for reconsideration of such order pursuant to Bankruptcy Code § 502 or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date.

### 4.8.1.4 Non-Dischargeable ERISA Liability

The Parent is a controlled group member within the meaning of 29 U.S.C. § 1301(a)(14) and may also be a contributing sponsor of one or more ongoing, defined benefit pension plans to which Title IV of ERISA applies (the "Pension Plans"). The Debtors intend, and the Plan contemplates, that the Reorganized Debtors will continue to be the contributing sponsor of all the Pension Plans that they currently sponsor. Each of the Pension Plans is a defined benefit pension plan insured by the Pension Benefit Guaranty Corporation ("PBGC") under ERISA. The Pension Plans are subject to minimum funding requirements of ERISA and Section 412 of the IRC. The PBGC believes the Pension Plans to be underfunded on a termination basis. As of their April 2004 Form 4010 Filings with the PBGC, the Debtors Actuarial Information Certification indicates the total unfunded status of the Pension Plans was $394.2 million as of December 31, 2003. An underfunded pension plan can terminate only in either a distress termination or PBGC-initiated termination under Title IV of ERISA. Should the Pension Plans terminate, the PBGC may assert claims for the underfunding, for any unpaid minimum funding contributions owed the Pension Plan, and for any unpaid premiums owed the PBGC. The PBGC further asserts that portions of those claims would be entitled to priority status.

Nothing contained in the Plan, Confirmation Order, the Bankruptcy Code (including Bankruptcy Code § 1141), or any other document Filed in the Chapter 11 Cases shall be construed to discharge, release or relieve the Debtors, or any other party, in any capacity, from any liability or responsibility to the PBGC with respect to the Pension Plans under any law, governmental policy, or regulatory provision. The PBGC shall not be enjoined or precluded from enforcing such liability or responsibility, as a result of any of the provisions of the Plan (including those provisions providing for exculpation, satisfaction, release and discharge of Claims), the Confirmation Order, the Bankruptcy Code (including Bankruptcy Code § 1141), or any other document Filed in the Chapter 11 Cases. Notwithstanding the foregoing, neither the

69

CC-BLG004131

PBGC nor any other Entity shall assert any liability or responsibility with respect to the Pension Plans under any law, governmental policy or regulatory provisions against, and such liability or responsibility shall not attach to, the Asbestos Trust or any of the Asbestos Trust Assets.

### 4.8.2    The Asbestos Channeling Injunction

In order to supplement, where necessary, the injunctive effect of the discharge provided by Bankruptcy Code §§ 1141 and 524(a) and as described in Article 8 of the Plan, and pursuant to the exercise of the equitable jurisdiction and power of the Court under Bankruptcy Code §§ 524(g) and 105(a), the Confirmation Order shall provide for issuance of the Asbestos Channeling Injunction to take effect as of the Effective Date. On and after the Effective Date, the sole recourse of the Holder of an Asbestos Claim on account of such Claim shall be to the Asbestos Trust pursuant to the provisions of the Asbestos Channeling Injunction and the appropriate TDPs and such Holder shall have no right whatsoever at any time to assert its Asbestos Claim against the Debtors, the Canadian Affiliates, the Reorganized Debtors, any other Asbestos Protected Party, or any property or interest (including any Distributions made pursuant to the Plan) in property of the Debtors, the Reorganized Debtors, or any other Asbestos Protected Party. Without limiting the foregoing, from and after the Effective Date, the Asbestos Channeling Injunction shall apply to all present and future Holders of Asbestos Claims, and all such Holders permanently and forever shall be stayed, restrained, and enjoined from taking any of the following actions for the purpose of directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Asbestos Claims other than from the Asbestos Trust in accordance with the Asbestos Channeling Injunction and pursuant to the Asbestos Trust Agreement and the appropriate TDPs, including:

(a)    commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or affecting any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party;

(b)    enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party;

(c)    creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party;

(d)    setting off, seeking reimbursement of, indemnification or contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party; and

(e)    proceeding in any other manner with regard to any matter that is subject to resolution pursuant to the Asbestos Trust, except in conformity and compliance with the Asbestos Trust Agreement and the appropriate TDPs.

91100-001\DOCS_DE:104617.1

CC-BLG004132

Notwithstanding anything to the contrary above, this Asbestos Channeling Injunction shall not enjoin the rights of Entities to the treatment accorded them under Article 3 of the Plan, as applicable, including the rights of Entities with Asbestos Claims to assert such Asbestos Claims in accordance with the appropriate TDPs.

Except as otherwise expressly provided in the Plan, the Sealed Air Settlement Agreement, or the Fresenius Settlement Agreement, nothing contained in the Plan shall constitute or be deemed a waiver of any claim, right, or cause of action that the Debtors, the Canadian Affiliates, the Reorganized Debtors, or the Asbestos Trust may have against any Entity in connection with or arising out of or related to any Asbestos Claim.

### 4.8.3   Asbestos Insurance Entity Injunction

Pursuant to the exercise of the equitable jurisdiction and power of the Court under Bankruptcy Code § 105(a), the Confirmation Order shall provide for issuance of the Asbestos Insurance Entity Injunction to take effect as of the Effective Date.

#### 4.8.3.1 Injunction

(a)    All Entities that have held or asserted, that hold or assert, or that may in the future hold or assert any Claim, Demand, or cause of action, against any Asbestos Insurance Entity, based upon, relating to, arising out of, or in any way connected with any Claim, Demand, Asbestos Insurance Rights, Asbestos Insurance Policies, or Asbestos Insurance Settlement Agreements, whenever and wherever arisen or asserted (including all Claims in the nature of or sounding in tort, or under contract, warranty, or any other theory of law, equity, or admiralty) shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such Claim, Demand, or cause of action, including:

(i)    commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or affecting any Asbestos Insurance Entity, or any property or interest in property of any Asbestos Insurance Entity;

(ii)    enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Asbestos Insurance Entity, or any property or interest in property of any Asbestos Insurance Entity;

(iii)    creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Asbestos Insurance Entity, or any property or interest in property of any Asbestos Insurance Entity;

(iv)    setting off, seeking reimbursement of, indemnification or contribution from, or subrogation against, or otherwise recouping in any

71

CC-BLG004133