IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

**Responses Due: July 3, 2008 at 4:00 p.m.**
**Hearing Date: July 21, 2008 at 1:00 p.m.**

### NOTICE OF DEBTORS' OBJECTION TO THE UNSECURED CLAIMS ASSERTED UNDER THE DEBTORS' CREDIT AGREEMENTS DATED AS OF MAY 14, 1998 AND MAY 5, 1999

On or about June 13, 2008, the above-captioned debtors and debtors in possession

(the "Debtors") filed the *Debtors' Objection to the Unsecured Claims Asserted Under the*

*Debtors' Credit Agreements Dated as of May 14, 1998 and May 5, 1999* (the "Objection") with

the United States Bankruptcy Court for the District of Delaware.  The Debtors will serve copies

of the Objection (with all Exhibits) on (i) the Office of the United States Trustee; (ii) JPMorgan

Chase (iii) counsel to the ad hoc group of Lenders; (iv) counsel to each of the official committees

---

[1] The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

91100-001\DOCS_DE:137759.1

appointed by the United States Trustee; (v) counsel for the Future Claimants' Representative;
(vi) counsel to the debtor in possession lender; and (vii) all parties who have requested notice
pursuant to Bankruptcy Rule 2002. Responses to the relief requested in the Objection, if any,
must be in writing and be filed with the Bankruptcy Court no later than 4:00 p.m. (prevailing
Eastern time) on **July 3, 2008.**

       If you file a response to the Objection, at the same time, you must also serve a
copy of the response upon the following parties: (i) co-counsel for the Debtors, Janet S. Baer,
Kirkland & Ellis LLP, 200 East Randolph Drive, Chicago, Illinois 60601, Theodore L.
Freedman, Kirkland & Ellis LLP, Citigroup Center, 153 East 53rd Street, New York, New York
10022 and James E. O'Neill, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th
Floor, P.O. Box 8705, Wilmington, DE  19899-8705 (Courier 19801); (ii) counsel to the Official
Committee of Unsecured Creditors, Lewis Kruger, Stroock & Stroock & Lavan, 180 Maiden
Lane, New York, NY  10038-4982, and Michael R. Lastowski, Duane, Morris & Heckscher,
LLP, 1100 N. Market Street, Suite 1200, Wilmington, DE  19801-1246; (iii) counsel to the
Official Committee of Property Damage Claimants, Scott L. Baena, Bilzin, Sumberg, Dunn,
Baena, Price & Axelrod, First Union Financial Center, 200 South Biscayne Boulevard, Suite
2500, Miami, FL  33131, and Michael B. Joseph, Ferry & Joseph, P.A., 824 Market Street, Suite
904, P.O. Box 1351, Wilmington, DE  19899; (iv) counsel to the Official Committee of Personal
Injury Claimants, Peter Van L. Lockwood, Caplin & Drysdale, Chartered, One Thomas Circle,
N.W., Washington, DC 20005, and Mark T. Hurford, Campbell & Levine, LLC, 800 N. King
Street, Suite 300, Wilmington, DE  19801; (v) counsel to the Official Committee of Equity
Holders, Gary Becker, Kramer Levin Naftalis & Frankel LLP, 919 Third Avenue, New York,

91100-001\DOCS_DE:137759.1

CC-BLG004248

NY 10022, and Teresa K.D. Currier, Buchanan, Ingersoll & Roney, P.C., 1000 West Street,

Suite 1410, P.O. Box 1397, Wilmington, DE 19899-1397; (vi) counsel to the Future Claimants'

Representative, Richard H. Wyron, Orrick, Herrington & Sutcliffe, LLP, 1152 15th Street, NW,

Washington, DC 20005, and John C. Phillips, Jr., Phillips, Goldman & Spence, P.A., 1200

North Broom Street, Wilmington, DE 19806; and (vii) the Office of the United States Trustee,

Attn: David Klauder, 844 N. King Street, Wilmington, DE 19801.

Any response should contain the following:

A.   a caption setting forth the name of the Court, the name of the Debtors, the case number, and the title of the Objection to which the Response is directed;

B.   the name of the claimant, his/her/its claim number, and a description of the basis for the amount of the claim;

C.   the specific factual basis and supporting legal argument upon which the party will rely in opposing the Objection;

D.   any supporting documentation, to the extent it was not included with the proof of claim previously filed with the Clerk or Claims Agent, upon which the party will rely to support the basis for and amounts asserted in the proof of claim;

E.   the name, address, telephone number, and fax number of the person(s) (which may be the claimant or the claimant's legal representative) with whom counsel for the Debtors should communicate with respect to the claim or the objection and who possesses authority to reconcile, settle, or otherwise resolve the objection to the Disputed Claim on behalf of the claimant.

If you file a response to the Objection, you should be prepared to argue that

response at the July 21, 2008 hearing (the "Claims Hearing") unless you reach an agreement with

the Debtors' counsel to continue or resolve your matter. You need not respond to the Objection

or appear at the Claims Hearing if you do not object to the relief requested in the Objection. If

you do not timely file and serve a response to the Objection, the relief requested in the Objection

91100-001\DOCS_DE:137759.1

CC-BLG004249

may be granted without further notice to you.  Failure to timely file a response to the Objection shall be deemed (i) a waiver of your right to respond to the Objection and (ii) your consent to the relief requested in the Objection respecting your claim.

IF NO RESPONSES ARE TIMELY FILED AND SERVED IN ACCORDANCE WITH THIS NOTICE, THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED BY THE OBJECTION WITHOUT FURTHER NOTICE OR HEARING.

IN THE EVENT THAT ANY OBJECTION OR RESPONSE IS FILED AND SERVED IN ACCORDANCE WITH THIS NOTICE, A HEARING ON THE OBJECTION WILL BE HELD BEFORE THE HONORABLE JUDITH K. FITZGERALD, AT THE UNITED STATES BANKRUPTCY COURT, 824 MARKET STREET, WILMINGTON, DELAWARE 19801 ON **JULY 21, 2008 AT 1:00 P.M.** PREVAILING EASTERN TIME.

*[Remainder of Page Intentionally Left Blank]*

4

CC-BLG004250

The Debtors reserve the right to file and serve a reply to a claimant's response. **If you have any questions regarding your claim(s) you should contact BMC at (888) 909-0100.**

**If you have any questions regarding the Objection, please call Janet S. Baer at 312-861-2000.**

Dated:  June 13, 2008

Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Theodore L. Freedman
200 East Randolph Drive
Chicago, IL  60601
(312) 861-2000

and

PACHULSKI STANG ZIEHL & JONES LLP

*James E O'Neill*

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Kathleen P. Makowski (Bar No. 3648)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
(302) 652-4100

Co-Counsel for Debtors and Debtors in Possession

91100-001\DOCS_DE:137759.1

CC-BLG004251

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| W. R. GRACE & CO., et al. [1] | ) | |
| | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

**Hearing Date: July 21, 2008 at 1:00 p.m.**
**Responses Due: July 3, 2008 at 4:00 p.m.**

## DEBTORS' OBJECTION TO THE UNSECURED
## CLAIMS ASSERTED UNDER THE DEBTORS' CREDIT
## AGREEMENTS DATED AS OF MAY 14, 1998 AND MAY 5, 1999

The above-captioned debtors (the "Debtors") object to the claims of their prepetition

bank lenders, Claim Nos. 9159 and 9168 (together, the "Proofs of Claim"), filed by JPMorgan

Chase Bank ("JPMorgan Chase"), in its capacity as agent for the lenders (collectively, the

"Lenders") under (i) a Credit Agreement dated as of May 14, 1998, as amended, among W. R.

Grace & Co., W. R. Grace & Co.-Conn., the Banks Party Thereto, JPMorgan Chase (then known

---

[1]    The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

CC-BLG004252

as The Chase Manhattan Bank), as Administrative Agent, and Chase Securities Inc., as Arranger (the "1998 Credit Agreement") and (ii) a 364-Day Credit Agreement, dated as of May 9, 1999, as amended, among W. R. Grace & Co., W. R. Grace & Co.-Conn., the Banks Party Thereto, Bank of America National Trust and Savings Association, as Documentation Agent, JPMorgan Chase (then known as The Chase Manhattan Bank), as Administrative Agent, and Chase Securities Inc., as Book Manager (the "1999 Credit Agreement"). In support of this Objection, the Debtors state the following:

### Preliminary Statement

1.      The Debtors recently received notice from the Lenders demanding the payment of postpetition interest at <u>100% of the contract default rate</u> on more than $500 million of prepetition claims against the Debtors under the 1998 and 1999 Credit Agreements as set forth in the Proofs of Claim. There is absolutely no basis to support this demand.

2.      As a threshold matter, the Lenders' position hinges entirely on the <u>presumption</u> that the Debtors are solvent as a matter of fact and law. But that presumption is only that and stands in service solely of the Lenders' demand for default interest. Since the very first day of these cases, the single overriding issue has been whether the Debtors' putative liability on account of asbestos personal injury claims renders the Debtors insolvent. While the Debtors would agree the value of that liability does not render them insolvent, the Official Committee of Asbestos Personal Injury Claimants (the "Asbestos Claimants Committee") and the Future Claims Representative have taken a very different view and have asserted values for their claims that would make the Debtors insolvent.

3.      Ultimately, after extensive litigation during the recent estimation proceedings, the Debtors, the Asbestos Claimants Committee, the Future Claims Representative and the Equity Committee reached the only type of settlement that was feasible under these circumstances –one

2

CC-BLG004253

that did not require agreement to any particular estimate of liability or adjudication of solvency. The settlement is a delicately balanced one, which contemplates a substantial payment by the Debtors to a section 524(g) trust, but also permits the Debtors' shareholders to retain an interest in the reorganized Debtors. The settlement does not even address the issue of solvency. The settlement is a compromise predicated upon resolving all issues and allocating values to various constituencies. Significantly, as a corollary to that settlement, this Court is not required to make any determination regarding the Debtors' solvency. The Lenders' demand for interest at the default rate represents an attempt to leverage this settlement into a claim as to which they are simply not entitled.

4. As such, the Lenders' demand is inherently in conflict with the proposed resolution of these cases. In that resolution, all constituencies have agreed to stand down from the litigation process. The asbestos personal injury claimants also have agreed to accept a certain value for their claims. Critically, the Debtors' equity holders have agreed to accept a certain value and, in exchange, will not insist that the Debtors continue the estimation process, notwithstanding that under the proposed settlement the equity holders will receive far less than what the Debtors' estimate in the litigation would call for. While the Lenders might prefer that equity accept a larger haircut, the fact is that it is within the rights of equity holders to insist upon continued litigation of the asbestos personal injury claims to resolve that issue.

5. As is made clear by their notice, the Lenders would also have this Court believe that, if solvency is established, the Lenders are <u>automatically</u> entitled to postpetition interest at the contract rate of default. That, of course, is not an accurate statement of the law. To the contrary, this Court has wide discretion in determining the appropriate rate of postpetition interest, and any analysis in that regard must take into account <u>all equitable considerations</u>. As

3

CC-BLG004254

set forth below, in light of the relevant equitable considerations here, the Lenders cannot argue that they are entitled to an award of postpetition interest at the highest contract default rate. By definition, and in fact, such an award can hardly be considered fair and equitable under the circumstances.

6.    For all these reasons, the Debtors' Objection should be sustained, and this Court should find that the Lenders are <u>not</u> entitled to postpetition interest at the contract default rate in connection with their Proofs of Claim.

### Jurisdiction

7.    This Court has jurisdiction over this matter under 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A) and (O).

8.    The statutory bases for relief requested herein include 11 U.S.C. §§ 105(a), 502(b), 726 and 1129 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>") and Rules 3001 and 3007 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

### Relief Requested

9.    The Debtors seek entry of an order disallowing the Proofs of Claim to the extent that they assert a right to recovery of postpetition interest calculated at the default rate of interest under the 1998 and 1999 Credit Agreements.

### Statement of Facts

10.    The Debtors, who filed for bankruptcy protection on April 2, 2001 (the "<u>Petition Date</u>"), are borrowers under the Credit Agreements with the Lenders. JPMorgan Chase serves as the administrative agent for the Lenders under the 1998 and 1999 Credit Agreements. As of the Petition Date, there were no defaults under the Credit Agreements.

4

CC-BLG004255

11.     On March 27, 2003, JPMorgan Chase filed the Proofs of Claim on behalf of the Lenders with respect to both the 1998 and 1999 Credit Agreements.  (A copy of the Proof of Claim with respect to the 1998 Credit Agreement is attached hereto as Exhibit A; a copy of the Proof of Claim with respect to the 1999 Credit Agreement is attached hereto as Exhibit B).  The Proofs of Claim assert an outstanding aggregate principal amount owing under the Credit Agreements of not less than $500 million, together with prepetition interest, postpetition interest, and other fees and expenses.  The Lenders' claim for postpetition interest is the primary subject of this Objection.

12.     More specifically, although the Proofs of Claim are silent as to the claimed rate of postpetition interest, the Lenders have recently made clear that they are demanding postpetition interest at the contract default rate under the Credit Agreements, which was 7.77% as of the Petition Date.[2]  To put that rate in perspective, the non-default contract rate of interest under the Credit Agreements as of the Petition date was 5.77%,[3] and the federal judgment rate of interest at that time was 4.19%.

13.     As this Court is well aware, from the outset, the Debtors' solvency has always been the primary issue in these chapter 11 cases.  One of the biggest challenges facing these Debtors, and their viability, has been determining the extent of their liability related to asbestos personal injury claims pending as of the Petition Date and arising thereafter (the "Asbestos PI

---

[2]     Under both the 1998 and 1999 Credit Agreements, the default rate of interest is 2% above the stated contract rate.  The Lenders may try to argue that the 2% spread between the default rate and the contract rate is de minimis and weighs in favor of granting their request for default interest.  The 2% spread, though, is far from de minimis.  Indeed, payment of default interest could result in an increased payment to the Lenders of over $100 million due to the large principal amount outstanding and the duration of these chapter 11 cases.

[3]     Under the 1999 Credit Agreement, the contract rate of interest as of the Petition Date was LIBOR plus 100 basis points.  Under the 1998 Credit Agreement, it was LIBOR plus 40 basis points.

DOCS_DE:138088.1

CC-BLG004256

Claims"), which in turn directly affects the Debtors' solvency. The Debtors, with the support of the Official Committee of Equity Security Holders (the "Equity Committee"), litigated the valuation issue aggressively and extensively in the recent estimation proceeding. To date, this litigation has dominated these chapter 11 cases. But, in an effort to bring this case to closure, the Debtors, the Asbestos Claimants Committee, the Future Claims Representative and the Equity Committee agreed to settle the Debtors' liability for the Asbestos PI Claims (the "Proposed Asbestos Settlement"). The terms and conditions of the Proposed Asbestos Settlement are memorialized in a Term Sheet for Resolution of Asbestos Personal Injury Claims, dated April 6, 2008, by and among the Debtors, the Equity Committee, the Asbestos Claimants Committee and the Future Claimants Representative, which contemplates implementation of the Proposed Asbestos Settlement in the context of a chapter 11 plan.

