1    (3) The proportion of the class members who do not

2    object or who affirmatively support the proposed

3    settlement;

4    (4) The competency and experience of counsel who

5    support the settlement;

6    (5) The relative benefits to be received by

7    individuals or groups within the class;

8    (6) The nature and breadth of releases to be

9    obtained by the directors and officers as a result

10    of the settlement; and,

11    (7) The extent to which the settlement is truly the

12    product of arm's length bargaining, and not of fraud

13    or collusion.

14    Whether articulated in the TMT Trailer Ferry terms -

15 - "the probabilities of ultimate success should the claim be

16 litigated" -- or in Texaco terms, those focusing on the

17 likelihood of success in the form in which I quoted them

18 above -- I think the first factor, which I weigh heavily,

19 plainly favors approval.

20    In my view, if the debtors were to litigate

21 entitlements to interest on the thousands of trade proofs of

22 claim, they would have mixed results, with mixed incremental

23 gains and losses, by reason of the variances in contractual

24 terms from one agreement to the next, differences in the law

25 amongst the thirty-one states whose substantive law would

CC-BLG004332

1    have to be applied, and differences in the application of the

2    law to each of those agreements.  It is arguable, but by no

3    means clear, that the debtors could prevail on the argument

4    that a common federal judgment interest rate would apply to

5    all non-interest-bearing claims, and it is even less clear

6    that they would necessarily prevail on claims where a stated

7    interest rate appeared on an invoice.

8           In that connection, many of the vendors' invoices

9    called for interest on unpaid amounts of one and a half to

10   two percent per month, which, if honored, would have resulted

11   in claims for interest of from eighteen percent to twenty-

12   four percent annum.  Though it's now nearly forty years ago,

13   I still remember the difficult "Battle of the Forms" issues

14   we dealt with in law school, and I consider them, at the

15   least, more than fair game for litigation.  And once one gets

16   past the offer and acceptance issues associated with battles

17   of the forms, there are separate issues as to whether

18   contracts seemingly including such interest provisions should

19   or should not be regarded as contracts of adhesion --

20   remembering that here we are not talking about

21   unsophisticated consumers being bound by those forms, but

22   rather by a multi-billion-dollar business entity.

23          I also recognize that the litigation might also

24   involve, apart from contractual and civil procedure issues,

25   issues as to discrimination amongst creditors or the

CC-BLG004333

1    equitable fairness of the proposed settlement, in a manner

2    akin to those I've addressed above on pendency interest.    In

3    this respect, Adelphia could certainly argue for a lower

4    rate, but it would have to do so in the context of other

5    creditors getting pendency interest of from six percent on

6    the low end to 11.875 percent on the high end -- a rate

7    environment in which the eight percent that would go to the

8    trade claims holders would hardly stand out.    There would be

9    differences in circumstances of course -- not the least of

10   which is that the interest rate is typically one of the most

11   heavily bargained-for aspects of funded debt.    But on the

12   other hand, the holders of trade claims could legitimately

13   argue that of all the creditor groups, they were the ones

14   that benefitted least from the substantial time that this

15   case took to reorganize.    They were structurally senior to

16   almost everybody, and didn't need such a long time to

17   generate enough value to pay them in full.    They were denied

18   the opportunity to get their distributions quickly and

19   reinvest those distributions elsewhere, while the debtors

20   focused on maximizing value for everyone else.    On the

21   merits, this argument would have some force.

22          Turning to the second factor, the burden and

23   complexity of the litigation, which I also weigh heavily, the

24   facts here likewise strongly support approval of the

25   settlement.    The debtors have spoken of having 18,000 proofs

CC-BLG004334

1   of claim, and while the number of those that are trade claims

2   has not been made clear, it is at least likely that they

3   represent a large proportion of the total.  They were filed

4   against debtors doing businesses in thirty-one states, and

5   representing thousands of individual contracts. (Since some

6   proofs of claim may combine claims on multiple contracts, and

7   others may involve master contracts, I assume this number may

8   be more or less, but plainly it would require review of all

9   those proofs of claims to find out.)  If the matter were to

10  be litigated, the debtors would be faced with the significant

11  burdens of (a) reviewing each agreement or instrument

12  supporting a particular rate of interest payable on the

13  claims; (b) in the event no agreement exists, determining the

14  state in which the claim arose to award the correct state

15  judgment rate of interest; and (c) litigating the entitlement

16  to interest reflected in invoices and purchase orders and

17  litigating whether such documents constitute "contracts" for

18  purposes of payment of pendency interest.  And then, as I

19  noted, addressing the battle of the forms, and then

20  addressing the extent to which they might be regarded as

21  contracts of adhesion.

22        At the outset of argument, I wondered whether the

23  interest rate agreed on might be slightly high, thinking that

24  I would have regarded the perfect settlement amount to be six

25  percent, rather than eight percent.  But I came to realize

CC-BLG004335

1   that this was an insufficient basis to disapprove the

2   settlement, both for factual reasons, which I'll discuss

3   momentarily, and legal ones; the latter referring to the

4   point that I previously discussed:  That a bankruptcy court's

5   review is not based on such a test, what the Bankruptcy Court

6   might have done or what it might have preferred, but rather

7   on whether the settlement falls below the lowest point in a

8   range of reasonableness.

9           At the outset, I had assumed -- now I believe

10  unrealistically -- that because at the time Adelphia had its

11  headquarters in Pennsylvania, which has a six percent

12  interest rate, its claims would bear at most the six percent

13  interest rate under Pennsylvania law.  But it later became

14  clear that the trade claims at least arguably arose much more

15  locally, where Adelphia has its subscribers and field

16  operations, resulting in an array of arguably applicable

17  interest rates, with those in several jurisdictions where

18  Adelphia has the most subscribers - for example, California,

19  with its ten percent interest rate, and New York, with its

20  nine percent rat -- higher than the eight percent that was

21  agreed on.  I also was reminded of the invoices claiming

22  interest entitlements of from eighteen to twenty-four percent

23  per year, as I have noted above, dramatically increasing the

24  stakes in losses over applicable interest rate issues.  All

25  of this would make litigating all of these issues a

CC-BLG004336

1  litigation nightmare.  To say there would be a "prospect of

2  complex and protracted litigation if the settlement is not

3  approved" would be the understatement of the decade.

4          With respect to the third _Texaco_ factor, which is

5  adapted from civil class action litigation and which

6  translates imperfectly into a bankruptcy context, I consider

7  this factor, but give it only modest weight.  Here, some

8  constituencies favor the settlement, but I sense that a

9  greater number oppose it.  But as I held in my ruling on the

10  DoJ-SEC settlement, the approval of a settlement cannot be

11  regarded as a counting exercise.  Rather, it must be

12  considered in light of the _reasons_ for any opposition, and

13  the more fundamental factors -- such as benefits of

14  settlement, likely rewards of litigation, costs of

15  litigation, and downside risk -- described above.  And as

16  counsel for the FrontierVision Bondholders observed, making a

17  point that I regarded as significant, there can come a time

18  in a case when it's important to get issues resolved and to

19  reach closure on outstanding issues.  And some constituencies

20  recognize this sooner than others do.

21          I also note in this connection that the settlement

22  interest rate is the same as the settlement interest rate in

23  the settlement recommended by the Creditors' Committee in the

24  fall of 2004.  Of course, the circumstances now are not quite

25  identical to those then.  But the underlying issues that

CC-BLG004337

1   would be the meat of any litigation do not differ, especially

2   in material respects, and since that time the estate has had

3   a greater need to get issues behind it to bring this case to

4   a successful conclusion; and, if it can meet the standards

5   for confirmation, getting its deal with Time Warner and

6   Comcast done, so that it can deliver value to creditors in

7   these cases.

8          The fourth Texaco factor -- the competency and

9   experience of counsel who support the settlement -- while not

10  as important as factors such as the chances of success and

11  the burdens of litigation -- likewise favors approval of the

12  settlement.  The fifth and sixth Texaco factors are not

13  applicable to any material extent here.  The seventh factor -

14  - the extent to which the settlement is the result of arm's

15  length bargaining and is not collusive -- is, as I noted in

16  my earlier settlement decision, of great importance when it

17  is lacking, but of only modest importance in other cases.

18  Here, there is no basis for a conclusion that the settlement

19  at this rate was anything other than an arm's length deal.

20         For the foregoing reasons, I can easily make the

21  Penn Central and W.T. Grant findings.  This settlement falls

22  well "within the reasonable range of litigation

23  possibilities."  I find that the eight percent rate to be

24  provided under the settlement is fair and equitable, and it

25  is approved.

CC-BLG004338

1          We're now going to take a five-minute recess, at

2   which time counsel can get ready for the disclosure statement

3   hearing.

4          I will note only one other thing before we take the

5   recess.

6          As most of you know, we have had discussions as to

7   whether one of my judicial colleagues should act as a

8   facilitator; in fact, I think we used the words "hall

9   monitor," to assist parties in the resolution of the MIA.   My

10  colleague Judge Morris will act in such a role.

11         I would request either or both of the debtors or the

12  Creditors' Committee to act as a mechanical facilitator to

13  help get the parties together with Judge Morris, so that she

14  can assist me in that regard.

15         We will now take a five-minute recess, at which time

16  I'll take the disclosure statement matters immediately

17  thereafter.

18      (Proceedings concluded at 9:54 a.m.)

19                          *****

20

21

22

23

24

25

33

1

<u>CERTIFICATION</u>

2         I certify that the foregoing is a correct transcript

3    from the electronic sound recording of the proceedings in the

4    above-entitled matter to the best of my knowledge and

5    ability.

6

7

8    _____         April 28, 2006
     Coleen Rand
9    Certified Court Transcriptionist/Agency Director
     For Rand Transcript Service, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT E

## Bench Ruling from *In re Loral Space & Communications Ltd.*

DOCS_DE:138088.1

CC-BLG004341

1

1
2   UNITED STATES BANKRUPTCY COURT
3   SOUTHERN DISTRICT OF NEW YORK
4   - - - - - - - - - - - - - - - -x
5   In the Matter of
6        LORAL SPACE & COMMUNICATIONS     03-41710 (RDD)
         LTD., et al.,                    03-41709 to
7                                         03-41728
                       Debtors.
8   - - - - - - - - - - - - - - - -x
9                        July 25, 2005
                         3:00 p.m.

10
                         United States Custom House
11                       One Bowling Green
                         New York, New York 10004

12
13
14
              CONFIDENTIAL TRANSCRIPT
15
16
17        BENCH RULING in the Matter of Loral Space &
18   Communications Ltd. and Space Systems/Loral, Inc.
19
20
21
22   B E F O R E:
23                HON. ROBERT D. DRAIN,
24                     U.S. Bankruptcy Judge.
25

CC-BLG004342

2

1
2    A P P E A R A N C E S:
3
4

        WEIL GOTSHAL & MANGES LLP
5
                Attorneys for the Debtors
6               767 Fifth Avenue
                New York, New York 10153
7
        BY:     STEPHEN KAROTKIN, ESQ.
8               THEODORE E. TSEKERIDES, ESQ.,
                SHAI Y. WAISMAN, ESQ.,
9          BRUCE MEYER, ESQ.,
                LORI R. FIFE, ESQ.
10
11
12      AKIN GUMP STRAUSS HAUER & FELD LLP
13              Attorneys for the Official
                Committee of Unsecured Creditors
14              590 Madison Avenue
                New York, New York 10022
15
        BY:     DANIEL M. GOLDEN, ESQ.,
16              DAVID H. BOTTER, ESQ.,
           ANDREW ROSSMAN, ESQ.
17              JOHN W. BERRY, ESQ.
18
19
        SONNENSCHEIN, NATH & ROSENTHAL, ESQS.
20
         Attorneys for the Official
21              Committee of Equity and Security
                Note Holders
22              1221 Avenue of the Americas
                New York, New York 10020
23
        BY:     JOHN A. BICKS, ESQ.,
24              PETER WOLFSON, ESQ.,
                ARTHUR H. RUEGGOR, ESQ.
25

CC-BLG004343

3

1

2  A P P E A R A N C E S  -  continued

3

4

         LOWENSTEIN SANDLER

5

6

         BY:  MICHAEL ETKIN, ESQ.

7

8

9        CAROLYN S. SCHWARTZ
         UNITED STATES DEPARTMENT OF JUSTICE

10       OFFICE OF THE UNITED STATES TRUSTEE
                  33 Whitehall Street

11                New York, New York 10004

12       BY:     PAMELA J. LUSTRIN, ESQ.,
                          of Counsel

13

14

15  A L S O    P R E S E N T:

16

    TONY CHRIST - Loral Stockholders Protective

17  Committee

18

19

20

21

22

23

24

25

CC-BLG004344

4

```
 1              LORAL SPACE AND COMMUNICATIONS, LTD.
 2    P.R O C E E D I.N G S:     .  ..  .
 3                    THE COURT:  Please be seated.
 4                    All right.  First, in looking at the
 5    audience, I assume there are people here who have
 6    not signed a confidentiality agreement with Loral;
 7    is that correct?
 8                    Because of that and because of the
 9    fact that a small but important part of the record
10    was prepared under seal and a part of my ruling
11    relates to that part of the record, I'm going to go
12    a little bit out of order and give that part of my
13    ruling first.  So, therefore, those of you who are
14    not bound by a confidentiality agreement with Loral
15    should leave now.  That part of my ruling will only
16    last five or ten minutes, and then someone will
17    come back and get you for the bulk of my ruling.
18    So anyone who has not signed a confidentiality
19    agreement with Loral needs to leave the courtroom
20    now, and someone will come and get you.
21
22
23
24
25
```

CC-BLG004345

5

```
 1                    CONFIDENTIAL
 2              THE COURT:  All right, as I just
 3   noted, I'm going to address two parts of my ruling
 4   now somewhat out of order because of the need to
 5   keep them confidential, for Loral's business
 6   reasons and for the benefit of the estates, and
 7   then go to the bulk of my opinion and call the
 8   audience back.
 9              As with all of my bench rulings, I
10   will review the transcript after it's prepared and
11   reserve the right and discretion to correct it for
12   errors, and my own errors, and make sure the
13   citations are correct.  The following constitutes a
14   part of my ruling on Loral's request for
15   confirmation of its fourth amended joint plan, as
16   well as the motion by the equity committee for
17   leave to pursue fraudulent transfer litigation in
18   respect of the Orion notes or, more properly, the
19   guarantee of those notes issued by Ltd.
     PAGE 5 LINE 20 THROUGH PAGE 19 LINE 21
     ARE FILED UNDER SEAL
     PER JUDGE DRAIN'S ORDER AT THE HEARING
22              Okay, could someone let the folks
23   in?  And that ends the sealed portion of the
24   transcript.
25
```

CC-BLG004346

20

1               LORAL SPACE AND COMMUNICATIONS, LTD.

2      .   .      .     THE COURT:  All right.  Let me

3  continue with my ruling on the request by Ltd. and

4  its subsidiary debtors for confirmation of their

5  joint Chapter 11 plan.

