IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al. | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

Related Docket Nos. 18922, 19072, 19073, 19074

Hearing Date: September 29, 2008 at 10:00 a.m.

## DEBTORS' TRIAL BRIEF IN SUPPORT OF OBJECTION TO THE UNSECURED CLAIMS ASSERTED UNDER THE DEBTORS' CREDIT AGREEMENTS DATED AS OF MAY 14, 1998 AND MAY 5, 1999

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Theodore L. Freedman
Eric F. Leon
153 East 53rd Street
New York, New York 10022

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones
James E. O'Neill
Timothy P. Cairns
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705

Co-Counsel for Debtors and Debtors in Possession

K&E 13163123.6

DKT. NO. 19476
DT. FILED 9/5/08

TRIAL EXHIBIT 38
CC-BLG004417-004471

CC-BLG004417

## INTRODUCTION

1.      More than three years ago, the fair and equitable rate of postpetition interest for the unsecured debt at issue was set using the method most hallowed by the bankruptcy process and most respected in the market – arms-length negotiation.  In 2005, the Debtors' proposed chapter 11 plan called for substantial value to remain with equity.  In 2005, the solvency of the Debtors was disputed and unresolved.  In 2005, at the behest of certain Lenders, the Creditors' Committee demanded postpetition default interest as a condition for supporting the Debtors' plan.  And in 2005, the Creditors' Committee and its counsel agreed on behalf of their constituency to a compromise which provided postpetition interest at an agreed rate in exchange for their support of the Debtors' plan.  The agreement was renegotiated and enhanced a year later.  In the intervening years, the Debtors regularly have used the agreed rate in their financial statements, all of which have been reviewed with the Committee.  The agreement has <u>never</u> been terminated.

2.      Today, the important facts are unchanged:  the Debtors' solvency is still disputed, the proposed plan (still in process) will preserve value for equity if it is confirmed, and the Debtors are still prepared to pay postpetition interest at the rate agreed upon in 2005 and 2006.  Only two things have changed: (1) new Lenders have come into the picture with a higher cost basis; and (2) they have sought to wash their hands of history and insist that they get the maximum default rate that could be argued from the applicable Credit Agreements.  The overreach is of major financial consequence, as reflected by the following undisputed figures:

| | | |
|---|---|---|
| Postpetition Interest (as of 12/31/08) using the <u>Base Contract Rate</u>: | $287 million | |
| Postpetition Interest Using the <u>Agreed Rate</u>: | $323 million | |
| Postpetition Interest Using the <u>Default Rate</u>: | $414 million | |

K&E 13163123.6

CC-BLG004418

3.     The Debtors and the plan proponents are still prepared today to pay the postpetition rates of interest contained in the long-standing agreements negotiated by the Creditors' Committee on behalf of all unsecured creditors, notwithstanding the Creditors' Committee's decision to litigate the matter with the Lenders. As shown below, those rates are better than the Lenders could ever do through litigation.

4.     Indeed, today – on this record – the Lenders' insistence on more than the agreed-upon rates has shown them to be entitled to far less. Today, there is no record of solvency and, absent solvency, the Lenders get no postpetition interest whatsoever. And so the Lenders have paraded like so many paper tigers a series of contentions that have utterly no foundation in fact or law. First, there was the haughty intonation of the oft-cited and totally inapposite "absolute priority rule." That rule applies only to prepetition allowed claims, not postpetition interest. Then, we were told by the Lenders of a legal doctrine that seemed odd – the presumption of solvency. And it was odd. It just does not exist, as this Court has noted:

> THE COURT: I am not aware that there is a presumption of either solvency or insolvency anywhere in the Bankruptcy Code having to do with the issue that we're about to litigate.

(See Docket No. 19210 (Transcript of Proceedings Before The Honorable Judith K. Fitzgerald United States Bankruptcy Court Judge) 95:20-23 (July 21, 2008)). The Creditors' Committee itself never really believed otherwise and so sought to establish the fact of solvency, but without any evidence of solvency. In a brief submitted at the same time as the Lenders, the Committee argued that the Debtors' stock price proved solvency. Of course, this approach, too, had no basis in the law, which defines solvency as the excess of assets over liabilities. And the approach has been abandoned in fact by the Committee's own expert, who reviewed the market capitalization of the Debtors but offered no opinion regarding solvency. Nor did he contest the affidavit of Pam Zilly, the Debtors' financial advisor, who opined that stock price is driven by many factors

2

CC-BLG004419

and does not establish solvency. The final tiger was paraded into the arena by the Creditors' Committee's expert who, giving up on solvency, was asked to and did give voice to his lawyers' argument that the amount in dispute is *de minimis*. A brief deposition adduced the obvious: (1) that there was no methodology behind this contention, just the teleprompting of counsel; (2) the contention rested upon the comparison of two entirely different securities, unsecured debt and equity; and (3) that looking at the issue in terms of the debt instruments themselves, the dispute is far from *de minimis*.

5.      Never deterred, the Lenders now undoubtedly will go to "Plan B" and press the Court to engage in a second round of estimation. This blunt proposal to set the chapter 11 cases back two years at the behest of those who just decided to come on the scene and rewrite history still cannot get the Lenders more than what the anticipated plan will provide. Indeed, it should earn them less. Even assuming now that they prevail in demonstrating solvency, their quest for default interest only begins. Will the absolute priority rule work then? No. It is still inapplicable and for the same reasons. The "best interests" test also will not do the trick. In the end, the Lenders will have to seek support in the "fair and equitable" test of section 1129 of the Bankruptcy Code. And so we will come full circle – the most probative evidence of fairness and equity will <u>remain</u> the result of the arms-length negotiations of 2005 and 2006 and the adherence of the Creditors' Committee and its counsel to the agreement for years. Can the Lenders even identify <u>any</u> contribution they have made since? They have tried through their expert, Edwin N. Ordway, arguing that the Debtors "used their money" and that they "supported" the Debtors. But, it turns out that Ordway could not actually say as an expert that the Debtors used any money beyond the original principal, for which the base contract rate, non-compounded, is the agreed compensation. Critically, the difference between the rate agreed in 2005-2006 and the full

3

CC-BLG004420

default rate the Lenders now seek is compounding – interest on interest – not interest on principal. The Lenders have no evidence that unpaid interest was ever "used" by the Debtors. As to the assertion that the Lenders "supported" the Debtors, it turns out that the Lenders' notion of support is their decision to forego unmerited opposition to the Debtors' pursuit of these cases. That brand of "support" cannot be in great demand.

   6.  The picture of "fair and equitable," then, is never going to get better if an extended solvency proceeding is begun. The Lenders' insistence, then, upon such a proceeding will be a factor that should count against them rather than in their favor. It would be precisely the sort of self-serving dilatory conduct that the law says should not be rewarded. See, e.g., In re Coram Healthcare Corp., 315 B.R. 321, 346-47 (Bankr. D. Del. 2004) (holding that a delay in the debtors' ultimate emergence resulting from a conflict of interest involving the debtors' unsecured noteholders and the fact that the "Noteholders have consistently acted as a group in this case in advancing their interests and opposing the Equity Committee" did not warrant payment of postpetition default interest under section 1129(b) of the Bankruptcy Code).

   7.  The cynicism of Plan B is starkly revealed by the Lenders' own decision to keep the 2005-06 agreements in place while they litigate for more. They do not believe in their own position and, while they hope the Court will give them more, they want to insist that the Court cannot give them less.

   8.  The Debtors therefore submit that the default interest rate issue can be decided now and with finality. As a matter of law, today the record supports no postpetition interest. Today, the record also establishes that even if the Debtors were solvent and the Lenders could clear the other legal hurdles, set out below, to default interest, the discretionary analysis of what is fair and equitable advocates only a result equal to or less than what the Creditors'

4

CC-BLG004421

Committee and the Lenders agreed to long ago. The Debtors respectfully ask the Court to so decide their pending Objection to the Lenders' claims.

## FACTUAL BACKGROUND

9.    The parties recently completed discovery into the facts bearing upon the Debtors' objection to contractual default interest. Based on that discovery, the Debtors believe that the following facts are undisputed.[1]

10.    The history of this dispute traces back to late 2004, when the Debtors were preparing to file their original plan of reorganization. In the Debtors' view, it was important that the Debtors' plan have the full support of both the general unsecured creditors and the equity holders, so that the Debtors could focus their legal efforts on unresolved matters related to asbestos contingencies.[2] Accordingly, the Debtors' management team, led by then-Chief Financial Officer Robert Tarola, entered into negotiations with representatives for the Creditors' Committee and the Official Committee of Equity Holders in an effort to enlist their support for the Debtors' plan. The point person for the Creditors' Committee during these negotiations was Mr. Thomas Maher of J.P. Morgan Chase & Co., Chairperson of the Creditors' Committee. (Docket No. 19323 (Tarola Decl.) ¶ 3)

---

[1]    The evidence concerning the factual background to this dispute comes largely from the declarations of the Debtors' former Chief Financial Officer, Robert Tarola, and the Debtors' General Counsel, Mark Shelnitz, and there is no evidence to contradict these declarations. Tellingly, the Creditors' Committee and the Lenders did not submit a declaration or affidavit from anyone at J.P. Morgan Chase who was involved in negotiating the agreements on postpetition interest. Their only evidence concerning the history of the parties' negotiations is the declaration of Lewis Kruger, counsel for the Creditors' Committee, and on the key factual issues, Mr. Kruger's testimony does not contradict that of Messrs. Tarola and Shelnitz.

[2]    See Docket No. 19323 (Declaration of Robert M. Tarola In Support Of Debtors' Objection To The Unsecured Claims Asserted Under The Debtors' Credit Agreements Dated As Of May 14, 1998 and May 5, 1999 ("Tarola Decl.")) ¶ 2.

CC-BLG004422

11.     Recent discovery in this matter demonstrates that, throughout these negotiations, Mr. Maher received input and recommendations from several of the Lenders under the Credit Agreements.  One such Lender, D.K. Acquisition Partners L.P., urged the Creditor's Committee "to insist that W. R. Grace commit to pay the contract default rate" as part of any plan of reorganization.  (See CC-JPM-0000009-12, attached hereto as Exhibit A)  However, another Lender, D.E. Shaw Laminar Portfolios, which at the time described itself as "likely the largest holder of W. R. Grace & Co. bank debt," encouraged the Creditors' Committee to compromise by accepting "postpetition interest in excess of floating-rate LIBOR (albeit less than fixed-rate LIBOR)."  (See CC-JPM-0000014-15, attached hereto as Exhibit B)  In its letter to counsel for the Creditors' Committee, D.E Shaw, rather presciently, wrote as follows:  "In this context, we believe that every avenue to reach agreement among the Debtor, the Committee and the equity committee should be aggressively pursued.  Through our involvement in cases like Owens Corning, we have seen what can happen when one constituency is seen by the court to be the obstacle to resolution."  (Id.)

12.     In the negotiations with the Debtors, Mr. Maher indicated that the Creditors' Committee would agree to be a proponent of the Debtors' plan if, and only if, the Debtors would agree to pay postpetition interest to the Lenders and other unsecured creditors at rates acceptable to the Creditors' Committee.  (Docket No. 19323 (Tarola Decl.) ¶3)  With respect to postpetition interest for the Lenders, Mr. Maher initially took the position that the Creditors' Committee would "not sign on to the Plan unless they get default interest compounded quarterly."  (DR01448, attached hereto as Exhibit C)  In taking this hard-line stance, Mr. Maher pointed out that the Creditors' Committee accounted for only a "small tranch of the bank debt," and that "the non-committee holders [were] posturing for a full default rate."  (DR00525,

6

CC-BLG004423

attached hereto as Exhibit D)  The Debtors were unwilling to meet the demand of the "non-committee holders" for postpetition interest at the contract default rate.

13.    On November 13, 2004, as negotiations with the Creditors' Committee were continuing, the Debtors, with no co-proponents, filed their original Plan of Reorganization (the "Original Plan").  (Docket No. 6895)  Section 3.1.9 of the Original Plan provided that the holders of general unsecured claims would receive postpetition interest equal to the interest they would have received in a non-default situation.  (Id.)  Importantly, the Original Plan also provided that the equity holders would retain majority ownership in the reorganized Debtors. (Id., at § 3.1.10)

14.    Negotiations between the Debtors and the Creditors' Committee continued after the filing of the Debtors' Original Plan.  Eventually, Mr. Maher moved off his demand for postpetition interest at the contract rate of default and agreed that the Lenders under the Credit Agreements would accept postpetition interest at the rate of 6.09% per annum, compounded quarterly, and other unsecured creditors would accept a non-default contract rate or the federal judgment rate of 4.19%, compounded annually.  (Docket No. 19323 (Tarola Decl.) ¶ 4)  The 6.09% interest rate that Mr. Maher agreed to accept on behalf of the Lenders was higher than the contract rate of interest, but lower than the default rate of interest.

15.    As noted above, at the time Mr. Maher agreed on the rates of postpetition interest under what would become a joint plan, it was expressly contemplated, as set forth in both the Original Plan and later in the joint plan, that equity holders would retain a significant level of economic value in the reorganized Debtors.  (Docket No. 19323 (Tarola Decl.) ¶ 4)  This was a key factor in obtaining the support of the Equity Committee for the joint plan.  (Id.)  Neither Mr. Maher nor any other representative from the Creditors' Committee ever suggested that the

7

CC-BLG004424

agreed-upon rates of postpetition interest would change if it turned out that the value of equity retained by current shareholders would be different from that estimated in the joint plan. (Id.)

