IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. Grace & Co., et al., | ) | Case No. 01-01139 (JKF) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | Re: Docket No. 22553 |

**PRELIMINARY RESPONSE OF NORFOLK SOUTHERN RAILWAY TO DEBTORS'
OBJECTION TO THE PROOF OF CLAIM FILED BY NORFOLK SOUTHERN
RAILWAY**

Norfolk Southern Railway ("NS")[1] files this Preliminary[2] Response (the "Response") to the Debtors' Objection to the Proof of Claim Filed by Norfolk Southern Railway [Docket No. 22553] (the "Objection") and in support hereof, respectfully represents as follows:

### INTRODUCTORY STATEMENT

1.  In drafting their Objection to NS' indemnity claim (the "Indemnity Claim")[3], the Debtors misconstrue the nature of the relationship between the parties, the breadth of the agreements concerning indemnity as between the parties and the facts of the underlying litigation that give rise to NS' Indemnity Claim against the Debtors. In sum, the agreements

---

[1] NS is the successor in interest to Southern Railway Company.

[2] In accordance with Rule 3007-1(h) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, NS submits that discovery will be required in order for this Court to make a final adjudication of this claim dispute. As such, NS requests that the currently scheduled September hearing date be used as a status/scheduling conference to discuss an appropriate time table for necessary discovery, motion practice and to set a date for an evidentiary hearing on the Objection.

[3] As part of their Objection, the Debtors do not object to the $2,102.00 requested as part of claim number 7021 for environmental cleanup costs. The Debtors did, however, object to the $20,415.52 requested as part of claim number 7021 for unpaid freight charges. NS consents to the freight charge portion of the claim being reduced to $4,820.35 as the Debtors' suggest. Thus, the only portion of claim number 7021 that remains in dispute is the Indemnity Claim.

1

930498v.1

between Grace and NS require Grace to indemnify NS for injuries to NS' employees resulting from Grace's use of the facility located at Natka, South Carolina (the "Facility"). As set forth below, it was the Grace's use (or more precisely, misuse) of the Facility that caused the accident giving rise to Mr. Kirkland's injuries. Thus, it is Grace's obligation under the Agreements (defined below) to indemnify NS for that loss.

## BASES FOR NS'S INDEMNITY CLAIM

**The Agreements**

2. On or about March 27, 2003, NS filed its Indemnity Claim as part of claim number 7021 against W.R. Grace & Co. ("Grace"). The Indemnity Claim is based on several agreements between NS and Grace. Those agreements are as follows:

   a. Agreement between Southern Railway Company and W.R. Grace & Company of December 15, 1980 (the "First Agreement") (attached as Exhibit A);

   b. Agreement between Southern Railway Company and W.R. Grace & Company of December 15, 1980 (the "Second Agreement") (attached as Exhibit B); and

   c. Supplemental Agreement between Southern Railway Company and W.R. Grace & Company of September 17, 1990 (the "Third Agreement") (attached as Exhibit C) (collectively with the First and Second Agreements, the "Agreements").

3. The First Agreement permitted Grace to use NS' property for kaolin[4] mining and manufacturing (Objection ¶ 3) and provides in pertinent part as follows:

> Licensee will maintain said Facility at all times during the life of this agreement in such condition that said Facility or the use thereof by Licensee shall not be or become an obstruction to, or interfere with, the safe and proper maintenance of said industrial track, or railroad

---

[4] Kaolin is soft white clay that is an essential ingredient in the manufacture of china and porcelain and is widely used in the making of paper, rubber, paint and many other products. (Objection fn. 1). As set forth below, kaolin from the Grace Facility is the "clay" or "clay like substance" that caused Mr. Kirkland to slip and injure himself.

2

930498v.1

operations upon said track, or endanger life or limb of employees of Company or other persons about said track. (First Agreement ¶ 18).

The liability of the parties to this agreement, as between themselves, for death, personal injury and property loss and damage, *which occurs by reason of, or arise out of, or is incidental to, the use or occupancy by Licensee of the property covered by this agreement,* shall be determined in accordance with the following provisions:

(b) Licensee shall be solely responsible for, and shall bear all cost, expense and liability resulting from death, personal injury, and loss and damage to property, caused solely by the negligence of Licensee or its agents or its employees of the terms of this agreement (First Agreement ¶ 10(b)) (emphasis supplied).

