68

Libby

1    A    Yes, sir.

2    Q    And the dispute, if I understand the opening statement

3    and the position taken by the company, is you folks claim

4    that you didn't know it was dangerous until about 1967.  Is

5    that correct?

6    A    That's roughly correct, yes.

7    Q    Is it your testimony that Zonolite or W. R. Grace

8    never became concerned with removing the tremolite asbestos

9    from the final vermiculite material because it could cause

10   disease?

11   A    No, sir.  That's not true.

12   Q    Maybe I misunderstood your --

13        MR. LEWIS:  Do you have Mr. Lovick's deposition?

14   The original?  That's not the original.  Oh, there it is.

15   I'm sorry, Deb.  Thank you very much.  I should have known

16   better than to question.

17        September 6th, 1989.

18        May I approach the witness, Your Honor?

19        THE COURT:  Very well.

20   Q    (BY MR. LEWIS)  Sir, I'm handing you what appears to

21   be your original deposition in this case and others.  Was

22   that deposition taken on September 6th, 1989?

23   A    Yes, sir.

24   Q    Would you turn to page 26 of that deposition.  And

25   look at line 20.  And was this question asked and this

1  Q    Okay.  So your testimony is part of the reason you

2  removed the tremolite from the concentrate was because it

3  created a health hazard to the users of the concentrated

4  vermiculite?  Is that your testimony?

5  A    That's -- That's a part of the reason that we did.

6  Q    Okay.  And what's the other part?  Because you had to

7  get it out so you could sell it?

8  A    No.  Because it -- We wanted to remove all of the

9  foreign material we could from the concentrate.

10  Q    But were you motivated by health concerns for the end

11  product user?  That's what the question goes to.

12  A    Well, I -- I'm not sure -- I'm not sure that I can

13  answer that question.

14  Q    Are you aware that vermiculite insulation from the

15  W. R. Grace plant was used in the home of Don and Millie

16  Johnson?

17  A    No, sir, I did not know that.

**Libby**

18  Q    Now, you said earlier that when this -- this ore comes

19  into the mill, you testified that a substantial tonnage is

20  tremolite asbestos.  And you said that it goes into the

21  tailings, different types of tailings; right?

22  A    Some of it, yes.

23  Q    But some of the it goes in the air, right?

24  A    Yes, sir.

25  Q    Some of it goes in the rafters and covers the

PP
Obj:
R

71

Libby

PP
Obj:
R;
F

1    equipment; right?

2    A    Yes, sir.

3    Q    And some of it goes all the way into the air above the

4    plant; right?

5    A    Yes, sir.

6    Q    And when that plant's running, it's a dusty mess;

7    right?

8    A    It's dusty, yes, sir.

9    Q    And the dust goes right up into the sky and spreads

10   all over Libby; isn't that true?

11   A    No, sir.

12   Q    It doesn't?

13   A    No, sir.

14   Q    All right.  This morning when I came to trial, I gave

15   you this book which has been marked for the record, Your

16   Honor, G -- Plaintiff's Exhibit G-57.

17        Did you have an opportunity to look through this book?

18   A    Yes, sir I did.

19        MR. LEWIS:  May I approach the witness, Your

20   Honor?

21        THE COURT:  Sure.

22   Q    (BY MR. LEWIS)  Do you recall your -- Excuse me, I

23   don't mean to turn my back on you.  I'm sorry.

24        Do you recall your deposition being taken in the

25   Gidley case?

Libby

PP
Obj:
R;
F;
BE

1    A    Yes, sir.

2    Q    Do you recall identifying a file that you maintained

3    concerning asbestos matters at the -- at the plant or the

4    mill in Libby?

5    A    Well, I'm not really sure what file you will refer to

6    but --

7    Q    In any event, are the documents contained in G-57

8    those documents you compiled in the ordinary and usual

9    course of your business with W. R. Grace or Zonolite?

10   A    Yes, sir.  These would all come from our files.

11   Q    And they are true and correct copies of what's

12   contained in your file?

13   A    I believe so, yes, sir.

14   Q    And they were accumulated in the ordinary course of

15   your business?

