Deposition Designations for:
**EARL D. LOVICK**
December 19, 1996

**Deposition Designation Key**

Arrowood = Arrowood Indem. Co.
f/k/a Royal Indem. Co. (Light Green)

BNSF = BNSF Railway Co. (Pink)

Certain Plan Objectors "CPO" = Government Employees Insurance Co.; Republic Insurance Co.
n/k/a Starr Indemnity and Liability Co.; OneBeacon America Insurance Co.; Seaton Insurance
Co.; Fireman's Fund Insurance Co.; Allianz S.p.A. f/k/a Riunione Adriatica Di Sicurta; and Allianz
SE f/k/a Allianz Aktiengesellschaft; Maryland Casualty Co.; Zurich Insurance Co.; and Zurich
International (Bermuda) Ltd.; Continental Casualty Co. and Continental Insurance Co. and
related subsidiaries and affiliates; Federal Insurance Co.; and AXA Belgium as successor to Royal
Belge SA (Orange)

CNA = Continental Cas. Co & Continental Ins. Co. (Red)

FFIC = Fireman Funds Ins. Co. (Green)
FFIC SC = Fireman Funds Ins. Co. "Surety Claims" (Green)

GR = Government Employees Ins. Co.; Republic Ins. Co. n/k/a Starr Indemnity and Liability Co.

Libby = Libby Claimants (Black)

OBS = OneBeacon America Ins. Co. and Seaton Ins. Co. (Brown)

PP = Plan Proponents (Blue)

Montana = State of Montana (Magenta)

Travelers = Travelers Cas. and Surety Cos. (Purple)

UCC & BLG = Unsecured Creditors' Committee & Bank Lenders Group (Lavender)

| | |
|---|---|
| AFNE = Assume Fact Not in Evidence | L = Leading |
| AO = Attorney Objection | LA = Legal Argument |
| BE = Best Evidence | LC = Legal Conclusion |
| Cum. = Cumulative | LPK - Lacks Personal Knowledge |
| Ctr = Counter Designation | LO = Seeking Legal Opinion |
| Ctr-Ctr = Counter-Counter | NT = Not Testimony |
| ET = Expert Testimony | Obj: = Objection |
| F = Foundation | R = Relevance |
| 408 = Violation of FRE 408 | S = Speculative |
| H = Hearsay | UP = Unfairly Prejudicial under Rule 403 |
| IH - Incomplete Hypothetical | V = Vague |

CONDENSED TRANSCRIPT

---

ERVIN E. HURLBERT, ET. AL.

VS.

W.R. GRACE & CO, ET. AL.

---

VIDEO DEPOSITION

OF

EARL D. LOVICK

(Volume 1)

Taken December 19, 1996

Reported by Jolene Asa, RPR
Hedman & Asa Reporting
947 South Main
P.O. Box 394
Kalispell, Montana 59901
(406)752-5751

EARL D. LOVICK (VOL. 1)          CondenseIt!™          HURLBERT VS. W.R. GRACE

**Page 1**

IN THE DISTRICT COURT OF THE NINETEENTH

JUDICIAL DISTRICT FOR THE STATE OF MONTANA

IN AND FOR THE COUNTY OF LINCOLN

| | | |
|---|---|---|
| 4 | ERVIN E. HURLBERT, | Cause No. DV-95-109 |
| 5 | Plaintiff, | |
| 6 | LESTER LEWIS SKRAMSTAD and | Cause No. DV-95-127 |
|  | NORITA IONE SKRAMSTAD, | |
| 7 | husband and wife, | |
| 8 | Plaintiffs, | |
|  | DONALD M. KAEDING and LOUISE | Cause No. DV-96-71 |
| 9 | E. KAEDING, husband and wife, | |
| 10 | Plaintiffs, | |
| 11 | CARLENE J. (TONI) RILEY, | Cause No. DV-96-111 |
| 12 | Plaintiff, | |
| 13 | vs | |
| 14 | W.R. GRACE & CO., a | |
| 15 | Connecticut corporation, I-IV,) | |
| 16 | Defendants. | |

VIDEO DEPOSITION

OF

EARL D. LOVICK

Taken at the Offices of Hedman & Asa Reporting
947 South Main
Kalispell, Montana
Thursday, December 19, 1996
9:04 a.m.

Reported by Jolene Asa, RPR, and Notary Public
for the State of Montana, Flathead County.

**Page 2**

A P P E A R A N C E S

Appearing on behalf of the Plaintiff:

Mr. Jon L. Heberling, Esq.
McGarvey, Heberling, Sullivan & McGarvey, P.C.
745 South Main
Kalispell, MT 59901

Appearing on behalf of the Defendants:

Mr. Gary L. Graham, Esq.
Garlington, Lohn & Robinson, PLLP
P.O. Box 7909
Missoula, MT 59807-7909

Appearing on behalf of the Earl D. Lovick:

Mr. Robert A. Murphy, Esq.
Casner & Edwards, LLP
One Federal Street
Boston, MA 02110

Videographer:

Mr. Matthew Scotten
Video Data Services of Montana
P.O. Box 1206
Whitefish, MT 59937

**Page 3**

S T I P U L A T I O N S

It was stipulated by and between counsel
for the respective parties that the deposition be
taken by Jolene Asa, Registered Professional
Reporter and Notary Public for the State of Montana,
residing in Flathead County, Montana.

It was further stipulated and agreed by
and between counsel for the respective parties that
the Deposition be taken at the time and place set
out on the caption and pursuant to the Montana Rules
of Civil Procedure.

It was further stipulated and agreed by
and between counsel for the respective parties and
the witness that the reading and signing of the
deposition would be expressly reserved.

**Page 4**

I N D E X

| EXAMINATION | | PAGE |
|---|---|---|
| BY MR. HEBERLING | | 6 |

| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| A | List of Lovick Depositions Delivered Per Hurlbert RFP Nos. 1 - 4 | 9 |
| B | Managers' Time Line | 33 |
| 1 - 194 | (See Exhibit Booklets) | |

Libby

Page 5

1    THE REPORTER: This is the video
2  deposition of Earl Lovick taken in the case of Ervin
3  Hurlbert versus W.R. Grace, Cause No. DV-95-109, a
4  Nineteenth Judicial District Court case in Lincoln
5  County. This deposition is being taken today at the
6  offices of Hedman & Asa Court Reporting in
7  Kalispell, Montana. The date today is December
8  19th, 1996, and the time is now 9:04 a.m.
9        I'd ask counsel to please identify
10  themselves for the record.
11        MR. HEBERLING: Jon Heberling
12  representing the Plaintiffs.
13        MR. GRAHAM: Gary Graham of
14  Garlington, Lohn & Robinson representing the
15  Defendant, W.R. Grace.
16        MR. MURPHY: Robert Murphy of
17  Casner & Edwards of Boston, Massachusetts
18  representing the witness, Mr. Lovick.
19        THE VIDEOGRAPHER: Matt Scotten of
20  Video Data Services of Whitefish.
21        THE REPORTER: And I'm Jolene Asa,
22  and I'm the court reporter, and I'm in Kalispell,
23  Montana.
24        I will now go ahead and swear in the
25  witness.

Libby

Page 6

1        If you'll raise your right hand.
2
3        EARL D. LOVICK,
4  being first duly sworn to tell the truth, the whole
5  truth, and nothing but the truth, testified as
6  follows:
7
8        EXAMINATION
9  BY MR. HEBERLING:
10  Q  Would you state your name for the record?
11  A  My name is Earl D. Lovick.
12  Q  And what is your address?
13  A  1021 Idaho Avenue, Libby, Montana.
14  Q  What's your age?
15  A  Seventy-six.
16  Q  How long have you lived in Libby?
17  A  I've lived there now since 1948.
18  Q  Continuously?
19  A  Yes.
20  Q  And are you retired from W.R. Grace?
21  A  Yes, sir, I am.
22  Q  When did you retire?
23  A  In 1983.
24  Q  Since that time, have you done consulting
25  work for W.R. Grace?

Libby

Pa

1  A  Yes, sir, I have.
2  Q  What has that consisted of?
3  A  Well, it's consisted of various things.
4  It's consisted of doing some work on health matters
5  for the company. It's consisted of doing some tax
6  work for the company and some legislative lobbying.
7  Q  Okay. And included in the health work,
8  have you given depositions?
9  A  Yes, sir, I have.
10  Q  When you give a deposition, are you paid
11  by the company?
12  A  Yes, sir, I am.
13  Q  How much?
14  A  $300 a day.
15  Q  And has this been true for quite some time
16  for most of the depositions you've given?
17  A  Yes, it has.
18  Q  Are you paid also for preparation time for
19  the depositions?
20  A  Yes, sir.
21  Q  And Mr. Murphy is here as your personal
22  attorney, is he?
23  A  Yes, he is.
24  Q  Are you paying him?
25  A  No, sir, I'm not.

Libby

Pa

1  Q  Do you know who does?
2  A  W.R. Grace is paying him.
3  Q  And have you given trial testimony in the
4  Montana case of Carol Graham, a case of asbest
5  against W.R. Grace?
6  A  Yes, sir, I believe I did.
7  Q  And have you given trial testimony in the
8  Montana case of Millie Johnson, a case of —
9  A  Yes, sir.
10  Q  — asbestosis against W.R. Grace?
11  A  Yes, sir.
12  Q  Have you testified in other trials outside
13  Montana?
14  A  Yes, I have.
15  Q  Could you tell us what they were?
16  A  I testified in a trial in Rochester,
17  New York, and it was a personal injury case, I
18  believe. I testified in a trial in New York that
19  was a personal injury case, and I believe I
20  testified in trial in Seattle.
21  Q  Were those all asbestosis cases?
22  A  Yes, sir.
23  Q  Have you given deposition testimony in th
24  Montana cases of Julius James Robertson, Orph
25  Smith, Tom DeShazer and Lawrence Carel?

HEDMAN & ASA REPORTING - (406)752-5

EARL D. LOVICK (VOL. 1)          CondenseIt!™          HURLBERT VS. W.R. GRACE

Page 9

Libby

1    A  I have given several depositions in
2  Montana, and I can't -- I don't remember
3  specifically whether those were included in them.
4    Q  Have you also given testimony in the case
5  of James Gidley and Virgil Priest?
6    A  Again, I'm not sure that I have.  It's
7  possible.  The names are both familiar to me, but I
8  don't know whether I testified in their cases or not
9  or gave depositions in those cases.
10    Q  One last case.  Did you give deposition
11  testimony in the case of Floyd Cole, Don Dutton, Roy
12  McMillan, Ray Belangie, Ernest Peterson?
13    A  I really don't remember.  I don't know.
14    Q  Do you receive a pension from W.R. Grace?
15    A  Yes, I do.
16    Q  I'll show you what's marked Exhibit A and
17  represent to you that that is a list of the
18  depositions we received that you've given in
19  asbestos cases pursuant to a request for
20  production.  Do you recognize the list of cases as
21  cases where you gave depositions?  Does it appear to
22  be a list of cases where you gave depositions?
23    A  Yes, it does.  I can't say that I remember
24  them all specifically, but it appears to be a
25  similar list.

Page 10

Libby

1    Q  Yeah.  I understand that.  Is it your
2  custom and practice to review a deposition and sign
3  it?
4    A  Yes, sir.
5    Q  Does Grace forward to you a copy of the
6  deposition sometime after the deposition for your
7  corrections, if any?
8    A  Yes, they do.
9    Q  And in the past have you made some
10  corrections?
11    A  Yes, sir, I have.
12    Q  And do you review the depositions
13  carefully?
14    A  Yes, sir.
15    Q  So if there's 22 depositions on this list,
16  would it be fair to say that you -- for 22 times you
17  have prepared for a deposition and given a
18  deposition and reviewed the deposition?
19    A  Probably that's correct, yes, sir.
20    Q  Is it fair to say you're familiar with the
21  history of asbestos exposure at Zonolite?
22    A  Yes, I would say that's true.
23    Q  Let's begin with the positions you had at
24  W.R. Grace.  Did you work during college there?
25    A  No, sir.  I went to work after I completed

Page 11

Libby

1  college.
2    Q  Did you work in 1946 as a truck driver?
3    A  Yes, sir, I did.
4    Q  Was that after college or before?
5    A  That was before I -- my college education.
6    Q  Was that a summer job, or did it extend
7  longer than that?
8    A  Basically, a summer job.  As I recall, it
9  was like from March to September, when I started
10  school.
11    Q  Okay.  And then did you graduate from the
12  University of Montana?
13    A  Yes, sir.
14    Q  Was that 1948?
15    A  I actually graduated in 1947.
16    Q  Okay.  Then when did you go to work for
17  Zonolite?
18    A  In March of 1948.
19    Q  What was your first position?
20    A  Accountant.
21    Q  Then in 1954 did you become an assistant
22  manager?
23    A  Yes, sir.
24    Q  And how did your duties change in 1954?
25    A  Well, I just had more responsibility in

Page 12

Libby

1  working with the general manager and worked on
2  assignments that he gave me, and the scope of my
3  work broadened.
4    Q  So you had all of the same work and more
5  work?
6    A  Yes, sir.
7    Q  And did you hold the position of assistant
8  manager from 1954 to '68?
9    A  Yes, sir.
10    Q  And in 1968 what position did you assume?
11    A  General manager, Libby operation.
12    Q  Do you know what month that was?
13    A  No, sir, I don't, but it was in the
14  midsummer.  It could have been June or July.
15    Q  Okay.  And, then, how long were you the
16  general manager?
17    A  Until 1970, I believe.
18    Q  Could it have been '71?
19    A  Yes, sir, it could have been.
20    Q  And who became general manager in 1971?
21    A  Robert Olivario.
22    Q  And was that because of his expertise in
23  planning and heading up the construction of the new
24  wet mill?
25    A  Yes, sir.