14.    The term sheet for the Proposed Asbestos Settlement contemplates that equity holders will receive an interest in the Debtors under the Plan (a concession by the asbestos personal injury claimants) but that equity's position will be substantially diluted by the issuance of the warrant and the potential deferred asbestos payments (a concession by the equity holders). Solvency is not addressed in the settlement.

15.    One of the key components of the Proposed Asbestos Settlement is the postpetition rate of interest to be paid to the Lenders under the 1998 and 1999 Credit Agreements. In that regard, the Proposed Asbestos Settlement provides that the Lenders shall receive "100% of allowed amount plus . . . postpetition interest at the rate of 6.09% from the filing date through December 31, 2005 and thereafter at floating prime, in each case compounded quarterly" (the "Negotiated Bank Debt Interest Rate"). (A copy of the Proposed Asbestos Settlement is attached hereto as Exhibit C.)

6

CC-BLG004257

16.     The prior course of dealing between the Debtors and all stakeholders, including the Lenders, explains the Negotiated Bank Debt Interest Rate.  In particular, in January 2005, the Creditors' Committee, which represents the interests of these Lenders (and others), agreed to become co-proponents of a plan of reorganization that, critically, both provided value for equity and offered the Lenders postpetition interest at a rate (6.09%) that was more than the base contract rate, but was not the default rate.  There was no agreement to pay the Lenders interest at the contract default rate.  In February 2006, the Creditors' Committee again acknowledged that the Lenders had agreed to  accept postpetition interest at 6.09% from the Petition Date through December 31, 2005, and, going forward, further agreed that the Lenders would accept postpetition interest at a floating prime rate (compounded quarterly) in conjunction with an overall settlement under a chapter 11 plan.

17.     However, now that the Debtors are getting closer to emerging from chapter 11, the same Negotiated Bank Debt Interest Rate no longer is acceptable to the Lenders.  In fact, notwithstanding their prior agreement and after benefiting from the several years that the Debtors spent litigating the Asbestos PI Claims, on April 21, 2008, the Lenders sent the Debtors a letter rejecting the Negotiated Bank Debt Interest Rate reflected in the Proposed Asbestos Settlement and demanding interest at the contract default rate.  In that demand, the Lenders took the position that they are entitled to this exorbitant rate of interest as a matter of law.  The Lenders also asserted that the previous proposed plan and related negotiations were completely irrelevant, notwithstanding that the Debtors negotiated the Proposed Asbestos Settlement in reliance upon the Lenders' previous agreements.  To date, despite in-person meetings and negotiations, the Lenders have shown no inclination to withdraw their demand.

7

CC-BLG004258

18.    Accordingly, because the Lenders' exorbitant demand is <u>inequitable</u>, and immediately threatens the Proposed Asbestos Settlement, this Objection ensued.

<b><u>Argument</u></b>

19.    The analysis as to the appropriate rate of postpetition, or pendency, interest on account of unsecured claims starts with section 502(b)(2) of the Bankruptcy Code, which prohibits allowance of a claim for "unmatured interest." 11 U.S.C. § 502(b)(2). In other words, under the plain text of the Bankruptcy Code, the Lenders are not entitled to any postpetition interest much less interest accruing at the default rate. There are two exceptions to the general prohibition against pendency interest for unsecured claims, both of which are only applicable in solvent debtor cases. The first results from the "best interests" test of section 1129(a)(7), and the second results from the "fair and equitable" requirement of section 1129(b). Here, given that the Debtors' solvency is still in dispute, this Court need not look beyond section 502(b)(2) to conclude that the Lenders are not entitled to <u>any</u> postpetition interest, let alone interest at the contract <u>default</u> rate. Nor would payment of postpetition interest at the contract default rate be warranted under the "best interests" test, and it certainly would not be "fair and equitable" under the circumstances here. Thus, the 6.09% rate included in the term sheet stands by the Debtor's course of dealings with the Lenders, is more generous than the law arguably provides, and is plainly equitable.

<b>I.</b>

<b><u>The Lenders Are Not Entitled To Any Postpetition Interest Under Section 502(b)(2).</u></b>

20.    Section 502 of the Bankruptcy Code governs the allowance of claims and interests in chapter 11 cases. Section 502(b)(2) expressly provides that a proof of claim shall not be allowed if "such claim is for unmatured interest." 11 U.S.C. § 502(b)(2). That is exactly what we have here.

8

CC-BLG004259

21.     The Proofs of Claim make clear that the Lenders are seeking postpetition interest on claims for principal of more than $500 million.  The Lenders' notice of April 21, 2008, adds that the rate of postpetition interest sought by the Lenders is the contract default rate under the 1998 and 1999 Credit Agreements.  Because the Debtors were not in default of the Credit Agreements as of the Petition Date, the postpetition or future interest was not due and payable. As result, the Lenders' claim for "postpetition interest" is undoubtedly a "claim . . for unmatured interest," and thus this aspect of the Lenders' Proofs of Claims must be denied pursuant to section 502(b) of the Bankruptcy Code.

22.     Although there are limited exceptions to the rule denying the payment of postpetition interest on account of unsecured claims -- which exceptions are discussed below -- this Court need not consider those exceptions here.  This is so because those exceptions only apply in cases where the debtor's solvency has been established.  That is not this case. Notwithstanding the Lenders' "presumption" of solvency, the fact remains that the Debtors' actual solvency remains in dispute, has not yet been determined, and will never be determined unless the Proposed Asbestos Settlement falls through and the estimation litigation relating to the Asbestos PI Claims is revived and completed.

## II.

### The Lenders Are Not Entitled To Contract Default Interest Under Section 1129.

23.     The Lenders' notice demanding the contract default rate of interest makes clear that they intend to rely, at least in part, on exceptions to the denial of postpetition interest derived from the "best interests" test and the absolute priority rule's "fair and equitable" test under section 1129 of the Bankruptcy Code.  But these exceptions are not available to the Lenders.

24.     Most importantly, as discussed above, the Lenders' reliance on these exceptions hinges on their presumption that the Proposed Asbestos Settlement establishes the Debtors'

9

CC-BLG004260

solvency as a matter of fact and law. This presumption is flawed. First, it is black letter law that for the Lenders to be entitled to claim any postpetition interest under either test, the Debtors' solvency must be established, which is not the case here, and not merely presumed.

25.    Moreover, a key component of the Proposed Asbestos Settlement is the payment of postpetition interest to the Lenders at the rate of 6.09% from the petition date through December 31, 2005 and thereafter at floating prime. The Lenders have objected to that proposed rate of interest, and are instead demanding interest at the higher default rate under the Credit Agreements. In other words, the Lenders want to cherry pick among the terms of the Proposed Asbestos Settlement. They embrace the Proposed Asbestos Settlement to the extent they believe it helps them establish the Debtors' solvency, but they reject a material provision of the settlement, which is the payment of postpetition interest to the Lenders at a rate that is lower than their default contract rate, but higher than their non-default contract rate.

26.    The Lenders cannot have it both ways. The fact remains that the Debtors' solvency simply is neither agreed nor adjudicated. If the Lenders were to prevail on their demand for postpetition interest at the contract default rate, that would represent a material change to the Proposed Asbestos Settlement. In that event, the various stakeholders who currently support the Proposed Asbestos Settlement, such as the Equity Committee, would likely pull their support for the settlement. Were that to happen, the litigation over the Asbestos PI Claims would necessarily resume, which would add further expense and delay.

27.    Thus, the indefiniteness as to the Debtors' solvency and the corresponding fact that this is not a "solvent debtor" case, establishes that the "best interests" and "fair and equitable" exceptions are not applicable here. Moreover, an analysis of the relevant factors

DOCS_DE:138088.1

CC-BLG004261

demonstrates that such exceptions in no way support, much less mandate, an award to the Lenders of postpetition interest at the contract default rate.

**A.**     **The "Best Interests" Test Does Not Mandate A Default Rate Of Interest.**

28.     Under section 1129(a)(7), the so-called "best interests" test requires a plan of reorganization to provide each dissenting creditor or interest holder in an impaired class of claims with value that is not less than the amount such holder would receive if the debtor was liquidated under chapter 7. *See Kane v. Johns-Manville Corp., (In re Johns-Manville Corp.),* 843 F.2d 636, 649 (2d Cir. 1988) (holding that the presentation of liquidation analysis showing lesser probable recovery in chapter 7 satisfies section 1129(a)(7)). In essence, the best interests test contemplates a comparison of distributions under a proposed chapter 11 plan of reorganization with those that would be realized in a hypothetical chapter 7 liquidation. *See In re Jartran, Inc.,* 44 B.R. 331, 390 (Bankr. N.D. Ill. 1984). A chapter 7 liquidation, in turn, is governed by the priority scheme set forth in section 726 of the Bankruptcy Code. Under section 726(a)(5), in a chapter 7 liquidation, a creditor must receive pendency interest on its claim "at the legal rate from the date of the filing of the petition" before distributions may be made back to the debtor. 11 U.S.C. § 726(a)(5).

29.     The Bankruptcy Code does not define the "legal rate" of interest. Courts, however, have consistently interpreted the "legal rate" of interest to be the federal judgment rate. *See, e.g., In re Cardelucci,* 285 F.3d 1231, 1234-35 (9th Cir. 2002); *In re Coram Healthcare Corp.,* 315 B.R. 321, 346 (Bankr. D. Del. 2004) ("Most courts, however, conclude that [the legal rate] means the federal judgment rate") (citations omitted); *see also In re Adelphia Commc'ns,* Case No. 02-41729, Bench Ruling, tr. at 7 (Bankr. S.D.N.Y. April 27, 2006) (Gerber, J.) ("It is

11

CC-BLG004262

by far the better view, in my opinion, that 'legal rate' is the federal judgment rate and not the same as that authorized under section 506(b), which is a contract rate.").[4]

30.    As of the Petition Date, the federal judgment rate was 4.19%, which was below the contract rate and default rate under the 1998 and 1999 Credit Agreements at that time. Clearly, then, the Lenders cannot argue that the best interests test warrants the payment of pendency interest at the contract default rate. And, given that the best interests test requires a comparison of a chapter 11 plan treatment to the liquidation of a debtor, the Lenders may not even be entitled to *any* postpetition interest absent evidence that the Debtors would be solvent using a chapter 7 liquidation valuation. *See, e.g., In re Lisanti Foods, Inc.*, 329 B.R. 491, 500 (Bankr. D. N.J. 2005) ("In making [a section 1129(a)(7)] showing, the liquidation value of the debtor's assets is controlling."); *but see In re Coram Healthcare*, 315 B.R. at 345 ("In this case, though, it is relevant to compare the amount of debt to the confirmation value ($317 million) because the Debtors are reorganizing instead of liquidating."). There is simply no record that would support a presumption of the Debtors' solvency in a liquidation.

**B.    The "Fair and Equitable" Test Does Not Mandate A Default Rate Of Interest.**

31.    In addition to the application of section 726(a)(5) to chapter 11 cases through the best interests test, certain courts have required the payment of postpetition interest to unsecured creditors at a rate sufficient to satisfy the "fair and equitable" test within section 1129(b).[5] That section allows a bankruptcy court to confirm a plan of reorganization over the objection of a

---

[4]    A copy of Judge Gerber's bench ruling is attached hereto as Exhibit D.

[5]    Notably, these courts diverge from the leading bankruptcy treatise, which states that the federal judgment rate is the only interest rate required for determining the payment of postpetition interest. *See* 4 Collier on Bankruptcy ¶ 502.03[3][c] (15th ed. rev. 2008) ("[W]hen interest is payable because a debtor proves to be solvent, the proper rate of interest is the statutory or legal rate. The purpose for this rule is because allowing a contractual rate over the statutory rate would benefit some creditors over others.").

CC-BLG004263

dissenting class of creditors provided that the plan does not "discriminate unfairly" and is "fair and equitable." 11 U.S.C. § 1129(b); *see In re PPI Enters. (U.S.), Inc.*, 324 F.3d 197, 205 n.14 (3d Cir. 2003) ("An impaired creditor in a solvent debtor case can demand postpetition interest under the 'fair and equitable' test of § 1129(b)(2).") (citations omitted); *In re Butler*, 42 B.R. 777, 787 (Bankr. E.D. Ark. 1984) (holding that unsecured creditors of chapter 11 solvent debtor are entitled to postpetition interest for two reasons -- under section 1129(a)(7) and under the cram down requirements of section 1129(b)(1) that treatment of all classes of dissenting creditors be fair and equitable).

32.     The determination of the appropriate rate of postpetition interest under section 1129(b) is a <u>matter within the Court's discretion</u> and must be based on the <u>equitable</u> considerations of each particular case.  Indeed, the fair and equitable basis for postpetition interest traces back to the United States Supreme Court's decision in *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156 (1946), where the Court stated: "It is manifest that the touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been a balance of equities between creditor and creditor or between creditors and the debtor." *Id.* at 165.

33.     Courts have formulated different articulations for determining what rate of postpetition interest will satisfy the "fair and equitable" standard of section 1129(b).  In *Coram Healthcare*, Chief Judge Walrath applied what can best be termed a "bottom-up" approach that starts with the premise that the federal judgment rate represents the minimum rate of interest necessary to satisfy the "fair and equitable" standard of section 1129(b).  *In re Coram Healthcare Corp.*, 315 B.R. at 346.  As Chief Judge Walrath recognized, the federal judgment rate is merely the minimum, and the specific equities of a given case can compel the application

13

CC-BLG004264

of a higher rate of postpetition interest. *Id.* Of course, in that case, the federal judgment rate also turned out to be the maximum. The Sixth Circuit, on the other hand, has articulated what can be termed a "top-down" approach, which starts with the presumption "that default interest should be paid to unsecured claim holders in a solvent debtor case." *In re Dow Corning Corp.*, 456 F.3d 668, 680 (6th Cir. 2006).[6] This presumption, however, is subject to a downward adjustment based upon "the consideration of any equitable factors affecting the interest rate." *Id.*

34.    No court, however, has adopted the rigid, formulaic approach taken by the Lenders in their demand letter of April 21, 2008. There, the Lenders take the position that, once solvency is established, unsecured creditors are automatically entitled to postpetition interest at the full contract default rate of interest -- period, full stop.

35.    The Lenders could not be more wrong. Indeed, regardless of the articulation, courts that have analyzed the appropriate rate of postpetition interest payable to unsecured creditors in solvent estates over the years agree that, consistent with *Vanston*, the analysis ultimately hinges upon "a balance of equities." *See In re Coram Healthcare Corp.*, 315 B.R. at 346 ("[T]he specific facts of each case will determine what rate of [postpetition] interest is 'fair and equitable.'"); *In re Dow Corning Corp.*, 456 F.3d at 680 (remanding the issue of the appropriate rate of postpetition interest for "consideration of any equitable factors affecting the interest rate"); *In re Loral Space & Commc'ns Ltd.*, Bench Ruling, No. 03-41710, tr. at 39-40 (Bankr. S.D.N.Y. July 25, 2005) (Drain, J.) ("In my view . . . the court has a large amount of discretion in deciding what the appropriate rate of interest should be under a Chapter 11 plan for

---

6    The Third Circuit has not yet addressed the question of the appropriate rate of postpetition interest to be paid to unsecured creditors in a solvent chapter 11 proceeding. Neither has the Second Circuit for that matter.