6           Based on my review of the plan and

7  disclosure statement, several days of testimony,

8  the briefs, and the exhibits, I find that the

9  debtors have satisfied the requirements of Sections

10  1129(a) and (b) of the Bankruptcy Code, and that

11  the plan should and will be confirmed.

12         I will discuss primarily those

13  sections or elements of Sections 1129(a) and (b) as

14  to which objections were raised, but I should note,

15  before I get to those objections, that Loral has

16  satisfied all of its burdens under 1129(a),

17  including in respect of feasibility under

18  Bankruptcy Code Section 1129(a)(11) and best

19  interests under Bankruptcy Code 1129(a)(7), which

20  were not objected to.

21         The primary objections to the plan

22  go to the plan's proposed cramdown of the preferred

23  and common shareholder classes, who would receive

24  no recovery under the plan.  In addition, there is

25  an objection as to whether the plan is in good

CC-BLG004347

21

1            LORAL SPACE AND COMMUNICATIONS, LTD.

2     faith, as required under Section 1129(a)(3) of the

3     Bankruptcy Code.

4            Let me address the cramdown

5     objections first.  They hinge obviously on the

6     assertion that Ltd., the parent and issuer of the

7     preferred and common stock, is solvent, and that

8     therefore the unsecured creditors of Ltd., and

9     potentially creditors of the subsidiary debtors, as

10    well, are receiving more than full recovery on

11    their claims under the plan and thus that the plan

12    improperly deprives the shareholders of their

13    rightful recovery.

14            I conclude, based on my review of

15    the expert reports and testimony of the three

16    investment banking firms retained in the case, as

17    well as the testimony of Mr. Schwartz and the

18    arguments and exhibits raised and introduced by the

19    informal Loral Stockholders Protective Committee,

20    or "LSPC," that in fact Ltd. is insolvent.  Let me

21    summarize those findings first, and then I will go

22    into some detail as to my reasons for them.

23            I base my conclusion primarily upon

24    my review of the analyses done by the three

25    experts: Greenhill, Jeffries and Chanin, retained

CC-BLG004348

22

1          LORAL SPACE AND COMMUNICATIONS, LTD.

2     respectively by the debtors, the creditors'

3     committee, and the official equity committee.

4     Those experts employed traditional and well

5     recognized methodologies for valuing companies of

6     this kind.   Each expert considered a going concern

7     valuation of Ltd. based on its two core business

8     segments, as well as other miscellaneous assets.

9     Each expert considered whether to apply a

10    discounted cash flow method, a comparable

11    transaction method, and a comparable companies

12    method, in placing a value on those assets together

13    as a going concern.   The first segment, if you

14    will, of Ltd.'s value is SS/L.   There, as a

15    midpoint, minus the EBITDA attributable to its

16    projection for government contracts, Chanin came to

17    a value of approximately $275 million, Jeffries

18    came to a value of approximately $202 million, and

19    Greenhill came to a value of approximately $97

20    million.

21               In considering what would be a

22    proper valuation of SS/L, I, of course, noted the

23    large difference between Greenhill and the other

24    two experts.   That difference is largely

25    attributable to Greenhill's method for ascertaining

CC-BLG004349

23

LORAL SPACE AND COMMUNICATIONS, LTD.

1

2  the terminal value on a DCF basis of SS/L.  Unlike

3  the other two investment bankers, Mr. Robins of

4  Greenhill applied a perpetual growth methodology to

5  determine that terminal value.  The equity

6  committee pointed out potential flaws with that

7  choice, including its assertion that the percentage

8  of 1 to 3 percent applied by Greenhill in that

9  methodology was too low.  Frankly, I don't accept

10  that it was too low as a matter of gauging

11  inflation, given the last 25 years or so of

12  inflation trends introduced into evidence.

13  However, I did, in the end, rule out the Greenhill

14  valuation for SS/L, because, to me, it appeared to

15  be simply too low in comparison to the liquidation

16  value of the company, and everyone's desire in this

17  case is to keep SS/L in business.

18              Instead I focused on the valuations

19  of SS/L prepared by Chanin and Jeffries.  And

20  basically on my review of those two valuations and

21  the differences between them, I determined that a

22  reasonable value for SS/L was 230 million dollars.

23  The main difference between Chanin's and Jeffries'

24  valuation of SS/L stemmed from the fact that

25  Chanin, like Greenhill, weighted it's valuation one

CC-BLG004350

24

LORAL SPACE AND COMMUNICATIONS, LTD.

1    LORAL SPACE AND COMMUNICATIONS, LTD.

2 hundred percent on the discounted cash flow

3 methodology, whereas, Jeffries gave 30 percent of

4 its weighting to a comparable companies

5 methodology.  All of the investment bankers, by the

6 way, determined that there were no relevant

7 comparable transactions upon which to do a

8 valuation of SS/L, except for one that was somewhat

9 dated and for which information was not

10 particularly reliable, the Hughes/Boeing

11 transaction.

12    Jeffries acknowledged that there was

13 no clear comparable company to SS/L; however, I

14 gave some weight to Mr. Derrough's testimony that

15 based upon, first, the similarities between Orbital

16 Sciences and SS/L, as well as his own and one of

17 his colleague's experience with Orbital Sciences,

18 its stock price could be used as a comparable

19 measure for determining SS/L's value.  Particularly

20 since, according to Mr. Derrough, he gave SS/L a

21 better multiple, notwithstanding Orbital Sciences'

22 more steady, or regular, government business as its

23 main source of revenue.  I also discounted Chanin's

24 evaluation of SS/L because so much of the value, in

25 fact all of the value for the company, was placed

CC-BLG004351

25

1              LORAL SPACE AND COMMUNICATIONS, LTD.

2      on the final projected year, 2008, to determine the

3      DCF terminal value.  While I accept that the

4      projections underlying the current going concern

5      valuations of the debtors are reasonable, I note

6      that it is only in that last year that there is

7      positive EBITDA for SS/L.  And given the

8      uncertainties of the contracts in this business

9      and, for want of a better word, the lumpiness of

10     its cash flow projections given the nature of that

11     business in which very substantial contracts

12     require very substantial outlays of expense, I

13     thought that the Chanin midpoint valuation should

14     be discounted accordingly.

15              The second segment, if you will, of

16     Ltd. for valuation purposes is the FSS business.

17     There, the three investment bankers' valuations

18     were much more comparable.  Each investment banker

19     recognized that each of the three traditional

20     valuation methodologies could be applied.  That is,

21     there were comparable transactions as well as

22     comparable companies with which to measure FSS's

23     value, and, therefore, those two methodologies

24     could be added to a DCF valuation.  The mid ranges

25     on FSS for Chanin, Greenhill and Jeffries were

CC-BLG004352

26

LORAL SPACE AND COMMUNICATIONS, LTD.

1

2    $470.6 million, $392 million, and $442.3 million

3    respectively.   The main difference among the

4    investment bankers with regard to their valuations

5    was the weighting of the three methodologies.

6    Chanin placed considerably more weight on the DCF

7    valuation, weighting the other two at 20 percent

8    each, with a DCF weighting 60 percent.   Greenhill's

9    valuation weighted each of the three methodologies

10   equally, and Jeffries had a slight preference for

11   the DCF valuation, going 30, 30 and 40 percent,

12   with 40 percent being accorded to its DCF

13   methodology.

14            I chose a valuation for FSS of $440

15   million, which is slightly over the average of all

16   three.   It seemed to me that this was justified for

17   a couple of reasons.   First, I did not accept

18   Chanin's giving 60 percent of the weight to DCF,

19   which it did, according to Mr. Belinsky, to reflect

20   the growth in the business that is being projected.

21   It seemed to me that this was somewhat skewing the

22   value toward a more risky valuation.   I did this

23   also noting that Chanin nevertheless had a somewhat

24   higher EBITDA multiple for its DCF valuation than

25   either of the other two bankers.

CC-BLG004353

27

1          LORAL SPACE AND COMMUNICATIONS, LTD.

2                    There are two other elements of the

3    valuation.  The first is a projection of available

4    cash at confirmation, and here there was roughly a

5    70 million dollar swing between the experts.  That

6    was largely attributable to the view of Mr.

7    Derrough and his colleagues at Jeffries that, given

8    the nature of SS/L's business and its cash needs,

9    it would need to retain a hundred million as

10   opposed to 50 million dollars of cash to be

11   comfortable about conducting that business.  Chanin

12   projected $180 million of cash for SS/L and FSS and

13   other sources being available for creditors,

14   Jeffries $117 million, and Greenhill $190.35

15   million.  I saw some merit in Jeffries' argument

16   about SS/L's cash needs, particularly given the

17   testimony about the lumpiness of SS/L's cash flow,

18   and therefore I chose an exit cash figure of 150

19   million dollars.

20                    The parties dropped into a basket

21   labeled "other assets" three main assets that they

22   ascribed -- or some of them ascribed -- value to:

23   Loral's interest in XTAR, unused orbital slots, and

24   SS/L's and other debtors' interests in real estate,

25   but primarily, if not exclusively, SS/L's

CC-BLG004354

28

1        LORAL SPACE AND COMMUNICATIONS, LTD.

2    headquarters in Palo Alto, California.  The spread

3    between the experts here was fairly large.  Chanin

4    projected $217 million dollars of value in the

5    other assets category, Jeffries $114 million, and

6    Greenhill $143 million.  The main differences were

7    primarily in respect of unused orbital slots, which

8    Chanin valued at a midpoint range of $50 million

9    dollars, as compared to Jeffries' $5 million, and

10   Greenhill's $13 million.

11             Frankly, based upon Loral's past

12   history of being unable to sell unused orbital

13   slots alone, as opposed to in connection with a

14   satellite order, I was originally prepared to put

15   zero dollars weight on this asset.  However,

16   Greenhill itself gives some value to them, and Mr.

17   Christ introduced some basis for ascribing value to

18   them, although indirectly connected to related

19   satellite orders.  I ascribed therefore 10 million

20   dollars value to them in the end.

21             As to the XTAR interest, the spread

22   is between $152 million, as valued by Chanin at its

23   mid point, $108 million by Jeffries, and $130

24   million by Greenhill.  The main difference with

25   respect to the experts' valuation of this asset is

CC-BLG004355

29

1             LORAL SPACE AND COMMUNICATIONS, LTD.

2   the percentage that they applied to the weighted

3   average cost of capital used in their DCF

4   valuation.  Jeffries' low valuation of $108 million

5   was attributable to a relatively high WACC, which

6   is attributable, in turn, to its view that XTAR

7   would likely be financed only through equity

8   financing, and is still a risky and uncertain

9   investment that has not fulfilled yet, or even come

10   close to, its projections or potential occupancy.

11   On the other hand Chanin chooses a WACC that treats

12   it much more like any other proven satellite asset

13   of FSS and financeable with debt.  Greenhill is

14   closer to Chanin, but in the middle.

15            There was no particular reason given

16   for Chanin's confidence in the XTAR asset, and its

17   criticism of Jeffries was misplaced, in that it

18   does appear that Jeffries revised its valuation

19   upwards once XTAR went into service.  In light of,

20   however, the aggressiveness of Jeffries' discount,

21   I took Greenhill's DCF number and added to it a

22   little bit, but not much, and came up with a total

23   value of $135 million.  Therefore, for the other

24   assets generally, I ascribed a value of 150

25   million.  This leads to a total enterprise value of

CC-BLG004356

30

1          LORAL SPACE AND COMMUNICATIONS, LTD.

2     970 million dollars for Ltd. as a going concern.

3               I've given an explanation of how I

4     got to most of those numbers, but let me add a

5     little bit more on points raised by the LSPC.  It

6     points out that Mr. Schwartz, and the LSPC are in

7     agreement about one thing, which is the value of

8     SS/L.  In October of 2003, when the parties and the

9     court were focused almost exclusively on the

10    proposed sale of Loral Skynet, or Loral's North

11    American satellites, to Intelsat, Mr. Schwartz did

12    his own not much more than back of the envelope

13    valuation of the assets that would survive the

14    Intelsat transaction.  He subsequently testified

15    that his valuation of SS/L, then and now, is

16    driven, in his mind, by a different methodology

17    than any of the three investment banker experts

18    recognized, which is by simply multiplying SS/L's

19    revenue by a factor of one.  And when pressed by

20    Mr. Christ, Mr. Schwartz acknowledged that he still

21    believes that SS/L could or should be worth roughly

22    one times revenue or something close to 450 to 500

23    million dollars.

24               By the way, Mr. Schwartz's back of

25    the envelope pro forma valuation of Loral after the

CC-BLG004357

31

LORAL SPACE AND COMMUNICATIONS, LTD.

1
2    Intelsat sale was approximately 1.48 billion
3    dollars and included the type of valuation of SS/L
4    that I just discussed.  Mr. Robins, on behalf of
5    Greenhill, pointed out that he disagreed with Mr.
6    Schwartz's revenue multiple valuation approach for
7    SS/L, noting in particular that such an approach
8    doesn't make a lot of sense for SS/L, especially
9    with its lumpy revenue projections, which are
10   driven by the type of project cash flow that it
11   tends to experience in connection with its
12   business.  Mr. Schwartz acknowledges his difference
13   with the experts, and also acknowledges that, but
14   for the Boeing-Hughes transaction, there are really
15   no meaningful transaction comparables.  Mr. Robins
16   also pointed out that there are or have been
17   significant changes in Loral since October of 2003.
18   Many of those would appear to be for the better;
19   however, in October of 2003, he testified FSS's
20   projected EBITDA was considerably higher than it is
21   now, SS/L's projected revenue was higher, and there
22   was a projection of a hundred million dollars value
23   for SatMex, which is currently in a bankruptcy case
24   here as well as in Mexico.  But more importantly, I
25   conclude that Mr. Schwartz's valuation, which the

CC-BLG004358

32

LORAL SPACE AND COMMUNICATIONS, LTD.

1

2    LSPC has adopted, may be a legitimate valuation by

3    a businessman who has, throughout his career, taken

4    risks both for the good and the bad, but is not a

5    reliable measure of valuation for purposes of the

6    Section 1129(b) valuation that I must conduct.

7            The Federal Rules of Evidence permit

8    a lay person to give an opinion as to value when he

9    is the owner of the property, but instructs the

10   judge to give that valuation whatever weight he or

11   she thinks is appropriate.  In this case, I relied

12   on the three experts for each of the contending

13   parties over Mr. Schwartz's valuation.