16.    The agreement between the Debtors and the Creditors' Committee concerning postpetition interest was memorialized in a letter dated January 12, 2005 (the "January 12, 2005 Letter Agreement").[3]  The next day, January 13, 2005, the Debtors filed an Amended Joint Plan of Reorganization (the "2005 Joint Plan") that incorporated the agreed-upon postpetition interest rates to be paid on the Lenders' claims under the Credit Agreements and on all other general unsecured claims. (See Docket No. 7560 at § 3.1.9(b))

17.    Toward the end of 2005, Mr. Maher indicated that if the Debtors wanted the Committee's continued support for the 2005 Joint Plan, there would have to be an adjustment to the agreed-upon rate of postpetition interest under the Credit Agreements. (Docket No. 19323 (Tarola Decl.) ¶ 6)  He indicated no need to change the postpetition rates of interest for other unsecured claims. (Id.)  This led to another round of negotiations over roughly three-months time between the Creditors' Committee and the Debtors' management team. (Id.)

18.    In February 2006, the Debtors and the Creditors' Committee agreed that, in exchange for the Committee's continued support of the 2005 Joint Plan, the Debtors would pay the Lenders postpetition interest at the rate of 6.09% through December 31, 2005 and, beginning January 1, 2006, at a floating adjusted interest rate tied to the "prime" rate of interest (the "floating Adjusted Base Rate"). (Docket No. 19323 (Tarola Decl.) ¶ 7)  This agreement was

---

[3]    See Docket No. 19072 (Response Of The Official Committee Of Unsecured Creditors To Debtors' Objection To The Unsecured Claims Asserted Under The Debtors' Credit Agreements Dated As Of May 14, 1998 And May 5, 1999 (the "Committee's Response")) Exhibit A.

K&E 13163123.6

CC-BLG004425

memorialized in a letter dated February 27, 2006 (the "February 27, 2006 Letter Agreement"). (See Docket No. 19072 (Committee's Response) Exhibit B).

19.    The Creditors' Committee has recently taken the self-defeating position that it was only the Creditors' Committee, and not its lawyers or the Lenders, that supported the February 27, 2006 Letter Agreement.  (See Docket No. 19072 (Committee's Response) ¶ 12) This false assertion is self-defeating because, while that may be what the Creditors' Committee says now, it is not what the Committee said then and therefore would only serve to show sharp practice.  Neither the Creditors' Committee nor the Lenders submitted an affidavit or declaration from Mr. Maher or anyone else suggesting that the Creditors' Committee gave any indication in 2006 that it was only the Creditors' Committee, and not its lawyers or the Lenders, that supported the February 27, 2006 Letter Agreement.  The only evidence on this point comes from the undisputed declaration of Mr. Shelnitz who testified that, in fact, "[t]here was no indication by anyone representing or acting in any capacity for the [Lenders] that the Agreement applied only to the Committee."[4]  Moreover, the plain language of the February 27, 2006 Letter Agreement makes clear that Mr. Maher negotiated that Agreement specifically on behalf of, and for the benefit of, the Lenders.  Indeed, the very first paragraph of the Letter Agreement expressly states that the floating Adjusted Base Rate would accrue to the benefit of "the Holders of the Debtors' pre-petition bank credit facilities" – that is, the Lenders. (See Docket No 19072 (Committee's Response) Exhibit B)

---

[4]    See Docket No. 19324 (Declaration Of Mark A. Shelnitz In Support Of Debtors' Objection To The Unsecured Claims Asserted Under The Debtors Credit Agreements Dated As Of May 14, 1998 And May 5, 1999 ("Shelnitz Decl.")) ¶ 4.

K&E 13163123.6

20.    At the time the Debtors and the Creditors' Committee entered into the February 27, 2006 Letter Agreement, the 2005 Joint Plan, which was in the public record, contemplated that equity would retain significant value in the reorganized Debtors. (Docket No. 19324 (Shelnitz Decl.) ¶ 5)  No one from the Creditors' Committee ever suggested that the February 27, 2006 Letter Agreement would terminate or that the agreed-upon postpetition interest rate should be increased if it turned out that equity did in fact retain significant value in the Debtors. (Id.)

21.    The Debtors relied on the 2005 Joint Plan and the February 27, 2006 Letter Agreement for accounting purposes and, eventually, for purposes of negotiating the agreement in principle to settle the asbestos personal injury claims (the "Asbestos PI Claims"). (Docket No. 19323 (Tarola Decl.) ¶ 9)  In addition, all of the Debtors' financials statements, settlement scenarios, valuation models and other information prepared from January 2005 through March 2008, both actual and projected, were based on the postpetition interest rates agreed to in the 2005 Joint Plan and the February 27, 2006 Letter Agreement. (Id.) The Debtors also relied upon these postpetition interest rates in all communications with the Creditors' Committee and its financial advisors and all other official committees and representatives in the Debtors' chapter 11 cases. (Id. ¶ 10)  For example, within approximately 30 days following every calendar quarter since mid-2001, the Debtors hosted a call with the financial advisors of all official committees and the asbestos personal injury futures representative. (Id.) The purpose of these calls was to update the financial advisors of the official committees about the financial condition of the Debtors. (Id.) During those calls that took place after the February 27, 2006 Letter Agreement, the Debtors would almost always mention that their financials were based

K&E 13163123.6

CC-BLG004427

upon the assumption that postpetition interest would be paid at rates reflected in the 2005 Joint

Plan and the February 27, 2006 Letter Agreement. (Id.) No one ever objected.

22.     Beginning in 2007, Lewis Kruger of Stroock Stroock & Lavan LLP

("Stroock"), counsel for the Creditors' Committee, contacted Mark Shelnitz, the Debtors'

General Counsel, to say that the market price of the unsecured debt under the Credit Agreements

suggested that some of the Lenders were now expecting default interest.[5]  (Docket No. 19324

(Shelnitz Decl.) ¶ 8)  Mr. Kruger never indicated that all, or even most, of the Lenders were

expecting default interest; he said only that some of the Lenders had this expectation. (Id.) Mr.

Shelnitz responded by noting that the Debtors and the Creditors' Committee had an agreement in

place, memorialized in the February 27, 2006 Letter Agreement, by which the Creditors'

Committee pledged its support for the 2005 Joint Plan. (Id.) Mr. Shelnitz indicated to Mr.

Kruger that the Debtors were relying on the Creditors' Committee to honor that Agreement.

(Id.)  Mr. Kruger never said or did anything in response to suggest that the Creditors'

Committee, counsel for the Creditors' Committee or the Lenders would withdraw support for the

2005 Joint Plan. (Id.) And Mr. Kruger certainly never said or did anything to suggest that the

Creditors' Committee would vote against a plan of reorganization if it failed to provide for a

default rate of interest for the Lenders. (Id.)

23.     Toward the end of the first quarter of 2008, the Debtors entered into

negotiations with the Asbestos Claimants' Committee, the Future Claims Representative and the

Equity Committee in an effort to resolve all of the Asbestos PI Claims and to gather additional

---

[5]   Mr. Kruger's testimony concerning this conversation is generally consistent with that of Mr. Shelnitz, although
Mr. Kruger does not identify when the conversation took place.  Accordingly, Mr. Shelnitz's testimony that this
conversation did not occur until early 2007 is undisputed.

K&E 13163123.6

CC-BLG004428

support for a consensual plan of reorganization. Throughout those negotiations, the February 27, 2006 Letter Agreement remained in place. These negotiations ultimately resulted in the Term Sheet For Resolution Of Asbestos Personal Injury Claims, dated April 6, 2008 (the "Proposed Asbestos Settlement"), which the Debtors will implement in the context of a chapter 11 plan. (See Docket No. 18922, Exhibit C)

.

       24.      Before the Debtors executed the Proposed Asbestos Settlement, they sent a draft Term Sheet to counsel for the Creditors' Committee. In response, on April 4, 2008, Ms. Krieger at Stroock sent an email to Mr. Shelnitz setting forth "our initial thoughts on changes to the Allowed General Unsecured Claims treatment description in the Term Sheet." (See CC-SSL-0000158, attached as Exhibit E) Ms. Krieger did not express any Committee opposition to the rates of postpetition interest set forth in the draft Term Sheet; she only sought to preserve (for the first time) an option for a "holder" to apply for a higher rate of postpetition interest. Specifically, Ms. Krieger proposed that the Debtors pay

> 100% of allowed amount plus postpetition interest as follows: (i) for holders of pre-petition bank credit facilities, postpetition interest at the rate of 6.09% from the filing date through December 31, 2005 and thereafter at floating prime, in each case compounded quarterly in the manner provided for under such bank credit facilities; and (ii) for all other unsecured claims, interest at 4.19% compounded annually, or if pursuant to an existing contract, interest at the non-default contract rate; provided, however, any such holder may seek to obtain a higher interest rate and shall be entitled to such higher interest rate if the Court determines such rate is appropriate.

Ms. Krieger's proposal reflects the same economic treatment for postpetition interest as that set forth in the February 26, 2007 Letter Agreement. While Ms. Kreiger suggested that individual Lenders should have the right to "seek to obtain a higher interest rate," she tellingly did not make a demand for contractual default interest. Nor did she say anything about the absolute priority rule requiring such interest. To the contrary, her email demonstrates that, as of April 4, 2008, the

12

CC-BLG004429

Creditors' Committee was still supportive of the February 26, 2006 Letter Agreement and, obviously, still of the view that the postpetition interest rates reflected in that Agreement were fair and equitable.

25.     As noted above, the Debtors entered into the Proposed Asbestos Settlement on April 6, 2008. In that settlement, the Debtors specifically incorporated the economic treatment for postpetition interest set forth in Ms. Krieger's email: "100% of allowed amount plus post-petition interest as follows: (i) for holders of pre-petition bank credit facilities, post-petition interest at the rate of 6.09% from the filing date through December 31, 2005 and thereafter at floating prime, in each case compounded quarterly; and (ii) for all other unsecured claims, interest at 4.19%, compounded annually, or if pursuant to an existing contract, interest at the non-default contract rate." (See Docket No. 18922, Exhibit C ¶ 7)

26.     On April 21, 2008, counsel for the Lenders sent the Debtors a letter rejecting the rate of postpetition interest reflected in the Proposed Asbestos Settlement and demanding interest at the contract default rate. (See Docket No. 19072, Exhibit C) Nowhere in that letter, or in the briefs that followed, do the Lenders or the Creditors' Committee even purport today to terminate the February 27, 2006 Letter Agreement.

## ARGUMENT

27.     As a general rule, the Bankruptcy Code prohibits the payment of postpetition interest on account of unsecured claims. While courts have recognized exceptions to this general prohibition, these exceptions only apply in cases where the debtors' solvency has been established. This is not such a case. Here, the Debtors' solvency has not been established, and unless the plan of reorganization contemplated by the Proposed Asbestos Settlement is not confirmed and the estimation litigation relating to the Asbestos PI Claims is revived and completed, solvency will never be established. Thus, as a matter of law, the Lenders today are

13

CC-BLG004430

not entitled to any postpetition interest, much less interest accruing at the default rate under the Credit Agreements. And any proposal now to allow the Lenders to embark upon an expensive and time-consuming solvency proceeding would only produce disruption and delay; even if the Lenders could ultimately establish solvency, they still would not be entitled to postpetition interest at a rate higher than that already provided for in the Proposed Asbestos Settlement.

## I.   ON THE RECORD AS IT EXISTS TODAY, THE LENDERS ARE NOT ENTITLED TO ANY POSTPETITION INTEREST BECAUSE THERE HAS BEEN NO SHOWING OF SOLVENCY.

28.     Section 502(b)(2) of the Bankruptcy Code governs the allowance of claims and interests in chapter 11 cases. That section prohibits allowance of a claim for "unmatured interest." See 11 U.S.C. § 502(b)(2); In re Chateaugay Corp., 156 B.R. 391, 403 (S.D.N.Y. 1993) ("502(b)(2) bars postpetition interest on a pre-petition unsecured claim"). As discussed below, courts have recognized two exceptions to the general prohibition against postpetition interest for unsecured claims, one based on the "best interests" test of section 1129(a)(7), and the other based on the "fair and equitable" requirement of section 1129(b). But these exceptions apply if, and only if, "the debtor ultimately proves solvent." In re Colortex Indus., Inc., 19 F.3d 1371, 1376 (11th Cir. 1994).

29.     Neither the Creditors' Committee nor the Lenders have offered any proof of the Debtors' solvency, and it would be impossible for them to do so. Solvency, by definition, is measured as the value of a company's assets in excess of the value of its liabilities. See In re Bus. Fin. Corp., 451 F.2d 829, 835 (3d Cir. 1971). Here, it is impossible to measure the Debtors' liabilities because the most significant component of those liabilities, the Asbestos PI Claims, is

K&E 13163123.6

CC-BLG004431

still in dispute.[6]  The estimation proceeding, which was designed specifically to estimate the Asbestos PI Claims, was not completed, meaning that the Debtors' total liabilities are still unknown.  (Docket No. 19325 (Zilly Aff.) ¶ 4)  Without a determination of the Asbestos PI Claims, there is no way to know if the value of the Debtors' assets exceeds the value of their liabilities and, therefore, if the Debtors are solvent.  (Id.)

30.     The fact that there has been no showing of the Debtors' solvency is what makes this case so different from In re Dow Corning Corp., 456 F.3d 668 (6th Cir. 2006).  In Dow, the Debtors' solvency was a matter of undisputed fact:  "Unlike most debtors in bankruptcy, Dow Corning was fully solvent at the time it filed its bankruptcy case; it has remained so throughout and has never disputed its ability to pay all of its creditors."  Id. at 670.  This case could not be more different.  Here, solvency has been disputed from day one, and whether the Debtors have the ability to pay all of their creditors in full has never been decided.