4.  The Second Agreement provides that Grace shall be solely responsible for liability resulting in death or personal injury caused solely by its negligence. (Second Agreement ¶ 5(b)). Paragraph 16 of the Second Agreement further provides that Grace is responsible for, among other things, all injuries accruing by reason of Grace's use of the property.

5.  The Third Agreement supplemented the First and Second Agreement to provide for the construction of an overhead loading structure with a retractable loading spout. The spout was used to load kaolin into rail cars. The Third Agreement, provides, in the same fashion as do the First and Second Agreements, that Grace would maintain the Facility "in such condition that said Facility or the use thereof by Industry shall not ... interfere with, the safe and proper...railroad operations upon said track, or endanger life or limb of employees of Railroad or other person on or about said track." (Third Agreement ¶ 3). The Third Agreement, like the two before it, further provides that:

> Industry proposes to construct, maintain and use said Facility with full cognizance of the risk of loss of life, personal injury or property loss or damage which may be caused by or result from railroad operations on said industrial track at the location of said Facility, *or which may accrue from or by reason of the* construction, installation, maintenance, presence or *use of said Facility by Industry*; and Industry covenants that said Facility

3

shall be constructed, maintained and used *solely at the risk of Industry,* and that neither Railroad, nor any associated, controlled or affiliated corporation, shall assume any responsibility in the premises; *Industry hereby specifically agreeing, notwithstanding any other provision of said Agreement, to indemnify and save harmless Railroad,* and any associated, controlled or affiliated corporation, *from and against the consequences of any and all such loss, injury or damage,* whether or not negligence of Railroad may have caused or contributed to such loss, injury or damage." (Third Agreement ¶ 5) (emphasis supplied).

### The Kirkland Complaint

6.　On or about July 8, 1998, Mr. Kirkland sued his employer, NS, for damages resulting from injuries he sustained on two separate dates – January 23, 1998 and January 26, 1998 (the "Complaint").[5] On July 27, 1998, NS answered the Complaint, denying liability. By September 15, 1999, it was clear to NS that Grace was the party responsible for Mr. Kirkland's injuries. As set forth in the September 15, 1999 letter attached as Exhibit D, Mr. Kirkland's deposition testimony revealed that the cause of his slips from the rail cars was the kaolin covering the cars left as a result of Grace's loading practices. The September 15 letter further notified Grace that NS was seeking indemnification pursuant to the Agreements and asked that Grace take over the defense of the Kirkland action. Grace refused.[6]

---

[5] In their Objection, Grace states that "[d]espite the fact that Mr. Kirkland had only requested $1.5 million, the jury awarded Mr. Kirkland judgment in the sum of $1,924,500 plus interest." (Objection ¶ 12). However, in his complaint, Mr. Kirkland sought damages "in excess of $2 million") (See Kirkland Complaint ¶ 14 attached as Exhibit D to NS' proof of claim).

[6] In their Objection, Grace states that "[t]here has been absolutely no allegation – either in the Kirkland Complaint or in the Norfolk Claim – that Grace was negligent or otherwise involved in the events that resulted in Kirkland's injuries." (Objection ¶ 21). In making this statement, Grace ignores all correspondence from NS' counsel at the time of the Kirkland litigation.

4

7.     Many letters followed from NS' counsel informing Grace of the status of the case and factual developments that, as the case progressed, highlighted Grace's culpability in Mr. Kirkland's injuries and, in light of Grace's indemnification obligations, repeating NS' request for Grace's participation. Grace stubbornly denied liability. Eventually, the case went to trial and ended in a jury verdict against NS. Subsequently, NS was able to reach a settlement with Mr. Kirkland. Even throughout settlement discussions, NS' counsel kept Grace informed of the progress and developments in the case and of NS' intention to enforce its contractual indemnity rights against Grace.

8.     In spite of the substantial evidence and the plain language of the Agreements, Grace continues their denial in the Objection.

**The Kirkland Accidents**

9.     In contradiction to Grace's protestation in the Objection that "Grace had no tie to the Kirkland litigation" (Objection p. 2), a review of the record in the state court litigation shows precisely the opposite is true.

10.    First, Mr. Kirkland's accident reports summarize the story of how Mr. Kirkland was injured:

"While releasing handbrake on covered hopper loaded with clay, slipped on clay on hopper and fell to ground." (Personal Injury Report dated January 23, 1998, attached as Exhibit E).