16   A    Yes, sir.

17        MR. LEWIS:  I'd move the admission of G-57.

18        MR. GRAHAM:  We would object to the introduction

19   of G-57, Your Honor, on the basis of relevancy and

20   materiality.  Most of these documents, as the witness will

21   testify, were accumulated subsequent to all of the matters

22   realted to this lawsuit and were accumulated in connection

23   with a study and not with the ordinary course of business.

24   So we would so object.

25        THE COURT:  Any response?

Libby

PP
Obj:
R;
BE

1          MR. LEWIS:  The witness has testified they were

2   accumulated in the ordinary and necessary course of

3   business of the company.  They certainly come within an

4   exception to the hearsay rule.

5          THE COURT:  Very well.  The objection is

6   overruled.

7   Q    (BY MR. LEWIS)  Now, these were referred in your

8   deposition as your documents.  Do you recall that?

9   A    No.  I can't say that I -- You mean just now?

10  Q    No.  In the Gidley deposition?

11  A    Well, I certainly don't remember everything that was

12  asked of me in the Gidley deposition but --

13  Q    Would you tell the jury what these documents are

14  generally, in general terms.

15  A    These documents cover a wide range -- a wide range of

16  material.  They cover -- They include letters and data that

17  I collected for a study.  There is included in here reports

18  from state agencies, reports that were compiled by myself

19  and others, there are engineering reports in here on the

20  results of dust sampling, there are many letters in here

21  that were written by others in and outside of the company

22  which refer to -- to dust matters and inspections that were

23  made by agencies and by air sampling.  There is a

24  considerable number of reports which pertain to a study

25  which I participated in gathering the raw data for -- after

Libby

PP
Obj:
R;
BE

1    I retired on former employees.  And included in these is a

2    large number of death certificates on people who had

3    previously worked for us.

4    Q    You went around and obtained those death certificates

5    for the McGill study.  That is correct?

6    A    Yes, sir.

7    Q    And those death certificates that you obtained are --

8    they're included in this Exhibit G-57; is that correct?

9    A    Copies of them, yes, sir.

10   Q    I stand corrected.  Copies of them.  That's correct.

11   And what was the purpose of securing these death

12   certificates?

13   A    This was data for the McGill study by a team of

14   epidemiologists who wished to evaluate the effects of

15   tremolite exposure by former employees and reasons for --

16   reasons for the deaths of the -- these employees who were

17   in the cohort list.

18   Q    What do you mean cohort list?

19   A    Well, we compiled a list of all employees who had ever

20   worked for us.  And for the study, in order for it to be

21   meaningful, there had to be some criteria.  And they used a

22   criteria of people who had been employed 20 or more years

23   previous to the study, which was done in 1983, which meant

24   that anybody who had been hired in 1963 or prior to that

25   and had worked for us one or more years were to be included

Libby

PP
Obj:
R

1   in this cohort list.

2   Q   And W. R. Grace acquired this company in 1963; is that

3   correct?

4   A   Yes, sir.

5   Q   So the study went back only as far as as 1963 and did

6   not include people that were employed before 1963; is that

7   correct?

8   A   Included all people that were employed before 1963.

9   Q   It included them?

10   A   Before 1963 not after 1963.

11   Q   Okay.  I misunderstood.  So this included only

12   employees that were --

13   A   Had been employed one or more years and had been hired

14   in 1963 or prior.

15   Q   All right.  Now we're tracking.  Thank you.

16      So if somebody got employed in 1964, they would not be

17   included in this study?

18   A   That is correct.

19   Q   All right.  Now, you said that these were a group of

20   epidemiologists that wanted to study this.  Actually, Grace

21   paid for this study; is that true?

22   A   It was not -- It was not the epidemiologists that

23   wanted this.  Grace made a grant to McGill University to

24   conduct this study.

25   Q   Grace paid for the study; right?

Libby

PP
Obj:
R;
F

1    A    Yes, sir.

2    Q    Okay.  And where is McGill university?

3    A    In Montreal, Quebec.

4    Q    Isn't it a fact that long before the McGill study in

5    '83, you already knew that this tremolite asbestos was very

6    dangerous to your employees?