Page 13

Libby

1  Q  And, then, did you continue as manager of
2  administration?
3  A  Yes, sir.
4  Q  And was that from 1971 to '83?
5  A  Yes, sir.
6  Q  What is vermiculite?
7  A  It's a micaceous mineral which is found
8  near Libby, Montana, among other places.
9  Q  Is there, essentially, a mountain of it
10  near Libby?
11  A  Well, there's a mountain that contains a
12  good deal of it.  It would not be true to say there
13  was a mountain of vermiculite.
14  Q  In with the vermiculite are there some
15  impurities?
16  A  Yes, sir.
17  Q  Is one of them tremolite, a form of
18  asbestos?
19  A  In the deposit at Libby, yes, that's true.
20  Q  Now, I've seen mention of sizes of plus
21  eight and minus eight for vermiculite.  What does
22  that mean?
23  A  That is a screen size, and plus eight
24  means — That is flakes of vermiculite that will not
25  pass through an eight-mesh screen, and minus eight

Page 14

Libby

1  vermiculite is a size that will pass through an
2  eight-mesh screen.  And an eight-mesh screen means
3  that there are eight meshes or divisions in an inch,
4  but that does not mean an eighth of an inch,
5  technically, because the inch includes the area
6  which is taken up by the wires of the screen.
7  Q  Okay.  What were some of the uses for the
8  minus eight size vermiculite?
9  A  Well, there were many uses.  The most
10  common ones would be aggregates of one sort or
11  another that went into concrete aggregate and
12  insulating concrete, plaster aggregate, which became
13  one of the ingredients of plasters, acoustical
14  plaster and general plaster, and some of it was used
15  in agricultural uses as a carrier for various
16  chemicals and for block fill where it would be
17  coated with a waterproofing material so that it
18  would not absorb moisture and would be used to fill
19  the cavities in concrete blocks that were used for
20  building purposes.  Those are some of the things it
21  would have been used for.
22  Q  How about the plus eight vermiculite?
23  A  Basically, the largest use of plus eight
24  vermiculite was used for a loose-fill insulating
25  material, and that is material that was poured

Libby

1  between the rafters and ceilings in residential
2  buildings, primarily.
3  Q  Okay.  Was vermiculite ore shipped out
4  Libby, then, on railroad cars?
5  A  Yes.
6  Q  Were there also expanding plants?
7  A  Yes, sir.
8  Q  What's an expanding plant?
9  A  Well, before — Basically and generally,
10  before the vermiculite can be used, it must be
11  processed, and the processing means exfoliatir
12  material, which is done in the expanding plan
13  they're so called because, when the vermiculit
14  treated in an expanding plant, it increases in si
15  considerably, or it expands, which is not
16  technically true.  Technically, it exfoliates, bu
17  it increases in size.
18  Q  When it exfoliates, does it open up and
19  expand sort of like popcorn?
20  A  No, sir.  That's the difference.  It opens
21  up like — The thing that causes it to expand o
22  exfoliate is molecular water, and in pages in a
23  which are made up of a lot of sheets, which is.
24  vermiculite is, the water between those sheets
25  to steam, and it expands, and it increases in s

P

1  in only one direction rather than overall.
2  Q  And was there an expanding plant in Li
3  A  Yes, sir.
4  Q  How long was that in operation?
5  A  Well, it was in Libby when I went to w
6  there in 1948.  It had been built some years b
7  that, I don't know exactly when.  I think dur
8  the war years.  And it operated until about 19
9  Q  And, then, the product from the expanc
10  plant, what did that look like?
11  MR. MURPHY:  Objection to the form
12  THE WITNESS:  Well, I can't describ
13  what it looked like.  It looked like — I don't l
14  how to describe it.
15  BY MR. HEBERLING:
16  Q  What color was it?
17  A  Golden color, basically, and it was ver
18  light, and it looked like a piece of golden fla
19  which were fastened together.
20  Q  And the raw ore, when it was shipped
21  what did it look like?
22  A  It was generally a dark green or a dark
23  brown color, and it was in flakes of various
24  depending on the size of the ore, and, again,
25  hard to describe, but I can't say that it looke

EARL D. LOVICK (VOL. 1)              CondenseIt!™              HURLBERT VS. W.R. GRACE

**Libby**

Page 17

1 like sand because the makeup of it is that the
2 circumference of these flakes would be larger than
3 the thickness of them.
4    Q  And in the 1970s can you say how many
5 expanding plants Grace had?
6    A  No.  I don't remember for sure.
7    Q  Was it about 20 or more than 20, do you
8 think?
9    A  I would estimate that in the '70s there
10 were probably between 20 and 30 that Grace owned.
11    Q  What were the sources for vermiculite in
12 the United States?
13    A  Well, the two principal sources -- but
14 this is not exclusive -- is -- The largest source
15 was from the Libby operation, and Grace had another
16 mine in South Carolina, and there were a few other
17 smaller producers, primarily in the Carolinas and
18 Virginia.
19    Q  So did Grace own the two largest sources?
20    A  Yes, sir.
21    Q  Now, when you went to work in 1948 at
22 Zonolite, did you know that it was dusty at the mine
23 and at the mill?
24    A  After I'd been there, yes, sir, I knew
25 that.

**Libby**

Page 18

1    Q  Were you concerned even in 1948 regarding
2 dust as a possible health hazard?
3    A  Yes, sir.
4    Q  Is it correct that from 1948 on you knew
5 and the company always knew that there was a serious
6 health problem because of the large amount of dust
7 concentrated there?
8        MR. GRAHAM:  Objection.  Calls for
9 speculation and to form.
10       Go ahead.
11       THE WITNESS:  Well, it was certainly
12 known in some areas there were large concentrations
13 of dust, and it's certainly common knowledge that
14 too much dust of any kind is not a healthy
15 situation.
16 BY MR. HEBERLING:
17    Q  And did you share that concern even as
18 early as 1948?
19    A  Yes, sir.
20    Q  When was the first time that it was known
21 there was asbestos in the mine at Libby?
22       MR. GRAHAM:  Objection.  Calls for
23 speculation.  Beyond the scope of this witness's
24 capabilities.
25       Go ahead and answer it to the extent you

**Libby**

Page 19

1 can.
2       THE WITNESS:  I don't know when it
3 was first known, but when I went to work there, it
4 was generally known that there was asbestos in that
5 deposit, because you could see it, and I would say
6 that all employees knew that there was asbestos
7 present.
8 BY MR. HEBERLING:
9    Q  Do you have any personal knowledge that
10 each employee knew that?
11    A  No.  I can't say what each employee knew.
12    Q  Then you say you could see it in the
13 deposit.  When you saw the asbestos, what did it
14 look like in the raw ore in the deposit?
15    A  It looked like gray rock.
16    Q  And what did the vermiculite or the other
17 ore look like?
18    A  It looked like dark green or brown rock.
19    Q  So the asbestos was gray, and the others
20 were green or brown?  Is that fair?
21    A  Well, varied colors, depending on the --
22 There were many other products in there other than
23 asbestos and vermiculite, and the colors varied.
24    Q  And was the asbestos an impurity in the
25 ore which the company tried to get out?

Page 20

1    A  Yes, sir.
2    Q  What was the range of percentage of
3 tremolite asbestos in the ore at Libby while you
4 were there?
5       MR. GRAHAM:  Objection.  Vague and
6 ambiguous, depending upon what constitutes ore.
7       THE WITNESS:  I don't know what that
8 question means, because I don't know what you mean
9 by the word "Ore".
10 BY MR. HEBERLING:
11    Q  Okay.  In terms of the ore coming into the
12 dry mill, have you testified about what percentage
13 tremolite asbestos was in that ore in the past?
14    A  Probably.
15    Q  What is your best estimate of the
16 percentage asbestos in the ore coming into the dry
17 mill?
18    A  I have no way of making an estimate,
19 because it depended upon when this was and where the
20 mining was actually occurring, because various parts
21 of the mine contained considerably more asbestos
22 than others, and on a particular day or particular
23 time, there could be a big variation on the amount
24 of asbestos that was in the yard.
25    Q  Okay.  That's why I asked you for the

*Libby*

Page 21

*Libby*

Pa

1  range. What would the range be in percentages?
2     A  Well, that's a difficult question to
3  answer, but the range could be from zero to --
4  Theoretically, I suppose it could be up to maybe
5  30 percent.
6     Q  And did you ever see samples -- the
7  results of samples taken over the years, and did you
8  see any as high as 30 percent?
9     A  I don't know that I did. I don't know.
10    Q  What was the highest you can recall you
11 saw as a percentage asbestos in the ore coming into
12 the dry mill?
13    A  I can't answer that question, because I
14 don't know. Among other things, it was very
15 difficult to determine by looking at it what
16 percentage it would be, so it's not possible for me
17 to answer the question.
18    Q  Were samples taken, and was the percentage
19 tremolite analyzed at times?
20    A  Of what?
21    Q  Percentage of the ore coming into the
22 mill.
23    A  Not really, because we had no way of
24 testing that, no easy way of testing that. We had
25 no accurate way of testing that.

1     MR. HEBERLING: I'm trying to
2  discover what his position is.
3  BY MR. HEBERLING:
4     Q  Did you give this answer?
5        MR. MURPHY: Objection to
6  characterizing Mr. Lovick as having a position.
7        THE WITNESS: I have every reason to
8  believe I gave that answer, and if I gave it, it was
9  to the best of my ability in making an estimate, and
10 as I said now, we had no accurate way of determin
11 that.
12 BY MR. HEBERLING:
13    Q  What was the approximate percentage of
14 tremolite asbestos in the product going out of Libb
15 in 1948?
16        MR. MURPHY: Could you read that
17 back, please?
18        (The reporter then read back the
19 preceding question.)
20        THE WITNESS: I can't give an answer
21 to that, because I don't recall. I don't think that
22 we ever knew.
23 BY MR. HEBERLING:
24    Q  Can you say what it was in the earliest
25 years, say the early '50s?

*Libby*

Page 22

*Libby*

P

1     Q  Have you testified in the past that the
2  range of tremolite asbestos in the ore was between
3  5 and 20 percent?
4     A  I don't know. Possibly.
5     Q  I'm now showing you a deposition,
6  Plaza 600 Corporation versus W.R. Grace. Do you see
7  the question, How much tremolite, as you understand
8  it, is found when the vermiculite is being mined?
9        Answer: It varies in the area of the mine
10 where the mining activity is taking place, and the
11 variation can be quite high, from probably less than
12 5 percent to maybe as much as 20 percent in some
13 areas.
14       Were you asked that question, and did you
15 give that answer?
16    A  I have every reason --
17       MR. GRAHAM: I would object on the
18 basis it's an attempt to impeach a witness on a
19 totally different question than was asked at the
20 time -- asked preceding the attempt to impeach,
21 because the question initially asked was what the
22 ore concentration or -- the concentration of
23 tremolite in the ore going into the dry mill was,
24 and this talks about the ore in the mine.
25       But go ahead.

1     A  No, I can't say what it was. Our
2  estimates, I believe, would be probably less th
3  one percent.
4     Q  From the same deposition, page 19, the
5  question is, How much asbestos or tremolite
6  the concentrate when it was ready to be shipp
7  1948? And if you want to do it according to
8  five grades, feel free to do that.
9        Answer: I can't state definitely, but an
10 estimate would have been -- In 1948 the amo
11 concentrate would have varied in some grade
12 possibly two or three percent to under one pe
13       Is that the answer you gave at the
14       MR. GRAHAM: Go ahead. Review it
15 you wish, Earl.
16       THE WITNESS: Yes. In answer to y
17 question, undoubtedly, this is the answer I ga
18 that time, and I have no reason to dispute it
19 BY MR. HEBERLING:
20    Q  And it's fairly consistent with what yo
21 told me as well; correct?
22    A  Yes.
23    Q  So there were some times when it was
24 little as one percent; correct?
25       MR. GRAHAM: I'd object. It

Page 21 - Page 24

**Libby**

Page 25

1 mischaracterizes the witness's testimony.
2 BY MR. HEBERLING:
3    Q  Then, as of 1983, when you retired from
4 Zonolite, what percentage of tremolite asbestos was
5 there in the product shipped out of Libby as of '83?
6    A  Well, to the best of my recollection --
7 Again, this would depend on the grade, which means
8 the size of the concentrates, but it would be well
9 under one percent.
10    Q  So did the company get better at removing
11 the asbestos impurity from the vermiculite?
12    A  Yes, sir.
13    Q  Were they ever able to remove it all?
14    A  No, sir.
15    Q  What was your understanding of the
16 approximate percentage asbestos in the dust in the
17 air in the dry mill in the '50s and '60s?  Again,
18 you can answer with a range.
19          MR. MURPHY:  Objection.  Vague and
20 ambiguous and nonspecific.
21          THE WITNESS:  May I hear the question
22 again, please?
23          MR. HEBERLING:  Go ahead.
24          (The reporter then read back the
25 preceding question.)

**Libby**

Page 26

1          THE WITNESS:  There was no way to
2 accurately determine what percentage of the dust in
3 the mill was asbestos and what percentage was other
4 materials.  There were various attempts made to
5 determine that, and as I recall the tests which came
6 back, it was estimated that the dust would vary from
7 a percentage asbestos of maybe five or six percent
8 and -- There was one test I recall where it was
9 estimated to be 40 percent.
10 BY MR. HEBERLING:
11    Q  Okay.  So if the asbestos was, say, five
12 percent or thereabouts in the raw ore, why would it
13 be 20 or even 40 percent asbestos in the dust in the
14 air in the dry mill?
15          MR. MURPHY:  Objection.  Vague and
16 ambiguous.
17          THE WITNESS:  There is a reason for
18 that, and that is that the asbestos in the ore is
19 all forms of asbestos, some of it in rather large
20 chunks.  In the dry mill the dust in the air is very
21 fine particles, and the nature of the asbestos is,
22 in the processing and concentration of the
23 material -- In the dry mill this was done by
24 crushing and screening, and the very nature of the
25 asbestos was that, when this material is crushed,

**Libby**

Page 27

1 the asbestos tended to defiberize, if you will, and
2 the small particles would become fibers and become
3 airborne, more so than the other materials which
4 were found in the mill feed.
5 BY MR. HEBERLING:
6    Q  So would it be fair to say that the
7 tremolite more readily generated dust than some of
8 the other kinds of ore?
9    A  Yes, sir, that is fair to say.
10    Q  And was it your understanding that the
11 operators could see the difference in the ore in the
12 dry mill as it was coming in, whether it had a high
13 percentage asbestos or not?
14    A  Yes, sir.
15    Q  What did the asbestos dust in the dry mill
16 look like?  What color was it?
17    A  The asbestos dust, all dusts, were
18 extremely fine, and it would be too fine to identify
19 a color.
20    Q  When you saw a pile of dust on the floor,
21 what color was that pile?
22          MR. MURPHY:  Objection.  Vague and
23 ambiguous.  Nonspecific as to time.
24          THE WITNESS:  I can't answer that
25 question.  I don't know.

**Libby**

Page 28

1 BY MR. HEBERLING:
2    Q  Did it vary in color?
3    A  Oh, yes.
4    Q  It wasn't always a light color?
5    A  No.
6    Q  Was it sometimes a dark color?
7    A  Yes, sir.
8    Q  What year did W.R. Grace close in Libby?
9    A  1990.
10    Q  And why was that?
11          MR. GRAHAM:  Objection.  Calls for
12 speculation.
13 BY MR. HEBERLING:
14    Q  Have you discussed with Mr. Walter or
15 Mr. McKay reasons for closing?
16    A  Well, the reasons for closing is that the
17 markets didn't justify continuing that operation.
18    Q  And was Scott's Lawn Fertilizer, the Scott
19 Company, a major customer of Zonolite?
20          MR. GRAHAM:  Objection.  Vague as to
21 time.
22          THE WITNESS:  At one time they were,
23 yes, sir.
24 BY MR. HEBERLING:
25    Q  Would that have been in the '70s and early

Libby

1  '80s?
2      A   No, sir.  Not in the early '80s.  Prior to
3  that.
4      Q   Okay.  And did Scott pull out?
5      A   I don't know what that means.
6      Q   Did Scott no longer send orders into
7  Zonolite for vermiculite?
8      A   Yes, sir.
9      Q   What's your understanding of the reason
10  for that?
11     A   I don't know what the reason was.
12     Q   Did it have anything to do with asbestos?
13     A   I don't know.
14         MR. GRAHAM:  Objection.  Asked and
15  answered.
16  BY MR. HEBERLING:
17     Q   Now, was one reason that Zonolite closed
18  the asbestos contamination in the product?
19         MR. GRAHAM:  Objection.  Foundation.
20  Calls for speculation.
21         THE WITNESS:  Yes, sir.  I don't
22  know.
23  BY MR. HEBERLING:
24     Q   I'm showing you a copy of your deposition
25  which was taken May 27, 1992, and there's a

Libby

1      A   I don't know that that's true.  I don't
2  know.
3      Q   Is it true that the concentrated product
4  delivered to customers had less asbestos in it than
5  the ore that the workers in Libby were working
6  with?
7         MR. GRAHAM:  Objection.  It's vague
8  and ambiguous as to, The ore that the Libby worke
9  were working with.
10         THE WITNESS:  I don't really know
11  what your question means, but the amount of asbe
12  that was in the concentrate that was shipped was
13  certainly less than what was contained in the mill
14  feed.
15  BY MR. HEBERLING:
16     Q   Can you say how many tons of ore were
17  mined per day in the '50s?
18     A   No.  I don't recall.
19     Q   Or the '60s?
20     A   I don't recall.
21     Q   Or the '70s?
22     A   I don't recall.
23     Q   I'm now showing you your deposition take
24  December 20, 1983.
25         MR. MURPHY:  Almost exactly thirteen

Libby

1  question, Do you know why the market was gone?
2      Answer:  Well, I think of number of
3  reasons, and one of them would have been asbestos
4  contamination or believed to have been asbestos
5  contamination, although the company had pretty much
6  solved that problem, but many of the customers were
7  afraid of the product.
8         Did you give that answer?
9         MR. MURPHY:  Objection.  Improper
10  attempt at impeachment.  Nothing inconsistent in the
11  answers previously given.
12         THE WITNESS:  It's stated in the
13  deposition.  I have every reason to believe that I
14  would have given it, and that would have been my
15  understanding at that time.
16  BY MR. HEBERLING:
17     Q   So the customers were afraid of the
18  concentrated product, the product that was delivered
19  to them?
20         MR. GRAHAM:  Same objection.
21  Foundation.  Calls for speculation.
22         MR. MURPHY:  And misstates his
23  testimony.
24  BY MR. HEBERLING:
25     Q   Go ahead.