14

CC-BLG004265

a solvent debtor.").[7] Depending on the balancing of these equitable factors, courts have held that the appropriate rate of postpetition interest can be tied to the legal rate, the contract rate or the contract default rate.

36.     Here, there can be no question that the Lenders' recent demand for payment of postpetition interest at the contract default rate is unwarranted and inequitable.

37.     First, the Lenders' rejection of the Negotiated Bank Debt Interest Rate and their demand for the contract default rate represent a clear departure from their prior agreements and course of conduct in these chapter 11 cases. As noted above, these same Lenders previously agreed to accept postpetition interest at the rate of 6.09% under a proposed plan of reorganization that just as plainly left value for equity.

38.     Moreover, despite the fact that the Proposed Asbestos Settlement is the product of meaningful concessions by all parties thereto, the Lenders want to accept all of the benefits of that agreement but none of what they perceive to be the burdens, such as the payment of postpetition interest at the rate of 6.09%. In other words, the Lenders want to profit from the concessions of others, while making no concessions of their own. By any definition, that is the opposite of equity.

39.     Second, the Lenders' attempt to take back their prior agreement as to the appropriate postpetition interest rate inevitably jeopardizes the Proposed Asbestos Settlement. As stated above, the proposed settlement that equity holders have bought into assumes a Negotiated Bank Debt Interest Rate starting at 6.09% until December 31, 2005 and then at floating prime thereafter. If that rate were to change as a result of the Lenders' demand, the

---

[7]    A copy of Judge Drain's bench ruling is attached hereto as Exhibit E.

CC-BLG004266

equity holders would be well within their rights to resume the estimation litigation over the estimated Asbestos PI Claims. Should that occur, any hope the Debtors currently have of achieving a consensual resolution would be seriously compromised. This potentially disastrous impact of an award of postpetition interest at the contract default rate is reason enough to reject the Lenders' demand. *Cf. In re A.H. Robins Co., Inc.*, 89 B.R. 555, 562 (E.D. Va. 1988) (disallowing claim for punitive damages in a chapter 11 case because of the potential impact on the debtor's plan of reorganization).

40.    This also proves that the Lenders' demand frustrates a fundamental purpose of the Bankruptcy Code, which is to provide a forum for various constituents to build agreements that allow debtors to manage their liabilities, reorganize their businesses and successfully emerge from bankruptcy. *See In re Mirant Corp.*, 334 B.R. 800, 811 (Bankr. N.D. Tex. 2005) ("One of the goals of Congress in fashioning the Bankruptcy Code was to encourage parties in a distress situation to work out a deal among themselves.").

41.    Third, the Lenders' demand for postpetition interest at the contract default rate is inequitable in light of the fact that any so-called default -- or failure to make timely payment -- exists solely because the Debtors have been legally precluded from making such payments during these proceedings. There was no prepetition default or failure to make timely payment. As a result, there can be no "default" now to substantiate a claim for default interest. *See In re Nextwave Personal Commc'ns, Inc.*, 244 B.R. 253, 276 (Bankr. S.D.N.Y. 2000) ("It is senseless to speak of a 'default' when, as a matter of bankruptcy law, the debtors had neither the authority nor the ability to make such payments absent notice and court approval.").

42.    In essence, the Lenders' claim for default interest is a veiled attempt to circumvent the well-established principles that a creditor's rights are fixed as of the petition date,

16

CC-BLG004267

and that creditors may not modify their contractual rights against a debtor based upon the debtor's reorganization under the Bankruptcy Code. *See, e.g.,* 11 U.S.C. §§ 502(b) and 365(e)(1); *Carrieri v. Jobs.com, Inc.,* 393 F.3d 508, 527 (5th Cir. 2004) ("Under § 502(b), the rights of holders of claims and interests are fixed as of the Petition Date."); S. Rep. No. 95-989 at 62 (1978), reprinted in 198 U.S.C.C.A.N. 5787, 5848 ("Whether interest is matured or unmatured on the date of bankruptcy [under section 502(b)] is to be determined without reference to any *ipso facto* or bankruptcy clause in the agreement creating the claim."); *cf. In re EBC I, Inc.,* 356 B.R. 631, 640 (Bankr. D. Del. 2006) ("Ipso facto clauses (by which a contract is terminated as a result solely of the debtor's insolvency or bankruptcy) are generally disfavored, if not expressly void, under the Bankruptcy Code.").

43.    <u>Fourth</u>, and finally, the Lenders' rejection of the Negotiated Bank Debt Interest Rate, which is greater than the Lenders' bargained for standard contract rate of interest and is significantly greater than the federal judgment rate of interest, is particularly inequitable in light of the fact that, but for the Debtors' litigation and reorganization efforts throughout the case, which have resulted in the Proposed Asbestos Settlement following the recent claims estimation proceedings, the Lenders might not be in a position to demand full repayment of their principal, let alone postpetition interest at the contract default rate.

## III.

### <u>Now Is The Time To Resolve The Postpetition Default Interest Issue.</u>

44.    The Debtors' chapter 11 cases are nearing a critical juncture. After years of litigating the Debtors' solvency in relation to the estimation of the Asbestos PI Claims, the Debtors are poised to proceed with the Proposed Asbestos Settlement and emerge from chapter 11. The Lenders' most recent demand, however, threatens to derail this process. Although the Lenders may argue that this Objection should be heard at confirmation of a plan based upon the

17

CC-BLG004268

Proposed Asbestos Settlement, the fact of the matter is that any effort to move forward with a plan without resolving this issue would only invite unnecessary delay and expense and threaten the closure which now is at hand. Simply put, there is no Proposed Asbestos Settlement on which to formulate a chapter 11 plan if the Lenders are entitled to postpetition interest at the contract default rate.

45.    Importantly, the Debtors' chapter 11 cases have been pending for more than seven years. As a result, this Court has before it a vast record of the Debtors' potential liabilities and knows well the extent to which the Debtors' solvency has been disputed from the outset of these cases. Given this extensive record, no further fact development is needed before determining whether or not the Lenders are entitled to postpetition interest at their contract default rate under a plan based upon the Proposed Asbestos Settlement. Indeed, at confirmation, this Court will not be presented with any additional information concerning the Debtors' solvency. As mentioned earlier, the Proposed Asbestos Settlement does not determine the Debtors' solvency -- it merely represents the terms by which the plan proponents have agreed to cease litigating the very issues affecting the Debtors' solvency.

46.    Finally, the Lenders have taken the position in their April 21, 2008 letter that any plan based upon the Proposed Asbestos Settlement is "unconfirmable" due to the default interest issue. As a result, this issue is ripe for consideration now given that the Debtors intend to file a plan and disclosure statement based upon the Proposed Asbestos Settlement. *See, e.g., In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) ("Courts generally have agreed that it may, on occasion, be appropriate to consider issues at the disclosure hearing stage which could otherwise be raised at confirmation, if the described plan is fatally flawed so that confirmation would not be possible."); *In re Felicity Assocs., Inc.*, 197 B.R. 12, 14 (Bankr. D.

18

CC-BLG004269

R.I. 1996) ("It has become standard Chapter 11 practice that 'when an objection raises substantive plan issues that are normally addressed at confirmation, it is proper to consider and rule upon such issues prior to confirmation, where the proposed plan is arguably unconfirmable on its face.'").

## IV.

### The Debtors Reserve Their Rights To Amend And Supplement This Objection And To File A Reply To Any Response By The Lenders.

47.    As noted above, the Debtors' primary objection to the Proofs of Claim relates to the Lenders' demand for postpetition default interest.  In addition, the Debtors reserve their rights to further object to the Proofs of Claim on other grounds, including to the extent that the Lenders seek (a) the compounding of interest contrary to the terms of the 1998 and 1999 Credit Agreements, (b) interest on interest and (c) facility and other fees, including attorney fees, which are generally described in the Proofs of Claim, but for which the Lenders have not provided any backup or documentation.[8]  The Debtors reserve also their right to file a reply to any response of the Lenders to this Objection.

### Conclusion

48.    The Debtors' Objection should be sustained and the Proofs of Claim should be disallowed to the extent they seek postpetition interest at the default rate of interest under the 1998 and 1999 Credit Agreements.

---

[8]    The Debtors do not believe that Local Rule 3007-1(f)(iii) applies to restrict their ability to assert additional substantive objections to the Proofs of Claim, because this Objection is not an "Omnibus Objection." In the event that the Court determines that Local Rule 3007-1(f)(iii) is applicable, the Debtors request that their reservation of rights in this Objection be deemed their objection to the Proofs of Claim in relation to the additional matters described herein.

DOCS_DE:138088.1

CC-BLG004270

**Notice**

49.    The Debtors will serve copies of this Objection on (i) the Office of the United States Trustee; (ii) JPMorgan Chase, as Administrative Agent for the Lenders; (iii) counsel to the ad hoc group of Lenders; (iv) counsel to each of the official committees appointed by the United States Trustee; (v) counsel for the Future Claimants' Representative; (vi) counsel to the debtor in possession lender; and (vii) all parties that have requested that they be served with all pleadings filed in these cases pursuant to Federal Rule of Bankruptcy Procedure 2002.

50.    The Debtors submit that notice of this Objection as outlined above is sufficient under Bankruptcy Rule 3007 and that no further notice is necessary.

**No Previous Request**

51.    No previous request for the specific relief set forth herein has been made to this or any other court.

DOCS_DE:138088.1

CC-BLG004271

WHEREFORE, the Debtors respectfully request that the Court (a) enter an order disallowing the Proofs of Claim to the extent they seek postpetition interest at the default rate of interest under the 1998 and 1999 Credit Agreements and (b) grant any further and related relief as it may deem appropriate.

Dated: June 13, 2008

Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Theodore L. Freedman
Janet S. Baer
200 East Randolph Drive
Chicago, IL 60601
(312) 861-2000

and

PACHULSKI STANG ZIEHL & JONES LLP

*James E. O'Neill*

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Kathleen P. Makowski (Bar No. 3648)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
(302) 652-4100

Co-Counsel for Debtors and Debtors in Possession

21

CC-BLG004272

## EXHIBIT A

### Proof of Claim for 1998 Credit Agreement

DOCS_DE:138088.1

CC-BLG004273

# WR Grace
### Bankruptcy Form 10
### Index Sheet

SR00000559 ■

| Claim Number: | 00009168 | Receive Date: | 03/28/2003 |
|---|---|---|---|

## Multiple Claim Reference

Claim Number _____

- [ ] MMPOC — Medical Monitoring Claim Form
- [ ] PDPOC — Property Damage
- [ ] NAPO — Non-Asbestos Claim Form
- [ ] Amended

Claim Number _____

- [ ] MMPOC — Medical Monitoring Claim Form
- [ ] PDPOC — Property Damage
- [ ] NAPO — Non-Asbestos Claim Form
- [ ] Amended

## Attorney Information

Firm Number:                                Firm Name:

Attorney Number:                          Attorney Name:

Zip Code:

Cover Letter Location Number:

| Attachments Medical Monitoring | Attachments Property Damage | Non-Asbestos |
|---|---|---|
| [ ] TBD | [ ] TBD | [x] Other Attachments |
| [ ] TBD | [ ] TBD | |
| [ ] TBD | [ ] TBD | |
| [ ] TBD | [ ] TBD | |
| [ ] TBD | [ ] TBD | |
| | [ ] Other Attachments | |

**Other**

- [ ] Non-Standard Form
- [ ] Amended
- [ ] Post-Deadline Postmark Date

Box/Batch: WRBF0037/WRBF0148                          Document Number: WRBF007396 ■

| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE | **GRACE NON-ASBESTOS PROOF OF CLAIM FORM** |
|---|---|

| Name of Debtor,[1] W.R. Grace & Co.-CONN. and each of the Guarantors and additional borrowers listed on the attached Schedule I | Case Number 01-01139 (JKF) (Jointly Administered) | |
|---|---|---|

NOTE: Do not use this form to assert an Asbestos Personal Injury Claim, a Settled Asbestos Claim or a Zonolite Attic Insulation Claim. Those claims will be subject to a separate claims submission process. This form should also not be used to file a claim for an Asbestos Property Damage Claim or Medical Monitoring Claim. A specialized proof of claim form for each of these claims should be filed.

| Name of Creditor (The person or other entity to whom the Debtor owes money or property): <br><br> JPMorgan Chase Bank <br> As Administrative Agent for the Credit Agreement dated as of May 14, 1998 | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. <br> ☐ Check box if you have never received any notices from the bankruptcy court in this case. | THIS SPACE IS FOR COURT USE ONLY |
|---|---|---|
| Name and address where notices should be sent: <br><br> 270 Park Avenue <br> New York, New York 10017 <br> Attention: Thomas F. Maher | ☐ Check box if the address differs from the address on the envelope sent to you by the court. | |

| Account or other number by which creditor identifies Debtor: <br> Not Applicable | Check here ☐ replaces <br> if this claim ☐ amends a previously filed claim, dated:_____ |
|---|---|

Corporate Name, Common Name, and/or d/b/a name of specific Debtor against whom the claim is asserted:
W.R. Grace & Co.-CONN. and each of the Guarantors and additional borrowers listed on Schedule 1 to the attached

| 1. **Basis for Claim** <br> ☐ Goods sold <br> ☐ Services performed <br> ☐ Environmental liability <br> ☒ Money loaned <br> ☐ Non-asbestos personal injury/wrongful death <br> ☐ Taxes <br> ☐ Other_____ | ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a) <br> ☐ Wages, salaries, and compensation (fill out below) <br><br> Your SS #:_____ <br> Unpaid compensation for services performed <br> from _____ to _____ (date) |
|---|---|

| 2. Date debt was incurred: Various, including March 15, 2001. | 3. If court judgment, date obtained: |
|---|---|

4. **Total Amount of Claim at Time Case Filed:**   $ See attached

If all or part of your claim is secured or entitled to priority, also complete Item 5 below.