14           I also should address briefly the

15   so-called expert report prepared in draft form by

16   Jeffries in October of 2003, which was not used as

17   a basis for expert testimony in connection with the

18   Intelsat hearing or for any other expert testimony.

19   And according to Mr. Derrough's testimony, it was

20   not based on any sort of valuation conducted in any

21   meaningful way of the non-Intelsat assets.  I

22   accept Mr. Derrough's testimony, which included a

23   fairly credible reference to his learning at the

24   time, or shortly thereafter, of real concerns about

25   SS/L's future, which, fortunately, since then have

CC-BLG004359

33

LORAL SPACE AND COMMUNICATIONS, LTD.

1

2    been alleviated as a result of, among other things,

3    the new satellite orders that I referred to

4    earlier.  That testimony leads me to accept Mr.

5    Derrough's assertion that this draft report was not

6    a real valuation of a the non-Skynet assets or one

7    that I should rely on.

8              I have not discussed yet my reason

9    for placing a low valuation on Loral's real estate,

10   which again, is primarily SS/L's Palo Alto

11   headquarters.  While it may be the case that that

12   real estate is worth a considerable amount of money

13   on a liquidation basis, I don't see much of a

14   prospect of realizing any value from it as long as

15   SS/L remains an ongoing business.  And as I said

16   earlier, I believe that my valuation of SS/L is

17   driven primarily by that assumption.  I ascribed a

18   5 million dollar value to the real estate.  And

19   frankly, even that I believe was generous, because

20   it was based solely on an assertion by Mr. Belinsky

21   that he had talked with a leveraged-leasing expert

22   who argued that a sale/leaseback of the real estate

23   was feasible, although I saw no real underpinnings

24   of that analysis.  Chanin's midpoint for the real

25   estate was $15 million; the other experts ascribed

CC-BLG004360

34

1            LORAL SPACE AND COMMUNICATIONS, LTD.

2    no value to it.   And again, that valuation is on a

3    going concern basis.  As Mr. Dewitt very credibly

4    testified, SS/L could not move out of its

5    headquarters without seriously jeopardizing the

6    performance of ongoing contracts because of the

7    very special equipment that is maintained there.

8    In addition, it is obviously a preferred location

9    attractive to the very special and highly qualified

10   engineers and scientists and others that SS/L

11   employs in building satellites.  One cannot assume

12   SS/L could maintain its business while selling and

13   moving its headquarters.

14           The equity committee and the LSPC

15   raised other sources of potential value without

16   ascribing any particular dollar amount to them.

17   These included patents and patent litigation,

18   potential new developments in technology, and

19   tangentially, potential new markets such as in

20   China and elsewhere.  With regard to the patents, I

21   have already discussed that matter:  Loral has not

22   been able to sell them, and although Chanin notes

23   that there has not been a formal investment banker

24   process for selling them, someone at Chanin also

25   noted that the one offer received, for roughly $300

CC-BLG004361

35

LORAL SPACE AND COMMUNICATIONS, LTD.

1

2    thousand was at arms length. As far as the patent

3    litigation is concerned, it appears to be a long

4    shot to me, particularly given the nature of the

5    patents at issue.  But what I did not say generally

6    about the patents is that the uncontroverted

7    testimony appears to be that the patents are useful

8    only for Loral's technology and that its

9    competitors use their own developed designs and

10    patents, thus reducing the sale value of the

11    patents considerably.

12                As far as potential new technologies

13    and new markets are concerned, I believe that those

14    possibilities, not being concrete enough to be

15    projected at this time, are not properly in the

16    valuations, except as they may appear in a

17    comparable company or precedent transaction

18    valuation, and that, beyond that measure, I cannot

19    give any particular dollar value to them, noting

20    that the experts have not either.

21                Mr. Christ raised one final point

22    which deserved careful consideration.  It is that,

23    in his view of what SS/L's expenses should be and

24    what they could be, the projected expenses for SS/L

25    that underlie the business plan are too high, in

CC-BLG004362

36

1                LORAL SPACE AND COMMUNICATIONS, LTD.

2      his view, by approximately 20 million dollars.

3      Obviously if that were the case, the valuation of

4      SS/L would increase considerably, because that 20

5      million dollars would go right to increasing SS/L's

6      EBITDA, which serves as the primary basis for each

7      expert's DCF valuation of SS/L.  Mr. Dewitt

8      provided some corroboration of that view for SS/L's

9      expenses in his testimony, in which he, as SS/L's

10     president, said that in his view he thought SS/L's

11     SG&A expense was approximately 21 million dollars.

12     However, he acknowledged that that figure did not

13     include any corporate allocation to SS/L and was

14     not otherwise a complete figure.

15               I've reviewed Debtors' Exhibit 24,

16     including Bates-stamped pages 050276 and 050282,

17     and it does appear to me that there are additional

18     categories of expenses that would not be included

19     in Mr. Dewitt's 21 million dollar number.  I also

20     note that the roughly 43 million dollars of SS/L

21     expenses in the projection was vetted by Greenhill,

22     Jeffries and Chanin in their due diligence on the

23     debtors' business plan, and I find it unlikely that

24     those parties would have overlooked or obfuscated

25     such a conspicuous discrepancy.  Therefore I feel

CC-BLG004363

LORAL SPACE AND COMMUNICATIONS, LTD.

1
2  constrained to accept that expense number as the
3  actual number that should be in the projections,
4  and, therefore, do not adjust the core valuation of
5  SS/L that I alluded to earlier.
6  Based on a 970 million dollar
7  enterprise value for Ltd., the debtors at the
8  parent company level are insolvent, whether one
9  applies a contract rate of interest or a Federal
10  judgement rate of interest to the unsecured claims.
11  Nevertheless, let me briefly address that issue,
12  because it has been addressed by the parties and is
13  one of the two additional factors that the equity
14  committee contends ultimately renders the debtors
15  insolvent.
16  Section 502(b)(2) of the Bankruptcy
17  Code disallows claims for unmatured interest.
18  Notwithstanding that fact, the courts have long
19  recognized that where a debtor is solvent, it is
20  inequitable and improper for shareholders to
21  recover before the debtors' unsecured creditors
22  receive postpetition interest.  To permit such a
23  recovery by shareholders would give them a windfall
24  at the expense of the unsecured creditors who have
25  had to wait through the course of the case to

CC-BLG004364

38

1            LORAL SPACE AND COMMUNICATIONS, LTD.

2    receive their distributions.  This "solvent debtor

3    rule" has two bases recognized by the courts.  The

4    first is in Section 726 of the Bankruptcy Code,

5    which flows through Section 1129(a)(7)'s best

6    interests test.  Section 726(a)(5) provides for

7    payment of postpetition interest at the "legal

8    rate" to unsecured creditors before recovery by the

9    debtor or its shareholders.  In addition, the

10   courts have long recognized the right of unsecured

11   creditors to receive postpetition interest under

12   the fair and equitable rule as part of the cramdown

13   standard.  The equity committee really does not

14   dispute that fact, but argues that, under the

15   circumstances as it's fair and equitable that

16   unsecured creditors receive postpetition interest

17   at the Federal judgment rate

18   of 1.1 percent rather than at their contract rate.

19            The fair and equitable basis for

20   postpetition interest goes back at least to the

21   Supreme Court's decision in Vanston Bondholders

22   Protective Committee versus Green at 329 U.S. 156

23   (1946), although it reaches back to cases before

24   the turn of the century.  That basis was referred

25   to by Congress in the legislative history in

CC-BLG004365

39

1        LORAL SPACE AND COMMUNICATIONS, LTD.

2    connection with its amendment of Section 1124(3) of

3    the Bankruptcy Code a few years ago, which further

4    confirmed a fair and equitable basis for the

5    solvent debtor rule.  See 140 Cong. Rec. H 10,768

6    (October 4, 1994) ("Specifically, courts have held

7    that where an estate is solvent, in order for a

8    plan to be fair and equitable, unsecured and under

9    secured creditors' claims must be paid in full,

10   including postpetition interest, before equity

11   holders may participate in any recovery.  See, e.g.

12   Consolidated Rock Products Co. v. Dubois, 312 U.S.

13   510, 527, 61 S.Ct. 675, 685 (1941);

14   Debentureholders Protective Committee of

15   Continental Inv. Corp., 679 F.2d 264 (1st Cir.),

16   cert. denied, 459 U.S. 894 (1982) and cases cited

17   therein").

18        In my view, given that fair and

19   equitable basis, and going back to the Vanston

20   Bondholders case, which expressly noted that "It is

21   manifest that the touchstone of each decision on

22   allowance of interest in bankruptcy, receivership

23   and reorganization has been a balance of equities

24   between creditor and creditor or between creditors

25   and the debtor," 329 U.S. at 165, the court has a

CC-BLG004366

40

1          LORAL SPACE AND COMMUNICATIONS, LTD.

2    large amount of discretion in deciding what the

3    appropriate rate of interest should be under a

4    Chapter 11 plan for a solvent debtor.  This is

5    confirmed by the more recent cases dealing with the

6    issue.  When it decided the postpetition interest

7    rate in a vacuum, as a declaratory judgement

8    matter, in In re Dow-Corning Corporation 237 B.R.

9    38 Bankruptcy Court Eastern District of Michigan,

10   1991, and considered only the right to postpetition

11   interest under 726(a)(5), the court applied the

12   Federal judgment rate.  However, later in that

13   case, when faced with a specific plan, both the

14   Bankruptcy Court and the District Court determined

15   that the contract rate was the appropriate rate of

16   interest.  See In re Dow-Corning Corporation 244

17   B.R. 678 Bankruptcy Court Eastern District of

18   Michigan 1999, as well as the District Court

19   opinion in a different aspect of the postpetition

20   interest litigation in that case, which declined to

21   apply the default rate, but made it clear that it

22   was comfortable with the plain contract rate, which

23   appears at 2004 US District Lexis 27989 Eastern

24   District of Michigan 2002.  Fairly recently Judge

25   Walrath in the In re Coram Healthcare Corporation

CC-BLG004367

41

1              LORAL SPACE AND COMMUNICATIONS, LTD.

2      case at 315 B.R. 321, 346 Bankruptcy Court District

3      of Delaware 2004 also confirmed this rule when she

4      said, "we are not persuaded that Section 1129(b)

5      requires the use of the Federal judgment rate for

6      postpetition interest under a Chapter 11 plan of

7      reorganization.  Instead we conclude that the

8      specific facts of each case will determine what

9      rate of interest is fair and equitable."  In that

10     case the creditors, in her view, unduly delayed the

11     case and otherwise engaged in conduct that she did

12     not believe was appropriate and, therefore, she

13     applied the lower rate.  See also In re Anderson

14     Carter 220 B.R. 411 Bankruptcy District New Mexico,

15     1998.  The highest level of contrary authority that

16     I could find, In re Cardalucci 285 F3d 1231 Ninth

17     Circuit 2002, relied exclusively on Section

18     726(a)(5) and focused on intercreditor fairness,

19     not creditor/shareholder issues, which again, is

20     contrary to the basis for interest here, which is

21     the fair and equitable rule.  So, therefore, I

22     believe that if it were important, postpetition

23     interest here should be awarded at the contract

24     rate, the non-default contract rate.  I note,

25     further, that in the so-called waterfall recovery

CC-BLG004368

42

1          LORAL SPACE AND COMMUNICATIONS, LTD.

2    analyses of both Jeffries and Chanin, the term

3    "contract rate" is somewhat of a misnomer, in that

4    a 6 percent rate is given for the SS/L debt, which,

5    in fact, was not a contract rate but rather a

6    compromise rate agreed upon by the SS/L creditors

7    and the other unsecured creditors.  According to

8    the SS/L creditors, the rate they were entitled to

9    was much higher than 6 percent, which is a fair

10    compromise rate here.

11          Again, at a 970 million dollar

12    enterprise valuation, I believe that the second

13    issue raised by the equity committee as a basis for

14    the shareholders being entitled to a recovery here

15    also is moot.  That is, even if Ltd.'s guarantee of

16    the Orion bonds issued in December of 2001 were

17    avoided, I believe that at a 970 million dollar

18    valuation, there would be little to no recovery by

19    the shareholders, and there would be no recovery

20    assuming postpetition interest at the contract

21    rate, and, if my math is right, no recovery at the

22    Federal judgment rate either, although just barely.

23          But again, let me address this

24    argument in more detail, particularly since the

25    equity committee has made a separate motion for

CC-BLG004369

43

1            LORAL SPACE AND COMMUNICATIONS, LTD.

2      leave to bring litigation avoiding the 2001 Ltd.

3      guarantee of the Orion bonds as a fraudulent

4      transfer under Section 544 of the Bankruptcy Code,

5      incorporating applicable state fraudulent transfer

6      law.

7            The first question to ask,

8      obviously, in this area is does the equity

9      committee have standing to bring a fraudulent

10     transfer claim?  Clearly it does not unless in the

11     exercise of the bankruptcy court's discretionary

12     authority, it is granted standing to do so on

13     behalf of Ltd.'s estate.  As recognized by the

14     Second Circuit, although not all circuits, official

15     committees, at least official creditors'

16     committees, as well as in some instances individual

17     creditors, can be granted standing to pursue debtor

18     causes of action if, after review by the court,

19     they have shown that the debtor has unjustifiably

20     refused to bring the action.  See generally In re

21     STN Enterprises 779 F2d 901, 904 Second Circuit

22     1985, as well as In re Housecraft Industries, USA,

23     Inc., 310 F3d 64, 71 Second Circuit 2002, which

24     noted that individual creditors might also receive

25     standing, and further noted that the standard for

CC-BLG004370

44

1              LORAL SPACE AND COMMUNICATIONS, LTD.

2     granting standing was basically met if three

3     factors are satisfied.  First, there needs to be a

4     colorable claim that would provide for a recovery.

5     Second, it needs to be shown that the action is

6     likely to benefit the debtor's estate.  And, third,

7     that granting standing is in the best interests of

8     the estate.  See also In re America's Hobby Center,

9     Inc., 223 B.R. 275 282 Bankruptcy Court Southern

10    District New York 1998.

11              At least as regard to the two latter

12    determinations, the court should reach its

13    conclusions after holding an evidentiary hearing.

14    See STN, 779 F2d at 905.

15              As stated by the STN court, the

16    bankruptcy court "should assure itself that there

17    is a sufficient likelihood of success to justify

18    the anticipated delay and expense to the bankruptcy

19    estate that the continuation of litigation is

20    likely to produce."  Id. at 906.  Here I considered

21    both the merits of litigation, and had the

22    advantage of hearing a significant amount of

23    evidence on that issue, as well as the benefits of

24    the litigation to the estate and whether its

25    pursuit is in the best interest of the estate.