31.     Recognizing that they cannot offer any proof of the Debtors' solvency, the Creditors' Committee and the Lenders instead have offered up a series of throw-away contentions in order to justify their belated demand for postpetition interest at contractual default rates.  These include the absolute priority rule, the unprecedented "presumption of solvency," the fact that the Debtors' anticipated plan of reorganization will provide value for equity, and the Debtors' current market capitalization.  But none of these contentions can survive any scrutiny.

---

6    See Docket No. 19325 (Affidavit Of Pamela D. Zilly In Support Of Debtors' Objection To The Unsecured Claims Asserted Under The Debtors' Credit Agreements Dated As Of May 14, 1998 And May 5, 1999 ("Zilly Aff.")) ¶ 4.

K&E 13163123.6

CC-BLG004432

**A.**    **The Absolute Priority Rule Is Inapplicable Because The Allowed Amount Of The Lenders' Claims Will Be Paid In Full.**

32.    Under the absolute priority rule, codified in section 1129(b)(2) of the Bankruptcy Code, confirmation of a plan over the dissent of an impaired class of unsecured claims requires that (i) "the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the <u>allowed amount</u> of such claim; or (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." § 1129(b)(2) (emphasis added). The Creditors' Committee and the Lenders erroneously assert that the absolute priority rule requires that the Lenders receive postpetition interest at the contract rate of default before equity can retain any value in the reorganized Debtors. This assertion is wrong as a matter of law.

33.    The absolute priority rule has nothing to do with the payment of postpetition interest to unsecured creditors. As made clear by the plain language of section 1129(b)(2), the absolute priority rule requires only the payment in full of the "allowed amount" of an unsecured creditor's claim. 11 U.S.C. § 1129(b)(2)(B) (emphasis added); see also In re Gosman, 282 B.R. 45, 48 (Bankr. S.D. Fla. 2002) (the absolute priority rule provides that "if unsecured creditors do not receive payment in full on their allowed claims, then no holder of a claim or interest junior to those of the unsecured creditors may retain any property under the plan") (emphasis added).

34.    It is well settled that an "allowed claim" does not include postpetition interest. See In re Coram Healthcare, 315 B.R. at 343 ("an allowed claim does not include interest unmatured as of the petition date") (emphasis added); In re Country Manor of Kenton, Inc., 254 B.R. 179 (Bankr. N.D. Ohio 2000) ("As a result [of section 502(b) of the Bankruptcy

16

K&E 13163123.6

CC-BLG004433

Code], upon a party objecting to a proof of claim such as occurred in the instant case, unmatured interest (i.e., <u>postpetition interest</u>) does not, under any circumstance, become a part of that creditor's allowed claim.") (emphasis added); <u>In re Timbers of Inwood Forest Assocs., Ltd.</u>, 793 F.2d 1380, 1399-1400 (5th Cir. 1986) ("an allowed claim may <u>not</u> include '<u>unmatured</u> interest'") (emphasis in original) (citing § 502(b)(2)).

36. The Lenders' "allowed claims" consist of the principal and interest that was due and owing under the Credit Agreements as of the petition date. <u>See</u> 11 U.S.C. §§ 101(5), 501 and 502. It is undisputed that these allowed claims will be paid in full under the Proposed Asbestos Settlement and, ultimately, under the plan of reorganization. That is all that is required under the absolute priority rule.

36. The Third Circuit's decision in <u>In re Armstrong World Industries, Inc.</u>, 432 F.3d 507 (3d Cir. 2005), does not in any way compel a different conclusion. In <u>Armstrong</u>, unsecured creditors, who were to be paid only 59.5% of their allowed claims under a proposed chapter 11 plan, challenged that plan on the basis that it provided for distributions of warrants to equity without paying unsecured creditors the full amount of their claims. The plan was particularly problematic because it ensured that the warrants would be distributed to equity even though the allowed amount of unsecured creditors' claims would not be paid in full. Given that the creditors stood to recover only 59.5% of their allowed claims, the Third Circuit affirmed the District Court's holding that the issuance of warrants to the equity interest holders violated the absolute priority rule. <u>Id</u>. at 509, 512-513. Any reliance that the Creditors' Committee and the Lenders place on <u>Armstrong</u> is, at best, misplaced. In sharp contrast with the creditors in <u>Armstrong</u>, the Lenders in this case will be paid 100% of the allowed amount of their claims. Therefore, in contrast with <u>Armstrong</u>, the absolute priority rule is not implicated in this case.

17

CC-BLG004434

37.    The Creditors' Committee's own conduct during these bankruptcy cases demonstrates that the Committee itself does not believe that the absolute priority rule entitles the Lenders to postpetition interest at the contract default rate. From the time that the Debtors filed their first plan of reorganization in November 2004, that plan has always expressly provided that equity would receive significant value in the reorganized Debtors. And yet, after the filing of that plan, the Creditors' Committee twice entered into agreements whereby the Lenders would receive postpetition interest at less than the contract rate of default. If the Committee truly believed that it was black-letter law that the absolute priority rule required the Debtors to pay postpetition interest at the contractual default rate before equity can receive any value, as it now asserts, there would have been no logical reason for the Committee to enter into those agreements. Instead, the Committee would have simply cited to the absolute priority rule and demanded that the Lenders receive contractual default interest. The fact that the Committee did not do so, but instead negotiated and agreed to a lower rate of postpetition interest, belies their position today.

B.    **There Is No Such Thing As A "Presumption Of Solvency."**

38.    The Lenders and the Creditors' Committee next urge this Court to adopt a "presumption of solvency."[7]    (Docket No. 19072 (Committee's Response) ¶ 18)  Tellingly, neither the Creditors' Committee nor the Lenders cite any legal authority for this type of presumption, and none exists. Simply put, there is no such thing as a presumption of solvency. While the Bankruptcy Code clearly recognizes a presumption of insolvency "on and during the

---

[7]    See Docket No. 19073 (Response Of The Bank Lender Group In Opposition To The Debtors' Objection To Claims Asserted Under The Debtors' Credit Agreements Dated As Of May 14, 1998 And May 5, 1999 ("Lenders' Response")) ¶¶ 52-56.

K&E 13163123.6

CC-BLG004435

90 days immediately preceding the date of the filing of the petition" for purposes of pursuing preferential payments, 11 U.S.C. § 547, it just as clearly does <u>not</u> recognize any type of presumption of solvency. And, contrary to the assertions of the Creditors' Committee and the Lenders, there is absolutely no basis for adopting such a novel presumption in these chapter 11 cases.

C.    <u>The Plan Of Reorganization Contemplated By The Proposed Asbestos Settlement Does Not Establish Solvency.</u>

39.    The Creditors' Committee and the Lenders then argue that solvency is established by the fact that equity stands to retain value under a plan of reorganization based upon the Proposed Asbestos Settlement. This argument makes no sense. Solvency, as noted above, is measured as the value of a company's assets in excess of the value of its liabilities. <u>See In re Bus. Fin. Corp.</u>, 451 F.2d at 835. The Proposed Asbestos Settlement, however, does not even purport to determine the Debtors' liabilities. Instead, the Proposed Asbestos Settlement represents a compromise in which each of the constituencies reached an artificial agreement concerning how to allocate the Debtors' assets specifically to avoid the need to litigate solvency. Because the various constituencies have never reached agreement on the Debtors' total liabilities, the Proposed Asbestos Settlement has no bearing on the issue of solvency. Indeed, if a plan incorporating the Proposed Asbestos Settlement is not consummated, the various constituencies will be right back where they were before that Settlement – embroiled in a dispute over the Debtors' total liabilities and, more generally, the Debtors' solvency. And should that happen, the Asbestos PI claimants almost certainly will seek to have the Debtors' liabilities resolved for a higher number than that set forth in the Proposed Asbestos Settlement.

40.    The Creditor's Committee and the Lenders need look no further than the history of these cases to recognize that the Proposed Asbestos Settlement and the pending plan of

19

CC-BLG004436

reorganization cannot possibly be considered a proxy of solvency. The Debtors filed their 2005 Joint Plan, which called for equity to receive significant value, in January 2005. At that time, the Debtors had not even started the estimation litigation, the very purpose of which was to determine the Debtors' liabilities. Clearly, then, the fact that Debtors have filed, or will file, a plan of reorganization calling for equity to receive value cannot possibly be viewed as a proxy of solvency.

### D.    The Debtors' Market Capitalization Does Not Establish Solvency.

41.    Equally unavailing is the Creditors' Committee's and Lenders' contention that the Debtors' current equity value, as measured by the trading price of W. R. Grace stock on the New York Stock Exchange, somehow demonstrates the Debtors' solvency. Absent a determination of the Debtors' total liabilities, the Debtors' equity value cannot possibly speak to the operative legal test of whether or not the Debtors are solvent. At most, the market capitalization, which has fluctuated wildly over the past few years, merely reflects traders' speculation as to the most likely outcome of the Debtors' total liabilities, most notably its Asbestos PI Claims.

42.    The Creditor's Committee's own expert, Edwin Ordway of Capstone Advisory Group, LLC, implicitly concedes that the Debtors' equity value does not establish solvency.[8] In his Declaration, Mr. Ordway specifically refers to the increase in the Debtors' market capitalization since the Petition Date. (Docket No. 19321 (Ordway Decl.) ¶ 5) And during his deposition, Mr. Ordway testified that he has rendered opinions on solvency.

---

[8]    See Docket No. 19321 (Declaration of Edwin N. Ordway, Jr. In Support Of The Response Of The Official Committee Of Unsecured Creditors To Debtors' Objection To The Unsecured Claims Asserted Under The Debtors' Credit Agreements Dated As Of May 14, 1998 And May 15, 1999 ("Ordway Decl.")).

K&E 13163123.6

CC-BLG004437

(Deposition excerpts of Edwin N. Ordway, Jr. ("Ordway Dep.") 59:4-8 (Aug. 29, 2008), attached as Exhibit F)  Tellingly, however, Mr. Ordway did not opine that the Debtors' market capitalization provided a basis to conclude that Debtors are solvent. (Exhibit F (Ordway Dep.) 36:3-25)

43.    The fact that Mr. Ordway refused to draw any connection between market capitalization and solvency is explained by the Affidavit of Pam Zilly and the exhibit thereto. (Docket No. 19325) As Ms. Zilly testifies, far from establishing solvency, the Debtors' equity value at most reflects speculative market views regarding the most likely resolution of the Debtors' potential asbestos (and other) liabilities.  In her Affidavit, Ms. Zilly compared W. R. Grace's relative stock price performance to a basket of chemical company stocks representing the chemical sector (the "Chemicals Index").  (Id. ¶ 7)  This comparison shows that, while Grace's stock price is directionally consistent with the Chemicals Index, Grace's stock price historically has demonstrated greater volatility.  (Id., Exhibit A)  She found that this volatility in Grace's stock price, and thus its equity value, is readily explainable by developments in the bankruptcy case that impact the market's speculation about the outcome of the Debtors' potential asbestos liabilities.  (Id. ¶ 7)

44.    For example, in the second half of 2004, as the Debtors engaged in negotiations with representatives of asbestos claimants while developing a plan of reorganization capping the overall asbestos liability at $1.7 billion, Grace's stock increased from $6.04 per share on July 1, 2004 to $14.00 per share on November 15, 2004, the trading day following the filing of the Original Plan.  (Id. ¶ 8)  This represents a 132% increase in Grace's market value, equating to approximately $530 million of value, while the Chemicals Index rose only 20% during that same time.  (Id.)  As another example, shortly after July 24, 2006, when public

21

CC-BLG004438

reports that mediation had failed and that the Debtors had decided to cease discussions with the asbestos personal injury claimants, Grace's stock fell to new lows for 2006. (Id.) And after the Bankruptcy Court terminated the Debtors' exclusivity period on July 26, 2007, the stock price dropped approximately 12% as measured by the closing price on July 25, 2007, against the closing price on July 27, 2007. (Id.)

45. As Ms. Zilly's analysis demonstrates, Grace's equity value reflects, at most, speculative estimates made by market participants with imperfect publicly available information as to the outcome of the Debtors' potential asbestos liabilities. It does not reflect any type of determination as to Debtors' solvency.

46. The recent Owens Corning bankruptcy amply demonstrates that a company's market value is not a measure of solvency. (Docket No. 19325 (Zilly Aff.) ¶ 5) In October 2000, Owens Corning filed for chapter 11 bankruptcy protection due primarily to material unresolved asbestos claims. (Id.) Its joint plan of reorganization, filed on March 28, 2003, specified a total asbestos liability of $10.7 billion (on a net present value basis) and provided no recovery to existing common equity. (Id.) In the ensuing years, while still in bankruptcy, Owens Corning's market value reached levels above $300 million. (Id.) According to the Creditors' Committee and the Lenders, this market value would indicate that Owens Corning was solvent during its bankruptcy. (Id.) But when Owens Corning emerged from chapter 11 on October 31, 2006, after its liabilities had been settled, the company's existing equity holders received only out of the money warrants. (Id.) Clearly, Owens Corning's market value was not a proxy for solvency, and the same holds true for the Debtors in these cases.