"Pulled 7 loads from W.R. Grace plant in Aiken, S.C. Brought all 7 loads which were covered in clay back to Aiken and ran around cars in house track to take to Warrenville, S.C. to be set off. While applying handbrakes on cars, conductor slipped

on NS245061 and twisted or tore or pulled something in lower back." (Personal Injury Report dated January 26, 1998, attached as Exhibit F).

11.  Mr. Kirkland's testimony further indicates that the cause of his injuries was the kaolin on the cars that were being removed from the Grace Facility. Of the three loads picked up by Mr. Kirkland on January 23, 1998 from the Grace facility all three were "just covered in clay, just all over." (Transcript p. 85 line 3).[7] Upon returning to the Aiken, S.C. depot with the clay covered cars, Mr. Kirkland "grabbed the brake wheel, and I was pulling it toward me again, to see if I could manually pull it off, and when I did I slipped off the car." (Id. p. 95 lines 22-24).

12.  Similarly, on January 26, upon arrival at the Grace Facility to remove the seven kaolin loaded rail cars scheduled for pick-up that day, "they were just covered [with kaolin]" (Id. p. 110 line 15). When Mr. Kirkland pointed out the situation to Mr. Wood, the Grace plant manager, Mr. Wood replied to Mr. Kirkland that he would "look into it" (Id. p. 112 line 7). Upon return to the Aiken depot with the seven kaolin loaded cars, Mr. Kirkland was attempting to apply the brake and "slipped again. My foot – my right foot slipped on that clay… I grabbed myself and was about to cry." (Id. p. 113 lines 7 - 10). According to the testimony at trial, "…the commodity -- the stuff is supposed to be in the car, not on the car…" (Id. p. 117 lines 4-5).

13.  The Grace Facility was used to mine and manufacture kaolin and then load that kaolin into the rail cars. To accomplish the task of loading the kaolin, Grace used the retractable loading spout covered by the Third Agreement. However, while filling the rail cars, the kaolin would spill and end up all over the cars. At one point in

---

[7] Excerpts of the trial transcript are attached as Exhibit G in the order in which they are cited.

930498v.1

time, Grace employees washed the rail cars off with water. (Id. p. 75 line 24). Later, Grace installed a blowing machine for this purpose. (Id.). However, Grace seldom kept up its end of the bargain when it came to cleaning the kaolin from the rail cars. (Id. p. 71 lines 7 – 17 (describing how after complaining about the clay on the cars, the situation at Grace would be get better for a day or two and then go back to the "same piling up, not cleaning them off.")). The end result of the kaolin on the cars was the creation of a "slick" surface akin to "pouring oil on them, and trying to step on them." (Id. p. 70 lines 5 - 6). It was this dangerous condition caused solely by Grace that resulted in Mr. Kirkland's falls.[8] Thus, it is Grace's obligation to indemnify NS for its losses associated with Mr. Kirkland's claims. For Grace to plead otherwise belies the facts of the incidents and the language of the Agreements.[9]

## CONCLUSION

14.     Under the Agreements, among other obligations, Grace was charged with the specific responsibility of using and maintaining the Facility so as not to endanger life or limb of NS' employees. It was Grace's use of the Facility, specifically, Grace's failure to properly load the kaolin into the rail cars and clean the rail cars, that on two occasions caused Mr. Kirkland to slip and injure himself. Thus, under the Agreements, it is Grace's responsibility to indemnify NS for all losses associated with Mr. Kirkland's injuries. Those losses are reflected in the Indemnity Claim, supported by the documents attached thereto and the facts as set forth herein.

---

[8] Photos of the kaolin covered rail cars removed from the Grace Facility are attached as Exhibit H.

[9] NS reserves all its rights to a portion of the Indemnity Claim as provided under the Agreements should the Court ultimately determine that fault should be shared between NS and Grace.

7

WHEREFORE, NS requests that the Court deny Debtors' Objection and sustain NS' Indemnity Claim and for such other and further relief as is just and proper under the circumstances.

Dated: August 26, 2009  
Wilmington, Delaware

POTTER ANDERSON & CORROON, LLP

*[signature]*

David J. Baldwin (DE ID 1010)  
Etta R. Wolfe (DE ID 4164)  
1313 North Market Street, 6th Floor  
Wilmington, DE 19899  
302.984.6000 (phone)  
302.658.1192 (facsimile)

Counsel for Norfolk Southern Railway