7    A    I don't understand the term "very dangerous," so I

8    can't agree.

9    Q    How about just dangerous?  Dangerous to your

10    employees?

11    A    We knew that tremolite was a toxic material, but we

12    did not know the degree of the danger it was.

13    Q    You didn't know in 1983, you didn't know -- You knew

14    only that tremolite was a dangerous -- or a toxic material,

15    but you didn't know how dangerous it was?  Is that your

16    testimony?

17    A    Yes, sir.

18    Q    Oh.  You've got the exhibits.  Thank you.

19         Did the State of Montana routinely do -- That's a bad

20    word.  Did the State of Montana from time to time do

21    studies or -- or inspect the plant that Zonolite or W. R.

22    Grace was operating in Libby?

23    A    Yes, sir.

24    Q    And did you always receive copies of those reports?

25    A    I believe so, yes, sir.

77

Libby

PP
Obj:
R;
BE

1    Q    Did you receive copies of those reports before W. R.

2    Grace acquired the company?

3    A    Yes, sir.

4    Q    I direct your attention to Plaintiff's Exhibit G-9.

5    I'll help you find it, sir.

6    A    G what?

7    Q    G-9.  These are tabulated on the side.  I hope you can

8    find it.

9    A    Yes, sir.

10   Q    Right here would be G-9.

11        Is G-9 a report from the Montana State Board of Health

12   Division of Disease Control concerning an industrial

13   hygiene study at Zonolite of Libby, Montana on August 8 and

14   9, 1956?

15   A    Yes, sir.

16   Q    Did you receive a copy of this report?

17   A    Yes, sir.

18   Q    Turn to page three of that report.  And do you see an

19   area that says "toxicity"?

20   A    Yes, sir.

21   Q    You just said you knew that asbestos was toxic, you

22   just don't know how dangerous it was; right?

23   A    Yes, sir.

24   Q    Okay.

25        MR. LEWIS:  First of all, I'd move the admission

78

Libby

1    of Plaintiff's Exhibit G-9.

2                    MR. GRAHAM:  No objection, Your Honor.

3                    THE COURT:  Be received.

4                    MR. LEWIS:  Thank you, Your Honor.

5    Q    (BY MR. LEWIS)  Under "toxicity," would you read those

6    paragraphs to the jury.

7    A    It's titled "Toxicity."  It states:  "A review of the

8    literature indicates that vermiculite or the dust from this

9    material is not especially toxic, and it's generally

10   included only as a nuisance dust.  However, the asbestos

11   dust in the dust in the air is of considerable toxicity and

12   is a factor in the consideration of reducing dustiness in

13   this plant."

14            Next paragraph:  "According to Drinker and Hatch, the

15   pathological changes produced by asbestos are not like

16   those of silicosis.  The asbestos fiber group about the

17   neck of the small air sacks in the lungs and stimulate the

18   formation of a diffuse fibrosis.  There is no definite

19   migration or transportation of the dust particles to lymph

20   nodes and no formation of fibrous nodules.  As the fibrosis

21   increases, the reduction in lung area causes a serious

22   decrease in lung capacity, more difficulty in breathing.

23   Hence it is suggested that enlarged hearts noted frequently

24   in the cases of secondary asbestosis may be the result of

25   the increased work with the heart resulting from this

PP
Obj:
R;
BE

Libby

PP
Obj.
R,
BE

1    condition.  It takes more work to pump the blood through

2    the asbestotic than through the normal lung."

3    Q    Now, you said you received this report.  Did that not

4    put -- Do you not understand that the asbestos in your mind

5    created a significant health hazard to your employees after

6    reading that?

7    A    Yes, sir.

8    Q    You did understand or did not?

9    A    Yes, sir.

10   Q    You knew that?

11   A    Yes.

12   Q    Did you give a copy of that report to any of your

13   employees?

14   A    No, sir.  Not to my knowledge.

15   Q    Now going to page four of that report, 1956 report, do

16   you see those conclusions?