Libby

1  years ago to the day.
2  BY MR. HEBERLING:
3      Q   Is it fair to say your recollection may
4  have been a little clearer in 1983 as to what
5  done in the 1950s and '60s?
6      A   Yes, sir.  That would be a fair stateme
7      Q   Okay.  Did you give the answer, The
8  quantity of material moved --
9         MR. GRAHAM:  I would object.
10  Improper impeachment.  If you're going to
11  let's read the questions.
12         MR. HEBERLING:  Okay.  I'll go bac
13         MR. MURPHY:  If you're trying to
14  refresh his recollection, you could ask him
15  something and see if it refreshes his recollec
16  and ask him the question again, if that's wh
17  you're trying to do.
18         MR. HEBERLING:  Okay.
19  BY MR. HEBERLING:
20     Q   I'll read the question to you.  How m
21  mines have there been at the Libby facility
22  years?
23         One.
24         What size mine is it?
25         A physical size or quantity size?

Page 33

Libby

1    Question: Both.
2    A physically -- I believe the mine area is
3 approximately 400 acres. The quantity of material
4 moved has varied over the period, but it has been as
5 high as approximately 25,000 tons a day.
6    Question: When did it reach the peak of
7 25,000 tons a day, during what period?
8    Answer: In the 1970s.
9    How much were you turning out during
10 the -- let's say 1950 to 1960 on average per day?
11    Answer: This is a rough estimate, but I
12 would think probably 15,000 tons.
13    How about in the 1960s?
14    About the same.
15    Were those the answers you gave at the
16 time?
17    A Apparently, yes.
18    Q And does that refresh your recollection as
19 to what the quantities were?
20    A Well, I can't say that it does, but if I
21 gave those answers at that time, it must have been
22 my belief that that's -- that they were correct.
23    Q I'm now showing you Exhibit B, which is
24 titled, A Manager's Time Line. I sent a copy to
25 counsel, an advanced copy. Have you had a chance to

Page 34

Libby

1 review this?
2    A Yes, sir, I have seen this.
3    Q We put this together based on answers
4 earlier, but we want to get it correct, and so if --
5 The purpose is to determine, you know, who was in
6 what position over the years, and having reviewed
7 it, do you have any corrections to make? Does it
8 appear correct?
9    A Well, No. 1, where it says, "Back east.
10 Supervisor who the plant manager reports to," I
11 don't know what that means.
12    Q Okay. You have a plant manager in Libby
13 who is the head of operations there; correct?
14    A Yes.
15    Q And then we're looking for the person who
16 the plant manager reports to.
17    A Okay.
18    Q So would it have been Mr. Myers up until
19 1954?
20    A Yes, sir.
21    Q Now, was Mr. Myers in Libby for a period
22 of time when you were first there in the early '50s?
23    A Yes. When I -- No. When I came in 1948,
24 Mr. Myers was in Libby, and he left some time after
25 that. I don't know when. I think it would have

Page 35

Libby

1 been in the early '50s he moved back to Chicago
2 where he became president of Zonolite Company.
3    Q Okay. And so did he become president in
4 about 1954?
5    A It was the early '50s. About 1954 could
6 be correct. I don't know exactly -- the exact date.
7    Q Okay. Having reviewed this managers' time
8 line, have you found any places where we were
9 incorrect in putting this together?
10    A Well, you've got here Myers, Kelley,
11 Sterrett and Vining on the top line, and over on the
12 side you've got Walsh, Vining and Wolter. There
13 were a couple of other names in there that are
14 missing that at various times they were responsible
15 for the Libby operation.
16    And on the Kostic thing, from 1963 to
17 1980, the safety supervisor, that is incorrect,
18 because in the early 1970s the safety supervisor was
19 Harry Eschenbach.
20    Q Then did Mr. Kostic remain with W.R. Grace
21 until about 1980?
22    A He remained with W.R. Grace. I don't know
23 when he left, but 1980 would probably be close.
24    Q Okay. What position was he in after
25 Mr. Eschenbach took the safety supervisor position?

Page 36

Libby

1    A He was still a safety engineer out of the
2 Cambridge office, in our division office.
3    Q But Mr. Eschenbach was his superior from
4 early '70s on?
5    A Yes, sir. I believe so.
6    Q Can you say after 1968 who the Libby plant
7 manager reported to? We have Vining there up until
8 about '71. Do you happen to know who it was in the
9 '70s?
10    A Well, the chain of command was that --
11 reported to O.F. Stewart who was in South Carolina,
12 who, in turn, reported to H.A. Brown, who was a
13 vice-president of our division, and, then, after
14 H.A. Brown, there were a couple of other people.
15 One of them's name was Tom Lyall, and another one
16 was E.S. Wood, but I can't tell you the dates that
17 they were there.
18    Q So in the 1970s did the Libby plant
19 manager report to Mr. Stewart, generally?
20    A Yes.
21    Q And how long was he with -- How long was
22 he in that position, Mr. Stewart, up until the time
23 you retired?
24    A No. I think when I -- I think he was out
25 of that position before I retired.

Libby

Libby

1   Q   Okay.  Then, in the Libby section of this
2 time line, do you have any corrections to make?
3   A   The only thing that I see here that I
4 would question -- And I can't see anything that I
5 recall as, basically, wrong on the positions above
6 that, but the construction supervisor, Don Riley,
7 from 1968 on, that is incorrect.
8   Q   Now, he would have -- Let's see.  He
9 stopped working in -- Didn't he stop in about 1986?
10   A   I don't know.  I was gone, but I think
11 that's about right, but prior to him was a man by
12 the name of Tom DeShazer, who is actually
13 construction supervisor, and I don't remember --
14 recall what date Don Riley took over, but it wasn't
15 in '68.
16   Q   You think it was later?
17   A   Yes.
18   Q   Okay.  And that's the only correction that
19 you're offering for the Libby section of the
20 managers' time line?
21   A   I think so, yes.
22       THE WITNESS:  I wonder if it would be
23 possible to have a short break?
24       MR. HEBERLING:  Sure.
25       THE VIDEOGRAPHER:  We're going off

Go ahead and answer to the extent you
2 can.
3       THE WITNESS:  Well, of course I'm
4 concerned about when any of my friends die [ ]
5 reason, so in that respect the answer would be [ ]
6 Yes.
7 BY MR. HEBERLING:
8   Q   In about 1983 did you collect death
9 certificates for ex-workers from Zonolite at th[ ]
10 request of W.R. Grace?
11   A   Well, yes, I did.  I did collect death
12 certificates of ex-workers.
13   Q   And what is your understanding of wha[ ]
14 mesothelioma is?
15   A   It's a rare form of cancer.
16   Q   Are you aware that it's virtually alway[ ]
17 related to asbestos exposure?
18       MR. MURPHY:  Objection to the form[ ]
19       THE WITNESS:  As I understand,
20 asbestos is usually attributed to be a cause of [ ]
21 mesothelioma.
22 BY MR. HEBERLING:
23   Q   Do you know workers who have died o[ ]
24 mesothelioma?
25   A   Yes, sir.

Libby

Libby

1 the record.  It's approximately 9:48.
2       (Brief recess.)
3       THE VIDEOGRAPHER:  Okay.  We're back
4 on the record.  It's approximately 9:52.
5 BY MR. HEBERLING:
6   Q   What is your understanding of what
7 asbestosis is?
8   A   My understanding is it's a disease of the
9 lungs.
10   Q   And to your knowledge have ex-workers at
11 Zonolite died of asbestosis?
12   A   Well, to my knowledge, ex-workers of
13 Zonolite who have died, one of the causes of death
14 is asbestosis.  I don't recall whether any of
15 them -- their death certificate stated that was
16 the primary cause, but it would have been one of the
17 contributing factors.
18   Q   Were some of these people friends of
19 yours?
20   A   Yes, sir.
21   Q   And does the number of them with
22 asbestosis as a cause of death concern you?
23       MR. GRAHAM:  I would object on the
24 basis that it's irrelevant and immaterial to the
25 issues of this lawsuit and prejudicial.

1   Q   Can you give us some names?
2   A   McNair, Olson, Baker.
3   Q   Is that Virgil Olson or Vergel?
4   A   Verle, V-E-R-L-E.
5   Q   And Morland Baker?
6   A   Yes, sir.  McNair, Michael McNair, I
7 believe was his name, and those are the three that
8 come to mind.  There's at least one other that --
9   Q   Is there Clarence Peterson also?
10   A   Yes, sir, Clarence Peterson.
11   Q   And was there an Ernest Roberts who died
12 of mesothelioma who is not a worker at W.R. Gr[ ]
13   A   Yes, sir.  To my understanding he was a
14 Libby resident, and he died of mesothelioma, but
15 had never been an employee of Grace.
16   Q   Do you know if he lived down near the
17 railroad tracks and the bridge on the edge of town[ ]
18   A   To my knowledge and memory, he did not
19 live in that area, no.
20   Q   Do you know if he was exposed as a child
21 playing on piles of the ore near the baseball
22 fields?
23   A   I would have no idea about that.  I don't
24 know.
25   Q   Do you know what his exposure was?

Libby                                                                Page 41

1    A  No, sir.
2    Q  And did Dale Thompson also die of
3  mesothelioma?
4    A  I don't know.
5    Q  How about Ed Wittlake?
6    A  I don't know.  I know both of them are
7  dead, but I don't know what the causes of their
8  death were.
9    Q  In 1948 who was responsible for worker
10  safety?
11    A  Well, in 1948 the general manager would
12  have been responsible.
13    Q  What is your understanding of what an
14  industrial hygienist is?
15    A  Well, an industrial hygienist would be one
16  who I expect would be an expert in industrial
17  hygiene.
18    Q  Is there such a thing as an industrial
19  hygiene engineer?
20    A  I don't know.
21    Q  Do you know what is included within the
22  area of industrial hygiene?
23    A  Well, I would think the broad definition
24  would be any malady or any disease which was
25  industrially caused.

Libby                                                                Page 42

1    Q  And would that also include dust control
2  and ventilation?
3    A  I don't know what that has -- I don't know
4  what -- In that sense I would say, No.
5    Q  Did you ever have an industrial hygienist
6  at Zonolite while you were there?
7    A  No, sir.
8    Q  Did you ever consult with one?
9    A  Well, I don't know what that means either,
10  but both Peter Kostic and Harry Eschenbach, I
11  believe, would be industrial hygienists, and they
12  came to Libby and visited our operation, and we
13  consulted with them, of course.
14    Q  And so Mr. Kostic would have come on board
15  for Zonolite in 1963 when Grace acquired Zonolite?
16    MR. MURPHY:  Objection to the form.
17    MR. GRAHAM:  I would -- Yeah.
18    THE WITNESS:  He would have come on
19  board after -- He worked for the division of which
20  the Zonolite operation was a part of, and he would
21  have been -- become involved after W.R. Grace took
22  over.
23  BY MR. HEBERLING:
24    Q  Did W.R. Grace acquire Zonolite?  You say
25  they took over.  What is your understanding of what

Libby                                                                Page 43

1  happened?
2    A  Well, Zonolite became a part of W.R. Grace
3  by an exchange of stock, of Zonolite Company stock
4  for W.R. Grace stock.
5    Q  Is it fair to say that W.R. Grace acquired
6  Zonolite?
7    MR. GRAHAM:  Objection.  Foundation.
8    THE WITNESS:  It would have been a
9  merger, and I don't know if that's an acquisition or
10  not.  I suppose it is, because W.R. Grace was the
11  larger of the two.
12  BY MR. HEBERLING:
13    Q  Before 1963 do you recall consulting with
14  an industrial hygienist ever?
15    A  I don't recall of it happening, no, sir.
16    Q  In the 1950s and up to 1963, who was
17  responsible for dust control at Zonolite?
18    A  The general manager at Libby would have
19  been responsible.
20    Q  Was there an engineer who had
21  responsibility for that, or was it just under the
22  general responsibility of the general manager?
23    A  Well, it would have been under the general
24  responsibility of the general manager, but the
25  general manager certainly could have assigned

Libby                                                                Page 44

1  somebody to be responsible.
2    Q  To your knowledge did that happen in the
3  1950s, up to 1963?
4    A  Yes, sir.  I think that those duties would
5  have been given to one of the -- probably the chief
6  engineer at Libby.  One of them that would have had
7  that responsibility in that period would have been
8  Ray Kujawa.
9    Q  Okay.  Let's begin with Exhibit 12 in the
10  green book in front of you.  Does that appear to be
11  a memo from J.A. Kelley to Mr. Friddle, Stewart and
12  Williams dated April 22, 1952?
13    A  Yes, sir.  I would say that's what it
14  appears to be.
15    Q  Now, who was Mr. Kelley in 1952?
16    A  In 1952, as I recall, J.A. Kelley was the
17  general manager of the South Carolina operation.
18    Q  Okay.  Was he higher up in the company
19  than the Libby plant manager?
20    A  I don't know.
21    Q  And who are Mr. Friddle, Stewart and
22  Williams?
23    A  The only one that I have knowledge of
24  would be O.F. Stewart, and he was at the
25  South Carolina operation, and it is possible -- But

Page 45

1 I don't know this for sure.  It is possible that at
2 that time Mr. Kelley was a vice-president of
3 Zonolite Company, and Mr. Stewart could have been
4 responsible for the South Carolina operation.  I
5 don't remember when that change took place, but it
6 could have been in 1952 or prior to that, a little
7 bit prior.
8    Q  Do you think you saw a copy of this memo
9 in 1952?
10   A  No, sir.  To my recollection I've never
11 seen this before right now.
12   Q  In 1952 did you get any directives from
13 the company as to dust, Something has got to be done
14 now?
15   A  Not that I recall, no, sir.
16   Q  Do you recall efforts in 1952 to reduce
17 the amount of dust at the operation in Libby?
18   A  Well, I can't recall anything specifically
19 in 1952, but dust was always a concern, and there
20 were always efforts being made to reduce the dust
21 levels as much as possible.
22   Q  Do you remember any campaign in the early
23 '50s to really put steam behind the effort to
24 reduce the dust?
25        MR. GRAHAM: Objection.  Vague and

1    Q  And does it appear that Mr. Myers is in
2 Libby?  Do you see "Libby" next to Mr. Myers's
3    A  Yes, sir.
4    Q  Who was Mr. Huxley?
5    A  Mr. Huxley was an engineer that was
6 employed at Libby, and later on he was transferred
7 to Chicago.  He was the engineer that was in charg
8 of expanding plants, design and -- particularly,
9 rather than operation.
10   Q  Did you say he was a mining engineer?
11   A  No.  I said he was an engineer.
12   Q  Do you know what kind of engineer?
13   A  No, sir, I don't.  He was a graduate of
14 the Montana School of Mines, but I don't know w
15 his engineer designation would have been.
16   Q  Okay.  Did you see this memo in Libby at
17 or about its date?
18   A  I have no reason to think that I've ever
19 seen this letter before right now.
20   Q  Okay.  Does this appear to be the format
21 of a memo that Mr. Myers would have produced i
22 Libby?
23        MR. GRAHAM: Objection.
24        MR. MURPHY: Objection.
25        MR. GRAHAM: Foundation.

Page 46

1 ambiguous.
2        Go ahead and answer to the extent you
3 can.
4 BY MR. HEBERLING:
5    Q  Does anything stand out to you?
6    A  No, sir.
7    Q  Okay.  Let's go to No. 13.  Does this
8 appear to be a letter by Paul Woolrich of the
9 Department of Health, Education & Welfare, Public
10 Health Service to Benjamin Wake, State of Montana
11 Board of Health, dated October 31, 1955?
12   A  Did you ask a question?  I'm sorry.
13   Q  Yes.  Does it appear to be the letter as I
14 described it?
15   A  Yes, sir.
16   Q  Do you think you saw this letter in the
17 1950s in Libby?
18   A  I don't recall ever seeing this letter
19 before right now.
20   Q  Okay.  Please refer to Exhibit 14.
21   A  What number?
22   Q  14, the next one.  Does this appear to be
23 a memo of J.B. Myers to Mr. John Huxley dated
24 December, it looks like, 21, 1955?
25   A  Yes, sir.