☒ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

5. **Classification of Claim.** Under the Bankruptcy Code all claims are classified as one or more of the following: (1) Unsecured Nonpriority, (2) Unsecured Priority, (3) Secured. It is possible for part of a claim to be in one category and part in another. CHECK THE APPROPRIATE BOX OR BOXES that best describe your claim and STATE THE AMOUNT OF THE CLAIM AT TIME CASE FILED.

| ☐ SECURED CLAIM (check this box if your claim is secured by collateral, including a right of setoff.) <br><br> Brief Description of Collateral: <br> ☐ Real Estate    ☐ Other (Describe briefly) <br><br> Amount of arrearage and other charges at time case filed included in secured claim above, if any: $_____ <br><br> Attach evidence of perfection of security interest <br> ☒ UNSECURED NONPRIORITY CLAIM <br> A claim is unsecured if there is no collateral or lien on property of the debtor securing the claim or to the extent that the value of such property is less than the amount of the claim. | ☐ UNSECURED PRIORITY CLAIM - Specify the priority of the claim. <br> ☐ Wages, salaries, or commissions (up to $4650), earned not more than 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3). <br> ☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4). <br> ☐ Taxes or penalties of governmental units - 11 U.S.C. § 507(a)(7). <br> ☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___). |
|---|---|

| 6. **Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. <br> 7. **Supporting Documents:** _Attach copies of supporting documents_, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary. <br> 8. **Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim. | This Space is for Court Use Only |
|---|---|

| Date <br> March 27, 2003 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): <br><br> JPMORGAN CHASE BANK, <br> AS ADMINISTRATIVE AGENT <br><br> Thomas F. Maher, Managing Director | WR Grace     BF.37.148.7396 <br> 00009168 <br> SR=559 |
|---|---|---|

**REC'D MAR 28 2003**

---

[1]   See General Instructions and Claims Bar Date Notice and its exhibits for names of all Debtors and other names used by the Debtors.

CC-BLG004275

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **W.R. GRACE & CO., et al.;** | ) | **Case No. 01-01139 (JFK)** |
| | ) | **Jointly Administered** |
| Debtors | ) | |
| | ) | |
| | ) | |

### MASTER PROOF OF CLAIM OF JPMORGAN CHASE BANK, IN ITS CAPACITY AS AGENT FOR THE CLAIMANTS UNDER THE CREDIT AGREEMENT DATED AS OF MAY 14, 1998, IDENTIFIED HEREIN

1.   The undersigned, Thomas F. Maher, whose business and mailing address is 270 Park Avenue, New York, New York 10017, is a Managing Director of JPMorgan Chase Bank (formerly known as The Chase Manhattan Bank; "JPMorgan Chase"), a banking corporation formed and existing under the laws of the State of New York, with offices at 270 Park Avenue, New York, New York 10017.  JPMorgan Chase is the administrative agent (in such capacity, the "Agent") for itself and the other banks and financial institutions (collectively, the "Lenders"; together with the Agent, the "Claimants") from time to time parties to the Credit Agreement, dated as of May 14, 1998 (as amended, supplemented or otherwise modified prior to the Petition Date referenced below, the "Credit Agreement"), among W.R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), ("W.R. Grace"), W.R. Grace & Co.–CONN., the Lenders party to the Credit Agreement, the Agent and Chase Securities, Inc., as Arranger.  Pursuant to the "Claims Bar Date Notice Order" entered by the Bankruptcy Court on April 25, 2002 and the "Order as to all Non-Asbestos Claims, Asbestos Property Damage Claims, and Medical Monitoring Claims: (I) Establishing Bar Dates, (II) Approving Proof of Claim Forms, and (III) Approving Notice Program" entered by the Bankruptcy Court on April 25, 2002, the Agent has been authorized to file this master proof of claim (this "Master Proof of Claim") on behalf of all of the Claimants.

CC-BLG004276

2.  The Agent is filing this Master Proof of Claim in order to set forth the aggregate claims of each Claimant as of April 2, 2001 (the "Petition Date") against (a) W.R. Grace & Co.-CONN., (b) W.R. Grace and W.R. Grace & Co.-CONN. as guarantors (together, the "Guarantors"), and (c) to the extent that any of them are Additional Borrowers under the Credit Agreement, each entity set forth on Schedule I hereto (collectively with W.R. Grace & Co.-CONN. and the Guarantors, the "Debtors"), arising under or in connection with the loans, extensions of credit and other financial accommodations made by the Claimants to the Debtors under or pursuant to the Credit Agreement.  All such loans, extensions of credit and other financial accommodations, and all fees and other amounts owing under, or in connection with, the Credit Agreement are hereinafter referred to as the "Pre-Petition Obligations".

3.  (a)  The Debtors were, as of the Petition Date, and still are indebted (or liable) (i) to the Claimants as set forth on Schedule II hereto in respect of loans made by the Claimants to the Debtors under the Credit Agreement in the aggregate principal amount as of February 11, 2003 of not less than $250,000,000 (the "Total Principal Amount") and (ii) to each Lender in an amount not less than the sum of the amounts set forth opposite such Lender's name on Schedule II hereto under the heading "Principal Outstanding", plus in each case (A) interest thereon (in amounts determined at the rates set forth in the Credit Agreement) accrued and unpaid as of the Petition Date and accrued and accruing subsequent to the Petition Date and (B) facility and other fees (in amounts determined at the rates set forth in the Credit Agreement) accrued and unpaid as of the Petition Date and accrued and accruing subsequent to the Petition Date, and for such additional amounts as described in paragraphs 3(c), 3(d) and 6 below.

(b)  The amount of the Claimants' claims against the Debtors on account of interest accrued as of the Petition Date and accruing subsequent to the Petition Date on the Total

CC-BLG004277

3

Principal Amount (including interest accrued and accruing in respect of any drawing under the letters of credit), and any fees payable under the Credit Agreement, shall be reduced by the amount, if any, of such interest and fees paid to the Claimants after the Petition Date.

(c) The Debtors are also indebted (or liable) to the Claimants for fees and costs and expenses, including attorneys' fees, incurred before or after the Petition Date to the extent provided in the Credit Agreement.

(d) The Guarantors were, as of the Petition Date, and still are, liable to the Claimants for the repayment of the Pre-Petition Obligations, including without limitation the amounts set forth in paragraphs 3(a) through 3(c) above and paragraph 6 below.

4.    The consideration for the indebtedness owing to the Claimants (or ground of liability) described in this Master Proof of Claim is the loans, extensions of credit and other financial accommodations made by the Claimants pursuant to, or in connection with, the Credit Agreement.

5.    By reason of the foregoing, the Debtors are indebted (a) to the Claimants as set forth on Schedule II hereto in the aggregate principal amount as of February 11, 2003 of not less than $250,000,000 in respect of loans made under the Credit Agreement plus (i) interest thereon (in amounts determined at the rates set forth in the Credit Agreement) accrued and unpaid as of the Petition Date and accrued and accruing subsequent to the Petition Date and (ii) facility and other fees (in amounts to be determined at the rates set forth in the Credit Agreement and the other Loan Documents) accrued and unpaid as of the Petition Date and accrued and accruing subsequent to the Petition Date and (b) to each Lender in an amount not less than the sum of the amounts set forth opposite such Lender's name on Schedule II hereto under the headings entitled "Principal Amount", plus in each case (i) interest thereon (in amounts

CC-BLG004278

4

determined at the rates set forth in the Credit Agreement) accrued and unpaid as of the Petition Date and accrued and accruing subsequent to the Petition Date and (ii) facility and other fees (in amounts determined at the rates set forth in the Credit Agreement) accrued and unpaid as of the Petition Date and accrued and accruing subsequent to the Petition Date. Estimated pre-petition interest and facility fees are shown as amounts not less than those set forth under columns bearing those titles on Schedule II hereto.

6.   In addition to the amounts claimed above, the Debtors are also liable to the Claimants and for such fees, indemnities, and costs and expenses as have accrued or have been incurred before or after the Petition Date and thereafter accrue or are incurred to the extent set forth in the Credit Agreement. In this regard, the Debtors are obligated pursuant to the Credit Agreement to reimburse each Claimant for all of its costs and expenses, including attorneys' fees and disbursements, incurred in connection with, among other things, any Debtor's defaults under the Credit Agreement. This Master Proof of Claim is without prejudice to the right of the Claimants to claim such fees and other expenses as administrative expenses of these cases pursuant to Section 503(b) of Title 11 of the United States Code (the "Bankruptcy Code").

7.   Annexed hereto as Exhibit A is an index of the principal documents upon which this Master Proof of Claim is based. Because of their voluminous nature, the Agent has not annexed hereto as separate exhibits copies of such documents. Rather, the Agent will provide copies upon the reasonable written request delivered to counsel for the Agent made by any party in interest in these cases.

8.   The claims set forth in this Master Proof of Claim are not subject to any valid set-off or counterclaim, except to the extent of any rights of set-off in favor of any Claimant which existed as at the petition date.

CC-BLG004279

5

9. No judgment has been rendered on the claims set forth in this Master Proof of Claim.

10. The amount of all payments on the claims set forth in this Master Proof of Claim has been credited and deducted for the purpose of making this Master Proof of Claim.

11. The Agent reserves the right to amend and/ or supplement this Master Proof of Claim and each of the Schedules and Exhibits hereto at any time and in any manner, including without limitation, to reflect a change in the holders or the allocation of the claims of the Claimants set forth on Schedule II hereto resulting from any transfer of such claims. Each Claimant reserves the right to file additional proofs of claim for additional claims which may be based on the same or additional documents. Each Claimant further reserves the right to file proofs of claim for administrative expenses or other claims entitled to priority.

12. The Agent also files this Master Proof of Claim on behalf of any creditor or class of creditors whose claims are subordinate to the claims of the Claimants (collectively, the "Subordinated Claims") and the Agent, on behalf of the Claimants, hereby asserts additional claims against the Debtors in the amount of any such Subordinated Claims. The Claimants hereby assert their right to enforce, and claim all benefits accorded by, any and all subordination provisions which exist in respect of the Subordinated Claims. The Agent also reserves the right to amend or supplement this Master Proof of Claim as may be necessary or appropriate to preserve the benefits of such Subordinated Claims or to further protect the rights and remedies of the Claimants with respect to any such Subordinated Claims.

13. This Master Proof of Claim is filed to protect the Claimants from potential forfeiture of their claims. The filing of this Master Proof of Claim shall not constitute: (a) a consent by the Claimants to the jurisdiction of this Court with respect to the subject matter of the

CC-BLG004280

claims set forth in this Master Proof of Claim, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in these cases against or otherwise involving any Claimant, (b) a waiver of the right of the Claimants to trial by jury in any proceedings so triable in these cases or any controversy or proceedings related to these cases or (c) an election of remedies.

CC-BLG004281

7

14. All notices concerning this Master Proof of Claim shall be sent to:

        JPMORGAN CHASE BANK,
        as Administrative Agent
        270 Park Avenue
        New York, New York  10017
        Attn:  Thomas F. Maher

        with a copy to:

        SIMPSON THACHER & BARTLETT
        Attorneys for JPMorgan Chase Bank
        425 Lexington Avenue
        New York, New York  10017
        Attn:  Peter Pantaleo, Esq.
             Richard W. Douglas, Esq.

CC-BLG004282

SCHEDULE I

**Guarantors**

W.R. Grace & Co.
W.R. Grace & Co.-CONN.

**Additional Borrowers**

A-I Bit & Tool Co., Inc.
Alewife Boston Ltd.
Alewife Land Corporation
Amicon, Inc.
CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.)
CCHP, Inc.
Coalgrace, Inc.
Coalgrace II, Inc.
Creative Food 'N Fun Company
Darex Puerto Rico, Inc.
Del Taco Restaurants, Inc.
Dewey and Almy, LLC (f/k/a Dewey and Almy Company)
Ecarg, Inc.
Five Alewife Boston Ltd.,
GC Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.)
GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.)
GEC Management Corporation
GN Holdings, Inc.
GPC Thomasville Corp.
Gloucester New Communities Company, Inc.
Grace A-B Inc.
Grace A-B II Inc.
Grace Chemical Company of Cuba
Grace Culinary Systems, Inc.
Grace Drilling Company
Grace Energy Corporation
Grace Environmental, Inc.
Grace Europe, Inc.
Grace H-G Inc.
Grace H-G II Inc.
Grace Hotel Services Corporation
Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.)
Grace Offshore Company
Grace PAR Corporation
Grace Petroleum Libya Incorporated
Grace Tarpon Investors, Inc.
Grace Ventures Corp.
Grace Washington, Inc.

CC-BLG004283

W.R. Grace Capital Corporation
W.R. Grace Land Corporation
Gracoal, Inc.
Gracoal II, Inc.
Guanica-Caribe Land Development Corporation
Hanover Square Corporation
Homco International, Inc.
Kootenai Development Company
LB Realty, Inc.
Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos
    Management, Inc.)
Monolith Enterprises, Incorporated
Monroe Street, Inc.
MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation)
MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.)
MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.)
Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating
    Corp., Emerson & Cuming, Inc.)
Southern Oil, Resin & Fiberglass, Inc.
Water Street Corporation
Axial Basin Ranch Company
CC Partners (f/k/a Cross Country Staffing)
Hayden-Gulch West Coal Company
H-G Coal Company

CC-BLG004284

SCHEDULE II

CLAIMANTS

| Credit Agreement dated as of May 14, 1988, Holdings as of March 11, 2003 | | | |
|---|---|---|---|
| Claimant | Principal Amount ($) | Estimated Pre-petition Interest ($) | Estimated Pre-petition Facility Fees ($) | Pre-Petition Total |
| Bank of Nova Scotia | 14,705,882.35 | 86,219.77 | 1,531.00 | 14,793,633.12 |
| Bear Stearns & Co. Inc. | 31,342,502.62 | 183,759.35 | 3,263.01 | 31,529,524.98 |
| Cypress Management Partnership | 2,000,000.00 | 11,725.89 | 208.22 | 2,011,934.10 |
| D.K. Acquisition Partners, L.P. | 81,835,674.50 | 479,798.02 | 8,519.75 | 82,323,992.26 |
| Deutsche Bank Trust Company Americas | 21,705,882.44 | 127,260.38 | 2,259.76 | 21,835,402.58 |
| Dresdner Bank AG | 14,705,882.35 | 86,219.77 | 1,531.00 | 14,793,633.12 |
| Goldman Sachs Credit Partners L.P. | 5,294,118.23 | 31,039.12 | 551.16 | 5,325,708.51 |
| JPMorgan Chase | 34,705,882.36 | 203,478.66 | 3,613.16 | 34,912,974.18 |
| King Street Capital, L.P. | 38,998,292.80 | 228,644.83 | 4,060.03 | 39,230,997.66 |
| Morgan Stanley Emerging Markets, Inc. | 4,705,882.35 | 27,590.33 | 489.92 | 4,733,962.60 |
| **Total** | **250,000,000.00** | **1,465,736.12** | **26,027.00** | **251,491,763.12** |

CC-BLG004285

EXHIBIT A

Principal Documents

CREDIT AGREEMENT

1.    The Credit Agreement dated as of May 14, 1998, among W.R. Grace, W.R. Grace & Co.-CONN., the Lenders party thereto, the Agent and Chase Securities, Inc, as Arranger.

OTHER

2.    "Claims Bar Date Notice Order" entered by the Bankruptcy Court on April 25, 2002.

3.    "Order as to all Non-Asbestos Claims, Asbestos Property Damage Claims, and Medical Monitoring Claims: (I) Establishing Bar Dates, (II) Approving Proof of Claim Forms, and (III) Approving Notice Program" entered by the Bankruptcy Court on April 25, 2002.