CC-BLG004371

45

1          LORAL SPACE AND COMMUNICATIONS, LTD.

2               Before turning to those issues, I

3 should address a second-tier standing issue that

4 has been raised by the debtor, the creditors'

5 committee, and the relevant indenture trustee,

6 which is the standing of an equity committee to

7 bring fraudulent transfer litigation on behalf of

8 the estate, as opposed to creditors. Here there is

9 apparently a direct conflict in the case law

10 between a bankruptcy court on the one hand, and a

11 district court on the other. In In re Revco DS

12 Inc., 118 B.R. 468 at 475 Bankruptcy Court in the

13 Northern District of Ohio 1990, the court refused

14 to give the shareholders standing to pursue

15 fraudulent transfer claims, taking the view that

16 fraudulent transfer recoveries are only for the

17 benefit of creditors, not for shareholders. And

18 that is in contrast with 9281 Shore Road Owners

19 Corporation versus Seminole Realty Company 187 B.R.

20 837 851 Eastern District New York 1995, in which

21 the court noted the difference between the fact

22 that outside of bankruptcy only creditors can bring

23 fraudulent transfer litigation and its view that in

24 bankruptcy fraudulent transfer litigation can be

25 brought for the benefit of all parties, including

CC-BLG004372

46

1          LORAL SPACE AND COMMUNICATIONS, LTD.

2    shareholders, because it's brought on behalf of the

3    estate as opposed to creditors.  That view, in my

4    mind, comports with the plain language of Section

5    550 of the Code which refers to recoveries from

6    avoidance litigation, including litigation under

7    Section 544, as being for the benefit of the

8    estate, and since recoveries here are generally

9    fungible, given that the secured debt was paid off

10   long ago, I believe that, in this situation, the

11   equity committee would have standing or would not

12   be barred from pursuing a cause of action if I

13   permitted it to do so, because it was an equity

14   committee as opposed to a creditors' committee.

15   There may be situations where that conclusion would

16   be changed by the equities of the case, but here,

17   where the committee is representing largely public

18   shareholders, the committee, if given standing,

19   would not be prevented from pursuing a claim, I

20   believe, because of its status as an equity

21   committee.

22              That however, does not answer the

23   question, because, based on my evaluation of the

24   merits, and my weighing of the benefits to the

25   estate as against the potential harm to the estate

CC-BLG004373

47

1           LORAL SPACE AND COMMUNICATIONS, LTD.

2    of bringing the litigation, I conclude that the

3    litigation would not be in the estate's best

4    interests and the committee's motion should be

5    denied.  The only valuation prepared in connection

6    with the proposed challenge to the 2001 exchange

7    offer and the guarantee given by Ltd. in connection

8    therewith was prepared by Mr. Robins at Greenhill.

9    He based it on the debtors' projections at the

10   time, which Mr. Townsend, who was very involved

11   with those projections at the time, testified were

12   reasonable and achievable based on historic trends

13   of EBITDA and revenue, and which Mr. Robins,

14   perhaps not with the care with which he

15   professionally vetted the current projections, but

16   nevertheless professionally, vetted in discussions

17   with management, by looking at the companies'

18   projections and performance, and by reviewing

19   analysts' reports.  In particular, Mr. Townsend

20   testified that notwithstanding 27 percent growth of

21   EBITDA between 2000 and 2001 for Orion, Orion and

22   Loral projected 15 percent growth for EBITDA in

23   2001 to 2002, going down to 11 percent in the next

24   year, and generally flattening out thereafter.  He

25   testified that he as the companies' chief financial

CC-BLG004374

48

1                LORAL SPACE AND COMMUNICATIONS, LTD.

2      officer had no concern regarding the ability of

3      Orion to make its debt payments after the exchange

4      offer, which were substantially reduced; and he

5      also did not have any concern also that Ltd. could

6      not pay its debts when due.

7                     Based on the company's projections,

8      Mr. Robins did a DCF analysis of Orion which showed

9      it to be quite solvent.  And he similarly did an

10     analysis of Ltd. which also showed it to be solvent

11     on an enterprise basis as of the time of the

12     exchange offer.  Based on Mr. Robins' analysis,

13     Orion was solvent by 111 million to 328 million

14     dollars on a going concern basis with $217 million

15     of solvency as the mid point.  Based on the DCF

16     analysis, Ltd. was solvent between 530 and a

17     billion 40 million dollars, which was also

18     considerably below the market capitalization at the

19     time of the exchange offer.  Mr. Townsend had also

20     testified as to the benefits of the exchange offer.

21     And he testified the guarantee by Ltd. was a

22     necessary and integral part of that exchange.  He

23     noted that Orion, before the exchange offer, was

24     facing the fact that in the next year it would have

25     to pay a considerable amount of interest that it

CC-BLG004375

49

1            LORAL SPACE AND COMMUNICATIONS, LTD.

2     previously had been paying in kind, and although

3     the company believed it had measures to ensure the

4     payment of Orion's debts, there was considerable

5     uncertainty about being able to meet them given

6     their increase in 2002.

7                 In addition, a default on the

8     pre-exchange Orion debt would trigger cross

9     acceleration provisions in the bank debt that was

10    secured by Loral's satellite assets, and therefore

11    trigger the acceleration of over 500 million

12    dollars of secured bank debt.  Moreover, the

13    exchange offer cannot be viewed in a vacuum, it was

14    part of an integrated strategy of delevering Loral,

15    which included extending the maturity of bank debt

16    which was coming due in respect of 535 million

17    dollars in 2002.  Because of the exchange offer,

18    again of which the Ltd. guarantee was an integral

19    part, the next day that bank debt was extended to a

20    new date coterminous with the Orion bonds.  In

21    addition, following the completion of the exchange

22    offer, Orion's debt was reduced by approximately

23    230 million dollars, and its annual interest burden

24    was reduced by approximately 39 million dollars.

25                 These changes not only benefited

CC-BLG004376

50

1              LORAL SPACE AND COMMUNICATIONS, LTD.

2      Orion, but also Ltd.  As Mr. Townsend testified,

3      although obviously Ltd. itself, before the issuance

4      of the guarantee, was not legally obligated for

5      Orion's debt, that fact was "interesting but not

6      persuasive" to lenders and the rating agencies who

7      viewed the enterprise on a consolidated business,

8      noting that their businesses were interrelated, not

9      only by the cross-acceleration and default

10     provisions I alluded to earlier, but also by the

11     fact that, as a business matter, they were

12     interrelated.

13              It appears that the exchange offer,

14     including the Ltd. guarantee of the new Orion

15     bonds, was discussed over many months and at length

16     by both Orion's board and Ltd.'s board.  Those

17     discussions as memorialized in the minutes

18     introduced into evidence, contain two somewhat

19     troubling remarks by Mr. Schwartz that pertain to

20     my evaluation of the transaction.  First, and I

21     believe this was in a July 2001 meeting, he noted

22     some competition and a general downturn in the

23     satellite business, as well as some softening, at

24     least in the data business, at Orion.  However, it

25     appears that Orion's primary business continued to

CC-BLG004377

51

1          LORAL SPACE AND COMMUNICATIONS, LTD.

2   meet or come close to meeting its projections for

3   2001, absent the data business, which was

4   transferred out of Orion in connection with the

5   exchange offer.  The equity committee has also made

6   or tried to make much of a reference to a solvency

7   discussion found in the board minutes; however, I

8   do not believe that the reference to a solvency

9   discussion at all indicates anything more than a

10  reasonable question raised by the board, which any

11  board should raise with regard to a transaction of

12  this nature.  It appears to have been addressed by

13  a discussion led by the treasurer, who was

14  primarily focused on how to pay ongoing

15  obligations, as well as by counsel.

16               There was not much inquiry by either

17  party, by the equity committee or the company in

18  the trial, with regard to whether Orion was

19  adequately capitalized after the exchange offer.

20  However, in the light of particular concerns that

21  were raised by the LSPC, I find as follows:  First,

22  having purchased its satellites that underlay the

23  projections before the exchange offer, Orion did

24  not have significant projected capital expense

25  obligations.  Second, it was aware of the so-called

CC-BLG004378

52

LORAL SPACE AND COMMUNICATIONS, LTD.

1

2       "solar array problem" with regard to some or all of

3       its satellites; however, there is no showing that

4       that problem was not already factored into the

5       projections.  And based on my review of the 10(k)s,

6       I believe it was factored into them.  Additionally,

7       I believe that the lack of a complete range of

8       transponders for Telstar 12 was also factored into

9       the projections.  And finally I believe that the

10      problem with Telstar 11 having one year less life

11      than anticipated, arose after the exchange offer

12      and was not reasonably anticipated at the time.

13      Given all the foregoing, it appears to me that

14      Orion did not have material capital expenditures

15      and therefore was not inadequately capitalized at

16      the time of the exchange offer.

17                  I've been focusing on the time of

18      the exchange offer and particularly immediately

19      after the exchange offer and Ltd.'s issuance of the

20      guarantee, because that is the time that one must

21      consider solvency in connection with a fraudulent

22      transfer claim.  In particular, one should be

23      careful not to be caught up in hindsight in

24      conducting a solvency analysis, although it is

25      appropriate to do some comparison between

CC-BLG004379

53

1          LORAL SPACE AND COMMUNICATIONS, LTD.

2    projections and actual results to see if the

3    projections were unreasonable.   See generally In re

4    RML Inc. 92 F3d 139, 155 Third Circuit 1996 and

5    Lippe versus Bairnco, 249 F.Supp. 2d 357 380

6    S.D.N.Y. 2003.

7               Here it seems to me, although we did

8    not have a full trial on the fraudulent transfer

9    issue, that Mr. Robins' valuation was quite

10   credible and that it would be difficult for the

11   equity committee to overcome it.   In trying to meet

12   its burden in respect to the STN factors, the

13   committee offered up Mr. Belinsky's critique of Mr.

14   Robins' 2001 analysis; however, that critique was

15   flawed in a number of respects.   First, the

16   critique merely involved applying a 33 percent

17   discount to EBITDA, as used by Mr. Robins, and

18   otherwise followed his valuation to the letter.

19   Mr. Belinsky adopted the 33 percent discount

20   approach to the projections upon which Mr. Robins'

21   2001 valuation was based because he believed that

22   such projections were highly flawed.

23               Mr. Belinsky did not do his own due

24   diligence on the projections however, but relied

25   only on two things: one, his recollection or

CC-BLG004380

54

LORAL SPACE AND COMMUNICATIONS, LTD.

1
2   someone at Chanin's recollection that Mr. Townsend
3   had told them during their due diligence that the
4   company was very aggressive in its projections at
5   the time and historically before then.  Mr.
6   Townsend's testimony before me, however, did not go
7   nearly that far in reference to the projections
8   either on direct or cross, as noted above.  In
9   addition, Mr. Belinsky compared the November 2001
10  projections versus actual results for 2001, 2002
11  and 2003.  However, this comparison, as well as his
12  33 percent methodology was itself flawed in two
13  respects.  First of all, he applied his 33 percent
14  discount not only to the projected numbers, but
15  also to Orion's actual EBITDA for 2001, minus the
16  negative EBITDA for the data business.  This
17  discounting of an actual number resulted in a
18  significant understatement of Orion's value.  The
19  equity committee tried to overcome this flaw at
20  oral argument by suggesting that the actual number
21  was only a projection and therefore should be
22  appropriately discounted as a projection, which
23  logically didn't make sense, but even if one were
24  to take that approach, one should have then taken
25  the original projection, which was considerably

CC-BLG004381

55

LORAL SPACE AND COMMUNICATIONS, LTD.

1

2  higher than the 105 million dollar actual amount

3  that Mr. Belinsky applied a 33 percent discount to.

4           In addition, in showing variations

5  from projected performance, Mr. Belinsky added in

6  the data business, which had a 20 million dollar

7  negative EBITDA in 2001, whereas the data business

8  was actually transferred out of Orion as part of

9  the exchange offer.  Finally, even the actual

10  versus projected variances for the key measures of

11  EBITDA and revenue as shown on Committee Exhibit

12  45, were lower than 33 percent for 2001 and 2002.

13           Given all the foregoing, I do not

14  accept that a 33 percent automatic discount of the

15  projections, let alone any discount as against

16  actual 2001 EBITDA, was reasonable; moreover, it

17  does appear to me that there is a logical

18  explanation for why Ltd. and Orion's performance

19  sharply declined in mid 2002, which is, as

20  testified to by the business people for Loral, the

21  severe downturn in the industry and the lack of

22  orders for satellites.  Therefore, again, while I

23  accept that it may be appropriate to compare

24  projections at the time of the allegedly fraudulent

25  transfer with actual results to see if those

CC-BLG004382

56

LORAL SPACE AND COMMUNICATIONS, LTD.

1

2  projections were unreasonable and therefore that

3  the actual value was much lower as of the time of

4  the transfer than the value based on the

5  projections, I believe that it was here an

6  intervening and uncontemplated set of events that

7  lead to the ultimate failure of the business plan

8  and Loral's going into bankruptcy.

9         Because Orion appears to have been

10  solvent, I believe it was proper for all the

11  parties, including Chanin, not to double count the

12  Ltd. guarantee, that is to treat it as one

13  liability on a consolidated basis.  See In re

14  Xonics, 841 F2d 198 Seventh Circuit 1998.

15         I should also note that what is at

16  issue here is a "downstream" guarantee, which

17  traditionally is viewed as immune to fraudulent

18  transfer attack because of the parent's interest in

19  its subsidiary.  There is a recognized exception to

20  that rule, although the cases applying it are very

21  few.  And they are basically In re Rodriguez 895

22  F2d 725 11th Circuit 1990 and Commerce Bank of

23  Kansas City versus Achtenberg 1993 US District

24  Lexis 16136 District Court Western District of

25  Missouri 1993.  Both of those cases point out that

CC-BLG004383

57

LORAL SPACE AND COMMUNICATIONS, LTD.

1

2  where a subsidiary is insolvent or clearly

3  insolvent at the time, the parent's incurrence of

4  an obligation, or a transfer by it on behalf of a

5  subsidiary does not confer any direct benefit on

6  the parent, and therefore, could be a fraudulent

7  transfer.  However, in both of those cases, the

8  insolvency of the subsidiary was stipulated.

9  That's clearly not the case here.

10          In addition, there appears to have

11  been both direct and indirect value afforded to the

12  parent, Ltd., as a result of and in conjunction

13  with its granting of the guarantee.  The direct

14  value is the value to its equity in Orion -- a 229

15  million dollar debt reduction and annual interest

16  expense reduced by a $39 million annually.  The

17  indirect benefit, which is well recognized under

18  the case law, including in the Second Circuit, see

19  HBE Leasing Company versus Frank 48 F3d 623 638

20  Second Circuit 1995, was also considerable.  I've

21  already discussed that the facts that the markets

22  and the rating agencies and lenders viewed Loral on

23  a consolidated basis, and the cross-defaults and

24  cross-acceleration provisions and the related bank

25  loan extension transaction that occurred a day

CC-BLG004384

58

1                LORAL SPACE AND COMMUNICATIONS, LTD.

2    after the exchange offer and Ltd.'s guarantee all

3    meant that the exchange offer and guarantee

4    provided considerable value and indirect benefit to

5    Ltd., which in my mind clearly exceeded the

6    negative impact of the Ltd. guarantee at the time.