47. Despite the creative efforts of the Creditors' Committee and the Lenders, the fact remains that the Debtors' solvency has not been established and will never be established

K&E 13163123.6

CC-BLG004439

unless the plan of reorganization incorporating the Proposed Asbestos Settlement is rejected. This is not a case, then, where the Debtors will "ultimately prove[] solvent." In re Colortex Indus., Inc., 19 F.3d at 1376. Therefore, the Lenders have no entitlement to any postpetition interest, and they certainly have no entitlement to postpetition interest at the contract rate of default.

## II. AN EXTENDED SOLVENCY PROCEEDING WOULD AT MOST CONFIRM THE APPROPRIATENESS OF THE AGREED-UPON RATES OF POSTPETITION INTEREST.

48.    Embarking on a new estimation proceeding is pointless.  Even if that proceeding were to establish the Debtors' solvency, the Creditors' Committee and the Lenders still would be left with no legal basis for demanding postpetition interest.  In solvent debtor cases, courts have recognized two exceptions to section 502(b)'s bar against postpetition interest, one grounded in the "best interests" test of section 1129(a)(7) and the second grounded in the "fair and equitable" requirement of section 1129(b) of the Bankruptcy Code.  But these exceptions are not only limited to solvent debtor cases, they also are limited to those creditors whose claims are "impaired."  Indeed, the best interests test of section 1129(a)(7) expressly applies only to "each impaired class of claims or interests."  11 U.S.C. § 1129(a)(7).  And the same restriction applies to the fair and equitable test of section 1129(b): "An impaired creditor in a solvent debtor case can demand postpetition interest under the 'fair and equitable' test of § 1129(b)(2). 'Unimpaired' creditors have no such rights."  Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.), 324 F.3d 197, 205 n.14 (3d Cir. 2003).  Here, the Lenders are not impaired as a matter of law, and thus the exceptions found in section 1129 do not apply.  And even if those exceptions do apply, the Lenders still have no entitlement to contractual default interest.  Payment of contractual default interest is not required under the "best interests" test, and it certainly would not be "fair and equitable" to award such interest where, as here, the

23

CC-BLG004440

Creditors' Committee and the Lenders are attempting to reap a windfall by reneging on their prior agreements.

A.     **The Exceptions in Section 1129 of the Bankruptcy Code Will Never Apply Because the Lenders' Claims Are Not Impaired.**

49.     The question of whether a claim is impaired is governed by section 1124 of the Bankruptcy Code, which states in pertinent part:  "Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan – (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest[.]" 11 U.S.C. § 1124 (emphasis added).  Consistent with this statutory language, the Third Circuit has made clear that a claim is only impaired under section 1124 of the Bankruptcy Code if a plan of reorganization itself, not some provision of the Bankruptcy Code, alters the alleged rights of a claimant. In re PPI Enterprises (U.S.), Inc., 324 F.3d at 204-05.

50.     With respect to a creditor's claims, plan impairment occurs "when the debtor alters the 'legal, equitable, and contractual rights to which [their] claim entitles the holder of such claim," whereas statutory impairment occurs when "the operation of a provision of the [Bankruptcy] Code alters the amount that the creditor is entitled to under nonbankruptcy law." In re PPI Enters. (U.S.), Inc., 228 B.R. 339, 353 (Bankr. D. Del. 1998).  The distinction between plan impairment and statutory impairment is critical in these cases.  "A creditor's claim outside of bankruptcy is not the relevant barometer for impairment; [the court] must examine whether the plan itself is a source of limitation on a creditor's legal, equitable, or contractual rights." In re PPI Enters. (U.S.), Inc., 324 F.3d at 204.  As long as a plan does not itself alter a creditor's rights but leaves such creditor subject to the other provisions of the Bankruptcy Code, the creditor's claim is unimpaired.  Id. ("[W]e hold that where § 502(b)(6) alters a creditor's

24

CC-BLG004441

nonbankruptcy claim, there is no alteration of the claimant's legal, equitable, and contractual rights for the purposes of impairment under § 1124(1).").

51.    Here, as made clear in the Proposed Asbestos Settlement, the Debtors' plan of reorganization will do nothing to impair the claims of the Lenders. To the contrary, the plan will pay the full amount of the Lenders' allowed claims. As such, this clearly is not a case of plan impairment. At most, this is a case of statutory impairment. To the extent that the Lenders contend that their claims are "impaired" because they will not receive postpetition interest at the contract default rate, this alleged "impairment" results, if at all, by operation of the Bankruptcy Code and, more specifically, section 502(b). As the Third Circuit has held, this is not the type of impairment that will trigger a claimant's rights under section 1129.

52.    The Lenders, relying upon In re Ace-Texas, Inc., 217 B.R. 719, 727 (Bankr. D. Del. 1998), claim that "impairment can be avoided only if the plan proposes cash payment in the full amount of the claim in accordance with the parties' agreement." (Lenders' Response at ¶ 44). The Lenders, however, overlook the fact that Ace-Texas predates the Third Circuit's decision in PPI Enterprises, which is now the governing standard for determining whether a claim is impaired under section 1124 of the Bankruptcy Code. The language from Ace-Texas on which the Lenders purport to rely is fundamentally inconsistent with the Third Circuit's pronouncement in PPI Enterprises that "a creditor's claim outside of bankruptcy is not the relevant barometer for impairment" and that the focus must be on "whether the plan itself is a source of limitation" on the creditor's rights. In re PPI Enter. (U.S.), Inc., 324 F.3d at 204. Under this standard, it is clear that the Lenders' claims are not impaired; the Lenders' contention to the contrary is premised upon outdated and inapposite case law.

25

CC-BLG004442

**B.**     <u>The Best Interests Test Would Not Entitle The Lenders To A Default Rate Of Interest.</u>

53.     Even if the Creditors' Committee and the Lenders could establish that the Debtors are solvent – which they cannot – and even if they could establish that the Lenders' claims are impaired – which they cannot – the Lenders still would not be entitled to postpetition interest at the contract rate of default. Neither the "best interests" test nor, as discussed in Section C below, the "fair and equitable" test would entitle the Lenders to an award of postpetition interest at the contract default rate.

54.     The "best interests" test of section 1129(a)(7) requires a plan of reorganization to provide each dissenting creditor or interest holder in an impaired class of claims with value that is not less than the amount such holder would receive if the debtor was liquidated under chapter 7. See <u>Kane v. Johns-Manville Corp., (In re Johns-Manville Corp.)</u>, 843 F.2d 636, 649 (2d Cir. 1988) (holding that the presentation of liquidation analysis showing lesser probable recovery in chapter 7 satisfies section 1129(a)(7)). In essence, the best interests test contemplates a comparison of distributions under a proposed chapter 11 plan of reorganization with those that would be realized in a hypothetical chapter 7 liquidation. See <u>In re Jartran, Inc.</u>, 44 B.R. 331, 390 (Bankr. N.D. Ill. 1984). A chapter 7 liquidation, in turn, is governed by the priority scheme set forth in section 726 of the Bankruptcy Code. Under section 726(a)(5), in a chapter 7 liquidation, a creditor must receive pendency interest on its claim "at the legal rate from the date of the filing of the petition" before distributions may be made back to the debtor. 11 U.S.C. § 726(a)(5).

55.     The Bankruptcy Code does not define the "legal rate" of interest. Courts, however, have consistently interpreted the "legal rate" of interest to be the federal judgment rate. See, <u>e.g.</u>, <u>In re Cardelucci</u>, 285 F.3d 1231, 1234-35 (9th Cir. 2002); <u>In re Coram Healthcare</u>

26

CC-BLG004443

Corp., 315 B.R. 321, 346 (Bankr. D. Del. 2004) ("Most courts, however, conclude that [the legal rate] means the federal judgment rate.") (citations omitted); see also In re Adelphia Commc'ns, Case No. 02-41729, Bench Ruling, tr. at 7 (Bankr. S.D.N.Y. April 27, 2006) (Gerber, J.) ("It is by far the better view, in my opinion, that 'legal rate' is the federal judgment rate and not the same as that authorized under section 506(b), which is a contract rate.").

56.    As of the Petition Date, the federal judgment rate was 4.19%, which was below the contract rate and default rate under either of the Credit Agreements at that time. Clearly, then, the Lenders cannot argue that the best interests test warrants the payment of pendency interest at the contract default rate. And, given that the best interests test requires a comparison of a chapter 11 plan treatment to the liquidation of a debtor, the Lenders may not even be entitled to any postpetition interest absent evidence that the Debtors would be solvent using a chapter 7 liquidation valuation. See, e.g., In re Lisanti Foods, Inc., 329 B.R. 491, 500 (Bankr. D. N.J. 2005) ("In making [a section 1129(a)(7)] showing, the liquidation value of the debtor's assets is controlling."); but see In re Coram Healthcare, 315 B.R. at 345 ("In this case, though, it is relevant to compare the amount of debt to the confirmation value ($317 million) because the Debtors are reorganizing instead of liquidating."). There is simply no record that would support a presumption of the Debtors' solvency in a liquidation.

## C.    The Fair And Equitable Test Would Not Entitle The Lenders To A Default Rate Of Interest.

57.    As with the "best interests test," the "fair and equitable" test would not even support, much less mandate, an award to the Lenders of postpetition interest at the contract default rate. The starting point for the "fair and equitable" test is the statutory language of section 1129(b)(2), which, as noted above, codifies the absolute priority rule. As previously discussed, the absolute priority rule is inapplicable here because, under the Proposed Asbestos

27

CC-BLG004444

Settlement, the allowed amount of the Lenders' claims will be paid in full. But the statutory language of section 1129(b)(2) is not the end of the inquiry. Even where these statutory requirements are met, courts have held that general equitable considerations in a "cram down" situation may justify an award of postpetition interest. In view of the relevant equitable considerations here, the Lenders cannot credibly argue that they are entitled to postpetition interest at the contract default rate.

58. The equitable basis for postpetition interest reaches back to at least the United States Supreme Court decision in <u>Vanston Bondholders Protective Committee v. Green</u>, 329 U.S. 156 (1946), where the Court stated: "It is manifest that the touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been a balance of equities between creditor and creditor or between creditors and the debtor." <u>Id.</u> at 165. The Lenders take the position that, once solvency is established (or in this case, presumed), unsecured creditors are automatically entitled to postpetition interest at the full contract default rate of interest. No court has ever adopted such a rigid, formulaic approach. Instead, courts that have analyzed the appropriate rate of postpetition interest payable to unsecured creditors in solvent estates over the years agree that, consistent with <u>Vanston</u>, the analysis ultimately hinges upon "a balance of equities." See <u>In re Coram Healthcare Corp.</u>, 315 B.R. at 346 ("[T]he specific facts of each case will determine what rate of [postpetition] interest is 'fair and equitable.'"); <u>In re Dow Corning Corp.</u>, 456 F.3d at 680 (remanding the issue of the appropriate rate of postpetition interest for "consideration of any equitable factors affecting the interest rate"); <u>In re Loral Space & Commc'ns Ltd.</u>, Bench Ruling, No. 03-41710, tr. at 39-40 (Bankr. S.D.N.Y. July 25, 2005) (Drain, J.) ("In my view . . . the court has a large amount of discretion in deciding what the appropriate rate of interest should be under a Chapter 11 plan for a solvent

28

CC-BLG004445

debtor."). Depending on the balancing of these equitable factors, courts have held that the appropriate rate of postpetition interest can be tied to the legal rate, the contract rate or the contract default rate.

59.    The Lenders plainly do not want the Court to engage in a true balancing of the equities. That is clear from the fact that the Lenders and the Creditors' Committee have never terminated the agreement on postpetition interest. The Lenders and the Creditors' Committee want to use the agreement to establish a minimum amount of postpetition interest, and hope that they can achieve a greater amount through litigation. But they cannot have it both ways. If the Lenders and the Creditors' Committee are unwilling to abide by their prior agreement, the Court must engage in a true balancing test with no predetermined minimum amount of postpetition interest. And in these chapter 11 cases, where the Lenders have only created burdens without providing any corresponding benefits, a true balance of the equities shows that they are plainly not entitled to contractual default interest, and arguably are not entitled to any postpetition interest at all.

60.    <u>Burden: Demanding a Solvency Proceeding.</u> As noted above, the Lenders' claim to postpetition interest of any type first requires a determination of solvency, and it would be wholly inequitable for the Lenders to demand a solvency hearing at this late date. Since early 2005, the Creditors' Committee has promised that in return for the Lenders receiving postpetition interest as set forth in the January 12, 2005 Letter Agreement, and later in the February 27, 2006 Letter Agreement, the Committee would support the Debtors' plan of reorganization. As late as April 4, 2008, the Creditors' Committee still expressed support for the previously agreed-upon rates of postpetition interest for the Lenders as being fair and reasonable. (<u>See</u> Exhibit E) The Debtors' entire exit strategy from chapter 11 has been based

29

CC-BLG004446

upon the Creditors' Committee's promise of continued support, from terminating the estimation litigation to entering into the Proposed Asbestos Settlement. Should the Creditors' Committee or the Lenders demand a solvency hearing at this late date, it would put on hold indefinitely the entire reorganization of the Debtors and jeopardize the anticipated recoveries of all of the other constituencies, including the asbestos personal injury claimants. For the Creditors' Committee or the Lenders to take such drastic action, after years of agreeing to be co-proponents of a plan that treated postpetition interest in exactly the same way as the Proposed Asbestos Settlement, would destroy any equitable claim to postpetition interest at the higher default rate.