17             THE COURT:  What year was this?

18             MR. LEWIS:  Excuse me, Your Honor.  It's 1956.

19             THE COURT:  Fifty-six.

20             MR. LEWIS:  August 8 and 9, 1956.

21   Q    (BY MR. LEWIS)  Do you see the conclusions and

22   recommendations there?

23   A    Yes, sir.

24   Q    I'm going to read some of those to speed this up and

25   see if you agree with me.  Number one -- Well, I'll skip

Libby

PP
Obj.
R;
BE

1    part of it.  Says, "The following are several reasons why

2    the dustiness in the dry mill and heavy -- and why the

3    exhaust mechanism in design does not function:  One.  Dust

4    vibrates almost continuously off the rafters which have

5    become loaded and are continually loaded with dust

6    generating from many sources."

7         Is that there?

8    A    Yes.

9    Q    "Rubber connectors between vibrating screens in the

10   feed spouts are not tight nor are they replaced when they

11   vibrate off or they are worn out."

12        Is that there?

13   A    Yes, sir.

14   Q    I could go on and read, but in any event, there's

15   about 14 different findings.  In fact, the summary says in

16   14, "In summary, the foregoing points are illustrative of

17   what would be poor policy in matters of maintenance and

18   operation of this plant.  The following recommendations are

19   based on the observations presented and on the basis of

20   dust counts, silica content, and asbestos content of the

21   dust.  It will be recognized that the following

22   recommendations are particularly broad and non-specific.

23   Until such time as the general overall maintenance and

24   repair of existing deduct work both in the exhaust system

25   and ore feed pipes have been sufficiently repaired, no

81

Libby

PP
Obj:
R;
BE

1   specific recommendations appear to be justified."

2       So it was -- the place was in such bad shape, they

3   couldn't make specific recommendations.  Is that true?

4   A    No.  I don't think that's true.  I think they could

5   have made specific recommendations.

6   Q    Well -- Okay.  Now turn to Exhibit G-10.  The first

7   page of that is a January 12, 1959 letter from Benjamin

8   Wick, industrial hygiene engineer for the Division of

9   Disease Control to Mr. R. A. Blake, manager of Zonolite

10  Company.  Is that correct?

11  A    Yes.

12  Q    And he's enclosing two copies of the industrial

13  hygiene study done on December 16 and 17 1958.  Is that

14  correct?

15  A    Yes, sir.

16  Q    And also included in this Exhibit G-10 is that

17  industrial hygiene study which is dated, I guess the date

18  of the study is January 12, 1959.  Is that correct?

19  A    Yes.

20      MR. LEWIS:  Move the admission of Plaintiff's

21  Exhibit G-10.

22      MR. GRAHAM:  No objection, Your Honor.

23      THE COURT:  Very well.  Be received.

24  Q    (BY MR. LEWIS)  Would you go to page one of that

25  report.  Under "concentrations," is there a paragraph or

82

PP
Obj:
R;
BE

Libby

1    subsection that says "concentrations" there?

2    A    Yes.

3    Q    Is there any mention of asbestos in that?

4    A    Yes, sir.

5    Q    Would you read that to the jury, please.

6    A    "A review of table one indicates that the

7    concentrations in the dust were somewhat lower than they

8    were during the previous study in August, 1956.  But the

9    concentrations were still significant in view of the

10   concentration of asbestos particles found in each of the

11   samples.  The concentration of asbestos was estimated by

12   counting the asbestos particles contained in each of the 13

13   samples collected.  The percentage of airborne asbestos was

14   determined to be in a concentration of from 12 to 31

15   percent with an average being approximately 27 percent.

16   The values found in the asbestos particles column is based

17   generally on the average concentration of 27 percent.  It

18   should be noted that this concentration may be less than

19   that actually present in the air, since the particles which

20   had characteristics of asbestos were the only ones counted

21   and those particles that are so small that the rod-like

22   appearance could not be observed were not counted asbestos

23   -- as asbestos but were evaluated as overall dust level."

24   Q    So they found concentrations of from 12 to 31 percent

25   of asbestos in the airborne dust, but they said that those

83

Libby

PP
Obj:
R;
BE

1    counts, if anything, would be low.  Is that true?

2    A    Yes, sir, it said they could be low.

3    Q    And that the actual amount of asbestos in the air

4    could have been higher?