1 Speculation.
2 BY MR. HEBERLING:
3    Q  Okay.  Were you familiar with how me
4 were prepared in Libby and sent to Chicago?
5    A  I don't know what that means.  I would
6 assume that they're prepared by a secretary.
7    Q  Did you have a standard format, for
8 example, putting the addressee on the top and
9 the name under that being the sender of the m
10   A  Yes, sir.  That was standard.
11   Q  And as of 1955, were you in charge of
12 record keeping for Zonolite?
13   A  I don't know that I was ever given that
14 designation, no, sir.
15   Q  Well, as assistant manager, was record
16 keeping something that was within your area
17 responsibility?
18   A  I suppose you could say, Yes.
19   Q  And did the secretaries and whoever els
20 worked in the office work under you, except
21 plant manager, of course?
22   A  Yes, sir.
23   Q  Does this memo appear to have a forma
24 a memo that would have been sent out in 195
25        MR. GRAHAM: Asked and answered.

EARL D. LOVICK (VOL. 1)          Condenselt!™          HURLBERT VS. W.R. GRACE

Libby

Page 49

```
10:07:46   1        MR. MURPHY: And, also, lack of
10:07:50   2   foundation. The memo has nothing to do with the
10:07:54   3   Libby mine and mill, and your questions make those
10:07:57   4   assumptions, I believe, or imply that.
10:07:58   5        MR. HEBERLING: The memo talks about
10:08:02   6   "The danger of exposing our employees to asbestos
10:08:04   7   dust". That's the subject of this case.
10:08:04   8        MR. MURPHY: But if you read the
10:08:08   9   whole thing, if you want to put this in fair
10:08:10  10   context, it's talking about plants and the
10:08:11  11   manufactured products at plants.
          12        THE WITNESS: I have not --
10:08:18  13   BY MR. HEBERLING:
10:08:18  14   Q   Okay. Do you remember the -- Go ahead and
10:08:21  15   make your comment.
10:08:23  16   A   All that I have read as of right now is
10:08:25  17   the first sentence, which I will repeat. "I have
10:08:30  18   previously written to you about the danger of
10:08:34  19   exposing our employees to asbestos dust while they
10:08:38  20   are manufacturing acoustical plastic," which has
10:08:42  21   nothing to do with the asbestos which was found in
10:08:44  22   Libby.
10:08:48  23   Q   In Libby in 1955 were you aware of the
10:08:54  24   danger of exposing employees to asbestos dust?
10:08:58  25        MR. MURPHY: Objection to the form.
```

Libby

Page 50

```
10:09:00   1   You mean at the Libby mine and mill? When you say
10:09:02   2   "At Libby" -- I object. Vague and ambiguous.
10:09:04   3   BY MR. HEBERLING:
10:09:04   4   Q   Okay. At the mine and mill in Libby, were
10:09:10   5   you aware of the danger of exposing employees to
10:09:12   6   asbestos dust as of 1955?
10:09:16   7   A   I don't recall, but I don't believe that I
10:09:18   8   was aware of this hazard.
10:09:22   9   Q   So is it your belief that you hadn't
10:09:24  10   discussed that with Mr. Myers as of 1955?
10:09:26  11        MR. GRAHAM: I'd object. That
10:09:34  12   assumes that Mr. Myers was aware of the dangers of
10:09:34  13   asbestos dust in Libby as opposed to a different
10:09:40  14   form of asbestos dust in the manufacturing process.
10:09:42  15        Go ahead and answer it to the extent you
10:09:42  16   can.
10:09:44  17        THE WITNESS: I don't believe I ever
10:09:48  18   would have discussed this with Mr. Myers, no, sir.
10:09:50  19   BY MR. HEBERLING:
10:09:50  20   Q   Is Mr. Myers still alive?
10:09:52  21   A   To the best of my knowledge, yes.
10:09:54  22   Q   Do you know where he is?
10:09:56  23   A   San Diego.
10:09:58  24   Q   Do you know his address?
10:09:58  25   A   No, sir.
```

Libby

Page 51

```
10:10:04   1   Q   What's his full name, John B. Myers?
10:10:04   2   A   Yes, sir.
10:10:14   3   Q   Do you know if Mr. Huxley had any training
10:10:14   4   in control of industrial dust?
10:10:22   5   A   No, sir, I don't know.
10:10:22   6   Q   When he was in Libby, did he have anything
10:10:24   7   to do with dust control?
10:10:26   8   A   No, sir. Not to my knowledge.
10:10:30   9   Q   What was his job when he was in Libby, to
10:10:30  10   your understanding?
10:10:34  11   A   His job was on research and development of
10:10:34  12   expanding plants.
10:10:40  13   Q   Okay. Let's refer to Exhibit 15, and does
10:10:52  14   this appear to be a letter from Ben Wake, State of
10:10:54  15   Montana, to Dohrman Byers, Public Health Service in
10:10:56  16   Ohio, dated August 13, 1956?
10:11:02  17   A   Yes, sir.
10:11:00  18   Q   Do you think you saw this in Libby in the
10:11:02  19   1950s?
10:11:08  20   A   I don't recall, no, sir.
10:11:16  21   Q   Go to Exhibit 16, and does this appear to
10:11:20  22   be another letter from Mr. Wake to Mr. Dohrman Byers
10:11:24  23   dated September 12th, 1956?
10:11:24  24   A   Yes, sir.
10:11:24  25   Q   Do you think you saw this letter in Libby
```

Libby

Page 52

```
10:11:30   1   in the 1950s?
10:11:32   2   A   No, sir, I don't recall.
10:11:34   3   Q   Okay. Let's go to Exhibit 17. Does this
10:11:44   4   appear to be a letter from Mr. Wake to Mr. Bleich, I
10:11:46   5   should say? Is that the proper pronunciation,
10:11:50   6   Mr. R.A. Bleich?
10:11:50   7   A   Yes, sir.
10:11:52   8   Q   Dated September 21, 1956?
10:11:54   9   A   Yes, sir.
10:11:56  10   Q   And did you see this document in Libby in
10:11:56  11   the 1950s?
10:12:00  12   A   Yes, sir.
10:12:06  13   Q   Did you see it at or about its date?
10:12:04  14   A   Probably, yes.
10:12:04  15   Q   Then go to Exhibit --
10:12:26  16        MR. HEBERLING: I think we have an
10:12:32  17   exhibit here that didn't get marked. Let's go off
10:12:34  18   the record.
10:12:34  19        THE VIDEOGRAPHER: We're going off
10:12:40  20   the record approximately 10:12.
10:12:42  21        (Discussion off the record.)
10:13:22  22        THE VIDEOGRAPHER: We're back on the
10:13:22  23   record. It's approximately 10:13.
          24   BY MR. HEBERLING:
10:13:40  25   Q   Okay. We solved that problem. Then
```

Libby

Page 53

1 attached to Exhibit 17, do you see a Montana State
2 Board of Health report of an industrial hygiene
3 study, August 8 to 9, 1956?
4    A  Yes, sir.
5    Q  Who was Ben Wake?
6    A  He was with the Montana Board of Health.
7    Q  Was he an industrial hygienist?
8    A  His title was industrial hygiene engineer.
9    Q  And what was your understanding of the
10 purpose of this visit by Mr. Wake?
11   A  Well, it was customary for the State Board
12 of Health to have an inspection of various
13 industrial operations throughout the state
14 periodically, and it was also their custom to visit
15 the Libby operation periodically, and Mr. Wake
16 visited Libby on several occasions to make
17 inspections of the operation, and this would have
18 been a report on his inspection, and he says it's a
19 report of an industrial hygiene study at Libby in
20 August of 1956.
21   Q  Okay.  Then, on the first page after the
22 cover page, in the first paragraph, do you see
23 mention of, Mr. Lovick, assistant manager?
24   A  Yes, sir.
25   Q  And that's you?

Libby

Page

1 plant"?  Do you see that?
2    A  Yes, sir.
3    Q  What was your understanding of the word --
4 what the word "Toxic" meant?
5    A  Well, it would be my understanding that it
6 would mean hazardous or unhealthy.
7    Q  And "Considerable toxicity," did you
8 discuss what that meant with Mr. Wake?
9    A  I don't recall.
10   Q  As a result of this report, did Mr. Bleich
11 direct you to do anything?
12   A  Not that I recall, no, sir.
13   Q  Continuing under "Toxicity," it says,
14 "According to Drinker and Hatch, the pathologic
15 changes produced by asbestos are not like those of
16 silicosis.  The asbestos fiber group about the neck
17 of the small air sacs in the lungs and stimulate the
18 formation of a diffuse fibrosis."  Do you see that?
19   A  Yes, sir.
20   Q  After obtaining this report, did the Libby
21 management obtain a copy of Drinker and Hatch, wh
22 is cited here, a book on industrial dust?
23   A  Not that I recall, no, sir.
24   Q  And then continuing, it says, "There is no
25 definite migration or transportation of the dust

Libby

Page 54

1    A  Yes, sir.
2    Q  Did you accompany Mr. Wake on this
3 inspection?
4    A  Well, I don't recall, but I probably did
5 not accompany him for the entire inspection.  I may
6 or may not have accompanied him for part of it.
7    Q  Okay.  Let's refer to page three of the
8 report.  Do you see where it says, "The maximum
9 allowable" -- This is three lines down from the top.
10 "The maximum allowable concentration for asbestos
11 is five million particles per cubic foot, and when
12 the concentration of asbestos in the dust samples
13 collected has been determined, further comments on
14 concentrations will be made.  At this time, however,
15 and on the basis of the concentration of asbestos
16 found in the dust, which varies from the company's
17 records from 8 to 21 percent, it would appear that
18 the maximum concentration of dust in the air should
19 not be greater than 25 to 30 million particles per
20 cubic foot."  Do you see that?
21   A  Yes, sir.
22   Q  And then do you see three lines down
23 under, "Toxicity - The asbestos dust in the dust in
24 the air is of considerable toxicity and is a factor
25 in the consideration of reducing dustiness in this

Libby

Page

1 particles to the lymph nodes and no formation of
2 (fibrous) nodules.  As the fibrosis increases, the
3 reduction in lung area causes a serious decrease
4 lung capacity or difficulty in breathing.  Lanza,
5 Citation No. 2, suggested that enlarged hearts not
6 frequently in the cases of secondary asbestosis"
7 Do you see that?
8    A  Yes, sir.
9          MR. GRAHAM:  Object to the form of
10 questioning and the line of questioning on the ba
11 that the document speaks for itself.
12          Go ahead.
13          THE WITNESS:  Okay.
14 BY MR. HEBERLING:
15   Q  Then, to your knowledge in 1956, after
16 receiving this report, did the Libby management
17 obtain a copy of the Lanza medical article titled
18 "Effects of the Inhalation of Asbestos Dust on th
19 Lungs of Asbestos Workers"?
20   A  I don't recall that they did, no, sir.
21   Q  To your knowledge did the company ask
22 Mr. Wake for more information on this?
23   A  Not that I recall, no, sir.
24   Q  Did the company ask anyone for more
25 information on this?

HEDMAN & ASA REPORTING - (406)752-57

**Page 57**

*Libby*

1 A Not that I recall, no, sir.
2 Q As of 1956, did you notice that workers
3 who had been at Zonolite for some time had -- that
4 there were workers who had been at Zonolite for some
5 time that had some difficulty in breathing?
6 MR. MURPHY: Read that back, please.
7 MR. HEBERLING: I'll restate it.
8 BY MR. HEBERLING:
9 Q As of 1956, did you notice workers at
10 Zonolite who had been there for, say, more than five
11 years who had difficulty in breathing?
12 A Well, I don't know that 1956 is a magic
13 date, but, certainly, over time and during the time
14 I was there and probably before 1956 we knew workers
15 that we had that had difficulty breathing, yes, sir.
16 Q Was anything done to identify who these
17 workers were as of 1956?
18 A I don't know what that means.
19 Q Was any listing made or any tests -- were
20 any tests done on workers to determine how serious
21 their breathing difficulties may have been?
22 A Well, at various times these workers were
23 referred to doctors to evaluate their general health
24 condition.
25 Q And, say, before 1956 did you receive any

**Page 58**

*Libby*

1 word from doctors as to what the condition of
2 particular workers was?
3 A I really don't recall. It's possible, but
4 I don't recall the --
5 Q Do you recall any particular individuals
6 before 1956 who had difficulty with breathing?
7 A I recall particular individuals, but I
8 don't know whether it would have been before or
9 after 1956.
10 Q How about Mr. Joughin, is it?
11 A Jouckin.
12 Q Jouckin. Did he die in 1952?
13 A Probably. He died certainly about that
14 time.
15 Q Did he die of lung disease?
16 A He died of tuberculosis.
17 Q Do you know who diagnosed -- who called it
18 tuberculosis? Was that a local doctor?
19 A At the time of his death, he was a patient
20 at the State tubercular hospital in Warm Springs.
21 No.
22 Q Galen?
23 A In Galen. Yes, sir.
24 Q Was his disease related to the dust at
25 Libby in any way?

**Page 59**

*Libby*

1 MR. GRAHAM: I would object. It
2 calls for a medical conclusion.
3 Go ahead.
4 THE WITNESS: I have no knowledge of
5 that, no.
6 BY MR. HEBERLING:
7 Q You didn't see any documents which related
8 the disease to the dust?
9 A No, sir.
10 Q To your knowledge, in 1956 did the company
11 consult with any doctors as to the disease
12 asbestosis?
13 A Not that I recall, no, sir.
14 Q Did you know what it was before 1956?
15 A No, sir, I don't --
16 Q Was this report your first knowledge of
17 what asbestosis was?
18 A To the best of my recollection, this
19 report is the first that we or I knew of the dangers
20 of asbestos in the workplace.
21 Q So as of 1956, the company knew there was
22 asbestos in the dust; correct?
23 A Yes, sir.
24 Q And the company also knew that asbestosis
25 is from inhaling asbestos dust; correct?

**Page 60**

*Libby*

1 A Yes, sir.
2 Q And the company also knew there were
3 workers at Zonolite who were inhaling asbestos dust;
4 correct?
5 A Yes, sir.
6 Q In 1956 were you aware that Drinker and
7 Hatch, 1954, which was cited in the report,
8 Exhibit 17, showed studies in England with 160
9 deaths from asbestosis?
10 A I don't know. Is that in this report?
11 Q No. I'm asking you if you were aware that
12 the Drinker and Hatch reference in this report
13 discussed studies in England which showed 160 deaths
14 due to asbestosis with an average age of
15 forty-eight.
16 MR. GRAHAM: I would object to the
17 form of question on the basis it's an attempt to
18 introduce hearsay evidence through this witness. If
19 you have the report, I'd prefer that you show it to
20 the witness.
21 Go ahead and answer it, Earl, if you can.
22 THE WITNESS: I don't have any
23 recollection that we were aware of that.
24 BY MR. HEBERLING:
25 Q Okay. I'm now showing you a copy of

Libby

Drinker and Hatch, 1954, by the McGraw-Hill Book Company.

MR. GRAHAM: Do you want him to review the whole document so that he can testify to that?

BY MR. HEBERLING:

Q Take a look at its format, and I'll ask you whether you've ever seen this book before.

A No, sir, I've never seen this before.

Q Okay. So is it fair to say that you didn't obtain this after 1956 either? Correct?

A I've never seen it before.

Q Okay. As of 1956 or, say, the late '50s, who in Libby was responsible for collecting literature on asbestos hazards?

MR. GRAHAM: Assumes facts.

MR. MURPHY: Object to the form.

THE WITNESS: Well, I don't know that anybody had that specific responsibility, but, certainly, if someone was going to be responsible, it would have to be the general manager.

BY MR. HEBERLING:

Q Do you know if -- up to 1963, when Grace took over, whether anyone in Libby collected literature on industrial hygiene relating to

Libby

asbestos or medical literature relating to asbestos?

A No, sir, I don't know that.