**EXHIBIT B**

**Proof of Claim for 1999 Credit Agreement**

CC-BLG004287

# WR Grace
## Bankruptcy Form 10
### Index Sheet

SR00000559

Claim Number:    00009159

Receive Date:    03/28/2003

## Multiple Claim Reference

Claim Number    _____

- ☐ MMPOC    Medical Monitoring Claim Form
- ☐ PDPOC    Property Damage
- ☐ NAPO    Non-Asbestos Claim Form
- ☐    Amended

Claim Number    _____

- ☐ MMPOC    Medical Monitoring Claim Form
- ☐ PDPOC    Property Damage
- ☐ NAPO    Non-Asbestos Claim Form
- ☐    Amended

## Attorney Information

Firm Number:    Firm Name:

Attorney Number:    Attorney Name:

Zip Code:

Cover Letter Location Number:

| Attachments Medical Monitoring | Attachments Property Damage | Non-Asbestos |
|---|---|---|
| ☐ TBD | ☐ TBD | ☒ Other Attachments |
| ☐ TBD | ☐ TBD | |
| ☐ TBD | ☐ TBD | |
| ☐ TBD | ☐ TBD | |
| ☐ TBD | ☐ TBD | |
| | ☐ Other Attachments | |

**Other**

- ☐ Non-Standard Form
- ☐ Amended
- ☐ Post-Deadline Postmark Date

Box/Batch: WRBF0037/WRBF0148

Document Number: WRBF007387

CC-BLG004288

| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE | **GRACE NON-ASBESTOS PROOF OF CLAIM FORM** |
|---|---|

| Name of Debtor.[1] W.R. Grace & Co.-CONN. and each of the Guarantors and additional borrowers listed on the attached Schedule I | Case Number  01-01139 (JKF) (Jointly Administered) |
|---|---|

**NOTE:** Do not use this form to assert an Asbestos Personal Injury Claim, a Settled Asbestos Claim or a Zonolite Attic Insulation Claim. Those claims will be subject to a separate claims submission process. This form should also not be used to file a claim for an Asbestos Property Damage Claim or Medical Monitoring Claim. A specialized proof of claim form for each of these claims should be filed.

| | | |
|---|---|---|
| Name of Creditor (The person or other entity to whom the Debtor owes money or property):<br><br>JPMorgan Chase Bank<br>As Administrative Agent for the 364-Day Credit Agreement dated as of May 5, 1999. | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br>☐ Check box if you have never received any notices from the bankruptcy court in this case.<br>☐ Check box if the address differs from the address on the envelope sent to you by the court. | THIS SPACE IS FOR COURT USE ONLY |
| Name and address where notices should be sent:<br><br>270 Park Avenue<br>New York, New York 10017<br>Attention: Thomas F. Maher | | |

| Account or other number by which creditor identifies Debtor:<br>Not Applicable | Check here ☐ replaces<br>if this claim ☐ amends a previously filed claim, dated:_____ |
|---|---|

Corporate Name, Common Name, and/or d/b/a name of specific Debtor against whom the claim is asserted:
W.R. Grace & Co.-CONN. and each of the Guarantors and additional borrowers listed on Schedule I to the attached

| 1. | Basis for Claim | | |
|---|---|---|---|
| | ☐ Goods sold | ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a) | |
| | ☐ Services performed | ☐ Wages, salaries, and compensation (fill out below) | |
| | ☐ Environmental liability | | |
| | ☒ Money loaned | Your SS #:_____ | |
| | ☐ Non-asbestos personal injury/wrongful death | Unpaid compensation for services performed | |
| | ☐ Taxes | from _____ to _____ (date) | |
| | ☐ Other_____ | | |

| 2. | Date debt was incurred:  Various, including March 6, 2001. | 3. | If court judgment, date obtained: |
|---|---|---|---|

| 4. | Total Amount of Claim at Time Case Filed: | $ See attached |
|---|---|---|

If all or part of your claim is secured or entitled to priority, also complete Item 5 below.

☒ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5.  Classification of Claim.** Under the Bankruptcy Code all claims are classified as one or more of the following: (1) Unsecured Nonpriority, (2) Unsecured Priority, (3) Secured. It is possible for part of a claim to be in one category and part in another. CHECK THE APPROPRIATE BOX OR BOXES that best describe your claim and STATE THE AMOUNT OF THE CLAIM AT TIME CASE FILED.

| | |
|---|---|
| ☐ SECURED CLAIM (check this box if your claim is secured by collateral, including a right of setoff.)<br>Brief Description of Collateral:<br>☐ Real Estate      ☐ Other (Describe briefly)<br><br>Amount of arrearage and other charges at time case filed included in secured claim above, if any:  $_____<br>Attach evidence of perfection of security interest<br>☒ UNSECURED NONPRIORITY CLAIM<br>A claim is unsecured if there is no collateral or lien on property of the debtor securing the claim or to the extent that the value of such property is less than the amount of the claim. | ☐ UNSECURED PRIORITY CLAIM - Specify the priority of the claim.<br>☐ Wages, salaries, or commissions (up to $4650), earned not more than 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).<br>☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4).<br>☐ Taxes or penalties of governmental units - 11 U.S.C. § 507(a)(7).<br>☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___). |

| | |
|---|---|
| 6.  **Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.<br>7.  **Supporting Documents:** _Attach copies of supporting documents_, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.<br>8.  **Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim. | This Space is for Court Use Only |

| | | |
|---|---|---|
| Date<br>March 27, 2003 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br><br>JPMORGAN CHASE BANK,<br>AS ADMINISTRATIVE AGENT<br><br>Thomas F. Maher, Managing Director | WR Grace    BF.37.148.7387<br>00009159<br>SR=559 |

REC'D MAR 28 2003

CC-BLG004289

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **W.R. GRACE & CO., et al.;** | ) | **Case No. 01-01139 (JFK)** |
| | ) | **Jointly Administered** |
| Debtors | ) | |
| | ) | |
| | ) | |

### MASTER PROOF OF CLAIM OF JPMORGAN CHASE BANK, IN ITS CAPACITY AS AGENT FOR THE CLAIMANTS UNDER THE CREDIT AGREEMENT DATED AS OF MAY 5, 1999, IDENTIFIED HEREIN

1.  The undersigned, Thomas F. Maher, whose business and mailing address is 270 Park Avenue, New York, New York 10017, is a Managing Director of JPMorgan Chase Bank (formerly known as The Chase Manhattan Bank; "JPMorgan Chase"), a banking corporation formed and existing under the laws of the State of New York, with offices at 270 Park Avenue, New York, New York 10017. JPMorgan Chase is the administrative agent (in such capacity, the "Agent") for itself and the other banks and financial institutions (collectively, the "Lenders"; together with the Agent, the "Claimants") from time to time parties to the 364-Day Credit Agreement dated as of May 5, 1999 (as amended, supplemented or otherwise modified prior to the Petition Date referenced below, the "Credit Agreement"), among W.R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), ("W.R. Grace"), W.R. Grace & Co.–CONN., the Lenders party to the Credit Agreement, Bank of America National Trust and Savings Association, as Documentation Agent, the Agent and Chase Securities, Inc., as Book Manager. Pursuant to the "Claims Bar Date Notice Order" entered by the Bankruptcy Court on April 25, 2002 and the "Order as to all Non-Asbestos Claims, Asbestos Property Damage Claims, and Medical Monitoring Claims: (I) Establishing Bar Dates, (II) Approving Proof of Claim Forms, and (III) Approving Notice Program", entered by the Bankruptcy Court on April

CC-BLG004290

2

25, 2002, the Agent has been authorized to file this master proof of claim (this "Master Proof of Claim") on behalf of all of the Claimants.

    2.  The Agent is filing this Master Proof of Claim in order to set forth the aggregate claims of each Claimant as of April 2, 2001 (the "Petition Date") against (a) W.R. Grace & Co.-CONN., (b) W.R. Grace and W.R. Grace & Co.-CONN. as guarantors (together, the "Guarantors") and, (c) to the extent that any of them are Additional Borrowers under the Credit Agreement, each entity set forth on Schedule I hereto (collectively with W.R. Grace & Co.-CONN. and the Guarantors, the "Debtors"), arising under or in connection with the loans, extensions of credit and other financial accommodations made by the Claimants to the Debtors under or pursuant to the Credit Agreement. All such loans, extensions of credit and other financial accommodations, and all fees and other amounts owing under, or in connection with, the Credit Agreement are hereinafter referred to as the "Pre-Petition Obligations".

    3.  (a) The Debtors were, as of the Petition Date, and still are indebted (or liable) (i) to the Claimants as set forth on Schedule II hereto in respect of loans made by the Claimants to the Debtors under the Credit Agreement in the aggregate principal amount as of February 11, 2003 of not less than $250,000,000 (the "Total Principal Amount") and (ii) to each Lender in an amount not less than the sum of the amounts set forth opposite such Lender's name on Schedule II hereto under the heading "Principal Outstanding", plus in each case (A) interest thereon (in amounts determined at the rates set forth in the Credit Agreement) accrued and unpaid as of the Petition Date and accrued and accruing subsequent to the Petition Date and (B) facility and other fees (in amounts determined at the rates set forth in the Credit Agreement) accrued and unpaid as of the Petition Date and accrued and accruing subsequent to the Petition Date, and for such additional amounts as described in paragraphs 3(c), 3(d) and 6 below.

CC-BLG004291

3

(b)   The amount of the Claimants' claims against the Debtors on account of interest accrued as of the Petition Date and accruing subsequent to the Petition Date on the Total Principal Amount (including interest accrued and accruing in respect of any drawing under the letters of credit), and any fees payable under the Credit Agreement, shall be reduced by the amount, if any, of such interest and fees paid to the Claimants after the Petition Date.

(c)   The Debtors are also indebted (or liable) to the Claimants for fees and costs and expenses, including attorneys' fees, incurred before or after the Petition Date to the extent provided in the Credit Agreement.

(d)   The Guarantors were, as of the Petition Date, and still are, liable to the Claimants for the repayment of the Pre-Petition Obligations, including without limitation the amounts set forth in paragraphs 3(a) through 3(c) above and paragraph 6 below.

4.   The consideration for the indebtedness owing to the Claimants (or ground of liability) described in this Master Proof of Claim is the loans, extensions of credit and other financial accommodations made by the Claimants pursuant to, or in connection with, the Credit Agreement.

5.   By reason of the foregoing, the Debtors are indebted (a) to the Claimants as set forth on Schedule II hereto in the aggregate principal amount as of February 11, 2003 of not less than $250,000,000 in respect of loans made under the Credit Agreement plus (i) interest thereon (in amounts determined at the rates set forth in the Credit Agreement) accrued and unpaid as of the Petition Date and accrued and accruing subsequent to the Petition Date and (ii) facility and other fees (in amounts to be determined at the rates set forth in the Credit Agreement and the other Loan Documents) accrued and unpaid as of the Petition Date and accrued and accruing subsequent to the Petition Date and (b) to each Lender in an amount not less than the

CC-BLG004292

4

sum of the amounts set forth opposite such Lender's name on Schedule II hereto under the headings entitled "Principal Amount", plus in each case (i) interest thereon (in amounts determined at the rates set forth in the Credit Agreement) accrued and unpaid as of the Petition Date and accrued and accruing subsequent to the Petition Date and (ii) facility and other fees (in amounts determined at the rates set forth in the Credit Agreement) accrued and unpaid as of the Petition Date and accrued and accruing subsequent to the Petition Date.  Estimated pre-petition interest and facility fees are shown as amounts not less than those set forth under columns bearing those titles on Schedule II hereto.

6.  In addition to the amounts claimed above, the Debtors are also liable to the Claimants for such fees, indemnities, and costs and expenses as have accrued or have been incurred before or after the Petition Date and thereafter accrue or are incurred to the extent set forth in the Credit Agreement.  In this regard, the Debtors are obligated pursuant to the Credit Agreement to reimburse each Claimant for all of its costs and expenses, including attorneys' fees and disbursements, incurred in connection with, among other things, any Debtor's defaults under the Credit Agreement.  This Master Proof of Claim is without prejudice to the right of the Claimants to claim such fees and other expenses as administrative expenses of these cases pursuant to Section 503(b) of Title 11 of the United States Code (the "Bankruptcy Code").

7.  Annexed hereto as Exhibit A is an index of the principal documents upon which this Master Proof of Claim is based.  Because of their voluminous nature, the Agent has not annexed hereto as separate exhibits copies of such documents.  Rather, the Agent will provide copies upon the reasonable written request delivered to counsel for the Agent made by any party in interest in these cases.

CC-BLG004293

5

8. The claims set forth in this Master Proof of Claim are not subject to any valid set-off or counterclaim, except to the extent of any rights of set-off in favor of any Claimant which existed as at the petition date.

9. No judgment has been rendered on the claims set forth in this Master Proof of Claim.

10. The amount of all payments on the claims set forth in this Master Proof of Claim has been credited and deducted for the purpose of making this Master Proof of Claim.

11. The Agent reserves the right to amend and/ or supplement this Master Proof of Claim and each of the Schedules and Exhibits hereto at any time and in any manner, including without limitation, to reflect a change in the holders or the allocation of the claims of the Claimants set forth on Schedule II hereto resulting from any transfer of such claims. Each Claimant reserves the right to file additional proofs of claim for additional claims which may be based on the same or additional documents. Each Claimant further reserves the right to file proofs of claim for administrative expenses or other claims entitled to priority.

12. The Agent also files this Master Proof of Claim on behalf of any creditor or class of creditors whose claims are subordinate to the claims of the Claimants (collectively, the "Subordinated Claims") and the Agent, on behalf of the Claimants, hereby asserts additional claims against the Debtors in the amount of any such Subordinated Claims. The Claimants hereby assert their right to enforce, and claim all benefits accorded by, any and all subordination provisions which exist in respect of the Subordinated Claims. The Agent also reserves the right to amend or supplement this Master Proof of Claim as may be necessary or appropriate to preserve the benefits of such Subordinated Claims or to further protect the rights and remedies of the Claimants with respect to any such Subordinated Claims.

CC-BLG004294

6

13. This Master Proof of Claim is filed to protect the Claimants from potential forfeiture of their claims. The filing of this Master Proof of Claim shall not constitute: (a) a consent by the Claimants to the jurisdiction of this Court with respect to the subject matter of the claims set forth in this Master Proof of Claim, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in these cases against or otherwise involving any Claimant, (b) a waiver of the right of the Claimants to trial by jury in any proceedings so triable in these cases or any controversy or proceedings related to these cases or (c) an election of remedies.

CC-BLG004295

14. All notices concerning this Master Proof of Claim shall be sent to:

> JPMORGAN CHASE BANK,
> as Administrative Agent
> 270 Park Avenue
> New York, New York  10017
> Attn:  Thomas F. Maher
>
> with a copy to:
>
> SIMPSON THACHER & BARTLETT
> Attorneys for JPMorgan Chase Bank
> 425 Lexington Avenue
> New York, New York  10017
> Attn:  Peter Pantaleo, Esq.
>         Richard W. Douglas, Esq.