7    Because of the unusual nature of a "downstream"

8    guarantee being the subject of a fraudulent

9    transfer attack, I gave little weight to the

10   argument by the equity committee that the absence

11   of a contemporaneous solvency opinion is a bad fact

12   here.  Mr. Belinsky acknowledged that his firm, to

13   his knowledge, had never rendered a downstream

14   guarantee solvency opinion, and he had never seen

15   one.

16                I do not give much weight either to

17   the other so-called indicia of insolvency that Mr.

18   Belinsky referred to in his testimony.  I note

19   that, again, Chanin's views are not backed up by

20   any sort of written work product or any market

21   value or going concern enterprise analyses of Ltd.

22   or Orion in the relevant time range.  Instead, in

23   addition to pointing to Orion's post 2001

24   performance versus its projections, Mr. Belinsky

25   pointed to book value indicia that were indeed

CC-BLG004385

59

1              LORAL SPACE AND COMMUNICATIONS, LTD.

2     concededly negative, including the write-off, for

3     GAAP purposes, of approximately 500 million dollars

4     to comply with a new accounting standard applied

5     industry-wide in 2002, and a history since well

6     before the exchange offer of negative book income.

7     Neither of those facts appear to have resulted in

8     any reduced interest by customers in doing business

9     with Loral or reduced borrowing prospects, which is

10    not surprising, given that they had very little

11    bearing on the company's actual ability to pay

12    their debts when they come due.  Those factors as

13    well as the book accounting "liquidity" factors

14    referred to in his exhibit, Mr. Belinsky

15    acknowledged, had never appeared in a solvency

16    opinion that he or his firm had written, and

17    wouldn't appear in a solvency opinion if one were

18    to be prepared in connection with this matter.  It

19    wasn't clear to me, therefore, how they would

20    "inform the opinion," as he testified, except as

21    some sort of nebulous confirmation of whatever else

22    the opinion contained.

23              Of similar relevance, or

24    irrelevance, is the trading value of Orion's and

25    Ltd.'s debt and equity securities before and after

CC-BLG004386

60

LORAL SPACE AND COMMUNICATIONS, LTD.

1

2   the exchange offers.  In my view, the negative

3   trading value before the exchange, the spike in the

4   trading value of the bonds after the exchange and

5   the subsequent decrease in the trading value in the

6   summer of 2002 is not particularly telling,

7   particularly given the fact that prices lowered in

8   2002 after a revised forecast by Ltd. in light of

9   its realization that satellite orders were not

10   coming in as they had previously been expected.

11   Similarly, the very positive market cap on the

12   equity securities is not particularly telling,

13   either.  Although it's often taken as gospel that

14   market pricing levels of debt and equity trading

15   are indicia of value, the very fact that people are

16   in the market to make substantial profits suggests

17   that, on a trading basis, those trading values are

18   not to be particularly relied upon, at least for

19   short term valuations.  And Mr. Belinsky

20   acknowledged as much by noting that, again, at most

21   such information would be informative of or

22   colorable to a solvency opinion if he were to

23   render one.

24                All things considered then, although

25   there wasn't obviously a full trial on the issue of

CC-BLG004387

61

1              LORAL SPACE AND COMMUNICATIONS, LTD.

2    solvency, or of fair consideration or reasonably

3    equivalent value, it's clear to me that the equity

4    committee would have a very difficult row to hoe if

5    it were to pursue this litigation.  I note that

6    even if I were somewhat off in my 2005 valuation,

7    it would also be pursuing litigation largely for

8    the benefit of the unsecured creditors, who very

9    much do not want it to be pursued.  Therefore, even

10   if the equity committee would have standing,

11   notwithstanding it being an equity committee, I

12   can't ignore the fact that based on my $970 million

13   valuation of Ltd. in 2005, or as of June 30, 2005,

14   most, if not all, the recovery would go to the

15   benefit of the unsecureds.

16              In addition to the unsecureds not

17   wanting the litigation to be pursued, as I said at

18   the beginning of this opinion in the portion of it

19   which is under seal, the company has given very

20   good reasons why the pursuit of litigation and the

21   delay of Ltd.'s emergence from Chapter 11 would be

22   a real determent to the debtors' business.  And

23   consequently I believe that the pursuit of the

24   litigation is not in the best interest of the

25   estate and creditors and does not meet a

CC-BLG004388

62

1          LORAL SPACE AND COMMUNICATIONS, LTD.

2     cost/benefit analysis, as required by STN and its

3     progeny.  Therefore I will deny the motion by the

4     equity committee for leave to have standing to

5     pursue the fraudulent transfer litigation.

6               I do that without additionally

7     considering factors going to the cost of

8     litigation, which would not only include out of

9     pocket costs, but also the additional postpetition

10    interest that would accrue during the time the

11    litigation was pursued.  The equity committee has

12    not quantified those costs, nor have the debtors,

13    but I believe they would both be quite significant.

14    And given, again, the unlikelihood of the

15    shareholders seeing any benefit from a recovery,

16    even if they were to obtain a settlement or some

17    victory on the merits, those costs would just eat

18    into the gap further.

19               Let me then address the final

20    objection made by the shareholders to confirmation

21    of the plan, which is the allegation that's long

22    been made in this case, that there has been some

23    form of unholy bargain between the debtors'

24    management and the creditors' committee or the

25    chairman of the creditors' committee.  Mr. Schwartz

CC-BLG004389

63

1              LORAL SPACE AND COMMUNICATIONS, LTD.

2      was really the only witness on this point, and he

3      testified that he has basically been involved in

4      all of the substantive negotiations in this case,

5      or kept very closely apprised of them when they

6      were done by financial advisers or lawyers in the

7      first instance.  He stated that he negotiated the

8      basic terms of the stock options granted to certain

9      members of management, although not to Mr. Schwartz

10     himself, in July of 2004, including the strike

11     price at an estimated midpoint valuation of 700

12     million for the debtors.

13              It is my belief, based on the

14     formulation of the plan as originally filed in

15     connection with the creditors' committee

16     negotiations, that the negotiation of the New

17     Skynet notes did not occur until substantially

18     thereafter.  A major element, if not the only

19     element of the "unholy bargain" argument is

20     premised upon a presumed linkage between the New

21     Skynet notes and the management contracts and stock

22     options.  But the timing doesn't seem to work.  In

23     fact, the New Skynet notes were still being

24     negotiated up until shortly before the commencement

25     of this hearing.

CC-BLG004390

64

1              LORAL SPACE AND COMMUNICATIONS, LTD.

2                        In addition, Mr. Schwartz testified

3    that the management contracts and the stock option

4    package, in his view, (a), closely followed the

5    form of those agreements that are in existence

6    today as far as the management contracts are

7    concerned, and, (b), were comparable to, and

8    necessary to compete against, similar packages of

9    executive compensation offered by the company's

10   competitors and necessary to retain key employees.

11   There was no real rebuttal of those points.  It's

12   obvious to me that the stock option grant is

13   generous given my valuation finding.  However, I

14   note the following: first, it does not kick in

15   immediately but spreads out in 25 percent segments,

16   therefore in effect binding key employees to the

17   debtor over time.  Secondly, largely at my

18   instigation, the Key Employee Retention Plan

19   originally proposed by these debtors has not been

20   revised as far as the senior management is

21   concerned.  I took Mr. Schwartz's testimony as to

22   the need for these contracts and stock options, in

23   part to be to fulfill, the commitment, which had

24   not heretofore been fulfilled, to retain key

25   employees.  And in effect management has been

CC-BLG004391

65

LORAL SPACE AND COMMUNICATIONS, LTD.

1

2    waiting for this for about a year and a half.

3                So in that sense, while normally one

4    would see stock options tied to the future

5    appreciation of the company's value after emergence

6    from Chapter 11 and thereafter, I view the stock

7    option program here as part of fulfilling an

8    unfulfilled promise to the employees for sticking

9    around during the case.

10               I certainly understand the LSPC's

11   dislike of such compensation, particularly the

12   stock options, given the treatment that

13   shareholders are receiving under the plan; however,

14   as a technical legal matter, I believe that

15   management is receiving this compensation here not

16   because they are shareholders but because they are

17   managers.  And I note that they are receiving it

18   with the agreement or lack of objection by the

19   future owners of the company, its unsecured

20   creditors, who I do not believe received any

21   improper quid pro quo for that agreement, but,

22   rather, had reached the view that they were willing

23   to have such compensation be paid to management

24   because they wanted that management in there

25   working for Loral and believed it was necessary to

CC-BLG004392

66

LORAL SPACE AND COMMUNICATIONS, LTD.

keep them.

      I note that given the renegotiation
of the plan in light of the settlement with the
SS/L creditors, the creditors as a whole had the
opportunity, if they wanted to, to renegotiate the
management arrangements, and they chose not to do
so.  Again in my view that means that they are
doing it for their own business purposes and not
for any other sort of quid pro quo.  As far as the
New Skynet Notes are concerned, there is very
little, if any, testimony by Chanin as to whether
and why, particularly as revised, they were still
clearly not at market as alleged by Chanin.  And
while it is clear that the interest rate was not in
and of itself negotiated, the terms of the notes,
including the basket for other secured debt and
other features that took it into the high yield
range, occurred before the confirmation hearing
began.  In any event, it is appears to me that to
the extent that those notes are not market priced,
and we will see if that's the case or not when
they're issued, because there is really very little
evidence in the record to show whether they're at
or over the market price, it appears to me that the

CC-BLG004393

1          LORAL SPACE AND COMMUNICATIONS, LTD.

2    difference in the grand scheme of things in the

3    overall valuation of these companies is not

4    material.

5              So, based on that analyses and there

6    being no other allegation of any other sort of an

7    unholy bargain, other than some ambiguous language,

8    in my view, in the disclosure statement pertaining

9    to the revision of the debtors' business plan after

10   discussion with the creditors' committee, I find

11   that the plan meets the good faith requirement

12   under Section 1129(a)(3) of the Bankruptcy Code and

13   therefore should be confirmed.

14             So, Mr. Karotkin, to continue, I

15   don't know if I've seen a proposed confirmation

16   order.

17             MR. KAROTKIN:  No, sir.

18             THE COURT:  You should circulate

19   one.

20             MR. KAROTKIN:  Yes, sir.  We didn't

21   want to be presumptuous.

22             THE COURT:  And as I recall from

23   your remarks at the start of the trial, you had

24   resolved the other plan objections except for some

25   language you were still working out with the U.S.

CC-BLG004394

68

1          LORAL SPACE AND COMMUNICATIONS, LTD.

2   Trustee and the creditors' committee.

3                  MR. KAROTKIN:  Yes.  Actually as to

4   the U.S. Trustee, we had resolved that language and

5   I believe that was reflected on the record and we

6   had also resolved the language as to the creditors'

7   committee on the record I just wanted to point out

8   as to the objection filed by the ERISA plaintiffs.

9                  THE COURT:  Yes.

10                 MR. KAROTKIN:  What we have agreed

11  is that that objection will be addressed as part of

12  the claims resolution process and we have agreed

13  that it will be withdrawn as an objection to

14  confirmation without any prejudice to any of their

15  rights, and we have no problem with that.

16                 THE COURT:  So what does that mean

17  with regard to Section 510, that language?  Is that

18  still open for argument?

19                 MR. KAROTKIN:  Yes.  That won't

20  impact the ability to go effective or not go

21  effective.

22                 THE COURT:  Is that correct, Mr.

23  Etkin?

24                 MR. ETKIN:  Yes, your Honor.  All

25  issues as to classification and subordination are

CC-BLG004395

69

1        LORAL SPACE AND COMMUNICATIONS, LTD.

2   reserved for the claims resolution process.

3                THE COURT:  All right.

4                MR. KAROTKIN:  So we'll be happy to

5   circulate a revised order to each of the

6   committees, we'll hopefully get that out tonight.

7                THE COURT:  Okay very well thank

8   you.

9                MR. GOLDEN:  Your Honor --

10               MR. KAROTKIN:  The only other matter

11  I guess, your Honor, is the order that you entered

12  permitting the complaint to be filed.

13               THE COURT:  Well, that I think by

14  its terms is of no effect at this point except that

15  it reserves an issue, in effect, on appeal.

16               MR. KAROTKIN:  That's fine.  Thank

17  you, sir.

18               THE COURT:  So once the order is

19  entered, the parties can go and argue in the

20  District Court about what that means.

21               MR. KAROTKIN:  Very well.  Thank

22  you, your Honor.

23               THE COURT:  Okay.

24               MR. WOLFSON:  Your Honor.

25               THE COURT:  I guess you owe me two

CC-BLG004396

70

LORAL SPACE AND COMMUNICATIONS, LTD.

1
2    orders then.

3              MR. KAROTKIN:  Yes, sir.

4              THE COURT:  Okay.

5              MR. GOLDEN:  Your Honor, I'm sorry.

6    I don't mean to prolong this, but I'm looking at

7    the order that Mr. Karotkin referred to, and the

8    ordered paragraph in question is that the court's

9    denial of the motion to prosecute may result in the

10   immediate dismissal of the complaint.  When we

11   talked about it that day, I think you left open the

12   possibility that you would rule on the automatic

13   dismissal.

14             THE COURT:  Well, someone is going

15   to have to ask me for a stay, otherwise it will be

16   dismissed.

17             MR. GOLDEN:  So absent a stay, the

18   complaint -- by virtue of the denial of the motion,

19   the complaint will be dismissed.

20             THE COURT:  Right.

21             MR. GOLDEN:  Thank you.

22             THE COURT:  But that's subject to

23   the equity committee's request for a stay.

24             MR. GOLDEN:  I understand.  Thank

25   you for your time and patience.

CC-BLG004397

71

1          LORAL SPACE AND COMMUNICATIONS, LTD.

2               THE COURT:  All right.  Thank you.

3               MR. WOLFSON:  Thank you, your Honor.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CC-BLG004398

72

1

2                    C E R T I F I C A T E

3  STATE OF NEW YORK      }
                           }    ss.:
4  COUNTY OF WESTCHESTER }

5              I, Denise Nowak, a Shorthand

6        Reporter and Notary Public within and for

7        the State of New York, do hereby certify:

8              That I reported the proceedings in

9        the within entitled matter, and that the

10       within transcript is a true record of such

11       proceedings.

12             I further certify that I am not

13       related, by blood or marriage, to any of

14       the parties in this matter and that I am

15       in no way interested in the outcome of

16       this matter.

17             IN WITNESS WHEREOF, I have

18       hereunto set my hand this _____ day of

19       _____, 2005.