61.    <u>Burden: Endangering the Proposed Asbestos Settlement.</u> The Lenders' demand for the contract default rate represents an improper attempt by the Lenders to "have it both ways" by accepting all of the benefits of the Proposed Asbestos Settlement without accepting what they perceive to be the burdens. The only reason that the Lenders stand to receive their principal and any postpetition interest whatsoever is because all of the parties to the Proposed Asbestos Settlement made meaningful concessions that, if implemented, will enable the Debtors to emerge from bankruptcy. While the Lenders are all too willing to accept the concessions of the other constituencies, they are unwilling to make any concessions of their own. What makes the Lenders' stance particularly unfair is that the only so-called "concession" required of the Lenders under the Proposed Asbestos Settlement is that they accept postpetition interest at a rate that is higher than both the federal judgment rate and the contract rate.

62.    <u>Burden: Reneging on Prior Agreements.</u> The Lenders' attempt to renege on their prior agreement as to the appropriate postpetition interest rate inevitably jeopardizes the Proposed Asbestos Settlement. As stated above, the Proposed Asbestos Settlement that equity holders have bought into assumes a postpetition interest rate starting at 6.09% until December

30

K&E 13163123.6

CC-BLG004447

31, 2005 and then at floating prime thereafter. If that rate were to change as a result of the Lenders' demand, the equity holders would be well within their rights to resume the estimation litigation over the Asbestos PI Claims. Should that occur, any hope the Debtors currently have of achieving a consensual resolution would be seriously compromised. This potentially disastrous impact of an award of postpetition interest at the contract default rate is reason enough to reject the Lenders' demand. Cf. In re A.H. Robins Co., Inc., 89 B.R. 555, 562 (E.D. Va. 1988) (disallowing claim for punitive damages in a chapter 11 case because of the potential impact on the debtor's plan of reorganization).

63.    Burden: Demanding Payments Prohibited by Law. The Lenders' demand for postpetition interest at the contract default rate is inequitable in light of the fact that any so-called default – or failure to make timely payment – exists solely because the Debtors have been legally precluded from making such payments during these cases. Under such circumstances, it would be wholly inequitable to treat the Debtors' failure to make timely payments under the Credit Agreements as triggering a claim for interest at the contract default rate. See In re Nextwave Personal Commc'ns, Inc., 244 B.R. 253, 276 (Bankr. S.D.N.Y. 2000) ("It is senseless to speak of a 'default' when, as a matter of bankruptcy law, the debtors had neither the authority nor the ability to make such payments absent notice and court approval.").

64.    In their brief, the Lenders argue that the Debtors' position would mean that "no creditor could ever obtain pendency interest at the contract default rate unless a default occurred prepetition." (Docket No. 19073 (Lenders' Response) ¶ 88) That is a mischaracterization of the Debtors' position. The Debtors' position is not that the absence of a prepetition default means that a creditor never has the right to postpetition interest at the contract default rate. Instead, the Debtors' position is simply that where, as here, the Debtors' only

31

CC-BLG004448

alleged "default" resulted from the fact that Debtors did not make payments that they were legally prohibited from making, it would be inequitable to treat such non-payment as triggering an award of default interest.[9]

      65.    <u>Burden: Behaving Opportunistically.</u>  The Lenders' rejection of the agreed-upon rate of postpetition interest, which is greater than the Lenders' bargained for standard contract rate of interest and is significantly greater than the federal judgment rate of interest, is particularly inequitable in light of the fact that, but for the Debtors' litigation and reorganization efforts throughout these cases, which have resulted in the Proposed Asbestos Settlement following the recent claims estimation proceedings, the Lenders might not be in a position to demand full repayment of their principal, let alone postpetition interest at the contract default rate.

      66.    While the Lenders have created a host of burdens in these chapter 11 cases, they have not accounted for a single corresponding benefit. The Lenders and the Creditors' Committee vainly attempt to prove otherwise by relying on the Declaration of Mr. Ordway, the financial advisor retained by the Committee.[10] But Mr. Ordway's declaration does

---

[9]    The Lenders cite <u>In re Chicago, Milwaukee, St. Paul & Pacific R.R.</u>, 791 F.2d 524 (7th Cir. 1986), for the proposition that "Courts do not regard payment-related default provisions as 'ipso facto' clauses, and in fact recognize that postpetition defaults are to be enforced and to enforce such rights in accordance with a creditor's contracts." (Docket No. 19073 (Lenders' Response) ¶ 91) The Lenders' reliance on <u>Chicago, Milwaukee</u> is misplaced. As a threshold matter, <u>Chicago, Milwaukee</u> was decided under the Bankruptcy Act, not the Bankruptcy Code. <u>Id.</u> at 525 (noting that the Bankruptcy Act "has since been repealed but remains applicable to this proceeding"). It is well-settled that the Bankruptcy Code offers debtors far greater protections with respect to creditors enforcing contractual defaults as a result of bankruptcy-related events. <u>See, e.g., In re C.A.F. Bindery, Inc.</u>, 199 B.R. 828, 832 (Bankr. S.D.N.Y. 1996) ("Recognized under the former Bankruptcy Act, [ipso facto] clauses are unenforceable under the Bankruptcy Code"). Moreover, <u>Chicago, Milwaukee</u> did not involve a demand for contractual default interest under section 1129(b), and thus does not even address the question of whether it would be inequitable to impose such interest where, as here, the only alleged "default" resulted solely from the operation of the Bankruptcy Code after the Petition Date.

[10]    <u>See</u> Docket No. 19321 (Declaration of Edwin N. Ordway, Jr. In Support Of The Response Of The Official Committee Of Unsecured Creditors To Debtors' Objection To The Unsecured Claims Asserted Under The
(Continued...)

CC-BLG004449

not provide any equitable support for the Lenders' claim for postpetition interest at the contract rate of default.

67.    <u>No Benefit from the Purported Use of the Lenders' Cash.</u>    In his Declaration, Mr. Ordway adopts the contention, first raised in the Lenders' brief, that the equities favor an award of postpetition interest at the contract default rate because the Debtors have had the use of the Lenders' money for over seven years. (Docket No. 19321 (Ordway Decl.) ¶ 7) But both Mr. Ordway and the Lenders overlook one very salient point – it was not <u>these</u> Lenders' money. Indeed, throughout their brief, the Lenders struggle to distance themselves from the January 2005 and February 2006 agreements on postpetition interest by trumpeting the fact that these agreements were reached by a different set of Lenders. As the Lenders proclaim: "We do not believe that any of these holders remain Bank Lenders today." (Docket No. 19073 (Lenders' Response) ¶ 23)    If that is true, it strains credulity for Mr. Ordway and these Lenders to simultaneously argue for postpetition interest at the contract default rate on the ground that the Debtors had the use of these Lenders' money for over seven years.

68.    Moreover, as Mr. Ordway admitted during his deposition, he had no idea how much, if any, of the unpaid interest under the Credit Agreements was actually used in the Debtors' operations. (Exhibit F (Ordway Dep.) 59:4-8) Mr. Ordway acknowledged that Debtors had substantial cash balances, and thus he could not say that Debtors in fact used any of the unpaid interest in operations. (Exhibit F (Ordway Dep.) 59:9-11; 60:24-61:25) Thus, even if the Debtors did in fact have the use of the money of these Lenders for over seven years, which is not

---

Debtors' Credit Agreements Dated As Of May 14, 1998 And May 15, 1999 ("Ordway Decl.")); <u>see also</u> Lenders' Br. ¶ 13.

K&E 13163123.6

CC-BLG004450

the case, the Creditors' Committee has no basis to say that any of the unpaid interest on these funds was actually used in the Debtors' operations.

69.    No Benefit from the Creditors' Committee's So-Called "Support." Mr. Ordway also attempts to bolster the Creditors' Committee's and the Lender's claim for contract default interest by asserting that "[t]he value created by the Debtors during these bankruptcy cases was made possible, in some part, by the creditors' support of the Debtors' use of such cash to fund numerous strategic acquisitions and otherwise reinvest in their business." (Docket No. 19321 (Ordway Decl.) ¶ 6) But when pressed about this assertion during his deposition, Mr. Ordway was forced to concede that the "creditors' support" consisted of nothing more than the fact that the Creditors' Committee did not object to the strategic acquisitions and reinvestments that were approved by this Court without objection by any of the constituencies. (Exhibit F (Ordway Dep.) 49:7-11; 50:9-13). As Mr. Ordway testified, this is the extent of the Creditors' Committee's support that supposedly created value for the Debtors during this bankruptcy proceeding:

> Q:    And you regard that as being a favorable contribution to the case, that [the creditors] simply failed to get in the way?
>
> MR. PASQUALE:  Objection to form.
>
> A:    Yes, I do.

(Id. 51:2-6) Despite Mr. Ordway's opinion, this is hardly the type of support that would justify an award of postpetition interest at the contract rate of default.

70.    Unable to articulate any real benefit created by the Lenders or the Creditors' Committee, Mr. Ordway resorts to the argument that the differential between the amount of interest sought by the Lenders and that offered under the Proposed Asbestos Settlement – $91 million – is "de minimus." (Docket No. 19321 (Ordway Decl.) ¶ 8).  Mr.

34

CC-BLG004451

Ordway's opinion is flawed for at least three reasons. First, Mr. Ordway admitted that there are no professional standards, accounting standards, or financial analyses that define whether an amount is "de minimus." (Exhibit F (Ordway Dep.) 24:6-14) Instead, the only reason that Mr. Ordway offered an opinion that the $91 million was "de minimus" was because he was asked to do so by his counsel. (Id. 24:19-25:25) Second, Mr. Ordway's "de minimus" opinion rests upon a comparison between two incomparable securities – W. R. Grace stock and the unsecured debt. (Id. 29:11-23) By Mr. Ordway's own admission, these are "two totally different kinds of securities." (Id. 31:16-21) Third, as Mr. Ordway testified, when viewed in relation to the debt, $500 million, the amount of interest at issue, $91 million, could hardly be deemed "de minimus." (Id. 34:18-35:5)

71.    In the end, Mr. Ordway's Declaration does nothing to bolster the Lenders' demand for contractual default interest. Try as they might, the Lenders cannot change the fact that, because the Debtors' solvency has not been determined, and will not be determined unless the anticipated plan of reorganization is rejected, the Lenders are not entitled to any postpetition interest, let alone postpetition interest at the contract default rate. Their belated demand for such interest is nothing more than an improper attempt to reap a windfall by reneging on an agreement that was negotiated specifically on their behalf and for their benefit. It would be the height of inequity to reward such tactics.

## CONCLUSION

For the foregoing reasons, as well as the reasons set forth in the Debtors' Objection, the Debtors respectfully submit that their Objection should be sustained and the Proofs of Claim should be disallowed to the extent they seek postpetition interest at the default rate of interest under the Credit Agreements.

35

CC-BLG004452

WHEREFORE, the Debtors respectfully request that the Court (a) enter an order disallowing the Lenders' Proofs of Claim to the extent they seek postpetition interest at the default rate of interest under the Credit Agreements and (b) grant any further and related relief as it may deem appropriate.

Dated: September 5, 2008

Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Theodore L. Freedman
Eric F. Leon
153 East 53rd Street
New York, New York 10022
(212) 446-4800

and

PACHULSKI STANG ZIEHL & JONES LLP


_/s/ James E. O'Neill_
Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
(302) 652-4100

Co-Counsel for Debtors and Debtors in Possession

36

K&E 13163123.6

November 11, 2004

<u>BY REGULAR MAIL, FAX AND EMAIL DELIVERY</u>

Mr. Lewis Kruger
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038

      Re:   <u>W.R. Grace & Co.</u>

Dear Lew:

      Willkie Farr & Gallagher LLP ("WF&G") represents D.K. Acquisition Partners L.P. ("D.K."), a substantial and active unsecured creditor of W.R. Grace & Co. ("W.R. Grace"). D.K. is a lender under various credit agreements with W.R. Grace (collectively, the "Credit Agreements"). I am writing to express D.K.'s views regarding the interest rate that should be used to calculate the accrued and accruing pendency interest (i.e., interest accruing as of the date of the bankruptcy filing and prior to the effective date of the plan of reorganization) that must be provided to bank debt holders in any plan of reorganization (the "Plan") proposed in the <u>W.R. Grace</u> bankruptcy case. D.K. urges the official committee of unsecured creditors (the "Committee") to insist that W.R. Grace commit to pay the contract default rate, fixed as of the date of the bankruptcy filing (the "Petition Date"), as the applicable Plan rate. D.K. believes that its position is endorsed by a majority of holders of outstanding bank debt as measured in dollar amount and perhaps number.

      In instances where a chapter 11 debtor is solvent, unsecured creditors are entitled to receive post-petition interest on their claims before shareholders receive any distribution. <u>See, e.g., In re Gaines</u>, 178 B.R. 101, 103 (Bankr. W.D. Va. 1995). As W.R. Grace is a solvent debtor, D.K. is entitled to receive post-petition interest on its claim at a rate consistent with its full contractual entitlements under undisputed credit agreements.

      <u>Contract Rate</u>

      Relevant and persuasive authority supports the application of the contract rate, as opposed to the federal judgment rate, in the calculation of postpetition interest. <u>See, e.g., In re Terry Ltd. P'ship</u>, 27 F.3d 241, 243 (7th Cir. 1994) (noting that there is a "presumption in favor of the contract rate" when calculating post-petition interest); <u>In re Route One W. Windsor Ltd. P'Ship</u>, 225 B.R. 76, 86 (Bankr. D.N.J. 1998) (same); <u>In re Dow Corning</u>, 244 B.R. 678, 696 (Bankr. E.D. Mich.