5    A    Yes, sir.

6    Q    Did you receive this report?

7    A    Yes, sir.

8    Q    And would you agree with me that on pages three --

9    actually two through six of this report, there are a

10   multitude of specific recommendations that needed to be

11   accomplished to clean up the dust problem at the mill?

12   A    Yes, sir.

13   Q    And those were the same kinds of problems pointed out

14   with more specificity in this report, the same kinds of

15   problems that were in the 1956 report.  Is that true?

16   A    Yes, sir.

17   Q    It was in that time that you folks heard about a

18   gentleman by the name of Glen Taylor having developed some

19   lung problems.  Is that true?

20   A    Yes, sir.

21   Q    Would you look at Plaintiff's Exhibit G-10.1.

22   A    Yes.

23   Q    And that indicates that there was a question of

24   asbestosis in that man's medical findings on that date.  Is

25   that correct?

84

Libby

PP
Obj:
R;
BE

```
 1    A    Yes.

 2    Q    And he's also had pulmonary tuberculosis; is that

 3    correct?

 4    A    Yes.

 5    Q    But you were put on notice at least by February 11,

 6    1959 that there was a questionable diagnosis of asbestosis

 7    for one of your employees; is that true?

 8    A    Yes, sir.

 9    Q    And you knew about that?

10    A    Yes.

11    Q    Is that true?

12    A    Yes.

13    Q    The direct your attention to Plaintiff's Exhibit

14    G-10.2.

15    Q    Do you recognize that document?

16    A    Yes, sir.

17    Q    What is the date of that document?

18    A    July 20th, 1959.

19    Q    And who was it addressed to?

20    A    It was addressed to Raymond A. Blake.

21    Q    Who was the author of the document?

22    A    Dr. J. M. Carins.

23    Q    And who was Dr. Carins?

24    A    He was a general practitioner and surgeon in Libby

25    Montana.
```

Libby

PP
Obj:
R;
S

| 1  | Q | Did you receive a copy of this report? |
| 2  | A | Mr. Blake received a copy and I saw a copy, yes, sir. |
| 3  | Q | Did you see a copy very soon after Mr. Blake received |
| 4  |   | it? |
| 5  | A | I don't remember exactly when, but it would have been |
| 6  |   | relatively soon. |
| 7  | Q | What does this report tell Mr. Blake? |
| 8  | A | It's an analysis of the -- a breakdown of the results |
| 9  |   | of the interpretations of an x-ray study that were done of |
| 10 |   | all of our employees in 1959. |
| 11 | Q | Who commissioned that x-ray study? |
| 12 | A | The company did. |
| 13 | Q | So this was an x-ray study done at the request of the |
| 14 |   | company? |
| 15 | A | Yes, sir. |
| 16 | Q | And how many employees were examined? |
| 17 | A | A hundred and thirty. |
| 18 | Q | How many of them had abnormal chest x-rays? |
| 19 | A | Forty-eight. |
| 20 | Q | And was there evidence of pleural thickening -- |
| 21 | A | Yes, sir. |
| 22 | Q | -- in some of those? |
| 23 | A | Yes, sir. |
| 24 | Q | And interstitial fibrosis? |
| 25 | A | Yes, sir. |

86

Libby

PP
Obj:
F;
R

1   Q   Do you understand interstitial fibrosis to be a form

2   of asbestosis?

3   A   No, sir.

4   Q   You don't understand that to be asbestosis?

5   A   No, sir.

6   Q   In any event, an interstitial fibrosis -- there were

7   26 cases of that in those x-rays; is that correct?

8   A   Yes.

9   Q   And there was at least one malignant lesion.  Is that

10  true?

11  A   Yes, sir.

12  Q   Now, were you informed by this doctor that that was an

13  inordinately high incident of lung disease for that group

14  of employees?

15  A   I don't -- I don't really recall.

16  Q   You don't recall?

17  A   No.

18  Q   You don't recall one way or the other?

19  A   No.  I think that -- I think the answer is yes.

20  Q   The answer is yes; isn't it?

21  A   Yes.

22  Q   You know that that's an exceptionally high level of

23  lung problems for a group of a hundred and thirty people;

24  is that true?