Q Back to the 1956 report, page four. Under "Conclusions and Recommendations," about five lines down, do you see where it says, "The following are several reasons why the dustiness in the dry mill is heavy and why the exhaust mechanism as designed does not function"? Do you see that?

A Yes, sir.

Q Then the first reason talks about the rafters loaded with dust. Do you see that?

A Yes, sir.

Q Did you see rafters loaded with dust in the late '50s?

A Yes, sir.

Q Did you understand how this contributed to the dustiness in the air?

MR. MURPHY: Objection. Vague and ambiguous.

THE WITNESS: Well, it would be because of the dust in the air that the rafters would be coated with dust. It would settle on those rafters.

BY MR. HEBERLING:

Q And then it says, "Dust vibrates almost

Libby

continuously off the rafters." Did you see that happening?

A Yes, sir.

Q And what was your understanding of the cure for this problem as of '56?

A Well, to remove that dust so it couldn't fall off.

Q Okay. Then No. 2, it says, "Rubber connectors between the vibrating screens and the feed spouts are not tight." Now, in the dry mill what would vibrating screens and feed spouts be?

A They would be for the purpose of sizing the material that came across them.

Q So ore would come across them, and some would fall down through the screens, and some wo pass on?

A Yes, sir.

Q Okay. Then there's mention of rubber connectors. What would the rubber connectors ha to do with dust control?

A Well, the dust collection system, on the upper part of the screen, there were hoods, and these hoods were ventilated much like -- There wo be an air stream coming across them and going int removing the dust from the screen and putting it

Libby

into a cyclone where it could be settled out and no go into the atmosphere.

Q Is that sort of like a hood on a kitchen stove?

A Yes, sir.

Q Okay. And then what do the rubber connectors have to do with dust control?

A Well, the hood -- The air coming across that, going out of those screens, has to go somewhere, and so the rubber connectors would connect this hood, which was vibrating with the screen, to the collection system.

Q Okay. And so would the cure for the rubber connectors problem be simply to maintain better and replace as necessary?

A Yes, sir.

Q Okay. Then No. 4 talks about, "Exhaust from some of the vibrators is insufficient". Is the exhaust a part of the ventilation system?

A Yes, sir.

Q So is it possible that a larger fan would be required to run the ventilation system?

A Yes, sir.

Q Above, under "Conclusions," line three, it says, The exhaust mechanism "was well designed

Page 65

*Libby*

1 originally, but under the handicap to which this
2 exhaust mechanism is subjected, it cannot and does
3 not function properly." Do you see that?
4    A  What number is that, please?
5    Q  I went up on the initial paragraph right
6 under "Conclusions," above No. 1.
7    A  Yes, sir, I see that.
8    Q  So in order to have the ventilation system
9 function better, might that require a larger fan?
10    A  Well, I think in this case it refers to
11 better maintenance being paid to the system itself,
12 like tightening or replacing the rubber connectors
13 and that sort of thing, rather than the fan
14 capability.
15    Q  And would increasing the fan capacity help
16 too?
17    A  Yes, sir.
18    Q  And nine years later, in 1965, did the
19 company install a larger fan?
20    A  Yes, sir.
21    Q  No. 5, it says, "Backs are off many of the
22 vibrators." Is that, again, the vibrating screens?
23    A  Yes, sir.
24    Q  Would the cure to that simply be to put
25 the backs back on the vibrators?

Page 66

*Libby*

1    A  Yes, sir.
2    Q  And No. 6 talks about holes in conveyor
3 pipes. So did you have conveyor pipes where the ore
4 would move from area to area?
5    A  I think that the conveyor pipes would be
6 the pipes which were for the conveyance of air
7 rather than of material.
8    Q  Okay. And then it talks about "Where
9 holes have been cut into the pipes at random
10 locations". Do you see that? It's the third line
11 of No. 6.
12    A  Yes, sir. I see that.
13    Q  Why would holes have been cut into the
14 pipes?
15    A  Well, I don't know that this means that
16 they were literally cut in there. I think the holes
17 could have been worn in there by the friction of the
18 material which was being conveyed. I don't know
19 which it means.
20    Q  And would the cure for that simply be to
21 fix the holes?
22    Q  Then No. 7 talks about hoods being broken.
23    A  Uh-huh.
24    Q  And would the cure for that simply be to

Page 67

1 fix the hoods?
2    A  Yes, sir.
3    Q  Then No. 9, it says there, "Many of the
4 dead ends in the exhaust system were left open,
5 permitting a large volume of air to be drawn in
6 through openings where no control was necessary."
7 Do you see how that would reduce the efficiency of
8 the ventilation system?
9    A  Yes, sir.
10    Q  What would be the cure to that?
11    A  To plug up those ends.
12    Q  Then No. 10 says, "In many (of the)
13 locations, it was obvious that the dust collection
14 mechanism was full of dirt or dust." Do you see
15 that?
16    A  Yes, sir.
17    Q  Did you see that condition in the dry mill
18 yourself?
19    A  I don't recall it, no.
20    Q  But, anyway, would the cure for that be
21 simply to clean out the areas where the dust
22 collection mechanism was full of dirt?
23    A  Yes, sir.
24    Q  And moving to page five in the report, at
25 the bottom there's a recommendation under No. 6 at

Page 68

*Libby*

1 the bottom of page five. It says "That a system of
2 vacuum cleaning or other cleaning of the rafters in
3 the entire mill be instituted." Do you see that?
4    A  Yes, sir.
5    Q  In the late '50s was there discussion of
6 getting a vacuum cleaning system?
7    A  Yes, sir.
8    Q  And was one obtained?
9    A  I believe there was, yes, sir.
10    Q  And wasn't that until much later, in the
11 mid-'50s, that you first obtained a portable vacuum
12 cleaner?
13    A  I don't recall.
14        MR. MURPHY: Excuse me. Objection to
15 the form of the question. You said "Much later,"
16 middle '50s, and we're talking about a '56 report.
17 BY MR. HEBERLING:
18    Q  Did I say middle '50s? I meant middle
19 '60s. Excuse me.
20    A  I don't recall.
21    Q  Do you recall any discussion among
22 management as to whether to get a vacuum cleaning
23 system as of the late '50s?
24    A  Yes, I do. I remember discussions on it.
25 I don't remember the time.

Page 69

*Libby*

1  Q  Do you remember the result?
2  A  We got one.  We got a vacuum cleaner
3  system, as a matter of fact, a couple of them, but
4  the results of their use was not what had been hoped
5  for.
6  Q  Okay.  What is your recollection on when a
7  vacuum system was first obtained?
8  A  I don't recall.
9  Q  And you mentioned that the vacuum system
10  had some difficulties?
11  A  Yes, sir.
12  Q  What was that?
13  A  Well, one thing that was done — And,
14  again, I don't recall the date, but they tried to
15  put a stationary vacuum system in with the
16  connections on each floor, and because of the
17  vibrations in the mill, the system could not be kept
18  intact.  It would keep separating.
19      Another thing that was done on the
20  portable vacuum systems, which they tried, is --
21  There was always a problem on the disposal of the
22  dust which was collected, in handling it and
23  disposing of that.  Just like any vacuum cleaner,
24  they have to be emptied periodically, and that was
25  the system that -- There was not a practical

Page 70

*Libby*

1  solution for it, as I recall.
2  Q  Okay.  On the in-wall system, was that a
3  system where there were vacuum cleaner pipes in the
4  walls, and then the vacuum cleaner could be attached
5  to an outlet in the wall?
6  A  Yes, sir.
7  Q  Much like an in-built house system can be?
8  A  Yes, sir.
9  Q  Was that done in the early '70s?
10  A  I don't recall when it was done.  I think
11  it was done before that.  I'm sure it was before
12  that.
13  Q  And that's the one that vibrated apart; is
14  that right?
15  A  Yes.
16  Q  And the portable vacuum cleaner, you say
17  there was a problem emptying it?
18  A  Yes, sir.
19  Q  Is it because it filled up so quickly?
20  A  Yes, sir.
21  Q  And what was the problem?  Why couldn't it
22  just be emptied over and over and over again?
23  A  Like where?  How do you dispose of it?
24  That was the problem.  Where do you empty the dust,
25  and how do you dispose of it?

*Libby*

1  Q  There was never a solution to that?
2  A  Not in — No, sir.  This mill was a
3  seven-story building, and if you have somethi
4  the top story, how do you get rid of that dust?
5  Q  Would it be possible for someone to car
6  it down the elevator?
7  A  There was no elevator in that mill.
8  Q  Was it a staircase down?
9  A  Yes, sir.
10  Q  So someone would have to carry the dus
11  down?
12  A  Yes, sir.
13  Q  And what was the problem there, lack o
14  manpower?
15  A  Well, just the quantity that was
16  involved.  It was, from a practical standpoint,
17  getting it down and getting it disposed of.
18  Q  From a practical standpoint?  You mear
19  number of men that would have been required
20  A  Yes, sir.
21  Q  Was that an unreasonable amount of wo
22  to devote to this task?
23      MR. GRAHAM:  I'd object.  Calls for
24  speculation.  Calls for an opinion.  Calls for a
25  conclusion.

1      Go ahead and answer it to the extent you
2  can.
3      THE WITNESS:  I can't answer.  I
4  don't know.
5  BY MR. HEBERLING:
6  Q  Was there a decision by management that it
7  would cost too much in worker time to carry the d
8  down the floors – down the stairs?
9  A  Well, there was a decision, and I don't
10  know that the decision was based on the cost that
11  would take.  Just from a practical standpoint, Hov
12  do you do it? more than what the cost would be
13  involved.
14  Q  And what were the practical problems?
15  A  Getting rid of the dust.
16  Q  You mean where to take it after it left
17  the dry mill?
18  A  Yes, sir.
19  Q  Did you have dumps?
20  A  Well, you could certainly build a dump.
21  Q  Do you know when this decision that it
22  would be impractical to empty the portable vacuu
23  cleaner so many times was made?
24  A  No, sir.
25  Q  Can you say?  Was that in the '60s?

**EARL D. LOVICK (VOL. 1)**     CondenseIt!™     **HURLBERT VS. W.R. GRACE**

Libby

Page 73

1   A   I don't know.
2   Q   You don't know?
3   A   I don't recall.
4   Q   Do you know who made the decision?
5   A   Well, local management.
6   Q   Were you in on the decision?
7   A   Not directly, I don't believe, but I would
8 have been aware of it.
9   Q   Do you know, in connection with that
10 decision, whether any industrial hygiene engineer
11 was consulted?
12   A   No, sir, I don't know.  I don't recall.
13   Q   Then page six, Item 7, it says "That until
14 such time as the repair and maintenance of both the
15 exhaust and ore conveying systems have been
16 completed, all the men in the dry mill be provided
17 with or required to wear an adequate respirator".
18 Do you see that?
19   A   Yes, sir.
20   Q   Since that's a recommendation, does that
21 mean that that was not being done as of 1956?
22   A   No, sir, it does not mean that.
23   Q   Was it your understanding that most men in
24 the dry mill were wearing respirators most of the
25 time as of 1956?

Libby

Page 74

1   A   Yes, sir.  The instructions were for the
2 men to be wearing respirators.
3   Q   And did you understand as of 1956 that a
4 respirator is a temporary measure and is not a
5 substitute for dust control?
6   A   Yes, sir.
7   Q   Back to the first page of No. 17, the
8 first page of the report.  Do you see where it says,
9 "This report is confidential and is not for
10 distribution except to the management of the
11 Zonolite Company"?
12   A   Yes, sir.
13   Q   Now, was this confidentiality established
14 per agreement between the company and the Board of
15 Health?
16   A   No, sir.
17   Q   Was it a condition the company placed on
18 having the inspection?
19   A   No, sir.
20   Q   How did the confidential statement get
21 there?
22   A   The Board of Health placed it there.  I
23 don't --
24   Q   Did you have any discussions with the
25 Board of Health representatives as to whether this

Libby

Page 75

1 be confidential or not?
2   A   No, sir.  Not that I -- Not to my
3 knowledge.
4   Q   So if Mr. Bleich, plant manager, had a
5 conversation with the Board of Health
6 representatives regarding this, you were unaware of
7 it?
8   A   Yes.
9       MR. GRAHAM: Objection.  Calls for
10 gross speculation.
11       Go ahead and answer.
12       THE WITNESS: I'm certainly not aware
13 of it.
14 BY MR. HEBERLING:
15   Q   Did Zonolite management keep the report
16 confidential?
17   A   Well, I believe so, yes.
18   Q   Was the report disseminated to the
19 employees?
20   A   No, sir.
21   Q   Did Zonolite management object to this
22 report?
23   A   No.
24   Q   As you recall?
25   A   No, sir.

Libby

Page 76

1   Q   Did Zonolite management agree that the
2 ventilation system was not functional as of '56?
3       MR. MURPHY: Object to the form of
4 the question.
5 BY MR. HEBERLING:
6   Q   Perhaps I should refresh your
7 recollection.  I read you a statement at page four
8 of the report, line five, where they're talking
9 about the ventilation system.  It says it does not
10 function properly, and so my question is whether
11 Zonolite management was in agreement that the
12 ventilation system did not function properly.
13       MR. GRAHAM: Object to the form
14 again.
15       Go ahead and answer.
16       THE WITNESS: Well, yes.  I believe
17 that they would agree that these things as outlined
18 here are accurate.
19 BY MR. HEBERLING:
20   Q   In 1956 did the company disclose to the
21 employees that asbestos and the dust in the air was
22 toxic?
23   A   Not that I recall, no, sir.
24   Q   Would you agree that, as of 1956 in the
25 dry mill, it was not a healthy environment to work

HURLBERT VS. W.R. GRACE          Condenselt!          EARL D. LOVICK (VOL. 1)

Page 77

1  in?
2     A  Yes, sir, I would agree with that.
3     Q  As of 1956, did Zonolite do anything to
4  inform the employees what asbestosis was?
5     A  Not that I recall, no, sir.
6     Q  Now, before 1963 did Zonolite have a
7  safety committee?
8     A  Yes, sir.
9     Q  Were you a member?
10    A  Yes, sir.
11    Q  Can you say during what period of time you
12  were a member of the safety committee?
13    A  No, sir.  I don't recall.
14    Q  Were you a member in the '50s?
15    A  Probably, yes.
16    Q  And were you a member up to the mid-'60s?
17    A  Probably, yes.
18    Q  Would you have began to be a member when
19  you became assistant manager in 1954?
20    A  I don't know.
21    Q  Were there workers who were members of the
22  safety committee as well?
23    A  Yes, sir.
24    Q  What did the safety committee do in the
25  '50s?

Page 78

1     A  Well, they met periodically, I think
2  generally monthly, and they -- The members of the
3  safety committee would actually do an inspection
4  each month of the operations, and anything that they
5  deemed to be unsafe they would record and turn into
6  management for correction, if possible.
7     Q  Did you review the 1956 State Department
8  of Health report with the safety committee?
9     A  Probably not as a report.
10    Q  Did you ever discuss with the safety
11  committee the matter of asbestos in the dust?
12    A  I don't recall, no, sir.
13    Q  Did you discuss, generally, the dust
14  problem?
15    A  Yes.
16    Q  Without discussing it as asbestos dust?
17    A  Yes, sir.
18    Q  And was that true through the rest of your
19  years on the safety committee up to the mid-'60s?
20    A  Probably, yes.
21    Q  Let's go to Exhibit 19.
22    A  Before we do that, can we have another
23  break, please?
24    Q  Sure.
25       THE VIDEOGRAPHER:  Going off the

Page 79

1  record at approximately 10:47.
2       (Brief recess.)
3       THE VIDEOGRAPHER:  We're back on the
4  record, and it's approximately 11:04.
5  BY MR. HEBERLING:
6     Q  Please refer to Exhibit 18.  Does this
7  appear to be a document which lists mill equipment
8  and includes some drawings of the placement of the
9  equipment?
10    A  Yes, sir, that's what it appears to be.
11    Q  Is this a document that you saw at
12  Zonolite in the late '50s?
13    A  I don't ever recall seeing this before.
14  It's possible I did, but I don't remember it.
15    Q  Do you recall seeing similar drawings of
16  the placement of mill equipment?
17    A  No, sir, I don't.
18    Q  As far as a drawing of the dry mill and
19  its various floors and the location of equipment,
20  was there a more formal set of drawings than what
21  you see here?
22    A  In some cases there would have been, but
23  the way that that mill was built and grew, something
24  like topsy, there would have been an incomplete set
25  of as-built drawings for the mill.