CC-BLG004296

SCHEDULE I

**Guarantors**

W.R. Grace & Co.
W.R. Grace & Co.-CONN.

**Additional Borrowers**

A-I Bit & Tool Co., Inc.
Alewife Boston Ltd.
Alewife Land Corporation
Amicon, Inc.
CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.)
CCHP, Inc.
Coalgrace, Inc.
Coalgrace II, Inc.
Creative Food 'N Fun Company
Darex Puerto Rico, Inc.
Del Taco Restaurants, Inc.
Dewey and Almy, LLC (f/k/a Dewey and Almy Company)
Ecarg, Inc.
Five Alewife Boston Ltd.,
GC Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.)
GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.)
GEC Management Corporation
GN Holdings, Inc.
GPC Thomasville Corp.
Gloucester New Communities Company, Inc.
Grace A-B Inc.
Grace A-B II Inc.
Grace Chemical Company of Cuba
Grace Culinary Systems, Inc.
Grace Drilling Company
Grace Energy Corporation
Grace Environmental, Inc.
Grace Europe, Inc.
Grace H-G Inc.
Grace H-G II Inc.
Grace Hotel Services Corporation
Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.)
Grace Offshore Company
Grace PAR Corporation
Grace Petroleum Libya Incorporated
Grace Tarpon Investors, Inc.
Grace Ventures Corp.
Grace Washington, Inc.

CC-BLG004297

W.R. Grace Capital Corporation
W.R. Grace Land Corporation
Gracoal, Inc.
Gracoal II, Inc.
Guanica-Caribe Land Development Corporation
Hanover Square Corporation
Homco International, Inc.
Kootenai Development Company
LB Realty, Inc.
Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos
    Management, Inc.)
Monolith Enterprises, Incorporated
Monroe Street, Inc.
MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation)
MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.)
MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.)
Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating
    Corp., Emerson & Cuming, Inc.)
Southern Oil, Resin & Fiberglass, Inc.
Water Street Corporation
Axial Basin Ranch Company
CC Partners (f/k/a Cross Country Staffing)
Hayden-Gulch West Coal Company
H-G Coal Company

CC-BLG004298

SCHEDULE II

CLAIMANTS

| 364 Day Revolving Credit Agreement dated as of May 5, 1999, Holdings as of March 11, 2003 | | | |
|---|---|---|---|
| Claimant | Principal Amount ($) | Estimated Pre-petition Interest ($) | Estimated Pre-petition Facility Fees($) | Pre-Petition Total |
| Bank Happoalim, B.M. | 15,000,000.00 | 93,986.46 | 1,561.62 | 15,095,548.08 |
| Bank of Nova Scotia | 24,000,000.00 | 150,378.33 | 2,498.59 | 24,152,876.93 |
| Bear Stearns & Co. Inc. | 39,300,624.98 | 246,248.44 | 4,091.51 | 39,550,964.93 |
| Credit Suisse First Boston | 5,000,000.00 | 31,328.82 | 520.54 | 5,031,849.36 |
| D.K. Acquisition Partners, L.P. | 30,070,207.85 | 188,412.82 | 3,130.55 | 30,261,751.22 |
| Deutsche Bank Trust Company Americas | 24,500,000.02 | 153,511.22 | 2,550.65 | 24,656,061.88 |
| Dresdner Bank AG | 24,000,000.00 | 150,378.33 | 2,498.59 | 24,152,876.93 |
| JPMorgan Chase | 28,000,000.00 | 175,441.39 | 2,915.02 | 28,178,356.41 |
| King Street Capital, L.P. | 44,276,225.97 | 277,424.38 | 4,609.51 | 44,558,259.86 |
| Northern Trust Company | 15,852,941.18 | 99,330.79 | 1,650.42 | 15,953,922.38 |
| Total | 250,000,000.00 | 1,566,440.97 | 26,027.00 | 251,592,467.97 |

CC-BLG004299

EXHIBIT A

Principal Documents

CREDIT AGREEMENT

1.     The 364-Day Credit Agreement dated as of May 5, 1999, among W.R. Grace, W.R. Grace & Co.-CONN., the Lenders party thereto, Bank of America National Trust and Savings Association, as Documentation Agent, the Agent and Chase Securities, Inc., as Book Manager.

OTHER

2.     "Claims Bar Date Notice Order" entered by the Bankruptcy Court on April 25, 2002.

3.     "Order as to all Non-Asbestos Claims, Asbestos Property Damage Claims, and Medical Monitoring Claims: (I) Establishing Bar Dates, (II) Approving Proof of Claim Forms, and (III) Approving Notice Program" entered by the Bankruptcy Court on April 25, 2002.

CC-BLG004300

# EXHIBIT C

## Proposed Asbestos Settlement

DOCS_DE:138088.1

CC-BLG004301

Exhibit 99.2

**W. R. GRACE & CO., et al.**
**CASE NO. 01-1139 (JFK)**

**TERM SHEET FOR RESOLUTION OF**
**ASBESTOS PERSONAL INJURY CLAIMS**

This Term Sheet sets forth certain of the principal terms and conditions under which the Debtors, the Official Equity Security Committee, the Official Committee of Personal Injury Claimants ("ACC") and the Future Claimants Representative ("FCR") in the above-captioned Chapter 11 cases are prepared to file a plan of reorganization ("Plan") as co-proponents providing for the resolution of all asbestos personal injury claims and liabilities, including without limitation all asbestos personal injury claims pending at the filing date of the Chapter 11 cases and those arising subsequent thereto (collectively, "Asbestos PI Claims"). This Term Sheet also sets forth the proposed treatment of other key classes of claims asserted in the Chapter 11 cases. This Term Sheet has been produced for settlement purposes only and is subject to the provisions of Rule 408 of the Federal Rules of Evidence.

I.      **Treatment of Claims**

A.      **Asbestos PI Trust**

All Asbestos PI Claims will be channeled to a trust (the "Asbestos PI Trust") that is established in accordance with Section 524(g) of the United States Bankruptcy Code. The Asbestos PI Trust will pay claims from trust assets in accordance with a trust agreement and trust distribution procedures established by the ACC and FCR in connection with the Plan.

1.      **Funding of Asbestos PI Trust at Emergence.**  On the Effective Date of the Plan, the Asbestos PI Trust shall receive the following, each of which shall be a condition to the Plan becoming effective:

a.      <u>Cash Payment:</u> $250 million, plus, if the Effective Date occurs after December 31, 2008, interest from January 1, 2009 to the Effective Date accrued at the same rate applicable to Grace's senior debt.

b.      <u>Insurance</u>: the assignment by W. R. Grace & Co.-Conn. ("Grace") and all of its affiliates to the Asbestos PI Trust, of all insurance policies and all insurance proceeds available for payment of Asbestos PI Claims, effective as of the Effective Date, including without limitation:

i.      Any such proceeds from the date hereof of all settlements with insurance companies, and all interest accrued thereon;

Source: W R GRACE & CO, 8-K, April 07, 2008

CC-BLG004302

ii.    Any proceeds of the settlement with Equitas held in escrow with all interest accrued thereon;

iii.    Any proceeds of all settlements with all insurance companies under coverage in place agreements or installment payment arrangements where payment has not yet occurred;

iv.    Assignment of and the right to recover on all outstanding insurance policies potentially applicable to personal injury claimants; and

v.    The right to recover from all insolvent insurance estates as to which Grace or its affiliates has made a claim and the proceeds of all payments received by Grace or its affiliates from those insolvent estates after the date hereof, and all interest accrued thereon.

Provided however that Grace is in the process of examining its policies and the foregoing will not affect Grace's separate coverages, if any, for losses not arising from asbestos personal injury claims.

The ACC and FCR (or, after the Effective Date, the Asbestos PI Trust) shall control (and Grace shall cooperate in connection with) any negotiations or legal proceedings related to the underlying policies or settlement agreements applicable to Asbestos PI Claims.

c.    Warrant:  a warrant for 10 million shares of W. R. Grace & Co. ("Parent") common stock, exercisable at $17 per share, and expiring one year after the Effective Date.

d.    Cryovac, Inc. Payment:  The consideration contemplated by the Sealed Air Settlement Agreement.

e.    Fresenius Medical Care Payment:  The proceeds of the payment contemplated by the Fresenius Settlement Agreement.

2.    **Deferred Payment Obligations:**  Grace shall make additional payments to the Asbestos PI Trust over a 15 year period as follows:  five annual payments of $110 million commencing on January 2, 2019; and 10 annual payments of $100 million commencing on January 2, 2024.  Such payment obligations shall be subordinate to any bank debt or bonds outstanding and shall be guaranteed by Parent or any successor ultimate parent entity of Grace.  Such guaranty shall be secured by an obligation of Parent to issue to the Asbestos PI Trust, in the event an additional payment is not made, the number of shares of Parent common stock which, when

2

Source: W R GRACE & CO, 8-K, April 07, 2008

CC-BLG004303

added to the number of shares of common stock issued and outstanding as of the Effective Date, shall constitute 50.1% of the voting shares of Parent as of the Effective Date (such number of shares shall be equitably adjusted for stock splits, stock dividends, recapitalizations, corporate reorganizations or changes in control of Parent after the Effective Date).

**B.      Other Classes**

1.      **Administrative Claims:** 100% of allowed amount in cash.

2.      **Priority Tax Claims:** 100% of allowed amount in cash.

3.      **Priority Non-Tax Claims:** 100% of allowed amount in cash.

4.      **Secured Claims:** 100% of allowed amount either in cash or by reinstatement.

5.      **Unsecured Employee Claims (post-retirement health and special pension):** 100% of allowed amount by reinstatement.

6.      **Workers Compensation Claims:** 100% by reinstatement.

7.      **Allowed General Unsecured Claims:** 100% of allowed amount plus post-petition interest as follows: (i) for holders of pre-petition bank credit facilities, post-petition interest at the rate of 6.09% from the filing date through December 31, 2005 and thereafter at floating prime, in each case compounded quarterly; and (ii) for all other unsecured claims, interest at 4.19%, compounded annually, or if pursuant to an existing contract, interest at the non-default contract rate.

8.      **Allowed Environmental Claims:** 100% of allowed amount in cash.

9.      **Traditional Asbestos Property Damage Claims:** 100% of allowed amount in cash for settled claims. The Plan shall set forth procedures for the allowance of all Asbestos PD Claims that are disputed as of the Effective Date.

10.     **ZAI Claims:** Unless the Plan Proponents agree otherwise as to the treatment of ZAI Claims, the court shall estimate, for purposes of allowance and distribution, any liability on account of ZAI Claims prior to or in connection with the confirmation of the Plan. ZAI Claims shall be paid 100% of their allowed amount up to the amount of the court's estimate.

II.     **Channeling Injunctions.** The Plan shall contain injunctions under Sections 524(g) and Section 105(a) of the Bankruptcy Code to protect the Debtors, Cryovac, Sealed Air, Fresenius, their affiliates, officers, directors and employees, and other parties in interest and certain insurers. The Plan shall also contain such provisions, injunctions and releases

3

Source: W R GRACE & CO, 8-K, April 07, 2008

CC-BLG004304

(i) as are necessary to comply with the terms of the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement; and (ii) to the full extent permitted by law, to indemnify, and release all of Grace's officers, directors, employees and professionals, and the members of all official committees, the FCR and their professionals, from any liability on account of claims against Grace, or arising in or in connection with these Chapter 11 cases. The foregoing injunctions, indemnifications and releases shall be at least as extensive as, and consistent with, the injunctions, indemnifications and releases provided for under Grace's Amended Plan currently filed in the Chapter 11 Cases to the extent such latter injunctions, indemnifications and releases are not inconsistent with this Term Sheet.

III.    **Resolution of Outstanding Issues.**  The parties agree to cooperate in seeking a resolution of outstanding issues material to or not otherwise resolved in connection with the confirmation of a plan of reorganization.

IV.    **Binding Effect.**  This Term Sheet has been approved by all necessary corporate or organizational action of the Board of Directors of Parent and Grace, the ACC, the FCR and the Equity Committee, and shall be binding upon the parties and each of their respective successors and assigns to the fullest extent permitted by applicable law. The parties shall use their best efforts to incorporate the terms of this Term Sheet into a mutually agreeable plan of reorganization to be filed with the Bankruptcy Court as soon as possible.

V.    **Confidentiality.**

The parties shall treat all negotiations regarding this Term Sheet as confidential. Neither the contents nor the existence of this Term Sheet shall be disclosed by any party, either orally or in writing, except to its directors, officers, employees, legal counsel, financial advisors, accountants and clients on a confidential basis until the Debtors have issued a press release announcing the terms and conditions contained herein. Notwithstanding the foregoing, the parties agree that this Term Sheet or the terms of this Term Sheet may be disclosed to the Official Committee of Unsecured Creditors and the Official Committee of Asbestos Property Damage Claimants. Grace will provide counsel to the ACC and counsel to the FCR an opportunity to review and comment on any press release relating to this Term Sheet prior to its issuance.