20

21             _____

                     DENISE NOWAK

22

23

24

25

CC-BLG004399

1

| A |
| --- |
| ability 48:2 59:11 68:20 |
| able 34:22 49:5 |
| absence 58:10 |
| absent 51:3 70:17 |
| acceleration 49:9,11 |
| accept 23:9 25:3 26:17 32:22 33:4 37:2 55:14,23 |
| accorded 26:12 |
| accounting 59:4,13 |
| accrue 62:10 |
| achievable 47:12 |
| Achtenberg 56:23 |
| acknowledged 24:12 30:20 36:12 58:12 59:15 60:20 |
| acknowledges 31:12 31:13 |
| action 43:18,20 44:5 46:12 |
| actual 37:3 53:2 54:10,15,17,20 55:2,9,16,25 56:3 59:11 |
| add 30:4 |
| added 25:24 29:21 55:5 |
| addition 20:24 34:8 38:9 49:7,21 54:9 55:4 57:10 58:23 61:16 64:2 |
| additional 36:17 37:13 62:9 |
| additionally 52:6 62:6 |
| address 5:3 21:4 32:14 37:11 42:23 45:3 62:19 |
| addressed 37:12 51:12 68:11 |
| adequately 51:19 |
| adjust 37:4 |
| adopted 32:2 53:19 |

advantage 44:22
advisers 63:6
afforded 57:11
agencies 50:6 57:22
aggressive 54:4
aggressiveness 29:20
ago 39:3 46:10
agreed 42:6 68:10 68:12
agreement 4:6,14,19 30:7 65:18,21
agreements 64:5
AKIN 2:12
al 1:6
allegation 62:21 67:6
alleged 66:14
allegedly 55:24
alleviated 33:2
allocation 36:13
allowance 39:22
alluded 37:5 50:10
Alto 28:2 33:10
ambiguous 67:7
amended 5:15
amendment 39:2
American 30:11
Americas 2:22
America's 44:8
amount 33:12 34:16 40:2 44:22 48:25 55:2
analyses 21:24 42:2 58:21 67:5
analysis 33:24 48:8 48:10,12,16 52:24 53:14 62:2
analysts 47:19
Anderson 41:13
ANDREW 2:16
annual 49:23 57:15
annually 57:16
answer 46:22
anticipated 44:18 52:11,12

apparently 45:9
appeal 69:15
appear 29:18 31:18 35:16 36:17 55:17 59:7,17
appeared 23:14 59:15
appears 35:3,7 40:23 50:13,25 51:12 52:13 56:9 57:10 66:20,25
applicable 43:5
applied 23:4,8 25:20 29:2 40:11 41:13 54:13 55:3 59:4
applies 37:9
apply 22:9 40:21
applying 53:16 56:20
appreciation 65:5
apprised 63:5
approach 31:6,7 53:20 54:24
appropriate 32:11 40:3,15 41:12 52:25 55:23
appropriately 54:22
approximately 22:17,18,19 31:2 36:2,11 49:22,24 59:3
area 43:8
argue 69:19
argued 33:22
argues 38:14
argument 27:15 42:24 54:20 58:10 63:19 68:18
arguments 21:18
arms 35:2
arose 52:11
arrangements 66:7
array 52:2
ARTHUR 2:24
ascertaining 22:25
ascribed 27:22,22

28:19 29:24 33:17 33:25
ascribing 28:17 34:16
aspect 40:19
assertion 21:6 23:7 33:5,20
asset 28:15,25 29:12 .29:16
assets 22:8,12 27:21 27:21 28:5 29:24 30:13 32:21 33:6 49:10
assume 4:5 34:11
assuming 42:20
assumption 33:17
assure 44:16
attack 56:18 58:9
Attorneys 2:5,13,20
attractive 34:9
attributable 22:15 22:25 27:6 29:5,6
audience 4:5 5:8
authority 41:15 43:12
automatic 55:14 70:12
available 27:3,13
Avenue 2:6,14,22
average 26:15 29:3
avoidance 46:6
avoided 42:17
avoiding 43:2
awarded 41:23
aware 51:25

| B |
| --- |
| b 1:22 20:10,13 64:7 |
| back 4:17 5:8 30:12 30:24 38:20,23 39:19 |
| backed 58:19 |
| bad 32:4 58:11 |
| Bairnco 53:5 |
| balance 39:23 |
| bank 49:9,12,15,19 |

CC-BLG004400

56:22 57:24
banker 25:18 30:17
  34:23
bankers 23:3 24:5
  25:17 26:4,25
banking 21:16
bankruptcy 1:2,24
  20:10,18,19 21:3
  31:23 37:16 38:4
  39:3,22 40:9,14,17
  41:2,14 43:4,11
  44:9,16,18 45:10
  45:12,22,24 56:8
  67:12
barely 42:22
bargain 62:23 63:19
  67:7
barred 46:12
base 21:23
based 20:6 21:14
  22:7 24:15 28:11
  32:20 33:20 37:6
  46:23 47:9,12 48:7
  48:12,15 52:5
  53:21 56:4 61:12
  63:13 67:5
bases 38:3
basic 63:8
basically 23:20 44:2
  56:21 63:3
basis 23:2 28:17
  32:17 33:13 34:3
  36:6 38:19,24 39:4
  39:19 41:20 42:13
  48:11,14 56:13
  57:23 60:17
basket 27:20 66:17
Bates-stamped
  36:16
bearing 59:11
began 66:20
beginning 61:18
behalf 31:4 43:13
  45:7 46:2 57:4
belief 63:13
believe 33:16,19

35:13 41:12,22
  42:12,17 46:10,20
  50:21 51:8 52:6,7
  52:9 56:5,10 61:23
  62:13 65:14,20
  68:5
believed 49:3 53:21
  65:25
believes 30:21
Belinsky 26:19
  33:20 53:19,23
  54:9 55:3,5 58:12
  58:18,24 59:14
  60:19
Belinsky's 53:13
bench 1:17 5:9
benefit 5:6 44:6
  45:17,25 46:7 57:5
  57:17 58:4 61:8,15
  62:15
benefited 49:25
benefits 44:23 46:24
  48:20
BERRY 2:17
best 20:18 38:5 44:7
  44:25 47:3 61:24
better 24:21 25:9
  31:18
beyond 35:18
BICKS 2:23
billion 31:2 48:17
binding 64:16
bit 4:12 29:22 30:5
blood 72:13
board 50:16,16 51:7
  51:10,11
Boeing-Hughes
  31:14
Bondholders 38:21
  39:20
bonds 42:16 43:3
  49:20 50:15 60:4
book 58:25 59:6,13
borrowing 59:9
BOTTER 2:16
bound 4:14

Bowling 1:11
briefly 32:14 37:11
briefs 20:8
bring 43:2,9,20 45:7
  45:22
bringing 47:2
brought 45:25 46:2
BRUCE 2:9
building 34:11
bulk 4:17 5:7
burden 49:23 53:12
burdens 20:16
business 5:5 22:7
  23:17 24:22 25:8
  25:11,16 26:20
  27:8,11 31:12
  33:15 34:12 35:25
  36:23 50:7,11,23
  50:24,25 51:3
  54:16 55:6,7,20
  56:7 59:8 61:22
  66:9 67:9
businesses 50:8
businessman 32:3
B.R 40:8,17 41:2,14
  44:9 45:12,19

———————————————
      C
———————————————
C 2:2 3:2 4:2 72:2,2
California 28:2
call 5:7
cap 60:11
capital 29:3 51:24
  52:14
capitalization 48:18
capitalized 51:19
  52:15
Cardalucci 41:16
care 47:14
career 32:3
careful 35:22 52:23
CAROLYN 3:9
Carter 41:14
case 21:16 23:17
  31:23 32:11 33:11
  36:3 37:25 39:20

40:13,20 41:2,8,10
  41:11 45:9 46:16
  57:9,18 62:22 63:4
  65:9 66:22
cases 38:23 39:16
  40:5 56:20,25 57:7
cash 22:10 24:2
  25:10 27:4,8,10,12
  27:16,17,18 31:10
categories 36:18
category 28:5
caught 52:23
cause 46:12
causes 43:18
Center 44:8
century 38:24
cert 39:16
certain 63:8
certainly 65:10
certify 72:7,12
chairman 62:25
challenge 47:6
changed 46:16
changes 31:17 49:25
Chanin 21:25 22:16
  23:19,25 25:13,25
  26:6,23 27:11 28:3
  28:8,22 29:11,14
  34:22,24 36:22
  42:2 56:11 66:12
  66:14
Chanin's 23:23
  24:23 26:18 29:16
  33:24 54:2 58:19
Chapter 20:5 40:4
  41:6 61:21 65:6
chief 47:25
China 34:20
choice 23:7
chooses 29:11
chose 26:14 27:18
  66:7
Christ 3:16 28:17
  30:20 35:21
Cir 39:15
Circuit 41:17 43:14

CC-BLG004401

43:21,23 53:4
56:14,22 57:18,20
circuits 43:14
circulate 67:18 69:5
circumstances
38:15
citations 5:13
cited 39:16
City 56:23
claim 43:10 44:4
46:19 52:22
claims 21:11 37:10
37:17 39:9 45:15
68:12 69:2
classes 20:23
classification 68:25
clear 24:13 40:21
59:19 61:3 66:15
clearly 43:10 57:2,9
58:5 66:14
close 29:10 30:22
51:2
closely 63:5 64:4
closer 29:14
Code 20:10,18,19
21:3 37:17 38:4
39:3 43:4 46:5
67:12
colleagues 27:7
colleague's 24:17
colorable 44:4 60:22
come 4:17,20 29:9
51:2 59:12
comfortable 27:11
40:22
coming 49:16 60:10
commencement
63:24
Commerce 56:22
commitment 64:23
committee 2:13,21
3:17 5:16 21:19
22:3,3 23:6 34:14
37:14 38:13,22
39:14 42:13,25
43:9 45:5,6 46:11

46:14,14,17,18,21
51:5,17 53:11,13
54:19 55:11 58:10
61:4,10,11 62:4,11
62:24,25 63:15
67:10 68:2,7
committees 43:15
43:16 69:6
committee's 47:4
70:23
common 20:23 21:7
Communications
1:6,18 4:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
companies 22:5,11
24:4 25:22 47:17
47:25 67:3
company 23:16
24:13,25 35:17
37:8 45:19 49:3
51:17 54:4 57:19
61:19 65:19
company's 48:7
59:11 64:9 65:5
comparable 22:10
22:11 24:4,7,13,18
25:18,21,22 35:17
64:7
comparables 31:15
compare 55:23

compared 28:9 54:9
comparison 23:15
52:25 54:11
compensation 64:9
65:11,15,23
compete 64:8
competition 50:22
competitors 35:9
64:10
complaint 69:12
70:10,18,19
complete 36:14 52:7
completion 49:21
comply 59:4
comports 46:4
compromise 42:6,10
concededly 59:2
concern 22:6,13
25:4 30:2 34:3
48:2,5,14 58:21
concerned 35:3,13
64:7,21 66:11
concerns 32:24
51:20
conclude 21:14
31:25 41:7 47:2
conclusion 21:23
46:15
conclusions 44:13
concrete 35:14
conduct 32:6 41:11
conducted 32:20
conducting 27:11
52:24
confer 57:5
confidence 29:16
confidential 1:14
5:1,5
confidentiality 4:6
4:14,18
confirmation 5:15
20:4 27:4 59:21
62:20 66:19 67:15
68:14
confirmed 20:11
39:4 40:5 41:3

67:13
conflict 45:9
Cong 39:5
Congress 38:25
conjunction 57:12
connected 28:18
connection 28:13
31:11 32:17 39:2
47:5,7 51:4 52:21
59:18 63:15
consequently 61:23
consider 52:21
considerable 33:12
48:25 49:4 57:20
58:4
considerably 26:6
31:20 35:11 36:4
48:18 54:25
consideration 35:22
61:2
considered 22:6,9
40:10 44:20 60:24
considering 22:21
62:7
consolidated 39:12
50:7 56:13 57:23
conspicuous 36:25
constitutes 5:13
constrained 37:2
contain 50:18
contained 59:22
contemporaneous
58:11
contending 32:12
contends 37:14
Continental 39:15
continuation 44:19
continue 20:3 67:14
continued 3:2 50:25
contract 37:9 38:18
40:15,22 41:23,24
42:3,5,20
contracts 22:16 25:8
25:11 34:6 63:21
64:3,6,22
contrary 41:15,20

CC-BLG004402

contrast 45:18
Coram 40:25
core 22:7 37:4
Corp 39:15
corporate 36:13
Corporation 40:8
  40:16,25 45:19
correct 4:7 5:11,13
  68:22
corroboration 36:8
cost 29:3 62:7
costs 62:9,12,17
cost/benefit 62:2
coterminous 49:20
counsel 3:12 51:15
count 56:11
COUNTY 72:4
couple 26:17
course 22:22 37:25
court 1:2 4:3 5:2
  20:2 30:9 39:25
  40:9,11,14,14,17
  40:18 41:2 43:18
  44:9,12,15,16
  45:10,11,12,13,21
  56:24 67:18,22
  68:9,16,22 69:3,7
  69:13,18,20,23,25
  70:4,14,20,22 71:2
courtroom 4:19
courts 37:18 38:3,10
  39:6
court's 38:21 43:11
  70:8
cramdown 20:22
  21:4 38:12
credible 32:23 53:10
credibly 34:3
creditor 39:24,24
creditors 2:13 21:8
  21:9 22:2 27:13
  37:21,24 38:8,11
  38:16 39:9,24
  41:10 42:6,7,8
  43:15,17,24 45:4,8
  45:17,22 46:3,14

61:8,25 62:24,25
63:15 65:20 66:5,5
67:10 68:2,6
creditor/sharehol...
  41:19
criticism 29:17
critique 53:13,14,16
cross 49:8 54:8
cross-acceleration
  50:9 57:24
cross-defaults 57:23
current 25:4 47:15
currently 31:23
Custom 1:10
customers 59:8

——————

D

D 1:23 4:2
DANIEL 2:15
data 50:24 51:3
  54:16 55:6,7
date 49:20
dated 24:9
DAVID 2:16
day 49:19 57:25
  70:11 72:18
days 20:7
DCF 23:2 25:3,24
  26:6,8,11,12,18,24
  29:3,21 36:7 48:8
  48:15
dealing 40:5
Debentureholders
  39:14
debt 29:13 42:4 46:9
  48:3 49:8,9,12,15
  49:19,22 50:5
  57:15 59:25 60:14
  66:17
debtor 37:19 38:2,9
  39:5,25 40:4 43:17
  43:19 45:4 64:17
debtors 1:7 2:5 20:4
  20:9 21:9 22:2
  25:5 27:24 36:15
  36:23 37:7,14,21