CC-JPM-0000009

CC-BLG004454

1999) (finding that the application of the federal judgment rate was not "fair and equitable," as required by section 1129(b) of the Bankruptcy Code). Moreover, in cases where the debtor is solvent, courts have underscored the importance of creditors' contractual rights. See In re Chicago Milwaukee, St. Paul & Pac. R.R. Co., 791 F.2d 524, 528 (7th Cir. 1986) ("[I]f the bankrupt is solvent the task for the bankruptcy court is simply to enforce the creditors' rights according to the tenor of the contracts that created those rights.").

        As you know, under specified conditions, the contract rate set forth in the Credit Agreements is not a fixed rate, but rather a floating or variable rate.[1] With the advent of bankruptcy, recent and relevant authority supports D.K.'s position that the applicable interest rate be fixed and determined as of the Petition Date for the purpose of calculating pendency interest. Recent rulings in the Dow Corning case provide guidance with respect to this issue. In an unpublished opinion dated March 31, 2004, the District Court for the Eastern District of Michigan (the "District Court") affirmed the bankruptcy court's ruling that the non-default contract rate should be used to calculate pendency interest. See Case No. 01-CV-71843, *March 31, 2004, Opinion and Order*. The District Court subsequently clarified that, for the purpose of determining pendency interest, "the contract rate of a contract with floating or variable rates was *'fixed' or set* at the specific rate in effect on the date of the filing of the petition." Case No. 01-CV-71843, *May 18, 2004, Opinion and Order Regarding Calculation of Pendency Interest Due*.[2] In reaching this conclusion, the District Court noted that fixing the contract rate as of the bankruptcy filing is consistent with the judicial practice of applying a "*set* rate". Id. The Bankruptcy Code itself commands the result reached in Dow Corning by making clear that creditors' rights are fixed as of the commencement of a bankruptcy case. See 11 U.S.C. § 502(b) ("[I]f [an] objection to a claim is a made, the court . . . shall determine the amount of such claim in lawful currency of the United States *as of the date of the filing of the petition*) (emphasis added). Bankruptcy is a procedure for enforcing pre-bankruptcy entitlements, not a mechanism to redistribute contractual entitlements to unfairly advantage common stockholders by providing the debtor with the benefits of a floating rate of interest under defaulted (and naturally mature) credit agreements.

### LIBOR vs. ABR

        Pursuant to the terms of the Credit Agreements, when the borrower defaults and certain circumstances take place, the interest rate "shall be automatically converted" from LIBOR to ABR. As an event of default has occurred under the Credit Agreements, the proper contract rate for D.K. is ABR. The fact that the default occurred after the Petition Date does not alter this analysis. Numerous courts have recognized that the automatic stay in inapplicable where a contractual event occurs

---

[1]      Specifically, the Credit Agreements use both the London Interbank Offer Rate (LIBOR) and the Alternate Base Rate (ABR) as benchmarks.

[2]      The Official Committee of Unsecured Creditors in the Dow Corning case has filed an appeal with the Court of Appeals for the Sixth Circuit based on, inter alia, the District Court's conclusion that the non-default interest rate would apply. The authorities cited below would support the Committee's appellate position.

CC-JPM-0000010

CC-BLG004455

automatically (i.e., without an affirmative act by the non-debtor party). See, e.g., In re Gull Air, Inc., 890 F.2d 1255, 1261 (1st Cir. 1989); In re Trigg, 630 F.2d 1370, 1374-75 (10th Cir. 1980).

### Default Rate Interest

Although we recognize the existence of contrary authority, in a recent trend, courts have approved the contract default rate when the debtor is solvent. See, e.g., In re 139-141 Owners Corp., 313 B.R. 364 (S.D.N.Y. 2004); Vanderveer Estates Holdings, Inc., 283 B.R. 122, 134 (E.D.N.Y. 2002) ("The developing consensus is a presumption in favor of the contract default rate subject to equitable considerations. . . If a debtor is solvent, there is much more leeway to grant the default rate because other creditors will not be injured."); In re Liberty Warehouse Associates Ltd. P'Ship, 220 B.R. 546 (Bankr. S.D.N.Y. 1998), (holding that the application of the contract default rate was equitable because the debtor was solvent and would be able to pay allowed unsecured claims in full irrespective of the rate at which pendency interest was paid).

In addition to debtor solvency, courts will also look to the default rate's reasonableness in absolute terms and in relation to the non-default rate. See Vanderveer Estates, 283 B.R. at 134; In re Ace-Texas, Inc., 217 B.R. 719 (Bankr. D. Del. 1998). In Vanderveer Estates, the court found that a default interest rate of 12.56%, and a differential of 5% between the default and non-default rate, was "well within the range of default rates that have been allowed as reasonable. . ." 283 B.R. at 134; see also In re Ace-Texas, 217 B.R. at 723-24 (noting that courts have accepted default rates that are more than three points higher than non-default rates).

In the instant case, a bankruptcy court will likely view the application of the contract default rate as appropriate and equitable. First, W.R. Grace is solvent. Second, as set forth in the Credit Agreements, there is a 2% differential between the default rate and the non-default rate. Based on the caselaw, such differential falls well within the range of reasonableness required for its approval. Third, W.R. Grace chose to accrue, rather than seek authority to pay, interest in a case where the market capitalization of its equity rose from $100,000,000, in April, 2001, to $990,000,000 as of November 2004.

### Compound Interest

Additionally, D.K. is entitled to compound interest (i.e., interest on overdue interest payments). Whether compound interest may be awarded to a creditor is a matter of state law. Ruskin v. Griffiths, 269 F.2d 827, 830-32 (2d Cir. 1959); see also In re Marfin Ready Mix Corp., 220 B.R. 148 (Bankr. E.D.N.Y. 1998). The Ruskin court noted that "where there is a contractual provision, *valid under state law*, providing for interest on unpaid instal[l]ments of interest, the bankruptcy court will enforce the contractual provision with respect to both instal[l]ments due before and instal[l]ments due after the petition was filed." Id. (emphasis added). The Credit Agreements are governed by New York state law. Section 5-527 of the New York General Obligations Law provides that in the case of

CC-JPM-0000011

CC-BLG004456

loans, provisions providing for "compound interest shall be enforceable." NY Gen. Oblig. L. §5-527. Accordingly, D.K. is entitled to compound interest under the Credit Agreements.

<u>Conclusion</u>

Lew, our approach is simple. There is ample case law support for adopting a firm negotiating posture that seeks pendency interest for lenders at the ABR default rate, fixed as of the Petition Date. Indeed, a demand for compound contract default rate interest is not a stretch. If concessions ultimately have to be made, we can discuss what an appropriate fall back position should be in the broader context of overall plan negotiations and relative shifts in distributive value. In no event will D.K. tolerate -- and in fact will oppose -- a plan that reallocates distributable value by providing for pendency interest at a floating LIBOR rate.

I will try to speak with you prior to the next Committee meeting, which I understand will be held tomorrow morning.

Sincerely,


Marc Abrams

cc:    Conor Bastable
       Anthony Yoseloff

CC-JPM-0000012

CC-BLG004457



D E Shaw & Co

39th Floor, Tower 45
120 West Forty-Fifth Street
New York, NY 10036

(212) 478-0000
FAX (212) 478-0100

November 12, 2004

Lewis Kruger, Esq.
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038-4982

Dear Lewis:

As you know, D. E. Shaw Laminar Portfolios L. L. C. ("Laminar") is likely the largest holder of W. R. Grace & Co. ("Grace") bank debt. Because Laminar also holds a significant equity position in Grace, it has been unable to join the Official Committee of Unsecured Creditors (the "Committee"). Given the impending deadline for filing a plan imposed by Judge Fitzgerald, we thought it would be useful to share our thoughts with you.

The recent national election results have substantially increased the likelihood of asbestos reform legislation emerging from the 109th Congress. We have discussed the issue with 12 different Senators and staffers for many more and believe that legislators on both sides of the aisle share our view that this issue is one which can and should be a legislative priority. More importantly, the backdrop of impending legislation presents an opportunity to reach a conclusion to the Grace bankruptcy which is more than satisfactory to all commercial constituencies.

In this context, we believe that every avenue to reach agreement among the Debtor, the Committee and the equity committee should be aggressively pursued. Through our involvement in cases like Owens Corning, we have seen what can happen when one constituency is seen by the court to be the obstacle to resolution. Such an agreement would leave the asbestos creditors in precisely that position and create significant positive momentum toward resolution.

While we have not had access to confidential information, it is our belief, based on our conversations with Grace management, that Grace would consider proposing a plan, supported by the equity committee, which would provide that bank creditors would receive post-petition interest in excess of floating-rate LIBOR (albeit less than fixed-rate LIBOR). We believe that such a compromise, in which bank lenders would receive in excess of 120% of par on their claims, is eminently reasonable and we would strongly encourage the Committee to support it.

We certainly believe that if the issue were fully litigated, lenders have a good likelihood of success in arguing that they are entitled to post-petition interest at no less than fixed-rate LIBOR (yielding a recovery in the neighborhood of 129% of par). We are also mindful of the risk that by signing on

CC-JPM-0000014

CC-BLG004458

Page 2

to a compromise plan at this stage, we raise the possibility of being cut back further in the event legislation does not occur and a protracted legal battle with the tort claimants continues. That said, the price of the aforementioned compromise is well worth paying to achieve unity, isolate the tort claimants and achieve unprecedented momentum toward a speedy and favorable settlement.

Please feel free to distribute this letter to the members of the Committee. Marc Sole and I are both available at any time to discuss our views further with you or Committee members or provide whatever assistance you may need.

Best regards,

*Max Holmes*

Max Holmes
Managing Director

Cc:     Paul Norris
         Chairman and Chief Executive Officer
         W. R. Grace & Co.

         R. Ted Weschler
         Peninsula Capital Advisors LLC

CC-JPM-0000015

CC-BLG004459

| From: | Shelnitz, Mark |
|---|---|
| Sent: | Tuesday, November 9, 2004 6:32 PM |
| To: | Siegel, David |
| Cc: | Finke, Richard |
| Subject: | GUCs Support |

The GUCs position after their meeting today is that they will not sign on to the Plan unless they get default interest compounded quarterly. We will discuss our position tomorrow in a con call with K&E and Blackstone. The GUC's position would add about $10 million per year of interest plus an additional amount for compounding. Pam doesn't think it's worth it but we will need to get K&E's view. We are targeting noon for the call but haven't yet heard what K&E's availability is. I will leave you a voice-mail with the call-in number and time when I can confirm everyone's availability.

Mark

DR01448

CC-BLG004460

**From:** Tarola, Robert
**Sent:** Monday, November 08, 2004 11:25 AM
**To:** 'blechman@blackstone.com'; Norris, Paul J.; Siegel, David; 'zilly@blackstone.com'
**Cc:** Sarikas, Bridget; Festa, Fred; Corcoran, William
**Subject:** RE: Maher

I spoke with Tom this morning. He stated that he is willing to compromise  – BUT the committee reps only hold a small tranch of the bank debt and the non-committee holders are posturing for a full default rate. I asked him to work with us on a rate at about 4%. He will get back to me tomorrow. Bob

> -----Original Message-----
> **From:** Tarola, Robert
> **Sent:** Friday, November 05, 2004 12:21 PM
> **To:** 'blechman@blackstone.com'; Norris, Paul J.; Siegel, David; 'zilly@blackstone.com'
> **Cc:** Sarikas, Bridget; Festa, Fred; Corcoran, William
> **Subject:** Maher
>
> Tom was out today. I left a detailed message. Expect a call on Monday. Bob

DR00525

CC-BLG004461

**Krieger, Arlene G.**

| | |
|---|---|
| **From:** | Krieger, Arlene G. |
| **Sent:** | Friday, April 04, 2008 1:33 PM |
| **To:** | Shelnitz, Mark |
| **Cc:** | Kruger, Lewis |
| **Subject:** | W. R. Grace - Term Sheet |

Date: April 4, 2008

Mark,

Set forth below are our initial thoughts on changes to the Allowed General Unsecured Claims treatment description in the Term Sheet.

7.    Allowed General Unsecured Claims: 100% of allowed amount plus post-petition interest as follows: (i) for holders of pre-petition bank credit facilities, post-petition interest at the rate of 6.09% from the filing date through December 31, 2005 and thereafter at floating prime, in each case compounded quarterly in the manner provided for under such bank credit facilities; and (ii) for all other unsecured claims, interest at 4.19%, compounded annually, or if pursuant to an existing contract, interest at the non-default contract rate; provided however, any such holder may seek to obtain a higher interest rate and shall be entitled to such higher interest rate if the Court determines such rate is appropriate.

1

CC-SSL-0000158

CC-BLG004462

Page 1

1        IN THE UNITED STATES BANKRUPTCY COURT

2            FOR THE DISTRICT OF DELAWARE

3

4

   In re:                    ) Chapter 11

5                            ) Case No.

   W.R. GRACE & CO., et al,   ) 01-1139(JFK)

6                            )

               Debtors.       ) Jointly

7   --------------------------) Administered

8

9

10

11       DEPOSITION OF EDWIN N. ORDWAY, JR.

12            New York, New York

13          Friday, August 29, 2008

14

15

16

17

18

19

20

21

22

23   Reported by:

24   MAYLEEN CINTRON, RMR, CRR

25   JOB NO. 18494

CC-BLG004463

## Page 22

E. Ordway

1
2  compounding should take place quarterly?
3      A.  There's a provision that addresses
4  default rate interest calculations.
5      Q.  But does that make any reference to
6  "quarterly"?
7      A.  It makes reference to the -- that
8  the calculation -- and I don't have the
9  document in front of me to be precise about
10  the language.  That there would be
11  calculations of interest on payments that are
12  past due every time that there was an unpaid
13  balance, which would be quarterly.
14          If the interest wasn't paid, then
15  there was another calculation of the default
16  charge.
17      Q.  Any other provisions that you can
18  recall?
19      A.  No.
20      Q.  So basically, the difference
21  between the default rate calculation and what
22  would be the base contract rate calculation
23  has two components; one is that the rate of
24  interest is different, and the other is that
25  there's interest on interest, correct?