25  A   Yes.

87

Libby

PP
Obj:
F;
BE;
R

1    Q    And those findings, pleural thickening and

2    interstitial fibrosis, are consistent with asbestos-related

3    disease, if nothing else; is that true?

4    A    I don't know.

5    Q    But in any event, in 1959, would you agree with me

6    this identified a potential serious health hazard to the

7    lungs of your workers?

8    A    Yes, sir.

9    Q    I want to ask you to go to --

10         MR. LEWIS:  Well, I better move the admission of

11   that, Your Honor.  I'm sorry.  Move the admission of

12   Plaintiff's Exhibit G-10.2.

13         THE COURT:  Objection?

14         MR. GRAHAM:  No objection.

15         THE COURT:  Received.

16         MR. GRAHAM:  That's the report of July 20th,

17   1959?

18         MR. LEWIS:  I apologize, counselor.  Yes, it is.

19   July --

20         THE COURT:  We'll go for about another ten

21   minutes then take a coffee break.

22         MR. LEWIS:  Thank you, Your Honor.

23   Q    (BY MR. LEWIS)  Would you turn to Plaintiff's Exhibit

24   G-11.  Did that come from the W. R. Grace file?

25   A    Yes, sir.

88

Libby

PP
Obj:
F;
R

1    Q    It's got "file" marked in the upper left-hand corner.

2    Is that your writing?

3    A    I believe not.

4    Q    But in any event, you received a copy of this April

5    19, 1962 report; is that correct?

6    A    Well, I'm not sure that I received a copy.  It would

7    have been received in the company.  I would have seen it

8    sometime after that.

9    Q    And that's another report from the Montana Department

10    of Health people; is that correct?

11    A    Yes, sir.

12    Q    Now, that's -- I apologize for the copy there.  That's

13    the best we can do.  Can you struggle with me to read this?

14    A    Yes, sir.

15    Q    Okay.

16    A    I'll certainly try.

17    Q    Okay.  I want to get a look at the very first

18    paragraph -- in fact the very first sentence of this

19    report.  Would you read that to the jury.

20    A    "On March 6th, 7th, and 8th, 1962, an industrial

21    hygiene study was made of the Zonolite mill at Libby,

22    Montana to determine if any of the" -- I can't read that

23    word.

24    Q    Does it look like components or -- It is difficult to

25    read.

Libby

PP
Obj:
BE;
R

1    A    ". . . if any of the components . . ."  That fits, but

2    -- ". . . if any of the components of the operations

3    continued to be a threat to the health of the employees.

4    The last" --

5    Q    That --

6    A    Excuse me.

7    Q    Go ahead.  Go ahead and read on if you want.

8    A    "The last study of December, 1958 indicated

9    substantial quantities of dust in various areas of the

10   plant for which recommendations were made concerning a

11   substantial reduction.  The study of March 6th through 8th,

12   1962 was made after a conference with Mr. R. A. Blake,

13   manager of the company, and Mr. R. J. Kujawa, chief

14   engineer of the plant.  Mr. Robert Vinion acted as guide

15   during the study and supplied information needed for the

16   performance of the investigation."

17   Q    Now Mr. Blake you've already said was the manager of

18   the company.  Mr. Kujawa -- that's K-U-J-A-W-A -- he was

19   the chief engineer.  Was he stationed in Libby?

20   A    Yes, sir.

21   Q    Is he still alive?

22   A    No, sir.

23   Q    Do you know what he died of?

24   A    Colonic cancer.

25        THE COURT:  What?

Libby

PP
Obj:
BE;
R

1    Q    (BY MR. LEWIS)  Do you know if he had any lung-related

2    problems?

3    A    Not to my knowledge.

4    Q    How about Mr. Vinion?  Is he still alive?

5    A    No, sir.

6    Q    What did he die of?

7    A    He died of lung cancer to my understanding from what

8    -- what I was told in both cases.

9    Q    Well, in any event, you checked into these employees

10   as part of your McGill study?