Page 80

1     Q  Do you know where the incomplete set of
2  as-built drawings may be now?
3     A  I didn't say there was.  I said that's all
4  there could have been.  There would not have been
5  as-built drawings.
6     Q  Have you seen any drawings of the dry
7  mill, say, in the last ten years?
8     A  No, sir.
9     Q  Do you know where any might be?
10    A  No, sir.
11    Q  Let's go to Exhibit 19.  Does this appear
12  to be a tentative outline of a safety program dated
13  March 13, 1957?
14    A  Yes, sir.
15    Q  Is this a document you likely saw in 1957
16  in Libby?
17    A  Yes, sir.
18    Q  Let's go on to Exhibit 20.  Does this
19  appear to be a letter from Mr. Gaudin, G-A-U-D-I-N,
20  to Mr. Kelley, executive vice-president of Zonolite,
21  dated June 26, 1957?
22    A  Yes, sir.
23    Q  Is this a document that you saw at Libby
24  in the 1950s?
25    A  Yes, sir.

**EARL D. LOVICK (VOL. 1)**          Condenselt!™          **HURLBERT VS. W.R. GRACE**

Libby

Page 81

1  Q  Is it likely you saw it on or about its
2  date?
3  A  Yes, sir.
4  Q  Let's go to Exhibit 21. Does this appear
5  to be a letter of Ben Wake to Mr. Bleich, manager of
6  Zonolite, dated January 12, 1959?
7  A  Yes, sir.
8  Q  And did you see this and the attached
9  report at or about its date?
10  A  Probably, yes, sir.
11  Q  Let's go to page one of the report. Do
12  you see, just above "Concentrations," two-thirds of
13  the way down and then two lines up from that, "The
14  wet mill was off the line or out of operation for
15  that period, thereby, reducing dustiness
16  considerably"? Do you see that?
17  A  Yes, sir.
18  Q  And then there's mention in that same
19  paragraph just above what I read, Ore from Bin
20  No. 1. Were there five bins for five sizes of ore?
21  A  There were five bins, but they were not
22  for sizes of ore. They were for different blends or
23  different types of ore. Those bins would have been
24  for storing mill feed, not concentrate.
25  Q  Were there five sizes of concentrate or

Libby

Page 82

1  five grades?
2  A  Of concentrate, yes.
3  Q  And which was the smallest, No. 1 or
4  No. 5?
5  A  No. 5.
6  Q  So would it be fair to say that No. 5,
7  being the smallest, would generate the most dust
8  when it was moved?
9  A  Probably, yes.
10  Q  Okay. Then, under "Concentrations," five
11  lines down, there's a sentence beginning, "The
12  percentage of airborne asbestos was determined to be
13  in a concentration of from 12 on 31 percent with an
14  average being approximately 27 percent." Do you see
15  that?
16  A  Yes, sir.
17  Q  Then in the last line, it says, "Those
18  particles that were so small that their rod-like
19  appearance could not be observed were not counted as
20  asbestos but were evaluated as (in the) overall dust
21  level." Do you see that? That's the very last line
22  of page one.
23          MR. GRAHAM: I would object to the
24  form of the questioning on the basis that the
25  document speaks for itself. It's improper

Libby

Page 83

1  questioning.
2          Go ahead and answer it, Earl.
3          THE WITNESS: Yes, sir, I see that.
4  BY MR. HEBERLING:
5  Q  So was it your understanding that the
6  average 27 percent asbestos in the dust in the air
7  did not include the small particles which were not
8  counted as asbestos?
9          MR. GRAHAM: Objection. Foundation.
10          Go ahead and answer, if you can.
11          THE WITNESS: I don't know whether
12  that would be true or not.
13  BY MR. HEBERLING:
14  Q  Then page two, do you see a table of
15  samples taken, 13 samples?
16  A  Yes, sir.
17  Q  And at the bottom it says "Maximum
18  Allowable Concentration, Asbestos Dust, 5.0"?
19  A  Yes.
20  Q  And then, for example, the first three
21  samples, do you see that that exceeds the standard
22  of five?
23  A  Yes, sir.
24  Q  Then page three -- Pages three, four and
25  five, do you see where this report goes into

Libby

Page 84

1  considerable detail as to which screens by number
2  and which machines were leaking dust?
3  A  Yes, sir. I see that.
4  Q  Did you go along on this inspection? Do
5  you know?
6  A  I don't know, but probably not.
7  Q  And did Zonolite dispute this report?
8  A  No, sir.
9  Q  So is it fair to say that Zonolite agreed
10  that there were, it appears, dozens of places that
11  needed repair as of the date of this report?
12          MR. MURPHY: Object to the form of
13  the question.
14          THE WITNESS: Zonolite didn't object
15  to it, but that doesn't necessarily mean that they
16  agreed with it all.
17  BY MR. HEBERLING:
18  Q  Okay. Then page seven, in the middle of
19  page, do you see where it says, "All of the
20  locations enumerated were those that were apparent
21  as major offenders in either production of dust or
22  in the sacrifice of exhaust capacity which permitted
23  dust to be generated at points that should have been
24  controlled as designed. The points enumerated were
25  not all of the locations where dust was produced,

CondenseIt!™    EARL D. LOVICK

**HURLBERT VS. W.R. GRACE**

*Libby*

Page 85

1 nor were they all the circumstances that permitted
2 the escape of dust." Do you see that?
3    A  Yes, sir.
4    Q  Okay. Then under "Toxicity," it says
5 "According to Ellman," and there's a cite to
6 Ellman, Pulmonary Asbestosis, 1933. Do you see
7 that?
8    A  Yes, sir.
9    Q  Does that appear to be an article in The
10 Journal of Industrial Hygiene?
11    A  Yes, sir.
12    Q  Do you know if you had a copy of that
13 article in Libby in 1959?
14    A  No, sir, I don't know.
15    Q  Do you know if one was obtained after this
16 report cited it?
17    A  Not to my knowledge, no, sir.
18    Q  It says, "According to Ellman, 'Inhalation
19 of asbestosis must be expected sooner or later to
20 produce pulmonary fibrosis, depending upon
21 (a) length of exposure and (b) nature and
22 concentration of the dust. Pulmonary asbestosis,
23 once established, is a progressive disease with a
24 bad prognosis. Its treatment can be only
25 symptomatic.'" Do you see that?

Page 86

*Libby*

1    A  Yes, sir.
2       MR. GRAHAM: Objection. Improper
3 examination.
4       THE WITNESS: I see it, yes, sir.
5 BY MR. HEBERLING:
6    Q  Was this the first time, in 1959, that you
7 learned that asbestosis was a disease with a bad
8 prognosis?
9    A  I don't recall.
10    Q  You don't recall whether you had some
11 understanding that maybe people could get over this
12 before '59?
13    A  No, sir, I don't -- That is a correct
14 statement. I don't recall whether I knew this or
15 not.
16    Q  As of the time you read this -- After you
17 read this, did you discuss this with Mr. Wake at a
18 conference?
19    A  Not that I recall, no, sir.
20    Q  Did you usually have a conference after
21 the inspection with Mr. Wake?
22    A  Usually, yes. He had a termination
23 conference.
24    Q  You just don't remember what happened in
25 1959?

Page 87

*Libby*

1    A  No, sir.
2    Q  Yes. We can understand that. When you
3 read this, did you understand that the asbestos dust
4 was a serious health hazard?
5    A  Yes, sir. We realized that.
6    Q  Did you realize that as early as '56?
7    A  It was so stated in the '56 report, and,
8 yes, sir, we understood that it was a hazard.
9    Q  And a serious hazard?
10    A  Yes, sir.
11    Q  Then do you see at page eight
12 recommendations that, again, the holes in the
13 exhaust system be repaired?
14    A  Yes, sir.
15    Q  And "That constant maintenance be
16 provided". In No. 2 do you see that?
17    A  Yes, sir.
18    Q  Is it your understanding that the State is
19 telling you in '59 that the maintenance wasn't
20 happening often enough?
21       MR. MURPHY: Objection.
22       MR. GRAHAM: I'd object.
23       MR. MURPHY: Objection to the form.
24 The report speaks for itself.
25 /////

Page 88

*Libby*

1 BY MR. HEBERLING:
2    Q  What was your understanding in '59? Did
3 you understand that you were being told that a mor
4 intensive maintenance had to be applied?
5    A  Yes, sir. That's what this states.
6    Q  And did the company do that?
7    A  I believe so, yes, sir.
8    Q  Put more manpower on maintenance?
9    A  Yes, sir.
10    Q  And then No. 3, the holes in the conveying
11 pipes, basically, that's the same as we discussed
12 before from the '56 report?
13    A  Yes, sir.
14    Q  And No. 4, "That all of the transfer
15 points for ore being deposited to open containers
16 adequately enclosed and provided with exhaust
17 ventilation." What was your understanding of
18 transfer points?
19    A  Well, a transfer point is where -- In this
20 case it's ore is transferred from one means of
21 conveyance to another, such as falling off the e
22 of a belt or whatever it happens to be where it'
23 transferred from one location to another.
24    Q  Okay. So you understood that as being
25 generally all transfer points, not just the place

**EARL D. LOVICK (VOL. 1)**          CondenseIt!™          **HURLBERT VS. W.R. GRACE**

Libby

---

Page 89

1 you called the transfer point where the trucks
2 dumped it into a conveyance down to the dry mill?
3     A No. That transfer point was an entity in
4 itself, and this does not refer to that at all.
5 This would be transfer points in the mill.
6     Q How about transfer points outside the mill
7 where the ore is being deposited into open storage?
8          MR. MURPHY: Objection to the form of
9 the question.
10 BY MR. HEBERLING:
11     Q Did you understand that those should be
12 ventilated as well?
13     A No, sir, and this doesn't refer to that.
14     Q You understood it as being -- this report
15 relating just to the dry mill?
16     A Yes, sir.
17     Q Then No. 5, the recommendation is repeated
18 "That until such time as repair and maintenance
19 of ... the exhaust and the ore conveying systems has
20 been completed all the men in the dry mill be
21 provided ... and ... required to be wear
22 respirators". Why is this repeated if they were
23 wearing respirators anyway?
24          MR. MURPHY: Objection. Form.
25          MR. GRAHAM: Objection. Form.

---

Libby

Page 90

1          MR. MURPHY: Object to the form of
2 the question. Foundation.
3 BY MR. HEBERLING:
4     Q Was it your understanding the men were
5 wearing respirators?
6     A Yes, sir. That was one of the
7 requirements. I don't know why it would be
8 repeated.
9     Q I believe you testified before about
10 95 percent of the time while you were at Grace was
11 in the office and five percent out at the mine and
12 the mill?
13     A Well, the bulk of my time was in the
14 office, certainly, yes. Five percent, 95 percent,
15 that breakdown is -- I can't dispute it.
16     Q Is that reasonable?
17     A I think so.
18     Q So is it possible that the men were not
19 wearing respirators when the supervisors weren't
20 around?
21          MR. MURPHY: Object to the form of
22 the question. Vague and ambiguous.
23          THE WITNESS: Certainly it's
24 possible.
25 /////

---

Libby

Page 91

1 BY MR. HEBERLING:
2     Q Did you hear problems like that?
3     A Yes. We knew that that was a difficult
4 rule to enforce, and the supervisors on the job did
5 their best to enforce it, but it was a problem. We
6 know that. We knew it.
7     Q And did you know that in the '50s and
8 '60s?
9     A Certainly.
10     Q To your knowledge was anybody ever
11 disciplined for not wearing a respirator?
12     A Well, I don't know what you mean by
13 "Disciplined," but certainly --
14     Q Let's say a written reprimand. Was there
15 ever any written reprimand to an employee for not
16 wearing a respirator while you were working there?
17     A Not to my recollection, no, sir. I don't
18 know of any.
19     Q And you were the keeper -- You were in
20 charge of the people who kept the records, at least
21 from '54 on all the way until '83?
22     A Well, yes. That would be office records,
23 but, you see, up at the operation, they would have
24 their own record keeping system, and I would have no
25 direct supervision over that.

---

Libby

Page 92

1     Q So a reprimand to an employee for not
2 wearing a respirator in the mill would have been
3 kept at the mill office?
4     A Probably, yes.
5     Q Would it have gone into his personnel
6 file?
7     A Not necessarily, no.
8     Q Did you keep the personnel files at the
9 office downtown where you were?
10     A Yes, sir.
11     Q So while you were at Zonolite, '54 to '83,
12 was there a policy of keeping the reprimand -- any
13 written reprimands on an employee in his personnel
14 file?
15     A No, sir, I believe not.
16     Q And as to any employee who was reprimanded
17 for not wearing a respirator at someplace outside
18 the dry mill, where would that reprimand have ended
19 up in a file?
20     A Well, it would depend on where that --
21 what department that employee was in, and each
22 department would have their own suboffice, if you
23 will.
24     Q So did the construction department have a
25 suboffice?

---

**HEDMAN & ASA REPORTING - (406)752-5751**

**Libby**

### Page 93

1   A  Yes, sir.

2   Q  Okay. On the cover of the report, which

3 is part of Exhibit 21, we have the same statement,

4 The report is confidential. Do you see that?

5   A  Yes, sir.

6   Q  And, again, do you know if this was the

7 company's suggestion or whether it was the State's

8 suggestion to put this statement on the face of the

9 report?

10   A  It was not the company's suggestion, no,

11 sir. It would have been the doings of the

12 Department of Health.

13   Q  Was this report, in fact, kept

14 confidential by management?

15   A  Generally, yes, I would say so.

16   Q  Was this report disseminated to the

17 employees?

18   A  No, sir.

19   Q  Regarding the statement from Dr. Ellman,

20 the 1933 article which was quoted on the seriousness

21 of asbestosis, was that disclosed to the workers in

22 1959?

23       MR. MURPHY: Object to the form of

24 the question. It's based on hearsay.

25       THE WITNESS: So far as I know, we

### Page 94

1 never had a copy of that report, so it wouldn't have

2 been disseminated to them.

3 BY MR. HEBERLING:

4   Q  How about the statement that was quoted to

5 them by the State in the 1959 report? Was that

6 disclosed to the employees?

7       MR. GRAHAM: Objection. Foundation.

8 Competency of this witness as regards to other

9 people disclosing it to the employees.

10 BY MR. HEBERLING:

11   Q  To your knowledge.

12   A  To my knowledge, no, sir. I don't know

13 that it was distributed to them.

14   Q  In 1959 who was primarily responsible for

15 safety?

16   A  The general manager, R.A. Bleich. It

17 would have been his responsibility.

18   Q  And what was Mr. Kujawa's responsibility

19 there as chief engineer? Was safety something that

20 he had specifically had responsibility for?

21   A  Probably, yes.

22   Q  And was that so up until 1963, at least?

23   A  Well, I don't know that he would have been

24 responsible all of that period, but certainly some

25 of that period he was.

**Libby**

1   Q  Okay. And do you know what Mr. Kujawa

2 training was?

3   A  He was a graduate of the Butte School of

4 Mines. I believe his major was in geology.

5   Q  To your knowledge did he have any train

6 in industrial hygiene?

7   A  No specific training that I know of.

8   Q  Did you have some responsibility for

9 safety as a member of the safety committee?

10   A  Yes, sir.

11   Q  What was that?

12   A  Well, I would have been -- I would have

13 been responsible to see that proper records wer

14 kept and the safety committee met as schedule

15 the recommendations of the safety committee

16 followed and carried out.

17   Q  Before 1963 did the company have a saf

18 manual?

19   A  Have what?

20   Q  A safety manual.

21       MR. MURPHY: Read that back, please

22       THE VIDEOGRAPHER: Excuse me. W

23 going to have to go off the record to change ta

24 moment.

25       We're going off the record at

**Libby**

1 approximately 11:26.