4

Source: W R GRACE & CO, 8-K, April 07, 2008

CC-BLG004305

AGREED TO AND ACCEPTED BY:
Dated: April 6, 2008

**THE DEBTORS:**
W. R. GRACE & CO., on behalf of itself and its subsidiaries and affiliates that are Debtors in
the Chapter 11 cases

By:     /s/ Fred Festa
Name:   Fred Festa
Title:  Chairman, President and Chief Executive Officer


**THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS**


By:     /s/ R. Ted Weschler
Name:   R. Ted Weschler
Title:  Chair of the Committee

**THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS:**
CAPLIN & DRYSDALE, CHARTERED, on behalf of and in its capacity as counsel to the ACC


By:     /s/ Elihu Inselbuch
Name:   Elihu Inselbuch


**THE FUTURE CLAIMANTS REPRESENTATIVE:**
ORRICK, HERRINGTON & SUTCLIFFE LLP, on behalf of and in its capacity as counsel to the FCR


By:     /s/ Roger Frankel
Name:   Roger Frankel

                                        5

Created by 10KWizard   www.10KWizard.com

Source: W R GRACE & CO, 8-K, April 07, 2008

CC-BLG004306

## EXHIBIT D

### Bench Ruling from *In re Adelphia Communications*

DOCS_DE:138088.1

CC-BLG004307

```
 1                  UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF NEW YORK
 2

 3
       IN RE:                        .  Case No. 02-41729
 4                                   .
       ADELPHIA COMMUNICATIONS,      .  New York, New York
 5                                   .  Thursday April 27, 2006
                          Debtors.   .  9:02 a.m.
 6     . . . . . . . . . . . . . . . .  CORRECTED TRANSCRIPT

 7                   TRANSCRIPT OF COURT DECISION
                         JOINT MOTION IN AID
 8          RATE AND COMPUTATION OF POST-PETITION INTEREST
                 BEFORE THE HONORABLE ROBERT E. GERBER
 9                 UNITED STATES BANKRUPTCY JUDGE

10     APPEARANCES:

11     For the Debtors:           Morris J. Massel, Esq.
                                  Paul V. Shalhoub, Esq.
12                                Rachel C. Strickland, Esq.
                                  WILLKIE, FARR & GALLAGHER, LLP
13                                787 Seventh Avenue
                                  New York, New York 10014
14                                (212) 728-8000

15     For W.R. Huff:             Gary L. Kaplan, Esq.
                                  Bonnie Steingart, Esq.
16                                FRIED, FRANK, HARRIS, SHRIVER
                                    & JACOBSON, LLP
17                                One New York Plaza
                                  New York, New York 10004
18                                (212) 859-8000

19     (Appearances continued)

20
       Audio Operator:           Electronically Recorded
21                               by Court Personnel

22     Transcription Company:    Rand Transcript Service, Inc.
                                  311 Cheyenne Road
23                                Lafayette, New Jersey  07848
                                  (973) 383-6977
24
       Proceedings recorded by electronic sound recording,
25     transcript produced by transcription service.
```

```
 1   APPEARANCES:   (Continued)

 2   For the Olympus
     Bondholders:                    Robert J. Rosenberg, Esq.
 3                                    LATHAM & WATKINS, LLP
                                      885 Third Avenue
 4                                    New York, New York 10022
                                      (212) 906-1200
 5
     For the Bank of America
 6   Agent for the Century
     Lenders:                        Robin E. Phelan, Esq.
 7                                    HAYNES AND BOONE, LLP
                                      901 Main Street, Suite 3100
 8                                    Dallas, Texas 75202
                                      (214) 651-5612
 9
                                      Judith Elkin, Esq.
10                                    HAYNES AND BOONE, LLP
                                      153 East 53rd Street
11                                    New York, New York 10022
                                      (212) 659-4968
12
     For the Ad Hoc Committee
13   of Arahova Noteholders:         J. Christopher Shore, Esq.
                                      WHITE & CASE, LLP
14                                    1155 Avenue of the Americas
                                      New York, New York 10036
15                                    (212) 819-8394

16   For the ACC Senior
     Noteholders:                    James O. Johnston, Esq.
17                                    HENNIGAN, BENNETT & DORMAN, LLP
                                      865 South Figueroa Street
18                                    Suite 2900
                                      Los Angeles, California 90017
19                                    (213) 694-1200

20   For the Class Action
     Plaintiffs:                     Leonard Gerson, Esq.
21                                    COLE, SCHOTZ, MEISEL, FORMAN
                                       & LEONARD, P.A.
22                                    460 Park Avenue, 8th Floor
                                      New York, New York 10022
23                                    (212) 752-8000

24   (Appearances continued)

25
```

CC-BLG004309

```
1   APPEARANCES:   (Continued)

2
    For the Equity Committee:      Gregory A. Blue, Esq.
3                                  Andrew Buck, Esq.
                                   MORGENSTERN, JACOBS & BLUE, LLC
4                                  885 Third Avenue
                                   New York, New York 10022
5                                  (212) 308-5858
    For the FrontierVision
6   Ad Hoc Committee:              Kenneth H. Eckstein, Esq.
                                   Philip Bentley, Esq.
7                                  KRAMER, LEVIN, NAFTALIS
                                     & FRANKEL, LLP
8                                  1177 Avenue of the Americas
                                   New York, New York 10036
9                                  (212) 715-9100

10  For the Official Committee
    of Unsecured Creditors:        Adam L. Shiff, Esq.
11                                 KASOWITZ, BENSON, TORRES &
                                     FRIEDMAN, LLP
12                                 1633 Broadway
                                   New York, New York 10010
13                                 (212) 506-1700

14  For U.S. Bank N.A., as
    Indenture Trustee:             David J. McCarty, Esq.
15                                 SHEPPARD MULLIN
                                   48th Floor, 333 South Hope Street
16                                 Los Angeles, California 90071
                                   (213) 620-1780
17
    For the "Eleven                Jeffrey S. Sabin, Esq.
18  Signatories":                  SCHULTE, ROTH & ZABEL, LLP
                                   919 Third Avenue
19                                 New York, New York 10022
                                   (212) 756-2000
20  For the Law Debenture
    Trust Co. of New York:         Arlene R. Alves, Esq.
21                                 SEWARD & KISSEL, LLP
                                   One Battery Park Plaza
22                                 New York, New York 10004
                                   (212) 547-1200

23

24

25
```

CC-BLG004310

4

1                              I N D E X

2
                                                                    Page
3    COURT DECISION                                                   5

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CC-BLG004311

5

1     (Proceedings commence at 9:02 a.m.)

2          THE COURT:  Have seats, everybody.

3          I have some decisions to announce and some matters

4     of a preliminary nature to address.  We'll use this time

5     between now and about 9:45 for those matters and then proceed

6     with the disclosure statement hearing at 9:45.

7          On Monday I took under advisement the separate

8     matters as to the appropriate rate of pendency interest and

9     the interest rate component of the debtors' settlement with

10    the holders of the trade claims.  For the reasons that will

11    follow, I am ruling that the payment at the rate the debtors

12    propose is appropriate.  I am further ruling that the

13    interest rate level aspect of the settlement with the holders

14    of trade claims should be approved.  Though, if time permits

15    or if circumstances require, I'll issue a superseding

16    discussion in writing.  I'm going to advise you now, in a

17    dictated summary on the record, of my determinations.

18          Turning first to the interest rate.

19          Section 502(b)(2) of the Code provides for the

20    allowance of claims except to the extent that they are "for

21    unmatured interest."  That means, at least as a practical

22    matter, interest after the filing date.  But while Section

23    502(b)(2) provides that an allowed unsecured claim doesn't

24    include unmatured interest, 502(b)(2) doesn't prohibit the

25    award of interest to creditors in all circumstances.  See

CC-BLG004312

1  Coram Healthcare at 315 B.R. 344 (citing Dow II, 244 B.R.

2  691.)  Many courts have recognized that the payment of

3  pendency interest to unsecured creditors is appropriate when

4  a debtor is solvent.

5        Courts have carved out two exceptions to the general

6  rule disallowing post-petition interest on unsecured claims.

7  Both apply only when a debtor is solvent.  The first is based

8  on Section 726(a)(5) of the Code, made relevant to Chapter 11

9  cases by the "Best Interests of Creditors" rule of Section

10 1129(a)(7).  The best interests test is triggered when a

11 member of an impaired class of creditors rejects a plan of

12 reorganization.  It requires courts to examine what such

13 dissenting creditor would receive in a hypothetical Chapter 7

14 liquidation.  Section 726(a)(5) provides that unsecured

15 creditors in a Chapter 7 liquidation must receive interest at

16 the "legal rate" from the date of the filing of the petition.

17       Courts differ as to the appropriate interpretation

18 of "the legal rate," and the Second Circuit has not decided

19 the issue.  For reasons that I'll discuss at length if I have

20 the luxury of doing a full-blown written opinion, I agree

21 with the Ninth Circuit's conclusion in Cardelucci, to the

22 extent that it addresses Section 726(a)(5) "legal rate" and

23 Best Interests of Creditors considerations (which seem to be

24 the only issues it focused on), Judge Spector's decision in

25 Dow I, and the majority of the cases, which hold similarly.

CC-BLG004313

1    It is by far the better view, in my opinion, that "legal

2    rate" is the federal judgment rate and not the same as that

3    authorized under Section 506(b), which is a contract rate.

4    Though _Cardelucci_ is the only decision at the Circuit Court

5    of Appeals level addressing the matter, I come to its "legal

6    rate" result not so much because it is a Circuit Court

7    decision, or for the quality of its analysis (which I frankly

8    think is inadequate in its discussion of 1129(b)

9    considerations), but rather for many of the reasons Judge

10   Spector articulated in _Dow I_ and by reason of the difference

11   -- significant, in my view -- in the manner of addressing

12   pendency interest in Section 506(b), with respect to secured

13   creditor entitlements, and Sections 502(b) and 726, with

14   respect to unsecured creditor entitlements.

15          Thus, any proposal that paid pendency interest at

16   either the contract rate, a rate close to the contract rate

17   (which is what the debtors proposed and which I'll call the

18   "Adjusted Contract Rate"), or the federal judgment rate would

19   pass muster under the Best Interests of Creditors Rule,

20   insofar as creditors of Adelphia subsidiaries were concerned.

21          But turning to the area where I think the _Cardelucci_

22   Court might have done a little better job, the Best Interests

23   of Creditors requirement is not the only requirement that

24   must be satisfied, and it is at that point that I must

25   diverge from the positions of the parent creditors, even

CC-BLG004314

1  though <u>Cardelucci</u> says what they say it says.  The second

2  exception is based on the "fair and equitable" standard of

3  Section 1129(b), which would need to be considered in the

4  event certain classes reject the plan, as some threaten to

5  do, and the debtors then seek to cram the dissenters down, or

6  the debtors' plan gives creditors a proxy for having done

7  that (as it does here) by saying that they can support the

8  plan and still reserve their "fair and equitable" rights.  To

9  satisfy the fair and equitable test under Section 1129(b), a

10  rejecting class of impaired creditors must be paid in full

11  before junior creditors may receive any distribution under a

12  plan.

13          But the threshold issue is:  What does "paid in

14  full" mean?  The answer to that, in my mind, is quite clear,

15  particularly as a statutory matter.  Section 1129(b)(2) says

16  that the condition that a plan be "fair and equitable" with

17  respect to a class "includes" certain requirements. and its

18  Subsection (b)(2)(B) says, with respect to a class of

19  unsecured claims, that before any junior creditor or interest

20  holder gets anything, the plan must provide that the more

21  senior creditor receives property of a value, as of the

22  effective date of the plan, "equal to the allowed amount of

23  such claim."  As I discussed at the outset, under Section

24  502(b) of the Code the allowed amount of an unsecured claim

25  doesn't include unmatured interest, and instead would be

CC-BLG004315

1    merely for principal and interest accrued and unpaid as of

2    the filing date.  So as a statutory matter, in order to

3    satisfy the "fair and equitable" requirement, you don't have

4    to pay pendency interest, even at the federal judgment rate.

5        But Section 1129(b)(2) precedes its three

6    subsections of requirements that have to be satisfied -- one

7    for secured claims, one for unsecured claims, and one for

8    interests -- with the expression "includes."  As I noted in

9    my recent decision on the Arahova Trustee motion, as Judge

10   Spector noted in Dow II, and most importantly, as Code

11   Section 102(3) expressly provides, the expression "includes"

12   is not limiting, so it does not by its terms foreclose the

13   possibility that other requirements for "fair and equitable"

14   might be imposed under common law.  And here I think there

15   are additional requirements, as embodied in the case law in

16   reorganization cases applicable to those rare cases in which

17   we have solvent debtors.

18       Judge Drain addressed these issues, though at least

19   arguably in dictum, in his bench decision in Loral.  I'm on

20   record as having said that the interests of predictability in

21   this District (and not just Circuit) are of considerable

22   importance to the financial community, and that as a personal

23   matter, while the decisions of fellow Southern District of

24   New York Bankruptcy Judges technically are not binding on me,

25   I follow them in the absence of manifest error.  Here we not

CC-BLG004316

1    only don't have such manifest error; I think Judge Drain

2    described the applicable law perfectly.  Thus, to the extent

3    his analysis is relevant here, I believe I should follow

4    Judge Drain's statements of the law in _Loral_ in full, and

5    then to take them into account in deciding the extent to

6    which I have discretion, and in exercising my discretion.

7            As Judge Drain noted, the fair and equitable basis

8    for post-petition interest reaches way back, at least as far

9    back as the Supreme Court decision in _Vanston Bondholders_.  I

10   think those pre-Code cases and _Loral_ collectively stand for

11   the proposition that where an estate is solvent, in order for

12   a plan to be fair and equitable, at least some pendency

13   interest must be paid.

14           But how much?  Some of the litigants here have

15   mentioned remarks read into the Congressional Record in

16   dealing with the 1994 amendments to the Code that deleted the

17   Subsection 3 that used to exist in Section 1124 of the Code,

18   to override the _New Valley_ decision.  As stated in the

19   Congressional record:

20           "Specifically, courts have held that where an estate

21           is solvent, in order for a plan to be fair and

22           equitable, unsecured and undersecured creditors'

23           claims must be paid in full, including post-petition

24           interest, before equity holders may participate in

25           any recovery."

CC-BLG004317

1    Counsel for the parent bondholders has pointed out

2  that the quoted language was not with respect to Section

3  1129, but rather Section 1124 of the Code, and that the

4  snippets from the Congressional record followed, by more than

5  fifteen years, the enactment of the statutory language in

6  Section 1129 that I need here to interpret.  But Judge Drain

7  considered that quotation worthy of mention and took it into

8  account, albeit to a limited extent, and I think I should do

9  likewise.  In favor of considering it, I think I should take

10  into account the statutory language Congress repealed, the

11  old Section 1124(3), which until then had permitted a debtor

12  to pay a creditor in full but without interest, and for that

13  creditor then to be unimpaired, thereby denying it the

14  opportunity to vote against a plan and invoke its rights, on

15  a cram-down, to fair and equitable treatment.

16    I think it's fair to read that legislative history

17  and the deletion of old Section 1124(3) as indicating a

18  Congressional comfort with the notion of solvent debtors

19  paying post-petition interest (even though no such explicit

20  requirement exists under the Code).  But I think it's less

21  fair to read it as specifying the amount, and I am wary of

22  considering that legislative history quote as a substitute

23  for the case law.  I think the greatest danger in mechanical

24  reliance on that legislative history is not its procedural

25  context or any hard and fast rules about when legislative

CC-BLG004318

1  history should or should not be considered, but rather the

2  legislative history's shorthand for a body of law that's

3  considerably more refined and sophisticated than the quoted

4  language reveals.  And the very words in that legislative

5  history make it rather clear that they do not express a

6  Congressional policy judgment, but rather a capsulization by

7  the speaker of cases that I could (and did) read myself.  I

8  think the best evidence of what the Supreme Court and other

9  courts have held can be found in the decisions themselves, as

10  compared and contrasted to what this legislative history says

11  those cases say.

12           Now what those cases say, as Judge Drain noted, is

13  that "the touchstone of each decision on allowance of

14  interest in bankruptcy, receivership and reorganization has

15  been a balance of equities between creditor and creditor or

16  between creditors and the debtor."  Like Judge Drain, I've

17  just quoted from Vanston Bondholders, a decision of the

18  Supreme Court that's binding on all of us.

19           And Judge Drain noted, consistent with the great

20  bulk, if not all of the cases of which I'm aware, that "the

21  Court has a large amount of discretion" in deciding "what the

22  appropriate rate of interest should be" under a Chapter 11

23  plan for a solvent debtor.  (Note, by the way, that he made

24  that observation after quoting the legislative history

25  referred to above, confirming his understanding, which is

CC-BLG004319

1  also mine, that the loose language in the legislative history

2  did not speak to what the appropriate rate of interest should

3  be.)