47:9 61:22 62:12
62:23 63:12 64:19
67:9
debtor's 44:6
debts 48:6 49:4
  59:12
December 42:16
decided 40:6
deciding 40:2
decision 38:21 39:21
declaratory 40:7
declined 40:20
  55:19
decrease 60:5
default 40:21 49:7
  50:9
Delaware 41:3
delay 44:18 61:21
delayed 41:10
delevering 49:14
denial 70:9,18
denied 39:16 47:5
Denise 72:5,21
deny 62:3
DEPARTMENT
  3:9
deprives 21:12
Derrough 24:20
  27:7
Derrough's 24:14
  32:19,22 33:5
deserved 35:22
designs 35:9
desire 23:16
detail 21:22 42:24
determent 61:22
determinations
  44:12
determine 23:5 25:2
  41:8
determined 23:21
  24:6 40:14
determining 24:19
developed 35:9
developments 34:18
Dewitt 34:3 36:7

Dewitt's 36:19
difference 22:23,24
  23:23 26:3 28:24
  31:12 45:21 67:2
differences 23:21
  28:6
different 30:16
  40:19
difficult 53:10 61:4
diligence 36:22
  53:24 54:3
direct 45:9 54:8
  57:5,11,13
disagreed 31:5
disallows 37:17
disclosure 20:7 67:8
discount 29:20
  53:17,19 54:14
  55:3,14,15
discounted 22:10
  24:2,23 25:14
  54:22
discounting 54:17
discrepancy 36:25
discretion 5:11 40:2
discretionary 43:11
discuss 20:12
discussed 31:4 33:8
  34:21 50:15 57:21
discussion 51:7,9,13
  67:10
discussions 47:16
  50:17
dislike 65:11
dismissal 70:10,13
dismissed 70:16,19
dispute 38:14
distributions 38:2
district 1:3 40:9,14
  40:17,18,23,24
  41:2,14 44:10
  45:11,13,20 56:23
  56:24,24 69:20
doing 59:8 66:9
dollar 27:5 33:18
  34:16 35:19 36:19

CC-BLG004403

5

37:6 42:11,17 55:2
  55:6 57:15
**dollars** 23:22 27:10
  27:19 28:4,9,15,20
  30:2,23 31:3,22
  36:2,5,11,20 48:14
  48:17 49:12,17,23
  49:24 59:3
**double** 56:11
**downstream** 56:16
  58:7,13
**downturn** 50:22
  55:21
**Dow-Corning** 40:8
  40:16
**draft** 32:15 33:5
**DRAIN** 1:23
**DRAIN'S** 5:19
**driven** 30:16 31:10
  33:17
**dropped** 27:20
**DS** 45:11
**Dubois** 39:12
**due** 36:22 48:6
  49:16 53:23 54:3
  59:12

**E**

**E** 1:22,22 2:2,2,8 3:2
  3:2,15,15 4:2,2
  72:2,2
**earlier** 33:4,16 37:5
  50:10
**Eastern** 40:9,17,23
  45:20
**eat** 62:17
**EBITDA** 22:15 25:7
  26:24 31:20 36:6
  47:13,21,22 53:17
  54:15,16 55:7,11
  55:16
**effect** 64:16,25
  69:14,15
**effective** 68:20,21
**either** 26:25 35:20
  42:22 51:16 54:8

58:16 60:13
**element** 63:18,19
**elements** 20:13 27:2
**emergence** 61:21
  65:5
**employed** 22:4
**Employee** 64:18
**employees** 64:10,16
  64:25 65:8
**employs** 34:11
**ends** 5:23
**engaged** 41:11
**engineers** 34:10
**ensure** 49:3
**entered** 69:11,19
**enterprise** 29:25
  37:7 42:12 48:11
  50:7 58:21
**Enterprises** 43:21
**entitled** 42:8,14 72:9
**envelope** 30:12,25
**equally** 26:10
**equipment** 34:7
**equitable** 38:12,15
  38:19 39:4,8,19
  41:9,21
**equities** 39:23 46:16
**equity** 2:21 5:16
  22:3 23:5 29:7
  34:14 37:13 38:13
  39:10 42:13,25
  43:8 45:6 46:11,13
  46:20 51:5,17
  53:11 54:19 57:14
  58:10 59:25 60:12
  60:14 61:3,10,11
  62:4,11 70:23
**equivalent** 61:3
**ERISA** 68:8
**errors** 5:12,12
**especially** 31:8
**ESQ** 2:7,8,8,9,9,15
  2:16,16,17,23,24
  2:24 3:6,12
**ESQS** 2:19
**estate** 27:24 33:9,12

33:18,22,25 39:7
  43:13 44:6,8,19,24
  44:25 45:8 46:3,8
  46:25,25 61:25
**estates** 5:6
**estate's** 47:3
**estimated** 63:11
**et** 1:6
**Etkin** 3:6 68:23,24
**evaluation** 24:24
  46:23 50:20
**event** 66:20
**events** 56:6
**everyone's** 23:16
**evidence** 23:12 32:7
  44:23 50:18 66:24
**evidentiary** 44:13
**exceeded** 58:5
**exception** 56:19
**exchange** 47:6 48:3
  48:12,19,20,22,23
  49:13,17,21 50:13
  51:5,19,23 52:11
  52:16,18,19 55:9
  58:2,3 59:6 60:2,3
  60:4
**exclusively** 27:25
  30:9 41:17
**executive** 64:9
**exercise** 43:11
**exhibit** 36:15 55:11
  59:14
**exhibits** 20:8 21:18
**existence** 64:5
**exit** 27:18
**expected** 60:10
**expenditures** 52:14
**expense** 25:12 36:11
  37:2,24 44:18
  51:24 57:16
**expenses** 35:23,24
  36:9,18,21
**experience** 24:17
  31:11
**expert** 21:15 22:6,9
  32:15,17,18 33:21

**experts** 21:25 22:4
  22:24 27:5 28:3,25
  30:17 31:13 32:12
  33:25 35:20
**expert's** 36:7
**explanation** 30:3
  55:18
**expressly** 39:20
**extended** 49:19
**extending** 49:15
**extension** 57:25
**extent** 66:21
**e.g** 39:11

**F**

**F** 1:22 72:2
**faced** 40:13
**facing** 48:24
**fact** 4:9 21:20 23:24
  24:25 37:18 38:14
  42:5 45:21 48:24
  50:5,11 58:11 60:7
  60:15 61:12 63:23
**factor** 30:19
**factored** 52:4,6,8
**factors** 37:13 44:3
  53:12 59:12,13
  62:7
**facts** 41:8 57:21
  59:7
**failure** 56:7
**fair** 38:12,15,19
  39:4,8,18 41:9,21
  42:9 61:2
**fairly** 28:3 32:23
  40:24
**fairness** 41:18
**faith** 21:2 67:11
**far** 35:2,12 54:7
  64:6,20 66:10
**feasibility** 20:17
**feasible** 33:23
**features** 66:18
**Federal** 32:7 37:9
  38:17 40:12 41:5
  42:22

CC-BLG004404

feel 36:25
**FELD** 2:12
**FIFE** 2:9
**Fifth** 2:6
**figure** 27:18 36:12
  36:14
**filed** 5:19 63:14 68:8
  69:12
**final** 25:2 35:21
  62:19
**finally** 52:9 55:9
**financeable** 29:13
**financed** 29:7
**financial** 47:25 63:6
**financing** 29:8
**find** 20:8 36:23
  41:16 51:21 67:10
**finding** 64:13
**findings** 21:21
**fine** 69:16
**firm** 58:12 59:16
**firms** 21:16
**first** 4:4,13 21:5,21
  22:13 24:15 26:17
  27:3 38:4 43:7
  44:3 50:20 51:21
  53:15 54:13 63:7
  64:14
**five** 4:16
**flattening** 47:24
**flaw** 54:19
**flawed** 53:15,22
  54:12
**flaws** 23:6
**flow** 22:10 24:2
  25:10 27:17 31:10
**flows** 38:5
**focused** 23:18 30:9
  41:18 51:14
**focusing** 52:17
**folks** 5:22
**followed** 53:18 64:4
**following** 5:13 49:21
  64:14
**follows** 51:21
**forecast** 60:8

**foregoing** 52:13
  55:13
**form** 32:15 62:23
  64:5
**forma** 30:25
**formal** 34:23
**formulation** 63:14
**fortunately** 32:25
**found** 51:7
**fourth** 5:15
**Frank** 57:19
**frankly** 23:9 28:11
  33:19
**fraudulent** 5:17
  43:3,5,9 45:7,15
  45:16,23,24 52:21
  53:8 55:24 56:17
  57:6 58:8 62:5
**FSS** 25:16,25 26:14
  27:12 29:13
**FSS's** 25:22 31:19
**fulfill** 64:23
**fulfilled** 29:9 64:24
**fulfilling** 65:7
**full** 21:10 39:9 53:8
  60:25
**fungible** 46:9
**further** 39:3 41:25
  43:25 62:18 72:12
**future** 32:25 65:4,19
**F.Supp** 53:5
**F.2d** 39:15
**F2d** 43:21 44:14
  56:14,22
**F3d** 41:16 43:23
  53:4 57:19

---

**G**

**G** 4:2
**GAAP** 59:3
**gap** 62:18
**gauging** 23:10
**general** 50:22
**generally** 29:24 35:5
  43:20 46:8 47:24
  53:3

**generous** 33:19
  64:13
**give** 4:12 32:8,10
  35:19 37:23 45:14
  58:16
**given** 23:11 25:7,10
  27:7,16 29:15 30:3
  35:4 39:18 42:4
  46:9,18 47:7 49:5
  52:13 55:13 59:10
  60:7 61:19 62:14
  64:13 65:12 66:3
**gives** 28:16
**giving** 26:18
**go** 4:11 5:7 20:22
  21:21 36:5 54:6
  61:14 68:20,20
  69:19
**goes** 38:20
**going** 4:11 5:3 22:6
  22:13 25:4 26:11
  30:2 34:3 39:19
  47:23 48:14 56:8
  58:21 62:7 70:14
**GOLDEN** 2:15 69:9
  70:5,17,21,24
**good** 20:25 32:4
  61:20 67:11
**gospel** 60:13
**GOTSHAL** 2:4
**government** 22:16
  24:22
**grand** 67:2
**grant** 64:12
**granted** 43:12,17
  63:8
**granting** 44:2,7
  57:13
**Green** 1:11 38:22
**Greenhill** 21:25
  22:19,23 23:4,8,13
  23:25 25:25 27:14
  28:6,16,24 29:13
  31:5 36:21 47:8
**Greenhill's** 22:25
  26:8 28:10 29:21

**growth** 23:4 26:20
  47:20,22
**guarantee** 5:19
  42:15 43:3 47:7
  48:21 49:18 50:4
  50:14 52:20 56:12
  56:16 57:13 58:2,3
  58:6,8,14
**guess** 69:11,25
**GUMP** 2:12

---

**H**

**H** 2:16,24 39:5
**half** 65:2
**hand** 29:11 45:10
  72:18
**happy** 69:4
**harm** 46:25
**HAUER** 2:12
**HBE** 57:19
**headquarters** 28:2
  33:11 34:5,13
**Healthcare** 40:25
**hearing** 5:19 32:18
  44:13,22 63:25
  66:19
**held** 39:6
**heretofore** 64:24
**hereunto** 72:18
**high** 29:5 35:25
  66:18
**higher** 26:24 31:20
  31:21 42:9 55:2
**highest** 41:15
**highly** 34:9 53:22
**hindsight** 52:23
**hinge** 21:5
**historic** 47:12
**historically** 54:5
**history** 28:12 38:25
  59:5
**Hobby** 44:8
**hoe** 61:4
**holders** 2:21 39:11
**holding** 44:13
**HON** 1:23

CC-BLG004405

**Honor** 68:24 69:9,11
69:22,24 70:5 71:3
**hopefully** 69:6
**House** 1:10
**Housecraft** 43:22
**Hughes/Boeing**
24:10
**hundred** 24:2 27:9
31:22

### I

**Id** 44:20
**ignore** 61:12
**immediate** 70:10
**immediately** 52:18
64:15
**immune** 56:17
**impact** 58:6 68:20
**important** 4:9 41:22
**importantly** 31:24
**improper** 37:20
65:21
**improperly** 21:12
**inadequately** 52:15
**include** 36:13 62:8
**included** 31:3 32:22
34:17 36:18 49:15
**including** 20:17 23:7
36:16 39:10 45:25
46:6 50:14 56:11
57:18 59:2 63:10
66:17
**income** 59:6
**incorporating** 43:5
**increase** 36:4 49:6
**increasing** 36:5
**incurrence** 57:3
**indenture** 45:5
**indicates** 51:9
**indicia** 58:17,25
60:15
**indirect** 57:11,17
58:4
**indirectly** 28:18
**individual** 43:16,24
**Industries** 43:22

**industry** 55:21
**industry-wide** 59:5
**inequitable** 37:20
**inflation** 23:11,12
**inform** 59:20
**informal** 21:19
**information** 24:9
60:21
**informative** 60:21
**inquiry** 51:16
**insolvency** 57:8
58:17
**insolvent** 21:20 37:8
37:15 57:2,3
**instance** 63:7
**instances** 43:16
**instigation** 64:18
**instructs** 32:9
**integral** 48:22 49:18
**integrated** 49:14
**Intelsat** 30:11,14
31:2 32:18
**intercreditor** 41:18
**interest** 27:23 28:21
37:9,10,17,22 38:7
38:11,16,20 39:10
39:22 40:3,6,11,16
40:20 41:6,9,20,23
42:20 44:25 48:25
49:23 56:18 57:15
59:8 61:24 62:10
66:15
**interested** 72:15
**interesting** 50:5
**interests** 20:19
27:24 38:6 44:7
47:4
**interrelated** 50:8,12
**intervening** 56:6
**introduced** 21:18
23:12 28:17 50:18
**Inv** 39:15
**investment** 21:16
23:3 24:5 25:17,18
26:4 29:9 30:17
34:23

**involved** 47:10
53:16 63:3
**irrelevance** 59:24
**issuance** 50:3 52:19
**issue** 35:5 37:11
40:6 42:13 44:23
45:3 53:9 56:16
60:25 69:15
**issued** 5:19 42:16
66:23
**issuer** 21:6
**issues** 41:19 45:2
68:25

### J

**J** 3:12
**Jeffries** 21:25 22:17
23:19,23 24:3,12
25:25 26:10 27:7
27:14,15 28:5,9,23
29:4,17,18,20
32:16 36:22 42:2
**jeopardizing** 34:5
**JOHN** 2:17,23
**joint** 5:15 20:5
**judge** 1:24 5:19
32:10 40:24
**judgement** 37:10
40:7
**judgment** 38:17
40:12 41:5 42:22
**July** 1:9 50:21 63:10
**June** 61:13
**JUSTICE** 3:9
**justified** 26:16
**justify** 44:17

### K

**Kansas** 56:23
**Karotkin** 2:7 67:14
67:17,20 68:3,10
68:19 69:4,10,16
69:21 70:3,7
**keep** 5:5 23:17 66:2
**kept** 63:5
**key** 55:10 64:10,16