## Page 23

E. Ordway

1
2      A.  Correct.
3      Q.  Okay.  Turning to the next page of
4  your declaration.  It's actually, again, a
5  part of Paragraph 8.  You go through the
6  calculation and find that, as you look at it,
7  the interest at issue is $90 million and you
8  say that the incremental amount being sought
9  by the lenders is 'di minimus'.  Do you see
10  that?
11      A.  Yes.
12      Q.  Is that your word?
13      A.  Yes.
14      Q.  Did you choose that word?
15      A.  Yes.
16      Q.  Is that a term that is given
17  meaning in the accounting literature?
18      A.  I'm not sure.
19      Q.  Is that term a term that is given
20  meaning in the standards for valuation?
21      A.  I'm not sure of that either.
22      Q.  We know that it's a legal term,
23  correct?
24      A.  Yes, we do.
25      Q.  Is that, in fact, the source of

## Page 24

E. Ordway

1
2  your decision to use the word; that is, a
3  legal context?
4      A.  It's a legal term that is commonly
5  used in my business.
6      Q.  But if we were to go to
7  professional standards and methodologies,
8  accounting standards and methodologies,
9  financial analyses standards and
10  methodologies, we would nowhere find an
11  objective standard stated on the basis of
12  which you can make a conclusion that something
13  is 'di minimus', correct?
14      A.  Correct.
15      Q.  Was it your idea or somebody else's
16  idea to offer an opinion as to whether the
17  interest rate at issue was 'di minimus'?
18      A.  I was asked to provide my opinion.
19      Q.  I know that.  But was it your idea
20  or somebody else's idea to actually go ahead
21  and do that kind of analysis or determination;
22  that is, whether the interest at issue was
23  'di minimus'?
24          MR. PASQUALE: Objection to form.
25      A.  I was asked to prepare this

## Page 25

E. Ordway

1
2  affidavit.
3      Q.  When you went down the road to say
4  is it 'di minimus' or not, was that something
5  that you thought of to do or something that
6  counsel thought to do?
7      A.  It was our finding.
8      Q.  I know it was your finding.  But
9  I'm asking --
10          MR. PASQUALE: He's answering you.
11      Q.  It wouldn't be your finding if it
12  wasn't in here.
13      A.  I wouldn't have said it if it
14  wasn't a finding.
15      Q.  I understand that.  But whose idea
16  was it to even go down the path of doing that
17  analysis?
18          MR. PASQUALE: Objection. Let's be
19  specific.  What analysis?
20          MR. BERNICK:  Determine whether the
21  amount of interest at issue was
22  'di minimus'.
23      A.  We were requested to prepare this
24  by counsel and to provide whether we believe
25  that this was 'di minimus' or not.

CC-BLG004464

## Page 26

E. Ordway

Q. Okay. So to be fair, then, it was counsel who came up with the idea of looking at the amount of interest at issue, correct?

A. Yes.

Q. It was counsel that came up with the idea of making that determination using the comparison between the default rate and the proposed plan rate, correct?

MR. PASQUALE: Objection to form. Misstates prior testimony.

MR. BERNICK: I think it is exactly what he said.

MR. PASQUALE: I don't think it is.

Q. It was counsel who decided, came up with the idea of using those particular elements -- that is, proposed plan versus default rate -- to define the interest at issue, correct?

A. I'm not sure if it was our idea or their idea--

Q. And it is certainly --

A. -- to frame it in any manner.

Q. And it was certainly, Counsel, then who asked you to determine whether that was

## Page 27

E. Ordway

'di minimus', correct?

A. Yes.

Q. Now, because there is no standard for what's 'di minimus', did counsel give you any suggestions about what would be 'di minimus'?

A. No.

Q. Now, you ultimately end up saying it's 'di minimus' by making a comparison to, I think as you put it, "the benefit now available to all stakeholders," right?

A. Yes.

Q. Whose idea was it to talk about what was available to all stakeholders? What does stakeholders even mean?

A. Stakeholders are all the -- in our context, the way we wrote this, were all the parties in interest associated with the Debtor's cases.

Q. Whose idea was it to determine whether the amount at issue was 'di minimus' by reference to the benefit available to all stakeholders?

MR. PASQUALE: Objection to form.

## Page 28

E. Ordway

Q. Whose idea was that?

A. I believe that was our thought to include that in the affidavit.

Q. So, your point of reference, it was you who decided that the point of reference for making a comparison and determining 'di minimus', that the right point of reference would be "benefit available to stakeholders"?

A. As well -- yes.

Q. And it's true, is it not, that there is no accounting standard, convention, or methodology that tells you to make that comparison?

A. That's correct.

Q. It's true that there is no financial analysis, standard or methodology or convention that tells you to make that comparison, correct?

A. Correct.

Q. If somebody else were to make a different comparison or to determine what was 'di minimus', you would have no basis using a standard, or method or convention to say what

## Page 29

E. Ordway

they are, correct?

A. It would be their judgment versus my judgment.

Q. And to decide between your judgment versus their judgment, there is no objective standard or reliable method that you could point to right now that would enable you to make the decision, correct?

A. That's correct.

Q. Now, it's true, is it not, that when you make the comparison between the interest at issue and the benefit available to the stakeholders, you're really talking about a comparison of the interest at issue and the value that's been generated at Grace, correct?

A. Yes.

Q. And it is true, is it not, that the value that has been generated in Grace is reflected, according to your work, in the stock price, right?

MR. PASQUALE: Objection to form.

A. Yes.

Q. And basically, the comparison that you draw in determining the significance of

CC-BLG004465

**Page 30**

E. Ordway

1     E. Ordway
2  the interest at issue, are comparisons between
3  the interest that has accrued to the debt on
4  which you're opining by comparison to the
5  value that's accreted to equity, correct?
6          MR. PASQUALE: I'm going to object
7      to form. The affidavit goes into more
8      than just that, David, as you well
9      know.
10     A.  It's one of the examples that we
11  use.
12     Q.  Right, you got comparisons to
13  EBITDA, you got comparisons to revenues. At
14  the end of the day, EBITDA and revenue are
15  also reflected in equity value, correct, or
16  not?
17     A.  One would assume that the market
18  value contemplates operating performance, so
19  the answer would be yes.
20     Q.  So fundamentally, at the heart of
21  your determination that the interest at issue
22  is 'di minimus', is a comparison between the
23  interest at issue on the one hand and the
24  value of Grace equity on the other, correct?
25     A.  Not only the value of Grace, but

**Page 31**

E. Ordway

1          E. Ordway
2  also the total value of the Company and the
3  operating performance of the Company.
4     Q.  Operating performance, generally
5  speaking, is reflected in equity; or not?
6     A.  Generally speaking.
7     Q.  But, is it true that equity value,
8  that is stock price, can reflect many, many
9  things other than company performance; true?
10    A.  Correct.
11    Q.  And in fact you provide no
12  methodology in your declaration here that
13  enables us to relate stock price to actual
14  company performance, correct?
15    A.  Correct.
16    Q.  Now, it's true, is it not, that the
17  debt that you're talking about here and the
18  equity securities that you're talking about
19  here, are two totally different kinds of
20  securities?
21    A.  Correct.
22    Q.  Debt accretes value based upon
23  interest, correct?
24    A.  Correct.
25    Q.  Equity accretes value based upon

**Page 32**

E. Ordway

1     E. Ordway
2  performance, not interest, correct?
3     A.  Can I change an answer?
4     Q.  Depends on which one you want to
5  change.
6          MR. PASQUALE: Yes, you could --
7     Q.  I tell you what, if you want to ask
8  me whether you could change an answer, I
9  appreciate that. But you probably have the
10  prerogative at some point in this process to
11  change it on your own.
12         So what answer do you want to
13  change?
14    A.  The one from -- the prior question
15  you asked me about the debt instrument, that
16  it accretes value according to its contract
17  rate of interest.
18         In this instance, too, the debt is
19  traded, there's a market for trading the debt,
20  and the debt improved in value since the
21  filing of the bankruptcy, albeit there were
22  some ups and down, based on the performance of
23  the Company as well.
24    Q.  Sure. As a matter of the debt
25  contract, the security agreement or the

**Page 33**

E. Ordway

1          E. Ordway
2  agreement that underpins the debt security,
3  the value of that debt security, in the sense
4  of the obligation to repay that security, is
5  driven solely by the interest rate and
6  principal amount, correct?
7     A.  And other fees that are contained
8  in the terms of the agreement.
9     Q.  The value of the debt security, in
10  the sense of what is owed to the creditor is
11  not contingent upon how the Company performs,
12  correct?
13    A.  The obligation is not contingent
14  upon the Company's performance, that's
15  correct.
16    Q.  Where in the case of equity, equity
17  does not accrete interest under contract,
18  correct?
19    A.  Correct.
20    Q.  Or under law, correct?
21    A.  Correct.
22    Q.  And equity, by contrast to debt,
23  accretes value based upon the performance of
24  the Company and how that performance then is
25  reflected in the stock price, correct?

CC-BLG004466

## Page 34

E. Ordway

A. Among other factors, yes.

Q. In fact, independently of market price, you could add private equity that accretes value simply based upon the performance of the Company, correct?

A. Correct.

Q. If you wanted to make a different comparison using your own work here -- put it differently.

If we look at the work that you've done here, you choose to determine whether the interest at issue is 'di minimus' by comparing it to the value that has accreted to Grace's operations, among other things, correct?

MR. PASQUALE: Thank you, David.

A. Yes, among other things.

Q. But if we just wanted to talk about what was owed under the debt instruments, would you say that the amount at issue here is 'di minimus' in relationship to the amounts that may or may not be owed under the debt agreements themselves?

In other words, you compare the debt to the equity. I'm asking you: If you

## Page 35

E. Ordway

just focused on the debt, the amount of interest at issue here is not 'di minimus' compared to what is owed on the debt, correct?

A. Correct.

Q. In fact, is it true that if we compare the highest number, which is the default interest calculation that you've done, to the base interest rate, even assuming that that base interest rate extends beyond the event of Grace filing for bankruptcy, you're talking about as much as a 40 percent difference in the amount of interest it's owing, correct?

A. I think that calculation is right.

Q. And that certainly would not be 'di minimus', correct?

A. The statement of being 'di minimus' was in the context of other financial information. But in the context of the debt itself and the interest itself, I would not call that 'di minimus', if that were the comparison.

Q. Excuse me, what?

A. If that were the comparison we were

## Page 36

E. Ordway

making.

Q. Have you ever done an opinion on solvency?

A. Yes.

Q. Is that something that's ordinarily done by people within your field of expertise?

MR. PASQUALE: David, I'm going to raise an objection. We had an agreement that questioning would be limited to the declaration.

MR. BERNICK: I'm not going to stray from that agreement. You'll see.

MR. PASQUALE: But solvency is not in here.

MR. BERNICK: That's what I wanted to get you to say, really.

Q. You know about solvency opinions, correct?

A. Yes, I do.

Q. You do not express here an opinion -- in your declaration, you do not express an opinion about solvency, nor do you do a solvency calculation, correct?

A. Correct.

## Page 37

E. Ordway

MR. BERNICK: Did I abide by my agreement?

MR. PASQUALE: Well, you did. But you asked about solvency questions, and now I feel compelled to say for the record that the judge has deferred any issues of solvency until after the hearing. So we will reserve the right to deal with that issue later if we need to.

MR. BERNICK: I don't want to argue about it. I'm making such progress here.

MR. COBB: On the record for bank lenders, the judge has deferred certain questions with regard to solvency, calculations thereof, until a later date.

MR. PASQUALE: That's more accurate.

MR. BERNICK: I'm glad we are in agreement with respect to that.