11   A    No, sir.  These two people were not included.

12   Q    They weren't?

13   A    They've died since that study was made.

14   Q    I see.  You only looked at people who died, you didn't

15   look for people who were still living and afflicted by this

16   disease; is that right?

17   A    Well, that and --

18   Q    In the McGill study?

19   A    That's not entirely true.  When you say "looked at,"

20   I'm not sure what that means, sir.

21   Q    Well, that's fair criticism.  When you did the McGill

22   study, was that a mortality study?

23   A    Basically, yes.

24   Q    And you obtained in 1983 death certificates; right?

25   A    Yes.

Libby

PP
Obj:
R

1    Q    That was the major thrust of the study; right?

2    A    Well, included in that, we -- If I may expand on this.

3    Q    Well, I'll ask you, did you look for people that were

4    still alive?  Did you look for people that were still alive

5    who suffered from lung disease?  Did you do that?

6    A    May I explain?

7    Q    Sure.  Go ahead.

8    A    Because that -- that statement is partially true, and

9    I'll explain why it's true.  These people, and there were

10    over 400 people included in the cohort list.  As I've

11    previously stated, I believe a hundred and sixty-five

12    people of these were dead, which meant that there were 240

13    or so alive.  And these people were scattered all over the

14    United States.  It was not practical to examine all of

15    those.

16    What we did is get addresses of these people as to

17    where they were located.  People that were located within

18    200 miles of Libby, we contacted them by writing letters

19    and asked them if they would be willing to participate in

20    this study and asked them if they would come into Libby for

21    a questionnaire and a chest x-ray and a pulmonary function

22    test.  And if they did, well, we would pay their expenses.

23    Some of these people, of course, lived in Libby and in

24    the area, and others within 200 miles.  There were

25    something over 200 people on this list, just over 200, and

Libby

PP
Obj:
RE

1    I think we got compliance of about 80 or 90 of these

2    people.

3         So we did, to use your words, we did look at some of

4    them.

5    Q    Okay.

6    A    But not all of them.

7    Q    And they were -- And McGill conducted that study,

8    McGill University?

9    A    Yes, sir.

10   Q    Okay.  Now, to go on, in this report, does it not say

11   under "Description of Operations" the second paragraph,

12   that the dry mill was observed most closely during this

13   study, and it was found as during all previous

14   investigations to be extremely dusty and in the need of

15   repair and modification to reduce dustiness to acceptable

16   limits?

17   A    Yes, sir.

18   Q    You see that?

19   A    Yes, sir.

20   Q    And participating in arriving at that conclusion was

21   the manager, Mr. Blake, the chief engineer, Mr. Kujawa, and

22   I guess Mr. Vinion as guide.  They were consulted before

23   that finding was made; is that correct?

24   A    Yes, sir.

25   Q    And the report indicates in the next paragraph that

Libby

PP
Obj:
BE;
F

1    the sampling that they did was conducted on what appeared

2    to be average days of operations; is that true?

3    A    Yes.

4    Q    So that would appear to make it, would you agree, an

5    adequate or reasonable sampling?

6    A    Yes, sir, I would agree.

7    Q    So you continued to have a serious dust problem in the

8    dry mill in 1962.  Do you agree with that?

9    A    Yes, sir.

10   Q    Now, look at Plaintiff's Exhibit G-11.1.  It's

11   entitled "Acquisition of Zonolite Company R-C-A No. 225."

12   Have you ever seen that document before?

13   A    Yes, sir.

14   Q    And is that part of the records of W. R. Grace?

15   A    I would assume that it is, yes, sir.

16   Q    Well, in fact, it was generated by W. R. Grace

17   employees; is that true?

18   A    When I say I've seen this, I have -- I've only seen it

19   in connection with preparation of a deposition very

20   recently.  So I am not familiar with it.  I have not read

21   this.

22   Q    All right.  I won't ask you any questions about it.

23   That's fair.  I appreciate that.

24        But you do recognize this as an official Grace

25   document; is that right?