2       (Brief recess.)

3       THE VIDEOGRAPHER: We're back on the

4 record. It's approximately 11:29.

5       THE REPORTER: I'll go ahead and read

6 the question back.

7       (The reporter then read back the

8 requested material beginning at page 95, line 17 ar

9 ending at page 95, line 20.)

10       THE WITNESS: I don't really recall.

11 I know that at one time the company published a

12 safety manual and had it printed, but I don't reall

13 remember when it would have been.

14 BY MR. HEBERLING:

15   Q  Could that have been in the '60s?

16   A  Yes, sir, it could have been.

17   Q  Let's refer to Exhibit 22.

18       MR. GRAHAM: Jon, before you do that,

19 back at Exhibit 20, I was just looking at that, and

20 it says, "I have read the letter from Mr. Clemmon

21 (from) the Bureau of Mines" and so forth. Was t

22 a copy of that letter, or is this the only document

23 that you had?

24       MR. HEBERLING: This is all I have.

25       MR. GRAHAM: Okay. So you don't hav

**EARL D. LOVICK (VOL. 1)**          Condenselt!™          **HURLBERT VS. W.R. GRACE**

Libby

1 that other?
2          MR. HEBERLING: Do you?
3          MR. GRAHAM: I don't know, and I
4 don't know whether it was actually attached, but it
5 refers to it, and I was just curious as to whether
6 you had it.
7          Thank you. Sorry for the interruption.
8 BY MR. HEBERLING:
9     Q   Would you please refer to Exhibit 22? Did
10 you receive this discharge summary for Glenn Taylor,
11 admission date, February 11, 1959 -- And the
12 admission summary is written by Dr. G.W. Setser.
13 Did you receive that in 1959?
14     A   We received this discharge summary. I
15 really don't recall exactly when, whether it was
16 right after his discharge or not, but, yes, we did
17 receive it.
18     Q   And did you receive it sometime -- Is it
19 likely that you received it sometime during the year
20 of 1959?
21     A   Yes, it is.
22     Q   Okay. It says here that Mr. Taylor worked
23 at Zonolite for eighteen years. Did you know him?
24     A   Yes, sir.
25     Q   As of 1959, did you observe any shortness

Libby

1 of breath in Mr. Taylor?
2     A   Yes, sir.
3     Q   In your estimation was it severe?
4          MR. GRAHAM: I would object on the
5 basis of foundation and speculation.
6          Go ahead and answer, if you can.
7          THE WITNESS: Well, I don't recall
8 exactly, but as I recall, yes, I would think it
9 would have to be classified as severe.
10 BY MR. HEBERLING:
11     Q   What did you see?
12     A   Just his general actions and his general
13 movements. It was obvious that he had breathing
14 difficulties.
15     Q   Then, on the second page, right in the
16 middle, it says "Final Diagnosis on Discharge". Do
17 you see, "1. Histoplasmosis" and, "2. Asbestosis"?
18     A   Yes, sir.
19     Q   Do you know what became of Glenn Taylor?
20     A   Yes, sir. He died.
21     Q   Do you know how long after this 1959
22 report he died?
23     A   No, sir, I don't know. I don't recall.
24     Q   Let's go to Exhibit No. 23. Does this
25 appear to be a letter of Dr. Knight at the Montana

Libby

1 State Tuberculosis Sanitarium to you dated March 10,
2 1959?
3     A   This letter was not to me. This letter
4 was from me.
5     Q   Are you looking at Exhibit 23?
6     A   I'm sorry. I was looking at Exhibit 24.
7 Excuse me.
8     Q   Okay.
9     A   Yes, sir. This is a letter to me from
10 Dr. Knight. I'm sorry.
11     Q   Did you receive that at or about its date
12 in 1959?
13     A   Yes, sir.
14     Q   Did you discuss this case with Dr. Knight
15 over the phone?
16     A   I don't recall.
17     Q   Do you know why he was inquiring about
18 asbestos?
19          MR. MURPHY: You mean beyond what's
20 stated in his letter?
21          MR. HEBERLING: Right. Generally.
22          MR. MURPHY: The letter states what
23 he's doing.
24 BY MR. HEBERLING:
25     Q   Generally, did you know why he was

Libby

1 inquiring about asbestos?
2     A   No, sir. I couldn't speculate on why he
3 was inquiring, other than what it states in this
4 letter.
5     Q   So you don't have any information beyond
6 what's in the letter --
7     A   No, sir.
8     Q   -- at this time? Let's go to -- Now, I
9 believe attached to the first page of Exhibit 23 is
10 a letter under your signature, April 1, 1959. Do
11 you see that?
12     A   Yes, sir.
13     Q   Were you the author of that letter?
14     A   Yes, sir.
15     Q   And also attached are two handwritten
16 pages. Do you see those?
17     A   Yes, sir.
18     Q   And whose handwriting is that?
19     A   Butch Bleich's, Mr. R.A. Bleich.
20     Q   And he was your supervisor? He was the
21 plant manager?
22     A   Yes, sir.
23          MR. GRAHAM: Excuse me. I'm
24 confused. Were you referring to 23 or 24?
25          THE WITNESS: 24.

**Page 101**

Libby

1  MR. HEBERLING: I have 23.

2  MR. GRAHAM: See. I think there's

3 confusion, because the letter from Lovick is, in our

4 set, marked as 24.

5  MR. HEBERLING: Okay. You probably

6 also have it attached as 23. There were two

7 different copies. Do you have it attached to 23?

8  MR. MURPHY: No.

9  MR. GRAHAM: No.

10  MR. MURPHY: 23 stands alone as

11 Knight to Lovick and is so marked one page, both

12 with your tab and with the Plaintiff's exhibit stamp

13 in the lower left corner. 24 is Lovick to Knight of

14 April 1, 1959, so marked with your tab and

15 Plaintiff's exhibit number in the lower left corner,

16 plus the two handwritten pages that you've just

17 begun to ask him about.

18  MR. GRAHAM: Plus another --

19  MR. MURPHY: Plus, in our book, two

20 more letters, so that Exhibit 24 in this book has a

21 total of five pages.

22 BY MR. HEBERLING:

23  Q  And is that true with regard to your book

24 as well? Is Exhibit 24 the April 1, 1959 letter?

25  A  Yes.

**Page 102**

Libby

1  Q  And it has the two handwritten pages

2 attached?

3  A  Yes. Yes.

4  MR. GRAHAM: And his also has, again,

5 the duplication of, then, 23 and then another copy

6 of his letter of 24. Should we just pull those two

7 off?

8  MR. MURPHY: I was going to say, you

9 may want to just pull them off or go off the record

10 to clear this up, but the last two pages could just

11 be removed because they're duplicates.

12  MR. HEBERLING: Yes. Let's do that.

13  THE VIDEOGRAPHER: Do you want to go

14 off the record?

15  MR. GRAHAM: No.

16  MR. HEBERLING: We can edit it

17 later.

18  THE WITNESS: Here are the two copies

19 which I've removed, if you'd like to --

20  MR. HEBERLING: Okay. I'm sure we're

21 making a lot of paper noises here.

22 BY MR. HEBERLING:

23  Q  So Exhibit 24, does that appear to be a

24 letter dated April 1, 1959 which you wrote?

25  A  Yes, sir.

**Page 103**

Libby

1  Q  And then are there two handwritten pages

2 attached to it?

3  A  Yes, sir.

4  Q  And is that the handwriting of Butch

5 Bleich?

6  A  Yes, sir.

7  Q  And in the handwritten part, on page one

8 of that, toward the bottom, do you see where

9 Mr. Bleich quotes the 1956 State report which says,

10 "However, the asbestos dust in the dust in the air

11 is of considerable toxicity"? Do you see that?

12  A  Yes, sir.

13  Q  And, then, with regard to the studies

14 being done by Dr. Knight, if any, did you ever ask

15 for the results of those studies?

16  A  Not that I recall, no, sir.

17  Q  Do you have any further contact with

18 Dr. Knight after this letter of April 1?

19  A  Not that I recall, no, sir.

20  Q  Then let's go to Exhibit 25. Does that

21 appear to be a memo, Lovick to Kelley, dated

22 April 17?

23  A  Yes, sir.

24  Q  Were you the author of that memo?

25  A  Yes, sir.

**Page 104**

Libby

1  Q  Then Exhibit 26, does that appear to be a

2 letter of Dr. Cairns, C-A-I-R-N-S, dated July 20,

3 1959 to Mr. Bleich, manager of Zonolite?

4  A  Yes, sir.

5  Q  Did you receive this in Libby in 1959?

6  A  Yes, sir.

7  Q  Was that on or about its date that you

8 received it?

9  A  Yes, sir.

10  Q  Was Dr. Cairns Glenn Taylor's doctor?

11  A  I don't know.

12  Q  There's a study of x-rays done on

13 employees in 1959 which Dr. Cairns reports here. Do

14 you see that?

15  A  Yes, sir.

16  Q  Was Dr. Cairns hired by the company to do

17 this report?

18  A  No, sir.

19  Q  How was it that he did the report? Did he

20 volunteer to do it?

21  A  He just did it, is all I can tell you. He

22 was chief of staff of the medical staff of the

23 hospital, and he was not asked to do this by the

24 company. I think he just did it on his own.

25  MR. GRAHAM: Excuse me, Counsel.

**EARL D. LOVICK (VOL. 1)**  CondenseIt!™  **HURLBERT VS. W.R. GRACE**

Libby

Page 105

1 With regard to Exhibit 26, is that a — I don't know
2 what the source for this report was, but is that a
3 complete report to your knowledge?
4        MR. HEBERLING: That was going to be
5 one of my questions, as to whether there should be a
6 signature page or something like that, it being a
7 letter.
8        MR. GRAHAM: Or whether the second
9 page has any relation to the first page.
10        MR. HEBERLING: That I think we can
11 establish. It's the same numbers. There's 130
12 people examined and 82 normal and 48 abnormal. That
13 appears on the first and second pages.
14        MR. MURPHY: Actually, there is one
15 number different in the two. I mean, they obviously
16 appear to be based on the same information, but if
17 you look at the pneumoconiosis numbers, one is
18 eight, and one is seven.
19        MR. GRAHAM: The only point that I
20 was trying to make is that these two pages are
21 included as one -- part of the exhibit, and I don't
22 know whether they're connected, but, anyway, maybe
23 you can establish that.
24        MR. HEBERLING: That's one of my
25 questions to the witness, and I'll ask if counsel

Libby

Page 106

1 has a third page. I've never seen one.
2        MR. GRAHAM: I think that you're
3 making a wrongful assumption in that the first page
4 in here is marked page one and the second one is
5 page two of the same document, and I don't believe
6 that's the case, but I don't know.
7 BY MR. HEBERLING:
8        Q Okay. In the middle of the first page, it
9 says "Number of Persons Examined - 130". Was that
10 all of the workers at Zonolite in 1959?
11        A Yes, sir.
12        Q And what was the purpose of having chest
13 x-rays for all 130 workers?
14        A In 1959 the Montana legislature passed an
15 industrial disease law, which became a part of the
16 Workmen's Compensation law, and that industrial
17 disease law took into account the responsibility of
18 employers for various specified industrial diseases,
19 which would become compensable, and one of the
20 diseases which was specified in the law was
21 silicosis, which we felt was the only industrial
22 disease which would have any possibility of
23 Zonolite, our operation, being responsible for.
24        And the law specified that compensation
25 would be based upon progression of the disease after

Libby

Page 107

1 the passage of this act, and we x-rayed all of our
2 employees to establish a base, which could then be
3 followed, so if there was any progression of the
4 disease in our people -- And the only disease we
5 could be responsible for was for silicosis, but the
6 results of the interpretations of the x-rays showed
7 that we had -- none of our employees had silicosis,
8 but, nevertheless, we had a base established for
9 their chest -- lung conditions at that time.
10        Q Was it your understanding that under this
11 '59 law for occupational disease the company was
12 not responsible for conditions which preexisted the
13 effective date of the law?
14        A It was our understanding we were not
15 responsible for conditions which existed at that
16 time, which had been contracted previously to the
17 passage of the law.
18        Q Was this effort in part to protect the
19 company against liability for preexisting
20 conditions?
21        MR. GRAHAM: Object to the form, and
22 it requires speculation as well.
23        THE WITNESS: Well, it would
24 establish what their conditions were at that time,
25 and in that sense, yes, it would be for the

Libby

Page 108

1 company's protection that they couldn't be
2 responsible.
3 BY MR. HEBERLING:
4        Q Okay. In the middle of the first page, do
5 you see 48 abnormal out of a total 130?
6        A Yes, sir.
7        Q So that would be a little over a third
8 abnormals?
9        A Yes, sir.
10        Q Would the 130 include workers who had been
11 there, say, less than a year?
12        A Yes, sir. It included everyone who was on
13 the payroll at that time.
14        Q And do you see under the lettering, "a" to
15 "I", "Pleural Thickenings - 8"? Do you see that?
16        A Yes, sir.
17        Q And are you aware that that could be the
18 result of asbestos exposure?
19        A Yes, sir, it could be.
20        Q And do you see, also, "Defects of the
21 Diaphragm" -- that's "b" -- three of those?
22        A Yes, sir.
23        Q You're aware that that could be a result
24 of asbestos exposure as well?
25        MR. GRAHAM: Objection. Vague and

HURLBERT VS. W.R. GRACE                    Condensit!

Libby

1 ambiguous as to time.

2          THE WITNESS: This just says

3 "Defects". It could be for any reason.

4 BY MR. HEBERLING:

5    Q Okay. And do you see "c. Interstitial

6 Fibrosis"?

7    A Yes.

8    Q 26?

9    A Yes.

10   Q Are you aware that that could be the

11 result of asbestos exposure?

12          MR. GRAHAM: Same objection.

13          THE WITNESS: It could be, yes, but

14 not necessarily.

15 BY MR. HEBERLING:

16   Q What's your understanding of interstitial

17 fibrosis is?

18   A It's a scarring of the lung tissues, to my

19 understanding.

20   Q Now, to your knowledge was there an

21 additional page or two of this report with the

22 doctor's signature on it?

23   A I don't know.

24   Q When you first saw this report, were you

25 alarmed?

Libby

1          MR. MURPHY: Objection to the form of

2 the question.

3          THE WITNESS: Well, that was forty

4 years ago almost, and I don't remember what my

5 reaction might have been.

6 BY MR. HEBERLING:

7    Q Did this appear to be an extraordinary

8 number of abnormal chests?

9          MR. MURPHY: Objection to the form of

10 the question.

11          THE WITNESS: There again, I don't

12 know what one could expect, but I would say, yes, it

13 would appear to be a large number of abnormal

14 chests.

15 BY MR. HEBERLING:

16   Q Did you make any inquiries as to how many

17 abnormal chests one could expect in a normal

18 population?

19   A Not specifically, no, sir. I don't know

20 that we did.

21   Q Did you determine which people were the 48

22 abnormal chests?

23   A We knew which ones they were because we

24 had copies of the interpretations of the x-rays.

25   Q And did you obtain those from the

Libby

1 hospital?

2    A Yes, sir.

3    Q And as of 1959, did you feel that serious

4 health problems had been identified?

5          MR. MURPHY: Objection to the form of

6 the question. Vague and ambiguous.

7          THE WITNESS: I don't recall what we

8 would have thought about that.

9 BY MR. HEBERLING:

10   Q Have you testified in the past that when

11 you received this report you did feel that serious

12 health problems had been identified?

13   A I don't recall.

14   Q I'm now showing you your deposition dated

15 May 27, 1992, and do you see on page 52 a discussi

16 of the July 20, 1959 report from Dr. Cairns?

17   A Yes.

18   Q And then do you see the question, And did

19 these appear to be serious health problems that had

20 been identified?

21          And then did you give the answer, As a

22 layman?

23          Repeat of the question. As a layman, do

24 you feel that these were serious health problems

25 identified?

Libby

1          Answer: Included in that abnormal list,

2 yes, there would have been some that were serious

3 health problems.

4    Q Do you see that?

5    A Yes, sir.

6    Q And is that the testimony you gave at the

7 time?