4       The cases addressing pendency interest under the

5  1129(b) standard consistently note the wide latitude of

6  discretion courts have in determining what constitutes a fair

7  and equitable rate of interest.  As Judge Spector noted in

8  Dow II, the "prevailing and better view is that the phrase

9  'fair and equitable' is as broad as it sounds."  Dow II, 244

10  B.R. 694.  The Dow II Court -- that's Judge Spector --

11  emphasized "the wide parameters associated with the fairness

12  inquiry" and "the discretion ... [courts] are generally

13  accorded in matters concerning post-petition in interest."

14  Id. at 695.

15       In Coram Healthcare, which Judge Drain cited with

16  approval and which I also believe warrants consideration,

17  Judge Walrath similarly concluded that the specific facts of

18  each case will determine what rate of interest is fair and

19  equitable.  In In Re:  Anderson Carter, 220 B.R. 411 (Bankr.

20  D. New Mexico), a Section 726 case addressed by Judge Drain

21  in the 1129(b) context, the Court likewise noted that "[c]ase

22  law also provides that payment of post-petition interest on

23  unsecured claims in a Chapter 11 setting is a matter within

24  the Court's discretion and depends on the equities of the

25  case."

CC-BLG004320

14

1          So now, in an area where I have wide discretion, I

2    need to determine what's fair here.  Assuming (which I will

3    for the purposes of this discussion only) that any given

4    debtor group is solvent, I think it would be an abuse of my

5    discretion to deny the payment of any pendency interest

6    whatever.  And though the matter is closer, I believe that on

7    the facts here, the adjusted contract rate, and not the

8    default and/or compounded rate on the one hand, or the

9    federal judgment interest rate, on the other, is the rate

10   that is fair and equitable.  The arguments cut both ways, but

11   on balance I believe the debtors' proposal most closely

12   tracks the applicable precedents and what Adelphia told its

13   creditors to expect, and I believe it should be approved.

14         Creditors of the subsidiaries argue that this --

15   excuse me.

16         Creditors of the parent argue that this situation is

17   quite different from the paradigm case in which equity, often

18   held by insiders, benefits at the expense of the creditor

19   community, and in this respect, they are of course right.

20   Under the facts of this case, awarding interest at a lower

21   rate won't reward insiders, or for that matter, even innocent

22   public equity; as a practical matter, it will merely shift

23   value from one creditor constituency to another.

24         The creditors of the parent -- and the non-Rigas

25   preferred stock and common stock equity, for that matter --

CC-BLG004321

1  were indeed victims, just as the creditors of the

2  subsidiaries were.  And the parent creditors are also correct

3  when they observe that they didn't bargain for equity-style

4  upside and lacked the ability to manage the affairs either of

5  the subsidiaries or of the parent.

6          I understand and sympathize with the parent

7  bondholders' points, but in the exercise of my discretion, I

8  think the countervailing factors outweigh them.  On balance,

9  I think the fact that parent creditors must recover from the

10  entity with whom they dealt -- and that the parent's interest

11  in its subs was in law and substance equity -- is a matter

12  not just of form, but also of substance.  For purposes of

13  analysis in a multi-debtor, parent/subsidiary, case where

14  creditors would have justifiably focused on what we refer to

15  in bankruptcy parlance as "structural seniority," that

16  structural seniority must be taken into account.  And I

17  believe that the "structural seniority" of subsidiaries and

18  subsidiary creditors' rights of priority to subsidiary assets

19  was something that senior creditors know about, or should

20  have when they bought their bonds.  Quoting from one of the

21  prospectuses for parent-level bonds:

22          "The operations of the Adelphia Parent Company are

23          conducted through its subsidiaries.  Therefore, the

24          Adelphia Parent Company is dependent on the

25          earnings, if any, and cash flow of and distributions

CC-BLG004322

1       from its subsidiaries, to meet its debt obligations,

2       including its obligations with respect to the notes.

3       Because the assets of its subsidiaries and other

4       investments constitute substantially all of the

5       assets of Adelphia Parent Company and because those

6       subsidiaries and other investments will not

7       guarantee the payment of principal of and interest

8       on the notes, the claims of holders of the notes

9       effectively will be subordinated to the claims of

10      creditors of those entitles."

11      Similarly, it stated in its Risk Factors:

12      "In the event of a foreclosure, dissolution,

13      winding-up, liquidation, reorganization or other

14      bankruptcy proceeding of Adelphia Parent Company and

15      our subsidiaries, the creditors and holders of

16      preferred stock of our subsidiaries must be paid in

17      full before any of the subsidiaries' assets would be

18      available to Adelphia Parent Company, *as the*

19      *subsidiaries' equity holder* for our creditors,

20      including the holders of the notes."

21      I have read from two places in that prospectus, but

22  there are other similar statements elsewhere in that

23  prospectus, and at least three other prospectuses are similar

24  in words or substance.

25      Now I need to emphasize something here.  These

CC-BLG004323

1  statements, which come from exhibits that are in evidence in

2  the hearings on the MIA, speak to the upstreaming of value,

3  from subsidiaries to their ultimate parent, in the form of

4  *dividends or liquidation payments* or their equivalents -- the

5  basic entitlement of equity -- to Adelphia Parent, *as the*

6  *subsidiaries' equity holder*.  And it is at least arguable, if

7  not strongly arguable, that those statements have nothing to

8  do with whether subsidiaries owe money to Adelphia Parent, or

9  to other subsidiaries, as *creditors* of those subsidiaries --

10 where the parent entitlement is in the nature of debt owed to

11 it, not equity.  That is an issue in the MIA, and I am not

12 deciding it today.  But what I am saying today is that when

13 we're talking about what's fair and equitable to creditors of

14 the subsidiaries on the one hand, and of the parent on the

15 other, the debtors' pendency interest proposal -- which

16 comports with what parent bondholders were told in the

17 prospectuses covering their bonds, and which is consistent

18 with the fact that higher- level debtors are equity holders

19 of their subsidiaries -- is, despite the fact that all

20 creditors are victims in the Adelphia cases, "fair and

21 equitable."  It is also consistent with my colleague Judge

22 Drain's conclusions in Loral, and those of Judge Spector in

23 Dow II.  Though I recognize once more that these cases are

24 fact-specific, I read the applicable case law authority the

25 same way they do, and think I should rule similarly.

CC-BLG004324

1    I think Judge Walrath's decision in <u>Coram Healthcare</u>

2  makes clear that in these fact-specific cases, bankruptcy

3  judges have the power to reduce the pendency interest

4  entitlement, at least down to the level of the federal

5  judgment rate, and perhaps even down to zero, in instances of

6  creditor misconduct, such as the situation Judge Walrath

7  faced there and, at least arguably, in other instances in

8  which an award of contract interest or adjusted contract

9  interest simply wouldn't be fair.  Now I considered whether

10  that principle was applicable here.

11    But I don't think the circumstances here are as

12  serious or unfair as those she encountered there, and on

13  balance are insufficient to warrant such a treatment in this

14  case.  The desire of creditors at the subsidiary level to

15  wish to litigate the merits of the issues in the MIA is

16  understandable, and well within their rights.  And the fact

17  that the litigation of the MIA has taken time, and likely

18  will take longer, can't be laid at the feet of any

19  particularized subset of the MIA participants.

20    The bulk of the longer-than-average four years

21  duration of this case was occasioned (in no particular order)

22  by the complexity of these cases, the need to deal with the

23  legacy of the Rigases, the difficulty in ascertaining the

24  company's true financial condition and true obligations, both

25  to the outside world and as between debtors, and, of course,

CC-BLG004325

1    in marketing the company for what has turned out to be the

2    proposed Comcast-Time Warner sale.  The MIA arose, in

3    material respects, less than a year ago, and MIA issues have

4    accounted for only about a fourth of the total duration of

5    these cases, at the most.

6         Plainly the conduct of some of the subsidiary

7    creditors in trying to maximize their distributions at the

8    expense of all of the other creditors has been a matter of

9    concern to me, but those concerns can be addressed in other

10   ways, and it would be grossly inappropriate, at the least, to

11   penalize all of the creditors who did not act likewise, but

12   who may be in the same creditor classes (or who may have

13   similar claims for pendency interest), based on the conduct

14   of a subset of them.

15        Also, I should emphasize that we are only talking

16   about pendency interest; that is, interest for the period

17   from the filing date to the effective date of the plan.  We

18   are not talking about the interest that will be recoverable

19   after that date.  If the holdback plan is confirmed, huge

20   amounts will be held in reserve, and it could be argued that

21   if a creditor constituency believes its debtor group will be

22   held to be solvent, it might have a perverse incentive to

23   drag out the MIA process at the expense of its opponents, in

24   the belief that interest accruals will augment its recovery

25   at the expense of the other creditors.  I am not addressing

CC-BLG004326

1   that now, only to note that the considerations applicable to

2   such a scenario might be very different from those presented

3   here, and that if we get to that point, people should be

4   prepared to address these matters, as they are a matter of

5   concern to me.

6          A word about the requests, by the Olympus

7   bondholders and others, for interest at more than the simple

8   interest rate, at higher default rates or as a consequence of

9   compounding.  I don't doubt that the Olympus creditors are

10  right when they say that applicable state law, in this case

11  the law of the State of New York, would permit them to

12  collect default interest and compound interest in a non-

13  bankruptcy situation.  But here we have a bankruptcy

14  situation and do not have secured creditors, who have

15  statutory rights to their contractual entitlements under

16  Section 506(b).  As I've discussed at length above, this is a

17  matter where I have wide discretion, and where the common

18  law, as enunciated by the Supreme Court in Vanston

19  Bondholders and its predecessors, tells us that the

20  touchstone of a decision of this character is the "balance of

21  equities between creditor and creditor or between creditors

22  and the debtor."

23         Here, because the amount of time it has taken to

24  administer these cases has to some degree benefitted all

25  creditors, the debtors' plan has evidenced a determination

CC-BLG004327

1  that awarding compound and/or default interest to subsidiary

2  creditors at the expense of recoveries of creditors of the

3  parent would not be fair because those subsidiary creditors

4  would receive not only the benefit of the time it took to

5  restructure the debtors' business, address the Rigases'

6  fraud, and maximize the estate's value, but also the benefit

7  of the highest possible return on capital available to those

8  subsidiary creditors, all to the detriment of junior

9  stakeholders.  Such a result is inequitable.  Giving

10 subsidiary bondholders the core of their bargain -- principal

11 and simple interest -- is, as I have discussed, a necessity

12 to honor basic expectations under the fair and equitable

13 requirement, even though it comes at the expense of

14 structurally junior creditors.  But giving subsidiary

15 creditors the further incremental recovery they also desire

16 is not.  The fact that the Supreme Court included "between

17 creditors and the debtor," along with "creditor and

18 creditor," in Vanston Bondholders leads me to conclude that,

19 at least in a case like this one, where entitlements of

20 creditors affect entitlements of structurally junior

21 creditors, of debtors that are the equity holders of lower-

22 level subs, there is much more than sufficient authority to

23 make adjustments in certain creditor groups' non-bankruptcy

24 interest entitlements to achieve greater overall fairness.

25 For instance, even as adjusted by the debtors' proposal, the

CC-BLG004328

1  Olympus Bondholders will receive, by my computation, about

2  144 percent of their claims, with about four years of

3  pendency interest, at nearly eleven percent per year.  Where,

4  as here, insider equity would not be the beneficiary of

5  giving the Olympus Bondholders even greater entitlements, and

6  the recoveries instead would be going to creditors who will

7  not even get 100 percent of their claims, I cannot regard the

8  balance of equities as having been inappropriately distorted

9  by the debtors, especially in a material fashion.  To the

10 contrary, distributions of the type the debtors propose --

11 providing payment in full of principal, plus pendency

12 interest in full at a simple interest rate; for example, the

13 nearly eleven percent rate to be awarded to the Olympus

14 bondholders -- do indeed, as the debtors argue, strike the

15 appropriate balance between delivering the essence of their

16 contractual promise and avoiding excessive payments at the

17 expense of other creditors.  In the exercise of my

18 discretion, I hold it to be entirely acceptable.

19         Now turning to the interest rate component of the

20 settlement on the trade claims.

21         I don't need to speak at length, or clutter up my

22 discussion with numerous citations, on the standards for

23 approval of a settlement in this Circuit.  I dealt with it at

24 length in my discussion in this case on the debtors' motion

25 to approve their settlement with the DoJ and SEC, which

CC-BLG004329

1   decision was affirmed on appeal.  See In Re:  Adelphia

2   Communications Corp., 327 B.R. 143 (Bankr. S.D.N.Y. 2005),

3   aff'd. 337 B.R. 475 (S.D.N.Y. 2006).  As set forth in that

4   decision, the legal standard for determining the propriety of

5   a bankruptcy settlement is whether the settlement is in the

6   "best interests of the estate."  I note in that connection,

7   as I noted in oral argument, that I am not applying a

8   "business judgment" test.

9        To determine that a settlement is in the best

10   interests of the estate, the Supreme Court held in TMT

11   Trailer Ferry that the settlement must be "fair and

12   equitable."  [Id. at 424, 88 S.Ct. 1157.]  Such a finding is

13   to be based on "the probabilities of ultimate success should

14   the claim be litigated," and:

15           "[A]n educated estimate of the complexity, expense,

16           and likely duration of ... litigation, the possible

17           difficulties of collecting on any judgment which

18           might be obtained, and all other factors relevant to

19           a full and fair assessment of the wisdom of the

20           proposed compromise.  Basic to this process in every

21           instance, of course, is the need to compare the

22           terms of the compromise with the likely rewards of

23           litigation."

24        Importantly, the settlement need not be the best

25   that the debtor could have obtained.  Rather, as the Second

CC-BLG004330

1   Circuit held in Penn Central, the settlement must fall

2   "within the reasonable range of litigation possibilities."

3   And as the Circuit held in W.T. Grant, a bankruptcy court

4   need only "canvass the issues and see whether the settlement

5   falls below the lowest point in the range of reasonableness."

6   A decision whether to accept or reject a compromise lies

7   within the sound discretion of the Bankruptcy Court.

8            At this juncture, I am asked only to gauge the

9   reasonableness of the eight percent pendency rate to be

10  provided to holders of trade claims, and I find that this

11  aspect of the settlement easily passes muster under the

12  standards of TMT Trailer Ferry, the Second Circuit cases, and

13  the decision of Judge Schwartzberg in Texaco, where he

14  articulated factors similar to, but a little more detailed

15  than, those set forth in TMT Trailer Ferry for consideration

16  when deciding whether or not to approve settlements.  Those

17  included:

18           (1)   The balance between the likelihood of

19                 plaintiff's or defendants' success should the case

20                 go to trial vis-a-vis the concrete present and

21                 future benefits held forth by the settlement without

22                 the expense and delay of a trial and subsequent

23                 appellate procedures;

24           (2)   The prospect of complex and protracted

25                 litigation if the settlement is not approved;

CC-BLG004331