64:18,24
**kick** 64:14
**kind** 22:6 49:2
**know** 67:15
**knowledge** 58:13

### L

**L** 3:15
**labeled** 27:21
**lack** 52:7 55:21
65:18
**language** 46:4 67:7
67:25 68:4,6,17
**large** 22:23 28:3
40:2
**largely** 22:24 27:6
46:17 61:7 64:17
**law** 43:6 45:9 57:18
**lawyers** 63:6
**lay** 32:8
**lead** 56:7
**leads** 29:25 33:4
**learning** 32:23
**Leasing** 57:19
**leave** 4:15,19 5:17
43:2 62:4
**led** 51:13
**left** 70:11
**legal** 38:7 65:14
**legally** 50:4
**legislative** 38:25
**legitimate** 32:2
**lenders** 50:6 57:22
**length** 35:2 50:15
**letter** 53:18
**level** 37:8 41:15
**levels** 60:14
**leveraged-leasing**
33:21
**Lexis** 40:23 56:24
**liability** 56:13
**life** 52:10
**light** 29:19 51:20
60:8 66:4
**likelihood** 44:17
**LINE** 5:19,19

CC-BLG004406

linkage 63:20
Lippe 53:5
liquidation 23:15
. 33:13.
liquidity 59:13
litigation 5:17 34:17
  35:3 40:20 43:2
  44:19,21,24 45:7
  45:23,24 46:6,6
  47:2,3 61:5,7,17
  61:20,24 62:5,8,11
little 4:12 29:22 30:5
  42:18 58:9 59:10
  66:12,23
LLP 2:4,12
loan 57:25
location 34:8
logical 55:17
logically 54:23
long 33:14 35:3
  37:18 38:10 46:10
  62:21
looking 4:4 47:17
  70:6
Loral 1:6,17 3:16
  4:1,6,14,19 20:1
  20:15 21:1,19 22:1
  23:1 24:1 25:1
  26:1 27:1 28:1
  29:1 30:1,10,25
  31:1,17 32:1 33:1
  34:1,21 35:1 36:1
  37:1 38:1 39:1
  40:1 41:1 42:1
  43:1 44:1 45:1
  46:1 47:1,22 48:1
  49:1,14 50:1 51:1
  52:1 53:1 54:1
  55:1,20 56:1 57:1
  57:22 58:1 59:1,9
  60:1 61:1 62:1
  63:1 64:1 65:1,25
  66:1 67:1 68:1
  69:1 70:1 71:1
Loral's 5:5,14 27:23
  28:11 30:10 33:9

  35:8 49:10 56:8
LORI 2:9
lot 31:8
low 23:9,10,15 29:4
  33:9
LOWENSTEIN 3:4
lower 41:13 55:12
  56:3
lowered 60:7
LSPC 21:20 30:5,6
  32:3 34:14 51:21
LSPC's 65:10
lumpiness 25:9
  27:17
lumpy 31:9
LUSTRIN 3:12

## M

M 2:15
Madison 2:14
main 23:23 24:23
  26:3 27:21 28:6,24
maintain 34:12
maintained 34:7
major 63:18
management 47:17
  62:24 63:9,21 64:3
  64:6,20,25 65:15
  65:23,24 66:7
managers 65:17
MANGES 2:4
manifest 39:21
market 48:18 58:20
  60:11,14,16 66:14
  66:21,25
markets 34:19 35:13
  57:21
marriage 72:13
material 52:14 67:4
math 42:21
matter 1:5,17 23:10
  34:21 40:8 50:11
  59:18 65:14 69:10
  72:9,14,16
maturity 49:15
mean 68:16 70:6

meaningful 31:15
  32:21
means 66:8 69:20
meant 58:3
measure 24:19
  25:22 32:5 35:18
measures 49:3 55:10
meet 49:5 51:2
  53:11 61:25
meeting 50:21 51:2
meets 67:11
members 63:9
memorialized 50:17
merely 53:16
merit 27:15
merits 44:21 46:24
  62:17
met 44:2
method 22:10,11,12
  22:25
methodologies 22:5
  25:20,23 26:5,9
methodology 23:4,9
  24:3,5 26:13 30:16
  54:12
Mexico 31:24 41:14
MEYER 2:9
MICHAEL 3:6
Michigan 40:9,18,24
mid 25:24 28:23
  48:15 55:19
middle 29:14
midpoint 22:15
  25:13 28:8 33:24
  63:11
million 22:17,18,20
  23:22 26:2,2,2,15
  27:5,9,10,12,14,15
  27:19 28:4,5,6,8,9
  28:10,19,22,23,24
  29:4,23,25 30:2,23
  31:22 33:18,25
  36:2,5,11,19,20
  37:6 42:11,17
  48:13,13,14,17
  49:11,16,23,24

  55:2,6 57:15,16
  59:3 61:12 63:12
mind 30:16 46:4
  58:5
minus 22:15 54:15
minutes 4:16 50:17
  51:7
miscellaneous 22:8
misnomer 42:3
misplaced 29:17
Missouri 56:25
money 33:12
months 50:15
moot 42:15
motion 5:16 42:25
  47:4 62:3 70:9,18
move 34:4
moving 34:13
multiple 24:21
  26:24 31:6
multiplying 30:18

## N

N 2:2 3:2,15 4:2
NATH 2:19
nature 25:10 27:8
  35:4 51:12 58:7
nearly 54:7
nebulous 59:21
necessary 48:22
  64:8,10 65:25
need 5:4 27:9 64:22
needs 4:19 27:8,16
  44:3,5
negative 54:16 55:7
  58:6 59:2,6 60:2
negotiated 63:7,24
  66:16
negotiation 63:16
negotiations 63:4,16
Neither 59:7
never 58:13,14
  59:15
nevertheless 26:23
  37:11 47:16
new 1:3,11,11 2:6,6

CC-BLG004407

9

2:14,14,22,22 3:11
3:11 33:3 34:18,19
35:12,13 41:14
44:10 45:20 49:20
50:14 59:4 63:16
63:20,23 66:11
72:3,7
**Ninth** 41:16
**non-default** 41:24
**non-Intelsat** 32:21
**non-Skynet** 33:6
**normally** 65:3
**North** 30:10
**Northern** 45:13
**Notary** 72:6
**note** 2:21 20:14 25:5
36:20 41:24 56:15
58:18 61:5 64:14
65:17 66:3
**noted** 5:3 22:22
34:25 39:20 43:24
43:25 45:21 48:23
50:21 54:8
**notes** 5:18,19 34:22
63:17,21,23 66:11
66:16,21
**noting** 26:23 31:7
35:19 50:8 60:20
**notwithstanding**
24:21 37:18 47:20
61:11
**November** 54:9
**Nowak** 72:5,21
**number** 29:21 36:19
37:2,3 53:15 54:17
54:20
**numbers** 30:4 54:14

───── **O** ─────

**O** 1:22 3:15 4:2
**obfuscated** 36:24 .
**objected** 20:20
**objection** 20:25
62:20 65:18 68:8
68:11,13
**objections** 20:14,15

20:21 21:5 67:24
**obligated** 50:4
**obligation** 57:4
**obligations** 51:15,25
**obtain** 62:16
**obvious** 64:12
**obviously** 21:5 34:8
36:3 43:8 50:3
60:25
**occupancy** 29:10
**occur** 63:17
**occurred** 57:25
66:19
**October** 30:8 31:17
31:19 32:16 39:6
**offer** 34:25 47:7
48:4,12,19,20,23
49:13,17,22 50:13
51:5,19,23 52:11
52:16,18,19 55:9
58:2,3 59:6
**offered** 53:13 64:9
**offers** 60:2
**OFFICE** 3:10
**officer** 48:2
**official** 2:13,20 22:3
43:14,15
**Ohio** 45:13
**Okay** 5:22 69:7,23
70:4
**once** 29:19 69:18
**ongoing** 33:15 34:6
51:14
**open** 68:18 70:11
**opinion** 5:7 32:8
40:19 58:11,14
59:16,17,20,22
60:22 61:18
**opportunity** 66:6
**opposed** 27:10 28:13
45:8 46:3,14
**option** 64:3,12 65:7
**options** 63:8,22
64:22 65:4,12
**oral** 54:20
**orbital** 24:15,17,21

27:23 28:7,12
**order** 4:12 5:4,19
28:14 39:7 67:16
69:5,11,18 70:7
**ordered** 70:8
**orders** 28:19 33:3
55:22 60:9 70:2
**original** 54:25
**originally** 28:14
63:14 64:19
**Orion** 5:18 42:16
43:3 47:21,21 48:3
48:8,13,23 49:8,20
50:2,14,24 51:4,18
51:23 52:14 55:8
56:9 57:14 58:22
**Orion's** 49:4,22 50:5
50:16,25 54:15,18
55:18 58:23 59:24
**outcome** 72:15
**outlays** 25:12
**outside** 45:22
**overall** 67:3
**overcome** 53:11
54:19
**overlooked** 36:24
**owe** 69:25
**owner** 32:9
**owners** 45:18 65:19

───── **P** ─────

**P** 2:2,2 3:2,2,15 4:2
**package** 64:4
**packages** 64:8
**PAGE** 5:19,19
**pages** 36:16
**paid** 39:9 46:9 65:23
**Palo** 28:2 33:10
**PAMELA** 3:12
**paragraph** 70:8
**parent** 21:6 37:8
57:6,12
**parent's** 56:18 57:3
**part** 4:9,10,11,12,15
5:14 38:12 48:22
49:14,19 55:8

64:23 65:7 68:11
**participate** 39:11
**particular** 29:15
─ 31:7 34:16 35:19
47:19 51:20 52:22
**particularly** 24:10
24:19 27:16 35:4
42:24 52:18 60:6,7
60:12,18 65:11
66:13
**parties** 27:20 30:8
32:13 36:24 37:12
45:25 56:11 69:19
72:14
**parts** 5:3
**party** 51:17
**patent** 34:17 35:2
**patents** 34:17,20
35:5,6,7,10,11
**patience** 70:25
**pay** 48:6,25 51:14
59:11
**paying** 49:2
**payment** 38:7 49:4
**payments** 48:3
**people** 4:5 55:20
60:15
**percent** 23:8 24:2,3
26:7,8,11,12,18
38:18 42:4,9 47:20
47:22,23 53:16,19
54:12,13 55:3,12
55:14 64:15
**percentage** 23:7
29:2
**performance** 34:6
47:18 55:5,18
58:24
**permit** 32:7 37:22
**permitted** 46:13
**permitting** 69:12
**perpetual** 23:4
**person** 32:8
**persuaded** 41:4
**persuasive** 50:6
**pertain** 50:19

CC-BLG004408

pertaining 67:8
PETER 2:24
placed 24:25 26:6
placing 22:12 33:9
plain 40:22 46:4
plaintiffs 68:8
plan 5:15 20:5,6,11
  20:21,24,25 21:11
  21:11 35:25 36:23
  39:8 40:4,13 41:6
  56:7 62:21 63:14
  64:18 65:13 66:4
  67:9,11,24
plan's 20:22
Please 4:3
pocket 62:9
point 28:23 35:21
  48:15 56:25 63:2
  68:7 69:14
pointed 23:6 31:5,16
  58:25
pointing 58:23
points 30:5,6 64:11
portion 5:23 61:18
positive 25:7 60:11
possibilities 35:14
possibility 70:12
post 58:23
postpetition 37:22
  38:7,11,16,20
  39:10 40:6,10,19
  41:6,22 42:20 62:9
potential 23:6 29:10
  34:15,18,19 35:12
  46:25
potentially 21:9
precedent 35:17
preference 26:10
preferred 20:22
  21:7 34:8
prejudice 68:14
premised 63:20
prepared 4:10 5:10
  23:19 28:14 32:15
  47:5,8 59:18
president 36:10

pressed 30:19
presumed 63:20
presumptuous
  67:21
prevented 46:19
previously 49:2
  60:10
price 24:18 63:11
  66:25
priced 66:21
prices 60:7
pricing 60:14
primarily 20:12
  21:23 27:25 28:7
  33:10,17 51:14
primary 20:21 36:6
  50:25
pro 30:25 65:21
  66:10
problem 52:2,4,10
  68:15
proceedings 72:8,11
process 34:24 68:12
  69:2
produce 44:20
product 58:20
Products 39:12
professionally 47:15
  47:16
profits 60:16
progeny 62:3
program 65:7
project 31:10
projected 25:2
  26:20 27:12 28:4
  31:20,21 35:15,24
  47:22 51:24 54:14
  55:5,10
projection 22:16
  27:3 31:22 36:21
  54:21,22,25
projections 25:4,10
  29:10 31:9 37:3
  47:9,11,15,18 48:7
  51:2,23 52:5,9

53:2,3,20,22,24
  54:4,7,10 55:15,24
  56:2,5 58:24
prolong 70:6
promise 65:8
proper 22:22 56:10
properly 5:18 35:15
property 32:9
proposed 20:22
  30:10 47:6 64:19
  67:15
prosecute 70:9
prospect 33:14
prospects 59:9
Protective 3:16
  21:19 38:22 39:14
proven 29:12
provide 44:4
provided 36:8 58:4
provides 38:6
provisions 49:9
  50:10 57:24
public 46:17 72:6
purchased 51:22
purposes 25:16 32:5
  59:3 66:9
pursue 5:17 43:17
  45:14 61:5 62:5
pursued 61:9,17
  62:11
pursuing 46:12,19
  61:7
pursuit 44:25 61:20
  61:23
put 28:14
p.m 1:9

--------- Q ---------
qualified 34:9
quantified 62:12
question 43:7 46:23
  51:10 70:8
quid 65:21 66:10
quite 48:9 53:9
  62:13
quo 65:21 66:10

|   R   |
| --- |
R 1:22 2:2,9 3:2,15
  4:2 72:2
raise 51:11
raised 20:14 21:18
  30:5 34:15 35:21
  42:13 45:4 51:10
  51:21
range 28:8 52:7
  58:22 66:19
ranges 25:24
rate 37:9,10 38:8,17
  38:18 40:3,7,12,15
  40:15,21,22 41:5,9
  41:13,24,24 42:3,4
  42:5,6,8,10,21,22
  66:15
rating 50:6 57:22
RDD 1:6
reach 44:12
reached 65:22
reaches 38:23
real 27:24 32:24
  33:6,9,12,18,22,23
  33:24 61:22 64:11
realization 60:9
realizing 33:14
really 31:14 38:13
  63:2 66:23
Realty 45:19
reason 29:15 33:8
reasonable 23:22
  25:5 47:12 51:10
  55:16
reasonably 52:12
  61:2
reasons 5:6 21:22
  26:17 61:20
rebuttal 64:11
Rec 39:5
recall 67:22
receive 20:23 37:22
  38:2,11,16 43:24
received 34:25
  65:20

CC-BLG004409