BY MR. BERNICK:

Q. Now, you have looked also in your

CC-BLG004467

| Page 46 | Page 47 |
|---|---|
| E. Ordway | E. Ordway |
| 2  Q.  Have you determined what other, if | 2  Q.  My question is whether you have |
| 3 any, contribution the general Unsecured | 3 looked to see whether the unsecured lenders in |
| 4 Creditors at issue here, what other | 4 this case made any other contribution to the |
| 5 contribution, if any, those creditors made to | 5 bankruptcy case itself other than being |
| 6 the bankruptcy case? | 6 co-proponents of Grace's Plan of |
| 7  MR. COBB:  Objection to form again. | 7 Reorganization? |
| 8  A.  Am I aware of other ones? | 8  A.  Is the question the unsecured |
| 9  Q.  Yes. | 9 lenders or the Creditors Committee? I guess |
| 10  A.  Yes. | 10 you said -- |
| 11  MR. PASQUALE:  Let's be clear. | 11  Q.  Either or both. |
| 12 Your objection is well taken. | 12  A.  The Committee, I believe, has |
| 13  MR. COBB:  Objection as to form. | 13 provided substantial contribution to the case |
| 14 I'll be precise. The "general | 14 in terms of, as the case has progressed, since |
| 15 Unsecured Creditors at issue here." | 15 its onset with being cooperative with the |
| 16 You can answer if you can. | 16 Debtor. |
| 17  MR. PASQUALE:  Do you mean the | 17  Q.  Is there anywhere in the |
| 18 Committee, David or do you mean the | 18 declaration where you state that those |
| 19 creditor body?  I think that's the | 19 activities in any way, shape, or form |
| 20 issue. | 20 contributed to Grace's stock price? |
| 21  MR. BERNICK:  I make no such | 21  A.  No. |
| 22 distinction.  If you want to object to | 22  Q.  Let's talk a little bit about |
| 23 form on the grounds that the Committee | 23 creditors' support.  Creditor's support for |
| 24 is different from the lenders, feel | 24 Grace acquisitions and reinvestments is one of |
| 25 free. | 25 the two contributions which you say that the |

| Page 48 | Page 49 |
|---|---|
| 1  E. Ordway | 1  E. Ordway |
| 2 Unsecured Creditors made to Grace's stock | 2  Q.  In fact, all of Grace's |
| 3 price, correct? | 3 acquisitions, everybody agreed, were prudent |
| 4  A.  Correct. | 4 and appropriate acquisitions to make, correct? |
| 5  Q.  I don't see anywhere in your | 5  A.  I'm not sure what the other party's |
| 6 declaration where you cite any evidence to | 6 conclusions were, but they didn't object. |
| 7 support the proposition that the creditors | 7  Q.  So, is what you're saying that the |
| 8 support for acquisition and reinvestment had | 8 contribution of general Unsecured Creditors |
| 9 any effect on stock price.  Would you agree | 9 when it comes to creditors' support, is that |
| 10 with me that there is nothing in the | 10 they decided not to object? |
| 11 declaration that provides that evidence? | 11  A.  They decided to not object. |
| 12  A.  I agree. | 12  Q.  What about reinvestment?  Are you |
| 13  Q.  Isn't it true that Grace had to | 13 aware of any reinvestment that Grace made? |
| 14 bring proposed acquisitions before the | 14 All Grace's financial, including CapEx, were |
| 15 Bankruptcy Court for approval? | 15 made available to the Committee and different |
| 16  A.  Correct. | 16 stakeholders, correct? |
| 17  Q.  Isn't it true that none of those | 17  A.  Correct. |
| 18 acquisitions were contested by anybody? | 18  Q.  Are you aware of any issue that was |
| 19  A.  They weren't contested by us as a | 19 ever raised with respect to the reinvestment |
| 20 result of our review and analysis, and belief | 20 of Grace earnings into the Grace business? |
| 21 that it was the appropriate course of action. | 21  A.  There were issues raised, but I |
| 22  Q.  But they weren't contested by any | 22 think concluded to our satisfaction over time. |
| 23 of the other stakeholders in the case, were | 23  Q.  But did anyone at any point in the |
| 24 they? | 24 bankruptcy ever object to any of Grace's |
| 25  A.  Not that I recall. | 25 reinvestments? |

CC-BLG004468

## Page 50

E. Ordway

1
2    A.  Not that I recall.
3    Q.  So they were essentially
4    noncontroversial, weren't they?
5    A.  I think it was controversial in the
6    sense of the Company making acquisitions
7    during a bankruptcy, but we accepted that they
8    were appropriate in the circumstances.
9    Q.  So again, the contributions that
10   the creditors made, insofar as reinvestment
11   was concerned, was simply a decision not to
12   object, correct?
13   A.  Correct.
14   Q.  So when we're sitting here today,
15   you say that the creditors' support with
16   respect to acquisitions and reinvestment
17   created a positive contribution to stock
18   value, all you're really referring to is that
19   you might have had an impact on Grace's stock
20   value if you had decided to object to the
21   acquisitions or the reinvestments, correct?
22   MR. PASQUALE:  Objection to form.
23   A.  It would have been detrimental to
24   the value of the Company, highly likely, if we
25   objected to some of these acquisitions.

## Page 51

E. Ordway

1
2    Q.  And you regard that as being a
3    favorable contribution to the case, that you
4    simply failed to get in the way?
5    MR. PASQUALE:  Objection to form.
6    A.  Yes, I do.
7    Q.  Let's talk about money, the use of
8    cash, which appears on, I think, the next
9    page.
10   It says, "The equity holders of the
11   Debtors have benefited substantially as
12   compared to the lenders, in part from the use
13   of lender's cash."  Do you see that?
14   A.  Yes.
15   Q.  Now, that has got two components,
16   one is that there was a benefit to the equity
17   holders, and the second, that the benefit was
18   substantial, right?
19   A.  Yes.
20   Q.  Incidentally, whose idea was it to
21   take a look at whether the general Unsecured
22   Creditors had created a positive contribution
23   to Grace's stock performance?  Was that your
24   idea or counsel's idea?
25   A.  I think it may have been counsel's

## Page 52

E. Ordway

1
2    idea.
3    Q.  Who decided how that analysis
4    should be done; you or counsel?
5    A.  I believe it was our idea as to how
6    this calculation and presentation should be --
7    should be made to illustrate that point.
8    Q.  Well, but when it came to
9    creditors' support, what we just got done
10   talking about, was it your idea to identify
11   creditors support as a potential contributor
12   to stock price or counsel's idea?
13   A.  The creditors' support as it
14   relates to the reinvestments and acquisitions?
15   Q.  Yes.
16   A.  That was my idea.
17   Q.  And the use of lender's cash, was
18   that your idea or counsel's idea?
19   A.  That may have been counsel's idea.
20   I don't recall.
21   Q.  Now, in neither instance, that is
22   neither in respect to creditors' support nor
23   in respect to use of lender's cash, in neither
24   case do we see any quantification of the
25   contribution, correct?

## Page 53

E. Ordway

1
2    A.  I don't have it calculated in here
3    in this paragraph, but it's a half a million
4    dollars worth of lending, plus 400 and change
5    of interest that hasn't been paid.
6    Q.  I just asked you whether we see
7    anywhere in here a methodology that you used
8    in determining what contribution, if any, that
9    cash had?
10   A.  No.
11   Q.  Now, if we wanted to determine --
12   with respect to creditors' support, if we
13   wanted to determine the impact that that had
14   on stock price, can you point to any
15   accounting or financial analysis, methodology
16   or standard that you used in determining the
17   creditors' support did have a positive impact
18   on stock price?
19   A.  I don't have a calculation to
20   demonstrate that.
21   Q.  Do you have any kind of standard,
22   methodology, or stated methodology to
23   demonstrate it, on creditors' support?
24   A.  There isn't a standard methodology
25   for determining a precise quantification of

CC-BLG004469

E. Ordway

1  E. Ordway
2  the benefit of the stock price from the
3  lender's cash.
4     Q.  I'm talking about creditors'
5  support.
6       MR. PASQUALE:  More generally.
7     Q.  Creditors' support for acquisitions
8  and reinvestments.
9     A.  There isn't a precise methodology
10 for determining that.
11    Q.  There isn't any methodology for
12 determining that, correct, this is a question
13 of your judgment?
14    A.  It would be a question of judgment.
15    Q.  When it comes to lender's cash.  I
16 want to go through lender cash a little bit.
17      First of all, we don't see here the
18 deployment of any standard, methodology or
19 objective test in saying the use of lender's
20 cash benefited the equity holders or the
21 Debtor, correct?
22    A.  Correct.
23    Q.  Same thing with regard to the word
24 "substantially," it says that the equity
25 holders benefited substantially.  Was that

E. Ordway

1  E. Ordway
2  your word or counsel's word?
3     A.  My word.
4     Q.  Is that a word that was derived
5  from the accounting literature or the
6  financial analysis literature, or that's just
7  a general word in your vocabulary?
8     A.  It's a general word in my -- it is
9  my judgment to use that word.
10    Q.  That there is no objective measure
11 or test that you used to determining
12 substantial or insubstantial, correct?
13    A.  No.
14    Q.  Is my statement correct, that there
15 was no objective test that you used?
16    A.  Sorry.  Yes.
17    Q.  Now, when we talk about the money,
18 the cash that the lenders provided to Grace
19 that Grace used, we have the principal of $503
20 million, principal plus accrued interest as of
21 the date of filing, correct?
22    A.  Correct.
23    Q.  Now, the loan documents call for
24 compensation for the use of that principal
25 with simple interest, correct?

E. Ordway

1  E. Ordway
2     A.  Correct.
3     Q.  And we know that the compensation
4  for the use of that principal with simple
5  interest, would be about the $287 million
6  number, right?
7     A.  That sounds correct.  That sounds
8  about right.
9     Q.  Now, if we deal with default,
10 default has got two components to it, one is a
11 different rate, and the other is compounded,
12 correct?
13    A.  Correct.
14    Q.  If we just talk about the default
15 rate applying before we get to interest on
16 interest, just apply the higher default rate,
17 am I right that that would take the interest
18 up approximately $15 to $18 million to about
19 $304 million?
20    A.  I don't know that calculation, if
21 that's right or wrong.
22    Q.  So, if we have principal of
23 $500 million, and the unpaid interest on the
24 principal, not interest on interest, but
25 interest on the principal, that would be

E. Ordway

1  E. Ordway
2  something in the area of between $280 and
3  $300 million approximately?
4       MR. PASQUALE:  Object to form.
5     A.  I'm not sure of your calculation.
6  But it sounds order of magnitude, like it
7  might be good for this discussion.
8     Q.  What I'm getting at is:  When we
9  talk about use of lender's cash, we have
10 principal, we have interest on the principal
11 and we have interest on interest.  Those are
12 three different things, correct?
13    A.  Correct.
14    Q.  And all I'm trying to do is get a
15 rough idea of the three tranches:  The
16 principal plus accrued interest as of the date
17 of the filing is roughly $500 million, the
18 unpaid interest on principal -- simple
19 interest, not interest on interest, interest
20 on principal -- is another 300-odd-million
21 dollars, and then we have the interest on
22 interest component which takes you as high up
23 as the $414 million, right?
24      MR. PASQUALE:  Objection.  Asked
25 and answered.

CC-BLG004470

## Page 58

E. Ordway

1  A.  I can't confirm precisely your
2  number other than the 414 and the
3  500-and-three-and-a-half, which is the
4  principal plus pre-petition interest.
5     Q.  So when you say that really it is
6  the equity holders and the Debtors used the
7  lender's cash, how do you know that they used
8  unpaid interest on principal?
9     A.  I don't understand the question.
10    Q.  Well, unpaid interest on principal,
11 you have the principal of $500 million, you
12 then have monies above that all the way up to
13 another $400 million, what portion of that
14 $400 million that you say would be owing to
15 the Unsecured Creditors as interest, either
16 interest on principal or interest on interest,
17 how much of that do you know that the Debtor
18 actually used in its operations?
19    A.  It would be -- I suppose we can
20 calculate it by looking at change in cash
21 balances from the beginning of the case
22 through now, for example.  The difference --
23 first of all, cash is fungible, but presumably
24 the balance -- the difference between that

## Page 59

E. Ordway

1  would have been used in operations, to support
2  operations.
3     Q.  But that's what I'm asking:  Do you
4  know how much of the lender's interest, unpaid
5  interest, actually got used in operations?
6  Does that anywhere appear in the affidavit?
7     A.  No.
8     Q.  It's true, is it not, that Grace
9  has had substantial cash balances, correct?
10    A.  Yes.
11    Q.  That cash balance as of the end of
12 June of this year is about $400 million and
13 that's after some very substantial payments,
14 correct?
15    A.  Yes.
16    Q.  Do you know that Grace's cash
17 balance ever was lower than the unpaid
18 interest on interest?
19    A.  I don't know.
20    Q.  Well, if you don't know, how do you
21 know that Grace actually used the lender's --
22 not the principal, but actually used unpaid
23 interest in order to fund its growth?
24    A.  I know that taken over time, this

## Page 60

E. Ordway

1  is a significant amount of money and that it
2  exceeds the change in the cash on-hand from
3  the beginning of the case till now.  So it is
4  implicit that that difference, a portion was
5  used to fund operations.  And certainly during
6  the case it was used to fund operations.
7     Q.  I'm not talking about just the
8  interest on principal or interest on interest.
9  Not the original $500 million.
10    MR. PASQUALE:  So he is going
11    outside the declaration to ask you that
12    question.
13    MR. BERNICK:  To the contrary.
14    MR. PASQUALE:  That's what he
15    wrote.
16    MR. BERNICK:  It is all embedded.
17    That's what I'm trying to find out.
18    Q.  You said that the equity holders
19 used the lender's cash.  I'm construing
20 lender's cash to be the broadest it could
21 possibly be, which is principal, interest on
22 principal and interest on interest.
23    I'm simply asking whether you know
24 that statement to be true with respect to

## Page 61

E. Ordway

1  interest on principal or interest on interest,
2  based on what is in your declaration?
3     A.  I don't have a calculation to
4  precisely demonstrate how much of the unpaid
5  interest, whether it's interest on interest,
6  was, in effect, used for operations other than
7  generally it had to have been.
8     Q.  No quantification at all appears in
9  the declaration, correct?
10    A.  No.
11    Q.  You can't tell whether it was
12 substantial or 'di minimus', correct, as an
13 expert?
14    A.  The reason that we're used the word
15 "substantial" is because the sum is $414
16 million, that's a substantial number.
17    Q.  Fair enough.  But you cannot, as an
18 expert, say "substantial" when it comes to the
19 actual cash that was actually used in
20 operations because you don't know how much
21 that was, correct?
22    A.  I don't know how much that was at
23 this point in time, although that's
24 determinable, certainly.

CC-BLG004471