94

Libby

PP
Obj.
BE

1    A    Yes, sir.

2    Q    And it was produced by Grace employees?

3    A    Yes, sir.  I would assume so.

4         MR. LEWIS:  Move the admission of Plaintiff's

5    Exhibit G-11.1.

6         MR. GRAHAM:  No objection, Your Honor.

7         THE COURT:  Be received.

8    Q    (BY MR. LEWIS)  Now, I'll direct your attention to

9    Plaintiff's Exhibit G-12.  This is an agreement and plan of

10   reorganization between W. R. Grace and Company and Zonolite

11   Company.  Do you see that?

12   A    Yes, sir.

13   Q    Have you had an opportunity to review this document?

14   A    Yes, sir.  I've seen it.  Again, I have not read it.

15   Q    It was generated by W. R. Grace and Zonolite, but it's

16   not within your area of expertise.  Is that fair?

17   A    That's correct.

18   Q    But you do recognize it as a Grace document?

19   A    Yes, sir.

20        MR. LEWIS:  For the record, we move for the

21   admission of Plaintiff's Exhibit G-12, Your Honor, because

22   it includes our representation concerning assumption of

23   liabilities and completes the record.

24        MR. GRAHAM:  We have no objection to the

25   admission of that, Your Honor.

1          THE COURT:  Be received.

2          MR. LEWIS:  Thank you, Your Honor.

Libby

3     Q    (BY MR. LEWIS)  Okay.  The next document is

4     Plaintiff's G-13.  Is that another Montana State Board of

5     Health report of industrial hygiene study at Zonolite?

6     A    Yes, sir.

7     Q    For April 11, 1963?

8     A    Yes, sir.

9     Q    Would you read the first paragraph under "Description

10    of Operations" on page two.

11    A    "The operation of the plant is essentially that as

12    described in previous reports and will not be repeated here

13    except to evaluate the overall dustiness on each floor and

14    concern-- comments concerning dust producers at the

15    locations noted.  In general, there appeared to be little

16    if any improvement at any point in the plant except perhaps

17    at the row grinder where a significant reduction in dust

18    contributed to this area has been accomplished.

19    Specifically, the major dust producing areas were as

20    follows . . ."

21    Q    Fifth floor the screens were very dusty.  Is that

22    true?

23    A    Yes.

24    Q    "Fourth floor:  Much dustiness continues to be

25    apparent in this area."  True?

PP
Obj:
BE;
R

Libby

PP
Obj:
R

1    A    Yes.

2    Q    "Third floor:  The main dust producers in this area

3    were at No. 3 concentrator bin"?

4    A    Yes.

5    Q    And there's other dust leaks on the third floor.  Is

6    that true?

7    A    Yes.

8    Q    And it goes on all the way down, at all levels there

9    was too much dust.  Do you agree with that?

10    A    Yes.

11    Q    Who was the general manager of Zonolite on April 11,

12    1963?

13    A    Mr. Blake.

14    Q    And you reported to him; is that correct?

15    A    Yes, sir.

16         THE COURT:  Well, perhaps this would be a good

17    time to -- we'll take a coffee break, members of the jury.

18    Get back here in about 15 minutes.  I think the coffee

19    ought to be ready for the jurors.  We'll recess.

20         (The proceedings in this matter were recessed at

21    2:40 p.m. and reconvened at 3:26 p.m.)

22         (The following proceedings were had in open court

23    with the jury present, beginning at 3:23 p.m.)

24         THE COURT:  Back on the matter of Mildred Johnson

25    versus W. R. Grace and Company.

97

Libby

PP
Obj:
Rj
408

1    Members of the jury, during the 15 minute coffee break

2   which stretched into 45 minutes, the case has been settled

3   to the complete satisfaction of both parties.  So it's

4   over.

5    Sometimes it doesn't happen until the jury is sitting

6   in the box and heard some evidence.  So you provided an

7   important public function just being here and moving this

8   matter along.  And we have two other matters that are very

9   similar to this; one has been settled, the other is very

10  close to being settled.  So I want to thank you for your

11  time and your service in this case.  And that's it.  You're

12  free to go.

13    Thank you very much.  You're discharged.

14       (The proceedings in this matter were adjourned

15  and the jury was released at 3:28 p.m.)

16

17

18

19

20

21

22

23

24

25