8    A Yes, sir.

9    Q So would you agree that Dr. Cairns

10 essentially confirmed what the company already kn

11 based on the '56 report, but he brought it home to

12 particular employees?

13          MR. GRAHAM: I would object on the

14 basis that it assumes that the health employees that

15 the witness has been talking about or -- the health

16 problems are those related to asbestos.

17          Go ahead and answer the question, if you

18 can.

19          THE WITNESS: Can I hear the question

20 again, please?

21          (The reporter then read back the

22 preceding question.)

23          MR. MURPHY: And I would also object

24 on the grounds that it's vague and ambiguous.

25          THE WITNESS: I don't think that I

**EARL D. LOVICK (VOL. 1)** — Condenseit!™ — **HURLBERT VS. W.R. GRACE**

*Libby*

### Page 113

1 could say that he did confirm that. I don't really
2 know what he confirmed, because this statistical
3 review included all abnormal chests from whatever
4 reason. For example, there's one in here that --
5 Metallic object in the chest, that certainly is not
6 something we would have been responsible for. Just
7 like some of these other things. There's no way
8 that they could have been caused by their employment
9 with us.
10 BY MR. HEBERLING:
11    Q  I am now showing you again your May 27,
12 1992 deposition, and at page 242 do you see the
13 question, So, really, would you agree with me that
14 Dr. Cairns essentially confirmed what you already
15 knew based upon the 1956 report but brought it home
16 to your particular employees?
17    Answer: I think that would be a true
18 statement. Yes.
19    Do you see that?
20    A  Yes.
21    Q  Did you give that testimony at that time?
22    A  Yes, I did.
23    MR. GRAHAM: We should note for the
24 record that the question at that time was objected
25 to, and Counsel omitted to read the objections that

*Libby*

### Page 114

1 were made, and we would make the same objections
2 now.
3 BY MR. HEBERLING:
4    Q  Did the company personally notify the 48
5 workers with abnormal chests?
6    A  The company did not directly notify them,
7 but the employees with abnormal chests were
8 notified.
9    Q  And how were they notified?
10    A  By their physicians.
11    Q  Are you sure that every one of them was
12 notified by his physician?
13    A  No. I can't say that I'm sure of that,
14 but that was the procedure, and the physicians had
15 all agreed that they would contact the employees on
16 their conditions.
17    Q  And so, as far as copies of these x-ray
18 reports went, was there one kept at the hospital,
19 one at Zonolite and one to the family doctors?
20    A  Yes, sir.
21    Q  Is that how it went?
22    A  Yes, sir. That is the way it was handled.
23    Q  And later on did you find out that there
24 were problems with this procedure of leaving it to
25 the family doctor to notify the employee?

*Libby*

### Page 115

1    A  Well, later on we changed the procedure so
2 that everyone with an abnormal chest was notified by
3 a company representative.
4    Q  And when did you do that?
5    A  I don't recall the date.
6    Q  Was that late '70s, about?
7    A  It would have been in the '70s, yes, sir.
8    Q  And did you change the procedure because
9 of problems that some employees were not being
10 notified?
11    MR. MURPHY: Objection. Asked and
12 answered.
13    THE WITNESS: I would not say that
14 that was true. We changed the procedure so that
15 that could not happen or would not happen.
16 BY MR. HEBERLING:
17    Q  Okay. I'm now showing you a memo from
18 yourself to -- and this is Exhibit 192. We'll get
19 to it. From yourself to Mr. Eschenbach dated
20 November 18, 1980. Was that a memo that you
21 authored?
22    A  I don't know what it says, but I probably
23 did.
24    MR. MURPHY: Please look at before
25 you assume that you did or you didn't, if you

*Libby*

### Page 116

1 haven't seen it.
2    THE WITNESS: Yes, sir, I --
3 BY MR. HEBERLING:
4    Q  Do you believe you were the author of that
5 memo?
6    A  Yes, sir.
7    Q  I'll read you a portion from the last
8 page. It says, "In all cases the employees'
9 physician is given a copy of the radiologist's
10 review and is to review it with his patient. We
11 found this was not always being done, so beginning
12 in 1975, we began notifying employees ourselves." Do
13 you see that?
14    A  Yes, sir.
15    Q  And was that a correct statement of what
16 happened?
17    A  I'm sure it was.
18    MR. MURPHY: Let me object if the
19 purpose of that was to suggest there was something
20 inconsistent in Mr. Lovick's prior answer with
21 respect to problems. Otherwise, it seems improper
22 Cross-Examination to simply read him something and
23 say, Is that what it says? The document speaks for
24 itself. So I object to that last question belatedly
25 on the grounds that it's improper impeachment.

Libby

## Page 117

1    MR. HEBERLING: Okay. Counsel, the
2    purpose is not to impeach. It's to get the full and
3    complete testimony into the record and get it
4    correct. So that's why I'm doing that, but I
5    understand the objection.
6    BY MR. HEBERLING:
7    Q  If the worker had an appointment to see
8    the doctor, would he have to pay for the
9    appointment?
10    A  No, sir.
11    Q  Was that arranged with the local
12    physicians?
13    A  Yes, sir, it was.
14    Q  And so they were donating their time in
15    that regard?
16    A  Yes, sir.
17    Q  Was the company's next set of x-rays on
18    the employees 1964?
19    A  Yes, sir.
20    Q  And did the company continue to do annual
21    chest x-rays all the way up to 1983 when you left?
22    A  Yes, sir.
23    MR. HEBERLING: It's a little after
24    twelve. We can stop there.
25    THE VIDEOGRAPHER: We're going off

Libby

## Page

1    doctors to get their results.
2    Q  I'm now showing you your deposition taken
3    December 20, 1983, page 209. Do you see the
4    question, When, as I understand it, in the mid-'60s,
5    if a person had significant x-ray changes, that
6    person was not informed directly, but his regular
7    physician was informed; is that correct?
8    Answer:  That's correct.
9    And if the employee did not talk to his
10    regular physician or his regular physician did not
11    inform him, no one would have discouraged him fro
12    continued employment? Is that a fair statement?
13    The answer, That would be correct, yes.
14    Is that the answer you gave at the time?
15    A  That's the answer I gave at the time.
16    MR. GRAHAM: Objection. Improper
17    attempt at impeachment.
18    BY MR. HEBERLING:
19    Q  Now back to Exhibit 26. Is that in front
20    of you?
21    A  Yes.
22    Q  Do you see in the second sentence in the
23    letter it states, "It is not accurate nor complete
24    without a personal, physical differential diagnosis,
25    which should be done on all cases showing any ·

Libby

## Page 118

1    the record. It's approximately 11:58.
2    (Lunch recess.)
3    THE VIDEOGRAPHER: We're back on the
4    record. It's approximately 1:04.
5    BY MR. HEBERLING:
6    Q  Before lunch we were discussing the
7    procedure for the annual chest x-rays, and we
8    discussed whether the workers were directly notified
9    or not, and so in the '60s and the '70s, up to 1975,
10    is it correct that if a worker had an abnormal x-ray
11    the company would not directly notify the worker
12    even though the company knew it?
13    A  Yes. It was the responsibility of the
14    doctor to tell the employee if there was a problem,
15    but if there was an x-ray that appeared to be quite
16    damaging to the employee, we would notify the
17    employee to be sure to see his doctor about it.
18    Q  Quite damaging?
19    A  Well, if it looked to be serious and he
20    might need some further follow-up or something.
21    Q  When did you start doing that?
22    A  I think we have always did that, but the
23    procedure was for the doctor to see them, and we
24    would always post notices that the employees
25    should -- all employees should check with their

Libby

## Page

1    abnormal defects of the chest"? Do you see that?
2    A  Yes, sir.
3    Q  And in 1959 did the company do anything to
4    ensure that workers with an abnormal chest had a
5    full exam?
6    A  No, sir. I don't know that they would
7    have done anything directly.
8    Q  To your knowledge did the company do
9    anything to notify the 82 workers with normal ches
10    that there was a pattern indicating danger in
11    the workplace?
12    MR. MURPHY: Objection to the form of
13    the question.
14    THE WITNESS: No. I don't know that
15    we did anything directly.
16    BY MR. HEBERLING:
17    Q  What about the eight workers with possible
18    asbestosis? Did the company do anything to move
19    them to work in areas of less exposure?
20    A  No, sir, but it must be understood that we
21    did not have the authority to do that. We were
22    bound by union rules as to what we could do to m
23    employees around.
24    Q  Did you raise the issue with the union?
25    A  Yes, we did, on occasions.

**Libby**

Page 121

1 Q In '59 did you?

2 A I don't know that we did in '59, no.

3 Q Did you or anyone receive a medical study

4 of the Libby -- Excuse me. Recommend a medical

5 study of the Libby employees to find out what the

6 risks were in 1959?

7 A No, sir. Not that I recall.

8 Q Did you disclose this report of

9 Dr. Cairns, Exhibit 26, to Ben Wake of the Board of

10 Health?

11 A I don't recall.

12 Q Do you recall receiving any directive from

13 company headquarters in Chicago to do anything as a

14 result of this report?

15 A No, sir, I don't recall that we did.

16 Q In your mind back in '59, did this

17 underscore the need to take better care of the dust

18 problem?

19 MR. GRAHAM: Object to the form.

20 Go ahead and answer.

21 It's vague and ambiguous.

22 THE WITNESS: I don't really know

23 what the question means, but it would certainly

24 reinforce what we have always felt, that we should

25 do what we can to alleviate the dust problem that we

**Libby**

Page 122

1 had.

2 BY MR. HEBERLING:

3 Q Let's go to Exhibit 27. Does this appear

4 to be a letter by you to Mr. Foot of Detroit

5 Insurance Agency in Michigan dated September 2,

6 1959?

7 A Yes, it is. However, it's not Foot. It's

8 Toot. It's T-O-O-T.

9 Q Okay. Are you the author of this letter?

10 A Yes, sir.

11 Q It states in the second paragraph,

12 "Dr. Little ... reviewed the x-rays of all our

13 employees. He sorted out those which showed any

14 evidence or where there was ... suspicion of ...

15 condition which possibly could be classified as an

16 industrial disease." Do you see that?

17 A Yes, sir.

18 Q And then the third paragraph, "We also

19 filed with the board our election to come under the

20 Occupational Disease Act with Royal Indemnity

21 Company as our insurance carrier." Do you see that?

22 A Yes, sir.

23 MR. GRAHAM: Object. Improper

24 examination.

25 /////

**Libby**

Page 123

1 BY MR. HEBERLING:

2 Q So was this for insurance against

3 occupational disease claims?

4 A Yes, sir.

5 Q And was it your understanding that a

6 occupational disease claim would only appear if

7 there was liability if it was caused for a condition

8 at work -- caused by a condition at work?

9 A Well, that's what the Occupational Disease

10 Act was is to cover employees whose condition

11 resulted from their employment.

12 Q And what was the purpose of purchasing

13 insurance?

14 MR. GRAHAM: I would object to the

15 question on the basis that it assumes that this

16 witness knows what the purpose was.

17 Go ahead and answer it, if you can.

18 THE WITNESS: For the same reason

19 that we had industrial accident insurance, so the

20 insurance company was involved in the compensation

21 and protection of those employees.

22 BY MR. HEBERLING:

23 Q And did you purchase insurance to protect

24 the company?

25 MR. GRAHAM: Same objection.

**Libby**

Page 124

1 THE WITNESS: Well, I don't know what

2 you mean by "Protect the company". I don't know

3 what you mean. For the same reason that you have

4 insurance for anything, you're buying it, in a

5 sense, for protection.

6 BY MR. HEBERLING:

7 Q And did the company seek coverage for all

8 occupational diseases, more than just silicosis?

9 A We sought coverage under the Occupational

10 Disease Act, which would cover any occupational

11 diseases which were defined in that act.

12 Q So anything the company was held liable

13 for the insurance would cover it? Is that fair?

14 A Yes, sir.

15 Q And in doing this were you doing all you

16 could to protect the company?

17 MR. MURPHY: Objection to the form of

18 the question.

19 THE WITNESS: Well, I don't know what

20 that question means, so I can't answer it.

21 BY MR. HEBERLING:

22 Q Well, was there anything that you could

23 have done to protect the company that you didn't do?

24 A Not that I know of, no, sir.

25 Q In the last paragraph it says, "In regard

HURLBERT VS. W.R. GRACE          CondenseIt!™          EARL D. LOVICK (VOl

Libby

### Page 125

1 to the list of diseases not covered by the act,
2 which we would like to consider insuring as
3 compensable, you will hear from Walter on this."
4 Who was Walter at that time?
5   A   Walter Bein, who was vice-president of
6 Zonolite Company.
7   Q   And was he in Chicago?
8   A   Yes, sir.
9   Q   Let's refer to Exhibit 28.  Does this
10 appear to be a memo from you to Mr. Bein dated
11 September 2, 1959?
12   A   Yes, sir.
13   Q   And are you the author of this memo?
14   A   Yes, sir.
15   Q   Okay.  In paragraph two it states, "No
16 people are hired until they have received a physical
17 examination, including (a) chest x-ray."  Do you see
18 that?
19   A   Yes, sir.
20   Q   Was that a new policy as of '59?
21   A   To the best of my recollection, that would
22 have been instituted in 1959.  Yes, sir.
23   Q   And why would the company not want people
24 with chest problems?
25   A   Well, for the same reason that you don't

### Page 126

1 want people with any other diseases which could be
2 aggravated by their employment.
3   Q   So was that also to protect the company,
4 that policy?
5   A   Yes.
6   Q   Let's refer to Exhibit 29.  Does that
7 appear to be a memo from you to Mr. Bein also dated
8 September 2, 1959?
9   A   Yes, sir.
10   Q   Are you the author of this one as well?
11   A   Yes, sir.
12   Q   In the middle paragraph you're discussing
13 a conversation with Dr. Little.  Do you see that?
14   A   Yes, sir.
15   Q   It says, "In our conversation we discussed
16 moral obligation to employees, the practical
17 aspects, i.e., cost of such insurance, et cetera.
18 It was his feeling that at this time he would not
19 recommend our asking to be insured for asbestosis or
20 other occupational disease.  He stated that,
21 actually, (we had not yet) proved that any of our
22 people are so afflicted."  Do you see that?
23   A   Yes, sir.
24   Q   Did you feel a moral obligation to the
25 employees --

Libby

### Pag

1   A   Yes.
2   Q   -- generally?
3   A   Yes, sir.
4   Q   Did you feel a moral obligation to notify
5 the workers that asbestos dust is toxic?
6   A   Well, we certainly felt that we had a
7 moral obligation to make as safe a working
8 environment as it was possible.
9   Q   Did you feel a moral obligation to notify
10 the workers that there was a serious health hazard
11 at the workplace?
12       MR. MURPHY:  Objection as to the
13 form.
14       MR. HEBERLING:  I'm going to object
15 to having two attorneys making objections.
16 Normally, we have one.
17 BY MR. HEBERLING:
18   Q   Go ahead.
19   A   Well, I would say that, yes, we would have
20 an obligation.
21   Q   Then Dr. Little apparently stated that it
22 was not proved what the situation was.  What was
23 your understanding as to what kind of proof might
24 required to prove the situation?
25       MR. MURPHY:  Objection as to the

### Pag

1 form.  Vague and ambiguous.
2       THE WITNESS:  I don't know.  This
3 would be a judgment thing on the part of a physici
4 that they would be convinced that that is what
5 caused the particular condition.
6 BY MR. HEBERLING:
7   Q   In 1959 was there any pulmonologist in
8 Libby?
9   A   No, sir.
10   Q   Is it your understanding that a
11 pulmonologist is a lung specialist?
12   A   Yes, sir.
13   Q   To your knowledge did the company consul
14 with a lung specialist in 1959 on how to proceed?
15   A   Not that I recall, no, sir.
16   Q   To your knowledge did the company ever d
17 so?
18   A   I don't know.  Not to my knowledge.  I
19 really don't know.
20   Q   Were you aware that Dr. Little was a
21 radiologist?
22   A   Yes, sir.
23   Q   And that he was not a lung specialist?
24   A   Yes, sir.
25   Q   Here, in the fourth paragraph down, with

Page 125 - Page 128